**Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09**

| Bates No. | Citation |
| --- | --- |
| 1 | Meissner, Doris, Memorandum, Eligibility for Permanent Residence under the Cuban Adjustment Act Despite Having Arrived at a Place Other Than Designated Port of Entry, reprinted in 76 Interpreter Release (Apr. 19, 1999). |
| 4 | Annette Bernhardt, Ruth Milkman, and Nik Theodor, National Employment Law Project, Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities 25, 42-45 (Sept. 21, 2009). |
| 75 | Black, S.E., Devereux, P.J. & Salvanes, K.G., From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes, Q.J. Econ. 122, no. 1 (2007): 409-439. |
| 108 | Caiumi, A. & Peri, G., Immigration's Effect on U.S. Wages and Employment Redux, Nat'l Bureau of Econ. Res. (Apr. 2024). |
| 171 | Card, D., Who Set Your Wage?, Am. Econ. Rev. vol. 112, no. 4 (Apr. 2022): 1075-90. |
| 189 | Cascio, E.U., Cornell, P. & Lewis, E.G., The Intergenerational Effects of Permanent Legal Status, NBER Working Paper No. 32635 (Jun. 2004). |
| 261 | Cong. Budget Off., The impact of Unauthorized immigrants on the Budgets of State and Local Governments, at p. 6 (Dec. 2007). |
| 285 | Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, White House Council of Economic Advisers, Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021). |
| 293 | Christoph Albert, The Labor Market Impact of Immigration: Job Creation versus Job Competition, 13 Am. Econ. J.: Macroecon. 35, 35-78 (2021). |
| 325 | Citizenship, Refugees, Border Sec., & Int'l L. of the Comm. on the Judiciary: Hearing Before the Subcomm. on Immigration, 110th Cong. 15 (2008) (statement of Margaret Stock). |
| 369 | Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for T Nonimmigr Status, 89 Fed. Reg. 34,864 (Apr. 30, 2024). |
| 449 | Comino, E. et al., Silence of the Innocents: Undocumented Immigrants' Underreporting of Crime and Their Victimization, J. Pol'y Analysis & Mgmt. 39 (2020): 1214, 1215. |
| 481 | Cuban Family Reunification Parole Program, 72 Fed. Reg. 65,588 (Nov. 21, 2007). |
| 482 | David Figlio, Jonathan Guryan, Krzysztof Karbownik & Jeffrey Roth, The Effects of Poor Neonatal Health on Children's Cognitive Development, 104 Am. Econ. Rev. 3921 (2014). |
| 518 | Davis, C., Guzman, M. & Sifre, E., Tax Payments by Undocumented Immigrants (Institute on Taxation and Economic Policy, July 30, 2024). |
| 569 | Deferred Action for Childhood Arrivals, Final Rule, 87 Fed. Reg. 53152, 53177-78 (Aug. 30, 2022). |
| 718 | Delegation to the Bureau of Citizenship and Immigration Services (Delegation No. 0150.1, Sec. II(O)) (Jun. 5, 2003). |
| 724 | Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). |
| 730 | Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4,902 (Jan. 17, 2017). |
| 734 | Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284 (Feb. 25, 2015). |
| 763 | Evin Millet & Jacquelyn Pavilon, Demographic Profile of Undocumented Hispanic Immigrants in the United States, Ctr. for Migration Stud., (Oct. 14, 2022). |
| 775 | Exec. Order No. 14012, Restoring Faith in Our Legal Immigration System and Strengthening Integration and Inclusion Efforts for New Americans, 86 Fed. Reg. 8,277 (Feb. 5, 2021). |
| 779 | Federal Reserve, Part. 3 Summary of Economic Projections, Monetary Policy Report Submitted to the Congress on July 5, 2024, pursuant to section 2B of the Federal Reserve Act. |
| 783 | Felipe González Morales (Special Rapporteur on the Human Rights of Migrants), How to Expand and Diversify Regularization Mechanisms and Programmes to Enhance the Protection of the Human Rights of Migrants, at 3, U.N. Doc. A/HRC 52/26 (Apr. 20, 2023). |
| 801 | Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28907 (May 9, 2016). |
| 805 | Francesc Ortega & Amy Hsin, Occupational Barriers and the Productivity Penalty from Lack of Legal Status, 76 Labour Econ., 102181 (June 2022). |
| 814 | George J. Borjas & Hugh Cassidy, The Wage Penalty to Undocumented Immigration, Lab. Econ. (2019) (art. 101757). |

**Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09**

| | |
|---|---|
| 831 | Giovanni Peri & Vasil Yasenov, The Labor Market Effects of a Refugee Wave: Synthetic Control Method Meets the Mariel Boatlift, J. Hum. Resources vol. 54, no. 2, 267-309 (2019). |
| 876 | Giovanni Peri, Derek Rury & Justin C. Wiltshire, The Economic Impact of Migrants from Hurricane Maria, J. Hum. Resources (2022) (manuscript at 0521–11655R1). |
| 921 | Government of Mexico, En Diálogo con su Homólogo Estadounidense, Presidente López Obrador Ratifica Propuesta en Materia Migratoria (In Dialogue with His American Counterpart, President López Obrador Ratifies Proposal on Immigration Matters) (Feb. 3, 2024) |
| 925 | General Services Admin., Privately Owned Vehicle Mileage Rates, effective Jul. 1, 2022. |
| 928 | Bernstein, Hamutal; Vilter, Carolyn; Upskilling the Immigrant Workforce to Meet Employer Demand for Skilled Workers, Urb. Instit. (Jul. 2018), |
| 998 | Heather Royer, Separated at Girth: U.S. Twin Estimates of the Effects of Birth Weight, 1 Am. Econ. J.: Applied Econ. 49-85 (2009). |
| 1037 | Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (Jul. 10, 2023). |
| 1048 | Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023). |
| 1061 | Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (Jul. 10, 2023). |
| 1072 | Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (Jul. 10, 2023). |
| 1082 | Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (Jul. 10, 2023). |
| 1094 | Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023). |
| 1108 | Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023). |
| 1120 | Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023). |
| 1133 | Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023). |
| 1138 | Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023). |
| 1143 | Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023). |
| 1147 | Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014). |
| 1152 | Immigr. & Naturalization Serv., Memorandum from Paul W. Virtue, INS General Counsel, to INS Officials, Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998). |
| 1156 | I.R.S., Federal Income Tax Rates and Brackets, https://www.irs.gov/filing/federal-income-tax-rates-and-brackets (last visited Aug. 24, 2024). |
| 1158 | I.R.S., Tax Topics, Topic No. 751, Social Security and Medicare Withholding Rates, https://www.irs.gov/taxtopics/tc751 (last visited Aug. 24, 2024). |
| 1159 | Jere R. Behrman & Mark R. Rosenzweig, Returns to Birthweight, 86 Rev. of Econ. & Stat., No. 2, 2004, at 568-601. |
| 1176 | Jeremy Harris & René Maldonado, Migrant Wages and Remittances to Latin America and the Caribbean in 2023, Migration Unpacked, Inter-Am. Dev. Bank (May 15, 2024). |
| 1187 | Joan Monras, Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisis, 128 J. Pol. Econ. 3017-89 (2020). |
| 1261 | Jose Ivan Rodriguez-Sanchez, An Economic Lifeline? How Remittances from the U.S. Impact Mexico's Economy, Baker Inst. for Pub. Pol'y (Nov. 13, 2023). |
| 1289 | Kossoudji & Cobb-Clark, Coming Out of the Shadows: Learning About Legal Status and Wages from the Legalized Population, 20 Lab. Econ. (2022). |
| 1321 | L. Rojas-Flores, M. Clements, J. Hwang Koo & J. London, Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation, Psychol. Trauma (2017). |
| 1331 | Linea Hasager, Does Granting Refugee Status to Family-Reunified Women Improve Their Integration?, 234 J. Pub. Econ. 105119 (2024). |
| 1342 | Manuel Rueda & Elliot Spagat, Colombia Asks for Legal Status for Its People Already in US, Associated Press, Nov. 29, 2022. |
| 1346 | Martinez, A., Ruelas, L. & Granger, D., Household Fear of Deportation in Mexican-Origin Families: Relation to Body Mass Index Percentiles and Salivary Uric Acid, Am. J. Hum. Biol., 29(6) (2017). |

**Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09**

| | |
|---|---|
| 1369 | Memorandum to File from Royce Bernstein Murray, Acting Ass't Sec'y for Border and Immigration Policy, Office of Strategy, Policy and Plans, U.S. Dep't of Homeland Security, Requests of Foreign Partners and Parole in Place Process (June 17, 2024). |
| 1372 | Migration Pol'y Inst., Profile of the Unauthorized Population: United States, available at (last visited June 16, 2024). |
| 1376 | Ministry of Foreign Affairs of Mexico, Visas: Important Information (last visited Aug. 24, 2024). |
| 1378 | Nat'l Conf. of State Legislat., States Offering Driver's Licenses to Immigrants (Mar. 13, 2023). |
| 1389 | Nat'l Taxpayer Advocate, Annual Report to Congress, vol. 1, 199 (2015). |
| 2031 | Nolan G. Pope, The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants, 143 J. Pub. Econ. 98-114 (2016). |
| 2048 | Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924, 68925 (Nov. 13, 2002). |
| 2051 | Patler, C. & Pirtle, W.L., From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Youth Adults?, Soc. Sci. & Med. vol. 199 (2018): 39–48. |
| 2061 | Philip Oreopoulos, Mark Stabile, Randy Walld & Leslie L. Roos, Short-, Medium-, and Long-Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins, 43 J. Hum. Resources 88-138 (2008). |
| 2112 | Pia M. Orrenius & Madeline Zavodny, The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes, 105 Am. Econ. Rev. 576-80 (2015). |
| 2118 | Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 536 (Jan. 6, 2013). |
| 2161 | Roberto G. Gonzales, Here's How DACA Changed the Lives of Young Immigrants, According to Research, Vox (Feb. 16, 2018). |
| 2172 | Rouse, C., Barrow, L., Rinz, K. & Soltas, E., Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (White House Council of Econom. Advisers, Sept. 17, 2021). |
| 2180 | Rouse et al., Nat'l Bureau of Econom. Research, The Immigration Reform and Control Act of 1986, Working Paper 24872 (Jul. 2018, Rev. Dec. 2018). |
| 2244 | Stacey Ivie & Natalie Nanasi, The U Visa: An Effective Resource for Law Enforcement, 78 FBI L. Enforcement Bull. 10, 10-16 (Oct. 2009). |
| 2249 | Stephen Goss et al., Social Security Administration, Office of the Chief Actuary, Actuarial Note No. 151, Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds (Apr. 2013). |
| 2255 | Tanya Broder and Gabrielle Lessard, Overview of Immigrant Eligibility for Federal Programs, National Immigration Law Center (May 2024). |
| 2275 | Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants, 89 Fed. Reg. 24628 (Apr. 8, 2024). |
| 2324 | The Nat'l Acadamies of Sci., Engineering, & Med., The Economic and Fiscal Consequences of Immigration (2017) |
| 2967 | The White House, Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala (May 7, 2024). |
| 2972 | The White House, Fact Sheet: President Biden Announces New Actions to Keep Families Together (Jun. 18, 2024). |
| 2975 | The White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (Jun. 10, 2022). |
| 2983 | The White House, Labor Market Indicators Are Historically Strong After Adjusting for Population Aging (Jul. 27, 2023). |
| 2988 | The White House, Mexico-U.S. Joint Communique: Mexico and the United States Reaffirm Their Shared Commitments on an Orderly, Humane and Regular Migration (Dec. 28, 2023). |
| 2990 | Tonya Moreno, Your Guide to State Income Tax Rates, The Balance (Jul. 11, 2024). |
| 3004 | Tsedeye Gebreselassie, Nayantara Mehta & Irene Tung, Nat'l Emp. L. Project, How California Can Lead on Retaliation Reforms to Dismantle Workplace Inequality 8 (2022). |
| 3038 | U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Proposed Rule, 88 Fed. Reg. 402, 428 (Jan. 4, 2023). |

Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09

| 3076 | U.S. Dep't of Homeland Sec., Customs and Border Protection, Form I-94, Arrival/Departure Record, OMB No. 1651-0111. |
|---|---|
| 3078 | U.S. Dep't of Homeland Sec., DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras (July 17, 2023). |
| 3080 | U.S. Dep't of Homeland Sec., DHS Announces Process Enhancements for Supporting Labor Enforcement Investigations (Jan. 13, 2023). |
| 3082 | U.S. Dep't of Homeland Sec., Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS Officials, Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act (Sep. 28, 2004). |
| 3088 | U.S. Dep't of Homeland Sec., Memorandum from Alejandro N. Mayorkas, Secretary of DHS, to Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement, et al., Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021). |
| 3095 | U.S. Dep't of Homeland Sec., Memorandum from Alejandro Mayorkas, Secretary, DHS, Worksite Enforcement: The Strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual (Oct. 12, 2021). |
| 3098 | U.S. Dep't of Homeland Sec., Memorandum from Jeh Johnson, Secretary, DHS, Families of U.S. Armed Forces Members and Enlistees (Nov. 20, 2014). |
| 3100 | U.S. Dep't of Homeland Sec., Memorandum, Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States. |
| 3109 | U.S. Dep't of Homeland Sec., Office of Homeland Sec. Stat., Estimate of Unauthorized Spouses of U.S. Citizens: Assumptions. |
| 3111 | U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022. |
| 3133 | U.S. Dep't of Homeland Sec., Office of Homeland Sec. Stat., Spouses of USC Estimates – Final Tables 1-6 (July 19, 2024). |
| 3135 | U.S. Dep't of Homeland Sec., Policy Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents Are U.S. Citizens or Permanent Residents. |
| 3140 | U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, Final Rule, 89 Fed. Reg. 6194 (Jan. 31, 2024). |
| 3347 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Adjudicator's Field Manual, Ch. 21, Family-Based Petitions and Applications. |
| 3533 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Appendix: Eligibility for Public Benefits. |
| 3544 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2024 Congressional Justification. |
| 3845 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification. |
| 3858 | U.S. Dep't. of Homeland Sec., U.S. Citizenship and Immigr. Serv., "Certain Individuals Requesting Parole Can Now File Form 1-131 Online" (Jun. 9, 2023). |
| 3860 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade (Feb. 9, 2024). |
| 3864 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form G-1055, Fee Schedule, Effective April 1, 2024, p. 33 of 39 (last visited Jul. 11, 2024). |
| 3903 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-130, Petition for Alien Relative, OMB No. 1615-0012, (Edition Apr. 1, 2024). |
| 3915 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, OMB Control Number 1615-0161 (expires Feb. 28, 2025). |

**Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09**

| | |
|---|---|
| 3919 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-131F, OMB Notice of Action (Aug. 16, 2024). |
| 3921 | Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-131F, PRA Emergency Memo (Aug. 16, 2024). |
| 3923 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-131F, PRA Supporting Statement (Aug. 16, 2024). |
| 3933 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-131F, Screenshots (Aug. 16, 2024). |
| 3972 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-134, Declaration of Financial Support, OMB Control Number 1615-0014 (expires Nov. 30, 2026). |
| 3985 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-360, Instructions for Petition for Amerasian, Widow(er), or Special Immigrant, OMB Control Number 1615-0020 (expires Feb. 28, 2026). |
| 4000 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, OMB Control Number 1615-0020 (expires Feb. 28, 2026). |
| 4019 | U.S. Dep't. of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-485, Application to Register Permanent Residence or Adjust Status, OMB Control Number 1615-0023 (expires Feb. 28, 2026). |
| 4039 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-485, Instructions for Application to Register Permanent Residence or Adjust Status, OMB Control Number 1615-0023 (expires Feb. 28, 2026) (last visited Jul. 11, 2024). |
| 4080 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-601, Application for Waiver of Grounds of Inadmissibility, OMB Control Number 1615-0029 (expires Feb. 28, 2026). |
| 4091 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-601, Instructions for Application for Waiver of Grounds of Inadmissibility, OMB Control Number 1615-0029 (expires Feb. 28, 2026). |
| 4111 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-601A, Application for Provisional Unlawful Presence Waiver, OMB Control Number 1615-0123 (expires Feb. 28, 2026). |
| 4120 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-601A, Instructions for Application for Provisional Unlawful Presence Waiver, OMB No. 1615-0123, Edition Apr. 1, 2024. |
| 4140 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-765, Instructions for Application for Employment Authorization, OMB Control Number 1615-0040 (expires Feb. 28, 2027) (last visited Jul. 11, 2024). |
| 4164 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-797, Notice of Action |
| 4165 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-864, Affidavit of Support Under Section 213A of the INA, OMB Control Number 1615-0075 (expires Jan. 31, 2026). |
| 4175 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-864, Instructions Affidavit of Support Under Section 213A of the INA, OMB Control Number 1615-0075 (expires Jan. 31, 2026). |
| 4192 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-864A, Contract Between Sponsor and Household Member, OMB Control Number 1615-0075 (expires Jan. 31, 2026). |
| 4200 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-864A, Instructions for Contract Between Sponsor and Household Member, OMB Control Number 1615-0075 (expires Jan. 31, 2026). |
| 4210 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-912, Instructions for Request for Fee Waiver, OMB Control Number 1615-0116 (expires Feb. 28, 2026). |
| 4222 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Form I-912, Request for Fee Waiver, OMB Control Number 1615-0116 (expires Feb. 28, 2026). |
| 4230 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Fiscal Year 2022 Progress Report (Dec. 2022). |
| 4244 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year. |
| 4252 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year (repeated). |

**Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09**

| | |
|---|---|
| 4260 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Instructions for Form I-130, Petition for Alien Relative, and Form I-130A, Supplemental Information for Spouse Beneficiary, OMB Control Number 1615-0012. |
| 4271 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Instructions for Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, OMB Control Number 1615-0161 (expires Feb. 28, 2025). |
| 4281 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Instructions for Form I-134, Declaration of Financial Support, OMB Control Number 1615-0014 (expires Nov. 30, 2026). |
| 4289 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Newsroom, One-Year Anniversary of the Humanitarian, Adjustment, Removing Conditions, and Travel Documents (HART) Service Center. |
| 4289 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Office of Performance and Quality (OPQ), Computer-Linked Application Information Management System (CLAIMS) 3 (queried Jun. 2024). |
| 4293 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Policy Research Div., G-28 Data, (queried Jul. 17, 2024). |
| 4294 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Policy Manual Vol. 12, Part G, Spouses of U.S. Citizens, Marriage and Marital Union for Naturalization, Section A, Validity of Marriage [12 USCIS-PM G.2(A)]. |
| 4302 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Policy Manual, Vol. 7, Adjustment of Status, Part B, 245(a) Adjustment, Eligibility Requirements, Sec. 3, Parole [7 USCIS-PM B.2(A)(3)] (last updated Jul. 16, 2024). |
| 4327 | U.S. Dep't of Homeland Sec., Policy Memorandum, PM-602-0091, Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve. |
| 4337 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Policy Memorandum, PM-602-1104, Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees (Nov. 23, 2016). |
| 4348 | U.S. Dep't of Labor, Bureau of Labor Stat., Occupational Employment and Wage Statistics, May 2023 National Occupational Employment and Wage Estimates (last visited Aug. 24, 2024). |
| 4349 | U.S. Dep't of Labor, Bureau of Labor Stat., Employer Costs for Employee Compensation – December 2023. |
| 4368 | U.S. Dep't of Labor, Bureau of Labor Stat., Employment Cost Index: Wages and Salaries: Private Industry Workers [ECIWAG], retrieved from FRED, Federal Reserve Bank of St. Louis (Aug. 20, 2024). |
| 4369 | U.S. Dep't of Labor, Bureau of Labor Stat., Employment-Population Ratio - 25-54 Yrs. [LNS12300060], retrieved from FRED, Federal Reserve Bank of St. Louis (Aug. 20, 2024). |
| 4370 | U.S. Dep't of Labor, Bureau of Labor Stat., Employment Projections (Sept. 2020), Occupations with the Most Job Growth, Table 1.4 (2019 and Projected 2029). |
| 4372 | U.S. Dep't of Labor, Bureau of Labor Stat., Employment Situation News Release 2023 (last visited Jul. 10, 2024). |
| 4407 | U.S. Dep't of Labor, Bureau of Labor Stat., Foreign-Born Workers: Labor Force Characteristics—2023 (May 21, 2024). |
| 4422 | U.S. Dep't of Labor, Bureau of Labor Stat., Number of Unemployed Persons per Job Opening, Seasonally Adjusted. |
| 4423 | U.S. Dep't of Labor, Bureau of Labor Stat., Occupational Employment and Wage Statistics, Occupational Employment and Wages, May 2023, 23-1011 Lawyers Wage. |
| 4431 | U.S. Dep't of State, Bureau of Population, Refugees, and Migration, Safe Mobility Initiative (last visited Jul. 24, 2024). |
| 4434 | U.S. Dep't of State, Bureau of Western Hemisphere Affairs, U.S. Relations with Mexico, Bilateral Relations Fact Sheet (Sept. 13, 2023). |
| 4446 | U.S. Dep't of State, Discussions with Mexican Officials on Migration at the Department of State (Jan. 20, 2024). |
| 4449 | U.S. Dep't of State, Bureau of Consular Affairs, U.S. Visas, Immigrant Visa Interview-Ready Backlog Report (July 2024). https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html (last visited Sept. 1, 2024). |
| 4450 | U.S. Dep't of State, Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability (Apr. 27, 2023). |
| 4466 | U.S. Dep't of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (Jun. 4, 2023). |

Administrative Record Index - Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024) CIS No. 2779-24. DJS Docket No. USCIS-2024-0010, RIN 1615-AC09

| | |
|---|---|
| 4469 | U.S. Dep't of Health and Human Services, Office of Refugee Resettlement, Benefits for Cuban/Haitian Entrants (Fact Sheet). |
| 4473 | U.S. Dep't of Health and Human Services, Office of Refugee Resettlement, Benefits for Cuban/Haitian Entrants Benefits for Cuban/Haitian Entrants | The Administration for Children and Families (Fact Sheet). |
| 4479 | Vargas, E. & Ybarra, V., U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children, J. Immigr. Minor. Health (Aug. 2017). |
| 4492 | Vincent J. Felitti et al., Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study, 14 Am. J. Preventive Med. 245 (1998). |
| 4506 | World Health Org. & Ctr. for Pub. Health, Preventing Violence Through the Development of Safe, Stable, and Nurturing Relationships Between Children and Their Parents and Caregivers (2009). |
| 4526 | Y. Pan, The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986, 33 J. Lab. Res. 119-42 (2012). |
| 4550 | Zachary Liscow & William Woolston, Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers, 20 Am. L. & Econ. Rev. 318 (2018). |
| 4614 | Implementation of Keeping Families Together, Notice, 89 Fed Reg 67459 (Aug. 20, 2024). |
| 4646 | U.S. Dep't of Homeland Sec., U.S. Citizenship and Immigration Services, Environmental Planning and Historic Preservation, DSS for Notice (Aug. 13, 2024). |
| 4648 | Jaddou, Ur, U.S. Dep't of Homeland Sec., USCIS, Memorandum for the Secretary of DHS, Process for Certain Noncitizen Spouses of U.S. Citizens (June 17, 2024). |
| 4675 | Cooper, Bo, General Counsel, INS, Memorandum to Jeffrey L.  Weiss, Dir., Office of Int'l Affairs, INS, Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status (June 15, 2001). |
| 4680 | USCIS Form I-601A, Application for Provisional Unlawful Presence Waiver, Receipts by Applicant Birth Country, FY 2022 – 2024 (June 10, 2024). |
| 4686 | USCIS Military Parole in Place Application Completions, by Age, FY 2022 and 2023, (June 4, 2024). |
| 4687 | DHS, Office of Homeland Security Statistics, Estimates of Unauthorized Immigrant Population and Those Married to a U.S. Citizen (Jan. 1, 2022). |
| 4690 | Visa Waiver Pilot Program Expires; INS Puts in Place Interim Procedures, 77 No. 18 Interpreter Releases 597, (May 8, 2000). |

20131029P NYCBAR 161

City Bar Center for Continuing Legal Education
New York City Bar
October 29, 2013

Immigration Remedies Available Now: Are You Prepared?
Parole

APPENDIX 23-4 TEXT OF COMMISSIONER'S MEMORANDUM FOR ELIGIBILITY
FOR PERMANENT RESIDENCE UNCER THE CUBAN ADJUSTMENT ACT DESPITE
HAVING ARRIVED AT A PLACE OTHER THAN A DESIGNATED PORT OF ENTRY.

Copyright (c) 2013 New York City Bar Association

**TEXT OF COMMISSIONER'S MEMORANDUM ON ELIGIBILITY FOR PERMANENT RESIDENCE UNDER THE CUBAN ADJUSTMENT ACT DESPITE HAVING ARRIVED AT A PLACE OTHER THAN A DESIGNATED PORT OF ENTRY**

Apr 19, 1999

MEMORANDUM FOR ALL REGIONAL DIRECTORS

 ALL DISTRICT DIRECTORS

 ALL CHIEF PATROL AGENTS

 ALL OFFICERS IN CHARGE

FROM: Doris Meissner /s/ Doris Meissner

Commissioner

SUBJECT: Eligibility for permanent residence under the Cuban Adjustment Act despite having arrived at a place other than a designated port of entry.

This memorandum sets forth Immigration and Naturalization Service (Service) policy concerning the effect of an alien's having arrived in the United States at a place other than a designated port of entry on the alien's eligibility for adjustment of status under the Cuban Adjustment Act of 1966 (CAA), 8 U.S.C. § 1255, note. This issue arises because many CAA applicants, in fact, arrive in the United States in an irregular manner. Section 1 of the CAA, however, requires that they must be "admissible." CAA §1,8 U.S.C. § 1255, note. If the inadmissibility ground that is based on an alien's having arrived at a place other than a port of entry, Immigration and Nationality Act (INA) § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), applies to CAA applicants, then many aliens who were formerly eligible for adjustment of status will no longer be eligible.

The policy of the Service is that the inadmissibility ground that is based on an alien's having arrived at a place other than a port of entry *does not* apply to CAA applicants. All Service officers adjudicating CAA applications will do so in accordance with this policy. So long as the applicant meets all other CAA eligibility requirements, it is contrary to this policy to find the alien ineligible for CAA adjustment on the basis of the alien's having arrived in the United States at a place other than a designated port of entry.

The Service will incorporate this policy into Service regulations as promptly as possible. The policy is, however, effective immediately. Service officers are not to await the publication of the intended rule before deciding CAA applications in accordance with this policy.

This policy is based on the rationale of the decision in *Matter of Mesa,* 12 I & N Dec. 432 (INS 1967). In *Matter of Mesa,* the Service held that the admissibility requirement of § 1 of the CAA must be construed generously, in order to give full effect to the purpose of the CAA. The decision noted that Congress was fully aware that many, and perhaps most, Cuban nationals were dependent on some forms of public assistance. Yet the purpose of the CAA would have been defeated, if the public charge ground of inadmissibility applied to these applicants. The Service concluded, therefore, that the public charge ground does not apply to CAA applicants. *Id.*

I have concluded that the same reasoning applies to inadmissibility for having arrived at a place other than a designated port of entry. Aliens arriving in this manner have been eligible for CAA adjustment for many years. Congress recently reaffirmed the availability of this adjustment provision, by enacting that the CAA is to continue in force until there is a democratic government in Cuba. Illegal Immigration Reform and Immigrant Responsibility Act of 1966 (IIRIRA), Pub. L. No. 104-208, Division C, § 60 6(a), 110 Stat. 3009-546, 3009-695. Section 212(a)(6)(A)(i) of the INA was designed to complement the new legal doctrine, enacted as part of IIRIRA, under which aliens who come into the United States without inspection are inadmissible, rather than deportable, aliens. *Compare* INA §§ 212(a)(6)(A)(i) and 235(a)(1), 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225(a)(1) *with* 8 U.S.C. § 1241(a)(1)(B) (1994). Nothing in the legislative history of these changes suggests that Congress also intended to make aliens who arrive in the United States away from ports of entry ineligible for CAA adjustment.

This policy does not relieve the applicant of the obligation to meet all other eligibility requirements. In particular, CAA adjustment is available only to applicants who have been "inspected and admitted or paroled into the United States." CAA §1, 8 U.S.C. § 1255, note. The authority to parole an applicant for admission, of course, is set forth in § 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), with § 236 of the INA, 8 U.S.C. § 1226, providing additional authority concerning the conditions the Service may place on the alien's parole. An alien who is present without inspection, therefore, would not be eligible for CAA adjustment unless the alien first surrendered himself or herself into Service custody and the Service released the alien from custody pending a final determination of his or her admissibility.

Service officers will not deny parole to an alien whose parole would be consistent with Service parole regulations and policy, solely in order to preclude CAA eligibility. Nor does this policy require the parole of any alien whose parole would not be consistent with Service parole regulations and policy, merely because paroling the alien would open the path to CAA adjustment. In the absence of a disqualifying criminal record or other factors that would bar CAA adjustment, however, the on-going difficulty in actually removing aliens to Cuba and the availability of CAA adjustment should ordinarily weigh heavily in favor of a grant of parole. The Service may properly consider the avoidance of detention costs with respect to an alien whose actual removal is unlikely as a factor in determining, as a matter of discretion, that parole would yield a "significant public benefit." INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). In similar fashion, the Service may properly consider the availability of CAA adjustment as a factor in determining, as a matter of discretion, that an "urgent humanitarian reason" justifies a grant of parole. *Id*. If the Service paroles the alien, he or she will be eligible to apply for employment authorization. 8 C.F.R. § 274a.12(c) (12).

The Service is also aware that, because of the CAA eligibility requirements, the parole will be for at least one year, so that the alien will be a "qualified alien" for purposes of eligibility for Federal means-tested public benefits. 8 U.S.C. § 1641 (b)(4). The alien will also be a "Cuban-Haitian entrant" for purposes of the Refugee Education Assistance Act of 1980, as amended. 8 C.F.R. § 212.5(g). Service officers will not consider these two factors as "adverse factors" in determining whether to grant or deny parole.

Finally, the Office of the General Counsel has advised the Service concerning the relationship between parole under § 212(d) (5) and "release" under § 236. Memorandum from Paul W. Virtue to Executive Associate Commissioners for Policy and Planning and for Field Operations, and to Regional, District and Sector Counsels (August 21, 1998). In a case involving an applicant for admission, the General Counsel concluded that:

... release under § 236 of the Act and 8 C.F.R. § 236.1 (d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. (Citations omitted.) In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms.

*Id*. at 3. For this reason, if the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled. This conclusion applies even if the Service officer who authorized the release thought there was a legal distinction between paroling an applicant for admission and releasing an applicant for admission under § 236. When the Service releases from custody an alien who is an applicant for admission because he or she is present without inspection, the Form I-94 should bear that standard annotation that shows that the alien has been paroled under § 212(d)(5)(A). [FN1]

[FN1]. It may be the case that the Service has released an alien who is an applicant for admission because he or she is present without inspection, without providing the alien with a parole Form I-94. In this case, the Service will issue a parole Form I-94 upon the alien's asking for one, and satisfying the Service that the alien is the alien who was released. The Service will then update the Service records concerning the alien to reflect the fact that the alien has been paroled.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Off the clock work
Meal breaks
Overtime
Minimum wage
Right to organize
Retaliation
Workers' comp
Rest breaks

# Broken Laws, Unprotected Workers

## Violations of Employment and Labor Laws in America's Cities

Annette Bernhardt

Ruth Milkman

Nik Theodore

Douglas Heckathorn

Mirabai Auer

James DeFilippis

Ana Luz González

Victor Narro

Jason Perelshteyn

Diana Polson

Michael Spiller

000004

# Advisory Boards

## National Advisory Board

Eileen Appelbaum, Rutgers University

Jennifer Gordon, Fordham Law School

Mark Handcock, University of Washington

Marielena Hincapie, National Immigration Law Center

Martin Iguchi, UCLA/Rand

Manuel Pastor, University of Southern California

Cathy Ruckelshaus, National Employment Law Project

## Los Angeles Community Advisory Board

Asian Pacific American Legal Center

Bet Tzedek Legal Services

California Community Foundation

Central American Resource Center

Coalition for Humane Immigrant Rights of Los Angeles

Economic Roundtable

Employment Law Unit, Legal Aid Foundation of Los Angeles

Korean Immigrant Workers Alliance

Los Angeles Alliance for a New Economy

Los Angeles Board of Public Works

Los Angeles County Federation of Labor

Maintenance Cooperation Trust Fund

Mexican American Legal Defense and Educational Fund

National Alliance of Latin American and Caribbean Communities

National Day Laborer Organizing Network

National Immigration Law Center

Neighborhood and Community Services, Office of Mayor Antonio R. Villaraigosa

Neighborhood Legal Services

Pilipino Workers' Center

SEIU Local 434B

SEIU Local 1877

Teamsters Joint Council 42

UCLA Center for the Study of Urban Poverty

UCLA Labor Occupational Safety & Health Program

UNITE HERE Local 11

## Chicago Community Advisory Board

ARISE Chicago

Centro Romero

Chicago Workers Collaborative

Latino Union

North Lawndale Employment Network

West Humboldt Park Family & Community Development Council

Working Hands Legal Clinic

## New York City Community Advisory Board

African Services Committee

Andolan - Organizing South Asian Workers

Asian American Legal Defense and Education Fund

Bronx Defenders

Community Voices Heard

Consortium for Worker Education

Domestic Workers United

El Centro (Project Hospitality)

Fifth Avenue Committee

Garment Industry Development Corporation

Latin American Workers Project

Legal Services NYC

Make the Road New York

New York City Central Labor Council

New York City Taxi Workers Alliance

New York Committee for Occupational Safety and Health

New York Jobs with Justice

North West Bronx Community Clergy Coalition

Queens Community House

Restaurant Opportunities Center of New York

Seedco

The New York Immigration Coalition

YKASEC – Empowering the Korean American Community

# Acknowledgements

We incurred numerous debts in conducting this study. Most of all, we thank the 4,387 low-wage workers who participated in our survey. We also are grateful to the members of our four advisory boards who assisted us at many stages in the project's development, and to the many organizations who provided space for us to conduct the surveys. The staffs at the UIC Center for Urban Economic Development, the UCLA Institute for Research on Labor and Employment, and the National Employment Law Project all provided vital support for our efforts.

For their invaluable comments on earlier drafts of this report, we thank Pablo Alvarado, Eileen Appelbaum, Ana Avendaño, Jennifer Gordon, Mark Handcock, Janet Herold, Jon Hiatt, Martin Iguchi, Saru Jayaraman, Raj Nayak, Chris Newman, Chris Owens, Manuel Pastor, and Cathy Ruckelshaus.

We also benefited from the legal expertise of Nathan Barksdale, Laurie Burgess, Michael Ettlinger, Natalia Garcia, Tsedeye Gebreselassie, E. Tammy Kim, Kevin Kish, Samuel Krinsky, Sarah Leberstein, Becky Monroe, Raj Nayak, Oscar Ospino, Luis Perez, Cathy Ruckelshaus, Paul Sonn, Jennifer Sung, and Chris Williams, as well as the many lawyers who responded to our queries to NELP's National Wage and Hour Clearinghouse. For advice on the intricacies of workers' compensation we are grateful to Danielle Lucido, Jeremy Smith, and Tom Rankin. Thanks also go to Nina Martin, Jamie Peck, and Noah Zatz for their input on the survey design, and to Terri Zhu for her assistance at the analysis stage.

Mark Handcock, Martin Iguchi, and Lawrence Ouellet offered helpful advice about the intricacies of RDS fielding and data analysis. Christine D'Onofrio, Michael Ettlinger, Mark Levitan, and Jeremy Reiss provided us expert advice about payroll tax deductions. On health and safety issues we relied heavily on Garrett Brown, Linda Delp, Eric Frumin, Danielle Lucido, Luis Mireles, Bruce Nissen, Jim Platner, Jackie Nowell, Joel Shufro, Scott Schneider, Fran Schreiberg, and Juliann Sum. Jeffrey Passel and John Schmitt provided invaluable analysis of demographic and wage data from the Current Population Survey.

We relied on an extraordinary team of interviewers and translators in the three cities.

In Chicago, Ryan Hollon directed the fielding of the survey with the help of Sandra Morales-Mirque. Both conducted interviews along with Reola Avant, Louisa Bigelow, Alison Dickson Quesada, Carlos Ginard, Hannaan Joplin, Kasia Kornecka, Tom McCormack, Meghan Mattingly, James Pfluecke, Kristi Sanford, Lucinda Scharbach, Lian Sze, Cecil Thomas, Tiffany Traylor, and Ada Utah.

In Los Angeles, the interviewers were Claudia Benavides, Jackelyn Cornejo, Vivien De La Torre, Jacqueline Euan, Olga Garcia, Yesenia Gonzalez, Soledad Gonzalez-Fiedler, Veronica Guerra, Jason M. Gutierrez, Rennie Lee, Tara Marray, Erin Michaels, Carla Orieta-Barbalace, Stella Park, Caitlin C. Patler, Victoria Preciado, Valmiki Reyes, Miguel Zavala, and Terri Zhu.

The New York City interview and translation team consisted of Zayne Abdessalam, Ingrid Baez, Mame-Yaa Bosumtwo, Lana Cheung, Lourdes Diaz, Beatriz Gil, Ilsoon Han, Julia Heming, Marta Kuersten, Julita Kwapinska, Emmanuel Louizaire, Olga Mexina, Eliseo Perez, Kwanza Price, Mohammed Rahman, Gabriela Reardon, and Rachel Soltis.

Madonna Camel, Yuteh Cheng, Jay Fraser, and Bob Lee of the Survey Research Center at the University of California, Berkeley provided expert assistance with interviewer training and the programming of the survey instrument. The survey instrument was translated into Spanish by Juanita Norori, and Alfredo Burgos created the pictographs we used in our recruitment documents.

This research was generously funded by the Ford Foundation, the John Randolph Haynes and Dora Haynes Foundation, the Joyce Foundation and the Russell Sage Foundation. We greatly appreciate the support we received from Whitney Smith, Diane Cornwell, and Héctor Cordero-Guzmán. We are especially indebted to Eric Wanner, Aixa Cintrón-Veléz and Katherine McFate, without whom this project would not have been possible. The views expressed in this report are solely those of the authors.

# About the Authors

**Annette Bernhardt**, Ph.D., is Policy Co-Director of the National Employment Law Project. She has published widely on low-wage work, and recently co-edited *The Gloves-Off Economy: Workplace Standards at the Bottom of America's Labor Market* (Cornell University Press, 2008).

**Ruth Milkman**, Ph.D., is Professor of Sociology at UCLA and the CUNY Graduate Center, and Associate Director of the Murphy Institute for Worker Education and Labor Studies at CUNY. Her most recent book is *L.A. Story: Immigrant Workers and the Future of the U.S. Labor Movement* (Russell Sage Foundation, 2006).

**Nik Theodore**, Ph.D., is the Director of the Center for Urban Economic Development and Associate Professor in the Department of Urban Planning and Policy at the University of Illinois at Chicago. He has published widely on economic development, labor markets, and urban policy.

**Douglas D. Heckathorn**, Ph.D., is Professor of Sociology at Cornell University. His work has focused on developing statistical methods for sampling hidden populations and formal theories of norm emergence and collective action. He is Editor-in-chief of the journal *Rationality and Society* and recipient of the Lon Fuller Prize in Jurisprudence.

**Mirabai Auer** is a Research Associate at the Center for Urban Economic Development at the University of Illinois at Chicago. Her interests include community economic development strategies and women in the informal economy.

**James DeFilippis**, Ph.D., is Associate Professor at the Bloustein School of Planning and Public Policy at Rutgers University. He has published extensively on the politics and economics of cities.

**Ana Luz González** is a doctoral candidate in Urban Planning at UCLA. Her research focuses on the labor market status of immigrants and minorities and the role of day labor worker centers in the informal economy.

**Victor Narro**, J.D., is Project Director at the UCLA Downtown Labor Center and a Lecturer in Chicano Studies at UCLA. He has published extensively on labor and immigrant rights issues.

**Jason Perelshteyn** is a Ph.D. student in Sociology at Cornell University. His research interests include social psychology and the philosophy of social science.

**Diana Polson** is a Policy Analyst at the National Employment Law Project and a Political Science Ph.D. student at the City University of New York. Her research focuses on the low-wage economy, care work and new forms of labor-community organizing.

**Michael Spiller** is a Ph.D. student in sociology at Cornell University. His research interests include social stratification, quantitative methodology, education, and sampling methodology.

# Contents

Executive Summary — 2

**1:** Introduction — 7

**2:** Pulling Back the Veil:  A Landmark Survey of the Low-Wage Labor Market — 11

**3:** The Prevalence of Workplace Violations in America's Cities — 19

**4:** The Role of Job and Employer Characteristics — 29

**5:** The Role of Worker Characteristics — 41

**6:** Wage Theft in America's Cities — 49

**7:** The Solution:  Fulfilling the Promise of Worker Protections in America — 51

**Appendix A:** Data and Methods — 55

Endnotes — 60

References — 63

# Executive Summary

This report exposes a world of work in which the core protections that many Americans take for granted—the right to be paid at least the minimum wage, the right to be paid for overtime hours, the right to take meal breaks, access to workers' compensation when injured, and the right to advocate for better working conditions—are failing significant numbers of workers. The sheer breadth of the problem, spanning key industries in the economy, as well as its profound impact on workers, entailing significant economic hardship, demands urgent attention.

In 2008, we conducted a landmark survey of 4,387 workers in low-wage industries in the three largest U.S. cities—Chicago, Los Angeles, and New York City. We used an innovative, rigorous methodology that allowed us to reach vulnerable workers who are often missed in standard surveys, such as unauthorized immigrants and those paid in cash. Our goal was to obtain accurate and statistically representative estimates of the prevalence of workplace violations. All findings are adjusted to be representative of front-line workers (i.e. excluding managers, professional or technical workers) in low-wage industries in the three cities—a population of about 1.64 million workers, or 15 percent of the combined workforce of Chicago, Los Angeles and New York.

## Finding 1: Workplace Violations Are Severe and Widespread in Low-Wage Labor Markets

We found that many employment and labor laws are regularly and systematically violated, impacting a significant part of the low-wage labor force in the nation's largest cities. The framework of worker protections that was established over the last 75 years is not working. Here we summarize only key violations; Table 3.1 lists all the violations measured in our study.

**Minimum wage violations:**

- Fully 26 percent of workers in our sample were paid less than the legally required minimum wage in the previous work week.*

- These minimum wage violations were not trivial in magnitude: 60 percent of workers were underpaid by more than $1 per hour.

**Overtime violations:**

- Over a quarter of our respondents worked more than 40 hours during the previous week. Of those, 76 percent were not paid the legally required overtime rate by their employers.

- Like minimum wage violations, overtime violations were of substantial magnitude. The average worker with a violation had put in 11 hours of overtime—hours that were either underpaid or not paid at all.

---

* In this summary we are not able to elaborate the complexity of employment and labor laws; see the main report for details on federal and state legal standards and coverage.

000009

**"Off-the-clock" violations:**

- Nearly a quarter of the workers in our sample came in early and/or stayed late after their shift during the previous work week. Of these workers, 70 percent did not receive any pay at all for the work they performed outside of their regular shift.

**Meal break violations:**

- The large majority of our respondents (86 percent) worked enough consecutive hours to be legally entitled to at least one meal break during the previous week. Of these workers, more than two-thirds (69 percent) received no break at all, had their break shortened, were interrupted by their employer, or worked during the break—all of which constitute a violation of meal break law.

**Pay stub violations and illegal deductions:**

- In California, Illinois and New York, workers are required to receive documentation of their earnings and deductions, regardless of whether they are paid in cash or by check. However, 57 percent of workers in our sample did not receive this mandatory documentation in the previous work week.

- Employers are generally not permitted to take deductions from a worker's pay for damage or loss, work-related tools or materials or transportation. But 41 percent of respondents who reported deductions from their pay in the previous work week were subjected to these types of illegal deductions.

**Tipped job violations:**

- Of the tipped workers in our sample, 30 percent were not paid the tipped worker minimum wage (which in Illinois and New York is lower than the regular state minimum wage).

- In addition, 12 percent of tipped workers experienced tip stealing by their employer or supervisor, which is illegal.

**Illegal employer retaliation:**

We found that when workers complained about their working conditions or tried to organize a union, employers often responded by retaliating against them. Just as important, many workers never made complaints in the first place, often because they feared retaliation by their employer.

- One in five workers in our sample reported that they had made a complaint to their employer or attempted to form a union in the last year. Of those, 43 percent experienced one or more forms of illegal retaliation from their employer or supervisor. For example, employers fired or suspended workers, threatened to call immigration authorities, or threatened to cut workers' hours or pay.

- Another 20 percent of workers reported that they did not make a complaint to their employer during the past 12 months, even though they had experienced a serious problem such as dangerous working conditions or not being paid the minimum wage. Half were afraid of losing their job, 10 percent were afraid they would have their hours or wages cut, and 36 percent thought it would not make a difference.

**Workers' compensation violations:**

We found that the workers' compensation system is not functioning for workers in the low-wage labor market.

- Of the workers in our sample who experienced a serious injury on the job, only 8 percent filed a workers' compensation claim.

- When workers told their employer about the injury, 50 percent experienced an illegal employer reaction—including firing the worker, calling immigration authorities, or instructing the worker not to file for workers' compensation.

- About half of workers injured on the job had to pay their bills out-of-pocket (33 percent) or use their health insurance to cover the expenses (22 percent). Workers' compensation insurance paid medical expenses for only 6 percent of the injured workers in our sample.

**When workers are exempt from workplace laws:**

- Some workers are either partially or completely exempt from employment and labor laws—either because of archaic exemptions of specific industries and occupations, or because they are considered to be independent contractors.

- We surveyed one group of workers that is often considered exempt from coverage: "in-home" child care workers who provide care in their own homes. When we analyzed their working conditions (separately from the rest of the sample), we found that 89 percent earned less than the minimum wage. This finding underscores the need to ensure that all workers who are in an employment relationship receive full legal protection.

## Finding 2: Job and Employer Characteristics Are Key to Understanding Workplace Violations

Workplace violations are ultimately the result of decisions made by employers—whether to pay the minimum wage or overtime, whether to give workers meal breaks, and how to respond to complaints about working conditions. We found that workplace violations are profoundly shaped by job and employer characteristics.

- Violation rates varied significantly by industry. For example, minimum wage violation rates were most common in apparel and textile manufacturing, personal and repair services, and in private households (all of which had violation rates in excess of 40 percent). Violation rates were substantially lower in residential construction, social assistance and education, and home health care (at 12 to 13 percent). Industries such as restaurants, retail and grocery stores, and warehousing fell into the middle of the range, with about 20 to 25 percent of their workers experiencing a minimum wage violation.

- Violation rates also varied significantly by occupation. For example, childcare workers had very high minimum wage (66 percent) and overtime (90 percent) violation rates. More representative were occupations such as cashiers, who had a minimum wage violation rate of 21 percent and an overtime violation rate of 59 percent.

- Workers who were paid a flat weekly rate or paid in cash had much higher violation rates than those paid a standard hourly rate or by company check.

- Workers at businesses with less than 100 employees were at greater risk of experiencing violations than those at larger businesses. But workers in big companies were not immune: nearly one in six had a minimum wage violation in the previous week, and of those who worked overtime, 53 percent were not paid time and a half.

- Not all employers violate the law. We found a range of workplace practices—offering health insurance, providing paid vacation and sick days, and giving raises—that were associated with lower violation rates. This suggests that employers' decisions about whether or not to comply with the law are part of a broader business strategy shaping the workplace.

## Finding 3: All Workers Are at Risk of Workplace Violations

Workplace violations are not limited to immigrant workers or other vulnerable groups in the labor force— everyone is at risk, although to different degrees.

- Women were significantly more likely than men to experience minimum wage violations, and foreign-born workers were nearly twice as likely as their U.S.-born counterparts to have a minimum wage violation.

- The higher minimum wage violation rate for foreign-born respondents was concentrated among women—especially women who are unauthorized immigrants.

- Foreign-born Latino workers had the highest minimum wage violation rates of any racial/ethnic group. But among U.S.-born workers, there were significant race differences: African-American workers had a violation rate triple that of their white counterparts (who had by far the lowest violation rates in the sample).

- Higher levels of education, longer job tenure, and English proficiency (for immigrants) each offered some protection from minimum wage violations. But even college-educated workers and those who had been with their employers for five or more years were still at significant risk.

- Overtime, off-the-clock and meal break violations generally varied little by worker characteristics. On the whole, job and employer characteristics were more powerful predictors of the workplace violations considered in this study.

## Weekly Wage Theft in America's Cities

Wage theft not only depresses the already meager earnings of low-wage workers, but also adversely impacts their communities and the local economies of which they are a part.

- *Workers:* More than two-thirds (68 percent) of our sample experienced at least one pay-related violation in the previous work week. The average worker lost $51, out of average weekly earnings of $339. Assuming a full-time, full-year work schedule, we estimate that these workers lost an average of $2,634 annually due to workplace violations, out of total earnings of $17,616. That translates into wage theft of 15 percent of earnings.

■ *Communities:* We estimate that in a given week, approximately 1,114,074 workers in the three cities combined have at least one pay-based violation. Extrapolating from this figure, front-line workers in low-wage industries in Chicago, Los Angeles and New York City lose more than $56.4 million *per week* as a result of employment and labor law violations.

## Fulfilling the Promise of Worker Protections in America

Everyone has a stake in addressing the problem of workplace violations. When impacted workers and their families struggle in poverty and constant economic insecurity, the strength and resiliency of local communities suffer. When unscrupulous employers violate the law, responsible employers are forced into unfair competition, setting off a race to the bottom that threatens to bring down standards throughout the labor market. And when significant numbers of workers are underpaid, tax revenues are lost.

Three principles should drive the development of a new policy agenda to protect the rights of workers.

■ **Strengthen government enforcement of employment and labor laws:** Public policy should leverage the resources and power that reside in agencies responsible for enforcing worker protections. This will require additional staffing, but more important, new strategies are needed to address the reality that workplace violations are becoming standard practice in many low-wage industries.

■ **Update legal standards for the 21st century labor market:** Weak employment and labor laws open the door to low-road business strategies focused on illegally cutting labor costs. Raising the minimum wage, updating health and safety standards, ending exclusions that deny workers coverage, and strengthening the right of workers to organize through labor law reform—all are key improvements that would raise compliance in the workplace and improve the competitive position of employers who play by the rules.

■ **Establish equal status for immigrants in the workplace:** The best inoculation against workplace violations is ensuring that workers know their rights, have full status under the law to assert them, have access to sufficient legal resources, and do not fear retaliation. But for unauthorized immigrant workers today, this can be a near impossibility. Any policy initiative to reduce workplace violations must prioritize equal protection and equal status in national immigration reform, and ensure status-blind enforcement of employment and labor laws.



# Introduction

In February 2009, a leading chain of gourmet grocery stores in New York City agreed to pay nearly $1.5 million in unpaid wages to 550 workers. Behind those numbers lie a grim set of business practices. Amish Markets denied its employees overtime pay, despite requiring many to work more than 40 hours a week. Some employees were paid only $300 a week for 60 to 70 hours of work, which translates into four to five dollars an hour, well below the state's minimum wage. Individual workers reported additional abuses: being fired after injuring a leg on the job, having delivery tips stolen by management, and being fired for talking to the state Department of Labor.[1]

In the same month on the other side of the country, the L.A. city attorney filed criminal charges against owners of four car washes, charging them with failure to pay the minimum wage and provide employees with breaks. Dozens of workers said they were paid a flat rate of $35 to $40 a day for shifts that usually lasted more than eight hours, with as little as 15 minutes a day for lunch; some worked for customer tips alone. The workers did not receive medical care for lacerations and acid burns caused by the machinery and chemicals they used. All told, these car wash workers could be owed close to half a million dollars in wages.[2]

And last year in Illinois, a large temporary staffing agency settled a class action suit with over 3,300 workers, totaling close to half a million dollars. Usually hired by the day, workers were placed in minimum wage jobs doing assembly, packaging and janitorial work. But when they accumulated more than 40 hours in a week working for different client companies, they didn't receive overtime—instead, the temp agency "split" their checks to avoid triggering mandatory overtime pay. Workers also reported that regardless of the actual amount of hours they worked in a given day, their time was rounded down to eight hours by the agency.[3]

Unfortunately, these cases are not unusual, nor are they limited to small businesses like gourmet groceries or car washes. In 2008, for example, Wal-Mart announced it would settle 63 cases in 42 states charging that the company forced its employees to work "off the clock"—that is, requiring unpaid work after employees had clocked out at the end of their official shifts. The settlement totaled $352 million in unpaid wages and involved hundreds of thousands of current and former employees.[4] Earlier the same year, a federal judge ordered the Saigon Grill restaurant in New York City to pay 36 of its delivery workers $4.6 million in owed wages; they had routinely worked 13-hour shifts for as little as $1.60 an hour.[5]

Also last year, a harrowing investigation by the *Charlotte Observer* documented systemic violations of health and safety laws by one of the largest poultry processing companies in North Carolina, House of Raeford. Faced with worker injuries such as chronic musculoskeletal disorders, broken bones and chemical burns, the company responded by hiding injury rates from the federal Occupational Safety and Health Administration, ignoring requests for medical help, and threatening to fire injured workers.[6]

Low-wage workers are not the only ones at risk of such workplace violations. For example, a group of Federal Express drivers has spent years pursuing a legal claim for employee status; illegally misclassified as "independent contractors," they received no benefits, lost the protection of most employment and labor laws, and had to pay all of their job-related expenses such as fuel, vehicle maintenance, and insurance. In October 2008, a court-appointed official awarded more than 200 FedEx drivers in California $14.4 million to compensate for these abuses.[7]

■ ■ ■

At the start of the 21st century, America's workplace laws are failing to protect the nation's workers. These are laws that most of us consider absolute and inviolate and that date back to the New Deal. Employers must pay workers at least the minimum wage, and time and a half for overtime hours. They must follow regulations to protect workers' health and safety, and carry workers' compensation insurance in case of injury. They may not discriminate against workers on the basis of age, race, religion, national origin, gender, sexual orientation or disability. And they must respect workers' right to organize and bring complaints about working conditions.

Yet there is growing evidence that employers are breaking these bedrock laws—not just in manufacturing plants outside our borders, or in the sweatshops that flourished a century ago. The many workplace violations documented by community groups and government agencies in recent years, as well as a small but growing body of research, suggest the need to take a closer look at the state of America's system of worker protections.

However, very few studies have been able to look across a broad set of industries or geographic regions to estimate the proportion of workers experiencing workplace violations, or the proportion of employers committing them. As a result, we lack robust benchmarks of the magnitude of the problem, the industries that are the biggest offenders, or the workers who are most affected. The limited data, in turn, hamper effective policy responses, whether at the federal, state or local level.

This report presents new research findings that begin to fill the gap. In 2008, we surveyed more than 4,000 workers in low-wage industries in the three largest U.S. cities—Chicago, Los Angeles, and New York City. Using a rigorous survey methodology that allowed us to reach vulnerable workers who are often missed in standard surveys, we attempted to answer the following questions: How common

are workplace violations, such as the percentage of workers earning less than the minimum wage or working overtime without pay? Which industries and occupations have high concentrations of violations? And who are the workers most affected? We think of this survey as a census of the invisible, because from the standpoint of public policy, government regulation and immigration policy, these jobs (and the workers who hold them) are all too often off the radar screen.

We found that there are significant, pervasive violations of core workplace laws in many low-wage industries. Workers are being paid less than the minimum wage and not receiving overtime pay. They are working off the clock without pay, and not getting meal breaks. When injured, they are not receiving workers' compensation. And they are retaliated against when they try to assert their rights or attempt to organize.

These problems are not limited to the "underground economy" or to a few "bad apples"; we found that both large and small employers violate the law, in industries such as retail, residential construction and home health care that are at the core of urban economies.

Nor are these abuses limited to unauthorized immigrants or other especially vulnerable workers. Although women, immigrants, and people of color are disproportionately affected by workplace violations, we found that where a worker is employed—that is, in which industry and in what type of job—is generally a much better predictor of violations than the worker's demographic characteristics.

Moreover, not all employers violate the law. Our study suggests that, even within high-violation industries, there are responsible employers who manage to be competitive while complying with core employment and labor laws. Both those employers, and the workers who regularly experience workplace violations, urgently need a new national commitment to full enforcement of labor standards.

**■ ■ ■**

Enforcement alone is not enough, however. America's system of employment and labor laws is badly out of date and riddled with weak standards. Some occupations and industries are either partly or completely exempted from coverage. Health and safety protections have not been updated in years, and the minimum wage is worth less today (controlling for inflation) than it was 40 years ago. Many employers are treating workers as independent contractors or hiring them through subcontractors, straining a legal framework predicated on a traditional employment relationship.

The high rates of workplace violations that we document in this report raise an urgent, resounding warning that even existing protections are failing millions of workers in low-wage industries. Our data were collected in 2008, but since then there is reason to believe that the situation has deteriorated further. Legal services organizations and community groups are reporting that the recession has intensified exploitation, as employers are ever more focused on cutting costs, and workers feel increased pressure to accept sub-minimum wages and unpaid overtime in the face of high unemployment.[8]

Rebuilding our economy on the back of illegal working conditions is not only morally but also economically untenable.  When unscrupulous employers break the law and drive down labor standards, they rob families of badly needed money to put food on the table. They rob communities of spending power. They rob state and local governments of vital tax revenues. And they rob the nation of the good jobs and workplace standards needed to compete in the global economy.

000017



# Pulling Back the Veil: A Landmark Survey of the Low-Wage Labor Market

Studying violations of workplace laws is a challenging task. Employers are unlikely to admit that they are paying workers less than the minimum wage, denying workers meal breaks, or otherwise breaking the law. Businesses with the worst conditions may be operating underground and thus difficult to find. Workers who need to support their families are understandably reluctant to talk to researchers about their employers, because of possible retaliation, their immigration status, or because they are working off the books.

The result is that existing data are inadequate to assess the current state of employer compliance with U.S. employment and labor laws. Standard government surveys such as the decennial Census do not gather the detailed data one would need to accurately identify workplace violations. And enforcement agencies usually only document the relatively small number of cases that come before them, leaving a significant part of the labor market unmeasured.[9] It is impossible to determine, for example, whether the cases of overtime violations brought to the U.S. Department of Labor in a given year represent a small or large share of the actual violations.[10]

For this study, we surveyed workers themselves, building on an emerging body of research that has established the viability of gathering reliable data on employment and labor law violations from workers.[11] Specifically, in 2008 we conducted a large-scale, representative survey of 4,387 low-wage workers in the three biggest U.S. cities.

We adopted two key methodological innovations to overcome the inadequacies of previous studies. First, we used a cutting-edge sampling methodology that allowed us to reach the full range of workers in the low-wage labor market, including unauthorized immigrants and off-the-books workers. Second, we developed an extensive questionnaire that allowed us to rigorously assess whether employment and labor laws were being broken, without relying on workers' own knowledge of these laws.

The result is a landmark survey that offers policymakers, regulatory agencies, community groups, legal services lawyers and researchers a window into the current state of worker protections in urban low-wage labor markets.

## Whom Did We Survey?

### The three cities

The 2008 Unregulated Work Survey focused on the three largest cities in America—Chicago, Los Angeles and New York City—which together represent a labor force of more than 11 million workers.[12] The large but concentrated size of these three labor markets provided us the opportunity to survey a diverse population of low-wage workers in a defined geographical area, and to capture a wide range of the sectors, industries and occupations that make up the 21st century U.S. economy.

### The study population

From January through August of 2008, we surveyed a total of 4,387 workers across the three cities—Chicago (Cook County), Los Angeles (Los Angeles County) and New York City (the five boroughs). To qualify for the survey, workers had to be:

a. age 18 or older, and currently working for an employer located in one of the three cities;

b. a "front-line" worker, i.e. not a manager, professional or technical worker; and

c. working in a low-wage industry as their primary job (see Appendix A for the detailed list of eligible jobs).

We designed the survey to be broad enough to capture a range of industries and occupations across the urban economy, yet targeted enough to exclude upper-level occupations such as lawyers or stock brokers (most of whom are not covered by many of the laws of interest here).

A note on timing. We fielded the survey at the start of the recession in 2008, but in all three cities, the recession had not yet fully set in when we were conducting our interviews. Unemployment rates—the most relevant measure in terms of labor market conditions—were just starting to edge upward in each of the three cities, and did not reach critical levels until late 2008 and early 2009, after we had completed our survey. Our assessment, therefore, is that the workplace violation rates documented in this study were not significantly influenced by the recession.

## How Did We Conduct Our Survey?

Our goal was to obtain accurate, statistically representative estimates of the prevalence of workplace violations. One key challenge we faced was how to reach the workers in the first place. Surveys that rely on telephone interviews or Census-style home visits are unlikely to gain the participation of the full population of low-wage workers, many of whom are missing from official databases, vulnerable because of their immigration status, and/or reluctant to take part in a survey because of fear of retaliation by their employers. Trust is also an issue when asking for details about a worker's job, the wages they receive, and whether or not they are paid off the books.

These problems have recently received significant attention from statisticians and social scientists. In this survey we use an innovative sampling strategy that was developed to overcome the barriers of surveying "hidden" or "hard-to-reach" populations: Respondent-Driven Sampling (RDS), originally

000019

developed by Cornell University sociologist and co-author Douglas Heckathorn, and subsequently elaborated in collaboration with other scholars.

Appendix A provides a detailed description of the RDS method and how we implemented it in this survey, but the basic concept is straightforward: sampling is done through social networks. In our case, recruiting started with a small number of workers who fit the study criteria; after they were interviewed they recruited other workers in their existing social networks; in turn, those workers completed the survey and then recruited others; and so on. The sample increases through successive waves of recruitment.

A key advantage of this method is that workers are recruited by trusted friends and acquaintances who already have participated in the survey and can vouch for its confidentiality. This provides a powerful way to overcome the barriers of fear and disclosure discussed above.

We took several steps to ensure that our sample is representative of the larger population of front-line workers in low-wage industries in the three cities. First, by collecting data on the social networks of the respondents, and in particular taking into account the size and interconnectivity of those networks, the RDS methodology is able to adjust for the fact that some individuals have more social connections than others, and thus are more likely to be recruited into the survey. Second, the RDS methodology is also able to adjust for the fact that different groups of workers have patterns of recruitment that vary both in which types of workers they recruit and in the effectiveness of their recruitment. Finally, we also included an adjustment to ensure that the distribution of industries and occupations in our sample fully reflected the composition of each city's low-wage labor market.

## Fielding the survey

The survey was closely coordinated across the three cities: the same instrument was used, and the RDS methodology was implemented in the same way, with detailed fielding protocols ensuring full comparability. Each city was in the field for about six months during the spring and summer of 2008, conducting interviews at multiple sites, including community colleges, service providers, community-based organizations, and churches scattered across each of the cities. All outreach materials were translated into multiple languages, and the surveys themselves were conducted in English, Spanish, Russian, Polish, Bengali, Hindi, Urdu, Mandarin, Cantonese, Korean, Portuguese, French and Haitian Creole. Including surveyors, translators, field coordinators and researchers, a total of 62 staff fielded this survey across the three cities (see Appendix A for more details on the fielding and methodology).

## How Did We Measure Workplace Violations?

The 2008 Unregulated Work Survey is unique in that it measures a range of violations of employment and labor law, using an original battery of detailed, in-depth questions. Our interviews typically lasted between 60 and 90 minutes.

The survey instrument was designed to gather information which would allow us to detect violations of laws guaranteeing the minimum wage and overtime pay; full and timely payment of wages owed; provision of legally required meal and rest breaks; protection against retaliation by employers for complaints about working conditions or attempting to organize; and access to workers' compensation in the case of an on-the-job injury (each of these types of violations is described in more detail in the next section). Due to time and measurement constraints, however, we were not able to measure violations

000020

13

of health and safety, family medical leave, and most anti-discrimination laws, although these too are critical worker protections.

The questionnaire did *not* rely on workers having any direct knowledge about their rights under employment and labor law, or about whether they had experienced a workplace violation. Instead, our strategy was to gather raw "inputs" from workers—the necessary data about their hours, earnings and working conditions, as well as relevant employer actions. We then used these data to determine whether or not a law had been violated.[13]

For example, we did not ask workers whether they were being paid the minimum wage. Instead, we gathered day-by-day data on exactly how many hours the respondent worked the week before the survey, the amount of money he or she received, whether the employer made any deductions (e.g. for uniforms or meals), and whether the respondent worked off the clock. We then calculated the worker's effective hourly wage, and determined whether or not it was below the minimum wage. This approach—gathering raw data and then calculating whether a workplace violation occurred—was used for the majority of the measures that we report.

Finally, in calculating the various violation measures, we were careful never to double-count. For example, if a respondent worked five overtime hours but was not paid for those hours, we recorded an overtime violation; once these five hours were "tagged" as unpaid, they did not contribute to any other violation (for example, they could not also trigger a minimum wage violation).

## The Workers and Their Characteristics

We close this section with an initial look at the 4,387 workers in our sample. Table 2.1 offers an overview of key demographic and employment characteristics, combined across the three cities. Like the low-wage workforce in cities and towns across the United States, our sample has more women than men; significant numbers of persons of color, especially Latino workers;[14] and a range of age groups and education levels, although about three-quarters of the sample has reached only a high school degree or less.

Consistent with recent trends in the low-wage labor market, immigrants comprise a large part of our sample—30 percent of the sample was U.S.-born, with the remainder comprised of naturalized citizens, and authorized and unauthorized immigrants. The sizeable number of the latter category in our sample is an indicator of our success in capturing this hard-to-reach part of the labor market.

Given that our focus was on low-wage industries, not surprisingly, workers in our sample earn very low wages. The median wage (in 2008 dollars) for our sample was $8.02 an hour, with few respondents earning significantly more than this amount: more than three-quarters of our sample earned less than $10.00 an hour.

Finally, this sample represents a range of industries (types of businesses) and occupations (job tasks or functions). Reflecting the larger economy, most workers in our sample are employed in the service sector—in industries such as restaurants, retail stores, and home health care—but there is also a sizable segment employed in residential construction, manufacturing, warehousing and transportation. Similarly, many of the occupations in our sample are service jobs, such as cashiers, cooks, childcare workers,

waiters and sales workers, but construction laborers and factory workers are also well represented. In short, our sample represents a rich and diverse mix of the industries and occupations that comprise America's urban economies.

**Table 2.1: Characteristics of Workers in the 2008 Unregulated Work Survey**

| | | Percent of workers |
|---|---|---|
| **Gender** | Male | 44.4 |
| | Female | 55.6 |
| **Age** | 18-25 | 28.5 |
| | 26-35 | 25.3 |
| | 36-45 | 21.2 |
| | 46+ | 25.0 |
| **Race/ethnicity** | Latino/Latina | 63.0 |
| | Black | 13.5 |
| | Asian/other | 17.1 |
| | White | 6.3 |
| **Education** | Less than high school, no GED | 45.1 |
| | High school graduate or GED | 30.9 |
| | Some college or higher | 24.0 |
| **Nativity and legal status** | U.S.-born citizen | 30.0 |
| | Foreign-born authorized (includes naturalized citizens) | 31.2 |
| | Foreign-born unauthorized | 38.8 |
| **Main industry during previous week of work** | Restaurants & hotels | 16.5 |
| | Private households | 13.7 |
| | Apparel & textile manufacturing | 12.5 |
| | Retail & drug stores | 10.0 |
| | Food & furniture manufacturing, transportation & warehousing | 9.5 |
| | Security, building & grounds services | 7.5 |
| | Social assistance & education | 6.3 |
| | Residential construction | 5.9 |
| | Grocery stores | 5.9 |
| | Personal & repair services | 5.6 |
| | Home health care | 4.9 |
| | Other (finance & other health care) | 1.7 |

Table continues on next page >

000022

Pulling Apart the Seams

| Characteristics of Workers in the 2008 Unregulated Work Survey continued… | | |
|---|---|---|
| **Main occupation during previous week of work** | Cooks, dishwashers & food preparers | 10.3 |
| | Sewing & garment workers | 10.0 |
| | Building services & grounds workers | 9.5 |
| | Factory & packaging workers | 8.7 |
| | Child care workers | 8.2 |
| | General construction | 7.9 |
| | Home health care workers | 6.5 |
| | Retail salespersons & tellers | 5.8 |
| | Maids & housekeepers | 5.6 |
| | Cashiers | 5.5 |
| | Waiters, cafeteria workers & bartenders | 5.1 |
| | Stock/office clerks & couriers | 5.0 |
| | Car wash workers, parking lot attendants & drivers | 4.3 |
| | Beauty, dry cleaning & general repair workers | 3.9 |
| | Security guards | 2.8 |
| | Teacher's assistants | 0.9 |
| **Hourly wage during previous work week (in 2008 dollars)** | Median hourly wage | $8.02 |
| **Total number of workers in the sample** | | **4,387** |

Source: Authors' analysis of 2008 Unregulated Work Survey.

## The Scope and Scale of the Survey Findings

Readers will naturally ask themselves what percentage of the overall workforce is represented in this study. All of the workplace violation prevalence rates and other findings reported in the following sections have been weighted so that they are representative of the larger population of front-line workers (i.e. excluding managers, professional or technical workers) in low-wage industries in Chicago, Los Angeles and New York City in 2008.

By our estimate, that population includes about 1.64 million workers combined across the three cities, which is about 31 percent of all front-line workers and about 15 percent of all workers in the three cities (see Table A.2 in Appendix A). By any standard, then, this study includes a significant part of the American urban labor market.

This report presents results for all three cities combined; subsequent publications (to be issued later in 2009) will report city-specific violation estimates.

000023

## Future Research

Although this study is the first to systematically document the prevalence of workplace violations in major U.S. cities, more research is needed. Some types of labor law violations, most importantly, those involving workplace health and safety and discrimination, were not included in our survey. And there is an urgent need for data obtained directly from employers, regulatory agencies, unions, and other stakeholders in American workplaces, in addition to surveys of workers, to help illuminate the connections between workplace conditions and competition in low-wage industries. Finally, our report is geographically limited. Although we studied the nation's three largest cities, with sizable labor markets and diverse economies, we hope that future researchers will measure the prevalence of labor law violations in other parts of the United States.

000025



# The Prevalence of Workplace Violations in America's Cities

The American workplace is governed by a core set of employment and labor laws that establish minimum standards for wages, health and safety on the job, fair treatment, and the right to organize. Our findings show that these laws and standards are systematically violated, impacting a significant part of the low-wage labor force in the nation's largest cities. The framework of worker protections that was established over the last 75 years is not working. As we demonstrate in the following pages, low-wage workers regularly experience violations of laws mandating minimum wage and overtime pay, and are frequently forced to work off the clock or during their breaks.

Table 3.1 summarizes the workplace violations experienced by our respondents. We computed these violation rates using two distinct measures. The first measure is designed to specify what proportion of all the workers in our survey experienced a violation, whereas the second measure specifies the proportion of workers experiencing a violation who were "at risk" for that violation. For example, in the case of weekly overtime pay laws, a worker is only at risk of a violation if she or he works more than 40 hours a week. Table 3.1 shows, in separate columns, both the percentage of all workers surveyed who experienced each violation and the percentage of workers "at risk" who experienced each violation. In this section, we present both violation measures; later sections focus on the risk-set measures alone.[15]

The Pr... ...co...

**Table 3.1: Workplace Violation Rates**

| | Percent of workers with violations | |
|---|---|---|
| **Violation** | **All workers surveyed\*** | **Workers at risk of a violation\*\*** |
| **Minimum wage violations in week prior to survey** | | |
| Worker was paid below the minimum wage | 25.9 | same |
| **Overtime violations in week prior to survey** | | |
| Worker had unpaid or underpaid overtime | 19.1 | 76.3 |
| **Off-the-clock violations in week prior to survey** | | |
| Worker not paid for off-the-clock work | 16.9 | 70.1 |
| **Meal break violations in week prior to survey** | | |
| Worker had any of the below meal break violations | 58.3 | 69.5 |
|     Worker was denied meal break | 18.0 | 21.8 |
|     Meal break was interrupted by employer or supervisor | 11.3 | 15.6 |
|     Worker worked through meal break | 12.0 | 16.7 |
|     Meal break was shorter than legally required | 43.3 | 50.3 |
| **Other pay violations in week prior to survey** | | |
| Worker was paid late | 4.3 | same |
| Worker did not receive a paystub | 56.8 | same |
| Worker was subjected to an illegal pay deduction | 2.3 | 40.5 |
| Tips were stolen by employer or supervisor | 1.6 | 12.2 |
| **Violations in the 12-month period prior to survey** | | |
| Worker had any of the below pay violations in last 12 months | 43.6 | same |
|     Worked off-the-clock without pay in last 12 months | 27.8 | same |
|     Paid late in last 12 months | 24.6 | same |
|     Paid less than owed in last 12 months | 16.6 | same |
|     Not paid at all in last 12 months | 5.6 | same |
| Regular and repeated verbal abuse on the basis of a protected category in last 12 months | 3.4 | same |
| **Retaliation violations for most recent complaint or organizing effort** | | |
| Worker experienced retaliation by employer for making complaint or organizing a union | 4.6 | 42.8 |
| **Workers' compensation violations for most recent on-the-job injury** | | |
| Worker experienced an illegal action by employer | 4.7 | 50.3 |
| **State specific violations in week prior to survey\*\*\*** | | |
| Tipped worker did not receive the tipped minimum wage (NY/IL) | 5.8 | 29.6 |
| Worker did not get required daily overtime rate (CA/NY) | 11.0 | 85.4 |
| Worker was denied or got a shortened rest break (CA) | 77.3 | 81.7 |

\* Calculated as a percent of all workers in our sample.

\*\* Calculated as a percent of workers who were at risk of a violation.

\*\*\* The "All workers surveyed" rates for the state-specific violations only include workers in the state where the law is relevant.

Source: Authors' analysis of
2008 Unregulated Work Survey.

000027

## Minimum Wage Violations

Minimum wage laws constitute the basic standard of pay for front-line workers in the U.S. labor market. Employers are required to pay workers at or above the minimum wage set by federal or state law, whichever is higher.[16] At the time of our survey, the states of New York, Illinois and California all had minimum wage rates higher than the federal standard. The hourly minimum wage was $7.15 in New York, $7.50 in Illinois, and $8.00 in California. These minimum wage laws apply to workers regardless of whether they are employed full- or part-time, or whether they are paid by the hour, by the piece or in some other manner. Minimum wage laws also cover unauthorized workers, as do all of the other laws considered in this study.

As noted above, to measure the prevalence of minimum wage violations, we did not rely on our respondents' own knowledge of these laws, but instead gathered detailed information from each worker about the work week immediately prior to his or her interview. We calculated each respondent's hourly wage rate for the job(s) in which he or she worked that week, dividing total weekly earnings by the number of hours worked, after taking into account bonuses, taxes, deductions and overtime pay. We then compared this calculated hourly wage rate to the relevant state minimum wage to determine whether or not there was a minimum wage violation.[17] For example, workers in New York City who were paid less than $7.15 an hour at any of their jobs in the previous work week were identified as having a minimum wage violation.

As Table 3.1 shows, over one-quarter (26 percent) of the workers in our sample were paid less than the minimum wage in the previous work week. Moreover, these minimum wage violations were not trivial in magnitude: as Figure 3.1 shows, 60 percent of workers in our sample were underpaid by more than $1 per hour. The median underpayment was $1.43 less than the minimum wage.

**Figure 3.1: Amount Paid Below the Hourly Minimum Wage for Workers with a Minimum Wage Violation**



- $1 per hour or less
- $1.01–$2 per hour
- $2.01–$3 per hour
- $3.01–$4 per hour
- More than $4 per hour

Source: Authors' analysis of 2008 Unregulated Work Survey.

## Overtime Violations

The Fair Labor Standards Act (FLSA) stipulates that covered employees must be paid "time and a half" (one-and-a-half times their regular rate of pay) for all hours worked over 40 during each week for a single employer. (Some states also regulate daily overtime, a point discussed below).

Over a quarter of our respondents worked more than 40 hours during the previous work week for a single employer and were therefore at risk for an overtime violation. As Table 3.1 indicates, 76 percent of these "at risk" workers were not paid the legally required overtime rate by their employers. The overtime violation rate among all workers in our sample (that is, regardless of whether they worked overtime or not in the previous week) was 19 percent.[18]

The Pr... ...s i... ...co...

**Figure 3.2: Number of Hours Worked Overtime (Beyond 40 Hours) for Workers with an Overtime Violation**



- 5 hours or less
- 5–10 hours
- 10–20 hours
- More than 20 hours

12.4%
35.4%
26.5%
25.6%

Source: Authors' analysis of 2008 Unregulated Work Survey.

Nonpayment or underpayment for overtime work takes a variety of forms. Seventy-three percent of respondents who had an overtime violation were paid only their regular hourly rate for the hours they worked over 40, another 19 percent were not paid at all for those hours, and 8 percent were paid less than their usual hourly rate or were promised "comp time." Like minimum wage violations, overtime violations were far from trivial in magnitude. Among those workers with an overtime violation, the average respondent had worked 11 overtime hours in the previous week, and 12 percent had worked more than 20 overtime hours (see Figure 3.2).

## "Off-the-clock" Violations: Unpaid Time Before or After a Regular Shift

In addition to unpaid overtime, many front-line workers in the low-wage labor market perform work that is effectively unpaid. This is "off-the-clock" work, or work that takes place before or after a regularly scheduled shift and for which no pay is provided.[19] Off-the-clock work is technically a type of minimum wage violation, but we chose to measure it separately in this study because it involves workers not being paid at all for time worked. By law, employees must be paid for all of the hours they work. That means any work performed before or after official start and end times must be compensated in accordance with minimum wage laws. In our survey, we asked workers whether they came in before their official shift or stayed late after their official ending time and, if so, whether or not they received payment for this time. If workers came in early and/or stayed late *and* were not paid at all for work they performed during those time periods, they had an off-the-clock violation.

About one-quarter of workers surveyed (22 percent) stated that they had worked before and/or after their regular shifts in the previous work week, and were thus "at risk" for off-the-clock violations. Of these "at risk" workers, 70 percent did not receive any pay at all for the work they performed outside of their regular shift. Those who experienced this type of violation typically worked a median of one hour per week without pay.

## Meal Break Violations

The states of New York, Illinois and California require employers to provide workers an uninterrupted meal break during their shift, although the length of the required meal break as well as the minimum shift length after which a break must be provided varies from state to state.[20] The law does not require the employer to pay for the meal break, but if the employee works during the break, he or she must be compensated. Based on each state's specific regulations, we determined whether workers received all of their required meal breaks and if these breaks were of the required length.

000029

A large majority of our respondents (86 percent) worked enough consecutive hours to be legally entitled to a meal break. However, as Table 3.1 indicates, more than two-thirds of these "at risk" workers (69 percent), and 58 percent of the total sample, experienced a meal break violation in the previous work week.

Meal break violations took a variety of forms. Nearly one-quarter (22 percent) of respondents with this violation received no meal break at all at some point during the previous week. Half (50 percent) had a meal break that was shorter than the legally mandated length. Workers also reported being interrupted by their employer during the break (16 percent) or working during part of their meal break (17 percent).

## Other Pay Violations

In addition to minimum wage, overtime, off-the-clock, and meal break violations, we collected data on several other pay-related violations (see Table 3.1). First, we asked workers if they had received their pay on time for the previous work week, and found that 4 percent had not. Second, we asked workers if they had received a paystub or other documentation of their earnings and deductions. According to New York, Illinois and California state law, all workers—regardless of whether they are paid in cash or by check—are required to receive documentation of their earnings and deductions. However, 57 percent of workers in our sample did not receive this mandatory documentation. Third, we asked about deductions from pay during the previous work week. In New York, Illinois and California, employers are generally not permitted to take deductions from a worker's pay for damage or loss, work-related tools, materials or transportation, or uniforms.[21] Among respondents who reported deductions from their pay, 41 percent were subjected to illegal deductions.

Finally, we examined pay-related violations specifically affecting tipped workers. It is illegal for employers or managers to appropriate any portion of the tips provided by customers in restaurants or other settings where tips are customary. However, 12 percent of tipped workers in our sample experienced such "tip stealing" during the previous work week.

## Workplace Violations During the Last 12 Months

For all of the violation rates discussed so far, we calculated whether or not a violation occurred during the week prior to the interview, based on information we collected about each worker's hours and earnings. In addition, we asked workers a series of questions about their experiences over the previous 12 months across all the jobs they had held. The purpose of these questions was to measure the prevalence of workplace violations that occur relatively infrequently and thus might be missed by questions limited to a single work week. These estimates are likely less reliable than those for the previous work week, because they rely on workers remembering incidents that occurred over a much longer time period.

Forty-four percent of respondents experienced at least one pay-related violation (off-the-clock work, late payment, being paid less than owed, or not being paid at all) in the 12-month period prior to their interview. Twenty-eight percent had worked off-the-clock without pay at least once in the last year. When workers experienced this violation, they did so frequently, on average 25 times in the last year.

Twenty-five percent of workers had been paid late at some point in the last year; this group experienced five incidents of late payment, on average, over the year. Seventeen percent of workers had been paid less than they were owed by their employers at least once in the last 12 months; on average, this took place five times for those who experienced such underpayment. Finally, 6 percent of workers in our sample were not paid at all for work they had performed at least once in the previous year; among these workers, nonpayment of wages occurred an average of three times in the last year.

We also asked workers about ways in which nonpayment or late payment occurred during the previous 12 months. Most often, workers were simply told that they could not be paid because the employer did not have the money. In other cases, workers were paid with checks that bounced, or their employers disappeared or closed up shop before they received their pay. A small number of workers said they were paid with goods or gifts instead of money.

Another violation we measured over the 12-month period prior to the survey interview was verbal abuse on the job. Regular and repeated verbal abuse by an employer or supervisor is illegal in Chicago, Los Angeles and New York City if such abuse involves race, religion, gender, sexual orientation, national origin, age and/or disability.[22] Three percent of workers in our sample experienced verbal abuse based on these protected categories in the 12 months prior to their interview.

## Illegal Retaliation by Employers

Workers who complain to their employer or to a government agency about their working conditions, as well as those who attempt to organize a union, are protected by law from retaliation by their employer for these activities.[23] Threatening to fire a worker, actually firing or suspending workers, cutting hours or pay, harassing or abusing workers, or giving workers a worse work assignment—all are illegal forms of employer retaliation if they occur as a direct result of a complaint or union organizing effort.

We asked respondents whether they had made a complaint in the last year to their employer, to their supervisor or to a government agency. If they had, we then gathered information about the most recent complaint. If they had not complained, we asked if they had any problem(s) on the job and, if so, why they chose not to complain about the problem(s).

Despite the existence of legal protection from retaliation, many workers chose not to make complaints to their employers, even when they encountered substandard conditions in the workplace. Twenty percent of workers in our sample either made a complaint in the last year or attempted to form a union. But another 20 percent indicated that they did not complain during the past 12 months even though they had experienced a serious problem such as dangerous working conditions, discrimination or not being paid the minimum wage. Over half (51 percent) of these workers said that they did not make a complaint because they were afraid of losing their job, another 10 percent were afraid they would have their hours or wages cut, and 36 percent thought it would not make any difference if they complained (not shown). Fear of retaliation and expectations of employer indifference, then, figure strongly in workers' decisions about whether or not to make a complaint.

Those who did complain identified a variety of on-the-job problems (not shown). Their complaints included: not being paid for all hours worked (13 percent of all complaints), dangerous working conditions (12 percent), being paid below the minimum wage (7 percent), not being paid on time (6 percent), and not being paid for overtime (6 percent).

Of those workers who either complained about a workplace issue or attempted to form a union in the past 12 months, 43 percent experienced retaliation from their employer or supervisor as a direct result of their most recent complaint or organizing effort. Figure 3.3 shows the various ways in which employers illegally retaliated against workers—including actions such as cutting workers' hours and pay, threatening to call immigration authorities, firing workers, and increasing workloads.



**Figure 3.3: Types of Illegal Retaliation by Employers***

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated only for workers who had experienced illegal retaliation for making a complaint or organizing a union during the year previous to the survey. Workers could report more than one type of retaliation.

## Workers' Compensation

Workers' compensation laws vary among the states. Generally, all employers are required to pay into the state's workers' compensation fund and carry workers' compensation insurance in order to cover costs incurred when a worker becomes sick or injured on the job for work-related reasons. These costs include medical bills as well as wages lost due to time away from work because of the injury or illness.

Twelve percent of our respondents experienced a serious on-the-job injury[24] during the last three years of work. For these workers, we gathered information about the most recent work-related injury and about the employer's response to that injury, in order to determine whether a violation of workers' compensation law had occurred.

We found that the workers' compensation system is very rarely used by our respondents. Only 8 percent of the workers in our sample who experienced a serious injury during the previous three years had filed a workers' compensation claim for their most recent injury. This finding clearly indicates that the workers' compensation system is not functioning as intended for front-line workers in the low-wage labor market.

Further, our data suggest that this is due at least in part to the ways in which employers respond to cases of on-the-job injury. Fully 43 percent of seriously injured respondents reported that they were required to work despite their injury; an additional 30 percent said their employer refused to help them with the injury; 13 percent were fired shortly after the injury; 10 percent said their employer made them come into work and sit around all day; 4 percent were threatened with deportation or notification of immigration authorities; and 3 percent were told by their employers not to file a workers' compensation claim. Only 8 percent of employers instructed injured workers to file a workers' compensation claim.

000032

Not all of the employer responses to on-the-job injuries reported above are illegal. Table 3.1 shows workers' compensation violation rates, but only for illegal employer actions such as: firing or threatening to fire an injured worker, calling immigration authorities in response to an on-the-job injury of an unauthorized worker; or instructing an injured worker not to file for workers' compensation insurance.[25] Across the three cities, fully 50 percent of those respondents who suffered an injury in the past three years experienced a violation of workers' compensation law for their most recent injury.

We also gathered information on who paid for injured workers' medical expenses. Fifty-five percent of respondents who experienced a serious injury at work sought medical attention for that injury, but within this group, only 40 percent indicated that their employers paid for all or part of their medical bills. About half of the workers who sought medical attention after an on-the-job injury had to pay their bills out-of-pocket (33 percent) or used their health insurance to cover the expenses (22 percent). Workers' compensation insurance paid the medical expenses for only 6 percent of the workers in our sample who visited a doctor for an on-the-job injury or illness.

## State-specific Violations

Some state-specific laws do not apply to all three of the cities surveyed. Here we briefly discuss violation rates for the tipped minimum wage in New York and Illinois, the daily overtime laws in California and New York, and the rest break laws in California.

In many states (and under federal law), there is a special provision in minimum wage law for workers who receive tips as a regular part of their wages. In addition to the tips that they receive from customers, tipped workers must be paid a minimum base wage by their employer for the hours they work; however, this base wage is less than the minimum wage for non-tipped workers.[26] New York and Illinois have a tipped worker minimum wage, but California does not.

For New York and Illinois only, we calculated the tipped minimum wage violation rate by comparing each tipped worker's base wage to the legally required wage.[27] Eighteen percent of workers in our sample in New York City and Chicago received tips in the previous week. These tipped workers were employed in a variety of jobs, the most common being restaurant workers, carwash workers, hair stylists, and other personal service workers. Thirty percent of these tipped workers experienced violations of the tipped minimum wage.

In addition to the weekly overtime laws discussed above, both California and New York (but not Illinois) have additional daily overtime pay laws. In New York State, employers are required to pay workers one extra hour (at the minimum wage) if they work more than 10 hours in a single day for a single employer. In California, daily overtime laws are more extensive and complex. If a worker works more than eight hours in a single day for a single employer, that employer is required to pay 1.5 times the regular wage; this increases to double the regular wage after 12 hours of work in a single day. In addition, if a worker in California works seven days in a given week for a single employer, on the seventh day, that employer is required to pay the worker 1.5 times the regular wage for the first eight hours and double the hourly rate for every hour beyond the eighth. However, among our respondents in New York City and Los Angeles who met their states' respective daily overtime criteria, the large majority—85 percent—did not receive the legally required wage.[28]

000033

Finally, California requires employers to give workers rest breaks during their shifts. The requirements specify the length of these breaks, along with how often workers should receive them. We measured rest break violations—which include being denied a break or receiving a shortened break—and found that 82 percent of workers who were eligible for at least one rest break in the previous work week experienced a violation (77 percent of the full sample in Los Angeles).

## When Workers Are Exempt from Workplace Laws

Up to this point, we have analyzed violations of employment and labor laws for workers who are covered by those laws. But some workers are either partially or completely exempt from coverage—either because of archaic exemptions of specific industries and occupations, or because they are considered to be independent contractors.[29]

In our survey, we captured one group of workers that is likely to be considered independent contractors: in-home child care workers. If workers take care of one or more children in their own homes, for legal purposes, they are often assumed to be running their own businesses. And it is true that some in-home child care providers are indeed independent contractors who truly set their wages and have control over their working conditions. But others are clearly in an employment relationship, either with the parents of the children they care for, with a government agency (in cases where the parents are receiving a child care subsidy), or both. Yet under current application of employment and labor law, both cases would likely be treated the same: exempt from coverage.[30]

We were not able to determine which of the in-home child care workers in our sample were independent contractors and which were not, so we excluded all of them from our analyses. But we did analyze their working conditions (separately from the rest of the sample) in order to explore the impact of their exemption from legal coverage. We found that in-home child care workers had working conditions that would have resulted in very high workplace violation rates, had they been covered by employment and labor law. Most notably, we calculated that 89 percent of in-home child care workers earned less than their state's minimum wage. This finding underscores the need to ensure that all workers who are clearly in an employment relationship receive full protection under our system of workplace protections (we return to this point in section 7).

## Summary

Front-line workers in the nation's three largest cities frequently are paid below the minimum wage, not paid for overtime, work off-the-clock without pay, and have their meal breaks denied, interrupted or shortened. In fact, more than two-thirds (68 percent) of the workers in our sample experienced at least one type of pay-related workplace violation in their previous week of work.[31] More than one-quarter of the workers in our sample were paid less than the minimum wage for their previous work week. Perhaps the most striking statistic is that among workers who worked more than 40 hours in their previous work week, more than three-fourths were not paid the legally required overtime rate.

Our data also show that employer retaliation is common: among those workers in our sample who made complaints or attempted to organize a union, 43 percent experienced retaliation from their employer or supervisor. In addition, we found that the workers' compensation system is not functioning

000034

The Pro_____s i_____co_____i

for workers in the low-wage labor market. The system is very seldom used by injured workers and (likely not unrelated) many employers either directly or indirectly discourage workers from filing claims.

In short, the core workplace laws established during the last century are being regularly violated by employers in the low-wage labor market. In the rest of this report we explore these violations in more detail, examining the industries and occupations in which they most often are found, as well as the workers who are most affected.

000035



# The Role of Job and Employer Characteristics

Workplace violations ultimately are the result of decisions made by employers—whether to pay the minimum wage or overtime, whether to give workers meal breaks, or how to respond to complaints about working conditions. For this reason, we explore some key characteristics of our respondents' employers in this section of the report, asking: Which types of businesses tend to violate employment and labor laws the most? Which occupations are hardest hit? Does the size of the business play a role? And are there specific employer practices that are associated with or enable workplace violations? In short, this section examines workplace violations through the lens of job and employer characteristics, analyzing differences in workplace violation rates by industry, occupation, employer size, as well as by pay arrangement.[32]

**Table 4.1: Workplace Violation Rates by Job and Employer Characteristics**

| | | Percent of workers with violations | | | |
|---|---|---|---|---|---|
| | | Minimum wage violation rate | Overtime violation rate* | Off-the-clock violation rate* | Meal break violation rate* |
| **All respondents** | | 25.9 | 76.3 | 70.1 | 69.5 |
| **Pay type** | Hourly | 14.8 | 60.7 | 64.8 | 67.5 |
| | Non-hourly | 46.2 | 92.3 | 78.9 | 73.7 |
| **Pay method** | Paid in cash | 34.1 | 87.8 | 74.6 | 72.9 |
| | Paid by company check | 17.2 | 61.5 | 64.4 | 67.4 |
| **Company size** | Less than 100 employees | 28.5 | 82.4 | 73.6 | 73.5 |
| | 100 employees or more | 15.2 | 52.8 | 64.9 | 63.8 |

\* Calculated as a percentage of all workers who were at risk for a violation during the previous work week.

Source: Authors' analysis of 2008 Unregulated Work Survey.

## Minimum Wage Violations

Minimum wage violation rates vary significantly by industry, as Figure 4.1 shows.[33] Violations were most common in apparel and textile manufacturing, personal and repair services, and in private households. In all three industries, more than 40 percent of workers were paid less than the minimum wage. Minimum wage violation rates were substantially lower in residential construction (13 percent); social assistance and education (12 percent); and home health care (12 percent). Industries such as retail, drug and grocery stores fell into the middle of the distribution, with about a quarter of their workers experiencing a minimum wage violation.

As Figure 4.2 shows, minimum wage violation rates also vary by occupation. Child care workers, many of whom work in private households, had a violation rate of 66 percent. Similarly, half of beauty, dry cleaning and general repair workers and 43 percent of sewing and garment workers had a minimum wage violation. By contrast, workers in the following occupations had relatively low minimum wage violation rates: general construction workers (11 percent); waiters, cafeteria workers and bartenders (8 percent); and teacher's assistants (4 percent). Occupations that fell into the middle of the distribution included building services, factory and car wash workers, with about a quarter experiencing a minimum wage violation.

Although many employers in low-wage industries pay their workers a regular hourly wage, others use weekly, daily or other pay types.[34] Many workers are paid on a flat weekly basis, so that their pay does not increase with the number of hours they work. A prep cook might be paid $300 weekly and be expected to work between 35 and 50 hours each week, depending on how busy the restaurant is and how the manager schedules work shifts. Other workers are paid on a flat daily basis. In the residential construction industry, for example, a day laborer might receive $80 for a day's work, regardless of the number of hours involved. In apparel and textile manufacturing, workers are often paid by the piece— for example, a garment worker might be paid seven cents for each shirt sleeve she sews. Overall, 64 percent of our sample was paid an hourly wage; of the remaining 36 percent, most were paid either a flat weekly or a flat daily amount.

000037

**Figure 4.1: Minimum Wage Violation Rates by Industry**



**Figure 4.2: Minimum Wage Violation Rates by Occupation**

000038

31

As Table 4.1 shows, workers in our sample who had non-hourly pay types had substantially higher minimum wage violation rates (46 percent) than those who were paid an hourly wage (15 percent). This is not surprising, since when employers use non-hourly pay types, workers' wages are only loosely tied to the number of hours they work and any increase in hours can result in wages falling below the legal minimum.

Piece rates are also strongly associated with high minimum wage violations. In order to earn the minimum wage, employers often mandate that piece-rate workers reach unachievable levels of productivity, as has been well documented for the garment industry, for example.[35]

In our sample, higher minimum wage violation rates for non-hourly workers are evident within (as well as across) industries and occupations. For example, retail salespersons and bank tellers who were paid by the hour had a minimum wage violation rate of 10 percent, while those who were paid on a non-hourly basis had a violation rate of 57 percent.

Minimum wage violation rates also vary sharply depending on whether workers are paid in cash or by company check.[36] Although it is not illegal for employers to pay employees in cash, the law requires that employees be provided an itemized statement of earnings and deductions for each pay period. As noted in the previous section, 57 percent of workers in our sample did not receive the required statement from their employer—and among workers who were paid in cash, fully 93 percent did not receive such a statement.

**Figure 4.3: Minimum Wage Violation Rates by Pay Arrangement**



Source: Authors' analysis of 2008 Unregulated Work Survey.

Without the transparency afforded by pay statements, workers often are unable to determine whether they have received the wages they are due. As Table 4.1 shows, workers who were paid in cash had double the minimum wage violation rate of those paid by company check (34 percent and 17 percent, respectively).

Pay type (hourly versus non-hourly) and pay method (cash versus company check) are related but not the same. One might expect that workers who were paid a regular hourly wage would generally be paid by company check; but in fact, more than a third of hourly workers in our sample were paid in cash. That said, when both pay type and pay method were nonstandard, minimum wage violations were especially high for workers in our sample. As Figure 4.3 shows, workers who were paid on an hourly basis and by company check had the lowest minimum wage violation rate, at 12 percent. By contrast non-hourly workers who were paid in cash had a violation rate four times this level (48 percent).

Finally, company size has a significant relationship to minimum wage violation rates. As Table 4.1 shows, workers employed in companies with less than 100 employees had a violation rate almost double that of workers in larger companies (29 percent and 15 percent, respectively).

All of the job and employer characteristics discussed have a statistically significant effect on minimum wage violation rates in our sample. In addition, many of these characteristics are related to one another. Some industries are more likely than others to pay workers in cash, or to pay flat weekly rates—and those very industries have the highest minimum wage violation rates. The private household industry is an example: 96 percent of workers in this industry were paid in cash and 63 percent had non-hourly pay arrangements; and not surprisingly, the industry had one of the highest minimum wage violation rates in our study, at 41 percent. Similarly, the apparel and textile manufacturing industry had a minimum wage violation rate of 43 percent, and nearly half of its workforce was paid in cash and on a non-hourly (largely piece-rate) basis. By contrast, the home health care industry (which does not include home health care workers employed by private households) had one of the lowest minimum wage violation rates in our sample (12 percent); this industry had very few non-hourly workers (3 percent) or workers paid in cash (2 percent).

## Overtime Violations

Overtime violations can occur in a number of ways.[37] For example, some employers only pay workers their regular hourly rate—or "straight time"—for overtime hours, rather than the time-and-a-half rate required by law. Other employers fail to pay employees anything at all for their overtime hours. For example, a full-time child care worker might be paid $400 a week to care for small children and to perform various light housekeeping duties. She routinely may be expected to extend those hours beyond the 40-hour threshold when family members return home late, though her salary remains the same. Still other employers may give workers small amounts of pay for overtime—say, an extra $20 for five additional hours on Saturday, after a full week's work.

As we saw in the previous section, 76 percent of respondents in our sample who worked more than 40 hours during the previous work week for a single employer did not get paid for overtime as required by law. Figure 4.4 shows that overtime violation rates are high across all the industries in our sample, ranging from 52 percent in the food and furniture manufacturing, transportation and warehousing industries, to 92 percent for workers in the personal and repair services industry. Private household workers also had very high overtime violation rates (89 percent).

Figure 4.5 shows that overtime violation rates are high across all the occupations in our sample, but there also is substantial variation in violation rates. Rates are particularly high for child care workers, with a violation rate of fully 90 percent among those who worked more than 40 hours during the previous work week.

Table 4.1 shows the relationship between pay type and overtime violations. As was the case for minimum wage violations, non-hourly workers in our sample experienced disproportionately high overtime violation rates. Among those who worked more than 40 hours during the previous work week for a single employer, 92 percent of non-hourly workers had an overtime pay violation. This high violation rate is not surprising, since flat weekly or flat daily pay rates, by definition, do not vary with hours worked.

000040

The Reconstruction of the Labor Market in America

## Figure 4.4: Overtime Violation Rates by Industry*



Source: Authors' analysis of 2008 Unregulated Work Survey.

## Figure 4.5: Overtime Violation Rates by Occupation*



Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked more than 40 hours for a single employer during the previous work week.

000041

But hourly workers also face very high overtime violation rates: 61 percent were not paid or were underpaid for their overtime hours in the previous work week. Similarly, when employers pay workers in cash, violations of overtime pay laws are markedly high: 88 percent of these workers experienced an overtime pay violation, compared to 62 percent of those who were paid by company check.

Overtime violation rates also vary with company size. As Table 4.1 shows, front-line workers in companies with less than 100 employees had an overtime violation rate of 82 percent.[38] By contrast, workers in companies with 100 or more employees had a violation rate of 53 percent.

## Off-the-clock Violations

A large majority (70 percent) of workers in our sample who worked before and/or after their shift in the previous work week were not paid for that part of their working time. Figures 4.6 and 4.7 show these off-the-clock violation rates by industry and occupation. As was the case for overtime violations, workers employed by private households had very high off-the-clock violation rates (83 percent). The rate was even higher (88 percent) for workers in the home health care industry. The same pattern is evident when the data are divided by occupation: again, the highest off-the-clock violation rate was for home health care workers (90 percent).

As Table 4.1 shows, workers with non-hourly pay type (such as flat daily or weekly pay) had higher off-the-clock pay violation rates than those paid by the hour.

**Figure 4.6: Off-the-clock Violation Rates by Industry***



Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked before and/or after their official shift during the previous work week.

000042

The Robert Wood Johnson Foundation Commission to Build a Healthier America

**Figure 4.7: Off-the-clock Violation Rates by Occupation***



Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who worked before and/or after their official shift during the previous work week.

## Meal Break Violations

Figures 4.8 and 4.9 show meal break violation rates by industry and occupation. Among respondents who worked enough hours to qualify for a meal break, 69 percent had their breaks denied, shortened or interrupted. Violation rates were especially high for workers in care-giving occupations and industries (private households, home health care, and child care workers). Waiters, cafeteria workers and bartenders, as well as other restaurant and hotel workers, also experienced relatively high meal break violation rates, as did security guards and beauty, dry cleaning and general repair workers.

Finally, Table 4.1 shows that meal break violations rates vary by company size. Nearly three-quarters of those employed by companies with less than 100 workers had a meal break violation, compared with 64 percent of those employed by larger companies.

000043

**Figure 4.8: Meal Break Violation Rates by Industry***



| Industry | Violation Rate |
|---|---|
| Private households | 83.6% |
| Home health care | 82.7% |
| Restaurants & hotels | 75.7% |
| Personal & repair services | 75.2% |
| Apparel & textile manufacturing | 73.2% |
| Food & furniture manufacturing, transportation & warehousing | 66.8% |
| Retail & drug stores | 63.8% |
| Grocery stores | 57.3% |
| Residential construction | 54.9% |
| Security, building & grounds services | 50.7% |
| Social assistance & education | 44.4% |
| Other (finance & other health care) | 42.9% |

**Violation Rate**

Source: Authors' analysis of 2008 Unregulated Work Survey.

**Figure 4.9: Meal Break Violation Rates by Occupation***

| Occupation | Violation Rate |
|---|---|
| Child care workers | 92.0% |
| Waiters, cafeteria workers & bartenders | 85.7% |
| Security guards | 80.5% |
| Beauty, dry cleaning & general repair workers | 80.0% |
| Home health care workers | 79.0% |
| Maids & housekeepers | 76.6% |
| Sewing & garment workers | 74.0% |
| Car wash workers, parking lot attendants & drivers | 71.3% |
| Cashiers | 70.2% |
| Retail salespersons & tellers | 70.1% |
| Cooks, dishwashers & food preparers | 69.3% |
| Factory & packaging workers | 68.0% |
| Stock/office clerks & couriers | 56.7% |
| General construction | 54.4% |
| Building services & grounds workers | 35.6% |

**Violation Rate**

Source: Authors' analysis of 2008 Unregulated Work Survey.

* Calculated as a percent of workers who were legally entitled to at least one meal break during the previous work week.

000044

## Workplace Practices Associated with Lower Violation Rates

Overall, our findings paint a picture of routine violations of labor and employment laws across the wide range of industries, occupations and workplaces in our sample. But the low-wage labor market is not monolithic: sociologists and economists have long documented that that there is significant variation in employers' business strategies, even within specific industries.[39] Our survey provides additional evidence along these lines. We asked the workers in our sample about a range of employer practices at their workplace, and 49 percent indicated that their employers offered them health insurance, provided paid vacation days, paid sick days, or had given them a raise in the past year.

As Table 4.2 shows, these workplace practices—offering health insurance, providing paid vacation and sick days, and raising wages—are associated with lower violation rates, especially for minimum wage violations. These are strong correlations, and they are not surprising. Employers that offer health benefits, provide paid time off, and give regular raises are following a business model where investing in workers leads to greater productivity, lower turnover, and other benefits for the company.[40] Compliance with employment and labor laws is aligned with these workplace practices. But as our data suggest, the alignment is not perfect, pointing to the need for future research on how compliance with or violation of workplace laws intersects with other business strategies.

**Table 4.2: Workplace Violation Rates by Other Employer Practices**

| | | Percent of workers with violations | | | |
|---|---|---|---|---|---|
| | | Minimum wage violation rate | Overtime violation rate* | Off-the-clock violation rate* | Meal break violation rate* |
| **All respondents** | | 25.9 | 76.3 | 70.1 | 69.5 |
| **Employer gave worker a raise in the 12-month period prior to the survey** | No | 31.8 | 80.7 | 72.7 | 70.3 |
| | Yes | 13.7 | 68.8 | 66.6 | 68.3 |
| **Employer offered worker health insurance in the 12-month period prior to the survey** | No | 28.9 | 80.3 | 72.4 | 70.3 |
| | Yes | 12.9 | 58.1 | 54.6 | 63.4 |
| **Employer gave worker paid sick and paid vacation time in the 12-month period prior to the survey** | No | 27.9 | 80.6 | 71.6 | 70.7 |
| | Yes | 12.1 | 53.5 | 55.2 | 64.1 |

\* Calculated as a percentage of all workers who were at risk for a violation during the previous work week.

Source: Authors' analysis of 2008 Unregulated Work Survey.

## Summary

Job and employer characteristics are strong determinants of workplace violations—and in fact, have a much greater impact on violation rates than do worker characteristics, as we will see in Section 6 below. Specifically:

- Workplace violation rates vary significantly by industry and occupation. For example, minimum wage violation rates ranged from as little as 3 percent in some industries to as much as 43 percent in others, and the range across occupations is similarly wide.

- Some industries and occupations are rife with multiple violations, suggesting that non-compliance with employment and labor laws may have become a standard business practice. For example, over 40 percent of all sewing and garment workers had a minimum wage violation and 70 percent had an overtime violation. High violation rates were also typical of the private household industry. In other cases, like residential construction, violation rates were lower.

- Employers can disguise pay-related violations by using non-hourly pay arrangements and/or paying workers in cash without providing a statement of earnings and deductions. Workers paid a flat weekly rate or paid in cash had much higher violation rates than those paid a standard hourly rate and paid by company check. Informal pay systems may facilitate minimum wage and other violations, while making it harder for workers to claim their rights under the law.

- Finally, workers employed by companies with less than 100 employees were at greater risk of experiencing violations than those employed by larger companies. But the problem of workplace violations is by no means limited to small firms. In our sample, nearly one out of six workers at large companies had a minimum wage violation in the previous week, and among those who worked overtime, over half were underpaid or not paid at all for the extra hours.

000046

000047



# 5

# The Role of Worker Characteristics

Workplace violations are not evenly distributed throughout the low-wage labor market, as we have seen, but vary with industry, occupation and other job and employer characteristics. These variations have a demographic dimension as well. Workers' gender, race/ethnicity, and nativity are all strongly related to the industries and occupations in which they are employed, and also may have independent effects on violation rates. In this section we examine workplace violations in relation to gender, race/ethnicity, education, age and nativity; and among the foreign-born, by date of arrival in the U.S., English-language proficiency and immigration status.

Each type of workplace violation discussed here—being paid less than the minimum wage, not being paid properly for overtime work, working off the clock, and not receiving legally required meal breaks—has a distinctive pattern of distribution across these demographic variables; for this reason we discuss each one separately below.

# Minimum Wage Violations

As Table 5.1 shows, 30 percent of the women workers in our sample experienced minimum wage violations, compared to 20 percent of the men.[41] Minimum wage violation rates also varied with race and ethnicity: nearly a third of Latino workers in our sample experienced minimum wage violations, compared to 8 percent of white respondents. Nativity is also a salient factor here: 31 percent of foreign-born workers had minimum wage violations, nearly twice the rate for their U.S.-born counterparts.

**Table 5.1: Minimum Wage Violation Rates by Worker Characteristics**

| | | Percent of workers with violations | | |
| --- | --- | --- | --- | --- |
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 25.9 | 15.6 | 31.1 |
| **Gender** | Male | 19.5 | 14.9 | 21.9 |
| | Female | 30.2 | 16.1 | 37.4 |
| **Race/ethnicity** | Latino/Latina | 32.8 | 16.6 | 35.1 |
| | Black | 19.1 | 18.4 | 30.2 |
| | Asian/other | 15.1 | N/A | N/A |
| | White | 7.8 | 5.6 | 10.1 |
| **Education** | Less than high school, no GED | 32.9 | 24.6 | 37.2 |
| | High school graduate or GED | 23.1 | 13.6 | 27.9 |
| | Some college or higher | 18.8 | 10.4 | 23.1 |
| **Age** | 18-25 | 27.0 | 19.7 | 30.8 |
| | 26-35 | 25.1 | 11.5 | 32.1 |
| | 36-45 | 24.6 | 15.5 | 29.3 |
| | 46+ | 27.0 | 15.0 | 33.0 |
| **Vocational training** | None | 27.3 | 16.4 | 32.9 |
| | Completed training program | 22.5 | 13.9 | 26.8 |
| **Job tenure** | Less than 3 years | 27.9 | 17.1 | 33.5 |
| | 3-4 years | 23.2 | 14.5 | 27.7 |
| | 5+ years | 17.6 | 10.2 | 21.4 |
| **Foreign-born respondents:** | | | | |
| **Legal status** | Authorized | | | 21.3 |
| | Unauthorized | | | 37.1 |
| **Years since arrival in the U.S.** | Less than 6 years | | | 32.4 |
| | 6+ years | | | 30.5 |
| **English proficiency** | Speaks very well or well | | | 23.7 |
| | Speaks not well or not at all | | | 32.6 |

N/A indicates that the data were insufficient to permit reliable estimates.                    Source: Authors' analysis of 2008 Unregulated Work Survey.

000049

Gender, nativity and race/ethnicity are deeply intertwined, and the aggregate patterns shown in Table 5.1 do not fully reveal the complex interrelationships among these categories. For example, minimum wage violation rates for Latino workers vary significantly by gender: Latina workers had a violation rate of 40 percent, compared to 24 percent for their male counterparts (not shown). Similarly, as Figure 5.1 shows, the high violation rates for foreign-born workers are concentrated among women, especially among unauthorized immigrants: nearly half (47 percent) of female unauthorized immigrants in our sample had minimum wage violations in the previous week, compared to 30 percent of their male counterparts. Authorized female immigrants also had a much higher minimum wage violation rate than their male counterparts; for the native-born, however, women and men had similar violation rates.[42]

**Figure 5.1: Minimum Wage Violation Rates by Gender, Nativity and Legal Status**



Source: Authors' analysis of 2008 Unregulated Work Survey.

As noted, U.S.-born workers in our sample had lower minimum wage violation rates than foreign-born workers. But here too the story is more nuanced, as shown in Table 5.1. For example, foreign-born Latinos had an especially high minimum wage violation rate of 35 percent, double the rate of U.S.-born Latinos and nearly six times the rate of U.S.-born whites. And race plays a marked role among U.S.-born respondents, where African-American workers had a violation rate three times that of white workers (this difference is statistically significant; a similar pattern holds when comparing U.S.-born Latino and white workers, but the difference is not statistically significant).

Education plays an important role in predicting minimum wage violation rates. Workers without a high-school degree or GED have violation rates that are significantly higher than those of workers with a high-school degree or who have attended college (see Table 5.1). This relationship holds for both U.S.-born and foreign-born workers. That said, higher education does not completely insulate workers from minimum wage violations. And while violation rates are lower for workers who had vocational training, the effect is not statistically significant.

Immigrants who speak English "well" or "very well" (as self-reported) had significantly lower minimum wage violation rates than those who speak "not well" or "not at all" (see Table 5.1). However, violation rates for immigrants varied surprisingly little between recent arrivals and those who are more settled in the U.S. As Table 5.1 shows, foreign-born respondents who had lived in the U.S. six or more years at the time of the survey had a minimum wage violation rate similar to that of newcomers.

Job tenure and age are often strong predictors of labor market outcomes, such as higher wages, benefits, promotions, and the like. But in our sample of workers, only job tenure had a statistically significant effect on minimum wage violations; age had virtually no effect (see Table 5.1).[43]

000050

# Overtime Violations

Overtime violations vary much less among demographic groups than do minimum wage violations. For respondents who worked more than 40 hours for a single employer during the previous work week, the prevalence of overtime violations is very high across virtually all demographic groups, as Table 5.2 shows.

**Table 5.2: Overtime Violation Rates by Worker Characteristics**

| | | Percent of workers with violations* | | |
|---|---|---|---|---|
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 76.3 | 68.2 | 80.4 |
| **Gender** | Male | 74.5 | 64.7 | 79.6 |
| | Female | 78.8 | 73.5 | 81.6 |
| **Race/ethnicity** | Latino/Latina | 77.6 | 69.6 | 78.6 |
| | Black | 63.9 | 64.2 | 46.9 |
| | Asian/other | 78.0 | 66.3 | 84.9 |
| | White | 82.3 | N/A | N/A |
| **Education** | Less than high school, no GED | 81.7 | 76.9 | N/A |
| | High school graduate or GED | 78.5 | 71.8 | N/A |
| | Some college or higher | 74.7 | 61.5 | N/A |
| **Age** | 18-25 | 76.2 | 74.5 | 77.2 |
| | 26-35 | 70.5 | 65.6 | 73.0 |
| | 36-45 | 79.6 | 66.1 | 86.5 |
| | 46+ | 79.7 | 74.4 | 82.4 |
| **Vocational training** | None | 76.3 | 68.0 | 80.6 |
| | Completed training program | 76.1 | 68.8 | 79.8 |
| **Job tenure** | Less than 3 years | 78.3 | 72.7 | 81.1 |
| | 3-4 years | 76.6 | 67.6 | 81.5 |
| | 5+ years | 66.9 | 57.4 | 71.7 |
| **Foreign-born respondents:** | | | | |
| **Legal status** | Authorized | | | 67.2 |
| | Unauthorized | | | 84.9 |
| **Years since arrival in the U.S.** | Less than 6 years | | | 85.8 |
| | 6+ years | | | 77.4 |
| **English proficiency** | Speaks very well or well | | | 70.0 |
| | Speaks not well or not at all | | | 82.7 |

\* Calculated as a percent of workers who worked more than 40 hours for a single employer during the previous work week.

N/A indicates that the data were insufficient to permit reliable estimates.

Source: Authors' analysis of 2008 Unregulated Work Survey.

000051

One of the few significant differences is by nativity: immigrant workers in our sample had an 80 percent overtime violation rate, compared to 68 percent for the U.S.-born.

While nativity, by itself, has a significant effect on overtime violation rates, there are also substantial differences *among* immigrants by documentation status. Unauthorized workers had very high overtime violation rates, with 85 percent of those who worked over 40 hours a week for a single employer reporting that they were not paid the legally required time-and-a-half pay rates for those extra hours, compared to 67 percent for authorized immigrant respondents.

Race, gender, job tenure, vocational training, education, English proficiency, and age do not appear to have any systematic relationship to overtime violation rates.

## Off-the-clock Violations

The patterns for off-the-clock violations are similar to those for overtime. As Table 5.3 shows, foreign-born respondents had higher off-the-clock violation rates than their U.S.-born counterparts; however, this difference is relatively small and not statistically significant. What is most striking here is how little the off-the-clock violation rates vary across demographic groups; among those at risk for this violation, even white workers, males, and the U.S.-born in our sample have high violation rates. That said, we found that off-the-clock violations increase with workers' age; older workers have significantly higher violation rates than younger workers. This relationship was especially strong for foreign-born workers in our sample.

## Meal Break Violations

Meal break violations also show very limited variation across demographic categories. Meal break violation rates were higher for women than for men, and higher for foreign-born than for U.S.-born respondents, and lower for older U.S.-born workers, as Table 5.4 shows. There were no other statistically significant differences for this violation.

**Table 5.3: Off-the-clock Violation Rates by Worker Characteristics**

| | | Percent of workers with violations* | | |
|---|---|---|---|---|
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 70.1 | 67.0 | 71.6 |
| **Gender** | Male | 67.4 | 69.4 | 66.3 |
| | Female | 71.5 | 67.0 | 73.7 |
| **Race/ethnicity** | Latino/Latina | 68.0 | N/A | 68.2 |
| | Black | 63.1 | N/A | 26.7 |
| | Asian/other | 81.1 | N/A | N/A |
| | White | 69.8 | N/A | 74.2 |
| **Education** | Less than high school, no GED | 73.2 | 69.4 | 75.0 |
| | High school graduate or GED | 68.1 | 64.1 | 70.4 |
| | Some college or higher | 68.1 | 69.2 | 67.6 |
| **Age** | 18-25 | 61.1 | 62.2 | 60.5 |
| | 26-35 | 72.5 | 56.3 | 80.8 |
| | 36-45 | 77.2 | 73.4 | 79.1 |
| | 46+ | 79.4 | 79.8 | 79.2 |
| **Vocational training** | None | 69.2 | 65.9 | 70.9 |
| | Completed training program | 72.3 | 67.9 | 74.5 |
| **Job tenure** | Less than 3 years | 69.5 | N/A | 70.0 |
| | 3-4 years | 77.9 | N/A | 82.6 |
| | 5+ years | 73.2 | N/A | 74.3 |
| **Foreign-born respondents:** | | | | |
| **Legal status** | Authorized | | | 68.9 |
| | Unauthorized | | | 76.3 |
| **Years since arrival in the U.S.** | Less than 6 years | | | 65.8 |
| | 6+ years | | | 74.5 |
| **English proficiency** | Speaks very well or well | | | 67.3 |
| | Speaks not well or not at all | | | 74.6 |

\* Calculated as a percent of workers who worked before and/or after their official shift during the previous work week.

Source: Authors' analysis of 2008 Unregulated Work Survey.

N/A indicates that the data were insufficient to permit reliable estimates.

000053

**Table 5.4: Meal Break Violation Rates by Worker Characteristics**

| | | Percent of workers with violations* | | |
| --- | --- | --- | --- | --- |
| | | All workers | U.S.-born | Foreign-born |
| **All respondents** | | 69.5 | 64.4 | 72.1 |
| **Gender** | Male | 64.6 | 59.5 | 67.2 |
| | Female | 74.4 | 72.4 | 75.4 |
| **Race/ethnicity** | Latino/Latina | 68.2 | 67.5 | 68.9 |
| | Black | 64.0 | 64.4 | 59.8 |
| | Asian/other | 68.2 | 69.4 | 66.5 |
| | White | N/A | N/A | N/A |
| **Education** | Less than high school, no GED | 70.3 | 66.7 | 72.1 |
| | High school graduate or GED | 74.2 | 71.4 | 75.7 |
| | Some college or higher | 64.1 | 53.0 | 69.8 |
| **Age** | 18-25 | 71.8 | 72.8 | 71.3 |
| | 26-35 | 70.8 | 63.0 | 74.7 |
| | 36-45 | 69.2 | 62.0 | 72.8 |
| | 46+ | 64.9 | 54.2 | 70.3 |
| **Vocational training** | None | 69.5 | 64.9 | 71.9 |
| | Completed training program | 70.7 | 63.8 | 74.2 |
| **Job tenure** | Less than 3 years | 68.9 | 65.5 | 70.6 |
| | 3-4 years | 71.1 | 62.8 | 75.4 |
| | 5+ years | 71.0 | 63.4 | 74.9 |
| **Foreign-born respondents:** | | | | |
| **Legal status** | Authorized | | | N/A |
| | Unauthorized | | | N/A |
| **Years since arrival in the U.S.** | Less than 6 years | | | 72.6 |
| | 6+ years | | | 71.7 |
| **English proficiency** | Speaks very well or well | | | 71.3 |
| | Speaks not well or not at all | | | 72.6 |

\* Calculated as a percent of workers who were legally entitled to at least one meal break during the previous work week.

Source: Authors' analysis of 2008 Unregulated Work Survey.

N/A indicates that the data were insufficient to permit reliable estimates.

## Summary

Gender, nativity, race and ethnicity all play a role in shaping at least some of the workplace violations discussed here. But these dimensions are deeply intertwined, and need to be examined together in order to understand which groups of workers are most at risk of a violation.

- Women were significantly more likely than men to experience minimum wage violations, and foreign-born workers were nearly twice as likely as their U.S.-born counterparts to have a minimum wage violation.

- But the higher minimum wage violation rates for foreign-born respondents were concentrated among women—especially women who are unauthorized immigrants, nearly half of whom had a minimum wage violation in the previous week.

- Foreign-born Latino workers had the highest minimum wage violation rates of any racial/ethnic group. And among U.S.-born workers, there was a significant difference by race: the violation rate for African-American workers was triple that of their white counterparts (who had by far the lowest violation rates in the sample).

- Higher levels of education, longer job tenures, and proficiency in English (for immigrants) all offered some protection from minimum wage violations. That said, even college-educated workers and those who had been with their employers for five or more years were still at significant risk.

- Two factors had a surprisingly weak impact on violation rates: the worker's age (except for off-the-clock violations), and for immigrants, number of years in the U.S.

- In contrast to minimum wage violations, overtime and especially off-the-clock and meal break violations varied little across the various demographic categories.

000055



# Wage Theft in America's Cities

In this report, we have documented that violations of core employment and labor laws are pervasive in America's largest urban labor markets. Minimum wage, overtime, meal break and other violations are not confined to the periphery of the economy or to marginal employers. On the contrary, such violations are widespread across demographic categories and in key industries and occupations that are at the heart of urban economies in the 21st century.

## Assessing the Role of Job and Worker Characteristics

As we have seen, a range of job and worker characteristics are correlated with workplace violations. Further analysis (see Appendix A for details) reveals that job and worker characteristics have *independent effects* on the violations we have documented in this report. Both matter, but they are not of equal importance. On the contrary, job and employer characteristics are far more powerful predictors of violation rates than are worker characteristics—especially when it comes to minimum wage, overtime and meal break violations.

Violation rates vary not only across industries and occupations but also with other factors, such as company size, pay arrangements, and compensation packages. Indeed, some employer practices, such as offering health insurance, providing paid sick and vacation days, and providing workers regular pay raises, are correlated with lower violation rates. More generally, our findings suggest that employers' business strategies shape their decisions about whether or not to comply with the law.

## The High Cost of Workplace Violations

It should come as no surprise that the extensive violations of employment and labor laws documented in this report directly impact the earnings of low-wage workers. The various forms of nonpayment and underpayment of wages take a heavy monetary toll on these workers and their families. For the workers in our sample who experienced a pay-based violation in the previous week, the average amount of lost wages was $51, out of average weekly earnings of $339. That amounts to wage theft of 15 percent. Assuming a full-year work schedule, we estimate that these workers lost an average of $2,634 annually due to workplace violations, out of total annual earnings of $17,616.

Furthermore, we estimate that in a given week, approximately 1,114,074 workers in the three cities have at least one pay-based violation. Extrapolating from this figure, front-line workers in low-wage industries in Chicago, Los Angeles and New York City lose more than $56.4 million *per week* as a result of employment and labor law violations. The largest portion of these lost wages is due to minimum wage violations (58 percent), followed by overtime violations (22 percent), rest break violations (10 percent), and off-the-clock violations (8 percent).[44]

Wage theft not only depresses the already meager earnings of low-wage workers, it also adversely impacts their communities and the local economies of which they are part. Low-income families spend the large majority of their earnings on basic necessities, such as food, clothing and housing. Their expenditures circulate through local economies, supporting businesses and jobs. Wage theft robs local communities of this spending, and ultimately limits economic growth.

000057



# The Solution: Fulfilling the Promise of Worker Protections in America

This report exposes a world of work in which the core protections that many Americans take for granted—the right to be paid at least the minimum wage, the right to be paid for overtime hours, the right to take meal breaks, access to workers' compensation when injured, the right to advocate for better working conditions—are failing significant numbers of workers. The sheer breadth of the problem, spanning key industries in the economy, as well as its profound impact on workers, entailing significant economic hardship, demands urgent attention—and action.

The three cities that we studied—Chicago, Los Angeles and New York City—are not unique. Across the country, community groups, legal advocates and regulatory officials are increasingly documenting the spread of workplace violations: in tomato farms in Florida, poultry processing plants in the Midwest and South, hotels in Miami, nursing homes in Dallas, day care centers in Kansas City, gas stations in Minneapolis, and residential construction in almost every town and city where there are day labor hiring sites.[45]

What, then, can be done? Our starting point is that everyone has a stake in addressing the problem of workplace violations. When low-wage workers and their families struggle in poverty and face constant economic insecurity, the strength and resilience of local communities suffers. When responsible employers are forced to compete with unscrupulous employers who violate core workplace laws by paying subminimum wages or cost-cutting on worker safety, the result is a race to the bottom that threatens to bring down standards throughout the labor market. And when significant numbers of workers are illegally underpaid, tax revenues are lost to the wider community.

In short, public policy has a fundamental role to play in protecting the rights of workers. Drawing on our own study as well as research and policy analysis by other organizations working in this area, we have identified three key principles that should drive the development of a strong policy agenda at the federal, state and local levels.[46]

The Social Security Administration and the Immigration Reform...

1. **Strengthen Government Enforcement of Employment and Labor Laws**

Government enforcement is the cornerstone of any viable response to workplace violations —but just as the need for worker protections has become most acute, enforcement efforts at both the federal and state level have weakened. Public policy must recognize the significant resources and power that reside with the various agencies responsible for enforcing wage and hour, health and safety, prevailing wage, anti-discrimination, and right-to-organize laws. Tapping the often unrealized potential of these agencies will require additional funding to increase staffing, but even more important, a new set of strategies to address the reality that workplace violations are becoming standard practice in many low-wage industries.[47] Government enforcement agencies should:

- **Move toward proactive, "investigation-driven" enforcement in low-wage industries, rather than reacting to complaints as they come in.** This means identifying industries where violations are systemic, conducting strategic, repeated and well-publicized workplace audits, and cracking down on employers who are repeat offenders as well as those who misclassify their workers. The goal should be to send industry-wide signals that the government will pursue violations, and that the likelihood of inspection is tangible. Data such as those contained in this report on the industries and occupations most at risk of violations can help agencies in targeting their proactive enforcement efforts.[48]

- **Increase the reach and effectiveness of enforcement by partnering with immigrant worker centers, unions, service providers, legal advocates and, where possible, responsible employers.**[49] Government alone will never have enough staff and resources to monitor every workplace in the country on a regular basis. Community partnerships can provide the vital "ears on the ground" to identify where workplace violations are most concentrated, as exemplified by recent innovative state-level collaborations with community groups.[50]

- **Restore funding levels for enforcement agencies to increase the number of investigators and other staff.** Between 1980 and 2007, the number of inspectors enforcing federal minimum wage and overtime laws declined by 31 percent, even as the labor force grew by 52 percent.[51] Similarly, the budget of the Occupational Safety and Health Administration has been cut by $25 million in real dollar terms between 2001 and 2007; at its current staffing and inspection levels, it would take the agency 133 years to inspect each workplace just once.[52] While the U.S. Department of Labor has recently added investigator staff, significantly more are needed to match the growth in the number of workplaces that has occurred over the past several decades.

- **Strengthen penalties for violations.** Currently, penalties for many workplace violations are so modest that they fail to deter many employers. For example, the savings to employers from paying their workers less than the minimum wage often outweigh the costs, even for those few who are apprehended. Enforcement agencies therefore need to fully pursue existing penalties for violations of wage and hour laws, health and safety regulations, and other established legal standards. But even more important, those penalties need significant strengthening and updating, to better ensure compliance and deterrence.

000059

**2.  Update Legal Standards for the 21st Century Workplace**

Strong enforcement is important, but so are strong legal standards that recognize the changing organization of work in the United States. Specifically, changes are needed on three fronts:

- Strengthen legal standards: The strength of laws and the strength of their enforcement are deeply intertwined: weak employment and labor laws send the wrong signal, opening the door to low-road business strategies to cut labor costs. When the bar is set too low, employers have little or no incentive to comply. Raising the minimum wage, updating health and safety standards, expanding overtime coverage, and strengthening the right of workers to organize through labor law reform—all are key improvements that will raise compliance in the workplace and improve the competitive position of employers who play by the rules.

- Close coverage gaps: Some employers exploit historical "coverage gaps" that exclude certain categories of workers from protection; these gaps must be closed once and for all. For example, as discussed above, home health care and domestic workers are not fully covered by employment and labor laws.

- Hold employers responsible for their workers: Employment and labor laws must be updated when unscrupulous employers devise new strategies for evading their legal obligations—such as misclassifying workers as independent contractors and subcontracting work to fly-by-night operators who break the law. The principle should be that employers are responsible for the workplace standards they control, whether directly or indirectly.

**3.  Establish Equal Status for Immigrants in the Workplace**

The best inoculation against workplace violations is workers who know their rights, have full status under the law to assert them, have access to sufficient legal resources, and do not fear exposure or retaliation when bringing claims against their employers. Achieving this is always a substantial challenge—but for unauthorized immigrant workers, it can be a near impossibility. While in theory, unauthorized workers are covered by most employment and labor laws, in practice, they are effectively disenfranchised in the workplace, by the lack of legal status, fear of deportation, and the willingness of all too many employers to exploit their vulnerability. The result is the high prevalence of workplace violations among unauthorized immigrants that we document in this report. Any policy initiative to reduce workplace violations must therefore act on two fronts:[53]

- Prioritize equal protection and equal status in national immigration reform: Comprehensive immigration reform without close attention to labor market impacts and workers' rights will push more workers into the informal economy, leading to greater insecurity for immigrant families and less economic integration. A guiding principle for reform must be that immigrant workers receive equal protection and equal status in the workplace.[54] This means guaranteeing all immigrants the full protection and remedies under U.S. employment and labor law. Any immigration reform that creates a second class of workers will only worsen the problems exposed in this report, ultimately hurting all U.S. workers.

> ■ **Ensure status-blind enforcement of employment and labor laws by maintaining a strong firewall between workplace and immigration inspections:** Agencies enforcing minimum wage, prevailing wage, overtime, and other workplace laws can and should create a firewall between themselves and immigration authorities, so that workers do not fear deportation when bringing a wage claim or workplace grievance. Without this protection, unauthorized workers will be driven further underground, too fearful to claim their right to workplace protections.

■ ■ ■

Government enforcement is only part of the solution. Just as important is that public policy helps to foster the efforts of immigrant worker centers and unions to represent and organize low-wage workers, enhances the capacity of legal services organizations to support workers in claiming their rights, and facilitates the efforts of private attorneys to advance strategic litigation. Public policies also need to support responsible employers. Above all, strong, vibrant employment and labor laws must be integrated into the broader policy agenda to rebuild good jobs and economic opportunity in 21st century America.

000061



# Appendix A:
# Data and Methods

An exhaustive, in-depth technical report describing the methods used in this study is available upon request from the authors; in this appendix we give a non-technical overview of our survey methodology.

## Defining the Survey Population

Our goal in this study was to survey workers in low-wage industries in Chicago, Los Angeles and New York City.[55] More precisely, in order to be included in our study, workers had to be:

   **a.** age 18 or older, and currently working for an employer within the limits of Los Angeles County, Cook County (Chicago), or the five boroughs of New York City;

   **b.** "front-line" workers, i.e. not managers, professionals or technical workers (many of these groups are not covered by key laws such as those regarding minimum wage and overtime); and

   **c.** working in a low-wage industry as their primary job.

To determine which industries to include in our sampling universe, we used an analysis of the 2006 Current Population Survey (CPS) conducted by the Center for Economic Policy Research, to identify the median hourly wage in each city for all workers age 18 or older who were not self-employed: in Chicago, $14.85; Los Angeles, $14.00; New York City $15.38 (in 2006 dollars). We then defined "low-wage industries" as those whose median wage for front-line workers was less than 85 percent of the city's median wage: in Chicago, $12.62; in Los Angeles, $11.90; in New York City $13.07 (in 2006 dollars). This 85 percent threshold is one of several commonly used measures used to identify low-wage industries or jobs.[56]

The sample size used in the CPS is too small to allow estimates of median wages at the detailed industry level. We therefore used 2000 Census data to generate a list of industries in each city that fell below 85 percent of the city's median hourly wage; the resulting industry and occupation distribution for our sample is shown in Table 2.1.

## Sampling Methodology

As described in Section 2, standard surveying techniques—phone interviews or Census-style door-to-door interviews—rarely are able to fully capture the population that we are most interested in: low-wage workers who may be hard to identify from official databases, who may be vulnerable because of their immigration status, or who are reluctant to take part in a survey because they fear retaliation from their employers. Trust is also an issue when asking for the details about a worker's job, the wages they receive, whether they are paid off the books or not, and their personal background.

In light of these difficulties, we adopted an innovative sampling method that operates through respondents' own social networks. All of the workers in the low-wage worker population have friends, family, or co-workers that they come into regular contact with and rely on for support; thus our approach relied on a system in which survey respondents recruited people they already knew into the survey, a recruitment technique known as chain-referral sampling.

The best known sampling method using this form of recruitment is snowball sampling, an approach that yields only convenience samples which are not representative of the target population. Snowball sampling cannot replicate the desirable properties of probability sampling methods that allow one to

56

make inferences about the population based on sample data. This method therefore would not have fulfilled the aims of our study.

To overcome this limitation, we adopted a newer form of chain-referral sampling, developed by co-author Douglas Heckathorn in the late 1990s.[57] This method was subsequently further developed in collaboration with other scholars. Called *Respondent-Driven Sampling* (RDS), it is based on a mathematical model of the social networks that connect survey respondents. Since some individuals or groups tend to have more social connections than others, they are more likely to be recruited into a survey. To make the results of an RDS-based survey representative of the whole population (and not just workers with large social networks), we weighted our data based on respondents' social network size—that is, based on their probability of being captured by our survey technique—as well as other features of the network which can affect the sampling process.

In addition, RDS features an important difference from snowball and other traditional chain-referral methods: it employs a dual-incentive structure. This approach involves remunerating respondents not only for the time they spend responding to the survey, but also for each eligible population member they recruit into the survey. To increase the breadth of the social network captured by the sample (and to prevent a cottage industry of survey recruitment), the number of recruitments that each respondent can make is limited through a coupon-based quota system.

Our RDS survey began with an initial set of population members to be surveyed, which we located through our contacts in each city. These "seeds" were then given a fixed number of uniquely numbered dollar-bill sized coupons to pass on to other eligible population members. These recruits then brought the coupons to one of several survey sites, where the number on the coupon was recorded, the recruit was surveyed, and then the respondent was given a fixed number of coupons with which to recruit other workers.[58] This process was repeated over a period of several months, yielding large numbers of respondents in each city (see Table A.1). As the recruitment progressed, the sample became increasingly diverse, eventually becoming independent of the initial sample of "seeds."

**Table A.1: Summary of Survey Fielding**

|  | Chicago | New York City | Los Angeles |
| --- | --- | --- | --- |
| Fielding period | January—June 2008 | March—August 2008 | April—August 2008 |
| Number of sites | 4 | 5 | 7 |
| Number of interviewers, translators and researchers on staff | 18 | 22 | 22 |
| Monetary incentive for being surveyed | $30 | $50 | $30 |
| Number of valid surveys completed | 1,140 | 1,432 | 1,815 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

An important part of the RDS method is clearly communicating to recruiters which types of workers are eligible for the survey. We converted the list of industries being sampled into simple job titles to use as criteria for recruitment into the survey. This information was communicated to respondents with flyers in multiple languages that included drawings of the target jobs that were distributed to all recruiters along with their coupons.

000064

## Respondent-driven Sampling in the Field

In each city, our research teams identified interview sites that were well recognized and welcoming to low-wage workers. Our sites included spaces in community colleges, churches, social service agencies and community-based organizations—neutral spaces that offered privacy and anonymity to workers. Recruitment coupons served as an ID, so that workers did not have to show identification at building entrances.

As shown in Table A.1, Chicago entered the field in January 2008 and exited at the end of June 2008. This was a firm deadline since Illinois increased its state minimum wage on July 1, 2008; we wanted to avoid having our survey straddle a minimum wage increase, since many of our core violation measures are linked to that legal standard. New York City entered the field at the beginning of March and exited in the first week of August. Los Angeles entered the field at the beginning of April—here we delayed the start of the process to allow time for the January 1, 2008 increase in the California minimum wage to be absorbed in the labor market—and exited the field at the very end of August. Altogether, we completed 4,387 surveys.

## Post-stratification Adjustments to the Data

One feature of the RDS methodology is the ability to conduct detailed tracking of recruitment patterns throughout the entire sampling period, in order to identify and adjust for deviations from pure random recruitment from respondents' social networks. For example, recruitment might be driven by strong social identities, such as race, ethnicity or age, so that respondents recruit disproportionately within their own group.

The RDS methodology anticipates that personal networks are not randomly distributed, and therefore adjusts for small to moderate levels of network clustering (people having ties to others like them), in the form of post-sampling weights. For example, if the sample contained more members of a given group than would be expected under purely random sampling, then cases in that group are given less weight in analyses of the data.  However, if network clustering becomes pronounced on one or more dimensions, then it is necessary to use additional, external sources of data in order to weight the final sample to be representative of the intended population.

In our study, we identified high levels of non-random recruitment among several racial/ethnic groups (the specific groups varied by city), as well as between US-born and foreign-born workers. (We did not find high levels of non-random recruitment on other dimensions, such as the workers' industry and occupation, employer, or most important, the experience of workplace violations).

That meant that RDS generated representative samples within the various race/ethnic/nativity groups, but not across the sampling universe as a whole—in effect, our study generated multiple sub-samples. To address this problem, we generated RDS violation rate estimates within each of the sub-samples (which are representative), and then recombined them using a weighting system based on estimates of the relative sizes of the race/ethnic/nativity groups in order to generate an overall estimate.

Specifically, we adjusted each city's sample to match the racial/ethnic and nativity distribution of the 2007 American Community Survey (ACS), with one modification.[59] Since standard government surveys tend to undersample unauthorized immigrants,[60] we developed an adjustment to the ACS race/ethnicity/ nativity distribution drawing on estimates of the number of unauthorized workers in each city in 2005.[61]

These adjustments, combined with the success of the RDS methodology in capturing hard-to-reach populations, are designed to ensure that our sample is representative of front-line workers in low-wage industries in each city. Such post-stratification adjustments are standard in complex social surveys; all surveys are subject to sampling error, and thus are almost universally adjusted using demographic distributions generated by the Census or other large surveys. This is a mechanism to enable the extra information available in supplementary surveys (in our case the ACS) to be incorporated in the estimates, improving accuracy.

In Table A.2, we summarize our estimates of the number of workers in each city that our sample represents—altogether, about 1.64 million workers, which we estimate represent roughly 31 percent of the front-line workers, and 15 percent of all workers, across the three cities.

**Table A.2: Profile of Cities Surveyed**

|  | Three cities combined | Chicago | New York City | Los Angeles |
|---|---|---|---|---|
| Estimated number of front-line workers in low-wage industries | 1,640,747 | 310,205 | 586,322 | 744,220 |
| Percentage of all front-line workers | 31.4 | 25.1 | 31.0 | 34.4 |
| Percentage of all workers | 15.1 | 12.2 | 14.2 | 17.0 |

Source: Authors' analysis of 2008 Unregulated Work Survey.

## Modeling the Impact of Worker and Job Characteristics on Violation Rates

In Section 6 above, we discussed the relative weight of job/employer characteristics compared to worker characteristics in accounting for the overall variation in workplace violation rates. That discussion is based on a series of logistic regression models we used to estimate the effects of selected independent variables on minimum wage, overtime, off-the-clock, and meal break violation rates.

Specifically, we considered two groups of independent variables. The job characteristics group consisted of industry, occupation, pay arrangement, company size, whether or not the employer was a temp agency, and whether or not the worker belonged to a union. The worker characteristics group consisted of gender, race, nativity, documentation status, education, age, job tenure, and whether or not the worker had received vocational training.

Our strategy was to estimate (a) the unique contribution of the group of job characteristics variables, above and beyond the impact of worker characteristics, and (b) the unique contribution of the group of worker characteristics variables, above and beyond the job characteristics. Both groups of variables were generally significant.[62] But the strength of their impact differed substantially. Job characteristics were 4.0 times stronger than worker characteristics in predicting minimum wage violation rates; 10.0 times stronger in predicting overtime violation rates; 1.8 times stronger in predicting off-the-clock violation rates; and 12.8 times stronger in predicting meal break violation rates.[63]

# Endnotes

1   Bhattarai (2009).

2   Larrubia (2008).

3   Illinois Circuit Court (2009).

4   Greenhouse and Rosenbloom (2008).

5   Bennett (2008).

6   Hall, Alexander and Ordoñez (2008) and St. Onge et al. (2008).

7   Associated Press (2008).

8   See Advincula (2009), Arriero (2009), Matza (2008), Schwartz (2009), and Southern Poverty Law Center (2009).

9   According to a report by the United States Government Accountability Office (2009), the U.S. Department of Labor did not even keep track of all the complaints that came before it in recent years.

10  The exceptions here are: (1) the random compliance surveys conducted by the U.S. Department of Labor in 1999 (United States Department of Labor 2001), and (2) the misclassification of independent contractors, where state agencies have been able to use administrative data to robustly estimate the extent of misclassification (Carré and Wilson (2004), DeSilva et al. (2000), and United States General Accountability Office (2006)).

11  See Asian American Legal Defense and Education Fund and YKASEC (2006), Bernhardt et al. (2008), Bernhardt, McGrath and DeFilippis (2007),  Bobo (2008), Cordero-Guzmán, Smith and Grosfoguel (2001), Domestic Workers United & Datacenter (2006), Fiscal Policy Institute (2007a, 2007b), Flaming, Haydamack and Joassart (2005), Gordon (2005), Greenhouse (2008), Hale and Wills (2005), Hondagneu-Sotelo (2001), Levin and Ginsburg (2000), Make the Road by Walking and Retail, Wholesale, and Department Store Union (2005), McGrath (2005), Mehta et al. (2002), Milkman (2006), Ness (2005), New York Taxi Workers Alliance (2003), Restaurant Opportunities Center of New York and New York City Restaurant Industry Coalition (2005, 2006, 2009), Southern Poverty Law Center (2009), Theodore, Valenzuela and Meléndez (2006), Tucker-Welch (2004), Valenzuela et al. (2006), Weil and Pyles (2005, 2007), and Workers Defense Project (2009).  At the international level, see Piore (2007) and Schrank and Piore (2007).

12  Authors' calculations from the U.S. Bureau of the Census, American Community Survey, pooled years 2005-2007, for Chicago (Cook County), Los Angeles (Los Angeles County) and New York City (the five boroughs). Found at: http://factfinder.census.gov/home/saff/main.html?_lang=en.

13  With the help of employment and labor law lawyers, we created an exhaustive and detailed inventory of state and federal laws relevant to a particular workplace standard (such as the minimum wage) in California, Illinois, and New York. We then used these legal rules to determine whether or not the workers in our sample experienced a given workplace violation (see Section 3 for more details).

14  Respondents self-identified their race/ethnicity to the interviewers, and could choose multiple races/ethnicities. All respondents who listed Latino/Latina in combination with other races/ethnicities were coded as Latino/Latina; therefore, the remaining categories are all non-Hispanic. In addition, because our sample includes only small numbers of Pacific Islanders, American Indians, Native Hawaiians, Alaska Natives, and people of mixed race, we included these groups, along with self-identified Asians, in the "Asian/other" category shown in the table.

15  All of the violation rates reported in this section are statistically significant, meaning they are significantly different from zero. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)).

16  Employers are legally required to pay their non-exempt workers at least the minimum wage. Not all workers are covered, and some aspects of coverage vary by state. For example, Illinois' minimum wage law exempts domestic workers, but they are covered by the federal minimum wage. For more details on exemptions from the minimum wage, see the Unregulated Work Survey Technical Report (available upon request from the authors).

17  Nearly every worker we surveyed was at risk of a minimum wage violation, with the exception of child care workers who work in their own homes.

18  If workers worked more than 40 hours in the previous week, we asked how much they were paid for those hours. If the stated amount was less than time and a half their regular wage, they were counted as having an overtime violation. For more details on the laws governing overtime, see the Unregulated Work Survey Technical Report (available upon request from the authors).

19  Off-the-clock work can be defined more broadly than how we have defined it here, and can happen during the middle of a workday when workers are instructed to "punch out" but continue to work. Our survey only captures off-the-clock work that occurred before or after a shift.

20  For more detail regarding state laws, see the Unregulated Work Survey Technical Report (available upon request from the authors).

21  There are some variations by state; for more details about deductions, see the Unregulated Work Survey Technical Report (available upon request from the authors).

22  These protections stem from a mix of federal and state laws; see the Unregulated Work Survey Technical Report (available upon request from the authors).

23  Legal protections vary depending on the subject of a worker's complaint and whether they complained alone or with co-workers. For more details about retaliation law and our measures, see the Unregulated Work Survey Technical Report (available upon request from the authors).

24  We defined a serious injury as one that needed medical attention, whether or not the worker actually received such attention.

25  Workers' compensation law is different in each state. California has the most comprehensive law. For more information, see the Unregulated Work Survey Technical Report (available upon request from the authors).

26  New York's base wage differs depending on the amount of tips earned and the industry and occupation of the worker. In Illinois, tipped workers must be paid 60 percent of the state's full minimum wage, which during our survey period equaled $4.50 per hour. California, however, is one of the seven states that require the same minimum wage rate (of $8.00 an hour in the case of California) for tipped and non-tipped workers.

27  Tipped workers in Illinois and New York can have two types of minimum wage violations. First, if their base pay and tips added together do not equal the minimum wage, they have a standard minimum wage violation. Second, if their employer does not pay the tipped worker base minimum wage, they have a tipped minimum wage violation. By contrast, in California, tipped workers are treated like all other workers, and so are only at risk for regular minimum wage violations.

000067

28   In order to avoid double-counting violations, this violation rate does not include workers who worked more than 40 hours in a week—these are counted in the 40-hour overtime violation measure.

29   We account for industry- and occupation-specific exemptions in calculating all violation rates in this report. For more details on exemptions, see the Unregulated Work Survey Technical Report (available upon request from the authors).

30   For more information on independent contractors and misclassification, see Carré et al. (2000), National Employment Law Project (n.d.), and Ruckelshaus and Goldstein (2002).

31   This measure includes the following violations: minimum wage, tipped minimum wage, overtime, off-the-clock, being paid in tips only, illegal deductions and rest-break violations.

32   This study is not able to provide an accurate estimate of the impact of unionization on the prevalence of workplace violations.  Many unionized industries were excluded from our sample because they had median wages that were higher than our low-wage threshold, and were therefore not included in our sample from the outset (see Appendix A for details on our sampling universe).  In addition, the small number of unionized workers who made it into our sample were concentrated in a very small set of industries, which resulted in a skewed industry distribution.  Therefore, any analysis of differences in violation rates between unionized and non-union workers in our sample would yield statistically biased results that could not be used to infer conclusions about the impact of unionization on workplace violations.

33   When interpreting estimates in the tables and graphs in this section, the reader should refer to the text for guidance regarding which differences are statistically significant.  In particular, the reader should be aware that differences of a few percentage points are very likely not statistically significant, and instead may result from stochastic variation in the sampling process. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)). As is customary, we interpret differences in violation rates between two or more groups or categories as statistically significant when $p \leq 0.05$. In such cases, the estimates' 95 percent confidence intervals fail to overlap, a procedure that is equivalent to a Student's $t$-test. For Figures 4.1, 4.2, 4.4, 4.5, 4.6, 4.7, 4.8 and 4.9, we only showed results for industries and occupations whose sample size was greater than or equal to 50.

34   See Bernhardt, McGrath and DeFilippis (2007), Hondagneu-Sotelo (2001), New York Jobs with Justice and Queens College Labor Resource Center (2005), and Valenzuela et al. (2006).

35   See Bonacich and Appelbaum (2000), Collins (2003), Hale and Wills (2005), Hum (2003), and Ross (2004).

36   The cash category also includes those paid by personal check and those paid in both cash and by check. The company check category also includes those paid by direct deposit. Both categories contain small numbers of workers who reported being paid by other methods.

37   For example, see the detailed industry profiles in Bernhardt, McGrath and DeFilippis (2007).

38   This difference is not explained entirely by the pay types used by these firms. Although small firms are more likely to pay non-hourly, pay type explains only part of the discrepancy between the violation rates of small and large firms.

39   See Appelbaum and Batt (1994), Appelbaum, Bernhardt and Murnane (2003), Beynon et al. (2002), and Kochan, Katz and McKersie (1994).

40   Appelbaum and Batt (1994) and Kochan and Osterman (1994).

41   When interpreting estimates in the tables and graphs in this section, the reader should refer to the text for guidance regarding which differences are statistically significant. In particular, the reader should be aware that differences of a few percentage points are very likely not significant, and instead may result from stochastic variation in the sampling process. In the RDS method, the level of significance is determined using a special form of bootstrapping process (see Heckathorn (2002) and Salganik (2006)). As is customary, we interpret differences in violation rates between two or more groups or categories as statistically significant when $p \leq 0.05$. In such cases, the estimates' 95 percent confidence intervals fail to overlap, a procedure that is equivalent to a Student's $t$-test.

42   Authorized immigrants include both those who are naturalized citizens and those with permanent resident status or other types of legal documentation.

43   This may be partly because workers who do advance in the labor market as they get older leave our sampling universe, which only includes low-wage jobs. However, in other parts of the labor market, age is often a good predictor of better outcomes, even for workers who remain in front-line occupations for their entire careers.

44   In our survey, 68 percent of workers had at least one pay-based violation in the previous work week.  We applied this percentage to the total number of front-line workers in low-wage industries in our three cities, i.e. 1,640,747 (see Table A.2 in Appendix A).

45   For an inventory of studies that document workplace violations, see Bernhardt et al. (2008) and McGrath (2005).

46   Pieces of this section are adapted from Bernhardt, McGrath and DeFilippis (2007) and National Employment Law Project (2008). It also draws on Ruckelshaus (2008).

47   For in-depth analyses of public enforcement, see Wial (1999), Weil (2005, 2007), and Weil and Pyles (2005, 2007).

48   In addition, agencies such as the U.S. Department of Labor should institute annual compliance surveys for the full range of low-wage industries.  Such surveys were conducted by the U.S. Department of Labor in the late 1990s, testing for violations of minimum wage and overtime laws, and still constitute some of the most robust data available. For example, in 1999 only 35 percent of apparel plants in New York City were in compliance with wage and hour laws; in Chicago, only 42 percent of restaurants were in compliance; in Los Angeles, only 43 percent of grocery stores were in compliance; and nationally, only 43 percent of residential care establishments were in compliance (United States Department of Labor 2001).

49   For in-depth analyses of immigrant worker centers, see Fine (2006), Gordon (2005), Jayaraman and Ness (2005), Martin, Morales and Theodore (2007), Ness (2005), Narro (2005, 2009), and Theodore, Valenzuela and Meléndez (2009).

50   In a similar vein, government agencies that enforce workers' rights need to better coordinate their efforts to achieve maximum impact, given that unscrupulous employers often violate multiple laws.

51   National Employment Law Project (2008).

52   The American Federation of Labor and Congress of Industrial Organizations (2007).

53   See Smith and Ruckelshaus (2007) for an in-depth treatment of labor standards policies related to immigration reform.

000068

54  On the centrality of equal status and equal protections, see Beardall (2006), Gordon (2007), National Employment Law Project (2003), National Immigration Law Center (2007), Read (2006), and Smith (2006).

55  We wrestled with the question of whether or not to include independent contractors such as taxi drivers and street vendors in our survey. In the end we decided to constrain the sample to include employees only; opening the sampling frame to any type of independent contractor would have made it almost impossible to construct a manageable questionnaire (that is, one that would work for both employees with wage income, as well as independent contractors, who we would need to ask detailed questions about both business income and costs). However, we hope that future surveys will focus on low-wage independent contractors, such as taxi drivers and port truckers, who are effectively in an employment relationship and whose working conditions are very similar to the population of workers we surveyed here.

56  The Organisation for Economic Co-operation and Development has used both the measure of 85 percent of the median wage (Organisation for Economic Co-operation and Development 1994) and the measure of two-thirds of the median wage (Organisation for Economic Co-operation and Development 1996); see also Freeman and Schettkat (2000), who use two-thirds of the mean wage.

57  Heckathorn (1997, 2007).

58  The number of coupons given to respondents varied over the course of the survey; on average, respondents recruited two other workers into the sample.

59  These adjustments were made within major occupation groups, in order to ensure a high level of accuracy in the weighting.

60  For example, see Hoefer, Rytina and Baker (2008), who estimate a nonimmigrant undercount rate of 10 percent.

61  Data on the number and characteristics of unauthorized immigrants in our three cities were generously provided by Jeffrey Passel of the Pew Center for Hispanic Research.

62  The one exception is that worker characteristics as a group were not significant in predicting overtime violations.

63  We measured the significance and the size of the effect of each group of variables by recording the change in the deviance statistic (-2 log likelihood measure) when a group of variables was added into the models. We assessed significance at the .05 level using a chi-square test. We assessed the relative strength of the effects of the two groups of variables by forming the ratio of the change in deviance. Full results are available upon request from the authors.

000069

# References

Advincula, Anthony D. 2009. "Fearful of Job Loss, Workers Ignore Abuse." *New American Media*, August 3, 2009. Found at: http://news.newamericamedia.org/news/view_article.html?article_id=3f9c5e6ea83e02d806ce2c5b8c73263d.

American Federation of Labor-Congress of Industrial Organizations-Safety and Health Office. 2007. *Death on the Job: The Toll of Neglect—A National and State-by-State Profile of Worker Safety and Health in the United States*. Washington, DC: AFL-CIO. Found at: http://www.aflcio.org/issues/safety/memorial/doj_2007.cfm.

Appelbaum, Eileen, Annette Bernhardt and Richard Murnane, eds. 2003. *Low-Wage America: How Employers Are Reshaping Opportunity in the Workplace*. New York: Russell Sage Foundation.

Appelbaum, Eileen and Rosemary Batt. 1994. *The New American Workplace: Transforming Work Systems in the United States*. Ithaca, NY: Cornell University Press.

Arriero, Elisabeth. 2009. "Slow Economy Spells Little Work for Day Laborers." *The Arizona Republic*, July 27, 2009. Found at: http://www.azcentral.com/12news/news/articles/2009/07/27/20090727daylaborers0727-CP.html.

Asian American Legal Defense and Education Fund and YKASEC. 2006. *"Forgotten Workers": A Study of Low-Wage Korean Immigrant Workers in the Metropolitan New York Area*. New York: AALDEF and YKASEC. Found at: http://www.aaldef.org/docs/KWP_2006WorkerSurvey_analysis.pdf.

Associated Press. 2008. "FedEx Drivers Win $14.4 Million in Labor Case." *San Francisco Chronicle*, October 20, 2008. Found at: http://www.sfgate.com/cgi-bin/article/article?f=/n/a/2008/10/20/financial/f144914D06.DTL.

Beardall, Bill. 2006. Statement of Bill Beardall on Behalf of the Equal Justice Center and the National Immigration Law Center to the House Committee on Education and the Workforce, Subcommittee on Employer-Employee Relations. Field Hearing on "Immigration: Enforcing Employee Work Eligibility Laws and Implementing a Stronger Employment Verification System." Monday, July 31, 2006.

Bennett, Chuck. 2008. "It's the Fall of 'Saigon:' Eatery Staff Wins $4M in 'Viet' War." *New York Post*, October 22, 2008. Found at: http://www.nypost.com/seven/10222008/news/regionalnews/its_the_fall_of_saigon_134740.htm.

Bernhardt, Annette, Heather Boushey, Laura Dresser and Chris Tilly, eds. 2008. *The Gloves-off Economy: Workplace Standards at the Bottom of America's Labor Market*. Ithaca, NY: Cornell University Press.

Bernhardt, Annette, Siobhán McGrath and James DeFilippis. 2007. *Unregulated Work in the Global City: Employment and Labor Law Violations in New York City*. New York: Brennan Center for Justice at New York University School of Law.

Bhattarai, Abha. 2009. "Grocery Chain to Pay Back Wages to 550 Workers." *New York Times*, February 26, 2009, New York Region section. Found at: http://cityroom.blogs.nytimes.com/2009/02/26/grocer-chain-to-pay-back-wages-to-550-workers/.

Bobo, Kim. 2008. *Wage Theft in America: Why Millions of Working Americans Are Not Getting Paid - And What We Can Do About It*. New York: The New Press.

Bonacich, Edna and Richard P. Appelbaum. 2000. *Behind the Label: Inequality in the Los Angeles Apparel Industry*. Berkeley and Los Angeles: University of California Press.

Beynon, Hue, Damian Grimshaw, Jill Rubery and Kevin Ward. 2002. *Managing Employment Change: The New Realities of Work*. Oxford: Oxford University Press.

Carré, Francoise, Marianne A. Ferber, Lonnie Golden and Stephen A. Herzenberg, eds. 2000. *Nonstandard Work: The Nature and Challenges of Changing Employment Arrangements*. Champaign: Industrial Relations Research Association.

Carré, Francoise and Randall Wilson. 2004. *The Social and Economic Costs of Employee Misclassification in Construction*. Boston: Construction Policy Research Center, Harvard Law School Labor and Worklife Program and Harvard School of Public Health.

Collins, Jane L. 2003. *Threads: Gender, Labor, and Power in the Global Apparel Industry*. Chicago and London: University of Chicago Press.

Cordero- Guzmán, Hector R., Robert C. Smith and Ramon Grosfoguel, eds. 2001. *Migration, Transnationalization, and Race in a Changing New York*. Philadelphia: Temple University Press.

DeSilva, Lalith, Adrian Millett, Dominic Rotondi and William Sullivan. 2000. *Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs*. Report prepared for the United States Department of Labor. Rockville, MD: Planmatics. Found at: http://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.

Domestic Workers United & Datacenter. 2006. *Home Is Where The Work Is: Inside New York's Domestic Work Industry*. New York: Domestic Workers United & Datacenter.

Fine, Janice. 2006. *Workers Center: Organizing Communities at the Edge of the Dream*. Ithaca, NY: Cornell University Press.

Fiscal Policy Institute. 2007a. *New York State Workers' Compensation: How Big Is the Coverage Shortfall?* New York: Fiscal Policy Institute.

—. 2007b. *The Underground Economy in the New York City Affordable Housing Construction Industry: Its Fiscal and Economic Costs*. New York: Fiscal Policy Institute.

Flaming, Daniel, Brent Haydamack and Pascale Joassart. 2005. *Hopeful Workers, Marginal Jobs: LA's Off-The-Books Labor Force*. Los Angeles: Economic Roundtable. Found at: http://www.economicrt.org/summaries/hopeful_workers_marginal_jobs_synopsis.html.

Freeman, Richard B. and Ronald Schettkat. 2000. "Low Wage Services: Interpreting the US-German Difference." National Bureau of Economic Research Working Paper No. 7611, 2000. Found at: http://www.nber.org/papers/w7611.

Gordon, Jennifer. 2005. *Suburban Sweatshops: The Fight for Immigrant Rights*. Cambridge, MA: The Belknap Press of Harvard University Press.

—. 2007. "Transnational Labor Citizenship." *Southern California Law Review* 80:503-588.

Greenhouse, Steven. 2008. *The Big Squeeze: Tough Times for the American Worker*. New York: Alfred A. Knopf.

Greenhouse, Steven and Stephanie Rosenbloom. 2008. "Wal-Mart Settles 63 Lawsuits Over Wages." *New York Times*, December 23, 2008, Business section. Found at: http://www.nytimes.com/2008/12/24/business/24walmart.html.

Hale, Angela and Jane Wills, eds. 2005. *Threads of Labour: Garment Industry Supply Chains from the Workers' Perspective*. London: Blackwell.

Hall, Kerry, Ames Alexander and Franco Ordoñez. 2008. "The Cruelest Cuts: The Human Cost of Bringing Poultry to your Table." *The Charlotte Observer*, September 30, 2008. Found at: http://www.charlotteobserver.com/595/story/223415.html.

000070

References

Heckathorn, Douglas D. 1997. "Respondent-Driven Sampling: A New Approach to the Study of Hidden Populations." *Social Problems* 44(2):174-199.

—. 2002. "Respondent-Driven Sampling II: Deriving Valid Population Estimates from Chain-Referral Samples of Hidden Populations." *Social Problems* 49(1):11-34.

—. 2007. "Extensions of Respondent-Driven Sampling: Analyzing Continuous Variables and Controlling for Differential Recruitment." *Sociological Methodology* 37(1):151-207.

Hondagneu-Sotelo, Pierrette. 2001. *Doméstica: Immigrant Workers Cleaning and Caring in the Shadows of Affluence*. Berkeley and Los Angeles: University of California Press.

Hoefer, Michael, Nancy Rytina and Bryan Baker. 2008. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2007." Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security. Found at: http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2007.pdf.

Hum, Tarry. 2003. "Mapping Global Production in New York City's Garment Industry: The Role of Sunset Park, Brooklyn's Immigrant Economy." *Economic Development Quarterly* 17(3):294-309.

Illinois Circuit Court. 2009. *Notice of Certification of Class, Proposed Settlement, Preliminary Court Approval of Settlement, and Hearing Date for Final Court Approval*. March 5, 2009. Found at: http://staffingnetworksettlement.com/uploads/10126_WEB_COMPLETE_NOTICE.pdf.

Jayaraman, Sarumathi and Immanuel Ness, eds. 2005. *The New Immigrant Workforce: Innovative Models for Labor Organizing*. Armonk, NY: M.E. Sharpe.

Kochan, Thomas, Harry Katz and Robert McKersie. 1994. *The Transformation of American Industrial Relations*. Ithaca, NY: Cornell University Press.

Kochan, Thomas and Paul Osterman. 1994. *The Mutual Gains Enterprise: Forging a Winning Partnership Among Labor, Management, and Government*. Boston: Harvard Business School Press.

Larrubia, Evelyn. 2008. "Criminal Charges Filed against Car Wash Owners." *Los Angeles Times,* February 10, 2008, California/Local News section. Found at: http://latimesblogs.latimes.com/lanow/2009/02/los-angeles-cit.html.

Levin, Rebekah and Robert Ginsburg. 2000. *Sweatshops in Chicago: A Survey of Working Conditions in Low-Income and Immigrant Communities*. Chicago: Center for Impact Research Sweatshop Working Group.

Make the Road by Walking and Retail, Wholesale and Department Store Union. 2005. *Street of Shame: Retail Stores on Knickerbocker Avenue*. New York: Department Store Union (RWDSU/UFCW) and Make the Road by Walking.

Martin, Nina, Sandra Morales and Nik Theodore. 2007. "Migrant Worker Centers: Contending with Downgrading in Low-Wage Labor Markets." *GeoJournal* 68:155-165.

Matza, Michael. 2008. "As the Economy Sinks, 'Wage Theft' Suits Rise." *Philadelphia Inquirer*, November 17, 2008. Found at: http://www.clsphila.org/NewsItem.aspx?id=116.

McGrath, Siobhàn. 2005. *A Survey of Literature Estimating the Prevalence of Employment and Labor Law Violations in the U.S.* New York: Brennan Center for Justice at New York University School of Law. Found at: http://nelp.3cdn.net/1ef1df52e6d5b7cf33_s8m6br9zf.pdf.

Mehta, Chirag, Nik Theodore, Iliana Mora and Jennifer Wade. 2002. *Chicago's Undocumented Immigrants: An Analysis of Wages, Working Conditions, and Economic Contributions*. Chicago: Center for Urban Economic Development, University of Illinois at Chicago.

Milkman, Ruth. 2006. *L.A. Story: Immigrant Workers and the Future of the U.S. Labor Movement*. New York: Russell Sage Foundation.

National Employment Law Project. n.d. Independent Contractor Misclassification and Subcontracting. Found at: www.nelp.org/site/issues/category/independent_contractor_misclassification_and_subcontracting.

—. 2003. *Used and Abused: The Treatment of Undocumented Victims of Labor Law Violations Since Hoffman Plastic Compounds v. NLRB*. New York: National Employment Law Project and Mexican American Legal Defense and Education Fund.

—. 2008. *Rebuilding a Good Jobs Economy: A Blueprint for Recovery and Reform*. New York: National Employment Law Project.

National Immigration Law Center. 2007. *Labor and Employment Priorities for Comprehensive Immigration Reform*. Los Angeles: National Immigration Law Center.

Narro, Victor. 2005. "Impacting Next Wave Organizing: Creative Campaign Strategies of the Los Angeles Worker Centers." *New York School Law Review* 50(2):465-513.

—. 2009. "¡Sí Se Puede! Immigrant Workers and the Transformation of the Los Angeles Labor and Worker Center Movements." *Los Angeles Public Interest Law Journal* 1:65-166.

Ness, Immanuel. 2005. *Immigrants, Unions, and the New U.S. Labor Market*. Philadelphia: Temple University Press.

New York Jobs with Justice and Queens College Labor Resource Center. 2005. *Is Your Gourmet Grocery a Sweatshop? A Report on Working Conditions at Upscale Groceries in New York City*. New York: New York Jobs with Justice and Queens College Labor Resource Center. Found at: http://nelp.3cdn.net/5ffc0b0b9f60ae9a0d_5dm6iehqq.pdf.

New York Taxi Workers Alliance. 2003. *An Analysis of Taxi Industry Fare and Lease Cap Proposals*. New York: New York Taxi Workers Alliance.

Organisation for Economic Co-operation and Development. 1994. *The OECD Jobs Study: Evidence and Explanations*. Paris: Organisation for Economic Co-operation and Development.

—. 1996. *OECD Employment Outlook: July 1996*. Paris: Organisation for Economic Co-operation and Development.

Piore, Michael J. 2007. "Labor Inspectors: The Front Line in the Battle for Decent Work." Outline of Presentation to: Making Decent Work a Global Goal and a National Reality, International ILO conference, Dusseldorf, Germany, September 19, 2007.

Read, Arthur N. 2006. "Protecting Worker Rights in the Context of Immigration Reform." *Journal of Law and Social Change* 9:65-92.

Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition. 2005. *Behind the Kitchen Door: Pervasive Inequality in New York City's Thriving Restaurant Industry*. New York: Restaurant Opportunities Center of New York and New York City Restaurant Industry Coalition.

—. 2006. *Dining Out, Dining Healthy: The Link Between Public Health and Working Conditions in New York City's Restaurant Industry*. New York: Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition.

—. 2009. *The Great Service Divide: Occupational Segregation & Inequality in the New York City Restaurant Industry*. New York: Restaurant Opportunities Center of New York and the New York City Restaurant Industry Coalition.

Ross, Robert J. S. 2004. *Slaves to Fashion: Poverty and Abuse in New York Sweatshops*. Ann Arbor, MI: University of Michigan Press.

Ruckelshaus, Catherine and Bruce Goldstein. 2002. *From Orchards to the Internet Confronting Contingent Work Abuse*. New York: National Employment Law Project and Farmworker Justice Fund. Found at: http://www.farmworkerjustice.org/Immigration_Labor/ContingentDOCS/OrchardstoInternet.pdf.

Ruckelshaus, Catherine. 2008. "Labor's Wage War." *Fordham Urban Law Journal* 35(2):373-408.

Salganik, Matthew J. 2006. "Confidence intervals, design effects, and sample size calculation for respondent-driven sampling." *Journal of Urban Health* 83:98-111.

Schrank, Andrew and Michael Piore. 2007. *Norms, Regulations, and Labour Standards in Central America.* Mexico: United Nations Publication. Found at: http://www.eclac.cl/publicaciones/xml/3/28113/Serie%2077.pdf.

Schwartz, Jeremy. 2009. "More Workers aren't Getting Paid: In Another Fallout from Recession, Unpaid Wage Claims Increase, Especially in the Construction Industry." *American-Statesman,* May 18, 2009. Found at: http://www.statesman.com/search/content/news/stories/local/05/18/0518wages.html.

Smith, Rebecca. 2006. Testimony Before U.S. House of Representatives, Committee on Education and the Workforce Hearing on "Guest Worker Programs: Impact on the American Workforce and U.S. Immigration Policy." Washington, DC. Found at: http://republicans.edlabor.house.gov/archive/hearings/109th/fc/immigration071906/smith.htm.

Smith, Rebecca and Catherine Ruckelshaus. 2007. "Solutions, Not Scapegoats: Abating Sweatshop Conditions for All Low-Wage Workers As a Centerpiece of Immigration Reform." *NYU Journal of Legislation and Public Policy* 10(3):555-602.

Southern Poverty Law Center. 2009. *Under Siege: Life for Low-Income Latinos in the South.* Montgomery, Alabama: Southern Poverty Law Center.

St. Onge, Peter, Franco Ordoñez, Kerry Hall and Ames Alexander. 2008. "An Epidemic of Pain: Growing Demand for Specialty Cuts Threatens Workers' Hands More Than Ever." *The Charlotte Observer,* September 30, 2008. Found at: http://www.charlotteobserver.com/595/story/223425.html.

Theodore, Nik, Abel Valenzuela and Edwin Meléndez. 2006. "*La Esquina* (The Corner): Day Laborers on the Margins of New York's Formal Economy." *WorkingUSA* 9:407-423.

—. 2009. "Defending Labor Standards for Migrant Workers in the Informal Economy." *International Journal of Manpower,* forthcoming.

Tucker-Welch, Suzette. 2004. *The State of Working Immigrants in Colorado.* Denver, CO: Colorado Fiscal Policy Institute.

United States Bureau of the Census, American Community Survey. Found at: http://factfinder.census.gov/home/saff/main.html?_lang=en accessed July 31, 2009.

United States Department of Labor. 2001. *1999-2000 Report on Low-Wage Initiatives.* Washington, D.C.: United States Department of Labor Employment Standards Administration Wage and Hour Division.

United States General Accountability Office. 2006. *Employment Arrangements: Improved Outreach Could Help Ensure Proper Worker Classification.* Report to the Ranking Minority Member, Committee on Health, Education, Labor, and Pensions, U.S. Senate. Washington, D.C.: United States General Accountability Office.

—. 2009. *Department of Labor: Wage and Hour Division Needs Improved Investigative Processes and Ability to Suspend Statute of Limitations to Better Protect Workers Against Wage Theft.* Washington, D.C.: United States General Accountability Office. Found at: http://www.gao.gov/new.items/d09629.pdf.

Valenzuela, Abel, Nik Theodore, Edwin Meléndez and Ana Luz González. 2006. *On the Corner: Day Labor in the United States.* Los Angeles: Center for the Study of Urban Poverty. Found at: http://www.sscnet.ucla.edu/issr/csup/uploaded_files/Natl_DayLabor-On_the_Corner1.pdf.

Wial, Howard. 1999. *Minimum-Wage Enforcement and the Low-Wage Labor Market.* Harrisburg, PA: Keystone Research Center. Found at: http://mitsloan.mit.edu/iwer/pdf/tfwial.pdf.

Weil, David. 2005. "Public Enforcement / Private Monitoring: Evaluating a New Approach to Regulating the Minimum Wage." *Industrial and Labor Relations Review* 58(2):238-257.

—. 2007. *Crafting a Progressive Workplace Regulatory Policy: Why Enforcement Matters.* Boston, MA: Boston University School of Management: Harvard University-John F. Kennedy School of Government.

Weil, David and Amanda Pyles. 2005. "Why Complain? Complaints, Compliance, and the Problem of Enforcement in the U.S. Workplace." *Comparative Labor Law and Policy Journal* 27(1):59-92.

—. 2007. "Exploring the Complaints and Compliance Gap Under U.S. Workplace Policies." *Proceedings of the 2007 Annual Meetings of the Labor and Employment Relations Association.* Found at: http://www.press.uillinois.edu/journals/irra/proceedings2007/.

Workers Defense Project. 2009. *Building Austin, Building Injustice: Working Conditions in Austin's Construction Industry.* Austin, TX: Workers Defense Project.

© Copyright 2009  Annette Bernhardt, Ruth Milkman, Nik Theodore, Douglas Heckathorn, Mirabai Auer, James DeFilippis, Ana Luz González, Victor Narro, Jason Perelshteyn, Diana Polson, and Michael Spiller.  All Rights Reserved.

The graphic on the back cover is taken from one of the survey's RDS recruitment chains. Each square represents a worker and the different colors represent the workers' industry.

Design by Hazan & Company



**Center for Urban
Economic Development**
University of Illinois at Chicago
400 S. Peoria St (M/C 345)
Chicago, IL 60607
**www.uic.edu/cuppa/uicued**

**National Employment
Law Project**
75 Maiden Lane, Suite 601
New York, NY 10038
**www.nelp.org**

**UCLA Institute for Research
on Labor and Employment**
10945 Le Conte Avenue, Suite 2107
Los Angeles, CA 90095-1478
**www.irle.ucla.edu**

# FROM THE CRADLE TO THE LABOR MARKET? THE EFFECT OF BIRTH WEIGHT ON ADULT OUTCOMES*

Sandra E. Black

Paul J. Devereux

Kjell G. Salvanes

Lower birth weight babies have worse outcomes, both short-run in terms of one-year mortality rates and longer run in terms of educational attainment and earnings. However, recent research has called into question whether birth weight itself is important or whether it simply reflects other hard-to-measure characteristics. By applying within twin techniques using an unusually rich dataset from Norway, we examine the effects of birth weight on both short-run and long-run outcomes for the same cohorts. We find that birth weight does matter; despite short-run twin fixed effects estimates that are much smaller than OLS estimates, the effects on longer-run outcomes such as adult height, IQ, earnings, and education are significant and similar in magnitude to OLS estimates.

## I. Introduction

Lower birth weight babies have worse outcomes, both short-run in terms of one-year mortality rates and longer run in terms of educational attainment and earnings. But is this relationship causal? Recent research has provided conflicting evidence, leaving us wondering whether birth weight itself is important or whether it simply reflects other hard-to-measure characteristics.

Understanding both the short-run and long-run effects of birth weight is important from a number of perspectives. On the policy side, governments have implemented a number of policies to improve the health of babies and, hence, their later outcomes. Consider, for example, the Women, Infants, and Children Program (WIC) in the United States, a federally funded program that provides nutrition counseling and supplemental food for pregnant

* Black and Devereux gratefully acknowledge financial support from the National Science Foundation and the California Center for Population Research. Salvanes thanks the Norwegian Research council for financial support. We are grateful to the Medical Birth Registry of Norway for providing the birth records data. We thank Marianne Bitler, Amitabh Chandra, Anne Daltveit, Susan Dynarski, Kanika Kapur, Linda Loury, Per Magnus, and Ole Martin Sundet for very useful discussions and seminar participants at the Federal Reserve Bank of New York, Boston College, Brown University, Princeton University, UCD Dublin, Tufts University, CEPR Upsala, Stockholm University, Socialforskningsinstituttet Copenhagen, Warwick, Essex, Maynooth College, Trinity College Dublin, Queens University Belfast, University College London, London School of Economics, University of Amsterdam, University of Bergen, and COST Paris for helpful comments. This research was conducted while Black was on leave at the Industrial Relations Section at Princeton University.

© 2007 by the President and Fellows of Harvard College and the Massachusetts Institute of Technology.

*The Quarterly Journal of Economics,* February 2007

000076

women, new mothers, infants, and children under age five in order to improve child health and aid long-term health, growth, and development. A key presumption underlying this type of policy is that, by affecting birth weight through improved prenatal nutritional intake, it will in turn affect the health and ultimate success of the children.[1] Recent evidence suggesting little effect of birth weight on short-run outcomes may understate the true impact of these policies if there are significant longer-run effects.

Until recently, analysis of birth weight effects has relied primarily on cross-sectional variation and has established a relationship between low birth weight and poor health, cognitive deficits, and behavioral problems among young children. It has also provided evidence that this relationship persists for longer-term outcomes such as health status, educational attainment, employment, and earnings [for example, Barker 1995, Currie and Hyson 1999, Case et al. 2004].[2] However, it is possible that there are no underlying causal relationships, as low birth weight may be correlated with many difficult-to-measure socio-economic background and genetic variables.

Most recently, the literature has moved to within-twin variation to identify the effects of birth weight.[3] Both Conley et al. [2006] and Almond et al. [ACL 2005] use U.S. data to identify the effects of birth weight on short-run health outcomes, including mortality. Almond et al. conclude that the effects of low birth weight are substantially smaller than originally thought, and Conley et al. have estimates of similar magnitudes. However, neither of these studies is able to look beyond short-run health outcomes.

In contrast, Behrman and Rosenzweig [BR 2004] use a subset

---

1. Additionally, birth weight is very commonly used as the outcome variable of interest in studies of the effects of policy interventions such as welfare reform, health insurance, and food stamps on infant welfare (for example, Currie and Gruber [1996]), and in analyses of the impact of maternal behavior on infant health. (For example, Currie and Moretti [2003] show that increased maternal education leads to a lesser incidence of low birth weight (LBW).

2. Typically, medical studies have limited data on longer-run outcomes and small sample sizes. For example, Hack et al. [1994] finds an effect of very low birth weights on school-age outcomes using sixty-eight treatment children using across family comparisons, and Hack et al. [2002] compare 242 very low birth weight young adults to 233 normal birth weight controls and find that the educational disadvantage associated with very low birth weight persists into early adulthood. Recent work in the Norwegian medical literature also finds a positive relationship between birth weight and adult outcomes [Eide et al. 2005 and Grjibovski et al. 2005].

3. Additionally, sibling fixed effects approaches are taken by Conley and Bennett [2000], who find a negative association between LBW and timely high school graduation using U.S. panel data, and by Currie and Moretti [2005] who use birth records from California and find evidence of significant effects of own birth weight on income at time of childbirth as well as on the birth weight of the child.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 85 of 4699 PageID #:  3250

of the Minnesota Twin Registry to do fixed effects using female monozygotic twins and examine the longer run effects of birth weight. They find evidence that the heavier twin goes on to be taller, have greater educational attainment, and have a higher wage, and the twin fixed effects estimates are substantially larger than the cross-sectional ones. In contrast, they find no evidence of effects on adult body mass index.

The conflicting evidence on short-run versus long-run outcomes could be real or could reflect the fact that BR rely on self-reported survey data and do not have access to comprehensive birth record data like that of ACL. As a result, their sample sizes are small (804 cases) and, because of the numerous surveys required, there is substantial attrition and item nonresponse that may not be random. Also, their use of survey data means that their outcome variables are self-reported and, unlike ACL, they cannot exclude twin pairs with congenital defects.

In this paper, we use rich administrative data on the population of Norway linked to birth records; with this, we can study both short- and long-run outcomes using large nationally representative samples that contain both administrative records of later outcomes as well as all the birth information contained in the birth register. We advance the recent literature by using twin fixed effects on a large sample of individuals to look at both short- and long-run outcomes for the same cohort of individuals. Our sample also differs from BR in that we study both men and women and analyze more recent cohorts (1967–1981 compared to their 1936–1955 cohorts). As such, the technology of birth and social conditions growing up should be more similar to those in the present day.[4]

We find that birth weight does matter. Consistent with earlier work, we find that twin fixed effects estimates of the effect of

4. In the process of completing a revision of the November 2005 version of this paper we became aware of two recently completed working papers on this topic. Oreopoulos et al. [2006] use Canadian administrative data and sibling and twin fixed effects to examine both short- and long-run effects of birth weight. Their results are similar to our own, although they are limited by small samples of twins and the outcomes they examine are different; they focus on mortality, physician visits, high school tests, grades completed by age 17, and social assistance receipt, while we examine high school completion, IQ, BMI, height, labor force participation, earnings, and intergenerational transmission. Royer [2005] uses within-twin variation and California administrative data to examine the effect of birth weight on educational attainment along with intergenerational transmission of birth weight and concludes that long-run effects are small. Her education analysis is limited by the fact that educational attainment is only observed if the woman has children in the sampling period. When we restrict our sample in a similar manner, we obtain similar results for our education variable.

birth weight on short-run outcomes such as one-year infant mortality are much smaller than their cross-sectional equivalents. However, studying only short-run outcomes may lead to incorrect inferences about the longer-run effects of birth weight; we find that birth weight has a significant effect on longer-run outcomes such as height, IQ at age 18, earnings, and education, and the fixed effects estimates are similar in size to cross-sectional ones.

When studying long-run outcomes, an important selection issue arises because twin pairs that experience infant mortality are dropped from the analysis. Because, unlike previous studies, we have information on individuals from birth to the labor market, we can investigate the potential impacts of such bias. Our investigation concludes that selection bias most likely leads to an understatement of the effects of birth weight on adult outcomes.

The paper unfolds as follows. Sections II and III discuss our methodology and data. Section IV presents our results. Section V focuses on our robustness checks, including an examination of the selection bias that might arise when studying adult outcomes. Section VI addresses issues of generalizability and Section VII concludes.

## II. Conceptual Framework

Following ACL, let

$$(1) \qquad y_{ijk} = \alpha + \beta bw_{ijk} + x_{jk}'\gamma + f_{jk} + \varepsilon_{ijk}$$

where subscript $i$ refers to the child, $j$ refers to the mother, and $k$ refers to birth. $y_{ijk}$ is then the outcome of child $i$ born to mother $j$ in birth $k$, $bw_{ijk}$ is birth weight, $x_{jk}$ is a vector of mother- and birth-specific variables (for example, mother's education, the year of birth), $f_{jk}$ refers to unobservables that are mother- and birth-specific (for example, the quality of prenatal care, genetic factors), and $\varepsilon_{ijk}$ is an idiosyncratic error term assumed independent of all other terms in the equation.

Cross-sectional estimation of equation (1) by OLS will generally lead to biased estimates of $\beta$ because of the presence of elements of $f_{jk}$ that influence both birth weight and child outcomes (for example, family background variables). Therefore, we take a twin fixed effect approach to estimation. That is, our sample is composed of twin pairs and we included dummy variables for each birth in the regression. Denoting the first-born twin as "1" and the second-born as "2," this can be written in differences as follows:

(2) $$y_{1jk} - y_{2jk} = \beta(bw_{1jk} - bw_{2jk}) + (\varepsilon_{1jk} - \varepsilon_{2jk})$$

Given the assumption that within-twin differences in $\varepsilon_{ijk}$ are independent of within-twin differences in $bw_{ijk}$, the twin fixed effects estimator of $\beta$ is consistent. This assumption is more likely to hold in the case of monozygotic twins (who are genetically identical) than with fraternal twins (who on average share about 50 percent of genes). Our full sample contains both monozygotic and fraternal twins. The medical literature suggests that adult health outcomes among fraternal twins are similar to those among identical twins [Christensen et al. 1995, Duffy and David 1993]. Consistent with this finding, we cannot reject the hypothesis that the relationship between birth weight and adult outcomes is the same for both types of twins when we examine a subset of twins for whom we have information on zygosity (see Section V).

The control variables we use in the OLS estimation are year- and month-of-birth dummies, indicators for mother's education (one for each year), indicators for birth order (which is known to be correlated with birth weight and is also a strong predictor of outcomes in Norway, see Black, Devereux, and Salvanes [2005a]), indicators for mother's year of birth (one for each year to allow for the fact that age of mother at birth may have independent effects on child outcomes), and an indicator for the sex of the child. With twin fixed effects, all controls are differenced out except the indicators for sex and birth order (either first born or second born twin).

### II.A. Why Does Birth Weight Differ?

Low birth weight can arise either because of short gestational length (preterm delivery) or because of low fetal growth rate, commonly known as intrauterine growth retardation (IUGR). When we look within twin pairs, gestation length is the same and differences in birth weight arise solely due to differences in fetal growth rates.[5]

Given that gestation is the same among twins, evidence suggests that much of the difference in birth weight is due to differences in nutritional intake.[6] In the case where there are two

---

5. While there are rare cases of twins who are not born at the same time, these twins are not included in our sample. We also drop twin pairs for which gestation length is unknown (about 4 percent of cases)

6. Because twins have the same gestation, we cannot examine the effect of being preterm (gestation less than thirty-seven weeks) on outcomes. We did, however, verify that there were no significant differences in the effects of birth

placentas (called dichorionic, including all fraternal twins and about 30 percent of identical twins), nutritional differences can arise because one twin is better positioned in the womb. Among single-placenta (monochorionic) twins, nutritional differences have been related to the location of the attachment of the two umbilical cords to the placenta [Bryan 1992, Phillips 1993]. Hence, since there are no genetic differences, birth weight differences within monozygotic twin pairs appear to come primarily from differences in nutritional intake.[7]

As emphasized by ACL, differences between cross-section and twin fixed effects estimates can support two different interpretations. One is that there is a homogenous birth weight effect and the cross-sectional estimate is inconsistent. Another is that different sources of variation in birth weight have different effects on child outcomes. That is, birth weight is not in itself a policy variable, and different policies that affect birth weight may have very different effects on other outcomes.

## III. Data

Our primary data source is the birth records for all Norwegian births over the period 1967–1997 obtained from the Medical Birth Registry of Norway. All births, including those born outside of a hospital, are included as long as the gestation period was at least sixteen weeks.[8] The birth records contain information on year and month of birth, birth weight, gestational length, age of mother, and a range of variables describing infant health at birth. In these data, we are also able to identify twin births and the birth order of twins but cannot distinguish between fraternal and monozygotic twins. We drop twin pairs where either twin was born with a congenital defect (approximately 2.1 percent), as this suggests an underlying difference between the twins.

Using unique personal identifiers, we match these birth files to the Norwegian Registry Data, a linked administrative dataset that covers the population of Norwegians aged 16–74 in the

---

weight on later outcomes between preterm and full-term babies. For one-year mortality, birth weight is more important for preterm twin pairs. About 35 percent of twins are born pre-term in our sample.

7. There is an extensive medical literature examining the determinants of birth weight differences (called discordance) among twins. See Blickstein and Kalish [2003] for a summary.

8. The data also include stillbirths, which constitute approximately fifteen per 1,000 births. We exclude these from the sample.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 89 of 4699 PageID #:  3254

1986–2002 period and is a collection of different administrative registers such as the education register, family register, and the tax and earnings register. These data are maintained by Statistics Norway and provide information about educational attainment, labor market status, earnings, and a set of demographic variables (age, gender) as well as information on families.[9]

Another source of data is the Norwegian military records from 1984 to 2005, which contain information on height, weight, and IQ. In Norway, military service is compulsory for every able young man. Before entering the service, their medical and psychological suitability is assessed; this occurs for the great majority between their eighteenth and twentieth birthday.[10] We match these data with our other data files and use the height, BMI, and test score data as outcome variables for men.[11]

Our final dataset is a survey of twins born from 1967 through 1979 that contains information on zygosity and can be matched to the administrative data. The survey includes information on twin pairs that were intact at age three and was collected in two waves, one in 1992 and one in 1998. This is the only survey we use that is based on voluntarily self-reported information. As a result, we only have zygosity information for surviving twin pairs who completed the survey questionnaire (approximately 64 percent of those contacted).[12]

In the literature, different variants of birth weight have been used as the primary variable of interest. These include birth weight, log(birth weight), fetal growth (defined as birth weight divided by weeks gestation), and an indicator for low birth weight ($<$2,500 grams). Given that there is no obvious choice a priori, we have examined the explanatory power of these variables in the

9. Our measure of child educational attainment is reported by the educational establishment directly to Statistics Norway, thereby minimizing any measurement error due to misreporting. This educational register started in 1970. See Møen, Salvanes, and Sørensen [2003] for a description of these data.

10. Of the men in the 1967–1987 cohorts, 1.2 percent died before one year and 0.9 percent died between one year of age and registering with the military at about age 18. About 1 percent of the sample of eligible men had emigrated before age eighteen, and 1.4 percent of the men were exempted because they were permanently disabled. An additional 6.2 percent are missing for a variety of reasons including foreign citizenship and missing observations. See Eide et al. [2005] for more details.

11. There is an extensive literature suggesting that height is a useful indicator of health, both in developed as well as developing nations. See Strauss and Thomas [1998] for references.

12. Zygosity assignment is based on questionnaire items about co-twin similarity during childhood. These classification techniques are considered to have a very high rate of correct classification (greater than 96 percent). See Harris, Magnus, and Tambs [2002] for more details.

twin fixed effects regressions. They indicate that log(birth weight) provides the best fit for all outcome variables. Thus, we use this variable in our analysis. Estimates are very similar when either of the other two continuous measures are used [Black, Devereux, and Salvanes 2005c].[13]

The outcomes we study are as follows:

*Infant Mortality.* This comes from the birth records and is defined as mortality within the first year of life. We have this variable for the full 1967–1997 period.

*Five-Minute APGAR Score.* APGAR scores are a composite index of a child's health at birth and take into account Activity (and muscle tone), Pulse (heart rate), Grimace (reflex irritability), Appearance (skin coloration), and Respiration (breathing rate and effort). Each component is worth up to two points for a maximum of ten. This measure comes from the birth register and is available beginning in 1977.

*Height, BMI, and Ability.* For the cohorts of men born from 1967 up to 1987, we have information from the military records on height, weight, and Body Mass Index (BMI, defined as kilograms divided by meters squared), all of which were measured as part of the medical examination. We also have a composite score from three speeded IQ tests—arithmetic, word similarities, and figures (see Sundet et al. [2004 2005] and Thrane [1977] for details). The composite IQ test score is an unweighted mean of the three subtests. The IQ score is reported in stanine (Standard Nine) units.[14]

*Education.* For the cohorts born between 1967 and 1981 (and who are therefore at least twenty-one in 2002), we create a binary

---

13. It is interesting to note that the LBW indicator fits most poorly for all outcomes. This suggests that using cutoffs such as <2,500 grams as the variable of interest may not be appropriate for this type of analysis. We have also tried including both ln(birth weight) and an indicator for LBW (<2,500 grams) in the same specifications. The continuous measure dominates for all outcomes and the effect of LBW is always statistically insignificant and often has the wrong sign. In the same vein, we have also tried including both ln(birth weight) and birth length; with the exception of height at age eighteen, birth length is always dominated by ln(birth weight).

14. The arithmetic test is quite similar to the Wechsler Adult Intelligence Scale (WAIS) [Sundet et al. 2005; Cronbach 1964]. The word test is similar to the vocabulary test in WAIS, and the figures test is similar to the Raven Progressive Matrix test [Cronbach 1964]. Stanine units are a method of standardizing raw scores into a nine point standard scale with a normal distribution, a mean of five, and a standard deviation of two.

000083

indicator for whether the person has at least twelve years of education.[15]

*Labor Market Outcomes.*  We look at attachment to the labor force by studying whether individuals who are aged greater than or equal to twenty-five are full-time, full-year workers in 2002 (the last year of our panel). To identify this group, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995, and in the fourth quarter thereafter).[16] We label these individuals as full-time workers. This includes about 62 percent of men and 43 percent of women in our sample.

We also study the earnings of full-time full-year employees, measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We use the most recent year of earnings in which we observe earnings for both twins, provided the twins are aged at least twenty-five in that year. Because of the age restrictions, the labor market variables are for 1967–1977 cohorts.

*Birth Weight of First Child.* Finally, we also examine whether or not there is evidence of intergenerational transmission of birth weight. This sample consists of women born between 1967 and 1988 whose first births occurred by 2004.[17] If the first birth is a twin birth, the woman is dropped from the sample. The outcome variable is the birth weight of the first born child.

### III.A. Summary Statistics

Table I presents summary statistics for our sample. Statistics are broken down into twin and singleton samples in Columns 1 and 2 and the twin sample is reduced to same-sex twin pairs by sex in Columns 3 and 4. Figure I shows the substantial variation in birth weight within twin pairs; 21 percent of the variation in

---

15. While we describe this as high school completion, in many individuals with twelve years of education obtain vocational rather than academic qualifications. We also tried using a more continuous measure of educational attainment as our dependent variable. However, because this necessitated restricting the sample further (aged twenty-five or older, at a minimum), our standard errors became quite large and we were not able to draw any real conclusions.

16. An individual is labeled as employed if currently working with a firm, on temporary layoff, on up to two weeks of sickness absence, or on maternity leave.

17. To get information on births up to 2004, we used a more recent birth register that has information on births between 1998 and 2004.

000084

TABLE I
SUMMARY STATISTICS

| | Singletons | Twins | Same-sex male twins | Same-sex female twins |
|---|---|---|---|---|
| Child's characteristics (1967–1997) | | | | |
| Infant birth weight | 3528 (558) | 2598 (612) | 2594 (639) | 2540 (599) |
| Fraction low birth weight (<2500 grams) | .03 (.18) | .39 (.49) | .39 (.49) | .42 (.49) |
| Gestation (weeks) | 39.83 (2.17) | 36.90 (3.18) | 36.62 (3.30) | 37.02 (3.20) |
| Fetal growth | 88.46 (13.07) | 69.84 (13.81) | 70.14 (14.38) | 68.06 (13.47) |
| Fraction female | .49 (.50) | .50 (.50) | 0 | 1 |
| Fraction with complications | .31 (.46) | .49 (.50) | .49 (.50) | .49 (.50) |
| Mother's characteristics (1967–1997) | | | | |
| Education | 11.25 (2.64) | 11.53 (2.61) | 11.54 (2.60) | 11.52 (2.62) |
| Age | 26.64 (5.23) | 28.06 (5.12) | 27.81 (5.11) | 27.74 (5.18) |
| $N$ | 1,595,203 | 33,366 | 11,528 | 11,284 |
| Short-run outcomes | | | | |
| 1 year mortality rate (per 1000 births) (1967–1997) | 6.23 (78.68) | 31.11 (173.62) | 41.20 (198.77) | 28.00 (164.99) |
| Five-minute APGAR score (1977–1997) | 9.29 (.75) | 9.01 (1.10) | 8.95 (1.19) | 9.02 (1.10) |
| Education (1967–1981) | | | | |
| High school completion | .73 (.44) | .74 (.44) | .74 (.44) | .75 (.43) |
| Military data (male sample 1967–1987) | | | | |
| Height (centimeters) | 179.96 (6.51) | — | 179.34 (6.57) | — |
| BMI (kilograms/meters$^2$) | 22.50 (3.38) | — | 21.84 (2.90) | — |
| IQ (stanines) | 5.20 (1.79) | — | 5.08 (1.82) | — |

000085

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 93 of 4699 PageID #:  3258

TABLE 1
(CONTINUED)

| | Singletons | Twins | Same-sex male twins | Same-sex female twins |
|---|---|---|---|---|
| Earnings data (1967–1977) | | | | |
| Fraction working full time | .55 (.50) | .53 (.50) | .62 (.49) | .43 (.50) |
| Earnings for full time workers | 297,834 (161,914) | 295,962 (127,805) | 337,888 (137,214) | 250,619 (95,357) |
| Intergenerational transmission (female sample 1967–1984) | | | | |
| Birth weight of first child | 3,465 (619) | — | — | 3,490 (614) |

Standard deviations are given in parentheses. Fetal growth is calculated as birth weight divided by weeks gestation. Years in parentheses indicate the cohorts for which data is available. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests–arithmetic, word similarities, and figures [see Sundet et al. 2004 2005, Thrane 1977 for details]. The arithmetic test is quite similar to the Wechsler Adult Intelligence Scale (WAIS) [Sundet et al. 2005, Cronbach 1964]. The word test is similar to the vocabulary test in WAIS, and the figures test is similar to the Raven Progressive Matrix test [Cronbach 1964]. The composite IQ test score is an unweighted mean of the three subtests. The IQ score is reported in stanine (Standard Nine) units. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We restrict attention to individuals aged at least twenty-five. Working full-time indicates whether individuals are full-time, full-year workers. To identify this group, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995 and in the fourth quarter thereafter). We label those individuals as full-time workers. For birth weight of child, the sample consists of women born between 1967 and 1988 whose first births occurred by 2004. If the first birth is a twin birth, the woman is discarded from the sample.

000086



FIGURE I

Distribution of Differences in Birth Weight of Twins

Each bar represents the percentage of twins whose birth weight difference falls within the specified range. The first bar is 0–100 gram differences, the second bar is 101–200, etc. The mean birth weight difference among twins in our sample is 320 grams. The sample includes all twins born between 1967 and 1997 in Norway.

birth weight is within-twin. Table II reports sample averages for heavier and lighter same-sex twins. It is clear that heavier twins have better outcomes on average than lighter twins.

## IV. RESULTS

As discussed earlier, different outcome variables are available for different cohorts. Initially, we maximize precision by using all available cohorts for each measure. Later, we show results when we study different outcomes using the exact same cohorts and even the exact same observations.

We first examine the sample of all twins and compare the results when we use pooled OLS versus a twins fixed-effect estimation strategy. Table III presents these estimates. Each coefficient represents the estimate from a separate regression. We present the results in approximate chronological order so that outcomes measured earlier in the life-cycle come first.

### IV.A. Short Run Outcomes: Mortality and Five-Minute APGAR Score

For mortality, the pooled OLS coefficient of $-280$ implies that a 10 percent increase in birth weight would reduce one-year

TABLE II
SUMMARY STATISTICS: SAME-SEX TWINS

| | Heavier | Lighter | T-statistics (difference in means) |
|---|---|---|---|
| Infant birth weight | | | |
| Mean | 2726 (611) | 2415 (586) | |
| Median | 2800 | 2490 | |
| Twenty-fifth percentile | 2400 | 2080 | |
| Tenth percentile | 1940 | 1640 | |
| Fifth percentile | 1570 | 1310 | |
| First percentile | 860 | 730 | |
| Fraction low birth weight | | | |
| (<2500 grams) | .30 (.46) | .51 (.50) | |
| Fetal growth | 73.35 (13.39) | 64.97 (13.22) | |
| Fraction with complications | .48 (.50) | .50 (.50) | |
| ln(birth weight) | .97 (.28) | .84 (.30) | |
| $N$ | | 22,366 | |
| Outcomes | | | |
| 1 year mortality rate (per 1,000 births) ($N$ = 22,366) | 32.55 (177.46) | 34.96 (183.70) | 1.48 |
| Five-minute APGAR score ($N$ = 14410) | 9.01 (1.11) | 8.96 (1.16) | 3.19 |
| Height (males only) ($N$ = 5264) | 179.67 (6.57) | 178.99 (6.56) | 7.34 |
| BMI (males only) ($N$ = 5254) | 21.90 (2.89) | 21.77 (2.86) | 2.62 |
| IQ (males only) ($N$ = 4804) | 5.10 (1.81) | 5.04 (1.82) | 1.99 |
| High school graduation rate ($N$ = 8832) | .76 (.43) | .73 (.44) | 3.08 |
| Percentage working full time ($N$ = 6446) | .52 (.50) | .52 (.50) | .03 |
| ln(earnings) for full time workers ($N$ = 4020) | 12.52 (.45) | 12.52 (.48) | .48 |
| ln(birth weight of first child) ($N$ = 1832) | 8.15 (.23) | 8.12 (.28) | 2.05 |

Standard deviations are given in parentheses. $N$ indicates the number of twins. T-statistics for the difference in means between heavier and lighter twins have been adjusted to reflect the covariance between the samples. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures [see Sundet et al. 2004 2005, Thrane 1977 for details]. The arithmetic test is quite similar to the Wechsler Adult Intelligence Scale (WAIS) [Sundet et al. 2005, Cronbach 1964]. The word test is similar to the vocabulary test in WAIS, and the figures test is similar to the Raven Progressive Matrix test [Cronbach 1964]. The composite IQ test score is an unweighted mean of the three subtests. The IQ score is reported in stanine (Standard Nine) units. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We restrict attention to individuals aged at least twenty-five. Working full-time indicates whether individuals are full-time, full-year workers. To identify this group, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995 and in the fourth quarter thereafter). We label these individuals as full-time workers. For ln(birth weight) of child, the sample consists of women born between 1967 and 1988 whose first births occurred by 2004. If the first birth is a twin birth, the woman is discarded from the sample.

422        *QUARTERLY JOURNAL OF ECONOMICS*

TABLE III
REGRESSION RESULTS: TWINS SAMPLE COEFFICIENT ON LN (BIRTH WEIGHT)

| Dependent variable | Singleton sample | | Twins sample | |
|---|---|---|---|---|
| | OLS | Family fixed effects | OLS | Twin fixed effects |
| One-year mortality | −123.46** (1.71) | −186.71** (.69) | −279.64** (9.12) | −41.10** (7.64) |
| N | 1,253,546 | | 33,366 | |
| Five minute APGAR score | .73** (.01) | 1.08** (.01) | 1.46** (.06) | .35** (.07) |
| N | 674,577 | | 21,580 | |
| Height (males only) | 11.03** (.11) | 7.33** (.12) | 7.48** (.55) | 5.68** (.56) |
| N | 203,741 | | 5,382 | |
| BMI (males only) | −6.19 (7.67) | −22.22 (15.23) | .56** (.23) | 1.12** (.30) |
| N | 203,378 | | 5,372 | |
| Underweight | −.09** (.004) | −.07** (.01) | −.07** (.02) | −.11** (.04) |
| N | 203,378 | | 5,372 | |
| Overweight | .08** (.01) | .08** (.01) | .03 (.02) | .09** (.04) |
| N | 203,378 | | 5,372 | |
| IQ (males only) | .91** (.03) | .58** (.04) | .48** (.14) | .62** (.18) |
| N | 184,045 | | 4,920 | |
| High school completion | .16** (.01) | .04** (.01) | .07** (.02) | .09** (.04) |
| N | 536,020 | | 13,106 | |
| Full-time work | .17** (.004) | .21** (.01) | .29** (.02) | .03 (.05) |
| N | 368,582 | | 10,388 | |
| ln(earnings) FT | .09** (.01) | .08** (.01) | .09** (.03) | .12** (.06) |
| N | 239,906 | | 5,952 | |
| ln(birth weight of first child) | .25** (.01) | .13** (.01) | .18** (.04) | .15** (.06) |
| N | 63,842 | | 1,862 | |

Standard errors are in parentheses. The control variables we use in the OLS estimation are year- and month-of-birth dummies, indicators for mother's education (one for each year), indicators for birth order, indicators for mother's year of birth, and an indicator for the sex of the child. Family fixed effects regressions include all of the above minus mother's education and mother's year of birth. Twin fixed effects regressions include indicators for sex and birth order of the twin (either first born or second born twin). Both cross-sectional and fixed effects regressions for height, BMI, and IQ also include indicator variables for the year the boy was tested by the military. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures—and is reported in stanine (Standard Nine) units. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We restrict attention to individuals aged at least twenty-five. Working full-time indicates whether individuals are full-time, full-year workers. To identify this group, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995 and in the fourth quarter thereafter). We label these individuals as full-time workers. For ln(birth weight) of child, the sample consists of women born between 1967 and 1988 whose first births occurred by 2004. If the first birth is a twin birth, the woman is dropped from the sample.
  ** Denotes statistically significant at the 5 percent level.
  * Denotes statistically significant at the 10 percent level.

000089

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 97 of 4699 PageID #: 3262

mortality by approximately twenty-eight deaths per 1,000 births. The twin fixed effects coefficient of −41 is statistically significant but only one sixth the size of the OLS coefficient. Similarly, when we look at five-minute APGAR scores as our outcome, we find a large OLS estimate but a much smaller twin fixed effects estimate. When we use linear measures of birth weight, our estimates are almost identical to the estimates of Almond et al. for the U.S., suggesting that the infant health production function may be similar in the U.S. and Norway.[18] For example, our twin fixed effects mortality estimate using birth weight is −10 (3) while theirs is −11 (.1).

*IV.B. Height, BMI, and IQ at Age Eighteen–Twenty for Men*

We next turn to male outcomes measured between ages eighteen and twenty.[19] Height is measured in centimeters so the OLS estimate suggests that a 10 percent increase in birth weight translates into about .75 extra centimeters of height at around age eighteen, and an increase in BMI of around .06. Twin fixed effects estimates are quite similar, with a 10% increase in birth weight leading to a .57 centimeter increase in height and a .11 increase in BMI. Our IQ measure is on a scale from one to nine; the estimated twin fixed effects coefficient of .62 suggests that an increase in birth weight by 10 percent will increase the score by .06 (about one twentieth of a stanine). For all three variables, fixed effects estimates are similar in magnitude to cross-sectional ones.

Given that BMI is an ambiguous health measure, as health may be adversely affected if BMI is too high (so men are overweight) or BMI is too low (so men are underweight), we have used the Center for Disease Control (CDC) cutoffs for overweight (BMI greater than or equal to 25—11 percent of the twins sample) and underweight (BMI less than 18.5—8 percent of the twins sample) to analyze the effect of birth weight on the probability of being in either of these two groups. The twin fixed effects estimates show

18. Because infant mortality is a rare outcome, estimated derivatives may be sensitive to functional form. When we assume other functional forms and estimate logit or probit equations instead of linear probability models, we get very different marginal effects (smaller by a factor of six) in the pooled estimation. Marginal effects from a fixed effects conditional logit model are also very different from the linear twin fixed effects estimates (not very surprising, given the selection problem induced by the fact that the logit only includes cases in which one twin lives and one twin dies).

19. To take account of the fact that men enter the military and take the test in different years and at different ages, we add dummies for the test year to the controls used earlier.

000090

that increased birth weight significantly increases the probability of being overweight and significantly decreases the probability of being underweight.[20]

### IV.C. High School Completion

We find that the within-twin estimates of the effect of birth weight on high school completion are similar in magnitude to the OLS estimates and statistically significant. The magnitude implies that an increase in birth weight of 10 percent increases the probability of high school completion by a bit less than 1 percentage point.[21]

### IV.D. Labor Market Outcomes

In terms of labor market participation, the twin fixed effects estimates provide no evidence that increased birth weight increases the probability of working full time, despite relatively large OLS estimates (which suggest that a 10 percent increase in birth weight increases the probability of working full time by about .03). In contrast, both OLS and twin fixed effects estimates suggest that a 10 percent increase in birth weight raises full-time earnings by about 1 percent.[22] Given the return to education in Norway has been estimated to be about 4 percent for men [Black, Devereux, and Salvanes 2005b], this suggests that 10 percent more birth weight is about as valuable in the labor market as a quarter of a year of education.[23]

### IV.E. Birth Weight of First Child

When we examine the subsample of female twins who both have children in our sample, we find that OLS and twin fixed effect estimates of the effects of birth weight on child's birth

20. Compared to Behrman and Rosenzweig [2004], we find smaller effects of birth weight on height and larger effects of birth weight on BMI. The estimates are not directly comparable, however, as theirs are for middle-aged women while ours are for young men.

21. Unlike with infant mortality, logit and probit marginal effects for high school graduation are very close to those from the linear probability model. However, fixed effects logit marginal effects are larger than the fixed effects linear probability model estimates.

22. Despite our finding of birth weight effects on education and earnings, controlling for birth weight has a negligible impact on the return to education estimated using twin difference models with our data. This is largely because birth weight explains very little of the education differences between twins (the within $R^2$ is .002 in the twins fixed effects regression of high school graduation on birth weight).

23. In contrast, Behrman and Rosenzweig [2004] find very large effects of fetal growth on female earnings (twin fixed effects estimates are about 6 times as large as their OLS estimates).

weight are quite similar, with a 10 percent increase in mother's birth weight leading to a 1.5 percent increase in the birth weight of their first child. This implies that our estimate is about twice that of Royer [2005]. Interestingly, we have found no evidence of an effect of birth weight on the weight of later-born children. Royer finds a small effect of birth weight using a sample of both first and second born children.

### IV.F. Possible Mechanisms for Birth Weight Effects

There are many possible channels through which birth weight can affect adult outcomes. Plausible candidates include both biological and behavioral explanations. For example, nutrition in utero can affect brain development [Mogane et al 1993], which is consistent with our IQ findings. Also, size itself may matter for children's longer-run outcomes; certainly our height and BMI results suggest size advantages persist into adulthood for men.

Other explanations involve how parental and societal investments interact with birth weight. For example, if parents perceive that the return to investment is higher for the bigger twin, they may invest more in him/her and this may lead to better long-run outcomes. On the other hand, parents may engage in compensatory investment behavior that would attenuate birth weight effects.[24]While we cannot observe investments, one might expect that such behavior might differ depending on family resources. To examine this, we tried breaking our sample on a number of dimensions, including by mother's education (less than twelve years and twelve or more years), by family income, and by birth order of the children. Also, effects might differ based on local attitudes towards social support. As a proxy for this, we broke the sample by the voting behavior of the municipality of the mother (the proportion voting for the labor party in 1961). In none of these cases did we find statistically significant differences in the effects of birth weight.[25] However, in the absence of information

24. Recent work by Rosenzweig and Zhang [2006] provides some evidence of reinforcing parental investments using twins data from China. Also, Datar et al. [2005] find evidence that is generally suggestive of reinforcing parental investments among singletons using U.S. data.

25. Royer [2005] reports a similar finding from U.S. data. In other literature, there is some evidence that family resources affect the degree of differential investment; this appears in the cross-sectional and sibling fixed effects context, but not controlling for twin fixed effects. See Loughran et al. [2004] for one example.

426          *QUARTERLY JOURNAL OF ECONOMICS*

on investments, we cannot come to any definitive conclusions about the importance of these mechanisms.

## V. Robustness Checks

### V.A. Singletons versus Twins

In Section VI, we address the question of the generalizability of our results. However, to facilitate comparison with other literature, we have included both cross-section and mother fixed effects estimates for singletons in Table III.[26] The singleton fixed effects provide an interesting contrast to twin fixed effects as they are robust to any factors that are mother-specific and unchanging but are not robust to any omitted factors that are correlated with particular pregnancies. The fixed effects estimates provide further support for birth weight having important long-run effects. However, they differ from the twin fixed effects models in that birth weight is also seen to have large short-run impacts.[27]

### V.B. Sample Consistency

In Table III, we used all available observations for each outcome to maximize precision. However, a key feature of our paper is that we can study both short- and long-run outcomes for the same cohorts of individuals. Table IV presents these results. The first set of results (Columns 1 and 2) are for male same-sex twins born between 1978 and 1986. For this group, we can use exactly the same twin pairs to study APGAR, height, BMI, and IQ. We also include infant mortality for these cohorts even though it obviously cannot be restricted to exactly the same twin pairs. The second set of results is for same-sex female twins born between 1967 and 1977. For these cohorts we present estimates for infant mortality, high school graduation, whether they work full-time, full-time earnings, and birth weight of first child.[28] Because of the selection problems resulting from infant mortality, work

26. We omit cases where there are fewer than two children in the family. However, the OLS results are essentially unchanged if we use the sample of all singletons.

27. Our family fixed effects estimates are quite consistent with estimates from North America. For example, Currie and Moretti [2005] estimate the intergenerational correlation in ln(birth weight) in California to be about .17 (.004) while we get an estimate of .13 (.01). Similar to our own findings, Oreopoulos et al. [2006] use Canadian data and find that the sibling fixed effects estimates for infant mortality are more negative than the corresponding OLS estimates.

28. Because of a variety of age restrictions and data availability, we selected these samples to maximize our ability to compare outcomes over time while maintaining the same sample of individuals.

TABLE IV
REGRESSION RESULTS CONSTANT SAMPLE: COEFFICIENT ON LN (BIRTH WEIGHT)

| Dependent variable | Male same-sex twins 1978–1986 | | Female same-sex twins 1967–1977 | |
|---|---|---|---|---|
| | OLS | FE | OLS | FE |
| 1-year mortality | −299.24** (31.74) | −33.20 (22.92) | −390.56** (27.62) | 5.84 (23.57) |
| N | 2760 | | 3804 | |
| Five-minute APGAR score | .90** (.15) | .37* (.21) | — | — |
| Height (males only) | 7.55** (.89) | 8.56** (.85) | — | — |
| BMI (males only) | .20 (.40) | 2.24** (.54) | — | — |
| Underweight | −.06 (.03) | −.05 (.05) | — | — |
| Overweight | .03 (.04) | .17** (.07) | — | — |
| IQ (males only) | .29 (.20) | 1.09** (.28) | — | — |
| N | 1894 | | | |
| High school completion | — | — | .03 (.04) | .11* (.06) |
| N | | | 3466 | |
| Full-time work | — | — | .19** (.03) | −.03 (.08) |
| N | | | 3574 | |
| ln(earnings) FT | — | — | .17** (.07) | .14 (.10) |
| N | | | 1732 | |
| ln(birth weight of first child) | | | .19** (.03) | .18** (.06) |
| N | | | 1722 | |

Standard errors are given in parentheses. The control variables we use in the OLS estimation are year- and month-of-birth dummies, indicators for mother's education (one for each year), indicators for birth order, indicators for mother's year of birth, and an indicator for the sex of the child. Twin fixed effects regressions include indicators for sex and birth order of the twin (either first born or second born twin). Both cross-sectional and fixed effects regressions for height, BMI, and IQ also include indicator variables for the year the boy was tested by the military. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures—and is reported in stanine (Standard Nine) scale. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We restrict attention to individuals aged at least twenty-five. Working full-time indicates whether individuals are full-time, full-year workers. To identify this group, we use the fact that our dataset identifies who are employed and working full time (30+ hours per week) at one particular point in time (in the second quarter in the years 1986–1995, and in the fourth quarter thereafter). We label these individuals as full-time workers. For ln(birth weight) of child, the sample consists of women born between 1967 and 1977 whose first births occurred by 2004. If the first birth is a twin birth, the woman is discarded from the sample.

** Denotes statistically significant at the 5 percent level.
* Denotes statistically significant at the 10 percent level.

decisions, and fertility decisions, we do not attempt to study a common set of twin pairs. Instead, the estimates are all for the same cohorts. For both cuts of the data, our results are similar to before: while the fixed effects estimates for short-run outcomes are smaller

than OLS, the equivalent estimates for long-run outcomes are generally about the same magnitude or larger than OLS.[29]

## V.C.  The Role of Zygosity

Because our twin sample includes both fraternal and monozygotic twins, estimates could in part reflect genetic differences between twins. To investigate this issue, we first restrict our sample to same-sex twin pairs. While this sample is not limited to monozygotic twins, by eliminating opposite-sex twin pairs (which are clearly not monozygotic), the sample now contains a larger fraction of identical twin births. Table V reports fixed effects estimates for all twins (from Table III) and all same-sex twin pairs for comparison. The estimates are very similar in both samples, suggesting no large differences in estimates by zygosity.[30]

While we don't observe zygosity for all twins in our sample, we do observe it for a subset of the twins born between 1967–1979 who completed the twins questionnaire described in Section III. We can thereby see how our results differ when we isolate monozygotic twins from all same-sex twins. These results are in further columns of Table V. Because the twins who complete the questionnaire are a selected sample, we present results for (1) all same-sex twin pairs in the 1967–1979 cohorts, (2) all same-sex twin pairs who complete the survey, and (3) all monozygotic twin pairs known from the survey.[31] It is clear from the last two columns of Table V that estimates for monozygotic twins are almost identical to those for all same-sex twins who complete the survey, suggesting that genetic factors are not confounding our earlier estimates. It is also interesting to note that our results are somewhat different from the results when we use our full administrative sample (that does not rely on any information being obtained from the individual), suggesting that there is selection as to who chooses to complete these twin surveys.[32] Given that

---

29. Our high school graduation estimate for women is a little larger than, but not statistically different from, the equivalent estimate from Royer [2005] of .05 (.05) for childbearing women. Also, we find that this estimate falls and becomes very close to Royer's if we restrict our sample to women who give birth in our sample period.

30. There are no statistically significant differences between estimates for same-sex twins and mixed-sex twins. We also tried breaking the sample by gender and did not find significant differences between men and women.

31. We are unable to look at 1-year mortality because questionnaires were mailed only to twin pairs that were intact at age 3, and we exclude APGAR as it does not become available until 1977.

32. Comparing estimates for all same-sex twins, and same-sex twins for the 1967–1979 period, it also appears that the effects of birth weight on height, BMI, and IQ get larger over the sample period. We examine this issue more thoroughly in Table VI.

000095

TABLE V
FIXED EFFECTS RESULTS FOR LN (BIRTH WEIGHT)

| | All twins | All same-sex twins | All same-sex twins 1967–1979 | Same-sex twins in survey | Monozygotic twins |
|---|---|---|---|---|---|
| One-year mortality | −41.10** (7.64) [33,366] | −40.15** (9.44) [22,812] | 14.03 (16.48) [9,120] | — | — |
| Five-minute APGAR score | .35** (.07) [21,580] | .38** (.08) [14,684] | — | — | — |
| Height (males only) | — | 5.68** (.56) [5,382] | 4.20** (.71) [3,558] | 3.79** (.83) [2,700] | 4.14** (.64) [1,376] |
| BMI (males only) | — | 1.12** (.30) [5,372] | .59** (.35) [3,552] | .37 (.39) [2,696] | .43 (.37) [1,372] |
| IQ (males only) | — | .62** (.18) [4,920] | .37 (.23) [3,332] | .20 (.27) [2,538] | .22 (.30) [1,312] |
| High school completion | .09** (.04) [113,122] | .10** (.04) [9,002] | .10** (.04) [8,186] | .08* (.05) [6,638] | .09* (.06) [3,468] |
| Full-time work | .03 (.05) [110,388] | −.02 (.06) [7,124] | −.02 (.06) [7,124] | .01 (.07) [5,434] | .01 (.09) [2,794] |
| ln(earnings) FT | .12** (.06) [5,952] | .13** (.06) [4,098] | .13** (.06) [4,098] | .08 (.06) [3,614] | .09 (.09) [1,904] |
| ln(birth weight of first child) | — | .15** (.06) [1,862] | .14** (.07) [1,812] | .12** (.07) [1,636] | .18** (.09) [858] |

Standard errors are given in parentheses. The control variables we use include indicators for sex and birth order of the twin (either first born or second born twin). Regressions for height, BMI, and IQ also include indicator variables for the year the boy was tested by the military. The twins survey is available for cohorts born between 1967–1979. Twin pairs that experienced infant mortality are not in the survey universe. APGAR scores are only available from 1977 so estimates from the 1967–1979 period are not reported. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures—and is reported in stanine (Standard Nine) units. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. We restrict attention to individuals aged at least twenty-five. Working full-time indicates whether individuals are full-time, full-year workers. To identify this group, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995, and in the fourth quarter thereafter). We label these individuals as full-time workers. For birth weight of child, unless otherwise specified, the sample consists of women born between 1967 and 1988 whose first births occurred by 2004. If the first birth is a twin birth, the woman is discarded from the sample. The outcome variable is the birth weight of the first born child.

** Denotes statistically significant at the 5 percent level.
* Denotes statistically significant at the 10 percent level.



FIGURE II

Mortality Rate by Birth Weight

The calculations for the non-twins and the twins samples are simply the average infant mortality per 1,000 births in that birth weight cell. The calculations for twin fixed effects (FE) are the average mortality rate for the cell after controlling for twin fixed effects. The sample is based on all Norwegian individuals born between 1967 and 1997.

the results for monozygotic twins are so similar to those for all same-sex twins, we will continue to stress the results using the twins samples from the administrative data.

### V.D. *Heterogeneous Effects across the Birth Weight Distribution*

While using the natural log of birth weight does allow for nonlinear effects, it is possible to allow the effects of birth weight to be more flexible. Figures II–V do this graphically. Figure II illustrates the differences between the OLS estimates for mortality and those with the twin fixed effects across the birth weight distribution by presenting the average one-year mortality rate (per thousand births) by birth weight, both with and without twin fixed effects. It is clear that not only are the twin fixed effects estimates much smaller than the OLS, but there is also evidence of significant nonlinearities, with increased body mass having a negative effect on mortality at low birth weights but little discernable effect at weights above 2,000 grams (in fact, the twin mortality rate falls from sixteen per thousand to one per thousand as one moves from 2,000 to 3,500 grams). This is also true of the 5 minute APGAR score (see Black, Devereux and Salvanes [2005c]).

000097



FIGURE III

Height by Birth Weight (Males Only)

The calculations for the non-twins and the twins samples are simply the average male height measured between ages eighteen and twenty in that birth weight cell. The calculations for twin fixed effects (FE) are the average height for the cell after controlling for twin fixed effects. The sample is based on all Norwegian males who registered for mandatory military service in Norway and who were born between 1967 and 1987.

Unlike the case with mortality, Figure III shows that OLS and twin fixed effects estimates for height are very similar to each other. Once again, there is some evidence of a non-linear relationship, with the positive relationship between birth weight and height flattening out after about 1,500 grams. The equivalent figures for IQ (Figure IV), and full-time earnings (Figure V) show once again that OLS and fixed effects estimates are very similar across the distribution and provide little evidence of strong non-linearities.[33] In all figures, the estimates are noisy at very low and very high birth weights, reflecting the paucity of data in these regions.

*V.E. Selection into the Later Outcomes Sample*

When looking at the effect of birth weight on later outcomes, we are inherently including only those individuals for whom we

---

33. In the working paper version, we also allowed for splines in birth weight with less than 1,500, 1,500–2,500, and 2,500 or more as the cutoffs. We found substantial non-linearities in mortality and the five minute APGAR score, with a large marginal benefit for additional grams among very low birth weight babies in terms of both these outcomes. However, as is suggested by Figures II–V, we found little evidence of significant nonlinearities in later outcomes (see Black, Devereux and Salvanes [2005c]).

000098



FIGURE IV
IQ by Birth Weight (Males Only)

The calculations for the non-twins and the twins samples are simply the average male IQ measured between ages eighteen and twenty in that birth weight cell. The calculations for twin fixed effects (FE) are the average IQ for the cell after controlling for twin fixed effects. The sample is based on all Norwegian males who registered for mandatory military service in Norway and who were born between 1967 and 1987. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures (see Sundet et al. [2004 2005] and Thrane [1977] for details). The arithmetic test is quite similar to the Wechsler Adult Intelligence Scale (WAIS) [Sundet et al. 2005, Cronbach 1964]. The word test is similar to the vocabulary test in WAIS and the figures test is similar to the Raven Progressive Matrix test [Cronbach 1964]. The composite IQ test score is an unweighted mean of the three subtests. The IQ score is reported in stanine (Standard Nine) units.

observe later outcomes. In particular, individuals who did not survive are not included in our sample and this may bias our estimates. Unlike previous twin studies of this nature, we observe birth characteristics (such as birth weight) of twin pairs who are subsequently impacted by infant mortality and can examine the characteristics associated with selection into the sample.

Table VI demonstrates that the twin fixed effects estimates of the impact of birth weight on later outcomes have tended to increase over time (we have omitted outcomes for which there were very few observations outside the first time period). Over this same time period, infant mortality amongst twins has declined, from about sixty-six per thousand births in 1967 to less than thirteen per thousand in 1997. While there are many possible reasons for the temporal pattern in the estimates, one possibility is that later effects are larger because the sample includes more twins who were on the margin of survival in infancy.

000099



FIGURE V

ln(Full-Time Earnings) By Birth Weight

The calculations for the non-twins and the twins samples are simply the average ln(earnings) for full-time workers aged at least twenty-five in that birth weight cell. The calculations for twin fixed effects (FE) are the average ln(earnings) for full-time workers for the cell after controlling for twin fixed effects. Earnings are measured as total pension-qualifying earnings reported in the tax registry. These are not topcoded and include labor earnings, taxable sick benefits, unemployment benefits, parental leave payments, and pensions. To identify full-time workers, we use the fact that our dataset identifies individuals who are employed and working full time (30+ hours per week) at one particular point in the year (in the second quarter in the years 1986–1995, and in the fourth quarter thereafter). For the twin sample, both twins must be working full time in a given year to be included in our data. We use the most recent year of earnings available. Because of the age restriction, the cohorts included are those born between 1967 and 1977.

Though it is inherently impossible to know what the effects of birth weight would have been on the later outcomes of the individuals we do not observe, we do try to think about how this selection may be biasing our results. If there are heterogeneous effects of birth weight across twin pairs and birth weight is actually more important for twin pairs who subsequently experience mortality, we may be underestimating the effect of birth weight on later outcomes. Because we observe the five-minute APGAR score for all individuals (even those who subsequently die in infancy) beginning in 1977, we can test this theory by separately estimating the relationship between birth weight and AP-GAR for the full sample and the sample of twin pairs where both twins live. When we do this using twin fixed effects, we find that

TABLE VI

DIFFERENCES BY BIRTH COHORTS: RESULTS FOR LN (BIRTH WEIGHT) OLS AND TWIN FIXED EFFECTS

| Year of birth | 1967–1976 | | 1977–1986 | | 1987–1997 | |
|---|---|---|---|---|---|---|
| | OLS | FE | OLS | FE | OLS | FE |
| One-year mortality | −427.00** (15.44) [10604] | 7.11 (16.20) | −279.02** (18.75) [8618] | −45.17** (14.11) | −173.89** (12.91) [14144] | −78.26** (10.03) |
| Five-minute APGAR score | — | — | 1.84** (.11) [7616] | .62* (.12) | 1.29** (.07) [13964] | .20** (.08) |
| Height (males only) | 7.52** (.76) [2900] | 3.38** (.79) | 7.80** (.81) [2400] | 8.24** (.78) | — | — |
| BMI (males only) | .82** (.29) [2898] | .37 (.38) | .22 (.37) [2392] | 2.01** (.48) | — | — |
| IQ (males only) | .63** (.21) [2700] | .32 (.25) | .33* (.19) [2150] | 1.02** (.27) | — | — |
| High school completion | .05** (.02) [9500] | .04 (.04) | .15** (.04) [3622] | .22** (.07) | — | — |

Standard errors are given in parentheses. Samples sizes are given in brackets. The control variables we use include indicators for sex and birth order of the twin (either first born or second born twin). Regressions for height, BMI, and IQ also include indicator variables for the year the boy was tested by the military. High school completion indicates whether or not the individual has completed at least twelve years of schooling and is restricted to those twenty-one and older. The IQ measure is generated from a composite score from three speeded IQ tests—arithmetic, word similarities, and figures—and is reported in stanine (Standard Nine) units.
   ** Denotes statistically significant at the 5 percent level.
    * Denotes statistically significant at the 6 percent level.
    * Denotes statistically significant at the 10 percent level.

000101

log birth weight has a significantly larger positive effect on the APGAR score for the full sample of twin births. The difference is large—.35 (.07) for the full sample versus .19 (.06) for the sample without mortality. If this relationship is also true of other, later outcomes, then we may be underestimating the true effect of birth weight on later outcomes by a substantial amount.[34]

## VI. External Validity

While using within-twin variation allows us to credibly identify the causal effect of differences in birth weight arising from differences in access to nutrition in utero, the issue of generalizability of these results to the general population of births remains.

From Table I, we can see that there are substantial differences between twin and singleton births. Gestation is longer for singletons, with the average at 39.8 weeks versus 36.9 for twins. Five-minute APGAR scores are also higher for singletons, there is a lower fraction with complications, and the one-year mortality rate is only six per 1,000 births as opposed to thirty-one for twins. Parental education is similar for both groups but the mothers of twins tend to be older.

One of the most notable differences is that twins come disproportionately from the lower part of the birth weight distribution. Only 3 percent of singletons are classified as low birth weight (less than 2,500 grams), while 39 percent of twins are low birth weight. In addition, there are few large birth weight twins; the fifth percentile singleton is approximately the same weight as the median twin (2,640 versus 2,660 grams) and the median singleton is approximately the same weight as the 95th percentile twin (3,540 vs 3,500 grams). However, when one compares twins and singletons with the same birth weight, their outcomes are

---

34. A more formal approach to the missing data problem is to model the probability that a twin pair will experience mortality within the first year and hence attrit from the later outcomes sample. We have tried allowing the probability of attrition to depend on flexible functions of the birth weight of each twin as well as the gestation length of the twin pair and used these estimates to form weights equal to the inverse of the probability of not attriting due to mortality in the first year. When we do this reweighting, we again find that our estimates are likely underestimating the true effect of birth weight on later outcomes, although the differences between the weighted and unweighted estimates are not large. Also, if we carry out this exercise allowing for attrition other than infant mortality, we find similar estimates.

surprisingly similar. In Figures II–V, we have graphed the relationship between birth weight and mortality, height, IQ, and earnings for the samples of twins and singletons. The twins and nontwins actually have quite similar outcomes conditional on birth weight, suggesting that our results may be generalizable to the rest of the population.[35] This conclusion is bolstered by the earlier finding in Table 3 that sibling fixed effects estimates for later outcomes are generally quite similar to our twin fixed effects estimates.

However, generalizability should still be viewed with caution, as different sources of variation in birth weight may have different effects on outcomes. Also, we cannot rule out the possibility that twins and singletons have very different causal relationships between birth weight and outcomes but that they are subject to different confounding factors that happen to cancel each other out so that the cross-sectional profiles are similar.

## VII. Conclusions

In this paper, we have examined the effect of birth weight on adult outcomes using within-twin variation in birth weight to control for other, often unobservable, parental and environmental factors. Consistent with the recent literature, we find that OLS estimates for infant mortality and APGAR are much larger than those from twin fixed effects. However, we find significant effects of birth weight on adult outcomes, including height, BMI, IQ, education, earnings, and birth weight of the first-born child. Twin fixed effects estimates for these adult outcomes are similar in size to OLS estimates.

It is not clear why twin fixed effects estimates are so much smaller than OLS estimates for short-run but not for adult outcomes. It may be that some omitted variables that are correlated with short-run outcomes may be less correlated with long-run

---

35. This is consistent with findings in the medical literature that suggest that the primary cause of disparities in outcomes between twins and singletons is due to differences in size at birth. Allen [1995] notes that, in a sample of preterm births, no differences were present between twins and singletons with respect to neurodevelopmental outcomes at eighteen months from due date, after adjusting for confounding social, obstetric, and neonatal factors (including birth weight). Differences were only found when they examined preterm infants with birth weights of <800 grams, suggesting greater vulnerability of twins born at the limit of viability. See also Hoffman and Bennett [1990].

outcomes such as earnings, and so OLS results are more biased for short-run outcomes than for longer-run outcomes. For example, maternal smoking may have a significant effect on short-run health outcomes but may have little or no effect on longer-run outcomes. Another possibility is that parental investments favor the heavier twin. If it is the case that the returns to parental investment are higher for heavier twins, this would tend to increase the twins fixed effects estimates for adult outcomes relative to the pooled OLS. As discussed in Section III, our limited tests provide little evidence of this type of behavior but they are far from conclusive. While birth weight clearly affects longer run outcomes, further research is required to determine the mechanisms underlying it.

To get a sense of the magnitude of our estimates, we consider the WIC program in the United States. Earlier work by Kowaleski-Jones and Duncan [2002] estimated the effect of WIC participation by a pregnant woman to be about a 7.5 percent increase in child birth weight.[36] Using this estimate, we can translate this increased birth weight into the effect of WIC on longer run outcomes. Based on our estimates, a 7.5 percent increase in birth weight would lead to a little less than half a centimetre increase in height, a .05 stanine increase in IQ, a 1 percent increase in full-time earnings, and a 1.1 percent increase in the birth weight of their children.

An important caveat to this quantification exercise is that we are identifying off of variation related to access to nutrition in utero. Other factors affecting birth weight, such as maternal behavior (smoking, etc) and gestation length, may have different effects on children's outcomes. However, the evidence does seem to suggest that, by looking exclusively at the effect of birth weight on short run outcomes, one may miss out on sizeable effects of birth weight that manifest themselves in the longer run.

DEPARTMENT OF ECONOMICS, UNIVERSITY OF CALIFORNIA, LOS ANGELES, NATIONAL BUREAU OF ECONOMIC RESEARCH, AND IZA
SCHOOL OF ECONOMICS AND GEARY INSTITUTE, UNIVERSITY COLLEGE DUBLIN, CEPR, AND IZA
DEPARTMENT OF ECONOMICS, NORWEGIAN SCHOOL OF ECONOMICS, STATISTICS NORWAY, CENTER FOR THE ECONOMICS OF EDUCATION, AND IZA

36. They use the National Longitudinal Survey of Youth and apply a sibling fixed effects approach, identifying off of mothers who participated in WIC during one pregnancy but not during the other one.

438          *QUARTERLY JOURNAL OF ECONOMICS*

## REFERENCES

Allen, Michael. C, "Factors Affecting Developmental Outcome" *in Multiple Pregnancy: Epidemiology, Gestation & Perinatal Outcome*, Louis Keith, Emile Papiernik, Donald Keith, and Barbara Luke, eds. (New York, NY: Parthenon, 1995).

Almond, Douglas, Kenneth Y. Chay, and David S. Lee, "The Costs of Low Birth Weight," *Quarterly Journal of Economics*, CXX (2005), 1031–1083.

Barker, David J, "Fetal Origin of Coronary Hearth Disease," *British Medical Journal*, CCCXVII (1995), 171–174.

Behrman, Jere R, and Mark R. Rosenzweig, "Returns to Birth Weight," *Review of Economics and Statistics*, XIVC (2004), 586–601.

Black, Sandra E, Paul J. Devereux, and Kjell G. Salvanes, "The More the Merrier? The Effects of Family Size and Birth Order on Children's Education," *Quarterly Journal of Economics*, CXX (2005a), 669–700.

——, "Why the Apple Doesn't Fall Far: Understanding Intergenerational Transmission of Education," *American Economic Review*, VC (2005b), 437–449.

——, "From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes," NBER Working Paper No. 11796, 2005c.

Blickstein, Isaac, and Robin B. Kalish, "Birthweight Discordance in Multiple Pregnancy," *Twin Research*, VI (2003), 526–531.

Bryan, Elizabeth, *Twins and Higher Order Births: A Guide to their Nature and Nurture*, (London, UK: Edward Arnold, 1992).

Case, Anne, Angela Fertig, and Christina Paxson, "The Lasting Impact of Childhood Health and Circumstance," Princeton Center for Health and Wellbeing Working Paper, April 2004.

Christensen, Kaare, JamesW. Vaupel, Niels V. Holm, and Anatoli I. Yashin, "Mortality Among Twins After Age 6: Fetal Origins Hypothesis Versus Twin Method," *British Medical Journal*, CCCX (1995), 432–36.

Conley, Dalton, and Neil G. Bennett, "Is Biology Destiny? Birth Weight and Life Chances," *American Sociological Review*, LXV (2000), 458–467.

Conley, Dalton, Kate W. Strully, and Neil G. Bennett, "Twin Differences in Birth Weight: The Effects of Genotype and Prenatal Environment on Neonatal and Post-Neonatal Mortality," *Economics and Human Biology,* IV (2006), 151–183.

Cronbach, Lee J, *Essentials of Psychological Testing,* 2nd ed. (London, UK: Harper and Row, 1964).

Currie, Janet, and Enrico Moretti, "Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings," *Quarterly Journal of Economics*, CXVIII (2003), 1495–1532.

——, "Biology as Destiny? Short and Long-Run Determinants of Inter-Generational Transmission of Birth Weight," NBER Working Paper No. 11567, 2005.

Currie, Janet, and Jonathan Gruber, "Saving Babies: The Efficacy and Cost of Recent Changes in the Medicaid Eligibility of Pregnant Women," *Journal of Political Economy*, CIV (1996), 1263–1296.

Currie, Janet, and Rosemary Hyson, "Is the Impact of Health Shocks Cushioned by Socio-Economic Status? The Case of Birth Weight," *American Economic Review*, LXXXIX (1999), 245–250.

Datar, Ashlesha M. Rebecca Kilburn, and David S. Loughran, "Health Endowments and Parental Investments in Infancy and Early Childhood," RAND Labor and Population Working Paper No. WR-367, 2005.

Duffy, David L, "Twin Studies in Medical Research," *Lancet,* CCCXLI (1993), 1418–1419.

Eide, Martha G, Nina Øyen, Rolv Skjaerven., Stein Tore. Nilsen, Tor Bjerkedal, and Grethe S. Tell, "Size at Birth and Gestational Age as Predictors of Adult Height and Weight," *Epidemiology*, XVI (2005), 175–181.

Grjibovski, A. M., J. H. Harris, and P. Magnus, "Birth Weight and Adult Health in a Population-Based Sample of Norwegian Twins," *Twin Results and Human Genetics*, VIII (2005), 148–155.

Hack, Maureen, Daniel J. Flannery, Mark Schluchter, Lydia Cartar, Elaine Borawski, and Nancy Klein, "Outcomes in Young Adulthood for Very-Low-Birth Weight Infants," *New England Journal of Medicine*, CCXLVI (2002), 149–157.

Hack, Maureen, H., Gerry Taylor, Nancy Klein, Robert Eiben, Christopher

000105

Schatschneider, and Nori Mercuri-Minich, "School-Age Outcomes in Children with Birth Weights Under 750 Grams," *New England Journal of Medicine*, CCCXXXI (1994), 753–759.

Harris, Jennifer R, Per Magnus, and Kristian Tambs, "The Norwegian Institute of Public Health Twin Panel: A Description of the Sample and Program of Research," *Twin Research*, V (2005), 415–423.

Hoffman, E. L., and F. C. Bennett, "Birth Weight Less than 800 Grams: Changing Outcomes and Influences of Gender and Gestation Number," *Pediatrics*, LXXXVI (1990), 412–414.

Keith, Louis G, Emile P, Donald M. Keith, and Barbara Luke, eds. *Multiple Pregnancy: Epidemiology, Gestation, & Perinatal Outcome*, (New York, NY: Parthenon, 1995).

Kowaleski-Jones, Lori, and Greg J. Duncan, "Effects of Participation in the WIC Program on Birthweight: Evidence from the National Longitudinal Survey of Youth," *Journal of Public Health*, XLII (2002), 799–804.

Little, Roderick J. A, and Donald B. Rubin, *Statistical Analysis with Missing Data*, (Hoboken, NJ: Wiley, 1987).

Loughran, David S., Ashlesha Datar, and M. Rebecca Kilburn, "The Interactive Effect of Birth Weight and Parental Investment on Child Test Scores," RAND Labor and Population Working Paper No. WR-168, 2004.

Møen, Jarle., Kjell G. Salvanes, and Erik Ø. Sørensen, "Documentation of the Linked Empoyer-Employee Data Base at the Norwegian School of Economics," Mimeo, The Norwegian School of Economics and Business Administration, 2003.

Morgane, Peter J., Robert Austin-LaFrance, Joseph Bronzino, John Tonkiss, Sofia Diaz-Cintra, L. Cintra, Tom Kemper, and Janina R. Galler, "Prenatal Malnutrition and Development of the Brain," *Neuroscience and Biobehavioral Reviews*, XVII (1993), 81–128.

Oreopoulos, Philip, Mark Stabile, Randy Walld, and Leslie Roos, "Short, Medium, and Long Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins," NBER Working Paper No 11998, January 2006.

Phillips, David I. W, "Twin Studies in Medical Research: Can They Tell Us whether Diseases are Genetically Determined?" *Lancet,* CCCXXXIV (1993), 1008–9.

Rosenzweig, Mark R, and Junsen Zhang, "Do Population Control Policies Induce More Human Capital Investment? Twins, Birthweight, and China's 'One Child' Policy," IZA Discussion Paper No. 2082, April 2006.

Royer, Heather, Separated at Girth: Estimating the Long-Run and Intergenerational Effects of Birthweight Using Twins, Unpublished manuscript, 2005.

Strauss, John, and Duncan Thomas, "Health, Nutrition, and Economic Development," *Journal of Economic Literature*, XXXVI (1998), 766–817.

Sundet, Martin Jon, Dag G. Barlaug, and Tore M. Torjussen, "The End of the Flynn Effect? A Study of Secular Trends in Mean Intelligence Test Scores of Norwegian Conscripts During Half a Century," *Intelligence*, XXXII (2004), 349–362.

Sundet, Jon Martin, Kristian Tambs, Jennifer R. Harris, Per Magnus, and Tore M. Torjussen, "Resolving the Genetic and Environmental Sources of the Correlation Between Height and Intelligence: A Study of Nearly 2600 Norwegian Male Twin Pairs," *Twin Research and Human Genetics*, VII (2005), 1–5.

Thrane, Vidkunn Coucheron, "Evneprøving av Utskrivingspliktige i Norge 1950–53," Arbeidsrapport nr. 26, INAS 1977.

Copyright of Quarterly Journal of Economics is the property of MIT Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

NBER WORKING PAPER SERIES

IMMIGRATION'S EFFECT ON US WAGES AND EMPLOYMENT REDUX

Alessandro Caiumi
Giovanni Peri

Working Paper 32389
http://www.nber.org/papers/w32389

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
April 2024

We are grateful for Rebecca Brough for her research assistance and suggestions. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2024 by Alessandro Caiumi and Giovanni Peri. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Immigration's Effect on US Wages and Employment Redux
Alessandro Caiumi and Giovanni Peri
NBER Working Paper No. 32389
April 2024
JEL No. F22,J21,J69

## ABSTRACT

In this article we revive, extend and improve the approach used in a series of influential papers written in the 2000s to estimate how changes in the supply of immigrant workers affected natives' wages in the US. We begin by extending the analysis to include the more recent years 2000-2022. Additionally, we introduce three important improvements. First, we introduce an IV that uses a new skill-based shift-share for immigrants and the demographic evolution for natives, which we show passes validity tests and has reasonably strong power. Second, we provide estimates of the impact of immigration on the employment-population ratio of natives to test for crowding out at the national level. Third, we analyze occupational upgrading of natives in response to immigrants. Using these estimates, we calculate that immigration, thanks to native-immigrant complementarity and college skill content of immigrants, had a positive and significant effect between +1.7 to +2.6\% on wages of less educated native workers, over the period 2000-2019 and no significant wage effect on college educated natives. We also calculate a positive employment rate effect for most native workers. Even simulations for the most recent 2019-2022 period suggest small positive effects on wages of non-college natives and no significant crowding out effects on employment.

Alessandro Caiumi
University of California, Davis
acaiumi@ucdavis.edu

Giovanni Peri
Department of Economics
University of California, Davis
One Shields Avenue
Davis, CA 95616
and NBER
gperi@ucdavis.edu

# Introduction and Review of the Literature

A classic question in the economics literature, and still at the center of the political debate as the US labor force is shrinking but federal immigration reforms are unpopular amid increasingly anti-immigrant sentiment, is: *what is the impact of immigrants on wages and employment of US workers?* A series of influential papers, Ottaviano and Peri (2012) and Manacorda, Manning, and Wadsworth (2012) – which extended and complemented their predecessor paper, Borjas (2003) – developed and estimated a robust model to calculate the effects of immigrants on national wages of US (or UK) workers with different levels of education and age between 1960-2000.

These studies considered immigration as a change to the national supply of a set of labor market skills and examined the effect on natives' wages in the long run, accounting for competition and complementarity with the newly arrived workers. Based on a nested constant elasticity of substitution (CES) production function with skill cells as labor inputs, their framework is a reasonable approximation of US labor markets in the long run, when workers' wages equate their marginal productivity and competition depends on skill types. These influential papers have been cited extensively and have provided benchmark calculations to assess the effects of immigrants on US wages in the 1980s and 1990s.

However, while influential, their approach has not been revived to estimate the impact of more recent immigrant flows (post-2000), or expanded to use current econometric techniques for estimating the key parameter values (the original studies use Least Squares estimation with panel data). Nor have they been used to analyze the long-run effects on native employment (which was assumed as not responding to immigration) or to investigate potential channels for the imperfect labor market competition between natives and immigrants (especially the impact of immigrants on occupational specialization of natives).

This paper, building on the insights of those seminal studies, introduces a new more rigorous identification approach and extends the analysis to include the effects on native employment and occupational specialization outcomes, allowing us to provide a complete picture of the impact of immigration on US native labor market outcomes nationally. Additionally, we update the analysis to the deeply changed trends in immigration to the US in the 2000-2022 period, as compared to the 1980-2000. Since 2000, immigration flows have become smaller and more concentrated among highly educated individuals, with a negative net change of immigrants with low levels of education (less than high school degree) over the last two decades. This change, on its own, warrants revisiting those findings and could change the predicted implications on native labor market outcomes.

Before discussing our innovations, it is useful to review the three approaches most commonly used in papers estimating the effects of immigrant on labor market outcomes in order

000110

to frame, within them, this contribution.[1]

A first line of research, which stresses credible causal identification through the use of "natural experiments", has focused on identifying exogenous, sudden and significant changes in immigrant supply specific to one (or few) individual location(s) in the US. This approach compares the response of local natives' wages, employment and other labor market outcomes in the location(s) where the sudden immigration occurred ("treated" area) to locations where it did not ("control" areas). Famous studies using this approach include a seminal paper by Card (1990) studying a large inflow of Cubans to Miami in 1981, the so-called *Mariel Boatlift*, as well as a series of subsequent papers that revisited this event (Borjas (2017), Peri and Yasenov (2019) and Clemens and Hunt (2019)). Other examples include Peri, Rury, and Wiltshire (2020), which used the inflow of Puerto Ricans to Orlando after Hurricane Maria, and Kugler and Yuksel (2011), which used the inflow of Central Americans after Hurricane Mitch.[2] While this approach may bring us closer to causally identifying the average impact of a sudden immigration event, the specific nature of the immigrant groups involved, of the timing, and location make results potentially not generalizable or externally valid. Even more crucially, it is challenging to translate these estimates to national effects that stem from larger, slower and more predictable immigration flows, usually with different distribution across skills (which is what we need to inform immigration policy).

In a second approach, which better addresses this external validity concern, economists have exploited changes in the inflows of immigrants *across all US commuting zones* (which approximate local labor markets) driven by increases and decreases in immigration flows from specific countries of origin. These flows are then distributed as differential "shocks" across US locations as preexisting networks of immigrants are known to affect the location choices of new arrivals. Several papers have used this variation in building "shift-share" instruments to compare labor market outcomes across US commuting zones (Card (2001, 2009); Peri and Sparber (2009); Peri, Shih, and Sparber (2015); Monras (2020)). After verifying the shift-share IV is not correlated with preexisting labor market trends, this approach can be used to analyze the local impact of immigrants.

The shift-share approach has evolved and been improved based on key criticisms. Recent developments provide stringent tests for identification validity which have increased the credibility of local area IV approaches (Goldsmith-Pinkham, Sorkin, and Swift (2020)). At the same time, papers using this approach have considered departures from the classical labor market approach. Some have introduced imperfect competition in the labor market and

---

[1] There were important studies in the recent years summarizing the effect of immigrants on labor market outcomes in the US. Chapter 5 of National Academies of Sciences and Medicine (2017) is probably the most well-known and covers a large body of research.

[2] Application of this approach to other countries' immigration episodes are numerous and some of them are summarized in Tumen (2015).

monopsony power of firms at the local level in models that produce negative wage effects of immigration (and positive effects on firms profit) as new flows of immigrants increase the bargaining power of the firms (Amior and Manning (2020); Amior (2020)). Other studies have examined how certain institutions, such as the minimum wage (Edo and Rapoport (2019)), interact with the inflow of immigrants to attenuate wage effects (at the same time exacerbating employment effects) at the local level.[3]

While interesting and useful, the local area literature, and the focus on monopsony power of firms has limitations. In particular, they may be only partially useful in thinking of the recent (post-2000) immigration to the US. First, as the analysis is local, one needs to analyze incumbents' geographic mobility in response to immigration and capture the "spillover effects", not just the local effect, to obtain national labor market results. The internal mobility response of natives and of immigrants can be large, as studies suggest (Borjas (2001); Basso and Peri (2020); Dustmann et al. (2017)), and inferring effects on national markets from local ones is not easy, requiring modelling and assumptions (Amior (2020)).

Second, by focusing on the impact of immigrants across geographies, this literature has somewhat oversimplified the analysis of skill-composition, often considering immigrants and natives as one type of undifferentiated labor (e.g., Amior and Manning (2020); Amior (2020)). This simplification limits this literature's ability to differentially study effects of immigration by skill groups.

Third, and most importantly, the focus on monopsony effects or the role of minimum wage present immigration as an inflow of less educated and often of undocumented immigrants, which is closer to US immigration in the 1990s.[4] However, it does not accurately reflect immigration post-2000, in which the net flow of immigrants with no high school degree was negative, the number of undocumented immigrants did not grow, and college educated immigrants expanded to becoming the largest group in the country.

Complementing these two lines of inquiry, but focusing on skills and on US national labor markets, we revive a third approach pioneered by Borjas (2003), Ottaviano and Peri (2012) and Manacorda et al. (2012). We refer to this as the national "factor-supply" approach which analyzes the national effects (i.e., for the whole US) of immigration on wages of native workers aggregated in different skill groups.

Three features of this approach are worth discussing. First, it separates the US national labor market into national markets (cells) by skills (education and experience) and allows

---

[3]Additionally, the recent literature (mostly outside of the US) has taken advantage of individual longitudinal data to follow the impact of immigration on native individual outcomes, rather than on aggregate labor market outcomes for natives (Foged and Peri (2016); Dustmann, Schönberg, and Stuhler (2017)). While this is a very important evolution, the evaluation of aggregate effects on natives by skill group is still a central question.

[4]Monras (2020) is an interesting paper combining a cross-commuting zones shock with a structural model to identify the effect of low skilled immigration in the 1990s.

for stronger competition among workers with similar skills. Immigrants are considered an additional skill group in each skill-cell and their inflow represents a supply change specific to each type of skill. This approach, by innovatively considering skill cells and labor markets nationally over the long run (decade), internalizes geographical mobility responses.

Second, the approach uses a simple nested CES production function of different skill groups (worker types) plus capital and, by equalizing marginal product of workers to wages, derives wage equations. Using them, it estimates the key elasticity parameters between worker types. As highlighted by Ottaviano and Peri (2012), when applied to immigration this model allows one to compute the immigrant-native elasticity within each education-experience cell as a key parameter of interest, which is distinct from how the approach is used to estimate the education premium (e.g., Autor, Goldin, and Katz (2020)) or the age premium (Card and Lemieux (2001)). One limitation of these original studies is that once they controlled for skill-specific demand shifters using fixed effects, and trends in a panel regression, the estimates were simple applications of Least Square methods without a careful focus on identification.

Third, these studies used the estimated parameters and the CES-derived formulas to calculate the long-run wage effect of immigration for each native workers' group, assuming no employment response in a classical model with rigid supply of labor. This allowed the approach to predict national effects of immigration on natives' wages for each skill group, depending on the size of the inflow in each cell, and thus specific to the period considered.

Several policy papers adopted this approach (e.g., Greenstone and Looney (2010, 2014); Edwards and Ortega (2017)) to evaluate the wage effects of immigration or the effects of re-moving undocumented immigrants on natives' earnings. Additionally, the complementarity between immigrants and natives, found in Ottaviano and Peri (2012), spurred a subsequent literature considering whether natives' occupational/skill upgrading in response to immi-gration was a potential mechanism (Peri and Sparber (2009); Llull (2018); Hunt (2017)). None of these papers, however, were expanded, modernized or extended over time. The main finding, still broadly cited, of Ottaviano and Peri (2012) was that immigrants and natives in each skill-cell (i.e., labor market) are not perfect substitutes. Their degree of complementarity was strong enough to generate average positive effects of the 1990-2006 immigration on wages of most natives, with zero or small effects even for the group of least educated workers (i.e., individuals without high school diploma), in spite of the large inflow of immigrants in this group.

This paper revives, expands and improves upon the contributions of the national "factor-supply" approach in four substantial ways. First, we update the estimates of the key elastic-ity between immigrants and natives, extending the analysis to 2000-2019 and by employing

a new Instrumental Variable (IV) estimation approach. We start by using the change in working-aged population for each group to capture labor supply shifts, then we implement a new skill-cell based shift-share approach to generate variation in immigrant labor supply across skills along with demographic-driven changes to generate changes in native labor supply across skills. We test the strength and validity of the IV and use this method to produce estimates of complementarity between natives and immigrants of similar skills.

Second, using the same framework and IV approach, we estimate the impact of immigrants on native employment-population ratio, a margin not yet considered by the "factor-supply" approach which often implicitly assumes rigid native labor supply. These results speak more directly to the potential "displacement" or "crowding out" effects of natives in each skill group at the national level. Third, we analyze occupational upgrades of natives in response to immigrants in each skill cell as mechanisms consistent with specialization, and which rationalize the complementarity and the positive employment effect from immigration.

Finally, using these updated estimates, we calculate the native wage (and employment) effect in response to the immigration flows of the 2000-2019, and estimate the potential impact of the more recent inflow of immigrants between 2019-2022.

We identify three main findings. First, using our more credible IV as supply shifts (for immigrants and natives) and more recent data, we estimate an elasticity of substitution between immigrants and natives post-2000 around 17-20 in our preferred specification which uses wages of pooled workers (male and female). If we allow the immigrant-native elasticity to differ by education group, we find an even smaller value in the post-2000 data for college educated (value around 10) and imperfect substitutability within each group. These estimates imply similar or even stronger complementarity between immigrants and natives than estimated in Ottaviano and Peri (2012).

Second, the 2SLS estimates of the effect of immigration in each skill cell on natives' employment-population ratio is positive, significant and between 0.05 and 0.095%, in response to a 1% increase in immigrant employment. This is consistent with rather rigid supply, a demand boost driven by immigrant-native complementarity as well as with occupational upgrading in response to the inflow of immigrants. We estimate that an average increase of native wage by 0.01 to 0.02% for each 1% growth of immigrant share can be fully due to shifts of natives into better-paying types of occupations in response to immigration.

Finally, using these elasticity estimates, we calculate that the recent 2000-2019 inflow of immigrants increased the wages of less educated natives (high school degree or less) by 1.7 to 2.6% and on average increased wages for natives by 0.5 to 0.8%, depending on parameter specifications, and had no significant wage effect on college educated natives. Additionally,

in the 2000-2019 period, natives' employment rate increased on average by 2.4% in response to immigration. Focusing on the most recent years, the predicted effect of the immigrant inflow from 2019 to 2022 is small, but still positive, around a +0.9% wage effect for less educated natives and a +0.1% for average wages of natives.

An additional contribution of this paper is to revive the factor-supply conceptual approach to help both economists and policy-makers think about the effects of immigration on native wages and employment. We think that the CES framework in Ottaviano and Peri (2012), revived in this paper, is useful to discuss and illustrate the issues related to skill complementarity, the impact of immigration on skill cells productivity, and the difference in partial and total effects. From this perspective, the present paper brings that model to current US immigration data and uses the modern econometric techniques needed to produce more credible and useful estimates.

In addition, we consider the national "factory-supply" framework relevant to many classic topics in economics by providing a framework to think through labor market effects of education and technology using a CES production (namely Goldin and Katz (2009)) and the effect of demographic change on age premium (Card and Lemieux (2001)). Some of these classic papers have been updated to recent data and extended to the inclusion of additional elements (e.g. in Autor et al. (2020)). We do the same for the extended "factor-supply" model with the intention of updating and refining the econometric analysis to make this framework and available estimates useful for graduate Labor/Macro classes and policy analysis.

The rest of the paper proceeds as follows. Section 1 describes the data used and shows trends for recent inflow of immigrants to the US by education group; Section 2 presents the framework for our estimation of the wage equations and the key complementarity parameter between immigrants and natives; Section 3 both shows our Least Square estimates updating Ottaviano and Peri (2012)'s ones and includes preliminary estimates of the effect on national employment-to-population ratio of natives using an elementary IV; Section 4 describes the new and improved IV strategy for identification of the key parameters, shows the IV's robustness and validity, and presents the main 2SLS estimates; Section 5 shows the estimates of occupational upgrading of natives; Section 6 calculates the effects of immigrant inflows during the 2000-2019 and 2019-2022 periods on wages and employment of natives. Finally, Section 7 concludes the paper.

# 1   Data and recent trends in immigration

First we discuss our data sources and the definitions used for our most relevant variables, and then we describe recent trends in immigration and wages for US workers by skill groups.

000115

## 1.1   Data, variables and sample description

We closely follow Ottaviano and Peri (2012) and Borjas (2003) to define and construct our variables and sample. We use employment and wage data from the integrated public use microdata samples (IPUMS), where the original sources are the US Decennial Census from 1960 to 2000 and the 1-in-100 samples for 2005-2010-2015-2019-2022 American Community Survey (Ruggles, Flood, Sobek, Backman, Chen, Cooper, Richards, Rogers, and Schouweiler (2023)).

We construct two slightly different samples to build employment measures and wage measures. In both samples, we consider people aged 18 and older in the Census year of interest not living in group quarters, who worked at least one week in the previous year. As our goal is to obtain a representative average wage for a given group of people with similar education and work experience, the wage sample is more restrictive: we drop individuals who either did not report a valid income or are self-employed. For each of the two samples, we also create a subset of full-time workers only, identified as those working at least 40 weeks in the year and at least 35 hours in the usual workweek. This allows us to construct full-time employment versions of our main measures.

Since our employment and wage measures of interest will be aggregated to the education-experience level, for each year in our data we build 32 cells identified by different combinations of education and experience, as in Ottaviano and Peri (2012). Specifically, we define four education groups using details on individuals' educational attainment: individuals with no high school degree, high school graduates, individuals with some college education, and college graduates (Bachelor's degree or more). Relying on the assumption that people enter the labor force at different ages depending on their education attainment, we define eight experience groups, grouping individuals into 5-year intervals of potential experience in the labor market: individuals with 0-5 years of experience, individuals with 5-10 years, and so on, with the eighth and final group characterized by 35-40 years of experience.[5,6]

We consider three main variables to measure labor supply. First, we build a measure of hours worked by cell by calculating the hours of labor supplied by each individual working a positive number of weeks during the previous year, multiply these by the individual weight (PERWT), and finally aggregate total hours within each education–experience cell. Alternatively, we calculate the cell-specific employment level (i.e., count of employed people), summing up the person weights for all individuals in the cell who worked a positive

---

[5]As in Ottaviano and Peri (2012), we assume that people without a high school degree enter the labor force at age 17, those with a high school degree enter at 19, those with some college enter at 21, and those with a college degree enter at 23.

[6]Individuals with 0 years of potential experience and with more than 40 years of potential experience are dropped from our sample.

amount of weeks during the previous year. Finally, we compute the population in each cell by summing the person weights of the people belonging to each cell (PERWT) regardless of their working status. We use population in the cell as a more "exogenous" measure of labor supply for a given skill group as well as to calculate employment/population ratios.

As for wage measures, in line with Ottaviano and Peri (2012), we construct the cell-specific average weekly wage by calculating the weighted average of individuals' real weekly wages (equal to annual wage and salary income, INCWAGE, converted to 1999 US dollars using the CPI multiplier provided by IPUMS, adjusted for top-coding, and then divided by weeks worked in a year), where weights are the hours worked by the individual times their person weight. For each cell, we compute not only the overall employment and wage measures aggregating all individuals, but also gender-by-origin specific measures by separating individuals in the cell into four groups: native males, native females, foreign-born males and foreign-born females. The status of foreign-born is given to those individuals who are noncitizens or are naturalized citizens. Clearly, differentiating by nativity will be crucial for our analysis.

Finally, in our analysis on occupational upgrading in Section 5, we define a measure of natives' occupational quality for each education-experience cell as follows. We apply our previously described sample restrictions to the 1980 US Decennial Census, the first period of our sample of analysis, to compute the average wage by occupation. We do so by averaging individual weekly wages, computed by diving the annual wage and salary income (IN-CWAGE) by weeks worked, and weighting each wage by the individual weight (PERWT). We identify occupations by relying on a version of the 1990 Census Bureau occupational classification scheme that provides researchers with a consistent classification of occupations over time (OCC1990). Since each occupation breaks out into more specific occupations, or is combined with others into a more general occupation, over the decades, we pick a classification from 1990 which is the midpoint of our initial sample (from 1960 to 2019), limiting crosswalks and adjustments. The new variable, 1980 average wage by occupation, is then assigned to each individual in the Decennial Census and ACS data of interest based on their reported occupation in that period. Similarly to the wage and employment measures, this variable is aggregated within education-experience groups, using individual weights of workers in each cell. We compute this measure only for natives, and separately for full-time workers and for men and women.

## 1.2   Immigration and wage trends

Figure 1 shows the evolution of the foreign-born adult population resident in the US between 1960 and 2022. The data are from the Decennial Censuses between 1960 and 2000

and then from the American Community Survey 2005, 2010, 2015, 2019 and 2022. These dates and sources are what we use throughout the paper. The four lines in the figure capture the populations of foreign-born individuals 18 years and older with no high school degree (red solid line), high school degree (red dashed line), some college education (dashed blue line) and college degree or more (solid blue line) over time.

The graph highlights the stark trend differences before compared to after 2000. Between 1970 and 2000 all groups grew in numbers and at comparable rates. In particular immigrants groups with no high school degree was the largest and growing at the same pace as the other groups. However, after 2000, lower educated immigrants stopped growing and actually declined in size (implying negative net migration), particularly after 2010. The population of the two intermediate education groups (those with high school diploma and those with some college education) slowed their growth and stabilized in size. In contrast, the number of college educated immigrants both continued to grow and possibly accelerate; since 2015, college educated immigrants are the largest group of foreign-born in the US adult population. The graph suggests that net immigration to the US went from large and unskilled intensive in the 1980-2000 period to smaller and skill-intensive in the 2000-2022 period.

Figure 2 further explores this change in composition by depicting the trend growth for each education group as a proportion of their initial population, standardized to one, and separating the sub-periods 1980-2000 (left panel), 2000-2019 (middle panel) and 2019-2022 (right panel). In the left panel of the figure, which represents the changes in the 1980-2000 period, we see that all education groups at least doubled their 1980 size by 2000. As a proportion of its initial size, the group of immigrant college graduates grew by a factor larger than 3. The group with no high school degree also grew by a remarkable 2.6 times, and the two intermediate groups more than doubled in size.

This period experienced the fastest immigrant population growth in the last 60 years. The 2000-2019 period, in contrast, shows a very different picture. First, the overall growth of each group is much smaller. Second, while college graduates still exhibit the highest growth rate, with population increasing by a factor of 2 by 2019, the two intermediate education groups grew at a much slower rate, increasing by around 50% their size in 20 years, and the group of individuals with no high school degree experienced a significant decline (about -10%). Finally, the much shorter post-Covid-19 period for which we have reliable census data, 2019-2022 period, which combines a drop in immigration during the pandemic and a subsequent immigration surge, confirms the dynamics of much smaller and more college-intensive immigration flows.

In Figure 3 we translate these population changes more directly into changes in labor supply available to the US economy. Specifically, we represent the percentage change in

Figure 1: Evolution of immigrant population by education group (1960-2022)



*Notes:* This figure depicts the evolution of foreign-born population in the US by education group. The ten dates used for this figure correspond to those used throughout our analysis (1960, 1970, 1980, 1990, 2000, 2005, 2010, 2015, 2019, and 2022). We restrict the sample to foreign-born individuals aged 18 years and older.
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

hours worked due to net immigration in each group (by education) and in three sub-periods (1980-2000, 2000-2019, 2019-2022) in the left panel. Then for comparison, we show the percentage change in weekly wages of native US workers for the same education groups and sub-periods (right panel), to examine correlations across periods and/or education group. The left panel clearly depicts the U-shaped pattern of change in supply of skills due to immigrants in the 1980-2000, as identified in Ottaviano and Peri (2012). During the 1980s and 1990s, the growth in labor due to immigrants was much larger (20% increase) for the most and least educated groups (no high school degree and college graduates) than for intermediate groups (high school degree and some college). This pattern, however, changed significantly in the 2000-2019 and 2019-2022 periods. First, the growth in each group's hours worked due to net immigration is much smaller. Second, the group of college graduates experienced the largest increase (+13% in 2000-2019 and +1.5% in 2019-2022) while

Figure 2: Period-specific factors of growth of immigrant population by education group

*Notes:* This figure reports factors of growth of the foreign-born population by education group and specific for the three sub-periods of interest (1980-2000, 2000-2019, 2019-2022). For this figure, we only use data for the beginning and the end of each sub-period, without intermediate data points. For each education group, we set population equal to 1 at the beginning of each sub-period (1980, 2000 or 2019) and then we compute the ratio between the initial population and the final population of the group at the end of the sub-period of interest (2000, 2019 or 2022, respectively) to obtain the factor of growth. We only include foreign-born individuals aged 18 years and older.
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

the group with no high school degree the smallest (negative) change in hours worked due to immigrants (-1.7% in 2000-2019 and -3.3% in 2019-2022). Net immigration in the post-2000 years can be characterized as shrinking the supply of the least educated workers and significantly increasing the supply of college educated ones.

For reference, the right panel of Figure 3 shows the percentage changes of native weekly wages for the same periods and education groups. In the 1980-2000 period, when immigration changed the supply of labor in the described U-shape, the changes in native wages show a monotonic increase in dispersion with college-educated wages growing very fast and wages of those with no degree declining fast. The following periods, 2000-2019 and 2019-2022, exhibit a smaller disparity between wage growth at the top and at the bottom of the

000120

schooling range, with average wages declining in 2000-2019 and increasing in 2019-2022. Notably, in no period across any education group is there a clear negative association between immigrant-driven labor supply growth and changes in native wages. This negative correlation is what a canonical model with 4 skill groups and perfect substitution of immigrants and natives within a group would predict.

Finally, Appendix Table 11 shows more systematically changes in the share of immigrants and in real wages across education-experience groups between 2000 and 2019. As it was also the case in Ottaviano and Peri (2012) for the 1990-2006 period, there is no clear negative correlation between column (3) and column (4) of Table 11, revealing no "prima facie" evidence of pure wage-competition effects from an increase in labor supply in each skill group due to immigration.

Figure 3: Percentage changes in hours worked and native wages by education group



*Notes:* This figure presents percentage changes in hours worked that are due to net immigration (left panel) and percentage changes in real weekly wages of native workers (right panel) by education group. Changes for the period 2000-2019, which are also reported in Appendix Table 11, are compared here with their corresponding values in two other periods, 1980-2000 and 2019-2022.
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

000121

## 2   Framework and estimating equations

### 2.1   Nested CES production function

The framework we use follows the seminal papers by Borjas (2003) and Ottaviano and Peri (2012). We assess the long-run effect of immigration on native wages using an aggregate production function that combines physical capital ($K$), a labor composite ($L$) and total factor productivity, TFP (denoted as $A$). Such a production function for the aggregate US in year $t$ is represented as follows:

$$Y = A_t L_t^\alpha K_t^{1-\alpha} \tag{1}$$

where $\alpha$ is the income share of labor. An aggregate production function like (1) is routinely used in many macro and growth models to represent long-run production (such as in those presented in Chapter 1, 2 and 3 of Romer (2019)). The key modelling assumption to analyze the interplay between supply of different types of workers and their marginal productivity, which in the long run is equated to wage compensation, is that labor $L_t$ is a nested CES composite of several different skill groups. Immigration changes the supply of different types of workers (skill cells) and this affects skill-specific marginal productivity, which in the long run equals wages, by changing relative scarcity of skills. The magnitude of the effects depends on the own and cross elasticity of substitution across skill groups and the relative change of each supply. By using this approach we stay close to the canonical model, and consider competitive labor markets in the long run. One important limitation of this approach is that we omit potential effects of immigration on productivity in the analysis, which could be an important consequence, especially in presence of high skilled immigration (see Peri et al. (2015)).

We acknowledge that physical capital is complementary to aggregate labor, and that it adjusts in the long run to keep the capital-labor ratio at the efficient level (by equating marginal productivity of capital to the long-run discount rate), which is proportional to total factor productivity. By applying this equilibrium condition for capital, one can rewrite the capital term from the production so that total output is a linear function of the labor composite, multiplied by a modified TFP term. Hence, aggregate productivity growth and the related accumulation of physical capital are responsible for the average wage growth in the long run. However, relative wages across skill groups depend on relative skill abundance and the skill group substitutability. In this case, immigration has an impact on long-run wages.

The labor aggregate $L$ is first composed of a CES aggregation of workers with high ($H$) and low ($L$) levels of schooling as follows:

000122

$$L_t = \left[ \theta_{Ht} L_{Ht}^{\frac{\sigma_{HL}-1}{\sigma_{HL}}} + \theta_{Lt} L_{Lt}^{\frac{\sigma_{HL}-1}{\sigma_{HL}}} \right]^{\frac{\sigma_{HL}}{\sigma_{HL}-1}} \tag{2}$$

where $\theta_{Ht}$ and $\theta_{Lt}$ are the relative productivity of more and less educated workers and $\sigma_{HL}$ is their elasticity of substitution. Following [Goldin and Katz (2009)](#) and [Autor et al. (2020)](#), we identify group $H$ as workers with some college education or more, and group $L$ as workers with high school diploma or less. This is an important partition in this framework which reflects very different performances of these workers in the labor market. Over the last three to four decades possessing college education has been a critical to access jobs and occupations with more intensive cognitive and analytical content, whose demand/productivity has increased substantially during this period ([Autor and Katz (1999)](#); [Autor, Katz, and Kearney (2006](#), [2008)](#); [Autor (2010)](#)). Within group $L$ of workers with high school diplomas or less, and within group $H$ of workers with college education or more, we then allow – as [Ottaviano and Peri (2012)](#) did – workers to be different from each other, in an additional layer of the CES nesting, as follows:

$$L_{Ht} = \left[ \theta_{SCOt} L_{SCOt}^{\frac{\sigma_{HH}-1}{\sigma_{HH}}} + \theta_{CODt} L_{CODt}^{\frac{\sigma_{HH}-1}{\sigma_{HH}}} \right]^{\frac{\sigma_{HH}}{\sigma_{HH}-1}} \tag{3}$$

$$L_{Lt} = \left[ \theta_{NDt} L_{NDt}^{\frac{\sigma_{LL}-1}{\sigma_{LL}}} + \theta_{HSDt} L_{HSDt}^{\frac{\sigma_{LL}-1}{\sigma_{LL}}} \right]^{\frac{\sigma_{LL}}{\sigma_{LL}-1}} \tag{4}$$

The parameters $\theta$ and $\sigma$ represent the productivity of, and the elasticity of substitution between, these education sub-groups, respectively.[7]

Following [Card and Lemieux (2001)](#), [Welch (1979)](#), and several other papers that have analyzed the evolution of experience premium of workers, we allow for an additional CES nest, combining workers with different work experience (based on age) in each education sub-group $k$ as follows:

$$L_{kt} = \left[ \sum_{j=1}^{8} \theta_{kj} L_{kjt}^{\frac{\sigma_{EXP}-1}{\sigma_{EXP}}} \right]^{\frac{\sigma_{EXP}}{\sigma_{EXP}-1}} \tag{5}$$

where the 8 groups represent bins of 5 years, from 0 to 40 years of potential experience, beginning at the time of finishing schooling, and therefore varying for each education group. Finally, as in [Ottaviano and Peri (2012)](#) and [Manacorda et al. (2012)](#), in each education $k$-experience $j$ group, natives (domestic workers, denoted by $D$) and immigrants (foreign-born

---

[7]In equation (3) for group $H$ of workers, $SCO$ and $COD$ denote "some college education" and "college degree", respectively. In equation (4) for group $L$, $ND$ and $HSD$ stand for "no high school diploma" and "high school diploma".

14

workers, denoted by $F$) provide different skills (due to language, culture and schooling-type differences) that are combined in a final nest of the CES, with relative productivity equal to $\theta_{Dkj}$ and $\theta_{Fkj}$, and elasticity of substitution equal to $\sigma_{IMMI}$, as follows:

$$L_{kjt} = \left[ \theta_{Dkj} L_{Dkjt}^{\frac{\sigma_{IMMI}-1}{\sigma_{IMMI}}} + \theta_{Fkj} L_{Fkjt}^{\frac{\sigma_{IMMI}-1}{\sigma_{IMMI}}} \right]^{\frac{\sigma_{IMMI}}{\sigma_{IMMI}-1}} \tag{6}$$

We choose this CES approach and nesting structure for three reasons. First, this framework is consistent with the structure of several papers analyzing the effect of technological and schooling changes on wages (e.g., Goldin and Katz (2009)) and the effect of aging and demographic change on experience premium (Card and Lemieux (2001)). Second, it enables us to derive simple equations relating (log) wages to the (log of) employment for each skill group of workers to represent labor demand. These equations allow us to estimate the elasticity of substitution between skill groups, provided we identify genuine shifts of the supply across skill groups. Third, once we obtain the elasticity estimates across skills, this model allows us to evaluate/predict the impact of different historical immigration episodes or potential immigration scenarios on long-run wages of native workers in each skill group. The calculated effects work through changes in relative supply affecting marginal productivity of different groups of workers through complementary and competition.

## 2.2   Estimating wage equations and the elasticity of substitution

The production function described above, combined with the long-run equilibrium conditions that wages for each group of workers are equalized to their marginal productivity, implies a simple log-linear relation between wages and employment of each skill group. In particular, considering immigrant and native labor in each of the 32 education-experience cells, equating their wages to marginal product and taking the log-ratio of the two, implies the following equation:

$$\ln \left( \frac{w_{Dkjt}}{w_{Fkjt}} \right) = \ln \frac{\theta_{Dkjt}}{\theta_{Fkj}} + \frac{1}{\sigma_{IMMI}} \ln \left( \frac{L_{Fkjt}}{L_{Dkjt}} \right) \tag{7}$$

where $\left( \frac{w_{Dkjt}}{w_{Fkjt}} \right)$ is the average wage of natives relative to immigrants in education $k$-experience $j$ group in year $t$, and $\left( \frac{L_{Fkjt}}{L_{Dkjt}} \right)$ is the employment of immigrants relative to natives. Equation (7) is the basis to estimate $\sigma_{IMMI}$ – a crucial model parameter capturing the elasticity of substitution between immigrants and natives in the same education-experience labor market. The smaller this parameter is (larger complementarity), the more an inflow of immigrants will boost productivity and demand for native workers. Sometimes we will refer to $\frac{1}{\sigma_{IMMI}}$ as the intensity of complementarity between immigrants and natives. If $\frac{1}{\sigma_{IMMI}} > 0$, then native

and immigrant workers are not purely competing (perfect substitutes) in a labor market, but have a degree of complementarity that increases as the estimate of this coefficient grows larger.

Assuming relative productivity of these two groups $\frac{\theta_{Dkjt}}{\theta_{Fkj}}$ can be captured by skill-specific fixed effects, year fixed effects and short-run fluctuations, and that the remaining variation of $\left(\frac{L_{Fkt}}{L_{Dkt}}\right)$ is driven by changes in the relative population of those two groups, uncorrelated with labor market conditions, then we can write equation (7) as follows:

$$\ln\left(\frac{w_{Dkjt}}{w_{Fkjt}}\right) = \phi_{kj} + \phi_t + \frac{1}{\sigma_N}\ln\left(\frac{Empl_{Fkjt}}{Empl_{Dkjt}}\right) + u_{kjt} \tag{8}$$

Under these assumptions, a panel Least Squares estimation of equation (8) generates a consistent estimate of the "intensity of complementarity" $\frac{1}{\sigma_{IMMI}}$. The term $\phi_{kj}$ captures a set of skill group fixed effects, the term $\phi_t$ represents time fixed effects, and $u_{kjt}$ captures a random error that includes demand variation uncorrelated with supply changes and measurement error.

This is the econometric approach taken by Borjas (2003), Ottaviano and Peri (2012) and Manacorda et al. (2012). Here, we extend those results in terms of period, sample and specifications to assess how robust those estimates were. Then we innovate by introducing a new Instrumental Variable (IV) method that captures changes in relative supply more likely to be uncorrelated to relative productivity, thus reducing potential omitted variable bias. The estimated parameter, $\frac{1}{\sigma_{IMMI}}$, is directly related to the boost that relative native wages receive when the relative supply of immigrants increases. Larger values of this parameter will produce larger positive wage impacts of immigration on natives.

Once $\frac{1}{\sigma_{IMMI}}$ is estimated, one can construct the labor aggregate in equation (6), and use a similar log wage equation for each cell as function of the corresponding log labor composite in (6) to estimate $\frac{1}{\sigma_{EXP}}$, the complementarity across experience groups. Subsequently, by aggregating within education groups, and then within the college ($H$) and non-college ($L$) groups, one can calculate the elasticity of substitution $\sigma_{HH}, \sigma_{LL}$ and $\sigma_{HL}$. Those parameters are not specific to the immigration literature, and have been estimated by several papers without relying on changes of labor supply driven by immigration. In particular, analyzing change in schooling, the education premium and the evolution of wage inequality, Katz and Murphy (1992), Goldin and Katz (2009), and more recently Autor et al. (2020), have estimated the parameters $\sigma_{HH}, \sigma_{LL}$ and $\sigma_{HL}$. Similarly, using changes in natives' demographics, Card and Lemieux (2001) (as well as Ottaviano and Peri (2012)) estimated the experience and age premium, $\sigma_{EXP}$. Therefore, in calculating the total effects of immigration in Section 6, we will use a range of these parameters' estimates from the existing literature and will combine them with the newly estimated elasticity between immigrants and natives to obtain

16

the total effects of immigration on wage of each skill group of natives.

Instead, in this article, we push further the implementation of a regression-like equation (8) to estimate not just the wage response but also the employment response of natives to immigration. In particular, we analyze how a percentage change in immigrant employment in each education-experience cell, $\ln\left(Empl_{Fkjt}\right)$, has affected the employment-population ratio of natives, $\frac{Empl_{Dkjt}}{Pop_{Dkjt}}$, in the same education-experience cell by estimating the following equation:

$$\frac{Empl_{Dkjt}}{Pop_{Dkjt}} = \phi_{kj} + \phi_t + \beta_{emp}\ln\left(Empl_{Fkjt}\right) + e_{kjt} \tag{9}$$

While the coefficient $\frac{1}{\sigma_{IMMI}}$ captures the relative complementarity boost provided by the immigrant inflow on relative native wages, the coefficient $\beta_{emp}$ captures a potential additional long-run effect of immigrants in crowding in (if positive) or crowding out (if negative) of similar-skilled natives.[8] Using natives' employment-population ratio as the outcome, we identify whether new immigrants attracted natives into the national labor market or, instead, if they pushed them out of employment. Given the similarity of equation (8) and (9), we will use similar methods and similar instrumental variables in our estimates, as to proxy for exogenous changes of the immigrant labor supply. Notice that the dependent variable in equation (9) is only relative to natives and captures their employment-population ratio, while the explanatory variable is only relative to immigrants, and captures their employment (in log).

## 3   Updated Least Square estimates

### 3.1   The native-immigrant elasticity of substitution

Table 1 shows the estimated parameter, $\frac{1}{\sigma_N}$, from equation (8) across different samples and specifications. Panel A uses decennial census data over the longer period 1960-2019, whereas Panel B uses quinquennial data in the more recent period 2000-2019. The specifications, samples and estimation methods used are very close to those in Panel A of Table 2 of Ottaviano and Peri (2012). Hence, the table can be considered an extension and update of those estimates considering a longer period (namely the period 1960-2019, in Panel A) or focusing on the more recent period only (2000-2019 in Panel B). In either case the coefficient captures the intensity of complementarity between natives and immigrants that is affected (or driven) by more recent immigration.

---

[8]This coefficient is related to the supply elasticity of natives as well as to the wage effect of immigrants.

000126

Notice that, as the dependent variable in equation (8) is $\ln\left(\frac{w_{Dkjt}}{w_{Fkjt}}\right)$, the estimates show the positive value of:

$$\frac{1}{\sigma_N}$$

while in Ottaviano and Peri (2012) the estimates reported were relative to the same coefficient but with negative sign:

$$-\frac{1}{\sigma_N}$$

as the dependent variable was $\ln\left(\frac{w_{Fkjt}}{w_{Dkjt}}\right)$.

The specifications of rows (1)-(4) in Panel A and Panel B follow the same sample, variable definitions and estimation methods as the first four rows in Table 2, Panel A of Ottaviano and Peri (2012). In the top three rows of Table 1 the labor supply measures are total hours worked (in the cell). The dependent variable is the log average weekly wages for men (row 1) women (row 2) or both pooled (row 3). In the fourth row we use employment (count of people working) instead of hours worker in a cell as measure of labor supply, and the dependent variable is the log average weekly wages for men. In the fifth row (of Panel A and B) we go beyond Ottaviano and Peri (2012) by proxying labor supply in the cell with log relative population in the cell, and in the sixth row we use log relative population to instrument log relative hours worked in the cell. The dependent variable in both cases is the log average weekly wages for men.

Specifications in row 5 and 6 replace employment as an explanatory variable with a proxy for labor supply – the cell population. The total count of people in the cell (defined by their education and age) rather than employment, varies with demographics and immigration forces, and therefore is less correlated to non-observable cell-specific productivity shocks. As for the column specifications, they differ in terms of worker's samples and estimation method. Specifications (1) to (4) include all workers with a positive amount of weeks worked in the sample, while (5) to (8) include only full-year full-time workers, identified as those working at least 40 weeks in the year and at least 35 hours in the usual workweek. Individual columns then differ for the set of fixed effects included and for weighting. Specifications (1) and (5) weight each cell by its employment and include no fixed effects; columns (2) and (6) include 32 cell (education by experience) fixed effects and year fixed effects; columns (3) and (7) use no weights; columns (4) and (8) push the fixed effects to be as extensive as possible by including all two-way fixed effects (year-education, year-experience and experience-year) in a regression, which is sometimes referred to as "fully saturated." This represents a more demanding specification than any used in the original analysis by

18

Ottaviano and Peri (2012).

Table 1: New estimates of $(1/\sigma_{IMMI})$ following Ottaviano and Peri (2012), Extended periods

| Specification | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Sample | All workers | | | | Full-time workers only | | | |

**Panel A: 1960-2019**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Men, Hours | 0.037*** | 0.048*** | 0.049*** | 0.034 | 0.042*** | 0.060*** | 0.061*** | 0.010 |
| | (0.009) | (0.011) | (0.014) | (0.027) | (0.010) | (0.011) | (0.014) | (0.020) |
| Women, Hours | 0.033*** | 0.074*** | 0.071*** | 0.085** | 0.035*** | 0.076*** | 0.067*** | 0.046* |
| | (0.009) | (0.015) | (0.014) | (0.033) | (0.009) | (0.013) | (0.013) | (0.026) |
| Pooled, Hours | 0.023** | 0.044*** | 0.035** | 0.058* | 0.028*** | 0.057*** | 0.048*** | 0.023 |
| | (0.010) | (0.013) | (0.015) | (0.031) | (0.010) | (0.012) | (0.014) | (0.020) |
| Men, Employment | 0.039*** | 0.051*** | 0.051*** | 0.039 | 0.041*** | 0.060*** | 0.061*** | 0.011 |
| | (0.009) | (0.011) | (0.014) | (0.025) | (0.010) | (0.011) | (0.014) | (0.020) |
| Men, Population | 0.043*** | 0.044*** | 0.047*** | 0.045* | 0.051*** | 0.057*** | 0.060*** | 0.019 |
| | (0.010) | (0.011) | (0.016) | (0.026) | (0.010) | (0.011) | (0.016) | (0.014) |
| Men, Hours (IV) | 0.040*** | 0.040*** | 0.042*** | 0.045** | 0.047*** | 0.051*** | 0.053*** | 0.020* |
| | (0.008) | (0.009) | (0.012) | (0.020) | (0.009) | (0.008) | (0.012) | (0.012) |

**Panel B: 2000-2019**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Men, Hours | 0.027* | 0.069*** | 0.063*** | 0.075* | 0.035** | 0.074*** | 0.066*** | 0.079* |
| | (0.015) | (0.017) | (0.016) | (0.044) | (0.015) | (0.018) | (0.017) | (0.045) |
| Women, Hours | 0.042*** | 0.070*** | 0.051** | 0.065 | 0.051*** | 0.079*** | 0.054** | 0.076 |
| | (0.012) | (0.025) | (0.025) | (0.050) | (0.012) | (0.025) | (0.025) | (0.050) |
| Pooled, Hours | 0.033** | 0.068*** | 0.061*** | 0.073* | 0.041*** | 0.073*** | 0.063*** | 0.076* |
| | (0.014) | (0.018) | (0.014) | (0.041) | (0.014) | (0.020) | (0.014) | (0.042) |
| Men, Employment | 0.029** | 0.067*** | 0.064*** | 0.087* | 0.034** | 0.074*** | 0.066*** | 0.082* |
| | (0.014) | (0.018) | (0.017) | (0.047) | (0.015) | (0.018) | (0.017) | (0.044) |
| Men, Population | 0.024 | 0.065*** | 0.065*** | 0.088* | 0.033** | 0.066*** | 0.065*** | 0.088* |
| | (0.016) | (0.018) | (0.017) | (0.046) | (0.016) | (0.019) | (0.018) | (0.046) |
| Men, Hours (IV) | 0.022 | 0.065*** | 0.064*** | 0.085*** | 0.029** | 0.067*** | 0.065*** | 0.083*** |
| | (0.014) | (0.016) | (0.015) | (0.032) | (0.014) | (0.016) | (0.016) | (0.032) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Weights | Yes | Yes | No | Yes | Yes | Yes | No | Yes |
| Cell FE | No | Yes | Yes | - | No | Yes | Yes | - |
| Year FE | No | Yes | Yes | - | No | Yes | Yes | - |
| All two-way FE | No | No | No | Yes | No | No | No | Yes |

*Notes:* Panel A considers the 1960-2019 period, using 7 data points (1960, 1970, 1980, 1990, 2000, 2010, 2019). Panel B considers the 2000-2019 period, using 5 data points (2000, 2005, 2010, 2015, 2019). Each coefficient of the table represents a different OLS regression, whose outcome is (log) relative weekly wage (for men, women or pooled, depending on the row). In both panels, all specifications use (log) relative hours worked as measure for labor supply (main regressor), except for rows (4) and (5), which employ (log) relative employment and (log) relative population, respectively. Row (6) instruments (log) relative hours worked with (log) relative population, and the 2SLS estimate is reported. Cell employment is used as weight for regressions in rows (1) to (4) in both panels, while cell population is used for those in rows (5) and (6). Cell FE include education and experience main-effect terms plus their interactions. All two-way FE include all main-effect and interaction terms from the combination of the three dimensions (education, experience, year). Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

Several clear results emerge from Table 1. First, focusing on the top four rows of Panel A, which most closely reproduces the estimates in Table 2 of Ottaviano and Peri (2012) and sim-

000128

ply extends them to 2019, most of the coefficient estimates are significantly different from 0 and on average around 0.05, implying an elasticity of substitution between natives and immigrants of 20. This was the value preferred in Ottaviano and Peri (2012) and represents a small but significant degree of complementarity between natives and immigrants. These results show that the original estimates are robust to extending and updating the sample.

Focusing on columns (2) and (6), which represent reasonable specifications including cell and year fixed effects and employment weights, the first four rows show all significant values of the coefficients, close to 0.06. Then, looking at the last two rows of Panel A, which use population variations either as an explanatory variable or as IV to isolate supply side changes, we find that the estimates are essentially unchanged, between 0.04 and 0.06 and highly significant and very precise. Capturing the variation of the labor supply with changes in population only, the original results are fully confirmed and the precision of the estimates is still remarkable.

We then consider the estimates of Panel B, which uses the same specifications as Panel A, and data for the 2000-2019 period only – this period was not covered in the seminal studies (Borjas (2003), Ottaviano and Peri (2012) or Manacorda et al. (2012)). The panel analysis uses shorter time intervals (5-years) but otherwise the same specifications as Panel A. The results on the intensity of native-immigrant complementarity are fully confirmed and possibly strengthened.

Overall, the coefficients are somewhat larger, often in the range between 0.06 and 0.08. Similar to Panel A, even the most demanding specifications with all two-way fixed effects and using population as IV show highly statistically significant coefficients in the vicinity of 0.07, implying an elasticity of substitution between natives and immigrants around 14. The complementarity between immigrants and natives revealed by these estimates is persistent to the last two decades, and possibly increased relative to the estimates pre-2000. The estimated elasticity of substitution ($\sigma_{IMMI}$) is between 12.5 and 16.6 in most cases. One explanation for the increase in complementary between immigrants and natives is that the recent composition of immigrants (increasingly college intensive, as discussed in Section 1) may be especially complementary to natives. In fact, in Table 2, we suggest this is precisely the case.

Finally, it is worth emphasizing that the estimated complementarity between natives and immigrants is robust; samples measuring wages of both men, women, full-time workers and all workers exhibit a similar estimated parameter. Additionally, the inclusion of progressively more demanding fixed effects hardly changes the estimates, especially in Panel B. As we will see in the simulations of Section 6, the larger estimated value of this parameter implies a larger "complementarity boost" to native wages from the increased inflow of immigrants (especially those with college education). The current estimates suggest that this

boost became stronger in the post-2000 period.

Table 2 expands the estimates of $\frac{1}{\sigma_{IMMI}}$ to allow for heterogeneity across education groups. Specifically, we show the estimates of $\frac{1}{\sigma_{IMMI}}$, when using the wage variable for the men sample and instrumenting relative hours with cell population, but also allowing separate coefficient estimates for each education group (no high school diploma, high school diploma, some college education, college degree or more). Estimates of the same specifications relative to women's and to pooled relative wages are reported in Appendix Table 12. As above, we consider the estimates for the whole period 1960-2019 in Panel A and limited to the more recent period 2000-2019 in Panel B. All specifications include experience fixed effects and separate the immigrant-native elasticity by education. Specifications (1) and (2) include all workers and (3) and (4) only full-time workers, while (1) and (3) use cell weights equal to the employment of the cell and (2) and (4) do not use weights.

Two features emerge from both panels. First, complementarity (i.e., a significantly positive value of the coefficient) is present for each education group, and it is stronger in the recent period, as the 2000-2019 estimates are 1.5 to 2 times as large as those for 1960-2019. Second, in most specifications, complementarity is stronger for individuals without a high school diploma and, even stronger (especially for full-time workers), for college graduates, namely the least and the most educated group of workers. In the post-2000 period, native-immigrant elasticity of substitution had a value as low as 9-10 for the two groups at the extremes of the education range, while it was as large as 40-50 for the intermediate ones. This is strongly consistent with existing evidence that immigrants are most different from natives in low-education job types, where they are employed in occupations requiring manual/physical intensive tasks in personal, food, healthcare services (Peri and Sparber (2009)), as well as, on the opposite end of the education spectrum, among college educated, where they take Science, Technology and Engineering jobs rather than occupations in law, communication, sales and human resources (Peri and Sparber (2011b); Peri et al. (2015)). We will use these complementarity parameters, differentiated by education, in our simulation of Section 6 and show their implications for native wages, as immigration inflows have become smaller and more college intensive during the post-2000 period.

000130

Table 2: Estimates of $\frac{1}{\sigma_{IMMI}}$, by education group

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Sample** | All workers | | Full-time workers only | |
| | | | | |
| **Panel A: 1960-2019** | | | | |
| | | | | |
| Men, Rel. hours (IV) - No HS diploma | 0.063*** | 0.064*** | 0.066*** | 0.069*** |
| | (0.010) | (0.007) | (0.011) | (0.007) |
| Men, Rel. hours (IV) - HS diploma | 0.030*** | 0.039*** | 0.037*** | 0.047*** |
| | (0.010) | (0.007) | (0.010) | (0.006) |
| Men, Rel. hours (IV) - Some college | 0.027** | 0.038*** | 0.036*** | 0.049*** |
| | (0.011) | (0.007) | (0.011) | (0.006) |
| Men, Rel. hours (IV) - College degree | 0.063*** | 0.051*** | 0.077*** | 0.064*** |
| | (0.012) | (0.008) | (0.013) | (0.006) |
| | | | | |
| **Panel B: 2000-2019** | | | | |
| | | | | |
| Men, Rel. hours (IV) - No HS diploma | 0.126*** | 0.119*** | 0.040 | 0.072*** |
| | (0.037) | (0.033) | (0.034) | (0.025) |
| Men, Rel. hours (IV) - HS diploma | 0.012* | 0.013*** | 0.015** | 0.020*** |
| | (0.007) | (0.005) | (0.008) | (0.004) |
| Men, Rel. hours (IV) - Some college | 0.026*** | 0.029*** | 0.033*** | 0.038*** |
| | (0.006) | (0.005) | (0.007) | (0.004) |
| Men, Rel. hours (IV) - College degree | 0.096*** | 0.094*** | 0.106*** | 0.107*** |
| | (0.008) | (0.006) | (0.009) | (0.006) |
| | | | | |
| Weights | Yes | No | Yes | No |
| Experience FE | Yes | Yes | Yes | Yes |
| Year FE | No | No | No | No |

*Notes:* In each panel, each set of 4 column-specific coefficients pertains to a different regression. The outcome variable is (log) relative weekly wage for men. Coefficients are 2SLS estimates on the interaction of (log) relative hours worked with 4 education dummies (no high school diploma, high school diploma, some college education, college degree or more), where (log) relative hours are instrumented by (log) relative population. Cell employment is used as weight. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

000131

## 3.2   The native employment-population ratio response

The imperfect substitution between immigrants and natives within skill group, shown in the previous section, suggests that the marginal productivity of natives may increase, on average, in response to inflows of immigrants. The wage effects of immigration, however, are only part of the potential labor market effects. Some recent studies (Dustmann et al. (2017); Amior (2020)) focusing on the impact of immigration on local employment, have emphasized possible displacement or crowding out effects. In particular, these papers find that natives are less likely to migrate to local economies where there are high inflows of immigrants from other local economies within the US.

Such a mechanism could certainly be at work at the local level. However, in analyzing national effects, as in this study, we internalize mobility across locations for each skill group. We note that once one accounts for local adjustments, employment effects may be very different. Additionally, the possible employment effects of cross-location complementarities of workers, driven by internal mobility and internal trade, would not be captured by area analysis but are captured by our national analysis.

To test this, we analyze whether competition effects of immigrants manifest themselves through a decrease in natives' employment-population ratio in the same skill group at the national level. The wage results shown in the previous section suggest increased marginal productivity of natives in response to immigrants, and therefore they are compatible with an *increase* (rather than a decrease/crowding out) of the employment-population ratio nationally. Better productive opportunities and higher marginal value of their labor could have drawn more natives into the labor force and employment. This channel is missing from the analysis and discussion in Ottaviano and Peri (2012), as well as in papers by Manacorda et al. (2012) and Borjas (2003).

To obtain a complete picture of the national effect of immigrants on native labor, therefore, we estimate panel equation (9) where changes in native employment-population ratio depend on changes of immigrant employment (instrumented by changes in their population). Table 3 shows the effect of immigration on native employment rate, using specifications similar to columns (2), (3), (6) and (7) of Table 1 above. The explanatory variable in this case is simply (log) employment of immigrants in a skill cell, instrumented by (log) immigrant population, and the dependent variable is the employment-population ratio of natives in the same cell. The estimates for the 1960-2019 period, reported in Panel A, are highly statistically significant and around 0.06 in the pooled (men and women) specification. This implies that an increase of immigrants by 10 log points (about 10%) in a cell increased the employment-population ratio of natives by 0.6 percentage points. The effect is estimated to be similar, possibly marginally smaller, for the period 2000-2019. Panel B

23

shows very significant estimates mostly around 0.05-0.06.

These estimates highlight two very important points. First, they are consistent with, and confirm, the native-immigrant complementarity shown by the complementarity estimates in the wage regressions. As the labor supplied by natives becomes more valuable due to complementarity with the immigrant labor, natives become more willing to supply labor in the long run and therefore their employment-to-population ratio increases while the share of non-employed among natives decreases. An important reason for this complementarity can be the occupation specialization and occupation upgrading of natives in response to immigration. We will investigate and test for this channel in Section 5. Second, this result shows no evidence that, at the national level, immigration is associated with employment displacement, or crowding out of natives. While this result does not rule out local adjustments of native employment to immigrants, it suggests that over the five-year horizon (as used in the Panel B estimates) these adjustments result in higher national level employment in response to immigrants with similar skills. We show in Section 5 that occupation reallocation takes place in response to immigration, and this may entail geographic mobility as well (or modification of geographic patterns for natives). As these adjustments occur, our estimates imply that at the national level, on average, both employment and wages of native workers increase in response to immigration.

One important caveat is that we analyze aggregate labor markets and not individual workers' outcomes which are not observable in our data. Some individuals may be displaced from work or experience reduced wages due to the competition of immigrants. The differences in individual outcomes and outcomes for the aggregate labor market in response to immigration were also pointed out in Dustmann et al. (2017) and Foged and Peri (2016). Still, our average outcomes suggest that for any group of native workers dropping out of employment or experiencing lower wages from immigration, a larger group of natives are attracted into employment or experiencing increased wages.

24

000133

Table 3: Effect on native employment-to-population ratio

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |

**Panel A: 1960-2019**

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Men, Imm. employment (IV) | 0.070*** | 0.078*** | 0.071*** | 0.072*** |
| | (0.006) | (0.006) | (0.008) | (0.008) |
| Women, Imm. employment (IV) | 0.078*** | 0.080*** | 0.112*** | 0.109*** |
| | (0.010) | (0.012) | (0.012) | (0.012) |
| Pooled, Imm. employment (IV) | 0.060*** | 0.060*** | 0.064*** | 0.062*** |
| | (0.009) | (0.009) | (0.006) | (0.006) |
| *F-stat (rows 1-3)* | 4280.41 | 3516.58 | 1779.85 | 1860.60 |

**Panel B: 2000-2019**

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Men, Imm. employment (IV) | 0.052*** | 0.052*** | 0.063*** | 0.050*** |
| | (0.008) | (0.006) | (0.011) | (0.014) |
| Women, Imm. employment (IV) | 0.048*** | 0.044*** | 0.063*** | 0.045*** |
| | (0.008) | (0.010) | (0.014) | (0.014) |
| Pooled, Imm. employment (IV) | 0.048*** | 0.047*** | 0.056*** | 0.045*** |
| | (0.007) | (0.007) | (0.009) | (0.011) |
| *F-stat (rows 4-6)* | 2117.50 | 1494.85 | 1735.53 | 538.80 |
| Weights | Yes | No | Yes | No |
| Cell FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |

*Notes:* Each coefficient of the table is a 2SLS estimate from a different regression. The ratio between native employment and native population (for men, women, or pooled, depending on the row) is the outcome variable, and (log) immigrant employment is the main regressor, which we instrument with (log) immigrant population. Cell employment is used as weight. Robust standard errors are clustered at the cell level (education by experience).

*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

000134

# 4   Reducing omitted variable bias: IV estimation

The estimates in Ottaviano and Peri (2012), as well as those presented in the other studies using a similar approach (Manacorda et al. (2012); Borjas (2003); Borjas and Katz (2007); Borjas, Grogger, and Hanson (2012)) did not go beyond Least Squares panel estimation of equation (8). They relied on the inclusion of large sets of fixed effects to control for the correlation of the error term (productivity changes) with the explanatory variable (labor employment).

Skill-cell-specific productivity shocks which may have initially attracted immigrants to the country and were beneficial to native and immigrant wages may induce a spurious correlation between relative wages and immigrant labor supply in a cell. This would generate a positive or negative bias depending on whether they affected the productivity of immigrants in the skill cell more or less than that of natives. Identifying variation in immigrant population that is less correlated with non-observable skill-specific productivity shocks can reduce such omitted variable bias.

The literature analyzing the effects of immigration across US locations (labor markets) has identified "supply-driven" variation in immigrant population across areas through the use of a shift-share IV approach (Card (2009); Goldsmith-Pinkham et al. (2020)). This method uses the variation in immigrant presence from different countries of origin across US locations, in a period well before the beginning of the analysis, and leverages the large changes in flows of immigrants from specific origins, by decade, to build variation in location-specific immigration flows that is exogenous to local economic trends. While in this context we cannot employ the same approach based on local networks, we adapt the idea of persistent characteristics of immigrants from each country of origin (in our case, in their education and age characteristics) interacted with the (changing) flows by origin over time to construct a shift-share instrument capturing the variation in labor supply of immigrants across skill cells. Additionally, we employ an IV for the population variation of natives across skill cells, whose changes are predicted by projecting age groups forward over decades, for given education structure of the population. Such variation is also driven by population (supply) and not by employment changes.

## 4.1   A new shift-share IV for cell-specific immigrant labor supply

Immigrants to the US originating from different countries differ significantly in several characteristics. Age and schooling are two of the main ones. For instance, while Mexican and Central American immigrants typically migrated to the US at a very young age (mainly between 20 and 35 years old) and they exhibited low levels of schooling (typically less than high school diploma), immigrants from India tend to move when they are slightly older (be-

26

tween 30 and 40) and tend to be highly educated (with a college degree or more). Chinese immigrants, on the other hand, are distributed more uniformly across education groups.

The different composition is driven, in part, by different selection mechanisms into immigration due to different monetary gains across groups which depend on persistent differences in earnings distribution between the origin and the US, as predicted by a Roy model (Borjas (1987)) and shown in Ambrosini and Peri (2012) and Grogger and Hanson (2011).

Inspired by this observation, we introduce a shift-share approach that considers the distribution of origin-specific flows of immigrants by education and experience cells, using the pre-1980 period, and allocates the more recent inflows from each origin across skill cells in the US labor market proportional to that pre-determined distribution. The changing pattern of countries of origin over decades generates the variation of labor supply across skills. For instance, if, as it was the case, Mexican immigration declined in the post-2000 period while immigration from India increased, this would be associated to a decline in the labor supply for low age-low education cells, and an increase in labor supply for the middle-age, high-education cells.

Specifically, we compute net flows of immigrants between 1960 and 1980 (the pre-1980 period) for each country of origin. We consider individually the top 5 sending countries, aggregating all others by continent.[9] This leaves us with 12 selected origins: the 5 top countries - i.e., Mexico, Cuba, China, Philippines and Korea - and 7 continents - i.e., North America, Central America and Caribbean, South America, Europe, Africa, Asia and Oceania.[10] We then use these 12 groups (henceforth, we will refer to them broadly as countries of origin) to build the cell-based shift-share IV. The share of immigrants from country of origin $c$, in education $k$-experience $j$ cell is defined as follows:

$$sh_{kj}^c = \frac{\Delta^{80,60} pop_{kj}^c}{\Delta^{80,60} pop^c} \tag{10}$$

where $\Delta^{80,60} pop$ represents the 1980-1960 net immigration for the group from country of origin $c$ residing in the US. In the numerator the net change is computed for each individual skill cell, while the change in the denominator aggregate the whole net immigration from country $c$. With 32 cells for each country of origin (4 education cells by 8 experience cells), we encounter a few cases with a negative cell-specific net flow (i.e., negative numerator in (10)). This happens when inflows of individuals from $c$ in a given cell did not compensate outflows (due to return migration or aging into other cells). In those instances, we set the net flows to zero both in the numerator and in the aggregation generating the denominator

---

[9]We compute the same estimates selecting the top 6 countries, which amounts to including India separately. We do not find any significant difference. Additional details on these flows are reported in Appendix B.

[10]We drop individuals not assigned to a specific country or continent, and those assigned to Antarctica.

of (10). This correction allows us to obtain:

$$sh_{kj}^c \geq 0 \ \forall \{c, k, j\} \text{ and } \sum_{\{k,j\}} sh_{kj}^c = 1 \ \forall c \tag{11}$$

Then, for each country, we compute the aggregate net flows $\Delta^{t,t-10}pop^c$ for each of the four decades from 1980 to 2019, and we use these along with the shares to obtain the country-specific imputed ten-year change for each cell as follows:

$$\Delta^{t,\widehat{t-10}}pop_{kj}^c = sh_{kj}^c * \Delta^{t,t-10}pop^c \qquad \forall t \in \{1990, 2000, 2010, 2019\} \tag{12}$$

The imputed changes from (12), which can be positive or negative depending on the aggregate net flow from each country of origin $c$ in a given decade, are then summed over countries of origin to obtain the imputed foreign-born ($F$) supply change in each education-by-experience cell:

$$\Delta^{t,\widehat{t-10}}pop_{kj}^F = \sum_c \Delta^{t,\widehat{t-10}}pop_{kj}^c \tag{13}$$

Finally, we compute the predicted cell-specific foreign-born population at time $\tau$, $\forall \tau \in \{1990, 2000, 2010, 2019\}$, which we will use as our instrument for immigrant labor supply measures (in this case, foreign employment), by summing the initial immigrant population of each cell in 1980 to the cumulative imputed supply change of the cell for all decades up to $\tau$ as follows:

$$\widehat{(pop_{kj}^F)}_\tau = (pop_{kj}^F)_{1980} + \sum_{t=1990}^{\tau} \Delta^{t,\widehat{t-10}}pop_{kj}^F \quad \text{with } t \in \{1990, 2000, 2010, 2019\} \tag{14}$$

In $\tau = 1980$ we simply have $\widehat{(pop_{kj}^F)}_{1980} = (pop_{kj}^F)_{1980}$. We use the measure constructed as in equation (14) to instrument for foreign-born employment.

When we consider the period 2000-2019, we repeat the same procedure, obtaining country-specific imputed changes for 2005 and 2015. We drop observations before 2000, obtaining five imputed 5-year changes (i.e., for 2000, 2005, 2010, 2015 and 2019).[11]

## 4.2   Demographic change as predictor of native cell supply

As the explanatory variable in equation (8) is the (log of the) ratio of immigrant and native employment, we will instrument the variation of native population across cells, and then take the (log of the) ratio as IV. We proxy for native population change by predicting the de-

---

[11]As they are cumulative changes, the imputed values for 2000, 2010 and 2019 remain the same as before.

000137

mographic evolution of the native population. Specifically, we forecast native employment of a given group with education level $k$ and years of potential labor market experience $j$ by using previous decade's native population in the group with the same education level $k$ but with experience $j - 10$ years. For instance, the native population of the group of individuals with high school degree and 15 years of potential experience in the labor market in 1990 is used to construct the native population for the group with high school degree and 25 years of experience in 2000, and so on.

In so doing, we project the size of each cell forward to the following decade (or 5-year period when considering the 2000-2019 interval), adding 10 (or 5) years to their experience group, while leaving the education structure unchanged. Since for the two youngest groups (between 0 and 5, and between 5 and 10 years of potential experience) we cannot impute exact population size from the past, we rely instead on the education structure of the youngest cohort in the previous period. Specifically, we take the total population of natives with years of potential experience 0 to 5 and 5 to 10 in the decade and allocate them across the four education groups using the education shares of the youngest cohort in the labor market observed in the previous decade.[12] We refer to this approach as the *best one decade-ahead prediction* for each cell.

### 4.3   Power and Validity of the instruments

Once we have constructed the predicted immigrant (foreign-born $F$) population, $\widehat{(pop_{kj}^F)}_t$, with the shift-share method described in Section 4.1, and the predicted native (domestic $D$) population, $\widehat{(pop_{kj}^D)}_t$, with the demographic projections described in Section 4.2, we are ready to build two instruments.

The first, $\ln \frac{\widehat{(pop_{kj}^F)}_t}{\widehat{(pop_{kj}^D)}_t}$, will be used in equation (8) as an instrument for $\ln\left(\frac{Empl_{Fkjt}}{Empl_{Dkjt}}\right)$ to estimate the parameter $\frac{1}{\sigma_{IMMI}}$; the second, $\ln\widehat{(pop_{kj}^F)}_t$ will be used in equation (9) as an IV for $\ln(Empl_{Fkjt})$ to estimate the parameter $\beta_{emp}$.

The panels of Figure 4 show the first-stage correlations of the two instruments with the changes in labor supply for the 1980-2019 period. The top left panel shows the raw correlation between the (log of) predicted relative population and (log of) relative employment for all workers, whereas the top right panel shows the same correlation for full-time workers only. A strong positive correlation is visible. This strong raw correlation carries over to the first-stage F statistics reported in column (1) and (3) of Table 5, Panel A and equal to 71.58

---

[12] Since for the 2000-2019 period we project the size of cells forward by 5 years, rather than 10, we rely on this education-based adjustment only for the youngest group (0 to 5 years of experience) in each period of this interval. Clearly, we do so by using the education shares of the youngest cohort observed 5 years earlier.

000138

and 92.05.  Those capture the partial correlation of the IV, after controlling for the fixed effects.

The two bottom panels of Figure 4 show the first-stage raw correlation between the (log of) predicted foreign-born population and (log of) foreign-born employment of all workers (left panel) or of full-time workers only (right panel). A positive correlation is visible, albeit weaker than for the top panels. The F statistics for these first-stage partial correlations from Panel B of Table 5 are 16.19 and 15.86. Overall, the first-stage F statistics for both panels are well above the standard rule of thumb of 10, below which concerns regarding weak instruments emerge.

Figure 4: First-stage relationships for Table 5



*Notes:* The upper left figure refers to the first-stage relationship for 2SLS coefficients reported in columns (1) and (2) of Panel A. Upper right figure refers to those in columns (3) and (4) of Panel A. Bottom left figure to those in columns (1) and (2) of Panel B. Bottom right figure to those in columns (3) and (4) of Panel B.

The panels of Figure 5 show the same first-stage correlations as in Figure 4, but are constructed for the more recent period 2000-2019 and for the relative changes in labor supply. The top panels show the raw correlation between the (log of) imputed population ratio and

the (log of) employment ratio, including all workers in the left panel and full-time only in the right one. The bottom panels show the correlation between the (log of) foreign-born employment and the (log of) imputed foreign-born population, again including all workers in the left panel and full-time workers only in the right. Visual inspection of the raw correlations in Figure 5 reveals a positive but a bit weaker correlation of the IV with (log of) immigrant employment, and a strong correlation of the IV with relative employment. Table 6 shows that the power to predict the (log of) relative employment is, in fact, somewhat weaker after controlling for the fixed effects (F statistics between 22 and 31) while IV predicting the (log of) foreign-born employment are a bit stronger (F statistics 30 to 36). Nevertheless, in this case as well, the first-stage F statistics of both panels exceed the conventional threshold, reassuring us against the presence of weak instruments.

As our regressions feature a single endogenous regressor, we can consider the relative asymptotic bias test for weak instruments by Olea and Pflueger (2013), more appropriate in presence of clustered errors. Conducting the test at the 5% confidence level, our "effective" F statistics reported in the tables surpass the critical value of 23.1 for 2SLS with a worst-case bias of 10%. Despite this more stringent threshold, if compared to the standard Stock-Yogo critical values for the i.i.d. case, we can confidently reject the null hypothesis of weak instruments for almost all our regressions of Tables 5 and 6, except for those in Panel B of Table 5, which should therefore be taken with a bit of caution.

In adopting a shift-share type of IV as we do, which is based on past skill-specific patterns combined with changing immigration flows by country of origin, it is important to test that the components of the IV are not driven by a correlation with past cell-specific labor market trends, which may persist and affect wages and employment in the post-2000 period.[13] Previously, we noted that aggregate inflows of immigrants changed significantly after 2000 with large declines of Mexicans and increases in Asians. These new flows produce the post-2000 variation of our IV and, since we newly estimate the post-2000 native-immigrant complementarity and the related effects of immigration, we test that they are uncorrelated with trends, specific to skill cells before 2000.

To check these correlations we proceed as follows. First we submit them to visual inspection by plotting them in the two panels of Figure 6. In the upper panel, we show the correlation of the 2000-2019 changes in the (log of) relative-population IV (horizontal axis) with the 1980-1990 and 1990-2000 stacked changes in the (log of) relative wage (vertical axis), after controlling for education and decade dummies. The units of observations are education-experience cells. In the bottom panel, instead, we show the scatterplot of the 2000-2019 changes in the (log of) immigrant-population IV (horizontal axis) against the

---

[13]This is a more direct test of lack of correlation with pre-trends for the IV, rather than one focused only on the more relevant "shares" of immigrants as in Goldsmith-Pinkham et al. (2020).

000140

Figure 5: First-stage relationships for Table 6



*Notes:* The upper left figure refers to the first-stage relationship for 2SLS coefficients reported in columns (1) and (2) of Panel A. Upper right figure refers to those in columns (3) and (4) of Panel A. Bottom left figure to those in columns (1) and (2) of Panel B. Bottom right figure to those in columns (3) and (4) of Panel B.

1980-1990 and 1990-2000 stacked changes in native employment-population ratio (vertical axis), controlling for education and decade dummies. Both panels plot the correlation of residuals of these changes, both unweighted (black diamond markers) and weighted (circles, whose size is proportional to cell employment in 1980, which we use as weight). We display on the chart the corresponding LS regression lines (dotted for the unweighted regression, dashed for the regression with weights) and the LS coefficients (capturing by the slope) with their p-values.

Both panels of Figure 6 show visually, and confirm statistically, the absence of a significant relationship, suggesting that IV-imputed population changes after 2000 are not correlated with wages and native employment changes before 2000. This evidence is shown more systematically in Table 4, where we report the LS estimates of regressions of changes in outcomes (1980-1990 and 1990-2000, stacked) on the IV-imputed population changes (2000-

000141

2019). The outcome for columns (1) to (4) are (log of) relative wage, while for columns (5) to (8) they are native employment-population ratio. Columns (1), (2), (5) and (6) do not include dummies, while column (3), (4), (7) and (8) control for education and decade dummies (4 education groups and 2 decades). The estimates, some of which were visualized in Figure 6, are never significant at the 5% confidence level, and only one coefficient out of eight is marginally significant at the 10% level.[14]

Table 4: Instrument validity - OLS estimates of the effect of IV on pre-trends in outcomes

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | $\Delta$ Wage | $\Delta$ Wage | $\Delta$ Wage | $\Delta$ Wage | $\Delta \frac{Emp}{Pop}$ | $\Delta \frac{Emp}{Pop}$ | $\Delta \frac{Emp}{Pop}$ | $\Delta \frac{Emp}{Pop}$ |
| $\Delta IV_{00-19}$ (SS + demogr.) | 0.021 | 0.038* | 0.014 | 0.032 | | | | |
| | (0.015) | (0.019) | (0.016) | (0.019) | | | | |
| $\Delta IV_{00-19}$ (SS) | | | | | 0.016 | 0.024 | -0.078 | -0.064 |
| | | | | | (0.021) | (0.021) | (0.047) | (0.045) |
| Constant | -0.006 | -0.011* | 0.009 | 0.001 | 0.011*** | 0.011*** | -0.031*** | -0.031*** |
| | (0.005) | (0.006) | (0.014) | (0.015) | (0.003) | (0.003) | (0.006) | (0.006) |
| Observations | 64 | 64 | 64 | 64 | 64 | 64 | 64 | 64 |
| R-squared | 0.035 | 0.075 | 0.115 | 0.152 | 0.003 | 0.006 | 0.701 | 0.670 |
| Weights | No | Yes | No | Yes | No | Yes | No | Yes |
| Education FE | No | No | Yes | Yes | No | No | Yes | Yes |
| Decade FE | No | No | Yes | Yes | No | No | Yes | Yes |

*Notes:* The table reports OLS estimates for regressions of stacked changes for 1980-1990 and 1990-2000 in outcome of interest (log relative wage in the first four columns, and native employment-population ratio in the last four columns) on the 2000-2019 changes in the corresponding IV-imputed population measure (log relative population and log immigrant population, respectively). Observations are education-experience cells. Cells are weighted by 1980 employment. Robust standard errors are reported in parentheses.
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

In conclusion the constructed IV exhibits reasonable power and passes validity tests as it is uncorrelated with pre-2000 trends. Next, we proceed to use our IV to estimate the parameters of interest.

---

[14]Including fixed effects as we do in all our specifications seems to help absorb the small correlation between IV and pre-2000 relative wages, which is displayed in Appendix Figure 7.

000142

Figure 6: Pre-trends in outcomes

(a) Relative wage



(b) Native employment-population ratio



*Notes:* This figure plots the correlation between residual changes in outcomes of interest before 2000 and residual changes in corresponding IV measures after 2000 by skill cell, after controlling for education and decade dummies. The upper (lower) panel displays residuals for 1980-1990 and 1990-2000 stacked changes in log relative wage (native employment-population ratio) and residuals in IV-imputed changes for 2000-2019 in log relative population (log immigrant population) by skill cell. OLS estimates from regressions of residual changes in outcomes on residual changes in IV measures (and corresponding p-values) are reported. Unweighted regressions are represented by the dotted lines (pertaining to the black diamond markers), while weighted regressions are given by the long-dashed lines (circles). Circle sizes are proportional to 1980 cell employment (used as weight).

34

## 4.4   2SLS estimates

Tables 5 and 6 present our IV results. Panel A presents estimates of $\frac{1}{\sigma_{IMMI}}$, which captures native-immigrant productive complementarity. Panel B shows the estimates for the coefficient $\beta_{emp}$, which captures the potential crowding out or crowding in of immigration on native employment-population ratio. All specifications use 2SLS estimation method controlling for skill-cell-effects and year-effects. The sample used in rows (1) to (3) of each panel includes men, women, and a pooled sample, respectively, in constructing the outcome variable. Table 5 is estimated over the period 1980-2019, while Table 6 only includes data for the more recent decades (2000-2019). The column estimates differ due to weighting (columns (1) and (3)) or not weighting (columns (2) and (4)) by the cell employment, and by worker sample (include all workers in the estimation of (1) and (2), or full-time workers only in (3) and (4)).

Overall, the key results from the Least Squares estimations are confirmed in these specifications with a few differences. First, the intensity of complementarity between immigrants and natives is weaker in the 2SLS estimates for the 1980-2019 period, especially for men. The coefficient is not significant for men, and is significant in half of the cases for women and the pooled sample, with a magnitude between 0.03 and 0.05. However, the estimates of Table 6 show that the same coefficient estimated on the two most recent decades is larger and mostly statistically significant. Its value is between 0.05 and 0.06 when estimated on the pooled sample. While the 2SLS estimates have a somewhat larger standard error (around 0.025) relative to OLS (around 0.01), most estimates in Table 6 reveal imperfect substitutability and an elasticity between natives and immigrants around $18-20$ for the period 2000-2019, consistent with the original results in Ottaviano and Peri (2012). The weaker complementarity estimates for the 1980-2000 period, when more low-educated immigrants arrived in the US, and the higher complementarity estimates in the post-2000 period are consistent with the important role of highly educated immigrants in generating differentiation and complementarity with natives.

The second important result is that both Panel B of Tables 5 and 6 reveal a significant positive response of employment-population ratio of natives to immigration. Skill cells experiencing a higher inflow of immigrants exhibited crowding in of natives, whose employment-population ratio increased significantly. The estimates vary somewhat depending on the sample, the period and the specification, ranging from 0.04 to 0.21 and are always statistically significant at the 5% level (and in most cases at the 1%). The estimates for the more recent period, 2000-2019, for the pooled sample are between 0.048 and 0.095, which is also consistent with the Least Squares estimates. We will use those as reference values.

The estimated positive effects on employment-population ratio are in contradiction with

000144

some local estimates that suggest crowding out of natives in response to immigration at the local level (Dustmann et al. (2017); Amior (2020)).[15] There are several reasons why the complementary effects of immigrants can be stronger in the aggregate national market than locally. First, adjustments through occupational reallocation and national response to higher demand from immigrants are likely to spill over outside the local economy and to imply reallocation of workers across commuting zones. The national approach, as predicated by its early advocates such as Borjas (2003), may be a better approach to internalize those effects and produce estimates that are more useful in evaluating the aggregate impact of immigrants on employment and wages. Additionally, our framework is much more careful in differentiating among workers' skills and substitutability-complementarity patterns, rather than considering labor as one type of undifferentiated workers (as in Amior (2020)). While we think the local analysis sheds light on important mechanisms, we also think that the present framework, focused on a national analysis across skill groups, both complements local analysis work and is better suited to infer national labor market effects of immigration.

In Table 7 we push our estimates relative to 2000-2019 a step further. We showed in Section 3, using an simple population instrument, that for different education groups the intensity of complementarity between immigrants and natives was different, with more intense complementarity among the college educated and the no-high-school-degree groups. In this table, we interact both the explanatory variable and the instrument with education-group dummies, providing the counterpart based on our refined IV approach to the education-specific estimates of Table 2. In particular, we estimate a different coefficient for each of the four education groups. Table 7 shows the results for the wage complementarity coefficients (Panel A) and for the employment-population ratio coefficients (Panel B). Since these regressions feature more than one endogenous explanatory variable, caution is needed. Table 18 in Appendix B reports several test statistics used to detail the nature of any weak-instrument problem concerning Table 7. In particular, it provides Shea's partial $R^2$, which generalizes the standard partial $R^2$ for cases with more than one endogenous regressor. While there is no consensus on what value indicates a problem, values for Panel A look sufficiently high and do not indicate the existence of a serious issue. Table 18 also provides first-stage $F$ statistics and the Sanderson–Windmeijer corrected conditional $F$ statistics for first-stage regressions of each endogenous regressor. The sizes of these statistics do not indicate a weak-instrument problem as they appear to be larger than Stock-Yogo critical values, even though their use is questionable as our models feature robust standard errors. We also report the Kleibergen-Paap statistic, a robust version of the Cragg–Donald minimum eigenvalue statistic, which

---

[15]Older studies on US local economies, such as Basso and Peri (2015) and Peri and Sparber (2011a), however, did not find significant crowding out.

000145

Table 5: 2SLS estimates for elasticity of substitution and labor supply effect, 1980-2019

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |
| **Panel A: Elasticity estimates (1980-2019)** | | | | |
| Men, Rel. employment (SS IV + demogr. IV) | -0.009 | -0.007 | 0.008 | 0.009 |
| | (0.023) | (0.020) | (0.021) | (0.018) |
| Women, Rel. employment (SS IV + demogr. IV) | 0.033 | 0.049** | 0.030 | 0.041** |
| | (0.024) | (0.020) | (0.022) | (0.017) |
| Pooled, Rel. employment (SS IV + demogr. IV) | 0.018 | 0.020 | 0.030* | 0.030** |
| | (0.020) | (0.016) | (0.018) | (0.015) |
| *F-stat (rows 1-3)* | 71.58 | 75.80 | 92.05 | 96.08 |
| **Panel B: Labor supply estimates (1980-2019)** | | | | |
| Men, Imm. employment (SS IV) | 0.100*** | 0.080*** | 0.152*** | 0.086** |
| | (0.029) | (0.025) | (0.043) | (0.035) |
| Women, Imm. employment (SS IV) | 0.063** | 0.031 | 0.215*** | 0.098* |
| | (0.025) | (0.021) | (0.074) | (0.050) |
| Pooled, Imm. employment (SS IV) | 0.056*** | 0.040** | 0.114*** | 0.057** |
| | (0.020) | (0.018) | (0.040) | (0.026) |
| *F-stat (rows 4-6)* | 16.19 | 18.48 | 15.86 | 18.38 |
| Weights | Yes | No | Yes | No |
| Cell FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |

*Notes:* Panel A reports 2SLS estimates for the immigrant-native elasticity of substitution. Relative weekly wage in log (for men, women, or pooled) is regressed on relative employment, which is instrumented with the imputed relative population, a ratio of instruments. We adopt a shift-share IV approach to impute the numerator (foreign-born population), while we use a demographic instrument for the denominator (native population). Panel B reports 2SLS estimates from regressions of native employment-population ratio (for men, women, or pooled) on immigrant employment in log, which is instrumented with immigrant population imputed with the same shift-share IV approach as in Panel A. Cells are weighted by employment. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

provides an overall test of weak instruments (Cameron and Trivedi (2022)).

In terms of complementarity coefficients, Panel A of Table 7 confirms the results of Section 3. The specifications estimated on the sample of all workers (columns (1) and (2)) show coefficients in the order of 0.1 for the most and least educated groups, while they are 0.02-0.04 for the two intermediate groups. The estimated effects on the employment-population ratio are more similar across education groups and around 0.04-0.06. As for the specification using full-time workers only, the complementarity coefficients on less educated are a

Table 6: 2SLS estimates for elasticity of substitution and labor supply effect, 2000-2019

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |
| **Panel A: Elasticity estimates (2000-2019)** | | | | |
| Men, Rel. employment (SS IV + demogr. IV) | 0.035 | 0.026 | 0.041 | 0.029 |
| | (0.027) | (0.029) | (0.026) | (0.027) |
| Women, Rel. employment (SS IV + demogr. IV) | 0.073** | 0.063** | 0.068** | 0.058** |
| | (0.028) | (0.025) | (0.029) | (0.023) |
| Pooled, Rel. employment (SS IV + demogr. IV) | 0.058** | 0.050** | 0.059** | 0.049** |
| | (0.025) | (0.025) | (0.025) | (0.023) |
| *F-stat (rows 1-3)* | 22.42 | 13.37 | 31.62 | 17.25 |
| **Panel B: Labor supply estimates (2000-2019)** | | | | |
| Men, Imm. employment (SS IV) | 0.076*** | 0.065*** | 0.078*** | 0.047*** |
| | (0.008) | (0.007) | (0.015) | (0.014) |
| Women, Imm. employment (SS IV) | 0.082*** | 0.053*** | 0.140*** | 0.056** |
| | (0.022) | (0.017) | (0.051) | (0.025) |
| Pooled, Imm. employment (SS IV) | 0.075*** | 0.057*** | 0.095*** | 0.048*** |
| | (0.013) | (0.011) | (0.027) | (0.015) |
| *F-stat (rows 4-6)* | 36.14 | 75.37 | 30.21 | 58.49 |
| Weights | Yes | No | Yes | No |
| Cell FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |

*Notes:* Panel A reports 2SLS estimates for the immigrant-native elasticity of substitution. Relative weekly wage in log (for men, women, or pooled) is regressed on relative employment, which is instrumented with the imputed relative population, a ratio of instruments. We adopt a shift-share IV approach to impute the numerator (foreign population), while we use a demographic instrument for the denominator (native population). Panel B reports 2SLS estimates from regressions of native employment-population ratio (for men, women, or pooled) on immigrant employment in log, which is instrumented with immigrant population imputed with the same shift-share IV approach as in Panel A. Cells are weighted by employment. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

bit smaller, but those on employment-population ratio are larger for all workers. The employment effects of complementary immigrants may have been stronger in pushing natives towards full-time jobs, especially among highly educated individuals.

The refinements and extensions of the Ottaviano and Peri (2012) estimates discussed in this section have confirmed three crucial features of the productive interactions of immigrants and natives in the long run. First, even when these two groups have similar education and age, their employment in the labor market shows a significant degree of complemen-

000147

Table 7: 2SLS estimates breaking down by education

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |

**Panel A: Elasticity estimates (2000-2019)**

| | | | | |
|---|---|---|---|---|
| Pooled, Rel. employment - No HS diploma | 0.115*** | 0.101*** | 0.025 | 0.052** |
| | (0.031) | (0.025) | (0.042) | (0.025) |
| Pooled, Rel. employment - HS diploma | 0.017*** | 0.015*** | 0.018*** | 0.018*** |
| | (0.006) | (0.005) | (0.005) | (0.004) |
| Pooled, Rel. employment - Some college | 0.041*** | 0.040*** | 0.044*** | 0.046*** |
| | (0.005) | (0.004) | (0.004) | (0.003) |
| Pooled, Rel. employment - College degree | 0.104*** | 0.098*** | 0.112*** | 0.107*** |
| | (0.008) | (0.006) | (0.008) | (0.006) |

**Panel B: Labor supply estimates (2000-2019)**

| | | | | |
|---|---|---|---|---|
| Pooled, Imm. employment - No HS diploma | 0.029 | 0.039* | 0.132** | 0.154*** |
| | (0.022) | (0.021) | (0.061) | (0.036) |
| Pooled, Imm. employment - HS diploma | 0.043* | 0.053** | 0.149** | 0.171*** |
| | (0.022) | (0.022) | (0.062) | (0.037) |
| Pooled, Imm. employment - Some college | 0.047** | 0.057*** | 0.153** | 0.176*** |
| | (0.022) | (0.022) | (0.063) | (0.037) |
| Pooled, Imm. employment - College degree | 0.049** | 0.059*** | 0.154*** | 0.176*** |
| | (0.022) | (0.021) | (0.060) | (0.035) |
| | | | | |
| Weights | Yes | No | Yes | No |
| Experience FE | Yes | Yes | Yes | Yes |
| Year FE | No | No | No | No |

*Notes:* This table expands upon Table 2. Coefficients reported are 2SLS estimates. In each panel, each set of 4 column-specific coefficients pertains to a different regression, which includes 4 endogenous variables and 4 instruments. In Panel A, the outcome variable is pooled (log) relative weekly wage, while the endogenous variable is the interaction of (log) relative employment with 4 education dummies (no high school diploma, high school diploma, some college education, college degree or more), instrumented with the interaction between (log) relative population imputed using our shift-share IV approach for foreign-born and a demographic IV for natives and the 4 education dummies. In Panel B, the outcome variable is the pooled native employment-population ratio, while the endogenous variable is the interaction of (log) immigrant employment with 4 education dummies (no high school diploma, high school diploma, some college education, college degree or more), instrumented with the interaction between (log) immigrant population imputed using a shift-share IV approach and the 4 education dummies. Cell employment is used as weight. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

tarity, implying that they do not compete for same jobs, but rather the employment of one group helps the productivity of the other. Second, these synergies/complementarities are strong in the group of workers with no high school degree, and even stronger for workers with college degree or more. Recalling that the latter group was also the fastest-growing group of immigrants in the last 20 years, it is unsurprising that the complementarity between immigrants and natives seems to have increased post-2000. Third, this complemen-

000148

tarity is consistent with immigrants generating productive opportunities for natives and attracting them in the labor market. As we have shown, the employment-population ratio of natives has responded positively to the inflow of immigrants in the last 20 years. Overall, these complementarities appear significant and seem to have grown stronger over the last two decades.

# 5   Effects on occupational upgrading

What mechanisms help generate the complementarity and positive employment effects of immigration on natives of similar education and experience? One natural candidate for explaining these effects is specialization in different/complementary occupations along the lines of comparative advantages. Occupational separation of natives and immigrants is a feature identified in local economies by a series of papers (e.g., Peri and Sparber (2009, 2011b); Cattaneo, Fiorio, and Peri (2015)), and occupational upgrading of natives in response to immigration – as discussed in existing literature (Peri and Sparber (2009); Foged and Peri (2016)) – can be a mechanism contributing to these results.

To investigate these mechanisms in our setting, we ask whether immigration shifted the cell-specific occupational distribution for natives towards occupations that pay more (and in which they have comparative advantages). As described in Section 1, we construct a measure of "occupational quality" by associating each occupation with the average national weekly wage paid to workers in 1980. Then we weight these occupational wages by the share of native workers employed in each occupation, within each education $k$-experience $j$ cell in each considered year $t$. A shift of natives towards occupations with higher weekly wages (i.e., upgrading), over the years, implies an increase in this "occupational quality" measure. In Table 8 we report the 2SLS estimates of coefficient $\beta_{occ}$ from the following regression:

$$\ln(Occ\ Index_D)_{kjt} = \phi_{kj} + \phi_t + \beta_{occ}\ln\left(Empl_{Fkjt}\right) + e_{kjt} \tag{15}$$

where $(Occ\ Index_D)_{kjt}$, as described above, is equal to $\sum_{Occ}\left((Share_{occ})_{Dkjt}x(Wage_{occ})_{Dkj,1980}\right)$, the employment share-weighted occupation wage in 1980 for domestic workers in cell of education $k$ and experience $j$. The occupation shares sum to one within each education-experience cell in each year. This definition implies that changes in the index are solely driven by changes of native worker shares within a skill group across occupations, with a positive change indicating a movement towards higher-quality/higher-paying occupations (based on 1980 wage data), on average.

Table 8 presents the estimates of coefficient $\beta_{occ}$ from equation (15) above. The table follows the same structure and specifications (in its rows and columns) as the previous tables,

000149

Table 8: 2SLS estimates on occupational quality of natives

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Sample** | All workers | | Full-time workers only | |
| | | | | |
| **Panel A: Occupational quality estimates (1980-2019)** | | | | |
| | | | | |
| Men, Imm. employment (SS IV) | 0.071*** | 0.054*** | 0.060*** | 0.039*** |
| | (0.018) | (0.015) | (0.014) | (0.012) |
| Women, Imm. employment (SS IV) | 0.054** | 0.027 | 0.043** | 0.007 |
| | (0.022) | (0.017) | (0.018) | (0.015) |
| Pooled, Imm. employment (SS IV) | 0.036*** | 0.030*** | 0.022*** | 0.017*** |
| | (0.010) | (0.008) | (0.007) | (0.006) |
| | | | | |
| *F-stat (rows 1-3)* | 16.19 | 18.48 | 15.86 | 18.38 |
| **Panel B: Occupational quality estimates (2000-2019)** | | | | |
| | | | | |
| Men, Imm. employment (SS IV) | 0.037*** | 0.030*** | 0.026*** | 0.019*** |
| | (0.006) | (0.004) | (0.005) | (0.003) |
| Women, Imm. employment (SS IV) | 0.015 | 0.002 | 0.008 | -0.007 |
| | (0.010) | (0.006) | (0.012) | (0.006) |
| Pooled, Imm. employment (SS IV) | 0.020*** | 0.018*** | 0.009 | 0.010*** |
| | (0.005) | (0.003) | (0.008) | (0.003) |
| | | | | |
| *F-stat (rows 4-6)* | 36.14 | 75.37 | 30.21 | 58.49 |
| | | | | |
| Weights | Yes | No | Yes | No |
| Cell FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |

*Notes:* Both panels report 2SLS estimates from regressions where the outcome variable is a measure of native occupational quality (for men, women, or pooled, depending on the row). We regress this variable on (log) immigrant employment, which is instrumented with immigrant population imputed with our shift-share IV approach. Cells are weighted by employment. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

separating rows by gender and columns by worker status. We show weighted (odd columns) or unweighted (even columns) regression results. Finally, Panel A displays the coefficients estimated using decade data for the 1980-2019 period, while Panel B shows the estimates with the five-year data over the more recent 2000-2019 period.

The coefficients of the table are positive and mostly significant, which is consistent with the idea that more immigrants pushed natives into higher-paid occupations, where they likely possess comparative advantages. This occupational upgrading seems to be slightly larger and more significant for men. Considering the pooled estimates, an increase of immigrants by 10 log points in a skill cell (about 10%) increased the occupational quality (wage) of natives in that cell by 0.2 to 0.3%, using the 1980-2019 estimates, or by 0.1 to 0.2%, using

000150

the more recent period. This reallocation to occupations with higher wages is consistent with the increased labor participation among natives and with the positive complementarity effect estimated in the previous sections. The type of job reallocation that we see taking place at the occupation level may also be happening at a finer level (for example, within occupations), with natives moving to tasks that are complementary to those performed by immigrants. Our data, however, lack the granularity needed to test this mechanism.

# 6   Simulated effects of immigration on native wages and employment rates: 2000-2019 and 2019-2022

In this section we return to the model described in Section 2. Using the parameter $1/(\sigma_N)$, newly estimated among the more recent sample (2000-2019) and with more current econometric methods (IV using shift-share and demographic predictions), in combination with other standard elasticity parameters taken from the literature (including Ottaviano and Peri (2012), Card and Lemieux (2001), Katz and Murphy (1992), Goldin and Katz (2009) and Autor et al. (2020)), we estimate the effects of changing the supply of immigrants in each skill group on wages of natives by skill group. In particular, we first equate the marginal productivity of each type of workers to their wages, obtaining a wage equation for each native worker (denoted as usual by $D$) of education group $k$ and experience $j$. Then we take a total differential of the log of the native wage $w_{Dkj}$ with respect to the supply of immigrants in each group $(\frac{\Delta L_{Fkj}}{L_{Fkj}})$. The corresponding formula obtained from this procedure is shown and described in Appendix C, by equation (16). Using the estimated elasticity values, the wage bill share for each skill group, and the percentage change in supply of foreign-born in each skill group, we can then calculate these effects of changing immigrants supply on natives' wages.

We present results grouped by native workers' education level. First, we consider the wage responses (averaged across age groups) to changes in immigrants for the 2000-2019 period. Results of these simulations are shown in columns (1) to (4) of Table 9. Columns (1) to (4) of Table 10, then show the wage effect on natives of the inflow of immigrants during the very recent 2019-2022 period. Table 9 and Table 10 follow a similar structure. The differences across the simulations of columns (1) to (4) are due to the choice of elasticity parameters, which are taken from their estimated values. The values used in each simulation are reported in the bottom six rows of the tables. In column (1) the choice of parameter values for the simulation follows the preferred specification of Ottaviano and Peri (2012) in terms of parameters not specific to the immigrant-native interactions. Specifically we set $1/\sigma_{H-L} = 0.54$, $1/\sigma_{EDU,H} = 0.16$, $\sigma_{EDU,L} = 0.03$, and $1/\sigma_{EXP} = 0.16$. We update the value of

000151

$1/(\sigma_N)$, which we impose equal to 0.058 for all groups, reflecting our estimate in Table 6 for the pooled sample of all workers in the specification that uses weights (i.e., the estimate in the third row of column (1) in Panel A of Table 6). In column (2) we leave the set of non-immigration specific parameter values unchanged, but we allow $1/(\sigma_N)$ to differ between more and less educated individuals, using $1/(\sigma_N)_L = 0.045$ for those with a high school degree or less (the average of our estimated coefficients in Table 7), and $1/(\sigma_N)_H = 0.10$ for those with some college education or more (the average value for the estimates in the last row of Table 7). This choice reflects the evidence, supported by most of the estimates in the previous sections, that the complementarity between immigrants and natives among college educated seems stronger than among other groups.

While interpreting the results, we need to bear in mind that the number of college-educated immigrants exhibited the largest growth over the past two decades, while the number of immigrants with no degree has declined.

We test the robustness of our results to alternative configurations in columns (3) and (4). In column (3) we increase the complementarity between broad education groups and set $1/\sigma_{H-L} = 0.71$, the exact estimate from Katz and Murphy (1992). Finally, in column (4), we use $1/\sigma_{EDU,H} = 1/\sigma_{EDU,L} = 0$, implying perfect substitution within broad education group. The standard errors for the $1/(\sigma_N)$ parameters are taken from Tables 6 and 7, while other elasticity values are from the same sources as the estimated parameter.

We proceed as follows. We begin by generating 1,000 extractions for a given configuration of the parameters from a joint normal distribution. Subsequently, using formula (16) from Appendix C, we calculate the wage effect for each education-experience group in response to the same immigration inflow (for 2000-2019, or for 2019-2022) and take the average and the standard deviation of the 1,000 simulated values. Native wage changes for each education group and the overall average (along with their standard errors), as reported in columns (1) to (4) of Tables 9 and 10, are obtained by averaging wage changes of each education-experience group weighting by its share in the 2019 wage bill in the relevant education group or overall.[16]

Three findings emerge from columns (1) to (4) of Table 9. First, due to the relative concentration of new immigrants among college-educated and the complementarity between college- and non-college-educated, the immigrant inflow of 2000-2019 helped the wage growth of less educated natives (those with high school degree or less) by between 1.7% and 2.6%. This represents a significant boost in real wages, especially considering that the real wage growth of this group during the 2000-2019 period was actually negative, between -5% to -6% .[17] Second, in spite of the large inflow of college-educated immigrants, the com-

---

[16]Tables 14 and 15 in Appendix A report the wage effects on foreign-born.

[17]See Table 11.

plementarity between immigrants and natives, especially when capturing using the specific complementarity within college educated (columns (2) to (4)), attenuated or reversed most of the competition effect for the groups with some college education or a college degree. As a result, they also experienced between no and small effects (between -0.5% and +0.7%), mostly not statistically significant if we account for the simulated standard errors. Third, the average effect on wages of natives was small, overall positive (+0.5% to +0.8%) and not statistically significant, when accounting for the simulated standard errors. Let us emphasize that, relative to the estimated impact of the immigration flows during the 1990s and early 2000s calculated in Ottaviano and Peri (2012), the effects we find here are more favorable to less educated Americans (now gaining about 2%, versus 0 to 1% as found in that previous analysis from Ottaviano and Peri (2012)) and are similar for college graduate (having close to 0 effects).

Columns (5) and (6) of Table 9 show the effects of immigration on native employment-population ratios, calculated by simply multiplying the cell-specific percentage change in immigrant employment, approximated by the difference of log immigrant employment, between 2000 and 2019, times the $\beta_{emp}$ estimates from Table 7 for the corresponding education group. We show two versions of those effects. In column (5) we use the set of four education-specific estimates for the sample of all workers (column (2) in Panel B of Table 7), while in column (6) we use the larger estimates for the sample of full-time workers only (column (4) in Panel B of Table 7). We then aggregate results by education group and overall, weighting by cell native employment at the beginning of the interval of interest (i.e., 2000 for Table 9).

These simulated values reveal two additional potential effects of immigration. First, during the 2000-2019 period, immigration boosted the employment-population ratio of natives on average by 2.4 percentage points (and as much as 7.4 p.p. when considering full-time workers). This employment effect suggests that the wage complementarity and the occupational upgrading pulled more natives into employment. Second, the effect is particularly strong and positive for highly educated natives, whose employment-population ratio increased by 4.2 p.p. (possibly up to 12.4 p.p. for full-time workers). The group of least educated saw a decrease in employment-population ratio, in spite of the positive coefficient estimated in Table 7. This is because the least educated group experienced a decline in the supply of immigrants over the 2000-2019 period. Estimates in column (5) suggest that groups of native workers with high school degrees, some college education and college degree, all experienced an increase (between 2 and 4.2 p. p.) in their employment-population ratio due to immigration.

Let us acknowledge that the calculated effects on the employment-population ratio of natives are much more basic than those for wages. They only account for the direct partial effect of immigrants on this measure of labor supply of natives in each cell. The wage ef-

fects, on the other hand, account for complementarity across skill cells as generated by the model in Section 2. Still, these simulations confirm that at the national level, immigration results in zero to positive wage effects and predominantly positive employment effects for natives. Neither predominant wage competition nor crowding out of natives from the labor market seem consistent with these results. These set of results are instead consistent with a significant degree of complementarity between immigrants and natives.

Table 10 shows the same simulated effects and specifications as Table 9, but, in this case, in response to changes in immigrant flows between 2019 and 2022. While there is some evidence that the US is experiencing a resurgence of immigrants during the post-Covid years, the period we consider, which includes the pandemic years, represents a period of particularly low average inflows and especially among immigrants with low schooling. Hence, the simulated wage effects are very small for native workers, but still positive for less educated ones with increases up to 1.1%, and negligible effects for college-educated natives. Similarly, the simulated effects on the employment-population ratio are very small, with values reaching at most a 1.4 percentage point increase for college-educated natives when using the largest parameter estimates. Therefore, even using the most current and up to date national data on immigration and our updated estimates, the positive wage and employment effect on natives, while small, still apply.

000154

Table 9: Calculated effect on native wages and employment-population ratio, as response to change in immigrant labor supply 2000-2019

| | Percentage change in native wages | | | | Percentage change in native supply | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Group:** | | | | | | |
| No High School Degree | 1.8 | 1.8 | 2.4 | 1.7 | -1.5 | -6.1 |
| | (0.9) | (0.9) | (1.0) | (0.8) | | |
| High School Degree | 2.1 | 2.0 | 2.6 | 2.1 | 2.8 | 9.0 |
| | (0.3) | (0.3) | (0.6) | (0.3) | | |
| Some College Education | 0.5 | 0.7 | 0.4 | -0.2 | 2.0 | 6.0 |
| | (0.5) | (0.5) | (0.5) | (0.2) | | |
| College Degree | -0.5 | 0.1 | -0.1 | 0.7 | 4.2 | 12.4 |
| | (0.5) | (0.4) | (0.4) | (0.2) | | |
| **Average** | 0.5 | 0.8 | 0.8 | 0.8 | 2.4 | 7.4 |
| | (0.5) | (0.4) | (0.5) | (0.3) | | |
| **Parameter configuration:** | | | | | | |
| $1/\sigma_{H-L}$ | 0.54 | 0.54 | 0.71 | 0.54 | | |
| | (0.06) | (0.06) | (0.15) | (0.06) | | |
| $1/\sigma_{EDU,H}$ | 0.16 | 0.16 | 0.16 | 0 | | |
| | (0.08) | (0.08) | (0.08) | | | |
| $1/\sigma_{EDU,L}$ | 0.03 | 0.03 | 0.03 | 0 | | |
| | (0.02) | (0.02) | (0.02) | | | |
| $1/\sigma_{EXP}$ | 0.16 | 0.16 | 0.16 | 0.16 | | |
| | (0.05) | (0.05) | (0.05) | (0.05) | | |
| $1/(\sigma_N)_H$ | 0.058 | 0.10 | 0.10 | 0.10 | | |
| | (0.025) | (0.008) | (0.008) | (0.008) | | |
| $1/(\sigma_N)_L$ | 0.058 | 0.045 | 0.045 | 0.045 | | |
| | (0.025) | (0.018) | (0.018) | (0.018) | | |

*Notes:* Percentage wage changes for each education group are obtained averaging the wage change of each education-experience group weighting by the wage share in the education group. The wage change for each group is calculated using formula (16) from Appendix C. Since the parameters used are normally distributed random variables we proceed as follows. We first generate 1,000 extractions for a given configuration of the parameters from a joint normal distribution. We then calculate the wage effect for each education-experience group and then we take the average and the standard deviation of the 1,000 values. The average changes and their standard errors are obtained by weighting changes (and standard errors) of each education group by its share in the 2019 wage bill of the group. Columns (1) to (4) report percentage changes in native wages each using a different configuration of mean and standard deviation for the distribution of parameters of interest. Simulated standard errors are reported in parentheses. Columns (5) and (6) report percentage changes in native employment-to-population ratios obtained with a partial effect approach. We employ cell-specific percentage changes in immigrant employment and the coefficients estimated in column (2) and column (4) of Table 7, respectively, to compute the effect on native supply. Education group effects and average effects are obtained using native employment at the beginning of the period as weight. *Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

Table 10: Calculated effect on native wages and employment-population ratio, as response to change in immigrant labor supply 2019-2022

| | Percentage change in native wages | | | | Percentage change in native supply | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **Group:** | | | | | | |
| No High School Degree | 0.8 | 0.8 | 1.1 | 0.7 | -0.1 | -0.3 |
| | (0.3) | (0.3) | (0.3) | (0.3) | | |
| High School Degree | 0.9 | 0.9 | 1.1 | 0.9 | 0.0 | 0.1 |
| | (0.1) | (0.1) | (0.3) | (0.1) | | |
| Some College Education | -0.0 | -0.0 | -0.1 | -0.3 | -0.2 | -0.6 |
| | (0.1) | (0.1) | (0.1) | (0.0) | | |
| College Degree | -0.2 | -0.1 | -0.2 | -0.0 | 0.5 | 1.4 |
| | (0.1) | (0.1) | (0.1) | (0.0) | | |
| **Average** | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 |
| | (0.1) | (0.1) | (0.1) | (0.1) | | |
| **Parameter configuration:** | | | | | | |
| $1/\sigma_{H-L}$ | 0.54 | 0.54 | 0.71 | 0.54 | | |
| | (0.06) | (0.06) | (0.15) | (0.06) | | |
| $1/\sigma_{EDU,H}$ | 0.16 | 0.16 | 0.16 | 0 | | |
| | (0.08) | (0.08) | (0.08) | | | |
| $1/\sigma_{EDU,L}$ | 0.03 | 0.03 | 0.03 | 0 | | |
| | (0.02) | (0.02) | (0.02) | | | |
| $1/\sigma_{EXP}$ | 0.16 | 0.16 | 0.16 | 0.16 | | |
| | (0.05) | (0.05) | (0.05) | (0.05) | | |
| $1/(\sigma_N)_H$ | 0.058 | 0.10 | 0.10 | 0.10 | | |
| | (0.025) | (0.008) | (0.008) | (0.008) | | |
| $1/(\sigma_N)_L$ | 0.058 | 0.045 | 0.045 | 0.045 | | |
| | (0.025) | (0.018) | (0.018) | (0.018) | | |

*Notes:* Percentage wage changes for each education group are obtained averaging the wage change of each education-experience group weighting by the wage share in the education group. The wage change for each group is calculated using the formula (16) from Appendix C. Since the parameters used are normally distributed random variables we proceed as follows. We first generate 1,000 extractions for a given configuration of the parameters from a joint normal distribution. We then calculate the wage effect for each education-experience group and then we take the average and the standard deviation of the 1,000 values. The average changes and their standard errors are obtained by weighting changes (and standard errors) of each education group by its share in the 2019 wage bill of the group. Columns (1) to (4) report percentage changes in native wages each using a different configuration of mean and standard deviation for the distribution of parameters of interest. Simulated standard errors are reported in parentheses. Columns (5) and (6) report percentage changes in native employment-population ratios obtained with a partial effect approach. We employ cell-specific percentage changes in immigrant employment and the coefficients estimated in column (2) and column (4) of Table 7, respectively, to compute the effect on native supply. Education group effects and average effects are obtained using native employment at the beginning of the period as weight. *Source:* ACS data downloaded from IPUMS on 01/12/2024.

000156

# 7   Conclusions

In this paper we have extended and updated a framework that has been broadly used since the 2000s-2010s, to enrich and update our understanding of the recent national effects of immigration on US wages, employment and labor markets. This framework, led by similar work by Borjas (2003), Ottaviano and Peri (2012), and Manacorda et al. (2012), has had a profound influence on policy discussions. By differentiating the impact of immigrants on the wages of natives across skill groups, this model allows one to measure the national wage effects of immigration while accounting for both competition and complementarity across skill groups.

In this present paper we update the estimates of the key parameters that capture productive complementarity between natives and immigrants and across skill groups by using more recent data and by applying a modern set of rigorous econometric techniques. Additionally, relative to the approach of the 2010s, we explicitly acknowledge that native employment, not just wages, can respond to immigration. We are the first to use then this framework to estimate the effect of immigration on the employment-population ratio of natives.

Our estimates establish that immigrants have a substantial degree of productive complementarity with natives. This offsets the competition effect, resulting in a boost of native wages and in an increase of natives' employment-population ratio in response to inflows for most native workers. We also show that after the year 2000, inflows of immigrants became more concentrated among college educated compared to the past, and that their complementarity with skilled natives was large enough not to harm, but rather to boost the wages of less educated American workers. Additionally, we find that one possible mechanism through which immigration results in a positive complementarity and a wage boost for natives is through positive occupational responses among natives. This is consistent with specialization between natives and immigrants along the lines of comparative advantage, so that an increase in immigration prompts natives to upgrade and specialize in terms of occupations.

Finally, our simulations of wage and employment effects of immigrants in the 20 years up to 2020 and in the last four years for which we have data (2019-2022), based on the updated, better and more carefully estimated coefficients, show a clear positive/complementary effect of immigrants on wages of less educated natives without suggesting employment displacement (i.e., immigrants taking the jobs) of most native workers. This paper, by focusing national effects as compared to the many recent papers considering local effects, provides a complementary and important picture of immigrants in the US labor markets.

000157

# References

Ambrosini, J. W. and G. Peri (2012): "The Determinants and the Selection of Mexico–US Migrants," *The World Economy*, 35, 111–151.

Amior, M. (2020): "Immigration, local crowd-out and labor market effects," Discussion Paper 1669, Centre for Economic Performance, LSE.

Amior, M. and A. Manning (2020): "Monopsony and the wage effects of migration," Discussion Paper 1690, Centre for Economic Performance, LSE.

Autor, D. (2010): "The polarization of job opportunities in the US labor market: Implications for employment and earnings," *The Hamilton Project and the Center for American Progress*, 6, 11–19.

Autor, D., C. Goldin, and L. F. Katz (2020): "Extending the race between education and technology," *AEA Papers and Proceedings*, 110, 347–351.

Autor, D. H. and L. F. Katz (1999): "Changes in the wage structure and earnings inequality," in *Ashenfelter O. and Card D., eds., Handbook of Labor Economics*, Amsterdam: North-Holland, vol. 3, 1463–1555.

Autor, D. H., L. F. Katz, and M. S. Kearney (2006): "The polarization of the US labor market," *American Economic Review*, 96, 189–194.

——— (2008): "Trends in US wage inequality: Revising the revisionists," *The Review of Economics and Statistics*, 90, 300–323.

Basso, G. and G. Peri (2015): "The association between immigration and labor market outcomes in the United States," Discussion paper no. 9436, IZA.

——— (2020): "Internal Mobility: The Greater Responsiveness of Foreign-Born to Economic Conditions," *Journal of Economic Perspectives*, 34, 77–98.

Borjas, G. J. (1987): "Self-Selection and the Earnings of Immigrants," *The American Economic Review*, 77, 531–553.

——— (2001): "Does Immigration Grease the Wheels of the Labor Market?" *Brookings Papers on Economic Activity*, 32, 69–134.

——— (2003): "The labor demand curve is downward sloping: Reexamining the impact of immigration on the labor market," *The Quarterly Journal of Economics*, 118, 1335–1374.

000158

——— (2017): "The wage impact of the Marielitos: A reappraisal," *ILR Review*, 70, 1077–1110.

BORJAS, G. J., J. GROGGER, AND G. H. HANSON (2012): "Comment: On estimating elasticities of substition," *Journal of the European Economic Association*, 10, 198–210.

BORJAS, G. J. AND L. F. KATZ (2007): "The evolution of the Mexican-born workforce in the United States," in *Mexican Immigration to the United States*, *edited by Borjas George*, University of Chicago Press, 13–56.

CAMERON, A. C. AND P. K. TRIVEDI (2022): *Microeconometrics using Stata: Second Edition*, Stata Press, College Station, TX.

CARD, D. (1990): "The impact of the Mariel boatlift on the Miami labor market," *ILR Review*, 43, 245–257.

——— (2001): "Immigrant inflows, native outflows, and the local labor market impacts of higher immigration," *Journal of Labor Economics*, 19, 22–64.

——— (2009): "Immigration and inequality," *American Economic Review*, 99, 1–21.

CARD, D. AND T. LEMIEUX (2001): "Can falling supply explain the rising return to college for younger men? A cohort-based analysis," *The Quarterly Journal of Economics*, 116, 705–746.

CATTANEO, C., C. V. FIORIO, AND G. PERI (2015): "What happens to the careers of European workers when immigrants "take their jobs"?" *Journal of Human Resources*, 50, 655–693.

CLEMENS, M. A. AND J. HUNT (2019): "The labor market effects of refugee waves: reconciling conflicting results," *ILR Review*, 72, 818–857.

DUSTMANN, C., U. SCHÖNBERG, AND J. STUHLER (2017): "Labor supply shocks, native wages, and the adjustment of local employment," *The Quarterly Journal of Economics*, 132, 435–483.

EDO, A. AND H. RAPOPORT (2019): "Minimum wages and the labor market effects of immigration," *Labour Economics*, 61, 101753.

EDWARDS, R. AND F. ORTEGA (2017): "The economic contribution of unauthorized workers: An industry analysis," *Regional Science and Urban Economics*, 67, 119–134.

FOGED, M. AND G. PERI (2016): "Immigrants' effect on native workers: New analysis on longitudinal data," *American Economic Journal: Applied Economics*, 8, 1–34.

000159

GOLDIN, C. AND L. F. KATZ (2009): *The race between education and technology*, Harvard University Press.

GOLDSMITH-PINKHAM, P., I. SORKIN, AND H. SWIFT (2020): "Bartik instruments: What, when, why, and how," *American Economic Review*, 110, 2586–2624.

GREENSTONE, M. AND A. LOONEY (2010): "Ten economic facts about immigration," Policy memo, Hamilton Project, The Brookings Institution.

——— (2014): "What immigration means for U.S. employment and wages," Commentary, Hamilton Project, The Brookings Institution, https://www.brookings.edu/articles/what-immigration-means-for-u-s-employment-and-wages/: :text=Based

GROGGER, J. AND G. HANSON (2011): "Income maximization and the selection and sorting of international migrants," *Journal of Development Economics*, 95, 42–57.

HUNT, J. (2017): "The impact of immigration on the educational attainment of natives," *Journal of Human Resources*, 52, 1060–1118.

KATZ, L. F. AND K. M. MURPHY (1992): "Changes in relative wages, 1963–1987: supply and demand factors," *The Quarterly Journal of Economics*, 107, 35–78.

KUGLER, A. AND M. YUKSEL (2011): "Do Recent Latino Immigrants Compete for Jobs with Native Hispanics and Earlier Latino Immigrants?" in *David Leal and Stephen Trejo, eds., Latinos and the Economy: Integration and Impact in Schools, Labor Markets, and Beyond*, Springer, New York, NY, 213–231.

LLULL, J. (2018): "Immigration, wages, and education: A labour market equilibrium structural model," *The Review of Economic Studies*, 85, 1852–1896.

MANACORDA, M., A. MANNING, AND J. WADSWORTH (2012): "The impact of mmigration on the structure of wages: Theory and evidence from Britain," *Journal of the European Economic Association*, 10, 120–151.

MONRAS, J. (2020): "Immigration and wage dynamics: Evidence from the mexican peso crisis," *Journal of Political Economy*, 128, 3017–3089.

NATIONAL ACADEMIES OF SCIENCES, E. AND MEDICINE (2017): *The Economic and Fiscal Consequences of Immigration*, Washington, DC: The National Academies Press.

OLEA, J. L. M. AND C. PFLUEGER (2013): "A robust test for weak instruments," *Journal of Business & Economic Statistics*, 31, 358–369.

000160

OTTAVIANO, G. I. AND G. PERI (2012): "Rethinking the effect of immigration on wages," *Journal of the European Economic Association*, 10, 152–197.

PERI, G., D. RURY, AND J. C. WILTSHIRE (2020): "The economic impact of migrants from Hurricane Maria," Working Paper 27718, National Bureau of Economic Research.

PERI, G., K. SHIH, AND C. SPARBER (2015): "STEM workers, H-1B visas, and productivity in US cities," *Journal of Labor Economics*, 33, S225–S255.

PERI, G. AND C. SPARBER (2009): "Task specialization, immigration, and wages," *American Economic Journal: Applied Economics*, 1, 135–169.

——— (2011a): "Assessing inherent model bias: An application to native displacement in response to immigration," *Journal of Urban Economics*, 69, 82–91.

——— (2011b): "Highly educated immigrants and native occupational choice," *Industrial Relations: A journal of economy and society*, 50, 385–411.

PERI, G. AND V. YASENOV (2019): "The labor market effects of a refugee wave: Synthetic control method meets the Mariel boatlift," *Journal of Human Resources*, 54, 267–309.

ROMER, D. (2019): *Advanced Macroeconomics (5th ed.)*, New York: McGraw-Hill Education.

RUGGLES, S., S. FLOOD, M. SOBEK, D. BACKMAN, A. CHEN, G. COOPER, S. RICHARDS, R. ROGERS, AND M. SCHOUWEILER (2023): "IPUMS USA: Version 14.0 [dataset]," Minneapolis, MN: IPUMS, 2023. Accessed: Jan. 12, 2024. https://doi.org/10.18128/D010.V14.0.

TUMEN, S. (2015): "The use of natural experiments in migration research," *IZA World of Labor 191*.

WELCH, F. (1979): "Effects of cohort size on earnings: The baby boom babies' financial bust," *Journal of Political Economy*, 87, S65–S97.

000161

# Appendix A   Summary statistics and additional evidence

Table 11: Immigration and changes in native wages by education-experience groups, 2000–2019

| Education | Experience | 2000-2019 percentage change in hours worked due to new immigrants (%) | 2000-2019 percentage change in native weekly wages (%) |
|---|---|---|---|
| (1) | (2) | (3) | (4) |
| **No High School Degree** | 1 to 5 years | -18.4 | -11.0 |
| | 6 to 10 years | -28.0 | -6.0 |
| | 11 to 15 years | -18.6 | -7.3 |
| | 16 to 20 years | -6.3 | -7.8 |
| | 21 to 25 years | 4.8 | -4.5 |
| | 26 to 30 years | 13.0 | -6.8 |
| | 31 to 35 years | 23.7 | -5.8 |
| | 36 to 40 years | 28.4 | -6.4 |
| | **All Experience Groups** | **-1.7** | **-5.6** |
| **High School Degree** | 1 to 5 years | 0.4 | -12.5 |
| | 6 to 10 years | 2.5 | -11.1 |
| | 11 to 15 years | 4.0 | -9.8 |
| | 16 to 20 years | 5.4 | -4.1 |
| | 21 to 25 years | 6.9 | -4.1 |
| | 26 to 30 years | 11.0 | -2.2 |
| | 31 to 35 years | 13.9 | -0.7 |
| | 36 to 40 years | 16.3 | -1.7 |
| | **All Experience Groups** | **7.2** | **-6.9** |
| <u>Low Education</u> | **All Experience Groups** | **4.5** | **-5.3** |
| **Some College Education** | 1 to 5 years | 1.4 | -12.5 |
| | 6 to 10 years | 1.1 | -13.1 |
| | 11 to 15 years | 1.3 | -10.3 |
| | 16 to 20 years | 1.5 | -7.5 |
| | 21 to 25 years | 3.4 | -4.9 |
| | 26 to 30 years | 6.3 | -2.9 |
| | 31 to 35 years | 10.4 | -4.5 |
| | 36 to 40 years | 17.1 | -4.8 |
| | **All Experience Groups** | **4.0** | **-7.5** |
| **College Degree** | 1 to 5 years | 6.6 | -4.7 |
| | 6 to 10 years | 9.9 | -3.8 |
| | 11 to 15 years | 11.9 | -5.0 |
| | 16 to 20 years | 12.8 | -2.5 |
| | 21 to 25 years | 13.5 | 3.4 |
| | 26 to 30 years | 12.4 | 6.2 |
| | 31 to 35 years | 20.6 | 5.4 |
| | 36 to 40 years | 30.4 | 3.4 |
| | **All Experience Groups** | **13.0** | **-0.3** |
| <u>High Education</u> | **All Experience Groups** | **8.4** | **1.8** |

*Notes:* This table extends Ottaviano and Peri (2012)'s Table 1 to the 2000-2019 period. For the 32 education-experience cells the table reports the percentage change, between 2000 and 2019, of hours worked due to hours worked by immigrants, and the percentage change in real weekly wages for natives (in 1999 US dollars). Averages of native weekly wages across groups are weighted by hours worked by natives.
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

000162

Table 12: Estimates of $\frac{1}{\sigma_{IMMI}}$, by education group - Other samples

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |
| **Panel A: 1960-2019** | | | | |
| Women, Rel. hours (IV) - No HS diploma | 0.056*** | 0.059*** | 0.053*** | 0.058*** |
| | (0.010) | (0.007) | (0.011) | (0.008) |
| Women, Rel. hours (IV) - HS diploma | 0.021** | 0.027*** | 0.025*** | 0.034*** |
| | (0.009) | (0.007) | (0.010) | (0.006) |
| Women, Rel. hours (IV) - Some college | 0.028*** | 0.036*** | 0.037*** | 0.046*** |
| | (0.011) | (0.008) | (0.011) | (0.007) |
| Women, Rel. hours (IV) - College degree | 0.031*** | 0.023*** | 0.048*** | 0.043*** |
| | (0.012) | (0.009) | (0.012) | (0.007) |
| Pooled, Rel. hours (IV) - No HS diploma | 0.042*** | 0.045*** | 0.044*** | 0.050*** |
| | (0.010) | (0.007) | (0.012) | (0.008) |
| Pooled, Rel. hours (IV) - HS diploma | 0.014 | 0.023*** | 0.020* | 0.032*** |
| | (0.010) | (0.007) | (0.011) | (0.006) |
| Pooled, Rel. hours (IV) - Some college | 0.019* | 0.029*** | 0.028** | 0.040*** |
| | (0.011) | (0.008) | (0.012) | (0.007) |
| Pooled, Rel. hours (IV) - College degree | 0.047*** | 0.039*** | 0.061*** | 0.052*** |
| | (0.013) | (0.009) | (0.013) | (0.007) |
| **Panel B: 2000-2019** | | | | |
| Women, Rel. hours (IV) - No HS diploma | 0.155*** | 0.129*** | 0.067** | 0.083*** |
| | (0.032) | (0.028) | (0.029) | (0.018) |
| Women, Rel. hours (IV) - HS diploma | 0.029*** | 0.028*** | 0.029*** | 0.033*** |
| | (0.006) | (0.005) | (0.007) | (0.005) |
| Women, Rel. hours (IV) - Some college | 0.048*** | 0.048*** | 0.053*** | 0.057*** |
| | (0.006) | (0.004) | (0.007) | (0.004) |
| Women, Rel. hours (IV) - College degree | 0.079*** | 0.076*** | 0.090*** | 0.091*** |
| | (0.007) | (0.005) | (0.009) | (0.006) |
| Pooled, Rel. hours (IV) - No HS diploma | 0.148*** | 0.134*** | 0.044 | 0.077*** |
| | (0.039) | (0.034) | (0.034) | (0.023) |
| Pooled, Rel. hours (IV) - HS diploma | 0.016** | 0.017*** | 0.017** | 0.023*** |
| | (0.007) | (0.005) | (0.007) | (0.004) |
| Pooled, Rel. hours (IV) - Some college | 0.036*** | 0.039*** | 0.041*** | 0.047*** |
| | (0.006) | (0.005) | (0.007) | (0.004) |
| Pooled, Rel. hours (IV) - College degree | 0.097*** | 0.094*** | 0.105*** | 0.107*** |
| | (0.008) | (0.005) | (0.009) | (0.006) |
| Weights | Yes | No | Yes | No |
| Experience FE | Yes | Yes | Yes | Yes |
| Year FE | No | No | No | No |

*Notes:* In each panel, the set of 4 column-specific coefficients reported from rows (1) to (4) pertains to the same regression, where (log) relative weekly wage for women is the outcome variable. The set of four column-specific coefficients reported from rows (5) to (8) pertains to the same regression, where pooled (log) relative weekly wage is the outcome instead. Coefficients are 2SLS estimates on the interaction of (log) relative hours worked with 4 education dummies (no high school diploma, high school diploma, some college education, college degree or more), where (log) relative hours are instrumented by (log) relative population. Cell employment is used as weight. Robust standard errors are clustered at the cell level (education by experience). *Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

ii

Table 13: Effect on native employment-to-population ratio - OLS estimates

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |

**Panel A: 1960-2019**

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Men, Rel. population | -0.045*** | -0.043*** | -0.051*** | -0.046*** |
| | (0.011) | (0.014) | (0.011) | (0.013) |
| Women, Rel. population | -0.050*** | -0.036* | -0.061*** | -0.052*** |
| | (0.014) | (0.019) | (0.017) | (0.019) |
| Pooled, Rel. population | -0.041*** | -0.035** | -0.045*** | -0.041*** |
| | (0.012) | (0.014) | (0.012) | (0.013) |
| Men, Rel. population (fixing native) | 0.070*** | 0.078*** | 0.072*** | 0.072*** |
| | (0.007) | (0.007) | (0.007) | (0.008) |
| Women, Rel. population (fixing native) | 0.078*** | 0.079*** | 0.112*** | 0.108*** |
| | (0.011) | (0.013) | (0.012) | (0.013) |
| Pooled, Rel. population (fixing native) | 0.060*** | 0.060*** | 0.064*** | 0.061*** |
| | (0.011) | (0.011) | (0.008) | (0.007) |

**Panel B: 2000-2019**

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Men, Rel. population | 0.018 | 0.024 | 0.009 | 0.011 |
| | (0.017) | (0.017) | (0.018) | (0.015) |
| Women, Rel. population | -0.009 | -0.006 | -0.009 | -0.007 |
| | (0.018) | (0.019) | (0.024) | (0.017) |
| Pooled, Rel. population | 0.007 | 0.012 | 0.002 | 0.005 |
| | (0.017) | (0.017) | (0.018) | (0.014) |
| Men, Rel. population (fixing native) | 0.053*** | 0.053*** | 0.065*** | 0.053*** |
| | (0.010) | (0.008) | (0.012) | (0.015) |
| Women, Rel. population (fixing native) | 0.049*** | 0.046*** | 0.064*** | 0.047*** |
| | (0.010) | (0.013) | (0.016) | (0.017) |
| Pooled, Rel. population (fixing native) | 0.049*** | 0.049*** | 0.058*** | 0.048*** |
| | (0.009) | (0.009) | (0.010) | (0.012) |

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Weights | Yes | No | Yes | No |
| Cell FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |

*Notes:* Each coefficient of the table represents a different OLS regression, where the outcome variable is represented by the ratio between native employment and native population (men, women, or pooled, depending on the row). In each panel, rows (1) to (3) report the OLS coefficient on (log) relative population. In rows (4) to (6), the OLS coefficient on the same explanatory variable built by fixing native population to the first year of the period considered (i.e. 1960 for Panel A, 2000 for Panel B) is reported. Such modification is not applied to the outcome variable. Cell employment is used as weight. Robust standard errors are clustered at the cell level (education by experience).
*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

Table 14: Calculated long-run effects of immigration on foreign-born, 2000–2019

|  | Percentage change in foreign-born wages | | | |
|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Group:** | | | | |
| No High School Degree | 2.1 | 2.2 | 2.7 | 2.0 |
|  | (1.1) | (1.0) | (1.1) | (1.0) |
| High School Degree | -2.6 | -1.7 | -1.2 | -1.7 |
|  | (1.9) | (1.5) | (1.5) | (1.5) |
| Some College Education | -2.4 | -4.5 | -4.7 | -5.4 |
|  | (1.4) | (0.7) | (0.7) | (0.4) |
| College Degree | -6.7 | -10.8 | -10.9 | -10.1 |
|  | (2.5) | (0.9) | (0.9) | (0.8) |
| **Average** | -3.5 | -5.7 | -5.6 | -5.6 |
|  | (1.9) | (1.0) | (1.0) | (0.9) |
| **Parameter configuration:** | | | | |
| $1/\sigma_{H-L}$ | 0.71 | 0.71 | 0.54 | 0.71 |
|  | (0.15) | (0.15) | (0.06) | (0.15) |
| $1/\sigma_{EDU,H}$ | 0 | 0 | 0 | 0.3 |
|  |  |  |  | (0.11) |
| $1/\sigma_{EDU,L}$ | 0 | 0 | 0 | 0.3 |
|  |  |  |  | (0.11) |
| $1/\sigma_{EXP}$ | 0.16 | 0.16 | 0.16 | 0.16 |
|  | (0.05) | (0.05) | (0.05) | (0.05) |
| $1/(\sigma_N)_H$ | 0.058 | 0.1 | 0.1 | 0.1 |
|  | (0.025) | (0.008) | (0.008) | (0.008) |
| $1/(\sigma_N)_L$ | 0.058 | 0.03 | 0.03 | 0.03 |
|  | (0.025) | (0.006) | (0.006) | (0.006) |

*Notes:* This table reports the simulated wage effects on foreign-born workers. The procedure used to build this table is the same as the one described for the simulations of the impact of immigration on natives, outlined in Section 6.

*Source:* ACS and Decennial Census data downloaded from IPUMS on 01/12/2024.

000165

Table 15: Calculated long-run effects of immigration on foreign-born, 2019–2022

|  | Percentage change in foreign-born wages | | | |
|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Group:** | | | | |
| No High School Degree | 1.2 | 1.1 | 1.4 | 1.1 |
|  | (0.3) | (0.2) | (0.3) | (0.2) |
| High School Degree | 1.0 | 1.0 | 1.3 | 1.0 |
|  | (0.2) | (0.1) | (0.3) | (0.1) |
| Some College Education | 0.2 | 0.3 | 0.2 | 0.1 |
|  | (0.2) | (0.1) | (0.1) | (0.0) |
| College Degree | -0.7 | -1.1 | -1.1 | -1.0 |
|  | (0.2) | (0.1) | (0.1) | (0.1) |
| **Average** | -0.2 | -0.3 | -0.3 | -0.3 |
|  | (0.2) | (0.1) | (0.2) | (0.1) |
| **Parameter configuration:** | | | | |
| $1/\sigma_{H-L}$ | 0.71 | 0.71 | 0.54 | 0.71 |
|  | (0.15) | (0.15) | (0.06) | (0.15) |
| $1/\sigma_{EDU,H}$ | 0 | 0 | 0 | 0.3 |
|  |  |  |  | (0.11) |
| $1/\sigma_{EDU,L}$ | 0 | 0 | 0 | 0.3 |
|  |  |  |  | (0.11) |
| $1/\sigma_{EXP}$ | 0.16 | 0.16 | 0.16 | 0.16 |
|  | (0.05) | (0.05) | (0.05) | (0.05) |
| $1/(\sigma_N)_H$ | 0.058 | 0.1 | 0.1 | 0.1 |
|  | (0.025) | (0.008) | (0.008) | (0.008) |
| $1/(\sigma_N)_L$ | 0.058 | 0.03 | 0.03 | 0.03 |
|  | (0.025) | (0.006) | (0.006) | (0.006) |

*Notes:* This table reports the simulated wage effects on foreign-born workers. The procedure used to build this table is the same as the one described for the simulations of the impact of immigration on natives, outlined in Section 6.

*Source:* ACS data downloaded from IPUMS on 01/12/2024.

000166

# Appendix B   IV descriptives and tests

Table 16: Top-10 countries of origin by 1960-1980 increase in nationals residing in the US

| 1960 | | 1980 | | 1980-1960 | |
|---|---|---|---|---|---|
| Country (1) | Headcount (2) | Country (3) | Headcount (4) | Country (5) | Difference (4)-(2) |
| Italy | 1,191,299 | Mexico | 1,719,940 | Mexico | 1,255,283 |
| Canada | 860,851 | Italy | 783,920 | Abroad, N.S. | 607,125 |
| Germany | 844,438 | Germany | 763,400 | Cuba | 493,779 |
| Poland | 707,831 | Canada | 757,000 | Philippines | 337,107 |
| UK | 665,240 | Abroad, N.S. | 658,120 | China | 291,852 |
| Russia/Other URSS | 655,854 | UK | 578,420 | Korea | 196,217 |
| Mexico | 464,657 | Cuba | 555,840 | India | 182,678 |
| Ireland | 308,815 | Philippines | 419,500 | Jamaica | 138,203 |
| Austria | 274,463 | Poland | 398,260 | Dominican Republic | 129,203 |
| Hungary | 226,077 | China | 379,300 | Colombia | 111,865 |

*Notes:* For consistency, foreign-born individuals younger than 18 years of age are dropped from the count. We aggregate some countries together in 1980 in order to be more consistent with the lower level of detail present in the 1960 breakdown of origins. This implies, for instance, that China includes Hong Kong, Macau, Mongolia and Taiwan; Korea includes North and South Korea; India includes Bangladesh, Bhutan, Myanmar and Sri Lanka.
*Source:* Decennial Census data downloaded from IPUMS on 01/12/2024.

Table 17: Net flows for selected shares

| Country | 1960 (2) | 1980 (3) | Difference (4) |
|---|---|---|---|
| Mexico | 331,572 | 1,446,600 | 1,115,028 |
| Cuba | 55,886 | 401,140 | 345,254 |
| China | 71,412 | 297,440 | 226,028 |
| Philippines | 65,747 | 332,900 | 267,153 |
| Korea | 4,284 | 179,080 | 174,796 |
| North America | 550,459 | 435,260 | -115,199 |
| Central America | 106,912 | 689,960 | 583,048 |
| South America | 55,281 | 398,800 | 343,519 |
| Europe | 2,870,343 | 2,474,860 | -395,483 |
| Africa | 15,443 | 134,300 | 118,857 |
| Asia | 131,160 | 839,260 | 708,100 |
| Oceania | 19,519 | 52,540 | 33,021 |

*Notes:* For consistency, foreign-born individuals younger than 18 years of age are dropped from the count. We aggregate some countries together in 1980 in order to be more consistent with the lower level of detail present in the 1960 breakdown of origins. This implies, for instance, that China includes Hong Kong, Macau, Mongolia and Taiwan; Korea includes North and South Korea. The discrepancy of some values with those in Table 16 is due to the exclusion from the sample of individuals who are predicted to have more than 40 years of experience in the labor market (this restriction is imposed when building the experience cells throughout the paper).
*Source:* Decennial Census data downloaded from IPUMS on 01/12/2024.

000168

Figure 7: Pre-trends in outcomes without fixed effects

(a) Relative wage



(b) Native employment-population ratio



*Notes:* This figure plots the correlation between changes in outcomes of interest before 2000 and changes in corresponding IV measures after 2000 by skill cell, without controlling for education nor decade. The upper (lower) panel displays 1980-1990 and 1990-2000 stacked changes in log relative wage (native employment-population ratio) and IV-imputed changes for 2000-2019 in log relative population (log immigrant population) by skill cell. Circle sizes are proportional to 1980 cell employment (used as weight). Correlation coefficients (and corresponding significance values) are reported. The dotted line represents an OLS unweighted regression of changes in outcome on changes in IV measures, while the long-dashed line represents the same OLS regression with weights.

Table 18: 2SLS estimates of breakdown by education - Tests

| Specification | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Sample | All workers | | Full-time workers only | |

**Panel A: Elasticity estimates (2000-2019)**

*Pooled, Rel. employment by education 1*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.46 | 0.53 | 0.33 | 0.43 |
| First-stage F | 3.41 | 5.45 | 4.94 | 7.87 |
| Sanderson-Windmeijer corrected F | 28.64 | 53.43 | 13.61 | 28.57 |

*Pooled, Rel. employment by education 2*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.67 | 0.81 | 0.71 | 0.83 |
| First-stage F | 695.67 | 753.20 | 1719.18 | 1271.23 |
| Sanderson-Windmeijer corrected F | 98.83 | 338.47 | 91.77 | 359.50 |

*Pooled, Rel. employment by education 3*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.67 | 0.81 | 0.71 | 0.83 |
| First-stage F | 344.85 | 386.86 | 351.99 | 358.60 |
| Sanderson-Windmeijer corrected F | 140.45 | 445.89 | 133.17 | 320.72 |

*Pooled, Rel. employment by education 4*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.65 | 0.80 | 0.68 | 0.81 |
| First-stage F | 303.58 | 351.50 | 277.14 | 218.04 |
| Sanderson-Windmeijer corrected F | 103.99 | 252.29 | 81.07 | 159.96 |

| Kleibergen-Paap stat. | 3.78 | 5.67 | 3.35 | 6.65 |

**Panel B: Labor supply estimates (2000-2019)**

*Pooled, Imm. employment by education 1*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.16 | 0.23 | 0.14 | 0.22 |
| First-stage F | 3.41 | 8235.22 | 5841.87 | 5044.74 |
| Sanderson-Windmeijer corrected F | 60.81 | 57.14 | 53.93 | 57.50 |

*Pooled, Imm. employment by education 2*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.16 | 0.23 | 0.14 | 0.22 |
| First-stage F | 30629.73 | 22705.31 | 17244.44 | 11120.29 |
| Sanderson-Windmeijer corrected F | 59.97 | 56.05 | 53.44 | 56.47 |

*Pooled, Imm. employment by education 3*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.16 | 0.23 | 0.14 | 0.22 |
| First-stage F | 5499.51 | 5657.80 | 4261.85 | 4196.84 |
| Sanderson-Windmeijer corrected F | 59.14 | 54.45 | 52.45 | 54.82 |

*Pooled, Imm. employment by education 4*

| | | | | |
|---|---|---|---|---|
| Shea's Partial $R^2$ | 0.16 | 0.23 | 0.14 | 0.22 |
| First-stage F | 6500.43 | 6787.29 | 6170.56 | 4862.12 |
| Sanderson-Windmeijer corrected F | 59.53 | 55.93 | 52.96 | 55.77 |

| Kleibergen-Paap stat. | 11.12 | 9.44 | 10.33 | 8.42 |

*Notes:* This table reports validity tests for the 2SLS regressions with multiple endogenous variables and instruments of Table 7. The same structure of Table 7 is maintained, so that each test or statistic reported here refers to the coefficient in the same position (and specification) of Table 7.

# Appendix C   Formula for the wage effect of all immigrants on native wages

Let us denote the change in foreign-born supply between two periods in education $k$-experience $j$ group as $\Delta L_{Fkj}$, and the initial value of supply of immigrants in that group as $L_{Fkj}$. We then use the demand function for domestic workers of skill $\{k, j\}$, obtained by equating the marginal product of that skill group (derived from production function (1)-(6)) to their wages and take a total (log) differential of that demand function with respect to (log) changes in the supply of each group of foreign-born. The resulting expression, capturing the total percentage change in native wage $w_{Dkj}$, is as follows:

$$
\begin{aligned}
\left(\frac{\Delta w_{Dkj}}{w_{Dkj}}\right)^{Total} =\ & \frac{1}{\sigma_{HL}} \sum_{H,L} \sum_{l} \sum_{i} \left( s_{Fli} \frac{\Delta L_{Fli}}{L_{Fli}} \right) \\
& + \left( \frac{1}{\sigma_l} - \frac{1}{\sigma_{HL}} \right) \sum_{l} \sum_{i} \left( s_{Fli}^{HH,LL} \frac{\Delta L_{Fli}}{L_{Fli}} \right) \\
& + \left( \frac{1}{\sigma_{EXP}} - \frac{1}{\sigma_k} \right) \sum_{i} \left( s_{Fki}^{k} \frac{\Delta L_{Fki}}{L_{Fki}} \right) \\
& + \left( \frac{1}{\sigma_N} - \frac{1}{\sigma_{EXP}} \right) \left( s_{Fkj}^{kj} \frac{\Delta L_{Fkj}}{L_{Fkj}} \right)
\end{aligned}
\tag{16}
$$

In equation (16) the terms $s_{Fkj}$ represent the share of wages going to foreign-born workers $F$ of education $k$ and experience $j$, within the group defined by the superscript. Hence, for instance, $s_{Fkj}^{kj}$ is the share of that group within income accruing to all workers of education $k$ and experience $j$, while $s_{Fkj}^{k}$ is the share within workers of education $k$, and $s_{Fkj}$ is the share among all workers. The running indicator $i$ denotes different experience groups and $l$ different education groups within $H$ and $L$, where $H$, $L$ are the broadest aggregates of workers with high school diploma or less and with some college education or more. Equation (16) is the formula we use in Section 6 to obtain the total wage effects of immigration for each group of native workers.

000171

*American Economic Review 2022, 112(4): 1075–1090*
*https://doi.org/10.1257/aer.112.4.1075*

# Who Set *Your* Wage?[†]

*By* David Card*

*I discuss the recent literature that has led to new interest in the idea of monopsonistic wage setting. Building on advances in search theory and in models of differentiated products, researchers have used a number of different strategies to identify the elasticity of firm-specific labor supply. A growing consensus is that firms have some wage-setting power, though many questions remain about the sources of that power. (JEL B21, D21, D24, D43, J22, J31, J42)*

In the textbook model of labor markets—synthesized by Hicks (1932)—product and factor markets are perfectly competitive and wages are equated to marginal products.[1] Just one year after Hicks, Robinson (1933) developed an alternative framework for understanding firm-specific wage setting and coined the term "monopsony." The book attracted a lot of attention, and at least some labor economists were enthusiastic. Reynolds (1946, p. 390) wrote that the concept of an upward-sloping supply curve of labor to the firm "… has made its way rapidly into the textbooks and seems well on its way to being generally accepted as a substitute for the horizontal supply curve of earlier days." But Reynolds's prediction was premature. By the 1960s the concept of monopsony had been relegated to discussions of company towns. Indeed, in the preface to the second edition to her book, Robinson (1969) observed, "All this had no effect. Perfect competition, supply and demand … and marginal products still reign supreme in orthodox teaching."

At the risk of following too closely in Reynolds's footsteps, in this paper I will try to make the case that the time has come to recognize that many—or even most—firms have some wage-setting power. Such a shift was made with respect to firm's *price-setting* power many decades ago. Economists now routinely accept that the prices of products like gasoline, breakfast cereal, and ketchup are set with some degree of market power, even in online markets. In the past few years we may have reached a tipping point for a similar transition in labor economics, driven by the combination of new (or at least post-1930) theoretical perspectives, newly available data sources, and accumulating evidence on several different fronts.

* UC Berkeley (email: card@berkeley.edu). Prepared for the 2022 Annual Meeting of the American Economic Association. I am grateful to Orley Ashenfelter, Alan Manning, and Pat Kline for helpful discussions over many years on the topic of this paper, and to Laura Giuliano for comments on an early draft.
† Go to https://doi.org/10.1257/aer.112.4.1075 to visit the article page for additional materials and author disclosure statement.
[1] Hicks (1932) also introduced the elasticity of substitution between labor and capital and corrected an error in "Marshall's rules" describing the industry-level elasticity of labor demand.

000172

## I. A Brief History: 1932–1970

In the final chapter of her book, Robinson (1933) laid out a model of a firm with a combination of price-setting and wage-setting power, and showed that the result was a "double wedge" between marginal productivity and wages, reflecting the *markup* of prices over marginal costs and the *markdown* of wages relative to value marginal products.[2] Why didn't this idea catch on?

I think there are several explanations. The first is that her framework describes "perfect" monopoly and "perfect" monopsony. She offers very little guidance on intermediate levels of market imperfection in either market, and says nothing about the interactions between competing firms in such intermediate cases—a criticism raised in the early review by Kaldor (1934) and freely acknowledged by Robinson herself (Robinson 1953).[3]

A second and related reason is that the simple geometric apparatus developed by Robinson (and also used by Chamberlain in his book published in the same year) was not very useful for further analytical exercises. Stigler (1949) made this point forcefully with respect to Chamberlain's theory of monopolistic competition, arguing "… it has not been useful in the concrete analysis of economic problems, in the sense that it does not contain more accurate or more comprehensive implications than neoclassical theory." The importance of a tractable framework is underscored by the *current* status of Chamberlain's idea. Once Spence (1976) and Dixit and Stiglitz (1977) wrote down constant-elasticity-of-substitution (CES) style models models of consumer demand, and showed how to embed those preferences in a general equilibrium setting, monopolistic competition took off, and is now a workhorse model for problems in macroeconomics, international trade, and economic geography (see Brakman and Heijdra 2004).

A third explanation is that in simple monopsony models, firms are ready and willing to hire any qualified worker who is willing to accept their offered wage. Indeed, a monopsonistic firm is always starved for labor. Proposing such a model in the depths of the Great Depression was not ideal timing for Robinson. In contrast, in today's economy the idea of labor-starved firms is more attractive.

Fourth, the question of *how* wages and prices are set got caught up in the grand ideological debate over alternative economic systems that occupied many minds during the twentieth century. Robinson rather dogmatically insisted that any divergence between marginal products and wages represented a failure of market capitalism. Chamberlain, for his part, spent many years defending the welfare properties of monopolistic competition (e.g., Chamberlain, 1950). Throughout the 1930s and into the Cold War era, economists were more interested in arguing about (often ill-posed) normative questions than in understanding the positive implications of alternative models of wage and price setting. In this context, Arthur Pigou's labeling of the gap between marginal productivity and wages as an index of "exploitation"

---

[2] Specifically, on page 315 she noted that the gap between wages and marginal products will be equal to $\frac{\epsilon-1}{\epsilon} \times \frac{E}{1+E}$ where $\epsilon$ is the elasticity of demand for the firm's output and E is the elasticity of supply to the firm.

[3] Of course satisfactory models of the strategic interactions between agents were not fully developed anywhere in economics until the late 1970s.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 181 of 4699 PageID #: 3346

was clearly unfortunate. And Robinson's public persona as a hard-left polemicist (Aslanbeigui and Oakes 2009) did not help.

For these and perhaps other reasons,[4] by the 1970s the standard graduate-level textbooks in microeconomics theory (e.g., Malinvaud 1972) chose to give only a brief discussion of market power in output markets, and to complete ignore monopsony. Students of that generation had heard of imperfect competition and market power in their *undergraduate* courses, but had almost no formal training in the analytics of such models.

## II. New Theoretical Frameworks

Early analysts (including Robinson and Reynolds) recognized two alternative explanations for a less-than-perfectly elastic supply of labor to a given firm: information frictions and idiosyncratic preferences for different jobs. New models of optimal search and of the demand for differentiated products that were developed in the 1970s provided the foundations to formalize these explanations.

### A. *Search Models*

Research in the late 1960s (including McCall 1970 and Mortensen 1970) led to an elegant theory of optimal search by unemployed workers faced with an exogenous distribution of potential wage offers. Almost immediately, Diamond (1971) and Rothschild (1973) noted difficulties with endogenizing the wage offer distribution in this setting. To sidestep this problem, much of the subsequent literature has followed the lead of Diamond (1982); Mortensen (1982); and Pissarides (1985) and switched to a model of search over *job match quality* (see Pissarides 2010). Since wages have no allocative role in such models, they are not particularly helpful for analyzing wage-setting power. The canonical status of these models may have also led to an overemphasis on the importance of match effects in wage determination and labor market dynamics.

An alternative approach, developed by Burdett (1978) and Burdett and Mortensen (1998) (hereafter BM) is to assume that employed workers also search for better opportunities. On-the-job search is empirically important; it also counters an employer's temptation to reduce wages for unemployed job seekers to the bare minimum. BM consider a world where each firm posts a single wage, and can recruit workers either from unemployment or lower-paying firms. As Manning (1994, 2003) showed, such a "job ladder" model offers many insights into the links between worker turnover and wages. It also provides a simple framework for thinking about the degree of market power of any single employer. Postel Vinay and Robin (2002) generalized BM by allowing firms to (perfectly) price discriminate against different workers, depending on their preceding job and any job offers so far. This sequential auction framework creates a more complex relationship between firm mobility and

---

[4]Robinson's gender may also have been an issue. Card et al. (2022) develop models of the probability that economists were elected as fellows of the Econometric Society which depend on past publications and citations. Their analysis suggests that prior to 1980 females as a whole were significantly less likely to be recognized as fellows than males with the same record.

wages (see Di Addario et al. forthcoming for a simple exposition focusing on starting wages for each job).

## B. *Differentiated Demand Models*

Chamberlain (1933) considered a model in which firms produce a differentiated set of products and set prices ignoring strategic interactions with other producers. This model translates directly to the supply side,[5] though to the best of my knowledge Bhaskar and To (1999) were the first to try to formalize the idea of monopsonistic competition. Chamberlain's simple graphical analysis was reproduced in many undergraduate textbooks, but (as noted above) had a limited impact on subsequent research until Spence (1976) and Dixit and Stiglitz (1977) wrote down CES-style models of representative agent preferences that rationalized his framework. Models based on these preferences (and generalizations with a nested CES structure) have proven amenable to a multitude of applications in different fields. Recently, Berger, Herkenhoff, and Mongey (2021) have adapted the approach to the study of wage setting.

An alternative approach to modeling demand for differentiated products is the multinomial logit (MNL) model proposed by McFadden (1974, 1978). The MNL and its generalizations specify *individual-level* preferences that lead to convenient expressions for the share of consumers that purchase each product (Berry 1994), and are widely used in industrial organization (IO) and labor economics. Card et al. (2018) proposed the use of MNL style preferences to model the dispersion in tastes for different workplaces. If employers ignore strategic interactions in wage setting, their setup leads to very simple expressions for the supply of labor to individual firms which can be used to rationalize the firm effects in a model like that of Abowd, Kramarz, and Margolis (1999). Azar, Berry, and Marinescu (2019) adapt this approach (with nested MNL preferences) to model the supply of applicants to different job openings. Likewise, Lamadon, Mogstad, and Setlzer (2022) use a nested MNL specification to model the supply of workers to individual firms.

While the "representative agent CES" approach and the "individual level MNL" approach might appear to be very different ways of modeling consumer demand (or labor supply), Anderson, de Palma, and Thisse (1978) and Verboven (1996) showed that at the market level they are isomorphic (subject to functional form choices about the terms in the CES function and the indirect utility function in the MNL).[6] This isomorphism is extremely convenient and in principal allows analysts to proceed with either approach, and build on advances that have been made in the two literatures.

---

[5] For example, one can draw an s-s curve showing the supply curve to a firm if its competitor's wages are held constant, and an S-S curve showing the supply curve when all their wages shift together (as might happen with a rise in the minimum wage, for example). The latter will be less elastic than the former (and could even be vertical).

[6] For example, Verboven (1996, Proposition 2) shows that the demand functions from a nested CES representative consumer model are the same as those derived from a nested MNL logit individual-level model where indirect utility depends on the log of the price of the specific option chosen.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 183 of 4699 PageID #:  3348

### III.  Empirical Evidence in the First Three Decades of Modern Labor Economics: 1965–1995

"Modern" labor economics began in the mid-1960s with the release of individual microdata from the 1960 census (e.g., Cain 1966; Hanoch 1967; Bowen and Finegan 1969), the Survey of Consumer Finances (e.g., Stafford 1968) and the Survey of Economic Opportunity (e.g., Ashenfelter 1972). As noted by Stafford (1986), these new datasets, along with cross-sectional microdata from the Current Population Surveys and longitudinal data from the Panel Study of Income Dynamics and the National Longitudinal Surveys, propelled research in the field for the next few decades and shaped our current understanding of the labor market.

Considerations of employer wage setting played little role in this stream of research. One reason for this was the influence of economists at the University of Chicago, who were at the forefront of the new "analytical" labor economics (Rees 1976), and strongly advocated for neoclassical modeling. Even more importantly, the newly available micro datasets had almost no information on *employers*. Thus, it was extremely convenient to frame the analysis in the setting described by Hicks (1932), where individual employers are irrelevant.

There were a couple of exceptions to this general rule. One was the analysis of wage setting under collective bargaining. Here, most analysts followed Lewis (1963) in modeling a unionized *sector* where wages were pushed above the competitive level, and a nonunion sector where wages were determined under perfect competition. There was little attention to the role of firm-specific factors, apart from a small literature based on wage contracts (e.g., Hamermesh 1970; Riddell 1979; Christofides, Swidinsky, and Wilton 1980) that eventually turned to the question of how employment and wages are *jointly* determined under collective bargaining (e.g., Brown and Ashenfelter 1986; Card 1986, 1990).

A second exception was the literature on quits, turnover, and the returns to seniority. Pencavel (1972) and Parsons (1972) presented multi-period models of employer wage setting with a trade-off between wages and quit rates—foreshadowing the dynamic monopsony literature discussed below. While the wage-setting equations in these papers are clearly interpretable in a monopsony framework, neither author acknowledged any connection with Robinson, or noted that in a perfectly competitive labor market the quit rate should rise to 100 percent if the wage is set below the "market" rate.

A problem faced by both papers was the confusion surrounding Becker's (1962) analysis of firm-specific human capital, which addressed what we now call the problem of "relationship-specific investments."[7] Many labor economists interpreted Becker as saying that firms choose wages to reduce quits (e.g., Parsons 1972 and Hashimoto 1981) assuming that quits are a smooth function of wages. This is equivalent to monopsonistic wage setting.[8]

---

[7]Crawford (1988) presents an elegant reformulation of Becker that clarifies the issues using modern terminology. See also MacLeod and Malcomson (1993).

[8]See Manning (2003) for more discussion. Donaldson and Eaton (1976) also noted some of the problems with a simple interpretation of Becker's model of wage setting with relationship investments.

000176

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 184 of 4699 PageID #:  3349

In addressing the closely related problem of optimal turnover in a model with a *fixed* (but unknown) match component, Jovanovich (1979) showed that an equilibrium contract pays the worker the expected value of her match-specific productivity, and allows her to quit when the option value of the current job falls below the option value of a fresh job.[9] Jovanovich's model has features of the canonical Diamond-Mortensen-Pissarides search model, but incorporates job-to-job mobility, leading to something like a "worker-specific job ladder" as jobs that are revealed to be worse matches (and therefore have lower pay) are terminated.[10] Topel and Ward (1992) interpreted the patterns of wages and turnover for young male workers as evidence of this process, but they did not have rich enough data to tell whether wages include a match-specific component (as in Jovanovich 1979) or whether later-career jobs pay higher wages to *all* workers (as in the BM model). In my view, the simple event studies developed by Card, Heining, and Kline (2013) and the surprisingly small job match component uncovered in that paper (and many later studies) suggest that workers tend to move up the same job ladder (as in Abowd, Kramarz, and Margolis 1999).

Finally, there were a few studies of specific institutional settings where firm wage setting power seemed possible. Sullivan (1989), for example, showed that increases in the number of nurses were correlated with hospital-specific wage increases, suggesting that employers were facing upward-sloping supply curves for nursing labor. Ransom (1993) used university payroll data to show that wages of professors decline with tenure—a pattern he attributed to monopsonistic wage discrimination.

## IV.  What Happened in the 1990s?

Four new types of evidence have accumulated in the past 25 years that suggest employer wage-setting power is nonnegligible: evidence on quit and recruiting responses to wages, evidence on the relationship between wages and firm productivity, evidence on the concentration of employment in small numbers of employers, and evidence of conspiracies and other forms of firm behavior targeted at suppressing firm-to-firm mobility and wage growth.

### A. *Quit, Recruiting, and Application Elasticities*

Though many economists acknowledge that quit and recruitment rates vary with wages, the connection between these responses and the elasticity of supply that is relevant for a monopsonistic wage setter does not seem to have been fully appreciated until the seminal paper by BM (which circulated for many years prior to its publication). Card and Krueger (1995) noted that in any steady state, the elasticity of labor supply is just the sum of the absolute values of the elasticities of recruiting and quitting. Manning (2003) showed that in a simple job ladder model the two are equal: thus, an analyst can estimate one or the other and double it to yield

---

[9] If match-specific productivity requires upfront investment, the solution is to have workers pay for the investment and then follow the Jovanovich rule. This is solution proposed by Crawford (1988). Discussions of such "bonding" contracts were widespread when I joined the Chicago faculty in 1982.

[10] Subsequent studies by Miller (1984) and McCall (1990) used the multi-arm bandit setup of Gittins and Jones (1974) to incorporate learning over an occupation-specific match component as well as a job-specific component.

an estimate of the overall supply elasticity. Manning's insight provides a tractable method of estimating labor supply elasticities that has been implemented in many different settings.

Perhaps the most compelling evidence based on this approach comes from the experiment on public sector hiring conducted by Dal Bo, Finan, and Rossi (2013). These authors randomly varied the salaries announced at different job sites to potential job applicants for a position in the office of the Regional Development Program in Mexico. Taking account of the combined impact of higher wages on application rates and on the probability of accepting a job, they calculate that the elasticity of recruiting with respect to wages is around 2.1 (though rather imprecisely estimated). Using Manning's shortcut, the implied (steady state) elasticity of labor supply is around 4.2.[11] In a simple monopsonistic model such an elasticity implies that wages are marked down relative to marginal revenue products by about 20 percent.

Observational studies of the partial correlation between wages and quit or recruiting rates tend to yield elasticities in the same range (see Sokolova and Sorensen, 2021 for a meta-analysis of this literature and Ashenfelter et al. forthcoming for an overview of a studies published in a recent issue of the *Journal of Human Resources*). For example, Bassier, Dube, and Naidu (2021) study job ending rates of workers using administrative data from the State of Oregon, and estimate elasticities in the range of $-1$ to $-2.5$, with a preferred point estimate of $-2.1$, implying a steady state labor supply elasticity of 4.2. Azar, Berry, and Marinescu (2019) use data from a large online job posting service to study the application choices of job searchers. Adopting the estimation approach of Berry, Levinsohn, and Pakes (2004) (and using instrumental variables for posted wages) they infer that the firm-specific elasticity of applications with respect to wages is around 2.9. Assuming the recruiting elasticity is the same as the application elasticity this implies a steady state labor supply elasticity of just under six.

### B. *The Relationship between Wages and Firm Productivity*

In a competitive labor market, more and less productive firms pay the same wages for workers, even if the more productive firms are larger. In imperfectly competitive labor markets, however, more productive firms will generally have to pay more to maintain a larger workforce. Card et al. (2018) developed a simple partial equilibrium model where workers have MNL preferences over different firms and firms set wages without accounting for strategic interaction effects (i.e., a model of monopsonistic competition). They then calibrated the model to (roughly) match the observed degree of pass-through from value added per worker to wages. In the existing literature researchers typically find that wages are about 0.5 to 1.5 percent higher at firms with 10 percent higher productivity. In the parameterization of preferences adopted by Card et al., this degree of pass-through is consistent with firm-specific supply elasticities of about four.

Lamadon, Mogstad, and Setlzer (2022) present a more extensive analysis of the pass-through of firm-specific and market-wide value added per worker to

---

[11] They also find that higher wages leads to an increase in the quality of successfully recruited applicants, as measured by scores on IQ and personality tests.

firm-specific wages and interpret the effect in a model of monopsonistic competition with nested MNL preferences over firms and markets. Their estimate of the parameter determining the elasticity of supply to each firm is five, broadly consistent with the calibration by Card et al. and with the evidence from quit and recruiting elasticities.

A related method of estimating the degree of wage-setting power is to look at establishment-level responses of employment and wages to an exogenous shock (similar to the pioneering study by Sullivan 1989). Berger, Herkenhoff, and Mongey (2021) uses evidence on firm-specific reactions to state tax changes to infer the degree of oligopsony power in a setting with strategic interactions among wage setters (based on Atkeson and Burstein 2008). They estimate that the average markdown of wages relative to marginal revenue products is around 25 percent (equivalent to the markdown in a simple monopsonistically competitive model with firm-specific elasticities of around 3.5). Kroft et al. (2020) extend the setup in Lamadon, Mogstad, and Setlzer (2022) using information on successful bids in government procurement auctions as firm-specific demand shocks that affect employment and wages at larger construction firms. They estimate labor supply elasticities in the range of four to five.

### C. *The Number of Competitors for Labor Services*

In thinking about price-setting or wage-setting power many economists turn instinctively to the question of how many potential sellers or buyers are present in a market, or to the degree of market concentration measured by the Herfindahl-Hirschman index (HHI). As noted by Berry, Gaynor, and Scott Morton (2019); Syverson (2019); and Eeckhout (2021), simple measures of the number of competitors or their concentration do not necessarily provide a clear index of market power. Nevertheless, a common perception (among judges for example) is that the number of potential employers for any given worker is large, and that the market power of employers is therefore negligible.[12]

One of the most surprising findings in the recent literature is that for many workers in many local markets the number of potential employers is relatively small, particularly when the "market" is defined by actively searching firms.[13] Azar et al. (2020), for example, use data on the near universe of US vacancy listings to calculate HHIs for labor markets at the narrowly defined occupation-by-commuting zone (CZ) level. They estimate that an average labor market has an HHI of around 4300—equivalent to 2.3 equal sized recruiting firms. This is low enough to possibly raise concerns about the effect of mergers and acquisitions on labor outcomes (see Naidu and Posner 2021).

A growing number of papers study the relationship between average wages for a specific subgroup of workers in a given local market and the HHI of potential employers in that market. These studies differ in how they define the set of

---

[12] Models based on search (which typically have a continuum of employers) illustrate the fallacy of this conclusion, as do models of monopolistic or monopsonistic competition.

[13] Of course some workers move across geographic regions (see, e.g., Card, Rothstein, and Yi 2021) but for many jobs a local perspective may be reasonable. The issue of within- versus between-market competition is handled nicely in a nested logit framework like that used by Azar, Berry, and Marinescu (2019).

potential employers (based on industry or occupation), how they count employment (based on the stock of employment, the number of job openings, or some transition-probability-adjusted stock of employment), and whether they use a purely observational approach, or implement a research design that isolates some exogenous component of the local HHI. Despite these differences, most recent studies seem to show a negative effect of higher concentration on wages, with elasticities between the HHI and wages on the order of −0.05 to −0.15.

For example, Azar, Marinescu, and Steinbaum (2022) use data from a large national employment website to study the relationship between posted wages for jobs in a given occupation and CZ and the HHI of employers listing vacancies in that occupation and location. They find smaller elasticities of posted wages with respect to the HHI in simple ordinary least squares (OLS) models, but larger elasticities when they instrument the HHI with the leave-out mean number of competitors searching for workers in that same occupation in other markets. Rinz (2020) estimates HHIs from counts of establishment-level employment by CZ and industry, then relates these to administrative earnings from tax data. In OLS models he finds that wages are slightly higher in more concentrated markets, but in models that use the leave-out mean of the HHI for the same industry in other locations as an instrumental variable, he obtains negative elasticities in the range of Azar, Marinescu, and Steinbaum (2022).

Recent studies by Arnold (2020) and Prager and Schmidt (2021) use event study designs to look at the effects of merger and acquisition activity on local HHIs and wages. In my opinion, these designs provide the best available evidence that employer consolidations that raise the HHI have significant negative effects on wages, at least for workers who are highly attached to the affected industry.[14]

### D. *Conspiracies and Other Arrangements to Suppress Competition*

Adam Smith (2003, p.94-95) wrote that employers "are always and everywhere in a sort of tacit, but constant and uniform combination, not to raise the wages of labor above their actual rate."[15] He also noted, however, that "(w)e seldom, indeed, hear of this combination, because it is the usual, and one may say, the natural state of things, which nobody ever hears of." While discoveries of employer collusion are still relatively rare, in the past two decades there have been a number of lawsuits and public disclosures that provide the details of some agreements to suppress competition. These provide a useful perspective on the mechanisms generating market power for employers.

The best-known lawsuit concerned "no poaching" and "no solicitation" agreements affecting software and animation engineers in Silicon Valley (see Ashenfelter et al. forthcoming for more details).[16] The agreement originated in the mid-1980s when Lucasfilm sold its computer animation division to Steve Jobs, who then

---

[14] A third study by Benmelech, Bergman, and Kim (2020) uses mergers and acquisitions as instrumental variables for the HHI and reaches the same conclusion.

[15] Alan Krueger provided a new introduction for an edition of *The Wealth of Nations* (Smith 2003) and highlighted this quote. It is also used by Ashenfelter and Krueger (2021).

[16] Judge Lucy Koh's order granting class certification of the case (Northern District of California, Case 5:11-cv-02509-LHK) provides much detail on this case.

renamed the company "Pixar." To avoid bidding wars over employees, Lucasfilm and Pixar agreed (i) not to "cold call" each other's employees; (ii) to notify the other company should they receive an application for employment; (iii) and that all offers to employees at the other company would be "final," with no further bidding. Ultimately this agreement was extended to other high-tech firms (e.g., Google, Microsoft, and Oracle) and lasted over 20 years, until 2008.

The size of the settlement to affected engineers ($585 million in two suits), and other wage adjustments made after the agreement was made public (e.g., a 10 percent across-the-board increase offered by Google to *all* its employees in November 2010) suggest that the suppression of between-firm competition was successful—a validation of the idea that at least some labor markets are vulnerable to wage fixing.

Another interesting lawsuit concerned a "no hire" agreement between the medical schools at Duke University and University of North Carolina (*Seaman v. Duke*). This case, which resulted in a settlement of around $10,000 for each member of the medical faculties at the two schools, reveals how localized competition appears to matter, even for workers who arguably face a national market.

While one might be tempted to think that "no hire" and "no poaching" agreements affect only highly skilled workers, Ashenfelter and Krueger (2021) found that no poaching clauses were widespread in US franchise agreements.[17] These agreements typically prohibit a franchisee from hiring another franchisee's employees for some prespecified period of time after an employee's departure. For example, a standard franchise agreement for McDonald's as of 2016 had a clause stating: "Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries … or otherwise induce, directly or indirectly, such person to leave such employment" (quoted in Ashenfelter and Krueger 2021). The prohibition extended to employees for six months after leaving another McDonald's job.

Another strand of recent research has focused on the prevalence of noncompete agreements, which prohibit employees from moving to jobs at "competitor" firms for a specified period (e.g., Starr 2019; Balasubramanian et al. 2020). Again, a surprising fact is the prevalence of these agreements even for relatively low-wage workers. Recently, however, a number of states have enacted legislation that prohibits noncompete agreements for "low-wage" workers (e.g., earning less than $100,000 per year in Washington State—see Goldstein and Oberlander 2021).

The popularity of no-poaching and noncompete agreements seems to confirm the basic insights of a BM-style job ladder model. Since the quit rate in such models depends in part on the rate at which workers obtain offers at other employers, limits on poaching or firm-to-firm mobility will reduce quits and increase monopsonistic power.

## V. An Agenda for the Future

It is presumptuous for anyone to try to influence the direction of research in a large and fractious field like labor economics. Nevertheless I have two suggestions

---

[17]Subsequent to the circulation of Ashenfelter and Krueger's paper the Attorney General of the State of Washington took action to outlaw such contracts, and it appears that they are being eliminated in many contracts.

for where I see the most exciting possibilities for progress: more and better models; and a sustained effort to move the entire topic of wage setting into the hands of (labor) economists.

### A. *Models*

There are two main approaches to modeling the factors that generate upward-sloping supply curves: search frictions (which Manning 2021 calls the "new monopsony") and idiosyncratic preferences for jobs (which Manning calls the "new classical monopsony"). Both approaches have some strengths and some weaknesses. The search approach directly addresses turnover, which is a key feature of labor markets and appears to be the main mechanism for between-firm competition. Models with on-the-job search also create a job ladder, which is a very useful construct for understanding the costs of job displacement and the effects of recessions (e.g., Altonji, Smith, and Vidangos 2013; Moscarini and Postel-Vinay 2018).

But the lack of information presumed in a typical posted wage search model is troubling. There is plenty of evidence that most workers know about at least *some* higher-paying jobs. (Everyone at Berkeley knows that salaries are higher at Stanford, for instance). Firms' positions on the wage ladder are relatively stable, so it seems possible to learn about opportunities through referrals (Caldwell and Harmon 2019) or other channels. And if the number of potential employers for a typical worker is a low as recent research suggests, it's hard to imagine that workers aren't aware of many of the relevant opportunities.

Models based on idiosyncratic preferences, on the other hand, ignore imperfect information but assume that most people simply *don't want* another job, even if it pays more. On the positive side, these models build directly on established frameworks from IO and trade: the accumulated experience in those fields will be very helpful, particularly in addressing strategic interactions between wage setters (as in Berger, Herkenhoff, and Mongey 2021). On the negative side, there is no job ladder or any particular cost of losing the current job: everyone is employed at their best option, given the wage and nonwage amenities offered by different employers. Employers are starving for workers, but are nonetheless setting wages below marginal revenue products to capture some of the surplus from inframarginal workers. Such a framework seems unlikely to yield helpful insights about recessions or depressed local labor markets.

Manning (2021) suggests that one way to combine some of the strengths from both approaches is to assume that workers have idiosyncratic preferences over *current* job openings, and that—as in directed search models—one of the attributes of an opening is the size of the application pool. This seems like a promising direction. Another idea is to assume more complicated task-based production functions for firms that lead to minimum skill standards—so many jobs are "off limits" for most workers, even within a given observed skill group (e.g., Haanwinckel 2020; Huckfeldt 2022). This might be a way to incorporate the cyclical upgrading process discussed by Reder (1955) and Okun (1973).

A related modeling issue is how to incorporate strategic interactions in wage setting. We know that firms spend a lot of resources monitoring wages of other employers through specialized sector-specific surveys. We also know that even at the low

end of the labor market, firms respond to wage-setting choices by their competitors (Derenoncourt et al. 2021). It therefore seems necessary to move beyond the "no strategic interactions" case considered in several recent studies. Berger, Herkenhoff, and Mongey (2021) have made some initial progress in this direction.

### B. *Who Should Study Wage Setting?*

Once we accept that firms set wages, the analysis of wage setting becomes a part of labor economics, just like the analysis of price setting is a part of IO. Right now, much of the practical discussion of wage setting is done by noneconomists. Human resources departments at large corporations are often staffed by people with primary training in social psychology or sociology. Most business schools have almost no courses on wage setting, and few if any that feature standard economic ideas.

By insisting that "markets set wages," labor economists ceded the field, and had very little to say about questions like the design of online labor markets, or the effects of no-solicitation or no-poaching agreements—other than that they should not matter. We also distanced ourselves from other economists—particularly those in IO—who were busy developing useful models of market power and strategic decision making.

One of the most exciting developments in the field today is the evidence of labor economists taking questions about wage setting seriously. This effort began with Manning's (2003) landmark book: I hope that the growing body of work since then finds its way into the classroom and into the textbooks soon. I also expect this work to lead to some rethinking on policies such as minimum wages, the regulation of trade unions, and anti-trust (see Langella and Manning 2021, and Naidu and Posner 2021). Perhaps we may even see a reevaluation of the widespread belief that excessive wages are the root cause of many economic problems. After all, if your employer set your wage, it's hard to believe that it's too high.

### REFERENCES

**Abowd, John M., Francis Kramarz, and David N. Margolis.** 1999. "High Wage Workers and High Wage Firms." *Econometrica* 67 (2): 251–333.

**Altonji, Joseph G., Anthony A. Smith Jr., and Ivan Vidangos.** 2013. "Modeling Earnings Dynamics." *Econometrica* 81 (4): 1395–454.

**Anderson, Simon, Andre de Palma, and Jacques Thisse.** 1978. "A Representative Consumer Theory of the Logit Model." *International Economic Review* 29 (3): 461–66.

**Arnold, David.** 2020. "Mergers and Acquisitions, Local Labor Market Concentration, and Worker Outcomes." Unpublished.

**Ashenfelter, Orley.** 1972. "Racial Discrimination and Trade Unionism." *Journal of Political Economy* 80 (3): 435–64.

**Ashenfelter, Orley, David Card, Henry S. Farber, and Michael R. Ransom.** Forthcoming. "Monopsony in the Labor Market: New Empirical Results and New Public Policies." *Journal of Human Resources.*

**Ashenfelter, Orley, and Alan B. Krueger.** 2021. "Theory and Evidence on Employer Collusion in the Franchise Sector." *Journal of Human Resources.* DOI:10.3368/jhr.monopsony.1019-10483.

**Aslanbeigui, Nahid, and Guy Oakes.** 2009. *The Provocative Joan Robinson: The Making of a Cambridge Economist.* Durham, NC: Duke University Press.

**Atkeson, Andrew, and Ariel Burstein.** 2008. "Pricing-to-Market, Trade Costs, and International Relative Prices." *American Economic Review* 98 (5): 1998–2031.

**Azar, Jose, Steven T. Berry, and Ioana Marinescu.** 2019. "Estimating Labor Market Power." SSRN 3456277.

**Azar, Jose, Ioana Marinescu, and Marshall I. Steinbaum.** 2022. "Labor Market Concentration." *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.1218-9914R1.

**Azar, Jose, Ioana Marinescu, Marshall I. Steinbaum, and Bledi Taska.** 2020. "Concentration of US Labor Markets: Evidence from Online Vacancy Data." *Labour Economics* 66: 101866.

**Balasubramanian, Natarajan, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr.** 2020. "Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers." *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.1218-9931R1.

**Bassier, Ihsaan, Arindrajit Dube, and Suresh Naidu.** 2021. "Monopsony in Movers: The Elasticity of Labor Supply to Firm Wage Policies." *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.0319-10111R1.

**Becker, Gary S.** 1962. "Investment in Human Capital: A Theoretical Analysis." *Journal of Political Economy* 70 (5): 9–49.

**Benmelech, Efraim, Nittai Bergman, and Hyunseob Kim.** 2020. "Strong Employers and Weak Employees: How Does Employer Concentration Affect Wages?" *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.0119-10007R1.

**Berger, David W., Kyle F. Herkenhoff, and Simon Mongey.** 2021. "Labor Market Power." NBER Working Paper 25719.

**Berry, Steven T.** 1994. "Estimating Discrete-Choice Models of Product Differentiation." *RAND Journal of Economics* 25 (2): 242–62.

**Berry, Steven T., Martin Gaynor, and Fiona Scott Morton.** 2019. "Do Increasing Markups Matter? Lessons from Empirical Industrial Organization." *Journal of Economic Perspectives* 33 (3): 44–68.

**Berry, Steven T., James Levinsohn, and Ariel Pakes.** 2004. "Differentiated Products Demand Systems from a Combination of Micro and Macro Data: The New Car Market." *Journal of Political Economy* 112 (1): 68-105.

**Bhaskar, V., and Ted To.** 1999. "Minimum Wages for Ronald McDonald Monopsonies: A Theory of Monopsonistic Competition." *Economic Journal* 109 (455): 190–203.

**Bowen, William G., and T. Aldrich Finegan.** 1969. *The Economics of Labor Force Participation*. Princeton, NJ: Princeton University Press.

**Brakman, Steven, and Ben J. Heijdra, eds.** 2004. *The Monopolistic Competition Revolution in Retrospect*. Cambridge, UK: Cambridge University Press.

**Brown, James N., and Orley Ashenfelter.** 1986. "Testing the Efficiency of Employment Contracts." *Journal of Political Economy* 94 (3): S40–87.

**Burdett, Kenneth.** 1978. "A Theory of Employee Job Search and Quit Rates." *American Economic Review* 68 (1): 212–20.

**Burdett, Kenneth, and Dale T. Mortensen.** 1998. "Wage Differentials, Employer Size, and Unemployment." *International Economic Review* 39 (2): 257–73.

**Cain, Glen G.** 1966. *Married Women in the Labor Force: An Economic Analysis*. Chicago: University of Chicago Press.

**Caldwell, Sydnee, and Nikolaj Harmon.** 2019. "Outside Options, Bargaining, and Wages: Evidence from Coworker Networks." Unpublished.

**Card, David.** 1986. "Efficient Contracts with Costly Adjustment: Short-Run Employment Determination for Airline Mechanics." *American Economic Review* 76 (5): 1045–71.

**Card, David.** 1990. "Unexpected Inflation, Real Wages, and Employment Determination in Union Contracts." *American Economic Review* 80 (4): 669–88.

**Card, David, Ana Rute Cardoso, Joerg Heining, and Patrick M. Kline.** 2018. "Firms and Labor Market Inequality: Evidence and Some Theory." *Journal of Labor Economics* 36 (S1): S13–70.

**Card, David, Stefano DellaVigna, Patricia Funk, and Nagore Iriberri.** 2022. "Gender Differences in Peer Recognition by Economists." Unpublished.

**Card, David, Jörg Heining, and Patrick Kline.** 2013. "Workplace Hetereogeneity and the Rise of West German Inequality." *Quarterly Journal of Economics* 128 (3): 967–1015.

**Card, David, and Alan B. Krueger.** 1995. *Myth and Measurement: The New Economics of the Minimum Wage*. Princeton, NJ: Princeton University Press.

**Card, David, Jesse Rothstein, and Moises Yi.** 2021. "Location, Location, Location." US Census Bureau Center for Economic Studies Working Paper CES-21-32.

**Chamberlain, Edward H.** 1933. *Theory of Monopolistic Competition*. Cambridge, MA: Harvard University Press.

**Chamberlain, Edward H.** 1950. "Product Heterogeneity and Public Policy." *American Economic Review* 40 (2): 85–92.

**Christofides, Louis, Robert Swidinsky, and David A. Wilton.** 1980. "A Microeconometric Analysis of Spillovers in the Canadian Wage Determination Process." *Review of Economics and Statistics* 62 (2): 213–21.

Crawford, Vincent P. 1988. "Long-Term Relationships Governed by Short-Term Contracts." *American Economic Review* 78 (3): 485–99.

Dal Bo, Ernesto, Federico Finan, and Martin A. Rossi. 2013. "Strengthening State Capabilities: The Role of Financial Incentives in the Call to Public Service." *Quarterly Journal of Economics* 128 (3): 1169–1218.

Derenoncourt, Ellora, Clemens Noelke, David Weil, and Bledi Taska. 2021. "Spillover Effects from Voluntary Employer Minimum Wages." Unpublished.

Di Addario, Sabrina, Patrick M. Kline, Raffaele Saggio, and Mikkel Solvsten. Forthcoming. "It Ain't Where You're From, It's Where You're At: Hiring Origins, Firm Heterogeneity, and Wages." *Journal of Econometrics*.

Diamond, Peter A. 1971. "A Model of Price Adjustment." *Journal of Economic Theory* 3 (2): 156–68.

Diamond, Peter A. 1982. "Wage Determination and Efficiency in Search Equilibrium." *Review of Economic Studies* 49 (2): 217–27.

Dixit, Avinash K., and Joseph E. Stiglitz. 1977. "Monopolistic Competition and Optimum Product Diversity." *American Economic Review* 67 (3): 297–308.

Donaldson, David, and B. Curtis Eaton. 1976. "Firm-Specific Human Capital: A Shared Investment or Optimal Entrapment?" *Canadian Journal of Economics* 9 (3): 462–72.

Eeckhout, Jan. 2021. "Book Review: The Great Reversal, by Thomas Philippon." *Journal of Economic Literature* 59 (4): 1340–60.

Gittins, John C., and D. M. Jones. 1974. "A Dynamic Allocation Index for the Sequential Design of Experiments." In *Progress in Statistics*, Vol. 1, edited by Joseph M. Gani, Karoly Sarkadi, and Istvan Vincze, 241–66. Amsterdam: North-Holland.

Goldstein, Mark S., and Noah S. Oberlander. 2021. "What Does the Future Hold for Restrictive Covenant Agreements in the U.S.?" *Reuters Legal News*, October 1. https://www.reuters.com/legal/legalindustry/what-does-future-hold-restrictive-covenant-agreements-us-2021-10-01/.

Haanwinckel, Daniel. 2020. "Supply, Demand, Institutions and Firms: A Theory of Labor Market Sorting and Wage Distribution." Unpublished.

Hamermesh, Daniel S. 1970. "Wage Bargains, Threat Effects and the Phillips Curve." *Quarterly Journal of Economics* 84 (3): 502–17.

Hanoch, Giora. 1967. "An Economic Analysis of Earnings and Schooling." *Journal of Human Resources* 2 (3): 310–29.

Hashimoto, Masanori. 1981. "Firm-Specific Human Capital as a Shared Investment." *American Economic Review* 71 (3): 475–82.

Hicks, John. 1932. *The Theory of Wages*. London: Macmillan.

Huckfeldt, Christopher. 2022. "Understanding the Scarring Effect of Recessions." *American Economic Review* 112 (4): DOI:10.1257/aer.20160449.

Jovanovich, Boyan. 1979. "Job Matching and the Theory of Turnover." *Journal of Political Economy* 87 (5–1): 972–90.

Kaldor, Nicholas. 1934. "Mrs. Robinson's Economics of Imperfect Competition." *Economica* 1 (3): 335–41.

Kroft, Kory, Yao Luo, Magne Mogstad, and Bradley Setlzer. 2020. "Imperfect Competition and Rents in Labor and Product Markets: The Case of Construction." Unpublished.

Lamadon, Thibaut, Magne Mogstad, and Bradley Setlzer. 2022. "Imperfect Competition, Compensating Differentials, and Rent Sharing in the US Labor Market." *American Economic Review* 112 (1): 169–212.

Langella, Monica, and Alan Manning. 2021. "The Measure of Monopsony." *Journal of the European Economic Association* 19 (6): 2929–57.

Lewis, H. Gregg. 1963. *Unionism and Relative Wages in the United States*. Chicago: University of Chicago Press.

MacLeod, W. Bentley, and James M. Malcomson. 1993. "Investments, Holdup, and the Form of Market Contracts." *American Economic Review* 83 (4): 811–37.

Malinvaud, Edmund. 1972. *Lectures on Microeconomic Theory*. New York: Elsevier.

Manning, Alan. 1994. "Labour Markets with Company Wage Policies." Centre for Economic Performance Discussion Paper 0214.

Manning, Alan. 2003. *Monopsony in Motion: Imperfect Competition in Labor Markets*. Princeton, NJ: Princeton University Press.

Manning, Alan. 2021. "Monopsony in the Labor Market: A Review." *Industrial and Labor Relations Review* 74 (1): 3–26.

McCall, Brian P. 1990. "Occupation Matching: A Test of Sorts." *Journal of Political Economy* 98 (1): 45–69.

000185

**McCall, John J.** 1970. "Economics of Information and Job Search." *Quarterly Journal of Economics* 84 (1): 113–26.

**McFadden, Daniel.** 1974. "The Measurement of Urban Travel Demand." *Journal of Public Economics* 3 (4): 303–28.

**McFadden, Daniel.** 1978. "Modelling the Choice of Residential Location." In *Spatial Interaction Theory and Planning Models*, edited by Anders Karlgvist, 72–77. Amsterdam: North-Holland.

**Miller, Robert A.** 1984. "Job Matching and Occupational Choice." *Journal of Political Economy* 92 (6): 1086–1120.

**Mortensen, Dale T.** 1970. "Job Search, the Duration of Unemployment, and the Phillips Curve." *American Economic Review* 60 (5): 847–62.

**Mortensen, Dale T.** 1982. "The Matching Process as a Non-cooperative Bargaining Game." In *The Economics of Information and Uncertainty*, edited by John J. McCall, 233–58. Chicago: University of Chicago Press.

**Moscarini, Giuseppe, and Fabien Postel-Vinay.** 2018. "The Cyclical Job Ladder." *Annual Review of Economics* 10: 165–88.

**Naidu, Suresh, and Eric A. Posner.** 2021. "Labor Monopsony and the Limits of the Law." *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.0219-10030R1.

**Northern District of California.** 2014. Case 5:11-cv-02509-LHK document 531.

**Okun, Arthur M.** 1973. "Upward Mobility in a High-Pressure Economy." *Brookings Papers on Economic Activity* 1: 207–52.

**Parsons, Donald O.** 1972. "Specific Human Capital: An Application to Quit Rates and Layoff Rates." *Journal of Political Economy* 80 (6): 1120–43.

**Pencavel, John H.** 1972. "Wages, Specific Training, and Labor Turnover in U.S. Manufacturing Industries." *International Economic Review* 13 (1): 53–64.

**Pissarides, Christopher A.** 1985. "Short-Run Equilibrium Dynamics of Unemployment, Vacancies, and Real Wages." *American Economic Review* 75 (4): 676–90.

**Pissarides, Christopher A.** 2010. "Equilibrium in the Labour Market with Search Frictions." *American Economic Review* 101 (4): 1092–1105.

**Postel Vinay, Fabien, and Jean-Marc Robin.** 2002. "Equilibrium Wage Dispersion with Worker and Employer Heterogeneity." *Econometrica* 70 (6): 2295–350.

**Prager, Elena, and Matt Schmidt.** 2021. "Employer Consolidation and Wages: Evidence from Hospitals." *American Economic Review* 111 (2): 397–427.

**Ransom, Michael R.** 1993. "Seniority and Monopsony in the Academic Labor Market." *American Economic Review* 83 (1): 221–33.

**Reder, Melvin W.** 1955. "The Theory of Occupational Wage Differentials." *American Economic Review* 45 (5): 833–52.

**Rees, Albert.** 1976. "H. Gregg Lewis and the Development of Analytical Labor Economics." *Journal of Political Economy* 84 (4): S3–8.

**Reynolds, Lloyd G.** 1946. "The Supply of Labor to the Firm." *Quarterly Journal of Economics* 60 (3): 390–411.

**Riddell, W. Craig.** 1979. "The Empirical Foundations of the Phillips Curve: Evidence from Canadian Wage Contract Data." *Econometrica* 47 (1): 1–24.

**Rinz, Kevin.** 2020. "Labor Market Concentration, Earnings, and Inequality." *Journal of Human Resources*. DOI:10.3368/jhr.monopsony.0219-10025R1.

**Robinson, Joan.** 1933. *The Economics of Imperfect Competition.* London: MacMillan Press.

**Robinson, Joan.** 1953. "Imperfect Competition Revisited." *Economic Journal* 63 (251): 579–93.

**Robinson, Joan.** 1969. *The Economics of Imperfect Competition, Second Edition.* London: MacMillan Press.

**Rothschild, Michael.** 1973. "Models of Market Organization with Imperfect Information: A Survey." *Journal of Political Economy* 81 (6): 1283–308.

**Smith, Adam.** 2003. *An Inquiry into the Nature and Causes of the Wealth of Nations.* New York: Bantam Books. (Orig. pub. 1776).

**Sokolova, Anna, and Todd Sorensen.** 2021. "Monopsony in Labor Markets: A Meta-Analysis." *Industrial and Labor Relations Review* 74 (1): 27–55.

**Spence, A. Michael.** 1976. "Product Selection, Fixed Costs and Monopolistic Competition." *Review of Economic Studies* 43 (2): 217–35.

**Stafford, Frank P.** 1968. "Concentration and Labor Earnings: Comment." *American Economic Review* 58 (1): 174–84.

**Stafford, Frank P.** 1986. "Forestalling the Demise of Empirical Economics: The Role of Microdata in Labor Economics Research." In *Handbook of Labor Economics*, Vol 1, edited by Orley Ashenfelter and Richard Layard, 387–423. New York: Elsevier.

**Starr, Evan.** 2019. "Consider This: Training, Wages, and the Enforceability of Covenants not to Compete." *Industrial and Labor Relations Review* 72 (4): 783–817.

**Stigler, George J.** 1949. *Five Lectures on Economic Problems*. London: Longmans, Green and Company.

**Sullivan, Daniel G.** 1989. "Monopsony Power in the Market for Nurses." *Journal of Law and Economics* 32 (2): S135–78.

**Syverson, Chad.** 2019. "Macroeconomics and Market Power: Context, Implications, and Open Questions." *Journal of Economic Perspectives* 33 (3): 23–43.

**Topel, Robert H., and Michael P. Ward.** 1992. "Job Mobility and the Careers of Young Men." *Quarterly Journal of Economics* 107 (2): 439–79.

**Verboven, Frank.** 1996. "The Nested Logit Model and Representative Consumer Theory." *Economics Letters* 50 (1): 57–63.

000187

Copyright of American Economic Review is the property of American Economic Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

NBER WORKING PAPER SERIES

THE INTERGENERATIONAL EFFECTS OF PERMANENT LEGAL STATUS

Elizabeth U. Cascio
Paul Cornell
Ethan G. Lewis

Working Paper 32635
http://www.nber.org/papers/w32635

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
June 2024

We thank William Paja and Meriem Fouad for their contributions at earlier stages of this project. For their comments and suggestions, we also thank seminar participants at the Florida Virtual Applied Micro Seminar, the University of Toronto, and the Spring 2024 NBER conference on Immigrants and the U.S. Economy. We are also grateful for generous funding support from a Dartmouth College Senior Faculty Grant, the Marion Enrichment Fund, and Undergraduate Research Assistantships at Dartmouth.  All errors are our own. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2024 by Elizabeth U. Cascio, Paul Cornell, and Ethan G. Lewis. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

The Intergenerational Effects of Permanent Legal Status
Elizabeth U. Cascio, Paul Cornell, and Ethan G. Lewis
NBER Working Paper No. 32635
June 2024
JEL No. I13,I14,I18,J15,J61,K37

## **ABSTRACT**

We estimate the effects of permanent legal status on the health of children born to immigrants in the United States using variation from the Immigration Reform and Control Act of 1986 (IRCA). Our empirical approach compares trends in birth outcomes for foreign-born Mexican mothers across counties with different application rates under IRCA's large-scale legalization programs. Maternal legalization raised birthweight. Effects arose immediately after the application process began – five years before affected women became Medicaid-eligible – suggesting causal mechanisms besides improved access to early prenatal care. Changes in the composition of births, stemming from changes in fertility and family reunification, contribute to but far from fully explain the birthweight impacts. The more likely mechanisms were instead the increases in family income and reductions in stress that came from gaining legal status.

Elizabeth U. Cascio
Department of Economics
Dartmouth College
6106 Rockefeller Hall
Hanover, NH 03755
and NBER
elizabeth.u.cascio@dartmouth.edu

Paul Cornell
Dartmouth College
paul.r.cornell.24@dartmouth.edu

Ethan G. Lewis
Department of Economics
Dartmouth College
6106 Rockefeller Hall
Hanover, NH 03755
and NBER
ethan.g.lewis@dartmouth.edu

## I.    Introduction

An estimated 11 million undocumented immigrants currently reside in the U.S. (Baker, 2021).  Most are adults, and many have had children on U.S. soil.[1]  These children start life at a disadvantage: their parents may be unable to work in the covered sector or move freely within the U.S., limiting the scope for upward economic mobility.  Even if the children themselves are eligible, fear of deportation may also prevent mixed-status families from taking up social safety net programs available to other families of similar means (Watson, 2014; Alsan and Yang, 2022).  Fear may also expose children to stress that inhibits their development.

This paper estimates the effect of maternal legal status on children's well-being – specifically, health at birth – using variation from the Immigration Reform and Control Act of 1986 (IRCA).  Unprecedented in scale, IRCA's legalization programs shocked the legal status of a large cohort of potential immigrant parents.  From 1987 to 1988, over 3 million unauthorized immigrants applied for work and travel authorization and a stay from deportation under IRCA; shortly thereafter – between 1989 and 1991 – 2.7 million became lawful permanent residents (LPRs) or received their Green Cards.  Most applicants and LPRs (70%) were between the ages of 16 and 35, so of prime age to be having children.  They were also spread unevenly across the U.S. as a share of the foreign-born population, largely due to pre-existing differences in unauthorized shares among the foreign-born.

Combining this geographic variation with program rollout, our empirical approach compares trends in birth outcomes within the foreign-born population across counties in the same state with different application rates.  Our analysis focuses on a particular group that can be identified in both applicant records and Vital Statistics natality detail data – foreign-born

---

[1] An estimated five million children – including four million U.S. citizens – lived with at least one undocumented parent over 2009 to 2013 (Capps, Fix, and Zong, 2016).

Mexican women, who accounted for over 675,000 legalization applications and 3.35 million U.S. births between 1987 and 1999.  While we cannot merge these anonymized universe files at the person level, we can merge estimated application rates to the natality data based on county of residence, to approximate an infant's likely *in utero* exposure to IRCA's legalization programs. To minimize the potential for contamination from ongoing immigration, we also focus on a subset of highly affected birth cohorts.[2]

We find that foreign-born Mexican women gave birth to heavier infants immediately after the application process began.  Our estimates imply that the average Mexican mother legalized through IRCA had a baby 96 grams heavier than she otherwise would have in the first six post-IRCA years.  This effect is driven by changes in the upper half of the pre-IRCA birthweight distribution.  It is also robust to specification checks (e.g., changes in the cohorts under study, model controls, and functional form) and does not manifest for U.S. born Mexican ethnic mothers, supporting a causal interpretation.  And while about a third of this effect is accounted for by changes in fertility, improved access to health care throughout pregnancy does not contribute.  Indeed, we find no initial impact of legalization on early prenatal care, consistent with most IRCA legalization applicants in our estimation sample being denied comprehensive Medicaid access until five years after their first application was approved.[3,4]

This finding suggests other mechanisms for the birthweight effect, such as improvements in household income or reductions in stress.  Previous research has found IRCA's legalization

---

[2] Foreign-born Mexican women in this subset of highly affected cohorts (born 1944 to 1972) accounted for about 531,000 IRCA legalization applicants and almost 2.5 million births between 1987 and 1999. These figures should not be read as implying that the average applicant had five children in the U.S.; a significant share of births would have been to post-IRCA immigrant arrivals, both authorized and unauthorized.

[3] IRCA legalization applicants were entitled to Medicaid coverage for late prenatal care and delivery. We exclude California from our analysis to avoid confounding the effects of legalization with the effects of Medi-Cal, which expanded eligibility to unauthorized mothers in October 1988 (Miller and Wherry, 2022).

[4] Applications for temporary status (work and travel authorization and a stay from deportation) were first approved in large numbers starting in August 1987, with most approvals occurring by July 1989 (see Figure 1).

programs raised the incomes of affected immigrants, by both improving earnings prospects (e.g., Kossoudji and Cobb-Clark, 2002; Amuedo-Dorantes, Bansak, and Raphael, 2007; Pan, 2012; Steigleder and Sparber, 2017) and increasing cash transfers under the Earned Income Tax Credit (EITC) (Cascio and Lewis, 2019).  Back-of-the-envelope calculations based on the findings of these studies and existing estimates of the effect of income or cash transfers on birthweight (Hoynes, Miller, and Simon, 2015) suggest that income gains may account for another third of the birthweight estimate.  The remaining third arguably owes to reductions in stress, consistent with previously estimated impacts of immigration enforcement on birth outcomes,[5] and the fact that birthweight effects arise immediately, before many applications were approved.

We also estimate the effects of IRCA's legalization programs on birthweight from 1993 through 1999, when affected mothers could access Medicaid.[6]  The birthweight effect persists, and indeed grows in magnitude.  But the effect on early prenatal care is much too small to explain this growth, reinforcing our conclusion that health care access is not an important mechanism.  While further income growth contributes to the increased effect, a rising authorized share among Mexican mothers does as well:  this period was one not just of Medicaid access, but also family reunification – IRCA-legalized Mexican *men* sponsoring their wives for Green Cards (Cascio and Lewis, 2023) and establishing families in the U.S.  The estimates are relatively noisy, but counties with higher application rates saw more growth in sponsored wives and births from 1993 to 1999 and a shift in birth composition toward first-born children.  First-born children tend to be lighter, so adjusting for parity strengthens the birthweight effect.

---

[5] For example, see Torche and Sirois (2019), Tome et al. (2021), and Amuedo-Dorantes, Churchill, and Song (2022), and Vu (2024).
[6] One caveat is that, starting August 1996, Medicaid – and indeed social assistance programs more generally – would have only been available to IRCA LPRs by state option (Royer, 2005).  No state in our analysis sample besides New York filled in these benefits with their own funds.  Still, about a third of IRCA legalization applicants had become naturalized citizens by 2001 (Rytina, 2002) and so would have maintained their Medicaid eligibility.

This paper makes several contributions. First, to our knowledge, we are the first to present causal estimates of the intergenerational effects of permanent legal status and a comprehensive analysis of underlying mechanisms. Despite the prevalence of mixed-status households in the American economy, there are few compelling estimates of parental legal status on children's outcomes. Existing quasi-experimental estimates focus on Deferred Action for Childhood Arrivals (DACA), which provided work authorization and a temporary stay from deportation to a more recent cohort of unauthorized immigrants brought to the U.S. as children. DACA protections have been temporary and uncertain, so these studies do not necessarily capture the full intergenerational effects of legal immigration. They also have other limitations.[7]

Second, we offer a novel approach to studying the effects of immigrant legal status in large-scale data, where legal status is typically not directly given but rather inferred from observables like citizenship and year of arrival in the U.S. Using several auxiliary data sources – IRCA applicant records, a 1980 INS registry of legal immigrants, and the Census of Population – we detect substantial variation in legalized share among foreign-born Mexicans, and we use that variation in our empirical approach. Foreign-born Mexicans would mostly be indistinguishable from each other by standard legal status proxies (e.g., Borjas, 2017; Borjas and Cassidy, 2019).[8]

Third, our findings provide new insight into trends and variation in birth outcomes among the large Mexican ethnic population in the U.S. Consistent with the so-called "healthy immigrant effect" (e.g., Stephen et al., 1994), foreign-born women in the fixed cohort of

---

[7] Using Medicaid claims data from Oregon and a regression discontinuity design comparing mothers eligible for Emergency Medicaid who were close in age but varied in their DACA eligiblity, Hainmueller et al. (2017) show that children of likely DACA-eligible mothers were less likely to be diagnosed with adjustment and anxiety disorders. Comparing Mexican women who varied in eligibility due to cohort, Hamilton, Langer, and Patler (2021) find that DACA-eligible immigrants have had heavier babies with longer gestational ages. However, the latter paper selects on high school attainment, which was affected by DACA (Kuka, Shenhav, and Shih, 2020). Impacts of DACA on teenage pregnancy (Kuka, Shenhav, and Shih, 2019) also complicate interpretation in both papers, and neither paper carries out a comprehensive analysis of mechanisms.
[8] These proxies don't detect moves to status among IRCA-legalized Mexicans (Cascio, Lewis, and Zhang, 2024).

Mexicans we consider had heavier babies than U.S. born Mexican women prior to IRCA.[9]
Contrary to typically declining health with years in the U.S., however, the foreign-born
birthweight advantage persisted as this cohort aged.  We show that IRCA was fundamental to
this trend:  average birthweights of children born to foreign- and U.S.-born Mexican ethnic
women would have converged in the absence of IRCA's legalization programs.  Our findings
thus suggest that policies promoting broad-based immigrant assimilation may counteract other
forces that lead to worsening immigrant health outcomes with time in the U.S.

**II.     IRCA's Legalization Programs**

*A.     The Application Process*

IRCA provided a path to becoming a lawful permanent resident to immigrants residing
without authorization in the U.S. in the late 1980s.  This analysis focuses on a subset of this
population – Mexican women of childbearing age at the time of application (1987-88), defined
here as ages 15 to 44 (born 1944 to 1972).  Mexicans comprised nearly three-quarters of all
applicants and Green Cards ultimately awarded under IRCA's legalization provisions.  While
women were a minority of both, the numbers affected were still substantial:  over 530,000
Mexican women of childbearing age applied, and nearly 482,000 received Green Cards.  Most of
these women (74%) applied under IRCA's General Legalization Program (GLP).  The remainder
applied under IRCA's Special Agricultural Workers (SAW) program.[10]

The application process had several phases. The first application was for *temporary* work
and travel authorization and a stay from deportation.  The Immigration and Naturalization

---

[9] The "healthy immigrant effect" is the empirical regularity that first-generation immigrants tend to be healthier than
the second or third generation.  Related is the so-called "Hispanic health paradox" (Markides and Coreil, 1986):
Hispanics tend to be healthier than whites in the U.S. despite being lower socio-economic status.  For work on both,
see Acevedo-Garcia et al. (2010), Antecol and Bedard (2006), Giuntella (2016, 2017), and Hummer et al. (2007).
[10] The GLP required proof of continuous residency in the U.S. from 1981 (or earlier) forward. The SAW program
required proof of at least 90 days of work on a USDA-approved crop over the 12-month period ending May 1, 1986,
with no additional residency requirement (Baker, 1990).

Service (INS) accepted GLP temporary status applications between May 1987 and May 1988 and temporary status applications under the SAW program between May 1987 and November 1988. Awards of temporary status were granted almost immediately – with a notable uptick in August 1987, three months after the first applications were received – and the success rate for the population of interest was high, at almost 94%.  Figure 1 shows the cumulative number of temporary status applications submitted and approved for Mexican women born 1944 to 1972 by event time for this analysis – August of one calendar year through July of the next – based on data from the Legalization Applications Processing System (see Section III).

The second application was for *permanent* legal status, or a Green Card.  GLP applicants were eligible to apply for a Green Card starting 18 months after a temporary status award, so long as they had learned English and passed a civics test. For SAW program applicants successful in the first phase, Green Cards came automatically 12 or 24 months after the award of temporary status. Most Green Cards under IRCA's legalization programs were thus awarded in 1989 and 1990, as shown in Figure 1.  The probability of success was also high in this phase for the population of interest, at 97%.  Once applicants became LPRs, they became eligible for the federal EITC. Consistent with existing policy, Green Card holders were also eligible to naturalize five years after their Green Card award (so starting in 1994).[11]

B.    *Timing and Potential Mechanisms*

We consider the opportunity to apply for temporary status to be the first legalization treatment.  Even if application alone did not improve an immigrant's material well-being or access to early prenatal care, the reduction in stress from simply knowing there was a prospect to become an LPR may have improved infant health.  Because birthweight is largely determined in

---

[11] The Legalization Applications Processing System does not follow applicants through 1994 and later, so we cannot include a naturalization series in Figure 1.

000196

the third trimester of pregnancy, we consider births in August 1987 – three months after the first application month – to be the first treated.  August 1987 to July 1988 is thus event year 0.

As immigrants transitioned across phases of the application process, other mechanisms for an impact on infant health – improvements in job stability or earnings, access to the EITC and other safety net programs – may have come into play.  Figure 2 provides the timeline for our analysis, incorporating all key moments in the lives of legalization program applicants.  Aside from the milestones in the application process, there are three moments worthy of note.

First, though IRCA allowed for Medicaid eligibility for late prenatal care and delivery, the law forbade GLP applicants cash welfare, Medicaid, and food stamps for a five-year period beginning on the date when an applicant was granted temporary status.[12]  Because temporary status awards began in earnest in August 1987, the earliest benefit access for most IRCA legalization applicants would have been August 1992.  While birthweight could thus have been affected by late 1992, the earliest improvements in early prenatal care access, by way of Medicaid, would show up with a six- to seven-month lag (January or February 1993).  The first event year fully affected by Medicaid access would have thus been August 1993 to July 1994.

Second, unless an IRCA LPR naturalized,[13] the period over which they would have had access to Medicaid (and food stamps and cash welfare) would have been brief:  welfare reform – codified in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) – cut off IRCA LPR's access to Medicaid and other social assistance starting in August 1996, unless states filled in those benefits with their own funds.  A few states in our

---

[12] SAW applicants had access to Medicaid and food stamps, but not cash welfare, over this five-year period.  Still, we expect to see little improvement in birth outcomes due to Medicaid and/or food stamps until August 1993:  most Mexican women applied through the GLP, and application rates are not correlated with the within-state composition of applications across the GLP and SAW program (Table 1).

[13] While overall rates naturalization rates were low, reaching only a third of all IRCA LPRs in 2001, they were higher in the GLP (closer to 40%), which dominates the population of interest (Rytina, 2002).

estimation sample (Section III) were fill-in states, but most were not, suggesting only partial Medicaid, cash welfare, and food stamp coverage from mid-1996 to the late 1990s.[14]  However, IRCA LPRs remained eligible for the EITC through this period (Cascio and Lewis, 2019).

Third, Mexican women in the cohort of interest who were not legalized directly under the GLP or SAW program may have nevertheless been able to enter the U.S. legally starting in the 1990s.  Consistent with existing law, married men receiving Green Cards under IRCA were eligible to sponsor Green Cards for their wives.  Once reunified in the U.S., couples may have started or continued families.  Green Card sponsored admissions of spouses were quota-restricted, and in response to IRCA, only became significant in the second half of the 1990s (Cascio and Lewis, 2023).  The long dashed green line in Figure 1 shows that cumulative Green Card-sponsored wives in the cohort of interest experienced an inflection point in the mid-1990s. Citizen-sponsored admissions of spouses were not quota-restricted (short dashed red line in Figure 1) but really ramped up relative to pre-existing trends starting in the 2000s (Cascio and Lewis, 2023), which we exclude from our analysis.

How IRCA's legalization programs affected birth outcomes may have thus changed over time, even within the fixed cohort of mothers we consider.  At first, reductions in stress would have been the main mechanism. However, improvements in immigrants' material well-being and access to health care could have eventually played a role.  Further, family reunification may have changed the number and composition of Mexico-born mothers in the second half of the 1990s. This variation in timing is useful for identifying potential mechanisms in the data.

### III.    Data

*A.    Sources and Key Variables*

---

[14] In related work, East (2020) uses variation from this period of authorized immigrants' changing eligibility to estimate the later effects on children's health of *in utero* and early childhood exposure to the food stamp program.

000198

1.    *Data on Prenatal Care and Birth Outcomes*

We draw outcomes from Vital Statistics Natality Detail Data, public use microdata compiled from birth certificates by the National Vital Statistics System of the National Center for Health Statistics.[15] We focus on data files from 1982 to 1999.  This span includes five years prior to 1987, the year in which the first IRCA legalization applicants achieved temporary legal status. We end in 1999 due to aging of the cohort of interest and continuing family reunification by way of naturalization of the IRCA legalization cohort (Cascio and Lewis, 2023), which had the potential to further change the number and composition of births.[16]  For reasons of statistical power, we consider a wide cohort (women born 1944-72) but also demonstrate the robustness of our estimates to a narrower cohort definition.

We create three sets of outcome variables.  The first concerns the child's health at birth. Potentially affected by stress (Aizer, Stroud, and Buka, 2016; Persson and Rossin-Slater, 2018) and income (Hoynes, Miller, and Simon, 2015) and a predictor of school achievement (Figlio, et al., 2014) and later-life outcomes (Behrman and Rosenzweig, 2004; Black, Devereux, and Salvanes, 2007; Oreopolous et al., 2008; Royer, 2009), birthweight is the best available measure of infant health.  We also consider whether a birth is small for gestational age (in the bottom decile of weight for a given gestational age in weeks) but note that low birthweight and preterm birth are relatively rare outcomes among Hispanic women, particularly immigrants (Giuntella, 2016).  For this reason, our analysis focuses on birthweight (in grams).

The other two sets of outcomes speak to mechanisms.  First, we measure health care access through two prenatal care indicators – one for care in the first two months of pregnancy

---

[15] All data sets used in this paper are described in detail in Appendix A.
[16] We cannot distinguish births in the natality data by a mother's year of arrival.  Unfortunately, maternal education is also not reported on birth certificates in Texas until 1989, so we cannot use that variable in this analysis.

("early" prenatal care) and another for "adequate" prenatal care by the Kessner index, which combines information on the timing of prenatal care initiation and the number of prenatal care visits (McDonald and Coburn, 1986). As noted, early prenatal care via Medicaid would have been accessible to most of our sample only starting in August 1992, registering in full-term births in February 1993 and not in full effect until the event year starting August 1993. The third set of outcomes are other birth characteristics, including parity and maternal age – reflecting fertility – and the presence of a father on the birth certificate, which could reflect socioeconomic status.[17]

Key treatment-related variables in the natality data include the child's month of birth, as well as the county of residence, ethnicity (incorporating country of descent), and birth country of mothers. Birth country is not identified for all mothers; Mexico is the only foreign country significantly affected by IRCA that is consistently separately reported. We use maternal county of residence to link natality outcomes with application rates, defined below. We use the combination of month and year of birth to assign event years. Using maternal country of descent and birth country, we can compare birth outcomes of foreign-born Mexican mothers (potentially treated) to the birth outcomes of U.S. born Mexican-ethnic mothers (not treated).

2.    *Data on Application and Legalization Rates*

We define a county's application rate as the fraction of foreign-born Mexican women born between 1944 and 1972 who reside in the county and applied for legal status though IRCA. The legalization rate is then the fraction of a county's foreign-born Mexican women in the same cohort who received Green Cards though either the GLP or SAW program. The legalization rate is of course lower than the application rate, but they unsurprisingly move close to one-to-one,

---

[17] Marital status is also provided, but prior to 1994, Texas coded almost all mothers as married if a father was listed on a birth certificate, even if this was not the case. We thus focus on paternal reports on a birth certificate.

given the high success rates at each step of the application process (Figure 1).  Because there is little variation in legalization rates given application rates, we focus on the application rate.

We use two datasets to construct application and legalization rates.  We generate the numerator for each using anonymized IRCA legalization application data from the Legalization Applications Processing System (LAPS). The LAPS tracked all applications for legal status through the end of 1992. In addition to basic information about applicants (such as age, sex, ethnicity, and country of origin), the LAPS recorded county of residence, as well as whether and when applications for temporary status and Green Cards were awarded.  We focus on cumulative applications for temporary status by – and cumulative Green Card awards to – Mexican women born 1944 to 1972, both as of 1992, under the GLP or SAW program.  While counties with under 100,000 residents (as of 1990) or fewer than 25 applications were not identified for confidentiality reasons, county is reported for almost 93% of our target demographic.

There are no published county Census tabulations of the total number of foreign-born Mexican women born 1944 to 1972 – the denominator of the application and legalization rates. We instead estimate this denominator using the 5% public-use microdata sample (PUMS) of the 1990 Census of Population (Ruggles et al., 2022).  County of residence is suppressed in the 1990 PUMS for counties with fewer than 100,000 residents, placing some limits on our sample.[18]

B.      *Analysis Sample and Descriptive Statistics*

Our analysis sample restricts attention to counties where we observe birth outcomes for foreign-born Mexican mothers in every (event) year of our analysis.  We also limit the sample states where at least four counties offer balanced panels of birth outcomes, since our

---

[18] There were 86 counties identified in the LAPS but not in the 1990 PUMS. These counties had at least 25 applicants, and so were reported in the LAPS, but are omitted from the 1990 PUMS due to having populations lower than 100,000.  There were also 24 counties in the PUMS with non-zero populations in our target demographic but no applicants.  In total, we were able to calculate application and legalization rates for 273 counties.

identification strategy relies on within-state variation in application rates (see Section IV). These restrictions result in a sample of 119 counties, which account for 84% of Mexican women born 1944 to 1972 who applied and were ultimately awarded Green Cards under IRCA's legalization programs. After removing California counties due to complications for interpretation surrounding Medi-Cal expansion,[19] we arrive at an analysis sample of 89 counties covering 8 states (Colorado, Florida, Illinois, Indiana, New Jersey, New York, Ohio, and Texas).[20]

We carry out the analysis on county-by-event-year averages of the natality outcomes, weighted by average cell counts in the pre-IRCA period. Appendix Table 1 presents descriptive statistics on the estimation sample separately for Mexico-born and U.S. born Mexican-ethnic mothers in the event years before (August 1982 to July 1987) and after (August 1987 through July 1999) status of any kind was awarded under IRCA's legalization programs. Both before and after IRCA, foreign-born Mexicans were less likely to receive early or adequate prenatal care but gave birth to heavier babies than U.S. born Mexicans. Mexico-born mothers were also older, their children were higher parity, and fathers were more likely to appear on their infants' birth certificates. Over time, mothers in both groups aged (reflecting that we follow a fixed cohort), and the gap in paternal reports on birth certificates narrowed. The foreign-born disadvantage in early prenatal care also widened, and the birthweight advantage fell.

These trends do not mean that IRCA's legalization programs caused worse outcomes for immigrant mothers. For example, the Medicaid expansions of the late 1980s and early 1990s increased citizens' access to early prenatal care and raised birthweight (Currie and Gruber, 1996;

---

[19] This expansion (in October 1988) covered non-emergency pregnancy-related services for undocumented immigrants, including early prenatal care (Miller and Wherry, 2022). By omitting California from the analysis, we thus ensure that our estimates are not confounded by concurrent policy changes affecting this population.

[20] The number of counties per state is 7 (Colorado), 16 (Florida), 11 (Illinois), 8 (Indiana), 10 (New Jersey), 10 (New York), 4 (Ohio), and 23 (Texas). These 89 counties account for 84% of Mexican women born 1944-1972 who applied for legalization through IRCA in these 8 states, and 61% of this population outside of California.

East et al., 2023). However, they suggest that any viable approach to identifying the effects of legalization will need to make comparisons within the population of mothers born in Mexico.

## IV.    Identification Strategy

### A.    *Empirical Specification*

Our identification strategy takes advantage of variation in the application rates of Mexico-born mothers across counties within the same state. If IRCA's legalization programs had an effect, birth outcomes should have improved more after program introduction (starting August 1987) in counties where application rates were higher. In these counties, Mexico-born mothers were more likely to have experienced a change in legal status.

Formally, we begin with the event-study model:

$$(1) \qquad y_{c(s)t} = \sum_{j \neq -1} \theta^j d_t^j a_{c(s)} + \gamma_{c(s)} + \delta_{st} + \varepsilon_{c(s)t}.$$

$y_{c(s)t}$ represents an average birth outcome (e.g., average infant birthweight in grams) for mothers born in Mexico between 1944 and 1972 and residing in county $c$ in state $s$ in event year $t$; $t = 0$ for births between August 1987 and July 1988, and all other event years are defined accordingly. $d_t^j$ is then an event year indicator, equal to one if $t = j$, and $a_{c(s)}$ is the application rate in county $c$. $\gamma_{c(s)}$ and $\delta_{st}$ are county and state-by-year fixed effects, which remove bias from fixed county characteristics and state-specific shocks, respectively.

The coefficients of interest are the $\theta^j$, which give how much more (or less) average outcomes changed in counties with higher application rates between August 1986 to July 1987 ($j = -1$) and event year $j$. These coefficient estimates allow us to test whether any effects of legalization varied over time (across $j > -1$), providing insights into mechanisms (Section II, Figures 1 and 2). They also allow us to test whether birth outcomes of mothers in our target

000203

population were already diverging prior to IRCA's legalization programs coming into effect (across $j < -1$). If the coefficients are identified, this should not be the case.

Indeed, the identifying assumption of this model is that children born to Mexico-born mothers in counties with higher versus lower application rates in the same state would have experienced the same trends in outcomes in the absence of IRCA's legalization programs. Finding no evidence of pre-IRCA trends in outcomes would support this assumption but not be dispositive; Mexico-born women in higher application counties could have still been affected differently by other shocks that coincided with the rollout of IRCA's legalization programs. Below we show there was no impact of legalization on birth outcomes for U.S. born Mexican-ethnic women, who may have experienced the same shocks.

*B.    Determinants and Correlates of Application Rates*

Still, knowing the determinants and correlates of within-state variation in application rates can help us further understand and address potential sources of bias. To this end, rewrite the application rate for county $c$ in state $s$ as:

$$a_{c(s)} = \frac{n_{c(s)}^{elig}}{n_{c(s)}^{pop}} \times \frac{n_{c(s)}^{app}}{n_{c(s)}^{elig}},$$

where $n_{c(s)}^{pop}$ represents the population of foreign-born Mexican women born 1944 to 1972 in county $c$ in state $s$, $n_{c(s)}^{elig}$ is the number eligible for IRCA's legalization programs, and $n_{c(s)}^{app}$ is the number of applicants. The application rate is thus directly proportional to the eligible population share, $n_{c(s)}^{elig}/n_{c(s)}^{pop}$ (approximately the unauthorized share) and to the application rate conditional on eligibility, $n_{c(s)}^{app}/n_{c(s)}^{elig}$. We lack data on $n_{c(s)}^{elig}$ when IRCA was passed and so cannot calculate these shares. However, using estimates of population and naturalized citizens from the 1980 5% Census PUMS (Ruggles et al., 2022), along with the universe of Green Card holders (from a

1980 INS registry), we can estimate the unauthorized population share in 1980 (see Appendix A).

The estimates in Table 1 Panel A provide a useful benchmark for interpretation. The first column gives the average application rate, legalization rate, and GLP share among applicants for sample counties. Column 2 then presents the estimated coefficient on the application rate, $a_{c(s)}$, in a regression model that includes state fixed effects.[21] As anticipated, the legalization rate is very strongly related to the application rate: for every 100 immigrants applying for legal status through IRCA, 97 to 98 eventually received Green Cards, implying a 97.5% probability of Green Card receipt among applicants. However, the application rate is not related to program composition of applicants (coef. (s.e.) = -0.0825 (0.102)). This is useful, since the characteristics of GLP and SAW program applicants tended to be very different (Cascio and Lewis, 2019).

The last row of Panel A repeats this exercise for the estimated 1980 unauthorized share. The coefficient on the application rate is again large and significant, implying that 87 out of every 100 IRCA legalization applicants were unauthorized in 1980 (coef. (s.e.) = 0.868 (0.136)). This figure is reassuringly close to the average GLP share among applicants in our sample – 0.859 (Panel A, column 1) – the GLP being the program targeting the long-term unauthorized, arriving before 1982 (Section II).[22] About half of within-state variation in the application rate is explained by the 1980 unauthorized share (within R-square=0.513; not shown in table).

The historical record also suggests some variation in application conditional on eligibility (i.e., in $n_{c(s)}^{app}/n_{c(s)}^{elig}$), due to differences in INS outreach and in the support of local entities like

---

[21] Here and throughout, statistics and regression estimates are weighted by the average annual number of births in a county across pre-IRCA event years. We winsorize legalization and application rates at one for a few counties in the sample. With small numbers of births to Mexico-born women, these counties receive little weight in our analysis.

[22] The GLP share in our sample is larger than the GLP share in the population of Mexican female applicants overall because our sample is weighted toward larger, urban counties where the SAW program was less prevalent.

churches and legal aid groups in the application process (Baker, 1990). However, this variation appears to have arisen largely across rather than within states:  when we impute the application rate among the unauthorized from the overall application rate and 1980 unauthorized share, we find it does not significantly contribute to within-state variation in the application rate. Model (1) may therefore effectively compare foreign-born Mexican women who were unauthorized well prior to IRCA to their counterparts who were already Green Card holders or naturalized citizens, rather than unauthorized Mexican women who varied in their odds of applying.[23]

The relevant question then becomes:  are there other reasons to expect a divergence in the outcome trends of existing authorized and unauthorized Mexican women starting in August 1987?  If these groups had different baseline characteristics, for example, they may have been affected differently by the early 1990s recession or the EITC expansions spread across the period of interest – shocks that could have directly affected birth outcomes (e.g., Dehejia and Lleras-Muney, 2004; Hoynes, Miller, and Simon, 2015).

If unauthorized women had different characteristics than the authorized population, these characteristics should be significantly related to the application rate. In Appendix Table 2, we present comparable estimates to those in Table 1 Panel A for average characteristics of foreign-born Mexican women at the county level before IRCA, based on data from the 1980 5% Census PUMS (Ruggles et al., 2023).  We focus on women aged 19 to 44 since many females born 1944 to 1972 would have still been children in 1980. Foreign-born Mexican women in counties with higher application rates were significantly younger and had a significantly lower likelihood of

---

[23] Sun and Shapiro (2022) show that difference-in-differences models with uniform treatment timing but a continuous treatment can be biased if there is self-selection into treatment intensity based on expected gains.  There are no counties in the U.S. that had substantial Mexican populations but IRCA application rates of zero, making it impossible to implement their fix for this type of bias. However, it is reassuring that most treatment variation in the present study derives from variation in the eligibility rate, not variation in the application rate among the eligible.

having a high school degree, possibly owing to being more recent arrivals.  However, sample sizes in the 1980 Census are small, so the remaining estimates are largely uninformative.

Returning to Table 1, Panel B shows estimates of the within-state relationship between the application rate and birth outcomes for Mexico-born mothers in the pre-IRCA period, which may correlate with these characteristics but be more precisely estimated.  The fact that there are few statistically significant slope coefficients is reassuring.  The application rate does not significantly predict our main outcome – birthweight – or early or adequate prenatal care, the likelihood of a multiple (e.g., twin or triplet) birth, first birth, or the likelihood of the father being reported on the birth certificate. Like in the Census data, however, foreign-born Mexican mothers in counties with higher application rates were significantly younger.[24]

## V.  Legalization and Birth Outcomes

### A.  *Baseline Estimates for Birthweight*

Figure 3 plots estimates of the event-study coefficients, or the $\theta^j$ in model (1), for the average weight (in grams) of babies born to foreign-born Mexican women (Panel A) and the share of those women had early or adequate prenatal care (Panel B).  The capped vertical lines represent 95% confidence intervals, with underlying standard errors clustered on county.  We present estimates for mechanisms aside from health care access in Section V.C.

The solid dots in Panel A show that average birthweights increased by significantly more between the event year immediately pre-IRCA (August 1986 to July 1987) and the first post-IRCA event year (August 1987 to July 1988) in higher application relative to lower application counties within the same state.  The magnitude of this relative gain eroded somewhat until

---

[24] There is also a significant positive coefficient on male, which if anything may suggest better baseline maternal health in higher application counties.  The survival of male fetuses may be more sensitive to the maternal health and the *in utero* environment (Trivers and Willard, 1973).  However, these are correlations, not causal relationships.

starting to grow again in the second half of the 1990s.  By the end of the decade, the increase in predicted birthweight in higher application counties was larger than it was initially and again statistically significant. Supporting a causal interpretation, trends in average birthweight were not already diverging prior to IRCA (joint *p*-value on pre-IRCA event-study coefficients = 0.59).

IRCA's legalization programs thus appear to have affected birthweight before legalization applicants would have been Medicaid-eligible, and so better able to access prenatal care in the early stages of pregnancy.  And indeed, the estimates in Panel B show that the initial post-IRCA gains in birthweight in higher application counties were not accompanied by relative improvements in the use of early prenatal care or receipt of adequate prenatal care in counties with higher application rates; in fact, the event-study coefficients for early prenatal care between August 1988 and July 1993 are negative.  Though they are not significant, they are positive starting in August 1993, consistent with the timing of Medicaid access for IRCA applicants. There is no evidence of an increase in adequate prenatal care.

To describe the magnitude of the estimates and improve statistical power, we turn to a difference-in-differences model that divides the post-IRCA period into two subperiods – the first spanning August 1987 to July 1993 and the second spanning the remainder of the period:

$$(2) \qquad y_{c(s)t} = \left(\theta_1 d_t^{8/87-7/93} + \theta_2 d_t^{8/93-7/99}\right) a_{c(s)} + \gamma_{c(s)} + \delta_{st} + \varepsilon_{c(s)t},$$

where $d_t^{\tau} = 1[t \in \tau]$.  The coefficient $\theta_1$ thus gives the predicted difference in the change in outcomes between the pre-IRCA period and the period from August 1987 to July 1993 between counties with higher versus lower application rates.  $\theta_2$ does the same, but for the later period – August 1993 to July 1999.

The first column of Table 2 Panel A presents model (2) estimates for birthweight.  The estimate of $\theta_1$ implies that the average IRCA legalization applicant had a baby that was 95.6

grams (about 3.35 ounces) heavier in the first six years of the post-IRCA period than she would have had in the absence of IRCA.  This is a substantial effect, amounting to almost 0.17 of a standard deviation in the pre-IRCA birthweight distribution for Mexico-born mothers; in logs, it amounts to a 2.63% increase (column 2).  Alternatively, due to IRCA's legalization programs, babies born to foreign-born Mexican women in the average sample county were 34 grams (1.2 ounces, 0.9%) heavier than they would have otherwise been during the late 1980s and early 1990s (95.6 and 0.0263 x 0.357).  This effect rises to 59 grams (a 1.5% increase in birthweight) between August 1993 and July 1999 ($\hat{\theta}_2$=165.4; 165.4 x 0.357 ≈ 59).

The corresponding estimates for early prenatal care, in column 3 of Table 2 Panel A, are negative for $\theta_1$ and much larger and positive for $\theta_2$, but not statistically significant in either case; the coefficients for adequate prenatal care are also both insignificant.  There is some hint that prenatal care may matter, in that we at least marginally reject the null that $\theta_1$ and $\theta_2$ are the same for both birthweight and early prenatal care (p-values = 0.098 and 0.053).  However, the implied effect of early prenatal care on birthweight – 217 grams ((165.4 - 95.6) / (0.251 - (-0.071))) – is much too large for early prenatal care to be the only factor behind the birthweight effect, and indeed existing work suggests early prenatal care explains very little of it.[25]

These findings point to mechanisms besides health care access for these improvements in birthweight.  Before presenting further empirical evidence on mechanisms, however, we attempt to rule out other explanations for this pattern of findings for birthweight, related to confounding factors and specification choices.

---

[25] For example, Cygan-Rehm and Karbownik (2022) find that a shift toward first-trimester prenatal care in an inframarginal population raised birthweight by on average 9 grams. Pre-IRCA, the OLS relationship between early prenatal care and birthweight among Mexico-born women was similar, at 11 grams.  These estimates imply that early prenatal care might account for only between 2 to 3 grams of the 165-gram birthweight coefficient estimate.

B.      *Robustness Checks*

1.      *Falsification Test*

The identifying assumption of our models is that foreign-born Mexican mothers in counties with higher application rates would have experienced similar trends in birth outcomes absent IRCA's legalization programs.  The insignificant pre-IRCA trends support this assumption, but it is also useful to estimate these models on another subsample of mothers who may have been similarly affected by other shocks (e.g., EITC expansions) but were not affected by IRCA's legalization programs.  If our estimates are identified, we should not uncover an impact of IRCA for these mothers.

The best candidate group for this falsification exercise is U.S. born Mexican ethnic mothers.  Table 2 Panel B presents estimates of model (2) for this group.  None of the difference-in-differences coefficient estimates are statistically significant, and we do not see the same pattern of increasing effects with the passage of time (i.e., we fail to reject that $\theta_1 = \theta_2$ for all dependent variables). That said, for birthweight, we only reject equality of the coefficients across foreign- and U.S.-born Mexican women at conventional levels of significance in the first six years the legalization programs were in effect (*p*-values = 0.035, 0.119 for first and second six-year periods, respectively; Panel C).[26],[27] In several of the robustness checks below, however, we reject equality for both periods while uncovering effects of a similar magnitude.

With these estimates in hand, we can reframe the magnitudes of our estimates, calculating the implied effect of IRCA on gaps in birth outcomes among Mexican ethnic women

---

[26] The event-study estimates are noisier for the U.S. born, as shown in Appendix Figure 1. Appendix Figure 2 gives the difference in event-study coefficients across the two groups, corresponding to the estimates in Table 2 Panel C. A triple-difference estimate may be considered a lower bound, since one could argue that this population was indirectly affected by IRCA's legalization programs. Indeed, studies of immigration enforcement have sometimes uncovered effects on Hispanic citizens (e.g., Watson, 2014; Alsan and Yang, 2022).

[27] Another candidate for this exercise is foreign-born mothers from outside of Central and Latin America, who were not greatly affected by IRCA.  However, there are small numbers of births to such women in the analysis counties.

by country of origin.  Our estimates imply that, in the absence of IRCA, the U.S.-foreign-born Mexican gap in early prenatal care would have expanded by 17 percentage points between 1982 and 1999 rather than the observed 7 percentage points (Appendix Table 1), to a 24 percentage-point gap.[28]  What was a persistent foreign-born birthweight advantage between 1993 and 1999 would have also been nearly eliminated had IRCA not been passed, falling to 5 grams.  IRCA's legalization programs thus enabled Mexico-born to regain some ground on U.S. citizens of Mexican descent.

*2.    Alternative Specifications*

Figure 4 plots estimates of $\theta_1$ and $\theta_2$, with 95% confidence intervals, for the baseline specification of (2) and nine alternatives, for both foreign-born and U.S.-born Mexican mothers (Panels A and B, respectively).[29]  Collectively, these alternative specifications reinforce our initial conclusions.  Many also improve statistical power.

We lacked universe data with which to calculate the denominator of the application rate, so one concern with the baseline specification is that the application rate is measured with error. Specification 1 re-estimates model (2) but substitutes a dummy for the application rate in a county being above the state median.[30]  These coefficients are larger, pointing to possible attenuation bias in the baseline model.  However, a significant foreign-U.S. born gap remains in the first six post-IRCA years (*p*-value for $\theta_1 = 0.048$) and emerges in the second six post-IRCA

---

[28] To arrive at this result, we multiplied the 1993-99 difference-in-differences estimates for early prenatal care (Table 2) by 0.357, the average application rate (Table 1).  The resulting figures were 0.0896 (Panel A) and -0.0079 (Panel B), implying nearly a 9 percentage point increase in use of early prenatal care for foreign-born Mexican women and a 1 percentage point reduction in the use of early prenatal care for U.S.-born Mexican ethnic women. Thus, we estimate that the U.S.-foreign born gap in early prenatal care use decreased by 10 percentage points due to IRCA.  We use a similar approach in our calculations for the birthweight gap.

[29] Appendix Table 3 gives the estimates, along with *p*-values on tests that $\theta_1 = \theta_2$ within sample and that $\theta_j$ is the same across the samples of foreign and U.S. born Mexican women.

[30] Figure 4 plots coefficients from this specification that are rescaled by the difference in average application rates between above- and below-median counties (approximately 0.15), to match the scale of the baseline coefficients. See Appendix Figure 3 for the corresponding event-study estimates from model (1).

years ($p$-value for $\theta_2 = 0.072$).  Nevertheless, calculating an alternative application rate using published tabulations of Hispanic female population in 1990 (based on a larger Census sample) doesn't affect the estimates at all (specification 2).

As earlier noted, we started with a wide cohort of women – born 1944 to 1972 – for power purposes.  However, the eldest among these were 43 or 44 when their legalization applications would have been approved, and so unlikely to have had additional children in the post-IRCA period.  Narrowing the sample to women born 1951 to 1972 (specification 3), the estimates are little changed, suggesting inclusion of older women doesn't affect our conclusions.  It is nevertheless important to follow a fixed cohort:  when we instead look at all women ages 16-44, regardless of birth cohort, estimates of $\theta_2$ for Mexico-born mothers shrink and are no longer significant (specification 4).  This finding is reassuring, since more recent cohorts were less likely to have been affected by IRCA's legalization programs, either directly (by obtaining a Green Card through IRCA) or indirectly (by being a Green Card or citizen-sponsored wife).

The next two models also concern measurement and interpretation.  We first substitute the 1980 unauthorized share for the application rate.  This model (specification 5) increases precision and yields larger effects for Mexico-born mothers and smaller effects for foreign-born Mexican ethnic mothers.[31]  The combination yields highly significant foreign-U.S. born gaps in both difference-in-differences coefficients (both $p$-values $< 0.001$).  Unauthorized arrivals prior to 1982 were eligible for the GLP, so the larger and more precise impacts from this specification might reflect stronger attachment of GLP applicants to their adopted communities. In other words, if GLP applicants were less likely to move within the U.S., county of residence reported

---

[31] We rescale these estimates so that they represent a one-unit change in the application rate, for comparability to estimates from the baseline specification. Estimates from the baseline specification for the more limited number of counties with 1980 unauthorized population shares (78) are comparable to the baseline estimates for the full sample.

on GLP applications would be a better predictor of county of residence at the time of birth. Specification 6 explores this idea further, returning to our original specification but limiting the sample to all counties in the four sample states with the highest average GLP shares:  Illinois (90.4%), Indiana (87.3%). New York (89.6%), and Texas (87.3%).[32]  The estimates are very similar in magnitude to specification 5.  Like in specification 5, we also reject equality of the difference-in-differences coefficients across the foreign-born and U.S. born Mexican subsamples ($p$-value for $\theta_1 = 0.023$ and for $\theta_2 = 0.058$).

The next two specifications add controls to model (2).  Adding county-by-time-varying per-capita earnings and government transfers has little impact relative to baseline (specification 7).[33]  These controls are an alternative to (triple) differencing to address bias from local economic shocks, so this result is consistent with our earlier finding of null effects for U.S. born Mexican-ethnic women.  Specification 8 then includes interactions between county average birthweight for foreign-born Mexican women in the pre-IRCA period and each of $d_t^{8/87-7/93}$ and $d_t^{8/93-7/99}$.  While the application rate was not significantly related to pre-IRCA birthweight (Table 1 Panel B), the coefficient was positive, raising questions about possible mean reversion. The coefficients on these new interaction terms are significantly negative, and the coefficients of interest get larger, as well as more precise.  Again, this specification strengthens confidence in the conclusion that IRCA had larger effects on the children of foreign-born than U.S. born Mexican-ethnic women ($p$-value for foreign-U.S. differences for $\theta_1 = 0.004$ and for $\theta_2 = 0.064$).

Finally, though the pre-IRCA interactions in (1) were jointly insignificant for Mexico-born mothers, we estimated an alternative specification removing pre-IRCA linear trends from

---

[32] For the remaining sample states, the GLP shares are 79.4% (CO), 28.2% (FL), 76.1% (NJ), and 64.8% (OH).

[33] These data are from the Bureau of Economic Analysis (BEA) and are denominated by fiscal year.  We merge birth outcomes data from an event year that starts in August of calendar year $b$ to income data from the fiscal year that starts in October of calendar year $b$ -1, to allow income to have an effect *in utero*.

the data (e.g., Goodman-Bacon, 2021). The underlying assumption is that any differential linear trend by county application rate would have continued in the absence of IRCA.[34] Detrending (specification 9) substantially increases standard errors, but leaves the coefficient estimates for foreign-born Mexicans little changed.[35]

### 3.    *Alternative Outcomes*

Figure 5 Panel A shows estimates $\theta_1$ and $\theta_2$ from model (2) for alternative outcomes related to birthweight and gestational age, limiting attention to foreign-born Mexican mothers.[36] Neither coefficient is significant for low birthweight, very low birthweight, small for gestational age, or whether a birth is full term or very preterm.[37] Both coefficient estimates are however significantly positive for high birthweight.

High birthweight carries risks for the infant, so this is not necessarily a positive outcome. In Figure 5 Panel B, we plot estimates of $\theta_1$ and $\theta_2$ (with 95% confidence intervals) for the share of births in each quintile of the pre-IRCA birthweight distribution for Mexico-born mothers in the analysis counties. The cutoff for the top quintile is 3,828 grams, 172 grams below the high birthweight threshold. The estimates for the top quintile indicator are thus unsurprisingly significant. But there is a significant positive coefficient in the 4th quintile as well – within the normal range (3,531 to 3,827 grams) – with shifts out of the first three quintiles.

### C.    *Changes in the Composition and Number of Births and Family Reunification*

---

[34] We obtained these estimates in two steps. First, following Wolfers (2006), we estimated a model with all post-IRCA event-study interactions (i.e., $d_t^j a_{c(s)}$ for $j \geq 0$) and an interaction between a linear event-time term and the application rate (i.e., $t \times a_{c(s)}$). We then averaged the event-study coefficients across the relevant event years ($j = 0$ to $j = 5$ for $\bar{\theta}_1$ and $j = 6$ to $j = 11$ for $\bar{\theta}_2$) Standard errors were calculated using the delta method.

[35] See Appendix Figure 4 and Appendix Table 4 for the same set of robustness checks for early prenatal care.

[36] Appendix Figure 5 gives the estimates for U.S. born Mexican women and Appendix Table 5 the full estimates.

[37] An infant is clinically low birthweight if less than 2,500 grams, clinically very low birthweight if less than 1,500 grams, and clinically high birthweight if greater than 4,000 grams. An infant is small for gestational age if in the bottom decile of weight given gestational age (in weeks). A full-term birth happens at a gestational age of 37+ weeks, whereas a very preterm birth happens at a gestational age of 34 weeks or less.

IRCA's legalization programs may have not only affected birthweight; they may have also affected the fertility of Mexican women, as well as the total number of Mexican women of childbearing age in the U.S., through Green Card sponsorship by their husbands.  Effects on fertility and family reunification may be a mediator of the birthweight impacts (Section VI).[38] However, they are also independently interesting, speaking to the role of immigration policy in demographic change in general and IRCA's specific role in Hispanic birth trends in the 1990s (e.g., Kearney and Levine, 2015).

Figure 6 plots event-study (model (1)) coefficients for four (sets of) birth characteristics – the report of a father on the birth certificate (Panel A), parity (Panel B), sex and multiplicity (Panel C), and maternal age (Panel D), for Mexico-born mothers.[39]  Figure 7 then gives event-study estimates for birth counts and admissions of Mexican women by way of Green Card or citizen sponsorship by their husbands; we scale both by the average annual number of births to Mexico-born women in the county in the pre-IRCA period.[40]  Table 3 gives the difference-in-differences (model (2)) estimates for all variables across the two figures.  Legalization caused changes in the composition of births that track changes in fertility and spousal admissions in sensible ways, and the timing of effects reflects the applicant timeline laid out in Figure 2.

Consider the first six post-IRCA years.  Mexico-born mothers in counties with higher application rates saw larger increases in the chances a father was reported on a birth certificate; they also aged significantly more quickly, and their births were significantly higher parity. Except for share first birth, all estimates of $\theta_1$ from model (2) are significantly different from the same coefficient estimates for U.S. born Mexican women (Table 3 Panels B and C columns 1 to

---

[38] The county-level application and legalization rates of Mexican men and women are strongly positively correlated.
[39] See Appendix Figure 6 for the event-study estimates for U.S. born Mexican mothers.
[40] Relative to a log transformation, this transformation puts birth counts and sponsored wives on the same scale and retains in the sample county-event year cells with no sponsored wives from Mexico.

4).  These compositional changes also arose without statistically significant changes in the total number of births to Mexico-born women, though the estimates for birth counts are negative (Table 3 Panel A column 7).  Collectively, these findings suggest that legalization may have temporarily discouraged fertility among younger Mexican women with fewer children.[41]

During the second six post-IRCA years, the impact on maternal age for Mexico-born mothers persisted, and the effect on the likelihood of a paternal report grew.  But there was a reversal in the impacts on parity: the estimate of $\theta_2$ for share first birth is positive and large, while that for share third or higher birth is negative.  While the parity coefficients are not statistically significant and not statistically different from those observed for U.S. born Mexican-ethnic women, the changing sign of these coefficients could reflect Mexican women having children they may have delayed.  Indeed, while the estimates for the total number of births for this period are not significant, they are positive (Figure 7, Table 3 column 7), the point estimate implying the number of births to Mexico-born women was 21% higher than it would have otherwise been between August 1993 and July 1999, due to IRCA.

However, family reunification also likely played a role during this period.  Figure 7 shows that higher application counties not only experienced larger increases in births between the pre-IRCA period and August 1993 to July 1999; they also saw larger gains in the number of Mexican women admitted to the U.S. through family sponsorship channels.  In fact, IRCA-induced arrivals can explain slightly over half of all Green Cards awarded to Mexican wives between 1993 and 1999, consistent with the findings of Cascio and Lewis (2023). If marginal sponsored wives were responsible for all marginal births, each of these mothers would have had four children over a six-year period ($0.766/0.205 \approx 3.75$).  While not completely out of line with

---

[41] This conclusion is potentially consistent with that of Kuka, Shenhav, and Shih (2019), who find that DACA reduced fertility. However, unlike that study, our estimates are not driven by reductions in births to teenagers.

the completed fertility of Mexican-born women in these cohorts, to have four children born over such a short time frame is unrealistic. Both new entrants and women legalized under IRCA therefore arguably contributed to the marginal births.

## VI.   Mechanisms

Thus far**,** we have presented evidence that IRCA's legalization programs improved outcomes of the children of affected women – specifically birthweight, a common measure of health at birth and predictor of later-life achievement and well-being.  We have also shown that early prenatal care cannot explain these effects, but changes in the composition of births, stemming from changes in fertility and family reunification, may be contributing.

This section attempts to quantify the role of changing birth composition in our birthweight findings, using the estimates from Section V.C.  We also discuss the potential contributions of improvements in family income and reductions in stress, drawing on previous literature.  We uncover evidence that each of these channels mattered.

*A.      Birth composition*

How much of the birthweight effects presented in Section V.A. can be explained by the changes in birth characteristics documented in Figure 6?  To address this question, we first estimated the relationship between birthweight and birth characteristics in the pre-IRCA period for Mexican-ethnic mothers, separately by country of birth. We then obtained an "adjusted birthweight" measure by subtracting the prediction from this regression, applied over the entire period, from actual birthweight. Effects on adjusted birthweight thus capture what would have happened to birthweight had the composition of births remained constant and the relationship between birth characteristics and birthweight remained the same as it was before IRCA.[42]

---

[42] Estimates based on adjusted birthweight should be considered speculative, since the relationship between birthweight and birth characteristics may have changed over time, possibly due to IRCA's legalization programs.

Figure 8 presents the results from this exercise.  The thick black line represents the baseline event-study estimates for birthweight (repeated from Figure 3 Panel A).  The remaining plots give event-study coefficients for adjusted birthweight, derived from three regressions with different combinations of birth characteristics.  Had the composition of births remained unchanged along the dimensions of parity (dummies for first and third or higher parity), maternal age (cubic), male (dummy), and multiplicity (dummy), average birthweight for the children of Mexico-born women would have increased by 65 grams (Table 4 column 2), not 96 grams, between August 1987 and July 1993. Adjusting in addition for paternal reports on the birth certificate further lowers the estimate of $\theta_1$ to 58 grams (column 3) but adding in early prenatal care – and coming full circle with the findings in Section V.A. – increases it to 74 grams (column 4).  Estimates of $\theta_2$ for adjusted birthweight vary in a tighter window around the baseline estimate of 165 grams.

Changes in birth composition, at least insofar as characteristics reported on the birth certificate, thus contribute to our estimates, but much more in the first post-IRCA period, and mostly due to the first adjustment.  However, under the fully saturated adjustment (Table 4 column 4), over two-thirds of the birthweight effect remains unexplained in the first period. Moreover, changes in observed birth composition account for little of the larger birthweight effect between 1993 and 1999, leaving open the question of why the impact might have grown.

One potential explanation for a growing birthweight effect – still owing to compositional changes – is that IRCA-induced changes in fertility and family reunification boosted the IRCA-authorized share among Mexico-born mothers over time.  Our estimates are reduced form in the sense that we do not observe whether a given mother was authorized at the time of birth.  Since counties with higher application rates saw larger inflows of Mexican wives sponsored for Green

Cards in the second six-year post-IRCA period (Figure 7, Table 3 Panel A column 8), the difference in average birthweight across counties with higher versus lower application rates should have risen, so long as these women had children once in the U.S.  Relative increases in fertility among Mexican women directly legalized through the GLP or SAW programs would have had the same effect.

How much of the rising birthweight effect we can explain by a rising legalized share depends on the initial IRCA-authorized share, as well as how much the Mexican women admitted through IRCA (directly through the GLP or SAW program, or indirectly by way of a husband's sponsorship) account for these births. We observe neither and the number of marginal births (based on the Table 3 Panel A column 7 estimate) is imprecisely estimated.  Still, suppose that all marginal births were to IRCA-authorized women, and that the initial (August 1987 to July 1993) IRCA-legalized share among mothers was 33% – about the average IRCA legalization rate (Table 1 Panel A). As we show in Online Appendix B, under these assumptions, the IRCA-authorized share among Mexico-born moms would have risen to about 45% between August 1993 to July 1999 – a 36% percent increase that can account for about half of the 73% increase in the birthweight effect across the two post-IRCA periods.

B.      *Family Income*

What role do increases in family income play in our findings, both initially and as the legalization applicants matured?  Previous research has tied legalization directly to family income and family income to birth outcomes.  Family income is not directly reported on birth certificates, precluding incorporation of it in our adjusted birthweight measure.  While we do observe some correlates of income – like paternal reports on a birth certificate – adjustments on this basis will arguably not capture its full effect.

Assessing the potential role of family income thus requires drawing on estimates from past studies.  We carry out a back-of-the-envelope calculation based on the Cascio and Lewis (2019) estimates of the effect of IRCA's legalization program on income (including EITC transfers) across the 1990s, combined with the Hoynes, Miller, and Simon (2015) estimates of the effect of income on birthweight, based on variation from the 1993 EITC expansion. This calculation implies that income gains from legalization raised birthweight by on average 35 grams between August 1987 to July 1993 and 59 grams between August 1993 and July 1999 – about a third of our estimates each period.[43]  Over part of the latter period, IRCA LPRs would also have had access to near-cash assistance – food stamps – making the 59-gram figure a lower bound.[44]

C.     *Reductions in Stress*

Another channel by which legal status might have affected birth outcomes is maternal stress.  Central to this channel is a (reduced) fear of deportation: IRCA included an immediate stay of deportation of anyone who was likely to meet the eligibility criteria for legalization (Section II).  This channel may therefore explain both the immediate birthweight effects and growing effects over time, as IRCA admits passed from temporary to permanent legal status. Unfortunately, we cannot do the same kind of back-of-envelope calculation for stress as we did for family income, since we lack estimates of how the IRCA's legalization programs affected stress levels in the foreign-born Mexican population.  However, two literatures suggest stress may account for birthweight effects not explained through other channels.

---

[43] See Online Appendix B for details.  There are caveats on these conclusions.  For example, income is also not independent of the birth characteristics considered in Section VI.A.  Some of underlying estimates, particularly those for adjusted gross income in Cascio and Lewis (2019), also have wide confidence intervals.

[44] Food stamp receipt has been linked to birthweight.  For example, using variation from program rollout, Almond, Hoynes, and Schanzenbach (2011) find that participation in the food stamp program (FSP) reduced the risk low birthweight.  Perhaps more pertinent to this study, using variation from immigrants' changing eligibility in the late 1990s, East (2020) estimates that 3rd trimester FSP eligibility for immigrants raised birthweight by 6.5 grams.

First, numerous studies have concluded that increased immigration enforcement negatively affects birth outcomes.[45]  Enforcement may directly affect material circumstances (e.g., Amuedo-Dorantes, Arenas-Arroyo, and Sevilla, 2017), including by "chilling" the use of public programs (Watson, 2014; Alsan and Yang, 2022). However, the oft-posited channel for these effects is an increased salience of deportation risk, which is associated with heightened anxiety among Latino youths (Capps, et al., 2020).  Magnitudes of estimates in enforcement studies are also in the range of the birthweight effects that remain unexplained in this paper (e.g., between 10 and 60 grams, depending on the study).

Second, there is direct evidence that maternal stress affects birth outcomes.  Some studies (e.g., Aizer, Stroud, and Buka (2016)) link stress to income, suggesting that some of any income effect may work through stress reduction.[46]  However, increases in stress holding income constant can also lower birthweight.  For example, Persson and Rossin-Slater (2018) find that the loss of a maternal relative during pregnancy reduces birthweight by about 10 grams.

## VII.    Conclusion

Unauthorized immigration is a pervasive fact of American life.  And yet, we know little about the well-being of children born to unauthorized immigrants in the U.S.  Getting empirical traction on this question is difficult:  it not only requires large-scale data linking parents and

---

[45] 287(g) agreements in conjunction with Immigration Control and Enforcement (ICE) enforcement in one county in North Carolina were associated with a 60-gram decline in the weight of babies from less-educated immigrants (but not native-born) mothers in the county relative to mothers in comparison counties (Tome et al., 2021).  Broader measures of immigration enforcement, such as "Secure Communities" (Vu, 2024), the Legal Arizona Workers Act (Torche and Sirios, 2018), E-Verify mandates (Strully et al., 2020) and an index of policies like these (Amuedo-Dorantes, Churchill, and Song, 2020), are also associated with lower birthweight.

[46] Following mothers in New England in the 1960s, Aizer, Stroud, and Buka (2016) found that higher levels of a blood marker for stress during late pregnancy was associated with significantly lower birthweight, even within mother across pregnancies.  The most stressed mothers (top quintile) birthed babies that were over 100 grams lighter than the least stressed mothers (bottom quintile), though this difference was not always statistically significant.

children, but also "as good as" random variation of the legal status of immigrant parents. Observation of legal status is also essentially impossible in existing data.

This paper has attempted to overcome these challenges using data from the universe of birth certificates, which link parents and children by design, and variation in parental legal status from an historic U.S. amnesty 35 years ago, under provisions of the Immigration Reform and Control Act.  Marshalling a variety of administrative data, we have constructed a localized measure of amnesty exposure among foreign-born Mexican women, almost all of whom would be classified identically by standard proxies for legal status.  Exploiting that geographic variation alongside the timing of IRCA's legalization programs, we have shown that both the promise and realization of permanent legal status raised the average birthweight of children born in the U.S. to Mexican women, and that these birthweight effects increased over time, as the legalized cohort matured.  These estimates survive a battery of specification checks, and additional empirical and narrative evidence has suggested that a combination of factors – changes in fertility and family reunification, increases in family resources, and reductions in stress – contributed.

The U.S. seems politically very far away from establishing any new legalization programs like those authorized under IRCA. We would urge caution in generalization even if this were not the case, since the unauthorized population is no longer majority Mexican (Baker, 2021), and the economic, health care, and immigration enforcement environments are different than they were 30 years ago.  But the question of how parental legal status affects children is still highly relevant, if only because parents of U.S. citizens who are unauthorized are likely to remain so for the foreseeable future.  Our findings suggest that having an unauthorized parent affects a child's health endowment.

Data constraints have precluded us from estimating the longer-term intergenerational effects of permanent legal status. The implied effects on longer-term outcomes, based on our birthweight estimates and existing research, are also quite small.[47]  However, effects flowing exclusively through birthweight are arguably a lower bound on the true longer-run impacts, since the positive effects of having an authorized parent would be ongoing throughout childhood.  We leave to future research direct estimation of these longer-run effects.

---

[47] For example, a 4.33% (or 165 gram) increase in birthweight is associated with only 0.02 to 0.03 standard deviation increases in achievement or IQ test scores (Figlio, et al., 2014; Black, Devereux, and Salvanes, 2007), a 0.4 percentage point increase in the likelihood of completing high school (Black, Devereux, and Salvanes, 2007), and 0.026 more years of schooling (Royer, 2009).

**References**

Acevedo-Garcia, Dolores, Lisa M. Bates, Theresa L. Osypuk, and Nancy McArdle. 2010. "The Effect of Immigrant Generation and Duration on Self-Rated Health Among U.S. Adults 2003-2007." *Social Science and Medicine* 71(6): 1161-1172.

Aizer, Anna, Laura Stroud, and Stephen Buka. 2016. "Maternal Stress and Child Outcomes: Evidence from Siblings." *Journal of Human Resources* 51(3): 523-555.

Almond, Douglas, Hilary Hoynes, and Diane Schanzenbach. 2011. "Inside the War on Poverty: The Impact of Food Stamps on Birth Outcomes." *Review of Economics and Statistics* 93(2): 387-403.

Alsan, Marcella and Crystal Yang. 2022. "Fear and the Safety Net: Evidence from Secure Communities." *Review of Economics and Statistics*, forthcoming.

Amuedo-Dorantes, Catalina, Cynthia Bansak, and Steven Raphael. 2007. "Gender Differences in the Labor Market: Impact of IRCA. *American Economic Association Papers and Proceedings* 97(2): 412-416.

Amuedo-Dorantes, Catalina, Esther Arenas-Arroyo, and Almudena Sevilla. 2017. "Immigration Enforcement and Economic Resources of Children with Likely Unauthorized Parents." *Journal of Public Economics* 158: 63-78.

Amuedo-Dorantes, Catalina, Brandyn Churchill, and Yang Song. 2022. "Immigration Enforcement and Infant Health." *American Journal of Health Economics* 8(3): 323-358.

Antecol, Heather and Kelly Bedard. 2006. "Unhealthy Assimilation: Why Do Immigrants Converge to American Health Status Levels?" *Demography* 43: 337-360.

Baker, Susan Gonzalez. 1990. *The Cautious Welcome: The Legalization Programs of the Immigration Reform and Control Act.* Washington, D.C.: The Urban Institute.

Baker, Bryan. 2021. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015-January 2018." *Population Estimates.* Washington, D.C.: Department of Homeland Security.

Behrman, Jere R. and Mark R. Rosenzweig. 2004. "Returns to Birth Weight." *Review of Economics and Statistics.* 86(2): 586-601.

Black, Sandra E., Paul J. Devereux, and Kjell G. Salvanes. 2007. "From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes." *Quarterly Journal of Economics* 122(1): 409-439.

Borjas, George J. 2017. "The Labour Supply of Undocumented Immigrants." *Labour Economics* 46: 1-13.

Borjas, George J. and Hugh Cassidy. 2019. "The Wage Penalty to Undocumented Immigration." *Labour Economics* 61: 101757.

Capps, Randy, Michael Fix, and Jie Zong. 2016. "A Profile of U.S. Children with Unauthorized Immigrant Parents." Washington, D.C.: Migration Policy Institute.

Capps, Randy, Jodi Berger Cardoso, Kalina Brabeck, Michael Fix, and Ariel G. Ruiz Soto. 2020. "Immigration Enforcement and the Mental Health of Latino High School Students." Washington, D.C.: Migration Policy Institute.

Cascio, Elizabeth U. and Ethan Lewis. 2019. "Distributing the Green (Cards): Permanent Residency and Personal Income Taxes After the Immigration Reform and Control Act of 1986." *Journal of Public Economics* 172: 135-150.

Cascio, Elizabeth U. and Ethan Lewis. 2023. "Opening the Door:  Immigrant Legalization and Family Reunification in the United States." *Journal of Labor Economics*, forthcoming.

Cascio, Elizabeth U., Ethan Lewis, and Chengguo Zhang. 2024. "How Good are Proxies for Legal Status?  Evidence from the Legalization of Two Million Mexicans." Manuscript.

Currie, Janet and Jonathan Gruber. 1996. "Saving Babies:  The Efficacy and Cost of Recent Changes in the Medicaid Eligibility of Pregnant Women." *Journal of Political Economy* 104(6): 1263-96.

Cygan-Rehm, Kamila and Krzysztof Karbownik. 2022. "The Effects of Incentivizing Early Prenatal Care on Infant Health." *Journal of Health Economics* 83: 102612.

Dehejia, Rajeev and Adriana Lleras-Muney. 2004. "Booms, Busts, and Babies' Health." *Quarterly Journal of Economics* 119(3): 1091-1130.

East, Chloe. 2020. "The Effect of Food Stamps on Children's Health:  Evidence from Immigrants' Changing Eligibility." *Journal of Human Resources* 55(2): 387-427.

East, Chloe, Sarah Miller, Marianne Page, and Laura R. Wherry. 2023. "Multigenerational Impacts of Childhood Access to the Safety Net: Early Life Exposure to Medicaid and the Next Generation's Health." *American Economic Review* 113(1): 98-135.

Figlio, David, Jonathan Guryan, Krzysztof Karbownik, and Jeffrey Roth.  2014. "The Effcdts of Poor Neonatal Health on Children's Cognitive Development." *American Economic Review* 104(12): 3921-3955.

Giuntella, Osea. 2016. "The Hispanic Health Paradox: New Evidence from Longitudinal Data on Second and Third-Generation Birth Outcomes." *SSM-Population Health* 2: 84-89.

Giuntella, Osea. 2017. "Why Does the Health of Mexican Immigrants Deteriorate?  New Evidence from Linked Birth Records." *Journal of Health Economics* 54: 1-16.

Goodman-Bacon, Andrew. 2021. "The Long-Run Effects of Childhood Insurance Coverage: Medicaid Implementation, Adult Health, and Labor Market Outcomes." *American Economic Review* 111(8): 2550-2593.

Hainmueller, Jens, Duncan Lawrence, Linna Marten, Bernard Black, Lucila Figuero, Michael Hotrd, Tomas R. Jimenez, Fernando Mendoza, Mari I. Rodrigueq, Jonas J. Swartz, and David D. Laitin. 2017. "Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health." *Science* 357(6355): 1041-1044.

Hamilton, Erin R., Paola D. Langer, and Caitlin Patler. 2021. "DACA's Association With Birth Outcomes Among Mexican-Origin Mothers in the United States" *Demography* 58(3): 975-985.

Hoynes, Hilary, Douglas L. Miller, and David Simon. 2015. "Income, the Earned Income Tax Credit, and Infant Health." *American Economic Journal: Economic Policy* 7(10): 172-211.

Hummer, Robert A., Daniel A. Powers, Starling G. Pullum, Ginger L. Gossman, W. Parker Frisbie. 2007. "Paradox Found (Again):  Infant Mortality Among the Mexican-origin Population in the United States." *Demography* 44(3): 441-457.

Kearney, Melissa and Philip Levine.  "Investigating Recent Trends in the U.S. Teen Birth Rate." *Journal of Health Economics* 41: 15-29.

Kossoudji, Sherry A. and Deborah Cobb-Clark. 2002. "Coming Out of the Shadows: Learning About Legal Status and Wages from the Legalized Population." *Journal of Labor Economics* 20(3): 598-628.

Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2020. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA" *American Economic Journal: Economic Policy* 12(1): 293-324.

Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2019. "A Reason to Wait:  The Effect of Legal Status on Teen Pregnancy."  *American Economic Association Papers and Proceedings* 109(2): 213-217.

Markides, Kyriakos S. and Jeannine Coreil.  "The Heath of Hispanics in the Southwestern United States:  An Epidemiologic Paradox." *Public Health Report* 101(3): 253-265.

McDonald, Thomas P. and Andrew F. Coburn. 1988. "Predictors of Prenatal Care Utililization." *Social Science and Medicine* 27(2): 167-172.

Miller, Sarah and Laura Wherry. 2022. "Covering Undocumented Immigrants:  The Effects of a Large-Scale Prenatal Care Intervention." NBER Working Paper 30299.  Cambridge, MA: National Bureau of Economic Research.

Oreopoulos, Philip, Mark Stabile, Randy Walld, and Leslie L. Roos. 2008.  "Short-, Medium-, and Long-Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins." *Journal of Human Resources* 43(1): 88-138.

Pan, Ying. 2012. "The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986." *Journal of Labor Research* 33: 119-142.

Persson, Petra and Maya Rossin-Slater. 2018. "Family Ruptures, Stress, and the Mental Health of the Next Generation." *American Economic Review* 108(4-5): 1214-52.

Royer, Heather. 2005. "The Response to a Loss in Medicaid Eligibility: Pregnant Immigrant Mothers in the Wake of Welfare Reform."  Manuscript.

Royer, Heather. 2009. "Separated at Girth:  U.S. Twin Estimates of the Effects of Birth Weight." *American Economic Journal: Applied Economics* 1(1): 49-85.

Ruggles, Steven, Sarah Flood, Ronald Goeken, Megan Schouweiler and Matthew Sobek. 2022. *IPUMS USA: Version 12.0* [dataset]. Minneapolis, MN: IPUMS. https://doi.org/10.18128/D010.V12.0

Ruggles, Steven, Sarah Flood, Matthew Sobek, Danika Brockman, Grace Cooper,  Stephanie Richards, and Megan Schouweiler. 2023. *IPUMS USA: Version 13.0* [dataset]. Minneapolis, MN: IPUMS.  https://doi.org/10.18128/D010.V13.0

Rytina, Nancy. 2002. "IRCA Legalization Effects:  Lawful Permanent Residence and Naturalization through 2001." Mimeo, Office of Policy Planning Statistics Division, U.S. Immigration and Naturalization Service.

Stephen, E.H., K. Foote, G.E. Hendershot, and C.A. Schoenborn. 1994. "Health of the Foreign-Born Population." *Advance Data from Vital and Health Statistics* 241: 1-10.

Steigleder, Quinn and Chad Sparber. 2017. "The Effect of Immigrant Legal Status on Immigrant Wages and Occupational Skills." *Applied Economics Letters* 24(2): 80-84.

Strully, Kate W., Robert Bozick, Ying Huang, and Lane F. Burgette. 2020. "Employer Verification Mandates and Infant Health."  *Population Research and Policy Review* 39: 1143-1184.

Sun, Liyang and Jesse M. Shapiro. 2022. "A Linear Panel Model with Heterogeneous Coefficients and Variation in Exposure." *Journal of Economic Perspectives* 36(4): 193-204.

Tome, R., M.A. Rangel, C.M. Davis, and L. Bellows. 2021. "Heightened Immigration Enforcement Impacts U.S. Citizens' Birth Outcomes: Evidence from Early ICE Interventions in North Carolina." *PLoS ONE* 16(2): e0245020.

Torche, Florencia and Catherine Sirois. 2019. "Restrictive Immigration Law and Birth Outcomes of Immigrant Women." *American Journal of Epidemiology* 188(1): 24-33.

Trivers, Robert L. and Dan E. Willard. 1973. "Natural Selection of Parental Ability to Vary the Sex Ratio of Offspring." *Science* 179 (4068): 90-92.

Vu, Hoa. 2024. "I Wish I Were Born in Another Time: Unintended Consequences of Immigration Enforcement on Birth Outcomes." *Health Economics* 33(2): 345-362.

Watson, Tara. 2014. "Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation." *American Economic Journal: Economic* Policy 6(3): 313-338.

Wolfers, Justin. 2006. "Did Unilateral Divorce Laws Raise Divorce Rates? A Reconciliation and New Results." *American Economic Review* 96(5): 1802-20.

000228

Figure 1.
Cumulative Legalization Applications Submitted and Approved:
Mexican Women Born 1944-72



*Sources:* Legalization Applications Processing System and *Immigrants Admitted to the United States*. *Notes:* Samples limited to women born in Mexico between 1944 and 1972.  Birth years imputed from age and date of application.  Green Card award dates assigned to SAW applicants 12 months after approval of their temporary status applications.

Figure 2.  Timeline for IRCA's Legalization Applicants



000230

## Figure 3.
## Event-Study Estimates for Birthweight and Prenatal Care: Mexico-Born Mothers



A. Birthweight



B. Prenatal care

*Sources:* Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022).

*Notes:* The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to mothers born in Mexico between 1944 and 1972. Markers represent coefficients on interactions between a county's application rate and event-year indicators in model (1). Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period (8/82-7/87).

000231

### Figure 4.
### Robustness of Difference-in-Differences Estimates for Birthweight



*Sources:* See Figure 3.

*Notes:* Figures plot coefficient estimates on the interaction terms in model (2) across different specifications and samples. Spec. 1 replaces $a_{c(s)}$ with an indicator for whether county $c$'s application rate was at or above the median in state $s$. Spec. 2 calculates $a_{c(s)}$ using published tabulations of the female Hispanic population. Spec. 3 limits the natality detail data to mothers born 1951-72, while spec. 4 includes mothers aged 16 to 44 regardless of birth cohort. Spec. 5 replaces $a_{c(s)}$ with estimated 1980 unauthorized share in the target population. Spec. 6 limits attention to the 4 highest GLP states (IL, IN, NY, TX). Spec. 7 controls for county-by-event-year-varying per-capita earnings and government transfers. Spec. 8 controls for interactions between the two post-IRCA indicators and average county pre-IRCA birthweight among foreign-born Mexican mothers. Spec. 9 residualizes birthweight for pre-IRCA linear trends. Throughout, capped vertical lines represent 95% C.I.s, standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period.

000232

Figure 5.
Difference-in-Differences Estimates for Alternative Outcomes:
Mexico-Born Mothers





*Sources:* See Figure 3.
*Notes:* Figures plot coefficient estimates on the interaction terms in model (2) for different dichotomous outcomes (Panel A) the share of births in each quintile of the pre-IRCA birthweight distribution of Mexico-born mothers (Panel B). Throughout, capped vertical lines represent 95% C.I.s, standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period.

000233



Figure 6.
Event-Study Estimates for the Composition of Births:
Mexico-Born Mothers

*Sources*: See Figure 3.
*Notes*: The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to mothers born in Mexico between 1944 and 1972. Markers represent coefficients on interactions between a county's application rate and event-year indicators in model (1). Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period (8/82-7/87).

000234

44

Figure 7.
Event-Study Estimates for the Number of Births and
of Wives Sponsored for Green Cards:  Mexico-Born Mothers



*Sources:*  Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022), *Immigrants Admitted to the United States.*
*Notes:*  Both outcomes are scaled by the average annual number of births in a county in the pre-IRCA period. The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX).  Births and admissions limited to women born in Mexico between 1944 and 1972.  Markers represent coefficients on interactions between a county's application rate and event-year indicators in model (1).  Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period (8/82-7/87).

Figure 8.

## Event-Study Estimates for Birthweight Adjusted for Changes to Composition: Mexico Born Mothers



*Sources:* Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022).

*Notes:* The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to mothers born in Mexico between 1944 and 1972. Bold solid line represents coefficients on interactions between a county's application rate and event-year indicators in model (1) for raw birthweight in grams. Other markers represent the same coefficients but for adjusted birthweight, the difference between raw birthweight and birthweight predicted based on the characteristics indicated using natality microdata limited to the pre-IRCA period. Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period (8/82-7/87).

**Table 1. Key Variables:  Pre-IRCA Means and Relationship with the Application Rate**

|  | Mean [sd] | Coef. (se) on application rate |
|---|---|---|
|  | (1) | (2) |
|  | *A.  Legalization Variables* | |
| Application rate | 0.357 | - |
|  | [0.094] | |
| Legalization rate | 0.329 | 0.975 |
|  | [0.091] | (0.0173) |
| GLP share | 0.859 | -0.0825 |
|  | [0.108] | (0.102) |
| Unauthorized share (1980)[a] | 0.364 | 0.868 |
|  | [0.133] | (0.136) |
|  | *B.  Pre-IRCA Birth Characteristics: Mexico-Born Mothers* | |
| Birthweight (grams) | 3,368 | 33.79 |
|  | [51.1] | (108.5) |
| Early prenatal care | 0.313 | 0.0215 |
|  | [0.116] | (0.275) |
| Adequate prenatal care | 0.107 | -0.0424 |
|  | [0.047] | (0.0991) |
| Male | 0.512 | 0.0176 |
|  | [0.026] | (0.00814) |
| Multiple | 0.018 | 0.00208 |
|  | [0.011] | (0.00575) |
| First birth | 0.319 | 0.0300 |
|  | [0.037] | (0.0318) |
| Third or higher birth | 0.401 | -0.0606 |
|  | [0.041] | (0.0568) |
| Mother's age | 25.54 | -4.949 |
|  | [0.744] | (0.835) |
| Father on birth certificate | 0.892 | -0.110 |
|  | [0.070] | (0.109) |

*Sources:*  Panel A - Legalization Applications Processing System, 1980 and 1990 5% Census PUMS (Ruggles et al., 2022), *Aliens Admitted to the United States*, 1980.  Panel B - Vital Statistics Natality Detail Files, August 1982 to July 1987.
*Notes:*  Estimation sample includes 89 counties spanning 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period. Regressions in column (2) include state fixed effects; standard errors (in parentheses) are heteroskedasticity-robust (Panel A) or clustered on county (Panel B).  [a] Observed for 78 counties only.

**Table 2. Difference-in-Differences Estimates for Birthweight and Prenatal Care**

| | Dependent variable: | | | |
|---|---|---|---|---|
| | Birthweight (grams) | Birthweight (natural log) | Early prenatal care | Adequate prenatal care |
| | (1) | (2) | (3) | (4) |
| *A.  Mexico-Born Mothers* | | | | |
| Aug. 1987 - July 1993 (=1) | 95.55 | 0.0263 | -0.0710 | 0.0471 |
| x Application rate | (39.17) | (0.0127) | (0.184) | (0.0447) |
| Aug. 1993 - July 1999 (=1) | 165.4 | 0.0433 | 0.251 | 0.110 |
| x Application rate | (75.22) | (0.0230) | (0.283) | (0.124) |
| | | | | |
| *p*:  1987-93 = 1993-99 | 0.098 | 0.178 | 0.053 | 0.623 |
| R-square | 0.617 | 0.822 | 0.822 | 0.823 |
| N (county x year) | 1,513 | 1,513 | 1,512 | 1,512 |
| | | | | |
| *B.  U.S. Born Mexican Ethnic Mothers* | | | | |
| Aug. 1987 - July 1993 (=1) | 12.14 | 0.00227 | -0.120 | 0.0256 |
| x Application rate | (39.45) | (0.0131) | (0.110) | (0.0654) |
| Aug. 1993 - July 1999 (=1) | 49.20 | 0.0141 | -0.0300 | -0.231 |
| x Application rate | (75.84) | (0.0253) | (0.109) | (0.204) |
| | | | | |
| *p*:  1987-93 = 1993-99 | 0.432 | 0.444 | 0.306 | 0.115 |
| R-square | 0.638 | 0.533 | 0.907 | 0.846 |
| N (county x year) | 1,506 | 1,506 | 1,506 | 1,506 |
| | | | | |
| *C.  P-values on Foreign-U.S. Born Difference* | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.035 | 0.089 | 0.599 | 0.657 |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.119 | 0.236 | 0.177 | 0.002 |

*Notes:*  Estimation sample includes 89 counties spanning 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Each column in Panels A and B presents estimates of the difference-in-differences coefficients in model (2), which also includes county and state-by-year fixed effects.  *p*-values in Panel C correspond to coefficients on the triple interactions between the grouped event-year indicators, the application rate, and a foreign-born Mexican indicator in a stacked and fully interacted (with the foreign-born indicator) version of model (2). Estimates are weighted by average annual births to mothers in the pre-IRCA period. Standard errors (in parentheses) are clustered on county.

000238

**Table 3. Difference-in-Differences Estimates for the Composition and Number of Births**

| | | | | Dependent variable: | | | Scaled by # Pre-IRCA Births: | |
|---|---|---|---|---|---|---|---|---|
| | Father Reported | Sh. 1st Birth | Sh. 3rd + Birth | Maternal Age | Male Birth | Multiple Birth | # Births | # Spon. wives |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| *A. Mexico-Born Mothers* | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.0952 (0.0300) | -0.0608 (0.0219) | 0.136 (0.0338) | 2.155 (0.453) | -0.0197 (0.0118) | -0.0004 (0.0067) | -0.250 (0.454) | -0.0869 (0.0274) |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.231 (0.117) | 0.333 (0.253) | -0.085 (0.149) | 2.679 (0.436) | -0.0045 (0.0119) | -0.0068 (0.0068) | 0.766 (0.625) | 0.205 (0.110) |
| *p*: 1987-93 = 1993-99 | 0.142 | 0.115 | 0.192 | 0.101 | 0.165 | 0.0489 | 0.062 | 0.011 |
| R-square | 0.827 | 0.692 | 0.776 | 0.983 | 0.166 | 0.174 | 0.802 | 0.732 |
| N (county x year) | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 | 1,513 |
| *B. U.S. Born Mexican-Ethnic Mothers* | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | -0.0198 (0.0268) | -0.0131 (0.0205) | 0.0004 (0.0272) | 0.236 (0.840) | -0.0057 (0.0089) | 0.0051 (0.0062) | 0.318 (0.418) | - |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.0960 (0.0831) | 0.152 (0.141) | -0.0456 (0.0700) | 1.002 (1.100) | 0.0099 (0.0138) | -0.0055 (0.0080) | 0.0201 (0.271) | - |
| *p*: 1987-93 = 1993-99 | 0.121 | 0.235 | 0.592 | 0.0248 | 0.209 | 0.141 | 0.163 | - |
| R-square | 0.840 | 0.831 | 0.853 | 0.980 | 0.150 | 0.263 | 0.824 | - |
| N (county x year) | 1,506 | 1,506 | 1,506 | 1,506 | 1,506 | 1,506 | 1,506 | - |
| *C. P-values on Foreign-U.S. Born Difference* | | | | | | | | |
| Aug. 1987 - July 1993  (=1) x Application rate | 0.0003 | 0.193 | 0.0002 | 0.017 | 0.359 | 0.584 | 0.082 | - |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.090 | 0.458 | 0.772 | 0.079 | 0.425 | 0.886 | 0.242 | - |

*Notes:* See Table 2.

000239

**Table 4. Difference-in-Differences Estimates for Birthweight:**
**Raw and Adjusted for Changes in Composition**

| | Dependent variable: | | | |
| --- | --- | --- | --- | --- |
| | | Birthweight adjusted for: | | |
| | Birthweight (raw) | Fertility variables[a] | + Father present | + Early prenatal care |
| | (1) | (2) | (3) | (4) |
| | *A.  Mexico-Born Mothers* | | | |
| Aug. 1987 - July 1993 (=1) | 95.55 | 64.78 | 58.46 | 73.70 |
| x Application rate | (39.17) | (37.98) | (36.76) | (32.87) |
| Aug. 1993 - July 1999 (=1) | 165.4 | 165.9 | 149.3 | 177.0 |
| x Application rate | (75.22) | (74.27) | (68.50) | (71.83) |
| | | | | |
| *p*: 1987-93 = 1993-99 | 0.098 | 0.050 | 0.060 | 0.055 |
| R-square | 0.617 | 0.663 | 0.645 | 0.656 |
| N (county x year) | 1,513 | 1,513 | 1,513 | 1,512 |
| | *B.  U.S. Born Mexican-Ethnic Mothers* | | | |
| Aug. 1987 - July 1993 (=1) | 12.14 | 10.08 | 12.89 | 16.81 |
| x Application rate | (39.45) | (34.05) | (34.63) | (35.00) |
| Aug. 1993 - July 1999 (=1) | 49.20 | 30.40 | 25.07 | 39.05 |
| x Application rate | (75.84) | (69.69) | (65.75) | (71.40) |
| | | | | |
| *p*: 1987-93 = 1993-99 | 0.432 | 0.636 | 0.757 | 0.635 |
| R-square | 0.638 | 0.674 | 0.672 | 0.666 |
| N (county x year) | 1,506 | 1,506 | 1,506 | 1,506 |
| | *C.  P-values on Foreign-U.S. Born Difference* | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.035 | 0.205 | 0.304 | 0.166 |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.119 | 0.047 | 0.057 | 0.037 |

*Notes:*  Estimation sample includes 89 counties spanning 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX).  Each column in Panels A and B presents estimates of the difference-in-differences coefficients in model (2), which also includes county and state-by-year fixed effects.  *p*-values in Panel C correspond to coefficients on the triple interactions between the grouped event-year indicators, the application rate, and a foreign-born Mexican indicator in a stacked and fully interacted (with the foreign-born indicator) version of model (2). The dependent variable in column 1 is raw birthweight (in grams). The dependent variables in columns 2-4 are adjusted birthweights, differences between raw birthweight and birthweight predicted based on the characteristics indicated using natality microdata limited to the pre-IRCA period. Estimates are weighted by average annual births to mothers in the pre-IRCA period.  Standard errors (in parentheses) are clustered on county.
[a] A cubic in maternal age and indicators for second or third or higher parity, male, and multiple birth.

*Online Appendices (Not for Publication)*
**The Intergenerational Effects of Permanent Legal Status**

Elizabeth U. Cascio
Paul Cornell
Ethan Lewis

June 2024

**Appendix A.  Data**

**I.     Treatment Variable**

*A.     Legalization Applications Processing System (LAPS) data*

The SAW and GLP admissions that enter the numerator of the legalization ratio were taken from the Legalization Applications Processing System (LAPS), available from the National Archives. These public-use microdata consist of selected fields from anonymized records from all forms I-687 (application for temporary legal status under IRCA's general legalization program, spilt across two files) and forms I-700 (application for temporary legal status under IRCA's SAW program) received by the Immigration and Naturalization Service (INS), consisting of 3,040,948 records in total.

These fields describe some outcomes of the application process, including whether and when a Green Card was awarded, through the end of the 1992 fiscal year.[1] These fields also include the applicant's age, sex, country of birth, and state and county of intended residence within the U.S. (current U.S. address) all at the time of application.  They can thus be used to create a count of the number of Mexican women admitted under the legalization programs born roughly between 1944 and 1972, the numerator of our treatment measure, by county.

*B.     Total Count of Mexicans*

The denominator of the treatment is the sum of the foreign-born Mexican women born 1944 to 1974 estimated from the 1990 Census PUMS (Ruggles et al., 2022).  The sample is limited to women residing in identified counties.  We estimate birth year as 1990-age-1, given the Census date of April 1.

*C.     Mexican Population in 1980*

We measure the share of the Mexican population that was unauthorized in 1980 using a combination of data sources.  First, we estimate the total number of Mexican females born between 1944 and 1972, our target demographic, in the 1980 Census PUMS (Ruggles et al., 2020).  This is the denominator.  To estimate the number of unauthorized Mexicans, we subtract from this total the set of Mexicans who are legally authorized (and who are in this target demographic), either citizens or LPRs.  We first estimate the number of Mexicans who are citizens again using the 1980 Census PUMS.  The 1980 LPR count is estimated with the immigrant "registry" described next.

*C.     Alien Address Reports*

To estimate the number of Mexican LPRs living in the U.S. in 1980, we turn to microdata on LPRs in 1980 available in the *Alien Address Reports, [United States], 1980 Public Use File*, available at ICPSR, also known as the immigrant registry.  These public-use microdata consist of selected fields from anonymized records of registered aliens in the U.S. in 1980 (collected as part

---

[1] Statistics on IRCA admissions through fiscal year 2001, reported in Rytina (2002), show that nearly all IRCA admissions had occurred by the end of the 1992 fiscal year.

of the INS's alien address reporting program).  LPRs are separately identified.  The fields include country of birth and state and zip code of residence within the U.S., which we map to counties.  It also contains age and sex, which allows us to construct the Mexican LPR count for our target demographic.

Combined with the Census data (I.C) we then have enough information to compute the number of Mexican females who are not authorized, as a share of the total number of Mexican females, in 1980.

## II.    Outcomes Data

### A.    *Natality Detail Public Use Files*

Our main outcomes are constructed from the *Detail Natality Public Data Tape*s (U.S. Department of Health and Human Services, National Center for Health Statistics, various years) for 1982 through 1999.  We obtained these data through the NBER.[2]

### B.    *Immigrants Admitted to the United States*

We calculate admission of sponsored wives by county from *Immigrants Admitted to the United States* microdata, available on ICPSR, for fiscal years 1983-1997 (United States Department of Justice, Immigration and Naturalization Service, various years) and 1999 (United States Department of Justice, Immigration and Naturalization Service, various years) and from the National Archives file for fiscal year 1998.  In table source notes, we refer to these files collectively as *Immigrants Admitted to the United States* (1983-1998). These data provide selected fields from anonymized records for Green Card admissions under all programs except the GLP and the SAW program.  These fields include detailed class of admission (identifying the relevant program), month and year of admission, country of birth, age, zip code of residence at the time of admission (through 1998), marital status, and sex.  Specifically, these data identify Mexican-born women who are either (1) married and admitted by a Green Card holding sponsor or (2) citizen-sponsored spouses.[3]  The sum these two gives our total count of Mexican wives who are admitted on a family-sponsored visa.

## III.    References

### A.    *Legalization Application Processing System Data*

Department of Justice. Immigration and Naturalization Service. Office of Strategic Planning. Statistics Division. 1991-1995.  *1992 Legalization Summary Public Use Tape: Application Form I-687 Data File for California*.  Distributed by the United States National Archives, https://catalog.archives.gov/id/1315257.

---

[2] https://www.nber.org/research/data/vital-statistics-natality-birth-data

[3] The former is needed to proxy for Green Card sponsored spouses in the 1999 public use data (used in Figure 1), which only identifies a broader category of Green Card sponsored wives and children (technically called the "family second preference" visa category.). As it turns out, in all other years, the number of married spouses in this category is nearly identical or identical to the actual number of Green Card sponsored spouses.

Department of Justice. Immigration and Naturalization Service. Office of Strategic Planning. Statistics Division. 1991-1995. *1992 Legalization Summary Public Use Tape: Application Form I-687 Data File for States Other Than California.*  Distributed by the United States National Archives, https://catalog.archives.gov/id/1315263.

Department of Justice. Immigration and Naturalization Service. Office of Strategic Planning. Statistics Division. 1991-1995. *1992 Legalization Summary Public Use Tape: Application Form I-700 Data File.*  Distributed by the United States National Archives, https://catalog.archives.gov/id/1315265.

B.    *Natality Detail Public Use Data*

U.S. Department of Health and Human Services, National Center for Health Statistics.  *1982 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, November 1984.

----. *1983 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, August 1985.

----. *1984 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, June 1986.

----. *1985 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, June 1987.

----. *1986 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, June 1988.

----. *1987 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, June 1989.

----. *1988 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, August 1990.

----. *1989 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, August 1991.

----. *1990 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, April 1993.

----. *1991 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, August 1993.

----. *1992 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, September 1994.

----. *1993 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, October 1995.

----. *1994 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, October 1996.

----. *1995 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, September 1997.

----. *1996 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, July 1998.

----. *1997 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland, May 1999.

----. *1998 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland.

----. *1999 Detail Natality Public Use Data Tape.*  Hyattsville, Maryland.

C.      *Immigrants Admitted to the United States.*

----. *Immigrants Admitted to the United States, 1983*. Inter-university Consortium for Political and Social Research [distributor], 2010-04-02. https://doi.org/10.3886/ICPSR08963.v2

----. *Immigrants Admitted to the United States, 1984*. Inter-university Consortium for Political and Social Research [distributor], 2010-04-02. https://doi.org/10.3886/ICPSR08964.v2

----. *Immigrants Admitted to the United States, 1985*. Inter-university Consortium for Political and Social Research [distributor], 2010-04-07. https://doi.org/10.3886/ICPSR08965.v2

----. *Immigrants Admitted to the United States, 1986*. Inter-university Consortium for Political and Social Research [distributor], 2010-04-07. https://doi.org/10.3886/ICPSR08966.v2

----. *Immigrants Admitted to the United States, 1987*. Inter-university Consortium for Political and Social Research [distributor], 2010-04-19. https://doi.org/10.3886/ICPSR09268.v2

----. *Immigrants Admitted to the United States, 1988*. Inter-university Consortium for Political and Social Research [distributor], 2010-05-12. https://doi.org/10.3886/ICPSR09269.v2

----. *Immigrants Admitted to the United States, 1989*. Inter-university Consortium for Political and Social Research [distributor], 2010-05-13. https://doi.org/10.3886/ICPSR06161.v2

----. *Immigrants Admitted to the United States, 1990*. Inter-university Consortium for Political and Social Research [distributor], 2010-05-14. https://doi.org/10.3886/ICPSR06164.v2

----. *Immigrants Admitted to the United States, 1991*. Inter-university Consortium for Political and Social Research [distributor], 2010-08-24. https://doi.org/10.3886/ICPSR06165.v2

----. *Immigrants Admitted to the United States, 1992*. Inter-university Consortium for Political and Social Research [distributor], 2010-08-26. https://doi.org/10.3886/ICPSR06449.v2

----. *Immigrants Admitted to the United States, 1993-1995*. [distributor], 2007-01-17. https://doi.org/10.3886/ICPSR02267.v1

----. *Immigrants Admitted to the United States, 1996*. Inter-university Consortium for Political and Social Research [distributor], 2010-09-17. https://doi.org/10.3886/ICPSR02534.v2

----. *Immigrants Admitted to the United States, 1997*. Inter-university Consortium for Political and Social Research [distributor], 2007-11-05. https://doi.org/10.3886/ICPSR02955.v1

Department of Homeland Security. Management Directorate. Office of Immigration Statistics. *Lawful Immigrant Files, Fiscal Year 1998.*  Distributed by the United States National Archives, https://catalog.archives.gov/id/1302576.

United States Department of Justice. Immigration and Naturalization Service. *Immigrants Admitted to the United States, 1999*. [distributor], 2008-08-08. https://doi.org/10.3886/ICPSR03485.v2.

000245

*D.*    *Census*

Ruggles, Steven, Sarah Flood, Ronald Goeken, Megan Schouweiler and Matthew Sobek. 2022.
*IPUMS USA: Version 12.0* [dataset]. Minneapol**is**, MN: IPUMS.
https://doi.org/10.18128/D010.V12.0

*E.*    *Alien Address Reports in 1980*

United States Department of Justice. Immigration and Naturalization Service. *Alien Address
Reports, [United States]: 1980 Public Use File*. [distributor], 1992-02-16.
https://doi.org/10.3886/ICPSR07998.v1

## Appendix B.  Further Details on Mechanisms Calculations

### I.    Legalized Share Calculations

One potential explanation for a rising effect of IRCA's legalization programs on birthweight over time (Table 2 Panel A) is a rising IRCA-legalized share among foreign-born Mexican mothers.  The IRCA-legalized share among mothers may have increased due to either increasing fertility among women authorized directly under IRCA's legalization provisions or the influx of family- (specifically husband-) sponsored Mexican wives in the second post-IRCA period (Figure 1, Table 3 Panel A, Figure 7).

To formalize, let $n_t^{legal}$ be the number of births to Mexican IRCA-authorized mothers (including sponsored wives) in period $t$, with $t = 1$ for August 1987 to July 1993 and $t = 2$ for August 1993 to July 1999.  Let $n_t^{tot}$ then represent the total number of births to foreign-born Mexican women in $t$.  The IRCA-legalized share of births in $t = 2$ is then given by:

$$n_2^{legal}/n_2^{tot} = \left(n_1^{legal} + \overline{\Delta}n^{legal} + \Delta n^{legal}\right)/\left(n_1^{tot} + \overline{\Delta}n^{tot} + \Delta n^{tot}\right), \qquad (B1)$$

where $\Delta$ represents the change from $t = 1$ to $t = 2$ attributable to changes in fertility or family reunification stemming from IRCA, and $\overline{\Delta}$ represents the change from $t = 1$ to $t = 2$ that would have happened for the cohort of interest in the absence of fertility or family reunification effects, due to aging and baseline differences in fertility between IRCA-legalized mothers and other foreign-born Mexican women.

Given (B1), how much of the rising birthweight effect can we explain through changes in the legalized share among mothers, stemming from fertility or family reunification effects of IRCA?  The answer depends on: (1) the number of marginal births in $t = 2$ attributable to IRCA (i.e., $\Delta n^{tot}$); (2) how much Mexican women legalized due to IRCA (either directly, through the GLP or SAW program, or indirectly, through family-sponsorship) contributed to the marginal births (i.e., the relationship between $\Delta n^{tot}$ and $\Delta n^{legal}$); (3) how the raw number of births overall and the raw number of births to IRCA-legalized mothers would have changed between $t = 1$ and $t = 2$ in the absence of fertility or family reunification effects (i.e., the values of $\overline{\Delta}n^{legal}$ and $\overline{\Delta}n^{tot}$); and (4) the initial legalized share ($n_1^{legal}/n_1^{tot}$).

Imputations based on sample statistics and the estimates in column 7 of Table 3 Panel A provide an answer to (1):  IRCA's legalization programs increased the number of births to foreign-born Mexican women by 21% in $t = 2$ relative to the number of births that would have happened in the absence of IRCA.  For the purposes of this calculation, we calculate the aggregate number of births across all counties in our sample attributable to IRCA in $t = 2$ ($\Delta n^{tot} = 52,264$).

For (2), we will assume no spillovers, or that the IRCA-legalized population is responsible for all marginal births (i.e., $\Delta n^{legal} = \Delta n^{tot} = 52,264$).  Regarding (3), note that $n_2^{tot} - \Delta n^{tot} = 249,999$, i.e., there would have been about 250,000 births in $t = 2$ if IRCA hadn't had any fertility or family reunification effects.  We can relate this to $n_1^{tot} = 309,249$ to arrive at the

expression $\overline{\Delta}n^{tot} \approx -0.2n_1^{tot}$. We will assume that the number of births to IRCA legalized mothers would have changed by the same proportion, i.e., : $\overline{\Delta}n^{legal} \approx -0.2n_1^{legal}$.

We can relate the number of marginal births to $n_1^{tot}$ as well: $\Delta n^{tot} = \Delta n^{legal} = 0.17n^{tot}$. Substituting this collection of expressions into (B1), we arrive at:

$$n_2^{legal}/n_2^{tot} = \left(n_1^{legal} - 0.2n_1^{legal} + 0.17n_1^{tot}\right)/(n_1^{tot} - 0.2n_1^{tot} + 0.17n_1^{tot})$$

or

$$n_2^{legal}/n_2^{tot} = \left(0.8n_1^{legal} + 0.17n_1^{tot}\right)/0.97n_1^{tot}.$$

or

$$n_2^{legal}/n_2^{tot} = (0.8/0.97)\left(n_1^{legal}/n_1^{tot}\right) + 0.17/0.97. \tag{B2}$$

Assuming that $n_1^{legal}/n_1^{tot} = 0.33$ – the approximate legalized share in our average county (from Table 1 Panel A) – we would conclude that $n_2^{legal}/n_2^{tot} \approx 0.45$. In other words, incorporating the effects of IRCA on fertility and family reunification, the legalization rate among mothers in $t = 2$ would have been about 45%, compared to 33% in $t = 1$. This is a 36% increase, suggesting that increases in the legalization rate alone explain just shy of half of the 73% increase in the birthweight effect estimate between $t = 1$ and $t = 2$.[1]

This back-of-the-envelope calculation has relied on some strong assumptions. First, if legalization did in fact postpone births among affected mothers, the IRCA legalized share in $t = 1$ may have been lower than 33%. Assuming an initial maternal legalization rate of 25%, for example, the maternal legalization rate would have increased to 38% in $t = 2$ , based on (B2) – a 53% increase that would account for the lion's share of the 73% increase in the birthweight effect. In general, the lower the initial ($t = 1$) legalized share among mothers, the more a rising legalized share due to fertility and family reunification effects might explain our estimates. In addition, we have taken point estimates (e.g., for the effect of IRCA's legalization programs on the number of births) as truth when they are in fact noisy estimates. Still, the exercise suggests that a rising legalized share among mothers contributes to our estimates.

## II.     Family Income Calculations

There have been several past studies of the earnings effects of IRCA's legalization programs (Kossoudji and Cobb-Clark, 2002; Amuedo-Dorantes, Bansak, and Raphael, 2007; Pan, 2012; Steigleder and Sparber, 2017). However, the most useful for our purposes is Cascio and Lewis (2019), which estimates IRCA's impacts on both an earnings proxy (adjusted gross income (AGI)) and cash transfers (from the EITC) across the same two periods and using similar identifying variation as the present paper. Cascio and Lewis (2019) find that IRCA's legalization programs increased AGI on the marginal (IRCA LPR-filed) tax return by on average $5,385 between 1988 and 1993 and $8,680 between 1993 and 1999. Their estimates for annual EITC transfers, which are much more precise, are $600 and $1,400 per household for the two

---

[1] Based on our assumptions, we can also calculate $n_2^{legal}/n_2^{tot}$ in the absence of fertility or family reunification effects, i.e., assuming that $\Delta n^{tot} = \Delta n^{legal} = 0$. Under the assumptions that we've made, it is trivial to show that the legalization rate would not have changed: $n_2^{legal}/n_2^{tot} = n_1^{legal}/n_1^{tot}$.

respective periods.[2] The implied effect on total income thus almost doubles across our study period.[3]

How much might average birthweight have risen with income gains like these?  Hoynes, Miller, and Simon (2015) provide a convenient estimate, based on variation from the 1993 EITC expansion:  every $1,000 in (EITC) income increases mean birthweight by 5.9 grams.[4]  The point estimates from these two studies thus imply that income gains from legalization should have raised the average birthweight of children born to Mexican women by about 35 grams between August 1987 to July 1993 and by about 59 grams between August 1993 and July 1999. In other words, income gains account for about a third of our estimates in each period.

---

[2] These estimates come from Table 4 of Cascio and Lewis (2019). Dollar amounts are in 2014 dollars.
[3] Several other studies (Kossoudji and Cobb-Clark, 2002; Amuedo-Dorantes, Bansak, and Raphael, 2007) only present short-term effects on earnings, through 1992. At around 6%, their earnings estimates are not out of line with the Cascio and Lewis (2019) estimates for the 1988 to 1993 period.
[4] Their original estimates are in 2009 dollars, which we convert to 2014 dollars for comparability to the Cascio and Lewis (2019) estimates.

000249

# Appendix Figure 1.
## Event-Study Estimates for Birthweight and Prenatal Care:
## U.S. Born Mexican Ethnic Mothers





*Sources:* Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022).

*Notes:* The unit of observation is a county-event year, and the estimation sample includes a panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to Mexican-ethnic mothers born in the U.S. between 1944 and 1972. Markers represent coefficients on interactions between a county's application rate and event-year indicators in model (1). Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to U.S. born Mexican mothers in a county in the pre-IRCA period (8/82-7/87).

000250

Appendix Figure 2.
Difference in Event-Study Estimates for Birthweight and Prenatal Care:
Foreign versus U.S. Born Mexican Ethnic Mothers





*Sources:* Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022).

*Notes:* The unit of observation is a county-event year, and the estimation sample includes stacked panel data on 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX) for both foreign- and U.S. born Mexican-ethnic models. Markers represent coefficients on interactions between a county's application rate, event-year indicators, and an indicator for foreign-born Mexican mother. Regression includes state-by-event-year-by-foreign born mother fixed effects, state-by-event-year fixed effects, county-by-foreign-born mother fixed effects, county fixed effects, and interactions between the application rate and event-time indicators. Capped vertical lines represent 95%confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to the relevant group of mothers in a county in the pre-IRCA period (8/82-7/87).

## Appendix Figure 3.
## Event-Study Estimates for Mexico-Born Mothers:
## Treatment as Above Median Application Rate



A. Birthweight



B. Prenatal care

*Sources:* Vital Statistics Natality Detail Files, Legalization Applications Processing System, 1990 5% Census PUMS (Ruggles et al., 2022).
*Notes:* The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to mothers born in Mexico between 1944 and 1972.  Markers represent coefficients on interactions between an indicator for whether a county's application rate was at or above the state median and event-year indicators. The regression model also includes county and state-by-event-year fixed effects, as in (1). Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period.

000252

## Appendix Figure 4.
## Robustness of Difference-in-Differences Estimates for Early Prenatal Care





*Notes:* Figures plot coefficient estimates on the interaction terms in model (2) across different specifications and samples. Spec. 1 replaces $a_{c(s)}$ with an indicator for whether county c's application rate was at or above the median in state $s$. Spec. 2 calculates $a_{c(s)}$ using published tabulations of the female Hispanic population. Spec. 3 limits the natality detail data to mothers born 1951-72, while spec. 4 includes mothers aged 16 to 44 regardless of birth cohort. Spec. 5 replaces $a_{c(s)}$ with estimated 1980 unauthorized share in the target population. Spec. 6 limits attention to the 4 highest GLP states (IL, IN, NY, TX). Spec. 7 controls for county-by-event-year-varying per-capita earnings and government transfers. Spec. 8 controls for interactions between the two post-IRCA indicators and average county pre-IRCA early prenatal care among foreign-born Mexican mothers. Spec. 9 residualizes early prenatal are for pre-IRCA linear trends. Throughout, capped vertical lines represent 95% C.I.s, standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period.

# Appendix Figure 5.
# Difference-in-Differences Estimates for Alternative Outcomes:
# U.S. Born Mexican Ethnic Mothers





*Notes:* Figures plot coefficient estimates on the interaction terms in model (2) for different dichotomous outcomes (Panel A) the share of births in each quintile of the pre-IRCA birthweight distribution of Mexico-born mothers (Panel B).  Throughout, capped vertical lines represent 95% C.I.s, standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period.

000254

Appendix Figure 6.
Event-Study Estimates for the Composition of Births:
U.S. Born Mexican Ethnic Mothers



*Sources*: See Figure 3.

*Notes*: The unit of observation is a county-event year, and the estimation sample includes a balanced panel of 89 counties across 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Births limited to Mexican-ethnic mothers born in the U.S. between 1944 and 1972. Markers represent coefficients on interactions between a county's application rate and event-year indicators in model (1). Capped vertical lines represent 95% confidence intervals. Standard errors are clustered on county, and estimates are weighted by average annual births to Mexico-born mothers in a county in the pre-IRCA period (8/82-7/87).

000255

**Appendix Table 1. Descriptive Statistics on Birth Outcomes and Characteristics: Mexican Ethnic Women by Place of Birth and Period**

|  | Pre-IRCA Legalization | | Post-IRCA Legalization | |
|---|---|---|---|---|
|  | Foreign-born | U.S.-born | Foreign-born | U.S.-born |
|  | (1) | (2) | (3) | (4) |
| Birthweight (grams) | 3,368 | 3,303 | 3,367 | 3,320 |
|  | [51.09] | [49.03] | [40.37] | [47.78] |
| Small for gestational age | 0.091 | 0.108 | 0.091 | 0.098 |
|  | [0.020] | [0.020] | [0.016] | [0.019] |
| Low birth weight (=1) | 0.051 | 0.067 | 0.054 | 0.066 |
|  | [0.014] | [0.014] | [0.010] | [0.013] |
| High birth weight (=1) | 0.103 | 0.083 | 0.102 | 0.089 |
|  | [0.023] | [0.021] | [0.020] | [0.021] |
| Early prenatal care | 0.313 | 0.384 | 0.407 | 0.551 |
|  | [0.116] | [0.079] | [0.119] | [0.123] |
| Adequate prenatal care (Kessner) | 0.107 | 0.170 | 0.157 | 0.277 |
|  | [0.026] | [0.054] | [0.071] | [0.105] |
| Male | 0.512 | 0.510 | 0.511 | 0.509 |
|  | [0.026] | [0.025] | [0.020] | [0.024] |
| Multiple | 0.0177 | 0.0174 | 0.020 | 0.021 |
|  | [0.011] | [0.008] | [0.008] | [0.010] |
| First birth | 0.319 | 0.371 | 0.272 | 0.283 |
|  | [0.037] | [0.034] | [0.075] | [0.063] |
| Mother's age | 25.54 | 24.13 | 27.89 | 27.25 |
|  | [0.74] | [0.63] | [1.78] | [2.19] |
| Father on birth certificate | 0.892 | 0.813 | 0.881 | 0.85 |
|  | [0.070] | [0.065] | [0.052] | [0.060] |

*Sources:* Vital Statistics Natality Detail Files, 1992 to 1999

*Notes:* Estimation sample includes 89 counties spanning 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX). Estimates are weighted by average annual births in the pre-IRCA period. Pre-IRCA legalization is defined as August 1982 through July 1987. Post-IRCA legalization is defined as August 1987 to July 1999. Standard deviations are in square brackets.

000256

**Appendix Table 2. 1980 Census Characteristics:  Pre-IRCA Means and Relationship with the Application Rate**

|  | Mean [sd] | Coef. (se) on application rate |
|---|---|---|
|  | (1) | (2) |
| High school degree + | 0.252 | -0.240 |
|  | [0.075] | (0.123) |
| Years of education | 7.585 | -0.675 |
|  | [0.910] | (1.883) |
| In the labor force | 0.486 | -0.051 |
|  | [0.088] | (0.157) |
| Employed | 0.439 | -0.0547 |
|  | [0.080] | (0.155) |
| Age | 29.99 | -9.184 |
|  | [1.339] | (1.942) |
| Married | 0.742 | 0.177 |
|  | [0.055] | (0.067) |
| Wage and salary income ($1980) | 2,810 | 909.8 |
|  | [924.9] | (1,024) |

*Sources:*  1980 5% Census PUMS (Ruggles et al., 2023).
*Notes:*  Underlying Census data limited to foreign-born Mexican women ages 19 to 44 in 1980.  Estimation sample includes 89 counties spanning 8 states (CO, FL, IL, IN, NJ, NY, OH, and TX).  Estimates are weighted by average annual births to Mexico-born mothers in the pre-IRCA period.  Regressions in column (2) include state fixed effects; standard errors (in parentheses) are heteroskedasticity-robust.

000257

**Appendix Table 3. Difference-in-Differences Estimates for Birthweight Shown in Figure 4**

| | 1. Above/below median | 2. Alt. denom. | 3. 1951-72 cohorts | 4. Ages 16-44 | 5. Share unauth | 6. High GLP | 7. Earnings and transfers | 8. Pre BW x post | 9. Detrended |
|---|---|---|---|---|---|---|---|---|---|
| *Specification* | | | | | | | | | |
| *Treatment* | =1 if above state median application rate | Denominator from published Census tabulations | Application rate | Application rate | Unauthorized share, 1980 | Application rate | Application rate ln per capita earnings, ln per capita transfers | Application rate Pre-IRCA early PNC x post indicators | Application rate Linear pre-IRCA trend |
| *Additional controls* | None | None | None | None | None | None | Application rate | Application rate | Application rate |
| *Sample* | Original | Original | 1951-72 cohorts | Ages 16-44 | Original | IL, IN, NY, TX | Original | Original | Original |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| *A. Mexico-Born Mothers* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | 19.52 (8.189) | 95.89 (39.17) | 96.01 (36.02) | 85.45 (40.16) | 113.3 (26.89) | 112.8 (50.01) | 90.12 (35.03) | 109.6 (30.84) | 114.0 (77.82) |
| Aug. 1993 - July 1999 (=1) x Treatment | 39.51 (16.46) | 162.6 (76.36) | 163.9 (71.16) | 108.9 (76.65) | 205.5 (60.25) | 204.8 (95.20) | 150.4 (67.61) | 191.1 (57.76) | 203.9 (166.01) |
| $p$: 1987-93 = 1993-99 | 0.045 | 0.123 | 0.099 | 0.560 | 0.041 | 0.080 | 0.140 | 0.023 | 0.322 |
| R-square | 0.628 | 0.615 | 0.62 | 0.661 | 0.657 | 0.646 | 0.620 | 0.673 | 0.623 |
| N (county x year) | 1,513 | 1,513 | 1,513 | 1,513 | 1,326 | 884 | 1,513 | 1,513 | 1,513 |
| *B. U.S.-Born Mexican Ethnic Mothers* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | 5.199 (6.980) | 9.555 (42.34) | 8.309 (42.11) | -2.344 (43.04) | 7.602 (31.62) | 2.173 (43.36) | 7.552 (40.10) | 18.34 (37.61) | -90.2 (55.94) |
| Aug. 1993 - July 1999 (=1) x Treatment | 12.36 (13.07) | 46.25 (80.46) | 47.49 (75.79) | 0.409 (82.17) | 11.62 (57.62) | 33.61 (84.31) | 35.51 (75.72) | 59.12 (70.74) | -155.3 (136.70) |
| $p$: 1987-93 = 1993-99 | 0.386 | 0.454 | 0.396 | 0.952 | 0.916 | 0.552 | 0.565 | 0.374 | 0.447 |
| R-square | 0.639 | 0.638 | 0.643 | 0.669 | 0.648 | 0.64 | 0.640 | 0.642 | 0.651 |
| N (county x year) | 1,506 | 1,506 | 1,506 | 1,507 | 1,323 | 882 | 1,506 | 1,506 | 1,506 |
| *C. P-values on Foreign-U.S. Born Difference* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | 0.048 | 0.038 | 0.051 | 0.027 | 0.0002 | 0.023 | 0.033 | 0.004 | 0.041 |
| Aug. 1993 - July 1999 (=1) x Treatment | 0.072 | 0.128 | 0.131 | 0.135 | 0.0003 | 0.058 | 0.106 | 0.064 | 0.114 |

*Sources and notes:* See Figure 4.

000258

**Appendix Table 4. Difference-in-Differences Estimates for Early Prenatal Care Shown in Appendix Figure 4**

| | 1. Above/below median | 2. Alt. denom. | 3. 1951-72 cohorts | 4. Ages 16-44 | 5. Share unauth | 6. High GLP | 7. Earnings and transfers | 8. Pre PNC x post | 9. Detrended |
|---|---|---|---|---|---|---|---|---|---|
| **Specification** | | | | | | | | | |
| Treatment | =1 if above state median application rate | Application rate | Application rate | Application rate | Application rate | Application rate | Application rate | Application rate | Application rate |
| Additional controls | None | Denominator from published Census tabulations | None | None | Unauthorized share, 1980 | None | ln per capita earnings, ln per capita transfers | Pre-IRCA early PNC x post indicators | Linear pre-IRCA trend |
| Sample | Original | Original | 1951-72 cohorts | Ages 16-44 | None | IL, IN, NY, TX | Original | Original | Original |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
| *A. Mexico-Born Mothers* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | -0.00188 (0.0404) | -0.0858 (0.189) | -0.0742 (0.185) | -0.0709 (0.185) | 0.106 (0.146) | -0.101 (0.227) | -0.121 (0.153) | -0.0361 (0.126) | -0.165 (0.267) |
| Aug. 1993 - July 1999 (=1) x Treatment | 0.0852 (0.0664) | 0.246 (0.288) | 0.240 (0.284) | 0.284 (0.299) | 0.488 (0.271) | 0.310 (0.362) | 0.182 (0.206) | 0.301 (0.257) | 0.044 (0.421) |
| $p$: 1987-93 = 1993-99 | 0.008 | 0.055 | 0.058 | 0.044 | 0.019 | 0.048 | 0.034 | 0.055 | 0.297 |
| R-square | 0.836 | 0.822 | 0.820 | 0.791 | 0.845 | 0.828 | 0.836 | 0.849 | 0.825 |
| N (county x year) | 1,512 | 1,512 | 1,512 | 1,512 | 1,326 | 884 | 1,512 | 1,512 | 1,512 |
| *B. U.S. Born Mexican Ethnic Mothers* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | -0.0168 (0.0225) | -0.141 (0.112) | -0.124 (0.112) | -0.147 (0.112) | 0.0405 (0.0965) | -0.133 (0.122) | -0.131 (0.104) | -0.0892 (0.0822) | -0.074 (0.222) |
| Aug. 1993 - July 1999 (=1) x Treatment | 0.00746 (0.0237) | -0.0306 (0.113) | -0.0324 (0.111) | -0.166 (0.133) | 0.0164 (0.0900) | -0.0492 (0.122) | -0.0363 (0.0828) | -0.0257 (0.111) | 0.049 (0.347) |
| $p$: 1987-93 = 1993-99 | 0.134 | 0.212 | 0.300 | 0.841 | 0.764 | 0.4 | 0.261 | 0.310 | 0.422 |
| R-square | 0.908 | 0.907 | 0.908 | 0.848 | 0.911 | 0.915 | 0.909 | 0.914 | 0.91 |
| N (county x year) | 1,506 | 1,506 | 1,506 | 1,507 | 1,323 | 882 | 1,506 | 1,506 | 1,506 |
| *C. P-values on Foreign-U.S. Born Difference* | | | | | | | | | |
| Aug. 1987 - July 1993 (=1) x Treatment | 0.482 | 0.571 | 0.592 | 0.411 | 0.468 | 0.792 | 0.907 | 0.373 | 0.607 |
| Aug. 1993 - July 1999 (=1) x Treatment | 0.113 | 0.189 | 0.189 | 0.035 | 0.023 | 0.199 | 0.170 | 0.067 | 0.986 |

*Sources and notes:*  See Appendix Figure 4.

000259

**Appendix Table 5. Difference-in-Differences Estimates for Alternative Birthweight Measures and Gestational Age**

| | Low Birthweight | Very low Birthweight | Small for Gestational Age | High Birthweight | Full-term | Very Preterm |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| *A. Mexico-Born Mothers* | | | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.00841 (0.00860) | -0.00213 (0.00443) | -0.00905 (0.0210) | 0.0624 (0.0206) | -0.00440 (0.0241) | 0.00467 (0.0121) |
| Aug. 1993 - July 1999 (=1) x Application rate | -0.00205 (0.0145) | 0.00189 (0.00313) | -0.0237 (0.0171) | 0.0999 (0.0414) | 0.0174 (0.0275) | -0.00132 (0.0149) |
| *p*: 1987-93 = 1993-99 | 0.220 | 0.215 | 0.217 | 0.132 | 0.212 | 0.528 |
| R-square | 0.252 | 0.207 | 0.465 | 0.520 | 0.260 | 0.222 |
| N (county x year) | 1,513 | 1,513 | 1,512 | 1,513 | 1,512 | 1,512 |
| *B. U.S. Born Mexican-Ethnic Mothers* | | | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.00935 (0.0124) | -0.00140 (0.00316) | -0.0112 (0.0176) | 0.0235 (0.0160) | -0.0288 (0.0173) | 0.0155 (0.00962) |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.00766 (0.0191) | -0.00409 (0.00536) | -0.0144 (0.0137) | 0.0207 (0.0325) | -0.00740 (0.0365) | 0.000715 (0.0243) |
| *p*: 1987-93 = 1993-99 | 0.897 | 0.438 | 0.806 | 0.903 | 0.459 | 0.376 |
| R-square | 0.261 | 0.208 | 0.520 | 0.546 | 0.319 | 0.262 |
| N (county x year) | 1,506 | 1,506 | 1,505 | 1,506 | 1,505 | 1,505 |
| *C. P-values on Foreign-U.S. Born Difference* | | | | | | |
| Aug. 1987 - July 1993 (=1) x Application rate | 0.943 | 0.902 | 0.904 | 0.0295 | 0.155 | 0.414 |
| Aug. 1993 - July 1999 (=1) x Application rate | 0.543 | 0.325 | 0.636 | 0.0182 | 0.413 | 0.926 |

*Sources and notes*:  See Figure 5.

000260

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE



A
CBO
PAPER



*A Series on Immigration*

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

**DECEMBER 2007**

000261

Pub. No. 2500

000262



# The Impact of
# Unauthorized Immigrants on the
# Budgets of State and Local Governments

December 2007

The Congress of the United States ■ Congressional Budget Office

000263



# Preface

**A**ccording to available estimates, there are about 12 million unauthorized immigrants in the United States. Federal, state, and local governments spend public funds that benefit those immigrants, and those immigrants pay individual income, sales, and property taxes. Most available studies conclude that the unauthorized population pays less in state and local taxes than it costs state and local governments to provide services to that population. However, those estimates have significant limitations; they are not a suitable basis for developing an aggregate national effect across all states.

This paper, requested by the Chairman and Ranking Member of the Senate Finance Committee, is one of several reports prepared by the Congressional Budget Office (CBO) that present facts and research on immigration. The paper focuses on the estimated costs that certain state and local governments incur for providing various services—especially those related to education, health care, and law enforcement—to unauthorized immigrants. It also looks at the estimated taxes those individuals pay and at certain types of federal assistance that are available to states to help provide such services. In keeping with CBO's mandate to provide objective, nonpartisan analysis, the paper makes no recommendations.

Melissa Merrell of CBO's State and Local Government Cost Estimates Unit wrote the paper under the supervision of Peter Fontaine, Theresa Gullo, and Robert Sunshine. Douglas Hamilton is the coordinator of CBO's series of reports on immigration. Raymond J. Hall and Eric Schatten reviewed the manuscript for factual accuracy, and Lauren McMahon provided research assistance. David Brauer, Patrice Gordon, Arlene Holen, Leo Lex, Noah Meyerson, Robert Murphy, Paige Piper/Bach, Lisa Ramirez-Branum, Eric Rollins, Ralph Smith, Shinobu Suzuki, and G. Thomas Woodward provided comments on early drafts of the paper, as did Paul Cullinan and Donald B. Marron (both formerly of CBO), and Alan Auerbach of the University of California, Berkeley. (The assistance of external reviewers implies no responsibility for the final product, which rests solely with CBO.)

Loretta Lettner edited the paper, and Christine Bogusz proofread it. Maureen Costantino prepared the paper for publication and designed the cover. Lenny Skutnik printed the initial copies, Linda Schimmel coordinated the print distribution, and Simone Thomas produced the electronic version for CBO's Web site (www.cbo.gov).

Peter R. Orszag
Director

December 2007

000266

# Contents

**Introduction**                                                                                      1

**The Budgetary Effects of Unauthorized Immigrants**                                                  2

**Size and Characteristics of the Unauthorized Population**                                           3

**Spending by State and Local Governments**                                                           7

    Education                                                                      7

    Health Care                                                                    8

    Law Enforcement                                                                9

**Revenues Versus Spending**                                                                          9

**Federal Assistance**                                                                                10

    Education                                                                      10

    Health Care                                                                    11

    Law Enforcement                                                                12

**Bibliography**                                                                                      13


**Box**

    1.   The Challenges of Estimating an Aggregate Effect                           4

# The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments

## Introduction

Over the past two decades, most efforts to estimate the fiscal impact of immigration in the United States have concluded that, in aggregate and over the long term, tax revenues of all types generated by immigrants—both legal and unauthorized—exceed the cost of the services they use.[1, 2] Generally, such estimates include revenues and spending at the federal, state, and local levels.[3] However, many estimates also show that the cost of providing public services to unauthorized immigrants at the state and local levels exceeds what that population pays in state and local taxes. It is important to note, though, that currently available estimates have significant limitations;

therefore, using them to determine an aggregate effect across all states would be difficult and prone to considerable error.

The impact of unauthorized immigrants on the federal budget differs from that population's effect on state and local budgets primarily because of the types of services provided at each level of government and the rules governing those programs. For instance, most unauthorized immigrants are prohibited from receiving many of the benefits that the federal government provides through Social Security and such need-based programs as Food Stamps, Medicaid (other than emergency services), and Temporary Assistance for Needy Families. At the same time, the federal government requires that state and local governments provide certain services to individuals, regardless of their immigration status or ability to pay, in order for those states or localities to participate in some of its assistance programs. Various court decisions also restrict the authority of state and local governments to avoid or constrain the cost of providing services to unauthorized immigrants who reside in their jurisdictions. In general, state and local governments bear much of the cost of providing certain public services—especially services related to education, health care, and law enforcement—to individuals residing in their jurisdictions. Such programs constitute a major portion of those governments' annual expenditures, but spending by state and local governments on services specifically provided to unauthorized immigrants makes up a small percentage of those governments' total spending.

Another factor that affects state and local spending is the extent to which the unauthorized population uses certain public services. For example, because unauthorized immigrants are less likely to have health insurance, they are

---

1. The term "unauthorized immigrants" refers to foreign citizens residing in the United States illegally. It applies to two categories of immigrants: those who enter the country without approval of the immigration process and those who violate the terms of a temporary admission without acquiring either permanent resident status or temporary protection from removal. Members of this population are also referred to as illegal or undocumented immigrants or aliens.

2. See Ronald D. Lee and Timothy W. Miller, "The Current Fiscal Impact of Immigrants and Their Descendants: Beyond the Immigrant Household," in James P. Smith and Barry Edmonston, eds., *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1998); James P. Smith and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, D.C.: National Academies Press, 1997); Georges Vernez and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996); and George Vernez and Kevin F. McCarthy, *Immigration in a Changing Economy: California's Experience* (Santa Monica, Calif.: RAND Corporation, 1998).

3. Typically, the estimates measure the costs and revenues attributed to immigrants during a specific period of time, usually one fiscal year.

more likely to rely on emergency facilities or public hospitals for treatment of nonemergency illnesses and other health-related problems. In 2000 and 2001, researchers from the RAND Corporation and the University of California surveyed immigrants in Los Angeles County and found that 65 percent of those respondents who identified themselves as unauthorized had no health insurance in the two years preceding the survey.[4] In a separate study, the Pew Hispanic Center estimated that in 2004, more than 50 percent of those children who were themselves unauthorized immigrants and almost 60 percent of adult unauthorized immigrants were uninsured. Moreover, 25 percent of those children who, by virtue of their birth, were U.S. citizens—but whose parents were unauthorized immigrants—also lacked health insurance.[5] In terms of public education, unauthorized immigrants who are minors increase the overall number of students attending public schools, and they may also require more educational services than do native-born children because of a lack of proficiency in English. Analyses from several states indicate that the costs of educating students who did not speak English fluently were 20 percent to 40 percent higher than the costs incurred for native-born students.[6, 7]

In addition to differences in the types of services that federal, state, and local governments provide and the extent to which the unauthorized population participates in those programs, the income that unauthorized immigrants earn and the taxes they pay also contribute to their net impact on state and local budgets. Unauthorized immigrants typically earn less than do native-born citizens and other immigrant groups and, partly as a result, they also pay a smaller portion of their income in taxes.

One study conducted by analysts at the Urban Institute found that in 1998, unauthorized immigrants in New York State paid an average of 15 percent of their income in federal, state, and local taxes; other immigrant groups paid between 21 percent and 31 percent.[8] The average household income for unauthorized families is significantly less than that of both legal immigrants and native-born citizens; therefore, that income is taxed at a lower rate than the income of other groups. The Pew Hispanic Center estimates that in 2004, the average annual income for unauthorized families was $27,400, compared with $47,800 for legal immigrant families and $47,700 for native-born families.[9]

A related effect is that lower-paying jobs also result in unauthorized immigrants' having less disposable income to spend on purchases subject to sales or use taxes. State and local governments typically rely more heavily on revenues from those and other sources (such as property taxes) than revenues generated by taxes on income.[10]

## The Budgetary Effects of Unauthorized Immigrants

In preparing its analysis, the Congressional Budget Office (CBO) reviewed 29 reports published over the past 15 years that attempted to evaluate the impact of unauthorized immigrants on the budgets of state and local governments. (See the bibliography for a complete list of those reports.) CBO did not assess the data underlying those estimates or the validity of the models used to prepare them. The estimates—whether from formal studies, analyses of data on particular topics, or less-formal inquiry—show considerable consensus regarding the

---

4.  See Dana P. Goldman, James P. Smith, and Neeraj Sood, "Legal Status and Health Insurance Among Immigrants," *Health Affairs,* vol. 24, no. 6 (2005), pp. 1640–1653, available at http://content.healthaffairs.org/cgi/reprint/24/6/1640.

5.  See Jeffrey S. Passel, *Unauthorized Migrants: Numbers and Characteristics* (background briefing prepared for the Task Force on Immigration and America's Future, Washington, D.C., Pew Hispanic Center, June 14, 2005), available at http://pewhispanic.org/files/reports/46.pdf.

6.  See Jose Cardenas and others, *Bilingual Education Cost Analysis* (San Antonio: Intercultural Development Research Association, 1976).

7.  See Albert Cortez, *Insufficient Funding for Bilingual Education in Texas,* IDRA Newsletter (San Antonio: Intercultural Development Research Association, 2004).

8.  See Jeffrey S. Passel and Rebecca L. Clark, *Immigrants in New York: Their Legal Status, Incomes, and Taxes* (Washington, D.C.: Urban Institute, 1998).

9.  See Passel, *Unauthorized Migrants.*

10. According to data from the Bureau of the Census, in 2005, almost 60 percent of revenue collected by state governments (excluding intergovernmental transfers) came from two sources: general sales taxes and certain taxes on business profits (35 percent) and individual income taxes (25 percent). For local governments, property taxes made up the largest source of revenue (45 percent), while general sales taxes accounted for about 10 percent and individual income taxes represented about 3 percent. See Bureau of the Census, *Federal, State, and Local Governments: State and Local Government Finances: 2004–05,* "State and Local Summary Tables by Level of Government," available at www.census.gov/govs/www/estimate05.html.

overall impact of unauthorized immigrants on state and local budgets. However, the scope and analytical methods of the studies vary, and the reports do not provide detailed or consistent enough data to allow for a reliable assessment of the aggregate national effect of unauthorized immigrants on state and local budgets. (See Box 1 for a discussion of the challenges of estimating such an aggregate effect). After reviewing the estimates, CBO drew the following conclusions:

■ **State and local governments incur costs for providing services to unauthorized immigrants and have limited options for avoiding or minimizing those costs.** All of the estimates that CBO reviewed, regardless of the jurisdiction examined or programs considered, reached this conclusion. Rules governing many federal programs, as well as decisions handed down by various courts, limit the authority of state and local governments to avoid or constrain the costs of providing services to unauthorized immigrants. For example, both state and federal courts have ruled that states may not refuse to provide free public education to a student on the basis of his or her immigration status. Furthermore, many states have their own statutory or constitutional requirements concerning the provision of certain services to needy residents.

■ **The amount that state and local governments spend on services for unauthorized immigrants represents a small percentage of the total amount spent by those governments to provide such services to residents in their jurisdictions.** The estimates that CBO reviewed measured costs associated with providing services to unauthorized immigrants that ranged from a few million dollars in states with small unauthorized populations to tens of billions of dollars in California (currently the state with the largest population of unauthorized immigrants). Costs were concentrated in programs that make up a large percentage of total state spending—specifically, those associated with education, health care, and law enforcement.[11] In most of the estimates that CBO examined, however, spending for unauthorized immigrants accounted for less than 5 percent of total state and local spending for those services. Spending for unauthorized immigrants in certain jurisdictions in California was higher but still represented less than 10 percent of total spending for those services.

■ **The tax revenues that unauthorized immigrants generate for state and local governments do not offset the total cost of services provided to those immigrants.** Most of the estimates found that even though unauthorized immigrants pay taxes and other fees to state and local jurisdictions, the resulting revenues offset only a portion of the costs incurred by those jurisdictions for providing services related to education, health care, and law enforcement. Although it is difficult to obtain precise estimates of the net impact of the unauthorized population on state and local budgets (see Box 1), that impact is most likely modest.

■ **Federal aid programs offer resources to state and local governments that provide services to unauthorized immigrants, but those funds do not fully cover the costs incurred by those governments.** Some of the reports that CBO examined did not include such federal transfers when estimating the net effect of the unauthorized population on state and local governments.

## Size and Characteristics of the Unauthorized Population

There are no comprehensive records that document the number of unauthorized immigrants currently residing in the United States; as a result, the size of that population must be estimated by indirect means.[12] Such estimates are subject to considerable uncertainty because of questions surrounding the following: the extent to which that population is undercounted in the census; rates of emigration and mortality; and whether immigrants who are in the United States in a quasi-legal capacity should be classified as unauthorized.[13] The Department of Homeland Security has reported that there were approximately

11. On the basis of data collected by the National Association of State Budget Officers, between 1995 and 2006, almost 60 percent of spending from state general funds was used for elementary and secondary education (35 percent), Medicaid (16 percent), and corrections (7 percent). See National Association of State Budget Officers, *State Expenditure Report: Fiscal Year 2005* (Washington, D.C.: 2006), available at www.nasbo.org/Publications/PDFs/2005%20State%20Expenditure%20Report.pdf.

12. See Congressional Budget Office, *A Description of the Immigrant Population* (November 2004).

13. Quasi-legal immigrants include those individuals whose legal authorization has expired but for whom renewals of or adjustments to status have not yet been finalized.

---

**Box 1.**

## The Challenges of Estimating an Aggregate Effect

Among the available estimates that the Congressional Budget Office reviewed for its analysis, the general consensus is that unauthorized immigrants impose a net cost on state and local budgets. However, no agreement exists as to the size of, or even the best way of measuring, that cost on a national level. Questions surround both methodology and the available data, including the following:

- *What unit of time should be used for the estimate?* Most of the research available to date measures the impact of unauthorized immigrants in terms of the funds spent and revenues collected within a given period, typically one fiscal year. Some analysts point out that such a method ignores the long-term impact of that population. A better measure, they suggest, would evaluate the lifetime costs that unauthorized immigrants impose on federal, state, and local governments and the lifetime revenues they generate. Generally, immigrants' use of services and their contributions to revenues vary over time as they become better

integrated into U.S. society and labor markets. Most analysts believe that those general trends also apply to the portion of the population that is unauthorized.

- *Are all costs and revenues captured?* Many of the estimates took into account certain selected costs and revenues; no study, including those that reported net costs, attempted to look at total costs and revenues.

- *To what extent does this population pay taxes and consume government-provided services?* Research that examines the extent to which unauthorized immigrants pay taxes is limited, as are available data that examine the extent to which the unauthorized population uses public services. For example, there is little information on the proportion of students participating in specialized language classes who are unauthorized immigrants or the frequency with which those immigrants use publicly funded health services.

---

11.6 million unauthorized immigrants in the United States in January 2006.[14] Researchers at the Pew Hispanic Center estimated an unauthorized population of between 11.5 million and 12.0 million in March 2006. Using a model developed by the former Immigration and Naturalization Service, Pew estimated that as much as one-half of the population of unauthorized immigrants (4.5 million to 6.0 million people) were admitted legally—with visas or border crossing cards—but overstayed or otherwise violated the terms of their authorization; and the remainder of that population (an estimated 6 million to 7 million individuals) entered the United States illegally.[15, 16]

State-level estimates are subject to even more uncertainty than estimates of the total size of the population. Historically, most foreign-born residents, including unauthorized immigrants, have settled in a few states. In 1990, almost 75 percent of the total foreign-born population and almost 90 percent of unauthorized immigrants lived

---

14. See Michael Hoefer, Nancy Rytina, and Christopher Campbell, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006* (Department of Homeland Security, Office of Immigration Statistics, 2007), available at www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf.

15. For more information on this model, see Robert Warren, *Estimates of the Undocumented Population Residing in the United States: October 1996* (Immigration and Naturalization Service, Office of Policy and Planning, 1996). As part of the Homeland Security Act of 2002, the functions of the Immigration and Naturalization Service were transferred to the Department of Homeland Security. Immigration and naturalization are the responsibility of Citizenship and Immigration Services. The border enforcement functions are split between two offices: Customs and Border Protection and Immigration and Customs Enforcement.

16. Pew Hispanic Center, *Modes of Entry for the Unauthorized Migrant Population: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, May 22, 2006), available at http://pewhispanic.org/files/factsheets/19.pdf.

## Box 1.

## Continued

In addition to disagreements about the methods that should be used to determine a national aggregate effect and the lack of reliable and consistent data, a number of other factors make it difficult to compare findings across studies:

■ *The estimates use varying sources of data for people and fiscal information.* The studies used data from a variety of sources, including but not limited to the Census Bureau, Immigration and Customs Enforcement, the former Immigration and Naturalization Service, the National Center for Education Statistics, a model developed by the Institute for Taxation and Economic Policy that estimates tax payments, and data from individual state and local programs.

■ *The population is not defined in the same way across reports.* Because the estimates looked at different populations of immigrants, few of them are comparable. For example, although most estimates looked only at unauthorized immigrants, others did not differentiate between unauthorized and legal immigrants. Some included all foreign-born residents, regardless of their immigration status, and some included children of unauthorized immigrants who were born in the United States (even though those children are U.S. citizens). If the U.S.-born children of unauthorized immi-

grants had been included in the estimates, the costs of certain programs, particularly education, would be higher.

■ *State and local governments vary widely in the types of benefits they provide and how they collect tax revenue.* Benefit programs and tax policies vary greatly among and even within states, making it difficult to produce a national estimate of the aggregate budget impact on all state and local jurisdictions. Even the studies that considered multiple jurisdictions or programs were constrained by those geographic variations.

■ *The impact in one jurisdiction cannot be generalized to other areas.* Because many unauthorized immigrants reside in a few states, most studies to date have focused on the jurisdictions in which those immigrants have traditionally lived and therefore are most likely not representative of the effects in other states. Demographic changes suggest, however, that other states whose populations of unauthorized immigrants are rapidly increasing also will face growing fiscal pressures in the future. Recent reports have estimated those costs in states—such as Minnesota, Missouri, North Carolina, and Oregon—that have not traditionally had large populations of unauthorized immigrants.

in six states: California, Florida, Illinois, New Jersey, New York, and Texas.[17] The concentration of that population in just a few states has been diminishing, however, as

more immigrants settle in states not traditionally considered destinations for recent immigrant populations. Using census data, Pew found that, in 2004, 10 times as many unauthorized immigrants lived outside the six traditional settlement states than in 1990. There was a marked increase in the number of unauthorized immigrants settling in states such as Arizona, Georgia, North Carolina, and Tennessee—states that previously had little

17. See "States Ranked by Numeric Difference in the Foreign-Born Population: 1990, 2000, and 2005," *Migration Information Source* (Washington, D.C.: Migration Policy Institute), available at www.migrationinformation.org/DataHub/acscensus.cfm.

experience with such immigration.[18, 19] That phenomenon notwithstanding, unauthorized immigrants in most states make up a small portion of the state's population. In California, however, where Pew estimates that one-quarter of all unauthorized immigrants live, those immigrants make up an estimated 8 percent of the total state population.[20]

Demographic characteristics are key factors in estimating the unauthorized population's fiscal impact on state and local governments. Characteristics such as age, gender, employment status, occupation, and level of income are needed to estimate school attendance and tax revenues, for example. Using data from the Census Bureau's March 2005 Current Population Survey (CPS), Pew analysts found that of the approximately 11 million unauthorized immigrants living in the United States in 2005, 5.4 million were adult males, 3.9 million were adult females, and 1.8 million were children under 18 years of age. An additional 3.1 million children of unauthorized immigrants were U.S. citizens, Pew estimated.[21] Among Pew's other findings: Members of unauthorized families were typi-

cally much younger and less educated than members of families composed of legal immigrants and U.S. citizens. The unauthorized population included 7.2 million workers, typically employed in lower-wage occupations in the agricultural, construction, and service industries. Analysts at the Urban Institute reported that in 2004, unauthorized immigrant men were less likely to be unemployed than native-born men (4.6 percent compared with 6.5 percent) and unauthorized immigrant women were more likely to be unemployed than native-born women (8.2 percent compared with 5.2 percent).[22]

In addition to demographic information, the extent to which this population pays taxes is also an important determinant of the fiscal impact of unauthorized immigrants. Data from the Social Security Administration (SSA) and the Internal Revenue Service (IRS) suggest that some unauthorized immigrants use false or fraudulently obtained Social Security numbers (SSNs) to satisfy paperwork requirements during the hiring process and that employers use those numbers to withhold federal, state, and local income and payroll taxes for employees. Workers who do not qualify for SSNs can use Individual Tax Identification Numbers issued by the IRS to file tax returns, make payments, and apply for refunds. Although there are no reliable data on unauthorized immigrants' rate of compliance with tax laws, the IRS estimates that about 6 million unauthorized immigrants file individual income tax returns each year.[23] Other researchers estimate that between 50 percent and 75 percent of unauthorized immigrants pay federal, state, and local taxes. For example:

- ■ The SSA assumes that about half of unauthorized immigrants pay Social Security taxes.[24]

18. Although not traditionally a destination for unauthorized immigrants, Arizona has seen a dramatic increase in that population in recent years, making it the state with the fourth highest estimated number of unauthorized immigrants (about 575,000, in 2007) and one of the states with the highest estimated percentage of unauthorized immigrants (9 percent). See *Immigrants in the United States, 2007: A Profile of America's Foreign-Born Population* (Washington, D.C.: Center for Immigration Studies, November 2007), available at www.cis.org/articles/2007/back1007.html

19. See Jeffrey S. Passel, *Estimates of the Size and Characteristics of the Undocumented Population* (Washington, D.C.: Pew Hispanic Center, March 21, 2005).

20. In 2006, Pew estimated that between 55 percent and 60 percent of all unauthorized immigrants lived in six states: Arizona, California, Florida, New York, Texas, and Illinois. See Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for States Based on the March 2005 CPS* (Washington, D.C.: Pew Hispanic Center, April 26, 2006*)*. Comparing those estimates to census data, unauthorized immigrants ranged from about 3 percent of the total state population in Illinois to 8 percent in California.

21. See Jeffrey S. Passel, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates Based on the March 2005 Current Population Survey* (Washington, D.C.: Pew Hispanic Center, March 7, 2006), available at http://pewhispanic.org/files/reports/61.pdf.

22. See Karina Fortuny and others, *The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States* (Washington, D.C.: Urban Institute, 2007)

23. See Paula N. Singer and Linda Dodd-Major, "Identification Numbers and U.S. Government Compliance Initiatives," *Tax Notes,* vol. 104 (September 20, 2004), pp. 1429–1433.

24. Social Security Advisory Board, Issue Brief No. 1, *The Impact of Immigration on Social Security and the National Economy* (report prepared by Joel Feinleib and David Warner, December 2005), available at www.ssab.gov/brief-1-immigration.pdf.

- Several of the states whose estimates CBO reviewed used a model developed by the Institute for Taxation and Economic Policy (ITEP) to determine state and local taxes paid by unauthorized immigrants. ITEP assumes a 50 percent compliance rate for income and payroll taxes.[25]

- Researchers from the Urban Institute, the Migration Policy Institute, the Pew Hispanic Center, and the Center for Immigration Studies have assumed a 55 percent compliance rate for income, Social Security, and Medicare taxes.[26]

- As part of a larger study on migration, the Center for Comparative Immigration Studies at the University of California at San Diego conducted a survey of unauthorized immigrants and found that, in 2006, 75 percent had taxes withheld from their paychecks, filed tax returns, or both.[27]

## Spending by State and Local Governments

Over the past two decades, many state and local governments, as well as researchers and academics, have tried to identify and quantify the fiscal impact of immigration on state and local governments. Most of those estimates have concentrated on costs associated with unauthorized immigrants, but some include costs related to other categories of people, such as children of unauthorized immigrants born in the United States, legal immigrants, refugees, and asylum-seekers.[28] The estimates looked at a range of public services, primarily concentrating on the cost of programs over which states have limited options for controlling costs, such as those related to education, health care, and law enforcement (including incarceration).[29]

### Education

Education is the largest single expenditure in state and local budgets. Because state and local governments bear the primary fiscal and administrative responsibility of providing schooling from kindergarten through grade 12, they incur substantial costs to educate children who are unauthorized immigrants.[30, 31] In 1982, the Supreme Court ruled that states may not exclude children from public education because of their immigration status.[32] Current estimates indicate that about 2 million school-age children (5 to 17 years old) in the United States are unauthorized immigrants; an additional 3 million

25. See Robin Baker and Rich Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants*, Issue Brief No. 3 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/06ImmigTaxes.pdf; Sarah Beth Coffey, *Undocumented Immigrants in Georgia: Tax Contributions and Fiscal Concerns* (Atlanta: Georgia Budget and Policy Institute, January 2006), available at www.gbpi.org/pubs/garevenue/20060119.pdf; Ruth Ehresman, *Undocumented Workers: Impact on Missouri's Economy* (St. Louis: Missouri Budget Project, June 21, 2006), available at www.mobudget.org/newstatebudgetreports.htm; and New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico: State Tax Contributions and Fiscal Concerns* (Albuquerque: New Mexico Voices for Children, May 2006), available at www.nmvoices.org/attachments/immigrant_tax_report.pdf.

26. See Steve Camarota, *The High Cost of Cheap Labor* (Washington, D.C.: Center for Immigration Studies, 2004); and Randy Capps and others, *Civic Contributions: Taxes Paid by Immigrants in the Washington, D.C., Metropolitan Area* (Washington, D.C.: Urban Institute, 2006).

27. See Wayne A. Cornelius and Jessica M. Lewis, eds., *Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities* (La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007).

28. Refugees and asylum-seekers are people who are unable or unwilling to return to their country of origin because of the risk of persecution or because of a well-founded fear of persecution. Refugees apply for admission from outside of the United States; asylum-seekers request legal admission from within the United States or at a U.S. port of entry.

29. Several of the earlier estimates also examined spending on public assistance programs. However, the main federal program for providing public assistance during that time, Aid to Families with Dependent Children, no longer exists, and there have been no comprehensive estimates of the costs imposed by unauthorized immigrants on the program that replaced it, Temporary Assistance for Needy Families. CBO has therefore not included those findings in its analysis.

30. The federal government provides about 10 percent of the total amount spent by all levels of government on kindergarten through grade 12 each year.

31. Most of the estimates that CBO reviewed did not include costs associated with children who were born to unauthorized immigrants in the United States because those children are U.S. citizens. If those children had been included in the estimates, their fiscal impact—particularly on education—would have been higher.

32. *Plyler v. Doe*, 457 U.S. 202 (1982).

children are U.S. citizens born to unauthorized immigrants.[33] According to the most recent population data released by the Census Bureau, as of July 2006, there were 53.3 million school-age children in the United States.[34] Thus, children who are unauthorized immigrants represent almost 4 percent of the overall school-age population. Their numbers are growing quickly in some states, adding additional budgetary pressures. For example:

■ As part of a larger study on the impact of unauthorized immigrants in Minnesota, the state's Department of Administration estimated that, during the 2003–2004 school year, the state and local governments in Minnesota spent between $79 million and $118 million to educate an estimated 9,400 to 14,000 children who were unauthorized immigrants.[35] The agency also estimated that an additional $39 million was spent for children who were U.S. citizens but whose parents were unauthorized immigrants. According to census data, Minnesota state and local governments spent about $8 billion for elementary and secondary education during the 2003–2004 school year (excluding capital costs for building maintenance and construction). The state estimated that its population of immigrant students—both legal and unauthorized—had almost doubled, from about 9,000 to more than 16,000, between 2000 and 2004.

■ On the basis of a population estimate developed by the Pew Hispanic Center, analysts at the New Mexico Fiscal Policy Project reported that, for the 2003–2004 school year, total spending in New Mexico at the state and local levels for 9,200 unauthorized immigrant schoolchildren was about $67 million.[36] The Census

Bureau reports that state and local expenditures for elementary and secondary education during that period in New Mexico totaled almost $3 billion. Of the estimated 40,000 unauthorized immigrants currently living in New Mexico, 95 percent are believed to be recent arrivals, having lived in that state for fewer than 10 years.

### Health Care

Immigrants in the United States, both authorized and unauthorized, are less likely than their native-born counterparts to have health insurance.[37] As a result, they are more likely to rely on emergency rooms or public clinics for health care. The federal government requires health facilities that receive federal assistance to provide a certain level of service to residents, regardless of their ability to pay for such medical services or their immigration status. The amount of uncompensated care provided by some state and local governments is growing because an increasing number of unauthorized immigrants are using those services. According to a report commissioned by the United States/Mexico Border Counties Coalition, in 2000, county governments that share a border with Mexico incurred almost $190 million in costs for providing uncompensated care to unauthorized immigrants; that figure represented about one-quarter of all uncompensated health costs incurred by those governments in that year.[38]

While those costs are increasing rapidly for some jurisdictions, they account for a small percentage of spending by most state and local governments. For example, in 2006, the Oklahoma Health Care Authority estimated that it would spend about $9.7 million on emergency Medicaid services for unauthorized immigrants that year, and that 80 percent of those costs would be for services associated

---

33. See Urban Institute, *Children of Immigrants: Facts and Figures* (Washington, D.C.: Urban Institute, 2006); and Passel, *Unauthorized Migrants.*

34. See Bureau of the Census, *Annual Estimates of the Population by Selected Age Groups and Sex for the United States: April 1, 2000, to July 1, 2006,* Series NC-EST2006-02 (last updated May 17, 2007), available at www.census.gov/popest/national/asrh/ NC-EST2006-sa.html. (This estimate includes children 5 to 17 years of age.)

35. See Minnesota Department of Administration, Office of Strategic Planning and Results Management, *The Impact of Illegal Immigration on Minnesota: Costs and Population Trends* (December 8, 2005), available at www.leg.state.mn.us/lrl/issues/immigration. asp.

36. See New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico.*

37. The Census Bureau estimates that foreign-born individuals are between two and two-and-a-half times more likely than native-born residents to lack health insurance. See Robert J. Mills and Shailesh Bhandari, *Health Insurance Coverage in the United States: 2002* (Bureau of the Census, 2003).

38. See MGT of America, *Medical Emergency: Costs of Uncompensated Care in Southwest Border Counties* (report prepared for the United States/Mexico Border Counties Coalition, September 2002), available at www.bordercounties.org.

with childbirth.[39] The agency's actual total spending for that year was $3.1 billion. The agency also reported that, since fiscal year 2003 (the first fiscal year considered), the services provided to unauthorized immigrants have accounted for less than 1 percent of the total individuals served and cost less than 1 percent of the total dollars spent for Medicaid services.

**Law Enforcement**
Unauthorized immigrants who commit criminal acts or who require law enforcement services to protect them from criminal acts or behavior impose a variety of costs on state and local budgets. Although state and local law enforcement activities related to unauthorized immigrants include the same protections that ordinary citizens rely upon (such as investigating reports of criminal activity that may have targeted an unauthorized immigrant), the estimates that are currently available include only costs related to the prosecution and incarceration of unauthorized immigrants under state and local laws.

Unauthorized immigrants accused or convicted of committing crimes (other than immigration-related offenses) are not deported immediately; rather, they enter into and are processed through the local criminal justice system in the same fashion that any other suspect would be. The federal government may take custody of those who are convicted after they have completed their sentences and then begin the deportation process, but until that point, state and local governments bear the cost of investigating, detaining, prosecuting, and incarcerating such immigrants.

Researchers from Rutgers University have found that, in general, immigrants are less likely than native-born citizens to be incarcerated.[40] However, the number of unauthorized immigrants in some state and local criminal justice systems adds significantly to law enforcement costs. For example, in 2001, the United States/Mexico Border Counties Coalition reported that law enforcement activities involving unauthorized immigrants in four states— California, Arizona, New Mexico, and Texas—cost some county governments that share a border with Mexico a combined total of more than $108 million in 1999.[41] Of the counties included in the report, San Diego County incurred the largest cost, spending over $50 million that year, or almost half of all estimated costs incurred by the border counties. That amount represented about 9 percent of San Diego County's total spending ($541 million) for law enforcement activities that year. The report identified several factors that influenced the fiscal impact on each county, including the number of ports of entry, the population of neighboring Mexican communities, border terrain, and federal programs for deterring illegal entry.

## Revenues Versus Spending
The available estimates of the budgetary impact of unauthorized immigrants vary greatly in their timing and scope. Most of the studies that include both revenues and costs for multiple programs show that state and local governments spend more on unauthorized immigrants than they collect in revenues from that population. For example:

■ Recent estimates indicate that annual costs for unauthorized immigrants in Colorado were between $217 million and $225 million for education, Medicaid, and corrections.[42] By comparison, taxes collected from unauthorized immigrants at both the state and local levels amounted to an estimated $159 million to $194 million annually.[43]

---

39. See statement of Nico Gomez, spokesman for Oklahoma Health Care Authority, before the Oklahoma Senate Task Force on Immigration, September 18, 2006. The Medicaid program is funded jointly by the states and the federal government. This report did not include the federal portion of funding for the program.

40. See Kristin F. Butcher and Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation*, Working Paper No. 2005-19 (Chicago: Federal Reserve Bank of Chicago, November 2005), available at www.chicagofed.org/publications/workingpapers/ wp2005_19.pdf.

41. See Tanis J. Salant and others, *Illegal Immigrants in U.S./Mexico Border Counties: The Costs for Law Enforcement, Criminal Justice, and Emergency Medical Services* (report prepared for the United States/Mexico Border Counties Coalition, February 2001). That report included costs incurred by the offices of the sheriff, the marshal, the district attorney, the public defender, the superior court, the medical examiner, and probation and juvenile services. It did not include activities related to border enforcement.

42. See Robin Baker and Rich Jones, *Costs of Federally Mandated Services to Undocumented Immigrants in Colorado*, Issue Brief No. 4 (Denver: Bell Policy Center, June 30, 2006). See also Elizabeth Burger, *Immigration in Colorado: State Impact and Recent Legislation*, Legislative Council, Staff Issue Brief No. 06-04 (Denver: Colorado General Assembly, 2006). This estimate used figures for multiple years for each of the three program areas and offset costs with federal transfers for incarceration and Medicaid.

43. See Baker and Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants*.

- The Iowa Legislative Services Agency reported that the estimated 70,000 unauthorized immigrants in the state paid between $45.5 million and $70.9 million in state income and sales taxes in fiscal year 2004.[44] The report did not quantify the costs of providing specific services to unauthorized immigrants. Rather, it estimated an average benefit of $1,534 per state resident based on total spending from the state's general fund and the number of state residents (including unauthorized immigrants). Using that average benefit calculation, the estimated cost for providing all services to unauthorized immigrants was $107.4 million in fiscal year 2004.

Some studies estimated that states may collect more in taxes from unauthorized immigrants than they spend to provide education for children who are unauthorized immigrants, but those studies do not include costs associated with health care or law enforcement. For example:

- In 2006, the Missouri Budget Project estimated that unauthorized immigrants paid between $29 million and $57 million in state income, property, and excise taxes.[45] That organization estimated that the state spent between $17.5 million and $32.6 million to provide elementary and secondary education for between 5,800 and 10,833 unauthorized immigrants. Local districts incurred between $26.5 million and $49.3 million in additional costs for educational services.

- The New Mexico Fiscal Policy Project estimated that the state collects about $69 million annually in individual income, property, and sales taxes from unauthorized immigrants, about $1 million to $2 million more annually than it spends on public elementary and secondary education for children who are unauthorized immigrants.[46]

Another report—prepared by the state comptroller of Texas—estimated that, in 2006, the state collected $424 million more in revenue from unauthorized immigrants than it spent to provide education, health care, and law enforcement activities for that population.[47] However, the state estimated that local governments incurred $1.4 billion in uncompensated costs for health care and law enforcement.

## Federal Assistance

Federal lawmakers have established several programs to assist state and local governments in funding the additional costs associated with providing services to unauthorized immigrants. Those programs, however, do not offset the full costs of providing those services. Although some of the reports that CBO reviewed included such transfers in their estimates of the net impact of unauthorized immigrants, most did not.

### Education

The Department of Education estimates that out of the nearly $1 trillion slated to be spent nationwide during the 2007–2008 school year on all levels of education, about 90 percent of those funds will come from state, local, and private sources; the federal government typically provides funding for about 10 percent of total educational expenditures nationwide. Most federal funding for kindergarten through grade 12 comes from various grants authorized in the No Child Left Behind Act of 2001 and the Individuals with Disabilities Education Act of 2004; however, some funding also comes from the Head Start program administered by the Department of Health and Human Services and the School Lunch program administered by the Department of Agriculture. Most federal grants for education are allocated to schools at a per-student rate, regardless of the student's immigration status.

The federal government also provides grants specifically intended to subsidize the cost of educating immigrant schoolchildren. The English Language Acquisition program is the primary support program provided under No Child Left Behind. Through that program, schools receive funds for teaching English to children with limited language proficiency. Grants are allocated to states using a formula that awards 80 percent of the funds on

---

44. See Kerri Johannsen, *Undocumented Immigrants' Cost to the State* (Des Moines: Iowa Legislative Services Agency, February 22, 2007).

45. See Ehresman, *Undocumented Workers*.

46. See New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico*.

47. See Carole Keeton Strayhorn, *Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy* (special report prepared by the Office of the Comptroller of Texas, December 2006), available at www.cpa.state.tx.us/specialrpt/undocumented/undocumented.pdf.

the basis of the number of children in the state that participate in limited-English proficiency programs; the remaining funds are allocated proportionally on the basis of the number of children in the state who are immigrants (regardless of their legal status).[48] In fiscal year 2006, the states received $621 million through this program. Although those grant programs offset some of the costs that unauthorized immigrants impose on state and local governments, the available funding is targeted only to language education and does not cover costs for general education.

### Health Care

Most of the available estimates that CBO reviewed for its analysis were prepared when there was no federal program specifically designed to help state and local governments provide emergency health care to immigrants. However, several federal programs currently subsidize the states' costs of providing medical care to low-income and underserved populations, including, to some extent, uninsured authorized and unauthorized immigrants.

Of the programs that provide federal assistance for emergency health care, Medicaid is the largest. The federal government sets the basic rules governing administration, eligibility, the scope of coverage, and the quantity of services and shares the cost of the program with the states. The states have great flexibility in determining eligibility requirements for their Medicaid programs. Hence, there is great variation from state to state in terms of who qualifies for such services, the types of services provided, and how much the state pays for each service. Historically, the federal government has paid anywhere from 50 percent to 83 percent of all Medicaid costs (the weighted average is about 57 percent), depending on the per capita income of the state.

The Consolidated Omnibus Budget Reconciliation Act of 1986 amended Medicaid law to authorize assistance to health care providers for services related to childbirth and emergency medical treatment delivered to immigrants who would, except for their immigration status, qualify for Medicaid benefits. This program is often referred to as emergency Medicaid.[49] Unauthorized immigrants may receive care through this program under the following circumstances: if they meet certain income requirements and are pregnant; if they are under the age of 19 or at

least 65 years old; if they are disabled; or if they are caregiver of a child under the age of 18. However, emergency Medicaid covers only those services that are necessary to stabilize a patient; any other services delivered after a patient is stabilized are not covered.

In 2003, the Congress and the President enacted the Medicare Modernization Act, which appropriated $250 million annually from fiscal year 2005 through 2008 to be distributed to hospitals and other health care providers for the cost of emergency health services for unauthorized immigrants. (A similar program, authorized in 1997, provided $25 million to 12 states for each fiscal year from 1998 to 2001; however, that program was not continued.)[50] By statute, two-thirds of the $250 million is to be divided proportionally among all states on the basis of the number of unauthorized immigrants residing in each state; the remaining one-third is to be split among the six states with the highest number of removable aliens that have been arrested by federal immigration officials.

According to the Centers for Medicare and Medicaid Services (CMS), more than 15,000 health care providers have registered for payments through this program. Analysis of the awards data shows that the total awards allocated to states have increased each quarter. For the third quarter of fiscal year 2005, CMS disbursed 20 percent of the available funds for that quarter. The amount remaining of the initial allocations for each state is available in the following quarters. By the end of the fourth quarter of fiscal year 2006, CMS awarded almost 95 percent of the newly available funds for that quarter. By the end of fiscal year 2006, providers in eight states—Alabama, Connecticut, Florida, Kansas, Louisiana, Nebraska, Nevada, and Texas—had submitted and received payments for at least 90 percent of the funds allocated to those states. In total, for fiscal years 2005 and 2006, CMS had awarded half of the $500 million available.

---

48. These programs may also be referred to as English as a Second Language, bilingual education, or dual immersion classes.

49. Hospitals can submit charges for providing care to "qualified immigrants," defined as those who are legal permanent residents, refugees, asylum-seekers, immigrants who have had deportation withheld, immigrants granted parole for at least one year, immigrants granted conditional entry, battered immigrants and their child/children, immigrants born in Canada who are at least 50 percent Native American, and immigrants who are Cuban or Haitian entrants.

50. Letter to state Medicaid directors from Sally K. Richardson, Director, Center for Medicaid and State Operations, Health Care Financing Administration, November 24, 1997.

## Law Enforcement

The Immigration Reform and Control Act of 1986 authorized the federal government to help state and local governments pay for some of the costs of incarcerating unauthorized immigrants who were convicted of committing crimes other than immigration-related offenses. The Department of Justice started providing assistance to states in 1994 through the State Criminal Alien Assistance Program (SCAAP). State and local governments apply for those funds annually by submitting demographic data on individual unauthorized immigrants who have been incarcerated, the length of each prisoner's incarceration, and the total costs per facility for the salaries of correction officers. The Department of Justice uses that information to determine the number of inmates meeting the program's requirements and to allocate available funding to each facility in proportion to the amount of money spent for the salaries of correction officers.

Between 2000 and 2006, the Department of Justice awarded almost $2.8 billion in SCAAP funds to more than 800 state and local jurisdictions, including all 50 states and the District of Columbia. Since the program began, those funds have offset only a portion of the amounts that state and local governments spent to incarcerate those criminals. In 2005, the awards represented 33 percent of eligible requests.

For several reasons, the total costs reported by state and local governments for incarcerating unauthorized immigrants exceed federal payments. First, according to the program's guidelines, applicants may request assistance only for unauthorized immigrants who have committed felonies or multiple misdemeanor offenses and who have been incarcerated for at least four days. Second, the formula used to calculate each jurisdiction's aid includes only the costs of providing correction officers' salaries. The department then allocates whatever funds are appropriated for the program on the basis of the number of verified prisoners and the salary costs per facility. The program does not include costs for the detention of aliens who do not meet program guidelines or for the costs of housing, feeding, or providing medical care to those prisoners. State and local governments bear those costs.

# Bibliography

The references cited in this Congressional Budget Office (CBO) paper fall into three main categories:

- Reports that served as the backdrop for CBO's analysis. These reports specifically explore the impact of unauthorized immigrants on the budgets of state and local governments;

- CBO publications—testimony, cost estimates, and reports—that focus on the general issue of immigration;[1] and

- Related studies and publications.

## Reports Reviewed by CBO

Baca, Leroy D., *The Impact of Criminal Aliens on the Los Angeles County Jail System* (Los Angeles: Los Angeles County Sheriff's Department, 2000).

Baker, Robin, and Rich Jones, *State and Local Taxes Paid in Colorado by Undocumented Immigrants,* Issue Brief No. 3 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/ 06ImmigTaxes.pdf.

Brown, Mark G., *The Impact of Illegal Immigrants in Rhode Island* (Providence: Rhode Island Department of Administration, Division of Planning, 1995).

Burger, Elizabeth, *Immigration in Colorado: State Impact and Recent Legislation,* Legislative Council Staff Issue Brief No. 06-04 (Denver: Colorado General Assembly, 2006).

Capps, Randy, and others, *Civic Contributions: Taxes Paid by Immigrants in the Washington, DC, Metropolitan Area* (Washington, D.C.: Urban Institute, May 2006), available at www.urban.org/UploadedPDF/ 411338_civic_contributions.pdf.

Clark, Rebecca L., and others, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C.: Urban Institute, September 1, 1994), available at www.urban.org/url.cfm?ID= 405796.

Clark, Rebecca L., and Jeffrey S. Passel, *How Much Do Immigrants Pay in Taxes: Evidence from Los Angeles County* (Washington, D.C.: Urban Institute, August 1993), available at www.urban.org/url.cfm?ID= 405130.

Clark, Rebecca L., and Scott A. Anderson, *Illegal Aliens in Federal, State, and Local Criminal Justice Systems* (Washington, D.C.: Urban Institute, June 2000), available at www.urban.org/url.cfm?ID=410366.

Coffey, Sarah Beth, *Undocumented Immigrants in Georgia: Tax Contributions and Fiscal Concerns* (Atlanta: Georgia Budget and Policy Institute, January 2006), available at www.gbpi.org/pubs/garevenue/ 20060119.pdf.

Donges, Kelli, *Health Care for Undocumented Immigrants: Who Pays?* House Research Organization Focus Report No. 77-13 (prepared for the Texas House of Representatives, October 29, 2001), available at www.hro.house.state.tx.us/focus/immigrant.pdf.

Ehresman, Ruth, *Undocumented Workers: Impact on Missouri's Economy* (St. Louis: Missouri Budget Project, June 21, 2006), available at www.mobudget. org/newstatebudgetreports.htm.

---

1. References to CBO testimony, cost estimates, and reports are arranged in reverse chronological order, according to the date of publication or issuance; all other citations are arranged alphabetically. CBO's publications are available online at www.cbo.gov.

Florida Advisory Council on Intergovernmental Relations, *Florida Newcomers: Inventory of Services and Program Costs Incurred by Governmental and Non-Governmental Agencies: Final Report* (September 1994), available at www.floridalcir.gov/UserContent/docs/File/reports/newcomers94.pdf.

Florida Hospital Association, *Care for Uninsured Non-Citizens: A Growing Burden on Florida's Hospitals* (updated February 2003), available at www.fha.org/acrobat/Noncitizensreport.pdf.

Johannsen, Kerri, *Undocumented Immigrants' Cost to the State* (Des Moines: Iowa Legislative Services Agency, February 22, 2007).

Jones, Rich, and Robin Baker, *Costs of Federally Mandated Services to Undocumented Immigrants in Colorado,* Issue Brief No. 4 (Denver: Bell Policy Center, June 30, 2006), available at www.thebell.org/PUBS/IssBrf/2006/06ImmigCosts.pdf.

Kasarda, John D., and James H. Johnson Jr., *The Economic Impact of the Hispanic Population on the State of North Carolina* (Chapel Hill, N.C.: University of North Carolina, Frank Hawkins Kenan Institute of Private Enterprise, January 2006), available at www.kenan-flagler.unc.edu/assets/documents/2006_KenanInstitute_HispanicStudy.pdf.

Los Angeles County Internal Services Department, *Impact of Undocumented Persons and Other Immigrants on Costs, Revenues and Services in Los Angeles County: A Report* (report prepared for Los Angeles County Board of Supervisors, November 6, 1992).

Martin, Jack, and Ira Mehlman, *The Costs of Illegal Immigration to Californians* (Washington, D.C.: Federation for American Immigration Reform, November 2004), available at www.fairus.org/site/PageServer?pagename=iic_immigrationissuecentersffec.

MGT of America, *Medical Emergency: Costs of Uncompensated Care in Southwest Border Counties* (report prepared for the United States/Mexico Border Counties Coalition, September 2002), available at www.bordercounties.org/vertical/Sites/%7BB4A0F1FF-7823-4C95-8D7A-F5E400063C73%7D/uploads/%7BFAC57FA3-B310-4418-B2E7-B68A89976DC1%7D.PDF.

Minnesota Department of Administration, Office of Strategic Planning and Results Management, *The Impact of Illegal Immigration on Minnesota: Costs and Population Trends* (December 8, 2005), available at www.leg.state.mn.us/lrl/issues/immigration.asp.

New Mexico Fiscal Policy Project, *Undocumented Immigrants in New Mexico: State Tax Contributions and Fiscal Concerns* (Albuquerque: New Mexico Voices for Children, May 2006), available at www.nmvoices.org/attachments/immigrant_tax_report.pdf.

Oregon Center for Public Policy, *Undocumented Workers Are Taxpayers, Too,* Issue Brief (April 1, 2006), available at www.ocpp.org/2006/issue060401%20Immigrants.pdf.

Padavan, Frank, *Our Teeming Shore: A Legislative Report on the Impact of U.S. Immigration Policy on New York State* (prepared for the New York State Senate, Majority Task Force on Immigration, January 1994).

Padavan, Frank, *Our Teeming Shore, 2: A Legislative Update on the Impact of U.S. Immigration Policy on New York State* (prepared for the New York State Senate, Majority Task Force on Immigration, April 1995).

Parker, Richard A., and Louis M. Rae, *Illegal Immigration in San Diego County: Analysis of Costs and Revenues* (prepared for the California State Senate Special Committee on Border Issues, 1993).

Passel, Jeffrey S., and Rebecca L. Clark, *Immigrants in New York: Their Legal Status, Incomes, and Taxes* (Washington, D.C.: Urban Institute, April 1, 1998), available at www.urban.org/url.cfm?ID=407432.

Romero, Philip J., Andrew J. Chang, and Theresa Parker, *Shifting the Costs of a Failed Federal Policy: The Net Fiscal Impact of Illegal Immigrants in California* (prepared for the Governor's Office of Planning and Research, and the California Department of Finance, September 1994).

Salant, Tanis J., and others, *Illegal Immigrants in U.S./Mexico Border Counties: The Costs for Law Enforcement, Criminal Justice, and Emergency Medical Services* (report prepared for the United States/Mexico Border Counties Coalition, February 2001).

Strayhorn, Carole Keeton, *Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy* (special report prepared by the Office of the Comptroller of Texas, December 2006), available at www.cpa.state.tx.us/specialrpt/ undocumented/undocumented.pdf.

## CBO Publications

### Testimony

Statement of Peter R. Orszag, Director, Congressional Budget Office, *The Role of Immigrants in the U.S. Labor Market,* before the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law of the House Committee on the Judiciary, May 3, 2007.

Statement of Paul R. Cullinan, Chief, Human Resources Cost Estimates Unit, Congressional Budget Office, *The Budgetary Impact of Current and Proposed Border Security and Immigration Policies,* before the Senate Committee on the Budget, August 30, 2006.

### Cost Estimates

Senate Amendment 1150 to S. 1348, the Comprehensive Immigration Reform Act of 2007, *Cost estimate for the amendment, as amended through May 4, 2007* (June 4, 2007).

Senate Amendment 1150 to S. 1348, the Comprehensive Immigration Reform Act of 2007 (Preliminary Information), *Letter to the Honorable Kent Conrad* (May 23, 2007).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Cost estimate for the bill as passed by the Senate on May 25, 2006* (August 18, 2006).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Letter to the Honorable Jeff Sessions providing additional detail on some components of the cost estimate for S. 2611, as introduced on April 7, 2006* (May 24, 2006).

S. 2611, Comprehensive Immigration Reform Act of 2006, *Letter to the Honorable Charles E. Grassley providing a cost estimate of the potential budgetary and economic impacts of S. 2611, as introduced on April 7, 2006* (May 16, 2006).

### Reports

*Projections of Net Migration to the United States* (June 2006).

*Immigration Policy in the United States* (February 2006).

*Global Population Aging in the 21st Century and Its Economic Implications* (December 2005).

"The Impact of Immigration on the Long-Term Budget Outlook," Box 1-2 in *The Long-Term Budget Outlook* (December 2005).

*The Role of Immigrants in the U.S. Labor Market* (November 2005).

*Remittances: International Payments by Migrants* (May 2005).

*A Description of the Immigrant Population* (November 2004).

## Related Works

Borjas, George J., "The Economics of Immigration," *Journal of Economic Literature,* vol. 32, no. 4 (December 1994), pp. 1667–1717.

Butcher, Kristin F., and Anne Morrison Piehl, *Why Are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation,* Working Paper No. 2005-19 (Chicago: Federal Reserve Bank of Chicago, November 2005), available at www.Chicagofed.org/publications/workingpapers/ wp2005_19.pdf.

Chiswick, Barry R., *The Economics of Immigration: Select Papers of Barry R. Chiswick* (Cheltenham, U.K.: Edward Elgar Publishing, 2005).

Clark, Rebecca L., *Costs of Providing Public Assistance to Immigrants* (Washington, D.C.: Urban Institute, August 1994), available at www.urban.org/ url.cfm?ID=405394.

Cowan, Cathy A., and others, "Burden of Health Care Costs: Businesses, Households, and Governments, 1987–2000," *Health Care Financing Review,* vol. 23, no. 3 (Centers for Medicare and Medicaid Services, Spring 2002).

Duignan, Peter, and Lewis H. Gann, eds., *The Debate in the United States over Immigration* (Stanford, Calif.: Stanford University, Hoover Press, December 5, 1997).

Edmonston, Barry, and Ronald Lee, eds., *Local Fiscal Effect of Illegal Immigration: Report of a Workshop* (Washington, D.C.: National Academies Press, 1996).

Goldman, Dana P., James P. Smith, and Neeraj Sood, "Legal Status and Health Insurance Among Immigrants," *Health Affairs,* vol. 24, no. 6 (2005), pp. 1640–1653.

Government Accountability Office, *Illegal Alien School-children: Issues in Estimating State-by-State Costs,* GAO-04-733 (June 2004), available at www.gao.gov/new.items/d04733.pdf.

Government Accountability Office, *Undocumented Aliens: Questions Persist About Their Impact on Hospitals' Uncompensated Care Costs,* GAO-04-472 (May 2004), available at www.gao.gov/new.items/d04472.pdf.

Hoefer, Michael, Nancy Rytina, and Christopher Campbell, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2005* (Department of Homeland Security, Office of Immigration Statistics, August 2006), available at www.dhs.gov/xlibrary/assets/statistics/publications/ILL_PE_2005.pdf.

Huddle, Donald, *Net Costs of Immigration: The Facts, Trends, and the Critics* (Washington, D.C.: Carrying Capacity Network, 1996).

National Association of State Budget Officers, *2004 State Expenditure Report* (2005).

Passel, Jeffrey S., *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.: Estimates Based on the March 2005 Current Population Survey* (Washington, D.C.: Pew Hispanic Center, March 7, 2006), available at http://pewhispanic.org/files/reports/61.pdf.

Passel, Jeffrey S., *Estimates of the Size and Characteristics of the Undocumented Population* (Washington, D.C.: Pew Hispanic Center, March 21, 2005), available at http://pewhispanic.org/files/reports/44.pdf.

Passel, Jeffrey S., *Unauthorized Migrants: Numbers and Characteristics* (background briefing prepared for the Task Force on Immigration and America's Future, Washington, D.C., Pew Hispanic Center, June 14, 2005), available at http://pewhispanic.org/files/reports/46.pdf.

Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for States Based on the March 2005 CPS: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, April 26, 2006), available at http://pewhispanic.org/files/factsheets/17.pdf.

Pew Hispanic Center, *Modes of Entry for the Unauthorized Migrant Population: Fact Sheet* (Washington, D.C.: Pew Hispanic Center, May 22, 2006), available at http://pewhispanic.org/files/factsheets/19.pdf.

Social Security Advisory Board, Issue Brief No. 1, *The Impact of Immigration on Social Security and the National Economy* (prepared by Joel Feinleib and David Warner, December 2005), available at www.ssab.gov/brief-1-immigration.pdf.

Urban Institute, *Children of Immigrants, Facts and Figures* (Washington, D.C.: Urban Institute, 2006), available at www.urban.org/UploadedPDF/900955_children_of_immigrants.pdf.

Vernez, Georges, and Kevin F. McCarthy, *The Costs of Immigration to Taxpayers: Analytical and Policy Issues* (Santa Monica, Calif.: RAND Corporation, 1996).

SEPTEMBER 17, 2021

# The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants

By Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas

The United States is often described as a nation of immigrants. With the exception of Native Americans, the vast majority of Americans are immigrants or the descendants of immigrants or enslaved people. This diversity has been celebrated for its contributions to American culture through cuisine, language, and the arts, among many other influences.

Immigrants also make an important contribution to the U.S. economy. Most directly, immigration increases potential economic output by increasing the size of the labor force. Immigrants also contribute to increasing productivity. Economists Gaetano Basso and Giovanni Peri find that immigrants are more mobile than natives in response to local economic conditions, perhaps because they have fewer long-standing familial and community ties, helping labor markets to function more efficiently. Economists Jennifer Hunt and Marjolaine Gauthier-Loiselle have also shown that immigrants boost innovation, a key factor in generating improvements in living standards. Specifically, they find that a 1 percentage point increase in the population share of immigrant college graduates increases patents per capita by 9 percent to 18 percent.

While most immigrants residing in the United States are legally authorized to live and work here, the Department of Homeland Security (DHS) estimates the population of unauthorized immigrants to be roughly 11.4 million as of 2018. This estimate and those used by researchers include beneficiaries of Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS), even though both groups have legal authorization to live and

000285

work in the United States on a temporary basis.[1] This diverse population also includes other individuals who either entered without passing through immigration (unauthorized entry), or legally came to the United States on a temporary basis and then overstayed their visa.[2] Most of these individuals may not legally work or receive safety-net benefits—or only can under substantial restrictions.

This blog discusses the economics of legalizing unauthorized immigrants. Some critics claim that legalizing unauthorized immigrants, as proposed by the Build Back Better framework, could be costly because they would become eligible for additional social insurance benefits such as Medicaid. However, granting permanent legal status would also likely raise tax revenues, increase productivity, and have additional benefits for the children of these immigrants, generating substantial economic value for the country.

**Permanent legal status is likely to increase the effective labor supply of unauthorized immigrants.**

About 73 percent of unauthorized-immigrant adults ages 18 to 65 were employed in any given year from 2014 to 2019, roughly equal to the employment rates of non-citizen legal residents and U.S. citizens.[3] Permanent legal status would likely allow these workers to be more productive, generating gains that could be realized through a variety of channels.

Critically, permanent legal status would allow these currently unauthorized immigrants to pursue and accept jobs for which their skills are well-suited, rather than being restricted to particular sectors of the economy, such as agriculture, construction, and leisure and hospitality, where employers often do not insist on legal status and where wages are lower on average. For example, around one-half of workers in the U.S. dairy industry—which in 2018 paid between $11 and $13 an hour for general labor—are immigrants, most of whom are thought to be unauthorized.[4] Without legal status, unauthorized immigrants have limited opportunities for job mobility, a key channel by which other workers find better, more productive employment matches over their careers.

Comparisons between the earnings of authorized and unauthorized immigrants suggest that limited job opportunities cause talent to be

000286

8/29/24, 2:58 PM    The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants | CEA | The White House

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 294 of 4699 PageID #: 8459

misallocated, reducing productivity. Unauthorized-immigrant workers have been estimated to earn about 40 percent less per hour than native-born workers and about 35 percent less per hour than legal immigrants. A large part of these gaps can be explained by differences in average skills as measured by educational attainment; however, after adjusting for these and other demographic differences, this research continues to find a significant "wage penalty" for unauthorized workers ranging from 4 percent to 24 percent of their hourly wage. Further, we estimate that there is no wage penalty for unauthorized-immigrant workers relative to similar legal immigrants within the same occupation and industry, which suggests the penalty arises from being confined to low-paying jobs.[5]

In addition to employment opportunities, evidence from prior legalizations in the United States and in other countries suggests that legalization also encourages immigrants to improve their language skills, induces them to complete additional education and training, and improves their health outcomes, all of which make them more productive members of society. For example, evidence from Germany finds that faster access to citizenship led immigrant women to improve their language skills in addition to increasing their labor force attachment. In a study of U.S. teenagers born to the same immigrant families—but whose legal status varies due to the countries in which they were born—the unauthorized-immigrant teenagers were about 2.6 percentage points less likely to be enrolled in school. In addition, evidence from the Immigration Reform and Control Act of 1986 (IRCA) and DACA shows these reforms increased schooling for previously-unauthorized immigrants. Finally, a recent economic study also suggests that DACA-recipients experienced improved physical and mental health, which contributes to increased productivity.

In a market economy, employees' productivity influences their pay. As a result, productivity improvements—through better job matches, investments in skills, and increases in physical and mental health—should be reflected in increased wages among the legalized immigrants. Indeed, the research evidence supports this hypothesis. For example, research finds that the wages of DACA-eligible Dreamers rose 4 to 5 percent by 2016 relative to those not eligible.[6] Another study concludes that the DACA-related gains in earnings for unauthorized workers were largest among the lowest paid workers. These results signify that even though these unauthorized

immigrants may currently be working in the United States, providing them with legal permanent status would increase their effective labor supply, that is, the work their greater productivity enables them to do. Importantly, this increase in productivity is foundational for improving U.S. economic growth.

Given that providing legal status to unauthorized immigrants would increase their effective labor supply, critics of legalization argue there could be adverse labor market consequences for native and other immigrant workers. While there is not a large economics literature on the labor market effects of legalization on other workers, in a well-cited National Academies report on the economic and fiscal impact of immigration, a distinguished group of experts concludes that in the longer run, the effect of immigration on wages overall is very small.[7]



**Figure 1: Age Distribution of Citizens and Unauthorized Immigrants**

Source: U.S. Current Population Survey (ASEC 2014-2019), CEA Analysis.

**Permanent legal status would likely have implications for costs and revenues for the Federal government.**

While granting permanent legal status to unauthorized immigrants would likely boost economic growth, some are concerned about the price tag, given that an increased number of legal immigrants could enroll in, and raise costs of, social benefit programs. However, some of this increased cost would likely be offset by higher tax contributions.[8]

Consider first the potential increase in costs to the Federal government associated with receipt of social benefits. Legal status may make undocumented immigrants more comfortable using Federal benefits for which they are already eligible, such as emergency health services under Medicaid and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In addition, newly-legalized immigrants could take up social benefits for which they were previously ineligible due to their unauthorized status. Based on benefit use among demographically-similar, non-citizen legal immigrants, this increase in take-up could be significant. For example, many of these immigrants could become fully eligible for Medicaid.[9] Finally, granting legal status could also increase benefit take-up among citizen or authorized-immigrant relatives of undocumented immigrants; several studies find that the threat of an undocumented relative being deported discouraged benefit take-up by citizen members of the same household, even though those citizens are eligible for benefits and cannot be deported.

However, much of the direct fiscal cost of these public benefits is likely to be repaid due to increased tax contributions from the immigrants, and, in the long run, by positive fiscal contributions from their children. Anyone working in the United States is supposed to be paying taxes; however, Federal income tax compliance rates for unauthorized immigrants are unknown. Several government agencies and nongovernmental organizations estimate rates between 50 and 75 percent. By comparison, tax compliance rates on ordinary wage income are close to 100 percent for the U.S. population as a whole, according to the U.S. Treasury Department.

Shifts from the informal to the formal sector that are expected to result from legal status would likely increase tax compliance rates. Indeed, after the passage of IRCA, researchers found that income tax compliance rates of previously-unauthorized immigrants in California became comparable to other residents. Combined with the wage gains, gross tax revenues would increase. Moreover, undocumented immigrants are disproportionately of prime-working age (see Figure 1) and relatively younger than prime-age U.S. citizens. Therefore, they are likely to have many working years during which they will be paying these higher payroll and income taxes if they are legalized.

Finally, many children of unauthorized immigrants grow up in households below the Federal poverty level because their parents cannot secure higher-paying work due to their immigration status. Growing up poor can be harmful for child development, and providing public health insurance and nutrition assistance has been shown to improve the health of immigrant children. In general, the direct fiscal cost of public assistance for low-income children is thought to be substantially or fully offset in the long run. The costs are offset by increases in tax revenues and reductions in spending on government programs when these children grow up to become higher-earning adults than they would have had they not received assistance.[10]

**Conclusion**

Immigrants have made innumerable contributions to American business and society. However, current law confines millions of them to a life in the shadows, without the rights to be fully economically engaged or have access to foundational social protections. Such treatment inflicts  harms on unauthorized immigrants themselves and their families—many of which include U.S. citizens and non-citizen legal residents—as well as to the broader economy.

Though some argue that increased take-up of social programs would generate a substantial fiscal cost to the government, the productivity of the newly-legalized would likely increase, which would benefit all in the United States by expanding economic output. Further, the ensuing increase in wages and compliance with tax requirements would increase their contributions to public sector finances, and their children would benefit as well. Allowing currently unauthorized workers to engage fully in the labor force would not only benefit the immigrants and their families, but society as a whole.

———————————

[1] DHS estimates of the unauthorized immigrant population are calculated as the residual from subtracting the legally-resident, foreign-born population from the total foreign-born population. Dreamers (individuals born between 1981 and 2012 brought to the United States as children) who applied to and were accepted into the DACA program can legally work and reside in the United States, but only for two years, at which point they must apply to renew their status; the Supreme Court ruled in June 2020 that the Trump

Administration could not end the program, but the U.S. District Court in Southern Texas ruled in July 2021 that the program is not lawful. While those currently in the DACA program are still protected and can reapply, new applicants are not accepted, and the case is making its way through the Federal courts. TPS is granted only until resolution of the conditions in a recipient's country of origin that make it difficult or unsafe to return.

[2] Unauthorized immigrants do not include people who have been granted asylum or refugee status or nonimmigrant residents, such as students and temporary workers, who have been granted permission to study or work in the United States for a limited period of time and for a specific purpose.

[3] CEA analysis of Current Population Survey microdata from 2014 to 2019.

[4] The average hourly wage in the United States in 2020 was about $27 an hour.

[5] Based on CEA analysis of Current Population Survey microdata from 2014 to 2019.

[6] Evidence from the wage impacts of naturalization in the United States and other countries; smaller extensions of work authorization to particular groups of unauthorized immigrants, such as those aided by the Chinese Student Protection Act of 1992; and reforms that have restricted employment options for unauthorized workers, also suggest that granting legal status would improve labor market outcomes of unauthorized workers.

[7] See also David Card's Richard T. Ely Lecture to the American Economic Association in which he argues that immigrants have had at most small impacts on wage inequality among natives.

[8] We note that the fiscal impacts of providing legal permanent status to existing unauthorized immigrants likely differ from prior analyses of the fiscal impacts of immigration generally, as unauthorized immigrants are already in the country, and many currently work, pay taxes, and receive some forms of government benefits. This existing relationship with the government makes it necessary to estimate how their rates of tax compliance and take-up of benefits would change if they gained legal status. Such

calculations are not straightforward and require important assumptions, some with scarce relevant data and evidence that could inform them.

[9] Unauthorized immigrants who entered the United States after August 22, 1996—the date Federal welfare reforms were signed into law—would generally be eligible only after a waiting period of five years of legal residence for several benefits, including non-emergency health services under Medicaid and the Supplemental Nutrition Assistance Program (SNAP).

[10] At present the Congressional Budget Office (CBO) does not account for any long-run fiscal return to public benefit programs, suggesting that current approaches to "scoring" the fiscal impacts of legal status are likely to overstate their true fiscal cost.

000292

The Labor Market Impact of Immigration:

Job Creation vs. Job Competition

By Christoph Albert

# Online Appendix

# A    Educational Attainment and Identification Accuracy

Table A.1: Educational attainment of undocumented immigrants across datasets, 2012-2013

|  | Pew file | Borjas method | |
| --- | --- | --- | --- |
|  | CPS March | CPS March | CPS Basic |
| < High school (%) | 42 | 39.5 | 40.2 |
| High school (%) | 28.8 | 26.9 | 26.2 |
| Some college (%) | 13.2 | 13.5 | 13.3 |
| College (%) | 16 | 20.1 | 20.3 |
| % of population | 5.4 | 5.7 | 5.8 |

Notes: Following Borjas (2017) the statistics are calculated using a sample of individuals aged 20-64 from the years 2012-2013. The statistics from the Pew file are taken from Borjas (2017, Table 1).

In this Appendix section, I investigate how accurate Borjas' identification method is depending on the educational attainment of immigrants. The benchmark against which I make a comparison is the Pew CPS March file of the years 2012-2013, which includes the undocumented immigrant identifier developed by Passel and Cohn (2014). The description of its construction in Appendix C in their paper is not detailed enough to allow a replication of their method. However, Borjas was granted access to their datafile and presents some summary statistics based on it in Borjas (2017, Table 1).

Table A.1 presents the distribution of undocumented immigrants across education levels and their total population share in the Pew CPS March, the Borjas CPS March and the CPS basic monthly files. In the CPS basic, I use all variables that are also used by the Borjas identification method except those related to social security benefits or health insurance, because these are exclusively available in the CPS March. Compared to the Pew CPS March, the education level

1

Figure A.1: Excess of undocumented immigrants (%) in CPS 2012-2013



Notes: The excess percentages are calculated by comparing the population shares of undocumented immigrants for each education level in the CPS March and CPS Basic data using the simplified Borjas (2017) identification method with the corresponding shares in the Pew CPS March file, which are calculated based on in Table A.1 as described in the text.

of undocumented immigrants is higher in both the Borjas CPS March and the CPS basic. In particular, the share of college graduates is around 4 percentage points (or 25%) higher, whereas the shares of both high school dropouts and high school graduates are lower. Moreover, in both datasets the total population share of undocumented immigrants, shown in the last row, is somewhat higher than in the Pew CPS March. This indicates that too many high-skilled immigrants are classified as undocumented by the simplified Borjas method.[40] In the CPS basic, the total population share is somewhat lower than in the CPS March, which is unexpected as the absence of some variables for the identification of documented immigrants should lead to an additional excess of immigrants classified as undocumented. The fact that there is no excess compared to the CPS March suggests that there is little difference in the accuracy of the identification method in the CPS basic data due to the missing variables.

The sample statistics in Table A.1 allow to quantify the difference between the sample

---

[40]If I reclassify undocumented immigrants with college degree to being documented in the Borjas CPS March so that the percentage of the college-educated among undocumented immigrants equals 16% instead of 20.1%, I obtain an undocumented immigrant population share of 5.4% as in the Pew CPS March. The share of high school dropouts then increases to 41.6%, which is very close to the percentage in the Pew file.

000294

size of undocumented immigrants classified by the Borjas method in the CPS March/basic and the sample size of those classified by the Pew CPS March for each education level. The population share of undocumented immigrants with education level $e$ can simply be calculated by multiplying their total population share with the share of undocumented immigrants having education level $e$. Thus, the population share of undocumented immigrants that hold a college degree is $0.054 \cdot 0.16 = 0.00864 = 0.864\%$. The corresponding value for the Borjas CPS March is around 1.15%. Hence, if we believe that the Pew CPS March file identifies all undocumented immigrants correctly, around 25% ($= (1.15 - 0.864)/1.15$) of college educated immigrants are falsely identified as undocumented in the Borjas CPS March.

Figure A.1 shows the analogously calculated percentages of excess undocumented immigrants for all education levels in the Borjas CPS March and the CPS basic data. For the lowest two education levels, there is no excess of undocumented immigrants in neither of the datasets. The undocumented immigrant population shares in the Borjas CPS March and the Pew CPS March almost exactly coincide, suggesting that the identifier constructed by Borjas' simplified method is very accurate for immigrants with at most a high school diploma. In the CPS basic, the population share of undocumented high school graduates is even somewhat too low, whereas for high school dropouts the shares are very similar as well. In both datasets, there is an excess of undocumented immigrants with at least some college education, with the excess being especially large for college graduates. Given that it is much easier for highly skilled workers to enter the US legally, e.g. with H-1B visa, this result is actually not surprising. Altogether, Figure A.1 suggests that Borjas' simplified but easily replicable identification method is very accurate for the low-skilled, but classifies up to around 25% of college-educated immigrants and up to around 7% of immigrants with some college education mistakenly as undocumented.

# B   Decomposition of Impact of Immigration on Job Finding

In this section, I analyze the total impact of an increase in immigrant job searchers on the job finding rates of each worker type by decomposing it into job creation and competition effect. The sign of the latter can be established by taking the partial derivatives with respect to the queue lengths of each type. For natives we have

$$\frac{\partial f_N}{\partial q_N} = \frac{e^{-\mu q_N}(1 + \mu q_N) - 1}{q_N^2}e^{-\mu q_D}e^{-\mu q_U} < 0 \quad \forall\, q_N > 0,$$

$$\frac{\partial f_N}{\partial q_D} = -\mu\frac{(1 - e^{-\mu q_N})e^{-\mu q_U}}{q_N}e^{-\mu q_D} < 0 \quad \forall\, q_D > 0,$$

$$\frac{\partial f_N}{\partial q_U} = -\mu\frac{(1 - e^{-\mu q_N})e^{-\mu q_D}}{q_N}e^{-\mu q_U} < 0 \quad \forall\, q_U > 0.$$

For documented immigrants we have

$$\frac{\partial f_D}{\partial q_N} = 0,$$

$$\frac{\partial f_D}{\partial q_D} = \frac{e^{-\mu q_D}(1 + \mu q_D) - 1}{q_D^2}e^{-\mu q_U} < 0 \quad \forall\, q_D > 0,$$

$$\frac{\partial f_D}{\partial q_U} = -\mu\frac{(1 - e^{-\mu q_D})}{q_D}e^{-\mu q_U} < 0 \quad \forall\, q_U > 0.$$

And for undocumented immigrants we have

$$\frac{\partial f_U}{\partial q_N} = 0,$$

$$\frac{\partial f_U}{\partial q_D} = 0,$$

$$\frac{\partial f_U}{\partial q_U} = \frac{e^{-\mu q_U}(1 + \mu q_U) - 1}{q_U^2} < 0 \quad \forall\, q_U > 0.$$

We can now analyze the total effect of a rise of unemployed immigrant workers. The arrival of more job searchers always leads to an increase in vacancies as the matching probability and hence the value of posting a vacancy rises. This drives down the queue length of workers of a different than the immigrating type. Taking derivatives with respect to $u_D$ we get the impact of documented immigration on job finding rates as

$$\frac{df_N}{du_D} = \underbrace{\underbrace{\frac{\partial f_N}{\partial q_N}}_{<0} \underbrace{\frac{dq_N}{dv}}_{<0} \underbrace{\frac{dv}{du_D}}_{>0} + \underbrace{\frac{\partial f_N}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{dv}}_{<0} \underbrace{\frac{dv}{du_D}}_{>0}}_{\text{job creation effect}} + \underbrace{\underbrace{\frac{\partial f_N}{\partial q_D}}_{<0} \underbrace{\frac{dq_D}{du_D}}_{>0}}_{\text{competition effect}} \lessgtr 0, \qquad (20)$$

$$\frac{df_D}{du_D} = \underbrace{\underbrace{\frac{\partial f_D}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{dv}}_{<0} \underbrace{\frac{dv}{du_D}}_{>0}}_{\text{job creation effect}} + \underbrace{\underbrace{\frac{\partial f_D}{\partial q_D}}_{<0} \underbrace{\frac{dq_D}{du_D}}_{>0}}_{\text{competition effect}} \lessgtr 0, \qquad (21)$$

$$\frac{df_U}{du_D} = \underbrace{\underbrace{\frac{\partial f_U}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{dv}}_{<0} \underbrace{\frac{dv}{du_D}}_{>0}}_{\text{job creation effect}} > 0. \qquad (22)$$

The impact of undocumented immigration on job finding rates is

$$\frac{df_N}{du_U} = \underbrace{\underbrace{\frac{\partial f_N}{\partial q_N}}_{<0} \underbrace{\frac{dq_N}{dv}}_{<0} \underbrace{\frac{dv}{du_U}}_{>0} + \underbrace{\frac{\partial f_N}{\partial q_D}}_{<0} \underbrace{\frac{dq_D}{dv}}_{<0} \underbrace{\frac{dv}{du_U}}_{>0}}_{\text{job creation effect}} + \underbrace{\underbrace{\frac{\partial f_N}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{du_U}}_{>0}}_{\text{competition effect}} \lessgtr 0, \qquad (23)$$

$$\frac{df_D}{du_U} = \underbrace{\underbrace{\frac{\partial f_D}{\partial q_D}}_{<0} \underbrace{\frac{dq_D}{dv}}_{<0} \underbrace{\frac{dv}{du_U}}_{>0}}_{\text{job creation effect}} + \underbrace{\underbrace{\frac{\partial f_D}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{du_U}}_{>0}}_{\text{competition effect}} \lessgtr 0, \qquad (24)$$

$$\frac{df_U}{du_U} = \underbrace{\underbrace{\frac{\partial f_U}{\partial q_U}}_{<0} \underbrace{\frac{dq_U}{du_U}}_{>0}}_{\text{competition effect}} < 0. \qquad (25)$$

Equations (20) and (23) establish that the effect of both documented and undocumented immigration on natives' job finding (and thus their unemployment rate) is ambiguous. The larger is the difference in wages between natives and the type of immigrant entering the pool of the unemployed, the higher is the number of additional vacancies posted. Therefore, we know that $\frac{df_N}{du_U} > \frac{df_N}{du_D}$ must hold. However, only solving and simulating the model for different $u_D$ and $u_U$ will allow us to determine the signs of $\frac{df_N}{du_U}$ and $\frac{df_N}{du_D}$.

5

# C   Model extensions

## C.1   Production using Capital and Labor

The first extension of the baseline model introduces an aggregate production function that uses capital and labor to generate a final output good. Thus, the productivity of a match is not constant but depends on the price of labor. Instead of assuming that a large representative firm directly posts vacancies and hires workers, I assume that recruiting agencies hire workers and bargain over their wages and then sell their labor services at the equilibrium price to competitive final good firms, which take the price for labor as given. This keeps the model tractable and as close as possible to the baseline version.

The final output is produced with a Cobb-Douglas function:

$$Y = AL^\alpha K^{(1-\alpha)}.$$

Perfect competition implies that the price for labor services equals their marginal product:

$$p_L = \alpha A (K/L)^{(1-\alpha)}.$$

In equilibrium, labor supply is determined by the number of workers of each type matched to recruiting agencies, which depends on the price of labor services:[41]

$$e_i(p_L) = \frac{\omega_i f_i(p_L)}{s_i + f_i(p_L) + \lambda_i^W},$$

$$L(p_L) = \sum_i e_i(p_L).$$

Thus, this extended model is solved by replacing the previously fixed match output $y$ with the expression for $p_L$, adding the labor supply equation and setting parameters $\alpha$, $A$, initial capital $K$ and the degree of the elasticity of capital supply. With perfect elasticity, $L^*$ denoting the equilibrium labor supply in the baseline model and $\alpha$, $A$ and $K$ normalized such that $\alpha A (K/L^*)^{(1-\alpha)} = 1$, we obtain a version of the model that is identical to the baseline. If on the other hand capital is inelastic, a change in labor supply, for example due to immigration, decreases the capital-labor ratio and leads to an equilibrium with a lower price for labor services

---

[41]The stock of matched workers is derived from the law of motion $\dot{e}_i = f_i(p_L)(\omega_i - e_i) - (s_i + \lambda_i^W)e_i$.

000298

compared to the baseline.

To illustrate how the predictions change depending on the degree of capital supply elasticity, I set $\alpha = 0.66$, the labor share of output, and normalize $A$ and $K$ so that $p_L = 1$ in the equilibrium with the calibration shown in Table 4. I then simulate immigration for different capital supply elasticities, ranging from 0 ($K$ stays fixed) to infinity (the baseline case). Figures C.1 and C.2 show the effects of a one percentage point increase in the share of documented and undocumented immigrants (i.e. the slopes of the lines in Figures 7 and 8) depending on the elasticity of capital supply. The limit on the left depicts the case with fixed capital, whereas the limit on the right depicts the baseline case of infinite elasticity. Immigration drives down the marginal product of labor more strongly when the capital supply elasticity is lower, resulting in fewer vacancies and lower wages. Accordingly, the effect on the unemployment rates of all worker types is more positive and the effect on their wages more negative.

In case of documented immigration, the signs of the effects on unemployment for each type remain the same for any degree of the capital supply elasticity (undocumented immigrants' unemployment rate decreases even with zero elasticity), whereas the effect on the overall unemployment rate becomes negative when the elasticity is low enough. In case of undocumented immigration, all signs are unaffected. That is, even when capital remains fixed, the unemployment rate of natives as well as the overall unemployment rate fall, although for natives the change is just around a third of the change with perfectly elastic capital supply. For both types of immigration, wages start to fall when the capital supply is only somewhat inelastic. This prediction would contradict the positive wage effects of undocumented immigrants found in section 7.1.

In sum, the qualitative predictions in terms of the employment effects of the two types of immigration hold even under the most extreme assumption of fixed capital. On the other hand, effects on wages are negative when the capital supply is somewhat inelastic, which stands in contrast to the empirical evidence shown in Section 7.1. This might suggest that capital supply is rather elastic in reality, at least in the low-skilled sector that is the subject of the paper.

000299

Figure C.1: Effects of documented immigration depending on capital supply elasticity



Figure C.2: Effects of undocumented immigration depending on capital supply elasticity



8

000300

## C.2   Imperfect Substitution between Natives and Immigrants

The second model extension allows for imperfect substitution between native and immigrant workers in production. I maintain the assumption that workers apply to the same jobs as otherwise the competition effect would be absent in the model. This implies that firms cannot affect the relative quantities of native and immigrant labor by posting type-specific vacancies. Rather, the quantities result from population shares and job finding and separation rates of natives and immigrants. Apart from the production function, the labor market has the same structure as described in Section C.1.

As a consequence of imperfect substitution, an inflow of immigrants will reduce the marginal product of immigrant labor and increase the marginal product of native labor, whereby the sizes of the effects depend on the degree of imperfect substitution. Due to the lack of an estimate for the elasticity of substitution between documented and undocumented immigrants, I assume that these two labor types are perfectly substitutable.[42] Thus, production is given by

$$Y = AK^{(1-\alpha)}[(\theta_N L_N^{\frac{\sigma-1}{\sigma}} + \theta_I L_I^{\frac{\sigma-1}{\sigma}})^{\frac{\sigma}{\sigma-1}}]^\alpha,$$

where $\theta_N$ and $\theta_I$ are productivity parameters and $\sigma$ is the elasticity of substitution between native and immigrant labor. The prices for labor services for each type $j \in \{N, I\}$ equal their marginal products and are given by

$$p_j = \alpha A(K/L)^{(1-\alpha)}\theta_j(\frac{L}{L_j})^{1/\sigma}.$$

The equilibrium labor supplies are

$$L_N(p_N) = e_N(p_N) = \frac{\omega_N f_N(p_N)}{s_N + f_N(p_N)},$$

$$L_I(p_I) = e_D(p_I) + e_U(p_I) = \frac{\omega_D f_D(p_I)}{s_D + f_D(p_I)} + \frac{\omega_U f_U(p_I)}{s_U + f_U(p_I) + \lambda_U^W}.$$

Analogously to Section C.1, the model is solved by replacing match output with the prices

---

[42]Edwards and Ortega (2017) allow documented and undocumented workers to be potentially imperfectly substitutable in their model but ultimately assume an elasticity of 1000, which practically is equivalent to perfect substitutability.

of labor services for each type, which are now different for natives and immigrants. Without loss of generality, I define the auxiliary parameter $\phi_j \equiv \alpha A(K/L)^{(1-\alpha)}\theta_j$ and set $\phi_N$ and $\phi_I$ so that $p_N = p_I = 1$ when all other parameters are set as shown in Table 4.[43] Hence, the productivity parameters are consistent with the parameterization that replicates the data.[44] I base the calibration of $\sigma$ on Ottaviano and Peri (2012). They find an overall elasticity of substitution around 20 considering all education levels but a value of only 12.5 among high school dropouts, which is the estimate I use.

Figure C.3 plots the effects of an inflow of documented immigrants on the equilibrium outcomes predicted by this extended model. Because $\phi_I < \phi_N$, the job creation effect of immigration is weaker than in the baseline model, which results in a somewhat steeper increase in natives' unemployment rate. However, the most notable deviation from the baseline model can be seen in the wage plots. Because of the change in relative labor supplies of natives and immigrants, the marginal productivity of the former rises whereas that of the latter falls. Accordingly, wages now strongly increase for natives and decrease for both types of immigrants, whereas they remained almost constant before.

Figure C.4, which depicts the effects of undocumented immigration, shows that due to the weaker job creation effect, the fall in natives' unemployment rate is somewhat less steep, although the difference to the baseline figure is marginal. The wage reactions largely resemble those in C.3 because they are now primarily driven by the effects on relative productivities, which are similar in the two figures.

Altogether, introducing imperfect substitutability has little impact on the predictions regarding unemployment rates. However, the shifts in relative labor supplies due to immigration imply positive effects on natives' and negative effects on immigrants' wages. An important caveat is the maintained assumption that all workers apply to the same jobs. If imperfect substitution induces firms to create different vacancies for natives and immigrants, the competition effect might be lower and the effects on natives' unemployment rates more positive than predicted by the model .

---

[43]Capital is therefore assumed to be perfectly elastic again in this extension.

[44]This implies that $\phi_I$ is somewhat smaller than $\phi_N$ because there are less immigrants than natives employed and thus the marginal product of immigrant labor would be larger, if the parameters were the same.

10

Figure C.3: Effects of documented immigration with imperfect substitution



Figure C.4: Effects of undocumented immigration with imperfect substitution



000303

# D   Robustness Checks

## D.1   Wage gaps using Census/ACS data

Table D.1: Legal status and hourly wage of low-skilled workers

|              | (1)       | (2)       | (3)       | (4)       | (5)       |
|--------------|-----------|-----------|-----------|-----------|-----------|
| Documented   | -0.136    | -0.033    | -0.064    | -0.026    | -0.025    |
|              | (0.0021)  | (0.0232)  | (0.0146)  | (0.0126)  | (0.0125)  |
| Undocumented | -0.344    | -0.205    | -0.238    | -0.144    | -0.139    |
|              | (0.0022)  | (0.0207)  | (0.0155)  | (0.0132)  | (0.0131)  |
| Demographics | No        | Yes       | Yes       | Yes       | Yes       |
| Year/MSA FE  | No        | No        | Yes       | Yes       | Yes       |
| Ind/occ FE   | No        | No        | No        | Yes       | No        |
| Ind x occ FE | No        | No        | No        | No        | Yes       |
| Observations | 508720    | 508720    | 508720    | 508720    | 508720    |
| R-squared    | 0.071     | 0.174     | 0.220     | 0.314     | 0.325     |

Notes: Dependent variable is the logarithm of the hourly wage. Data come from the Census 1990/2000 and ACS 2009-2011 and include high school dropouts aged 25-65. Demographic controls include *sex*, *race*, *age* and *age squared*. Standard errors are clustered at the metropolitan area level.

## D.2   Job finding rate gaps and search effort

If (undocumented) immigrants search for jobs more intensively and the job finding rate positively depends on search effort, this could be driving the job finding rate difference observed in the data. To control for this possibility, I use additional variables in the basic CPS and data from the American Time Use Survey (ATUS).

Job seekers in the CPS can indicate up to six different search methods in response to the question "What are all of the things you have done to find work during the last 4 weeks?". Figure D.1 shows the possible methods and their frequencies by worker type among low-skilled job seekers. Being used by almost half of them, the most frequent method for all types is to contact employers directly. It also stands out that immigrants tend to contact more often friends and relatives and less often send resumes than natives. Figure D.2 shows the average number of different job search methods used over time. Except in the very beginning of the period, both types of immigrants use less methods than natives.

Figure D.1: Search methods used by unemployed low-skilled workers (%)



Figure D.2: Number of search methods used by unemployed low-skilled workers



000305

However, immigrants might use these search methods more intensively, i.e. spend more time using a specific method. To investigate this possibility, I use additional data from the ATUS. In this survey, a sample of respondents interviewed for the CPS report their time spent on various activities during the day before the interview. Importantly, one of the categories is "Job search activities". I use this information to calculate for all unemployed in the ATUS the daily time spent searching for a job (in minutes). Although the observations in the ATUS and the CPS monthly data can be linked and I therefore have observed search time for a subset of CPS observations, the ATUS sample size is too small to analyze the determinants of job finding rates (there are around 1300 unemployed high school dropouts).

Therefore, to be able to control for search time in the regressions using the full CPS sample, I exploit the fact that also ATUS respondents report the methods used for job search. This allows me to estimate a relationship between search time and methods in the ATUS data and then, based on this relationship, impute search time for all CPS observations. I thereby follow Mukoyama et al. (2018) and use a Heckman selection model, which estimates the effects of search methods and demographic variables on the probability of observing positive search time in the first step and the effects on minutes spent searching conditional on positive search time in the second step. I then predict search time based on the estimated model in the CPS sample.

Additionally to the demographic variables used by Mukoyama et al. (2018) in both steps of the estimation, I also include the two immigrant dummies to allow for systematic differences in search time between natives, documented and undocumented immigrants. Figure D.3 plots the resulting imputed daily minutes spent searching by worker type. Both types of immigrants spend less time searching than natives and the difference widens from around two to six minutes over the period. In 2016, natives have spent around 50% more time per day on searching for a job than immigrants according to this imputation. If higher search effort positively affects the speed of job finding, we would therefore expect immigrants to find jobs at a *lower* rate than natives.

Table D.2 shows the results of the job finding rate regressions controlling for imputed search time. The coefficients are virtually the same as in the baseline Table 2. Thus, the empirical evidence does not support that varying search effort drives the job finding rate differentials.

14

Figure D.3: Imputed minutes spent searching by unemployed low-skilled workers



Table D.2: UE regressions controlling for imputed time spent on job search

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Documented | 0.063 | 0.058 | 0.068 | 0.066 | 0.067 |
|  | (0.0047) | (0.0062) | (0.0084) | (0.0078) | (0.0078) |
| Undocumented | 0.136 | 0.121 | 0.137 | 0.137 | 0.138 |
|  | (0.0054) | (0.0100) | (0.0118) | (0.0123) | (0.0123) |
| Demographics | No | Yes | Yes | Yes | Yes |
| Year/State FE | No | No | Yes | Yes | Yes |
| Ind/occ FE | No | No | No | Yes | No |
| Ind x occ FE | No | No | No | No | Yes |
| Observations | 75032 | 75032 | 75032 | 75032 | 75032 |
| R-squared | 0.021 | 0.039 | 0.052 | 0.064 | 0.086 |

Notes: Dependent variable is the probability of a UE transition. Data come from the CPS basic files 1994-2016 and include high school dropouts aged 25-65. Demographic controls include *sex*, *race*, *age* and *age squared*. Standard errors are clustered at the state level.

000307

### D.3 Wage and job finding rates when excluding occupations with disproportionally high concentration of undocumented immigrants

Table D.3: Legal status and hourly wage of low-skilled workers

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Documented | -0.127 | -0.073 | -0.094 | -0.047 | -0.046 |
|  | (0.0051) | (0.0100) | (0.0080) | (0.0066) | (0.0067) |
| Undocumented | -0.268 | -0.195 | -0.223 | -0.128 | -0.126 |
|  | (0.0057) | (0.0197) | (0.0172) | (0.0130) | (0.0133) |
| Demographics | No | Yes | Yes | Yes | Yes |
| Year/MSA FE | No | No | Yes | Yes | Yes |
| Ind/occ FE | No | No | No | Yes | No |
| Ind x occ FE | No | No | No | No | Yes |
| Observations | 57393 | 57393 | 57393 | 57393 | 57393 |
| R-squared | 0.046 | 0.148 | 0.176 | 0.277 | 0.305 |

Notes: Dependent variable is the logarithm of the hourly wage. Data come from the CPS March supplement 1994-2016 and include high school dropouts aged 25-65. Demographic controls include *sex*, *race*, *age* and *age squared*. The dropped occupations are *Cooks, Construction laborers, Carpenters, Gardeners* and *Food prep workers*. Standard errors are clustered at the metropolitan area level.

Table D.4: Legal status and UE transition of low-skilled workers

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Documented | 0.059 | 0.053 | 0.062 | 0.059 | 0.060 |
|  | (0.0051) | (0.0060) | (0.0067) | (0.0063) | (0.0064) |
| Undocumented | 0.132 | 0.119 | 0.134 | 0.130 | 0.130 |
|  | (0.0059) | (0.0076) | (0.0099) | (0.0116) | (0.0119) |
| Demographics | No | Yes | Yes | Yes | Yes |
| Year/State FE | No | No | Yes | Yes | Yes |
| Ind/occ FE | No | No | No | Yes | No |
| Ind x occ FE | No | No | No | No | Yes |
| Observations | 62653 | 62653 | 62653 | 62653 | 62653 |
| R-squared | 0.014 | 0.025 | 0.040 | 0.055 | 0.080 |

Notes: Dependent variable is the probability of a UE transition. Data come from the CPS basic files 1994-2016 and include high school dropouts aged 25-65. Demographic controls include *sex*, *race*, *age* and *age squared*. The dropped occupations are *Cooks, Construction laborers, Carpenters, Gardeners* and *Food prep workers*. Standard errors are clustered at the state level.

16

## D.4   Robustness to alternative bargaining mechanism

The bargaining mechanism described in the main text implies that with some probability, which depends on the bargaining power, workers send their firm wage offers before the hiring decision. However, a sensible alternative might be to assume that firms first commit to hire the candidate that yields the highest expected surplus and then engage in bargaining with the chosen worker. As a consequence, hired workers could capture the full match surplus with probability $\beta_i$ independently of the number and nature of the competitors. While contractually committing to a wage after the hiring decision certainly resembles the real world more closely, the assumption that competitors do not influence the wage negotiation at all seems extreme as well. Reality most likely lies somewhere in-between the two alternatives. To check whether the predictions of the model are robust to this alternative assumption, I estimate and solve the model with wage bargaining after the hiring decision. Thus, a hired worker of type $i$ always earns $\underline{w}_i + \beta_i(y - \underline{w}_i)$.

Figure D.4 shows the resulting effects documented immigration. While the reactions of the unemployment rates to documented immigration are unaffected, the expected wage of natives experiences a (barely visible) decline, whereas in the baseline model it increases. The rationale behind this is the following. Previously, natives could only capture a share of the match surplus when having no competitors, as indicated by case 1 in Table E.2. As there is a positive job creation effect due to documented immigration, probability $f_1$ increases and thus there are more natives earning a wage higher than the reservation wage, although there are overall less natives employed because of the decline in $f_2$. The higher probability of finding a job with some surplus over staying unemployed increases the reservation wage (see equation (4)) and therefore the actual wage. This wage effect of natives shifting to matches with positive surplus vanishes under the alternative bargaining mechanism as natives receive a wage above the reservation wage in all matches. Therefore, now the expected wage of natives is initially higher, but falls when the share of immigrants increases as $f_2$ declines due to the additional immigrant competitors.

Figure D.5 plots the reactions of unemployment rates and wages to undocumented immigration. The unemployment rates of natives and documented immigrants are now higher initially compared to Figure 8. This is because for a low share of undocumented immigrants, wages of

all workers are higher and therefore there are less vacancies in equilibrium. When the share increases, the wages of legal workers increase less steeply and the wages of undocumented immigrants decrease. Thus, expected wage costs of firms fall more sharply, leading to a stronger job creation effect and a steeper decline in the unemployment rate of natives. The reason for the weaker wage increase (or decrease in case of undocumented immigrants) is again the lack of the wage effect caused by workers shifting to jobs with wages above the reservation wage that arises under the baseline bargaining assumption.

In sum, the competition effect has no impact on natives' wages under the baseline assumption because competition only decreases the number of natives with jobs that generate no surplus above staying unemployed anyways. This is not true anymore when the wage is bargained after being hired and therefore generally wages move in the opposite direction of unemployment rates because a lower job finding rate necessarily translates into a lower reservation wage, if every job that can be found yields a surplus. Hence, the effects of immigration on unemployment rates are qualitatively robust and quantitatively even stronger for natives in case of undocumented immigration with the alternative bargaining mechanism, whereas the effects on wages are both qualitatively and quantitatively different.

000310

Figure D.4: Documented immigration with alternative bargain mechanism



Figure D.5: Undocumented immigration with alternative bargain mechanism



19

## D.5   Robustness to calibration of the deportation disutility

The existence of two opposing forces whose magnitudes depend on the parameterization suggests that the findings might be sensitive to particular parameters, in particular the size of the surplus firms make by hiring undocumented workers. Therefore I next check whether the predictions of Figures 7 and 8 are robust to allowing $\Delta\lambda$ to be different from zero and to changes in the value of $R$. In particular, I consider the extreme case in which only employed undocumented workers can be detected and deported, i.e. $\lambda^U = 0$ and $\lambda^W = \Delta\lambda$. I recalibrate $\lambda^W$ following the same method of calibration as described in section 5 except that I divide monthly interior removals by the number of employed undocumented immigrants instead of the total number. The resulting probability is 0.22%. As now $\Delta\lambda$ is strictly greater than zero, $R$ always has a positive effect on $\underline{w}_U$. Thus, it affects undocumented immigrants' wages and as a consequence the wage gap between worker types. The value of $R$ also affects job finding rates because a rise in $\underline{w}_U$ makes hiring undocumented workers more expensive, which mutes the vacancy creation effect. Therefore, it is necessary to re-estimate $c$, $\mu$, $\beta_D$ and $\beta_U$ to match the moments from the data after a change in $R$. Figures D.6 and D.7 present the effects of immigration when setting R equal to 75% of an undocumented job seeker's lifetime utility $U_U$, which is the most extreme value I consider throughout the paper, and compare them to the benchmark calibration with $\Delta\lambda = 0$ (in light colors). Both unemployment rates and expected wages are virtually unaffected when choosing a high value for $R$. The unemployment rate of undocumented workers is somewhat elevated as their overall separation probability $(s_U + \lambda_W)$ is now higher. Moreover, undocumented immigration has a weaker effect on vacancy creation, because the higher separation probability decreases their hiring surplus. This can be seen by a slightly less steep decline in the unemployment rate of natives in Figure D.7. In sum, for any reasonable calibration of the deportation disutility and deportation risk, undocumented immigration is unambiguously beneficial for native workers.

Figure D.6: Documented immig. with $\lambda^W = 0.0022$, $\lambda^U = 0$ and $R = 0.75U_U$



Figure D.7: Undocumented immig. with $\lambda^W = 0.0022$, $\lambda^U = 0$ and $R = 0.75U_U$



000313

## D.6   Robustness to using inflow rates to capture immigration shocks

The analysis in section 7.1 differs from the extensive literature employing the previous settlement instrument with respect to the measurement of immigration. While most studies examine immigration in a perfect competition model, in which the increase in the mere supply of workers affects the equilibrium wage, I examine immigration in a model, in which only the change in the composition of the worker supply but not its size matters for the equilibrium. This is why my empirical measurement of immigration is the change in the population share and not the inflow rate, i.e. the change in the number of immigrants in a region divided by the population level. These two measure can be very different as the former takes into account changes in the total population, which becomes especially important when there are adjustments through internal migration. If a higher labor market tightness due to an increase in undocumented immigrants attracts natives, total population changes additionally to the immigration shock between two points in time. This is reflected in the population shares, but not the inflow rate, which is commonly calculated as the number of inflowing immigrants relative to the initial population level.

To investigate the results with the traditional measurement of immigration, I repeat the regressions with inflow rates $m_{i,r,t} = I_{i,r,t}/P_{r,t}$ as endogenous regressors and predicted inflow rates $m_{i,r,t}^{Z} = I_{i,r,t}^{Z}/P_{r,t}$ as instruments. The second stage results in Panel C of Table D.6 confirm the baseline results. However, the effects of undocumented immigration in columns (1), (3) and (4) are not significant in Panel B. This is likely to be caused by the failure of inflow rates to account for internal migration. If internal migration reacts sluggishly (due to migration costs) and immigrant inflows are correlated over time, population changes triggered by previous immigration shocks are correlated to current immigration shocks and therefore the estimates of the conventional IV model are biased. Long-term adjustment mechanisms like internal migration are precisely what the JRS IV strategy controls for, which explains why only the coefficients of Panel C remain significant when using inflow rates.

000314

Table D.5: First stage with immigrant inflow rates as regressors

|  | IV | | JRS IV | | | |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) | (6) |
|  | Doc. inflow | Undoc. inflow | Doc. inflow | Undoc. inflow | (Doc. inflow)$_{t-1}$ | (Undoc. inflow)$_{t-1}$ |
| (Doc. inflow)$^Z$ | 0.723 | -0.271 | 1.221 | 1.261 | -0.598 | -0.250 |
|  | (0.460) | (0.924) | (0.127) | (0.259) | (0.379) | (0.390) |
| (Undoc. inflow)$^Z$ | 0.025 | 0.509 | 0.093 | 0.844 | 1.035 | 2.010 |
|  | (0.191) | (0.332) | (0.206) | (0.410) | (0.291) | (0.825) |
| (Doc. inflow)$^Z_{t-1}$ |  |  | 0.091 | 0.331 | 0.838 | -0.220 |
|  |  |  | (0.191) | (0.216) | (0.487) | (0.936) |
| (Undoc. inflow)$^Z_{t-1}$ |  |  | -0.458 | -1.403 | -0.374 | -0.533 |
|  |  |  | (0.132) | (0.320) | (0.124) | (0.216) |
| Observations | 99 | 99 | 66 | 66 | 66 | 66 |
| R-squared | 0.523 | 0.255 | 0.629 | 0.631 | 0.674 | 0.455 |
| F-stat. | 169.7 | 62.07 | 27.28 | 42.21 | 376.2 | 195.1 |
| SW F-stat. | 25.87 | 85.02 | 40.47 | 82.11 | 51.21 | 24.38 |

Notes: Population data are from the US Census 1980-2000 and ACS 2009-2011 and include high school dropouts participating in the labor force. The sample consists of 33 MSAs, for which data on job openings are available. Standard errors are clustered at the MSA level. The observations are weighted by MSA population.

Table D.6: Second stage with immigrant inflow rates as regressors

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
|  | Vacancies | Native wage | Doc. wage | Undoc. wage |
| **Panel A: OLS** |  |  |  |  |
| Doc. inflow | -2.113 | -0.356 | -0.439 | -0.487 |
|  | (1.313) | (0.119) | (0.152) | (0.162) |
| Undoc. inflow | 1.449 | 0.463 | 0.269 | 0.280 |
|  | (0.468) | (0.044) | (0.111) | (0.093) |
| Observations | 99 | 99 | 99 | 97 |
| R-squared | 0.770 | 0.327 | 0.056 | 0.127 |
| **Panel B: IV** |  |  |  |  |
| Doc. inflow | -1.998 | -0.314 | -0.312 | -0.460 |
|  | (3.625) | (0.185) | (0.212) | (0.242) |
| Undoc. inflow | -1.084 | 0.504 | 0.105 | 0.070 |
|  | (2.887) | (0.148) | (0.155) | (0.155) |
| Observations | 99 | 99 | 99 | 97 |
| R-squared | 0.653 | 0.319 | 0.045 | 0.095 |
| **Panel C: JRS IV** |  |  |  |  |
| Doc. inflow | -1.679 | -0.284 | -0.526 | -0.765 |
|  | (1.153) | (0.192) | (0.419) | (0.422) |
| Undoc. inflow | 1.877 | 0.449 | 0.496 | 0.620 |
|  | (0.514) | (0.078) | (0.168) | (0.191) |
| (Doc. inflow)$_{t-1}$ | -4.285 | 0.359 | 0.370 | 0.764 |
|  | (1.567) | (0.352) | (0.331) | (0.3300) |
| (Undoc. inflow)$_{t-1}$ | 1.379 | -0.241 | -0.027 | -0.310 |
|  | (1.242) | (0.201) | (0.201) | (0.216) |
| Observations | 66 | 66 | 66 | 66 |
| R-squared | 0.879 | 0.558 | 0.078 | 0.119 |

Notes: Population data are from the US Census 1980-2000 and ACS 2009-2011 and include high school dropouts participating in the labor force. The sample consists of 33 MSAs, for which data on job openings are available. Standard errors are clustered at the MSA level. The observations are weighted by average MSA population.

000315

## D.7   Robustness to using 1980 as base period for the IV

As an additional robustness check, I change the base period for the distribution of immigrants according to which the national inflows are allocated to MSAs. Instead of taking the distribution in the initial year, I take the distribution in the year 1980 for the allocation of all national inflows in the periods 1980-1990, 1990-2000 and 2000-2010. As shown in Table D.8, with the recalculated instruments the effects of undocumented immigration are qualitatively unchanged in the preferred model in Panel C. Quantitatively, the response of vacancies is somewhat smaller and the response of wages somewhat larger compared to the responses in Table 6.

Table D.7: First stage with base period 1980

| | IV | | JRS IV | | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | Doc. share | Undoc. share | Doc. share | Undoc. share | $(Doc. share)_{t-1}$ | $(Undoc. share)_{t-1}$ |
| $(Doc. share)^Z$ | 0.589 | 0.093 | 0.517 | 0.647 | 0.387 | -0.165 |
| | (0.072) | (0.306) | (0.071) | (0.168) | (0.155) | (0.137) |
| $(Undoc. share)^Z$ | 0.126 | 0.580 | -0.016 | 0.408 | -0.043 | 0.908 |
| | (0.024) | (0.120) | (0.039) | (0.186) | (0.082) | (0.059) |
| $(Doc. share)^Z_{t-1}$ | | | 0.025 | 0.465 | 0.459 | -0.193 |
| | | | (0.083) | (0.146) | (0.060) | (0.130) |
| $(Undoc. share)^Z_{t-1}$ | | | 0.109 | -0.701 | 0.119 | 0.581 |
| | | | (0.051) | (0.100) | (0.050) | (0.081) |
| Observations | 99 | 99 | 66 | 66 | 66 | 66 |
| R-squared | 0.646 | 0.463 | 0.692 | 0.524 | 0.783 | 0.918 |
| F-stat. | 49.75 | 85.7 | 47.92 | 17.91 | 84.48 | 120.6 |
| SW F-stat. | 8.16 | 34.06 | 32.82 | 57.97 | 32.33 | 98.02 |

Notes: Population data are from the US Census 1980-2000 and ACS 2009-2011 and include high school dropouts participating in the labor force. The sample consists of 33 MSAs, for which data on job openings are available. Standard errors are clustered at the MSA level. The observations are weighted by MSA population.

000316

Table D.8: Second stage with base period 1980

|  | (1) Vacancies | (2) Native wage | (3) Doc. wage | (4) Undoc. wage |
|---|---|---|---|---|
| **_Panel A: OLS_** | | | | |
| Doc. share | -4.834 | -0.291 | -0.542 | -0.729 |
|  | (1.068) | (0.2500) | (0.328) | (0.359) |
| Undoc. share | 2.108 | 0.578 | 0.267 | 0.267 |
|  | (0.259) | (0.056) | (0.153) | (0.137) |
| Observations | 99 | 99 | 99 | 97 |
| R-squared | 0.792 | 0.314 | 0.053 | 0.130 |
| **_Panel B: IV_** | | | | |
| Doc. share | -4.688 | -0.286 | -0.123 | -0.751 |
|  | (1.673) | (0.367) | (0.366) | (0.475) |
| Undoc. share | 1.195 | 0.459 | -0.031 | 0.103 |
|  | (1.156) | (0.169) | (0.188) | (0.222) |
| Observations | 99 | 99 | 99 | 97 |
| R-squared | 0.787 | 0.305 | 0.031 | 0.122 |
| **_Panel C: JRS IV_** | | | | |
| Doc. share | 0.737 | -0.832 | -0.121 | -1.036 |
|  | (3.793) | (0.445) | (0.5600) | (0.713) |
| Undoc. share | 1.858 | 0.421 | 0.270 | 0.425 |
|  | (0.5100) | (0.106) | (0.148) | (0.179) |
| (Doc. share)$_{t-1}$ | -6.127 | 0.759 | -0.099 | 0.337 |
|  | (2.756) | (0.397) | (0.543) | (0.687) |
| (Undoc. share)$_{t-1}$ | 0.325 | -0.311 | -0.098 | -0.098 |
|  | (0.788) | (0.084) | (0.157) | (0.197) |
| Observations | 66 | 66 | 66 | 66 |
| R-squared | 0.886 | 0.569 | 0.095 | 0.090 |

Notes: Population data are from the US Census 1980-2000 and ACS 2009-2011 and include high school dropouts participating in the labor force. The sample consists of 33 MSAs, for which data on job openings are available. Standard errors are clustered at the MSA level. The observations are weighted by average MSA population.

000317

# E    Additional Figures and Tables

Figure E.1: Worker distribution across industries by education



Figure E.2: Composition of low-skilled workers in most frequent occupations of natives



26

Figure E.3: Job creation effect of documented and undocumented immigration



Notes: The plots show the effects of the same decrease in total queue length $q$ as implied by immigration but without changing the actual composition of population. Darker colors correspond to documented immigration, lighter colors to undocumented immigration.

Figure E.4: Competition effect of documented and undocumented immigration

Notes: The plots show the effects of a change in the population composition implied by immigration but without changing total queue length $q$. Darker colors correspond to documented immigration, lighter colors to undocumented immigration.

000319

Figure E.5: Serial correlations of predicted changes in immigrant shares



Figure E.6: Effects of undocumented immigration depending on fine for firms



000320

Table E.1: Top 25 most common occupations of low-skilled workers by status

| Native | | | Documented Immigrant | | | Undocumented Immigrant | | |
|---|---|---|---|---|---|---|---|---|
| Occupation | Wage | % | Occupation | Wage | % | Occupation | Wage | % |
| Truck/delivery/tractor drivers | 12.8 | 7.7 | Janitors | 8.7 | 6.7 | Cooks | 7.3 | 8.2 |
| Janitors | 8.8 | 4.1 | Cooks | 8.5 | 6.1 | Construction laborers | 8.9 | 8.0 |
| Cooks | 8.2 | 3.9 | Truck/delivery/tractor drivers | 12.1 | 5.9 | Gardeners and groundskeepers | 7.5 | 5.9 |
| Nursing aides | 8.0 | 3.8 | Housekeepers/maids etc. | 7.4 | 5.0 | Housekeepers/maids etc. | 7.0 | 4.7 |
| Supervisors/proprietors in sales | 12.2 | 3.1 | Construction laborers | 11.4 | 4.2 | Janitors | 7.7 | 4.6 |
| Cashiers | 7.3 | 2.7 | Gardeners and groundskeepers | 8.8 | 3.8 | Carpenters | 9.6 | 4.3 |
| Housekeepers/maids etc. | 7.1 | 2.7 | Assemblers of electrics | 9.4 | 3.5 | Truck/delivery/tractor drivers | 10.9 | 3.8 |
| Laborers outside construction | 9.8 | 2.7 | Nursing aides | 9.4 | 3.4 | Food prep workers | 7.4 | 3.5 |
| Construction laborers | 10.1 | 2.6 | Carpenters | 14.0 | 2.6 | Farm workers | 7.2 | 3.5 |
| Assemblers of electrics | 11.3 | 2.1 | Laborers outside construction | 11.2 | 2.4 | Painters/construction/maintenance | 8.8 | 3.1 |
| Managers and administrators | 19.1 | 2.1 | Machine operators | 10.9 | 2.3 | Laborers outside construction | 8.3 | 2.6 |
| Carpenters | 13.6 | 2.1 | Food prep workers | 7.6 | 2.1 | Machine operators | 8.9 | 2.0 |
| Machine operators | 11.2 | 2.0 | Farm workers | 8.4 | 2.1 | Assemblers of electrics | 8.2 | 2.0 |
| Stock and inventory clerks | 8.6 | 1.9 | Waiters | 7.6 | 1.7 | Packers and packagers by hand | 7.1 | 1.8 |
| Retail sales clerks | 10.1 | 1.9 | Textile sewing machine operators | 7.5 | 1.6 | Masons, tilers, and carpet installers | 9.9 | 1.8 |
| Automobile mechanics | 11.5 | 1.7 | Packers and packagers by hand | 7.4 | 1.6 | Cashiers | 7.2 | 1.5 |
| Gardeners and groundskeepers | 8.7 | 1.5 | Cashiers | 7.7 | 1.5 | Drywall installers | 9.4 | 1.5 |
| Supervisors of construction work | 15.9 | 1.4 | Painters/construction/maintenance | 9.9 | 1.4 | Roofers and slaters | 9.0 | 1.5 |
| Waiters | 6.6 | 1.3 | Welders and metal cutters | 12.3 | 1.3 | Stock and inventory clerks | 8.0 | 1.4 |
| Food prep workers | 6.7 | 1.2 | Stock and inventory clerks | 8.9 | 1.3 | Textile sewing machine operators | 6.8 | 1.4 |
| Production supervisors or foremen | 14.4 | 1.2 | Wood lathe machine operators | 11.3 | 1.2 | Waiter's assistant | 7.3 | 1.3 |
| Salespersons | 13.4 | 1.2 | Supervisors/proprietors in sales | 12.4 | 1.2 | Nursing aides | 7.7 | 1.2 |
| Secretaries | 11.9 | 1.1 | Hairdressers and cosmetologists | 7.2 | 1.2 | Butchers and meat cutters | 9.0 | 1.2 |
| Customer service reps/investigators/adjusters | 9.9 | 1.0 | Mechanics and repairers | 11.1 | 1.2 | Packers, fillers, and wrappers | 7.7 | 1.1 |
| Welders and metal cutters | 12.0 | 1.0 | Packers, fillers, and wrappers | 8.3 | 1.0 | Waiters | 7.6 | 1.1 |

Notes: The table ranks occupations by frequency among high school dropout workers. Wages are hourly and calculated as described in the text. Occupations refer to the 3-digit occ1990 categories provided by IPUMS.

29

000321

Table E.2: Wage distribution

| Case | Probability | Native | Documented | Undocumented |
|---|---|---|---|---|
| | | | Wage | |
| 1) No competitors | $f_1 = e^{-\mu q_N}e^{-\mu q_D}e^{-\mu q_U}$ | $\underline{w}_N + \beta_N(y - \underline{w}_N)$ | $\underline{w}_D + \beta_D(y - \underline{w}_D)$ | $\underline{w}_U + \beta_U(y - \underline{w}_U)$ |
| 2) Only N competitors | $f_2 = (1 - e^{-\mu q_N})e^{-\mu q_D}e^{-\mu q_U}$ | $\underline{w}_N$ | $\underline{w}_D + \beta_D(\frac{\bar{r}_D}{\bar{r}_N}\underline{w}_N + (1 - \frac{\bar{r}_D}{\bar{r}_N})y - \underline{w}_D)$ | $\underline{w}_U + \beta_U(\frac{\bar{r}_U}{\bar{r}_N}\underline{w}_N - (1 - \frac{\bar{r}_U}{\bar{r}_N})y - \underline{w}_U)$ |
| 3) $\geq 1$ D, no U competitor | $f_3 = (1 - e^{-\mu q_D})e^{-\mu q_U}$ | $rU_N = \underline{w}_N$ | $\underline{w}_D$ | $\underline{w}_U + \beta_U(\frac{\bar{r}_U}{\bar{r}_D}\underline{w}_D - (1 - \frac{\bar{r}_U}{\bar{r}_D})y - \underline{w}_U)$ |
| 4) $\geq 1$ U competitor | $f_4 = (1 - e^{-\mu q_U})$ | $rU_N = \underline{w}_N$ | $rU_D = \underline{w}_D$ | $\underline{w}_U$ |

Table E.3: Profit distribution

| Case | Probability | Profit | Hire |
|---|---|---|---|
| 1) One N, no D, no U | $\mu q_N e^{-\mu q_N}e^{-\mu q_D}e^{-\mu q_U}$ | $(1 - \beta_N)(y - \underline{w}_N)$ | N |
| 2) One D, no N, no U | $\mu q_D e^{-\mu q_D}e^{-\mu q_N}e^{-\mu q_U}$ | $(1 - \beta_D)(y - \underline{w}_D)$ | D |
| 3) One U, no N, no D | $\mu q_U e^{-\mu q_U}e^{-\mu q_N}e^{-\mu q_D}$ | $(1 - \beta_U)(y - \underline{w}_U)$ | U |
| 4) $>$ one N, no D, no U | $(1 - e^{-\mu q_N} - \mu q_N e^{-\mu q_N})e^{-\mu q_D}e^{-\mu q_U}$ | $y - \underline{w}_N$ | N |
| 5) $>$ one D, no U | $(1 - e^{-\mu q_D} - \mu q_D e^{-\mu q_D})e^{-\mu q_U}$ | $y - \underline{w}_D$ | D |
| 6) $>$ one U | $(1 - e^{-\mu q_U} - \mu q_U e^{-\mu q_U})$ | $y - \underline{w}_U$ | U |
| 7) $\geq$ one N, one D, no U | $(1 - e^{-\mu q_N})\mu q_D e^{-\mu q_D}e^{-\mu q_U}$ | $y - \underline{w}_D - \beta_D(\frac{\bar{r}_D}{\bar{r}_N}\underline{w}_N + (1 - \frac{\bar{r}_D}{\bar{r}_N})y - \underline{w}_D)$ | D |
| 8) $\geq$ one N, no D, one U | $(1 - e^{-\mu q_N})e^{-\mu q_D}\mu q_U e^{-\mu q_U}$ | $y - \underline{w}_U - \beta_U(\frac{\bar{r}_U}{\bar{r}_N}\underline{w}_N + (1 - \frac{\bar{r}_U}{\bar{r}_N})y - \underline{w}_U)$ | U |
| 9) $\geq$ one D, one U | $(1 - e^{-\mu q_D})\mu q_U e^{-\mu q_U}$ | $y - \underline{w}_U - \beta_U(\frac{\bar{r}_U}{\bar{r}_{r+sD}}\underline{w}_D + (1 - \frac{\bar{r}_U}{\bar{r}_D})y - \underline{w}_U)$ | U |

000322

30

Table E.4: MSAs used in Section 7.1 and immigrant population shares among low-skilled

| MSA | Documented imm. (%) | | | | Undocumented imm. (%) | | | |
|---|---|---|---|---|---|---|---|---|
| | 1980 | 1990 | 2000 | 2010 | 1980 | 1990 | 2000 | 2010 |
| Baltimore, MD | 1.8 | 2.7 | 3.8 | 9.0 | 0.6 | 1.3 | 3.2 | 11.6 |
| Birmingham, AL | 0.3 | 0.6 | 2.0 | 3.7 | 0.1 | 0.5 | 3.6 | 14.7 |
| Boston, MA/NH | 12.9 | 15.1 | 19.6 | 23.4 | 5.9 | 12.2 | 15.9 | 24.4 |
| Charlotte-Gastonia-Rock Hill, NC/SC | 0.7 | 1.5 | 5.6 | 11.2 | 0.4 | 1.1 | 12.9 | 21.5 |
| Chicago, IL | 10.4 | 14.9 | 19.7 | 24.6 | 7.9 | 15.1 | 23.3 | 29.2 |
| Cleveland, OH | 5.9 | 5.6 | 3.8 | 5.0 | 1.5 | 1.8 | 2.0 | 3.4 |
| Columbus, OH | 1.6 | 1.6 | 4.0 | 7.2 | 0.4 | 0.9 | 4.6 | 9.4 |
| Dallas-Fort Worth, TX | 3.9 | 12.0 | 17.4 | 23.4 | 3.7 | 13.9 | 27.8 | 37.0 |
| Denver-Boulder, CO | 4.5 | 7.4 | 13.4 | 16.4 | 2.3 | 5.3 | 21.6 | 30.9 |
| Detroit, MI | 5.1 | 5.2 | 6.8 | 9.9 | 2.0 | 2.0 | 5.2 | 6.6 |
| Hartford-Bristol-Middleton- New Britain, CT | 14.5 | 19.1 | 18.7 | 19.3 | 6.3 | 10.4 | 8.2 | 20.5 |
| Houston-Brazoria, TX | 7.0 | 15.8 | 22.2 | 27.7 | 6.9 | 18.2 | 27.0 | 37.6 |
| Indianapolis, IN | 0.8 | 1.2 | 2.7 | 7.1 | 0.3 | 0.4 | 5.4 | 14.3 |
| Kansas City, MO/KS | 1.9 | 2.8 | 5.2 | 9.3 | 0.7 | 1.3 | 8.3 | 16.5 |
| Los Angeles-Long Beach, CA | 16.2 | 24.2 | 32.4 | 38.3 | 26.1 | 42.6 | 39.7 | 40.0 |
| Louisville, KY/IN | 0.5 | 1.2 | 2.5 | 6.1 | 0.1 | 0.3 | 1.7 | 8.8 |
| Memphis, TN/AR/MS | 0.6 | 0.7 | 3.3 | 6.5 | 0.1 | 0.8 | 5.0 | 14.3 |
| Miami-Hialeah, FL | 46.1 | 52.5 | 56.2 | 57.2 | 6.6 | 18.8 | 19.8 | 23.0 |
| Minneapolis-St. Paul, MN | 2.3 | 3.5 | 7.9 | 14.3 | 0.6 | 2.0 | 10.3 | 18.3 |
| Nashville, TN | 0.5 | 0.9 | 4.6 | 12.6 | 0.2 | 0.8 | 8.3 | 18.4 |
| New York, NY-Northeastern NJ | 21.3 | 26.6 | 32.1 | 34.8 | 10.2 | 18.3 | 25.8 | 33.0 |
| Oklahoma City, OK | 1.8 | 4.7 | 8.1 | 15.3 | 1.0 | 3.9 | 10.6 | 22.2 |
| Philadelphia, PA/NJ | 4.4 | 5.0 | 7.2 | 11.7 | 1.2 | 2.1 | 4.7 | 13.3 |
| Phoenix, AZ | 6.7 | 10.8 | 15.5 | 21.0 | 3.6 | 11.4 | 27.0 | 31.2 |
| Pittsburgh, PA | 2.8 | 2.8 | 2.3 | 3.3 | 0.3 | 0.6 | 0.8 | 0.8 |
| Providence-Fall River-Pawtucket, MA/RI | 12.1 | 18.5 | 19.4 | 24.2 | 10.5 | 15.8 | 12.6 | 19.4 |
| Sacramento, CA | 9.0 | 11.7 | 18.5 | 27.5 | 5.3 | 9.1 | 12.7 | 23.1 |
| St. Louis, MO/IL | 1.6 | 1.5 | 2.3 | 3.2 | 0.2 | 0.6 | 1.8 | 3.8 |
| San Antonio, TX | 10.4 | 14.3 | 16.1 | 20.4 | 4.8 | 9.0 | 12.8 | 19.8 |
| San Diego, CA | 14.3 | 20.3 | 27.0 | 32.8 | 11.3 | 25.9 | 29.1 | 34.8 |
| San Francisco-Oakland-Vallejo, CA | 15.8 | 21.7 | 29.2 | 36.7 | 10.3 | 22.9 | 27.9 | 35.7 |
| Seattle-Everett, WA | 6.2 | 7.6 | 14.6 | 25.9 | 2.0 | 5.3 | 11.4 | 21.1 |
| Washington, DC/MD/VA | 5.3 | 10.8 | 18.1 | 25.0 | 3.6 | 14.8 | 23.0 | 35.1 |

Notes: Population data are from the US Census 1980-2000 and ACS 2009-2011 and include high school dropouts participating in the labor force.

# References

**Borjas, George J.**, "The Labor Supply of Undocumented Immigrants," *Labour Economics*, 2017, *46*.

**Edwards, Ryan and Francesc Ortega**, "The Economic Contribution of Unauthorized Workers: An Industry Analysis," *Regional Science and Urban Economics*, 2017, *67* (Supplement C), 119 – 134.

**Mukoyama, Toshihiko, Christina Patterson, and Ayşegül Sahin**, "Job Search Behavior over the Business Cycle," *American Economic Journal: Macroeconomics*, January 2018, *10* (1), 190–215.

**Ottaviano, G. and G. Peri**, "Rethinking the Effect of Immigration on Wages," *Journal of the European Economic Association*, 2012, *10* (1), 152–197.

**Passel, Jeffrey S. and D'Vera Cohn**, "Unauthorized Immigrant Totals Rise in 7 States, Fall in 14 States: Decline in Those From Mexico Fuels Most State Decreases," Technical Report, Washington, DC: Pew Research Center 2014.

000324

# IMMIGRATION NEEDS OF AMERICA'S FIGHTING MEN AND WOMEN

# HEARING

BEFORE THE

## SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES, BORDER SECURITY, AND INTERNATIONAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

MAY 20, 2008

## Serial No. 110–92

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

U.S. GOVERNMENT PRINTING OFFICE

42–509 PDF          WASHINGTON : 2008

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON THE JUDICIARY

JOHN CONYERS, JR., Michigan, *Chairman*

| | |
|---|---|
| HOWARD L. BERMAN, California | LAMAR SMITH, Texas |
| RICK BOUCHER, Virginia | F. JAMES SENSENBRENNER, JR., |
| JERROLD NADLER, New York | Wisconsin |
| ROBERT C. "BOBBY" SCOTT, Virginia | HOWARD COBLE, North Carolina |
| MELVIN L. WATT, North Carolina | ELTON GALLEGLY, California |
| ZOE LOFGREN, California | BOB GOODLATTE, Virginia |
| SHEILA JACKSON LEE, Texas | STEVE CHABOT, Ohio |
| MAXINE WATERS, California | CHRIS CANNON, Utah |
| WILLIAM D. DELAHUNT, Massachusetts | RIC KELLER, Florida |
| ROBERT WEXLER, Florida | DARRELL ISSA, California |
| LINDA T. SA NCHEZ, California | MIKE PENCE, Indiana |
| STEVE COHEN, Tennessee | J. RANDY FORBES, Virginia |
| HANK JOHNSON, Georgia | STEVE KING, Iowa |
| BETTY SUTTON, Ohio | TOM FEENEY, Florida |
| LUIS V. GUTIERREZ, Illinois | TRENT FRANKS, Arizona |
| BRAD SHERMAN, California | LOUIE GOHMERT, Texas |
| TAMMY BALDWIN, Wisconsin | JIM JORDAN, Ohio |
| ANTHONY D. WEINER, New York | |
| ADAM B. SCHIFF, California | |
| ARTUR DAVIS, Alabama | |
| DEBBIE WASSERMAN SCHULTZ, Florida | |
| KEITH ELLISON, Minnesota | |

PERRY APELBAUM, *Staff Director and Chief Counsel*
SEAN MCLAUGHLIN, *Minority Chief of Staff and General Counsel*

————

SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES,
BORDER SECURITY, AND INTERNATIONAL LAW

ZOE LOFGREN, California, *Chairwoman*

| | |
|---|---|
| LUIS V. GUTIERREZ, Illinois | STEVE KING, Iowa |
| HOWARD L. BERMAN, California | ELTON GALLEGLY, California |
| SHEILA JACKSON LEE, Texas | BOB GOODLATTE, Virginia |
| MAXINE WATERS, California | DANIEL E. LUNGREN, California |
| WILLIAM D. DELAHUNT, Massachusetts | J. RANDY FORBES, Virginia |
| LINDA T. SA NCHEZ, California | LOUIE GOHMERT, Texas |
| ARTUR DAVIS, Alabama | |
| KEITH ELLISON, Minnesota | |
| ANTHONY D. WEINER, New York | |

UR MENDOZA JADDOU, *Chief Counsel*
GEORGE FISHMAN, *Minority Counsel*

(II)

000326

# C O N T E N T S

---

MAY 20, 2008

Page

OPENING STATEMENT

The Honorable Zoe Lofgren, a Representative in Congress from the State of California, and Chairwoman, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law ...................................................1
The Honorable Steve King, a Representative in Congress from the State of Iowa, and Ranking Member, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law.................................................4
The Honorable John Conyers, Jr., a Representative in Congress from the State of Michigan, and Chairman, Committee on the Judiciary .............................5

WITNESSES

Ms. Margaret Stock, Attorney and Lieutenant Colonel, Military Police Corps, United States Army Reserve
  Oral Testimony .......................................................................................................9
  Prepared Statement ...............................................................................................13
Ms. Karla Arambula de Rivera, E2 Officer, United States Navy
  Oral Testimony .......................................................................................................16
  Prepared Statement ...............................................................................................18
Ms. Christine Navarro, KC-5 Aircraft Commander, United States Air Force
  Oral Testimony .......................................................................................................19
  Prepared Statement ...............................................................................................20
Lieutenant General (Retired) Edward D. Baca, President and CEO, Baca Group
  Oral Testimony .......................................................................................................21
  Prepared Statement ...............................................................................................23
Mr. Mark C. Seavey, Assistant Director of the National Legislative Commission, American Legion
  Oral Testimony .......................................................................................................24
  Prepared Statement ...............................................................................................26

LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARING

Prepared Statement of the Honorable Zoe Lofgren, a Representative in Congress from the State of California, and Chairwoman, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law.....................................................................................................................3
Prepared Statement of the Honorable John Conyers, Jr., a Representative in Congress from the State of Michigan, and Chairman, Committee on the Judiciary ...............................................................................................................6
Prepared Statement of the Honorable Sheila Jackson Lee, a Representative in Congress from the State of Texas, and Member, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law .................7

(III)

# IMMIGRATION NEEDS OF AMERICA'S FIGHTING MEN AND WOMEN

————

### TUESDAY, MAY 20, 2008

House of Representatives,
Subcommittee on Immigration, Citizenship,
Refugees, Border Security, and International Law
Committee on the Judiciary,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 2:39 p.m., in Room 2141, Rayburn House Office Building, the Honorable Zoe Lofgren (Chairwoman of the Subcommittee) presiding.

Present: Representatives Lofgren, Gutierrez, Jackson Lee, Waters, King, Goodlatte, Lungren and Gohmert.

Also Present: Representative Conyers.

Staff Present: Traci Hong, Majority Counsel; Ur Mendoza Jaddou, Majority Chief Counsel; Andres Jimenez, Professional Staff Member; and George Fishman, Minority Counsel.

Ms. Lofgren. The hearing of the Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law will come to order.

This is a hearing that I think is very important because it is about the duty we owe to those we ask to pay the last full measure of devotion. This duty should transcend politics and partisanship, and in this we can find agreement. We owe no greater duty than the one we owe to the members of the Armed Forces and their families.

As we ask our troops to stand in harm's way as we send them to war, our duty to our soldiers, airmen and women and Marines must remain paramount. As they protect us, we must protect them. Each of them is a son or a daughter, a husband or a wife, a parent or a child, a brother or a sister.

Tens of thousands are immigrants. Countless others have spouses or other close relatives who are immigrants or have immigration issues. Our duty to these brave men and women obligates us to ensure that their focus stays on their mission and on the safety and security of those they serve with. We must do all we can to reduce the stresses of war on the families of these brave men and women. The wives, husbands, children, parents, brothers and sisters of our soldiers agonize every minute of every day for their loved ones who stand in harm's way. They do double and triple duty while their loved ones are away.

For our troops, peace of mind about the home front is the ultimate comfort. When our soldiers or their family members face immigration issues, it clouds their effectiveness and their focus. We

(1)

2

must do all we can to relieve the burden that our service members face.

Last year, I was privileged to meet Petty Officer Second Class Eduardo Gonzalez when he testified before the Immigration Subcommittee. A United States citizen, he enlisted in the U.S. Navy in 2003 after graduating from high school and going on to earn an associate's degree in occupational studies.

Eduardo has been deployed to Iraq three times on ship and on shore. He was married in 2004 to his long-time girlfriend. They now have a son.

When they married, Eduardo's wife had been waiting for more than 4 years to get her Green Card. What neither Eduardo or his wife realized was that, simply by getting married, she would no longer be eligible to get her Green Card because her application was dependent on her being the single child of her mother. Eduardo's wife came to the U.S. from Guatemala when she was 5 years old. She had waited for years for USCIS to process her case, but she was in danger of being deported.

When I talked to Eduardo, he expressed the great burden his wife's immigration difficulties placed upon him. They were distracted. He told me how he constantly worried about her and how he feared that she might be deported while he was at sea or in a combat zone. He worried that their child would be left without a mother and a father.

Another soldier whose wife arrived legally in the U.S. at age 13 but overstayed her visa thereafter feared that his wife would be deported and worried that his 2-year-old son would be in limbo while he was deployed for the third time. Quote, "I joined the Army, and I take pride in what I do," Angel Rodriguez said, "but it is hard being away and defending a country that doesn't want your family."

These stories, real stories, are happening every day to soldiers serving our Nation; and that is the reason why I believe we must change the law to provide immigration assistance to family members of American soldiers. It would be one small measure we could do for those we ask to pay the last full measure of devotion for us.

I look forward to hearing from our witnesses today who can each provide us their own perspectives on the need for immigration changes for our soldiers, from the perspective of a 3-star general who has commanded many soldiers in need of immigration help, soldiers trying to navigate an immigration system that has thus far failed them and from an attorney who volunteers her time to help soldiers around the country solve their immigration cases where she can.

I would like to recognize the sister of one of our witnesses, Airman Karla Rivera, who is with us today in the audience. Ms. Daisy Maldonado, who is 12 years old, has traveled all the way from Tustin, California, to watch her sister testify. And we welcome you, and we hope that you enjoy your day here.

I would also like to note that Sergeant Yolanda Guevara has come all the way from North Carolina with her husband and three kids to show her support at this hearing. She, too, is experiencing the labyrinth of immigration law and has not yet found a way out. Thank you for being here today.

3

I would now like to recognize our distinguished Ranking Minority Member, Steven King, for his opening statement.

[The prepared statement of Ms. Lofgren follows:]

PREPARED STATEMENT OF THE HONORABLE ZOE LOFGREN, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF CALIFORNIA, AND CHAIRWOMAN, SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES, BORDER SECURITY, AND INTERNATIONAL LAW

The duty we owe to those we ask to pay "the last full measure of devotion" transcends politics and partisan pettiness. In this we can find agreement—we owe no greater duty than the one we owe members of the Armed Forces and their families. As we ask our troops to stand in harm's way, as we send them to war, our duty to our soldiers, sailors, airmen and marines must remain paramount. As they protect us, we must protect them.

Each of them is a son or a daughter, a husband or a wife, a parent or a child, a brother or a sister. Tens of thousands are immigrants. Countless others have spouses or other close relatives who are immigrants or have immigration issues.

Our duty to these brave men and women obligates us to ensure that their focus stays on their mission and on the safety and security of those they serve with.

We must also do all we can to reduce the stresses of war on the families of these brave men and women. The wives, husbands, children, parents, brothers and sisters of our soldiers agonize every minute of every day for their loved ones who stand in harm's way. They do double and triple duty while their loved ones are away.

For our troops, peace of mind about the home front is the ultimate comfort. When our soldiers or their family members face immigration issues, it clouds their focus and effectiveness.

We must do all we can to relieve the burden our service members face.

Last year, I was privileged to meet Petty Officer Second Class Eduardo Gonzalez when he testified before the Immigration Subcommittee. A United States citizen, Eduardo enlisted in the United States Navy in 2003 after graduating from high school and going on to earn an associate's degree in occupational studies. Eduardo has been deployed to Iraq three times, on ship and shore.

Eduardo was married in 2004 to his longtime girlfriend. They now have a son. When they married, Eduardo's wife had been waiting for more than four years to get her green card. What neither Eduardo nor his wife realized was that simply by getting married she would no longer be eligible to get her green card because her application was dependent on her being the single child of her mother.

Eduardo's wife came to the U.S. from Guatemala when she was 5 years old. She had waited for years for USCIS to process her case. But she was in danger of being deported.

When I talked to Eduardo, he expressed the great burden his wife's immigration difficulties placed on him. They were distracting. He told me how he constantly worried about her, and how he feared that she might be deported while he was at sea in a combat zone. He worried that their child would be left without a mother and a father.

Another soldier whose wife arrived legally in the U.S. at age 13, but overstayed her visa thereafter, feared that his wife would be deported and worried that his two-year-old son would be in limbo while he was deployed for the third time. "I joined the Army and I take pride in what I do," Angel Rodriguez said. "But it's hard being away and defending a country that doesn't want your family."

These real stories happening every day to soldiers serving our nation in harm's way is the reason I believe we must change the law to provide immigration assistance to family members of American soldiers.

It would be one small measure we could do for those we ask to pay the last full measure of devotion for us.

I look forward to hearing from our witnesses today who can each provide us their own perspective on the need for immigration changes for our soldiers, from the perspective of a three-star General who has commanded many soldiers in need of immigration help, a soldier trying to navigate an immigration system that has thus far failed her, and from an attorney who volunteers her time to help soldiers around the country solve their immigration cases where she can.

I'd like to recognize the sister of one of our witness, Airman Karla Rivera, who is with us today in the audience. I'd also like to note that Sergeant Yolanda Guevara has come all the way from North Carolina with her husband and three kids to show her support of this hearing. She too is experiencing the labyrinth of immigration law and has not yet found a way out. Thank you for being here today.

4

Mr. KING. Thank you, Madam Chair; and I want to thank the witnesses for being here today and for your testimony that I anticipate.

Our Nation owes a debt of gratitude to those legal, permanent residents who serve in the U.S. Armed Forces, the same debt we owe to citizen soldiers. And since September 11, 111 noncitizen service members have made the ultimate sacrifice and have been granted posthumous citizenship. They have a special place in our hearts.

Congress has long sought to facilitate the naturalization of noncitizens serving in the Armed Forces. In fact, our immigration laws contain three special naturalization provisions just for service members. The first is section 328 of the Immigration and Nationality Act, which permits a permanent resident who has served honorably in the U.S. Armed Forces for a year during peacetime to naturalize. In the 108th Congress, we reduced the period from 3 years. This is in contrast to most legal permanent residents who must be in that status for 5 years before they can naturalize, one way of respecting and appreciating service in our Armed Forces.

The second, section 329 of the Immigration and Naturalization Act, permits an alien who has served honorably in an active duty status in the U.S. Armed Forces during a time of war to immediately naturalize. We are now in such a war. As of July 3, 2002, President Bush officially designated the period beginning on September 11, 2001, as a period of hostilities.

Third, section 329(a) of the Immigration Nationality Act provides that an alien who has honorably served in the military during a period of hostilities and died as a result can be granted posthumous citizenship if requested by their next of kin.

After we learned that some of the members of the military who died in combat during Operation Iraqi Freedom were not U.S. citizens, Congress acted to provide enhanced benefits to permanent resident service members and their families.

As I mentioned, Congress reduced the peacetime military service requirement for expedited naturalization from 3 years to 1 year. We prohibited fees from being charged to service members who are applying for naturalization. We require that naturalization applications, interviews, filings, oaths and ceremonies be available through United States embassies, consulates and, as practicable, through U.S. military installations overseas. We provided that the spouses, children and parents of U.S. citizens who died as a result of serving in active duty status, including service members granted posthumous citizenship, would retain the immigration benefits available to the immediate relatives of U.S. citizens.

However, this hearing is about a much different proposition. It is not about easing the naturalization of U.S. service members and providing substantive immigration benefits to the legally present family members of service members who were killed in action. Rather, this hearing is about whether to grant amnesty to illegal immigrants who are family members of U.S. service members. This hearing is about whether to waive many grounds of removability for noncitizens who are serving in or who have ever served in the military and for noncitizen family members of service members, including those grounds predicated on the most serious of crimes.

5

Our soldiers fight and, in some cases, give their lives to preserve the rule of law. It seems ironic indeed that some would propose to disregard the rule of law just as another reward or inducement to serve our country.

How do I know this? Let's take a look at H.R. 6020 introduced by Chair Lofgren. This bill waives many grounds of inadmissibility and deportability for aliens in the military. These benefits also go to most aliens who have ever served in the military, no matter how short or how long ago were their periods of service. And they go to aliens who are the spouses, minor children, adult children, parents and minor siblings of service members.

Just what grounds are waived? Well, among them are illegal entry into the U.S. and the 3- and 10-year bars to re-entry for aliens who have been illegally present in the U.S. more than 6 months.

Additionally, immigration judges are given the discretionary authority to waive most other nonterrorism-related grounds, including the authority to waive most criminal grounds and document fraud. Falsely claiming citizenship would be waived potentially as well as illegal voting.

And how soon we forget that the abuse of discretion by liberal immigration judges forced Congress to remove much of their discretion in 1996. Thus, the aliens who arrive in the U.S. illegally cannot be removed and can re-enter the U.S. despite having been in the U.S. illegally for extended periods of time. Immigration judges will have the ability to waive all the criminal grounds of deportability for murder, gang crimes and rape on down. Remember, these waivers apply not just to service members but to their family members and to most aliens who have ever served in the military.

What else does the bill do? It prohibits the use of expedited removal against illegal immigrants and immigrants convicted of aggravated felonies as long as they served honorably in the military at any time. It also would prohibit the reinstatement of removal orders against such aliens who illegally return to the U.S. after being removed.

This bill will create a perverse incentive for persons who intentionally enter the military for the express purpose of procuring amnesty or relief from the immigration consequences of serious crimes for themselves or for their extended family members. This is not what service to this country is about. We do need to stand for the rule of law here.

I am, though, interested in this testimony; and I do appreciate greatly the service to this country by the witnesses here and all those they represent.

Madam Chair, I thank you; and I yield back the balance of my time.

Ms. LOFGREN. The gentleman's time has expired.

I would turn now to the Chairman of the full Judiciary Committee, Congressman John Conyers, for any statement he may have.

Mr. CONYERS. Thanks, Chairman Lofgren and Ranking Member Steve King, Dan Lungren.

I am trying to work out a way to talk to National Commander of the American Legion, Mr. Martin Conatser, but we weren't able

6

to communicate before the hearing began. But it might be useful if we meet informally and see if we can work out our differences; and the first person I would like to ask to join myself and Dan Lungren is the Ranking Member, Steve King, if we can work out a mutual time to do this.

Ms. LOFGREN. Mr. Chairman, if you would yield to me, I would note also that this bill has a good bipartisan group of original co-sponsors. Mac Thornberry, who is a member of the Armed Services Committee, is the lead Republican. I would hope that he would be included along with Mike Pence, a Member of the Judiciary Committee, as well as Mike Turner, also a Member of the Armed Services Committee.

Mr. CONYERS. It's is a good idea. And Lungren and I just thought it up a few minutes ago. This has not been laying around a long time.

Mr. LUNGREN. Mr. Chairman, this is a meeting without preconditions.

Ms. LOFGREN. Diplomacy.

Mr. CONYERS. You know, what I keep thinking of, I don't know who else served in combat as I have. It is one thing to wonder how your family is doing back home. It is another thing to wonder if your Government has locked up your spouse or kicked her out of the country or whatever could happen.

Mr. KING. If the Chairman would yield. And certainly my response to that offer is yes. I would be very happy to sit down and discuss this.

Mr. CONYERS. Thank you.

Mr. KING. If I could just make a point. Having those kind of discussions really helps us flush out some of the unintended consequences. And I don't question the heart. I just question some of the potential unintended consequences.

Mr. CONYERS. Thank you. Thank you for that clarification. And then we need a little flexibility in the law, and I think the Lofgren legislation may cover that.

You know, to require a person to show up at the immigration office when he is in Iraq and the office is in the United States as a condition to your wife getting the clearance would be funny except that it is so tragic. And so if we really want to do this, we would get more efficient about this.

And then of course our colleague from Texas, Gene Green, has another bill that is not under discussion here today that also makes this a little more efficient and a little smoother.

And I am proud of all the witnesses that are here today, and I ask that my statement be made a part of the record.

Ms. LOFGREN. Without objection, that is so ordered.

[The prepared statement of Mr. Conyers follows:]

PREPARED STATEMENT OF THE HONORABLE JOHN CONYERS, JR., A REPRESENTATIVE IN CONGRESS FROM THE STATE OF MICHIGAN, AND CHAIRMAN, COMMITTEE ON THE JUDICIARY

We have heard too many tragic stories of people being arrested or deported while their loved ones are overseas in Iraq and Afghanistan.

Patriotism doesn't start only with a naturalization ceremony. Over 45,000 non-citizens serve in the U.S. military, and countless more servicemembers have close immigrant family members.

7

The first American killed in Iraq—Lance Corporal Jose Antonio Gutierrez—came to the United States illegally. He loved this country so much that he dedicated himself to service, and gave his life for his new country. We need to honor his sacrifice by recognizing that today's undocumented immigrant might be tomorrow's American hero.

Immigration is a military issue. It affects readiness of native and foreign-born troops alike. At worst the broken and inflexible system can prevent us from tapping the skills and energy of immigrants who want to serve their new country. We *must* address the immigration issues that affect our troops.

**First,** active duty soldiers and veterans should be able to become citizens expeditiously. They should not be sidetracked into "conditional" permanent residence.

**Second,** our troops should not be forced to wait for years to be reunited with their spouses or children.

Administrative functions, such as in-person interviews, should have flexibility.

A family's applications should not fall through the cracks when we are deploying these men and women all over the world and they cannot attend an in-person interview.

**Third,** there needs to be a rational system for dealing with undocumented family members.

Nobody should be distracted from their mission, fearing that their parents or siblings, or spouses will be arrested and deported.

Nobody should have to go into combat fearing that if they are killed, their spouse will lose their ability to adjust to lawful status.

I welcome our witnesses—on active duty, in the reserves, and members of veterans' organizations. I look forward to tackling this important issue.

Ms. LOFGREN. I know that Mr. Smith is not yet present, but his statement will be invited, should he appear later. And in view of the time and in order to hear from the witnesses, without objection, opening statements of all other Members will be made part of the record.

[The prepared statement of Ms. Jackson Lee follows:]

PREPARED STATEMENT OF THE HONORABLE SHEILA JACKSON LEE, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF TEXAS, AND MEMBER, SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES, BORDER SECURITY, AND INTERNATIONAL LAW

Chairwoman, Lofgren, and ranking member King, thank you for convening today's very important hearing on "Immigration Needs of America's Fighting Men and Women."

This Subcommittee is well aware of the problems caused by our broken immigration system. U.S. citizens and employers must wait years before close family members or needed workers can legally immigrate to the United States. U.S. citizens and employers must wait years before close family members or needed workers can legally immigrate to the United States. If the family members or the workers are undocumented, they have no realistic way to gain legal status, even though they may be eligible to become permanent residents through family or employment petitions. Immigration officials lack the discretion to determine which noncitizens should be removed and which noncitizens deserve relief based upon their contributions to the United States and the impact on their U.S. citizen family, employer, and/or community.

Due to the nature of military service and the hardship that such service imposes on the soldiers and their families, U.S. citizen soldiers with noncitizen family members, or lawful permanent resident soldiers and veterans are particularly impacted by our dysfunctional immigration system. This hearing will examine the immigration problems that our soldiers, veterans, and their families face, and discuss solutions to these problems that recognize their unique predicament and the service that they render our country.

The following witnesses will assist the Subcommittee in examining the immigration problems that our soldiers, veterans, and their families face, and discuss solutions to these problems that recognize their unique predicament and the service that they render our country.

Welcome Lt. Col. Margaret Stock, of the Military Police Corps, U.S. Army Reserve; Airman Karla Rivera, of the U.S. Navy; Capt. Christine Navarro, of the U.S. Air Force; Lt. Gen. (retired) Edward Baca, on behalf of the American GI Forum;

8

and, Mark Seavey, Assistant Director of the National Legislative Commission, American Legion. Again, welcome, and I look forward to hearing your insightful testimony.

Thank you, I yield the balance of my time.

Ms. LOFGREN. We now turn to our panel.

It is my pleasure to introduce Margaret Stock. Ms. Stock is an attorney and a Lieutenant Colonel in the United States Army Reserve. She is currently assigned as an Associate Professor, Drilling Individual Mobilization Augmentee, in the Department of Social Sciences at the U.S. Military Academy at West Point.

Ms. Stock earned her bachelor's degree in government at Harvard-Radcliffe and a juris doctorate at Harvard Law School and master's in public administration at John F. Kennedy School of Government, also at Harvard University. She is a 2006 graduate of the Army War College, which awarded her a master's of strategic studies degree. She is a nationally recognized expert in issues related to immigration and citizenship law, and she has testified on these issues before Congress in the past.

Next, I would like to introduce Karla Arambula de Rivera. A native of Mexico, Airman Rivera was brought to live in the United States as a little girl and has lived here ever since. She married a U.S. citizen in 2004 and later became a conditional permanent resident. In March of 2007, she enlisted in the Navy. She is currently assigned to the USS Carl Vinson, where she serves as an aviation boatswain's mate airman.

Next, I am pleased to welcome Captain Christine Navarro. Captain Navarro is an aircraft commander pilot, assigned to the 91st Air Refueling Squadron at MacDill Air Force Base. As a graduate of the Air Force Academy in 2002, Captain Navarro received her commission and degree in astronautical engineering with a minor in mathematics. She is currently attending Texas A&M University distance learning master's degree program in industrial engineering. Captain Navarro has a 3-year-old son with her husband, Jose Navarro.

Our next witness is retired Lieutenant General Edward Baca, who is testifying on behalf of the American G.I. Forum. His military career included 41 years of distinguished service, culminating in appointment by the President of the United States to the Chief National Guard Bureau. In his position, General Baca oversaw the Army and the Air National Guard in 54 States, territories and the District of Columbia. General Baca began his military career with the New Mexico National Guard. At the onset of the Vietnam conflict, he volunteered for active duty and overseas deployment and served in the Republic of Vietnam.

Just a few of his numerous awards and decorations include the Department of Defense Distinguished Service Medal, two Army Distinguished Service Medals, and the Air Force Distinguished Service Medal and the Legion of Merit.

General Baca is a graduate of numerous military schools, has a bachelor's of science degree in liberal arts from the State University of New York at Albany. He was also awarded an honorary doctorate of law degree from New Mexico State University at Las Cruces, New Mexico. After retiring from active duty military service and prior to forming the Baca Group, General Baca consulted

9

in both the public and private sectors and devoted his time to community service.

Finally, I would like to introduce Mark Seavey. Mr. Seavey began his career with the American Legion in 1997. Prior to his employment with the American Legion, he served in the active duty Army, the U.S. Army Reserve and the Virginia Army National Guard.

As an infantry squad leader with the Virginia Army National Guard, he was activated for service in Bosnia Herzegovina in 1997. In 2004, he deployed to Afghanistan for 1 year, performing a variety of functions, including providing security for Afghan President Hamid Karzai and serving as an infantry squad leader on combat patrols.

Mr. Seavey is a recipient of the Combat Infantryman's Badge, two Armed Forces Expeditionary Medals, the NATO Medal, two Army Achievement Medals, and other medals from his service. He is a graduate of The Citadel, the Military College of South Carolina, and has a juris doctorate from George Mason University School of Law.

As I mentioned before our hearing began, the written statements of each of the witnesses will be made part of our official record of this hearing. We would ask each witness to testify for about 5 minutes, and then we will have an opportunity to pose questions to you.

So may we begin with you, Ms. Stock, on your testimony; and thanks again for being here.

**TESTIMONY OF MARGARET STOCK, ATTORNEY AND LIEUTENANT COLONEL, MILITARY POLICE CORPS, UNITED STATES ARMY RESERVE**

Ms. STOCK. Madam Chairwoman and distinguished Members of the Committee, I am honored to be here today to talk with you about the field of U.S. citizenship and immigration law and its effect on military members, veterans and their families. The statements, opinions and views that I will express today are my own. They are not necessarily the opinions of the United States Military Academy, the Department of the Army, the Department of Defense or any other Government agency.

For the past several months, I have been volunteering with the American Immigration Lawyers Association Military Assistance Program, a new collaborative effort between the American Immigration Lawyers Association and the Legal Assistance Offices of the Judge Advocate Generals of the United States Armed Forces. The military Legal Assistance Offices provide free legal assistance to military members and their families, including active duty, reserve component and retired military personnel in order to maintain the highest level of readiness possible in the event a military member is deployed.

Recently, JAG attorneys in these offices have been inundated with immigration problems, complex immigration problems. And to resolve these cases successfully, they often need the assistance and experience of immigration lawyers who have been dealing with this complex area of the law.

10

AILA MAP, this new program with the American Immigration Lawyers Association, has brought these two groups together for the first time in a dynamic partnership. And as a volunteer with AILA MAP, I have been able to see the wide range of immigration problems that U.S. military members, veterans and their families face today.

And I will just mention that the U.S. military members who are present here today have all contacted AILA MAP for assistance, and I became aware of their issues because of that program.

Thus, I am honored to be appearing, as I said, before you today to discuss the immigration law problems faced by members of the U.S. military and their families. These problems are numerous and result from the fact that immigration law is an extremely complex area of the law, often arbitrary, and many of the laws and regulations that affect immigrants and their family members don't take into account the situation of members of the Armed Forces fully. The U.S. is a global power, and members of the military are deployed in more than 100 countries around the world. And while our Armed Forces are engaged in fighting a global war on terrorism with an enemy who speaks many languages and travels internationally and fights our forces here at home and across the globe, America's immigration laws often detract from our ability to fight that war.

Currently, many military members fighting overseas find that they have to fight their Government back home, as that Government creates bureaucratic obstacles that impede military readiness by preventing family members from accessing benefits or getting benefits under the immigration law, by refusing to allow family members into the United States altogether, or even seeking to deport military members or their families.

It is important to emphasize—and I know that many Members of this Committee are fully aware of the complexity of immigration law, but it is important to emphasize the current state of the law. It is dysfunctional and irrational, and it only promises to get worse.

As military members encounter these laws and this system, they are often experiencing the same difficulties and frustrations that civilians experience. They have to deal with a complex system that requires years of study to understand, a system that makes it nearly impossible for many people to immigrate legally to the United States unless they can find and have the funds to hire an extremely experienced immigration lawyer. These military members face the added burden that they must cope with these complexities of the immigration law while at the same time they are coping with the stresses of the military lifestyle.

I applaud Congress for its efforts in recent years to smooth the citizenship application process for military members, and I would like to note for the record that United States Citizenship and Immigration Services has a very dedicated team of professionals at the Nebraska Service Center who have been doing everything they can to naturalize military members as fast as possible. I know they have received some criticism, but, in my view, the criticism is probably undeserved, because they have been working really, really hard to naturalize our military members. I would also note, however, that sometimes their efforts are stymied by other agencies

11

that are required to do name checks and process fingerprints and that sort of thing; and that has caused problems for our military members.

Congress has also made some recent changes to the law so that family members sent overseas will not lose their entitlement to continue with citizenship and Green Card processes simply because they have gone overseas on orders with their military family members. We have had a problem in the past with that. The fact that you got deployed to Germany meant that you lost your ability to naturalize as a U.S. citizen.

But more needs to be done, and I want to give you some examples of immigration problems that still exist and that are hurting military readiness.

First, active duty members of the military are still being placed into removal proceedings and forced to hire private attorneys, seek assistance from AILA MAP or represent themselves. While the Department of Homeland Security is represented in removal proceedings by qualified attorneys, it does not provide defense attorneys to aliens who are in removal proceedings or even U.S. citizens who are mistakenly put into removal proceedings. So you have to find a lawyer on your own.

And although, theoretically, there is a policy with the Immigration and Customs enforcement folks that they won't try to deport active duty military, that policy doesn't apply across the board to everybody in Homeland Security. So they have been doing that today.

I know that Airman Rivera is going to tell you more about that later, so I will defer to her personal story on that front.

A second problem military members face is their inability to obtain permanent legal status for their family members in a timely manner. This doesn't just affect people who are unauthorized. This affects legal people. Government processing times are slow, the procedures are complex, and the fees are often unaffordable for many military families.

We are finding through AILA MAP that many military spouses can't get driver's licenses, can't get Social Security numbers and are facing situations where their spouse is being deployed overseas by the military and they are left back home without the ability to drive, without a Social Security number. This puts tremendous strain on the family support groups on the bases which have to go and take these people around and take them to appointments and things since there is no mass transit readily available on a lot of the bases. So this has been a problem.

Another problem, military families are able to file applications for immigration benefits, but sometimes they often run afoul of the complex laws through no fault of their own. They move frequently, so DHS notices don't reach them. We are having a little technical problem with DHS where they don't recognize APO and FPO addresses in their computer system. So military family members don't get notified about things, and then they lose their entitlement or become illegal because they didn't show up at an appointment or they were ordered to go overseas while an application was pending. When these things happen, DHS will deny the applications or sometimes put them into removal proceedings. We have had a

000339

12

number of military spouses put into removal proceedings simply because notices didn't reach them on time.

We have problems with fingerprints where family members have to travel more than 100 miles just to get fingerprinted by the U.S. Government. We have problems with medical exams where military doctors are not recognized by Homeland Security as being allowed to do the perfunctory immigration medical examine that is required to get benefits.

But our worst problem right now is the problem faced by military family members who are out of compliance with immigration law. This is mainly due to the 1996 changes to the immigration laws which are extraordinarily harsh. They punish people who have been here illegally in the United States and leave to go get a visa overseas. In some cases, people have a legal status, such as temporary protected status, but they are barred from getting a Green Card. So even though they have some status that allows them to be here, they can't get permanent residence.

And then there are many military family members who are simply barred from getting Green Cards altogether. They have no hope of getting a Green Card because there are no waivers to many of the violations of immigration law that they are involved with. These laws have a particularly harsh effect on military families and force them to make a choice between abandoning their families—military members have to decide whether to abandon their families or to leave the United States military altogether.

Ms. LOFGREN. Ms. Stock, I mentioned to all of you that I would not have a heavy gavel out of respect for our military, but we do need to ask you to summarize at this point.

Ms. STOCK. I will.

Madam Chairwoman, I will just give you one case in point. George Mayicka, who is an Army soldier who serves in the critical health care field. His wife was told by an immigration judge, and an immigration attorney working for the Government, that if she simply left the United States and went overseas to a consulate she would get her immigrant visa and be back in 6 months. When she went overseas to get her visa at the instruction of the immigration judge, the State Department told her that she was barred permanently from the U.S. and could never be allowed back in.

George Mayicka now is facing a really difficult choice. He has to now decide whether to join his wife in Africa, where she is now being forced to live, or leave the military, seek a hardship waiver from the military to join his wife in Africa, or abandon her to stay in the military.

I offer that as just one case. I know that you will hear about others.

But I want to summarize by saying that President Bush emphasized the important contributions of military families in his State of the Union address earlier this year. He lauded the contributions military families make and how they sacrifice for America. It is time that we honor those sacrifices by allowing some flexibility in the immigration laws for military families. This will enhance military readiness.

Ms. LOFGREN. Thank you.

[The prepared statement of Ms. Stock follows:]

13

PREPARED STATEMENT OF MARGARET D. STOCK

Madam Chairwoman and distinguished Members of the Committee, my name is Margaret Stock. I am honored to be here in my capacity as an expert in the field of immigration and citizenship law and to discuss its effect on military members, veterans, and their families.

I am an attorney admitted to the bar in the State of Alaska, where I have practiced primarily in the area of immigration and citizenship law for nearly fifteen years. I have also been a member of the Army Reserve for more than twenty-six years; currently, in my capacity as a Lieutenant Colonel in the Military Police Corps, US Army Reserve, I am assigned as an Associate Professor (Drilling Individual Mobilization Augmentee) in the Department of Social Sciences at the United States Military Academy at West Point, New York. As an attorney in private practice and as an employee of the Department of the Army, I have assisted numerous military members and their families with US immigration matters. The statements, opinions, and views I express today are my own, however, and do not represent the views of the United States Military Academy, the Department of the Army, the Department of Defense, or any other government agency.

For the past several months, I have been volunteering with the American Immigration Lawyers Association Military Assistance Program, a new collaborative effort between the American Immigration Lawyers Association (AILA) and the Legal Assistance Offices of the United States military Judge Advocate General Corps. The military Legal Assistance Offices provide free assistance to military members and their families, including active duty, reserve component, and retired military personnel in order to maintain the highest level of readiness possible in the event a military member is deployed. Recently, JAG attorneys have been inundated with complex immigration legal questions. To resolve these cases successfully, they often need the assistance and experience of seasoned immigration attorneys. AILA MAP has brought these two groups together for the first time in a dynamic partnership.

As a volunteer with AILA MAP, I have been able to see the wide range of immigration problems that US military members, veterans, and their families face today. Thus, I am honored to be appearing before you today to discuss the immigration law problems faced by members of the US military and their families. These problems are numerous and result from the fact that Congress and the Executive Branch have created an extremely complex and arbitrary system of immigration laws and regulations without full attention to the detrimental impact that this system has on the readiness of the US Armed Forces. The United States is a global power and members of its military are deployed in more than a hundred countries around the world. And while our Armed Forces are engaged in fighting a Global War on Terrorism, with an enemy who speaks many languages, travels internationally, and fights our forces here at home and across the globe, America's immigration laws often detract from the military's ability to fight that war. Currently, many military members fighting overseas find that they must also fight their own government at home, as that government creates bureaucratic obstacles that impede military readiness by preventing family members from accessing immigration benefits, refuses to allow family members into the United States altogether, or even seeks to deport military personnel or their family members.

It is important to emphasize—as Members of this Committee know very well—that the current state of immigration law is dysfunctional and irrational, and only promises to get worse. The most apt description of the state of our immigration laws comes from former INS spokesperson Karen Kraushaar, who said that US "immigration law is a mystery and a mastery of obfuscation." As military members encounter these laws and this system, they often experience the same difficulties and frustrations that civilians experience. They must deal with a complex system that requires years of study to understand—a system that makes it nearly impossible for many people to immigrate to the United States legally unless they can find, and have the funds to hire, one of the rare attorneys who knows how to navigate the system successfully. And these military members face the added burden that they must cope with these complexities at the same time that they are coping with added stresses necessitated by today's military lifestyle.

Congress has done much in recent years to try to help non-citizen military members become citizens more quickly, and the process for expediting military naturalization cases has improved greatly in the past few years. I applaud this effort, which has been highly beneficial to the US Armed Forces in obtaining and retaining qualified enlisted personnel and officers. Congress also made some recent changes to the law so that family members sent overseas will not lose their US residency or eligibility to naturalize simply because they have spent time overseas with their military spouse or parent. But much more must be done. Let me give you some ex-

14

amples of immigration problems that still exist, and that are hurting military readiness:

First, active duty military personnel are still being placed into removal proceedings and forced to hire private attorneys, seek assistance from AILA MAP, or represent themselves. The Department of Homeland Security is represented by qualified attorneys when it moves to deport aliens, but it does not provide defense attorneys to aliens (or even United States citizens) who are placed into proceedings, even if those individuals are active duty military members. DHS has a policy—laid out in a document called the "Forman memo"[1]—that its officers are not supposed to try to deport active duty military personnel without checking with their headquarters. Lately, however, DHS officers have been ignoring the policy. Active duty military personnel have been placed into proceedings—or threatened with being placed into proceedings—for technical violations of immigration law. To give one example, Navy sailor Karla Rivera was recently placed into removal proceedings because she failed to file Form I-751 to lift the conditions on her permanent residence—despite the fact that she is eligible for a waiver of the timely filing of the form, and despite having a pending citizenship application. It is unlikely that the United States Government will ever deport Karla—or that there would be any rational reason to deport Karla—but this sailor has had to attend removal proceedings on the other side of the country, at her own expense, despite having a pending citizenship application that will likely be approved. Not only is Karla's time being wasted with this exercise, but the US taxpayers are paying for the time of immigration judges and DHS attorneys so that Karla can be forced to engage in a Kafkaesque dance with the immigration bureaucracy. And she must take time away from her Navy job to do so.

Another problem that military members face is their inability to obtain permanent legal status for their family members in a timely manner. This is a problem that does not just affect military personnel whose family members have violated immigration law—it affects perfectly legal people as well. Slow government processing times, complex filing procedures, and huge fees can often mean that family members awaiting their lawful residency cannot obtain Employment Authorization Documents, Social Security numbers, or driver's licenses for months or sometimes years. Military personnel deployed overseas often have spouses and children back home in the United States who cannot work or drive legally—and military bases are often very large places in isolated areas where mass transit is not readily available. Military units are forced to provide transportation and other support to these family members because the Department of Homeland Security takes so long to approve their applications for the basic legal documents that they need to survive in today's America.

Even when military families are able to file applications for immigration benefits, they often run afoul of our complex laws through no fault of their own. Because of military requirements, they move frequently, so that DHS notices do not reach them timely. The military will order them to go overseas while their applications are pending, and they often thereby lose eligibility for the benefit they seek. When these things happen, DHS will deny their applications or even put them into removal proceedings, forcing them again to incur significant time and expense to resolve the problem. They also live on military bases that are often very far away from the DHS offices with which they must file their applications. Many military family members must travel more than 100 miles just to have their fingerprints taken for immigration benefits. They are also required to take medical exams with DHS-designated civil surgeons because DHS does not recognize most military doctors as being qualified to provide these exams. Thus military members and their families are forced to pay large fees and travel to obtain the required exams.

Even worse are the problems faced by military personnel whose family members are out of compliance with immigration law. Due to the 1996 changes to the immigration laws, many of these family members are unable to obtain legal status in the United States. In some cases, they have a legal status such as Temporary Protected Status, but are unable to obtain lawful permanent residence. In other cases, they must leave the United States to have any hope of obtaining an immigrant visa—but once they leave, they will trigger a bar that prevents their return. And finally, there are those who are simply barred from permanent residence altogether due to harsh provisions of the immigration laws that provide no waivers for even very minor transgressions. In a country that professes to value the ideals of family unity,

[1] Marcy M. Forman, Acting Director, Office of Investigations, Immigration & Customs Enforcement, Memorandum, Issuance of Notices to Appear, Administrative Orders of Removal, or Reinstatement of A Final Removal Order on Aliens with United States Military Service, June 21, 2004, available at http://www.bibdaily.com/pdfs/Forman%206-21-04.pdf.

15

forgiveness, and rehabilitation, it is hard to explain why past minor violations of immigration law can never be forgiven, but lead to permanent banishment from the United States and force the break-up of many families, both military and civilian. These laws have a particularly harsh effect on military families, forcing military members to make a choice between abandoning their families, or leaving the United States military altogether.

The plight of U.S. military family members with these types of immigration problems is no better illustrated than by reference to the well-publicized case of Yaderlin Hiraldo and Alex Jimenez. Yaderlin's situation came to national media attention in mid-2007, when her husband, Specialist Alex Jimenez of the United States Army, was reported Missing In Action (MIA) after his squad was ambushed in Iraq.[2] Prior to his disappearance, Alex had filed papers seeking to obtain lawful permanent residence status for his wife.[3] Unfortunately for Alex, Department of Homeland Security (DHS) officials decided that Yaderlin was not eligible for lawful permanent residence (LPR) status because she had entered the United States in an irregular manner.[4] She was placed into removal proceedings, and for several years the Department of Homeland Security tried to deport her. She was in removal proceedings when her husband was reported missing, and had been told to leave the US and seek a visa overseas; and yet without his presence and support, she could not hope to obtain permission to return to the United States, and would be barred for ten years from returning to the United States.[5] But the Department of Homeland Security stood firm; she was not to be granted any special grace due to her status as the spouse of a deployed soldier.

And yet when Senator John Kerry wrote a letter to Secretary of Homeland Security Michael Chertoff, and major news media began highlighting Yaderlin's predicament,[6] Secretary Chertoff suddenly exercised his authority to grant "discretionary parole" to Yaderlin.[7] Once she had been granted parole, Yaderlin was immediately eligible to adjust her status, despite her unlawful entry. Within a matter of days, USCIS granted her application to adjust status, and she was given a "green card." [8] The story would have had a happy ending but for the continued status of Alex Jimenez, who remains MIA as of this writing.[9]

Other military families remain in the same predicament. Yaderlin's case was resolved successfully, but their cases have not; although DHS has a parole policy for Cubans who enter the United States unlawfully, it has no such policy for US military family members. An example is Army Sergeant Yolanda Guevara, a top-notch soldier whose husband is from El Salvador and has Temporary Protected Status. The couple have three children who were all born in the United States. Sergeant Guevara tried to obtain legal status for her husband; she filed all the required papers and paid the required fees, only to be told that her husband was not eligible for a green card and would have to go back to El Salvador for ten years when his Temporary Protected Status expires next year. Under current law, Sergeant Guevara's husband is unable to obtain permanent status, and she fears that he may deported during her next deployment, leaving her children without a parent. Secretary Chertoff could order that Sergeant Guevara's husband receive discretionary parole so that he could be eligible for a green card, but as of today, he has not. Furthermore, no system can operate successfully and fairly if it depends on the personal intervention of the Secretary of Homeland Security.

---

[2] Marcus Baram & David Schoetz, *A Military Wife's Rock and Hard Place: Husband Missing in Iraq; Wife Facing Potential Deportation at Home*, ABC News, June 20, 2007, http://abcnews.go.com/TheLaw/story?id=3297537.

[3] Marcus Baram & David Schoetz, *A Military Wife's Rock and Hard Place: Husband Missing in Iraq; Wife Facing Potential Deportation at Home*, ABC News, June 20, 2007, http://abcnews.go.com/TheLaw/story?id=3297537.

[4] Marcus Baram & David Schoetz, *A Military Wife's Rock and Hard Place: Husband Missing in Iraq; Wife Facing Potential Deportation at Home*, ABC News, June 20, 2007, http://abcnews.go.com/TheLaw/story?id=3297537.

[5] Associated Press, Wife of Mass. Soldier missing in Iraq faces deportation, June 21, 2007.

[6] *See* Greg Simmons, *Feds Say Missing Soldier's Illegal Immigrant Wife Not Likely To Be Deported*, Fox News, June 20, 2007, http://www.foxnews.com/story/0,2933,284832,00.html.

[7] Chertoff Agrees to Kerry's Request to Protect Wife of Missing Soldier, June 21, 2007, available at http://kerry.senate.gov/cfm/record.cfm?id=277541 (containing text of letter from DHS Secretary Chertoff to Senator John Kerry of Massachusetts, describing how Secretary Chertoff had directed that "ICE will grant Ms. Hiraldo discretionary parole into the United States").

[8] Associated Press, Illegal Immigrant Wife of Missing Soldier Awarded Green Card to Stay in U.S., July 2, 2007.

[9] Neil Graves & Douglas Montero, New Hope for GI: Qaeda 'Kidnap' Busts, N.Y. Post, December 28, 2007, at 27.

16

Hundreds of other US military families face similar dilemmas, with family members who cannot adjust status facing possible deportation at the hands of the same government that employs their military member relatives. Still others have foreign family members who have been denied entry to the United States because of minor immigration law violations, and are essentially trapped overseas with no hope of joining their US military family members in America. Ironically, this same government often lauds the families' contributions to military morale, praises their sacrifices, and provides them with military-related benefits—but will not permit them to obtain the legal status that would truly allow their loves ones to focus on service to their country.

Some of these problems might be resolved if the Department of Homeland Security would issue the same sort of policy memo with regard to military family members that it has issued for Cubans, but other problems cannot be solved without changes to the law. A very serious problem today is the fact that many military family members are completely barred from obtaining lawful permanent residence, and the law does not permit waivers. Some have entered the United States illegally and cannot adjust their status; some have worked unlawfully; many cannot leave the United States for fear of triggering a 3-year, 10-year, or permanent bar to their return. The current stepped-up enforcement efforts by the Department of Homeland Security have forced many military family members into exile in a foreign country. When this happens, the US military may eventually lose the US military member, who may not want to continue to serve in the United States military when his or her family has been banished to Mexico, the Philippines, Kenya, or some other far away place. Without legal reform, these problems cannot be resolved.

A case in point is the plight of George Mayieka, an Army soldier who serves in the critical health care field. George's wife was told to leave the United States and go to a U.S. consulate abroad for her green card processing by the well-meaning but mistaken advice of a trained U.S. Government immigration attorney and a trained Immigration Judge. At the consulate, the consul—whose decision is final and not subject to judicial review in any U.S. court—determined that George's wife is not, under current law, eligible for a green card after all, nor for any waiver that would make her eligible. George's wife is now trapped in a conflict-ridden country in Africa while he worries constantly about her well-being, and agonizes about whether to see a hardship discharge from the Army so that he can live with her overseas. If George leaves the service, America's Army will lose yet another critical health care worker at a time when they are in short supply.

I mention this case as just one example—but America's grounds of exclusion and deportation—now inadmissibility and removability—have become so strict, so tight, and so unforgiving that few home-grown Americans could ever qualify for green cards. Those grounds need wholesale revision. In the meantime, as a stopgap, we should improve our system of executive branch waivers to allow families to stay together. Many families could benefit from such waivers, but a good starting point would be to allow DHS to grant waivers to military families. This is not just a matter of fairness, but a matter of military readiness.

On January 28, 2008, in his State of the Union address, President George W. Bush emphasized the important contribution that military families make to America's national defense. "Our military families also sacrifice for America," President Bush said. "They endure sleepless nights and the daily struggle of providing for children while a loved one is serving far from home." [10] It is time that we honor the sacrifices of non-citizen military families by fixing our broken immigration laws so that these families can enter and remain legally in the United States, where they provide critical support to our fighting men and women.

Ms. Lofgren. Captain Rivera, we would be pleased to hear from you now. Could you turn on the microphone, please.

### TESTIMONY OF KARLA ARAMBULA DE RIVERA, E2 OFFICER, UNITED STATES NAVY

Ms. de Rivera. Good afternoon, Chairwoman Lofgren and Members of the Subcommittee. I am pleased to provide you an overview of my experience as an immigrant to the United States.

---

[10] President George W. Bush, State of the Union Address (Jan. 28, 2008), *available at* http://www.whitehouse.gov/news/releases/2008/01/20080128-13.html.

17

My name is Karla Arambula de Rivera. I am a native of Mexico. I was brought to live in the United States as a little girl, and I have lived here ever since.

I married a U.S. citizen in 2004 and became a conditional permanent resident that was set to expire in 2 years. In March of 2007, I enlisted in the Navy. In July of 2007, I was supposed to apply to adjust my status to that of a lawful permanent resident, removing the condition.

While in a school in Pensacola, Florida, I went to seek help from Navy Legal Service Office Central, where they helped me to file the I-751 to adjust my status based on my marriage to a citizen. This form was returned due to a postdated check. I returned to the Naval Legal Service Office Central, where I was advised I could file instead an N-400 to become a naturalized citizen based on my military status.

Naval Legal Service Office Central filed an N-400. I then reported to the USS Carl Vinson in August of 2007. The Vinson checked on my immigration package to find out that the Nebraska Service Center had no record of me filing an N-400. The Vinson helped me file a new N-400 in December of 2007.

In January of 2008, I was sent a notice to appear in an immigration court in Los Angeles, California, due to the fact that my status was terminated because I failed to file the petition to remove the conditions based on my marriage to a U.S. citizen. My hearing date was on February 28, 2008.

I went to my new local legal assistance office, Naval Legal Service Office Mid-Atlantic in Norfolk, Virginia. With their help, I filed a motion to change venue to Arlington, Virginia, but the court would not rule out on that motion until the day of the hearing, which required me to travel to California. At the hearing, I was fortunate to be represented by pro bono counsel who had helped me file my original paperwork for residency. The counsel asked the judge to terminate the proceedings based on the form and memo put out by U.S. Immigration and Customs Enforcement which states that ICE should not initiate removal proceedings against military members who are eligible for naturalization under section 328 or 329 of the INA.

Despite the fact that I had an N-400 application pending based on my military service, ICE objected to the termination on the judge and the judge would only grant the motion written by Naval Legal Service Office Mid-Atlantic to change the venue to Arlington.

I have a new hearing date set for July 1, 2008, in Arlington. Naval Legal Service Office Mid-Atlantic helped me find an organization that would help provide an attorney for free and got me started toward citizenship. I have an interview with the Norfolk Field Office for my naturalization scheduled for May 27, 2008.

Hopefully, by the time my hearing in Arlington comes, I will be a citizen, and this nightmare will be behind me. The situation has been extremely difficult for me both professionally and personally as an enlisted member of the Navy, stationed onboard the USS Carl Vinson, a carrier that frequently deploys. I am worried about letting my shipmates down and working out of my rate if left behind during deployment, which would have an effect on my mili-

18

tary career. I know the ship will ensure that I make the hearing, but it is difficult for them and for me.

I have also had to spend my own time and money travelling to Los Angeles for the removal hearing. I am grateful that I have had the assistance of Naval Legal and opportunities to find pro bono legal services to help me with this complex issue. If it hadn't been for their help, I would not have been able to afford legal counsel on my own.

Thank you for your continued support.

Ms. LOFGREN. Thank you very much and for your service to our country.

[The prepared statement of Ms. de Rivera follows:]

PREPARED STATEMENT OF KARLA ARAMBULA DE RIVERA

Chairwoman Lofgren and members of the subcommittee, I am pleased to provide you an overview of my experience as an immigrant to the United States.

My name is Karla Arambula de Rivera. I am a native of Mexico. I was brought to live in the United States as a little girl and have lived here ever since. I married a U.S. citizen in 2004 and became a conditional permanent resident that was set to expire in two years. In March of 2007, I enlisted in the Navy. In July of 2007, I was supposed to apply to adjust my status to that of a lawful permanent resident, removing the conditions. While in A school in Pensacola, Florida, I went to Navy Legal Service Office Central where they helped me to file the I-751, to adjust my status based on my marriage to a citizen. This form was returned due to a post-dated check. I returned to Navy Legal Service Office Central where I was advised I could file instead an N-400 to become a naturalized citizen based on my military status. Navy Legal Service Office Central filed the N-400. I then reported to the USS CARL VINSON in August 2007. The VINSON checked on my immigration package to find out that the Nebraska Service Center had no record of me filing the N-400. The VINSON helped me file a new N-400 in December 2007. In January 2008, I was sent a Notice to Appear in Immigration Court in Los Angeles, California, due to the fact that my status was terminated because I failed to file the petition to remove the conditions (based on my marriage to a U.S. citizen). My hearing date was on February 28, 2009. I went to my new local legal assistance office, Navy Legal Service Office Mid Atlantic in Norfolk, Virginia. With their help, I filed a Motion to Change Venue to Arlington, Virginia, but the court would not rule on that motion until the day of the hearing, which required me to travel to California. At the hearing I was fortunate to be represented by pro bono counsel who had helped me file my original paperwork for residency. The counsel asked the judge to terminate the proceeding based on the Forman Memo put out by U.S. Immigration and Customs Enforcement which states that ICE should not initiate removal proceedings against military members who are eligible for naturalization under sections 328 or 329 of the INA. Despite the fact that I had an N-400 application pending based on my military service, ICE objected to the termination and the judge would only grant the motion written by Navy Legal Service Office Mid Atlantic to change venue to Arlington. I have a new hearing date set for July 1, 2008 in Arlington. Navy Legal Service Office Mid Atlantic helped me find an organization that would provide an attorney for free and got me started toward citizenship. I have an interview with the Norfolk Field Office for my naturalization scheduled for May 27, 2008. Hopefully, by the time my hearing in Arlington comes, I will be a citizen and this nightmare will be behind me. This situation has been extremely difficult for me both professionally and personally. As an enlisted member of the Navy, stationed on board the USS CARL VINSON, a carrier, that frequently deploys, I am worried about letting my shipmates down and working out of my rate if left behind during deployment, which would have an effect on my military career. I know the ship will ensure that I make the hearing, but it is difficult for them and for me. I have also had to spend my own time and money traveling to Los Angeles for the removal hearing. I am grateful that I have had the assistance of Navy legal and opportunities to find pro bono legal services to help with this complex issue. If it hadn't been for their help, I would not have been able to afford legal counsel on my own.

Thank you for your continued support.

19

Ms. LOFGREN. Captain Navarro, we would be pleased to hear from you now.

**TESTIMONY OF CHRISTINE NAVARRO, KC-5 AIRCRAFT COMMANDER, UNITED STATES AIR FORCE**

Ms. NAVARRO. Chairman Lofgren, Members of the Subcommittee and special guests, good afternoon.

I attended pilot training in Pensacola and Vance Air Force Base, and my first assignment was at MacDill. I have been deployed three times since my commissioning, all in support of Operation Iraqi and Enduring Freedom. My next deployment is in September of this year for 4 months. The statements and opinions expressed today are my own and do not represent the views of the Air Force, the Department of Defense or any other Government agency.

Now let me take you back to my humble beginnings and tell you about the positive impact a bill like this would have on me and my family. I come from a family of migrant workers. I grew up in a small town. My husband and I were neighbors. Prom, high school graduation, acceptance to the academy, he was there. He moved out to Colorado in 1999 to be close to me and be part of what I wanted to become, a pilot. Academics, football games, parades, jump school, and in 2002 graduation, he was there.

We were married 2 days after I graduated the Academy by the justice of the peace. Three weeks later, we found an immigration attorney to help us start drafting papers to adjust his status.

After my leave was over, I was back to work, water survival, resistance training, pilot training. Three military moves later, he was there. In August, 2004, my son was born. By then we were settled in Florida, and I had done what I had set out to do, fly. The TDYs, the two trips around the world in a month, safety school and two deployments, he was there as a loving, supportive military spouse. All the while, we were both waiting to hear from immigration.

I received word from my attorney while I was deployed that on 13 November, 2006, we were to go to Juarez, Mexico, for my husband's consulate interview. We arrived 3 days prior to be sure we had time to get all our paperwork in order. His interview consisted of a 5-hour wait in line, followed by a 2-minute question and answer period about how he had entered the country. Our lawyers had warned us that his prior entry and false claim to citizenship could bar him from the country, but we were confident that after 4 years of waiting and thousands of dollars we would be able to move on.

But what you hear on television from so-called experts is not the truth. It is not easy to stand in line and get legal. Our application was denied, and my husband was told he was barred forever from entering the U.S.

I flew home the next day a single parent, and I flew my husband to Mexico. I didn't cry, because I had not accepted defeat. I made it a priority to find a way to get us together. I would find a way. It could not be possible that my husband, who had never been convicted of any crimes, could be barred permanently. In the meantime, I could take an assignment overseas for a few years while we worked out a waiver.

20

In March, 2007, 5 months later, my son was diagnosed with cerebral palsy. I was crushed. The EEG, the CAT scan, two surgeries, therapies, the doctor's appointments, my husband was not there. My better half, my shoulder to cry on is not here.

I refocused my attention on my son. His medical condition takes overseas assignments out of reach for us. So from worrying about child care to now worrying about my next mission now that my husband is not here, I carry that load alone. I have accepted defeat. I could not get us back together. I could not find a waiver because there is no waiver.

I don't work for a one-mistake Air Force or even a two-mistake Air Force. I maintained that, throughout all of this, honesty was the best policy; and it would work out in our favor. I don't condone my husband's actions, although in the scheme of things what he did was not horrible. He comes from humble beginnings. My husband is not a criminal. He is worse off than a criminal. Even criminals can pay their debt and are afforded the opportunity to be reintegrated into society. Yet under U.S. immigration law today, there is no forgiveness process.

I do not know how to love someone and never have an opportunity to make a life. Am I supposed to file for divorce papers? Should I break up my family to comply with the law? To love is to let go, and I need closure and to move on. It is only to fair to give him permission to rebuild a life in a country he never grew up in. I can't imagine what it must feel like for your wife to choose country before you and then to choose your son before you.

I suppose I could apply for a hardship and go live in Mexico like others. But I am an American soldier. My life, my family, my job is here in the U.S.

I am proud to do my part today, and I know by testifying today I can make you aware of the horrible decision I am being forced to make, to choose between husband and country. I hope you do your part by passing a bill that will spare other fellow soldiers in similar situations my pain. So as long as I can, I am honored to serve you in uniform.

Thank you.

Ms. LOFGREN. Thank you very much.

[The prepared statement of Ms. Navarro follows:]

PREPARED STATEMENT OF CHRISTINE NAVARRO

Chairwoman Lofgren, Members of the Committee, and Special Guests: Good afternoon. Let me start off by thanking you for this opportunity. I am a US Air Force Academy graduate, with a degree in astronautical engineering and a minor in mathematics. Currently I am working on my master's degree in Industrial Engineering from Texas A&M. I attended pilot training in Pensacola and Vance AFB, with my first assignment being at MacDill AFB. I have been deployed three times since my commissioning, all in support of Operation Iraqi and Enduring Freedom. My next deployment is in September of this year for four months. The statements and opinions I express today are my own and do not represent the views of the Air Force, the Department of Defense or any other government agency.

Now let me take you to my humble beginnings and tell you about the positive impact a bill like this would have on me and my family. I come from a family of migrant workers. I grew up in a small town. My husband and I were neighbors. Prom, high school graduation, acceptance to the Academy, he was there. He moved out to Colorado in 1999 to be close to me and a part of what I wanted to become—a pilot. Academics, football games, parades, jump school and then in 2002, graduation, he was there. We were married two days after graduating the Academy, by

21

the justice of the peace. Three weeks later, we found an immigration attorney to help us start drafting papers to adjust my husband's status.

After my leave was over, it was back to work. Water survival, resistance training, pilot training, three military moves, he was there. In August of 2004, our son was born. By then we were settled in Florida and I had done what I had set out to do. Fly. The TDYs, the two trips around the world in one month, safety school and two deployments, he was there. As the loving, supportive military spouse. All the while, we were both waiting to hear from immigration.

I received word from our attorney, while I was deployed, that on November 13, 2006, we would go to Juarez, Mexico for my husband's consulate interview. We arrived three days prior, to be sure we had enough time to get all our paperwork in order. His interview, consisted of a five hour wait in line, followed by a two minute question and answer period about how he had entered the country. Our lawyers warned us that his prior entry and false claim to citizenship, could bar my husband from the country. But we were confident that after four years of waiting, and thousands of dollars, we would be able to move on.

But what you hear on television from so-called experts, is not true—it is not easy to stand in line and get legal. Our application was denied and my husband was told that he was barred forever from entering the United States. I flew home the next day a single parent. I flew my husband to his mother's house in Mexico. But I did not cry—because I had not accepted defeat, I made it a priority to find a way to get us together again. I would find a way. It could not be possible, that my husband, who has never been convicted of any crimes, could be barred permanently. In the mean time, I could take an assignment overseas for a few years while we worked out a waiver.

Then in March 2007, five months later, my son was diagnosed with cerebral palsy. I was crushed. The EEG, CatScan, two surgeries, therapies, the doctor's appointments, my husband was not there. My better half, my shoulder to cry on . . . is not here. I refocused my attention and energy on my son. His medical condition, takes overseas assignments out of reach for us. From worrying about child care to worrying about my next mission, now that my husband is not here, I carry the load alone.

I have accepted defeat. I could not get us together again. I could not find a waiver, because there is no waiver. I do not work for a one-mistake Air Force, or even a two-mistake Air Force. I maintained throughout all of this, that honesty was the best policy and that it would all work out in our favor. I don't condone my husband's actions, although in the scheme of things, what he did was not horrible. He too comes from humble beginnings. My husband is not a criminal. He is worse off than a criminal—even criminals can pay their debt and are afforded the opportunity to be reintegrated into society. Yet under US immigration law today, there is no forgiveness process.

And I do not know how to love someone and never have an opportunity to make a life together. Am I supposed to file divorce papers? Should I break up my family to comply with the law? To love is let go. I need closure, and to move on. It's only fair to give him permission to try and rebuild his life in a country he never grew up in. I can't imagine what it must feel like for your wife to choose country before you and then again to choose your son before you.

I suppose I could apply for a hardship separation from the military and go live in Mexico, as others have done. But, I am an American soldier, my life, my family, my job, is here in the US. I'm proud to do my part. I want my family intact. I know by testifying today I can make you aware of the horrible decision I am being forced to make—choosing between husband and country. I hope you do your part by passing a bill that will spare other fellow soldiers in similar situation, my pain. So as long as I can, I am honored to continue to serve you in uniform. Thank you.

Ms. LOFGREN. General Baca.

## TESTIMONY OF LT. GENERAL (RETIRED) EDWARD D. BACA, PRESIDENT AND CEO, BACA GROUP

Mr. BACA. Thank you, Madam Chairwoman.

As you mentioned, Commander Morales and I are here representing the American G.I. Forum. I feel that I am somewhat qualified to testify before this Subcommittee on this topic since I spent over 41 years, as you mentioned, wearing the uniform of the

22

Armed Forces of the greatest Nation in the world, the United States of America.

Let me make it clear that I am not an immigrant, but I do understand and can relate to them. I am not sure how to categorize my grandparents, who were arguably some of the first settlers who came to this continent from the Iberian Peninsula to what is now New Mexico. I believe it was called New Spain then. My grandparents didn't cross the border. The border crossed them.

My maternal grandparents, who lived with us and helped raise me, never learned the English language. We spoke Spanish at home, and I had to go to school to learn how to speak English. We spoke Spanish as our first language. They and my parents taught me a sense of patriotism and love of God and country that compelled me to join the military and rise from the rank of private to lieutenant general. Only in America is that possible, and no one loves and appreciates this country more than I do.

I am here because I have seen and experienced firsthand the sacrifices that members, like the ones sitting next to me today testifying, and their families endure in the interest of gaining and maintaining the freedom that all of us, as Americans, enjoy.

In my service, my duties took me to every corner of the world. I was in all seven continents and more countries than I could have ever imagined. I was also fortunate in that I had been in all 54 States at least once. And all these travels made me realize one thing that I have known all my lifetime, that with all its warts and sores and weaknesses, we live in the greatest country in the world, the United States of America; and I am proud to be an American.

I also realize that it is American service members which have made and kept this the greatest Nation in the world. These are men and women who have taken a solemn oath to protect and defend the oldest living democratic document in the history of the world. They subscribe to the code of conduct which first article says, I am American fighting man/woman. I serve in the forces that guard our country and its way of life. I am prepared to give my life in its defense.

Most women who have taken that oath, that solemn oath have upheld it. All have sacrificed, and some have made the ultimate sacrifice, giving up their precious lives.

However, it is not only the service member but their families also pay the price for our freedom. The hardships they endure are unimaginable for those who have not experienced them. Unfortunately, some veterans and members of our families have not always been afforded the same rights and privileges that our Constitution guarantees most citizens of our society. That is why the American G.I. Forum, whom I represent today, exists. That is why I am here today to testify before this Committee. It is your responsibility, as well as all of us, to ensure that if we are willing to send our troops in harm's way, that they and their families are guaranteed all the benefits of our Constitution, to include citizenship.

Service members have a right to expect all of us to do our part in not only supporting them but also their family members. The last thing they need when they are deployed in a dangerous situation is to worry about the well-being of their loved ones.

23

Let me conclude, Madam Chairwoman, by saying once again how proud I am to be an American and to say that I am proud of my Hispanic heritage. Hispanic Americans have answered this Nation's call in every crisis this country has ever faced, starting with a Revolutionary War.

In 1993, I had the privilege of narrating a documentary for Telemundo called Hispanic Heroes. It highlights the contribution of Hispanics to our national defense. This documentary was awarded three Emmys, not for my performance, I might add. The American G.I. Forum and the producer and director of this film are planning to make a sequel to the original film to include Hispanic contributions since 1993 to include all that has occurred post-9/11. We are meeting with the producer and, as I said, and asked them if they will produce it and air it—excuse me—if they will air it afterwards. These documentaries tell the stories and show actual interviews with some of those brave veterans that we speak of during this testimony.

Please let me add that Hispanics are one of the many ethnic minorities and other proud veterans that have served our country in its time of need, many that were immigrants like the ones we represent today. We urge you, Madam Chairwoman and Members of the Subcommittee, to support our immigrant service members and their families and pass this legislation.

Ms. LOFGREN. Thank you very much, General.

[The prepared statement of Mr. Baca follows:]

PREPARED STATEMENT OF EDWARD D. BACA

I am Lieutenant General (Retired) USA, (Retired). Commander Morales and I are here representing the American G. I. Forum I feel that I am somewhat qualified to testify before this sub committee on this topic, since I spent over 41 years wearing the uniform of the Armed Forces of the greatest Nation in the world, the United States of America.

Let me make it clear that I am not an immigrant but I do understand and can relate to them. I am not sure how to categorize my Grandparents who arguably were some of the first settlers who came to this Continent, from the Iberian Peninsula, to what is now the State of New Mexico. I believe it was called New Spain then. My Grandparents didn't cross the border the border crossed them. My maternal Grandparents, who lived with us and helped raise me, never learned the English language. We spoke Spanish at home and I had to learn to speak English in my first year of school. They and my parents taught me a sense of patriotism and love of God and Country that compelled me to join the Military and rise from the rank of Private to Lieutenant General. Only in America is that possible. No one loves and appreciates this Country more than I.

I am here because I have seen and experienced, first hand the sacrifice that members and their families endure in the interest of gaining and maintaining peace and freedom for not only the U.S. but for the entire world. In my service my duties took me to every corner of the world. I was on all seven Continents and in more countries than I could have ever imagined. I was also fortunate in that I have been in all 54 States and Territories at least once. Over a lifetime I have been aware that we are not a perfect nation, we never have claimed to be, but with all its warts and sores and weakness we live in the greatest Country in the world, our United States of America and I'm extremely proud to be an American.

I have also realized that it is American Service Members which have made and kept us the greatest Nation in the world. These are men and women who have taken a solemn oath to protect and defend the oldest living Democratic document in the history of world. They subscribe to a code of conduct which states in its first article "I am an American Fighting Man/Woman, I serve in the forces that guard our Country and its way of life, I am prepared to give my life in its defense". Most men and women who have taken the oath have upheld it. All have sacrificed and some have made the ultimate sacrifice giving up their precious lives.

24

However, it is not only the Service Members but their families also pay the price for our freedom. The hardships they endure are unimaginable for those who have not experienced them. Unfortunately some Veterans and members of our Military and their families have not always been afforded the same rights and privileges that our Constitution guarantees most Citizens of our Society. That is why the American GI Forum, whom I represent today, exists. That is why I am here today to testify before this Committee. It is your responsibility, as well as ours, to insure that if we are willing to send our troops in harms way that they and their families are guaranteed all of the benefits of our Constitution to include citizenship. Service members have a right to expect all of us do our part in not only supporting them but also their family members. The last thing they need when they are deployed in a dangerous situation is to worry about the well being of their loved ones.

Let me conclude by saying once again how proud I am to be an American and also to say that I am proud of my Hispanic heritage. Hispanics Americans have answered this nation's call in every crisis this Country has ever faced starting with the Revolutionary war. In 1993 I had the privilege of narrating a documentary for Telemundo, Hispanic Heroes that highlights the contribution of Hispanics to our national defense. This Documentary was awarded three Emmys. The American GI forum and the Producer and Director of this film are planning to make a sequel to the original film to include Hispanic contributions since 1993 to include all that has occurred post 9/11. We are meeting with Officials from PBS this Friday to discuss a proposal that we have sent to them asking them when it is produced if they will air it. These Documentaries tell the stories and shows interviews with some of those brave Veterans that we speak of during this testimony.

Please let me add that Hispanics are one of the many ethnic minorities and other proud veteran's that have served our Country in it's time of need. Many that were immigrants like the ones we represent today.

We urge you Mr. Chairman and members of the Committee to support our Immigrant Service Members and their families and pass this legislation.

Thank You.

Ms. LOFGREN. Finally, we turn to you, Mr. Seavey.

## TESTIMONY OF MARK C. SEAVEY, ASSISTANT DIRECTOR OF THE NATIONAL LEGISLATIVE COMMISSION, AMERICAN LEGION

Mr. SEAVEY. Madam Chairwoman, Mr. King, thank you for the opportunity to appear before you today and present the views of the nearly three million wartime veterans who make up the American Legion.

The American Legion has been a leader in mentoring candidates for United States citizenship dating back to the beginning of the organization in 1919. Early on, the American Legion worked closely with Federal courts to assist in naturalization schools throughout the country by aiding legal immigrants in learning English, U.S. history and American Government.

Under the Department of Homeland Security's Task Force on New Americans Program, the American Legion has partnered with the USCIS to again provide assistance to legal immigrants moving through the naturalization process on their way to becoming American citizens. The early efforts in renewed support to those who arrive on our shores legally stems from the American Legion's longstanding position on immigration.

The American Legion remains opposed to any great influx of legal immigrants and has called for immigration quotas to be set on a moderate and regulated scale in numbers that enable the immigrants to be readily absorbed into the culture and life stream of the United States. It is expected that all who would be citizens arrive in this country legally and while within the United States that

25

they be law-abiding residents. Those unable or unwilling to do so should be held accountable.

In recent years, the American Legion has supported much legislation that was outlined by Mr. King earlier. We have supported legislation that allows noncitizen veterans with less than 3 years of active duty service and who are legally in the U.S. at the time of enlistment to seek naturalization.

The American Legion has also encouraged Congress to amend the INA to allow immigrant spouses of U.S. military personnel who die whether in training or on military installations or overseas in hostile conflict to continue their petition for permanent resident status within the current 2-year eligibility restrictions.

Additionally, the American Legion argued that the Immigration and Nationalization Act should be amended to waive fees for posthumous citizenship, assessed to survival family members who lose a relative in hostile combat while a member of the U.S. Armed Forces and who has a pending application for United States citizenship.

The American Legion opposes any legislation with provisions which waives certain grounds of inadmissibility for citizenship for both permanent residents who served honorably in the Nation's Armed Forces and for their family members. This would seem to reward lawbreakers and possibly illegal immigrants with a shortcut to citizenship that is nothing less than an official pardon for illegal acts or an amnesty.

Alien service members' relatives who have entered this country illegally or overstayed a visa or who may be fugitives from justice deserve no special adjustment to their alien status. Honorable service in the military of the United States must be no more an asset to the family of a permanent resident alien than it is to the family of an American citizen who has served this Nation with honor.

No special pardon, no reprieve for lawlessness, no exoneration for bad behavior is given to the service person or the family simply because one wore the uniform of the United States military. The same should be applied to the individual or the family of the individual who lacks the status of United States citizenship.

Laws that prohibit illegal entry or continued unlawful residency in the U.S. exist for good reason. These reasons include national security, the Nation's economy, and a general impact that certain aliens would have upon the American society.

The American Legion continues to welcome and strongly support legal immigration into the United States.

One thing I did want to say is that I apologize that our National Commander was unable to make it here today. Mr. Conyers had mentioned that perhaps he would like to have a meeting set up, and we are more than amenable to do that. Our National Commander travels extensively, but we would love to work——

Ms. LOFGREN. No offense is taken by the Committee. We understand there are scheduling conflicts, and we will reach out and see if we can have such a meeting.

Mr. SEAVEY. Wonderful. Thank you, Ma'am.

[The prepared statement of Mr. Seavey follows:]

26

PREPARED STATEMENT OF MARK C. SEAVEY

The American Legion has been a leader in mentoring candidates for US citizenship, dating back to the beginning of the Organization. Early on, the Legion worked closely with federal courts to assist naturalization schools throughout the country. By aiding legal immigrants with learning English and by teaching US history and American government the Legion helped the new citizens to become contributing members of our society.

Just recently, The American Legion began this effort anew. Under the Department of Homeland Security's "Task Force on New Americans" program, the Legion has partnered with the U.S. Citizenship and Immigration Service to provide assistance to legal immigrants moving through the naturalization process on their way to becoming American citizens.

The early efforts and the renewed support to those who arrive on our shores legally, stems from the Legion's long-standing position on immigration. The American Legion remains opposed to any great influx of legal immigrants and has called for immigration quotas to be set on a moderate and regulated scale in numbers that enable the immigrants to be readily absorbed into the culture and life stream of the United States.

Of all who would become American citizens, it is expected that they would have arrived in our country legally, and while within the United States been law abiding residents. Those unable or unwilling to do so should be held accountable.

The American Legion has supported legislation that allows non-citizen veterans with less than three years of active duty service and who were legally in the US at the time of enlistment, to seek naturalization if they are injured or their injuries were aggravated while on active duty with the US Armed Forces, resulting in a discharge under honorable conditions. The American Legion also encouraged the Congress of the United States to amend the Immigration and Nationality Act to allow immigrant spouses of U.S. military personnel who die whether in training on military installations or overseas in hostile conflict to continue their petition for permanent resident status without the current two-year eligibility restriction. Additionally, The American Legion argued that the Immigration and Nationality Act should be amended to waive the fees for posthumous citizenship assessed to surviving family members who lose a relative in hostile combat while a member of the U.S. Armed Forces and who has a pending application for United States citizenship.

The American Legion opposes any bills with provisions to waive certain grounds of inadmissibility for citizenship for both permanent residents who served honorably in the nation's Armed Forces and their family members. This would seem to reward law breakers and—possibly—illegal immigrants with a short cut to citizenship that is nothing less than an official pardon for illegal acts: an amnesty. Alien society members' relatives who have entered our country illegally or overstayed a visa or who may be fugitives from justice deserve no special "adjustment" to their alien status.

Honorable service in the military of the United States must be no more an asset to the family of a permanent resident alien than it is to the family of the American citizen who has served the nation with honor. No special pardon, no reprieve from lawlessness, no exoneration for bad behavior is given to the service person or their family because one wore the uniform of the United States military. The same should apply to the individual or the family of the individual who lacks the status of United States citizen.

Laws that prohibit illegal entry or continued unlawful residency in the U.S. exist for good reason. Those reasons include national security, the nation's economy, and the general impact that certain aliens would have upon American society.

Ms. LOFGREN. At this point, we will go to the part of our proceedings when Members of the Committee have an opportunity to pose questions to our witnesses.

Before I do, let me just note, as I mentioned earlier, that there is a bill that has been introduced, H.R. 6020. There are also several other bills in the House relating to immigration and our soldiers. I would just note that H.R. 6020 was authored by myself, with Mr. Thornberry on the Armed Services Committee as the principal co-author; Mr. Conyers; Mr. Pence; Mr. Loretta Sanchez, who is also on the Armed Services Committee; Mike Turner, who is also on the Armed Services Committee; and Mr. Silvestre Reyes, who is Chair

27

of the House Intelligence Committee. So it was my hope that we would show a bipartisan but also very solid effort toward making our soldiers' lives easier. You do a lot for us. It seems to me that we should do what is necessary for you, for your families to be safe and for you to serve our country with that knowledge.

I would like to just note that the provision of the bill questioned by the Ranking Member, and inferentially questioned by Mr. Seavey, could be misunderstood and, in fact, was changed to a waiver provision from an earlier draft at the suggestion of Mr. Sensenbrenner so that it would match what is currently the state for service in the military.

And here is the point. According to published reports, about 12 percent of current Army recruits entered basic training this year with a special waiver for so-called criminal records. And what the military is doing on a case-by-case basis is taking a look at what the conviction is and seeing whether, really, it is serious or not serious, and if not serious, they are allowing those individuals to serve their country in the military.

So here is the situation we end up in. Say, for example, you have an offense, it sounds serious when you read it. You know, you have been convicted of a sex offense, indecent exposure, but it turns out you were actually mooning somebody at your high school prom. Not that I approve of that, but it is a little different than what you might have imagined by the charge itself. In that circumstance, the military is going to let that kid join the Army and serve his country.

However, there is no waiver for naturalization purposes. So you end up with a situation where a person joins the military, they are waived in for an offense that is actually not serious enough to keep them out, so they can go and get shot at in Iraq, but they can't raise their right hand and swear allegiance to become a citizen of the United States.

Mr. Seavey, do you think that is reasonable?

Mr. SEAVEY. I think our problem is less with it waiving for an active-duty military person as much as it is the fact that this benefit would accrue to family members who might not be——

Ms. LOFGREN. But the question I posed, you have an offense, it lets you serve, lets you get shot at and risk your life, but prevents you from becoming a citizen. Do you think that is reasonable?

Mr. SEAVEY. If you are asking if I think it is the same offense, in other words——

Ms. LOFGREN. If it is the exact same offense.

Mr. SEAVEY. If offense A initially kept you out of the military and a waiver was done so that you were put in, I would think that that specific incident of that same specific person should be waived to become a citizen, if you are in the military. And, again, I think our——

Ms. LOFGREN. That is the question I posed.

Mr. SEAVEY. Right. I think, again, our issue is more the accrual to family members.

Ms. LOFGREN. And we can have another discussion about those other issues. But I just wanted to get clear on that point.

Let me turn to you, Captain Navarro. And your testimony is enormously moving. First, your story is the American dream. I

28

mean, from humble beginnings through the academy, I mean, what an achievement, and how patriotic you are. And then for this terrible result for you, it is really heart-breaking to listen to.

I guess it is obvious to ask, but would life be easier for you if your husband were back in the United States to help you take care of your child with cerebral palsy and do your duty to your country in the Air Force?

Ms. Navarro. Yes, ma'am, it would. As soon as we got married, my husband pretty much became a stay-at-home dad while we waited for immigration to do everything. So that was his job, is he was a stay-at-home dad.

Ms. Lofgren. Let me turn to you, Colonel Stock. And your testimony is extensive, and I read it, and it is very interesting. And I recommend that all of the testimony from all of the witnesses will be posted on the Subcommittee Web site.

But you talk about the 1996 act. I personally have problems with much of the 1996 act. I voted against the 1996 act.

But when it comes to, say, a false claim of citizenship, I mean, that is pretty easy to do in a nonmalicious way. As a matter of fact, we have one of our colleagues, Mr. Gohmert of Texas, who has a private bill that he introduced for a person who signed with his alien registration number that he was a U.S. citizen. Obviously, it was an error. He signed something his lawyer prepared for him. He is permanently barred under the law, unless we enact legislation.

Before 1996, was there a possibility to show some common sense, for a judge to take a look at it and say, "This outcome isn't reasonable"?

Ms. Stock. Yes, ma'am. Before September 30, 1996, if you made a false claim, then the Government could take into account the factors and possibly give you a waiver. It didn't mean they had to give you a waiver, but there was flexibility within the law that would allow you to possibly, if you merited it, get favorable exercise of discretion.

I think it is also important to point out that this false claim can simply be an allegation made on some form. There doesn't have to be a conviction for this at all. It is just somebody in the Government writing down on a form that you made a false claim, and you are just permanently barred for life. You have no chance to refute that information. You can't go to court and argue that this information was incorrect. And it does happen inadvertently. Sometimes it happens on purpose. But the point is you don't need a criminal conviction to be permanently barred from the United States. This is an awfully harsh provision of the law, and it just can't be justified on principles of fairness. There has to be some flexibility in the law for minor things like this.

Ms. Lofgren. Let me ask you, based on your experience, of the things that cause problems for soldiers, you mentioned, I think, the false-claim-of-citizenship issue we just discussed, the fact that soldiers aren't getting notices because they are moving, and because they don't get notice, then things proceed.

Have you come across circumstances, other than Ms. Rivera here, where you have an American soldier doing combat in Iraq and yet another arm of the U.S. Government is moving to deport them?

29

Ms. STOCK. Well, they get told that—it is a little bit complicated. They get told that they are going to be deported or that a notice to appear has been issued. And, normally, the military scrambles with these folks and tries to get them to——

Ms. LOFGREN. I am not criticizing the military. I am just examining what the law ought to be.

Ms. STOCK. Well, the interesting thing about the law is, if a notice to appear is issued to you and you don't show up for your hearing, then a deportation order is issued in absentia because you didn't show up for your hearing. And then you get your name put into the database and you are considered to be a fugitive. And the next time you get stopped for a traffic stop, you get arrested and deported, basically.

Now, this is a system that kicks in, and this is one of the reasons why Airman Rivera was anxious to go to her hearing in California, because if military duty prevented her from going to that hearing, the judge would simply issue an in absentia order. And then the next thing you know, if she ran into law enforcement for some reason, she would get deported.

Ms. LOFGREN. But if she never got the notice because they are not using APO boxes or because she moved from one base to another, then that circumstance would just fall into place?

Ms. STOCK. It would fall into place. Now, theoretically, she could fight it and say, "I didn't get notice," and try to fight it, but there is no lawyer given to you to do that. You have to have the resources to hire a lawyer. The lawyer has to file a motion within a certain period of time.

Ms. LOFGREN. And that is not paid for? And we know how much we pay our military.

Ms. STOCK. No, none of this gets paid for. And that is why we have created the AILA MAP program to try to provide this assistance.

Ms. LOFGREN. With volunteers.

Ms. STOCK. It is a pro bono program, right.

Ms. LOFGREN. My time has expired.

I will turn now to the Ranking Member for his 5 minutes of questions.

Mr. KING. Thank you, Madam Chair.

And I thank the witnesses for your testimony.

Ms. Stock, just picking up with you, as I listened to your testimony, a number of questions occur to me. And I will just take you back to—you put together a pretty complete list of issues that I think should be brought before this Committee.

But I would ask you generally overall, are there crimes that you would join with, I will say, me in excluding them from waivers, crimes that are so egregious that they should be excluded from waiver, with regard to this bill that is before us?

Ms. STOCK. Well, sir, I think the problem with generally excluding crimes is the same one that Madam Chairwoman identified. Sometimes when you look at the details, it turns out that the situation is not as bad as it may appear from the definition of the crime.

And we were talking about the waivers earlier——

Mr. KING. Murder?

30

Ms. Stock [continuing]. But there was somebody let into the Army, and the press made hay about it because this person had an arson conviction——

Ms. Lofgren. Would the gentleman yield?

Mr. King. I would yield.

Ms. Lofgren. Because it occurred to me, I mean, the military is not waiving in murderers into the U.S. Military. I mean, if you have a conviction of murder, they are not allowing you to enlist in the military.

And I yield back. I thank the gentleman for yielding.

Mr. King. Perhaps, Madam Chair, reclaiming my time. I don't know that it is a misunderstanding. I am here, thinking in terms of someone who has gotten into the military, then who has applied under this bill for them or their family members to have a path to citizenship, say, a green card. And then if this is a blanket permission that allows the judge to waive crimes, then, you know, I think we need to build a very tight fence around that.

And I understand your argument about the indecent exposure, which I don't know that that is a sex crime. I don't think that we actually prosecute that in my part of the country. So I am concerned about that.

And rather than press for an answer, though, let me just go another way. Who would you say no to? If you were in charge of writing the immigration policy for the United States of America, philosophically, would you draw a line? And where would you draw that line, Ms. Stock?

Ms. Stock. I would go back to the definition prior to 1996 of aggravated felony, which actually meant serious crimes. Today——

Mr. King. But excuse me. Aside from that, the legal discussion then about waivers or aggravated felonies, to set an overall immigration policy—let me ask this another way.

Is immigration policy for the United States, is that a whole that we look at as, as I think I heard come out of Mr. Seavey, an overall number of people that we legally allow to come into the United States, and then a whole that has a sum of its part to stay within the whole? Or is it simply the sum of its parts and if there is any component of immigration that we find that someone had a bad experience with, that we should open that up and not be paying attention to the breadth of whole?

What would your policy look like? Would you put a cap on the overall number of legal immigrants coming into the United States? Because I don't see any restraints there when I listen to your testimony.

Ms. Stock. Well, first of all, as far as I can tell, the bill does absolutely nothing to eliminate all the family quotas for the whole, entire immigration system. The only thing it does is relax some of those quotas for certain——

Mr. King. Without regard to the bill, your own personal philosophy, is 1.3 million people too many or too few? Would you put a cap at 2 million, 10 million? Would you cap it at all?

Ms. Stock. Well, with regard to people in the military, I think the problem you run into is we are a global military. And when you deploy people all around the world, they do fall in love with foreigners.

Mr. KING. But with regard to your personal philosophy?

Ms. STOCK. My personal philosophy is that in a global society, currently our immigration quotas are too low to meet the needs of our——

Mr. KING. What would you set them at then, Ms. Stock?

Ms. STOCK. I would set them at substantially higher than what they are today, because they have——

Mr. KING. Two million, 5 million, 10 million a year? In what range would you be? Or would you cap them at all?

Ms. STOCK. I think I would at least double the current quotas. Because, to me, they are artificially low. They were set decades ago. And they haven't——

Mr. KING. Roughly 2.5 million a year?

Ms. STOCK [continuing]. They haven't kept pace with our population growth.

Mr. KING. Really?

Ms. STOCK. But I think the critical point here—and I will give you an example. Earlier, we were talking about crimes. I spoke to a Navy sailor last week who is serving honorably in the Navy but he cannot become an American citizen. And the reason he cannot become an American citizen is because, 9 years ago, he stole a bicycle, and he was sentenced to 365 days in jail——

Mr. KING. Thank you, Ms. Stock. My clock is running down, and I am sorry. I have to move on, or I won't be able to get my last question in. I appreciate your testimony.

And I would turn to Mr. Seavey and pose this question. And I heard it come out of your testimony, Mr. Seavey. When a soldier takes an oath, and takes an oath also to the Constitution of the United States, is it not implicit to uphold the rule of law? And is it not inconsistent then to waive the rule of law for those who have taken that oath?

Mr. SEAVEY. Well, certainly, we would argue that it is.

And if I could real quick on your previous question about the discretion, I think that the DOD, when it makes a waiver for someone coming in, has a more vested interest than perhaps an immigration judge in granting this waiver.

So I am not a big fan of waivers into the military, having served as an infantry squad leader, but they happen, and I have enough faith in the DOD that they are using this discretion wisely. I am a little nervous about what an open-ended waiver might be, going back to the earlier discussion.

But certainly, when you raise your hand and swear allegiance and everything else when you join the military, I think the rule of law is the fundamental precept to which you are pledging your allegiance.

Mr. KING. I thank you, Mr. Seavey.

And, Madam Chair, I yield back.

Ms. LOFGREN. I would just note before recognizing Mr. Gutierrez that the number assigned for family preference every year is 226,000.

And, Mr. Gutierrez, you are recognized for 5 minutes.

Mr. GUTIERREZ. Madam Chair, thank you so much for calling this hearing.

32

And I thank the witnesses for coming forward, and specifically Ms. Rivera and Ms. Navarro for coming and sharing their plight with this Committee. I think it is very, very important to establish a record that will allow us the legislative action necessary in order to stop these things from happening in the future. I mean, you are obviously representative of a class of people that need Congress to respond.

I will say that I find it amazing that people could come forward since—somebody to my left or somebody is to my right, and they are having an immigration issue, and they helped save my life and we are in combat together, I don't know, I don't know if the soldier asks his comrade in arms next to him. It kind of reminds me of my dad. He couldn't speak English, but it wasn't a problem, he was sent to Korea, as I know tens of thousands of others who could never speak the language, the English language, have served in the military without a problem.

As a matter of fact, if memory serves me correctly, a young man from Guatemala who entered this country illegally, then applied under false pretenses saying that he was really not 20 but he was 17 and thereby got his legal permanent residence, the first thing he did was join the Marines, and he was the first casualty in Iraq. That just happens to be the history of what goes on here.

So, you know, let's look at things not from this legal, illegal—let's look at what people do and how they participate, and then let's do the right thing based on that. Because I think that the law and the consequences of the law should have some relationship with what it is they supposedly did wrong.

So we have people that are obviously heroes in anyone's view whose wives are being deported, whose husbands are being deported, and I think that other men and women in the military might want to stand up.

I bet that if I went back on that ship with Petty Officer Gonzalez, and I went to all of the people who were on that ship—I don't know if you all know about Petty Officer Gonzalez, whose wife now is an LPR—and it is amazing what happens when you testify before this Committee; your problems get resolved. But that is a positive note. But if I went to all of fellow sailors and said, "What do you think we should do? Should we deport his wife, or should we allow her to stay in the United States with Petty Officer Gonzalez?", I bet I know what the men and women in uniform would decide instantaneously that they would do with their fellow brother. I mean, come on, just think of this from a logical point of view, in terms of what people would do. Obviously it would be there.

But then we have a situation where, let me see, Roosevelt thought during World War II, "You know, after this war, we should make sure that all of those men and women who come back here, that they are able to buy a home and go to college." Now we have legislation that has over 300 sponsors in the House to allow anybody who went to war in Iraq, that served in our military, that after they have served be able to go to college. And we have a President of the United States who it is said was in the National Guard during the Vietnam War, and a Vice President who on five different occasions said, "I have something more important to do than to serve in Vietnam," and got five deferments, we have that

000360

33

Administration saying, no, if that legislation comes before us, although the war was our idea and we really think it is a terrible thing that all of these men and women have died in combat and all of these tens of thousands, we are going to veto that legislation.

So that is the kind of quandary that you find yourself in. We have a Congress of the United States and we have an executive government who extols the virtues of those who serve in our Armed Forces but won't stand up to make sure that, at the end of the day, you get a fair shake, that your family is sacrosanct. We go thousands of miles away in order to establish democracy while the basic foundation of any democracy, I think, is the family. We should do everything we can to preserve that family.

So I thank you all for your testimony here today.

Ms. LOFGREN. The gentleman yields back.

I would turn to Mr. Goodlatte for his questions.

Mr. GOODLATTE. Well, thank you, Madam Chairman. I appreciate your holding this hearing.

I would like to ask all of the witnesses if, in their opinion, H.R. 6020 grants more favorable treatment to illegal aliens serving in the military than current law grants to legal residents serving in the military?

Ms. Stock, do you want to comment on that first?

Ms. STOCK. I am sorry, but I am not quite sure I understood what you were asking. If it grants more favorable treatment to——

Mr. GOODLATTE. To people who are illegally in the United States serving in the military than it grants to legal residents serving in the military?

Ms. STOCK. No, I don't believe that it does. People who are legally here currently, for the most part, can adjust their status, can obtain benefits.

I mean, the problem we are having with the legal people is that they become illegal because the laws are so complicated and they have trouble complying with them, and then they fall out of status and become illegal, and then they can't get their status straightened out. In fact, that is a lot of the cases that we are dealing with, are people who entered legally at one point but ran afoul of the immigration laws.

I am not sure that you can separate the two out so neatly, as everybody likes to try to do.

Mr. GOODLATTE. Are there requirements that are relaxed for illegal aliens that are not relaxed for similarly situated legal residents serving in the military?

Ms. STOCK. Well, I will just throw out one thing. People keep talking about they are against an amnesty, but we have an amnesty going on right now for everybody from Cuba. If you are——

Mr. GOODLATTE. Okay. So your answer is yes.

Let me ask Mr. Seavey if he would care to respond to that.

Mr. SEAVEY. I would certainly say that I know of no other circumstance where someone gains a benefit from having a relative serving in the active duty. So I guess I would have to say yes.

If the question was whether the American Legion feels it is appropriate to deport the spouse of someone serving in Iraq, our answer is no. But we think that could be more easily solved through

34

something like the Soldiers and Sailors Relief Act or something of that nature.

The fact that this benefit is accruing to such a wide range of people in such a wide range of ways certainly makes us very, very leery. So, in short, yes, I think it is safe to say that this benefit does accrue more rapidly, at least, to someone who is here illegally than someone who here legally or family members.

Mr. GOODLATTE. Does anyone else want to respond to that?

Well, let me ask, then, Mr. Seavey and Ms. Stock too, if she cares to respond, if the Army found out that a member of the Armed Forces got a job with the military by committing fraud in his or her paperwork about their legal status, which would seem to amount to a fraud against the U.S. Government, what punishment would be imposed?

Do you know, Mr. Seavey?

Mr. SEAVEY. I honestly don't know.

Mr. GOODLATTE. Do you know, Ms. Stock?

Ms. STOCK. Well, I think it depends on the case, because military justice is administered by commanders. But there was a Senator from Washington who committed fraud a long time ago by joining the military. He lied about his age and was allowed into the military, and later on went on to become a United States Senator. He was not punished because it was determined that, although he had lied about his age and used a false birth certificate in order to enlist in the Navy at the time, he went on to have a great career and serve his Government, so he was not punished.

Commanders take into account the individual circumstances of people and their background and the equities when administering military justice.

Mr. GOODLATTE. So do you think it is a national security concern for foreign nationals in the country illegally to commit fraud to obtain positions in the Armed Forces?

Ms. STOCK. Well, I do believe that any time anybody enters the United States military, there is always a security issue. You need to vet people, fingerprint them. But the Armed Forces are doing that right now. We check their status with Homeland Security. We fingerprint people. We run background——

Mr. GOODLATTE. Well, that doesn't really answer my question. If they commit fraud to enter the military, is there a national security concern?

Ms. STOCK. Well, there could be. Again, I throw the example of the Senator out when——

Mr. GOODLATTE. Mr. Seavey, do you want to respond to that?

Mr. SEAVEY. Absolutely, we think there is. And that is something that obviously should be focused on. We would hope that the military entrance processing would pick up on that, but obviously that is not always going to be the case, particularly when they are receiving faulty information from the get-go. So, yes, we think clearly it is a national security issue.

Mr. GOODLATTE. And wouldn't this legislation provide relief for the very individuals who committed that fraud?

Mr. SEAVEY. My cursory reading of it is, yes, yes, it would.

Mr. GOODLATTE. You know, I think there are some good objectives in this legislation, but I would hope that some of the issues that have been raised here——

Mr. BACA. Sir, may I——

Mr. GOODLATTE. Sure, just 1 second—related to family members and related to these types of actions, related to fraud, ought to be addressed before the legislation moves forward.

And I will be happy to recognize you.

Mr. BACA. Individuals that enlist in the Armed Services are screened, all screened thoroughly.

And in terms of people that take the oath, my mentor and the person that enlisted me came into the service and served as a World War II hero and a Korean War hero, and he came in under false pretenses in that he lied about his age. He was 16 years old. And he served well and was never punished for it. Eventually it came out. He just wasn't given credit for that 1 year between 16 and 17.

Mr. GOODLATTE. Well, we certainly understand that these things have to be addressed on a case-by-case basis, as Ms. Stock suggested. But I wouldn't give the kind of latitude that this legislation provides, because it might not be just lying about your age. It might be lying about some other aspects of your status. And it might be for the purpose of entering the military for the purpose of engaging in activities that are not helpful to the United States. So I think we need to be very careful about that as we move this legislation before.

I thank you, Madam Chairman.

Ms. LOFGREN. I thank you. The gentleman's time has expired.

I would recognize the gentlelady from California, my colleague, Congresswoman Waters.

Ms. WATERS. Thank you very much, Madam Chairman. I have said on several occasions that the work that you have done on immigration is commendable. It is remarkable that you have spent so much time taking up issues that I never even dreamed existed with immigration. And I am very appreciative for the opportunity to learn a lot more about the complications of this issue and very appreciative that you have dedicated so much of your time to dealing with these issues.

I am a little bit in awe of the witnesses, some of our witnesses that are here today, particularly our two members of the military, who are describing to me what I consider to be an unbelievable situation.

I have worked in this Congress long enough to know that we hold our soldiers, our military, our troops in high esteem, and we hear on a daily basis how much we support them. I didn't know that there was a difference between some soldiers and soldiers who may—are military who may have served, who are not, as it was described, in complete compliance with military law in some way, based on their immigration status. And it is hard for me to internalize and to understand how it is someone could serve this country and make those sacrifices and we not want to do everything that we can to honor that service with citizenship.

I guess the case can be made that somehow they are getting something that others are not getting. But if others don't have the

problem of trying to keep their families together and of having been brought to this country when they were babies, having lived here, attended school here and worked here and gone into the military, and only then to be told at some point that, not only will the military service perhaps not be honored, but they may be separated from their families, they may be sent to countries that they know nothing about, on and on and on, it is just amazing to me.

It seems to me that the best thing that we could do for many of these situations is to try and come up with a way that we can honor those who serve with citizenship certainly after they have demonstrated their support for this country and their ability to serve satisfactorily in the service.

I feel a little bit strange that, as I listened, I don't and most of us don't really understand what the 1751 is and what an M-400 is and what a 328 and a 329, and on and on and on, but it sounds as if it is the kind of run-around that nobody should have to experience.

So I think, with all of these hearings—I don't know if I have any questions. I mean, we have heard—I guess maybe just one.

Colonel Rivera, have you discussed with your lawyer if or how your immigration status would be affected if you were to leave the United States while you were still in removal proceedings? I mean, what is your lawyer saying about that?

Ms. DE RIVERA. Well, thank you, Congresswoman Waters.

I have not quite discussed what would happen if I were to leave—if I were to get ordered removed from the country. We are not really focusing on that right now, to be honest with you. However, it does affect me greatly to know that that is even a possibility.

Ms. WATERS. What if you are not able to deploy when they deploy, what happens to your career?

Ms. DE RIVERA. I could quite possibly lose my rate, my job——

Ms. LOFGREN. Would the gentlelady yield?

Ms. WATERS. Yes.

Ms. LOFGREN. Because I think the answer is that if Ms. Rivera is deployed outside the United States, she would be, under immigration law, she would be perceived as self-deporting, and she would not be readmitted with her unit if she had to go. She would be considered deported, even though she is active-duty military.

And I thank the gentlelady for yielding.

Ms. WATERS. Thank you very much.

So there is a possibility, if you are deployed, you could be considered as just described and not allowed to come back in. There is a possibility if you stay here and you don't deploy when they do, that you could lose your rank? Is that what you said? Or your rate?

Ms. DE RIVERA. My rate, which would be my job. I would not be able to perform my job. And, more importantly, I would not be able to return to the United States. Say we deployed to Kuwait, once I hit port, once I get off the ship, I am not allowed to come back.

Ms. WATERS. So if you were deployed to Kuwait, we would leave you there?

Ms. DE RIVERA. Yes, ma'am.

Ms. WATERS. That is shocking.

37

Ms. DE RIVERA. And then it would be up to that government to return me back to Mexico.

Ms. WATERS. Well, I suppose I have no other questions. I just want to be a part of the solution.

I yield back the balance of my time.

Ms. LOFGREN. I thank the gentlelady.

And I would recognize the gentleman from California, Congressman Lungren.

Mr. LUNGREN. Thank you very much, Madam Chairman.

I am glad that most of this hearing has been nonpartisan. I am sorry we had to have some swipes, the usual bash Bush and bash Cheney, and then hit and run, because I don't think that really adds anything to our discussion, and I think that is to be lamented.

Colonel Stock, as I understand some of your testimony at the very beginning, you suggested that we have some problem with the slowness with which there is naturalization for military members as a general rule. Is that correct?

Ms. STOCK. No. As a general rule, the citizenship process for military personnel is going very well. But we do have an ongoing problem with the FBI name checks and with the quick processing of enlistment fingerprints. The enlistment fingerprints don't get processed very fast.

Mr. LUNGREN. And you also mentioned sometimes they won't recognize military doctors for the physical examines? Is that what I heard you say?

Ms. STOCK. Yes. Homeland Security only recognizes the persons that they have certified to perform medical examinations, and most of the military doctors can't qualify because of the arcane rules relating to the civil surgeons.

Mr. LUNGREN. So they are good enough to take care of our military people but not good enough to do physicals?

Ms. STOCK. Yes.

Mr. LUNGREN. It seems to me that is a simple thing we might be able to check on.

Ms. LOFGREN. One would think.

Mr. LUNGREN. No, I am serious.

Ms. LOFGREN. I agree.

Mr. LUNGREN. We could at least say, what is the nonsense here? And you and I both serve on Homeland Security Committee. It seems to me that we ought to be able to do——

Ms. STOCK. I think it would be great to give an automatic certification to all of the military doctors to do——

Ms. LOFGREN. If the gentleman will yield, I will be happy to prepare a letter that bipartisan Members can sign.

Mr. LUNGREN. Now, what is the problem with fingerprints?

Ms. STOCK. Well, right now, in order to expedite military naturalizations, we have an agreement with Homeland Security that they will accept military enlistment fingerprints, so that soldiers, sailors, airmen and Marines don't have to go to an application support center and have their fingerprints redone.

Mr. LUNGREN. Right. We have that. So what is the problem?

Ms. STOCK. Well, the problem is that the enlistment fingerprints don't get processed fast. Sometimes they take 9 or 10 months to process.

38

Mr. LUNGREN. So that is a military problem?

Ms. STOCK. It is not the military. It is apparently related to another Federal agency outside the Department of Homeland Security.

Mr. LUNGREN. And who is that?

Ms. STOCK. I believe it is the FBI.

Mr. LUNGREN. Madam Chair, again——

Ms. LOFGREN. We actually have flagged some of these items from the testimony, and we are preparing a letter.

Mr. LUNGREN.—it seems we could do something on that, as well. And the other thing you mentioned was the address for the notices, that somehow DHS doesn't recognize the military addresses? Is that correct?

Ms. STOCK. This is a software computer problem where their system doesn't recognize APO and FPO addresses.

Mr. LUNGREN. Are they addressing that?

Ms. STOCK. Not as far as I know.

Mr. LUNGREN. Again, Madam Chairman, we all agree on that. I mean, these are dumb things for bureaucracy that ought to be taken care of. And I don't think there would be any disagreement among all of us on those sorts of things.

Ms. LOFGREN. I would hope.

Mr. LUNGREN. Now let me address something else. And, again, I am sorry that one of our fellow members has left, because he said, "legal, illegal, let's get away from that; it doesn't matter." Well, it does matter. And what we do here and how we fashion the bill is important.

In 1986, I was the Republican floor manager for the Simpson-Mazzoli bill, the largest single legalization in the history of this Nation. We thought it was appropriate at that time. We thought it would, with enforcement, stop the tremendous amount of illegal immigration we had.

We legalized a lot of people; I am proud of that, frankly, under the circumstances. But it didn't have the intended effect, which was to close off illegal immigration into this country.

So I would just say that it is important how we fashion a bill, it is important how we enforce the bill.

So, Captain Navarro, I just want to get a little bit of your story. And that is, what is the basis of your husband's illegal status? He came to the country illegally when he was a young boy, young man? What is that deal?

Ms. NAVARRO. Honestly, sir, I am really not prepared to answer any questions on the specifics of my case. But I can prepare something in writing for you, so I don't give you any false information or misquote anything. It has been almost 2 years since when all this happened, so I honestly don't want to give you any wrong information.

Mr. LUNGREN. Okay, but let me just ask you this. When you went to the Air Force Academy and your now-husband, then-boyfriend, followed you there, did you realize that he was not in the country legally at that time?

Ms. NAVARRO. Again, sir, I don't believe any of that really has anything to do with what——

39

Mr. LUNGREN. Well, here is the reason I am asking. You have come forward as an example of the reason why we ought to change the law, and I respect that very much. And so maybe you are here to testify on that, but we can't ask you questions because you think it might jeopardize your husband's case. And, okay, I can appreciate that.

But, as I said, having been involved in immigration law structure in the past, how we fashion a law to take care of perceived problems is extremely important so that we avoid unintended consequences.

Ms. LOFGREN. Would the gentleman yield?

Mr. LUNGREN. I would be happy to yield.

Ms. LOFGREN. I would note, the captain's testimony, on page 2, is that her husband was not permitted to receive his visa because of a prior entry and false claim to citizenship. As we know, there is no waiver, no matter what the circumstances, on an allegation of a false claim to citizenship.

Rather than question Captain Navarro—and I appreciate that all these military people have come forward, I would think—and we will diligently follow up her offer to provide the details of this case.

And I thank the gentleman for yielding.

Mr. LUNGREN. Well, I appreciate the gentlelady, but, you know, it does make it difficult for us to hold hearings to try and gather information if, when we have witnesses here, we can't ask a question. I am not asking the question to embarrass anybody. I am trying to get a kind of idea of the circumstances that occur that we think we ought to take care of.

Because, as the Ranking Member has said, this bill has a wide scope. I have some sympathy for parts of the bill, but the bill has a wide scope. It is asking us in many cases to make waivable different disqualifiers, including crimes. When I got the original memo on the bill, it included crimes such as human trafficking was to be one of the waivable offenses. I thought that was one of the things we ought not do, and there were several other things.

So all I am trying to do is try and figure out stories, figure out how they specifically applied to the language of the bill. And I am kind of disappointed that I can't ask those questions.

Ms. LOFGREN. I thank the gentleman.

And noting that there are no additional Members here seeking to ask questions, let me at this point first thank you for your service.

Oh, Mr. Gohmert, you have arrived. I didn't see you there. Mr. Gohmert, are you interested in asking questions?

Mr. GOHMERT. No, Madam Chairman. Thank you.

Ms. LOFGREN. Then I will note that, number one, we thank you for your service to our country. I am personally committed—I can't guarantee success, but I can guarantee effort—to try and make sure that we do the right thing when it comes to our men and women serving in the military and their families.

I would note that, you know, no bill is necessarily perfect. This one may be no exception. But we have worked hard to try and make sure that it is a solid, rational approach.

I think that it is a mistake for the Congress to think that they can micromanage every case. Because that takes a judge looking at

40

the facts of each and every case to make a decision that is a just one.

I would just note that the stated law is today, if you are an American citizen serving in the military in Iraq, and you got married to a woman from another country, say you married somebody from Paris, but you get killed by an IED before that visa is processed, is your widow honored? No, she is deported. So I don't think that is the kind of America I believe in, and I think there are some things we need to do to clean this up.

As we look forward to Memorial Day, I hope that we can sort through. I think there has been maybe some confusion on some of the details of this bill. I think Mr. Conyers's idea to have a sit-down session and sort through the details is a good one. I plan to do that in the spirit of bipartisanship and in the hopes that we can honor our military for their tremendous service to us.

And let me just further say to the two servicewomen who are here, if there is anything that we can do, that I can do personally, to assist either of you in your personal situations, I would very much like to do that.

With that, we may have further questions. If so, we will forward them to you, and we ask that you answer them as promptly as possible.

The hearing record for this hearing will be open for the next 5 days.

And, with that, we thank you very much, and the hearing is adjourned.

[Whereupon, at 4:12 p.m., the Subcommittee was adjourned.]

Æ

**34864**  **Federal Register** / Vol. 89, No. 84 / Tuesday, April 30, 2024 / Rules and Regulations

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 212, 214, 245, and 274a**

[CIS No. 2507–11; DHS Docket No. USCIS–2011–0010]

RIN 1615–AA59

## Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security.

**ACTION:** Final rule.

---

**SUMMARY:** On December 19, 2016, the Department of Homeland Security (DHS) published an interim final rule (2016 interim rule) amending its regulations governing the requirements and procedures for victims of a severe form of trafficking in persons seeking T nonimmigrant status. The 2016 interim rule amended the regulations to conform with legislation enacted after the publication of the initial regulations and to codify discretionary changes based on DHS's experience implementing the T nonimmigrant status program since it was established in 2002. DHS is adopting the 2016 interim rule as final with several clarifying changes based on USCIS experience implementing the interim rule, in response to comments received, and due to an organizational change to move the regulations to a separate subpart as explained in the **SUPPLEMENTARY INFORMATION** section below. This final rule is intended to respond to public comments and clarify the eligibility and application requirements so that they conform to current law.

**DATES:** This rule is effective August 28, 2024.

Comments on the Paperwork Reduction Act section of this final rule must be submitted by July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Rena´ Cutlip-Mason, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Dr, Camp Springs, MD 20529–2140; or by phone at 240–721–3000 (this is not a toll-free number). Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 1–877–889–5627 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
A. Purpose of the Regulatory Action
B. Summary of Changes Made in the Final Rule
1. Definitions
2. Bona Fide Determination Process
3. Evidence of Extreme Hardship
4. Technical Changes
C. Costs and Benefits
II. Background and Legislative Authority
III. Response to Public Comments on the 2016 Interim Final Rule
A. Summary of Public Comments
B. General and Preliminary Matters
1. General Support for the Rule
2. Additional Comments
C. Terminology
D. Definitions
1. Involuntary Servitude
2. Reasonable Person Standard
c. Involuntary Servitude Induced by Domestic Violence
d. Mixed Motives
2. Law Enforcement Agency (LEA)
3. Law Enforcement Involvement
4. Reasonable Request for Assistance
5. Commercial Sex Act
6. Severe Form of Trafficking in Persons
E. Evidence and Burden and Standard of Proof
1. Reasonable Person Standard
2. Credibility of Evidence
3. Opportunity To Respond to Adverse Information
4. Requests for Evidence (RFE)
F. Application
1. Applicant Statements
2. Interviews of Applicants
3. Notification to the Department of Health and Human Services (HHS)
4. Notification of Approval of T Nonimmigrant Status
G. Law Enforcement Declarations
1. Declaration Signature
2. Withdrawn Declarations and Revoked Continued Presence (CP)
3. Requirement To Sign Law Enforcement Declaration
H. Bona Fide Determination (BFD)
I. Evidence To Establish Trafficking
J. Physical Presence
1. Applicability of Physical Presence Requirement
2. Passage of Time Between Trafficking and Filing the T Visa
3. LEA Liberation and LEA Involvement
4. Presumption of Physical Presence
5. Continuing Presence and Nexus to Trafficking
6. Effect of Departure or Removal
7. Trafficking That Occurs Outside the United States, and Traveling Outside the United States Following Victimization
8. Opportunity To Depart
9. Presence for Participation in Investigative or Judicial Process
10. Evidence To Establish Physical Presence
K. Compliance With any Reasonable Request for Assistance
1. Requirement To Comply With Reasonable Request
2. Incompetence and Incapacity
3. Minimum Contact With Law Enforcement
4. Determining the Reasonableness of a Request
5. Trauma Exception
6. DHS Contact With Law Enforcement
7. Age Exemption
L. Extreme Hardship
M. Family Members Facing a Present Danger of Retaliation
N. Marriage of Principal After Principal Files Application for T Nonimmigrant Status
O. Relationship and Age-Out Protections
P. Travel Abroad
Q. Extension of Status
R. Revocation Procedures
S. Waivers of Inadmissibility
T. Adjustment of Status
U. Applicants and T Nonimmigrants in Removal Proceedings or With Removal Orders
1. Principal Applicants, T–1 Nonimmigrants, and Derivative Family Members
2. Immigration Judges
3. Automatic Stays of Removal
4. Unrepresented Applicants
5. Detained Applicants
6. Reinstatement of Removal
7. Issuances of Notices to Appear (NTAs)
V. Notification to ICE of Potential Trafficking Victims
W. Fees
X. Restrictions on Use and Disclosure of Information Relating to T Nonimmigrant Status
Y. Public Comment and Responses on Statutory and Regulatory Requirements
Z. Biometrics
AA. Trafficking Screening, Training, and Guidance
1. Screening
2. Training
3. Guidance
BB. Miscellaneous Comments
1. Cases Involving Multiple Victims
2. Social Security Cards
3. Victim-Blaming
4. Processing Times
5. Motions To Reopen and Reconsider
6. HHS Notification
7. Program Integrity
8. Annual Cap
9. Continued Presence Adjudication
10. Comment Period
CC. Out of Scope Comments
IV. Statutory and Regulatory Requirements
A. Executive Orders 12866, 13563, and 14094
1. Summary
2. Background and Population
3. Updates to the Economic Analysis Since the 2016 Interim Rule, Pre-IFR Baseline
4. Costs, and Benefits of the Final Rule
5. Final Costs of the Final Rule
B. Regulatory Flexibility Act
C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
I. Family Assessment
J. National Environmental Policy Act

K. Paperwork Reduction Act

1. Comments on the Information Collection Changes to Form I–914 and Related Forms and Instructions Published With the 2016 Interim Rule

2. Comments on Information Collection Changes to Form I–914, Application for T Nonimmigrant Status, and Related Forms and Instructions Published With Final Rule (60 Day Notice)

3. Changes to Form I–914, Form I–765, and Related Forms and Instructions Published With Final Rule

## I. Executive Summary

### A. Purpose of the Regulatory Action

The T nonimmigrant status regulations—which include the eligibility criteria, application process, evidentiary standards, and benefits associated with the T nonimmigrant classification (commonly known as the "T visa" [1])—have been in effect since a 2002 interim rule. *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status,* 67 FR 4783 (Jan. 31, 2002) (2002 interim rule). Since the publication of that interim rule, the public submitted comments on the regulations, and Congress enacted numerous pieces of related legislation. DHS published a 2016 interim rule to respond to the public comments, clarify requirements based on statutory changes and its experience operating the program for more than 14 years, and amend provisions as required by legislation. *Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status,* 81 FR 92266 (Dec. 19, 2016). In July 2021, DHS reopened the public comment period for the interim rule for 30 days, and subsequently extended the deadline for comments. This final rule adopts the changes in the 2016 interim rule, with some modifications. The rationale for the 2016 interim rule and the reasoning provided in the preamble to the 2016 interim rule remain valid with respect to many of those regulatory amendments, and DHS adopts such reasoning to support this final rule. In response to the public comments received on the 2016 interim rule, DHS has modified some provisions in the final rule. DHS has also made some technical changes in the final rule. The

changes are summarized in the following section I.B. Responses to public comments, and substantive changes being made in response, are discussed in detail in section III.

### B. Summary of Changes Made in the Final Rule

1. Definitions

In the final rule, DHS has updated several definitions to clarify them and ensure that they are consistent with those in the Trafficking Victims Protection Act of 2000 (TVPA), as amended. *See* 22 U.S.C. 7102; new 8 CFR 214.201. The rule strikes language from the definition of "involuntary servitude" which had been derived from the *United States* v. *Kozminski,* 487 U.S. 931 (1988), decision. DHS has also added definitions of the terms "serious harm" and "abuse or threatened abuse of the legal process." Additionally, DHS has added a definition of "incapacitated or incompetent." DHS has clarified in the definition of law enforcement agency several additional examples of what may constitute such an agency. In addition, DHS has amended the definition for "Law Enforcement Agency declaration." DHS has also included a new definition for the term "law enforcement involvement." Finally, DHS has struck repetitive language from the definition of "reasonable request for assistance."

2. Bona Fide Determination Process

DHS has moved the definition of "bona fide determination," (BFD) to define the process in the relevant provision of the regulations for clarity. *See* new 8 CFR 214.204(m), 214.205.

DHS has also amended provisions regarding BFDs, which reflect a modified process. *See* new 8 CFR 214.204(m), 214.205, and 274a.12(c)(40). The new streamlined process will include case review and background checks. Once an individual whose application has been deemed bona fide files a Form I–765, Application for Employment Authorization under new 8 CFR 274a.12(c)(40), USCIS will consider whether an applicant warrants a favorable exercise of discretion and will

be granted deferred action and a BFD employment authorization document.[2]

3. Evidence of Extreme Hardship

In response to comments, DHS is clarifying the regulations to state that hardship to persons other than the applicant will be considered when determining whether an applicant would suffer the requisite hardship, only if the evidence specifically demonstrates that the applicant will suffer hardship upon removal as a result of hardship to a third party. New 8 CFR 214.209(c)(2).

4. Technical Changes

a. Reorganization of 8 CFR Part 214

This rule moves the regulations for T nonimmigrant status to a separate subpart of 8 CFR part 214 to reduce the length and density of part 214 and to make it easier to locate specific provisions. In addition to the renumbering and redesignating of paragraphs, the rule has reorganized and reworded some sections to improve readability, such as in new sections 8 CFR 214.204(d)(1) (discussing the law enforcement agency (LEA) declaration) and 8 CFR 214.208(e)(1) (discussing the trauma exception to the general requirement of compliance with any reasonable law enforcement requests for assistance). The rule also divides overly long paragraphs into smaller provisions to improve the organization of the regulations.

The Administrative Procedure Act (APA) exempts from the prior notice and opportunity for comment requirements, ". . . rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A). Restructuring the regulations and moving them to a separate subpart resulted in no substantive changes to program requirements. This rule's changes to renumber paragraphs and improve readability affects rules of agency organization, procedure or practice, and those portions of the rule are exempt from the notice-and-comment requirements under 5 U.S.C. 553(b)(A).

Table 1 lists where provisions of 8 CFR 214.11 that were codified in the 2016 interim rule have been moved to in this final rule.

---

[1] Although T nonimmigrant status is known as the "T visa" colloquially, such a classification is not entirely accurate. T–1 applicants must be physically present in the United States or at a port of entry on account of the trafficking in persons to be eligible for T–1 nonimmigrant status, so they do not obtain a "T visa" to enter the United States. T–1 nonimmigrants may seek derivative T nonimmigrant status for certain family members. *See* new 8 CFR 214.211(a). Some of these family members may reside outside the United States and,

if eligible, can join the T–1 nonimmigrant in the United States. Before family members with approved applications for derivative T nonimmigrant status can enter the United States, the family members must first undergo processing with the Department of State (DOS) at a U.S. Embassy or Consulate to obtain a T visa abroad. This is known as consular processing. USCIS will decide based on the application filed by the T–1 nonimmigrant whether an overseas family member qualifies for derivative T nonimmigrant status. DOS

will then separately determine that family member's eligibility to receive a visa to enter the United States. A family member outside of the United States is not a derivative T nonimmigrant until they are granted a T–2, T–3, T–4, T–5, or T–6 visa by the DOS and are admitted to the United States in T nonimmigrant status. *See* new 8 CFR 214.211(a).

[2] Persons seeking or granted T nonimmigrant status pay no fee for Form I–765. *See* 8 CFR 106.3(b)(2)(viii).

| Table 1.  Redesignation Table | |
|---|---|
| Previous section | New section |
| 214.11(a) | 214.201 |
| 214.11(b) | 214.202 |
| 214.11(c) | 214.203 |
| 214.11(d) | 214.204 |
| 214.11(e) | 214.205 |
| 214.11(f) | 214.206 |
| 214.11(g) | 214.207 |
| 214.11(h) | 214.208 |
| 214.11(i) | 214.209 |
| 214.11(j) | 214.210 |
| 214.11(k) | 214.211 |
| 214.11(l) | 214.212 |
| 214.11(m) | 214.213 |
| 214.11(n) | 214.214 |
| 214.11(o) | 214.215 |
| 214.11(p) | 214.216 |

b. Terminology Changes

USCIS is making technical clarifications throughout the regulation in amending the use of the term "alien" and replacing it with "victim," "applicant," "survivor," or "noncitizen" where appropriate. USCIS is also updating terminology to be gender neutral throughout.

Throughout the regulations, DHS has made revisions to reference "detection, investigation, or prosecution" rather than just "investigation or prosecution" for consistency and accuracy.

DHS has also removed the term "principal T nonimmigrant" from the regulations and replaced it with the term "T–1 nonimmigrant." The term "principal T nonimmigrant" did not appear elsewhere in the CFR, whereas "T–1 nonimmigrant" is used consistently to describe a victim of a severe form of trafficking in persons who has been granted T–1 nonimmigrant status.

c. Definition of Eligible Family Member

DHS has made a technical clarification to the definition of "eligible family member." The 2016 Interim Rule defines this term as a family member who may be eligible for derivative T nonimmigrant status based on their relationship to a noncitizen victim and, if required, upon a showing of a present danger *or* retaliation; however, the statute indicates that the derivative must face a present danger *of* retaliation as a result of escape from the severe form of trafficking or cooperation with

law enforcement. INA sec. 101(a)(15)(T)(ii)(III). As such, DHS has made a technical revision to the regulatory text to comply with Congressional intent. *See* new 8 CFR 214.201.

d. Clarification To Address T Visa Evidentiary Standard and Standard of Proof

DHS is also clarifying the evidentiary standard and standard of proof that apply to the adjudication of a T visa application. This rule retains the standard that applicants may submit any credible evidence relating to their T visa applications for USCIS to consider. *See* new 8 CFR 214.204(l).

e. Interview Authority

DHS is removing the interview provision at former 8 CFR 214.11(d)(6) to avoid redundancy. This section indicated that USCIS may require an applicant for T nonimmigrant status to participate in a personal interview. USCIS is removing this provision, because USCIS authority to require any individual filing a benefit request to appear for an interview is already covered at 8 CFR 103.2(b)(9).

f. USCIS Review

DHS has stricken "de novo" from 8 CFR 214.11(d)(5) and (8) (redesignated as 8 CFR 214.204(l)(2) and (n)) to reflect that USCIS conducts an initial review, not a "de novo" review.

g. Travel Authority

DHS has clarified that a noncitizen granted T nonimmigrant status must apply for advance parole to return to the United States after travel abroad pursuant to section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). Compliance with advance parole procedures is required to maintain T nonimmigrant status upon return to the United States and remain eligible to adjust status under section 245(l) of the INA, 8 U.S.C. 1255(l). *See* new 8 CFR 214.204(p), 214.211(i)(4); 8 CFR 245.23(j).

h. Departure From the United States as a Result of Continued Victimization

DHS wishes to clarify that the "continued victimization" criteria referenced at 8 CFR 214.207(b)(1) does not require that the applicant is currently a "victim of a severe form of trafficking in persons." Instead, continued victimization can include ongoing victimization that directly results from past trafficking. For example, if an applicant experienced harm such as abduction, abuse, threats, or other trauma that resulted in continuing harm, that applicant's reentry could be a result of their continued victimization, even though they were not trafficked upon reentry. As such, the applicant may be able to satisfy the physical presence requirement if they establish that their reentry into the United States was the result of continued victimization tied to ongoing or past trafficking. *See* new 8 CFR 214.207(b)(1).

### i. Severe Form of Trafficking in Persons

DHS has revised the regulatory text so that references to ''trafficking'' and ''acts of trafficking'' are consistent with the INA, for consistency and clarity. These changes are intended to clarify for applicants when ''a severe form of trafficking in persons'' applies to a particular eligibility requirement and when instead ''trafficking'' or ''acts of trafficking'' apply to an eligibility requirement. For example, applicants must demonstrate that they have complied with reasonable requests for assistance in the investigation or prosecution of ''acts of trafficking'' or the investigation of crime where ''acts of trafficking'' are at least one central reason for the commission of the crime, pursuant to section 101(a)(15)(T)(i)(III)(aa) of the INA, 8 U.S.C. 1101(a)(15)(T)(i)(III)(aa), as distinct from a ''severe form of trafficking in persons'' that applies to other eligibility requirements, such as section 101(a)(15)(T)(i)(I) of the INA, 8 U.S.C. 1101(a)(15)(T)(i)(I). *See, e.g.,* new 8 CFR 214.201, 214.204(c), 214.208(a) and (c) through (e), 214.209(b), 214.211(a), 214.212(a) and (e), 214.215(b) (addressing ''acts of trafficking''); 214.201, 214.202(a) and (e), 214.204(g), 214.206(a), 214.207(a) and (b), 214.208(b), 214.209(b), 214.215(a) (discussing ''severe form of trafficking in persons'').

### j. Extreme Hardship Involving Unusual and Severe Harm

DHS has amended previous 8 CFR 214.11(i)(1) because the previous citation at 8 CFR 240.58 no longer exists. *See* new 8 CFR 214.209(a).

### k. Waiting List

DHS has revised previous 8 CFR 214.11(j) for clarity, and reorganized the provision at new 8 CFR 214.210, to reflect how the waiting list works in conjunction with the amended bona fide determination process.

### l. Appeal Rights and Procedures

USCIS has clarified appeal rights and procedures at new 8 CFR 214.213(c). *See* 8 CFR 103.3. USCIS has further clarified the existing practice that an automatic revocation cannot be appealed. *See* new 8 CFR 214.213(a).

### m. References to Forms

The phrase ''form designated by USCIS'' has been replaced in several places with an official form name. Form numbers have also been removed throughout and replaced with form names.

### n. Law Enforcement Endorsement

DHS has updated references to ''Law Enforcement Endorsement'' to instead refer to ''Law Enforcement Declaration.'' This update more effectively captures the declaration process in the T visa program. In addition, DHS has deleted the requirement under 8 CFR 214.11(d)(3)(i) that a law enforcement agency (LEA) declaration must include ''the results of any name or database inquiries performed'' because the information is redundant, as USCIS conducts background checks on the applicant as part of its adjudication.

### o. Assistance in the Investigation or Prosecution for Adjustment of Status

Prior to TVPRA 2008, the INA referenced the Attorney General at INA section 245(l)(1)(C), 8 U.S.C. 1255(l)(1)(C), which describes the requirement of assisting in an investigation or prosecution of acts of trafficking. TVPRA 2008 amended the INA so that the Secretary of Homeland Security is now only required to consult with the Attorney General as appropriate. *See* INA sec. 245(l)(1)(C), 8 U.S.C. 1255(l)(1)(C). As a result of TVPRA 2008, DHS has sole jurisdiction over the entire T nonimmigrant adjustment of status process, including the determination of whether an applicant complied with any reasonable requests for assistance in the investigation or prosecution of acts of trafficking, and DHS consults the Attorney General as it deems appropriate.[3] The regulations state that the Attorney General has jurisdiction to determine whether an applicant received any reasonable request for assistance in the investigation or prosecution of acts of trafficking, and, if so, whether they complied with that request. *See* previous 8 CFR 245.23(d). This required applicants for adjustment of status to submit a document issued by the Attorney General (or their designee) certifying the applicant had complied with any reasonable requests for assistance. *See* previous 8 CFR 245.23(f). After TVPRA 2008, however, an applicant was no longer required to obtain a certification from the Attorney General to demonstrate compliance with any reasonable requests in the investigation or prosecution of acts of

trafficking, and immigration officers were no longer required to deny an application for lack of an Attorney General certification.[4] Instead, officers were required to determine whether the applicant had met the statutory requirement to comply with any reasonable request for assistance. Therefore, consistent with DHS' longstanding practice, and the changes made to the INA by TVPRA 2008, DHS amends 8 CFR 245.23(d) and (f) in this rule to indicate that an applicant is not required to provide a certification letter from the Attorney General regarding their compliance with any reasonable request for assistance in the investigation or prosecution of acts of trafficking. DHS has stricken any reference to the Attorney General in these sections; applicants must establish their compliance with any reasonable request for assistance to the satisfaction of USCIS only.

### C. Costs and Benefits

As discussed further in the preamble below, this final rule adopts the changes from the 2016 interim final rule (IFR), with some modifications. The rationale for the 2016 interim rule and the reasoning provided in the preamble to the 2016 interim rule remain valid with respect to these regulatory amendments; therefore, DHS adopts such reasoning to support this final rule. In response to the public comments received on the 2016 interim rule, DHS has modified some provisions for this final rule. In addition, DHS has also made some technical changes in the final rule.

This final rule clarifies some definitions and amends the bona fide determination (BFD) provisions to implement a new process. This final rule also clarifies evidentiary requirements for hardship and codifies the evidentiary standard of proof that applies to the adjudication of an application for T nonimmigrant status. Lastly, DHS made technical changes to the organization and terminology of 8 CFR part 214.

For the 10-year period of analysis of the rule using the post-IFR baseline, DHS estimates the annualized costs of this rule will be $807,314 annualized at 3 and 7 percent. Table 1 in section IV provides a more detailed summary of the final rule provisions and their impacts.

### II. Background and Legislative Authority

Congress created T nonimmigrant status in the TVPA. *See* Victims of Trafficking and Violence Protection Act

---

[3] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008: Changes to T and U Nonimmigrant Status and Adjustment of Status Provisions; Revisions to Adjudicator's Field Manual (AFM) Chapters 23.5 and 39 (AFM Update AD10–38)'' (2010), *https://www.uscis.gov/sites/default/files/document/memos/William-Wilberforce-TVPRAct-of-2008-July-212010.pdf* (TVPRA Memo).

[4] *See* TVPRA Memo.

of 2000, div. A, TVPA, Public Law 106–386, 114 Stat. 1464 (Oct. 28, 2000). Congress has since amended the TVPA, including the T nonimmigrant status provisions, several times: Trafficking Victims Protection Reauthorization Act (TVPRA) of 2003, Public Law 108–193, 117 Stat. 2875 (Dec. 19, 2003); Violence Against Women Act (VAWA) 2005, Public Law 109–162, 119 Stat. 2960 (Jan. 5, 2006); Technical Corrections to VAWA 2005, Public Law 109–271, 120 Stat. 750 (Aug. 12, 2006); TVPRA 2008, Public Law 110–457, 122 Stat. 5044 (Dec. 23, 2008); VAWA 2013, Public Law 113–4, titles viii, xii, 127 Stat. 54 (Mar. 7, 2013); Justice for Victims of Trafficking Act (JVTA) Public Law 114–22, 129 Stat 227 (May 29, 2015). The TVPA may be found in 22 U.S.C. 7101–7110; 22 U.S.C. 2151n, 2152d.

The TVPA and subsequent reauthorizing legislation provide various means to detect and combat trafficking in persons, including tools to effectively prosecute and punish perpetrators of trafficking in persons, and protect victims of trafficking through immigration relief and access to Federal public benefits. T nonimmigrant status is one type of immigration relief available to victims of a severe form of trafficking in persons who assist LEAs in the investigation or prosecution of the perpetrators of these crimes.

The Immigration and Nationality Act (INA) permits the Secretary of Homeland Security (Secretary) to grant T nonimmigrant status to individuals who are or were victims of a severe form of trafficking in persons and have complied with any reasonable request by an LEA for assistance in an investigation or prosecution of crime involving acts of trafficking in persons (or are under 18 years of age or are unable to cooperate due to physical or psychological trauma), and to certain eligible family members of such individuals.[5] *See* INA sec. 101(a)(15)(T)(i)(I), (III), (ii), 8 U.S.C. 1101(a)(15)(T)(i)(I), (III), (ii). Applicants for T–1 nonimmigrant status must be physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a port-of-entry to the United States, on account of a severe form of trafficking in persons. This includes being physically present on account of having been allowed to enter the United States to participate in investigative or judicial processes associated with an act or a perpetrator of trafficking. *See* INA sec. 101(a)(15)(T)(i)(II), 8 U.S.C. 1101(a)(15)(T)(i)(II). In addition, an applicant must demonstrate that they would suffer extreme hardship involving unusual and severe harm if removed from the United States. *See* INA sec. 101(a)(15)(T)(i)(IV), 8 U.S.C. 1101(a)(15)(T)(i)(IV). T nonimmigrant status allows eligible individuals to: remain in the United States for a period of not more than four years (with the possibility for extensions in some circumstances), receive work authorization, become eligible for certain Federal benefits and services, and apply for derivative status for certain eligible family members. *See* INA sec. 214(o), 8 U.S.C. 1184(o); INA sec. 101(i)(2), 8 U.S.C. 1101(i)(2); 22 U.S.C. 7105(b)(1)(A); TVPA 107(b)(1); section 431 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended, 8 U.S.C. 1641(c)(4); INA sec. 101(a)(15)(T)(ii), 8 U.S.C. 1101(a)(15)(T)(ii). T nonimmigrants who qualify may also be able to adjust their status and become lawful permanent residents. INA sec. 245(l), 8 U.S.C. 1155(l).

## III. Response to Public Comments on the 2016 Interim Final Rule

### A. Summary of Public Comments

On December 19, 2016, DHS published an interim final rule (IFR) in the **Federal Register** and received 17 public comments. 81 FR 92266 (Dec. 19, 2016). On July 16, 2021, DHS reopened the public comment period for the IFR rule for 30 days to provide the public with further opportunity to comment on the interim final rule. 86 FR 37670 (July 16, 2021). DHS received multiple requests from stakeholders to extend the deadline for submitting public comments during the reopened public comment period. In response to that request, DHS extended the reopened comment period for an additional 30 days, to provide a total of 60 days for the public to submit comments. DHS received an additional 41 comments on the IFR during the reopened comment period. In total, between the two comment periods, DHS received 58 comments. DHS has reviewed all the public comments and addresses them in this final rule.

### B. General and Preliminary Matters

Most comments came from representatives of nonprofit legal service providers who provided detailed recommendations based on their experience advocating for and providing services to trafficking victims. Commenters also included members of the public and individual law practitioners.

#### 1. General Support for the Rule

*Comment:* Most commenters were generally in favor of the 2016 interim rule. Several commenters supported DHS's decision to issue detailed regulations that reflect statutory changes since the initial 2002 interim rule; some commenters mentioned the confusion that has been caused by having outdated regulations that did not reflect subsequent statutory changes. Some commenters expressed concern about the growing epidemic of human trafficking in the United States and globally. Commenters expressed support for the following:

• Eliminating the requirement that applicants for T nonimmigrant status provide three passport-sized photographs with their applications, which saves victims and assisting nonprofit organizations time and money;

• Removing the filing deadline for applicants whose trafficking occurred before October 28, 2000, recognizing that there was no statutory requirement for the deadline;

• Clarifying that if a T nonimmigrant cannot file for adjustment of status within the 4-year filing deadline and can show exceptional circumstances, they may be eligible to receive an extension of status and may potentially be able to adjust status to a lawful permanent resident;

• Updating regulatory language to reflect statutory changes to the categories of eligible family members and clarifying age-out protections for family members who are eligible at the time of filing but exceed the required age before USCIS adjudicates the application;

• Clarifying that T nonimmigrant applicants are exempted from the public charge ground of inadmissibility;

• Revising the waiver authority for grounds of inadmissibility during the T nonimmigrant application stage and the T adjustment of status stage;

• Providing additional guidance that an individual need not actually perform labor, services, or commercial sex acts to meet the definition of a "victim of a severe form of trafficking in persons";

• Clarifying the "any credible evidence" standard;

---

[5] The primary applicant who is the victim of trafficking may also be referred to as the "principal T nonimmigrant" or "principal applicant" and receives T–1 nonimmigrant status, if eligible. The principal applicant may be permitted to apply for certain family members who are referred to as "eligible family members" or "derivative T nonimmigrants" and if approved, those family members receive T–2, T–3, T–4, T–5, or T–6 nonimmigrant status. The term derivative is used in this context because the family member's eligibility derives from that of the principal applicant.

• Referencing the confidentiality provisions that apply to applicants for T nonimmigrant status under 8 U.S.C. 1367(a)(2) and (b);

• Exempting applicants who, due to trauma, are unable to comply with any reasonable request by a law enforcement agency;

• Clarifying that presence in the Commonwealth of the Northern Mariana Islands after being granted T nonimmigrant status qualifies towards meeting the requisite physical presence requirement for adjustment of status;

• Conforming the regulatory definition of sex trafficking to the revised statutory definition in section 103(10) of the TVPA, 22 U.S.C. 7102(10), as amended by section 108(b) of the JVTA, 129 Stat. 239;

• Expanding the definition of "Law Enforcement Agency" to include State and local agencies, as well as those that detect and investigate trafficking;

• Removing the requirement that an applicant establish they had no "opportunity to depart" the United States and clarifying the circumstances in which an applicant who has left the United States can establish physical presence in the United States on account of trafficking;

• Clarifying that "involuntary servitude" encompasses "the use of psychological coercion"; and

• Removing the extreme hardship requirement for overseas derivative family members.

*Response:* DHS acknowledges and appreciates commenters' support of the rule. DHS agrees with the substance of these comments and believes these changes provide greater clarity and further align the T visa program with its statutory purpose.

2. Additional Comments

Commenters also requested that DHS modify certain provisions in the 2016 interim rule. Although there was some variation in the proposed changes, there was also significant overlap in their comments. DHS considered the comments received and all other material contained in the docket in preparing this final rule. This final rule does not address comments beyond the scope of the 2016 interim rule, including, for instance, those that express general opinions, those that include personally identifying information, or those that request that USCIS establish a regular timeline for regulatory updates. All comments and other docket material are available for viewing at the Federal Docket Management System (FDMS) at *www.regulations.gov* and searching

under Docket Number USCIS–2011–0010.

Many commenters wrote about several subjects. Comments are summarized for clarity and combined with other comments on the same subject matter. The substantive comments received on the 2016 interim rule and DHS responses are discussed in depth below.

*C. Terminology*

*Comment:* Several commenters requested terminology changes to the regulation, including replacing "victim" with "survivor," using gender neutral language throughout, and replacing "alien" with a more appropriate term.

*Response:* DHS agrees with these recommendations and has made technical clarifications throughout the regulation in amending the use of the term "alien" and replacing it with "victim," "applicant," "survivor," or "noncitizen" where appropriate, while recognizing that "alien" is the statutorily-defined term used by Congress in INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T) and INA sec. 214(o), 8 U.S.C. 1184(o).[6] DHS has also updated terminology to be gender neutral throughout.

*D. Definitions*

DHS added U.S. Code citations to the regulations that will be afforded due regard throughout subpart B of 8 CFR part 214 based on amendments to subsequent reauthorizing legislation.

1. Involuntary Servitude

*Comment:* Commenters wrote that they supported DHS removing the citation to *United States* v. *Kozminski,* 487 U.S. 931 (1988), from the definition of "involuntary servitude" and made several suggestions for further clarifying the definition. Several commenters requested that DHS delete language derived from the *Kozminski* decision to avoid confusion and promote consistency with the statutory definition of "involuntary servitude" at 22 U.S.C. 7102, which codifies section 103 of the TVPA and subsequent amendments.

*Response:* DHS agrees to delete the language derived from the *Kozminski* decision from the rule's involuntary servitude definition that is inconsistent with the TVPA's definition at 22 U.S.C. 7102(8). As stated in the preamble to the 2002 interim rule, Congress intended to expand the definition of involuntary servitude that was used in *Kozminski* by broadening the types of criminal

conduct that could be labeled "involuntary servitude." 67 FR 4786.

a. Abuse of the Legal System and Serious Harm

*Comment:* One commenter wrote that DHS should acknowledge that traffickers may specifically traffic individuals to force them to commit crimes for the benefit of the trafficker, force victims to commit crimes as a control mechanism, and target individuals with criminal histories for trafficking due to that person's reluctance or inability to seek redress from law enforcement agencies.

*Response:* DHS acknowledges that traffickers target individuals for these reasons, but does not feel it appropriate or necessary to include references to such practices in the regulations.

*Comment:* Multiple commenters proposed that the definitions section of the regulation adopt the current terms of "abuse or threatened abuse of the legal process" and "serious harm" from the criminal provisions related to "forced labor" in 18 U.S.C. 1589 and "sex trafficking" in 18 U.S.C. 1591, respectively. The commenters stated that these additional definitions would clarify for attorneys, LEAs, and advocates that "serious harm" is not based on subjective severity but broadly encompasses the surrounding circumstances, including financial and reputational harm. They commented further that many practitioners do not realize that "abuse or threatened abuse of legal process" can include administrative or civil processes and that the inclusion of these two definitions would be consistent with Congressional intent regarding how these terms should be interpreted in the trafficking context.

*Response:* DHS agrees with these proposed changes and the commenters' stated rationale. As stated in the preamble to the 2002 interim rule on T nonimmigrant status, the TVPA defines "a severe form of trafficking in persons" to include "involuntary servitude." For purposes of T nonimmigrant status, this inclusion and other relevant definitions from section 103 of the TVPA, as amended, 22 U.S.C. 7102, apply. *See* 67 FR 4783, 4786. In defining "severe form of trafficking in persons," the TVPA "builds upon the Constitutional prohibition on slavery, on the existing criminal law provisions on slavery and peonage (Chapter 77 of title 18, U.S. Code, sections 1581 *et seq.*), on the case law interpreting the Constitution and these statutes (specifically *United States* v. *Kozminski,* 487 U.S. 931, 952 (1988)), and on the new criminal law prohibitions contained in the TVPA."

---

[6] *See* INA sec. 101(a)(3), 8 U.S.C. 1101(a)(3) (The term "alien" means any person not a citizen or national of the United States).

*Id.* Furthermore, ''[t]he statutory definition of involuntary servitude [in the TVPA] reflects the new Federal crime of 'forced labor' contained in section 103(5) of the TVPA, and expands the definition of involuntary servitude contained in *Kozminski.*'' *Id.* Thus, DHS agrees that it is appropriate to draw from the definition of ''serious harm'' in the statute that criminalizes forced labor, 18 U.S.C. 1589. Accordingly, DHS incorporates these definitions in new 8 CFR 214.201.

b. Reasonable Person Standard

*Comment:* One commenter requested that the Department state within the involuntary servitude definition that the reasonable person standard applies to those with mental, cognitive, and physical disabilities or those who have been trafficked by a family member.

*Response:* DHS acknowledges that these factors are considered in individual cases but declines to adopt this language within the definition of involuntary servitude, as DHS does not feel it is necessary or prudent to address every possible scenario within the regulations and that such factors are best addressed in sub-regulatory guidance.[7]

c. Involuntary Servitude Induced by Domestic Violence

*Comment:* One commenter requested that the Department codify within the definition of involuntary servitude that the trafficker could be the victim's ''paramour or relative.'' Other commenters stated that USCIS inaccurately characterizes domestic relationships and presumes that the presence of domestic violence negates the possibility of trafficking.

*Response:* DHS acknowledges that trafficking can occur alongside intimate partner abuse, and involuntary servitude and domestic violence may coexist in some situations; however, DHS declines the commenter's

suggestion. DHS believes that the regulations are not intended to explicitly capture every possible situation, and that this degree of specificity would not be helpful, and may inadvertently preclude scenarios that are not explicitly described in the regulation.

In determining whether threats, abuse, or violence create a condition of involuntary servitude that constitutes a severe form of trafficking in persons, DHS evaluates a number of factors, including but not limited to whether the situation involves compelled or coerced labor or services and is induced by force, fraud, or coercion. Although domestic violence and trafficking may intersect, not all work that occurs as the result of domestic violence constitutes involuntary servitude. To distinguish between domestic violence and labor trafficking resulting from domestic violence, an individual must demonstrate that the perpetrator's motive is or was to subject them to involuntary servitude.

d. Mixed Motives

*Comment:* Several commenters wrote that DHS has incorrectly suggested that a trafficker's sole purpose must be involuntary servitude, and that a trafficker's intent cannot also be extortion or for monetary gain. They request DHS clarify that an applicant may meet the definition of a severe form of trafficking in persons if at least one purpose of the perpetrator's force, fraud, or coercion is to subject the person to involuntary servitude, peonage, debt bondage, slavery, or a commercial sex act. Commenters also request that DHS specify in the preamble of the final rule that a severe form of trafficking in persons may occur during smuggling even if the smugglers also have the purpose of subjecting the victim or their families to other crimes such as extortion, if they also have the purpose of subjecting them to, *inter alia*, involuntary servitude or commercial sex.

*Response:* DHS agrees that a trafficker may simultaneously have multiple motivations, including a desire to subject the victim to involuntary servitude and a desire for monetary gain through extortion. DHS acknowledges, as commenters note, that human trafficking rarely occurs in a vacuum. In the process of exerting force, fraud, and/or coercion on their victims, perpetrators may commit other crimes during the scheme to initiate and maintain control over the victim, including false imprisonment, assault, sexual assault, domestic violence, and extortion.

A perpetrator's motivations can be multifaceted. For example, smugglers who intend to extort an individual during a smuggling arrangement may also intend to compel forced labor or services that place the person into a condition of servitude, even where the forced labor or services end upon completion of the smuggling arrangement. Nonetheless, DHS recognizes that not all smuggling arrangements can or will qualify as a severe form of trafficking in persons, particularly where smugglers force a person to perform an act or multiple acts outside of a condition of servitude during a smuggling operation. For example, a person may be forced to perform certain labor during a smuggling arrangement to facilitate the smuggling operation or avoid detection at the border, which would not qualify as involuntary servitude and therefore would not constitute trafficking or a severe form of trafficking in persons. In addition, there may be situations where an individual is forced to perform labor for another purpose, and not for the purpose of involuntary servitude, peonage, debt bondage, or slavery. As with any T visa application, DHS considers all the evidence on a case-by-case basis before making a final determination on an application.

Although DHS agrees with the commenter, no changes have been made to the regulatory text in response to this comment given DHS' consideration of these factors when evaluating evidence in cases involving smuggling, as detailed in existing USCIS policy guidance.[8]

2. Law Enforcement Agency (LEA)

*Comment:* One commenter suggested using the term ''law enforcement agency'' (LEA) consistently throughout the regulation to provide clarity.

*Response:* DHS agrees with this comment and has amended the regulation to use the term ''law enforcement agency'' consistently throughout, rather than ''law enforcement'' or ''law enforcement officer.''

*Comment:* Multiple commenters expressed support for DHS expanding the definition of an LEA. Some commenters stated support for the rule's clarification that LEAs can provide

---

[7] For example, *see* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 2, Eligibility Requirements, Section B, Victim of Severe Form of Trafficking in Persons, Subsection 3, Definition of Coercion,'' *https://www.uscis.gov/policy-manual/ volume-3-part-b-chapter-2* (discussing analyzing coercion using a ''reasonable person'' standard) (last updated Oct. 20, 2021). As discussed elsewhere, DHS also applies a victim-centered approach in its adjudications, which takes into consideration all relevant factors in the case, including a victim's individual circumstances. *See, e.g.,* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 7, Adjudication, Section A, Victim-Centered Approach,'' *https://www.uscis.gov/policy-manual/ volume-3-part-b-chapter-7* (last updated Oct. 20, 2021).

[8] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 2, Eligibility Requirements, Section B, Victim of Severe Form of Trafficking in Persons, Subsection 7, Difference Between Trafficking and Smuggling,'' *https://www.uscis.gov/ policy-manual/volume-3-part-b-chapter-2* (last updated Oct. 20, 2021).

Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons,[9] even when there is no formal investigation or prosecution. Several commenters requested that the rule further expand the LEA definition to include additional agencies, which would help inform victims of their reporting options and identify similar local and state counterpart agencies that would meet the LEA definition. Commenters wrote that employees of some Federal agencies have expressed confusion over their certification authority because they are explicitly designated as certifying agencies in the regulations for U nonimmigrant status but not in this regulation. *See* 8 CFR 214.14(a). Several commenters also requested DHS add tribal authorities to the list of authorized LEAs.

*Response:* Although the list of agencies included is not exhaustive, DHS agrees that expanding the list will provide clarity to victims, stakeholders, and the LEAs themselves, and has updated the definition accordingly. DHS has also amended the definition to include tribal authorities. Including a more expansive list will assist certifiers and will be an operational efficiency, as adjudicators will not need to evaluate in each case whether a specific agency meets the definition of an LEA.

3. Law Enforcement Involvement

*Comment:* DHS received comments related to the term "law enforcement involvement," which is a concept used to analyze whether an applicant is physically present in the United States on account of trafficking ("physical presence"). Commenters requested additional clarification regarding the physical presence requirement, discussed in further detail in section J, below.

*Response:* DHS has defined "law enforcement involvement" under new 8 CFR 214.207(c)(4) to mean LEA action beyond simply receiving the applicant's reporting of victimization, to include the LEA interviewing the applicant, liberating the applicant from their trafficking, or otherwise becoming involved in detecting, investigating, or prosecuting the acts of trafficking. Liberation of an applicant from their trafficking will suffice to establish law enforcement involvement where the record indicates that the LEA detected the applicant's trafficking as part of this process. This definition will provide clarity to adjudicators and stakeholders

as to the extent of involvement required for physical presence under new 8 CFR 214.207(c)(4).

4. Reasonable Request for Assistance

Although DHS did not specifically receive comments on this topic, as a technical edit DHS has removed the term "reasonable" from the definition of the term "reasonable request for assistance," because the initial inquiry for DHS is to determine whether a request was made. After the threshold determination that a request was made by the LEA, the reasonableness of that request is analyzed. Accordingly, the reasonableness is assessed using the list of factors at new 8 CFR 214.208(c) (formerly 8 CFR 214.11(h)(2)). DHS retained "reasonable request for assistance" in other sections to reflect this analysis. DHS removed the paragraph at 8 CFR 214.11(a) describing the factors to consider the reasonableness of a request, because this language was duplicative of the language contained at 8 CFR 214.11(h)(2) (redesignated as 8 CFR 214.208(c)). Several revisions were made to the language at 8 CFR 214.208(c), which are discussed further below.

5. Commercial Sex Act

*Comment:* Commenters requested DHS interpret the term "commercial sex act" broadly, beyond what the commenters understood the current definition of "anything of value" may encompass, to avoid confusion and maintain consistency with the statute and legal precedent.

*Response:* DHS acknowledges that the term "anything of value" has been interpreted very broadly and encompasses things other than monetary or financial gain. "Anything of value" may include a range of activity that does not always have an exact monetary value attached to it, including but not limited to safety, protection, housing, immigration status, work authorization, or continued employment. Given Congressional intent and the significant precedent interpreting the term broadly, DHS has determined that it is not necessary to specifically reflect this range of activity in the regulatory text.

6. Severe Form of Trafficking in Persons

*Comment:* One commenter wrote that DHS should clarify that attempted trafficking may constitute a severe form of trafficking in persons by adding the following language to the definition of "severe form of trafficking in persons": "This definition does not require a

victim to have actually performed labor, services, or a commercial sex act."

*Response:* DHS agrees that it is not necessary for the victim to actually perform the labor or commercial sex act(s) to be eligible for T nonimmigrant status. For example, a victim may be recruited through force, fraud, or coercion for the purpose of performing labor or services but be rescued or have escaped before performing any labor or services; however, DHS declines to adopt the commenter's suggestion to state this directly in the definition of a severe form of trafficking in persons, as the fact that attempted trafficking may qualify as trafficking is already clarified at 8 CFR 214.206(a) (formerly 8 CFR 214.11(f)).

*E. Evidence and Burden and Standard of Proof*

USCIS has historically considered "any credible evidence" when evaluating T visa applications. T nonimmigrant applicants are instructed to submit any credible, relevant evidence to establish that they have been a victim of a severe form of trafficking in persons, and that they have complied with any reasonable request for assistance from law enforcement. To this end, DHS has included new language in 8 CFR 214.204(f) indicating that all evidence demonstrating cooperation with law enforcement will be considered under the "any credible evidence" standard, for consistency with the remainder of the rule, which states that applicants may submit any credible evidence relating to their T applications for USCIS to consider. *See* new 8 CFR 214.204(l).

The "preponderance of the evidence" standard of proof is distinct from the evidentiary requirements and standard set by regulation. *Matter of Chawathe,* 25 I&N Dec. 369 (AAO 2010). USCIS has historically applied a "preponderance of the evidence" standard when determining whether the T applicant has established eligibility and has included that standard at new 8 CFR 214.204(l). To meet this standard, the applicant must prove that facts included in their claim are "more likely than not" to be true. *Id.* at 369. To determine whether an applicant has met their burden under the "preponderance of evidence" standard, DHS considers not only the quantity, but also the quality (including relevance, probative value, and credibility) of the evidence. *Id.* at 376.

This standard of proof should not be confused with the burden of proof. The burden of proving eligibility for the

---

[9] The title of the Form I–914, Supplement B, is being changed in this rule to "Declaration for Trafficking Victim."

benefit sought remains entirely with the applicant. *Id.* at 375.

### 1. Reasonable Person Standard

*Comment:* One commenter requested DHS acknowledge in the preamble or regulation that individuals with cognitive, mental, and physical impairments are at greater risk for trafficking and face greater barriers to escape trafficking. The commenter stated that this should be acknowledged so that whenever a reasonableness standard is used, it should be interpreted as a reasonable person with the cognitive, mental, and physical impairments of the specific applicant.

*Response:* DHS acknowledges that individuals with impairments are at greater risk for exploitation. DHS does not believe that this is necessary or appropriate to include in the regulation. DHS considers all relevant evidence in adjudicating each case, including the circumstances and any vulnerabilities of an individual applicant when determining reasonableness.[10] Despite the existence of certain vulnerabilities, however, each applicant retains the burden of proof to establish eligibility by a preponderance of the evidence.

### 2. Credibility of Evidence

*Comment:* Commenters suggested that DHS amend provisions regarding initial evidence at 8 CFR 214.11(d)(2) and (3) (redesignated here as 8 CFR 214.204(c) and (e)) to state that a victim's statement alone may prove victimization.

*Response:* DHS declines to amend 8 CFR 214.11(d)(2) and (3) (redesignated here as 8 CFR 214.204(c) and (e)) to explicitly state that a victim's statement alone may prove victimization. While DHS may determine, based on the facts and circumstances of a particular case, that a personal statement alone may be sufficient to prove victimization, in such a scenario, the victim's statement would have to be sufficiently detailed, plausible, and consistent in order to satisfy evidentiary requirements. With all T visa applications, DHS makes an individualized determination of whether trafficking has been established based on the evidence in each particular case. DHS notes that it has revised the requirements for a victim's personal statement included in the list of evidence in redesignated 8 CFR 214.204(c) (Initial evidence). These

additions are intended to clarify what is expected to be included in a victim's personal statement to establish eligibility and will reduce barriers for victims of trafficking. The revisions in § 214.204(c)(1) are intended to align with longstanding USCIS policy guidance and practice, and are consistent with the program's evidentiary standards.

*Comment:* One commenter requested DHS clarify that evidence is not rendered less credible because of the amount of time that has elapsed between an applicant's eligibility for T nonimmigrant status and when they filed their application. The commenter also requested DHS clarify that evidence, including personal statements and psychiatric evaluations, is not less credible because it was generated in response to a Request for Evidence.

*Response:* DHS acknowledges there may be legitimate reasons why significant time elapses between an applicant's trafficking and when they file for T nonimmigrant status. DHS also acknowledges that individuals produce evidence that was not initially submitted with their application in response to Requests for Evidence (RFEs) for various reasons. DHS emphasizes that any credible evidence will be evaluated in determining an applicant's eligibility but declines to include this level of specificity within the regulation. DHS acknowledges that due to the nature of victimization, victims may be unable to provide information or documentation that would otherwise be available to establish eligibility. USCIS instructs adjudicators to be mindful of the ways trauma may impact victims, including their recollection of traumatic experiences, which may shift over time.[11]

### 3. Opportunity To Respond to Adverse Information

*Comment:* Multiple commenters discussed RFEs [12] that require applicants to explain inconsistencies identified by adjudicators in the

applicant's administrative record to which the applicant is not privy. The commenters stated that the inconsistent evidence typically is found within records of other agencies and that attorneys often cannot obtain this information in a timely manner through requests under the Freedom of Information Act (FOIA), 5 U.S.C. 552, as amended. The commenters also wrote that advocates have reported that U.S. Customs and Border Protection (CBP) interviews were conducted without the use of trauma-informed techniques and did not lead to accurate identification of trafficking victims. The commenters wrote that statements taken during these interviews can later appear to be inconsistent statements. The commenters stated that the full content of the CBP interviews is not released in response to a FOIA request and that the applicant is not able to correct the inconsistent statements.

The commenters requested that DHS change the regulation to state that DHS will consider the totality of the evidence submitted along with the administrative record in evaluating the T visa application, and that if information contained in the administrative record could result in an unfavorable determination, the applicant must be given a copy of the information and must be provided an opportunity to meaningfully respond to such adverse evidence.

*Response:* DHS agrees that all evidence should be assessed in its totality. DHS also agrees that it is important for applicants and their advocates to understand derogatory information on which the decision will be based; however, other regulatory provisions currently address this issue. Specifically, under 8 CFR 103.2(b)(16)(i), when a decision will be adverse and is based on derogatory information "of which the applicant or petitioner is unaware, [they] shall be advised of this fact and offered an opportunity to rebut the information and present information in [their] own behalf before the decision is rendered." Accordingly, when there is derogatory information of which the applicant is unaware and upon which an adverse decision will be based, USCIS will comply with existing laws and regulations in advising an applicant of the derogatory information and offer them an opportunity to rebut such information through an RFE, Notice of Intent to Deny, or other formal notice under 8 CFR 103.2(b)(8)(iii), (b)(16)(i) and 214.205(a)(1), except as otherwise provided in 8 CFR 103.2(b)(16).

---

[10] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 3, Documentation and Evidence for Principal Applicants," *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-3 (discussing "any credible evidence" and the nature of victimization) (last updated Oct. 20, 2021).*

[11] As of the time of the publication of this regulation, further policy guidance describing USCIS' interpretation of the T nonimmigrant regulation can be found in the USCIS Policy Manual. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking," *https://www.uscis.gov/policy-manual/volume-3-part-b* (last updated Oct. 20, 2021).

[12] 8 CFR 103.2(b)(8)(ii) ("If all required initial evidence is not submitted with the benefit request or does not demonstrate eligibility, USCIS in its discretion may deny the benefit request for lack of initial evidence or for ineligibility or request that the missing initial evidence be submitted within a specified period of time as determined by USCIS.").

### 4. Requests for Evidence (RFE)

*Comment:* Some commenters expressed concern about a trend of increasing RFEs from USCIS. They indicate that the RFEs do not indicate what evidence is lacking, are boilerplate, and create unnecessary work for practitioners and anxiety for survivors. The commenters state that issuance of RFEs has increased processing times, leaving survivors vulnerable. Finally, the commenters state that these RFEs have resulted in unprecedented denial rates.

*Response:* DHS acknowledges the concerns stakeholders are raising regarding RFE trends in the program. USCIS strives to apply a victim-centered, trauma-informed approach in each adjudication while also ensuring that the statutory requirements for T nonimmigrant status are met. In addition, USCIS has recently issued significant guidance in the Policy Manual aimed at clarifying evidentiary requirements for both applicants and adjudicators and reducing the need for RFEs.[13] Along with these updates, USCIS included training to adjudicators on the updates. Adjudicators also receive ongoing training on this and other issues. In addition, USCIS reviews trends in the program and revises any guidance if necessary. For example, if USCIS notices patterns in inquiries or questions asked at stakeholder engagements, it prompts review and potential revision of internal procedures.

### F. Application

#### 1. Applicant Statements

*Comment:* One commenter proposed that 8 CFR 214.11(d)(2)(i) (redesignated here as 8 CFR 214.204(c)(1)), which requires applicants to provide a written statement describing their victimization, include an exemption for victims who are minors and victims who invoke the trauma exception from the requirement to comply with reasonable LEA requests. They wrote that DHS could determine on a case-by-case basis whether to waive the requirement of a signed statement. They noted that preparing a statement can re-traumatize victims, even when the victim is assisted by trauma-informed service providers. The commenter stated that the statement may not be necessary

when the victimization is apparent from other evidence.

*Response:* DHS understands that applicants could be re-traumatized by retelling their experience of victimization. Nevertheless, the information provided in the victim's personal statement is very important for USCIS. It allows USCIS to fully understand the facts of the case from the victim's perspective and helps USCIS determine whether the eligibility requirements are met. In addition, it would not be efficient and would cause unnecessary processing delays for USCIS to determine on a case-by-case basis whether a statement was necessary and, when necessary, request one after reviewing the initial filing. Therefore, DHS maintains the requirement that applicants provide a written statement describing their victimization in this final rule. 8 CFR 214.204(c)(1).

#### 2. Interviews of Applicants

*Comment:* Commenters suggested that 8 CFR 214.11(d)(6) explicitly state that interviews of applicants for T nonimmigrant status are not required, and that DHS could request an interview. They asserted that this change would encourage victims who have faced high levels of trauma to come forward to apply for immigration relief.

*Response:* DHS is sympathetic to the issues victims face and applies a victim-centered and trauma-informed approach but declines to adopt this recommendation. DHS still reserves the discretion to require an interview for all immigration benefits, including applicants for T nonimmigrant status, as it deems necessary. In such circumstances, interviews can be an important method of obtaining further information when determining eligibility for T nonimmigrant status. As discussed above, DHS has removed the interview provision at 8 CFR 214.11(d)(6) to avoid redundancy with 8 CFR 103.2(b)(9).

#### 3. Notification to the Department of Health and Human Services (HHS)

*Comment:* One commenter wrote to welcome the addition of a provision indicating that upon receiving an application for T nonimmigrant status from a minor under the age of 18, USCIS will notify HHS to facilitate interim assistance. Multiple commenters discussed the automatic nature of USCIS's notification to HHS upon receiving an application for T nonimmigrant status from a minor. *See* 8 CFR 214.11(d)(l)(iii) (redesignated here as 8 CFR 214.204(b)(4)). These commenters wrote that, in some

instances, a referral to HHS can result in premature termination of some State-funded benefits that may be more comprehensive than the Federal interim assistance obtained through HHS. The commenters requested that the rule be amended to include an exception to the provision mandating automatic notification of HHS upon receiving an application for T nonimmigrant status from a minor.

*Response:* DHS understands the commenters' concerns and appreciates why minor applicants may want to access more expansive State-funded benefits. DHS is unable to change the regulations in response to these concerns, however, because TVPRA 2008 section 212(a)(2), 22 U.S.C. 7105(b)(1)(H), requires that DHS notify HHS no later than 24 hours after discovering that a person who is under 18 years of age may be a victim of a severe form of trafficking in persons.

### 4. Notification of Approval of T Nonimmigrant Status

The rule at 8 CFR 214.11(d)(9) (redesignated as 8 CFR 214.204(o)) states that upon approving an application for T–1 nonimmigrant status, USCIS may notify others "as it determines appropriate, including any LEA providing an LEA endorsement and the HHS Office of Refugee Resettlement, consistent with 8 U.S.C. 1367."

*Comment:* Commenters requested that DHS clarify in the rule which agencies or bodies that it considers appropriate to receive information about applicants for T nonimmigrant status or to limit the language to the entities listed in the rule.

*Response:* DHS has maintained the current broader language because it provides USCIS and applicants with more flexibility in implementing these provisions than an exhaustive list would. USCIS may identify other entities that are appropriate to receive this information and instances in which the notification would be beneficial to the T–1 nonimmigrant and/or an LEA and its efforts to combat trafficking. The final rule continues to require that the disclosure of any information must be consistent with the restrictions on information sharing in 8 U.S.C. 1367. USCIS has issued guidance and training to those who adjudicate applications for T nonimmigrant status to ensure there is no inappropriate sharing of applicant information, and to ensure any information sharing action is consistent with 8 U.S.C. 1367.

### G. Law Enforcement Declarations

As noted in new 8 CFR 214.204(e), applicants may wish to submit evidence

---

[13] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 3, Documentation and Evidence for Principal Applicants," *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-3* (last updated Oct. 20, 2021).

from LEAs, including an LEA declaration, to help establish their eligibility. Although an LEA declaration is an optional form of evidence and does not have any special evidentiary weight, it may support a T nonimmigrant application by providing detailed, relevant information about the applicant's victimization and compliance with reasonable requests for assistance. DHS received several comments on LEA declarations, discussed below.

1. Declaration Signature

*Comment:* One commenter supported the clarification that a formal investigation or prosecution is not required for an LEA to complete the declaration, and stated that the requirement that a law enforcement declaration be signed by a supervising official may add an unnecessary step to this more flexible approach.

*Response:* DHS declines to adopt this recommendation. First, the Law Enforcement Declaration is an optional form of evidence. Second, maintaining the status quo in requiring a supervisor's signature adds a level of review to DHS's flexible approach, which acknowledges that whether an investigation or prosecution occurs is outside of a victim's control.

2. Withdrawn Declarations and Revoked Continued Presence (CP)

DHS has updated terminology at new 8 CFR 214.204(c) and (l). DHS has replaced the term ''revocation'' relating to law enforcement declarations with ''withdrawal'' for accuracy and to avoid any confusion that status is being revoked.

a. Withdrawn Declarations

*Comment:* Commenters requested that DHS delete the language in 8 CFR 214.11(d)(3)(ii) (redesignated here as 8 CFR 214.204(h)) that provides that disavowed or withdrawn LEA declarations will no longer be considered evidence. Commenters suggested that rather than leaving it to the discretion of the LEA to provide a written explanation of its reasons for disavowing or withdrawing the declaration, the LEA should be required to do so. Commenters stated that an application should not be rejected based solely on one factor or one piece of evidence. They wrote that USCIS must provide a T nonimmigrant the opportunity to review and respond to the documentation from the LEA. Commenters also suggested adding language to 8 CFR 214.11(d)(3)(ii) (redesignated here as 8 CFR 214.204(h)) and 8 CFR 214.11(m)(2)(iv)

(redesignated here as 8 CFR 214.213(b)(4)) to state that before revoking T nonimmigrant status due to a revocation or disavowal of an LEA declaration, USCIS would review the application and reassess the applicant's eligibility for T–1 nonimmigrant status in light of the LEA's explanation for the revocation, and consider all other evidence provided by the applicant under the ''any credible evidence'' standard. Finally, they stated that if USCIS determines that the application no longer meets the requirements, USCIS should issue a Notice of Intent to Revoke or a Request for Evidence.

*Response:* The rule at 8 CFR 214.213(b)(4) provides that USCIS may revoke T nonimmigrant status based on withdrawal by the LEA, but does not require USCIS to automatically revoke T nonimmigrant status upon a disavowal or withdrawal of the Supplement B. DHS recognizes that a Supplement B may be withdrawn or disavowed for reasons unrelated to the applicant's cooperation with the LEA's reasonable request for assistance. For example, an LEA may receive additional information indicating the initial Supplement B was issued in error. The law enforcement declaration is one piece of evidence that USCIS considers in determining whether an applicant meets the eligibility requirements for T nonimmigrant status based on the totality of the evidence. *See, e.g.,* new 8 CFR 214.204(c) and (l). Furthermore, 8 CFR 214.213(b)(4) indicates that the LEA must provide an explanation for any withdrawal or disavowal for it to serve as the basis for revocation. Therefore, DHS clarifies in this rule that a disavowed or withdrawn Supplement B will not be completely disregarded. After withdrawal or disavowal, the LEA declaration will *generally* no longer be considered as evidence of the applicant's compliance with requests for assistance in the LEA's detection, investigation, or prosecution; however, a disavowed or withdrawn Supplement B may be considered for other eligibility requirements (such as evidence of victimization) along with any other credible evidence relevant to the application. *See* new 8 CFR 214.204(f) and (h). DHS will determine whether the disavowed or withdrawn Supplement B will be considered as evidence of compliance by assessing the reasons for the disavowal or withdrawal. Once the Supplement B is disavowed or withdrawn, DHS will determine the reason for the disavowal or withdrawal and then determine what purpose, if any, for which it may be used. DHS notes that if there is an

explanation from the LEA for the withdrawal or disavowal, adjudicators should consider that explanation in determining whether to still consider the declaration as evidence of compliance with requests for assistance.

DHS acknowledges that even if a declaration is disavowed or withdrawn, an individual may still meet the eligibility requirements for T nonimmigrant status, and a withdrawal or disavowal will not always lead to revocation of T nonimmigrant status. In addition, prior to issuing a Notice of Intent to Revoke (NOIR) based on the withdrawal or disavowal of the Supplement B, DHS would reassess an applicant's eligibility based on all available evidence. If DHS intends to revoke T nonimmigrant status following the withdrawal or disavowal of a Supplement B, DHS will issue a NOIR to inform the individual of the agency's intent to revoke T nonimmigrant status and the basis for intended revocation. The individual would then be able respond to the NOIR with additional evidence to overcome any noted deficiencies or discrepancies. The NOIR would detail or summarize the reasons for withdrawal or disavowal from the LEA and any other bases for intended revocation, but DHS declines to codify a requirement that USCIS provide a copy to the individual.

b. Revoked Continued Presence

DHS has similarly clarified that if the DHS Center for Countering Human Trafficking (CCHT) revokes a grant of Continued Presence (CP), generally the CP grant will no longer be considered as evidence of the applicant's compliance with the corresponding LEA investigation or prosecution but may be considered for other purposes. *See* new 8 CFR 214.204(i). If DHS determines that the revocation of the CP grant was unrelated to an applicant's compliance, for example revocation based on departing without advance parole or for subsequent criminal conduct, it may continue to consider the grant of CP as evidence of the applicant's compliance with the LEA investigation or prosecution.

3. Requirement To Sign Law Enforcement Declaration

*Comment:* One commenter stated DHS should clarify in the regulations that immigration judges and ICE counsel should be required to sign law enforcement declarations. The commenter wrote that a directive to immigration judges and ICE attorneys should indicate that they, and not just Homeland Security Investigations (HSI),

should be able to detect trafficking and certify in the process.

*Response:* DHS declines to adopt this recommendation. DHS cannot require any certifying agencies to certify a case, as signing the LEA Declaration is at the discretion of the LEA and the LEA Declaration is not a required piece of initial evidence. However, DHS agrees that immigration judges and ICE attorneys may submit declarations upon detection of trafficking consistent with applicable law and agency policy. However, DHS may accept declarations from immigration judges and ICE attorneys should such declarations be permissible under applicable law and agency policy.

### H. Bona Fide Determination (BFD)

By statute, a determination that an application for T nonimmigrant status is bona fide (T BFD) enables trafficking survivors to obtain certain stabilizing benefits, including access to Federal services and benefits via the issuance of Certification Letters from HHS,[14] and the ability to obtain an administrative stay of removal.[15] The preamble to the 2016 IFR provided that USCIS may grant deferred action if the application for T nonimmigrant status is deemed bona fide, and the applicant could request employment authorization based on the grant of deferred action.[16] Although an extensive BFD process was codified in the 2016 IFR, such a process has not been implemented in the last decade outside of litigation cases due to resource constraints and the inefficiencies of the prior process. Under the extensive BFD review process set forth in the IFR, USCIS generally adjudicated the merits of T nonimmigrant applications in the same amount of time that it would take to issue a BFD. Therefore, it has generally been more efficient to adjudicate the T visa application alone than to conduct both a BFD review and full adjudication of the same application.

The revised BFD process codified in this rule at 8 CFR 214.205 is as follows: USCIS will conduct an initial review of the T nonimmigrant status application filed on or after the effective date for completeness and conduct and review the results of background checks to determine if the application is bona fide and the applicant merits a favorable exercise of discretion to receive a grant of deferred action and employment authorization. Applicants must file a Form I–765, Application for Employment Authorization, under proposed 8 CFR 274a.12(c)(40) to receive a BFD Employment Authorization Document (EAD), even if they have indicated on Form I–914, Application for T Nonimmigrant Status that they are requesting an EAD. If an applicant has not already filed a Form I–765, they will be notified in writing that they may do so, to receive a BFD EAD under 8 CFR 274a.12(c)(40). DHS strongly recommends that applicants file a Form I–765, Application for Employment Authorization, simultaneously with their T nonimmigrant status application to facilitate expeditious case processing.[17] If DHS issues a request for evidence in a case filed before the effective date of the final rule, DHS will automatically convert previously filed applications for employment authorization filed under 8 CFR 274a.12(a)(16) and (25), to applications for the newly created BFD EAD classification. This will limit the need for applicants to submit new requests or information, and enable DHS to focus on the adjudication, rather than the process of issuing multiple notices, including first notifying the applicant that they have a pending bona fide application, and then notifying the applicant that they are eligible for employment authorization. If initial review does not establish that the application is bona fide, USCIS will conduct a full T nonimmigrant status eligibility review. If the full review establishes eligibility and the statutory cap has been reached, the application will be considered bona fide.

In the situation where DHS is issuing a request for evidence and thus conducts a bona fide determination on an application filed before the effective date of this rule, if an applicant with a pending bona fide application has not previously filed an application for employment authorization, DHS will issue a notice of eligibility to apply for a BFD EAD, indicating that the individual should designate category

"(c)(40)" on the application. *See* new 8 CFR 274a.12(c)(40).

After receipt of the Form I–765, USCIS will then consider whether the applicant warrants a favorable exercise of discretion to be granted deferred action, and if granted deferred action, whether they will be granted a discretionary employment authorization document.

In the interim rule, DHS provided that employment authorization for a bona fide T nonimmigrant applicant to whom USCIS grants deferred action would be requested under category "(c)(14)," 8 CFR 274a.12(c)(14). 81 FR 92285. DHS has decided to record T BFD EADs as a separate category from other EADs that are based on a grant of deferred action. Accordingly, in this rule DHS amends 8 CFR 274a.12 to establish a specific eligibility category for applicants for T nonimmigrant status whose applications have been deemed bona fide. These BFD EADs will be issued under category (c)(40). *See* new 8 CFR 274a.12(c)(40). DHS notes that a bona fide determination, or an initial grant or renewal of a BFD EAD and deferred action does not guarantee that DHS will approve the principal applicant or their derivative family members for T nonimmigrant status.

*Comment:* Several commenters wrote that USCIS has justified its operational practice of fully adjudicating the T visa application rather than initiating the BFD review process by claiming that because there is no T visa application backlog, it is more efficient to conduct a full adjudication. Commenters urged USCIS to uphold the regulatory mandate to provide BFDs. They emphasized that BFDs provide work authorization, which allows survivors to be self-sufficient and help reduce the risk of revictimization as well as provide access to federally funded public benefits. Commenters also wrote that BFDs are much more important given increased processing times, especially as applicants lose access to time-limited social services benefits. Commenters indicated that USCIS' failure to conduct BFDs has had a negative impact on trafficking survivors in removal proceedings and has led to survivors being removed while their applications were pending. Multiple commenters noted that applicants are forced to proceed with other forms of relief in removal proceedings while awaiting a decision on their T visa application, which wastes administrative resources and inflicts needless trauma.

*Response:* DHS acknowledges that processing times have increased in recent years. DHS also understands the important stabilizing benefits the BFD

---

[14] 22 U.S.C. 7105(b)(1)(E)(i)(II)(aa).

[15] INA sec. 237(d)(1); 8 U.S.C. 1227(d)(1). This statutory provision authorizes the Secretary of Homeland Security to grant an administrative stay of removal to an individual whose Application for T Nonimmigrant Status sets forth a "prima facie case for approval," until the application is approved or there is a final administrative denial on the application after the exhaustion of administrative appeals. A determination that the application is "bona fide" is also sufficient to establish that the applicant has established a "prima facie case for approval" within the meaning of section 237(d)(1) of the INA, 8 U.S.C. 1227(d)(1). "Prima facie" means that the application appears sufficient on its face, which is encompassed by the bona fide determination described at 8 CFR 214.205.

[16] *See* 81 FR 92279.

[17] There is no fee for a Form I–765 filed by an applicant seeking T nonimmigrant status. 8 CFR 106.3(b)(2)(viii).

can provide to trafficking survivors, and that a lack of a viable BFD process can have negative impacts on victims. DHS is committed to implementing a streamlined and operationally efficient BFD process through the final rule and has codified a new BFD process at new 8 CFR 214.205, consistent with DHS's victim-centered approach. Pursuant to new 8 CFR 214.204(m), USCIS will conduct a BFD review for applicants in the United States once they have applied for principal or derivative T nonimmigrant status. DHS has also amended 8 CFR 214.11(d)(7) (redesignated as 8 CFR 214.204(m)) to state that USCIS will conduct an initial review of an eligible family member's Application for Derivative T Nonimmigrant Status once the principal's application has been deemed bona fide. However, as a matter of discretion, USCIS generally will not grant deferred action and employment authorization to an eligible family member based on a bona fide determination unless the principal applicant has received a positive bona fide determination.

*Comment:* Several commenters stated that the IFR's inclusion of an inadmissibility determination as part of the BFD is contrary to Congressional intent. They recommended that either the filing of a waiver of inadmissibility constitute *prima facie* evidence of eligibility, or that USCIS implement the same procedures used in the U visa BFD context, which eliminates the requirement that USCIS assess an applicant's admissibility as part of the BFD process. Some commenters further recommended that DHS amend the standard for finding an application to be bona fide to mirror the requirements to establish a prima facie case in an application for benefits available under VAWA. *See* 8 U.S.C. 1641; 8 CFR 204.2(c)(6).

*Response:* DHS agrees with the commenters' suggestion to remove the inadmissibility determination from the BFD process. The BFD process is an initial review, and an assessment of the applicant's admissibility is not necessary to determine whether an application is bona fide. In addition, as commenters noted, considering admissibility twice during adjudication would be inefficient and burdensome and would delay the BFD process. Accordingly, DHS has eliminated the requirement that USCIS analyze an applicant's admissibility as part of the BFD process, but will implement other safeguards, including background checks, to ensure the applications are bona fide, that the applicants merit a favorable exercise of discretion and do

not present a threat to national security, and to maintain the integrity of the program.

*Comment:* Commenters also requested DHS eliminate 8 CFR 214.11(e)(1)(ii), which requires a T visa applicant to demonstrate that their application "does not appear to be fraudulent," because the fraud assessment is superfluous to the other BFD requirements.

*Response:* DHS agrees with the commenters' rationale. Because USCIS considers an applicant's compliance with initial evidence requirements and background checks in the T visa BFD process, as well as whether the applicant merits a favorable exercise of discretion, it is unnecessary to separately analyze whether the application appears to be fraudulent. DHS has removed consideration of whether an application appears to be fraudulent from the BFD review process. An applicant who attempts to gain an immigration benefit through fraud is inadmissible,[18] and would not be granted deferred action or a BFD EAD.

*Comment:* Commenters urged DHS to implement a BFD review process for T derivative applicants, applying the standards set forth in the Policy Manual for eligible family members of U visa applicants.

*Response:* DHS understands the importance of BFDs not just for principal applicants, but for their eligible family members. Conducting BFD reviews and providing initial benefits to eligible family members is also consistent with a victim-centered approach, as it provides victims needed support from stabilized family members. DHS will conduct BFDs for eligible family members who are in the United States at the time of review, if the principal has already received a BFD.

*Comment:* Several commenters requested that USCIS commit to a 30- or 90-day timeline for making a bona fide determination and notifying applicants of the outcome in 8 CFR 214.11(e)(2) (redesignated here as 8 CFR 214.205(c)).

*Response:* Although DHS recognizes that being without work authorization or Federal benefits may be a hardship for applicants, it declines to mandate that USCIS conduct a BFD within a certain number of days. USCIS strives to process all immigration benefits in a reasonable and timely manner; however, USCIS cannot guarantee that the determination will be completed within any set number of days. The volume of applications to be reviewed will vary over time, each application is unique, and some may be complex. In addition,

there are aspects of the determination beyond USCIS' control (for example, background checks) that may take longer than 90 days.

*Comment:* Some commenters recommended that qualified trafficking survivors on the waiting list should be granted BFDs and should have access to employment authorization and Federal benefits to ensure their safety, and so they are not vulnerable to exploitation or trafficking.

*Response:* DHS acknowledges the importance of these benefits for trafficking survivors, which is why USCIS will initiate the BFD process upon initial review of the application. After considering the comments on the interim final rule and our recent experience with the program, DHS has added 8 CFR 214.205(a)(3), which provides that USCIS will conduct a full T nonimmigrant status eligibility review of any applications that do not initially receive a favorable BFD. Applicants who are determined eligible following the T nonimmigrant status eligibility review will then be issued a BFD if the statutory cap has been met. In addition, applicants with a favorable BFD may be considered for deferred action and may request employment authorization based on a grant of deferred action. 8 CFR 214.205(d)(1).

DHS notes that the T visa waiting list has never been utilized in the history of the program due to the statutory cap never being reached. However, if the statutory cap is met, USCIS will place all applications that have been issued a BFD on the waiting list, including those that are deemed eligible for a BFD following a T nonimmigrant status eligibility review. 8 CFR 214.210(b). This revision will allow BFD recipients to be on the waiting list without having to provide additional information, avoid USCIS having to perform additional processing of cases with a BFD to place them on the waiting list, and provide all applications on the waiting list equal status of BFD, instead of some receiving a BFD and others being deemed approvable but for the unavailability of a visa.

This change will not affect the order in which applications are processed. The following fiscal year, when a new statutory cap becomes available, the oldest pending applications that are on the waiting list and have been granted a BFD will be processed first. The oldest application may not necessarily be approved in date-received order depending on updates and additional evidence that may be needed to adjudicate the application to a final decision. The date that applicants receive a BFD will generally not affect

---

[18] *See* INA 212(a)(6)(C)(i), 8 U.S.C. 1182(a)(6)(C)(i).

the order in which their application will be processed for cap adjudication.

*Comment:* Several commenters encouraged DHS to add language to the final rule that requires ICE to take affirmative steps to seek a BFD from USCIS for detainees with pending applications for T nonimmigrant status, which commenters note would lead to a stay of removal.

*Response:* DHS declines to add this language to the final rule as unnecessary, because all applications filed after the effective date of the final rule will receive a BFD review. In addition, in August 2021, ICE issued a Directive that addresses using a victim-centered approach with noncitizen crime victims, including applicants for T nonimmigrant status.[19] The ICE directive specifies that ICE will coordinate with USCIS to "seek expedited adjudication of victim-based immigration applications and petitions" and that in the cases of a detained individual with a pending application for a victim-based immigration benefit, ICE will request USCIS expedite the decision.[20] USCIS will continue to coordinate with ICE on this process.

**I. Evidence To Establish Trafficking**

*Comment:* Several commenters wrote that they appreciate that 8 CFR 214.11(f)(1) (redesignated here as 8 CFR 214.206(a)) includes examples of evidence that may be submitted to demonstrate a trafficker's purpose in cases where no commercial sex act or forced labor occurred. They also stated that they approve of the non-exhaustive list at 8 CFR 214.11(f)(1) (redesignated 8 CFR 214.206(a)) of examples of evidence that may be submitted to demonstrate the trafficker's purpose in this type of scenario. However, these same commenters also recommended that DHS expand the list of possible evidence and expressed that trafficking victims may not be able to supply the types of evidence in the list. They suggested DHS add additional types of evidence; clarify that all forms of evidence are acceptable; and clarify that no form of evidence is preferred over another. Specifically, commenters wrote that DHS should clarify that a law enforcement declaration or grant of Continued Presence are not required or preferred forms of evidence. The commenters also requested that 8 CFR 214.11(f)(l) (redesignated here as 8 CFR

214.206(a)) be revised to state that a victim's statement alone could be sufficient in proving attempted victimization.

*Response:* DHS agrees with the commenters' rationale and has amended the list of evidence in new 8 CFR 214.206(a). Although the list is not intended to be exhaustive, the regulation may have unintentionally emphasized certain types of evidence. In amending this list, DHS emphasizes that alternate forms of evidence can be submitted to establish an individual is a victim of a severe form of trafficking, or to establish the trafficker's purpose. DHS acknowledges there are some types of evidence that victims are more likely to have. Each form of evidence alone may be sufficient under the any credible evidence standard, and no form of evidence is preferred over another. As noted above, DHS declines to amend the regulatory text to explicitly state that a victim's statement alone may prove victimization. While DHS may determine, based on the facts and circumstances of a particular case, that a personal statement alone may be sufficient to prove victimization, in such a scenario, the victim's statement would have to be sufficiently detailed, plausible, and consistent in order to satisfy evidentiary requirements. With all T visa applications, DHS makes an individualized determination of whether trafficking has been established based on the evidence in each particular case. However, DHS encourages applicants to submit any additional credible evidence that could help establish their claim.

*Comment:* One commenter wrote that they were concerned about the statement in the Preamble to the 2016 IFR that a victim can submit any credible evidence from any reliable source that shows the purpose for which the victim was recruited, transported, harbored, provided, or obtained. *See* 81 FR 92272. That commenter requested that DHS clarify that reliable sources could include not only direct evidence, but also circumstantial evidence as well as the victim's own statement. The commenter asked that DHS assess the purpose or motivation of the trafficker in the same way it assesses the motive of a persecutor in asylum cases.

*Response:* DHS declines to specify in the regulation that circumstantial evidence and the applicant's affidavit can be submitted to establish the trafficker's purpose or motive. The evidentiary standards that DHS applies to all T nonimmigrant status eligibility requirements are based on an understanding that victims of severe forms of trafficking in persons often

have difficulty acquiring evidence and that the best available evidence may include circumstantial evidence. But, as noted above, under the regulations an applicant's affidavit may be sufficient if it is sufficiently detailed, plausible, and consistent in order to satisfy evidentiary requirements. DHS declines to adopt asylum standards, as trafficking and asylum are distinct and involve unique forms of relief.

**J. Physical Presence** [21]

**1. Applicability of Physical Presence Requirement**

*Comment:* One commenter requested DHS replace the language in 8 CFR 214.11(g)(1) (redesignated here as 8 CFR 214.207(a)) that reads "The requirement reaches an alien who" with "An applicant must demonstrate one of the following requirements." The commenter stated the wording was confusing for applicants and practitioners.

*Response:* DHS agrees that the language in 8 CFR 214.11(g)(1) caused confusion. DHS revised this section (new 8 CFR 214.207) to make it active tense and clarified the applicability of the physical presence standard, such that it reads: "An applicant must demonstrate that they are physically present under one of the following grounds............."

**2. Passage of Time Between Trafficking and Filing the T Visa**

*Comment:* Commenters stated that DHS has imposed a *de facto* deadline for physical presence, leading adjudicators to erroneously conclude that the mere passage of time signifies that an individual's physical presence in the United States is unrelated to their trafficking. The commenters claim this excludes many bona fide victims, who may file for T nonimmigrant status long after their trafficking. Commenters also recommended DHS explicitly consider when a survivor learned of their status as a victim of trafficking, by modifying § 214.11(g)(4) (redesignated here as 8 CFR 214.207(c)).

*Response:* DHS acknowledges the commenters' concerns and has clarified in the text of multiple provisions of the regulation that physical presence may be established regardless of the length of time that has passed between the trafficking and filing of the application. For example, DHS has clarified that under 8 CFR 214.207(a)(2) and (3), the applicant may satisfy the physical

---

[19] U.S. Immigr. & Customs Enforcement, U.S. Dep't of Homeland Security, "ICE Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims" (2021), *https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf* (ICE Directive).

[20] *Id.*

[21] DHS also received comments regarding physical presence and law enforcement involvement, which are addressed above in Section D, Definitions.

presence requirement if they were liberated from a severe form of trafficking in persons by an LEA at any time prior to filing their T visa application. This is intended to clarify that there is no *de facto* deadline for filing. DHS has also already clarified its interpretation via policy guidance, consistent with the legislative intent behind the program.[22] In addition, under 8 CFR 214.207(a)(4), DHS has added that the current presence may be directly related, "regardless of the length of time that has passed between the trafficking and filing" of the applicant's T visa application.

DHS acknowledges that survivors of trafficking experience serious consequences because of their victimization that can delay filing, including lack of access to legal representation, trauma, lack of support, and even lack of knowledge that they are a victim of trafficking. DHS emphasizes that the passage of time alone does not negate an applicant's ability to establish physical presence on account of the trafficking. In addition, DHS has clarified in the regulation that when analyzing physical presence, it will consider when and how an applicant learned that they were a victim of human trafficking.[23] DHS acknowledges that many survivors may delay filing for legitimate reasons; however, the applicant still bears the burden of establishing that their current presence in the United States is on account of trafficking.

### 3. LEA Liberation and LEA Involvement

*Comment:* Many commenters requested DHS remove 8 CFR 214.11(g)(1)(ii) and (iii) (redesignated here as 8 CFR 214.207(a)(2) and (3)) because there has been no guidance clarifying the practical distinction between these provisions versus paragraph (g)(1)(iv) (redesignated here as 8 CFR 214.207(a)(5)), and adjudicators have required applicants claiming physical presence under paragraph (g)(1)(ii) or (iii) to also demonstrate their continuing physical presence.

*Response:* DHS declines to remove the language at new 8 CFR 214.207(a)(2) and (3), as these provisions are important ways applicants can establish

their physical presence. DHS acknowledges there has been confusion surrounding these provisions. To establish physical presence under new 8 CFR 214.207(a)(2), an individual must demonstrate that law enforcement assisted in liberating them from their trafficking situation. To satisfy physical presence under new 8 CFR 214.207(a)(3), an individual must demonstrate that law enforcement became actively involved in detecting, investigating, or prosecuting the acts of trafficking. To establish physical presence under new 8 CFR 214.207(a)(5), regardless of where the trafficking occurred, an individual must establish that they have been allowed entry into the United States for the purpose of participating in the detection, investigation, prosecution, or judicial processes associated with an act or perpetrator of trafficking. DHS has retained these provisions as additional means by which an applicant can establish physical presence; however, as discussed above, DHS has updated these sections to clarify that physical presence can be satisfied if the LEA liberated the applicant from the trafficking situation or was involved in detecting, investigating, or prosecuting the acts of trafficking the case at any point prior to the application process.

### 4. Presumption of Physical Presence

*Comment:* Several commenters urged DHS to adopt a broader interpretation of "physical presence on account of trafficking" such that a presumption of physical presence could apply in various scenarios, including physical presence at the time of filing.

*Response:* DHS appreciates the commenters' concerns but declines to codify any generalized presumptions of physical presence in the regulations. The applicant bears the burden of establishing that they satisfy each eligibility criteria for T nonimmigrant status, including physical presence on account of trafficking at the time of filing and adjudication. Each application for T nonimmigrant status will be evaluated on its own merits. Although DHS declines to formally codify any presumptions of physical presence, DHS has clarified how physical presence may be satisfied, consistent with many of the commenters' requests. For example, the regulations have expanded the evidence applicants may submit to establish physical presence or overcome the effect of a prior departure. DHS notes that generally, where the applicant provides evidence that they are receiving services in the United States as a trafficking victim or pursuing civil, administrative,

or criminal remedies because of the trafficking, this will be considered favorably in the physical presence assessment. Because DHS cannot enumerate all circumstances under which an applicant may satisfy physical presence, DHS declines to codify any presumption.

### 5. Continuing Presence and Nexus to Trafficking

*Comment:* Many commenters suggested revising 8 CFR 214.11(g)(1)(iv) (redesignated here as 8 CFR 214.207(a)(4)) to refer to "current presence" rather than "continuing presence." One commenter stated that DHS ignores, discounts, or improperly analyzes the impacts of trafficking victimization in analyzing continuing presence. The commenter recommended DHS provide a non-exhaustive list of factors that USCIS will consider in determining whether an applicant has demonstrated continuing presence.

*Response:* DHS agrees that the "continuing presence" terminology at 8 CFR 214.11(g)(1)(iv) has caused confusion for adjudicators and stakeholders. DHS has replaced the phrase with "current presence." This change is intended to clarify that the focus of the evaluation is on the applicant's presence at the time of filing and adjudication, rather than their presence prior to that time. *See* new 8 CFR 214.207(a)(4). DHS has also revised the regulation to include a non-exhaustive list of factors USCIS will consider in analyzing the physical presence requirement, at redesignated 8 CFR 214.207(c) (discussed further below). These updates clarify expectations regarding timeline requirements and bring this provision into present tense.

*Commenter:* One commenter requested the rule clarify that for an applicant's continuing presence in the United States to be directly related to their original trafficking, it is sufficient that if the applicant were to depart the United States, they would suffer hardship as a result of circumstances caused by their trafficking, regardless of whether such hardship constitutes extreme hardship. The commenter also requested the rule clarify that whether the applicant's continuing presence in the United States is directly related to their original trafficking, and whether the applicant would suffer extreme hardship upon removal are separate requirements that may be supported by the same evidence.

*Response:* DHS declines to adopt this recommendation. Physical presence is a current assessment of an applicant's experience, whereas extreme hardship

---

[22] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 2, Eligibility Requirements," *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-2* (stating that an individual may satisfy the physical presence requirement regardless of the time that has passed since liberation from the initial trafficking and filing the T visa application) (last updated Oct. 20, 2021).

[23] *See* new 8 CFR 214.207(c)(1)(i).

is a prospective assessment of hardship the applicant may face. Although DHS acknowledges that the same evidence may be presented to satisfy multiple eligibility requirements, an applicant must explain how the evidence satisfies each eligibility requirement. The applicant bears the burden of establishing each eligibility requirement and clearly explaining how the evidence presented addresses each eligibility criteria.

*Comment:* Another commenter stated that if DHS retains the requirement that certain victims demonstrate that their continuing presence is directly related to trafficking, the rule should provide explicit guidance as to what sort of nexus is and is not required to meet this test. Another commenter indicated that USCIS practice suggests that if a survivor becomes stable at any point after their trafficking victimization, they are no longer present in the United States on account of their trafficking. The commenter emphasized that progress in a victim's life does not negate the ongoing impact of the trafficking victimization.

*Response:* DHS has revised the regulations to include a more expansive list of scenarios that can establish physical presence on account of trafficking. DHS has also provided significant guidance for adjudicators in its Policy Manual on analyzing whether an applicant's ongoing presence is directly related to their trafficking.[24] The Policy Manual provides that if the applicant has repeatedly traveled outside the United States since the trafficking, and their departures are not the result of continued victimization; or the applicant lacks continued ties to the United States or has established an intent to abandon life in the United States; this may support a finding that their current presence is not directly connected to the original trafficking. On the other hand, developments in an applicant's life following the trafficking do not prevent an applicant from establishing ongoing presence on account of trafficking. An applicant may still demonstrate that their current presence in the United States is directly related to the initial victimization and should not be penalized for stabilizing themselves following their victimization.

USCIS will assess the specific impacts of trafficking on the applicant's life at the time of application. The applicant

[24] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 2, Eligibility Requirements," *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-2* (last updated Oct. 20, 2021).

may not establish eligibility if the evidence of the ongoing impact of trauma on the applicant's life does not sufficiently establish the connection between the trafficking and the applicant's presence in the United States at the time of filing.

**6. Effect of Departure or Removal**

*Comment:* Commenters asked DHS to eliminate the "departure from the United States" language at 8 CFR 214.11(g)(2) (redesignated here as 8 CFR 214.207(b)). Commenters indicated that the departure language prevents trafficking victims from obtaining benefits simply by virtue of their removal, even if they have a pending T application. They requested that DHS update the final rule to clarify that if an individual was in the United States on account of trafficking when they filed the application, subsequent departure or removal should not bar relief.

*Response:* DHS appreciates the concerns the commenters have raised but declines to eliminate the language describing the effect of departure or removal on physical presence. Instead, DHS has codified additional scenarios by which victims who have departed the United States following their victimization and subsequently re-entered may establish physical presence (including returning to the United States to pursue remedies against their trafficker or returning to seek treatment or services related to victimization they cannot obtain elsewhere). *See* new 8 CFR 214.207(b)(4) and (5). In addition, although DHS appreciates the sensitivities and unique impact removal has on applicants for T nonimmigrant status, T visa applicants must demonstrate physical presence in the United States pursuant to the statute.

*Comment:* Other commenters suggested that the rule should identify scenarios that may demonstrate that a victim's reentry to the United States is the "result of continued victimization" under § 214.11(g)(2)(i) (new 8 CFR 214.207(b)(1)) and would satisfy the physical presence requirement. The commenters proposed the following scenarios be included in the regulations: reentry into the United States (1) due to current fear of the traffickers in the victim's home country or last place of residence; (2) to seek treatment for victimization from trafficking which cannot be provided in the victim's home country or last place of residence; or (3) to pursue civil and criminal remedies against the traffickers in the victim's home country or last place of residence.

*Response:* DHS agrees with the second and third suggestions and has updated the regulations accordingly,

such that both suggestions are encompassed in the new language at 214.207(b)(3)–(5). DHS declines to adopt the first suggestion, as a reentry to the United States due to current fear of the traffickers in the victim's home country or last country of residence would already fall under the "continued victimization" scenario articulated in 8 CFR 214.11(g)(2) (redesignated 8 CFR 214.207(b)).

*Comment:* One commenter requested that if DHS did not remove the departure language from the regulation, it should substantially alter the language found in 8 CFR 214.11(g)(2) (redesignated 8 CFR 214.207(b)), such that the regulation: acknowledges the possibility that a trafficker may have played a role in the survivor's departure from the United States; clarifies that a new incident of trafficking or new attempted incident of trafficking is not required; makes explicit that reentry related to fear of retaliation or re-victimization by the traffickers allows an applicant to meet this requirement; and clarifies that applicants may meet this requirement if, after their return to the United States, regardless of the exact motivation of the reentry, they are actively cooperating with an investigation or prosecution of trafficking.

*Response:* DHS has clarified how an applicant may establish physical presence after departure from and reentry to the United States by adding additional scenarios that can allow an applicant who has departed and returned to establish physical presence at 8 CFR 214.207(b)(4) and (5). These new provisions aim to provide clarity and reduce barriers for victims. Under new 8 CFR 214.207(b)(4), an applicant may establish physical presence after departure if their current presence in the United States "is on account of their past or current participation in investigative or judicial processes associated with an act or perpetrator of trafficking, regardless of where such trafficking occurred." An applicant may satisfy this provision "regardless of the length of time that has passed between their participation in an investigative or judicial process associated with an act or perpetrator of trafficking" and the filing of their application for T nonimmigrant status. *See* new 8 CFR 214.207(b)(4). These new provisions allow individuals who have participated in investigative or judicial processes to establish physical presence following a prior departure, regardless of their manner of entry or where such trafficking occurred. Under new 8 CFR 214.207(b)(5), an applicant may establish physical presence following a

previous departure if they returned to the United States and received treatment or services related to their victimization that cannot be provided in their home country or last place of residence. These additions support the dual purpose of the T visa, acknowledge there may be various reasons an individual may depart the United States, are consistent with a victim-centered approach to combatting trafficking, and do not require an individual to be revictimized to establish physical presence following a departure.

### 7. Trafficking That Occurs Outside the United States, and Traveling Outside the United States Following Victimization

*Comment:* Various commenters wrote that DHS interprets the physical presence requirement too narrowly for victims whose trafficking occurred outside the United States or who traveled outside of the United States after suffering trafficking. They stated that trafficking victims may be present in the United States on account of trafficking in various situations, including those in which they were trafficked in a neighboring country that failed to protect them before fleeing to the United States for protection. Some commenters stated that Congress did not specifically require that the trafficking occur in the United States or have violated U.S. law to qualify for the T visa. One commenter wrote that presence in the United States at the time of filing the application for T nonimmigrant status should be sufficient to meet the requirement, regardless of where the trafficking occurred or the circumstances of the applicant's reentry. Commentors also encouraged DHS to ensure definitions and interpretations acknowledge the global nature of trafficking, such as international child pornography rings and international sex trafficking rings, often with perpetrators based in the United States even if the trafficking occurred abroad.

*Response:* First, DHS acknowledges that trafficking may have a global nature and include a nexus to the United States even if the trafficking occurred abroad; however, DHS declines to interpret the TVPA to encompass trafficking situations in which a trafficking victim seeks protection in the United States for a trafficking situation that occurred fully outside U.S. borders and for which there is no nexus to the United States—either through presence at a United States port of entry on account of the trafficking or cooperation with U.S. law enforcement.

Congress created T nonimmigrant status with a dual purpose: to protect victims of a severe form of trafficking in persons and to encourage and facilitate assistance to U.S. law enforcement to prosecute and combat human trafficking. *See generally,* TVPA section 102, 22 U.S.C. 7101. Congress provided an incentive for victims of a severe form of trafficking in persons to report their victimization by providing for an immigration benefit contingent upon complying with reasonable requests for assistance to LEAs. *Id.;* new 8 CFR 214.202(c). If DHS adopted the commenters' suggested interpretation of the physical presence requirement, victims who were trafficked anywhere in the world could seek T nonimmigrant status in the United States, although a U.S. law enforcement agency would not necessarily have jurisdiction to investigate or prosecute the trafficking. This result would not be consistent with the dual purposes for which Congress created T nonimmigrant status.

DHS appreciates the difficult circumstances facing victims trafficked outside of the United States, particularly when an applicant is unable to find protection elsewhere; however, DHS does not believe that Congress intended to offer protection in the form of T nonimmigrant status in the United States to victims who suffer trafficking in other countries, who flee to the United States for protection, and whose trafficking has no nexus to the United States. DHS acknowledges, however, there may be situations in which trafficking could have occurred abroad that would make an applicant eligible for T nonimmigrant status; as indicated in the Policy Manual, applicants whose trafficking ended outside of the United States may be able to satisfy physical presence if they can demonstrate that they are now in the United States or at a port of entry on account of trafficking or were allowed valid entry into the United States to participate in a trafficking-related investigation or a prosecution or other judicial process. Cases where trafficking occurred abroad require an individualized and nuanced consideration. Consistent with this interpretation, DHS has amended 8 CFR 214.11(g)(1)(v) (redesignated 8 CFR 214.207(a)(5)) to indicate that an applicant may be deemed physically present under this provision regardless of where such trafficking occurred. *See* new 8 CFR 214.207(a)(5)(i). DHS has consolidated the language at 8 CFR 214.11(g)(3) at new 8 CFR 214.207(a)(5)(ii) and (b)(3) to instruct applicants how they may demonstrate physical presence, by showing

documentation of valid entry into the United States for purposes of an investigative or judicial process associated with an act or perpetrator of trafficking.

*Comment:* Another commenter requested that DHS address situations where trafficking occurred abroad, but the applicant can satisfy physical presence because the trafficking is directly the result of U.S. immigration policy.

*Response:* DHS emphasizes that applicants who are physically present in the United States or at a port of entry on account of trafficking can demonstrate eligibility for T nonimmigrant status even if the trafficking occurred abroad; however, the requirement that an applicant be physically present in the United States or at a port of entry is a statutory requirement that cannot be waived. Eligibility may be established where there exists a nexus between the trafficking and presence in the United States.

### 8. Opportunity To Depart

*Comment:* Commenters also requested DHS strike the reference to the "applicant's ability to leave the United States" at 8 CFR 214.11(g)(4) because such evidence is unnecessary, and DHS had already removed the requirement for an applicant to prove they had no "opportunity to depart" the United States. Another commenter indicated that DHS imposes a de facto "opportunity to depart" requirement.

*Response:* DHS agrees that striking the "ability to leave" language is consistent with the prior removal of the "opportunity to depart" language and has revised the regulation accordingly. DHS clarifies that an applicant need not show they had no opportunity to depart the United States to establish physical presence.

### 9. Presence for Participation in Investigative or Judicial Process

*Comment:* Commenters stated that DHS incorrectly interprets the language in 8 CFR 214.11(g)(3), redesignated as § 214.207(a)(5)(ii) and (b)(3) to require a victim's entry through lawful means. *See* 81 FR 92274. The commenters claim the statute does not indicate that only lawful reentries or those arranged by the government can be used to demonstrate physical presence. The commenters noted that the regulations are not structured to include non-criminal processes, and it is likely that LEAs will not be involved in such proceedings, making it unlikely that a victim would be able to enter the United States through lawful means. The commenters

also stated that it would be unlikely for a victim to have a visa authorized for the purpose of pursuing civil remedies.

*Response:* DHS maintains that the current interpretation requiring a lawful entry to establish physical presence based on "having been allowed entry into the United States for participation in investigative or judicial processes associated with an act or a perpetrator of trafficking," remains the best legal reading of the statutory language added by TVPRA 2008, as explained in detail in the 2016 IFR preamble. Where the regulatory provisions focus on the purpose of the entry, for example at 8 CFR 214.11(g)(2)(iii) (new 8 CFR 214.207(b)(3)), the statutory authority comes from the "allowed entry" language found in section 101(a)(15)(T)(i)(II) of the INA, 8 U.S.C. 1101(a)(15)(T)(i)(II), which includes physical presence on account of an individual "having been allowed entry." DHS therefore is retaining the provisions as drafted, striking 8 CFR 214.11(g)(3), and moving the language to new 8 CFR 214.207(a)(5)(ii) and (b)(3). However, having been allowed entry to participate in investigative or judicial processes is just one example of how an individual can establish they are physically present on account of trafficking, and DHS acknowledges that the requirement of a lawful reentry in 8 CFR 214.11(g)(3) has had unintentional limitations, such that victims of trafficking who departed the United States and reentered unlawfully, but are present in order to participate in an investigative or judicial process associated with the trafficking, were unable to establish eligibility due to their manner of reentry. DHS believes it is consistent with Congressional intent to recognize that such victims may be able to establish that they are physically present on account of trafficking, regardless of the manner of reentry or the time that has passed between cooperation and filing of the T visa application. Accordingly, DHS has added new 8 CFR 214.207(b)(4), which focuses on the reason for the victim's current presence rather than the purpose or means of their entry. DHS maintains that "allowed entry" as used in section 101(a)(15)(T)(i)(II) of the INA, 8 U.S.C. 1101(a)(15)(T)(i)(II), signifies a "lawful entry" for purposes of initial entry and reentry after departure.

*Comment:* Another commenter requested that DHS revise the language in 8 CFR 214.11(g)(3) (consolidated into 8 CFR 214.207(a)(5)(ii) and (b)(3)) to include civil or administrative investigations, prosecutions, or judicial processes associated with acts or perpetrators of trafficking.

*Response:* DHS declines to make this edit, as the new language at 8 CFR 214.207(b)(5) encompasses these processes. "Investigative or judicial processes" covers all the suggested language from the commenter, and includes criminal, civil, administrative, or other investigations, prosecutions, or judicial processes.

**10. Evidence To Establish Physical Presence**

*Comment:* One commenter requested that in determining whether trafficking survivors are present on account of trafficking, DHS should consider the ability or inability of survivors to access legal and social services after escaping a trafficker.

*Response:* DHS emphasizes that adjudicators consider all evidence presented, including the applicant's ability to access services following victimization. DHS has made several clarifications and amendments to redesignated 8 CFR 214.207(c) to address this concern; however, DHS cannot specifically agree to such a broad request to acknowledge consideration of an applicant's inability to access services if this information is not presented via evidence relevant to a particular case.

*Commenter:* Another commenter proposed significant revisions to 8 CFR 214.11(g)(4) (redesignated as 8 CFR 214.207(c)). The commenter stated that Requests for Evidence appear to require mental health diagnoses, which places survivors in rural areas at great disadvantage; and current emphasis on law enforcement evidence reinforces that evidence from law enforcement is considered primary evidence and encourages misinterpretation that there is a statute of limitations to file for a T visa.

*Response:* DHS has updated the evidentiary requirements for how applicants may establish that they are physically present in the United States on account of trafficking in redesignated 8 CFR 214.207(c). The amended section codifies a non-exhaustive list of evidence with the intent of providing clarity to stakeholders and adjudicators around evidentiary expectations. DHS acknowledges that the prior regulation may have inadvertently created confusion surrounding what types of evidence are preferred, rather than underscoring that any credible evidence will be considered in determining whether an applicant has established physical presence in the United States on account of trafficking. Although the list at 8 CFR 214.207(c) has been significantly expanded, DHS again emphasizes that there is no preferred or

required type of evidence, and victims may be more likely to have access to certain types of evidence.

*K. Compliance With Any Reasonable Request for Assistance*

**1. Requirement To Comply With Reasonable Request**

*Comment:* One commenter requested DHS rephrase, reconsider, or remove the requirement that an applicant for a T visa cooperate with law enforcement, particularly because of safety considerations for relatives abroad and continued victimization. The commenter also stated that LEAs deport individuals who refuse to cooperate.

*Response:* DHS declines to adopt this recommendation. Although DHS is sympathetic to these concerns, the statute requires compliance with a reasonable request for assistance in order to be eligible to receive T nonimmigrant status. DHS notes that there is a trauma exception and an age exemption to this eligibility requirement to account for circumstances that may impact an applicant's ability to comply with reasonable requests for assistance. In addition, as discussed above, DHS endeavors not to remove trafficking victims and applicants for T nonimmigrant status outside of exigent circumstances.[25] Moreover, as discussed further below, the statute and regulations provide eligibility for T nonimmigrant status to family members facing a present danger of retaliation as a result of the principal T nonimmigrant's escape from the severe form of trafficking or cooperation with law enforcement. *See* 8 CFR 214.211; INA sec. 101(a)(15)(T)(ii)(III), 8 U.S.C. 1101(a)(15)(T)(ii)(III).

**2. Incompetence and Incapacity**

*Comment:* Commenters requested DHS expand the exceptions for compliance with a reasonable request for assistance, including lack of capacity/competency found in the U visa regulations. The commenters proposed including the same exception for individuals lacking capacity or competency even if it is not linked to the trafficking because it often prevents the trafficking because it often prevents

---

[25] The White House, "The National Action Plan to Combat Human Trafficking," (2021) *https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf* (National Action Plan); U.S. Dep't of Homeland Security, "Department of Homeland Security Strategy to Combat Human Trafficking, the Importation of Goods Produced with Forced Labor, and Child Sexual Exploitation" (Jan. 2020), *https://www.dhs.gov/sites/default/files/publications/20_0115_plcy_human-trafficking-forced-labor-child-exploit-strategy.pdf* (DHS Strategy); "ICE Directive 11005.3," *https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf.*

victims from complying with reasonable requests from law enforcement.

*Response:* DHS appreciates and shares these concerns about individuals who lack capacity or competency; however, the age exemption and trauma exception are both statutory. There is no statutory authority for an incapacity or incompetence exemption or exception. Instead, DHS has included consideration of an individual's capacity, competency, or lack thereof as factors to be considered when determining whether a request was reasonable. Moreover, the existing age exemption and trauma exception cover incapacity or incompetence due to age or trauma suffered. The existing exemption and exception, coupled with DHS's addition of capacity/competency as a factor to consider will have the same intended effect as a specific exception for incapacity and incompetency.

### 3. Minimum Contact With Law Enforcement

To meet the requirement that an applicant comply with reasonable LEA requests for assistance, 8 CFR 214.11(h)(1) (redesignated 8 CFR 214.208(b)) mandates that an applicant, at a minimum, has contacted an LEA regarding an act of a severe form of trafficking in persons, unless an exemption or exception applies.

*Comment:* One commenter requested DHS clarify that an applicant under 18 years of age who reports the trafficking to the National Human Trafficking Hotline or Office of Trafficking in Persons meets the requirement that the person report to LEAs and comply with reasonable requests, including if they make an anonymous report.

*Response:* DHS emphasizes that applicants who are under the age of 18 at the time of victimization are, by statute, exempt from the requirement to cooperate with any reasonable requests for assistance from law enforcement. Additionally, reports to the National Human Trafficking Hotline or the Office of Trafficking in Persons would generally satisfy the reporting requirement, if the person making the report requested or provided permission for the report to be referred to law enforcement; however, anonymous reports generally do not satisfy the requirement, as they do not meet the required evidentiary standard of proof.

*Comment:* Some commenters supported DHS' removal of regulatory provisions describing how to obtain an LEA declaration when the victim has not had contact with an LEA. *See* 81 FR 92276. Commenters stated that adjudicators apply inconsistent

standards as to what type of contact with an LEA is sufficient. They wrote that some applicants have documented in their T visa applications that they reported to law enforcement, but received no LEA response, and then received RFEs requesting additional documentation of law enforcement contact including a Supplement B or proof of Continued Presence. The commenters recommended that DHS amend 8 CFR 214.11(h)(1) (redesignated 8 CFR 214.208(b)) to provide that a single contact with law enforcement by telephone or electronic means documented by the applicant is sufficient to meet the eligibility requirement. They also recommended that in this same section, DHS repeat aspects of the definition of an LEA to speed responses to RFEs, clarify the minimum amount of LEA contact required, and clarify that it is not necessary that law enforcement respond to the contact. Commenters also requested DHS explicitly clarify in the regulations that participation in civil, family, juvenile, criminal, administrative or any type of court proceedings involving human trafficking or where the victim reveals facts of the trafficking to the court meets the ''contact with an LEA'' requirement.

*Response:* DHS agrees to adopt this recommendation regarding clarifying what constitutes minimum conduct and has revised the regulation to state that a single contact through telephonic, electronic, or other means may suffice. The means of contact can vary depending on the agency and the facts of the case. Applicants may document whether the LEA responded, and the type of response received. DHS encourages applicants to document all interactions they have had with law enforcement. DHS also clarified that the LEA to which the applicant reports must have jurisdiction over the reported crime. DHS emphasizes that there is no requirement that an individual provide a Supplement B or evidence of a Continued Presence grant, that an investigation or prosecution has been initiated, or that law enforcement respond to the applicant. While an investigation or prosecution is not necessary, the LEA's response to the report of trafficking is helpful to understand LEA involvement in the criminal case and determine whether the applicant meets the requirement to comply with any reasonable LEA requests. DHS does not consider it necessary to repeat the definition of an LEA or to specify every type of contact or the context of that contact that would suffice, given that redesignated 8 CFR

214.201 (defining an LEA) clearly specifies the types of agencies that qualify as LEAs.

### 4. Determining the Reasonableness of a Request

*Comment:* Multiple commenters suggested eliminating language in 8 CFR 214.11(a) (redesignated here as 8 CFR 214.201) and 8 CFR 214.11(h)(2) (redesignated as 8 CFR 214.208(c)) referencing the presence of an attorney. The commenters stated that the presence of an attorney should not be evaluated as a factor in whether an LEA request was reasonable and doing so may lead to victims with an attorney being held to higher standards in complying with LEA requests than those without an attorney present. The commenters wrote that the presence of an attorney does not make the law enforcement request more or less reasonable.

*Response:* DHS declines to adopt this recommendation. Whether an attorney was present during an LEA request is just one of the potentially many factors that DHS considers in examining the totality of the circumstances. Applicants may feel pressured to comply with an LEA request in the absence of an attorney, so DHS believes that it is appropriate to include it as a relevant factor. Furthermore, including an attorney's presence as a factor does not create a higher standard for victims who have attorneys present when requests are made, nor does it put such victims at a relative disadvantage. The presence or absence of an attorney generally will not be dispositive, but is a relevant factor in determining the reasonableness of a request, and will be analyzed on a case-by-case basis.

*Comment:* Several commenters requested that a ''qualified interpreter'' be added into 8 CFR 214.11(h)(2) (redesignated as 8 CFR 214.208(c)), as language access during LEA interactions is critical to victim protections and is legally required by the Civil Rights Act.

*Response:* DHS agrees that language access during such interaction is important for victims and has updated the language at new 8 CFR 214.208(c)(11) accordingly.

*Comment:* Commenters requested DHS add additional factors in determining the reasonableness of a request, including: the circumstances in which a request was made, the ability and health of an applicant, and the nature of trauma suffered. Commenters stated it was critical to understand the context in which requests are made of victims, as well as the circumstances of the victims themselves. The commenters also requested striking ''severe'' from

''severe trauma'' at 8 CFR 214.11(h)(2) (redesignated as § 214.208(c)) because all trauma should be considered.

*Response:* DHS generally agrees with these comments and has amended the list of factors to consider, by adding the victim's capacity, competency, or lack thereof; removing ''severity'' of trauma; adding ''qualified'' to interpreters; adding the ''health'' of the victim; and adding ''any other relevant circumstances surrounding the request.'' *See* new 8 CFR 214.208(c). DHS believes that these clarifying changes will improve determinations of the applicant's compliance with a reasonable LEA request.

5. Trauma Exception

*Comment:* Several commenters expressed support for provisions clarifying the types of supporting evidence that applicants can submit to establish that they meet the trauma exception from the general eligibility requirement of compliance with any reasonable LEA request for assistance in 8 CFR 214.11(h)(4)(i) (redesignated here as 8 CFR 214.208(e)(1)). Commenters suggested DHS consider the circumstances of the victim while they were being victimized and the surrounding circumstances, which may have exacerbated the trauma. They also recommended including additional examples of types of evidence that could be submitted to establish that an applicant meets the trauma exception.

*Response:* DHS has revised the regulations to include additional examples of evidence that may be submitted to establish the applicant qualifies for the trauma exception, to benefit adjudicators and applicants, give applicants additional information, and allow for consistency in adjudications. The updated provision clarifies that an applicant's statement should explain the circumstances surrounding the trauma and includes additional types of credible evidence that may be submitted. *See* 8 CFR 214.208(e)(1).

*Comment:* One commenter recommended DHS define what constitutes physical or psychological trauma to help applicants determine what evidence to submit when claiming the exception.

*Response:* DHS declines to include a definition of trauma in the regulatory text, as it could have the unintended effect of restricting access to benefits for victims.

*Comment:* One commenter stated that requiring an applicant to prove trauma to qualify for the exception risks re-traumatization, and that implicit in the definition of trafficking is some element of trauma. The commenter stated that

requiring survivors to retell their experiences could hinder healing, and this could be mitigated by mandating a signed attestation to the psychological trauma from a qualified individual. The commenter stated that not requiring an applicant's affidavit would reduce the risk of re-traumatization.

*Response:* DHS declines to adopt this recommendation. DHS is sympathetic to the risks of re-traumatization for survivors of trafficking, but the trauma exception is statutory. The personal statement is and will continue to be initial required evidence because it is one of the most important sources of information for adjudicators in determining whether an individual meets the eligibility requirements for T nonimmigrant status. The personal statement also allows an applicant to provide credible evidence of their experiences in their own words, without requiring them to provide other evidence that may be more difficult to obtain. In addition, adjudicators consider the impact of trauma and victimization when evaluating the personal statement.[26] DHS declines to mandate a signed attestation from a medical or other qualified professional, as this would be inconsistent with the ''any credible evidence'' standard and would create a limitation on types of evidence that may be submitted under this standard.

6. DHS Contact With Law Enforcement

*Comment:* Several commenters requested that DHS amend 8 CFR 214.11(h)(4)(i) (redesignated here as 8 CFR 214.208(e)(1)) to provide that, in cases where an applicant has invoked the trauma exception and is unable to comply with reasonable LEA requests, USCIS will only contact an LEA if the applicant has already had initial contact. These commenters stated that maintaining this provision might discourage applicants who fear that USCIS' discretion to contact an LEA could potentially endanger applicants or their family members. Multiple commenters also requested clarification to ensure adjudicators understand that applicants who qualify for the exception are not required to have any contact with any LEA.

*Response:* DHS appreciates the sensitivities of applicants who are seeking an exception due to trauma and acknowledges that individuals who

qualify for the trauma exception are not required to have had contact with any LEA. However, DHS feels it is important to retain the authority to contact law enforcement agencies for any information that may be necessary to adjudicate an application, in certain limited circumstances, even where an applicant has not already contacted an LEA. This is especially true for T nonimmigrant status, which requires cooperation with law enforcement unless the trauma exception or age exemption applies. *See* 8 CFR 214.208. DHS has stricken the reference to contacting law enforcement in relation to the trauma exception and has created a new section at 8 CFR 214.208(f) indicating that USCIS reserves the authority and discretion to contact an LEA involved in a case where an applicant previously contacted an LEA or when otherwise permitted by law. *See, e.g.,* 8 U.S.C. 1367.

7. Age Exemption

*Comment:* Several commenters commended DHS for updating its regulations to reflect the statutory provision that minors under 18 years of age are not required to comply with any reasonable law enforcement requests. *See* INA sec. 101(a)(15)(T)(i)(III). Multiple commenters requested that DHS clarify its interpretation of the exemption by amending 8 CFR 214.11(h)(4)(ii) (redesignated here as 8 CFR 214.208(e)(2)) to specify that the relevant age for determining whether this exemption is met is the age at the time of victimization, not the age at the time of application. Commenters stated this change is important because child trafficking victims in particular suffer long-term trauma that may limit their ability to cooperate with law enforcement and to confide in their attorneys. Additionally, commenters noted that attorneys may not identify applicants who suffered trafficking as a minor until after they have turned 18. One commenter requested that DHS consider increasing the age for the minor exemption. Another commenter stated there should be no requirement to comply with reasonable requests for assistance from law enforcement regardless of age, considering that brains are not fully developed until the age of 25. One commenter requested DHS clarify that any credible evidence related to a minor's age be included. The commenter indicated they work with many children who do not have access to birth certificates, passports, or certified medical opinions; whose documents have been withheld by their legal guardians; or do not know their

[26] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security ''Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 3, Documentation and Evidence for Principal Applicants,'' *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-3* (last updated Oct. 20, 2021).

own birthdates or exactly where they were born.

*Response:* DHS agrees that suffering human trafficking as a child can be particularly traumatizing and has significant and negative impacts on development. DHS has revised the regulation to clarify that the exemption for minors applies based on the age of the applicant at the time of victimization. An applicant is exempt from the requirement to comply with reasonable law enforcement requests if the applicant was under 18 years of age at the time at least one of the acts of trafficking occurred. This is consistent with longstanding DHS policy and practice. DHS declines to increase the age for the minor exemption above age 18, as this exemption is provided in the statute. Moreover, DHS declines to remove the requirement to comply with reasonable requests for assistance, as it is a statutory requirement, and individuals who were under the age of 18 at the time of at least one of the acts of trafficking or may not be able to comply with reasonable requests for assistance due to trauma qualify for an exemption or exception.

DHS also acknowledges that minors may have difficulty obtaining certain types of evidence to establish their age and has revised the regulation to emphasize that any other credible evidence regarding age will be considered.

### L. Extreme Hardship

*Comment:* One commenter requested DHS remove the extreme hardship requirement altogether. Another commenter wrote that the standard for "unusual and severe harm" in 8 CFR 214.11(i) (redesignated here as 8 CFR 214.209) for purposes of evaluating whether an applicant would suffer extreme hardship if removed from the United States is unnecessarily narrow and should include considerations of hardship inflicted on individuals other than the applicant. The commenter also recommended that DHS revise this section to take greater account of economic detriment and financial harm as factors in assessing hardship, particularly when those factors create a risk of re-victimization. The commenter requested DHS add language to 8 CFR 204.11(i) (redesignated here as 8 CFR 214.209) "indicating that current or economic detriment may be considered as one factor in assessing hardship, particularly when it creates a risk of re-victimization." Another commenter supported the broad list of factors that should be considered, but also requested to include financial and support issues, and encouraged DHS to

provide a greater list of possible, but not exhaustive factors to be considered.

*Response:* DHS declines to fully adopt these recommendations. DHS cannot remove the extreme hardship eligibility requirement, as it is required by statute. *See* INA sec. 101(a)(15)(T)(i)(IV), 8 U.S.C. 1101(a)(15)(T)(i)(IV) ("the alien would suffer extreme hardship involving unusual and severe harm upon removal"). The statute is clear that the extreme hardship eligibility requirement refers to hardship that the applicant would suffer and does not include hardship to anyone other than the applicant as a factor. *See* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T). Accordingly, USCIS will not consider hardship to family members unless the evidence demonstrates specific harms that the applicant will suffer upon removal as a result of hardship to a family member. DHS has amended redesignated 8 CFR 214.209(c)(2) to provide this clarification.

DHS has revised 8 CFR 214.209 to include economic harm as an extreme hardship factor. Economic harm has always been considered a factor; the prior regulation indicated that economic detriment alone could not be the sole basis for a finding of extreme hardship involving unusual and severe harm. Although the revised regulations do not bar economic hardship as the sole basis for such a finding, it must rise to the level of extreme hardship involving unusual and severe harm, and thus, generally, economic hardship alone may not suffice. However, adjudicators will consider the totality of the circumstances and all relevant factors in making an extreme hardship determination. Each case will require an analysis based on the specific facts and circumstances present.

*Comment:* One commenter requested that DHS clarify whether the hardship must be directly related to trafficking and that it does not need to rise to the level of extreme hardship.

*Response:* As discussed above, DHS has not removed the reference to extreme hardship in the regulation. DHS clarifies that an applicant's hardship does not need to be directly related to their trafficking. *See* 8 CFR 214.209.

### M. Family Members Facing a Present Danger of Retaliation

The regulations at 8 CFR 214.11(k) (redesignated here as 8 CFR 214.211) implement section 101(a)(15)(T)(ii)(III) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii)(III), to provide that T nonimmigrant status may be available for a parent, unmarried sibling under the age of 18, or the adult or minor child of a derivative of the principal facing a

present danger of retaliation as a result of the T–1 nonimmigrant's escape from the severe form of trafficking or cooperation with law enforcement. One commenter expressed support for allowing principal applicants under 21 years of age to apply for derivative T nonimmigrant status for unmarried siblings under 18 years and parents as eligible derivative family members.

*Comment:* Commenters requested that DHS mandate an expedited adjudication process for these applications, which would protect family members at risk and encourage victims of trafficking to report their victimization. Some commenters recommended a specific 30-day timeline.

*Response:* DHS shares the commenters' concerns about family members at risk; however, it declines to impose processing deadlines on itself given staffing resources and the case-by-case review required in adjudicating T visa applications. DHS notes that there is already a process in place to request expedited processing based on urgent humanitarian reasons. Guidance for requesting expedited processing can be found on the USCIS website.[27]

*Comment:* Commenters also wrote that section 101(a)(15)(T)(ii)(III) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii)(III), does not provide an opportunity to request T nonimmigrant status for a principal's adult children who face a present danger of retaliation. Some commenters indicated they understood that DHS had limited ability to address this statutory gap, while others stated that DHS could construe the statute more broadly to include these adult children but did not provide legal support for this assertion.

*Response:* DHS acknowledges that the statute omits a principal's adult children who face a present danger of retaliation. However, the statutory language is not ambiguous on this point and a change in the law to include a principal's adult children would be necessary to include adult children of a T–1 nonimmigrant as eligible family members. INA sec. 101(a)(15)(T)(ii)(III), 8 U.S.C. 1101(a)(15)(T)(ii)(III).

*Comment:* Commenters wrote that family members at risk of retaliation from traffickers have difficulty securing evidence listed in 8 CFR 214.11(k)(6) (redesignated here as 8 CFR 214.211(f)) to prove a present danger of retaliation. They requested that DHS indicate that a victim's statement describing the present danger of retaliation alone would be sufficient or, at a minimum,

---

[27] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "How to Make an Expedite Request," *https://www.uscis.gov/forms/filing-guidance/how-to-make-an-expedite-request* (last updated Oct. 20, 2022).

clarify that police reports filed in the home country and affidavits from witnesses in the home country would meet the evidentiary standard. Several commenters requested that DHS consider any credible evidence of the danger of retaliation.

*Response:* DHS appreciates the difficulties that trafficking victims and their family members may have in obtaining evidence. For this reason, the rule is clear that applicants may submit any credible evidence related to all the eligibility requirements for both principal applicants and derivative applicants. *See, e.g.,* 8 CFR 214.204(c) and (l). The standard also applies specifically to the evidentiary standard for proving that an eligible family member faces a present danger of retaliation. *See* 8 CFR 214.211(a)(3). In cases where the LEA has not investigated the trafficking, USCIS will evaluate any credible evidence demonstrating derivatives' present danger of retaliation. The types of evidence listed at 8 CFR 214.211(f) are non-exhaustive examples, and the inclusion of "and/or" at the end of the list before the inclusion of "any credible evidence" clarifies that USCIS will consider any credible evidence.

An applicant's personal statement alone could be sufficient to establish a present danger of retaliation, in accordance with the "any credible evidence" standard. *See* new 8 CFR 214.211(f). DHS has not specifically revised the rule to state that a statement describing the present danger of retaliation alone would be sufficient, as this is already permitted by the "any credible evidence" standard, and referencing one particular piece of evidence in the regulatory text could unintentionally discourage applicants from submitting additional relevant, credible evidence that would assist in the adjudication. DHS encourages applicants to submit additional credible evidence whenever possible to provide USCIS adjudicators with as complete an understanding of the facts of the case as possible.

The "any credible evidence" standard also encompasses evidence originating from a family member's home country; however, DHS has clarified that evidence may be from the United States or any country in which an eligible family member faces retaliation at new 8 CFR 214.211(f).

*Comment:* One commenter requested DHS revise the T–6 regulation to eliminate the policy of requiring that a derivative beneficiary of a T–1 nonimmigrant have already secured T nonimmigrant status before their adult or minor children facing present danger

of retaliation become eligible for T–6 status. They stated that DHS's interpretation of "derivative beneficiary" is overly narrow, that the interpretation that the term means someone who has "derived status" and "benefited" from the qualifying relationship has no basis, and that it is inconsistent with DHS's own use of the term "beneficiary" elsewhere.

*Response:* DHS appreciates the commenter's concerns; however, it maintains that its interpretation as presented in the 2014 Policy Memorandum [28] regarding T derivatives (T Derivative Memo) is the correct legal reading of the statute. The commenter's contention that a "derivative beneficiary" may include someone who merely "stands to benefit," but has not, at minimum, sought such a benefit, lacks statutory support. DHS maintains that the phrase "adult or minor children of a derivative beneficiary" plainly requires the T–6 family member to establish their eligibility through their relationship to the derivative beneficiary of the principal. A plain language reading of "derivative beneficiary" is someone who has *derived* a *benefit;* that is, an individual who has derived their nonimmigrant status as a family member, as defined at section 101(a)(15)(T)(ii) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii), and who has benefited from the qualifying relationship to the principal. As noted in the T Derivative Memo, this means that a "derivative beneficiary" is a family member described in section 101(a)(15)(T)(ii)(I) and (II) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii)(I) and (II), who has been granted derivative T nonimmigrant status. Accordingly, a "derivative beneficiary" must have been granted T–2, T–3, T–4, or T–5 nonimmigrant status through the principal in order for the derivative beneficiary's adult or minor child to be eligible for T–6 nonimmigrant status. This conclusion is further supported by the requirement under section 101(a)(15)(T)(ii) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii) that any derivatives be "accompanying, or following to join" the principal T–1 applicant.

As noted in the T Derivative Memo, Congress created the T–6 classification through a relationship to a derivative, instead of directly to a principal, as it is in other immigration benefits.

Therefore, establishing a qualifying relationship between the T–6 family member and their parent is insufficient to derive eligibility as a T–6, if the T–6's parent never held T nonimmigrant status as a T derivative beneficiary. To be eligible for T–6 classification, the adult or minor child must establish the qualifying relationship to their parent who actually derived T nonimmigrant status through the principal beneficiary. Accordingly, DHS declines to make any changes in response to this comment.

*N. Marriage of Principal After Principal Files Application for T Nonimmigrant Status*

The regulation at redesignated 8 CFR 214.211(g)(4) states that if an applicant marries after filing the application for T–1 nonimmigrant status, USCIS will not consider the spouse eligible for derivative T–2 nonimmigrant status.

*Comment:* Several commenters wrote that this limitation on eligible derivatives relies on an unnecessarily narrow interpretation of section 101(a)(15)(T)(ii) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii), by requiring that a spousal relationship exist at the time of filing. They suggested that the spouse from a marriage that occurs after the principal applicant applies for T–1 nonimmigrant status should be able to be considered as a T–2 derivative spouse.

*Response:* The U.S. Court of Appeals for the Ninth Circuit, in *Medina Tovar* v. *Zuchowski,* held that the regulatory requirement at 8 CFR 214.14(f)(4) that a spousal relationship must exist at the time a Petition for U Nonimmigrant Status is filed for the spouse to be eligible for classification as a derivative U–2 nonimmigrant was invalid.[29] As a matter of policy, DHS applies this decision nationwide to spousal and stepparent relationships arising in adjudications of derivative U nonimmigrant status petitions, as well as derivative T nonimmigrant status applications.[30] Accordingly, DHS has amended the regulations in the final rule to adopt the holding in *Medina Tovar* for T nonimmigrant adjudications and has stricken the following language: "If a T–1 marries subsequent to filing the application for T–1 status, USCIS will not consider the spouse eligible as a T–2 eligible family member." DHS has

---

[28] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "New T Nonimmigrant Derivative Category and T and U Nonimmigrant Adjustment of Status for Applicants from the Commonwealth of the Northern Mariana Islands" (2014), *https://www.uscis.gov/sites/default/files/document/memos/Interim_PM-602-0107.pdf* (T Derivative Memo).

[29] *Medina Tovar* v. *Zuchowski,* 982 F.3d 631 (9th Cir. 2020).

[30] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Volume 3, Humanitarian Protection and Parole, Part B, Victims of Trafficking, Chapter 4, Family Members, Section D, Family Relationship at the Time of Filing," *https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-4* (last updated Oct. 20, 2021).

added language that principal applicants who marry while their Application for T Nonimmigrant Status is pending may file an Application for Family Member of T–1 Recipient on behalf of their spouse, even if the relationship did not exist at the time they filed their principal application. *See* new 8 CFR 214.211(e). DHS has also included language allowing for a principal applicant to apply for a stepparent or stepchild if the qualifying relationship was created after they filed their principal application but before it was approved. Finally, DHS has clarified that it will evaluate whether the marriage creating the qualifying spousal relationship or stepchild and stepparent relationship exists at the time of adjudication of the principal's application and thereafter.

*Comment:* One commenter requested that principal applicants should be permitted to apply for derivative T status for the parent of the principal's derivative children, as many individuals may not formalize their committed relationships through marriage.

*Response:* Although DHS sympathizes with these situations, the family relationships giving rise to derivative T nonimmigrant status eligibility are set forth at section 101(a)(15)(T)(ii) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii). Thus, DHS declines to add a new standard for derivative benefits for a committed relationship in the T visa context.

*O. Relationship and Age-Out Protections*

DHS has amended new 8 CFR 214.211(e)(1) to state that if the principal applicant establishes that they have become a parent of a child after filing, the child will be deemed an eligible family member. This new language replaces "had a child" because it is more inclusive and accurate, and mirrors similar regulations in the U visa context.

DHS has also amended new 8 CFR 214.211(e)(3) to state that the age-out protections apply to a child who may turn 21 during the pendency of the principal's application for T nonimmigrant status. The prior text erroneously referred to age-out protections for children of principals who were 21 years of age or older.

*P. Travel Abroad*

*Comment:* Commenters encouraged DHS to provide advance parole for T nonimmigrants in recognition of the fact that victims' families may remain abroad. They wrote that victims would feel safer and be able to return to the United States without immigration consequences.

*Response:* DHS notes that T nonimmigrants are already permitted to apply for advance parole, as clarified in both the Form I–914 and Form I–131 form instructions and Policy Manual. Applications for advance parole are evaluated on a case-by-case basis pursuant to section 212(d)(5) of the INA, 8 U.S.C. 1182(d)(5). In addition, DHS has clarified that a noncitizen granted T–1 nonimmigrant status or an eligible family member must apply for advance parole to return to the United States after travel abroad. The T nonimmigrant must comply with advance parole requirements to maintain T nonimmigrant status upon return to the United States and remain eligible to adjust status under section 245(l) of the INA, 8 U.S.C. 1255(l). 8 CFR 245.23(j). *See* new 8 CFR 214.204(p), 214.211(i)(4).

*Q. Extension of Status*

DHS provides in this rule that a derivative T nonimmigrant may file for extension of status independently, if the T–1 nonimmigrant remains in status, or the T–1 nonimmigrant may file for an extension of their own status and request that the extension be applied to their derivative family members. This codifies the current process for derivatives to seek extensions of status. *See* new 8 CFR 214.212(b). In administering the T nonimmigrant program, USCIS found, and stakeholders expressed, that there was a lack of clarity with the extension of status process for T nonimmigrants. USCIS issued a Policy Memorandum in 2016 to clarify requirements for extension of status for T and U nonimmigrants (T/U Extension Memo).[31] DHS is codifying some of the policies in the T/U Extension Memo at new 8 CFR 214.212(f). First, this rule provides that USCIS may approve an extension of status for principal applicants based on exceptional circumstances. Second, when an approved eligible family member is awaiting initial issuance of a T visa by an embassy or a consulate and the principal's T–1 nonimmigrant status will soon expire, USCIS may approve an extension of status for a principal applicant based on exceptional circumstances. *See* new 8 CFR 214.212(f).

Finally, DHS has clarified in the evidence section for extension of status that it will consider affidavits from

individuals with direct knowledge of or familiarity with the applicant's circumstances, rather than affidavits of "witnesses." *See* new 8 CFR 214.212(g)(2)(v).

*R. Revocation Procedures*

DHS has clarified the existing practice that an automatic revocation cannot be appealed. *See* new 8 CFR 214.213(a). DHS has also clarified at § 214.213(c) that if an applicant appeals a (non-automatic) revocation, the decision will not become final until the appeal is decided. *See* 8 CFR 103.3. DHS has revised the language at new 8 CFR 214.213(b)(1) which previously referenced errors that affected the "outcome" and now refers to errors that led to an "approval" of a case.

*Comment:* Some commenters expressed concern that 8 CFR 214.11(m) (redesignated here as 8 CFR 214.213) eliminates a step in the process of revocation, stating that under the prior rule at 8 CFR 214.11(s)(2), a notice of intent to revoke (NOIR) would initiate a 30-day window for the applicant to submit a rebuttal that a district director would then consider as evidence. They proposed that the rule include this prior process and provide individuals with an opportunity of rebuttal.

*Response:* The removal of this language in the interim rule does not reflect a change in USCIS' revocation procedures. T nonimmigrants who are issued a NOIR are provided 30 days to respond with evidence to rebut the grounds stated for revocation in the notice. These grounds and the deadline to respond are stated in all NOIRs. USCIS will consider all evidence presented in deciding whether to revoke the approved application. The reference to the district director in the 2002 interim rule is outdated, as district offices are no longer involved in revoking T nonimmigrant status. DHS has codified the current procedures for NOIRs, including the time period during which an individual may submit rebuttal evidence at 8 CFR 214.213(c).

*S. Waivers of Inadmissibility*

DHS has the authority to waive grounds of inadmissibility on a discretionary basis under section 212(d)(3)(A)(ii) or (d)(13) of the INA, 8 U.S.C. 1182(d)(3)(A)(ii), (d)(13).

*Comment:* Commenters requested that DHS clarify in the regulation that immigration judges have jurisdiction over waiver applications, referencing recent court decisions in the U visa context.

*Response:* DHS declines to adopt this recommendation. In the 2002 interim rule, DOJ delegated T-related waiver authority exclusively to the Immigration

---

[31] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Extension of Status for T and U Nonimmigrants (Corrected and Reissued)" (2016), *https://www.uscis.gov/sites/default/files/document/memos/2016-1004-T-U-Extension-PM-602-0032-2.pdf* (T/U Extension Memo).

and Naturalization Service (INS), and INS's adjudicative authority transferred to USCIS with the Homeland Security Act.[32]

*Comment:* In cases involving violent or dangerous crimes, 8 CFR 212.16 specifies that USCIS will only exercise favorable discretion toward the applicant in extraordinary circumstances unless the criminal activities were caused by or were incident to the victimization. *See* 8 CFR 212.16(b)(3). Several commenters wrote that this provision is too stringent in its application. They stated that this language is not statutorily required, that victims of trafficking often have unfavorable criminal histories that are not directly tied to their victimization but are related to their vulnerability that led to their exploitation, and that this provision could have a chilling effect on victims coming forward to report crimes.

Other commenters encouraged DHS to require consideration of the effects and circumstances of the trafficking as they relate to criminal issues. They suggested DHS determine whether the crime occurred before the trafficking situation or is related to the trafficking, including trauma or vulnerabilities in the wake of trafficking. They requested DHS focus not on the seriousness or number of crimes and instead focus on a victim-centered approach using a balancing test.

*Response:* DHS declines these edits, while recognizing nuances in evaluating an applicant's criminal history and the potential for unique factors related to victimization. DHS believes that 8 CFR 212.16 appropriately informs the exercise of discretion and is fundamental to maintaining the integrity of the T nonimmigrant status program and the ability to adjudicate T visa applications on a case-by-case basis. DHS has broad waiver authority to waive most grounds of inadmissibility under section 212(d)(3)(A)(ii) and (d)(13) of the INA, 8 U.S.C. 1182(d)(3)(A)(ii), (d)(13) (if in the national interest for section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1), or if in the national interest and caused by or incident to the victimization for most other provisions of subsection 212(a) of the INA, 8 U.S.C. 1182(a) inadmissibility grounds). DHS reserves the ability to evaluate inadmissibility grounds in each individual case to ensure that the waiver is in the national interest and considers a broad variety of factors in doing so. Moreover, DHS already considers all positive and

negative factors in the exercise of discretion.

### T. Adjustment of Status

DHS has made several changes to the adjustment of status regulations for T nonimmigrants. DHS has stricken from 8 CFR 245.23(a)(3) the requirement that an applicant accrue 4 years in T–1 nonimmigrant status and file a complete application prior to April 13, 2009, as all such applications have been adjudicated.

In addition, DHS has removed the word "first" before "date of lawful admission" in 8 CFR 245.23(a)(4) to clarify the agency's interpretation of re-accrual of physical presence following a break in presence. This edit clarifies an outstanding legal and policy concern in the program and eliminates barriers for victims of trafficking. The statutes and regulations permit T nonimmigrants to restart the clock after a break in continuous physical presence after the first admission as a T nonimmigrant (including, but not limited to, restarting after a subsequent admission as a T nonimmigrant, or restarting after returning with advance parole after a break in continuous physical presence). This interpretation treats T nonimmigrant adjustment of status applicants and U nonimmigrant adjustment of status applicants the same regarding the requirements for continuous physical presence.

*Comment:* Commenters encouraged DHS to take a broader approach to adjustment of status eligibility, including allowing derivative family members to adjust independently of the T–1 nonimmigrant, and to evaluate each application on its own merits. One commenter recommended incorporating the policies outlined in the T/U Extension Memo, because it allowed derivatives to adjust independently of principals.

*Response:* Section 245(l) of the INA, 8 U.S.C. 1255(l), provides that if a T–1 nonimmigrant has been continuously physically present for three years since admission as a T–1 nonimmigrant (or during the investigation or prosecution of trafficking which is complete); establishes good moral character; and has complied with any reasonable request for assistance in the trafficking investigation or prosecution, would suffer extreme hardship involving unusual and severe harm upon removal, or was under age 18 at the time of victimization, the Secretary may adjust the status of the T–1 nonimmigrant and any person admitted under section 101(a)(15)(T)(ii) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii). Thus, a precondition for a derivative T nonimmigrant to

adjust status under section 245(l) of the INA, 8 U.S.C. 1255(l) is that the T–1 nonimmigrant has met the above specified requirements (continuous physical presence, good moral character, etc.). For all practical purposes, a derivative T nonimmigrant generally cannot demonstrate that the T–1 nonimmigrant meets the requirements for adjustment of status in the absence of USCIS adjudicating an application for adjustment of status from the T–1 nonimmigrant themself. Therefore, DHS declines to adopt the commenter's recommendation to permit T derivatives to adjust independent of the T–1 principal.

DHS also notes that the T/U Extension Memo says derivative family members with T nonimmigrant status do not lose their status when the T–1 nonimmigrant adjusts status, allowing the derivative to adjust status later. DHS has codified this longstanding policy at 8 CFR 245.23(b)(5).

*Comment:* Commenters also requested changes to 8 CFR 245.23(a)(6) such that it includes an exemption for trafficking victims under the age of 18 at the time of victimization, to be consistent with the statute at 8 U.S.C. 1255(l)(1)(C).

*Response:* DHS agrees that Congress intended to exempt trafficking victims who were under the age of 18 at the time of their victimization from being required to contact law enforcement. This exemption should apply at the adjustment of status stage; accordingly, DHS has made this change to the regulation as a technical edit. Similarly, DHS has added reference to the trauma exception, consistent with the statute and congressional intent. *See* new 8 CFR 245.23(a)(7)(iii) and (iv).

*Comment:* Other commenters requested changes be made to the minimum 3-year continuous physical presence requirement because it punishes trafficking victims by forcing them to wait, and conditions early adjustment eligibility on things outside the victim's control, such as the conclusion of the investigation or prosecution.

*Response:* DHS is sympathetic to the difficulties victims may face in waiting to adjust status; however, the continuous physical presence period is statutory and cannot be changed by regulation.

*Comment:* Commenters also requested that DHS implement a process by which principal applicants who obtain lawful permanent residence and subsequently marry may file the equivalent of a Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant on behalf of eligible family members.

---

[32] 6 U.S.C. 271(b).

*Response:* DHS is sympathetic to the concerns raised in these comments but declines to adopt a process for certain relatives to apply to adjust status if they have never held T nonimmigrant status. Commenters noted the ability of U–1 nonimmigrants to file for spouses they subsequently marry after receiving U nonimmigrant status; U–1 nonimmigrants are able to do so under 8 U.S.C. 1255(m)(3); however, there is no equivalent statutory basis to create such a process in the T visa context under 8 U.S.C. 1255(l)(1).

*U. Applicants and T Nonimmigrants in Removal Proceedings or With Removal Orders*

*Commenter:* One commenter requested DHS acknowledge that trafficking survivors often escape trafficking through arrest or contact with Immigration and Customs Enforcement (ICE), who may later prosecute them without investigating whether they have been trafficked. The commenter requested that special protections be extended to survivors placed in removal proceedings and detention, to ensure survivors have access to due process in requesting a T visa.

*Response:* DHS acknowledges that many survivors may escape their trafficking through encounters with ICE. Understanding the concern that trafficking victims may require additional protection, DHS has made several changes to the regulation (discussed below) to further its victim-centered approach. In addition, DHS has made significant accomplishments of Priority Actions within the Department of Homeland Security Strategy to Combat Human Trafficking, the Importation of Goods Produced with Forced Labor, and Child Sexual Exploitation (DHS Strategy). For example, in October 2020, DHS launched the Center for Countering Human Trafficking (CCHT), a DHS-wide effort comprising 16 supporting offices and components, led by U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI). The CCHT is the first unified, intercomponent coordination center for countering human trafficking and the importation of goods produced with forced labor. In October 2021, the Secretary directed DHS components to incorporate a victim-centered approach into all policies, programs, and activities governing DHS interactions with victims of crime. Finally, in August 2021, ICE issued Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims, which sets forth ICE policy regarding civil immigration enforcement

actions involving noncitizen crime victims, including victims of trafficking and Continued Presence recipients.[33] This Directive emphasizes the duty to protect and assist noncitizen crime victims.

*Comment:* Another commenter requested that in cases where applicants can make a credible showing that they were placed in removal proceedings through retaliatory actions of their trafficker or due to their trafficking, DHS should automatically join in a motion to administratively close or to terminate the removal proceeding for the pendency of the T nonimmigrant application, including through any appeals, and overcoming any applicable time and numerical limitations.

*Response:* DHS declines to adopt this recommendation. DHS is cognizant that individuals may be placed in removal proceedings because of their trafficking experience and implements a victim-centered approach for all individuals it encounters. DHS believes that the following changes (listed in the subsequent seven numbered paragraphs) made to the regulation will address many of the commenter's concerns.

1. Principal Applicants, T–1 Nonimmigrants, and Derivative Family Members

*Comment:* Commenters indicated that their clients have faced unnecessary hurdles and additional trauma when seeking to reopen and terminate a prior removal order due to opposition by ICE. Commenters also stated that ICE "rarely" joins applicants' motions to administratively close, continue, or terminate proceedings. They emphasized that removal from the United States can render a victim ineligible for a T visa and vulnerable to re-trafficking or retaliation from the trafficker. The commenters suggested that the regulations be amended to mandate ICE's participation in joint motions to reopen upon a grant of T–1 or T derivative nonimmigrant status in these circumstances, or at the respondent's request, ICE should agree to a motion to administratively close, terminate or continue proceedings (if proceedings are ongoing).

*Response:* DHS values the need to conserve government resources and maintain coordination across the department; however, DHS declines to codify limitations on ICE's ability to make case-by-case determinations. In line with the victim-centered approach, we have revised the regulation to provide that ICE will maintain a policy

regarding the exercise of discretion toward all applicants for T nonimmigrant status, and all T nonimmigrants. *See* new 8 CFR 214.214(b). To that end, DHS has also revised the regulation at new 8 CFR 214.204(b)(1)(ii), 214.205(e), and 214.211(b)(2)(ii) to state that ICE may exercise prosecutorial discretion as appropriate.

*Comment:* Other commenters stated that if DHS disagreed with mandating ICE to join such motions, DHS should add permissive language to this effect, making clear that the language set forth at 8 CFR 214.11(d)(1)(ii) and (k)(2)(i) (redesignated as 8 CFR 214.204(b)(2) and 214.211(b)(2)) applies both to T–1 nonimmigrants as well as T derivatives in pending removal proceedings. Other commenters also requested the regulation address derivative family members in removal proceedings.

*Response:* DHS agrees with the commenter's suggestion, and as described above, has amended the regulation to state that ICE may exercise prosecutorial discretion, including in cases of T derivatives or eligible family members. *See* new 8 CFR 214.211(b)(2)(ii).

2. Immigration Judges

*Comment:* Several commenters requested DHS add language to the regulation specifically stating that an immigration judge may terminate removal proceedings once T nonimmigrant status is granted. They requested DHS add language clarifying that an immigration judge can administratively close removal proceedings while USCIS adjudicates an application for T nonimmigrant status.

*Response:* This rule amends DHS regulations only and is not a joint Department of Justice (DOJ) rule. Accordingly, comments related to the authority of an immigration judge to terminate or administratively close removal proceedings are outside the scope of this rule, which cannot bind DOJ.

*Comment:* Commenters also suggested that the regulation direct immigration judges to terminate or administratively close proceedings for all T nonimmigrant status applicants and recipients on their own accord without a motion or request from the parties.

*Response:* DHS declines to adopt this recommendation. This rule amends DHS regulations only and is not a joint Department of Justice (DOJ) rule. Thus, DHS cannot bind DOJ in this rule.

3. Automatic Stays of Removal

*Comment:* One commenter urged DHS to automatically stay removals of

---

[33] "ICE Directive 11005.3," *https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf.*

applicants whose applications are deemed to be properly filed. They request in the alternative that DHS expedite bona fide determinations for applicants with final orders of removal. Other commenters requested that DHS issue a stay of removal to applicants with pending T visa applications until a bona fide determination is made.

One commenter stated that if an application is found to be bona fide, DHS should extend an administrative stay of a final order until a final decision is made on the application for T nonimmigrant status.

*Response:* DHS declines to adopt these recommendations. DHS acknowledges the commenters' concerns regarding the removal of applicants with pending T visa applications. As a matter of policy, DHS generally will not remove applicants with pending T nonimmigrant status applications; however, there may be situations where it is prudent for DHS to execute removal orders prior to adjudication, and DHS does not intend to limit DHS discretion in this manner. DHS feels that the regulation's language at 8 CFR 214.204(b)(2)(i) and (ii) is sufficient to address these commenter's concerns by providing that, once granted, a stay of removal will remain in effect until a final decision is made on the application for T nonimmigrant status.

4. Unrepresented Applicants

*Comment:* One commenter requested that in cases where an applicant is unrepresented in proceedings, DHS should be mandated to move for termination, dismissal, administrative closure, or a continuance. The commenter stated that actively pursuing removal cases against survivors of trafficking is inconsistent with ICE's goal of prioritizing limited resources.

*Response:* DHS declines to adopt these recommendations. Generally, relief from removal has been historically requested by the noncitizen and is not initiated by DHS. DHS does not wish to limit ICE's discretion by mandating specific actions, as each case will present different circumstances. However, DHS agrees that prioritizing the removal of trafficking survivors is generally inconsistent with the victim-centered approach to which DHS adheres.

5. Detained Applicants

*Comment:* Commenters requested DHS be required to release a detained applicant once a bona fide determination has been made. Some commenters requested that DHS add a provision to the regulation requiring ICE to seek expedited processing for all detained T visa applicants (principals and derivatives). They also stated that ICE should be required to check DHS systems for VAWA confidentiality flags that indicate a pending or approved T, U, or VAWA application or petition for every detainee within 24 hours of detention. Finally, they state the regulation should specify how quickly ICE should make this request and how long USCIS should generally take to respond to the expedite request.

*Response:* DHS declines to adopt this recommendation. DHS appreciates the commenter's concerns. Existing USCIS and ICE processes already flag protected records via secure methods for information sharing, including through the USCIS Central Index System, which, among other things, includes flags for individuals whose records are protected under 8 U.S.C. 1367.

In addition, there is already a process in place to request expedited processing based on urgent humanitarian reasons, which can be found on the USCIS website.[34] ICE also will request expedited adjudication when necessary and appropriate, including when noncitizens are detained so adjudication of applications for T nonimmigrant status is prioritized. ICE then exercises discretion to defer decisions on enforcement action in compliance with their directives and processes.[35] Finally, although DHS understands the commenter's concerns about detained T applicants, it declines to impose processing deadlines on itself given resource needs and shifting priorities.

6. Reinstatement of Removal

*Comment:* One commenter requested DHS create a presumption that reinstatement of removal would not occur in cases of T, U, and VAWA eligible victims, to avoid victims being removed from the United States.

*Response:* DHS declines to adopt this recommendation. This comment is partially out of scope, as DHS can make no changes to VAWA or U regulations in this rule because we made no changes to those programs in the interim rule. In addition, relief from removal has been historically requested by the noncitizen and is not initiated by DHS. Operationally, it would take many resources and considerable infrastructure to create a process in which DHS could actively seek out noncitizens with pending T applications, and who have a prior removal order, just to ensure a reinstatement would not be issued. Furthermore, DHS declines to limit ICE's discretion in this manner, but emphasizes that ICE uses a victim-centered approach in which all relevant circumstances are considered.

7. Issuances of Notices To Appear (NTAs)

*Comment:* Commenters suggest codifying DHS statements from the 2016 Interim Final Rule preamble language regarding not issuing NTAs to individuals with pending applications for T nonimmigrant status.

*Response:* DHS agrees to adopt this suggestion and has introduced a new provision at 8 CFR 214.204(b)(3) clarifying that USCIS does not have a policy to refer applicants for T nonimmigrant status for removal proceedings absent serious aggravating circumstances, such as the existence of an egregious criminal history, a threat to national security, or where the applicant is complicit in trafficking. Issuing NTAs to survivors of trafficking outside of these circumstances undermines both the humanitarian and law enforcement purposes of the statute. The new provision at 8 CFR 214.204(b)(3) is consistent with several of the Priority Actions outlined in the White House's 2021 National Action Plan to Combat Human Trafficking [36] as well as several objectives laid out in the DHS Strategy.[37]

## *V. Notification to ICE of Potential Trafficking Victims*

8 CFR 214.11(o) (redesignated here as 8 CFR 214.215) addresses the duty of USCIS employees who encounter potential victims of trafficking to consult with the appropriate ICE officials to initiate law enforcement investigation and assistance to victims.

*Comment:* Commenters requested that DHS reconsider whether USCIS employees should be making referrals to consult with ICE officials. They wrote

[34] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''How to Make an Expedite Request,'' *https://www.uscis.gov/forms/filing-guidance/how-to-make-an-expedite-request* (last updated Oct. 20, 2022).

[35] *See* ''ICE Directive 11005.3,'' *https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf.*

[36] ''National Action Plan,'' *https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf.* In particular, this aligns with ''Priority Action 2.2.2: Provide human trafficking victims protection from removal'' and ''Priority Action 2.3.2: Provide immigration protections to ensure eligible victims are not removed.''

[37] ''DHS Strategy,'' *https://www.dhs.gov/sites/default/files/publications/20_0115_plcy_human-trafficking-forced-labor-child-exploit-strategy.pdf.* Specifically, the new regulation is consistent with the priority actions ''Develop Victim-Centered Policies and Procedures for DHS Personnel'' and ''Improve Coordination of Immigration Options for Victims of Human Trafficking.''

**34890** **Federal Register** / Vol. 89, No. 84 / Tuesday, April 30, 2024 / Rules and Regulations

that interaction with ICE may put trafficking survivors at risk for criminal liability and potential deportation and that these interactions may harm applicants eligible for the trauma exception or who do not feel comfortable cooperating with LEAs. Commenters suggested instead that USCIS employees should advise potential victims of their possible immigration remedies and provide a referral to the National Human Trafficking Hotline. Some commenters suggested that such a referral would defeat the purpose of the confidentiality protections at 8 U.S.C. 1367. They wrote that USCIS should be especially cautious of such consultations when the potential victim is represented by an attorney or receiving services from a social services agency and recommended that DHS revise the provision to require USCIS to consider such information when consulting with ICE officials.

*Response:* DHS appreciates concerns about the protection of vulnerable applicants and the potential consequences of LEA intervention, including concerns that represented individuals and those receiving social services may have made an informed decision with regard to reporting to law enforcement in light of the trauma exception; however, referrals to ICE's Homeland Security Investigations (HSI) are important given the role they play in combating criminal organizations that commit human rights violations, including human trafficking. HSI is victim-oriented, has extensive experience handling trafficking cases with sensitivity, and employs victim assistance specialists that work directly with individuals who have experienced trafficking. Sharing information between USCIS and ICE under these circumstances is permitted under 8 U.S.C. 1367 because the referral is within DHS for legitimate Department purposes, including coordination on Continued Presence and expedite requests. Nevertheless, in consideration of these comments, DHS has revised 8 CFR 214.215 to state that USCIS "may" consult, rather than "should" consult with ICE.

USCIS exercises caution whenever it shares information protected under 8 U.S.C. 1367 with ICE HSI, and evaluates all relevant circumstances in deciding whether to share such information, including whether there is a legitimate Department purpose for sharing. ICE HSI is equally bound by the confidentiality protections of 8 U.S.C. 1367(a)(2), including whether a person is represented by an attorney or accredited representative.

### W. Fees

*Comment:* Commenters stated that T visa applicants incur significant fees in filing related forms and that access to fee waivers is crucial. Some commenters noted that detained trafficking survivors do not have funds to pay filing fees or provide documentation of their financial circumstances. They asked DHS to simplify and streamline the fee waiver request process and consider "any credible evidence" in adjudicating fee waiver requests. Other commenters requested that DHS extend the fee exemption to all ancillary applications related to the application for T nonimmigrant status to include motions and appeals. A few commenters noted that DHS has eliminated many of the fees associated with applying for T nonimmigrant status in recognition of the challenges victims of a severe form of trafficking in persons and their family members may face in bearing these costs. Commenters asked that DHS extend the fee exemptions to applications for employment authorization filed by eligible family members in 8 CFR 214.11(k)(10) (redesignated here as 8 CFR 214.211(i)(3)). They proposed that, at a minimum, the rule clarify that family members seeking employment authorization can submit fee waiver requests instead of associated fees. Other commenters requested DHS require that all fee waiver requests be processed within 30 days of receipt.

*Response:* DHS recognizes the challenges faced by trafficking victims and their family members, including the costs of submitting applications associated with T nonimmigrant status. DHS appreciates the importance of the fee waiver process and takes note of the commenters' concerns. On January 31, 2024, USCIS published a Final Rule (Fee Rule) to adjust certain immigration and naturalization benefit request fees.[38] That rule codified 8 CFR 106.3(b)(2) which exempts persons seeking or granted T nonimmigrant status from the fees for several different USCIS forms. As a result, T nonimmigrants, T nonimmigrant applicants, and their derivatives will generally pay no USCIS fees until they apply for naturalization, at which time they may request a fee waiver or a reduced fee.

*Comment:* Commenters also requested a presumption in favor of granting fee waivers submitted in association with a T visa application or if the applicant is

---

[38] *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 FR 6194 (Jan. 31, 2024).

detained by DHS, in the absence of specific and exceptional circumstances.

*Response:* Persons seeking or granted T nonimmigrant status are exempt from paying fees for all related forms through adjustment of status. 8 CFR 106.3(b)(2). As a result, T nonimmigrants, T nonimmigrant applicants, and their derivatives will not be required to request a fee waiver until they file Form N–400, Application for Naturalization.[39]

### X. Restrictions on Use and Disclosure of Information Relating to T Nonimmigrant Status

*Comment:* Commenters expressed support for DHS including the reference at 8 CFR 214.11(p) (redesignated as 8 CFR 214.216) in confidentiality provisions and exceptions that specifically apply to human trafficking survivors under 8 U.S.C. 1367(a)(2) and (b). One commenter acknowledged DHS's rationale for not including the entire list of exceptions to the restrictions included in 8 U.S.C. 1367(b) but requested that DHS add language to the provision that would highlight the exceptions on disclosure for law enforcement or national security purposes. The commenter wrote that including these specific examples would help victims make an informed decision of whether to apply for T nonimmigrant status.

*Response:* DHS recognizes the importance of ensuring that applicants are fully informed of the consequences of applying for immigration benefits. Nevertheless, DHS may share the information with other Federal, State, and local government agencies and other authorized organizations. *See* 5 U.S.C. 552a. DHS regulations already discuss the reasons an applicant's information may be released. *See* 6 CFR part 5, subpart B. In addition, the Form I–914, Application for T Nonimmigrant Status, Instructions clearly state that the information provided may also be made available as appropriate for law enforcement purposes or in the interest of national security as permitted by 8 U.S.C. 1367. Therefore, DHS made no changes in the final rule in response to this comment.

*Comment:* One commenter requested DHS add to the regulation that upon denial of an application, USCIS will inform an applicant that their privacy protections are void per 8 U.S.C. 1367 and will state the parties with whom the applicant's information may be shared.

*Response:* DHS declines to adopt this recommendation because protections

---

[39] DHS published multiple new fee exemptions for T nonimmigrants as part of a comprehensive adjustment to all USCIS fees. *See, e.g.,* 89 FR 6392.

under 8 U.S.C. 1367(a)(2) only end when "the application for relief is denied and all opportunities for appeal of the denial have been exhausted." 8 U.S.C. 1367(a)(2). Therefore, including such a notification in the denial notice would be premature.

*Y. Public Comment and Responses on Statutory and Regulatory Requirements*

*Comment:* Some commenters cited statistics on the number and demographics of trafficked victims within the United States. One commenter cited a survey entitled, "YES Project; Youth Experiences Survey: Exploring the Sex Trafficking Experiences of Arizona's Homeless and Runaway Young Adults," conducted by Arizona State University (ASU) School of Social Work in 2014. The results of the survey found that 25 percent of the 246 homeless youth who were surveyed reported being victims of trafficking. Additionally, the commenter cited that the average age of entry to sex trafficking is 14 years old. Another commenter provided data on the total number of human trafficking victims (20.9 million people) as published in a U.S. News and World Reports opinion editorial.

*Response:* DHS appreciates the commenters' responses and has reviewed the cited data provided by commenters. Although DHS recognizes that the cited data supports the goals of this rule, DHS cannot confirm or deny the data with reliable accuracy and, therefore, does not use it in its analysis. The sampling frame of the YES Project survey included 246 homeless youth who received services from three Arizona-based young adult serving organizations.[40] Because the survey sampled only a small number of homeless youth and a small number of Arizona youth-based programs, DHS did not feel it was appropriate to make any general conclusions from such data.

*Z. Biometrics*

*Comment:* One commenter encouraged USCIS to accept biometrics taken by ICE rather than require a detained applicant to submit their biometrics at a USCIS Application Support Center.

*Response:* DHS appreciates the commenter's goal of increasing efficiency. USCIS is examining whether

it has the legal authority and technical capability to submit to the Federal Bureau of Investigation biometrics collected by a criminal justice agency or from a non-criminal justice agency when the biometrics were collected for a different purpose from USCIS' purpose of use. DHS will continue to explore the feasibility of permitting USCIS to use biometrics collected by ICE for adjudication of applications for T nonimmigrant status from detained individuals, but declines to codify any changes at this time.

*AA. Trafficking Screening, Training, and Guidance*

1. Screening

*Comment:* One commenter requested that the regulation require DHS to conduct screening for trafficking victims by all levels of DHS, at each stage of the immigration process; require ICE to screen all detained individuals and provide release on bond or parole for anyone identified as a trafficking victim; and require OPLA attorneys to screen for trafficking both before issuing NTAs as well as for each case they prosecute. The commenter also stated that if an NTA has already been issued, the regulation should require that the ICE attorney immediately notify the court and opposing counsel (or, in absence of counsel, the Respondent), request a continuance or administrative closure, and refer the victim for trafficking support services and investigation.

*Response:* DHS appreciates the commenter's recommendation regarding screening efforts to protect victims of trafficking. In response to the White House National Action Plan to Combat Human Trafficking, there is a government-wide effort to update screening forms and protocols for all Federal officials who have the potential to encounter a human trafficking victim in the course of their regular duties that do not otherwise pertain to human trafficking. In support of this priority action, DHS co-chairs the interagency working group to document promising practices and identify opportunities to strengthen current efforts to screen for victims of human trafficking.[41] DHS declines to impose anything further via regulation at this time, as DHS believes these actions address the commenter's concerns.

2. Training

*Comment:* Several commenters requested DHS provide additional resources, support, and training to LEAs

to help them understanding the nuances of trafficking. Specifically, they stated that LEAs should be trained to recognize the co-existence of trafficking and domestic violence. The commenters encouraged DHS to release a Law Enforcement Declaration Guide. They also suggested that DOJ's Office on Violence Against Women (OVW) should provide training, not DHS.

*Response:* DHS is committed to providing training and support to certifying officials and stakeholders on trafficking and the T visa program. As discussed extensively above, DHS acknowledges that domestic violence and trafficking may coexist, and has provided significant guidance in the Policy Manual to reflect this.

On October 20, 2021, USCIS published the first ever standalone T Visa Law Enforcement Resource Guide for certifying officials,[42] which clarifies the role and responsibility of certifying agencies in the T visa program, provides certifying officials with best practices for approaching the T visa certification process, and emphasizes that completing the declaration is consistent with a victim-centered approach. In addition, OVW provides leadership in developing the national capacity to "reduce violence against women and administer justice for and strengthen services to victims of domestic violence, dating violence, sexual assault, and stalking." [43] OVW also supports the provision of training and technical assistance to assist service providers and the anti-trafficking field in ensuring successful for survivors of trafficking.[44]

As DHS is responsible for adjudicating T visas, and encounters trafficking victims in various ways, it is imperative DHS continues to train certifying officials and others about trafficking and the T visa.

3. Guidance

*Comment:* Several commenters requested DHS issue policy guidance to LEAs on referring potential victims to local nongovernmental organizations for assistance to identify, support, and protect trafficking victims.

*Response:* DHS already works with local governments and NGOs to assist

---

[40] Dominique Roe-Sepowitz, and Kristen Bracy, "YES Project; Youth Experiences Survey: Exploring the Sex Trafficking Experiences of Arizona's Homeless and Runaway Young Adults." Office of Sex Trafficking Intervention Research (2014): ASU School of Social Work, *http://www.trustaz.org/downloads/rr-stir-youth-experiences-survey-report-nov-2014.pdf.* (Nov. 2014).

[41] "DHS Strategy," *https://www.dhs.gov/sites/default/files/publications/20_0115_plcy_human-trafficking-forced-labor-child-exploit-strategy.pdf.*

[42] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "T Visa Law Enforcement Resource Guide" (2021), *https://www.uscis.gov/sites/default/files/document/guides/T-Visa-Law-Enforcement-Resource-Guide.pdf.*

[43] Office on Violence Against Women, U.S. Dep't of Justice, *https://www.justice.gov/ovw* (last visited Apr. 4, 2023).

[44] *See, e.g.,* Office on Violence Against Women, U.S. Dep't of Justice, "OVW Fiscal Year 2022 Training and Technical Assistance Initiative Solicitation" (2022), *https://www.justice.gov/ovw/page/file/1484676/download.*

trafficking victims and it is not necessary to address those efforts and guidance in this rule. DHS will consider this comment in future policy-making efforts.

*BB. Miscellaneous Comments*

1. Cases Involving Multiple Victims

*Comment:* One commenter requested DHS recognize the complexity and special nature of cases of groups of trafficking victims in an active and ongoing law enforcement investigation. Specifically, the commenter requested DHS create a mechanism to identify cases with multiple victims and to coordinate a streamlined evaluation of these victims' applications.

*Response:* DHS declines to adopt this recommendation, as each applicant is required to meet their own individual burden of proof, and each case is evaluated based on the evidence presented in that specific application. USCIS adjudicates each case on its own merits and declines to create processes to handle cases as a group. DHS thinks a group application process would be particularly difficult to administer considering the confidentiality protections each member of the group would have as required by 8 U.S.C. 1367.

2. Social Security Cards

*Comment:* Another commenter requested that DHS revise the Form I–914 and Form I–914, Supplement A, Application for Family Member of T–1 Recipient, to include a checkbox for applicants to indicate they wish to receive a Social Security card, similar to the checkbox for applicants to indicate they wish to receive an Employment Authorization Document (EAD). The commenter stated that it would allow trafficking survivors to obtain their Social Security cards in a more streamlined manner, and this would allow individuals to more easily access important services needed for emotional and financial stability.

*Response:* DHS acknowledges the concerns of the commenter regarding delays in victims obtaining benefits and appreciates there are significant benefits and efficiencies that could be achieved through this change; however, DHS declines to adopt this recommendation in this final rule. The Social Security Administration (SSA) issues Social Security cards, whereas USCIS issues EADs. Implementing this suggestion would require specific coordination with SSA, as well as updating USCIS systems. At this time, DHS does not have the required infrastructure or resources to adopt this

recommendation. Moreover, rulemaking would not be required to implement this recommendation when the capabilities are in place. Therefore, DHS will keep this suggestion under consideration for possible, future form revision efforts and interagency coordination.

3. Victim-Blaming

*Comment:* One commenter stated that USCIS routinely blames the victim and says in RFE and denial notices that individuals who knowingly undertook the dangerous journey to the United States should have expected to experience forced labor or rape. The commenter wrote that blaming the victim should not be allowed by regulation and this language should be prohibited from RFEs.

*Response:* DHS appreciates the commenter's concern and has taken these comments into consideration. DHS has implemented a victim-centered approach, which is evident in the language of the regulation. Moreover, adjudicators are specifically trained to write RFEs in a manner that does not revictimize applicants. Officers regularly receive supervisory guidance. USCIS conducts ongoing training to adjudicators, and routinely evaluates trends that may require additional training or recalibration of procedures. As part of this rulemaking, USCIS is also updating related policy guidance on issuance of RFEs and the victim-centered approach. However, DHS declines to adopt the recommendation of including specific language in the regulation about what should be included in RFEs. General guidelines on the contents of official correspondence are more appropriately suited for policy guidance, and DHS feels that prohibiting specific language could unnecessarily restrict discretion to address case-specific circumstances.

4. Processing Times

*Comment:* One commenter stated that the new regulations should indicate that any case pending for more than 90 days should be considered to be outside an acceptable processing time, to allow attorneys to sue USCIS more easily when it unnecessarily delays adjudication of T visas. The commenter wrote that survivors need status and adjudication quickly.

*Response:* DHS understands and is sympathetic to the commenter's concern about survivors receiving status as quickly as possible and their frustrations with processing times but declines to implement an "acceptable processing time" due to various factors, including USCIS resource constraints. Each case presents a different set of facts

that require highly technical analysis, and processing times may differ between cases. Some cases, due to circumstances outside of DHS's control, may not be able to be adjudicated within such a prescribed timeframe. DHS also notes the new BFD provisions address this concern, as their goal is to help stabilize bona fide applicants faster.

5. Motions To Reopen and Reconsider

*Comment:* One commenter stated that there is a lack of clarity in the regulations as to whether a Motion to Reopen and Reconsider filed by a T visa principal extends to their derivatives' applications. The commenter stated that their clients who were derivatives received NTAs related to denied T visa applications, although the associated T principal applicant had submitted a timely Motion to Reopen and Reconsider. This would indicate that a separate Motion to Reopen and Reconsider should be filed for each individual derivative application, despite the fact that this would be duplicative, and the T–1 application is the decisive factor in the adjudication of the derivative applications. The commenter recommended revising the regulation to state that a denial would not become final for the applicant or their derivatives until the administrative appeal is decided.

*Response:* DHS declines to adopt this recommendation. Each denied application, Forms I–914 and I–914A, requires a separately filed Form I–290B, Notice of Appeal or Motion as a Form I–290B cannot be filed for multiple receipts or filings. DHS emphasizes that in cases where an appeal of a T–1 application denial has been filed, the case is considered to remain administratively pending until a decision on appeal is made. If an applicant files an appeal for a denied Form I–914A, then that application would also be considered administratively pending until a final decision is rendered by the Administrative Appeals Office (AAO). A decision on appeal is then considered to be administratively final even if a subsequent motion is filed. 8 CFR 214.11(d)(10) (redesignated as 8 CFR 214.204(q)). In this case, an administratively final decision occurs when the AAO issues a decision affirming the denial of the Form I–914. The filing of an appeal of the Form I–914 denial would affect its own administratively pending status and not automatically place any denied Form I–914As in a pending status.

6. HHS Notification

*Comment:* Other commenters requested that USCIS notify HHS of any applicant on the waiting list.

*Response:* DHS declines to adopt this recommendation. Such inter-agency communications are generally not appropriate to be mandated in the Code of Federal Regulations. In addition, given the confidentiality protections and sensitive nature of T applications, DHS wishes to avoid mandating any communications that are not required by statute.

7. Program Integrity

*Comment:* One commenter expressed concern about oversight in the T visa program. They expressed concern that victims could cause harm to themselves and American society. The commenter wondered about vetting and expressed concern about exploitation of loopholes. The commenter also stated that Americans should be receiving the same type of or superior benefits first.

*Response:* DHS acknowledges the commenter's concerns; however, DHS implements the T visa program as authorized by Congress. Adjudicators evaluate each application on its own merits. DHS remains committed to the fair and just adjudication of all immigration benefit requests. At the same time, DHS vets all immigration benefit requests to ensure they are granted only to those who have established eligibility. This requires DHS to ensure that applicants do not obtain benefits for which they are not eligible under the law.

8. Annual Cap

*Commenter:* One commenter stated that the annual cap on T visas is inconsistent with Congress' intent when creating T nonimmigrant status relief. They stated DHS should provide comprehensive data about T visa application trends, and other information as necessary, to support any Congressional efforts to eliminate the T visa cap.

*Response:* DHS provides comprehensive data on the characteristics of T visa applications, and regularly posts quarterly updates on the number of applications received, approved, denied, and pending by fiscal year.[45] In addition, DHS is responsive to

Congressional and stakeholder inquiries on T visa filing trends, including questions and concerns about the cap.

9. Continued Presence Adjudication

*Comment:* Another commenter encouraged DHS to ensure Continued Presence (CP) benefits are not arbitrarily adjudicated or delayed. They suggested DHS create regulations on CP that: direct DHS to grant CP within 60 days of receiving a credible report of human trafficking; detail a uniform, fair, and timely process for granting or denying CP, with a focus on providing the maximum protections envisioned by Congress; and to the extent possible under legislation, allow DHS to receive CP requests from any law enforcement agency.

*Response:* DHS appreciates the commenter's concerns but declines to address them in this rulemaking effort, particularly because CP was not included in the IFR. The CCHT, which processes all requests for CP, implements a victim-centered approach. DHS declines to impose a deadline on adjudicating CP, given shifting priorities and resource allocations. CP may already be requested by any LEA with the authority to investigate or prosecute human trafficking, including local law enforcement.[46]

10. Comment Period

*Comment:* One commenter requested that DHS and other agencies allow 60 days for comment on proposed regulations. The commenter also requested that DHS establish a regular schedule for updating regulations when statutory changes are made in order to reflect legislative changes.

*Response:* DHS generally publishes proposed rules for 60 days of public comments as provided in section 6.(a)(1) of Executive Order 12866, Regulatory Planning and Review, unless exigent circumstances justify a 30-day comment period as permitted by 5 U.S.C. 553. DHS also published regulations as soon as practicable after new legislation is passed that requires a change in the applicable regulations. This comment requires no change to the final rule.

CC. Out of Scope Comments

Several comments were submitted that did not relate to the substance of the Final Rule. One commenter provided a list of general criticisms of USCIS in general and its administration of the T nonimmigrant program as follows:

• USCIS generally ignores expedite requests.

• USCIS regularly dismisses labor trafficking, particularly of men, as "mere exploitation" without defining what the difference between that and trafficking may be.

• USCIS uses boilerplate RFEs and denial letters that are victim blaming and dismissive of the survivor's experience.

• USCIS denial notices have stated that less weight would be given where an individual initiated therapy after issuance of an RFE, even though USCIS made it very difficult for a person to be able to pay for therapy, by refusing to review prima facie/bona fides and issue a determination that could help the person access services. The commenter wrote that this blames the victim for something outside their control.

*Response:* DHS acknowledges the commenter's feedback but notes that their suggestions are not about and do not affect the substantive content of this rulemaking. DHS makes no changes to the final rule in response to these comments.

**IV. Statutory and Regulatory Requirements**

*A. Executive Orders 12866, 13563, and 14094*

Executive Orders 12866 (Regulatory Planning and Review), as amended by Executive Order 14094 (Modernizing Regulatory Review), and 13563 (Improving Regulation and Regulatory Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of

quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Management and Budget (OMB) has designated this rule a "significant regulatory action" as defined under section 3(f) of E.O. 12866, as amended by Executive Order 14094, but it is not significant under section 3(f)(1) because its annual effects on the economy do not exceed $200 million in

---

[45] *See* U.S. Citizenship and Immig. Servs., U.S. Dep't of Homeland Security, "Characteristics of T Nonimmigrant Status (T Visa) Applicants Fact Sheet" (2022), *https://www.uscis.gov/sites/default/files/document/fact-sheets/Characteristics_of_T_Nonimmigrant_Status_TVisa_Applicants_FactSheet.pdf;* U.S. Citizenship and Immig. Servs., U.S. Dep't of Homeland Security, "Characteristics of T Nonimmigrant Status (T Visa) Applicants Fact

Sheet" (2023), *https://www.uscis.gov/sites/default/files/document/fact-sheets/Characteristics_of_T_Nonimmigrant_Status_TVisa_Applicants_FactSheet_FY22.pdf;* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Immigration and Citizenship Data" (last visited Feb. 15, 2023).

[46] *See* Center for Countering Human Trafficking, U.S. Dep't of Homeland Security, "Continued Presence Resource Guide" (2023), *https://www.ice.gov/doclib/human-trafficking/ccht/continuedPresenceToolkit.pdf.*

any year of the analysis. Accordingly, OMB has reviewed this rule.

1. Summary

As discussed further in the preamble, this final rule adopts the changes from the 2016 interim rule with some modifications. The rationale for the 2016 interim rule and the reasoning provided in the preamble to the 2016 interim rule remain valid with respect to these regulatory amendments, therefore, DHS adopts such reasoning to support this final rule. In response to the public comments received on the 2016 interim rule, DHS has modified some provisions for the final rule. DHS has also made some technical changes in the final rule.

This final rule clarifies some definitions and amends provisions regarding bona fide determinations (BFD) to implement a new process. This final rule also clarifies evidentiary requirements for hardship, codifies the evidentiary standard, and codifies the standard of proof that applies to the adjudication of an application for T nonimmigrant status. DHS also made technical changes to the organization and terminology of 8 CFR part 214.

For the 10-year period of analysis of the rule using the post-IFR baseline of the rule, DHS estimates the annualized costs of this rule will be $807,314 annualized at 3- and 7 percent. Table 1 provides a more detailed summary of the final rule provisions and their impacts.

BILLING CODE 9111–97–P

**Table 1. Summary of Provisions and Impacts of the Final Rule Using the Post-IFR Baseline**

| Final Rule Provisions | Description of Change to Provision | Estimated Costs of Provisions | Estimated Benefits of Provisions |
|---|---|---|---|
| • Bona Fide Determination (BFD) Process Modifications. | • The new streamlined process will include case review and background checks.<br><br>• Once an individual whose application has been deemed bona fide files a Form I-765, Application for Employment Authorization, DHS will consider whether the applicant warrants a favorable exercise of discretion and will be granted deferred action and a BFD employment authorization document. | Quantitative:<br>Applicants -<br>• None.<br>• DHS estimates the additional cost for completing and filing Form I-765 will be $807,314 annually.<br><br>DHS/USCIS -<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• DHS may incur additional costs due to the time to review evidence; however, DHS cannot estimate how many applications would take any additional time. | Quantitative:<br>Applicants -<br>• None.<br><br>DHS/USCIS -<br>• None.<br><br>Qualitative:<br>Applicants –<br>• The primary benefits of this provision to applicants are the opportunity to receive work authorization sooner and the ability to receive forbearance from removal (deferred action) while the T visa application is pending. Likewise, applicants with a final order of removal will receive a stay of removal more quickly.<br><br>DHS/USCIS –<br>• The benefit of this provision is that it prioritizes efficient T visa BFD review, protects the integrity of the BFD review by requiring review of initial required evidence and assessment of routine background checks. |
| • Clarifications to eligibility requirements. | • DHS is also clarifying the eligibility requirements that apply to the adjudication of an application for a T visa. | Quantitative:<br>Applicants -<br>• None.<br><br>DHS/USCIS -<br>• None.<br><br>Qualitative:<br>Applicants –<br>Based on the additional clarifications regarding eligibility requirements for T | Quantitative:<br>Applicants -<br>• None.<br><br>DHS/USCIS -<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS – |

| | | nonimmigrant status, USCIS estimates that there will be a reduction in Requests for Evidence (RFEs). This reduction will save the applicant time and will allow for their application to be adjudicated earlier. DHS/USCIS – • None. | • USCIS estimates that there will be a reduction in RFEs, because applicants will be aware of the evidentiary requirements from the outset, resulting in a decrease in time per adjudication. |
|---|---|---|---|
| • Technical Changes, Clarifying Definitions, and other Qualitative Impacts in this Final Rule. | • This rule moves the regulations for T nonimmigrant status to a separate subpart of 8 CFR part 214 to reduce the length and density of part 214, while making it easier to locate specific provisions.<br><br>• In addition to the re-numbering and re-designating of paragraphs, the rule has reorganized and modified some sections to improve readability, such as in new sections. | Quantitative: Applicants - • None.<br><br>DHS/USCIS - • None.<br><br>Qualitative: Applicants – • None.<br><br>DHS/USCIS – • None. | Quantitative: Applicants - • None.<br><br>DHS/USCIS - • None.<br><br>Qualitative: Applicants – • The benefit of these changes is to make the application process clearer for T visa applicants.<br><br>DHS/USCIS – • None. |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 2 presents the prepared accounting statement showing the costs and benefits to each individual affected by this final rule using the post-IFR baseline.[47]

[47] Office of Mgmt. & Budget, Exec. Office of the President, "OMB Circular A–4" (2003), *https:// www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/circulars/A4/a-4.pdf.*

**Table 2. OMB A-4 Accounting Statement ($ millions, FY 2021)**
**Time Period: FY 2023 through FY 2032** Post-IFR Baseline

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Monetized Benefits | N/A | | | Regulatory Impact Analysis ("RIA") |
| Annualized quantified, but unmonetized, benefits | N/A | | | RIA |
| Unquantified Benefits | This rule will allow certain T visa applicants the opportunity to receive work authorization sooner and to receive forbearance from removal (deferred action) while their T visa applications are pending.<br><br>This rule prioritizes efficient T visa BFD review and protects the integrity of the BFD review by requiring review of initial required evidence and assessment of routine background checks. | | | RIA |
| **COSTS** | | | | |
| Annualized monetized costs (7%) | **$0.81** | N/A | N/A | RIA |
| Annualized monetized costs (3%) | **$0.81** | N/A | N/A | |
| Annualized quantified, but unmonetized, costs | N/A | | | |
| Qualitative (unquantified) costs | USCIS estimates that there will be a reduction in RFEs.  This reduction will save the applicant time and will allow USCIS to adjudicate their applications earlier.  The reduction in RFEs will also save USCIS adjudicators time because they will more frequently have all required information at the outset of adjudication.  This will allow USCIS to adjudicate applications more efficiently.  These are all seen as unquantified cost savings.<br><br>DHS may incur additional costs due to the time to review evidence from the new streamlined process; however, DHS cannot estimate how many applications would take additional time. | | | RIA |
| **TRANSFERS** | | | | |
| Annualized monetized transfers (7%) | **N/A** | N/A | N/A | |
| Annualized monetized transfers (3%) | **N/A** | N/A | N/A | |
| From whom to whom? | From the fee-paying populations to Form I-914 applicants. | | | |
| *Miscellaneous Analyses/Category* | *Effects* | | | *Source Citation* |
| Effects on State, local, or tribal governments | None | | | RIA |
| Effects on small businesses | None | | | RIA |
| Effects on wages | None | | | None |
| Effects on growth | None | | | None |

In addition to the impacts summarized above, and as required by OMB Circular A–4, table 3 presents the prepared accounting statement showing the costs and benefits to each individual affected by this final rule using the pre-IFR baseline.[48]

---

[48] Office of Mgmt. & Budget, Exec. Office of the President, "OMB Circular A–4" (2003), *https://*

*www.whitehouse.gov/wp-content/uploads/legacy_ drupal_files/omb/circulars/A4/a-4.pdf.*

**Table 3. OMB A-4 Accounting Statement ($ millions, FY 2021)**
**Time Period: FY 2017 through FY 2032,** Pre-IFR Baseline

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Monetized Benefits | N/A | colspan Regulatory Impact Analysis ("RIA") | | |
| Annualized quantified, but unmonetized, benefits | N/A | | RIA | |
| Unquantified Benefits | Provided clarity and consistency in DHS practice with DHS regulations will lead to a qualitative benefit providing transparency to both the victims of trafficking and USCIS adjudicators. Provided a broader definition of an eligible family member and may increase the number of eligible family members. Provided a benefit by acknowledging the significance of an applicant's maturity in understanding the importance of participating with an LEA. Victims who are likely to become a public charge are able to apply for T nonimmigrant status and receive the benefits associated with that status. Provided T nonimmigrants status for an additional year with the possibility of extension. Provided a broader definition of physical presence on account of trafficking and may increase the number of eligible applicants. Provided a qualitative benefit by removing an age-out restriction, allowing a principal applicant parent to apply for a child as a derivative beneficiary, even if the child reaches age 21 while the principal's T-1 application is pending. Provided a qualitative benefit by enabling the health and well-being of a minor victimized by trafficking. These victims also obtain federally funded benefits and services. | | RIA | |
| **COSTS** | | | | |
| Annualized monetized costs (7%) | N/A | | RIA | |
| Annualized monetized costs (3%) | N/A | | | |
| Annualized quantified, but unmonetized, costs | N/A | | | |
| Qualitative (unquantified) costs | N/A | | RIA | |
| **TRANSFERS** | | | | |
| Annualized monetized transfers (7%) | N/A | | RIA | |
| Annualized monetized transfers (3%) | N/A | | | |

| From whom to whom? | | |
|---|---|---|
| *Miscellaneous Analyses/Category* | *Effects* | *Source Citation* |
| Effects on State, local, or tribal governments | None | RIA |
| Effects on small businesses | None | RIA |
| Effects on wages | None | None |
| Effects on growth | None | None |

BILLING CODE 9111–97–C

2. Background and Population

As stated in the 2016 interim final rule, Congress created T nonimmigrant status in the Trafficking Victims Protection Act (TVPA) of 2000. T nonimmigrant status is available to victims of a severe form of trafficking in persons who comply with any reasonable request for assistance from law enforcement agencies (LEAs) in investigating or prosecuting the perpetrators of these crimes and who meet other requirements. T nonimmigrant status provides temporary immigration benefits (nonimmigrant status and employment authorization) and the ability to adjust to lawful permanent resident status, provided that established criteria are met, and a favorable exercise of discretion is warranted. Additionally, if a victim of a severe form of trafficking in persons obtains T nonimmigrant status, then certain eligible family members may also obtain T nonimmigrant status.[49]

Table 4 provides the number of T nonimmigrant application receipts, approvals, and denials for principals and derivative family members for FY 2017 through FY 2022. Although the maximum annual number of T nonimmigrant visas that may be granted is 5,000 for T–1 principal applicants per fiscal year[50] Table 4 shows that based on a 6-year annual average, DHS receives 2,889 Form I–914 applications (both Form I–914 and I–914 Supplement A) per year.

| Table 4. USCIS Processing Statistics for Form I-914[1] and Form I-914 Supplement A FY 2017 through FY 2022. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | VICTIMS (T-1), Form I-914 | | | FAMILY OF VICTIMS (T-2 through T-6), Form I-914A | | | Form I-914 and Form I-914A TOTALS | | |
| FY | Receipts | Approved | Denied | Receipts | Approved | Denied | Receipts | Approved | Denied |
| **2017** | 1,141 | 672 | 226 | 1,118 | 690 | 115 | 2,259 | 1,362 | 348 |
| **2018** | 1,666 | 580 | 310 | 1,313 | 698 | 261 | 2,979 | 1,278 | 571 |
| **2019** | 1,302 | 495 | 390 | 1,029 | 464 | 236 | 2,331 | 959 | 626 |
| **2020** | 1,207 | 1,041 | 798 | 992 | 1,013 | 526 | 2,199 | 2,054 | 1,324 |
| **2021** | 1,596 | 826 | 564 | 1,033 | 623 | 379 | 2,629 | 1,449 | 943 |
| **2022** | 3,070 | 1,715 | 389 | 1,865 | 1,319 | 247 | 4,935 | 3,034 | 636 |
| **6-year Total** | **9,982** | **5,329** | **2,677** | **7,350** | **4,807** | **1,764** | **17,332** | **10,136** | **4,448** |
| **6-year Annual Average** | **1,664** | **888** | **446** | **1,225** | **801** | **294** | **2,889** | **1,689** | **741** |

Notes:
[1]Approved and denied volumes may not add up to the receipts in a given fiscal year because the processing and final adjudication decision for T nonimmigrant status applications may overlap fiscal years, due to backlogs.  USCIS records indicate that processing an application for T nonimmigrant status requires an estimated 6 to 9 months.  Data source for the table: Performance Analysis System (PAS), USCIS Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch (DARB), March 2023& USCIS Analysis.

Table 5 shows the number of receipts received with and without Form G–28, FY 2017 through FY 2022. Based on a 6-year annual average, DHS estimates the annual average receipts to be 2,909 and the annual average number of Form G–28 receipts to be 2,673. Based on these figures, DHS estimates that 92 percent of Form I–914 receipts are filed by applicants represented by an attorney or accredited representative. The data in table 4 and table 5 differ due to the dates the data were pulled and the different systems from which they were pulled. Both data sources are accurate; however, they use different criteria/assumptions to extract the results from USCIS sources. Estimates in table 4 are based

---

[49]The current T nonimmigrant categories are T–1 (principal applicant), T–2 (spouse), T–3 (child), T–4 (parent), T–5 (unmarried sibling under 18 years of age); and T–6 (adult or minor child of a principal's derivative beneficiary).

[50]There is no statutory cap for grants of derivative T nonimmigrant status or visas.

on vintage data while results in table 5 continue to fluctuate in real-time, sometimes even in prior fiscal years, as updates are made in the administrative data.

| FY | Form G-28 Receipts Received without a Form I-914 and Form I-914 Supplement A | Form G-28 Receipts Received with a Form I-914 and Form I-914 Supplement A | Total Form I-914 and Form I-914 Supplement A Receipts | Percentage of Forms I-914 and Form I-914 Supplement A filed with Form G-28 |
|---|---|---|---|---|
| **2017** | 191 | 2,128 | 2,319 | 92% |
| **2018** | 415 | 2,516 | 2,931 | 86% |
| **2019** | 164 | 2,101 | 2,265 | 93% |
| **2020** | 135 | 2,010 | 2,145 | 94% |
| **2021** | 166 | 2,617 | 2,783 | 94% |
| **2022** | 343 | 4,667 | 5,010 | 93% |
| **6-year Total** | **1,414** | **16,039** | **17,453** | **92%** |
| **6-year Annual Average** | **236** | **2,673** | **2,909** | **92%** |

**Table 5. Total Form I-914 and Form I-914 Supplement A Receipts with and without Form G-28, FY 2017 through FY 2022.**

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), Claims 3 database. May 31, 2023 & USCIS Analysis.

DHS acknowledges that there was a significant increase in receipts in FY 2022 as shown in table 4 and table 5. While there was a sharp increase in this single year, DHS could not build a forecast solely based on the increase during a single year. This analysis uses a 6-year annual average as an estimate to calculate the total costs of this rule.

As Graph 1 shows, since FY 2005 there has been a gradual increase in receipts until FY 2022. On October 20, 2021, USCIS added comprehensive policy guidance on T visas to its Policy Manual.[51] The goal of the Policy Manual Update was to provide consolidated guidance as to how USCIS approaches T visa adjudication and interprets eligibility criteria. The Policy Manual offers more comprehensive guidance than previous USCIS policy sources and provides interpretation and examples of previously undefined terms and concepts. This will hopefully assist practitioners better identify trafficking survivors who are eligible for a T visa. This could be one possible reason that there were increased receipts in FY 2022.

[51] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA–2021–22 Policy Alert, "T Nonimmigrant Status for Victims of Severe Forms of Trafficking in Persons" (Oct. 20, 2021), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20211020-VictimsOfTrafficking.pdf.*



Graph 1. USCIS Processing Statistics for Form I-914 and Form I-914 Supplement A FY 2005 through FY 2022.

3. Updates to the Economic Analysis Since the 2016 Interim Rule, Pre-IFR Baseline

In this final rule, DHS has updated several definitions to provide clarity and ensure consistency with the Trafficking Victims Protection Act (TVPA) of 2000. DHS has amended provisions regarding bona fide determinations (BFD), which reflect a modified process. This process will now allow applicants for T nonimmigrant status to file a Form I–765, Application for Employment Authorization, concurrently with their Form I–914.

DHS also codified the evidentiary standard and standard of proof that apply to the adjudication of a T visa application. For T nonimmigrants, this rule retains the standard that applicants may submit any credible evidence relating to their T visa applications for USCIS to consider. This is presented as

a qualitative benefit to both USCIS and T nonimmigrant applicants.

The pre-IFR baseline is shown below with zero costs to the government or to the applicants. Because the pre-IFR baseline is identical to the post-IFR baseline, consistent with table 7, it is not useful to do a complete pre-IFR baseline and the analysis will focus on the post-IFR baseline.

Congress created the T nonimmigrant status in the TVPA of 2000. The TVPA provides various means to combat trafficking in persons, including tools for LEAs to effectively investigate and prosecute perpetrators of trafficking in persons. The TVPA also provides protection to victims of trafficking through immigration relief and access to Federal public benefits. DHS published an interim final rule on January 31, 2002, implementing the T nonimmigrant status and the provisions

put forth by the TVPA 2000.[52] The 2002 interim final rule established the eligibility criteria, application process, evidentiary standards, and benefits associated with obtaining T nonimmigrant status.

T nonimmigrant status is available to eligible victims of severe forms of trafficking in persons who comply with any reasonable request for assistance from LEAs in investigating and prosecuting the perpetrators of these crimes or otherwise meet the statutory criteria. T nonimmigrant status provides temporary immigration benefits (nonimmigrant status and employment authorization) and a pathway to permanent resident status, provided that established criteria are met. Additionally, if a victim obtains T nonimmigrant status, certain eligible family members may also apply to obtain T nonimmigrant status.[53]

---

[52] See 67 FR 4784.

[53] The current T nonimmigrant categories are: T–1 (principal applicant), T–2 (spouse), T–3 (child), T–4 (parent), and T–5 (unmarried sibling under 18 years of age). The interim rule created a new T nonimmigrant category, T–6 (adult or minor child of a principal's derivative).

| | VICTIMS (T-1), Form I-914 | | | FAMILY OF VICTIMS (T-2 through T-6), Form I-914 Supplement A | | | Form I-914 and Form I-914 Supplement A TOTALS | | |
|---|---|---|---|---|---|---|---|---|---|
| **FY** | Receipts | Approved | Denied | Receipts | Approved | Denied | Receipts | Approved | Denied |
| 2005 | 379 | 113 | 321 | 34 | 73 | 21 | 413 | 186 | 342 |
| 2006 | 384 | 212 | 127 | 19 | 95 | 45 | 403 | 307 | 172 |
| 2007 | 269 | 287 | 106 | 24 | 257 | 64 | 293 | 544 | 170 |
| 2008 | 408 | 243 | 78 | 118 | 228 | 40 | 526 | 471 | 118 |
| 2009 | 475 | 313 | 77 | 235 | 273 | 54 | 710 | 586 | 131 |
| 2010 | 574 | 447 | 138 | 463 | 349 | 105 | 1,037 | 796 | 243 |
| 2011 | 967 | 557 | 223 | 795 | 722 | 137 | 1,762 | 1,279 | 360 |
| 2012 | 885 | 674 | 194 | 795 | 758 | 117 | 1,680 | 1,432 | 311 |
| 2013 | 799 | 848 | 104 | 1,021 | 975 | 91 | 1,820 | 1,823 | 195 |
| 2014 | 944 | 613 | 153 | 925 | 788 | 105 | 1,869 | 1,401 | 258 |
| 2015 | 1,062 | 610 | 294 | 1,162 | 694 | 192 | 2,224 | 1,304 | 486 |
| 2016 | 953 | 750 | 194 | 895 | 986 | 163 | 1,848 | 1,736 | 357 |

**Table 6. USCIS Processing Statistics for Form I-914[1] and Form I-914 Supplement A FY 2005 through FY 2016.**

Notes: Approved and denied volumes may not add up to the receipts in a given fiscal year because the processing and final decision for T nonimmigrant status applications may overlap fiscal years.  USCIS records indicate that processing an application for T nonimmigrant status requires an estimated 6 to 9 months.  Data for T-6 applications has been collected since January 2014 and is included in FY 2014 – FY 2016.

Data source for the table:  Performance Analysis System (PAS), USCIS Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch (DARB).

Table 6 provides the number of T nonimmigrant application receipts, approvals, and denials for principal victims and derivative family members for FY2005 through FY2016. The maximum annual number of T nonimmigrant visas that may be granted is 5,000 for T–1 principal applicants per fiscal year.

From the publication of the interim final rule in 2002 through 2016, Congress passed various statutes amending the original TVPA 2000. These include: the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA 2003), the Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA 2005), the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA 2008), and the Violence Against Women Reauthorization Act of 2013 (VAWA 2013). After the passage of each of the statutes, as noted in section I.A.1 of this preamble, USCIS issued policy and guidance memoranda to both implement the provisions of the Acts and to ensure compliance with the legal requirements of the Acts.[54]

The 2016 interim final rule codified DHS policy and guidance from these statutes into the Code of Federal Regulations (CFR). The statutory changes from TVPRA 2003, TVPRA 2008, and VAWA 2005 are reflected in table 7, below. Codifying existing USCIS policy and guidance ensures that the regulations are consistent with the applicable legislation, and that the general public has access to these policies through the CFR without locating and reviewing multiple policy memoranda. DHS provides the impact of these provisions in table 7 assuming a pre-IFR baseline per OMB Circular A–4 requirements.

**BILLING CODE 9111–97–P**

---

[54] See U.S. Citizenship and Immig. Servs., U.S. Dep't of Homeland Security, "Trafficking Victims Protection Reauthorization Act of 2003," (2004); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008: Changes to T and U Nonimmigrant Status and Adjustment of Status Provisions; Revisions to AFM Chapters 23.5 and 39 (AFM Update AD10–38)" (2010), https://www.uscis.gov/sites/default/ files/document/memos/William-Wilberforce-TVPRAct-of-2008-July-212010.pdf; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Extension of Status for T and U Nonimmigrants; Revisions to Adjudicator's Field Manual (AFM) Chapter 39.1(g)(3) and Chapter 39.2(g)(3) (AFM Update AD11–28)" (2011), https:// www.uscis.gov/sites/default/files/document/ memos/exten.status-tandu-nonimmigrants.pdf; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "New T Nonimmigrant Derivative Category and T and U Nonimmigrant Adjustment of Status for Applicants from the Commonwealth of the Northern Mariana Islands" (2015), https://www.uscis.gov/sites/default/files/ document/memos/2015-0415-TNonimmigrant-TVPRA.pdf.

**Table 7. Summary of Impacts to the Regulated Population of TVPRA 2003, TVPRA 2008 and VAWA 2005 Statutory Changes Codified by this Interim Rule**

| Provision | Current policy | Expected cost of the interim rule | Expected benefit of the interim rule | Actual Outcome of Changes |
|---|---|---|---|---|
| Expanding the definition and discussion of LEA (added by VAWA 2005) | LEA includes State and local law enforcement agencies | None | Provides clarity and consistency in DHS practice with DHS regulations will lead to a qualitative benefit providing transparency to both the victims of trafficking and USCIS adjudicators. | There were no costs associated with this change. This provision provided clarity to the victims and adjudicators. |
| Removing the requirement that eligible family members must face extreme hardship if the family member is not admitted to the United States or was removed from the United States (removed by VAWA 2005) | Family members may be eligible for T nonimmigrant status without having to show extreme hardship | No additional costs, other than the opportunity cost of time to file Form I-914 Supplement A. However, DHS reiterates that this is a voluntary provision | Provides a broader definition of an eligible family member and may increase the number of eligible family members. | There were no costs associated with this change. This provision provided increased the number of eligible family members. |
| Raising the age at which the applicant must comply with any reasonable request by an LEA for assistance in an investigation or prosecution of acts of trafficking in persons (added by TVPRA 2003) | The provision increased the minimum age requirement from 15 years to 18 years of age | None | Provides a benefit by acknowledging the significance of an applicant's maturity in understanding the importance of participating with an LEA. | There were no costs associated with this change. |

| | | | | |
|---|---|---|---|---|
| Exempting T nonimmigrant applicants from the public charge ground of inadmissibility (added by TVPRA 2003) | DHS may grant T nonimmigrant status to applicants even if they are likely to become a public charge | No additional costs, other than the opportunity cost of time to file Form I-914 and if necessary, Supplement B | Victims who are likely to become a public charge are able to apply for T nonimmigrant status and receive the benefits associated with that status. | There are no costs associated with this change. This provision allowed victims who were likely to become a public charge |
| Exemptions to an applicant's requirement, to comply with any reasonable request by an LEA (added by TVPRA 2008) | Applicants are exempt from the requirement to comply with any reasonable request by an LEA in cases where the applicant is unable to comply, due to physical or psychological trauma | None | Provides a benefit by acknowledging the significance of an applicant's mental capacity in understanding the importance of participating with an LEA. | There are no costs associated with this change. |
| Limiting duration of T nonimmigrant status but providing extensions for LEA need, for exceptional circumstances, and for the pendency of an application for adjustment of status (VAWA 2005 and TVPRA 2008) | Extends the duration of T nonimmigrant status from 3 years to 4 years, but limits the status to 4 years unless an applicant can qualify for an extension | None | Provides T nonimmigrants status for an additional year with the possibility of extension. | There were no costs associated with this change. |
| Expanding the regulatory definition of physical presence on account of trafficking (added by TVPRA 2008) | DHS will consider victims as having met the physical presence requirement if they were allowed entry into the United States for participation in investigative or judicial processes associated with an act or perpetrator trafficking for purposes of eligibility for T nonimmigrant classification | None | Provides a broader definition of physical presence on account of trafficking and may increase the number of eligible applicants. | There were no costs associated with this change. This provision allowed more applicants to be eligible. |

| | | | | |
|---|---|---|---|---|
| Allowing principal applicants under 21 years of age to apply for derivative T nonimmigrant status for unmarried siblings under 18 years and parents as eligible derivative family members (added by TVPRA 2003) | Unmarried siblings under 18 years of age and parents of the principal applicant may now be eligible for T nonimmigrant status under the T-4 and T-5 derivative category, if the principal applicant is under age 21 | No additional costs, other than the opportunity cost of time to file Form I-914 Supplement A on behalf of the principal's unmarried siblings under 18 years of age and parents | Provides a broader definition of eligible family member and may increase the number of eligible family members. | There were no costs associated with this change.  This provision allowed more family members to be eligible. |
| Providing age-out protection for child principal applicants to apply for eligible family members (added by TVPRA 2003) | A principal applicant who was under 21 years of age at the time of filing the Form I-914 can file Form I-914 Supplement A on behalf of eligible family members, including parents and unmarried siblings under age 18, even if the principal alien turns 21 years of age before the principal T-1 application is adjudicated | None | Provides a qualitative benefit by removing an age-out restriction, allowing principal applicants to apply for parents and unmarried siblings under age 18, even if the principal applicant turns 21 years of age before the T-1 application is adjudicated. | There were no costs associated with this change.  This provision allowed more applicants to be eligible. |
| Providing age-out protection for child derivatives (added by TVPRA 2003) | An unmarried child of the principal who was under age 21 on the date the principal applied for T-1 nonimmigrant status may continue to qualify as an eligible family member, even if he or she reaches age 21 while the T-1 application is pending | None | Provides a qualitative benefit by removing an age-out restriction, allowing a principal applicant parent to apply for a child as a derivative beneficiary, even if the child reaches age 21 while the principal's T-1 application is pending. | There were no costs associated with this change.  This provision allowed more applicants to be eligible. |

| | | | | |
|---|---|---|---|---|
| Allowing principal applicants of any age to apply for derivative T nonimmigrant status for unmarried siblings under 18 years of age and parents as eligible family members if the family member faces a present danger of retaliation as a result of the principal applicant's escape from a severe form of trafficking or cooperation with law enforcement (added by TVPRA 2008) | Allows any principal applicant, regardless of age, to apply for derivative T nonimmigrant status for parents or unmarried siblings under 18 years of age if they face a present danger of retaliation | No additional costs, other than the opportunity cost of time to file Form I-914 Supplement A, on behalf of the derivative's unmarried siblings under 18 years of age and parents | If eligible, unmarried siblings under 18 years of age and parents of principal applicants may qualify for T-4 and T-5 nonimmigrant status and obtain the immigration benefits that accompany that status. In addition, LEAs may benefit if more victims come forward to report trafficking crimes. | There were no costs associated with this change.<br><br>This provision allowed more applicants to be eligible. |
| Care and custody of unaccompanied children with the HHS (added by TVPRA 2008) | Federal agencies must notify HHS upon apprehension or discovery of an unaccompanied child or any claim or suspicion that an individual in custody is under 18 years of age. Minors are eligible to receive federally funded benefits and services as soon as they are identified by HHS as a possible victim of trafficking | DHS may have some additional administrative costs associated with informing HHS of unaccompanied children. As a result, HHS may have some additional costs in providing benefits and services to the affected minors | Provides a qualitative benefit by enabling the health and well-being of a minor victimized by trafficking. These victims also obtain federally funded benefits and services. | There were no costs recorded with this change. |

BILLING CODE 9111–97–C

In calculating the additional costs of the increased time burden to Form I–765, DHS uses updated wage and fiscal year data. Wages were updated according to the occupational data released by the Bureau of Labor Statistics (BLS). The 2016 interim rule used 2015 BLS data, and now more current data is available from 2022. The 2016 interim rule used fiscal year filing data from FY 2005 through FY 2015, and DHS has updated this analysis by using filing data from FY 2017 through FY 2022.

DHS is increasing the time burden for Form I–765 by 4 minutes from 4 hours and 30 minutes (4.5 hours) per response to 4 hours and 34 minutes (4.56 hours) to reflect the current Form I–765 estimated time burden. DHS is clarifying the Form I–765 instructions, increasing the time burden of the form, which includes the time for reviewing instructions, gathering the required documentation, and completing and submitting the request.

4. Costs, and Benefits of the Final Rule

(a) Bona Fide Determination Process

Although an extensive BFD process was codified in the 2016 IFR, such a process has not been consistently implemented in the last decade outside of litigation cases due to resource constraints. After this rule takes effect, on a routine basis USCIS will review an applicant's filing for completeness and conduct background checks to determine if the application is bona fide. If an applicant has not already filed a Form I–765, they will be notified that they may do so. Adjudicators will then consider whether an applicant warrants deferred action as a matter of discretion. This process will benefit the applicants with bona fide filings, as they will be invited to apply for an EAD when they receive their bona fide determination letter. Applicants may also choose to apply for an EAD at the same time they submit their Form I–914. USCIS plans to implement a process concurrently with this rule (*see* new 8 CFR 214.205 on the Bona Fide Determination Process) taking effect under which future applicants may file Form I–765 at the same time as their Form I–914. This will benefit the applicants because they will be more likely to apply for an EAD simultaneously and therefore be eligible to work sooner than they would have previously. This concurrent Form I–765 policy could be paused if, in the future, USCIS is able to process Form I–914 from intake to approval within a time frame that obviates the need for employment while the application is being adjudicated.

USCIS estimates that 100 percent of applicants will file Form I–765 concurrently with their Form I–914, so they may receive employment authorization quickly if USCIS determines that their T visa application is bona fide, that they warrant a favorable exercise of discretion to be granted deferred action, and that they warrant a discretionary grant of employment authorization, rather than waiting for USCIS to make a bona fide determination and inviting them to submit a Form I–765. DHS does not expect material impacts to the U.S. labor market from this final rule. DHS believes these impacts would accrue as benefits to the T visa applicants who apply for an EAD and their families.

Table 8 shows that the average adjudication timeframe from FY 2017 through 2022 was around 458 days from the time an applicant submits their T visa application, to the time they receive a final decision. The goal of this rule is that all applicants will apply for their BFD-based EAD at the same time they apply for their T visa. This will allow the applicants with bona fide filings to begin working earlier than they would have previously. DHS uses the 6-year annual average because it typically takes 1.25 years [55] for an adjudicative decision.[56]

| Table 8. Average Number of Days for Form I-914 Application to Notice of Decision of Approval or Denial, FY 2017 through FY 2022. | | | |
|---|---|---|---|
| **FY** | **Form I-914** | **Form I-914A** | **Average** |
| **2017** | 430 | 457 | 444 |
| **2018** | 625 | 615 | 620 |
| **2019** | 547 | 498 | 523 |
| **2020** | 359 | 309 | 334 |
| **2021** | 486 | 514 | 500 |
| **2022** | 303 | 347 | 325 |
| **6-year Total** | **2,750** | **2,740** | **2,746** |
| **6-year Annual Average** | **458** | **457** | **458** |

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), Claims 3 database.  June 07, 2023 & USCIS Analysis.

This new process would not add a large cost to the government because the process has been in place since 2002, when USCIS began adjudicating Form I–914. However, this change could add additional time to review cases. DHS cannot estimate how many additional applications would take additional time to review. DHS anticipates any particular case requiring additional time should not take more than an additional 15 to 30 minutes. This additional time will be a cost to USCIS.

As a part of the BFD process, if the statutory cap prevents further grants of T–1 nonimmigrant status, all BFD recipients will be placed on a waiting list. USCIS is unable to determine if, when, or for what duration T visa approvals will grow to exceed the annual statutory cap, but recent volumes depicted in Chart 1 suggest this occurrence is possible in the future. Past growth in the number of T visa approvals alone is not indicative of continued growth. While DOJ's Bureau of Justice Statistics collects data and reports statistics on human trafficking, they do not forecast trends.[57] Consequently, DHS cannot predict the contribution of growing T visa awareness to future volumes. The placement of individuals on the waiting list results in nominal cost to USCIS, as BFD recipients are simply moved to the waiting list once the cap is reached. In addition, applicants with a favorable BFD may be considered for deferred action and may request employment authorization based on a grant of deferred action. This change will benefit

---

[55] Calculation: 458 days/365 days in a year = 1.25 years.

[56] This analysis also assumes that the adjudication timeframe for Form I–914 will continue to require several months for the foreseeable future and thus not remove the incentive for simultaneous filing of Form I–765 that the faster EAD provides.

[57] *See* Bureau of Justice Statistics, U.S. Dep't of Justice, "Human Trafficking Data Collection Activities, 2022," *https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/htdca22.pdf* (last visited Sept. 27, 2023).

applicants because if they are unable to be approved for a T visa they may now receive deferred action and have the possibility to request employment authorization, allowing them to stay and lawfully work in the United States.

(b) Additional Time Burden for Form I–765

The revised BFD process allows T visa applicants the opportunity to apply for their BFD EAD concurrently with their T visa application. Under the revised BFD process, USCIS will review an applicant's file for completeness and complete background checks to determine if the applicant is bona fide. If an applicant has not already filed a Form I–765, they will be invited to do

so. T visa applicants did not previously file Form I–765 for employment authorization incident to T nonimmigrant status. DHS estimates that all T–1 visa applicants will now apply for a BFD-based EAD with their T visa application. Although T–1 visa applicants pay no fee to file Form I–765, DHS estimates the current public reporting time burden is 4 hours and 30 minutes (4.5 hours) for paper submissions, which includes the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.[58] DHS acknowledges that T visa applicants

filing Form I–765 may elect to acquire legal representation.

Table 9 shows the total receipts received for Form I–914 for FY 2017 through FY 2022. The table also shows the number of Form I–914 receipts filed with an attorney or accredited representative using Form G–28. The number of Form G–28 submissions allows USCIS to estimate the number of Forms I–765 that are filed by an attorney or accredited representative and thus estimate the opportunity costs of time for an applicant, attorney, or accredited representative to file each form. Based on a 6-year annual average, DHS estimates the annual average receipts of Form I–765 to be 2,909, with 92 percent of applications filed by an attorney.

| FY | Form G-28 Receipts Received without a Form I-914 and Form I-914 Supplement A | Form G-28 Receipts Received with a Form I-914 and Form I-914 Supplement A | Total Form I-914 and Form I-914 Supplement A Receipts | Percentage of Forms I-914 and Form I-914 Supplement A filed with Form G-28 |
|---|---|---|---|---|
| 2017 | 191 | 2,128 | 2,319 | 92% |
| 2018 | 415 | 2,516 | 2,931 | 86% |
| 2019 | 164 | 2,101 | 2,265 | 93% |
| 2020 | 135 | 2,010 | 2,145 | 94% |
| 2021 | 166 | 2,617 | 2,783 | 94% |
| 2022 | 343 | 4,667 | 5,010 | 93% |
| **6-year Total** | **1,414** | **16,039** | **17,453** | **92%** |
| **6-year Annual Average** | **236** | **2,673** | **2,909** | **92%** |

**Table 9. Total Form I-914 and Form I-914 Supplement A Receipts with and without Form G-28, FY 2017 through FY 2022.**

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), Claims 3 database. June 07, 2023 & USCIS Analysis.

Table 10 shows the total receipts received for Form I–914 for FY 2017 through FY 2022 for only the T–1 classification. The table also shows the number of Form I–914 receipts filed with an attorney or accredited

representative using Form G–28. The number of Form G–28 submissions allows USCIS to estimate the number of Form I–765 that are filed by an attorney or accredited representative and thus estimate the opportunity costs of time

for an applicant, attorney, or accredited representative to file each form. Based on a 6-year annual average, DHS estimates the annual average receipts of Form I–765 to be 1,664, with 92 percent of applications filed by an attorney.

---

[58] See U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Instructions for Application for T Nonimmigrant Status (Form I– 914), OMB No. 1615–0020 (expires Dec. 31, 2023) *https://www.uscis.gov/sites/default/files/document/* *forms/i-914instr.pdf* (time burden estimate in the Paperwork Reduction Act section).

| FY | Form G-28 Receipts Received without a Form I-914 | Form G-28 Receipts Received with a Form I-914 | Total Form I-914 Receipts | Percentage of Forms I-914 filed with Form G-28 |
|---|---|---|---|---|
| **2017** | 75 | 1,102 | 1,177 | 94% |
| **2018** | 295 | 1,319 | 1,614 | 82% |
| **2019** | 73 | 1,178 | 1,251 | 94% |
| **2020** | 64 | 1,082 | 1,146 | 94% |
| **2021** | 93 | 1,609 | 1,702 | 95% |
| **2022** | 218 | 2,877 | 3,095 | 93% |
| **6-year Total** | **818** | **9,167** | **9,985** | **92%** |
| **6-year Annual Average** | **136** | **1,528** | **1,664** | **92%** |

Table 10. Total Form I-914, T-1 Receipts with and without Form G-28, FY 2017 through FY 2022.

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD), Claims 3 database. June 07, 2023& USCIS Analysis.

In order to estimate the opportunity costs of time for completing and filing Form I–765, DHS assumes that an applicant will use an attorney or accredited representative to prepare Form I–765s or will prepare Form I–765 themselves. DHS estimates the opportunity cost of time for attorneys or accredited representatives using an average hourly wage rate of $78.74 for lawyers to estimate the opportunity cost of the time for preparing and submitting Form I–765.[59]

However, average hourly wage rates do not account for worker benefits such as paid leave, insurance, and retirement. DHS accounts for worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier using a Department of Labor (DOL), Bureau of Labor Statistics (BLS) report detailing average compensation for all civilian workers in major occupational groups and industries. DHS estimates the benefits-to-wage multiplier is 1.45.[60] DHS calculates the average total rate of compensation as 114.17 [61] per hour for a lawyer.

To estimate the new opportunity costs of time, USCIS uses an average total rate of compensation based on the effective minimum wage. DHS assumes that T visa applicants would have limited work experience/education and would therefore have lower wages. The Federal minimum wage is currently $7.25 per hour,[62] but many states have implemented higher minimum wage rates.[63] However, the Federal Government does not track a nationwide population-weighted minimum wage estimate. Individuals in the population of interest for an analysis could be located anywhere within the United States and may be subject to a range of minimum wage rates depending on the state or city in which they live.

For this final rule, DHS uses the most recent wage data from DOL, BLS National Occupational Employment and Wage Estimates. More specifically, we use the 10th percentile hourly wage estimate for all occupations as a reasonable proxy for the effective minimum wage when estimating the opportunity cost of time for individuals in populations of interest who are likely to earn an entry-level wage.[64] We also use the 10th percentile hourly wage estimate for individuals who are unemployed, or for individuals who cannot, or choose not to, participate in the labor market as these individuals

incur opportunity costs, assign valuation in deciding how to allocate their time, or both.

Due to the wide variety of unpaid activities an individual could pursue, such as childcare, housework, or other activities without paid compensation, it is difficult to estimate the value of that time. Even when an individual is not working for wages, their time has value. In addition, using a percentile of the hourly wage estimate for all occupations allows DHS the flexibility to adjust its estimates, when necessary, depending on the population(s) of interest for regulatory impact analyses. Moreover, BLS estimates account for changes in wages across the United States labor market, which includes any future changes to state minimum wage rates. DHS will continue to evaluate the most appropriate wage assumptions for the populations of interest in its regulatory impact analyses.

The 10th percentile hourly wage estimate for all occupations is currently $13.14, not accounting for worker benefits. DHS accounts for worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier. The benefits-to-wage multiplier is calculated using the most recent BLS report detailing average total employee compensation for all civilian U.S. workers.[65] DHS estimates the benefits-to-wage multiplier to be 1.45, which incorporates employee wages and salaries and the full cost of benefits,

---

[59] See Bureau of Labor Stat., U.S. Dep't of Labor, "Occupational Employment Statistics, May 2022, Lawyers," https://www.bls.gov/oes/2022/may/oes231011.htm (last visited May. 11, 2023).

[60] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/(Wages and Salaries per hour) ($42.48 Total Employee Compensation per hour)/($29.32 Wages and Salaries per hour) = 1.44884 = 1.45 (rounded). See Bureau of Labor Stat., U.S. Dep't of Labor, Economic News Release, "Employer Costs for Employee Compensation—December 2022," "Table 1. Employer Costs for Employee Compensation by ownership [Dec. 2022]," https://www.bls.gov/news.release/archives/ecec_03172023.htm (last updated Mar. 17, 2023). The Employer Costs for Employee Compensation measures the average cost to employers for wages and salaries and benefits per employee hour worked.

[61] Calculation: $78.74 * 1.45 = $114.17 total wage rate for lawyer.

[62] See U.S. Dep't of Labor, "Minimum Wage," https://www.dol.gov/general/topic/wages/minimumwage (last visited May 17, 2023).

[63] See U.S. Dep't of Labor, "State Minimum Wage Laws," https://www.dol.gov/agencies/whd/minimum-wage/state (last visited May 17, 2023).

[64] See Bureau of Labor Stat., U.S. Dep't of Labor, "Occupational Employment Statistics," https://www.bls.gov/oes/2022/may/oes_nat.htm#00-0000 (last visited May 15, 2023). The 10th, 25th, 75th and 90th percentile wages are available in the downloadable XLS file link.

[65] See Bureau of Labor Stat., U.S. Dep't of Labor, Economic News Release, "Employer Costs for Employee Compensation—December 2022," "Table 1. Employer costs for employer compensation by ownership," https://www.bls.gov/news.release/archives/ecec_03172023.pdf (last visited Mar. 17, 2023).

such as paid leave, insurance, and retirement.[66] Therefore, using the benefits-to-wage multiplier, DHS calculates the total rate of compensation for individuals as $19.05 per hour for this final rule, where the 10th percentile hourly wage estimate is $13.14 per hour and the average benefits are $5.91 per hour.[67]

DHS uses the historical Form G–28 filings of 92 percent by attorneys or accredited representatives accompanying T visa applications as a proxy for how many may accompany Form I–765 applications. The remaining 8 percent [68] of T visa applications are filed without a Form G–28. DHS estimates that a maximum of 1,528 applications annually would be filed with a Form G–28 and 136 applications would be filed by the applicant.

To estimate the opportunity cost of time to file Form I–765, DHS applies the newly estimated time burden 4 hours and 34 minutes (4.56 hours) for to the newly eligible population and compensation rate of who may file the form. Therefore, for those newly eligible, as shown in table 11, DHS estimates the total annual opportunity cost of time to applicants completing and filing Form I–765 applications are estimated to be $795,500 for lawyers and estimates the cost to be $11,814 for applicants who submit their own application. DHS estimates the total additional cost for completing and filing Form I–765 are expected to be $807,314 annually.

| Table 11. Average Annual Opportunity Costs of Time to Newly Eligible Form I-914 Applicants applying for Form I-765 | | | | |
|---|---|---|---|---|
| | **Affected Population** | **Time Burden to Complete Form I-765 (Hours)** | **Cost of Time (Hourly)** | **Annual Opportunity Cost** |
| | A | B | C | D=(AxBxC) |
| **Attorney- Paper Form** | 1,528 | 4.56 | $114.17 | $795,500 |
| **Applicant- Paper Form** | 136 | 4.56 | $19.05 | $11,814 |
| **Total** | **1,664** | | | **$807,314** |
| Source: USCIS Analysis | | | | |

(c) Clarifying Eligibility Requirements To Reduce RFEs

DHS is codifying the evidentiary standard and standard of proof that apply to the adjudication of a T visa. For T nonimmigrants, this rule retains the standard that applicants may submit any credible evidence relating to their T applications for USCIS to consider. This expression in the evidentiary standard and standard of proof could affect the number of requests for evidence (RFE) that USCIS must send for Form I–914. DHS is also making clarifications to eligibility requirements. USCIS estimates that there will be a reduction in RFEs. Table 12 shows the total number of requests for evidence (RFE) for FY 2017 through FY 2022. Based on a 6-year annual average, DHS estimates the annual requests for information to be 1,107.

| Table 12. Form I-914 Receipts with additional Requests for Evidence (RFEs), FY 2017 through FY 2022. | | | |
|---|---|---|---|
| **Reported Fiscal Year** | **Non-RFE Count** | **RFE Count** | **Total** |
| **2017** | 1,343 | 976 | 2,319 |
| **2018** | 1,330 | 1,601 | 2,931 |
| **2019** | 1,037 | 1,228 | 2,265 |
| **2020** | 1,128 | 1,017 | 2,145 |
| **2021** | 2,262 | 521 | 2,783 |
| **2022** | 3,709 | 1,301 | 5,010 |
| **6- year Total** | **10,809** | **6,644** | **17,453** |
| **6year Annual Average** | **1,802** | **1,107** | **2,909** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division (PRD)/ Data Analysis Branch, Claims 3 database.  June 07, 2023 & USCIS Analysis. | | | |

---

[66] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour)/ (Wages and Salaries per hour) = $42.48/$29.32 = 1.45 (rounded). *See* Bureau of Labor Stat., U.S. Dep't of Labor, Economic News Release, "Employer Costs for Employee Compensation—December 2022," "Table 1. Employer costs for employer compensation by ownership," *https://www.bls.gov/news.release/archives/ecec_03172023.pdf* (last updated Mar. 17, 2023).

[67] The calculation of the benefits-weighted 10th percentile hourly wage estimate: $13.14 per hour * 1.45 benefits-to-wage multiplier = $19.053 = $19.05 (rounded) per hour.

[68] Calculation: 100 percent—92 percent filing with Form G–28 = 8 percent only filing Form I–914.

Based on the additional information expected to be provided with the initial Form I–914 filing USCIS estimates that there will be a reduction in RFEs. This change will also reduce the burden on applicants because they will be better aware of the evidentiary requirements from the outset, and they will not have to take the time to search for additional information subsequent to the submission of their application. DHS cannot estimate the amount of time each applicant takes to search for additional information. This would then allow the applicant to receive their employment authorization document earlier and allow them to work sooner. The reduction in RFEs will also save USCIS adjudicators time because they will not have to return to a particular application a second time once USCIS receives the additional required evidence. This change will make the overall process faster for applicants and USCIS.

(d) Technical Changes, Clarifying Definitions, and Other Qualitative Impacts in This Final Rules

The remaining changes in this final rule do not add quantifiable implications beyond those already discussed in the 2016 IFR. This rule moves the regulations for T nonimmigrant status to a separate subpart of 8 CFR part 214 to reduce the length and density of part 214, while making it easier to locate specific provisions. In addition to the renumbering and redesignation of paragraphs, the rule has reorganized and reworded some sections to improve readability, such as in new 8 CFR 214.204(d)(1) (discussing the law enforcement agency (LEA) declaration) and 8 CFR 214.208(e)(1) (discussing the trauma exception to the general requirement of compliance with any reasonable law enforcement requests for assistance).

The rule also divides overly long paragraphs into smaller provisions to improve the organization and understanding of the regulations. The reorganization of the rule does not impact the analysis provided in the 2016 IFR. DHS also added clarifying language to support current eligibility and application requirements in response to public comments. These changes are consistent with the Immigration and Nationality Act and the Trafficking Victims Protection Act. The primary benefit of these changes is to make it clearer and easier for T visa applicants to understand and apply for T nonimmigrant status.

DHS is also amending 8 CFR 214.11(k) (redesignated here as 8 CFR 214.211) implementing section 101(a)(15)(T)(ii)(III) of the INA, 8 U.S.C. 1101(a)(15)(T)(ii)(III), to clarify that, USCIS will evaluate any credible evidence demonstrating the derivative applicant's present danger of retaliation in cases where the LEA has not investigated the acts of trafficking after the applicant reported the crime. This revision benefits the applicant, because it provides greater clarity on the evidence USCIS will consider in determining their eligibility. The "any credible evidence" standard also encompasses evidence originating from a family member's home country; however, DHS has clarified that evidence may be from the United States or any country in which an eligible family member faces retaliation. 8 CFR 214.211(g). This flexibility is shown as an unquantified benefit the applicant to provide additional credible evidence in order to establish eligibility.

DHS has also clarified in the preamble that the "continued victimization" criteria referenced at 8 CFR 214.207(b)(1) does not require that the applicant is currently a "victim of a severe form of trafficking in persons," but instead may include ongoing victimization that directly results from either ongoing or past trafficking. This will allow applicants who were victims of a severe form of trafficking in persons in the past, departed the United States, and reentered as a result of their continued victimization to establish that they meet the physical presence eligibility requirement without demonstrating that they are currently victims of a severe form of trafficking in persons. DHS cannot estimate how many victims may now be able to establish that they meet the physical presence eligibility requirement due to this change. This clarification benefits applicants who may be able to satisfy the physical presence requirement if their reentry into the United States was the result of continued victimization tied to ongoing or past trafficking.

(e) Alternatives Considered

Where possible, DHS has considered, and incorporated alternatives to maximize net benefits under the rule. For example, DHS considered multiple different elements and the operational considerations for implementing a BFD review. DHS considered conducting a fully electronic T visa BFD review with extremely limited background checks and conducting physical file review with limited background checks. However, DHS chose an approach that accommodated public comments, preserves a good faith review of the initial filing, removes barriers to the immigration process, and prioritizes efficient T visa BFD review. This protects the integrity of the BFD review by requiring review of initial required evidence and assessment of routine background checks.

5. Final Costs of the Final Rule

(a) Undiscounted Costs

Table 13 details the annual costs of this final rule. DHS estimates the annual additional cost for completing and filing Form I–765 are expected to be $807,314.

| Table 13. Summary of Costs | |
|---|---|
| **Description** | **Annual Cost** |
| Changes to BFD Process | $807,314 |
| Source: USCIS Analysis | |

(b) Discounted Costs

Table 14 shows the total cost over the 10-year implementation period of this final rule. DHS estimates the total annualized costs to be $807,314 discounted at 3 and 7 percent.

| FY | Total Estimated Costs $807,314 (Undiscounted) | |
|---|---|---|
| | Discounted at 3 percent | Discounted at 7 percent |
| **2023** | $783,800 | $754,499 |
| **2024** | $760,971 | $705,139 |
| **2025** | $738,807 | $659,009 |
| **2026** | $717,288 | $615,896 |
| **2027** | $696,396 | $575,604 |
| **2028** | $676,113 | $537,947 |
| **2029** | $656,420 | $502,755 |
| **2030** | $637,301 | $469,864 |
| **2031** | $618,739 | $439,125 |
| **2032** | $600,717 | $410,398 |
| **10-year Total** | **$6,886,552** | **$5,670,236** |
| **Annualized Cost** | **$807,314** | **$807,314** |

Table 14. Total Undiscounted and Discounted Costs of this Final Rule Using the Post-IFR Baseline.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121, (Mar. 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, or governmental jurisdictions with populations of less than 50,000. This final rule does not mandate any actions or requirements for small entities. This final rule regulates individuals and individuals are not defined as a "small entities" by the RFA.[69] DHS did not receive any comments on small entities during the previous comment period. A regulatory flexibility analysis is not required when a rule is exempt from notice and comment rulemaking. The changes made in the interim rule were determined to not require advance notice and opportunity for public comment, because they are (1) required by various legislative revisions, (2) exempt as procedural under 5 U.S.C. 553(b)(A), (3) logical outgrowths of the 2002 interim rule, or (4) exempt from public comment under the "good cause" exception to notice-and-comment under 5 U.S.C. 553(b)(B). 81 FR 92288.

Therefore, a regulatory flexibility analysis is not required for this rule. Nonetheless, USCIS examined the impact of this rule on small entities under the Regulatory Flexibility Act, 5 U.S.C. 601(6). The individual victims of trafficking and their derivative family members to whom this rules applies are not small entities as that term is defined in 5 U.S.C. 601(6).

*C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)*

This final rule is not a major rule as defined by section 804 of Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). This final rule likely will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*D. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments,

in the aggregate, or by the private sector. This rule is exempt from the written statement requirement because DHS did not publish a notice of proposed rulemaking for this rule.

In addition, the inflation-adjusted value of $100 million in 1995 is approximately $192 million in 2022 based on the Consumer Price Index for All Urban Consumers (CPI–U).[70] This proposed rule does not contain a Federal mandate as the term is defined under UMRA.[71] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

*E. Congressional Review Act*

The Office of Information and Regulatory Affairs has determined that this final rule is not a major rule, as defined by 5 U.S.C. 804, for purposes of congressional review of agency rulemaking pursuant to the Congressional Review Act, Public Law 104–121, sec. 251, 110 Stat. 868, 873 (codified at 5 U.S.C. 804). This rule will

---

[69] *See* Public Law 104–121, tit. II, 110 Stat. 847 (5 U.S.C. 601 note). A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act. *See* 15 U.S.C. 632(a)(1).

[70] *See* Bureau of Labor Stat., U.S. Dep't of Labor, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," *www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202212.pdf* (last visited Jan. 19, 2023). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2022); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2022—Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)]*100 = [(292.655 ¥ 152.383)/152.383]*100 = (140.272/152.383)*100 = 0.92052263*100 = 92.05 percent = 92 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars*1.92 = $192 million in 2022 dollars.

[71] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

not result in an annual effect on the economy of $100 million or more. DHS has complied with the reporting requirements of and has sent this final rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1). While the Congressional Review Act requires a delay in the effective date of 30 days, this rule has a delayed effective date of 120 days, to provide DHS time to comply with the Paperwork Reduction Act as explained later in this preamble.

*F. Executive Order 13132 (Federalism)*

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS does not expect this rule would impose substantial direct compliance costs on State and local governments or preempt State law. As stated above, neither the proposed rule nor this final rule modifies the extent of State involvement set by statute.

*G. Executive Order 12988 (Civil Justice Reform)*

This final rule meets the applicable standards set forth in section 3(a) and (b)(2) of E.O. 12988.

*H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This final rule does not have "tribal implications" because it does not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

*I. Family Assessment*

Section 654 of the Treasury and General Government Appropriations Act, 1999 (Pub. L. 105–277) requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being. Agencies must assess whether the regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) financially

impacts families, and whether those impacts are justified; (6) may be carried out by State or local government or by the family; and (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the determination is affirmative, then the agency must prepare an impact assessment to address criteria specified in the law. As discussed in the interim final rule, DHS assessed this action in accordance with the criteria specified by section 654(c)(1). This final rule will continue to enhance family well-being by aligning the regulation more closely with the statute. This rule will also enhance family well-being by encouraging vulnerable individuals who have been victims of a severe form of trafficking in persons to report the criminal activity and by providing critical assistance and immigration benefits. Additionally, this regulation allows certain family members to obtain T nonimmigrant status once the principal applicant has received status.

*J. National Environmental Policy Act*

DHS analyzes actions to determine whether the National Environmental Policy Act (NEPA) applies to them and, if so, what degree of analysis is required. DHS Directive 023–01, Revision 01, "Implementation of the National Environmental Policy Act," and DHS Instruction Manual 023–01–001–01, Revision 01, "Implementation of the National Environmental Policy Act (NEPA)" (Instruction Manual), establish the procedures DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA codified at 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4 and 1507.3(e)(2)(ii). The DHS categorical exclusions are listed in Appendix A of the Instruction Manual. For an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that demonstrate, or create the potential for, significant environmental impacts. Instruction Manual, section V.B(2)(a–c).

This action amends existing regulations governing requirements and procedures for victims of severe forms of trafficking in persons seeking T Nonimmigrant Status. The amended regulations codify and clarify eligibility criteria and will have no impact on the overall population of the United States and will not increase the number of immigrants allowed into the United States.

DHS analyzed the proposed amendments and has determined that this action clearly fits within categorical exclusion A3(a) in Appendix A of the Instruction Manual because the regulations being promulgated are of a strictly administrative or procedural nature. DHS has also determined that this action clearly fits within categorical exclusion A3(d) because it amends existing regulations without changing their environmental effect. This final rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, this final rule is categorically excluded from further NEPA review.

*K. Paperwork Reduction Act*

Under the Paperwork Reduction Act (PRA) of 1995, as amended, 44 U.S.C. 3501–3521, all Departments are required to submit to OMB, for review and approval, any reporting requirements inherent in a rule. In this final rule, DHS is addressing the public comments received on the revised information collections in the interim rule and also amending the application requirements and procedures that the interim rule provided for individuals to receive T nonimmigrant status. Therefore, DHS is revising Form I–914, Form I–914, Supplement A, Form I–914, Supplement B, and Form I–765, as well as the associated form instructions to conform with the new regulations. These forms are information collections under the PRA.

When DHS published the 2016 interim rule, it revised Form I–914, Form I–914, Supplement A, Form I–914, Supplement B, and the associated form instructions (OMB Control Number 1615–0099). DHS published two versions of the forms and associated instructions for public comment, the first version on December 20, 2016, and the second version on January 20, 2017. *See* DHS Docket No. USCIS–2011–0010 at *www.regulations.gov.* Once OMB approved the forms and the rule became effective, DHS published a final version of the forms and associated instructions, which were dated February 27, 2017.

On December 2, 2021, OMB approved and USCIS issued a revised Form I–914,

Form I–914, Supplement A, Form I–914, Supplement B, with additional changes. The December 2, 2021, changes were independent of the interim rule that is being finalized by this rule, but the changes made in that revision may obviate or address some of the public comments on the information collection requirements for the interim rule. *See* DHS Docket No. USCIS–2006–0059. In this final rule, USCIS is requesting comments for 60 days on this information collection by July 1, 2024. When submitting comments on the information collection, your comments should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, such as permitting electronic submission of responses.

Table 15 Information Collections, below, lists the information collections that are part of this rulemaking.

### Table 15. Information Collections

| OMB Control No. | Form No. | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0099 | I–914 | Application for Derivative T Nonimmigrant Status, and Declaration for Trafficking Victim | Revision of a Currently Approved Collection |
| 1615-0040 | I–765 | Application for Employment Authorization | Revision of a Currently Approved Collection |
| 1615-0013 | I–539 | Application to Extend/Change Nonimmigrant Status | No material change/Non-substantive change to a currently approved collection |
| 1615-0023 | I–485 | Application to Register Permanent Residence or Adjust Status | No material change/Non-substantive change to a currently approved collection |

This final rule requires non-substantive edits to the forms listed above where the Type of PRA Action column states, ''No material change/Non-substantive change to a currently approved collection.'' USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

USCIS Form I–914; Form I–914, Supplement A; Form I–914, Supplement B (OMB Control Number 1615–0099)

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a currently approved collection.

(2) *Title of Form/Collection:* Application for T Nonimmigrant Status, Application for Derivative T Nonimmigrant Status, and Declaration for Trafficking Victim.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* Form I–914, Form I–914, Supplement A, and Form I–914, Supplement B; USCIS.

(4) *Affected public who will be asked or required to respond:* Individuals or households. Form I–914 permits victims of a severe form of trafficking in persons and certain eligible family members to demonstrate that they qualify for temporary nonimmigrant status pursuant to the Victims of Trafficking and Violence Protection Act of 2000, and to receive temporary immigration benefits.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* Form I–914, 1,310 responses at 2.63 hours per response; Form I–914, Supplement A, 1,120 responses at 1.083 hours per response; Form I–914, Supplement B (section that officer completes), 459 responses at 3.58 hours per response; Form I–914, Supplement B (section that respondent completes), 459 responses at .25 hours per response.

Biometric processing 2,430 respondents requiring Biometric Processing at an estimated 1.17 hours per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 9,261 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated annual cost burden associated with this collection of information is $2,532,300.

USCIS Form I–765; I–765WS (OMB Control Number 1615–0040)

*Overview of information collection:*
(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization; I–765 Worksheet.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–765; I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of work authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–765 paper filing is 1,830,347 and the estimated hour burden per response is 4.56 hours; the estimated total number of respondents for the information collection I–765 online filing is 455,653 and the estimated hour burden per response is 4.00 hours; the estimated total number of respondents for the information collection I–765WS is 302,000 and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the information collection biometrics submission is 302,535 and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the information collection passport photos is 2,286,000 and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual

hour burden associated with this collection is 11,816,960 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

1. Comments on the Information Collection Changes to Form I–914 and Related Forms and Instructions Published With the 2016 Interim Rule

*Comment:* Two commenters on the 2016 interim rule also provided comments on the forms and associated instructions. One of the commenters had a general comment that applied to all the forms and instructions. The commenter wrote that although DHS published a table of changes for each of the forms, advocates and community members had not been able to review the actual forms and instructions with the final changes included. The commenter requested that the proposed forms and instructions with all planned changes be made available to the community and that DHS extend the comment period for the proposed forms to allow the community an opportunity to comment fully.

*Response:* DHS understands that the table of changes must be used in comparison with the previous versions of the form and instructions to determine the precise impact the changes have on the form and agrees that this comparison requires some effort. Nonetheless, the table of changes clearly indicated where the changes were being made or proposed to a sufficient extent to determine the effects on the form and the changes to the information collection burden.

Commenters also suggested specific revisions to the forms and associated instructions. DHS responds to those recommendations for each form, supplement, or instructions. Following this discussion, DHS explains the changes it is making on its own initiative for legal accuracy, consistency with the 2016 interim rule and the final rule, and enhanced clarity.

Form I–914

*Comment:* One commenter provided many recommendations to revise Form I–914. The commenter appears to have suggested edits to the version of Form I–914 labeled, "Form I–914, Application for T Nonimmigrant Status 10.20.16" published on December 20, 2016, with the 2016 interim rule. Thus, all the commenter's references to content of the form relate to that version. In discussing final changes all references are to the

version of the forms published in connection with this final rule.

The commenter recommended that DHS amend the question on page 1, part B, "General Information About You" requesting applicants to choose whether their gender is male or female. The commenter suggested including a blank space in which applicants could write in their gender identity. The commenter wrote that an increasing number of its clients who are survivors of trafficking identify as lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) and may identify as non-binary or gender non-conforming. The commenter stated that these clients face heightened vulnerabilities to trafficking and requiring applicants to select from a binary answer option may deter them from representing their preferred gender expression and perpetuate their marginalization.

*Response:* DHS notes that components across the Department are reviewing forms to pursue more inclusive sex and gender markers that accommodate non-binary and transgender individuals.[72] This will improve DHS's ability to verify identity, as well as to expand access to accurate identity documents, thereby reducing the risk of future harm to LGBTQI+ persons. DHS is also reviewing policy guidance, training materials, and website content to ensure they provide accurate guidance and consistently use appropriate terminology. To support these Department-wide efforts, DHS will revise the forms to include a third gender option, "Another Gender Identity." Including a third option on Form I–914, Form I–914, Supplement A, and Form I–914, Supplement B supports Executive Order 14012 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) to promote inclusion and identify barriers that impede access to immigration benefits.

*Comment:* Regarding questions related to T nonimmigrant status eligibility requirements in part C (now designated part 3), the commenter suggested that the questions be reordered to match the order that the requirements appear in the statute to facilitate completing and adjudicating the form.

---

[72] "Interagency Report on the Implementation of the Presidential Memorandum on Advancing the Human Rights of LGBTQI+ Persons Around the World," (2022) *https://www.state.gov/wp-content/uploads/2022/04/Interagency-Report-on-the-Implementation-of-the-Presidential-Memorandum-on-Advancing-the-Human-Rights-of-Lesbian-Gay-Bisexual-Transgender-Queer-and-Intersex-Persons-Around-the-World-2022.pdf.*

*Response:* DHS understands the commenter's stated rationale, but the commenter did not explain why reordering would make the form easier to complete. Neither adjudicators nor other stakeholders have reported any challenges with the ordering of the questions. DHS believes the suggested change is not essential enough to warrant the burden of reprogramming USCIS Form I–914 related computer systems.

*Comment:* On page 3, part C, "Additional Information," (now titled "Part 3. Additional Information About your Application") the commenter recommended deleting the question regarding whether the applicant's most recent entry was on account of the trafficking that forms the basis for the applicant's claim and requests that the applicant explain the circumstances of their most recent arrival. The commenter stated that to qualify for T nonimmigrant status, an applicant need only show physical presence in the United States on account of trafficking, and there is no requirement an applicant's most recent entry be on account of trafficking.

*Response:* The commenter is correct with respect to the statutory eligibility requirements; however, including this question does not mean that an applicant must show their last entry was related to their trafficking. *See* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T). The question (now located at part 3, question 9) helps provide information to adjudicators about the general circumstances of the applicant's most recent arrival, whether related to the trafficking or not, and information regarding the applicant's immigration history. All this information assists adjudicators in understanding the full history and facts of an applicant's claim. Accordingly, DHS declines to delete the question.

*Comment:* The form at part D, "Processing Information," question 1(a) (now part 4, question 1.A) asked whether the applicant has ever committed a crime or offense for which the applicant has not been arrested. The commenter suggested that DHS clarify the meaning of the question, noting that the question is broadly written and would include even minor criminal activity and behavior (such as jaywalking) that has no effect on the applicant's eligibility for T nonimmigrant status.

*Response:* DHS will maintain this question as it is useful for adjudicators in gathering relevant information related to determining admissibility and assessing the applicant's truthfulness. In addition, in DHS's experience, answers

to the question have provided information relevant to the applicant's trafficking experiences.

*Comment:* The commenter requested that DHS revise part D "Processing Information," question 3(a) (Now at part 4, question 2.A), regarding whether the applicant has engaged in prostitution or procurement of prostitution or intends to engage in prostitution or procurement of prostitution. The commenter stated that although the referenced conduct renders an applicant inadmissible under section 212(a)(2)(D) of the INA, 8 U.S.C. 1182(a)(2)(D), DHS should explicitly exclude acts of prostitution that occurred during trafficking and should clarify that this question does not apply to sex trafficking. The commenter also stated that this question causes confusion and anxiety for many of its clients who are victims of sex trafficking. The commenter suggested rephrasing the question to read: "Have you engaged in prostitution that was not related to being a victim of trafficking?"

*Response:* DHS declines to make the specific suggested change. The question is appropriate as written because engaging in prostitution is a ground of inadmissibility, regardless of whether it is connected to the victimization. If the applicant has engaged in this conduct and the prostitution was connected to the trafficking, the applicant can request a waiver but must still answer the question so that USCIS can assess whether the inadmissibility ground applies in the first instance, and thus whether a waiver is needed. USCIS will examine all the evidence submitted and decide on a case-by-case basis whether to grant any waiver request.

*Comment:* The commenter requested that DHS revise part D, "Processing Information," question 8, regarding whether the applicant has, "during the period of March 23, 1933, to May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, nationality, membership in a particular social group, or political opinion[.]" The commenter suggested that DHS delete the question entirely or preface it with the question: "Were you born before May 8, 1945?," followed by "If no, proceed to the next question." The commenter stated that, given the temporal limits, this question applies to an extremely limited number of applicants, and the question as written is confusing and time-consuming to explain to applicants.

*Response:* DHS declines to make the suggested revision. DHS appreciates the suggestion and will take it under consideration for future revision efforts, but will retain the question as is, to collect information about specific conduct that constitutes a ground of inadmissibility under section 212(a)(3)(E) of the INA, 8 U.S.C. 1182(a)(3)(E).

*Comment:* The form at part D, "Processing Information," question 8 (now part 4, question 8), asked whether the applicant has ever been present or nearby when a person was: "(a) intentionally killed, tortured, beaten or injured?; (b) displaced or moved from their residence by force, compulsion, or duress?; or (c) in any way compelled or forced to engage in any kind of sexual contact or relations?." The commenter requested that DHS delete the question, and indicated that the question was vague, led to confusion among attorneys and applicants, and did not relate to any particular ground of inadmissibility in section 212(a) of the INA, 8 U.S.C. 1182(a).

*Response:* DHS declines to delete the question. Although it does not relate to a specific ground of inadmissibility, the question tends to yield information helpful to adjudicators in understanding the details of both the victimization and the applicant's conduct, which are relevant to the adjudication of the claim for T nonimmigrant status.

The following suggestions have already been resolved by revisions to the Form I–914 and are maintained in the version of the form published with this final rule:

• Page 2, part C, "Additional Information," insert a question that allows an applicant to invoke the "trauma exception" for cooperation with law enforcement codified in section 101(a)(15)(T)(i)(III)(bb) of the INA, 8 U.S.C. 1101(a)(15)(T)(i)(III)(bb);

• Page 2, part C, "Additional Information," delete the question related to whether the applicant is submitting an LEA declaration on Form I–914, Supplement B and if not, to explain why;

• Page 4, part D, "Processing Information," delete question 2 on whether the applicant has ever received public assistance given that the 2016 interim rule indicates USCIS intends to remove this question on both Form I–914 and Form I–914, Supplement A; and

• Page 10, part H, "Checklist":
• Insert language in second box allowing applicants to indicate that they are asserting an exception to the compliance with reasonable law

enforcement requests requirement based on trauma;

• Delete checkbox indicating the applicant has included three photographs of the applicant; and

• Delete checkbox indicating the principal applicant has included three photographs of each family member for whom they are applying.

• DHS has deleted the checklist with the version of the Form I–914 and associated instructions published with this final rule because the instructions are sufficiently clear without the checklist, and it added unnecessary length to the forms. There is a checklist and other filing tips on the Form I–914 forms landing page.

Form I–914, Supplement A

DHS received suggestions from two commenters to revise Form I–914, Supplement A. One commenter proposed edits to the version of the supplemental form entitled, "Form I–914A, Supplement A, Application for Family Member of T–1 Recipient 10.20.16" published on December 20, 2016, with the 2016 interim rule. This commenter made several of the same suggestions it made on the Form I–914 in relation to the following questions, which DHS declines for the same reasons discussed above:

• Part E, "Processing Information," delete the question asking whether the family member has committed any offense for which they have not been arrested;

• Part E, "Processing Information," delete or simplify question 8 related to whether the family member has ever engaged in persecutory conduct between March 23, 1933, and May 8, 1945, in association with either the Nazi Government of Germany or any organization or government associated or allied with the Nazi Government of Germany;

• Part E, "Processing Information," delete question 9 on whether the applicant has ever been present or nearby during certain conduct.

The commenter also made suggestions that have already been resolved by revisions to Form I–914, Supplement A, and remain resolved with the publication of the Form I–914, Supplement A published with this final rule:

• Page 1, part A (now part 1), "Family Member Relationship to You," insert a box to include the T–6 derivative-of-derivative category; and

• Part E, "Processing Information," delete the question about whether the family member has ever received public assistance.

The other commenter proposed edits to the version of the supplemental form entitled, "(I–914A) Supplement A, Application for Family Member of T–1 Recipient 1.11.2017."

*Comment:* The commenter recommended that on page 1, part B, DHS remove the new additional heading "Part B. Family Member Relationship to Your Derivative" and combine the additional checkboxes related to the T–6 derivative category with the existing "Part A. Family Member Relationship to You." The commenter wrote that the new part B heading made it appear as though both parts A and B of Form I–914, Supplement A would need to be completed for all derivatives. The commenter wrote that combining the boxes in one heading would more clearly distinguish how the family member is related to the principal applicant.

*Response:* To address this concern, DHS has edited the form so that it is no longer divided into two parts with separate headings. The new form includes one part, labeled part 1, which has two items numbered 1 and 2, but do not contain further headings. DHS is removing the parenthetical "(the derivative)" in the title to previous part D (renumbered part 3), "Information About Your Family Member" consistent with the changes to new part 1. DHS amends the Form I–914 Instructions, as discussed in the next section, to provide further clarification on the questions in new part 1 and the form's references to family members.

Form I–914 Instructions

Commenters provided several comments on the Form I–914 Instructions. With respect to one of the commenters, it is not clear which version of the instructions its comments refer to, as some of the suggestions were already resolved by both versions of the form published in the docket with the 2016 interim rule. The other commenter's proposed edits relate to the version of the instructions entitled, "(I–914) Instructions for Application for T Nonimmigrant Status 1.11.2017." In discussing both commenters' proposed edits, DHS will use references to the January 11, 2017, version.[73]

*Comment:* One commenter suggested adding the statutory citation of section 103 of the TVPA, as amended, 22 U.S.C. 7102, for the definition of "a severe form of trafficking in persons" when explaining that to qualify for T

nonimmigrant status, an applicant must meet that definition at page 1, Point 1(A), "Who May File This Form?". The commenter explained that including the citation would easily refer applicants and advocates to review the statutory definition of "a severe form of trafficking in persons." *See* 22 U.S.C. 7102. The commenter mentioned that the instructions to Form I–918, Petition for U Nonimmigrant Status, provide references to the relevant designation of qualifying crimes.

*Response:* DHS agrees that the term "a severe form of trafficking in persons" has a specific legal meaning and that applicants may not readily understand the term. DHS has added language at new page 1, "What Is The Purpose of Form I–914?," to refer applicants to the language of the definition of "a severe form of trafficking" included in the section "Evidence to Establish T Nonimmigrant Status," which derives from the language in TVPA section 103, the citation suggested by the commenter.[74] This approach will provide applicants with easy reference to the actual definition.

*Comment:* The commenter recommended changing the description of family members who may be eligible for T nonimmigrant status based on facing a danger of retaliation at page 2, Point 2(C)(3), "Who May File This Form?" and at page 4, part B, "Completing Form I–914, Supplement A, Application for Family Member of T–1 Recipient." The commenter requested DHS use the term "your sibling's children" rather than the phrase "niece or nephew," which could have a more expansive definition than the regulations have intended. The commenter also recommended using the term "your parent's adult child" rather than "your sibling," explaining that the term sibling could include all siblings of a T–1 applicant, which it believed was a broader category than that of the adult or minor children of the parent.

*Response:* DHS disagrees with the commenter's reasoning. The terms suggested by the commenter would exclude some eligible family members who Congress intended to include in the statute. INA sec. 101(a)(15)(T)(ii)(III), 8 U.S.C. 1101(a)(15)(T)(ii)(III), provides that the "adult or minor child" of a

---

[73] Although it is not clear which version of the forms one commenter reviewed, the commenter's suggestions are consistent with the version dated January 11, 2017.

[74] The page numbers and section headings of the forms and instructions are provided in these comment responses to permit the commenter to find and review precisely how their comment was addressed. However, text may have shifted during final development and publication and DHS does not guarantee that the page numbers in the final version of the form will correspond to the page numbers cited here or as they existed on the forms when they were published for the interim rule or on January 10, 2018.

derivative of the principal who faces a present danger of retaliation may obtain derivative T nonimmigrant status. DHS interprets the term "adult or minor child" to encompass both the "son or daughter" and "child" immigration definitions; therefore, persons of any age and any marital status can be "adult or minor children." *See* USCIS Policy Memorandum, *New T Nonimmigrant Derivative Category and T and U Nonimmigrant Adjustment of Status for Applicants from the Commonwealth of the Northern Mariana Islands* (Oct. 30, 2014).[75] Because the term "child" is a legal term of art defined as an unmarried person who is under the age of 21, *see* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1), using the phrase "your parent's child" would only include unmarried children under age 21 of the principal's derivative parents. The term "your parent's child" would not include the adult children of the principal's derivative parents, or the married children of any age of the principal's derivative parents. The phrase "your sibling's children" would be similarly restrictive.

However, as discussed above, to provide greater clarity on the family relationship of the category of adult or minor children who may be eligible for T nonimmigrant status based on facing a danger of retaliation, DHS has revised Form I–914, Supplement A (*see* new page 1, part 1, item 2) and the Form I–914 Instructions (*see* new page 4, "Completing Form I–914, Supplement A, Application for Derivative T Nonimmigrant Status").

*Comment:* The commenter suggested changes to page 2, "General Instructions," part B, "General Information About You," item 1, and page 5, part D, "Information About Your Family Member (the derivative)," item 1. Both sections explained that the questions requesting the applicant's or family member's name refer to the name as shown on the individual's "birth certificate or legal name change document." The commenter requested DHS delete these explanations because some trafficking survivors do not have access to identity documents with the applicant's legal name, and such a requirement could create an evidentiary barrier for victims.

*Response:* It is important to maintain similar language as it provides clear instruction on the name that DHS is requesting. It is essential for DHS to know the name of the applicant or their family member as it appears on official

identification documents so that DHS can conduct proper background checks and ensure there is no confusion about the identity of the person receiving the status, if approved. Neither this explanation nor the questions on the form indicate that evidence of a specific document is a requirement to obtaining status. Furthermore, the requirement does not in any way impact an applicant's evidentiary burden. However, DHS has changed the phrasing to "birth certificate, passport, or other legal document" to provide more clarity. *See* new part 4, "Information About your Family Member," item 1.

*Comment:* Regarding the instruction at part D, "Information About Your Family Member," item 3, the commenter opposed the collection of the family member's intended physical street address because the 2016 interim rule states that DHS is allowed to disclose an applicant's information to a law enforcement agency with the authority to detect, investigate, or prosecute severe forms of trafficking in persons. The commenter wrote that disclosing the applicant's physical street address could jeopardize the victim's safety and recommended adding language to clarify that an applicant should only provide this information if it was safe to do so and could instead provide an alternate safe mailing address.

*Response:* DHS declines to make the change. The request for the applicant's physical street address is distinct from the request for the applicant's mailing address used to provide official correspondence. DHS allows applicants to provide an alternative mailing address if they do not feel it is safe to receive mail at their residence as noted on previous editions of the form as well as at new page 5, part 4, item 4. This provision is to protect against perpetrators having access to USCIS correspondence with the applicant. DHS requests the applicant's physical street address for internal information purposes and consistent with requirements that individuals applying for visas register their presence. *See* INA secs. 221(b), 261, 265, 8 U.S.C. 1201(b), 1301, 1305. Furthermore, while DHS appreciates the commenter's concern that sharing address information with law enforcement agencies could jeopardize an applicant's safety, that authority exists for the purpose of promoting investigation and prosecution of traffickers, not to put victims of trafficking at risk.

*Comment:* The commenter made a general recommendation that DHS clarify on page 2, "Completing Form I–

914," part B, number 3, that an applicant's home address will not be used to contact an applicant if the applicant provides an address in the "safe mailing address" space on the Form I–914.

*Response:* DHS believes that the explanation of the safe mailing address is clear on this point. The language explains that if an applicant does not feel secure in receiving correspondence regarding their application at the applicant's home address, the applicant should provide a safe mailing address. DHS maintains this language in the Form I–914 Instructions. *See* new page 3, part 3, "General Information About You," item 4, and new page 4, "Completing Form I–914, Supplement A, Application for Derivative T Nonimmigrant Status," part 4, item 4, for instructions regarding the safe mailing address.

*Comment:* The commenter also requested that the instructions at page 3, "Completing Form I–914," part B, number 6, include a clarification that the applicant's home telephone number will not be used to contact an applicant if they provide a telephone number in the "safe daytime telephone number" blank on the Form I–914.

*Response:* Again, DHS believes the explanation of the safe telephone number in the instruction at part 6 is clear and already explains that an applicant may include a safe daytime phone number if they wish. *See* new page 4, part 6, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature" and new page 6, part 6, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature" for instructions regarding the safe telephone number.

*Comment:* The other commenter requested DHS add an instruction to the section, "General Instructions," that applicants represented by an attorney should include on the Notice of Entry of Appearance as Attorney or Accredited Representative (Form G–28) to be filed with Form I–914 that the attorney also represents the applicant with respect to the Form I–765. The commenter reported that attorneys have experienced difficulty communicating with USCIS regarding the status of Employment Authorization Documents (EADs) for approved T–1 nonimmigrants when the attorney has submitted a Form G–28 in connection with the Form I–914.

*Response:* DHS agrees with the commenter's recommendation. Because USCIS has codified a new, streamlined Bona Fide Determination process, DHS believes it would be helpful for

---

[75] "T Derivative Memo," *https://www.uscis.gov/sites/default/files/document/memos/Interim_PM-602-0107.pdf*.

attorneys or representatives to include all forms covered by their representation on the Form G–28.

*Comment:* The commenter requested that in the "Evidence to Establish T Nonimmigrant Status" section of the Instructions, DHS delete the phrase "You must demonstrate that you were brought to the United States" and replace it with either "You must demonstrate that you were a victim of a severe form of trafficking as defined by 22 U.S.C. 7102" or with the full definition of the term "a severe form of trafficking in persons." The other commenter also suggested adding the statutory reference for the definition of "a severe form of trafficking in persons" so applicants could easily review the statutory definition.

*Response:* DHS declines to include the statutory citation but, as recommended, already included the actual language of the definition from 22 U.S.C. 7102 in the revisions to the Form I–914 Instructions published on December 2, 2021, and February 27, 2017, in conjunction with the 2016 interim rule. To provide an even more complete definition, DHS also added further detail from the definition of sex trafficking included at 22 U.S.C. 7102. *See* new page 8, "Evidence to Establish T Nonimmigrant Status," second items 1–2.

*Comment:* One commenter suggested adding language to the section "Evidence of Cooperation with Reasonable Requests from Law Enforcement." The commenter recommended adding after the statement that USCIS makes the decision of whether the applicant meets the eligibility requirements for T nonimmigrant status: "regardless of whether LEA chooses to investigate or prosecute the trafficking crime." The commenter wrote that the proposed language would further clarify that USCIS makes the final determination about whether an applicant is eligible for T nonimmigrant status and provide additional reassurance to law enforcement agencies that their declarations are not determinations of an individual's eligibility to obtain T nonimmigrant status.

*Response:* In DHS's view, the proposed language does not achieve the commenter's goal, and DHS believes the existing language is sufficient on this point; therefore, DHS declines to adopt this recommendation.

*Comment:* One of the commenters recommended deleting from the "Evidence to Establish T Nonimmigrant Status" section, language instructing applicants to describe their attempts to obtain a Form I–914, Supplement B if

one was not included with their Form I–914. The commenter wrote that there is no requirement in statute or the 2016 interim rule regulations requiring this information and that this instruction is inconsistent with the 2016 interim rule's clarification that Form I–914, Supplement B Declarations will be given "no special weight."

*Response:* This suggestion was resolved by revisions to the Form I–914 Instructions published on February 27, 2017, in conjunction with the 2016 interim rule. To provide additional clarity, however, DHS is adding guidance to the Form I–914 Instructions at new page 8, "Evidence of Cooperation with Reasonable Requests from Law Enforcement," that applicants are not required but may choose to provide evidence of their reasons for not submitting or attempting to obtain a Form I–914, Supplement B. In DHS's experience, if applicants choose to include this information, it can be helpful to adjudicators in understanding the full details of an applicant's claim and their engagement with law enforcement.

*Comment:* One commenter requested DHS update items 10–11, which directed applicants to discuss the harm or mistreatment they fear if removed from the United States and the reasons for the fear. The commenter stated that the factors detailed in 8 CFR 214.11(a) (redesignated here as 8 CFR 214.201) are broader than "harm" or "mistreatment" and that the current instructions fail to detail the types of extreme hardship involving unusual and severe harm contemplated by the 2016 interim rule.

*Response:* DHS acknowledges that this item's phrasing could be revised to ensure that applicants do not believe that USCIS only considers extreme hardship factors related to feared harm or mistreatment. Accordingly, DHS is revising the form to direct applicants to include information on the hardship that they believe they would suffer, including harm or mistreatment as examples. For conciseness, DHS has also combined items 10 and 11. DHS has also revised the other factors for consistency with the new regulatory text, discussed further below. *See* new page 9, "Personal Statement," item 3.

The following suggestions were resolved by subsequent revisions to the Form I–914 Instructions:

• Page 1, "Who May File this Form?," item 1(C), next to "under the age of 18:" insert the following text: "or is asserting an exception due to physical or psychological trauma;"
• Page 1, "Who May File this Form?," number 2, insert language to reflect T–6 classification;

• Page 1, "Who May File This Form?," add language to the heading to clarify that principal applicants can file for their eligible family members at any time after the initial T–1 application has been filed and that the principal applicant need not be granted T–1 nonimmigrant status before they can file for their eligible family members;
• Page 7, "Initial Evidence" and throughout the form, delete references to a requirement to submit passport photos;
• Page 7, "Evidence to Establish T Nonimmigrant Status," section 1, delete "You must demonstrate that you were brought to the United States . . .";
• Page 8, "Evidence of Cooperation with Reasonable Requests from Law Enforcement," add language that if an applicant does not provide Form I–914, Supplement B, they must provide additional evidence, which can be in the form of a declaration to show victimization and attempted cooperation with law enforcement;
• Page 8, "Personal Statement," delete item 2 that directed applicants to provide information on "the purpose for which [they] were brought to the United States";
• Page 8, "Personal Statement," delete item 6 requesting information on the length of time the applicant was detained by the traffickers because there is no requirement that the victim be detained in order to qualify for T nonimmigrant status;
• Page 8, "Personal Statement," delete item 9, instructing applicants to indicate why they were unable to leave the United States after being separated from the traffickers;
• Regarding the discussion of privacy in the instructions, add examples of the entities to which an applicant's information could be disclosed under 8 U.S.C. 1367;
• Throughout the instructions, delete distinctions between primary and secondary evidence, consistent with 2016 interim rule's elimination of this distinction; and
• Throughout the instructions, insert language to include the T–6 classification.

### Form I–914, Supplement B

One commenter provided suggested revisions to the Form I–914, Supplement B. It is not clear which version of the form the commenter refers to in its suggestions. In discussing the commenter's proposed edits, DHS will use references to the version of the Form I–914, Supplement B entitled, "(I–914B) Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons 1.9.2017" in the

rulemaking docket. The commenter made the same request it made with respect to Form I–914 and Form I–914, Supplement A to expand the options for answering the question on gender on page 1, part A, "Victim Information." DHS will make the suggested revision to the question about gender for the same reasons discussed above in DHS's response to comments to Form I–914.

*Comment:* The commenter recommended that at page 3, part E, "Family Members Implicated in Trafficking," in the question regarding whether the applicant believes that their family members were involved in the applicant's trafficking to the United States, DHS delete the phrase "to the United States." The commenter noted that the statutory requirement for eligibility is that the victim be physically present on account of trafficking and that there is no requirement that the trafficker trafficked the victim to the United States or brought the person to the United States for the purpose of trafficking.

*Response:* DHS agrees with the comment and is revising the question accordingly. *See* new page 4, part 5, "Family Members Implicated in Trafficking," question 1.

The following suggestion was resolved by subsequent revisions to the Form I–914, Supplement B and is maintained in the form revision published with this rule:

• Page 2, part C, "Statement of Claim," item 1, add the words "patronizing, or soliciting" after "obtaining" to reflect statutory changes made by the JVTA to the definition of sex trafficking codified at 22 U.S.C. 7102 and reflected in the definition of sex trafficking in the 2016 interim rule at 8 CFR 214.11(a).

Form I–914, Supplement B Instructions

One commenter made several requests to revise the Form I–914, Supplement B Instructions to the version entitled, "(I–914B) Instructions for Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons 1.9.2017."

*Commenter:* Regarding the first paragraph included on page 1, in the section, "What is the Purpose of this Form?," the commenter recommended DHS add language that "a formal investigation or prosecution is not required in order for a LEA to complete an endorsement." The commenter also suggested that DHS move to the beginning of the second paragraph under this heading the language that USCIS, not the LEA, makes the decision regarding whether the applicant meets the eligibility requirements for T

nonimmigrant status. The commenter wrote that some law enforcement officers believed that criminal charges or convictions were needed before Form I–914, Supplement B could be signed and that signing a Supplement B would lead to the automatic approval of an immigration benefit.

*Response:* The commenter's first suggestion was resolved by revisions to the Form I–914, Supplement B Instructions published on February 27, 2017, in conjunction with the 2016 interim rule. The instructions on page 1 in the third paragraph under the heading, "When Should I Use Form I–914, Supplement B?" clearly state that a formal investigation is not a requirement for an LEA to sign the form. The instructions also state in the first paragraph that a formal investigation or prosecution is not required for an LEA to complete the form. DHS declines to make the commenter's recommendation to move the language about USCIS' role in the adjudication process. DHS believes it is appropriate to describe the purpose of Form I–914, Supplement B before clarifying the respective roles of USCIS and the LEA signing the form. *See* new page 1, "When Should I Use Form I–914, Supplement B?".

*Comment:* At page 1 "When Should I Use Form I–914, Supplement B," and at page 2, part C, "Statement of the Claim," item 1, the commenter suggested adding the statutory citation for the definition of "a severe form of trafficking in persons" when explaining that to qualify for T nonimmigrant status, an applicant must meet that definition. *See* TVPA 103, 22 U.S.C. 7102. The commenter wrote that some officers interpret "severe" as extremely cruel or egregious activity or to mean the length of time in trafficking. The commenter wrote, for example, that a law enforcement officer had stated that 2 months of involuntary servitude was "not severe enough" to be trafficking. Other officers, the commenter continued, have stated that human trafficking means sex trafficking and have not recognized labor trafficking survivors as victims.

*Response:* DHS agrees it is important for LEAs to understand the term but declines to include the statutory citation to TVPA section 103, 22 U.S.C. 7102. The instructions refer the reader to the "Statement of Claim" section to read a definition, which includes a plain language definition that incorporates relevant text from the statute. *See* new page 2, part 3, "Statement of Claim," item 1.

*Comment:* The commenter suggested at page 2, "General Instructions," part A, "Victim Information," number 1, that

DHS remove from the instructions the text, "as shown on his or her birth certificate or legal name change document," for the same reasons discussed above in the section on the Form I–914 Instructions.

*Response:* DHS has revised the language in a similar manner as the Form I–914 Instructions. The language now refers to a "birth certificate, passport, or other legal document." As discussed above in the context of the same suggestion with respect to Form I–914 Instructions, it is important to provide clear instruction on what name USCIS is requesting. Neither this explanation nor the question on Form I–914, Supplement B indicate that the applicant must submit a specific document to obtain T nonimmigrant status or for law enforcement to sign a Form I–914, Supplement B. *See* new page 2, part 1, "Victim Information," item 1.

*Comment:* The commenter suggested that at page 2, part B, "Agency Information," number 1, DHS revise the discussion of certifying agencies to mirror language in the preamble to the 2016 interim rule and to include other agencies, such as the U.S. Department of Labor, that have the authority to provide a Form I–914, Supplement B.

*Response:* DHS agrees that the language in this section is inconsistent with the definition of LEA at 8 CFR 214.201 (previously 8 CFR 214.11(a)). Although DHS did not include every example of a certifying agency, DHS revised the Form I–914, Supplement B Instructions for consistency with the language in new 8 CFR 214.201 and included a cite to the new regulation. *See* new page 2, part 2, "Agency Information," item 1.

The following suggestions were resolved by revisions to the Form I–914, Supplement B Instructions published on February 27, 2017, in conjunction with the 2016 interim rule, and/or in the December 2, 2021, publication:

• Page 3, part C.1.D, "Statement of Claim," delete the option for law enforcement officers to certify that they believe the individual is not a victim of trafficking.

• Page 3, part D, "Cooperation of Victim," add language clarifying that if an applicant is unable to cooperate with LEA requests due to physical or psychological trauma or age, "the applicant must provide additional evidence."

2. Comments on Information Collection Changes to Form I–914, Application for T Nonimmigrant Status, and Related Forms and Instructions Published With Final Rule (60 Day Notice)

DHS received several comments on the January 10, 2018, **Federal Register** notice, many of which suggested revisions to the forms and associated instructions. DHS responds to those recommendations for each form, supplement, or instructions. DHS does not respond to comments outside the scope of the information collection.

Form I–914

*Comment:* A few commenters requested that on page 1, part 2, "U.S. Physical Address," the form include instructions informing applicants that they could provide a safe mailing address instead of their physical address. The commenters stated many victims of trafficking are involved in multiple legal systems and are often required to provide the T nonimmigrant status application to the trafficker as part of the criminal or civil discovery process. Additionally, they stated that under this rule, DHS may disclose an applicant's information to an LEA that may be required to share this information with the trafficker to comply with constitutional requirements during criminal prosecution, potentially jeopardizing the applicant's safety. The commenters further suggested that DHS could instruct them to provide just the ZIP code of their physical address to ensure that applicants can have their biometrics appointments scheduled at the nearest ASC.

*Response:* DHS shares the commenters' goal of ensuring the safety of applicants for T nonimmigrant status; however, DHS declines to make these changes. As discussed previously, DHS requests the applicant's physical street address for internal information purposes and consistent with requirements that individuals applying for visas register their presence. *See* INA secs. 221(b), 261, 265, 8 U.S.C. 1201(b), 1301, 1305. Although DHS appreciates the concern regarding information provided to law enforcement agencies, that authority exists for the purpose of promoting investigation and prosecution of traffickers, not to put victims of trafficking at risk. If law enforcement is obligated to turn over a T nonimmigrant status application in the context of a criminal prosecution, law enforcement and the prosecutor should take steps to ensure the victim's safety.

*Comment:* The same commenters recommended adding an instruction at page 2, part 2, "Other Information," question 9, for applicants to check the box corresponding to the gender with which they identify. The commenters mentioned USCIS' policy to change the gender on official immigration documents, such as employment authorization cards and documentation of immigration status, if the individual can provide specifically enumerated evidence verifying a change in gender.

*Response:* DHS appreciates the sensitivity that surrounds the issue of gender identity. Although DHS declines to make universal changes at this time to questions and data collections regarding sex, gender, male, female, mother, father, sister, brother, and other gender-related terms, as discussed above, DHS will add a third gender identity option to the Form I–914 and related forms.

*Comment:* On page 3, part 4, "Additional Information About Your Application," questions 3.b. and 4.b., commenters suggested changes to the instruction to provide an explanation and supporting documentation for the answers to the questions. The commenters recommended deleting language indicating that the applicant should attach documents in support of their claim to be a victim of a severe form of trafficking in persons and the specific facts supporting the claim. The commenters also suggested deleting instructions in 3.b. and 4.b. to use extra space on the form to provide explanations for affirmative answers to questions regarding the physical presence requirement and the extreme hardship requirement. Finally, they recommended adding an instruction that the personal narrative statement describing the trafficking also address each eligibility requirement for T nonimmigrant status.

Both commenters stated the current language appears to suggest that a one-sentence explanation will be sufficient evidence of the physical presence and extreme hardship eligibility requirements. They also expressed that the recommended additional language would help ensure that the personal narrative sufficiently addresses all eligibility requirements. One of the commenters stated it has observed an increase in RFEs for lack of sufficient information in the initial T visa application on these two eligibility requirements. The commenter stated that the additional language could reduce the number of RFEs and delays in processing time.

*Response:* DHS agrees that it is important for applicants to provide sufficient information regarding their eligibility for T nonimmigrant status in their initial application. DHS already deleted the instruction included in 3.b. and 4.b., which it agrees may not have encouraged applicants to provide sufficient information as to the physical presence and extreme hardship eligibility requirements. DHS also already included an instruction to address the eligibility requirements in the personal narrative statement. DHS has deleted the instructions in questions 1, 3, and 4 requested the applicant attach evidence or documentation; instead, DHS has included in the introductory paragraph that the applicant should attach evidence and documents to support their claim if they answer "Yes" to questions 1–4. The applicant bears the burden of establishing their eligibility for T nonimmigrant status and available documentation corroborating the applicant's claim should be provided.

*Comment:* About page 3, part 4, "Additional Information About Your Application," question 5, which asks whether the applicant has reported the crime they claim to have suffered, one commenter suggested DHS change the word "crime" to "trafficking." The commenter stated this change will clarify that applicants must report a crime that includes trafficking as at least one central reason for the commission of the crime.

*Response:* DHS agrees and has already changed the wording to "trafficking crime," which is more specific and appropriate, given the requirement that the applicant be a victim of "a severe form of trafficking in persons" and comply with any reasonable law enforcement requests for assistance in an investigation or prosecution of a crime involving acts of trafficking in persons. *See* INA sec. 101(a)(15)(T)(i)(I), (III), 8 U.S.C. 1101(a)(15)(T)(i)(I), (III).

*Commenter:* Regarding page 3, part 4, "Additional Information About Your Application," commenters suggested adding the parenthetical "(if any)" after the question requesting the criminal case number. The commenters stated that the recommended language would provide clarification that a police report case number is not required and that it would reinforce that a law enforcement declaration or documentation of criminal investigation is not required to file for a T visa. One of the commenters stated it frequently encounters the misconception that a law enforcement declaration is required to apply for a T visa, causing some survivors and advocates to unnecessarily delay filing their application until a law enforcement report is made or a

criminal investigation is instigated. The commenters also suggested deleting the request for an explanation if the applicant did not report to law enforcement. They instead suggested adding in an instruction to provide the explanation in the applicant's personal narrative. Two commenters stated that question 7 suggests that the explanation of why the survivor has not reported the trafficking crime can be achieved by a brief sentence and makes it appear as if reporting to law enforcement is optional rather than reinforcing the need for the applicant to raise either the trauma-based exception or age-based exemption to the requirement to comply with reasonable law enforcement requests.

*Response:* DHS agrees with the commenters' suggestion regarding the case number and has already revised the form to state that the applicant should indicate "the case number assigned, if any." *See* new page 3, part 3, question 5. However, DHS declines to remove the requirement that an applicant explain why they did not report the crime. The current form indicates that an applicant should explain the circumstances. Applicants have the option to either provide an explanation on the form or in their personal narrative statement. DHS does not see the need to further specify where the explanation is included.

*Comment:* Regarding page 3, part 4, "Additional Information About Your Application," questions 8 and 9 (now questions 6 and 7), two commenters recommended deleting the instruction for minors under 18 years of age to skip question 9.b. (now question 7) related to whether the minor reported their trafficking to law enforcement. The commenters stated that although minors are exempt from the general requirement to comply with reasonable law enforcement requests for assistance in the investigation or prosecution of acts of trafficking, many minor applicants do report their trafficking victimization to law enforcement and do not need to skip the question. The commenters further stated that forcing minors to skip question 9.b. regarding cooperation with law enforcement may jeopardize their opportunity to adjust status to lawful permanent residence early based on the criminal investigation or prosecution having been completed. The commenters also stated the language creates unnecessary confusion that only those who are minors at the time of filing Form I–914 are eligible for an exemption to the requirement to comply with reasonable law enforcement requests when USCIS has stated that minors under 18 at the time of the victimization can meet this exemption.

*Response:* DHS agrees with the commenter's stated rationale and has deleted this instruction.

*Comment:* At page 4, part 4, "Additional Information About Your Application (continued)," questions 14.a.–14.b. (now question 9), commenters suggested deleting both questions regarding the circumstances of the applicant's most recent entry. Two commenters stated that question 3.a. (now question 3) already sufficiently addressed the physical presence eligibility requirement and question 14.a. confuses the physical presence eligibility requirement and reinforces existing physical presence misconceptions. The first misconception is that an applicant's latest entry must be based on the trafficking and does not recognize that there are other alternative exceptions to satisfy the physical presence requirement when the latest entry is not related to the trafficking. Commenters wrote that question 14.a. also reinforces the misconception that a victim of severe form of trafficking in persons is required to be trafficked across the United States border. One commenter stated that question 14.a. misstates the physical presence eligibility requirement. Neither the statutory language nor the regulatory language requires that an applicant's last entry be related to the trafficking.

*Response:* As discussed previously in response to comments on Form I–914 published with the IFR, the commenters are correct with respect to the statutory eligibility requirements, *see* INA sec. 101(a)(15)(T), 8 U.S.C. 1101(a)(15)(T); however, including these questions does not mean that an applicant must show their last entry was related to the trafficking suffered. The questions help provide information to adjudicators about the general circumstances of the applicant's most recent arrival, whether related to the trafficking or not, and information regarding the applicant's immigration history. All this information assists adjudicators in understanding the full history and facts of an applicant's claim. Accordingly, DHS declines to delete the questions; however, DHS has combined the two into a new question at new page 4, part 3, item 9.

*Comment:* At page 4, part 5, "Processing Information," the introductory paragraph instructs applicants to answer affirmatively any question that applies even if their records were sealed, otherwise cleared or the applicants have been told they no longer have a record. Commenters

requested DHS add an instruction that applicants could answer "no" to questions 1.b. through 1.f. and "n/a" to questions 2–5 regarding their criminal history if they had been granted vacatur. The commenter stated that vacatur is a form of relief for trafficking survivors who were forced to commit illegal acts by their traffickers and that, unlike expungement, vacatur is the recognition from the criminal justice system that a mistake was made, that the accused was wrongfully accused and in fact is a victim, and that the arrest or conviction should never have occurred. The commenters expressed that vacatur completely eradicates a survivor's criminal history as if the arrest and conviction had not occurred, instead of excusing criminal behavior; vacatur also recognizes that victims who did not have the requisite *mens rea* to commit the criminal act should not be penalized. They also stated that the current instructions are confusing and may lead to the inadvertent or illegal disclosure of state court records where state confidentiality laws may prevent disclosure of juvenile state court files without a court order. One of these commenters also requested that DHS delete instructions to answer each question about the applicant's criminal history regardless of whether the criminal records were sealed or otherwise cleared.

*Response:* DHS recognizes that victims of human trafficking may be forced to commit illegal acts at the hands of their traffickers; however, DHS declines to make the requested changes because having all information relevant to an applicant's trafficking experience is helpful to the adjudication. Applicants have an opportunity to explain in their personal statement and through their supporting evidence, the circumstances of any criminal activity. As the instructions state, answering "yes" to the questions regarding criminal conduct and inadmissibility will not necessarily lead to a denial of the application.

*Comment:* Another commenter requested DHS add an instruction that applicants could answer questions in the negative if their response related to prostitution that they were forced to engage in by their trafficker. The commenter stated the question could lead to filing unnecessary inadmissibility waivers, fee waivers, and additional explanations.

*Response:* DHS responded to a similar comment above. As discussed above, the question is appropriate as written because engaging in prostitution is a ground of inadmissibility, whether or not connected to victimization. If the

applicant has engaged in this type of conduct and the prostitution was connected to the trafficking, the applicant can request a waiver but must still answer the question to address possible inadmissibility. USCIS will examine all the evidence submitted and decide on a case-by-case basis whether to grant any waiver request.

*Comment:* Regarding page 4, part 5, "Processing Information," question 1.a., one commenter requested DHS delete the question which asks whether the applicant has ever committed a crime or offense for which the applicant has not been arrested. The commenter stated the question was vague and overbroad and goes beyond the statutory grounds of inadmissibility at section 212(a)(2) of the INA, 8 U.S.C. 1182(a)(2). The commenter further stated that the question would encompass very minor criminal infractions as well as serious criminal activity, and that the question assumes applicants have sufficient legal knowledge to answer accurately.

*Response:* DHS declines to delete the question. As discussed previously in response to a similar comment above, answers to this question are useful for adjudicators in gathering relevant information related to determining admissibility and assessing the applicant's truthfulness. In addition, in DHS's experience, answers to the question have provided information relevant to the applicant's trafficking experiences.

*Comment:* One commenter stated that DHS's changes to the inadmissibility questions dramatically expand the scope of information sought without identifying the need for the expansion. According to the commenter, these changes appear intended to bolster an adjudicator's ability to deny applications on attenuated discretionary grounds. The commenter stated that this was especially troubling given that several of these expanded queries relate to potential inadmissibility grounds or other discretionary concerns that are often incidental to the trafficking or the victim's attendant vulnerabilities that helped precipitate the trafficking victimization.

*Response:* DHS will not change the wording or delete any of the inadmissibility questions as a result of this comment. The changes to these questions do not change the meaning of any of the statutory grounds of inadmissibility but were meant to make the questions less legalistic and use plain language to facilitate greater understanding of their meaning. The changes were also made to promote consistency with changes to questions

on admissibility used in other USCIS forms.

*Comment:* Regarding page 5, part 5, "Processing Information," question 7, one commenter suggested making a change to the inadmissibility question related to whether the applicant ever imported prostitutes. The commenter stated that the phrase "imported prostitutes" was dehumanizing and insensitive, especially because many victims who suffered sex trafficking will be using this form and suggested, in the alternative, the phrase "prostituted persons" or "persons in prostitution."

*Response:* DHS declines to make this change. The question uses the statutory language from section 212(a)(2)(D) of the INA, 8 U.S.C. 1182(a)(2)(D) and is not meant to ascribe any characteristics to the people referenced.

*Comment:* At page 8, part 7, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature," commenters requested DHS add to the paragraph on the authorization of release of information that "any disclosure shall be in accordance with the VAWA confidentiality provisions at 8 U.S.C. 1367 and 8 CFR 214.14(e)." One commenter stated this inclusion would clarify and reinforce the applicability of these confidentiality provisions.

*Response:* DHS agrees that it is important that applicants understand that their release of information is subject to the confidentiality provisions at 8 U.S.C. 1367 and is adding in language regarding these provisions.

*Comment:* One commenter requested DHS not restrict the forms from editing to allow users to make comments directly on the form. The commenter is a national technical assistance provider and uses forms to provide training and technical assistance by creating comments and guidance on how to complete specific sections of the forms.

*Response:* DHS declines to make any changes in response to the comment. Nevertheless, stakeholders can obtain an unlocked version of the form for training purposes by contacting the information contact for this rule.

The following suggestion was resolved by subsequent revisions to the Form I–914:

• Page 2, part 2, "General Information About You (Victim)," "Information About Your Last Arrival in the United States," questions: 14.b.–14.f, add the parenthetical "(if any)" after the requests for recent passport or travel document information.

### Form I–914, Supplement A

DHS received several comments on Form I–914, Supplement A, some of

which were duplicative of comments received on Form I–914. For the following comments, DHS declines to make the requested change for the same rationale stated in response to suggestions to revise Form I–914:

• Page 1, part 2, U.S. Physical Address, 2.a.–2.e, include instructions informing applicants they could provide a safe mailing address instead of their physical address;

• Page 2, part 3, "Current or Intended U.S. Physical Address," 4.a.–4.e., include instructions informing applicants they could provide a safe mailing address instead of their family member's physical address;

• One commenter made a general comment about DHS's proposed changes to the inadmissibility questions, stating that the changes dramatically expand the scope of information sought without identifying the need for the expansion;

• One commenter requested DHS not restrict the forms from editing to allow users to have the capability to make comments directly on the form.

*Comment:* Two commenters repeated their comment on the Form I–914 that DHS should add language at page 8, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature," to the paragraph on the authorization of release of information that "any disclosure shall be in accordance with the VAWA confidentiality provisions at 8 U.S.C. 1367 and 8 CFR 214.14(e)."

*Response:* For the reason discussed above, DHS agrees to add language referencing the confidentiality protections included in 8 U.S.C. 1367.

The following suggestions were resolved by subsequent revisions to the Form I–914, Supplement A:

• Page 3, part 3, "Information About Your Family Member," question 16 (asked for "Your Current Immigration Status or Category"), change the question to add "Family Member's" after "Your" and delete the reference to "Category";

• Page 4, part 3, "Additional Information About Your Family Member," question 37 directs the applicant to answer questions 38–40.g. if the applicant answers question 37 affirmatively and to skip to item 41.a. if the applicant answers question 37 negatively. One commenter stated that it was not clear whether applicants who respond affirmatively to the question must answer question 41.b;

• Page 4, part 3, "Additional Information About Your Family Member," question 41.b., add a space to write that the family member is currently in removal proceedings;

• Page 5, part 4, ''Processing Information,'' question 15 regarding whether the family member has ever ''illicitly (illegally) trafficked or benefited from the trafficking of any controlled substance, such as chemicals, illegal drugs, or narcotics?,'' remove the reference to illegal drugs;

• Page 8, Part 5, ''Applicant's Statement, Contact Information, Declaration, Certification, and Signature,'' item 8.a., remove requirement of a signature from an applicant's family members who are not in the United States.

Form I–914 Instructions

DHS received several comments on the Form I–914 Instructions, many of which were duplicative of comments received on the Form I–914. For the following comments, DHS declines to make the requested changes for the same rationale discussed in response to comments on Form I–914:

• Page 4, part 2, ''General Information About You (Victim),'' items 4.a.–4.e., ''U.S. Physical Address,'' and items 5.a.–5.f., ''Safe Mailing Address;'' page 7, ''Specific Instruction for Form I–914, Supplement A,'' part 2, ''General Information About You (Principal Applicant (Victim)),'' items 2.a.–3.e., ''U.S. Physical Mailing Address'' and items 3.a.–3.f., ''Safe Mailing Address,'' commenters requested DHS include instructions informing applicants that could provide a safe mailing address in lieu of their physical address and just provide the ZIP code of their physical address to ensure a biometrics appointment near their physical location.

DHS provides individualized responses to the remaining comments.

*Comment:* Commenters recommended several changes to the description of the adult or minor children at page 2, item 2.C.3 including deleting the parenthetical phrase specifying the relationship of the adult or minor children to the applicant's family members. The commenters made a similar recommendation at page 14, ''Evidence to Establish T Nonimmigrant Status For Your Family Member,'' item 3.C. The commenters stated that applicants and advocates often struggle with understanding the ''derivative of a derivative'' category and stated that removing this language will simplify the description and avoid confusion.

*Response:* DHS appreciates the complex nature of this category of eligible family members and the value of simplifying instructions but believes the additional information could be helpful to applicants in confirming the

meaning of the description of the eligible family members.

*Comment:* At page 4, part 2, ''General Information About You (Victim),'' items 1.a.–1.c., ''Your Full Legal Name,'' and page 7, part 2, ''General Information About You (Principal Applicant (Victim)),'' items 1.a.–1.c., ''Your Full Legal Name,'' commenters recommended DHS delete its request for the applicant's and family member's legal name as shown on the individual's ''birth certificate or legal name change document.'' The commenter stated that some trafficking survivors do not have access to identity documents with the applicant's legal name and that the current text could create an evidentiary barrier for victims who do not have these documents.

*Response:* As discussed previously in response to this same comment in response to the Form I–914 instructions published on December 20, 2016, it is essential for DHS to know the name of the applicant or their family member as it appears on official identification documents so that DHS can conduct proper background checks and ensure there is no confusion about the identity of the person receiving the status, if approved. Neither this explanation nor the questions on the form indicate that evidence of a birth certificate or legal name change document is a requirement to obtain status. DHS has already amended the language to state ''birth certificate, passport, or other legal document.'' Furthermore, the requirement does not in any way impact an applicant's evidentiary burden.

*Comment:* At page 4, part 2, ''General Information About You (Victim),'' item 9, which requests the applicant's gender, commenters consistent with comments to Form I–914 and Form I–914, Supplement A, requested an instruction regarding an additional checkbox for applicants who identify as transgender or, as one commenter stated, ''a non-binary option for LGBTQI applicants.'' Another commenter also made a similar comment at page 8, part 3, ''Information about Your Family Member,'' item 8, ''Gender.''

*Response:* For the rationale discussed above in response to similar comments on Form I–914, DHS will make this change.

*Comment:* At page 5, items 14.a.–14.f., ''Passport and Travel Document Numbers,'' commenters suggested making changes to this instruction on providing passport and travel document information to take into account the fact that trafficking survivors often do not have these documents and that having a passport is not required to apply for T nonimmigrant status. One of the

commenters made a similar comment at page 10, ''Specific Instructions for Form I–914, Supplement A.''

*Response:* DHS agrees that many trafficking victims may lack access to passports or travel documentation, and, therefore, adds to the instructions at both pages for applicants to provide the passport and travel document information ''if applicable and if known.''

*Comment:* One commenter requested that DHS add a similar instruction in relation to questions about the applicant's last arrival into the United States and the applicant's current immigration status or category at page 5, item 15.–16.b., ''Information About Your Last Arrival in the United States'' and item 17, ''Current Immigration Status or Category.''

*Response:* DHS declines to adopt this recommendation. This information should be reasonably available to the applicant, as it does not require the applicant to have particular documents in their possession. If an applicant does not know the information, the applicant can write ''unknown'' and provide an explanation.

*Comment:* About page 6, part 5, ''Processing Information,'' commenters requested DHS delete instructions to answer each question about the applicant's criminal history regardless of whether the criminal records were sealed or otherwise cleared. One of the commenters also made this suggestion in reference to page 10, ''Specific Instructions for Form I–914, Supplement A,'' part 4, ''Processing Information,'' items 1.a.–44.c. Both commenters stated the language was unduly burdensome, confusing to trafficking survivors, and assumes applicants have sufficient legal knowledge to respond accurately. One of the commenters also recommended deleting the instruction at page 6, part 5, ''Processing Information,'' for applicants to answer affirmatively to the questions about their conduct, regardless of whether the actions or offenses occurred in the United States or anywhere in the world. Another commenter requested DHS add an instruction at page 6, part 5, ''Processing Information,'' that applicants could answer questions about their conduct in the negative if their conduct involved prostitution that they were forced to engage in by their trafficker.

*Response:* DHS declines to delete any language from these instructions. All of an applicant's prior conduct is relevant to the adjudication of their application and DHS can consider any extenuating circumstances such as forced criminal conduct or other circumstances that

may have led to the applicant's records being sealed or criminal history being cleared.

*Comment:* At page 7, "Specific Instructions for Form I–914, Supplement A," one commenter recommended throughout that DHS replace the use of the pronouns "his" and "hers" with "family member" or "derivative" to provide more clarity to the applicant.

*Response:* DHS has revised the use of pronouns to be gender neutral throughout but declines to adopt this suggestion because DHS believes the use of pronouns is clear.

*Comment:* At page 11, "Specific Instructions for Form I–914, Supplement B," one commenter suggested adding an instruction that if applicants do not submit the Form I–914, Supplement B, they should provide alternative evidence to show victimization and cooperation with law enforcement. Another commenter suggested that DHS add a similar instruction but recommended that it state that applicants "must" provide additional evidence to show victimization and cooperation with law enforcement. The commenters also suggested referring applicants to the section of the Form I–914, Supplement B Instructions on "Evidence of Cooperation with Reasonable Requests from Law Enforcement" for additional information. The commenters expressed that the language would clarify that the I–914 Supplement B is not required and is no longer considered primary evidence and would prompt applicants to consider providing alternate evidence.

*Response:* DHS had already included an instruction that applicants may provide other evidence and directs applicants to the relevant portion of the Form I–914, Supplement B Instructions; however, to emphasize that applicants must provide evidence to show victimization and cooperation with law enforcement, DHS has revised the language to state that an applicant "must" provide other evidence.

*Comment:* At page 11, "What Evidence Must You Submit?," commenters suggested that the initial paragraph state that applicants may submit "any credible evidence" in accordance with 8 CFR 214.11(d)(2)(ii) (new 8 CFR 214.204). In addition, the commenters suggested adding language that the application may not be denied for failure to submit particular evidence, but only if the evidence that was submitted was not credible or otherwise failed to establish eligibility and that the "any credible evidence" standard is discretionary. Commenters also

suggested including mention of the "any credible evidence" standard in the "General Instructions" at page 2.

*Response:* DHS agrees that it is important to mention the "any credible evidence" standard and has added language in the form instructions to describe the standard. DHS is not adding language on the standard in the "General Instructions" at page 2 as one mention should be sufficient.

*Comment:* At page 12, "Evidence of Cooperation with Reasonable Requests from Law Enforcement," in the introductory paragraph, commenters requested DHS amend the sentence specifying that it is USCIS' role to decide whether the applicant meets the eligibility requirements for T nonimmigrant status. The commenter suggested DHS include the phrase "regardless of whether [the] LEA choose[s] to investigate or prosecute the trafficking crime." Commenters stated that the proposed language would further clarify that USCIS has the final determination of whether an applicant is eligible for T nonimmigrant status and that this determination is not dependent on a declaration from law enforcement. One commenter added that this proposed language will provide clarity to applicants that an LEA's unwillingness to sign a Form I–914, Supplement B should not be a deterrent to filing the application for T nonimmigrant status and to provide additional reassurance to LEAs that the Form I–914, Supplement B is not a determination of an individual's eligibility to obtain T nonimmigrant status.

*Response:* DHS declines the suggested change. The introductory paragraph clearly states that Form I–914, Supplement B is not required, and states that eligibility for T nonimmigrant status is not dependent upon whether the LEA pursues an investigation or prosecution. It also already states that USCIS determines whether an applicant meets the eligibility requirements.

*Comment:* At page 16, "Waiver of Grounds of Inadmissibility," commenters suggested the inclusion of the standards that USCIS uses in determining whether an applicant or their family member is eligible for a waiver of inadmissibility. The commenters stated this addition will provide clarity that the applicant may be eligible to receive a waiver and provides additional guidance on when USCIS will use its discretion to waive grounds of inadmissibility.

*Response:* DHS declines to make this change. The suggested language conflates two different waiver standards included in section 212(d)(3) and (d)(13)

of the INA, 8 U.S.C. 1182(d)(3), (d)(13). The "Waiver of Grounds of Inadmissibility" section was added for contextual information. The standards and requirements for a waiver are discussed in detail on the separate inadmissibility waiver application forms. The standards and requirements that apply are too detailed and complex to include in these form instructions.

*Comment:* At page 16, "What is the Filing Fee?," the Instructions state that there is no fee for the Form I–914 and commenters recommended adding a discussion of fees for other related forms, available fee waivers and where to find more information on these topics, to provide clear guidance on where more information can be obtained.

*Response:* DHS appreciates the suggestions but declines to adopt them. The information provided on fees and fee waivers for all related forms is sufficiently specified through vehicles such as the USCIS website or Form G–1055, Fee Schedule.

*Comment:* One commenter requested DHS include information earlier in the "General Instructions" on the 8 U.S.C. 1367 protections related to disclosure and to the prohibitions on using information provided solely by a perpetrator. The commenter also requested DHS include information on which agency the applicant should contact with questions or concerns about confidentiality violations.

*Response:* DHS believes the Instructions only need to mention the 8 U.S.C. 1367 protections once. DHS does not believe it is necessary to include information on which agency to contact if the applicant has questions or concerns about confidentiality violations because that is outside the scope of instructions for completing a form. In addition, USCIS provides information on its website on how to make a complaint about employee misconduct.

The following suggestions were resolved by subsequent revisions to the Form I–914 Instructions:

• Page 1, "Principal Applicant," question 1.C., add language about enforcement agencies with the authority to detect or investigate trafficking crimes.

• Page 1, "Who May File Form I–914?," item 2, "Principal Applicant Filing for Eligible Family Members at the Same Time," delete the phrase "at the same time" from this title and the instruction, and add an instruction that the applicant may file a Supplement A with an initial application or at a later time;

• Page 3, "General Instructions," "Copies," delete the statement that USCIS may destroy original documents that are submitted when not required or requested;

• Page 10, part 5, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature," "NOTE;" page 11, "Initial Evidence," item 4; page 11, "Initial Evidence," second item 1, remove requirement that all eligible family members sign the Supplement A;

• Page 10, part 5, "Applicant's Statement, Contact Information, Declaration, Certification, and Signature," "Note;" page 11, "Initial Evidence," delete the instruction that all family members must sign Form I–914, Supplement A;

• Page 11, "What Evidence Must You Submit?," delete the first two sentences of the initial paragraph, which instruct applicants to submit all evidence requested in the Instructions and warns that a failure to provide required evidence could result in a rejection or denial of the application;

• Page 15, "Unavailable Documents," delete language that suggests applicants can provide secondary evidence if a required document is not available and that USCIS may require a certification from an appropriate civil authority if a necessary document is unavailable;

• Page 17, "Processing Information," "Confidentiality," add examples of the entities to which an applicant's information could be disclosed under 8 U.S.C. 1367.

Form I–914, Supplement B

DHS received three comments on Form I–914, Supplement B, two of which are similar to comments made on Form I–914 and Form I–914, Supplement A regarding questions about the gender of applicants and family members at page 1, part 1, "Victim Information," "Other Information About Victim," question 8. For the same reasons discussed above, DHS will instruct that responses to questions about the applicant's gender on Form I–914, Supplement B reflect the gender with which the applicant identifies.

The following suggestion was resolved by subsequent revisions to the Form I–914, Supplement B:

• Page 2, part 3, "Statement of Claim," "Type of Trafficking," question 1.e., remove the option for law enforcement to indicate a belief that the applicant is not a victim of trafficking.

Form I–914, Supplement B Instructions

*Comment:* For page 1, "What is the Purpose of Form I–914, Supplement

B?," "Description," commenters suggested DHS move to the beginning of the second paragraph under this heading the language that USCIS, not the LEA, makes the decision regarding whether the applicant meets the eligibility requirements for T nonimmigrant status and add a phrase that signing a Supplement B does not lead to automatic approval of the T visa application. The commenters wrote that the changes would correct the misconception that criminal charges or convictions were needed before Form I–914, Supplement B could be signed and that signing a Supplement B would lead to the automatic approval of an immigration benefit. Another commenter suggested adding language that officers can sign the Form I–914, Supplement B even if there is no investigation opened. That commenter stated that the existing language in the Form I–914, Supplement B Instructions has not been sufficient to empower some law enforcement agents to sign the Form I–914, Supplement B if a prosecuting authority decides not to open a case. The commenter also suggested DHS add detailed language about the compliance with reasonable law enforcement requests requirement to give examples of sufficient cooperation and include language that there is a presumption of compliance for applicants who reported the trafficking incident and had not denied any reasonable requests for assistance.

*Response:* For reasons discussed previously in response to similar suggestions when the Form I–914, Supplement B Instructions were published on December 20, 2016, DHS declines to make these changes. The instructions on page 1 in the third paragraph under the heading, "When Should I Use Form I–914, Supplement B?" clearly state that a formal investigation is not a requirement for an LEA to sign the form. DHS does not believe it is necessary to provide more detail regarding the compliance with reasonable law enforcement requests requirement. Law enforcement decides at its own discretion whether to provide a Form I–914, Supplement B, and an applicant does not have to submit Form I–914, Supplement B to receive T nonimmigrant status. The regulations do not include a presumption of compliance with reasonable law enforcement requests, and DHS declines to include language to that effect in the Form I–914, Supplement B Instructions.

DHS also declines to adopt the recommendation to move the language about USCIS' role in the adjudication process. DHS believes it is appropriate to describe the purpose of Form I–914,

Supplement B before clarifying the respective roles of USCIS and the LEA signing the form. DHS also does not believe it is necessary to add a phrase that signing does not lead to automatic approval of the application for T nonimmigrant status. The Form I–914, Supplement B Instructions already state that by providing a Supplement B, the LEA is not giving an immigration benefit.

*Comment:* For page 1, "When Should I Use Form I–914, Supplement B?," one commenter requested that DHS not use the phrase "on account of" but "as a result of" when describing the physical presence on account of trafficking eligibility requirement. The commenter stated that the phrase is a legal term of art that will generate confusion and will dissuade law enforcement agents from signing a Form I–914, Supplement B.

*Response:* DHS agrees with the commenter and has changed this language for consistency.

*Comment:* Regarding page 3, part 1, "Victim Information," items 1.a.–1.c., "Full Legal Name of Victim," commenters repeated a request made in connection with the Form I–914 and the Form I–914, Supplement A to delete instructions to provide the applicant's name as shown on their birth certificate or legal name change document.

*Response:* As discussed previously, DHS declines to make this change, but has revised the question to include "other legal documents."

*Comment:* Regarding page 3, part 1, "Victim Information," item 8, "Gender," commenters provided similar suggestions to those made on Form I–914 and Form I–914, Supplement A regarding providing additional options to respond to the question about the applicant's gender.

*Response:* For the same reasons discussed previously, DHS will instruct that the response reflect the gender with which the applicant identifies.

*Comment:* For page 4, "General Instructions," items 10.–12.b., one commenter stated that asking for the case number, case status, and, if applicable, the FBI Universal Control Number or State Identification Number is likely to dissuade LEAs from signing a Form I–914 Supplement B because they will believe they need to have an identifying case number associated with the investigation. The commenter suggested adding language that to sign a Form I–914, Supplement B, an investigation consisting of an initial report is sufficient, and no case number is required.

*Response:* DHS does not believe that asking for this information will dissuade LEAs from providing a Form I–914,

Supplement B. The "General Instructions" at page 2 make it clear that if the LEA does not have certain information, the LEA can leave the field blank. The Form I–914, Supplement B Instructions at page 1 clarify that the LEA does not necessarily need to formally launch an investigation or file charges to provide a Form I–914, Supplement B. In addition, the instructions indicate this information should be filled out only if applicable. DHS will retain the question because the case identifying information is helpful if USCIS needs to inquire further with the LEA about the case.

*Comment:* About page 4, part 3, "Statement of Claim," items 1.a.–1.e., "Type of Trafficking," one commenter stated that the options available to LEAs to choose which type of trafficking occurred do not account for sex or labor trafficking that did not result in a completed sex act or completed labor/ service.

*Response:* DHS agrees and has added a statement clarifying that victims of attempted labor or sex trafficking can be considered victims of a severe form of trafficking in persons.

*Comment:* Regarding page 4, part 3, "Statement of Claim," item 2, "Victimization Description," LEAs are instructed to identify the relationship between the victimization and the crime under investigation or prosecution. One commenter requested the instructions clarify that the LEA's own investigation independently satisfies the threshold and that a separate investigation opened by a prosecutor is not required.

*Response:* DHS feels that the Instructions do not suggest the need for a separate investigation or prosecution and do not need to be changed.

*Comment:* At page 4, part 3, "Statement of Claim," items 3.a.–3.b., "Fear of Retaliation or Revenge," the instruction asks LEAs to indicate whether the applicant has expressed any fear of retaliation or revenge if removed from the United States. One commenter stated that it was unlikely that many victims will feel comfortable enough to provide much detail to LEAs about why they fear returning to their home country but did not recommend any specific changes.

*Response:* DHS does not believe any change is necessary. In some cases, trafficking victims may share information with LEAs about what they fear will happen to them if removed from the United States. In other cases, as the commenter stated, they may not. The instruction asks for the information if it exists and, if it is shared, it can help adjudicators understand the full facts of a case. If the LEA has no information

about this topic and applicants want to show they have such a fear, they can submit other relevant credible evidence.

*Comment:* Regarding page 5, part 5, "Family Members Implicated in Trafficking," one commenter expressed that requiring LEAs to include the names of family members "who they believe to be affected by the trafficking may instill fear and uncertainty in a survivor's mind." The commenter stated that applicants may not want to disclose this information initially, and it could come out later creating the appearance of an inconsistency and affect their credibility.

*Response:* DHS understands trafficking victims may be hesitant to admit that a family member was involved in their trafficking; however, DHS will maintain this question. Again, the Form I–914, Supplement B Instructions do not require this information, and whether the information exists does not directly impact an applicant's eligibility for T nonimmigrant status. However, if an LEA has this information, it can help USCIS understand the full facts of an applicant's victimization. The information may also be relevant to the family member's eligibility for derivative T nonimmigrant status, as section 214(o)(1) of the INA, 8 U.S.C. 1184(o)(1), provides that an individual is ineligible for admission to the United States as a T nonimmigrant if there is substantial reason to believe they have committed an act of a severe form of trafficking in persons. If the family member is an immigrant USCIS may be able to use the information provided to deny or revoke immigration status if appropriate.

The following suggestions were resolved by subsequent revisions to the Form I–914, Supplement B Instructions:

• Page 1, "What is the Purpose of Form I–914, Supplement B?," "Description," add language that "a formal investigation or prosecution is not required in order for a LEA to complete an endorsement";

• Page 3, part 1, "Victim Information," items 4–6, add that LEAs should provide this information if known;

• Page 4, part 3, "Statement of Claim," items 1.a.-1.e., "Type of Trafficking," remove the option for an LEA to indicate that the applicant for T nonimmigrant status is not a victim of trafficking;

• Page 4, part 4, "Cooperation of the Victim," add that the victim must provide additional evidence if they claim they are unable to cooperate with law enforcement requests for assistance.

3. Changes to Form I–914, Form I–765, and Related Forms and Instructions Published With Final Rule

a. Discretionary and Technical Changes to Form I–914 Package

i. Overarching Changes

To improve readability, DHS made non-substantive edits to questions, headings and narrative in the forms and the associated instructions. DHS revised all forms and associated instructions to use gender neutral language. DHS has also updated all references to the regulations.

Throughout the forms and instructions, DHS has revised the reference to law enforcement officials to match the new definition found at new 8 CFR 214.201.

On the Form I–914 and Form I–914, Supplement A, in the "For USCIS Use Only" section, DHS changed its reference from "Conditional Approval" to "Waitlisted," which is a more accurate descriptor for this internal process.

ii. Specific Form Changes

Form I–914

At new page 3, part 3, "Additional Information," item 6, DHS has revised the question to read that the applicant *was* under 18 years of age at the time at least one of the acts of trafficking occurred, and as discussed above, has removed the parenthetical instructing the applicant to skip item 7 if they answered yes to item 6. The relevant inquiry is the applicant's age at the time at least one of the acts of trafficking occurred, not at the time of filing, as clarified in the Preamble and the regulations. Similarly, in item 7, DHS has added that an explanation of why an individual did not comply with reasonable requests for assistance is only required if the individual was over the age of 18 at the time one of the acts of trafficking occurred.

At new page 7, part 5, "Information About Your Family Members," DHS has added "Information About Your Spouse" to item 1 to clarify that the information being requested (date of birth, country of birth, etc.) is for the applicant's spouse. DHS has also renumbered the items, and under "Information About Your Children," has deleted "relationship," as the relationship should always be "child."

DHS deleted language at the end of part 5 of Form I–914 regarding completion of Form I–914, Supplement A. This language is unnecessary to include in the form as the Form I–914 Instructions provide clear guidance on the topic.

As previously discussed, in updating standard language at new page 9, "Applicant's Declaration and Certification," DHS added language so that the applicant understands that any disclosure will be in accordance with the confidentiality protections contained in 8 U.S.C. 1367 and new 8 CFR 214.216.

At new page 11, part 9, "Additional Information," DHS has added "if any" after A-Number and instructed the applicant to sign and date each additional sheet of paper included with the application. These additions will help ensure the integrity of additional sheets included with the application.

Form I–914, Supplement A

DHS has revised the name of the Supplement A to "Application for Derivative T Nonimmigrant Status," as the prior title incorrectly implied that the application could only be filed by family members of T–1 recipients, rather than T–1 applicants *or* recipients.

As discussed above, DHS has combined part 1 and part 2, such that they both are now under new part 1, "Family Members for Whom You Are Filing,"

At new page 2, part 4, "Information About Your Family Member," DHS has revised item 2, "Other Names Used" to state that the applicant should provide any other names "your family member has used" rather than "you have used." This clarifies the information being sought.

At new page 5, part 5, "Processing Information," DHS has revised the first paragraph for clarity.

DHS made the same additions in the Form I–914, Supplement A regarding release of information to new page 9, "Applicant's Declaration and Certification" that it made to the same section in Form I–914 and for the same reasons as discussed in the previous section discussing changes to Form I–914. In the same section, at the end of the paragraph just prior to the signature, DHS has added a note stating that if a family member is in the United States, they must verify the information in Supplement A and sign the Supplement A. Stakeholders had indicated confusion over who was required to sign the form. Finally, in the Applicant's signature block, DHS included "(if any)" after the "Safe Phone Number" field to indicate the field is not required, and revised item 7, to clarify that the signature is for the family member for whom the applicant is filing (rather than using the less clear terminology of "derivative").

Form I–914 Instructions

As noted previously, DHS has added language at new page 1, "What Is the Purpose of Form I–914?," to refer applicants to the language of the definition of "a severe form of trafficking" included in the section "Evidence to Establish T Nonimmigrant Status," to provide easy reference to the definition.

DHS added a note regarding filing for adult or minor children of eligible family members at new page 2, "Who May File Form I–914," item 2(C)(3) to clarify that although applications for all eligible family members can be filed concurrently, USCIS will not approve the application for an adult or minor child unless the application for derivative T nonimmigrant status for their parent has already been approved, consistent with existing policy. USCIS Policy Memorandum, *New T Nonimmigrant Derivative Category and T and U Nonimmigrant Adjustment of Status for Applicants from the Commonwealth of the Northern Mariana Islands* (Oct. 30, 2014). DHS also added this note at new page 4, "Completing Form I–914, Supplement A, Application for Derivative T Nonimmigrant Status," "Part 1. Family Member For Whom You Are Filing."

At new page 2, "General Instructions," DHS has added a note for applicants with attorneys who wish to receive communication from USCIS about filings related to the I–914, they should include those additional form numbers on the Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative.

At new page 3, part 5, "Information about Your Family Members," DHS clarified its guidance that all children regardless of age or marital status should be included, which is consistent with the change made to the Form I–914, Supplement A.

DHS had already included an instruction that applicants may provide other evidence and directs applicants to the relevant portion of the Form I–914, Supplement B Instructions; however, to emphasize that applicants must provide evidence to show victimization and cooperation with law enforcement, DHS has revised the language at new page 7, "Completing Form I–914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons to state that an applicant "must" provide other evidence.

At new page 7, "Initial Evidence," DHS deleted the instruction to submit a copy of the principal applicant's Form I–914 with a Form I–914, Supplement A, due to enhanced processing

procedures. DHS has also added an instruction that an applicant must include all evidence at the time of filing, and that any credible evidence can be submitted.

At new page 8, "Evidence to Establish T Nonimmigrant Status," item 2, DHS has replaced "as a result of" with "on account of," as discussed above, for consistency with the regulation. DHS has also added a grant of Continued Presence as a type of evidence that can be submitted to establish that an individual is or has been a victim of trafficking. DHS has also added a note that an applicant may explain why they did not provide or attempt to obtain a Supplement B (even though it is not required). In addition, DHS has added a list of evidence that an applicant may submit to establish tier claim that they were unable to cooperate with requests from law enforcement due to trauma, or due to their age.

At new page 9, "Personal Statement," DHS has revised the list of what the applicant's personal statement should include, due to changes in the regulations relating the contents of the statement at new 8 CFR 214.204(c).

At new page 11, DHS has included a personal statement from the principal applicant or a derivative family member as an example of credible evidence describing the danger of retaliation, due to changes in the regulations at new 8 CFR 214.211(f)(3). DHS has also changed the section on this page from "Unavailable Documents" to "Required Evidence." DHS has removed any reference to secondary evidence, as well as the list of secondary evidence, and instead instructs that applicants may submit any credible evidence, consistent with the evidentiary standard USCIS applies.

At new page 12, "Initial Processing," DHS has added that a Form I–914 may also be rejected if the form's *required fields* are not completely filled out or the forms do not include *required* initial evidence. This will support timely applicant notification if USCIS determines that they are missing critical information that would otherwise delay processing or result in a denial of their request. As a result, applicants will have an opportunity to resolve the issue(s) with their filing sooner than if USCIS accepted the filing and ultimately issued a Request for Additional Evidence or Notice of Intent to Deny. Additionally, this will allow USCIS to focus its limited resources on cases that are properly completed and filed.

At new page 12, DHS has added a section titled "Bona Fide Determination Process" to describe the new, streamlined bona fide determination

process codified at 8 CFR 214.205. At the same page, DHS has also revised "Employment Authorization" to include reference to the bona fide determination process.

Form I–914, Supplement B and Form I–914, Supplement B Instructions

DHS has changed the title of Form I–914, Supplement B to "Declaration for Trafficking Victim" for simplicity and for ease of reference.

DHS has revised Form I–914, Supplement B at new page 2, part 3, "Statement of Claim," "Note:" to reference the correct regulatory provision because USCIS is redesignating these provisions in the final rule. DHS has removed the language from part 3, "Statement of Claim" requesting the LEA attach the results of any name or database inquiry, as well as any relevant reports and findings, because this requirement was removed from the regulations.

DHS clarified at new page 4, part 6, "Attestation," that the officer signing Form I–914, Supplement B is certifying their belief that the individual has been a victim of a severe form of trafficking in persons and is not certifying that it is an established fact that the individual is a victim.

DHS has added a new part 7, "Additional Information," and included references throughout Form I–914, Supplement B and its Instructions to use the new part 7 if extra space is needed to complete any section. DHS has revised "law enforcement officer" to "certifying official" in recognition of the fact that many individuals who complete Supplement B may not consider themselves law enforcement officials.

On new page 2 of the Instructions in the section, "General Instructions," DHS has included guidance to leave a field blank if the answer to a question is unknown. DHS also added a new section below entitled "Specific Instructions."

DHS has clarified at new page 3, part 3, "Statement of Claim," item 1, that the official signing the Form I–914, Supplement B should base their analysis as to whether an individual is or has been a victim of a severe form of trafficking in persons based on the practices to which the victim was subjected (as listed in new 8 CFR 214.201), rather than any criminal violations or prosecutions.

At new page 3, part 5, "Family Members Implicated in Trafficking," DHS added a "NOTE:" and replaced the word "principal applicant" with "victim" based on regulatory changes to terminology.

Also at new page 3, "How Can I Provide Further Information at a Later Date?," DHS has replaced the term "revoke" with "withdraw or disavow" to mirror a change in the wording of the regulations.

At new page 4, under "DHS Privacy Notice," "PURPOSE:" and "DISCLOSURE," DHS replaced "you" with "the applicant," because Supplement B is filled out by someone other than the applicant. This clarifies that the purpose is to determine the applicant's eligibility, and that failure to provide the applicant's information could result in denial of their application.

Form I–765 Instructions

DHS has revised the Form I–765 Instructions to include a section titled "Bona Fide Determination Process for T Nonimmigrant Status Principal Applicants and Eligible Family Members." This change describes the bona fide determination process, including how to obtain work authorization, codified at new 8 CFR 214.205.

List of Subjects

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 1. The authority citation for part 212 continues to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (section 7209 of Pub. L. 108–458, 118 Stat. 3638), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2. Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 2. Revise § 212.16 to read as follows:

**§ 212.16  Applications for exercise of discretion relating to T nonimmigrant status.**

(a) *Requesting the waiver.* An applicant requesting a waiver of inadmissibility under section 212(d)(3)(A)(ii) or (d)(13) of the Act must submit an Application for Advance Permission to Enter as a Nonimmigrant, or successor form as designated by USCIS in accordance with 8 CFR 103.2.

(b) *Treatment of waiver request.* USCIS, in its discretion, may grant a waiver request based on section 212(d)(13) of the Act of the applicable ground(s) of inadmissibility, except USCIS may not waive a ground of inadmissibility based on section 212(a)(3), (a)(10)(C), or (a)(10)(E) of the Act. An applicant for T nonimmigrant status is not subject to the ground of inadmissibility based on section 212(a)(4) of the Act (public charge) and is not required to file a waiver form for the public charge ground. Waiver requests are subject to a determination of national interest and connection to victimization as follows.

(1) *National interest.* USCIS, in its discretion, may grant a waiver of inadmissibility request if it determines that it is in the national interest to exercise discretion to waive the applicable ground(s) of inadmissibility.

(2) *Connection to victimization.* An applicant requesting a waiver under section 212(d)(13) of the Act on grounds other than the health-related grounds described in section 212(a)(1) of the Act must establish that the activities rendering them inadmissible were caused by, or were incident to, the victimization described in section 101(a)(15)(T)(i)(I) of the Act.

(3) *Criminal grounds.* In exercising its discretion, USCIS will consider the number and seriousness of the criminal offenses and convictions that render an applicant inadmissible under the criminal and related grounds in section 212(a)(2) of the Act. In cases involving violent or dangerous crimes, USCIS will only exercise favorable discretion in extraordinary circumstances, unless the criminal activities were caused by, or were incident to, the victimization described under section 101(a)(15)(T)(i)(I) of the Act.

(c) *No appeal.* There is no appeal of a decision to deny a waiver request. Nothing in this section is intended to prevent an applicant from re-filing a

request for a waiver of a ground of inadmissibility in appropriate cases.

(d) *Revocation.* USCIS, at any time, may revoke a waiver previously authorized under section 212(d) of the Act. There is no appeal of a decision to revoke a waiver.

## PART 214—NONIMMIGRANT CLASSES

■ 3. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357 and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note, and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

### §§ 214.1 through 214.15   [Designated as Subpart A]

■ 4. Designate §§ 214.1 through 214.15 as subpart A and add a heading for subpart A to read as follows:

## Subpart A—Classes A through S

■ 5. Revise § 214.11 to read as follows:

### § 214.11   Former regulations for noncitizen victims of severe forms of trafficking in persons.

For DHS and USCIS regulations governing Noncitizen Victims of Severe Forms of Trafficking in Persons, see subpart C of this part.

## Subpart B—[Added and Reserved]

■ 6. Add and reserve subpart B.
■ 7. Add subpart C to read as follows:

## Subpart C—Noncitizen Victims of Severe Forms of Trafficking in Persons

Sec.
214.200   Scope of this subpart.
214.201   Definitions.
214.202   Eligibility for T–1 nonimmigrant status.
214.203   Period of admission.
214.204   Application.
214.205   Bona fide determination.
214.206   Victim of a severe form of trafficking in persons.
214.207   Physical presence.
214.208   Compliance with any reasonable request for assistance in the detection, investigation, or prosecution of an act of trafficking.
214.209   Extreme hardship involving unusual and severe harm.
214.210   Annual numerical limit.
214.211   Application for eligible family members.
214.212   Extension of T nonimmigrant status.
214.213   Revocation of approved T nonimmigrant status.
214.214   Removal proceedings.
214.215   USCIS employee referral.
214.216   Restrictions on use and disclosure of information relating to applicants for T nonimmigrant classification.

### § 214.200   Scope of this subpart.

This subpart governs the submission and adjudication of an Application for T Nonimmigrant Status, including a request by a principal applicant on behalf of an eligible family member for derivative status.

### § 214.201   Definitions.

Where applicable, USCIS will apply the definitions provided in section 103 and 107(e) of the Trafficking Victims Protection Act (TVPA), 22 U.S.C. 7102, and 8 U.S.C. 1101, 1182(d), and 1184, with due regard for the definitions and application of these terms in 28 CFR part 1100 and the provisions of 18 U.S.C. 77. As used in this section the term:

*Abuse or threatened abuse of the legal process* means the use or threatened use of a law or legal process whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

*Application for Derivative T Nonimmigrant Status* means a request by a principal applicant on behalf of an eligible family member for derivative T–2, T–3, T–4, T–5, or T–6 nonimmigrant status on an Application for T Nonimmigrant Status.

*Application for T Nonimmigrant Status* means a request by a principal applicant for T–1 nonimmigrant status on the form designated by USCIS for that purpose.

*Child* means a person described in section 101(b)(1) of the Act.

*Coercion* means threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of the legal process.

*Commercial sex act* means any sex act on account of which anything of value is given to or received by any person.

*Debt bondage* means the status or condition of a debtor arising from a pledge by the debtor of their personal services or those of a person under their control as a security for debt, if the value of those services as reasonably assessed is not applied toward the liquidation of the debt or the length and

nature of those services are not respectively limited and defined.

*Derivative T nonimmigrant* means an eligible family member who has been granted T–2, T–3, T–4, T–5, or T–6 derivative status. A family member outside of the United States is not a derivative T nonimmigrant until they are issued a T–2, T–3, T–4, T–5, or T–6 visa by the Department of State and they are admitted to the United States in derivative T nonimmigrant status.

*Eligible family member* means:

(1) A family member eligible for derivative T nonimmigrant status based on their relationship to a principal applicant or T–1 nonimmigrant and, if required, upon a showing of a present danger of retaliation;

(2) In the case of a principal applicant or T–1 nonimmigrant who is 21 years of age or older, the spouse and children of such applicant;

(3) In the case of a principal applicant or T–1 nonimmigrant under 21 years of age, the spouse, children, unmarried siblings under 18 years of age, and parents of such applicant; and

(4) Regardless of the age of a principal applicant or T–1 nonimmigrant, any parent or unmarried sibling under 18 years of age, or adult or minor child of a derivative of such principal applicant or T–1 nonimmigrant where the family member faces a present danger of retaliation as a result of the principal applicant or T–1 nonimmigrant's escape from a severe form of trafficking in persons or cooperation with law enforcement.

*Involuntary servitude,* for the purposes of this part:

(1) Means a condition of servitude induced by means of any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or a condition of servitude induced by the abuse or threatened abuse of legal process; and

(2) Includes a condition of servitude in which the victim is forced to work for the trafficker by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through the law or the legal process. This definition encompasses those cases in which the trafficker holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion.

*Law Enforcement Agency (LEA)* means a Federal, State, Tribal, or local law enforcement agency, prosecutor, judge, labor agency, children's protective services agency, adult protective services agency, or other

authority that has the responsibility and authority for the detection, investigation, and/or prosecution of severe forms of trafficking in persons under any administrative, civil, criminal, or Tribal laws. Federal LEAs include but are not limited to the following: Department of Justice (including U.S. Attorneys' Offices, Civil Rights Division, Criminal Division, U.S. Marshals Service, Federal Bureau of Investigation (FBI)); U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP); Department of State (including Diplomatic Security Service); Department of Labor (DOL); Equal Employment Opportunity Commission (EEOC); National Labor Relations Board (NLRB); Offices of Inspectors General (OIG); Bureau of Indian Affairs (BIA) Police, and Offices for Civil Rights and Civil Liberties.

*Law Enforcement Agency (LEA) declaration* means an official LEA declaration submitted on the Declaration for Trafficking Victim.

*Law enforcement involvement,* for purposes of establishing physical presence, means law enforcement action beyond receiving the applicant's reporting and may include the LEA interviewing the applicant or otherwise becoming involved in detecting, investigating, or prosecuting the acts of trafficking.

*Peonage* means a status or condition of involuntary servitude based upon real or alleged indebtedness.

*Principal applicant* means a noncitizen who has filed an Application for T Nonimmigrant Status.

*Request for assistance* means a request made by an LEA to a victim to assist in the detection, investigation, or prosecution of the acts of trafficking in persons or the investigation of a crime where acts of trafficking are at least one central reason for the commission of that crime. The reasonableness of the request is assessed using the factors delineated at § 214.208(c).

*Serious harm* means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Severe form of trafficking in persons* means sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act is under the age of 18 years; or the recruitment, harboring, transportation,

provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

*Sex trafficking* means the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of a commercial sex act.

*T–1 nonimmigrant* means the victim of a severe form of trafficking in persons who has been granted T–1 nonimmigrant status.

*United States* means the fifty States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, and the Commonwealth of the Northern Mariana Islands.

*Victim of a severe form of trafficking in persons (victim)* means a noncitizen who is or has been subjected to a severe form of trafficking in persons.

### § 214.202   Eligibility for T–1 nonimmigrant status.

An applicant is eligible for T–1 nonimmigrant status under section 101(a)(15)(T)(i) of the Act if they demonstrate all of the following, subject to section 214(o) of the Act:

(a) *Victim.* The applicant is or has been a victim of a severe form of trafficking in persons, according to § 214.206.

(b) *Physical presence.* The applicant is physically present in the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or at a port-of-entry thereto, according to § 214.207.

(c) *Compliance with any reasonable request for assistance.* The applicant has complied with any reasonable request for assistance from law enforcement or meets one of the conditions described below. The reasonableness of the request is assessed using the factors delineated at § 214.208(c).

(1) *Exemption for minor victims.* An applicant who was under 18 years of age at the time at least one act of trafficking occurred is not required to comply with any reasonable request for assistance.

(2) *Exception for trauma.* An applicant who, due to physical or psychological trauma, is unable to cooperate with a reasonable request for assistance from law enforcement is not required to comply with such reasonable request.

(d) *Hardship.* The applicant would suffer extreme hardship involving unusual and severe harm upon removal, according to § 214.209.

(e) *Prohibition against traffickers in persons.* No applicant will be eligible to receive T nonimmigrant status if there is

substantial reason to believe that the applicant has committed an act of a severe form of trafficking in persons.

### § 214.203   Period of admission.

(a) *T–1 Principal.* T–1 nonimmigrant status may be approved for a period not to exceed 4 years, except as provided in section 214(o)(7) of the Act.

(b) *Derivative family members.* A derivative family member who is otherwise eligible for admission may be granted T–2, T–3, T–4, T–5, or T–6 nonimmigrant status for an initial period that does not exceed the expiration date of the initial period approved for the T–1 principal applicant, except as provided in section 214(o)(7) of the Act.

(c) *Notice.* At the time an applicant is approved for T nonimmigrant status or receives an extension of T nonimmigrant status, USCIS will notify the applicant when their T nonimmigrant status will expire. USCIS also will notify the applicant that the failure to apply for adjustment of status to lawful permanent resident during the period of T nonimmigrant status, as set forth in 8 CFR 245.23, will result in termination of the applicant's T nonimmigrant status in the United States at the end of the 4-year period or any extension.

### § 214.204   Application.

(a) *Jurisdiction.* USCIS has sole jurisdiction over all applications for T nonimmigrant status.

(b) *Filing an application.* An applicant seeking T–1 nonimmigrant status must submit an Application for T Nonimmigrant Status on the form designated by USCIS in accordance with 8 CFR 103.2 and with the evidence described in paragraph (c) of this section.

(1) *Applicants in pending immigration proceedings.* (i) An applicant in removal proceedings under section 240 of the Act, or in exclusion or deportation proceedings under former sections 236 or 242 of the Act (as in effect prior to April 1, 1997), and who wishes to apply for T–1 nonimmigrant status must file an Application for T Nonimmigrant Status directly with USCIS.

(ii) In its discretion, ICE may exercise prosecutorial discretion, as appropriate, while USCIS adjudicates the Application for T Nonimmigrant Status, including applications for derivatives.

(2) *Applicants with final orders of removal, deportation, or exclusion.* An applicant subject to a final order of removal, deportation, or exclusion may file an Application for T Nonimmigrant Status directly with USCIS.

(i) The filing of an Application for T Nonimmigrant Status has no effect on DHS authority or discretion to execute a final order of removal, although the applicant may request an administrative stay of removal pursuant to 8 CFR 241.6(a).

(ii) If the applicant is in detention pending execution of the final order, the period of detention (under the standards of 8 CFR 241.4) reasonably necessary to bring about the applicant's removal will be extended during the period the stay is in effect.

(iii) If USCIS subsequently determines under the procedures in § 214.205 that the application is bona fide, the final order of removal, deportation, or exclusion will be automatically stayed, and the stay will remain in effect until a final decision is made on the Application for T Nonimmigrant Status.

(3) *Referral of applicants for removal proceedings.* USCIS generally will not refer an applicant for T nonimmigrant status for removal proceedings while the application is pending or following denial of the application, absent serious aggravating circumstances, such as the existence of an egregious criminal history, a threat to national security, or where the applicant is complicit in committing an act of trafficking.

(4) *Minor applicants.* When USCIS receives an application from a principal applicant under the age of 18, USCIS will notify the Department of Health and Human Services to facilitate the provision of interim assistance.

(c) *Initial evidence.* An Application for T Nonimmigrant Status must include:

(1) A detailed, signed personal statement from the applicant, in their own words, addressing:

(i) The circumstances surrounding the applicant's victimization, including:

(A) The nature of the victimization; and

(B) To the extent possible, the following:

(1) When the victimization occurred;

(2) How long the trafficking lasted;

(3) How and when they escaped, were rescued, or otherwise became separated from the traffickers;

(4) The events surrounding the trafficking;

(5) Who was responsible for the trafficking; and

(6) The circumstances surrounding their entry into the United States, if related to the trafficking;

(ii) How the applicant's physical presence in the United States relates to the trafficking; (iii) The hardship, including harm or mistreatment the applicant fears if they are removed from the United States; and

(iv) Whether they have complied with any reasonable law enforcement request for assistance and whether any criminal, civil or administrative records relating to the acts of trafficking exist, if known, (or if applicable, why the age exemption or trauma exception applies); and

(2) Any credible evidence that supports any of the eligibility requirements set out in §§ 214.206 through 214.208.

(d) *Inadmissible applicants.* If an applicant is inadmissible to the United States, they must submit a request for a waiver of inadmissibility on the Application for Advance Permission to Enter as a Nonimmigrant, or successor form as designated by USCIS accordance with 8 CFR 103.2, in accordance with form instructions and 8 CFR 212.16, and accompanied by supporting evidence.

(e) *Evidence from law enforcement.* An applicant may wish to submit evidence from an LEA to help establish eligibility, including victimization and the compliance with reasonable requests for assistance. An LEA declaration:

(1) Is optional evidence;

(2) Is not given any special evidentiary weight;

(3) Does not grant an immigration benefit and does not lead to automatic approval of the Application for T Nonimmigrant Status;

(4) Must be submitted on the "Declaration for Trafficking Victim," and must be signed by a supervising official responsible for the detection, investigation, or prosecution of severe forms of trafficking in persons;

(5) Is completed at the discretion of the certifying official; and

(6) Does not require that a formal investigation or prosecution be initiated.

(f) *Any credible evidence.* All evidence demonstrating cooperation with law enforcement will be considered under the any credible evidence standard.

(g) *USCIS determination.* USCIS, not the LEA, will determine if the applicant was or is a victim of a severe form of trafficking in persons, and otherwise meets the eligibility requirements for T nonimmigrant status.

(h) *Disavowed or withdrawn LEA declaration.* An LEA may disavow or withdraw the contents of a previously submitted declaration and should provide a detailed explanation of its reasoning in writing. After disavowal or withdrawal, the LEA declaration generally will no longer be considered as evidence of the applicant's compliance with requests for assistance in LEA's detection, investigation, or prosecution, but may be considered for other purposes.

(i) *Continued Presence.* An applicant granted Continued Presence under 28 CFR 1100.35 should submit documentation of the grant of Continued Presence. If revoked, the grant of Continued Presence will generally no longer be considered as evidence of the applicant's compliance with requests for assistance in the LEA's investigation or prosecution but may be considered for other purposes.

(j) *Other evidence.* An applicant may also submit any evidence regarding entry or admission into the United States or permission to remain in the United States. An applicant may also note that such evidence is contained in their immigration file.

(k) *Biometric services.* All applicants for T–1 nonimmigrant status must submit biometrics in accordance with 8 CFR 103.16.

(l) *Evidentiary standards, standard of proof, and burden of proof.* (1) The burden is on the applicant to demonstrate eligibility for T–1 nonimmigrant status by a preponderance of the evidence. The applicant may submit any credible evidence relating to a T nonimmigrant application for consideration by USCIS.

(2) USCIS will conduct a review of all evidence and may investigate any aspect of the application.

(3) Evidence previously submitted by the applicant for any immigration benefit request or relief may be used by USCIS in evaluating the eligibility of an applicant for T–1 nonimmigrant status. USCIS will not be bound by previous factual determinations made in connection with a prior application or petition for any immigration benefit or relief. USCIS will determine, in its sole discretion, the evidentiary value of previously or concurrently submitted evidence.

(4) USCIS will consider the totality of the evidence the applicant submitted and other evidence available to USCIS in evaluating an Application for T Nonimmigrant Status.

(m) *Bona fide determination.* Once an applicant submits an Application for T Nonimmigrant Status or Application for Derivative T Nonimmigrant Status, USCIS will conduct an initial review to determine if the application is bona fide under the provisions of § 214.205. USCIS will conduct an initial review of an eligible family member's Application for Derivative T Nonimmigrant Status to determine if the application is bona fide if the principal's Application for T Nonimmigrant Status has been deemed bona fide.

(n) *Decision.* After completing its review of the application and evidence, USCIS will issue a decision approving

or denying the application in accordance with 8 CFR 103.3.

(o) *Approval.* If USCIS determines that the applicant is eligible for T–1 nonimmigrant status, USCIS will approve the application and grant T–1 nonimmigrant status, subject to the annual limitation as provided in § 214.210. USCIS will provide the applicant with evidence of T–1 nonimmigrant status. USCIS may also notify other parties and entities of the approval as it determines appropriate, including any LEA providing an LEA declaration and the Department of Health and Human Service's Office of Refugee Resettlement, consistent with 8 U.S.C. 1367.

(1) *Applicants with an outstanding order of removal, deportation, or exclusion issued by DHS.* For an applicant who is the subject of an order of removal, deportation, or exclusion issued by DHS, the order will be deemed cancelled by operation of law as of the date of the USCIS approval of the application.

(2) *Applicants with an outstanding order of removal, deportation, or exclusion issued by the Department of Justice.* An applicant who is the subject of an order of removal, deportation or exclusion issued by an immigration judge or the Board of Immigration Appeals (Board) may seek rescission of such order by filing a motion to reopen and terminate removal proceedings with the immigration judge or the Board. ICE may agree, as a matter of discretion, to join such motion to overcome any applicable time and numerical limitations of 8 CFR 1003.2 and 1003.23.

(3) *Employment authorization.* An individual granted T–1 nonimmigrant status is authorized to work incident to status. An applicant does not need to file a separate Application for Employment Authorization to be granted employment authorization. USCIS will issue an initial Employment Authorization Document (EAD) to such T–1 nonimmigrants for the duration of the T–1 nonimmigrant status. An applicant granted T–1 nonimmigrant status seeking to replace an EAD that was lost, stolen, or destroyed must file an Application for Employment Authorization in accordance with form instructions.

(p) *Travel abroad.* In order to return to the United States after travel abroad and continue to hold T–1 nonimmigrant status, a T–1 nonimmigrant must be granted advance parole pursuant to section 212(d)(5) of the Act prior to departing the United States.

(q) *Denial.* Upon denial of an application, USCIS will notify the

applicant in accordance with 8 CFR 103.3. USCIS may also notify any LEA providing an LEA declaration and the Department of Health and Human Service's Office of Refugee Resettlement. If an applicant appeals a denial in accordance with 8 CFR 103.3, the denial will not become final until the administrative appeal is decided.

(1) *Effect on bona fide determination.* Upon denial of an application, any benefits derived from a bona fide determination will automatically be revoked when the denial becomes final.

(2) *Applicants previously in removal proceedings.* In the case of an applicant who was previously in removal proceedings that were terminated on the basis of a pending Application for T Nonimmigrant Status, once a denial becomes final, DHS may file a new Notice to Appear to place the individual in removal proceedings again.

(3) *Applicants subject to an order of removal, deportation, or exclusion.* In the case of an applicant who is subject to an order of removal, deportation, or exclusion that had been stayed due to the pending Application for T Nonimmigrant Status, the stay will be automatically lifted as of the date the denial becomes final.

### § 214.205   Bona fide determination.

(a) *Bona fide determinations for principal applicants for T nonimmigrant status.* If an Application for T Nonimmigrant Status is submitted after August 28, 2024, USCIS will conduct an initial review to determine if the application is bona fide.

(1) *Request for evidence.* If an Application for T Nonimmigrant Status was pending as of August 28, 2024, and additional evidence is required to establish eligibility for principal T nonimmigrant status, USCIS will issue a request for evidence, and conduct a bona fide review based on available evidence.

(2) *Initial review criteria.* After initial review, USCIS will deem an Application for T Nonimmigrant Status bona fide if:

(i) The applicant has submitted a properly filed and complete Application for T Nonimmigrant Status;

(ii) The applicant has submitted a signed personal statement; and

(iii) The results of initial background checks are complete, have been reviewed, and do not present national security concerns.

(3) *Secondary review criteria.* If initial review does not establish an Application for T Nonimmigrant Status is bona fide, USCIS will conduct a full T nonimmigrant status eligibility review. An Application for T

Nonimmigrant Status that meets all eligibility requirements will be approved, or if the statutory cap has been reached, will receive a bona fide determination.

(b) *Bona fide determinations for eligible family members in the United States.* Once a principal applicant's application has been deemed bona fide, USCIS will conduct an initial review for any eligible family members in the United States who have filed an Application for Derivative T Nonimmigrant Status to determine whether their applications are bona fide.

(1) If an Application for Derivative T Nonimmigrant Status was pending as of August 28, 2024, and additional evidence is required to establish eligibility for derivative T nonimmigrant status, USCIS will issue a request for evidence and conduct a bona fide review based on available evidence.

(2) After initial review, USCIS will determine an Application for Derivative T Nonimmigrant Status is bona fide if:

(i) The eligible family member is in the United States at the time of the bona fide determination;

(ii) The principal applicant or T–1 nonimmigrant has submitted a properly filed and complete Application for Derivative T Nonimmigrant Status;

(iii) The Application for Derivative T Nonimmigrant Status is supported by credible evidence that the derivative applicant qualifies as an eligible family member; and

(iv) Initial background checks are complete, have been reviewed, and do not present national security concerns.

(3) If initial review does not establish an Application for Derivative T Nonimmigrant Status is bona fide, USCIS will conduct a full T nonimmigrant status eligibility review. An Application for Derivative T Nonimmigrant Status that meets all eligibility requirements during this secondary review will be approved, or if the statutory cap has been reached, will receive a bona fide determination.

(c) *Notice of USCIS determination.* If USCIS determines that the Application for T Nonimmigrant Status or Application for Derivative T Nonimmigrant Status is bona fide under this section, USCIS will issue written notice of that determination, and inform the applicant that they may be considered for deferred action and may file an Application for Employment Authorization if they have not already filed one. The notice will also inform the applicant that any final order of removal, deportation, or exclusion is automatically stayed as set forth in paragraph (g) of this section. An

application will be treated as a bona fide application as of the date of the notice.

(d) *Not considered bona fide.* If an application is incomplete or presents national security concerns, it will not be considered bona fide. There are no motion or appeal rights for a bona fide determination upon initial review under this section.

(1) For applications found not to be bona fide upon initial review, USCIS will proceed to full T nonimmigrant status eligibility review as described in paragraphs (a)(3) and (b)(3) of this section, generally in order of application receipt date.

(2) If an application is found through this review not to establish eligibility for T nonimmigrant status, the application will be denied in accordance with § 214.204(q).

(e) *Exercise of discretion.* (1) Once USCIS deems an Application for T Nonimmigrant Status or Application for Derivative T Nonimmigrant Status bona fide, USCIS may consider the applicant for deferred action.

(2) If, after review of the available information including background checks, USCIS determines that deferred action is warranted in a particular case as an exercise of enforcement discretion, USCIS will then proceed to adjudication of the Application for Employment Authorization, if one has been filed.

(3) There are no motion or appeal rights for the exercise of enforcement discretion under this section.

(f) *Bona fide determinations for applicants in removal proceedings.* This section applies to applicants whose Applications for T Nonimmigrant Status or Applications for Derivative T Nonimmigrant Status have been deemed bona fide and who are in removal proceedings under section 240 of the Act, or in exclusion or deportation proceedings under former sections 236 or 242 of the Act (as in effect prior to April 1, 1997). In such cases, ICE may exercise prosecutorial discretion, as appropriate, while USCIS adjudicates an Application for Derivative T Nonimmigrant Status.

(g) *Stay of final order of removal, deportation, or exclusion.* (1) If USCIS determines that an application is bona fide it automatically stays the execution of any final order of removal, deportation, or exclusion.

(2) This administrative stay will remain in effect until any adverse decision becomes final.

(3) Neither an immigration judge nor the Board has jurisdiction to adjudicate an application for a stay of removal, deportation, or exclusion on the basis of the filing of an Application for T Nonimmigrant Status or Application for Derivative T Nonimmigrant Status.

### § 214.206  Victim of a severe form of trafficking in persons.

(a) *Evidence.* The applicant must submit evidence that demonstrates:

(1) That they are or have been a victim of a severe form of trafficking in persons. Except in instances of sex trafficking involving victims under 18 years of age, severe forms of trafficking in persons must involve both a particular means (force, fraud, or coercion) and a particular end or a particular intended end (sex trafficking, involuntary servitude, peonage, debt bondage, or slavery); or

(2) If an applicant has not performed labor or services, or a commercial sex act, they must establish that they were recruited, transported, harbored, provided, or obtained for the purposes of subjection to sex trafficking, involuntary servitude, peonage, debt bondage, or slavery, or patronized or solicited for the purposes of subjection to sex trafficking.

(3) The applicant may satisfy the requirements under paragraph (a)(1) or (2) of this section by submitting:

(i) The applicant's personal statement, which should describe the circumstances of the victimization suffered. For more information regarding the personal statement, see § 214.204(c).

(ii) Any other credible evidence, including but not limited to:

(A) Trial transcripts;

(B) Court documents;

(C) Police reports or other documentation from an LEA;

(D) News articles;

(E) Copies of reimbursement forms for travel to and from court;

(F) Affidavits from case managers, therapists, medical professionals, witnesses, or other victims in the same trafficking scheme;

(G) Correspondence or other documentation from the trafficker;

(H) Documents used in furtherance of the trafficking scheme such as recruitment materials, advertisements, pay stubs, logbooks, or contracts;

(I) Photographs or images;

(J) An LEA declaration as described in § 214.204(c); or

(K) Documentation of a grant of Continued Presence under 28 CFR 1100.35.

(b) [Reserved]

### § 214.207  Physical presence.

(a) *Requirement.* To be eligible for T–1 nonimmigrant status, an applicant must be physically present in the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or at a port-of-entry thereto on account of such trafficking. USCIS considers the applicant's presence in the United States at the time of application. An applicant must demonstrate that they are physically present under one of the following grounds:

(1) Are currently being subjected to a severe form of trafficking in persons;

(2) Were liberated from a severe form of trafficking in persons by an LEA, at any time prior to filing the Application for T Nonimmigrant Status;

(3) Escaped a severe form of trafficking in persons before an LEA was involved, at any time prior to filing the Application for T Nonimmigrant Status;

(4) Were subject to a severe form of trafficking in persons at some point in the past and their current presence in the United States is directly related to the original trafficking in persons, regardless of the length of time that has passed between the trafficking and filing of the Application for T Nonimmigrant Status; or

(5) Have been allowed entry into the United States for participation in the detection, investigation, prosecution, or judicial processes associated with an act or perpetrator of trafficking.

(i) An applicant will be deemed physically present under this provision regardless of where such trafficking occurred.

(ii) To demonstrate that the applicant's physical presence is for participation in an investigative or judicial process, the applicant must submit documentation to show valid entry into the United States and evidence that this valid entry is for participation in investigative or judicial processes associated with an act or perpetrator of trafficking.

(b) *Departure from the United States.* An applicant who has voluntarily departed from or has been removed from the United States at any time after the act of a severe form of trafficking in persons is deemed not to be present in the United States as a result of such trafficking in persons unless:

(1) The applicant's reentry into the United States was the result of the continued victimization of the applicant;

(2) The applicant is a victim of a new incident of a severe form of trafficking in persons;

(3) The applicant has been allowed reentry into the United States for participation in the detection, investigation, prosecution, or judicial process associated with an act or a perpetrator of trafficking. An applicant will be deemed physically present

under this provision regardless of where such trafficking occurred. To demonstrate that the applicant's physical presence is for participation in an investigative or judicial process, the applicant must submit documentation to show valid entry into the United States and evidence that this valid entry is for participation in investigative or judicial processes associated with an act or perpetrator of trafficking;

(4) The applicant's presence in the United States is on account of their past or current participation in investigative or judicial processes associated with an act or perpetrator of trafficking, regardless of where such trafficking occurred. The applicant may satisfy physical presence under this provision regardless of the length of time that has passed between their participation in an investigative or judicial process associated with an act or perpetrator of trafficking and the filing of the Application for T Nonimmigrant Status; or

(5) The applicant returned to the United States and received treatment or services related to their victimization that cannot be provided in their home country or last place of residence outside the United States.

(c) *Evidence.* The applicant must submit evidence that demonstrates that their physical presence in the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or at a port-of-entry thereto, is on account of trafficking in persons. USCIS will consider any credible evidence presented to determine the physical presence requirement, including but not limited to:

(1) A detailed personal statement describing the applicant's current presence in the United States on account of the trafficking, including:

(i) The circumstances describing the victimization, including when the events took place, the length and severity of the trafficking, how and when the applicant escaped, was rescued, or otherwise became separated from the traffickers, when the trafficking ended, and when and how the applicant learned that they were a victim of human trafficking;

(ii) An explanation of any physical health effects or psychological trauma the applicant has suffered as a result of the trafficking and a description of how this trauma impacts the applicant's life at the time of filing;

(iii) The financial impact of the victimization;

(iv) The applicant's ability to access mental health services, social services, and legal services;

(v) Any relevant description of the applicant's cooperation with law enforcement at the time of filing;

(vi) A description of how the victimization relates to the applicant's current presence in the U.S., if relevant.

(2) Affidavits, evaluations, diagnoses, or other records from the applicant's service providers (including therapists, psychologists, psychiatrists, and social workers) documenting the therapeutic, psychological, or medical services the applicant has sought or is currently accessing as a result of victimization and that describe how the applicant's life is being impacted by the trauma at the time of filing, and describing any mental health conditions resulting from the trafficking;

(3) Documentation of any stabilizing services and benefits, including financial, language, housing, or legal resources, the applicant is accessing or has accessed as a result of being trafficked. For those services and benefits not currently being accessed, the record should demonstrate how those past services and benefits related to trauma the applicant is experiencing at the time of filing;

(4) An LEA declaration as described in § 214.204(c) or other statements from LEAs documenting the cooperation between the applicant and the LEA or law enforcement involvement in liberating the applicant;

(5) Documentation of a grant of Continued Presence under 28 CFR 1100.35;

(6) Any other documentation of entry into the United States or permission to remain in the United States, such as parole under section 212(d)(5) of the Act, or a notation that such evidence is contained in the applicant's immigration file;

(7) Copies of news reports, law enforcement records, or court records; or

(8) Any other credible evidence to establish the applicant's current presence in the United States is on account of the trafficking victimization.

**§ 214.208  Compliance with any reasonable request for assistance in the detection, investigation, or prosecution of an act of trafficking.**

(a) *Requirement.* To be eligible for T–1 nonimmigrant status, an applicant must have complied with any reasonable request for assistance from an LEA in the detection, investigation, or prosecution of acts of trafficking or the investigation of a crime where acts of trafficking are at least one central reason for the commission of that crime, unless the applicant meets an exception or exemption described in paragraph (e) of this section.

(b) *Applicability.* An applicant must, at a minimum, contact an LEA with proper jurisdiction to report the acts of a severe form of trafficking in persons. Credible evidence documenting a single contact with an LEA may suffice. Reporting may be telephonic, electronic, or through other means. An applicant who has never had contact with an LEA regarding the acts of a severe form of trafficking in persons will not be eligible for T–1 nonimmigrant status, unless they meet an exception or exception as described in paragraph (e) of this section.

(c) *Reasonable requests.* An applicant need only show compliance with reasonable requests made by an LEA for assistance in the investigation or prosecution of the acts of trafficking in persons. The reasonableness of the request depends on the totality of the circumstances. Factors to consider include, but are not limited to:

(1) General law enforcement and prosecutorial practices;

(2) The nature of the victimization;

(3) The specific circumstances of the victim;

(4) The victim's capacity, competency, or lack thereof;

(5) Trauma suffered (both mental and physical) or whether the request would cause further trauma;

(6) Access to support services;

(7) The safety of the victim or the victim's family;

(8) Compliance with previous requests and the extent of such compliance;

(9) Whether the request would yield essential information;

(10) Whether the information could be obtained without the victim's compliance;

(11) Whether a qualified interpreter or attorney was present to ensure the victim understood the request;

(12) Cultural, religious, or moral objections to the request;

(13) The time the victim had to comply with the request;

(14) The age, health, and maturity of the victim; and

(15) Any other relevant circumstances surrounding the request.

(d) *Evidence.* An applicant must submit evidence that demonstrates that they have complied with any reasonable request for assistance in a Federal, State, Tribal, or local detection, investigation, or prosecution of trafficking in persons, or a crime where trafficking in persons is at least one central reason for the commission of that crime. In the alternative, an applicant can submit evidence to demonstrate that they should be exempt under paragraph (e) of this section. If USCIS has any question

Federal Register / Vol. 89, No. 84 / Tuesday, April 30, 2024 / Rules and Regulations

about whether the applicant has complied with a reasonable request for assistance, USCIS may contact the LEA. The applicant may satisfy this requirement by submitting any of the following:

(1) An LEA declaration as described in § 214.204(c);

(2) Documentation of a grant of Continued Presence under 28 CFR 1100.35; or

(3) Any other evidence, including affidavits of witnesses. In the victim's statement prescribed by § 214.204(c), the applicant should show that an LEA that has responsibility and authority for the detection, investigation, or prosecution of severe forms of trafficking in persons has information about such trafficking in persons, that the victim has complied with any reasonable request for assistance in the investigation or prosecution of such acts of trafficking, and, if the victim did not report the crime, why the crime was not previously reported.

(e) *Exception or exemption.* An applicant who has not had contact with an LEA or who has not complied with any reasonable request may be excepted or exempt from the requirement to comply with any reasonable request for assistance in an investigation or prosecution if either of the following circumstances apply:

(1) *Trauma.* The applicant is unable to cooperate with a reasonable request for assistance from an LEA in the detection, investigation, or prosecution of acts of trafficking in persons due to physical or psychological trauma. An applicant must submit credible evidence of the trauma experienced. The applicant may satisfy this exception by submitting:

(i) A personal statement describing the trauma and explaining the circumstances surrounding the trauma the applicant experienced, including their age, background, maturity, health, disability, and any history of abuse or exploitation;

(ii) A signed statement from a qualified professional, such as a medical professional, mental health professional, social worker, or victim advocate, who attests to the victim's mental state or medical condition;

(iii) Medical or psychological records documenting the trauma or its impact;

(iv) Witness statements;
(v) Photographs;
(vi) Police reports;
(vii) Court records and court orders;
(viii) Disability determinations;
(ix) Government agency findings; or
(x) Any other credible evidence.

(2) *Age.* The applicant was under 18 years of age at the time of victimization.

An applicant who was under 18 years of age at the time at least one of the acts of trafficking occurred is exempt from the requirement to comply with any reasonable request for assistance in the detection, investigation, or prosecution, but they must submit evidence of their age at the time of the victimization. Where available, an applicant should include an official copy of their birth certificate, a passport, or a certified medical opinion. USCIS will also consider any other credible evidence submitted regarding the age of the applicant.

(f) *Exception or exemption established.* When an applicant has established that the exception or exemption applies, they are not required to have had any contact with law enforcement or comply with future requests for assistance, including reporting the trafficking. USCIS reserves the authority and discretion to contact the LEA involved in the case, if appropriate.

### § 214.209  Extreme hardship involving unusual and severe harm.

To be eligible for T–1 nonimmigrant status, an applicant must demonstrate that removal from the United States would subject the applicant to extreme hardship involving unusual and severe harm.

(a) *Standard.* A finding of extreme hardship involving unusual and severe harm may be based on the following factors.

(b) *Factors.* Factors that may be considered in evaluating whether removal would result in extreme hardship involving unusual and severe harm should include both traditional extreme hardship factors and factors associated with having been a victim of a severe form of trafficking in persons. These factors include, but are not limited to:

(1) The age, maturity, and personal circumstances of the applicant;

(2) Any physical or psychological issues the applicant has that necessitate medical or psychological care not reasonably available in the foreign country to which the applicant would be returned;

(3) The nature and extent of the physical and psychological consequences of having been a victim of a severe form of trafficking in persons;

(4) The impact of the loss of access to the United States courts and the criminal justice system for purposes relating to the incident of a severe form of trafficking in persons or other crimes perpetrated against the applicant, including criminal and civil redress for

acts of trafficking in persons, criminal prosecution, restitution, and protection;

(5) The reasonable expectation that the existence of laws, social practices, or customs in the foreign country to which the applicant would be returned would penalize the applicant severely for having been the victim of a severe form of trafficking in persons;

(6) The likelihood of re-victimization and the need, ability, and willingness of foreign authorities to protect the applicant;

(7) The likelihood that the trafficker or others acting on behalf of the trafficker in the foreign country would cause the applicant harm;

(8) The likelihood that the applicant's individual safety would be threatened by the existence of civil unrest or armed conflict; or

(9) Current or likelihood of future economic harm.

(c) *Evidence.* (1) An applicant is encouraged to describe and document all factors that may be relevant to the case, as there is no guarantee that a particular reason(s) will satisfy the requirement.

(2) Hardship to persons other than the applicant may be considered in determining whether an applicant will suffer the requisite hardship only if the related evidence demonstrates specifically that the applicant will suffer extreme hardship upon removal as a result of hardship to persons other than the applicant.

(3) The applicant may satisfy this requirement by submitting any credible evidence regarding the nature and scope of the hardship if the applicant was removed from the United States, including evidence of hardship arising from circumstances surrounding the victimization and any other circumstances.

(4) An applicant may submit a personal statement or other evidence, including evidence from relevant country condition reports and any other public or private sources of information.

### § 214.210  Annual numerical limit.

(a) *5,000 per fiscal year.* DHS may not grant T–1 nonimmigrant status to more than 5,000 principal applicants in any fiscal year.

(b) *Waiting list.* If the numerical limit prevents further grants of T–1 nonimmigrant status, USCIS will place applicants who receive a bona fide determination pursuant to § 214.205 on a waiting list. USCIS:

(1) Will assign priority on the waiting list based on the date the application was properly filed, with the oldest applications receiving the highest priority for processing;

(2) Will in the next fiscal year, issue a number to each application on the waiting list, in the order of the highest priority; and

(3) After T–1 nonimmigrant status has been issued to eligible applicants on the waiting list, USCIS will issue any remaining T–1 nonimmigrant numbers for that fiscal year to new eligible applicants in the order the applications were filed.

(c) *Unlawful presence.* While an applicant for T nonimmigrant status in the United States is on the waiting list, the applicant will not accrue unlawful presence under section 212(a)(9)(B) of the Act.

(d) *Removal from the waiting list.* An applicant may be removed from the waiting list consistent with law and policy. Applicants on the waiting list must remain admissible to the United States and otherwise eligible for T nonimmigrant status. If at any time prior to final adjudication USCIS receives information that an applicant is no longer eligible for T nonimmigrant status, the applicant may be removed from the waiting list. USCIS will provide notice to the applicant of that decision.

**§ 214.211  Application for eligible family members.**

(a) *Eligibility.* Subject to section 214(o) of the Act, an applicant who has applied for or has been granted T–1 nonimmigrant status (principal applicant) may apply for the admission of an eligible family member, who is otherwise admissible to the United States, in derivative T nonimmigrant status if accompanying or following to join the principal applicant.

(1) *Principal applicant 21 years of age or older.* For a principal applicant who is 21 years of age or over, eligible family member means a T–2 (spouse) or T–3 (child).

(2) *Principal applicant under 21 years of age.* For a principal applicant who is under 21 years of age, eligible family member means a T–2 (spouse), T–3 (child), T–4 (parent), or T–5 (unmarried sibling under the age of 18).

(3) *Family member facing danger of retaliation.* Regardless of the age of the principal applicant, if the eligible family member faces a present danger of retaliation as a result of the principal applicant's escape from the severe form of trafficking or cooperation with law enforcement, in consultation with the law enforcement agency investigating a severe form of trafficking, eligible family member means a T–4 (parent), T–5 (unmarried sibling under the age of 18), or T–6 (adult or minor child of a derivative of the principal applicant). In

cases where the LEA has not investigated the acts of trafficking after the applicant has reported the crime, USCIS will evaluate any credible evidence demonstrating derivatives' present danger of retaliation.

(4) *Admission requirements.* The principal applicant must demonstrate that the applicant for whom derivative T nonimmigrant status is being sought is an eligible family member of the T–1 principal applicant, as defined in § 214.201, and is otherwise eligible for that status.

(b) *Application.* (1) *Application submission.* A T–1 principal applicant may submit an Application for Derivative T Nonimmigrant Status in accordance with the form instructions.

(i) The Application for Derivative T Nonimmigrant Status for an eligible family member may be filed with the T–1 application, or separately.

(ii) T nonimmigrant status for eligible family members is dependent on the principal applicant having been granted T–1 nonimmigrant status and the principal applicant maintaining T–1 nonimmigrant status.

(iii) If a T–1 nonimmigrant cannot maintain status due to their death, the provisions of section 204(l) of the Act may apply.

(2) *Eligible family members in pending immigration proceedings.* (i) If an eligible family member is in removal proceedings under section 240 of the Act, or in exclusion or deportation proceedings under former sections 236 or 242 of the Act (as in effect prior to April 1, 1997), the principal applicant or T–1 nonimmigrant must file an Application for Derivative T Nonimmigrant Status directly with USCIS.

(ii) At the request of the eligible family member, ICE may exercise prosecutorial discretion, as appropriate, while USCIS adjudicates an Application for Derivative T Nonimmigrant Status.

(3) *Eligible family members with final orders of removal, deportation, or exclusion.* (i) If an eligible family member is the subject of a final order of removal, deportation, or exclusion, the principal applicant must file an Application for Derivative T Nonimmigrant Status directly with USCIS.

(ii) The filing of an Application for Derivative T Nonimmigrant Status has no effect on ICE's authority or discretion to execute a final order, although the applicant may file a request for an administrative stay of removal pursuant to 8 CFR 241.6(a).

(iii) If the eligible family member is in detention pending execution of the final order, the period of detention (under the

standards of 8 CFR 241.4) will be extended while a stay is in effect for the period reasonably necessary to bring about the applicant's removal.

(c) *Required supporting evidence.* In addition to the form, an Application for Derivative T Nonimmigrant Status must include the following:

(1) Biometrics.

(2) Evidence demonstrating the relationship of an eligible family member, as provided in § 214.211(d).

(3) In the case of an applicant seeking derivative T nonimmigrant status based on danger of retaliation, evidence demonstrating this danger as provided in § 214.211.

(4) If an eligible family member is inadmissible based on a ground that may be waived, a request for a waiver of inadmissibility under section 212(d)(13) or section 212(d)(3) of the Act must be filed in accordance with § 212.16 of this subchapter and submitted with the completed application package.

(d) *Relationship.* Except as described in paragraph (e) of this section, the family relationship must exist at the time:

(1) The Application for T Nonimmigrant Status is filed;

(2) The Application for T Nonimmigrant Status is adjudicated;

(3) The Application for Derivative T Nonimmigrant Status is filed;

(4) The Application for Derivative T Nonimmigrant Status is adjudicated; and

(5) The eligible family member is admitted to the United States if residing abroad.

(e) *Relationship and age-out protections*—(1) *Protection for new child of a principal applicant.* If the T–1 principal applicant establishes that they have become a parent of a child after filing the application for T–1 nonimmigrant status, the child will be deemed to be an eligible family member eligible to accompany or follow to join the T–1 principal applicant.

(2) *Age-out protection for eligible family members of a principal applicant under 21 years of age.* If the T–1 principal applicant was under 21 years of age when they applied for T–1 nonimmigrant status, USCIS will continue to consider a parent or unmarried sibling as an eligible family member.

(ii) A parent or unmarried sibling will remain eligible even if the principal applicant turns 21 years of age before adjudication of the application for T–1 nonimmigrant status.

(iii) An unmarried sibling will remain eligible even if the unmarried sibling is over 18 years of age at the time of

adjudication of the T–1 application, so long as the unmarried sibling was under 18 years of age at the time the T–1 application was filed.

(iv) The age of an unmarried sibling when USCIS adjudicates the T–1 application, when the principal applicant or T–1 nonimmigrant files the Application for Derivative T Nonimmigrant Status, when USCIS adjudicates the derivative application, or when the unmarried sibling is admitted to the United States does not affect eligibility.

(3) *Age-out protection for child of a principal applicant.* (i) USCIS will continue to consider a child as an eligible family member if the child was under 21 years of age at the time the principal filed the Application for T Nonimmigrant Status, but reached 21 years of age while the principal's application was still pending.

(ii) The child will remain eligible even if the child is over 21 years of age at the time of adjudication of the T–1 application.

(iii) As long as the child is under age 21 when the Application for T Nonimmigrant Status is filed and reaches age 21 while such application is pending, the age of the child when the principal applicant or T–1 nonimmigrant files the Application for Derivative T Nonimmigrant Status, when USCIS adjudicates the Application for Derivative T Nonimmigrant Status, or when the child is admitted to the United States does not affect eligibility.

(4) *Marriage of an eligible family member.* (i) An eligible family member seeking T–3 or T–5 status must be unmarried when the principal applicant files an Application for T Nonimmigrant Status, when USCIS adjudicates the Application for T Nonimmigrant Status, when the principal applicant or T–1 nonimmigrant files the Application for Derivative T Nonimmigrant Status, when USCIS adjudicates the Derivative T Nonimmigrant Status, and if relevant, when the family member is admitted to the United States.

(ii) Principal applicants who marry while their Application for T Nonimmigrant Status is pending may file an Application for Derivative T Nonimmigrant Status on behalf of their spouse, even if the relationship did not exist at the time they filed their Application for T Nonimmigrant Status.

(iii) Similarly, the principal applicant may apply for a stepparent or stepchild if the qualifying relationship was created after they filed their Application for T Nonimmigrant Status but before it was approved.

(iv) USCIS evaluates whether the marriage creating the qualifying spousal relationship or stepchild and stepparent relationship exists at the time of adjudication of the principal's application and through completion of the adjudication of the derivative's application.

(f) *Evidence demonstrating a present danger of retaliation.* A principal applicant or T–1 nonimmigrant seeking derivative T nonimmigrant status for an eligible family member on the basis of facing a present danger of retaliation as a result of the principal applicant's or T–1 nonimmigrant's escape from a severe form of trafficking or cooperation with law enforcement, must demonstrate the basis of this danger.
USCIS may contact the LEA involved, if appropriate. An applicant may satisfy this requirement by submitting:

(1) Documentation of a previous grant of advance parole to an eligible family member;

(2) A signed statement from a law enforcement agency describing the danger of retaliation;

(3) A personal statement from the principal applicant or derivative applicant describing the danger the family member faces and how the danger is linked to the victim's escape or cooperation with law enforcement; and/or

(4) Any other credible evidence, including trial transcripts, court documents, police reports, news articles, copies of reimbursement forms for travel to and from court, and affidavits from other witnesses. This evidence may be from the United States or any country in which the eligible family member is facing danger of retaliation.

(g) *Biometric submission; evidentiary standards.* The provisions for biometric submission and evidentiary standards described in § 214.204(b) and (d) apply to an eligible family member's Application for Derivative T Nonimmigrant Status.

(h) *Review and decision.* USCIS will review the application and issue a decision in accordance with paragraph (d) of this section.

(i) *Derivative approvals.* A noncitizen whose Application for Derivative T Nonimmigrant Status is approved is not subject to the annual limit described in § 214.210. USCIS will not approve an Application for Derivative T Nonimmigrant Status unless and until it has approved T–1 nonimmigrant status for the principal applicant.

(1) *Approvals for eligible family members in the United States.* When USCIS approves an Application for Derivative T Nonimmigrant Status for

an eligible family member in the United States, USCIS will concurrently approve T nonimmigrant status for the eligible family member. USCIS will notify the T–1 nonimmigrant of such approval and provide evidence of T nonimmigrant status to the derivative.

(2) *Approvals for eligible family members outside the United States.* When USCIS approves an application for an eligible family member outside the United States, USCIS will notify the T–1 nonimmigrant of such approval and provide the necessary documentation to the Department of State for consideration of visa issuance.

(3) *Employment authorization.* (i) A noncitizen granted derivative T nonimmigrant status may apply for employment authorization by filing an Application for Employment Authorization in accordance with form instructions.

(ii) For derivatives in the United States, the Application for Employment Authorization may be filed concurrently with the Application for Derivative T Nonimmigrant Status or at any later time.

(iii) For derivatives outside the United States, an Application for Employment Authorization based on their T nonimmigrant status may only be filed after admission to the United States in T nonimmigrant status.

(iv) If the Application for Employment Authorization is approved, the derivative T nonimmigrant will be granted employment authorization pursuant to 8 CFR 274a.12(c)(25) for the period remaining in derivative T nonimmigrant status.

(4) *Travel abroad.* In order to return to the United States after travel abroad and continue to hold derivative T nonimmigrant status, a noncitizen granted derivative T nonimmigrant status must either be granted advance parole pursuant to section 212(d)(5) of the Act and 8 CFR 223 or obtain a T nonimmigrant visa (unless visa exempt under 8 CFR 212.1) and be admitted as a T nonimmigrant at a designated port of entry.

### § 214.212   Extension of T nonimmigrant status.

(a) *Eligibility.* USCIS may grant extensions of T–1 nonimmigrant status beyond 4 years from the date of approval in 1-year periods from the date the T–1 nonimmigrant status ends if:

(1) An LEA detecting, investigating, or prosecuting activity related to acts of trafficking certifies that the presence of the applicant in the United States is necessary to assist in the detection, investigation, or prosecution of such activity; or

(2) USCIS determines that an extension is warranted due to exceptional circumstances.

(b) *Application for a discretionary extension of status.* Upon application, USCIS may extend T–1 nonimmigrant status based on law enforcement need or exceptional circumstances. A T–1 nonimmigrant may apply for an extension by submitting the form designated by USCIS in accordance with form instructions. A derivative T nonimmigrant may file for an extension of status independently if the T–1 nonimmigrant remains in valid T nonimmigrant status, or the T–1 nonimmigrant may file for an extension of T–1 status and request that this extension be applied to the derivative family members in accordance with the form instructions.

(c) *Timely filing.* An applicant should file the application to extend nonimmigrant status before the expiration of T nonimmigrant status. If T nonimmigrant status has expired, the applicant must explain in writing the reason for the untimely filing. USCIS may exercise its discretion to approve an untimely filed application for extension of T nonimmigrant status.

(d) *Evidence.* In addition to the application, a T nonimmigrant must include evidence to support why USCIS should grant an extension of T nonimmigrant status. The nonimmigrant bears the burden of establishing eligibility for an extension of status and that a favorable exercise of discretion is warranted.

(e) *Evidence of law enforcement need.* An applicant may demonstrate law enforcement need by submitting evidence that comes directly from an LEA, including:

(1) A new LEA declaration;

(2) Evidence from a law enforcement official, prosecutor, judge, or other authority who can detect, investigate, or prosecute acts of trafficking, such as a letter on the agency's letterhead, email, or fax; or

(3) Any other credible evidence.

(f) *Exceptional circumstances.* (1) USCIS may, in its discretion, extend status beyond the 4-year period if it determines the extension of the period of such nonimmigrant status is warranted due to exceptional circumstances as described in section 214(o)(7)(iii) of the Act. (2) USCIS may approve an extension of status for a principal applicant, based on exceptional circumstances, when an approved eligible family member is awaiting initial issuance of a T visa by an embassy or consulate and the principal applicant's T–1 nonimmigrant status is soon to expire.

(g) *Evidence of exceptional circumstances.* An applicant may demonstrate exceptional circumstances by submitting:

(1) The applicant's affirmative statement; or

(2) Any other credible evidence, including but not limited to:

(i) Medical records;

(ii) Police or court records;

(iii) News articles;

(iv) Correspondence with an embassy or consulate; and

(v) Affidavits from individuals with direct knowledge of or familiarity with the applicant's circumstances.

(h) *Mandatory extensions of status for adjustment of status applicants.* USCIS will automatically extend T nonimmigrant status when a T nonimmigrant properly files an application for adjustment of status during the period of T nonimmigrant status, in accordance with 8 CFR 245.23. No separate application for extension of T nonimmigrant status, or supporting evidence, is required.

**§ 214.213   Revocation of approved T nonimmigrant status.**

(a) *Automatic revocation of derivative status.* An approved Application for Derivative T Nonimmigrant Status will be revoked automatically if the family member with an approved derivative application notifies USCIS that they will not apply for admission to the United States. An automatic revocation cannot be appealed.

(b) *Revocation on notice/grounds for revocation.* USCIS may revoke an approved Application for T Nonimmigrant Status following issuance of a notice of intent to revoke if:

(1) The approval of the application violated the requirements of section 101(a)(15)(T) of the Act or this subpart or involved error in preparation, procedure, or adjudication that led to the approval;

(2) In the case of a T–2 spouse, the applicant's divorce from the T–1 principal applicant has become final;

(3) In the case of a T–1 principal applicant, an LEA with jurisdiction to detect, investigate, or prosecute the acts of severe forms of trafficking in persons notifies USCIS that the applicant has refused to comply with a reasonable request to assist with the detection, investigation, or prosecution of the trafficking in persons and provides USCIS with a detailed explanation in writing; or

(4) The LEA that signed the LEA declaration withdraws it or disavows its contents and notifies USCIS and provides a detailed explanation of its reasoning in writing.

(c) *Procedures.* (1) USCIS may revoke an approved application for T nonimmigrant status following a notice of intent to revoke.

(i) The notice of intent to revoke must be in writing and contain a statement of the grounds for the revocation and the time period allowed for the T nonimmigrant's rebuttal.

(ii) The T nonimmigrant may submit evidence in rebuttal within 30 days of the notice.

(iii) USCIS will consider all relevant evidence in determining whether to revoke the approved application for T nonimmigrant status.

(2) If USCIS revokes approval of the previously granted T nonimmigrant status application, USCIS:

(i) Will provide written notice to the applicant; and

(ii) May notify the LEA who signed the LEA declaration, any consular officer having jurisdiction over the applicant, or the Office of Refugee Resettlement of the Department of Health and Human Services.

(3) If an applicant appeals the revocation, the decision will not become final until the administrative appeal is decided in accordance with 8 CFR 103.3.

(d) *Effect of revocation.* Revocation of T–1 nonimmigrant status will terminate the principal's status as a T nonimmigrant and result in automatic termination of any derivative T nonimmigrant status. If a derivative application is pending at the time of revocation of T–1 nonimmigrant status, such pending applications will be denied. Revocation of a T–1 nonimmigrant status or derivative T nonimmigrant status also revokes any waiver of inadmissibility granted in conjunction with such application. The revocation of T–1 nonimmigrant status will have no effect on the annual numerical limit described in § 214.210.

**§ 214.214   Removal proceedings.**

(a) Nothing in this section prohibits DHS from instituting removal proceedings for conduct committed after admission, or for conduct or a condition that was not disclosed prior to the granting of T nonimmigrant status, including misrepresentations of material facts in the Application for T–1 Nonimmigrant Status or in an Application for Derivative T Nonimmigrant Status, or after revocation of T nonimmigrant status.

(b) ICE will maintain a policy regarding the exercise of discretion toward all applicants for T nonimmigrant status and T nonimmigrants. This policy will address, but need not be limited to,

ICE's discretionary decision-making in proceedings before the Executive Office for Immigration Review and considerations related to ICE's immigration enforcement actions involving T visa applicants and T nonimmigrants.

### § 214.215   USCIS employee referral.

(a) Any USCIS employee who, while carrying out their official duties, comes into contact with a noncitizen believed to be a victim of a severe form of trafficking in persons and is not already working with an LEA may consult, as necessary, with the ICE officials responsible for victim protection, trafficking investigations and prevention, and deterrence.

(b) The ICE office may, in turn, refer the victim to another LEA with responsibility for detecting, investigating, or prosecuting acts of trafficking.

(c) If the noncitizen has a credible claim to victimization, USCIS may advise the individual that they can submit an Application for T Nonimmigrant Status and seek any other benefit or protection for which they may be eligible, provided doing so would not compromise the noncitizen's safety.

### § 214.216   Restrictions on use and disclosure of information relating to applicants for T nonimmigrant classification.

(a) The use or disclosure (other than to a sworn officer or employee of DHS, the Department of Justice, the Department of State, or a bureau or agency of any of those departments, for legitimate department, bureau, or agency purposes) of any information relating to the beneficiary of a pending or approved Application for T Nonimmigrant Status is prohibited unless the disclosure is made in accordance with an exception described in 8 U.S.C. 1367(b).

(b) Information protected under 8 U.S.C. 1367(a)(2) may be disclosed to Federal prosecutors to comply with constitutional obligations to provide statements by witnesses and certain other documents to defendants in pending Federal criminal proceedings.

(c) Agencies receiving information under this section, whether governmental or non-governmental, are bound by the confidentiality provisions and other restrictions set out in 8 U.S.C. 1367.

(d) DHS officials are prohibited from making adverse determinations of admissibility or deportability based on information obtained solely from the trafficker, unless the applicant has been convicted of a crime or crimes listed in section 237(a)(2) of the Act.

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 8. The authority citation for part 245 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1252, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 9. Revise § 245.23 to read as follows:

### § 245.23   Adjustment of noncitizens in T nonimmigrant classification.

(a) *Eligibility of principal T–1 applicants.* Except as described in paragraph (c) of this section, a noncitizen may be granted adjustment of status to that of a noncitizen lawfully admitted for permanent residence, provided the noncitizen:

(1) Applies for such adjustment.

(2) Was lawfully admitted to the United States as a T–1 nonimmigrant, as defined in 8 CFR 214.201.

(3) Continues to hold T–1 nonimmigrant status at the time of application.

(4) Has been physically present in the United States for a continuous period of at least 3 years since the date of lawful admission as a T–1 nonimmigrant, or has been physically present in the United States for a continuous period during the investigation or prosecution of acts of trafficking and the Attorney General has determined that the investigation or prosecution is complete, whichever period is less; except

(i) If the applicant has departed from the United States for any single period in excess of 90 days or for any periods in the aggregate exceeding 180 days, the applicant shall be considered to have failed to maintain continuous physical presence in the United States for purposes of section 245(l)(1)(A) of the Act; and

(ii) If the noncitizen was granted T nonimmigrant status, such noncitizen's physical presence in the CNMI before, on, or after November 28, 2009, and subsequent to the grant of T nonimmigrant status, is considered as equivalent to presence in the United States pursuant to an admission in T nonimmigrant status.

(5) Is admissible to the United States under the Act, or otherwise has been granted a waiver by USCIS of any applicable ground of inadmissibility, at the time of examination for adjustment.

(6) Has been a person of good moral character since first being lawfully admitted as a T–1 nonimmigrant and until USCIS completes the adjudication of the application for adjustment of status.

(7)(i) Has, since first being lawfully admitted as a T–1 nonimmigrant, and until the conclusion of adjudication of the application, complied with any reasonable request for assistance in the detection, investigation or prosecution of acts of trafficking, as defined in § 8 CFR 214.201; or

(ii) Would suffer extreme hardship involving unusual and severe harm upon removal from the United States, as provided in 8 CFR 214.209; or

(iii) Was younger than 18 years of age at the time of the victimization that qualified the T nonimmigrant for relief under section 101(a)(15)(T) of the Act, 8 U.S.C. 1101(a)(15)(T); or

(iv) Established an inability to cooperate with a reasonable request for assistance at the time their Application for T Nonimmigrant Status was approved, as defined in 8 CFR 214.202(c)(1) and (2).

(b) *Eligibility of derivative family members.* A derivative family member of a T–1 nonimmigrant status holder may be granted adjustment of status to that of a noncitizen lawfully admitted for permanent residence, provided:

(1) The T–1 nonimmigrant has applied for adjustment of status under this section and meets the eligibility requirements described under paragraph (a) of this section;

(2) The derivative family member was lawfully admitted to the United States in derivative T nonimmigrant status under section 101(a)(15)(T)(ii) of the Act, and continues to hold such status at the time of application;

(3) The derivative family member has applied for such adjustment; and

(4) The derivative family member is admissible to the United States under the Act, or otherwise has been granted a waiver by USCIS of any applicable ground of inadmissibility, at the time of examination for adjustment.

(5) The derivative family member does not automatically lose T nonimmigrant status when the T–1 nonimmigrant adjusts status.

(c) *Exceptions.* A noncitizen is not eligible for adjustment of status under paragraph (a) or (b) of this section if:

(1) Their T nonimmigrant status has been revoked pursuant to 8 CFR 214.213;

(2) They are described in section 212(a)(3), 212(a)(10)(C), or 212(a)(10)(E) of the Act; or

(3) They are inadmissible under any other provisions of section 212(a) of the Act and have not obtained a waiver of

inadmissibility in accordance with 8 CFR 212.18 or 214.210.

(4) Where the applicant establishes that the victimization was a central reason for their unlawful presence in the United States, section 212(a)(9)(B)(iii) of the Act is not applicable, and the applicant need not obtain a waiver of that ground of inadmissibility. The applicant, however, must submit with their application for adjustment of status evidence sufficient to demonstrate that the victimization suffered was a central reason for the unlawful presence in the United States. To qualify for this exception, the victimization need not be the sole reason for the unlawful presence but the nexus between the victimization and the unlawful presence must be more than tangential, incidental, or superficial.

(d) *Jurisdiction.* (1) USCIS shall determine whether a T–1 applicant for adjustment of status under this section was lawfully admitted as a T–1 nonimmigrant and continues to hold such status, has been physically present in the United States during the requisite period, is admissible to the United States or has otherwise been granted a waiver of any applicable ground of inadmissibility, and has been a person of good moral character during the requisite period.

(2) USCIS shall determine whether the applicant received a reasonable request for assistance in the investigation or prosecution of acts of trafficking as defined in 8 CFR 214.201 and 214.208(c), and, if so, whether the applicant complied in such request.

(3) If USCIS determines that the applicant failed to comply with any reasonable request for assistance, USCIS shall deny the application for adjustment of status unless USCIS finds that the applicant would suffer extreme hardship involving unusual and severe harm upon removal from the United States.

(e) *Application*—(1) *Filing requirements.* Each T–1 principal applicant and each derivative family member who is applying for adjustment of status must file an Application to Register Permanent Residence or Adjust Status; and

(i) Accompanying documents, in accordance with the form instructions;

(ii) A photocopy of the applicant's Notice of Action, granting T nonimmigrant status;

(iii) A photocopy of all pages of their most recent passport or an explanation of why they do not have a passport;

(iv) A copy of the applicant's Arrival-Departure Record; and

(v) Evidence that the applicant was lawfully admitted in T nonimmigrant status and continues to hold such status at the time of application. For T nonimmigrants who traveled outside the United States and returned to the United States after presenting an Advance Parole Document issued while the adjustment of status application was pending, the date that the applicant was first admitted in lawful T status will be the date of admission for purposes of this section, regardless of how the applicant's Arrival-Departure Record is annotated.

(2) *T–1 principal applicants.* In addition to the items in paragraph (e)(1) of this section, T–1 principal applicants must submit:

(i) Evidence, including an affidavit from the applicant and a photocopy of all pages of all of the applicant's passports valid during the required period (or equivalent travel document or a valid explanation of why the applicant does not have a passport), that they have been continuously physically present in the United States for the requisite period as described in paragraph (a)(2) of this section. Applicants should submit evidence described in § 245.22. A signed statement from the applicant attesting to the applicant's continuous physical presence alone will not be sufficient to establish this eligibility requirement. If additional documentation is not available, the applicant must explain why in an affidavit and provide additional affidavits from others with first-hand knowledge who can attest to the applicant's continuous physical presence by specific facts.

(A) If the applicant has departed from and returned to the United States while in T–1 nonimmigrant status, the applicant must submit supporting evidence showing the dates of each departure from the United States and the date, manner, and place of each return to the United States.

(B) Applicants applying for adjustment of status under this section who have less than 3 years of continuous physical presence while in T–1 nonimmigrant status must submit a document signed by the Attorney General or their designee, attesting that the investigation or prosecution is complete.

(ii) Evidence of good moral character in accordance with paragraph (g) of this section; and

(A) Evidence that the applicant has complied with any reasonable request for assistance in the investigation or prosecution of the trafficking as described in paragraph (f)(1) of this section since having first been lawfully admitted in T–1 nonimmigrant status

and until the adjudication of the application; or

(B) Evidence that the applicant would suffer extreme hardship involving unusual and severe harm if removed from the United States as described in paragraph (f)(2) of this section.

(3) *Evidence relating to discretion.* Each applicant seeking adjustment under section 245(l) of the Act bears the burden of showing that discretion should be exercised in their favor. Where adverse factors are present, an applicant may offset these by submitting supporting documentation establishing mitigating equities that the applicant wants USCIS to consider. Depending on the nature of adverse factors, the applicant may be required to clearly demonstrate that the denial of adjustment of status would result in exceptional and extremely unusual hardship. Moreover, depending on the gravity of the adverse factors, such a showing might still be insufficient. For example, only the most compelling positive factors would justify a favorable exercise of discretion in cases where the applicant has committed or been convicted of a serious violent crime, a crime involving sexual abuse committed upon a child, or multiple drug-related crimes, or where there are security- or terrorism-related concerns.

(f) *Assistance in the investigation or prosecution or a showing of extreme hardship.* Each T–1 principal applicant must establish that since having been lawfully admitted as a T–1 nonimmigrant and up until the adjudication of the application, they complied with any reasonable request for assistance in the investigation or prosecution of the acts of trafficking, as defined in 8 CFR 214.201, or establish that they would suffer extreme hardship involving unusual and severe harm upon removal from the United States.

(1) Each T–1 applicant for adjustment of status under section 245(l) of the Act must submit evidence demonstrating that the applicant has complied with any reasonable requests for assistance in the investigation or prosecution of the human trafficking offenses during the requisite period; or

(2) In lieu of showing continued compliance with requests for assistance, an applicant may establish that they would suffer extreme hardship involving unusual and severe harm upon removal from the United States.

(i) The hardship determination will be evaluated on a case-by-case basis, in accordance with the factors described in 8 CFR 214.209.

(ii) Where the basis for the hardship claim represents a continuation of the hardship claimed in the Application for

T Nonimmigrant Status, the applicant need not re-document the entire claim, but rather may submit evidence to establish that the previously established hardship is ongoing. However, in reaching its decision regarding hardship under this section, USCIS is not bound by its previous hardship determination made under 8 CFR 214.209.

(g) *Good moral character.* A T–1 nonimmigrant applicant for adjustment of status under this section must demonstrate that they have been a person of good moral character since first being lawfully admitted as a T–1 nonimmigrant and until USCIS completes the adjudication of their applications for adjustment of status. Claims of good moral character will be evaluated on a case-by-case basis, taking into account section 101(f) of the Act and the standards of the community. The applicant must submit evidence of good moral character as follows:

(1) An affidavit from the applicant attesting to their good moral character, accompanied by a local police clearance or a state-issued criminal background check from each locality or state in the United States in which the applicant has resided for 6 or more months during the requisite period in continued presence or T–1 nonimmigrant status.

(2) If police clearances, criminal background checks, or similar reports are not available for some or all locations, the applicant may include an explanation and submit other evidence with their affidavit.

(3) USCIS will consider other credible evidence of good moral character, such as affidavits from responsible persons who can knowledgeably attest to the applicant's good moral character.

(4) An applicant who is under 14 years of age is generally presumed to be a person of good moral character and is not required to submit evidence of good moral character. However, if there is reason to believe that an applicant who is under 14 years of age may lack good moral character, USCIS may require evidence of good moral character.

(h) *Filing and decision.* An application for adjustment of status from a T nonimmigrant under section 245(l) of the Act shall be filed with the USCIS office identified in the instructions to the Application to Register Permanent Residence or Adjust Status. Upon approval of adjustment of

status under this section, USCIS will record the noncitizen's lawful admission for permanent residence as of the date of such approval and will notify the applicant in writing. Derivative family members' applications may not be approved before the principal applicant's application is approved.

(i) *Denial.* If the application for adjustment of status or the application for a waiver of inadmissibility is denied, USCIS will notify the applicant in writing of the reasons for the denial and of the right to appeal the decision to the Administrative Appeals Office (AAO) pursuant to the AAO appeal procedures found at 8 CFR 103.3. Denial of the T–1 principal applicant's application will result in the automatic denial of a derivative family member's application.

(j) *Effect of Departure.* (1) If an applicant for adjustment of status under this section departs the United States, they shall be deemed to have abandoned the application, and it will be denied.

(2) If, however, the applicant is not under exclusion, deportation, or removal proceedings, and they filed an Application for Travel Document, in accordance with the instructions on the form, or any other appropriate form, and was granted advance parole by USCIS for such absences, and was inspected and paroled upon returning to the United States, they will not be deemed to have abandoned the application.

(3) If the adjustment of status application of such an individual is subsequently denied, they will be treated as an applicant for admission subject to sections 212 and 235 of the Act. If an applicant for adjustment of status under this section is under exclusion, deportation, or removal proceedings, USCIS will deem the application for adjustment of status abandoned as of the moment of the applicant's departure from the United States.

(k) *Inapplicability.* Sections 245.1 and 245.2 do not apply to noncitizens seeking adjustment of status under this section.

(l) *Annual limit of T–1 principal applicant adjustments*—(1) *General.* The total number of T–1 principal applicants whose status is adjusted to that of lawful permanent residents under this section may not exceed the statutory limit in any fiscal year.

(2) *Waiting list.* (i) All eligible applicants who, due solely to the limit imposed in section 245(l)(4) of the Act and paragraph (l)(1) of this section, are not granted adjustment of status will be placed on a waiting list. USCIS will send the applicant written notice of such placement.

(ii) Priority on the waiting list will be determined by the date the application was properly filed, with the oldest applications receiving the highest priority.

(iii) In the following fiscal year, USCIS will proceed with granting adjustment of status to applicants on the waiting list who remain admissible and eligible for adjustment of status in order of highest priority until the available numbers are exhausted for the given fiscal year.

(iv) After the status of qualifying applicants on the waiting list has been adjusted, any remaining numbers for that fiscal year will be issued to new qualifying applicants in the order that the applications were properly filed.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 10. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 114–74, 129 Stat. 599 (28 U.S.C. 2461 note); 8 CFR part 2.

■ 11. Amend § 274a.12 by reserving paragraphs (c)(37) through (39) and adding paragraph (c)(40) to read as follows:

### § 274a.12  Classes of aliens authorized to accept employment.

\*     \*     \*     \*     \*

(c) \* \* \*

(40) A noncitizen applicant for T nonimmigrant status, and eligible family members, who have pending, bona fide applications, and who merit a favorable exercise of discretion.

\*     \*     \*     \*     \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–09022 Filed 4–29–24; 8:45 am]

**BILLING CODE 9111–97–P**

# Silence of the Innocents: Undocumented Immigrants' Underreporting of Crime and their Victimization

*Stefano Comino*
*Giovanni Mastrobuoni*
*Antonio Nicolò*

*Do undocumented migrants underreport crimes to the police in order to avoid being deported? And do criminals exploit such vulnerability? We address these questions using victimization surveys and administrative data around the 1986 U.S. immigration amnesty. The amnesty allows us to solve two major identification issues that have plagued this literature: migrants' legal status is endogenous and unobserved. The results show that the reporting rate of undocumented immigrants is 17 percent, which limits the immigrants' ability to protect some of their fundamental human rights. However, right after the 1986 amnesty, which disproportionately legalized individuals of Hispanic origin, crime victims of Hispanic origin show enormous improvements in reporting behavior. The implied increase in the reporting rate by amnesty applicants is close to 20 percentage points. © 2020 The Authors.* Journal of Policy Analysis and Management *published by Wiley Periodicals LLC on behalf of Association for Public Policy and Management*

## INTRODUCTION

In recent years the estimated number of unauthorized immigrants living in the United States is estimated to have flattened at around 11 million (representing 3.5 percent of the entire population), up from about 3.5 million in 1990.[1] One of the most controversial issues in the United States and in several Western countries is how to deal with undocumented immigrants. The main policy options are usually amnesties, though these tend to polarize the electorate. Public opinion polls show that many citizens fear that undocumented immigration might not just bring job losses and rising welfare costs but also high rates of crime.[2]

Because of such anti-immigration sentiments, a comprehensive immigration reform has eluded the U.S. Congress, and in 2016 a perfectly divided U.S. Supreme Court blocked former President Obama's Immigration Plan that would have shielded up to half of the undocumented immigrant population from deportation, allowing them to work in the United States. European institutions, subject to similar political pressure, cannot agree on a common immigration policy. Anti-immigration

---

[1] See Krogstad et al. (2019) and Warren and Warren (2013).
[2] See, for instance, http://www.pollingreport.com/immigration.htm.

Journal of Policy Analysis and Management, Vol. 39, No. 4, 1214–1245 (2020)
© 2020 The Authors. *Journal of Policy Analysis and Management* published by Wiley Periodicals LLC on behalf of Association for Public Policy and Management
Published by Wiley Periodicals, Inc. View this article online at wileyonlinelibrary.com/journal/pam
DOI:10.1002/pam.22221

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is pro...

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 457 of 4699 PageID #:  3622

sentiments have fueled the BREXIT vote in the UK referendum, and more anti-immigration acts may follow in other European countries.

A thorough evaluation of the various consequences of unauthorized migration represents the most likely solution to such gridlock. There is growing evidence of the positive consequences of immigration amnesties. Economists have shown that amnesties allow undocumented immigrants to access segments of the labor market granting enhanced employment protection, better working conditions, higher salaries, and the possibility of benefitting from better health-care (Barcellos, 2010; Kossoudji & Cobb-Clark, 2002; Lozano & Sorensen, 2011). And, as pointed out by the Washington Post (Badger, November 26, 2014), acquiring legal status might influence many more outcomes. Immigrants who benefit from an amnesty might invest more in education, in community institutions, as well as in political participation. They may become more likely to learn the host country language, and their children might become more likely to go to college. Alsan and Yang (2018) show that immigrants who fear deportation reduce the take-up of safety net programs, while Wang (2019) shows that with an increased risk of deportation immigrants become more likely to enter self-employment.

This study contributes to debate on illegal immigration and on amnesties providing evidence on an important negative consequence of illegally residing in the country: Undocumented immigrants are unable to protect their property and their human right to security. Arguably out of fear of deportation, undocumented immigrants who become crime victims are shown to under-report such crimes to the police, generating an essentially unenforced space for ruthless criminals. Amnesties might thus not only improve the labor market opportunities of immigrants, thus lowering their criminal propensity, they are shown to increase reporting rates and alter the expected cost of criminal behavior.

The evidence on the reporting behavior of undocumented immigrants is still scarce, as it either relies on correlational studies that do not measure legal status or on studies that do measure legal status but only for small convenience samples. In search of such evidence, we use the National Crime Victimization Survey (NCVS) around the 1986 immigration amnesty (the Immigration Reform and Control Act [IRCA]) to deal with the endogeneity of legal status as well as with its measurement issue. We develop a simple empirical strategy to circumvent the main issue when dealing with undocumented migrants: In most household surveys, respondents are not asked about their legal status; this is also the case for the National Crime Victimization Survey (NCVS). But administrative records of IRCA applicants show that most of the undocumented immigrants were of Hispanic origin. This implies that we can use Hispanic ethnicity as a proxy for legal status. Since such proxy has known probabilities of misclassifying legal status, we can adapt Aigner's (1973) regression with a binary independent variable subject to errors of observation to our difference-in-differences setup, which is centered around the 1986 U.S. immigration amnesty. The amnesty granted legal status to about 2.7 million undocumented immigrants (out of three million who applied).

Using this adjusted proxy method, we show that amnesties change the immigrants' incentives to report a crime. Following the IRCA amnesty, as the risk of deportation ceased to exist for IRCA applicants, the reporting rates of IRCA applicants went from 17 percent to 37 percent, approaching the 39 percent reporting rates of non-Hispanics, who are almost exclusively legal citizens.

Since police investigations are unlikely to start without a formal report of the offence, amnesties are also likely to increase the conviction rate of criminals whose victim is a newly legalized individual, therefore changing the relative benefits of

15306484, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15308684, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

victimizing immigrants versus natives. Whenever ethnicity or other observable characteristics signal the legal status of immigrants, criminals may choose their targets based on such signals. We study an ethnicity-based targeting strategy by criminals in a formal model developed in Appendix A and briefly discussed in the next section.[3] The comparative statics of this analysis highlight the identification strategy for this amnesty-induced displacement of victimization. Specifically, the model predicts amnesties to reduce the victimization of immigrants, and more so in places where a large fraction of them become legalized, delivering a clear difference-in-differences strategy. There is some evidence of these predictions in the data.

This implies not only that undocumented immigrants are unable to protect some of their fundamental human rights, but also that the absence of this fundamental human right makes them even more vulnerable. It also means that the deterrent effect of law enforcement might be severely damped by the mere existence of such victims.

Our results on the underreporting of crime has implications for the current political debate. Recently, President Trump's administration has made attempts to increase detection and deportation of undocumented immigrants (the so-called Secure Communities program) by involving local authorities in the enforcement of federal immigration law (287(g) program). This is likely to lead to additional underreporting. One potential solution would be to limit the collaboration between local and federal authorities, when immigrants' human right to security is involved.

Some local authorities have indeed set up Sanctuary policies, which, in order to limit the fear of deportation and possible family break-up, attempt to limit the role of local officials in immigration enforcement.

Our analysis has an additional implication that is worth mentioning. Investigating the consequences of amnesties by looking at reported crimes may be misleading, as an increase in reporting may be misinterpreted as an increase in crime. This happens for two reasons: i) legalized immigrants report more, and ii) criminals shift their targets from immigrants to natives, who are more likely to report.

## RELATED LITERATURE

The evidence on the reporting behavior of undocumented immigrants is still scarce, as it either relies on correlational studies that do not measure legal status or on studies that do measure legal status but only for small convenience samples. Our findings are consistent with those obtained in a few small-scale sample studies that document the low propensity of undocumented immigrants to report crimes to the police. Based on interviews in Memphis, Tennessee, Bucher et al. (2010) find that these individuals experience a high rate of victimization and yet are reluctant to report crimes to the police, mainly because of the perceived risk of deportation.

That fear of deportation may induce underreporting amongst Latino immigrants has also been mentioned in a study about immigrants in Phoenix, Arizona (Menjivar & Bejarano, 2004), and in one about immigrants in Reno, Nevada (Correia, 2010).[4] The only study that also uses a large and representative sample (the NCVS), finds that crime reporting rates are negatively correlated with the relative size of noncitizen and foreign-born individuals living in a metropolitan area (Gutierrez & Kirk, 2015), but does not exploit any exogenous variation in legal status.

---

[3] That higher reporting rates might reduce the incentives to commit a crime has been discussed in more general terms in a theoretical paper (Garoupa, 2003) and in two more empirical ones (Goldberg & Nold, 1980; Goudriaan et al., 2006).
[4] See also Barrick (2014).

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 459 of 4699 PageID #:  3624

In spirit, our study is also closely related to recent research on the determinants of crime reporting by women and victimization against them. Miller and Segal (2019) use the NCVS to show that the integration of women in U.S. police departments increased the reporting behavior of women who were victims of violent crimes, especially domestic violence. Consistent with our finding, they find that the increased reporting behavior leads to subsequent reductions in crime.

Several contributions in the literature focus on the effect of immigration on crime.[5] The results are rather mixed, although most recent studies find little evidence that immigration spurs crime (see, among others, Bianchi et al., 2012; Bell et al., 2013).[6] A couple of recent articles focus on amnesties and employ IRCA data to study their effect on crime (see Baker, 2015; Freedman et al., 2013). The authors show that documented immigrants have a lower propensity to be involved in criminal activities than undocumented ones and interpret this finding using a standard opportunity cost argument. There is also evidence from other countries showing that granting legal status changes the criminal involvement of immigrants. Mastrobuoni and Pinotti (2015) exploit exogenous variation in legal status following the January 2007 European Union enlargement, while Pinotti (2017) employs Italian data on legalization lotteries. Pinotti (2015) also provides evidence that stricter enforcement of migration policy reduces the crime rate of undocumented immigrants.

## A MODEL OF CRIME AND REPORTING: AN INFORMAL PRESENTATION

In this section, we offer an intuitive discussion of the theoretical model presented in the Appendix. In the model, we consider a city composed of two ethnic groups: natives and immigrants. Some immigrants are legal citizens while others are undocumented. Individuals differ also in terms of their wealth: All immigrants are poor, while natives can be rich or poor.[7]

We study the following decisions. Each citizen chooses whether to be honest or to commit crimes. Individuals who decide to become criminals observe the ethnicity—native or immigrant—of the potential victims and choose which ethnic group to target.[8] Honest individuals who are victimized decide whether to report the crime to the police. In our analysis, we first analyze the reporting decision of a victim. The propensity for victims to report a crime increases with the economic loss they suffer (which is proportional to their wealth) and it also depends on their legal status (legal or undocumented). Undocumented immigrants who are poor and who fear they could be deported if they contact the police have the smallest propensity to report crime. By contrast, rich natives have the largest propensity to contact the police and report crime. It follows that the average reporting rate is higher in the group of natives than in that of immigrants.

The decision of whether to be honest or criminal is based on a comparison of the utility enjoyed in the two cases. The utility of honest individuals increases

---

[5] The consequences of immigration for labor market outcomes is also a topic that is intensively investigated in the literature. See Borjas (1994) and Card (1990) among others.

[6] Also, Butcher and Piehl (1998) and Piehl (2007) find no evidence that immigration overall increases crime or incarceration rates.

[7] This assumption is in line with what we observe in our dataset. Income differences between Hispanics and non-Hispanics are shown to be large in the National Crime and Victimization Survey (see Appendix Figure A2). Household incomes are only available in broad intervals, but in relative terms non-Hispanics versus Hispanic income differences are at least equal to 25 percent.

[8] We assume that criminals cannot observe the wealth or the legal status of potential victims; but they do observe an informative signal, their ethnic group—ethnicity may be an observable characteristic due to different physical appearance or urban segregation by ethnicity. The U.S. is a clear example of where ethnicity, particularly being of Hispanic origin, carries some signal for the migration status.

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 460 of 4699 PageID #:  3625

with their wealth and their propensity to report crimes to the police. This latter assumption rests on the observation that the probability that a victim of a crime receives a monetary compensation, for instance by means of the (partial) return of the stolen goods or an insurance compensation, increases with the reporting rate: A higher reporting rate increases the capacity to protect one's property rights.

The utility of criminals depends on their ability to commit crimes. From this assumption, it follows that only those who are skilled enough to commit offences actually choose to become criminals. The decision of which ethnic group to target depends on a trade-off between a larger gain when targeting natives—natives are richer on average—with a smaller expected punishment when targeting immigrants—the average reporting rate is lower among immigrants. It follows that criminals with higher criminal abilities prefer to target natives while those with a lower criminal ability commit offences primarily against immigrants.

In the Appendix, we characterize the equilibrium choices of individuals. We then study how these decisions change in the case of an amnesty that legalizes a fraction of undocumented immigrants. The direct consequence of an amnesty is that legalized individuals do not fear the risk of deportation anymore and, therefore, increase their reporting rate. This fact has two effects. First, legalized immigrants are better able to protect their property rights, and therefore the utility of honesty increases for them—their opportunity cost of becoming criminals gets larger. Second, the average reporting rate of the immigrant group increases, and such an increase is stronger the larger the number of legalized immigrants. The predictions of the model regarding the consequences of amnesties are the following:

### Predictions of the Model

1. Amnesties increase the reporting rate of undocumented migrants, while they do not change those of legal immigrants and natives.
2. Amnesties reduce the overall number of crimes.
3. Amnesties reduce the number of crimes committed against immigrants while they can either increase or decrease those committed against natives.
4. The reduction in the overall number of crimes and in the number of crimes committed against immigrants is larger the larger the fraction of legalized immigrants.

The increased opportunity cost of becoming criminal for legalized immigrants and the deterrent effect on crime of the higher average reporting rate of the immigrant group reduce the number of individuals who choose to become criminals. This fact implies that crime reduces. In addition to that, the higher reporting rate of immigrants also changes the distribution of crime, inducing some criminals to shift from the immigrant to the native target. These two effects, overall reduction in criminality and shift in targeting, are stronger the larger the share of legalized immigrants and they both reduce the number of crimes committed against the immigrants. By contrast, the effect of an amnesty on the number of crimes committed against natives is, in general, ambiguous. On one side, some criminals shift from targeting immigrants to targeting natives; on the other side, natives benefit from the spillovers related to the overall reduction in criminality.

### Discussion of the Modeling Assumptions

Our model is based on some important assumptions that are worth discussing before moving to the empirical analysis. We assume that the only effect of an amnesty

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 461 of 4699 PageID #:  3626

15306688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

is to reduce the risk of deportation. In principle, however, amnesties may also increase immigrants' labor market prospects. This may lower the incentives to become criminals and increase the likelihood to become victims of crime. Nevertheless, two considerations are in order. The first effect would increase the opportunity cost of crime, thus reinforcing our findings. As for the second effect, as long as the effect of the greater propensity to report is stronger than the effect related to the increase in actual wealth, we would still see that an amnesty reduces the incentives to commit crimes against immigrants. Moreover, the increase in wealth would not be immediate, while our empirical analysis is going to focus on the short-run effect of legalization.

Another important assumption of the model is that undocumented immigrants can benefit from an amnesty irrespective of their skill at criminal activity. Governments, however, may choose to grant legalization only to individuals without a criminal history. This would potentially introduce a negative correlation between legalization and criminal activity. If this were the case, then the effect of amnesties on crime would be dampened by the fact that only honest immigrants would benefit from the amnesty. However, the deterrence effect of an increasing reporting rate would still generate a crime reduction.

Finally, it is worth noting that some of the predictions of the model are consistent with an alternative way of modeling criminals' behavior. Evidence suggests that offenders often target individuals who belong to their own ethnicity or race (see, for instance, Morgan, 2017). If this is the case, then an amnesty would mostly affect immigrants' victimization. But because of spillover effects, the effect on natives would still be ambiguous. Only in the limiting case of perfectly separated ethnicities would an amnesty entail no effect on the number of crimes committed against natives.

## THE IRCA, DATA, AND MEASUREMENT STRATEGIES

This section describes the IRCA and main data sources used in the empirical section.

### The IRCA

The U.S. Senate introduced the IRCA bill in May 1985 and President Ronald Reagan signed the bill in June 1986.[9] In order to be eligible, unauthorized immigrants had to be in continuous residence since January 1, 1982 (for a total of five years). Temporary residency lasted 18 months, after which the legalized immigrants became eligible for permanent residency (i.e., green cards). Approximately 1.75 million people applied for legalization through the program and about 94 percent of applications were approved for temporary residency (on average in about seven months). Alternatively, in more rural places, the Special Agricultural Worker (SAW) program provided permanent residency to undocumented immigrants who could demonstrate they had 60 days of seasonal agricultural work experience in qualifying crops from May 1985 to May 1986. Nearly 1.3 million people applied for the SAW program. We are going to use both types of applicants: in our sample applicants are split approximately 50/50 across the two programs. About 2.7 million applicants, or about 90 percent, were ultimately approved for permanent residence (Rytina, 2002).

The administrative records of the 1986 amnesty, called IRCA's Legalization Summary Public Use Tape, contains information about all applicants. County of residence is supplied only when the county had at least 100,000 residents in the 1990

---

[9] See Appendix Figure A3 for a full timing of all the amnesty proposals.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15384618, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1220 / *Silence of the Innocents*

Census, and at least 25 legalization applicants. Since we focus on large Metropolitan Statistical Areas (MSAs) that are part of the NCVS-MSA victimization survey, this is not a constraint. The other information we use is age and race of the applicants (there are five categories: Asian; Black, non-Hispanic; Hispanic; White, non-Hispanic; Unknown).[10]

The IRCA records give us the exact number of applicants for Hispanic and non-Hispanic adults. Next, to measure the fraction of applicants by Hispanic origin, we need the corresponding population, which we get from the 1980 and 1990 Census.

### CENSUS Data

The 1980 and 1990 decennial Censuses from the IPUMS allow us to estimate the population of Hispanic and non-Hispanic individuals by MSA. While the IRCA years do not coincide with a Census year, we interpolate the 1980 and 1990 Census population to get an estimate of 1987 (the starting year of the amnesty). The fraction of Hispanic and non-Hispanic applicants in each NCVS-MSA is shown in Table 1.

### Reporting and Victimization Data

The analysis of crime reporting behavior and victimization relies on victimization surveys. We use the National Crime Victimization Survey (NCVS), conducted by the Bureau of Justice Statistics (BJS) since 1973. Like most surveys, there is no information on the legal status of immigrants; in fact, there is not even information on migration or on the country of birth.[11]

But the NCVS-MSA version of the survey contains information on the 40 largest MSAs and can be merged with geographic information about IRCA applicants. The survey asks a nationally representative sample of individuals about crime incidents, and whether these have been reported or not to police. Crimes include rapes, assaults, including sexual ones, robberies, purse snatching, burglaries, motor vehicle thefts, and other thefts.

We focus on a symmetric time window from 1981 to 1994, around 1987 and 1988, when the IRCA applications were granted (see the left panel of Figure 1). Post 1994 years are excluded because of the 1994 Immigration and Nationality Act (which went into effect at the end of 1994), which introduced a temporary amnesty for about half a million undocumented immigrants. We exclude from the NCVS data American Indians (less than one percent of the sample), Asians (about 4 percent), and individuals for whom no race is specified (about 7 percent).[12] The right panel of Figure 1 shows, based on Immigration and Naturalization Service (now called U.S. Citizenship and Immigration Services [USCIS]) data, that the number of yearly deportations fell immediately after the IRCA, and started growing again in 1990, which is something we are going to come back to shortly.

The NCVS contains information about Hispanic origin and about the age range of respondents in five- or 10-year intervals, starting with age 12.[13] We focus our

---

[10] The administrative records also contain information about the country of origin, gender, wages, occupation, marital status, date of entry in the U.S., date of application, and whether the application was approved.
[11] Without this information it is impossible to use a residual approach to predict whether a respondent is an undocumented immigrant (see Borjas, 2017).
[12] Adding these small groups does not alter the results.
[13] Appendix Figure A4 plots the probability of IRCA application by Hispanic origin and age. In the next two sections, we explain how we compute the probability.

000455

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 463 of 4699 PageID #:  3628

**Table 1.** Fraction of Hispanic population by MSA (undocumented and total).

| MSA | Fraction of applicants in the IRCA amnesty | |
| --- | --- | --- |
| | Non-Hispanics | Hispanics |
| Atlanta, GA | 0.17% | 45.07% |
| Anaheim-Santa Ana, CA | 0.23% | 42.92% |
| Riverside-San Bernardino, CA | 0.22% | 41.68% |
| Portland-Vancouver, OR-WA | 0.03% | 40.38% |
| San Diego, CA | 0.13% | 33.32% |
| Los Angeles-Long Beach, CA | 0.46% | 33.19% |
| Houston, TX | 0.23% | 25.05% |
| Dallas, TX | 0.12% | 24.72% |
| West Palm Beach-Boca Raton, FL | 2.17% | 24.38% |
| Phoenix-Mesa, AZ | 0.16% | 24.05% |
| Chicago, IL | 0.16% | 19.82% |
| Washington, DC-MD-VA-WV | 0.31% | 16.37% |
| San Jose, CA | 0.16% | 16.05% |
| Tampa-St. Petersburg-Clearwater, FL | 0.10% | 12.81% |
| Charlotte-Gastonia-Rock Hill, NC-SC | 0.04% | 12.16% |
| Fort Worth-Arlington, TX | 0.10% | 12.14% |
| Fort Lauderdale, FL | 1.52% | 12.00% |
| Orlando, FL | 0.32% | 11.94% |
| Average for MSAs with $\delta > \mathbf{10\%}$ | 0.27% | 28.80% |
| Sacramento, CA | 0.06% | 8.71% |
| Seattle-Bellevue-Everett, WA | 0.04% | 8.07% |
| Nassau-Suffolk, NY | 0.16% | 8.04% |
| Oakland, CA | 0.10% | 7.81% |
| San Francisco, CA | 0.07% | 7.15% |
| Miami, FL | 3.78% | 6.10% |
| Kansas City, MO-KS | 0.02% | 5.96% |
| Denver, CO | 0.03% | 5.66% |
| Boston, MA-NH | 0.16% | 4.77% |
| Newark, NJ | 0.39% | 4.58% |
| San Antonio, TX | 0.09% | 3.91% |
| New York, NY | 0.70% | 3.52% |
| Philadelphia, PA-NJ | 0.04% | 3.40% |
| Minneapolis-St. Paul, MN-WI | 0.03% | 2.88% |
| Baltimore, MD | 0.03% | 1.95% |
| St. Louis, MO-IL | 0.01% | 1.81% |
| Detroit, MI | 0.02% | 1.77% |
| Columbus, OH | 0.07% | 1.46% |
| Cleveland, Lorain, Elyria, OH | 0.02% | 1.22% |
| Pittsburgh, PA | 0.00% | 0.49% |
| Cincinnati, OH-KY-IN | 0.01% | 0.47% |
| Norfolk-Virginia Beach-Newport News, VA | 0.01% | 0.28% |
| Average for MSAs with $\delta < \mathbf{3\%}$ | 0.02% | 1.55% |
| Overall Average | 0.25% | 18.07% |

*Notes*: The fraction of applicants is the ratio between IRCA's total number of applicants and the corresponding population based on the 1980 and 1990 Census, linearly interpolated to get the figure for 1987 (the onset of the amnesty). $\delta$ represents the fraction of Hispanics in the MSA.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 464 of 4699 PageID #:  3629




*Notes*: The number of NCVS-MSA IRCA applicants is based on authors' calculation by matching the Legalization Summary Public Use Tape with the NCVS survey. The number of deportations refers to the entire U.S. and is based on the U.S. Citizenship and Immigration Services data.

**Figure 1.** IRCA Applicants and Deportations of Unauthorized Immigrants.

**Table 2.** Summary statistics.

|  | Victims | | All | | | |
|---|---|---|---|---|---|---|
|  | Mean | Std. Dev. | Mean | Std. Dev. | Min | Max |
| Reported the crime | 0.39 | 0.49 | | | 0 | 1 |
| Crime victim | 1.00 | 0.00 | 0.14 | 0.35 | 0 | 1 |
| Hispanic | 0.12 | 0.32 | 0.13 | 0.33 | 0 | 1 |
| White | 0.84 | 0.36 | 0.85 | 0.36 | 0 | 1 |
| Female | 0.52 | 0.50 | 0.52 | 0.50 | 0 | 1 |
| Age 25–29 | 0.26 | 0.44 | 0.25 | 0.43 | 0 | 1 |
| Age 29–34 | 0.23 | 0.42 | 0.24 | 0.43 | 0 | 1 |
| Age 35–39 | 0.19 | 0.39 | 0.22 | 0.41 | 0 | 1 |
| Income $7,500-$14,999 | 0.16 | 0.37 | 0.13 | 0.34 | 0 | 1 |
| Income $15,000-$24,999 | 0.20 | 0.40 | 0.19 | 0.39 | 0 | 1 |
| Income $25,000-$29,999 | 0.08 | 0.28 | 0.09 | 0.28 | 0 | 1 |
| Income $30,000-$49,999 | 0.19 | 0.39 | 0.22 | 0.41 | 0 | 1 |
| Income $50,000 and over | 0.11 | 0.32 | 0.14 | 0.35 | 0 | 1 |
| Income missing | 0.12 | 0.33 | 0.14 | 0.34 | 0 | 1 |
| Year | 1987 | 4 | 1987 | 4 | 1981 | 1994 |
| Observations | 73,248 | | 518,596 | | | |

*Notes*: Based on NCVS data matched with the 1980 Census.

analysis on respondents between the ages of 18 and 39, whose chance of applying for the amnesty is more than twice as much as for younger and older respondents. The 18- to 39-year-old respondents represent about 50 percent of the population but more than 70 percent of the victims. Given the MSA-level stratified cluster sample design of the NCVS data, we cluster the standard errors at the MSA level.[14]

Table 2 (Summary Statistics) shows that we have an overall sample of about half a million respondents, about 15 percent of whom are victims of a crime.[15]

Of these, only 39 percent report the crime to the police. In Appendix Table A1, we divide the summary statistic by whether in an MSA more or less than 10 percent

[14] While we do not use sampling weights, this makes almost no difference.
[15] For respondents who report being victimized several times, there is one observation for each incident. This allows us to properly characterize the incident and to properly account for multiple victimizations.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 465 of 4699 PageID #:  3630

of the Hispanic population were amnesty applicants (see Table 1). Not surprisingly, the main difference is in the fraction of Hispanic individuals and Hispanic victims. The likelihood of victimization is also larger in MSAs when a larger fraction of Hispanics applied for IRCA. All other variables appear to be well-balanced.

## Measurement Strategies

We exploit two features about the 1986 IRCA amnesty to circumvent the issue that immigration status and legal status are both unobserved in the victimization surveys. The first is that Hispanics represent the grand majority of applicants and can thus be used as their proxy. The left panel of Figure 1 shows that between 1987 and 1988 about 1.6 million Hispanics applied for legal status in the MSAs covered by the NCVS. The number of non-Hispanic applicants is almost an order of magnitude smaller. Given that Hispanics made up only about 10 percent of the total population, the likelihood that someone of Hispanic origin was an IRCA applicant is about two orders of magnitude larger than for non-Hispanics.

The MSA-NCVS version of the U.S. victimization survey can be linked with the U.S. Census, which has information about Hispanic origin, allowing us to compute the corresponding overall population. For the fraction of Hispanic (H = 1) and non-Hispanic (H = 0) individuals who applied for the IRCA in a given MSA, we simply take the ratio between the total number of IRCA applicants and the corresponding total population from the CENSUS:

$$\delta_{MSA,H} = \frac{\text{IRCA Applicants}_{MSA,H}}{\text{CENSUS Population}_{MSA,H}} \tag{1}$$

Table 1 lists the fraction of applicants by Hispanic origin. In almost all MSAs non-Hispanics have less than a one percent chance of applying for the amnesty. Their overall chance of applying is 0.25 percent, while it is 18 percent for Hispanics.

These numbers imply that using Hispanic origin as proxy for IRCA applicants is subject to misclassification, an issue we are going to tackle later on. The second feature that we exploit is that the distribution of applicants across U.S. cities was quite uneven.

Table 1 ranks cities based on the fraction of Hispanics who applied for the IRCA. The MSAs where more than 10 percent of the Hispanic population were amnesty applicants are, starting from the top, Atlanta, GA, Anaheim-Santa Ana, Riverside-San Bernardino, Portland-Vancouver, San Diego, Los Angeles-Long Beach, Houston, Dallas, West Palm Beach-Boca Raton, Phoenix-Mesa, Chicago, Washington (DC), San Jose, Tampa-St. Petersburg-Clearwater, Charlotte-Gastonia-Rock Hill, Fort Worth-Arlington, Fort Lauderdale, and Orlando. For these cities the average probability is almost one-third. For the bottom nine MSAs, all with Hispanic fractions that are less than 3 percent, Columbus, Detroit, Cleveland, Lorain, Elyria (OH), Cincinnati, Pittsburgh, and Norfolk-Virginia Beach-Newport News the overall number is just 1.55 percent. The next section describes how we plan to exploit these differences for identification.

## REPORTING BEHAVIOR, VICTIMIZATION, AND LEGAL STATUS

## Identification Strategy

We model two different behaviors, the victims' reporting behavior as a function of whether they are legal immigrants or not, and the criminals' ethnic targeting

000458

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [1908/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

behavior as a function of whether there is a large or small fraction of IRCA applicants in the city, and we allow these behaviors to change with the IRCA.

Right before the IRCA, we know that at least three million undocumented immigrants, mostly of Hispanic origin, resided in the United States (the applicants) out of about 18.5 million Hispanics, while after the IRCA an estimated flow of 800,000 undocumented immigrants would enter the country every year (Warren & Warren, 2013). We also know that by 1990, the estimated stock of undocumented immigrants had already reached 3.5 million (Warren & Warren, 2013). This implies that the IRCA effect should be short-lived, as the stock of eligible migrants would quickly mix with the new flow of ineligible migrants (Orrenius & Zavodny, 2003).[16] This is consistent with the observed resurgence of deportations following the end of the amnesty (right panel of Figure 1).

The main identification assumption is that treated and control individuals would have followed parallel trends in the absence of the amnesty.

*Reporting Behavior*

Our theoretical model predicts that undocumented immigrants should increase their reporting following the IRCA, while natives should not (Prediction 1). This leads to an empirical strategy where we compare the indicator variable for reporting a crime to the police ($R = 0,1$) depending on Hispanic ($H = 1$) and the non-Hispanic ($H = 0$) origin of the victim in the two IRCA amnesty years 1987 and 1988 ($AY = 1$), with those before (1981 to 1986) and after (1989 to 1994) the amnesty ($AY = 0$):

$$R_i = \beta_1 H_i + \beta_2 H_i \times AY_i + \beta_3' X_i + \epsilon_i. \qquad (2)$$

The coefficient $\beta_2$ measures the difference in reporting rates between Hispanics and non-Hispanics in 1987 and 1988 compared to the years before and after the amnesty. This empirical strategy is supposed to isolate the changes in reporting that are driven by the amnesty (underreporting may be driven by many other factors, but as long as these factors are not changing over time they are going to be differenced out). The vector of regressors $X_i$ contains year and MSA fixed effects, and in some specifications, crime-type fixed effects, as well as MSA-specific time trends. Errors can be correlated across individuals living in the same MSA in a given year.

Given that from the victims' perspective, the aim is to estimate these difference-in-differences conditional on being an IRCA applicant $A$ as opposed to just a Hispanic individual $H$, the estimates are subject to misclassification bias. On one side, not all Hispanics were eligible and applied for the amnesty, $P(A = 1|H = 1) = \delta < 1$, on the other side, some non-Hispanics might also have applied, or $P(A = 0|H = 0) = q < 1$. Since most eligible applicants are believed to have applied (which is unsurprising given the incentives of becoming legalized), these errors stem from Hispanics who entered the country after January 1, 1982 (they had been a resident for less than five years at the time of the IRCA), as well as from those who were already U.S. citizens by the time of the IRCA.

The misclassification probabilities $1 - \delta$ and $1 - q$ are known to bias the results (Aigner, 1973). Assuming that, conditional on the application status, Hispanic origin has an additive effect $\alpha$ on reporting, we have that the application rates for Hispanics and non-Hispanics are:

$$E(R|H = 1, t) = \alpha + \delta E_t(R|A = 1, t) + (1 - \delta)E(R|A = 0, t)$$

---

[16] These numbers imply that in 1986, the fraction of undocumented Hispanics was at least 3/18.5=16.2 percent. In 1990, the same fraction was 3.5/21=16.6 percent.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

000459

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 467 of 4699 PageID #:  3632

$$E(R|H = 0, t) = qE(R|A = 0, t) + (1 - q)E(R|A = 1, t).$$

Taking first a difference between the two equations and, after rearranging, taking a second difference across time ($\Delta_t$), we get rid of $\alpha$ and obtain our difference-in-difference:

$$\Delta_t\left[E(R|A = 1) - E(R|A = 0)\right] = \frac{\Delta_t\left[E(R|H = 1) - E(R|H = 0)\right]}{\delta + q - 1}, \qquad (3)$$

which is biased by the factor $\delta + q - 1$. Similarly to Card and Krueger (1992), we are going to first estimate the differences across Hispanic and non-Hispanic respondents and later adjust the estimates based on MSA-level numbers for $q$ and $p$.

In Table 1, the fraction of applicants for non-Hispanics is an estimate of $1 - q$, while for Hispanics it is an estimate of $\delta$. Across all MSAs, the estimated $q$ is larger than 99.75 percent, while the estimated overall $\delta$ is 18 percent. Since the differences-in-differences are downward biased by a factor equal to $\delta + q - 1$, they have to be inflated by a factor of 5.6. Focusing on MSAs with a very small fraction of Hispanic applicants is also going to provide an interesting placebo group. With respect to the parallel trends assumption, it is important to add that differences in policing would be differenced out across individuals residing in the same MSA, unless the police responded to the amnesty by changing their focus based on ethnicity (with victims noticing such changes).

*Victimization Behavior*

According to our model, Hispanics are estimated to be victimized at lower rates following the IRCA (Prediction 3), and the changes are predicted to be increasing in the share $\delta$ of eligible immigrants in the MSA (Prediction 4).[17] Victimization rates against non-Hispanics might increase or decrease depending on the degree of spillover in victimization across ethnicity. For this reason, the ideal difference-in-differences strategy compares victimization rates of individuals of Hispanic origin in places with large and small $\delta$s. We compare victimization rates in the top and bottom MSAs based on $\delta$, providing a full spectrum of robustness checks about how we define such groups.

Unlike what happens for reporting, predictions are about differences based on ethnicity rather than IRCA applicants, which implies that the estimates do not need to be adjusted for misclassification. The difference-in-differences model in victimization ($V = 0, 1$) that is run separately for Hispanics and non-Hispanics is:

$$V_i = \delta_1 TOP(\delta)_i \times AY_i + \delta_2' X_i + \varepsilon_i. \qquad (4)$$

The indicator variable $TOP(\delta)_i$ indicates whether the individual resides in an MSA where the number of Hispanic amnesty applicants was more than 10 percent of the Hispanic population. The regressors $X_i$ contain year and MSA fixed effects, and, in some specifications, MSA-specific time trends. We allow errors to be correlated across individuals living in the same MSA in a given year. Regarding the parallel trends assumption, changes in policing would not be differenced out as we are taking changes across different MSAs. For this reason, we allow for differential trends, but cannot rule out that changes in policing may alter the results.

---

[17] The amnesty should also reduce overall crime, though such a prediction is more difficult to test given that several factors may influence overall crime.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

000460

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1226 / *Silence of the Innocents*



**Figure 2.** Unconditional Reporting Rates for Hispanics and Non-Hispanics.



**Figure 3.** Difference-in-Differences in Reporting Rates Between Hispanics and Non-Hispanics in all MSAs with Base Year 1987.

## RESULTS

### Reporting Rates

The evolution of the difference-in-differences in reporting rates between Hispanics and non-Hispanics using 1987 as a base year is shown in Figure 3 (the raw series is shown in Figure 2).[18] Reporting rates are usually lower for Hispanics than for non-Hispanics, but not in the years of the amnesty.

Unconditional reporting rates for Hispanics and non-Hispanics differ by about five percentage points. The only years where the reporting rates are quite close to each other are 1987 and 1988. Then they start diverging again, in line with growing numbers of undocumented Hispanics who keep on entering the country. It is

---

[18] The regression controls for year and MSA fixed effects.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 469 of 4699 PageID #:  3634



*Notes*: The sample is made of MSAs where less than 3 percent of Hispanics applied for the IRCA. The base year is 1987.

**Figure 4.**  Placebo Difference-in-Differences in Reporting Rates Between Hispanics and Non-Hispanics.

**Table 3.** Reporting regressions.

| | All MSAs | | | |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Amnesty years × Hispanic | 0.051*** | 0.046*** | 0.036** | 0.036** |
| | (0.018) | (0.017) | (0.014) | (0.014) |
| Hispanic | −0.055*** | −0.038*** | −0.048*** | −0.047*** |
| | (0.013) | (0.00) | (0.008) | (0.008) |
| Year fixed effects | ✓ | ✓ | ✓ | ✓ |
| MSA fixed effects | | ✓ | ✓ | ✓ |
| Socioeconomic characteristics | | ✓ | ✓ | ✓ |
| Crime-type fixed effects | | | ✓ | ✓ |
| MSA-specific time trends | | | | ✓ |
| Observations | 73,248 | 73,248 | 73,248 | 73,248 |
| R-squared | 0.002 | 0.009 | 0.108 | 0.109 |
| Mean dep. var | 0.385 | 0.385 | 0.385 | 0.385 |

*Notes*: The socioeconomic variables include age group dummies, gender, number of household members, and dummies for household income categories. Clustered standard errors (by MSA) are in parentheses. *** p<0.01; ** p<0.05; * p<0.1.

comforting to notice that the figure shows no pre-trends in the difference between Hispanics and non-Hispanics, which is a necessary condition for the appropriateness of the difference-in-differences strategy.

As a placebo exercise, Figure 4 focuses on communities where the fraction of IRCA applicants is less than 3 percent. The estimates are necessarily noisier, given the small sample of Hispanics, but no differences emerge during the Amnesty years.

Whether all these differences are statistically significant and robust when controlling for potential confounders is evidenced in Table 3. We estimate equation (2) using a linear probability model. The first column controls only for year fixed effects, capturing changes in reporting behavior that are shared by Hispanics and

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 470 of 4699 PageID #:  3635

**Table 4.** Placebo regressions: Reporting in MSAs in which less than 3 percent of the Hispanic population were amnesty applicants.

| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| | MSAs with less than 3% of Hispanic Applicants. | | | |
| Amnesty years × Hispanic | 0.050 | 0.048 | 0.026 | 0.021 |
| | (0.048) | (0.054) | (0.046) | (0.045) |
| Hispanic | −0.041 | −0.034 | −0.042 | −0.038 |
| | (0.026) | (0.021) | (0.025) | (0.024) |
| Year fixed effects | √ | √ | √ | √ |
| MSA fixed effects | | √ | √ | √ |
| Socioeconomic characteristics | | √ | √ | √ |
| Crime-type fixed effects | | | √ | √√√ |
| MSA-specific time trends | | | | √ |
| Observations | 14,213 | 14,213 | 14,213 | 14,213 |
| R-squared | 0.004 | 0.012 | 0.107 | 0.109 |
| Mean dep. var | 0.395 | 0.395 | 0.395 | 0.395 |

*Notes*: This Table mimics Table 3. Clustered standard errors (by MSA) are in parentheses. *** $p<0.01$; ** $p<0.05$; * $p<0.1$.

**Table 5.** Reporting regressions by crime types.

| Crime type | (1) Violent | (2) Economic | (3) Robbery | (4) Burglary | (5) Theft | (6) Assault |
|---|---|---|---|---|---|---|
| Amnesty years × Hispanic | 0.027 | 0.042** | −0.005 | 0.031 | 0.043** | 0.038 |
| | (0.050) | (0.016) | (0.086) | (0.048) | (0.020) | (0.065) |
| Hispanic | −0.011 | −0.039*** | −0.112*** | −0.028 | −0.044*** | 0.027 |
| | (0.019) | (0.008) | (0.036) | (0.023) | (0.008) | (0.020) |
| Observations | 12,844 | 61,352 | 2,765 | 10,896 | 47,691 | 9,723 |
| R-squared | 0.026 | 0.011 | 0.076 | 0.038 | 0.011 | 0.026 |
| Mean dep. var | 0.521 | 0.365 | 0.557 | 0.523 | 0.318 | 0.512 |

*Notes*: All regressions are restricted to MSAs with many undocumented immigrants of Hispanic origin. All regressions include MSA and year fixed effects, as well as age group dummies, gender, number of household members, and dummies for household income categories. Clustered standard errors (by MSA) are in parentheses. *** $p<0.01$; ** $p<0.05$; * $p<0.1$.

non-Hispanics alike. Hispanic reporting rates are estimated to go up by 5.1 percentage points in the two years of the amnesty. Adding MSA fixed effects and controlling for socioeconomic characteristics lowers the effect only slightly.

In column 3, we add crime-type fixed effects that might be correlated with the legal status of the respondents (as well as with the reporting behavior). When doing so, the difference-in-differences estimate is equal to 3.6 percentage points and is still significant at the one percent level. To make sure that the results are not driven by pre-existing differential trends, in the last column we add MSA-specific time trends, and the results are basically unchanged. Replicating the previous analysis for individuals in MSAs in which the number of Hispanic amnesty applicants was less than 3 percent of the Hispanic population, shows that the estimated difference-in-differences end up being very close to zero (see Table 4).

Table 5 shows that the results are more precisely estimated for economic crimes, especially thefts. Most differences by types of crime are positive, though statistical power is an issue, particularly for the less prevalent violent crimes.

Given the misclassification, the effects have to be inflated by a factor of 5.5, meaning that based on the last column of Table 3, applicants' chance of reporting

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

000463

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

 

*Notes*: In top MSAs at least 10 percent of Hispanics applied for the IRCA, in bottom ones less than 3 percent did. The base year is 1987.

**Figure 5.** Difference-in-Differences in Victimization Rates of Hispanics (left) and Non-Hispanics (right) in Top and Bottom MSAs.

goes up by $0.036 \times 5.5$, or 20 percentage points. What does this imply for the level of underreporting of undocumented immigrants?

In the non-amnesty years and in the amnesty years, the reporting rate of Hispanics is a weighted average of documented ($R^D$) and undocumented Hispanics($R^U$).

$$R_0^H = \gamma R^U + (1 - \gamma) R^D$$

$$R_1^H = (\gamma - \delta) R^U + (1 - (\gamma - \delta)) R^D$$

Taking the difference and solving for the unobserved $R^U$

$$R^U = R^D - \frac{R_1^H - R_0^H}{\delta},$$

which, importantly, does not depend on the fraction of undocumented Hispanics $\gamma$ (as it is unobserved). But it does depend on the reporting rate of documented Hispanics. Taking the reporting rate in MSAs with almost no Hispanics as a benchmark for $R^D$, we get that $R^U = 0.36 - 0.20 = 0.16$.

Could these results be compounded by changes in police behavior? Reporting depends on victims' cost/benefit calculations. For the observed changes in reporting to be driven by police behavior, the victims would have to quickly realize that an increased police effort is aimed at helping Hispanic victims. While police officers may devote more effort to protecting legal citizens, it would probably be hard for victims to observe such changes.

There is clear evidence that Hispanic victims are less likely to report crimes to the police and that these effects narrow when amnesties are passed. Undocumented victims' reporting rate is less than half the size of documented ones. Whether these differences trigger a criminal response is going to be our next research question.

*Victimization Rates*

The left panel of Figure 5 shows the difference in Hispanic victimization rates between the top and the bottom MSAs in terms of $\delta$s. The effect is large, but Appendix Figure A5 shows that this result is driven by an increase in victimization in the control MSAs, those with few Hispanic applicants, around the years of the

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22211 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15384688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1230 / *Silence of the Innocents*

**Table 6.** Victimization regressions.

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
|  | Has been victimized (0/1) | | | | | |
| Amnesty years × | −0.095[*] | −0.096[*] | −0.096[*] | −0.006 | −0.005 | −0.005 |
| Large fraction of Hisp. applicants | (0.055) | (0.054) | (0.053) | (0.007) | (0.007) | (0.007) |
| MSA fixed effects | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Year fixed effects | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Socioeconomic characteristics |  | ✓ | ✓ |  | ✓ | ✓ |
| MSA specific time trends |  |  | ✓ |  |  | ✓ |
| Observations | 42,406 | 42,406 | 42,406 | 309,974 | 309,974 | 309,974 |
| R-squared | 0.005 | 0.009 | 0.011 | 0.008 | 0.023 | 0.024 |
| Mean dep. var | 0.134 | 0.134 | 0.134 | 0.148 | 0.148 | 0.148 |

*Notes:* The socioeconomic variables include age group dummies, gender, number of household members, and dummies for household income categories. Clustered standard errors (by MSA) are in parentheses. *** $p<0.01$; ** $p<0.05$; * $p<0.1$.

amnesty. This implies that the results are correct as long as that pattern would have been the counterfactual victimization in the MSAs with many applicants in the absence of the IRCA. Later we are going to see that the results are driven by the bottom 10 MSAs in terms of share of applicants among the Hispanic population, and that the effects are increasing as we reduce the number of control MSAs.

An additional issue is that the decrease in victimization appears to start in 1986, one year ahead of the amnesty. This would be consistent with some anticipation effect, as criminals may fear a delayed reporting once it is known that an immigration amnesty is going to take place.

There are no apparent changes in victimization for non-Hispanics. The absence of crime displacement against non-Hispanics is in line with the model's predictions with intermediate probability of targeting the wrong ethnic group (see the Appendix).[19]

Estimating equation (4) using a linear probability model of victimization, we find similar effects to the ones shown in the figures (see Table 6). Comparing the victimization probabilities of Hispanics, depending on whether they live in MSAs with a small or a large fraction of Hispanic IRCA applicants, both before, during, and after the IRCA, we find evidence that during the IRCA years the victimization rates drop by about 9.5 percentage points (−75 percent). The first three columns show that the results are robust to various controls (age, gender, number of household members, and income). Adding MSA level time trends in column 3 makes little difference. The last three columns show that there is no change with respect to non-Hispanic victims.

Since the treatment and control separation around the top and bottom half of the MSAs is arbitrary, one thing we can do in Appendix Figure A6 is to test whether the effects are robust to a different choice of treatment MSAs. Each dot corresponds to a separate difference-in-differences in victimization rates among Hispanics (vertical caps shows the 95 percent confidence intervals). There is a total of 40 MSAs and we

[19] In our theoretical model, crime is assumed to be linked to the likelihood of reporting. In order to make this relationship explicit, we would have to regress victimization on reporting, instrumenting the likelihood of reporting to get rid of the endogeneity. In order to do this, we would face three major issues: i) we would have to define the likelihood of reporting; ii) we would have to assume that the amnesty only has an impact through reporting; and iii) we would have to deal with the fact that the reporting regression model and the victimization regression model use different treatment and control groups: Hispanics vs. non-Hispanics and MSAs with a small vs. large fraction of Hispanic applicants.

**Table 7.** Robust victimization regression.

| Sample: | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| | No 85, 86 | | No NYC | | No LA | | Economic Crimes | | Violent Crimes | |
| | | | | | Dependent Variable: Has the Respondent been victimized (0/1) | | | | | |
| Amnesty years × Large fraction of Hisp. applicants (IRCA) | -0.102[*] | -0.102[*] | -0.095[*] | -0.096[*] | -0.080 | -0.080 | -0.083 | -0.084 | -0.030 | -0.031 |
| | (0.053) | (0.050) | (0.055) | (0.053) | (0.056) | (0.053) | (0.055) | (0.053) | (0.020) | (0.020) |
| Observations | 37,351 | 37,351 | 42,406 | 42,406 | 25,738 | 25,738 | 41,634 | 41,634 | 37,655 | 37,655 |
| R-squared | 0.006 | 0.011 | 0.005 | 0.011 | 0.008 | 0.016 | 0.005 | 0.010 | 0.002 | 0.007 |
| Mean dep. var | 0.136 | 0.136 | 0.134 | 0.134 | 0.134 | 0.134 | 0.117 | 0.117 | 0.0242 | 0.0242 |

Notes: The socioeconomic variables include age group dummies, gender, number of household members, and dummies for household income categories. Clustered standard errors (by MSA) are in parentheses. *** p<0.01; ** p<0.05; * p<0.1.

000466

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 474 of 4699 PageID #:  3639

always use the bottom nine as our control MSAs. Moving to the right we add more and more MSAs to the treatment group. The difference-in-differences is decreasing as one adds MSAs with a lower fraction of Hispanic applicants, but the effects are significant all the way to the 29th MSA.

Alternatively, we can change the composition of the control MSAs. This turns out to generate much larger changes in the effects. Starting with the two MSAs with the lowest fraction of Hispanics that applied for the IRCA, Cincinnati MSA, and Norfolk Virginia Beach-Newport News MSA, the effects are close to -20 percent. Adding more and more MSAs with larger fractions lowers the effects substantially. The one MSA that really lowers the effects dramatically is NYC (the 11th added control MSA). Since it is not unimaginable that NYC represents an outlier, in the right panel we exclude NYC from the sample. When we do this, the effects converge to about -5 percentage points.

The results are robust to the exclusion of the first two years before the IRCA, 1984 and 1985 (see column 1 of Table 7) and to the exclusion of New York City (columns 3 and 4) and Los Angeles. The last 4 columns show that the changes in victimization appear to be concentrated among economic crimes (which is consistent with the results in reporting behavior). These crimes could arguably be the ones where criminals act in a more rational way.

## CONCLUSIONS

We provide evidence that out of fear of deportation, undocumented immigrants are considerably less likely to report crimes to the police compared to natives (17 percent vs. almost 40 percent). The 1986 U.S. amnesty that provided legal status to 2.7 million immigrants, mainly of Hispanic origin, allows for a difference-in-differences strategy that deals with the issue that in victimization surveys information about legal status is unavailable. It also deals with the issue that legal status is endogenous. We develop an empirical model that uses Hispanic origin around amnesties as a proxy (with known probabilities of mis-classification) for changes in legal status. The strategy could be used to analyze other outcomes—for example, employment (Barcellos, 2010).

We show that right after the amnesty, Hispanic immigrants became considerably more likely to report a crime to the police. Taking into account that not all Hispanic immigrants are undocumented, the changes in reporting rates are close to 20 percentage points.

Undocumented immigrants who are currently living in the U.S. and in other Western countries are at least as likely as undocumented immigrants living in the U.S. around the 1986 IRCA to be deported. This implies that an estimated 11 million undocumented immigrants are vulnerable when trying to safeguard their fundamental right to protect their property and their human right to security.

Given that about 15 percent of them are victimized, a 20 percentage point gap in reporting implies that because of their legal status immigrants have been unwilling to report 330,000 crimes to the police. Moreover, by increasing the risk of deportation and its salience, the current U.S. federal policy has probably pushed undocumented immigrants to further underreport crime incidents. Several newspapers have covered stories of immigrant victims who stay away from the police, even in Sanctuary Cities (see, among others, Campbell, Mendoza, Diestel, 2018; Queally, 2017; Robbins, 2018).

The most recent announcements of immigration crackdowns by U.S. immigration officials may also influence reporting rates, but not necessarily in the expected direction. In our model, victims report crimes when the benefits are larger than the cost of reporting and the expected cost of deportation. If the risk of deportation

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15284688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

increases across the board, even without reporting, undocumented immigrants may actually become more likely to report a crime, as the relative cost of doing so is decreasing.

In line with the predictions of this model of crime, there is also some evidence that undocumented immigrants may be preferred victims of crime, though this evidence is certainly weaker and requires additional research. In recent years, U.S. lawmakers have partially addressed the issue. In order to favor the reporting of undocumented immigrants, in 2008 the U.S. Congress approved a special Visa program (U nonimmigrant status). According to this program, every year victims of serious offences who are willing to work with local law enforcement authorities are given temporary legal status and work eligibility in the United States. The U Visa is unlikely to be sufficient to protect immigrants' right to property and security. On one side, only violent crimes are considered. On the other side, the U Visa is only temporary, lasting up to four years, which might not be enough to incentivize immigrants to report the crime to the police. And, finally, the number of U visas is capped at 10,000.

An open question is whether our results are generalizable to other countries. This should depend on whether, as in the U.S., immigrants are at risk of deportation when reporting a crime. It also depends on whether criminals can somehow predict the legal status of their victims. For example, in many European countries, African and Asian immigrants have a higher likelihood of being undocumented immigrants.

Our analysis has additional implications that are worth mentioning. It points out that investigating the consequences of amnesties by looking at reported crimes may have some important undesirable pitfalls. The increase in reporting might turn out to be a rise in crime rates even if the true crime rates decreased. These effects should be carefully taken into account in the empirical investigation of amnesties, especially when the size of the undocumented immigrant population is large.

*STEFANO COMINO is Associate Professor of Economics in the Department of Economics and Statistics at the University of Udine, Via Tomadini, 30/A, 33100, Udine, Italy (e-mail: stefano.comino@uniud.it).*

*GIOVANNI MASTROBUONI is Professor of Economics at the Collegio Carlo Alberto at the University of Turin (ESOMAS) and the University of Essex, Corso Unione Sovietica 218/bis – 10134 Torino , Italy (e-mail: giovanni.mastrobuoni@carloalberto.org). He is a Research Fellow for the Institute of Labor Economics (IZA).*

*ANTONIO NICOLÒ is Professor of Economics in the Department of Economics and Management at the University of Padova, via del santo 33, 35123 Padova, Italy, and in the School of Social Sciences at the University of Manchester, M13 9PL, Manchester, UK (e-mail: antonio.nicolo@manchester.ac.uk and antonio.nicolo@unipd.it).*

## ACKNOWLEDGMENTS

The authors wish to thank Nancy Chau and Francesco Fasani for their valuable comments on an earlier version of the paper. We would also like to thank seminar participants at universities and workshops and Shanker Satyanath, in particular, for helpful comments.

## REFERENCES

Aigner, D. J. (1973). Regression with a binary independent variable subject to errors of observation. Journal of Econometrics, 1, 49–59.

Alsan, M., & Yang, C. (2018). Fear and the safety net: Evidence from secure communities. Technical report. Cambridge, MA: National Bureau of Economic Research.

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 476 of 4699 PageID #:  3641

15306848, 2020, 4. Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Badger, E. (2014, November 26). What happened to the millions of immigrants granted legal status under Ronald Reagan? Washington, DC: The Washington Post.

Baker, S. R. (2015). Effects of immigrant legalization on crime. The American Economic Review, 105, 210–213.

Barcellos, S. H. (2010). Legalization and the economic status of immigrants. RAND Working Paper No. WR-754. Available at SSRN: https://ssrn.com/abstract=1604230 or https://doi.org/10.2139/ssrn.1604230.

Barrick, K. (2014). Latino confidence in the police: The role of immigration enforcement, assimilation, and immigration status. Journal of Ethnicity in Criminal Justice, 12, 289–307.

Bell, B., Machin, S., & Fasani, F. (2013). Crime and immigration: Evidence from large immigrant waves. The Review of Economics and Statistics, 95, 1278–1290.

Bianchi, M., Buonanno, P., & Pinotti, P. (2012). Do immigrants cause crime? Journal of the European Economic Association, 10, 1318–1347.

Borjas, G. J. (1994). The economics of immigration. Journal of Economic Literature, 32, 1667–1717.

Borjas, G. J. (2017). The labor supply of undocumented immigrants. Labour Economics, 46, 1–13.

Bucher, J., Manasse, M., & Tarasawa, B. (2010). Undocumented victims: An examination of crimes against undocumented male migrant workers. Southwest Journal of Criminal Justice, 7, 159–179.

Butcher, K. F., & Piehl, A. M. (1998). Cross-city evidence on the relationship between immigration and crime. Journal of Policy Analysis and Management, 17, 457–493.

Campbell, B., Mendoza, A., & Diestel, T. (2018, August 15). Rising hate drives Latinos and immigrants into silence. News21.

Card, D. (1990). The impact of the Mariel boatlift on the Miami labor market. Industrial & Labor Relations Review, 43, 245–257.

Card, D., & Krueger, A. B. (1992). Does school quality matter? Returns to education and the characteristics of public schools in the United States. Journal of Political Economy, 100, 1–40.

Correia, M. E. (2010). Determinants of attitudes toward police of Latino immigrants and non-immigrants. Journal of Criminal Justice, 38, 99–107.

Cullen, J. B., & Levitt, S. D. (1999). Crime, urban flight, and the consequences for cities. The Review of Economics and Statistics, 81, 159–169.

Freedman, M., Owens, E., & Bohn, S. (2013). Immigration, employment opportunities, and criminal behavior. American Economic Journal: Economic Policy, 2018, 10, 117–151.

Garoupa, N. (2003). Optimal law enforcement when victims are rational players. In Conflict and Governance, pp. 123–134. New York, NY: Springer.

Gibbons, S. (2004). The costs of urban property crime. The Economic Journal, 114, F441–F463.

Goldberg, I., & Nold, F. C. (1980). Does reporting deter burglars? An empirical analysis of risk and return in crime. The Review of Economics and Statistics, 62, 424–431.

Goudriaan, H., Wittebrood, K., & Nieuwbeerta, P. (2006). Neighbourhood characteristics and reporting crime effects of social cohesion, confidence in police effectiveness and socio-economic disadvantage. British Journal of Criminology, 46, 719–742.

Gutierrez, C. M., & Kirk, D. S. (2015). Silence speaks: The relationship between immigration and the underreporting of crime. Crime & Delinquency, 63, 1–25.

Kossoudji, S. A., & Cobb-Clark, D. A. (2002). Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population. Journal of Labor Economics, 20, 598–628.

Krogstad, J. M., Passel, J. S., & Cohn, D'V. (2019). 5 Facts about Illegal Immigration in the U.S. Washington, DC: Pew Research Center.

000469

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 477 of 4699 PageID #:  3642

Linden, L., & Rocko, J. E. (2008). Estimates of the impact of crime risk on property values from Megan's laws. American Economic Review, 98, 1103–1127.

Lozano, F., & Sorensen, T. (2011). The labor market value to legal status. IZA working paper. Bonn, Germany: Institute of Labor Economics.

Mastrobuoni, G., & Pinotti, P. (2015). Legal status and the criminal activity of immigrants. American Economic Journal: Applied Economics, 7(2), 175–206.

Menjiar, C., & Bejarano, C. (2004). Latino immigrants' perceptions of crime and police authorities in the United States: A case study from the Phoenix metropolitan area. Ethnic and Racial Studies, 27, 120–148.

Miller, A. R., & Segal, C. (2019). Do female officers improve law enforcement quality? Effects on crime reporting and domestic violence. The Review of Economic Studies, 86, 2220–2247.

Morgan, R. E. (2017). Race and Hispanic origin of victims and offenders, 2012–15. Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, NCJ 250747. Available at https://www.bjs.gov/content/pub/pdf/rhovo1215.pdf.

Orrenius, P. M., & Zavodny, M. (2003). Do amnesty programs reduce undocumented immigration? Evidence from IRCA. Demography, 40, 437–450.

Piehl, A. M. (2007). The Connection between Immigration and Crime. Hearing on comprehensive immigration reform: Impact of immigration on states and localities. Washington, DC: Committee on the Judiciary; Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law.

Pinotti, P. (2015). Immigration enforcement and crime. The American Economic Review, 105, 205–209.

Pinotti, P. (2017). Clicking on heaven's door: The effect of immigrant legalization on crime. American Economic Review, 107, 138–168.

Queally, J. (2017, October 9). Fearing deportation, many domestic violence victims are steering clear of police and courts. Los Angeles, CA: Los Angeles Times.

Robbins, L. (2018, February 27). In a "sanctuary city," immigrants are still at risk. New York, NY: New York Times.

Rytina, N. (2002). IRCA legalization effects: Lawful permanent residence and naturalization through 2001. Technical report. Washington, DC: Office of Policy and Planning, Statistics Division, U.S. Department of Citizenship and Immigration Services, (USCIS), Department of Homeland Security.

Thaler, R. (1978). A note on the value of crime control: Evidence from the property market. Journal of Urban Economics, 5, 137–145.

Wang, C. (2019). Tightened immigration policies and the self-employment dynamics of Mexican immigrants. Journal of Policy Analysis and Management, 38, 944–977.

Warren, R., & Warren, J. R. (2013). Unauthorized immigration to the United States: Annual estimates and components of change, by state, 1990 to 2010. International Migration Review, 47, 296–329.

000470

15396688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## APPENDIX

### The Model

We consider a city composed of two ethnic groups—natives and immigrants—each with mass 1.[20] Immigrants are either legal citizens (mass $1 - \gamma$) or undocumented (mass $0 < \gamma < 1$). Individuals differ in terms of their wealth:

**Table A1.** Summary statistics.

| | Victims | | | | All | | | |
|---|---|---|---|---|---|---|---|---|
| | Large fraction of Hispanic applicants | | Small fraction of Hispanic applicants | | Large fraction of Hispanic applicants | | Small fraction of Hispanic applicants | |
| Sample: | | | | | | | | |
| MSAs with: | Mean | Std. Dev. | Mean | Std. Dev. | Mean | Std. Dev. | Mean | Std. Dev. |
| Reported the crime | 0.38 | 0.49 | 0.39 | 0.49 | | | | |
| Crime victim | 1.00 | 0.00 | 1.00 | 0.00 | 0.15 | 0.36 | 0.13 | 0.34 |
| Hispanic | 0.15 | 0.35 | 0.09 | 0.29 | 0.17 | 0.37 | 0.09 | 0.29 |
| White | 0.85 | 0.36 | 0.84 | 0.36 | 0.85 | 0.35 | 0.85 | 0.36 |
| Female | 0.51 | 0.50 | 0.52 | 0.50 | 0.51 | 0.50 | 0.53 | 0.50 |
| Age 25–29 | 0.26 | 0.44 | 0.26 | 0.44 | 0.25 | 0.43 | 0.24 | 0.43 |
| Age 30–34 | 0.23 | 0.42 | 0.22 | 0.42 | 0.25 | 0.43 | 0.24 | 0.43 |
| Age 35–39 | 0.19 | 0.39 | 0.19 | 0.39 | 0.21 | 0.41 | 0.22 | 0.42 |
| Income $7,500-$14,999 | 0.17 | 0.37 | 0.16 | 0.36 | 0.14 | 0.34 | 0.13 | 0.33 |
| Income $15,000-$24,999 | 0.20 | 0.40 | 0.19 | 0.40 | 0.19 | 0.39 | 0.19 | 0.39 |
| Income $25,000-$29,999 | 0.08 | 0.27 | 0.09 | 0.28 | 0.09 | 0.28 | 0.09 | 0.28 |
| Income $30,000-$49,999 | 0.19 | 0.39 | 0.19 | 0.39 | 0.22 | 0.41 | 0.22 | 0.41 |
| Income $50,000 and over | 0.12 | 0.32 | 0.11 | 0.32 | 0.15 | 0.35 | 0.13 | 0.34 |
| Income missing | 0.12 | 0.33 | 0.12 | 0.32 | 0.13 | 0.34 | 0.14 | 0.35 |
| Observations | 37,254 | | 35,994 | | 246,972 | | 271,624 | |

*Notes*: Based on NCVS data matched with the 1980 Census. Large and small are defined based on whether in an MSA more or less than 10 percent of the Hispanic population were amnesty applicants.

---

[20] We use the term "immigrants" loosely to indicate minorities that contain a group of undocumented individuals. Later on, in our empirical analysis, we focus on Hispanics, an ethnic group that includes legal citizens and a large fraction of undocumented individuals.

*Journal of Policy Analysis and Management*  DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 479 of 4699 PageID #:  3644

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



**Figure A1.** Optimal Choice of Undocumented Immigrants.

**Figure A2.** Distribution of Household Income by Hispanic Origin (in percentage).

all immigrants are poor, while natives can be rich (mass $1 - \varphi$) or poor (mass $\varphi$).[21]

Each individual chooses whether to be honest or to commit crimes. Criminals also choose which ethnic group they want to primarily target. Honest individuals who are victimized decide whether to report the crime to the police. As we show below, the probability that victims report a crime, $\rho_{w,k}$, depends on their wealth $w \in \{r,p\}$, with $r > p$ (rich and poor), and on their legal status $k \in \{l,a\}$, legal citizen ($l$), or undocumented immigrant, for brevity, undocumented ($a$).

The utility of honest individuals increases with their wealth and their propensity to report crimes to the police. This latter assumption rests on the observation that the probability that a victim of a crime receives a monetary compensation—for instance,

[21] This assumption is in line with what we observe in our dataset. Income differences between Hispanics and Non-Hispanics are shown to be large in the National Crime and Victimization Survey (see Appendix Figure A2). Household incomes are only available in broad intervals, but relative income differences between the two groups are at least equal to 1/4.

15306848, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1238 / *Silence of the Innocents*



**Figure A3.** Time and Duration of Immigration Amnesty Proposals.



*Notes*: The fraction of IRCA applicants by age and Hispanic origin is based on authors' calculation matching the Legalization Summary Public Use Tape with the Census.

**Figure A4.** Fraction of IRCA Applicants by Hispanic Origin and Age.



*Notes*: Based on NCVS data matched with IRCA Administrative data and the 1980/1990 Census.

**Figure A5.** Victimization Rates for Hispanics and Non-Hispanics by MSA type.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15306684, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License



*Notes*: Each dot corresponds to a separate difference-in-differences in victimization rates among Hispanics. Vertical caps represent the corresponding 95 percent confidence intervals. There are a total of 40 MSAs. The control cities are always the bottom 9 based on $\delta$. MSAs are added to the treatment group starting from top.

**Figure A6.** Difference-in-Differences in Victimization When Changing the Treated MSAs.

by means of the (partial) return of the stolen goods or an insurance compensation— is increasing in the reporting rate: A higher reporting rate increases the capacity to protect one's property rights. Crime, instead, reduces the utility. Summing up, the utility of an honest individual with wealth $w \in \{r,p\}$ and legal status $k \in \{l,a\}$ is:

$$u_{w,k}^{hon} = f(w, \rho_{w,k}) - \beta X,$$

where $f(\cdot)$ is an increasing function of the wealth and of the reporting rate of the individual. In turn, $\beta X$ measures the disutility from crime, with $\beta > 0$ and $X$ representing the overall number of criminals in the city.[22]

Individuals choose whether to be honest or criminals, and, in the latter case, which ethnic group to primarily target. Individuals differ in terms of their (potential) criminal ability. We let $\theta \in [0,1]$ be a random variable measuring the individual's criminal ability, assumed to be uniformly distributed in the population. Criminals observe the ethnicity of potential victims, but not their wealth or their legal status.

[22] Notice that the disutility from crime depends on the overall level of criminality and not just on the number of criminals targeting the ethnic group to which the individual belongs. This assumption greatly simplifies the computation of the equilibrium and it is in line with the fact that, despite targeting primarily one group, a criminal may end up committing offences to individuals belonging to the other group. Moreover, the disutility from crime incorporates all the direct and indirect welfare loss, as, for instance, the drop in real estate value (see Gibbons, 2004; Linden & Rocko, 2008; Thaler, 1978), population, as well as economic activity (see Cullen & Levitt, 1999), when crime levels are high.

15306688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1240 / *Silence of the Innocents*



*Notes*: Each dot corresponds to a separate difference-in-differences in victimization rates among Hispanics. Vertical caps represent the corresponding 95 percent confidence intervals. There are a total of 40 MSAs. The treated cities are always the top 18 based on $\delta$. MSAs are added to the control group starting from the bottom based on $\delta$. The right panel excludes the 11th control MSA, NYC, a clear outlier.

**Figure A7.** Difference-in-Differences in Victimization Rates When Changing the Control MSAs.

By targeting immigrants, criminals know that, compared to natives, the average wealth is lower, and, with probability $\gamma$, the victim is undocumented.[23]

Criminals choose which ethnic group to primarily target. When a criminal chooses to target primarily group $j$, then with probability $\xi$ the crime is actually committed against an individual in group $j$, where $1/2 \leq \xi \leq 1$. With probability $1-\xi$, instead, the victim belongs to the other group; these mistakes—the criminal targets one group but ends up committing a crime against individuals belonging to the other group—may depend on the victim's physical appearance, as well as on the level of segregation of ethnic groups. Taking the case of the U.S., not all Hispanic-looking individuals are necessarily of Hispanic origin, and vice versa, although living in a severely segregated Hispanic neighborhood may lower $1-\xi$.

The expected utility of an individual with criminal ability $\theta$ who commits crimes targeting individuals belonging to the ethnic group $j \in \{n, i\}$ is:

$$u^{cr,j}(\theta) = \theta E(w|j) - C(\rho|j).$$

$E(w|j)$ is the expected wealth of the victim, conditional on the criminal targeting ethnic group $j$. The expectation operator accounts both for the fact that victims in the target group may have different levels of wealth (this is the case of natives) and for the fact that the victim belongs to the targeted group with probability $\xi \leq 1$. The term $C(\rho|j)$ is the expected cost of punishment, conditional on the criminal targeting individuals of group $j$. $C(\rho|j)$ is an increasing function of the average reporting rate of the ethnic groups weighted by $\xi$. Again, the expectation accounts for the fact that individuals in the target group may have different reporting rates and also for the fact that the crime can end up being committed against an individual who does not belong to the target ethnicity.

[23] The U.S. is a clear example of where ethnicity, particularly being of Hispanic origin, carries some signal for the migration status.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 483 of 4699 PageID #:  3648

15500688, 2020, 4. Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

*The Reporting Decision*

We assume that the monetary loss that a victim suffers is proportional to his level of wealth $w$, but in a stochastic way. The loss is $\alpha w \in [0, w]$, where $\alpha$ is the realization of a random variable distributed according to $F(\alpha)$, with support $[0,1]$.

Victims report the crime to the police when the monetary loss is larger than the cost of reporting; formally, this occurs when:

$$\alpha w \geq T + g_k D, \text{ or } \alpha \geq \frac{T + g_k D}{w} \equiv \bar{\alpha}_{w,k},$$

where $T$ is a fixed cost of reporting crime, $g_k$ is the risk of deportation for an individual with status $k$, which is zero for legal citizens and positive for undocumented immigrants (evidence is provided in the empirical section), and $D$ is the associated cost. Notice that the threshold $\bar{\alpha}_{w,k}$ decreases with wealth ($w$), and increases with the risk of deportation ($g_k$) and with the cost of deportation ($D$); hence, $\bar{\alpha}_{p,a} > \bar{\alpha}_{p,l} > \bar{\alpha}_{r,l}$. The probability that victims report a crime is simply $\rho_{w,k} \equiv 1 - F(\bar{\alpha}_{w,k})$, with $\rho_{r,l} > \rho_{p,l} > \rho_{p,a}$: the propensity to report crime to the police is largest for rich natives, lowest for undocumented immigrants, and intermediate for legal immigrants and poor natives. These inequalities imply that the average reporting rate is larger for natives compared to immigrants.

*Equilibrium*

Individuals observe their criminal ability $\theta$ and decide whether to be honest or to become criminals. Criminals also choose their target group, natives or immigrants. Let us start with this latter decision. Criminals prefer to target primarily natives whenever:

$$\theta \geq \frac{C(\rho|n) - C(\rho|i)}{E(w|n) - E(w|i)} \equiv \bar{\theta}.$$

The relevant trade-off when deciding the target ethnic group is between a larger gain when targeting natives (among the natives there are also some rich individuals) with a smaller expected punishment when targeting immigrants (the average reporting rate is lower among immigrants). It follows that criminals with higher abilities ($\theta \geq \bar{\theta}$) prefer to target natives rather than immigrants.

Consider now the decision of whether to be honest or become a criminal. We focus on the most interesting case in which the marginal criminal is indifferent between being honest and committing crimes targeting primarily immigrants.[24] Moreover, we assume that $r$ (the wealth of the rich) is large enough so that all rich natives prefer to be honest. Poor natives and legal immigrants have the same wealth and reporting rate; therefore, they behave in the same way. They prefer to commit crimes targeting immigrants rather than being honest when:

$$\theta \geq \frac{f\left(p, \rho_{p,l}\right) - \beta X + C(\rho|i)}{E(w|i)} \equiv \hat{\theta}_p(X).$$

---

[24] This is an interesting case since each group of natives and immigrants is targeted by some criminals. By contrast, if the marginal criminal is indifferent between being honest and committing crimes targeting natives, then all criminals prefer to target the native group and no criminal targets the immigrant community. Formally, in the analysis, we focus on the case in which $\hat{\theta}_a(X) < \bar{\theta}$.

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 484 of 4699 PageID #:  3649

The above condition says that these individuals prefer to be criminals rather than honest when their criminal ability is sufficiently large: $\theta \geq \hat{\theta}_p(X)$. Notice that the threshold $\hat{\theta}_p(X)$ depends on the level of criminality $X$.

Similarly, for undocumented immigrants, committing crimes that target group $i$ is preferred to being honest when:

$$\theta \geq \frac{f\left(p, \rho_{p,a}\right) - \beta X + C\left(\rho \mid i\right)}{E\left(w \mid i\right)} \equiv \hat{\theta}_a\left(X\right).$$

Looking more closely to the thresholds $\hat{\theta}_p(X)$ and $\hat{\theta}_a(X)$, it follows that undocumented immigrants have a higher propensity to become criminals than poor natives/legal immigrants: $\hat{\theta}_a(X) < \hat{\theta}_p(X)$. This is due to their lower reporting rate $(\rho_{p,a} < \rho_{p,l})$, which implies a reduced ability to protect their property rights: $f(w_p, \rho_{p,a}) < f(w_p, \rho_{p,l})$.

In order to define the equilibrium, we need to determine the endogenous level of criminality, $X$. Since, $\theta \sim U(0,1)$, it follows that among the $\gamma$ undocumented immigrants $\gamma(1 - \hat{\theta}_a(X))$ are criminals. The number of criminals in the pool of poor natives and legal immigrants, instead, amounts to $(1 - \gamma + \varphi)(1 - \hat{\theta}_p(X))$. Therefore, $X = \gamma(1 - \hat{\theta}_a(X)) + (1 - \gamma + \varphi)(1 - \hat{\theta}_p(X))$ and the equilibrium is determined by the triple $[\bar{\theta}, \hat{\theta}_p, \hat{\theta}_a]$ satisfying:[25]

i) $\frac{C(\rho \mid n) - C(\rho \mid i)}{E(w \mid n) - E(w \mid i)}$

ii) $\hat{\theta}_p$ and $\hat{\theta}_a$ that solve the system

$$\hat{\theta}_p = \frac{f\left(p, \rho_{p,l}\right) - \beta\left[\gamma\left(1 - \hat{\theta}_a\right) + \left(1 - \gamma + \varphi\right)\left(1 - \hat{\theta}_p\right)\right] + C(\rho \mid i)}{E(w \mid i)}$$

$$\hat{\theta}_a \frac{f\left(p, \rho_{p,a}\right) - \beta\left[\gamma\left(1 - \hat{\theta}_a\right) + \left(1 - \gamma + \varphi\right)\left(1 - \hat{\theta}_p\right)\right] + C(\rho \mid i)}{E(w \mid i)}.$$

Figure A1 provides a graphical representation of the optimal choices of undocumented immigrants depending on $\theta$: Individuals with low criminal ability $(\theta < \hat{\theta}_a)$ are honest, those with intermediate ability $(\hat{\theta}_a \leq \theta < \bar{\theta})$ become criminals and target immigrants, while individuals with high criminal skills $(\theta \geq \bar{\theta})$ become criminals and target natives. For poor natives/legal immigrants, the optimal choices and their graphical representation are similar, with threshold $\hat{\theta}_p$ in place of $\hat{\theta}_a$.

*The Effect of an Amnesty*

Consider now the effects of an amnesty that legalizes a fraction $\delta \in (0, \gamma]$ of undocumented immigrants. The amnesty eliminates the risk of deportation, thus increasing the reporting rate of legalized immigrants from $\rho_{p,a}$ to $\rho_{p,l}$. This fact has two direct consequences. First, legalized immigrants are better able to protect their property rights, and therefore their utility when honesty increases. Second, the average reporting rate of immigrants increases, and such an increase is stronger the larger $\delta$, i.e., the larger the number of legalized immigrants. The effects that these changes have on crime are described in the following proposition.

---

[25] We implicitly assume $0 < \hat{\theta}_a < \hat{\theta}_p < \theta < 1$.

000477

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 485 of 4699 PageID #:  3650

*Proposition A1*

An amnesty reduces the overall number of crimes. It also reduces the number of crimes committed against immigrants while, depending on the parameter $\xi$, it can either increase or decrease those committed against natives. The reduction in the overall number of crimes and in the number of crimes committed against immigrants is larger the greater the mass of legalized immigrants (the larger $\delta$).

*Proof of Proposition A1*

Let $\bar{\rho}_i(\delta)$ and $\bar{\rho}_n(\delta)$ be the average reporting rate of immigrants and natives, respectively. From our assumptions about the masses of the different groups of individuals, it follows that:

$$\bar{\rho}_i(\delta) = (1 - \gamma + \delta)\rho_{p,l} + (\gamma - \delta)\rho_{p,a},$$

$$\bar{\rho}_n = \varphi\rho_{p,l} + (1 - \varphi)\rho_{r,l}$$

Notice that the average reporting rate of immigrants depends on $\delta$, the mass of legalized individuals. Specifically, since $\rho_{p,l} > \rho_{p,a}$, $\bar{\rho}_i(\delta)$ increases with $\delta$ and takes the lowest value when $\delta = 0$, i.e., before the amnesty.

The expected cost of punishment when targeting primarily immigrants and natives is:

$$C(\rho|i, \delta) = C\left(\xi\bar{\rho}_i(\delta) + (1 - \xi)\bar{\rho}_n\right),$$

$$C(\rho|n, \delta) = C\left(\xi\bar{\rho}_n + (1 - \xi)\bar{\rho}_i(\delta)\right),$$

respectively. Notice that since we assume that $C(\cdot)$ is increasing in the average reporting rate, then it follows that both $C(\rho|i)$ and $C(\rho|n)$ are increasing in $\delta$.

The expected wealth of the victim when targeting primarily immigrants and natives is:

$$E[w|i] = \xi p + (1 - \xi)(\varphi p + (1 - \varphi)r),$$

$$E[w|n] = \xi(\varphi p + (1 - \varphi)r) + (1 - \xi)p,$$

respectively; notice that these expressions do not depend on $\delta$.

Before demonstrating the statement of Proposition A1, we determine the equilibrium of the model. Following the discussion in the text, the equilibrium is defined by the triple:[26]

i) $\bar{\theta}(\delta) = \frac{C(\rho|n,\delta) - C(\rho|i,\delta)}{E(w|n) - E(w|i)}$

ii) $\hat{\theta}_p(\delta)$ and $\hat{\theta}_a(\delta)$ that solve the system:

$$\hat{\theta}_P(\delta) = \frac{f(p, \rho_{p,l}) - \beta[(\gamma - \delta)(1 - \hat{\theta}_a(\delta)) + (1 - \gamma + \delta + \varphi)(1 - \hat{\theta}_p(\delta))] + C(\rho|i, \delta)}{E(w|i)},$$

$$\hat{\theta}_a(\delta) = \frac{f(p, \rho_{p,a}) - \beta[(\gamma - \delta)(1 - \hat{\theta}_a(\delta)) + (1 - \gamma + \varphi)(1 - \hat{\theta}_p(\delta))] + C(\rho|i, \delta)}{E(w|i)}.$$

---

[26] We implicitly assume $0 < \hat{\theta}_a < \hat{\theta}_p < 1$.

15206688, 2020, 4. Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

1244 / *Silence of the Innocents*

Simple algebra leads to the following expressions:

$$\hat{\theta}_p(\delta) = \frac{E(w|i)(\beta(1+\varphi) - f(p, \rho_{p,l})) - C(\rho|i, \delta)) + \beta(\gamma - \delta)(f(p, \rho_{p,l}) - f(p, \rho_{p,a}))}{E(w|i)(\beta(1+\varphi) - E(w|i))},$$

$$\hat{\theta}_a(\delta) = \frac{E(w|i)(\beta(1+\varphi) - f(p, \rho_{p,a})) - C(\rho|i, \delta)) - \beta(1 - \gamma + \delta + \varphi)(f(p, \rho_{p,l}) - f(p, \rho_{p,a}))}{E(w|i)(\beta(1+\varphi) - E(w|i))}.$$

We first characterize the effect of the amnesty on the thresholds $\hat{\theta}_p(\delta)$, $\hat{\theta}_a(\delta)$, and $\bar{\theta}(\delta)$. This is shown in Claim A1 below. For the sake of simplicity, we let $\hat{\theta}_p(\delta = 0)$, $\hat{\theta}_a(\delta = 0)$, and $\bar{\theta}(\delta = 0)$ denote the thresholds before the amnesty is in place (when $\delta = 0$). Similarly, we let $C^0(\rho|i)$ and $C^0(\rho|n)$ be the expected costs of punishment before the amnesty. Finally, notice that neither $E[w|i]$ nor $E[w|n]$ change because of amnesty.

### Claim A1

An amnesty that legalized $\delta \in (0, \gamma]$ undocumented immigrants increases $\hat{\theta}_p(\delta)$ and $\hat{\theta}_a(\delta)$ while reducing $\bar{\theta}(\delta)$. These changes are larger the greater $\delta$.

### Proof of Claim A1

Consider the effect of the amnesty on $\hat{\theta}_p(\delta)$. The change in the threshold equals

$$\hat{\theta}_p(\delta = 0) - \hat{\theta}_p(\delta > 0)$$

$$= \frac{E(w|i)[C(\rho|i, \delta)0) - C(\rho|i, \delta = 0)] + \beta\delta(f(p, \rho_{p,l}) - f(p, \rho_{p,a}))}{E(w|i)(\beta(1+\varphi) - E(w|i))}. \quad \text{(A.1)}$$

This expression is positive since $C(\rho \mid i, \delta > 0) > C(\rho \mid i, \delta = 0)$, $f(p, \rho_{p,l}) > f(p, \rho_{p,a})$, and the denominator is positive since $0 < \hat{\theta}_p(\delta) < 1$. These conditions and the fact that $C(\rho|i, \delta)$ increases with $\delta$ ensures that the above expression is larger the greater $\delta$. Similar arguments apply for the other two thresholds, $\hat{\theta}_a(\delta)$ and $\bar{\theta}(\delta)$.

Claim A1 and condition $\hat{\theta}_a(\delta) < \hat{\theta}_p(\delta)$ ensure that the level of criminality—i.e., $(\gamma - \delta)(1 - \hat{\theta}_a(\delta)) + (1 - \gamma + \varphi)(1 - \hat{\theta}_p(\delta))$—reduces after the amnesty and that the reduction is stronger the larger $\delta$.

Consider now the number of criminals targeting the two ethnic groups and the number of crimes committed against immigrants and natives. Criminals who are primarily targeting immigrants and natives are

$$I(\delta) = (\gamma - \delta)(-\hat{\theta}_a(\delta)) + (1 - \gamma + \delta + \varphi)) - \theta\hat{\theta}_p(\delta)),$$

$$N(\delta) = (\gamma - \delta)(1-)) + (1 - \gamma + \delta + \varphi)(1-)) = (1 + \varphi)(1-)),$$

respectively. Since criminals targeting group $j \in [n, i]$ commit crimes against members of the other group with probability $(1-\xi)$, the number of criminals actually committing crimes against immigrants is $X^i(\delta) = \xi I(\delta) + (1 - \xi)N(\delta)$ while that of criminals actually committing crimes against natives is $X^n = \xi N(\delta) + (1 - \xi)I(\delta)$. Simple algebra leads to the following expressions:

$$X^i(\delta) = (1 + \varphi)\bar{\theta}(\delta)(2\xi - 1) + (1 - \xi)(1 + \varphi) - \xi((\gamma - \delta)\hat{\theta}_a(\delta) + (1 - \gamma + \delta + \varphi)\hat{\theta}_p(\delta)),$$

$$X^n(\delta) = (1 + \varphi)\bar{\theta}(\delta)(1 - 2\xi) + \xi(1 + \varphi) - (1 - \xi)((\gamma - \delta)\hat{\theta}_a(\delta) + (1 - \gamma + \delta + \phi)\hat{\theta}_p(\delta)).$$

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

Notice that $X^i(\delta)$ decreases with $\delta$ since $\xi \geq 1/2$, $\bar{\theta}(\delta)$ decreases with $\delta$, $\hat{\theta}_a(\delta)$ and $\hat{\theta}_p(\delta)$ increase with $\delta$, and $\hat{\theta}_a(\delta) < \hat{\theta}_p(\delta)$. Moreover, the higher $\delta$, the stronger the reduction in $X^i(\delta)$. Therefore, the number of crimes committed against immigrants lessens after the amnesty and the reduction is stronger the larger the number of legalized individuals (the larger $\delta$). Consider now the crimes that are committed against natives. For $\xi = 1$, $X^n(\delta)$ becomes $-(1+\varphi)\bar{\theta} + (1+\varphi)$, which increases with $\delta$ (since $\bar{\theta}(\delta)$ decreases with $\delta$). By contrast, for $\xi = 1/2$, $X^n(\delta)$ becomes

$$\frac{1}{2}(1+\varphi) - \frac{1}{2}((\gamma - \delta)\hat{\theta}_a(\delta) + (1 - \gamma + \delta + \varphi)\hat{\theta}_p(\delta)),$$

which reduces with $\delta$ since: $\hat{\theta}_a(\delta)$ and $\hat{\theta}_p(\delta)$ increase with $\delta$, and $\hat{\theta}_p(\delta) < \hat{\theta}_p(\delta)$. Therefore, after the amnesty, the number of crimes committed against natives can increase (when $\xi$ is close to 1) or decrease (when $\xi$ is close to 1/2).

*Journal of Policy Analysis and Management*   DOI: 10.1002/pam
Published on behalf of the Association for Public Policy Analysis and Management

15206688, 2020, 4, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/pam.22221 by National Criminal Justice Reference Service, Wiley Online Library on [19/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

000480

Dated: November 16, 2007.

**Richard A. Sloan,**

*Chief, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. E7–22771 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2426–07; DHS Docket No. USCIS–2007–0043]

RIN 1615–ZA61

### Cuban Family Reunification Parole Program

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This Notice announces U.S. Citizenship and Immigration Services' Cuban Family Reunification Parole Program. Under this program, U.S. Citizenship and Immigration Services is offering beneficiaries of approved family-based immigrant visa petitions an opportunity to receive a discretionary grant of parole to come to the United States rather than remain in Cuba to apply for lawful permanent resident status. The purpose of the program is to expedite family reunification through safe, legal, and orderly channels of migration to the United States and to discourage irregular and inherently dangerous maritime migration.

**DATES:** This Notice is effective November 21, 2007.

**FOR FURTHER INFORMATION CONTACT:** Manpreet S. Dhanjal, Refugee Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW., 8th Floor, Washington, DC 20529, Telephone (202) 272–1613.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In furtherance of the U.S.-Cuba Migration Accords, the United States endeavors to provide a minimum of 20,000 travel documents annually to aspiring Cuban emigrants. *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the May 2, 1995 Joint Statement as the U.S.-Cuba Migration Accords (hereinafter "Migration Accords")). In so doing, the United States offers a safe, legal, and orderly means of coming to the United States. To date, the majority of travel documents issued under the Migration Accords fall into one of three programs: family-based immigrant visas; refugee resettlement; and parole under the Special Cuban Migration Program, also referred to as the Cuban Lottery. For information on the Cuban Lottery, see *http://havana.usinterestsection.gov/ diversity_program.html.*

Two aspects of the existing array of migration programs limit the ability of the United States to effectively promote safe, legal, and orderly migration as an alternative to maritime crossings. First, with the exception of "immediate relatives" (*e.g.,* spouse, unmarried child) of U.S. citizens (USCs), the number of family-based immigrant visas that are available in any given year is limited by statute. *See* Immigration and Nationality Act (INA) sections 201(c), 202(a) & 203, 8 U.S.C. 1151(c), 1152(a) & 1153. The statutory caps have resulted in long waiting periods before family members remaining in Cuba may rejoin the USCs and lawful permanent residents (LPRs) residing in the United States who petitioned for them. Second, the United States has not been permitted to hold a new registration period since 1998 due to constraints placed on the Cuban Lottery program by the Cuban Government. This greatly reduces the pool of individuals to whom the United States may issue travel documents.

For these reasons, this Notice adds the Cuban Family Reunification Parole (CFRP) Program to the list of migrant programs based on which the United States issues travel documents under the Migration Accords.

### II. The CFRP Program

Under the CFRP Program, USCIS may exercise its discretionary parole authority to permit eligible Cuban nationals to come to the United States to rejoin their family members. *See* INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permits parole of an alien into the United States for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(c) & (d) (discretionary authority for granting parole). Granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States. Whether to parole a particular alien remains, however, a case-by-case, discretionary determination.

### III. Participation in the CFRP Program

USCIS will offer participation in the CFRP Program to Cuban nationals who reside in Cuba and who are the beneficiaries (including any accompanying or following to join spouse and children (see INA section 203(d), 8 U.S.C. 1153(d)) of a properly filed Form I–130, "Petition for Alien Relative," that has been approved, but for which an immigrant visa is not yet immediately available.

Under the CFRP Program, USCIS or the Department of State's National Visa Center (NVC) will mail written notice to U.S.-based USC and LPR petitioners whose Forms I–130 have been approved regarding their beneficiary's eligibility to participate in the CFRP Program and the procedures for requesting parole. However, participation in the CFRP is voluntary. If USCIS exercises its discretion to grant parole, it will issue the necessary U.S. travel documents to the beneficiary in Cuba. These travel documents will enable the beneficiary to travel safely to the United States to rejoin his or her family members.

Participation in the CFRP Program is not available to aliens who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i). The extraordinary benefit of parole is not needed for these aliens, since they may seek visas for travel to the United States immediately upon the approval of Form I–130.

Additional information about the CFRP Program will be posted at *http://www.uscis.gov.*

Dated: November 15, 2007.

**Emilio T. Gonzalez,**

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. E7–22679 Filed 11–20–07; 8:45 am]

**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–5123–N–16]

### Notice of Proposed Information Collection for Public Comment: Notice of Funding Availability for the Tribal Colleges and University Programs

**AGENCY:** Office of the Assistant Secretary for Policy Development and Research, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of

*American Economic Review 2014, 104(12): 3921–3955*
*http://dx.doi.org/10.1257/aer.104.12.3921*

# The Effects of Poor Neonatal Health
# on Children's Cognitive Development[†]

*By* David Figlio, Jonathan Guryan,
Krzysztof Karbownik, and Jeffrey Roth*

*We make use of a new data resource—merged birth and school records for all children born in Florida from 1992 to 2002—to study the relationship between birth weight and cognitive development. Using singletons as well as twin and sibling fixed effects models, we find that the effects of early health on cognitive development are essentially constant through the school career; that these effects are similar across a wide range of family backgrounds; and that they are invariant to measures of school quality. We conclude that the effects of early health on adult outcomes are therefore set very early. (JEL I12, J13, J24)*

A large literature documents the effects of neonatal health (commonly proxied by birth weight) on a wide range of adult outcomes such as wages, disability, adult chronic conditions, and human capital accumulation. A series of studies, conducted in a variety of countries including Canada, Chile, China, Norway, and the United States, have made use of twin comparisons to show that the heavier twin of the pair is more likely to have better adult outcomes measured in various ways.[1]

*Figlio: Northwestern University, 2040 Sheridan Road, Evanston, IL 60208, and NBER (e-mail: figlio@northwestern.edu); Guryan: Northwestern University, 2040 Sheridan Road, Evanston, IL 60208, and NBER (e-mail: j-guryan@northwestern.edu); Karbownik: Northwestern University, 2040 Sheridan Road, Evanston, IL 60208, and Uppsala University (e-mail: krzysztof.karbownik@northwestern.edu); Roth: 1701 SW 16th Avenue, Gainesville, FL 32608 (e-mail: rothj@peds.ufl.edu). We are grateful to the Florida Department of Health and Florida Department of Education for providing us access to merged education and health data for the purposes of this project, and for the technical support in interpreting the key variables described herein. Figlio and Roth appreciate the financial support of the National Science Foundation, as well as the US Department of Education, Smith Richardson Foundation, and the Bill and Melinda Gates Foundation through the National Center for the Analysis of Longitudinal Data in Education Research (CALDER). Karbownik appreciates the support of a Hedelius Scholarship and Uppsala Center for Labor Studies that permitted him to participate in this research while visiting Northwestern University. Seminar and conference participants at the Association for Education Finance and Policy, CESifo (Munich), Claremont McKenna College, Cornell University, Dartmouth College, Duke University, Emory University, Harvard University, International Workshop on Applied Economics of Education (Catanzaro, Italy), National Bureau of Economic Research, National Center for the Analysis of Longitudinal Data in Education Research, Northwestern University, Roosevelt University, Stanford University, Tulane University, University of California-Irvine, University of Florida, University of Maryland, University of New South Wales, University of Notre Dame, University of Oklahoma, University of Texas, University of Wisconsin-Madison, and Uppsala University provided helpful comments and feedback. Three anonymous referees provided many helpful suggestions. All errors of omission and commission are our own.*

*† Go to http://dx.doi.org/10.1257/aer.104.12.3921 to visit the article page for additional materials and author disclosure statement(s).*

*1 Examples of influential previous research include, for the United States: Behrman and Rosenzweig (2004) on schooling and wages; Almond, Chay, and Lee (2005) and Conley, Strully, and Bennett (2003) on neonatal outcomes and hospital costs; and Royer (2009) on next-generation birth weight, neonatal outcomes, and educational attainment. For Norway: Black, Devereux, and Salvanes (2007) on neonatal outcomes, height, IQ, high school completion, employment, earnings, and next generation birth weight. For Canada: Oreopoulos et al. (2008) on*

000482

While the existing literature makes clear that there appears to be a permanent effect of poor neonatal health on socioeconomic and health outcomes, it is important for a variety of policy reasons to know how poor neonatal health affects child development, and whether there are public policies that might act to remediate the negative relationship between early poor health and later-life outcomes. Knowing this relationship can also be useful in helping to understand whether favorable health at birth can shield children against adverse shocks, policy or otherwise. However, we know very little to date about whether the effects of poor neonatal health on cognitive development vary at different ages (say, at kindergarten entry versus third grade versus eighth grade), and no existing study identifies whether public policies such as school quality could help to mitigate the effects of poor neonatal health on cognitive development. We also know very little about whether these effects vary heterogeneously across different demographic or socioeconomic groups, or whether early neonatal health and parental inputs are complements or substitutes. While we have strong evidence from twin comparison studies that poor initial health conveys a disadvantage in adulthood, we have little information about the potential roles for policy interventions in ameliorating this disadvantage during childhood.

The principal reason for these gaps in the literature involves data availability. The datasets that previous researchers have used to study the effects of poor neonatal health on adult outcomes (e.g., Scandinavian registry data, or data matching a mother's birth certificate to her children's birth certificates) do not include information on schooling and human capital measures during key developmental years.[2]

Another gap in the adult-outcomes literature is that the subjects of that literature were necessarily born in the 1970s and earlier. Given the advances in modern neonatology, it is reasonable to believe that poor neonatal health in the twenty-first century may bear little resemblance to poor neonatal health 50 years ago.[3] There have been no studies linking neonatal health to either educational or later outcomes in a highly developed country context using very recent birth cohorts.[4]

We make use of a major new data source which can help fill these gaps in the literature. We match all births in Florida from 1992 to 2002 to subsequent schooling records for those remaining in the state to attend public school. Florida is an excellent

---

neonatal outcomes, health outcomes in adolescence, educational attainment, and social assistance take-up. For China: Rosenzweig and Zhang (2013) on educational attainment, wages, and weight for health. And for Chile: Torche and Echevarria (2011) on fourth-grade mathematics test scores. Bharadwaj, Eberhard, and Neilson (2013), in a current working paper, study fourth-grade test scores and grades in school (also in Chile).

[2] Exceptions include Bharadwaj, Eberhard, and Neilson (2013); Torche and Echevarria (2011); and Rosenzweig and Zhang (2009), which examine this relationship in developing countries with less access to advances in medical technology that have reduced the lower end of viable birth weights, and in settings that lack the socioeconomic and ethnic diversity present in the data from Florida used in this paper. Another alternative data source is the Early Childhood Longitudinal Study—Birth Cohort (ECLS-B) of children born in the United States in 2001 which oversamples twins. However, the ECLS-B is too recent to investigate outcomes in late elementary school or adolescence, too small to study heterogeneous effects of birth weight, and does not include cognitive outcomes which have high stakes for children.

[3] One example of the temporal differences in neonatology is that, whereas 50 years ago the threshold for infant viability was around 1,500 grams, today the threshold for viability in developed countries is as low as 500 grams or even lower (Lau et al. 2013). Thus, it is independently valuable to study the effects of birth weight using a more contemporary set of births than those used in the existing literature.

[4] The potential benefits of using more current data from a highly developed country become apparent when we compare the mean birth weight among twins in our study of children born after 1992 (2,410 grams) to those from previous studies of twins from highly developed countries born in the 1930s through the 1970s (which range from 2,517 to 2,598 grams, depending on the cohort and country) and those from the late 1990s in Chile (2,500 grams).

place to study these questions because it is large (its population of around 17 million compares to Norway, Denmark, and Sweden combined) and heterogeneous (nearly one-half of mothers are racial or ethnic minorities, and nearly one-quarter of mothers were born outside the United States). In addition, Florida has some of the strongest education data systems in the United States, and Florida has been testing children annually from third through tenth grades for well over a decade. With these new data, we follow over 1.3 million singletons and nearly 15,000 pairs of twins from birth through middle school to study the relationship between birth weight and cognitive development.

We find that neonatal health, as measured by birth weight, affects cognitive development in childhood, and that this relationship is remarkably consistent across subgroups from a wide range of family socioeconomic status (SES).[5] We observe this relationship for twin-pair comparisons, sibling-pair comparisons, and singletons, and while the magnitudes of these comparisons differ somewhat, they provide reasonable bounds of the likely effects of neonatal health on children's cognitive outcomes.

Comparing across a range of demographic and socioeconomic dimensions allows us to address both the stability of results across background and the degree to which parental inputs and early health are complements or substitutes. Understanding this complementarity is important because it provides a window into the mechanisms by which neonatal health and parental resources and behavior contribute to human capital development. Whether parental inputs and neonatal health are complements or substitutes also has important implications theoretically for understanding the distributional effects of investments in infant health, and for guiding the targeting of policies intended to reduce inequalities by improving early life health (e.g., consider the role complementarities play in the models of human capital accumulation of Cunha et al. 2006; Cunha and Heckman 2007; and Conti and Heckman 2010). We find evidence that the effects of birth weight on student outcomes are stronger for higher SES families than for lower SES families, suggesting that neonatal health and parental inputs are at least to some degree complements. Such complementarity could be driven by parents with more resources investing more in children with better neonatal health, or could be the result of parents making equal investments but those investments by more educated higher SES parents being relatively more or less effective at building the human capital of children born with better initial health.

Importantly, ours is the first study to explore the interaction between schooling factors and the relationship between birth weight and children's cognitive development. Once children reach school age, they spend considerably more time with adults who are not their parents than they did before school age. Schooling is the

---

[5]We are certainly not the first paper to conduct heterogeneity analyses of families with twins. Black, Devereux, and Salvanes (2007) mention that they investigated sample splits by income and education and find no significant differences, but do not report their subgroup-specific findings, making it impossible to address the question of whether parental inputs and early health are complements or substitutes. Oreopoulos et al. (2008) report results broken down by birth weight group, gestational length, and APGAR scores, but not by different socioeconomic groups. Johnson and Schoeni (2011) report results by parental age and the presence of health insurance, which could reflect a variety of factors other than the key questions that we are interested in studying. Bharadwaj, Eberhard, and Neilson's (2013) working paper and Torche and Echevarria (2011) split their analyses by maternal education—but the developing Chilean context at the time means that Bharadwaj, Eberhard, and Neilson (2013) only split by high school and over versus middle school or lower education.

000484

most natural place where public policy can play a role in promoting cognitive development amongst children in nonfamilial settings. We seek to understand the degree to which school quality can help to overcome disadvantages associated with poor neonatal health. We find that the relationship between birth weight and cognitive outcomes is invariant to a variety of measures of school quality, suggesting that while high quality schools have the potential to improve the outcomes of all children, they do not reduce the gaps generated by poor neonatal health.

## I. A New Data Source

### A. *Description of the Dataset and Match Diagnostics*

We make use of matched data for all children born in Florida between 1992 and 2002 and educated in a Florida public school between 1996 and 2012. For the purposes of this study, Florida's education and health agencies matched children along three dimensions: first and last names, exact date of birth, and social security number, with a small degree of fuzziness permitted in the match. Common variables excluded from the match were used as checks of match quality. These checks confirm that the matches are very clean: in the overall population, the sex recorded on birth records disagreed with the sex recorded in school records in about one one-thousandth of 1 percent of cases, suggesting that these differences are due to typos in the birth or school records almost surely.

Between 1992 and 2002, 2,047,663 births were recorded by the Florida Bureau of Vital Statistics, including 22,625 pairs of twins. Of these children, 1,652,333 were subsequently observed in Florida public school data maintained by the Florida Department of Education's Education Data Warehouse, and 17,639 pairs of twins have both twins present in the Department of Education data. All told, 80.7 percent of all children born in Florida, and 79.5 percent of all twins born in Florida, were matched to school records using the match protocols.

In order to judge the quality of the match, we compare the 80.7 percent rate to population statistics from the American Community Surveys and census of population from 2000 to 2009.[6] Recall that a child can only be matched in the Florida data if he or she (i) is born in Florida; (ii) remains in the state of Florida until school age; (iii) attends a Florida public school; and (iv) is successfully matched between birth and school records using the protocol described above. Reasons (i) through (iii) are "natural" reasons why we might lose children from the match. Our calculations from the American Community Survey indicate that, among the kindergarten-aged children found in that survey who were born in Florida, 80.9 percent were remaining in Florida at the time of kindergarten and were attending public school.[7] We

---

[6] The benefit of non-name unique match identifiers in Florida becomes apparent when we compare our 80.7 percent match rate to the match rate in North Carolina, the only other state where, to our knowledge, researchers are making use of matched birth-school data today. The cleanest North Carolina match rate, which relies on children being matched by name, date of birth, and county, is just over 50 percent, and when the match is made less exactly, just on name and date of birth, the match rate in North Carolina is between 60 and 65 percent, depending on subgroup (Ladd, Muschkin, and Dodge 2012).

[7] The 80.9 percent figure is an overstatement of the true expected match rate because the American Community Survey includes only children who are still living in the United States at the time of kindergarten. Given that some children born in Florida leave the country in their first five years—because of emigration, because they were born

TABLE 1—REPRESENTATIVENESS OF THE FLORIDA TEST SCORE AND TWIN POPULATION

| Maternal attribute | Full population of births (1) | Population of kids matched to Florida school records (2) | Population of kids with a third-grade test score (3) | Population of twins with a third-grade test score (4) |
|---|---|---|---|---|
| Black | 22.6 | 24.8 | 25.7 | 25.9 |
| Hispanic | 23.0 | 23.3 | 23.9 | 18.0 |
| High school dropout | 20.9 | 22.5 | 23.3 | 15.5 |
| High school graduate | 58.6 | 60.0 | 60.5 | 61.5 |
| College graduate | 20.1 | 17.1 | 15.8 | 23.1 |
| Age 21 or below | 22.0 | 23.6 | 24.2 | 14.4 |
| Age between 22 and 29 | 42.2 | 42.2 | 42.2 | 40.2 |
| Age between 30 and 35 | 26.1 | 24.8 | 24.4 | 31.8 |
| Age 36 or above | 9.8 | 9.3 | 9.2 | 13.6 |
| Foreign born | 23.4 | 22.9 | 23.2 | 18.0 |
| Married at time of birth | 64.8 | 62.2 | 60.9 | 68.4 |
| Number of children | 2,047,663 | 1,652,333 | 1,334,006 | 28,434 |

*Notes:* The first column presents fractions in total population of children born in Florida between 1992 and 2002. The second column presents fractions in total population of children born between 1992 and 2002 linked to Florida school records. The third column presents fractions in total population of children born between 1992 and 2002 for whom we observe a third-grade test score. Fourth column presents fractions in total population of twin pairs born between 1992 and 2002 for whom we observe third-grade test scores. We restrict columns 3 and 4 only to observations that include full information on birth certificate.

therefore conclude that the match rate is extremely high, and that nearly all potentially matchable children have been matched in our data.

### B. *Comparisons of the Matched Dataset to the Overall Population*

The set of Florida-born children attending Florida public schools differs fundamentally from the set of all Florida-born children. It is important to note that twins differ from singletons in important ways. Twins have a lower mean gestational age and a lower mean birth weight than singletons; they have older and more educated mothers, as well as mothers who are more likely to be married (Antsaklis, Malamas, and Sindos 2013). We discuss issues of external validity in the conclusion.

Table 1 presents some evidence regarding the overall representativeness of the population of children matched to schools and the population of twins, along a number of dimensions: maternal race and ethnicity, maternal education, maternal age, maternal immigrant status, and parental marital status. There are four columns in the table: the first column reflects the total population of children born in Florida; the second reflects the population of children matched to Florida public school records; the third represents the set of children with a third-grade test score; and the fourth reflects the set of twins born in Florida who have a third-grade test score. (Children in these last two columns also must fulfill the other data requirements, such as non-missing core control variables, for inclusion in the study.) The comparison between the first and second columns makes clear the costs associated with carrying out this type of analysis in the United States, where children are lost for matching if

to nonimmigrant visitors to the country, or because they were born to undocumented immigrants who returned to their home countries—the true expected match is somewhat below 80.9 percent.

they cross state lines between birth and school or if they attend private school. We observe that the set of matched children are more likely to be Black (24.8 percent of matched children versus 22.6 percent of all children) and less likely to have married mothers (62.2 percent versus 64.8 percent of all children). The mothers of matched children are more likely to be less educated (17.1 percent college graduate versus 20.1 percent overall, and 22.5 percent high-school dropout versus 20.9 percent overall) and are moderately younger (23.6 percent aged 21 or below versus 22.0 percent overall, and 9.3 percent aged 36 or above versus 9.8 percent overall).

The comparison between the second and third columns of Table 1 shows the difference in composition of the population of test takers in elementary school versus those matched to school records more generally. Third-grade test takers are still lower in terms of socioeconomic status than are all children appearing in public school data. The fact that matched children are of somewhat lower socioeconomic status, and that those with third-grade scores are somewhat lower again, is unsurprising, given the well documented relationship between family income (or parental education) and private school attendance.[8] However, our findings of estimated relationships between birth weight and test scores which are remarkably similar across very dissimilar groups reduce some of the potential concerns regarding external validity.

The comparison between the third and fourth columns of Table 1 demonstrates the consequences of making use of twin comparisons. Mothers of twins are quite different from the overall population: mothers of twins are substantially less likely to be Hispanic or foreign-born and substantially more likely to be married than are mothers of singletons. In addition, they are considerably better educated (23.1 percent college graduate versus 15.8 percent in the overall population of test takers, and 15.5 percent high school dropout versus 23.3 percent of all test takers) and considerably older (13.6 percent aged 36 or above versus 9.2 percent in the overall population of test takers, and 14.4 percent aged 21 or below versus 24.2 percent in the overall population of test takers.).[9] Therefore, the decision to focus on twin comparisons to promote increased internal validity brings with it some cost in terms of external validity. In this paper, we therefore present evidence on the relationship between birth weight and cognitive development both in the case of twin comparisons—where internal validity is greatest—as well as the case of singletons—where external validity is greatest. Our general patterns of results are quite similar across both cases.

### C. *Birth Weight Distributions*

The variation which we use to identify the effect of poor neonatal health on cognitive skills comes from the fact that nearly all twin pairs differ in the birth weights of the two newborns, and sometimes the difference is substantial. In Florida, the

---

[8] These relationships are observed in the census data: in the 2000 census, for instance, 6 percent of families earning $25,000 or less per year sent their children to private school, as compared with 7 percent for those earning $25,000–$50,000 per year, 13 percent for those earning $50,000–$75,000 per year, and 19 percent for those earning over $75,000 per year.

[9] Twins are also more likely to be the consequence of in vitro fertilization (IVF) or other forms of assisted reproductive technologies (ART). Later in this paper we investigate the differential effects of birth weight for twins likely conceived using IVF/ART versus those less likely to have been conceived using IVF/ART.



FIGURE 1. DISCORDANCE IN BIRTH WEIGHT AMONG TWINS BORN IN FLORIDA BETWEEN 1992 AND 2002

*Notes:* Figure 1 plots kernel density distributions of within-twin-pair difference in birth weight for all twin births in Florida (solid line) between 1992 and 2002 and twin births who were born in Florida and were successfully matched to Florida public school records (dashed line). Distributions are censored at 2,000 grams for the sake of clarity.

average discordance in twins' birth weight is 284 grams (gr) (0.63 pounds), or 11.8 percent of the average twin's birth weight of 2,410 gr.[10] Figure 1 shows that the distribution of discordance for all twins is virtually identical to the distribution of discordance for twins matched to test scores. Of twin pairs, 51.4 percent have birth weight discordance over 200 gr, and 16.8 percent have birth weight discordance over 500 gr. Forty-five percent of twin pairs have birth weight discordance greater than 10 percent of the larger twin's birth weight, 26.6 percent have discordance greater than 15 percent of the larger twin's birth weight, and 14.7 percent have discordance greater than 20 percent of the larger twin's birth weight.[11]

Figure 2 makes clear that twins have a dramatically different distribution of birth weight than do singletons. The mean twin birth weight during our time period (2,410 gr) is 27.9 percent smaller than the mean singleton birth weight of 3,342 gr. For both twins and singletons the birth weight distribution of children observed in the test score data is identical to the distribution of all children born in Florida. 53.2 percent of twins have birth weights below 2,500 gr (considered clinically low birth weight), as compared with 5.9 percent of singletons, while 7.1 percent of twins have birth weights below 1,500 gr (considered clinically very low birth weight), as compared with 0.9 percent of singletons.

---

[10] Blickstein and Kalish (2003) provide an overview of the literature on growth restriction explanations for birth weight discordance. In addition, there are some medical reasons which might lead to birth weight discordance; for example, Kent et al. (2011) find that noncentral placental cord insertion leads to birth weight discordance in some pregnancies. Breathnach and Malone (2012) survey the literature on fetal growth disorders in twin gestations.

[11] There exists medical evidence that large birth weight discordances lead to increased chances of severe disability. For instance, Luu and Vohr (2009) find that the likelihood of cerebral palsy in a twin is four times greater when birth weight discordance is over 30 percent than when it is less than 30 percent.

000488



Figure 2. Difference in Birth Weight Distributions
among Singletons and Twins Born in Florida between 1992 and 2002

*Notes:* Figure 2 plots kernel density distributions of infant birth weight for all singletons (solid gray line) and twins (solid black line) born in Florida between 1992 and 2002 as well as infant birth weight distribution of singletons (dashed black line) and twins (dashed gray line) that were successfully matched to Florida public school records.

## II. Empirical Framework

Our empirical framework largely follows what has become standard in the literature. For our twins' analysis, we estimate twin fixed effect models in which the regressor of interest is the natural logarithm of birth weight.[12] Following Almond, Chay, and Lee (2005)—henceforth, ACL—and Black, Devereux, and Salvanes (2007)—henceforth, BDS—let

$$(1) \qquad y_{ijk} \,=\, \alpha \,+\, \beta \ln(bw)_{ijk} \,+\, \mathbf{x}'_{ijk}\gamma \,+\, \phi_{jk} \,+\, \varepsilon_{ijk},$$

where $i$ indexes individuals, $j$ indexes mothers, $k$ indexes births, $y_{ijk}$ denotes the outcome of child $i$, born to mother $j$ in twin-pair $k$, $\mathbf{x}$ is a vector of child-specific determinants of the outcome (in the case of twins, child gender and within-twin-pair birth order), $\phi$ denotes unobservable determinants of the outcome which are specific to the mother and birth, and $\varepsilon$ is an error term. We also estimate singleton-specific analyses in which we control for a wide range of maternal characteristics, as well as (in some specifications) gestational length, to make as apples-to-apples comparisons with the twin specifications as possible. Our results are invariant to whether or not we condition on geography.

Our outcome, denoted $y$, is a test score—the criterion-referenced Florida Comprehensive Assessment Test (FCAT)—which is standardized within grade and year to have mean zero and standard deviation one in the entire population of

---

[12] We follow an analogous approach regarding sibling comparisons.

children in Florida.[13] For ease of presentation, we average standardized reading and mathematics FCAT scores for our dependent variable, but our results are qualitatively similar for reading and mathematics, and the test-specific results are available on request.[14] The regressor of interest, $\ln(bw)$, is the natural logarithm of birth weight in grams. In Section VI we present results from specifications other than the linear-in-log model, but the linear-in-log model appears to fit the data well.

Ordinary least squares (OLS) estimation of (1) would produce biased estimates of $\beta$ if $\phi_{jk}$ were correlated with $\ln(bw)_{ijk}$. In other words, if there were unobservable determinants of cognitive ability correlated with birth weight. To address the potential bias due to correlation between $\phi_{jk}$ and $\ln(bw)_{ijk}$, we estimate a twin fixed effect model. Twins necessarily share the same $\phi_{jk}$. Essentially, a twin fixed effect model differences out any mother- or birth-specific confounder and identifies $\beta$ based on between-twin variation in test scores and birth weight. Logically, birth weight can vary due either to variation in gestation length or to variation in fetal growth rates. By focusing on twins, necessarily we hold gestation length constant. Our estimates are identified, therefore, by variation in fetal growth rates. We also present evidence from singleton births that, while they lack the internal validity of the twin comparisons, allow us to show the relationships between gestation length, birth weight, and cognitive skills in the overall population of children.

One potential internal validity concern is that we can only make use of test score data for a twin pair if both members of the pair have test scores. If one twin is present in the test score data but not the other, and the reasons for differential inclusion in the data are correlated with neonatal health, the absence of one twin's test score could present a source of bias. A related concern relates to the fact that we only observe education records for individuals born in Florida who remained in Florida, attended Florida public schools and took the FCAT. Various tests reported in detail in Figlio et al. (2013) suggest that in practice the selection bias resulting from either of these sources is likely to be minimal. For example, the likelihood of leaving the sample between third grade and fourth or fifth grade is uncorrelated with whether the twin is the heavier or lighter of the pair, and only slightly more likely for the lighter twin in grades six through eight. The relative number of missing twins is too small to make a meaningful difference in the estimates even in these later grades. Furthermore, estimates in which we impute very low or very high test scores for missing twins yield almost identical results as those reported in the main specifications.

### III. Preliminary Results: Heavier versus Lighter Twins

To fix ideas before presenting the main regression results, Figure 3 shows the average within-twin-pair difference in average math and reading test score between the higher birth-weight twin and the lower birth-weight twin for grades three through eight.[15] Within twin pairs, on average the heavier twin scores about 5 percent of a

---

[13] We standardize FCAT scores for ease of interpretation. Our results are not substantively changed if instead we measure the FCAT in its unstandardized developmental scale score format.

[14] In the main twins regression specification, 99.5 percent of observations have both math and reading scores, 0.2 percent have only math, and 0.3 percent have only reading.

[15] The same patterns for math and reading separately are in Figures A1 and A2 in the online Appendix.



FIGURE 3. AVERAGE WITHIN-TWIN-PAIR DIFFERENCE
IN TEST SCORES BETWEEN HEAVIER AND LIGHTER TWINS

*Notes:* Figure 3 plots difference between the mean test score of heavier and lighter twin from each pair in each grade and the respective 95 percent confidence interval of this difference. Mean test score is constructed as an average of scores in mathematics and reading for each individual in each grade where we observe both twins. If score in mathematics is not available then only reading is used and vice versa. In each grade we create an average of scores for heavier and lighter twins and then calculate the difference between the two.

standard deviation higher than the lighter twin. This difference in test scores is statistically distinguishable from zero, and is stable from third through eighth grades, covering ages from approximately 9 to 14.[16] The results imply that neonatal health, as proxied by birth weight, has effects on cognitive skills by age nine. Furthermore, this effect does not seem to either dissipate or widen through middle school.

Figure 4 breaks down this mean difference by quartile of twin birth weight discordance;[17] the bottom and top quartiles average 2.5 and 23.9 percent discordance, respectively. Two facts are apparent from this figure: first, the relationship between relative birth weight and relative test scores within twin pairs is roughly flat as children age. Second, the higher degree of birth weight discordance, the larger test score gap between the larger and the smaller twin. Figure A3 in the online Appendix shows that the positive relationship between birth weight discordance and test score differences is present and clear when we break down the twin pairs or sibling pairs into fine discordance bins (one for each percentage point, and a final bin for pairs with greater than 20 percent discordance), with the slope of the relationship modestly flatter for sibling pairs than it is for twin pairs. These findings foreshadow the main findings of this paper.

---

[16]For all analyses separated by grade, we assign students to the grade they would have been in had they progressed one grade per year from the first time we observe them with an FCAT score in third grade. We use this "imputed grade" rather than the student's actual grade because grade retention may be affected by birth weight and because we are interested in following children longitudinally. All results are extremely similar if we focus on actual grade rather than this imputed grade.

[17]We limit this analysis to same-sex twins to ensure that the differences in discordance are not due to well-documented differences in birth weight between boys and girls.



FIGURE 4. MEANS OF SCORES BY DISCORDANCE QUARTILES

*Notes:* Figure 4 plots difference between the mean test score of heavier and lighter twin from each pair in each grade for four quartiles of discordance in birth weight. Mean test score is constructed as an average of scores in mathematics and reading for each individual in each grade where we observe both twins. If score in mathematics is not available then only reading is used and vice versa. In each grade we create an average of scores for heavier and lighter twins and then calculate the difference between the two. Discordance is calculated as the difference between heavier and lighter twin birth weight over the weight of the heavier twin. Mean discordance for each group in parentheses.

## IV.  Main Results

### A. *Pooled Results for Full Sample*

We now turn to our main regression results. The basic regression model is an OLS estimate which includes twin-pair fixed effects, a gender dummy, and a dummy for within-twin-pair birth order. The dependent variable is the standardized FCAT score averaged between reading and math,[18] and the regressor of interest is the natural logarithm of birth weight in grams. We report some results based on separate regressions for each grade from third to eighth, and other results that pool test scores across all six grades. In the pooled regressions, standard errors are clustered at the individual level (for singletons) and twin-pair level (for twins) to account for the fact that each individual has up to six observations, one for each grade in which he or she was tested.[19]

The nonparametric plots of the relationship between test scores and birth weight reported in Figure 5 present evidence supportive of the log birth weight specification which we employ, as there appears to be a concave relationship between birth weight and test scores. The figure shows two series, each derived from a test score

---

[18] See Figlio et al. (2013) for separate findings for reading and mathematics.

[19] An earlier version of this paper (Figlio et al. 2013) clusters standard errors for twins at the individual level. The level of clustering (individual versus twin or sibling pair) has no substantive effect on our findings. In grade-by-grade singleton models with one observation per child, we estimate robust standard errors.



FIGURE 5. NONPARAMETRIC RELATIONSHIP BETWEEN BIRTH WEIGHT AND TEST SCORES

*Notes:* Figure 5 plots coefficients from OLS (black solid line) and twin fixed effects (gray solid line) models where the dependent variable (*y*-axis) is the mean of pooled grades 3–8 of combined mathematics and reading test scores for each individual and the independent variables (*x*-axis) are indicators for 36 weight bins corresponding to each individual birth weight. No additional controls are included in the models.

regression that pools grades 3–8 and both math and reading scores. Each series plots the coefficients from a set of 36 dummy variables corresponding to 100 gram-wide birth weight bins. The bins range from a low of 501–600 to a high of 4,001–4,100 gr. In both regressions, the excluded group is below 501. As was observed in similar sets of plots by ACL and BDS, the shape of the relationship between test scores and birth weight is similar whether or not we condition on twin-pair fixed effects.

The main result, an estimated coefficient of 0.443 presented in column 2 of Table 2, implies that a 10 percent increase in birth weight is associated with just under one-twentieth of one standard deviation increase in test scores in grades 3–8.[20] The coefficient is precisely estimated, with a *t*-statistic of over 10. The fixed effects result is modestly larger than, but close to, the equivalent OLS coefficient of 0.285 reported in the first column of Table 2.[21]

To put the magnitude of these coefficients into perspective, BDS estimate that the effect of log birth weight on log earnings is 0.12. Assuming the log wage return to cognitive skills is 0.2 as estimated by Neal and Johnson (1996), our estimates imply that increases in cognitive skills present in grades 3–8 explain approximately three-quarters of the effect of birth weight on wages found by BDS. Similarly, Royer (2009) estimates that a 1,000 gr increase in birth weight is associated with an extra 0.16 years of schooling. Using the online analysis tool of the High School

---

[20] We also find that birth weight is associated with a modest but strongly statistically significant increase in a child's grade in school at any given age. In the twin fixed effects model, a 10 percent increase in birth weight is associated with just under one-one hundredth higher grade for any given age; the estimated coefficient on log birth weight when the dependent variable is grade for age is 0.083 with a standard error of 0.019.

[21] We concentrate on birth weight because there is greater variation in birth weight than in other measures of neonatal health. That said, we find positive, statistically significant relationships between APGAR scores and test scores. For instance, in a pooled twin fixed effects model, a one-unit increase in one-minute APGAR scores is associated with 0.8 percent of a standard deviation higher average reading and math scores.

000493

TABLE 2—ESTIMATED EFFECTS OF BIRTH WEIGHT ON COGNITIVE DEVELOPMENT

| | Pooled | | Imputed grade | | | | | |
|---|---|---|---|---|---|---|---|---|
| | OLS (1) | FE (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Panel A. Twins (average of mathematics and reading): Estimates on ln(birth weight) | | | | | | | | |
| All twins | 0.285*** | 0.443*** | 0.444*** | 0.526*** | 0.431*** | 0.428*** | 0.390*** | 0.376*** |
| | (0.022) | (0.039) | (0.043) | (0.045) | (0.047) | (0.053) | (0.057) | (0.061) |
| | [126,636] | | [28,434] | [26,508] | [22,970] | [19,340] | [16,186] | [13,198] |
| Same-sex twins | 0.300*** | 0.452*** | 0.463*** | 0.532*** | 0.411*** | 0.469*** | 0.402*** | 0.368*** |
| | (0.027) | (0.043) | (0.050) | (0.053) | (0.053) | (0.059) | (0.062) | (0.066) |
| Opposite-sex twins | 0.259*** | 0.421*** | 0.399*** | 0.513*** | 0.475*** | 0.330*** | 0.360*** | 0.390*** |
| | (0.038) | (0.082) | (0.086) | (0.088) | (0.097) | (0.112) | (0.122) | (0.136) |
| Panel B. Singletons (average of mathematics and reading): Estimates on ln(birth weight) and gestation | | | | | | | | |
| ln(birth weight) | 0.285*** | — | 0.305*** | 0.289*** | 0.292*** | 0.281*** | 0.262*** | 0.261*** |
| | (0.004) | | (0.004) | (0.004) | (0.004) | (0.005) | (0.005) | (0.005) |
| | [5,752,665] | | [1,254,821] | [1,181,590] | [1,040,814] | [888,895] | [756,478] | [630,067] |
| ln(birth weight) \| gestation weeks | 0.332*** | — | 0.345*** | 0.336*** | 0.337*** | 0.328*** | 0.313*** | 0.316*** |
| | (0.005) | | (0.005) | (0.005) | (0.006) | (0.006) | (0.007) | (0.007) |
| ln(birth weight) \| gestation weeks [overlapping] | 0.421*** | — | 0.430*** | 0.424*** | 0.428*** | 0.421*** | 0.399*** | 0.406*** |
| | (0.007) | | (0.008) | (0.008) | (0.009) | (0.009) | (0.010) | (0.011) |
| Gestation weeks | 0.013*** | — | 0.015*** | 0.013*** | 0.013*** | 0.012*** | 0.011*** | 0.010*** |
| | (0.000) | | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.001) |
| Panel C. Siblings (average of mathematics and reading): Estimates on ln(birth weight) and gestation | | | | | | | | |
| ln(birth weight) | 0.277*** | 0.238*** | 0.263*** | 0.254*** | 0.241*** | 0.219*** | 0.179*** | 0.178*** |
| | (0.009) | (0.011) | (0.012) | (0.013) | (0.015) | (0.017) | (0.021) | (0.026) |
| | [1,110,206] | | [294,782] | [267,751] | [212,294] | [156,910] | [109,883] | [68,586] |
| ln(birth weight) \| gestation weeks [overlapping] | 0.403*** | 0.317*** | 0.345*** | 0.335*** | 0.315*** | 0.344*** | 0.227*** | 0.200*** |
| | (0.018) | (0.022) | (0.024) | (0.025) | (0.028) | (0.033) | (0.039) | (0.050) |
| Gestation weeks | 0.012*** | 0.008*** | 0.009*** | 0.009*** | 0.008*** | 0.005*** | 0.006*** | 0.005** |
| | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) | (0.001) | (0.002) | (0.002) |

*Notes:* Columns 1 and 2 present pooled grade 3–8 results for OLS, twin, and sibling fixed effects models. Columns 3 to 8 present OLS, twin, and sibling fixed effects estimates separately for each of the six grades. Each coefficient comes from a separate regression. Sample sizes in square brackets reflect number of observations in each regression; only twin pairs where both twins are observed with test scores in each grade are included; only siblings where at least two siblings are observed with test scores in each grade are included. We include all siblings who have test scores in given grade. In column 7 we focus only on siblings where the birth weight ranges from 847 to 3,600 gr. This restriction provides overlapping distribution of birth weight among twins and singletons. The dependent variables are averaged test scores in mathematics and reading. If the test score in mathematics is not available then reading is included and vice versa. The main variable of interest is natural logarithm of birth weight. The remaining independent variables in twin fixed effects models include infant gender and within-twin-pair birth order. OLS estimates further control for infant birth month and year, marital and immigration status, race and ethnicity, indicators for maternal age (each for one year), education (high-school dropout, high-school graduate, college graduate), and number of births (each for one birth). Siblings could be identified only in about one-half of the population. We include all siblings who have test scores in given grade. In column 7 we focus only on siblings where the birth weight ranges from 847 to 3,600 gr. This restriction provides overlapping distribution of birth weight among twins and singletons. The dependent variables are averaged test scores in mathematics and reading. If the test score in mathematics is not available then reading is included and vice versa. The main variable of interest is natural logarithm of birth weight. The remaining independent variables in twin fixed effects models include infant gender and within-twin-pair birth order. Sibling fixed effects estimates further control for birth order within a family. Naturally time invariant characteristics of the mothers are dropped in sibling fixed effects specifications. Standard errors in all twin estimates are clustered at twin-pair level. Standard errors in singleton estimates are clustered at individual level in pooled regressions (column 1) while heteroskedasticity robust standard errors are calculated in columns 3 to 8 where there is just one observation per individual. Standard errors in all sibling estimates are clustered at mother level.

*** Significant at the 1 percent level.
** Significant at the 5 percent level.
* Significant at the 10 percent level.

000494

and Beyond dataset, which follows longitudinally a cohort in the middle of Royer's sample, we estimate that a one standard deviation increase in tenth-grade test scores is associated with 0.84 additional years of completed education.[22] Combining this with our finding that a 1,000 gr increase in birth weight is associated with a 0.187 standard deviation increase in test scores, our results imply a 1,000 gr increase in birth weight is associated with 0.156 additional years of schooling, almost exactly in line with Royer's findings.

Our estimate of the effect of neonatal health on cognitive development is reasonably large in these terms, but it is worth comparing to other important correlates of student achievement. Figure 6 shows that the difference in test scores resulting from differences in birth weight is small compared with differences in achievement associated with mother's education. Each of the differences between heavier and lighter twins shown in the figure is statistically significant. However, it is clear that in terms of math and reading achievement, it is better to be the lighter twin of a college educated mother than the heavier twin of a high-school dropout mother. Taken together, these findings suggest that while *nurture* can go a long way toward remediating a child's initial disadvantage, there are still biological factors at play that make it difficult to fully remediate this disadvantage.[23]

## B. *Results by Grade for Full Sample*

A key question of interest is how the cognitive effects of in utero conditions and neonatal health develop. We have already shown that the effects of birth weight on cognitive achievement in grades three through eight are similar to those observed with respect to adult earnings. We next explore how the impact on test scores changes during these important years for human capital development. Does the effect of birth weight grow larger as children develop, or does the effect appear by age nine and remain constant through the upper elementary and middle grades?

The results are presented in columns 3–8 in Table 2. The table shows the estimated effect of log birth weight from twin fixed effects models that are estimated separately for test scores from each grade, 3–8. The table shows that the twin fixed estimate of the effect of birth weight on cognitive achievement is already 0.444 by the third grade, and that the grade specific estimated effect remains fairly stable from third through eighth grade, ranging from 0.376 to 0.526. The *F*-test that the grade level estimated effects are identical is rejected at a moderate level of statistical significance ($p = 0.069$). However, there is no evidence that this effect follows a substantial systematic pattern as children progress through school; in a regression model in which we interact the log of birth weight linearly with grade in school, the coefficient estimate on the interaction term is one-two thousandth the magnitude of the coefficient on log birth weight. These results suggest that whatever effect early

[22] We weighted the individuals in the High School and Beyond data by their base year replicate weights. For the sake of this analysis, we define high-school dropouts as having 10 years of education, GED recipients as having 11, high school graduates as having 12, certificate recipients as having 13, associates recipients as having 14, bachelors recipients as having 16, masters or professional degree recipients as having 18, and doctorate recipients as having 19 years of education.

[23] We do not mean to suggest that our results answer the age-old nature/nurture question. Rather, they are consistent with the growing literature on epigenetics which shows that environmental and biological factors interact (Miller et al. 2009 or Lam et al. 2012).



FIGURE 6. AVERAGE WITHIN-TWIN-PAIR DIFFERENCE IN TEST SCORES BETWEEN HEAVIER AND
LIGHTER TWIN BY MATERNAL EDUCATION CATEGORIES

*Notes:* Figure 6 plots means of combined mathematics and reading test scores for lighter and heavier twins from each pair stratified by maternal education. Black lines correspond to averages for lighter while gray lines correspond to heavier twins. Solid lines present means for high-school dropout mothers, dashed lines present means for children of mothers with high-school diploma or some college while dotted lines present means for college graduates.

health at birth has on cognitive development occurs largely by age nine, and remains fairly constant throughout the preadolescent and adolescent years.

In a previous version of this paper (Figlio et al. 2013), we look further back, to the beginning of formal schooling.[24] In various years between 1998 and 2008, Florida performed universal kindergarten readiness screening. From 1998 through 2001 all kindergarten entrants were screened with the School Readiness Checklist (SRC), a list of 17 expectations for kindergarten readiness. Subsequently, kindergarten entrants were screened with the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), and beginning in 2006 the results of this screening were collected and recorded by the Florida Department of Education.[25] DIBELS rates children's letter sound recognition and letter naming skills and categorizes children as above average, low risk, moderate risk, or high risk. In our data, 82.1 percent of children were deemed ready according to the earlier SRC screen, and a very similar 83.8 percent of children were deemed either above average or low risk according to the DIBELS. Making use of twin comparisons in a linear probability model,[26] we observe that

---

[24] There is some reason to believe that the effects of early health deficits may differ between the start of kindergarten and the end of third grade. At ages 6–8, as children enter full-time schooling, they spend on average 30 percent less time being actively cared for by their parents than they did when they were 3–5 and 43 percent less time than when they were 0–2 (Folbre et al. 2005). The shift in time spent with parents to time spent with other adults (such as teachers) and peers (Sacerdote 2001) suggests it may be important to gauge how the effect of neonatal health on cognitive development changes in the early schooling years.

[25] For more details about the structure and interpretation of DIBELS, see, e.g., Hoffman, Jenkins, and Dunlap (2009).

[26] The pattern of results and statistical significance is extremely similar when we instead estimate conditional logit models.

a 10 percent increase in birth weight is associated with a 0.67 percentage point increase in being deemed ready for kindergarten according to the school readiness checklist, and a 1.15 percentage point increase in kindergarten readiness according to the DIBELS. When we pool the two sets of cohorts, these figures average to a 0.86 percentage point increase.[27] All estimates are statistically distinct from zero at conventional levels. These results suggest that the effect of neonatal health on cognitive development is present by age five.

### C. *Role of Genetic Differences between Twins*

For some policy questions, it might be important to isolate the impact of factors that change intrauterine growth while holding genetics constant. A potential weakness of our data is that they do not include the zygosity of the twins. However, we can look at same-sex versus different-sex twins: if genetic differences were driving a significant portion of the relationship between birth weight and test scores, and birth weight was positively correlated with positive determinants of later cognitive skills, we would expect to see a stronger correlation between birth weight and test scores among opposite-sex twin pairs. As can be seen in the second and third rows of Table 2, the estimated effect of birth weight is extremely similar for same-sex twins (0.452) and opposite-sex twins (0.421), suggesting that the estimated relationship is within the same general range regardless of zygosity. Our finding is consistent with results reported in BDS, who find no significant difference in the effect of birth weight on adult earnings between same-sex and opposite-sex twins, nor do they find a significant difference in the estimated effect of birth weight on earnings for monozygotic twins and dizygotic same-sex twins in their sample with available zygosity information.

### D. *Parallel Results for Singletons*

As mentioned above, our emphasis (and the prevailing emphasis in the literature) on using twin comparisons to improve internal validity comes at a cost in terms of external validity. Twins have older and more educated mothers, and weigh considerably less on average at birth than singletons. In addition, there could be some unmeasured factor (e.g., a factor associated with in utero fetal competition) associated with both birth weight and cognitive skills that could compromise our ability to draw causal inferences about the effects of neonatal health on later test scores in twin comparison studies. For these reasons, it is valuable to gauge the degree to which the estimated relationships for singletons compare with the findings for twins. In our singletons regressions, we further control for a set of background characteristics: gender, month and year of birth dummies, marital and immigrant status, race and ethnicity, three dummies for maternal education, and dummies for age and number of prior births.

The fourth row of Table 2 presents OLS findings for singletons. Two features are apparent: first, the relationship between log birth weight and test scores is roughly

---

[27] In Figlio et al. (2013) we go into detail about the metrics one can employ to directly compare the dichotomous kindergarten readiness assessments to later continuous test scores.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 505 of 4699 PageID #:  3670

constant as children grow older, just as it was in the case of twins. Furthermore, the OLS coefficient for singletons in the pooled model (0.285) is identical to the comparable OLS coefficient for twins (0.285). This similarity provides the first piece of evidence about the potential external validity of our twin results.

Recall that our twin fixed effects relationship is larger than our twin OLS relationship. One possible reason for this difference is that the twin fixed effects relationship conditions effectively on gestational length. In the fifth row of Table 2 we condition on gestational length for singletons, and find an OLS coefficient that is somewhat larger than was the case without controlling for gestational length. A comparison of the results may indicate that the rate of intrauterine growth matters for cognitive development, above and beyond the effect of measured birth weight.

Singletons include some infants whose birth weight is high enough that it likely indicates an underlying poor maternal health condition such as gestational diabetes, whereas it is rare for a twin to have a birth weight in this high range. When we further limit the singletons analysis to the range between 847 and 3,600 gr, the first and ninety-ninth percentiles of the twin birth weight distribution, we estimate the OLS relationship between log birth weight and pooled test scores, conditional on gestational length, to be 0.421, extremely similar to the twin fixed effects finding of 0.443. In sum, the closer we get to shaping the singletons OLS analysis to be parallel to the twin fixed effects analysis, the closer the two results become. In addition, as can be seen in row 7 of Table 2, when we look just at the relationship between weeks of gestation and standardized test scores, we observe that each week of gestation is associated with just over 1 percent of a standard deviation increase in test scores.

In a set of counties representing 56 percent of the population of the state of Florida, we are able to also control for family fixed effects in the singletons analysis. The results of this sibling analysis are presented in rows 8–10 of Table 2. The estimated effects of birth weight on test scores in the sibling comparisons tend to be around three-quarters of the magnitude of the twin fixed effects estimates, but remain in the same ballpark. The differences in magnitudes are due to the differences between the sibling comparisons and the twin comparisons, and not the fact that we observe siblings in a subset of the state, as can be seen when we consider the OLS coefficients in the sibling subpopulation to the overall singletons population. The OLS coefficient on log birth weight is 0.277 for siblings and 0.285 for singletons, and the coefficient on log birth weight conditional on gestation in the overlapping sample is 0.403 versus 0.421 for all singletons. We suspect that the modest differences between the twin fixed effects models and sibling fixed effects models are due to factors such as differential parental investments in siblings (Bharadwaj, Eberhard, and Neilson 2013; Hsin 2012) or direct spillovers between siblings (as we find in Black et al. 2014).

Since we find that the estimated coefficients on log birth weight are so similar when we condition on twin fixed effects or when we use the population of singletons with birth weights in the observed range of twins and condition on gestation length, a natural next step is to observe whether the distribution of these estimated effects are the same as well. In Figure 7, we present the estimated marginal effects of log birth weight on different parts of the cumulative distribution function (CDF) of the test score distribution, broken down by half-standard-deviation increments, for

000498

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 506 of 4699 PageID #:  3671

twins, singletons, and siblings. This figure demonstrates that additional birth weight is especially strongly associated with moving children from the range of scores just below average to the range of scores just above average, and is less strongly related to test scores far away from the average score.

### E. *Heterogeneity of Results by Gender, Maternal Health, and Background*

The diversity of demographics in Florida combined with the size of the dataset allow us to investigate heterogeneity in the effects of birth weight in ways that have not been possible in other related work to this point. It is inherently interesting to learn whether the long-term effects of in utero conditions on cognitive development vary across demographic and socioeconomic groups. Moreover, examining this heterogeneity may shed light on the mechanisms by which neonatal health affects cognitive skills. If the factors of disadvantage (e.g., household income, wealth, and parental education) are substitutes with neonatal health in the production of cognitive skills one should expect to see larger effects of birth weight on test scores for more disadvantaged groups. If they are complements with neonatal health, one should expect to see larger effects for more advantaged groups.

Table 3 presents a wide range of heterogeneity findings. For the sake of clarity, in the table we report the results in which we pool test scores across all grades; in online Appendix Table A1 we report grade-by-grade results for all subgroups of the twins analysis. Furthermore due to space constraints, in the print Appendix Table A1 we report the group mean test score and birth weight for twins and singletons, respectively, in each subgroup. The first column in Table 3 reports the mean and standard error of the estimated effect of birth weight on test scores in a twin fixed effects model. The second through fourth columns report the parallel findings for singletons: the estimated coefficient on log birth weight (column 2), log birth weight conditional on gestation length (column 3),[28] and gestation length (column 4), while the fifth through seventh columns perform the same analysis when we condition on sibling fixed effects.

As can be seen in panel A of Table 3, the results are very similar for boys and girls.[29] While boys are heavier than girls (4.4 percent for twins, 3.8 percent for singletons), the pooled twin fixed effects estimates for boys and girls are virtually identical (0.454 and 0.449, respectively). The same is true when we make comparisons in either the singleton population or in the case of sibling fixed effects.

Panel B of Table 3 stratifies births based on whether the mother has a medical history that potentially posed a problem for the pregnancy or delivery.[30] Around one-quarter of mothers have at least one of these risk factors. We observe that the pooled fixed effects estimates are very similar (0.422 for mothers with medical

---

[28] In the singleton and sibling specifications conditioning on gestational length, we also limit the range of birth weights to the approximate twins birth weight range, between 847 and 3,600 gr.

[29] Rosenzweig and Zhang (2009) suggest that there could be important differences by gender in their study's setting. However, these differences may reflect cultural factors specific to the rural Chinese context.

[30] The specific medical history factors recorded on the birth record are: anemia; cardiac disease; acute or chronic lung disease; diabetes; genital herpes; hydramnios/oligohydramnios; hemoglobinopathy; chronic hypertension; pregnancy-associated hypertension; eclampsia; incompetent cervix; previous infant over 4,000g; previous preterm or small for gestational age infant; renal disease; RH sensitization; uterine bleeding; and other specified history factors.



FIGURE 7. ESTIMATED EFFECTS OF BIRTH WEIGHT ON THE POSITION IN THE TEST SCORE DISTRIBUTION

*Notes:* Figure 7 plots estimated effects of log birth weight on the CDF of test scores. Specifically, the top panel plots coefficients on log birth weight from a series of standard twin fixed effects regressions in which the dependent variables are indicators marking various points in the CDF of test scores (e.g., greater than −3.5, greater than −3, etc.). The middle panel plots estimates from analogous regressions that include singletons with birth weights that overlap with the twin birth-weight distribution. The bottom panel plots estimates from analogous sibling fixed effects regressions conditional on gestation that include singletons with birth weight which overlap with the twin birth-weight distribution.

000500

TABLE 3—ESTIMATED EFFECTS OF BIRTH WEIGHT ON COGNITIVE DEVELOPMENT
BY CHILD AND MOTHER CHARACTERISTICS

| | Twins | Singletons | | | Siblings | | |
|---|---|---|---|---|---|---|---|
| Sample | Birth weight (1) | Birth weight (2) | Birth weight \| gestation (3) | Gestation (4) | Birth weight (5) | Birth weight \| gestation (6) | Gestation (7) |
| *Panel A* | | | | | | | |
| Boys | 0.454*** (0.068) | 0.296*** (0.005) | 0.440*** (0.011) | 0.013*** (0.001) | 0.230*** (0.022) | 0.321*** (0.044) | 0.007*** (0.002) |
| Girls | 0.449*** (0.052) | 0.276*** (0.005) | 0.407*** (0.010) | 0.013*** (0.000) | 0.223*** (0.021) | 0.291*** (0.037) | 0.008*** (0.002) |
| *Panel B* | | | | | | | |
| No medical problems | 0.449*** (0.048) | 0.296*** (0.005) | 0.437*** (0.009) | 0.011*** (0.000) | 0.249*** (0.015) | 0.331*** (0.028) | 0.007*** (0.001) |
| Medical problems | 0.422*** (0.066) | 0.249*** (0.006) | 0.372*** (0.013) | 0.015*** (0.001) | 0.244*** (0.032) | 0.319*** (0.063) | 0.011*** (0.003) |
| *Panel C* | | | | | | | |
| White | 0.464*** (0.045) | 0.293*** (0.005) | 0.457*** (0.009) | 0.011*** (0.000) | 0.244*** (0.015) | 0.346*** (0.030) | 0.006*** (0.001) |
| Black | 0.392*** (0.082) | 0.262*** (0.006) | 0.344*** (0.013) | 0.015*** (0.001) | 0.232*** (0.017) | 0.282*** (0.033) | 0.011*** (0.002) |
| *Panel D* | | | | | | | |
| Non-Hispanic | 0.436*** (0.044) | 0.283*** (0.004) | 0.426*** (0.008) | 0.012*** (0.000) | 0.228*** (0.013) | 0.304*** (0.025) | 0.007*** (0.001) |
| Hispanic | 0.480*** (0.079) | 0.270*** (0.008) | 0.384*** (0.015) | 0.012*** (0.001) | 0.270*** (0.023) | 0.357*** (0.046) | 0.012*** (0.002) |
| *Panel E* | | | | | | | |
| Non-immigrant | 0.441*** (0.044) | 0.284*** (0.004) | 0.422*** (0.008) | 0.012*** (0.000) | 0.223*** (0.013) | 0.292*** (0.024) | 0.006*** (0.001) |
| Immigrant | 0.456*** (0.077) | 0.255*** (0.008) | 0.379*** (0.015) | 0.013*** (0.001) | 0.291*** (0.024) | 0.411*** (0.048) | 0.012*** (0.002) |
| *Panel F* | | | | | | | |
| Education below 12 years | 0.358*** (0.094) | 0.265*** (0.008) | 0.368*** (0.014) | 0.012*** (0.001) | 0.229*** (0.026) | 0.303*** (0.046) | 0.008*** (0.002) |
| 12–15 years | 0.439*** (0.050) | 0.291*** (0.005) | 0.436*** (0.009) | 0.013*** (0.000) | 0.225*** (0.016) | 0.306*** (0.030) | 0.008*** (0.001) |
| Above 15 years | 0.523*** (0.079) | 0.256*** (0.010) | 0.380*** (0.020) | 0.013*** (0.001) | 0.238*** (0.031) | 0.418*** (0.059) | 0.001 (0.003) |
| *Panel G* | | | | | | | |
| Bottom | 0.388*** (0.076) | 0.289*** (0.007) | 0.407*** (0.013) | 0.015*** (0.001) | 0.250*** (0.020) | 0.287*** (0.038) | 0.011*** (0.002) |
| Middle | 0.445*** (0.072) | 0.269*** (0.007) | 0.407*** (0.014) | 0.012*** (0.001) | 0.221*** (0.024) | 0.339*** (0.047) | 0.007*** (0.002) |
| Top | 0.447*** (0.078) | 0.264*** (0.008) | 0.400*** (0.016) | 0.011*** (0.001) | 0.239*** (0.026) | 0.401*** (0.049) | 0.004* (0.002) |
| *Panel H* | | | | | | | |
| Unmarried | 0.372*** (0.076) | 0.269*** (0.006) | 0.384*** (0.011) | 0.013*** (0.001) | 0.235*** (0.018) | 0.284*** (0.034) | 0.009*** (0.002) |
| Married | 0.482*** (0.044) | 0.292*** (0.005) | 0.439*** (0.010) | 0.012*** (0.000) | 0.259*** (0.017) | 0.366*** (0.032) | 0.007*** (0.001) |

*(Continued)*

TABLE 3—ESTIMATED EFFECTS OF BIRTH WEIGHT ON COGNITIVE DEVELOPMENT
BY CHILD AND MOTHER CHARACTERISTICS (*Continued*)

| Sample | Twins Birth weight (1) | Singletons Birth weight (2) | Birth weight \| gestation (3) | Gestation (4) | Siblings Birth weight (5) | Birth weight \| gestation (6) | Gestation (7) |
|---|---|---|---|---|---|---|---|
| *Panel I* | | | | | | | |
| Age below 22 | 0.372*** | 0.268*** | 0.373*** | 0.011*** | 0.195*** | 0.305*** | 0.005** |
| | (0.115) | (0.007) | (0.014) | (0.001) | (0.025) | (0.046) | (0.002) |
| 22–29 | 0.444*** | 0.274*** | 0.415*** | 0.011*** | 0.249*** | 0.317*** | 0.009*** |
| | (0.059) | (0.006) | (0.012) | (0.001) | (0.022) | (0.042) | (0.002) |
| 30–35 | 0.490*** | 0.294*** | 0.446*** | 0.014*** | 0.228*** | 0.329*** | 0.006** |
| | (0.069) | (0.007) | (0.015) | (0.001) | (0.034) | (0.066) | (0.003) |
| Above 35 | 0.410*** | 0.326*** | 0.490*** | 0.018*** | 0.269*** | 0.335*** | 0.016*** |
| | (0.104) | (0.012) | (0.024) | (0.001) | (0.054) | (0.119) | (0.005) |

*Notes:* Column 1 presents pooled grades 3–8 twin fixed effects model estimates corresponding to model outlined in column 2 in Table 2. Columns 2 to 4 present estimates for singleton population. Column 2 presents the correlation between pooled grades 3–8 test scores and birth weight for all singletons. Column 3 presents the correlation between pooled grades 3–8 test scores and birth weight conditional on gestation for the sample of singletons that overlap in birth weight with twin population: i.e., birth weight in range 847 to 3,600 gr. Column 4 presents the correlation between pooled grades 3–8 test scores and gestation weeks for all singletons. Columns 5 to 7 present estimates for sibling population. Twins fixed effects regressions control for child gender and birth order. All singleton models include the following controls: gender, month and year of birth dummies, marital and immigrant status, race and ethnicity, dummies for maternal education (3 categories), age, and number of births. Sibling models further control for birth order within a family. Standard errors in column 1 are clustered at twin-pair level, in columns 2 to 4 at individual level while in columns 5 to 7 at mother level. Sample sizes are: 126,636 individual years observations in column 1, 5,752,665 individual year observations in columns 2 and 4, 4,025,893 individual year observations in column 3, 1,110,206 individual year observations in columns 5 and 7, 648,486 individual year observations in column 6. There are fewer observations in zip code income because we do not observe these for years 1992 and 1993. There are fewer observations in racial breakdown because we exclude other races than Black or White from this comparison. There are fewer observations in maternal marital history breakdown because we miss information for some mothers.

 ***Significant at the 1 percent level.
  **Significant at the 5 percent level.
   *Significant at the 10 percent level.

history, and 0.449 for mothers without medical history), as are the log birth weight coefficients for singletons (for instance, 0.372 for mothers with medical history, and 0.437 for mothers without medical history in the case where we condition on gestational length). These results indicate that maternal health at the time of labor and delivery does not appear to matter much in terms of the effects of birth weight on cognitive development.

Panels C–I of Table 3 show estimates of the effect of birth weight on pooled third- through eighth-grade test scores separately by maternal race (panel C), maternal ethnicity (panel D), maternal immigrant status (panel E), maternal education (panel F), a proxy for family income: the zip code's median income as of the 2000 census (panel G), maternal marital status (panel H), and maternal age at the time of the child's birth (panel I). These factors represent a massive range of student advantage, with average group test scores among twins as low as −0.475 and as high as 0.663 (see Appendix Table A1), reflecting gaps that are consistent with other studies of US school children (e.g., Chay, Guryan, and Mazumder 2009). Strikingly, the twin fixed effects coefficient estimates are remarkably similar across this wide range of groups, with point estimates ranging between 0.358 and 0.523. The OLS coefficient estimates in the singleton population range from 0.249 to 0.326, and the

OLS coefficient estimates on birth weight conditional on gestation range between 0.344 and 0.490. Sibling fixed effects coefficients conditional on gestation range from 0.282 to 0.418. Taken together, these results indicate that the effects of birth weight on test scores are roughly the same for children from a wide range of different backgrounds.

### F. Complementarity of Neonatal Health and Parental Inputs

A close look at the subgroup analysis can provide some evidence regarding the degree to which neonatal health and parental inputs are complements or substitutes. One might expect parents with more resources to be better able to remediate the effects of poor neonatal health. However, whether neonatal health and parental inputs are complementary is determined by whether parents with more resources are relatively more effective at building human capital for children of good versus poor neonatal health, which could happen either because parents with more resources invest more or because the investments they make have higher returns.[31] Learning whether parental resources and neonatal health are complementary provides a window into mechanisms by which parents and early health interact in the human capital development process.

To explore this question systematically, we pursue an approach similar to that employed by Hoynes, Miller, and Simon (forthcoming) to study the relationship between the earned income tax credit (EITC) and rates of low birth weight for different groups broken down by their rate of EITC usage. In our case, we use maternal race, maternal ethnicity, maternal immigrant status, maternal marital status, maternal age, maternal education, and neighborhood income to predict student test scores in order to construct an index of the family socioeconomic status (SES), and then divide the students into ten mutually exclusive groups; these groups range in mean predicted test scores from $-0.701$ to $0.809$ in the twins population—a range greater than a full individual level standard deviation of the test score distribution.[32] Figure 8 plots each group's estimated coefficient on log birth weight against the group's mean score. We explore the relationship between SES and the effect of birth weight on children's cognitive development in three different models: the twin fixed effects model, the sibling fixed effects model conditional on gestation and restricted to the population of singletons whose birth weights fall within the observed range of twin birth weights, and the comparable OLS model for singletons.

The figure demonstrates two important features of the heterogeneity of birth weight effects across a wide range of groups stratified by predicted test scores. First, the estimated effects of birth weight are all within the same general range between 0.30 and 0.67 in the twin fixed effects model, between 0.29 and 0.48 in the singletons OLS model, and between 0.24 and 0.45 in the sibling fixed effects model, and the estimated effects are both statistically and economically significant for every

---

[31] See Guryan, Hurst, and Kearney (2008) for evidence that more educated parents spend more time in parenting activities with their children, and for a discussion of how that could theoretically result from either a desire to invest more or from higher returns.

[32] The groups range in mean test scores from $-0.618$ to $0.755$ in the case of singletons and from $-0.696$ to $0.817$ in the case of sibling fixed effects.



FIGURE 8. AVERAGE TEST SCORES AMONG GROUPS AND ESTIMATED BIRTH WEIGHT EFFECTS

*Notes:* Figure 8 plots the estimates for the ten predicted groups based on the regression of test scores on maternal race, ethnicity, immigrant origin, marital status, education, age categories, and income indicators. These groups are not overlapping. In this graph income from 1992 and 1993 is imputed based on observables. Groups are calculated only for individuals with all information available and for all singletons and siblings with birth weight in a range of 847 to 3,600 gr.

demographic and socioeconomic group analyzed.[33] These magnitudes would imply that the effects on cognitive development could account for one-half to all of the long-term relationship between birth weight and earnings estimated by BDS.

The second pattern the figure illustrates is an upward-sloping relationship between estimated treatment effects and the subgroup's mean test score. This positive relationship indicates that the effects of birth weight are larger for relatively advantaged groups of children than they are for relatively disadvantaged groups of children. The slopes of the lines plotted in Figure 8 are 0.132, with a standard error of 0.086, in the case of the twin fixed effects model, 0.136, with a standard error of 0.060, in the case of the sibling fixed effects model, and 0.083, with a standard error of 0.019, in the case of the singletons OLS model.[34] The three lines are similar in terms of both slope and intercept, and indeed, the twin fixed effects and sibling fixed effects lines are virtually parallel. It is highly unlikely that these results are driven by differential selection into the sample across groups, at least by birth weight. As an illustration, the difference in gaps in average birth weight between twin-pairs with test scores and those without test scores ranges from −47 to 82 gr, and follow no apparent

[33] We have also estimated specifications in which we interact log birth weight separately with the socioeconomic variables referenced in Table 3. We then evaluated the marginal effect of log birth weight separately for every child in the population. The marginal effects in the case of the twin fixed effects specification ranged from 0.17 to 0.62. Online Appendix Figure A4 plots the estimated marginal effects of log birth weight for the full distribution of possibilities in this specification.

[34] We estimate the standard errors of the slopes of these lines by bootstrapping. We randomly drew twin pairs (sibling pairs or singletons) with replacement to generate a sample of the same size as our analysis sample. We then used this sample to predict test scores and to separate the bootstrapped sample into ten deciles based on predicted test scores. Next, we estimated twin fixed effects (sibling fixed effects or singleton) models for each of the ten deciles. For both twins, siblings, and singletons, we ran 1,000 replications of these 10-observation regressions and calculated the standard deviation from these slopes for our bootstrapped standard errors.

pattern: the typical gap is just 3 grams for the bottom half of the SES distribution and 7 grams for the top half. Therefore, while by no means definitive, these patterns indicate that poor neonatal health may disproportionately affect children growing up in high socioeconomic status families, and are suggestive that neonatal health and parental resources are to some degree complementary.[35]

## V. Effect Variation across the Birth Weight Distribution and by Discordance Levels

Thus far, we have presented estimates of our baseline model, which specifies that the relationship between average test scores and birth weight is linear in the log of birth weight. Understanding how the marginal effect of birth weight varies across the birth weight distribution and with birth weight discordance may be helpful in narrowing down potential mechanisms for the relationship. Public health officials and medical practitioners frequently direct attention on the thresholds of 1,500 and 2,500 gr, the conventional delimiters of very low birth weight and low birth weight, respectively. Stronger marginal effects of proportional increases in birth weight for very low and low birth weight babies might suggest different physiological mechanisms than if the effects were only present in comparisons between moderate and high birth-weight infants.

We have already presented nonparametric evidence (Figure 5) that the relationship between birth weight and student test scores appears to be concave, supporting the log birth weight specification that is common in the related literature. That said, there could still be some important nonlinearities in the relationship. In this subsection we relax the assumptions underlying our main specification and explore how the marginal effect of poor neonatal health varies across the distribution of birth weight and with birth weight discordance. First we estimate models that allow the marginal effect of log birth weight to vary across different bins of the birth weight distribution. As seen in Figure 9, which presents separate twin fixed effects coefficients for 20 equally sized bins, based on the lighter-born twin's birth weight,[36] we observe no systematic relationship between the marginal effect of log birth weight on test scores and the level of birth weight. The estimated effects are largely stable,

[35] Children in higher scoring subgroups (who tend to have high income, highly educated families with older mothers) are more likely to have been born with the assistance of in vitro fertilization (IVF) or other assisted reproduction technologies (ART). It is therefore conceivable that the positive relationship plotted in Figure 8—at least for the twins population—is due at least in part to differential patterns of IVF/ART. This association could be especially important in a population of twins, given that Bitler (2008) demonstrates that requiring health insurance plans to cover use of IVF/ART substantially increases the likelihood that a mother will have twins, and these new twins likely conceived with the assistance of IVF/ART have lower quality birth outcomes. While we cannot measure IVF/ART use in our data, we conduct two checks to see whether or not differential IVF/ART prevalence is a plausible explanation for our findings. First, we conduct the identical analysis for twins born to mothers aged 30 and above, versus those under 30. Bitler uses this age breakdown to proxy for IVF/ART likelihood. Next, we conduct the identical analysis for twins who were the first children born to the mother to those who were not the first children born to the mother, given that IVF/ART is more likely among families with previous fertility challenges. We do not find evidence that these slopes differ appreciably across these groups of mothers. Taken together, these results suggest that differential probabilities that children from high-scoring subgroups were conceived via IVF/ART are not responsible for the positive-sloped relationship between the scoring level of the subgroup and the subgroup-specific estimated effect of birth weight on test scores.

[36] We have also estimated models that define the bins based on the heavier born twin's birth weight. These results are very similar and are presented in online Appendix Figure A8.

000505

FIGURE 9. ESTIMATED EFFECTS OF BIRTH WEIGHT, BY WEIGHT OF SMALLER TWIN

*Notes:* Figure 9 plots coefficient estimates from a twin fixed effects regression where the dependent variable (*y*-axis) is the mean test score and the independent variables (*x*-axis) are the products of log birth weight with indicators for 20 bins reflecting lighter twin percentile birth weight. The regression additionally controls for infant gender and birth order within-twin pair. Heteroskedasticity robust standard errors are used to calculate the 95 percent confidence interval. Numbers on the *x*-axis correspond to the mean smaller twin birth weight in each of the 20 bins.

aside from variation that appears to be due to sampling variation, across the distribution of birth weight.[37]

We next explore whether the relationship between birth weight and test scores varies by birth weight discordance in Figure 10. We divide twins into 20 bins by birth weight discordance, excluding the twin pairs that are very close in weight (less than 150 gram difference).[38] As can be seen in the figure, the estimated relationship between log birth weight and test scores is qualitatively similar across a wide range of discordance.

Given the salience in the medical and public health literature of specific birth weight thresholds (1,500 and 2,500 gr), we next explore whether the estimated effects of log birth weight in twin fixed effects models differ systematically above and below 2,500 gr. Rows 2 through 5 of online Appendix Table A2 break down our estimates into different groups based on the birth weights of the smaller twin. As can be seen, the estimated effect of a marginal increase in birth weight is quite similar for pairs with at least one low birth weight (less than 2,500 gr) twin and those with only normal birth weight (greater than or equal to 2,500 gr) twins; the estimate for the former is 0.428, and for the latter it is 0.526, and the two pooled coefficients are not statistically distinguishable from one another. Likewise, the estimated effects reported in rows 4 and 5 of the table for twin pairs with at least one

---

[37] An *F*-test fails to reject the null hypothesis that the coefficient on log birth weight is the same across all 20 bins (*p*-value: 0.943).

[38] At very small discordances of less than 3 or 4 percent, the estimates are too noisy to obtain a meaningful result. We exclude the very small discordances, therefore, so that the results for more meaningful discordances are more straightforward to present and observe.



FIGURE 10. ESTIMATED EFFECTS OF BIRTH WEIGHT, BY BIRTH WEIGHT DISCORDANCE

*Notes:* Figure 10 plots coefficient estimates from a twin fixed effects regression where the dependent variable ($y$-axis) is the mean test score and the independent variables ($x$-axis)are the products of log birth weight with indicators for 20 bins reflecting birth weight discordance between twins. The regression additionally controls for infant gender and birth order within-twin pair. Heteroskedasticity robust standard errors are used to calculate the 95 percent confidence interval. Numbers on the $x$-axis correspond to the mean twin pair percentage discordance.

very low birth weight (less than 1,500 gr) and those where the smallest twin is low birth weight (1,500–2,499 gr) twins do not vary substantially across these groups. The estimated effects for very low birth weight, low birth weight, and normal weight are, respectively, 0.432, 0.431, and 0.526. Online Appendix Table A2 also presents other specifications, such as birth weight measured linearly, and birth weight interacted with the population demeaned mean birth weight in the twin pair, and all sets of results paint the same fundamental picture.[39]

## VI. School Quality and the Effect of Birth Weight on Test Scores

The results presented thus far have demonstrated that there is a robust relationship between birth weight and grade 3–8 test scores, and that this relationship is remarkably stable as children age through preadolescence, across different demographic groups, and across different socioeconomic groups. The stability of this relationship is all the more notable because the marginal effect of birth weight does not vary much across groups that have very different average test scores. Children growing up in circumstances that lead to very different achievement levels nonetheless appear to be impacted by early health conditions in similar ways. This finding raises the question whether investments in children remediate the effect of early deficits in health.

Schools are an obvious place to look for investments in human capital. In this section we ask whether the effect of birth weight on test scores is different for students

---

[39] Additional formal tests supporting the linear in log birth weight specification are described in Figlio et al. (2013).

who attend high quality versus low quality schools. Students who attend higher quality schools have higher test scores. But does a lower birth-weight twin perform better relative to his counterpart if the twin pair attends a high quality school instead of a low quality school? In other words, does school quality remediate the effect of early health deficits?

To answer this question, we measure school quality in six different ways. All are based on test scores; however, the available evidence (e.g., Chetty et al. 2011, Chetty, Friedman, and Rockoff 2013) suggests that measures of school or teacher quality based on test scores correlate strongly with later life outcomes. First, we take advantage of the fact that since 1999 the state of Florida has given each of its public schools a letter grade ranging from A (best) to F (worst). Initially, this grading system was based mainly on average proficiency rates on the FCAT. Beginning in 2002, grades were based on a combination of average FCAT proficiency rates and average student level FCAT test score gains from year to year. We stratify schools based on average proficiency levels and average gains from year to year.[40] In addition, because jurisdictions have made very different determinations about what it means to be a "good" school, we have coded, to the closest degree possible in our data, three other highly publicized state/city school grading systems that weight measures of school quality in substantially different ways: the systems in Indiana, Louisiana, and New York City.

The results of the school quality analyses are presented in Tables 4 and 5 (similarly to Table 3 we present mean group test scores and birth weight in the print Appendix Table A1). Panel A of Table 4 shows estimates separately for twins who attended schools that received an A, B, and C or below. For reasons due either to school quality or to selection, test scores are much higher in A-rated schools than in lower rated schools, and we also observe that twins and singletons who attend higher rated schools tend to have heavier birth weights than those attending lower-rated schools. But while there are relationships between school grade, birth weights, and test scores, there is no monotonic relationship in the association between birth weight and test scores: the estimated effect of birth weight is largest among twins who attend schools receiving a grade of B (0.499). The smallest estimated effect is for twins attending A schools (0.407), and the estimate in the middle is for twins attending C/D/F schools (0.458). These coefficients are not statistically distinguishable from one another. The point estimates are even closer together for singletons, where the estimated coefficient on birth weight varies between 0.273 and 0.284 (0.224 to 0.237 for sibling pairs) and the estimated coefficient on birth weight conditional on gestational length ranges from 0.377 to 0.413 (0.276 to 0.333 for siblings).

Florida's school grades are based in large measure on the school's average FCAT scores and the school's average student-level FCAT score improvements. Panels B and C of Table 4 explicitly subdivide schools based on these dimensions. We find that regardless of whether schools are stratified by average levels of FCAT scores or average score improvements, the estimated effects of birth weight are present and approximately the same. For instance, the estimated marginal effect of log birth

---

[40] If we code the school grades on the scale from 0 (F) to 4 (A), we observe that state-awarded grades correlate with average school achievement at 0.71 and with growth in achievement at 0.23, while the average achievement correlates with achievement growth at 0.03.

TABLE 4—RESULTS BY SCHOOL QUALITY MEASURES

| Sample | Twins<br>Birth weight<br>(1) | Singletons<br>Birth weight<br>(2) | Singletons<br>Birth weight \| gestation<br>(3) | Singletons<br>Gestation<br>(4) | Siblings<br>Birth weight<br>(5) | Siblings<br>Birth weight \| gestation<br>(6) | Siblings<br>Gestation<br>(7) |
|---|---|---|---|---|---|---|---|
| *Panel A. Awarded grade* | | | | | | | |
| A | 0.407*** | 0.273*** | 0.412*** | 0.012*** | 0.233*** | 0.333*** | 0.005*** |
|  | (0.042) | (0.004) | (0.009) | (0.000) | (0.014) | (0.027) | (0.001) |
| B | 0.499*** | 0.284*** | 0.413*** | 0.012*** | 0.224*** | 0.305*** | 0.007*** |
|  | (0.063) | (0.006) | (0.011) | (0.001) | (0.022) | (0.043) | (0.002) |
| C and D and F | 0.458*** | 0.275*** | 0.377*** | 0.014*** | 0.237*** | 0.276*** | 0.010*** |
|  | (0.076) | (0.006) | (0.012) | (0.001) | (0.021) | (0.040) | (0.002) |
| *Panel B. Average proficiency* | | | | | | | |
| Below median | 0.437*** | 0.281*** | 0.395*** | 0.014*** | 0.230*** | 0.293*** | 0.010*** |
|  | (0.061) | (0.005) | (0.010) | (0.000) | (0.016) | (0.030) | (0.001) |
| Above median | 0.426*** | 0.267*** | 0.404*** | 0.011*** | 0.240*** | 0.348*** | 0.005*** |
|  | (0.043) | (0.004) | (0.009) | (0.000) | (0.015) | (0.029) | (0.001) |
| *Panel C. Growth in proficiency* | | | | | | | |
| Below median | 0.453*** | 0.286*** | 0.428*** | 0.012*** | 0.245*** | 0.324*** | 0.008*** |
|  | (0.044) | (0.004) | (0.008) | (0.000) | (0.014) | (0.026) | (0.001) |
| Above median | 0.427*** | 0.284*** | 0.413*** | 0.013*** | 0.229*** | 0.281*** | 0.008*** |
|  | (0.045) | (0.004) | (0.008) | (0.000) | (0.014) | (0.026) | (0.001) |

*Notes:* Column 1 presents pooled grades 3–8 twin fixed effects model estimates corresponding to model outlined in column 2 in Table 2. Columns 2 to 4 present estimates for singleton population. Column 2 presents the correlation between pooled grades 3–8 test scores and birth weight for all singletons. Column 3 presents the correlation between pooled grades 3–8 test scores and birth weight conditional on gestation for the sample of singletons that overlap in birth weight with twin population: i.e., birth weight in range 847–3,600 gr. Column 4 presents the correlation between pooled grades 3–8 test scores and gestation weeks for all singletons. Columns 5 to 7 present estimates for sibling population. Twins fixed effects regressions control for child gender and birth order. All singleton models include the following controls: gender, month and year of birth dummies, marital and immigrant status, race and ethnicity, dummies for maternal education (three categories), age, and number of births. Sibling models further control for birth order within a family. Standard errors in column 1 are clustered at twin-pair level, in columns 2 to 4 at individual level, while in columns 5 to 7 at mother level. In the case of awarded grades since not all schools are awarded grades every year our sample consists of 123,886 observations used in models in column 1, 5,650,536 observations in models in columns 2 and 4, 3,952,642 observations used in models in column 3, 1,084,620 observations used in models in columns 5 and 7, and 632,125 observations used in column 6. In the case of average proficiency we use 125,936 observations in models in column 1, 5,731,434 observations in models in columns 2 and 4, 4,011,368 observations in models in column 3, 1,106,452 observations used in models in columns 5 and 7, and 646,284 observations used in column 6. In the case of growth in proficiency we use 125,566 observations in models in column 1, 5,716,150 observations in models in columns 2 and 4, 4,000,486 observations in models in column 3, 1,102,938 observations used in models in columns 5 and 7, and 644,010 observations used in column 6. The discrepancy between the samples in Table 3 and Table 4 is due to the fact that we do not have data on school quality for the universe of schools in every year in Florida (in particular average proficiency and growth cannot be calculated for a newly established school).

 ***Significant at the 1 percent level.
 **Significant at the 5 percent level.
 *Significant at the 10 percent level.

weight for twins attending schools with above median FCAT scores is 0.426, versus 0.437 for twins attending schools with below median FCAT scores, and the estimated marginal effect twins attending a school that had above median year-to-year gains in FCAT scores is 0.427, versus 0.453 for schools with below median gains in FCAT scores.

Applying other jurisdictions' school grading formulas to Florida's data, as reported in Table 5, does not change the fundamental conclusion regarding school quality. We break the Florida school rankings based on each of the three state

alternative grading systems into thirds and find several consistent patterns. First, the estimated relationship between log birth weight and student test scores is strong and present in all cases. Second, there is rarely a monotonic relationship observed between the measure of school quality and the coefficient on log birth weight, whether it is derived from a twin fixed effect model, a sibling fixed effect model, or from a singletons model controlling for gestational length or from a singletons model without controlling for gestation. Third, in the rare cases in which there exists a monotonic relationship, in one case (singletons in New York City) the pattern runs counter to that of the other two (sibling fixed effects in Indiana and Louisiana), and in all cases the coefficient estimates are very similar.[41]

Given that we observe larger estimated effects of birth weight for higher SES families than for lower SES families, and since higher SES families tend to select into higher rated schools, it is possible that our finding of no relationship between measured school quality and the estimated effect of birth weight is biased due to these differentials. To investigate this possibility, we repeat the school grades analysis but further stratify the estimated effects of birth weight by predicted socioeconomic status using the same approach that we followed to generate Figure 8. These results are presented in online Appendix Table A3. We continue to observe strong, positive relationships between log birth weight and test scores for all school grade levels and all predicted socioeconomic groups. In addition, there continues to be no consistent pattern in these estimated relationships across school grades. For the twin fixed effect model, the smallest estimated effects are seen in A schools in two of the three socioeconomic groups (the lower and middle SES groups), but the patterns are different for singletons. It appears, therefore, that the differential selection of higher SES families into higher-rated schools is not responsible in a substantial way for our finding that school quality appears to not affect substantively the relationship between birth weight and student outcomes.[42]

In summary, the evidence appears to indicate that the effect of birth weight on test scores does not vary substantially with measures of the quality of schools that a child attends. One view of this result could be that the effects of in utero health conditions create a ceiling to learning that cannot be remediated after the fact, at least by the time that children are of schooling age. Students spend a great deal of time in schools, and schooling is the primary formal way that human capital investment takes place during childhood. The amount (Card 1999) and quality (Card and Krueger 1992a; Card and Krueger 1992b; Krueger and Whitmore 2001; Chetty et al. 2011; Chetty, Friedman, and Rockoff 2013) of schooling have been shown to have significant positive impacts on earnings and other outcomes. If attending a better school improves all students' outcomes in parallel but does not completely remediate the effects of early health deficits on cognitive development, it may be that schools currently lack the resources or information necessary to fully remediate these deficits.

---

[41] The relationship between gestational length and test scores is monotonic in measured school quality, but the results across measured school quality are always similarly-sized, consistent with our overall findings.

[42] We have also estimated models in which we control for log birth weight interacted with observable maternal and socioeconomic characteristics. Our results regarding no apparent relationship between school quality measures and the estimated effect of log birth weight are fundamentally unchanged when we further condition on these interaction terms.

TABLE 5—RESULTS BY SCHOOL QUALITY MEASURES:
RUNNING FLORIDA DATA THROUGH OTHER STATE SCHOOL GRADING SYSTEMS

| State | Quality group | Twins | Singletons | | | Siblings | | |
|---|---|---|---|---|---|---|---|---|
| | | Birth weight (1) | Birth weight (2) | Birth weight \| gestation (3) | Gestation (4) | Birth weight (5) | Birth weight \| gestation (6) | Gestation (7) |
| New York City | Top | 0.389*** (0.049) | 0.270*** (0.005) | 0.405*** (0.010) | 0.011*** (0.000) | 0.195*** (0.018) | 0.265*** (0.035) | 0.004*** (0.002) |
| | Middle | 0.491*** (0.051) | 0.275*** (0.005) | 0.407*** (0.009) | 0.012*** (0.000) | 0.233*** (0.018) | 0.318*** (0.033) | 0.008*** (0.002) |
| | Bottom | 0.484*** (0.062) | 0.294*** (0.005) | 0.418*** (0.011) | 0.014*** (0.001) | 0.251*** (0.020) | 0.293*** (0.038) | 0.011*** (0.002) |
| Louisiana | Top | 0.399*** (0.048) | 0.263*** (0.005) | 0.403*** (0.010) | 0.011*** (0.000) | 0.232*** (0.018) | 0.353*** (0.034) | 0.005*** (0.002) |
| | Middle | 0.480*** (0.054) | 0.283*** (0.005) | 0.409*** (0.010) | 0.013*** (0.000) | 0.241*** (0.018) | 0.319*** (0.035) | 0.008*** (0.002) |
| | Bottom | 0.450*** (0.104) | 0.267*** (0.008) | 0.360*** (0.015) | 0.015*** (0.001) | 0.218*** (0.028) | 0.250*** (0.052) | 0.010*** (0.002) |
| Indiana | Top | 0.401*** (0.047) | 0.260*** (0.005) | 0.395*** (0.010) | 0.011*** (0.000) | 0.217*** (0.017) | 0.330*** (0.034) | 0.005*** (0.001) |
| | Middle | 0.522*** (0.054) | 0.286*** (0.005) | 0.415*** (0.010) | 0.013*** (0.000) | 0.236*** (0.019) | 0.290*** (0.034) | 0.008*** (0.002) |
| | Bottom | 0.434*** (0.097) | 0.276*** (0.007) | 0.384*** (0.014) | 0.015*** (0.001) | 0.243*** (0.026) | 0.274*** (0.049) | 0.010*** (0.002) |

*Notes:* Column 1 presents pooled grades 3–8 twin fixed effects model estimates corresponding to model outlined in column 2 in Table 2. Columns 2 to 4 present estimates for singleton population. Column 2 presents the correlation between pooled grades 3–8 test scores and birth weight for all singletons. Column 3 presents the correlation between pooled grades 3–8 test scores and birth weight conditional on gestation for the sample of singletons that overlap in birth weight with twin population: i.e., birth weight in range 847–3,600 gr. Column 4 presents the correlation between pooled grades 3–8 test scores and gestation weeks for all singletons. Columns 5 to 7 present estimates for sibling population. Twin fixed effects regressions control for child gender and birth order. All singleton models include the following controls: gender, month and year of birth dummies, marital and immigrant status, race and ethnicity, dummies for maternal education (three categories), age, and number of births. Sibling models further control for birth order within a family. Standard errors in column 1 are clustered at twin-pair level, in columns 2 to 4 at individual level, while in columns 5 to 7 at mother level. In the case of awarded grades since not all schools are awarded grades every year and not every system was functioning through the same time period our samples differ. New York system simulation consists of 107,794 observations used in models in column 1, 4,972,962 observations used in models in column 2 and 4, 3,471,424 observations used in models in column 3, 850,751 observations used in models in columns 5 and 7, and 493,281 observations used in models in column 6. Louisiana system simulation consists of 108,926 observations used in models in column 1, 5,027,615 observations used in models in columns 2 and 4, 3,508,071 observations used in models in column 3, 850,751 observations used in models in columns 5 and 7 and 493,281 observations used in models in column 6. Indiana system simulation consists of 107,798 observations used in models in column 1, 4,973,114 observations used in models in column 2 and 4, 3,471,516 observations used in models in column 3, 850,751 observations used in models in columns 5 and 7, and 493,281 observations used in models in column 6.

\*\*\*Significant at the 1 percent level.
\*\*Significant at the 5 percent level.
\*Significant at the 10 percent level.

An alternative view of the results is that school quality does not affect remediation differentially, but leaves open the possibility that remediation *could* happen. This view is supported by a few observations. The difference in birth weights between twins or siblings is probably far more noticeable to parents than to classroom teachers. To parents a 15 percent difference in twins' or siblings' birth weight would be noticeable, but to a teacher 9 to 14 years later, children's initial birth weights would be insignificant compared to the cognitive achievement she observes in the

classroom. Even differences in cognitive achievement resulting from large discordances in birth weight among twins or siblings probably appear to the teacher to be the result of temperamental differences. Recall that the difference in achievement between the average high and low birth-weight twin is far less than the difference in achievement between children born to college-educated and high-school dropout mothers. Given this discrepancy, it is likely that teachers treat twins or siblings—or, for that matter, similar children under a different dimension—similarly. The lack of relative improvement of children with poor neonatal health in better-rated schools may not indicate that it is impossible to remediate. Rather, it may indicate that it is not done, or at least not done systematically.

## VII. Conclusion

Using a unique population level data source from Florida, we present the first look at the effects of poor neonatal health on child cognitive development in a highly developed context, provide the first comprehensive study of the differential effects on a wide range of different demographic and socioeconomic groups, and offer the first exploration of the degree to which school quality might influence these effects. Our results are remarkably consistent: children with higher birth weight enter school with a cognitive advantage that appears to remain stable through the elementary and middle school years. The birth weight related patterns in test score performance observed in twins are also seen in the overall population of singletons. The estimated effects of low birth weight are present for children of highly educated and poorly educated parents alike, for children of both young and old mothers, and for children of all races and ethnicities, parental immigration status, parental marital status, and other background characteristics. The estimated effects of neonatal health are of roughly the same magnitude throughout the tested grades as they are at the beginning of kindergarten (Figlio et al. 2013), and even as they are in very early childhood (Hart 2008).[43] The estimated effects are just as pronounced for students attending highly performing public schools (measured in a variety of ways) as they are for students attending poorly performing public schools. These results strongly point to the notion that the effects of poor neonatal health on adult outcomes are largely determined early: in early childhood and the first years of elementary school.

This pattern persists despite parental attempts to provide different experiences to their different children in early childhood. Bharadwaj, Eberhard, and Neilson (2013) and Hsin (2012), for example, find evidence that parents tend to invest more in lower birth-weight children than they do in higher birth-weight children, indicating a desire for remediation. While our administrative data do not offer the types of survey data used in those two papers, we see evidence of parents actively and simultaneously making different choices for their *twins*, suggesting that parents recognize developmental differences in their children and seek to remediate these differences in early childhood. It is reasonably common in Florida for parents to send one twin to preschool but not the other (true in 7.6 percent of twin pairs and 8.9 percent of twin pairs in which the birth weight discordance is greater than 20 percent). In

---

[43] Hart's (2008) study of a much smaller set of twins in the ECLS-B finds estimated effects of birth weight on the Bayley Scales of Infant Development that are close in effect size to those presented in our paper.

9.2 percent of twin pairs (10.5 percent of twin pairs with discordance greater than 20 percent) parents choose different preschool arrangements for their twins by either sending one twin to preschool but not the other, or sending both twins to preschool but only one to privately financed preschool. And in just under one percent of cases (1.2 percent of twin pairs with discordance greater than 20 percent) parents *redshirt* one twin but not the other by starting twins in school at different ages.[44]

Children with poor neonatal health who come from highly educated families perform much better than those with good neonatal health who come from poorly educated families, indicating that *nurture* can at least partially overcome *nature*. Indeed, this finding is very much in keeping with the literature on the positive relationship between household income and health status in childhood and adulthood (see, e.g., Case, Lubotsky, and Paxson 2002). Still, the fact that these initial biological factors are not fully overcome for even the most affluent and educated families—and, indeed, that the estimated effects of log birth weight are actually somewhat higher for these families—is consistent with the notion that parental inputs and neonatal health are complements rather than substitutes. While what exactly parents do to remediate initial biological disadvantage successfully and what schools and parents could do potentially in early childhood and the early elementary grades and beyond to continue to remediate are open questions, this study provides numerous indications that poor neonatal health establishes a stable trajectory for children's cognitive development.

These findings have potential implications for both health and education policy and practice. While it is premature to suggest specific policy responses based on this work, these findings indicate some potentially fruitful places to look for additional evidence. On the health side, for example, it will be valuable to learn whether improvements in earnings by families with pregnant women, improved maternal nutrition, or reduced maternal stress (all factors associated with higher birth weight) also translate to better cognitive outcomes in childhood. On the education side, it will be important to learn whether the relationship between birth weight and cognitive outcomes is attenuated in cases in which health and education providers have more interaction, such as in the case of children who participate in early intervention pre-kindergarten programs. Understanding these types of relationships will help us to modify the mechanisms through which neonatal health affects cognitive outcomes in childhood and adulthood, and guide health and education policy and practice.

---

[44] In cases of differential redshirting, parents are slightly more likely to redshirt the lighter twin than they are to redshirt the heavier twin. We discuss differential redshirting in greater detail in Figlio et al. (2013).

## APPENDIX

TABLE A1—MEAN TEST SCORES AND BIRTH WEIGHT FOR GROUPS USED IN TABLES 3, 4, AND 5

| Sample | Mean test score [mean birth weight] Twins (1) | Singletons (2) | Sample | Mean test score [mean birth weight] Twins (3) | Singletons (4) |
|---|---|---|---|---|---|
| *Table 3* | | | 30–35 | 0.280 [2,467] | 0.305 [3,390] |
| Boys | 0.049 [2,473] | 0.051 [3,397] | Above 35 | 0.342 [2,480] | 0.306 [3,353] |
| Girls | 0.101 [2,369] | 0.119 [3,274] | *Table 4* | | |
| No medical problems | 0.076 [2,457] | 0.098 [3,359] | A | 0.278 [2,437] | 0.276 [3,365] |
| Medical problems | 0.074 [2,356] | 0.041 [3,259] | B | −0.093 [2,410] | −0.039 [3,323] |
| White | 0.258 [2,457] | 0.228 [3,393] | C and D and F | −0.399 [2,375] | −0.310 [3,266] |
| Black | −0.465 [2,318] | −0.362 [3,180] | Below median | −0.339 [2,382] | −0.248 [3,281] |
| Non-Hispanic | 0.099 [2,413] | 0.110 [3,333] | Above median | 0.298 [2,442] | 0.298 [3,371] |
| Hispanic | −0.034 [2,454] | 0.001 [3,346] | Below median | 0.046 [2,421] | 0.058 [3,337] |
| Non-immigrant | 0.074 [2,414] | 0.079 [3,334] | Above median | 0.100 [2,422] | 0.106 [3,335] |
| Immigrant | 0.082 [2,452] | 0.106 [3,344] | *Table 5* | | |
| Education below 12 years | −0.475 [2,339] | −0.339 [3,252] | New York City | | |
| 12–15 years | 0.005 [2,430] | 0.095 [3,348] | Top | 0.305 [2,440] | 0.291 [3,363] |
| Above 15 years | 0.663 [2,451] | 0.677 [3,417] | Middle | 0.053 [2,427] | 0.073 [3,336] |
| Bottom | −0.216 [2,393] | −0.138 [3,285] | Bottom | −0.180 [2,395] | −0.120 [3,308] |
| Middle | 0.121 [2,410] | 0.085 [3,337] | Louisiana | | |
| Top | 0.437 [2,434] | 0.381 [3,382] | Top | 0.375 [2,448] | 0.371 [3,381] |
| Non-married | −0.359 [2,336] | −0.234 [3,237] | Middle | −0.090 [2,414] | −0.024 [3,325] |
| Married | 0.273 [2,459] | 0.277 [3,396] | Bottom | −0.489 [2,365] | −0.377 [3,250] |
| Age below 22 | −0.394 [2,268] | −0.207 [3,237] | Indiana | | |
| 22–29 | −0.005 [2,419] | 0.076 [3,357] | Top | 0.359 [2,448] | 0.349 [3,376] |
| | | | Middle | −0.068 [2,412] | −0.006 [3,328] |
| | | | Bottom | −0.450 [2,369] | −0.352 [3,259] |

*Notes:* Descriptive statistics for each group reported in Tables 3, 4, and 5. These present mean combined mathematics and reading test scores as well as mean birth weight for twins and singletons, respectively.

## REFERENCES

**Almond, Douglas, Kenneth Y. Chay, and David S. Lee.** 2005. "The Costs of Low Birth Weight." *Quarterly Journal of Economics* 120 (3): 1031–83.

**Antsaklis, Aris, Fotodotis M. Malamas, and Michael Sindos.** 2013. "Trends in Twin Pregnancies and Mode of Delivery During the Last 30 Years: Inconsistency Between Guidelines and Clinical Practice." *Journal of Perinatal Medicine* 41 (4): 355–64.

**Behrman, Jere R., and Mark R. Rosenzweig.** 2004. "Returns to Birthweight." *Review of Economics and Statistics* 86 (2): 586–601.

**Bharadwaj, Prashant, Juan Eberhard, and Christopher Neilson.** 2013. "Health at Birth, Parental Investments and Academic Outcomes." Unpublished.

**Bitler, Marianne.** 2008. "Effects of Increased Access to Infertility Treatment on Infant and Child Health: Evidence from Health Insurance Mandates." Unpublished.

**Black, Sandra E., Paul J. Devereux, and Kjell G. Salvanes.** 2007. "From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes." *Quarterly Journal of Economics* 122 (1): 409–39.

**Black, Sandra E., David N. Figlio, Jonathan Guryan, Krzysztof Karbownik, and Jeffrey Roth.** 2014. "The Effects of Disability on Sibling Academic Outcomes." Unpublished.

**Blickstein, Isaac, and Robin B. Kalish.** 2003. "Birthweight Discordance in Multiple Pregnancy." *Twin Research* 6 (6): 526–31.

**Breathnach, Fionnuala M., and Fergal D. Malone.** 2012. "Fetal Growth Disorders in Twin Gestations." *Seminars in Perinatology* 36 (3): 171–81.

**Card, David E.** 1999. "The Causal Effect of Education on Earnings." In *Handbook of Labor Economics.* Vol. 3A, edited by Orley C. Ashenfelter and David Card, 1801–64. Amsterdam: Elsevier Science B.V.

**Card, David E., and Alan B. Krueger.** 1992a. "Does School Quality Matter? Returns to Education and the Characteristics of Public Schools in the United States." *Journal of Political Economy* 100 (1): 1–40.

**Card, David E., and Alan B. Krueger.** 1992b. "School Quality and Black-White Relative Earnings: A Direct Assessment." *Quarterly Journal of Economics* 107 (1): 151–200.

**Case, Anne, Darren Lubotsky, and Christina Paxson.** 2002. "Economic Status and Health in Childhood: The Origins of the Gradient." *American Economic Review* 92 (5): 1308–34.

**Chay, Kenneth Y., Jonathan Guryan, and Bhashkar Mazumder.** 2009. "Birth Cohort and the Black-White Achievement Gap: The Roles of Access and Health Soon After Birth." National Bureau of Economic Research Working Paper 15078.

**Chetty, Raj, John N. Friedman, Nathaniel Hilger, Emmanuel Saez, Diane Whitmore Schanzenbach, and Danny Yagan.** 2011. "How Does Your Kindergarten Classroom Affect Your Earnings? Evidence from Project STAR." *Quarterly Journal of Economics* 126 (4): 1593–660.

**Chetty, Raj, John N. Friedman, and Jonah E. Rockoff.** 2013. "Measuring the Impacts of Teachers II: Teacher Value-Added and Student Outcomes in Adulthood." National Bureau of Economic Research Working Paper 19424.

**Conley, Dalton, Kate Strully, and Neil G. Bennett.** 2003. "A Pound of Flesh or Just Proxy? Using Twin Differences to Estimate the Effect of Birth Weight on Life Chances." National Bureau of Economic Research Working Paper 9901.

**Conti, Gabriella, and James Heckman.** 2010. "Understanding the Early Origins of the Education–Health Gradient: A Framework That Can Also Be Applied to Analyze Gene–Environment Interactions." *Perspectives on Psychological Science* 5 (5): 585–605.

**Cunha, Flavio, and James Heckman.** 2007. "The Technology of Skill Formation." *American Economic Review* 97 (2): 31–47.

**Cunha, Flavio, James J. Heckman, Lance Lochner, and Dimitriy V. Masterov.** 2006. "Interpreting the Evidence on Life Cycle Skill Formation." In *Handbook of the Economics of Education.* Vol. 1, edited by Eric Hanushek and Finis Welch, 697–812. Amsterdam: Elsevier B.V.

**Figlio, David N., Jonathan Guryan, Krzysztof Karbownik, and Jeffrey Roth.** 2013. "The Effects of Poor Neonatal Health on Children's Cognitive Development." National Bureau of Economic Research Working Paper 18846.

**Figlio, David, Jonathan Guryan, Krzysztof Karbownik, and Jeffrey Roth.** 2014. "The Effects of Poor Neonatal Health on Children's Cognitive Development: Dataset." *American Economic Review.* http://dx.doi.org/10.1257/aer.104.12.3921.

**Folbre, Nancy, Jayoung Yoon, Kade Finnoff, and Allison Sidle Fuligni.** 2005. "By What Measure? Family Time Devoted Children in the United States." *Demography* 42 (2): 373–90.

**Guryan, Jonathan, Erik Hurst, and Melissa Kearney.** 2008. "Parental Education and Parental Time With Children." *Journal of Economic Perspectives* 22 (3): 23–46.

**Hart, Cassandra M.D.** 2008. "Parenting and Child Cognitive and Socioemotional Development: A Longitudinal Twin Differences Study." Unpublished.

**Hoffman, Amy R., Jeanne E. Jenkins, and S. Kay Dunlap.** 2009. "Using DIBELS: A Survey of Purposes and Practices." *Reading Psychology* 30 (1): 1–16.

**Hoynes, Hilary W., Douglas L. Miller, and David Simon.** Forthcoming. "Income, the Earned Income Tax Credit, and Infant Health." *American Economic Journal: Economic Policy.*

**Hsin, Amy.** 2012. "Is Biology Destiny? Birth Weight and Differential Parental Treatment." *Demography* 49 (4): 1385–405.

**Johnson, Rucker C., and Robert F. Schoeni.** 2011. "The Influence of Early-Life Events on Human Capital, Health Status, and Labor Market Outcomes Over the Life Course." *B.E. Journal of Economic Analysis & Policy* 11 (3): 1–57.

000515

**Kent, Etaoin M., Fionnuala M. Breathnach, John E. Gillan, Fionnuala M. McAuliffe, Michael P. Geary, Sean Daly, John R. Higgins, et al.** 2011. "Placental Cord Insertion and Birthweight Discordance in Twin Pregnancies: Results of the National Prospective ESPRiT Study." *American Journal of Obstetrics and Gynecology* 205 (4): 376.e1–7.

**Krueger, Alan B., and Diane M. Whitmore.** 2001. "The Effect of Attending a Small Class in the Early Grades on College-Test Taking and Middle School Test Results: Evidence from Project STAR." *Economic Journal* 111 (468): 1–28.

**Ladd, Helen F., Clara G. Muschkin, and Kenneth Dodge.** 2012. "From Birth to School: Early Childhood Initiatives and Third Grade Outcomes in North Carolina." Unpublished.

**Lam, Lucia L., Eldon Emberly, Hunter B. Fraser, Sarah M. Neumann, Edith Chen, Gregory E. Miller, and Michael S. Kobor.** 2012. "Factors Underlying Variable DNA Methylation in a Human Community Cohort." *Proceedings of the National Academy of Sciences* 109 (Supplement 2): 17253–60.

**Lau, Carissa, Namasivavam Ambalavanan, Hrishikesh Chakraborty, Martha S. Wingate, and Waldemar A. Carlo.** 2013. "Extremely Low Birth Weight and Infant Mortality Rates in the United States." *Pediatrics* 131 (5): 855–60.

**Luu, Thuy M., and Betty Vohr.** 2009. "Twinning on the Brain: The Effect on Neurodevelopmental Outcomes." *American Journal of Medical Genetics, Part C: Seminars in Medical Genetics* 151C (2): 142–47.

**Miller, Gregory E., Edith Chen, Alexandra K. Fok, Hope Walker, Alvin Lim, Erin F. Nicholls, Steve Cole, and Michael S. Kobor.** 2009. "Low Early-Life Social Class Leaves a Biological Residue Manifested by Decreased Glucocorticoid and Increased Proinflammatory Signaling." *Proceedings of the National Academy of Sciences* 106 (34): 14716–21.

**National Center for Education Statistics.** 1995. "High School and Beyond Data Analysis Systems." http://nces.ed.gov/surveys/hsb/das.asp (acessed January 3, 2014).

**Neal, Derek A., and William R. Johnson.** 1996. "The Role of Premarket Factors in Black-White Wage Differences." *Journal of Political Economy* 104 (5): 869–95.

**Oreopoulos, Philip, Mark Stabile, Randy Walld, and Leslie L. Roos.** 2008. "Short-, Medium-, and Long-Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins." *Journal of Human Resources* 43 (1): 88–138.

**Rosenzweig, Mark R., and Junsen Zhang.** 2009. "Do Population Control Policies Induce More Human Capital Investment? Twins, Birth Weight and China's 'One-Child' Policy." *Review of Economic Studies* 76 (3): 1149–74.

**Rosenzweig, Mark R., and Junsen Zhang.** 2013. "Economic Growth, Comparative Advantage, and Gender Differences in Schooling Outcomes: Evidence from the Birthweight Differences of Chinese Twins." *Journal of Development Economics* 104: 245–60.

**Royer, Heather.** 2009. "Separated at Girth: US Twin Estimates of the Effects of Birth Weight." *American Economic Journal: Applied Economics* 1 (1): 49–85.

**Sacerdote, Bruce.** 2001. "Peer Effects with Random Assignment: Results for Dartmouth Roommates." *Quarterly Journal of Economics* 116 (2): 681–704.

**Torche, Florencia, and Ghislaine Echevarria.** 2011. "The Effect of Birthweight on Childhood Cognitive Development in a Middle-Income Country." *International Journal of Epidemiology* 40 (4): 1008–18.

000516

Copyright of American Economic Review is the property of American Economic Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



July 30, 2024

# Tax Payments by Undocumented Immigrants

REPORT

## Authors



**Carl Davis**
Research Director



**Marco Guzman**
Senior Policy Analyst



**Emma Sifre**
Senior Data Analyst

Read as PDF  |  Leer en Español | View state data map here

## Key Findings

- Undocumented immigrants paid $96.7 billion in federal, state, and local taxes in 2022. Most of that amount, $59.4 billion, was paid to the federal government while the remaining $37.3 billion was paid to state and local governments.

- Undocumented immigrants paid federal, state, and local taxes of $8,889 per person in 2022. In other words, for every 1 million undocumented immigrants who reside in the country, public services receive $8.9 billion in additional tax revenue.

- More than a third of the tax dollars paid by undocumented immigrants go toward payroll taxes dedicated to funding programs that these workers are barred from accessing. Undocumented immigrants paid $25.7 billion in Social Security taxes,

000518

$6.4 billion in Medicare taxes, and $1.8 billion in unemployment insurance taxes in 2022.

- At the state and local levels, slightly less than half (46 percent, or $15.1 billion) of the tax payments made by undocumented immigrants are through sales and excise taxes levied on their purchases. Most other payments are made through property taxes, such as those levied on homeowners and renters (31 percent, or $10.4 billion), or through personal and business income taxes (21 percent, or $7.0 billion).

- Six states raised more than $1 billion each in tax revenue from undocumented immigrants living within their borders. Those states are California ($8.5 billion), Texas ($4.9 billion), New York ($3.1 billion), Florida ($1.8 billion), Illinois ($1.5 billion), and New Jersey ($1.3 billion).

- In a large majority of states (40), undocumented immigrants pay higher state and local tax rates than the top 1 percent of households living within their borders.

- Income tax payments by undocumented immigrants are affected by laws that require them to pay more than otherwise similarly situated U.S. citizens. Undocumented immigrants are often barred from receiving meaningful tax credits and sometimes do not claim refunds they are owed due to lack of awareness, concern about their immigration status, or insufficient access to tax preparation assistance.

- Providing access to work authorization for undocumented immigrants would increase their tax contributions both because their wages would rise and because their rates of tax compliance would increase. Under a scenario where work authorization is provided to all current undocumented immigrants, their tax contributions would rise by $40.2 billion per year to $136.9 billion. Most of the new revenue raised in this scenario ($33.1 billion) would flow to the federal government while the remainder ($7.1 billion) would flow to states and localities.

# Introduction

000519

Immigration has always been an important part of the story of the United States. Today is certainly no exception.

Debates over immigration policy raise a huge array of issues that are fundamental to life in the U.S. To shed light on just one of those issues, this study undertakes the most thorough examination to date of the federal, state, and local tax payments made by undocumented immigrants.

To accomplish this, the study combines well-established techniques for estimating the size and tax-relevant characteristics of the undocumented population with the trove of data underlying ITEP's comprehensive studies of U.S. tax incidence.[1] In doing so, it arrives at nationwide estimates of the overall tax contributions of the estimated 10.9 million undocumented immigrants living in the U.S. as of 2022, as well as state-by-state estimates for those immigrants' payments of state and local taxes.[2] The report also forecasts the growth in tax contributions that would occur under a scenario in which these taxpayers were granted work authorization.

000520

## Who are Undocumented Immigrants? They are...

 **Diverse**. While most undocumented immigrants are from the Americas, almost a quarter are from Asia, Africa, Europe, and the Pacific Islands. Just over 4 in 10 are from Mexico.

 **Families**. Close to half of undocumented immigrant adults are married. Compared to U.S. citizens, undocumented immigrants are more likely to head households with children.

 **Mixed Status**. Most undocumented immigrants are members of families that have mixed legal status. A total of 12 million U.S. citizens, including 6 million citizen children, live in households with mixed legal status.

 **Working**. Nearly all income received by undocumented immigrants comes from wages (86 percent) and self-employment income (11 percent). The labor force participation rate among undocumented immigrants is higher than in the native-born population. Undocumented immigrants make up 4.7 percent of the workforce despite only being 3.4 percent of the overall population.

 **Established**. Most undocumented immigrant adults have lived in the U.S. for 16 years or more.

 **Concentrated**. While the undocumented population is more geographically dispersed than in prior years, a large share of this population resides in a just few states. Over half of the undocumented population lives in California, Texas, Florida, and New York.

Source: Institute on Taxation and Economic Policy, Center for Migration Studies, Pew Research Center

# Current Tax Payments by Undocumented Immigrants

Federal, state, and local governments in the U.S. levy a wide array of taxes and most of those taxes affect undocumented immigrants in some fashion. Much like their neighbors, undocumented immigrants pay sales and excise taxes on goods and services like utilities, household products, and gasoline. They pay property taxes either directly on their homes or indirectly when these taxes are folded into the price of their monthly rent. And they pay income and payroll taxes through automatic withholding from their paychecks or by filing income tax returns using Individual Taxpayer Identification Numbers (ITINs).[3]

Using the method described in detail at the end of this report, we estimate that undocumented immigrants paid $96.7 billion in U.S. taxes in 2022, including $59.4 billion in payments to the federal government and $37.3 billion in payments to states and localities. Those tax payments are disaggregated by major category in Figure 1.



FIGURE 1

## Tax Contributions by Undocumented Immigrants in 2022

Misc. Federal Taxes
$7.6 billion | 8%

Federal Income Tax
$19.5 billion | 20%

$96.7 billion
in total taxes paid

State and Local Taxes
$37.3 billion | 39%

Federal Social Insurance Taxes*
$32.3 billion | 33%

*Includes both employer and employee shares of levies that fund Social Security and Medicare, plus the federal portion of Unemployment Insurance (UI) taxes. As seen in Figure 2 of this report, adding state UI taxes to this category reveals the total social insurance tax contribution to be $33.9 billion, or nearly 35 percent of total taxes paid.
Source: Institute on Taxation and Economic Policy

Institute on Taxation and Economic Policy | ITEP.org

Given that the undocumented population included 10.9 million people in 2022, this $96.7 billion tax payment is equivalent to $8,889 per person. In other words, this analysis finds that for every 1 million undocumented immigrants who reside in the country, public services receive $8.9 billion in additional tax revenue. It bears noting that this figure

000522

includes only the taxes borne by undocumented immigrants and that other research attempting to quantify the significance of immigrants to the economy more broadly points toward a higher revenue impact per person.[4]

In total, the tax contribution of undocumented immigrants amounted to 26.1 percent of their incomes in 2022. This figure is close to the 26.4 percent rate facing the median income group of the overall U.S. population.[5] This closeness is the net result of factors that tend to lower the tax contributions of undocumented immigrants relative to U.S. citizens (such as lower incomes, lower income tax compliance, and lower smoking rates), as well as factors that tend to increase the contributions of those immigrants (such as tax credit restrictions, reduced likelihood of claiming refunds owed, and lower prevalence of tax-preferred retirement and investment income). These issues are discussed in more detail in the report methodology.

Most of the tax dollars paid by undocumented immigrants are collected through levies applied to their incomes. This includes broad income taxes as well as narrower payroll taxes levied on workers' earnings that are dedicated to specific programs. It is well established that undocumented workers contribute to the solvency of major social insurance programs through their tax contributions.[6] They pay taxes that fund Social Security, Medicare, and Unemployment Insurance, among other programs, despite their exclusion from most of those benefits.[7] Figure 2 details the tax contributions that undocumented immigrants make under major social insurance programs.

FIGURE 2.

## Social Insurance Taxes Attributed to Undocumented Immigrants

| Tax Type | Revenue |
|---|---|
| Social Security Tax | $25.7 billion |
| Medicare Tax | $6.4 billion |
| Unemployment Insurance Tax | $1.8 billion |
| **Sum of Social Insurance Taxes** | **$33.9 billion** |
| **Grand Total of All Taxes** | **$96.7 billion** |

000523

| Tax Type | Revenue |
|----------|---------|
| **Social Insurance Share of Grand Total** | **35.00%** |

*Note: Figures include both the employer and employee share of these taxes. Unemployment Insurance Tax figure includes both state and federal components.*

*Source: Institute on Taxation and Economic Policy*

---

While the federal government collects the bulk of its revenue through various kinds of income taxes, states and localities levy a wider array of tax types. Nearly 39 percent of the total tax dollars paid by undocumented immigrants are to state and local governments, for a total of $37.3 billion in 2022. Figure 3 disaggregates those payments by broad tax category.

000524



FIGURE 3

## State and Local Tax Contributions by Undocumented Immigrants, by Category

Other Taxes
**$0.5 billion | 2%**

Personal and Business
Income Taxes
**$7.0 billion | 21%**

Sales and
Excise Taxes
**$15.1 billion | 46%**

**$37.3 billion**
in state and local taxes

Property Taxes
**$10.4 billion | 31%**

Note: Chart depicts tax payments made by undocumented immigrants to the states in which they reside. Payments to other states, totaling $4.2 billion, are excluded from the chart but included in the $37.3 billion total.
Source: Institute on Taxation and Economic Policy

Institute on Taxation and Economic Policy | **ITEP**.org

The bulk of state and local tax payments by undocumented immigrants occur through sales and excise taxes on their purchases. The total state and local tax contribution of these families, in 2022, included $15.1 billion in sales and excise taxes, $10.4 billion in property taxes, $7.0 billion in personal and business income taxes, and $0.5 billion in other taxes to the states in which they live. Undocumented immigrants also paid another $4.2 billion in taxes to states aside from the ones in which they reside, mostly by making taxable purchases when traveling across state lines or by purchasing items from businesses located in other states that have passed some of their tax expense along to their consumers.

The undocumented immigrant population, and its tax contributions, are relatively concentrated in just a few states. Six states raised more than $1 billion each in tax revenue from undocumented immigrants in 2022, and together those states made up nearly two-thirds (64 percent) of all state and local tax collections from undocumented immigrants in that year. Those states are California ($8.5 billion), Texas ($4.9 billion), New York ($3.1 billion), Florida ($1.8 billion), Illinois ($1.5 billion), and New Jersey ($1.3 billion).

Measured relative to their incomes, undocumented immigrants nationwide paid an average effective state and local tax rate of 8.9 percent toward funding public infrastructure, services, and institutions in their home states. To put this in perspective, the nation's most affluent taxpayers (those in the top 1 percent of the income scale) paid an average nationwide effective tax rate of just 7.2 percent to their home states.[8] Appendix Table 4 provides effective tax rate data by state and reveals that 40 states collect higher tax rates, relative to income, from undocumented immigrants than from the top 1 percent of households living within their borders.

State-by-state data on the tax contributions of undocumented immigrants can be found in Figure 4 and in the appendix to this report.

FIGURE 4.

# State and Local Tax Contributions by Undocumented Immigrants

## Current Contributions and Potential Contributions if Granted Legal Status

| State | Current Contributions | Potential Contributions with Legal Status | Tax Change |
|---|---|---|---|
| Alabama | $146,000,000 | $180,000,000 | $34,000,00 |
| Alaska | $12,600,000 | $14,600,000 | $2,000,00 |
| Arizona | $704,000,000 | $813,500,000 | $109,500,00 |
| Arkansas | $188,200,000 | $223,200,000 | $35,000,00 |
| California | $8,470,100,000 | $10,314,700,000 | $1,844,600,00 |
| Colorado | $436,500,000 | $537,800,000 | $101,300,00 |

000526

| State | Current Contributions | Potential Contributions with Legal Status | Tax Change |
|---|---|---|---|
| Connecticut | $406,400,000 | $496,400,000 | $90,000,000 |
| Delaware | $57,000,000 | $75,000,000 | $18,000,000 |
| District of Columbia | $73,600,000 | $94,700,000 | $21,100,000 |
| Florida | $1,844,300,000 | $1,998,600,000 | $154,300,000 |
| Georgia | $928,500,000 | $1,156,600,000 | $228,100,000 |
| Hawaii | $157,200,000 | $194,400,000 | $37,200,000 |
| Idaho | $71,900,000 | $89,900,000 | $18,000,000 |
| Illinois | $1,551,300,000 | $1,917,300,000 | $366,100,000 |
| Indiana | $285,900,000 | $354,600,000 | $68,700,000 |
| Iowa | $124,300,000 | $150,100,000 | $25,700,000 |
| Kansas | $208,200,000 | $253,100,000 | $44,900,000 |
| Kentucky | $118,900,000 | $151,900,000 | $33,000,000 |
| Louisiana | $181,000,000 | $211,000,000 | $29,900,000 |
| Maine | $15,600,000 | $19,800,000 | $4,100,000 |
| Maryland | $779,300,000 | $1,041,400,000 | $262,100,000 |
| Massachusetts | $649,800,000 | $847,100,000 | $197,300,000 |
| Michigan | $290,100,000 | $353,200,000 | $63,100,000 |
| Minnesota | $221,700,000 | $294,100,000 | $72,400,000 |
| Mississippi | $49,900,000 | $58,100,000 | $8,200,000 |
| Missouri | $113,700,000 | $139,300,000 | $25,600,000 |
| Montana | $2,000,000 | $2,500,000 | $500,000 |
| Nebraska | $113,100,000 | $136,300,000 | $23,200,000 |
| Nevada | $507,100,000 | $585,100,000 | $78,100,000 |
| New Hampshire | $23,100,000 | $26,000,000 | $2,800,000 |
| New Jersey | $1,325,500,000 | $1,658,000,000 | $332,500,000 |

| State | Current Contributions | Potential Contributions with Legal Status | Tax Change |
|---|---|---|---|
| New Mexico | $153,800,000 | $174,100,000 | $20,300,00 |
| New York | $3,102,700,000 | $3,953,600,000 | $850,800,00 |
| North Carolina | $692,200,000 | $843,600,000 | $151,400,00 |
| North Dakota | $12,900,000 | $14,400,000 | $1,500,00 |
| Ohio | $265,400,000 | $332,400,000 | $67,000,00 |
| Oklahoma | $227,500,000 | $273,100,000 | $45,700,00 |
| Oregon | $353,100,000 | $487,700,000 | $134,600,00 |
| Pennsylvania | $523,100,000 | $667,000,000 | $143,900,00 |
| Rhode Island | $94,900,000 | $115,000,000 | $20,100,00 |
| South Carolina | $213,800,000 | $256,800,000 | $43,100,00 |
| South Dakota | $14,300,000 | $15,600,000 | $1,300,00 |
| Tennessee | $314,200,000 | $341,300,000 | $27,000,00 |
| Texas | $4,872,500,000 | $5,346,400,000 | $473,900,00 |
| Utah | $235,100,000 | $292,500,000 | $57,400,00 |
| Vermont | $7,900,000 | $10,100,000 | $2,300,00 |
| Virginia | $689,800,000 | $856,900,000 | $167,100,00 |
| Washington | $997,300,000 | $1,099,300,000 | $101,900,00 |
| West Virginia | $10,400,000 | $12,900,000 | $2,500,00 |
| Wisconsin | $198,900,000 | $246,800,000 | $47,900,00 |
| Wyoming | $15,800,000 | $18,100,000 | $2,300,00 |
| **SUM ALL STATES*** | **$33,052,600,000** | **$39,745,700,000** | **$6,693,100,00** |
| **Payments to other states** | **$4,225,000,000** | **$4,582,800,000** | **$357,900,00** |
| **NATIONAL TOTAL**** | **$37,277,600,000** | **$44,328,600,000** | **$7,051,000,00** |

*Figures may not sum to totals due to rounding.
**National total differs from the all states sum because it includes taxes paid by residents of one state to governments of another state.

*Source: Institute on Taxation and Economic Policy*

In many respects, undocumented immigrants face a harsher tax code than legal residents. They often pay taxes that are dedicated to funding programs from which they are barred from participating because of their immigration status. In addition, undocumented immigrants and the citizen members of their families are ineligible for the federal Earned Income Tax Credit (EITC).[9] While some states have moved to make more taxpayers eligible for state EITCs regardless of immigration status, most states still exclude taxpayers filing with ITINs. On top of that, only qualifying taxpayers with children with Social Security Numbers (SSNs) qualify for the federal Child Tax Credit (CTC) and a few states with CTCs have chosen to mimic this restriction in their own CTCs. While some kids — with valid taxpayer identification numbers — may qualify for the Credit for Other Dependents, the credit value is only one-fourth the size of the federal CTC and is not refundable.[10]

Steps toward more immigrant-inclusive tax policies have been uneven in recent years. On the one hand, the 2017 Trump tax law added the SSN requirement for the Child Tax Credit that has barred many immigrant children and their families from benefiting. On the other hand, a growing number of states have chosen a more inclusive path with their own tax credits in recent years. Roughly one-third of states with EITCs and most states with CTCs have written their tax laws to be inclusive of children who do not qualify for an SSN.[11]

# Effect of Work Authorization on Undocumented Immigrant Tax Contributions

Undocumented immigrants work without authorization and, as a result, their tax contributions are lower than what would be paid by a worker with legal status in an otherwise comparable position. Granting work authorization to undocumented immigrants would increase their tax contributions for two reasons.

000529

First, income tax revenues would increase because legal status would lessen barriers to complying with existing income tax laws. Second, the data demonstrate that immigrants with employment authorization earn higher wages than undocumented immigrants.[2] Greater access to job opportunities and higher-level education would provide immigrants with the opportunity to earn substantially higher wages which would have the effect of raising taxable earnings, consumption, and property ownership.

We estimate that providing access to work authorization to the currently undocumented population would boost their overall tax contribution by $40.2 billion per year, from $96.7 billion to $136.9 billion. As seen in Figure 5, $33.1 billion of that increase would occur through higher federal tax payments while the other $7.1 billion would occur through higher tax payments to states and localities. Disaggregation of the state and local figure by state is available in Figure 4 and Appendix Table 3.

Recipients of Deferred Action for Childhood Arrivals (DACA) already have access to work authorization and are therefore not included in these estimates of expanded access to work authorization, or in the other estimates contained in this report.



FIGURE 5

## Change in Tax Contributions by the Currently Undocumented Population if Legal Status is Granted

*The change in federal social insurance tax revenue includes both the employer and employee shares of levies that fund Social Security (+$17.3B), Medicare (+$4.4B), and the federal portion of Unemployment Insurance (+$0.1B). Changes in state and local taxes by tax type and state are disaggregated in Appendix Table 3.
Source: Institute on Taxation and Economic Policy

Institute on Taxation and Economic Policy | ITEP.org

# Conclusion

Undocumented immigrants pay substantial amounts toward the funding of public infrastructure, institutions, and services. Specifically, we find that in 2022, undocumented immigrants paid $96.7 billion in taxes at the federal, state, and local levels. More than a third of that amount, $33.9 billion, went toward funding social insurance programs that these individuals are barred from accessing because of their immigration status.

In total, the federal tax contribution of undocumented immigrants amounted to $59.4 billion in 2022 while the state and local tax contribution stood at $37.3 billion. These figures make clear that immigration policy choices have substantial implications for public revenue at all levels of government.

See Appendix A for detailed state-level estimates of the state and local portion of tax contributions made by undocumented immigrants.

See Appendix B for the methodology used to calculate the estimates contained in this report.

# Appendix A: State-Level Disaggregation of the State and Local Tax Contributions of Undocumented Immigrants

APPENDIX TABLE 1.

## State and Local Tax Contributions by the Undocumented Immigrant Population in 2022

*(Scroll right for more)*

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
|---|---|---|---|---|
| Alabama | $79,600,000 | $24,900,000 | $38,300,000 | $ |
| Alaska | $3,900,000 | $5,200,000 | $2,500,000 | $ |
| Arizona | $422,100,000 | $186,900,000 | $91,200,000 | $ |
| Arkansas | $119,700,000 | $35,300,000 | $31,000,000 | $ |
| California | $3,878,400,000 | $2,605,600,000 | $1,780,500,000 | $2( |
| Colorado | $184,700,000 | $142,700,000 | $104,300,000 | $ |
| Connecticut | $140,400,000 | $146,800,000 | $117,900,000 | $ |
| Delaware | $12,100,000 | $17,100,000 | $25,600,000 | $ |
| District of Columbia | $22,900,000 | $26,100,000 | $23,700,000 | |

000532

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
|---|---|---|---|---|
| Florida | $1,059,600,000 | $725,700,000 | $36,300,000 | $2 |
| Georgia | $435,700,000 | $239,600,000 | $245,900,000 | $ |
| Hawaii | $71,500,000 | $29,900,000 | $54,900,000 | $ |
| Idaho | $31,400,000 | $19,900,000 | $19,600,000 | $ |
| Illinois | $585,600,000 | $529,600,000 | $418,300,000 | $ |
| Indiana | $129,100,000 | $67,000,000 | $88,200,000 | $ |
| Iowa | $51,300,000 | $42,000,000 | $29,900,000 | $ |
| Kansas | $88,600,000 | $62,200,000 | $55,400,000 | $ |
| Kentucky | $54,800,000 | $24,100,000 | $39,000,000 | $ |
| Louisiana | $117,900,000 | $29,400,000 | $30,900,000 | $ |
| Maine | $4,900,000 | $6,000,000 | $4,400,000 | |
| Maryland | $261,500,000 | $196,400,000 | $314,700,000 | $ |
| Massachusetts | $160,700,000 | $209,600,000 | $274,400,000 | $ |
| Michigan | $113,900,000 | $80,300,000 | $94,400,000 | $ |
| Minnesota | $84,700,000 | $59,200,000 | $75,700,000 | $ |
| Mississippi | $29,900,000 | $13,600,000 | $6,100,000 | |
| Missouri | $52,800,000 | $32,100,000 | $28,000,000 | |
| Montana | $400,000 | $700,000 | $800,000 | |
| Nebraska | $47,700,000 | $41,000,000 | $23,100,000 | $ |
| Nevada | $271,900,000 | $138,600,000 | $77,300,000 | $ |
| New Hampshire | $4,000,000 | $15,900,000 | $3,000,000 | |
| New Jersey | $424,100,000 | $450,200,000 | $434,700,000 | $ |
| New Mexico | $102,700,000 | $38,100,000 | $3,700,000 | $ |
| New York | $919,500,000 | $1,021,700,000 | $1,154,700,000 | $ |

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
|---|---|---|---|---|
| North Carolina | $365,900,000 | $164,800,000 | $154,300,000 | |
| North Dakota | $7,700,000 | $3,200,000 | $1,000,000 | |
| Ohio | $114,100,000 | $69,200,000 | $78,400,000 | |
| Oklahoma | $122,600,000 | $49,100,000 | $51,300,000 | |
| Oregon | $65,400,000 | $101,300,000 | $181,800,000 | |
| Pennsylvania | $183,600,000 | $139,600,000 | $185,300,000 | $ |
| Rhode Island | $35,500,000 | $32,500,000 | $25,500,000 | |
| South Carolina | $99,100,000 | $68,700,000 | $41,000,000 | |
| South Dakota | $9,000,000 | $4,400,000 | $400,000 | |
| Tennessee | $233,200,000 | $63,900,000 | $10,800,000 | |
| Texas | $2,829,000,000 | $1,802,000,000 | $180,900,000 | $6 |
| Utah | $115,700,000 | $56,600,000 | $60,400,000 | |
| Vermont | $2,400,000 | $3,200,000 | $2,200,000 | |
| Virginia | $244,700,000 | $204,200,000 | $209,500,000 | $3 |
| Washington | $646,600,000 | $278,200,000 | $57,400,000 | $1 |
| West Virginia | $4,800,000 | $1,900,000 | $3,000,000 | |
| Wisconsin | $71,500,000 | $70,100,000 | $55,700,000 | |
| Wyoming | $6,900,000 | $5,300,000 | $2,500,000 | |
| **SUM ALL STATES**\*\* | **$15,125,300,000** | **$10,381,800,000** | **$7,029,700,000** | **$51** |
| **Payments to other states** | **N/A** | **N/A** | **N/A** | |
| **NATIONAL TOTAL\*\*\*** | **N/A** | **N/A** | **N/A** | |

*Includes state share of Unemployment Insurance (UI) taxes.
**Figures may not sum to totals due to rounding.
***National total differs from the all states sum because it includes taxes paid by residents of one state to state and local governments in other states.

*Source: Institute on Taxation and Economic Policy*

APPENDIX TABLE 2.

# Potential State and Local Tax Contributions by the Currently Undocumented Population if Legal Status is Granted

*(Scroll right for more)*

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
|---|---|---|---|---|
| Alabama | $85,500,000 | $26,700,000 | $64,300,000 | |
| Alaska | $4,000,000 | $5,800,000 | $3,700,000 | |
| Arizona | $454,500,000 | $202,400,000 | $152,500,000 | |
| Arkansas | $129,100,000 | $38,600,000 | $53,200,000 | |
| California | $4,136,800,000 | $2,820,300,000 | $3,136,500,000 | $. |
| Colorado | $196,500,000 | $155,100,000 | $181,000,000 | |
| Connecticut | $149,300,000 | $157,700,000 | $188,100,000 | |
| Delaware | $12,800,000 | $18,300,000 | $41,400,000 | |
| District of Columbia | $24,200,000 | $28,700,000 | $40,800,000 | |
| Florida | $1,143,200,000 | $780,100,000 | $50,700,000 | $ |
| Georgia | $467,200,000 | $260,300,000 | $421,200,000 | |
| Hawaii | $76,300,000 | $32,200,000 | $84,900,000 | |
| Idaho | $33,700,000 | $21,500,000 | $33,700,000 | |
| Illinois | $622,700,000 | $576,500,000 | $698,800,000 | $ |
| Indiana | $138,400,000 | $72,600,000 | $142,000,000 | |
| Iowa | $55,100,000 | $45,600,000 | $48,300,000 | |
| Kansas | $95,500,000 | $68,100,000 | $87,300,000 | |
| Kentucky | $58,900,000 | $25,700,000 | $66,100,000 | |
| Louisiana | $127,400,000 | $31,900,000 | $48,500,000 | |

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* |
|---|---|---|---|
| Maine | $5,300,000 | $6,600,000 | $7,600,000 |
| Maryland | $277,300,000 | $215,700,000 | $541,100,000 |
| Massachusetts | $170,600,000 | $230,900,000 | $440,100,000 |
| Michigan | $121,400,000 | $89,100,000 | $141,000,000 |
| Minnesota | $90,600,000 | $66,100,000 | $135,100,000 |
| Mississippi | $32,400,000 | $14,700,000 | $10,500,000 |
| Missouri | $56,700,000 | $34,700,000 | $46,900,000 |
| Montana | $400,000 | $800,000 | $1,200,000 |
| Nebraska | $51,400,000 | $44,400,000 | $39,100,000 |
| Nevada | $292,000,000 | $150,900,000 | $121,200,000 |
| New Hampshire | $4,200,000 | $17,400,000 | $4,100,000 |
| New Jersey | $450,700,000 | $498,000,000 | $691,500,000 |
| New Mexico | $110,900,000 | $40,900,000 | $12,100,000 |
| New York | $980,600,000 | $1,114,300,000 | $1,851,200,000 |
| North Carolina | $392,800,000 | $177,600,000 | $265,400,000 |
| North Dakota | $8,300,000 | $3,300,000 | $1,600,000 |
| Ohio | $122,200,000 | $75,400,000 | $130,800,000 |
| Oklahoma | $131,900,000 | $53,400,000 | $82,900,000 |
| Oregon | $68,500,000 | $109,300,000 | $304,900,000 |
| Pennsylvania | $195,200,000 | $150,500,000 | $305,800,000 |
| Rhode Island | $37,900,000 | $35,500,000 | $40,200,000 |
| South Carolina | $106,900,000 | $74,600,000 | $70,000,000 |
| South Dakota | $9,700,000 | $4,700,000 | $600,000 |
| Tennessee | $250,700,000 | $69,400,000 | $14,200,000 |

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
| --- | --- | --- | --- | --- |
| Texas | $3,043,900,000 | $1,959,100,000 | $276,300,000 | |
| Utah | $124,700,000 | $62,000,000 | $103,400,000 | |
| Vermont | $2,500,000 | $3,600,000 | $3,900,000 | |
| Virginia | $261,400,000 | $223,800,000 | $337,800,000 | |
| Washington | $691,300,000 | $302,400,000 | $89,400,000 | |
| West Virginia | $5,000,000 | $2,100,000 | $5,000,000 | |
| Wisconsin | $76,600,000 | $76,400,000 | $92,100,000 | |
| Wyoming | $7,300,000 | $5,800,000 | $3,800,000 | |
| **SUM ALL STATES**\*\* | **$16,192,000,000** | **$11,281,500,000** | **$11,713,500,000** | **$5** |
| **Payments to other states** | **N/A** | **N/A** | **N/A** | |
| **NATIONAL TOTAL**\*\*\* | **N/A** | **N/A** | **N/A** | |

*Includes state share of Unemployment Insurance (UI) taxes.*
**Figures may not sum to totals due to rounding.*
***National total differs from the all states sum because it includes taxes paid by residents of one state to state and local governments in other states.*

*Source: Institute on Taxation and Economic Policy*

APPENDIX TABLE 3.

# Change in State and Local Tax Contributions by the Currently Undocumented Population if Legal State is Granted

*(Scroll right for more)*

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | C T |
| --- | --- | --- | --- | --- |
| Alabama | $5,900,000 | $1,800,000 | $26,000,000 | $300 |

000537

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | C T |
|---|---|---|---|---|
| Alaska | $100,000 | $500,000 | $1,200,000 | $100 |
| Arizona | $32,400,000 | $15,500,000 | $61,200,000 | $300 |
| Arkansas | $9,400,000 | $3,200,000 | $22,200,000 | $200 |
| California | $258,400,000 | $214,600,000 | $1,356,000,000 | $15,500 |
| Colorado | $11,900,000 | $12,400,000 | $76,700,000 | $300 |
| Connecticut | $8,800,000 | $10,900,000 | $70,200,000 | $100 |
| Delaware | $700,000 | $1,200,000 | $15,800,000 | $200 |
| District of Columbia | $1,300,000 | $2,600,000 | $17,100,000 | $100 |
| Florida | $83,600,000 | $54,300,000 | $14,400,000 | $2,000 |
| Georgia | $31,500,000 | $20,700,000 | $175,300,000 | $600 |
| Hawaii | $4,800,000 | $2,300,000 | $30,000,000 | $100 |
| Idaho | $2,300,000 | $1,600,000 | $14,000,000 | $100 |
| Illinois | $37,200,000 | $46,900,000 | $280,500,000 | $1,500 |
| Indiana | $9,300,000 | $5,600,000 | $53,700,000 | $100 |
| Iowa | $3,700,000 | $3,600,000 | $18,300,000 | $100 |
| Kansas | $6,900,000 | $5,900,000 | $31,900,000 | $200 |
| Kentucky | $4,100,000 | $1,700,000 | $27,100,000 | $100 |
| Louisiana | $9,500,000 | $2,600,000 | $17,600,000 | $300 |
| Maine | $300,000 | $600,000 | $3,200,000 | |
| Maryland | $15,800,000 | $19,300,000 | $226,500,000 | $500 |
| Massachusetts | $9,900,000 | $21,300,000 | $165,700,000 | $400 |
| Michigan | $7,500,000 | $8,800,000 | $46,600,000 | $100 |
| Minnesota | $5,900,000 | $6,900,000 | $59,400,000 | $200 |
| Mississippi | $2,500,000 | $1,200,000 | $4,500,000 | |

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | ... T... |
|-------|------------------------|----------------|-------------------------------------|----------|
| Missouri | $3,900,000 | $2,600,000 | $19,000,000 | $100 |
| Montana | — | — | $500,000 | |
| Nebraska | $3,600,000 | $3,400,000 | $16,000,000 | $100 |
| Nevada | $20,100,000 | $12,300,000 | $43,900,000 | $1,800 |
| New Hampshire | $200,000 | $1,600,000 | $1,100,000 | |
| New Jersey | $26,600,000 | $47,800,000 | $256,700,000 | $1,400 |
| New Mexico | $8,200,000 | $2,800,000 | $8,400,000 | $900 |
| New York | $61,200,000 | $92,600,000 | $696,600,000 | $400 |
| North Carolina | $26,900,000 | $12,800,000 | $111,100,000 | $600 |
| North Dakota | $500,000 | $200,000 | $700,000 | $100 |
| Ohio | $8,100,000 | $6,200,000 | $52,400,000 | $300 |
| Oklahoma | $9,400,000 | $4,300,000 | $31,500,000 | $500 |
| Oregon | $3,100,000 | $8,000,000 | $123,100,000 | $400 |
| Pennsylvania | $11,600,000 | $10,900,000 | $120,500,000 | $900 |
| Rhode Island | $2,400,000 | $2,900,000 | $14,700,000 | $100 |
| South Carolina | $7,700,000 | $5,900,000 | $29,000,000 | $500 |
| South Dakota | $700,000 | $300,000 | $200,000 | |
| Tennessee | $17,500,000 | $5,500,000 | $3,400,000 | $600 |
| Texas | $214,900,000 | $157,000,000 | $95,400,000 | $6,600 |
| Utah | $8,900,000 | $5,300,000 | $43,000,000 | $200 |
| Vermont | $200,000 | $400,000 | $1,700,000 | |
| Virginia | $16,600,000 | $19,600,000 | $128,300,000 | $2,600 |
| Washington | $44,700,000 | $24,200,000 | $32,000,000 | $1,100 |
| West Virginia | $300,000 | $200,000 | $2,000,000 | $100 |

000539

| State | Sales and Excise Taxes | Property Taxes | Personal and Business Income Taxes* | |
|---|---|---|---|---|
| Wisconsin | $5,100,000 | $6,300,000 | $36,400,000 | $100 |
| Wyoming | $400,000 | $500,000 | $1,300,000 | $100 |
| **SUM ALL STATES**** | **$1,066,700,000** | **$899,800,000** | **$4,683,800,000** | **$42,900** |
| **Payments to other states** | **N/A** | **N/A** | **N/A** | |
| **NATIONAL TOTAL ***** | **N/A** | **N/A** | **N/A** | |

*Includes state share of Unemployment Insurance (UI) taxes.
**Figures may not sum to totals due to rounding.
***National total differs from the all states sum because it includes taxes paid by residents of one state to state and local governments in other states.

*Source: Institute on Taxation and Economic Policy*

---

APPENDIX TABLE 4.

# State and Local Effective Tax Rate Data for the Currently Undocumented Population, and Comparison to Each State's Top 1% of Taxpayers

| State | — Currently Undocumented Immigrants — | | Curren |
|---|---|---|---|
| | Current Tax Rate | Potential Tax Rate with Legal Status | Al |
| Alabama | 8.7% | 9.7% | |
| Alaska | 5.9% | 6.2% | |
| Arizona | 8.4% | 8.9% | |
| Arkansas | 9.0% | 9.8% | |
| California | 9.1% | 10.1% | |
| Colorado | 7.8% | 8.8% | |
| Connecticut | 9.5% | 10.6% | |

000540

— Currently Undocumented Immigrants —

| State | Current Tax Rate | Potential Tax Rate with Legal Status | Curren AI |
|---|---|---|---|
| Delaware | 6.8% | 8.1% | |
| District of Columbia | 9.5% | 11.1% | |
| Florida | 8.0% | 7.9% | |
| Georgia | 8.0% | 9.0% | |
| Hawaii | 11.8% | 13.3% | |
| Idaho | 7.2% | 8.2% | |
| Illinois | 10.3% | 11.6% | |
| Indiana | 8.5% | 9.6% | |
| Iowa | 9.6% | 10.6% | |
| Kansas | 9.7% | 10.7% | |
| Kentucky | 8.5% | 9.9% | |
| Louisiana | 9.9% | 10.5% | |
| Maine | 8.9% | 10.2% | |
| Maryland | 8.7% | 10.6% | |
| Massachusetts | 7.6% | 9.0% | |
| Michigan | 8.0% | 8.8% | |
| Minnesota | 7.8% | 9.4% | |
| Mississippi | 8.9% | 9.4% | |
| Missouri | 7.4% | 8.2% | |
| Montana | 6.9% | 8.0% | |
| Nebraska | 8.7% | 9.5% | |
| Nevada | 8.4% | 8.8% | |
| New Hampshire | 5.0% | 5.1% | |

## — Currently Undocumented Immigrants —

| State | Current Tax Rate | Potential Tax Rate with Legal Status | Curre... AI |
|---|---|---|---|
| New Jersey | 8.4% | 9.5% | |
| New Mexico | 9.3% | 9.5% | |
| New York | 10.6% | 12.3% | |
| North Carolina | 7.6% | 8.5% | |
| North Dakota | 6.9% | 6.9% | |
| Ohio | 8.2% | 9.4% | |
| Oklahoma | 8.9% | 9.8% | |
| Oregon | 9.0% | 11.3% | |
| Pennsylvania | 9.0% | 10.4% | |
| Rhode Island | 9.2% | 10.1% | |
| South Carolina | 7.7% | 8.4% | |
| South Dakota | 7.2% | 7.1% | |
| Tennessee | 8.4% | 8.3% | |
| Texas | 8.9% | 8.8% | |
| Utah | 8.3% | 9.4% | |
| Vermont | 7.7% | 9.0% | |
| Virginia | 7.9% | 9.0% | |
| Washington | 8.7% | 8.7% | |
| West Virginia | 8.9% | 10.0% | |
| Wisconsin | 8.0% | 9.0% | |
| Wyoming | 6.8% | 7.1% | |
| **SUM ALL STATES** | **8.9%** | **9.7%** | |
| **Payments to other states** | **1.1%** | **1.1%** | |

| | — Currently Undocumented Immigrants — | | |
|---|---|---|---|
| **State** | **Current Tax Rate** | **Potential Tax Rate with Legal Status** | **Curren** **Al** |
| **NATIONAL TOTAL**\*\* | **10.0%** | **10.8%** | |

**Number of States Where Undocumented Immigrants Pay Highe**

Undocumente

Undocumente

*Figures may not sum to totals due to rounding.*
**National total differs from the all states sum because it includes taxes paid by residents of one state to state and local governments in other states.*

*Source: Institute on Taxation and Economic Policy*

---

APPENDIX TABLE 5.

# Population and Income Data for the Undocumented Immigrant Population

| State | Population | Aggregate Income |
|---|---|---|
| Alabama | 61,000 | $1,684,000,000 |
| Alaska | 6,000 | $214,000,000 |
| Arizona | 263,000 | $8,343,000,000 |
| Arkansas | 64,000 | $2,081,000,000 |
| California | 2,434,000 | $92,803,000,000 |
| Colorado | 156,000 | $5,585,000,000 |
| Connecticut | 117,000 | $4,264,000,000 |
| Delaware | 28,000 | $843,000,000 |
| District of Columbia | 17,000 | $773,000,000 |
| Florida | 747,000 | $23,074,000,000 |
| Georgia | 364,000 | $11,677,000,000 |

| State | Population | Aggregate Income |
|---|---|---|
| Hawaii | 39,000 | $1,329,000,000 |
| Idaho | 30,000 | $1,001,000,000 |
| Illinois | 422,000 | $15,054,000,000 |
| Indiana | 105,000 | $3,353,000,000 |
| Iowa | 42,000 | $1,288,000,000 |
| Kansas | 75,000 | $2,157,000,000 |
| Kentucky | 51,000 | $1,400,000,000 |
| Louisiana | 64,000 | $1,823,000,000 |
| Maine | 5,000 | $176,000,000 |
| Maryland | 259,000 | $8,945,000,000 |
| Massachusetts | 198,000 | $8,545,000,000 |
| Michigan | 111,000 | $3,644,000,000 |
| Minnesota | 82,000 | $2,856,000,000 |
| Mississippi | 21,000 | $560,000,000 |
| Missouri | 57,000 | $1,543,000,000 |
| Montana | 1,000 | $28,000,000 |
| Nebraska | 42,000 | $1,307,000,000 |
| Nevada | 180,000 | $6,034,000,000 |
| New Hampshire | 13,000 | $467,000,000 |
| New Jersey | 428,000 | $15,837,000,000 |
| New Mexico | 61,000 | $1,661,000,000 |
| New York | 676,000 | $29,186,000,000 |
| North Carolina | 314,000 | $9,065,000,000 |
| North Dakota | 7,000 | $189,000,000 |
| Ohio | 104,000 | $3,225,000,000 |
| Oklahoma | 89,000 | $2,545,000,000 |

| State | Population | Aggregate Income |
|-------|-----------:|-----------------:|
| Oregon | 112,000 | $3,921,000,000 |
| Pennsylvania | 174,000 | $5,845,000,000 |
| Rhode Island | 29,000 | $1,037,000,000 |
| South Carolina | 97,000 | $2,784,000,000 |
| South Dakota | 8,000 | $199,000,000 |
| Tennessee | 134,000 | $3,744,000,000 |
| Texas | 1,863,000 | $54,978,000,000 |
| Utah | 92,000 | $2,825,000,000 |
| Vermont | 4,000 | $102,000,000 |
| Virginia | 274,000 | $8,703,000,000 |
| Washington | 276,000 | $11,445,000,000 |
| West Virginia | 4,000 | $117,000,000 |
| Wisconsin | 76,000 | $2,496,000,000 |
| Wyoming | 6,000 | $232,000,000 |
| **SUM ALL STATES** | **10,900,000** | **$373,000,000,000** |

*Source: Institute on Taxation and Economic Policy*

# Appendix B: Methodology

The methodology underlying this report involves three broad components. The first is construction of a data file containing income and other tax-relevant economic and demographic data for the undocumented population. The second is application of federal, state, and local tax parameters to the data in that file, with certain adjustments to reflect the ways in which undocumented immigrants interact with the tax code. The third component of the work is to adjust both the underlying economic data and the applicable tax parameters to reflect the likely impact that granting legal status would have on the economic profile and tax contributions of currently undocumented immigrants.

Each of these three steps is described below, followed by a discussion of how the methodology underlying this report differs from ITEP's most recent prior study of this issue (Gee et al. 2017).

# Construction of the Undocumented Immigrant Data File

The analysis begins with our estimates of the economic profile of undocumented immigrants in each state, which is based on our analysis of the U.S. Census Bureau's American Community Survey (ACS) PUMS 2018-2022 5-year extract. It is a variation on the residual method employed by the Department of Homeland Security (Baker 2021) and of similar methods employed by other researchers (Passel and Cohn 2018; Van Hook et al. 2023; Warren 2024).

The method utilizes demographic, employment, and other social and economic characteristics to make a series of 'logical edits' to the entire population of the United States that leaves us with a pool of individuals who are very likely undocumented. The logical edits we employed take place over several iterations, which are listed below.

**Round 1**: Identify the entire pool of potential non-citizen residents of the United States as a starting point for the analysis. This includes anyone who:

- Is part of the civilian noninstitutionalized population.

- Arrived in the U.S. after 1980.

- Reported their citizenship status as 'Not a citizen of the U.S.,' report being recently naturalized (within the last 3 years for spouses of U.S citizens and within 6 years for all other reported naturalized citizens), or report being a naturalized citizen whose country of origin is Mexico.[13]

- Listed their country of birth as Cuba and their date of entry to the U.S. as after 2017, before which all Cuban immigrants are assumed to have taken advantage of the Cuban Adjustment Act.

**Round 2**: Disqualify people within this universe who likely have lawful permanent residence or temporary authorization to reside in the United States. For some categories of immigration status, these determinations are based on eligibility and then matched to

administrative totals, such as those provided in Baker and Miller (2022). This includes anyone who:

- Is a likely recipient of Deferred Action for Childhood Arrivals (DACA), based on age, year of entry into the United States, and occupational information.

- Works in an industry with extensive licensing requirements or strict citizenship requirements, such as the medical field, the legal field, the U.S. government, or the military.

- Likely has a category of work authorization based on a combination of educational attainment and occupations related to highly skilled, religious, or diplomatic work.

- Is a foreign student.

- Is a foreign spouse of a U.S. citizen or a likely visa-holder.

- May be a refugee based on country of birth, year of entry, and DHS-reported refugee arrivals.

- Comes from a country designated by DHS for having Temporary Protected Status.

**Round 3**: Disqualify people within this universe who receive public assistance for which undocumented individuals are ineligible.

We then adjust for undercounting of the undocumented population in the ACS. It is well established that the foreign-born population is consistently undercounted compared to the native-born population. We adjust for an expected undercount of 13 percent for those immigrants who arrived in the most recent year, with that rate declining by 7.5 percent in each prior year of arrival, in line with Baker (2021). We also make an additional adjustment, based on the work of Warren (2024), to account for more severe undercounting of immigrants from El Salvador, Guatemala, and Honduras in 2020, 2021, and 2022. The final step in our calculation is a slight adjustment to bring our population total in line with the 2022 population count of 10.9 million found in Warren (2024), which builds on the work of Warren and Warren (2013). The result is a 2022-level population total, with detailed economic and demographic information supplied by the larger sample size available in the 5-year, 2018-2022 ACS data.

000547

After identifying undocumented individuals, it is necessary to group those individuals into tax units—which are persons or groups of people who file one tax return or, for nonfilers, who would file one tax return if they were to file. Tax units are the standard unit of analysis in ITEP's research and in the research of most other organizations that engage in tax modeling (see, for example, JCT 2023 and Gillette et al. 2023). The ACS household is a conceptually different unit of analysis from a tax unit. Tax units can either be smaller or larger than the Census definition of households, though on average they are smaller because the latter can include roommates or multigenerational families that file more than one tax return. ITEP translates ACS households into tax units using an algorithm similar to those described in Cilke (1994) and Rohaly et al. (2005). ITEP uses information about individual relationships, ages, marital status, and incomes to determine dependents, heads of households, spouses, and filing statuses. We then group these people into tax units.

This methodology produces detailed information on tax units in the ACS with undocumented individuals and their economic profiles. For our tax modeling, the most important component of that economic profile is income level, which is taken from the ACS with certain adjustments to account for consistent underreporting of income (particularly self-employment income) in Census surveys, as discussed in Hurst et al. (2014) and Rothbaum (2015). We compute income for undocumented immigrants within seven income groups in each state: the bottom four quintiles as well as the next 15 percent, next 4 percent, and top 1 percent of tax units overall. We use this information to compute the tax contributions of undocumented immigrants across all tax types using the approaches described below.

## Application of Tax Parameters to the Data File

The method used in this analysis involves applying modified versions of effective tax rates obtained from three sources: the seventh edition of ITEP's Who Pays? report, which measures the impact of state and local taxes on families at every income level (ITEP 2024), a subsequent report examining federal tax impacts by income level (Wamhoff 2024), and custom runs of the ITEP Microsimulation Tax Model completed for this study. Those tax rates are applied to the undocumented immigrant data file with adjustments as described below that reflect economic, demographic, behavioral, and statutory factors

000548

that impact the tax contributions of undocumented immigrants. In most cases, we use tax rates calculated for the non-senior population as the starting point of our analysis because 97 percent of the undocumented population is below the age of 65 and retirement income makes up an extremely small share (less than 1 percent) of the total income flowing to undocumented immigrants.

### Individual income and payroll taxes

This analysis of the individual income and payroll tax contributions of undocumented immigrants relies in part on our estimates of the distribution of income, by source, among those immigrants. After calculating the income received by undocumented immigrants within each income band, we apply modified versions of our population-wide effective income tax rates to each of those bands.

The first step in modifying those tax rates is to remove the federal Earned Income Tax Credit (EITC) and most state EITCs from the tax rates facing undocumented immigrants. This is necessary because the federal government and most states prohibit filers who do not have a valid SSN from claiming the EITC.

We also scale back the amount of federal Child Tax Credit (CTC) claimed by undocumented families to reflect a provision of federal law that limits eligibility based on the citizenship status of otherwise qualifying children. State CTCs are also scaled back in the small number of states that mirror this provision in their own laws. The CTC adjustment is done by identifying the share of children in undocumented tax units who we expect are ineligible for state CTCs based on citizenship status, and then scaling down potential CTC claims by that share.

These refinements to the EITC and CTC provide us with a series of effective income tax rates, by income level, that better reflect the income tax laws that apply to undocumented immigrants.

The next step in the calculation requires an adjustment to account for the administrative factors confronting undocumented immigrants as they navigate federal, state, and local tax systems. Those factors can yield either higher, or lower, tax contributions by undocumented individuals than would be the case among similarly situated U.S. citizens.

000549

It is widely understood that undocumented immigrants exhibit a lower income tax compliance rate than other households, though perhaps not as low as is commonly thought. The literature on this subject has coalesced around a compliance rate in the range of 50 to 75 percent (CBO 2007). Past ITEP studies, for instance, have adopted a 50 percent assumption in the interest of conservative estimation (Gee et al. 2017). The few studies that have attempted formal measurement of the compliance rate, however, generally suggest a rate significantly above the 50 percent level.

For example, a survey of more than 700 undocumented immigrants from Mexico by Cornelius and Lewis (2006) found that 75 percent paid federal income taxes via withholding, filing an income tax return, or both. This finding aligns closely with earlier work by North and Houstoun (1976) which, in a survey of nearly 800 undocumented immigrants, found that 73 percent paid federal income tax via withholding.

But the income tax compliance rate does not provide a full picture of the tax contributions of undocumented immigrants. In the literature on this subject, the income tax compliance rate typically refers only to the share of undocumented immigrants who pay income tax through withholding or filing returns. For purposes of revenue estimation, however, it is necessary to look not at the share of tax units who pay, but rather at the share of taxes paid relative to the share of taxes owed. We will refer to this share as the "contribution rate."

The overall compliance rate differs from the overall contribution rate because some undocumented individuals pay more income tax than they owe. North and Houstoun (1976), for example, found that while 73 percent of undocumented immigrants paid federal income tax via withholding, just 32 percent of undocumented immigrants filed an income tax return. While the tax filing process has changed significantly for undocumented immigrants since the 1970s, it is clear that a significant number of undocumented immigrants still pay through withholding without filing returns. Because most taxpayers see more tax withheld from their paychecks than they owe and receive a refund upon filing, this suggests that a meaningful number of undocumented immigrants are overpaying federal, state, and local income taxes.

000550

This phenomenon is widespread and has been the subject of some study. The Comptroller of Maryland, for instance, uses the term "unallocated withholding" to refer to tax withholding from individuals who do not file income tax returns (Comptroller of Maryland 2021). Using confidential data from information returns, one study conducted by an official at the Congressional Joint Committee on Taxation found that, at the federal level, 2.7 million people had $7.1 billion in federal income withheld from the paychecks in 2011 and yet failed to file a return despite having incomes above the filing threshold (Cilke 2014). Another study conducted for the IRS Statistics of Income Division estimated that nonfilers failed to claim $3.8 billion in refunds of their withholding in 2005, even before considering the impact of the EITC and CTC (Lawrence et al. 2011). While there are a variety of reasons that a person might choose not to file a return, there is no doubt that a meaningful number of undocumented immigrants are among this group of income tax over-payers.

With this research in mind, we target a 60 percent contribution rate for the undocumented population under the federal individual income tax—a value slightly below the midpoint of the 50 to 75 percent range described earlier. To be clear, the 60 percent contribution rate used in this study implies an income tax compliance rate somewhat below 60 percent because some undocumented immigrants who comply with the tax law pay more income tax than they owe (a fact that bolsters the contribution rate without impacting the compliance rate). Available data do not allow us to translate our contribution rate into a compliance rate and, indeed, such a translation is not needed for the calculations underlying the estimates presented in this report. A sensitivity analysis examining alternative contribution rates of 50 and 75 percent is provided later in this methodology.

The first step in achieving our 60 percent contribution rate target is to derive contribution rates, by income source, for the broader U.S. population. U.S. citizens, much like their undocumented immigrant neighbors, do not exhibit perfect compliance with federal tax law. The IRS estimates that the overall net contribution rate for all federal taxes was 86 percent in 2021 (Krause 2023). For the individual income tax, the net contribution rate is likely closer to 82 percent. These rates vary significantly across individuals based largely on the forms of income they receive. Taxes owed are more likely to be paid on sources of income with robust third-party reporting requirements,

such as salaries and wages (Johns and Slemrod 2010; Krause et al. 2023). Our analysis suggests that the average U.S. resident with an income profile in line with that seen in the undocumented population exhibits a contribution rate of 92 percent. This is above the population-wide rate of 82 percent mentioned above because undocumented immigrants receive an unusually large share of their income from salaries and wages.

With contribution rates for the overall U.S. population in hand, we then devise a second set of contribution rates specifically for the undocumented population that allow us to achieve our 60 percent target for the contribution rate under the federal individual income tax. The fact that these contribution rates are constructed separately for each kind of income has the advantage of allowing us to employ different contribution rates to different tax bases. Unemployment insurance taxes, for example, exhibit somewhat higher contribution rates than Social Security and Medicare taxes because the former apply only to wages while the latter include self-employment income that is more likely to go unreported.

Both the employer and employee share of payroll taxes are included in this analysis as there is broad consensus among tax modelers that these taxes are ultimately borne by the employee (Department of the Treasury 2021; CBO 2023). This approach is consistent with our approach to other forms of indirect taxation. For example, motor fuel taxes (discussed below) are remitted by a small number of fuel suppliers, but the final incidence of these taxes is widely understood to fall on fuel consumers and their impact is therefore presented as such.

### Sales, excise, and most other consumption taxes

Taxes on purchases made by undocumented immigrants make up the largest share of their state and local tax contributions. These payments are made both through general sales taxes, which apply to a wide range of purchases, as well as through selective taxes levied on narrow categories of goods and services such as alcohol, tobacco, motor fuel, and utilities. These taxes on spending are often referred to as consumption taxes. While the federal government does not levy a broad consumption tax, it does tax certain narrow categories of purchases such as alcohol, tobacco, and motor fuel.

000552

ITEP's consumption tax model is described in the methodology section of our most recent Who Pays? report (ITEP 2024). The primary data source underlying the model is the Bureau of Labor Statistics' Consumer Expenditure Survey (CEX), though it is supplemented with data from a variety of other sources. Crucially, the model provides estimates not just the sales and excise taxes paid directly by individuals on their own purchases, but also the sizeable amount of consumption taxes that are paid by businesses on their inputs (Phillips and Ibaid 2019). These taxes are ultimately borne by those businesses' consumers, workers, and owners—and a portion of those tax payments therefore come from undocumented immigrants.

The ITEP model produces effective tax rates for all consumption tax types, by income level, which provide a key input to our analysis. This analysis assumes that undocumented immigrants' spending habits are broadly similar to those of U.S. citizens with similar levels of income, with a few exceptions outlined below that reduce the amount of sales and excise tax paid.

We assign 15 percent of income earned by undocumented immigrants to remittances to family members living in other nations. That income is considered unavailable for taxable consumption. The body of research into remittances made by immigrants living in the United States has produced a wide range of estimates depending on the methods used and the populations being studied. Yang (2015) summarizes several studies that find remittances as a share of earnings for various migrant populations in the U.S. as low as 1.4 percent of earnings and as high as 37.7 percent of earnings. Our 15 percent estimate is well within this range and is calibrated to match the United Nations' 2019 estimate of the share of migrant earnings devoted to remittances worldwide.

To calculate the amount of sales, excise, and other consumption taxes paid by undocumented immigrants, we apply a modified version of the effective consumption tax rates calculated in ITEP (2024) and Wamhoff (2024) to the portion of income earned by undocumented immigrants that is not devoted to remittances. This calculation is performed separately for each of our seven income groupings. A sensitivity analysis examining alternative remittance values of 10 and 20 percent is provided later in this methodology.

**Consumption taxes on tobacco**

000553

Our federal, state, and local tobacco tax estimates account for the below-average smoking rates observed among immigrants to the U.S. as demonstrated in Bosdriesz et al. (2013) and Azagba et al. (2019). In most states, tobacco is subject to higher effective tax rates than other types of purchases and thus it is important that we avoid overstating the amount of undocumented immigrant spending occurring in this high-tax category. The overall tax rate charged on tobacco is also bolstered with federal excise taxes. Our calculations apply tobacco usage rates among the undocumented population at one half the rate seen among the broader U.S. population.

### Vehicle-related taxes

Our analysis of the ACS finds that undocumented immigrants are less likely to own vehicles than other individuals living in the U.S. Other researchers have observed this as well (Cho 2022). The significance of this finding to tax revenue measurement, however, is not entirely clear. While there is little doubt that undocumented immigrants are spending less than average on vehicle-related expenses, the tax impact of that depends on whether foregone spending in that category is instead directed toward taxable spending in another category, or toward a nontaxable purpose such as spending in an exempt category (e.g., public transportation fares) or an increase in personal savings. We err on the side of slightly underestimating the tax contributions of undocumented immigrants by assuming the latter.

More specifically, we reduce sales and excise tax contributions made through taxation of vehicle purchases, repairs, insurance, and motor fuel using ratios that reflect the lower number of vehicles owned by tax units with at least one undocumented individual. We also perform this adjustment for vehicle property taxes and registration charges, and for driver's license charges in states that allow undocumented immigrants to obtain such licenses. These license charges are set to zero in states that prohibit undocumented immigrants from obtaining driver's licenses (NCSL 2023).

### Residential property taxes

Residential property taxes paid directly by undocumented homeowners and indirectly by undocumented renters make up the second largest component of this group's state and local tax contribution, after sales and excise taxes on their purchases.

Our analysis of ACS data indicates that undocumented individuals are less likely to own their homes than other U.S. residents. Other researchers have made similar findings (Gelatt and Zong 2018).

After controlling for income level, our review of the ACS data did not uncover consistent, meaningful differences between the average property tax bill paid by undocumented homeowners and the average bill facing other homeowners. We therefore assign undocumented homeowners within each of our seven income groups the same effective property tax rate as all homeowners within that income group.

We then perform a similar calculation for the portion of the undocumented population that does not own homes. Renters are widely understood to pay at least a portion of the property tax levied on their homes as landlords pass along the cost of property taxes in the form of higher rents. We assume in each state that half of the tax is borne by the renter while the other half is borne by the landlord. We are aware of studies finding pass-through percentages both higher and lower than this amount but have concluded that this is roughly the midpoint estimate of the best available literature and, in particular, it is close in line with the estimates produced by Orr (1970), Hyman and Pasour (1973), and Black (1974).

### Other included taxes

A wide array of federal, state, and local taxes is included in this study. Our approach to the bulk of those taxes is outlined above. Most other tax types, such as business property taxes, corporate income taxes, and severance taxes are indirect taxes that are formally imposed on business entities but are ultimately borne by people: specifically, by business owners in the form of a reduction in the return on their investments, by employees in the form of lower compensation, or by consumers in the form of higher prices. The parties who ultimately pay different types of indirect taxes vary based on the design of the tax and the nature of the industry being taxed (ITEP 2024).

For the labor share of these indirect taxes, we apply effective tax rates to undocumented immigrants within each income group consistent with the rates paid by the broader population of tax units within that group. For the consumer share, we apply reduced effective tax rates within each group that reflect the lower consumption level occurring

000555

due to remittances. For the capital share of these taxes, we reduce the effective tax rate faced by undocumented immigrants to reflect the fact that these immigrants exhibit lower levels of capital ownership than other U.S. residents at the same income level. Specifically, we scale down the capital tax rates by 60 percent based on our analysis of the ratios of capital income to total income in the undocumented population and the broader U.S. population. This adjustment, combined with the fact that undocumented immigrants are disproportionately found in the lower income groups where capital taxes tend to have little impact, means that taxes shifted to labor and consumption have a comparatively larger impact than taxes borne by owners of capital.

### Omitted revenue sources

This analysis does not attempt to calculate tax payments made by undocumented immigrants through the federal Net Investment Income Tax, federal excise taxes on airfare, or estate and inheritance taxes levied at all levels of government. While it is clear that undocumented immigrants pay a non-zero amount of at least some of these levies, available data do not allow for reliable estimates and the revenue raised is likely to be low.

The analysis omits a wide array of non-tax revenues paid by undocumented immigrants such as public transportation fares, public parking fees, toll road charges, and college tuition. Including these non-tax revenue contributions would reveal undocumented immigrants to have even greater significance to federal, state, and local revenue streams than is found in this report.

### Taxes paid to other states

The bulk of the state and local results reported in this study show the distribution of state and local taxes paid by undocumented immigrants to the states in which they live. This analysis allows lawmakers to understand how undocumented immigrants who live in their states are contributing toward funding the infrastructure, institutions, and services that their states provide.

Some state and local taxes, however, are "exported" to residents of other states. This happens through a variety of channels, such as when a person travels to another state and makes a taxable purchase or, more often, when a business pays a tax and its ultimate incidence is on consumers or firm owners located in another state. From a national perspective, it is worth examining these taxes as well to better understand the full state and local tax contribution made by undocumented immigrants.

We measure undocumented immigrants' payment of exported taxes using the same kinds of adjustments applied to the measurement of in-state tax contributions, with an added downward adjustment of 50 percent to the direct portion of sales and excise taxes paid by visitors to other states. This adjustment is meant to reflect the fact that lower vehicle ownership, lower access to drivers' licenses, and fear of deportation likely combine to lessen the amount of travel to other states undertaken by undocumented immigrants.

## Sensitivity Analysis for Calculation of Current Tax Contributions

The results presented in this study are relatively insensitive to alternative assumptions regarding the income tax contribution rate (which affects income and payroll tax collections) and the remittance value (which affects consumption tax collections by lowering disposable income).

000557

FIGURE 6

# Sensitivity Analysis for Key Parameters

**Revenue Amounts**

| | | Income Tax Contribution Rate | | |
|---|---|---|---|---|
| | | 50% | 60% (Base Case) | 75% |
| Remittance Value | 20% | 86,421,000,000 | 95,938,000,000 | 110,168,000,000 |
| | 15% (Base Case) | 87,205,000,000 | 96,721,000,000 | 110,952,000,000 |
| | 10% | 87,958,000,000 | 97,474,000,000 | 111,705,000,000 |

**Percent Difference from Base Case**

| | | Income Tax Contribution Rate | | |
|---|---|---|---|---|
| | | 50% | 60% (Base Case) | 75% |
| Remittance Value | 20% | -10.6% | -0.8% | +13.9% |
| | 15% (Base Case) | -9.8% | — | +14.7% |
| | 10% | -9.1% | +0.8% | +15.5% |

Source: Institute on Taxation and Economic Policy

Institute on Taxation and Economic Policy | ITEP.org

The base case presented in this study employs a 60 percent income tax contribution rate and 15 percent remittance value and yields a tax revenue estimate of $96.7 billion.

Under a more pessimistic set of alternative assumptions, with a 50 percent contribution rate (a value that we expect is likely too low) and a 20 percent remittance value (which we expect is likely too high), we instead see a revenue yield of $86.4 billion in 2022, or 10.6 percent less than in the base case.

On the other hand, if we apply a higher income tax contribution rate at 75 percent, and a lower remittance value at 20 percent, the resultant revenue figure is $111.7 billion, or 15.5 percent more than in the base case.

Figure 6 provides all nine pairs of possible assumptions for these two values.

## Data and Tax Parameter Adjustments Used to Calculate Tax Contributions if Legal Status is Granted

This analysis examines both the current tax contribution of undocumented immigrants and this group's likely tax contribution if it is granted legal status broadly as part of a comprehensive immigration reform. We modify four indicators in performing the latter calculation: earnings level, personal income tax compliance, eligibility for state Earned Income Tax Credits (EITC), and eligibility for Child Tax Credits (CTC).

**Earnings boost**: This study accounts for the fact that having the authority to work legally in the United States would increase undocumented immigrants' wages and thus increase the taxes paid by those immigrants. A literature review by the Fiscal Policy Institute documented that legal immigrants are consistently found to have higher wages than undocumented immigrants and that gaining legal status is likely to boost the wages of affected workers by 6 to 15 percent (FPI 2013). A Congressional Budget Office report on the economic impact of immigration reform estimated the eventual wage boost to be 12 percent (CBO 2013).

This study applies a conservative estimate of a 10 percent wage increase from granting legal status to all undocumented immigrants. An increase in income would directly result in higher income tax payments from the currently undocumented population, and it would bring higher sales and property tax payments on the portion of that income directed toward consumption and housing.

In the face of uncertainty regarding the degree to which legal status would raise homeownership and vehicle ownership rates in the currently undocumented population, we do not apply any adjustments to these rates in calculating the additional tax contribution that would occur if legal status is granted. This suggests that our revenue figure in the full legal status scenario is likely to underestimate the increased tax contributions.

000559

**Personal income tax compliance** As explained above, our calculations apply an income tax contribution rate of 60 percent among undocumented immigrants. To calculate the anticipated income tax revenue gain from allowing undocumented immigrants to work in the U.S. legally, this analysis assumes that legal status would cause the formerly undocumented population to exhibit a state income tax compliance rate of 92 percent, a level on par with the contribution rate seen among people with an income profile that matches the one seen in the undocumented population.

**Earned Income Tax Credit (EITC) eligibility** All members of a tax unit must have valid SSNs to receive the federal EITC and most state EITCs. This analysis assumes that undocumented immigrants do not claim state EITCs under current law in states where ITIN filers are disallowed from doing so, as documented in Davis and Butkus (2023a). The analysis also assumes that, under a scenario where legal status is granted, currently undocumented immigrants who otherwise meet the EITC eligibility requirements will begin to claim state EITCs for which they become eligible at the same rate observed in the rest of the population. That rate varies by state but, nationally, tends to hover between 75 and 80 percent (IRS 2024).

**Child Tax Credit (CTC) eligibility** Most state CTCs are available to income tax filers broadly, without restrictions based on citizenship or immigration status. As documented in Davis and Butkus (2023b), however, some states with CTCs have rules mirroring the federal provision restricting CTC eligibility to children with valid SSNs. In these states, the calculations underlying this analysis only allow for a CTC for tax units with qualifying children. Granting these children legal status could therefore expand CTC claims in some states, which is reflected in this analysis.

## Comparison to ITEP's Prior Estimates of the State and Local Tax Contributions of Undocumented Immigrants

This report represents the first time that ITEP has quantified the federal tax contributions of undocumented immigrants. It is also the first time ITEP has measured the tax contributions that undocumented immigrants living in one state make (directly or indirectly) to the governments of other states. Prior ITEP research, however, has quantified the state and local tax contributions of undocumented immigrants to the

000560

states in which they reside (Gee et al. 2017). A brief discussion of the method and conclusions of ITEP's prior research, relative to the comparable portions of this study, is provided below.

The analysis presented in this report finds that undocumented immigrants pay significantly more state and local taxes to their home states ($33.1 billion) than reported in ITEP's prior research ($11.7 billion). The most important driver of this finding is an increase in our estimate of the amount of income earned by undocumented immigrants. Part of that increase is a result of wage growth that took place between 2014 (the base year of the previous study) and 2022 (the base year of this study). That wage growth is in large part a reflection of changes in the broader economy that increased wages for most workers in recent years. For undocumented immigrants specifically, wage growth may be bolstered further by the fact that the typical undocumented immigrant has deeper roots in the U.S. than was the case in 2014, as the median duration of U.S. residence among this population has increased during this time (Passel and Cohn 2019). In addition, we have also improved the technique, described above, that we use to estimate the amount of income earned by undocumented immigrants. Our new method is better suited to estimating the amount of income flowing to middle- and upper-income undocumented immigrants—income which we expect was understated in our prior estimates.

The analysis in this report also incorporates several changes to the calculations of tax amounts paid by undocumented immigrants. For instance, the tax calculations in this edition include tax policies enacted through the end of 2023, whereas the 2017 edition included changes enacted through 2014. This edition also includes estimates for some additional taxes—such as unemployment insurance taxes, motor vehicle property taxes, and taxes on business income and property—that were excluded from the 2017 edition. This edition uses a somewhat higher estimate for personal income tax compliance and somewhat lower estimate for sales and excise tax payments relative to income than the previous edition. The sales and excise tax change is the result of an upward revision in the amount of remittances sent to family members living in other countries.

Taken together, these improvements to our tax calculations have led to a modest increase in our estimate of the effective state and local tax rate facing undocumented immigrants. While our 2017 report found that undocumented immigrants paid an

average rate of 8.0 percent to their home states, the comparable figure from this report is 8.9 percent.

## Appendix B References

Azagba, Sunday, Lingpeng Shan, and Keely Latham (2019). "Assessing Trends and Healthy Migrant Paradox in Cigarette Smoking among US Immigrant Adults." Prev. Med. (129): 105830.

Baker, Bryan (2021). "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015-January 2018." U.S. Department of Homeland Security, Office of Immigration Statistics: Population Estimates.

Baker, Bryan and Sarah Miller (2022). "Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2022." U.S. Department of Homeland Security, Office of Immigration Statistics: Population Estimates.

Black, David E. (1974). "The Incidence of Differential Property Taxes on Urban Housing: Some Further Evidence." National Tax Journal 27 (2), 367-369.

Bosdriesz, Jizzo R., Nienke Lichthart, Margot I. Witvliet, Wim B. Busschers, Karien Stronks, and Anton E. Kunst (2013). "Smoking Prevalence among Migrants in the US Compared to the US-Born and the Population in Countries of Origin." PLoS One 8 (3): e58654.

Brown, J. David, Misty L. Heggeness, Suzanne M. Dorinski, Lawrence Warren, and Moises Yi (2019). "Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census." U.S. Census Bureau, Center for Economic Studies, Research Paper CES 18-38R.

CBO (2007). "The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments." Congressional Budget Office Pub. No. 2500. Washington, DC.

CBO (2013). "Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act." Congressional Budget Office. Washington, DC.

CBO (2023). "The Distribution of Household Income in 2020." Congressional Budget Office Pub. No. 59509. Washington, DC.

Cho, Heepyung (2022). "Driver's license reforms and job accessibility among undocumented immigrants." Labour Economics 76 (C).

Cilke, James (1994). "The Treasury Individual Income Tax Simulation Model." U.S. Department of the Treasury, Office of Tax Analysis.

Cilke, James (2014). "The Case of the Missing Strangers: What we Know and Don't Know About Non-Filers." Proceedings of the 107th Annual Conference of the National Tax Association in Santa Fe, NM.

Comptroller of Maryland (2021). "Tax Incidence Report: Tax Year 2017." Comptroller of Maryland, Bureau of Revenue Estimates. Annapolis, MD.

Cornelius, Wayne A. and Jessica M. Lewis, eds. (2006). Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities. Boulder, Col., Lynne Rienner Publishers and Center for Comparative Immigration Studies, UCSD.

Davis, Aidan and Neva Butkus (2023a). "Boosting Incomes, Improving Equity: State Earned Income Tax Credits in 2023." Institute on Taxation and Economic Policy.

Davis, Aidan and Neva Butkus (2023b). "States are Boosting Economic Security with Child Tax Credits in 2023." Institute on Taxation and Economic Policy. Department of the Treasury (2021). "Treasury's Distribution Methodology and Results." U.S. Department of the Treasury, Office of Tax Analysis.

FPI (2013). "Three Ways Immigration Reform Would Make the Economy More Productive." Fiscal Policy Institute.

000563

Gelatt, Julia and Jie Zong (2018). "Settling In: A Profile of the Unauthorized Immigrant Population in the United States." Migration Policy Institute.

Gee, Lisa Christensen, Matthew Gardner, Misha E. Hill, and Meg Wiehe (2017). "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy.

Gillette, Robert, Siva Anantham, Will Boning, Michael Cooper, Rachel Costello, Julie-Anne Cronin, Portia DeFilippes, John Eiler, Geoff Gee, Kye Lippold, Ithai Lurie, and Ankur Patel (2023). "U.S. Treasury Individual Income Tax Model." U.S. Department of the Treasury, Office of Tax Analysis Technical Paper 12.

Gross, Stephen, Alice Wade, J. Patrick Skirvin, Michael Morris, K. Mark Bye, and Danielle Huston (2013). "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds." Social Security Administration: Office of the Chief Actuary, Baltimore, Maryland. Actuarial Note No. 151.

Hurst, Erik, Geng Li, and Benjamin Pugsley (2014). "Are Household Surveys Like Tax Forms: Evidence from Income Underreporting of the Self-Employed." The Review of Economic Statistics 96 (1), 19-33.
Hyman, David N., and Ernest C. Pasour, Jr. (1973). "Property Tax Differentials and Residential Rents in North Carolina." National Tax Journal 26 (2), 303-307.

ITEP (2024). "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States. Seventh Edition." Institute on Taxation and Economic Policy.

IRS (2024). "EITC Participation Rate by States Tax Years 2013 through 2020." Internal Revenue Service. Accessed June 2024.

Krause et al. (2023). "Federal Tax Compliance Research: Tax Gap Projections for Tax Years 2020 and 2021." Internal Revenue Service Publication 5869 (Rev. 10-2023).

JCT (2023). "Estimating Changes in the Federal Individual Income Tax: A Description of the Individual Tax Model for 2023." Joint Committee on Taxation, JCX-48-23.

000564

Johns, Andrew and Joel Slemrod (2010). "The Distribution of Income Tax Noncompliance." National Tax Journal 63 (3), 397-418.

Lawrence, Joshua, Michael Udell, and Tiffany Young (2011). "The Income Tax Position of Persons Not Filing Returns for Tax Year 2005." Select Paper Given at the 2011 IRS-TPC Research Conference: New Perspectives on Tax Administration in Washington, DC.

NCSL (2023). "States Offering Driver's Licenses to Immigrants." National Conference of State Legislatures, Brief.

North, David S. and Marion F. Houstoun (1976). "The Characteristics and Role of Illegal Aliens in the U.S. Labor Market: An Exploratory Study." Linton and Co., Washington, D.C.

Orr, Larry L. (1970). "The Incidence of Differential Property Taxes: A Response." National Tax Journal 23 (1), 99-101.

Passel, Jeffrey S., Rebecca L. Clark, and Michael Fix (1997). "Naturalization and Other Current Issues in U.S. Immigration: Intersections of Data and Policy." Proceedings of the Social Statistics Section of the American Statistical Association in Alexandria, VA.

Passel, Jeffrey S. and D'Vera Cohn (2018). "U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade." Pew Research Center.

Passel, Jeffrey S. and D'Vera Cohn (2019). "Mexicans decline to less than half the U.S. unauthorized immigrant population for the first time." Pew Research Center.

Phillips Andrew, and Muath Ibaid (2019). "The impact of imposing sales taxes on business inputs." Ernst & Young LLP.

Rohaly, Jeffrey, Adam Carasso, and Mohammed Adeel Saleem (2005). "The Urban-Brookings Tax Policy Center Microsimulation Model: Documentation and Methodology for Version 0304." Urban-Brookings Tax Policy Center.

000565

Rothbaum, Jonathan L. (2015). "Comparing Income Aggregates: How do the CPS and ACS Match the National Income and Product Accounts, 2007-2012." U.S. Census Bureau SEHSD Working Paper 2015-01.

United Nations (2019). "Remittances matter: 8 facts you don't know about the money migrants send back home." UN News: Global perspective on Human stories. Accessed April 30, 2024.

Van Hook, Jennifer and James D. Bachmeier (2013). "How Well Does the American Community Survey Count Naturalized Citizens?." Demographic Research 29 (1), 1-32.

Van Hook, Jennifer, Julia Gelatt, and Ariel G. Ruiz Soto (2023). "A Turning Point for the Unauthorized Immigrant Population in the United States." Migration Policy Institute.

Wamhoff, Steve (2024). "Who Pays Taxes in America 2024." Institute on Taxation and Economic Policy.

Warren, Robert and John Robert Warren (2013). "Unauthorized Immigration to the United States: Annual Estimates and Components of Change, by State, 1990 to 2010." International Migration Review 47 (2), 296-329.

Warren, Robert (2024). "After a Decade of Decline, the US Undocumented Population Increased by 650,000 in 2022." Journal on Migration and Human Security.

Yang, Dean (2011). "Migrant Remittances." Journal of Economic Perspectives, Vol. 25 (3), 129-152.

---

# Endnotes

[1] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 7th ed.," Institute on Taxation and Economic Policy, January 2024. https://itep.org/whopays-7th-edition/Wamhoff, Steve. "Who Pays Taxes in America

000566

in 2024." Institute on Taxation and Economic Policy, April 2024.
https://itep.org/who-pays-taxes-in-america-in-2024/

[2] See methodology section for more information on the calculation of estimated tax payments by undocumented immigrants.

[3] See methodology section for more information about current personal income tax compliance.

[4] Clemens, Michael A. "The Economic and Fiscal Effects on the United States from Reducing Numbers of Refugees and Asylum Seekers," Oxford Review of Economic Policy, Vol. 38 (3), 449-486.

[5] Wamhoff, Steve. "Who Pays Taxes in America in 2024." Institute on Taxation and Economic Policy, April 2024.https://itep.org/who-pays-taxes-in-america-in-2024/

[6] Goss, Stephen, et al. "Effects of Unauthorized Immigration on the Actuarial Status of Social Security Trust Funds," Social Security Administration, April 2013. https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf

Ranker, Lynsie, et al. "Keeping Medicare Solvent: How Immigrants Subsidize Medicare's Trust Fund for All U.S. Seniors," New American Economy, April 2021. https://research.newamericaneconomy.org/wp-content/uploads/sites/2/2021/05/NAE_Medicare_Report.pdf

[7] Broder, Tanya, and Gabrielle Lessard. "Overview of Immigrant Eligibility for Federal Programs," National Immigration Law Center, October 2023. https://www.nilc.org/wp-content/uploads/2023/10/overview-immeligfedprograms-2023-10-01.pdf. [If you go to the landing page, you get the most current version, which is now May 2024: Overview of Immigrant Eligibility for Federal Programs – National Immigration Law Center (nilc.org)]

[8] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 7th ed."

[9] Guzman, Marco, and Emma Sifre. "Improving Refundable Tax Credits by Making them Immigrant-Inclusive," Pittsburgh Tax Review, Vol. 21 (2), 205-223.

[10] Internal Revenue Service. "What You Need to Know about CTC, ACTC, and ODC," March 14, 2024.https://www.eitc.irs.gov/other-refundable-credits-toolkit/what-you-need-to-know-about-ctc-and-actc/what-you-need-to-know

[11] Davis, Aidan, and Neva Butkus. "Boosting Income, Improving Equity: State Earned Income Tax Credits in 2023," Institute on Taxation and Economic Policy, September 12, 2023. https://itep.org/boosting-incomes-improving-equity-state-earned-income-tax-credits-in-2023/

Davis, Aidan, and Neva Butkus. "States are Boosting Economic Security with Child Tax Credits in 2023," Institute on Taxation and Economic Policy, September 12, 2023. https://itep.org/states-are-boosting-economic-security-with-child-tax-credits-in-2023/.

[12] Borjas, George. "The Earnings of Undocumented Immigrants," National Bureau of Economic Research Working Paper 23236, March 2017.

https://www.nber.org/system/files/working_papers/w23236/w23236.pdf

[13] Census survey data tend to overestimate the number of naturalized citizens when compared to INS administrative data. This is true of most reported recent naturalizations and naturalizations from Central America (Passel et al. 1997). More recent research suggests this may be more limited to those whose country of origin is Mexico (Van Hook and Bachmeier 2013). For a broader discussion of this literature, see Brown et al. (2019).

 DOWNLOAD PDF

000568

**53152**   **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 106, 236, and 274a**

[CIS No. 2691–21; DHS Docket No. USCIS–2021–0006]

**RIN 1615–AC64**

### Deferred Action for Childhood Arrivals

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

---

**SUMMARY:** On September 28, 2021, the Department of Homeland Security (DHS) published a notice of proposed rulemaking (NPRM or proposed rule) that proposed to establish regulations to preserve and fortify the Deferred Action for Childhood Arrivals (DACA) policy to defer removal of certain noncitizens who years earlier came to the United States as children, meet other criteria, and do not present other circumstances that would warrant removal. After a careful review of the public comments received, DHS is now issuing a final rule that implements the proposed rule, with some amendments.

**DATES:** This rule is effective October 31, 2022.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Office of Policy and Strategy, Division of Humanitarian Affairs, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

## Preamble Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the 2021 Proposed Rule
  C. Summary of Changes From Proposed Rule to Final Rule
  D. Summary of Costs and Benefits
II. Response to Public Comments on the Proposed Rule
  A. General Feedback on the Rule
  1. General Support for Rule
  2. General Opposition to Rule
  3. Impacts on DACA Recipients and Their Families
  4. Impacts on Other Populations, Including U.S. Workers and Other Noncitizens
  5. Impacts on the Economy, Communities, and States
  6. Impacts on Businesses, Employers, and Educational Institutions
  7. Impacts on Migration
  8. Other Impacts on the Federal Government
  9. Criminality, National Security Issues, and Other Safety Concerns
  10. Creation of a ''Permanent'' Class of Individuals Without Legal Status
  11. Pathway to Lawful Status or Citizenship
  12. Other General Reactions and Suggestions
  B. Background, Authority, and Purpose
  1. Statutory Authority
  2. Litigation and Legal Disputes
  3. Other Comments and Suggestions
  C. Comments on Proposed Provisions
  1. Deferred Action/Forbearance From Enforcement Action (§ 236.21(c)(1))
  2. Employment Authorization (§§ 236.21(c)(2) and 274a.12(c)(33))
  a. General Comments on Employment Authorization
  b. Authority To Provide Employment Authorization to Deferred Action Recipients
  c. Unbundled Process To Make Form I–765 Optional
  d. Automatic Termination of Work Authorization
  3. Lawfully Present (§ 236.21(c)(3)) and Unlawful Presence (§ 236.21(c)(4))
  4. Discretionary Determination (§ 236.22)
  a. General Comments on Discretionary Determination
  b. Threshold Criteria
  (1) Arrival in United States Under the Age of 16
  (2) Continuous U.S. Residence From June 15, 2007
  (3) Physical Presence in United States
  (4) Lack of Lawful Immigration Status
  (5) Education
  (6) Criminal History, Public Safety, and National Security
  (7) Age at Time of Request
  (8) General Comments on Criteria and Comments on Multiple Overlapping Criteria
  5. Procedures for Request, Terminations, and Restrictions on Information Use (§ 236.23)
  a. Fees and Fee Waivers
  b. USCIS Jurisdiction (Including Comments on Inability To Grant DACA to Someone in Immigration Detention)
  c. Grants and Denials of a Request for DACA (Including Additional Evidence, 2-Year Period, Consultations, Notice of Decision)
  d. Notice To Appear or Referral to ICE
  e. Appeals and Reconsideration
  f. Termination of a Grant of DACA (Including Comments on Discretionary/Automatic Termination and Alternatives)
  g. Restrictions on Use of Information Provided by DACA Requestors (Including Information Sharing and Privacy Concerns)
  6. Severability (§ 236.24)
  7. Advance Parole and Adjustment of Status
  D. Other Issues Relating to the Rule
  1. Public/Stakeholder Engagement (e.g., Requests To Extend the Comment Period)
  2. Administrative Procedure Act and Rulemaking Requirements
  3. Processing Time Outlook (Including Comments on Backlogs)
  4. DACA FAQs
  5. Other Comments on Issues Relating to the Rule
  E. Statutory and Regulatory Requirements
  1. Impacts and Benefits (E.O. 12866 and E.O. 13563)
  a. Methodology and Adequacy of Cost-Benefit Analysis
  (1) Methodology of the RIA
  (2) Comments on Population Estimates and Assumptions
  (3) Comments on Wage Rages
  b. Benefits (No Action Baseline, Pre-Guidance Baseline, or Unspecified)
  c. Regulatory Alternatives
  d. Regulatory Flexibility Act (Impact on Small Entities)
  e. Other Comments on Costs and Benefits
  f. Paperwork Reduction Act (Including Comments on Actual Forms/Instructions, and Burden Estimates for Forms I–821D and I–765)
  3. Other Statutory and Regulatory Requirements (e.g., National Environmental Policy Act)
  F. Out of Scope
III. Statutory and Regulatory Requirements
  A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  1. Summary of Major Provisions of the Regulatory Action
  2. Summary of Costs and Benefits of the Final Rule
  3. Background and Purpose of the Rule
  4. Cost-Benefit Analysis
  a. No Action Baseline
  (1) Population Estimates and Other Assumptions
  (2) Forms and Fees
  (3) Wage Assumptions
  (4) Time Burdens
  (5) Costs of the Final Regulatory Action
  (6) Benefits of the Final Regulatory Action
  (7) Transfers of the Final Regulatory Changes
  b. Pre-Guidance Baseline
  (1) Population Estimates and Other Assumptions
  (2) Forms and Fees
  (3) Wage Assumptions
  (4) Time Burdens
  (5) Costs of the Final Regulatory Action
  (6) Benefits of the Final Regulatory Action
  (7) Transfers of the Final Regulatory Changes
  c. Costs to the Federal Government
  d. Labor Market Impacts
  e. Fiscal Effects on State and Local Governments
  f. Reliance Interests and Other Regulatory Effects
  g. Discounted Direct Costs, Cost Savings, Transfers, and Benefits of the Final Regulatory Changes
  h. Regulatory Alternatives
  B. Regulatory Flexibility Act
  C. Unfunded Mandates Reform Act of 1995
  D. Small Business Regulatory Enforcement Fairness Act of 1996
  E. Executive Order 13132: Federalism
  F. Executive Order 12988: Civil Justice Reform
  G. Paperwork Reduction Act—Collection of Information
  H. Family Assessment
  I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  J. National Environmental Policy Act
  K. Executive Order 12630: Governmental Actions and Interference With

Constitutionally Protected Property Rights

L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

## List of Abbreviations

ACA    Affordable Care Act
APA    Administrative Procedure Act
AST    Autonomous Surveillance Tower
BIA    Board of Immigration Appeals
BLS    Bureau of Labor Statistics
CBP    U.S. Customs and Border Protection
CEQ    Council on Environmental Quality
CFR    Code of Federal Regulations
CHIP    Children's Health Insurance Program
CLAIMS    Computer-Linked Application Information Management System
CMS    Centers for Medicare & Medicaid Services
CPI–U    Consumer Price Index for All Urban Consumers
DACA    Deferred Action for Childhood Arrivals
DAPA    Deferred Action for Parents of Americans and Lawful Permanent Residents
DHS    Department of Homeland Security
DOJ    Department of Justice
DREAM Act    Development, Relief, and Education for Alien Minors Act
DUI    Driving under the influence
EAD    Employment authorization document
ELIS    Electronic Immigration System
E.O.    Executive Order
EOIR    Executive Office for Immigration Review
EPS    Egregious public safety
EVD    Extended voluntary departure
FAIR    Federation for American Immigration Reform
FAQs    Frequently Asked Questions
FLCRAA    Farm Labor Contractor Registration Act Amendments of 1974
FR    Federal Register
FY    Fiscal Year
GED    General Education Development
HHS    Department of Health and Human Services
ICE    U.S. Immigration and Customs Enforcement
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IMMACT 90    Immigration Act of 1990
INA    Immigration and Nationality Act of 1952
INS    Immigration and Naturalization Service
IOM    International Organization for Migration
IRCA    Immigration Reform and Control Act of 1986
LPR    Lawful Permanent Resident
MPI    Migration Policy Institute
NEPA    National Environmental Policy Act
NOA    Notice of action
NOIT    Notice of intent to terminate
NTA    Notice to appear
OCFO    Office of the Chief Financial Officer
OI    Operations Instructions
OIRA    Office of Information and Regulatory Affairs
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
OPQ    Office of Performance and Quality
PRA    Paperwork Reduction Act of 1995

PRWORA    Personal Responsibility and Work Opportunity Reconciliation Act of 1996
Pub. L.    Public Law
RFA    Regulatory Flexibility Act
RIA    Regulatory Impact Analysis
RIN    Regulation Identifier Number
RTI    Referral to ICE
SBREFA    Small Business Regulatory Enforcement Fairness Act of 1996
Secretary    Secretary of Homeland Security
SIJ    Special Immigrant Juvenile Classification
SORN    System of Record Notice
Stat.    U.S. Statutes at Large
STEM    Science, technology, engineering, and mathematics
TPS    Temporary Protected Status
UMRA    Unfunded Mandates Reform Act of 1995
USBP    U.S. Border Patrol
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
VAWA    Violence Against Women Act of 1994
VPC    Volume Projection Committee
VTVPA    Victims of Trafficking and Violence Protection Act of 2000

## I. Executive Summary

### A. Purpose of the Regulatory Action

On June 15, 2012, then-Secretary of Homeland Security (Secretary) Janet Napolitano issued a memorandum providing new guidance for the exercise of prosecutorial discretion with respect to certain young people who came to the United States years earlier as children, who have no current lawful immigration status, and who were already generally low enforcement priorities for removal.[1] The Napolitano Memorandum states that DHS will consider granting "deferred action," on a case-by-case basis, for individuals who:

1. Came to the United States under the age of 16;

2. Continuously resided in the United States for at least 5 years preceding June 15, 2012, and were present in the United States on that date;

3. Are in school, have graduated from high school, have obtained a General Education Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

4. Have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, or otherwise do not pose a threat to national security or public safety; and

5. Were not above the age of 30 on June 15, 2012.[2]

Individuals who request relief under this policy, meet the criteria above, and pass a background check may be granted deferred action.[3] Deferred action is a longstanding practice by which DHS and the former Immigration and Naturalization Service (INS) have exercised their discretion to forbear from or assign lower priority to removal action in certain cases for humanitarian reasons, for reasons of administrative convenience, or on the basis of other reasonable considerations involving the exercise of prosecutorial discretion.[4]

In establishing this policy, known as DACA, then-Secretary Napolitano emphasized that for the Department to use its limited resources in a sensible manner, it necessarily must exercise prosecutorial discretion. Then-Secretary Napolitano observed that these "young people . . . were brought to this country as children and know only this country as home" and as a general matter "lacked the intent to violate the law." She reasoned that limited enforcement resources should not be expended to "remove productive young people to countries where they may not have lived or even speak the language."[5] The Napolitano Memorandum also instructs that the individual circumstances of each case must be considered, and that deferred action should be granted only where justified in light of the specific circumstances of each case.[6]

Since 2012, more than 825,000 people have received deferred action under the DACA policy.[7] The mean year of arrival in the United States for DACA recipients was 2001, and the average age at arrival was 6 years old.[8] In addition, 38 percent of recipients arrived before the age of 5.[9] For many, this country is

---

[1] Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection (CBP), et al. (June 15, 2012), *https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf* (hereinafter Napolitano Memorandum).

[2] *Id.*

[3] *Id.*

[4] *See, e.g., Reno* v. *Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 484 (1999) (*AADC*); 8 CFR 274a.12(c)(14).

[5] Napolitano Memorandum.

[6] *Id.*

[7] *See* USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2021, Q1)* (Mar. 2021), *https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr1.pdf.* As of the end of calendar year 2020, there were over 636,000 noncitizens in the United States with a grant of deferred action under DACA currently in effect ("active DACA recipients"). *See* USCIS, *Count of Active DACA Recipients by Month of Current DACA Expiration (Dec. 31, 2020), https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients%E2%80%93December31%2C2020.pdf.*

[8] DHS, USCIS, Office of Performance and Quality (OPQ), Electronic Immigration System (ELIS) and Computer-Linked Application Information Management System (CLAIMS) 3 Consolidated (queried Mar. 2021).

[9] *Id.*

the only one they have known as home. In the 10 years since this policy was announced, DACA recipients have grown into adulthood and built lives for themselves and their loved ones in the United States. They have gotten married and had U.S. citizen children. Over 250,000 children have been born in the United States with at least one parent who is a DACA recipient, and about 1.5 million people in the United States share a home with a DACA recipient.[10] DACA recipients have obtained driver's licenses and credit cards, bought cars, and opened bank accounts.[11] In reliance on DACA, its recipients have enrolled in degree programs, started businesses, obtained professional licenses, and purchased homes.[12] Because of the health insurance that their deferred action allowed them to obtain through employment or State-sponsored government programs, many DACA recipients have received improved access to health care and have sought treatment for long-term health issues.[13]

For DACA recipients and their family members, receiving deferred action has increased DACA recipients' sense of acceptance and belonging to a community, increased their sense of hope for the future, and has given them the confidence to become more active members of their communities and increase their civic engagement.[14] The DACA policy has also encouraged its recipients to make significant investments in their careers and education. Many DACA recipients report that deferred action—and the employment authorization that DACA

permits them to request—allowed them to obtain their first job or move to a higher paying position more commensurate with their skills.[15] DACA recipients are employed in a wide range of occupations, including management and business, education and training, sales, office and administrative support, and food preparation; thousands more are self-employed in their own businesses.[16] Many have continued their studies, and some have become doctors, lawyers, nurses, teachers, or engineers.[17] In 2017, 72 percent of the top 25 Fortune 500 companies employed at least one DACA recipient.[18] About 30,000 are healthcare workers, many of whom have helped care for their communities on the frontlines during the COVID–19 pandemic.[19] DACA recipients who are healthcare workers are helping to alleviate a shortage of healthcare professionals in the United States, and they are more likely to work in underserved communities where shortages are particularly dire.[20]

As a result of these educational and employment opportunities, DACA recipients make substantial contributions in taxes and economic activity.[21] According to one estimate, as of 2020, DACA recipients and their households pay about $5.6 billion in annual Federal taxes and about $3.1 billion in annual State and local taxes.[22] In addition, through their employment, they make significant contributions to Social Security and Medicare funds.[23] Approximately two-thirds of recipients purchased their first car after receiving DACA,[24] and an estimated 56,000 DACA recipients own homes and are directly responsible for $566.7 million in annual mortgage payments.[25] DACA recipients also are estimated to pay $2.3 billion in rental payments each year.[26] Because of these contributions, the communities of DACA recipients—who reside in all 50 States and the District of Columbia[27]—have grown to rely on the economic contributions this policy facilitates.[28] In sum, despite the express limitations in the Napolitano Memorandum, over the 10 years in

[10] Nicole Prchal Svajlenka and Philip E. Wolgin, *What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition*, Center for American Progress (Apr. 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482676/know-demographic-economic-impacts-daca-recipients-spring-2020-edition* (hereinafter Svajlenka and Wolgin (2020)).

[11] *See* Roberto G. Gonzales and Angie M. Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA*, American Immigration Council (June 2014); Zenén Jaimes Pérez, *A Portrait of Deferred Action for Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three Years Later*, United We Dream (Oct. 2015), *https://unitedwedream.org/wp-content/uploads/2017/10/DACA-report-final-1.pdf* (hereinafter Jaimes Pérez (2015)); Tom K. Wong, et al., *Results from Tom K. Wong et al., 2020 National DACA Study*, Center for American Progress, *https://cdn.americanprogress.org/content/uploads/2020/10/02131657/DACA-Survey-20201.pdf* (hereinafter Wong (2020)).

[12] *See* Roberto G. Gonzales, et al., *The Long-Term Impact of DACA: Forging Futures Despite DACA's Uncertainty*, Immigration Initiative at Harvard (2019), *https://immigrationinitiative.harvard.edu/files/hii/files/final_daca_report.pdf* (hereinafter Gonzales (2019)); Wong (2020).

[13] Gonzales (2019).

[14] Gonzales (2019); Jaimes Pérez (2015); Wong (2020).

[15] Roberto G. Gonzales, et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 a.m. Behav. Scientist 1852 (2014); Wong (2020); *see also* Nolan G. Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. of Pub. Econ. 98 (2016), *http://www.econweb.umd.edu/~pope/daca_paper.pdf* (hereinafter Pope (2016)) (finding that DACA increased participation in the labor force for undocumented immigrants).

[16] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Center for American Progress (Sept. 5, 2019), *https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states*; Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Institute (Nov. 2017), *https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf* (hereinafter Zong (2017)).

[17] *See* Gonzales (2019); Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (Apr. 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response* (hereinafter Svajlenka (2020)); Wong (2020); Zong (2017).

[18] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress (Aug. 28, 2017), *https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow* (hereinafter Wong (2017)).

[19] Svajlenka (2020).

[20] Angela Chen, et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* (Sept. 2019) (hereinafter Chen (2019)), at 27 (presenting survey data showing that 97 percent of undocumented students pursuing health and health-science careers planned to work in an underserved community); *See also* Andrea N. Garcia, et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), *https://www.ncbi.nlm.nih.gov/pmc/*

*articles/PMC5743635* (hereinafter Garcia (2017)) (finding that underrepresented minorities graduating from medical school are nearly twice as likely as white students and students of other minorities to report an intention to work with underserved populations).

[21] See the regulatory impact analysis (RIA) for this final rule, which can be found in Section III.A. The RIA includes analysis and estimates of the costs, benefits, and transfers that DHS expects this rule to produce. Note that the estimates presented in the RIA are based on the specific methodologies described therein. Figures may differ from those presented in the sources discussed here.

[22] Svajlenka and Wolgin (2020). *See also* Misha E. Hill and Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy (Apr. 2017) (hereinafter Hill and Wiehe (2017)) (analyzing the State and local tax contributions of DACA-eligible noncitizens in 2017).

[23] Jose Magaña-Salgado and Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017) (hereinafter Magaña-Salgado and Wong (2017)); *see also* Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center (Dec. 2016) (hereinafter Magaña-Salgado (2016)) (analyzing the Social Security and Medicare contributions of DACA recipients in 2016).

[24] Wong (2017).

[25] Svajlenka and Wolgin (2020).

[26] *Id.*

[27] USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (FY 2021, Q1)* (Mar. 2021), *https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr1.pdf*, at 6.

[28] Reasonable reliance on the existence of the DACA policy is distinct from reliance on a grant of DACA to a particular person. Individual DACA grants are discretionary and may be terminated at any time, but communities, employers, educational institutions, and State and local governments have come to rely on the existence of the policy itself and its potential availability to those individuals who qualify.

which the DACA policy has been in effect, the good faith investments recipients have made in both themselves and their communities, and the investments that their communities have made in them, have been, in the Department's judgment, substantial.

This rule responds to President Biden's memorandum on January 20, 2021, "Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)," [29] in which President Biden stated:

DACA reflects a judgment that these immigrants should not be a priority for removal based on humanitarian concerns and other considerations, and that work authorization will enable them to support themselves and their families, and to contribute to our economy, while they remain.[30]

This rule embraces the consistent judgment that has been maintained by the Department—and by three presidential administrations since the policy first was announced—that DACA recipients should not be a priority for removal.[31] It is informed by the Department's experience with the policy over the past 10 years and the ongoing litigation concerning the policy's continued viability. It reflects the reality that DACA supports the Department's efforts to more efficiently allocate enforcement resources, by allowing DHS to focus its limited enforcement resources on higher-priority noncitizens. It also is meant to preserve legitimate reliance interests that have been engendered through the continued implementation of the decade-long policy under which deferred action requests will be considered, while emphasizing that individual grants of deferred action are an act of enforcement discretion to which recipients do not have a substantive right.

This rule recognizes that enforcement resources are limited, that sensible priorities are vital to the effective use of those resources, and that it is not generally the best use of those limited resources to remove from the United States those who arrived here as young people, have received or are pursuing an education or served in the military, have no significant criminal history, do not pose a threat to national security or

public safety, and are valued members of our communities. It recognizes that, as a general matter, DACA recipients, who came to this country many years ago as children and may not even speak the language of the country in which they were born, lacked the intent to violate the law. It reflects the conclusion that, while they are in the United States, they should have access to a process that, operating on a case-by-case basis, may allow them to work to support themselves and their families, and to contribute to the economy in multiple ways. This rule also accounts for the momentous decisions DACA recipients have made in ordering their lives in reliance on and as a result of this policy, and it seeks to continue the benefits that have accrued to DACA recipients, their families, their communities, their States, and the Department itself that have been made possible by the policy. And as discussed in detail elsewhere, this rule reflects DHS's continued belief, supported by available data, that DACA does not have a substantial effect on lawful or unlawful immigration into the United States. DHS emphasizes that the DACA policy set forth in this rule is not a permanent solution for the affected population, and legislative efforts to find such a solution remain critical.

DHS recognizes that this rule comes in the wake of prior attempts to wind down and terminate the DACA policy.[32] In rescission memoranda issued, respectively, by then-Secretary Kirstjen Nielsen and then-Acting Secretary Elaine Duke, DHS cited potential litigation risk as one reason that winding down and terminating DACA was warranted. But upon further consideration, it is DHS's view that those prior statements failed fully to account for all the beneficial aspects of the DACA policy for DHS as well as for many other persons and entities, which in DHS's view outweigh the costs. The position taken in the Duke and Nielsen Memoranda placed undue weight on litigation risk, failing to account for all the positive tangible and intangible benefits of the DACA policy, the economic and dignitary gains from that policy, the length of time that DACA opponents waited to challenge the

policy, and the risk that rescinding DACA would itself expose DHS to legal challenge—a risk that indeed materialized in the *Regents* litigation.[33] In short, proper consideration of all pertinent factors on balance establishes that the DACA policy is well worth the agency resources required to implement it and to defend it against subsequent legal challenges.

On July 16, 2021, the U.S. District Court for the Southern District of Texas vacated the 2012 DACA policy, finding, among other things, that it was contrary to the Immigration and Nationality Act of 1952 (INA).[34] DHS has carefully and respectfully considered all aspects of the analysis in that decision, including that decision's conclusions about DACA's substantive legality. DHS also invited comments on its conclusions in the proposed rule and discusses the comments received herein.

*B. Summary of the 2021 Proposed Rule*

The proposed rule set forth DHS's proposal to preserve and fortify the DACA policy, which allows for the issuance of deferred action to certain young people who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities.[35] The proposed rule included the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The proposed rule provided a definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States, and that does not prevent DHS from initiating any criminal or other enforcement action against the DACA recipient at any time.

• *Threshold Criteria.* The proposed rule included the following longstanding threshold criteria: that the requestor must have: (1) come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been

---

[29] 86 FR 7053 (hereinafter Biden Memorandum).

[30] *Id.*

[31] *See id.*; Sept. 5, 2017 Statement from President Donald J. Trump, *https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-7* ("I have advised [DHS] that DACA recipients are not enforcement priorities unless they are criminals, are involved in criminal activity, or are members of a gang."); Napolitano Memorandum.

[32] *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* from Elaine Duke, Acting Secretary, DHS (Sept. 5, 2017), *https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca* (hereinafter Duke Memorandum); Memorandum from Secretary Kirstjen M. Nielsen, DHS (June 22, 2018), *https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf* (hereinafter Nielsen Memorandum), at 3 ("In setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy").

[33] *See Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020).

[34] *Texas* v. *United States,* 549 F. Supp. 3d 572 (S.D. Tex. 2021) (*Texas* July 16, 2021 memorandum and order).

[35] The preamble discussion in the NPRM, including the detailed presentation of the need to establish regulations implementing the DACA policy to defer removal of certain noncitizens who years earlier came to the United States as children, is generally adopted by reference in this final rule, except to the extent specifically noted in this final rule, or in the context of proposed regulatory text that is not contained in this final rule. *See* 86 FR 53736–53816 (Sept. 28, 2021).

physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in the rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, or has a final order of removal or a voluntary departure order. The proposed rule also stated that deferred action under DACA would be granted only if USCIS determines in its sole discretion that the requestor meets the threshold criteria and otherwise merits a favorable exercise of discretion.

• *Procedures for Request, Terminations, and Restrictions on Information Use.* The proposed rule set forth procedures for denial of a request for DACA or termination of a grant of DACA, the circumstances resulting in the issuance of a notice to appear (NTA) or referral to U.S. Immigration and Customs Enforcement (ICE) (RTI), and restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to retaining these longstanding DACA policies and procedures, the proposed rule proposed the following changes:

• *Filing Requirements.* The proposed rule proposed to modify the existing filing process and fees for DACA by making the request for employment authorization on Form I–765, Application for Employment Authorization, optional and charging a filing fee of $85 for Form I–821D, Consideration of Deferred Action for Childhood Arrivals. DHS proposed to maintain the current total cost to DACA requestors who also file Form I–765 of $495 ($85 for Form I–821D plus $410 for Form I–765). As noted below, DHS has modified this approach in this final rule.

• *Employment Authorization.* The proposed rule proposed to create a DACA-specific regulatory provision regarding eligibility for employment authorization for DACA deferred action

recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph did not constitute any substantive change in current policy; it merely proposed a DACA-specific provision in addition to the existing provision at 8 CFR 274a.12(c)(14) that provides discretionary employment authorization to deferred action recipients more broadly. Like the provision at 8 CFR 274a.12(c)(14), 8 CFR 274a.12(c)(33) continued to specify that the noncitizen[36] must have been granted deferred action and must establish an economic need to be eligible for employment authorization.

• *Automatic Termination of Employment Authorization.* The proposed rule proposed automatically terminating employment authorization granted under 8 CFR 274.12(c)(33) upon termination of a grant of DACA.

• ''*Lawful Presence.*'' The proposed rule reiterated USCIS' codification in 8 CFR 1.3(a)(4)(vi) of agency policy, implemented long before DACA, that a noncitizen who has been granted deferred action is considered ''lawfully present''—a specialized term of art that does not in any way confer ''lawful status'' or authorization to remain in the United States—for the discrete purpose of authorizing the receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The term ''lawful presence'' historically has been applied to some persons who are subject to removal (and who may in fact have no ''lawful status''), and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors. Lawful presence also encompasses situations in which the Secretary, pursuant to express statutory authorization, designates certain categories of noncitizens as lawfully present for particular statutory purposes, such as receipt of Social Security benefits. *See* 8 U.S.C. 1611(b)(2); 8 CFR 1.3(a)(4)(vi). The proposed rule also reiterated longstanding policy that a noncitizen who has been granted deferred action does not accrue ''unlawful presence'' for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9)(B) (imposing certain inadmissibility grounds on noncitizens who departed after having accrued certain periods of unlawful presence in

the United States and again seek admission to the United States).

*C. Summary of Changes From Proposed Rule to Final Rule*

Following careful consideration of public comments received, DHS has made modifications to the regulatory text proposed in the proposed rule, as described below. The rationale for the proposed rule and the reasoning provided in that rule remain valid, except as described in this regulatory preamble. Section II of this preamble includes a detailed summary and analysis of the comments. Comments may be reviewed in the Federal Docket Management System at *https://www.regulations.gov*, docket number USCIS–2021–0006.

• The NPRM proposed to codify at 8 CFR 236.23(a)(1) a modification of the existing filing process and fees for DACA by making it optional to submit a request for employment authorization on Form I–765, Application for Employment Authorization (''unbundled process''), and charging a fee of $85 for Form I–821D, Consideration of Deferred Action for Childhood Arrivals. That proposal would have maintained the current total cost to DACA requestors who also file Form I–765 of $495 ($85 for Form I–821D plus $410 for Form I–765). Upon careful consideration of comments received on this NPRM provision, DHS is adopting the suggestion of a majority of commenters who addressed this provision to retain the existing requirement that DACA requestors file Form I–765 and Form I–765WS concurrently with the Form I–821D (''bundled process''). However, in this rule DHS adopts the fee structure proposed in the NPRM of an $85 filing fee for Form I–821D, as well as a Form I–765 filing fee, currently set at $410. This change codifies in regulation the process that has been in place since the Napolitano Memorandum was implemented in 2012, while maintaining a consistent overall current cost to requestors. *See* new 8 CFR 236.23(a)(1).

• The NPRM proposed to codify at 8 CFR 236.22(b)(6) the longstanding criminal history, public safety, and national security criteria found in the Napolitano Memorandum. Upon careful consideration of comments received on this NPRM provision, DHS is revising it to further clarify that, consistent with longstanding DACA policy, expunged convictions, juvenile delinquency adjudications, and immigration-related offenses characterized as felonies or misdemeanors under State laws are not considered automatically disqualifying

---

[36] For purposes of this discussion, USCIS uses the term ''noncitizen'' to be synonymous with the term ''alien'' as it is used in the INA.

convictions for purposes of this provision. *See* new 8 CFR 236.22(b)(6).

• The NPRM proposed to codify at 8 CFR 236.23(d)(1) and (2) DHS's longstanding DACA termination policy, prior to the preliminary injunction issued in *Inland Empire-Immigrant Youth Collective* v. *Nielsen,* No. 17– 2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018), with some modifications. The NPRM proposed that USCIS could terminate DACA at any time in its discretion with or without a Notice of Intent to Terminate (NOIT). The NPRM also proposed that DACA would terminate automatically upon departure from the United States without advance parole or upon filing of an NTA with the Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (a modification from prior policy of automatic termination upon NTA issuance), but DACA would not terminate automatically in the case of a USCIS-issued NTA solely based on an asylum referral to EOIR. The NPRM raised four alternative approaches and invited comment on these and other alternatives for DACA termination. After careful consideration of the comments on this provision and the alternatives suggested in the NPRM and by commenters, DHS is maintaining in the final rule that USCIS may terminate DACA at any time in its discretion. However, DHS is revising this provision to provide that USCIS will provide DACA recipients with a NOIT prior to termination of DACA, but maintains discretion to terminate DACA without a NOIT if the individual is convicted of a national security related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), 1182(a)(3)(B)(iv), or 1227(a)(4)(A)(i), or an egregious public

safety offense. DHS also is revising this provision to provide that USCIS may terminate a grant of DACA, in its discretion and following issuance of a Notice of Intent to Terminate, for those recipients who depart from the United States without first obtaining an advance parole document and subsequently enter the United States without inspection. *See* new 8 CFR 236.23(d)(1) and (2).

• The NPRM proposed at 8 CFR 236.23(d)(3) that employment authorization would terminate automatically upon termination of DACA. This provision included a cross-reference to 8 CFR 274a.14(a)(1)(iv). However, on February 8, 2022, 8 CFR 274a.14(a)(1)(iv) was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* No. 20–cv–3815, 2022 WL 355213 (D.D.C. Feb. 7, 2022). As a result of the that vacatur, as well as additional revisions to the DACA termination provisions to eliminate automatic termination based on filing of an NTA, as described in this preamble, DHS is modifying 8 CFR 236.23(d)(3) in this final rule to remove the vacated cross-reference and clarify that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted. *See* new 8 CFR 236.23(d)(3).

• In this final rule, DHS is clarifying at 8 CFR 236.21(d) that this subpart rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and from this point forward governs all current and future DACA grants and requests. DHS also clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Historically, DHS has promulgated rules

without expressly rescinding prior guidance in the regulatory text itself. However, DHS has chosen to depart from previous practice in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum. *See* new 8 CFR 236.21(d).

### D. Summary of Costs and Benefits

This rule will result in new costs, benefits, and transfers. To provide a full understanding of the impacts of the DACA policy, DHS considered the potential impacts of this rule relative to two baselines. The No Action Baseline represents a state of the world under the DACA policy; that is, the policy initiated by the guidance in the Napolitano Memorandum in 2012 and prior to the July 16, 2021 *Texas* decision. (The No Action Baseline does not directly account for the *Texas* decision, as discussed further in the Population Estimates and Other Assumptions section of the Regulatory Impact Analysis (RIA).) The second baseline considered in the analysis is the Pre-Guidance Baseline, which represents a state of the world before the issuance of the Napolitano Memorandum, where the DACA policy does not exist and has never existed. To better understand the effects of the DACA policy, we focus on the Pre-Guidance Baseline as the most useful point of reference.

Table 1 provides a detailed summary of the provisions and their estimated impacts relative to the No Action Baseline. Table 2 provides a detailed summary of the provisions and their estimated impacts relative to the Pre-Guidance Baseline.

BILLING CODE 9111–97–P

**Table 1. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2021–FY 2031 (Relative to the No Action Baseline)**

| Provision | Description of Provision | Estimated Impact of Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Qualitative:**<br><br>Benefits<br><br>• The final rule allows active DACA recipients to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed. |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment to receive an Employment Authorization Document. DACA recipients are considered lawfully present and not unlawfully present for certain purposes. | • For DACA recipients and their family members, the rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. |

| | | |
|---|---|---|
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | |

Source: USCIS analysis.

Note: The No Action Baseline refers to a state of the world under the current DACA policy in effect under the guidance of the Napolitano Memorandum.

**Table 2. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Provision | Description of Provision | Estimated Impact of Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Quantitative:**<br><br>Net Benefits<br><br>Income earnings of the employed DACA recipients due to obtaining an approved EAD, dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy, less the value of non-paid time:<br><br>• Annualized net benefits are estimated to be as much as $21.9 billion at a 3-percent discount rate and $20.7 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.21(c). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment. DACA recipients are considered | |

| | | |
|---|---|---|
| | lawfully present and not unlawfully present for certain purposes. | • Total net benefits over a 20-year period are estimated to be as much as:<br>○ $455.0 billion for undiscounted benefits;<br>○ $424.4 billion at a 3-percent discount rate; and<br>○ $403.2 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | Costs<br><br>Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS:<br><br>• Annualized costs could be $494.9 million at a 3-percent discount rate or $480.8 million at a 7-percent discount rate. |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | • Total costs over a 20-year period could be:<br>○ $10.1 billion undiscounted;<br>○ $9.6 billion at a 3-percent discount rate; and<br>○ $9.4 billion at a 7-percent discount rate.<br><br>Transfer Payments<br><br>Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy:<br><br>• Annualized transfers could be up to $5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate.<br>• Total transfers over a 20-year period could be up to:<br>○ $113.2 billion undiscounted;<br>○ $105.6 billion at a 3-percent discount rate; and<br>○ $100.3 billion at a 7-percent discount rate.<br><br>**Qualitative:** |

| | | |
|---|---|---|
| | | Cost Savings |
| | | The DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. |
| | | Benefits |
| | | • The rule results in more streamlined enforcement encounters and decision making, as well as avoided costs associated with enforcement action against low-priority noncitizens. It also allows DHS to focus its limited enforcement resources on higher-priority noncitizens.<br>• The rule gives DACA recipients the option to request renewal of DACA in the future if needed.<br>• For DACA recipients and their family members, the rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum.

BILLING CODE 9111–97–C

## II. Response to Public Comments on the Proposed Rule

### A. General Feedback on the Rule

DHS received 16,361 public comments during the comment period for the NPRM. The majority of comment submissions, excluding duplicates, non-germane submissions, and a submission that contained only reference material, originated from individual or anonymous commenters. The remaining comments came from a range of entities, including advocacy groups, schools and universities, legal services providers, religious organizations, businesses, professional organizations, State and local government, Federal and State elected officials, and unions. Many comments expressed general support for the rule, with only 3 percent of the total expressing generalized opposition. A large majority of the comments indicated support for the proposal to preserve and fortify DACA, while opposing or offering suggestions to change some provisions.

Of the submissions expressing generalized opposition to the NPRM, only one was from a government entity; all other government submissions expressed generalized support or support for some provisions of the rule while suggesting revisions or providing feedback for others. DHS has reviewed all the public comments received, and below addresses the comments related to the substance of the NPRM.

1. General Support for Rule

*Comment:* Many commenters expressed general support for DACA and the rule for a variety of reasons. These commenters stated that DACA should be protected and is beneficial not only to the youth impacted but also to the United States; that childhood arrivals to the United States should not be removed from the only home they know; and that the United States has a

moral obligation as a nation to retain DACA and to lead by compassion, honor, and respect. One commenter expressed strong support for deferred action for DACA recipients as both appropriate and justified, stating that certain young productive people should not be a priority for deportation to countries where they have not lived in and do not speak the language. Some commenters agreed that DACA recipients should not be a priority for removal as these individuals have no criminal history, pose no threat to national security, contribute to the economy and their communities, are blameless minors or are ''not morally blameworthy,'' and have lived in the United States for nearly all their lives. Several commenters stated that DACA recipients provide rich cultural traditions, share unique cultural contributions, and create a sense of community in the United States.

Another commenter said that they were pleased that the rule clarifies who is eligible for DACA. Another commenter remarked that the proposed rule would affect government stakeholders or departments, including DHS, ICE, CBP, EOIR, and State Departments of Motor Vehicles, and that retaining DACA best respects the rights of these stakeholders.

*Response:* DHS acknowledges these commenters' support for the rule and agrees that the DACA policy has benefits that extend not just to the recipients themselves, but also to their communities and the United States more broadly. DHS also agrees that removing DACA recipients, who came to the United States as children and may have only known this country as their home, would cause significant hardship to DACA recipients and their family members.

Regarding the comment that retaining the DACA policy respects the rights of impacted government stakeholders, DHS agrees that this rule reflects the Department's strong interests in the effective and judicious use of its limited enforcement resources. This preamble also discusses comments submitted by a range of government entities and officials.

2. General Opposition to Rule

*Comment:* Some commenters generally opposed the proposed rule. These commenters stated that allowing undocumented noncitizens into the United States harms U.S. citizens and must be stopped, that DACA should be abolished, and that DACA requestors and undocumented noncitizens claiming ''amnesty'' in the United States are ''illegal immigrants'' regardless of

how they are characterized. Several commenters said that the DACA policy was not a constructive way to handle the immigration challenges that the country is facing and that the Government should terminate DACA and implement new policies that protect borders and encourage more legal immigration.

*Response:* DHS respectfully acknowledges these commenters' opposition to the rule. This rule reflects the consistent judgment of DHS that DACA is an appropriate exercise of its prosecutorial discretion given the realities of the limited resources available to remove every noncitizen lacking lawful status from the United States. This rule does not authorize new entrants to the United States; indeed, it codifies, but does not expand, the threshold criteria for consideration for deferred action under the DACA policy that have existed since 2012. DHS has been attentive to all relevant reliance interests. DHS discusses in greater detail the rule's alleged impact on migration in Section II.A.7. However, as the rule does not confer lawful status on DACA recipients or provide DACA recipients with permanent protection from removal, DHS disagrees with the characterization of DACA as an amnesty program; it does not give amnesty to anyone. DHS also does not believe that this rule or the DACA policy is in conflict with policies that promote maintaining an orderly, secure, and well-managed border, which are high priorities for DHS and for the Administration, and except as specifically related to the DACA policy are generally beyond the scope of the rulemaking.[37] DHS declines to make changes to the rule in response to these comments.

3. Impacts on DACA Recipients and Their Families

*Comment:* Many commenters expressed support for the proposed rule, noting the positive impacts of DACA on recipients and their families. These commenters stated that the rule would provide the opportunity for DACA recipients to meet their professional goals, such as obtaining a college degree and pursuing a career, which would allow them to support their families. Commenters similarly noted that the rule would improve overall quality of life and provide opportunities to DACA recipients and their families, reduce fear and anxiety among DACA recipients and their families, and foster a sense of

belonging to the United States, which, they stated, DACA recipients consider as their home. In support of these statements, many commenters shared anecdotes about the positive impacts DACA has had on their or others' livelihoods, such as earning degrees and entering the workforce, attributing these opportunities to DACA.

Some commenters stated that writing the DACA policy into Federal regulations would be an essential step to fortifying DACA and protecting recipients, especially considering the adverse rulings in recent litigation. Other commenters expressed their concern that if DACA were revoked, their lives in the United States would be uprooted and the ability to pursue their goals would be hindered. They also stated the positive traits of DACA recipients and referred to them as kind and hardworking people. A commenter cited an article from a Brookings Institution blog, Brookings Now, to emphasize the importance of the policy in allowing children to remain with their families, attend school, and earn money to support themselves.[38] A group of commenters, citing figures contained in the NPRM,[39] stated that ending DACA would cause harm to over 250,000 children born in the United States to DACA recipients, the 1.5 million people in the United States who share a home with DACA recipients, and other close connections who would suffer from the loss of security and means for support that the DACA policy provides to recipients. Another commenter added that there are over 94,000 DACA and DACA-eligible students in California alone, and that the policy has a direct impact on current and future students.

Some commenters said that, because of DACA, recipients can obtain driver's licenses, auto insurance, bank accounts, Social Security numbers, and other benefits that are valuable to their daily lives. A commenter stated some States offer benefits to DACA recipients that they otherwise would be unable to obtain, such as in-state tuition and access to REAL IDs. Several commenters said that many DACA recipients financially support their families and children who also are living in the United States.

A commenter stated that DACA should not have to be reinstated by each president, as the issue of immigration is

---

[37] *See, e.g.,* DHS, *2022 Priorities, https:// www.dhs.gov/2022-priorities* (last updated Mar. 17, 2022).

[38] Brennan Hoban, *The reality of DACA, the Deferred Action for Childhood Arrivals program,* Brookings Now (Sept. 22, 2017), *https:// www.brookings.edu/blog/brookings-now/2017/09/ 22/the-reality-of-daca-the-deferred-action-for-childhood-arrivals-program.*

[39] See 86 FR 53738.

an ethical one and decisions should not be based on politics or economics. The commenter cited historical examples of the United States denying entry to immigrants to highlight the negative consequences immigrants may face when forced to return to their birth countries. The commenter went on to say that the DACA policy should continue to be in place indefinitely. Another commenter stated it would be unethical to send DACA recipients back to their birth countries, as they did nothing more than travel with their parents at a young age to the United States.

*Response:* DHS acknowledges the commenters' support for the rule and agrees with commenters that DACA has a positive impact on recipients' ability to pursue employment and education, maintain family unity, and make contributions to their communities. DHS further agrees that removing DACA recipients, who have been determined to be a low priority for enforcement, would cause significant hardship to DACA recipients and their family members. DHS acknowledges commenters' views that it would be unethical to remove childhood arrivals from the United States and agrees that DACA is an appropriate framework for making case-by-case determinations to defer the removal of certain eligible noncitizens who arrived in the United States as children.

*Comment:* Several commenters stated DACA has provided recipients with educational opportunities and professional growth that they would not have been able to pursue without the policy. Several commenters pointed to research finding that DACA significantly increased high school attendance and high school graduation rates, reducing the citizen-noncitizen gap in graduation by 40 percent; and also finding positive, though imprecise, impacts on college attendance.[40]

Multiple commenters provided statistics on the number of DACA recipients who are enrolled in postsecondary educational programs. A group of commenters representing multiple States estimated that up to 37,000 students in the California Community Colleges system are DACA-eligible noncitizens, more than 19,000 post-secondary students are DACA recipients in New York, approximately 9,000 post-secondary students in New Jersey are DACA recipients or DACA-eligible, and that thousands more DACA recipients are enrolled in public universities and colleges in other States. The commenters described multiple State regimes under which DACA recipients or DACA-like populations may qualify for in-state tuition or other financial assistance. For instance, the commenters wrote that Minnesota "has invested in the education of individuals receiving DACA by extending student childcare grants, teacher candidate grants, and student loan programs to DACA recipients."

Similarly, a commenter stated DACA plays a major role in higher education affordability, remarking that 83 percent of DACA recipients attend public institutions, a fact that, according to the commenter, makes accessibility to in-state tuition and financial aid a vitally important issue. The commenter wrote that 8 States require undocumented students to have DACA in order to access in-state tuition; 17 additional States and the District of Columbia allow the State's eligible undocumented students, including DACA recipients, to access in-state tuition and State financial aid; and 4 States allow their State's undocumented students access to in-state tuition but not financial aid. The same commenter stated that work authorization enables DACA recipients to legally work, save, and pay for their higher education expenses.

A commenter stated the proposed rule would help numerous DACA recipient students continue to receive the benefits of DACA such as an employment authorization document to ease the financial burden of pursuing higher education and the opportunity to obtain an advance parole document. A commenter representing a higher education institution expressed support for the proposed rule and commented that many opportunities for young people to learn and develop skills are employment-based, leaving students without employment authorization at a significant disadvantage academically, professionally, and socially. The commenter stated that students without employment authorization may lack income, resume-building experiences, and opportunities to build networks among peers, staff, and faculty, whereas DACA recipient students can engage in on-campus jobs and employment-based

research opportunities, and cautiously plan for their futures.

*Response:* DHS acknowledges that by applying a more formal administrative framework to forbearance from enforcement with respect to DACA recipients, DHS has enabled a range of additional benefits to this population, including increased educational and professional opportunities that benefit DACA recipients and society at large. DHS agrees that members of the DACA population have achieved a significantly higher level of educational attainment than would likely have occurred without the DACA policy. DHS also appreciates commenters' acknowledgement of how DACA has increased graduation rates and expanded access to both earned income and, as a result of actions by certain States, financial aid, which DACA recipients have used to fund undergraduate, graduate, and professional degrees.

*Comment:* Multiple commenters, with some citing studies, said the rule would provide relief from legal uncertainty and offer a sense of security, minimizing the anxiety and other physical and mental health concerns related to the fear of deportation. One commenter referenced multiple studies to support their assertion that immigrants who fear deportation are much more vulnerable to deleterious health effects, including "heart disease, asthma, diabetes, depression, anxiety, and post-traumatic stress disorder." [41] Citing additional studies, the commenter further stated that by removing or limiting the fear of deportation, "DHS may be able to directly impact and improve the health of these individuals who are eligible for DACA, as well as their families and communities." [42] Another commenter cited a study finding that DACA significantly reduced the odds of

---

[40] *See* Elira Kuka, et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA,* 12 a.m. Econ. J. 293, 295–96 (2020) ("Our results imply that more than 49,000 additional Hispanic youth obtained a high school diploma because of DACA") (hereinafter Kuka (2020)); Victoria Ballerini and Miriam Feldblum, *Immigration Status and Postsecondary Opportunity: Barriers to Affordability, Access, and Success for Undocumented Students, and Policy Solutions,* 80 a.m. J. Econ. and Soc., 165 (2021) ("The advent of DACA and the extension of in-state tuition and financial aid to undocumented students in a growing number of states have increased college-going rates among undocumented students, yet these students still complete college at lower rates than their peers"); Wong (2020).

[41] Omar Martinez, et al., *Evaluating the impact of immigration policies on health status among undocumented immigrants: A systematic review,* J. of Immigrant and Minority Health, 17(3), 947–70 (2015), *https://doi.org/10.1007/s10903-013-9968-4*; Brian Allen, et al., *The children left behind: The impact of parental deportation on mental health,* J. of Child and Fam. Stud., 24(2), 386–92 (2015); Kalina M. Brabeck and Qingwen Xu, *The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration,* Hisp. J. of Behav. Sci., 32(3), 341–61 (2010).

[42] Elizabeth Aranda, et al., *The Spillover Consequences of an Enforcement—First US Immigration Regime,* Am. Behav. Scientist, 58(13), 1687–95 (2014); Samantha Sabo and Alison Elizabeth Lee, *The Spillover of US Immigration Policy on Citizens and Permanent Residents of Mexican Descent: How Internalizing "Illegality" Impacts Public Health in the Borderlands,* Frontiers in Pub. Health, 3, 155 (2015).

individuals reporting moderate or worse psychological distress.[43]

Another commenter stated that DACA facilitates the healthy development of recipients' children. The commenter remarked that DACA helps families feel comfortable accessing public programs that support their children and provides income that increases access to healthcare, nutritious food, and upward mobility. Relatedly, a commenter stated the DACA policy protects public health because DACA recipients are more likely to have health insurance than similarly situated undocumented noncitizens who do not have DACA. The commenter said DACA reduces the overall burden on the healthcare system because individuals with lawful status and health insurance are more likely to seek out preventive care, rather than relying on more expensive, more intrusive, and often less successful emergency-department care. According to the commenter, this increased ability to access healthcare also makes it easier to correctly monitor the public health of the population and respond to public health issues effectively.

Other commenters stated that DACA reduces noncitizens' vulnerability to domestic and sexual violence and other exploitation by helping to ensure they can live safely and be economically independent. One commenter said that DACA promotes safety for survivors of domestic violence, sexual assault, trafficking and other gender-based violence by eliminating the fear that their abusers can contact immigration authorities if they seek help or attempt to leave an abusive situation. The commenter went on to say that access to work authorization through DACA further strengthens survivors' ability to leave abusive or exploitative situations by enabling them to support themselves and their families.

*Response:* DHS appreciates commenters' recognition of the measure of assurance and stability DACA provides to recipients and their families. DHS agrees that these benefits help DACA recipients, their families, and communities. DHS also agrees that DACA facilitates the physical and mental well-being of recipients and their families by providing, in many cases, access to employer-sponsored health insurance and stable income that allows recipients in turn to provide their families with food, shelter, clothing, and adequate medical care. DHS also appreciates that in States that

have chosen to provide State-only funded health care programs to DACA recipients, DACA may better protect public health by expanding access to healthcare.

In addition, DHS agrees that there are reports concluding that by providing recipients with a measure of security with respect to immigration matters, the DACA policy reduces psychological stress and anxiety while also decreasing barriers to interacting with the healthcare system, helping to promote early detection and treatment of medical conditions before they worsen into serious conditions requiring more extensive treatment. DHS also notes that uncertainty regarding one's immigration situation contributes to increased levels of stress, and that DACA may reduce such stress for its recipients.[44]

DHS also appreciates commenters stating that the DACA policy supports safety for survivors of gender-based violence, trafficking, and abuse by enabling economic self-sufficiency and minimizing fear of an abuser reporting them to immigration authorities, thereby providing recipients with more confidence to seek help or leave abusive or exploitative circumstances. DHS notes the existence of multiple additional immigration options specifically available to certain victims of crimes.[45]

*Comment:* One commenter, referencing evidence from a series of federal district court cases from Texas regarding the Napolitano Memorandum, cited a 2017 survey which found that roughly 22 percent of DACA participants stated they would "likely" or "very likely" return to their country of origin or elsewhere if DACA were to end, if they were not given permission to work in the United States, or if deferred action were not granted. The commenter stated that these data contradict the Department's rationale regarding the well-being of these individuals if the proposed rule were not issued, and that "[m]any if not all will depart our country for their place of origin or elsewhere."

*Response:* DHS acknowledges the data cited in connection with the commenter's statement that "many if not all" DACA recipients would leave the United States in the absence of the DACA policy. DHS notes that approximately 22 percent of DACA recipients surveyed stated in 2017 that they would "likely" or "very likely" return to their country of origin if they lost their work authorization or deferred action or if they could not receive either in the first place. However, DHS notes that this data is five years old, calls for some degree of speculation by DACA recipients, and was collected in a particular time and context. Even taking the results at face value, DHS notes that less than a quarter of DACA recipients surveyed assessed that they would "likely" or "very likely" leave the country if DACA ended, whereas approximately half reported that they were "unlikely" or "very unlikely" to leave. DACA recipients necessarily came to the United States at a very young age, and many have lived in the United States for effectively their entire lives. For many DACA recipients, the United States is their only home. Indeed, some DACA recipients do not even speak the language of their parents' home country. Precisely for these reasons, DACA recipients often would face significant barriers to living self-sufficiently in their countries of origin if they lost their grants of deferred action or work authorization.

*Comment:* One commenter stated that because the policy was never intended to be permanent, DACA recipients' reliance interests are very weak, and "can be remediated by other means such as grace period and/or congressional actions." Another commenter said it is unclear what kind of reliance interests DACA recipients have from a policy that did not receive any public comments or consider any alternatives. Another commenter stated that DHS made the wrong assumptions regarding existing DACA recipients' reliance interests and that it is unclear what reliance interests DACA recipients have when they request DACA when DACA recipients should be aware of the possibility that the policy could be terminated at any time.

*Response:* DHS disagrees with commenters to the extent that they suggest that DACA recipients lack reliance interests worthy of meaningful consideration. As explained by the Supreme Court's *Regents* decision, the method of DACA's original implementation—including the Napolitano Memorandum's statement that it "conferred no substantive rights" and the limitation to two-year grants—

---

[43] Atheendar Venkataramani, et al., *Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study*, The Lancet, Pub. Health, 2(4), 175–81 (2017).

[44] *See, e.g.,* Luz M. Garcini, et al., *Health-Related Quality of Life Among Mexican-Origin Latinos: The Role of Immigration Legal Status*, 23 Ethnicity & Health 566, 578 (2018) (hereinafter Garcini (2018)) (finding significant differences in health-related quality of life across immigration legal status subgroups and noting that increased stress was one factor that diminished well-being for undocumented immigrants); Osea Giuntella, et al., *Immigration Policy and Immigrants' Sleep. Evidence from DACA,* 182 J. Econ. Behav. & Org. (2021) (hereinafter Giuntella (2021)).

[45] *See* DHS, *Immigration Options for Victims of Crimes, https://www.dhs.gov/immigration-options-victims-crimes* (last updated Jan. 30, 2022).

did not "automatically preclude reliance interests." [46] At the same time, the Court cautioned that such limitations "are surely pertinent in considering the strength of any reliance interests." [47] In the Court's view, before deciding to terminate the DACA policy, notwithstanding the method of DACA's original implementation, DHS was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests along with "other interests and policy concerns." [48]

DHS has evaluated the relevant reliance interests—and the policy stakes more generally—with the Court's decision in mind. With respect to reliance interests in particular, DHS recognizes, as the Court did, that the expressly limited and discretionary nature of the deferred action conferred upon individuals under the DACA policy (who are not guaranteed a grant or renewal of DACA, whose DACA may be terminated in USCIS' discretion, and who have no right or entitlement to remain in the United States) is relevant to the assessment of reliance interests. At the same time, DHS is aware of the real-world decisions that approximately 825,000 DACA recipients and their families, employers, schools, and communities have made over the course of more than 10 years of the policy being in place. While acknowledging and emphasizing the absence of a legal right, DHS would hesitate to conclude that reliance on DACA was "unjustified" or entitled to significantly "diminished weight" in light of the express limitations in the Napolitano Memorandum.[49] At the same time, DHS agrees that its determination regarding the existence of "serious" reliance interests does not dictate the outcome of this rulemaking proceeding, but is just one factor to consider.[50]

DHS appreciates the recommendation for a grace period, and observes that the Court discussed this possibility as well.[51] DHS believes that in many cases, a grace period (even a lengthy grace period) would be insufficient to avoid the significant adverse consequences associated with terminating the DACA policy, because the planned termination of the policy on a broad scale (whether within months or years) would ultimately prove far more harmful to DACA recipients and their families, employers, schools, and communities

than the policy pursued in this final rule. It would also not meaningfully change the number of people without lawful status in the United States. DHS notes that in staying its 2021 vacatur in *Texas* with respect to renewal requestors, the district court noted the "hundreds of thousands of DACA recipients and others who have relied upon this program for almost a decade" and that their "reliance has not diminished and may, in fact, have increased over time." [52]

DHS acknowledges that while new initial DACA requestors' reliance interests may be less robust or clear as those of current DACA recipients, it is also true that among prospective DACA requestors, there are many who have not yet "aged in" to request deferred action under DACA. These individuals and their families, schools, and communities may have deferred or made choices in reliance upon their future ability to request DACA, even as DHS's decision whether to confer deferred action to a DACA requestor remains a fully discretionary case-by-case decision, and even though deferred action itself does not provide any right or entitlement to remain in the United States.

### 4. Impacts on Other Populations, Including U.S. Workers and Other Noncitizens

#### Impacts on U.S. Workers and Wages

*Comment:* A few commenters generally opposed the proposed rule based upon its perceived impact on U.S. workers. Some of these commenters said that U.S. citizens would lose jobs to DACA recipients, while others stated more generally that DACA affects jobs and benefits for U.S. citizens or those with lawful immigration status. Other commenters stated that DACA recipients and other unauthorized noncitizens steal jobs from U.S. citizens and depress wages, often for the benefit of large corporations. One commenter said that DACA results in depressed wages and a lower standard of living for low-income persons of color.

One commenter stated that the proposed rule made an incorrect and unfounded assumption that jobs held by DACA recipients cannot be replaced by someone else. Instead, the commenter stated, terminating the DACA policy or its employment authorization would provide more jobs for U.S. workers, benefit communities, reduce unemployment rates, and potentially increase the wages of U.S. workers. The commenter stated that DHS's logic in analyzing the impacts of terminating the

DACA policy is flawed, because: (1) jobs currently held by DACA recipients can be replaced by someone else and (2) the time businesses need to find replacement workers does not differ from that involved in regular worker turnover in a market economy and is not based on workers' immigration status.

Another commenter stated that DHS made a "misleading and plainly wrong claim" that DACA recipients have been essential workers during the COVID–19 pandemic, arguing that, while some may indeed be essential workers, most are not. The commenter suggested that, if DHS wanted to prioritize this population for deferred action, it could have established additional requirements for DACA eligibility, such as employer sponsorship or evidence of being an essential worker.

In contrast, one commenter stated that DACA has a positive effect on wages, as compared to a circumstance where unauthorized noncitizens continue to work. The commenter wrote that according to the Department of Labor's National Agricultural Worker Survey, more than two thirds of farmworkers are foreign-born and a majority of those lack work authorization.[53] The commenter stated that DACA helps avoid a circumstance where undocumented workers are easily exploitable, which in turn depresses wages and working conditions for other farmworkers. Citing their own studies, joint commenters also said their research indicates that not only does the DACA policy not harm low-wage U.S. citizen workers, but also that it actually boosts the wages and employment of this population.[54] The commenters stated that the position that DACA harms citizens is based on the "faulty premise" that if the DACA policy were ended, the population of young undocumented noncitizens would leave the United States. The commenter said because many DACA recipients have spent most of their lives in the United States, and some do not speak the language of their country of

---

[46] *See Regents,* 140 S. Ct. at 1913.

[47] *See id.* at 1913.

[48] *See id.* at 1909–15.

[49] *See id.* at 1914.

[50] *See id.*

[51] *See id.*

[52] 549 F. Supp. 3d at 624.

[53] *See* U.S. Department of Labor, *Findings from the National Agricultural Workers Survey (NAWS) 2017–2018 (2021), https://www.dol.gov/sites/ dolgov/files/ETA/naws/pdfs/ NAWS%20Research%20Report%2014.pdf.*

[54] Ike Brannon and M. Kevin McGee, *Estimating the Economic Impacts of DACA* (July 5, 2019), *https://ssrn.com/abstract=3420511 or http:// dx.doi.org/10.2139/ssrn.3420511* [hereinafter Brannon and McGee (2019)]. ("Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA is lose-lose-lose, benefiting virtually no one while hurting pretty much everyone.").

citizenship, voluntary self-deportation is unlikely.

*Response:* DHS acknowledges and shares commenters' desire to ensure that U.S. workers are not harmed by the DACA policy. As an initial matter, DHS notes that beginning in August 2021 and continuing into 2022, the U.S. economy experienced more job openings than available workers.[55] Nevertheless, DHS agrees, in principle, that jobs currently held by DACA recipients might potentially be performed by U.S. citizens or noncitizens with lawful immigration status if DACA recipients lost their work authorization. However, myriad factors influence employment rates in a market economy, including prevailing conditions in specific labor markets and unique characteristics of local economies, and importantly, these various factors are interrelated and dynamic rather than independent and static. (In some circumstances, for example, hiring DACA recipients might actually boost employment of citizens and those with lawful immigration status, such as where hiring DACA recipients increases the potential for business expansion and thus leads to increased employment.) For these reasons, it is overly simplistic to predict that elimination of employment authorization for DACA recipients would result in a transfer of jobs and their corresponding wages from DACA recipients to citizens or those with lawful immigration status.

As discussed in further detail in Section II.A.5, DHS cannot quantify the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, and training needs, and labor market regulations, among others. As noted, labor market conditions are not static; the hiring of DACA workers might contribute to expansion in business activity and potentially in increased hiring of American workers.[56] As discussed in further detail in Section

II.A.5, similar to the citizen population, noncitizens, including DACA recipients, also pay taxes; stimulate the economy by consuming goods, services, and entertainment; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations.[57] The net effect on employment of citizens is difficult to specify and might turn out to be positive. DHS believes that these investments that DACA recipients have made in their communities and in the country as a whole are substantial.

With regard to wage rates, DHS recognizes that, in general, any increase in labor supply or improvement in labor supply competition may potentially affect wages and, in turn, the welfare of other workers and employers.[58] But the magnitude and even the direction of the effect are challenging to specify in the abstract. As with employment, so with wages: Changes in wages depend on a range of factors and relevant market forces, such as the type of occupation and industry, and overall economic conditions. For example, in industries such as healthcare, agriculture, food services, and software development, labor demand might outpace labor supply. In such sectors, increases in the labor supply might not be enough to satisfy labor demand, resulting in increases in wages to attract qualified workers, thereby improving welfare for all workers in these sectors. The opposite could happen for industries or sectors where labor supply outpaces labor demand.[59]

With respect to comments regarding the assumptions and methodology for the labor market impact portion of the NPRM, the bases for DHS's assumptions and estimates of labor market impacts was discussed extensively in Section V.A.4.D. of the NPRM. This section included a discussion of the 2017 National Academies of Sciences, Engineering, and Medicine (NAS) Report, wherein an expert panel of immigration economists examined the peer-reviewed literature on displacement and wage effects of immigrants on native workers and attempted to describe what consensus exists around decades of findings. To the extent that this panel found research indicating that noncitizen workers displace or negatively affect the wages of U.S. citizen workers, most of these effects occur with the lowest wage jobs, potentially affecting teens and

individuals without a high school diploma.[60] DHS acknowledged this potential effect in the NPRM, and explained that the literature consistently finds these less favorable labor-market effects were more likely to occur to certain disadvantaged workers and recent prior immigrants, resulting in "very small" impacts for citizens overall.[61] The NPRM also described studies discussed in the 2017 NAS Report's survey of research indicating that highly skilled noncitizen workers positively impact wages and employment of both college-educated and non-college-educated citizens.[62] This is a similar finding to what commenters pointed to in their own studies.[63] Additionally, as a commenter noted, many current and potential DACA recipients would remain in the United States even without deferred action or employment authorization. A lack of access to employment authorization by these individuals would give rise to greater potential for exploitation and substandard wages, which in turn may have the effect of depressing wages for some U.S. workers.

Given the lack of additional evidence provided by the commenter on the impact of DACA recipients participation in the labor force, DHS has not substantially revised its analysis in response to this comment.

*Impacts on Other Noncitizens*

*Comment:* A commenter stated that DHS never elicited public comment or considered reliance interests when it proposed shifting costs from ICE and CBP to fee-paying noncitizens. Some commenters stated that DHS failed to sufficiently articulate why it prioritizes the DACA population over other lawful, well-qualified noncitizens, including international students, F–1 Optional Practical Training (OPT) students with postgraduate degrees, dependents of H–1B highly skilled workers, H–4 dependents, or EB–1 applicants. Commenters said that "hundreds of thousands" of individuals in these other groups face the same mental stress as DACA recipients when unable to work, secure employment authorization or visa status, or faced with deportation.

*Response:* As an initial matter, DHS did elicit public comments and consider reliance interests related to DACA, and so it disagrees with the claim that it did not do so. In the NPRM, DHS specifically and explicitly requested "comments on potential reliance

---

[55] Bureau of Labor Statistics data show that as of March 2022, there were 0.5 unemployed persons per job opening. U.S. Department of Labor, U.S. Bureau of Labor Statistics, *Number of Unemployed Persons per Job Opening, Seasonally Adjusted (March 2007 through March 2022)*, https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm (last visited May 23, 2022).

[56] NAS, *The Economic and Fiscal Consequences of Immigration* (2017), https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration* (hereinafter 2017 NAS Report), at 195.

[57] 86 FR 53801.
[58] 86 FR 53800.
[59] 86 FR 53800.

[60] 86 FR 53801.
[61] 86 FR 53801.
[62] 86 FR 53801.
[63] *See* Brannon and McGee (2019).

interests of all kinds, including any reliance interests established prior to the issuance of the Napolitano Memorandum, and how DHS should accommodate such asserted reliance interests in a final rule.'' [64] DHS acknowledges commenters' concerns about the numerous other classes of noncitizens who face stresses similar to those experienced by the DACA population with respect to their immigration status, lack of work authorization, and potential removal from the United States. DHS, however, scoped the proposed rule to address DACA in particular. DHS views the DACA-eligible population as particularly compelling candidates for deferred action by virtue of their entry to the United States as children, and by virtue of the substantial reliance interests that have developed over a period of time among DACA recipients and their families, schools, communities, and employers. DHS does not disagree with the view that other populations share characteristics that are compelling in their own way. But DHS has decided as a matter of policy to focus this rule on preserving and fortifying DACA as directed by the Biden Memorandum.

*Comment:* Some commenters stated that resources used on policies such as DACA increase backlogs, delays, and otherwise bog down the courts and enforcement agencies, which unfairly affects other noncitizens. Commenters said that DACA diverts staff and resources away from lawful immigration programs and increases the costs and delays for legal immigrants to service the interests of unauthorized noncitizens. Some commenters stated that DHS failed to consider the reliance interests of lawful immigrants and nonimmigrants in USCIS expeditiously adjudicating their petitions. One of these commenters opposed DACA requests taking precedence over other immigration filings, such as employment-based visas. The commenter objected that although many applicants for other immigration benefits are facing long processing delays due to the COVID–19 pandemic, USCIS shifted resources amid insufficient staffing levels due to fiscal challenges, built new case management system enhancements, and trained and reassigned officers to process initial DACA filings. Other commenters stated that claiming there is insufficient funding for Congress to enforce immigration laws on DACA recipients is ''puzzling,'' as the proposed rule would cost the Department ''millions of

dollars'' by not charging the full cost of processing DACA requests.

Another commenter remarked that the $93 million allocated to DACA adjudications would have been better spent upgrading USCIS' IT systems and expanding online filing capabilities. Commenters also stated that it is unfair to those seeking U.S. citizenship by following immigration laws and that DACA would make things worse for those legally trying to become citizens and easier for those who wish to use the United States for their own benefit. Another commenter urged USCIS to devote its limited resources to lawful immigration programs that Congress has authorized instead of diverting manpower, office space, and agency funds to ''amnesty programs'' benefiting undocumented individuals and ''those who profit off of continuous illegal immigration into the United States.''

*Response:* DHS acknowledges the interests of noncitizens seeking immigrant or nonimmigrant status in the timely adjudication of their petitions, and USCIS is strongly committed to reducing backlogs and improving processing times.[65] DHS notes as it did in the NPRM that the costs of USCIS are generally funded by fees paid by those who file immigration requests, and not by taxpayer dollars appropriated by Congress.[66] Funds spent on DACA adjudications do not take any resources away from other workloads, which (with very few exceptions) may be funded by other fees. Rather, DACA revenue provides USCIS with the resources it needs to maintain the policy. Consistent with that authority and USCIS' reliance on fees for its funding, and as discussed in greater detail in Section II.C.5.a, this rule amends DHS regulations to codify the existing requirement that requestors file Form I–765, Application for Employment Authorization, with Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and re-classifies the $85 biometrics fee as a Form I–821D filing fee, to fully recover DACA adjudication costs.[67]

In the NPRM and related material,[68] USCIS explained that the proposed $85

fee for DACA would not recover the full costs for individuals who did not request an EAD and pay the full costs of the Form I–765.[69] In codifying the requirement that requestors submit both Forms I–765 and I–821D, USCIS is ensuring that all adjudicative costs are fully recovered and no costs of DACA are passed on to other fee-paying populations. As Tables 3 and 4 of the Supplemental Cost Methodology Document make clear, charging the full cost of $332 for each Form I–821D would be double-counting each requestor's fair share of the same indirect costs on both their Form I–821D and Form I–765 given that the estimated additional cost of processing a Form I–821D attached to a Form I–765 is negligible. Therefore, in light of the changes made in the final rule, DHS disagrees with the suggestion that this rule displaces resources, including staffing for other noncitizens. To the contrary, ending DACA would reduce USCIS revenue from DACA-related fees, which cover not only the direct costs of staffing, systems, and other resources to process DACA requests, but also contribute to recovering an appropriate portion of indirect costs that USCIS would incur even in the absence of DACA. As explained in the Supplemental Cost Methodology Document, the cost model proportionately distributes the total estimated budget for USCIS across various activities.[70] Table 4 of the same document lists all of the activities that contribute to the $332 cost estimate, including indirect activities in the DACA cost model. For example, the cost model includes the Management and Oversight activity which includes all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.[71] DACA's proportionate share of the activity cost is $140 in Table 4 of the Supplemental Cost Methodology Document. In the absence of DACA, USCIS would still incur costs for this activity. In short, as it relates to fees in particular, the DACA policy works in the interest of other immigrants and nonimmigrants by covering the full cost of DACA policy without burdening other USCIS customers with additional costs to fund DACA. Additionally, many investments in case management system development, training, or previous adjudications are sunk costs. In other words, ending DACA would not

---

[64] 86 FR 53803.

[65] *See, e.g.,* USCIS, *USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders* (Mar. 29, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

[66] *See* INA sec. 286(m), 8 U.S.C. 1356(m).

[67] *See* new 8 CFR 236.23(a)(1).

[68] *See* USCIS, *DACA NPRM Supplemental Cost Methodology Docket* (Sept. 28, 2021), *https://www.regulations.gov/document?D=USCIS-2021-0006-0008* (hereinafter Supplemental Cost Methodology Docket).

[69] *See* 86 FR 53764.

[70] Supplemental Cost Methodology Docket at 8–10.

[71] *Id.* at 6.

recapture time or money invested in the past.

### 5. Impacts on the Economy, Communities, and States

#### Impacts on the Economy

*Comment:* A number of commenters expressed support for the proposed rule, stating that it would have positive economic effects at local, State, and national levels. The commenters said that the proposed rule would allow recipients to start, own, and contribute to businesses, which could help create jobs for other Americans, and would spur further economic activity. Commenters also noted the proposed rule would allow DACA recipients to contribute to State and Federal tax revenue, and to pursue education that would eventually help them work in critical jobs, which would decrease labor shortages facing the United States.

Citing their own research, another commenter stated DACA's implementation increased the education, employment, and wages of DACA recipients while also boosting tax revenue and output. The commenter cited its 2019 study that found that eliminating DACA would result in the DACA population losing about $120 billion in income, the Federal Government losing approximately $72 billion in tax revenue, and States and local governments losing about $15 billion in tax revenue over the 2020–2029 decade.[72] Likewise, a joint comment of 14 States' Attorneys General stated that given the economic contributions of DACA recipients, the effect of a full rollback of DACA would result in a loss of an estimated $280 billion in national economic growth over the course of a decade. Another commenter cited multiple studies indicating that the DACA policy improves labor market prospects of DACA recipients by expanding "above the table" work opportunities. The commenter stated that in some studies this is captured in simple measures like reduced unemployment and better wages, while other studies confirm that DACA recipients find jobs that are experienced as a better "fit" and more satisfactory even at similar wage levels.[73]

In addition to comments noted above regarding potential displacement of workers by DACA recipients, multiple commenters suggested DACA recipients help to fill labor gaps amid labor shortages in the United States, with a joint comment pointing to the 8.4 million job seekers as compared to the 10 million job openings in the United States as of September 2021. These commenters cited statistics that 46 percent of DACA recipients have a bachelor's degree or higher,[74] and as a group they tend to be younger, better educated, and more highly paid than the typical immigrant.[75] As a result, they are poised to contribute to the worker pool for higher-skilled jobs that U.S. employers have reported having difficulty filling with other workers.[76] Another joint comment cited a 2019 survey in which 64 percent of small businesses reported they had tried to hire workers, but of those, 89 percent reported they found few or no qualified applicants, and asserted that DACA recipients have helped to fill these worker shortages, especially during the COVID–19 pandemic.[77] Another commenter wrote that DACA recipients who pursue higher education help offset critical shortages of skilled labor in the United States and become better positioned to support their families, communities, and the U.S. economy. Some commenters stated that if the DACA policy were terminated, then worker shortages would increase. For example, a commenter stated that if DACA recipients were to lose their protections, an estimated 30,000 front line healthcare workers would be displaced. Additionally, a commenter stated that DACA recipients fill a need in the United States for bilingual employees.

Pointing to other labor market and economic benefits of DACA, a commenter cited a large study showing that DACA recipients play a critical role in the creation of jobs and increasing spending in local economies.[78] Commenters also said that the proposed rule would allow recipients to contribute to innovation in the U.S. economy and mitigate aging trends in the U.S. population.

*Response:* DHS acknowledges some commenters' support for the rule and agrees that DACA recipients and their households have made substantial economic contributions to their communities. The communities in which DACA recipients live, and DACA recipients themselves, have grown to rely on the economic contributions this policy facilitates.[79] As noted above, the Napolitano Memorandum contains express limitations, but over the 10 years in which the DACA policy has been in effect, DACA recipients have made major good faith investments in both themselves and their communities, and their communities have made major good faith investments in them. In the Department's judgment, the investments, and the resulting benefits, have been substantial and valuable.

DHS also acknowledges some commenters' concerns regarding the economic impact that terminating the DACA policy would have. DHS appreciates the comments regarding the number of healthcare workers who are DACA recipients and the role that DACA recipients play in job creation and spending in local economies. DHS agrees that without DACA, DACA recipients in the labor market would lose employment. Additionally, beyond the immediate impact of job loss to DACA workers and their employers, the impacts to the broader economy would depend on factors such as the nature of the jobs being performed, the level of substitutability with similarly skilled workers, and DACA recipients' ability and willingness to find undocumented employment. Similarly, as with any other population, DACA recipients participate in the local and broader U.S. economy in various employment or consumer roles and thus impact their communities and beyond.

DHS has described the assumptions used in the labor market section of the

---

[72] Brannon and McGee (2019).

[73] Pope (2016); Wong (2020); Erin R. Hamilton, Caitlin Patler, and Robin Savinar, *Transition into liminal legality: DACA's mixed impacts on education and employment among young adult immigrants in California,* Soc. Probs., 68(3), 675–95 (2021).

[74] Tom K. Wong, et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November,* Center for American Progress (Sept. 19, 2019), *https://www.americanprogress.org/ issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-november.*

[75] Ike Brannon and Logan Albright, *The Economic and Fiscal Impact of Repealing DACA,* Cato at Liberty (Jan. 18, 2017), *https://www.cato.org/blog/ economic-fiscal-impact-repealing-daca* (hereinafter Brannon and Albright (2017)).

[76] William C. Dunkelberg and Holly Wade, *Small Business Economic Trends,* Nat'l Fed'n of Indep. Bus. (Oct. 2021), *https://www.nfib.com/surveys/ small-business-economic-trends,* at 1; Anneken Tappe, *Nearly half of American companies say they are short of skilled workers,* CNN (Oct. 25, 2021), *https://www.cnn.com/2021/10/25/economy/ business-conditions-worker-shortage/index.html.*

[77] Nat'l Fed'n of Indep. Bus., *Small Business Optimism Index* (Aug. 2019), *https://www.nfib.com/ surveys/small-business-economic-trends.*

[78] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow,* Center for American Progress (Aug. 28, 2017), *https://www.americanprogress.org/article/daca-recipients-economic-educational-gains-continue-grow.*

[79] Reasonable reliance on the existence of the DACA policy is distinct from reliance on a grant of DACA to a particular person. Individual DACA grants are discretionary and may be terminated at any time, but communities, employers, educational institutions, and State and local governments have come to rely on the existence of the policy itself and its potential availability to those individuals who qualify.

RIA as well as in the estimated costs and benefits. There are many open questions here. It cannot be said with certainty whether all jobs held by DACA recipients are fully replaceable or irreplaceable by other workers, and local labor market conditions can vary such as industry characteristics and preferences for specific types of skills by employers. For example, U.S. employers apply for employment-based immigrant visas for foreign workers on an annual basis. These employment-based immigrant visas are for jobs for which there are not enough domestic workers, domestic workers with the required skills, and/or domestic workers with the required level of education. In these cases, domestic labor is not readily available as a substitute. For example, the medical field exhibits shortages of workers such as physicians, nurses, and other professionals, and nearly 30,000 DACA recipients are employed in the medical field.[80] Indeed, DACA recipients who are healthcare workers are also helping to alleviate a shortage of healthcare professionals in the United States, and they are more likely to work in underserved communities where shortages are particularly dire.[81] Whether jobs that DACA recipients occupy can be easily replaced by other authorized workers is a complex matter that depends on factors such as the nature of the job, the industry, and the employer, among others. Nevertheless, DHS considered evidence presented by these commenters, as well as the empirical findings discussed in the 2017 NAS report. DHS has determined that, on balance, the various positive economic impacts of DACA outweigh the potential adverse impacts to the labor market.

*Comment:* Many commenters cited studies indicating DACA recipients contribute to Federal, State, and local tax revenue, as well as Medicare and Social Security. For example, numerous commenters wrote that DACA recipients pay taxes—$5.6 billion in Federal taxes and $3.1 billion in State and local taxes annually according to one study using 2020 data—and contribute significantly to Social Security and Medicare.[82] Another commenter pointed to studies that in California alone, DACA-eligible

noncitizens make $905.4 million in Federal tax contributions and $626.6 million in State and local tax contributions,[83] and that "reversing" the DACA policy would result in a $351 billion loss for the U.S. economy and a $92.9 billion loss in tax revenue.[84] Another commenter, however, said that DHS could not establish these estimates without the names and tax returns of the affected populations.

Commenters identified other economic contributions of DACA recipients beyond tax payments. Some commenters cited statistics that DACA recipients hold $25.3 billion in spending power.[85] Many commenters also provided statistics and general information on other ways DACA recipients contribute to the economy by increasing consumer spending, purchasing homes and making $566.7 million in annual mortgage payments, paying $2.3 billion in annual rental payments, buying cars, applying for lines of credit, and opening businesses.[86] Commenters stated that recipients' purchasing power increases once they receive DACA, citing surveys stating that a majority of DACA recipients reported having purchased their first car after receiving DACA.[87]

Numerous commenters stated that many DACA recipients have been employed in essential industries such as education, the military, and healthcare during the COVID–19 pandemic. A commenter wrote that DACA recipients form a critical, stable, and reliable workforce that enables retailers to continue to provide goods and services throughout the pandemic. Some commenters stated that DACA recipients are critical members of unions and workforces across many sectors of the economy. Several commenters cited studies stating that DACA recipients boost wages and increase employment opportunities for all U.S. workers.[88] Others wrote that

there are significant business and economic reasons to preserve DACA as its recipients drive innovation, create breakthroughs in science, build new businesses, launch startups, and spur job growth. Another commenter stated that more than two-thirds of farmworkers are immigrants and most of them lack work authorization. The commenters continued that DACA is therefore necessary to protect immigrants from employer exploitation and abuse. The commenters further stated that the presence of an easily exploitable workforce depresses wages and working conditions for all farmworkers, including the hundreds of thousands of U.S. citizens and lawful immigrants who work in agriculture.

*Response:* DHS appreciates commenters' recognition of DACA recipients' contributions, both prior and ongoing, tangible and intangible, to the U.S. economy. DHS agrees members of the DACA population carry substantial spending power, generate billions in tax revenue, and fill vital roles across a broad array of industries. DHS disagrees with the comment that DHS is not able to establish various estimates without the names and tax returns of the affected populations. To develop estimates of the quantified costs and benefits presented in this rule, DHS did not need the names and tax returns of individuals in the estimated population. Moreover, DHS's methodology for the analysis is clearly presented in the RIA of this rulemaking.

Commenters, in DHS's view, correctly note that the DACA policy and DACA recipients improve economic conditions broadly in the United States by driving innovation, starting businesses, and employing themselves and others,

---

[80] *See, e.g.,* Xiaoming Zhang, et al., *Physician workforce in the United States of America: forecasting nationwide shortages,* Human Resources for Health, 18(1), 1–9 (2020); Svajlenka (2020).

[81] Chen (2019) presents survey data showing that 97 percent of undocumented students pursuing health and health-science careers planned to work in an underserved community.

[82] *See* Svajlenka and Wolgin (2020). *See also* Hill and Wiehe (2017) (analyzing the State and local tax contributions of DACA-eligible noncitizens in 2017).

[83] Higher Ed Immigration Portal, *California—Data on Immigrant Students, https:// www.higheredimmigrationportal.org/state/ california* (last visited June 9, 2022).

[84] Logan Albright, et al., *A New Estimate of the Cost of Reversing DACA,* Cato Inst. (Feb. 15, 2018), *https:// www.cato.org/publications/working-paper/ new-estimate-cost-reversing-daca* (hereinafter Albright (2018)).

[85] *See* Nicole Prchal Svajlenka and Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition,* Center for American Progress (Nov. 24, 2021), *https:// www.americanprogress.org/article/the- demographic-and-economic-impacts-of-daca- recipients-fall-2021-edition.*

[86] *See* Svajlenka and Wolgin (2020).

[87] *See* Wong (2020).

[88] *See, e.g.,* Brannon and Albright (2017); Albright (2018); Brannon and McGee (2019); Ike Brannon and M. Kevin McGee, *Estimating the Economic*

*Impact of the 2021 Dream Act* (June 6, 2021), *https://ssrn.com/abstract=3861371* or *http:// dx.doi.org/10.2139/ssrn.3861371* (hereinafter Brannon and McGee (2021)); Martin Ruhs and Carlos Vargas-Silva, *The Labour Market Effects of Immigration,* Migration Observatory (Feb. 2021), *https://migrationobservatory.ox.ac.uk/resources/ briefings/the-labour-market-effects-of-immigration;* Matthew Denhart, *America's Advantage: A Handbook on Immigration and Economic Growth,* George W. Bush Inst. 118–19 (3d ed. Sept. 2017), *http://gwbcenter.imgix.net/Resources/gwbi- americas-advantage-immigration-handbook- 2017.pdf;* Ryan D. Edwards and Mao-Mei Liu, *Recent Immigration Has Been Good for Native-Born Employment,* Bipartisan Pol'y Ctr. (June 2018), *https://bipartisanpolicy.org/download/?file=/wp- content/uploads/2019/03/Recent-Immigration-Has- Been-Good-for-Native-Born-Employment.pdf;* Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy,* PBS NewsHour (Nov. 2, 2018), *https://www.pbs.org/newshour/economy/ making-sense/4- myths-about-how-immigrants- affect-the-u-s-economy;* Alex Nowrasteh, *Three Reasons Why Immigrants Aren't Going to Take Your Job,* Cato at Liberty (Apr. 22, 2020), *https:// www.cato.org/blog/three-reasons-why-immigrants- arent-going-take-job.*

thereby reducing reliance on public assistance (to the extent that such reliance is possible given eligibility restrictions) and pressure on the job market for low-skilled workers. DHS also agrees that if members of the DACA population stopped performing their work, labor shortages could be exacerbated depending on the industry and employer.

DHS appreciates commenters' concern for the well-being of agricultural workers. DHS agrees that the ability to lawfully work empowers employees in all sectors to leave dangerous employment situations by decreasing fear that reporting exploitative or illegal employment practices could potentially result in immigration consequences. Additionally, as mentioned above, a lack of access to employment authorization raises the potential for exploitation and substandard wages, which in turn may have the effect of depressing wages for some U.S. workers. Thus, making employment authorization available to DACA recipients helps protect U.S. workers and employers against the possible effects of unauthorized labor.

Other Impacts on Communities

*Comment:* Some commenters described DACA recipients as law-abiding, valued members of their communities. Commenters also supported the proposed rule based on positive impacts on communities and society as a whole. These commenters stated that the proposed rule would prevent families and communities from being separated; encourage diversity; and allow recipients to participate in military service, jobs, and community service roles that keep communities safe. One commenter expressed agreement with DHS's overall description of the substantial reliance interests of communities on DACA recipients.

Other commenters stated that DACA was a crucial part of facilitating professional licensing eligibility, opening the door to licensure for many professions, including as a lawyer, teacher, doctor, nurse, social worker, or psychologist. These commenters further stated that communities have benefited from the education, professional expertise, and professional and economic contributions of DACA recipients in those professions. One of these commenters further stated that the increasing number of DACA recipients admitted to the Bar Associations of their respective States has promoted diversity in the legal profession while also helping to ensure all communities

understand the judicial process and have greater access to justice. A joint comment by 14 States also identified examples of reliance interests engendered by community and State-level investments in the DACA population; for example, losing the benefits of investment into the training of DACA recipients working in healthcare who have committed to four years of post-graduation work in underserved Illinois communities.

Other commenters opposed the rule, stating that undocumented noncitizens exacerbate affordable housing shortages and that U.S. citizens should instead be prioritized.

*Response:* DHS acknowledges some commenters' support of the rule and agrees, as discussed in this rule, that there is strong evidence that DACA has had a positive impact on communities in promoting family unity, encouraging diversity, and opening pathways to military and other community service roles. DHS also recognizes, as discussed by commenters below, that the reduction of fear among DACA recipients contributes to improved law enforcement and community relations, which improves public safety.

DHS acknowledges the commenter's support for DHS's description of the substantial reliance interests of DACA recipients and communities. DHS appreciates the additional reliance interests identified by the commenter and agrees that some States have structured or amended their professional licensing requirements in reliance on the existence of the DACA policy, and therefore have reliance interests in the preservation of the DACA policy, as do the DACA recipients who have established careers dependent upon licensure by the State and the entities that employ professionally licensed DACA recipients.

DHS also acknowledges a commenter's concern that undocumented noncitizens, including DACA recipients, exacerbate the affordable housing shortage confronting some communities. Although some studies have examined the impact of immigration on housing,[89] the housing market is influenced by many factors, and DHS is unable to quantify the potential impact of the DACA policy itself on housing availability, including affordable housing. It is important to distinguish the effect of the DACA policy itself from the impact of current

DACA recipients and the DACA eligible population in the United States. Current and potential DACA recipients have shown, through a course of years, that many would remain in the United States even without deferred action or employment authorization. The presence of these noncitizens affects housing availability regardless of the DACA policy. Nonetheless, DHS acknowledges that, as some DACA recipients have increased their earning potential and incomes as a result of the DACA policy, this could arguably affect the availability of housing for others in those communities in which these DACA recipients reside. DHS is cognizant that, like other community impacts of the DACA policy, the impact upon housing availability can vary across communities. However, DHS has determined that the many positive impacts of the DACA policy on communities, as discussed throughout this section, outweigh the possible impact of DACA recipients, as a subset of a larger undocumented noncitizen population, on the availability of affordable housing in some communities.

Impacts on States

*Comment:* Some commenters generally opposed the proposed rule based on the use of public benefits programs, education resources, and other costs to the government by noncitizens and DACA recipients. A commenter stated that USCIS ignores the costs borne by local, State, and Federal agencies for services provided to DACA recipients, such as Medicaid services to pregnant women and bilingual education services provided to students in local schools, which the commenter asserts also result in higher taxes to U.S. citizens at the State and local levels. Commenters also stated that U.S. citizens and States have reliance interests weighing against promulgating this rule. These commenters stated that the government should take care of U.S. citizens before spending money on undocumented noncitizens or DACA recipients, that DACA recipients generally divert limited resources from U.S. citizens, and that the United States cannot financially or otherwise afford to support undocumented noncitizens, including DACA recipients.

Other commenters stated that DACA recipients should not be given special privileges, benefits, or money at the expense of American taxpayers. A commenter wrote, without accompanying citations or other support, that DACA recipients ''use much more than their fair share of social safety net programs especially in places

---

[89] *See, e.g.,* Abeba Mussa, et al., *Immigration and housing: A spatial econometric analysis,* J. of Housing Econ., 35, 13–25 (2017), *https://doi.org/10.1016/j.jhe.2017.01.002.*

like [N]ew [Y]ork where very few questions are asked, fake names and documentation is given and people without documentation are offered services citizens are unable to use at times.'' Some commenters stated that immigrants should prove that they can financially support themselves and will not be dependent on the U.S. Government. One commenter stated that in previous decades, DACA recipients have sent millions of American dollars in remittances back to their countries of origin with no repercussions.

The Attorney General of Texas submitted the only comment from a State expressing general opposition to the proposed rule. The comment stated that DACA increases the State's expenditures associated with education, healthcare, and law enforcement by incentivizing unauthorized noncitizens to remain in the country. The comment stated that Texas spends over $250 million each year in the provision of social services to DACA recipients. The comment also stated that unauthorized migration costs Texas taxpayers over $850 million each year: between $579 million and $717 million each year for public hospital districts to provide uncompensated care for undocumented noncitizens; $152 million in annual costs for incarceration of undocumented noncitizens in the penal system; between $62 million and $90 million to include undocumented noncitizens in the State Emergency Medicaid program; more than $1 million for The Family Violence Program to provide services to undocumented noncitizens for one year; between $30 million and $38 million per year on perinatal coverage for undocumented noncitizens through the Children's Health Insurance Program; and between $31 million and $63 million to educate unaccompanied noncitizen children each year.

In contrast, a joint comment submitted by the Attorneys General of 14 States [90] that together represent approximately 61 percent of the total DACA recipient population discussed how their States have adopted laws, regulations, and programs in reliance on the existing DACA policy and have a strong interest in preserving these frameworks and the benefits they secure to the States, as well as in avoiding the costs incurred upon adjusting or revoking these frameworks should DACA be revoked. The Attorneys General said that DACA recipients are vital members of and workers within

their communities, including essential workers and State government employees. To the extent that their States employ DACA recipients, they stated that ending the DACA policy would harm their States' reliance interests because they would lose the critical skills of these employees and their investments in these employees, while also incurring costs associated with terminating their employment and the additional costs of recruiting, hiring, and training their replacements. These States further noted that the increased earning power of DACA recipients is economically beneficial to their States, citing data that DACA recipients' estimated spending power is approximately $24 billion. The 14 States jointly commented that because the service sector represents approximately 80 percent of the U.S. GDP and 86 percent of total employment, and the service sector relies on consumer spending, this purchasing power is critical to the overall economic health of their States. Additionally, they noted that due to the economic stability and ability to make long-term plans provided by a DACA-related grant of deferred action and employment authorization, approximately a quarter of DACA recipients aged 25 and older have been able to purchase homes, creating jobs and boosting spending in their States, including California, where DACA recipients make yearly mortgage payments totaling $184.4 million. These States added that ending DACA, or limiting it to current active recipients, would result in significant losses in tax revenue—$260 million in State and local taxes over the next decade in California alone—and negatively impact their States' residents. They also noted that ending DACA would result in an estimated loss of $33.1 billion in Social Security contributions and $7.7 billion in Medicare contributions—funds that are critical to ensuring the financial health of these programs, upon which residents of their States depend.

These States also asserted that opponents of the DACA policy have failed to demonstrate a single law enforcement cost attributable to the policy, and cited an article in which numerous police chiefs, prosecutors, and other law enforcement professionals advocated for the continuation of DACA.[91] They went on to identify that mistrust of communities toward law enforcement is a significant challenge that results in individuals being less

likely to report being witnesses to or victims of crime. The commenters cited one recent study finding that in neighborhoods where 65 percent of residents are immigrants, there is only a 5 percent chance that a victim will report a violent crime, compared with a 48 percent chance in a neighborhood where only 10 percent of residents are born outside the United States (although the relationship in general was nonlinear).[92] Citing survey results that 59 percent of DACA recipients confirmed they would report crimes that they would previously have not reported in the absence of DACA, these States asserted that the benefits of such increasing cooperation far outweighs any alleged ways in which DACA hinders law enforcement.

The joint comment from these 14 States also disputed the notion that DACA imposes significant healthcare costs on the States, and stated that, to the extent there are costs, they do not outweigh the strong benefits and healthcare cost savings of DACA. They stated that DACA saves States money by allowing DACA recipients to receive employer-sponsored health insurance or to purchase insurance directly from carriers. Without DACA, they stated, those individuals would have to rely more on emergency services, as opposed to preventative services, in order to meet their healthcare needs, thereby increasing the costs to both the States themselves and their healthcare systems. The 14 States also stated that DACA reduces healthcare costs because its positive population-level mental health consequences reduce, rather than increase, State healthcare costs.

The joint comment from the States also characterized as a ''false premise'' the assumptions of opponents of the DACA policy that DACA recipients would depart the United States if the policy ended. They reasoned that, given the unlikelihood of large-scale departure of DACA recipients in the event DACA were terminated, the need to reduce healthcare expenses by making recipients eligible for insurance and by improving health outcomes becomes paramount. The States went on to explain that a number of States have structured healthcare access programs in reliance on the existence of DACA, and would incur costs to amend the programs were DACA limited or terminated. The commenters wrote that for example, New York currently uses

---

[90] The joint comment was submitted by the Attorneys General of California, New Jersey, New York, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, and Washington, DC.

[91] Georgetown Law, *Law Enforcement Leaders and Prosecutors Defend DACA* (Mar. 20, 2018), *https://www.law.georgetown.edu/news/law-enforcement-leaders-and-prosecutors-defend-daca.*

[92] *See* Min Xie and Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey,* 57 Criminology 237, 249 (2019), *https://perma.cc/QS5RK867.*

State-only funds to provide full health coverage for deferred action recipients (including DACA recipients, whom New York State considers to be Permanently Residing Under Color of Law (PRUCOL)), while noncitizens without DACA or another qualified immigration status only qualify for emergency Medicaid coverage, which provides treatment of emergency medical conditions. Were DACA to be terminated or limited, the States explained, New York would incur the costs of seeking a State legislative change to maintain coverage for DACA-eligible persons (again, with State dollars only), or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

These 14 States also stated that DACA does not increase the States' educational costs, and that opponents of the DACA policy have not identified specific costs attributable to DACA, citing numerous other States' declarations in the record in *Texas*. The joint commenters stated that the assertion of educational costs attributable to DACA rely on, as discussed above, a flawed assumption that in the absence of DACA, recipients would depart the United States and thus reduce the cost of providing legally required public K–12 education to DACA recipients. Furthermore, the joint comment noted that the obligation imposed by *Plyler* v. *Doe* requires States to educate students regardless of their immigration status; thus, every State has the same responsibility for educating DACA-eligible students regardless of whether the DACA policy continues to exist. Rather than impose costs, the 14 States asserted that DACA benefits State and local governments by eliminating a major source of challenges for undocumented students and those with mixed-status families, allowing them to thrive and contribute to their communities and State economies, to the benefit of the entire community and to the States themselves. The 14 States pointed to research that DACA significantly increased both school attendance and high school graduation rates, closing the gap between citizen and noncitizen graduation rates by more than forty percent.[93]

Another joint comment stated that States lack any reliance interest in the nonexistence of a DACA policy because States are not harmed by how the Federal Government prioritizes and enforces its immigration laws. The rule as proposed, the commenters stated, does not harm any reliance interests on the part of States. The commenters stated that the reliance interests thus weigh strongly in favor of DACA recipients and of other individuals who benefit from a DACA policy and from other policies that spring from the same statutory authority.

*Response:* DHS acknowledges commenters' concerns about diversion of resources to DACA recipients. After carefully considering each of the concerns, DHS recognizes that while the final rule could result in some indirect fiscal effects on State and local governments, the size and even the direction of the effects is dependent on many factors, making for a complex calculation of the ultimate fiscal impacts. Section III.A.4.e of the RIA discusses fiscal impacts in more detail.

DHS disagrees with a comment that it ignored possible fiscal impacts at the local, State, and federal levels. The RIA specifically addresses potential fiscal impacts, both positive and negative, at various levels of government. As the commenter notes, a comprehensive quantified accounting of local and State fiscal impacts specifically due to DACA is not possible due to the lack of individual-level data on DACA recipients who might use State and local programs or contribute in a variety of ways to State and local budgets. In general, however, DACA is not a qualifying immigration category for Medicaid eligibility and does not affect access to public schools. DHS is aware that some State and local jurisdictions have chosen to expand assistance to deferred action recipients in certain contexts.

Furthermore, the claim of a causal link between Texas fiscal spending and the DACA policy relies to a significant extent on the assumption that in the absence of DACA, a substantial portion of DACA recipients who would otherwise impose a net fiscal burden on the States would depart the United States. DHS welcomed comments on all aspects of the NPRM, but received scant evidence in support of this

assumption.[94] Even in 2012 when the DACA policy was first announced, DACA-eligible persons would already have been residing in the United States for five years, without deferred action. At this stage, an additional ten years on, many DACA recipients have developed deep ties to the United States and have children and close relations with family and friends (and have also just entered their prime working years). Many recipients know only the United States as home, and English is their primary language. Leaving the country would mean leaving behind children, parents, other family members, and close friends. In short, DHS believes that DACA-eligible individuals generally would be unlikely to leave the United States if the DACA policy were discontinued. DHS thus does not believe that reliable evidence supports the conclusion that a decision to terminate the DACA policy would result in a net transfer to States. Although commenters provided some estimates of DACA recipients' fiscal effects on States, it is worth noting that commenters' concerns focus on the marginal effect of each DACA recipient on State and local revenues as well as expenditures. While some DACA recipients might leave the country if the program did not exist, DHS has no basis to assume those individuals would cause decreases in State expenditures that exceeded their contributions to tax revenue. Again, in the RIA, DHS presents additional available evidence and discusses possible labor market and fiscal impacts of the DACA policy.

DHS also acknowledges the comment of 14 other States—including multiple states in which large numbers of DACA recipients currently reside—that DACA does not increase States' law enforcement, healthcare, or education costs, and, if anything, reduces such costs. With respect to law enforcement in particular, DHS agrees that DACA mitigates a dilemma faced by those without lawful status; by virtue of the measure of assurance provided by the DACA policy, DACA recipients are more likely to proactively engage with law enforcement in ways that promote public safety. With respect to health care and education, DHS appreciates that some of these States, as well as some localities, have enacted laws

---

[93] *See, e.g.*, Kuka (2020). Moreover, deferred action actually saves local governments money by increasing attendance and preserving critical sources of funding to public school districts across the United States. School districts in many States receive funding based on primary and secondary school attendance; poor attendance rates jeopardize that funding. Laura Baams, et al., *Economic Costs of Bias-Based Bullying*, 32 Sch. Psychol. Q. 422 (2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC5578874*; Chandra Kring Villanueva, *Texas Schools at Risk of Significant Funding Cuts due to*

*Pandemic-Related Attendance Loss*, Every Texan (Feb. 22, 2021), *https://everytexan.org/2021/02/22/ keeping-schools-whole-through-crisis*. In California, for example, student absenteeism costs public schools an estimated $1 billion per year. *See* Laura Baams, et al., *supra*, at 3.

[94] In contrast, DHS is aware of a peer-reviewed study that found no statistical causal link between the DACA policy and border crossings. For details, see Catalina Amuedo-Dorantes and Thitima Puttitanun, *DACA and the Surge in Unaccompanied Minors at the U.S.-Mexico Border*, International Migration, 54(4), 102–17 (2016) (hereinafter Amuedo-Dorantes and Puttitanun (2016)).

making DACA recipients eligible for more benefits than they otherwise would be eligible for without DACA, because DACA recipients are not "qualified alien[s]" as defined in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 8 U.S.C. 1641(b), and are, therefore, generally ineligible for public benefits at the Federal, State, and local levels.[95] These States have made a judgment that providing such benefits to DACA recipients is beneficial to the State in some way. Other States have made different judgments, and as a consequence do not bear a substantially greater burden with respect to healthcare or education than they would if DACA were terminated and its current recipients remained in the United States regardless. In fact, because the DACA policy permits DACA recipients to obtain lawful employment, in many cases giving them access to private health insurance and reducing their dependence on state-funded healthcare, eliminating DACA could increase State and local healthcare expenditures.

In connection with this discussion of fiscal burdens, DHS reiterates its understanding that DACA recipients make substantial contributions in taxes and economic activity.[96] As discussed in the NPRM and this rule, and as cited by numerous commenters, according to one study, DACA recipients and their households pay approximately $5.6 billion in annual Federal taxes and approximately $3.1 billion in annual State and local taxes.[97] DHS notes that the estimates from this study show that in 2020, the State and local tax contributions of the 106,090 DACA recipients in Texas amounted to $409.9 million,[98] exceeding the $250 million that the comment from the Attorney General of Texas stated that Texas spends each year in the provision of social services to DACA recipients. DACA recipients also make significant contributions to Social Security and Medicare funds through their employment.[99] The governments and residents of States in which DACA recipients reside benefit from increased tax revenue due to the contributions of DACA recipients, and the States and their residents have also benefited and

come to rely on the broader economic contributions this policy facilitates.

With respect to comments suggesting that DHS should consider a DACA requestor's self-sufficiency, DHS does not believe it is necessary to supplement the rule in this way, both because there is little evidence that DACA results in a net fiscal burden on governments, and because the DACA criteria (such as the criteria related to educational attainment, age, and criminality) relate to the contributions DACA recipients have made and will make in the future. Additionally, the DACA policy allows its recipients to work lawfully in the United States and has allowed them to significantly increase their earning power over what they could earn without DACA.[100] Finally, although DACA recipients may have sent remittances abroad, DHS lacks data about the amount of those remittances or about the effect the DACA policy has had on this amount, and notes that many citizens and noncitizens both with and without lawful immigration status or deferred action send a portion of their income abroad.

As discussed in Section II.A.3, the DACA policy has encouraged its recipients to make significant investments in their education and careers. They have continued their studies, and some have become doctors, lawyers, nurses, teachers, or engineers.[101] About 30,000 are healthcare workers, and many of them have helped care for their communities on the frontlines during the COVID–19 pandemic.[102] In addition, DACA recipients have contributed substantially to the U.S. economy through taxes and other economic activity. DHS believes these benefits of the rule outweigh the potential negative impacts identified by some commenters. DHS therefore declines to make any changes in response to these comments.

DHS also acknowledges the joint commenters' statement that States have no reliance interests in the nonexistence of a DACA policy. To the extent that any State may have reliance interests in the nonexistence of DACA, DHS believes that those interests are significantly diminished by the fact that the DACA policy has been in place for a decade. After careful consideration, DHS agrees with these commenters that the reliance

interests weigh strongly in favor of recipients and others who benefit from the DACA policy, including the States themselves, in reliance on DACA as codified in this rule. After carefully considering these comments, DHS therefore declines to make any changes in response to them.

6. Impacts on Businesses, Employers, and Educational Institutions

Impacts on Businesses and Employers

*Comment:* A commenter said that businesses need DACA recipients' continued contributions as they work to reinvigorate the U.S. economy, and that failure to act would have a significant impact on businesses that rely on DACA recipients as employees and customers. Several commenters also stated that the proposed rule would provide a sense of security to organizations that employ recipients of DACA.

A group of commenters similarly said that the proposed rule would protect the substantial reliance interests of their very large companies in current and future employment relationships with DACA recipients. These commenters noted that more than 75 percent of the top 25 Fortune 500 companies—together representing every major sector of the U.S. economy and generating almost $3 trillion in annual revenue—employ Dreamers.[103] They further stated that DACA recipients have helped keep the U.S. economy running, particularly during the COVID–19 pandemic, and help ameliorate labor shortages. The commenters stated that ending DACA would cripple the nation's healthcare system and cost small business employers over $6 billion in turnover costs from losing investments in training DACA workers and having to recruit and train potentially less productive, new workers. Noting that DACA allows recipients to pursue careers that match their skills without the fear of deportation, the commenters stated that the policy therefore makes the economy more productive and decreases the extent to which immigrants compete with American citizens for lower income jobs. The commenters also identified businesses' reliance interests in DACA because employed DACA recipients have increased purchasing power, and that the rule, as proposed, would bring

---

[95] *See* 8 U.S.C. 1641(b), 1611 (general ineligibility for Federal public benefits), and 1621 (general ineligibility for State public benefits).

[96] 86 FR 53738 and 53802.

[97] Svajlenka and Wolgin (2020); *see also* Hill and Wiehe (2017).

[98] Svajlenka and Wolgin (2020).

[99] Magaña-Salgado and Wong (2017); *see also* Magaña-Salgado (2016).

[100] Wong (2017).

[101] *See* Gonzales (2019); Svajlenka (2020); Wong (2020); Zong (2017).

[102] Svajlenka (2020). DACA recipients who are healthcare workers also are helping to alleviate a shortage of healthcare professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire. Chen (2019); Garcia (2017).

[103] Use of the term "Dreamers" as a descriptor for young undocumented immigrants who came to the United States as children originated with the Development, Relief, and Education for Alien Minors Act (DREAM Act), a legislative proposal first introduced in 2001 (S.1291, 107th Cong.) that, if passed, would have granted them protection from removal, the right to work, and a path to citizenship.

stability to the DACA population, which has become an integral part of the U.S. economy.

A joint comment submitted by an educational institution and corporation stated that they have considerable reliance interests in a DACA policy because they have enrolled and employed DACA recipients who have made significant contributions to their institutions. The commenters further stated that DACA recipients contribute to the educational institutions they attend, and that communities and employers depend upon them and have invested significant time and money in training them, such that hiring and training replacements would cost employers $6.3 billion.

*Response:* DHS agrees that employers, including businesses and educational institutions, have relied upon the existence of the DACA policy over the course of 10 years and that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, including their reliance interests in the labor and spending contributions of DACA recipients. For those employers that hire DACA recipients with highly specialized skills and higher levels of education, if the DACA policy were to end, some of these employers could face challenges and higher costs in finding replacement labor for these highly specialized workers, assuming all else remains constant. Regarding DACA recipients' spending power, DHS agrees that the DACA policy does bring stability to the DACA population with employment authorization that enables them to earn compensation that, in turn, is spent, at least in part, in the economy. The preamble details further the motivations for this rule and the RIA the potential economic, labor, and fiscal impacts.

Impacts on Educational Institutions

*Comment:* As discussed in greater detail in Section II.A.5, some commenters opposed the proposed rule, stating that DACA recipients, and undocumented students in general, displace citizens from schools and cost localities and States to provide public primary and secondary schooling to these students. One of these commenters pointed to a study that found that, in 1994, lawful and unlawful immigration resulted in $4.51 billion in primary and secondary education costs. Meanwhile, as discussed above, another commenter stated that Texas spends between $31 million and $63 million to educate unaccompanied noncitizen children

each year. Another commenter also opposed the rule, saying that DACA recipients get special scholarships.

*Response:* DHS acknowledges these commenters' concerns that undocumented noncitizen students, including DACA recipients, receive education that is publicly funded. As discussed in greater detail in Section II.A.5 and Section III.A.4.e in the RIA, DHS recognizes that although the rule may result in some indirect fiscal effects on State and local governments, the direction of effects is dependent on many factors. DHS, however, notes that the Texas Attorney General cited the cost to Texas of educating unaccompanied noncitizen children, not DACA recipients specifically. Given the threshold criteria requiring that a noncitizen have continuously resided in the United States since June 15, 2007, it is a reasonable assumption that most unaccompanied children presently enrolled in Texas public schools are not potentially DACA eligible. Indeed, two-thirds (61 percent) of active DACA recipients are between the ages of 20 and 29, with most other recipients between the ages of 30 and 45 (38 percent), and therefore unlikely to be enrolled in a public K–12 school.[104] As of June 2022, the youngest noncitizens who meet DACA threshold criteria are generally in the 10th grade. DHS recognizes that other noncitizens who are enrolled in publicly funded K–12 schools may meet threshold criteria but have not previously requested DACA; however, as discussed in the RIA, retention of the existing threshold criteria means there is a diminishing number of noncitizens who may make initial DACA requests under this rule.

With respect to assertions that DACA recipients receive special scholarships, DHS recognizes that some educational institutions and States have established scholarships or other financial aid to support undocumented students, including DACA recipients. DHS cannot determine the degree to which, in the absence of a DACA policy, those underlying resources would instead be directed toward U.S. citizens or other students with lawful status. As for assertions that DACA recipients displace U.S. citizens in schools or colleges or otherwise impact educational resources, DHS generally agrees that educational resources in primary and secondary education are also shared by those enrolled DACA recipients as enrollment at these

educational levels generally is not dependent on immigration status. Enrollment in primary or secondary education by undocumented noncitizens is not predicated on this rule. Undocumented noncitizens without DACA can enroll in these institutions regardless of this rule. The commenter's assertions also assume that DACA recipients and/or their family members do not contribute economically and fiscally to their local schools and communities, that educational resources are fixed, and that local laws and regulations, economic conditions, and demographics remain constant. Many factors can impact local educational resources, including the level of local immigration, and a static analysis cannot appropriately assess a dynamic issue such as this. Assuming that DACA recipients only draw down government resources without also analyzing their beneficial contributions distorts realistic fiscal impacts, which are discussed in more detail in Section III.A.4.e in the RIA. DHS further notes that educational institutions (some of which accept undocumented students without deferred action as well) expressed widespread support for the proposed rule, as discussed below, which stands in contrast to some commenters' views that the DACA policy imposes a substantial strain on educational resources.

*Comment:* Numerous universities and colleges commented that DACA and DACA recipients positively impact their institutions, and that they have reliance interests in the various benefits that DACA recipients bring to their campuses. Commenters described DACA recipient students as bright, dedicated, and resilient. They identified various missions and core philosophies of their institutions, including diverse and inclusive learning environments that prepare students for living and working in an increasingly diverse workforce and society, social justice, developing global citizens, and advancing research, and commented that DACA recipient students make meaningful and important contributions to those missions.

Commenters also noted that the DACA policy enables them to hire DACA recipient students as teaching assistants, tutors, and researchers, among other on-campus work-study positions, benefiting the DACA recipients themselves, other students, and the universities more broadly. Commenters also stated that the availability of advance parole has enabled DACA recipients to pursue study abroad, fellowships, research, and other academic programs or related

---

[104] DHS, USCIS, Office of Performance and Quality (OPQ), Electronic Immigration System (ELIS) and Computer-Linked Application Information Management System (CLAIMS) 3 Consolidated (queried Apr. 30, 2022).

employment opportunities that significantly enhance the intellectual and professional development of individual students and increase their contributions to their campuses.

A comment jointly submitted by 14 States also identified the reliance interests of public universities and colleges in their States, which rely upon significant tuition revenue from DACA recipient students, and have made significant investments in financial aid and other programs to support DACA recipient students. These commenters further stated that such investments are ''consistent with their interests in ensuring diversity and nondiscrimination and in developing a well-educated workforce that can contribute to the States' overall economies.''

Another commenter highlighted studies estimating that there are approximately 9,000 DACA recipients working as teachers in the United States. The commenter stated that teacher shortages have become more strained during the COVID–19 pandemic, and the removal forbearance and work authorization provisions of DACA are critical to ensure the quality education of children in the United States. Similarly, a university commented that expanding pathways to DACA would have an immediate positive impact on the number of teachers its teacher preparation program could produce, addressing needs in their State to increase the number of teachers who reflect the State's diverse demographics.

*Response:* DHS acknowledges the commenters' discussion of specific reliance interests that educational institutions have in the preservation of the DACA policy as codified in this rule. DHS agrees that educational institutions have relied upon the existence of the DACA policy over the course of 10 years in the form of DACA recipients' tuition payments and academic and research contributions; and in preparing additional teachers to serve schools throughout the country. DHS agrees that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, and that the benefits of DACA identified by these institutions weigh in favor of promulgating this rule.

7. Impacts on Migration

*Comment:* Some commenters stated that DACA encourages criminals to enter the United States, rewards criminal activity, ''promotes chain migration that the nation cannot afford,'' and incentivizes breaking U.S. laws.

Similarly, some commenters opposed the proposed rule on the basis that the creation of DACA resulted in a ''pull factor'' for additional migration to the United States, and stated that the United States is currently apprehending large numbers of minors at the Southwest border. The commenters stated the United States should not continue to reward those who enter the country unlawfully, and that the rule as proposed would incentivize unauthorized immigration. A commenter also characterized DACA as an amnesty that opens the door to the prospect of the executive branch exempting anyone from any law at any time, simply by designating them as ''low-priority'' for enforcement.

One commenter pointed to CBP statistics showing that the number of unaccompanied noncitizen children (UC) apprehended at the border had increased from 15,949 in FY 2011 to 68,541 in FY 2014, which the commenter asserted occurred when the U.S. Government, in their view, began signaling an unwillingness to enforce immigration law against this population. The commenter similarly stated that DACA encourages unauthorized immigration and trafficking of children across the U.S.-Mexico border, and that maintaining DACA and dismantling enforcement against undocumented noncitizens resulted in record apprehensions by CBP at the Southwest border, citing CBP statistics that Border Patrol apprehended 1,659,206 noncitizens who crossed the Southwest border without authorization in FY 2021. The commenter suggested that the humanitarian crisis on the border continues threaten national security, public health, wage levels, and employment security, and poses unsustainable strains to DHS, DOJ, and HHS resources. This commenter and others said that continuing the DACA policy sends the message that unauthorized entry into the United States will be rewarded, and periods of unlawful presence will be mooted by executive action. From their perspective, promulgating a DACA regulation would only perpetuate a widespread belief that immigration laws will not be enforced, therefore incentivizing unlawful entry and unlawful presence by raising the hopes of undocumented noncitizens of attaining DACA or an equivalent status in the future. This, commenters asserted, will exacerbate the situation at the border. One of the commenters similarly stated that continuing DACA would give other undocumented

noncitizens reason to risk their lives and the lives of their children by making the journey to the United States.

Other commenters urged that no action should permit undocumented immigrants to participate in, share, or otherwise obtain status and benefits without first becoming a U.S. citizen, and that no ''lawful status'' should be granted to those entering the country unlawfully. Some commenters also raised concerns about open borders, stating that DACA is not in the interest of the United States, and that the United States must protect its sovereignty and rule of law. Other commenters expressed concern about the migration of DACA recipients' relatives to the United States and said that such migration should be restricted.

Another commenter stated that DHS should supply additional evidence for its claim that DACA has no substantial effect on lawful or unlawful immigration to address the concerns of the Southern District of Texas, including: (1) the effects of DACA on legal and illegal immigration; (2) the secondary costs of DACA associated with any alleged increase in illegal immigration; and (3) the effect of illegal immigration on human trafficking activities. The commenter cited a 2021 Pew Research Center study showing that the number of unauthorized noncitizens in the United States steadily declined from 2007 to 2017.[105] The commenter further pointed to 2014 and 2017 studies showing that recent increases in children crossing the border are driven by migration increases across all age groups from Guatemala, Honduras, and El Salvador, which have experienced higher rates of violence and economic instability.[106] The commenter suggested DHS add a more detailed discussion of global immigration trends, which bolsters DHS's claim that DACA does not have a significant impact on immigration rates.

*Response:* DHS acknowledges these commenters' concerns and agrees that

---

[105] Mark Hugo Lopez, et al., *Key Facts About the Changing U.S. Unauthorized Immigrant Population,* Pew Research Center (Apr. 13, 2021), *https://www.pewresearch.org/fact-tank/2021/04/13/key-facts-about-the-changing-u-s-unauthorized-immigrant-population.*

[106] *See* Tom K. Wong, *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border,* Center for American Progress (July 8, 2014), *https://www.americanprogress.org/article/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border* (hereinafter Wong (2014)); *see also* David J. Bier, *DACA Definitely Did Not Cause the Child Migrant Crisis,* Cato Institute (Jan. 9, 2017), *https://www.cato.org/blog/daca-definitely-did-not-cause-child-migrant-crisis.*

the United States is a sovereign nation committed to the rule of law. Maintaining an orderly, secure, and well-managed border, reducing irregular migration, and combatting human trafficking are priorities for DHS and for the Administration.[107] DHS disagrees, however, with the suggestion that this rule creates a pull factor for additional irregular immigration. This rule reflects DHS's continued belief, supported by available data, that a continuation of the DACA policy does not have a substantial effect on volumes of lawful or unlawful immigration into the United States. The final rule codifies without material change the threshold criteria that have been in place for a decade, further reinforcing DHS's clear policy and messaging since 2012 that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007, and that border security remains a high priority for the Department.

Even as it relates to the DACA policy under the Napolitano Memorandum, DHS respectfully disagrees with commenters' characterization of the policy's effects. In the proposed rule, DHS wrote that it does not ''perceive DACA as having a substantial effect on volumes of lawful and unlawful immigration into the United States,'' and DHS is not aware of any evidence that, and does not believe that, DACA ''has acted as a significant material 'pull factor' (in light of the wide range of factors that contribute to both lawful and unlawful immigration into the United States).'' [108] Although commenters offered data on overall levels of irregular migration as well as irregular migration by noncitizen minors, these data do not point to DACA as a substantial causal factor in driving such migration or, as some commenters asserted, trafficking of children across the southwest border.

DHS acknowledges commenters' statements that the 2012–2014 increase in the number of unaccompanied children apprehended at the border began in the months preceding DACA's announcement in June 2012 (and peaked in that fiscal year in March),[109]

and that overall border apprehensions actually decreased in the months directly following DACA's announcement.[110] But DHS is also aware of seasonal patterns in migration and other trends suggesting increasing levels of overall migration by children and family units during parts of this time period. DHS believes it would be unreasonable, on the basis of this data alone, to draw or completely disavow a direct causal line between apprehensions and a single policy. Such an approach would be inconsistent with available studies, which indicate that increases in migration of noncitizen children correlate closely with increased levels of violence in their countries of nationality. In short, it is likely that broader sociocultural factors drive youth migration much more than migrants' perception of receiving favorable immigration treatment in the United States.[111]

As DHS noted in the NPRM, Amuedo-Dorantes and Puttitanun (2016) investigated whether the DACA policy had an effect on the rate of irregular migration by noncitizen minors using data from 2007–2013. Their approaches employed multiple models to examine whether the DACA policy had any effect on border apprehensions of unaccompanied minors. These models accounted for additional factors beyond the DACA policy, such as enactment of TVPRA 2008, economic and social conditions in the United States and originating countries, and border conditions. The authors found no evidence of causality between the DACA policy and the number of border apprehensions of unaccompanied minors, and they identified stronger associations between other factors (namely, the economic and social conditions in the originating country and the enactment of TVPRA 2008) and apprehensions of unaccompanied minors at the U.S.-Mexico border. This finding suggests that even in the immediate aftermath of the initial DACA policy, migration decisions were the product of a range of factors, but not

primarily a consequence of the DACA policy.[112]

Additionally, the overall FY 2021 apprehensions by CBP at the southern border cited by a commenter represent total encounters, not the number of unique individuals apprehended. Although the total number of unique encounters did increase to record levels, DHS notes that a portion of the increased encounters cited by the commenter is attributable to noncitizens making multiple attempts to enter the United States during the period in which the Centers for Disease Control and Prevention (CDC) has exercised its Title 42 authority to prohibit the introduction of certain noncitizens into the United States. In FY 2019, prior to implementation of the CDC's Orders under 42 U.S.C. 265, 268 and 42 CFR 71.40, the rate of noncitizens encountered by CBP who attempted to enter the United States more than once in the same fiscal year was 7 percent. In FY2020, the recidivism rate rose significantly to 26 percent, and in FY 2021 further increased to 27 percent.[113]

As discussed above, there are many reasons why noncitizens decide to emigrate from their countries, with some reports claiming economic and social issues as primary reasons.[114] Still, as noted by another commenter, global migration trends are complex and multifaceted. The International Organization for Migration (IOM) found in its World Migration Report 2022 that recent years saw major migration and displacement events that caused great hardship, trauma, and loss of life. The IOM notes that the scale of international migration globally has increased, although at a reduced rate due to COVID–19. Long-term data on international migration, the IOM report states, demonstrate that migration is not uniform across the world, but is shaped by economic, geographic, demographic and other factors, resulting in distinct migration patterns.[115]

Beyond the complex factors underpinning migration patterns, the

---

[107] See generally DHS, *2022 Priorities, https://www.dhs.gov/2022-priorities* (last updated Mar. 17, 2022).

[108] 81 FR 53803 (quoting Amuedo-Dorantes and Puttitanun (2016), at 112 (''DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013.'')).

[109] U.S. Border Patrol, *Total Unaccompanied Alien Children (0–17 Years Old) Apprehensions By Month—FY 2010–FY 2014* (Jan. 2020), *https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20UAC*

*%20Apprehensions%20by%20Sector%20%28FY%202010%20-%20FY%202019%29_0.pdf.*

[110] U.S. Border Patrol, *Total Illegal Alien Apprehensions By Month—FY 2000–FY 2019* (Jan. 2020), *https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Monthly%20Apprehensions%20%28FY%202000%20-%20FY%202019%29_1.pdf.*

[111] Wong (2014); *see also* Amelia Cheatham, *Central America's Turbulent Northern Triangle*, Council on Foreign Relations (July 1, 2021), *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[112] There are reports and surveys that investigate some of these factors. *See, e.g.,* Ariel G. Ruiz Soto, et al., *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration*, Migration Policy Institute (Nov. 2021), *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration* (hereinafter Ruiz Soto (2021)).

[113] CBP, *CBP Enforcement Statistics Fiscal Year 2022: U.S. Border Patrol Recidivism Rates, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics* (last modified June 15, 2022).

[114] *See, e.g.,* Ruiz Soto (2021).

[115] Marie McAuliffe and Anna Triandafyllidou, *Report Overview: Technological, Geopolitical and Environmental Transformations Shaping Our Migration and Mobility Futures*, in World Migration Report 2022 (2021), IOM, Geneva.

core guidelines of the DACA policy itself—codified in this rule—refute the idea that DACA serves as a significant material "pull factor" for migration, as DHS has clearly messaged from the beginning of the DACA policy that only individuals continuously residing in the United States since June 15, 2007, can be considered for deferred action under DACA. That DHS declines, after careful consideration, to expand this or other criteria to permit other populations to request DACA further rebuts the notion that the Department is sending a message incentivizing unlawfully present noncitizens to remain in the United States or prospective migrants to enter without authorization in hopes of being granted lawful status. DHS further reiterates that DACA recipients are considered lawfully present under prior guidance, and now this rule, only for very limited purposes as described in this preamble and at sections 236.21(c)(3) and (4), and that the DACA policy does not confer "lawful status" to recipients.

Nevertheless, DHS acknowledges that, as with any discourse on immigration policy or legislation, some individual noncitizens might misinterpret the policy's intent and applicability and hope that they might benefit from the policy. DHS, however, is unaware of a substantial body of evidence to support such a theory, and in any event does not think it necessary or appropriate to terminate the DACA policy to address such concerns, in light of DHS's interests in setting appropriate enforcement priorities, as well as the significant reliance interests at play.

With respect to the suggestion that the DACA policy promotes "chain migration," DHS understands the commenter to be referring to family-sponsored immigration, one of the foundational principles of U.S. immigration law,[116] and notes that DACA recipients cannot sponsor relatives for immigrant visas under 8 U.S.C. 1153, 1154. DHS also refers the reader to the discussion of the DACA policy's economic effects in the RIA below. DHS does not believe that DACA's effects are "unaffordable" or detrimental to U.S. citizens, and is issuing this rule following detailed consideration of the policy's effects, as discussed elsewhere in this preamble.

### 8. Other Impacts on the Federal Government

*Comment:* Multiple commenters stated that the proposed rule would increase costs and negatively impact the Federal Government, urging that although every undocumented individual cannot be deported, it is a waste of resources to have law enforcement release a removable individual who has already been apprehended. A commenter also stated that the DACA policy is less efficient, less secure, and more costly than prosecutorial discretion decisions made by ICE and CBP, especially given what is necessary to review and perform background checks, review travel history, interview requestors, and conduct biometrics. The commenter further stated that because few DACA recipients would be subject to removal even in the absence of this rule, the number of such individuals ICE and CBP would need to process would be minimal, and thus the enforcement resources savings engendered by DACA would be minimal.

Other commenters stated that it would be extremely costly, in the billions of dollars, for the U.S. Government to remove the hundreds of thousands of young people who qualify for DACA.

*Response:* DHS respectfully acknowledges the commenters' concerns regarding the potential for increased costs and negative impacts to the Federal Government as a result of this rule. DHS acknowledges that, by the very nature of identifying a segment of the population that is low priority for enforcement, most noncitizens who meet the DACA threshold criteria would continue to be a low priority for enforcement even in the absence of the DACA policy. In the RIA, DHS addresses the potential effects of the policy on the Federal Government, including cost savings resulting from the DACA policy that are not easily quantified or monetized; tax transfers; and other effects. However, the DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.

Indeed, the cost of apprehension is only one part of the process to remove a noncitizen; the removal process includes other significant costs to the Federal Government, including the costs of removal proceedings before EOIR, detention, potential for related federal litigation, and transportation. The DACA policy allows DHS, in line with its particular expertise, to proactively identify noncitizens who may be a low priority for removal should ICE or CBP encounter them in the field and once a valid DACA recipient is confirmed, ICE or CBP may be able to make a determination without necessitating further investigation.[117] DHS further notes that USCIS can directly access a noncitizen's travel history from CBP databases, and that by virtue of the use of the Form I–821D and Form I–765, USCIS is provided with significant information and documentation relevant to a prosecutorial discretion determination that CBP and ICE would not have related to the noncitizen's residency, education, work history, criminal history, and other positive and negative discretionary factors. Most noncitizens would not have such information or documentation in their possession when encountered by CBP or ICE. As to the commenter's concern regarding the costs of interviews and biometric collection, interviews are very rarely required by USCIS, and the cost of biometrics is covered by the Form I–821D filing fees, which conserves resources for the Department.

Furthermore, under longstanding policy and procedure, in cases where ICE grants deferred action, the noncitizen is eligible to subsequently file Form I–765 to apply for work authorization. This process requires ICE to issue a document to the noncitizen, who then must include it in their work authorization application. USCIS routinely must verify the information provided in these letters, which requires time and uses USCIS and ICE personnel resources. It promotes administrative efficiency and preserves resources and time for both agencies to streamline the DACA-related processes within one DHS agency. Furthermore, while USCIS recovers the costs of conducting background checks via the DACA-related filing fees, ICE and CBP, which are funded primarily through congressionally appropriated taxpayer dollars, would not recover these costs from requestor fees unless they established additional fees for that purpose.

*Comment:* A commenter stated that DACA is a massive new government program that would require significant government resources to administer that will be placed on both the executive and judicial branches, while the Federal agencies specifically entrusted to secure the border continue to go understaffed and under-supported.

*Response:* DHS respectfully disagrees with this commenter's characterization of the DACA policy. This rule preserves and fortifies in regulation a policy that has been in place for 10 years. The rule does not establish a new program, nor does the policy require administration by the judicial branch. To the extent

---

[116] *See* 8 U.S.C. 1153 (providing allocation of immigrant visas among family-sponsored, employment-based, and diversity categories).

[117] 86 FR 53752.

that any resource burden is placed on the judicial branch, that is the result of outside parties who seek to challenge the DACA policy in court and is not a burden on the judicial branch that is inherent in the DACA policy itself.

The final rule does not introduce new criteria for consideration, expand the population eligible for consideration, change standards of review, provide lawful immigration status, or alter the forbearance from removal or employment authorization structure that has been in place for a decade. As discussed elsewhere in this rule and in the NPRM, the DACA policy reflects the reality that DHS must exercise discretion in immigration enforcement, and that its limited resources are best focused on noncitizens who pose a security threat, public safety, or border security threat to the United States or are otherwise a high priority for enforcement. Codification of the DACA policy in this rule does not divert needed funds from CBP or ICE, and instead supports their enforcement work by clearly identifying a subset of the noncitizen population already determined not to be a priority for enforcement.

9. Criminality, National Security Issues, and Other Safety Concerns

*Comment:* Some commenters expressed concerns about criminal or other negative conduct by DACA recipients, along with national security concerns. Some of these commenters stated that DACA recipients generally do not respect the rule of law, and that too many noncitizens without lawful status are present in the United States and commit crimes against citizens. Some commenters described noncitizens without lawful status as criminals because they entered the United States without authorization, and asserted that those individuals would not become law-abiding citizens.

Some commenters characterized DACA recipients as "invaders" or "parasites" or used other pejorative terms, and stated that some DACA recipients try to manipulate U.S. citizens into marriage for immigration purposes. Other commenters stated that DACA is a threat to the United States and its security, and that it creates avenues for drug cartels to operate in the United States, enabling human trafficking and drug trafficking.

In contrast, multiple commenters stated that undocumented immigrants are less likely to be convicted of crimes (*e.g.,* crimes involving drugs, violence, or property) compared to U.S.-born citizens. Another commenter stated that the proposed rule could help DHS focus

enforcement resources on noncitizens who commit crimes rather than on DACA recipients. Further, several commenters either cited data or expressed the notion that DACA removes barriers for immigrants to approach law enforcement and report crime. Referencing a 2020 survey, one commenter stated that DACA recipients would be more than 30 percent less likely to report a crime committed against them and almost 50 percent less likely to report wage theft without the protection of DACA.[118]

*Response:* DHS acknowledges the commenters' concerns about national security, public safety, and crime in the United States, and as a general matter, shares those concerns. At the same time, DHS is not aware of any data suggesting that the DACA policy contributes to those challenges, or that DACA recipients engage in criminal activity, commit fraud, or pose national security concerns to any greater degree than the general population. As an initial matter, data suggest that DACA recipients are arrested at far lower levels than the general U.S. adult population. As of February 1, 2018, 7.76 percent of approved DACA requestors had an arrest.[119] In contrast, a 2018 DOJ survey of State records found that 49 States, the District of Columbia, and Guam reported the total number of U.S. adults with criminal history records indicating arrests and subsequent dispositions to be more than 112 million, amounting to as much as 40 percent of the U.S. adult population.[120] In addition, DHS notes that an arrest indicates the individual was arrested or apprehended only; it does not mean the individual was convicted of a crime. Further, individuals may not have been charged with a crime resulting from the arrest, may have had their charges reduced or dismissed entirely, or may have been acquitted of any charges.[121]

As discussed in further detail in Section II.C.4.b.6, determining whether

someone poses a threat to national security or public safety is at the heart of DHS's mission, and Congress has directed the Secretary to prioritize national security, public safety, and border security. Consistent with this mission, the rule at new 8 CFR 236.22(a)(6) disqualifies from consideration for DACA individuals who have been convicted of any felony; three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct; or who otherwise pose a threat to national security or public safety. In addition, the rule disqualifies from consideration for DACA any individual who is convicted of any misdemeanor, as defined by Federal law, that meets the following criteria: (i) regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or (ii) if not one of these offenses, is one for which the individual was sentenced to time in custody of more than 90 days. And even if an individual requestor's background check shows a criminal history that does not meet the above criteria, DHS may still decide not to grant the DACA request as a matter of discretion. These criminal criteria are also grounds for terminating DACA, as discussed in Section II.C.5.f below, and because DHS conducts recurrent vetting on DACA recipients, the Department can take action to terminate DACA as it becomes aware of any evidence of such criminal criteria in a particular case.

DHS also does not believe that it is accurate or helpful to characterize DACA recipients or potential DACA requestors—who entered the United States as children and have resided in this country for over a decade—as "invaders" or to use other pejorative or inflammatory terms to refer to DACA recipients, noncitizens, or any other group of people who are, on the whole, peaceful and hardworking. With respect to all comments submitted, DHS has focused on the merits of commenters' inputs, rather than such characterizations.

With respect to the comment regarding DACA recipients and marriage, DHS notes that under 8 U.S.C. 1325(c), any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both. Activity falling under 8 U.S.C. 1325(c) is a felony falling within the criminal

---

[118] *See* Wong (2020).

[119] USCIS, *DACA Requestors with an IDENT Response* (June 5, 2018), *https://www.uscis.gov/sites/default/files/document/data/DATA_DACA_CRIM.PDF* (arrests include apprehensions for immigration-related civil violations).

[120] DOJ, Office of Justice Programs, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2018* (Nov. 5, 2020), *https://www.ojp.gov/pdffiles1/bjs/grants/255651.pdf.* ("Readers should note that an individual offender may have records in more than one state and that records of deceased persons may be included in the counts provided by states. This means the number of living persons in the United States with criminal history records is less than the total number of subjects in state criminal history files.").

[121] USCIS, *DACA Requestors with an IDENT Response* (June 5, 2018), *https://www.uscis.gov/sites/default/files/document/data/DATA_DACA_CRIM.PDF.*

disqualifications described above. To whatever extent such activity occurs among DACA recipients, DHS does not expect that a rescission of the DACA policy would reduce the incidence of such activity.

DHS does not believe that DACA creates avenues for drug cartels to operate in the United States or enables human trafficking and drug trafficking. Conviction for such offenses would result in termination of DACA or denial of DACA renewal, and as discussed above, DACA recipients receive work authorization that enables them to participate in the legitimate economy, an option that would not be available to them absent DACA. Human trafficking and drug trafficking are serious crimes and top priorities for DHS.[122] Again, DHS does not believe that terminating DACA would meaningfully reduce the incidence of such crimes or that DACA prevents DHS or other law enforcement officials from fully investigating or prosecuting such crimes or removing noncitizens involved in such activity.

With regard to concerns about public safety more broadly, as one commenter noted, the DACA policy may increase recipients' willingness to report crimes by deferring the possibility of immediate removal and thereby ameliorating the risk that approaching law enforcement would expose the recipient to an immigration enforcement action. DHS also agrees with the commenter that this rule will enable the Department to focus its enforcement resources on those that pose national security or public safety concerns. After careful consideration, DHS thus respectfully disagrees with commenters concerned that the DACA policy promotes criminal activity or otherwise undermines national security or public safety.

**10. Creation of a ''Permanent'' Class of Individuals Without Legal Status**

*Comment:* A few commenters generally opposed the proposed rule on the ground that it would create a ''permanent'' class of individuals without legal immigration status. One commenter stated that DACA recipients can renew their deferred action and employment authorization indefinitely, resulting in ''de facto LPR [lawful permanent resident status,'' which the

commenter stated is distinct from other immigration benefits and visa categories created by Congress that are limited in their ability to renew.

Another commenter stated that it is wrong to allow people to come to the United States unlawfully and stay in the country long enough until the Government decides they can become citizens. The commenter stated that letting people enter and remain in the United States unlawfully ''does not instill a sense of patriotism for the recipient.'' Another commenter stated that the DACA policy lacked some of the benefits of naturalization, because naturalization applicants learn about the United States. The commenter stated that skipping this step is an affront to naturalized citizens and that the United States should end DACA and encourage prospective residents to naturalize legally.

Another commenter said that DACA is a ''made-up policy'' that holds its recipients in a purgatory-like state waiting for the Government to ultimately address the issue of lawful status, while another commenter added that DACA recipients live in a state that experts call ''liminal legality,'' which has health implications for many undocumented individuals.

*Response:* DHS agrees that the rule does not extend lawful immigration status to DACA recipients and does not set a cap on the number of times a DACA recipient may submit a renewal request, but notes that even in the absence of DACA, DACA recipients generally would be unlikely to depart the United States. DHS disagrees, however, that the rule allows people to enter unlawfully and remain until they can become citizens. As discussed in the NPRM and in this rule, this rule applies to a specific class of individuals who entered the United States as children over a decade and a half ago, and who have made significant investments and contributions to their communities. Although the DACA criteria were developed administratively, the program is supported by longstanding administrative practice and precedent. DHS and the former INS have a long history of issuing policies under which groups of individuals without lawful status who are low enforcement priorities may receive a discretionary, temporary, and nonguaranteed reprieve from removal.[123] Deferred action under

the DACA policy is a form of prosecutorial discretion well within the Executive's authority to efficiently allocate limited enforcement resources.[124] In deferring removal under this rule, DHS is not creating a pathway to U.S. citizenship for DACA recipients. DHS also disagrees that the rule creates a ''de facto'' lawful permanent residence status. Unlike lawful permanent residence, which can only be rescinded or result in removability of the beneficiary in narrowly prescribed circumstances,[125] a grant of deferred action under DACA is by its nature temporary, and it can be terminated at any time.

As to the commenters' concerns that the DACA policy does not engender a sense of patriotism for recipients or that because there is no pathway to naturalization, DACA recipients do not benefit from learning about the United States as naturalization applicants do, DHS notes that many commenters wrote of DACA recipients' ''dreams and aspirations to help America,'' sharing that they are ''grateful for this country'' and want to work hard to take advantage of the opportunities they have in the United States. And while the DACA policy has no U.S. history knowledge requirement, DHS notes that virtually all recipients have been enrolled in or completed some form of secondary education in the United States consistent with the education criteria for DACA. Several DACA recipients stated in their comments that through their studies, they knew more about American history than the history of their countries of origin. As to the commenter's suggestion that DHS terminate the DACA policy and encourage prospective residents to naturalize legally, DHS notes that those eligible for DACA generally do not have a pathway to lawful permanent status or naturalization, and as discussed in Section II.A.11 below, establishing such pathways requires Congressional action. However, DHS also notes, that nothing precludes a DACA recipient from

---

[122] See DHS, *DHS Efforts to Combat Human Trafficking* (Jan. 25, 2022), *https://www.dhs.gov/sites/default/files/2022-01/DHS%20Efforts%20to%20Combat%20Human%20Trafficking.pdf*; The White House, Executive Office of the President, Office of National Drug Control Policy, *National Drug Control Strategy* (Apr. 18, 2022), *https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf*.

[123] *See generally* Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others*, Congressional Research Service, No. R45158 (Apr. 10, 2018) [hereinafter CRS Report on Discretionary Reprieves from Removal]. *See also* American Immigration

Council, *Executive Grants of Temporary Immigration Relief, 1956–Present* (Oct. 2, 2014), *https://www.americanimmigrationcouncil.org/research/executive-grants-temporary-immigration-relief-1956-present* [hereinafter AIC Report on Executive Grants of Temporary Immigration Relief] (identifying 39 examples of temporary immigration relief); Sharon Stephan, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation*, Congressional Research Service, No. 85–599 EPW (Feb. 23, 1985) [hereinafter CRS Report on EVD].

[124] *See Regents of the Univ. of Cal.* v. *DHS*, 908 F.3d 476, 487 (9th Cir. 2018) (deferred action ''arises . . . from the Executive's inherent authority to allocate resources and prioritize cases''), *aff'd*, 140 S. Ct. 1891 [2020].

[125] *See* 8 U.S.C. 1256; 8 U.S.C. 1227.

becoming a citizen through the existing naturalization provisions of the INA if they meet the preexisting eligibility requirements.[126]

DHS also acknowledges commenters' concerns that the legal uncertainty of the DACA policy causes stress and negative health outcomes for some DACA requestors. DHS reiterates that ameliorating legal uncertainty for the DACA population, and preserving and fortifying DACA as directed by the Biden Memorandum, are among the purposes for promulgating this rule. DHS therefore declines to make any changes in response to these comments.

### 11. Pathway to Lawful Status or Citizenship

*Comment:* Many commenters urged DHS to provide DACA recipients a pathway to citizenship, such as by providing eligibility for lawful permanent residency. Some commenters urged DHS to provide protections, including a pathway to citizenship, for all persons who would have been eligible for relief under prior versions of the DREAM Act, including "Documented Dreamers."[127]

Some commenters acknowledged and appreciated the proposed rule's discussion of the term of art "lawfully present," and their joint submission proposed, without substantial additional explanation, that DHS interpret its "lawful presence" authority to allow a path to citizenship, through naturalization, to DACA recipients. Others suggested that DHS provide Temporary Protected Status (TPS), or some other form of legal status, to DACA recipients.

A commenter expressed concern that they may not be eligible for future promotions due to restrictions on work authorization associated with DACA, such as the program's prohibition on employment sponsorship. Another commenter likewise remarked that many DACA recipients do not have a path to employment-based permanent residence and, therefore, are barred from adjusting status through filing Form I–601 waiver applications. The commenter stated that continuing to

[126] 8 U.S.C. 1421, *et seq.*

[127] "Documented Dreamer" is a term used to identify children of long-term visa holders who have grown up in the United States with derivative nonimmigrant visa status, and who have aged out or are likely to age out of this status by virtue of turning 21 without a pathway to lawful immigrant status. *See Testimony of Pareen Mhatre,* Student Member of Improve the Dream, before the House Judiciary Committee Subcommittee on Immigration and Citizenship (Apr. 28, 2021), *https:// docs.house.gov/meetings/JU/JU01/20210428/ 112515/HHRG-117-JU01-Wstate-MhatreP-20210428.pdf.*

extend DACA in its current form or effectively making it a fixture of U.S. immigration law with only minor changes would be a "cruel joke" for the numerous individuals who are ineligible for both family and family-based immigration. The commenter urged the inclusion of provisions to address the gap in the treatment of DACA recipients to permit them to pursue employment-based immigration options. The commenter stated the provisions should include, at a minimum, the opportunity for DACA recipients to file Form I–601 waiver or Form or I–601A provisional waiver applications so that they can proceed with consular processing for approved Form I–140 petitions. Commenters stated that such solutions are preferable in light of the uncertainty, fear, and anxiety surrounding the DACA request process, legal challenges to the policy, and the complexity of the U.S. immigration system.

Some commenters said that providing a pathway to permanent residence or citizenship would provide much-needed stability and lift the psychological and financial burden of biennial renewals. Some of these commenters cited personal examples highlighting the negative effects of uncertainty on existing or hopeful DACA recipients and their families, including financial and psychological hardship. Expressing concern that DACA recipients' livelihood could be destroyed if they lost protections, a commenter remarked that citizenship would allow DACA recipients to continue to reside in the United States without assuming any further fees or expenses, reasoning that staying should cost recipients nothing after they have established their residence and livelihood here.

Some commenters said that DACA recipients experience unique disadvantages compared to other immigrants and those with a pathway to citizenship in terms of finding adequate employment or obtaining Federal employment, receiving Federal financial aid or grants, obtaining a driver's license, joining the military, traveling overseas, qualifying for State and Federal benefits and programs such as Premium Tax Credits and Medicaid, or obtaining legal status through alternative pathways such as employee sponsorship. Referencing various examples above, several commenters suggested that DACA recipients are "citizens" or "Americans" in various contexts, only lacking this status by law. Other commenters similarly said that children who grew up in the United

States inherently belong and deserve the same rights as citizens who consider this country their home.

Some commenters stated that a pathway to citizenship or permanent residency would reinforce the humanitarian and legal principles underlying DACA, the proposed rule, U.S. law, or U.S. values. One commenter said that creating a pathway to citizenship would be the right thing to do for human rights and society. The commenter further reasoned that citizenship would recognize that the United States has only benefitted from DACA recipients' contributions.

A couple of commenters stated that providing a path to citizenship would not only reduce uncertainty but would also ease the burden of the administrative and judicial review processes for DACA cases, as well as the costs of deportation. A couple of commenters also stated that, as individuals who are compelled to maintain a "spotless record" to keep their status, DACA recipients have earned their citizenship.

In the absence of a pathway to citizenship, some commenters suggested that, at a minimum, the rule could provide assurance to DACA recipients that they are safe and will not be deported without just cause. Similarly, several commenters stated the need for clear messaging and guidelines around DACA protections.

*Response:* Comments suggesting that DHS should provide a path to citizenship or similar relief are outside the scope of the rulemaking. DHS nonetheless agrees with commenters that DACA recipients make substantial contributions to their communities and the U.S. economy. DHS also acknowledges commenters' concerns about legal and political uncertainty around the DACA policy. As discussed elsewhere in this rule and in the NPRM, DHS emphasizes that while this rule represents the agency's best efforts to preserve and fortify DACA, a legislative solution would offer unique benefits for the DACA population, as congressional action would be needed to extend a pathway to lawful permanent residence or citizenship for DACA recipients. As it relates to this rule, DHS emphasizes that the benefits of the rule for DACA recipients are multifold. At its core, the DACA policy represents an exercise of enforcement discretion, under which DHS indicates its intention to forbear from enforcing the immigration laws against a DACA recipient, and which the courts have generally not questioned. Other features of the policy, including eligibility for employment authorization, lawful presence as

defined in 8 CFR 1.3, and non-accrual of unlawful presence for the purposes of INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B), have been the focus of litigation, but these features can be traced directly to DHS's statutory authority over these topics, are consistent with longstanding regulations and policy, and are, in DHS's view, broadly beneficial to DACA recipients and their families, schools, communities, and employers.

Although DHS does not have legal authority to amend the rule to provide a direct procedure for a DACA recipient to attain citizenship, as recommended by some commenters, DHS notes that nothing precludes DACA recipients from becoming LPRs or applying for naturalization through the existing provisions of the INA if they meet the preexisting eligibility requirements.[128] For example, DACA recipients who qualify to become LPRs through existing family or employment-based avenues may be eligible to apply for naturalization after 3 or 5 years, depending on their category of permanent resident status.[129] Similarly, a DACA recipient who is a member of the military or spouse of such a military member may ultimately meet the requirements for military naturalization.[130]

DHS also acknowledges the commenter's concerns about the professional implications that lack of a permanent legal immigration status may have on DACA recipients. DHS recognizes that some DACA recipients may not meet the eligibility requirements for certain employment-based nonimmigrant and immigrant visa categories. DHS notes, however, that there is nothing in the DACA policy or this rule that limits or prohibits a recipient from attaining such employment-based status if a petitioning employer and the individual are able to meet the requirements of the particular category. Certain restrictions that exist on employment-based nonimmigrant and immigrant classifications, moreover, as well as the waivable grounds of inadmissibility, are statutory, and DHS lacks authority to change them through this rulemaking. Solutions to statutory requirements must originate with Congress in the form of legislation. And because DHS did not propose modifications to regulatory requirements for immigrant and nonimmigrant work-based avenues to lawful immigration status, modifying

those requirements in this final rule is outside the scope of this rule.

DHS appreciates the commenter's concern over protecting DACA recipients regardless of whether Congress passes an adjacent legislative solution. DHS agrees with commenters, that regardless of whether Congress acts to extend a pathway to lawful permanent residence or citizenship for the DACA-eligible population, there is ample justification to consider DACA recipients to generally be of a low enforcement priority.

*Comment:* A commenter suggested that DHS cooperate with the U.S. Department of Education to create a process by which school-age DACA recipients could take citizenship tests upon graduation of high school to help them attain legal citizenship. Another commenter, stating that DHS and the Federal Government need to end the uncertainty for DACA recipients by creating a path to lawful permanent residency and citizenship, suggested that the agency may need to enforce community service requirements to offset the fact that these individuals came to the United States without authorization.

*Response:* As discussed above, DACA does not provide a pathway to citizenship, and DHS cannot create such a pathway through this rulemaking. Congressional action is required to extend a pathway to lawful permanent residence or citizenship for DACA recipients. Additionally, while DHS appreciates the commenters' suggestions, creating such processes would be within the purview of entities external to the Department and outside of the scope of this rulemaking. DHS is unable to make any changes in response to this comment.

**12. Other General Reactions and Suggestions**

Strengthening the Proposed Rule or DACA

*Comment:* Many commenters commended USCIS for preserving and fortifying DACA while adding that the proposed rule should go further to benefit and provide assurance to recipients. Commenters reasoned that, by maintaining the DACA framework, the proposed rule would perpetuate a "band-aid solution," reinforce the status quo, or fail to address the root problems recipients face in the absence of permanent protections against deportation or the loss of work authorization. Other commenters recommended that the rule expand eligibility for DACA by allowing those who entered the United States more

recently to apply, or by revising or removing the criminality component of the adjudication.

Another commenter expressed strong opposition to the proposed rule, arguing that many of the proposed provisions conflict with DHS's stated intent of preserving and strengthening DACA. According to the commenter, the proposed rule would not do enough to preserve access to DACA for its intended beneficiaries, expand access to individuals that fall outside the Napolitano Memorandum's criteria, protect victims of domestic and sexual violence, ensure fair and consistent application of DACA, or protect DACA recipients and requestors from deportation.

One commenter stated that the 2012 eligibility requirements reiterated in the NPRM are overly narrow and now outdated. Furthermore, the commenter stated, unlike many other issues it canvasses, the proposed rule fails to suggest expanded alternatives to the core feature of DACA: its coverage. As a result, according to the commenter, this rule fails to provide ambitious protection for immigrant youth.

Many commenters said that, while the proposed rule, or DACA generally, would not provide a permanent solution for recipients, the policies represent a necessary step in the absence of congressional action or a better alternative. One commenter stated that DACA serves both national and international interests amid flawed legal standards, including for asylum, and policy gridlock. They stated that DACA, while imperfect, should be preserved and expanded. Some commenters expressed concern with legal or political uncertainty around DACA and the potential loss of protections for recipients. One commenter said that DACA is premised on Executive discretionary power and, therefore, is ill-equipped to endure changes in administrations. Other commenters provided examples highlighting the need to do more to address uncertainty and legal limbo among DACA recipients.

Describing the existing difficulties children and families face in the U.S. immigration system, as well as the need for DACA protections, commenters urged DHS to expand or improve efforts to protect, welcome, and support DACA recipients or DACA-eligible individuals. Some commenters alluded to a general need for a permanent solution or relief, through DACA or otherwise, while others added that, beyond protecting DACA, there also is a need for broad immigration reform.

---

[128] 8 U.S.C. 1421 *et seq.*
[129] *See* 8 U.S.C. 1427(a).
[130] *See* 8 U.S.C. 1439 *et seq.*

*Response:* DHS appreciates commenters' support for the rule and the agency's work to preserve and fortify DACA, and DHS agrees with those commenters who said that codifying the DACA policy is an appropriate step in the absence of a permanent solution. DHS also acknowledges the commenters' concern for the well-being of noncitizen survivors of domestic and sexual violence and individuals brought to the United States as children in general.

DHS recognizes the rule's limited scope, but this scope is consistent with the President's directive to focus efforts toward preserving and fortifying DACA. A central goal of this rule is to respect reliance interests. As discussed further in Section II.C, DHS does not believe that it would be appropriate to expand the policy in the final rule.

DHS also acknowledges some commenters' desire to see ambitious protections for immigrant youth written into law. DHS agrees that the DACA policy as codified in this rule does not address the circumstances of all immigrant youth, is not a permanent solution for affected persons, and does not provide lawful immigration status or a path to citizenship.

Other Feedback and Recommendations

*Comment:* DHS received other general feedback and recommendations from commenters regarding the DACA policy and DACA recipients more generally. Some commenters requested that the agency consider allowing DACA recipients to serve in the military. Another commenter stated that the United States should cut military funding and use the money to increase support for DACA recipients. Another commenter said that, while DACA has granted certain privileges to recipients, they continue to feel threatened by the Government while lacking access to the democratic process. The commenter said that they would like the privilege of voting in the only country they have known as home.

Citing personal experiences, another commenter expressed concern that DACA recipients are unable to obtain a Commercial Driver License (CDL) and requested that recipients be allowed to have a CDL. Considering the national driver shortage and opportunities for business owners, the commenter reasoned that this change would allow DACA recipients to serve their communities.

Other commenters recommended that the agency implement more safeguards for children coming to the United States, including through background checks on DACA recipients' guardians or household members.

*Response:* DHS acknowledges these commenters' feedback but notes that their suggestions are outside of the purview of the Department and beyond the scope of this rulemaking. DHS, therefore, is unable to make any changes to the final rule in response to these comments.

*Comment:* Another commenter said that they would support the rule if it provided language stating that DACA would be "a one-time thing." The commenter reasoned that there should not be an opportunity for newly arrived individuals to participate in a policy created for those "who have fought tirelessly to achieve it."

*Response:* As discussed in the NPRM and in this rule, DHS is acting consistent with the direction of the President to preserve and fortify the DACA policy, and in light of the particular contributions and reliance interests of DACA recipients and related parties. In accordance with the President's instruction and in recognition of the significant reliance interests at stake, DHS is generally retaining the threshold criteria from the Napolitano Memorandum and longstanding policy as proposed in the NPRM, including the requirement that DACA requestors be physically present as of June 15, 2012, and continuously resided in the United States since June 15, 2007.[131] Therefore, consideration for deferred action under DACA will not be available to recently arrived noncitizens under this rulemaking.

*Comment:* Some commenters stated that the proposed rule failed to provide flexibility for the administration in terms of terminating the DACA policy. A commenter objected that if, in the future, DHS does have sufficient resources to remove DACA recipients, DHS could not simply terminate this rule without notice. Another commenter described DACA as outdated, urged it be abolished, and stated that the policy was supposed to be temporary.

*Response:* DHS and the former INS have a long history of issuing policies under which groups of individuals without lawful status may receive a discretionary, temporary, and nonguaranteed reprieve from removal.[132] Deferred action under DACA is a form of prosecutorial discretion well within the Executive's authority to efficiently allocate limited enforcement resources.[133] This rule codifies an existing and appropriate use of such prosecutorial discretion to defer removal and does not expand upon or create new mechanisms by which the executive branch could exempt anyone from the enforcement of any law. DHS acknowledges that this rule codifies DACA, which reduces the agency's flexibility with regard to terminating or changing certain aspects of the policy, but reiterates the purpose of the rule is to preserve and fortify DACA, a policy that has been in place for 10 years.

Regarding a commenter's concern that DACA was intended to be a temporary policy, DHS notes that the Napolitano Memorandum did not impose temporal limits to the policy or otherwise indicate a temporary intent. To the extent that the policy was described as a temporary measure by President Barack Obama when he announced it in 2012, DHS notes that President Obama also stated that, "[i]n the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places," and that DACA is a measure "that lets us focus our resources wisely while giving a degree of relief and hope to talented, driven, patriotic young people."[134]

As the DACA-eligible population remains a low priority for enforcement; in recognition of the investments that DACA recipients have made in their families, work, schools, and communities, and vice versa; and in light of the litigation history associated with the DACA policy, DHS has determined it is appropriate to codify the DACA policy in regulation. DHS agrees, however, that in general, such codification should not be necessary for policies guiding the case-by-case exercise of enforcement discretion. In response to a commenter's concern that promulgation of this rule restricts the flexibility of the Department to terminate the DACA policy, for example, if there are sufficient enforcement resources so as to not need to exercise prosecutorial discretion, DHS declines to make changes to the rule. In the event that DHS receives such a sustained infusion of resources,

---

[131] *See* new 8 CFR 236.22(b)(2) and (3).

[132] *See generally* CRS Report on Discretionary Reprieves from Removal. *See also* AIC Report on Executive Grants of Temporary Immigration Relief; CRS Report on EVD.

[133] *See Regents of the Univ. of Cal.* v. *DHS,* 908 F.3d 476, 487 (9th Cir. 2018) (deferred action "arises . . . from the Executive's inherent authority to allocate resources and prioritize cases"), *aff'd,* 140 S. Ct. 1891 (2020).

[134] White House Office of the Press Secretary, *Remarks by the President on Immigration* (June 15, 2012), *https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.*

Congress could invalidate this rule or DHS could rescind or modify it.

*B. Background, Authority, and Purpose*

1. Statutory Authority

Assertions That Proposed Rule Is Unlawful

*Comment:* Many commenters stated, without providing an additional substantive rationale, that the DACA policy is unlawful and illegal, unconstitutional, or otherwise does not follow the law as enacted. Some commenters said generally that neither DHS nor USCIS has legal authority to issue the proposed rule. Other commenters stated the matter is "comprehensively" covered by provisions of 8 U.S.C. 1325 pertaining to improper entry by a noncitizen. Other commenters said neither of the two statutes that grant DHS authority broadly, 6 U.S.C. 202(5) and 8 U.S.C. 1103, nor any other statute grants authority for DHS to issue the rule. Many commenters stated Congress has considered legislation to protect a DACA-like population a number of times in the past but declined to enact such legislation each time, even after the issuance of the Napolitano Memorandum. Other commenters said the rule bypasses Congress' role in the legislative process, and only Congress has the authority to make and revise immigration law.

Similarly, one commenter wrote that Congress has not enacted legislation to authorize DHS to propose rules to implement the DACA policy. The commenter referenced the various authorities that DHS cited in proposing the rule, concluding that none of them permits DHS to propose this rule. Specifically, the commenter cited sources that in their view establish: (1) prosecutorial discretion does not permit DHS to implement sweeping policy changes; (2) "longstanding" DHS policies do not create authority for the proposed rule; and (3) court decisions are inapplicable or explicitly foreclose DHS's interpretation of its authority.

The commenter went on to state that the courts, not DHS, determine whether DHS has authority to implement DACA. The commenter wrote that the courts have, in that respect, "expressly concluded" that DHS does not have that authority. The commenter further stated that, because the rule implements the same program that the courts reviewed, the reasoning in those court decisions applies with equal force to the proposed rule. The commenter characterized this rulemaking as demonstrating DHS's opinion that certain court decisions concerning DHS's authority do not

apply to it. The commenter said DHS's policies, even if longstanding, do not hold greater weight than legal determinations by the judiciary, nor do they overcome the force of law as determined by the courts.

The commenter also stated that, throughout the NPRM, DHS cites a series of agency policies that Congress later codified, presumably to show authority for this rulemaking. The problem with these references, in the commenter's view, is the referenced policies are "distinguishable and unrelated" to the current proposed rule. The commenter wrote that in earlier instances of deferred action, DHS implemented a policy that was: (1) not held by a court of law to be outside the scope of DHS's authority; and (2) not relied on as authority for a proposed rule. The commenter said that a history of DHS policies, even where Congress ratified those policies, is not evidence of authority for an agency to implement the DACA rules or any rule because historical practice is not a duly enacted statute by Congress.

The commenter also stated that DHS is not consistent in its reliance on Congress' post-implementation treatment of DACA policy as authority for these rules. For example, the commenter wrote that DHS takes the position that Congress' inaction concerning the DREAM Act should not lead to an inference concerning the Secretary's authority, while simultaneously relying on Congress' inaction to support its position that the Secretary has authority to confer "lawful presence" as part of DACA. The commenter stated that DHS's "completely subjective" analysis illustrates why statutes, not Congress' action or inaction after a policy is implemented, must authorize any agency rulemaking endeavor.

Another commenter likewise wrote that maintaining DACA through rulemaking is both unlawful and bad immigration policy. The commenter stated that Congress has not authorized DACA, and DACA therefore is outside DHS's rulemaking authority. Citing the district court's 2021 decision in *Texas,* the commenter wrote that DHS bases the proposed rule on an impermissible interpretation of the INA. The commenter stated that DACA directly conflicts with Congress' legislative scheme to regulate the employment of noncitizens, adjustment of status of noncitizens who entered the United States without inspection, removal of certain noncitizens from the United States, and reentry into the United States by noncitizens who have accrued unlawful presence.

The commenter wrote that DACA is more than an exercise of prosecutorial discretion and instead goes further to ignore statutorily mandated removal proceedings and unlawfully provide immigration benefits to an ineligible population. The commenter also stated that Congress has spoken on DACA's legality by consistently and expressly rejecting legislation that would substantively enact the program or otherwise legalize DACA's intended beneficiaries. The commenter wrote that Congress has not implicitly ratified DACA, either. Citing case law, the commenter stated ratification requires "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." The commenter wrote DACA "falls short" of satisfying this standard "because prior instances of Executive misconduct cannot be regarded as even a precedent, much less an authority for the present misconduct." The commenter stated that it disagrees with DHS's position that prior non-enforcement policies justify the proposed rule. And the commenter further said implementation of DACA would violate the Take Care Clause of the U.S. Constitution because it "dispens[es]" with certain statutes.

Multiple commenters stated that the rule cannot be issued as an executive decision. These commenters said DACA is an example of executive disregard of the Constitution and current law, and no administration has the authority to decide which laws agencies get to ignore. Many commenters stated the rule is in direct violation of U.S. immigration law, which requires that people living in this country illegally be apprehended and returned to their country. Some commenters also said there is an established procedure for U.S. citizenship, and DACA recipients should follow this path to legal citizenship the same as any other immigrant.

One commenter stated that, while previous administrations have granted deferred action to limited groups of immigrants, DHS lacks authority to provide "unconditional and indefinite" relief and benefits to a large group ("more than half million") of noncitizens without lawful immigration status. Another commenter similarly remarked that the main flaw in DHS pointing to prior deferred action programs as justification for this rule is that "none of them has the broad scope and indefinite timeframe of the [DACA] program." The commenter stated that "a litmus test is whether the department created a program that is narrowly scoped, and has a time restriction, either

in terms of max number of renewals, or restricted to a bridge-gap measure before the applicant's next status take[s] effect.'' Providing examples, the commenter concluded that, while ''all previous deferred actions'' met these criteria, DACA does not. Another commenter asserted that the rule would grant lawful presence and work authorization to potentially hundreds of thousands of noncitizens by 2031 ''for whom Congress has made no provision and has consistently refused to make such a provision,'' and cited *King* v. *Burwell,* 576 U.S. 473, 474 (2015) for the proposition that ''had Congress wished to assign [a question of 'deep economic and political significance'] to an agency, it surely would have done so expressly.''

Multiple commenters stated that the rule comes on the heels of the *Texas* ruling, which struck down the DACA policy as unlawful. One commenter said that DHS mischaracterizes the district court's ruling throughout the NPRM in an apparent attempt to justify the NPRM as a legitimate rulemaking endeavor, writing that the finding that the Napolitano Memorandum violated the Administrative Procedure Act (APA) was only part of the district court's decision, and the district court also determined DHS could not cure DACA's underlying legal deficiencies even by using notice-and-comment rulemaking. The commenter stated the rule impermissibly substitutes DHS's own opinion in place of a legally binding court order. The commenter further said the rule demonstrates DHS's ''blatant disregard'' for the district court's ruling, exposing DHS to potential liability for contempt of court and setting a ''dangerous precedent'' with respect to our government's system of checks and balances. The commenter stated that regardless of whether DHS ''agrees'' with the district court's ruling, it is nonetheless bound by the ruling unless an appellate court overturns it. The commenter also said pursuing this rulemaking while litigation continues reflects a gross mismanagement of resources at DHS and USCIS. The commenter concluded by addressing the statutory authority of USCIS officers, stating DHS ''glosses over'' the distinct authorities Congress delegated to each of the three immigration components within DHS. Writing that USCIS is not an enforcement agency and, therefore, lacks the ability to grant deferred action to any noncitizen, the commenter stated the precise wording of the delegation in the Homeland Security Act (HSA) irrefutably demonstrates that Congress intentionally gave USCIS authority only

to adjudicate immigration benefit requests, not to take (or decline to take) enforcement actions against nonimmigrants. Thus, the commenter said, even if DHS's pursuit of rulemaking while simultaneously appealing the district court's ruling in *Texas* were proper, USCIS lacks the authority to administer DACA, making DACA inherently *ultra vires* and exposing DHS to significant litigation risk.

*Response:* DHS respectfully disagrees with commenters' statements that this rulemaking is unlawful, illegal, unconstitutional, or represents bad immigration policy. Both the INA and the HSA confer clear authority on the Secretary to administer the immigration laws of the United States, including authority to set ''national immigration enforcement policies and priorities.''[135] DHS, the former INS, and the U.S. Supreme Court all have long recognized the fundamental role that prosecutorial discretion plays with respect to immigration enforcement. As the U.S. Court of Appeals for the Ninth Circuit has explained, ''[T]he INA explicitly authorizes the [Secretary] to administer and enforce all laws relating to immigration and naturalization. . . . As part of this authority, it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion.''[136] Stated another way, ''[d]eferred action is simply a decision . . . by DHS not to seek the removal of an alien for a set period of time,''[137] a decision well within DHS's discretion in light of competing policy objectives and scarce resources. Deferred action thus is a well-established form of prosecutorial discretion, acknowledging ''that those qualifying individuals are the lowest priority for enforcement.''[138]

DHS likewise disagrees with commenters' assertions that this rulemaking fails to follow the law as established by Congress, conflicts with Congress' legislative scheme to regulate the employment of noncitizens, adjustment of status, removal, and reentry, or otherwise violates the Executive's duty to ''take care that the Laws be faithfully executed'' under Article II, Section 3 of the Constitution. To the contrary, DHS strongly believes this rule is consistent with the text of all relevant statutes and furthers Congress' goals in enacting the INA and HSA. DHS acknowledges that the Constitution

vests Congress with the legislative power and, accordingly, the authority to make and revise the immigration laws. The Department's prioritization of the apprehension and removal of noncitizens who are a threat to national security, border security, and public safety is entirely consistent with the immigration laws, including provisions providing for mandatory detention and expedited removal of certain categories of individuals.[139] Indeed, as noted in the NPRM, a mandate to prioritize the removal of criminal offenders, taking into account the severity of the crime, has been included in every annual DHS appropriations act since 2009.[140] This rule facilitates those objectives.

More than 11 million undocumented noncitizens currently live in the United States,[141] demonstrating an obvious need for DHS to allocate its limited resources toward the removal of priority enforcement targets. For example, in fiscal year 2021, when ICE operations were dramatically impacted by the COVID–19 pandemic, ICE conducted a total of 74,082 administrative arrests of noncitizens and removed 59,011 noncitizens.[142] During fiscal years 2016–2020, ICE averaged 131,771 administrative arrests and 235,120 removals per year.[143] It is clear from

[135] 6 U.S.C. 202(5).

[136] *Ariz. Dream Act Coal.* v. *Brewer,* 855 F.3d 957, 967 (9th Cir. 2017).

[137] *Arpaio* v. *Obama,* 27 F. Supp. 3d 185, 192–93 (D.D.C. 2014), *aff'd,* 797 F.3d 11 (D.C. Cir. 2015).

[138] *Id.; see also AADC,* 525 U.S. at 484–85.

[139] *See, e.g.,* INA sec. 235(b)(1), 8 U.S.C. 1225(b)(1) (establishing ''expedited removal'' for certain noncitizens arriving in the United States); INA sec. 236(c), 8 U.S.C. 1226(c) (providing mandatory detention for certain criminal noncitizens); INA sec. 236A, 8 U.S.C. 1226a (providing mandatory detention of suspected terrorists); *see also, e.g.,* Public Law 114–113, 129 Stat. 2241, 2497 (providing that ''the Secretary . . . shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime''); DHS, *Secretary Mayorkas Announces New Immigration Enforcement Priorities* (Sept. 30, 2021), *https://www.dhs.gov/news/2021/09/30/secretary-mayorkas-announces-new-immigration-enforcement-priorities.*

[140] *See, e.g,* Consolidated Appropriations Act, 2014, Public Law 113–76, div. F, tit. II, 128 Stat. 5, 251.

[141] *See* DHS, Office of Immigration Statistics (OIS), *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018* (Jan. 2021), *https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.*

[142] ICE, *ICE Annual Report Fiscal Year 2021* (Mar. 11, 2022), *https://www.ice.gov/features/2021-year-review.*

[143] ICE, *Fiscal Year 2016 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/default/files/documents/Report/2016/removal-stats-2016.pdf;* ICE, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf;* ICE, *Fiscal Year 2018 ICE Enforcement and Removal Operations Report, https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf;* ICE, *Fiscal Year 2019 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/*

Continued

these numbers that even if each of the estimated 1.7 million noncitizens who may be eligible to request initial or renewal deferred action under DACA (which as discussed in the regulatory analysis below is likely an overestimate) did so and were found to warrant deferred action as codified in this rule as low enforcement priorities, DHS would still lack adequate resources to pursue full enforcement actions against the estimated 9 million other undocumented noncitizens present in the United States. This rulemaking accordingly will allow DHS to focus its enforcement resources on the removal of dangerous criminal offenders and other noncitizens who threaten public safety and national security.

DHS shares commenters' recognition of and respect for the Constitution's separation of powers framework. But DHS disagrees with commenters' position that this rulemaking bypasses Congress' role in the legislative process or otherwise fails to adhere to DHS's proper place within the Government of the United States. DHS acknowledges that the INA generally provides for the removal of noncitizens who are in the United States without authorization. Never in the history of DHS or the former INS, however, has either agency or a court taken the position that the agency is obligated to seek the removal of every removable noncitizen in the United States at any given time. And both the long history of formal deferred action policies instituted both by DHS and the former INS (some of which Congress went on to ratify) and other forms of prosecutorial discretion that individual government officials lawfully exercise on a case-by-case basis every day belie any assertion to the contrary. DHS agrees that those prior policies are not "authority" for this rule. Rather, the authority for the rule lies in a range of statutory authorities, including DHS's general rulemaking authority under section 103 of the INA as well as DHS's power to exercise enforcement discretion, which is inherent in the delegation of authority over enforcement of the INA.[144] The prior, related policies discussed in the NPRM and by commenters are *evidence* of the Secretary's authority, recognized by Congress when it ratified those policies in later statutes without limiting INS's (and now DHS's) ability to create similar enforcement discretion policies in the

future. DHS also notes that many of these policies also contained similar or the same ancillary features, including employment authorization upon showing of economic necessity, lawful presence for the limited purposes stated in 8 CFR 1.3, and nonaccrual of unlawful presence for the duration of the period of deferred action. The lawfulness of these ancillary features is addressed at length in the sections corresponding to each such feature later in this preamble.

DHS disagrees with the commenter's assertion that a policy granting lawful presence and work authorization to the DACA-eligible population is a matter of such "deep economic and political significance" as to constitute a "major question," as recently described by the Supreme Court in *West Virginia* v. *EPA.*[145] While DHS expects that this rule would carry significant benefits and would result in significant tax transfers, this rule is not akin to the rule in *West Virginia,* where the agency's "own modeling concluded that the rule would entail billions of dollars in compliance costs (to be paid in the form of higher energy prices), require the retirement of dozens of coal-fired plants, and eliminate tens of thousands of jobs across various sectors."[146] This rule involves DHS's enforcement posture towards a population that is likely to remain in the United States regardless of the existence of DACA; the costs imposed by this rule are borne by DACA recipients themselves; and the rule's indirect effects are nowhere near as vast as the effects described in *West Virginia.*

Even if the major questions doctrine did apply, there is clear statutory authority and agency precedent for the rule. Unlike the authority at issue in *West Virginia,* this final rule reflects "the longstanding practice of [DHS] in implementing the relevant statutory authorities."[147] Congress was well aware of the long history of deferred action and similar enforcement discretion policies, as well as the deferred action provisions in the employment authorization and lawful presence rules, when Congress made the Secretary responsible for "[e]stablishing national immigration enforcement policies and priorities";[148] charged the Secretary with "the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens";[149] and

authorized the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."[150] Likewise, although the Secretary inherited from the Attorney General his statutory authority for determining which noncitizens should be authorized for employment, that grant of power clearly endorsed a longstanding practice as discussed in section II.C.2.b below.[151] And as discussed in section II.C.3 below, after the Department of Justice established the lawful presence regulation pursuant to express statutory authority, Congress in fact amended 8 U.S.C. 1611 to provide DHS additional authority. These authorities have long provided the basis for the exercise of prosecutorial discretion when making immigration enforcement decisions, or described some of the consequences of those decisions. These are not "ancillary provisions" of the Act that are rarely used,[152] but rather are foundational powers used daily in the Secretary's routine administration of the nation's immigration system. Nor is the exercise of prosecutorial discretion as laid out in this rule a "fundamental revision" of the statutory scheme; the exercise of prosecutorial discretion is and has long been a consequence of a lack of resources to enforce the terms of that scheme against each and every individual who may violate it.[153]

As detailed below, these policies date as far back as 1956 and DHS and its precursor agencies have "routinely" implemented prosecutorial discretion policies of a similar scale and type as the DACA policy, *Biden* v. *Missouri,* 142 S. Ct. 647, 653 (2022). There is no sense in which this rule exercises a "newfound power." And, although DHS recognizes that Congress has, on occasion, considered legislation concerning the population affected by this rule, such action does not negate the authority previously provided to and historically exercised by the Secretary in the same realm. As noted elsewhere in this preamble, unlike the legislative actions considered by Congress, the rule does not provide lawful status, a path to permanent residency or citizenship, or any other type of permanent immigration solution for the population, which the

---

*default/files/documents/Document/2019/eroReportFY2019.pdf;* ICE, *FY 2020 Annual Report, https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf.*

[144] *See* 6 U.S.C. 202(3), (5); 8 U.S.C. 1103(a)(1), (3); *see also Arizona,* 567 U.S. at 396–97; *AADC,* 525 U.S. at 483–84.

[145] 142 S. Ct. 2587 (2022).

[146] *Id.* at 2604.

[147] *See Biden* v. *Missouri,* 142 S. Ct. 647, 653 (2022).

[148] 6 U.S.C. 202(5).

[149] 8 U.S.C. 1103(a)(1).

[150] 8 U.S.C. 1103(a)(3).

[151] 8 U.S.C. 1324a(h)(3).

[152] 142 S.Ct. at 2610.

[153] *Id.* at 2612.

Department agrees only Congress can enact.

DHS disagrees with commenters who stated that prior instances of deferred action or similar enforcement discretion policies referenced in the NPRM are materially different from deferred action under the DACA policy. In essence, commenters said that the validity of prior policies such as EVD, Family Fairness, and deferred enforced departure turned on those programs' ''interstitial'' nature. Those programs, in the commenters' view, simply provided a stopgap measure intended to serve only as a temporary solution while Congress legislated a permanent fix. That may have been the ultimate result for the affected populations, but it was by no means assured that Congress would act when legacy-INS implemented those policies. The INS relied not on an assurance of future Congressional ratification, but on its authority to exercise enforcement discretion when implementing those policies, with the possibility that Congress might one day act. DACA in this respect is no different from the earlier programs. Congress is actively considering legislation to provide substantive immigration benefits to a DACA-like population. Thus, to the extent commenters characterized prior instances of deferred action as ''interstitial'' simply because they occupied the space between an agency seeking to implement a certain policy and Congress providing an adjacent legislative solution, DACA occupies an identical space. And also like DACA, the administrative enforcement discretion policies practiced by the INS did not provide beneficiaries with lawful immigration status, protection from removal, or a pathway to citizenship until Congress made a change in law.[154]

DHS further disagrees with commenters who stated that Congress' consistent failure to enact DACA-like legislation is evidence that this rule exceeds DHS's authority. For one thing, many of the bills the commenters point to differ greatly from DACA in substance. Both the DREAM Act and the American Dream and Promise Act differ dramatically from DACA in the protections and substantive benefits that they would offer to their respective

target populations, the most notable being lawful immigration status and a pathway to citizenship. DACA, by contrast, as preserved and fortified by this rule, does not and could not provide a blanket grant of lawful immigration status, conditional or permanent residence, or a pathway to citizenship because DHS lacks authority to do so without a change in law. For another, inaction is not legislation, and Congress does not legislate by failing to legislate. Congress' past inaction on any given topic is not a law. Congressional inaction may occur for any number of reasons, and it does not enact the status quo, or come with an account of Congress' reasons for declining to take action. In DHS's view, inaction as such has no bearing on the legality of an adjacent rulemaking. For example, the former INS instituted Family Fairness in the wake of Congress' express rejection of legislation that would have provided immigration benefits to spouses and children ineligible for such relief under the Immigration Reform and Control Act of 1986 (IRCA). Legislation stalls in Congress for myriad reasons, not the least of which include competing priorities of national and international importance and the sheer volume of business to which Congress must attend.

One more point bears mentioning with respect to congressional inaction in this space. While commenters drew much attention to Congress perennially declining to enact DACA-like legislation, commenters largely ignored Congress' comparable failure to legislatively override the DACA policy even though it has now existed for years. There is no basis to conclude that Congress has rejected a longstanding deferred action policy for the DACA population from its failure to enact more comprehensive legislation governing a similar population.

With respect to a commenter's statement that, setting aside the Secretary's authority to exercise prosecutorial discretion in favor of this rulemaking's target population, DHS cannot implement sweeping policy changes under the guise of prosecutorial discretion: DACA is no such sweeping change. As the NPRM makes clear, there is nothing new about a policy deferring enforcement action for nonviolent individuals who are low priorities for enforcement, nor is there anything new about the ancillary policies, regulations, and statutes associated with such forbearance, including according employment authorization to such individuals upon a showing of economic necessity, or deeming such individuals to be lawfully present for certain purposes or not unlawfully

present for the duration of the deferred action. Indeed, as it relates to the core of the policy (*i.e.*, its forbearance element), the former INS first implemented the EVD program in 1956, which provided relief to certain immigrant professionals whose lawful immigration status lapsed simply by virtue of constraints on visa availability.[155] This program continued until 1990 and was joined along the way by a variety of other deferred action policies all geared toward making the most efficient use of the former INS's limited enforcement resources.[156] DHS also reiterates the prior deferred action policies in favor of (1) ''nonpriority'' cases identified in the former INS's 1959 Operations Instructions (OI); (2) spouses and children of noncitizens granted benefits under IRCA; (3) Violence Against Women Act of 1994 (VAWA) self-petitioners; (4) children eligible for benefits under the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA); (5) T visa applicants; (6) U visa petitioners; and (7) former F–1 students who lost their status due to intervening natural disasters.[157] Each of these populations by their nature possess characteristics that make them low enforcement priorities. DHS views the DACA population as prime candidates for deferred action for similar reasons.

The same commenter wrote that the ''longstanding'' nature of the above policies nevertheless does not excuse the absence of express statutory authority to engage in this rulemaking. DHS first disagrees with the commenter's premise that DHS lacks express statutory authority to issue this rule. To the contrary, as explained earlier, both the INA and the HSA vest the Secretary with authority to issue this rule by virtue of statutory directives that he administer and enforce the immigration laws of the United States, set ''national immigration enforcement policies and priorities,'' and ''establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority'' under the INA.[158] This rulemaking is a lawful exercise of that authority, facilitating DHS's immigration enforcement priorities through a thoughtful exercise of prosecutorial

---

[154] *See* Alan C. Nelson, Commissioner, INS, *Legalization and Family Fairness—An Analysis* (Oct. 21, 1987), *reprinted in* 64 No. 41 Interpreter Releases 1191, App. I (Oct. 26, 1987); Memorandum to INS Regional Commissioners from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990); IMMACT 90, Public Law 101–649, sec. 301(g), 104 Stat. 4978, 5030 (1990).

[155] *See United States ex rel. Parco* v. *Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977).

[156] *See* Adam B. Cox and Cristina M. Rodriguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 122–24 (2015) (discussing the origins and various applications of EVD).

[157] *See* 86 FR 53747–53748.

[158] *See* 6 U.S.C. 112, 202; 8 U.S.C. 1103(a)(1), (3).

discretion. Because deferred action under the proposed rule would constitute a lawful exercise of prosecutorial discretion in line with over 60 years of similar policies (some of which, as discussed elsewhere in this preamble, came with grants of work authorization so recipients could support themselves and their families while in the United States without resorting to informal employment, which has the possibility of lowering wages and employment standards for some workers), DHS finds the commenter's arguments to the contrary unpersuasive.

DHS disagrees with multiple commenters' characterization of DHS's view of the July 2021 ruling of the United States District Court for the Southern District of Texas in the *Texas* litigation. Contrary to commenters' assertions, DHS respects the courts' role in this nation's government under the separation of powers framework. DHS has carefully and respectfully considered the court's ruling on all procedural and substantive issues involved in that litigation and is pursuing an appeal to vindicate its position on DACA's legality. In the meantime, DHS has complied with the district court's injunction, to the extent that the injunction has not been stayed, and will continue to do so as long as the injunction is in effect.

In any event, this rulemaking should not be construed as indicating that DHS doubts DACA's procedural or substantive legality. DHS elected to undertake this rulemaking for a variety of reasons, including to affirm administrative practices that help the Department to allocate its enforcement resources efficiently; accommodate the substantial reliance interests that have developed in connection with the DACA policy; implement the President's directive to preserve and fortify DACA; and facilitate compelling humanitarian objectives.

Last, DHS disagrees with the commenter's statement that USCIS lacks authority to administer DACA because it is not an enforcement agency. The authority to administer the immigration laws and set immigration enforcement priorities ultimately rests with the Secretary.[159] This rule is issued under

these and other broad authorities; as a consequence, there is no basis to distinguish between USCIS and other immigration components as the commenter proposes. And in any event, USCIS has historically been delegated and has exercised a range of functions that would fall under the rubric of "enforcement" as described by the commenter.[160] DHS has determined that USCIS has the expertise and administrative infrastructure to assess on a case-by-case basis whether a DACA requestor has met the threshold criteria and warrants a favorable exercise of discretion. Housing administration of the DACA policy within USCIS also furthers DHS's interest in encouraging candidates for deferred action under DACA to come forward and identify themselves to the Federal Government. Proactively identifying noncitizens eligible for and deserving of deferred action under the DACA policy will ultimately conserve department resources by helping ICE and CBP identify noncitizens who are low priorities for removal should those components encounter them in the field, as discussed in Section II.A.8, and utilizes existing structures for collecting fees from DACA requestors to cover the costs of such adjudication.[161]

*Assertions That DACA/the Proposed Rule Is Lawful*

*Comment:* Multiple commenters stated the DACA policy and its implementation are constitutional, lawful, and within the authority of DHS and the executive branch. Some commenters stated that DHS has authority to fortify, update, and expand the DACA policy. Another commenter stated that DACA is legal and within DHS's authority, and that both Congress

and the Federal courts have recognized that protecting the well-being of children is in the public interest. Citing sources, the commenter said the legislative history of the INA indicates Congress "intended to provide for a liberal treatment of children" and sought to keep mixed-status families together.[162] A different commenter stated that DACA is constitutional because "it transformed the lives of many individuals who came to the United States improperly as youngsters and because the court decision that resulted would provide Dreamers broader access to American citizenship." Quoting from the NPRM, a joint comment wrote that Congress' failure to pass the DREAM Act or any of the other similar acts identified by the district court in *Texas* does not limit DHS's ability to make a rule similar to the DACA policy first set forth in the Napolitano Memorandum.

A commenter stated that the DACA policy is a lawful exercise of the Secretary's authority, even without notice-and-comment rulemaking. A different commenter stated that DACA has a strong legal foundation and agreed with DHS that the proposed rule "should not be interpreted as suggesting that DHS itself doubts the legality of the 2012 DACA policy." Another commenter stated that, like DOJ and DHS, they strongly disagreed rulemaking is necessary for DACA. However, the commenter said, because litigation has challenged the legality of the policy and prompted DHS to engage in formal rulemaking, DHS taking the additional step to "preserve and fortify" the policy through the rulemaking process not only strengthens the legal foundation for the policy, but also provides DHS with the opportunity to expand and modernize it.

Referencing the proposed language at 8 CFR 236.21 set forth in the NPRM, a group of commenters characterized this section of the proposed rule as a "clarification (for the courts)" of DHS's authority to regulate in this space. The commenters stated they hoped the agency would keep this section as clear as possible given the likelihood of litigation.

One commenter said the proposed rule provides a "rigorous" review of the legal precedent and broad executive authority, all of which provides a "strong" justification for DACA's

---

[159] *See, e.g.,* 6 U.S.C. 112(a)(3) ("All functions of all officers, employees, and organizational units of the Department are vested in the Secretary"); 8 U.S.C. 1103(a)(1) ("The Secretary . . . shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ."), 1103(a)(3) ("He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying

out his authority under the provisions of this chapter."), 1103(a)(4) ("He may require or authorize any employee of the Service or the Department . . . to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.").

[160] *See, e.g.,* DHS Del. No. 0150.1 (June 5, 2003) (delegating to USCIS the authority to place noncitizens in removal proceedings, to cancel a notice to appear before jurisdiction vests with DOJ, and to grant voluntary departure and deferred action, among other things); Memorandum from Secretary John Kelly to the heads of CBP, ICE, and USCIS, et al., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, *or USCIS* that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents . . . ." (emphasis added)).

[161] *See* 86 FR 53764.

[162] *See INS* v. *Errico,* 385 U.S. 214, 220 n.9 (1966) ("The legislative history of the [INA] clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." (internal quotation marks omitted)).

establishment of national immigration policies and priorities and places the rule on strong legal footing. Another commenter stated that the historical examples of prior deferred action policies explain well why DACA is lawful as a subregulatory program fully within the Secretary's authority under the INA.

*Response:* DHS agrees with commenters that the proposed rule is a lawful exercise of DHS's authority under the INA. DHS agrees with commenters that the proposed rule is constitutional and that it furthers compelling humanitarian, public safety, and other policy objectives. Additionally, as discussed above, DHS agrees with commenters that Congress' failure to pass legislation to protect a DACA-like population does not implicate DHS's authority to engage in this rulemaking.

DHS agrees with commenters that the DACA policy has stood on strong legal footing since first set forth in the Napolitano Memorandum, even without engaging in full notice-and-comment rulemaking. DHS appreciates commenters' recognition of DHS's efforts to preserve and fortify DACA through this rulemaking. DHS agrees that 8 CFR 236.21 clearly articulates DACA's limited scope and DHS's authority for deferring action for the DACA population. DHS likewise agrees with commenters that DACA respects Congress' legislative scheme to regulate noncitizens present in the United States without authorization and eligibility for lawful immigration status, while providing stability to recipients through a lawful exercise of DHS's prosecutorial discretion.

DHS appreciates the commenter's concern about DACA recipients' current lack of ability to adjust status, but DHS disagrees with commenters to the extent they suggest the rule does or should provide a pathway to lawful immigration status, legal permanent residence, or U.S. citizenship. DHS appreciates commenters' concern about the current lack of a permanent immigration status for the DACA population. DHS reiterates its discussion in Section II.A.11 that it lacks the authority to provide legal immigration status through rulemaking. DHS nevertheless ultimately agrees with commenters that this rulemaking is a lawful exercise of its statutory authority.

Prosecutorial Discretion and Deferred Action Authority

*Comment:* Numerous commenters stated that DACA is a lawful application of DHS's broad authority to exercise prosecutorial discretion and defer

enforcement action for certain noncitizen youth.

Multiple commenters referenced 8 U.S.C. 1103(a) in stating that Congress empowered the Secretary with broad authority to administer and enforce immigration laws, with one commenter stating that such authority must include the ability to set enforcement priorities for an agency with limited resources. Also citing 6 U.S.C. 202(5), commenters wrote that Congress has broadly authorized DHS to establish national immigration enforcement policies and priorities. One of these commenters said that, as a purely practical matter, the Executive must be able to set priorities for administrative agencies with limited resources, and it may do so by choosing to defer action in certain areas. The commenter stated both the Supreme Court and Congress have recognized this authority, as Congress has enacted statutes expressly recognizing the legal authority to grant deferred action, and the Supreme Court has acknowledged the "regular practice" of "deferred action." Another commenter similarly stated that as a purely practical matter, the Executive must be able to set priorities for administrative agencies with limited resources, and it may do so by choosing to defer action in certain areas. The commenter stated both the Supreme Court and Congress have recognized this authority, as Congress has enacted statutes expressly recognizing the legal authority to grant deferred action and the Supreme Court has acknowledged the "regular practice" of "deferred action."

A commenter wrote that the president and executive agencies have the power to carry out legislation, interpret ambiguous provisions, and make decisions about how best to allocate scarce agency resources. Another commenter stated the Supreme Court on numerous occasions has reaffirmed the wide latitude agencies enjoy in deciding whether or when "to prosecute or enforce" laws within their purview. As recently as 2020, the commenter wrote, the Supreme Court affirmed the key part of deferred action when it stated in *Regents* that "[t]he defining feature of deferred action is the decision to defer removal." These commenters and others stated that, as existing 8 CFR 1.3(a)(4)(vi) makes clear, this rulemaking fits within the deferred action framework because it does not confer legal status, but instead merely exempts individuals from accumulating "unlawful presence." Similarly, a commenter agreed with USCIS that DACA is consistent with the INA because it is limited in scope and nature, conferring only "lawful

presence," not "lawful status," which does not create a legally enforceable right for undocumented immigrants able to avail themselves of the DACA policy.

A commenter added that for decades the Federal Government has implemented deferred action as a discretionary forbearance of removal. The commenter reasoned that this policy of deferring removal of noncitizens who came to this country as youth did not then (and does not now) create new rights for those individuals; rather, it is merely a recognition that as an agency, DHS (through USCIS), just as every other law enforcement agency, must exercise enforcement discretion. The commenter, writing that the proposed rule rightfully sets forth the position that people who otherwise qualify for DACA are not a priority for removal, urged DHS to maintain this policy in the final rule and use its discretion accordingly. A commenter stated that deportations are a discretionary duty of the executive branch as established by *Regents, Trump* v. *Hawaii,* and other cases establishing executive branch authority to regulate immigration policy.

A commenter stated that Congress, which has the ability to prohibit DHS from granting deferred action and work and travel authorization, through funding or through legislation, has not done so, implying the policy does not fall outside of congressional intent.

A commenter stated the DACA policy has been in place for a decade, and no State filed suit to challenge the legality of the Napolitano Memorandum until 2018—more than 5 years after the memorandum was issued. But beginning long before 2012, the commenter remarked, DHS and INS routinely exercised prosecutorial discretion to deprioritize categories of individuals for enforcement and to provide these individuals with adjacent, necessary privileges, such as work authorization. The commenter stated that the proposed rule, like the Napolitano Memorandum, therefore does not constitute a deviation from established practice, nor does the proposed rule constitute abandonment of the Executive's duty to enforce the immigration laws. Rather, the commenter stated, it represents the Executive's educated judgment about the best and most efficient way to enforce the immigration laws. Another commenter said this history refutes the Department's prior assertion in the Duke Memorandum that deferred action programs should be initiated by Congress. In fact, the commenter wrote, Congress later clarified, expanded, or adopted through statute many of the

deferred action programs that originated with INS or DHS. The commenter stated that, rather than refute DHS's assertion of authority to make such exceptions, Congress used them as a ''legislative springboard,'' which the commenter said implies not only the legality of those programs, but also their political wisdom. The commenter concluded that DHS should thus use this long history of creating deferred action programs to rebut its prior assertion that only Congress should adopt deferred action policies as a matter of policy.

Commenters further stated that previous executive action bears out the Government's authority to exercise discretion in enforcing immigration laws, saying that, since 1956, immigration agencies have issued policies granting individuals temporary and discretionary relief from deportation and, in many cases, work authorization, without opposition from Congress or the courts. A commenter stated that these prosecutorial discretion policies have allowed the executive branch to balance competing domestic policy objectives, foreign policy concerns, and humanitarian considerations. Multiple commenters wrote that existing areas of humanitarian relief, such as VAWA self-petitions, U nonimmigrant status, and TPS, demonstrate the well-established character and practice of granting deferred action for sympathetic, nonpriority populations. Another commenter pointed to 17 deferred action policies other than DACA that were enacted without being judicially challenged. In particular, the commenter wrote, President Reagan's ''Family Fairness'' program often draws comparison with DACA, as it provided deferred action for the children of parents eligible for legal status and, like DACA, provided an opportunity for employment authorization.

Another commenter stated that even the detractors of DACA acknowledge its legality amid their challenges by recognizing DHS has the authority to defer enforcement against migrants. Subjected to scrutiny and rulemaking, the commenter said, DACA has been and remains a lawful vehicle for protecting migrants brought to the United States as young children. The commenter concluded that, just as the Napolitano Memorandum emphasizes not only the legality, but also the necessity, of exercising prosecutorial discretion on a case-by-case basis, so too does the proposed rule both meet and exceed the threshold requirements of the APA and INA. A commenter wrote that Congress and the courts have recognized the importance of child well-

being and family unity as a basis for humanitarian considerations in immigration law and the executive branch's authority to exercise its discretion.[163] The commenter concluded that ''it clearly follows'' that it is well within DHS's authority to use the powers given to it by Congress to grant deferred action to immigrants who are not and should not be a priority for deportation—immigrants who came to the United States as children—and preserve the family unity and well-being of these immigrants' children. Commenters thus stated DACA is a lawful and appropriate use of the Executive's longstanding deferred action authority, unless and until Congress passes a permanent solution to address the problems of undocumented youth.

A commenter stated that DHS's decision to undertake full notice-and-comment rulemaking in this instance does not reflect a requirement to do so when implementing deferred action policies or exercising other forms of prosecutorial discretion in the future. Citing DOJ's Justice Manual and Supreme Court caselaw on prosecutorial discretion,[164] the commenter said that DACA and other forms of prosecutorial discretion lie within the executive branch's power to determine ''when, whom, how, and even whether to prosecute,'' a power that applies across criminal, civil, and administrative contexts. The commenter stated Congress and the Supreme Court have affirmed that prosecutorial discretion, including through deferred action, applies in the immigration context, and Congress also has given the executive branch the authority to establish national immigration enforcement policies and priorities.

*Response:* DHS agrees that deferring enforcement action for the DACA population on a case-by-case basis is a lawful exercise of DHS's broad

prosecutorial discretion, which both Congress and the courts have recognized for decades. DHS also agrees that the DACA policy furthers compelling humanitarian and law enforcement objectives by allowing DHS to focus limited agency resources on priority targets and deferring action on the cases of certain noncitizens who entered the United States as children. DHS recognizes that Congress' inaction with respect to the DACA population has been taken by commenters to cut both ways; regardless of that inaction, DHS agrees with commenters that Congress has vested the Secretary with clear authority to administer and enforce the immigration laws and to establish national immigration policies, objectives, and priorities. DHS agrees with commenters that DACA facilitates a prudent set of immigration enforcement priorities, allowing DHS to utilize its limited resources efficiently by targeting high-priority cases, such as those that pose a threat to public safety, national security, or border security. DHS likewise agrees with commenters that the proposed rule comfortably fits within the deferred action framework that DHS and INS before it have utilized for decades.

DHS also agrees the extensive use of deferred action in the past by both INS and DHS to facilitate enforcement priorities further indicates the lawfulness of this rule. Although VAWA self-petitions, U-visas, and TPS are statutory forms of substantive immigration benefits (and therefore distinguishable from the DACA policy, which constitutes only an exercise of prosecutorial discretion to defer enforcement action against removable noncitizens), DHS accordingly nevertheless agrees with commenters that the long history of deferred action immigration policies originating with INS or DHS rebuts any assertion that such policies must always originate in Congress with a law specific to the particular population at issue.

DHS appreciates commenters' recognition of the numerous similarities between DACA and prior instances of deferred action and agrees the DACA population shares a number of sympathetic characteristics with the target populations of prior deferred action policies, making members of the DACA population prime candidates for deferred action themselves. DHS agrees that DACA is another in a long line of deferred action policies that have facilitated the necessary prioritization of enforcement resources by granting forbearance to sympathetic populations of noncitizens in the United States. DHS agrees that such populations have

---

[163] The commenter cited *Prince* v. *Massachusetts*, 321 U.S. 158, 165 (1944) (noting ''the interests of society to protect the welfare of children''); *Moore* v. *East Cleveland*, 431 U.S. 494, 503–04 (1977) (''Our [substantive due process] decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.''); *INS* v. *Errico*, 385 U.S. 214, 220 n.9 (1966) ('' 'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united.' '' (quoting H.R. Rep. No. 85–1199, at 7 (1957))).

[164] The commenter cited DOJ, Justice Manual, § 9–27.110 (Comment), *https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.001*; *Bordenkircher* v. *Hayes*, 434 U.S. 357, 364 (1978); *Heckler* v. *Chaney*, 470 U.S. 821, 831–32 (1985); and *Arizona* v. *United States*, 567 U.S. 387, 396 (2012).

included certain pending U nonimmigrant petitioners before they have attained lawful status and certain VAWA self-petitioners prior to their final approvals to adjust to permanent resident status, among many other compelling population groups that have received deferred action and that are discussed in detail in the preamble to the proposed rule.[165] DHS disagrees, however, that TPS beneficiaries, who are in a lawful temporary status, are an example of noncitizens with deferred action as that is not accurate.

DHS shares commenters' view that in addition to DHS's authority to forbear from pursuing the removal of DACA recipients, DHS has authority to allow such DACA recipients to work during their time in the United States, and that work authorization, and just as necessary and appropriate for the DACA population as it was, for example, for the population that received deferred action under the Family Fairness policy. DHS addresses comments related to work authorization, lawful presence, and non-accrual of unlawful presence more fully later in this preamble.

## 2. Litigation and Legal Disputes

*Comment:* Multiple commenters stated that the rule adequately addressed the concerns raised by the district court in *Texas,* which held DACA to be unlawful. One commenter said the rule responds to prolonged litigation over the policy's legality. Another commenter summarized the litigation involving DACA. Citing legal memoranda and court cases, the commenter stated the core components of DACA are legally and historically well-established, including deferred action, a well-established form of prosecutorial discretion under which the Federal Government forbears removal action against an individual for a designated period of time; employment authorization; and nonaccrual of unlawful presence. Another commenter wrote that the *Texas* district court was wrong in concluding notice-and-comment rulemaking was necessary to create the DACA policy, as well as in its concerns about the policy's substantive legality. A couple of commenters noted that the

Supreme Court's June 23, 2016 affirmance without opinion of the Fifth Circuit's preliminary injunction blocking Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded DACA is not precedential and does not bind DHS, and further noted that the Court's 2020 *Regents* decision does not restrict DHS from expanding DACA. The commenters said other courts have and would likely again grapple with similar questions. DHS therefore is, in the commenters' view, ''completely justified'' in continuing to litigate the district court's decision until a single, final disposition emerges.

A commenter stated that DACA does not violate the INA and is a lawful exercise of executive discretion conferred by Congress, contrary to the district court's 2021 decision in *Texas.* The commenter cited 8 U.S.C. 1103 in discussing DHS's authority and went on to say the Supreme Court recognized this authority with respect to immigration enforcement and removals in *Arizona* v. *United States* when it underscored that executive officials have ''broad discretion'' in deciding ''whether to pursue removal at all.'' [166] The commenter reasoned that the case-by-case consideration of DACA requests is not the automatic conferral of a benefit as some detractors have characterized it, but rather an exercise of discretion in deciding whether to invest limited enforcement resources into the removal of low-priority individuals. The commenter stated that, while the court in *Texas* held DACA violates the INA by making statutorily ''removable'' individuals unremovable, DACA does not make any individual unremovable because the agency may initiate removal proceedings against the individual at any time.

A commenter stated that it was ''unclear'' whether the rulemaking would be deemed legal if the litigation begun in 2018 is upheld by the Supreme Court but remarked that their research disputes that any irreparable harm or additional costs to States would be caused by the proposed rule.[167]

Citing *Regents* and another source, a commenter stated that, in response to litigation surrounding the Trump administration's efforts to rescind DACA, the Supreme Court held that DHS failed to properly rescind DACA procedurally, but the Court did not issue a finding that DACA was illegal. Regardless of how the Fifth Circuit decides DHS's appeal in *Texas,* the commenter remarked, it appears inevitable that the Supreme Court ultimately will have to make a determination as to the legality of the DACA policy. A university characterized the evidentiary record of *Regents* as a tool in this rulemaking, as it outlines the many benefits of DACA to the university and society, including expert testimony and studies about the value of DACA. A few commenters noted that they are participating or have participated in ongoing litigation to support the DACA policy.

*Response:* DHS agrees that undertaking notice and comment through the proposed rule puts DACA on stronger legal footing in light of the district court's decision in *Texas* and other pertinent litigation. DHS continues to believe that notice-and-comment rulemaking is not necessary to implement in the exercise of prosecutorial discretion a deferred action policy for the DACA population. Nevertheless, DHS agrees that the notice-and-comment process has significant value, as a means of obtaining a variety of input on proposed rules (including this one), and it also agrees with commenters that the proposed rule addresses the district court's procedural concerns and plays an important role in DHS's vindication of its position on DACA's legality.

DHS has given careful consideration to the district court's reasoning regarding the substantive legality of the DACA policy and the court's conclusion that the policy is not authorized by the INA. For reasons set forth above and below, in the preamble to the proposed rule,[168] and also reflected in the government's publicly available briefs in the appeal from the district court's decision, DHS respectfully disagrees with the district court's reasoning and conclusion regarding the policy's substantive legality. Notwithstanding that disagreement, DHS recognizes that it is currently subject to an injunction and that it is obligated to comply with that injunction to the extent that the injunction is not stayed. Nothing in this

---

[165] *See* 53736 FR 53746–53749 (discussing the history of at least 60 years of prosecutorial discretion policies that have provided various sympathetic groups protection from removal action). DHS does note with respect to the examples of the pending U nonimmigrant petitioners and the VAWA self-petitioners that once they are granted U nonimmigrant status or permanent resident status, these individuals are not like DACA recipients because they are in a lawful status and no longer subject to the prosecutorial discretion afforded by deferred action.

[166] 567 U.S. 387, 388 (2012); *see also id.* at 396 (''Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations.'').

[167] The commenter cited Brannon and Albright (2017), Albright (2018), Brannon and McGee (2019), and Brannon and McGee (2021).

[168] *See* 86 FR at 53753 n.145, 53756 n.178, 53759–61, 53761 at n.235.

preamble or in the final rule itself is intended to suggest otherwise.

Additionally, DHS is clarifying at new 8 CFR 236.21(d) that this rule rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and governs all current and future DACA grants and requests from this point forward. It further clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Although incorporating such a provision into regulatory text is a departure from previous practice, in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum, DHS has determined that doing so is appropriate in this context.[169]

### 3. Other Comments and Suggestions

*Comment:* One commenter suggested that DHS more thoroughly address several arguments that it previously offered against DACA in the Duke and Nielsen rescission memoranda. On this point, the commenter stated, in the Duke Memorandum, Nielsen Memorandum, and subsequent court filings, DHS cited the risk of litigation as one basis for rescinding DACA, focusing on the risk of DACA being struck down as unlawful or enjoined to justify the position that DACA was too legally vulnerable to continue without properly balancing competing positive factors. The commenter said DHS's prior stance that DACA was bad policy because of litigation risk is inconsistent with the proposed rule, which finds that the benefits of the rule would exceed its costs. To address this inconsistency and give a "reasoned explanation" for "facts and circumstances" in the rescission, the commenter stated, DHS should address the risk of litigation in the final rule. The commenter recommended DHS: (1) explain how the prior rescission incorrectly analyzed litigation risk; or (2) conclude that the rule is justified even when litigation risk is properly accounted for. The commenter provided suggestions on how DHS may address these issues, citing an article that analyzed litigation risk in the context of DACA's rescission and identified four key factors for DHS to consider. The commenter stated that DHS should incorporate in the final rule an explanation for why its previous assertions about litigation risk are not dispositive here. In particular, the commenter added, DHS should explain how its previous attempt to rescind DACA failed to analyze properly the risks of litigation and put forth a more

rational framework to analyze DACA's litigation risk.

A couple of commenters understood the proposed rule as indicating that the forthcoming final rule would displace the Napolitano Memorandum and establish a new and independent basis through which existing DACA recipients can maintain their deferred action. The commenters agreed with that approach and suggested the final rule state even more clearly that it supplants the Napolitano Memorandum, which the commenters said would benefit current DACA recipients by providing them with additional certainty. In addition, the commenters stated that this clarification would provide broader certainty by making even clearer that the pending litigation over the Napolitano Memorandum is moot because that memorandum no longer has any independent legal effect.

A commenter urged the administration to make all reasonable efforts to preserve and strengthen DACA, including ensuring that DHS is authorized to promulgate future policy and operational guidance for the policy, consistent with the objectives of the 2012 policy.

A commenter wrote that a policy such as DACA should be a law made by Congress and not made as an agency rule change. However, the commenter stated, given the current partisan nature of Congress and the low likelihood of Congress settling the issue of DACA anytime soon, the proposed rule allowing DACA to continue is "perhaps the best we can hope for."

*Response:* As indicated in the NPRM, the prior memoranda referenced by the commenter have been vacated or deemed inoperative by various courts.[170] DHS acknowledges that such memoranda assigned more significant weight to the risks associated with adverse litigation against the DACA policy, but as noted earlier in this preamble, litigation materialized as a consequence of attempts to rescind DACA as well, and DHS believes that the significant costs associated with DACA rescission would not be justified by the benefits identified in those memoranda, including the asserted litigation risk benefit which, as evidenced by the *Regents* litigation and other cases, did not fully materialize. DHS agrees with commenters that codifying DACA will provide recipients and their families, schools, communities, and employers with additional certainty. DHS also will utilize appropriate messaging to ensure DACA recipients are aware that the new

DACA regulation, not the Napolitano Memorandum, governs the DACA policy going forward. DHS, however, will not be in a position to advise DACA recipients that pending litigation concerning the Napolitano Memorandum is moot unless and until a court issues a judgment of dismissal on mootness grounds.

DHS appreciates the comment concerning DHS's efforts to protect DACA recipients. DHS assures all interested parties that it is taking all available action to preserve and fortify DACA consistent with the President's directive. DHS likewise appreciates the commenter's statements concerning the desirability of Congress enacting legislation to protect the DACA population. In the absence of such action, DHS believes that DACA is a viable approach that accommodates the relevant reliance interests while preserving DHS's discretion on a case-by-case basis.

### C. Comments on Proposed Provisions

#### 1. Deferred Action/Forbearance From Enforcement Action (§ 236.21(c)(1))

*Comment:* Several commenters expressed general support for DHS's provision of an official definition of "deferred action" and for the definition proposed. A few commenters expressed concern with the proposed definition of "deferred action." One stated that the definition does not guarantee the ability to permanently reside in the United States, which affects the ability to resettle, work, and thrive in the United States successfully and forces DACA recipients to "live on the precipice of fearing deportation and being able to successfully contribute to the community in which they choose to reside." Another said that providing a definition creates safeguards but expressed concern regarding the provision stating that deferred action does not prevent DHS from initiating any criminal or other enforcement action against the DACA recipient at any time. One commenter specifically recommended removing the following language from proposed 8 CFR 236.21(c)(1): "[a] grant of deferred action under this section does not preclude DHS from commencing removal proceedings at any time."

One commenter stated that the rule should directly address DHS's prior statements that

DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress

---

[169] *See* new 8 CFR 236.21(d).      [170] 86 FR 53749–53751.

has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.[171]

The commenter stated that DHS should explicitly recognize the merits and benefits of a broader approach, which enables the development of enforcement priorities under limited resources, reduces the need for further investigation by officers, and streamlines an enforcement officer's review of whether a DACA recipient should be an enforcement priority. According to the commenter, these benefits, which are inherent to a broad scope and the ease with which DACA can be applied, refute DHS's previous assertions that DACA is unwisely broad.

One commenter expressed strong support for the aspects of the proposed rule that would maintain forbearance from removal. Another stated that temporary forbearance of removal would not carry the same protections as a more permanent forbearance, and that identifying DACA recipients as generally a low priority for enforcement action does not assuage fears that removal actions will nonetheless be taken as anxiety and reservation remains about the lack of stability. While recognizing that USCIS may not be able to address this directly, since permanent congressional action is needed to at least in part address this barrier, the commenter said that USCIS "tak[ing] all measures possible" to expand the protections and rights of DACA recipients to the extent permitted is in the best interests of USCIS resources; local, State, and Federal economies; the well-being of U.S. communities; and the individuals themselves.

One commenter, by contrast, suggested that individuals should only be considered for forbearance when apprehended. One commenter stated that this would not only release the pressure on USCIS' "already stressed system" but also provide "a more consistent application of law and allow[] DHS to propose rules to guide ICE and CBP on enforcement priorities." Another commenter stated that the proposed rule prevents the removal of DACA recipients despite Congress having dictated their eligibility for removal. This commenter also stated that the proposed rule is not simply a "non-enforcement policy" or prosecutorial discretion, but instead

creates standardized proceedings by which DHS solicits and reviews requests from eligible aliens, effectively engaging in adjudications where the result is (likely) an affirmative act of approval. Another commenter opposing the rule stated there is a difference between forbearance from enforcement and actively granting the benefits of employment authorization, travel permission, and lawful presence. The commenter said that the logic that forbearance from enforcement action requires grants of immigration benefits through USCIS is flawed and unexplained.

Similarly, a commenter stated that the proposal to charge separate fees for the deferred action request did not adequately address the *Texas* ruling, which provided the agency an opportunity to modify the policy only to include temporary deportation forbearance. The commenter based this statement on concerns that DACA was housed within USCIS to give noncitizens "permission to work lawfully in the country despite lacking a lawful immigration status." The commenter concluded that, instead of exploring a "true 'forbearance' policy within one of the enforcement components" in accordance with the court's order, DHS's proposal was "not a good faith effort" to adhere to the Federal district court's ruling and would "continue the inappropriate practice of giving USCIS adjudicators . . . decision-making authority they do not have under the law." One commenter questioned why ICE would agree to continue, administratively close, or dismiss a DACA recipient's removal proceeding without prejudice, stating: "Clearly any removal order or case logged against DACA recipients shall not be dismissed without prejudice because unless the case is based on wrong facts, DACA recipients did break immigration laws and it should be on their records, not without prejudice."

Some commenters suggested that additional policies should be adopted for coordination among DHS subagencies to prevent the erosion of DACA protections for recipients related to removal proceedings, including:

• Not issuing NTAs against DACA recipients or DACA-eligible individuals unless and until USCIS terminates their DACA.

• Exercising favorable prosecutorial discretion by joining motions by DACA recipients or DACA-eligible individuals to reopen, terminate, dismiss, or administratively close removal proceedings. The commenter stated that these protections would be in line with May 2021 guidance issued by the ICE

Office of the Principal Legal Advisor recognizing the dismissal of cases of noncitizens likely to be granted temporary or permanent relief or who present compelling humanitarian factors, as well as recent decisions recognizing immigration judges' authority to administratively close and terminate removal proceedings.

• Adopting provisions to provide for cooperation among components with respect to removal proceedings, ensuring consistent and fair DACA decisions.

A commenter stated that it is costly for ICE to litigate removal proceedings against DACA recipients and DACA-eligible individuals, adding that the cost savings referenced at 86 FR 53794 would be nullified if individual ICE officers issue NTAs or oppose, for example, motions to administratively close removal proceedings for DACA recipients and DACA-eligible individuals, and stating that the proposed rule erroneously assumes ICE acts in a manner consistent with DACA protections. Conversely, the commenter said, past practice demonstrated that ICE and CBP have issued NTAs to DACA recipients who, per DACA guidance and established definitions, are not enforcement priorities. The commenter concluded that, without regulatory language directing DHS components to act according to USCIS' DACA request determinations and eligibility guidelines, recipients would continue to be subject to ICE officers' de facto veto power over a DACA grant.

Another commenter stated that such additional policies would reduce mental health harms to recipients facing uncertainty while promoting efficiency and cost savings. The commenter said that the decreased likelihood of mental health problems would allow DACA recipients to flourish as members of society and of the U.S. workforce. Furthermore, the commenter stated that future administrations could alter ICE enforcement priorities without first going through notice-and-comment rulemaking, thus leaving DACA recipients vulnerable to termination of DACA with no due process protections. The commenter recommended that DHS codify the above additional protections to promote efficiency and due process and to adhere to the administration's directive to "preserve and fortify" DACA.

*Response:* DHS acknowledges the variety of views expressed, from support for providing an official definition of deferred action, to specific support for the definition proposed, to concern that the specific definition is insufficient,

[171] *See* Nielsen Memorandum at 2.

000610

and to general opposition to forbearance from removal for DACA recipients.

DHS agrees with commenters that the proposed deferred action definition is consistent with longstanding legal and historical practice. DHS acknowledges commenters' concern with the temporary aspect of the definition of deferred action, but notes that DHS does not have the authority to provide a permanent solution absent action by Congress. DHS further acknowledges commenters' concern that the definition of deferred action does not prohibit DHS from initiating enforcement action; however, the purpose of deferred action is to identify a person as a low priority for removal, rather than to eliminate all possibility of enforcement action. DHS therefore intends to maintain the ability to determine that an individual is no longer a low priority for removal.

DHS disagrees with the suggestion that individuals should only be considered for forbearance when apprehended, as this merely shifts resource burdens within DHS, does not enable DHS to realize the full potential of resource savings, as discussed in Section II.A.8, and could create a perverse incentive for individuals to seek out immigration encounters. As explained in the proposed rule at 86 FR 53752, the proposed framework would enable DHS to continue to realize the efficiency benefits of the DACA policy. USCIS' determination that an individual meets the DACA guidelines and merits a favorable exercise of discretion assists law enforcement activities in several areas by streamlining the review required when officers encounter a DACA recipient.

DHS further disagrees that utilizing a standard process to consider requests for deferred action transforms DACA into more than prosecutorial discretion. As noted by the commenter who encouraged DHS to speak to the benefits of the approach taken here, this rule structures the exercise of prosecutorial discretion in a proactive, organized, and efficient manner. This approach allows for the exercise of the Secretary's authority while providing for case-by-case consideration and collection of fees to cover the cost of determining whether the noncitizen is a high or low enforcement priority. Such a structure has certain benefits, but does not make this rule any less of an exercise in enforcement discretion.

DHS disagrees with the suggestion that the rule "requires grants of immigration benefits." Nothing in the Napolitano Memorandum, the proposed rule, or this final rule requires DHS to grant immigration benefits to recipients of deferred action. Rather, DHS, in the

exercise of its discretion and pursuant to underlying statutory authority, may indicate its intention to forbear from removing certain individuals who are low priorities for enforcement. Separately, DHS also may grant ancillary benefits such as employment authorization, as well as provide for limited circumstances in which DACA recipients will be considered lawfully present, as explained more fully elsewhere in this rule. DHS further incorporates here its points in the preamble to the NPRM at 86 FR 53756–53762 regarding DHS's view that employment authorization, advance parole, and lawful presence may be provided in conjunction with DACA's forbearance of removal. But DHS reiterates its view that deferred action provides for temporary forbearance from removal without "requir[ing]" the conferral of other benefits.

DHS also disagrees with a commenter's characterization of the NPRM as it relates to the *Texas* ruling. As DHS explained in the NPRM, DHS proposed to unbundle the requests for deferred action and employment authorization to provide flexibility and reduce cost barriers to noncitizens who sought forbearance protections but did not need, want, or prioritize employment authorization. Upon consideration of comments, DHS has made changes to the rule to retain the existing requirement of bundled deferred action and employment authorization requests, as discussed in greater detail in Section II.C.2.c. DHS nonetheless considers those elements to be severable from each other, in the event that a court of competent jurisdiction disagrees with DHS and concludes that any aspect of this rule is unlawful. DHS also disagrees with the commenter's characterization of the rationale for vesting jurisdiction to administer DACA within USCIS. To the contrary, in addition to the reasons discussed in Section II.A.8, vesting jurisdiction within USCIS fortifies DHS's prioritized approach to immigration and border enforcement by allowing DHS to continue to realize the efficiency benefits of the DACA policy, as discussed in this rule. Additionally, in vesting jurisdiction with USCIS to exercise prosecutorial discretion in the form of DACA, DHS also retains streamlined procedures for terminating an individual's DACA and EAD, because the same agency that exercised prosecutorial discretion as an initial matter would be determining whether to terminate it, in consultation with immigration enforcement components

when necessary.[172] USCIS also plays a crucial role in safeguarding the lawful immigration system of the United States, including by issuing Form I–862, Notice to Appear, to commence removal proceedings in some circumstances.[173]

DHS acknowledges commenters' suggestions that the rule include provisions relating to other DHS immigration components' enforcement actions with respect to DACA recipients or individuals who meet the DACA criteria. However, DHS believes that direction for CBP and ICE with respect to their handling of DACA recipients, beyond that which was contained in the NPRM, is most appropriately left for subregulatory guidance. Finally, DHS notes that the commenter suggesting that DACA recipients' removal proceedings should not be continued, administratively closed, or dismissed "without prejudice" misunderstands the meaning of "without prejudice." In the removal proceedings context, an action taken "without prejudice" means without prejudice to further action (*i.e.,* that the recommencement of removal proceedings in the future will not be barred by the judicial doctrines of res judicata or collateral estoppel).

Accordingly, DHS will not be making any changes to 8 CFR 236.21(c)(1) in response to public comments.

2. Employment Authorization (§§ 236.21(c)(2) and 274a.12(c)(33))

a. General Comments on Employment Authorization

General Support for Work Authorization for DACA Recipients

*Comment:* Some commenters expressed support for strengthening and protecting employment authorization as a key part of the DACA policy. Multiple commenters discussed the benefits of employment authorization including self-reliance; access to health insurance, education, housing, and living needs; career advancement; safe working conditions; fair wages and narrowing of the wage gap between employment-authorized workers and workers without employment authorization; ability to obtain forms of identification; and the development, as well as the retention, of skilled workers in the community, especially frontline workers during the COVID–19 pandemic. (One study found more than 200,000 DACA recipients working in occupations deemed by DHS as "essential critical

---

[172] *See* 86 FR 53752.

[173] *See, e.g.,* 8 CFR 239.1(a)(18) through (20) (authorizing "Supervisory immigration services officers," "Supervisory immigration officers," and "Supervisory asylum officers," respectively, to issue NTAs).

infrastructure workers.'') [174] Commenters cited a 2020 survey of DACA recipients that found that nearly 90 percent of DACA recipients surveyed were employed; 83.7 percent of respondents reported that having work authorization related to DACA helped them become financially independent; and 86.4 percent reported that their increased earnings helped pay for tuition.[175]

Considering such personal and societal benefits, a commenter stated that it had significant interests in preventing the disruption of the employment relationship with its DACA-recipient personnel. The commenter stated that it employs 500 DACA beneficiaries across every division in the company, across 38 States, and in all regions of the country. Many commenters urged DHS to ensure that deferred action and employment authorization remain connected in the rule, and that DACA recipients' ability to request EADs is protected. Other commenters expressed support for including employment authorization in the proposed rule but commented that the proposed disaggregation of other benefits from enforcement forbearance would not make it any less important. Some commenters stated that DACA-eligible individuals should be granted work authorization, or the opportunity to work, because they deserve the opportunity to support themselves financially, and because they want to make, and are capable of making, important economic and labor contributions to society. A commenter stated that more should be done to minimize barriers to employment authorization. Another commenter recommended that DHS and the Federal Government continue to strongly defend the ability of DACA recipients to apply for work authorization and to reach their full potential. A commenter stressed that the proposed rule allows local communities to continue to benefit from the important contributions of the DACA workforce, including in frontline healthcare, law enforcement, social services, land-use planning, teaching, and road repair.

*Response:* DHS agrees employment authorization is an important component of the DACA policy with myriad positive impacts on recipients' families and communities. For one, employment authorization enables DACA recipients to exit the shadow economy of unauthorized employment, dramatically reducing the risk of exploitation by unscrupulous

employers. Maintaining DACA recipients' ability to work lawfully while in the United States is an important component of DHS's broader initiative to preserve and fortify the DACA policy. DHS appreciates and agrees with commenters' recognition of DACA recipients' contributions to their communities. DHS agrees, as stated elsewhere in the NPRM and this preamble, that DACA recipients, on balance, overwhelmingly make positive contributions to this nation. DHS also agrees that DACA recipients' ability lawfully to work while in the United States is beneficial to their economic and psychological well-being.

In this regard, DHS emphasizes that self-reliance is beneficial not only to the social and economic prosperity of recipients of deferred action under the DACA policy, but also to the well-being of those individuals' families and communities, and to the workforce more broadly. Work authorization enables DACA recipients lawfully to support themselves and their families instead of risking potential exploitation in the shadow economy. As a commenter pointed out, companies have invested substantial resources in their DACA-recipient employees, and DHS agrees DACA recipients are not the only population that benefits from this rule; this rule also serves businesses' substantial reliance interest in the continued employment of employees in whom they have made significant tangible and intangible investments. Furthermore, a 2020 survey indicates that employment authorization for DACA recipients supports business creation, indicating that 6.1 percent of DACA recipients surveyed reported that they started their own businesses after receiving DACA, and that among respondents 25 years old and older, this increased to 7 percent.[176] Moreover, work authorization allows individuals to leave the shadow economy and work on the books to provide for their families, thereby reducing the risk of exploitation by unscrupulous employers and distortion in our labor markets. Work authorization addresses practical concerns that could otherwise result from a decision solely to grant temporary forbearance from removal, and DHS therefore believes that it is appropriate to allow DACA recipients to work in conformity with its authority at

INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3).

Employment authorization for DACA recipients also helps to prevent their need for public assistance to the extent such limited assistance is available to them. Although DACA recipients do not constitute ''qualified alien[s]'' for purposes of eligibility for most Federal public benefits under PRWORA,[177] certain excepted emergency, in-kind, and other public benefits do remain available to them.[178] In addition, a State may affirmatively provide State and local public benefits to noncitizens who are not lawfully present in the United States if the State passes such a law after August 22, 1996.[179] Several States have enacted such laws.[180] Therefore, if DACA recipients were to lack a means to earn their own living, they would be more likely to utilize the limited forms of public assistance available to them.

DHS appreciates one commenter's desire to see even more done to minimize barriers to DACA recipients' employment. This commenter advocated that DHS lower the application fees, shorten the application processing backlog, guarantee work authorization, and extend the duration of work authorization. However, as set forth elsewhere in this rule, DHS believes the current application fees are appropriate for the time being. DHS also reiterates the limits of this rulemaking, which, as discussed elsewhere in this preamble in more detail, focuses on preserving and fortifying the policy as set forth in the Napolitano Memorandum.

## Positive Impacts on Universities and Healthcare Systems

*Comment:* Citing research, several commenters described DACA recipients' positive impact on their universities and

---

[174] *See* Svajlenka (2020).

[175] *See* Wong (2020).

[176] Wong, et al., *New DHS Policy Threatens to Undo Gains Made by DACA Recipients,* Center for American Progress (Oct. 5, 2020), *https:// www.americanprogress.org/issues/immigration/ news/2020/10/05/491017/new-dhs-policy-threatens-undo-gains-made-daca-recipients.*

[177] *See* 8 U.S.C. 1611(a) *et seq.;* 8 U.S.C. 1641(b) (providing definition of ''qualified alien'').

[178] *See* 8 U.S.C. 1611(b)(B) [providing for ''[s]hort-term, non-cash, in-kind emergency disaster relief'' to non-qualified aliens); 8 U.S.C. 1611(b)(1)(D) (providing non-qualified aliens with access to ''[p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter)'' that ''deliver in-kind services at the community level, including through public or private nonprofit agencies''; ''do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources''; and ''are necessary for the protection of life or safety'').

[179] *See* 8 U.S.C. 1621(d). In addition, the general limitations PRWORA places on noncitizens' eligibility for State and local public benefits do not apply to certain emergency, in-kind, immunization, and other assistance. *See* 8 U.S.C. 1621(b).

[180] *See, e.g.,* Cal. Welf. & Inst. Code § 14007.8(a)(1); 130 Mass. Reg. 505.006(B); NY Soc. Serv. L. § 122; Or. Rev. Stat. § 414.231; Wash. Admin. Code 182–503–0535(2)(e); DC Code § 1–307.03.

communities. Commenters stated that work authorization is critical to DACA recipients' ability to make such positive contributions. A university described the academic contributions of DACA recipients. The university also cited the proposed rule's statement on the number of DACA recipients in healthcare to underscore the need for the rule and work authorization. The commenter further remarked that work authorization for DACA recipients allows them to engage more deeply with their university's curriculum, campus, and community. Noting the successful academic and professional careers of DACA recipient alumni, a commenter stated that work authorization is critical to DACA recipients' ability to contribute on and off campus, warning that the lack of work authorization often discourages individuals from pursuing educational growth. The commenter also remarked that it relies on DACA to retain valuable employees, noting its university system employs around 466 non-student DACA recipients. A group of commenters similarly pointed out DACA recipients' impact on institutions of higher education, citing several sources to support their position that DACA recipients enrich school environments. The commenters stated employment authorization granted after a DACA grant allows students to pursue higher education and other improved educational and economic outcomes. The commenters added that many DACA recipients have gone on to work and provide valuable services (such as serving in educational positions or healthcare posts) in the communities associated with their educational institutions, noting DACA recipients possess valuable skills—like foreign language fluency—that benefit employers.

Citing references, a commenter discussed in detail the current and future need for medical physicians and how DACA work permits allow medical schools to accept these noncitizens, enabling the number of matriculants with DACA to steadily grow since 2013. This commenter stated that over the course of one year, DACA-recipient physicians will collectively care for 700,000 to 2.1 million patients, totaling more than 5.1 million U.S. patients over the course of their careers. The commenter concluded that the administration should take action to expand eligibility for Federal student aid and education loans to DACA recipients to enable these individuals to pay for the incredibly high costs of medical education. Another commenter stated that the current healthcare

staffing gaps associated with the COVID–19 pandemic could be filled by DACA recipients. The commenter cited research stating that 8,600 healthcare workers in California have DACA. The commenter concluded that DACA and work authorization would help to adequately address the current healthcare staffing shortage, which the commenter warned could last until 2026.

*Response:* DHS appreciates the commenters' recognition of DACA recipients' academic and professional contributions to their institutions and communities at large. DHS agrees that work authorization is critical to DACA recipients unlocking their full potential. By helping to lessen the financial burden of pursing higher education, DHS agrees that work authorization makes available to DACA recipients many educational and professional opportunities that otherwise would have remained out of reach.

DHS appreciates the comment citing statistics about the volume of care provided by DACA-recipient physicians. DHS deeply appreciates these contributions. DHS recognizes that DACA recipients fill critical roles in the healthcare field and the high cost of entry into this field, especially for physicians. At the same time, DHS lacks authority to alter DACA recipients' statutory ineligibility for Federal student aid through rulemaking. Comments concerning DACA recipients' eligibility for benefits not administered by DHS are also addressed elsewhere in this preamble. Still, DHS remains committed to preserving and fortifying the policies upon which DACA recipients and their families, employers, schools, and communities have come to rely.

''Economic Necessity'' and Work Authorization

*Comment:* A commenter stated that the proposed requirement to prove economic need appeared intentionally vague and could leave thousands of undocumented students without a form of income. Some commenters requested that the regulation provide clear guidelines and suggested that DHS limit discretion in the determination of ''economic necessity'' for all applicants. A commenter warned that ''economic necessity'' does not negate a student's expenses of pursuing an education (*e.g.,* tuition, living costs, groceries, textbooks, caring for family members) and said the term must acknowledge that higher education is vital for community and economic health. A commenter asked DHS to clarify that students' circumstances will be taken

into account in determining ''economic necessity,'' citing education-related expenses such as internet and computers required during the COVID–19 pandemic. Another commenter likewise suggested DHS should further clarify the definition of economic necessity in the DACA context while providing language that acknowledges the ''reality'' that most DACA requestors have an economic necessity to work. The commenter reasoned work authorization is critical to DACA recipients' entry into the labor market and their ability to support themselves and their families. A commenter similarly suggested DHS establish a rebuttable presumption that DACA recipients have an economic necessity to work, stating such a presumption would simplify the application and adjudication process because the need to work to support oneself is very often self-evident.

A commenter expressed opposition to the proposal's provision granting work authorization to DACA recipients who establish an arbitrary economic need and suggested instead that all DACA recipients receive work authorization under the proposal. A few other commenters likewise opposed the economic need requirement for employment authorization. A commenter stated that requiring economic need imposes assumptions and limitations on DACA recipients' choices and growth. A commenter recommended the statement of economic need be eliminated, as EADs often are used as a primary form of identification for noncitizens, aside from their intended purpose. Without an EAD, the commenter stated, a noncitizen cannot obtain a Social Security number or State identification, which are necessary to conduct activities of daily life.

One commenter went further, saying DHS should prioritize a DACA framework that automatically grants work permit benefits alongside ''deportation protection.'' A commenter likewise recommended work authorization ''continue to be granted automatically and coincide with granting DACA.'' Other commenters similarly suggested automatic, permanent, or guaranteed work authorization grants alongside deferred action.

Numerous commenters added that USCIS verifies underlying status with a Form I–821D approval, which could be sufficient for I–9 authorization. They concluded the I–765 adjudication is an unnecessary use of the agency's time and resources that creates significant

repercussions due to delays in adjudication.

*Response:* DHS thanks commenters for their input on the economic necessity component of this rulemaking. Some commenters characterized the requirement to prove economic need as a new component of a DACA request. However, the economic need requirement is not new to DACA or to employment authorization for deferred action recipients more broadly. It has been part of the DACA policy since 2012 and the deferred action employment authorization regulation since 1987.[181] DACA recipients, like all other deferred action recipients, fall within the categories of noncitizens for whom employment authorization is discretionary, not mandatory as it is for certain categories where Congress has made employment authorization incident to the noncitizen's lawful immigration status.[182] The rule makes no change to that longstanding policy for deferred action recipients, including for DACA recipients.[183] As explained in the NPRM, 8 CFR 274a.12(c)(14) has, for decades, authorized deferred action recipients to apply for and receive an EAD if they establish economic

necessity. The NPRM also explains that this rule does not change the eligibility of DACA recipients to apply for work authorization or alter the existing general rule that they must establish economic necessity.

DHS acknowledges some commenters' calls for DHS to eliminate the economic necessity requirement altogether, along with other commenters' suggestion to automatically grant employment authorization to DACA recipients alongside deferred action. DHS appreciates commenters' concern about DACA recipients' continued access to employment authorization under this rule. DACA is a discretionary policy, however, and DHS has determined that, as such, employment authorization also should remain discretionary and require a showing of economic need as has been the case since the beginning of the DACA policy in 2012, and in keeping with pre-existing regulatory requirements for deferred action recipients seeking employment authorization. To automatically grant employment authorization to every DACA recipient would mean that such authorization would effectively be "incident to status," as it is for certain types of lawful immigration status, such as refugee, asylum, and TPS.[184] As previously discussed, DACA is fundamentally not a lawful immigration status; thus, DHS believes that making employment authorization effectively automatic upon a DACA approval would not be appropriate. Moreover, DHS believes that the general rule requiring DACA recipients to show economic need before they may receive discretionary employment authorization has proved workable in the past and remains workable today. It also bears noting that most recipients of deferred action under the DACA policy also have been approved for employment authorization based on economic need. At this time, DHS declines to change the requirement for DACA recipients relative to the general rule for other deferred action recipients or to otherwise disturb the longstanding rule.

DHS thanks commenters for their suggestions pertaining to expanding on the concept of economic necessity in the final rule to expressly recognize the costs of pursuing higher education. However, DHS declines to write such granularity into the final rule. This rule continues historical practice by basing the economic necessity inquiry on the Federal Poverty Guidelines and existing regulations at 8 CFR 274a.12(e). That regulation broadly provides an applicant's assets, income, and expenses

all may constitute evidence of economic need to work. DHS believes that this regulation—particularly its provision for consideration of expenses—provides adjudicators with sufficient leeway to consider the costs attendant to pursuing higher education when determining an applicant's economic need to work. And while it may be true that DACA requestors' economic necessity to work is often obvious, DHS maintains its position that the current employment authorization framework is sufficient to capture all the types of costs and expenses, including those for higher education, that DACA requestors and recipients may have and that may support their economic need to work.

Moreover, DHS's decision whether to grant discretionary employment authorization entails more than verifying the requestor's identity through adjudication of the Form I–821D. As explained above, requestors must establish economic necessity to work. DHS therefore disagrees with the commenter that adjudicating the Form I–765 and accompanying Form I–765WS is an unnecessary use of DHS's time and resources. Rather, those adjudications ensure applicants establish the requisite economic need to work. Because the current framework on economic necessity and work authorization has not proven unworkable over DACA's 10-year lifespan, DHS elects to maintain the status quo on this point.

Employment Authorization for DACA Recipients Versus Visa Categories

*Comment:* A commenter suggested that instead of spending time pursuing a rule for DACA, DHS should have drafted rules governing employment authorization for F–1 OPT students waiting for H–1B visas or establishing an improved process to ensure H–1B visas are used within a fiscal year. Another commenter similarly stated that DHS should prioritize action for F–1 students who do not win the H–1B lottery or H–4 dependents who wish to support their families, critiquing the proposal for failing to explain why DACA recipients deserve employment authorization.

*Response:* DHS acknowledges that members of the DACA population are not the only category of noncitizens with pressing matters in need of agency attention and resources. However, the DACA policy has distinctive functions and serves distinctive needs (including protection of reliance interests). In addition, the President has expressly directed DHS to preserve and fortify the DACA policy, and that is the subject of this rulemaking. Because DACA recipients necessarily came to the

---

[181] *Control of Employment of Aliens,* 52 FR 16216, 16228 (May 1, 1987). *See also* Instructions to Form I–765, Application for Employment Authorization (revised Jan. 19, 2011), at 5 (instructions for form version in use at time DACA implemented and including requirement for deferred action recipients to file Form I–765 with authorization of deferred action and evidence of economic necessity for EAD); ICR Reference No. 201208–1615–002, Instructions to Form I–765, Application for Employment Authorization (revised Aug. 6, 2014), at 5 (continuing requirement for economic necessity for EAD for deferred action recipients, including specific reference to DACA recipients, and requiring revised financial worksheet, Form I–765WS (Form I–765 Worksheet) (Aug. 6, 2014)). Proof of economic necessity for an EAD has continued to date for deferred action recipients, including for those with DACA. *See* Instructions to Form I–765, Application for Employment Authorization (revised Aug. 25, 2020), at 16–17.

[182] *See* 8 CFR 274a.12(c) (categories of noncitizens for whom employment authorization may be provided in DHS's discretion, including for deferred action recipients under paragraph (c)(14)). *But see* 8 CFR 274a.12(a) (categories of noncitizens for whom employment authorization is "incident to status," such as asylees, refugees, certain nonimmigrants, and others).

[183] As explained both in the NPRM and in this rule, the Attorney General and later the Secretary, have for decades interpreted their statutory authority to "establish such regulations . . . and perform such other acts as he deems necessary" for administering the INA (now vested in the Secretary) as allowing that officer to grant discretionary work authorization to recipients of deferred action. *See* 86 FR 53757. Congress confirmed this authority in INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), which expressly contemplates a framework in which the Attorney General (now the Secretary) may authorize certain classes of noncitizens for employment. This interpretation has stood undisturbed for over 30 years.

[184] *See* 8 CFR 274a12(a)(3), (8), and (12).

000614

United States as children, and because of the substantial reliance interests that have developed over a period of time, DACA recipients occupy a unique space in the world of noncitizens in need of work authorization. To be sure, DHS acknowledges the circumstances of the populations that the commenter identifies and is taking steps to address them where appropriate, lawful, and feasible.

Other Comments on Work Authorization

*Comment:* Expressing support for DACA, a commenter remarked that recipients with more qualifications should receive better benefits, such as a stronger work permit. Similarly, a commenter suggested that DHS should recommend that the Department of Labor place DACA recipients with science, technology, engineering, and mathematics (STEM) degrees onto Schedule A so that highly educated DACA recipients may self-petition for permanent residence by filing a Form I–140.

A commenter stated that, should DACA recipients receive the ability to seek relief through a future longer term but nonrenewable work permit program, their ability to re-request deferred action under DACA should be protected. The commenter further reasoned, if a recipient obtained alternate relief through a longer-term work permit in the future, and Congress failed to pass a pathway to citizenship during the relief period, it would be important for those who did not renew their DACA request in that period to be allowed to request DACA again.

*Response:* Employment authorization for a DACA recipient is based upon the DACA recipient's eligibility for deferred action and demonstrating an economic necessity, as it is for all other deferred action recipients, and not on any other status or authorization to be in the United States. There is no "stronger work permit" that DHS could offer to DACA recipients solely based on their deferred action. Rather, when a DACA recipient is granted employment authorization, the DACA recipient is then generally eligible for employment anywhere in the United States and with any legal employer for the duration of the validity period of the employment authorization document without additional restriction.[185] DHS also does not have the authority to place DACA recipients on the Department of Labor's Schedule A. Thus, while some DACA recipients may have different skill sets,

levels of education, or technical training, it is ultimately DACA recipients' eligibility for deferred action and economic necessity that make them eligible for employment authorization, and for the reasons explained and discussed throughout this preamble DHS is not changing the eligibility requirements for consideration for deferred action under DACA.

b. Authority To Provide Employment Authorization To Deferred Action Recipients

DHS Lacks Authority To Grant Work Authorization

*Comment:* A commenter stated, "DHS does not have the authority to grant employment authorization documents . . . to aliens [for] whom the INA does not provide such benefits or for whom the INA does not expressly grant the Secretary discretionary authority, such as is the case with asylum-based EADs." The commenter stated Congress has established an extensive scheme for the admission of immigrant and nonimmigrant foreign workers into the United States. The commenter went on to write that Congress has not authorized DHS to create employment eligibility for classes of noncitizens not already provided by law, reasoning that designating new classes of employment-eligible populations undermines the deliberate scheme created by Congress, which contemplates intricate social, economic, and foreign policy considerations beyond the scope of DHS's interests and mission. The commenter stated INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3) does not provide the authority that DHS claims because that section is "merely definitional" and does not itself grant the Secretary any authority. Citing the COVID–19 pandemic and inflation, the commenter wrote the U.S. Government has both a moral and legal obligation to ensure that U.S. workers of all backgrounds are first in line for jobs as the economy reopens and are not further harmed by unfair competition and wage suppression.

A commenter remarked that the proposal violates the provision at INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), prohibiting DHS from providing work authorization to an "alien," citing the statutory language. The commenter further stated that the interpretation cited in the proposed rule, 86 FR 53758, does not reflect the actual meaning of the statute, and that any examination of legislative history is irrelevant when the statutory language is clear. Ultimately, the commenter opposed the proposed rule, stating that it is inconsistent with the "INA's unambiguously specific and

intricate provisions" regarding immigration status and work authorization.

*Response:* DHS disagrees with commenters' position that DHS lacks authority to grant employment authorization to DACA recipients. The text of the relevant statute, understood in light of the relevant historical context, confers that authority on DHS. As the NPRM explains in detail, since at least the 1970s, the INS and later DHS have made employment authorization available for noncitizens without lawful immigration status but who receive deferred action or certain other forms of forbearance from removal.[186] As noted in the NPRM, INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), enacted in 1986 in IRCA, defines an "unauthorized alien" for purposes of employment authorization as a noncitizen who "is not at that time either . . . an alien lawfully admitted for permanent residence, or . . . authorized to be so employed by this chapter or by the Attorney General" (now the Secretary of Homeland Security). This provision plainly recognizes that the Secretary may authorize employers to employ certain removable persons, endorsing the longstanding, pre-IRCA agency practice. And even before Congress enacted section 274a(h)(3), INS and Congress had consistently interpreted the broad authority in INA sec. 103(a), 8 U.S.C. 1103(a), to allow the Secretary to grant work authorization. That section charges the Attorney General and, since 2003, the Secretary, with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," and authorizes the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out" the Secretary's authority under the INA. That provision also plainly allows for the granting of discretionary employment authorization to certain noncitizens even when no additional statute expressly so provides.[187]

DHS finds the commenters' arguments to the contrary unpersuasive. One commenter disagreed with DHS's interpretation that INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), which defines an "unauthorized alien" for purposes of employment authorization as a noncitizen who "is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by

---

[185] *See* INA sec. 212(n)(4)(E), 8 U.S.C. 1182(n)(4)(E); 8 CFR 274a.12(c).

[186] *See* 86 FR 53737–53760.

[187] *See also id.* at 53757 and n.190.

the Attorney General.'' DHS has pointed out that this definition demonstrates that Congress recognized and accepted the former INS's long history of providing employment authorization to individuals under the general section 103 authority in the INA. The commenter stated that the section is ''merely definitional.'' But the commenter's reading of that provision fails to account for the importance of the definition of ''unauthorized alien'' in the statutory scheme and its extensive regulatory and legislative history.

In the decades leading up to IRCA, the INS frequently stated its view of its authority to grant work authorization to certain classes of noncitizens, or restrict the work authorization of the same.[188] The INS and later DHS have also regularly exercised that authority without congressional intervention.[189] In fact, Congress expressly acknowledged the Attorney General's— and now the Secretary's—authority to grant employment authorization to certain classes of noncitizens in 1974 when it passed the Farm Labor Contractor Registration Act Amendments, which in pertinent part made it unlawful for farm labor contractors knowingly to employ any ''alien not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment.''[190] INS sought

to codify its work authorization practice in a 1981 final rule permitting discretionary work authorization for certain noncitizens without lawful status, such as those who (1) had pending applications for asylum, adjustment of status, or suspension of deportation; (2) had been granted voluntary departure; or (3) had been recommended for deferred action.[191] In the proposed rule that preceded these changes, the INS explained that ''[t]he Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and [Nationality] Act[,] which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act.''[192]

Congress then passed IRCA in 1986, making it unlawful for the first time for employers knowingly to hire an ''unauthorized alien (as defined in subsection (h)(3))'' for employment. 8 U.S.C. 1324a(a). Subsection (h)(3) defines an ''unauthorized alien'' in part as an individual whom the Attorney General has not authorized for employment. Thus, even though INA sec. 274a(h)(3) is ''definitional'' as one commenter observes, it is not meaningless or unimportant. To the contrary, that definition is part of IRCA and defines the scope of IRCA's core substantive provision that makes it unlawful to hire ''an unauthorized alien *(as defined in subsection (h)(3))*.'' 8 U.S.C. 1324a(a) (emphasis added). As INS explained in IRCA's implementing regulations:

[T]he only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined ''unauthorized alien'' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[193]

In other words, Congress was well aware of INS's view of its authority to grant work authorization when it passed IRCA, and chose expressly to acknowledge INS's practice on this point, ratifying it in the most comprehensive immigration legislation in a generation.

For this same reason, DHS disagrees with the commenter's assertion that Congress' expressly authorizing certain classes of noncitizens for employment in the years since IRCA's enactment negatively implicates DHS's ancillary and longstanding authority to grant discretionary work authorization. This assertion depends on a misuse of the ''expressio unius est exclusio alterius'' canon. The express authorization was supplemental to the general authority that already existed, and not in derogation of it or contradictory to it. As explained above, Congress has had ample opportunity for input through legislation on INS's authority to grant work authorization over the years. But in enacting IRCA Congress ratified the Attorney General's (now the Secretary's) authority to grant work authorization to various classes of noncitizens. Nor did Congress disturb this text or alter this authority in any way in other watershed immigration legislation since that time, including the Immigration Act of 1990, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, or the REAL ID Act of 2005.

DHS acknowledges that in prior litigation, the agency took the position that INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3) did not authorize the Secretary to grant work authorization to recipients of deferred action under the DACA policy.[194] However, after careful consideration, DHS now disagrees with that position. For the reasons explained throughout this preamble and the NPRM, Congress clearly ratified the Attorney General's longstanding authority to authorize classes of noncitizens for employment through the enactment of INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3). DHS accordingly disagrees with the commenter that it lacks authority to provide EADs to recipients of deferred action under the DACA policy who establish an economic need to work.

DHS acknowledges the commenter's concern for citizen workers during this period of particular economic uncertainty, but DHS disagrees that this rule would result in material adverse effects on such workers. As explained in greater detail elsewhere in this rule,

---

[188] *See, e.g., Aliens and Nationality,* 17 FR 11469, 11489 (Dec. 19, 1952) (codified at 8 CFR 214.2(c) (1952)) (prohibiting a nonimmigrant in the United States from engaging in ''any employment or activity inconsistent with and not essential to the status under which he is in the United States *unless such employment or activity has first been authorized by the district director or the officer in charge having administrative jurisdiction over the alien's place of temporary residence in the United States.*'' (emphasis added)); *Aliens and Nationality,* 22 FR 9765, 9782 (Dec. 6, 1957) (codified at 8 CFR 214.2(c) (1957)) (same). *See also generally* Sam Bernsen, *Employment Rights of Aliens Under the Immigration Laws, In Defense of the Alien,* Vol. 2 (1979), at 21, 32–33 (collecting former INS Operating Instructions (OI) on employment authorization), *reprinted in https://www.jstor.org/ stable/23142996*; Geoffrey Heeren, *The Immigrant Right to Work,* 31 Georgetown Immigr. L. J. 243 (2017). In addition, as noted in the NPRM, the former INS's OI in 1969 allowed for discretionary employment authorization to be issued to individuals who were provided voluntary departure, which permitted certain deportable noncitizens to remain in the United States until an agreed-upon date at which point they had to leave at their own expense but without the INS needing to obtain an order of removal. *See* INS OI 242.10(b) (Jan. 29, 1969).

[189] *See, e.g.,* 17 FR 11469; *Matter of S-,* 8 I&N Dec. 574, 575 (BIA 1960) (noting that ''the Immigration Service has issued printed material putting nonimmigrant aliens on notice that they may not engage in employment without permission of the Immigration Service Form I–358, which is routinely given to all entering nonimmigrant aliens.'' (cleaned up)).

[190] *See* Public Law 93–518 (Dec. 7, 1974).

[191] *See Employment Authorization to Aliens in the United States,* 46 FR 25079 (May 5, 1981).

[192] 45 FR 19563 (Mar. 26, 1980). The INS also stated that the Attorney General's authority to authorize employment of aliens in the United States was ''a necessary incident of his authority to administer the Act'' and had recently been ''specifically recognized by the Congress in the enactment of section 6 of [Pub. L. 94–571].'' *Id.* As described by the INS, that provision ''amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.'' *Id.*

[193] *Employment Authorization: Classes of Aliens Eligible,* 52 FR 46093 (Dec. 4, 1987).

[194] *See* Reply Br. for Pet'r at 19, *U.S. Dep't of Homeland Security, et al.* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020) (No. 18–587).

including the RIA at Section III.A.4.d, the relationship between DACA recipients and U.S. workers is more complicated. For instance, the data consistently indicate that introducing skilled noncitizen workers to the workforce positively impacts the wages and employment of both college-educated and non-college-educated citizens, suggesting that DACA recipient workers falling into this category would generally be complementary to, rather than competitive with, U.S. citizen workers.

DHS likewise disagrees with the other commenter's position that INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), prohibits DHS from granting work authorization. DHS first notes INA sec. 236 governs the apprehension and detention of noncitizens pending removal proceedings. The commenter seeks to overextend that statute's reach, for there is no indication that Congress intended it to apply beyond the context of removal proceedings. In any event, as explained in the NPRM, DHS interprets the clause of INA sec. 236(a)(3) stating that DHS may not provide work authorization to a noncitizen in removal proceedings "unless the alien . . . otherwise would (without regard to removal proceedings) be provided such authorization" to represent Congress' further recognition that noncitizens who are not also permanent residents may nevertheless receive work authorization.[195] That clause (added in 1996) preserves the Secretary's authority to grant work authorization to deferred action recipients, as the Secretary had done pursuant to preexisting regulation, 8 CFR 274a.12(c)(14) (1995). DHS maintains its position that because Congress expressly referenced situations in which a noncitizen "otherwise" would receive work authorization, Congress preserved DHS's authority to grant work authorization to categories of noncitizens other than lawful permanent residents, including to deferred action recipients, consistent with DHS's longstanding interpretation of its statutory authority. Any other reading renders that statutory text superfluous.

DHS has further considered the district and appellate court opinions questioning DHS's authority to provide employment authorizations to DAPA or DACA recipients, and respectfully disagrees with those decisions for the reasons explained in the proposed rule.[196]

DHS Has Authority To Grant Work Authorization

*Comment:* Many commenters stated that the Department's statutory authority to provide work authorization to DACA recipients is clear, citing longstanding regulations and law to support their claim: INA sec. 103(a), INA sec. 274(h)(3), and 8 CFR 274a.12(c)(9), (10), and (14). Citing INA sec. 274a(h)(3), one commenter stated that Congress delegated authority to DHS to administer and enforce the INA, saying the proposed rule is consistent with DHS's legal authority to grant work authorization to those "who benefit from prosecutorial discretion." Other commenters similarly agreed that granting work authorization does not "undermine" the INA or IRCA, contrary to the district court's recent holding in *Texas.* A commenter also reasoned that if the agency did not provide employment authorization, then the agency's action would be arbitrary and capricious for failing to consider the third parties impacted by the loss of employment authorization. Citing INA sec. 274a(h)(3), a commenter warned "undercutting" the clear statutory and regulatory authority the Department has to grant employment authorization would have far-reaching impacts beyond DACA to many other vulnerable groups of migrants. Another commenter likewise applauded DHS's "thorough" explanation of its discretionary authority to grant deferred action and work authorization to certain individuals. Several commenters urged the Department to add a DACA-specific provision to longstanding work authorization regulations to clarify and reinforce the policy for DACA recipients.

Several other commenters expressed concern with the separation of work authorization and deferred action, writing that access to deferred action and work authorization are not separate in their view. The commenters stated that the ability for DACA recipients to live with their families and communities without fear of deportation is synonymous with their ability to work legally and contribute to their families' and communities' economic well-being. The commenters acknowledged State legislators cannot grant work authorization to DACA recipients and instead must rely on DHS's discretion to do so.

*Response:* DHS agrees with commenters that it has authority to grant work authorization to DACA recipients attendant to their grant of deferred action. DHS agrees the pertinent regulatory and legislative

context indicates Congress' consistent recognition and ratification of this authority.[197] With respect to the comment suggesting that eliminating employment authorization for DACA recipients would be arbitrary and capricious, DHS takes the commenter's point regarding the benefits of employment authorization and existing reliance interests, but notes that DHS has not eliminated employment authorization from the policy. DHS agrees with commenters that DACA recipients and their communities would be negatively affected if discretionary employment authorization upon demonstration of economic necessity were eliminated from the DACA policy. To this end, DHS has included a DACA-specific EAD provision in this rule at new 8 CFR 274a.12(c)(33).

c. Unbundled Process To Make Form I–765 Optional

Support for Unbundled Process That Makes Form I–765 Optional

Financial Benefits to Applicants

*Comment:* Some commenters expressing support for the unbundled process stated that the provision would allow requestors to secure deferred action before applying for employment authorization, preventing them from losing the $410 Form I–765 filing fee upon a denial of deferred action. Other commenters said the unbundled process would provide flexibility and ease the financial burden for applicants who do not need employment authorization, such as some university students and those who are unable to work. Commenters said that the 181,000 DACA-eligible students in higher education would benefit from the ability to financially prioritize the separate requests, as many of these students may not need or want employment authorization during their enrollment in higher education. Another commenter reasoned that the $410 filing fee for Form I–765 is significant and a potential barrier for many requestors.

*Response:* DHS acknowledges these commenters' support for the proposed provision and agrees that an unbundled process would provide additional flexibility and reduce financial barriers to deferred action requests for some DACA requestors, including those who do not want to or cannot currently work. DHS agrees that the proposed unbundled process would provide DACA requestors with the ability to prioritize requests for forbearance from removal over employment authorization

---

[195] 86 FR 53759.

[196] 86 FR 53759–53760.

[197] *See* the preamble to the NPRM at 86 FR 53756–53760.

or to wait until they know their DACA request is approved before filing and paying the fees for an EAD, as needed. DHS has weighed these important interests carefully against countervailing considerations discussed below and, as discussed in greater detail in this section, has modified the proposed rule to codify the existing bundled process.

Protect the Integrity of DACA Against Future Litigation

*Comment:* Other commenters supporting the provision stated that unbundling the requests for employment authorization and deferred action would protect DACA recipients from the results of future litigation and possible deportation. A commenter agreed with what they perceived as DHS's rationale for the proposed change, namely that if employment authorization requests were optional, there would be a greater likelihood that the deferred action component of the policy and, thus, relief from deportation would be upheld if a court invalidated employment authorization for DACA recipients. Other commenters stated that while it was within the Executive's immigration authority to grant both deferred action and employment authorization, an unbundled process would bolster the continued existence of DACA in whole or in part.

A commenter stated that the proposed change would strengthen DACA's designation as an executive exercise of prosecutorial discretion because it would align DACA with other forms of prosecutorial discretion that grant employment authorization based on economic need. The commenter concluded that placing the program on firm ground with regard to prosecutorial discretion while providing financial relief and flexibility to DACA recipients would be essential "until there is a permanent congressional solution."

*Response:* DHS acknowledges commenters who reasoned that the proposed unbundled process would align DACA with other DHS exercises of deferred action and could fortify the forbearance component of the DACA policy in the event of ongoing or future DACA litigation. However, DHS disagrees that unbundling these forms is necessary to preserve and fortify the forbearance from removal component of the DACA policy. DHS therefore disagrees with commenters to the extent they characterize DHS's rationale for proposing the unbundled process as a necessary means to insulate the policy from litigation. Rather, DHS's primary reason for proposing the unbundled approach was to provide applicants with greater flexibility and to reduce

cost barriers to eligible noncitizens who sought forbearance but did not want, prioritize, or have economic need for employment authorization. And as discussed throughout the NPRM and this rule, DHS strongly believes it is legally authorized to implement the DACA policy, including to grant recipients discretionary work authorization. DHS accordingly disagrees with commenters' position that unbundling forbearance from removal and work authorization is necessary to place DACA on stronger legal footing. This rule, moreover, includes both a DACA-specific EAD provision at new 8 CFR 274a.12(c)(33) and a severability provision at new 8 CFR 236.24. Thus, even if a court were to hold that DHS lacked authority to grant discretionary work authorization to DACA recipients, DHS maintains that the court should sever the work authorization provision from the rest of the regulation, leaving DACA's forbearance component intact. As unbundling the filing of the DACA request from the employment authorization application is not legally required to preserve the forbearance component of DACA, and as discussed in greater detail below, despite the greater financial and other flexibility it would offer DACA requestors, DHS has decided to modify the proposed rule to maintain the status quo policy that requires all DACA requestors to file Form I–765, Application for Employment Authorization, and Form I–765WS concurrently with their form I–821D, Consideration of Deferred Action for Childhood Arrivals.

Mixed Feedback on the Provision

*Comment:* Some commenters provided mixed feedback on the proposed unbundled process without opposing or supporting the proposal. These commenters acknowledged, as discussed above, that an unbundled process would provide greater flexibility, reduce cost barriers to requestors, and that unbundling the forms could better protect deferred action should a court strike down access to employment authorization. A commenter, however, questioned the purpose of DACA if recipients could not legally work and obtain Social Security numbers and expressed concern that the change would cause confusion for DACA recipients. Commenters expressed concerns about delays that would result in misaligned validity dates for deferred action and work authorization. Citing USCIS historical processing times data that DACA initial requests were taking on average nearly 6 months and DACA-related

employment authorization requests were taking on average nearly 2 months to be processed, a commenter stated that unbundling Forms I–821D and I–765 could lead to additional delays in EAD adjudications, causing disruptions for U.S. employers and harming DACA recipients and their families. Likewise, a commenter stated that the rule, as proposed, could not guarantee the timely adjudication of employment authorization applications.

Without clearly supporting or opposing the proposed unbundled process, other commenters urged DHS to proceed with caution and suggested ways to ameliorate concerns with the proposed provision, including: clearly and carefully communicating the change to the DACA population, ensuring DACA recipients who work without authorization do not face penalties, maintaining a procedure that would not confuse or cause backlogs in applications due to the extended process, and adding language to the rule that DACA and EAD applications USCIS receives concurrently are adjudicated together and have the same validity dates.

Expressing support for this provision, a commenter raised concerns that the optional form would effectively change the cost of DACA and questioned whether the reduced cost would result in substantially lower revenue for USCIS.

*Response:* DHS acknowledges these comments on the proposed unbundled process. DHS agrees that the proposal would have provided additional flexibility to requestors regarding whether or when to request employment authorization in connection with their deferred action requests under the DACA policy. DHS, as discussed elsewhere in this rule, disagrees that unbundling these requests is necessary to strengthen the legal footing of the DACA policy or this rule. DHS also acknowledges these commenters' concerns that the proposed provision could introduce confusion among the DACA-eligible population and cause other unintended consequences, such as lengthier processing times, backlogs, and EAD validity dates that do not match the full 2-year period of deferred action for requestors who do not bundle their requests. USCIS has made important strides in reducing backlogs and ensuring efficient processing times for DACA-related requests. Of note, median processing times for DACA renewal requests and related employment authorization applications have decreased to half a month in Fiscal Year (FY) 2022 to date. As discussed above, since July 16, 2021, the *Texas*

district court order has prohibited USCIS from granting initial DACA requests and related employment authorization applications. Nevertheless, DHS agrees that an unbundled option could result in DACA recipients who receive EADs with validity periods of less than 2 years because the expiration date would necessarily be the end date of the deferred action period, while the EAD validity date would depend on the date of adjudication. DHS agrees with the commenter who suggested unbundling these forms could result in diminished cost recovery if a significant number of DACA requestors chose not to file Form I–765. In the NPRM, DHS considered carefully this concern and, based on projections, estimated that USCIS would charge, on average, approximately $93,736,500 less than the estimated full cost of adjudication for Form I–821D annually in FY 2022 and FY 2023 in the unbundled scenario.[198] Nevertheless, in the NPRM, DHS decided to hold the fee for Form I–821D below the approximately $332 estimated full cost of adjudicating that form alone and to propose the unbundled process to offer greater flexibility to DACA requestors, finding this framework to be in the public interest. In the NPRM, DHS explained its view that the proposed Form I–821D fee of $85 balances the need to recover some of the costs of reviewing DACA requests filed without Form I–765, including the costs of biometric services, with the humanitarian needs of the DACA requestor population and the benefits of expanding DACA to DHS and to communities at large. Many DACA recipients are young adults who are vulnerable because of their lack of immigration status and may have little to no means to pay the fee for the request for deferred action. However, DHS has considered these comments and, as further discussed elsewhere in this rule, has decided to instead codify the existing bundled process in this rule.

Opposition to the Optional Form I–765

Most commenters who provided feedback on this provision expressed concern about the consequences it would have for DACA recipients, the application process, program benefits, or the integrity of the program overall. Many of these commenters urged DHS to instead retain the existing bundled process that has been in place since 2012, with some stating the proposed unbundled process undermined DACA.

Recognition of the Rationale Behind the Provision

*Comment:* Many commenters opposed the proposal while also recognizing the financial and flexibility benefits the proposal would have provided to some requestors, as discussed in more detail above. Other commenters who expressed concern with the provision stated that they appreciated the absence of any substantive alterations to EAD adjudications or filing fees. One commenter noted that the requirement for the DACA request to be submitted with the employment authorization application is clearer, forces people to be ''all in or all out on the Employment Authorization,'' and provides a greater understanding of DACA and its benefits to requestors.

*Response:* DHS appreciates these commenters' recognition that the proposed unbundled process would have benefitted some DACA requestors by reducing cost barriers and expanding choice and flexibility for these individuals. However, the Department accepts that these commenters nevertheless preferred the bundled process, which is the longstanding status quo practice since 2012 of requiring both the DACA request and the employment authorization application to be filed simultaneously. DHS addresses these commenters' opposition to the proposal in this section, and, for the reasons discussed, has modified this rule to codify the existing and longstanding bundled process.

Litigation and Loss of Employment Authorization

*Comment:* Many commenters remarked that strengthening the legal position of deferred action through the proposed unbundled process would create an opportunity for the courts or future administrations to invalidate employment authorization for DACA recipients altogether.

A commenter stated that this change would be legally unnecessary, citing DHS's recognition that deferred action has never created an entitlement to employment authorization and that DACA recipients must show an economic necessity to obtain such authorization. The commenter concluded that the existing bundled process has promoted access to an important benefit while minimizing costs to requestors and DHS.

Another commenter remarked that an unbundled process could leave the program vulnerable to political attacks labeling DACA recipients as unproductive members of society,

which could weaken support for DACA and leave the program open to future litigation. Similarly, another commenter noted that that the proposed unbundling could create an opportunity for individuals who are not motivated to work with authorization to forgo the Form I–765 filing fee.

*Response:* DHS disagrees that unbundling the deferred action and employment authorization requests would create any greater likelihood that the employment authorization for DACA recipients would be invalidated altogether. This rule again codifies an exercise of DHS's authority to grant employment authorization to DACA recipients and thereby serves to preserve and fortify DACA. This rule includes a DACA-specific EAD provision at new 8 CFR 274a.12(c)(33). Thus, DHS would need to engage in additional notice-and-comment rulemaking to remove the regulatory text and the ability for DACA requestors to request employment authorization. DHS agrees with commenters' assertion that the proposed change is not legally necessary to fortify the Department's authority to grant employment authorization to DACA recipients. As explained in detail in the NPRM and elsewhere in this rule, since at least the 1970s, the INS and later DHS have made employment authorization available for noncitizens without lawful immigration status but who receive deferred action or certain other forms of prosecutorial discretion.[199] In response to these comments, and for additional reasons explained elsewhere in this preamble, DHS is modifying the rule to adopt the existing bundled process instead of adopting the unbundled process as proposed in the NPRM. Finally, DHS notes that comments regarding political descriptions of DACA recipients are outside the scope of this rule and declines to respond to these comments.

DHS's Rationale Regarding the Need for Work Authorization

*Comment:* A few commenters critiqued DHS's rationale that some DACA requestors may not need employment authorization and questioned how likely it would be that DACA recipients would choose not to apply for an EAD. Similarly, a legal services provider stated that employment authorization is not an add-on benefit to DACA and that it would not expect any of its clients to request deferred action under the DACA policy without employment authorization. Echoing these arguments, a commenter further reasoned that it is

---

[198] 86 FR 53764.

[199] 86 FR 53757.

difficult to see work authorization and deferred action as two separate issues, adding that a deferred action-only DACA policy would have little to no value to individuals. A commenter reasoned that, as the only individuals who fit within the DACA policy under the *Texas* ruling and partial stay are seeking to renew DACA and have always requested deferred action alongside employment authorization, they would continue to request these protections jointly and would not require the additional flexibility. This commenter said that it would be important for recipients to have assurance that they would not have any lapses in employment authorization because of this change.

A commenter stated that the NPRM's projection that 30 percent of DACA requestors would opt out of requesting employment authorization was at odds with rapidly changing individual circumstances and the importance of having the ability to work even if it is not continually exercised. The commenter concluded the vast majority afforded the opportunity to request work authorization will do so.

*Response:* DHS agrees with these commenters that most DACA requestors likely will request employment authorization but reiterates that the unbundled process proposed in the NPRM was intended to not only offer options to requestors about whether to request employment authorization, but also when to request this authorization. DHS acknowledges some commenters' position that employment authorization is not an "add-on" benefit of deferred action, but DHS disagrees. Certainly, as discussed in the NPRM and elsewhere in this rule, policy considerations weigh heavily in favor of authorizing employment for individuals with deferred action. Nonetheless, as discussed throughout this rule, DACA is an exercise of prosecutorial discretion in the form of deferred action, upon which determination DHS has authority to confer employment authorization. Indeed, as other comments have indicated, there is likely to be a subset of the DACA population that does not want or need an EAD at a given time and, therefore, may benefit from the option to delay or defer requesting employment authorization. DHS also reiterates that although the *Texas* court order currently enjoins DHS from granting DACA to initial requestors, this rule addresses the threshold criteria and process for both initial DACA requests and renewal requests. DHS has carefully considered these comments, weighing the unbundled process's potential benefits to a subset of DACA requestors

against the complications posed to the larger population of DACA requestors. Upon careful consideration, as explained below, DHS agrees that the benefits of the proposed unbundled process do not outweigh the potential negative impacts raised by commenters as discussed in this rule. DHS therefore has decided to modify the proposed rule and instead to codify the longstanding bundled process that requires requestors to simultaneously file Form I–765, Application for Employment Authorization, and Form I–765WS along with their Form I–821D, Consideration of Deferred Action for Childhood Arrivals.

Administrative Burdens on Applicants, Confusion, and Impacts on Pro Se Applicants

*Comment:* Many commenters stated that the proposed unbundled process would create unnecessary burdens for current DACA recipients who are accustomed to the bundled process and those who may unknowingly opt out of work authorization due to financial necessity, confusion, or a lack of legal assistance. Another commenter said that any confusion resulting from this change could deprive DACA recipients of access to or ability to work, which the commenter stated is necessary to establish their families' safety and security in the United States.

A commenter stated that, in its experience with the administration of and access to public benefit programs, duplicative applications create unnecessary barriers to participation, while increasing the administrative burden on requestors and the granting agencies. Similarly, commenters stated this change could increase time and resources spent on legal fees to submit additional paperwork or to navigate the new process. In addition to compounding burdens for requestors, agencies, and legal services providers, a commenter suggested that confusion related to this provision would overwhelm under-resourced organizations that assist DACA requestors.

A commenter said that many requestors with financial limitations may fail to understand the benefits of concurrently filing Forms I–821D and I–765. Other requestors, commenters remarked, may erroneously believe they can apply for deferred action and automatically receive employment authorization, or inadvertently fail to opt into applying for employment authorization, leading to further delays and the potential loss of employment opportunities.

Many commenters stated that the burden of this change could fall largely on pro se requestors, making the policy less accessible for those lacking proper guidance to navigate complex, evolving processes. A commenter said this provision would create an acute risk that pro se requestors would not understand that they must apply separately for an EAD under the new process, and that there would be a "skeletal track" resulting in deferred action alone. This confusion, the commenter warned, could result in EAD applications lagging behind DACA requests and subsequent losses in the work authorization period, despite paying the full fee for an EAD. Other commenters stated that these challenges would largely fall on first-generation noncitizens and requestors with limited resources.

*Response:* DHS acknowledges these commenters' concerns and recognizes the need for clarity regarding the process to request consideration for deferred action and employment authorization under the DACA policy. DHS has carefully considered these concerns and agrees that the population of DACA requestors is accustomed to the well-established bundled process that has been in place since 2012. DHS recognizes that diverging from this longstanding process could cause confusion and agrees that requestors without the assistance of attorneys or accredited representatives could be disproportionately and adversely impacted by the proposed change. DHS also recognizes that codifying the unbundled process could strain resources among nonprofit legal services providers because it could result in more requestors seeking assistance from these providers and introduce more procedural options to consider, causing legal services providers to spend additional time and resources explaining the change, counseling requestors, and preparing and filing unbundled forms. DHS also acknowledges commenters' concerns that while the proposed change could reduce cost barriers to forbearance from removal, those DACA requestors with acute economic distress such that they could not afford the filing fee under a bundled process also likely would be among those individuals with the most economic need for employment authorization. DHS also agrees that it is important that DACA recipients who pay the Form I–765 filing fee receive an EAD with a validity period that matches the full deferred action period, and that those who have limited resources may be disproportionately impacted by

delaying filing the Form I–765 due to inability to pay. Because DHS has decided to maintain the 2-year DACA deferred action validity period set forth in the Napolitano Memorandum, the Department declines to make changes to this rule that would extend employment authorization validity periods beyond that timeframe. However, after careful consideration of these concerns raised by commenters, and having carefully weighed the potential benefits against the unintended negative consequences raised by the proposal, DHS agrees to make changes in the rule to codify the existing bundled approach, rather than offering requestors the option of an unbundled process.

Delays in Adjudication and Gaps in Employment Authorization

*Comment:* Several commenters expressed concern that unbundling requests for employment authorization and deferred action would increase administrative burdens for USCIS and lead to delays that could harm DACA recipients' ability to meet economic needs through work. A commenter stated that an unbundled process would magnify delays in grants of deferred action or work authorization, leading to incomplete protection and increased uncertainty. Citing current USCIS backlogs, a commenter similarly expressed concern that an unbundled process would compound bureaucratic delays in an agency already experiencing backlogs in adjudicatory functions, including EAD processing. Commenters stated that an unbundled process not only would lead to delays but also could result in the improper denial of work authorization requests. A commenter added that employment authorization gaps heighten the delays employers already experience with noncitizen employees amid labor shortages. Other commenters stated that the unbundled process would result in misaligned validity dates for DACA and employment authorization, leading to the potential loss of a full term of employment authorization and uncertainty for employers and recipients.

*Response:* DHS recognizes that DACA recipients and employers have significant reliance interests in the DACA policy this rule aims to preserve and fortify. DHS acknowledges these commenters' concerns regarding processing delays and bureaucratic complications arising from an unbundled process. DHS agrees that DACA requestors and their employers have an interest in efficiently processed DACA-related employment authorization requests and in EAD

validity dates that align with the authorized deferred action period. DHS notes that the median processing time for a DACA-related Form I–765 is 0.5 months in FY 2022, as of May 31, 2022,[200] reflecting important measures USCIS has taken to ensure properly filed requests are swiftly adjudicated. Nevertheless, DHS acknowledges it would require additional resources to operationalize an unbundled approach that results in multiple configurations of requests and an increased likelihood of "second touch" processing, whereby a requestor files a Form I–765 at some point after submitting their deferred action request. DHS has carefully weighed the intended benefits of additional flexibility for requestors and the potential unintended consequences of increased confusion, uncertainty, and bureaucratic delay, and agrees with these commenters that the flexibility benefits do not outweigh these potential negative impacts. DHS therefore agrees to adopt the suggestion of these commenters to codify the rule at new 8 CFR 236.23(a)(1) to require that a request for DACA also must contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

Two-Tiered System and Unauthorized Employment

*Comment:* Many commenters stated that confusion, delays, or denial of work authorization under an unbundled process would create "unequal DACA tiers" between recipients with and without EADs. A few commenters expressed concern that unbundling deferred action and work authorization could create an opportunity for individuals who are not motivated to work with authorization to forgo the I–765 filing fee or for DACA recipients to avoid work at taxpayers' expense.

Most commenters who raised concerns about a two-tiered system discussed the adverse impact on unauthorized workers, workplace safety, and labor rights. A commenter stated that unbundling deferred action and work authorization would lead to persons opting out of paying the Form I–765 fee for reasons of poverty, suggesting that the choice to delay entry into the workforce would not be done freely. Another commenter said the proposed change to the application process would result in some DACA recipients being granted DACA and not employment authorization.

---

[200] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

A commenter remarked that this provision would make work authorization more difficult to obtain, "forcing" some individuals into precarious situations where they pursue unauthorized employment. This outcome, the commenter stated, would run counter to the agency's intention of using its power to protect wages, facilitate workplace safety, and enforce other labor and employment standards. Another commenter noted that, whether due to fear, confusion, or cost, requestors may be deterred from accessing work authorization under an unbundled process, which would open the possibility of a new "second class" of DACA recipients without work authorization. These DACA recipients who lack employment authorization, commenters stated, would open the door for increased unauthorized employment and empower unscrupulous employers to take advantage of unauthorized labor, including lower pay and exploitative, even hazardous work conditions. A commenter added that unscrupulous employers often exploit the lack of employment authorization to chill workers' efforts to organize, protest substandard working conditions, and enforce wage, safety, and discrimination laws, and also interfere with collective bargaining rights, suggesting that the proposed change could cause irreversible harm to many individuals by forcing them into informal employment. Citing studies, a commenter stated that the economic consequences of this change and possible involvement in abusive work situations would be particularly acute for populations that are disproportionately harmed by systemic inequalities, including LGBTQ populations, racial minorities, and people with disabilities.

A commenter expressed concern that a reduced population of work-authorized DACA recipients would lead to the DACA population's increased reliance on nonprofits, community organizations, and city or State funding for daily needs.

*Response:* DHS acknowledges these commenters' concerns about the proposed unbundled process. DHS agrees that, to the extent that some DACA requestors would forgo employment authorization under the unbundled process, two groups of DACA recipients would result, those with and those without employment authorization. As discussed in the NPRM, DHS recognizes that, if offered the option to forgo employment authorization, some DACA recipients would opt out due to a financial

inability to pay the Form I–765 filing fee. However, DHS disagrees with the commenter that an unbundled process would force some DACA requestors into unauthorized employment, although DHS acknowledges that such unauthorized employment may be more likely to occur. While DHS acknowledges commenters' point that an unbundled process could result in confusion or uncertainty among DACA requestors, DHS reiterates that it proposed the unbundled process as a mechanism to offer more flexibility and make forbearance from removal more accessible to individuals who might otherwise forgo DACA altogether due to an inability to pay filing fees for employment authorization. Nevertheless, DHS recognizes and agrees with commenters that there are strong policy reasons to make employment authorization requests accessible for those to whom DHS has extended deferred action. As discussed above, self-reliance of community members is critical not only to social and economic prosperity, but also to individuals' personal well-being. While the DACA policy, even without employment authorization, has substantial value, DHS recognizes that without employment authorization, DACA recipients would be unable to engage in lawful employment to support themselves and their families, potentially exposing them to exploitation and crime. DHS has carefully weighed the benefits of increased flexibility offered by the proposed unbundled process against these unintended negative consequences and agrees to modify the rule to codify the existing bundled process instead of the proposed unbundled process.

The Provision Would Undermine the Purpose and Benefits of DACA

*Comment:* Some commenters warned that the proposed unbundled process would, as a result of other residual consequences of the provision, frustrate the main purpose of DACA, to provide both protection from deportation and the ability to work in the United States. A commenter reasoned that the decision to make employment authorization "more challenging for DACA recipients belies [the] recognition of the pivotal role of employment authorization to the proper operation" of DACA. Several commenters similarly said that the provision would undermine the rationale behind DACA. A commenter stated that separating forbearance from deportation and work authorization would have negative effects on its city economy, arguing that DACA without

work authorization would mean an increase in poverty (including mixed-status families), a loss of desperately needed essential workers, and a significant loss to their city's economy and revenues. The commenter estimated that DACA-eligible New Yorkers contribute over $3 billion annually to New York City's GDP.

Commenters reasoned that deferred action and work authorization are not separate, as the ability for Dreamers to freely live with their families and communities is synonymous with their ability to legally work. A commenter said that DHS could not fortify DACA with a regulation that separates deferred action from employment authorization. In addition to stating the potential impacts of this change on the request process, the commenter added that the proposed change would weaken the purpose of DACA by undermining the worth and agency of childhood arrivals.

Many commenters noted that, if this provision led to any recipients losing their employment authorization, recipients also could lose the other benefits an EAD provides beyond the ability to work. Commenters said that the EAD functions as a foundational form of identification for many DACA recipients, who may find this new process confusing and, therefore, fail to reapply for this benefit. They reasoned that an EAD is often the only acceptable form of identification for obtaining a driver's license while providing access to a Social Security number, health insurance and preventative care, entrance to Federal buildings, social benefits, school registration for children, long-term educational opportunities, bank loans, and home utilities. Other commenters added that, without an EAD, DACA recipients have no way of demonstrating "lawful presence," which is the criterion that some States have chosen to use for eligibility for a State identification card, which could in turn affect their right to domestic travel when full enforcement of REAL ID requirements begins. A commenter similarly stated that, even among those who do not require work authorization, an EAD is valuable for obtaining these additional benefits. Considering the loss of benefits for individuals only granted deferred action under this change, commenters suggested that recipients should be allowed to receive an alternative form of identification with their approved DACA request, including a Social Security number and Federal identification.

*Response:* DHS acknowledges these commenters' concerns. DHS agrees that the ability to request employment authorization has been an important

component of the DACA policy since it was implemented in 2012. Although DHS reiterates that employment authorization is not incident to receipt of deferred action—which is an act of prosecutorial discretion—as it is incident to certain forms of lawful immigration status, such as TPS and asylum, DHS agrees that employment authorization is important to most DACA recipients. DHS also agrees with and is persuaded by comments that point to the many reasons beyond employment that DACA recipients may want or need an EAD to facilitate important aspects of daily living while they have deferred action. DHS acknowledges that DACA recipients may require an EAD for identification or to access a variety of State and local benefits, programs, or services. DHS agrees that the proposed unbundled process raises the prospect that some DACA recipients may unwittingly forgo or be deterred from applying for an important identity document or restrict their access to these benefits, programs, or services by virtue of forgoing an employment authorization request for any number of reasons discussed above. Although it is generally the purview of States and municipalities to make policies regarding eligibility of DACA recipients for these benefits, programs, and services, DHS has a strong interest in ensuring that individuals who have been granted DACA are not deterred from requesting an EAD to establish their identity and DACA forbearance. DHS appreciates the commenter's suggestion that DHS furnish individuals who request only deferred action under an unbundled process with an alternative identity document. However, DHS declines to adopt this suggestion as it would impose additional operational costs, could introduce confusion among States and localities, and would result in DACA recipients receiving an identity document not available to recipients of deferred action under other policies or processes. Instead, upon careful consideration of the important concerns raised by these commenters, DHS agrees to modify the final rule at new 8 CFR 236.23(a)(1) to require that a request for DACA must also contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

Fee Waivers as an Alternative to the Unbundled Process

*Comment:* Commenters expressed concern that the proposed provision would have made filing Form I–765 optional while maintaining the existing fee structure. Recognizing that the provision would reduce fees for

applicants with financial hardship or not needing employment authorization, some commenters requested DHS consider other alternatives for making the application affordable or more accessible, including through fee waivers. A commenter also stated that, although separating the two forms and their fees could alleviate the financial burden of requesting DACA for some, it would not eliminate that burden entirely. Other commenters said that the only benefit of the unbundled process would be to offer a lower cost option, but stated that providing a fee waiver was a better alternative than restricting the application to a limited benefit for some. A commenter further expressed concern that DACA is one of the few immigration requests for which requestors are prohibited from requesting a fee waiver, while another commenter urged implementation of a fee waiver option, stating that the current fee exemption process for DACA requestors is cumbersome and further delays beneficiary status. Another commenter said that USCIS is authorized to carry out fee waivers under 8 CFR 106.3(b). To this end, a commenter recommended that USCIS allocate additional funds to waive the fee associated with Form I–765 to reduce the burden on DACA-eligible students.

*Response:* DHS agrees with commenters that policy interests favor making DACA accessible to those who meet the criteria and merit a favorable exercise of discretion and, as such, is not increasing the DACA-related fees in this rule. As discussed in greater detail elsewhere in this rule, DHS has carefully considered the suggestion to make fee waivers available to DACA requestors and weighed the benefits of fee waivers to requestors with the fiscal impact and objective to preserve and fortify DACA. Although DHS agrees to modify the rule to require the existing bundled process, DHS declines to adopt the suggestion to implement fee waivers.

Other Alternatives to an Unbundled Process

*Comment:* A commenter stated that DACA would benefit from not changing the application process in the manner set forth in the proposed rule due to the precarious situation of the policy's long-term viability. Alternatively, the commenter suggested that DHS amend the rule to provide an unbundled process option for initial DACA requestors should they be allowed to receive benefits in the future and maintain the existing bundled process for individuals seeking to renew their

status. A different commenter recommended that the agency provide a way for requestors to affirmatively decline filling out an application for work authorization, instead of unbundling these processes. Another commenter suggested that either the rule maintain the bundled process or that an additional option be included that combines the work permit and DACA renewal instead of "completely decoupling" the two requests. Another commenter urged DHS to continue to grant employment authorization concurrently with deferred action and to prominently list on Form I–821D the significant benefits and any known drawbacks of having an EAD for requestors.

*Response:* DHS acknowledges and thanks commenters for these suggestions. As an initial matter, DHS reiterates that the proposed unbundled process would not have completely "decoupled" deferred action and employment authorization requests for the DACA population. Under the proposed rule, requestors would have retained the option to bundle and concurrently file these requests, but would have the added option of filing for employment authorization separately or not at all. Nevertheless, as discussed above, upon careful consideration of comments received and the extensive comments filed in opposition to the proposed unbundled process, DHS is modifying the rule to codify the longstanding bundled process. DHS believes that a consistent request process for both initial and renewal requestors would best ensure efficient processing and minimize processing delays or other bureaucratic drawbacks of an unbundled process noted by commenters. DHS therefore declines to adopt an unbundled approach for initial requestors. In light of DHS's decision to adopt the existing bundled process, DHS also declines to adopt suggestions to provide a means for requestors to affirmatively decline employment authorization or to list on Form I–821D the benefits and drawbacks of having an EAD.

d. Automatic Termination of Work Authorization

*Comment:* One commenter expressed general concern that, under the proposed rule, termination of a DACA grant would result in termination of the EAD as well, while another stated that the automatic termination of work authorization provision is an example of the proposed rule giving the policy "more of a back[bone]," stating that this was not strictly enforced beforehand.

*Response:* DHS acknowledges the range of views expressed, from one commenter's concern that individuals are no longer eligible to work lawfully once their EAD is terminated, to another commenter's support for the provision. However, DHS disagrees that this provision was not strictly enforced previously. Historically, when an individual's grant of DACA has been terminated, so too has the individual's employment authorization been terminated, because the underlying basis for the employment authorization no longer exists upon the termination of DACA.

DHS is revising 8 CFR 236.23(d)(3) in this rule to remove the cross-reference to 8 CFR 274a.14(a)(1)(iv), which was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* civ. 20–cv–3815 (D.D.C. Feb. 7, 2022). As a result of the vacatur and additional revisions made to the DACA termination provisions to eliminate automatic termination based on filing of an NTA, as discussed elsewhere in this rule, DHS is further clarifying at 8 CFR 236.23(d)(3) that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted.

3. Lawfully Present (§ 236.21(c)(3)) and Unlawful Presence (§ 236.21(c)(4))

In proposed 8 CFR 236.21(c)(3) and (4), DHS proposed that DACA recipients, like all other deferred action recipients, would continue to be considered "lawfully present" (a legal term of art) for the purpose of receiving certain title II Social Security benefits under existing 8 CFR 1.3(a)(4)(vi) and would not accrue unlawful presence for inadmissibility determinations under INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) while they have DACA. Both provisions reflect policy and practice for persons subject to deferred action more broadly since well before the inception of DACA. As detailed below, the public comments on these two proposals were overwhelmingly supportive of the two proposed lawful presence provisions, with only a few commenters expressing opposition to them. Several of the supportive commenters also provided recommendations for additional modifications to the proposed provisions. DHS responds first to the supporting comments, then to the opposing comments, and finally to those comments that supported the lawful presence provisions but recommended certain modifications.

Support for ''Lawfully Present'' and ''Unlawful Presence'' Proposals

*Comment:* In expressing their strong support for DHS's proposal that DACA recipients will continue to be deemed ''lawfully present'' for certain benefit purposes as noted in 8 CFR 1.3(a)(4)(vi), commenters provided several reasons. These reasons included: appreciation for DHS's clarification and confirmation that DACA recipients are ''lawfully present''; support for DHS's explanation in the preamble that it would continue to treat individuals granted deferred action under DACA as ''lawfully present,'' as well as the agency's discussion of the differences between lawful presence and lawful status; treating undocumented immigrants as ''lawfully present'' allows them to find employment to support themselves and their families; DACA recipients would be able to obtain Social Security numbers, an outcome the commenters said would allow individuals to obtain jobs and forms of identification, pay taxes, and surpass evidentiary barriers to services; the proposal on lawful presence would enable the recipients to qualify for Social Security and certain other public benefits; and there is no legitimate reason for treating DACA recipients differently from others with deferred action with respect to ''lawful presence.''

One commenter was particularly supportive of the proposal to treat DACA recipients as ''lawfully present'' for purposes of statutes governing eligibility for certain Federal benefits. Many commenters applauded the proposals for confirming that DACA recipients are deemed ''lawfully present'' and do not accrue unlawful presence, commenting that these individuals were not able to understand the implications of, nor control, their entry into the United States at a young age.

Many commenters were similarly supportive of the proposed rule's incorporation of DHS's longstanding policy that DACA recipients, like other deferred action recipients, do not accrue unlawful presence for purposes of the inadmissibility grounds in INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) while their deferred action is valid. In expressing their support, commenters noted the following: accruing unlawful presence could otherwise present an obstacle to future admissibility; removing lawful presence for DACA recipients would create a permanent underclass and prevent such individuals from pursuing a green card; the treatment of DACA recipients as lawfully present helps shield and protect DACA recipients against adverse immigration consequences associated with the accrual of unlawful presence, including bars on reentry; accrual of unlawful presence would present barriers for individuals or their relatives to pursue legal pathways to permanent residency; maintaining the proposed rule's provision on unlawful presence will help ensure that the largest possible percentage of DACA recipients remain eligible for other forms of immigration relief; and holding DACA protections always should prevent the accrual of unlawful presence.

Several commenters specifically responded to DHS's request for comments on whether persons who receive deferred action pursuant to the proposed rule should be regarded as ''lawfully present'' or ''unlawfully present'' for purposes of eligibility for specified Federal public benefits under 8 U.S.C. 1611(b) and admissibility under 8 U.S.C. 1182(a)(9), respectively. Commenters stated that individuals with deferred action always have been covered by the lawfully present regulation and that any other formulation would break from legal precedent and longstanding policy, as well as create an unworkable and overly complex adjudication framework. One commenter said that changing longstanding policy around deferred action and lawful presence would create a logistical nightmare in the complex realm of immigration law. The commenter further stated that if such a change were made retroactive, it would fly in the face of extensive legal precedent regarding retroactive lawmaking, but if the change were not retroactive, USCIS would have the problem of determining when different recipients had DACA that prevented the accrual of unlawful presence (pre-rule) and when their DACA did not protect them from accruing such unlawful presence. According to the commenter, this would involve an increase in adjudication and require the expenditure of more agency resources that would significantly counterbalance any possible benefit of such a change, resources the commenter noted the DACA policy is intended to preserve. The commenter also stated that this would present constitutional issues under the Fifth Amendment's equal protection guarantee[201] because that guarantee requires the Government to provide sufficient rationale if it wants to treat persons in similar situations in a disparate manner. The commenter noted that USCIS would need to increase adjudication as those who are similarly situated are offered rights that new DACA recipients are not. Other commenters made similar points regarding the disadvantages of changing the longstanding practice regarding DACA recipients' nonaccrual of unlawful presence, including the constitutional equal protection concerns and the difficulties of applying such a change. The commenters added that the change likely would necessitate DHS deciding which DACA recipients had not accrued unlawful presence prior to the rule given that it would likely not be retroactive as compared to those who would accrue unlawful presence after promulgation of such a change. A commenter also noted that removal of the lawful presence designation could undermine postsecondary educational opportunities for DACA recipients in the workforce.

Some commenters stated that they supported the provision to consider individuals with deferred action as lawfully present and opposed any DACA rule that would fail to confirm lawful presence for individuals with deferred action. Similar to the commenter noted above, these commenters said that any DACA rule that fails to include lawful presence could present Equal Protection Clause implications, citing the Fourteenth Amendment of the U.S. Constitution and stating that DHS must treat DACA recipients the same as individuals with other forms of deferred action. A form letter submitted by several commenters cited the Department of Health and Human Services (HHS) action stripping lawful presence for DACA recipients for Affordable Care Act (ACA) purposes as an agency action that received significant public opposition and worsened healthcare outcomes for impacted individuals. Several commenters noted that DHS should formalize its longstanding policy that DACA recipients granted deferred action do not accrue unlawful presence for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9).

*Response:* The Department acknowledges and appreciates the many

---

[201] The commenter cited both the Fourteenth and Fifth Amendments. Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the Federal Government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S. 497, 500 (1954), held that while ''equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process.'' In the case of racial discrimination in DC public schools, the Court found that no lesser Constitutional protections apply to the Federal Government through the application of the Due Process Clause in the Fifth Amendment than by application of the Equal Protection Clause of the Fourteenth Amendment.

reasons that commenters provided for their support of the proposed rule's two provisions on lawful presence (proposed 8 CFR 236.21(c)(3) and (4)). For the reasons detailed in Section III.E of the proposed rule and discussed further below,[202] DHS agrees that DACA recipients are provided deferred action and should continue to be deemed ''lawfully present'' like all other deferred action recipients—as they have been since the start of DACA—under 8 CFR 1.3(a)(4)(vi) for purposes of receiving title II Social Security benefits described in that regulation. Similarly, DHS agrees that the rule properly codifies DHS's decade-long policy that DACA recipients are similarly situated to other individuals with deferred action who have, since at least 2002, not accrued unlawful presence for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) inadmissibility while action is deferred in their case.[203] The Department sees no reason to treat DACA recipients any differently from other deferred action recipients for these purposes, and therefore is retaining proposed 8 CFR 236.21(c)(3) and (4) in the final rule. DHS notes, however, that although it firmly believes it has the legal authority to promulgate these provisions, as described in its response below to the opponents of the lawful presence provisions, DHS also maintains its views on severability, as provided in 8 CFR 236.24 and discussed elsewhere in this rule, in the event that any portion of the rule is declared invalid, including one or both of these lawful presence provisions. In particular, even if a court determines that DHS does not have the legal authority to promulgate one or both of the lawful presence provisions, DHS intends that the remainder of this rule, including the forbearance and work authorization provisions, should be maintained.

DHS also notes the concerns expressed by some commenters that a rule that states that DACA recipients, unlike other deferred action recipients, lack lawful presence would violate equal protection principles and that

changing this policy would create significant operational complexity for DHS. Since DHS has not taken such an approach and the rule continues the long-existent policy that DACA recipients, similar to other deferred action recipients, are lawfully present for certain public benefits and do not accrue unlawful presence for purposes of section 212(a)(9)(B) of the INA, DHS does not express a position regarding the commenters' hypothetical equal protection arguments. DHS will address the claim if it becomes necessary to do so in a subsequent forum. However, DHS concurs that changing the policy regarding lawful presence would create significant operational complexity if done prospectively, as USCIS would need to determine in future adjudications the specific amount of unlawful presence accrued by DACA recipients on an individual basis.[204]

Opposition to ''Lawfully Present'' and ''Unlawful Presence'' Proposals

*Comment:* A few commenters opposed the proposed rule's provisions on lawful presence for certain public benefits and the nonaccrual of unlawful presence while in DACA for inadmissibility purposes. One commenter, who also set forth a view of the overall illegality of DACA, wrote that the proposed rule not only ignored statutorily mandated removal proceedings but also went further to provide immigration benefits to people with no lawful access to immigration benefits. In support of this view, the commenter quoted from the district court in *Texas:* '' 'Against the background of Congress' 'careful plan,' DHS may not award lawful presence and work authorization to approximately 1.5 million aliens for whom Congress has made no provision.'' The commenter further stated that the message to the world is that illegal entry will be rewarded and unlawful presence will be mooted by executive action. The commenter said that promulgating a DACA regulation only perpetuates the problem. Another

commenter who expressed opposition to the DACA policy and the rule's provision of lawful presence to recipients wrote that *Texas* district court's ruling that DACA is unlawful and cannot continue with DACA rulemaking just because it disagrees with the court.

One commenter stated that Congress' careful plan for the allotment of lawful presence forecloses the possibility that DHS may designate hundreds of thousands of people to be lawfully present. The commenter noted that the proposed rule would allow the Secretary to grant lawful presence and work authorization to every ''illegal alien'' in the United States. The commenter stated that the INA does not permit DHS to reclassify ''illegal aliens'' as ''lawfully present'' and eligible for Federal and State benefits, including work authorization. Another commenter similarly expressed opposition to the proposed rule for intentionally choosing not to enforce immigration law, stating that DACA recipients do not have lawful presence regardless of any economic activity in which they engage after entering the country illegally. The commenter further noted that the recipients' intent or age at the time has no relevance and that the commenter could not present a personal defense in court based upon a lack of knowledge of the law or lack of intent if charged of any crime. The commenter stated that illegally entering the United States is no exception.

*Response:* DHS appreciates these comments but continues to respectfully disagree with the commenters who oppose the two provisions in this rule related to lawful presence for the reasons described in the preamble to the proposed rule in Section III.E.[205] As noted elsewhere in this rule, DHS fundamentally disagrees with the commenters who stated DHS does not have the legal authority to implement the DACA policy or to promulgate a rule continuing the policy. DHS also believes it has the legal authority to continue providing DACA recipients the same longstanding treatment it has afforded to all other recipients of deferred action, who are deemed ''lawfully present'' under 8 CFR 1.3(a)(4)(vi) for title II Social Security benefits and under DHS's guidance on nonaccrual of unlawful presence for INA sec. 212(a)(9) purposes.

In PRWORA,[206] Congress provided the Attorney General (now Secretary) the authority to determine which noncitizens would be considered

---

[202] *See* 86 FR 53760–53762. *See also* DHS response under *Opposition to* ''*lawfully present*'' *and* ''*unlawful presence*'' proposals below.

[203] *See* Memorandum to Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act,* at 42 (May 6, 2009) (hereinafter Neufeld Memorandum); Memorandum for Johnny N. Williams, INS Executive Associate Commissioner, from Stuart Anderson, INS Executive Associate Commissioner, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status,* at 1 (May 8, 2002) (hereinafter Williams Memorandum); USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J).

[204] Several commenters cited *Vartelas* v. *Holder,* 566 U.S. 257(2012) (noted in ruling against retroactive application of a law that court was ''[g]uided by the deeply rooted presumption against retroactive legislation''). *Cf. also, e.g., Bowen* v. *Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) (''a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms''). DHS takes note of commenters' stated retroactivity concerns, but declines to express a view at this time as to whether retroactive application of a policy change regarding DACA recipients and the accrual of unlawful presence for section 212(a)(9)(B) purposes would be impermissibly retroactive.

[205] 86 FR 53760–53762.

[206] Public Law 104–193, 110 Stat. 2105.

"lawfully present" for purposes of retirement and disability benefits under title II of the Social Security Act.[207] The Balanced Budget Act of 1997[208] amended PRWORA to add substantially identical exceptions for Medicare and railroad retirement and disability benefits.[209] States may also affirmatively enact legislation making noncitizens "who [are] not lawfully present in the United States" eligible for State and local benefits.[210] Federal law also limits the availability of residency-based State postsecondary education benefits for individuals who are "not lawfully present."[211] Thus, while there is no express definition of "lawfully present" or "unlawfully present" for all purposes, Congress clearly authorized the Secretary to determine who is "lawfully present" for certain purposes. DHS notes that in the intervening 26 years since the Attorney General determined by rule, 8 CFR 1.3(a)(4)(vi), that deferred action recipients are "lawfully present" for purposes of 8 U.S.C. 1611(b)(2), the provision has not been struck down by courts. Nor has Congress enacted any legislation contrary to the Secretary's determination to designate deferred action recipients as eligible for receiving Social Security benefits. To the contrary, Congress has enacted other similar provisions indicating that the Attorney General's determinations as to lawful presence for certain individuals make those individuals eligible for public benefits.[212] Noncitizens granted deferred action long have been considered "lawfully present" under 8 CFR 1.3(a)(4)(vi) for purposes of receiving title II Social Security benefits, and DHS sees no basis for distinguishing deferred action recipients under the DACA policy.

DHS also disagrees with the commenters who expressed opposition to the proposed codification of the decade-long DHS practice of including DACA recipients within the group of all other deferred action recipients who do not accrue "unlawful presence" for purposes of the inadmissibility grounds in INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). For purposes of those specific grounds, Congress stated "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General

[now Secretary] or is present in the United States without being admitted or paroled."[213] As DHS explained in the proposed rule, since 2002 the Government has interpreted this deeming provision enacted by Congress to mean that persons should not be deemed "unlawfully present" during "period(s) of stay authorized by the Attorney General," including a period of deferred action.[214] DHS also notes that the first clause of the statutory definition of "unlawfully present" addresses how an alien's presence should be "deemed" after expiration of a period of stay, not during such a period. DHS sensibly construes Section 1182(a)(9)(B) as a whole not to deem a noncitizen "unlawfully present" during an authorized stay, regardless of whether the person was previously "admitted or paroled." Otherwise, "unlawful presence" would accrue when a noncitizen's presence has been authorized by DHS. For example, asylum is a lawful status, but it does not constitute an "admission" (or parole).[215] Such an interpretation would mean noncitizens who entered without inspection and then received asylum would still accrue "unlawful presence"—notwithstanding that they are authorized to remain in the United States, and in fact have lawful status. That would make little sense.

DHS's interpretation does not mean that, in a broad sense, deferred action recipients, such as those with DACA, are lawfully in the United States for all purposes.[216] Instead, the concept of "lawful presence" is a term of art, and very different from "lawful status." It encompasses situations in which the executive branch tolerates an individual being present in the United States at a certain, limited time or for a particular, well-defined period. The term is reasonably understood to include

someone who is (under the law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors. For these reasons, DHS believes that it is within its authority, as provided by INA sec. 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii) to deem DACA recipients, like other deferred action recipients, to be within "a period of stay authorized by the [Secretary]" and, thus, not accruing unlawful presence for purposes of inadmissibility under INA sec. 212(a)(9)(B).

DHS has further considered the district and appellate court opinions concerning DHS's authority to deem DAPA or DACA recipients "lawfully present" for certain purposes, and respectfully disagrees with those decisions for the reasons explained in the proposed rule.[217]

Support for "Lawfully Present" and "Unlawful Presence" Provisions, but With Suggested Modifications

*Comment:* A commenter stated that granting "lawful presence" instead of "lawful status" (as was the case under "previous rulings," according to the commenter) would establish different rules and protections for DACA recipients.

A commenter who commended DHS for its proposal to continue treating DACA recipients as "lawfully present," and for clarifying the distinction from "lawful status," also requested that DHS include details in the final rule explaining that DACA recipients would be eligible for any other forms of Federal benefits for lawfully present noncitizens associated with future laws or prospective legislative immigration reform (*e.g.*, any such benefits contained in the proposed Build Back Better legislation if it is enacted). Multiple other commenters similarly requested that the final rule explicitly establish that DACA recipients, considered lawfully present and eligible to receive certain Social Security benefits, would be eligible for title IV Federal student aid programs like Pell grants, work study, and direct loans under proposed legislation's extension of eligibility for these programs to individuals with deferred action and TPS. The same commenters urged DHS to allow for flexibility for DACA recipient students to demonstrate title IV eligibility, if that

---

[207] *See* 8 U.S.C. 1611(b)(2).

[208] Public Law 105–33, 111 Stat. 251.

[209] 8 U.S.C. 1611(b)(3) and (4).

[210] 8 U.S.C. 1621(d).

[211] 8 U.S.C. 1623(a).

[212] 8 U.S.C. 1611(b)(3) and (4).

[213] 8 U.S.C. 1182(a)(9)(B)(ii).

[214] *See* 86 FR 53761 (citing Neufeld Memorandum; Williams Memorandum; USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J)).

[215] *In re V– X–,* 26 I&N Dec. 147, 150–52 (BIA 2013).

[216] Nor does DHS's interpretation address similar terms. For example, it is unlawful for an "alien [who] is illegally or unlawfully in the United States" to possess a firearm or ammunition. *See* 18 U.S.C. 922(g)(5)(A). Multiple courts have concluded that this criminal bar encompasses DACA recipients. *See, e.g., United States* v. *Lopez,* 929 F.3d 783, 786–87 (6th Cir. 2019) (in noting that DACA recipient was an "alien illegally or unlawfully in the United States for purposes of section 922(g)(5)(A)," court distinguished 8 U.S.C. 1611(b)(2–4), concerning specific public benefits for individuals who are "lawfully present," and 8 U.S.C. 1182(a)(9)(B)(ii), concerning "unlawful presence" for inadmissibility purposes); *United States* v. *Arrieta,* 862 F.3d 512, 515–16 (5th Cir. 2017) (holding that DACA did not confer a legal status for purposes of section 922(g)(5)).

[217] 86 FR 53761–53762.

000626

eligibility is extended to DACA recipients and those who qualify.

Several commenters expressed support for granting lawful presence to DACA recipients to confirm Social Security eligibility, with one commenter citing research [218] demonstrating that DACA recipients make significant contributions to Social Security and Medicare and that ending DACA could result in a $39.3 billion loss of Social Security and Medicare contributions over a 10-year period. The commenter further remarked that many States require lawful presence for public benefit eligibility. Citing research, a commenter similarly stated that the Social Security and Medicare trust funds would be significantly diminished if DACA recipients are not contributing to the program. The commenter also said that, because Social Security requires workers to reach retirement age with at least 10 years of covered work experience, some DACA recipients may pay Federal Insurance Contributions Act and Medicare taxes without ever receiving benefits. One commenter stated that the designation of lawful presence was important for DACA recipients to qualify for certain State benefits, referencing New York State regulations affording professional licensing eligibility to those "not unlawfully present."

Several of the commenters noted above, as well as other commenters, suggested that additional clarity was needed to assist State and Federal agencies in making decisions about benefit eligibility, including confirmation from USCIS that: (1) DACA recipients are authorized to be present in the United States during the period of their grant; (2) DACA recipients' grant of relief is identical to relief associated with any other person granted deferred action; and (3) individuals granted deferred action are permitted to establish domicile in the United States. Commenters also requested that the rule include language stating that individuals granted deferred action are not precluded by Federal law from establishing domicile in the United States, as this would assist the recipients in seeking certain State benefits. One such commenter also requested that DHS clarify that individuals with lawful presence are not prohibited from establishing domicile in the United States, stating that DACA recipients should be treated the same as other individuals with deferred action and suggesting that DHS take additional steps to communicate this clarification

to other Federal and State agencies. The commenter said that confusion over whether DACA recipients can establish domicile in the United States would result in DACA recipients' exclusion from certain benefits and programs that are available to other individuals with deferred action (citing eligibility for residential property tax relief in South Carolina as an example of such exclusion).

Commenters noted that USCIS' posted Frequently Asked Questions (FAQs) on DACA [219] include the following helpful clarifications that have assisted State and Federal agencies in making decisions about eligibility for services and public benefits that they control:

• While distinguishing lawful presence from lawful status, USCIS clarifies that "[a]n individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered to be lawfully present during the period deferred action is in effect." (A. 1) [of the DACA FAQs]

• USCIS explains that "[t]he relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion." (A. 3) [of the DACA FAQs]

• USCIS confirms that "[i]ndividuals granted deferred action are not precluded by federal law from establishing domicile in the U.S." (A.5) [of the DACA FAQs]

By contrast, one such commenter said that some language in the proposed rule's preamble could contribute to confusion, such as the notation that the term lawful presence does not confer authorization or authority to remain in the United States, and gave examples at 86 FR 53740 and 53773. The commenter stated it assumed that the agency meant "beyond the period of the grant" or that "individuals granted DACA do not have an absolute right to remain, and . . . may nevertheless be removed under certain conditions." The commenter recommended that DHS clarify that its interpretation of lawful presence is at least as broad as under previous DACA guidance. This commenter, as well as others, requested that DHS and USCIS confirm that individuals granted DACA are federally authorized to be present in the United States, and are considered to be lawfully present during the period of their grant; relief that DACA recipients receive is identical for immigration purposes to the relief obtained by any other person granted deferred action; and individuals granted deferred action are not precluded by Federal law from

establishing domicile in the United States.

Commenters expressed support for the proposal's confirmation that DACA recipients would be considered lawfully present and its statement that DHS has treated persons who receive a period of deferred action under DACA like other deferred action recipients for purposes of establishing lawful presence. The commenters stated that this would ensure DACA recipients are eligible for Social Security and do not accrue unlawful presence toward the 3- and 10-year bars. The commenters further suggested that additional clarification was needed to ensure other Federal and State agencies understand the implications of a DACA grant, its relation to deferred action for other individuals, and any related interpretations of immigration law, citing DACA recipients' exclusion from certain healthcare benefits under the ACA as one example of the need for additional clarity.

One commenter recommended that DHS work with the HHS to extend health insurance coverage under the ACA to DACA recipients, stating that a lack of eligibility for ACA marketplace coverage contributes to higher uninsured rates among DACA recipients. Another commenter expressed support for providing access to affordable healthcare for all individuals, including DACA recipients, and urged DHS to ensure that DACA recipients are not excluded from purchasing subsidized health coverage through the ACA marketplace. Additional commenters agreed and recommended that DHS align the definition of "lawfully present" with eligibility requirements for certain health coverage programs to allow DACA recipients to access such programs and avoid disparate treatment. The commenters expressed concern about HHS' exclusion of DACA recipients from participation in Medicaid, the Children's Health Insurance Program (CHIP), and the ACA health insurance marketplace and said that other individuals with deferred action are eligible for such programs. The commenters questioned why DACA recipients are excluded from these important health programs and, citing research, said that participation in Medicaid is associated with higher educational attainment and greater financial stability. The commenters recommended that DHS clarify the definition of "lawfully present" to ensure DACA recipients are not excluded from Medicaid, CHIP, and subsidized health insurance through the ACA marketplace.

Citing research demonstrating the importance of access to healthcare for vulnerable immigrant populations, including immigrant women, a commenter also urged DHS to ensure that DACA recipients are eligible for all public benefits available to similarly situated immigrants, including Medicaid, CHIP, and subsidized health coverage through the ACA marketplace. The commenter said that access to healthcare is a critical equity consideration that the agency must consider in complying with Executive Order (E.O.) 13563 and its focus on promoting equity and fairness, and it urged DHS to ensure that DACA recipients are entitled to the same benefits as all other individuals considered "lawfully present."

A commenter recommended that DHS grant deferred action retroactively to erase periods of unlawful presence accrued prior to confirmation of deferred action, particularly noting that such retroactivity should cover any period since June 15, 2007, because DACA requestors must establish that they have resided in the United States since that date. The commenter further noted that USCIS has the authority for such retroactive application of deferred action and gave as an example current practice that permits USCIS to grant "nunc pro tunc" reinstatement of status to individuals who have filed untimely Extension or Change of Status applications, meaning that unlawful presence is erased because the applicant is considered to have been in status the whole time.

*Response:* DHS acknowledges and appreciates the many supportive comments on the proposed rule's two provisions regarding lawful presence, as well as the recommendations and suggestions for modifications. With respect to the comment that the rule only provides lawful presence to DACA recipients instead of the previous rulings' grant of lawful status, which the commenter indicated would institute different rules and protections for DACA recipients, DHS notes that DACA has never conferred lawful immigration status on recipients as the commenter mistakenly asserts, nor has any other grant of deferred action. DHS does not have the legal authority to deem deferred action recipients to be in a lawful immigration status by virtue of such deferred action. As discussed elsewhere in this rule and in the preamble to the proposed rule at Section IV.B, deferred action is not a lawful immigration status but rather is only an exercise of prosecutorial discretion not to remove a noncitizen from the United States for a designated period of time.

Thus, DHS declines to modify the rule to provide protections to DACA recipients akin to those with lawful status.

DHS also declines to adopt the suggestion of the commenter who urged that the rule allow for the retroactive elimination of any unlawful presence time between June 15, 2007, and an individual's approval for DACA because the individual had to demonstrate continuous residence in the United States since that date to obtain deferred action under the DACA policy. The commenter likened this suggestion to a noncitizen who is in a lawful nonimmigrant status but who files late to extend or change that status to another nonimmigrant category and who, if approved, is allowed "nunc pro tunc" reinstatement of nonimmigrant status for the period between the initial status and the changed or extended status. Unlike the person who files late to change or extend a lawful nonimmigrant status and is approved, a DACA recipient is not in a lawful immigration status that is amenable to reinstatement "nunc pro tunc," but rather enjoys a temporary period in which DHS has chosen not to remove them from the United States for a period of time in the future as an act of prosecutorial discretion. Thus, deferred action is a forward-facing step; forbearance not to remove a noncitizen for a period that already has passed would be meaningless and incompatible with DHS's general deferred action practices. For these reasons, DHS does not believe it may properly erase a person's pre-DACA unlawful presence by beginning deferred action from a date in the past.

Similarly, DHS is unable to adopt the suggestions of commenters to specify that DACA recipients will be considered "lawfully present" for purposes of current or future proposed legislation regarding noncitizens' eligibility for public benefits before such legislation is enacted. Until legislation is enacted that authorizes DHS to define who has lawful presence for particular purposes—as has occurred for the purpose of receiving certain Social Security benefits,[220] railroad retirement benefits,[221] and Medicare[222]—it is premature for DHS to attempt to predict the final terms of such legislation and the extent to which Congress may or may not authorize DHS to describe the categories of noncitizens who may be eligible to apply for particular public benefits. Other agencies whose statutes

independently link eligibility for benefits to lawful presence may have the authority to construe such language for purposes of those statutory provisions.

In response to commenters who recommended that DHS make clear that DACA recipients are affirmatively authorized to be in the United States during the period of their deferred action, DHS has plainly stated in 8 CFR 236.21(c) that the Department intends to forbear from removing DACA recipients from the United States. This is consistent with the fact that the DACA policy is an exercise of prosecutorial discretion and does not confer lawful immigration status, affirmative authorization to remain in the United States, or a defense to removal. In that sense, DACA differs from a grant of lawful immigration status such as permanent resident status, asylum, or TPS. At the same time and as noted previously, DHS also views an individual's time as a DACA recipient as "a period of stay authorized by the [Secretary]" under section 212(a)(9)(B)(ii); therefore, while the individual has DACA, there is no accrual of "unlawful presence" for inadmissibility purposes. DHS believes that the rule is more precise and sufficiently clear on this point as well. In response to the request that DHS clarify that its interpretation of "lawful presence" in the rule is at least as broad as its interpretation under prior DACA guidance, DHS confirms that the rule reflects the same longstanding treatment of DACA recipients as "lawfully present" for purposes described in 8 CFR 1.3(a)(4)(vi), and with regard to their nonaccrual of "unlawful presence" for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) while they have deferred action under DACA, as existed under DHS's DACA policy prior to implementation of this rule.

In terms of whether DACA is "identical relief" to other forms of deferred action, DHS agrees that forbearance from removal for a designated period applicable to the individual is true for DACA recipients as it is for all other deferred action recipients and that EADs for all deferred action recipients, including DACA recipients, are available based on a determination of economic need. However, DHS declines to adopt the suggestion made by some commenters to label DACA as "identical relief" to that provided to all other recipients of deferred action because DHS believes that using such a label could create confusion with respect to the bases for obtaining deferred action and the conditions that may apply to an

---

[220] 8 U.S.C. 1611(b)(2).
[221] 8 U.S.C. 1611(b)(4).
[222] 8 U.S.C. 1611(b)(3).

individual's deferred action. For example, guidelines differ depending on the category under which deferred action is provided, as well as with respect to individual requests that are granted outside of special policies.[223] Different periods of deferred action also may be provided, and conditions placed on the individual's deferred action may vary. For these reasons, DHS declines to adopt the suggestions to modify the rule to state that DACA is an "authorization" to remain in the United States or that it is "identical" to all other forms of deferred action.

The Department understands the concerns expressed by some commenters regarding DACA recipients' ability to obtain State and local public benefits that require applicants to demonstrate "domicile" in a particular locality. Some commenters requested that the rule state that Federal law does not prohibit DACA recipients from establishing domicile while others urged an affirmative statement that DACA recipients may establish domicile in the United States. Although the Department knows of no Federal law that prohibits DACA recipients from establishing domicile within the United States, the Department declines to amend the text of the rule to address "domicile" explicitly because doing so would be outside the scope of the rule, and Congress has not directed the Department to provide guidance on or a definition of "domicile" for any Federal, State, or local public benefit purposes.

The Department also understands and respects the concerns expressed by several commenters who requested that the rule clarify for Federal, State, and local governments that DACA recipients are considered "lawfully present" for purposes of all public benefits that require such presence for eligibility. However, absent a specific authorizing law, the Department does not have the authority to mandate that other Federal, State, and local departments and agencies provide benefits that they administer to DACA recipients, even when DHS categorizes them as "lawfully present" for certain discrete, limited purposes. Subject to enacted laws, DHS may only determine the categories of immigration status or other authorization (or lack of either) that apply to noncitizens. Through programs such as Systematic Alien Verification for Entitlements, DHS thus informs participating benefit-administering agencies of the immigration category that may apply to a particular person. DHS does not, however, establish the eligibility rules or administer Federal, State, or local public benefits such as those that provide for health, housing, food, education, and general welfare. Other departments and agencies, such as HHS, the Social Security Administration, and the U.S. Department of Agriculture, have those responsibilities.

With limited exceptions, noncitizens who are not "qualified aliens" as defined in 8 U.S.C. 1641 are not eligible for Federal public benefits.[224] Deferred action recipients are not encompassed within the definition of "qualified alien." As such, they are generally excluded from receipt of Federal public benefits.[225] Congress, however, did expressly except certain Federal benefits from the restrictions in 8 U.S.C. 1611(a). With respect to certain title II Social Security benefits, railroad retirement benefits, railroad unemployment insurance, and Medicare, Congress provided that the restrictions shall not apply to noncitizens who are "lawfully present" as determined by the Attorney General (now the Secretary).[226] Other agencies whose statutes independently link eligibility for benefits to lawful presence may have the authority to construe such language for purposes of those statutory provisions. For instance, any future revision of this determination for Medicaid, CHIP, or with respect to the ACA Exchange and private market programs would need to be made by HHS. DHS has determined that addressing the eligibility of DACA recipients for additional benefits is beyond its legal authority and the scope of this rule.

Commenters also recommended that DHS work with other Federal agencies, such as HHS, to amend their guidance and regulations to clarify that DACA recipients are eligible for benefits under the ACA. DHS acknowledges the suggestion, but these topics are also beyond the scope of this rulemaking.

## 4. Discretionary Determination (§ 236.22)

### a. General Comments on Discretionary Determination

**Case-by-Case Determination and Discretion**

*Comment:* A commenter said that DACA recipients should be vetted on a case-by-case basis. Another commenter stated that requestors should be considered for forbearance only when considered on a true case-by-case basis, which the commenter said would ease pressure on USCIS and provide a more consistent application of law. Similarly, a commenter said that DACA has a very low denial rate and that officers rarely ask for additional evidence to demonstrate that requestors have good moral character. The commenter added that the broad criteria for DACA "leave almost no room for officers to exercise discretion." Another commenter said that the proposed rule deprives ICE and CBP officers of discretion. The commenter stated that the proposed rule suggests that officers may be able to make a determination without necessitating further investigation, but it is unclear how an officer could have used their discretion without a full picture of the individual's immigration and criminal history.

*Response:* DHS acknowledges commenters' concerns but disagrees with the suggestion that DACA requests will not be assessed on a case-by-case basis as a result of this rule or that the threshold criteria are so broad that officers are limited in their ability to exercise discretion. On the contrary, the rule explicitly requires case-by-case assessments. At new 8 CFR 236.22, DHS lays out several threshold discretionary criteria that USCIS will assess on a case-by-case basis as a review of the totality of the circumstances. DHS proposed in the NPRM that, even when a request meets all threshold criteria, USCIS would examine the totality of the circumstances in the individual case to determine whether there are negative factors that make the grant of deferred action inappropriate or outweigh the positive factors presented by the threshold criteria or by any other evidence.[227] DHS is retaining this same approach to the individualized case-by-case assessment in this final rule and is now codifying it at new 8 CFR 236.22(b) and (c).

Regarding one commenter's concern that the NPRM deprives ICE and CBP officers of discretion by suggesting that an officer may be able to make a determination without necessitating

---

[223] *See, e.g.,* Military Deferred Action (available to certain relatives of certain active and former members of the military), *https://www.uscis.gov/military/discretionary-options-for-military-members-enlistees-and-their-families;* Special Immigrant Juveniles—Consideration of Deferred Action, 6 USCIS PM J.4 [G.1], *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf;* VAWA—Deferred Action, 3 USCIS PM D.5 [C.2], *https://www.uscis.gov/policy-manual/volume-3-part-d-chapter-5.*

[224] *See* 8 U.S.C. 1611(a).

[225] There are exceptions for certain emergency, in-kind, and other benefits, as well as other limited exceptions to PRWORA's restrictions. *See* 8 U.S.C. 1611(b)(1).

[226] *See* 8 U.S.C. 1611(b)(2), (3), and (4).

[227] 86 FR 53765.

further investigation, there appears to be some confusion as to DHS's intended meaning. The language referenced pertains to how the regulatory provisions would ''fortify DHS's prioritized approach to immigration and border enforcement'' by streamlining the review required when DHS officers encounter a DACA recipient.[228] As USCIS already will have reviewed the individual's immigration and criminal history and made the individualized determination to defer enforcement action against that individual according to the DACA policy, it may be duplicative for an officer to conduct a full review again in circumstances such as the primary inspection booth at a checkpoint. As the NPRM further notes, and as discussed in Section II.A.8, while officers must exercise their judgment based on the facts of each individual case, the prior vetting of DACA recipients provides a baseline that can streamline an enforcement officer's review of whether a DACA recipient is otherwise an enforcement priority.[229] However, where warranted by the evidence, ICE and CBP may find that certain DACA recipients no longer merit a favorable exercise of enforcement discretion. DHS therefore declines to make any changes in response to these comments.

*Comment:* A commenter expressed due process and notice concerns related to the discretionary case-by-case assessment as part of a totality of circumstances review. The commenter wrote that USCIS would be wise to attach an automatic right of judicial review to their DACA determinations. Given that Section IV.C of the proposed rule clearly lays out the factors the agency is to consider when making its decision, the commenter said that a reviewing court should have no problem assuring the agency action is not arbitrary or capricious.

*Response:* Because deferred action is by its nature an exercise of prosecutorial discretion and not a benefit, USCIS will not provide for the right to file an administrative appeal or allow for the filing of a motion to reopen or motion to reconsider.[230] Furthermore, an act of prosecutorial discretion is generally not reviewable by the courts. As discussed in the NPRM, USCIS may, however, reopen or reconsider either an approval or a denial of such a request on its own initiative.[231] In addition, a denied requestor would be allowed to submit another DACA request on the required

form and with the requisite fees or apply for any applicable form of relief or protection under the immigration laws.[232] DHS therefore declines to make any changes in response to this comment.

USCIS Discretion To Deny if Criteria Are Met

*Comment:* Several commenters discussed the proposed rule's indication that, under the totality of circumstances review, even if all the threshold criteria are found to have been met, the adjudicator has discretion to deny deferred action if, in the adjudicator's judgment, the case presents negative factors that make the grant of deferred action inappropriate or that outweigh the positive factors. One commenter objected to using a totality of the circumstances test in lieu of granting those requests that meet threshold criteria and enumerated guidelines, even if this changes existing processes. The commenter stated that there would be too much room for adjudicator discretionary bias in the proposed process, particularly since there is no guidance or definition provided in the NPRM for determining the totality of the circumstances. Another commenter expressed concern about the proposed rule's layering of discretion and said the two-step process would be vulnerable to future abuses of discretion to deny requests. The commenter said that discretion is already exercised in devising eligibility requirements and the protocols for assessing them, thus there is no need for a final denial override that would discourage requestors out of concern that, even if fully eligible, they could be denied. Another commenter stated that, per the proposed rule, a requestor who has filed the proper documents, paid the required fees, and has a college degree may be denied DACA if USCIS, within its discretion, decides that the requestor's totality of positive contributions do not outweigh, for example, a one-time instance of driving under the influence.

Another commenter stated that they supported instituting the DACA policy via regulation but opposed empowering officers to deny, in an exercise of discretion, DACA requests that otherwise meet threshold criteria for a grant of deferred action. This commenter stated that the language of proposed 8 CFR 236.22(c) does not provide clarity to requestors or to USCIS adjudicators as to what circumstances would be considered nor what would make deferred action inappropriate, and the proposed rule preamble provides

little additional clarity. The commenter said that the proposed rule states only that: (1) USCIS would review the totality of the circumstances to see if there are any negative factors that would make the grant of deferred action inappropriate or that outweigh the positive factors; and (2) foreign convictions, minor traffic offenses, and other criminal activity outside of what is described by proposed 8 CFR 236.22(b)(6) would be considered in the totality of the circumstances. However, the commenter said, there is no further guidance in the proposed rule as to what, if any, additional factors should be considered nor how to analyze any of these factors in making a determination to grant deferred action. Contrary to DHS's explanation that the threshold discretionary requirements in combination with the exercise of discretion is meant to promote consistency and avoid arbitrariness in grants of deferred action, the commenter wrote, applying discretion to these adjudications would have the opposite effect.

The commenter also said that the absence of clarity in the proposed rule combined with USCIS' policy guidance for applying discretion in adjudications would result in inconsistent and arbitrary grants of deferred action for those individuals who otherwise meet the threshold requirements for DACA. The commenter discussed the USCIS Policy Manual guidance on discretion, stating that it would be the primary tool used by adjudicators in making a discretionary analysis. The commenter said that: (1) the methodology for discretionary analysis set out in the USCIS Policy Manual would result in arbitrary and capricious decisions that are inconsistent and reliant on biased assumptions; (2) the Policy Manual does not provide clear guidelines for adjudication; (3) the Policy Manual's guidance regarding the weighing of discretionary factors is confusing and contradictory; and (4) amendments to the Policy Manual were based on a discriminatory and illegal animus toward immigrants and were intended to further undermine the function of the lawful immigration system.

*Response:* DHS maintains the position expressed in the proposed rule and codified at new 8 CFR 236.22(c) that it is appropriate for adjudicators to have discretion to deny a deferred action request, even if they have found that the requestor meets all of the threshold criteria, if in their judgement the case presents negative factors that make the grant of deferred action inappropriate or

---

[228] 86 FR 53752.

[229] *Id.*

[230] *See* new 8 CFR 236.21(b) and 236.23(c)(3).

[231] 86 FR 53769.

[232] *See* new 8 CFR 236.22(d) and 236.23(c).

that outweigh the positive factors.[233] As discussed in the NPRM, case-by-case assessment is a longstanding feature of deferred action determinations, inherent in the exercise of discretion, that can provide important benefits in cases where the balance of the circumstances and relevant equities suggests a result that could not have been codified in prior policy guidance.[234] While DHS recognizes that there may be costs associated with maintaining adjudicator discretion to deny a request even where the requestor meets the threshold eligibility guidelines at new 8 CFR 236.22, DHS has concluded that this approach maintains an appropriate balance of guidelines and discretion, which serves to promote consistency and avoid arbitrariness in these determinations.

DHS appreciates the commenter's feedback on the USCIS Policy Manual but declines to address it further as the Policy Manual is outside of the scope of this rulemaking. DHS is therefore not making any changes in response to these comments.

### b. Threshold Criteria

Evidentiary Requirements for Threshold Criteria

*Comment:* A commenter recommended that DHS drastically reduce the evidentiary burden on DACA requestors. The commenter stated that currently, DHS requires initial requestors to produce decades' worth of evidence that is particularly difficult to gather given the age of many individuals when they entered the United States. The average age of a DACA recipient at the time they entered the country is only 7 years old, and given the length of time since then, the commenter said, primary evidence documenting physical presence may be impossible to obtain. Additionally, the commenter wrote that DHS has not publicly expressed any fraud-related concerns with affidavits. The commenter stated that with wildly varying Federal enforcement regimes in place, and many States creating hostile environments for noncitizen residents, immigrant families often go to great lengths to prevent their children from interacting with these systems, denying them the very proof that DHS currently requires to demonstrate DACA eligibility. In addition, the commenter said, whatever proof may have existed is rarely maintained long enough to be accessible, as many institutions maintain records for only 5 years or less before destroying them, and records are

rarely digitally stored. The commenter concluded that establishing a standard of review that recognizes this reality and ensures that the broadest possible eligible population is able to request and receive DACA is in the interests of DHS, potential requestors, their communities, and the advocates who are devoting significant resources to helping them submit requests.

Referencing the proposed rule's discussion in the preamble of primary and secondary evidentiary requirements, a commenter stated that the provisions continue to reflect a first world understanding of documentation from countries of origin and the ability of a DACA requestor to find and obtain these records. The commenter said the provisions would benefit from greater clarification on further examples of circumstantial documentary evidence that DHS would accept as part of DACA requests from individuals who do not benefit from the powerful consular help that a country of origin like Mexico provides. Other commenters said that many farmworkers and their families may have difficulty accessing identification documents, such as birth certificates, as births may not be registered or may be registered incorrectly. Considering these concerns, the commenters encouraged DHS to maintain a flexible approach regarding documentation.

*Response:* DHS appreciates commenters' concerns and acknowledges that some DACA requestors may face substantial challenges in obtaining or providing primary or secondary evidence demonstrating they meet the threshold criteria. Recognizing these challenges and that the evidence available may vary from requestor to requestor, DHS is declining to specify in detail in this preamble and will not include in regulatory text the types of evidence that may or may not be sufficient to meet the threshold criteria for DACA, to avoid creating a list that may unintentionally be construed as exhaustive or limiting to adjudicators or requestors.

The DACA requestor has the burden to demonstrate that they meet the threshold criteria by a preponderance of the evidence.[235] Under the preponderance of the evidence standard, the sufficiency of each piece of evidence is examined for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is

probably true.[236] DHS believes this standard provides an appropriate balance between ensuring that deferred action under the DACA policy is extended to the intended population and retaining a threshold that the evidence show that the facts are more likely than not to be so. This also has been the standard of proof for DACA requests since the initiation of the DACA policy, and it is the standard of proof applicable to immigration benefit adjudications as well, unless otherwise specified. DHS is therefore retaining the preponderance of the evidence standard at new 8 CFR 236.22(a)(3).

Consistent with longstanding practice and as proposed in the preamble of the NPRM, DHS will accept either primary or secondary evidence to determine whether the DACA requestor meets the threshold criteria. As used in this final rule, primary evidence means documentation, such as a birth certificate, that, on its face, proves a fact. Secondary evidence means other documentation that could lead the reviewer to conclude that it is more likely than not that the fact sought to be proven is true. In response to a commenter's request that DHS provide greater clarification of what may constitute qualifying secondary evidence, DHS is expanding here on the examples provided in the NPRM preamble, but cautions that these examples are not meant to be exhaustive. Such examples of secondary evidence may include baptismal records issued by a church or school records with a date of birth showing that the DACA requestor was born at a certain time, rental agreements in the name of the DACA requestor's parents, or the listing of the DACA requestor as a dependent on their parents' tax return to demonstrate periods of residence in the United States. Secondary evidence may, but does not necessarily, require corroboration with other evidence submitted by the requestor. DHS will evaluate the totality of all the evidence to determine if the threshold criteria have been met.

### Affidavits

*Comment:* A commenter urged DHS to reduce barriers preventing people from receiving relief and to ensure the policy is accessible by continuing to accept affidavits. Another commenter suggested that DHS should incorporate into the final rule expanded ways for requestors to prove that they meet the eligibility criteria, including giving more weight to sworn affidavits and

---

[233] *See* 86 FR 53765.
[234] *See id.*

[235] *See* 86 FR 53766; proposed 8 CFR 236.22(a)(3).

[236] *Matter of Chawathe,* 25 I&N Dec. 369, 376 (AAO 2010).

letters for periods of continuous residence and proof of entry.

Another commenter stated that, if DHS publishes the proposed rule as is, it should clarify that affidavits will be accepted as evidence for all the eligibility requirements, including physical presence, continuous residence, and lack of lawful status. The commenter said that this policy should be codified in regulation, such as through a separate evidentiary section in 8 CFR 236.22. The commenter wrote that this regulation could adopt the "any credible evidence" standard used in other areas of immigration law, with which immigration practitioners are familiar, thus creating much-needed flexibility.

A joint comment also stated that DHS should demonstrate increased flexibility in allowing requestors to meet documentation requirements, commenting that farmworkers and their family members face extreme difficulty meeting the documentation requirements of DACA. To help remedy this issue, the commenter urged DHS to provide that affidavits would be accepted as secondary evidence for all requestors at all stages of their request and to not require supplemental documents beyond affidavits, as that undermines requestors who do not have other forms of documentation. Another commenter said that DHS could improve access to DACA by including references to sworn affidavits as acceptable evidence, accepting affidavits as proof of satisfying that the requestor came to the United States before reaching their 16th birthday, and accepting affidavits from the requestors themselves.

*Response:* DHS acknowledges commenters' concerns regarding the challenges some DACA requestors face in obtaining primary and secondary evidence to demonstrate eligibility under the threshold criteria. However, as discussed in the response above, DHS is declining to specify in detail in this rule the types of evidence that may or may not suffice to meet the threshold criteria for DACA, to avoid creating a list that may be unintentionally viewed as exhaustive or limiting to adjudicators or requestors. DHS therefore declines the commenter's suggestion to create a separate evidentiary section within new 8 CFR 236.22.

As stated in the NPRM and consistent with longstanding practice, while there are certain circumstances in which affidavits may be submitted in lieu of primary or secondary evidence, affidavits are generally not sufficient on their own to demonstrate that a requestor meets the DACA threshold criteria. This is reflective of DHS's desire to balance that under the preponderance of the evidence standard, the evidence must show that the facts asserted are more likely than not to be so, while also allowing for some flexibility to account for circumstances in which DACA requestors may not have access to primary or secondary evidence for reasons beyond their control.

One circumstance in which affidavits may be used in lieu of primary and secondary evidence is in support of a requestor meeting the continuous residence requirement. Another circumstance is where there may be a shortcoming in documentation with respect to brief, casual, and innocent departures during the continuous residence period before August 15, 2012. DHS will consider affidavits in these contexts in recognition of the challenges DACA requestors may face in obtaining primary or secondary evidence in these contexts, particularly for those who may have been very young during the periods for which documentation is needed.

Finally, as discussed in further detail below, in recognition of the challenges faced in obtaining primary and secondary evidence for the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States, DHS will consider affidavits in this context when assessing whether the new initial requestor has submitted sufficient evidence to demonstrate their residence in the United States at the beginning of the continuous residence period.

(1) Arrival in United States Under the Age of 16

Support for the "Arrival in United States Under the Age of 16" Criterion

*Comment:* A few commenters generally supported maintaining the criterion of arrival in the United States before age of 16. One of these commenters said that this criterion would preserve the character of DACA as a program for individuals brought to the United States as children.

*Response:* DHS acknowledges commenters' support for maintaining the threshold requirement of arrival in the United States prior to age 16. DHS is retaining this threshold requirement in the final rule at new 8 CFR 236.22(b)(1), reflecting the Department's desire, as described in the NPRM, to limit DACA to those who came to the United States as children, and who therefore present special considerations that may merit assigning lower priority for removal action due to humanitarian and other reasons.

USCIS Should Revise the "Arrival in United States Under the Age of 16" Criterion

*Comment:* Many commenters suggested changing the criterion regarding age at the time of entry to expand eligibility for DACA to those who entered at or after the age of 16. A few commenters stated that the threshold criterion of arrival before the age of 16 has left otherwise eligible immigrant youth and students out of DACA and the critical protection it offers. Another commenter said that these potential requestors who would be left out either arrived after their 16th birthday but before becoming an adult at age 18, or they had no proof that they entered the United States before the age of 16 (*e.g.,* their birthday is in the summer, and they turned 16 before enrolling in school). The commenter said that changing this criterion would ensure that more immigrant youth are covered and would improve their ability to cite more reliable evidence, such as school records, to prove their entry.

While some of these commenters did not suggest a specific age for modifying this threshold requirement, others urged DHS to change the age of entry to be consistent with other laws that define childhood and the age of majority. Many commenters suggested that DHS revise the arrival age to 18, with some saying that a minor is legally defined as someone under age 18. Some commenters stated that some of the proposed legislation for Dreamers requires a requestor to have entered the United States before the age of 18, including the DREAM Act, the Health, Opportunity, and Personal Empowerment Act, and the American Dream and Promise Act. A few commenters noted that the definition of an unaccompanied child under Federal law references children without a parent or legal guardian and without lawful immigration status who have not yet reached the age of 18 (6 U.S.C. 279(g)(2)). A joint comment submission also said that the cutoff age of 16 is contrary to other U.S. societal norms regarding who is considered a child, such as individuals under 18 not being allowed to vote, join the military, or work in most hazardous occupations.

Some commenters urged DHS to expand the age of entry to 21, as INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) defines a child as "an unmarried person under twenty-one years of age." A couple of commenters remarked that this definition governs other types of immigration benefits (*e.g.,* family-based

visa petitions and derivative status on a parent's application). One commenter wrote that expanding the age to 21 would be consistent with other humanitarian immigration classifications such as Special Immigrant Juvenile (SIJ) classification. This commenter also cited the United Nations (UN) definition of a child as under the age of 18, under the UN Convention of the Rights of a Child, and definition of a youth as between the ages of 15 and 24 years. A couple of commenters said that DACA should be available to individuals who entered the United States prior to 21 years of age, or at most 18 years of age, to ensure that immigrant youth would be covered, as is the intended rationale for DACA.

One commenter stated the rule perpetuates the inconsistency and unfairness of an age-16 cap, and said that whether looking at ages of majority, high-school enrollment ages, humanitarian definitions of unaccompanied children, or the INA itself, defining children as under 18 or under 21 is more common and accurate. The commenter concluded that retaining this threshold requirement would echo anti-immigrant propaganda hostile to treating 16- and 17-year-old teenagers as children.

One commenter stated that the proposed rule must offer a justification and explanation for the age cutoff rather than reiterating the policy from the Napolitano Memorandum, as there is no way to determine that this decision of age 16 is not capricious. Another commenter stated that DHS should be concerned that the proposed rule would entirely exclude younger "Generation Z" undocumented students. The commenter remarked that this would amount to an unforced error and create bitterness and disillusionment among young people who have lived in the United States most of their lives and have witnessed the benefits of DACA.

*Response:* DHS acknowledges commenters' concerns about immigrant youth who may be similarly situated to those in the DACA population but who may not meet the criterion of having arrived in the United States prior to their 16th birthday. However, as discussed elsewhere in the NPRM and this rule, DHS has decided to focus this rulemaking on preserving and fortifying DACA, as directed by President Biden's memorandum. DHS has determined that the best approach to preserving and fortifying DACA for those recipients— and their families, employers, schools, and communities—who have significant reliance interests in DACA is to codify the threshold criteria as articulated in the Napolitano Memorandum.

DHS also recognizes that certain laws and intergovernmental bodies may define a child as a person up to the age of 18 or 21.[237] However, DHS notes that there is precedent in immigration law for limiting eligibility for a benefit to those under the age of 16, such as in the context of adoption-related immediate relative petitions, orphan cases, and Hague Convention adoptee cases— except in limited circumstances.[238] With this point in mind, and with an emphasis on protection of reliance interests for this particular rulemaking, DHS therefore disagrees that retaining the threshold requirement of arrival in the United States under 16 years of age is arbitrary or capricious and declines to make any changes in response to these comments.

(2) Continuous U.S. Residence From June 15, 2007

General Concerns With the "Continuous Residence" Date

*Comment:* Some commenters provided personal anecdotes about individuals not having access to DACA, and the opportunities that accompany it, due to the June 15, 2007, threshold date. A couple of commenters called the eligibility cutoff date arbitrary. Another commenter also described the requirement for continuous residence as arbitrary and wrote that the requirement would exclude many otherwise eligible applicants.

*Response:* DHS acknowledges that, as a result of the continuous residence date requirement, there are noncitizens who will not be eligible to request deferred action under the DACA policy. However, in the Department's effort to preserve and fortify DACA, it is maintaining this threshold criterion in line with longstanding policy and the Napolitano Memorandum.[239] As discussed elsewhere in this rule and the NPRM, this approach reflects the reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. As discussed above, DHS has determined the best way to preserve and fortify DACA as directed by President Biden's memorandum is to codify in regulation the longstanding criteria in the Napolitano Memorandum. It is also informed by DHS's assessment that this and other threshold criteria in the

Napolitano Memorandum advance DHS's important enforcement mission and reflects the practical realities of a defined class of undocumented noncitizens who, for strong policy reasons, are unlikely to be removed in the near future and who contribute meaningfully to their communities, as discussed elsewhere in this rule. Finally, as discussed in greater detail in Section II.A.7, DHS also is retaining this requirement in recognition of the Department's desire to avoid creating an incentive to migrate in order to attain eligibility for deferred action under DACA. DHS is therefore not making any changes in response to these comments.

USCIS Should Revise the "Continuous Residence" Date

*Comment:* Many commenters discussed the exclusionary effects of the continuous residence threshold and suggested that USCIS revise the 2007 date to a more recent date in order to include more individuals. One commenter cited sources indicating that of the more than 450,000 undocumented students in higher education nationwide, less than half are DACA-eligible. The commenter said that the DACA policy, without an update to the eligibility criteria, would continue to beget this counterintuitive outcome of leaving new generations of students without avenues to success. Echoing these concerns, multiple legal services providers offered examples of clients who would be negatively impacted by the requirement. Other commenters asked that DHS consider either removing the continuous presence requirement in the rule or adjusting the date to provide relief for individuals who arrived in the United States after 2007.

Other commenters stated that USCIS should preserve and fortify DACA without turning back the clock to 2012. The commenters said that DACA's original eligibility date was arbitrary, and USCIS could advance the date to expand the number of eligible individuals through rulemaking, thus strengthening the program's humanitarian impact while yielding greater economic and social benefits. A commenter similarly said that DACA's timeline still operates from the Napolitano Memorandum, which has remained untouched despite the lack of progress in getting any permanent legislative solutions passed through Congress. The commenter said it is time to strengthen, not weaken, the program and protect those who have grown up in the United States as the only home they have ever known.

---

[237] *See, e.g.,* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1); 6 U.S.C. 279(g)(2); UN Convention on the Status of the Child.

[238] *See* INA sec. 101(b)(1)(E), (F), and (G), 8 U.S.C. 1101(b)(1)(E), (F), and (G).

[239] *See* new 8 CFR 236.22(b)(2).

Many commenters said that USCIS should revise the "continuous residence" date or "continuous presence" date to 5 years before the publication or implementation of this final rule to expand eligibility for DACA to younger individuals. Some of these commenters stated that the 2007 continuous residence date was 5 years before President Obama created DACA, and another remarked that this would be consistent with other areas of immigration law, such as naturalization. Other commenters similarly wrote that the continuous residence requirement should be updated to be closer to the date of the final rule given that the 2007 date is based on the 2012 issuance of the initial DACA policy. Similarly, another commenter said that DHS should draw from the original intent of DACA in 2012, which required a minimum continuous presence of 5 years, not 14 or more, which is unduly burdensome. The commenter said that Dreamers who spend their entire lives in the United States would be left without any relief if DHS does not adjust the continuous presence requirements to reflect the original intent of President Obama's Executive order.

Commenters recommended a number of alternative continuous residence dates, including June 15, 2017, January 21, 2021, or five years prior to the publication of the final rule. Commenters stated that advancing the continuous residence date would provide more young people with the opportunity to succeed and contribute to society. One of these commenters noted that, because individuals must be age 15 or over to request DACA and have had continuous presence since June 15, 2007, by June 15, 2022, the number of Dreamers eligible to apply would be locked into place, not including those over the age of 15 who had not yet applied. The commenter said that this would mean that the past 14 years of Dreamers, many of whom would be entering high school in the coming year, would not be eligible and would have no career prospects, which the commenter said would go against the purpose of DACA.

A joint submission expressed support for a continuous presence date 5 years prior to publication of the final rule that would be updated annually. Another commenter suggested that the continuous presence date should be revised to 5 years prior to when a requestor is first eligible for DACA.

Another commenter reflected this view, also stating that the rule already provide that moving forward, the President should review this requirement every 2 years to determine

if it should be further extended. Another commenter wrote that DHS should require no more than 3 years of continuous residence for DACA requestors.

Multiple commenters said that DHS should establish a rolling continuing presence requirement. Some commenters said that there should be a rolling date instead of moving the June 15, 2007 date forward, specifically suggesting a 5-year continuous presence from the date of the filing of the request for DACA consideration, which the commenter said would allow DHS the ability to make case-by-case determinations about its enforcement priorities as it relates to this population well into the future. Commenters said that this would expand DACA to populations of noncitizens who, but for their date of entry, would meet the criteria for DACA, and one remarked that it would reduce the burden of gathering 14 years of evidence of continuous residence. Another wrote that this suggestion would focus eligibility on those with significant ties to the United States, would not require routine regulatory updates, and would preserve the disincentive to immigrate to attain DACA protections.

Some commenters wrote that DHS should remove the requirement for continuous presence prior to a certain date, and instead require continuous presence prior to a certain age, as this would expand protection to undocumented youth. Similarly, a commenter stated that USCIS should eliminate the date requirement for continuous residence, and instead require that a person has lived in the United States before turning 18. The commenter stated that this would allow those originally left out of the policy to request DACA, while easing the burden on requestors who lack 14 years of continuous residence documentation. Another commenter wrote that the continuous residence requirement should be removed from the rule as long as applicants meet age and uninterrupted residence requirements.

*Response:* While DHS appreciates the many suggestions of commenters to modify or remove the continuous residence requirement to expand the threshold criteria to include a broader population, as noted above, DHS is maintaining this threshold criterion in line with longstanding policy and the Napolitano Memorandum.[240] As discussed elsewhere in this rule and the NPRM, this approach reflects the reliance interests of those who already have received DACA and those similarly

situated who have not yet requested DACA, and their families, employers, schools, and communities. This approach is also consistent with DHS's longstanding message that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007.[241] While several commenters stated that advancing the date for the start of the continuous residence requirement would not create an incentive to migrate to attain deferred action under DACA, DHS believes that advancing the date or eliminating the requirement would potentially undermine the agency's enforcement messaging, but that by keeping the dates from the 2012 Napolitano Memo, DHS is clear that it is not incentivizing future migration flows. As discussed in the NPRM and in additional detail in Section II.A.7 of this preamble, border security is a high priority for the Department, and by codifying the longstanding DACA policy, including the original continuous residence date, DHS focuses this rulemaking on the problem identified in the proposed rule and avoids the possibility of creating any unintended incentive for migration.

*Comment:* A commenter wrote that DHS does not offer a rationale for codifying the 2007 continuous residence date outside of stating that it would not impact border security. The commenter stated that this appears to be a reference to a false argument that DACA encourages unauthorized border crossings. Another commenter also mentioned DHS's decision to link the rationale for the continuous residence requirement to border security concerns, writing that this justification is not related to the agency's goals with DACA. The commenter wrote that DACA was initially intended to recognize the positive economic and social impacts of granting deferred action to young people brought to the United States at least 5 years prior to the policy's creation. The commenter stated that DHS does not explain why it only has considered alternatives where that goal is frozen in the past, rather than using a date such as analogously utilizing the date from other border policy, November 1, 2020 (which has been included in recent enforcement priorities memoranda), or implementing a 5-year cushion from the present. The commenter said that merely invoking border security is an insufficient justification, reasoning that moving the relevant dates forward would increase the positive effects that DACA already

---

[240] *See* new 8 CFR 236.22(b)(2).

[241] *See* new 8 CFR 236.22(b)(2).

**53218** **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

has had on communities and on the national economy.

*Response:* DHS disagrees with commenters that the Department's strong interest in border security is an insufficient justification for maintaining the continuous residence requirement as proposed in the NPRM. It is also not DHS's only justification for codifying this threshold criterion. As discussed above, DHS's desire not to undermine its enforcement messaging, together with its adherence to the President's directive to preserve and fortify the DACA policy; its desire to protect the reliance interests of DACA recipients and those similarly situated and their families, employers, schools, and communities; and the Department's need to preserve finite resources, all serve as the underlying bases for DHS's determination to maintain this longstanding threshold requirement from the Napolitano Memorandum.

DHS also disagrees that retaining the continuous presence requirement for DACA conflicts with recent enforcement policy, including the September 30, 2021, DHS Guidelines for the Enforcement of Civil Immigration Law ("Enforcement Guidelines"), which are currently not in effect.[242] While the Enforcement Guidelines highlight that noncitizens who are "apprehended in the United States after unlawfully entering after November 1, 2020," will be considered a threat to border security and are therefore a priority for apprehension and removal, it also clarifies that any noncitizen "apprehended at the border or a port of entry while attempting to unlawfully enter" as of the effective date of the memorandum is also a priority for apprehension and removal.[243] This

serves to reinforce the Department's enforcement messaging while continuing to recognize that it must prioritize its use of limited resources.

*Comment:* A commenter said that continuous residence should incorporate a universal exception for brief, casual, and innocent departures, not the unsupportable distinction between departures before and after August 15, 2012. The commenter went on to state that such a bright-line rule is severe and unfair as there are many reasons why an individual may need to travel abroad and therefore interrupt their continuous residence. Another commenter recommended that DHS consider extraordinary circumstances when determining whether travel outside of the United States disrupts continuous residence, reasoning that it is unfair to deny DACA to an individual who would otherwise qualify, but for a brief, casual, or innocent departure after August 15, 2012, that resulted from an emergency or other exigent circumstance.

*Response:* DHS acknowledges that there may be reasons why a DACA requestor would need to travel abroad during the continuous residence period following August 15, 2012. However, it has been DHS's longstanding policy to allow for exceptions to the continuous residence period only for any brief, casual, and innocent travel *prior* to August 15, 2012, as this is the date of implementation of the DACA policy. After this date, noncitizens who met the DACA criteria could plan accordingly. Furthermore, those granted DACA after that date had the ability to request advance parole for certain kinds of travel. Prior to that date, in contrast, the DACA population may not have been eligible for advance parole. DHS therefore declines to make the commenters' suggested changes to the brief, casual, and innocent exception to the continuous residence requirement.

Documentation Standards for the "Continuous Residence" Date

*Comment:* Multiple commenters suggested that USCIS reduce the evidentiary burden and amount of documentation required to prove continuous residence. One commenter suggested that the evidentiary requirements in the proposed rule preamble could deter qualified requestors from making requests under the policy and require significant attorney and paralegal effort for nonprofits to prepare successful requests. Another commenter said that noncitizen requestors may fear interacting with systems that could provide the necessary documentation

and, as a result, would not have the appropriate evidence of continuous residence. One commenter similarly wrote that some States create hostile environments for noncitizen residents, resulting in noncitizen families avoiding institutions that could provide acceptable proof of physical presence in the country.

Other commenters stated that the continuous residence requirement should be satisfied for the relevant year if a requestor submits one document demonstrating residency during that particular year; or for multiple years if a requestor submits one document covering multiple years in the continuous residency period. Similarly, other commenters said that DHS should clarify that: (1) there is no minimum number of documents that a DACA requestor must provide per year to demonstrate continuous residence; and (2) agency adjudicators must draw reasonable inferences from the totality of the evidence of residence a requestor provides, including presuming residence for a reasonable period of time on the basis of point-in-time evidence that the requestor resided in the United States on a particular date. For example, in some cases a single document (such as a tax filing or lease) should suffice as evidence of residence for an entire year. In other cases, the requestor may show continuous residence over the course of a year by producing three or four point-in-time documents such as date-stamped photos or records of calls or purchases.

The commenter further stated that DHS should adopt a standard of accepting "any credible evidence" of a requestor's continuous residence. This standard of proof applies in other immigration contexts where, as in the DACA policy, requestors or applicants may experience significant difficulty obtaining primary or secondary evidence. Examples of documents that the commenter said should qualify as "credible evidence" include tax returns or tax transcripts (which, according to the commenter, should establish a full year of presence), a date-stamped photo of the requestor at a recognizable location in the United States, credit or debit card statements showing purchases made in the United States, insurance policies, vehicle registrations, and cell phone records showing calls placed from the United States. Another commenter also said that USCIS should adopt a "credible evidence" standard for the various forms of evidence that are allowed to show continuous residence, including primary sources like school and work records, as well as

---

[242] Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, Acting Director, ICE, et al., *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf* (hereinafter Enforcement Guidelines). On July 5, the U.S. Court of Appeals for the Sixth Circuit vacated a nationwide preliminary injunction that a district court had entered against the Enforcement Guidelines. *Arizona* v. *Biden,*—F.4th—, 2022 WL 2437870 (6th Cir. July 5, 2022). The district court's injunction had previously been stayed pending appeal. Nevertheless, the Enforcement Guidelines are not currently in effect because, on June 10, another district court vacated the guidance nationwide. On July 7, 2022, the Fifth Circuit denied the government's request to stay the district court's decision. *Texas* v. *United States,* 40 F.4th 205 (5th Cir. 2022). On July 21, 2022, the Supreme Court denied the Government's application for a stay of the district court's nationwide vacatur, but granted the petition for writ of certiorari. *United States* v. *Texas,* No. 22–58 (22A17), 597 U.S. ___, 2022 WL 2841804 (July 21, 2022). The case will be set for argument in the first week of the December 2022 argument session.

[243] *Id.* at 4.

secondary sources like parent documentation, church records, and affidavits. A commenter wrote that DHS should ensure that any credible evidence of continuous residence is accepted and clarify that it will draw reasonable inferences of residence and expand the use of affidavits to do this.

One commenter stated that the proposed rule is vague as to how much evidence requestors need to supply to prove continuous residence and added that the requirement that requestors provide as much documentation as "reasonably possible" is unclear. The commenter wrote that this vagueness has resulted in advocacy groups creating their own documentation requirement guidance with varying standards to better inform requestors. Another commenter stated that the requirements for documentation of continuous presence should be relaxed during the COVID–19 pandemic, writing that DACA requestors may have difficulty producing documentation from this period.

*Response:* DHS appreciates commenters' concerns and desire for greater clarity on the evidentiary requirements for the continuous residence requirement. DHS also acknowledges commenters' request for additional leniency in the evidentiary requirements for continuous residence, particularly in the context of the COVID pandemic and in light of the challenges that noncitizens may face in obtaining primary and secondary evidence. However, as discussed above, DHS is refraining from specifying in detail in this rule the types of evidence that may or may not be sufficient to meet the threshold criteria for DACA, to avoid creating a list that may be unintentionally exhaustive or limiting to adjudicators or requestors. DHS will take commenters' suggestions under advisement in the development of any subregulatory guidance on this subject.

*Comment:* A commenter said that it would be burdensome for initial DACA requestors to find proof of their continuous residence in the United States for 14 years, as well as burdensome for DHS officers who must then review 14 years' worth of documentation. The commenter recommended allowing requestors to show they have continuously resided in the United States for a shorter period prior to submitting their request, a length of time that they described as more reasonable. A commenter wrote that the added benefit of a shortened continuous residence requirement would be a reduced workload on legal service providers and, as a result, increased access to immigration services

for requestors. Other commenters stated that updating the eligibility dates would help prevent some of the documentation burdens of providing proof of continuous presence.

*Response:* DHS acknowledges that retaining the continuous residence requirement as proposed in the NPRM results in requestors needing to provide documentation for a lengthy period, which may be burdensome for some requestors. However, as stated above, DHS is maintaining this threshold guideline in its efforts to preserve and fortify DACA, in recognition of the particular reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities, and consistent with the agency's longstanding enforcement messaging. DHS declines to make any changes in response to these comments.

Affidavits as Acceptable Evidence of Continuous Residence

*Comment:* Multiple commenters stated that various forms of evidence, including affidavits attesting to presence, should be sufficient for the continuous residence criterion. One commenter expressed support for the use of affidavits as acceptable evidence for the start of the continuous residence period in initial requests and for any other gap in the continuous presence timeline, stating that as affidavits are written under the penalty of perjury, they should be taken as accurate. Another commenter stated that acceptance of affidavits is particularly important because undocumented individuals, and particularly those who are Indigenous and do not speak common languages, often do not have access to the services and resources that would provide the kinds of evidence DACA has previously required (*e.g.,* bank accounts, valid employment documents, evidence of property ownership).

*Response:* As discussed above and in the preamble of the NPRM, affidavits may be submitted to demonstrate that the requestor meets the continuous residence requirement if there is a gap in documentation for the requisite periods and primary and secondary evidence is not available. DHS will consider affidavits in this context in recognition of the challenges DACA requestors may face in obtaining primary or secondary evidence in these contexts, particularly for those who may have been very young during the periods for which documentation is needed. As described further below, DHS also will consider affidavits when

determining if the requestor has submitted sufficient evidence of their residence in the United States at the start of the requisite continuous residence period for new initial DACA requests where the requestor was unable to access primary or secondary evidence due to their young age at the time of entry to the United States.

*Comment:* Several commenters responded to DHS's request for comments on whether affidavits should be considered acceptable evidence of the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States. Multiple commenters expressed support for the use of affidavits as acceptable evidence of the start of the continuous residence period in initial DACA requests, as new requestors may have been very young at the time of entry and may have difficulty obtaining primary or secondary evidence. One commenter noted that this is a particular challenge for those who arrived as very young children as they typically do not enter the formal educational system until age 5 and therefore often do not have formal primary documentation of their presence in the United States until their enrollment in school.

Other commenters agreed that the use of affidavits should be acceptable evidence of the start of the continuous residence period for this population, but added that the use of affidavits should not be limited to just those who were very young at the time of entry. One commenter said expanding the use of affidavits is especially necessary if DHS retains the continuous residence requirement as proposed in the NPRM, as it would be difficult for requestors to demonstrate over 14 years of evidence for continuous presence. Similarly, another commenter said that other requestors, not just those who were very young at the time of entry, would face challenges in providing documentation.

*Response:* In the NPRM, DHS requested comments on whether affidavits should be considered acceptable evidence of the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States and may have difficulty obtaining primary or secondary evidence to establish this threshold requirement.[244] Many commenters expressed support for this suggestion, and as a result, DHS is clarifying in this final rule preamble that it will consider affidavits when determining if the requestor has

---

[244] 86 FR 53767.

submitted sufficient evidence of their residence in the United States at the start of the continuous residence period for new initial requestors who were very young at the time of entry to the United States. As one commenter noted, part of the challenge that those who arrived in the United States as a young child may face is that they may not have primary or secondary evidence of their physical presence until they enter the formal educational system. As age 8 is the highest age at which school attendance becomes compulsory within the United States, DHS plans to extend the flexibility of submitting affidavits for the start of the continuous residence period for new initial requestors who arrived in the United States at or before age 8 in subregulatory guidance.[245]

While DHS appreciates commenters' requests to further extend this flexibility beyond new initial requestors who arrived as very young children, as noted above, DHS will continue to consider affidavits to support evidence that the requestor meets the continuous residence requirement if there is a gap in documentation for the requisite periods and primary and secondary evidence is not available.

Other Comments on the ''Continuous Residence'' Date

*Comment:* Multiple commenters urged an exception that would allow deported individuals to meet the continuous residence requirement. Several commenters also stated that the proposed rule would penalize those individuals who complied with a legal directive to depart, noting that those who are subject to a final order of removal but who do not depart the United States remain eligible for DACA. The commenters further noted that many of those who departed the United States under a removal order did so as children, not on their own volition and without understanding the legal context.

*Response:* DHS will consider deferred action under DACA for noncitizens with final removal orders that have not been executed who otherwise meet the threshold guidelines for DACA, as DHS may still elect to exercise discretion as to whether to remove the noncitizen. However, it has been long-standing practice and policy for DHS to consider departures on or after June 15, 2007, due to an order of exclusion, deportation, voluntary departure, or removal to interrupt the continuous residence

criterion. In such a scenario, continuous residence would not only be interrupted by the departure, but the noncitizen may also be barred from re-entering the United States for years or permanently, further inhibiting any ability to comply with the continuous residence requirement.[246]

(3) Physical Presence in United States

Support for ''Physical Presence in the United States'' Criterion

*Comment:* A commenter stated that physical presence within the United States on the day that DACA was announced is an important qualifier toward acceptance and ensures that the policy is not being exploited by individuals entering the country after the fact to gain deferred status.

*Response:* DHS acknowledges the commenter's support for maintaining the threshold criterion of being physically present in the United States on June 15, 2012, which is the date of issuance of the Napolitano Memorandum. For the same reasons described above and as proposed in the NPRM, DHS is codifying this criterion in this rule.[247]

USCIS Should Revise the ''Physical Presence in the United States'' Criterion

*Comment:* Numerous commenters suggested moving forward the physical presence requirement from June 15, 2012, to expand eligibility for DACA to a larger population. Several commenters stated that the date is arbitrary and suggested removing this criterion or substituting it with a larger timeframe.

Multiple commenters said that the rule should advance the date for physical presence from June 15, 2012, to the date the final rule is implemented. A commenter similarly suggested advancing the date of physical presence to the date of final rule promulgation. Relatedly, another commenter recommended that the date should be advanced to a time closer to when individuals submit requests and recommended a time period of 5 years from the date the rule is published or implemented. A commenter recommended advancing the date for physical presence to at least 5 years prior to submitting a request.

Another commenter recommended replacing the June 15, 2012, date with a flexible standard that would expand access to those individuals who otherwise would qualify for DACA. The commenter stated that this

recommendation would align with the enforcement priorities set by the Secretary on September 30, 2021. A commenter suggested that a rolling date approach and linking the requirement dates only to the date of the request would reduce significant documentation burden on requestors and increase consistency with the Napolitano Memorandum.

Several commenters recommended that DHS advance the physical presence requirement to January 1, 2021, which matches the date found in H.R. 6, the American Dream and Promise Act of 2021. Many of these commenters stated that DHS has not updated the physical presence date in 9 years, and there is nothing that prevents DHS from moving the date in recognition that there are many Dreamers who arrived since the original physical presence date who are otherwise eligible for DACA. The commenter said that most individuals who would benefit would not be enforcement priorities, and enabling these Dreamers to access higher education and employment authorization through DACA would help them contribute to their communities and would be in line with the intent of the Napolitano Memorandum.

Similarly, a commenter suggested a revised date of January 20, 2021, stating that prescribing a date is at the discretion of USCIS and the rule should be more inclusive. Other commenters recommended updating the date to January 21, 2021, and another suggested updating the date to June 15, 2020. One commenter stated that if the requirement for physical presence is to be retained, the date should be based on the age of the requestor when they immigrated to the United States, rather than an arbitrary date from a policy memorandum.

A few commenters stated that the requirement of physical presence on June 15, 2012, should be eliminated, but the requirement of physical presence at the time of filing of the DACA request should be retained. One of these commenters said that this would ensure that DACA remains available only to individuals currently in the United States.

A commenter suggested that DHS grant deferred action and extend eligibility for a work permit to individuals who arrived after June 15, 2012, but meet all other eligibility criteria and commit to teaching or other public service. Given the teacher shortage and the need to diversify the teaching profession, the commenter asked that consideration be given to

---

[245] *See* Institute of Education Sciences, National Center for Education Statistics, State Education Practices, *Table 1.2. Compulsory school attendance laws, minimum and maximum age limits for required free education by state: 2017, https://nces.ed.gov/programs/statereform/tab1_2-2020.asp.*

[246] *See* INA sec. 212(a)(9)(B)(i)(I) and (II), INA sec. 212(a)(9)(C)(i)(I); 8 U.S.C. 1182(a)(9)(B)(i)(I) and (II), 8 U.S.C. 1182(a)(9)(C)(i)(I).

[247] *See* new 8 CFR 236.22(b)(3).

other eligibility factors, including individuals who desire to teach.

*Response:* DHS appreciates commenters' suggestions to modify or eliminate the physical presence requirement to expand eligibility for DACA to a larger population. However, for the same reasons as discussed in the continuous residence section above, DHS is maintaining this threshold criterion in line with the longstanding DACA policy, under which DACA is not available to individuals who were not physically present on June 15, 2012, the date of issuance of the Napolitano Memorandum.[248] As discussed in the NPRM and elsewhere in this rule, border security is a high priority for the Department, and by codifying the longstanding DACA policy, including the physical presence criterion, DHS is preserving its finite resources and avoiding the possibility of creating any unintended incentive for migration.

(4) Lack of Lawful Immigration Status

USCIS Should Eliminate the ''Lack of Lawful Immigration Status'' Criterion

*Comment:* Numerous commenters stated USCIS should eliminate the threshold criterion that the requestor demonstrate that they were not in a lawful immigration status on June 15, 2012. Many of these commenters said that Documented Dreamers should be eligible to request DACA, with some stating that these children know America as their country, contribute to society, and should not be discriminated against. Some of these commenters said that, absent a clear, legal pathway to citizenship for Documented Dreamers, eligibility to receive DACA would allow Documented Dreamers an opportunity to remain in the United States with families, and access work and educational opportunities. Another commenter stated that expanding eligibility for immigrant youth in lawful status that meet all other DACA requirements would provide an opportunity to end one of the artificial distinctions that separates immigrant youth based on how they arrived in the United States.

Many commenters said that the exclusion of Documented Dreamers is unjust to children brought here lawfully by their parents and with lawful status (*e.g.,* H–4 dependents) who will have to self-deport when they ''age out'' at 21 due to backlogs. Other commenters stated that, by removing this requirement, thousands of young people who grew up in the United States as dependents of nonimmigrant visa

holders and had lawful status on June 15, 2012, would be afforded protection.

Citing sources, several companies stated that many Documented Dreamers follow in the footsteps of their parents and are leaders in STEM fields, only to age out of status at age 21. The commenters said this situation is untenable for these children and their employees on high-skilled visas who face the prospect of separation from family members if their child ages out before they receive a green card. Other commenters stated that the proposed criterion would result in the loss of valuable talent and potentially significant contributions to the national economy by children of visa holders that age out. The commenters also said this issue hinders U.S. companies' ability to retain highly skilled workers and prevents the United States from competing in the global economy, citing a source indicating the net economic cost of losing Documented Dreamers is over $30 billion.[249] Another commenter similarly stated that the parents of Documented Dreamers have skills that allowed them to build U.S. technologies, and every U.S. company has been able to be a leader in the world because of these high-skilled immigrants who were given visas and did everything right. The commenter said it is inhumane to ask Documented Dreamers to self-deport because of an unfair policy.

Another commenter asked DHS to update this criterion to allow individuals who had lawful status in the United States on June 15, 2012, but subsequently lost such status by the time of their request, to qualify for DACA. The commenter said that this update could be accomplished by changing the criterion to read: ''had no lawful status at the time of filing of the request for DACA.'' The commenter further remarked that Documented Dreamers have been raised in the United States, went to school here, graduated from the U.S. education system, and have gone on to become productive members of our society, contributing greatly to the national economy and communities.

*Response:* DHS thanks commenters for highlighting the important contributions of Documented Dreamers

and agrees that many have strong ties to the United States and may not have known another country as their home. DHS also acknowledges that, as a result of the longstanding ''lack of lawful status'' criterion, Documented Dreamers are not able to request deferred action under the DACA policy. However, as with the other threshold criteria, in the Department's effort to preserve and fortify DACA, DHS is maintaining this criterion in line with longstanding policy.[250] As discussed in Sections II.A and III.A of this rule and in the NPRM, this approach reflects the Department's acknowledgement of the reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. It also preserves limited agency resources while retaining the Napolitano Memorandum's focus on providing forbearance from removal for those who entered as children and did not have lawful status as of the time of the creation of the policy.

*Comment:* A commenter said that the lack of lawful status provision is outrageous and strange in that it would require DACA requestors to show they broke the law to be eligible. Some commenters said that it would encourage further unauthorized immigration.

*Response:* As discussed above and in the NPRM, this rule reflects the reality that DHS enforcement resources are limited, and that sensible priorities for the use of those limited resources are vital. It also recognizes that, as a general matter, DACA recipients, who came to this country many years ago as children, lacked the intent to violate the law, have not been convicted of any serious crimes, and remain valued members of our communities. Furthermore, the rule requires that a noncitizen have entered the United States prior to the age of 16 and have been continuously present in the United States since June 15, 2007, to meet the threshold criteria for DACA.[251] As discussed in Section II.A.7, the rule will not forbear the removal of any noncitizen who arrived after that date. Because DHS has declined to expand the threshold eligibility criteria and for the other reasons discussed in Section II.A.7, DHS disagrees with commenters that the ''lack of lawful status'' criterion would incentivize further irregular migration.

*Comment:* Multiple commenters stated that the June 15, 2012 date was arbitrary and that USCIS did not

---

[248] *See* new 8 CFR 236.22(b)(3).

[249] *See* Dip Patel, *Biden's Immigration Plan Must Reform DACA to Cover Dreamers Whose Parents Are Here Legally,* NBC News ''Think'' (Dec. 4, 2020), *https://www.nbcnews.com/think/opinion/biden-s-immigration-plan-must-reform-daca-cover-dreamers-whose-ncna1248885;* David J. Bier, *Huge Fiscal Benefits of Including Legal Immigrant Dreamers in the DREAM Act,* Cato at Liberty (Oct. 23, 2017), *https://www.cato.org/blog/huge-fiscal-benefits-including-legal-immigrant-dreamers-dream-act.*

[250] *See* new 8 CFR 236.22(b)(4).

[251] *See* 8 U.S.C. 236.22(b)(1) and (2).

sufficiently justify the reason for retaining the date. Several commenters remarked along the same line that DHS should remove the requirement that DACA requestors have no lawful status on that date in order to qualify for deferred action under the DACA policy. One commenter said that the proposed rule's claim that the requirement is implicit in the Napolitano Memorandum's reference to children and young adults who are subject to removal because they lack lawful immigration status ignores the memorandum's key goal, which was to give consideration to the individual circumstances of each case and not remove productive young people to countries where they may not have lived or even speak the language. Additionally, the commenter said that there is precedent from previous deferred action initiatives, such as a 2009 deferred action initiative via memorandum for certain widows of U.S. citizens.

*Response:* As several commenters point out, this explicit guideline was not in the Napolitano Memorandum issued on June 15, 2012. However, DHS disagrees that retaining this longstanding criterion conflicts with the primary goals of the Napolitano Memorandum or the underlying motivations in creating the DACA policy. To the contrary, this requirement is consistent with the purpose of the policy, inasmuch as it limits the availability of the policy to those individuals who were subject to removal at the time the memorandum was issued, and therefore reflects that the DACA policy is an enforcement discretion policy, allowing DHS to focus its limited enforcement resources on higher priority populations.[252] While DHS recognizes that there are other noncitizens, including Documented Dreamers, who will not be able to request deferred action under the DACA policy as a result of DHS codifying the lack of lawful immigration status criterion in this rule, as discussed above, this approach reflects the Department's careful balancing of its directive to preserve and fortify DACA, as well as the reliance of DACA recipients and those who have not yet requested DACA on the Napolitano Memorandum's criteria.

Other Comments on the "Lack of Lawful Immigration Status" Criterion

*Comment:* A few commenters urged the Department to consider amending proposed 8 CFR 236.22(b)(4) to remove the reference to June 15, 2012, and only

require a lack of lawful immigration status on the date of filing the DACA request. Commenters suggested that this change would better align with the intent of DACA to protect young people brought to the United States as children and reduce the significant burden of demonstrating lack of lawful status going back to 2012. Alternatively, some commenters suggested other modifications to the date of the criterion, including changing the date in proposed 8 CFR 236.22(b)(4) to the date the final rule is promulgated, or using a period of time, instead of a concrete date, in the provision.

*Response:* DHS appreciates commenters' suggestions and understands that the criterion that the requestor demonstrate lack of lawful status as of June 15, 2012, may present a burden to some requestors or result in others being unable to meet the DACA criteria. However, for the reasons stated above, DHS is retaining this threshold criterion as proposed.

(5) Education

Support for the "Education" Criteria

*Comment:* A few commenters provided general support for the educational criteria, stating that educational opportunities provide a chance for DACA recipients to further their contributions to society. While suggesting changes to other threshold requirements, another commenter recommended no changes to the current educational requirements.

Other commenters supported the codification of longstanding standards for establishing when an individual is "currently . . . enrolled in school" for purposes of the threshold criteria as proposed at 8 CFR 236.22(b)(5). The commenter stated that doing so would offer additional stability to DACA requestors as they consider their educational options and assess the consequences of those decisions for obtaining DACA.

*Response:* DHS appreciates commenters' support for the proposed education guideline and agrees that educational opportunities provide a chance for DACA recipients to further their contributions to society, and agrees that maintaining the current standards will provide clarity and stability for DACA requestors. As discussed in the NPRM, this guideline also reflects DHS's recognition of the importance of education and military service to the United States and the Department's desire to support and promote such opportunities.[253] In accordance with longstanding DHS policy and the

Napolitano Memorandum, DHS is therefore codifying the guideline that a DACA requestor must be currently enrolled in school, have graduated or received a certificate of completion from high school, have obtained a GED, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.[254]

As proposed in the NPRM preamble, and in accordance with longstanding DHS policy, to be considered enrolled in school for the purposes of new 8 CFR 236.22(b)(5), the DACA requestor must be enrolled in one of the following as of the date of the request:

• A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets State requirements;

• an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where the requestor is working toward such placement; or

• an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other State-authorized exam (*e.g.,* HiSet or TASC) in the United States.[255]

Such education, literacy, or career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under State law, or in passing a GED exam or other State-authorized exam in the United States, include programs funded, in whole or in part, by Federal, State, county, or municipal grants, or administered by nonprofit organizations. Under longstanding policy, which DHS currently plans to maintain (but could revise to the extent consistent with law at a future date) programs funded by other sources would qualify if they are programs of demonstrated effectiveness.[256] As discussed in the NPRM, DHS does not consider enrollment in a personal enrichment class (such as arts and crafts) or a recreational class (such as canoeing) to be an alternative educational

---

[252] *See* 86 FR 53767.

[253] 86 FR 53768.

[254] *See* new 8 CFR 236.22(b)(5).
[255] 86 FR 53768.
[256] *Id.*

program.[257] Therefore, enrollment in such a program will not be considered to meet the "currently enrolled in school" guideline for purposes of this final rule.

As noted above, DHS is also codifying the longstanding policy as proposed in the NPRM that a DACA requestor also can meet the educational guideline if they have graduated from high school or received a GED.[258] To meet this component of the educational guideline, consistent with longstanding policy and as discussed in the preamble of the NPRM, the DACA requestor will need to show that they have graduated or obtained a certificate of completion from a U.S. high school or have received a recognized equivalent of a high school diploma under State law; have passed a GED test or other equivalent State-authorized exam in the United States; or have graduated from a public or private college, university, or community college. USCIS considers graduation from a public or private college, university, or community college as sufficient proof of meeting the educational guideline because a college or university generally would require a high school diploma, GED certificate, or equivalent for enrollment.[259]

Finally, DHS also is codifying the longstanding policy as proposed in the NPRM that a DACA requestor may meet the educational guideline if they are an honorably discharged veteran (including honorably discharged reservists) of the Coast Guard or Armed Forces of the United States. As has been longstanding policy and as discussed in the NPRM preamble, current or ongoing service in the Coast Guard or Armed Forces of the United States will not, however, qualify under this component of the guideline, although such service may, in some instances, qualify noncitizens for other forms of enforcement discretion or for lawful immigration status.[260]

Opposition to the "Education" Criteria

*Comment:* One commenter voiced opposition to the proposed educational criteria, stating that the intent of the DACA policy—to protect young people who were brought to the United States as children and lacked the intent to violate the law—has no relation to an individual's educational attainment. The commenter stated that if the educational requirements were removed, and noncitizens who qualify for DACA but for the education requirements could enter the workforce,

States could benefit from increased tax revenue from those requestors. The commenter asked that if the educational requirements remain as proposed, the Department address what constitutes "demonstrated effectiveness" such that requestors are not limited based on the type of educational program they attend.

Another commenter opposed the education criteria that DACA recipients graduate high school and stated that the education requirements are unnecessarily stringent. The commenter asked why—if an individual has not been eliminated from disqualification due to any other criteria—their ability to pass the 12th grade would make an impact on their qualification.

*Response:* DHS acknowledges that there are many noncitizens who may meet the threshold guidelines for DACA but for the education requirement. DHS also does not disagree that were such noncitizens to be granted deferred action and work authorization under the DACA policy, States could potentially benefit from their increased economic contributions and tax revenue. However, DHS disagrees that the education criteria as codified in this rule is too stringent. To the contrary, DHS provides myriad ways for DACA requestors to meet this threshold guideline, including enrollment in a variety of educational programs, graduation from high school or a GED program, or honorable discharge from the Coast Guard or Armed Forces of the United States.[261]

DHS also disagrees that the education criteria is unsupported by the foundational principles undergirding the creation of the DACA policy. As the Napolitano Memorandum highlights, this policy was intended to defer removal for "productive young people" who have "contributed to our country in significant ways." [262] While the Department recognizes that there are many ways that the DACA population have and continue to contribute to the United States and their communities, by incorporating an education criteria into the threshold guidelines, DHS is highlighting the importance of education and military service by considering those who give back and invest in their future through education to be lower priorities for enforcement action.

In response to one commenter's request to address what constitutes "demonstrated effectiveness" for alternative education programs that are not publicly funded, DHS notes that it has provided subregulatory guidance on

its website explaining that when looking at demonstrated effectiveness, USCIS reviews:

• the duration of the program's existence;

• the program's track record in assisting students in obtaining a GED, or a recognized equivalent certificate;

• receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or

• any other information indicating the program's overall quality.[263] DHS believes that these factors provide flexibility to requestors while also maintaining a threshold level of educational quality as it relates to a program's overall effectiveness, and that such factors are best provided in subregulatory guidance rather than in regulation. DHS is therefore not making any changes to new 8 CFR 236.22(b)(5) in response to these comments.

Other Comments on the "Education" Criteria

*Comment:* Several commenters recommended creating a hardship waiver for people who, for example, had to drop out of high school to work, to be caregivers due to the pandemic, due to domestic violence, or due to other reasons. Some commenters suggested that a requestor demonstrate compelling circumstances for the inability to satisfy the educational guidelines in Form I–821D, Part 8 or include an addendum in their DACA request for USCIS' consideration. Several commenters recommended adding a caregiving exemption to the educational requirements that would recognize the importance of domestic work, paid or unpaid, in immigrant communities. One of these commenters reasoned that caring for family members requires significant time and can be a barrier to meeting the current educational requirements. Another of these commenters requested that DHS also provide a hardship exemption to the education criteria in recognition of the financial hardship and challenges of residing in a remote location faced by many farmworker families. The commenter noted that farmworkers also have inflexible and long work hours that further exacerbate difficulties in obtaining an education. Another commenter urged DHS to expand eligibility to those who were unable to graduate from high school or earn a GED, stating that the requirement is biased toward youth who have supports that allow them to pursue an education.

Some commenters also recommended adding an exemption to the educational

---

[257] *Id.*

[258] *Id.*

[259] *Id.*

[260] *Id.*

[261] *See* new 8 CFR 236.22(b)(5).

[262] Napolitano Memorandum at 2.

[263] DACA FAQs.

requirement through community service. One commenter reasoned that allowing a community service exemption would demonstrate a commitment to DACA objectives through structured volunteer activities and would strengthen future employability in the nonprofit sector.

*Response:* DHS appreciates the commenters raising the importance of caregiving and community service and agrees that these are meaningful occupations that contribute to society. DHS also acknowledges that caregiving duties, financial hardship, residing in a remote location, inflexible work schedules, domestic violence, the pandemic, and other challenges may impact a requestor's ability to meet the education criteria. However, as noted above, DHS believes that there is sufficient flexibility in the various ways a requestor may satisfy this threshold guideline to enable requestors in a variety of circumstances to find a program that fits their needs. For the reasons articulated throughout this rule, DHS also is retaining this threshold guideline as proposed in its efforts to preserve and fortify the policy. DHS therefore declines to create an exemption to the education criteria for hardship, caregiving, community service, or other reasons.

*Comment:* Some commenters recommended that individuals in current or ongoing military service be eligible to meet the education criteria, not just those who have received an honorable discharge. One commenter stated that this expansion of eligibility for current military service members would align with the requirements of the Department of Veterans Affairs benefits. Another commenter requested that USCIS clarify that union apprenticeships qualify as approved educational programs that meet current requirements.

*Response:* DHS appreciates commenters raising these possibilities for expanding the education criteria to include current military service or union apprenticeships. However, as discussed elsewhere in this rule, DHS is retaining this and the other threshold criteria as proposed in its efforts to preserve and fortify DACA, and in recognition of the reliance interests of current DACA requestors and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities.

*Comment:* A commenter referenced former USCIS Director Francis Cissna's May 25, 2018 response to Rep. Steve King's questions regarding the education levels of DACA recipients. The commenter said that the NPRM does not mention, as stated by Director Cissna, that education is a required field on Form I–821D for initial requests but is not a required field on renewal requests. The commenter went on to cite education-related figures for approved DACA recipients from 2012–2018, questioning whether the rule is simply allowing 800,000 children to get work authorization and a driver's license with little apparent hope of reaching their dreams. Another commenter said that many DACA requestors only register to study while the request is processed and then they abandon their studies.

*Response:* As discussed above, DHS incorporated the education criteria into the threshold guidelines for DACA in recognition of the importance of education and military service and of the contributions that DACA requestors make to the country. For example, one study of the effects of DACA on educational achievement concluded that, because of DACA, more than 49,000 additional Hispanic youth obtained a high school diploma, and that the gap in high school graduation between citizen and noncitizen youth in the study's sample closed by 40 percent.[264] The same study found positive, though imprecise, impacts on college attendance.[265]

DHS also recognizes that there may be circumstances beyond a requestor's control that may impede their ability to participate in or complete certain educational programs, and for that reason, DHS intentionally provided a variety of options for meeting this threshold guideline.

It is DHS's position that participation in or graduation from educational programs is beneficial to requestors and to the community writ large. As stated elsewhere in this rule, many DACA recipients have gone on to continue their studies at post-secondary and professional levels, and some have become doctors, lawyers, nurses, teachers, or engineers.[266] Approximately 30,000 DACA recipients are healthcare workers, and many of them have helped care for their communities on the frontlines during the COVID–19 pandemic.[267] DHS therefore disagrees with the commenters that this rule provides work authorization to DACA recipients without supporting educational outcomes or continuing.

DHS acknowledges commenters' correct assertion that DHS does not currently require requestors to affirmatively provide evidence of their continued participation in educational programs upon seeking renewal of DACA. Once the threshold educational guideline is met by evidence provided for adjudication of the initial request, DHS focuses its renewal adjudications on critical issues such as whether the individual continues to meet the criminality, public safety, national security, and continuous residence guidelines.

(6) Criminal History, Public Safety, and National Security

General Comments

*Comment:* Some commenters generally expressed that DACA should be more forgiving of minor offenses, with most stating that young people, like everyone, make mistakes that should not result in excessive punishment or deprive them of DACA. However, one commenter expressed that the requirement related to criminal history was sound judgment.

One commenter stated that DHS failed to elaborate on why it allows convicted criminals to obtain DACA, whereas law-abiding prospective immigrants are not considered for deferred action and employment authorization, saying that existing data do not support that officers exercise discretion in granting DACA. Another commenter said that DHS failed to conduct meaningful studies on crimes DACA recipients have committed and their negative impacts on U.S. society or on crime victims, nor did DHS consider any measures to enhance national security, such as banning all persons with any criminal records from receiving DACA. The commenter went on to cite data indicating that more than 10 percent of the approved DACA recipients have at least one arrest, which the commenter said was not acknowledged in the rule. This commenter questioned how much discretion the adjudicating officer has, stating that it is unimaginable that someone who has been accused of crimes such as murder or assault could receive favorable discretion.

A commenter expressed concern over the use of vague language to disqualify individuals who pose a threat to national security or public safety, stating that this abstract language provides no standard or guidance as to how an individual can prove by a preponderance of the evidence that they meet this requirement. Further, the

---

[264] Kuka (2020).

[265] *Id.*

[266] *See* Gonzales (2019); Svajlenka (2020); Wong (2020); Zong (2017).

[267] Svajlenka (2020). DACA recipients who are healthcare workers also are helping to alleviate a shortage of healthcare professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire. Chen (2019); Garcia (2017).

commenter stated that this vague language leaves open the possibility of uneven and discriminatory application, and officers who are unfriendly to the policy's ideals may wield it to exclude otherwise-qualified individuals for dishonorable and politically motivated aims. The commenter said that this concern is based on the historical use of similar grounds to incite fear and discriminate against individuals based on race, religion, sexual orientation, political ideology, and various other identities. Another commenter suggested eliminating or narrowing the public safety discretionary factor, stating that overbroad categorizations of being a threat to public safety rely heavily on often unfounded allegations of gang membership or participation in criminal activities, and that public safety long has been used as a pretext for criminalizing immigrants.

Multiple commenters opposed DHS requiring or requesting juvenile records as part of the DACA adjudication process, stating that requiring such records is a breach of confidentiality for juveniles and may be illegal in some States, such as California. The commenter recommended that DHS refrain from requesting juvenile records as a nationwide policy to ensure a consistent and fair process across all States.

*Response:* DHS acknowledges the variety of comments on this issue, ranging from concern that the rule should be more forgiving of minor offenses, to agreement with the criteria, to objection that someone with a criminal conviction at all (regardless of the severity of the offense) can receive DACA. DHS maintains that the criminal history, public safety, and national security criteria, as proposed, strike an appropriate balance that is generally consistent with the spirit of DHS's Enforcement Guidelines, which focus on threats to national security, public safety, and border security. Excluding all individuals with any criminal records from receiving DACA, as proposed by one commenter, would not serve DHS's enforcement priority goals, as DHS does not have the ability to pursue removal of every individual without lawful status who has a criminal record. DHS agrees with commenters that the rule should be forgiving of some minor offenses and maintains that the criteria as proposed do accomplish that goal: individuals with isolated minor convictions are not categorically excluded, including those with minor traffic offenses. While those with three or more misdemeanor convictions will not be granted DACA, this reflects DHS's judgment that an

individual with multiple misdemeanor convictions, however minor as individual offenses, generally does not warrant a favorable exercise of enforcement discretion in the form of DACA.

DHS acknowledges one commenter's reference to the November 2019 USCIS report ''DACA Requestors with an IDENT Response,'' [268] which includes data reflecting that approximately 10 percent of DACA requestors approved between 2012 and October 2019 had been arrested or apprehended for a criminal offense or immigration-related civil offense, but disagrees that the NPRM did not acknowledge this data as it is explicitly referenced in the preamble to the NPRM at 86 FR 53752. Additionally, because the report reflects arrests and apprehensions—not charges or convictions—and includes apprehensions for immigration-related civil violations which cannot be systematically excluded from the report, the report is significantly overinclusive and not a reliable basis for informing the development of the criminal conviction-related criteria.

DHS acknowledges a commenter's view that whether someone poses a threat to national security or public safety is vague, but disagrees with the assertion that this may lead to discriminatory application or that officers will use this provision to exclude individuals for dishonorable or politically motivated aims. Determining whether someone poses a threat to national security or public safety is at the heart of DHS's mission, and Congress has directed the Secretary to prioritize national security, public safety, and border security. These concepts are longstanding and familiar to officers based on both experience and training, and are incorporated into DHS's enforcement priorities, as reflected in the rule.

DHS further disagrees with a commenter's assertion that existing data do not support the conclusion that officers should exercise discretion in adjudicating DACA requests. The DACA policy has historically included threshold discretionary criteria that USCIS assesses on a case-by-case basis as a review of the totality of circumstances. The assessment of whether a requestor meets these criteria itself entails the exercise of discretion by adjudicators—such as whether the requestor meets the criminal history,

public safety, and national security criteria or whether they meet the continuous residence criterion, and additionally, even when a requestor meets all threshold criteria, USCIS adjudicators have had (and will continue to have) discretion to determine that in the totality of circumstances, a favorable exercise of discretion is nonetheless not warranted. Thus, USCIS data on DACA denials is itself an indication that officers exercise discretion in adjudicating DACA requests. USCIS data through December 31, 2021, reflects that USCIS has denied 107,245 DACA requests since the policy was implemented.[269]

With respect to juvenile delinquency records, as explained elsewhere in this rule, USCIS does not consider a juvenile delinquency determination a conviction for immigration purposes, consistent with longstanding DACA policy and Board of Immigration Appeals (BIA) precedent. Also consistent with longstanding DACA policy, USCIS does not consider juvenile delinquency adjudications as automatically disqualifying for DACA. If a requestor cannot provide the record because it is sealed or because State law prohibits even the individual to whom the record relates (*i.e.,* the DACA requestor) from themselves disclosing the record, USCIS still may request information about the underlying conduct in order to perform a case-by-case analysis of whether the individual presents a threat to public safety or national security and whether a favorable exercise of prosecutorial discretion is otherwise warranted.

Mandatory/Categorical Criminal Bars to DACA

*Comment:* One commenter recommended no changes be made to the criminal criteria as drafted in the proposed rule. However, many commenters opposed categorically denying DACA based on contact with the criminal legal system, suggested removal of the criminal conviction bars entirely, and recommended instead instituting a case-by-case review for those with such convictions. Commenters stated that the proposed criminal criteria are much broader than DHS's current memorandum on enforcement priorities, undermining the claim that the criminal criteria identify young people who are a high priority for removal, and that categorical bars by their nature eliminate the option of case-by-case determinations.

[268] USCIS, Office of Policy & Strategy, Research & Evaluation Division, *DACA Requestors with an IDENT Response: November 2019 Update* (Nov. 2019), *https://www.uscis.gov/sites/default/files/document/data/DACA_Requestors_IDENT_Nov._2019.pdf* (last accessed February 25, 2022).

[269] USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2022, Q1)* (Mar. 2022), *https://www.uscis.gov/sites/default/files/document/reports/DACA_performancedata_fy2022_qtr1.pdf* (last visited June 2, 2022).

Commenters added that as a result, mandatory criminal bars require DHS to deny certain requestors even when they have demonstrated that they warrant favorable discretion, noting that the very nature of DACA means that every eligible requestor entered the United States as a child, and this fact alone should obligate DHS to consider each case in the totality of circumstances without being constrained by mandatory criminal bars. One commenter stated that consideration of the final DHS enforcement priorities, issued after the proposed rule was published, should be incorporated into the final rule so that no one is denied DACA who is not an enforcement priority. The commenter further noted that the statement in the proposed rule that where DACA guidelines may not align with current or future enforcement discretion guidance, USCIS may consider that guidance when determining whether to deny or terminate DACA even when the guidelines are met, invites future administrations to nearly end DACA by determining that all immigrants encountered by DHS may be enforcement priorities. Commenters stated that eliminating criminal conviction exclusions would decrease barriers for individuals with criminal records seeking DACA, bringing the policy into compliance with basic tenets of racial equity as well as compliance with E.O. 13985.

Commenters who oppose the criminal conviction criteria stated that they are arbitrary and discriminatory; unjustly transfer the racial inequities of the criminal legal system into the administration of DACA in light of the long history of racial disparities in the U.S. criminal legal system; unfairly exclude communities who already are criminalized, surveilled, and facing discrimination; impose a "double punishment" on largely Black, Brown, and Indigenous immigrants who already have served their full sentences and complied with consequences; ignore the disparities in the criminal legal system and the over-policing and over-prosecution of people, particularly youths, in communities of color; and do not sufficiently take into account the impact on children, as children whose parents or caregivers would be ineligible could experience the harms of family separation through detention or deportation.

One commenter noted that no other area has changed as significantly since 2012 as social perceptions of the criminal legal system, concluding that the rule's exclusions for criminal history are fundamentally incompatible with this reform movement. A legal services provider shared anecdotal examples of how the criminal bars disproportionately affected its clients. Another commenter stated that removing the criminal bars would align with the dual intentions of DACA—to preserve DHS resources and provide relief to individuals brought to the United States as children—because it would provide relief to a broader population and lead to greater stability for more families, more opportunities to pursue education or careers, and increased tax revenue. The commenter further noted that removing the criminal bars would acknowledge the capability of rehabilitation.

Commenters said that the criminal framework within DACA includes a unique system of criminal bars, separate from the grounds of inadmissibility and deportability, that is used to unfairly target certain members of the DACA population, by singling out certain contact with the criminal legal system based on the type of offense or conduct, and that does not account for differences in sentencing or severity of punishment across different localities. Commenters stated that this encourages officers to reach beyond the criminal legal system's disposition and form their own judgment without the benefit of due process.

Some commenters recommended eliminating certain per se criminal bars, including minor traffic offenses, driving under the influence, 8 U.S.C. 1325 (improper entry) and 1326 (reentry of removed individuals), and offenses involving marijuana or related paraphernalia, in light of the decriminalization of marijuana.

Commenters stated that a conviction does not necessarily indicate whether an individual poses a threat to persons or property, or otherwise does not warrant deferred action. The commenter further stated a conviction is an unreliable predictor of future danger, and is an unreliable indicator of past criminal conduct because of disparate policing practices and the significant number of people who may plead guilty to a crime for a number of reasons. The commenter stated that by adopting categorical criminal bars, the agency prevents itself from considering mitigating circumstances or humanitarian concerns.

One commenter stated that individualized consideration for those few exceptional cases in which DHS has an objectively reasonable, particularized belief that criminal history is currently relevant should account for differences in sentencing or severity of punishment across different localities and provide an opportunity for the requestor to respond to and explain the information. The commenter further noted that the rule does not require most sentences described to be actually served and fails to cut off consideration of past conduct based on the passage of time since the conviction. Another commenter also recommended that the conviction definitions consider actual time served rather than potential sentences imposed.

One commenter stated that when a conviction occurred should limit exclusions, reasoning that no one should be defined solely by their long-past actions. The commenter recommended considering actual sentences served rather than the potential sentences captured by the felony and misdemeanor conviction definitions in order to reflect the courts' assessments of offense severity.

*Response:* DHS appreciates and acknowledges the range of views expressed by the commenters, with one supporting the criminal criteria as drafted, and many opposing categorical criminal criteria and instead recommending a framework that considers aggravating and mitigating factors on a case-by-case basis. DHS notes commenters' comparison of the criminal criteria with the Enforcement Guidelines, observation that the criteria are distinct from the criminal grounds of inadmissibility and deportability, and attention to the fact that the definitions provided of felonies and misdemeanors reference potential sentences rather than actual time served. DHS acknowledges commenters' statements that: the criminal criteria are arbitrary and discriminatory, systemic racism or other disparities may result in disproportionate contact with the criminal legal system, and it is improper to draw conclusions about future threats to public safety based on the fact of a past conviction.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State laws often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. It is likewise consistent with Federal law definitions of felonies and misdemeanors for DHS to classify offenses for DACA purposes based on the potential sentence, rather than time served. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to take into consideration a requestor's criminal convictions. As

noted in the NPRM, DHS acknowledges that the threshold DACA criteria and DHS's broader enforcement priorities may not always perfectly align. In its effort to preserve and fortify DACA, DHS does not believe that it is necessary or beneficial to tie the DACA threshold criteria to the specific DHS enforcement priorities that are in place at any given time, in light of the possibility for the priorities to change, because the DACA criteria are such that the DACA population will generally be considered a low priority. Although the criteria outlined in this rule are the primary factors considered in determining whether to grant DACA, because deferred action is a case-by-case act of prosecutorial discretion, DHS may consider other relevant factors, including changed enforcement priorities, when determining whether to grant deferred action in an individual case. Factors outside of the threshold criteria may not universally overrule the threshold criteria in all cases such that changed enforcement priorities render the threshold criteria entirely moot, but because DHS may consider all factors in a case, the current enforcement priorities may properly be taken into consideration. DHS acknowledges that as a result, there may be cases in which ICE or CBP determine in their discretion that an individual is not a priority for removal even when USCIS determines the individual does not warrant a favorable exercise of enforcement discretion in the form of DACA. But DACA was never intended to capture *every* individual who ICE or CBP determines is not a priority for removal. Indeed, the very nature of discretion is such that different DHS components may exercise their discretion differently based on differing operational considerations, reaching different outcomes for an individual, all while remaining within the boundaries of the applicable guidelines.

The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. While the criteria serve as important benchmarks for consideration of DACA, they do not prevent or replace a case-by-case weighing of all relevant factors by USCIS adjudicators. Moreover, as explained in the proposed rule, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the

continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, as well as their families, employers, schools, and communities. DHS determined that the best approach to preserving and fortifying DACA to ensure the continued existence of the policy to is to codify the existing threshold criteria. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission.

Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Waivers and Exceptions

*Comment:* Multiple commenters stated that the rule should, at a minimum, include a waiver for individuals who trigger the criminal bars, so DACA requestors would not be rendered ineligible without a case-by-case determination. Commenters said that adjudicators should be able to consider the totality of circumstances, mitigating factors, and positive equities, including the severity of the crime, the age of the individual at the time the crime was committed, rehabilitation, minor drug-related offenses, whether a conviction was related to the individual having been a survivor of domestic violence or human trafficking, the time that has passed between the conviction and adjudication of the DACA request, length of residence, community ties, family ties, the impact of a possible denial of a request on U.S. citizen or permanent resident family members, and mental and physical health. One commenter said that requestors should be allowed to seek a waiver for ineligibility, similar to the waiver available under INA sec. 212(h), 8 U.S.C. 1182(h).

A few commenters stated that a program rooted in a case-by-case exercise of discretion should not categorically exclude a class of individuals without providing them an opportunity to present their equities to an adjudicator who can weigh the totality of the circumstances. Other commenters also noted concern that barring whole categories of individuals imports the biases of the criminal legal system into immigration decision making and unfairly targets portions of the population who are already targets of discriminatory policing practices. Some commenters said that DHS should use its authority to grant extraordinary

circumstances waivers in cases of DACA requestors with felony convictions to avoid the unjust, disproportionate impact of the felony conviction bar on communities of color and LGBTQ DACA-eligible individuals.

Multiple commenters also noted that the existing DACA policy allows a waiver of the criminal exclusions due to "exceptional circumstances," but stated that it is unclear what evidence a requestor should submit to establish exceptional circumstances, nor is it clear how adjudicators determine if the standard is met. One commenter urged DHS to codify and expand the availability of this exception for convictions from the existing DACA policy.

*Response:* DHS acknowledges commenters' concerns regarding communities of color and LGBTQIA+ individuals being disproportionately impacted by the criteria, and the suggestion that the criminal criteria include a waiver or exception that takes into consideration aggravating and mitigating factors on a case-by-case basis. However, DHS declines to accept the recommendation that DHS codify the longstanding "exceptional circumstances" exception to the criminal conviction criteria. Commenters correctly note that historically, under DACA FAQs 61 and 66,[270] USCIS retained discretion to determine that an individual with a disqualifying conviction nonetheless warranted a favorable exercise of enforcement discretion due to exceptional circumstances after careful consideration of the specific facts of the case. DHS is choosing not to codify that exception because it believes that the criminal criteria strike the correct balance for determining what criminal history should be disqualifying for enforcement discretion under DACA. Moreover, DHS notes that despite the long history of this exception, USCIS rarely, if ever, found exceptional circumstances that warranted a grant of DACA where the requestor did not meet the criminal guidelines. If such cases arise in the future, DHS may, where appropriate, consider the DACA requestor for other forms of enforcement discretion.

Statute of Limitations

*Comment:* One commenter stated that there should be no misdemeanor bar in the rule, but if there is one, there should be a "statute of limitations" on misdemeanors. Other commenters similarly stated that the rule should impose a statute of limitations, saying

---

[270] DACA FAQs.

**53228** **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

that lack of a statute of limitations is punitive because few people are the same person they were 5 or 10 years before when they made bad decisions. Multiple commenters specifically recommended that DHS establish an administrative statute of limitations for consideration of convictions that occurred 5 or more years before the request date, and one recommended that all conviction-based exclusions be limited to within 5 years of the rule's promulgation.

Several commenters said that DACA-eligible youth have developed deep ties to family and community in the United States, deserve the chance to rehabilitate and contribute, and should not suffer further consequences if they have successfully completed the terms of any sentence resulting from a criminal conviction. A few commenters also stated that this approach would be in line with the administration's current enforcement priorities, which lists how long ago the conviction occurred as one of the factors in deciding whether to exercise prosecutorial discretion.

One commenter stated that this change to the rule is necessary when Southeast Asian immigrant and refugee communities have a long history of being over-policed and racially profiled, and to prevent further repercussions of racial inequities and injustices in the criminal legal system that disproportionately impact Black and Indigenous communities and other people of color.

*Response:* DHS acknowledges commenters' suggestion that the criminal criteria include an administrative ''statute of limitations'' to limit USCIS from considering convictions that occurred more than 5 or 10 years ago as automatically disqualifying. DHS further acknowledges commenters' statements that individuals may have rehabilitated following older convictions and that contact with the criminal legal system is often the result of systemic racism.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State laws often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, in the exercise of discretion, it remains appropriate for USCIS to take into consideration convictions even if they occurred more

than 5 or 10 years in the past. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained in the proposed rule and elsewhere in this rule, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Expunged and Juvenile Convictions

*Comment:* Many commenters stated that the rule should clearly prohibit consideration of expunged convictions and juvenile delinquency adjudications in DACA determinations, including the many ways in which expungement is defined, and opposed the rule's reference to the definition of conviction at INA sec. 101(a)(48)(A), 8 U.S.C. 1101(a)(48)(a) because it includes expunged convictions. One commenter said that this could be read to limit DHS's discretion in this area.

Commenters stated that expungements were available for similar programs such as the Special Agricultural Worker and other legalization programs of the 1980s and are included in legislation currently before Congress. They noted recognizing the validity of expungements is critical to meeting the intent of DACA and giving effect to important safeguards of the criminal legal system that recognize the capacity for rehabilitation of impacted individuals and the special vulnerabilities of youth and counter the impact of policing in our communities. One commenter stated that expunged, sealed, or otherwise vacated records are a powerful indicator of change in an individual. One commenter noted that many DACA recipients are Black, Latinx, and/or other people of color who come from communities harmed by a

history of racial injustice and a deeply flawed law enforcement system.

Multiple commenters stated that considering expunged convictions and juvenile delinquency adjudications as disqualifying convictions would be a damaging departure from longstanding DACA policy that would result in current DACA recipients being unable to renew. Many stated that, at a minimum, the rule should codify existing DACA policy, which provides that expunged convictions and juvenile delinquency determinations do not presumptively bar an applicant from receiving DACA and are considered on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted.

However, multiple commenters opposed the case-by-case review of expunged convictions and juvenile delinquency adjudications as provided by current policy. Commenters stated that it leads to differing decisions for similarly situated requestors based on the adjudicating officer, undermining the finality of a State or local judicial decision to set aside and expunge an individual's criminal conviction, noting that the very purpose of expungement is to eliminate collateral consequences arising from the existence of the conviction on an individual's record. Commenters also noted that it wastes valuable agency time, as State and local authorities already examined the facts of the case and concluded that the conviction merited expungement, and almost all States have expungement mechanisms that do not allow for the expungement of felonies.[271] Another commenter stated that current guidance does not align with the purpose of expungement, nor comport with relevant research on young adults, their decision-making process, and their brain development. They cited the importance of the research because it suggests a person's past juvenile record is not indicative of their adult potential.

Commenters cited academic research demonstrating that individuals with expunged convictions present a low public safety risk and, thus, should be a low priority for removal, like other members of the DACA-eligible population. Additionally, a commenter said that legislative and policy changes providing for expungement—including automatic expungement—reflect an increased desire to create second-chance

---

[271] *See* Restoration of Rights Project, *50-State Comparison: Expungement, Sealing & Other Record Relief, https://ccresourcecenter.org/state-comparison-profiles/50-state-comparisonjudicial-expungement-sealing-and-set-aside* (last updated Oct. 2021).

opportunities in employment, housing, and professional licensing for individuals with prior criminal convictions. Commenters also stated that, in the criminal legal system, an expunged conviction is removed from the system entirely, including for housing, loan, employment, voting, and all other purposes, and DHS must similarly abide by this standard.

Commenters also noted that the immigration system recognizes the special position of juveniles in immigration court proceedings, where a juvenile delinquency adjudication is not considered to be a criminal conviction for immigration purposes and does not trigger adverse immigration consequences that flow from a conviction, which has been repeatedly affirmed by the BIA. Therefore, commenters state that the same should be true regarding DACA. One said that no conduct committed when under 18 should exclude someone from receiving DACA and that juvenile convictions should not be considered a negative factor, noting the inconsistency of saying that children lacked intent to violate the law in coming to the United States but then holding them responsible as a collateral consequence for other conduct while adolescents.

*Response:* DHS agrees with commenters that the longstanding DACA policy of not considering expunged convictions and juvenile delinquency adjudications as automatically disqualifying should be continued. DHS did not intend for the rule to abandon this policy as reflected in DACA FAQ 68,[272] which provides that expunged convictions and juvenile delinquency adjudications are not considered disqualifying convictions for purposes of the criminal criteria, but instead are assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted.

However, DHS disagrees with commenters that case-by-case consideration of such criminal history should be eliminated and that the rule should prohibit entirely any consideration of expunged convictions or juvenile delinquency adjudications. By conducting an individual, case-by-case assessment that takes into consideration the nature and severity of the underlying conduct, DHS is giving effect to the State or local judicial determination to erase the conviction itself from the individual's criminal record, while still allowing DHS to consider the underlying facts to make a

proper determination as to whether a requestor poses a threat to public safety or national security and whether the favorable exercise of prosecutorial discretion is otherwise warranted. While DHS recognizes that in other immigration contexts, expungements are generally considered convictions for immigration purposes with few exceptions, providing for case-by-case consideration of the underlying nature and severity of the criminal offense rather than categorically excluding requestors with otherwise disqualifying convictions that were expunged is consistent with the nature of DACA as an exercise of enforcement discretion— as distinct from an adjudication involving statutory eligibility requirements plus the exercise of adjudicative discretion—and reflects a balancing of the use of guidelines and discretion, which serves to promote consistency and avoid arbitrariness in DACA determinations.

Likewise, in the case of juvenile delinquency adjudications, DHS agrees that the rule should not depart from longstanding DACA policy and BIA precedent establishing that a juvenile delinquency determination is not a conviction for immigration purposes.[273] Nonetheless, for the same reasons explained above, DHS maintains that it is appropriate for adjudicators to still consider the underlying conduct as part of a case-by-case analysis of whether the individual presents a threat to public safety or national security and whether a favorable exercise of prosecutorial discretion is otherwise warranted.

In this final rule, DHS is revising 8 CFR 236.22(b)(6) to clarify that expunged convictions and juvenile delinquency adjudications are not considered automatically disqualifying under the criminal history criteria. However, consistent with longstanding policy, expunged convictions and juvenile delinquency adjudications will still be assessed on a case-by-case basis to determine whether the individual presents a national security or public safety concern and otherwise warrants a favorable exercise of discretion.[274]

Misdemeanors

*Comment:* Multiple commenters asserted that the single-misdemeanor bar should be eliminated because the offenses are undefined, overbroad, and arbitrary, with one stating that the definition was at best vague and at worst unjustly punitive. A commenter noted that these categories are broad

and subject to interpretation, and conduct is criminalized differently in different jurisdictions, so there will continue to be wildly inconsistent application and arbitrary adjudications, stating that it undercuts the underlying spirit and intention of DACA, which was created to assist DHS by providing a well-defined framework for exercising its discretionary prosecutorial power and minimizing DHS waste on non-priority enforcement cases. One commenter suggested DHS define each offense rather than listing crimes, since States have different versions of every law; another suggested considering them on a case-by-case basis since young adults make dumb mistakes very often and a mistake should not ruin someone's life.

Commenters also stated that the use of an arbitrary length of sentence imposed in determining a particular misdemeanor is disqualifying is inappropriate and arbitrary, and will further prevailing trends of inequality in the justice system, as well as disparate treatment based on the applicant's jurisdiction and its sentencing scheme. One noted that this provision undervalues a federalist system in which a misdemeanor offense in one system can be considered a felony in another, and sentencing varies by locality.

One commenter stated that the misdemeanor definition used for the single-conviction and three-conviction bars include offenses that are considered non-criminal "violations" under New York law. The commenter noted that a violation of disorderly conduct under New York law is a violation, not a crime, but is a common disposition in criminal courts, often for minor alleged conduct, and pleas to this violation are often the release valve for the criminal legal system, yet regularly lead to ineligibility for DACA. The commenter stated that maintaining this bar will force people to choose between quickly and efficiently disposing of their case and defending their innocence through often prolonged and unnecessary litigation to ensure they do not face a bar to obtaining DACA. The commenter additionally noted the criminal bars would disparately impact those who are routinely criminalized because of disparate policing practices, including based on race, sexual orientation, and gender, or in connection with experiences of trafficking and domestic violence, stating that DACA recipients often come from vulnerable communities that may be more susceptible to low-level offenses. Another commenter stated that disqualifying individuals based on

---

[272] DACA FAQs.

[273] *Matter of Ramirez-Rivero,* 18 I&N Dec. 135 (BIA 1981).

[274] *See* new 8 CFR 236.22(b)(6).

convictions incurred by a system characterized by institutionalized discrimination and racism only serves to compound punishment on Black and Brown immigrants.

Multiple commenters noted appreciation of the clarified definition of a "significant misdemeanor," but nonetheless opposed the criminal bars, stating that they add to the harmful rhetoric of immigrants as criminals. Some of these commenters expressed concern that a "significant misdemeanor" offense from many years ago may act as a bar to DACA, despite positive discretionary factors.

Many commenters said that individuals should not be barred from DACA by any single offense or offenses where a sentence of less than 90 days was imposed. The commenters stated that adjudicators have applied the misdemeanor bars inconsistently in the DACA context, State criminal legal systems present a wide array of different treatment for different offenses, and regional differences in policing compound the impact of disparate treatment for individuals who otherwise would be eligible for DACA. By adopting this measure, the commenters stated that the rule would increase consistency in DACA adjudications and ensure that individuals are not disqualified for offenses for which a lesser sentence was imposed.

One commenter said that TPS has a limit of two misdemeanors, and this rule should do the same.

*Response:* DHS acknowledges commenters' suggestion to remove single defined misdemeanors as disqualifying for DACA purposes, to instead consider such offenses on a case-by-case basis, and to provide that any offenses where a sentence of less than 90 days was imposed should not be disqualifying. DHS further notes commenters' statements that the categories of offenses listed are vague and broad and that contact with the criminal legal system is often the result of systemic racism.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State law often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions, including misdemeanors, into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to take into consideration a requestor's

misdemeanor convictions. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. In addition to the merits of this targeted and balanced approach, and as explained in the proposed rule, DHS has decided to codify the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, as well as their families, employers, schools, and communities.[275] Furthermore, DHS has determined that retaining the criteria as set forth in the Napolitano Memorandum defines the population of those who may request DACA to those who are likely to continue to be a low priority for removal under the Department's general enforcement priorities. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

DHS acknowledges the commenter's statement that New York "violations" are "non-criminal" and often lead to denial of DACA requests. DHS further acknowledges that New York's penal code does not classify violations, such as disorderly conduct, as "crimes" but rather labels them "petty offenses."[276] DHS notes, however, that New York violations are punishable by up to 15 days of incarceration.[277] As such, New York violations meet the Federal definition of a misdemeanor as an offense for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days, which has been in DACA policy since 2012 and is

codified in this rule at new 8 CFR 236.22(b)(6). Moreover, New York violations meet the minimum constitutional requirements for criminal convictions discussed by the BIA in *Matter of Eslamizar*, such as requiring the "beyond a reasonable doubt" standard of proof.[278] DHS recognizes that certain low-level crimes, which some States and localities do not term "misdemeanors," will be encompassed under the Federal definition of that term in this rule. However, DHS believes that the rule's standardized sentence-based definition helps DHS treat many different State and local offenses similarly for DACA purposes, rather than relying on the many variations of terminology and classifications in State and local penal codes.[279] For these reasons, DHS declines to change this rule to exclude New York violations from being considered misdemeanors for DACA purposes.

Driving Under the Influence (DUI) Convictions

*Comment:* Multiple commenters recommended eliminating misdemeanor DUI convictions as an automatic bar to DACA, and several recommended instead a case-by-case review. One commenter said that including a DUI conviction is extreme, and that there should be allowances for one bad experience.

Another commenter suggested that DHS clarify its DUI restrictions under the proposed rule. The commenter stated that DUI charges should be reviewed on a case-by-case basis, or at a minimum the rule should provide that a DUI with no aggravating factors is an exception, because a DUI can have varying degrees of threat and culpability. The requestor also recommended including an exception for requestors under age 21 with a DUI conviction, absent aggravating factors on a case-by-case basis. Another commenter acknowledged that violent or drug crimes are a concern, but similarly stated that a single DUI should not be a bar to DACA and it is not an inadmissibility ground in other programs. A different commenter asked why the bar is so high for an undocumented person just to obtain DACA protections, when there are

---

[275] 86 FR 53766.

[276] N.Y. Crim. Proc. L. § 1.20(39). *See also Galenson* v. *Kirwan*, 324 N.Y.S. 2d 540, 541 (N.Y. Sup. Ct. 1971) (noting the revision of the N.Y. Penal Law that classified violations as petty or non-criminal offenses, but that retained criminal procedures and actions for trying and sentencing offenders).

[277] *See* N.Y. Penal L. § 10.00(3) ("A 'violation' means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed.")

[278] *See* 23 I&N Dec. 684, 687–88 (BIA 2004) (BIA provided helpful guideposts in assessing whether a conviction for an Oregon violation was a criminal conviction, including noting constitutional requirements of beyond a reasonable doubt standard of proof and the right to counsel where imprisonment is a possibility).

[279] State law is not controlling for Federal immigration purposes. *See, e.g., Franklin* v. *INS,* 72 F.3d 571(8th Cir. 1995).

lawyers with multiple DUIs that still hold their licenses.

Multiple commenters stated that DUIs have not been consistently or fairly adjudicated in DACA requests, which has led to erroneous denials and requests for evidence that are highly dependent upon the State in which the applicant resides. For example, the commenters said that: (1) some State laws criminalize sitting in a vehicle while inebriated, without attempting to operate it; (2) other States have statutes that criminalize offenses considered less than a "regular" DUI but that still have some element of impairment, or simply include the word "impairment" in the title, and these have been counted as DUI bars to DACA; and (3) yet other State laws do not require any finding of impairment of the ability to drive safely due to consumption of a substance, and some of these laws have been wrongly counted as a DUI and an automatic bar to DACA. The commenters concluded that because of this inconsistency, the rule should eliminate DUIs from the list of specific misdemeanors that would automatically bar someone from qualifying for DACA.

A commenter stated that, if DHS must continue to include DUIs in the list of enumerated misdemeanors, at minimum, it should clearly define that term to ensure consistent adjudication throughout the country. Because of the diverse State-law definitions of "DUI," the commenter wrote, requestors are erroneously denied due to a misdemeanor conviction that may constitute a DUI in one State but not another. The commenter said that a consistent definition would allow requestors to assess their eligibility and adequately prepare their requests with a full understanding of the consequences of their criminal convictions.

One commenter stated that a DUI is inappropriate as a categorically elevated misdemeanor given the array of circumstances covered and differential outcomes based on access to counsel and other means that depend on privilege and racial hierarchies. If DUI is included, the commenter suggested that elements of the offense should be defined to require either a blood alcohol content finding of 0.08 or higher or a finding of impaired ability to drive safely, noting that ICE has used such a definition. The commenter also recommended defining "impairment" as "to a degree that renders the operator incapable of safe operation."

A legal services provider stated that, despite having paid fees, attended court hearings, and participated in rehabilitation classes, several of its clients have either lost DACA protection or been ineligible to apply. The commenter said that the uncertainty and upheaval to the lives of these individuals is immeasurable and further stated that individuals who seek to request DACA, and were otherwise eligible but for a single DUI conviction, will never have the opportunity to "rise out of the shadows" and take a path of greater success.

One commenter said that the DUI rule should be the same for DACA as it is for applying for citizenship to leave room for mistakes: if you have one in the last 5 years or two in the last 10 years, you cannot apply.

*Response:* DHS acknowledges commenters' suggestions to remove misdemeanor DUIs as disqualifying for DACA and instead consider such convictions on a case-by-case basis and to provide a clear definition of DUI for DACA purposes. DHS further notes commenters' concerns with inconsistent adjudications and variations in State law.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a single DUI conviction disqualifying for DACA. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained in the proposed rule and elsewhere in this section, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012. DHS determined that the best approach to preserving and fortifying DACA, as directed by the Biden Memorandum, for these recipients, future similarly situated requestors, as well as their families, employers, schools, and communities, who have significant reliance interests in the continued existence of the DACA policy is to codify the existing threshold criteria.

Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission, and who are likely to continue to be a low priority under DHS's general enforcement priorities. DHS agrees with commenters that a clear definition of a DUI conviction for DACA purposes is valuable to promoting consistent adjudications, and longstanding internal guidance has provided such a

definition. However, DHS believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Domestic Violence

*Comment:* Multiple commenters recommended that the rule remove misdemeanor domestic violence convictions as a categorical bar to DACA, but most also stated that if the bar is retained, the rule should include a clear definition of a domestic violence offense for DACA purposes. Commenters noted that the lack of a definition has led to inconsistent adjudications and irrational bases for denials. Some of these commenters stated that, in practice, any misdemeanor related to a domestic conflict has been deemed a bar to DACA. The commenters said that consistent adjudications necessitate a definition of a domestic violence offense and a requirement that the person have been convicted of that offense. Also, the commenters reasoned, it is not possible for defense counsel to provide an adequate *Padilla*[280] advisal of the immigration effect of a plea without a clear definition of domestic violence. In addition, commenters said that DACA requestors who initially were charged with a domestic offense, but who were either convicted of a different offense not related to domestic conflict or never convicted of any offense at all, are routinely denied DACA.

Multiple commenters specifically recommended that DHS use the definition of a "crime of domestic violence" from INA sec. 237(a)(2)(E)(i), 8 U.S.C. 1227(a)(2)(E)(i), which requires conviction of a "crime of violence" (as defined in 18 U.S.C. 16(a)) in a qualifying domestic situation. One of the commenters said that definition "provides a relevant waiver for survivors of domestic violence who have a conviction but were not the primary perpetrators of violence in their relationships." Another of the commenters added that the new DHS enforcement priorities state that "a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct." Several commenters noted the potential impact of the bar on survivors of

---

[280] *Padilla* v. *Kentucky,* 559 U.S. 356 (2010).

domestic violence, stating that it is not uncommon for both the victim and perpetrator to be arrested, or for survivors of domestic violence to be convicted of crimes as a result of their victimization, and warned that perpetrators could potentially take advantage of the legal system to terrorize survivors.

One commenter suggested DHS abandon the domestic violence conviction exclusion and instead adopt a totality of circumstances approach with a presumption that an individual with a misdemeanor conviction for domestic violence who was not physically incarcerated for over 30 days be considered prima facie eligible for DACA.

*Response:* DHS acknowledges commenters' suggestions to remove misdemeanor domestic violence convictions as disqualifying for DACA and instead consider such convictions on a case-by-case basis and to provide a clear definition of domestic violence for DACA purposes, and DHS notes commenters' concerns with inconsistent adjudications and the exclusion's impact on victims of domestic violence.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a single domestic violence conviction disqualifying for DACA. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As discussed above, DHS does so in recognition that a central purpose of this rulemaking is to preserve and fortify DACA as directed by the President's memorandum, and modifications to the threshold criteria related to criminal history, public safety, and national security could invite additional challenges to the policy. DHS therefore does not believe that changing the threshold criteria best serves it purpose of preserving the policy for those DACA recipients and other similarly situated individuals who have not yet requested DACA, and their families, employers, schools, and communities, all of whom have significant reliance interests in the continued existence of the DACA policy. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement

mission. The DHS Enforcement Guidelines acknowledge that a categorical determination that domestic violence offenses compel apprehension and removal could make victims more reluctant to report offenses; however, this is provided as an example in the Enforcement Guidelines of how the broader public interest is material in deciding whether to take enforcement action in a particular case, noting the specific facts of the case should be determinative. As noted in the NPRM and elsewhere in this rule, the threshold DACA criteria and DHS's broader enforcement priorities may not always perfectly align, as DHS has determined that to best preserve and fortify DACA, it is beneficial to maintain the longstanding threshold criteria rather than to tie the criteria to the specific DHS enforcement priorities in place at a given time. Regardless, the approach to domestic violence convictions reflected in this rule is still generally consistent with the spirit of the DHS Enforcement Guidelines: while the threshold criteria serve as important benchmarks for consideration of DACA, they do not prevent or replace a case-by-case weighing of all relevant factors by USCIS adjudicators, just as the DHS Enforcement Guidelines emphasize case specific determinations. DHS agrees with commenters that a clear definition of a domestic violence conviction for DACA purposes is valuable to promoting consistent adjudications, and longstanding internal guidance has provided such a definition. However, DHS believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Minor Traffic Offenses

*Comment:* Several commenters generally stated that minor traffic offenses should not be added as disqualifying offenses for DACA purposes, as a minor traffic offense does not make someone a high priority for enforcement and would open the door for disproportionately punishing communities of color, which are generally targeted by law enforcement. Numerous commenters supported including a definition of "minor traffic offenses" to prevent arbitrary deprivation of DACA and help prevent a minor traffic violation from being incorrectly deemed a misdemeanor. Multiple commenters recommended

that the rule define "minor traffic offenses" as any traffic-related infraction, misdemeanor, or felony where there was no serious bodily injury to a third party, including driving without a license, driving on a suspended license, driving without insurance, and violating traffic regulations such as speeding, regardless of the level of offense under State law—noting that Florida, Georgia, Illinois, Indiana, Kentucky, and Missouri all classify driving without a license as a felony. In contrast, one commenter discouraged DHS from defining "minor traffic offenses" and opposed including language that permits USCIS to consider such offenses in its discretion, stating that State traffic and criminal codes create consequences that are proportionate to the violation and the threat of deportation should never be a consequence of a minor traffic offense.

Multiple commenters stated that minor traffic offenses should explicitly be excluded from consideration in a totality of circumstances analysis, in addition to being excluded from triggering misdemeanor or felony bars, but stated that where a traffic offense does involve serious bodily injury, USCIS should use a totality of circumstances analysis to determine if a favorable exercise of prosecutorial discretion is warranted. Commenters stated that undocumented individuals face disproportionate barriers to obtaining driver's licenses, which they said directly leads to higher instances of traffic-related offenses. Commenters also noted that police officers are more likely to stop drivers of color than white drivers and that consideration of racially disparate minor traffic offenses in a totality of circumstances analysis compounds the racist impact of such traffic stops on communities of color. One commenter stated that minor traffic offenses are irrelevant to the objectives of DACA or any applicant's fitness.

A commenter said that the proposed rule eliminates the "minor traffic offenses" exception that always has existed and that this change would be "fatal" to new applicants, as almost any young immigrant who has been here since 2007 has had three or more traffic tickets. The commenter stated that the preamble language about considering minor traffic offenses in the totality of circumstances contradicts the unambiguous and mandatory language of the proposed rule, and officials would be obliged to follow the rule. The commenter also said that this provision would result in unequal treatment of immigrants, depending on where they live and whether their State allows licenses for undocumented immigrants.

*Response:* DHS acknowledges commenters' support for adopting a definition of minor traffic offenses in light of the variations in State laws, the suggested definition some commenters provided, and other commenters' recommendation that such offenses be explicitly excluded from consideration in a totality of circumstances analysis. DHS notes that some commenters misunderstood the request for comments on whether to add a more detailed definition of minor traffic offenses to the rule as a request for comments on whether to make minor traffic offenses disqualifying offenses in the rule. DHS does not intend to treat minor traffic offenses as per se disqualifying for DACA purposes; rather, DHS will consider such offenses in the totality of circumstances to determine if a DACA requestor merits a favorable exercise of prosecutorial discretion. DHS disagrees with the suggestion that the rule prohibit USCIS from considering such offenses at all, as excluding particular factors is generally inconsistent with a totality of circumstances approach.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a requestor's entire offense history along with other facts to determine whether, under the totality of circumstances, an individual warrants a favorable exercise of enforcement discretion. The criminal criteria, including the ability to consider an individual's entire offense history, reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained above, DHS has determined that retaining the existing threshold criteria is the appropriate mechanism by which to preserve and fortify the DACA policy. In weighing the interests of preserving the policy to ensure its continued existence against altering the threshold criteria, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. DHS agrees with commenters that a clear definition of minor traffic offenses for DACA purposes is valuable to promoting consistent adjudications. However, upon consideration, DHS

believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Immigration-Related Offenses

*Comment:* One commenter stated that the final rule should codify the exception for immigration-related offenses in the regulatory text, as USCIS officials would be bound by the regulatory text, not the policy statements in the preamble to the **Federal Register** notice. Another commenter said that criminal exclusions should not be based on immigration-related conduct, as the proposal rightly recognizes in eliminating immigration-related offenses characterized as felonies or misdemeanors under State laws. The commenter said that one of the starkest examples of criminalizing immigrants is Federal law on border crossings and recommended removing convictions under 8 U.S.C. 1325 (improper entry) and 1326 (reentry of removed individuals) from consideration.

*Response:* As explained in the preamble to the NPRM, DHS intends to continue its longstanding policy that convictions under State laws for immigration-related offenses will not be treated as disqualifying crimes for the purposes of considering a request for DACA. Although the NPRM did not propose to codify this exception in the regulatory text and instead only referenced the exception in the preamble, because 8 CFR 236.22(b)(6) specifies that a requestor must not have been convicted of a felony, misdemeanor as described, or three or more other misdemeanors and this is an exception to that general premise, DHS agrees with the commenter's suggestion that this exception for State-level immigration-related offenses should be codified in the regulatory text. Accordingly, DHS is revising 8 CFR 236.22(b)(6) to include this exception.[281] While DHS acknowledges that certain federal statutes criminalize unlawful entry and re-entry, such regulation in the field of immigration is properly within the realm of the federal government, in contrast with State-level immigration offenses which may be preempted.[282] DHS therefore has

determined it is appropriate to consider federal immigration-related criminal offenses in determining whether the DACA criteria are met. Of course, where appropriate, DHS may consider such offenses when exercising discretion in individual cases.

(7) Age at Time of Request

*Comment:* A number of commenters suggested that DHS should remove the proposed rule's criterion that DACA requestors were born on or after June 16, 1981, ("upper age limit") and are at least 15 years of age at the time of filing their request ("lower age limit"), unless, at the time of filing their request, they are in removal proceedings, have a final order of removal, or have a voluntary departure order.

Some commenters recommended eliminating the age limits to include requestors who meet all other requirements. Many of these commenters described the age limits as arbitrary and stated that they unfairly bar individuals from requesting DACA based on their age when DACA was announced, which is no fault of their own. Other commenters said the age limits disregard the benefits of protection for requestors under 15 years old and the continued necessity of protection for individuals who were older when DACA first was implemented.

Some commenters who suggested removing the upper age limit reasoned that childhood arrivals excluded by this limit have been living in the United States for more than 15 years without any immigration relief, that the limit goes against equal protection and law, and that it divides families and prevents individuals who have resided in the United States for decades longer than DACA recipients from receiving protections. Other commenters said that eliminating the upper age limit would particularly benefit older noncitizens who are more likely to have U.S. citizen children, and that doing so also would benefit older adult learners. Other commenters said that removing this age cap would further DACA's goal by addressing an arbitrary date that excludes many otherwise eligible requestors and would allow people who already are not enforcement priorities to receive lawful status and work authorization. Some commenters stated that DHS previously attempted to remove this age cap in a 2014 memorandum that was rescinded following the 2016 *Texas* opinion, partially due to failure to comply with the APA. The commenters said that nothing precludes the agency from

---

[281] *See* new 8 CFR 236.22(b)(6).

[282] *See, e.g., Arizona* v. *United States,* 567 U.S. 387 (2012).

removing this age cap through the instant notice-and-comment process.

Several commenters also urged DHS to remove the lower age limit, stating that parents want relief from deportation for their children as early as possible, and that opportunities for growth and development, such as school field trips, job opportunities, and driver's permits, arise before a child turns 15. Additionally, the commenters said that high school students pursuing a college education would benefit from having DACA and using their EAD and State identification card to prove their identity when taking college admission exams, and to be able to list a Social Security number on college applications. Likewise, some commenters who supported eliminating the lower age threshold stated that work authorization is important to youth in agricultural communities where the Fair Labor Standards Act allows children as young as age 12 to work in agriculture. Another commenter said the lower age cap leaves many young noncitizens with the fear of deportation, leading to poor mental health outcomes.

Some commenters stated that the age at time of request requirements impose undue barriers for requestors and should be revised. A couple of commenters suggested lowering the minimum age requirement for requestors and providing protections to children from removal until they are eligible to request DACA.

Other commenters discussed the exclusionary effects of the age restrictions and suggested that USCIS revise the age criterion to include noncitizens who were not above the age of 35 on June 15, 2012. Citing sources, one commenter discussed multiple benefits of raising the maximum age of requestors to 35, including a strengthened economy, less spending on enforcement, and improved access to healthcare for a greater number of immigrants. A commenter reasoned that not updating the outdated age eligibility criteria would have negative consequences on the health, well-being, and growth of undocumented individuals, their families, communities, and the economy. Other commenters stated that changing the dates and removing the age cap to expand eligibility would demonstrate to Congress the need for legislation to preserve and fortify DACA.

*Response:* DHS appreciates the many suggestions of commenters to modify or remove the upper and lower age caps in the threshold criteria and recognizes that the criteria exclude certain noncitizens who arrived as children from consideration for DACA deferred action and employment authorization and delays it for otherwise eligible noncitizens until age 15. DHS agrees that it has legal authority to modify or remove these age caps through notice-and-comment rulemaking. However, as discussed elsewhere in the NPRM and this rule, DHS has determined as a matter of policy to focus this rulemaking on preserving and fortifying DACA by generally retaining the threshold criteria of the Napolitano Memorandum. Retaining the criteria fortifies the longstanding policy upon which the DACA population and their families, employers, schools, and communities have relied for a decade.

(8) General Comments on Criteria and Comments on Multiple Overlapping Criteria

DACA Eligibility Criteria Related to Age and Dates Should Be Expanded

*Comment:* Commenters suggested that DHS change certain guidelines so that the proposed rule and DHS's Enforcement Guidelines correspond with one another, and so that DHS can concentrate its resources on border security. Specifically, the commenters recommended that DHS remove the age cap and require that requestors have continuously resided in the United States since November 1, 2020, to the time of filing the request; were physically present in the United States on the date of enactment of the proposed rule, as well as at the time of filing the request; and had no lawful immigration status on the date of enactment of the proposed rule, as well as at the time of filing of the request.

Another commenter suggested that work authorization be expanded to include recipients regardless of status to add additional security to the lives of recipients and their families.

*Response:* DHS acknowledges these commenters' suggestion to amend certain threshold criteria to align with the Secretary's enforcement priorities as defined in the Enforcement Guidelines. However, DHS reiterates that it is issuing this rule to preserve and fortify the DACA policy, to ameliorate legal uncertainty, and to clarify criteria for the DACA population, which, along with their families, employers, and communities, has significant reliance interests in DACA. Nor could DHS extend employment authorization to any non-DACA population through this rulemaking due to its limited scope. DHS therefore declines to make changes to the rule in response to this comment.

High Bar for DACA Recipients

*Comment:* A commenter said that multiple criteria, including criminal history and education, set a higher bar for DACA recipients than for the rest of the U.S. population. Another commenter said that DACA recipients have registered themselves to be under a microscope—they have given up their personal information and agreed to a higher standard than the average citizen.

A commenter stated that DACA has stricter requirements than does the process of adjustment of status or naturalization, which negatively impacts young people and their families. The commenter urged DHS to view DACA recipients as future U.S. citizens and, thus, ensure that the eligibility requirements are not stricter than those for adjustment of status or naturalization since strict requirements do not influence whether a DACA recipient ultimately will gain citizenship.

*Response:* DHS acknowledges these commenters' statements and suggestions. DHS reiterates that this rule is a reflection of the Department's authority to identify a target population—and the threshold criteria for inclusion in this target population—for deferred action as an exercise of prosecutorial discretion. DHS agrees that, by virtue of requesting DACA, requestors must provide personal information and have the burden to establish they satisfy threshold eligibility criteria and otherwise merit the favorable exercise of discretion. DHS reiterates that DACA is a form of time-bound deferred action, which requires an assessment of positive and negative discretionary factors. DHS notes that the eligibility criteria for benefit classifications such as adjustment of status and naturalization are outside the scope of this rulemaking, and disagrees that criteria for DACA, an exercise of prosecutorial discretion, necessarily should align with the criteria for adjustment of status or naturalization. DHS therefore declines to make changes to the rule in response to these comments.

Other Comments

*Comment:* Multiple commenters recommended that the final rule should explicitly state USCIS will accept new requests to prevent ambiguity caused by previous court decisions that kept USCIS from accepting new requests. Some of these commenters wrote that many more people would qualify for this vital policy if they are able to apply, and these future recipients should not be excluded as they merit the same

favorable exercise of discretion. Another commenter said that it supports DHS's decision to apply the proposed rule to both current and future DACA requestors, as both groups have reliance interests and should not be denied significant opportunities afforded by DACA.

One commenter stated that it assumed an extension of time would be given to requestors who missed a qualification deadline during the time of the July 16, 2021 injunction.

A commenter said that the proposed rule fails to provide alternatives to its narrow and outdated coverage. Another commenter stated that it disagreed with the notion that DACA's coverage cannot be expanded due to the reliance interests of previous recipients of DACA and those similarly situated who have not yet requested DACA.

*Response:* DHS acknowledges these commenters' concerns but for reasons expressed throughout this preamble, DHS believes the scope of this rule is amply justified. DHS does not assert in this rulemaking that reliance interests prohibit DHS from altering the criteria set forth in the Napolitano Memorandum. Rather, as explained in this rule, this focus on reliance interests and preservation of the primary features of the policy is consistent with the President's directive to preserve and fortify DACA, as well as the Supreme Court's decision in *Regents,* as described above. Further, DHS also has determined that the criteria contained in the Napolitano Memorandum successfully advance DHS's important enforcement mission and reflect the practical realities of a defined population of undocumented noncitizens who, because of limited enforcement resources are unlikely to be removed in the near future and who contribute meaningfully to their families, their communities, their employers, and the United States generally, as discussed elsewhere in this rule. Moreover, the establishment and continued application of these threshold criteria, while allowing for the residual exercise of discretion to account for other relevant considerations, serves to promote consistency and avoid arbitrariness in these determinations. Finally, because this final rule codifies longstanding threshold criteria, DHS does not believe any requestors impacted by the *Texas* decision have qualification deadlines that would need extension upon implementation of this rule. DHS therefore declines to adopt changes in response to these comments.

*Comment:* A commenter expressed support for DACA but recommended that DHS pick a date and, from that day

forward, no person, including children, should be allowed to remain in the United States without lawful status.

*Response:* The comment is outside the scope of the proposed rule. DHS nonetheless acknowledges this commenter's suggestion, and emphasizes that it enforces the immigration laws consistent with available resources, statutory requirements, and agency priorities, including a particular focus on those who pose a threat to our national security, public safety, and border security. However, DHS maintains authority to exercise prosecutorial discretion and defer the removal of noncitizens lacking lawful status. DHS declines to make changes to the rule in response to this comment.

5. Procedures for Request, Terminations, and Restrictions on Information Use (§ 236.23)

a. Fees and Fee Waivers

Fees Are Too Low

*Comment:* A commenter stated that the proposed $85 DACA filing fee was too low and recommended that this fee should be at least $250. Another commenter recommended a larger one-time fee. A commenter stated that DACA requestors should at least pay the full cost of adjudicating their cases plus a surcharge to fund enforcement and restitution initiatives. The commenter went on to cite figures relating to USCIS' backlog. The commenter also stated that USCIS disclosed to Congress in 2018 that to fund DACA processing, the agency dipped into funds from application fees of lawful visa applicants and their sponsors. The commenter further remarked that the fee proposed in the NPRM for the Form I–821D is woefully insufficient to cover the costs associated with adjudicating a DACA request. The commenter reasoned that the cost of processing an initial DACA request is $446 and the cost of processing a DACA renewal request is $216, yet the proposed rule only requires DACA requestors to pay an $85 fee to cover the cost of fingerprinting, essentially making the cost of adjudication free to the requestor.

Another commenter stated that USCIS may make $310 less per DACA request for any number of requests, which could diminish the agency's budget by $34.9 million annually, or $384 million over the next 11 years. The commenter said that the proposed restructuring of the fees would make it nearly impossible for USCIS to meet its obligation for ensuring that the USCIS has enough capital to cover the total cost of full

adjudication for each request considered, which is $332, and USCIS would recover only $85 of this potential cost from each request. The commenter remarked that, under the proposed fee restructuring, each request would recover $247 less than the potential cost of full adjudication, and that the proposed rule acknowledges that, under the current structure, USCIS would charge $93 million less than the estimated full cost of adjudication for every DACA request received annually. The commenter stated that the final rule should include evidence to justify the risks of the proposed rule for funding USCIS operations. The commenter further stated that estimating how many requestors would no longer apply for employment authorization under the proposed fee restructuring would allow for more accurate estimates of the total losses that USCIS would face. A commenter asked if the Government would be affected financially by the drastic reduction in the cost of DACA requests, or if the change would be negligible. Another commenter remarked that more research is needed to justify how restructuring fees may affect USCIS operations that rely on those fees for funding.

*Response:* As explained elsewhere in greater detail, this rule is amending DHS regulations to codify the existing requirement that requestors file Form I–765, Application for Employment Authorization, which currently requires a $410 fee, with Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and reclassifying the $85 biometric services fee as a Form I–821D filing fee, to recover any additional DACA adjudication costs.[283] In the NPRM and Supplemental Cost Methodology Document, DHS explained that the current $85 fee for DACA would not recover the full costs for individuals who did not request an EAD and pay the full costs of the Form I–765. 86 FR 53764. At the time USCIS conducted its cost analysis for the proposed rule, it estimated that the unit cost of Form I–821D was $332. *Id.* This represents the most recent unit cost estimates for Form I–821D.

USCIS cost estimates may change over time. New information may be available, such as more recent receipts or adjudication hours. Estimates may use different assumptions. For example, the Supplemental Cost Methodology Document in the NPRM docket did not distinguish between initial and renewal DACA requests. However, the older USCIS cost estimate cited by a commenter relied on older information

---

[283] *See* new 8 CFR 236.23(a)(1).

and distinguished between initial and renewal DACA requests.[284] That old estimate used draft FY 2019–2020 fee rule information. The published proposed rule for the FY 2019–2020 fee rule had different results than the draft cited by the commenter. In the supporting documentation accompanying the FY 2019–2020 proposed fee rule, USCIS estimated the unit cost for Form I–821D was $273.[285] Ultimately, DHS removed DACA fees [286] from the final fee rule, which was later enjoined.[287] DHS maintains its position that the $332 in the NPRM and Supplemental Cost Methodology Document represents a reasonable estimate of the Government's costs of processing these forms. In the future, DHS plans to propose new USCIS fees in a separate rulemaking after reviewing fees for Form I–765 and other immigration benefit requests.[288] DHS determined that the cost for adjudicating concurrently filed Forms I–765 and I–821D, as required in this final rule, is a negligible increase in costs compared to the $332 estimated in the NPRM for adjudicating Form I–821D alone. USCIS determined there is a negligible workload difference between adjudicating Form I–821D alone and the combined Forms I–821D/I–765 DACA adjudicative action.[289] As such, DHS determined the $332 estimated cost in the NPRM is reasonable to use for the final rule. DACA requestors will therefore be covering the full cost of adjudicating a DACA request and should not create a deficit in USCIS' budget. However, DHS disagrees that DACA filing fees should include a surcharge to fund enforcement and restitution initiatives because DHS has an interest in ensuring that requests for DACA are accessible to those who may meet threshold criteria. As discussed throughout this rule, the DACA policy reflects an appropriate use of the Department's resources to exercise deferred action for a specific population of individuals who are low priorities for removal. As discussed elsewhere, it serves DHS's interest in conserving enforcement resources when the DACA policy is accessible for those who are potentially eligible to come forward to submit requests so that DHS can conduct background checks and determine whether they merit the exercise of prosecutorial discretion and thereby conserve other congressionally appropriated resources for higher priority enforcement uses.

Fees Are Too High

*Comment:* By contrast, many commenters stated that DACA-related fees are too high and urged DHS to reduce them to make DACA more accessible. Commenters stated that many requestors come from low-income backgrounds and struggle to cover the costs. Others noted that the COVID–19 pandemic has resulted in a loss of work for many, while many DACA recipients continue to work in essential roles, with one commenter noting that DACA recipients with front-line jobs have endured additional costs related to acquiring Personal Protective Equipment and covering the costs of their own healthcare due to exclusions from ACA subsidies. Many commenters stated that requiring individuals to pay $495 in fees to renew DACA every 2 years presents a challenging financial burden. A commenter stated that the cost of filing the request for deferred action together with the application for work authorization should be reduced to a level that is realistically affordable to DACA-eligible requestors based on their age and level of income. The commenter said that the fees for deferred action and work authorization together amount to 69 hours of work at the Federal minimum wage rate, and there is no fee waiver available. The commenter stated that because the forms are lengthy, with legal jargon and generally confusing language, many requestors need filing assistance, with associated costs as high as $900. In addition to the costs of filing fees and filing assistance are the costs for obtaining documents, making copies, and mailing them. Other commenters cited research from the Migration Policy Institute indicating that fees remain a barrier to DACA renewal and that an estimated 35 percent of DACA eligible individuals live in families with incomes less than 100 percent of the Federal Poverty Line. Commenters expressed concern that requestors often seek private loans that later develop into more challenging financial burdens. Other commenters cited data that 36 percent of DACA recipients reported a delay submitting their request to raise funds. A number of commenters stated that the fees created barriers to employment and would lead otherwise eligible noncitizens to engage in unauthorized employment.

*Response:* DHS acknowledges these commenters statements related to DACA related fees. DHS recognizes that the $85 Form I–821D filing fee, proposed to replace the existing $85 biometrics fee, coupled with the current $410 Form I–765 filing fee, may present a financial barrier to otherwise eligible requestors. However, DHS disagrees with comments that fees are arbitrarily determined. As stated in the NPRM, DHS recognizes that many DACA requestors are young adults who are vulnerable because of their lack of immigration status and may have little to no means to pay fees associated with a DACA request. DHS also acknowledges that DACA-eligible noncitizens may have a variety of financial burdens that make it difficult to afford the fees. DHS has accounted for filing costs to the requestors in the RIA, including the time burden for completing the request, costs related to assistance in completing and filing a DACA request, travel costs, and filing fees.

USCIS is funded primarily by immigration and naturalization benefit request fees charged to applicants and petitioners and must balance the need to recover some of the costs of reviewing DACA requests with the humanitarian needs of the DACA requestor population. As discussed in the NPRM and in this rule, DHS proposed to eliminate the DACA biometrics fee, replace it with an $85 Form I–821D filing fee, and unbundle the Forms I–821D and I–765 as a mechanism to recover some costs of adjudicating these requests while providing an option that would reduce financial barriers to DACA requestors. However, as discussed Section II.C.2.c, after careful consideration of comments, DHS has made changes in the rule to codify the existing bundled form requirements, thus requiring requestors to concurrently file Form I–821D with associated $85 filing fee, Form I–765 with associated $410 filing fee (currently set at $410), and Form I–765WS. DHS has determined this fee structure to be reasonable because it fully recovers adjudicatory costs. DHS has already determined, as explained in the NPRM and in the context of the unbundled filing process proposed, that it is in the

---

[284] USCIS, *USCIS Responses to the Congressional Research Service* (Oct. 2018), *https://www.uscis.gov/sites/default/files/document/questions-and-answers/USCIS_Responses_to_Congressional_Research_Service_CRS_Questions_on_DACA_Costs.pdf.*

[285] *See* USCIS, *FY 2019/2020 Immigration Examinations Fee Account: Fee Review Supporting Documentation* (Apr. 2019), *https://www.regulations.gov/document/USCIS-2019-0010-0007.* On page 24, the Model Output column of Appendix Table 3, Proposed Fees by Immigration Benefit Request, is $273 for Form I–821D. Model Output is the projected total cost from the ABC model divided by projected fee-paying volume. It is only a unit cost forecast (using a budget) and not the actual unit cost (using spending from prior years). USCIS does not track actual costs by immigration benefit request.

[286] 85 FR 46801.

[287] *See* 85 FR 46788 (Aug. 3, 2020) and 86 FR 7493 (Jan. 29, 2021).

[288] *See* 87 FR 5241.

[289] *See* Table 3 of the Supplemental Cost Methodology Document and the subsequent paragraph on page 8.

public interest to hold the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, below the estimated full cost of adjudication. But DHS has not so determined for the Form I–765, Application for Employment Authorization, which is filed by millions of noncitizens outside the DACA population. Additionally, as DACA is an act of enforcement discretion designed to allow DHS to focus enforcement resources on higher-priority cases, DHS believes it is appropriate for DACA recipients to cover the cost of adjudicating their requests. DHS therefore declines to make changes to the fee amounts proposed in the NPRM.

Need for Fee Waivers

*Comment:* In light of the financial hardship fees present many DACA requestors, many commenters urged DHS to permit DACA requestors to request a waiver or reduction of the filing fee, in addition to the existing limited fee exemption criteria. One commenter suggested eliminating the fees completely or, at a minimum, providing a fee waiver. A commenter cited data stating that naturalization almost doubled when eligible applicants were offered a fee waiver and increased by 30 percent when they were simply informed of their eligibility for a fee waiver. One commenter supported a fee waiver, even if it requires raising the overall fee for DACA requests to cover the adjudication costs of those who cannot pay.

Commenters proposed a variety of approaches to expand fee waiver access to the DACA population. Some commenters suggested a "hardship waiver" for individuals under economic or employment difficulties, including challenges affording secondary education, especially with the lack of access to Federal and State tuition aid, or those who are forced to prioritize other costs, such as childcare. Other commenters recommended reduced fees for individuals not interested in work authorization, especially students; and fee waivers for employment authorization applications. A commenter suggested replacing fee exemptions before applications with regular fee waivers simultaneous to applications. A commenter suggested that DHS can allow the fee waiver by amending 8 CFR 106.3 to add a paragraph providing that DACA requestors may apply for a waiver of any fees for DACA and any associated filing. Another commenter reasoned that the hardship of a recurring fee for DACA renewal requestors is considered an emergent circumstance that allows for USCIS to authorize a fee waiver.

*Response:* DHS acknowledges commenters' suggestion to make fee waivers broadly available to DACA requestors. DHS recognizes that fee waivers may make DACA more accessible to eligible noncitizens who may have insufficient resources to pay DACA related fees. The INA authorizes DHS to establish and collect fees for adjudication and naturalization services to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." [290] Through the collection of fees established under that authority, USCIS is funded primarily by immigration and naturalization fees charged to applicants, petitioners, and other requestors. [291] As discussed above, DHS is adopting in this rule the existing bundled process and fee structure that includes filing fees associated with the Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and the Form I–765, Application for Employment Authorization.

DHS recognizes that some DACA requestors face economic hardship that impacts their ability to pay the required fees, but notes that DACA, as an exercise of prosecutorial discretion that allows DHS to focus limited resources on higher priority cases, is not an immigration benefit or associated filing authorized for fee waiver under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and that it is appropriate for beneficiaries of this enforcement discretion to cover the cost of adjudication.

In the NPRM, USCIS estimated the full cost for processing Form I–821D using the agency's established cost methodology and the available parameters at the time of the review. [292]

USCIS estimated that the total cost of adjudicating Form I–821D is approximately \$125.9 million. USCIS assumed that all DACA requestors in the workload would pay the fee. [293] Dividing the total cost by the estimated DACA workload resulted in a unit cost of approximately \$332 each, as illustrated in Table 4 of the of the Supplemental Cost Methodology Document. If some DACA requestors received fee waivers, then that would decrease the fee-paying workload and increase the unit cost. For example, if only 50 percent of DACA workload paid the fee, then the unit cost would be approximately twice as high because of the lower divisor. [294] USCIS uses 50 percent for illustrative purposes only. USCIS does not know how DACA fee waivers would affect fee-paying receipts. Based on FY 2021 revenue and receipts, USCIS estimates that approximately 44 percent of Form I–765 filings unrelated to DACA paid the \$410 fee. USCIS analysis indicated that approximately 77 percent of the TPS population may have paid the fee for Form I–765 because these individuals have a valid EAD as of April 12, 2021. Using any of these fee-paying percentages would reduce DACA revenue estimates.

DHS estimates that making fee waivers available to DACA requestors for Form I–765 would result in a reduction of approximately \$72,324,000 and \$100,105,600 in fees paid in FY 2022 and 2023, respectively, from the current policy permitting only limited fee exemptions. DHS must carefully balance the interest of making DACA available to those who may meet the criteria with the need for adequate resources to process requests efficiently and effectively. A reduction in fees collected would either negatively impact processing times or require increased fee amounts paid by others to offset revenue diminished by waived fees. In weighing these important interests, and in line with President Biden's directive to preserve and fortify DACA, DHS has determined that maintaining the existing fee structure with limited fee exemptions strikes the appropriate balance. For these reasons, DHS declines to modify the rule to extend fee waivers for DACA and related work authorization requests.

Fee Exemptions

*Comment:* Several commenters urged DHS to broaden its DACA fee exemption

---

[290] INA sec. 286(m), 8 U.S.C. 1356(m).

[291] On August 3, 2020, DHS published a final rule, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* (hereinafter 2020 Fee Schedule Final Rule), which was to be effective October 2, 2020. 85 FR 46788 (Aug. 3, 2020). The 2020 Fee Schedule Final Rule, among other things, established a new USCIS fee schedule and effectively transferred the USCIS fee schedule from 8 CFR 103.7(b) to the new 8 CFR part 106 at 8 CFR 106.2, *Fees*. However, before the 2020 Fee Schedule Final Rule took effect it was enjoined. *See Immigr. Legal Resource Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rts. Proj.* v. *USCIS,* 496 F. Supp. 3d 21 (D.D.C. 2020). At this time, DHS is complying with the terms of these orders and is not enforcing the regulatory changes set out in the 2020 Fee Schedule Final Rule, including the specific fees found in 8 CFR 106.2. 86 FR 7493 (Jan. 29, 2021). Nothing in this proposed rule proposes any change to that ongoing compliance.

[292] *See* Supplemental Cost Methodology Document.

[293] *Id.* at 8.

[294] *Id.* at 8–9. In Table 4, the Total Cost of Form I–821D Activities and Cost Objects is \$125,853,334. The unit cost is the total cost divided by 379,500. The calculation for the 50 percent example is \$125,853,334/(379,500 \* 50%) = \$663.26.

policy. Commenters also suggested DHS should, at minimum, codify the availability of fee exemptions for DACA and DACA-related EADs, stating that fee exemptions are a valuable failsafe for eligible individuals, and fee waivers should be available to the DACA requestor population to facilitate their entry into the workforce. The commenters took the position that adding a provision to the rule stating fee exemptions will be available under certain circumstances will help to ensure that the fee exemptions will remain available to requestors. The commenters provided draft language for the proposal at 8 CFR 263.23(a)(5) to clarify the availability of fee exemptions for DACA-related application for employment authorization. Some commenters suggested codifying the availability of fee exemptions and expanding to a broader group of people, such as children under age 18, similar to the policies for U Nonimmigrant Status petitioners or VAWA self-petitioners.

*Response:* DHS acknowledges these commenters' suggestion to codify and broaden its DACA fee exemption criteria. DHS agrees fee exemptions are necessary in some situations. Under current policy and practice, a requestor may be considered for a fee exemption if they submit a letter and supporting documentation to USCIS demonstrating that they meet one or more of the following circumstances: (1) their annual income is less than 150 percent of the U.S. poverty level, they are under 18, and are either homeless, in foster care or otherwise lacking any parental or other familial support; (2) they cannot care for themself because they suffer from a serious, chronic disability and their income is less than 150 percent of the U.S. poverty level; or (3) they have, at the time of the request, accumulated $10,000 or more in debt in the prior 12 months as a result of unreimbursed medical expenses for themself or an immediate family member, and their income is less than 150 percent of the U.S. poverty level.[295] As discussed in this rule, DHS must carefully weigh the interest of access to DACA with the need to collect fees at a level that ensures recovery of the full cost of providing immigration services except under very limited circumstances. DHS has determined that the current fee structure with limited fee exemptions strikes the appropriate balance. For these reasons, DHS declines to modify the rule to codify or expand fee exemptions for DACA and related work authorization requests.

DHS has further determined that subregulatory guidance provides the best vehicle for fee exemption guidance so that DHS maintains flexibility to retain or modify such agency procedures as necessary in the future, and thus declines to modify the rule to codify the existing fee exemption guidance.

Other Alternatives To Reduce the Fee Burden

*Comment:* A commenter recommended reducing the total fee for DACA by half if DHS does not lengthen the 2-year validity period for DACA related EADs. Another commenter suggested that fee waivers should be available to DACA renewal requestors, if not available for all requestors. A different commenter suggested that all fees should be capped at $250 and that the fee for associated advance parole requests be reduced or eliminated. Other commenters suggested that DHS reallocate funds to provide financial assistance and fee waivers for DACA requestors. Another commenter who suggested that the DACA request should be free and reasoned that any lost revenue could be replaced by dissolving ICE and its subsidiary departments. Other commenters suggested that fees should be as minimal as possible to still maintain the necessary DHS funding. Another commenter suggested that renewal fees for DACA should be less than the initial request fees because it should not take as much labor to review renewal requests. A different commenter said that the $85 fee for Form I–821D is appropriate if it is entirely devoted to application processing but suggested a reduction to the EAD fee. The commenter recommended mitigating costs as much as possible to facilitate employment.

A commenter suggested that DHS base fees on the requestor's age and income. Other commenters recommended establishing a family plan to ease the financial burden on families that must file separately for individual family members.

*Response:* DHS acknowledges the suggestions raised by these commenters. As discussed above, DHS has carefully considered the DACA fee structure, weighing the interests in recovering the costs of adjudicating these requests and in reasonably mitigating financial barriers to requestors. DHS has concluded that the proposed fee structure, in which the Form I–821D and Form I–765 filing fees, within a bundled filing process, recover the costs of processing DACA requests, represents a reasonable approach to balance these interests. Although DHS recognizes the

commenter's suggestion that initial and renewal requests should have different filing fees because renewal requests require less time to adjudicate, DHS has concluded that having two fees would be administratively burdensome and potentially confusing to requestors. Furthermore, as this rule does not modify longstanding threshold criteria to expand DACA eligibility, DHS expects that the majority of DACA requests moving forward will be renewal requests. DHS therefore declines to make changes to the rule in response to these comments. DHS also notes that recommendations regarding appropriations, budget allocation, and dissolution of DHS agencies fall outside the scope of this rule and declines to address these comments further.

b. USCIS Jurisdiction (Including Comments on Inability To Grant DACA to Someone in Immigration Detention)

*Comment:* Most commenters who submitted comments on this topic requested that USCIS adjudicate DACA requests from detained individuals rather than require DACA-eligible individuals to secure release from detention before their request can be granted. Several commenters expressed concern that the proposed approach would bar detained individuals from seeking DACA. Other commenters expressed concern that extending USCIS jurisdiction over detained individuals would provide more protection to immigrant youth. Commenters argued that the proposed framework would deprive certain individuals of the main benefit of DACA—the ability to demonstrate their low priority for removal and their eligibility for deferred action (which, according to a commenter, would necessarily constitute a strong basis for release from detention). One commenter argued that denying access to DACA to detained young people deprives them of a tool to advocate for their release and defend themselves against deportation while in removal proceedings.

Commenters expressed concern that the proposed approach would lead to unnecessary and prolonged detention of DACA-eligible individuals. A commenter similarly opposed the approach stating it would lead to unnecessary detention, where the commenter stated that they had witnessed abuse, inadequate legal and medical services, unsanitary conditions, and lax COVID–19 protocols.

Several commenters expressed concern that DACA decisions should be made by USCIS and not be subject to separate action or decision by ICE. Commenters argued that providing

---

[295] DACA FAQs.

USCIS jurisdiction over detained cases would permit USCIS to make informed decisions based on the totality of the circumstances.

Several commenters opposed granting ICE veto power over DACA decisions. Commenters expressed concern about ICE's decision-making process for release from detention, stating that the process is notoriously arbitrary and disorganized and noting inconsistent decisions would block individuals from receiving DACA even if USCIS determines an applicant is eligible and merits a favorable exercise of discretion. Another commenter stated that ICE staff often fail to execute ICE's mandate, fail to review cases accurately, are unresponsive to counsel, and are not transparent or accountable in decision-making. Other commenters expressed concern that ICE or CBP could prevent renewal of a DACA grant keeping an individual detained, and cited examples of *Inland Empire* class members who were unable to renew their DACA request due to being detained.

A commenter noted that release from detention is often based on factors that do not bear on an individual's fitness for DACA, and that decisions about bonds are similarly arbitrary and subject to great variety across different regions of the United States. Several commenters stated their concern that ICE and CBP detention decisions may be based on noncitizens' contact with the criminal legal system that does not always lead to a disqualifying conviction, and permitting ICE or CBP to take DACA decisions away from USCIS would unfairly reproduce racial inequities associated with the criminal legal system (stating that many DACA recipients are Black, Latinx, or other people of color whose communities experience a high rate of policing).

*Response:* DHS acknowledges commenters' concerns regarding the requirement that detained individuals be released from detention for USCIS to grant their DACA request. DHS likewise acknowledges commenters' requests to place DACA decisions solely in the hands of USCIS rather than ICE or CBP. DHS emphasizes that foundationally, DACA is a policy setting the exercise of prosecutorial discretion for certain individuals who are low enforcement priority, and as such, is necessarily connected to, and dependent on, immigration enforcement decisions made by the Department's enforcement agencies. USCIS' role in considering requests from individuals identifying themselves as low enforcement priorities does not strip ICE and CBP of the responsibility to enforce the immigration laws. DHS has determined

that the balance of the relevant agencies' responsibilities is best served by permitting individuals who have been apprehended and are currently in immigration detention to identify themselves as DACA-eligible so that ICE may consider whether they are a low enforcement priority such that they should be released from custody, after which USCIS may then approve or deny their request. DHS notes that USCIS has not previously had jurisdiction to grant DACA to a noncitizen in immigration detention under custody of ICE and that under longstanding DACA policy, detained noncitizens were instructed to identify themselves to ICE for potential release to pursue their DACA request.[296] Under current procedures, if, after review, these noncitizens appear to meet the DACA criteria, ICE may release them to file a DACA request with USCIS.[297] DHS believes that, as provided in this rule, permitting detained individuals to instead begin the DACA request process by filing a request with USCIS before being released from detention will make the decision-making process more efficient while maintaining ICE's role in determining the enforcement priority level of individual detainees. While requestors may file their requests while detained, under this rule, USCIS may not grant these requests until the individuals have been released from detention.

DHS acknowledges the concerns expressed by commenters regarding release-from-detention policies and the potential impact of decisions by individual ICE officers. As originally envisioned by the Napolitano Memorandum, DACA is one portion of implementing the Department's overall enforcement strategies. The Napolitano Memorandum included guidelines for identifying low enforcement priority individuals for deferred action under what became the DACA policy, including those individuals in detention and removal proceedings, and envisioned individuals would self-identify as candidates for deferred action. Similarly, the Department's Enforcement Guidelines set out enforcement priorities and instruct enforcement agencies to exercise discretion as appropriate for individuals

outside of those priorities. While all discretionary enforcement and adjudicatory decisions involve multiple decisions made by a single enforcement officer or adjudicator, DHS asserts that consistent policies, training, and review best address concerns of individual ICE officers "vetoing" otherwise DACA-eligible noncitizens. Additionally, DHS has set up a case review process for noncitizens to obtain expeditious review of enforcement actions, including decisions on detention.[298]

DHS thanks commenters for highlighting concerns that differential policing of communities will affect detention decisions based on contact with the criminal justice system. DHS acknowledges that arrests and convictions are best understood in the totality of the circumstances.

DHS acknowledges the related concern that detention of a DACA recipient could prevent that individual from renewing a DACA grant. However, individuals with DACA are generally not subject to enforcement action absent a determination that enforcement discretion is no longer warranted, typically due to activity that would serve as a basis for termination of the DACA grant. Additionally, DHS encourages DACA recipients to file renewal requests within the recommended filing window to best avoid gaps between periods of deferred action under DACA.[299]

Inefficiency Concern

*Comment:* Some commenters suggested it would be more efficient for USCIS to adjudicate requests from detained noncitizens. Several commenters stated that the proposed bifurcation of DACA adjudication for detained and non-detained individuals would be inefficient and impede individuals from making a showing of low priority for removal and eligibility for deferred action. One commenter suggested that ICE be granted authority to adjudicate DACA in certain cases to avoid double adjudication and promote efficiency.

*Response:* DHS appreciates suggestions on ensuring efficiency in the implementation of DACA. DHS emphasizes that USCIS remains responsible for the adjudication of all DACA requests. As discussed above, USCIS has determined that permitting detained individuals to request DACA from USCIS prior to release will increase efficiency. This change will

---

[296] DACA FAQ 12; ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[297] ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[298] ICE, *Contact ICE About an Immigration/ Detention Case, https://www.ice.gov/ICEcasereview* (last updated June 24, 2022).

[299] DACA FAQ 49.

also resolve situations under the previous policy where a requestor who had already been released from detention could be found ineligible for DACA because they were detained when they submitted the DACA request. DHS asserts that specific details of intra-department coordination between ICE and USCIS are best handled through subregulatory guidance in order to retain operational flexibility and to best respond to the circumstances that individual cases may present.

Lack of Justification or Rationale for Rule

*Comment:* Commenters stated there is no reason why USCIS would be prohibited from adjudicating DACA from detained individuals, noting that USCIS regularly adjudicates other applications for detained individuals. Another commenter stated that no other immigration benefit effectively precludes detained individuals from applying, and that tying approval for DACA to detention status is unprecedented and unwarranted. One commenter stated that DHS risks violating the principle that immigration detention be nonpunitive by promulgating a DACA rule that deems detained individuals ineligible for DACA. A commenter stated that there was no evidence on the ICE website suggesting that individuals cannot be granted DACA while in custody, and remarked that detained individuals have previously sought and been granted DACA, with that approval informing subsequent decisions on the individual's release from custody. The commenter further stated that it was arbitrary and capricious to require release from custody before USCIS can grant a DACA request because DACA eligibility requirements do not require that an individual *not* be detained and that past practice had created a reliance interest in adjudicating DACA requests from detained individuals.

*Response:* DHS acknowledges that USCIS sometimes adjudicates immigration applications and petitions benefiting detained individuals. DHS submits that as a discretionary exercise of prosecutorial discretion, DACA is difficult to compare to immigration benefits, some of which may be granted to detained individuals, and refers to the above response regarding the balance of responsibility between ICE and USCIS. DHS believes that it would not be appropriate to grant enforcement discretion under the DACA policy to an individual that ICE has determined warrants continued detention. As explained above, since the inception of the DACA policy, USCIS has not

exercised jurisdiction to grant DACA to a detained individual. Both the USCIS DACA FAQs and the ICE public web page containing DACA information instruct detained individuals to identify themselves for potential release to seek DACA with USCIS.[300] Additionally, to answer the first question on Form I–821D, Consideration of Deferred Action for Childhood Arrivals, the requestor states ''I am not in immigration detention.''[301] Acknowledging that some cases may present complicated detention histories, DHS submits that any such request referred to by commenters was likely granted in error if the requestor was in fact detained at the time of the adjudication of the request. DHS also notes that the regulation permits detained individuals to submit requests for DACA to USCIS, which were previously denied under the existing DACA policy. Given the longstanding DACA policy, DHS does not believe requestors have a reliance interest in USCIS adjudicating DACA requests from detained requestors. DHS recognizes the strong interest a noncitizen in immigration detention may have in requesting and receiving DACA, but denies that the rule's approach is punitive; in these cases, the immigration enforcement entity detaining the potential DACA requestor applies the Department's enforcement strategy in determining whether to release that person from detention prior to or in coordination with another agency's decision to grant deferred action for a period of time.

Further Recommendations

*Comment:* One commenter criticized DHS for failing to include in the proposed rule guarantees that ICE would release DACA-eligible individuals from detention. Another commenter recommended aligning DACA with other humanitarian programs by providing similar safeguards to other classes of vulnerable people DHS has recognized as unsuitable for detention, such as SIJ petitioners, petitioners and applicants for U and T nonimmigrant status, and VAWA self-petitioners. The commenter recommended expeditious processing of DACA requests for detainees, including explicitly allowing USCIS to accept biometrics taken by ICE to facilitate the

processing; that the rule afford automatic stays of removal for requestors until requests are adjudicated; and that the rule consider directing immigration judges to sua sponte continue proceedings where a DACA request is pending, and to terminate or administratively close proceedings where there is evidence that USCIS approved a DACA request. The commenter also urged USCIS to consider a prima facie or bona fide determination process for DACA requestors.

*Response:* DHS appreciates the suggestion to include guarantees that ICE will release DACA-eligible individuals from detention. Specific guidance on how USCIS and ICE will cooperate to address detained individuals who request DACA is best addressed in subregulatory guidance.

DHS notes that the DACA policy serves important humanitarian aims, as do immigration benefit requests such as U and T nonimmigrant status, SIJ classification, and relief under VAWA; however, there are important distinctions between DACA—a policy to exercise prosecutorial discretion to defer removal of noncitizens who demonstrate they are a low enforcement priority—and those benefits that are designed to assist abused, neglected, or abandoned minors, and victims of crime, human trafficking, and domestic battery or extreme cruelty. DHS notes that, unlike for petitions for U nonimmigrant status, there is no annual cap on the number of DACA requests that may be approved, and as a result, requestors do not wait years for a final adjudication of their request. As a result, DHS has not found it necessary to create a prima facie or bona fide determination policy for DACA. DHS appreciates suggestions on managing removal proceedings over the course of the adjudication of a DACA request. Because the rule is not a joint DHS/DOJ rule, DHS cannot insert provisions binding EOIR, though it notes the suggestions as applied to ICE's Office of the Principal Legal Advisor. DHS appreciates the request to streamline processing by allowing USCIS to accept biometrics taken by ICE. USCIS is examining whether it has the legal authority and technical capability to submit to the Federal Bureau of Investigation biometrics collected by a criminal justice agency or from a non-criminal justice agency when the biometrics were collected for a different purpose from USCIS' purpose of use. DHS will continue to explore the feasibility of permitting USCIS to use biometrics collected by ICE for

---

[300] DACA FAQs 12–14; ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[301] USCIS, Form I–821D, Consideration of Deferred Action for Childhood Arrivals, *https://www.uscis.gov/sites/default/files/document/forms/i-821d.pdf*.

adjudication of DACA requests from detained individuals.

c. Grants and Denials of a Request for DACA (Including Additional Evidence, 2-Year Period, Consultations, Notice of Decision)

Two-Year Grant Period for Deferred Action and Work Authorization

*Comment:* Many commenters opposed the 2-year DACA validity period, commenting that it is too short, limits DACA recipients' ability to plan between renewals, and places a financial burden on applicants due to a frequent and complex renewal process. A commenter also stated that the validity period undermines the goals of DACA by generating fear of imminent deportation or loss of schooling or work authorization approximately every 1½ years. Commenters expressed concern that the 2-year validity period for DACA and related EADs, coupled with slow processing times for renewals and a lack of sequential renewal option (such that DACA is renewed from the date of expiration of the previous grant, avoiding any overlap in approval periods), negatively impacts DACA recipients, employers, and others, causing lapses in deferred action that result in accrual of unlawful presence, lost work authorization and potentially suffering other lasting harms. A commenter stated that delays and lapses in employment authorization result in a trickle-down effect to manufacturers of consumer goods, customers, and other business stakeholders when applicants lose the ability to work. Some commenters highlighted that the 2-year period for DACA EADs creates additional burdens for USCIS, as well as requestors.

Commenters recommended that the DACA grant period be extended beyond 2 years, with suggestions ranging from 3 to 10 years. Commenters stated that longer grant periods would result in less taxing administrative processes and judicial review of renewals and, consequently, reduced backlogs. Commenters also expressed concern surrounding the financial hardship DACA recipients face, stating that many recipients are from low-income families and cannot afford the renewal fee. A commenter advocating for longer validity periods stated that working families need and deserve stability and the ability to plan for the future, and that a 2-year validity period is too short to provide adequate assurances that it is worth the risk to submit a detailed, personal application to DHS. The commenter also noted that the short timeframe creates disincentives for

employers looking to hire and train DACA recipients. Commenters cited studies indicating the benefits of extending DACA and EAD grants beyond 2 years, including cost and time savings for applicants, reduced administrative burdens for USCIS, and avoided consequences for recipients, employers, and the workforce upon loss of employment authorization. Other commenters similarly discussed the economic benefits of extending DACA and EAD grants beyond 2 years. Commenters stated that USCIS approves more than 98 percent of DACA renewal requests each year and extending the validity period would reduce the burden of biennial renewal requests, while supporting DHS's stated policy goal of prioritizing limited enforcement resources. The commenters further stated that the Department could make this extension without undermining its enforcement authority, as it would retain the discretion to revoke DACA at any time.

*Response:* DHS acknowledges these commenters' concerns regarding the 2-year validity period for DACA and associated employment authorization. DHS recognizes and appreciates that biennial renewal requests may cause uncertainty for DACA recipients and employers and impose higher costs than a longer validity period. DHS also agrees that extending DACA and associated EAD validity periods could improve stability for recipients and reduce adjudicatory costs. DHS acknowledges one commenter's concern that the 2-year validity period could provide a disincentive for employers to hire and train DACA recipients, but notes that the commenter did not provide data to support this statement, and other sources indicate an 84- to 89-percent employment rate among DACA recipients.[302]

DHS must carefully balance the benefits of a longer validity period with the nature of deferred action as a discretionary, temporary exercise of prosecutorial discretion. In other contexts, DHS has provided deferred action for periods both greater than and less than 2 years. As DACA recipients do not have an underlying petition or application for nonimmigrant or immigrant status pending adjudication, DHS believes 2 years is an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action. DHS also has

determined that codifying the longstanding 2-year validity period for deferred action best achieves President Biden's directive to preserve and fortify DACA. DHS appreciates that DACA recipients may risk either overlap or gaps in their DACA and EAD validity periods when renewing their requests and reiterates the importance of filing their renewal requests in accordance with guidance published on the USCIS website to mitigate these risks. Regarding a commenter's concern that 2 years is too short of a period of both deferred action and employment authorization to be worth the risk of submitting detailed, personal information to USCIS, DHS notes that this rule clarifies longstanding policy protecting information provided in DACA requests from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless DHS initiates immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns.[303] DHS therefore declines to make changes in the rule in response to these comments.

DACA Renewals: Sequential Grant Periods

*Comment:* Some commenters stated that, due to fluctuating processing times and concerns over losing work authorization, DACA recipients rarely benefit from the full 2-year validity period in practice. As such, these commenters stated that most DACA recipients submit their renewal applications well before the grant has expired, resulting in additional time and costs for requestors and USCIS. Because USCIS currently assigns the renewal approval date as the date the validity period begins, early filing can result in an overlap between the grant periods, described by one commenter as reducing the effective validity period to 1½ years.

Commenters recommended that the agency instead issue sequential approval validity dates for renewal requests. Some of these commenters stated that sequential grants, which they asserted were previously piloted, would allow DACA recipients to receive full 2-year periods of deferred action rather than one overlapping into the next. Commenters stated this would allow recipients to avoid disruptions to their work or education and better plan for the future, while another commenter stated it would mitigate the punitive effect on recipients who file renewal requests early. Another commenter

---

[302] Congressional Research Service, *Deferred Action for Childhood Arrivals (DACA): By the Numbers* (Apr. 14, 2021), *https://sgp.fas.org/crs/homesec/R46764.pdf*.

[303] *See* new 8 CFR 236.23(e).

suggested that sequential grant periods would reduce USCIS' workload.

*Response:* DHS thanks commenters for the suggestion to forward-date DACA and associated EAD validity periods. DHS recognizes that this suggestion could reduce recipients' disruptions to education and employment and mitigate the risk of gaps or significant overlap in validity periods. DHS notes that sequential grant periods were not previously piloted, but will continue to evaluate operational and processing mechanisms to improve efficiency and reliability for the DACA population and, if appropriate, issue subregulatory guidance. DHS therefore declines to make changes to the rule in response to these comments.

Automatic Renewals or Extensions

*Comment:* Some commenters urged USCIS to issue automatic extensions of deferred action and work authorization validity upon receipt of a DACA renewal request or when USCIS is experiencing staffing issues and processing delays. Commenters suggested automatic extensions would mitigate the profound impact of lapses in protection and disruption in employment for those who timely file renewal requests but risk lapse due to USCIS backlogs, as well as assist requestors who experience other financial and practical obstacles in the renewal process. As an alternative to automatic EAD renewals, commenters suggested that the agency add DACA to the list of employment authorization categories that receive an automatic 180-day extension of their EAD validity period when an employment authorization renewal application is timely filed. A commenter noted that the alternative 180-day automatic extension is an existing process that currently includes TPS holders. The commenter further reasoned that allowing for automatic extensions would be in line with the agency's rationale that this safeguard provides additional stability to U.S. employers and individuals eligible for employment authorization. A commenter added that allowing the receipt notice for a DACA-based EAD renewal application to serve as temporary work authorization would avoid disruptions to the workforce and free up USCIS resources used towards inquiries on pending cases.

*Response:* DHS appreciates these commenters' suggestions to automatically extend deferred action and employment authorization temporarily upon filing of a DACA renewal request. DHS notes that in FY 2022, USCIS has reduced median processing times for DACA renewal requests and related employment authorization requests to 0.5 months, as of May 31, 2022.[304] DHS reiterates that the decision to grant deferred action—initially and upon a renewal request—is a case-by-case determination of whether to favorably exercise prosecutorial discretion. Providing automatic temporary extensions of deferred action to DACA renewal requestors would be inconsistent with DHS's treatment of other deferred action populations' requests for renewed deferred action and the nature of enforcement discretion. DHS therefore declines to modify the rule to codify automatic temporary extension of deferred action based upon the filing of a renewed request. As employment authorization granted in connection with DACA is predicated upon the grant of deferred action, DHS also declines to make changes to the rule to qualify DACA renewal requestors for automatic extensions of their EADs beyond the validity of the underlying deferred action. DHS acknowledges that certain applicants who have filed Form I–765 in other categories are eligible for the automatic temporary extension. However, under 8 CFR 274a.13(d)(iii), a category can only be designated as eligible if the category does not require the adjudication of an underlying application or petition before the adjudication of the renewal application. DACA-based renewal requests for employment authorization do not meet this regulatory requirement.[305] DHS therefore declines to make changes to the rule in response to these comments.

Lapsed DACA Requestors

*Comment:* Some commenters recommended that USCIS deem as a renewal request any request from an individual who has previously been granted DACA, regardless of the length of time since their prior DACA grant lapsed. Citing instructions for USCIS considerations of DACA requests, a commenter opposed the current policy whereby DACA requests qualify for renewal only if the requestor files within 1 year after their last period of deferred action expired. The commenters concluded that, as DHS is enjoined from granting initial DACA requests, current policy bars eligible individuals from obtaining DACA when they delay renewal due to financial, legal, or other reasons. Commenters suggested that the policy could be updated in the instructions and online DACA FAQs.

A commenter recommended that USCIS provide an optional backdating of deferred action grants for requestors whose DACA expires and who later apply for initial or renewal of DACA. This, the commenter said, would prevent requestors from accruing unlawful presence during USCIS adjudication delays or other barriers to renewal.

*Response:* DHS acknowledges and thanks these commenters for their suggestions. DHS recognizes that in light of the *Texas* district court order, former DACA recipients whose DACA has lapsed for more than 1 year are precluded from receiving a renewed grant of DACA. However, DHS reiterates that this rule aims to preserve and fortify DACA for both initial and renewal requestors. DHS notes that "initial" DACA requests must be accompanied by evidence demonstrating that the requestor meets all of the DACA guidelines at the time of filing, while renewals only require evidence of some of the criteria, on the understanding that only some criteria are related to factors that are more prone to change (*e.g.,* comparing evidence of criminal history to evidence that the requestor entered the country before 2007). DHS believes it is important to retain the ability to fully review eligibility in cases where DACA has been allowed to lapse for a significant period of time. DHS also believes that granular policy matters such as filing requirements for lapsed recipients are better addressed through subregulatory guidance and therefore declines to modify the rule in response to these comments. DHS also declines to make changes to the rule to allow for back-dating DACA grants to retroactively eliminate the accrual of any unlawful presence for individuals whose DACA expires and later are granted DACA again. As discussed above, deferred action is a forward-facing step; the decision to forbear removal of a noncitizen for a period that has already past would be meaningless. For these reasons, the Department does not believe it may properly erase a person's pre-DACA unlawful presence by beginning deferred action from a date in the past.

DHS Should Waive Biometrics Collection for Renewal

*Comment:* Several commenters urged the agency to utilize existing biometrics

---

[304] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[305] *See* USCIS, *Automatic Employment Authorization Document (EAD) Extension, https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-employees/automatic-employment-authorization-document-ead-extension* (last updated July 22, 2022).

for DACA renewals rather than requiring new biometrics every 2 years upon renewal. Some of these commenters reasoned that there is no clear rationale for requiring new biometrics as biometrics are unlikely to change, and requesting them is costly for both the Government and requestors. Some commenters further reasoned that Application Support Center closures during the COVID–19 pandemic and the successful use of prior biometrics demonstrate that this step is unnecessary for DACA renewal. A commenter further reasoned that many DACA requests face significant physical and psychological struggles with presenting for biometrics. The commenter requested that, at minimum, USCIS allow the reuse of biometrics upon the request of requestors or their representatives where presenting for biometrics would impose an unnecessary burden on the requestor.

*Response:* DHS acknowledges commenters' suggestion to reuse requestor biometrics for DACA renewal requests. DHS notes that as of May 31, 2022, USCIS reduced FY 2022 median processing times for DACA renewal requests and related employment authorization requests to 0.5 months.[306] DHS continues to evaluate and implement, as appropriate, strategies to improve efficiency in processing DACA requests. DHS thanks commenters for the suggestion to reuse biometrics, but wishes to maintain flexibility in this type of processing decision and will consider whether to adopt this suggestion in subregulatory guidance. DHS therefore declines to make changes to the rule in response to these comments.

Denials of a Request for DACA

*Comment:* Some commenters urged USCIS to provide requestors the reasons for denial or intended denial and allow requestors an opportunity to respond, with one commenter stating the requirement to submit another request without full knowledge of any administrative or eligibility errors in the first request unnecessarily increases costs for the individual seeking protection or renewal of protections.

*Response:* DHS appreciates these suggestions. Given the nature of deferred action as an exercise of prosecutorial discretion, as opposed to a benefit request, defined in 8 CFR 1.2, the decision to not confer deferred action, either initially or upon a

renewed request, is appropriately an action within DHS's sole and unreviewable discretion. DHS further notes that as a matter of existing practice and policy, USCIS typically issues either a Request for Evidence or a Notice of Intent to Deny that identifies the reason(s) DHS intends to deny, and provides an opportunity for requestors to respond before a request is denied. Furthermore, if DHS denies a DACA request, the notice of denial will generally state the reasons for denial. DHS acknowledges that a request denied as a matter of discretion will not repeat the negative discretionary factors in the request, but those issues are identified to the requestor in the RFE or NOID prior to DHS issuing a denial. DHS therefore declines to make changes to the rule in response to these comments.

Other Comments and Recommendations

*Comment:* One commenter suggested that the agency consider a faster request process such that requestors would be able to apply between 30 and 45 days prior to the EAD permit expiring and possibly eliminating the fingerprinting process.

*Response:* DHS acknowledges this commenter's suggestions, but believes that operational considerations to improve adjudicatory efficiency and the potential reuse of biometrics for renewal applicants are better addressed through subregulatory guidance. DHS therefore declines to make changes to the rule in response to this comment.

d. Notice to Appear or Referral to ICE

*Comment:* Some commenters stated that automatic NTAs after denial should not be permitted under any circumstances. While the commenters supported the rule's listing of situations in which USCIS would issue an NTA or refer a denial to ICE, noting it would provide clarity for requestors, they expressed concern about the inclusion of denials for fraud on that list. The commenters expressed concern that issuing an NTA after a denial for fraud could have a "chilling effect" on requestors that might frustrate DACA's ultimate goals, as requestors unfamiliar with immigration law could worry that simple errors could be perceived as fraud. The commenters asserted that issuing NTAs to fraud-based denials does little to further the sensible DHS priorities of "protecting national security, border security, and public safety."

*Response:* DHS appreciates the commenters' concerns, and notes that NTAs are not automatic, as each denial and decision to initiate removal

proceedings by issuing an NTA or referring a denied requestor to ICE is made by an adjudicator after assessing the evidence in a case. In response to the suggestion that denials for fraud should not be issued an NTA, DHS notes that the proposed 8 CFR 236.23(c)(2) codifies and clarifies longstanding DACA policy, including on referring fraud-based denials to ICE for purposes of removal proceedings.[307] As such, DHS does not anticipate a change in requestors' behavior based on fear of filing errors being mistaken for fraud. However, DHS appreciates the concern and will consider public perception when developing filing instructions, website language, and other public messaging. DHS strongly disagrees that countering immigration fraud does little to further DHS priorities. Combatting fraud and misrepresentation is central to DHS's mission and to DHS's ability to provide immigration benefits and relief to qualifying individuals. In recognition of this principle, Congress provided a specific ground of inadmissibility to address the use of fraud or willful misrepresentation when obtaining a benefit under the INA.[308]

e. Appeals and Reconsideration

*Comment:* A few comment submissions addressed appeals and reconsideration of DACA denials. A few commenters said that the final rule should include a reconsideration process for requestors to challenge denials, with procedural protections and legal representation. While recognizing that reconsideration motions and appeals may not be required, one commenter stated that this does not explain why the proposed rule does not create a process for challenging denials and stated that the costs of an erroneous denial to the requestor, their family, community, and society are too high to rely on re-request as the sole corrective. One commenter stated that to promote filing and fairness, DACA requestors should have, among other things, avenues to challenge denials or terminations.

Commenters opposed the proposed rule's exclusion of administrative appeals, reopening, or reconsideration stating that it violates USCIS' inherent authority to exercise discretion to review prior decisions, as Service Officers generally retain an inherent ability to review past decisions via motion or appeal, citing 8 CFR 103.5 as an example. Commenters also noted that the proposed rule would limit the

---

[306] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[307] DACA FAQ 26.

[308] INA sec. 212(a)(6), 8 U.S.C. 1182(a)(6).

authority inherently granted to all USCIS officers and add another unnecessary burden to an immigration system that is already overburdened with gratuitous regulatory and administrative complications. Commenters further stated that the proposed rule would not stop officers from acting of their own accord and questioned whether attempting to foreclose any review of past DACA decisions would result in an increase in motions and letters requesting the reviewing Service Officer to exercise discretion to reconsider their decision via self-motion. Commenters also stated that the proposed rule will undermine USCIS' ability to adjudicate DACA requests, because the failure to provide an opportunity for reconsideration will undermine the deference attributed to USCIS when a DACA decision is challenged in APA litigation. The commenters noted criticism of the AAO and stated that USCIS should instead be empowered to exercise its inherent authority to review past DACA denials or rejections. The joint submission stated that DACA requestors must be afforded a mechanism for challenging denials on the basis of abuse of discretion and that whether a mechanism is embedded in the proposed rule will not prevent DACA recipients from attempting to challenge a DACA denial through an APA challenge. Finally, the submission stated that this would be one of the only instances where an applicant is barred from seeking to have a negative decision reviewed, reconsidered, or appealed, which they stated is notable given the lack of uniformity and clarity on which misdemeanors make an applicant ineligible, for example.

One group of commenters stated that incentivizing denied requestors to create and submit new materials rather than appealing or amending their prior requests burdens both USCIS and requestors because USCIS must reprocess and consider requests that are only marginally different from those it already considered, while requestors spend additional money on filing fees and try to ascertain and fix the error that led to the prior denial. The submission stated that allowing amendments to requests prior to denial would reduce workloads, as requestors could correct their forms that otherwise would impact their requests. They further stated that creating an appeal structure would not be procedurally difficult because such a structure already exists for appealing denials caused by administrative errors, and parallel structures already exist for most other immigration processes

through the AAO. They stated that expanding the existing DACA appeals process to accommodate substantive appeals and allow amendments to correct requestor errors is not likely to be substantially difficult.

*Response:* DHS appreciates commenters' suggestion that the rule include a reconsideration process for challenging denials or terminations. However, DHS disagrees with commenters that such a process is appropriate for DACA decisions. Given the nature of deferred action as an exercise of prosecutorial discretion, rather than as a benefit request as defined in 8 CFR 1.2, the decision not to exercise favorable enforcement discretion or not to continue to do so is appropriately an action within DHS's sole and unreviewable discretion.

While DHS recognizes that refiling a DACA request after denial requires an expenditure of money, time, and effort for the DACA requestor, so too would filing a motion to reopen/reconsider or an administrative appeal to the AAO, if USCIS were to permit such motions or appeals. Individuals seeking reopening, reconsideration, or appeal of a benefit request must do so by filing a Form I–290B, Notice of Appeal or Motion with a statement and supporting evidence, and generally must pay a $675 fee.[309] DHS additionally notes that it generally issues an RFE or a NOID before denying a DACA request, providing requestors notice of deficiencies in the request and an opportunity to fix them.

DHS also disagrees with commenters who state that by not providing for administrative appeals or motions to reopen or reconsider, DHS is violating USCIS' inherent authority to exercise discretion to review prior decisions. The preamble to the proposed rule specifies that USCIS would still be permitted to reopen or reconsider a DACA approval or denial on its own initiative.[310] The rule does not impact USCIS' inherent authority to reopen or reconsider its decisions, in its discretion. Further, under current policy and practice as reflected in DACA FAQ 25,[311] USCIS may also reopen or reconsider its DACA decisions if a DACA requestor seeks review of their DACA denial by contacting the USCIS Contact Center for creation of a Service Request, where the requestor believes USCIS incorrectly denied the request due to certain administrative errors. DHS intends to maintain the ability for requestors to

request review via the Contact Center in certain limited circumstances involving administrative error, however DHS believes this process is best suited to subregulatory guidance.

DHS further disagrees with commenters who state that the rule will undermine the deference attributed to USCIS when challenged in APA litigation and in any event, does not believe that the availability of deference to USCIS' decisions on DACA requests when challenged in litigation should determine how the final rule addresses the availability of appeals and reconsideration.

While DHS agrees with commenters that an existing appeal structure exists at the AAO for certain benefit requests, DHS disagrees with the cited criticism of the AAO and maintains that establishing an appeal process for DACA denials is inconsistent with the nature of deferred action as a temporary, favorable exercise of immigration enforcement discretion that gives some cases lower priority for enforcement action.

Accordingly, DHS is not making any changes to 8 CFR 236.23(c)(3) in response to public comments.

f. Termination of a Grant of DACA (Including Comments on Discretionary/ Automatic Termination and Alternatives)

Notice of Intent To Terminate and Automatic Termination Upon Filing an NTA

*Comment:* No commenters wrote to support the termination provisions presented as the primary proposal in the proposed rule. Many commenters stated that USCIS should be required to provide a Notice of Intent to Terminate (NOIT) prior to terminating DACA in all cases in order to provide notice of the proposed grounds for termination and a fair opportunity to respond. Several of these commenters said that this change would preserve due process by allowing DACA recipients the opportunity to correct misinformation and provide supplementary support or documentation, thus preventing unjustified terminations. Similarly, many commenters emphasized the importance of fairness and accuracy in the decision process for terminating a DACA grant, stating that terminating a DACA grant without notice or opportunity to respond is inconsistent with the rule's principle of allowing USCIS to make decisions based on the totality of the circumstances. Commenters also stated that terminating a DACA grant without notice would be

---

[309] Only special immigrant Iraqi or Afghan nationals who work for or on behalf of the U.S. Government are not required to pay the Form I–290B filing fee.

[310] 86 FR 53769.

[311] DACA FAQs.

arbitrary and capricious in violation of the APA.

One commenter suggested that USCIS implement the third proposed alternative in the NPRM to specify the instances in which USCIS generally will issue a NOIT, with opportunity for the DACA recipient to respond before USCIS makes its final decision on DACA termination. Another expressed general agreement with implementing this third alternative but requested that the agency provide a narrower definition of cases involving criminal offenses or concerns regarding national security or public safety so as to only include the most extreme threats to public safety.

One organizational commenter stated that it was disappointed that the proposed regulation at 8 CFR 236.23(d)(1) would permit USCIS to terminate a DACA grant at any time in its discretion with or without issuance of a notice of intent to terminate and urged USCIS to provide DACA recipients with a fair process before termination. The commenter requested that, at a minimum, USCIS provide the recipient with an opportunity to respond, reasoning that procedural fairness is essential to minimize the risk of erroneous deprivation and to decrease racially disparate outcomes. The commenter proposed various amendments to the language at 8 CFR 236.23(d)(1) regarding USCIS' discretionary authority to terminate DACA. The commenter stated that providing notice and an opportunity to respond would: (1) decrease the risk of erroneous DACA terminations; (2) decrease the potential for racially discriminatory decision-making; and (3) honor the deeply held reliance interests that DACA recipients possess.

Many commenters opposed automatic termination based on the filing of an NTA, stating that the rule should not allow ICE or CBP to force USCIS to automatically terminate DACA by issuing and filing an NTA. Some of these pointed out that allowing ICE or CBP to take these actions is contradictory to the core principle of the proposed DACA regulations, which allows USCIS to make considered decisions based on the totality of the circumstances. Similarly, other commenters stated that automatic termination of DACA upon issuance of an NTA undermines the tenets of DACA, which protects against removal and can be requested while in proceedings. Other commenters stated that USCIS is in the best position to make DACA determinations based on agency policy and that ICE and CBP should not be permitted to override

USCIS' determinations. Commenters also stated that automatic termination upon NTA filing is arbitrary and capricious under the APA.

Multiple commenters expressed concerns that the proposal would perpetuate racial disparities in policing and the criminal justice since, since NTAs are often issued as a result of encounters with local law enforcement, which disproportionately impact Black people and other people of color. Many other commenters expressed similar concerns, adding that criminal charges are often later dismissed, but if a DACA recipient is placed in removal proceedings on the basis of a criminal charge that is eventually dismissed, their DACA protections are unjustifiably terminated regardless.

One commenter also stated that automatic termination would be a significant change to policy without adequately addressing DACA recipients' serious reliance interests, particularly for those granted DACA after the filing of an NTA or in the presence of a final order of removal who have made career and life plans for the immediate future in reliance on the continuation of DACA, and specifically, on the continuation of the individual's DACA despite the filing of an NTA. Another stated that there are significant reliance interests in the continuation of existing DACA grants because people make consequential decisions based on the 2-year grants of deferred action and many rely on DACA recipients for financial, emotional, and other support.

Many commenters supported the NPRM's first option in alternative two: striking the provision regarding automatic termination of DACA solely based on the filing of an NTA for all DACA recipients. Some recommended going further and specifically prohibiting DACA termination based solely on the filing of an NTA, with one proposing to allow exceptions for fraud, national security threats, or public safety concerns with additional safeguards and a NOIT. Multiple commenters stated that the alternatives proposed did not go far enough and presented problems with consistency and due process. One stated that they agreed with only the second proposed alternative, which would strike or modify the provision regarding automatic termination of DACA solely based on the filing of an NTA. A few commenters opposed the second option in alternative two, stating that tying automatic termination to the issuance of a final removal order would be irrational since individuals with final orders of removal still can be granted DACA. One commenter suggested that

the later point in the process when DACA should terminate automatically is upon removal. A few commenters opposed the first alternative—limiting automatic termination based on NTA filing to certain individuals, such as those subject to investigation, arrest, or conviction of an Egregious Public Safety (EPS) offense or who fall within certain terrorism or national security-related inadmissibility or deportability grounds—as too broad and vague, and as continuing to present due process concerns.

Multiple commenters recommended that, at a minimum, if DHS is not inclined to provide NOITs before terminating DACA in all cases and to eliminate automatic termination upon NTA filing, the rule should codify the approach required by the *Inland Empire-Immigrant Youth Collective* v. *Nielsen* ("*Inland Empire*") injunction and apply it to all DACA recipients. Commenters stated that DHS provided insufficient explanation for why DHS proposes to depart from the *Inland Empire* approach that it has followed for nearly 4 years and why instead DHS seeks to codify an approach that was already found unlawful by the *Inland Empire* court.

*Response:* DHS agrees with commenters that in most cases, there are good reasons to give DACA recipients adequate notice and an opportunity to respond prior to termination of their DACA. This approach will promote fairness and accuracy in the decision-making process for terminating a DACA grant by allowing DACA recipients the opportunity to correct any incorrect information and provide supplementary information to rebut the intended basis for termination.

DHS further agrees that the *Inland Empire* preliminary injunction provides a framework for the limited circumstances in which termination without a NOIT is necessary. However, DHS now intends to issue NOITs in even broader circumstances than required by *Inland Empire,* in recognition of the concerns raised by commenters about fairness and accuracy in the termination process. Accordingly, DHS is revising 8 CFR 236.23(d) to adopt the first option in alternative two (eliminate automatic termination based on filing of an NTA) and to codify that USCIS will issue a NOIT prior to terminating DACA in most circumstances not involving travel without advance parole, but retains discretion to terminate without a NOIT when the DACA recipient has been convicted of an EPS offense or a national security offense. For these purposes, an EPS offense is a crime

involving significant risk to the safety of others,[312] and a conviction for a national security offense is a conviction relating to conduct described in 8 U.S.C. 1182(a)(3)(B)(iii) (terrorist activity), (iv) (engage in terrorist activity), or 1227(a)(4)(A)(i)) (national security). This approach is a modified, simpler approach than required by the *Inland Empire* injunction, which permits USCIS to proceed quickly to termination (but not automatic termination) for those individuals who present a potential egregious public safety or national security risk. Eliminating automatic termination based on NTA issuance and generally providing NOITs except in circumstances involving certain convictions also mitigates commenters' concerns that automatic termination fails to take into consideration DACA recipients' reliance interests.

Automatic Termination Upon Departing the United States Without Advance Parole

*Comment:* Many commenters opposed automatic termination due to departure without advance parole, and multiple commenters specifically supported the fourth alternative proposed in the NPRM: providing an exception for departure without advance parole under exigent circumstances. Commenters said that this change would give DACA recipients much-needed flexibility, as recipients may experience emergency situations where they need to leave the country temporarily, but do not have time to obtain an advance parole document, or where the departure is brief and accidental. One commenter described obtaining an advance parole document as an arduous process that can take weeks, which complicates efforts to seek emergency advance parole when visiting a dying family member or attending to other pressing matters. Another commenter stated that the USCIS Contact Center may be unable or unwilling to schedule an in-person emergency advance parole appointment in time for those who need to depart on short notice. If given an appointment but denied emergency advance parole, the commenter stated, the DACA recipient would need to make the impossible choice between seeing a loved one for the last time and maintaining their right to reside and work in the country they call home.

Commenters supported what they called a more humane approach that would consider the totality of the circumstances of the individual's departure. One commenter remarked that any DACA recipient who leaves the United States without an advance parole document should have the opportunity to explain their circumstances prior to the termination of their DACA grant. One commenter requested that USCIS communicate specific criteria under which a person would be allowed to leave the United States without securing an advance parole document, including the circumstances that would warrant leaving without advance parole, how long a DACA recipient would be permitted to remain outside of the United States, what evidence they might need to prove their request matches prescribed circumstances, the types of travel documentation they would need to bring along, and the process for returning.

*Response:* DHS agrees with commenters that there may be some limited circumstances where a DACA recipient departs the United States without first obtaining an advance parole document due to exigent circumstances—such as departures that are accidental or involuntary, and in such circumstances the automatic termination of their DACA may not be warranted. In consideration of the comments received, DHS is eliminating the provision at 8 CFR 236.23(d)(2)(ii) on automatic termination of DACA following departure without advance parole and revising 8 CFR 236.23(d)(2) to provide that USCIS may terminate DACA after NOIT if a DACA recipient departs the United States without first obtaining advance parole and subsequently enters without inspection. Generally, a recent entry without inspection will be a significant negative factor warranting termination of DACA as a threat to border security, but where there are exigent circumstances, such as accidental or involuntary border crossings, DHS may choose to continue exercising prosecutorial discretion and allow the grant of deferred action to continue. DACA recipients who depart the United States without first obtaining advance parole but who are paroled into the United States may resume their DACA upon expiration of the period of parole. However, DHS notes that DACA recipients who depart the United States without first obtaining an advance parole document run a significant risk of being unable to reenter the United States, and that obtaining an advance parole document prior to departure is strongly encouraged to reduce the risk of being unable to return and resume DACA.

Effect of Prior Termination

*Comment:* Several commenters discussed USCIS' past practice of automatically denying renewal requests for anyone whose DACA grant had been terminated previously at any point. The commenters stated that many DACA grants have been terminated based on arrests or charges that ultimately did not result in any serious criminal conviction. Considering these concerns, the commenters suggested that prior automatic termination of DACA not be used to justify the denial of a renewal request.

*Response:* DHS acknowledges commenters' concerns but believes that the elimination of automatic termination based on NTA issuance in the final rule will largely alleviate these concerns. Except in limited circumstances described elsewhere in this preamble and at new 8 CFR 236.23(d)(1), USCIS will generally issue a NOIT before terminating an individual's DACA. Where USCIS proceeds to termination and the individual also has a renewal request pending, USCIS believes that immediate denial of the pending renewal in light of the termination remains appropriate, as the underlying basis for the termination remains true such that favorably exercising prosecutorial discretion to grant a new period of deferred action is not warranted. In cases where an individual files a new DACA request after their DACA has been terminated, USCIS does not automatically deny the new request. However, DHS continues to believe that considering all relevant factors and evidence is appropriate in determining whether to grant a DACA request, including the basis for a prior termination, which may be an indication the individual is no longer a low enforcement priority. Accordingly, DHS is not making any revisions to the regulations based on these comments.

g. Restrictions on Use of Information Provided by DACA Requestors (Including Information Sharing and Privacy Concerns)

*Comment:* A few commenters expressed support for codifying the restrictions on use of information in the final rule. One commenter also stated that they supported the exceptions to the restrictions on information use as proposed in the rule, including for identifying and preventing fraudulent claims, for national security purposes, and for the investigation or prosecution of a criminal offense.

*Response:* DHS appreciates commenters' support for codifying the

---

[312] *See, e.g.,* definition of EPS in *Revised Guidance for the Referral of Cases and Issuances of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens,* USCIS PM–602–0050 (Nov. 7, 2011).

restrictions on use of information from DACA requestors in this rule. DHS proposed to codify the longstanding policy that has governed the use of information provided by DACA requestors to mitigate the possibility that noncitizens eligible for DACA may be disincentivized to file a request and become known to the U.S. Government. As described in the NPRM, under this longstanding policy, information provided by DACA requestors is collected and considered for the primary purpose of considering their DACA requests and may not be used for immigration enforcement-related purposes apart from limited exceptions.[313] In furtherance of the Department's dual desire to minimize concerns that DACA requestors may have in providing their information through the submission of a DACA request while also retaining exceptions for limited national security or public safety purposes, DHS is now codifying this policy at new 8 CFR 236.23(e).

*Comment:* Expressing concern about information sharing and use among ICE, CBP, and other Federal, State, or local law enforcement agencies, a few commenters advocated that DHS further strengthen data privacy under proposed 8 CFR 236.23(e). A few commenters recommended that DHS both ensure and demonstrate that requesting DACA would not lead to immigration enforcement against a requestor. A group of commenters said that the "need to know" policy for sharing information with ICE and CBP should be clarified, because the list of uses and instances in which information can be shared is not presented as exhaustive, making it possible to demonstrate "need to know" in other circumstances that may have a lower evidentiary threshold. Instead, the commenter suggested that DHS definitively enumerate the exclusion of any specific uses and instances not listed. A commenter requested that agencies protect DACA by strengthening data privacy, reasoning that the fear of immigration enforcement could preclude recipients from enrolling in healthcare coverage. Another commenter urged DHS to strengthen protections around the personal identifiable information (PII) of DACA recipients and expressed concern around ICE handling DACA recipients' PII. The commenter, along with another commenter, said that DACA recipients' PII should never be used for enforcement purposes. Another commenter recommended specific regulatory language for this provision to ensure the protection of requestors'

information from being shared with immigration enforcement agencies, along with appropriate administrative penalties for violations.

*Response:* DHS acknowledges these commenters' recommendations to further enhance data privacy in this rule, including to enumerate the exclusion of specific uses not listed. DHS however respectfully declines to write such granularity into the final rule. As discussed above, the rule codifies longstanding prohibitions on use of information for enforcement purposes with specific exceptions. This longstanding practice has worked to protect against improper uses of information provided in DACA requests for enforcement purposes. In January 2022, the U.S. Government Accountability Office (GAO) published a report on the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies and for what purpose. The GAO report found that, in keeping with the DACA information-sharing policy, USCIS has shared information with ICE, for immigration enforcement purposes, on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA, estimating that from June 2012 to June 2021, of the 106,000 DACA requests that USCIS denied, USCIS referred fewer than 900 cases (less than 1 percent) to ICE.[314] The report did not make any recommendations for necessary changes. Given this conclusion and DHS's experience since the inception of DACA, DHS believes that the longstanding policy governing use of DACA information sufficiently protects DACA requestors' privacy. Regarding one commenter's request that there be appropriate administrative penalties for violations of the information use provision, DHS declines to address penalties in regulatory text, as DHS components already have robust systems in place for ensuring that its personnel follow applicable laws, regulations, policies, and procedures in the performance of their duties, including but not limited to information sharing and use.

*Comment:* Some commenters expressed concern with broad exceptions pertaining to fraud, national, security, and public safety that in their view undermined the protective provisions under proposed 8 CFR 236.23(e). Citing reports indicating that

some gang databases are unreliable, one commenter recommended that the regulations eliminate these exceptions. The commenter added that, at the very least, the regulations should delineate the situations warranting national security or public safety exceptions that justify initiating removal proceedings while compelling DHS to establish clear and convincing evidence to bolster the exception when a requestor, recipient, or family member or guardian listed in the request is placed in removal proceedings.

Another commenter recommended that the regulations provide specific, clear and precise circumstances supporting a national security or public safety exception warranting initiation of proceedings. Pursuant to these exceptions, commenters recommended that, if removal proceedings are initiated against a DACA requestor or recipient, or against family members or guardians listed in a DACA request, DHS should assume the burden of proof to support the exception. Similarly, some commenters recommended that DHS be compelled to prove to the Immigration Judge by clear and convincing evidence that the information divulged in the request was not a basis for commencing removal proceedings. If DHS cannot meet this burden of proof, the commenters suggested that removal proceedings be terminated.

*Response:* DHS acknowledges commenters' concerns with the use of information provided in DACA requests for the purposes of immigration enforcement. DHS notes that new 8 CFR 236.23(e)(2) prohibits the use of information pertaining to family members or guardians provided in DACA requests for the purpose of enforcement proceedings against such family members or guardians, without exception. DHS refers commenters requesting additional guidelines on when removal proceedings may be initiated to the discussion of issuance of an NTA above.

*Comment:* One commenter stated that data privacy protections were and continue to be important for building sufficient trust between the DACA requestor and the government to submit sensitive information but expressed concern that there are few enforceable controls preventing ICE from accessing information on DACA requestors. The group recommended that USCIS prevent both direct and indirect disclosure of information in DACA requests to ICE or CBP. To the extent mutually accessible data systems must be used between agencies, another commenter recommended that USCIS be allowed to track which agencies view that

---

[313] 86 FR 53771.

[314] GAO, Report No. GAO–22–104734, *Immigration: Information on Deferred Action for Childhood Arrivals* (Jan. 2022), *https://www.gao.gov/assets/gao-22-104734.pdf* (last visited May 22, 2022).

information and to monitor and enforce limitations on the rationale for access or acceptable uses of information.

Some commenters recommended that USCIS modify the information use provisions to further restrict information use and sharing. These commenters recommended the provisions forbid the disclosure, circulation, or use of all past or future information—including via electronic systems—for reasons beyond implementing DACA. In the event that another agency obtained any information submitted during the DACA process, or if the information was used for any reason beyond carrying out the DACA policy, the commenters recommended that DHS notify the DACA requestor.

Several commenters also recommended that DHS incorporate guidelines on information storage and electronic access, including strict protocols on accessing information stored or obtained electronically, as well as transparency and oversight measures. One commenter urged DHS to make multiple specific improvements to information protection and sharing, including by establishing stronger safeguards for data from noncitizens who were denied DACA, such as not entering biographical information, biometric information, information about the requestor's family, or immigration status information for denied requestors into the A-file. The commenter said these protections are needed because these individuals are vulnerable to identification and removal by enforcement officers, even if their case is not affirmatively referred to ICE. This risk could deter individuals from requesting DACA. This commenter also suggested reconsidering the Form I–812D disclaimer and limiting third-party data sharing, because the combined risk and complexity it poses could potentially deter eligible DACA recipients and their family who depend on deferred action.

A commenter requested a firm and transparent commitment from all branches of the U.S. Government to refrain from collecting or sharing information on DACA requestors with ICE, including geolocation data from private apps requestors use. Another commenter urged DHS to limit its collection of biometric and biographical data to information that is absolutely necessary to verify eligibility for temporary forbearance under DACA. This commenter also requested the opportunity for public comment on any future proposals to expand biometric data collection or use.

*Response:* DHS appreciates commenters' suggestions for building

trust among the communities that DACA is intended to benefit. DHS notes that since the inception of the policy, the DACA requestor population has stepped forward to request DACA under the same guidelines on information use to be codified in this rule. DHS acknowledges the suggestion for monitoring access to data systems accessible by multiple agencies but believes that such modifications to DHS data systems are unwarranted at this time. As support for the adequacy of the current policies DHS refers to the GAO report on DACA information sharing referenced above, which documents the small number of DACA requests that have been referred to ICE for further investigation or issuance of an NTA and makes no recommendations for changes to DHS policy or practice. DHS therefore declines to make any changes to the rule in response to these comments.

*Comment:* Commenters wrote that requestors should be permitted to redact false Social Security numbers from documents used to demonstrate continuous residence, and privacy guidelines should state that this information will not be shared with immigration or law enforcement agencies or used against the requestor in any other manner.

*Response:* DHS recognizes that individual requestors will submit the evidence that they believe is appropriate in support of the threshold guidelines. However, DHS will afford the appropriate weight to the evidence based upon the information included. As noted elsewhere in this preamble, under the preponderance of the evidence standard, the sufficiency of each piece of evidence is examined for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true.

In response to commenter's request to modify the information use provision, as discussed above, the rule codifies longstanding prohibitions on use of information with specific exceptions. This longstanding practice has worked to protect against improper uses of information provided in DACA requests for enforcement purposes. DHS therefore respectfully declines to write such granularity into the final rule.

### 6. Severability (§ 236.24)

*Comment:* A number of commenters addressed the severability provision of the proposed rule. One commenter expressed support for the severability provision of the proposed rule because it would mitigate risks associated with the fact that the DACA policy faces

continued litigation risk. Another commenter supported making DACA benefits severable, reasoning that this aspect of the rule aligns with longstanding principles of contract law.

A commenter said that inserting a severability provision in the regulation is not enough to protect and insulate EADs from litigation and preserve access to work authorization. Another commenter echoed this while also expressing concern that future administrative or legal actions could create barriers to DACA recipients' efforts to secure work authorization in a timely manner. Another group of commenters argued against separating deferred action from work authorization, including via the severability provision, arguing that a severability provision should not be necessary because granting employment benefits to DACA recipients does not violate the INA.

*Response:* A severability clause is a standard legal provision. It indicates DHS's intent that if a court finds that a specific provision of a rule is unlawful, the court should allow the remainder of the rule to survive. Those provisions that are unaffected by a legal ruling can be implemented by an agency without requiring a new round of rulemaking simply to promulgate provisions that are not subject to a court ruling.

DHS understands the concern that if one portion of the rule is severed from the others by a court it could lead to undesirable consequences for DACA recipients. However, although DHS believes that all portions of this rule are well within its legal authority, if a court finds that portions of the rule are unlawful it is preferable to sever and strike only those portions, rather than having the rule stricken in its entirety. Although the important goals and policies reflected here are best served if each of the portions of the rule remains intact, DHS recognizes that each portion of the rule will remain workable without the others. Therefore, even if portions of the rule are struck down DHS will implement the provisions of this rule that survive judicial review. For example, DHS will continue to implement 8 CFR 236.21(c)(1) (relating to forbearance) and 8 CFR 236.21(c)(2) (relating to employment authorization) even if DHS is prohibited from deeming DACA recipients ''lawfully present'' for purposes of receiving certain Social Security benefits (8 CFR 236.21(c)(3)) or the unlawful presence provisions at INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) (8 CFR 236.21(c)(4)). Similarly, although there are significant benefits to providing work authorization alongside forbearance, forbearance remains

workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized. There are further discussions of the comments received on the separation of deferred action and work authorization elsewhere in this preamble.

### 7. Advance Parole and Adjustment of Status

**Strengthening and Expanding the Availability of Advance Parole**

*Comment:* Many commenters expressed support for the proposal's clarification that advance parole will continue to be an option for DACA recipients. Several commenters remarked that DACA recipients should have the right to travel internationally and requested that DHS remove the requirements for advance parole or expand the circumstances that make DACA recipients eligible for advance parole. Other commenters stated that including advance parole for DACA recipients in regulation will allow them to study and conduct research abroad and would be critical for opening opportunities to develop international skills and gain experience via study abroad programs. Commenters described DACA recipients' significant contributions to campus life, corporate success, and the overall economy, and said that these contributions have engendered significant reliance interests, including recruiting and investments by educational institutions and employers.

Many commenters requested expanding advance parole beyond employment, educational, or humanitarian grounds. Commenters noted that current categories are often not applicable for DACA recipients, or that they may be difficult to predict or document months in advance. Some commenters reasoned that delays or denial of parole based on narrow restrictions have adverse impacts on students' educational experiences and outcomes and stated that DACA recipients' access to advance parole improves their educational outcomes and enhances their contributions on campus. Several commenters stated that there was no statutory, regulatory, or practical reason for the narrow grounds for advance parole available to DACA recipients. One commenter requested that USCIS exercise its discretion to issue advance parole to DACA recipients for the broadest range of travel purposes when justified by urgent humanitarian need or significant public

benefit, arguing that USCIS is clearly authorized to exercise such discretion. The commenter reported inconsistent application of the current standards by adjudicators and suggested that applying a broader interpretation and maximum discretion would be more efficient, allowing USCIS to timely adjudicate applications for advance parole.

Many commenters suggested DHS expand the grounds for advance parole to include any reason for travel. One commenter requested that advance parole apply to DACA recipients in the same manner as it is applied for TPS recipients (requiring less documentation of specific reasons for travel). Other commenters agreed and recommended that DHS harmonize advance parole requirements for DACA with other forms of humanitarian relief (such as TPS) that require less documentary evidence and allow travel for any reason. Other commenters recommended travel standards be revised to include cultural and familial reasons. One commenter cited research demonstrating that a high percentage (35.4 percent) of DACA students interviewed meet the clinical cutoff for anxiety, and recommended that DHS expand the parameters for advance parole to provide a greater opportunity for DACA recipients to travel abroad and visit family and loved ones over holiday breaks to support mental health.

*Response:* DHS acknowledges the comments in support of advance parole for DACA recipients. DHS agrees with the commenters that allowing DACA recipients to apply for advance parole is consistent with the INA. The INA authorizes DHS to grant parole on a case-by-case basis, for urgent humanitarian reasons or significant public benefit, to individuals, at the discretion of DHS. 8 U.S.C. 1182(d)(5). Advance parole allows a noncitizen to leave the United States and then be paroled back in, consistent with INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5) and 8 CFR 212.5(f). The statute provides that the Secretary may parole "*any alien applying for admission to the United States*" for the purposes in the statute. 8 U.S.C. 1182(d)(5) (emphasis added). Because DACA recipients who depart the United States and seek to reenter are applicants for admission, they are statutorily eligible to apply for parole.[315] And because parole is not an

"admission," DACA recipients remain eligible for parole even if they are "inadmissible" under 8 U.S.C. 1182.[316]

Consistent with these comments in support of advance parole, DHS reiterates that under the rule, it would continue its adherence to that standard. In response to the commenters who suggest broadening the standard for advance parole to include all reasons for travel, or all reasons for travel if a significant public benefit or urgent humanitarian reason is articulated, DHS has considered this request, but declines to make changes, as statutory language in INA sec. 212(d)(5) that limits DHS's exercise of parole to urgent humanitarian or significant public benefit reasons requires case by case consideration of the reason for travel. While DHS acknowledges commenters' requests to specifically broaden DACA recipients' access to advance parole beyond travel for humanitarian, employment, and educational purposes, DHS declines to set such standards in this rule. DHS has generally found that permitting DACA recipients to travel in certain circumstances for humanitarian, educational, or employment related reasons provides a significant public benefit or is justified as an urgent humanitarian reason for travel. DHS additionally notes that specific instructions for applying for an advance parole document under several categories are provided in the Form I–131, Application for Travel Document itself, and declines to write them into this rule for only DACA requestors.[317]

With respect to the commenters who requested that advance parole for DACA recipients be harmonized with the standards for granting travel authorization to TPS beneficiaries, DHS first notes that TPS, unlike DACA, is a lawful immigration status expressly prescribed by statute. Indeed, Congress expressly contemplated that TPS beneficiaries be able to travel and return with advance authorization.[318] In addition, the law requires that a TPS beneficiary who travels abroad with such prior authorization, "shall be inspected and admitted in the same immigration status the alien had at the time of departure" unless certain narrow exceptions related to mandatory ineligibility for TPS apply.[319] DACA, on

---

[315] Although some DACA recipients were admitted as nonimmigrants or under other authorization, they overstayed their authorization period in the United States. When they depart and seek to reenter, they would become "applicants for admission" and may be paroled at that time in DHS's discretion.

[316] *See* 8 U.S.C. 1101(a)(13)(B) ("An alien who is paroled . . . shall not be considered to have been admitted.").

[317] Form instructions are incorporated into regulations by operation of 8 CFR 103.2(a)(1).

[318] *See* INA sec. 244(f)(3), 8 U.S.C. 1254a(f)(3).

[319] *See* 8 U.S.C. 1254a note ("Aliens Authorized to Travel Abroad Temporarily") (This note derives from section 304(c) of the Miscellaneous and

Continued

the other hand, is not a statutorily-provided immigration status like TPS, but merely forbearance from removing an individual from the United States. Accordingly, the Department has a reasonable basis for prescribing different criteria for TPS beneficiaries seeking permission to travel and for DACA recipients seeking advance parole.

Advance Parole and Relation to INA Sec. 245(a)

*Comment:* Commenters stated that expanding the categories for advance parole would eliminate barriers to adjustment of status and would streamline the adjudication workload. Several other commenters expressed support for the proposed rule's recognition that DACA recipients who travel abroad and return to the United States can be paroled back into the country and will satisfy the "inspected and admitted or paroled" requirement for adjustment of status under INA sec. 245(a), 8 U.S.C. 1255(a). Expressing support for expanding the circumstances for requesting advance parole, a commenter said that advance parole has allowed many DACA recipients to travel internationally and satisfies the "inspected and admitted" requirement for adjustment of status. Multiple commenters expressed concern about the uncertainty of being allowed to reenter when DACA recipients return to a port of entry, arguing that this uncertainty prevents many DACA recipients from applying for advance parole. As a solution, the commenters recommended establishing a parole-in-place program, similar to the program available for U.S. military families, for eligible DACA recipients to adjust their status to lawful permanent resident to reduce uncertainty and promote administrative efficiency. Another commenter remarked that undocumented immigrants should have a pathway to achieve legal status without risking prohibitions or restrictions on international travel and reentry into the United States, suggesting that a Reentry Permit should be made available to DACA recipients

because this population should be permitted to travel and reenter the country legally without fear of rejection or other consequences.

Conversely, one commenter referred to the court's discussion in *Texas* stating that allowing DACA recipients to receive advance parole contradicts Congress' intention to restrict adjustment of status eligibility for those who have not been lawfully admitted or paroled into the United States. The commenter disagreed with DHS's rationalization that DACA recipients are subject to the same urgent humanitarian or significant public benefit analysis the statute requires, and therefore, providing DACA recipients the ability to seek advance parole is in line with the authorization provided by Congress in the statute. The commenter argued that applying the parole standard does not mean that "Congress intended to create a class-based exception to the adjustment of status restriction or the bars to reentry."

*Response:* Advance parole is rooted in INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5), which authorizes parole on a case-by-case basis for urgent humanitarian or significant public benefit reasons. The INA contains several relevant statutory provisions and requirements for eligibility for adjustment of status to that of a lawful permanent resident, including those laid out at INA sec. 245, 8 U.S.C. 1255, which requires, among other things, that applicants for adjustment of status be eligible for an immigrant visa and be admissible under INA sec. 212, 8 U.S.C. 1182, and that applicants were "inspected and admitted or paroled" into the United States. Although advance parole granted to DACA recipients may aid certain recipients later seeking adjustment of status in meeting the requirement in 8 U.S.C. 1255(a) to have been "inspected and admitted, or paroled," that effect of parole was determined by Congress. Parole may have a similar effect with respect to the restriction in 8 U.S.C. 1182(a)(6)(A)(i), which applies only if an individual is "present in the United States without being admitted or paroled," but that too was determined by Congress and is likewise independent of DACA itself.[320]

Moreover, even if parole removes a particular bar to subsequent adjustment of status, parole itself does not entitle any individual to adjustment of status; each applicant for adjustment of status must meet all other statutory requirements relevant to their particular basis for adjusting status to that of a lawful permanent resident and be granted adjustment in an exercise of discretion, and those requirements are not affected by this rule. So long as DHS acts within the limits of its parole authority in 8 U.S.C. 1182(d)(5), there is no conflict with Congress' expressed intent for eligibility for adjustment of status. As discussed above, DHS believes the DACA-based advance parole guidance does just that. DHS also disagrees with the characterization of this process as "class-based," as all advance parole decisions are made on a case-by-case, individualized basis. DHS therefore declines to make any changes in response to the comments either requesting expansion or limitations to Congress' requirements for adjustment of status, which is beyond the scope of rulemaking.

Reducing Financial and Administrative Burdens for DACA Recipients Seeking Advance Parole

*Comment:* A few commenters recommended that DHS design a streamlined, less intricate, or less costly application process for advance parole. Some commenters recommended incorporating advance parole with a reduced or eliminated fee into the final rule. Another commenter requested that USCIS expand DACA provisions to allow for a right of reentry and stated that requiring DACA recipients to file form I–131 (at a significant cost of $575) creates delays and increased paperwork burdens. Other commenters recommended that DHS allow applications for advance parole to occur at the same time as both initial DACA requests, and requests for DACA renewal. One commenter suggested that the final rule allow for departures from the United States for 6 months or 1 year instead of the discrete windows allowed under current policy. The commenter further recommended USCIS develop clear procedures and criteria for adjudication of advance parole applications to allow for more efficient

---

Technical Immigration and Naturalization Amendments Act of 1991, Public Law 102–232, 105 Stat. 1733, 1749 (Dec. 12, 1991) (as amended). This provision requires admission in TPS of a TPS beneficiary who travels abroad with prior authorization, unless the individual is inadmissible for reasons that are also certain mandatory criminal or security ineligibility bars to TPS in INA sec. 244(c)(2)(A)(iii), 8 U.S.C. 1254a(c)(2)(A)(iii)). *See generally Duarte* v. *Mayorkas,* 27 F.4th 1044 (5th Cir. 2022). Accordingly, DHS is no longer using the advance parole mechanism to authorize TPS travel. *See Rescission of Matter of Z-R-Z-C- as an Adopted Decision; agency interpretation of travel authorized by TPS beneficiaries,* USCIS PM–602–0188 (Jul. 1, 2022).

[320] In response to the Intervenors' discovery request in *Texas,* USCIS estimated, with a +/− 1.5% margin of error, that between 13,908 and 14,358 requestors who were approved for DACA between June 2012 and June 2018 and who had subsequently adjusted to LPR status as an immediate relative (*i.e.,* qualified spouse, child, or parent of a United States citizen) could not have met the requirement in 8 U.S.C. 1255(a) to have been "inspected and admitted, or paroled" but for their entries to the United States on DACA-based advance parole granted prior to the filing of their Forms I–485 for

adjustment of status. *See* Fed. Defs.' Revised Resp. to Def.-Intervenors' Revised Disc. Req., dated November 8, 2019, provided in *Texas.* Reaching this estimate involved several months of intensive statistical research, data sampling, manual file reviews, and subsequent data analysis. DHS has not had another occasion to undertake such a labor-intensive effort to update this estimate, which was based on the sampling of cases from the first 6 years of DACA.

and effective processing of such applications.

Another commenter stated that long processing times and the 2-year grant of DACA present challenges for DACA recipients to travel freely internationally. The commenter noted that USCIS policies already provide for a combined EAD and advance parole document for applicants for adjustment of status and recommended expanding this option to allow DACA recipients to receive joint EAD and advance parole cards. Similarly, a commenter suggested creating an EAD travel card for work, educational, or humanitarian purposes.

*Response:* DHS recognizes the financial costs and time required for adjudication of applications for advance parole for DACA recipients. The advance parole adjudication process, however, is the same for DACA recipients as for all noncitizens filing Form I–131 Application for Travel Document, including the filing costs, which are set by the fee rule, and processing times for an advance parole document. While acknowledging the financial costs and time required for processing advance parole requests, DHS notes that other noncitizens face similar processing times and fee costs for travel documentation and declines to provide differentiated treatment to DACA recipients. In response to concerns regarding the timing of advance parole, DHS does offer an expedited adjudication for exceptionally urgent reasons, and does offer longer time periods for advance parole where warranted. Finally, with regard to requests for a combination employment authorization document and advance parole card as is available for adjustment of status applicants, DHS has considered the various concerns of commenters, but notes that DACA recipients granted a temporary reprieve from removal action and applicants for adjustment of status awaiting visa availability are differently situated, and has determined not to create new forms, identity documents, and additional operational processes for advance parole for DACA recipients.

Easing or Eliminating Need for Advance Parole

*Comment:* A commenter expressed concern about what they perceived as DACA recipients' inability to travel internationally, writing that a continued restriction on international travel could hinder their professional development and prevent them from traveling abroad to visit relatives. Several commenters likewise requested that DHS consider proposals to eliminate advance parole requirements or travel restrictions more generally. One commenter stated that advance parole for DACA recipients was unnecessarily restrictive and costly, and recommended that DHS consider ways to facilitate travel for DACA recipients by loosening advance parole requirements, including permitting DACA recipients to travel without advance parole in emergency situations. One commenter expressed general support for allowing DACA recipients to travel internationally and expressed a willingness to pay for an upgraded DACA that would allow for international travel without needing to establish advance parole.

*Response:* DHS acknowledges the commenter's concern about DACA recipients' ability to engage in international travel. DHS notes the existing DHS policy of granting advance parole to DACA recipients in its discretion on employment, educational or humanitarian grounds, if the applicant satisfies certain criteria, allowing recipients to travel internationally in some circumstances.

DHS also acknowledges commenters' requests to ease or eliminate advance parole requirements for DACA recipients, as well as the uncertainty associated with returning to the United States. DHS notes that it lacks the authority to do so through rulemaking. DHS does not have the legal authority to eliminate the statutory requirements for parole under INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5), or broaden the requirement beyond the statutory standard of urgent humanitarian reasons or significant public benefit. For these reasons, and those discussed above, DHS is not altering the advance parole requirement in the rule.

*D. Other Issues Relating to the Rule*

1. Public/Stakeholder Engagement (*e.g.,* Requests To Extend the Comment Period)

Public Engagement

*Comment:* One commenter stated that DHS should communicate with immigrant communities and organizations about the rule and should read every comment submitted. Other commenters commented that DHS should continue to collaborate with and provide information to farmworker communities about DACA. The commenters suggested that DHS continue to share information in accessible languages, including Indigenous languages, through a variety of media, and engage in outreach sessions with trusted voices in the farmworker community.

*Response:* DHS appreciates these commenters' suggestions. DHS has reviewed and carefully considered all comments that fall within the scope of this rulemaking. DHS communicates with the DACA requestor population through the online DACA FAQs, social media, and other stakeholder engagements, which it intends to continue upon publication of this rule.

2. Administrative Procedure Act and Rulemaking Requirements

Compliance With the Administrative Procedure Act

*Comment:* A few commenters wrote that DHS should establish DACA through notice-and-comment rulemaking following the requirements of the Administrative Procedure Act (APA). Others voiced opinions on the sufficiency with which the rule complies with the APA. One commenter remarked that the proposed rule was so long and complex that it may subvert the APA's public comment process.

*Response:* In this rule, DHS is establishing DACA through notice-and-comment rulemaking in accordance with the APA. During this process and as DHS explains throughout this rule, DHS has complied with the APA, in particular by welcoming comments on and carefully considering all comments received during the comment period. DHS understands that notice-and-comment rulemaking and the associated documents can be long and complex, but this rulemaking follows the appropriate process, and the rule is at an appropriate level of detail.

Negotiated Rulemaking

*Comment:* Multiple commenters requested that DHS require negotiated rulemaking for future changes made to the final rule since negotiated rulemaking involves enhanced stakeholder input and would be in the public's best interest.

*Response:* DHS appreciates that negotiated rulemaking can provide additional collaboration with affected parties outside of notice-and-comment rulemaking. All comments received during the comment period have been considered. However, DHS declines to limit the available means by which future changes to DACA regulations or policies can be made by requiring negotiated rulemaking, which is not a process typically used by DHS.

Future Changes Timeline

*Comment:* Multiple commenters suggested that any future changes to the final rule should not take effect for 240 days because modifications to DACA could result in significant impacts to those involved.

*Response:* DHS understands that future changes to these regulations could have significant effects on DACA recipients and in some instances longer lead times to implement changes might be desirable. Recognizing this, DHS will take such effects into consideration when considering future changes to the regulations and will comply with the APA and other legal requirements when doing so.

### 3. Processing Time Outlook (Including Comments on Backlogs)

*Comment:* Many commenters expressed general concern about long processing times and urged DHS to improve its infrastructure to shorten timeframes or otherwise address backlogs that slow down the immigration process overall to give individuals the chance to succeed academically and economically and preserve families. Citing research and government data, commenters highlighted wait times for DACA requests lasting more than 11 months, as well as an 85-percent increase in the USCIS backlog between 2015 and 2020. A commenter noted that that the COVID–19 pandemic has exacerbated processing delays at a time when many DACA recipients are on the front lines as essential workers. Commenters expressed concern that long wait times threaten DACA recipients' safety and jobs, and cause stress and uncertainty, and that processing delays of renewal requests cause lapses in recipients' work authorization.

Commenters suggested additional ways for USCIS to address processing times, including: resuming expedited request criteria for DACA recipients to reduce the backlog of requests; prioritizing processing of initial and renewal DACA requests; completing processing within 60 days and prioritizing renewal requests nearing their validity expiration; addressing staffing shortages that have contributed to the backlog; and DHS leveraging congressional appropriations to improve DACA request processing.

*Response:* DHS appreciates commenters' concerns with processing times for DACA-related requests and suggestions for improving efficiency in considering these requests. DHS recognizes the significant impact that backlogs and delays have on requestors, and acknowledges that policy changes, court rulings, and resource constraints in recent years contributed to increased backlogs and processing delays. As discussed in this rule, USCIS has taken important steps to ensure properly filed requests are swiftly adjudicated. These steps are reflected in significantly

improved processing times for renewal requests. As of May 31, 2022, the FY 2022 median processing time for a DACA-related Form I–765 is 0.5 months.[321] Further, USCIS continues to examine strategies for ensuring efficient processing of DACA-related requests.[322] Indeed, this rule serves to codify threshold criteria, clarify processes, and establish a filing and fee structure intended to fortify DACA and support efficient processing of requests. DHS takes under advisement commenters' suggestions, but believes that the operational details of resource allocation and prioritization of adjudications are best addressed through subregulatory guidance, which provides greater flexibility to address fluctuating workloads.

### 4. DACA FAQs

*Comment:* A commenter stated that the DACA FAQs are a large source of policy clarification that should be examined carefully, recommending that the final rule clarify that relevant policy and operational directives, or other guidance, will be incorporated or updated as appropriate, including anything related to pandemic relief assistance for DACA recipients. The commenter produced a non-exhaustive list of DACA FAQs that should be preserved, including those pertaining to request processing, acceptable documentary evidence, travel, and fee exemptions, as well as those that proscribe information sharing with immigration enforcement authorities.

*Response:* DHS appreciates the commenter's suggestions and has incorporated into the preamble and regulatory text some of the guidance from the DACA FAQs, including guidance on the definition of "currently enrolled in school" and acceptable documentary evidence in support of the threshold criteria. DHS takes under advisement the commenter's suggestions regarding any future revisions of the DACA FAQs.

[321] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[322] *See, e.g.,* USCIS, *USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders* (Mar. 29, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.* Also, since April 2022, DACA recipients have had the option to submit their renewal request and associated work authorization request online. *See* USCIS, *USCIS Announces Online Filing for DACA Renewal Forms* (Apr. 12, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-online-filing-for-daca-renewal-forms.*

### 5. Other Comments on Issues Relating to the Rule

#### Other Comments

*Comment:* A commenter requested that DHS remove what it described as dehumanizing language from the regulation, including the use of the word "alien." The commenter said that the use of this language is at odds with the Biden administration's own proposed immigration legislation and direction from the Department's leaders, citing relevant memoranda. Another commenter objected to the use of the term noncitizen and encouraged DHS to use the term "alien" instead.

*Response:* While the term "alien" is a legal term of art defined in the INA for immigration purposes, DHS recognizes that the term has been ascribed with a negative, dehumanizing connotation, and alternative terms, such as "noncitizen," that reflect our commitment to treat each person the Department encounters with respect and recognition of that individual's humanity and dignity are preferred. DHS will use the term "alien" when necessary in the regulatory text as the term of art that is used in the statute, but where possible DHS will use the terms "requestor" or "recipient" to refer to those who are seeking or who have received deferred action under the DACA policy.[323] This preamble uses the term noncitizen for that same reason.

*Comment:* A commenter stated that Asian and Pacific Islander communities have historically low rates of DACA requests and attributed this to cultural stigma, language barriers, high application fees, difficulties collecting required documents, and a lack of awareness. The commenter requested that USCIS work to remove these barriers to accessing the DACA policy.

*Response:* DHS appreciates commenter's request and takes it under advisement as it considers outreach to Asian and Pacific Islander communities.

*Comment:* A commenter stated that DACA provides essential protections and opportunities for survivors of gender-based violence. However, the commenter requested that DHS do more to protect this vulnerable population and consider establishing an "amnesty" program for DACA requestors who are survivors of sexual misconduct, harassment, and abuse that would provide automatic protection against deportation resulting from their report of such victimization.

*Response:* DHS appreciates the commenter's support of the DACA

[323] *See, e.g.,* new 8 CFR 236.21(c)(2) and 236.22(a)(3).

policy and acknowledgement that it provides important protections to eligible survivors of gender-based violence. However, the commenter's request to create a program that would provide automatic protection against removal for DACA requestors who report their victimization goes beyond the scope of this rulemaking.

*Comment:* One commenter said that any modifications or updates to DACA should allow spouses of U.S. citizens to obtain legal status by paroling in place.

*Response:* DHS acknowledges the commenter's feedback but notes that this suggestion is beyond the scope of this rulemaking.

*E. Statutory and Regulatory Requirements*

1. Impacts and Benefits (E.O 12866 and E.O. 13563)

a. Methodology and Adequacy of Cost-Benefit Analysis

(1) Methodology of the RIA

*Comment:* One commenter approved of DHS's consideration of various costs and benefits such as application costs and earned income of DACA recipients. The commenter also recommended that DHS supplement the RIA by more thoroughly addressing several arguments that DHS previously offered against the DACA policy in its rescission memoranda.

*Response:* DHS considered the input and suggestions received throughout the public comments and adjusted the RIA where it deemed applicable and feasible. The adjustments made are described in applicable comment responses and corresponding RIA sections. Additionally, we refer readers to Table 3 in the RIA of this final rule. The table provides details of the changes and adjustments made in the estimates of the analysis from the NPRM to the final rule. DHS also addresses the Duke and Nielsen recission memoranda in detail in Section II.B.3.

(2) Comments on Population Estimates and Assumptions

*Comment:* A commenter stated that the proposed rule should have also considered half a million existing DACA recipients, not just new DACA recipients in the labor market analysis section, which, the commenter stated, is not a small number.

*Response:* DHS appreciates the comment regarding the population estimates in labor market analysis section. As presented in the RIA, DHS analyzed possible labor market impacts relative to two baselines, a No Action baseline where only future DACA recipients where considered, and a Pre-

Guidance baseline where existing and future DACA recipients were considered, consistent with the commenter's suggestion. The RIA details this methodology and analysis.

*Comment:* A group of commenters stated that DHS assumptions about the DACA population are unsound. The commenter stated that new intakes under the DACA policy, "declined consistently between FY 2014 and FY 2016," even before the announced decision to rescind DACA further curtailed "new intakes in FY 2018–2020." The commenter further reasoned that conditioning DACA eligibility on having "continuously resided" in the United States since June 2007 and having been "physically present" in the United States since June 2012 would reduce DACA's new intakes more quickly than what DHS population estimates reflect.

*Response:* DHS appreciates the comment regarding the assumptions about the projections of an active DACA population presented in the RIA. The purpose of presenting active DACA population projections is not to project the trend of the "stable" period of FY 2015–FY 2017 identified in the RIA. DHS identified the "stable" period of FY 2015–FY 2017 as a period that was characterized by relatively consistent operations of the DACA policy in which there were no requestor surges nor stoppages in the processing due to policy changes or litigation. Although the rate of increase of the active DACA population was slowing during the "stable" period as some recipients ceased renewing their DACA requests, and the number of Initial Approved Requests was declining, DHS does not assume the same trend in the active DACA projections, as it is uncertain what trends will emerge in the future. Instead, DHS uses the average population during the "stable" period as the estimated active DACA population. By using the average population during the "stable" period, DHS is better able to account for policy uncertainties and the policy's population, and the gap between the views supporting the existence of large numbers of potentially eligible requestors and the views supporting the opposite. Further, although the threshold criteria set forth a minimum age at the time of request, which could reduce the number of future eligible requestors, DACA intake data for FY 2021 indicate the possibility still exists that there are many adults who may meet threshold criteria for consideration under the policy and

could submit a request.[324] For example, under threshold criteria in place since 2012 and as codified by this rule, a 15-year-old in 2025 would not meet threshold criteria, but an 18-year-old in 2025 would. There could be many or few 18-year-old potential requestors. Among those potential requestors, many or only a few might choose to request DACA, decisions that could be influenced by personal circumstances, political environments, and other factors.

*Comment:* A commenter stated that DHS projections in the NPRM at Table 8, 86 FR 53786, overstate the growth in the DACA population and inadequately account for the aging of the DACA population due to the threshold criteria. The commenter suggested that even if the proposal to unbundle the Forms I–821D and I–765 result in a larger number of initial applications, the number of initial applications resulting from this change will be too small to justify USCIS' estimates of the active DACA population. The commenter suggested that DHS should adopt more empirically responsible and internally consistent DACA modeling estimates. However, the commenter did not propose any specific methodological suggestions or guidelines for USCIS to implement, other than to take greater account of the role of age.

*Response:* DHS appreciates the commenter drawing attention to the NPRM's projections of an active DACA population, including the estimated labor force participation rate for the DACA population discussed in the NPRM RIA. As described in the NPRM RIA, the 30-percent threshold is based on data from the Bureau of Labor Statistics (BLS) on the labor force participation rates by age cohort. DHS acknowledges that such participation may fluctuate over time. As it relates to the population estimates more generally, as discussed in the NPRM RIA and in a previous comment response, the phenomenon of "aging in" to eligibility under the DACA threshold criteria does not solely control DHS's projections of the active DACA population, or prevent growth in the active DACA population in line with DHS projections.

DHS acknowledges that the projections may be an overestimate, as discussed above. DHS estimated this population based on available internal and external data, and carefully considered a wide variety of economic, policy, and legal expertise and relevant

---

[324] Source: USCIS, Office of Performance and Quality, NPD, C3, ELIS, queried Aug. 2021, TRK#8129.

literature. DHS acknowledges the possibility that the average age of the projected active DACA population could increase and, as a result, a higher proportion of active DACA individuals might choose to participate in the labor market relative to the NPRM. Therefore, in the final rule RIA, DHS is adjusting upwards the estimated percentage of DACA recipients who might choose to participate in the labor market from the estimated rate of 70 percent in the NPRM to the estimated rate of 78 percent in the final rule. The assumptions and methodology of this adjustment are discussed in greater detail in Section III.A.4.a.6.

*Comment:* A commenter expressed concern with the Department's methodology, noting it was sensitive to specific modeling assumptions that could cause an under- or overestimation of the residual subpopulation. They also noted that the Department does not have a tested methodology to predict how many potential DACA-eligible individuals will request DACA, and that to predict future DACA requests, DHS used historical request data that USCIS collected from individuals over the last several years, rather than estimating the overall DACA eligible population and then further estimating the share of the population eligible to request DACA in the future. However, despite these concerns, the commenter generally approved of the Department's population calculating methodology, noting that, all methodologies face challenges and that they see no reason to believe that another methodology would yield a more accurate estimate.

*Response:* DHS appreciates the commenter's support of DHS's analytical efforts as well as the feedback on the projections of the active DACA population. DHS has determined that estimating the population of those who are potentially eligible for DACA is not necessary to estimate the number of individuals who might choose to request DACA in the future. While estimating the total DACA-eligible population would offer an upper bound of potential requestors, such an estimate would not offer a precise number of those who will submit requests that are approved. Thus, it would likely be overinclusive because DHS lacks accurate data about several of the DACA criteria in the potentially eligible population, such as educational attainment and criminal histories, as well as the discretionary analysis performed in each request. Nevertheless, given relevant estimates of potential DACA-eligible populations, DHS believes that the projections offered in the NPRM RIA and this rule

are within the possible upper-bound estimates given the historical data on the policy, the uncertainty surrounding the DACA policy and its population, public comments that support larger or smaller population estimates, existing literature, and available expertise on the policy.

*Comment:* A commenter stated that given the bias of all available data, DHS should be cautious in considering the Migration Policy Institute's data suggesting that 700,000 DACA-eligible individuals have not submitted initial requests. The commenter expressed concern regarding DHS's statement that DACA requestors will stop "aging in" to the policy in June 2022, but that this should not impact the number of requests, based on available data. The commenter said that past administration attempts to rescind DACA and the recent Texas court case that bars new requestors have skewed the available data.

*Response:* DHS appreciates the comment concerning the assumptions in developing projections of the DACA population in this rule. To estimate the relevant populations for this rule, DHS considered the DACA-eligible population estimates from the Migration Policy Institute. As discussed in elsewhere in this section and in Section III.A.4.a.1, DHS agrees with the commenter that the "age in" restriction of the policy will not necessarily impact the number of potential DACA requestors, at least in the short run, and DHS did not base the population estimates on this restriction. Additionally, recent attempts at rescinding DACA and the district court injunction prohibiting DHS from administering DACA for new requestors were not factors that impacted DHS's population projections. The two baseline assumptions and the methodology for population projections are detailed in Sections III.A.2 and III.A.4, and III.A.4.a.1, respectively.

(3) Comments on Wage Rates

*Comment:* One commenter cited literature and other information in support of this rulemaking. The commenter stated that extending work authorization to undocumented noncitizens would reduce the wage penalty for those undocumented noncitizens, stabilize immigrant wages, and benefit the overall economy. The commenter stated that the wage-earning profiles of undocumented workers are far below authorized noncitizens' and citizens' workers' age-earning profiles and is virtually flat during most prime working years. The commenter further stated that undocumented noncitizen

women work fewer hours at lower pay than do their undocumented noncitizen male counterparts, and that State-level restrictions on undocumented employment increased the male wage penalty by around 40 percent. The commenter suggested that work authorization improves career and earnings prospects for DACA recipients and the resulting increase in earnings and spending increases tax revenue and labor demand, benefitting U.S. workers overall.

*Response:* DHS appreciates the comment in support of this rulemaking and in drawing attention to the direct and indirect wage penalty implications discussed in the NPRM RIA. In consideration of this comment, DHS presents additional qualitative discussion in the final rule RIA regarding the potential wage penalty implications of this rulemaking given the size of the affected population. For example, assuming all else is constant, granting employment authorization to undocumented noncitizens and allowing them to find employment in the formal labor market could reduce the number of undocumented workers in the informal labor market. Thus, informal labor market wages would rise as employers would find it necessary to raise wages to attract remaining informal labor market undocumented participants. In this scenario, the wage gap between documented and undocumented noncitizens would shrink. Conversely, "State-level restrictions" on the hiring of undocumented noncitizens could reduce employer demand for undocumented workers, lowering wages for this group, thus increasing the wage gap. These outcomes, however, are heavily dependent on theoretical assumptions. For example, countervailing forces may be present that could affect not just the magnitude of these wage penalty outcomes, but even push them in opposite directions.

b. Benefits (No Action Baseline, Pre-Guidance Baseline, or Unspecified)

Quantifying the Benefits of Advance Parole

*Comment:* A commenter wrote that certain benefits of advance parole to DACA recipients, such as the ability to maintain family ties across generations, simply cannot be quantified and that these and other benefits outweigh the policy's costs. The same commenter responded to DHS's request for comment on how to quantify the benefits of advance parole by stating that advance parole allows some DACA recipients to "be the bridge between

generations who cannot cross borders,'' providing an anecdotal example. Another commenter acknowledged DHS's qualitative discussion of the benefit of advance parole and offered suggestions to quantify this benefit, including assessing economic data on travel spending. Other commenters responded to USCIS' statement that the benefits of advance parole could not be quantified, stating that 45,000 DACA recipients have been approved for international travel under advance parole as of August 2017 (citing the Congressional Research Service). The commenters said that this figure demonstrates the deep importance of advance parole and listed other reasons why advance parole was beneficial for DACA recipients, including enhanced opportunities to apply for adjustment of status, participation in enriching educational programs, travel for work, and ability to visit families in countries of origin.

*Response:* DHS appreciates the suggestions from commenters that past demand for international travel under advance parole is indicative of the benefit to DACA recipients of traveling for work and education, or to visit families in countries of origin. DHS has taken these comments into consideration in the RIA of this rule but does not quantify these benefits. While some of the assumptions that commenters suggested would permit DHS to quantify benefits like a reduction of fear and anxiety, there is cause for concern about the accuracy of such estimates. For example, assuming average annual spending on international trips to be representative of the value of advance parole to a DACA recipient could either overstate the kind of spending that a DACA recipient would do or underestimate the nonmonetary benefit of attending a relative's funeral. Describing such impacts as non-quantified in the RIA should not be construed as a denial of their occurrence nor magnitude.

*Comment:* A commenter stated that, based on the USCIS analysis, the benefits of allowing DACA recipients to stay in the United States and work over 20 years at a 7-percent discount rate would be $400 billion and would far outweigh the approximately $7 billion in costs. Another commenter urged USCIS to consider the incalculable benefits DACA provides in terms of equity, human dignity, and fairness, as well as lifetime benefits to the economy. The commenter said that the proposed rule lays out some benefits that would be hard to quantify, such as: (1) a reduction of fear or anxiety for DACA recipients and their families; (2) an

increased sense of acceptance and belonging to a community; (3) an increased sense of family security; and (4) an increased sense of hope for the future. Another commenter similarly said that DHS should acknowledge that the proposed rule's quantifiable costs can be, and are, outweighed by the unquantifiable benefit to DACA recipients, their communities, and the nation.

*Response:* DHS appreciates the commenters' support of the rule and the additional evidence of the benefits of the DACA policy they provide. DHS presents its analysis of costs and benefits of the rulemaking in the RIA. In addition, DHS considers and discusses the unquantifiable impacts of this rule in the RIA. DHS agrees that the unquantifiable benefits are substantial and broadly agrees with the commentator's characterization of some of those benefits, including reduction of fear and anxiety.

*Comment:* A commenter urged DHS to use available research to quantify the mental health benefits of the proposed rule and offered suggestions on how to do so. The commenter also offered suggestions on how to quantify: (1) DACA's benefits from granting individuals the ability to travel outside of the United States; (2) the ancillary benefits of EADs; and (3) the benefits of streamlined enforcement encounters.

*Response:* DHS greatly appreciates the commenter's valuable suggestions regarding a methodology to address the quantification of certain benefits of this rulemaking. Consistent with E.O. 13563, DHS agrees that quantification and monetization are desirable, to the extent feasible and consistent with the best available evidence. As discussed in the NPRM and in this final rule, a complete valuation of many of these benefits is challenging and complex. There could be starting points as to how much DACA requestors value these benefits, such as filing costs, possibly representing a minimum willingness-to-pay value. It is not clear, however, that these starting points adequately capture the welfare benefits to the requestors. In addition, DHS appreciates the commenter's suggestion to use proxies, such as average U.S. population treatment costs for anxiety, average U.S. population international travel costs, or average officer licenses' costs. These are all instructive starting points or proxies for estimation of lower bounds, and DHS has referred to them in its final analysis. At the same time, and as explained in that analysis, DHS continues to believe that such starting points and proxies do not permit a full and accurate valuation of these benefits

to this population. Given this point, other public comments, and DHS's own assessment, DHS has determined that these unquantifiable benefits are of great positive magnitude and that attempts to fully monetize them raise serious conceptual, normative, and empirical challenges. Consistent with E.O. 13563, DHS has determined that considerations of human dignity are among the main drivers of this rule, which is focused on fortifying and preserving a policy for a vulnerable population that has been present in the United States since 2012 and is a low priority for enforcement measures, and on protecting the reliance interests of DACA recipients and similarly situated noncitizens, their families, schools, employers, communities, and States. The final analysis thus offers relevant information on the challenging task of fully quantifying and monetizing considerations of human dignity. Consistent with E.O. 13563, human dignity greatly matters and is a relevant consideration even if it cannot be quantified or turned into monetary equivalents.

*Comment:* A commenter stated that the economic benefits cited in the proposed rule come not only from DACA protections, but also from the benefit of work authorization. The commenter said that the proposed rule does not acknowledge that by introducing the option of severing the requests. The commenter stated that this provision creates a potential gap between a DACA grant, when an applicant can begin to establish reliance interests, and the economic production cited as a motivating factor behind the proposed rule.

*Response:* DHS appreciates the comment regarding the benefits of work authorization associated with DACA. DHS considered other request and fee structures as well as public input on this topic. As discussed in greater detail in Section II.C.2.c, DHS has decided to codify the longstanding required bundled process for deferred action and employment authorization requests under the DACA policy.

### c. Regulatory Alternatives

*Comment:* In response to the NPRM's request for comments on regulatory alternatives in Section III.H, multiple commenters emphasized the importance of protecting deferred action and work authorization. Some of these commenters said that deferred action and work authorization are not separate, as the ability for Dreamers to freely live with their families and communities without fear of deportation is synonymous with their ability to legally

work and contribute to their communities. A commenter agreed that a policy of forbearance without work authorization would disrupt the reliance of interests of hundreds of thousands of people, as well as the families, employers, and communities that rely on them. The commenter stated it would result in substantial economic losses and would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support.

*Response:* DHS appreciates the commenters' statements regarding the regulatory alternatives. DHS considered a forbearance-only alternative, as well as other request and fee structures. Upon careful consideration of comments received, DHS agrees that a policy of forbearance without work authorization—while still a policy that would carry substantial benefits—would harm the substantial reliance interest of thousands of DACA recipients, their families, employers, and communities. In response to these commenters, DHS also notes its extensive discussion of its reasoning and support for maintaining employment authorization as a component of the DACA policy in Section II.C.2. DHS therefore is not making changes to the final rule regarding DACA requestors' ability to request employment authorization. Further, as discussed in detail elsewhere in this rule, DHS is codifying the longstanding requirement that requires requestors to concurrently file Form I–765, Application for Employment Authorization, and Form I–765WS with their Form I–821D, Consideration of Deferred Action for Childhood Arrivals.

d. Regulatory Flexibility Act (Impact on Small Entities)

*Comment:* A commenter, referencing the Small Business Regulatory Enforcement Act (SBREFA), said that strengthening DACA would create a limitless positive impact on small businesses, while any attempt to restrict DACA would be detrimental. Another commenter said that the nature of the economic evidence of DACA participants in the market and the labor force indicates that these individuals contribute in uniquely positive ways to the economy and to small businesses. The commenter said that immigrants are some of the nation's most prolific small business owners, and their rates of business ownership far exceed those of native-born citizens. Rather than harming small businesses by forcing them to match and contribute to Federal benefits, the commenter reasoned, DACA recipients increase the volume of small businesses in the United States. The commenter concluded that DACA has an overall positive effect on the U.S. economy, and on the strength, proliferation, and livelihood of small businesses. The commenter said that these sizable benefits are attributable not only to the DACA policy, but more specifically to the designation that DACA recipients are lawfully present, which enables them to join the workforce and contribute in significant ways to the workforce and small business. More importantly, the commenter stated, the designation makes them eligible to receive benefits, like Social Security and Medicare, to which they are entitled after making such a mark on the U.S. economy.

*Response:* DHS appreciates the comment regarding the RFA, SBREFA, and the impact on small business in relation to DACA. DHS presents possible direct and indirect costs and benefits of this rulemaking in the RIA and in Section II.A.6. However, DHS reiterates that this rule does not directly regulate small entities, including small businesses, and is not expected to have a direct effect on small entities. This rule does not mandate any actions or requirements for small entities in the process of a noncitizen requesting deferred action or employment authorization under the DACA policy. Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA.[325] Based on the evidence presented in this analysis and throughout the preamble, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

e. Other Comments on Costs and Benefits

*Comment:* Expressing mixed views on the proposed rule, a commenter encouraged DHS and the Office of Management and Budget to adopt the proposed rule once a final cost-benefit analysis is made.

*Response:* DHS appreciates the comment in support of promulgating the DACA final rule. DHS provided the public an opportunity to comment on the RIA that presents possible direct and indirect costs and benefits of this rulemaking as well as the quantified and qualitative costs and benefits. DHS has fully considered the public comments received and has made relevant changes to the RIA.

2. Paperwork Reduction Act (Including Comments on Actual Forms/ Instructions, and Burden Estimates for Forms I–821D and I–765)

*Comment:* A commenter requested that prominent information be placed on the Form I–765WS, Employment Authorization Worksheet, that specifies and clearly explains the new, higher standard for passing the Form I–765WS review.

*Response:* DHS is not changing, nor did it propose to change, the standard for demonstrating economic necessity via Form I–765WS for DACA requestors applying for employment authorization. Although the NPRM proposed making it optional for DACA requestors to file a Form I–765, Application for Employment Authorization, DHS did not propose any changes to the existing general rule for establishing economic necessity, which is determined on a case-by-case basis pursuant to 8 CFR 274a.12(e). In this final rule, DHS is codifying the status quo bundled process that requires the Form I–765 with accompanying Form I–765WS be filed together with the Form I–821D. DHS is not modifying the rule to eliminate or change the requirement of demonstrating economic necessity. Therefore, DHS is not making any changes in response to the commenter's request.

3. Other Statutory and Regulatory Requirements (e.g., National Environmental Policy Act)

National Environmental Policy Act

*Comment:* Commenters expressed concerns that DHS has not adequately complied with the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq,* by failing to consider potential environmental impacts of this rule. Commenters contend that allowing DACA recipients to remain in the United States has the effect of adding people to (or not removing people from) the U.S. population, which requires preparation of an environmental impact statement or environmental assessment to comply with NEPA. Commenters contend that the environmental impact of the proposed regulatory action was not unduly speculative for DHS to analyze and make projections of various potential effects resulting from allowing individuals to remain in the United States. Commenters also disagreed with DHS's determination in the NPRM that categorical exclusion A3(c) applies to this action, arguing that A3(c) cannot be applied because no prior NEPA analysis was conducted for the DACA policy contained in the 2012 Napolitano Memorandum.

---

[325] 5 U.S.C. 601(6).

*Response:* This action codifies DHS policy regarding exercise of enforcement discretion and defines the criteria under which DHS may exercise that discretion, with respect to a defined category of persons that have been present in the United States since at least 2007.

The commenters assumed this rule will result in 800,000 "extra people" in the U.S. population because individuals meeting the threshold criteria would be removed from or depart the United States absent this rule. DHS disagrees with both assumptions. The persons subject to the Secretary's 2012 policy of enforcement discretion have, by definition, been present in the United States since at least 2007 without lawful status. Promulgation of this rule will neither directly "add" to the number of individuals currently residing in the United States nor increase population growth. DHS also disagrees with the commenters' assumption that in the absence of the rule DACA recipients would be removed or would leave the United States voluntarily. DACA recipients necessarily came to the United States at a very young age, and many have lived in the United States for effectively their entire lives. For many DACA recipients, the United States is their only home. Indeed, some DACA recipients do not even speak the language of their parents' home country. They are unlikely to voluntarily leave the only country they have ever known. Nor is it reasonably foreseeable that their removal would soon be a priority for the agency.

DHS disagrees with the commenters' assertion that this rule "would ultimately grant approximately 800,000 illegal aliens the right to stay and work in the U.S." This rule does not provide any protection from removal or access to employment authorization beyond what is contemplated in the 2012 DACA policy. It is intended to preserve and fortify the existing DACA policy; it does not alter DACA eligibility criteria, grant lawful immigration status or citizenship for noncitizens or provide a means for entry into the United States. Therefore, DHS anticipates no change in U.S. population as a direct effect of this rule.

In addition, as discussed above, DHS does not believe that codification of the DACA policy is likely to have measurable population effects nationwide or in any particular locations. If such effects were to occur, the relationship between such effects and this rule would likely be highly attenuated. Impacts in particular locations would be contingent upon the independent decisions of individual current and prospective DACA recipients, and upon choices and decision-making processes across a range of individuals and institutions (*e.g.*, employers, law enforcement officers, courts) at indeterminate times and locations in the future under unknown and unpredictable economic, personal, and employment conditions and circumstances entirely outside the control of DHS.

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect. Under DHS implementing procedures for NEPA, for a proposed action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

This rulemaking implements, without material change, the 2012 DACA policy addressing exercise of enforcement discretion with respect to a specifically defined population of noncitizens and is not part of a larger DHS action. It defines the criteria under which DHS will consider requests for DACA, the procedures by which one may request DACA, and what an affirmative grant of DACA will confer upon the requestor. DHS considered the potential environmental impacts of this rule with respect to an existing population that has been present in the United States since at least 2007 and determined, in accordance with the Instruction Manual, that this rule does not present extraordinary circumstances that would preclude application of a categorical exclusion.

This rule, therefore, satisfies the requirements for application of categorical exclusion A3(c) in accordance with the Department's approved NEPA procedures. DHS does not agree with commenters' assertion that categorical exclusion A3(c) cannot be applied to this action unless DHS first "establish[es] that it had not previously violated NEPA" because it would effectively impose a new procedural step or condition on application of categorical exclusions that is not required or approved for the Department's NEPA implementing procedures. Commenters also raised broader concerns about the adequacy of DHS's NEPA compliance procedures as set forth in the DHS Directive and Instruction Manual. Those concerns are outside the scope of this rulemaking.

Family Assessment

*Comment:* Two commenters stated that the proposed rule's Family Assessment is incomplete because the rule does not provide additional administrative relief for or properly considers DACA-eligible individuals' parents, spouses, grandparents, and other loved ones central to their lives.

*Response:* As described in the Family Assessment in Section III.H, DHS has assessed the effect of this rule on family well-being as required by section 654 of the Treasury and General Government Appropriations Act, 1999,[326] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[327] In doing so, DHS considered the effect of this rule on the family, as family is defined in section 654(b)(2) of that act. While DHS appreciates the commenters' desire to provide additional administrative relief to DACA recipients' parents, spouses, grandparents, and other loved ones central to their lives, such relief falls outside of the scope of this rule, which is limited to the population described within this rule.

*F. Out of Scope*

As noted throughout this preamble, a number of comments were submitted that did not relate to the substance of the NPRM. Several commenters expressed general opposition to the current administration or its handling of immigration policy, without referring to the proposed rule at all. Some commenters expressed direct opposition to specific political parties, while others opposed Congress.

Multiple commenters shared the challenges they faced in the United States as either an undocumented or documented immigrant without referring to the substance of this rulemaking. Other comments were from noncitizens seeking information or

---

[326] *See* 5 U.S.C. 601 note.
[327] Public Law 105–277, 112 Stat. 2681 (1998).

making requests regarding their own cases.

Numerous commenters provided general support for immigration but did not explicitly refer to DACA. Other out-of-scope comments related to the COVID–19 pandemic, asylum seekers and the Asylum Officer proposed rule, recommendations not pertaining to this rule, and general statements unrelated to the substance of the regulation. DHS has reviewed and considered all such comments and incorporated them as applicable.

## III. Statutory and Regulatory Requirements

*A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

E.O. 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, to the extent permitted by law, to proceed only if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits while giving consideration, to the extent appropriate and consistent with law, to values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. In particular, E.O. 13563 emphasizes the importance of not only quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility, but also considering equity, fairness, distributive impacts, and human dignity. The latter values are highly and particularly relevant here.

This final rule is designated as a "significant regulatory action" that is economically significant since it is estimated the rule will have an annual effect on the economy of $100 million or more, under section 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this final regulation.

### 1. Summary of Major Provisions of the Regulatory Action

This final rule will preserve and fortify DHS's DACA policy for the issuance of deferred action to certain young people who came to the United States many years earlier as children, who have no current lawful immigration status, and who are generally low enforcement priorities. The final rule codifies the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The final rule codifies the definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States and does not prevent DHS from initiating any criminal or other enforcement action against the DACA requestor at any time.

• *Threshold Criteria.* The final rule codifies the longstanding threshold criteria where the requestor must have: (1) come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6) of the final rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety—with additional clarifications explained below; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, has a final order of removal, or a voluntary departure order. The final rule also codifies that deferred action under DACA may be granted only if USCIS determines in its discretion that the requestor meets the threshold criteria and merits a favorable exercise of discretion.

• *Employment Authorization.* The final rule codifies DACA-related employment authorization for deferred action recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph does not constitute any substantive change in current policy and, therefore, the final rule will continue to specify that the noncitizen must have been granted deferred action and must establish economic need to be eligible for employment authorization.

• *"Lawful Presence."* The final rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered "lawfully present"—a term that does not confer authority to remain in the United States—for the discrete purpose of authorizing the receipt of certain benefits under that regulation. The final rule also reiterates longstanding policy that a noncitizen

who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9).

• *Procedures for Request and Restrictions on Information Use.* The final rule codifies the procedures for denial of a request for DACA, the circumstances that would result in the issuance of an NTA or RTI, and the restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to the retention of longstanding DACA policy and procedure, the final rule includes the following changes in comparison to the NPRM:

• *Filing Requirements.* The final rule codifies the longstanding bundled filing requirement, in which requestors must file Form I–765, Application for Employment Authorization, and Form I–765WS, concurrently with the Form I–821D Consideration of Deferred Action for Childhood Arrivals. *See* new 8 CFR 236.23(a)(1).

• *Criminal History, Public Safety, and National Security:* The NPRM proposed to codify at 8 CFR 236.22(b)(6) the longstanding criminal history, public safety, and national security criteria for consideration of DACA. Upon careful consideration of comments received on this NPRM provision, DHS is revising this provision to additionally clarify that, consistent with longstanding DACA policy, expunged convictions, juvenile delinquency adjudications, and immigration-related offenses characterized as felonies or misdemeanors under State laws are not considered automatically disqualifying convictions for purposes of this provision. *See* new 8 CFR 236.22(b)(6).[328]

• *Termination of DACA:* The NPRM proposed to codify at 8 CFR 236.23(d)(1) and (2) DHS's longstanding DACA termination policy, as it existed prior to the preliminary injunction issued in *Inland Empire-Immigrant Youth Collective* v. *Nielsen*, No. 17–2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018), with some modifications. The rule proposed that USCIS could terminate DACA at any time in its discretion with or without a NOIT, and that DACA would terminate automatically upon departure from the United States

---

[328] Regarding the criteria related to criminal convictions, DHS also clarified in the preamble to this final rule that it does not intend to retain the provision in the DACA FAQs that in exceptional circumstances DHS may grant DACA notwithstanding that the requestor does not meet the criminal guidelines. USCIS has rarely, if ever, found exceptional circumstances that warrant a grant of DACA where the requestor does not meet the criminal guidelines.

without advance parole and upon filing of an NTA with EOIR (a modification from the prior policy of automatic termination upon NTA issuance), but DACA would not terminate automatically in the case of a USCIS-issued NTA solely based on an asylum referral to EOIR. The NPRM raised four alternative approaches and invited comment on these and other alternatives for DACA termination. After careful consideration of the comments on this provision and the alternatives suggested in the NPRM and by commenters, DHS is maintaining in the final rule that USCIS may terminate DACA at any time in its discretion. However, DHS is revising this provision to provide that USCIS will generally provide DACA recipients with a NOIT prior to termination of DACA, but maintains discretion to terminate DACA without a NOIT if the individual is convicted of a national security related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), (iv), or 1227(a)(4)(A)(i), or an egregious public safety offense. DHS is also revising this provision to provide that DACA recipients who depart the United States

without advance parole, but who are nonetheless paroled back into the United States, will resume their DACA upon expiration of the period of parole. *See* new 8 CFR 236.23(d)(1) and (2).

• *Automatic Termination of Employment Authorization.* The NPRM proposed at 8 CFR 236.23(d)(3) that employment authorization would terminate automatically upon termination of DACA. This provision included a cross reference to 8 CFR 274a.14(a)(1)(iv), however on February 8, 2022, 8 CFR 274a.14(a)(1)(iv) was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* civ. 20–cv–3815 (D.D.C. Feb. 7, 2022). As a result of the vacatur and additional revisions to the DACA terminations provisions to eliminate automatic termination based on filing of an NTA, as described in this preamble, DHS is modifying 8 CFR 236.23(d)(3) in this final rule to remove the vacated cross reference and clarify that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted. *See* new 8 CFR 236.23(d)(3).

• *Provision Rescinding and Replacing the Napolitano Memorandum.* In this final rule, DHS is clarifying at 8 CFR 236.21(d) that this subpart rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and from this point forward governs all current and future DACA grants and requests. DHS also clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Historically, DHS has promulgated rules without expressly rescinding prior guidance in the regulatory text itself. However, DHS has chosen to depart from previous practice in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum. *See* new 8 CFR 236.21(d).

2. Summary of Costs and Benefits of the Final Rule

In light of public comments, DHS has made some adjustment to parts of this RIA analysis. The following table captures the changes in the RIA from the NPRM to the final rule.

**BILLING CODE 9111–97–P**

**Table 3. Changes in RIA Estimates from the NPRM to the Final Rule**

| Variable | Section | NPRM and Final Rule Comparison | | | Description | Description of Changes |
|---|---|---|---|---|---|---|
| | | *NPRM* | *Final Rule* | *Difference* | | |
| Estimated DACA recipients' labor force participation rate | III.A.4.a.(6) | 70% | 78% | 8% | Rate is applied to the projected Active Population to estimate how many recipients might choose to participate in the labor market for Benefits estimation stemming from DACA recipients' labor market earnings. | This estimate increased in response to public comments that suggested the possibility of an upward shift of the DACA recipient age distribution into higher potential labor force participation brackets. |
| Estimated DACA recipient's average hourly compensation rate (in 2020 dollars) | III.A.4.a.(3) | $24.20 | $32.58 | $8.38 | Rate is used in the estimation of the costs of requesting DACA and the benefits and transfers from the earnings of DACA recipients that choose to participate in the labor market. | This estimate increased in response to public comments that suggested the possibility of an upward shift of the DACA recipient age distribution into higher potential earning brackets. |

000677

| Biometrics travel cost ($ rate per mile traveled in a private vehicle; in 2020 dollars) | III.A.4.a.(4) | $0.56 | $0.54 | ($0.02) | Rate is used in the estimation of the cost of requesting DACA. Requestor biometrics-related costs are part of a DACA request. | This rate changed due to updated information from the Bureau of Labor Statistics on the Consumer Price Index. |
| Annualized monetized discounted (7%) cost savings (No Action baseline FY 2021-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $22.4 million | $0 | ($22.4) million | Potential cost savings from the NPRM provision that gave the DACA requestor population the option of requesting only deferred action without also applying for employment authorization. | The final rule requires a complete DACA request to include a request for both deferred action (Form I-821D) and employment authorization (Forms I-765 and I-765WS). There are no longer potential cost savings from the NPRM provision that gave the requestors the option of requesting only deferred action. |
| Annualized monetized discounted (7%) transfers (No Action baseline FY 2021-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $17.8 million | $0 | ($17.8) million | Potential transfers accounted for in the NPRM from USCIS to the DACA requestor population that would request only deferred action. | The final rule does not allow the DACA requestor population the option of only requesting deferred action through Form I-821D. The fees paid by DACA requestors for a complete application cover the USCIS cost for both Forms I-821D and I-765. As a result, there are no longer transfers from USCIS to the DACA requestor population that would have requested only deferred action. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Annualized monetized discounted (7%) net benefits (Pre-Guidance baseline FY 2012-FY 2031; in 2020 dollars) | III.A.4.g | $20.72 billion | $20.70 billion | ($0.02) billion | Benefits from the labor market earnings of DACA recipients less the value of non-paid time | The gross benefits increased as the estimated DACA recipient average hourly compensation rate and the labor force participation rate increased. For the final rule, DHS subtracted the value of non-paid time from the estimated gross benefits. As a result, estimated net benefits decreased in the final rule. |
| Annualized monetized discounted (7%) costs (Pre-Guidance baseline FY 2012-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $410.4 million | $480.8 million | $70.4 million | Costs associated with requesting DACA. | This estimate increased as the estimated DACA recipient average hourly compensation rate increased. |
| Annualized monetized discounted (7%) transfers (Pre-Guidance baseline FY 2012-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $14.8 million | $0 | ($14.8) million | Potential transfers accounted for in the NPRM from USCIS to the DACA requestor population that would request only deferred action. | The final rule does not allow the DACA requestor population the option of only requesting deferred action through Form I-821D. The fees paid by DACA requestors for a complete request cover the USCIS cost for both Forms I-821D and I-765. As a result, there are no longer transfers from USCIS to the DACA requestor population that would have requested only deferred action. |

| Annualized monetized discounted (7%) transfers (Pre-Guidance baseline FY 2012-FY 2031; in 2020 dollars) | III.A.4.g | $3.4 billion | $5.1 billion | $1.7 billion | Transfers in terms of employment taxes from the employed DACA recipients and their employers to the Federal government. | This estimate increased as the estimated DACA recipient average hourly compensation rate and labor force participation rate increased. Therefore, the employment taxes from the employed DACA recipients and their employers to the Federal Government also increased. |

BILLING CODE 9111–97–C

The final rule will result in new costs, benefits, and transfers. To provide a full understanding of the impacts of DACA, DHS considers the potential impacts of this final rule relative to two baselines. The No Action Baseline represents a state of the world under the DACA policy; that is, the policy initiated by the guidance in the Napolitano Memorandum in 2012 and prior to the July 16, 2021 *Texas* decision. However, the No Action Baseline does not directly account for the *Texas* decision, as discussed further in the Population Estimates and Other Assumptions section discussing this baseline. The second baseline considered in the analysis is the Pre-Guidance Baseline, which represents a state of the world before the issuance of the Napolitano Memorandum, where the DACA policy did not exist and has never existed. To better understand the effects of the DACA policy, we focus on the Pre-Guidance Baseline as the most useful point of reference, as it captures the effects of going from a world completely without the DACA policy to a world with the DACA policy.

Table 4 provides a detailed summary of the provisions and their estimated impacts relative to the No Action Baseline. Additionally, Table 5 provides a detailed summary of the provisions and their estimated impacts relative to the Pre-Guidance Baseline.

BILLING CODE 9111–97–P

**Table 4. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2021—FY 2031 (Relative to the No Action Baseline)**

| Final Provision | Description of Final Provision | Estimated Impact of Final Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Qualitative:**<br><br>Benefits<br>• The final rule allows the active DACA-approved population to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed.<br>• For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment to receive an Employment Authorization Document. DACA recipients are considered lawfully present and not unlawfully present for certain limited purposes. | |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | |

Source: USCIS analysis.

Note: The No Action Baseline refers to a state of the world under the current DACA policy in effect under the guidance of the Napolitano Memorandum.

**Table 5. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Final Provision | Description of Final Provision | Estimated Impact of Final Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Quantitative:**<br><br>Net Benefits<br><br>Income earnings of the employed DACA recipients due to obtaining an approved EAD less the value of non-paid time: |
| Amending 8 CFR 236.21(c). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment. DACA recipients are considered lawfully present and not unlawfully present for certain limited purposes. | • Annualized net benefits are estimated to be as much as $21.9 billion, at a 3-percent discount rate or $20.7 billion at a 7-percent discount rate, dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy.<br>• Total net benefits over a 20-year period are estimated to be as much as:<br>  ○ $455.0 billion undiscounted;<br>  ○ $424.4 billion at a 3-percent discount rate; and<br>  ○ $403.2 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | Costs<br><br>Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS: |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | • Annualized costs could be $ 494.9 million, at a 3-percent discount rate or $480.8 million at a 7-percent discount rate.<br>• Total costs over a 20-year period could be:<br>  ○ $10.1 billion undiscounted;<br>  ○ $9.6 billion at a 3-percent discount rate; and<br>  ○ $9.4 billion at a 7-percent discount rate.<br><br>Transfer Payments |

|  |  | Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy:<br><br>• Annualized transfers are estimated to be up to $ 5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate.<br>• Total transfers over a 20-year period are estimated to be up to:<br>  ○ $113.2 billion undiscounted;<br>  ○ $105.6 billion at a 3-percent discount rate; and<br>  ○ $100.3 billion at a 7-percent discount rate.<br><br>**Qualitative:**<br><br>Cost Savings<br><br>DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.<br><br>Benefits<br><br>• The final rule will result in more streamlined enforcement encounters and decision making, as well as avoided costs associated with enforcement action against low-priority noncitizens. It also allows DHS to focus its limited enforcement resources on higher-priority noncitizens.<br>• The final rule gives the DACA-approved population the option to request renewal of DACA in the future if needed.<br>• For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an |

| | | increased sense of family security, and (4) an increased sense of hope for the future. |
|---|---|---|
| Source: USCIS analysis. | | |
| Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum. | | |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 6 and Table 7 present the prepared accounting statements showing the costs, benefits, and transfers associated with this regulation relative to the No Action Baseline and the Pre-Guidance Baseline, respectively.[329]

**Table 6. OMB A-4 Accounting Statement – No Action Baseline ($ in millions, 2020; period of analysis: FY 2021–FY 2031)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source/ Citations |
|---|---|---|---|---|
| Benefits | | | | |
| Annualized monetized benefits (3%) | N/A | N/A | N/A | RIA |
| Annualized monetized benefits (7%) | N/A | N/A | N/A | RIA |
| Unquantified benefits | The final rule will allow active DACA recipients to continue enjoying the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. | | | RIA |
| Costs | | | | |
| Annualized monetized costs (3%) | N/A | N/A | N/A | RIA |

---

[329] *See* OMB, Circular A–4 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

**53268**      **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

| | | | | |
|---|---|---|---|---|
| Annualized monetized costs (7%) | N/A | N/A | N/A | RIA |
| Unquantified costs | N/A | | | RIA |
| Transfers | | | | |
| From whom to whom? | N/A | | | RIA |
| Annualized monetized transfers (3%) | N/A | N/A | N/A | |
| Annualized monetized transfers (7%) | N/A | N/A | N/A | |
| Unquantified transfers | None | | | |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | No direct effects | | | RIA |
| Effects on small businesses | The final rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this final rule will not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages | None | | | RIA |
| Effects on growth | None | | | RIA |
| Source: USCIS analysis. | | | | |

Table 7 shows the pre-guidance baseline estimates, which are a comprehensive assessment of the costs and benefits of the rule. Note that the monetized benefits and transfers are a maximum estimate. We are unable to provide a range because of uncertainty as to two factors: (1) the substitutability of workers, and (2) the extent to which the relevant population would be willing and able to work without authorization in the absence of DACA. See discussion in Sections III.A.4.b.6. and III.A.4.b.7.

**Table 7. OMB A-4 Accounting Statement – Pre-Guidance Baseline ($ in millions, 2020; period of analysis: FY 2012–FY 2031)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source/ Citations |
|---|---|---|---|---|
| Benefits | | | | |
| Annualized monetized net benefits (3%) | N/A | N/A | $21,861.6 | RIA |
| Annualized monetized net benefits (7%) | N/A | N/A | $20,702.1 | RIA |
| Unquantified benefits | The final rule will allow DACA recipients to enjoy the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. | | | RIA |
| Costs | | | | |
| Annualized monetized costs (3%) | $494.9 | N/A | N/A | RIA |
| Annualized monetized costs (7%) | $480.8 | N/A | N/A | RIA |
| Unquantified costs | N/A | | | RIA |
| Unquantified Cost Savings | DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. | | | RIA |
| Transfers | | | | |

| From whom to whom? | Transfer payments in the form of employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy. | | | RIA |
|---|---|---|---|---|
| Annualized monetized transfers (3%) | N/A | N/A | $5,438.4 | RIA |
| Annualized monetized transfers (7%) | N/A | N/A | $5,149.9 | RIA |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | Indirect effects, such as tax revenues and provision of certain government services, depend on (among other factors) policy choices made by the State, local, and/or Tribal governments. | | | RIA |
| Effects on small businesses | The rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this final rule will not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages* | None | None | None | RIA |
| Effects on growth | None | None | None | RIA |
| Source: USCIS analysis. | | | | |
| *Note, as explained below, that the population of DACA recipients is small relative to the size of the national labor market so we do not find a national effect on wages; however, there is survey data indicating that individuals earn higher wages since receiving DACA. | | | | |

BILLING CODE 9111–97–C

### 3. Background and Purpose of the Rule

The INA generally charges the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.[330] The INA further authorizes the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of" the INA.[331] In the Homeland Security Act of 2002, Congress also provided that the Secretary "shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."[332] The Homeland Security Act also provides that the Secretary, in carrying out their authorities, must "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."[333]

The Secretary, in this final rule, establishes guidelines for considering requests for deferred action submitted by certain individuals who came to the United States many years ago as children, consistent with the Napolitano Memorandum described above. As with the 2012 DACA policy, this final rule will serve the significant humanitarian and economic interests animating and engendered by the DACA policy, with respect to the population covered by that policy. In addition, the final rule will preserve not only DACA recipients' substantial reliance interests, but also those of their families, schools, employers, faith groups, and communities.[334] The final rule also will

---

[330] Public Law 82–414, 66 Stat. 163 (as amended); INA sec. 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also vests certain authorities in the President, Attorney General, and Secretary of State, among others. *See id.*

[331] INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3).

[332] Public Law 107–296, sec. 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. 202(5)).

[333] 6 U.S.C. 111(b)(1)(F).

[334] *See DHS* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1914 (2020) (*Regents*) ("DACA recipients have 'enrolled in degree programs,

help to appropriately focus the Department's limited immigration enforcement resources on threats to national security, public safety, and border security where they are most needed.

4. Cost-Benefit Analysis

In light of public comments received and relative to the NPRM RIA, DHS has adjusted parts of the RIA for this final rule to incorporate some of the ideas and suggestions presented in various public comments. For example, relative to the NPRM, DHS adjusted the projected DACA population age distribution to account for the possibility that the eligible and active population might age over the next 10 years, thereby moving into higher age groups. As a result of the updated age distribution, the estimated labor force participation rate of the active DACA population also changed. The age distribution is used in the estimation of an average compensation rate for DACA recipients. The average compensation rate together with the estimated labor force participation rate of the active DACA population are used in the estimation of costs, benefits, and transfers of this final rule. In the final rule, DHS also accounted for the value of non-paid time which individuals would forgo when approved for DACA and if they chose to participate in the labor market. This value was subtracted from the estimated benefits. Further, DHS made additions to the qualitative discussion regarding the unquantified and unmonetized benefits after considering suggestions from commenters regarding potential quantification and monetization of certain benefits bestowed on the DACA population by this rulemaking. Additionally, the final rule codifies the longstanding bundled filing requirements and reclassifies the $85 biometrics fee as a Form I–821D filing fee. As such, a complete DACA request under the final rule includes Forms I–821D, I–765, and I–765WS with total fees of $495. Relative to the NPRM, this final rule no longer estimates any

potential cost savings from the request and fee structure in the No Action Baseline and no potential transfers from USCIS to the DACA requestor population as DHS is codifying the status quo bundled filing process instead of the proposed provision to unbundle the requests for deferred action from the Application for Employment Authorization. The details of all the adjustments are presented and incorporated throughout this RIA.

DHS estimates the potential impacts of this final rule relative to two baselines. The first baseline is a No Action Baseline, which represents a state of the world wherein the DACA policy would be expected to continue under the Napolitano Memorandum guidance. The No Action Baseline does not account for the July 16, 2021, district court decision, as discussed further in the Population Estimates and Other Assumptions section below discussing this baseline. Relative to this baseline, there were no quantitative and monetized impacts.

The second baseline considered in the analysis is a Pre-Guidance Baseline, which represents a state of the world before the guidance in the Napolitano Memorandum, where the DACA policy does not exist and has never existed. The Pre-Guidance Baseline is included in this analysis in accordance with OMB Circular A–4 guidance, which directs agencies to include a pre-statutory baseline in an analysis if substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action.[335] In this case, the DACA policy was implemented through DHS and USCIS guidance. DHS has not performed a regulatory analysis on the regulatory costs and benefits of the DACA policy guidance previously and, therefore, includes a Pre-Guidance Baseline in this analysis for clarity and completeness. Moreover, DHS presents the Pre-Guidance Baseline to provide a more informed picture on the overall impacts of the DACA policy since its inception, while at the same time recognizing that many of these impacts have already been realized. DHS notes that the Pre-Guidance Baseline analysis also can be used to better understand the state of the world under the district court's decision in *Texas,* should the partial stay of that decision be lifted. Relative to this baseline, DHS estimated annualized net benefits of $21.9 billion at a 3-percent discount rate or $20.7 billion at a 7-percent discount rate,

annualized costs of $494.9 million at a 3-percent discount rate or $480.8 million at a 7-percent discount rate, and annualized transfers of $5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate.

The cost-benefit analysis of the RIA presents the impacts of this final rule relative to the No Action Baseline first, and then relative to the Pre-Guidance Baseline. In each of the baseline analyses, we begin by specifying the assumptions and estimates used in calculating any costs, benefits, and transfers of this final rule.

a. No Action Baseline

(1) Population Estimates and Other Assumptions

The numbers presented in this section have not changed from the NPRM to the final rule. Based on the public comments received, DHS added more clarity to some of the assumptions used in making the population projections in this section. For example, DHS clarified further that the averages of the "stable" period and not its trends are used in the projections of the population numbers.

The final rule will affect certain individuals who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities. DHS currently allows certain individuals to request an exercise of discretion in the form of deferred action on a case-by-case basis according to certain criteria outlined in the Napolitano Memorandum. Individuals may request deferred action under this policy, known as DACA.

DHS recognizes a growing literature on the impacts of DACA that identifies noncitizens who may potentially meet DACA threshold criteria based on age and length of time in the United States. This approach to estimating the population affected by this final rule estimates the total number of people who are potentially eligible for consideration for deferred action under the DACA policy and then predicts the proportion of those people who will request DACA in the future. Widely available national microdata that reports the immigration status of the foreign-born population does not exist. The subpopulation that is potentially eligible to request DACA must therefore be estimated by other means. In general, analysts estimate the size of the DACA-eligible population using a residual method in which the total foreign-born population is estimated using various

---

embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA policy. The consequences of the rescission, respondents emphasize, would 'radiate outward' to DACA recipients' families, including their 200,000 U.S. citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year." (internal citations omitted)).

[335] *See* OMB, Circular A–4 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

surveys.[336] The unlawfully and lawfully present foreign-born population can be estimated based on DHS administrative records, including a mix of DHS administrative records and logical rules based on foreign-born demographic characteristics.[337] Further, the demographic characteristics from some of the underlying survey data may be used to further identify the portion of the unauthorized population that would potentially meet the DACA criteria, although some factors, such as education, criminal history, and discretionary determinations may not be accounted for in such estimates. For example, the Migration Policy Institute (MPI) estimates an eligible DACA population of 1.7 million, including the currently active population, although this estimate looked only at certain eligibility criteria and did not consider the proportion of the potentially-eligible population who may not meet the criminal history or continuous physical presence criteria, or who might merit a favorable exercise of discretion, meaning that it is likely an overestimate.[338] Historical DHS administrative data between FY 2012 and FY 2021 show a total of around 1 million initial DACA requests.[339] Thus, MPI's estimate implies a remaining DACA-eligible population of up to roughly 700,000 people.

DHS has two concerns with adopting this approach to estimate the number of future DACA requestors. First, as analysts who use the residual method observe, the approach is complex and highly sensitive to specific modeling assumptions. In a 2021 report estimating the U.S. unauthorized immigrant population for the period January 2015 to January 2018, OIS states that "estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for

estimation [of the unauthorized population]." [340] Additionally, the U.S. Census Bureau (Census) details the many complex adjustments applied to produce estimates of the population by sex, age, race, Hispanic origin, and number of household units in the latest ACS design and methodology report on weighting and estimation,[341] clarifying that "[t]he ACS estimates are based on a probability sample, and will vary from their true population values due to sampling and non-sampling error." [342] A rigorous analysis by sociologists and statisticians of the external validity of available methods used to impute unauthorized status in Census survey data concluded that:

it is not possible to spin straw into gold. All approaches that we tested produced biased estimates. Some methods failed in all circumstances, and others failed only when the join observation condition was not met, meaning that the imputation method was not informed by the association of unauthorized status with the dependent variable.[343]

In light of these modeling challenges, it is possible that a new estimate of the DACA-eligible population based on the residual method would systematically under- or overestimate the authorized immigrant population, which would, in turn, lead to systematic, but unknown, under- or overestimation of the residual subpopulation.[344]

A second concern about using the residual method to estimate the number of future DACA requestors is that even if DHS accurately estimates the total DACA-eligible population, DHS will still need a reliable methodology to predict how many potentially DACA-eligible individuals will actually request DACA in the future. Given the nature of the DACA policy, political factors, the challenging legal history, and the characteristics of the active DACA and DACA-eligible populations, including varying personal circumstances and expectations, predicting how many potentially eligible noncitizens may request DACA would be uncertain and complex, even if a census of the remaining DACA-eligible population existed. Therefore, in the context of this final rule, DHS relies instead on the administrative data USCIS collects from individuals who have requested DACA over the past several years, as described later in this analysis.

To provide a framework for the baseline population estimates, DHS starts by first presenting historical USCIS data on the active DACA population and then presenting historical data on DACA request receipts. These data provide a sense of historical participation in the DACA policy and insights into any trends. The data also allow DHS to make certain assumptions in estimating a potential future active DACA population that would enjoy the benefits of this policy and that may contribute potential transfers to other populations as well as in estimating potential future DACA request receipts (i.e., the population that would incur the costs associated with applying under the policy). DHS therefore proceeds by presenting first the historical active DACA population and its estimates of a potential future active DACA population, and then the historical volume of DACA request receipts and its estimates of this potential future population.

However, before presenting the historical and projected populations associated with this rule, DHS first identifies certain historical time periods of interest for this analysis. Historically, the 2012 and, subsequently, the 2017 DACA-related memoranda have shaped the level of participation in the DACA policy. The 2012 Napolitano Memorandum initiated the policy, and the 2017 Duke Memorandum halted

[336] The surveys may include the U.S. Census Bureau's American Community Survey (ACS), the Current Population Survey (CPS), the American Time Use Survey, and the Survey of Income and Program Participation (SIPP), among others.

[337] See, e.g., OIS, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018 (Jan. 2021), https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.

[338] For more details and additional resources on this methodology, see Migration Policy Institute, Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate (Feb. 2021), https://www.migrationpolicy.org/research/us-legalization-unauthorized-immigrant-groups (accessed May 16, 2022).

[339] Source: DHS/USCIS/OPQ (July 2021).

[340] See OIS, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018 (Jan. 2021), https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf, at 10.

[341] See U.S. Census Bureau, American Community Survey Design and Methodology (January 2014), Chapter 11: Weighting and Estimation, https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_ch11_2014.pdf (accessed Mar. 23, 2022).

[342] Id. at 16.

[343] See Jennifer Van Hook, et al., Can We Spin Straw into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches, Demography 52(1), 329–54, at 330.

[344] In Pope (2016), see section 5, "Empirical method." See also George J. Borjas and Hugh Cassidy, The wage penalty to undocumented immigration, Lab. Econ. 61, art. 101757 (2019), https://scholar.harvard.edu/files/gborjas/files/labourecon2020.pdf (hereinafter Borjas and Cassidy (2019)). In section 2, "Imputing undocumented status in microdata files," the authors state that, "[i]n the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias," and in footnote 2 they describe DHS's assumed correction for sample bias. See also Catalina Amuedo-Dorantes and Francisca Antman, Schooling and Labor Market Effects of Temporary Authorization: Evidence from DACA, J. of Population Econ. 30(1): 339–73 (Jan. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5497855/pdf/nihms866067.pdf. In Section III.B, "Capturing Undocumented Immigrants and DACA Applicants," the authors describe a potential

effect of a limitation in the data relied upon as follows: "As such, some may be concerned that the control group may be made up of individuals who immigrated with the purpose of getting an educational degree in the United States, as is the case with F1 and J1 visa holders."

new requests.[345] As such, DHS

[345] As discussed above, the Duke Memorandum rescinded the DACA policy, allowing for a brief wind-down period in which a limited number of renewal requests would be adjudicated, but all initial requests would be rejected. Duke Memorandum at 4–5. In the litigation that followed, the Duke Memorandum was enjoined in part, such that DHS was required to adjudicate renewal requests as well as "initial" requests from individuals who had been granted DACA previously but did not qualify for the renewal process. *See Regents* v. *DHS; Batalla Vidal* v. *Nielsen,* 279 F. Supp. 3d 401 (E.D.N.Y. 2018). In July 2020, then-Acting Secretary Wolf issued a memorandum rescinding the Duke and Nielsen memoranda and making certain immediate changes to the DACA policy, namely directing DHS personnel to reject all pending and future initial requests for DACA, reject all pending and future applications for advance parole absent exceptional circumstances, and shorten DACA renewals. Memorandum from Chad F. Wolf, Acting Secretary, to heads of immigration components of DHS, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* dated July 28, 2020 (hereinafter Wolf Memorandum). The effect of the Duke Memorandum, along with these court orders and the Wolf Memorandum, was that individuals who were granted DACA at some point before September 5, 2017, remained able to renew DACA, while those who had never before received DACA were not able to do so until the Wolf Memorandum was vacated in December 2020. *See Batalla Vidal* v.

identifies three periods of interest: (1) a surge period, FY 2012–FY 2014, where initial requests were high compared to later years; (2) a stable policy period, FY 2015–FY 2017, where initial requests were slowing, renewal requests were leveling off, and the overall active DACA-approved population was stabilizing; and (3) a cooling-off period, FY 2018–FY 2020, where initial requests dramatically decreased, the active DACA-approved population started to decline, and most requests were for renewals.[346]

Table 8 presents historical data on the volume of DACA recipients who were

*Wolf,* No. 16–cv–4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020).

[346] DHS believes it is likely that the initial surge in DACA requests reflects a rush of interest in the new policy, and that the slowdown in 2014–2017 simply reflects the fact that many of the eligible and interested noncitizens requested DACA shortly after it became available. It is also possible that there was a decline in interest due to the uncertainty caused by the *Texas* litigation regarding the 2014 Memorandum described above, which began in 2014. The limits on requests described above, *supra* n.345, along with changes in the national political sphere, likely account for much of the "cooling off" after 2017.

active as of September 30th of each fiscal year. For clarity, "active" is defined as those recipients who have an approved Form I–821D and I–765 in the relevant USCIS database. The approval can be either an initial or a renewal approval. Additionally, DHS does not need specificity or further breakdown of these data into initial and renewal recipients to project this active DACA population and calculate associated monetized benefits and transfers based on the methodology employed in this RIA. Both initial recipients and renewal recipients are issued an EAD that could be used to participate in the labor market.[347] Therefore, the annual cumulative totals of the active DACA population suffices for estimating the quantified and monetized benefits and transfers of this final rule that stem from the potential labor market earnings of the DACA population with an EAD.

**BILLING CODE 9111–97–P**

[347] See the Labor Market Impacts section of this RIA for discussion and analysis of labor force participation as well as discussion of the possibility that some DACA recipients might choose not to work despite having employment authorization.

| **Table 8. Historical Active DACA Population, FY 2012–FY 2020 (as of September 30th of Each FY)** | |
|---|---|
| **FY** | **Total Active DACA Recipients** |
| 2012 | 2,019 |
| 2013 | 472,880 |
| 2014 | 608,037 |
| 2015 | 652,530 |
| 2016 | 679,830 |
| 2017 | 700,572 |
| 2018 | 704,095 |
| 2019 | 660,552 |
| 2020 | 647,278 |
| **Annual Growth Rate** | |
| FY 2015–FY 2016 | 4.1837% |
| FY 2016–FY 2017 | 3.0511% |
| **Average** | **3.6174%** |

Source: DHS/USCIS/OPQ ELIS, CLAIMS 3, and CIS2 (queried June 2021).

Notes: DHS considers FY 2015–FY 2017 to be a stable policy period in the DACA policy history—after the surge in DACA initial requests prompted by the Napolitano Memorandum, FY 2012–FY 2014, and before the cooling-off prompted by the Duke Memorandum, FY 2018–FY 2020. As noted below, the average annual growth rate of FY 2015–FY 2017 will be used to project the potential future active DACA population for FY 2021–FY 2031 and not the trend of FY 2015-FY 2017. Although not needed for the projections as explained above, the December 2021 active DACA population stood at approximately 611,470.

On July 16, 2021, the *Texas* decision enjoined USCIS from approving initial DACA requests.[348] Nevertheless, for this RIA, DHS employs the assumption that the historical trends in the active DACA population outlined remain a reasonable and useful indication of the trend in the future over the period of analysis. Table 9 presents DHS's estimates for the active DACA population for FY 2021–FY 2031.

Given the motivation and scope of this final rule, DHS assumes that upon the implementation of the final rule the DACA policy will be characterized by relatively more stability, where the yearly active DACA population will not continue to decrease as it did in FY 2018–FY 2020. Therefore, in our projections of the active DACA population, DHS uses the average

annual growth rate of 3.6174 percent in the stable policy period, FY 2015–FY 2017,[349] and multiplied it by the current year cumulative totals to obtain the next year's estimated active DACA population. Therefore, the values in Table 9 grow at an annual rate of 3.6174 percent. These estimates will be used later when calculating the monetized benefits and transfers of this final rule.

---

[348] As of July 20, 2021, USCIS ELIS and CLAIMS 3 data show 89,605 initial requests have been accepted at a lockbox in FY 2021.

[349] For clarity and in consideration of public comments, DHS reemphasizes that the average of period FY 2015–FY 2017 is used, and not the trend.

**Table 9. Projected Active DACA Policy Population (FY 2021–FY 2031)**

| FY | Active DACA Recipients |
|----|------------------------|
| 2020 | 647,278 |
| 2021 | 670,693 |
| 2022 | 694,954 |
| 2023 | 720,093 |
| 2024 | 746,142 |
| 2025 | 773,133 |
| 2026 | 801,100 |
| 2027 | 830,079 |
| 2028 | 860,106 |
| 2029 | 891,219 |
| 2030 | 923,458 |
| 2031 | 956,863 |

Source: USCIS analysis.

Notes: FY 2020 is included as a reference. Active DACA recipients equals previous year total plus the average annual growth rate (3.6174%) of the stable historical policy period FY 2015–FY 2017. The active DACA population is used to calculate the monetized benefits and transfers of this rule. Numbers are rounded for presentation purposes.

BILLING CODE 9111–97–C

DHS notes that although this methodology for projecting a future active DACA population has important advantages (including transparency, reproducibility, and a clear nexus to historical policy data), it also has some potential limitations. For instance, the methodology assumes that the active DACA population again will grow at the average rate it grew over the period FY 2015–FY 2017, which was just a few years after the Napolitano Memorandum was issued. Additionally, public comments on this rulemaking have raised concerns over the fact that potential DACA requestors stopped "aging in" to the policy in June 2022, which is when the youngest possible requestor reaches 15 years of age. However, DHS does not believe there will necessarily be a precipitous decline in the growth rate of DACA requestors after new requestors stop "aging in" in 2022. For example, some individuals may newly meet the criteria after June

2022, upon satisfying the educational or military service requirement for the first time. Nothing in the DACA age threshold criteria restrict the population projections made by DHS in this final rule. Nevertheless, DHS projects a decline over the analysis period, albeit gradual, of Initial requests in Table 11.

Similarly, the active DACA population projections do not directly capture the possibility that there could be a surge of request receipts following publication of a final rule, followed by a slower growth rate in later years. However, USCIS notes that projecting a surge in request receipts does not necessarily imply a surge in the active DACA population. The levels of approvals, renewals, and noncitizens renewing or lapsing deferred action under the DACA policy can vary. For example, there could be delays in processing requests caused by the surge of new requests (assuming USCIS maintains current staffing levels) or by other events, noncitizens could cease

making renewal requests at higher rates than before, or approval rates could change relative to historical trends. As mentioned previously, a continuation of the injunction on approving initial DACA requests would curtail initial requests.

Next, DHS presents the population used when calculating the monetized costs of this final rule. Table 10 presents historical data on the numbers of DACA request receipts. This population incurred the cost of requesting DACA. The population is composed of initial and renewal requestors, both of whom face similar costs, such as filing fees,[350] time burdens, and opportunity costs. For clarity, this table represents intake and processing data and is silent on the number of requests that were approved as that level of detail is not required to estimate the monetized costs of this final rule. DHS only needs total receipts to estimate the monetized costs of this final rule.

---

[350] The proposed fee does not differentiate between initial and renewal receipt costs. The

estimated full cost reflects a weighted average of

April 2020 to March 2021 initial and renewal workload receipt data.

| FY | Initials | Renewals | Total |
|---|---|---|---|
| 2012 | 157,826 | | 157,826 |
| 2013 | 443,967 | | 443,967 |
| 2014 | 141,538 | 122,249 | 263,787 |
| 2015 | 92,470 | 391,878 | 484,348 |
| 2016 | 74,498 | 198,520 | 273,018 |
| 2017 | 45,637 | 470,668 | 516,305 |
| 2018 | 2,062 | 287,709 | 289,771 |
| 2019 | 1,574 | 406,588 | 408,162 |
| 2020 | 4,301 | 339,632 | 343,933 |

**Table 10. Historical DACA Receipts**

Source: DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Dec. 2020).

Note: The paragraphs surrounding this table explain how this historical information is used to project the future population over FY 2021–FY 2031.

To project total DACA receipts, DHS uses the historical information from Table 10 with the intention to capture a possible surge effect in initial requests, a stabilization effect through the renewals, and then a steady decline in initial requests as the newly DACA-eligible population might dwindle over time because individuals stopped "aging in" in June 2022. DHS first calculates the percentage of initial requests in the previously defined surge years FY 2012–FY 2014 out of the total period FY 2012–FY 2017 to account for a similar possibility in projections, which DHS calls a surge rate.[351] This surge rate is 77.7595 percent. Second, DHS calculates the average initial requests over the stable period of FY 2015–FY 2017, which is 70,868.33. Third, DHS calculates the average annual rate of growth of 29.08806 percent for initial requests over FY 2015–FY 2017. Fourth, DHS calculates the average number of renewal requests over FY 2015–FY 2020, which is 349,165.83. DHS chose FY 2015–FY 2020 for this calculation due to the relatively stable nature of historical renewal requests. The intention is to capture a possible surge effect in initial requests, a stabilization effect through the renewals, and then a steady decline

in initial requests as the DACA-eligible population might dwindle over time.

Table 11 presents the projected volume of DACA request receipts. DHS estimates a surge component in initial requests over FY 2021–FY 2022. As stated, these projections do not adjust for the uncertain impacts of the *Texas* injunction on initial requests. To estimate the surge component, DHS first calculates the total number of historic initials over the stable period FY 2015–FY 2017, which is 212,605. DHS then multiplies this number by the surge rate of 77.7595 percent to estimate a potential surge in its projections of 165,320.57 initial requests in the first two projected years, FY 2021–FY 2022. DHS then divides this number in two to estimate a surge in initial requests for FY 2021 and FY 2022, which is 82,660.29. Adding to this number the average number of historic initial requests of 70,868.33 yields a total (surge) number of 153,528.62 initial requests for FY 2021 and FY 2022. Starting with FY 2024, DHS applies the historic FY 2015–FY 2017 growth rate of −29.08806 percent to initial requests for the rest of the projected years.[352]

The renewals in FY 2023–FY 2024 capture this surge as the historical average number of renewals of

349,165.83 plus 153,528.62. DACA recipients can renew their requests for deferred action every 2 years. Adding total initials and renewals for every fiscal year then yields a total number of requests that will be used in estimating the monetized costs of this final rule.

As with DHS's projection methodology for the active DACA population, DHS acknowledges potential limitations associated with the methodology used to project requests. For instance, although the methodology is transparent, reproducible, and has a clear nexus to historical policy data, the methodology assumes that the "surge rate" for DACA requests following publication of this rule would mirror the surge rate that followed issuance of the Napolitano Memorandum. There are reasons to support such an assumption, including a potential backlog of demand following the Duke Memorandum, subsequent guidance, and ongoing litigation. But there are also reasons to question it, such as the potential that demand was exhausted in the years before issuance of the Duke Memorandum, such that any "surge" in requests would consist primarily of requests from individuals who turned 15 after the Duke Memorandum was issued.

---

[351] Calculation: FY 2012–FY 2014 initials total = 743,331; FY 2012–FY 2017 initials total = 955,936;

initials surge rate = (743,331/955,936) * 100 = 77.7595%.

[352] For example: FY 2024 = FY 2023 * (1 − 29.08806%), which yields 70,868.33 * (1 − 0.2908806) = 50,254.11.

| FY | Initials | Renewals | Total |
|----|----------|----------|-------|
| **Table 11. Projected DACA Receipts (FY 2021–FY 2031)** | | | |
| 2021 | 153,529 | 349,166 | **502,695** |
| 2022 | 153,529 | 349,166 | **502,695** |
| 2023 | 70,868 | 502,695 | **573,563** |
| 2024 | 50,254 | 502,695 | **552,949** |
| 2025 | 35,636 | 420,034 | **455,670** |
| 2026 | 25,270 | 420,034 | **445,304** |
| 2027 | 17,920 | 420,034 | **437,954** |
| 2028 | 12,707 | 420,034 | **432,741** |
| 2029 | 9,011 | 420,034 | **429,045** |
| 2030 | 6,390 | 420,034 | **426,424** |
| 2031 | 4,531 | 420,034 | **424,565** |

Source: USCIS analysis.

Notes: For FY 2023, 70,868.33 represents initials averaged over the stable policy period of FY 2015–FY 2017. For the rest of the projection period this population declines at the average annual rate of 29.08806%. For FY 2021–FY 2022, 349,165.83 represents renewals averaged over FY 2015–FY 2020. For FY 2025–FY 2031, 420,034 represents historical average initials (349,165.83) plus historical average renewals (70,868.33). The calculations for the surges in initials in FY 2021–FY 2022 and renewals in FY 2023–FY 2024 are explained in the surrounding text. For simplicity, it is assumed the projected surges in the first two projected years are the same. Total receipts are used in calculating the monetized cost (to the requestors) of this final rule. Numbers are rounded for presentation purposes.

As of July 2021, DHS administrative data for quarters 2 and 3 of FY 2021 show that there were 89,701 initial DACA requests and 302,985 renewal DACA requests pending.[353] These data include requests filed during earlier periods in which DHS did not accept most initial DACA requests due to ongoing litigation and subsequent policy changes.[354] For the projections presented in this RIA, it is assumed that initial DACA requests would be accepted without interruptions from any legal rulings on the policy in FY 2021 and all other subsequent projected fiscal years. In the absence of these restrictions on initial requests, DHS's projection for FY 2021 tracks with the observed trend in the most recent FY 2021 administrative data.

In sum, while population estimates in this final rule are consistent with the overall MPI population estimate,[355] this RIA relies on historical request data to estimate future DACA requests rather than estimating the overall DACA-eligible population and then further estimating the share of the population likely to request DACA in the future. Either approach would still require a methodology for projecting how many potentially eligible individuals might choose to request DACA and also stay active. While both approaches face methodological challenges, the Department has no reason to believe the residual-based methodology would yield a more accurate estimate. At the same time, the current approach based on historical request data offers an especially transparent and easily reproducible estimation methodology.

(2) Forms and Fees

The final rule codifies, as proposed in the NPRM, that the Form I–821D require an $85 filing fee and eliminates the $85 biometrics fee that had been assessed since the Napolitano Memorandum was issued.[356] Individuals requesting deferred action under the DACA policy must file Form I–821D to be considered. Currently, and as codified in the final rule, all individuals filing Form I–821D to request deferred action under DACA, whether for initial consideration of or renewal of DACA, also must file Form I–765 and Form I–765WS (Form I–765 Worksheet) and pay relevant fees. Submission of Forms I–821D, I–765, and I–765WS and filing fees together is considered to comprise a complete DACA request.[357] Additionally, certain DACA requestors choose to have a representative, such as a lawyer, prepare and file their DACA request.[358] In such cases, a Form G–28 must accompany a complete DACA request.[359]

[353] Source: DHS/USCIS/OPQ (July 2021).

[354] *See* Section II.B above for litigation history, including *Regents*, 140 S. Ct. 1891 (2020), and *Texas*, 549 F. Supp. 3d 572 (S.D. Tex. 2021).

[355] That is, the DHS projected number of DACA requests, and active DACA recipients falls within the ranges estimated by the residual-based methodology.

[356] *See* new 8 CFR 106.2(a)(38).

[357] *See* new 8 CFR 236.23(a)(1).

[358] An internal OPQ data request reveals that 44 percent of requestors chose to have a preparer. We use this percentage breakdown in subsequent cost calculations.

[359] Individuals retained to help a requestor prepare and file their DACA request must submit a Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, to provide

Continued

**53278** **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

The final rule sets for the following fees associated with a DACA request: the fee to file Form I–765 is $410; a $85 filing fee for Form I–821D; no filing fee for Form I–765WS, or Form G–28; and no biometric services fee. Therefore, the total fee as of May 20, 2020, to submit a DACA request is $495, with or without the submission of Form G–28. DHS believes this is a reasonable proxy for the Government's costs of processing and vetting these forms when filed together.[360] As stated in the NPRM, USCIS data suggest there is a negligible workload difference from adjudicating Form I–821D when submitted with Form I–765.[361] These fees will allow DHS to recover the Government's costs of processing these forms in line with USCIS' standard fee-funded operating structure. In the future, DHS plans to propose new USCIS fees in a separate rulemaking after evaluating the resource requirements for Form I–765 and other immigration benefit requests.[362] The fee for Form I–765 as of May 20, 2020 may need to be adjusted because it has not changed since 2016.[363]

(3) Wage Assumptions

Compared to the NPRM, in this final rule, DHS adjusted the preparer's estimated total compensation rate to reflect BLS data updates and the estimated DACA recipients' total compensation rate to reflect an adjusted DACA population age distribution. These adjustments are described in detail below. The estimated hourly compensation rate of DACA requestors and the total compensation rate of those hired to prepare and file DACA requests are used as proxies for the opportunity cost of time in the calculation of costs. The estimated wage rate of the requestors also is used to estimate the benefits of income that accrue to those requestors who participate in the labor market through the grant of employment authorization. In the following, DHS explains how it estimates compensation rates of the preparers and requestors. All compensation estimates are in 2020 dollars.

A DACA request can be prepared on behalf of the requestor. In this final rule, DHS assumes that a preparer has similar knowledge and skills necessary for filing a DACA request as an average lawyer would for the same task. Based on Bureau of Labor Statistics (BLS) data, DHS estimates an average loaded wage,

or compensation, for a preparer of $103.81.[364]

To estimate the hourly opportunity cost of time of the DACA requestor population, DHS uses data from Census and USCIS. DHS assumes, for the purposes of this analysis, that the profile of DACA recipients follows that of the U.S. population at large. For example, DHS assumes that the average DACA recipient values education and employment in a similar way as the average person in the U.S. population. This allows DHS to use other government agencies' official data, such as Census data, to estimate DACA recipient compensation rates and other economic characteristics given the absence of DHS-specific DACA recipient population economic data.

USCIS data on the active DACA population [365] lend themselves to delineation by age group: 15 to 24, 25 to 34, and 35 to 44.[366] In an effort to provide a more focused estimate of wages, DHS uses these age groups in its estimates, assuming that different age groups have different earnings potential. DHS estimates these age groups to represent about 36 percent, 56 percent, and 9 percent, respectively, of the total DACA population. Based on the public comments DHS received regarding the FY 2022 "aging in" aspect of the DACA policy, DHS has adjusted its analysis in the final rule to account for the aging of the DACA recipient population, which implies a shift in the age distributions. As such, DHS takes the average of the FY 2021 age distribution of the DACA-eligible population (15 to 24 years old [36 percent], 25 to 34 years old [56 percent], and 35 to 44 years old [9 percent]) and FY 2031 age distribution

(15 to 24 years old [0 percent], 25 to 34 years old [36 percent], and 35 to 44 years old [64 percent]).[367] Therefore, DHS assumes an overall age group distribution of the DACA-eligible population to be 18 percent for those 15 to 24 years old; 46 percent for those 25 to 34 years old; and 37 percent for those 35 to 44 years old. For the purposes of this analysis, these calculations seek to account for a range of possible DACA recipients' skill, education, and experience levels. This age distribution could be expected to change over time.

Next, DHS seeks to estimate an average compensation rate that accounts for income variations across these age groups. DHS first obtains annual average Consumer Price Index information for calendar years 2012 through 2020.[368] DHS sets 2020 as the base year and then calculate historical average annual incomes (in 2020 dollars) based on Census historical income data.[369] To do this, DHS converts the annual mean incomes in the Census data (2019 dollars) into 2020 dollars and then averages the period 2012–2019 to obtain average full-time salary information for the population at large for these age groups as $18,389.39, $45,528.59, and $60,767.17, respectively.[370] DHS recognizes that not all DACA recipients work full time or have jobs that offer additional benefits beyond the offered wage. The employment and school attendance status of DACA recipients is varied and includes being in school only, working full or part time, or being unemployed. Moreover, some DACA recipients have additional compensation benefits such as health

---

information about their eligibility to act on behalf of the requestor (*see* 8 CFR 292.4(a)).

[360] USCIS Office of the Chief Financial Officer (OCFO) analysis.

[361] *See* 86 FR 53764.

[362] *See* 87 FR 5241.

[363] *See* 81 FR 73292.

[364] DHS assumes the preparers with similar knowledge and skills necessary for filing DACA requests have average wage rate equal to the average lawyer wage of $71.59 per hour. Source: BLS, Occupational Employment and Wage Statistics, *Occupational Employment and Wages, May 2020,* 23–1011 Lawyers, *https://www.bls.gov/oes/2020/may/oes231011.htm.*

The benefits-to-wage multiplier is calculated as follows: (total employee compensation per hour.)/(wages and salaries per hour) = $38.60/$26.53 = 1.4549 = 1.45 (rounded). *See* BLS, Economic News Release (Mar. 2021), *Employer Cost for Employee Compensation—December 2020,* Table 1. Employer Costs for Employee Compensation by ownership, *https://www.bls.gov/news.release/archives/ecec_03182021.htm.*

Total compensation rate calculation: (wage rate) * (benefits multiplier) = $71.59 * 1.45 = $103.81.

[365] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[366] We assume this distribution remains constant throughout the periods of analysis for both baselines as new DACA recipients enter and previous DACA recipients exit the policy. The current (age) requirements of the DACA policy do not prohibit us from making this assumption.

[367] We assume the age group 15–24 has no members by the end of the projection period, FY 2031. To obtain the FY 2031 age group distribution, we shift the FY 2021 distribution under the assumption that DACA recipients in a particular age group retain their DACA approval as they age throughout the projection period of this analysis. That is, (a) age group 15–24 becomes 0 percent of the population; (b) FY 2031 age group 25–34 becomes the FY 2021 age group 15–24, with 36 percent of the population; and (c) FY 2031 age group 35–44 becomes 64 percent of the population, which is the sum of FY 2021 age group 25–34 (56 percent) and FY 2021 age group 35–44 (9 percent).

[368] Source: BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, index averages* (Mar. 2021), *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf.*

[369] Source: U.S. Census Bureau, *Historical Income Tables: People,* Table P–10. Age—People (Both Sexes Combined) by Median and Mean, *https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-income-people.html* (last revised Nov. 9, 2021).

[370] The Census data delineate age groups as 15 to 24, 25 to 34, and 35 to 44. DHS assumes the age groups identified in the USCIS data follow the same pattern on average as the age groups in the Census data (*e.g.,* the Census income information by age group also represents the income information in the age groups identified in the USCIS data).

insurance whereas others do not. Additionally, DACA recipients could hold entry-level jobs as well as more senior positions. Some are employed in industries that generally pay higher wages and some are employed in industries where wages are relatively lower. To account for this wide range of possibilities, DHS takes a weighted average of the salaries presented above using the distribution of the age groups as weights, divided by 26 pay periods and 80 hours per pay period (the typical biweekly pay schedule), loading the wage to account for benefits, to arrive at an average hourly DACA requestor and recipient compensation of $32.58.[371]

(4) Time Burdens

Compared to the NPRM, this section contains no changes to the time burdens. In the final rule, DHS did adjust the GSA 2021 travel rate per mile for biometrics adjusted to 2020 values using BLS CPI. Calculating any potential costs associated with this final rule involves accounting for the time that it takes to fill out the required forms, submit biometrics collection, and travel to and from the biometrics collection site. DHS estimates the time burden of completing for Form I–821D is 3 hours per request, including the time for reviewing instructions and completing and submitting the form.[372] Moreover, DHS estimates the time burden of completing Form I–765 is 4.75 hours, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application, and the time burden of completing Form I–765WS is 0.5 hours, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.[373] Additionally, DHS

estimates the time burden of completing Form G–28 is 0.83 hours.[374]

In addition to the filing fee, the requestor will incur the costs to comply with the biometrics submission requirement as well as the opportunity cost of time for traveling to an USCIS Application Support Center (ASC), the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting their biometrics. While travel times and distances vary, DHS estimates that a requestor's average roundtrip distance to an ASC is 50 miles and takes 2.5 hours on average to complete the trip.[375] Furthermore, DHS estimates that a requestor waits an average of 70 minutes or 1.17 (rounded, 70 divided by 60 minutes) hours for service and to have their biometrics collected at an ASC according to the PRA section of the instructions for Form I–765, adding up to a total biometrics-related time burden of 3.67 hours (2.5 plus 1.17). In addition to the opportunity cost of time for providing biometrics and traveling to an ASC, requestors will incur travel costs related to biometrics collection. The per-requestor cost of travel related to biometrics collection is about $27.00 per trip,[376] based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.54 per mile.[377] DHS assumes that each requestor travels independently to an ASC to submit their biometrics.

(5) Costs of the Final Regulatory Action

The provisions of this final rule would not impose any new costs on the

potential DACA requestor population when requesting deferred action through Form I–821D and an EAD through Form I–765 and Form I–765WS. The final rule would not implement any new forms to file, nor would it change the estimated time burden for completing and filing any of the required forms to request deferred action, and thus the total DACA request cost would not change from the current amount if requestors continued to file Forms I–821D, I–765, and I–765WS. Therefore, relative to the No Action Baseline, the final rule does not impose any new costs on requestors.

(6) Benefits of the Final Regulatory Action

There are quantified and monetized benefits as well as unquantified and qualitative benefits associated with the DACA policy under the Napolitano Memorandum and this final rule. The quantified and monetized benefits stem from the income earned by DACA recipients who participate in the labor market. DHS recognizes that some recipients will not participate in the labor market. For example, this category could include DACA recipients who are currently enrolled in school, who perhaps have scholarships or other types of financial aid, and who may not need additional financial support (*e.g.,* young DACA requestors, including high school students, who are supported by their parents or guardians). Therefore, such individuals may choose not to participate in the labor market.

To identify the proportion of the DACA recipients who might participate in the labor market, DHS uses data from BLS on labor force participation rates.[378] BLS data show historical and projected labor force participation rates (as a percent of total working-age population) by age group. Assuming the DACA requestors' population profiles (such as education and employment status) match those of the U.S. population at large, DHS combines the BLS data on labor force participation by age group with previously presented USCIS data on the distribution of ages for the approved DACA requestor population (*see Wage Assumptions*

[371] Calculation: $32.58 = (((\$18,389.39 * 18\%) + (\$45,528.59 * 46\%) + (\$60,767.17 * 37\%))/26)/80 * 1.45.

[372] USCIS, Instructions for Consideration of Deferred Action for Childhood Arrivals (Form I–821D), OMB No. 1615–0124 (expires Mar. 31, 2023), *https://www.uscis.gov/sites/default/files/document/forms/i-821dinstr.pdf.*

[373] Department of Homeland Security, USCIS, Instructions for Application for Employment Authorization (Form I–765), OMB No. 1615–0040, *https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf.* Last accessed Aug. 12, 2022. On July 26, 2022, OMB approved an emergency revision action (ICR# 202207–1615–004) associated with the final rule titled Asylumworks Vacatur 1615–AC66. This action will change the future Form I–765 time burden from 4.75 hours to 4.50 hours once USCIS releases new Form I–765 and

form instructions. This time burden change of 15 minutes was not a result of the DACA rulemaking and/or its provisions. In our estimations, we use the time burden of 4.75 as it is the most current Form I–765 time burden published by USCIS as of August 12, 2022.

[374] USCIS, Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative (Form G–28), OMB No. 1615–0105, *https://www.uscis.gov/sites/default/files/document/forms/g-28instr.pdf.* Last accessed Aug. 12, 2022.

[375] See Final Rule, *Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10284 (Feb. 25, 2015), and Final Rule, *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* 78 FR 536, 572 (Jan. 3, 2013).

[376] Calculation: 50 miles * $0.54 per mile = $27 per trip.

[377] See the U.S. General Services Administration website at *https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived* for privately owned vehicle mileage reimbursement rates.

Also see BLS CPI information at *https://www.bls.gov/cpi/tables/seasonal-adjustment/revised-seasonally-adjusted-indexes-2021.xlsx.*

Calculation: GSA 2021 rate = $0.56 per mile; average 2021 CPI = 270.97, average 2020 CPI = 258.84. Rate per mile in 2020 dollars is $0.56/((1 + ((270.97 − ;258.84)/258.84)) = $0.5349, rounded to $0.54.

[378] Source: BLS, Employment Projections (Sept. 2020), *Civilian labor force participation rate by age, sex, race, and ethnicity,* Table 3.3. Civilian labor force participation rates by age, sex, race, and ethnicity, 1999, 2009, 2019, and projected 2029, *https://www.bls.gov/emp/tables/civilian-labor-force-participation-rate.htm.*

section) to calculate an age group-adjusted weighted average. Based on this methodology, DHS estimates that the average rate of the potential DACA recipients who will participate in the labor market and work is 78 percent and the rate of those who might not is 22 percent.[379] The 78 percent estimate is interpreted as an average estimate over the analysis period meant to encapsulate any fluctuations due to labor market dynamics. DHS recognizes that the estimated 78 percent participation rate of potential DACA recipients does not directly account for the potential additional benefits of an EAD beyond income earnings. DHS describes these potential additional benefits in the analysis below, regarding the benefits of the rule relative to the Pre-Guidance Baseline.

DHS calculates the quantified and monetized benefits associated with this final rule by taking the sum of the approved initial and renewal populations (*i.e.,* those who have been granted an EAD) and multiplying it by an estimated yearly compensation total of $67,769, which is the previously estimated compensation rate of $32.58, multiplied by 80 hours in a pay period, times 26 pay periods per year. As previously discussed, DHS assumes that over the analysis period, on average, 78 percent of DACA recipients will work, so the total population projections presented previously are adjusted to reflect this (population * 78 percent). Given the previously delineated provisions of this final rule and the stated assumptions, there are no new quantified and monetized benefits

relative to the No Action Baseline. In the No Action Baseline, the same average estimate of 78 percent of DACA recipients will work, which is the same percentage of people estimated that would work under this final rule.

The unquantified and qualitative benefits of an approved DACA request are discussed in significantly greater detail in the analysis below, regarding the benefits of the rule relative to the Pre-Guidance Baseline.

(7) Transfers of the Final Regulatory Changes

The provisions of this final rule will produce no transfers relative to the No Action Baseline.

b. Pre-Guidance Baseline

The period of analysis for Pre-Guidance Baseline also includes the period FY 2012–FY 2020, which includes the period during which DHS has operated under the Napolitano Memorandum, to provide a more informed picture of the total impact of the DACA policy. DHS proceeds by considering the DACA population from this period (given by the historical data of Table 8 and Table 10), but applying all the assumptions as presented before (*e.g.,* on wages and age distributions). In essence, in this baseline, we assume the DACA policy never existed, but instead of the period of analysis beginning in FY 2021, the Pre-Guidance Baseline period of analysis is FY 2012–FY 2031, which allows DHS to analyze the potential effects of the final rule's provisions starting in FY 2012. As a result, the Pre-Guidance baseline condition is similar to the state of the world under the July 16, 2021, district court decision, should the partial stay of that decision ultimately be lifted.

(1) Population Estimates and Other Assumptions

For the Pre-Guidance Baseline, the total population estimates include all the projected populations described earlier in this analysis for FY 2021–FY 2031, in Table 9 and Table 11, while also adding the historical population numbers presented in Table 8 and Table 10 for FY 2012–FY 2020. To conserve space and time, we will not repeat those numbers here.

(2) Forms and Fees

All the forms and fees remain the same in the Pre-Guidance Baseline as those presented for the No Action Baseline.

(3) Wage Assumptions

For the Pre-Guidance Baseline, the wage assumptions remain as presented previously for the No Action Baseline with an overall average compensation rate for the DACA requestors of $32.58 and an average compensation rate for preparers of $103.81.

(4) Time Burdens

For the Pre-Guidance Baseline, all the time burdens remain as presented previously for the No Action Baseline.

(5) Costs of the Final Regulatory Changes

The Pre-Guidance Baseline represents a world without DACA; that is, all baseline impacts are $0. DHS calculates the final rule's impacts relative to this baseline of $0 costs, benefits, and transfers. Given the population estimates, form fees, time burdens, wage assumptions (including preparers'), biometrics fee, travel costs, and biometrics time burden information presented in Section III.A.4.a, DHS presents the requestors' application costs for period FY 2012–FY 2031. The estimated cost per average DACA request is $1,206.83.[380] Multiplying these per-request costs by the population estimates yields the total estimated cost. The following table presents our quantified and monetized cost estimates.

BILLING CODE 9111–97–P

---

[379] BLS labor force calculated averages by age group, United States: 16 to 24 years old average is 53.6 percent (average of FY 2019 [55.9%] and FY 2029 [51.3%]); 25 to 34 years old average is 82.4 percent (average of FY 2019 [82.9%] and FY 2029 [81.9%]); and 35 to 44 years old average is 82.15 percent (average of FY 2019 [82.1%] and FY 2029 [82.2%]). Previously estimated USCIS age group distribution of the active DACA-approved population: 16 to 24 years old is 18 percent; 25 to 34 years old is 46 percent; and 35 to 44 years old is 37 percent. Calculations: Age group adjusted weighted average is (53.6% * 18%) + (82.4% * 46%) + (82.15% * 37%) = 78.151% = 78% (rounded) of the DACA recipient population who potentially will participate in the labor market. Thus, it follows, (1 − 78.151%) = 21.849% = 22% (rounded) of the DACA recipients who potentially will opt out of the labor market.

[380] The average request cost equals Form I–821D average cost plus Form I–765 average cost, that is $1,206.83 = $461.24 + $745.59. Breaking this down, Form I–821D average cost = Preparer average cost + DACA requestor average cost + Biometrics cost. Preparer average cost = ($103.81 (estimated compensation) * 3.83 hours (total time burden) + $85 (fee)) * 0.44 (application preparer use rate) = $212.34. DACA applicant average cost = ($32.58 (estimated compensation) * 3 (time burden)) + $85) * (1 − 0.44) = $102.33. Biometrics cost = ($32.58 * 3.67 hours (time burden)) + $27 (50 miles * $.54/ mile) = $146.57. Average Form I–821D cost = $212.34 + $102.33 + $146.57 = $461.24. Average Form I–765 cost = $420.20 (preparer average cost) + $325.39 (DACA requestor average cost) = $745.59.

### Table 12. Total Costs Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars)

| FY | Request Costs |
|----|----|
| 2012 | $190,469,138 |
| 2013 | $535,792,656 |
| 2014 | $318,346,042 |
| 2015 | $584,525,654 |
| 2016 | $329,486,289 |
| 2017 | $623,092,318 |
| 2018 | $349,704,310 |
| 2019 | $492,582,111 |
| 2020 | $415,068,632 |
| 2021 | $606,666,703 |
| 2022 | $606,666,703 |
| 2023 | $692,192,928 |
| 2024 | $667,315,063 |
| 2025 | $549,916,378 |
| 2026 | $537,406,537 |
| 2027 | $528,535,567 |
| 2028 | $522,244,990 |
| 2029 | $517,784,221 |
| 2030 | $514,621,003 |
| 2031 | $512,377,903 |
| **Undiscounted Total** | **$10,094,795,145** |

Source: USCIS analysis.

Note: Numbers are rounded for readability.

BILLING CODE 9111–97–C

The DACA policy also creates cost savings for DHS that are not easily quantified and monetized. For instance, the DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. Cost savings vary considerably depending on the circumstances of the encounter; the type of enforcement officer involved; relevant national security, border security, and public safety considerations; and any intervening developments in the noncitizen's situation and equities. In addition, some cost savings that historically have been considered as part of deferred action decision making are inherently difficult to quantify, such as costs associated with taking enforcement action without

first considering "the likelihood of ultimately removing the alien, the presence of sympathetic factors that could adversely affect future cases or generate bad publicity . . ., and whether the alien had violated a provision that had been given high enforcement priority." [381]

(6) Benefits of the Final Regulatory Changes

There are potential quantified and monetized benefits and unquantified and qualitative benefits associated with this final rule. The quantified and monetized benefits stem from the income earned by DACA recipients who have an EAD and choose to participate

[381] *See AADC*, 525 U.S. at 484 n.8 (citing 16 Charles Gordon, et al., *Immigr. L. and Proc.* § 242.1 (1998)).

in the labor market. By participating in the labor market, DACA recipients are increasing the production of the economy and earning wages, which, in turn, leads to additional consumption. DHS acknowledges the possibility that certain DACA recipients might have participated in the informal labor market and earned wages prior to being granted lawful presence and work authorization under the DACA policy. For this segment of the DACA-recipient population, DHS would be overestimating the quantified benefits in the form of earned income directly attributable to receiving work authorization. Adjusting the quantified benefits to show only income attributable to work authorization under DACA would entail estimating the difference between the compensation these individuals might expect to earn

in the informal labor market and the compensation estimates presented in this analysis, multiplied by the estimate of this population.[382]

For example, Borjas and Cassidy (2019) examine the wage differential between informal and formal work for immigrant populations. They apply their analysis of a wage differential, or "wage penalty," to an estimated proxy of the DACA-eligible population, suggesting that the wage earned as a documented noncitizen could be, on average, 4 percent to 6 percent higher than the wage of an individual working as an undocumented noncitizen. This phenomenon also is discussed in a recently published report on the economic benefits of unauthorized immigrants gaining permanent legal status, which points out that per-hour income differentials exist when comparing unauthorized immigrant workers to citizen and legal immigrant workers.[383] In contrast, in a survey of 1,157 DACA recipients, Wong (2020) finds that respondents age 25 and older (n=882) reported wage increases of 129 percent ($27.17/$11.89 = 2.285) since receiving DACA.[384] Such an adjustment would yield a more accurate estimate of the quantified benefits attributable to the receipt of work authorization under DACA.[385] DHS received public comments on the topic of wage differentials specifically mentioning that, for undocumented women, wage differentials could be even higher. However, no comments made suggestions about whether DHS should adjust the benefit estimates to account for possible wage differentials, or how to adjust these estimates. Therefore, DHS made no adjustments in this final rule RIA.

In addition, DHS considered an additional modification to the estimated benefits to help ensure DHS is not overestimating the quantified benefits directly attributable to receiving DACA. For those who entered the labor market after receiving work authorization and began to receive paid compensation from an employer, counting the entire amount received by the employer as a benefit could likely results in an overestimate. Even without working for wages, the time spent by an individual has value. For example, if someone performs childcare, housework, or other activities without paid compensation, that time still has value. DHS notes that for many workers, paid work can also provide subjective value that exceeds and is not adequately captured by wages; we bracket that possibility here.

Because nonpaid time still has value, a more accurate estimate of the net benefits of receiving work authorization under the final rule would take into account the value of time of the individual before receiving work authorization. For example, the individual and the economy would gain the benefit of the DACA recipients entering the workforce and receiving paid compensation but would lose the value of their time spent performing non-paid activities. Due to the wide variety of non-paid activities an individual could pursue without DACA-based work authorization, it is difficult to estimate the value of that time. DHS requested public comment on how to best value the non-paid time of those who were not part of the authorized workforce without DACA, but did not receive any suggestions as to whether DHS should adjust the estimated benefits to possibly account for leisure or non-paid activities, nor how to adjust the estimated benefits. For this reason, and based on approaches from previous DHS rules,[386] DHS estimated that a reasonable proxy of the value of one hour of non-paid time is equal to the federal minimum wage, adjusted for benefits and in 2020 dollars, at

$10.05.[387] For an annual value, as before, DHS takes the hourly rate (including benefits), $10.05, and multiplies it by 80 hours in a pay period and further multiplies by 26 pay periods, which yields an annual value for non-paid time of $20,904.

For total yearly income earnings calculations, DHS uses the previously estimated average annual compensation of DACA EAD recipients of $67,768.79 multiplied by 78 percent of the active population data in Table 9 and the active population estimates in Table 11. DHS estimated 78 percent of DACA recipients will choose to participate in the labor market, potentially earning income. This earned income is presented here as part of the quantified and monetized benefit of this final rule because of recipients having an EAD and working. The benefit (from earned income) per working DACA recipient is adjusted by subtracting the portion that is a transfer from working recipients to the Federal Government, which ends up being $62,584.47 ($67,768.79 * (1 − 0.0765)). These calculations assume that DACA workers were not substituted for other already employed workers, and that all workers looking for work can find employment in the labor market. As stated in the NPRM and discussed below in Section III.A.4.d, DHS cannot predict the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on many factors. Multiplying this per-recipient benefit (income earnings) by the population projections presented earlier in Table 9 and Table 11 yields the results in column A in Table 13.[388] Similarly, using the 78 percent rate applied to the active DACA populations in Tables 9 and 11 yields the results in column B in Table 13. Subtracting the two columns, A–B, yields our quantified and monetized net benefits presented in column C of Table 13.

**BILLING CODE 9111–97–P**

---

[382] *See* Borjas and Cassidy (2019).

[383] *See* White House Council of Economic Advisors, *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants*.

[384] *See* Wong (2020). DHS notes that the intervening years of experience could explain some of this growth rate.

[385] Borjas and Cassidy (2019) and Wong (2020) suggest that the additional earnings from wages presented in this final rule, for this segment of the DACA population, would have to be adjusted by this formula: NPRM estimated DACA wage—(NPRM DACA estimated wage/(1 + wage differential %)]. This adjustment multiplied by this population yields a more accurate estimate of the quantified and monetized benefits of this final rule.

[386] For example, in prior rules, the DHS position was that the value of time for those not authorized to be in the workforce still has a positive value. DHS valued this time as the minimum wage of $7.25 * a benefits multiplier of approximately 1.45. *See Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10283 (Feb. 25, 2015), and *International Entrepreneur Rule,* 82 FR 5238 (Jan. 17, 2017).

[387] Federal minimum wage equals $7.25. Benefits multiplier from before = 1.45. Average annual 2021 CPI = 270.970; 2020 CPI = 258.811. Value of non-paid time = (7.25/(270.970/258.811)) * 1.45 = $10.05 (rounded).

[388] The portion of total potential income earned that is a payroll tax transfer from the DACA working population to the Federal Government is 7.65%. Multiplying the benefits numbers in Table 13 by [1/(1 − 0.0765)] yields the pre-tax overall total potential income earned. The section below on Transfers discusses more details on the calculations and transfer estimates.

**Table 13. Total Net Benefits Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars)**

| FY | Column | | |
|---|---|---|---|
| | A | B | C = A - B |
| | Income Earnings | Value of Non-Paid Time | Net Benefits |
| 2012 | $98,559,281 | $32,920,037 | $65,639,244 |
| 2013 | $23,084,057,955 | $7,710,365,146 | $15,373,692,809 |
| 2014 | $29,681,867,169 | $9,914,116,249 | $19,767,750,920 |
| 2015 | $31,853,832,553 | $10,639,579,954 | $21,214,252,599 |
| 2016 | $33,186,506,344 | $11,084,709,730 | $22,101,796,614 |
| 2017 | $34,199,045,529 | $11,422,910,529 | $22,776,135,000 |
| 2018 | $34,371,023,909 | $11,480,353,466 | $22,890,670,443 |
| 2019 | $32,245,433,621 | $10,770,379,626 | $21,475,053,995 |
| 2020 | $31,597,451,500 | $10,553,945,463 | $21,043,506,037 |
| 2021 | $32,740,453,377 | $10,935,722,439 | $21,804,730,938 |
| 2022 | $33,924,802,048 | $11,331,309,763 | $22,593,492,285 |
| 2023 | $35,151,993,185 | $11,741,207,009 | $23,410,786,176 |
| 2024 | $36,423,576,566 | $12,165,931,821 | $24,257,644,745 |
| 2025 | $37,741,158,030 | $12,606,020,570 | $25,135,137,460 |
| 2026 | $39,106,401,505 | $13,062,029,029 | $26,044,372,476 |
| 2027 | $40,521,031,110 | $13,534,533,076 | $26,986,498,034 |
| 2028 | $41,986,833,332 | $14,024,129,420 | $27,962,703,912 |
| 2029 | $43,505,659,284 | $14,531,436,354 | $28,974,222,930 |
| 2030 | $45,079,427,036 | $15,057,094,540 | $30,022,332,496 |
| 2031 | $46,710,124,048 | $15,601,767,813 | $31,108,356,235 |
| **Undiscounted Total** | **$683,209,237,384** | **$228,200,462,035** | **$455,008,775,347** |

Source: USCIS analysis.
Note: Numbers rounded for readability.

BILLING CODE 9111–97–C

DHS notes that to whatever extent a DACA recipient's wages otherwise would be earned by another worker, the income earnings and therefore net benefits in Table 13 would be overstated (*see* Labor Market Impacts section for additional analysis).

The unquantified and qualitative benefits stem in part from the forbearance component of an approved DACA request. The DACA requestors who receive deferred action under this final rule would enjoy additional benefits relative to the Pre-Guidance Baseline. DHS describes these next along with any other qualitative impacts of this final rule relative to the Pre-Guidance Baseline.

Some of the benefits associated with the DACA policy accrue to DHS (as discussed above), whereas others accrue to the noncitizens who are granted deferred action and employment authorization, and still others accrue to family members, employers, universities, and others. Quantification and monetization of many of these benefits is unusually challenging. E.O. 13563 states that:

each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify,

including equity, human dignity, fairness, and distributive impacts.[389]

DHS emphasizes that the goals of this regulation include protection of equity, human dignity, and fairness, and the Department is keenly alert to distributive impacts. DHS also recognizes that while some of those qualitative benefits are difficult or impossible to measure, it is essential that they be considered. Under the final rule, deferred action may be available to people who came to the United States many years ago as children—often as young children. As discussed above, in DHS's view, scarce resources are not best expended with respect to people

[389] 76 FR 3821 (Jan. 21, 2011).

000700

who meet the relevant criteria and are deemed, on a case-by-case basis, to warrant a favorable exercise of discretion. In addition, DHS believes forbearance of removal for such individuals furthers values of equity, human dignity, and fairness.

It is not simple to quantify and monetize the benefits of forbearance for those who obtain deferred action and their family members. These challenging-to-quantify benefits include (1) a reduction of fear and anxiety for DACA recipients and their families,[390] (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. Some of these benefits are connected with equity and fairness, mentioned in E.O. 13563; others are plausibly connected with human dignity, also mentioned in that E.O. Again, these benefits are difficult to quantify.[391] One might attempt to compare the benefits of the reduced risk of deportation to other benefits from risk reduction, such as the reduction of mortality and morbidity risks. But any such comparison would be highly speculative, and DHS does not believe that it can monetize the total value of these specific benefits to DACA recipients. A possible (and very conservative) lower bound estimate could be the cost of requesting DACA; that is, it would be reasonable to assume that the DACA-approved population values these benefits at least as much as the cost of requesting DACA. DHS does not speculate on an upper bound but concludes that it could well be a substantially large sum, much larger than the lower bound; the benefits of items (1), (2), (3), and (4) above are likely to be high.

DHS notes as well that DACA recipients could be approved for discretionary advance parole, which permits them to seek parole into the United States upon their return from travel outside the United States.[392] In addition to the benefits of travel itself, DHS recognizes that some DACA recipients who were not previously lawfully admitted or paroled into the United States and are otherwise eligible to adjust status to that of a lawful permanent resident (such as through employment or family sponsorship) may satisfy the "inspected and admitted or paroled" requirement of the adjustment of status statute at 8 U.S.C. 1255(a) after being paroled into the United States upon their return. However, DHS may grant advance parole to any individual who meets the statutory criteria with or without lawful status or deferred action, and a grant of advance parole alone does not create a pathway to lawful status or citizenship. Regardless, DHS is also unable to quantify the value of advance parole to the DACA population.

Employment authorization and receipt of an EAD provides additional benefits to the DACA-approved population and their families. An EAD can serve as official personal identification, in addition to serving as proof that an individual is authorized to work in the United States for a specific period. In certain States, depending on policy choices made by the State, an EAD also could be used to obtain a driver's license or other government-issued identification. Like the discussion on the benefits that are derived from being granted deferred action, DHS is unable to fully quantify and monetize the benefits from having official personal identification or a driver's license for individuals in the DACA population.

DHS requested and received public comments on the additional benefits from forbearance and employment authorization beyond the estimated potential labor market earnings of the approved DACA population. A commenter offered some valuable insights as to how to potentially estimate or proxy for some of these additional benefits. For example, the commenter suggested looking at the average treatment costs for anxiety disorders and anxiety reducing services such as anxiety app downloads and purchases as a proxy for the value that people might place on the reduction of fear and anxiety. Further, the commenter suggested looking into the financial and education investments people make as a possible proxy for the value people might place on community belongingness; U.S. data on the average amount of spending for international travel as a possible proxy for the value of advance parole to the DACA recipient population; and the cost of driver licenses as a possible proxy for the value of an EAD beyond the labor market benefits. These are all instructive starting points or proxies for estimation of perhaps lower bound. At the same time, and as explained in that analysis, DHS continues to believe that such starting points and proxies do not permit a full and accurate valuation of these benefits to this population. DHS continues to believe that these unquantifiable benefits are of great positive value and that attempts at fully monetizing them raise serious conceptual, normative, and empirical challenges. It is nonetheless the position of DHS that consistent with E.O. 13563, considerations of human dignity are some of the main drivers of this rule, which is focused on fortifying and preserving a policy for a vulnerable population in the United States since 2012, and on protecting a range of reliance interests.

Finally, as discussed above, this rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered "lawfully present"—a specialized term of art that does not confer lawful status or the right to remain in the United States—for the discrete purpose of authorizing receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The final rule also reiterates longstanding policy that a noncitizen who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9) (imposing certain admissibility limitations for noncitizens who departed the United States after having accrued certain periods of unlawful presence). These benefits as well are difficult to quantify in part due to the time-limited nature of the benefits and the various ways in which accrual of unlawful presence might ultimately affect an individual based on their immigration history.

(7) Transfers of the Final Regulatory Changes

Relative to the Pre-Guidance Baseline, the final rule could yield tax transfers to different levels of government, assuming that DACA recipients with an EAD who are employed are not substituting their labor for the labor of workers already employed in the economy, and that all workers looking for work can find employment in the labor market. DHS makes this assumption for the purposes of this analysis only.[393] It is difficult to quantify tax transfers because individual tax situations vary widely (as do taxation rules imposed by different levels of government), but DHS estimates the increase in transfer payments to Federal employment tax programs, namely Medicare and Social Security, which have a combined payroll tax rate of 7.65 percent (6.2 percent and 1.45 percent,

---

[390] Giuntella (2021).

[391] On some of the conceptual and empirical issues, *see* Matthew Adler, *Fear Assessment: Cost-Benefit Analysis and the Pricing of Fear and Anxiety*, 79 Chicago-Kent L. Rev. 977 (2004).

[392] *See* 8 U.S.C. 1182(d)(5), 8 CFR 212.5, authorizing parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

[393] The assumption is based on Section III.4.d, Labor Market Impacts, which summarizes the research of isolating immigration effects on labor markets and discusses the relative impact of DACA recipients entering the work force.

respectively).[394] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated increase in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent. This analysis relies on this total tax rate to calculate these transfers relative to the Pre-Guidance Baseline. DHS takes this rate and multiplies it by the total (pre-tax income earnings) benefits,[395] which yields our transfer estimates for this section. Table 14 presents these estimates.

**BILLING CODE 9111–97–P**

| FY | Transfers |
|---|---|
| **Table 14. Total Employment Federal Tax Transfers, FY 2012–FY 2031 (from DACA Employees and Employers to the Federal Government) (2020 dollars)** | |
| 2012 | $16,328,717 |
| 2013 | $3,824,429,742 |
| 2014 | $4,917,515,622 |
| 2015 | $5,277,353,958 |
| 2016 | $5,498,143,444 |
| 2017 | $5,665,894,928 |
| 2018 | $5,694,387,285 |
| 2019 | $5,342,232,100 |
| 2020 | $5,234,878,267 |
| 2021 | $5,424,244,035 |
| 2022 | $5,620,459,895 |
| 2023 | $5,823,773,641 |
| 2024 | $6,034,442,030 |
| 2025 | $6,252,731,108 |
| 2026 | $6,478,916,546 |
| 2027 | $6,713,283,985 |
| 2028 | $6,956,129,399 |
| 2029 | $7,207,759,470 |
| 2030 | $7,468,491,972 |
| 2031 | $7,738,656,177 |
| **Undiscounted Total** | **$113,190,052,322** |

Source: USCIS analysis.

Note: Numbers rounded for readability.

### c. Costs to the Federal Government

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing immigration adjudication and naturalization services by DHS, including administrative costs and services provided without charge to

---

[394] Internal Revenue Service, *Topic No. 751 Social Security and Medicare Withholding Rates,* *https://www.irs.gov/taxtopics/tc751* (last updated May 20, 2022).

[395] The estimated benefit (from pre-tax income earnings) per applicant is $67,768.79. Multiplying this benefit per applicant by the population projections presented earlier in Table 9 and Table 11 adjusted (or multiplied) by the labor force participation rate of 78% yields total pre-tax earnings (for example FY 2012 calculation: $67,768.79 * 2,019 * 0.78 = $106,723,639.90).

Multiplying the 15.3% payroll tax rate to this pre-tax total yields the Table 14 estimates (*e.g.,* FY 2012 = 106,723,639.90 * 0.153 = $16,328,716.91 or $16,328,717 rounded).

certain applicants and petitioners.[396] Generally, DHS establishes USCIS fees according to the estimated cost of adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, such as clerical, officer, and managerial salaries and benefits, plus an amount to recover unassigned overhead (*e.g.*, facility rent, information technology equipment and systems) and immigration benefits provided without a fee charge. For this final rule, DHS considered other application and fee structures as well as public input on this topic and decided to re-classify, as proposed in the NPRM, the $85 biometrics fee as an $85 Form I–821D filing fee, and maintain the current framework requiring all DACA requestors to file both Form I–821D and Form I–765, for a total fee of $495 after biometrics services. These fees will allow DHS to recover the Government's costs of processing these forms in line with USCIS' standard fee-funded operating structure. As part of the biennial fee review and subsequent fee setting process, DHS plans to propose new USCIS fees in a separate rulemaking after evaluating the resource requirements for Form I–765 and other immigration benefit requests.[397] The fee for Form I–765 may need to be adjusted in the process because it has not changed since 2016.[398]

d. Labor Market Impacts

The projected active DACA population in the *No Action Baseline* section of the analysis suggests that about 18,263 new participants [399] could enter the U.S. labor force in the first year of implementation of the final rule as compared to the number of DACA recipients in the labor market in FY 2020 (based on the 78 percent labor force participation rate presented earlier). This number increases annually at a growth rate of 3.6174 percent, reaching up to 26,056 new participants in the last year of analysis, FY 2031. As of 2020, there were an estimated 160,742,000 people in the U.S. civilian labor force.[400] The aforementioned estimate of 18,263 new potential active DACA participants in the U.S. labor

force in FY 2021 would represent approximately 0.0114 percent of the 2020 overall U.S. civilian labor force.[401] These figures could represent an overestimate, insofar as some individuals otherwise might choose to be engaged in informal employment.

The top four States where current DACA recipients reside represent about 55 percent of the total DACA-approved population: California (29 percent), Texas (16 percent), Illinois (5 percent), and New York (4 percent).[402] These States may have a slightly larger share of potential additional DACA workers compared with the rest of the United States. Assuming the estimate for first year impacts could be distributed following the same patterns, DHS estimates the following potential impacts. California could receive approximately 5,296 (*i.e.*, 29% * 18,263) additional workers in the first year of implementation; Texas 2,922 additional workers; Illinois 913 additional workers; and New York 731 additional workers. To provide additional context, in April of 2021, California had a population of 18,895,158 in the civilian labor force in February 2021, Texas had 14,034,972, Illinois had 6,146,496, and New York had 9,502,491.[403] As an example, the additional 5,296 workers who could be added to the Californian labor force in the first year after promulgation of this final rule would represent about 0.0280 percent of the overall California labor force.[404] The potential impacts to the other States would be lower. For Texas, the impact would be about 0.0208 percent; for Illinois, 0.0149 percent; and for New York, 0.0077 percent.

As noted above, the analysis of the final rule relative to the Pre-Guidance Baseline entails consideration of effects going back to FY 2012, when the policy was introduced and the surge of new requestors occurred. Because the Napolitano Memorandum was issued in June of 2012, the FY 2012 September 30th count of 2,019 active DACA participants does not cover a full fiscal year; therefore, DHS adds FY 2012 and FY 2013 together, adjusting by the 78 percent labor market participation rate, for a count of new active DACA entrants

in the U.S. labor market equal to 370,421. Applying this number to the U.S. labor market statistics, as in the No Action Baseline labor market analysis above, we estimate that this number of new potential active DACA entrants would represent about 0.2384 percent of the 2013 overall U.S. civilian labor force of 155,389,000.[405] As discussed in the preceding paragraph, for California, the new active DACA entrant population in FY 2012 and FY 2013 would represent about 0.5685 percent of California's April 2021 labor force, 0.4223 percent of Texas's, 0.3013 percent of Illinois's, and 0.1599 percent of New York's. These figures could represent an overestimate, insofar as some individuals otherwise might choose to be engaged in informal employment.

As noted above, the relative proportion of DACA recipients in any given labor market would depend on the number of active DACA recipients who choose to work and the size of the labor market at that time. DHS expects the number of DACA recipients in the labor force to increase in future years within the period of analysis because, as indicated in Table 9, the RIA projects an increase in the active DACA population in future years. Even in FY 2031, however—when the projected active DACA population would be at its peak of 956,863—the number estimated to participate in the labor force would be 746,353, or 0.4643 percent of the 2020 U.S. civilian labor force.[406]

Although the estimated annual increases in the active DACA population in this final rule are small relative to the total U.S. and individual State labor forces, DHS recognizes that, in general, any increase in worker supply may affect wages and, in turn, the welfare of other workers and employers. However, the effects are not obvious as changes in wages depend on many factors and various market forces, such as the type of occupation and industry, geographic market locations, and overall economic conditions. For example, there are growing industries where labor demand might outpace labor supply, such as in healthcare, food services, and software development sectors. BLS projects that home health and personal care aide occupations will grow by about 34 percent over the next 10 years, cooks in restaurants by about

---

[396] *See* INA sec. 286(m), 8 U.S.C. 1356(m).

[397] *See* 87 FR 5241 (Jan. 31, 2022).

[398] *See* 81 FR 73292 (Oct. 24, 2016).

[399] Calculation: (FY 2021 projected active DACA population—FY 2020 projected active DACA population) * 0.78 = (670,693—647,278) = 23,415 * 0.78 = 18,263.

[400] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 3. Employment status of the civilian noninstitutional population by age, sex, and race, *https://www.bls.gov/cps/cpsaat03.htm.*

[401] Calculation: (18,263/160,742,000) * 100 = 0.0114%.

[402] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[403] Source: BLS, News Release, *State Employment and Unemployment—May 2021,* Labor Force Data Seasonally Adjusted: Table 1. Civilian labor force and unemployment by State and selected area, seasonally adjusted, *https://www.bls.gov/news.release/pdf/laus.pdf.*

[404] Calculation: (5,296/18,895,158) * 100 = 0.0280%.

[405] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 1. Employment status of the civilian noninstitutional population, 1950 to date, *https://www.bls.gov/cps/cpsaat01.pdf.*

Calculation: (332,429/155,389,000) * 100 = 0.2139%.

[406] Calculation: (746,353/160,742,000) * 100 = 0.4643%.

23 percent, and software development occupations by about 22 percent.[407] In growing industries or sectors such as these, holding everything else constant, increases in the labor supply might not be enough to temporarily satisfy labor demand. As a result, employers might offer higher wages to attract qualified workers. The opposite could happen for industries or sectors where labor supply is greater than labor demand due to these industries not growing and/or too many workers entering these industry relative to labor demand. DHS also notes the possibility of positive dynamic effects from employing DACA recipients; hiring DACA recipients might permit businesses to grow and thus have positive, rather than negative, effects of other workers, including U.S. citizens. DHS cannot predict the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as described above as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, training needs, and labor market regulations, among others.[408] Current and potential DACA recipients have shown, over the course of years, that they would remain in the United States even without deferred action or employment authorization. However, undocumented noncitizens looking for work without authorization may be easily exploited, and employers may pay substandard wages, which in turn potentially depresses wages for some U.S. workers. By reducing this possibility, the policy may help to protect U.S. workers and employers against the possible effects of unauthorized labor.

Isolating immigration's effect on labor markets has been an ongoing task in the research. A 2017 National Academies of Sciences, Engineering, and Medicine (NAS) publication synthesizes the current peer-reviewed literature on the effects of immigration and empirical findings from various publications.[409] Notably, the 2017 NAS Report addresses a different subject than this final rule, which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade. Nonetheless, the analysis presented in that report may be instructive.

The 2017 NAS Report cautions that:

economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers.[410]

Whether immigrants are low-skilled or high-skilled workers can matter with respect to effects on wages and the labor market generally.[411] According to the 2017 NAS Report, some studies have found high-skilled immigrant workers positively impact wages and employment of both college-educated and non-college-educated native workers, consistent with the hypothesis that high-skilled immigrants often complement native-born high-skilled workers, and some studies looking at "narrowly defined fields" involving high-skilled workers have found adverse wage or productivity effects on citizens.[412] In addition:

some studies have found sizable negative short-run wage impacts for high school dropouts, the native-born workers who in many cases are the group most likely to be in direct competition for jobs with immigrants. Even for this group, however, there are studies finding small to zero effects, likely indicating that outcomes are highly dependent on prevailing conditions in the specific labor market into which immigrants flow or the methods and assumptions researchers use to examine the impact of immigration. The literature continues to find less favorable effects for certain disadvantaged workers and for prior immigrants than for natives overall.[413]

With respect to wages, in particular, the 2017 NAS Report described recent research showing that,

when measured over a period of more than 10 years, the impact of immigration on the wages of natives overall is very small. However, estimates for subgroups [of noncitizens] span a comparatively wider range, indicating a revised and somewhat more detailed understanding of the wage impact of immigration since the 1990s. To the extent that negative wage effects are found, prior immigrants—who are often the closest substitutes for new immigrants—are most likely to experience them, followed by native-born high school dropouts, who share job qualifications similar to the large share of low-skilled workers among immigrants to the United States.[414]

With respect to employment, the report described research finding

little evidence that immigration significantly affects the overall employment levels of native-born workers. However, recent research finds that immigration reduces the number of hours worked by native teens (but not their employment rate). Moreover, as with wage impacts, there is some evidence that recent immigrants reduce the employment rate of prior immigrants—again suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.[415]

Further, the characteristics of local economies matter with respect to wage and employment effects. For instance, the impacts to local labor markets can vary based on whether such market economies are experiencing growth, stagnation, or decline. On average, immigrants tend to locate in areas with relatively high labor demand or low unemployment levels where worker competition for available jobs is low.[416]

Overall, as noted, the 2017 NAS Report observed that when measured over a period of 10 years, the impact of immigration on the wage of the citizen population overall was "very small."[417] Although the current and eligible DACA population is a subset of the overall immigrant population, it still shares similar characteristics with the overall immigrant population, including varying education and skill levels, although DACA recipients must at least be enrolled in school or be an honorably discharged veteran. Therefore, one could expect the DACA population to have similar economic impacts as the overall immigrant population, relative to the Pre-Guidance Baseline.

The 2017 NAS Report also discusses the economic impacts of immigration and considers effects beyond labor market impacts. Similar to citizens, immigrants also pay taxes; stimulate the economy by consuming goods, services, and entertainment; engage in the real estate market; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations.[418] DHS sought and received public comments on these issues, which it discusses in detail in Sections II.A.4, II.A.5, and II.A.6 of this rule.

---

[407] Source: BLS, Employment Projections (Sept. 2020), *Occupations with the most job growth*, Table 1.4. Occupations with the most job growth, 2019 and projected 2029, *https://www.bls.gov/emp/tables/occupations-most-job-growth.htm*.

[408] DHS also discusses the possibility of informal employment elsewhere in this analysis.

[409] *See supra* n.56.

[410] *Id.* at 4.

[411] *Id.* at 4.

[412] *Id.* at 6.

[413] *Id.* at 267.

[414] *Id.* at 5.

[415] *Id.* at 5–6.

[416] *Id.* at 5.

[417] *Id.* at 5.

[418] *Id.* at 6–7.

e. Fiscal Effects on State and Local Governments

In this section, in consideration of the *Texas* court's discussion of fiscal effects (as described in the next section of this RIA), DHS briefly addresses the final rule's potential fiscal effects on State and local governments. It would be extremely challenging to measure the overall fiscal effects of this final rule, in particular, especially due to those governments' budgetary control. The 2017 NAS Report discussed above canvassed studies of the fiscal impacts of immigration as a whole, and it described such analysis as extremely challenging and dependent on a range of assumptions. Although the 2017 NAS Report addresses a different subject than this final rule (which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade), DHS discusses the 2017 NAS Report to offer general context for this topic. DHS then offers a discussion of the potential effects of this final rule, in particular.

With respect to its topic of study, the NAS wrote that:

estimating the fiscal impacts of immigration is a complex calculation that depends to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. The first-order net fiscal impact of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. The foreign-born are a diverse population, and the way in which they affect government finances is sensitive to their demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs.[419]

In addition, second-order effects also clearly occur; analysis of such effects also presents methodological and empirical challenges.[420]

For example, as with the citizen population, the age structure of immigrants plays a major role in assessing any fiscal impacts. Children and young adults contribute less to society in terms of taxes and draw more in benefits by using public education, for example. On average, as people age and start participating in the labor market they become net contributors to public finances, paying more in taxes than they draw from public benefit programs. Moreover, people in post-retirement again could become net users of public benefit programs. Compared to

the citizen population, immigrants also can differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying fiscal impacts.

Local and State economic conditions and laws that govern public finances and availability of public benefits also vary and can influence the fiscal impacts of immigration. The 2017 NAS Report explained that fiscal impacts of immigration:

vary strongly by level of governments. States and localities bear the burden of funding educational benefits enjoyed by immigrant and native children. The federal government transfers relatively little to individuals at young and working ages but collects much tax revenue from working-age immigrant and native-born workers. Inequality between levels of government in the fiscal gains or losses associated with immigration appears to have widened since 1994.[421]

The extent of such gaps among Federal, State, and local impacts necessarily varies by jurisdiction and due to a range of surrounding circumstances.[422]

Based on the information presented in the 2017 NAS Report, DHS approaches the question of State and local fiscal impacts as follows. First, it is clear that the fiscal impacts of the final rule to State and local governments would vary based on a range of factors, such as the characteristics of the DACA-recipient population within a particular jurisdiction at a particular time (or over a particular period of time), including recipients' age, educational attainment, income, and level of work-related skill as well as the number of dependents in their families. In addition, fiscal effects would vary significantly depending on local economic conditions and the local rules governing eligibility for public benefits.[423] For example, some States may allow DACA recipients to apply for subsidized driver's licenses or allow DACA recipients to qualify for in-state tuition at public universities, which

may not be available to similarly situated individuals without deferred action. These costs to the State will depend on choices made by States and will be location specific and are, therefore, difficult to quantify let alone predict.

Second, as compared to the Pre-Guidance Baseline, multiple aspects of this final rule suggest that any burden on State and local fiscal resources imposed by the final rule is unlikely to be significant, and the rule may well have a positive net effect. Under the Pre-Guidance Baseline, most noncitizens who otherwise would be DACA recipients likely would remain in the country, but without the additional measure of security, employment authorization, and lawful presence that this rule would provide. Under the Pre-Guidance Baseline, these noncitizens would continue to use and rely, as necessary, on those safety net and other public resources for which they are eligible. As noted above, DACA recipients may be eligible for more benefits under current State and local law than they otherwise would be eligible for without DACA, but they still do not fall under the "qualified alien" category, and are, therefore, generally ineligible for public benefits at the Federal, State, and local levels.[424] Under the final rule, these noncitizens can work and build human capital and, depending on the choices made by a State, may be able to secure driver's licenses and other identification, obtain professional licenses, or otherwise realize benefits from the policy. In short, this rule could have the effect of increasing tax revenues, with uncertain outcomes on the reliance on safety net programs, as effects on specific programs may vary based on a range of factors including eligibility criteria that may exclude DACA recipients.

Third, DHS notes the relatively small size of the DACA population in any particular region relative to any given jurisdiction's overall population. The overall long-term fiscal health of State and local jurisdictions where DACA recipients choose to work and live will depend on many other factors not within DHS's control. In the long term, DHS expects State and local governments to continue to choose how to finance public goods, set tax structures and rates, allocate public resources, and set eligibilities for various public benefit programs, and to adjust these approaches based on the

---

[419] *Id.* at 28.
[420] *Id.* at 342.

[421] *Id.* at 407.
[422] *See, e.g., id.* at 518, 545 (tables displaying State and local revenues per independent person unit and State and local expenditures per independent person unit, by immigrant generation by State, but without adjusting for eligibility rules specific to noncitizens).
[423] DHS notes that DACA recipients are not considered "qualified aliens." *See* 8 U.S.C. 1641(b). As noted elsewhere in the preamble, PRWORA also limits the provision of "state and local public benefits" to noncitizens who are "qualified aliens," with limited exceptions, but provides that States may affirmatively enact legislation making noncitizens "who [are] not lawfully present in the United States" eligible for such benefits. *See* 8 U.S.C. 1621(d).

[424] *See* 8 U.S.C. 1641(b), 1611 (general ineligibility for Federal public benefits), and 1621 (general ineligibility for State public benefits).

evolving conditions of their respective populations.

In short, DHS acknowledges that though the final rule may result in some indirect fiscal effects on State and local governments (both positive and negative), such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments. DHS sought and received public comments on these issues, which it discusses in detail in Section II.A.5.

f. Reliance Interests and Other Regulatory Effects

In the *Texas* district court's decision, the court identified a range of considerations potentially relevant to "arbitrary and capricious" review of any actions that DHS might take on remand,[425] although the court noted that many of these considerations were matters raised by parties and amici in the course of *Texas* (2015) and *Texas* (2021), and the court did not appear to suggest that DHS was required to analyze each of these considerations. The court further cautioned that it did not mean to suggest "this is an exhaustive list, and no doubt many more issues may arise throughout the notice and comment period. Further, the Court takes no position on how DHS (or Congress, should it decide to take up the issue) should resolve these considerations, as long as that resolution complies with the law." [426] DHS has assessed the considerations presented by the district court and sought public comment on these and any other potential reliance interests. DHS discusses the reliance interests raised by commenters, including from States, in Section II.A, and it presents its views in this section as relevant to this analysis.[427]

First, the court raised potential reliance interests of States and their residents, writing that

for decades the states and their residents have relied upon DHS (and its predecessors) to protect their employees by enforcing the law as Congress had written it. Once again, neither the DACA Memorandum nor its underlying record gives any consideration to these reliance interests. Thus, if one applies the Supreme Court's rescission analysis from *Regents* to DACA's creation, it faces similar deficiencies and would likely be found to be arbitrary and capricious.[428]

In developing this final rule, DHS has considered a wide range of potential reliance interests. As noted throughout this preamble, reliance interests can take multiple forms, and may be entitled to greater or lesser weight depending on the nature of the Department action or statement on which they are based. Such interests can include not only the reliance interests of DACA recipients, but also those indirectly affected by DHS's actions, including DACA recipients' family members, employers, schools, and neighbors, as well as the various States and their other residents. Some States have relied on the existence of DACA in setting policies regarding eligibility for driver's licenses, in-state tuition, State-funded healthcare benefits, and professional licenses.[429]

In addition, prior to 2012, some States may have relied on the pre-DACA status quo in various ways, although the relevance of such reliance interests may be attenuated by the fact that DACA has been in existence since 2012, and by the fact, as discussed in detail in the NPRM, that the executive branch has long exercised, even prior to 2012, various forms of enforcement discretion with features similar to DACA.[430] DHS is aware of such interests and has taken them into account, as discussed in Section II.A.5. However, DHS does not believe they are sufficient to outweigh the many considerations, outlined above and in Section II.A.5, that support the final rule.

Second, the court wrote that "the parties and amici curiae have raised various other issues that might be considered in a reformulation of

DACA," as follows (in the court's terms):

1. the benefits bestowed by the DACA recipients on this country and the communities where they reside;

2. the effects of DACA or similar policies on legal and illegal immigration;

3. the effects of DACA on the unemployed or underemployed legal residents of the States;

4. whether DACA amounts to an abandonment of the executive branch's duty to enforce the law as written (as the plaintiff States have long claimed);

5. whether any purported new formulation violates the equal protection guarantees of the Constitution (as Justice Sotomayor was concerned that DACA's rescission would [431]); and

6. the costs DACA imposes on the States and their respective communities.[432]

The court also identified "more attenuated considerations," as follows:

7. the secondary costs imposed on States and local communities by any alleged increase in the number of undocumented immigrants due to DACA; and

8. what effect illegal immigration may have on the lucrative human smuggling and human trafficking activities of the drug cartels that operate on our Southern border.[433]

DHS sought comment on these reliance interests and discusses them in detail in Section II.A.7 (as to effect on migration and the border), Section II.A.4 (as to effect on other populations, including U.S. workers), and Section II.A.5 (as to effects on communities and States). In those sections, and in this RIA specifically, DHS has addressed several of these issues relative to both baselines.

With respect to item (1), the benefits bestowed by DACA recipients on this country and the communities where they reside are numerous, as discussed in detail in the preamble and RIA. DACA recipients have made substantial contributions, including as members of families and communities, and have offered substantial productivity and tax revenue through their work in a wide range of occupations.

With respect to item (2), as discussed in greater detail elsewhere in the final rule, available data supports DHS's determination that DACA does not act as a significant material "pull factor" (in light of the wide range of factors that contribute to both lawful and unlawful

---

[425] In the same section of the court's opinion, the court also suggested that DHS consider a forbearance-only alternative to DACA. The court wrote that "the underlying DACA record points out in multiple places that while forbearance fell within the realm of prosecutorial discretion, the award of status and benefits did not. Despite this distinction, neither the DACA Memorandum nor the underlying record reflects that any consideration was given to adopting a policy of forbearance without the award of benefits." 549 F. Supp. 3d at 622. DHS has addressed this issue in the Regulatory Alternatives section below.

[426] 549 F. Supp. 3d at 623–24.

[427] DHS has opted to address these considerations out of deference to the district court's memorandum and order, and in an abundance of caution. This decision should not be viewed as a concession that DHS is required to consider the various considerations raised by the district court, with respect to this final rule or any other final rule.

[428] 549 F. Supp. 3d at 622.

[429] *See, e.g.,* National Conference of State Legislators, *Deferred Action for Childhood Arrivals | Federal Policy and Examples of State Actions, https://www.ncsl.org/research/immigration/deferred-action.aspx* (last updated Apr. 16, 2020) (describing State actions, in the years following the Napolitano Memorandum, with respect to unauthorized noncitizens generally, DACA recipients in particular, and other classes of noncitizens); National Conference of State Legislators, *States Offering Driver's Licenses to Immigrants, https://www.ncsl.org/research/immigration/states-offering-driver-s-licenses-to-immigrants.aspx* (last updated Aug. 9, 2021) (describing multiple State decisions to offer driver's licenses to noncitizens with lawful presence).

[430] *See* 86 FR 53746–53749.

[431] *See* 140 S. Ct. at 1916 (Justice Sotomayor's opinion, dissenting in part and noting that she would have permitted respondents to develop their equal protection claims against DACA's rescission on remand).

[432] 549 F. Supp. 3d at 622–23.

[433] *Id.* at 623.

immigration into the United States).[434] The final rule codifies without material change the threshold criteria that have been in place for a decade, further reinforcing DHS's clear policy and messaging since 2012 that DACA is not available to individuals who have recently entered the United States, and that border security remains a high priority for the Department.[435] Because the final rule codifies in place for a decade and does not expand consideration of deferred action under DACA to new populations, nor would it increase irregular migration as explained elsewhere in this rule, DHS does not believe it necessary to address items (7) and (8) above.

With respect to item (3), DHS details its consideration of potential harm to unemployed and underemployed individuals in the Labor Market Impacts section. That section discusses findings from the 2017 NAS Report, which summarizes the work of numerous social scientists who have studied the costs and benefits of immigration for decades.

This RIA does not contain a section that discusses the costs of a regulatory alternative in which DACA EADs are terminated or phased out relative to a No Action baseline, although it does contain estimates of costs, benefits, and transfers relative to the Pre-Guidance Baseline, which may be instructive for understanding some of these effects. In a scenario where EADs are terminated

and DACA recipients lose their labor market compensation, the estimated monetized benefits in the Pre-Guidance Baseline, could serve as a proxy for the cost of lost productivity to U.S. employers that are unable to find replacement workers in the U.S. labor force. There also could be additional employer costs related to searching for new job applicants.

With respect to item (4), DHS continues to enforce the law as written. As discussed in greater detail throughout the final rule, prioritization and discretion are necessary strategies to fulfill the DHS mission, and the use of deferred action for this purpose is consistent with decades of practice of DHS and the former INS.

With respect to item (5), DHS does not believe that the DACA policy as embodied in this final rule would violate the equal protection component of the Fifth Amendment's Due Process Clause. The rule preserves and fortifies DACA as opposed to rescinding it. Thus, Justice Sotomayor's equal protection concerns over rescission are not implicated. The rule also continues the longstanding practice of treating DACA recipients the same as other recipients of deferred action in that all such recipients are subject to forbearance from removal while they have deferred action, may obtain discretionary employment authorization based on economic need, may obtain advance parole to travel, continue to be deemed "lawfully present" for purposes of receiving certain Social Security benefits identified in 8 CFR 1.3(a)(iv), and do not accrue unlawful presence for purposes of INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Therefore, DHS cannot discern a basis for any equal protection claims, much less whether they would have any legal merit.

With respect to item (6), DHS addresses the issue in Section III.A.4.e above. In short, although such an analysis is challenging for a variety of reasons, multiple aspects of this rule suggest that it is unlikely to impose a significant burden on State and local fiscal resources, and it may well have a positive effect.

With respect to items (7) and (8), which relate to the costs of unlawful immigration and human smuggling,

DHS disagrees with the premise, as noted in DHS's discussion of item (2) above.

Finally, the court also stated that "if DHS elects to justify DACA by asserting that it will conserve resources, it should support this conclusion with evidence and data. No such evidence is to be found in the administrative record or the DACA Memorandum. DHS should consider the costs imposed on or saved by all governmental units." [436] DHS agrees on the importance of evidence and data and has addressed the resource implications of DACA throughout the final rule, including at Sections II.C and III.A.4.b.(5).

g. Discounted Direct Costs, Cost Savings, Transfers, and Benefits of the Final Regulatory Changes

The quantified impact categories are direct costs, benefits, and transfers. The drivers of quantified direct costs stem from the opportunity cost of time associated with requesting deferred action and work authorization under the DACA policy by the requestor population, application fees for Forms I–821D and I–765, and biometrics travel costs. The drivers of quantified direct benefits stem from the total compensation received by those DACA recipients that are employed due to the EAD granted through the DACA policy less the value of non-paid time. The drivers of quantified direct transfers stem from the federal taxes (Social Security and Medicare) paid by the employed DACA recipients.

To compare costs over time, DHS applied a 3 percent and a 7 percent discount rate to the total estimated costs, transfers, and benefits associated with the final rule. Relative to the No Action Baseline, there are no new quantified and monetized costs, benefits, and transfers associated with this final rule. The tables present the costs, benefits, and transfers relative to the Pre-Guidance Baseline. Table 15 presents a summary of the potential costs relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**BILLING CODE 9111–97–P**

---

[434] *See, e.g.,* Amuedo-Dorantes and Puttitanun (2016) ("DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013.").

[435] For example, DHS continues to invest in new CBP personnel, including hiring more than 100 additional U.S. Border Patrol (USBP) Processing Coordinators in FY 2021, with plans to hire hundreds more. CBP also is investing in technology that enhances its border security mission. Over the last few years, CBP has increased its use of relocatable Autonomous Surveillance Towers (ASTs) along the border, which enable enhanced visual detection, identification, and classification of subjects or vehicles at a great distance via autonomous detection capabilities. ASTs can be moved to areas of interest or high traffic, as circumstances on the ground dictate. To increase situational awareness, CBP also recently integrated the Team Awareness Kit, which provides near real-time situational awareness for USBP agents and the locations of suspected illegal border activities. Advanced technology returns agents to the field and increases the probability of successful interdiction and enforcement.

[436] 549 F. Supp. 3d at 623.

**Table 15. Total Estimated Potential Costs of the Final Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Costs | Annualized Costs | Total Estimated Costs Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • $85 to file form + opportunity costs | | |
| Form I-765 | • $410 to file form + opportunity costs + travel costs; <br> • $0 for Biometrics | | $10,094,795,145 |
| | | | **Total Estimated Costs Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$494,890,483** | **$9,606,680,563** |
| **7-Percent Discount Rate** | | **$480,773,363** | **$9,363,860,806** |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline applies reverse-discounts to the costs associated with the FY 2012–FY 2021 population applying under the DACA policy.

Table 16 presents a summary of the potential net benefits relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**Table 16. Total Estimated Potential Net Benefits of the Final Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Benefits | Estimated Annualized Net Benefits | Total Estimated Potential Net Benefits Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • Deferred Action | | |
| Form I-765 | • Total compensation earned less the value of non-paid time | | $455,008,775,347 |
| | | | **Total Potential Net Benefits Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$21,861,586,546** | **$424,371,220,680** |
| **7-Percent Discount Rate** | | **$20,702,075,777** | **$403,207,355,098** |
| Source: USCIS analysis. | | | |

Table 17 presents a summary of the potential tax transfers relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**Table 17. Final Rule Employment Federal Tax Transfers from DACA Employees and Employers to the Federal Government Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Tax Transfers | Total Estimated Potential Annual Tax Transfer (Undiscounted) | Total Estimated Potential Tax Transfers Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • N/A | | |
| Form I-765 | • Taxes paid on the total compensation earned | | $113,190,052,322 |
| | | **Total Estimated Potential Annual Tax Transfer (Discounted)** | **Total Estimated Potential Tax Transfers Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$5,438,387,695** | **$105,568,514,885** |
| **7-Percent Discount Rate** | | **$5,149,942,523** | **$100,303,695,430** |
| Source: USCIS analysis. | | | |

BILLING CODE 9111–97–C

h. Regulatory Alternatives

Consistent with the Supreme Court's general analysis in *Regents*, and the more recent analysis of the district court in *Texas,* DHS is keenly alert to the importance of exploring all relevant alternatives. This focus is also consistent with E.O. 12866 and E.O. 13563. As stated in E.O. 12866,

[i]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

Consistent with these requirements, DHS has considered a range of regulatory alternatives to the final rule, including alternatives related to a policy of forbearance from removal without employment authorization or the benefits associated with so-called lawful presence. As discussed in detail in Section II.B, the authority to forbear from removal is an undisputed feature of DHS's enforcement discretion,

whereas the district court in *Texas* held that DHS lacked authority to provide employment authorization and benefits such as Social Security benefits to DACA recipients.[437]

The analysis of this forbearance-only alternative is in a sense relatively straightforward. Like the final rule, as compared to the Pre-Guidance Baseline, such an approach would confer a range of benefits to DHS, while also conferring benefits to DACA recipients and their families, in the form of increased security, reduced fear and anxiety, and associated values (which we have not been able to quantify). Unlike the final rule, however, such an approach would not confer upon DACA recipients, their families, and their communities the benefits of their work authorization and employment, or impose the corresponding costs (both quantified here, to the extent feasible). To that extent, although a forbearance-only approach would still have value, such an alternative would have substantially lower net benefits, consistent with the numbers discussed above.

For instance, as discussed in Section II.C.2.a, a policy of forbearance without work authorization also would disrupt the reliance interests of hundreds of

thousands of people, as well as the families, employers, schools, and communities that rely on them. It would result in substantial economic losses. It would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support. Any change that eliminates employment authorization for the DACA population, whether a forbearance-only policy or a wholesale termination of the DACA policy, would result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work lawfully to support either themselves or their families. Importantly, it also would deprive American employers and the American public at large of the ability to benefit from valuable work of hundreds of thousands of skilled and educated individuals and disappoint their own, independent reliance interests as well. For the Federal Government, as well as for State and local governments, it likely would have adverse fiscal implications, due to reduced tax revenues. In addition, unlike the proposed rule, such an approach would produce reduced transfers to Medicare and Social Security funds, as well as any other transfers associated with the DACA policy under the No Action Baseline. Nonetheless, as explained elsewhere in this preamble, DHS believes that if a

---

[437] As the court stated in *Texas* in objecting to work authorization and lawful presence, "the individualized notion of deferred action" is an approach "that courts have found permissible in other contexts." 549 F. Supp. 3d at 620–21.

court finds certain provisions of this rule to be contrary to law, it is preferable to sever and strike only those provisions found unlawful while retaining the remaining provisions. Doing so has significant disadvantages relative to retaining the entire policy, but the remaining provisions will remain workable and are preferable to a regime in which none of the provisions operate at all.

A possible alternative to the policy in the final rule would include (1) forbearance and (2) work authorization, but exclude (3) "lawful presence" and the resulting elimination of one ground of ineligibility for the associated benefits. DHS has carefully considered this alternative and sought public comment on the issues of law and policy associated with it, including data as to the potential effects of such an approach. As noted above, "lawful presence" is not a universal concept but rather is a term of art, referring to eligibility for certain limited Social Security, Medicare, and Railroad Retirement benefits, or the lack of accrual of unlawful presence for purposes of determining inadmissibility under INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9). It could not and does not mean "lawful status." But DHS believes that this alternative approach also may be inferior, for at least two reasons. First, that approach would single out DACA recipients—alone among other recipients of deferred action, as well as others whose continued presence DHS has chosen to tolerate for a period of time—for differential treatment. Second, DHS is aware that some States have keyed benefits eligibility to lawful presence and may experience unintended indirect impacts if DHS, a decade after issuance of the Napolitano Memorandum, revises that aspect of the policy.

As discussed in greater detail in this rule, DHS also has carefully considered comments related to DHS's authority to confer work authorization and whether the Department should codify a forbearance-only alternative in this rule. The majority of commenters who discussed work authorization supported DHS's proposal that the final rule maintain DACA requestors' ability to request employment authorization, and provided persuasive reasoning for rejecting a forbearance-only alternative, including the substantial reliance interests of DACA requestors, their families, employers, schools, and broader communities in their ability to engage in lawful employment and receive a government-issued ID in the form of an EAD. Upon careful consideration of data available and

public comments received, DHS has determined that policy and reliance interests weigh strongly in favor of maintaining forbearance and work authorization in promulgating this rule.

Finally, consistent with the *Texas* district court's equitable decision to stay its vacatur and injunction as it relates to existing DACA recipients, DHS considered the alternative of applying this final rule only to existing DACA recipients. Existing DACA recipients have clearer reliance interests in the continuation of DACA than do prospective requestors who have yet to request DACA. On the other hand, the benefits of the policy are equally applicable to those who have yet to request DACA, and some who might have benefited under the Napolitano Memorandum but have yet to "age in" to eligibility to request DACA, given the limitations on initial requests in recent years due to litigation. DHS has determined that restricting the ability to request consideration for DACA to existing recipients would not be desirable or maximize net benefits.

## B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA),[438] as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[439] requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.[440]

This final rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not mandate any actions or requirements for small entities in the process of a DACA requestor seeking DACA or employment authorization. Rather, this final rule regulates individuals, and individuals are not defined as "small entities" by the RFA.[441] Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this final rule would not have a

significant economic impact on a substantial number of small entities.

## C. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value of $100 million in 1995 is approximately $177.8 million in 2021 based on the CPI–U.[442]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate.[443] The term "Federal intergovernmental mandate" means, in relevant part, a provision that would impose an enforceable duty upon State, local, or Tribal governments (including as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[444] The term "Federal private sector mandate" means, in relevant part, a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[445]

This final rule does not contain such a mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices and would not be a consequence of an enforceable duty.

---

[438] 5 U.S.C. ch. 6.

[439] Public Law 104–121, tit. II, 110 Stat. 847 (5 U.S.C. 601 note).

[440] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act (15 U.S.C. 632).

[441] 5 U.S.C. 601(6).

[442] *See* BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month* (Dec. 2021), *https://www.bls.gov/ cpi/tables/supplemental-files/historical-cpi-u-202112.pdf*.

Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2021); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100.

Calculation of inflation: [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/ (Average monthly CPI–U for 1995)] * 100 = [(270.970 − 152.383)/152.383] * 100 = (118.587/ 152.383) * 100 = 0.7782 * 100 = 77.82 percent = 77.8 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.778 = $177.8 million in 2021 dollars.

[443] *See* 2 U.S.C. 1502(1), 658(6).

[444] 2 U.S.C. 658(5), 1555.

[445] 2 U.S.C. 658(7).

Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA.[446] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA. DHS has, however, analyzed many of the potential effects of this action in the RIA above. While DHS welcomed public comment in the proposed rule about the UMRA with regard to this analysis, it did not receive any comments.

### D. Small Business Regulatory Enforcement Fairness Act of 1996

OIRA has designated this final rule as a major rule as defined by section 804 of SBREFA.[447] Accordingly, this final rule will be effective no earlier than 60 days after the date on which this Rule is published in the **Federal Register** as required by 5 U.S.C. 801(a)(3).

### E. Executive Order 13132: Federalism

This final rule would not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS does not expect that this rule would impose substantial direct compliance costs on State and local governments or preempt State law. Therefore, in accordance with section 6 of E.O. 13132, this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988: Civil Justice Reform

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

### G. Paperwork Reduction Act— Collection of Information

Under the PRA,[448] all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. In compliance with the PRA, DHS published a notice of proposed rulemaking on September 28, 2021, in which comments on the revisions to the information collections associated with this rulemaking were requested for a period of 60 days. DHS responded to those comments in Section II of this final rule. Table 18, Information Collections, below lists the information collections that are part of this rulemaking. In this final rule, DHS invites written comments and recommendations for the proposed information collection within 30 days of publication of this notice to *https:// www.reginfo.gov/public/do/PRAMain*. Find this particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function.

### Table 18. Information Collections

| OMB Control No. | Form No. | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0040 | I-765; I-765WS | Application for Employment Authorization. | Revision of a Currently Approved Collection |
| 1615-0013 | I-131 | Application for Travel Document. | No material change/Non-substantive change to a currently approved collection |

This final rule requires non-substantive edits to the form listed above where the Type of PRA Action column states, ''No material change/ Non-substantive change to a currently approved collection.'' USCIS has submitted a Paperwork Reduction Act Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

USCIS Form I–821D

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

---

[446] See 2 U.S.C. 1502(1), 658(6).

[447] See 5 U.S.C. 804(2).

[448] Public Law 104–13, 109 Stat. 163.

(2) *Title of the Form/Collection:* Consideration of Deferred Action for Childhood Arrivals.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–821D; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. The information collected on this form is used by USCIS to determine whether certain noncitizens who entered the United States as minors meet the guidelines to be considered for DACA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–821D initial requests information collection is 112,254 annually, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the I–821D renewal requests (paper) information collection is 221,167, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the I–821D renewal requests (electronic) information collection is 55,292, and the estimated hour burden per response is 2.5 hours; the estimated total number of respondents for the biometrics collection is 388,713 annually, and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,593,287 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $42,758,430.

USCIS Form I–765; I–765WS

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–765 and I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–765 information collection is 2,178,820 annually, and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the Form I–765 (e-file) information collection is 107,180 annually, and the estimated hour burden per response is 4 hours; the estimated total number of respondents for the I–765WS information collection is 302,000 annually, and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the biometrics collection is 302,535 annually, and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the passport photos collection is 2,286,000 annually, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 11,881,376 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

*H. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[449] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[450] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this rule will not negatively affect family well-being, but rather will strengthen it. This regulation creates a positive effect on the family by helping certain mixed-status families to remain together in the United States and enabling access to greater financial stability. More than 250,000 children have been born in the United States with at least one parent who is a DACA recipient.[451] DACA provides recipients with U.S. citizen children a greater sense of security, which is important for families' overall well-being and success. It also makes recipients eligible for employment authorization and motivates DACA recipients to continue their education, graduate from high school, pursue post-secondary and advanced degrees, and seek additional vocational training, which ultimately provides greater opportunities, financial stability, and disposable income for themselves and their families.[452] DHS received comments on the family assessment. Those comments are discussed earlier in the preamble.

*I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This rule has been reviewed in accordance with the requirements of E.O. 13175, Consultation and Coordination with Indian Tribal Governments. E.O. 13175 requires Federal agencies to consult and coordinate with Tribes on a Government-to-Government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. DHS has assessed the impact of this rule on Indian Tribes and determined that this rule does not have Tribal implications that require Tribal consultation under E.O. 13175.

---

[449] *See* 5 U.S.C. 601 note.
[450] Public Law 105–277, 112 Stat. 2681 (1998).

[451] Svajlenka and Wolgin (2020).
[452] Gonzales (2019); Wong (2020).

## J. National Environmental Policy Act

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect. Under DHS implementing procedures for NEPA, for a proposed action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

As discussed earlier in this preamble, DHS does not believe the rule triggers NEPA obligations in the first instance because it simply codifies existing policy toward a population already in the United States and thus does not alter the environmental status quo. As discussed above, many DACA recipients have lived in the United States for nearly their entire lives and are unlikely to voluntarily leave. And because DACA recipients would be at very low priority for removal even absent DACA, it is very unlikely that DACA recipients would be involuntarily removed. That said, DHS continues to believe that speculating about the difference in the population effects between the existing DACA policy and the DACA rule—or between existing DACA policy and no DACA—would require predicting a myriad of independent decisions by a range of actors (including current and prospective DACA recipients, employers, law enforcement officers, and courts) at indeterminate times in the future. Such predictions are unduly speculative and not amenable to NEPA analysis.

Nevertheless, if NEPA does apply to this action, the action would fit within categorical exclusion number A3(c), which includes rules that "implement, without substantive change, procedures, manuals, and other guidance

documents" as set forth in the Instruction Manual. This rulemaking implements, without material change, the 2012 DACA policy addressing exercise of enforcement discretion with respect to a specifically defined population of noncitizens and is not part of a larger DHS action. It defines the criteria under which DHS will consider requests for DACA, the procedures by which one may request DACA, and what an affirmative grant of DACA will confer upon the requestor. DHS considered the potential environmental impacts of this rule with respect to an existing population that has been present in the United States since at least 2007 and determined, in accordance with the Instruction Manual, that this rule does not present extraordinary circumstances that would preclude application of a categorical exclusion. This rule, therefore, satisfies the requirements for application of categorical exclusion A3(c) in accordance with the Department's approved NEPA procedures.

## K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights

This rule would not cause a taking of private property or otherwise have taking implications under E.O. 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights. Therefore, a takings implication assessment is not required.

## L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

E.O. 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. DHS has reviewed this rule and determined that this rule is not a covered regulatory action under E.O. 13045. Although the rule is economically significant, it would not create an environmental risk to health or risk to safety that may disproportionately affect children. Therefore, DHS has not prepared a statement under this E.O.

## List of Subjects and Regulatory Amendments

### List of Subjects

*8 CFR 106*

Fees, Immigration.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends parts 106, 236, and 274a of chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 106—USCIS FEE SCHEDULE

■ 1. The authority citation for 8 CFR part 106 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 115–218; Pub. L. 116–159.

■ 2. Amend § 106.2 by revising paragraph (a)(38) to read as follows:

### § 106.2  Fees.

(a) * * *

(38) *Application for Deferred Action for Childhood Arrivals, Form I–821D:* $85.

\* \* \* \* \*

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 3. The authority citation for part 236 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 6 U.S.C. 112(a)(2), 112(a)(3), 112(b)(1), 112(e), 202, 251, 279, 291; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1232, 1324a, 1357, 1362, 1611; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

■ 4. Add subpart C, consisting of §§ 236.21 through 236.25, to read as follows:

### Subpart C—Deferred Action for Childhood Arrivals

Sec.
236.21   Applicability.
236.22   Discretionary determination.
236.23   Procedures for request, terminations, and restrictions on information use.
236.24   Severability.
236.25   No private rights.

### § 236.21  Applicability.

(a) This subpart applies to requests for deferred action under the enforcement discretion policy set forth in this subpart, which will be described as Deferred Action for Childhood Arrivals (DACA). This subpart does not apply to or govern any other request for or grant of deferred action or any other DHS deferred action policy.

(b) Except as specifically provided in this subpart, the provisions of 8 CFR

part 103 do not apply to requests filed under this subpart.

(c)(1) Deferred action is an exercise of the Secretary's broad authority to establish national immigration enforcement policies and priorities under 6 U.S.C. 202(5) and section 103 of the Act. It is a form of enforcement discretion not to pursue the removal of certain aliens for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources, taking into account humanitarian considerations and administrative convenience. It furthers the administrability of the complex immigration system by permitting the Secretary to focus enforcement on higher priority targets. This temporary forbearance from removal does not confer any right or entitlement to remain in or reenter the United States. A grant of deferred action under this section does not preclude DHS from commencing removal proceedings at any time or prohibit DHS or any other Federal agency from initiating any criminal or other enforcement action at any time.

(2) During this period of forbearance, on the basis of this subpart only, USCIS may grant employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33) to DACA recipients who have demonstrated an economic need.

(3) During this period of forbearance, on the basis of this subpart only, a DACA recipient is considered "lawfully present" under the provisions of 8 CFR 1.3(a)(4)(vi).

(4) During this period of forbearance, on the basis of this subpart only, a DACA recipient is not considered "unlawfully present" for the purpose of inadmissibility under section 212(a)(9) of the Act.

(d) This subpart rescinds and replaces the DACA guidance set forth in the Memorandum issued by the Secretary of Homeland Security on June 15, 2012. All current grants of deferred action and any ancillary features previously issued pursuant to the Memorandum remain in effect and will expire according to their existing terms. All such current grants of deferred action and any ancillary features, as well as any requests for renewals of those grants and new requests, are hereafter governed by this subpart and not the Memorandum.

### § 236.22   Discretionary determination.

(a) *Deferred Action for Childhood Arrivals; in general.* (1) USCIS may consider requests for Deferred Action for Childhood Arrivals submitted by aliens described in paragraph (b) of this section.

(2) A pending request for deferred action under this section does not authorize or confer any interim immigration benefits such as employment authorization or advance parole.

(3) Subject to paragraph (c) of this section, the requestor bears the burden of demonstrating by a preponderance of the evidence that he or she meets the threshold criteria described in paragraph (b) of this section.

(b) *Threshold criteria.* Subject to paragraph (c) of this section, a request for deferred action under this section may be granted only if USCIS determines in its sole discretion that the requestor meets each of the following threshold criteria and merits a favorable exercise of discretion:

(1) *Came to the United States under the age of 16.* The requestor must demonstrate that he or she first resided in the United States before his or her sixteenth birthday.

(2) *Continuous residence in the United States from June 15, 2007, to the time of filing of the request.* The requestor also must demonstrate that he or she has been residing in the United States continuously from June 15, 2007, to the time of filing of the request. As used in this section, "residence" means the principal, actual dwelling place in fact, without regard to intent, and specifically the country of the actual dwelling place. Brief, casual, and innocent absences from the United States will not break the continuity of one's residence. However, unauthorized travel outside of the United States on or after August 15, 2012, will interrupt continuous residence, regardless of whether it was otherwise brief, casual, and innocent. An absence will be considered brief, casual, and innocent if it occurred before August 15, 2012, and—

(i) The absence was short and reasonably calculated to accomplish the purpose for the absence;

(ii) The absence was not because of a post-June 15, 2007 order of exclusion, deportation, or removal;

(iii) The absence was not because of a post-June 15, 2007 order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

(iv) The purpose of the trip, and the requestor's actions while outside the United States, were not contrary to law.

(3) *Physical presence in the United States.* The requestor must demonstrate that he or she was physically present in the United States both on June 15, 2012, and at the time of filing of the request

for Deferred Action for Childhood Arrivals under this section.

(4) *Lack of lawful immigration status.* Both on June 15, 2012, and at the time of filing of the request for Deferred Action for Childhood Arrivals under this section, the requestor must not have been in a lawful immigration status. If the requestor was in lawful immigration status at any time before June 15, 2012, or at any time after June 15, 2012, and before the submission date of the request, he or she must submit evidence that lawful status had expired or otherwise terminated prior to those dates.

(5) *Education or veteran status.* The requestor must currently be enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development certificate, or be an honorably discharged veteran of the United States Coast Guard or Armed Forces of the United States.

(6) *Criminal history, public safety, and national security.* The requestor must not have been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 1003.41 of this chapter) of a felony, a misdemeanor described in this paragraph (b)(6), or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety. For purposes of this paragraph (b)(6) only, expunged convictions, juvenile delinquency adjudications, and convictions under State (including U.S. territory) laws for immigration-related offenses are not considered disqualifying convictions. For purposes of this paragraph (b)(6) only, a single misdemeanor is disqualifying only if it is a misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

(i) Regardless of the sentence imposed, is an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; or

(ii) If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody and, therefore, does not include a suspended sentence.

(7) *Age at time of request.* The requestor must have been born on or after June 16, 1981. Additionally, the requestor must be at least 15 years of age at the time of filing his or her request, unless, at the time of his or her request, he or she is in removal proceedings, has a final order of removal, or has a voluntary departure order.

(c) *Final discretionary determination.* Deferred action requests submitted under this section are determined on a case-by-case basis. Even if the threshold criteria in paragraph (b) are all found to have been met, USCIS retains the discretion to assess the individual's circumstances and to determine that any factor specific to that individual makes deferred action inappropriate.

### § 236.23   Procedures for request, terminations, and restrictions on information use.

(a) *General.* (1) A request for Deferred Action for Childhood Arrivals must be filed in the manner and on the form designated by USCIS, with the required fee, including any biometrics required by 8 CFR 103.16. A request for Deferred Action for Childhood Arrivals must also contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

(2) All requests for Deferred Action for Childhood Arrivals, including any requests made by aliens in removal proceedings before EOIR, must be filed with USCIS. USCIS has exclusive jurisdiction to consider requests for Deferred Action for Childhood Arrivals. EOIR shall have no jurisdiction to consider requests for Deferred Action for Childhood Arrivals or to review USCIS approvals or denials of such requests. A voluntary departure order or a final order of exclusion, deportation, or removal is not a bar to requesting Deferred Action for Childhood Arrivals. An alien who is in removal proceedings may request Deferred Action for Childhood Arrivals regardless of whether those proceedings have been administratively closed. An alien who is in immigration detention may request Deferred Action for Childhood Arrivals but may not be approved for Deferred Action for Childhood Arrivals unless the alien is released from detention by ICE prior to USCIS' decision on the Deferred Action for Childhood Arrivals request.

(3) USCIS may request additional evidence from the requestor, including, but not limited to, by notice, interview, or other appearance of the requestor. USCIS may deny a request for Deferred Action for Childhood Arrivals without prior issuance of a request for evidence or notice of intent to deny.

(4) A grant of Deferred Action for Childhood Arrivals will be provided for an initial or renewal period of 2 years, subject to DHS's discretion. Related work authorization granted pursuant to 8 CFR 274a.12(c)(33), if approved in DHS's discretion, will be issued, subject to DHS's discretion, for the period of the associated grant of Deferred Action for Childhood Arrivals.

(b) *Consideration of a request for Deferred Action for Childhood Arrivals.* In considering requests for Deferred Action for Childhood Arrivals, USCIS may consult, as it deems appropriate in its discretion and without notice to the requestor, with any other component or office of DHS, including ICE and CBP, any other Federal agency, or any State or local law enforcement agency, in accordance with paragraph (e) of this section.

(c) *Notice of decision.* (1) USCIS will notify the requestor and, if applicable, the requestor's attorney of record or accredited representative of the decision in writing. Denial of a request for Deferred Action for Childhood Arrivals does not bar a requestor from applying for any benefit or form of relief under the immigration laws or requesting any other form of prosecutorial discretion, including another request for Deferred Action for Childhood Arrivals.

(2) If USCIS denies a request for Deferred Action for Childhood Arrivals under this section, USCIS will not issue a Notice to Appear or refer a requestor's case to U.S. Immigration and Customs Enforcement for possible enforcement action based on such denial unless USCIS determines that the case involves denial for fraud, a threat to national security, or public safety concerns.

(3) There is no administrative appeal from a denial of a request for Deferred Action for Childhood Arrivals. The alien may not file, pursuant to 8 CFR 103.5 or otherwise, a motion to reopen or reconsider a denial of a request for Deferred Action for Childhood Arrivals.

(d) *Termination.* (1) *Discretionary termination.* USCIS may terminate a grant of Deferred Action for Childhood Arrivals at any time in its discretion. USCIS will provide a Notice of Intent to Terminate and an opportunity to respond prior to terminating a grant of Deferred Action for Childhood Arrivals, except USCIS may terminate a grant of Deferred Action for Childhood Arrivals without a Notice of Intent to Terminate and an opportunity to respond if the Deferred Action for Childhood Arrivals recipient is convicted of a national security-related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), (iv), or 1227(a)(4)(A)(i), or an egregious public safety offense. If USCIS terminates a grant of Deferred Action for Childhood Arrivals without a Notice of Intent to Terminate and an opportunity to respond, USCIS will provide the individual with notice of the termination.

(2) *Departure without advance parole and reentry without inspection.* USCIS may terminate a grant of Deferred Action for Childhood Arrivals, in its discretion and following issuance of a Notice of Intent to Terminate with an opportunity to respond, for DACA recipients who depart from the United States without first obtaining an advance parole document and subsequently enter the United States without inspection.

(3) *Automatic termination of employment authorization.* Any grant of employment authorization pursuant to § 274a.12(c)(33) of this chapter will automatically terminate upon termination of a grant of Deferred Action for Childhood Arrivals, rather than in accordance with § 274a.14(a)(1)(ii) of this chapter. Notice of intent to revoke employment authorization is not required pursuant to § 274a.14(a)(2) of this chapter.

(e) *Restrictions on information use.* (1) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor will not be used by DHS for the purpose of initiating immigration enforcement proceedings against such requestor, unless DHS is initiating immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns.

(2) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor's family members or guardians will not be used for immigration enforcement purposes against such family members or guardians.

### § 236.24   Severability.

(a) Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

(b) The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and

274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

### § 236.25   No private rights.

This subpart is an exercise of the Secretary's enforcement discretion. This subpart—

(a) Is not intended to and does not supplant or limit otherwise lawful activities of the Department or the Secretary; and

(b) Is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Amend § 274a.12 by revising paragraph (c)(14) and adding paragraph (c)(33) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*      \*      \*      \*      \*

(c)  \*  \*  \*

(14) Except as provided for in paragraph (c)(33) of this section, an alien who has been granted deferred action, an act of administrative convenience to the government that gives some cases lower priority, if the alien establishes an economic necessity for employment.

\*      \*      \*      \*      \*

(33) An alien who has been granted deferred action pursuant to 8 CFR 236.21 through 236.23, Deferred Action for Childhood Arrivals, if the alien establishes an economic necessity for employment.

\*      \*      \*      \*      \*

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–18401 Filed 8–24–22; 4:15 pm]

**BILLING CODE 9111–97–P**

Department of Homeland Security
Delegation Number: 0150.1
**Issue Date: 06/05/2003**

# DELEGATION TO THE BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICES

## I.    Purpose

This delegation vests in the Bureau of Citizenship and Immigration Services (BCIS) and through its highest ranking official to regional directors, asylum directors, district directors, service center directors, adjudication officers, asylum officers, immigration information officers, and other officers or employees of the BCIS the authorities described herein in order to accomplish the mission of the BCIS.  This delegation is made through, and the exercise of any authorities therein is subject to the authority, direction, and control of, the Deputy Secretary of the Department of Homeland Security.

## II.    Delegations

Pursuant to the authority vested in the Secretary of Homeland Security by law, including the Homeland Security Act of 2002, I hereby delegate to the Bureau of Citizenship and Immigration Services:

      A.    Authority to establish policies for performing such functions as are transferred to the Director by section 451 of the Homeland Security Act of 2002 (Act) or otherwise vested in the Bureau by law.

      B.    Authority to oversee the administration of such policies.

      C.    Responsibility for advising the Deputy Secretary with respect to any policy or operation of the BCIS that may affect the Bureau of Customs and Border Protection (BCBP) or the Bureau of Immigration and Customs Enforcement (BICE) of the Department, including potentially conflicting policies or operations.

      D.    Authority to establish national immigration services policies and priorities.

      E.    Authority to meet regularly with the Citizenship and Immigration Services Ombudsman ("the Ombudsman") described in section 452 of Act and to establish procedures requiring a formal response to any recommendations submitted in the Ombudsman's annual report to Congress pursuant to section 451(a)(3)(F) of the Act.

1

F.      Authority to design and implement in consultation with the Chief Human Capital Officer the managerial rotation program described in section 451(a)(4) of the Homeland Security Act of 2002.

G.      Authority to implement pilot initiatives for backlog elimination as described in section 451(a)(5) of the Homeland Security Act of 2002, including the authority to increase personnel, transfer personnel to focus on areas with the largest potential for backlog, and streamline paperwork.

H.      Authority under section 103(a)(1) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. §1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

I.      Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

J.      Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262-266 of the INA, 8 U.S.C. §§1302-06.

K.      Authority, in consultation with the legislative affairs function of the Department of Homeland Security, to prepare reports on private bills pertaining to immigration matters under 28 C.F.R. §0.105(h).

L.      Authority to certify official Department of Homeland Security records relating to immigration matters.

M.      Authority to maintain such files and records systems as are necessary to carry out the functions of the BCIS.

N.      Authority to place aliens in removal proceeding by issuance of a Notice to Appear, and to cancel such Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

O.      Authority to parole an applicant for admission into the United States under section 212(d)(5) of the INA, 8 U.S.C. §1182(d)(5), and to issue advance parole documentation.

P.      Authority to grant voluntary departure under section 240B of the INA, 8 U.S.C. §1229c, and deferred action.

Q.      Authority to approve bonds issued pursuant to the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

Delegation # 0150.1
000719

R.      Authority to grant employment authorization under sections 214(a) or 274A(h)(3) of the INA (8 U.S.C. §§1184(a) and 1324A(h)(3)), 8 C.F.R. §274a.13, or other applicable law.

S.      Authority to interrogate aliens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph aliens under sections 287(a), (b), and (f) of the INA, 8 U.S.C. §1357 and under section 235(d) of the INA, 8 U.S.C. §1225(d).

T.      Authority under the immigration laws, including but not limited to sections 207 and 208 of the INA (8 U.S.C. §1157 and §1158), to grant asylum and refugee status (and terminate such status), adjust status of refugees and asylees, make credible fear determinations, and approve withholding of removal under the Convention Against Torture.

U.      Authority to exercise appellate jurisdiction over the matters described in 8 C.F.R. §103.1(f)(3)(E)(iii) (as in effect on February 28, 2003).

V.      Authority under the immigration laws, including but not limited to sections 310 and 341 of the INA (8 U.S.C. §1421 and §1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of aliens.

W.      Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. §1154 and §1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of the EOIR.

X.      Authority to invalidate labor certifications under 8 C.F.R §214.2, 20 C.F.R. §655.209 and §656.30.

Y.      Authority to approve participation as a Regional Center and to terminate such participation under 8 C.F.R.§204.6(m) and to take other actions to administer the Immigrant Investor (EB-5) Program.

Delegation # 0150.1
000720

Z.      Authority under the immigration laws to extend and change nonimmigrant status and to adjust the status of aliens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of aliens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

AA.     Authority to approve or deny, or withdraw approval of petitions for schools seeking approval for attendance by nonimmigrant students under 8 C.F.R. §214.3.

BB.     Authority under the immigration laws to accept, process and adjudicate any application for any immigration benefit or service not exclusively under the jurisdiction of the EOIR, ICE or CBP, including but not limited to the authority to approve, deny, transfer, revoke, rescind, or certify all existing and future immigration, naturalization and citizenship benefits.

CC.     Authority to station officers and employees of the BCIS in foreign countries as provided by section 103(a)(7) of the INA, 8 U.S.C. §1103(a)(7), and other applicable law, and to perform such other activities with respect to the international operations of the Department of Homeland Security as I may direct.

DD.     Authority to perform other functions or duties as I may direct.

The authority delegated herein may be exercised by the director, his deputy, or the highest ranking official in the Bureau.  In exercising the authority delegated herein, the BCIS shall be governed by the Homeland Security Act of 2002; all applicable federal laws, rules and regulations; and the policies, procedures, direction, authority and control of the Secretary, the Deputy Secretary, the Under Secretary for Management, or other officer authorized by the Secretary to prescribe such policies and procedures or exercise such authority, direction and control.  Nothing herein shall be construed to limit or detract from the authority of the Secretary under section 102(a)(2) and (3) of the Homeland Security Act and other applicable law.

# III.   Reservations

The above delegations of authority to the BCIS in no way limit the functions, rights, privileges, powers, and duties vested in the Commissioner of CBP or in the Assistant Secretary for ICE by law, including authority provided by the above listed statutes or any delegation from the Secretary of Homeland Security.

Delegation # 0150.1
000721

The BCIS is directed to coordinate, to the extent necessary and appropriate, his exercise of the authorities under this delegation with other officials to whom I have delegated authorities that complement, relate to, involve, or are concurrent with the authorities in this delegation.  Specific reference in this delegation to coordination or consultation with other officials as to certain matters is not meant to limit the responsibility of the BCIS to coordinate or consult in other matters when appropriate.  Delegation of an authority to the BCIS shall not be construed to mean that the authority may be exclusively exercised by the Director; in particular, reference is made to delegations of authority to the Commissioner of CBP and to the Assistant Secretary for ICE that are with respect to many authorities parallel to, concurrent with, or overlapping with this delegation.

Unless specifically provided therein, nothing in this delegation authorizes the BCIS to enforce immigration laws by inspection of aliens or vehicles, issuance or execution of warrants, detention or release of aliens on bond, removal of aliens from the United States, issuance of stays of removal, reinstatement of removal orders, or any other enforcement authority exclusively delegated to the Commissioner of CBP or the Assistant Secretary for ICE.

Nothing is this delegation is intended to grant or provide authority or jurisdiction over any determination or matter within the sole authority of the Executive Office for Immigration Review of the Department of Justice.

# IV.   Re-delegations

Unless otherwise proscribed by statute, Executive Order, or the terms of this delegation, the powers, authorities, responsibilities, and functions of the BCIS may be re-delegated in writing by the Director or the highest ranking official to appropriate subordinate officials of the BCIS, and may be successively re-delegated to other officers or employees of the BCIS qualified to exercise the authority.  The Director or the highest ranking official also may re-delegate the authority contained in this delegation to the Commissioner of CBP or to Assistant Secretary for ICE, with their consent.

Officers and employees of the former Immigration and Naturalization Service (INS), including but not limited to the Examinations (Adjudications), Citizenship and International Affairs (including asylum and refugee) Programs of the former INS will, following their transfer to the BCIS, continue to exercise their authorities and responsibilities as they existed on February 28, 2003, unless modified or revoked by the BCIS or other authorized official.  Asylum officers continue to be delegated responsibilities as described in 8 C.F.R. §103.1(g)(3)(ii) (as in effect on February 28, 2003) unless modified or revoked by the BCIS or other authorized official.

Delegation # 0150.1
000722

## V.   Authorities

Homeland Security Act, 116 Stat. 2135, Pub. L. 107-296 §§ 101, 102, 403, 441, 1502, 1706 (2002); 5 U.S.C. § 301; Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101 et seq.; the "immigration laws," as defined by section 101(a)(17) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. 1101(a)(17).

## VI.   Credentials

Any badge, credential, seal, stamp or other such item or document that is valid at 11:59 p.m. on February 28, 2003, and that identifies an officer or employee of the INS, who is transferred to the BCIS, shall continue in effect as a badge, credential or other documentation identifying an officer or employee of the BCIS until its expiration, revocation, withdrawal, or replacement, whichever comes first.  The BCIS may authorize replacement, renewal, or new issuance of badges, credentials, seals, stamps or other such items or documents to BCIS officers or employees using Immigration and Naturalization Service identity and forms until BCIS forms are available.

## VII.  Office of Primary Interest

The Bureau of Citizenship and Immigration Services is the office with primary interest in this delegation.

## VIII. Cancellation

Delegation Number 0150 is rescinded.

## IX.   Effective Date and Time

This delegation of authority shall take effect at 12:00 midnight, March 1, 2003.


_Tom Ridge_
Secretary of Homeland Security

6

CBP regulations for the purposes of conducting a test program or procedure designed to evaluate the effectiveness of new technology or operational procedures regarding the processing of passengers, vessels, or merchandise.

## IV. Privacy

CBP will ensure that all Privacy Act requirements and applicable policies are adhered to during the implementation of this pilot.

## V. Paperwork Reduction Act

The Paperwork Reduction Act (PRA) of 1995 (44 U.S.C. 3507(d)) requires that CBP consider the impact of paperwork and other information collection burdens imposed on the public. The PRA applies to collections of information imposed on ''ten or more persons.'' This pilot will initially include fewer than ten participants and as such will not require an OMB control number. If CBP expands the pilot to include ten or more persons, CBP will adhere to the requirements of the PRA.

## VI. Misconduct Under the Pilot

A pilot participant may be subject to civil and criminal penalties, administrative sanctions, liquidated damages, or discontinuance from participation in the Section 321 Data Pilot for any of the following:

(1) Failure to follow the rules, terms, and conditions of this pilot;

(2) Failure to exercise reasonable care in the execution of participant obligations; or

(3) Failure to abide by applicable laws and regulations that have not been waived.

If the Director, Intellectual Property Rights and E-Commerce Division, Office of Trade, finds that there is a basis for discontinuance of pilot participation privileges, the pilot participant will be provided a written notice proposing the discontinuance with a description of the facts or conduct warranting the action. The pilot participant will be offered the opportunity to appeal the decision in writing within 10 calendar days of receipt of the written notice. The appeal of this determination must be submitted to the Executive Director, Trade Policy and Programs, Office of Trade, by emailing *e-commercesmallbusiness branch@cbp.dhs.gov.*

The Executive Director, Trade Policy and Programs, Office of Trade, will issue a decision in writing on the proposed action within 30 working days after receiving a timely filed appeal from the pilot participant. If no timely appeal is received, the proposed notice becomes the final decision of the Agency as of the date that the appeal

period expires. A proposed discontinuance of a pilot participant's privileges will not take effect unless the appeal process under this paragraph has been concluded with a written decision adverse to the pilot participant.

In cases of willfulness or those in which public health, interest, or safety so requires, the Director, Intellectual Property Rights and E-Commerce Division, Office of Trade, may immediately discontinue the pilot participant's privileges upon written notice to the pilot participant. The notice will contain a description of the facts or conduct warranting the immediate action. The pilot participant will be offered the opportunity to appeal the decision within 10 calendar days of receipt of the written notice providing for immediate discontinuance. The appeal of this determination must be submitted to the Executive Director, Trade Policy and Programs, Office of Trade, by emailing *e-commercesmallbusinessbranch@ cbp.dhs.gov.*

The immediate discontinuance will remain in effect during the appeal period. The Executive Director, Trade Policy and Programs, Office of Trade, will issue a decision in writing on the discontinuance within 15 working days after receiving a timely filed appeal from the pilot participant. If no timely appeal is received, the notice becomes the final decision of the Agency as of the date that the appeal period expires.

Date: July 18, 2019.

**Robert E. Perez,**

*Deputy Commissioner, U.S. Customs and Border Protection.*

[FR Doc. 2019–15625 Filed 7–22–19; 8:45 am]

**BILLING CODE 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

**[DHS Docket No. DHS–2019–0036]**

### Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** This Notice (this Notice) enables the Department of Homeland Security (DHS) to exercise the full remaining scope of its statutory authority to place in expedited removal, with limited exceptions, aliens determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the Immigration and Nationality Act (INA or the Act) who have not been admitted

or paroled into the United States, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers can apply expedited removal to aliens encountered anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal are satisfied. For aliens who entered the United States by crossing a land border, the Secretary of Homeland Security has exercised his discretion under the INA to permit the use of expedited removal if the aliens were encountered by an immigration officer within 100 air miles of the United States international land border and were continuously present in the United States for less than 14 days immediately prior to that encounter. The INA grants the Secretary of Homeland Security the ''sole and unreviewable discretion'' to modify at any time the discretionary limits on the scope of the expedited removal designation. The Acting Secretary of Homeland Security is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not previously designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice (the New Designation) harmonizes the authorization for aliens arriving by land with the existing authorization for aliens arriving by sea. The effect of that change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the New Designation will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or

be provided relief or protection from removal.

**DATES:** This Notice, including the New Designation, is effective on July 23, 2019. Interested persons are invited to submit written comments on this Notice on or before September 23, 2019.

**ADDRESSES:** You may submit comments, identified by Docket Number DHS–2019–0036 using the Federal e-Rulemaking Portal at *https:// www.regulations.gov*. See the ''Public Participation and Request for Comments'' portion of the **SUPPLEMENTARY INFORMATION** for further instructions on submitting comments.

**FOR FURTHER INFORMATION CONTACT:** Ihsan Gunduz, Policy Analyst, Office of Policy, Department of Homeland Security, 202–282–9708.

**SUPPLEMENTARY INFORMATION:**

## I. Public Participation and Request for Comments

The Department of Homeland Security (DHS) is requesting public comments on the substance of this Notice as a matter of discretion. As discussed in Section D below, the Administrative Procedure Act's (APA) notice-and-comment requirements do not apply to this Notice, and the New Designation is effective immediately upon publication. However, DHS believes that by maintaining a dialogue with interested parties, DHS can ensure that it is even more effective in addressing the significant national security and public safety interests implicated with respect to aliens present in the United States who entered the United States without admission or parole and have been continuously present in the United States for at least 14 days but less than two years after their entry regardless of where in the U.S. they are encountered, and those continuously present for up to 14 days who are encountered more than 100 miles from a land border, while at the same time continuing to ensure appropriate procedural safeguards for affected individuals.

We encourage commenters to submit comments through the Federal e-Rulemaking Portal at *https:// www.regulations.gov*. Please follow the website instructions for submitting comments. If you cannot submit your comments using the Federal e-Rulemaking Portal, please contact the person in the **FOR FURTHER INFORMATION CONTACT** section of this notice for alternate instructions.

Comments received by means other than those listed above or comments received after the comment period has closed will not be reviewed. Comments posted on the Federal e-Rulemaking portal are available and accessible to the public. All comments received will be posted without change on *https:// www.regulations.gov*. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http:// www.regulations.gov* website. It is the commenter's responsibility to safeguard his or her information.

## II. Background

### A. DHS Statutory Authority Over Expedited Removal Proceedings

Under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), DHS [1] may remove, without a hearing before an immigration judge, certain aliens arriving in the United States at a port of entry, and certain other aliens (as designated by the Secretary of Homeland Security and as discussed more below) who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). Sections 212(a)(6)(C) and 212(a)(7) of the INA designate aliens as inadmissible if they lack valid documents that are necessary for admission, or if they have ever fraudulently or willfully misrepresented a material fact to acquire admission to the United States, including whether they are a U.S. citizen, or to procure a visa or other immigration-related documentation. Unaccompanied alien children, as defined in 6 U.S.C. 279(g)(2), may not be placed in expedited removal under current law.[2] *See* 8 U.S.C. 1232(a)(5)(D).

The Secretary, in his ''sole and unreviewable discretion,'' may designate certain aliens to whom the expedited removal provisions may be applied. INA section 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I); 8 CFR 235.3(b)(1)(ii). The statute provides that the Secretary may apply (by designation) expedited removal to any alien ''who has not been admitted or

---

[1] The INA provided the Attorney General those authorities; however, under section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions that were transferred from the Attorney General or other Department of Justice official to DHS by the HSA ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517); 6 U.S.C. 542 note; 8 U.S.C. 1551 note.

[2] In certain limited circumstances, an unaccompanied alien child who is a national or habitual resident of a contiguous country (*i.e.,* Mexico or Canada) may be permitted to withdraw his or her application for admission to the United States and return to such contiguous country without a removal hearing. *See* 8 U.S.C. 1232(a)(2).

paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility..........'' INA section 235(b)(1)(A)(iii)(II), 8 U.S.C. 1225(b)(1)(A)(iii)(II). In other words, Congress provided the Secretary, in his sole and unreviewable discretion, the authority to apply expedited removal to aliens inadmissible under INA section 212(a)(6)(C) or 212(a)(7), who had not been admitted or paroled and who could not prove that they have been continuously present in the United States for two years.

In 1997, the Attorney General promulgated a regulation applying expedited removal to aliens arriving in the United States at a port-of-entry and aliens interdicted in international or United States waters. *Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures,* 62 FR 10,312 (Mar. 6, 1997) (the 1997 Regulation). The 1997 Regulation also delegated the Attorney General's authority to the Commissioner of the former Immigration and Naturalization Service (INS) and established a mechanism for later designations of aliens subject to expedited removal. *See id.* The Attorney General ''emphasized that a proposed expansion of the expedited removal procedures may occur at any time and may be driven either by specific situations such as a sudden influx of illegal aliens motivated by political or economic unrest or other events or by a general need to increase the effectiveness of enforcement operations at one or more locations.'' *See id.*

In 2002, the Commissioner of the INS invoked this authority to designate as eligible for expedited removal aliens who arrived in the United States by sea, were not paroled or admitted into the United States, and ''who have not been physically present in the United States continuously for the two-year period prior to the determination of inadmissibility under'' the Notice. *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act,* 67 FR 68923 (Nov. 13, 2002) (the 2002 Notice). Under the 2002 Notice, immigration officers could apply expedited removal to aliens encountered anywhere in the United States for up to two years after the alien arrived in the United States, as long as the alien arrived by sea and the other

conditions for expedited removal were satisfied.

In 2004, the Secretary designated additional aliens for expedited removal through a **Federal Register** notice, pursuant to which DHS officials could apply expedited removal to aliens encountered within 100 air miles of the border and within 14 days of their date of entry regardless of the alien's method of arrival, as long as the other conditions for expedited removal were satisfied. *Designating Aliens for Expedited Removal,* 69 FR 48877 (Aug. 11, 2004) (the 2004 Notice and, together with the 1997 Regulation and the 2002 Notice, collectively the Previous Designations); *see also Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea,* 82 FR 4902 (Jan. 17, 2017). The 2004 Notice explained that in the interest of focusing limited resources ''upon unlawful entries that have a close spatial and temporal nexus to the border,'' the 2004 Notice did not implement ''the full nationwide expedited removal authority available to DHS.'' It did, however, expressly reserve to DHS the option of ''implementing the full nationwide enforcement authority of the statute through publication of a subsequent **Federal Register** notice.'' *Designating Aliens for Expedited Removal,* 69 FR at 48879.

In recent years, increasing numbers of aliens have been detained after being apprehended within the interior of the United States, necessitating a change in the focus of limited government resources to include the use of expedited removal proceedings for aliens apprehended within the U.S. interior, as well as near the border.

Aliens otherwise subject to expedited removal who indicate either an intention to apply for asylum or a fear of persecution or torture will be given further review by an asylum officer including an opportunity to establish a ''credible fear,'' and thus potential eligibility for asylum. INA section 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); 8 CFR 235.3(b)(4). Further, an alien otherwise subject to expedited removal is ''given a reasonable opportunity to establish to the satisfaction of the examining immigration officer that he or she was admitted or paroled into the United States.'' 8 CFR 235.3(b)(6). Aliens who have not been admitted or paroled and who are subject to expedited removal have the burden of proving that they are not inadmissible and satisfy the continuous physical presence requirement. 8 CFR 235.3(b)(1)(ii). Any absence from the United States serves to break the period

of continuous physical presence. *Id.* Aliens determined by immigration officers to be subject to expedited removal nonetheless will receive prompt review of that determination if they claim under oath, after being warned of the penalties for perjury, that they have been admitted for permanent residence, admitted as a refugee, granted asylum, or are a U.S. citizen. INA section 235(b)(1)(C), 8 U.S.C. 1225(b)(1)(C); 8 CFR 235.3(b)(5)(i).

*B. DHS Need for the New Designation*

In light of the ongoing crisis at the southern border, the large number of aliens who entered illegally and were apprehended and detained within the interior of the United States, and DHS's insufficient detention capacity both along the border and in the interior of the United States, DHS is issuing the New Designation to use more effectively and efficiently its limited resources to fulfill its mission to enforce the immigration laws and ensure the security of the Nation's borders. *See* INA section 103(a)(5), 8 U.S.C. 1103(a)(5); 6 U.S.C. 202; Exec. Order 13767, *Border Security and Immigration Enforcement Improvements,* 82 FR 8793, section 1 (Jan. 25, 2017) (Border Security E.O.) (''Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety.''). Fully exercising DHS's statutory expedited removal authority to include certain aliens who would not be subject to expedited removal under the Previous Designations will provide to DHS officers a valuable tool to fulfill their mission.

Fully implementing expedited removal will help to alleviate some of the burden and capacity issues currently faced by DHS and DOJ by allowing DHS to remove certain aliens encountered in the interior more quickly, as opposed to placing those aliens in more time-consuming removal proceedings. Indeed, many of the aliens previously encountered in the interior of the United States likely would have been eligible for expedited removal under this Notice. In Fiscal Year (FY) 2018, 37% (20,570) of ICE's 54,983 total interior encounters, with entry dates, were of aliens who had been present in the United States for less than two years. Through March 30, 2019, 39% (6,410) of U.S. Immigration and Customs Enforcement's (ICE) 15,328 total interior encounters, with entry dates, in FY2019 were aliens who had been present in the United States for

less than two years. ICE estimates that a significant number of the aliens it encounters in the interior likely would have been eligible for expedited removal had DHS used its discretion to exercise its full statutory authority. Placing certain aliens apprehended in the interior of the United States in expedited removal would allow ICE to more effectively use its limited detention resources. In FY 2018, the average time in DHS custody for aliens placed in expedited removal was 11.4 days. Conversely, for inadmissible aliens encountered in the interior of the United States and placed into full removal proceedings, the average time in DHS custody was 51.5 days. Under the New Designation, ICE will be able to use expedited removal for certain aliens who it arrests in the interior, which will likely result in those aliens spending less time in ICE detention than if they were placed in full removal proceedings. That, in turn, will more quickly make available additional ICE bed space, which can be used for additional interior arrests and removals.

Additionally, the Acting Secretary of Homeland Security has determined that the implementation of additional measures is a necessary response to the ongoing immigration crisis. Presently, U.S. Border Patrol and ICE lack sufficient detention capacity and resources to detain the vast majority of aliens DHS apprehends along the southern border. As a result, hundreds of thousands of aliens are released into the interior of the United States, pending the outcome of their immigration proceedings. However, by more effectively utilizing ICE's limited resources, more aliens apprehended along the southern border likely will be able to be detained in ICE custody, where they can be more quickly processed and removed from the country than if they had been released into the interior of the United States. The New Designation will also allow ICE to place into expedited removal certain aliens that cross the border illegally but evade apprehension due to vulnerabilities in border operations resulting from U.S. Border Patrol's lack of sufficient resources.

Additionally, immigration courts nationwide are experiencing a historic backlog of removal cases, and non-detained cases are taking years to complete. In June 2019, EOIR reported a total of 909,034 pending immigration cases. By contrast, there were fewer than 168,000 cases pending at the end of Fiscal Year 2004 when DHS exercised its discretion to apply expedited removal to certain aliens encountered within 100 miles of the border who

**35412**   **Federal Register** / Vol. 84, No. 141 / Tuesday, July 23, 2019 / Notices

could not establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously for the previous 14 days. The current number of pending immigration cases represents a substantial increase of the number of cases pending completion in 2004, notwithstanding the 2004 Notice. Moreover, the average non-detained alien's removal proceeding has been pending for more than two years before an immigration judge. That backlog includes many cases involving aliens who were encountered by an immigration officer during the two-year period after they illegally entered the United States, but who were not covered by a Previous Designation. DHS expects that the New Designation will help mitigate additional backlogs in the immigration courts and will reduce the significant costs to the government associated with full removal proceedings before an immigration judge, including the costs of a longer detention period and government representation in those proceedings. DHS acknowledges that it will need to devote certain additional resources to implement this Notice, including by making credible fear determinations for certain aliens placed in expedited removal proceedings. Nonetheless, DHS anticipates that the mitigation of additional backlogs in the immigration courts, the reduction of costs associated with placing aliens in full removal proceedings, and the ability to use limited resources and detention capacity more effectively outweighs any additional costs to the government.

Under this Notice, the Acting Secretary is designating as eligible for expedited removal: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. The designation under the 2004 Notice restricting expedited removal to those encountered within 100 miles of the border makes insufficient use of the authorities Congress has granted to address the current immigration crisis, the large number of aliens illegally present in the United States, insufficient DHS resources, and the backlog of removal cases before immigration judges and the Board of Immigration Appeals.

The statute places no geographic limitation on the application of expedited removal. DHS has anecdotal evidence, moreover, that many aliens who have been smuggled into the United States hide in "safe houses" that are located more than 100 miles from the nearest land border. For instance, in 2019, ICE conducted a "knock and talk" of a safe house in Roswell, New Mexico, which is more than 100 miles from the nearest land border, and encountered 67 illegal aliens, resulting in arrests and numerous charges. In 2018, ICE executed a search warrant at a safe house in San Antonio, Texas, during an extortion attempt tied to a human smuggling event, resulting in the rescue of three victims and arrests and charges against the subjects with alien smuggling.

Under the Previous Designations, DHS officers could not apply expedited removal to those individuals, thus limiting the availability of an important authority that Congress has granted to DHS for quickly and efficiently removing certain inadmissible aliens. Under this Notice, DHS anticipates that this broader use of expedited removal orders will reduce incentives not only to enter unlawfully but also to attempt to travel quickly into the interior of the United States in an effort to avoid the application of expedited removal. It will also accelerate the processing of covered inadmissible aliens, because expedited removal does not entail merits hearings before an immigration judge or appeals to the Board of Immigration Appeals except upon positive fear determinations. Therefore, designating aliens encountered anywhere in the United States, who are not subject to a Previous Designation, will help to ensure efficient removal from the United States of aliens who cannot establish a credible fear of persecution or torture.

DHS has determined that the volume of illegal entries, and the attendant risks to national security and public safety presented by these illegal entries, warrants this immediate implementation of DHS's full statutory authority over expedited removal. This Notice will ensure that those individuals present in the United States without being admitted or paroled, particularly those who evade apprehension at the southern border, are quickly and efficiently removed (except if they have demonstrated a credible fear of persecution or torture). DHS expects that the full use of expedited removal statutory authority will strengthen national security, diminish the number of illegal entries, and otherwise ensure the prompt removal of

aliens apprehended in the United States. And it will further Congress's purpose for creating expedited removal procedures, which was "to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States . . . ." H.R. Rept. 104–828 at 209 (1996). Accordingly, immigration officers may now use expedited removal authority not only for those individuals apprehended at or near the border, but also for those individuals who evade detection at the border and are apprehended within two years thereafter anywhere within the United States.

*C. Implementation Considerations*

As in the case of the Previous Designations, immigration officers generally have broad discretion to apply expedited removal to individuals covered under the New Designation. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011) (holding that language in INA section 235(b)(1)(A)(i) does not limit DHS's discretion to place aliens amenable to expedited removal into removal proceedings under INA section 240). DHS recognizes that the circumstances of certain aliens, including aliens with serious medical conditions and aliens who have substantial connections to the United States, for example, may weigh against the discretionary use of expedited removal proceedings.[3] Accordingly, in appropriate circumstances, and as an exercise of prosecutorial discretion, immigration officers, in their sole and unreviewable discretion, may permit certain aliens otherwise eligible for placement into expedited removal proceedings to return voluntarily, withdraw their applications for admission, or be placed in full removal proceedings under section 240 of the Act, in lieu of expedited removal. DHS plans to issue guidance to immigration officers to guide the exercise of discretion in referring aliens for expedited removal.

The expedited removal procedures required under existing law and regulations are applicable to the aliens designated by this Notice.[4] As required

---

[3] *Trump* v. *Int'l Refugee Assistance Project,* 582 U.S. ___, No. 16–1436, slip op. at 11 (noting that "foreign nationals abroad who have no connection to the United States at all" can be denied entry as such a denial does not "impose any legally relevant hardship" on the foreign nationals themselves).

[4] Under existing law, aliens wishing to apply for asylum are required by statute to do so within one year of entering the United States. INA section 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B). *See also* Convention relating to the Status of Refugees, art. 31(1), July 28, 1951, 189 U.N.T.S. 137, 174 (obliging refugees to "present themselves without delay to

by statute and regulation, any alien who falls within the New Designation, who is placed in expedited removal, and who indicates an intention to apply for asylum or expresses a fear of persecution or torture or a fear of return to his or her country, will be interviewed by an asylum officer who will determine whether the alien has a credible fear of persecution or torture. *See* INA section 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v); 8 CFR 235.3(b)(4), 208.30. DHS expects to continue to use the form I–867A/B, which includes questions officers must ask with respect to fear of return. Immigration officers are trained to be alert for indications that the alien may be afraid to return to his or her country. *See* INA section 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E).[5] Aliens that express a fear of return are referred for an interview with an asylum officer. INA section 235(b)(1)(A)(ii); 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.3(b)(4). Asylum officers determining that an alien has or has not established a credible fear are to provide a written record of the factual basis for their determination. *See* INA sections 235(b)(1)(B)(iii)(II), 8 U.S.C. 1225(b)(1)(B)(iii)(II).

If an asylum officer determines that the alien has established a credible fear of persecution or torture, the alien will be referred to an immigration judge for further consideration of the alien's application for asylum. INA section 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii); 8 CFR 208.30, 235.6. If the officer determines that the alien has not established a credible fear of persecution or torture, the alien may request de novo review by an immigration judge of the officer's negative credible fear determination. *See* INA section 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1003.42, 1208.30, 1235.3(b)(4).

Similarly, all aliens placed in expedited removal as a result of the New Designation who claim lawful permanent resident, refugee, or asylee status, or U.S. citizenship will have the benefit of the same procedural safeguards that apply in all expedited removal proceedings. *See* INA section 242(e)(2); 8 CFR 235.3(b); 1235.3(b)(5).

*D. This Notice Is Immediately Effective*

In keeping with the practice followed in announcing the Previous

Designations, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii),[6] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR. 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea). The rulemaking procedures of the APA do not apply to this Notice, because delaying the New Designation's implementation to allow public notice and comment would be impracticable, unnecessary, and contrary to the public interest. *Cf.* 5 U.S.C. 553(b)(3)(B) and (d)(3).

Implementation of the New Designation is exempt from notice-and-comment requirements, because public notice and comment and the delay attendant thereon would be impracticable, unnecessary, and contrary to the public interest. *See* 5 U.S.C. 553(b)(B) and (d)(3). Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal may be applied on a case-by-case basis, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." INA section 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I). As such, the Secretary's designation is not required to go through notice-and-comment rulemaking. Indeed, the application of APA's notice-and-comment requirements would defeat a major purpose of the expedited removal provision: To allow the Secretary to authorize immigration officers to respond rapidly, effectively, and flexibly to border security and public safety challenges, including urgent situations such as the present high number of aliens unlawfully entering and remaining in the United States and the lack of sufficient DHS resources to deal with these aliens. Consistent with the mandate of INA section

235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I), that the Secretary may modify the scope of expedited removal under section 235(b)(1)(A)(iii) "at any time," such designation "shall become effective upon publication of a notice in the **Federal Register**." 8 CFR 235.3(b)(1)(ii) (noting that such designation where appropriate "shall become effective immediately upon issuance"). Accordingly, it is appropriate to publish such designation, effective immediately, without prior notice and comment.

Indeed, as in the cases of the Previous Designations, DHS is concerned that delayed implementation could lead to a surge in migration across the southern border during a notice-and-comment period. *See* 67 FR 68,924, 68,925; 82 FR 4902, 4904. "Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge could result in significant loss of human life." 82 FR 4902, 4904.

In addition, DHS could not meaningfully implement INA section 235(b)(1)(A)(iii)(I), which establishes that the Secretary's designation "may be modified at any time," if such modification is not effective until after notice and comment. The New Designation is necessary to remove from the United States inadmissible aliens not covered by a Previous Designation who are encountered less than two years after entering the United States without admission or parole.

Although DHS believes that pre-promulgation notice-and-comment procedures are neither statutorily mandated nor in the interests of the United States with respect to this Notice, DHS is interested in receiving comments from the public on all aspects of this Notice. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that it is even more effective in combating and deterring illegal entry, while at the same time providing for appropriate procedural safeguards for the individuals designated.

**III. Notice of Designation of Aliens Subject To Expedited Removal**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (INA) and 8 CFR 235.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

---

the authorities and show good cause for their illegal entry or presence").

[5] As the New Designation will result in greater use of expedited removal by ICE immigration officers, ICE will also develop and deploy updated training on the use of this authority, including proper referral of aliens for credible fear screening.

[6] 8 CFR 235.3(b)(1)(ii) (providing that "[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time,* to any class of aliens described in this section" and that this "designation shall become effective upon publication of a notice in the **Federal Register**" as well as that, "if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter" (emphasis added)).

(1) Except as otherwise expressly provided, the Department of Homeland Security may place in expedited removal any or all members of the following class of aliens (other than unaccompanied alien children as defined in 6 U.S.C. 279(g)(2)) as determined by an immigration officer: Aliens who are inadmissible under sections 212(a)(6)(C) or (7) of the INA, who are physically present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, and who either (a) did not arrive by sea, are encountered by an immigration officer anywhere in the United States more than 100 air miles from a U.S. international land border, and have not been physically present in the United States continuously for the two-year period immediately prior to the date of the determination of inadmissibility, or (b) did not arrive by sea, are encountered by an immigration officer within 100 air miles from a U.S. international land border, and have been physically present in the United States continuously at least 14 days but less than two years immediately prior to the date of the determination of inadmissibility. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923 (collectively, the Previous Designations).

(2) Any alien who is placed in expedited removal under this designation who indicates an intention to apply for asylum or who expresses a fear of persecution or torture, or a fear of return to his or her country, will be interviewed by an asylum officer to determine whether such alien has a credible fear as defined in section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v). If the asylum officer determines that the alien has established a credible fear, the alien will be referred to an immigration judge for further consideration of his or her application for asylum in proceedings under section 240 of the INA, 8 U.S.C. 1229a.

(3) Any alien who is placed in expedited removal under this designation who claims lawful permanent resident, refugee, or asylee status, or U.S. citizenship will be reviewed in accordance with the procedures provided in 8 CFR 235.3(b) and 8 CFR 1235.3(b).

(4) This Notice applies to aliens described in paragraph (1) on or after July 23, 2019.

(5) This Notice does not supersede, abrogate, or amend or modify any of the Previous Designations, which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC, this 19th day of July 2019.

**Kevin K. McAleenan,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2019–15710 Filed 7–22–19; 8:45 am]

**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7012–N–03]**

### 60-Day Notice of Proposed Information Collection: Application for Community Compass TA and Capacity Building Program NOFA and Awardee Reporting

**AGENCY:** Office of Community Planning and Development, HUD.

**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* September 23, 2019.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Colette Pollard, Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street SW, Room 4186, Washington, DC 20410–5000; telephone 202–402–3400 (this is not a toll-free number) or email at *Colette.Pollard@hud.gov* for a copy of the proposed forms or other available information. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

**FOR FURTHER INFORMATION CONTACT:**
Kenneth Rogers, Senior CPD Specialist,

Kenneth Rogers at *Kenneth.W.Rogers@hud.gov* or telephone 202–402–4396. This is not a toll-free number. Persons with hearing or speech impairments may access this number through TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

Copies of available documents submitted to OMB may be obtained from Ms. Pollard.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Application for Community Compass Technical Assistance and Capacity Building Program Notice of Funding Availability (NOFA).

*OMB Approval Number:* 2506–0197.

*Type of Request:* Extension.

*Form Number:* SF–424, SF424CB, SF–424CBW, SF–425, SF–LLL, HUD–2880, HUD–50070, HUD–XXX, HUD–XXX, HUD–XXX, HUD–XXX, HUD–XXX, HUD–XXX, and *Grants.gov* Lobbying Form Certification.

*Description of the need for the information and proposed use:* Application information is needed to determine competition winners, *i.e.,* the technical assistance providers best able to develop efficient and effective programs and projects that increase the supply of affordable housing units, prevent and reduce homelessness, improve data collection and reporting, and use coordinated neighborhood and community development strategies to revitalize and strengthen their communities. Additional information is needed during the life of the award from the competition winner, *i.e.,* the technical assistance providers to fulfill the administrative requirements of the award.

*Application/Pre-Award*

*Respondents (i.e.,* affected public): For profit and non-profit organizations.

*Estimated Number of Respondents:* 60.

*Estimated Number of Responses:* 60.

*Frequency of Response:* 1.

*Average Hours per Response:* 118.14.

*Application/Pre-Award Total Estimated Burden:* 7,088.40.

*Post-Award*

*Estimated Number of Respondents/ Awardees:* 30.

*Work Plans:* 10 per year/awardee.

*Average Hours per Response:* 18.

*Reports:* 4 per year/awardee.

*Average Hours per Response:* 6.

*Recordkeeping:* 12 per year/awardee.

# DEPARTMENT OF HOMELAND SECURITY

**[Docket No. DHS–2016–0089]**

## National Infrastructure Advisory Council

**AGENCY:** National Protection and Programs Directorate, DHS.
**ACTION:** Committee management; notice of an Open Federal Advisory Committee meeting.

**SUMMARY:** The National Infrastructure Advisory Council (NIAC) will meet Thursday, February 16, 2017, at 1331 F Street NW., Suite 1000, Washington, DC 20004. This meeting will be open to the public.
**DATES:** The NIAC will meet on February 16, 2017. The meeting will be held from 1:30 p.m.–4:30 p.m. EST. The meeting may close early if the committee has completed its business. For additional information, please consult the NIAC Web site, *www.dhs.gov/NIAC,* or contact the NIAC Secretariat by phone at (703) 235–2888 or by email at *NIAC@ hq.dhs.gov.*

**ADDRESSES:** 1331 F Street NW., Suite 1000, Washington, DC 20004. Members of the public will register at the registration table prior to entering the meeting room. For information on facilities or services for individuals with disabilities, or to request special assistance at the meeting, contact the person listed under **FOR FURTHER INFORMATION CONTACT** below as soon as possible.

To facilitate public participation, we are inviting public comment on the issues to be considered by the Council as listed in the "Summary" section below. Comments must be submitted in writing no later than 12:00 p.m. on February 13, 2017, in order to be considered by the Council in its meeting. The comments must be identified by "DHS–2016–0089," and may be submitted by any *one* of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting written comments.
• *Email: NIAC@hq.dhs.gov.* Include the docket number (DHS–2016–0089) in the subject line of the message.
• *Fax:* (703)235–9707.
• *Mail:* Ginger Norris, National Protection and Programs Directorate, Department of Homeland Security, 245 Murray Lane SW., Mail Stop 0612, Washington, DC 20598–0607.

*Instructions:* All written submissions received must include the words "Department of Homeland Security"

and the docket number for this action. Written comments received will be posted without alteration at *www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket or to read background documents or comments received by the NIAC, go to *www.regulations.gov.* Enter "NIAC" in the search line and the Web site will list all relevant documents for your review.

Members of the public will have an opportunity to provide oral comments on the topics on the meeting agenda below, and on any previous studies issued by the NIAC. We request that comments be limited to the issues and studies listed in the meeting agenda and previous NIAC studies. All previous NIAC studies can be located at *www.dhs.gov/NIAC.* Public comments may be submitted in writing or presented in person for the Council to consider. Comments received by Ginger Norris on or after 1:00 p.m. on February 16, 2017 will still be accepted and reviewed by the Members, but not necessarily at the time of the meeting. In-person presentations will be limited to three minutes per speaker, with no more than 15 minutes for all speakers. Parties interested in making in-person comments should register on the Public Comment Registration list available at the entrance to the meeting location prior to the beginning of the meeting.
**FOR FURTHER INFORMATION CONTACT:** Ginger Norris, Department of Homeland Security, National Protection and Programs Directorate, Office of Infrastructure Protection, NIAC, Designated Federal Officer, 245 Murray Lane SW., Mail Stop 0607, Washington, DC 20598–0607, telephone 202–441– 5885.

**SUPPLEMENTARY INFORMATION:** Notice of this meeting is given under the Federal Advisory Committee Act, 5 U.S.C. appendix. The NIAC shall provide the President, through the Secretary of Homeland Security, with advice on the security and resilience of the Nation's critical infrastructure sectors. The NIAC will meet to discuss issues relevant to critical infrastructure security and resilience, as directed by the President.

The meeting will commence at 1:00 p.m. EST. At this meeting, the Council will discuss its newest tasking and receive briefings. All presentations will be posted prior to the meeting on the Council's public Web page— *www.dhs.gov/NIAC.*

## Public Meeting Agenda

I. Opening of Meeting
II. Roll Call of Members
III. Opening Remarks and Introductions

IV. Approval of SEP 2016 Meeting Minutes
V. Presentations on Future Focus Study
VI. Public Comment
VII. Discussion of New NIAC Business
VIII. Closing Remarks
IX. Adjournment

Dated: January 4, 2017.

Ginger Norris,
*Designated Federal Officer for the NIAC.*
[FR Doc. 2017–00789 Filed 1–13–17; 8:45 am]
**BILLING CODE 9110–9–P**

# DEPARTMENT OF HOMELAND SECURITY

## Office of the Secretary

**[DHS Docket No. DHS–2017–0004]**

## Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea

**AGENCY:** Office of the Secretary, Department of Homeland Security.
**ACTION:** Notice.

**SUMMARY:** This notice concerns the authority of the Department of Homeland Security (DHS or the Department) to place certain designated categories of aliens in expedited removal proceedings. On November 13, 2002, the former Immigration and Naturalization Service (INS) of the Department of Justice issued a notice designating certain aliens who arrive by sea, either by boat or other means, as eligible for placement in expedited removal proceedings, with an exception for Cuban citizens or nationals (hereinafter "Cuban nationals"). On August 11, 2004, DHS issued a notice designating certain aliens in the United States as eligible for placement in expedited removal proceedings, also with an exception for Cuban nationals. In light of recent changes in the relationship between the United States and Cuba, the Department has determined that the exceptions for Cuban nationals, contained in the designations of November 13, 2002 and August 11, 2004, are no longer warranted and are thus hereby eliminated. The rest of the November 13, 2002 and August 11, 2004 designations, including any implementing policies, are unaffected by this notice and remain unchanged.
**DATE:** This notice is effective on January 13, 2017. Interested persons are invited to submit written comments on this notice on or before March 20, 2017.
**ADDRESSES:** You may submit comments, identified by DHS Docket Number DHS– 2017–0004, by any one of the following methods:

• *Federal e-Rulemaking Portal* *www.regulations.gov.* Follow the Web site instructions for submitting comments.

• *Mail or Hand Delivery/Courier:* Please submit all written comments (including and CD–ROM submissions) to Amanda Baran, Principal Director for Immigration Policy, DHS, 245 Murray Lane SW., Mail Stop 0445, Washington, DC 20528.

Please submit your comments by only one method. Comments received by means other than those listed above or received after the comment period has closed will not be reviewed. All comments received will be posted without change on *http:// www.regulations.gov.* The *http:// www.regulations.gov* Web site is the Federal e-rulemaking portal and comments posted there are available and accessible to the public. Commenters should not include personal information such as Social Security Numbers, personal addresses, telephone numbers, and email addresses in their comments as such information will become viewable by the public on the *http://www.regulations.gov* Web site. It is the commenter's responsibility to safeguard his or her information. Comments submitted through *http:// www.regulations.gov* will not include the commenter's email address unless the commenter chooses to include that information as part of his or her comment.

Postal delivery in Washington, DC, may be delayed due to security concerns. Therefore, DHS encourages the public to submit comments through the *http://www.regulations.gov* Web site.

*Docket:* For access to the docket to read background documents or comments received, go to the Federal eRulemaking portal at *http:// www.regulations.gov.* If you need assistance to review the comments, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section below.

**FOR FURTHER INFORMATION CONTACT:** Amanda Baran, Principal Director for Immigration Policy, 202–282–8805, *Amanda.baran@hq.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to

remove, without a hearing before an immigration judge, aliens arriving in the United States and certain other applicants for admission who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7), for lack of valid documents necessary for admission or entry or for procuring or seeking to procure a visa, other immigration-related documentation, admission to the United States, or other immigration benefit by fraud or willful misrepresentation of a material fact.

Expedited removal proceedings under section 235(b) of the Act, 8 U.S.C. 1225(b), may be applied to two categories of aliens. First, expedited removal proceedings may be used for aliens who are "arriving in the United States." Section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i). Second, the Secretary, in his or her sole and unreviewable discretion, may designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii); *see* 8 CFR 235.3(b)(1)(ii). Specifically, with limited exception, the Act authorizes the Secretary to apply (by designation) expedited removal proceedings to all or any subset of aliens who (1) have not been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and (2) have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the two-year period immediately prior to the date of determination of inadmissibility. Section 235(b)(1)(A)(iii)(I)–(II), 8 U.S.C. 1225(b)(1)(A)(iii)(I)–(II). The Secretary may modify such designations at any time. *Id.*

On November 13, 2002, the former INS issued a **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), to designate additional aliens who may be placed in expedited removal proceedings. 67 FR 68924. Specifically, that notice designated the following class of aliens who may be placed in expedited removal proceedings: "all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility." *Id.* The INS noted at the time that "[p]lacing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions,

will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected." *Id.* The INS also stated that "exercising its authority to detain this class of aliens . . . will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life." *Id.* The INS further noted that preventing illegal migration by sea also protects national security, as "[a] surge in illegal migration by sea threatens [that] security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities." *Id.*

The November 13, 2002 notice, however, contained an exception for Cuban nationals who are otherwise described in the designated class, stating that expedited removal proceedings would not be initiated against such Cuban nationals who arrive by sea. *Id.* The INS based this exception on "longstanding U.S. policy to treat Cubans differently from other aliens," citing the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), as an example of such treatment. *Id.* The notice also cited section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), which at the time statutorily exempted Cuban nationals who arrived by aircraft at a U.S. port of entry from being placed into expedited removal proceedings because of the lack of diplomatic relations between the United States and Cuba. That section expressly provides that expedited removal "shall not apply to an alien who is a native or citizen of a country in the Western Hemisphere with whose government the United States does not have full diplomatic relations and who arrives by aircraft at a port of entry." Section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F).

On August 11, 2004, DHS issued a similar **Federal Register** notice announcing that it was exercising its authority under section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), to designate an additional class of aliens who may be placed in expedited removal proceedings. 69 FR 48877. That notice authorized the Department to place in expedited removal proceedings any or all members of the following class of aliens: "Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, who are encountered by an immigration officer within 100 air miles

of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter." *Id.* DHS noted at the time that "exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected." *Id.*

Like the November 13, 2002 notice, the August 11, 2004 notice contained an exception for Cuban nationals who are otherwise described in the designated class and stated that expedited removal proceedings would not be initiated against such nationals encountered in the United States. *Id.* The notice similarly based this exception on that fact that "removals to Cuba [could not] presently be assured and for other U.S. policy reasons," *id.,* citing section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F), as well.

Since those notices were issued, significant changes in the relationship between the United States and Cuba have occurred. In December 2014, President Obama announced a historic opening between the United States and Cuba, as well as an approach for reestablishing diplomatic relations and adjusting regulations to facilitate greater travel, commerce, people-to-people ties, and the free flow of information to, from, and within Cuba. On July 20, 2015, the United States and Cuba formally reestablished full diplomatic relations and opened embassies in each other's countries. In the time following the reestablishment of full diplomatic relations, the United States and Cuba have taken concrete steps towards enhancing security, building bridges between our peoples, and promoting economic prosperity for citizens of both countries. And recent migration discussions have yielded important changes that will dramatically affect travel and migration between our two countries. Among other things, Cuba has agreed to accept and facilitate the repatriation of its nationals who are ordered removed from the United States. This arrangement and other changes remain the focus of ongoing diplomatic discussions between the two countries.

DHS also has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States. Many of those Cuban nationals have taken a dangerous journey through Central America and Mexico; others have taken to the high seas in the dangerous attempt to cross the Straits of Florida. DHS believes this increase in attempted migration has been driven in part by the perception that there is a limited window before the United States will eliminate favorable immigration policies for Cuban nationals.

The application of the expedited removal authorities to Cuban nationals must reflect these new realities. First, the Department notes that the statutory provision categorically barring the use of expedited removal for certain aliens who arrive by aircraft at a U.S. port of entry no longer applies to Cuban nationals, as the United States and Cuba have reestablished full diplomatic relations. *See* section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). In fact, DHS and DOJ are promulgating rules in this issue of the **Federal Register**, amending 8 CFR 235.3(b)(1)(i) and 1235.3(b)(1)(i) to strike the regulatory exception for Cuban nationals arriving by aircraft at a U.S. port of entry. Second, the improved relationship between the United States and Cuba, along with Cuba's agreement to accept the repatriation of its nationals, has eroded certain U.S. policy justifications for the exception. Finally, a categorical exception severely impairs the Government's ability to remove unauthorized aliens encountered within the United States. For these reasons, DHS has determined, in consultation with the Department of State, that a categorical exception from expedited removal for Cuban nationals is no longer in the interests of the United States.

Accordingly, this notice eliminates the categorical exceptions for Cuban nationals, with respect to both the November 13, 2002 and August 11, 2004 notices, on a prospective basis, beginning on January 13, 2017, *see* 8 CFR 235.3(b)(1)(ii) (designation may be effective as early as the date of issuance). As a result, Cuban nationals encountered on or after January 13, 2017 are included in the classes of aliens subject to expedited removal as designated in the November 13, 2002 and August 11, 2004 notices. DHS is not changing any other aspects of those designations and, apart from the modification described above, will continue exercising its expedited removal authority as indicated in the November 13, 2002 and August 11, 2004 notices.

As it did for the November 13, 2002 and August 11, 2004 notices, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii), the Department has determined that good cause exists to exempt this notice from the notice-and-comment and 30-day delayed effective date requirements under the Administrative Procedure Act (APA). *See* 5 U.S.C. 553(b)(3)(B) and (d)(3). Delaying the implementation of this notice to allow public notice and comment would be impracticable and contrary to the public interest. Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(I) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I).

Moreover, as with the August 11, 2004 notice, the designation in this notice is necessary to remove quickly from the United States aliens who are encountered shortly after illegally entering across U.S. land borders. The ability to detain such aliens while admissibility and identity are determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety.

DHS has determined that pre-promulgation notice and comment would undermine these interests, while endangering human life and having a potential destabilizing effect in the region. Among other things, such opportunity for notice and comment could result in a surge in migration of Cuban nationals seeking to travel to and enter the United States prior to the effectuation of the changes announced in this notice. Such a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. *See Matter of D–J-,* I. & N. Dec. 572, 579 (A.G. 2003). A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations. Additionally, a surge in migration over land or sea could result in significant loss of human life. For the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable and contrary to the public interest.

In addition, the change implemented by this notice is part of a major foreign policy initiative announced by the President, and is central to ongoing

diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries. DHS, in consultation with the Department of State, has determined that eliminating the exception from expedited removal proceedings for Cuban nationals involves a foreign affairs function of the United States, 5 U.S.C. 553(a)(1), and that this notice is exempt from APA procedural requirements on that basis.

Finally, and for the same reasons described above, DHS finds that delay caused by publication would adversely affect the interests of the United States and the effective enforcement of the immigration laws, and therefore invokes 8 CFR 235.3(b)(1)(ii) to make this designation effective immediately upon placement on public inspection.

Although advance notice and comment procedures are not in the interests of the United States with respect to this notice, DHS is interested in receiving comments from the public on the elimination of the categorical exception for Cuban nationals. DHS believes that by maintaining a dialogue with interested parties, DHS may be better positioned to ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

### Notice of Designation of Aliens Subject to Expedited Removal Proceedings

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (8 U.S.C. 1225(b)(1)(A)(iii)) and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) With respect to the above-referenced Designation of November 13, 2002, 67 FR 68924, I hereby rescind the provision at numbered paragraph (5), specifying that "[e]xpedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

(2) With respect to the above-referenced Designation of August 11, 2004, 69 FR 48877, I hereby rescind the provision at numbered paragraph (6), specifying that "[t]he expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals," and other language of the Designation referencing or relating to that exception for Cuban citizens or nationals.

Signed: at Washington, DC this 11th of January, 2017.

**Jeh Charles Johnson,**
*Secretary of Homeland Security.*
[FR Doc. 2017–00914 Filed 1–13–17; 8:45 am]
**BILLING CODE P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2593–16; DHS Docket No. USCIS–2015–USCIS–2013–0006]**

**RIN 1615–ZB62**

### Extension of the Designation of Somalia for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Somalia for Temporary Protected Status (TPS) for a period of 18 months, effective March 18, 2017 through September 17, 2018. This extension allows eligible Somali nationals (and aliens having no nationality who last habitually resided in Somalia) to retain TPS through September 17, 2018, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because conditions in Somalia supporting its designation for TPS continue to be met. Through this Notice, DHS also sets forth procedures necessary for nationals of Somalia (or aliens having no nationality who last habitually resided in Somalia) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** The 18-month extension of the TPS designation of Somalia is effective as of March 18, 2017, and will remain in effect through September 17, 2018. The 60-day re-registration period runs from January 17, 2017 through March 20, 2017. Note: It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. You can find specific information about the extension of Somalia's designation for TPS by selecting "Somalia" from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Program Manager, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals DHS—Department of Homeland Security EAD—Employment Authorization Document FNC—Final Nonconfirmation Government—U.S. Government IJ—Immigration Judge INA—Immigration and Nationality Act OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices SAVE—USCIS Systematic Alien Verification for Entitlements Program Secretary—Secretary of Homeland Security TNC—Tentative Nonconfirmation TPS—Temporary Protected Status TTY—Text Telephone USCIS—U.S. Citizenship and Immigration Services

### What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible aliens without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs, so long as they continue to meet the requirements of TPS.

**10284** **Federal Register** / Vol. 80, No. 37 / Wednesday, February 25, 2015 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 214 and 274a**

[CIS No. 2501–10; DHS Docket No. USCIS–2010–0017]

RIN 1615–AB92

**Employment Authorization for Certain H–4 Dependent Spouses**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends Department of Homeland Security ("DHS" or "Department") regulations by extending eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who are seeking employment-based lawful permanent resident ("LPR") status. Such H–1B nonimmigrants must be the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140), or have been granted H–1B status in the United States under the American Competitiveness in the Twenty-first Century Act of 2000, as amended by the 21st Century Department of Justice Appropriations Authorization Act. DHS anticipates that this regulatory change will reduce personal and economic burdens faced by H–1B nonimmigrants and eligible H–4 dependent spouses during the transition from nonimmigrant to LPR status. The final rule will also support the goals of attracting and retaining highly skilled foreign workers and minimizing the disruption to U.S. businesses resulting from H–1B nonimmigrants who choose not to pursue LPR status in the United States. By providing the possibility of employment authorization to certain H–4 dependent spouses, the rule will ameliorate certain disincentives for talented H–1B nonimmigrants to permanently remain in the United States and continue contributing to the U.S. economy as LPRs. This is an important goal considering the contributions such individuals make to entrepreneurship and research and development, which are highly correlated with overall economic growth and job creation. The rule also will bring U.S. immigration policies concerning this class of highly skilled workers more in line with those of other countries that are also competing to attract and retain similar highly skilled workers.

**DATES:** This final rule is effective May 26, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Oppenheim, Adjudications Officer, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 1100, Washington, DC 20529–2140; Telephone (202) 272–1470.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Summary of the Major Provisions of the Regulatory Action
  D. Summary of Costs and Benefits
  E. Effective Date
II. Background
  A. Current Framework
  B. Proposed Rule
  C. Final Rule
III. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Classes Eligible for Employment Authorization
  1. Comments Supporting the Rule
  2. Comments Requesting Expansion of the Rule
  3. Comments Opposing the Rule
  4. Comments Requesting a More Restrictive Policy
  C. Legal Authority To Extend Employment Authorization to Certain H–4 Dependent Spouses
  D. Comments on the Analysis of Executive Orders 12866 and 13563
  1. Comments Related to Labor Market Impacts
  2. Comments on the Volume Estimate and Methodology
  3. Comments on Specific Costs and Benefits Discussed in the Analysis
  E. Comments on the Application for Employment Authorization
  1. Streamlined or Modernized Filing Procedures
  2. Employment Authorization Document (Form I–766) Validity Period
  3. EAD Renewals
  4. Acceptable Evidentiary Documentation
  5. Concurrent Filings
  6. Premium Processing
  7. Automatic Extensions of Work Authorization
  8. Filing Fees
  9. *Possible Restrictions on EADs Issued to H–4 Dependent Spouses*
  10. Circular EADs
  11. Form I–765 Worksheets
  12. Other Related Issues
  F. Fraud and Public Safety Concerns
  1. Falsifying Credentials and Marriage Fraud
  2. Prohibition Related to Felony Charges and Convictions
  3. Unauthorized Employment
  4. Employer Abuse of H–1B Nonimmigrants and H–4 Dependent Spouses
  G. General Comments
  H. Modifications to the H–1B Program and Immigrant Visa Processing
  1. H–1B Visa Program

  2. Immigrant Visa Processing and Adjustment of Status
  I. H–1B Nonimmigrant's Maintenance of Status
  J. Environmental Issues
  K. Reporting
  L. Implementation
IV. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 and 13563
  1. Summary
  2. Purpose of the Rule
  3. Volume Estimate
  4. Costs
  5. Benefits
  6. Alternatives Considered
  D. Regulatory Flexibility Act
  E. Executive Order 13132
  F. Executive Order 12988
  G. Paperwork Reduction Act
V. Regulatory Amendments

## I. Executive Summary

### A. Purpose of the Regulatory Action

DHS does not currently extend eligibility for employment authorization to H–4 dependents (spouses and unmarried children under 21 years of age) of H–1B nonimmigrants. *See* 8 CFR 214.2(h)(9)(iv). The lack of employment authorization for H–4 dependent spouses often gives rise to personal and economic hardships for the families of H–1B nonimmigrants. Such hardships may increase the longer these families remain in the United States. In many cases, H–1B nonimmigrants and their families who wish to acquire LPR status in the United States must wait many years for employment-based immigrant visas to become available. These waiting periods increase the disincentives for H–1B nonimmigrants to pursue LPR status and thus increase the difficulties that U.S. employers have in retaining highly educated and highly skilled nonimmigrant workers. These difficulties can be particularly acute in cases where an H–1B nonimmigrant's family is experiencing economic strain or other stresses resulting from the H–4 dependent spouse's inability to seek employment in the United States. Retaining highly skilled workers who intend to acquire LPR status is important to U.S. businesses and to the Nation given the contributions of these individuals to U.S. businesses and the U.S. economy. These individuals, for example, contribute to advances in entrepreneurship and research and development, which are highly correlated with overall economic growth and job creation.

In this final rule, DHS is amending its regulations to extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants to support the retention

of highly skilled workers who are on the path to lawful permanent residence. DHS expects this change to reduce the economic burdens and personal stress that H–1B nonimmigrants and their families may experience during the transition from nonimmigrant to LPR status while, at the same time, facilitating their integration into American society. As such, the change will ameliorate certain disincentives that currently lead H–1B nonimmigrants to abandon efforts to remain in the United States while seeking LPR status, thereby minimizing disruptions to U.S. businesses employing such workers. The change will also support the U.S. economy, as the contributions H–1B nonimmigrants make to entrepreneurship and research and development are expected to assist overall economic growth and job creation. The rule also will bring U.S. immigration policies concerning this class of highly skilled workers more in line with those of other countries that compete to attract similar highly skilled workers.

*B. Legal Authority*

The authority of the Secretary of Homeland Security (Secretary) for this regulatory amendment can be found in section 102 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, 6 U.S.C. 112, and section 103(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1103(a), which authorize the Secretary to administer and enforce the immigration and nationality laws. In addition, section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes the Secretary's authority to extend employment to noncitizens in the United States.

*C. Summary of the Major Provisions of This Regulatory Action*

On May 12, 2014, DHS published a notice of proposed rulemaking, which proposed to amend DHS regulations at 8 CFR 214.2(h)(9)(iv) and 274a.12(c) to extend eligibility for employment authorization to H–4 dependent spouses of H–1B nonimmigrants if the H–1B nonimmigrants either: (1) Are the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140); or (2) have been granted H–1B status pursuant to sections 106(a) and (b) of the American Competitiveness in the Twenty-first Century Act of 2000, Public Law 107–273, 116 Stat. 1758, as amended by the 21st Century Department of Justice Appropriations Act, Public Law 107–273, 116 Stat. 1758 (2002) (collectively referred to as "AC21"). *See* Employment Authorization for Certain H–4 Dependent Spouses, 79 FR 26886 (May 12, 2014). After careful consideration of public comments, DHS is adopting the proposed regulatory amendments with minor wording changes to improve clarity and readability.[1] Also, DHS is making additional revisions to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) to permit H–4 dependent spouses under this rule to concurrently file an Application for Employment Authorization (Form I–765) with an Application to Extend/Change Nonimmigrant Status (Form I–539).

*D. Summary of Costs and Benefits*

In preparing this final rule, DHS updated its estimates of the impacted population by examining more recent data, correcting data entry errors made in calculating the population of H–4 dependent spouses assumed to be in the backlog, and revising the estimate of the population eligible pursuant to AC21. This final rule is expected to result in as many as 179,600 H–4 dependent spouses being eligible to apply for employment authorization during the first year of implementation. As many as 55,000 H–4 dependent spouses will be eligible to apply for employment authorization each year after the first year of implementation. DHS stresses that these are maximum estimates of the number of H–4 dependent spouses who may become eligible to apply for employment authorization. Although the estimates are larger than those provided in the preamble to the proposed rule, the initial year estimate (the year with the largest number of potential eligible applicants) provided in this final rule still represents far less than one percent of the overall U.S. workforce. DHS's rationale for this rule thus remains unchanged, especially as the changes made in this rule simply alleviate the long wait for employment authorization that these H–4 dependent spouses endure through the green card process, and accelerate the timeframe within which they generally will become eligible to apply for employment authorization (such as when they apply for adjustment of status).

The costs associated with this final rule stem from filing fees and the opportunity costs of time associated with filing an Application for Employment Authorization, Form I–765 ("Application for Employment Authorization" or "Form I–765"), as well as the estimated cost of procuring two passport-style photos. These costs will only be borne by the H–4 dependent spouses who choose to apply for employment authorization. The costs to the Federal Government of adjudicating and processing the applications are covered by the application fee for Form I–765.

DHS expects these regulatory amendments to provide increased incentives to H–1B nonimmigrants and their families who have begun the immigration process to remain permanently in the United States and continue contributing to the Nation's economy as they complete this process. DHS believes these regulatory changes will also minimize disruptions to petitioning U.S. employers. A summary of the costs and benefits of the rule is presented in Table 1.

TABLE 1—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%

[$Millions]

|  | Year 1 estimate (179,600 filers) | Sum of years 2–10 (55,000 filers annually) | Total over 10-year period of analysis* |
|---|---|---|---|
| 3% Discount Rate: | | | |
| Total Costs Incurred by Filers @3% ................................................................ | $76.1 | $181.3 | $257.4 |
| 7% Discount Rate: | | | |
| Total Costs Incurred by Filers @7% ................................................................ | 73.2 | 146.1 | 219.3 |

[1] In this final rule, DHS has amended its estimate of the volume of individuals who may become eligible to apply for employment authorization pursuant to this rulemaking. The impact on the U.S. labor market resulting from this change is negligible, and the justification for the rule remains unaffected by this change.

TABLE 1—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%—Continued

[$Millions]

| | Year 1 estimate (179,600 filers) | Sum of years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| Qualitative Benefits ........................................................................ | | This rule is intended to remove a disincentive to pursuing lawful permanent resident (LPR) status due to the potentially long wait for employment-based immigrant visas for many H–1B nonimmigrants and their family members. This rule will encourage H–1B nonimmigrants who have already taken steps to become LPRs to not abandon their efforts because their H–4 dependent spouses are unable to work. By encouraging H–1B nonimmigrants to continue in their pursuit of becoming LPRs, this rule would minimize disruptions to petitioning U.S. employers. Additionally, eligible H–4 dependent spouses who participate in the labor market will benefit financially. DHS also anticipates that the socioeconomic benefits associated with permitting H–4 spouses to participate in the labor market will assist H–1B families in integrating into the U.S. community and economy. | |

* Note: Totals may not sum due to rounding.

### E. Effective Date

This final rule will be effective on May 26, 2015, 90 days from the date of publication in the **Federal Register**. *DHS has determined that this 90-day effective date is necessary to guarantee that* USCIS will have sufficient resources available to process and adjudicate Applications for Employment Authorization filed by eligible H–4 dependent spouses under this rule while maintaining excellent customer service for all USCIS stakeholders, including H–1B employers, H–1B nonimmigrants, and their families. With this 90-day effective date, USCIS will be able to implement this rule in a manner that will avoid wholesale delays of processing other petitions and applications, in particular those H–1B petitioners seeking to file petitions before the FY 2016 cap is reached. DHS believes that this effective date balances the desire of U.S. employers to attract new H–1B workers, while retaining current H–1B workers who are seeking employment-based LPR status.

### II. Background

#### A. Current Framework

Under the H–1B nonimmigrant classification, a U.S. employer or agent may file a petition to employ a temporary foreign worker in the United States to perform services in a specialty occupation, services related to a Department of Defense (DOD) cooperative research and development project or coproduction project, or services of distinguished merit and ability in the field of fashion modeling. *See* INA section 101(a)(15)(H)(i)(b), 8

U.S.C. 1101(a)(15)(H)(i)(b); 8 CFR 214.2(h)(4). To employ a temporary nonimmigrant worker for such services (except for DOD-related services), a U.S. petitioner must first obtain a certification from the U.S. Department of Labor (DOL) confirming that the petitioner has filed a labor condition application (LCA) in the occupational specialty in which the nonimmigrant will be employed. *See* 8 CFR 214.2(h)(4)(i)(B) and 8 CFR 214.2(h)(1)(ii)(B). Upon certification of the LCA, the petitioner may file with U.S. Citizenship and Immigration Services (USCIS) a Petition for a Nonimmigrant Worker (Form I–129 with H supplements) ("H–1B petition" or "Form I–129").

If USCIS approves the H–1B petition, the approved H–1B status is valid for an initial period of up to three years. USCIS may grant extensions for up to an additional three years, such that the total period of the H–1B nonimmigrant's admission in the United States does not exceed six years. *See* INA section 214(g)(4), 8 U.S.C. 1184(g)(4); 8 CFR 214.2(h)(9)(iii)(A)(*1*), (3), and 8 CFR 214.2(h)(15)(ii)(B)(*1*). At the end of the six-year period, the nonimmigrant generally must depart from the United States unless he or she: (1) Falls within one of the exceptions to the six-year limit;[2] (2) has changed to another

nonimmigrant status; (3) or has applied to adjust status to that of an LPR.[3] *See* INA sections 245(a) and 248(a), 8 U.S.C. 1255(a) and 1258(a); 8 CFR 245.1 and 8 CFR 248.1. The dependents (*i.e.,* spouse and unmarried children under 21 years of age) of the H–1B nonimmigrants are entitled to H–4 status and are subject to the same period of admission and limitations as the H–1B nonimmigrant. *See* 8 CFR 214.2(h)(9)(iv).

For H–1B nonimmigrants seeking to adjust their status to or otherwise acquire LPR status through employment-based (EB) immigration, an employer generally must first file a petition on their behalf. *See* INA section 204(a), 8 U.S.C. 1154(a). An H–1B nonimmigrant may seek LPR status under one of the following five EB preference categories:

---

[2] These exceptions to the six-year limit include those authorized under sections 104(c) and 106(a) and (b) of AC21. Under sections 106(a) and (b) of AC21, an H–1B nonimmigrant who is the beneficiary of a permanent labor certification application or an employment-based immigrant petition that was filed at least 365 days prior to reaching the end of the sixth year of H–1B status may obtain H–1B status beyond the sixth year, in one year increments. *See* AC21 sections 106(a)-(b),

as amended. Another exception is found in section 104(c) of AC21. Under that provision, H–1B nonimmigrants with approved Form I–140 petitions who are unable to adjust status because of per-country visa limits are able to extend their H–1B stay in three-year increments until their adjustment of status applications have been adjudicated. *See* AC21 section 104(c).

[3] For H–1B nonimmigrants performing DOD-related services, the approved H–1B status is valid for an initial period of up to five years, after which the H–1B nonimmigrants may obtain up to an additional five years of admission for a total period of admission not to exceed 10 years. *See* 8 CFR 214.2(h)(9)(iii)(A)(2) and (h)(15)(ii)(B)(2). These H–1B nonimmigrants cannot benefit from AC21 sections 106(a) or (b), because those sections solely relate to the generally applicable six-year limitation on H–1B status under INA section 214(g)(4), whereas the requirements for H–1B status for DOD-related services, including the 10-year limitation, were established in section 222 of the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978; *see* 8 U.S.C. 1101 note. This rule, however, will authorize eligibility for employment authorization of H–4 dependents of H–1B nonimmigrants performing DOD-related services if the H–1B nonimmigrant is the beneficiary of an approved I–140 petition.

• First preference (EB–1)—Aliens with extraordinary ability, outstanding professors and researchers, and certain multinational executives and managers;

• Second preference (EB–2)—Aliens who are members of the professions holding advanced degrees or aliens of exceptional ability;

• Third preference (EB–3)—Skilled workers, professionals, and other workers;

• Fourth preference (EB–4)—Special immigrants (*see* INA section 101(a)(27), 8 U.S.C. 1101(a)(27)); and

• Fifth preference (EB–5)—Employment creation immigrants. *See* INA section 203(b), 8 U.S.C. 1153(b).

Generally, the second (EB–2) and third (EB–3) preference categories require employers to obtain an approved permanent labor certification from DOL prior to filing an immigrant petition with USCIS on behalf of the worker. *See* INA section 212(a)(5)(A), 8 U.S.C. 1182(a)(5)(A); 8 CFR 204.5(a). To apply for adjustment to LPR status, the alien must be the beneficiary of an immigrant visa that is immediately available. *See* INA sections 201(a), 203(b) and (d), and 245(a); 8 U.S.C. 1151(a), 1153(b) and (d), 1255(a).

The EB–2 and EB–3 immigrant visa categories for certain chargeability areas are oversubscribed, causing long delays before applicants in those categories, including H–1B nonimmigrants, are able to obtain LPR status. U.S. businesses employing H–1B nonimmigrants suffer disruptions when such workers are required to leave the United States at the termination of their H–1B status as a result of these delays. To ameliorate those disruptions, Congress enacted provisions in AC21 that allow for the extension of H–1B status past the sixth year for workers who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications. *See* S. Rep. No. 106–260, at 22 (2000) (''These immigrants would otherwise be forced to return home at the conclusion of their allotted time in H–1B status, disrupting projects and American workers. The provision enables these individuals to remain in H–1B status until they are able to receive an immigrant visa number and acquire lawful permanent residence through either adjustment of status in the United States or through consular processing abroad, thus limiting the disruption to American businesses.'').

DHS cannot alleviate the delays in visa processing due to the numerical limitations set by statute and the resultant unavailability of immigrant visa numbers.[4] DHS, however, can alleviate a significant obstacle that may encourage highly skilled foreign workers to leave the United States,[5] thereby preventing significant disruptions to U.S. employers in furtherance of the congressional intent expressed through AC21.

### B. Proposed Rule

On May 12, 2014, DHS published a proposed rule in the **Federal Register** at 79 FR 26886, proposing to amend:

• 8 CFR 214.2(h)(9)(iv) to extend eligibility for employment authorization to H–4 dependent spouses of H–1B nonimmigrants if the H–1B nonimmigrants either: are the principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140);[6] or have been granted H–1B status pursuant to sections 106(a) and (b) of AC21; and

• 8 CFR 274a.12(c) by adding paragraph (26) listing the H–4 dependent spouses described in revised 8 CFR 214.2(h)(9)(iv) as a new class of aliens eligible to request employment authorization from USCIS. Aliens within this class would only be authorized for employment following approval of their Application for Employment Authorization (Form I–765) by USCIS and receipt of an Employment Authorization Document (Form I–766) (''EAD'').

DHS also proposed conforming changes to Form I–765. DHS proposed adding

---

[4] The worldwide level of EB immigrant visas that may be issued each fiscal year is set at 140,000 visas, plus the difference between the maximum number of immigrant visas which may be issued under section 203(a) of the INA, 8 U.S.C. 1153(a) (relating to family-sponsored immigrants) and the number of visas used under that section for the previous fiscal year. *See* INA section 201(d), 8 U.S.C. 1151(d). These EB visa numbers are also limited by country. Generally, in any fiscal year, foreign nationals born in any single country may use no more than 7 percent of the total number of immigrant visas available in the family- and employment-based immigrant visa classifications. *See* INA section 202(a)(2), 8 U.S.C. 1152(a)(2).

[5] These obstacles, moreover, may discourage highly skilled foreign workers from seeking employment in the United States in the first instance. This final rule will diminish that possibility.

[6] The H–1B nonimmigrant must be the principal beneficiary of the approved I–140 petition, not the derivative beneficiary, consistent with the preamble to the proposed rule: ''Specifically, DHS is proposing to limit employment authorization to H–4 dependent spouses only during AC21 extension periods granted to the H–1B principal worker or after the *H–1B principal has obtained an approved Immigrant Petition for Alien Worker.''* *See* 79 FR at 26891 (emphasis added); *see also id.* at 26896 (estimating ''annual demand flow of H–4 dependent spouses who would be eligible to apply for initial work authorization under this proposed rule . . . based on: (1) the number of approved Immigrant Petitions for Alien Worker (Forms I–140) where the principal beneficiary is currently in H–1B status'').

H–4 dependent spouses described in the proposed rule to the classes of aliens eligible to file the form, with the required fee. DHS also proposed a list of the types of supporting documents that may be submitted with Form I–765 to establish eligibility.

DHS received nearly 13,000 public comments to the proposed rule. An overwhelming percentage of commenters (approximately 85 percent) supported the proposal, while a small percentage of commenters (approximately 10 percent) opposed the proposal. Approximately 3.5 percent of commenters expressed a mixed opinion about the proposal.

### C. Final Rule

In preparing this final rule, DHS considered all of the public comments contained in the docket. Although estimates of the current population of H–4 dependent spouses who will be eligible for employment authorization pursuant to this rule have changed, the effect of the revision does not affect the justification for the rule, and DHS is adopting the regulatory amendments set forth in the proposed rule with only minor, non-substantive changes to 8 CFR 214.2(h)(9)(iv) to improve clarity and readability. These technical changes clarify that an H–4 dependent spouse covered by this rule should include with his or her Application for Employment Authorization (Form I–765) evidence demonstrating that he or she is currently in H–4 status and that the H–4 nonimmigrant is currently in H–1B status. Also, in response to public comments regarding filing procedures for Applications for Employment Authorization (Forms I–765) under this rule, DHS is making conforming revisions to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) to permit H–4 dependent spouses under this rule to concurrently file the Form I–765 with an Application to Extend/Change Nonimmigrant Status (Form I–539).

The rationale for the proposed rule and the reasoning provided in its background section remain valid with respect to these regulatory amendments. This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to this rulemaking. This final rule also does not change the procedures or policies of other DHS components or federal agencies, or resolve issues outside the scope of this rulemaking. Comments may be reviewed at the Federal Docket Management System (FDMS) at *http://www.regulations.gov,* docket number USCIS–2010–0017.

## III. Public Comments on the Proposed Rule

### A. Summary of Public Comments

In response to the proposed rule, DHS received nearly 13,000 comments during the 60-day public comment period. Commenters included, among others, individuals, employers, academics, labor organizations, immigrant advocacy groups, attorneys, and nonprofit organizations. More than 250 comments were also submitted through mass mailing campaigns.

While opinions on the proposed rule varied, a substantial majority (approximately 85 percent) of commenters supported the extension of employment authorization to the class of H–4 dependent spouses described in the proposed rulemaking. Supporters of the proposed rule agreed that it would help the United States to attract and retain highly skilled foreign workers; alleviate economic burdens on H–1B nonimmigrants and their families during the transition from nonimmigrant to LPR status; and promote family unity. Some supporters also stated that the rule furthers women's rights, noting the impact the rule's change will have on promoting financial independence for the H–4 dependent spouse, potentially reducing factors which could lead to domestic violence, and assuaging negative health effects (such as depression).[7] Others voiced the belief that this rule aligns with core U.S. values, asserting that employment authorization should be considered a constitutional or human rights issue or an issue of equal opportunity.

Commenters commonly stated that if spouses are authorized for employment, families would be more stable, contribute more to their local communities, and more fully focus on their future in the United States. Additionally, commenters outlined ways they thought this proposal would help the U.S. economy, such as by increasing disposable income, promoting job creation, generating greater tax revenue, and increasing

home sales. Several commenters agreed that extending employment authorization as described in the rule will promote U.S. leadership in innovation by strengthening the country's ability to recruit and retain sought-after talent from around the world. Finally, some commenters noted that this rule would facilitate U.S. businesses' ability to create additional U.S. jobs by improving the retention of workers with critical science, technology, engineering and math (STEM) skills.

The approximately 10 percent of commenters who opposed the proposed rule cited to potential adverse effects of the rule, including displacement of U.S. workers, increasing U.S. unemployment, and lowering of wages. Some commenters expressed concern that the rule may negatively affect other nonimmigrant categories. Other commenters were concerned that this rule may cause the lowering of minimum working standards in certain sectors of the economy, such as in the Information Technology sector. Some commenters questioned DHS's legal authority to promulgate this regulatory change.

About 3.5 percent of commenters had a mixed opinion about the proposed regulation. Some of these commenters were concerned about the size and scope of the class made eligible for employment authorization under the rule; some argued that the described class is too restrictive, while others argued that it is too broad. Other commenters expressed concern about the possibility of fraud. Approximately 200 commenters (about 1.5 percent of commenters) submitted responses that are beyond the scope of this rulemaking, such as comments discussing U.S. politics but not addressing immigration, submissions from individuals who sent in their resumes or discussed their professional qualifications without opining on the proposed rule, and comments on the merits of other commenter's views, but not on the proposed changes.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses relevant comments in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by commenters.

### B. Classes Eligible for Employment Authorization

#### 1. Comments Supporting the Rule

The comments supporting the proposed rule largely underscored the positive socioeconomic benefits this

rule would have for certain H–1B nonimmigrants and their H–4 dependent spouses. For example, several commenters noted that while they knew about the restriction on H–4 employment before coming to the United States, they did not anticipate such a long wait to apply for LPR status or the emotional toll that long-term unemployment would take on them and their families. Other commenters noted they have not been able to apply for a social security card or a driver's license in certain states because they do not have an Employment Authorization Document (EAD) (Form I–766). Approximately 200 commenters noted that the current policy of allowing only the H–1B nonimmigrant to work often led to family separation or the decision to immigrate to other countries that authorize employment for dependent spouses.

A few commenters described their families as dual H–1B nonimmigrant households and supported the principle of both spouses working. These commenters voiced appreciation for the changes in the proposed rule, which will allow the H–4 dependent spouse to seek employment while the H–1B nonimmigrant continues to pursue permanent residence.

More than a thousand commenters believe this change will help U.S. businesses retain highly skilled H–1B nonimmigrants. More than 500 commenters asserted that the addition of skilled H–4 dependent spouses into the workforce will help U.S. employers. More than 60 commenters stated that they had planned to move out of the United States, but will instead remain and pursue LPR status as a result of this rule change. Approximately two dozen commenters noted that they had already moved out of the United States due to the prohibition on employment for H–4 dependent spouses. Several commenters stated that they are planning to leave the United States in the near future because H–4 dependent spouses cannot work under the current rules.

Nearly 400 commenters who supported the final rule also asserted that the regulation should be implemented without change as a matter of fairness. According to the comments, the regulation will help H–1B nonimmigrants and their families who have maintained legal status for years, contributed to the economy, and demonstrated the intent to permanently remain in the United States.

The overwhelmingly positive responses from the public to the proposed rule has strengthened DHS's view, as expressed in the proposed rule,

---

[7] An H–4 dependent spouse who is the victim of domestic violence may be independently eligible for employment authorization under certain circumstances. As noted in the proposed rule, section 814(b) of the Violence Against Women Act and Department of Justice Reauthorization Act of 2005 (VAWA 2005), Public Law 109–162, amended the INA by adding new section 204(a)(1)(K), 8 U.S.C. 1154(a)(1)(K), which provides for employment authorization incident to the approval of a VAWA self-petition. Section 814(c) of VAWA 2005 amended the INA by adding new section 106, which provides eligibility for employment authorization to battered spouses of aliens admitted in certain nonimmigrant statuses, including H–1B status.

that extending employment authorization eligibility to the class of H–4 dependent spouses of H–1B nonimmigrants described in this rulemaking will have net beneficial results. Among other things, the rule will increase the likelihood that H–1B nonimmigrants will continue to pursue the LPR process through completion. DHS further believes that this rule will provide increased incentives to U.S. employers to begin the immigrant petitioning process on behalf of H–1B nonimmigrants, encourage more H–1B nonimmigrants to pursue lawful permanent residence, and bolster U.S. competitiveness. This rule will also decrease workforce disruptions and other harms among U.S. employers caused by the departure from the United States of H–1B nonimmigrants for whom businesses have filed employment-based immigrant visa petitions. This policy supports Congress' intent in enacting AC21. *See* S. Rep. No. 106–260, at 2–3, 23 (2000).

A handful of commenters supporting the proposed rule requested clarification on whether H–4 dependent spouses will be permitted to file for employment authorization based on their classification as an H–4 dependent spouse if they have a pending adjustment of status application. DHS confirms that under this rule, H–4 dependent spouses with pending adjustment of status applications are still eligible for employment authorization on the basis of their H–4 classification. They may choose to apply for employment authorization based on either the H–4 dependent spouse category established by this rule under new 8 CFR 274a.12(c)(26) or the adjustment of status category under 8 CFR 274a.12(c)(9).

Another commenter asked if H–4 dependent spouses of H–1B nonimmigrants who have extended their stay under section 104(c) of AC21 would be eligible for work authorization. DHS confirms that H–4 dependent spouses of H–1B nonimmigrants who have extended their stay under section 104(c) of AC21 are eligible for employment authorization under this rule. Section 104(c) of AC21 applies to a subset of H–1B nonimmigrants who are the principal beneficiaries of approved Form I–140 petitions.[8] Because this rule provides

eligibility for employment authorization to H–4 dependent spouses of all H–1B nonimmigrants who are the principal beneficiaries of approved Form I–140 petitions, it captures the section 104(c) subset. DHS has thus determined that it is unnecessary to include section 104(c) of AC21 as a separate basis for employment authorization eligibility in this rule.

2. Comments Requesting Expansion of the Rule

i. H–4 Dependent Spouses of H–1B1, H–2 and H–3 Nonimmigrants

Slightly over 200 commenters requested that DHS extend eligibility for employment authorization to the H–4 dependent spouses of H nonimmigrants who are not in H–1B status (H–1B1, H–2 and H–3 nonimmigrants), and not only to the spouses of certain H–1B nonimmigrants who have begun the process of permanent residence through employment.[9] Some of these commenters expressed that this expansion would also help U.S. competitiveness by attracting more skilled workers from abroad.

DHS has determined that expansion of employment authorization beyond the class of H–4 dependent spouses described in the proposed rule is not appropriate at this time, and it has therefore not included such an expansion in this final rule. First, the Department believes this rule best achieves DHS's goals of helping U.S. employers minimize potential disruptions caused by the departure from the United States of certain highly skilled workers, enhancing U.S. employer's ability to attract and retain such workers, and increasing America's economic competitiveness.

Second, DHS notes two significant differences between H–1B nonimmigrants and other H nonimmigrants under the immigration laws. The INA explicitly permits H–1B nonimmigrants to have what is known as "dual intent," pursuant to which an H–1B nonimmigrant may be the beneficiary of an immigrant visa petition filed under section 204 of the INA or otherwise seek LPR status without evidencing an intention to

abandon a foreign residence for purposes of obtaining or maintaining H–1B status. *See* INA 214(h); *see also* 8 CFR 214.2(h)(16). Further, in enacting AC21, Congress permitted H–1B nonimmigrants who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications to remain in the United States beyond the six-year statutory maximum period of stay. Congress therefore has passed legislation specifically encouraging, and removing impediments to, the ability of H–1B nonimmigrants to seek LPR status, such that they may more readily contribute permanently to United States economic sustainability and growth. Congress has not extended similar benefits to other H nonimmigrants, including H–1B1 (Free Trade Agreement specialty workers from Chile and Singapore), H–2A (temporary agricultural workers), H–2B (temporary nonagricultural workers), or H–3 nonimmigrants (trainees). Extending employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants, and not to H–4 dependent spouses of other H nonimmigrants, thus serves to advance the Department's immediate interest in furthering the aims of AC21.[10]

Finally, as noted in the proposed rule, DHS may consider expanding H–4 employment eligibility in the future. *See Ctr. for Biological Diversity* v. *EPA,* 722 F.3d 401, 410 (D.C. Cir. 2013) (observing that "'agencies have great discretion to treat a problem partially'") (quoting *City of Las Vegas* v. *Lujan,* 891 F.2d 927, 935 (D.C. Cir. 1989)); *Lamers Dairy Inc.* v. *U.S. Dep't of Agric.,* 379 F.3d 466, 475 (7th Cir. 2004) ("[T]he government must be allowed leeway to approach a perceived problem incrementally. Similarly, equal protection does not require a governmental entity to choose between attacking every aspect of a problem or not attacking the problem at all.") (quotation marks omitted) (citing *FCC* v. *Beach Commc'ns,* 508 U.S. 307,

---

[8] *See* Mem. from Donald Neufeld, Acting Assoc. Dir., Domestic Operations, USCIS, Supplemental Guidance Relating to Processing Forms I–140 Employment-Based Immigrant Petitions and I–129 H–1B Petitions, and I–485 Adjustment Applications Affected by the American Competitiveness in the Twenty-First Century Act of 2000 (AC21) (Pub. L. 106–313), as amended, and the American

Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Title IV of Div. C. of Public Law 105–277, at 6 (May 30, 2008) ("AC21 § 104(c) is applicable when an alien . . . is the beneficiary of an *approved* I–140 petition.") (emphasis in original).

[9] The H–4 classification includes dependents of H–2A temporary agricultural workers, H–2B temporary nonagricultural workers, H–3 trainees, H–1B specialty occupation workers, and H–1B1 Free Trade Agreement specialty occupation workers from Singapore and Chile. *See* INA 101(a)(15)(H); *see also* 8 CFR 214.2(h)(9)(iv).

[10] As noted in the proposed rule, to ease the negative impact of immigrant visa processing delays, Congress intended that the AC21 provisions allowing for extension of H–1B status past the sixth year for workers who are the beneficiaries of certain pending or approved employment-based immigrant visa petitions or labor certification applications would minimize disruption to U.S. businesses employing H–1B workers that would result if such workers were required to leave the United States. *See* S. Rep. No. 106–260, at 22 (2000) ("These immigrants would otherwise be forced to return home at the conclusion of their allotted time in H–1B status, disrupting projects and American workers. The provision enables these individuals to remain in H–1B status until they are able to receive an immigrant visa number and acquire LPR status either through adjustment of status in the United States or through consular processing abroad, thus limiting the disruption to American businesses.").

316 (1993); and *Dandridge* v. *Williams,* 397 U.S. 471, 487 (1970)).

### ii. H–4 Dependent Spouses of All H–1B Nonimmigrants

Over 150 commenters noted that all dependent spouses of other nonimmigrant categories, such as the spouses of L–1 (intracompany transferee), E–1 (treaty trader), E–2 (treaty investor), and E–3 (Australian specialty occupation workers) nonimmigrants, are eligible to apply for employment authorization These commenters stated that because the employment-based nonimmigrant categories are similar to each other, all H–4 dependent spouses of H–1B nonimmigrants—rather than only certain subclasses of H–4 dependent spouses—likewise should be eligible for employment authorization.

DHS, however, recognizes an important difference between the dependent spouse category of H–1B nonimmigrants and those of L–1, E–1, E–2, and E–3 nonimmigrants. Specifically, Congress directed by statute that DHS grant employment authorization to all spouses of L–1, E–1, E–2, and E–3 nonimmigrants.[11] *See* Public Law 107–124 (2002) (amending the INA to expressly authorize employment for spouses of E nonimmigrants); Public Law 107–125 (2002) (same for spouses of L nonimmigrants); *see also* INA section 214(c)(2)(E) & (e)(6), 8 U.S.C. 1184(c)(2)(E) & (e)(6). Congress has not provided such statutory direction with respect to the spouses of H–1B nonimmigrants. Thus, the fact that the INA authorizes dependent spouses of L and E nonimmigrants for U.S. employment does not indicate that H–4 dependent spouses of all H–1B nonimmigrants also must be authorized to work.

In extending such employment authorization through regulation, DHS studied congressional intent with respect to H–1B nonimmigrants. Although Congress has not specifically required extending employment authorization to dependent spouses of H–1B nonimmigrants, Congress did recognize in AC21 the importance of addressing the lengthy delays faced by such workers seeking to obtain LPR status. Consistent with this congressional concern, and the legal authorities vested in the Secretary of Homeland Security described in Section C, below, DHS has chosen to limit this

regulation within that statutory framework, and the Department declines to extend the changes made by this rule to the H–4 dependent spouses of all H–1B nonimmigrants at this time.

### iii. Employment Authorization Incident to Status

Over 60 commenters requested that H–4 dependent spouses be granted employment authorization "incident to status," which would relieve the need to apply for employment authorization before receiving it. These commenters generally recommended that DHS provide employment authorization incident to status by authorizing the employment of H–4 dependent spouses through amendment to 8 CFR 274a.12(a) instead of 8 CFR 274a.12(c), which provides employment authorization through case-by-case, discretionary adjudications of each individual request.[12] For those classes of aliens listed in 8 CFR 274a.12(a), employment authorization is automatic upon the grant of immigration status. Examples of classes of aliens who are employment authorized incident to status under 8 CFR 274a.12(a) are LPRs, asylees, and refugees.

DHS is unable to classify H–4 dependent spouses described in this rule as employment authorized incident to status. Unlike other noncitizens who are employment authorized incident to status, H–4 dependent spouses will not be eligible for employment authorization based solely on their immigration status. Rather, H–4 dependent spouses must meet certain additional conditions before they can be granted employment authorization, and current USCIS systems cannot automatically and independently determine whether such conditions have been met. USCIS systems, for example, cannot independently or automatically determine whether an H–4 dependent spouse has the requisite spousal relationship to an H–1B nonimmigrant who either is the beneficiary of an approved Form I–140 petition or has been granted H–1B nonimmigrant status under sections 106(a) and (b) of AC21; that determination must be made by a USCIS adjudicator. DHS has therefore determined that it must require the filing of an application requesting employment authorization, *see* 8 CFR

274a.12(c) and 8 CFR 274a.13, before it can extend employment authorization to the class of H–4 dependent spouses described in this rule. This application process will ensure that only eligible H–4 dependent spouses receive a grant of employment authorization and proper documentation evidencing such employment authorization, and will avoid granting employment authorization to ineligible spouses.

### iv. Employment Authorization at Different Points in Time

More than a dozen commenters requested that the class of H–4 dependent spouses who are eligible for employment authorization be expanded by permitting them to file at points in time different from those provided in the proposed rule. DHS carefully considered these suggestions for determining when an H–4 dependent spouse should be eligible for employment authorization. For the reasons that follow, DHS has determined that it will not adopt the commenters' suggestions in this final rule.

### (1) H–1B Nonimmigrants With Pending PERM Labor Certifications or Form I–140 Petitions

Some commenters requested that DHS make H–4 dependent spouses eligible for employment authorization when their H–1B nonimmigrant spouses have filed permanent (PERM) labor certifications with DOL.[13] Other commenters suggested providing such eligibility when H–1B nonimmigrants have Form I–140 petitions or adjustment of status applications pending with USCIS.

DHS believes that the basis for eligibility in the proposed rule reasonably addresses H–4 dependent spouses' interests in obtaining employment authorization at the earliest possible time in advancing the Department's policy goals of attracting and retaining highly skilled workers and promoting compliance with U.S. immigration laws. In furtherance of these goals, DHS has chosen to limit eligibility for employment authorization to cases where the H–1B nonimmigrant either: (1) Is the principal beneficiary of an approved Form I–140 and thus is on a path to lawful permanent residence that is reasonably likely to conclude successfully; or (2) has been granted H–

---

[11] DHS is implementing the statutory provisions authorizing employment of spouses of L–1, E–1, E–2, and E–3 nonimmigrants, though the regulations have not been revised.

[12] DHS regulations provide for three categories of persons eligible for employment authorization: (1) aliens authorized for employment incident to status, *see* 8 CFR 274a.12(a); (2) aliens authorized to work for a specific employer incident to status, *see* 8 CFR 274a.12(b); and (3) aliens who must apply to USCIS for employment authorization, *see* 8 CFR 274a.12(c).

[13] Currently, employers seeking to file immigrant visa petitions on behalf of noncitizens in certain employment-based preference categories must first obtain a labor certification under DOL's PERM program. *See generally* INA sections 204(b), 212(a)(5); 8 U.S.C. 1154(b), 1182(a)(5); 8 CFR 204.5(k)–(l); 20 CFR pt. 656.

1B status under sections 106(a) and (b) of AC21. This approach provides several benefits to the Department.

Among other things, the approach allows DHS to confirm a significant record of compliance with U.S. immigration laws, which indicates the likelihood of continued compliance in the future. Requiring an approved Form I–140 petition, for example, reduces the risk of frivolous labor certification and immigrant visa petition filings for the purpose of making H–4 dependent spouses eligible for employment authorization, because the approval of the petition generally signifies that the foreign worker is eligible for the underlying immigrant classification. In contrast, authorizing employment immediately upon the filing of a PERM application or Form I–140 petition (rather than after the 365-day waiting period or the approval of the Form I–140 petition) could produce a reasonable possibility of granting employment authorization to an H–4 dependent spouse where the H–1B nonimmigrant's case might not be approvable and the H–1B nonimmigrant has a relatively shorter record of compliance with U.S. immigration laws. The eligibility requirements in this rule also allow for better control of processing, as it is difficult for USCIS to track another agency's filings, such as PERM applications. Finally, with respect to the comment suggesting that employment should be authorized at the point when an adjustment of status application is pending, Department regulations already provide eligibility for employment authorization in that situation. *See* 8 CFR 274a.12(c)(9).

(2) H–1B Nonimmigrants Who Are Eligible for AC21 Extensions Under Sections 106(a) and (b)

Some commenters expressed support for an alternative policy that would extend employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who are eligible for, but have not yet been approved for, extensions of status under sections 106(a) and (b) of AC21. DHS declines to adopt such a policy because it creates the possibility of granting employment authorization to H–4 dependent spouses of H–1B nonimmigrants who are later denied the extension of H–1B status. For instance, a labor certification or Form I–140 petition may have been timely filed on behalf of the H–1B nonimmigrant 365 days prior to the prospective expiration of his or her six-year limitation of stay, thus making the H–1B nonimmigrant eligible for an extension under AC21. But the labor certification or Form I–140 petition

ultimately may be denied before the H–1B nonimmigrant files for and receives the AC21 extension. Additionally, if the individual is determined to be ineligible for the H–1B extension, he or she would no longer be maintaining H–1B status and the U.S. employer will be unable to retain the worker. Accordingly, DHS believes the sounder policy is to extend employment authorization to H–4 dependent spouses of H–1B nonimmigrants who have been *granted* H–1B status pursuant to AC21, ensuring that such H–1B nonimmigrants are maintaining H–1B status and are significantly down the path to obtaining LPR status.

(3) Pending Form I–140 Immigrant Petitions With New Employer

Fewer than a dozen commenters requested that DHS extend employment authorization to H–4 dependent spouses in cases where the H–1B nonimmigrants have transferred their employment to a new employer and are in the process of obtaining approval of a new Form I–140 petition. As noted above, however, authorizing employment based solely on the filing (rather than the approval) of a PERM application or Form I–140 petition is likely to encourage frivolous filings to allow the H–4 dependent spouse to obtain employment authorization while the filings remain pending. DHS thus is not extending this rule on the basis of pending PERM applications or Form I–140 petitions. By requiring that a Form I–140 petition first be approved, DHS will further disincentivize frivolous filings and better serve the goal of extending the immigration benefit of this rule to only those spouses of H–1B nonimmigrants who are genuinely on the path to lawful permanent residence.

v. H–4 Minors

Less than 40 commenters requested that DHS authorize employment for certain H–4 dependent minor children whose H–1B nonimmigrant parent is the beneficiary of an approved Form I–140 or has been granted an extension of his or her authorized period of admission in the United States under AC21. These commenters cited concerns about H–4 dependent children being unable to obtain the same types of work experience as their peers, being unable to afford post-secondary education in the United States, and losing eligibility for H–4 status through age (known as "aging-out" [14]) before their parents can

file for adjustment of status. Some commenters also raised concerns given the eligibility under DHS deferred action policies that make eligible for employment authorization certain individuals who come to the United States unlawfully as children under the age of 16.[15]

DHS declines to adopt the commenters' suggestions to expand eligibility for employment authorization to H–4 dependent minor children. As reflected by the comments, DHS does not view the employment of dependent minor children in the United States as a significant deciding factor for an H–1B nonimmigrant considering whether to remain in the United States and seek LPR status while continuing employment with his or her U.S. employer. Also, as stated in the proposed rule, extending employment eligibility to certain H–4 dependent spouses will alleviate a significant portion of the potential economic burdens that H–1B nonimmigrants currently may face, such as paying for academic expenses for their children, during the transition from nonimmigrant to LPR status as a result of the inability of their dependent family members to work in the United States.

Additionally, limiting employment authorization to H–4 dependent spouses is consistent with the treatment of dependent minors in other nonimmigrant employment categories (such as the L and E nonimmigrant categories), which provide employment authorization to dependent spouses but not dependent children. And in the instances where DHS has extended eligibility for employment authorization to minor children, foreign policy reasons have been an underlying consideration. DHS has extended eligibility for employment authorization to minors within the following nonimmigrant categories: Dependents of Taipei Economic and Cultural

---

[14] To qualify for a "child" for purposes of the immigration laws, an individual generally must be unmarried and under the age of 21. *See* INA section 101(b)(1), 8 U.S.C. 1101(b)(1). The Child Status Protection Act (CSPA) amended the INA by permitting certain individuals over the age of 21 to continue to qualify as a child for purposes of certain immigration benefits. *See* Public Law 107–208 (2002). If an individual becomes too old to qualify as a child under the immigration law, and in turn no longer can derivatively benefit from a petition or application on behalf of a parent, he or she is described as "aging out."

[15] On June 15, 2012, the Secretary of Homeland Security announced that certain aliens who came to the United States as children and meet several guidelines may request consideration for deferred action from removal for a period of two years, subject to renewal. This policy is generally referred to as Deferred Action for Childhood Arrivals (DACA). On November 20, 2014, the Secretary announced expanded eligibility guidelines for consideration under the DACA policy and extended the period of deferred action and work authorization from two years to three years.

Representative Office (TECRO) E–1 nonimmigrants; J–2 dependent children of J–1 foreign exchange visitors; dependents of A–1 and A–2 foreign government officials; dependents of G–1, G–3, and G–4 international organization officials; and dependents of NATO officials. Each of these instances involves foreign policy considerations that are not present in the H–1B nonimmigrant program.

DHS also declines to extend employment authorization to H–4 dependent children who age out and lose their H–4 status. Providing work authorization in such circumstances would encourage such individuals to violate the terms of their authorized stay. Moreover, comments suggesting that the Department should make changes to prevent H–4 dependent minor children from aging out are outside the scope of this rulemaking, which in no way involves the ability of a minor to maintain H–4 status or eligibility for LPR status as a derivative beneficiary of a parent's immigrant petition.

Finally, the circumstances of persons eligible for consideration of Deferred Action for Childhood Arrivals ("DACA") are distinct from those of H–4 dependent minor children, and the policy for authorizing employment for individuals who have received deferred action has no bearing on whether H–4 dependent minor children should be eligible to apply for employment authorization. The DACA program concerns the departmental exercise of prosecutorial discretion with the aim of ensuring that limited DHS enforcement resources are appropriately focused on the Department's highest enforcement priorities. The policy aims underlying this rule, as described above, are different, and for the reasons already discussed do not justify extending employment authorization to the H–4 dependent children of H–1B nonimmigrants.

### vi. Principal Beneficiaries

A few dozen commenters requested that the rule also allow H–1B nonimmigrants to receive Employment Authorization Documents (EADs), which authorize employment without regard to employer, incident to status.[16] One commenter requested that DHS provide one EAD to households in which both spouses have H–1B status in order to avoid necessitating one of the spouses to change to H–4 status. A few

commenters requested an EAD for an H–1B nonimmigrant whose spouse is also in H–1B status, but has been granted a different length of stay.

DHS declines to adopt the commenters' suggestions regarding EADs for H–1B nonimmigrants. If an H–1B nonimmigrant would like to apply for an EAD as the dependent spouse of an eligible H–1B nonimmigrant, he or she must first change to H–4 status. Moreover, issuance of an EAD to an H–1B nonimmigrant authorizing employment other than with his or her petitioning employer is incompatible with the H–1B classification, which allows employment only with the petitioning employer.[17] If an H–1B nonimmigrant works on an EAD for an employer other than his or her petitioning employer, he or she may be violating the terms and conditions of his or her petition and, therefore, may no longer be maintaining a valid nonimmigrant status.

### vii. H–4 Dependent Spouses Not Selected in the H–1B Lottery

Less than 20 commenters requested a carve-out for H–4 dependent spouses who had filed an H–1B petition but who were not selected in the H–1B computer-generated random selection process ("H–1B lottery").[18] Although DHS appreciates the frustration that may result from not being selected in the H–1B lottery, the Department declines to extend eligibility for employment authorization to these H–4 dependent spouses. This rule is not a substitute for the H–1B program and is not intended to circumvent the H–1B lottery. A primary purpose of this rule is to help U.S. businesses retain the H–1B nonimmigrants for whom they have already filed an employment-based immigrant petition. Expanding the rule to help nonimmigrants in other situations does not directly support this goal.

### viii. Other Nonimmigrant Categories

Less than 20 commenters requested that DHS authorize employment for the dependents of principals in other employment-based nonimmigrant classifications, such as dependents of O–1 nonimmigrants (O–3) [19] and TN nonimmigrants (TD).[20] One commenter specifically requested employment authorization for children of O–1 and TN nonimmigrant highly skilled workers who are on the path to lawful permanent residence.

DHS declines to expand eligibility for employment authorization in this rule to the dependents of principals with other nonimmigrant classifications. DHS is narrowly tailoring the expansion of eligibility for employment authorization to meet several policy objectives, including the goal of helping U.S. businesses retain highly skilled H–1B nonimmigrants who are on the path to lawful permanent residence. DHS may consider expanding employment authorization to other dependent nonimmigrant categories in the future.

Moreover, there are significant differences between the H–1B nonimmigrant classification on the one hand, and the O–1 and TN classifications on the other, that inform the Department's decision to limit applicability of this rule to only H–4 dependent spouses. The spouses of H–1B nonimmigrants, for example, generally have greater need for the benefits of this rule than the spouses of O–1 nonimmigrants. O–1 nonimmigrants typically apply for LPR status through the EB–1 immigrant visa preference category, which has not historically suffered from visa backlogs. This allows the spouses of O–1 nonimmigrants to generally obtain employment authorization much more quickly than the spouses of H–1B nonimmigrants who typically seek LPR status through the EB–2 and EB–3 preference categories, which have historically been subject to lengthy backlogs.

---

[16] The commenters' refer to these unrestricted EADs as "open market" EADs. In contrast, classes of aliens listed in 8 CFR 274a.12(b), such as H–1B nonimmigrants, are authorized for employment only with a specific employer.

[17] See INA sections 101(a)(15)(H)(i)(b) (requiring that DOL secure and certify that "the *intending employer* has filed" an LCA) (emphasis added), 212(n) (establishing LCA requirements applicable to employers of H–1B nonimmigrants), 214(c) (requiring employers file petitions with the Secretary of Homeland Security to employ an H–1B nonimmigrant); 8 U.S.C. 1101(a)(15)(H)(i)(b), 1182(n), 1184(c).

[18] If USCIS receives more than a sufficient number of H–1B petitions to reach the general statutory cap of 65,000 visas or the 20,000 cap under the advanced degree exemption during the filing period, see INA section 214(g)(1)(A), (5)(C), 8 U.S.C. 1184(g)(1)(A), (5)(C), USCIS holds a computer-generated random selection process, or lottery, to select enough petitions to meet the statutory caps. See 8 CFR 214.2(h)(8)(ii)(B). USCIS rejects and returns cap-subject petitions not randomly selected, with filing fees, unless a petition is found to be a duplicate filing.

[19] An O–3 nonimmigrant is a dependent of an O–1 nonimmigrant. The O–1 nonimmigrant classification applies to individuals who possess extraordinary ability in the sciences, arts, education, business, or athletics, or who have a demonstrated record of extraordinary achievement in the motion picture or television industry and have been recognized nationally or internationally for those achievements. See INA section 101(a)(15)(O), 8 U.S.C. 1101(a)(15)(O); 8 CFR 214.2(o).

[20] A TD nonimmigrant is a dependent of a TN nonimmigrant. The TN nonimmigrant classification permits qualified Canadian and Mexican citizens to seek temporary entry into the United States to engage in business activities at a professional level. See INA section 214(e), 8 U.S.C. 1184(e); 8 CFR 214.6.

The spouses of TN nonimmigrants are also not similarly situated to the spouses of H–1B nonimmigrants. Unlike H–1B status, TN status stems from an international agreement—the North American Free Trade Agreement (NAFTA)—negotiated between the United States and foreign nations. As such, changes to that status implicate reciprocal international trade and foreign policy concerns that are generally not implicated with respect to the H–1B classification and are beyond the scope of this rulemaking.

3. Comments Opposing the Rule

Approximately ten percent of commenters opposed extending employment authorization to the class of H–4 dependent spouses described in the proposed rule. Many of these commenters were generally concerned that the rule would result in the displacement of U.S. workers; exacerbation of the nation's unemployment rate; and a decrease in wages. All comments discussing economic issues, both in opposition to and in support of the proposed rule, are discussed in Part III, Public Comments on Proposed Rule, Section D, Comments on Executive Orders 12866 and 13563.

Commenters also questioned whether the change in the proposed rule is actually necessary in light of other provisions of U.S. immigration law. Other commenters suggested that the proposed rule would have an adverse impact on other immigration categories or nationalities. DHS has carefully considered these concerns. But for the reasons that follow, DHS has decided to finalize the rule as proposed.

i. Change Unnecessary

More than 20 commenters believed that because current immigration laws provide the ability for H–4 dependent spouses to change status to an employment-authorized category, the proposed rule would not provide any additional incentives for H–1B nonimmigrants to remain in the United States and continue to pursue LPR status. One commenter stated that most of the comments posted on *www.regulations.gov* failed to indicate that potential immigrants have abandoned the immigration process, or have decided against coming to the United States in the first place, because their spouses would not be authorized to work.

DHS disagrees with these commenters and believes that the changes made by this rule are warranted. DHS acknowledges that thousands of commenters who voiced support for the rule did not provide specific reasons for their support, including whether H–1B nonimmigrants were abandoning their applications for LPR status. DHS notes, however, that more than 60 commenters specifically indicated they planned to abandon their pursuit of lawful permanent residence without the changes in the proposed rule. Approximately, two dozen commenters stated that they left the United States because the current regulations preclude H–4 dependent spouses from engaging in employment. And several U.S. employers submitted comments in which they describe the loss of valued H–1B nonimmigrants because of the restriction on spousal employment. These employers noted that the changes in the proposed rule would help to align America's immigration laws with the policies of other countries that allow spousal employment. DHS agrees with these employers and other commenters who supported the proposed rule, and the Department believes that this change will support U.S. businesses and strengthen U.S. competitiveness. DHS also believes that this rule will fulfill its intended purpose and encourage certain highly skilled H–1B nonimmigrants to remain in the United States and continue to pursue their efforts to become LPRs.

ii. Impact on Other Categories or Nationalities

Less than 80 commenters suggested that the proposed rule would harm persons in other nonimmigrant categories or with certain nationalities. A few commenters who had changed status from H–4 status to F–1 nonimmigrant student status, for example, thought the rule was unfair because F–1 nonimmigrant graduates who had exhausted their Optional Practical Training had no path to employment authorization except through another principal nonimmigrant classification, such as the H–1B classification. These commenters argued that the rule would put recent F–1 nonimmigrant graduates at a disadvantage because they would have to go through the H–1B petition process whereas the qualifying H–4 dependent spouses would be eligible for an EAD authorizing employment without regard to employer.

DHS appreciates these commenters' concerns but does not believe that the changes made by this rule will adversely affect other classifications or specific nationalities. Rather, DHS expects that this rule will help to partially alleviate the adverse impact of oversubscription of certain chargeability categories in the EB–2 and EB–3 categories on certain H–1B

nonimmigrants and their families, without negatively impacting others. DHS has narrowly tailored this rule to provide employment authorization to only those H–4 dependent spouses of H–1B nonimmigrants who have taken active steps to become LPRs. The rule does not affect any other nonimmigrant category, nor does the rule make distinctions among persons of different nationalities. Moreover, as noted throughout this rule, DHS expects that because of the small size of the newly eligible class of workers, the rule should not negatively impact the employment of persons in other nonimmigrant categories. DHS also notes that the H–4 dependent spouses at issue may already obtain employment authorization when they file their applications to adjust status; this rule simply accelerates the timeframe in which they may enter the labor market.

iii. Impact on Universities

Several commenters suggested that because it is common for H–4 dependent spouses to change status to F–1 nonimmigrant status to enhance their marketability and use their time productively, universities may lose revenue from decreased enrollment if such H–4 dependent spouses are allowed to work pursuant to this rule. DHS carefully considered but declined to address these concerns. First, this rule does not directly regulate U.S. institutions of higher education or its students (including F–1 nonimmigrants), and any impacts on university enrollments or revenues would be an indirect impact of this rule. Second, the rule merely expands the choices available to H–4 dependent spouses. While the rule expands the ability for such individuals to obtain employment authorization, it does nothing to restrict or otherwise change their ability to engage in study to the extent authorized by the Department in accordance with law. Third, even if the opportunity for employment authorization may mean that fewer H–4 dependent spouses eventually choose to enroll as nonimmigrant students, it is not clear how this rule could significantly impact revenues at colleges and universities considering the relatively small number of people impacted by this rule.[21] Indeed, other

---

[21] According to Department of Education statistics, approximately 21 million students are expected to enroll in postsecondary degree-granting institutions in fall 2014. *See http://nces.ed.gov/fastfacts/display.asp?id=372.* Given the relatively large student population enrolled in American schools and the narrow population impacted by this rule, DHS believes this rule would not significantly impact net college enrollments.

commenters noted that this rule could actually help university enrollment, as the increased ability for H–1B nonimmigrant families to generate income would further enable the H–1B nonimmigrant and H–4 dependent spouse to engage in higher education or contribute towards the higher education of their children. Consequently, it is uncertain if the net impact of this rule is to reduce overall enrollment and revenues, given the offsetting effects of this rule suggested by commenters. Commenters did not provide statistics or data demonstrating that this rule will have significant adverse effects on U.S. institutions of higher education or that DHS should limit employment opportunities for H–4 dependent spouses to protect revenue sources. Finally, DHS notes that it received several supportive comments both from representatives of the academic community and also from self-identified H–4 dependent spouses who viewed this rulemaking as positive.

### 4. Comments Requesting a More Restrictive Policy

Slightly over 180 commenters suggested limiting employment authorization to a more restricted class of H–4 nonimmigrants. For the reasons discussed below, DHS has determined that it will not adopt the commenters' suggestions in this final rule.

#### i. Certain Skills or Sectors

A number of commenters recommended granting employment authorization only to H–4 dependent spouses who have certain skills or work in certain sectors of the economy. Other commenters requested that DHS limit employment authorization under the rule to H–4 dependent spouses who hold advanced degrees from U.S. universities or have degrees in certain subjects, such as subjects in STEM fields. Some commenters were concerned that eligible H–4 dependents will be able to compete across all occupations, not just skilled professions.

DHS declines to restrict employment authorization eligibility to H–4 dependent spouses with certain skills or degrees. A primary purpose of this rule is to help U.S. employers retain H–1B nonimmigrant employees who have demonstrated the intent to become LPRs, which would provide substantial benefits to these employers and the U.S. economy. This rule is intended to provide this incentive to H–1B nonimmigrants regardless of the academic backgrounds of their H–4 dependent spouses. Limiting the rule to benefit only H–1B nonimmigrants

whose H–4 dependent spouses have certain skills or hold certain educational credentials would undermine the effectiveness of this rule.

#### ii. Reciprocity

A number of commenters recommended limiting employment authorization to H–4 dependent spouses who are from countries that authorize employment for spouses of U.S. citizens in a similar immigration status abroad (*i.e.,* when there is reciprocity). DHS's focus in this rule, however, is on retaining H–1B nonimmigrants for the benefit of U.S. employers and the U.S. economy, including by helping businesses minimize expensive disruptions caused by the departures from the United States of certain highly skilled H–1B nonimmigrants. As noted above, limiting the rule to affect only a subset of H–1B nonimmigrant families based on reciprocity would weaken the rule's efficacy. Moreover, reciprocity would implicate foreign policy considerations that are outside the scope of this rulemaking.

#### iii. Limiting Employment Authorization Based on AC21 Extensions

A few commenters requested that DHS extend eligibility for employment authorization only to the H–4 dependent spouses of H–1B nonimmigrants who are beneficiaries of AC21 extensions. DHS discussed this option in the proposed rule. The Department appreciates this suggestion, but believes that also extending employment authorization to the spouses of H–1B nonimmigrants who are the beneficiaries of approved Form I–140 petitions more effectively accomplishes the goals of this rulemaking. For the benefit of U.S. businesses and the U.S. economy, DHS believes the rule should provide incentives for those workers who have established certain eligibility requirements and demonstrated intent to reside permanently in the United States and contribute to the U.S. economy. Extending employment authorization to H–4 dependent spouses of H–1B nonimmigrants with either approved Form I–140 petitions or H–1B status granted pursuant to sections 106(a) and (b) of AC21 encourages a greater number of professionals with high-demand skills to remain in the United States. Moreover, by tying eligibility for employment authorization to approved Form I–140 petitions, DHS is reaching the H–4 dependent spouses of H–1B nonimmigrants granted status under section 104(c) of AC21. DHS thus declines to exclude from this rule the

spouses of H–1B nonimmigrants who have approved Form I–140 petitions.

*C. Legal Authority To Extend Employment Authorization to Certain H–4 Dependent Spouses*

Over 40 commenters questioned DHS's legal authority to extend employment authorization to certain H–4 dependent spouses, often emphasizing that employment for spouses of L and E nonimmigrants is expressly authorized by statute.[22] Several commenters argued that it was the role of Congress, not the Executive Branch, to create immigration laws.

DHS disagrees with the view that this rule exceeds the Secretary's authority. In the INA, Congress provided the Secretary with broad authority to administer and enforce the immigration laws. The Secretary is expressly authorized to promulgate rules and "perform such other acts as he deems necessary for carrying out his authority" based upon considerations rationally related to the immigration laws. INA section 103(a)(3), 8 U.S.C. 1103(a)(3). Congress also provided the Secretary with the more specific statutory authority to set by regulation the conditions of nonimmigrant admission. INA section 214(a), 8 U.S.C. 1184(a). These provisions grant the Secretary broad discretion to determine the most effective way to administer the laws. *See Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him"); *see also Arizona* v. *United States,* 132 S. Ct. 2492, 2499 (2012) (noting "broad discretion exercised by immigration officials" under the immigration laws).

More specifically, section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes that employment may be authorized by statute or by the Secretary. *See Arizona Dream Act Coalition* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1050 (5th Cir. 1990) (describing the authority recognized by INA 274A(h)(3) as "permissive" and largely "unfettered"). Thus, the commenters' arguments that DHS lacks authority to grant employment eligibility to H–4 dependent spouses because Congress

---

[22] *See* INA section 214(c)(2)(E), (e)(6); 8 U.S.C. 1184(c)(2)(E), (e)(6).

has not specifically required it by statute are misplaced. The fact that Congress has directed the Secretary to authorize employment to specific classes of aliens (such as the spouses of E and L nonimmigrants) does not mean that the Secretary is precluded from extending employment authorization to other classes of aliens by regulation as contemplated by section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B).[23]

### D. Comments on the Analysis of Executive Orders 12866 and 13563

#### 1. Comments Related to Labor Market Impacts

Of the approximately ten percent of commenters who generally opposed the rule, a majority of those commenters asserted that allowing eligible H–4 dependent spouses to receive employment authorization would have negative economic impacts. Chief among these concerns was the impact of the proposed rule on the U.S. labor market. Many commenters believed that the proposed rule would increase competition for jobs; exacerbate the nation's unemployment rate; drive down wages; and otherwise negatively impact native U.S. workers. A few commenters also suggested that allowing H–4 dependent spouses to enter the labor market would negatively impact highly skilled H–1B nonimmigrants.

DHS appreciates these viewpoints and has carefully considered the potential for negative labor market impacts throughout this rulemaking. DHS affirms its belief expressed in the proposed rule that any labor market impacts will be minimal. As a preliminary matter, this regulatory change applies only to the H–4 dependent spouses of H–1B nonimmigrants who have actively taken certain steps to obtain LPR status. As such, the rule simply accelerates the timeframe by which these spouses are able to enter the U.S. labor market. Importantly, the rule does not require eligible H–4 spouses to submit an application for an EAD, nor does the granting of an EAD guarantee that H–4 spouses will obtain employment. Further, the relatively small number of people affected by the rule limits any impact the rule may have on the labor market. Although DHS, in this final rule, increased its estimate of the number of H–4 dependent spouses who might benefit from the rule, the maximum number of such spouses who could request employment authorization and actually enter the labor market in the initial year (the year with the largest number of potential applicants) represents only 0.1156 percent of the overall U.S. civilian labor force. This increased estimate does not change the Department's conclusion that this rule will have minimal labor market impacts.

Moreover, with respect to the potential that this rule and the policy goals of retaining certain highly skilled H–1B nonimmigrants may cause native-worker displacement and wage reduction, DHS notes that there is a large body of research that supports the findings that immigration of highly skilled workers is beneficial to the U.S. economy and labor market in the long-term. For example, several commenters provided studies that refuted arguments that highly skilled immigrants are used for "cheap labor,"[24] while many others offered evidence that showed the positive effects of immigration, and particularly high-skilled immigration, on the U.S. labor market.[25] These commenters pointed to a Congressional Budget Office report and academic study[26] that showed that immigration generally produces a modest increase in the wages of native-born workers in the long-run, and that any negative economic effects—in the form of wages—are largely felt by other immigrant workers with similar education and skill levels. DHS also notes that the Immigration and Nationality Act's employment-related antidiscrimination provision, enforced by the Department of Justice's Office of Special Counsel for Immigration-Related Unfair Employment Practices, prohibits employment discrimination in hiring, firing and recruiting and referring for a fee based on citizenship status. In general, employers may not reject U.S. workers in favor of nonimmigrant visa holders based on citizenship status. INA section 274B(a)(1)(B), 8 U.S.C. 1324b(a)(1)(B).

From a labor market perspective, it is important to note that there are not a fixed number of jobs in the United States. Basic principles of labor market economics recognize that individuals not only fill jobs, but also stimulate the economy and create demand for jobs through increased consumption of goods and services. On this point, approximately 2,600 commenters thought that the regulation as proposed will stimulate the U.S. economy through the spillover effects associated with dual-income households, thus leading to increased spending throughout the economy, greater investments in real estate, the potential for job creation, and increased tax revenue. Relatedly, other commenters expressed their belief that the rule will bolster U.S. competitiveness, economic strength and innovation. A few commenters noted that the proposal will enhance the ability of U.S. businesses to attract and retain highly skilled immigrants, resulting in potential economic gains to U.S. companies and the U.S. economy.

In addition, commenters also highlighted several social benefits of the proposed rule, including: Family unification; overall family financial security and stability; providing a means for H–4 dependent spouses to be financially independent; and significantly aiding the H–1B nonimmigrant and his or her family in integrating into American culture and communities. DHS appreciates these comments and agrees that the rule will provide economic and social benefits to the H–1B nonimmigrant worker and his or her family as they wait to obtain LPR status.

---

[23] Moreover, in the few instances in which Congress has determined to limit employment authorization for certain classes of aliens, it has done so expressly. *See* INA section 208(d)(2), 8 U.S.C. 1158(d)(2) ("An [asylum] applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum."); INA section 236(a)(3), 8 U.S.C. 1226(a)(3) (restricting employment authorization for aliens who have been arrested and are in removal proceedings unless the alien is a lawful permanent resident "or otherwise would (without regard to removal proceedings) be provided work authorization"); INA section 241(a)(7), 8 U.S.C. 1231(a)(7) (providing that alien who has been ordered removed is ineligible for work authorization unless the Secretary finds that the alien cannot be removed for lack of a country willing to receive the alien or "the removal of the alien is otherwise impracticable or contrary to the public interest").

[24] For example, commenters cited to the following studies in refuting the claim that H–1B workers are a source of cheap labor: Lofstrom, M. & Hayes, J., "H–1Bs: How Do They Stack Up to US Born Workers? IZA Discussion Paper No. 6259" (Dec. 2011), *available at http://ssrn.com/ abstract=1981215;* Rothwell, J. & Ruiz, N. "H–1B Visas and the STEM Shortage: A Research Brief" (May 11, 2013), *available at http://ssrn.com/ abstract=2262872.*

[25] Commenters cited to the following to highlight positive effects of highly skilled immigration: National Foundation for American Policy, "H–1B Visas and Job Creation" (Mar. 2008), *available at http://www.nfap.com/pdf/080311h1b.pdf.*

[26] Commenters cited to the following studies in highlighting the effects of immigration: Congressional Budget Office, "The Economic Impact of S. 744, the Border Security, Economic Opportunity, and Immigration Modernization Act," June 18, 2013, *available at http://www.cbo.gov/ sites/default/files/cbofiles/attachments/44346- Immigration.pdf;* Mathews, D., "No, the CBO Report Doesn't Mean Immigration Brings Down Wages," June 19, 2013, *available at http:// www.washingtonpost.com/blogs/wonkblog/wp/ 2013/06/19/no-the-cbo-report-doesnt-mean- immigration-brings-down-wages/;* Ottaviano, G. &

---

Peri, G., *Rethinking the Effects of Immigration on Wages* (March 2010), *available at http:// economics.ucdavis.edu/people/gperi/site/papers/ rethinking-the-effect-of-immigration-on-wages.*

Finally, a few commenters suggested that allowing H–1B dependent spouses to enter the labor market would negatively impact the job prospects of highly skilled H–1B nonimmigrants. These commenters generally suggested, without providing empirical support, that by allowing H–4 dependent spouses to have an EAD, U.S. employers will prefer to hire such individuals rather than to go through the additional effort of hiring an H–1B nonimmigrant. DHS appreciates these concerns but lacks data on the skillsets or educational levels of H–4 dependent spouses to indicate that they will take jobs that are typically held by highly skilled H–1B nonimmigrants. Nor, as noted above, is the U.S. labor market static; individuals who supply labor also create demand for labor through increased consumption and other spending. The fact that this rule provides employment authorization only to H–4 dependent spouses who are tied to an H–1B nonimmigrant who is sufficiently on the path to LPR status further mitigates the possibility that this rule will cause employers to hire H–4 dependent spouses over H–1B nonimmigrants. DHS anticipates that employers will continue to fully utilize the H–1B program and does not believe that this rule will adversely affect the job prospects of H–1B nonimmigrants.

### 2. Comments on the Volume Estimate and Methodology

Of the ten percent of commenters who opposed the rule, many felt that the Department's estimates of the potential eligible population were too low. Two commenters suggested that DHS employ a different methodology to arrive at the estimated number of likely eligible H–4 dependent spouses. One commenter provided highlighted excerpts of the Yearbook of Immigration Statistics, as published by the DHS Office of Immigration Statistics, containing statistics on individuals who had obtained LPR status under employment-based preference categories. The commenter highlighted the total number of spouses who had adjusted status to lawful permanent residence and the total number of individuals who adjusted to LPR status under the first through third employment-based preference categories. DHS assumes that the commenter was suggesting that DHS simply apply that historical average to estimate the number of H–4 dependent spouses who will be eligible to apply for employment authorization under this rule.

DHS appreciates this response and carefully considered this approach. However, that approach fails to account

for those H–1B nonimmigrants and their families who are currently in the backlog waiting for immigrant visas. Furthermore, that approach would also overstate the likely number of H–4 dependent spouses who would be eligible to apply for employment authorization under this rule. That is because the approach does not account for the proportion of employment-based adjustment applicants who are in H–1B status as compared to those adjusting from another nonimmigrant status. Moreover, not all spouses of H–1B nonimmigrants are currently in H–4 nonimmigrant status. For these reasons, DHS disagrees with the commenters' suggested approach to estimating the volume of H–4 dependent spouses who will be eligible to apply for employment authorization under this rule. Estimating the eligible population by taking into account the backlog of H–1B nonimmigrants who have approved I–140 petitions but are unable to adjust status due to a lack of available immigrant visas, along with the estimated future flow of newly eligible spouses, is a more accurate methodology for estimating the number of H–4 dependent spouses whom this rule may impact.

DHS has carefully considered ways to estimate the volume of potential H–4 dependent spouses who will be eligible to apply for employment authorization under this rule. Based on comments received that questioned whether the estimated volume of such spouses was too low, DHS reviewed and updated its estimates in preparing this final rule. DHS acknowledges that there is some uncertainty in this analysis, but believes its methodology offers the best available estimates.

Although the estimate of H–4 dependent spouses who could be eligible to apply for employment authorization increased in this final rule,[27] the findings and impacts of the rule remain essentially the same. In the first year, if all 179,600 H–4 dependent spouses who DHS estimates may be eligible under the rule were to enter the U.S. labor market, that population would still constitute a small fraction of one percent of the overall U.S. civilian workforce. And many of these H–4 dependent spouses will be able to seek employment even without this rule, as immigrant visa numbers become available and H–1B nonimmigrant families become eligible to file for adjustment of status. As noted previously, this rule simply accelerates

the timeframe in which certain H–4 dependent spouses are able to enter the labor market.

Notwithstanding the revised volume estimates, the basis for this rule, as discussed throughout the proposed rule and this final rule, remains accurate. DHS is taking this action to further incentivize H–1B nonimmigrants and their families to continue to wait and contribute to the United States through an often lengthy waiting period for an immigrant visa to become available. DHS expects that these actions will also benefit U.S. employers by decreasing the labor disruptions that occur when H–1B nonimmigrants abandon the permanent resident process.

### 3. Comments on Specific Costs and Benefits Discussed in the Analysis

One commenter believed that the proposed rule overstated the potential costs and understated the benefits of the rule. Specifically, the commenter alleged that DHS' estimates for cost per applicant were exaggerated because DHS included the monetized opportunity costs associated with applying for employment authorization. That same commenter also believed that DHS failed to stress the economic and social benefits of the rule. Another commenter believed that the proposed rule failed to acknowledge the economic losses incurred by the current inability of H–4 dependent spouses to work.

DHS has carefully considered these comments and does not believe that the potential costs and benefits were either under- or overestimated. In the proposed rule, DHS highlighted the economic benefits to both the H–4 dependent spouse and the H–1B family unit that would accrue from additional income. In addition, in the proposed rule DHS discussed the societal integration benefits that would accrue to the H–4 dependent spouse and the H–1B family that would come from the spouse's ability to participate in the U.S. labor market. DHS disagrees with comments that the application costs were inflated because we assigned a valuation to the H–4 dependent spouse's time. DHS acknowledged in the proposed rule that these spouses do not currently work. DHS decided to use the minimum wage as a reasonable proxy to estimate the opportunity costs of their time. DHS disagrees with the questionable notion that just because these spouses are not currently able to participate in the labor market, they do not face opportunity costs and/or assign valuation in deciding how to allocate their time. As such, DHS utilized a reasonable approach in assigning value to their time.

---

[27] Please refer to Section IV.C. of this document for a deeper discussion of the final estimate of the impact of this rule.

*E. Comments on the Application for Employment Authorization*

Over 180 commenters raised issues related to employment authorization, including filing procedures, premium processing, validity periods, renewals, evidentiary documentation, concurrent filings for extension of stay/change of status, automatic extensions of employment authorization, and filing fees. DHS carefully considered these comments and addresses them below.

1. Streamlined or Modernized Filing Procedures

Commenters urged DHS and USCIS to utilize streamlined or modernized filing procedures for Applications for Employment Authorization (Forms I–765) submitted by H–4 dependent spouses. USCIS is moving from a paper-based application and adjudication process to an electronic one through the development of an Electronic Immigration System ("USCIS ELIS"). When complete, USCIS ELIS will allow customers to electronically view their applications, petitions or requests, receive electronic notification of decisions, and electronically receive real-time case status updates. This is a global effort affecting all USCIS benefit request programs and, therefore, is outside the scope of this rulemaking. DHS will notify the public when USCIS is prepared to begin accepting electronic filings of Applications for Employment Authorization by eligible H–4 dependent spouses. DHS will begin accepting Applications for Employment Authorization (Forms I–765) submitted by certain H–4 dependent spouses on the effective date of this rule, May 26, 2015. This effective date is intended to prevent an overlap of H–1B cap season and an initial filing surge of Forms I–765 under 8 CFR 274a.12(c)(26). As a result, USCIS will be able to implement this program in a manner that will avoid prolonged delays of processing other petition and application types, in particular those H–1B petitions seeking an FY 2016 cap number. It will also allow USCIS to maintain excellent customer service for all USCIS stakeholders, including H–1B employers, H–1B nonimmigrants and their families.

2. Employment Authorization Document (Form I–766) Validity Period

Nine commenters requested that DHS issue the Employment Authorization Document (EAD) (Form I–766) with a validity period that matches the H–4 dependent spouse's status. Related to this request, another commenter requested a three-year validity period to match the H–1B and H–4 authorized periods of admission. DHS agrees with commenters that to reduce possible cases of unauthorized employment, the EAD validity period should match the H–4 dependent spouse's length of authorized admission. Thus, in issuing an EAD to an otherwise eligible H–4 dependent spouse, DHS generally will authorize a validity period that matches the H–4 spouse's remaining authorized period of admission, which may be as long as three years in cases not involving DOD-related services. This policy will ensure that USCIS does not grant employment authorization to an H–4 dependent spouse who is not eligible for the benefit. It will also likely reduce the number of times that H–4 dependent spouses may need to request renewal of their employment authorization.

One commenter requested that DHS issue a probationary EAD with a six-to twelve-month validity period, at the end of which the H–4 dependent spouse would have to prove that he or she is working legally and paying taxes. DHS declines to adopt this suggestion. The EAD that DHS will issue H–4 dependent spouses pursuant to this rule is evidence of employment authorization to lawfully work in the United States for any employer. DHS is not aware of any risk factors—such as fraud, criminal activity, or threats to public safety or national security—associated with H–4 dependent spouses as a whole that would support imposing a six-month validity period. Moreover, the administrative burden resulting from additional adjudications and the possibility of gaps in employment authorization, together with the burdens this limitation would place on the H–4 dependent spouse, make imposing a six-month validity period unreasonable.

Regarding the suggestion that H–4 dependent spouses should be required to prove that they pay taxes as a condition of obtaining or maintaining work authorization, DHS does not require proof of payment of taxes for any of the classes of aliens eligible to file the Application for Employment Authorization. As a preliminary matter, issuance of an EAD does not require an H–4 dependent spouse to work. Nor does issuance of the EAD guarantee that an H–4 dependent spouse will find employment and therefore be required to pay taxes on any income earned through such employment. Moreover, DHS is not aware of any evidence, and the commenter provided none, indicating that H–4 dependent spouses are likely to engage in tax evasion or other tax-related unauthorized activity if they are provided employment authorization pursuant to this rule. At the same time, USCIS would face significant operational burdens if it were required to collect and verify tax documents for each H–4 dependent spouse seeking employment authorization under this rule.

3. EAD Renewals

Five commenters requested that DHS allow H–4 dependent spouses to apply for EAD renewals up to six months in advance, in part to align with the time frame permitted for filing of the Petition for a Nonimmigrant Worker (Form I–129) to extend the H–1B nonimmigrant's status. As explained below in Section III.E.5, DHS will permit those H–4 dependent spouses seeking to concurrently file their Form I–765 application with their Application to Extend/Change Nonimmigrant Status (Form I–539), and if applicable their spouses' Form I–129 petition, to file up to six months in advance of the requested start date. Please note, however, that USCIS will not adjudicate the Form I–765 application until a determination has been made on the underlying Form I–539 application and/or Form I–129 petition. The time at which an H–4 dependent spouse will be eligible to apply for an EAD renewal will vary, as it is dependent on actions taken by the H–1B nonimmigrant, including actions to maintain and extend his or her H–1B status, as well as the H–4 dependent spouse's status.

4. Acceptable Evidentiary Documentation

Several commenters submitted comments related to the Application for Employment Authorization (Form I–765) and to the evidence required to be submitted by applicants with the application. One commenter asked DHS to make changes to assist applicants in obtaining acceptable evidentiary documentation. This commenter requested that USCIS provide the H–4 dependent spouse, upon request, with his or her immigration case related paperwork, such as the original underlying petition. Another commenter requested that DHS provide clarification about the evidentiary standard relating to AC21 eligibility.

In conjunction with the proposed rule, DHS proposed conforming revisions to the Form I–765 application to add H–4 dependent spouses described in this rule to the classes of aliens eligible to file the form. Concurrent with publication of this final rule, DHS has made further changes to the form. DHS has made clarifying changes to improve readability of the form instructions describing the types of

documentary evidence that may be submitted in support of the application. As further discussed in Part III.F.1 relating to marriage fraud concerns, DHS also has revised the regulatory text in 8 CFR 214.2(h)(9)(iv) and the form instructions to clarify that supporting documentary evidence includes proof of marriage. Finally, DHS has revised the form itself to include a check box that self-identifies the applicant as an eligible H–4 dependent spouse. DHS believes that adding the check box for H–4 dependent spouses to the form will aid in the efficient processing of the form by facilitating USCIS's ability to match the application with related petitions that are integral to determining the H–4 dependent spouse's eligibility for employment authorization, as discussed below in Part III.E.5.

DHS appreciates the concerns regarding the difficulty that some applicants may face in obtaining the necessary documentation to support the Form I–765 application. DHS's revisions in this final rule to 8 CFR 214.2(h)(9)(iv) and the instructions to Form I–765 provide for flexibility in the types of evidentiary documentation that may be submitted by applicants. If the H–4 dependent spouse cannot submit the primary evidence listed in the form instructions, he or she may submit secondary evidence, such as an attestation that lists information about the underlying Form I–129 or Form I–140 petition, so that an adjudicator may be able to match the Form I–765 application with the underlying petition(s). Such information may include the petition receipt number, the beneficiary's name and/or the petitioner's name. If secondary evidence does not exist or cannot be obtained, an applicant may demonstrate this and submit two or more sworn affidavits by non-parties who have direct knowledge of the relevant events and circumstances. This approach should address the situation where the H–4 dependent spouse is unable to access the immigration paperwork relating to the H–1B nonimmigrant. Notwithstanding the option for submitting secondary evidence, if an applicant prefers to obtain the primary evidence listed in the form instructions from USCIS for submission with the Form I–765, the applicant may make a request for documents maintained by USCIS by following established procedures for making such requests under the Freedom of Information Act (FOIA). *See http://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia/how-file-foia-privacy-act-request/how-file-foiapa-request.* DHS

declines to establish new procedures for making document requests that are applicable only to applicants who are H–4 dependent spouses. The established FOIA process for making document requests promotes fairness, uniformity, and administrative efficiency, while ensuring that privacy protections are enforced.

Finally, in response to the comment on the evidentiary standard that will apply to H–4 dependent spouses, DHS notes that such spouses will have to meet the same burden of proof (*i.e.*, preponderance of the evidence) as other applicants for employment authorization. *See, e.g. , Matter of Chawathe,* 25 I. & N. Dec. 369, 376 (AAO 2010) (describing "preponderance of the evidence" standard).

5. Concurrent Filings

A couple of commenters requested that DHS allow eligible H–4 dependent spouses to file the Application for Employment Authorization (Form I–765) concurrently with an Immigrant Petition for Alien Worker (Form I–140) or an Application to Extend/Change Nonimmigrant Status (Form I–539). For the reasons that follow, DHS agrees to allow Form I–765 to be concurrently filed with Form I–539, but not with Form I–140.

DHS currently permits an H–4 dependent spouse to file Form I–539 concurrently with a Petition for a Nonimmigrant Worker (Form I–129) filed on behalf of the H–1B nonimmigrant. This provides several efficiencies, as the status of the H–4 dependent spouse is based on the resolution of the H–1B nonimmigrant's Form I–129 petition and both forms may be processed at the same USCIS locations. For similar reasons, DHS has decided to permit H–4 dependent spouses to file Applications for Employment Authorization (Forms I–765) concurrently with certain related benefit requests: Applications to Extend/Change Nonimmigrant Status (Forms I–539) and, if applicable, with Petitions for a Nonimmigrant Worker (Form I–129). As noted previously, DHS has decided to issue EADs to eligible H–4 dependent spouses with validity dates that match their authorized periods of admission. That period of admission is determined as part of the Form I–539 application adjudication, which, in turn, is largely dependent on the H–1B nonimmigrant's period of admission determined as part of the Form I–129 adjudication. Because adjudication of those forms are interrelated, and because they are submitted to the same USCIS locations, DHS has determined

that it is reasonable to allow those forms to be concurrently filed.

DHS, however, cannot extend the courtesy of concurrent filing with Form I–140 immigrant visa petitions filed on behalf of the H–1B nonimmigrant. Presently, Forms I–129 and I–539 are not processed at the same USCIS locations in which Form I–140 petitions are adjudicated. As a result, each form must be filed separately at the USCIS Service Center location having jurisdiction over the relevant form. Additionally, determining the spousal relationship between the H–1B nonimmigrant and the H–4 dependent spouse is not a necessary part of the adjudication of the Form I–140 petition.[28] To permit concurrent filing of Form I–765 with Form I–140 would undermine DHS' efforts to facilitate efficient processing of both benefit requests.

DHS also notes that it cannot adjudicate a Form I–765 filed by an H–4 dependent spouse until the Department has made a determination regarding the H–1B nonimmigrant's eligibility for H–1B status under sections 106(a) and (b) of AC21 or until a Form I–140 petition has been approved. Prior to adjudicating such Form I–765, DHS must also make a determination that the H–4 dependent spouse remains eligible for H–4 status. As such, DHS amends the current rule to clarify that the 90-day clock specified in 8 CFR 274a.13(d) authorizing DHS to issue interim employment authorization if the Form I–765 is not adjudicated within 90 days is not triggered until necessary eligibility determinations have been made on the underlying nonimmigrant status for the H–1B nonimmigrant and the H–4 dependent spouse. If the H–4 dependent spouse's employment authorization is based on a favorable eligibility determination relating to the nonimmigrant status of either the H–1B nonimmigrant or the H–4 dependent spouse, the 90-day clock is triggered when that eligibility determination is made. Alternatively, if employment authorization is based on a favorable eligibility determination relating to the nonimmigrant status of both the H–1B nonimmigrant and the H–4 dependent spouse, the 90-day clock is not triggered until an eligibility determination is made on both. Accordingly, DHS is making conforming amendments to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) in this final rule and the instructions to Form I–765. These amendments permit H–4

---

[28] Unlike the I–140 adjudication, adjudication of Form I–539 requires evidence of such spousal relationship.

dependent spouses under this rule to concurrently file their Form I–765 with related benefit requests, specified in the form instructions to include their Application to Extend/Change Nonimmigrant Status (Form I–539), and if applicable, their spouse's Form I–129 petition. As a result of the amendments, the 90-day clock described in 8 CFR 274a.13(d) would also not start until after a determination has been made on the underlying H–1B status, H–4 status, or both.

6. Premium Processing

Three commenters requested premium processing service for H–4 dependent spouses seeking to file Applications for Employment Authorization (Forms I–765). These commenters highlighted the benefit that the extra premium processing fees could bring to USCIS. DHS appreciates these comments, but has decided not to extend premium processing to Form I–765 applications filed by H–4 dependent spouses in conjunction with this rulemaking. DHS currently offers premium processing service for certain employment-based petitions and applications, including H–1B, L, and E nonimmigrant worker petitions and certain EB–1, EB–2 and EB–3 immigrant visa petitions. Extending premium processing to Form I–765 applications, however, presents operational concerns and would be inconsistent with procedural realities for USCIS. The agency, for example, would be unable to comply with premium processing requirements on any Form I–765 application that is contingent on the adjudication of a concurrently filed Application to Extend/Change Nonimmigrant Status (Form I–539). Due to these and other operational concerns, DHS will not extend premium processing service to Form I–765 applications, including applications filed by H–4 dependent spouses under this rule at this time.

7. Automatic Extensions of Work Authorization

One commenter requested an automatic extension of work authorization for 240 days after an H–4 dependent spouse's EAD expires. DHS, however, is concerned with improperly granting employment authorization to an H–4 dependent spouse who is ineligible for it. As the validity of the H–4 dependent spouse's eligibility for employment authorization will be tied to his or her authorized period of admission, automatic extensions of employment authorization without review of the underlying extension of stay applications for the H–

1B nonimmigrant and H–4 dependent spouse could result in employment authorization being extended to individuals who will eventually be determined ineligible for this benefit. DHS thus declines to adopt this recommendation.

To avoid any potential gaps in employment authorization when seeking an extension of employment authorization, DHS recommends that the H–4 dependent spouse timely file all necessary applications. DHS's policy to permit concurrent filing of Forms I–539, I–129, and I–765 should also help H–4 dependent spouses avoid gaps in employment authorization, as these forms may be filed concurrently up to six months in advance of date of need.

8. Filing Fees

Several commenters submitted remarks on the filing fees without expressing support for or opposition to the fees. Additionally, some commenters asserted that USCIS would benefit from an increased volume of fees, and another commenter requested that the U.S. Government help pay for immigration-related application fees.

DHS is bound by statutes and regulations governing its collection of fees in connection with immigration benefit requests. *See* INA section 286(m)–(p), 8 U.S.C. 1356(m)–(p); 8 CFR 103.7. DHS generally must set application fees at a level that enables it to recover the full costs of providing services, including the costs of similar services provided without charge to certain other applicants. But DHS may offer assistance with respect to immigration-related application fees in the form of fee waivers. Discretionary fee waivers are provided on a case-by-case basis when the party requesting the benefit is unable to pay the prescribed fee and the waiver request is consistent with the underlying benefit being requested. *See* 8 CFR 103.7(c)(1).

For the reasons that follow, DHS believes that it would be unlikely that H–4 dependent spouses would be unable to pay the prescribed fee for the Application for Employment Authorization (Form I–765). By definition, H–4 dependent spouses are married to H–1B nonimmigrants who are employed and earning a salary of at least the prevailing wage in their occupation. H–4 dependent spouses will thus generally be unable to establish that they cannot pay the fee prescribed for the Form I–765 application. For these reasons, DHS declines to establish a general fee waiver for the Form I–765 filed by eligible H–4 dependent spouses under this rule. *See* 8 CFR 103.7(d). USCIS

will consider fee waiver requests on a case-by-case basis. See 8 CFR 103.7(c)(3)(viii). As noted above, given the nature of the H–1B nonimmigrant's employment, a showing of inability to pay as required by the regulation would be the exception rather than the rule.

9. Possible Restrictions on EADs Issued to H–4 Dependent Spouses

A few commenters recommended imposing certain restrictions on employment authorization issued to H–4 dependent spouses, such as: Creating a cap on the number of EADs that could be granted to H–4 dependent spouses; prohibiting the H–1B nonimmigrant and H–4 dependent spouse from having the same employer or working in the same occupation; prohibiting employers from replacing an American veteran with an H–1B nonimmigrant; restricting H–4 work authorization to certain employers; creating a National Registry of Jobs that H–4 dependent spouses would be allowed to apply for; forcing individuals to surrender their foreign passports when they obtain U.S. citizenship as a way of proving allegiance; allocating EADs in a proportionate manner based on nationality; and requiring H–4 dependent spouses to pay for training programs for U.S. citizens.

DHS declines to incorporate the suggested restrictions into this final rule. A primary purpose of this rule is to assist U.S. employers in retaining certain highly skilled H–1B nonimmigrants. Allowing certain H–4 dependent spouses to apply for employment authorization removes a disincentive that currently undermines this goal. Imposing the suggested restrictions, such as numerical caps or per-country quotas, would limit the effectiveness and purpose of this rule. Additionally, DHS believes that EADs provide inherent protections that mitigate the risk of abuse and exploitation. Because these EADs may be used to work for any employer, workers are free to find new employment at any point during the EAD's validity, including if they are dissatisfied with their pay or working conditions. Finally, DHS reiterates that the individuals being provided employment authorization under this rule belong to a class of aliens that is already likely to enter the U.S. labor market with EADs. In sum, DHS does not believe that extending eligibility for employment authorization to H–4 dependent spouses will lead to the broad exploitation of EADs.

## 10. Circular EADs

One commenter noted that this rule could lead to "circular EADs," whereby spouses who are both eligible for H–1B status may switch status (H–1B to H–4 and vice versa) so that one spouse may maintain an EAD at all times. This commenter conveyed the concern that H–1B nonimmigrants might initiate the primary steps towards permanent residence, then switch back and forth between H–1B and H–4 statuses to stay in the United States forever.

DHS acknowledges that H–1B nonimmigrants will be able to change status, as permitted by law. DHS believes it is extremely unlikely, however, that an H–1B nonimmigrant will seek to remain in the United States forever by switching between nonimmigrant statuses as a result of this rule. The rule is intended to benefit those H–1B nonimmigrants who are already well on the path to lawful permanent residence and, therefore, seek to remain in the United States permanently on this basis. Although the waiting period for an immigrant visa may be lengthy, there is an end date as indicated on the Department of State's Visa Bulletin. So any incentive to switch between statuses indefinitely would be weighed by the nonimmigrant against the benefits of obtaining LPR status, including the ability to work in the United States without being tied to a specific employer and the ability of the H–4 dependent spouse to work without needing to periodically apply and pay for an EAD. Moreover, with lawful permanent residency, an individual is eligible to apply for U.S. citizenship, generally after five years, and to petition for relatives to immigrate to the United States, benefits that are not available to persons with H–1B or H–4 status.

## 11. Form I–765 Worksheets

One commenter expressed concern that H–4 dependent spouses would need to demonstrate economic need for employment because of the reference in the Paperwork Reduction Act section of the proposed rule to the Form I–765 Worksheet (Form I–765WS). DHS is clarifying that H–4 dependent spouses are not required to establish economic need for employment authorization. H–4 dependent spouses are not required to submit Form I–765WS with their Application for Employment Authorization (Form I–765). DHS has corrected this error in the form instructions to the Application for Employment Authorization (Form I–765).

## 12. Other Related Issues

Several commenters sought guidance on issues tangential to the issuance of employment authorization to H–4 dependent spouses. For example, one commenter asked for clarification on the type of status that an H–4 dependent spouse will receive when readmitted into the United States after traveling abroad. Another commenter wanted to know if an H–4 dependent spouse could work from home in the United States for his or her native country employer on the native country salary. Because this rulemaking is limited to extending eligibility for employment authorization to H–4 dependent spouses and does not make changes to admission requirements or conditions of employment authorization, DHS considers these questions outside the scope of this rulemaking. Please consult the USCIS Web site at *www.uscis.gov* or contact USCIS Customer Service at 1–800–375–5283 for current guidance.

Finally, several commenters requested clarification about EAD processing and adjudication times. USCIS posts current processing times on its Web site and encourages interested stakeholders to consult *www.uscis.gov* if they have questions about adjudication times.[29]

### F. Fraud and Public Safety Concerns

Over 100 commenters raised concerns related to fraud and public safety, including issues related to resume fraud, marriage fraud, participation by individuals with criminal records, unauthorized employment, and employer abuse in the H–1B program. Strict consequences are already in place for immigration-related fraud and criminal activities, including inadmissibility to the United States, mandatory detention, ineligibility for naturalization, and removability. *See, e.g.,* INA sections 101(f), 212(a)(2) & (a)(6), 236(c), 237(a)(1)(G) & (a)(2), 318; 8 U.S.C. 1101(f), 1182(a)(2) & (a)(6), 1226(c), 1227(a)(1)(G) & (a)(2), 1429. Nevertheless, the Department welcomes suggestions to further prevent fraud and protect public safety in the implementation of its programs. The Department carefully considered these comments and addresses them below.

### 1. Falsifying Credentials and Marriage Fraud

Over 100 commenters anticipated that certain H–4 dependent spouses would

falsify their resumes or qualifications or marry for immigration purposes. With respect to potential resume fraud, DHS notes that eligibility for employment authorization for H–4 dependent spouses will not depend in any way on their professional or educational qualifications or their resumes. It will be up to potential employers to verify the qualifications of H–4 dependent spouses they may be seeking to hire. This concern is therefore outside the scope of this rulemaking.

With respect to marriage fraud, DHS is revising 8 CFR 214.2(h)(9)(iv) to clarify that establishing eligibility for employment authorization under this rule requires evidence of the spousal relationship between the H–4 dependent spouse and the H–1B nonimmigrant. DHS is also making conforming revisions to the form instructions to Form I–765 to require that H–4 dependent spouses submit proof of marriage to the H–1B nonimmigrant with the form. USCIS officers are specially trained to recognize indicia of fraud, including marriage fraud and falsified documents, and review other immigration petitions for these circumstances as well. If such fraud is suspected, the relevant USCIS officer may refer the case to the local fraud unit for further inquiry. USCIS may also submit leads related to significant fraud to U.S. Immigration and Customs Enforcement for criminal investigation. DHS believes that current fraud-detection training, mechanisms for detecting and investigating fraud, and fraud-related penalties are sufficient for deterring and detecting marriage fraud in this context.

### 2. Prohibition Related to Felony Charges and Convictions

Two commenters requested a prohibition against participation by anyone charged with, awaiting trial for, or convicted of a felony. DHS appreciates the commenters' concerns over public safety and notes that the eligibility for employment authorization extended by this rule to certain H–4 dependent spouses is discretionary. DHS officers will consider any adverse information—including criminal convictions, charges, and other criminal matters—on a case-by-case basis.

### 3. Unauthorized Employment

A few commenters thought that this rule would help curb any unauthorized employment in which H–4 dependent spouses are currently engaging. Additionally, several commenters raised concerns that this rule could encourage illegal immigration and increase the number of undocumented workers in

---

[29] For example, as of January 26, 2015, the processing time at the California Service Center (CSC) for the Application for Employment Authorization, Form I–765, ranged from 3 weeks to 3 months depending on the basis for the Form I–765. *See https://dashboard.uscis.gov/index.cfm?formtype=12&office=2&charttype=1.*

the United States. DHS disagrees that this rule may encourage illegal immigration. DHS believes that this rule will provide options to certain H–4 dependent spouses allowing them to engage in authorized employment. Individuals eligible for employment authorization under this rule must have been granted H–4 status and must remain in such lawful status before they can be granted employment authorization pursuant to this rule. An H–4 dependent spouse who engaged in unauthorized employment would not have been maintaining lawful H–4 status and therefore would be ineligible for this new benefit. Therefore, the Department does not believe that this rule will incentivize unauthorized employment or any other illegal activities.

**4. Employer Abuse of H–1B Nonimmigrants and H–4 Dependent Spouses**

A number of commenters raised concerns over potential employer abuse of H–1B nonimmigrants and H–4 dependent spouses. These concerns included failure to pay prevailing wages and demanding long hours without adequate compensation. DHS appreciates these concerns and maintains that employers must not intimidate, threaten, restrain, coerce, blacklist, discharge or otherwise discriminate or take unlawful action against any employee. Violators face severe penalties. *See* INA 212(n)(2)(C)(iv), 8 U.S.C. 1182(n)(2)(C)(iv). DHS takes seriously any potential abuse of H–1B nonimmigrants and H–4 dependent spouses and encourages any workers who feel that their rights have been violated by their employers to file a complaint with DOL or another appropriate entity, such as the Equal Employment Opportunity Commission.[30] Any concerns raised by commenters regarding H–1B nonimmigrants and worker protections in the H–1B program, however, are outside the scope of this rulemaking.

*G. General Comments*

Over 300 commenters submitted feedback about general immigration issues. A few commenters expressed support for or opposition to immigration. Comments ranged from requesting DHS to discontinue all types

of immigration to underscoring the need for comprehensive reform of the immigration laws to general support of immigration. DHS is charged with administering the immigration laws enacted by Congress, and only Congress can change those laws. The comments described above are therefore outside the scope of this rulemaking. DHS, however, is committed to comprehensive immigration reform that creates a workable system that strengthens border security, improves the U.S. economy, unites families, and preserves national security and public safety.

Additionally, fewer than a dozen commenters objected to the ability of non-U.S. citizens to submit comments on the proposed rule. As noted in that rule, DHS welcomed comments from all interested parties and did not place any restrictions based on citizenship or nationality.

*H. Modifications to the H–1B Program and Immigrant Visa Processing*

**1. H–1B Visa Program**

**i. Circumventing the H–1B Cap**

A few commenters suggested that employers may try to exploit this regulation by using it to avoid the H–1B numerical cap and hiring more foreign specialty occupation workers than permitted by the statute. As a preliminary matter, DHS cannot agree with the premise that hiring an individual with general (rather than employer-specific) employment authorization constitutes circumvention of the cap on H–1B nonimmigrants. This is particularly so when such employment authorization is contingent on being married to an individual who was selected in the H–1B program and is subject to the cap. Moreover, commenters provided no evidence or data that would support the contention that this rule will be used by employers and H–4 dependent spouses to circumvent the cap. For example, DHS does not have, and commenters did not provide, data on the skillsets or educational levels of H–4 dependent spouses to indicate that they will generally qualify for jobs that are typically held by highly skilled H–1B nonimmigrants. Finally, it is unlikely that highly skilled individuals who could independently qualify under the H–1B program will instead opt to enter the United States as H–4 dependent spouses and subject themselves to lengthy periods of unemployment with the intent to circumvent the H–1B cap.  As noted previously, this rule provides eligibility for employment authorization only to those H–4 dependent spouses

who are married to certain H–1B nonimmigrants who have taken substantial steps, generally taking many years, towards obtaining permanent residence. Such an individual may eventually obtain a job for which an H–1B nonimmigrant could possibly have qualified, but the Department does not consider this a circumvention of the H–1B cap.

**ii. Elimination or Modification of the H–1B program**

More than a dozen commenters requested that the H–1B program be terminated. An approximately equal number of commenters requested that the H–1B visa cap be eliminated or modified in various ways. Several commenters requested that DHS increase the number of visas available, other commenters asked DHS to eliminate the H–1B visa cap, while others recommended decreasing the number of visas available.

DHS cannot address the commenters' suggestions in this rulemaking. The H–1B program is required by statute, which also sets the current cap on H–1B visa numbers. Congressional action is thus required to address the commenters' concerns, as the Secretary does not have the authority to eliminate the program or change the visa cap without congressional action. The suggested changes are thus outside the scope of this rulemaking.

Additionally, one commenter requested that DHS allow for more flexible filing times for H–1B visas. This request would require DHS to amend its H–1B regulations, which currently provide that an H–1B petition may not be filed or approved earlier than six months before the date of actual need for the beneficiary's services. *See* 8 CFR 214.2(h)(9)(i)(B). This rulemaking, however, does not make substantive changes to the H–1B program or its regulations. The request is thus outside the scope of this rulemaking.

**iii. More Flexible Change of Status From H–1B to H–4**

One commenter requested a modification of the H–1B program to allow a family member who has been in the United States for more than five years to choose between H–1B and H–4 status. To some extent, H–1B nonimmigrants currently have this option. An H–4 dependent spouse may seek classification as an H–1B nonimmigrant if an employer files a petition on his or her behalf. As long as one of the spouses maintains H–1B status, the other is eligible for H–4 status. However, the underlying H–1B status is connected to the need of a U.S.

---

[30] An individual can submit a Nonimmigrant Worker Information Form, Form WH–4, with DOL. This form was authorized by the American Competitiveness and Workforce Improvement Act (ACWIA) of 1998. *See* INA sections 212(n)(2)(G), 8 U.S.C. 1182(n)(2)(G). It is available on-line at *http://www.dol.gov/whd/forms/wh-4.pdf.*

employer. To the extent that the commenter is suggesting a change to this requirement such that both spouses could be present in the United States in H–4 status, such a change would require congressional action and therefore, is beyond the scope of this rulemaking.

### iv. Applying for H–1B Status and Cap Exemption

One commenter recommended that H–4 dependent spouses be allowed to apply for H–1B visas and be exempt from the cap. This final rule does not prohibit H–4 dependent spouses from seeking and obtaining H–1B status. Once an H–4 spouse seeks to change to H–1B status, he or she is subject to annual limitations on H–1B nonimmigrants. Only Congress can exempt groups of individuals from the statutory H–1B numerical limitations. This request is therefore beyond the scope of this rulemaking.

### v. Dependents of G Principal Nonimmigrants

One commenter requested that DHS change its G visa regulations to allow dependents of principal G visa holders to more freely obtain a different visa classification (such as H–1B classification). Such a change is outside the scope of this rulemaking.

### 2. Immigrant Visa Processing and Adjustment of Status

Over 30 commenters requested the elimination of the worldwide quotas for immigrant visas.[31] One commenter requested allowing the submission and receipt of applications for adjustment of status when visas are not available, and another requested that the rule include provisions to expedite the permanent residence process for the EB–2 and EB–3 preference categories. Several commenters requested that USCIS grant EADs to LPR applicants while they wait for their immigrant visas. Another commenter requested that USCIS grant one skilled worker visa per eligible family unit (rather than per each individual family member), for the purpose of reducing backlogs. One commenter requested that USCIS establish a procedure by which those in the process of seeking LPR status could "pre-register" their intention to apply to adjust status.

DHS appreciates feedback from the public regarding possible changes to the immigration laws and the system for obtaining LPR status. DHS, however, will not respond to these comments as they do not address changes to the regulations made by this rulemaking and are therefore outside the scope of this rulemaking.

### I. H–1B Nonimmigrant's Maintenance of Status

Several commenters asked for more information about the effect that an H–1B nonimmigrant's loss of employment or change of employer would have on the H–4 dependent spouse's employment authorization. As stated in the proposed rule, the H–4 dependent's status is tied to the H–1B nonimmigrant's status. Thus, if the H–1B nonimmigrant fails to maintain status, the H–4 dependent spouse also fails to maintain status and would therefore no longer be eligible for employment authorization. Under current regulations, DHS may seek to revoke employment authorization if, prior to the expiration date of such authorization, any condition upon which it was granted has not been met or no longer exists. *See* 8 CFR 274a.14(b).

### J. Environmental Issues

In the proposed rule, DHS requested comments relating to the environmental effects that might arise from the proposed rule. Nine commenters submitted related feedback, noting general environmental issues that come with an increased population. DHS appreciates these comments but notes that the vast majority of the population immediately affected by the rule is already in the United States and has been here for a number of years while waiting for their immigrant visas. The H–4 dependent spouses affected by this rule generally will eventually be able to seek employment even without this rule, as immigrant visa numbers become available and H–1B nonimmigrant families become eligible to file for adjustment of status. As noted previously, this rule simply accelerates the timeframe in which these individuals are able to enter the labor market.

### K. Reporting

A few commenters requested more information about how DHS will monitor the outcome of the final rule, such as by tracking EAD adjudications for H–4 dependent spouses and publishing annual reports. DHS maintains statistics on all immigration benefit programs and will monitor H–4 EAD adjudications and include relevant information in its annual reports in accordance with current reporting protocols.

### L. Implementation

Several hundred commenters requested that the rule be implemented as soon as possible. One commenter requested that a sunset provision be included in the rule. At the end of the sunset period, the commenter recommended that DHS evaluate the program, and, if the results are positive, expand it. DHS believes that a general sunset provision would not be practicable or fair as it would require DHS to provide different periods of employment authorization to H–4 dependent spouses depending on when they become eligible to apply. Further, DHS considers a sunset provision to be at odds with the rule's purpose, which is to retain highly skilled workers who often have a multi-year wait before being eligible to apply for permanent residence.

With respect to implementation of this rule, DHS must consider the 30-day effective date requirement at 5 U.S.C. 553(d) as well as USCIS's implementation requirements. Based on these factors, DHS has decided that this rule will be effective 90 days from the date of publication, May 26, 2015.

### IV. Statutory and Regulatory Requirements

#### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The value equivalent of $100,000,000 in 1995 adjusted for inflation to 2014 levels by the Consumer Price Index for All Urban Consumers is $155,000,000.

This rule does not exceed the $100 million expenditure in any one year when adjusted for inflation ($155,000,000 in 2014 dollars), and this rulemaking does not contain such a mandate. The requirements of Title II of the Act, therefore, do not apply, and DHS has not prepared a statement under the Act.

---

[31] Section 201(d) of the INA, 8 U.S.C. 1151(d), prescribes the worldwide level of employment-based immigrants. Section 203(b) of the INA, 8 U.S.C. 1153(b), prescribes the preference allocation for employment-based immigrants. Section 202 of the INA, 8 U.S.C. 1152, prescribes per country levels for family-sponsored and employment-based immigrants.

*B. Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more, a major increase in costs or prices, or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 and 13563*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule has been designated a "significant regulatory action" under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget.

DHS is amending its regulations to extend eligibility for employment authorization to certain H–4 dependent spouses of H–1B nonimmigrants who either: (1) Are principal beneficiaries of an approved Immigrant Petition for Alien Worker (Form I–140); or (2) have been granted H–1B status under sections 106(a) and (b) of AC21.

1. Summary

Currently, USCIS does not issue work authorization to H–4 dependent spouses. To obtain work authorization, the H–4 dependent spouse generally must have a pending Application to Register Permanent Resident Status or Adjust Status or have changed status to another nonimmigrant classification that permits employment. AC21 provides for an authorized period of admission and employment authorization beyond the typical six-year limit for H–1B nonimmigrants who are seeking permanent residence. This final rule will extend eligibility for employment authorization to H–4 dependent spouses where: the H–1B nonimmigrant is the principal beneficiary of an approved Form I–140 petition; or the H–1B nonimmigrant has been granted status pursuant to sections 106(a) and (b) of AC21.

DHS has updated its estimate of the population of H–4 dependent spouses who will be impacted by the rule. DHS estimates the current population of H–4 dependent spouses who will be eligible for employment authorization could initially be as many as 179,600 after taking into account the backlog of H–1B nonimmigrants who have approved I–140 petitions, or who are likely to have such petitions approved, but who are unable to adjust status because of the lack of immigrant visas. For ease of analysis, DHS has assumed that those H–4 dependent spouses in the backlog population will file for employment authorization in the first year of implementation. DHS estimates the flow of new H–4 dependent spouses who could be eligible to apply for initial employment authorization in subsequent years may be as many as 55,000 annually. Even with the increased estimate of H–4 dependent spouses who could be eligible to apply for employment authorization, DHS still affirms in the initial year (the year with the largest number of eligible applicants) that the rule will result in much less than a one percent change in the overall U.S. labor force.

DHS is unable to determine and does not include in this analysis the filing volume of H–4 dependent spouses who will need to renew their employment authorization documents under this rule as they continue to wait for immigrant visas. Eligible H–4 dependent spouses who wish to apply for employment authorization must pay the $380 filing fee to USCIS, provide two passport-style photos, and incur the estimated 3-hour-and-25-minute opportunity cost of time burden associated with filing an Application for Employment Authorization (Form I–765). After monetizing the expected opportunity cost and combining it with the filing fee[32] and the estimated cost associated with providing two passport-style photos, an eligible H–4 dependent spouse applying for employment authorization will face an anticipated total cost of $436.18.

The maximum anticipated annual cost to eligible H–4 dependent spouses applying for initial employment authorization in Year 1 is estimated at $78,337,928 (non-discounted), and $23,989,900 (non-discounted) in subsequent years. The 10-year discounted cost of this rule to eligible H–4 dependent spouses applying for employment authorization is $257,403,789 at 3 percent and $219,287,568 at 7 percent. Table 2 shows the maximum anticipated estimated costs over a 10-year period of analysis for the estimate of 179,600 applicants for initial employment authorization, and the 55,000 applicants expected to file for initial employment authorization annually in subsequent years.

TABLE 2—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%

[$Millions]

|  | Year 1 estimate (179,600 filers) | Sum of Years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| 3% Discount Rate: |  |  |  |
|     Total Costs Incurred by Filers @3% ........................ | $76.1 | $181.3 | $257.4 |
| 7% Discount Rate |  |  |  |
|     Total Costs Incurred by Filers @7% ........................ | 73.2 | 146.1 | 219.3 |

---

[32] The filing fee is assumed to be a reasonable approximation for USCIS's costs of processing the application. *See* INA section 286(m), 8 U.S.C. 1356(m).

TABLE 2—TOTAL COSTS AND BENEFITS OF INITIAL EMPLOYMENT AUTHORIZATION FOR CERTAIN H–4 DEPENDENT SPOUSES 10-YR PRESENT VALUE ESTIMATES AT 3% AND 7%—Continued

[$Millions]

| | Year 1 estimate (179,600 filers) | Sum of Years 2–10 (55,000 filers annually) | Total over 10-year period of analysis * |
|---|---|---|---|
| Qualitative Benefits ............................................. | This rule is intended to remove a disincentive to pursuing LPR status due to the potentially long wait for employment-based immigrant visas for many H–1B nonimmigrants and their family members. This rule will encourage H–1B nonimmigrants who have already taken steps to become LPRs to not abandon their efforts because their H–4 dependent spouses are unable to work. By encouraging H–1B nonimmigrants to continue in their pursuit of becoming LPRs, this rule would minimize disruptions to petitioning U.S. employers. Additionally eligible H–4 dependent spouses who participate in the labor market will benefit financially. DHS also anticipates that the socioeconomic benefits associated with permitting H–4 spouses to participate in the labor market will assist H–1B families in integrating into the U.S. community and economy. | | |

*Note: Totals may not sum due to rounding.

## 2. Purpose of the Rule

According to the most recently released reports prepared by the DHS Office of Immigration Statistics, in Fiscal Year (FY) 2013 a total of 990,553 persons became LPRs of the United States.[33] Most new LPRs (54 percent) were already living in the United States and obtained their LPR status by applying for adjustment of status within the United States.

Employment-based immigrant visas accounted for approximately 16 percent of the total number of persons obtaining LPR status, and 30 percent of total LPRs who adjusted status in FY 2013. In FY 2013, there were a total of 161,110 LPRs admitted under employment-based preference visa categories. Of these 161,110 individuals, "priority workers" (first preference or EB–1) accounted for 24 percent; "professionals with advanced degrees" (second preference or EB–2) accounted for 39 percent; and "skilled workers, professionals, and other workers" (third preference or EB–3) accounted for 27 percent.[34]

Based on historical trends, H–1B nonimmigrants seeking to adjust status to lawful permanent residence will most likely adjust under the EB–2 and EB–3 preference categories, with a much smaller amount qualifying under the EB–1 preference category. As of January 2015, the employment-based preference categories are "current" and have visas available, *except* for Chinese and Indian nationals seeking admission under the second preference category and

individuals of all nationalities seeking admission under the third preference category.[35] Thus, the employment-based categories under which H–1B nonimmigrants typically qualify to pursue LPR status are the very categories that are currently oversubscribed.[36]

In many cases, the timeframe associated with seeking lawful permanent residence is lengthy, extending well beyond the six-year period of stay allotted by the H–1B nonimmigrant visa classification. As a result, retention of highly educated and highly skilled nonimmigrant workers can become challenging for U.S. employers. Retaining highly skilled persons who intend to acquire LPR status is important when considering the contributions they make to the U.S. economy, including advances in research and development and other entrepreneurial endeavors, which are highly correlated with overall economic growth and job creation. By some estimates, immigration was responsible for one quarter of the explosive growth in patenting in past decades, and these

innovations have the potential to contribute to increasing U.S. gross domestic product (GDP).[37] In addition, over 25 percent of tech companies founded in the United States from 1995 to 2005 had a key leader who was foreign-born.[38] Likewise, the Kauffman Foundation reported that immigrants were more than twice as likely to start a business in the United States as the native-born in 2012, and a report by the Partnership for a New American Economy found that more than 40 percent of Fortune 500 companies in 2010 were founded by immigrants or their children.[39] Additionally, in March 2013, the House Committee on the

---

[33] *See* DHS Office of Immigration Statistics, Annual Flow Report, U.S. Lawful Permanent Residents: 2013 (May 2014), *available at* http://www.dhs.gov/sites/default/files/publications/ois_lpr_fr_2013.pdf.

[34] *Id.*

[35] *See* Department of State Bureau of Consular Affairs, December 2014 Visa Bulletin (Nov. 7, 2014), *available at* http://travel.state.gov/content/dam/visas/Bulletins/visabulletin_January2015.pdf.

[36] *See* Wadhwa, Vivek, et al., *Intellectual Property, the Immigration Backlog, and a Reverse Brain-Drain – America's New Immigrant Entrepreneurs, Part III*, Center for Globalization, Governance & Competitiveness (Aug. 2007), *available at* http://www.cggc.duke.edu/documents/IntellectualProperty_theImmigrationBacklog_andaReverseBrainDrain_003.pdf. Note: The report examined the 2003 cohort of employment-based immigrants and showed that 36.8 percent of H–1B nonimmigrants that adjust status do so through the EB–3 category and another 28 percent do so through the EB–2 category, while only 4.62 percent adjust through the EB–1 category.

[37] *See generally* Jennifer Hunt & Marjolaine Gauthier-Loiselle, *How Much Does Immigration Boost Innovation?*, Nat'l Bureau of Econ. Research, Sept. 2008, *available at* http://www.nber.org/papers/w14312.

[38] *See* Wadhwa, Vivek, et al., "America's New Immigrant Entrepreneurs," Report by the Duke School of Engineering and the UC Berkeley School of Information (Jan. 4, 2007) *available at* http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf; *see also* Wadhwa, Vivek, et al., *Intellectual Property, the Immigration Backlog, and a Reverse Brain-Drain – America's New Immigrant Entrepreneurs, Part III, Center for Globalization, Governance & Competitiveness* (Aug. 2007), *available at* http://www.cggc.duke.edu/documents/IntellectualProperty_theImmigrationBacklog_andaReverseBrainDrain_003.pdf; *cf.* Preston, Julia, "Work Force Fueled by Highly Skilled Immigrants," *N.Y. Times*, Apr. 15, 2010, *available at* http://www.nytimes.com/2010/04/16/us/16skilled.html?_r=1.

[39] *See* Fairlie, Robert,"Kauffman Index of Entrepreneurial Activity: 1996–2012," The Ewing Marion Kauffman Foundation. Apr. 2013, *available at* http://www.kauffman.org/what-we-do/research/2013/04/kauffman-index-of-entrepreneurial-activity-19962012; Partnership for a New American Economy, 2011, The "New American" Fortune 500, *available at* http://www.nyc.gov/html/om/pdf/2011/partnership_for_a_new_american_economy_fortune_500.pdf.

Judiciary held a hearing on Enhancing American Competitiveness Through Skilled Immigration, providing some members of the business community with an opportunity to provide their perspectives on immigration. The witnesses represented various industries, but underscored a unified theme: Skilled immigrants are contributing significantly to U.S. economic competitiveness and it is in our national interest to retain these talented individuals.[40]

As noted above, this rule is intended to reduce the disincentives to pursue lawful permanent residence due to the potentially long wait for immigrant visas for many H–1B nonimmigrants and their families. Also, this rule will encourage those H–1B nonimmigrants who have already started the process for permanent residence not to abandon their efforts because their H–4 dependent spouses are unable to work.

3. Volume Estimate

Due to current data limitations, DHS is unable to precisely track the population of H–4 dependent spouses tied to H–1B nonimmigrants who have an approved Immigrant Petition for Alien Worker (Form I–140) or who have been granted H–1B status under the provisions of AC21. DHS databases are currently "form-centric" rather than "person-centric." As USCIS transforms its systems to a more fully electronic process, there will be a shift from application- and form-based databases to one database that tracks information by the applicant or petitioner and which will improve DHS's ability to track the number of potential H–4 employment authorization applicants.

In the proposed rule, DHS estimated that as many as 100,600 H–4 dependent spouses would be eligible to apply for employment authorization in the first year, and as many as 35,900 H–4 dependent spouses would be eligible to apply annually in subsequent years. The estimates provided in the proposed rule have been updated in this final rule. In an effort to provide a reasonable approximation of the number of H–4 dependent spouses who will be eligible for employment authorization under this final rule, DHS has compared historical data on persons obtaining LPR status against employment-based immigrant demand estimates. Based on current visa availability, DHS believes that dependent spouses of H–1B

nonimmigrants who are seeking employment-based visas under the second or third preference categories will be the group most impacted by the provisions of this rule, because certain chargeability barriers in these preference categories are currently oversubscribed. In addition, in line with the goals of this rule and AC21, and based on immigration statistics, we assume that the large majority of H–4 dependent spouses who will be eligible for this provision are residing in the United States and will seek to acquire LPR status by applying to adjust status with USCIS rather than by departing for an indeterminate period to pursue consular processing of an immigrant visa application overseas. This assumption is supported by immigration statistics on those obtaining LPR status. In FY 2013, there were a total of 161,110 employment-based immigrant visa admissions, of which 140,009 (or 86.9 percent) obtained LPR status through adjustment of status in the United States.[41] This analysis limits the focus and presentation of impacts based only on the employment-based preference immigrant population seeking to adjust status to that of a lawful permanent resident, rather than the employment-based preference immigrant population seeking to obtain an immigrant visa through consular processing.

DHS will extend eligibility to apply for employment authorization to the H–4 dependent spouses of H–1B nonimmigrants who are principal beneficiaries of approved Form I–140 petitions or who have been granted H–1B status pursuant to sections 106(a) and (b) of AC21. Therefore, DHS assumes that the volume of H–4 dependent spouses newly eligible for employment authorization is comprised of two estimates: (1) an immediate, first year estimate due to the current backlog of Form I–140 petitions; and (2) an annual estimate based on future demand to immigrate under employment-based preference categories. Extending eligibility for employment authorization to H–4 dependent spouses is ultimately tied to the actions taken by the H–1B nonimmigrant; therefore, the overall volume estimate is based on the population of H–1B nonimmigrants who have taken steps to acquire LPR status under employment-based preference categories.

DHS has estimated the number of persons waiting for LPR status in the first through third employment-based preference categories as of June 30, 2014. In this analysis, the estimated number of persons waiting for an immigrant visa is referred to as the "backlog" and includes those with an approved Form I–140 petition as of June 30, 2014 and those with a filed Form I–140 petition that is pending as of June 30 but is likely to be approved in the future.[42] Currently, the first preference employment-based (EB–1) visa category is not oversubscribed. Therefore, DHS believes that the majority of H–4 dependent spouses applying for employment authorization under this rule will be those whose H–1B principals are seeking to adjust status under the second or third preference category. However, as there are persons with pending Form I–140 petitions in the first preference category that are approved or likely to be approved based on historical approval rates, and because the provisions of AC21 apply to these individuals, DHS has included them in this analysis.[43] Additionally, DHS has examined detailed characteristics about the LPR population for FY 2009–FY 2013 to further refine this estimate.[44] We have laid out each of our assumptions and methodological steps for both the backlog and annual estimates of H–4 dependent spouses who will be eligible to apply for employment authorization. Again, the estimates are based on the actions and characteristics of the H–1B nonimmigrant (*e.g.*, whether the H–1B nonimmigrant reports being married) because the H–4 dependent spouse's

[40] *See* Enhancing American Competitiveness through Skilled Immigration: Hearing before the H. Judiciary Subcomm. on Immigration, 113th Cong. 15 (2013), *available at http://www.gpo.gov/fdsys/pkg/CHRG-113hhrg79724/pdf/CHRG-113hhrg79724.pdf.*

[41] *See* DHS Office of Immigration Statistics, 2013 Yearbook of Immigration Statistics, Table 6, *available at http://www.dhs.gov/yearbook-immigration-statistics-2013-lawful-permanent-residents* (compare statistics listed under "total employment-based preferences" and "adjustment of status employment-based preferences").

[42] Source for backlog estimation: USCIS Office of Policy & Strategy analysis of data obtained from the USCIS Office of Performance and Quality. Analysis based on CLAIMS3 data captured in approved Immigrant Petition for Alien Worker (Form I–140). Of the Form I–140 petitions that were approved or pending as of June 30, 2014, USCIS allocated those that were pending that were "likely to be approved" based on USCIS approval rates in order to more accurately estimate the cases in the backlog.

[43] Despite the fact that a beneficiary is in a preference category where a visa is immediately available, and the beneficiary is able to apply to adjust status to an LPR immediately upon the filing of the I–140 petition, DHS is including estimates of first-preference LPRs that have an approved Form I–140 or are waiting for Form I–140 approval as of June 30, 2014 for which we are unable to determine that an adjustment of status application has been concurrently filed. As mentioned previously, principal beneficiaries of Form I–140 petitions and their dependents who are eligible to file for adjustment of status also are eligible for employment authorization.

[44] Source: USCIS Office of Policy & Strategy analysis of data obtained from DHS Office of Immigration Statistics. Analysis based on CLAIMS3 data captured in Application to Register Permanent Residence or Adjust Status (Form I–485) records approved in the FY 2009–13 period.

eligibility to apply for employment authorization is tied to the steps taken on behalf of the H–1B nonimmigrant to acquire LPR status under an employment-based preference category.

a. Backlog Estimate

The estimate of the number of individuals who are the principal beneficiaries of either an approved Form I–140 petition or a Form I–140 petition that is likely to be approved and who are waiting for an immigrant visa in the EB–1, EB–2, and EB–3 categories is shown in Table 3. Importantly, the number of principal workers shown in Table 3 is not limited only to those individuals who are currently in H–1B status. The estimates in Table 3 include

aliens who are currently in H–1B and other nonimmigrant statuses, as well as those seeking to immigrate under employment-based preference categories who are currently abroad.

TABLE 3—DHS ESTIMATE OF BACK-LOG (PRINCIPALS ONLY) AS OF JUNE 30, 2014

| Preference category | Principal workers |
|---|---|
| EB–1 ......................................... | 9,000 |
| EB–2 ......................................... | 146,500 |
| EB–3 ......................................... | 78,500 |

DHS is unable to precisely determine the number of H–1B nonimmigrants in

the backlog who will be impacted by this rule. Instead, DHS examined detailed statistics of those obtaining LPR status from FY 2009–2013, and used this information as a proxy to refine the estimate of principal workers in the backlog that DHS expects to be married H–1B nonimmigrants seeking to adjust status. That estimate provides the basis for approximating the number of H–4 dependent spouses who will be impacted by this rule.[45] Table 4 presents the assumptions and steps taken to determine the upper-bound estimate of H–4 dependent spouses who are represented in the backlog and will likely now be eligible to apply for work authorization.

TABLE 4—STEPS TAKEN TO ARRIVE AT THE UPPER-BOUND FINAL ESTIMATE OF H–4 DEPENDENT SPOUSES OF H–1B NONIMMIGRANTS WHO ARE IN THE ''BACKLOG''[46]

| Assumption and/or Step | EB–1 | EB–2 | EB–3 | Total |
|---|---|---|---|---|
| (1) Principal workers in the backlog (as of June 30, 2014) ............................................. | 9,000 | 146,500 | 78,500 | 234,000 |
| (2) Historical percentage of principal workers who obtained LPR Status through adjustment of status, average over FY 09–FY13 data ......................................... | 96.1% | 98.2% | 89.3% | .................. |
| (3) Estimated proportion of the backlog that DHS assumes will adjust status (rounded) ......................................... | 8,649 | 143,863 | 70,128 | 222,640 |
| (4) Historical percentage of those who adjusted status who were H–1B nonimmigrants, average over FY 09–FY13 data ......................................... | 32.5% | 89.3% | 61.6% | .................. |
| (5) DHS estimated proportion of the assumed H–1B nonimmigrants who adjusted status (rounded) ......................................... | 2,811 | 128,470 | 43,199 | 174,480 |
| (6) Historical percentage of H–1B principal workers who adjusted status and who reported being married, average over FY 09–FY13 data ......................................... | 81.1% | 72.6% | 67.2% | .................. |
| (7) DHS estimated proportion of the assumed H–1B nonimmigrants who adjusted status and who report being married (rounded) ......................................... | 2,280 | 93,269 | 29,030 | 124,579 |
| (8) Final Estimate of H–1B Nonimmigrants in the Backlog Potentially Impacted by the Final Rule (Rounded Up) | | | | 124,600 |

As shown in Table 4, DHS estimates there are approximately 124,600 H–1B nonimmigrants currently in the backlog for an immigrant visa under the first through third employment-based preference categories who are married. Accordingly, DHS assumes by proxy that there could be as many as 124,600 H–4 dependent spouses of H–1B nonimmigrants currently in the backlog who could be initially eligible to apply for employment authorization under this rule. DHS does not have a similar way to parse out the backlog data for those classified as ''dependents'' to capture only those who are spouses rather than children. Furthermore, DHS recognizes that the estimate of H–4 dependent spouses in the backlog who will now be eligible to apply for

employment authorization is a maximum estimate since there is no way to further refine this estimate by determining the immigration or citizenship status of the spouses of H–1B nonimmigrants who report being married. For instance, the spouse of the H–1B nonimmigrant could reside abroad, be a U.S. citizen or LPR, or be in another nonimmigrant status that confers employment eligibility. Additionally, H–4 dependent spouses who may be eligible for employment authorization under this rule may decide not to work and therefore not apply for an EAD. Accordingly, DHS believes that the estimate of 124,600 represents an upper-bound estimate of H–4 dependent spouses of H–1B

nonimmigrants currently waiting for immigrant visas.

b. Annual Demand Estimate

The annual demand flow of H–4 dependent spouses who will be eligible to apply for initial employment authorization under the final rule is based on: (1) The number of Form I–140 petitions approved where the principal beneficiary is currently in H–1B status; and (2) the number of extensions of stay petitions approved for H–1B nonimmigrants pursuant to AC21.[47] Petitioners request extensions of stay or status for an H–1B nonimmigrant using the Petition for a Nonimmigrant Worker (Form I–129). Section 104(c) of AC21 allows for extensions of stay for an  H–1B nonimmigrant who has an

---

[45] Id.

[46] Note: In the proposed rule, there was a data compilation error in step 4 for EB–2 estimates of the H–1B population which carried through the calculations. Instead of 19,159 reported in the proposed rule as the estimated proportion of H–1B nonimmigrants that adjusted their status to EB–2 and reported being married, that total should have

read approximately 60,000. The proposed rule's total estimate of H–1B in the backlog as of September 2012 (step 8 of the calculation) should have read approximately 106,000 based on FY 08—FY 11 data.

[47] There may be a very limited number of instances where an individual could be abroad and obtain an H–1B nonimmigrant visa pursuant to

AC21; however, USCIS is unable to precisely determine this limited population due to current system limitations. As such, this analysis focuses only on those cases where an H–1B nonimmigrant is currently in the United States and requesting an extension of their H–1B status pursuant to AC21.

approved Form I–140 petition but is unable to apply to adjust to LPR status because of visa unavailability. Sections 106(a) and (b) of AC21 allow for extensions of stay for an H–1B nonimmigrant on whose behalf a labor certification application or a Form I–140 petition was filed at least 365 days prior to reaching the end of the sixth year of his or her H–1B status.

In the preamble of the proposed rule, DHS used colloquial language to describe the basis for H–1B nonimmigrants to be eligible for extensions of their stay under section 106 of AC21. It is typical to describe H–1B nonimmigrants who are eligible for AC21 extensions as those H–1B nonimmigrants who are the beneficiaries of a labor certification application or Form I–140 petition that *has been pending for at least 365 days* prior to reaching the end of the sixth year of H–1B status. This colloquial description was used in the proposed rule; however, this language does not accurately describe AC21 eligibility. Per the statute, an H–1B nonimmigrant is eligible for an extension of stay pursuant to AC21 provided that they are the beneficiary of a labor certification application or a Form I–140 petition that has been *filed* at least 365 days prior to the end of their sixth year of H–1B status. From a practical standpoint, neither the labor certification nor the Form I–140 petition needs to remain pending adjudication for 365 days or more to qualify for an extension pursuant to AC21.

It may be helpful to illustrate this description using a graphical illustration of a case where an H–1B nonimmigrant would generally be eligible for an extension of his or her maximum period of stay pursuant to AC21, even though neither the labor certification application nor the Form I–140 petition remain pending with DOL or DHS, respectively, for a year or more.

| Labor certification filed with DOL on December 31, 2014. | 6th year of H–1B status starts January 1, 2015. | Labor Certification Application "certified" on June 1, 2015. | Form I–140 Petiton filed on October 31, 2015. | H–1B status extended on January 1, 2016 pursuant to AC21. | USCIS approves Form I–140 petition on March 31, 2016. |
|---|---|---|---|---|---|

In this illustration, the H–1B nonimmigrant would be eligible for extension of his or her stay pursuant to sections 106(a) and (b) of AC21, even though his or her labor certification was certified in 6 months and the Form I–140 petition had only been pending for two months at the time of AC21 extension.

In this final rule's preamble, DHS is correcting the description of how H–1B nonimmigrants become eligible for extensions of stay pursuant to sections 106(a) and (b) of AC21. Importantly, this language change does not impact who ultimately qualifies to apply for employment authorization under this final rule. The informal language used in the preamble of the proposed rule also does not impact the USCIS adjudication of petitions to authorize H–1B status pursuant to AC21. Accurately describing the statutory conditions of AC21 does, however, necessitate that DHS amend its estimate of the annual flow projections of H–4 dependent spouses who may be eligible to apply for employment authorization. In the proposed rule, DHS estimated the number of H–4 dependent spouses who would be eligible to apply for work authorization pursuant to AC21 by examining historical data of labor certifications or Form I–140 petitions pending for a year or more with the DOL and DHS, respectively. In contrast, this final rule examines the historical data of extensions of stay petitions approved for nonimmigrants currently in H–1B status to estimate the volume of H–4 dependent spouses eligible to apply for work authorization pursuant to AC21.

To recap, this rule will permit certain H–4 dependent spouses of H–1B nonimmigrants to be eligible to apply for employment authorization provided that the H–1B nonimmigrants are: (1) The principal beneficiaries of an approved Form I–140 petition, or (2) granted H–1B status pursuant to sections 106(a) and (b) of AC21. The annual flow estimate will therefore be based on historical data of these two categories. USCIS began tracking those cases that were approved for an extension pursuant to AC21 on October 17, 2014; in the past, USCIS databases have not captured and stored this information.[48] An extension of stay request may be submitted on behalf of H–1B nonimmigrants at any point throughout their authorized maximum six-year period of stay, or to extend stay beyond the maximum six years pursuant to AC21. Typically, an extension of stay request seeking eligibility pursuant to AC21 would be at least the second extension request filed on behalf of that H–1B nonimmigrant. The historical data of H–1B nonimmigrants who have been approved for extensions of stay include all requests, only some of which relate to extensions pursuant to AC21.

The number of approved Form I–140 petitions and approved Form I–129 extension of stay petitions where the beneficiary currently has H–1B status is presented in Table 5.

TABLE 5—FORM I–140 AND FORM I–129 (EXTENSION OF STATUS OR STAY (EOS) ONLY) APPROVALS FOR BENEFICIARIES CURRENTLY IN H–1B NONIMMIGRANT STATUS

| Fiscal year | Form I–140 approvals | Form I–129 Extensions of status/stay approvals |
|---|---|---|
| 2010 ................. | 48,511 | 116,363 |
| 2011 ................. | 54,363 | 163,208 |
| 2012 ................. | 45,732 | 125,679 |
| 2013 ................. | 43,873 | 158,482 |
| 2014 ................. | 42,465 | 191,531 |
| 5-Year Average | 46,989 | 151,053 |

Based on approximately 90 days of tracking data (which is all that is

[48] On October 17, 2014, USCIS began capturing this information during the adjudication of Form I–129 petitions. Importantly, the tracking of cases that were approved for extension pursuant to AC21 do not distinguish between cases approved under section 104 and cases approved under section 106. There is thus a potential for overlap between the estimate of cases approved under AC21 and the estimate of persons with approved Form I–140 petitions.

currently available), DHS estimates that 18.3 percent of approved extension of stay requests filed on behalf of H–1B nonimmigrants are approved pursuant to AC21. Assuming this proportion holds constant, DHS estimates that annually it will approve approximately 27,643 [49] extension of stay requests pursuant to AC21. Importantly, because the tracking of extensions pursuant to AC21 does not distinguish between those cases adjudicated under section 104(c) of AC21 and those cases adjudicated under section 106 of AC21, there is likely some overlap in the baseline estimate of 27,643 and the estimate of persons who have approved I–140 petitions. Because DHS is unable to parse out the individuals who have extended their status pursuant to section 104(c) of AC21, and because such persons have approved I–140 petitions, DHS may be overestimating the annual number of H–4 dependent spouses who will be eligible to apply for initial employment authorization. However, while there is uncertainty that may result in overstating the annual estimates, DHS relied on the best available information to arrive at this estimate. Thus, for purposes of this analysis, DHS will use 74,632 [50] as the baseline projection of H–1B nonimmigrants who have started the immigration process.

To refine the annual flow projection estimates, DHS has chosen to estimate the proportion of applications filed in the first through third employment-based preference categories. Additionally, since DHS has already limited the historical counts in Table 5 to those approved petitions where the beneficiary's current nonimmigrant classification is H–1B, DHS has made the assumption that the petitions shown in Table 5 represent H–1B nonimmigrants who are physically present in the United States and intend to adjust status. As shown in Table 4, the historical proportion of H–1B nonimmigrants obtaining LPR status under EB–1, EB–2, and EB–3 categories who reported being married was 81.1 percent, 72.6 percent, and 67.2 percent, respectively, resulting in an average of 73.6 percent. Applying this percentage to the baseline projection results in an annual flow estimate of 55,000 (rounded).[51] Again, due to the fact that

DHS is unable to estimate the proportion of H–1B nonimmigrants granted extensions of status pursuant only to section 106 of AC21, and because DHS is unable to determine the immigration or citizenship status of spouses of H–1B nonimmigrants who report being married, this is an upper-bound estimate of H–4 dependent spouses who could be eligible to apply for employment authorization under the rule.

Therefore, DHS estimates that this rule will result in a maximum initial estimate of 179,600 [52] H–4 dependent spouses who could be newly eligible to apply for employment authorization in the first year of implementation, and an annual flow of as many as 55,000 who are newly eligible in subsequent years.

### 4. Costs

#### i. Filer Costs

The final rule will permit certain H–4 dependent spouses to apply for employment authorization in order to work in the United States. Therefore, only H–4 dependent spouses who decide to seek employment while residing in the United States will face the costs associated with obtaining employment authorization. The costs of the rule will stem from filing fees and the opportunity costs of time associated with filing Form I–765.

The current filing fee for Form I–765 is $380. The fee is set at a level to recover the processing costs to DHS. Applicants for employment authorization are required to submit two passport-style photos along with the application, which is estimated to cost $20.00 per application based on Department of State estimates.[53] DHS estimates the time burden of completing this application to be 3 hours and 25 minutes. DHS recognizes that H–4 dependent spouses do not currently participate in the U.S. labor market, and, as a result, are not represented in national average wage calculations. However, to provide a reasonable proxy of time valuation, DHS chose to use the minimum wage to estimate the opportunity cost consistent with methodology employed in other DHS rulemakings when estimating time

burden costs for those who are not work authorized.

The Federal minimum wage is currently $7.25 per hour.[54] In order to anticipate the full opportunity cost to petitioners, we multiplied the average hourly U.S. wage rate by 1.46 to account for the full cost of employee benefits such as paid leave, insurance, and retirement for a total of $10.59 per hour.[55] Based on this wage rate, H–4 dependent spouses who decide to file Form I–765 applications will face an estimated opportunity cost of time of $36.18 per applicant.[56] Combining the opportunity costs with the fee and estimated passport-style photo costs, the total cost per application will be $436.18.[57] In the first year of implementation, DHS estimates the total maximum cost to the total of H–4 dependent spouses who could be eligible to file for an initial employment authorization will be as much as $78,337,928 (non-discounted), and $23,989,900 annually in subsequent years. The 10-year discounted cost of this rule to filers of initial employment authorizations is $257,403,789 at 3 percent, while the 10-year discounted cost to filers is $219,287,568 at 7 percent. Importantly, in future years the applicant pool of H–4 dependent spouses filing for employment authorization will include both those initially eligible and those who will seek to renew their EADs as they continue to wait for visas to become available. DHS could not project the number of renewals as the volume of H–4 dependent spouses who will need to renew is dependent upon visa availability, which differs based on the preference category and the country of nationality. H–4 dependent spouses needing to renew their employment authorization will still face a per-application cost of $436.18.

---

[49] Calculation: 151,053 (5-year average of I–129 extension of stay approvals) × 18.3 percent = 27,643 extensions approved pursuant to AC21.

[50] Calculation: 46,989 (5-year average of Form I–140 approvals) + 27,643 (annual estimate of approved extensions of stay pursuant to AC21) = 74,632 baseline estimate.

[51] Calculation: 74,632 × 73.6 percent = 54,929 or 55,000 rounded up to the nearest hundred.

[52] Calculation: Backlog of 124,600 plus annual demand estimate for married H–1Bs of 55,000 = 179,600.

[53] DOS estimates an average cost of $10 per passport photo in the Paperwork Reduction Act (PRA) Supporting Statement found under OMB control number 1450–0004. A copy of the Supporting Statement is found on Reginfo.gov at http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201102-1405-001 (see question #13 of the Supporting Statement) (accessed Oct. 21, 2014).

[54] U.S. Dep't of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009, available at http://www.dol.gov/dol/topic/wages/minimumwage.htm.

[55] The calculation to burden the wage rate: $7.25 × 1.46 = $10.59 per hour. See Economic News Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (June 2014), available at http://www.bls.gov/news.release/archives/ecec_09102014.htm (viewed Oct. 23, 2014).

[56] Calculation for opportunity cost of time: $10.59 per hour × 3.4167 hours (net form completion time) = $36.18.

[57] Calculation for total application cost: $380 (filing fee) + $20 (cost estimate for passport photos) + $36.18 (opportunity cost of time) = $436.18.

## ii. Government Costs

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including administrative costs and services provided without charge to certain applicants and petitioners. *See* INA section 286(m), 8 U.S.C. 1356(m). DHS has established the fee for the adjudication of Form I–765 in accordance with this requirement. As such, there are no additional costs to the Federal Government resulting from this rule.

## iii. Impact on States

Currently, once visas are determined to be immediately available, H–1B nonimmigrants and their dependent family members may be eligible to apply for adjustment of status to that of a lawful permanent resident. Upon filing an adjustment of status application, the H–4 dependent spouse is eligible to request employment authorization. This rule will significantly accelerate the timeframe by which qualified H–4 dependent spouses are eligible to enter the U.S. labor market. As a result of the changes made in this rule, certain H–4 dependent spouses will be eligible to request employment authorization well before they are eligible to apply for adjustment of status. Even with the change in the maximum number of H–4 dependent spouses who may be impacted as reported in the proposed rule and this final rule, DHS maintains that the expected outcomes are the same. DHS believes that this regulatory change will encourage families to stay committed to the immigrant visa process during the often lengthy wait for employment-based status whereas, otherwise, they may leave the United States and abandon immigrant visa processing altogether. As such, DHS presents the geographic labor impact of this rule even though this rule does not result in "new" additions to the labor market; it simply accelerates the timeframe by which they can enter the labor market. As mentioned previously, DHS estimates this rule can add as many as 179,600 additional persons to the U.S. labor force in the first year of implementation, and then as many as 55,000 additional persons annually in subsequent years. As of 2013, there were an estimated 155,389,000 people in the U.S. civilian labor force.[58]

Consequently, 179,600 additional available workers in the first year (the year with the largest number of eligible applicants) represent a little more than one-tenth of a percent, 0.1156 percent, of the overall U.S. civilian labor force (179,600/155,389,000 × 100 = 0.1156 percent).[59]

The top five States where persons granted LPR status have chosen to reside are: California (20 percent), New York (14 percent), Florida (10 percent), Texas (9 percent), and New Jersey (5 percent).[60] While allowing certain H–4 dependent spouses the opportunity to work will result in a negligible increase to the overall domestic labor force, the states of California, New York, Florida, Texas, and New Jersey may have a slightly larger share of additional workers compared with the rest of the United States. Based on weighted average proportions calculated from FY 2009–2013, and assuming the estimate for first year impacts of 179,600 additional workers were distributed following the same patterns, DHS anticipates the following results: California could receive approximately 35,920 additional workers in the first year of implementation; New York could receive approximately 25,144 additional workers; Florida could receive approximately 17,960 additional workers; Texas could receive approximately 16,164 additional workers; and New Jersey could receive approximately 8,980 additional workers. To provide context, California had 18,597,000 persons in the civilian labor force in 2013.[61] The additional 35,920 workers who could be added to the Californian labor force as a result of this rule in the first year would represent less than two-tenths of a percent of that state's labor force (35,920/18,597,000 × 100 = 0.1931 percent). As California is the state estimated to receive the highest number of additional workers, the

impact on the states civilian labor force is minimal.

## 5. Benefits

As previously mentioned, once this rule is finalized, these amendments will increase incentives of certain H–1B nonimmigrants who have begun the process of becoming LPRs to remain in the United States and contribute to the U.S. economy as they complete this process. Providing the opportunity for certain H–4 dependent spouses to obtain employment authorization during this process will further incentivize H–1B nonimmigrants to not abandon their intention to remain in the United States while pursuing LPR status. Retaining highly skilled persons who intend to become LPRs is important when considering the contributions of these individuals to the U.S. economy, including advances in research and development and other entrepreneurial endeavors. As previously discussed, much research has been done to show the positive impacts on economic growth and job creation from highly skilled immigrants. In addition, these regulatory amendments will bring U.S. immigration policies more in line with the policies of other countries that seek to attract skilled foreign workers. For instance, in Canada spouses of temporary workers may obtain an "open" work permit allowing them to accept employment if the temporary worker meets certain criteria.[62] As another example, in Australia, certain temporary work visas allow spousal employment.[63]

This final rule will result in direct, tangible benefits for the spouses who will be eligible to enter the labor market earlier than they would have otherwise been able to do so due to the lack of immigrant visas. While there will be obvious financial benefits to the H–4 dependent spouse and the H–1B nonimmigrant's family, there is also evidence that participating in the U.S. workforce and improving socio-economic attainment has a high correlation with smoothing an

---

[58] *See* News Release, United States Dept's of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2013 Annual Averages, Table 1 "Employment status of the civilian noninstitutional population 16 years of age and over by region,

division, and state, 2012–13 annual averages" (Feb. 28, 2014), *available at http://www.bls.gov/ news.release/archives/srgune_02282014.pdf.*

[59] Note that even with the changed estimate from the proposed rule, the finding remains consistent; the overall impact to the U.S. labor force is a fraction of one percent.

[60] DHS Office of Immigration Statistics, Annual Flow Reports, "U.S. Legal Permanent Residents" for 2009–2012 and "U.S. Lawful Permanent Residents: 2013," *available at http://www.dhs.gov/ immigration-statistics-publications#0.* Author calculated percentage distributions by State weighted over FY 2009–2013 (rounded).

[61] *See* News Release, U.S. Dep't of Labor, Bureau of Labor Statistics, Local Area Unemployment Statistics, Regional and State Unemployment—2013 Annual Averages, Table 1, Employment status of the civilian noninstitutional population 16 years of age and over by region, division, and state, 2012– 13 annual averages (Feb. 28, 2014), *available at http://www.bls.gov/news.release/archives/srgune_ 02282014.pdf.*

[62] *See* Canadian Government, Citizenship and Immigration Canada, Help Centre under Topic "Work Permit—Can my spouse or common-law partner work in Canada?", *available at http:// www.cic.gc.ca/english/helpcentre/index-featured-can.asp#tab1* (last visited Jan. 13, 2015).

[63] *See* Australian Government, Dep't of Immigration and Citizenship, Temporary Work (Skilled) visa (subclass 457), *available at http:// www.immi.gov.au/Visas/Pages/457.aspx* (last visited Jan. 13, 2015).

immigrant's integration into American society.[64]

Prior to this rule being effective, H–4 dependent spouses were not able to apply for employment authorization until they were eligible to submit their applications for adjustment of status or otherwise acquire a nonimmigrant status authorizing employment. The amendments to the regulations made by this final rule accelerate the timeframe by which H–4 dependent spouses of H–1B nonimmigrants who are on the path to being LPRs are able to enter into the U.S. labor market.

6. Alternatives Considered

One alternative considered by DHS was to permit employment authorization for all H–4 dependent spouses. As explained in both the proposed rule and in response to public comments, DHS declines to extend the changes made by this rule to H–4 dependent spouses of all H–1B nonimmigrants at this time. Such an alternative would offer eligibility for employment authorization to those spouses of nonimmigrant workers who have not taken steps to demonstrate a desire to continue to remain in and contribute to the U.S. economy by seeking lawful permanent residence. In enacting AC21, Congress was especially concerned with avoiding the disruption to U.S. businesses caused by the required departure of H–1B nonimmigrants (for whom the businesses intended to file employment-based immigrant visa petitions) upon the expiration of the workers' maximum six-year period of authorized stay. *See* S. Rep. No. 106–260, at 22 (2000). This rule further alleviates these concerns.

Another alternative considered was to limit employment eligibility to just those H–4 dependent spouses of H–1B nonimmigrants who extended their status under the provisions of AC21. As discussed in Section 3.b of this Executive Order 12866/13563 assessment, DHS databases began tracking the number of extensions of H–1B status that were approved pursuant to AC21 on October 17, 2014. Historically DHS did not capture this information. Based on approximately 90 days of case history, DHS believes that

approximately 18.3 percent of all extension of stay applications filed on behalf of H–1B nonimmigrants are approved pursuant to AC21. DHS estimates that there could be as many as 27,643 [65] H–1B nonimmigrants with extensions of stay requests that were approved pursuant to AC21. Further, DHS estimates that there could be as many as 20,400 [66] married H–1B nonimmigrants who are granted an extension of stay pursuant to AC21. This alternative would also result in some fraction of the backlog population being eligible for employment authorization in the first year after implementation, but DHS is unsure of what portion of the backlog population has been granted an extension under AC21. However, DHS believes that this alternative is too limiting and fails to recognize that other H–1B nonimmigrants and their H–4 dependent spouses also experience long waiting periods while on the path to lawful permanent residence. One of the primary goals of this rulemaking is to provide an incentive to H–1B nonimmigrant families to continue on the path to obtaining LPR status in order to minimize the potential for disruptions to U.S. businesses caused by the departure from the United States of these workers. The Department believes that also extending employment authorization to the spouses of H–1B nonimmigrants who are the beneficiaries of approved Form I–140 petitions more effectively accomplishes the goals of this rulemaking, because doing so incentivizes these workers, who have established certain eligibility requirements and demonstrated intent to reside permanently in the United States and contribute to the U.S. economy, to continue their pursuit of LPR status. Thus, extending employment authorization to H–4 dependent spouses of H–1B nonimmigrants with either approved Form I–140 petitions or who have been granted H–1B status pursuant to sections 106(a) and (b) of AC21 encourages a greater number of professionals with high-demand skills to remain in the United States.

*D. Regulatory Flexibility Act*

USCIS examined the impact of this rule on small entities under the Regulatory Flexibility Act (RFA), 5

U.S.C. 601(6). A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business under the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than fifty thousand people). After considering the impact of this rule on such small entities, DHS has determined that this rule will not have a significant economic impact on a substantial number of small entities. The individual H–4 dependent spouses to whom this rule applies are not small entities as that term is defined in 5 U.S.C. 601(6). Accordingly, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule requires that eligible H–4 dependent spouses requesting employment authorization complete an Application for Employment Authorization (Form I–765), covered under OMB Control number 1615–0040. As a result of this final rule, this information collection will be revised. DHS has received approval of the revised information collection from OMB.

DHS submitted the proposed revisions to Form I–765 to OMB for review. DHS has considered the public comments received in response to the publication of the proposed rule. Over 180 commenters raised issues related to employment authorization requests, including filing procedures, premium

[64] *See* Jiménez, Tomás, *Immigrants in the United States: How Well Are They Integrating in Society?* (2011) Washington, DC: Migration Policy Institute, *available at* http://www.migrationpolicy.org/research/immigrants-united-states-how-well-are-they-integrating-society; *see also* Terrazas, Aaron, *The Economic Integration of Immigrants in the United States: Long- and Short-Term Perspectives* (2011) Washington, DC: Migration Policy Institute, *available at* http://www.migrationpolicy.org/research/economic-integration-immigrants-united-states.

[65] Calculation: 151,053 (5-year average of I–129 extension of stay approvals) × 18.3 percent = 27,643 extensions approved pursuant to AC21.

[66] Calculation: 27,643 (extensions approved pursuant to AC21) × 73.6 percent (average percentage of H–1B nonimmigrants who adjust to LPR status that report being married) = 20,345 or 20,400 (rounded up).

processing, validity periods, renewals, evidentiary documentation, concurrent filings for extension of stay/change of status, automatic extensions of employment authorization, filing fees, and marriage fraud. One commenter asked for clarification regarding whether H–4 dependent spouses under this rule are required to demonstrate economic need for employment authorization using the Form I–765 Worksheet (I–765WS).

DHS's responses to these comments appear under Part III.E. and F. USCIS has submitted the supporting statement to OMB as part of its request for approval of this revised information collection instrument.

DHS has revised the originally proposed Form I–765 and form instructions to clarify the supporting documentation that applicants requesting employment authorization pursuant to this rule must submit with the form to establish eligibility, and to state that USCIS will accept Forms I–765 filed by such applicants concurrently with Forms I–539. DHS has also revised the Form I–765 to include a check box for the applicant to identify him or herself as an H–4 dependent spouse. The inclusion of this box will aid USCIS in its efforts to more efficiently process the form for adjudication by facilitating USCIS's ability to match the application with related petitions integral to the adjudication of Form I–765. DHS does not anticipate any of these changes will result in changes to the previously reported time burden estimate. The revised materials can be viewed at *www.regulations.gov*.

Lastly, DHS has updated the supporting statement to reflect a change in the estimate for the number of respondents that USCIS projected would submit this type of request from 1,891,823 respondents to 1,981,516 respondents. This change of the initially projected number of respondents is due to better estimates regarding the general population of I–765 filers, in addition to this final rule's revised estimate on the new number of applicants that will request EADs, which results in a change of the estimated population of aliens that DHS expects could file Form I–765. Specifically, in the proposed rule USCIS estimated that approximately 58,000 new respondents would file requests for EADs as a result of the changes prompted by this rule. USCIS has revised that estimate and projects in this final rule that approximately 117,300 new respondents will be able to file a Form I–765. With this change on the number of Form I–765 application filers, the estimate for the total number of

respondents has been updated. The current hour inventory approved for this form is 7,140,900 hours, and the requested new total hour burden is 8,159,070 hours, which is an increase of 1,018,170 annual burden hours.

## V. Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change, except for conforming amendments to 8 CFR 214.2(h)(9)(iv) and 8 CFR 274a.13(d) and minor punctuation and wording changes in 8 CFR 214.2(h)(9)(iv) to improve clarity and readability.

## List of Subjects

### 8 CFR Part 214

Administrative practice and procedure, Aliens, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

### 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 214—NONIMMIGRANT CLASSES

■ 1. The authority citation for part 214 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305 and 1372; sec. 643, Public Law 104–208, 110 Stat. 3009–708; Public Law 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2.

■ 2. Section 214.2 is amended by revising paragraph (h)(9)(iv) to read as follows:

### § 214.2  Special requirements for admission, extension, and maintenance of status.

\*      \*      \*      \*      \*

(h) * * *

(9) * * *

(iv) *H–4 dependents.* The spouse and children of an H nonimmigrant, if they are accompanying or following to join such H nonimmigrant in the United States, may be admitted, if otherwise admissible, as H–4 nonimmigrants for the same period of admission or extension as the principal spouse or parent. H–4 nonimmigrant status does not confer eligibility for employment

authorization incident to status. An H–4 nonimmigrant spouse of an H–1B nonimmigrant may be eligible for employment authorization only if the H–1B nonimmigrant is the beneficiary of an approved Immigrant Petition for Alien Worker, or successor form, or the H–1B nonimmigrant's period of stay in H–1B status is authorized in the United States under sections 106(a) and (b) of the American Competitiveness in the Twenty-first Century Act of 2000 (AC21), Public Law 106–313, as amended by the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273 (2002). To request employment authorization, an eligible H–4 nonimmigrant spouse must file an Application for Employment Authorization, or a successor form, in accordance with 8 CFR 274a.13 and the form instructions. If such Application for Employment Authorization is filed concurrently with another related benefit request(s), in accordance with and as permitted by form instructions, the 90-day period described in 8 CFR 274.13(d) will commence on the latest date that a concurrently filed related benefit request is approved. An Application for Employment Authorization must be accompanied by documentary evidence establishing eligibility, including evidence of the spousal relationship and that the principal H–1B is the beneficiary of an approved Immigrant Petition for Alien Worker or has been provided H–1B status under sections 106(a) and (b) of AC21, as amended by the 21st Century Department of Justice Appropriations Authorization Act, the H–1B beneficiary is currently in H–1B status, and the H–4 nonimmigrant spouse is currently in H–4 status.

\*      \*      \*      \*      \*

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 3. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; Title VII of Public Law 110–229; 48 U.S.C. 1806; 8 CFR part 2.

■ 4. Section 274a.12 is amended by adding a new paragraph (c)(26), to read as follows:

### § 274a.12  Classes of aliens authorized to accept employment.

\*      \*      \*      \*      \*

(c) * * *

(26) An H–4 nonimmigrant spouse of an H–1B nonimmigrant described as eligible for employment authorization in 8 CFR 214.2(h)(9)(iv).

\*      \*      \*      \*      \*

■ 5. Section 274a.13 is amended by revising the first sentence of paragraph (d), to read as follows:

**§ 274a.13  Application for employment authorization.**

*   *   *   *   *

(d) *Interim employment authorization.* USCIS will adjudicate the application within 90 days from the date of receipt of the application, except as described in 8 CFR 214.2(h)(9)(iv), and except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). * * *

*   *   *   *   *

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2015–04042 Filed 2–24–15; 8:45 am]
**BILLING CODE 9111–97–P**

![CMS Center for Migration Studies logo]

**DATA BRIEFING**

# Demographic Profile of Undocumented Hispanic Immigrants in the United States

### by Evin Millet and Jacquelyn Pavilon

OCTOBER 2022

## 1 Introduction

Hispanic immigrants make up the largest undocumented immigrant population in the United States. Despite having relatively low levels of education, Hispanic undocumented immigrants have high labor force participation and employment rates, especially in essential occupations. Nevertheless, lack of legal status still serves as a barrier for many, who face wage gaps and are excluded from social safety nets despite their economic contribution. The Center for Migration Studies

of New York (CMS) estimates that approximately 21,036,500 immigrants of Hispanic origin live in the United States, of which 7,410,000 are undocumented, based on one-year 2019 American Community Survey (ACS) data (Ruggles et al. 2021). Figure 1 shows the Hispanic undocumented immigrant population compared to the total undocumented immigrant population from 2010 to 2019. The share of the undocumented population that is Hispanic has remained relatively stable over the last decade, ranging between 72-76 percent.

**Figure 1. Total and Hispanic Undocumented Immigrants, by Year, 2010-2019**



Source: Center for Migration Studies of New York (CMS). 2022. Democratizing Data Initiative: Undocumented Immigrants in the United States, by Race and Year, 2010-2019 [dataset]. New York, NY: CMS.

## 2   Demographic Characteristics

**The majority of the undocumented Hispanic population arrived from North America (64 percent) followed by Central America (26 percent), South America (8 percent), the Caribbean (2 percent).[1]** Mexicans by far make up the largest share of the Hispanic undocumented immigrant population (63.6 percent). Following Mexico, Hispanic undocumented immigrants in the United States come primarily from El Salvador (9.6 percent), Guatemala (8.8 percent), Honduras (6.2 percent), Venezuela (2.5 percent), Dominican Republic (2.3 percent), Columbia (2.0 percent), Ecuador (1.4 percent), Peru (1.0 percent), and Nicaragua (0.7 percent). These countries together account for almost the entire Hispanic undocumented population (Figure 2).

**Over half of the Hispanic undocumented population resides in five states: California, Texas, Florida, New York, and Illinois (Figure 3).** Over the past decade (2010-2019), these five states have remained the top five states of residence, and California and Texas have stayed as the first and second states, respectively, that host the largest share of the Hispanic undocumented population (CMS 2022).

**The Hispanic undocumented population is relatively gender-balanced and approximately half are long-term residents.** Forty-six percent of Hispanic undocumented immigrants are female, and 54 percent are male. Half are unmarried, 45 percent are married with a spouse present, and 5 percent are married with a spouse absent (among those aged 15 and older.) Slightly more than half (52 percent) have been living in the United States for 15 years or more. Half of the undocumented Hispanic population speaks English well, very well, or only English.  Newly arrived immigrants may still be building their English-language skills in the United States.

### Figure 2. Hispanic Undocumented Immigrants, by Country of Origin



Source: CMS estimates using the one -year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

---

[1] Caribbean countries include Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados,  Bonaire, British Virgin Islands, Caribbean Netherlands, Cayman Islands, Cuba, Curacao, Dominica, Dominican Republic, Dutch St. Maarten,  French St. Maarten, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, Netherlands Antilles, Saba, Sint Maarten, St. Barthelemy, St. Kitts and Nevis, St. Lucia, St. Eustatius,  St. Martin, St. Vincent, Trinidad and Tobago, Turks and Caicos Islands, Virgin Islands.

DEMOGRAPHIC PROFILE OF UNDOCUMENTED HISPANIC IMMIGRANTS IN THE UNITED STATES

**Figure 3: Hispanic Undocumented Immigrants, by State**



Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

**Figure 4. Age Distribution of Hispanic Undocumented Immigrants and the US-born Population**



Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

**Hispanic undocumented immigrants are overall younger than the US-born population (Figure 4).** The vast majority of Hispanic undocumented immigrants are of working age (16-64) (91 percent), and most are of prime working age (25-54) (72 percent). By contrast, less than two-thirds of the US-born population (62 percent) are of working age, and just over a third are of prime working age (37 percent). Age gaps between countries can drive migration as younger persons in sending countries seek opportunities in receiving countries. These younger workers bring human capital and fill open jobs in the United States, a country with an aging workforce. population compared to the total undocumented immigrant population from 2010 to 2019. The share of the undocumented population that is Hispanic has remained relatively stable over the last decade, ranging between 72-76 percent.

## 3   Education and Labor Force Participation

The Hispanic undocumented immigrant population overall has relatively low levels of education. Lack of legal status is a barrier to higher educational attainment in the United States. However, despite this relatively low level of education, Hispanic undocumented immigrants are crucial to filling key occupations in the US economy.

**Half of the Hispanic undocumented population, ages 18 and over, have less than a high school education.** Twenty-nine percent have completed high school, 13 percent have some college education, and 7 percent have a college degree or higher education (Figure 5). Hispanic undocumented immigrants from Mexico are less likely to have an education level beyond a high school degree (17 percent) compared to those from other countries (26 percent). Legal status can be a barrier to education. Figure 5 shows that educational attainment increases substantially with legal status: only 37 percent of Hispanic documented immigrants, ages 18 and over, have less than a high school education, 26 percent have completed high school, 21 percent have some college education, and 16 percent have a college degree or higher education.

**Figure 5. Educational Attainment of Hispanic Immigrants (Ages 18 and Older), by Immigration Status**



Source: CMS estimates using the one -year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

**Figure 6.  Occupational Composition of Hispanic Immigrants (Ages 16 and Older), by Immigration Status**

Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

**Hispanic undocumented immigrants are concentrated in certain sectors.** Hispanic undocumented immigrants are more likely to be in the labor force (78 percent) than the US-born Hispanic population (68 percent), or the overall US-born population (63 percent). More than 96 percent of Hispanic undocumented immigrants in the labor force are employed. Nearly two-thirds of the overall Hispanic undocumented population is employed in either *Service occupations* or *Natural resources, construction, and maintenance occupations* (Figure 6). Legal status plays a role in the type of occupations in which immigrants are employed. Only 8 percent of undocumented Hispanic immigrants are employed in *Management, business, and arts occupations* as opposed to 23 percent of Hispanic documented immigrants. On the contrary, 31 percent of Hispanic undocumented immigrants are employed in each of the occupational categories, *Service occupations* and *Natural resources,* *construction, and maintenance occupations,* compared to 26 percent and 16 percent  of Hispanic documented immigrants, respectively.

**Many Hispanic undocumented immigrants help fill jobs which do not require a high level of education yet are nevertheless categorized as essential.** Figure 7 shows the top 20 detailed essential occupations[2] which employ the largest number of persons in the United States. Undocumented Hispanic immigrants, and Hispanic immigrants overall, represent a larger share of the workforce in many of the top key low-skilled occupations, relative to their share of the overall US population. Hispanic undocumented immigrants are overrepresented in the following occupations:

- Construction laborers
- Maids and housekeeping cleaners
- Grounds and maintenance workers

[2] Essential occupations are those  in those industries classified as essential by the Department of Homeland Security Cybersecurity and Infrastructure Security Agency.

### Figure 7. Share of Hispanic Documented and Undocumented Immigrants in Essential Occupations



Note: The occupations are the top 20 essential occupations which employ the largest number of persons in the United States. Essential occupations are classfied by the Department of Homeland Security Cybersecurity and Infrastructure Security Agency. The blue vertical line represents the share of Hispanic undocumented immigrants in the US population The red vertial line represents the share of Hispanic immigrants overall in the US population.

Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

### Figure 8. Share of Hispanic Undocumented Immigrants in the Population and the Essential Workforce, by US State



Note: Essential occupations are classified by the Department of Homeland Security Cybersecurity and Infrastructure Security Agency.

Source: CMS estimates using the one-year 2019 American Comunity Survey (ACS) data, Ruggles et al. (2021)

**Table 1. Top Ten Occupations of Hispanic Undocumented Immigrants, by Sex (Ages 16 and Older)**

| A.   FEMALE | | B.   MALE | |
|---|---|---|---|
| Occupation | Percent | Occupation | Percent |
| Maids and housekeeping cleaners | 15.54% | Construction laborers | 11.84% |
| Cooks | 6.74% | Landscaping and groundskeeping workers | 6.69% |
| Janitors and building cleaners | 6.51% | Carpenters | 5.73% |
| Cashiers | 4.48% | Cooks | 4.99% |
| Other agricultural workers | 4.05% | Other agricultural workers | 4.95% |
| Waiters and waitresses | 3.67% | Painters and paperhangers | 4.29% |
| Packers and packagers, hand | 3.63% | Driver/sales workers and truck drivers | 3.34% |
| Childcare workers | 2.95% | Janitors and building cleaners | 3.13% |
| Food preparation workers | 2.67% | Laborers and freight, stock, and material movers, hand | 2.44% |
| Retail salespersons | 2.08% | Roofers | 2.18% |
| Total | 52.32% | Total | 49.58% |

Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

- Chefs and cooks
- Janitors and building cleaners
- Laborers and freight, stock, and hand material movers
- Waiters and waitresses
- Drivers/sales workers and truck drivers
- Cashiers

**Hispanic undocumented workers represent a larger share of the essential workforce than their share of the population in the top five US states that host the largest share of this population.** Figure 8 shows the share that Hispanic undocumented immigrants comprise of the population and the share they comprise of the essential workforce in Texas, California, Florida, New York, and Illinois. In all five states, Hispanic undocumented immigrants are overrepresented among essential workers. In Texas and California, for example, Hispanic undocumented immigrants comprise 6.9 and 6.1 percent of the population respectively, but 7.6 and 6.7 percent of essential workers.

**Hispanic undocumented men are much more likely to participate in the labor force than US-born men, whereas the labor force participation for Hispanic undocumented women is roughly the same as the US-born.** Ninety percent of Hispanic undocumented men are employed, 8 percent are not in the labor force, and 2 percent are unemployed. By contrast, among the US-born ages 16 and over, only 64 percent of men are employed, while 33 percent are not in the labor force and 3 percent are unemployed. For women, the employment rate of Hispanic undocumented immigrants and the US-born is 56 percent. For Hispanic undocumented women, 56 percent of women are employed, 40 percent are not in the labor force, and 4 percent are unemployed. By comparison, among US-born women, ages 16 and over, 41 percent are not in the labor force, and 3 percent are unemployed.

Table 1 shows the top 10 occupations in which the largest share of Hispanic undocumented female and male immigrants are employed. Over half of female Hispanic undocumented immigrants (nearly 1.1 million) are employed in the top 10 occupations listed in Panel A. Additionally, half of the male Hispanic undocumented immigrants (over 1.7 million) are employed in the top 10 occupations listed in Panel B.

**Hispanic undocumented immigrants, particularly women, help to fill jobs where there are labor shortages.** Figure 9 shows there is a positive correlation across occupations between the unfilled job rate[3] and the share of workers that are Hispanic undocumented women. In other words, Hispanic undocumented women are more likely to be working in the jobs that are more

---

[3] The unfilled job rate is the share of unfilled jobs over the total jobs (filled and unfilled) in the industry.

**Figure 9. Correlation between Share of Workers That Are Hispanic Undocumented Immigrants and the Unfilled Job Rate across Occupations**



Note: Each scatter point represents an industry. The unfilled job rate
is the share of unfilled jobs divided by the total number of jobs in the industry

Source: CMS estimates using the one-year 2019 American Community Survey (ACS)
data, Ruggles et al. (2021) and the US Bureau of Labor Statistics
BLS Job Openings and Labor Turnover Survey June2022 monthly national report.

likely to be unfilled. Figure 8 highlights *Leisure and hospitality*, *Nondurable goods manufacturing*, and *Other services* as the industries that employ the largest share of Hispanic female undocumented workers.

**Legal status can be a barrier to higher earnings and financial stability, as shown by the wage gap between documented and undocumented Hispanic immigrants.** The mean and median annual wages of Hispanic undocumented immigrants who are employed (ages 16 and above) are $28,252 and $25,000, respectively, whereas the mean and median wages for Hispanic documented immigrants are $40,032 and $30,000, respectively. Furthermore, 21 percent of the Hispanic undocumented population live at or below the poverty threshold, and only 36 percent own or are buying a house.

## 4   Legalization under Pending Bills

CMS provides estimates of the undocumented population in the United States, populations that are eligible for special legal status programs, and those that would be eligible for permanent residence (legalization) under pending bills (Kerwin, Pacas, and Warren 2022). The CMS estimates of the numbers and characteristics of Hispanic undocumented immigrants coming that could be eligible for permanent residence under pending bills are presented in Table 2.

The American Dream and Promise Act of 2021 (ADPA) provides conditional permanent resident status for immigrants who entered the United States as a minor; removal of the conditions on permanent resident status for persons who meet certain requirements specified in the bill, such as completing certain programs at an educational institution, serving in the military, or being

# $25,000:

## Median wage of Hispanic undocumented workers

employed; and adjustment to lawful permanent resident (LPR) status for immigrants eligible for temporary protected status (TPS) and deferred enforced departure proficiency levels. Even though they all completed high school, the share of those pursuing higher education is low. (DED). [4] Hispanic undocumented immigrants who could be eligible for conditional permanent residence and removal of conditions on permanent residence under ADPA are longer-term residents and have high English

Over 2.1 million Hispanic undocumented immigrants could acquire legal status under the Dream Act of 2021, which provides conditional permanent residence and removal of conditions on permanent residence for undocumented immigrants who were younger than 18 years of age on age on the initial date of US entry, have been continuously physically present in the United States for four years preceding the bill's enactment, and have fulfilled specified educational and other requirements specified in the bill. [5] Even though nearly all persons eligible for legalization under this Act completed high school, just over a third went on to pursue higher education, indicating that legal status may be a barrier to pursuing higher education.

The Citizenship for Essential Workers Act provides lawful permanent resident status to those who have worked essential jobs during the pandemic and their spouses, parents, and children, as well as to the spouses, parents, and children of immigrants who performed essential labor and died from COVID-19.[6] The bill would provide more than 4.2 million Hispanic undocumented immigrant essential workers, not including their immediate family members, with the opportunity for

legal status and a path to citizenship. This group is comprised of short-term residents with low English proficiency and education levels, highlighting that often immigrants with lower education levels are those who are performing the essential jobs in the US economy.

An estimated 320,400 Hispanic undocumented immigrants would be eligible for certified agricultural worker (CAW) status under the Farm Workforce Modernization Act of 2021, which would provide undocumented farmworkers and their family members with a path to legal immigration status and citizenship.[7]

Those who could be eligible Those who could be eligible for legalization under this Act also are short-term residents and have low English proficiency and education levels, though nevertheless performing essential work.

CMS estimates that all Hispanic undocumented immigrants would be *prima facie* eligible for a legalization program if Congress passes the US Citizenship Act of 2021, which would provide lawful prospective immigrant (LPI) status to undocumented immigrants who were physically present in the United States on or before January 1, 2021. [8] The bill also provides lawful permanent resident (LPR) status to eligible noncitizens who entered the United States as a minor or were eligible for TPS or DED. In contrast to the other groups, *DACA recipients and childhood arrivals* or *TPS and DED recipients* who would be eligible for LPR status under the Citizenship Act are longer-term residents and have higher English proficiency levels. However, similar to the other groups, the share that pursue higher education remains low.

---

[4] H.R.6 - 117th Congress (2021-2022): American Dream and Promise Act of 2021. (2021, June 15). See https://www.congress.gov/bill/117th-congress/house-bill/6

[5] Dream Act of 2021, S. 264, 117th Cong. (2021-2022). https://www.congress.gov/bill/117th-congress/senate-bill/264

[6] Citizenship for Essential Workers Act, S. 747, 117th Cong. (2021-2022). https://www.congress.gov/bill/117th-congress/senate-bill/747

[7] Farm Workforce Modernization Act of 2021, H.R. 1603, 117th Cong. (2021-2022). https://www.congress.gov/bill/117th-congress/house-bill/1603?s=1&r=76

[8] US Citizenship Act of 2021. H.R. 1177 and S. 348, 117th Cong. (2021-2022). https://www.congress.gov/bill/117th-congress/house-bill/1177

**Table 2. Estimates of the Number and Characteristics of the Hispanic Undocumented Population Affected by Legislative Programs**

| Program | Total | In the US 15+ years | Speak English well very well or only English | Completed high school | Some college B.A. or higher | Household income above poverty level | Have health insurance |
|---|---|---|---|---|---|---|---|
| **American Dream and Promise Act of 2021** | | | | | | | |
| Conditional permanent residence | 1,112,200 | 74% | 82% | 100% | 38% | 86% | 47% |
| Removal of conditions on permanent residence | 761,000 | 80% | 82% | 100% | 37% | 91% | 50% |
| Direct adjustment to LPR status for TPS recipients under the Promise Act | 262,300 | 100% | 51% | 41% | 14% | 87% | 54% |
| Direct adjustment to LPR status for DED recipients under the Promise Act | 177,100 | 8% | 63% | 95% | 78% | 82% | 69% |
| **Dream Act of 2021** | | | | | | | |
| Conditional permanent residence | 1,634,000 | 53% | 83% | 96% | 36% | 80% | 50% |
| Removal of conditions on permanent residence | 492,400 | 89% | 88% | 99% | 41% | 92% | 52% |
| **Citizenship for Essential Workers Act** | | | | | | | |
| Essential Workers | 4,244,500 | 57% | 49% | 49% | 19% | 86% | 39% |
| **Farm Workforce Modernization Act** | | | | | | | |
| CAW status | 320,400 | 54% | 26% | 30% | 9% | 83% | 37% |
| **US Citizenship Act of 2021** | | | | | | | |
| General legalization program | 7,410,000 | 51% | 50% | 50% | 20% | 79% | 39% |
| LPR Status for DACA recipients and childhood arrivals | 761,000 | 80% | 82% | 100% | 37% | 91% | 50% |
| DACA recipients | 488,500 | 89% | 88% | 100% | 41% | 92% | 52% |
| Other childhood arrivals | 272,500 | 64% | 72% | 100% | 30% | 90% | 48% |
| Total TPS-DED recipients | 262,300 | 100% | 51% | 41% | 14% | 87% | 54% |

Note: Figures are rounded to the nearest hundred. Source: CMS estimates using the one-year 2019 American Community Survey (ACS) data, Ruggles et al. (2021).

CMS estimates indicate that Hispanic undocumented immigrants are highly engaged in natural resources, which are potentially low-skilled and lower-paying occupations. Furthermore, our estimates highlight the fact that many Hispanic undocumented workers are filling in essential jobs but not receiving the benefits, compensation, and job security that they could receive if they had legal status. The enactment of pending bills would provide legal status and a path to citizenship to millions of Hispanic undocumented immigrants as they make essential contributions to local communities without access to protection and public services.

## 5   References

CMS (Center for Migration Studies). 2022. "Democratizing Data Initiative: Undocumented Immigrants in the United States, by State, Race, and Year, 2010-2019 [dataset]." New York, NY: CMS. https://www.cmsny.org/data-undocumented-state-race-2010-to-2019.

Kerwin, Donald, José Pacas, and Robert Warren (2022). Ready to Stay: A Comprehensive Analysis of the US Foreign-Born Populations Eligible for Special Legal Status Programs and for Legalization Under Pending Bills. *Journal on Migration and Human Security.* 10(1): 37-76. doi: 10.1177/23315024211065016.

Ruggles, Steven, Sarah Flood, Sophia Foster, Ronald Goeken, Jose Pacas, Megan Schouweiler, and Matthew Sobek (2021). *IPUMS USA: Version 11.0 [dataset].* Minneapolis, MN: IPUMS. https://doi.org/10.18128/D010.V11.0.

000773

## About Center for Migration Studies of New York

The Center for Migration Studies of New York (CMS) is a think tank and an educational institute devoted to the study of international migration, to the promotion of understanding between immigrants and receiving communities, and to public policies that safeguard the dignity and rights of migrants, refugees, and newcomers.

### Contact Information

Phone:     (212) 337-3080
Email:     cms@cmsny.org
Address:   Center for Migration Studies
           307 East 60th Street, 4th Floor
           New York, NY 10022
           www.cmsny.org

### Authors

Evin Millet and Jacquelyn Pavilon

### Suggested Citation

Millet, Evin and Jacquelyn Pavilon. 2022. "Demographic Profile of Undocumented Hispanic Immigrants in the United States." Center for Migration Studies of New York (CMS) Report. New York, NY: CMS.

@ 2022 The Center for Migration Studies (CMS)
All Rights Reserved.

    

Sign up to receive CMS's weekly newsletter and information our publications, journals, and events.



# Presidential Documents

Executive Order 14012 of February 2, 2021

## Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1**. *Policy*. Over 40 million foreign-born individuals live in the United States today. Millions more Americans have immigrants in their families or ancestry. New Americans and their children fuel our economy, working in every industry, including healthcare, construction, caregiving, manufacturing, service, and agriculture. They open and successfully run businesses at high rates, creating jobs for millions, and they contribute to our arts, culture, and government, providing new traditions, customs, and viewpoints. They are essential workers helping to keep our economy afloat and providing important services to Americans during a global pandemic. They have helped the United States lead the world in science, technology, and innovation. And they are on the frontlines of research to develop coronavirus disease 2019 (COVID–19) vaccines and treatments for those afflicted with the deadly disease.

Consistent with our character as a Nation of opportunity and of welcome, it is essential to ensure that our laws and policies encourage full participation by immigrants, including refugees, in our civic life; that immigration processes and other benefits are delivered effectively and efficiently; and that the Federal Government eliminates sources of fear and other barriers that prevent immigrants from accessing government services available to them. Our Nation is enriched socially and economically by the presence of immigrants, and we celebrate with them as they take the important step of becoming United States citizens. The Federal Government should develop welcoming strategies that promote integration, inclusion, and citizenship, and it should embrace the full participation of the newest Americans in our democracy.

**Sec. 2**. *Role of the Domestic Policy Council*. The role of the White House Domestic Policy Council (DPC) is to convene executive departments and agencies (agencies) to coordinate the formulation and implementation of my Administration's domestic policy objectives. Consistent with that role, the DPC shall coordinate the Federal Government's efforts to welcome and support immigrants, including refugees, and to catalyze State and local integration and inclusion efforts. In furtherance of these goals, the DPC shall convene a Task Force on New Americans, which shall include members of agencies that implement policies that impact immigrant communities.

**Sec. 3**. *Restoring Trust in our Legal Immigration System*. The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall review existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that may be inconsistent with the policy set forth in section 1 of this order.

(a) In conducting this review, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall:

(i) identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law; and

(ii) identify any agency actions that fail to promote access to the legal immigration system—such as the final rule entitled, ''U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,'' 85 Fed. Reg. 46788 (Aug. 3, 2020), in light of the Emergency Stopgap USCIS Stabilization Act (title I of division D of Public Law 116–159)—and recommend steps, as appropriate and consistent with applicable law, to revise or rescind those agency actions.

(b) Within 90 days of the date of this order, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a plan to the President describing the steps their respective agencies will take to advance the policy set forth in section 1 of this order.

(c) Within 180 days of submitting the plan described in subsection (b) of this section, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing the progress of their respective agencies towards implementing the plan developed pursuant to subsection (b) of this section and recognizing any areas of concern or barriers to implementing the plan.

**Sec. 4.** *Immediate Review of Agency Actions on Public Charge Inadmissibility.* The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the heads of other relevant agencies, as appropriate, shall review all agency actions related to implementation of the public charge ground of inadmissibility in section 212(a)(4) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a)(4), and the related ground of deportability in section 237(a)(5) of the INA, 8 U.S.C. 1227(a)(5). They shall, in considering the effects and implications of public charge policies, consult with the heads of relevant agencies, including the Secretary of Agriculture, the Secretary of Health and Human Services, and the Secretary of Housing and Urban Development.

(a) This review should:

(i) consider and evaluate the current effects of these agency actions and the implications of their continued implementation in light of the policy set forth in section 1 of this order;

(ii) identify appropriate agency actions, if any, to address concerns about the current public charge policies' effect on the integrity of the Nation's immigration system and public health; and

(iii) recommend steps that relevant agencies should take to clearly communicate current public charge policies and proposed changes, if any, to reduce fear and confusion among impacted communities.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing any agency actions identified pursuant to subsection (a)(ii) of this section and any steps their agencies intend to take or have taken, consistent with subsection (a)(iii) of this section.

**Sec. 5.** *Promoting Naturalization.*

(a) *Improving the naturalization process.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall, within 60 days of the date of this order, develop a plan describing any agency actions, in furtherance of the policy set forth in section 1 of this order, that they will take to:

(i) eliminate barriers in and otherwise improve the existing naturalization process, including by conducting a comprehensive review of that process with particular emphasis on the N–400 application, fingerprinting, background and security checks, interviews, civics and English language tests, and the oath of allegiance;

(ii) substantially reduce current naturalization processing times;

(iii) make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee and restoration of the fee waiver process;

(iv) facilitate naturalization for eligible candidates born abroad and members of the military, in consultation with the Department of Defense; and

(v) review policies and practices regarding denaturalization and passport revocation to ensure that these authorities are not used excessively or inappropriately.

(b) *Implementing improvements to the naturalization process.* Within 180 days of the issuance of the plan developed pursuant to subsection (a) of this section, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall each submit a report to the President describing the progress in implementing the plan, any barriers to implementing the plan, and any additional areas of concern that should be addressed to ensure that eligible individuals are able to apply for naturalization in a fair and efficient manner.

(c) *Strategy to promote naturalization.* There is established an Interagency Working Group on Promoting Naturalization (Naturalization Working Group) to develop a national strategy to promote naturalization. The Naturalization Working Group shall be chaired by the Secretary of Homeland Security, or the Secretary's designee, and it shall include the heads of the following agencies, or senior-level officials designated by the head of each agency:

(i) the Secretary of Labor;

(ii) the Secretary of Health and Human Services;

(iii) the Secretary of Housing and Urban Development;

(iv) the Secretary of Education;

(v) the Secretary of Homeland Security;

(vi) the Commissioner of Social Security; and

(vii) the heads of other agencies invited to participate by the Working Group chair.

(d) Within 90 days of the date of this order, the Naturalization Working Group shall submit a strategy to the President outlining steps the Federal Government should take to promote naturalization, including the potential development of a public awareness campaign.

**Sec. 6.** *Revocation.* The Presidential Memorandum of May 23, 2019 (Enforcing the Legal Responsibilities of Sponsors of Aliens), is revoked. The heads of relevant agencies shall review any investigations or compliance actions initiated pursuant to that memorandum and shall determine whether to suspend, as appropriate, any investigations or compliance actions inconsistent with the policy set forth in section 1 of this order. The heads of relevant agencies shall review any agency actions developed pursuant to that memorandum and, as appropriate, issue revised guidance consistent with the policy set forth in section 1 of this order.

**Sec. 7.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 2, 2021.*

[FR Doc. 2021–02563
Filed 2–4–21; 8:45 am]
Billing code 3295–F1–P

# Monetary Policy Report – July 2024

 PDF

---

## Part 3: Summary of Economic Projections

### *Monetary Policy Report submitted to the Congress on July 5, 2024, pursuant to section 2B of the Federal Reserve Act*

*The following material was released after the conclusion of the June 11–12, 2024, meeting of the Federal Open Market Committee.*

In conjunction with the Federal Open Market Committee (FOMC) meeting held on June 11–12, 2024, meeting participants submitted their projections of the most likely outcomes for real gross domestic product (GDP) growth, the unemployment rate, and inflation for each year from 2024 to 2026 and over the longer run. Each participant's projections were based on information available at the time of the meeting, together with her or his assessment of appropriate monetary policy—including a path for the federal funds rate and its longer-run value—and assumptions about other factors likely to affect economic outcomes. The longer-run projections represent each participant's assessment of the value to which each variable would be expected to converge, over time, under appropriate monetary policy and in the absence of further shocks to the economy. "Appropriate monetary policy" is defined as the future path of policy that each participant deems most likely to foster outcomes for economic activity and inflation that best satisfy his or her individual interpretation of the statutory mandate to promote maximum employment and price stability.

### Table 1. Economic projections of Federal Reserve Board members and Federal Reserve Bank presidents, under their individual assumptions of projected appropriate monetary policy, June 2024

Percent

| Variable | Median | | | | Central Tendency | | | | Ra... | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | Longer run | 2024 | 2025 | 2026 | Longer run | 2024 | 2025 |
| Change in real GDP | 2.1 | 2.0 | 2.0 | 1.8 | 1.9–2.3 | 1.8–2.2 | 1.8–2.1 | 1.7–2.0 | 1.4–2.7 | 1.5–2.5 |
| March projection | 2.1 | 2.0 | 2.0 | 1.8 | 2.0–2.4 | 1.9–2.3 | 1.8–2.1 | 1.7–2.0 | 1.3–2.7 | 1.7–2.5 |
| Unemployment rate | 4.0 | 4.2 | 4.1 | 4.2 | 4.0–4.1 | 3.9–4.2 | 3.9–4.3 | 3.9–4.3 | 3.8–4.4 | 3.8–4.3 |
| March projection | 4.0 | 4.1 | 4.0 | 4.1 | 3.9–4.1 | 3.9–4.2 | 3.9–4.3 | 3.8–4.3 | 3.8–4.5 | 3.7–4.3 |
| PCE inflation | 2.6 | 2.3 | 2.0 | 2.0 | 2.5–2.9 | 2.2–2.4 | 2.0–2.1 | 2.0 | 2.5–3.0 | 2.2–2.5 |

000779

| Variable | Median | | | | Central Tendency | | | | Ran |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2024 | 2025 | 2026 | Longer run | 2024 | 2025 | 2026 | Longer run | 2024 | 2025 |
| March projection | 2.4 | 2.2 | 2.0 | 2.0 | 2.3–2.7 | 2.1–2.2 | 2.0–2.1 | 2.0 | 2.2–2.9 | 2.0–2.5 |
| Core PCE inflation[4] | 2.8 | 2.3 | 2.0 | | 2.8–3.0 | 2.3–2.4 | 2.0–2.1 | | 2.7–3.2 | 2.2–2.6 |
| March projection | 2.6 | 2.2 | 2.0 | | 2.5–2.8 | 2.1–2.3 | 2.0–2.1 | | 2.4–3.0 | 2.0–2.6 |
| Memo: Projected appropriate policy path | | | | | | | | | | |
| Federal funds rate | 5.1 | 4.1 | 3.1 | 2.8 | 4.9–5.4 | 3.9–4.4 | 2.9–3.6 | 2.5–3.5 | 4.9–5.4 | 2.9–5.4 |
| March projection | 4.6 | 3.9 | 3.1 | 2.6 | 4.6–5.1 | 3.4–4.1 | 2.6–3.4 | 2.5–3.1 | 4.4–5.4 | 2.6–5.4 |

Note: Projections of change in real gross domestic product (GDP) and projections for both measures of inflation are percent changes from the fourth quarter of the previous year to the fourth quarter of the year indicated. PCE inflation and core PCE inflation are the percentage rates of change in, respectively, the price index for personal consumption expenditures (PCE) and the price index for PCE excluding food and energy. Projections for the unemployment rate are for the average civilian unemployment rate in the fourth quarter of the year indicated. Each participant's projections are based on his or her assessment of appropriate monetary policy. Longer-run projections represent each participant's assessment of the rate to which each variable would be expected to converge under appropriate monetary policy and in the absence of further shocks to the economy. The projections for the federal funds rate are the value of the midpoint of the projected appropriate target range for the federal funds rate or the projected appropriate target level for the federal funds rate at the end of the specified calendar year or over the longer run. The March projections were made in conjunction with the meeting of the Federal Open Market Committee on March 19–20, 2024. One participant did not submit longer-run projections for the change in real GDP, the unemployment rate, or the federal funds rate in conjunction with the March 19–20, 2024, meeting.

1. For each period, the median is the middle projection when the projections are arranged from lowest to highest. When the number of projections is even, the median is the average of the two middle projections. Return to table

2. The central tendency excludes the three highest and three lowest projections for each variable in each year. Return to table

3. The range for a variable in a given year includes all participants' projections, from lowest to highest, for that variable in that year. Return to table

4. Longer-run projections for core PCE inflation are not collected. Return to table

Figure 1. Medians, central tendencies, and ranges of economic projections, 2024–26 and over the longer run



NOTE: Definitions of variables and other explanations are in the notes to table 1. The data for the actual values of the variables are annual.

Accessible Version

Figure 2. FOMC participants' assessments of appropriate monetary policy: Midpoint of target range or target level for the federal funds rate



NOTE: Each shaded circle indicates the value (rounded to the nearest 1/8 percentage point) of an individual participant's judgment of the midpoint of the appropriate target range for the federal funds rate or the appropriate target level for the federal funds rate at the end of the specified calendar year or over the longer run.

Accessible Version

000782

United Nations



# General Assembly

A/HRC/53/26

Distr.: General
20 April 2023

Original: English

**Human Rights Council**
**Fifty-third session**
19 June–14 July 2023
Agenda item 3
**Promotion and protection of all human rights, civil,**
**political, economic, social and cultural rights,**
**including the right to development**

## How to expand and diversify regularization mechanisms and programmes to enhance the protection of the human rights of migrants

### Report of the Special Rapporteur on the human rights of migrants, Felipe González Morales

*Summary*

    The present report outlines the main activities undertaken by the Special Rapporteur on the human rights of migrants, Felipe González Morales, during the reporting period. In the report, the Special Rapporteur highlights the human rights challenges faced by migrants in an irregular situation by providing an analysis on how irregularity increases vulnerability to human rights violations. He discusses how to address situations of vulnerability of migrants due to a lack of regular migration status by creating and strengthening regularization mechanisms.

    On the basis of the information and analysis provided by States, international organizations, civil society and other stakeholders, the Special Rapporteur identifies promising practices, ongoing efforts and existing challenges and provides a set of recommendations aimed at expanding and diversifying regularization mechanisms and programmes to enhance the protection of the human rights of migrants.

Please recycle 

## I.   Introduction

1.      The present report is submitted to the Human Rights Council at its fifty-third session by the Special Rapporteur on the human rights of migrants, Felipe González Morales, pursuant to Human Rights Council resolution 43/6.

## II.   Activities of the Special Rapporteur

**Country visits**

2.      The Special Rapporteur conducted an official visit to Poland and Belarus from 12 to 25 July 2022 .[1] He also undertook a visit to Bangladesh from 20 to 31 January 2023.[2]

**Other activities**

3.      In September 2022, the Special Rapporteur participated in the thirty-fifth session of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families and in an event organized by that Committee and the Committee on the Rights of the Child on their joint general comment on migrant children.

4.      On 18 October, the Special Rapporteur presented his report on climate change and the human rights of migrants to the General Assembly. On 18 and 19 October, he participated in the annual meeting of the United Nations Network on Migration.

5.      Also in October, the Special Rapporteur participated in a live meeting on Facebook about climate change and human mobility, organized by Sin Fronteras, the International Organization for Migration and other institutions; a side event to the General Assembly on a human rights-based approach to climate change, together with six other special rapporteurs; a dialogue with representatives of civil society on the fundamental rights of migrants and refugees in Europe, organized by the Spanish Commission for Aid to Refugees, Acoge and other institutions, in Toledo, Spain; an event on protection and law enforcement in sea operations and the question of non-penalization, organized jointly by the Special Rapporteur, the United Nations Office on Drugs and Crime (UNODC), the Office of the United Nations High Commissioner for Refugees (UNHCR) and other institutions; and a workshop, organized by Aula Abierta, where the Special Rapporteur spoke about Venezuelan human mobility.

6.      On 3 November, the Special Rapporteur spoke at the Vienna Discussion Forum, organized by UNODC, the United Nations Industrial Development Organization and other institutions, which was focused on women on the move. On 4 November, the Special Rapporteur was the keynote speaker at the twenty-fifth anniversary commemoration of the Centre for Human Rights of the University of Deusto, presenting a lecture on new challenges for the protection of the human rights of migrants. On 21 November, he participated in a round-table discussion organized by the International Labour Organization (ILO) on protecting the rights of migrant workers in irregular situations. On 28 November, he spoke at an event organized by the United Nations Entity for Gender Equality and the Empowerment of Women (UN-Women) on women human rights defenders at risk in migration contexts.

7.      Also in November, the Special Rapporteur participated in an event organized by the Office of the Ombudsman of Argentina on communicating about migration with a human rights-based approach; spoke at the twenty-fifth anniversary commemoration of the Chiapas-based Centre for Human Rights Fray Matías of Córdova; participated in an event organized by the Centre for Human Rights of the University of Buenos Aires, at which students presented papers about cases on migration in the Americas; addressed the Regional South American Meeting of Ombudsman's Offices on the subject of legal defence and international

---

[1] See A/HRC/53/26/Add.1 and A/HRC/53/26/Add.2.
[2] See A/HRC/53/26/Add.3.

000784

protection; and spoke at the annual congress of the Ibero-American Federation of Ombudsmen on access to justice for migrants.

8.       On 24 January 2023, the Special Rapporteur spoke at a United Nations University round-table discussion on decent work for migrants in the global South.

9.       On 1 March, the Special Rapporteur gave a lecture at the International Institute for the Sociology of Law on the main challenges for the protection of the human rights of migrants. On 7 March, he was a speaker at the launch of the Migrant Rights database, organized by the Global Migration Centre of the Geneva Graduate Institute and the Migrant Rights Initiative of Cornell University. On 30 March, he participated in a panel on decolonizing human rights practice to promote racial justice at the annual meeting of the American Society of International Law.

10.      Also in March, the Special Rapporteur participated in a panel on the coronavirus disease (COVID-19) pandemic, borders and migratory regularization at the World Forum on Human Rights, held in Buenos Aires; a panel at the Forum on Migration Trends, convened by the Conference of Bishops of Guatemala and other organizations, where he was the keynote speaker, addressing the situation of shelters for migrants in Guatemala and Mexico; and a side event to the fifty-second session of the Human Rights Council on disappearances of migrants, which he co-organized together with the Permanent Mission of Mexico, the Office of the United Nations High Commissioner for Human Rights (OHCHR) and other institutions.

## III.   Study on how to expand and diversify regularization mechanisms and programmes to enhance the protection of the human rights of migrants

### A.   Introduction

11.      Migration can bring positive and empowering experiences to migrants, their families and their communities in their countries of origin and destination. Yet many undocumented migrants continue to struggle due to the lack of regular migration status. Migrants in irregular situations live and work in critical circumstances and may be disproportionately subjected to discrimination, abuse, exploitation and marginalization. Undocumented migrant women may be more exposed to abuse and exploitative conduct, gender-based violence and harassment and intersecting forms of discrimination. Irregular migration status associated with restrictive legislative and policy responses may drive migrants into situations of vulnerability, which also reduce the development benefits of migration for migrants, their families and the communities involved.

12.      The factors that lead migrants to find themselves in irregular situations are multilayered. Regardless of the circumstances that led them into irregularity, the enjoyment of their right to health, housing, decent work, access to justice, education and other rights is usually negatively affected. The denial of migrants' rights is often closely linked to discriminatory laws and to the expression of prejudice in practice, including intolerance or xenophobia.

13.      Undocumented migrants, including those with international protection needs, have human rights and need the protection of those rights, as many of them cannot return to their countries of origin for a wide range of legal and practical reasons. Considering that most migrants in irregular situations do not have access to social benefits, it is likely that a high proportion of them work in order to survive and thus may be having a significant impact on the economy through their contribution to the labour market. Irregular migration is often a consequence of limited regular pathways through which to migrate for work, safety or family reunification or because of inadequate information about other options. Policies that focus solely on returning migrants to their country of origin may also risk generating cycles of repeated migration in more critical conditions.

14.     The regularization of migrants in an irregular situation, namely granting them a regular migration status to legalize their stay in the country, can be an effective measure to ensure the protection of the human rights of migrants in vulnerable situations, especially those who have experienced or encountered human rights violations and abuses in their home countries, or during the migration journey, in countries of transit and destination. The implementation of regularization mechanisms may contribute to both human development and national development.

15.     In preparing the present report, the Special Rapporteur issued a questionnaire on how to expand and diversify regularization mechanisms and programmes to enhance the protection of the human rights of migrants. He expresses his gratitude to all the States, United Nations entities, civil society organizations and academics that contributed. The report is based primarily on the 83 submissions received,[3] complemented by additional research, data and legal documentation issued by the United Nations, international organizations, States, civil society organizations and academics and by other open resources that were publicly available as of February 2023.

## B.   Informative aspects of regularization programmes and mechanisms

### 1.   Key definitions

16.     Although there is no universally accepted definition of irregular migration, the term is generally used to identify persons moving outside regular migration channels. The fact that they migrate irregularly does not relieve States from the obligation to protect their rights. Moreover, categories of people who may not have any other choice but to use irregular migration channels can also include migrants, refugees, asylum-seekers, victims of trafficking or unaccompanied migrant children in addition to migrants who are compelled to leave their country of origin for a variety of reasons. The Special Rapporteur would like to emphasize that, under international law, States are also obliged to protect the human rights of persons resorting to irregular migration pathways, including through access to asylum and international protection for asylum-seekers fleeing persecution, conflicts or generalized violence.[4]

17.     The terms "undocumented migrants", "irregular migrants" and "migrants in irregular situations" denote persons who live in a country in which their residency is not officially recognized by that country. Some may not yet have been able to obtain a residence or stay permit or citizenship due to restrictive migration categories, including labour migration, and residence policies. Other people may have had residence permits linked to education, employment or family reunification, but those permits were either temporary or had precarious stay conditions and their validity expired. Children who are born to undocumented parents inherit their irregular status. "Tolerated status" refers to a situation in which Governments do not grant regular residence status, but rather de facto enact a stay that leaves an individual in an irregular situation, severely impairing the exercise of many of their fundamental rights (e.g. the right to freedom of movement, to work, to family reunification and to access social welfare benefits).

18.     With regard to the distinction between "regular" and "irregular" migrants, regular and irregular situations are rarely clear. The vast majority of the world's migrants arrive in their destination country through a regular channel and, owing to different circumstances, become "irregular" at a later stage. This may be through no fault of the migrants themselves, but instead owing to unclear or overly bureaucratic migration procedures, discrimination or such practical impediments as high visa renewal costs, language barriers and a lack of access to legal assistance. Such overstay has a negative impact on migrants from all countries and at all socioeconomic and educational levels.[5]

---

[3]  See https://www.ohchr.org/en/calls-for-input/2023/report-how-expand-and-diversify-regularization-mechanisms-and-programs-enhance.

[4]  See https://www.iom.int/key-migration-terms.

[5]  See https://www.ohchr.org/sites/default/files/Documents/Issues/Migration/GlobalCompactMigration/RegularAndIrregular.pdf.

19.     "Regularization" is considered to be any process or procedure through which someone can be granted a residence permit from a government authority regularizing their stay in the country in which they live. The person applies under such procedures when they are already in the territory, including when arriving and/or residing irregularly. The process for applying for regularization differs from that used to obtain residence and work permits, which must be applied for from another country prior to or upon regular arrival. Regularization can also occur through policy amendments that exempt a specific nationality from the requirement to hold a residence permit in the country. Regularization is subdivided into three categories: regularization programmes, consisting of national measures that are not part of the regular policy framework, have a limited time period in which to apply and typically target particular categories of non-nationals in irregular situations; regularization mechanisms, which are part of the regular migration law and policy framework, with applications accepted on a rolling basis, and thus are permanent measures; and regularization initiatives, which are based on existing mechanisms in the policy framework and are aimed at putting a mechanism into practice. All three types of regularization may be time-bound and are often undertaken by local or regional authorities in a specific city or region. Regularization initiatives can be followed by awareness-raising campaigns, legal assistance and other support targeting migrants in irregular situations.[6] People can find themselves in a so-called "limbo" situation, in which they experience the rejection of their request for asylum or bureaucratic and lengthy asylum and/or migration procedures, leading to a protracted, indefinite and undefined legal and social situation.

## 2.    International framework on regularization

20.     The international normative and policy framework on regularization comprise references to both government commitments and aspects that regularization initiatives should meet. The United Nations human rights treaties establish important provisions relating to the human rights of all migrants, including those in an irregular situation. For example, the International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families requires States parties to take appropriate measures to address the situation of migrants in an irregular situation and to consider the possibility of regularizing their situation. Specifically, article 69 of the Convention provides that States parties shall, when there are migrant workers and members of their families within their territory in an irregular situation, take appropriate measures to ensure that such a situation does not persist, and that whenever the States parties concerned consider the possibility of regularizing the situation of such persons in accordance with applicable national legislation and bilateral or multilateral agreements, appropriate account shall be taken of the circumstances of their entry, the duration of their stay in the States of employment and other relevant considerations, in particular those relating to their family situation.

21.     It is important to mention that States parties should also respect and realize the rights of all children as enshrined in the Convention on the Rights of the Child, including its guiding principles: the principle of non-discrimination and of the best interests of the child, the right to be heard and the right to life, survival and development. In a joint general comment, the Committee on the Rights of the Child and the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families issued guidance specifically recommending that States parties ensure that regularization procedures are clear and accessible for children and their families. With regard to the States parties' obligations, in particular with respect to countries of transit and destination, the Committees recognized the negative impacts on children's well-being of having an insecure and precarious migration status. The Committees therefore recommended that States ensure that there were clear and accessible status determination procedures for children to regularize their status on various grounds, such as length of residence.[7]

---

[6]  Platform for International Cooperation on Undocumented Migrants, "Regularization mechanisms and programmes: why they matter and how to design them" (2022).
[7]  Joint general comment No. 4 of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families/No. 23 of the Committee on the Rights of the Child (2017) on State obligations regarding the human rights of children in the context of international migration in countries of origin, transit, destination and return, para. 18.

22.     The Special Rapporteur would also like to refer to joint general comment No. 3 of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families/No. 22 of the Committee on the Rights of the Child (2017) on the general principles regarding the human rights of children in the context of international migration, in which the Committees stressed that States parties should develop and put into practice, with regard to unaccompanied children and children with families, a best-interests determination procedure aimed at identifying and applying comprehensive, secure and sustainable solutions, including further integration and settlement in the country of current residence, repatriation to the country of origin or resettlement in a third country. The Committees noted that solutions might include medium-term options and ensuring that there were possibilities for children and families to gain access to secure residence status in the best interests of the child. They also noted that best-interests determination procedures should be guided by child protection authorities within child protection systems and that possible solutions and plans should be discussed and developed together with the child, in a child-friendly and sensitive manner, in accordance with general comment No. 12 (2009) of the Committee on the Rights of the Child on the right of the child to be heard.

23.     In 2018, the Global Compact for Safe, Orderly and Regular Migration was adopted by over 150 Member States, setting out the commitment to build on existing practices to facilitate access for migrants with an irregular status to an individual assessment that may lead to regular status, on case-by-case basis and with clear and transparent criteria, especially in cases where children, youth and families are involved, as an option to reduce vulnerabilities, as well as for States to ascertain better knowledge of the resident population.[8] In its objective 15, the Global Compact sets out the need for the provision of access to basic services for migrants and the commitment to ensure that cooperation between service providers and immigration authorities does not exacerbate the vulnerabilities of migrants in an irregular situation by compromising their safe access to basic services or by unlawfully infringing upon the human rights to privacy, liberty and security of person at places of basic service delivery.[9]

24.     Under the Global Compact, Governments also agreed to prevent people from becoming undocumented by reviewing and revising existing pathways for regular migration in consultation with the private sector and other relevant stakeholders; to develop flexible, rights-based and gender-responsive labour mobility schemes by providing flexible, convertible and non-discriminatory visa and permit options; and to develop or build upon existing national and regional practices for admission and stay on compassionate, humanitarian or other considerations for migrants compelled to leave their countries of origin, due to sudden-onset natural disasters and other precarious situations, such as by providing humanitarian visas, private sponsorships, access to education for children, and temporary work permits, while adaptation in or return to their country of origin is not possible.[10]

25.     On the occasion of the Progress Declaration of the International Migration Review Forum in 2022,[11] Governments agreed to include more commitments and standards relevant to regularization. In this regard, Governments and other stakeholders recognized that the availability and flexibility of pathways for regular migration remained limited in many cases[12] and they committed to strengthening their efforts to enhance and diversify the availability of pathways for safe, orderly and regular migration, including in response to demographic and labour market realities, and for migrants in vulnerable situations, as well as those affected by disasters, climate change and environmental degradation.[13] Other commitments refer to labour mobility agreements, optimizing educational opportunities, facilitating access to procedures for family reunification that promote the best interests of the

---

[8]   Global Compact for Safe, Orderly and Regular Migration, para. 23 (i).
[9]   Ibid., para. 31 (b).
[10]   Ibid., para. 21 (c), (d) and (g).
[11]   The goal of the Progress Declaration of the International Migration Review Forum is to review the progress made at the local, national, regional and global levels in implementing the Global Compact for Safe, Orderly and Regular Migration.
[12]   Progress Declaration of the International Migration Review Forum, para. 24.
[13]   Ibid, para. 59.

child and to providing migrants with access to information pertaining to their rights and obligations during all stages of migration.

## C.   Irregularity and human rights

### 1.   Drivers leading migrants to irregularity

26.     Pathways towards irregular migration are varied. Migrants may fall into situations of irregularity when entering a country irregularly seeking protection or in search of safety and dignity or when losing their regular status because of a change in employers and/or restrictive migration labour policies. In some cases, migrant victims of crime or abusive conduct may find themselves in an irregular situation when fighting for justice. It is important to acknowledge that most migrants have little control over the complex factors that define their migration status. In most cases, they find themselves in an irregular situation through no fault of their own.

27.     Residence and work permits are often linked to a job contract, which must be regularly renewed. The implication of such a practice is that migrants can easily lose residence status following the loss of a job. Not fulfilling administrative requirements to renew residence status (e.g. due to high financial fees, unclear requirements or ambiguously communicated deadlines) may also result in migrants falling into irregularity. Other migrants may have their regular residence status associated with their spouse in cases of marriage or family reunification, which in some circumstances, such as separation from a violent partner, may result in the loss of regular residence status. Asylum-seekers who are found not to be in need of international protection may receive a return decision that may not be enforced immediately nor long into the future. There may be a variety of reasons for such a situation, for example a lack of administrative documents needed to enter the country of origin, health issues, or the best interests of the child. In such a case, authorities may tend to formally or informally tolerate the asylum-seeker's stay, although they do not grant residence status. This leaves asylum-seekers in a protracted legal and social limbo without any long-term prospects.[14]

28.     When options for safe and regular pathways for migration are insufficient, some people may still be compelled to leave their country of origin for reasons of health or survival. The adverse effects of climate change and environmental degradation; unequal access to economic and social rights, including health care, decent work, food, land or water; unequal opportunities, including gender inequality; and gender-based violence can all be compelling reasons for migrants to move through irregular migration channels. Other drivers or structural factors include gender-based migration bans, recruitment costs, dishonest labour recruiters, misleading or false information and a lack of understanding of complex migration rules.[15]

29.     Detention, deportation, social exclusion and the denial of migrants' access to their rights in the country of destination are also among the reasons that migrants in irregular situations live in fear for their lives. Undocumented migrants may be detained for several reasons. Refugees, asylum-seekers and migrants in situations of vulnerability fleeing violence and war often do not possess the proper documentation. As a consequence, many migrants and asylum-seekers are questioned and detained for not having valid and regular forms of identification, despite having pending asylum claims. On the other hand, impoverished migrants prefer irregular channels for migration, which exacerbates their vulnerability and exposure to exploitation.[16]

30.     It should be noted that the intersection between migration and other forms of discrimination (based on gender, race, ethnicity, religion and sexual orientation) and the false connection of irregularity to criminalization exacerbate the vulnerability of irregular migrants. Such exacerbated forms of discrimination, together with the oppression resulting from the marginalization and criminalization of such migrants, tend to result in the systemic

---

[14]   Caritas Europa, "Demystifying the regularisation of undocumented migrants" (2021).

[15]   ILO, *Protecting the Rights of Migrant Workers in Irregular Situations and Addressing Irregular Labour Migration: A Compendium* (2021).

[16]   See submission from the Migrant Forum in Asia.

violation of their human rights.[17] Furthermore, the Special Rapporteur notes that when migration policy is restrictive and, concurrently, paired with anti-migration rhetoric, a false image of migrants in society may emerge, with accusations that they pose a serious threat to the internal security of the country of destination.

31.     The Special Rapporteur observes that, when migrants are criminalized and dehumanized by policies and rhetoric, the message given is that they are not entitled to rights and have no place in society. The impacts of such biased narratives are wide-reaching within society, reducing people's trust in and connections with each other and enabling a range of harmful policy measures, such as widespread and unregulated surveillance practices, harassment of non-governmental organizations and the shrinking of space for defenders of migrant rights. The Special Rapporteur notes with concern that such negative rhetoric surrounding the issue can lead to the wrongful association of migrants with criminals in the public debate.[18]

32.     Under international human rights law, the criminalization of irregular migrants goes against the legitimate interests of States in protecting their territories and regulating migration. In the New York Declaration for Refugees and Migrants, Member States agreed to consider reviewing policies that criminalize cross-border movement and affirmed that children should not be criminalized on the basis of their migration status.[19] Undocumented migrants should not be treated as criminals or as national or public security threats. Criminalizing people on the basis of their migration status can lead to several other human rights violations, including discriminatory profiling, arbitrary arrest and detention, family separation and the inability to access health care, adequate housing, education, employment or other rights. The Special Rapporteur wishes to highlight that such criminalization of migrants further pushes them to live and work in the shadows of society and may increase their exposure to exploitation and abuse by different actors.

## 2.     Human rights challenges faced by migrants in irregular situations

33.     While in transit or in destination countries, many migrants find themselves in irregular and precarious conditions, unable to access basic services or justice and at risk of human rights violations and abuses, including trafficking in persons, sexual and gender-based violence and treatment that may result to torture and other cruel, inhuman or degrading treatment or punishment. Migrants in irregular situations also face challenges in the exercise of their human rights, including access to health care, education, essential services and adequate housing and to labour rights and social protection. Hence, irregularity increases exclusion, disempowers migrants and exposes them to greater risk of discrimination, abuse and exploitation.[20] When migrants experience exploitation or abuse, their lack of a regular status prevents them from reporting cases to the police out of fear of deportation.

34.     Labour inspections at the workplace are often conducted in conjunction with migration enforcement authorities, and exploited undocumented migrant workers can be apprehended. With reference to health care, financial barriers and fear that their personal data will be communicated to immigration authorities may result in migrants not going to the doctor or the hospital.[21] Irregular migration status also increases migrants' vulnerability to modern slavery, including because of their reliance on smugglers, the corruption of officials and a lack of access to protection mechanisms and safety nets. When combined with other circumstances, such as a lack of local language skills, physical or emotional isolation, a lack

---

[17]   Ibid.
[18]   OHCHR, "Seven key elements on building human rights-based narratives on migrants and migration" (2020).
[19]   General Assembly resolution 71/1, paras. 33 and 56.
[20]   United Nations Network on Migration, "Guidance note: regular pathways for admission and stay for migrants in situations of vulnerability" (2021).
[21]   Caritas Europa, "Demystifying the regularisation of undocumented migrants".

of integration and the absence of firewalls,[22] vulnerability to modern slavery for migrants without regular migration status becomes even greater.[23]

35.    Migrant workers also face challenges and abuses due to restrictive migration labour policies in countries of destination. For instance, some key obstacles to the empowerment of migrant workers to fight for their rights are that third-country national workers' visas, and the resulting ability to acquire or keep regular residence status, are often tied to one specific employer and an employment contract. In addition, certain regularization schemes require migrant workers to allocate a long period of time to a specific employment arrangement. Such instances can lead to situations in which migrant workers accept exploitative work conditions in order to acquire or renew regular residence status or to regularize their status.[24]

36.    It is important to note that the Committee on the Rights of the Child and the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families have recognized several negative impacts on children's well-being of having an insecure and precarious migration status, including but not limited to the risk of physical harm, psychological trauma, marginalization, discrimination, xenophobia and sexual and economic exploitation; different forms of violence on irregular migration journeys or in irregular situations in countries of destination; the risk of being denied access to education, housing, health care, recreational activities, participation, protection, social security and justice; the risk of child marriage, violence, trafficking, forced recruitment, exploitation and child labour, which is exacerbated when accompanied by a lack of birth registration and childhood statelessness; and risks to children's physical and mental health, recognizing that children experience stress differently than adults.[25]

37.    Undocumented migrant women and girls face specific vulnerabilities deriving from exploitative and illegal recruitment practices, especially those related to the payment of recruitment fees and poor working conditions. Migrant women are overrepresented in the informal economy, lacking access to decent work, social protection, labour rights or services. Women migrants are at increased risk of workplace violence and harassment and sexual and gender-based violence and are often reluctant to report crimes and transgressions due to their irregular or precarious migration status and are therefore unable to exercise their right to seek appropriate and effective remedies.[26] Migrant women without a regular migration status are often denied access to health care, housing and other vital public services. Gender-based discrimination against them is compounded by further discrimination based not only on their migration status but on ethnicity, race, class or caste identity.[27]

38.    The Special Rapporteur observes that, around the globe, the COVID-19 pandemic resulted in an increase in the type and complexity of vulnerabilities for migrants and a diversification of protection needs. Requests by migrants for low-threshold care have increased, including for the provision of services dedicated to health protection, legal protection, access to training and job placement services and the maintenance of housing autonomy. Victims of severe labour exploitation, in particular, have been clamouring for agile, customized and quick access to the labour market. During the first and second waves of the pandemic, because of the need to observe precautionary measures against the spread of the virus, direct access to such public services as social services, employment offices and

---

[22]  Firewalls are measures to separate immigration enforcement activities from public service provision, labour law enforcement and criminal justice processes to protect migrants, including migrant victims of crime, that States and non-State actors implement to ensure that persons with irregular status are not denied their human rights.

[23]  See submission from Anti-Slavery International and Focus on Labour Exploitation.

[24]  See submission from the European Union Agency for Fundamental Rights.

[25]  Joint general comment No. 3 of the Committee on the Protection of the Rights of All Migrant Workers and Members of Their Families/No. 22 of the Committee on the Rights of the Child (2017) on the general principles regarding the human rights of children in the context of international migration, para. 40; and submission from United Nations Children's Fund (UNICEF).

[26]  United Nations Network on Migration, "Guidance note".

[27]  See Ibid., paras. 9 and 12.

the revenue agencies was severely restricted, and associations that assist migrants were required to complete various types of paperwork.[28]

39.    The Special Rapporteur takes the opportunity to emphasize that undocumented migrants have rights, regardless of their migration status, under international human rights law and related standards and it is important to ensure that those rights are upheld. The human rights and protection needs of all persons moving across borders, including women and girls, children, trafficked persons, migrant workers, refugees, asylum-seekers, stateless persons and persons with disabilities, have also been recognized in specific international instruments. International and regional conventions and instruments on human rights and legal national frameworks ensure a wide range of rights and obligations. Such rights include the right to life, to human dignity, to asylum and non-refoulement, to a nationality, to protection from torture and inhumane treatment, to family life, to basic health services, to decent work and to access to justice, among others.

40.    Some of the rights and obligations established by international human rights law may restrict the return of migrants and therefore constitute a non-discretionary ground for regularization. These include the absolute prohibition of non-refoulement under international human rights law, including when related to the risk of socioeconomic irreparable harm, for instance on medical grounds; the right to family life; the right to private life; and the right to rehabilitation of victims of torture. Regardless of the parents' migration status, the best interests of the child must also be protected and children have the right to access basic education and should not be detained.

## D.    Regularization of undocumented migrants

### 1.    Objectives and human rights impact of regularization

41.    Regularization processes and procedures can facilitate the enjoyment of human rights by migrants holistically through civil and political rights and economic, social and cultural rights, improving migrants' access to social protection, including health care, decent work, education, adequate living conditions and family reunification. Providing undocumented migrants with regular migration status empowers them to live in less precarious conditions and to enjoy more certain and dignified lives, leading to the improvement of their socioeconomic situations and, hence, enhancing their physical and mental well-being.[29] Regular migration status protects migrants from detention and deportation and enables them to access social protection systems and participate fully in society, positively contributing to economic growth and development. As a result of their regularization, children and youth could also benefit from access to education, physical and mental health care, safe housing and other social services, improving their overall well-being. Regular status can also help children and youth to resist exploitation, abuse and discrimination and to access justice.

42.    When regularization and integration processes are considered in migration policy, migrants, including women and girls, are better able to exercise and enjoy their rights. Regular migration status supports migrant women's access to housing, banking services, education, the justice system and health care, including sexual and reproductive health services, and the ability to work in the formal economy. Regularization enables migrants to "come out of the shadows" and employ agency by joining unions, exercising freedom of expression and the right to assembly and association, advocating for services and defending their rights, including resisting all forms of discrimination and abuse.[30] Regularization also enables migrants to realize their right to decent work in just and favourable conditions and protects them from all forms of violence, including torture and exploitation, whether committed by State or private actors.

43.    It must be acknowledged that the purpose of integrating migrant workers into the local labour market is principally to ensure their successful integration into the destination country, as such integration can diminish tensions between migrant communities and the national

---

[28]   See submission from Comitato per i Diritti Civili delle Prostitute APS.
[29]   See submission from Better Engagement Between East and Southeast Asia.
[30]   See submission from the Women in Migration Network.

population and thus promote social cohesion and inclusive societies. The link between regularization and integration can be noted by the number of spaces in social and political life that persons with irregular status often cannot access: employment; labour guarantees; education; the health-care system; legal representation; the protection of rights; elections; membership in political parties and community organizations; and the right to association, among others. While residence and work permits should not depend upon a specific employer or contract, existing work relationships can continue and have continued after the employee was regularized. Depending upon the conditions of the permit granted, regularized migrant workers have greater labour market mobility. They are also able to negotiate fair conditions at work, develop in their careers and, in some cases, find employment that better matches their skills and expertise.[31]

44.    The Special Rapporteur particularly notes that, while integration is a complex process that is not ensured simply by acquiring regular status, regularization serves as a first step towards concrete economic and social integration for migrants in their destination countries and communities. In economic terms, regularization allows migrants to obtain formal employment, undertake entrepreneurial ventures, establish small businesses, pursue self-employment and exercise their capacity for innovation. Regarding social rights, obtaining regular status also allows migrants to access social security protection systems as, in some countries, universal health care is limited to emergency treatment and the schooling available to migrant children with irregular status is limited to primary education; migrants in regular situations enjoy greater access to health-care systems and education.

45.    Regularization also benefits family life. Family members that have been living in different countries from one another can be reunited and regularization can also lead to family reunification through official channels. Mixed-status families benefit, particularly when an undocumented parent, partner or child of a regularly residing migrant receives a permit. Regularization offers an opportunity for migrants and society to connect and build more durable relationships with one another. Specifically, regular migrants start engaging more with formal social networks and entities, such as employment centres, real estate agents and social and professional guidance services, because it is safe to do so. School boards, consumer protection bodies, women's, youth, environmental and a host of other civil society organizations also benefit from regularization as they become more representative of the population.[32]

46.    Additionally, the Special Rapporteur is aware that several countries are known to grant a "tolerated status" to migrants who cannot return to their countries of origin owing to international human rights obligations that bar their return (i.e. risk of refoulement; severe illness; family or private life ties in the country of destination; best interests of the child) or practical situations beyond their control, such as a lack of identity papers. Thus, their removal order is suspended for a certain period of time and their continued presence in the country of destination is tolerated. However, migrants are typically granted only very limited basic rights. It must be emphasized that such a procedure may keep those migrants in a limbo situation, with neither an irregular status nor a secure residence permit with full rights. This type of status should not be confused with regularization.[33]

47.    Regularization effectively leads to the stabilization of a migrant's status within the country of destination, decreases the likelihood of migrant exploitation, increases tax and social security revenues for the State, improves the availability of more accurate data on the labour market and irregular migration and weakens the underground economy. Furthermore, regularization provides migrants with access to justice and to tools for effectively safeguarding their rights. However, it is important to highlight that regularization alone is not enough to ensure the full enjoyment of human rights. Such measures as policies to oppose discrimination and xenophobia and access to justice and effective labour rights protection must also be put in place.

---

[31]  Platform for International Cooperation on Undocumented Migrants, "Regularisation mechanisms and programmes: why they matter and how to design them" (2022).

[32]  See submission from the Platform for International Cooperation on Undocumented Migrants.

[33]  Platform for International Cooperation on Undocumented Migrants, "Regularisation mechanisms and programmes".

**2.    Regularization mechanisms and programmes as promising practices**

48.     The Special Rapporteur would like to highlight some of the measures that have been implemented by States to facilitate the regularization of undocumented migrants. For instance, Operation Papyrus, implemented in the Swiss Canton of Geneva in 2017 and 2018, enabled people to apply for a residence permit without the support of their employer by simply "self-declaring" their current working relationship. Several civil society organizations took part in both the technical and political steering committees set up for the implementation phase. Candidates had to meet five criteria to be eligible: continuous residence in Geneva for 5 years for families with school-aged children, or 10 years for others; being employed; being financially independent; obtaining a certified A2 level in French; and being able to produce a clean criminal record. Although each case was reviewed individually, the procedure was standardized and based solely upon objective criteria, which made it easier to process many cases in a short amount of time. Operation Papyrus lasted almost two years, and people who started meeting the requirements halfway through the initiative could still apply.[34]

49.     By the end of 2020, 56 per cent of Venezuelans in Colombia were undocumented. The country's ongoing regularization programme for Venezuelan nationals was launched in 2021, with 2.5 million Venezuelans registered and more than 1 million Venezuelans documented through the regularization programme as at March 2023, making it the largest regularization programme to date. This programme provides a temporary residence permit valid for 10 years, during which time people can apply for an indefinite residence permit, which requires five years of residence. Thus, the temporary protection provides ample time for people to decide, prepare, apply for and acquire the indefinite permit.[35]

50.     The Law on Migration in Mexico incorporates several options for regularization, including visitor with permission to undertake economic activities; regional visitor; visiting worker from the border countries of Mexico; visitor for humanitarian reasons; visitor for reasons of adoption; temporary resident; temporary student resident; and permanent resident. It should be highlighted that the visa for visitors for humanitarian reasons is granted in the territory rather than before travel. The reasons for the granting of this visa include being a victim of a crime or human rights violation in Mexican territory; being an unaccompanied child or an asylum-seeker; or for any reason that the National Immigration Institute deems sufficient when there is a humanitarian or public interest reason for allowing persons either to enter the country or to access regularization once they are in the country.

51.     During the COVID-19 pandemic, Portugal enacted a temporary residence permit for people with a pending application for asylum, residence or a work permit to ensure their inclusion in the public-health response. The measure, which was adopted in May 2020 and extended until 31 March 2021, temporarily regularized 246,000 people.[36] In 2020, the Government of Canada implemented a pathway to permanent residency for asylum claimants across the country who served as front-line workers during the pandemic providing direct care to patients in health-care institutions. This approach recognized those with precarious migration status who were filling an urgent need and putting their own lives at risk to care for others in Canada.[37]

52.     The Deferred Action for Childhood Arrivals programme of the United States of America, which went into effect in 2012, has provided over 800,000 undocumented migrant youth who met eligibility requirements for age at arrival, education and criminal record with the ability to reside legally in the country without risk of deportation and to receive a social security number, pursue education, work and obtain a driver's licence.[38]

---

[34]  See submissions from Switzerland and the Platform for International Cooperation on Undocumented Migrants.

[35]  See submissions from the Platform for International Cooperation on Undocumented Migrants and Sures.

[36]  Caritas Europa, "Demystifying the regularisation of undocumented migrants", p. 7.

[37]  Organization for Security and Cooperation in Europe (OSCE), "Regularization of migrants in an irregular situation in the OSCE region: recent developments, points for discussion and recommendations" (August 2021).

[38]  See submission from UNICEF.

53.     Spain has a three-fold regularization mechanism, the "settling" (*arraigo*) system, comprising "work settling", "social settling" and "family settling", which allows the regularization of migrants who have developed enduring roots through employment, social integration or family ties. A temporary residence and work permit can be authorized for those who meet certain criteria. "Work settling" requires a minimum of two years of residence, a clean criminal record and the existence of a previous relationship with an employer of not less than six months. "Social settling" requires a minimum of three years of residence, a clean criminal record, labour contract proposals for at least one year and family ties with other resident foreigners or a certificate attesting to integration, issued by the local municipality. "Family settling" is designed for the parents of a child with Spanish nationality who are responsible for and cohabit with the child and are aware of their parental obligations. The system generally results in the regularization of the residence status of more than 30,000 people every year.[39]

54.     Thailand has regularly implemented amnesty programmes that allow migrants in an irregular situation to regularize their status and obtain work permits, most recently during the COVID-19 pandemic.[40] During the height of the pandemic, approximately 1.6 million migrant workers benefited from these measures. The Government continues to provide regularization windows, for instance, on 5 July 2022, approving a new registration window for irregular migrant workers and for previously registered migrant workers to continue working in Thailand until February 2025, subject to their travel document and visa validity.

55.     The Philippines assists undocumented migrants in destination countries by providing them with valid passports, negotiating with the Governments of those countries to settle migration fines and repatriating those who have urgent needs, such as those who are ill, as well as those who have died. The Philippines' Aid to Nationals programme coordinates consular efforts in responding to urgent requests for assistance made by Filipino individuals or groups, primarily involving police, migration and judicial agencies.[41]

56.     The Special Rapporteur would like to highlight that it is efficient for regularization programmes for migrants in an irregular situation already in the territory to provide them with or to extend work and residence permits. Ad hoc and time-bound regularization programmes can be implemented for numerous reasons, including to respond to emergency situations, provide access to health care, tackle undeclared work and labour exploitation, address and reduce situations of vulnerability faced by irregular migrants in destination countries, provide residence status on the basis of time spent in or integration into the country or in order to maintain family unity. It must be noted that although ad hoc and time-bound regularization programmes can be effective in the short term, they should be accompanied by standard and permanent mechanisms of access to regular stay status, which respond effectively to the needs of migrants in vulnerable situations.

## E.    Reframing the narrative on migration and the need to move forward on regularization

### 1.    Contribution of migrants to economies and societies

57.     The Special Rapporteur recognizes that migrants are vital to the development of economies and community growth. Such contributions can be seen through the payment of taxes, consumption, investment, subsidies and innovation. Migrants are more likely than nationals to start their own businesses, creating jobs for the host community; they can fill labour shortages in specific industries, including agriculture and health care; and they bring diverse skills, languages and cultural perspectives to the host country.[42] Migrants constitute a potential supply of workers that can influence productive capital. For instance, Brazil has registered positive indicators of economic activity in periods of intensified migratory movements, including, for example, an improvement in the socioeconomic situation of

---

[39]   OSCE, "Regularization of migrants in an irregular situation".
[40]   See submission from Thailand.
[41]   See submission from the Migrant Forum in Asia.
[42]   See submission from the Migration Youth and Children Platform.

Roraima State after an increased inflow of Venezuelans. There was also growth in retail trade and exports, with a 25 per cent increase in the amount of state tax collected on the circulation of goods and services between the end of 2018 and the first semester of 2019.[43]

58.      Migrant workers also generate revenue for their countries of origin, which is undeniably beneficial. In India, migrant workers sent home between $90 and $100 billion in remittances in 2022 alone. In the Philippines, in 2021, remittances from migrant workers increased by 3.6 per cent to an all-time high of $36.14 billion. With reference to cultural contributions, the presence of migrant communities in their countries of destination may also help to bridge cultural gaps by promoting diversity and introducing new cultures and perspectives through various activities, including sports, community outreach and the observance of holidays. The cultural diversity owed to migratory movements allows for the sharing of new perspectives and life experiences through cross-cultural interactions, the emergence of innovative and hybrid cultural practices and a general societal openness to difference and change.[44]

59.      In countries of destination, labour migration may also generate additional employment opportunities, rejuvenate the workforce, contribute to social protection schemes and provide such beneficial feedback effects as knowledge, skills and technology transfer. Well-governed labour migration also raises living standards and may be an important source of empowerment for migrant workers. Furthermore, women's participation in the labour force is a driver of growth and poverty reduction, and leveraging women's skills is essential for societies to prosper. For many women, labour migration is a positive experience, providing opportunities to strengthen livelihoods and autonomy. Evidence is mounting that gender equality in labour migration is smart economics.

60.      While the Special Rapporteur takes note of the important above-mentioned information and data with respect to the contribution of migrants to the economy of destination countries and communities, he would like to emphasize the need to rethink and change the way migration is spoken about, especially when harmful narratives on migration are inserted into the public discourse. In this regard, the Special Rapporteur takes the opportunity to observe that well-meaning narratives promote the positive economic contributions migrants make to their countries of origin and destination, emphasizing the economic benefits of migration. However, it should be noted that such messaging does not tend to resonate with audiences. It also risks reinforcing the perception of migrants as a commodity or instrumentalizing them as exploitable units of labour to fulfil labour market needs. Such messaging may also invoke a negative framing, in which migrants are seen as a threat to jobs, employment standards and union power or to the welfare system. It may also jeopardize the recognition of migrants as rights holders who are entitled to decent work, social protection and benefits, regardless of their contributions. The Special Rapporteur would like to highlight the need to focus on a positive narrative in which social and cultural abundance is valued and respect for people's rights is seen as improving everyone's situation – when "we work together, we can achieve shared goals and improve our communities". Centralizing non-economic values is key for societies to prosper, including such values as kindness, caring for each other and solidarity.[45]

## 2.      Moving forward on regularization under international human rights law

61.      While the Special Rapporteur takes note of some progress on the implementation of regularization, it is nonetheless important to refer to the challenges faced in designing and implementing regularization processes. In some countries, many people seeking asylum are considered in the same way as undocumented migrants or are granted a very precarious temporary status that does not provide adequate protection because of the lack of a legal framework and/or the implementation of a framework to protect refugees and others in need of international protection. Such lack of protection of refugees and asylum-seekers increases their risk of statelessness. Children born to undocumented refugees and asylum-seekers and

---

[43]   See submission from Conectas Brazil.
[44]   See submission from the Migrant Forum in Asia.
[45]   See OHCHR, "Step 7: do no harm – be aware of unconscious bias in messaging, and avoid discrimination" (2020).

undocumented migrants frequently lack documentation and are at risk of statelessness and insufficient or no access to education, health care and other social protection. Migrant workers in some sectors, including domestic work, fisheries and agriculture, are not covered by national labour laws in many countries and are therefore granted no or very limited status. They are often victims of trafficking in persons and at high risk for experiencing occupational safety issues. Women migrant workers consistently experience unfair treatment when they are pregnant or are forbidden from becoming pregnant by employers or by Governments. The Special Rapporteur notes with concern that due to a lack of a gender-based approach to protect and promote the human rights of migrants, gender-based violence and sexual harassment in the workplace against women and migrant workers with marginalized gender identities are rampant.[46]

62.     Considering that undocumented migrants usually find themselves in or at risk of poverty, the high cost of residence procedures poses a significant challenge to them. Administrative fees are a common policy in migration management and may include fees for applying for a visa or a permit; renewing a permit; translating documents; obtaining photographs; issuing a permit; and having biometric data taken. Another frequent cost is paying for a lawyer if there are no pro bono lawyers or if an undocumented migrant cannot access pro bono lawyers or expert civil society organizations. Serious financial consequences can result from taking time off work to submit applications in person, meet for interviews or have fingerprints taken. It has also been brought to the attention of the Special Rapporteur that criticisms of regularization mechanisms often include their lack of transparency and the large discretionary power given to the authorities, as criteria are not always clear and are often interpreted in a narrow and restricted way.

63.     It must be acknowledged that residence procedures are becoming more digitized. Several countries have now developed online portals where migrants can submit, renew or follow up on their permit application. Undocumented migrants sufficiently familiar with the online environment may find it less complicated to apply using such systems, as will those who have a computer or know someone or a civil society organization with a computer that they can use. The Special Rapporteur notes that while digital procedures may remove some barriers, such as the need to travel to apply, they can create new ones, including the need a for computer or a smartphone to scan and submit required documentation. Migrants who are digitally excluded usually do not have affordable access to the Internet and/or digital devices to connect. They may not have the basic digital skills required to digitize documents or to use the Internet, including navigating online portals, a challenge that is exacerbated when portals are not user-friendly.[47]

64.     In order for States to move forward on regularization processes, procedures to assess stay claims submitted by migrants in situations of vulnerability should be people-centred; child-sensitive, including applying the principle of the best interests of the child; gender-responsive; and trauma-informed and should uphold international human rights and labour standards, including the prohibition of discrimination. States can enhance the flexibility and accessibility of regularization processes by ensuring that the criteria used are clear, transparent and rights-based and respond to the specific needs of migrants, the situations of vulnerability they face and their sociodemographic and economic reality. Accessible information and advice should be available in a language that migrants can understand. Regularization processes should also be affordable or free of charge, including for obtaining the required documentation. Regularization should be also free of charge for child-related costs and should be paid once for each family group and States should avoid charging fines on account of irregular migration status.[48]

65.     When a request for residence renewal is lodged, States should issue formal, individualized decisions in writing and give reasons for rejection. Procedures should be in conformity with essential procedural safeguards, notably the guarantee of a prompt and transparent process, the administrative and judicial review of a negative decision and the

---

[46]   See submission from Better Engagement Between East and Southeast Asia.
[47]   See Platform for International Cooperation on Undocumented Migrants, "Regularisation mechanisms and programmes" (2022).
[48]   See United Nations Network on Migration, "Guidance note".

suspensive effect of appeal. States should ensure that migrants, including irregular migrants, can apply for procedures themselves and have access to all related information and documentation, so that they do not have to rely upon family members, abusive partners, sponsors, employers, corrupt agents, law enforcement actors or others to submit and follow up on their applications. In addition, a document should provide proof of their legal provisional regularity until a final decision is made. Police and other enforcement bodies should be made aware of the nature of such provisional status. Migrants should be able to work or have access to adequate means of subsistence while their case is being reviewed.[49]

66.    Regardless of the grounds for and length of residence that is granted, migrants should be provided with full and equal access to human and labour rights and essential services, including health care, education, an adequate standard of living, justice, social protection and decent work. Where it is not lawful, legitimate, necessary and proportionate, differential treatment in relation to access to rights and services based on migration status and the grounds under which residency is granted amounts to discrimination. Moreover, limited access to rights and services can itself be a further cause of vulnerability for the individual. When temporary residence is granted to migrants, States should provide for avenues to transition to another status, including those that provide long-term residency. Extensions, renewals and transition to another regular migration status should be facilitated by States through clear, streamlined, accessible and affordable procedures.[50]

67.    The Special Rapporteur regrettably notes that Governments and civil society work separately from each other when it comes to undocumented migrants, effective administration and the wider society. However, it must be acknowledged that involving all stakeholders benefits everyone involved: Governments can be confident of designing and implementing effective processes that will reach migrants and of receiving high-quality applications from migrants, refugees and asylum-seekers eligible for the scheme, while migrants access procedures that are designed with them in mind and can trust in a fair and positive result. In such a scenario, both the design and the implementation of the procedures benefit from everyone's expertise.

## IV.    Conclusion and recommendations

68.    **The Special Rapporteur concludes that through human rights-based, gender-responsive pathways for regular migration and for the regularization of undocumented migrants, States must provide options for permanent residence, citizenship and meaningful participation in civic life to facilitate social and family integration. The global narrative on regular pathways must not be narrowed to emphasize temporary migration. Regularization programmes should focus on promoting and allowing access to permanent residence and pathways to citizenship, including family reunification initiatives. The Special Rapporteur particularly notes that existing regularization programmes, including temporary residence permits benefitting asylum-seekers, victims of trafficking and other crime victims, offer solely short-term stays, with restricted or no access to the labour market. As such, they fall short of needed rights-based regularization. In addition, regularization policies should not be tied to sponsorship schemes that lead to exploitation and rights abuses. While such schemes, in theory, may grant a person regular status, in practice they are precarious, exposing migrants to many of the same risks and challenges as being undocumented.[51]**

69.    **The Special Rapporteur notes with concern that in some countries, accompanied children may be denied their right to be heard and are treated as a "footnote" to their parents' files, which means that child-specific or individual reasons for the granting of asylum or other regular status may be overlooked. Unaccompanied children in care systems may fall into irregularity when they "age out" at the age of 18 years, starting adulthood undocumented and leading to their potential exclusion, exploitation and even deportation. Residence or work permits tied to the employer may easily lead migrant**

---

[49]    Ibid.
[50]    Ibid.
[51]    See submission from the Women in Migration Network.

000798

children and parents to become undocumented, making them vulnerable to abuse and exploitation and limiting their enjoyment of human rights.[52]

70.    The Special Rapporteur urges Governments to focus on addressing the root causes that drive people to migrate irregularly, while policies and regularization procedures should provide irregular migrants with the tools for success. For instance, free-of-charge workshops that teach migrants to be entrepreneurs can provide them with the tools to bring development into their communities and financial security for their families. Furthermore, regularization programmes should be designed and implemented in consultation with civil society organizations, particularly migrants' associations and, where relevant, youth-led organizations.[53] The Special Rapporteur highlights the importance of creating structural conditions for migrants to thrive and contribute to society.

71.    The Special Rapporteur wishes to emphasize the triple function of regularization as a central mechanism for the protection of the rights of migrants and their families, especially those who are in a particularly vulnerable situation; as a key tool for the effective implementation of a comprehensive migration policy; and as a factor that contributes to the fulfilment of the goals of numerous public policies in countries of destination. Regularization is, therefore, a protection and inclusion tool that benefits migrants, their families, destination countries and communities. In short, expanding pathways for regular migration and guaranteeing temporary regularization leading to permanent mechanisms in destination countries represent two essential aspects for compliance with the Global Compact for Safe, Orderly and Regular Migration and other international standards.

72.    The Special Rapporteur recommends that States:

    (a)    Strengthen the legal framework for the protection of all migrants in line with international human rights standards. States should take appropriate measures towards regularizing the situation of such people, considering such factors as the duration of their stay and their family situation. Progress in this area may also require legislative review and reform at the national level to establish and refine regularization mechanisms and to ensure access to legal assistance for such procedures. This may include the ratification of relevant international standards, including the International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families;[54]

    (b)    Review and design regularization mechanisms and any ongoing programmes, with particular attention to the implementation of permanent regularization mechanisms on a range of grounds;

    (c)    Ensure that international human rights law limitations to returns are included in national law and policy frameworks as permanent grounds for regularization by reviewing and reforming national legislation to comply with international human rights law obligations (e.g. the principle of non-refoulement, the right to family life, the right to private life, the best interests of the child and the right to rehabilitation of victims of torture), which may give rise to an entitlement to regularization;

    (d)    Provide clear, efficient, affordable and accessible administrative procedures by which migrants, including undocumented ones, can apply for and renew their residence status to prevent people from falling into irregularity due to inefficient administrative migration policies;

    (e)    Ensure that fee waivers are available for children, young people and people in poverty and that any fees levied are proportionate and do not exceed the costs of the services provided to process applications and issue permits;

---

[52]  See submission from UNICEF.
[53]  See submission from the Migration Youth and Children Platform.
[54]  OSCE, "Regularization of migrants in an irregular situation". https://www.osce.org/odihr/494251.

(f)    **Replace forms of tolerated status with a national protection status, which would allow individuals to exercise their rights and be ensured the same treatment as other migrants. States should ensure that those with tolerated status are able to access a pathway out of that status through a regularization mechanism and that interim measures are taken to protect their fundamental rights;**

(g)    **Implement integration policies and programmes that promote and support the inclusion of migrants, including undocumented ones, and provide resources for the integration and access to rights of those whose status has been regularized;**

(h)    **Facilitate access to migratory regularization for migrant workers by removing obstacles and contributing to the exercise of their labour rights, including access to justice in the face of abuses by their employers;**

(i)    **Provide more flexibility to ensure that the rights and residence status of migrants are not tied to one employer or one sector by taking into account the reality of the labour market when renewing residence status, allowing bridges between different types of work and work permit statuses (e.g. employed, self-employed, entrepreneur) to prevent migrant workers from falling into irregularity when a job situation changes or in cases of exploitation;**[55]

(j)    **Adopt measures to guarantee the rights of migrant women, including domestic workers, through migration regularization that is not dependent upon a specific employer, spouse or other family member and is accessible at reasonable rates;**

(k)    **In the context of mixed movements, give migrants and asylum-seekers, including potential victims of trafficking, an adequate "interim" status, including the right to work, pending the outcome of the relevant procedures, such as regularization, asylum and the official determination of a person as a victim of trafficking;**

(l)    **Put an end to the criminalization of irregular migrants and promote solidarity towards migrants to change the narrative on migration and combat xenophobia, racism and discrimination.**

---

[55]   Caritas Europa, "Demystifying the regularisation of undocumented migrants".

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0016]

### Agency Information Collection Activities: Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act, Form I–191; Revision of a Currently Approved Collection

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) invite the general public and other Federal agencies to comment upon this proposed revision of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.,* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until July 8, 2016.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0016 in the subject box, the agency name and Docket ID USCIS–2006–0070. To avoid duplicate submissions, please use only *one* of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *http://www.regulations.gov* under e-Docket ID number USCIS–2006–0070;

(2) *Email.* Submit comments to *USCISFRComment@uscis.dhs.gov;*

(3) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW, Washington, DC 20529–2140.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Acting Chief, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, Telephone number (202) 272–8377 (This is not a toll-free number. Comments are not accepted via

telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Comments:**

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2006–0070 in the search box. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

## Overview of This Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Relief under Former Section 212(c) of the Immigration and Nationality Act.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* I–191; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or households. Form I–191 is necessary for USCIS to determine whether the applicant is eligible for discretionary relief under former section 212(c) of the Immigration and Nationality Act.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–191 is 600 and the estimated hour burden per response is 1.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 900 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $75,750.

**Samantha Deshommes,**
*Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2016–10803 Filed 5–6–16; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2573–15; DHS Docket No. USCIS–2016–0003]

### Filipino World War II Veterans Parole Policy

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** This notice announces the implementation of U.S. Citizenship and Immigration Services' (USCIS) Filipino World War II Veterans Parole (FWVP) policy. Under this policy, USCIS will

**28098**      **Federal Register** / Vol. 81, No. 89 / Monday, May 9, 2016 / Notices

offer certain beneficiaries of approved family-based immigrant visa petitions an opportunity to request a discretionary grant of parole on a case-by-case basis so that they may come to the United States as they wait for their immigrant visa numbers to become available. Among other things, the policy recognizes the extraordinary contributions and sacrifices of Filipino veterans who fought for the United States during World War II. The policy also enhances the ability of such elderly veterans and their spouses to obtain care and support from their family members abroad.

**DATES:** On or after June 8, 2016, individuals will be able to request parole under the FWVP policy.

**FOR FURTHER INFORMATION CONTACT:** Maura Nicholson, Deputy Chief, International Operations Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Suite 3300, Washington, DC 20529, Telephone 202–272–1892. (This is not a toll-free number.)

**SUPPLEMENTARY INFORMATION:**

## I. Background of the FWVP Policy

More than 260,000 Filipino soldiers enlisted to fight for the United States during World War II. Estimates indicate that as many as 26,000 of these brave individuals became U.S. citizens. As U.S. citizens or lawful permanent residents (LPRs), these veterans may petition for certain of their family members to come to the United States. Estimates indicate that there are approximately between 2,000 to 6,000 Filipino American World War II veterans still alive in the United States today, many of whom greatly desire to have their family members in the United States during their final days.[1]

With the exception of "immediate relatives" (*i.e.,* parents, spouses, unmarried children under 21 years of age) of U.S. citizens, *see* Immigration and Nationality Act (INA) sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), the number of family-sponsored immigrant visas that are available in any given year is limited by statute. *See* INA secs. 201(a) and (c), 202(a) and 203, 8 U.S.C. 1151(a) and (c), 1152(a) and 1153. These statutory limits have resulted in long waiting periods before family members may join the petitioning U.S. citizens or LPRs in the United States and become LPRs

themselves. For certain Filipino American family members, this wait can exceed 20 years.[2]

Recognizing the contributions and sacrifices of Filipino veterans who fought for the United States during World War II and their families, USCIS has decided to implement the FWVP policy. In many cases, paroling these family members may also allow them to provide support and care for elderly veterans or their surviving spouses. Under this policy, USCIS will consider individual requests for parole submitted for certain relatives who are the beneficiaries of approved family-based immigrant visa petitions filed by Filipino veterans or their surviving spouses.[3] Where USCIS determines that exercising such discretion is appropriate, USCIS may approve parole requests for such relatives so that they may wait in the United States until they are able to adjust status under existing immigration laws.[4]

In light of the circumstances described above, among other considerations, USCIS believes that the parole of qualified applicants who establish on a case-by-case basis that they are eligible for consideration under this policy and merit a favorable exercise of discretion would generally yield a "significant public benefit." Additionally, considering the advanced age of World War II Filipino veterans and their spouses, and their increased need for care and companionship, grants of parole under the FWVP policy would often address urgent humanitarian concerns. In all cases, whether to parole a particular individual under this policy is a discretionary determination that will be made on a case-by-case basis. Accordingly, parole applications for

individuals who fall within the general criteria but whose cases present overriding adverse factors (*e.g.,* criminal history) would not be approved.

## II. Participation in the FWVP Policy and Application Process

Those who may benefit from the FWVP policy are individuals: (1) who are the beneficiaries of Forms I–130, Petition for Alien Relative, including any accompanying or following-to-join spouse and children,[5] who were approved on or before the filing date of the parole request (Form I–131, Application for Travel Document); (2) whose qualifying relationship with the petitioning relative existed on or before May 9, 2016; (3) whose petitioning relative is residing in the United States (or, if deceased, was residing in the United States at the time of death); (4) whose immigrant visas are not authorized for issuance per the Application Final Action Dates chart for family-sponsored preference cases on the Department of State's Visa Bulletin; and (5) whose petitioning relatives have established they are either Filipino World War II veterans or are the surviving spouses of such individuals.

The Filipino veteran's qualifying World War II military service must have previously been recognized by the Department of Defense and must be described in section 405 of the Immigration Act of 1990 (IMMACT'90),[6] as amended by section 112 of Department of Justice Appropriations Act, 1998, which requires an individual to fall within one of three categories:[7]

1. Individuals who are *listed on the final roster* prepared by the recovered Personnel Division of the United States Army of those who served honorably in an active duty status under the Philippine Army during the World War II occupation and liberation of the Philippines;

2. Individuals who are *listed on the final roster* prepared by the Guerilla Affairs Division of the United States Army of those who received recognition as having served honorably in an active duty status within a recognized guerilla unit during the World War II occupation and liberation of the Philippines; or

3. Individuals who served honorably in an active duty status within the Philippine Scouts or within any other component of the United States Armed Forces in the Far East (other than a component described in clauses 1 or 2) at any time during the period beginning

---

[1] See *Modernizing and Streamlining our Legal Immigration System for the 21st Century* 38 (July 2015), *available at https://www.whitehouse.gov/sites/default/files/docs/final_visa_modernization_report1.pdf.*

[2] The January 2016 Visa Bulletin issued by the Department of State indicates that for individuals chargeable to the Philippines, visas may be issued to individuals with priority dates ranging from before August 01, 2014 for family-sponsored second preference category (for spouses and unmarried children of LPRs) to before July 22, 1992 for the family-sponsored fourth preference category (for siblings of U.S. citizens). *See* January 2016 Visa Bulletin, U.S. Department of State, Bureau of Consular Affairs, *available at http://www.travel.state.gov/content/dam/visas/Bulletins/visabulletin_january2016.pdf.*

[3] See INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (permitting parole of certain aliens into the United States, as a matter of discretion and on a case-by-case basis, for urgent humanitarian reasons or significant public benefit); *see also* 8 CFR 212.5(a) and (c)–(e) (discretionary authority for establishing conditions of parole and for terminating parole).

[4] INA sec. 245(a), 8 U.S.C. 1255(a), permits adjustment of status for an alien paroled into the United States. Under 8 CFR 245.1(d)(1)(v), a parolee is considered to be in a lawful status for purposes of INA sec. 245(c)(2) if an individual is seeking adjustment of status as an immediate relative or family-based immigrant.

[5] *See* INA sec. 203(d), 8 U.S.C. 1153(d).

[6] *See* Pub. L. 101–649, 104 Stat. 4978.

[7] *See* Pub. L. 105–119, 111 Stat. 2440.

September 1, 1939, and ending December 31, 1946.

USCIS will review government records to verify that the Filipino veteran's World War II military service was recognized by the Department of Defense. When this documentation is not available, USCIS will issue a Request for Evidence to allow the petitioner to submit evidence establishing the Filipino veteran's military service.

When the petitioning relative in the United States is the Filipino World War II veteran, individuals eligible for parole consideration could include beneficiaries under any family-sponsored preference category. Individuals who qualify as "immediate relatives" under section 201(b)(2)(A)(i) of the INA, 8 U.S.C. 1151(b)(2)(A)(i), however, will not be eligible for parole under this policy because immigrant visas for these individuals are already immediately available. Immediate relatives may seek immigrant visas for travel to the United States immediately upon the approval of immigrant visa petitions filed on their behalf. In situations where the petitioning relative in the United States is the surviving spouse of a Filipino World War II veteran, eligible individuals who may be considered for parole under this policy include only the child, son, or daughter of the surviving spouse who is also the child, son, or daughter of the Filipino World War II veteran.[8]

In cases where the petitioning relative is deceased, eligible individuals described in this paragraph may also seek parole on their own behalf, under this policy, in cases where USCIS has reinstated the approval of Form I–130, Petition for Alien Relative, for humanitarian reasons. If such petition is reinstated, the self-petitioner must establish (1) a qualifying family relationship with the deceased Filipino veteran or spouse (*i.e.* the self-petitioner is a qualifying child, son, daughter, brother or sister of the Filipino World War II veteran); and (2) that the deceased Filipino veteran had qualifying World War II military service, as described above. Again, each of these parole requests will be reviewed on a case-by-case basis to determine whether the petitioner has met the criteria for parole and merits a favorable exercise of discretion.

Seeking parole under the FWVP policy is voluntary.

On or after June 8, 2016, an eligible U.S.-based U.S. citizen or LPR Filipino

World War II veteran, or surviving spouse, with an approved Form I–130 may request parole under the FWVP policy on behalf of his or her eligible beneficiary relatives (or, if a self-applicant, on his or her own behalf). An eligible petitioner or self-applicant must file a completed Form I–131, Application for Travel Document, and a completed Form I–134, Affidavit of Support, and submit the required fee(s) or fee waiver request [9] on behalf of each beneficiary he or she wishes to have considered for parole. The veteran, surviving spouse, or self-petitioner must provide documentation of the veteran's qualifying World War II military service as described under section 405 of IMMACT'90, as amended. Detailed instructions on how to request parole under this policy will be included in the Instructions to Form I–131, Application for Travel Document, and on the USCIS Web site at (*www.uscis.gov*). USCIS will reject a Form I–131 that is not properly filed. USCIS strongly encourages individuals seeking to request parole under the FWVP policy to make such requests within 5 years from June 8, 2016 in order for their qualifying family members to be considered under this policy. Following the first four years of the implementation of this policy, USCIS will conduct additional outreach and evaluate whether the volume of actual or potential requests would support maintaining the policy, or whether it should be phased out at the end of 5 years.

USCIS or Department of State consular officers will interview all individuals considered for parole under the FWVP policy to determine whether parole is appropriate on a case-by-case basis.[10] Individuals requesting parole under this policy may also be required to have their biometrics collected. If USCIS favorably exercises its discretion to issue parole under the FWVP policy by approving the Form I–131, USCIS or the Department of State will issue the necessary travel documents to the beneficiary in the location he or she was interviewed. These travel documents generally will enable the beneficiary to travel to a U.S. port-of-entry and request parole from U.S. Customs and Border

Protection (CBP) to join his or her family member. Before the beneficiary's parole expires, the beneficiary would be required to (1) seek re-parole; (2) if eligible, apply to adjust status to that of lawful permanent resident or apply and be processed overseas for an immigrant visa; or (3) depart the United States.

If an immigrant visa becomes available to an individual who is not an "immediate relative" while a Form I–131 filed under the FWVP policy is pending, the individual will be considered for parole under this policy, if desired. Alternatively, the beneficiary can choose to pursue immigrant visa processing, which will require payment of associated fees, but will enable the individual to apply for admission to the United States as an immigrant, if found eligible by the Department of State for the immigrant visa and admissible by CBP at a U.S. port of entry.

## III. Paperwork Reduction Act (PRA)

Under the PRA, 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB) for review and approval, any new reporting requirements they impose. The USCIS, Application for Travel Document, (Form I–131), has been approved by OMB and assigned OMB control number 1615–0013. USCIS is only revising the Form I–131 Instructions in connection with the implementation of the FWVP policy and this notice. USCIS filed an emergency request with OMB and obtained approval of the changes to the Form I–131 Instructions. More information regarding the annual burden impact resulting from the implementation of this new policy will be provided during the next renewal cycle of the Form I–131. Currently, USCIS estimates that the FWVP policy might result in approximately 6,000 new respondents filing Form I–131s. The current OMB-approved estimated number of respondents filing Form I–131 is 940,671. USCIS believes it has overestimated the number of individuals who will use this form to apply for immigration benefits to the degree that additional respondents who will use it to file a request under the FWVP policy will be covered within the 940,671 estimated.

Additional information about the consideration of parole requests under the FWVP policy will be posted on the USCIS Web site at *www.uscis.gov*.

---

[8] *See* INA sec. 101(b)(1) (defining "child"). This definition includes individuals who qualify as step-children, legitimated children, children born out of wedlock and adopted children.

[9] The Director of USCIS has determined that individuals seeking parole under the FWVP policy may request a waiver of the fee for Form I–131, Application for Travel Document. Making the fee waiver available for those applicants who are unable to pay is in the public interest and consistent with other applicable law, consistent with 8 CFR 103.7(d). A fee waiver may be requested by completing Form I–912, Request for Fee Waiver, in accordance with its instructions, and submitting that form with Form I–131.

[10] The Department of State, however, will not make parole determinations.

Dated: May 2, 2016.

Leo´n Rodrı´guez,

*Director, U.S. Citizenship and Immigration Services.*

[FR Doc. 2016–10750 Filed 5–6–16; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**[FWS–R8–ES–2016–N044; FF08ESMF00–FXES11120800000–156]**

**Proposed Habitat Conservation Plan/Natural Community Conservation Plan for Western Butte County, California: Environmental Impact Statement**

**AGENCY:** Fish and Wildlife Service, Interior; National Marine Fisheries Service, Commerce.

**ACTION:** Notice; reopening of public comment period.

**SUMMARY:** We, the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, are reopening the comment period for our joint request for comments on the Butte Regional Conservation Plan (Plan) and the Draft Environmental Impact Statement/Report (DEIS/R) for Authorization of Incidental Take and Implementation of the Plan. As of January 19, 2016, we have received comments from four organizations and individuals requesting that the comment period be extended. In response to these requests, we are reopening the comment period.

If you previously submitted comments, you need not resubmit them; we have already incorporated them into the public record and will fully consider them in finalizing these documents.

**DATES:** *Submitting Comments:* To ensure consideration, written comments must be received by June 8, 2016, no later than 5 p.m. Pacific Time.

**ADDRESSES:** *Submitting Comments:* Please address written comments to one of the following individuals:

1. Mike Thomas, Chief, Conservation Planning Division; or Eric Tattersall, Assistant Field Supervisor, by mail/hand-delivery at U.S. Fish and Wildlife Service, Sacramento Fish and Wildlife Office, 2800 Cottage Way, W–2605, Sacramento, California 95825; or by facsimile to (916) 414–6713. You may telephone (916) 414–6600 to make an appointment during regular business hours to drop off comments at the Sacramento Fish and Wildlife Office.

2. Maria Rea, Assistant Regional Administrator, by mail/hand-delivery at National Oceanic and Atmospheric Administration, West Coast Region, National Marine Fisheries Service, 650 Capitol Mall, Suite 5–100, Sacramento, California 95814; or by facsimile to (916) 930–3629. You may telephone (916) 930–3600 to make an appointment during regular business hours to drop off comments at the National Marine Fisheries Service.

Please send comments related specifically to the California Environmental Quality Act (CEQA) process to the Jon Clark, Executive Director, Butte County Association of Governments, 2580 Sierra Sunrise Terrace, Suite 100, Chico, California 95928. You may also submit comments by facsimile to (530) 879–2444.

**FOR FURTHER INFORMATION CONTACT:**

(1) Rick Kuyper, Endangered Species Division; Mike Thomas, Chief, Conservation Planning Division; or Eric Tattersall, Deputy Assistant Field Supervisor, at the Sacramento Fish and Wildlife Office address above or at (916) 414–6600 (telephone); or

(2) Gretchen Umlauf, National Marine Fisheries Service, at the address above or at (916) 930–5646 (telephone).

If you use a telecommunications device for the deaf, please call the Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:** We are reopening the comment period for the Butte Regional Conservation Plan and a DEIS/R for Authorization of Incidental Take and Implementation of the Plan. On November 18, 2015, we opened a 90-day public comment period via a **Federal Register** notice (80 FR 72108). This comment period officially closed on February 16, 2016. Public meetings in Butte County were held in the cities of Chico on January 5, 2016, and Oroville and Gridley on January 6, 2016. As of January 19, 2016, we have received comments from four organizations and individuals requesting that the comment period be extended. In response to requests from the public, we have reopened the comment period (see **DATES**).

**Background Information**

For background information, see our November 18, 2015, notice (80 FR 72108).

**Document Availability**

You may obtain copies of the Draft Plan and DEIS/R from any of the individuals in **FOR FURTHER INFORMATION CONTACT**, or from the Sacramento Fish and Wildlife Office Web site at *http://www.fws.gov/sacramento.* Copies of these documents are also available for public inspection, by appointment, during regular business hours, at the Sacramento Fish and Wildlife Office. Additionally, hard-bound copies of the DEIS/R and Draft Plan are available for viewing, or for partial or complete duplication, at the following locations in Chico:

• Butte County Association of Governments, 2580 Sierra Sunrise Terrace, Suite 100;

• Biggs Branch Library, 464A B Street;

• Chico Branch Library, 1108 Sherman Avenue;

• Gridley Branch Library, 299 Spruce Street; and

• Oroville Branch Library, 1820 Mitchell Avenue.

**Alexandra Pitts,**

*Deputy Regional Director, Pacific Southwest Region, U.S. Fish and Wildlife Service, Sacramento, California.*

**Angela Somma,**

*Chief, Endangered Species Conservation Division, Office of Protected Resources, National Marine Fisheries Service.*

[FR Doc. 2016–10863 Filed 5–6–16; 8:45 am]

**BILLING CODE 4333–15–P**

---

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**[167 A2100DD/AAKC001030/A0A501010.999900]**

**Renewal of Agency Information Collection for Indian Self-Determination and Education Assistance Contracts**

**AGENCIES:** Bureau of Indian Affairs, DOI.

**ACTION:** Notice of request for comments.

**SUMMARY:** In compliance with the Paperwork Reduction Act of 1995, the Bureau of Indian Affairs (BIA) is seeking comments on the renewal of Office of Management and Budget (OMB) approval for the collection of information for Indian Self-Determination and Education Assistance Contracts, authorized by OMB Control Number 1076–0136. This information collection expires July 31, 2016.

**DATES:** Submit comments on or before July 8, 2016.

**ADDRESSES:** You may submit comments on this information collection activities to Ms. Sunshine Jordan, Acting Division Chief, Office of Indian Services—Division of Self-Determination, 1849 C Street NW., MS 4513–MIB, Washington, DC 20240, telephone: (202) 513–7616, email: *Sunshine.Jordan@bia.gov.*



ScienceDirect

# Labour Economics

Volume 76, June 2022, 102181

# Occupational barriers and the productivity penalty from lack of legal status ☆

Francesc Ortega [1][a] , Amy Hsin [2][b] 

Show more ⌄

⤝ Share   „ Cite

https://doi.org/10.1016/j.labeco.2022.102181 ↗
Get rights and content ↗

## Highlights

- Identification of the productivity penalty is crucial to estimate the net economic gains from legalization.

- Our paper presents a model-based strategy to identify the productivity penalty associated with lack of legal status.

- We estimate that the productivity penalty associated with lack of legal status in the United States is upward of 12% and affects roughly one third of undocumented workers.

- Thus, legalization of undocumented workers not only improves their wages, but also increases GDP.

- We estimate legalization would increase U.S. GDP by a minimum of 0.96%.

Case 6:24-cv-00306-JCB    Document 134    Filed 11/07/24    Page 812 of 4699 PageID #:   3978

# Abstract

Wage gaps between documented and undocumented workers reflect employer exploitation, endogenous occupational sorting and productivity losses associated with lack of legal status. Our paper presents a model-based strategy to identify the productivity penalty associated with lack of legal status, which is crucial to estimate the net economic gains from legalization. In the model, heterogeneous workers choose occupations and undocumented workers are subject to employer discrimination and experience productivity loss in occupations characterized by tasks that require legal status. The theoretical analysis provides guidance on how to identify occupational barriers and delivers an easy-to-compute lower bound for the undocumented productivity penalty. Applying this strategy to individual-level data that imputes undocumented status, we estimate that the productivity penalty associated with lack of legal status in the United States is upward of 12% and affects roughly one third of undocumented workers, which in turn account for over 5% of US employment. Thus, legalization of undocumented workers would not only improve their wages, but also increase GDP by a minimum of 0.96% per year.

# Introduction

Many countries are home to large numbers of unauthorized immigrants.[3] Despite lacking the right to reside or work legally, unauthorized immigrants contribute in significant ways to the economies of the host countries. Roughly 11 million unauthorized immigrants live in the United States, comprising 5% of the labor force and contributing over 3% of GDP (Edwards and Ortega, 2017). Legalization of undocumented workers is widely debated by policy-makers and social scientists. While questions of human rights and ethics are foundational to these debates, so are questions related to the economic effects of legalization for host countries.

A large body of literature shows that the wages and working conditions of undocumented immigrants increase when they gain legal status. In the context of the United States, many studies have supported this claim based on the 1986 IRCA legalization (Amuedo-Dorantes, Bansak, Raphael, 2007, Kossoudji, Cobb-Clark, 2002, Lozano, Sorensen, 2011, Pan, 2012, Rivera-Batiz, 1999) and, more recently, on the 2012 DACA program providing temporary work permits to undocumented youth (Amuedo-Dorantes, Antman, 2017, Pope, 2016).

However, the previous evidence is insufficient to answer some key concerns in the debate about the economic effects of legalization, such as the aggregate effects on GDP and on government coffers. Answering these questions requires distinguishing how much of the

000806

wage increase upon gaining legal status can be attributed to a gain in productivity versus other factors, such as the loss of employers' ability to exploit undocumented workers. While the latter mainly entails income redistribution from employers to formerly undocumented workers, productivity increases generate a net increase in income (and tax revenue) for the host country. Quantifying the undocumented productivity penalty is crucial in structural analyses aimed at estimating the net economic contribution of undocumented workers and simulating the effects of legalization on GDP, the wage structure and government coffers (Edwards, Ortega, 2017, Machado, 2017, Ortega, Edwards, Hsin, 2019, Peri, Zaiour)).

Identifying the productivity gains associated with gaining legal status is a challenging task. While hard to quantify with precision, several studies have shown that unauthorized immigrants suffer wage exploitation (Bartolucci, 2014, Brown, Hotchkiss, Quispe-Agnoli, 2013, Gleeson, Gonzales, 2012). At the same time, there is clear evidence that (implicit) occupational barriers lead to occupational mismatch and diminish worker productivity (Hsieh, Hurst, Jones, Klenow, 2019, Weeden, 2002). The labor market opportunities of undocumented workers are almost certainly diminished by occupational barriers in similar ways (Abrego, 2011, Amuedo-Dorantes, Antman, 2017). These barriers vary importantly across occupations, reflecting regulatory constraints, such as legal residence requirements associated with licenses, as well as the nature of the specific tasks involved in each occupation. For instance, the need to hold face-to-face interactions with customers or government agencies, or to travel extensively, exposes undocumented workers to apprehension and deportation. Besides reducing the productivity of undocumented workers in these occupations, these entry barriers are likely to distort their occupational choices.

Our paper presents a new strategy to identify the productivity penalty associated with lack of legal status. We lay out a theoretical model where heterogeneous workers choose occupations (as in the Roy model). Some occupations entail tasks that require legal status. As a result, undocumented workers in these occupations suffer a productivity loss that entails lower wages and acts as an entry barrier into those occupations and distorts their occupational choices. In addition, employers may exploit undocumented workers in all occupations, paying them wages below productivity. The theoretical analysis suggests an empirical strategy to identify which occupations have entry barriers for undocumented workers, clarifies the factors that determine the productivity and wage gaps between documented and undocumented workers, and shows how to estimate the undocumented productivity penalty. Additionally, the model also illustrates the labor market effects of legalization in terms of occupational switching, wage growth and net economic gains. An important lesson of our analysis is that exact identification of the undocumented productivity penalty is infeasible due to endogenous occupational sorting in terms of

000807

unobserved idiosyncratic productivity. However, even in this scenario, we derive a *lower bound* for the productivity loss associated with lack of legal status.

The second part of the paper goes on to implement this strategy using a special extract of the *American Community Survey* (ACS) that also includes a sophisticated imputation to identify likely undocumented individuals. Our empirical analysis has two main findings. First, we identify the occupations with the largest entry barriers to undocumented workers. Many of these occupations require legal status (e.g. teachers and nurses) or entail tasks that involve driving, long-distance travel or face-to-face interaction with the public and government officials (e.g. managers, secretaries or salespersons). These tasks cannot be accomplished in full by undocumented workers, reducing their productivity in these jobs and distorting their career choices. Secondly, we estimate that the productivity penalty associated with lack of legal status is upwards of 12 percent and affects roughly one third of all undocumented workers. This finding implies that legalization would increase GDP and we quantify this increase to be *at least* 0.96% per year.

Our analysis is not only relevant in the United States. Unauthorized immigration is pervasive in high-income countries that are in geographical proximity to countries with demographic, economic or political pressures (Orrenius and Zavodny, 2016). Several studies have used European data to analyze the economic effects of legalization. For instance, Monras et al. (2017) empirically analyze a large legalization process in Spain. Among other findings, they show that legal status increased the labor market opportunities of immigrants. Along similar lines, Devillanova et al. (2018) study the effect of the *prospect* of legal status on the employment of undocumented immigrants in Italy, finding a positive effect. Inevitably, an important factor in the discussions on whether to provide legal status to undocumented workers in receiving countries is the consequences of such a policy for GDP and the public coffers. As argued above, these effects rely crucially on whether legal status increases the productivity of undocumented workers or simply redistributes income from employers to employees.

The structure of the paper is the following. Section 2 summarizes the relevant literature. Section 3 presents our theoretical analysis. Section 4 presents the data and descriptive statistics. Section 5 estimates the gaps in occupational shares between documented and undocumented workers, Section 6 estimates the undocumented productivity penalty, and Section 7 concludes.

## Access through your organization

Check access to the full text by signing in through your organization.

000808

Case 6:24-cv-00306-JCB   Document 134   Filed 11/07/24   Page 816 of 4699 PageID #:   3981

Access through **your institution**

## Section snippets

## Related literature

Our paper draws on the broad literature analyzing wage gaps by race and gender and applies a similar approach to estimating wage gaps by legal status. One of the most relevant studies for our paper is Hsieh et al. (2019), which argues that occupational barriers led to substantial misallocation of talent by race and gender in the United States. The authors use a generalized Roy (1951) model where individuals first choose education and later enter the labor market by choosing occupations. These…

## Theoretical framework

Consider an economy with two occupations, indexed by $o = 1, 2$. Workers are heterogeneous in their idiosyncratic productivity vector $\varepsilon = (\varepsilon_1, \varepsilon_2)$, drawn from joint distribution $f(\varepsilon_1, \varepsilon_2)$ with domain $\mathbf{R}^2$ and assumed strictly positive over its domain. We will also refer to idiosyncratic productivity as *ability*. There are also two types of workers: documented (which includes natives) and undocumented ($d = D, U$). The measure of documented workers is normalized to 1 and the measure of undocumented workers is $u \leq 1$…

## Data and summary statistics

We use a special extract of the *American Community Survey* provided by the for Migration Studies (2014). Besides the usual information on employment, skills and wages, this confidential dataset contains a sophisticated imputation for documentation status developed by Warren (2014). These data have been used to estimate, by means of calibration and simulation methods, the economic contribution of undocumented workers (Edwards and Ortega, 2017) and the consequences of providing legal status to…

## Gaps in employment shares

000809

The main goal of the empirical analysis in this paper is to estimate the lower bound for the undocumented productivity penalty. As we showed earlier, estimation requires computing the undocumented-documented wage gaps in occupations where lacking legal status lowers productivity and in occupations where this is not the case. The productivity penalty operates as an entry barrier into the corresponding occupations (Hsieh et al., 2019) because only individuals with a large comparative advantage…

## Wage gaps and the undocumented productivity penalty

Next, we turn to estimate the wage gaps between observationally equivalent documented and undocumented workers, and to use these estimates to learn about the productivity loss associated with lack of legal status.

To bridge the gap between wages and productivity, we need to address two challenges. First, we need to adjust for differences in observable characteristics between documented and undocumented workers, as we did to estimate the conditional employment share gaps. Besides the roles of…

## Conclusions

In policy discussions around legalization of undocumented workers, one of the most prominent and controversial issues is whether legalization entails an increase in GDP and, if so, of what magnitude. A large number of studies quantify this effect using calibrated general equilibrium models (e.g. Edwards and Ortega (2017) and Peri and Zaiour (2021)). In these analyses, the crucial parameter is the size of the labor productivity increase accompanying legalization. This parameter is typically…

Recommended articles

---

## References (55)

J. Calvo

Professional licensing and teacher certification for non-Citizens: federalism, equal protection and a state?s socio-Economic interests

Columbia Journal of Race and Law (2017)

000810

R.G. Gonzales

Learning to be illegal: undocumented youth and shifting legal contexts in the transition to adulthood

Am Sociol Rev (2011)

M. Hall *et al.*

The occupational cost of being illegal in the united states: legal status, job hazards, and compensating differentials

International Migration Review (2015)

L.J. Abrego

Legal consciousness of undocumented latinos: fear and stigma as barriers to claims-making for first-and 1.5-generation immigrants

Law & Society Review (2011)

C. Albert

The labor market impact of immigration: job creation versus job competition

American Economic Journal: Macroeconomics (2021)

C. Amuedo-Dorantes *et al.*

Schooling and labor market effects of temporary authorization: evidence from DACA

J Popul Econ (2017)

C. Amuedo-Dorantes *et al.*

Gender differences in the labor market: impact of IRCA

American Economic Review (2007)

Baker, B. C., Rytina, N., 2013. Estimates of the unauthorized immigrant population residing in the united states:...

C. Bartolucci

Understanding the native-immigrant wage gap using matched employer-Employee data

ILR Review (2014)

P. Blair *et al.*

Occupational Licensing Reduces Racial and Gender Wage Gaps: Evidence from the Survey of Income and Program Participation

Technical Report(2017)

000811



View more references

## Cited by (5)

Shattered Dreams: The Economic Impact of Eliminating Daca ↗

2024, SSRN

Legalization and Long-Term Outcomes of Immigrant Workers ↗

2024, SSRN

Back to Work: The Unequal Effects of the COVID-19 Pandemic on Ecuador's Labor Market ↗

2023, SSRN

Monopsony, Efficiency, and the Regularization of Undocumented Immigrants ↗

2023, SSRN

Monopsony, Efficiency, and the Regularization of Undocumented Immigrants ↗

2023, SSRN

☆   We thank the William T. Grant Foundation and PSC/CUNY for generous financial support. We also thank Catalina Amuedo-Dorantes, Marianne Bertrand, Janet Calvo, Michael Clemens, Albrecht Glitz, Laura Giuliano, Jennifer Hunt, Fernando Lozano, Lilia Maliar, Joan Monras, Giovanni Peri, Amy Ellen Schwartz, Yochanan Shachmurave, Kevin Shih, Todd Sorensen, Chad Sparber, Suleyman Taspinar, Thom Thurston, Marcos Vera-Hernandez and Wim Vijverberg for helpful comments. We are also grateful to the Editor and two anonymous referees for their suggestions.

1   Dina A. Perry Professor of Economics.

2   Associate Professor of Sociology.

View full text

Published by Elsevier B.V.

000812

8/16/24, Case No. Occupational barriers and reproducibility in gecko... Strength out...

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 820 of 4699 PageID #:  3985



All content on this site: Copyright © 2024 Elsevier B.V., its licensors, and contributors. All rights are reserved, including those for text and data mining, AI training, and similar technologies. For all open access content, the Creative Commons licensing terms apply.



000813

Labour Economics 61 (2019) 101757



Contents lists available at ScienceDirect

## Labour Economics

journal homepage: www.elsevier.com/locate/labeco



# The wage penalty to undocumented immigration ☆



George J. Borjas [a,*], Hugh Cassidy [b]

[a] Harvard University, United States
[b] Kansas State University, United States

## ABSTRACT

This paper examines the determinants of the wage penalty experienced by undocumented workers, defined as the wage gap between observationally equivalent legal and undocumented immigrants. Using recently developed methods that impute undocumented status for foreign-born persons sampled in microdata surveys, the study documents a number of empirical findings. Although the unadjusted gap in the log hourly wage between the average undocumented and legal immigrant is very large (over 35%), almost all of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics. The wage penalty to undocumented immigration for men was only about 4% in 2016. Nevertheless, there is sizable variation in the wage penalty over the life cycle, across demographic groups, across different legal environments, and across labor markets. The flat age-earnings profiles of undocumented immigrants, created partly by slower occupational mobility, implies a sizable increase in the wage penalty over the life cycle; the wage penalty falls when legal restrictions on the employment of undocumented immigrants are relaxed (as with DACA) and rises when restrictions are tightened (as with E-Verify); and the wage penalty responds to increases in the number of undocumented workers in the labor market, with the wage penalty being higher in those states with larger undocumented populations.

## 1. Introduction

The Department of Homeland Security (DHS) estimates that 12.1 million undocumented persons resided in the United States in January 2014 (Baker, 2017). In the past decade, Congress considered (but failed to enact) a number of proposals that would regularize the status of the undocumented population and provide a "path to citizenship." Given the large size of this population, any future change in its immigration status is bound to have significant effects on the labor market and the broader economy. But any evaluation that attempts to predict the economic impact of regularization immediately runs into a major roadblock: We know little about the economic status of the 12 million undocumented persons already living in the United States.

The study of the socioeconomic status of the undocumented is obviously hampered by the fact that no widely available microdata survey reports whether a particular foreign-born person is undocumented or not. In recent years, however, there has been progress in developing methods that attempt to impute the undocumented status of foreign-born persons at the individual level, such as the imputation algorithm for the Current Population Surveys (CPS) developed at the Pew Research Center or Warren's (2014) analogous exercise using the American Community Survey (ACS). These attempts build on the framework first proposed by Warren and Passel (1987) that attempts to estimate the size of the undocumented population. The Passel-Warren methodology, in fact, underlies the "official" estimates of this population as reported by DHS.

The Pew researchers essentially built an algorithm that considers various aspects of a person's demographic background to add a variable to a CPS microdata file indicating if a foreign-born person is "likely authorized" or "likely unauthorized" (Passel and Cohn, 2014). After being granted access to some of the Pew data files, Borjas (2017) used a variant of this algorithm to create an undocumented status identifier in all the post-1994 Current Population Surveys, and used these data to analyze the differences in labor supply behavior among undocumented immigrants, legal immigrants, and natives. The differences in work propensities were striking. Undocumented men had much larger labor force participation and employment rates than other groups in the population; the gap widened substantially over the past two decades; and the labor supply elasticity of undocumented men was close to zero, suggesting that their labor supply is very inelastic. In contrast, undocumented women had much lower participation and employment rates than other groups in the population.

This paper applies the algorithm to the American Community Survey (ACS) to measure the size and examine the determinants of the wage penalty to undocumented immigration.[1] Undocumented immigrants are likely to earn less than equally qualified legal immigrants simply because the undocumented have many fewer options in the labor market.

---

[1] The ACS data was downloaded from the Integrated Public Use Microdata Series (IPUMS) website. See Ruggles et al. (2018).

---

☆ Parts of this paper subsume research that appeared in separate unpublished working papers by Borjas (2016) and Cassidy (2017). We are particularly grateful to Mark Lopez and Jeffrey Passel of the Pew Research Center for their generosity in sharing data files. We have also benefited from the comments and reactions of Joan Llull, Joakim Ruist, and two referees.
* Corresponding author.
   E-mail address: gborjas@harvard.edu (G.J. Borjas).

https://doi.org/10.1016/j.labeco.2019.101757
Received 10 September 2018; Received in revised form 11 August 2019; Accepted 12 August 2019
Available online 14 August 2019
0927-5371/© 2019 Elsevier B.V. All rights reserved.

000814

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

Not all jobs are available to undocumented immigrants, and the possibility of detection (and eventual deportation) may lead to exploitation of the undocumented by unscrupulous employers. Our analysis of the ACS data yields a number of potentially important findings:

(1) Although the unadjusted gap in the log hourly wage between undocumented workers and legal immigrants is large (around 35% for both men and women), much of the gap disappears after adjusting for differences in observable socioeconomic characteristics between the two groups. Two variables, educational attainment and English language proficiency, account for nearly half of the observed wage gap between the groups.

(2) The wage penalty to undocumented immigration declined between 2008 and 2016. In 2008, the wage penalty stood between 4 and 6% for both men and women. By 2016, the wage penalty had declined for both groups. Although it is difficult to ascertain why the *average* wage penalty in the national labor market has shrunk, the decline in the wage penalty coincides with the timing of actions by the Obama administration which led to a less restrictive approach to undocumented immigration. In fact, our evidence indicates that the wage penalty to specific groups of immigrants, such as those targeted by the Deferred Action for Childhood Arrivals (DACA) executive action, declined significantly after the relaxation of restrictions.

(3) The finding that the *average* wage penalty is relatively low hides a lot of variation in the penalty among different types of undocumented workers, and among undocumented workers employed in different labor markets. Not surprisingly, the (cross-section) age-earnings profile of undocumented workers lies far below that of legal immigrants (and, of course, of native workers). More strikingly, the age-earnings profile of undocumented workers is almost perfectly flat during much of the prime working years, As a result, the wage penalty for undocumented workers rises significantly over the life cycle.

(4) The evidence indicates that observationally equivalent undocumented workers and legal immigrants are not perfect substitutes. As a result, the wage penalty responds to increases in the relative size of the undocumented population. In particular, the wage penalty is larger in states with relatively larger undocumented populations: A 1 percentage point increase in the fraction of the state's workforce that is undocumented increases the wage penalty for men by about 1 percent. In addition, the wage penalty responds to the enactment of state-level legislation that restricts the employment of undocumented workers, with tighter restrictions leading to significantly larger wage penalties.

This diverse set of findings provides a foundation upon which any eventual analysis of the impact of alternative regularization proposals can be based. It is important to acknowledge at the outset, however, that the robustness of the evidence presented below depends on the validity of the procedure used to impute undocumented status at the micro level.

## 2. Imputing undocumented status in microdata files

Warren and Passel (1987) introduced the "residual" methodology used by the DHS to calculate the size of the undocumented population. The first step involves estimating how many legal immigrants should reside in the United States at a point in time. Over the years, immigration officials have tracked the number of legal immigrants admitted to the country (i.e., the number of "green cards" granted each year). Other immigration records allow us to determine how many foreign-born persons live in the United States temporarily (e.g., foreign students, business visitors, diplomats, etc.). These data enable us to apply mortality tables to the cumulative count of green cards and predict how many foreign-born persons should be legally residing in the United States at a point in time.

At the same time, many government surveys, such as the decadal census, enumerate the U.S. population and specifically ask where each person was born. These surveys provide estimates of how many foreign-born people are actually living in the country. In rough terms, the difference between the number of foreign-born persons who are actually living in the United States and the number of legal immigrants who should be living in the United States is the Warren–Passel (and now "official" DHS) estimate of the number of undocumented persons.[2]

Jeffrey Passel has continued to work on the enumeration and identification of undocumented immigrants over the past two decades. As a result of these efforts, Passel (and colleagues at the Pew Research Center) developed a comparable methodology that attempts to identify the undocumented immigrants at the *individual level* in survey data. This important extension of the Warren–Passel methodology relies on the same residual approach that was initially used to calculate the size of the undocumented population.

Passel and Cohn (2014) describe the methodology used to add an undocumented status identifier to the Annual Social and Economic Supplement (ASEC) files of the CPS. In rough terms, the algorithm identifies the foreign-born persons in the sample who are likely to be legal, and then classifies the residual group as likely to be undocumented. In closely related work, Warren (2014) used logical edits and other adjustments to impute the legal status of foreign-born persons in the ACS. After being granted access to the 2012–2013 CPS files created by Passel and Cohn (2014), Borjas (2017) "reverse-engineered" the approach and applied the algorithm to all available CPS files to examine the labor supply of undocumented immigrants. The residual method classifies a foreign-born person as a legal immigrant if any of the following conditions hold:

(a) that person arrived before 1980;
(b) that person is a citizen;
(c) that person receives Social Security benefits, SSI, Medicaid, Medicare, or Military Insurance;
(d) that person is a veteran, or is currently in the Armed Forces;
(e) that person works in the government sector;
(f) that person resides in public housing or receives rental subsidies, or that person is a spouse of someone who resides in public housing or receives rental subsidies;
(g) that person was born in Cuba (as practically all Cuban immigrants were granted refugee status);
(h) that person's occupation requires some form of licensing (such as physicians, registered nurses, air traffic controllers, and lawyers);
(i) that person's spouse is a legal immigrant or citizen.[3]

We use this algorithm to create a comparable undocumented status identifier in the American Community Survey (ACS) data beginning in 2008.[4] The only difference in the algorithms applied to the CPS and ACS data arises because the ACS does not identify whether a particular household is living in public housing or receiving subsidized rents, and thus we omit condition *f* from the imputation procedure for the ACS. As Fig. 1 shows, the predicted fraction of undocumented immigrants in the population at any particular age is roughly the same regardless of whether we use the Pew files in our possession (the 2012–2013 cross-sections) or the comparable ACS files, although the ACS tends to slightly overpredict the relative number of undocumented persons at younger

---

[2] Note that government surveys, including the decadal census, miss many people. Some of the people missed are undocumented immigrants who wish to avoid detection. To calculate an estimate of the size of the undocumented population, the Warren–Passel methodology requires an assumption about the undercount rate. The DHS assumes that the undercount for undocumented persons is 10% (Baker, 2017, p. 7).

[3] Condition *i* implies that a person who does not satisfy any condition between *a* and *h*, but whose spouse satisfies at least one of these conditions, would be considered legal by virtue of their spouse's legal status.

[4] Prior to 2008, the ACS does not report information on Medicare or Medicaid receipt, so that the classification of undocumented status in the pre-2008 ACS requires further assumptions.

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*



**Fig. 1.** Percent of population that is undocumented, by age. (Pooled 2012–2013 CPS-ASEC files, pooled 2011–2012 ACS). Notes: The figure calculates the percent of the population (at a particular age) that is foreign-born and is classified as undocumented using either the "likely unauthorized" status indicator created by Jeffrey Passel and colleagues at the Pew Research Center or my reconstruction of the undocumented status indicator in the ACS (see text for details).

**Table 1**
Comparison of summary statistics for male workers, 2012–2013.

| | Natives | Legal No correction. | H1B correction. | Undocumented No correction. | H1B correction. |
|---|---|---|---|---|---|
| **A. Pew** | | | | | |
| Percent of pop. | 80.9 | 12.4 | 12.6 | 6.6 | 6.5 |
| Average age | 41.9 | 42.7 | 42.6 | 37.4 | 37.5 |
| Education: | | | | | |
| High school dropouts | 5.4 | 20.1 | 19.9 | 44.7 | 45.6 |
| High school graduates | 31.2 | 23.5 | 23.3 | 29.4 | 30.0 |
| Some college | 29.3 | 17.7 | 17.5 | 10.1 | 10.3 |
| College graduates | 23.4 | 21.3 | 21.5 | 9.1 | 8.6 |
| Postcollege | 10.8 | 17.3 | 17.8 | 6.6 | 5.5 |
| State of residence: | | | | | |
| California | 9.1 | 26.1 | 26.1 | 22.5 | 22.5 |
| New York | 5.4 | 11.1 | 11.0 | 6.7 | 6.8 |
| Texas | 8.1 | 10.0 | 9.9 | 14.8 | 14.9 |
| Log wage gap | 0.000 | −0.070 | −0.062 | −0.438 | −0.460 |
| Sample size | 66,632 | 15,794 | 15,936 | 7016 | 6874 |
| **B. ACS** | | | | | |
| Percent of pop. | 81.5 | 11.3 | 11.6 | 7.2 | 6.9 |
| Average age | 42.0 | 43.6 | 43.5 | 36.8 | 37.0 |
| Education: | | | | | |
| High school dropouts | 5.6 | 19.2 | 19.0 | 42.6 | 44.5 |
| High school graduates | 31.8 | 25.7 | 25.4 | 28.9 | 30.1 |
| Some college | 31.7 | 20.4 | 20.3 | 10.7 | 11.2 |
| College graduates | 21.0 | 19.2 | 19.3 | 9.4 | 7.9 |
| Postcollege | 10.0 | 15.5 | 16.0 | 8.4 | 6.3 |
| Speaks English | – | 58.4 | 58.5 | 29.5 | 27.4 |
| State of residence: | | | | | |
| California | 8.9 | 25.8 | 25.8 | 23.6 | 23.7 |
| New York | 5.4 | 11.0 | 11.0 | 8.2 | 8.4 |
| Texas | 7.7 | 9.9 | 9.9 | 13.5 | 13.7 |
| Log wage gap | 0.000 | −0.040 | −0.025 | −0.398 | −0.439 |
| Sample size | 980,270 | 121,699 | 124,433 | 60,889 | 58,155 |

Notes: The statistics are calculated in the sample of men aged 21–64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, weeks worked, and usual hours worked weekly.

ages. The figure also shows that the life cycle trend in the fraction of persons who are imputed to be undocumented in the ACS closely tracks the fraction predicted in the original Pew CPS files.

To further document that our application of the algorithm to the ACS leads to very similar results as those implied by the Pew CPS files, Table 1 reports summary statistics for the samples of male working natives, legal immigrants, and undocumented persons in both the Pew CPS

and the ACS 2012–2013 cross-sections. The corresponding results for women are reported in Appendix Table A1. The sample is restricted to persons aged 21–64 who are not enrolled in school, and who report positive wage and salary income in the previous calendar year, positive weeks worked, and positive usual hours worked weekly.

As illustrated in Table 1, the Pew residual method suggests that a strikingly large number of undocumented workers have high levels of

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*

educational attainment. For example, 17.8% of the undocumented male population in the ACS have at least a college degree. Although this surprising result has not been explored in any of the previous studies that impute an undocumented status indicator in micro data, we suspect that the typical imputation algorithm misclassifies many highly educated immigrant workers. Specifically, the algorithms do not "filter out" the large sample of high-skill immigrants who are in the United States temporarily under the auspices of the "high tech" H-1B program. In fact, Albert (2019) reports that the algorithm (and the Pew methodology it is based on), while very accurate for low-skilled immigrants, mistakenly classified around 25% of college educated immigrants as undocumented. This inaccuracy suggests that accounting for the legal status of H-1B immigrants may be appropriate.

In this paper, we refine the Pew algorithm by adding an additional filter to the list above, further classifying a person as a legal immigrant if he or she is likely to be an H-1B visa-holder. Specifically, we assume that a foreign-born person is likely to be in the country with an H-1B visa if: (1) the immigrant works in an occupation that commonly employs H-1B visa holders (such as computer programmer)[5]; (2) the immigrant has resided in the United States for six years or fewer (i.e., the maximum length of time an H-1B visa is valid); and (3) the immigrant is at least a college graduate. As Table 1 shows, the application of the H-1B filter reduces the fraction of undocumented immigrant men with at least a college degree from 17.8 to 14.2%. Note, however, that both the original Pew files and our imputation in the ACS still produce a relatively large number of undocumented workers with high levels of educational attainment. We use the H-1B filter throughout the empirical analysis reported in this paper.[6]

There is a lot of similarity in the socioeconomic characteristics of the three demographic groups across the two data extracts. Among men, for example, the fraction of the population that is undocumented is 6.5% in the Pew CPS and 6.9% in the ACS. The average age of undocumented immigrants is the same in the two files (about 37 years). And 45.2 of undocumented men in the Pew files are high school dropouts, as compared to 44.0% in the ACS files.

We also calculated the hourly wage rate for each worker in the sample (defined as wage and salary income divided by the product of weeks worked in the past year and usual hours worked weekly). Table 1 also shows that the log wage gap between undocumented workers and natives is similar across the data sets. The wage disadvantage of undocumented men is −0.398 log points in the Pew CPS and −0.414 log points in the ACS data (equivalent to about a 33% wage gap between the two groups). The comparable statistics reported in Table A1 for undocumented women imply that an equally large wage disadvantage (of about −0.385 log points in the ACS).

The validity of the evidence presented below hinges on the accuracy of the undocumented status indicator in the original Pew algorithm. In the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias. We can, however, compare key socioe-

conomic characteristics in our sample with comparable data in samples of undocumented immigrants created by other researchers using different methods. For instance, the Center for Migration Studies (CMS) has also developed an analogous method of imputing legal status in the ACS (Warren, 2014).[7] The CMS method uses individual characteristics (including birthplace, occupation, or the receipt of public benefits) to classify some immigrants as likely legal. The CMS also makes further adjustments by country of origin and incorporates a correction for the undercount of undocumented persons (our methodology does *not* perform any reweighting).[8] Table 2, adapted from Warren (2014, Table 2), compares that predicted size of the undocumented population as well as its geographic distribution using alternative methods, and adds results from our own imputation in the ACS. It is evident that the geographic distribution of undocumented immigrants in our imputed ACS data is broadly consistent with the distribution predicted by the four alternative methodologies summarized in the Warren study. It seems, therefore, that our approach closely duplicates the undocumented population examined in other studies.

## 3. Estimating the wage penalty

We calculate the wage penalty to undocumented status by estimating the following Mincerian wage regression in the sample of working immigrants:

$$\log w_i = \beta h_i + \beta_L L_i + \varepsilon_i, \tag{1}$$

where $w_i$ is the hourly wage rate of worker $i$; $h_i$ is a vector of socioeconomic characteristics that affect earnings; and $L_i$ is a dummy variable that equals one if the worker is a legal immigrant. The coefficient $\hat{\beta}_L$ measures the wage penalty, with a positive value indicating the earnings advantage enjoyed by legal immigrants over observationally equivalent undocumented workers.

It is also possible to calculate the wage penalty by instead performing an Oaxaca–Blinder decomposition that yields the predicted wage disadvantage of the average undocumented immigrant arising from differential treatment in the labor market (i.e., allows the coefficient vector $\beta$, the returns to socioeconomic characteristics, to vary by legal status). One alternative definition of the wage penalty would calculate by how much the earnings of the average undocumented immigrant increased if he or she were "treated" just like an observationally equivalent legal immigrant in the labor market.

It is unlikely, however, that observationally equivalent legal immigrants and undocumented immigrants are perfect substitutes in production (and the empirical evidence reported below shows that they are not). Even putting aside the possibility the two groups might have different unobservable skill sets, legal restrictions prevent employers from viewing one type of immigrant as a clone of the other type.[9] As a result, the relative number of undocumented immigrants in a particular labor market actually affects the structure of wages (and hence the

---

[5] The list of occupations assumed to commonly employ H-1B visa holders are computer and information systems managers; computer and mathematical occupations; architecture and engineering occupations; and postsecondary teachers. These occupations account for over 80% of all H-1B petitions filed in 2017 (U.S. Citizenship and Immigration Services, 2018a).

[6] Our H-1B filter identifies 598,000 foreign-born persons as H-1B visa holders, which is in the ballpark of what one would expect to be the steady-state number of that population (i.e., the visa is capped at 85,000 visas per year, and the visa lasts 6 years). It may be that H-1B visa holders stay in the country beyond the sixth year while waiting to adjust their status because of country-specific quotas on the number of green cards available. An alternative filter might define H-1B status only by education and occupation. However, the predicted number of H-1B visa holders if one ignores the 6-year limitation is 2.1 million, which seems far too large to be consistent with the number that is expected to reside in the country.

---

[7] See also Van Hook et al. (2015), which evaluates various methods of imputing the legal status of immigrants using Monte Carlo simulations.

[8] Specifically, the CMS algorithm assigns each immigrant a likely legal status based on individual characteristics, in a manner similar to our approach. Two additional steps are then performed: (1) likely undocumented are randomly sampled at a rate that varies by country of origin; and (2) undercounting of undocumented immigrants is accounted for by re-weighting the microdata, depending on year of arrival.

[9] Cotton (1988, p.238) makes a related point in the context of measuring racial wage discrimination. In his discussion of whether to use the black or the white regression coefficients to measure discrimination he writes: "…each assumption abstracts from the central reality of wage and other forms of economic discrimination: not only is the group discriminated against undervalued, but the preferred group is overvalued, and the undervaluation of the one subsidizes the overvaluation of the other. Thus, the white and black wage structures are both functions of discrimination and we would not expect either to prevail in the absence of discrimination."

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 2**
Geographic distribution of the undocumented population in 2010, using alternative methodologies.

|  | Borjas–Cassidy | CMS | Warren and Warren | DHS | Pew Research Center |
|---|---|---|---|---|---|
| US Total (thousands) | 12,256 | 11,725 | 11,725 | 11,570 | 11,400 |
| Distribution by state (%): |  |  |  |  |  |
| California | 23.6 | 24.9 | 25.0 | 25.2 | 21.9 |
| Texas | 13.7 | 14.7 | 13.7 | 15.4 | 14.5 |
| New York | 7.9 | 7.8 | 6.0 | 6.0 | 7.0 |
| Florida | 7.3 | 6.7 | 8.5 | 6.3 | 7.9 |
| Illinois | 4.8 | 5.1 | 5.0 | 4.8 | 4.4 |
| New Jersey | 4.3 | 4.1 | 3.5 | 3.8 | 4.4 |
| Georgia | 3.4 | 3.4 | 3.4 | 3.7 | n/a |
| North Carolina | 2.8 | 2.9 | 3.2 | 3.4 | n/a |
| Arizona | 2.4 | 2.6 | 2.9 | 3.0 | n/a |
| Washington | 2.0 | 2.0 | 2.2 | 2.2 | n/a |
| Other states and DC | 27.7 | 25.9 | 26.6 | 26.3 | n/a |

Notes: The first column shows the geographic distribution of the undocumented by state in 2010 applying our methodology across the whole population. The remaining columns show the distribution using alternative methodologies, with data derived from Table 2 in Warren (2014).

coefficient vector $\beta$) for both groups.[10] Any large-scale legalization initiative would then influence the wage-setting decisions by employers and change the $\beta$ vectors for both legal and undocumented workers. Running a Mincerian wage regression on the pooled sample of legal and undocumented immigrants, where the vector $\beta$ gives the returns to socioeconomic characteristics for the average worker, bypasses this problem.[11]

To document that our application of the Pew residual method to the ACS does not alter the nature of the empirical evidence, we initially focus on the 2012–2013 period. As noted earlier, we have access to the pooled 2012–2013 CPS files created by the Pew Research Center, which allows us to compare the estimates of the wage penalty in those years to those obtained in the ACS. After we establish the similarity between the estimates, we can then expand the analysis to other periods and other samples in the much larger ACS data files.[12] To simplify the presentation, we pool the two cross-sections and treat them as a single data set.

Table 3 reports the wage penalty results. For the Pew data, we only report a single specification where the vector $h$ includes age, state of residence, years since migration, educational attainment, and country of birth.[13] For the ACS regression, we add a vector of fixed effects that characterizes the worker's English language proficiency, a variable that is not available in the CPS but which is likely an important component of an immigrant's human capital stock. In fact, there are sizable differences between the English language skills of undocumented and legal immigrants, with legal immigrants being far more proficient. The ACS data indicate that 16.3% of undocumented immigrants reported not speaking

English at all, as compared to only 4.1% of legal immigrants. Similarly, 59.4% of legal immigrants reported they spoke either only English or English "very well," as compared to only 28.9% of undocumented immigrants.

The top three rows of Table 3 show the overall "raw" difference in log wages between legal and undocumented immigrants, the wage gap that is explained by the control variables, and the unexplained portion, which is our estimate of the wage penalty.

There are several interesting findings in the table. First, the Pew CPS and ACS data generate very similar estimates of the raw wage gap between legal and undocumented immigrants, as well as of the adjusted wage penalty. Among men, for example, the raw wage gap is approximately 39.8% in the Pew CPS and 41.3% in the ACS. Adjusting for age, state of residence, years since migration, educational attainment, and country of birth implies an estimated wage penalty of 6.0% in the Pew CPS and of 8.6% in the ACS. Among women, the estimated wage penalty is 4.6% in the CPS and 6.3% in the ACS. In short, our application of the residual methodology to the ACS data yields similar estimates of the wage penalty as those obtained in the Pew CPS files.

It turns out, however, that these estimates of the wage penalty are "too big," as adding English language proficiency fixed effects to the regression model further reduces the wage penalty in the ACS, from 8.6 to 6.1% for men and from 6.3 to 4.2% for women. In short, after controlling for an extensive set of observable individual characteristics, we find there is a positive and significant wage penalty to undocumented immigration, but it is numerically small—on the order of 4–6%.[14]

This striking finding raises a number of interesting questions. For example, which differences in observable characteristics play a larger role in generating the observed wage gap between legal immigrants and undocumented workers? In other words, when introducing the full set of characteristics dramatically lowers the estimate of the wage penalty $\beta_L$, how much does each set of covariates contribute to the reduction?

Gelbach (2016) presents a methodology that allows us to decompose the contribution of each set of covariates (e.g., education) to the change in the estimated wage penalty. The advantage of this approach over the more common procedure of sequentially adding each set of covariates

---

[10] Ortega, Edwards, and Hsin (2018) simulate the impact of DACA on the wage structure of both legal and undocumented workers who do not change status. Because of the small number of DACA recipients relative to the immigrant population, the effects are minimal.

[11] The estimate of the wage penalty given by the regression in Eq. (1) is numerically identical to that implied by the Oaxaca-Blinder decomposition method if the reference coefficients for the socioeconomic characteristics are estimated on the pooled sample of legal and undocumented immigrants.

[12] Because the CPS reports earnings in the previous calendar year, the analysis uses the comparable 2011 and 2012 cross-sections of the ACS.

[13] Age is included as a vector of fixed effects indicating a worker's age 5-year bands (20–24, 25-29, and so on); state of residence is included as a vector of 51 fixed effects; years since migration is included as a fourth-order polynomial; educational attainment is included as a vector of fixed effects indicating if the worker has less than 12 years of schooling, 12 years, 13–15 years, 16 years, or more than 16 years; and country of birth is included as a vector of fixed effects using all the information in the CPS or ACS data. The vector of fixed effects indicating English proficiency uses all the information contained in the English language variable in the ACS.

[14] Ortega and Hsin (2018) use the ACS data from 2010–2012 which contains legal status based on the CMS methodology. The authors find that, due to occupational barriers, lacking legal status reduces undocumented immigrants' productivity by 12%. They also find wage gaps (see Table 4 of their paper) between legal and undocumented immigrants that are larger than those reported in our paper, though their imputation methodology does not correct for potential H-1B immigrants. Hotchkiss and Quispe-Agnoli (2013), who identify undocumented workers using state administrative data, also find that the large difference in wages between legal and undocumented immigrants is mostly attributable to differences in observed characteristics.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 3**
Wage penalty to undocumented status in the 2012–2013 cross-section.

|  | Men | | | Women | | |
|---|---|---|---|---|---|---|
|  | Pew | ACS (1) | (2) | Pew | ACS (1) | (2) |
| Difference | 0.398 | 0.413 | 0.413 | 0.358 | 0.385 | 0.385 |
|  | (0.009) | (0.003) | (0.003) | (0.011) | (0.004) | (0.004) |
| Explained | 0.338 | 0.327 | 0.352 | 0.311 | 0.322 | 0.343 |
|  | (0.005) | (0.003) | (0.003) | (0.009) | (0.003) | (0.003) |
| Unexplained | 0.060 | 0.086 | 0.061 | 0.046 | 0.063 | 0.042 |
|  | (0.009) | (0.003) | (0.003) | (0.011) | (0.004) | (0.004) |
| Fraction explained by: |  |  |  |  |  |  |
| Age | 0.011 | 0.021 | 0.035 | −0.002 | 0.005 | 0.016 |
|  | (0.002) | (0.001) | (0.001) | (0.002) | (0.001) | (0.001) |
| State of residence | 0.002 | 0.003 | 0.004 | 0.007 | 0.009 | 0.009 |
|  | (0.002) | (0.001) | (0.001) | (0.002) | (0.001) | (0.001) |
| YSM | 0.053 | 0.080 | 0.057 | 0.061 | 0.090 | 0.066 |
|  | (0.003) | (0.002) | (0.002) | (0.004) | (0.002) | (0.002) |
| Education | 0.195 | 0.168 | 0.144 | 0.171 | 0.160 | 0.136 |
|  | (0.005) | (0.002) | (0.002) | (0.006) | (0.002) | (0.002) |
| Birthplace | 0.078 | 0.056 | 0.042 | 0.075 | 0.059 | 0.048 |
|  | (0.005) | (0.002) | (0.002) | (0.006) | (0.002) | (0.002) |
| English | – | – | 0.071 | – | – | 0.067 |
|  | – | – | (0.001) | – | – | (0.002) |

Notes: Standard errors are reported in parentheses. The dependent variable gives a worker's log hourly wage rate. The statistics reported in the table are the results from a Mincerian wage regression that includes controls for survey year, age, educational attainment, state of residence, years-since-migration, and birthplace, while ACS columns (2) add English language proficiency. The rows labeled "Difference", "Explained", and "Unexplained" indicate the raw wage gap between legal and undocumented immigrants, the amount of that gap that is explained by the covariates, and the amount that remains unexplained, respectively. Each covariate row under "Fraction explained by:" indicate the fraction of the explained portion of the wage gap explained by that set of covariates (Gelbach, 2016). The years-since-migration variable is introduced as a fourth order polynomial; the age, education, state of residence, birthplace, and English language proficiency variables are introduced as vectors of fixed effects.

and simply documenting the change in the coefficient is that the Gelbach methodology accounts for the correlations among sets of covariates. In the presence of such correlations, the order in which each set of covariates is added impacts the interpretation of the results, whereas the Gelbach decomposition is independent of any sequential introduction of sets of covariates.[15]

The bottom panel of Table 3 reports the part of the wage gap "explained" by each of the covariate groups in our regression model. For example, differences between the two groups in the values of the covariate group "age" (which stands for a vector of nine age fixed effects) leads to a 3.5 percentage point wage gap for men, while the covariate group "state of residence" generates only a 0.4 percentage point wage gap. It is evident that the covariate groups that "matter," in terms of explaining a large part of the observed wage gap, are years since migration (with undocumented immigrants having been in the United States for a shorter period), educational attainment, and English proficiency. For men, these three sets of variables together generate a 27.2% wage gap, about two-thirds of what is actually observed; and differences in educational attainment alone generate a 14.4% wage gap, about a third of what is actually observed. Similar results are obtained for women.[16]

Having established the similarity between the Pew CPS and the ACS results, we can now extend the analysis to other ACS cross sections and subgroups of the population. We first explore how the wage penalty evolved over the past decade. Specifically, we conduct our decomposition exercise separately in each of the ACS cross-sections between 2008

and 2016, using the full model specification that includes English language proficiency. The top panel of Fig. 2 illustrates the trend in the wage penalty for the entire male workforce, as well as for low-skill (i.e., at most a high school education) and high-skill (i.e., at least some college) workers.[17] The bottom panel of the figure duplicates the analysis for the female workforce.[18]

It turns out that the wage penalty for undocumented men was relatively stable at about 5–6% through 2013, at which time it began a noticeable, and statistically significant, decline. In 2013, for example, the wage penalty for the average male worker was 6.7 percentage points (with a standard error of 0.6), but it declined to 4.1 percentage points by 2016 (with a standard error of 0.6).

The figure also illustrates the analogous trends in the wage penalty for low- and high-skill workers. Both groups exhibit the post-2013 decline in the wage penalty, with the decline being steeper for high skill undocumented workers. The wage penalty for low-skill workers stood at 8.3% in 2013, before beginning its decline and ending up at 6.6% in 2016. In contrast, the wage penalty for high-skill workers was 6.1% in 2013, but by 2016 had declined to 2.7%. As the descriptive statistics reported in Table 1 show, there are a surprisingly large number of high-skill workers in the undocumented population. Both the Pew CPS and the ACS suggest that about 14% of undocumented men have at least a college diploma (even after applying the filter for H-1B status), and that an additional about 11% have some college education. The debate over undocumented immigration in the United States has focused on its

---

[15] We use the Stata package "b1x2" to perform the decomposition.

[16] Adding occupation controls to the decomposition further lowers the wage penalty to 2.7% for men and to near zero for women in the ACS, and occupation explains 15.3 and 17.7 percentage points of the wage gap between legal and undocumented immigrants for men and women, respectively.

[17] The standard error of the wage penalty in any given year is about 0.006 for men and 0.008 for women.

[18] The wage penalty for low- or high-skill workers is calculated by estimating the regression model separately in the samples of low- or high-skill workers.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

## A. Men



Fig. 2. Trend in the wage penalty for undocumented workers. Notes: Figures show the log hourly wage penalty between legal and undocumented immigrants calculated with Mincerian wage regressions estimated separately in each cross-section that include controls for age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status. "Low-skill" and "high-skill" include workers who are high school graduates or less and workers with more than a high school degree, respectively. All results calculated from the ACS.

## B. Women



impact on the low-skill labor market, and the presence and labor market impact of high-skill undocumented immigrants has been ignored.

The bottom panel of Fig. 2 illustrates the analogous trends in the wage penalty estimated in the sample of women. As with men, the key finding is that there has been a long-term decline in the average wage penalty to undocumented women, with the decline beginning a bit earlier (around 2010). In 2010, the wage penalty for women stood at over 5%. By 2016, it had fallen to about 2%. The decline in the female wage penalty was also steeper for high-skill women. As noted earlier, however, undocumented women have very low employment rates, so that it is difficult to disentangle the impact of self-selection biases in the labor supply decision from secular trends in the wage penalty.[19]

It is of interest to compare our estimate of the wage penalty obtained from adding an undocumented identifier to the ACS to existing

estimates of how much legalization raises the wage of undocumented workers. Almost all existing estimates of this wage penalty come from studies that examine what happened to the earnings of the persons who received amnesty in 1986 as part of the Immigration Reform and Control Act (IRCA). Nearly 3 million undocumented immigrants received amnesty at the time, and contemporaneous surveys tracked those immigrants as they received their legal working papers (Kossoudji and Cobb-Clark, 2002; and Kaushal. 2006). Their wage rose by at most 6% between 1989 and 1992. The estimates of the wage penalty implied by the ACS around 2008 (the earliest year available where the ACS provides the requisite information required to identify undocumented status), are very similar (around 4–6%). In short, the existing estimates of the wage penalty (based on measuring the wage impact of the IRCA amnesty) closely resemble the penalty implied by the wage data in the early years of our ACS cross-sections.[20]

It is difficult to identify precisely which factor drove the decline in the wage penalty in the national labor market after 2013.[21] A number

---

[19] We also estimated the wage penalty and its trend using the alternative approach of holding constant the demographic composition of the immigrant population, and then using those fixed characteristics to compute the average wage for legal and undocumented immigrants in each ACS cross-section. Specifically, we calculated (by gender) the distribution of immigrants across demographic cells using the pooled 2008-2016 ACS (where the cells are defined in terms of education, English language proficiency, age, years-since-migration, and state of residence). We then use those shares to get a weighted average of the log wage for legal and undocumented immigrants each year. This approach also reveals a decline of 3–+5 percentage points in the wage penalty starting around 2012 or 2013.

[20] Rivera-Batiz (1999, p. 106) looks specifically at Mexican undocumented immigrants using the 1990 Census. His results are similar to those reported in this paper, and he concludes that: "The most important characteristics in explaining the wage gap are: schooling, English proficiency, and recency of immigration."
[21] One stumbling block is that the composition of the undocumented population has changed in unknown ways during this period. The estimated number of undocumented immigrants (as reported by the DHS) rose between 2000 and 2006, and held relatively steady through 2016. The constant number of un-

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757



**Fig. 3.** Trend in the wage penalty for undocumented workers in specific cohorts.

Notes: Figures show the log hourly wage penalty between legal and undocumented immigrants calculated with Mincerian wage regressions estimated separately in each cross-section that include controls for age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status. "Low-skill" and "high-skill" include workers who are high school graduates or less and workers with more than a high school degree, respectively. All results calculated from the ACS.

of sensitivity exercises can be conducted, however, that help to further identify the groups that experienced a substantial decline in the wage penalty and that may suggest a potential source for the decline. For example, we can examine what happened to the entry wage disadvantage of *new* undocumented immigrants over the past decade. We define a recent immigrant as someone who arrived in the 3-year period prior to the ACS cross-section, and we define an "older" immigrant as someone who has been in the United States more than 10 years. Because of the small number of "new" immigrants (only about 5% of legal immigrants and 12% of undocumented immigrants are recent arrivals), we pool the sample of male and female workers to calculate the wage penalty.[22] Fig. 3 illustrate the wage trends for the new and the earlier immigrants.

It is evident that the wage penalty associated with undocumented status for the newly arrived immigrants shrank substantially in the post-2011 period. The wage penalty to new immigrants fell from 10.7% in 2011 to 5.0% (with a standard error of 1.5) by 2016. In contrast, the trend in the wage penalty to immigrants who have been in the United States more than 10 years was more stable, with the wage penalty declining by only about 2 percentage points (from about 6% in 2013 to 4% in 2016).

One plausible explanation for the decline in the wage penalty for the newly arrived immigrants is that there was a favorable shift in the legal environment regarding undocumented immigration during the years of the Obama administration. It seems plausible to argue that the shift would particularly benefit newly arrived immigrants, as they better represent the "marginal" worker in the labor market that will most quickly be affected by the implied changes in the legal environment. Unfortunately, the time-series giving the trend in the national wage penalty do not provide sufficient information that would help identify the impact of such *economy-wide* changes in the labor market for undocumented workers. There is evidence, however, suggesting that changes in the legal environment at the federal level *do* affect the national wage penalty

(and we will show below that corresponding changes in the local legal environment also influence the wage penalty in the local labor market).

On June 15, 2012, President Barack Obama issued an executive action that grants undocumented immigrants who entered the United States as children a temporary reprieve from the threat of deportation as long as some eligibility requirements were met. The undocumented persons who qualify for the Deferred Action for Childhood Arrivals (DACA) program are immigrants who entered the United States under the age of 16, were at most 31 years old at the time the executive action was taken, and had at least a high school (or equivalent) education. The executive action permits these immigrants to work as if they were legal immigrants. In other words, the DACA program potentially represents a substantial change in labor market opportunities for the eligible undocumented workers in the national labor market, and it would be important to determine if it led to a reduction in the wage penalty for the affected workers.

We can use the ACS data to determine if the wage penalty for the DACA-eligible population fell towards the end of our sample period.[23] Because of the relatively small sample of undocumented immigrants who can potentially benefit from DACA, we use a simpler strategy to estimate how the wage penalty responded to the executive action. In particular, we pool the sample of all immigrants (legal and undocumented) who satisfy the *demographic* requirements for DACA eligibility: the immigrant must have migrated to the United States before the age of 16, be at most 31 years old in 2012, and have at least a high school education. In the 2012 ACS, 30.1% of the workers in this sample were undocumented and would qualify for the benefits provided by DACA.

We estimate a regression in this sample of persons relating the worker's log hourly wage rate on a variable indicating if the worker was a legal immigrant, holding constant the set of demographic characteristics used throughout this section (i.e., age, sex, educational attainment, English language proficiency, state of residence, and country of birth). The coefficient of the legal status indicator, of course, measures the wage penalty. To isolate the impact of the DACA executive action on the wage penalty just before and after the 2012 announcement, we restrict the analysis to the 2010–2016 ACS cross-sections. We then interact the legal status indicator with variables indicating if the observation

---

documented persons does *not* imply that the flow of undocumented immigrants stopped altogether in 2006. Some of the undocumented persons present in the United States in 2006 may have left the country and many may have been able to adjust their immigration status and obtain a green card. These "exits" were then replaced by a similarly sized flow of new undocumented immigrants. We lack the requisite information to precisely measure how much of the decline in the wage penalty can be accounted for by changes in the sample composition of the relevant populations over the past decade.

[22] Note that although the pooling of male and female workers helps alleviate the small sample issue, it also introduces a problem. Nearly half of the undocumented women do not work so that wage trends in this sample are likely influenced by sample selection.

[23] Pope (2016) also uses the ACS to test the impact of DACA and finds that it increased the labor force participation and reduced the unemployment of eligible unauthorized immigrants, though only raised income for unauthorized immigrants in the bottom of the income distribution. Amuedo-Dorantes and Antman (2017) find that DACA reduced the probability of school attendance, consistent with a lack of legal work status leading to a substitution away from work and towards schooling.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 4**
The impact of DACA on the wage penalty.

| | Schooling > 12 | | Schooling = 12, not enrolled | |
| | Excludes enrolled (1) | Includes enrolled (2) | DACA eligible (3) | Not DACA eligible, but age <31 as of 2012 (4) |
|---|---|---|---|---|
| Legal status indicator | 0.064 | 0.069 | 0.068 | 0.039 |
| | (0.008) | (0.007) | (0.011) | (0.012) |
| Legal status indicator interacted with: | | | | |
| 2010–2011 | –0.013 | –0.011 | –0.004 | 0.030 |
| | (0.011) | (0.010) | (0.016) | (0.017) |
| 2012–2013 | – | – | – | – |
| 2014 | –0.023 | –0.022 | –0.016 | 0.022 |
| | (0.012) | (0.011) | (0.017) | (0.018) |
| 2015 | –0.017 | –0.023 | –0.023 | 0.024 |
| | (0.013) | (0.011) | (0.017) | (0.018) |
| 2016 | –0.038 | –0.045 | –0.045 | 0.028 |
| | (0.012) | (0.011) | (0.017) | (0.017) |
| Includes school enrollment indicator | No | Yes | No | No |
| Number of observations | 89,759 | 119,231 | 34,433 | 32,982 |

Notes: Standard errors are reported in parentheses. The sample in columns (1) and (2) consists of working immigrants who meet the demographic qualifications for DACA: aged 31 or less in 2012, have at least a high school education, and who migrated to the United States when they were 16 years old or younger. The sample in column (3) adds the further restriction that the immigrants have exactly 12 years of schooling. The sample in column (4) consists of workers who do not meet the demographic qualifications for DACA, but were 31 years old or younger in 2012. The regression includes vectors of fixed effects for age, gender, educational attainment, English language proficiency, state of residence, and birthplace.

is drawn from a particular cross-section, allowing us to document the trend in the wage penalty. Table 4 presents the relevant coefficients.

Before proceeding to discuss the coefficients, it is worth noting that it took a while for the DACA program to go into effect. Only 1687 applications had been approved by the end of the 2012 calendar year, and many more (472,378) were approved during the 2013 calendar year (U.S. Citizenship and Immigration Services, 2014). Much of the initial implementation of the program, therefore, took place over the 2012–2013 period, and we use this period as the baseline for our analysis.

The first column of Table 4 shows that the wage penalty in the demographic sample potentially affected by DACA stood at 6.4% during the baseline period. However, note that the wage penalty began to decline after 2014. By 2017, it had dropped by 3.8 percentage points.

The DACA executive action obviously encourages further education for the affected undocumented immigrants (as one needs at least a high school diploma to qualify for the benefits that DACA imparts).[24] Our empirical study of the wage penalty has been restricted to workers not enrolled in school. In the DACA context, however, this restriction might generate results that miss some of the potential impact of the executive action. The second column of the table replicates the analysis using the larger sample of DACA-eligible immigrants, which includes those who are enrolled in school (but report earnings). The regression suggests that the measured decline in the wage penalty in the post-DACA period is slightly larger, about 4.5 percentage points.

Note that the regression analysis reported in Table 3 is, in an important sense, "tracking" a particular cohort of immigrants (those who satisfy the demographic restrictions in DACA, whether legal or not) across ACS cross-sections. For example, the average age of a worker in our sample is 25.2 in 2010 and 28.5 in 2016. As a result, there may be life cycle effects on the wage penalty that contaminate the secular trend, and we might be mistakenly attributing any life cycle effects to DACA.

A simple way of showing that DACA does indeed seem to have an impact is to further refine the sample to workers not enrolled in school who have exactly 12 years of schooling, leading to a much more focused "tracking" of a particular set of workers.[25] In 2012, 64.5% of the

sample of DACA-eligible undocumented workers had exactly 12 years of schooling. Column (3) of the table re-estimates the regression in this subsample of the DACA-eligible population and shows that the wage penalty in the baseline period 2012–2013 was 6.8% and had declined by 4.5 percentage points by 2016.

We can document that this decline in the wage penalty is not reflecting a life cycle effect by simply showing what happened to the trend in a comparable population that is *not* DACA-eligible. In particular, column 4 estimates the regression using the sample of immigrants who are not DACA-eligible, but were high school graduates and were at most 31 years old in 2012.[26] It is evident that the wage penalty in this comparable, but non-eligible, sample did not decline over time. If anything, the wage penalty was *rising* somewhat over the life cycle in this "counterfactual" sample (a trend consistent with the life cycle effects documented in the next section). In sum, the evidence in Table 4 suggests that the DACA executive action significantly improved the labor market conditions facing the affected undocumented workers and reduced the wage penalty by at least 4 or 5 percentage points.[27]

## 4. The wage penalty over the life cycle

The last section documented the differences in the wage penalty across different groups of undocumented workers, and the differential trends in the penalty experienced by the different groups. It turns out that the wage penalty will also vary for a given worker along the life cycle.

We begin our analysis of the life cycle variation in the wage penalty by illustrating the differences in the (cross-sectional) age-earnings profiles of natives, legal immigrants, and undocumented immigrants, shown in Fig. 4.[28] The age-earnings profiles of undocumented immigrants lie far below those of the other two groups *and* are relatively flat. At the age of

---

[24] Hsin and Ortega (2018) find that DACA, which is effectively a work permit program, serves to incentivize work over schooling, and the effect of DACA on university and community college attendance depends on how accommodating schools are of working students.

[25] The sample restriction avoids the sample composition problem created by the fact that some of the workers who do not appear in the early years of the

sample because they enrolled in school eventually show up in the labor force in the later cross-sections as college graduates.

[26] By construction, the only difference between the two samples is that workers in the DACA-eligible sample migrated before age 16, while non-eligible undocumented workers migrated after age 16.

[27] Ortega et al. (2018) report that DACA recipients experienced a wage increase of around 12%, although they find no evidence that undocumented immigrants with a college degree experienced a wage increase.

[28] The analysis reported in this section pools the 2008–2016 cross-sections of the ACS.

*G.J. Borjas and H. Cassidy*

*Labour Economics 61 (2019) 101757*

**A. Men**



**Fig. 4.** Age-earnings profiles of workers.
Notes: The age-earnings profiles report the average log hourly wage of workers in each of the nativity groups at each age.

**B. Women**



25, for example, the hourly wage of undocumented men in the ACS is 0.24 log points below that of natives and 0.27 log points below that of legal immigrants. By age 45, the wage gap between natives and undocumented immigrants rose to 0.47 log points, while the wage gap between legal and undocumented immigrants rose to 0.37 log points. The bottom panel of Fig. 3 shows similar life cycle effects for women.

It is important to emphasize that it is difficult to interpret the cross-section age-earnings profiles of both legal, and particularly, undocumented workers as measuring some type of wage evolution over the life cycle. It is well known (Borjas, 1985) that cross-section age-earnings profiles of immigrants are affected by both assimilation effects, the wage growth that occurs as a particular immigrant gets older, and by cohort effects, the differences in earnings potential across waves of immigrants that entered the United States at different times. The wage evolution of the undocumented sample is also affected by the fact that some of the undocumented will be able to "filter themselves" out and obtain green cards as they age, joining the legal sample, and by the fact that changes in the legal infrastructure regulating undocumented immigration (such as non-enforcement of existing laws or enactment of new penalties) might affect the flow of undocumented workers in and out of the country over time.

An important factor in understanding the evolution of earnings over the life cycle, particularly for undocumented versus legal immigrants, may be occupational attainment. A lack of legal immigration status

likely acts as a barrier in the occupational mobility of undocumented immigrants as some occupations may be more difficult (or nearly impossible to attain) in the absence of legal status. To understand the importance of occupations in explaining the life cycle pattern of wages, we use a task-based approach to occupational attainment. Each occupation is assigned a vector of task requirements that summarize what is required to perform that job. The task requirements for each occupation are derived from the U.S. Department of Labor's O*NET, with details of the procedure used to assign the task requirements discussed in Appendix A.

To simplify the presentation, we focus on only two tasks that efficiently summarize the difference in the types of jobs held by legal and undocumented immigrants: cognitive and non-cognitive tasks. An occupation that has a high level of cognitive task requirement might involve, for example, high levels of mathematical and deductive reasoning. In our data, the occupations with the highest cognitive task requirements are actuaries and physicists and astronomers. In contrast, occupations that require high levels of non-cognitive tasks typically involved physical strength and stamina, and the two occupations with the highest levels of non-cognitive task requirements are millwrights and dancers.

Fig. 5 shows the age-task requirement profiles (analogous to the age-earnings profiles in Fig. 4) for our cognitive and non-cognitive occupational task requirement measures. These figures mirror the age-earnings profiles. The cognitive task, which is strongly and positively associated

*G.J. Borjas and H. Cassidy*

*Labour Economics 61 (2019) 101757*

## A. Cognitive



## B. Non-cognitive



**Fig. 5.** Age-task requirement profiles of workers.
Notes: The age-task requirement profiles report the average cognitive and non-cognitive task requirements of workers in each of the nativity groups at each age.

with wages, starts lower for undocumented immigrants than for natives or legal immigrants, rises more slowly with age, and actually begins to decline quite early in the life cycle. In contrast, the non-cognitive task shows the opposite pattern, falling more slowly for undocumented immigrants than the other groups, flattening out for men after about age 35, and actually starting to rise early in the life cycle for women. Note that the divergence between legal and undocumented immigrants in the occupational task requirements occurs between the ages of 21 and 35. More generally, Fig. 5 demonstrates the striking difference in the jobs the two groups perform, how this difference widens prior to age 35, and how the substantial gap then persists over the lifecycle.[29]

The "raw" age-earnings profiles illustrated in Fig. 4 do not adjust for differences in other worker characteristics such as educational at-

tainment and English language proficiency, but they do suggest that the wage penalty to undocumented immigration is not constant over the life cycle, while Fig. 5 suggests that differences in occupational mobility (particularly at younger ages) may be an important factor in explaining both the overall wage penalty as well as in understanding the evolution of the wage penalty over the life cycle. To study the variation in the wage penalty over the life cycle, we estimate a Mincerian log wage regression that allows us to measure the difference in the slope of the age-earnings profile between legal and undocumented immigrants. In particular, consider the following regression model estimated in the pooled 2006–2016 ACS sample (separately for men and women):

$$\log w_{it} = \beta h_i + \theta_t + A_i + \pi_A \left( L_i \times A_i \right) + \varepsilon_{it}, \qquad (3)$$

where $w_{it}$ gives the wage of worker $i$ in year $t$; $h_i$ is a vector of the worker's socioeconomic characteristics (i.e., education, years since migration, English proficiency, state of residence, and country of birth); $\theta t$ is a vector of calendar year fixed effects; $At$ is a vector of age fixed effects, with each value of age having its own fixed effect; and these age fixed effects are interacted with $L_i$, a variable indicating if worker $i$ is a legal immigrant. The coefficient vector $\pi A$ measures the wage penalty at a particular age.

---

[29] The most common occupation among low-skilled men is truck driver for legal immigrants but construction laborer for undocumented immigrants, which is consistent with truck drivers often requiring an occupational license and these licenses being more difficult to undocumented immigrants to acquire. See Cassidy and Dacass (2019) for a more thorough discussion of occupational licensing and immigrants.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**A. Men**



**B. Women**



Fig. 6. Wage penalty for undocumented workers over the life-cycle.

Notes: Figures show the wage penalty between legal and undocumented immigrants in log hourly wage at different points in the life cycle calculated with a Mincerian wage regression that includes controls for survey year, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status interacted with age. The line "occupation" adds occupation controls to the baseline specification. All results calculated from the ACS.

Fig. 6 illustrates the "baseline" life cycle trend in the measured wage penalty. Consistent with Figs. 4 and 5, we find that the wage penalty increases steadily over the life cycle until approximately ages 45–50, when it plateaus for men and begins to decline slightly for women. Note that the measured wage penalty is negative for the youngest undocumented workers. Given the unadjusted age-earnings profiles illustrated in Fig. 4, the finding of a negative wage penalty at younger ages is not surprising. After all, the average wage of undocumented immigrants is basically equal to that of legal immigrants for workers in their 20s. At the same time, however, the undocumented population has far less education and is much less English proficient, generating a negative wage penalty. The relatively superior economic performance of young undocumented workers seems like an empirical finding that deserves much further study.

We explore the role of occupational mobility in generating the life cycle trend in the wage penalty by adding a vector of occupation fixed effects to the log wage regression in Eq. (3). Fig. 6 shows that the introduction of the occupation fixed effects noticeably reduces the growth in the wage penalty between ages 21 and 35, particularly for men. For example, the baseline wage penalty for men grows by 19.4 percentage points (from −12.9–+6.5%) through age 35, while the wage penalty that adjusts for the widening gap in occupational attainment grows by only 15.5 percentage points (from −12.4–+3.1). The evidence, therefore, suggests that occupational mobility (or, more specifically, the lack thereof) is a determinant of the life cycle trend in the wage penalty.

## 5. The wage penalty across states

The analysis reported in the previous sections suggests that the *average* wage penalty to undocumented immigration was quantitatively small for both undocumented men and women by 2016. As we have seen, however, this conclusion does not necessarily imply that there was little wage penalty throughout the U.S. labor market. We have documented important differences in the wage penalty as a worker ages, between new immigrants and older immigrants, and over time as relaxed restrictions on undocumented immigration affected some groups of workers. This section continues the analysis of the dispersion in the wage penalty by exploiting the fact that the relative number of undocumented immigrants varies substantially across states. According to the official DHS statistics (Baker, 2017), 56% of undocumented immigrants in January 2104 lived in only 5 states (California with 24%; Texas with 16%; Florida with 6%; and New York and Illinois, each with 5%).

Further, the labor market environment facing undocumented immigrants in the past decade changed differently across states, due perhaps to geographic differences in the impact of the Great Recession (and subsequent recovery) or to state-specific legislation that made it more difficult for undocumented immigrants to work in particular regions (more on this below). These differences may account for some of the observed changes in the relative number of undocumented immigrants choosing to settle in some states over time. For example, the official DHS statistics (Baker, 2017) reveal a sizable decline between 2007 and 2014 in the number of undocumented immigrants in Arizona (from 530,000 to

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 5**
Interstate variation in undocumented immigration and the wage penalty for men.

| State | Number of undocumented workers (1000s) | | Undocumented share of workforce (%) | | Wage penalty | |
|---|---|---|---|---|---|---|
| | 2008 | 2016 | 2008 | 2016 | 2008 | 2016 |
| Arizona | 251.0 | 140.1 | 8.6 | 4.8 | −0.039 | 0.011 |
| California | 1940.1 | 1491.9 | 11.3 | 8.3 | 0.080 | 0.061 |
| Colorado | 138.6 | 124.6 | 5.4 | 4.5 | 0.120 | −0.012 |
| Florida | 558.3 | 519.2 | 6.7 | 5.8 | 0.035 | 0.039 |
| Georgia | 280.5 | 260.1 | 6.1 | 5.6 | 0.072 | 0.053 |
| Illinois | 400.8 | 332.3 | 6.5 | 5.5 | 0.045 | 0.049 |
| Maryland | 150.0 | 165.9 | 5.3 | 5.6 | 0.045 | 0.062 |
| Massachusetts | 140.2 | 103.2 | 4.3 | 3.1 | −0.036 | −0.020 |
| Nevada | 139.6 | 119.7 | 11.0 | 8.9 | −0.032 | 0.010 |
| New Jersey | 339.5 | 324.5 | 8.0 | 7.7 | 0.079 | 0.086 |
| New York | 676.9 | 562.0 | 7.3 | 6.1 | 0.051 | 0.058 |
| North Carolina | 215.0 | 202.9 | 4.9 | 4.5 | 0.066 | 0.048 |
| Pennsylvania | 102.7 | 103.7 | 1.7 | 1.8 | −0.002 | −0.001 |
| Texas | 997.3 | 1084.1 | 8.8 | 8.6 | 0.015 | 0.065 |
| Virginia | 173.3 | 182.5 | 4.4 | 4.5 | 0.086 | 0.066 |
| Washington | 149.0 | 164.9 | 4.6 | 4.8 | −0.022 | 0.070 |

Notes: The 16 states listed in this table had the largest number of undocumented workers (at least 100,000) in 2008. The undocumented share is the fraction of undocumented workers in the state's workforce. The wage penalty values are for male immigrants.

270,000), a stable undocumented population in New York (at 640,000), and a slight increase in the number of undocumented persons in North Carolina (from 380,000 to 400,000).

The potential interstate differences in the labor market conditions facing undocumented immigrants suggest a novel use of the ACS data. Specifically, we can estimate the wage penalty to undocumented immigration in each state/year cell and then determine whether this variation responds to factors that describe the local labor market, including the relative number of undocumented immigrants, aggregate economic conditions in the state, and state-specific legislative changes that made it more difficult for employers to hire undocumented workers.[30]

To calculate the wage penalty for each state-year cell, we again estimate a Mincerian earnings function using the pooled ACS data over the entire sample period 2008–2016:

$$\log w_{ist} = \beta h_i + \theta_{rt} + \pi_{rt}(L_i \times \theta_{rt}) + \varepsilon_{irt}, \qquad (4)$$

where $w_{ist}$ gives the wage of worker $i$ residing in state $r$ in year $t$; $h_i$ is a vector of the worker's socioeconomic characteristics (which now also includes a vector of age fixed effects in 5-year bands); $\theta rt$ is a vector of state-year interaction fixed effects; and these fixed effects are interacted with $L_i$, the variable indicating if worker $i$ is a legal immigrant. The coefficient vector $\pi rt$ measures the wage penalty in state $r$ at time $t$.

We first illustrate the sizable interstate variation in both the number of undocumented workers and in the measured wage penalty for male immigrants in the 2008 and 2016 ACS cross-sections. Table 5 reports the number of undocumented workers (aged 21–64) in the 16 states that employed at least 100,000 undocumented workers in 2008. The table also reports the share of undocumented workers as a fraction of the state's total workforce.

It is evident that the number of undocumented workers fell significantly in some states, while rising in others. For example, the number of undocumented workers fell by over 40% in Arizona (from 251.0 thousand to 140.1 thousand), while rising by nearly 10% in Texas (from 997.3 thousand to 1084.1 thousand).

The table also shows sizable differences in both the level and the trends in the undocumented share. The fraction of the state's workforce composed of undocumented workers fell from 8.6 to 4.8% in Arizona and from 11.3 to 8.3% in California. In contrast, it declined slightly in Texas from 8.8 to 8.6 % and rose slightly from 4.6 to 4.8 in Washington.

Of the 16 states listed, only Washington, Pennsylvania, and Maryland experienced an increase in the *share* of their workforce that is undocumented, and those increases were modest.

Although the average wage penalty in the national labor market hovered between 4 and 6% throughout much of the period, there was much greater interstate variation in the penalty. Table 5 also reports the estimated wage penalty for men for each of the states in 2008 and 2016. The wage penalty rose by 5 percentage points in Arizona (from −3.9% to 1.1%), by 0.7 percentage point in New Jersey (from 7.9 to 8.6%), and fell by 1.9 percentage points in California (from 8.0 to 6.1%). Fig. 7 illustrates the dispersion in the size of the wage penalty for men across the 16 states with the largest number of undocumented workers. Note that most of the penalties estimated for each state-year cell are positive, i.e., legal immigrants have higher wages that otherwise similar undocumented immigrants.

We exploit this variation to determine if there are systematic factors that explain the differences in the wage penalty that undocumented immigrants face in different geographic labor markets at different times. Specifically, we estimate second-stage regressions that relate the wage penalty in a state-year cell to variables that describe local labor market conditions facing the undocumented.[31] We consider three specific variables that might determine the size of the wage penalty: (1) the relative number of undocumented immigrants in the local labor market; (2) the presence of state-level legislation that restricts the employment of undocumented immigrants; and (3) the impact of the Great Recession on local labor market conditions. This second-stage regression is estimated using the entire sample of 459 state-year observations (9 annual observations for each of the 51 "states," which includes the District of Columbia). The regression also includes vectors of state fixed effects and year fixed effects. The regression is weighted by the number of observations used to calculate the dependent variable (i.e., the wage penalty in the state-year cell), and the standard errors are clustered at the state level.[32]

The top panel of Table 6 presents the relevant OLS coefficients of the regression model. Consider initially the regressions estimated using the sample of male workers. As column 1 shows, there is a positive

---

[30] Related work by Massey and Gentsch (2014), using Mexican Migration Project data and state-year undocumented population estimates from Warren and Warren (2013), find that the percent of a state in a given year is negatively related to the wage of undocumented Mexican immigrants.

[31] Note that we are using the state as the geographic definition of the local labor market. It might be preferable to look at smaller geographic units, such as metropolitan areas or commuting zones, but the sample size of undocumented immigrants would fall substantially in many of these smaller geographic units.

[32] More precisely, the weight is given by $(nL \times nU)/(nL + nU)$, where $nL$ and $nU$ give the number of observations in the state-year cell for legal immigrants and undocumented workers, respectively.

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*



**Fig. 7.** Distribution of wage penalty for men in states with largest number of undocumented workers, 2008–2016.
Notes: The wage penalty is calculated at the state-year cell and is regression coefficient of state-year interacted with legal immigrant status in a Mincerian wage regression that includes controls for survey year, age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency.

**Table 6**
Determinants of variation in wage penalty across states, 2008–2016.

|  | All men (1) | All men (2) | Low-skill men (3) | High-skill Men (4) | Women (5) |
|---|---|---|---|---|---|
| **OLS estimates** | | | | | |
| Undocumented share | 0.009 | 0.011 | 0.012 | 0.017 | 0.015 |
|  | (0.003) | (0.004) | (0.005) | (0.006) | (0.004) |
| E-Verify | – | 0.045 | 0.038 | 0.048 | –0.015 |
|  |  | (0.014) | (0.027) | (0.042) | (0.011) |
| Unemployment rate | – | –0.003 | –0.002 | –0.001 | –0.002 |
|  |  | (0.005) | (0.005) | (0.007) | (0.005) |
| **IV estimates** | | | | | |
| Undocumented share | 0.009 | 0.011 | 0.013 | 0.019 | –0.002 |
|  | (0.003) | (0.006) | (0.006) | (0.009) | (0.011) |
| E-Verify | – | 0.045 | 0.037 | 0.047 | –0.003 |
|  |  | (0.013) | (0.025) | (0.039) | (0.014) |
| Unemployment rate | – | –0.003 | –0.003 | –0.002 | 0.004 |
|  |  | (0.005) | (0.005) | (0.008) | (0.007) |

Notes: Standard errors in parentheses clustered at the state level. The undocumented share gives the percent of the state's total workforce that is composed of undocumented workers. The E-Verify variable is set to unity if employers in a given state/year cell were required to use E-Verify in their new hiring. The "low-skill" regressions are estimated using the sample of immigrants who have at most a high school education; and the "high skill" regressions are estimated in the sample of immigrants who have more than a high school education. Columns (1), (2), and (4), have 459 observations, column (3) has 456 observations, and column (5) has 458 observations.

and statistically significant relationship between the wage penalty and the fraction of the state's workforce that is undocumented. Moreover, the impact is quantitatively sizable: An increase of 1 percentage point in the undocumented share raises the wages penalty by about 0.9 percentage points.[33]

It is worth noting that the positive relationship between the wage penalty and the relative size of the undocumented workforce suggests that legal and undocumented immigrants are not perfect substitutes in production. If the two groups were perfect substitutes, the relative wage of undocumented immigrants would not depend on their relative number. In fact, if we assume that the wage data was generated in labor markets where profit-maximizing competitive firms faced the technology implied by a nested CES aggregate production function, we can use our data to estimate the elasticity of substitution between the two groups. It is well known that the elasticity of substitution is given by the reciprocal

of the coefficient of a regression of the log wage ratio between any two labor inputs on the log quantity ratio of those two inputs. The estimated regression for men is:

$$\pi_{rt} = \theta_r + \theta_t - 0.059 \log \frac{E_{Lrt}}{E_{Urt}}, \tag{5}$$

where $\theta r$ and $\theta t$ denote vectors of state and time fixed effects; and $Ejrt$ gives the number of workers of type $j$ in state $r$ at time $t$. The implied elasticity of substitution between the two groups is 17.0. For women, the coefficient on the log ratio of legal to undocumented immigrants is −0.087 (with a standard error of 0.029), which yields an implied elasticity of 11.5. Note that the coefficient is statistically significant for both men and women, so that we can reject the hypothesis that legal and undocumented immigrants are perfect substitutes. In short, there are factors—perhaps due to unobservable differences in the skill set of the two groups, or because the two groups face different labor market constraints—which imply that the labor market does not view the two groups as interchangeable. As a result, an important insight from this type of empirical analysis is that the relative size of the undocumented

---

[33] Massey and Gentsch (2014) also find that a one percentage point increase in the share of a state that is undocumented lowers the wages of undocumented Mexican immigrants by one percentage point.

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*

population is itself a major determinant of the wage penalty. A larger undocumented population generates a substantially larger wage penalty.

Of course, the OLS correlation between the wage penalty and the undocumented share is contaminated by the potentially endogenous settlement of both undocumented and legal immigrants in some states and not in others. We address the endogeneity problem by using a variant of the generic shift-share instrument that has become popular in the immigration literature (although see Jaeger et al., 2018, for a critical appraisal). Specifically, we use the pooled Current Population Surveys between 1995 and 2000 to obtain the baseline interstate distribution of both legal and undocumented immigrants from a particular country of origin, where the CPS surveys use the residual method described in section II of the paper to impute an undocumented immigration status variable for each observation.[34]

Let $scr$ be the share of the undocumented population from country $c$ living in state $r$ in the pooled CPS. Suppose that the ACS survey in cross-section year $t$ reveals the presence of $Uc(t)$ undocumented immigrant workers from that country. We then predict the number of undocumented immigrants from country $c$ residing in state $r$ in year $t$ to be the product $(scr \times Uc(t))$. We conduct a similar calculation for legal immigrants. By adding up this predicted number across all countries of birth, we can then obtain the number of undocumented and legal immigrants that would be predicted to be in state $r$ in cross-section $t$, or $\hat{U}_r(t)$ and $\hat{L}_r(t)$. The instrument for the undocumented immigrant share variable is then given by:

$$S = \frac{\hat{U}_r(t)}{\hat{U}_r(t) + \hat{L}_r(t) + N_r(t)}, \qquad (4)$$

where $Nr(t)$ gives the size of the native workforce in state $r$ in year $t$.

The first-stage regression shows that there is indeed there is a significant positive correlation between the actual undocumented immigrant share in the state and the predicted share. The relevant coefficient of the first stage is 0.916, with a standard error of 0.188. The bottom panel of Table 6 shows that the IV coefficient of the share is again positive and statistically significant. In fact, the magnitude of the coefficient is nearly identical to that obtained using OLS. A one percentage point increase in the undocumented share again increases the size of the wage penalty by about 0.9 percentage points.

The second column of the table adds two additional regressors to the model that attempt to explain the interstate variation in the wage penalty—a variable that measures state-specific legislative measures to restrict undocumented employment and the state's unemployment rate (as reported by the BLS).

During the period under analysis, the federal inaction on resolving the status of undocumented immigrants led some states to take state-specific actions that made it more difficult for employers to employ the undocumented. The best known of these attempts was the 2010 legislation in Arizona that, among many things, "[required] law enforcement officers to determine immigration status during any lawful stop; [created] state crimes and penalties for failure to carry federally-issued alien registration documents; [made] it unlawful for an unauthorized alien to knowingly apply for or perform work in Arizona; and [permitted] an officer to make a warrantless arrest if the officer has probable cause to believe the person has committed any public offense that makes the person removable from the United States" (National Conference of State Legislatures, 2012a).[35]

One common provision in the restrictive state-level statutes was the requirement that employers use E-Verify to authenticate the legal status of new hires. As the Department of Homeland Security describes it: "E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available to the Social Security Administration (SSA) and the Department of Homeland Security (DHS)."[36] During the period under analysis, four states enacted legislation mandating that *all* private employers in those states use the E-Verify system to confirm the employment eligibility of new hires: Arizona beginning in 2008, Alabama in 2012, Mississippi in 2011, and South Carolina in 2010.[37]

We introduced a variable into our regression model indicating if an E-Verify provision was in effect in a particular state at time $t$. Table 6 shows that the legislation mandating the use of E-Verify had a significant positive impact on the wage penalty to undocumented immigration, raising the wage penalty by 4.5 percentage points (in both the OLS and IV regressions). Not surprisingly, legal restrictions that make it harder for employers to hire undocumented immigrants (and make legal and undocumented immigrants less substitutable) increases the wage penalty. It is important to note, however, that our evidence exploits the enactment of the E-Verify system in only a very small number of states, so that it would not be prudent to generalize from this exercise to a prediction of what would happen to the wage penalty if the system were adopted nationwide.

Our results showing an impact of the E-Verify program on the wage penalty are generally consistent with related evidence reported in other studies, although these studies typically examine the link between E-Verify and the economic outcomes of Hispanic (mainly Mexican) immigrants (Bohn et al., 2015; Orrenius and Zavodny, 2015, 2016; and Orrenius et al., 2018). In rough terms, these studies find that the adoption of the E-Verify system reduces the hourly wage of undocumented Mexican men; leads to an outflow of undocumented immigrants from the states that adopt the system; and reduces the employment propensities of Hispanic workers.[38]

The second column of the table also includes the BLS unemployment rate in the state-year cell. Surprisingly, the impact of the local unemployment rate on the wage penalty is near zero, both statistically and numerically. It seems that changes in local labor market conditions arising from the business cycle affect aggregate wages, and likely affect immigrant wages, but do not seem to affect the relative wage of undocumented workers.

Column 5 of the table replicates the analysis using the sample of female workers. The results are far less stable, although they still show a significant positive relation between the wage penalty and the relative size of the undocumented population (but only in the OLS specification). As noted earlier, the analysis of wage trends in the female undocumented sample is problematic, as undocumented women have a very low labor force participation rate, so that selection biases likely play a significant role in determining both the interstate variation in the wage penalty and the trend in that penalty within a particular state. Borjas (2017, Table 1) reports that the employment rate in the 2012–2013 CPS

---

[34] Ideally, the instrument would employ the geographic settlement of legal and undocumented immigrants many years prior to the sample period of 2008–2016. The longer lag would reduce the probability that serial correlation in economic conditions at the state level invalidate the instrument. Unfortunately, there are no large-scale micro surveys that can be used to impute the legal status of a foreign-born person prior to the 1994 CPS.

[35] Some of the provisions in this legislation were later ruled to be unconstitutional by the U.S. Supreme Court.

[36] U.S. Citizenship and Immigration Services (2018b).

[37] NumbersUSA (2016); see also National Council of State Legislatures (2012b). A few other states passed versions of the E-Verify requirement, but these states typically exempted many employers (such as small firms) and had a phase-in period before the requirement was fully operational.

[38] We defined the states that use an E-Verify system using a strict definition of the regulation, specifically isolating the states and time periods where E-Verify applied to all workers. The Orrenius–Zavodny–Gutierrez studies use a less strict definition, classifying some states as having an E-Verify system even though many employers are exempt from the legislation or there is a phasing-in period when the regulation was not enforced.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

is 84.7% for legal immigrant men and 88.1% for undocumented men. In contrast, the employment rate is 64.4% for legal immigrant women and only 56.7% for undocumented women. The selection biases in wage regressions are likely to be substantial when nearly half the sample self-selects out of the workforce.

Finally, Table 6 also reports regressions estimated separately for low-skill (defined as persons with at most a high school education) and high-skill (those with more than a high school education) male immigrants. These regressions tend to reinforce the finding that the wage penalty is larger in states that have a relatively larger undocumented population, and that restrictions on the employment of undocumented immigrants tend to raise the wage penalty.

## 6. Summary

The past decade has witnessed a series of attempts to create some type of "path to citizenship" for the over 12 million undocumented immigrants now residing in the United States. This paper uses newly developed algorithms that impute undocumented status for each person in microdata files, including the Current Population Surveys and the American Community Surveys, to examine the determinants of what is perhaps the key indicator of their economic well-being, their earnings in the U.S. labor market.

The analysis yields a number of new insights into the determination of earnings for the large undocumented population:

(1) The age-earnings profiles of undocumented workers lies far below that of legal immigrants and of native workers. Moreover, the age-earnings profile of undocumented workers is almost perfectly flat during the prime working years.
(2) The unadjusted gap in the log hourly wage between legal immigrants and undocumented workers is large (around 35% for both men and women). Much of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics, including age, education, state of residence, country of birth, and English language proficiency. As a result, the wage penalty—the wage disadvantage suffered by undocumented workers relative to statistically comparable legal immigrants—hovered around 6% until about 2013 for men and 4% for women, at which point it began a noticeable decline. Between 2013 and 2016, the wage penalty to both male and female undocumented workers had shrunk to about only 2–4%.
(3) There are important differences in the level and trend in the wage penalty over the life cycle and across labor markets. The wage penalty rises over the life cycle partly because undocumented immigrants do not experience the same extent of occupational mobility as legal immigrants; and the wage penalty is larger in states with a larger undocumented population and in states that have enacted state-specific legislation that restricts the employment of undocumented immigrants.

It is important to emphasize that the analysis reported in this paper represents a first step in any evaluation of the proposals being discussed to regularize the status of undocumented workers. Much more information about the economic well-being of the undocumented population needs to be documented and examined before a full evaluation can be made. Similarly, it is crucial to continue to assess the validity of the statistical methods that are used to impute a person's undocumented status in microdata surveys.

## Appendix A. Deriving occupational task requirements

In this appendix, we briefly describe the procedure used to assign cognitive and non-cognitive task requirements to each *occ1990* occupation code in the ACS.

**Table A1**
Comparison of summary statistics for workers, 2012–2013, Women.

| | Natives | Legal | | Undocumented | |
| --- | --- | --- | --- | --- | --- |
| | | No correction | H1B correction. | No correction. | H1B correction |
| A. Pew | | | | | |
| Percent of pop. | 84.6 | 11.4 | 11.5 | 4.0 | 4.0 |
| Average age | 42.5 | 43.5 | 43.5 | 39.1 | 39.2 |
| Education: | | | | | |
| High school dropouts | 3.8 | 14.2 | 14.2 | 38.2 | 38.6 |
| High school graduates | 25.4 | 24.2 | 24.1 | 28.0 | 28.4 |
| Some college | 32.3 | 20.7 | 20.7 | 14.4 | 14.6 |
| College graduates | 25.1 | 26.0 | 26.1 | 12.4 | 12.1 |
| Postcollege | 13.3 | 14.9 | 15.1 | 7.0 | 6.3 |
| State of residence: | | | | | |
| California | 8.9 | 26.2 | 26.2 | 21.1 | 21.0 |
| New York | 5.5 | 11.6 | 11.6 | 7.7 | 7.7 |
| Texas | 7.7 | 8.1 | 8.1 | 14.1 | 14.2 |
| Log wage gap | 0.000 | −0.048 | −0.045 | −0.391 | −0.403 |
| Sample size | 64,173 | 11,864 | 11,924 | 4553 | 4493 |
| B. ACS | | | | | |
| Percent of pop. | 84.6 | 11.4 | 11.6 | 3.9 | 3.8 |
| Average age | 42.7 | 43.9 | 43.8 | 38.3 | 38.5 |
| Education: | | | | | |
| High school dropouts | 3.7 | 15.1 | 14.9 | 36.2 | 37.2 |
| High school graduates | 25.8 | 24.3 | 24.1 | 29.5 | 30.4 |
| Some college | 34.5 | 23.4 | 23.2 | 14.2 | 14.6 |
| College graduates | 23.2 | 23.2 | 23.3 | 12.0 | 11.1 |
| Postcollege | 12.7 | 14.1 | 14.5 | 8.0 | 6.7 |
| Speaks English | – | 60.2 | 60.3 | 32.9 | 31.7 |
| State of residence: | | | | | |
| California | 8.7 | 25.5 | 25.4 | 24.0 | 24.1 |
| New York | 5.7 | 12.5 | 12.5 | 8.7 | 8.8 |
| Texas | 7.6 | 8.5 | 8.5 | 12.0 | 12.1 |
| Log wage gap | 0.000 | −0.024 | −0.019 | −0.381 | −0.404 |
| Sample size | 933,459 | 114,975 | 115,854 | 31,398 | 30,519 |

Notes: The statistics are calculated in the sample of women aged 21–64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, weeks worked, and usual hours worked weekly.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

Each occupation in the O*NET (version 17.0) contains a vector of job characteristics, e.g., number facility. Using the ACS variable *occsoc*, we merge these O*NET job characteristics with the ACS for years 2010–2016, which are the years in the ACS where the *occsoc* code most closely matches the SOC codes used in the O*NET. Each individual in the ACS with a valid *occsoc* code between ages 21–64 is assigned a vector of O*NET job characteristics. Since we will use the *occ1990* occupation code to merge the task requirements with the other ACS samples, we average across the O*NET job characteristics within each *occ1990* occupation code.

We follow the approach of Yamaguchi (2012) and Imai et al. (2018) and perform an *a priori* grouping of some of these job characteristics into our two groups: cognitive and non-cognitive. The cognitive characteristics follow the analytical category used in Imai et al. (2018), and contains: Deductive Reasoning, Inductive Reasoning, Information Ordering, Category Flexibility, Mathematical Reasoning, Number Facility, Analytical Thinking, Making Decisions and Solving Problems, and Mathematics. The non-cognitive characteristics follow the physical strength category from Imai et al. (2018), and include: Static Strength, Dynamic Strength, Trunk Strength, Stamina, Performing General Physical Activities, and Handling Moving Objects.

To reduce the job characteristics in the cognitive and non-cognitive groups to a single task measure each, we perform principal component analysis separately for each group of characteristics and extract the first component, which yields our cognitive and non-cognitive task requirements. We then rescaled each task requirement to have a mean of zero and a standard deviation of one in the 2010–2016 ACS sample. This entire procedure is performed separately for men and women, whose task measures may differ depending on how the *occsoc* codes map into the *occ1990* codes.

At the end of this procedure, we have, for each *occ1990* code (and separately for men and women), a two-dimensional vector of cognitive and non-cognitive occupational task requirements. We then merge these task requirements for all of our ACS sample years (2008–2016).

## References

Amuedo-Dorantes, C., Antman, F., 2017. Schooling and labor market effects of temporary authorization: evidence from daca. J. Popul. Econ. 31 (1), 339–373.

Albert, C., 2019. The Labor Market Impact of Immigration: Job Creation vs. Job Competition. CEMFI Working Paper.

Baker, B., 2017. Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014. Department of Homeland Security, Office of Immigration Statistics, Washington, DC.

Bohn, S., Lofstrom, M., Raphael, S., 2015. Do E-Verify mandates improve labor market outcomes of low-skilled native and legal immigrant workers? South. Econ. J. 81 (4), 960–979.

Borjas, G.J., 1985. Assimilation, changes in cohort quality, and the earnings of immigrants. J. Labor Econ. 3 (4), 463–489.

Borjas, G.J., 2016. The Earnings of Undocumented Immigrants. NBER Working Paper No. 23236.

Borjas, G.J., 2017. The labour supply of undocumented immigrants. Labour Econ. 46, 1–13.

Cassidy, H., 2017. Kansas State University Working Paper.

Cassidy, H., Dacass, T., 2019. Kansas State University Working Paper.

Cotton, J., 1988. On the decomposition of wage differentials. Rev. Econ. Stat. 70 (2), 236–243.

Gelbach, J.B., 2016. When do covariates matter? And which ones, and how much? J. Labor Econ. 34 (2), 509–543.

Hotchkiss, J.L., Quispe-Agnoli, M., 2013. The expected impact of state immigration legislation on labor market outcomes. J. Policy Anal. Manag. 14, 34–59.

Hsin, A., Ortega, F., 2018. The effects of deferred action for childhood arrivals on the educational outcomes of undocumented students. Demography 55 (4), 1487–1506.

Imai, S., D. Stacey, and C. Warman (2018): "From engineer to taxi driver? Language proficiency and the occupational skills of immigrants," Working Paper.

Jaeger, D.A., Ruist, J., Stuhler, J., 2018. Shift-Share Instruments and the Impact of Immigration. National Bureau of Economic Research NBER Working Paper No. 24285.

Kossoudji, S.A., Cobb-Clark, D.A., 2002. Coming out of the shadows: learning about legal status and wages from the legalized population. J. Labor Econ. 20 (3), 598–628.

Kaushal, N., 2006. Amnesty programs and the labor market outcomes of undocumented workers. J. Hum. Resour. 16 (3), 631–647.

Massey, D.D., Gentsch, K., 2014. Undocumented migration to the United States and the wages of Mexican immigrants. Int. Migr. Rev. 48 (2), 482–499.

National Conference of State Legislatures. 2012a. "State omnibus immigration legislation and legal challenges," August 27. Website: http://www.ncsl.org/research/immigration/omnibus-immigration-legislation.aspx.

National Conference of State Legislatures. 2012b. "E-Verify," August 27. Website: http://www.ncsl.org/research/immigration/everify-faq.aspx.

NumbersUSA. 2016. "Map of states with E-verify laws," December 18. Website: https://www.numbersusa.com/resource-article/everify-state-map.

Orrenius, P.M., Zavodny, M., 2015. The impact of E-Verify mandates on labor market outcomes. South. Econ. J. 81 (4), 947–959.

Orrenius, P.M., Zavodny, M., 2016. Do state work eligibility verification laws reduce unauthorized immigration? IZA J. Migr. 5 (5), 1–17.

Orrenius, P.M., Zavodny, M., Gutierrez, E., 2018. Do state employment eligibility verification laws affect job turnover? Contemp. Econ. Policy 36 (2), 394–409.

Ortega, F., Hsin, A., 2018. IZA Discussion Paper No. 11680.

Ortega, F., Edwards, R., Hsin, A., 2018. IZA Discussion Paper No. 11281.

Passel, J.S., Cohn, D'V., 2014. Unauthorized Immigrant Totals Rise in 7 States, Fall in 14 States: Decline in Those From Mexico Fuels Most State Decreases. Pew Research Center, Washington, DC.

Pope, N.G., 2016. The effects of DACAmentation: the impact of deferred action for childhood arrivals on unauthorized immigrants. J. Public Econ. 143, 98–114.

Rivera-Batiz, F.L., 1999. Undocumented workers in the labor market: an analysis of the earnings of legal and illegal Mexican immigrants in the United States. J. Popul. Econ. 12 (1), 91–116.

Ruggles, S., Flood, S., Goeken, R., Grover, J., Meyer, E., Pacas, J., Sobek, M.

U.S. Citizenship and Immigration Services. 2014. "Deferred action for childhood arrivals (DACA) report (Aug. 15, 2012–Dec. 31, 2013)," Washington, DC. https://www.uscis.gov/sites/default/files/USCIS/Resources/ReportsandStudies/ImmigrationFormsData/AllFormTypes/DACA/DACA-06-02-14.pdf.

U.S. Citizenship and Immigration Services. 2018a. "Characteristics of H-1B specialty occupation workers," Washington, DC. https://www.uscis.gov/sites/default/files/reports-studies/Characteristics-of-Specialty-Occupation-Workers-H1B-Fiscal-Year-2017.pdf.

U.S. Citizenship and Immigration Services. 2018b. "About E-Verify," Washington, DC. https://www.uscis.gov/e-verify.

Van Hook, J., James, D, Donna Coffman, B., Harel, O., 2015. Can we spin straw into gold? An evaluation of immigrant legal status imputation approaches. Demography 52 (1), 329–354.

Warren, R., 2014. Democratizing data about unauthorized residents in the United States: estimates and public-use data, 2010 to 2013. J. Migr. Hum. Secur. 2 (4), 305–328.

Warren, R., Warren, J.R., 2013. Unauthorized immigration to the United States: annual estimates and components of change, by state, 1990 to 2010. Int. Migr. Rev. 47 (2), 296–329.

Warren, R., Passel, J.S., 1987. A count of the uncountable: estimates of undocumented aliens counted in the 1980 United States census. Demography 24 (3), 375–393.

Yamaguchi, S., 2012. Tasks and heterogeneous human capital. J. Labor Econ. 30 (1), 1–53.



# PROJECT MUSE®

The Labor Market Effects of a Refugee Wave: Synthetic
Control Method Meets the Mariel Boatlift

Giovanni Peri, Vasil Yasenov



Journal of Human Resources, Volume 54, Number 2, Spring 2019, pp. 267-309
(Article)

Published by University of Wisconsin Press

➡ For additional information about this article
https://muse.jhu.edu/article/724354

Access provided at 24 May 2019 13:51 GMT from Ebsco Publishing

# The Labor Market Effects
# of a Refugee Wave
## Synthetic Control Method Meets
## the Mariel Boatlift

**Giovanni Peri**
**Vasil Yasenov**

ABSTRACT

*We apply the synthetic control method to reexamine the labor market effects of the Mariel Boatlift, first studied by David Card (1990). This method improves on previous studies by choosing a control group of cities that best matches Miami's labor market trends pre-Boatlift and providing more reliable inference. Using a sample of non-Cuban high school dropouts we find no significant difference in the wages of workers in Miami relative to its control after 1980. We also show that by focusing on small subsamples and matching the control group on a short pre-1979 series, as done in Borjas (2017), one can find large wage differences between Miami and the control because of large measurement error.*

## I. Introduction

How do receiving countries absorb sudden waves of immigrants? What are their immediate effects on wages and employment? How long do these effects last? Sudden and unexpected refugee waves may provide a cleaner source of

*Giovanni Peri is a professor of economics at the University of California, Davis, a Research Associate of the National Bureau of Economic Research in Cambridge, MA, and a Research Fellow at IZA Institute of Labor Economics in Bonn, Germany (gperi@ucdavis.edu). Vasil Yasenov is a postdoctoral scholar at the Goldman School of Public Policy at the University of California, Berkeley and a Research Affiliate at IZA Institute of Labor Economics in Bonn, Germany (yasenov@berkeley.edu). The authors thank Colin Cameron, David Card, Michael Clemens, David Green, Patrick Kline, Thomas Lemieux, Doug Miller, Joan Monras, Enrico Moretti, David Neumark, David Roodman, Shu Shen, and participants in seminars at University of British Columbia, Georgetown University, NBER Labor Studies 2016 Meeting, IZA Summer School of Labor Economics 2016, and 2017 ASSA Annual Meeting, as well as two anonymous referees for valuable suggestions and useful comments. The authors have not received any financial support for this paper. The raw data used in this paper can be found in http://www.nber.org/data/cps_may.html and http://www.nber .org/morg/annual/. Additional code to replicate all results can be obtained beginning six months after publication through three years hence at http://giovanniperi.ucdavis.edu (gperi@ucdavis.edu).*
[Submitted February 2017; accepted August 2017]; doi:10.3368/jhr.54.2.0217.8561R1
JEL Classification: J3 and J61
ISSN 0022-166X E-ISSN 1548-8004 © 2019 by the Board of Regents of the University of Wisconsin System

*THE JOURNAL OF HUMAN RESOURCES • 54 • 2*

exogenous supply shocks, relative to inflows of economic migrants that are more gradual, predictable, and driven by local economic conditions.[1]

One such episode has held a special place in the minds of the American citizens and economists as an example of an unexpected and large refugee inflow. On April 20, 1980, Fidel Castro announced he would open the ports of Mariel, in Cuba, enabling anyone who wanted to leave the country to do so. Consequently, between April and September of that year, almost 125,000 Cubans fled to the United States' shores in what is known as the Mariel Boatlift. The majority of them settled in Miami, increasing its labor force by about 8 percent. Because most of these immigrants had little schooling, the relative increase of workers with no high school degree was much larger (around 18 percent). This event provides a quasi-experimental environment to test theories about the effects of a sudden change in the supply of immigrants. If all other factors of the economy (for example, technology, productivity, physical capital, etc.) remain fixed, this sudden inflow generates high potential for negative short-run impacts on wages and/or on employment of existing workers.

An early study by David Card (1990) analyzed the Mariel Boatlift. His results showed that the impact on employment and wages of low-skilled non-Cubans in Miami was economically insignificant. This study became a prominent example of how the predictions of the simplistic canonical model of labor demand and labor supply do not work well in analyzing the consequences of immigration even in the short run.[2] From a methodological point of view, the design of Card's paper profoundly influenced the direction of research in labor economics (see Angrist and Pischke 2010). Card (1990) has been the definitive study on this episode for 25 years. However, his analysis has important econometric limitations that modern-day methods can significantly improve upon. First, the choice of a control group of cities to substitute for Miami, consisting of Los Angeles, Houston, Atlanta, and Tampa Bay–St. Petersburg, was somewhat arbitrary and ad hoc, and its validity was never formally tested. Second, he did not systematically analyze wage and unemployment outcomes in Miami for low-skilled individuals and for subgroups of those based on gender, ethnicity, and age. Finally, when constructing standard errors, Card (1990) did not take into account city-level idiosyncratic shocks to labor market outcomes. In other words, he treated data from all workers within a city over time as independent observations, accounting only for classical measurement error on wages.

Given the historical importance of the Mariel Boatlift and of the Card (1990) study, one reason to revisit it is that, since then, we have improved our methodological toolbox. The synthetic control method (SCM), an econometric technique developed and used in a series of papers by Alberto Abadie and coauthors (Abadie and Gardeazabal 2003; Abadie, Diamond, and Hainmueller 2010, 2015), is better suited than the classic difference-in-differences methodology to address this type of case studies. The main

---

1. Several studies have examined the impact of sudden inflows, often of refugees, in Europe. Examples include Hunt (1992), Carrington and De Lima (1996), Friedberg (2001), and Borjas and Monras (2016), among others.
2. Other studies have suggested how different channels for absorbing the Mariel Cubans might have worked, rationalizing the results within richer models. Lewis (2004) showed that less skilled Cubans were absorbed by industries that chose more "unskilled-intensive" technology and less automation. In addition, Bodvarsson, Van den Berg, and Lewer (2008) argued that the immigrants increased significantly local demand for services, shifting the labor demand and not only labor supply.

underlying idea is that a linear combination of labor markets is a better control group for Miami than any single one.

This method has several advantages that address the shortcomings of the original Mariel Boatlift study. First, rather than arbitrarily choosing a single (or a group of) labor market(s) as a control, we identify an "optimal" control group by minimizing the pre-1980 difference with Miami for a given set of relevant labor market characteristics. This creates a "synthetic" city that serves as the control group and reduces the ad hoc nature of choosing the control group. Second, we validate its quality by checking the pretreatment differences of the outcome variable (wages or unemployment) between the treated and the synthetic control units. Finally, by constructing a synthetic control for every available city we can obtain a distribution of observed effects. Then we can calculate a $p$-value for how significant the posttreatment difference is compared to the pretreatment one for Miami relative to the whole distribution, thus conducting inference with idiosyncratic city-specific shocks.

Two relevant data sources are available, the May-ORG (Outgoing Rotating Group) and the March extracts from the Current Population Survey (CPS). We analyze the statistical power of both data sets, and we conclude that the May-ORG CPS is superior in measuring average weekly wage of subgroups in metropolitan areas for two reasons. First, the much larger sample size of ORG CPS, beginning in 1979, implies smaller measurement error. Second, the May-ORG CPS reports "point-in-time" weekly wages, as opposed to retrospective yearly wages (March CPS), which reduces recall error especially for the main group of interest—low-skilled workers—who are often paid by the hour. Before 1979, both the March CPS and the May-ORG CPS have small samples and large measurement error. Hence when selecting a control group we emphasize the importance of using a long pre-1979 sample, inclusive of as many years as possible. To further alleviate the measurement error problem, which is the main concern in this analysis, we include the largest group potentially affected by the competition of Mariel immigrants. Ideally one would want to study all low-skilled native workers in Miami at the time of arrival of the Mariel Cubans. A natural way to do this is to include all prime-age non-Cuban workers with no high school degree.[3] We also analyze heterogeneous responses by separating the main sample into subgroups of workers who could be affected differently due to their different skills and attachment to the labor market. The labor market outcomes we analyze are log wages (weekly and hourly) and unemployment rates.

Our results show no significant difference in the post-1979 labor market outcomes of high school dropouts between Miami and its synthetic control. Neither wages (annual, weekly, or hourly) nor unemployment rates of high school dropouts differ significantly between Miami and its control group during the 1981–1983 period. The point estimate of the Miami control difference in log wages is actually positive after 1979 in most samples. We reach the same conclusion when we consider wages in the bottom 15th or 20th percentile of the distribution for all non-Cuban workers. We also run difference-in-differences type regressions for Miami and the synthetic control, and we provide the

---

3. Because several Hispanic non-Cubans could also be immigrants, an alternative is to include only non-Hispanic individuals. We therefore perform extensive analysis on subgroups as well. Note that the CPS began reporting country of birth for the survey respondents only after 1994.

000834

simulated significance level of the synthetic control method estimates to show formally the lack of statistically significant differences. In essence our results confirm the early findings of Card (1990).

We then move on to reconcile our results with those presented in Borjas (2017). Using a restricted subsample of high school dropouts and the March CPS,[4] he finds a large and long-lasting negative difference in wages between Miami and its control in the 1982–1985 period. We begin by reproducing his finding, and then we show that these results hold only when considering small subgroups *and* using the March CPS data set. They are strongest in the subsample obtained including only non-Hispanic men and selecting a short age range of prime-age workers (25–59 years old) among high school dropouts. We consider all 27 possible combinations of high school dropouts subgroups along the gender (male, female, and both), ethnicity (non-Cuban Hispanic, non-Hispanic, and all non-Cubans), and age (prime, young-old, and all working age) dimensions, and we show that smaller subgroups exhibit very large fluctuations of average weekly wages in Miami, around the long-run trend 1972–1979. These yearly fluctuations are both positive and negative, occur over the whole period, and are not particularly large after 1979. Larger subsamples, still from the March CPS, show much smaller variations away from the trend and no significant differences after 1979. We also highlight the importance of considering a long pre-1979 period to match the labor market trends in Miami. Given the small size of all samples before 1979, matching on only three years (1977–1979) of data can be very imprecise and may result in selecting a control group that does not mimic the 1972–1979 labor market behavior of Miami. When using the ORG CPS and a control group matched on the 1972–1979 period, we never find negative differences between Miami and the control, even in specific subgroups of low-skilled workers.

Finally, we address the criticism of Angrist and Krueger (1999), who show the risk of drawing inference from analyzing an event with a small number of treatment and control units. They imagine a "nonexistent" Mariel Boatlift in 1994 and analyze it the same way Card (1990) did, erroneously finding a statistically significant increase in unemployment for Black workers. They argue that in small samples differences may arise by pure chance. While we agree with their general point, we also show that the synthetic control analysis obviates the problem in this case. In fact we find that a well-constructed control group for Miami in 1994 shows no significant difference of relevant outcomes between Miami and the control in the years after 1994.

More broadly, this paper contributes to the literature on the effects of immigrants on wages and labor market outcomes of less-educated native workers. Some recent papers analyzing U.S. labor markets have found negative wage effects, as predicted by a simple canonical model (for example, Borjas 2017; Monras 2015), while others have not (for example, Card 2001, 2009; Ottaviano and Peri 2012). The latter have argued that several adjustment margins and some degree of complementarity between natives and immigrants reduce the wage impact of immigrants (Peri 2016). The results of this paper are in line with the second set of findings.

---

4. Perhaps due to the reasons outlined in this paper, virtually all previous studies analyzing labor market aspects of the Mariel Boatlift also choose the ORG CPS. These include Card (1990); Angrist and Krueger (1999); Bodvarsson, Van den Berg, and Lewer (2008); Laing (2011); Borjas (2012); Cahuc, Carcillo, and Zylberberg (2014); Monras (2015); and Doudchenko and Imbens (2016).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 843 of 4699 PageID #:  4008

## II. Data, Variables, and Samples

Our preferred data source is the combination of the May extracts from the Current Population Survey (CPS) for years 1973 until 1978, with the Merged Outgoing Rotational Group (ORG) data from the same survey, starting from 1979 (the first year available). This sample allows us to construct a measure of average log weekly and hourly wages, unemployment rate, and wages at different percentiles of the distribution for workers in Miami and in 43 other metropolitan areas. The May-ORG CPS collects earnings per hour for hourly workers, and per week for other workers. We obtained a consistent hourly wage series before deductions during the entire period, using imputed hourly wage for weekly workers (dividing weekly earnings by hours worked per week) and actual hourly wage for hourly workers.

Alternatively, we also analyze wage outcomes using the March CPS data. This survey collects information on the respondent's total pre-tax salary and wage income for the previous calendar year, as well as the number of weeks worked last year. We construct weekly wages by dividing the former by the latter. In both March CPS and May-ORG CPS we retain imputed wages to maximize the sample size.

To evaluate the impact of the sudden inflow of Cuban immigrants on the labor market outcomes of Miami workers, we should focus on studying the wage and employment of the group that was more likely to be affected by their competition and was working in Miami in 1980. Given that—as we will document below—a large majority of Mariel Cubans were unskilled and without a high school diploma, we analyze wage and labor market outcomes of working-age high school dropouts in Miami, excluding any Cuban individuals. To approximate this group and maintain the largest sample of potentially affected workers, our preferred sample includes non-Cuban[5] high school dropouts, between 19 and 65 years of age, in the labor force, and not self-employed, with positive earnings and sample weight.

### A. Sample Size and Measurement Error

Table 1 shows the number of observations for our preferred sample (constituted by all non-Cuban high school dropouts aged 19–65) in Miami. Using the March CPS (first column), it includes between 60 and 80 observations per year. The May-ORG CPS data set, available between 1973 and 1978, is somewhat smaller, with about 40 observations per year. However, beginning in 1979 and spanning the years during and after the Mariel Boatlift, the ORG CPS sample usually consists of around 150 observations per year.[6] In Section V we discuss in detail how the small size of the March CPS data set affects the analysis of Borjas (2017), who focuses on a small subgroup of the population of high school dropouts. On average, the size of Borjas' (2017) sample is between one-quarter

---

5. We want to focus only on U.S. born workers. However, the CPS began identifying birthplace only after 1994. One option is to use the information about Hispanic origin and only include non-Hispanics in the sample to exclude first generation Hispanic immigrants from previous waves. However, this will also eliminate a potentially large group of U.S. born second generation Hispanics. Hence, in our preferred sample, we include Hispanic non-Cuban workers, and then we provide robustness checks including only non-Hispanic workers.
6. The one exception is year 1985 for which our preferred sample includes only 72 observations for Miami. The CPS Labor Extract 1979–2006 Documentation from NBER, January 2007, mentions a change in coding system for cities in 1985 and the fact that the relevant MSA identifier is missing in the third quarter of 1985 (see pages 12–13 of documentation) likely explaining such a smaller sample.

000836

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 844 of 4699 PageID #:  4009

**Table 1**
*Number of Observations, High School Dropouts Sample in Miami*

| Year | Non-Cuban Dropouts, 19–65, March CPS | Non-Cuban Dropouts, 19–65, May-ORG CPS |
|------|------|------|
| 1973 | 70 | 42 |
| 1974 | 69 | 32 |
| 1975 | 66 | 41 |
| 1976 | 62 | 43 |
| 1977 | 64 | 39 |
| 1978 | 61 | 37 |
| 1979-Pre | 62 | 145 |
| 1980-Shock | 68 | 161 |
| 1981-Post | 72 | 145 |
| 1982 | 62 | 135 |
| 1983 | 59 | 149 |
| 1984 | 55 | 145 |
| 1985 | 55 | 72 |
| 1986 | 61 | 183 |
| 1987 | 66 | 221 |
| 1988 | 86 | 222 |
| 1989 | 96 | 222 |
| 1990 | 74 | 250 |
| 1991 | 72 | 175 |

Notes: Our sample includes individuals with no high school degree, non-Cuban, with positive earnings, not self-employed, in the labor force and in the age range 19–65. A one year adjustment is made to the March CPS numbers as previous year earnings are reported.

and one-third of our preferred sample. He justifies the choice of such a restricted sample as measuring wages more precisely without the contamination from trends in women's participation rates and transitions in early and late working life. However, those were national trends, unlikely to affect Miami in particular or to change abruptly after 1980. An individual-level regression including ethnic, gender, and age controls can address those differences, and using city-specific residuals, as we will do below in our empirical methodology, and Borjas (2017) also does for age-controls only, the analysis should not be affected by those demographic trends.

A second important lesson from Table 1 is that the pre-1979 samples are especially small and likely noisy. This suggests that when matching Miami to a control group of cities, whose labor market trends were similar before 1979, one should include as many years as possible to reduce the impact of measurement error. Data for Miami and other 43 metropolitan areas exist since 1973, so we choose that as the initial year of analysis.

Another argument in favor of relying on the May-ORG CPS data set is that the hourly and weekly wages figures are more accurate than the corresponding ones from the March CPS. The variation of measurement error in average wages across cities in the

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 845 of 4699 PageID #:  4010

March CPS sample is much larger than in the May-ORG CPS sample. One way to show this is to assume that, for year 1979, the "true" average city log wages for the group of high school dropouts can be calculated using the 5 percent sample of the 1980 Census. From the Census data set, we calculate the log wage measure analogously to the March CPS by dividing the respondent's total pre-tax wage and salary income for the past year by the number of weeks worked for the same period. First, we calculate average log weekly wages for our preferred sample in each of the 32 metropolitan areas available in all three data sets. Then, we calculate the difference of these average log wages in each metropolitan area, between the March CPS and the Census and between the ORG CPS and the Census. The measurement error in the March CPS has a standard deviation of 0.12 logarithmic points (about 12%), while for the ORG CPS it is equal to about half of that (0.07 log points, 7%). Consequently, differences in average measured wages across cities, which are the crucial statistics used in the SCM, will depend on differences in true mean and differences in measurement error.[7] With average differences of measurement errors on the order of 15 percent, for the March CPS it will be impossible to separate true differences within the 15–20 percent level from differences in measurement error.

A final limitation of the March CPS in measuring weekly wages, especially of low-skilled individuals, was proved by Bollinger (1998) and Lemieux (2006). They showed that the March CPS wage data, based on the recollection of previous year annual salary and weeks worked, compounds recall and division errors that are particularly severe for people who are paid by the hour; this includes a large fraction of the high school dropouts who are the main subject of this analysis. People often have a difficult time recalling the exact actual number of hours worked last year, a figure used in construct-ing weekly wages. The impact of this measurement error will certainly be magnified in small samples, such as metropolitan-area-level subgroups in the March CPS. To the contrary, the May-ORG CPS sample, based on weekly wages recall from the last week of work, produces a less noisy and more reliable estimate of earnings for less educated individuals who are usually paid by the hour.

### B. Number and Demographics of the Mariel Cubans

Table 2 shows the summary statistics as well as the aggregate count of immigrants and existing workers in Miami around the time of the Boatlift. In the first column, we present data relative to the labor force in Miami as of 1980 as measured in the Census. In the second one, we display the same characteristics for all Mariel Cubans identified in the 1990 Census as Cubans who arrived in the United States in 1980 and were 19 or older at arrival. In the last column, we do the same for Mariel Cubans who were still living in Miami as of 1990 and hence had likely settled there permanently.

We obtain a total of 54,196 working-age Mariel Cubans (by multiplying the Census personal weight by the number of observations in the 5 percent Census sample), 56 percent of whom lacked a high school degree. Of those, only 62 percent were in still in Miami as of 1990. Hence, either at arrival or in the successive years, about two out of five Mariel Cubans relocated to other places. The share of Cubans in Miami, in fact, peaks in 1981 and then declines between 1981 and 1985. As we show below, there is additional

---

7. Assuming normal and independent measurement errors across cities, the mean absolute difference between measurement errors for two randomly chosen cities will be equal to $\approx 2/(\sqrt{\pi} \times \text{SD})$.

000838

**Table 2**
*Demographics of Mariel Immigrants and of Existing Labor Force in Miami, 1980*

|  | Miami Labor Force in 1980 | Mariel Immigrants, Measured from the 1990 Census | Mariel Immigrants Still in Miami as of 1990 |
|---|---|---|---|
| Total in Labor Force (16–65 years of age) | 644,860 | 87,347 | 54,196 |
| Share with no high school degree | 26.28 | 55.77 | 56.34 |
| Share with high school degree | 32.11 | 25.18 | 24.22 |
| Share with some college | 22.37 | 12.53 | 12.47 |
| Share with college | 19.24 | 6.52 | 6.97 |
| Share of female | 45.79 | 37.80 | 41.97 |
| Share of young (<25 years old) | 16.35 | 16.34 | 14.01 |
| Only Individuals with no High School degree |  |  |  |
| Total in labor force | 169,440 | 48,714 | 30,532 |
| Percentage female | 43.33 | 39.79 | 44.41 |
| Percentage young (<25 years old) | 11.36 | 12.90 | 10.24 |

Notes: The values for the Miami Labor force are obtained from the 1980 census. Those on the Mariel immigrants are obtained from the 1990 census as people born in Cuba who arrived in the United States in 1980 and 1981 and were at least 19 years of age at the time of arrival. Labor force is defined as individuals 19–65, not in school, and working or looking for a job.)

evidence in the CPS data for Miami that some of the Cubans who arrived in 1980 might have left the city in the following two to three years.

Overall, the statistics of Table 2 imply that the Mariel Boatlift produced an 18 percent increase in the number of high school dropouts in the Miami labor market, while it increased the other education groups by only 5 percent and the total Miami labor force by 8.4 percent. The last three lines of Table 2 show that among dropouts, the Mariel Cubans had a comparable share of women and young individuals to those in the existing Miami labor force.[8]

### C. Measured Labor Supply Shift in Miami

Figure 1 shows the share of Cubans in Miami's population, aged 19–65 (black lines), and in the population with no high school degree, aged 19–65 (lighter gray line), between 1973 and 1985. Panel A shows the March CPS data, while Panel B uses the May-ORG CPS. In both panels we observe a clear jump upwards of the Cuban share from

---

8. The numbers presented in this section are in accordance with previous studies including Card (1990) and Borjas (2017). As this supply shock took place over the course of a few months, it was largely exceptional. The most significant change analyzed in other "quasi-experiments" literature is the inflow of Russians to Israel (Friedberg 2001), which was equal to 12 percent of initial population but took place over five years (1989–1994).

**Panel A: March CPS**



**Panel B: May-ORG CPS**



**Figure 1**

*Cubans in Miami as a Share of Total and of High School Dropout Population*

Notes: We calculate the share of all those who define themselves as "Cuban" in the ethnicity question of the CPS. The population considered is the total number of individuals between 19 and 65. The high school dropout population includes those who do not have a high school degree in the age range 19–65. For the March CPS, we include the figure for March 1980 as "1979-Pre" and we interpolate the figure for "1980-Shock", between 1979-Pre and 1981-Post. The vertical dashed bar corresponds to the last observation before the Mariel Boatlift happened.

000840

"1979-Pre" to "1981-Post", which is the mark of the Boatlift. In all figures, we adopt the convention to call "1979-Pre" the data relative to the last observation before the Mariel Boatlift and "1981-Post" the first data point certainly after all Mariel Cubans had arrived.[9] The 1980 data in the May-ORG CPS are collected year round and include pre- and post-Boatlift information. Similarly, for the March CPS the wage data are yearly averages and in 1980 include pre and post. Hence, the reader should look at the difference 1979–1981 as the short-run impact of the Boatlift, with the idea that the 1980 data point is "during" the Boatlift.[10]

Three facts emerge from Figure 1. First, the March CPS and May-ORG CPS data show similar shares of Cubans in the total population, but they are less consistent with each other for the share among high school dropouts. This indicates that there is significant noise and discrepancies between the May-ORG CPS and the March CPS statistics when the sample size is small. Second, both time series and samples show an increase between the "1979-Pre" and "1981-Post" data points. The 1979–1981 increase does not seem particularly large compared to the trends and year-to-year movements before and after. Considering May-ORG CPS figures, the 1979–1981 increase as a percentage of the population equals about six points, and as a percentage of high school dropouts, the increase was around 12 points.[11] Third, after initially increasing between 1979 and 1981, the share of Cubans decreased in the following four years (in both samples), and this effect was larger for the share among high school dropouts. In fact, in 1985 the share of Cubans among high school dropouts was back at percentage levels comparable to those of the pre-Boatlift period. This emphasizes the temporary nature of the shock.[12]

## III. Empirical Methods

### A. The Synthetic Control Method

The SCM, first introduced by Abadie and Gardeazabal (2003) and then further developed in Abadie, Diamond, and Hainmueller (2010, 2015), provides a systematic way of

---

9. The former one is usually year 1979. For wages and unemployment in the March CPS we use data collected in 1980, which is relative to the previous year. For the ORG CPS we use data collected in year 1979. We also take the convention, in each figure, of showing a vertical bar exactly at the last pre-shock period (hence on "1979-Pre"). This notation helps to visually identify the last period of the status quo, right before the shock. To the immediate right of the bar we can see the impact of the sudden shock. To its left we can see the trend and variation during the pretreatment period.

10. Notice that as the demographic data for the March CPS are relative to the month of March, the last pretreatment observation is the one collected in March 1980, and it is called "1979-Pre", and it is differentiated from the 1979 (March CPS 1979). The "1981-Post" is the observation for March CPS 1981, while "1980-Shock" is simply the linear interpolation of 1979 and 1981. This is done only for this graph, due to the timing of the March CPS enumeration, that in 1980 was just before the Boatlift. For the May-ORG CPS sample, instead, the last pre-Boatlift observation was that in 1979 as the survey is conducted year-round.

11. These figures are broadly in line with the ones obtained from the Census and described in Section II.B.

12. One can also show that the inflow of Cuban high school dropouts did not move the non-Cuban high school dropouts out of Miami. Figure A1 in the Appendix shows that in the period 1979–1983, non-Cuban high school dropouts (dashed line) remained flat, as share of the Miami population, while Cuban dropouts as share of the population (dotted line) temporarily increased between 1979 and 1981, right after the Boatlift. Hence, the local supply of all high school dropouts (solid line) increased between 1979 and 1981 as a result of Mariel, with virtually no change in the non-Cuban dropouts, revealing no offsetting outmigration of natives.

analyzing the impact of case-study events such as the Mariel Boatlift. Typically in these settings a single unit (often represented by a city or a region) experiences, at a point in time, an event (or treatment), while the rest do not. In order to evaluate whether the treatment had an impact on some outcomes in the treated unit, relative to what would have happened in its absence, the method formally identifies a control group called the synthetic control unit.

In our case, we consider $J + 1$ metropolitan areas indexed by $j = 0, 1, 2 \ldots J$ and denote Miami as 0, while we call the group of all the rest the "donor pool." This is the group of 43 other cities (31 for the March CPS) in the United States for which data are consistently available in the Current Population Survey for the relevant time period. Then, we define a vector $G_0$ of dimension $k \times 1$ whose elements are equal to the values of variables that help predict the wages of high school dropouts in Miami between 1972 and 1979. Similarly, we define a $k \times J$ matrix, $G_J$, in which row $j$ is the sequence of values for the same variables and years relative to city $j$ in the "donor pool."

The SCM then identifies the vector of nonnegative weights $W^* = (w_1, \ldots, w_J)$ that produces a convex combination of variables in cities in the donor pool, $G_J$, to approximate as close as possible, in terms of a quadratic error, the pretreatment vector of variables chosen for metropolitan area 0, $G_0$. In other words, it minimizes the difference between $G_0$ and $G_J W$

(1)  $W^* = argmin(G_0 - G_J W)^{'} V(G_0 - G_J W)$ subject to $\sum_{j=1}^{J} w_j = 1, \; w_j \geq 0$

Once we have identified $W^*$ we can use it to calculate the posttreatment outcome variables for the synthetic control unit by weighting each city accordingly.[13]

Comparing the pre–post 1979 change in the outcome variable for Miami relative to the pre–post change for the Synthetic Control is the basis to evaluate if the treatment has had any effect. The synthetic control method hence produces a figure with two time series, one for the treated unit (Miami) and one for the synthetic control. In Section IV.A, we show these two lines for several wage and unemployment outcomes, and we visually examine the post-1979 differences in order to assess whether they are large relative to the pre-event differences (1972–1979).

We minimize the distance for the following variables in the pretreatment period: the outcome variable itself for selected pre-1979 years (and/or its average value), the share of low-skilled workers, the share of Hispanics, and the share of manufacturing workers in the labor force. These are all important characteristics in predicting the labor market outcomes of low-skilled workers.[14] In robustness checks, we also match alternative variables, such as overall employment, wages growth, and low-skilled employment growth, which mirrors the analysis of Borjas (2017).

---

13. $V$ is a $k \times k$ diagonal, positive-definite matrix that determines the weight for each element of the vector in the objective function. We use STATA's default option for the matrix $V$, which is chosen among all diagonal and positive definite matrices to minimize the average squared prediction error of the outcome variable during the pre-shock period.

14. The share of Hispanic and pre-1979 employment are also among the variables used by Card (1990) to choose the control group.

Given the noise and the small samples it is crucial to allow for as long a pretreatment period as possible. The most influential studies using the synthetic control method include more than 20 pre-event years (for example, Abadie, Diamond, and Hainmueller 2010, 2015). In our case, because data for Miami begin in 1973, the best we can do is to include six pre-event years of data. Most results are robust to variations in the selection of the synthetic control group, as long as one matches the whole 1973–1979 period. However, matching only on a very short pre-1979 period may produce control groups with very large pre-event differences between the treated unit and control, reducing the validity of the method.

### B. Accounting for Differential Demographic Composition

It is well known that the average wages of different demographic groups, such as women, men, young, old, Hispanic, Black, and White workers, had different national trends in the 1970s and 1980s. Depending on the demographic composition, these trends may affect labor markets differentially, introducing confounding factors in the analysis. The commonly used method for reducing the potential confounding effects from differential demographic characteristics (age, gender, and ethnicity) is to adjust individual log wages by running the following regression

$$\ln w_{ijt} = \alpha + \beta_1 \times Age_{it} + \beta_2 \times Female_i + \beta_3 \times Ethnic_i + \beta_4 \times Year_t + \beta_5 \times Age_{it}$$
$$\times Year_t + \beta_6 \times Female_i \times Year_t + \beta_7 \times Ethnic_i \times Year_t + \epsilon_{ijt}$$

The (log) wage of individual $i$ in metropolitan area $j$ in year $t$, $\ln w_{ijt}$, is regressed on a set of five-year age dummies $Age_{it}$, on a female dummy $Female_i$, dummies for Hispanic and Black $Ethnic_i$, three-year bin dummies $Year_t$, as well as the first three variables interacted with $Year_t$. This produces the residual, $\epsilon_{ijt}$, that captures individual log wage variation once those aggregate trends are accounted for. We then average these residuals by city–year and treat them as outcome variables in several specifications of the empirical analysis.

### C. Inference

A main drawback of the original analysis of the Mariel Boatlift by Card (1990) is neglecting aggregate city-specific idiosyncratic shocks in conducting statistical inference. This is problematic because it treats contemporaneous observations from different workers within the same labor market (and hence subject to the same labor demand shocks) as independent data while in fact they could be strongly correlated due to city-specific idiosyncratic shocks.[15] We address this issue within the context of the SCM in two ways.

#### 1. Regression-based standard errors

One approach we undertake in this direction is to use classic regression analysis for the two time series, Miami and its control city. The main goal of this exercise is to quantify

---

15. For instance, in modern-day regression analysis it is common to apply a "cluster-robust" adjustment to the standard errors of the estimated coefficients to account for aggregate level shocks which are common to all observations within the "cluster" (for example, Cameron and Miller 2015).

the noise in the data and give a sense of statistically significant difference. The pre-Boatlift differences Miami–control in this regression will also provide a validity test for the comparison group selected by the synthetic control method. We estimate the following regression:

$$(2) \quad y_{it} = \alpha + \sum_{P \in Pre-79} \beta_P (D_P \times Miami_i) + \sum_{P \in Post-80} \beta_P (D_P \times Miami_i) + \sigma_i + \gamma_t + \epsilon_{it}$$

The variable $y_{it}$ is the outcome of interest (for example, average log of weekly wages of high school dropouts) in unit (city) $i$ which is either Miami or its synthetic control. Next, $\sigma i$ and $\gamma_t$ are unit (city) and year fixed effects. The variable $Miami_i$ is a dummy equal to one for Miami and zero for the Synthetic Control. Next, $D_P$ is a set of three-year dummies that span the whole period but omit 1979, which is absorbed in the constant and hence serves as a reference year. In the pre-1979 period, the dummies are $D_{73-75}$ and $D_{76-78}$. In the post-1980 period, they are $D_{81-82}$, $D_{83-85}$, $D_{86-88}$, and $D_{89-91}$, and they equal one in the years indicated in the subscript and zero otherwise. We drop the 1980 observation as it is "during the Boatlift" and is hard to classify as either "before" or "after." Next, $\beta_P$ is the set of coefficients associated to the interaction between the city dummy Miami and the time period dummies. The term $\epsilon_{ijt}$ is the classical city-level error term, uncorrelated with the observables. The main coefficient of interest in this regression is $\beta_{81-82}$, which captures the wage difference Miami–control right after the Boatlift.

The method of estimation is feasible generalized least squares (FGLS), allowing the errors to be autocorrelated in an AR(1) process. The city weights for the synthetic control are estimated in a first step. There is dependence among observations across units, the sample size is small, and hence the limiting distribution of the estimated coefficients is unclear. Therefore, one has to be careful in doing inference on the estimated coefficients.[16] We report the estimated standard errors and comment on their size relative to the coefficients in Section IV.C, but we do not attach specific significance levels.

### 2. Placebo permutations

An alternative and more accurate way of doing inference with the synthetic control method proposed by Abadie, Diamond, and Hainmueller (2010) is based on permutations. The core idea is to simulate a distribution of differences between each city in the donor pool and its synthetic control and examine whether Miami shows a post-1979 difference from its synthetic control, relative to its pre-1979 difference, that is large vis-à-vis the whole distribution. We apply this method graphically showing the treatment–control differences for all cities, and we also provide the $p$-value of a test of significance for the outcome (wages or unemployment) in Miami.

### D. Others Methodological Considerations

The Mariel Boatlift was a one-time, unexpected shift in supply that took place mostly between March and July 1980. It was not a persistent policy change or a prolonged

---

16. It would likely be more accurate to bootstrap the standard errors. However, to increase comparability with the estimates of Borjas (2017), we calculate, as he does, robust standard errors. We still slightly differ from his regression method as Borjas (2017) does not allow for autocorrelated AR(1) errors.

increase in immigration rates from Cuba. As shown in Figure 1, the share of Cubans among high school dropouts in Miami was back to pre-Boatlift levels by 1985. Hence, the bulk of the effect on employment and/or wages should be detected in years 1981 and 1982. After that, only transitional dynamics would be detected and should imply smaller effect than in 1981–1982 as the shock was temporary. Moreover, several other economic shocks (including a significant recession and a worsening of the war on drugs in 1982, which actively and differentially involved Miami) took place during the following decade, and Miami could have responded differently from any chosen control group. Differences between Miami and the control city after 1983 are likely caused by factors unrelated to the Boatlift. Consequently, any study of a labor market impact of the Mariel Boatlift should focus on the years 1981 and 1982.

## IV. Empirical Estimates

### A. Main Results

We show our main results in Figures 2 and 3. In each panel we present two time series lines, one for Miami (solid) and one for its synthetic control (dashed). To learn about the possible impact of the Boatlift, our focus will be on two features of the graphs. First, we assess the magnitude of the differences between Miami and the control between 1972 and 1979. This indicates how well our control group matches Miami pre-Boatlift. Second, relative to those, we eyeball the magnitude of the difference in the outcomes in the 1981–1982 period, when the Boatlift should have had its largest potential effect. In Panels A–C of Figure 2 and all panels of Figure 3, we present various wage measures, and in Panel D of Figure 2, we show the unemployment rate for low-skilled workers. The footnotes of each figure indicate the sample and the cities that enter the synthetic control and their associated weights. Notice that in every panel the synthetic control is constructed (at least partly) from cities not included in the Card (1990) control group (Los Angeles, Houston, Atlanta, and Tampa Bay–St. Petersburg). By construction we improve on his identification strategy because we match variables similar to the ones on which he based his choice of control group, and we make no arbitrary decision regarding which cities enter the control.

We do not observe a drop in wages in Miami relative to its control in the 1980–1983 period in any of the panels in Figures 2 and 3. Panels A and B of Figure 2 show (log) weekly wage and hourly wages, respectively, taken as raw measures, that is, without regression adjustment. One may argue that the second measure is closer to capturing the marginal productivity (and hence price) of labor. However, we follow previous studies and consider weekly wages as our main variable of interest. These two panels show a reasonable, but noisy, Miami–control match for the pre-1979 period, a small positive difference in 1980 and 1981 for Miami relative to its control, and essentially no difference in 1982 and 1983. This difference is magnified in the longer run, after 1985. Panel C shows the path for the 15th (log) wage percentile of non-Cuban workers in Miami and its control. An advantage of using the wage percentile, relative to looking at the average wage of a small group (such as the high school dropouts), is that the sample used in estimating the statistic is larger. Hence, the results are less sensitive to extreme



**Figure 2**

*Miami and Synthetic Control, Wages and Unemployment of Low-Skilled Workers*

Notes: The data source is May-ORG CPS. Each panel shows the outcome variable for Miami (solid line) and the synthetic control (dashed line) in the period 1972–1991. The outcome variable is noted in the title of each panel. The sample for Panels A, B, and D is non-Cuban high school dropouts, age 19–65, not self-employed and in the labor force. The sample for Panel C removes the high school dropout restriction. Some time series are standardized to the same value in 1979. The cities with positive weight in the synthetic control are as follows. Panel A: New Orleans, LA 43.9%; New York City, NY 29.9%; Baltimore, MD 24.8%. Panel B: New Orleans, LA 43.2%; New York City, NY 30.1%; Baltimore, MD 24.9%. Panel C: Birmingham, AL 60.6%; Rochester, NY 28.6%; Nassau-Suffolk, NY 10.4%. Panel D: New Orleans, LA 48.4%; New York City, NY 30.9%; Albany-Schenectady-Troy, NY 19.5%; Cincinnati, OH 1.1%.

values and therefore less volatile. Confirming this, Panel C exhibits a better Miami–control match pre-1979 and also shows small positive differences between 1980 and 1983.

A possible explanation for the small wage effects is that wages were rigid in the years 1979–1982, and hence a negative demand shock for native workers did not translate into lower wages in Miami.[17] In the presence of a supply shock and rigid wages, the result would be displacement and nonemployment of natives. If this explanation is correct, we would expect the inflow of Mariel Cubans to be associated with an increase in the unemployment rate of non-Cuban high school dropouts in Miami. Panel D of Figure 2

---

17. As inflation in the early 1980s was high, nominal wages were rather flexible. It is unlikely, therefore, that the rigidity of real wages is a significant concern in this setting.

282   The Journal of Human Resources



**Figure 3**

*Miami and Synthetic Control, Additional Outcomes of Low-Skilled Workers*

Notes: The data source is May-ORG CPS. Each panel shows the outcome variable for Miami (solid line) and the synthetic control (dashed line) in the period 1972–1991. The outcome variable is noted in the title of each panel. The sample for Panels B, C, and D is non-Cuban high school dropouts, age 19–65, not self-employed and in the labor force. The sample for Panel A removes the high school dropout restriction. See Section III.B in the text for an explanation of the regression adjustment. The cities with positive weight in the synthetic control are as follows. Panel A: San Diego, CA 57.7%; Birmingham, AL 28.4%; Nassau-Suffolk, NY 13.8%. Panel B: Tampa–St. Petersburg, FL 64.6%; Anaheim, CA 25.2%. Panel C: Greensboro, NC 70.5%; Norfold–Portsmouth, VA 18.4%; Cincinnati, OH 7.3%; Buffalo, NY 3.8%. Panel D: Los Angeles, CA, Tampa Bay–St. Petersburg, FL; Houston, TX, Anaheim, CA.

shows the unemployment rate of this group for Miami and the synthetic control. In the years after the shock, between 1980 and 1983, no significant difference between the unemployment rate in Miami and synthetic control arises. A caveat in this case is that the year-to-year volatility of unemployment in Miami before 1979 was quite large.

Next, in Figure 3, Panel A we show the behavior of the 20th (log) weekly wage percentile in Miami and the synthetic control, which is another measure of wage among less skilled workers in Miami. In Panels B and C we present the results for the regression-adjusted weekly and hourly wages for high school dropouts, respectively (as described in Section III.B). Any spurious behavior driven by national trends in the wages of women or Hispanics and Blacks or young-old workers affecting the previous figures is controlled for. All three panels show very small differences in the outcomes for

1980–1983 and a reasonably good pre-1979 match. Finally, in Panel D of Figure 3, we show the log weekly wage graph for high school dropouts, as in Panel A of Figure 2, using the control group of cities as used in Card (1990) (Los Angeles, Houston, Atlanta, and Tampa Bay–St. Petersburg). Again, no systematic difference between Miami and the control is discernible for the period 1980–1983. We also see that the control group chosen by Card (1990) produces a reasonably good pre-1979 match of low-skilled wages.

The key takeaway from Figures 2 and 3 is that the average labor market outcomes of low-wage workers and high school dropouts in Miami do not show any negative break or jump corresponding to the Mariel Boatlift relative to the control group. The pre-1979 match between the constructed control group and Miami is quite noisy, and hence one has to take these results with a grain of salt. There is, however, no unusually large difference in any outcome for Miami and the control during the 1980–1983 period, corresponding to the aftermath of the Boatlift.

### B. Robustness Checks

#### 1. Subsamples

In this section we begin exploring the sensitivity of the results to the selection of subsamples. A more systematic analysis of how choosing small subsamples affects the results is carried out in Section V. By restricting the focus to subsamples of high school dropouts we face the risk of introducing measurement error as the sample size drops. When we consider the May-ORG data set and our preferred sample, we still have more than 39 observations in Miami even before 1979. Hence, while we need caution, it can be interesting to separate across various demographic subgroups to check whether there is evidence of heterogeneous effects.

It is worth noting that, while the Mariel Cubans were disproportionately high school dropouts, they were rather similar in terms of age and gender composition to native dropouts. Hence, there is no clear reason why the Mariel Cubans should compete more closely in the labor market with one of these subgroups. Still, one may think that their impact was different for men than for women and for incumbent Hispanic (whose culture and language were similar) or Black workers. This may be the case if, for instance, the Mariel Cubans specialized in occupations that were in direct competition with males and with Hispanics. Figure 4 shows first the synthetic control analysis, when separating the labor force by gender between non-Hispanic men (Panel A) and women (Panel B). The outcome is log weekly wages of high school dropouts. While the time profiles of the wages in Panel A and B are different, and the year-to-year variation is large, we do not observe negative differences between Miami and the control between 1980 and 1983 in either group.

In Panels C and D of Figure 4 we perform the analysis for Hispanic and Black workers. This second group could be particularly exposed to the new immigrant competition as they may be more similar in terms of skills and occupational choices. Even in these cases, Miami and the control exhibit small differences (positive in the case of Hispanics) for wages between 1980 and 1983 and similar, albeit noisy, trends of average log wages in the 1970s. Overall, selecting the sample on one dimension (ethnicity or gender) at a time does not produce evidence of a negative post-1979 difference in wages between Miami and the control.

000848



**Figure 4**

*Miami and Synthetic Control, Wages of Subsamples of High School Dropouts*

Notes: The data source is May-ORG CPS. Each panel shows log weekly wages for Miami (solid line) and the synthetic control (dashed line) in the period 1973–1991. The sample is a separate subgroup of high school dropouts age 19–65, not self-employed and in the labor force. Panel A and B restrict the sample to males and females only, respectively. Panels C and D further restrict it to Hispanics only and Blacks only. Some time series are standardized to the same value in 1979. The cities with positive weight in the synthetic control are as follows. Panel A: Tampa–St. Petersburg, FL 92.6%; Greensboro, SC 6.3%; New York City, NY 1.1%. Panel B: Cincinnati, OH 66.8 %; Pittsburgh, PA 29.4%; Indianapolis, IN 3.8%. Panel C: Sacramento, CA 49.8%; Houston, TX 30.1%; Philadelphia, PA 20.1%. Panel D: Greensboro, NC 39.6%; Cincinnati, OH 19.8%; New York City, NY 15.8%; Seattle, WA, 9.7%; Birmingham, AL, 8.5%; New Orleans, LA 6.7%.

## 2. Different control groups

In the panels of Figures 2–4 we chose the synthetic control so as to best match a common set of variables and the outcome pre-1980. This results in a somewhat different synthetic control group for each panel. We now show that small variations in the choice of the control group do not change the visual impression obtained from those figures. In Figure 5 we present the same outcomes as in Figure 2, but now comparing Miami to a fixed set of control cities (New York, Nassau-Suffolk, New Orleans, and Tampa–St. Petersburg), which is the set of cities most frequently selected by the synthetic control method (for both the ORG CPS and the March CPS) when matching share of high school dropouts, share of Hispanics, share of manufacturing, plus outcome variables in the 1972–1979



**Figure 5**

*Miami and Fixed Control, Wages and Unemployment of Low-Skilled Workers*

Notes: The data source is May-ORG CPS. Each panel shows the outcome variable for Miami (solid line) and the synthetic control (dashed line) in the period 1972–1991. The outcome variable is noted in the title of each panel. The sample for Panels A, B and D is a non-Cuban high school dropouts age 19–65, not self-employed and in the labor force. The sample for Panel C removes the high school dropout restriction. The set of available cities in the control group is restricted to New York, Nassau–Suffolk, New Orleans and Tampa–St. Petersburg. The associated weights are as follows: Panel A: Tampa–St. Petersburg, FL 67.7%, New York City, NY 30.9; Panel B: Tampa–St. Petersburg, FL 69.0%, New York City, NY 31.0%; Panel C: New Orleans, LA 75.9%, New York City, NY 24.1%; Panel D: Tampa–St. Petersburg, FL 44.5%, New York City, NY 31.9; Nassau–Suffolk, NY 23.3%.

period. The figures show, as expected, a worse match of the pre-1980 trend on average, but they confirm the result of no negative difference (rather a positive one) between Miami and the control log wages between 1980 and 1983 (see Panels A and B for wages of high school dropouts and Panel C for wages at the 15th percentile). Similarly, only small differences in unemployment rates are observed between Miami and this fixed control group between 1980 and 1983, and they are comparable with those pre-1979 (Panel D). Although the choice of the control group is important, as one needs to approximate as closely as possible the pre-1979 trends in labor market outcomes, Figure 5 shows that the results are not sensitive to small differences in the choice of the best matching set for each variable. Nevertheless, as we will see in Section V below, one can be misled when selecting a control group that only matches a very short pre-event period (such as 1977–1979), as short-run idiosyncratic noise may be masking the pre-event trend behavior of

286    The Journal of Human Resources



**Figure 6**

*Miami and Synthetic Control, Wages and Unemployment of Low-Skilled Workers, March
CPS Sample*

Notes: The data source is March CPS. Each panel shows the outcome variable for Miami (solid line) and the synthetic
control (dashed line) in the period 1972–1991. The outcome variable is noted in the title of each panel. The sample for
Panels A and D are non-Cuban high school dropouts age 19–65, not self-employed and in the labor force. The sample
for Panels B and C remove the high school dropout restriction. The cities with positive weight in the synthetic control
are as follows. Panel A: Cincinnati–Hamilton, OH/KY/IN 37.1%; Atlanta, GA 32.3%; New Orleans, LA 18.5%;
Tampa–St. Petersburg, FL 12.0%. Panel B: New York City, NY 51.8%; San Diego, CA 38.2%; Riverside, CA 10.0%.
Panel C: San Diego, CA 50.7%; New York, NY 41.9%; Tampa–St. Petersburg, FL 4.6%; Los Angeles–Long Beach,
CA 2.8%. Panel D: Denver, CO 65.8%; Cincinnati–Hamilton, OH/KY/IN 30.3%; San Diego, CA 3.95.

labor market variables. It is always important, as a check of validity, to look at the 1972–
1979 match of the outcome variables between Miami and the synthetic control.

### 3. Using March CPS data

In Section II we argued that the small size and the measurement and recall error in the
March CPS may introduce significant noise in the average wages in Miami. Never-
theless, in this section, we show how the synthetic control analysis performs when we
use our sample in the March CPS.

In Figure 6, we simply show the Miami and control comparison for some outcomes as
we did in Figures 2 and 3, but now measured in the March CPS. The sample, exactly as in

the previous section, consists of non-Cuban high school dropouts aged 19–65. We observe similar patterns as the ones from ORG CPS. Panel A represents log weekly wages (we do not calculate hourly wages in the March CPS) and shows a negative difference for Miami relative to control in 1981–1982, no difference in 1983, and then a quite large difference in 1986. While the difference in 1981–1982 seems larger than in pre-1979, it seems also driven by an increase of average wage in the control group (specific to this sample), as much as by a decrease of average wage in Miami. Panels B and C show that such difference is not visible in the 15th and 20th wage percentile time series. Moreover, even in Panel A a simple continuation of the pre-1979 trend for Miami would show little difference with the actual wages in Miami up to 1985. The unemployment rate in Panel D shows no post-1979 difference between Miami and the control. However, we can observe sizable differences in Panel D before 1979, which imply that the noise in the data prevent a precise pre-1979 match for the unemployment rate. In sum, the preponderance of evidence in Figures 2–5 does not show differences in the labor market outcomes of less skilled incumbent workers of Miami relative to the synthetic control during the post-Mariel period.

### C. Regression Results

In Table 3 we show the $\beta_P$ coefficients from Regression 2 with their respective standard errors. If the Mariel shock had any labor market effect, this should be captured primarily by the coefficient $\beta_{81-82}$ that shows the average difference between Miami and the synthetic control arising in 1981 and 1982 once the 1979 difference is set to zero, as the reference year, and we exclude the 1980 observation.[18] Just as importantly, our framework allows us to quantify the pre-1979 differences between the two cities. Specifically, the estimates of $\beta_{73-75}$ and $\beta_{76-78}$ provide validation for how well the two cities track each other before the shock. Statistically significant pre-1979 differences would cast doubt on our control group as they will imply systematic differences between Miami and the control, even before the Boatlift. The subsequent coefficients $\beta_{83-85}$, $\beta_{86-88}$, and $\beta_{89-91}$ complete the picture.

Each column in Table 3 corresponds to an outcome variable/specification. The header indicates the corresponding panel and figure, as well as the outcome variable in the regression. Some consistent features of the estimates are worth pointing out. First, none of the $\beta_{81-82}$ coefficients for the wage variables is negative and larger than its standard error. Most point estimates (Columns 2–5) are positive, and they reveal that Miami had a small positive difference relative to its synthetic control after the Boatlift. Given the estimated coefficients and standard errors, there is no support for a significant negative effect. For the unemployment rate (Column 6) we estimate a positive coefficient $\beta_{81-82}$ after the Boatlift. However, this value is not very different from the estimates of $\beta_{73-75}$ and $\beta_{76-78}$. This suggest similar behavior of dropouts' unemployment before and after 1980 in Miami and Control.

Second, the estimated coefficients $\beta_{76-78}$ in Columns 2–5 are, for the most part, smaller than their standard errors. This is a more formal way of checking that Miami and its synthetic control move together to a reasonable extent, in the pre-Boatlift period, validating our identification strategy. The pre-1979 coefficients are smaller for the percentile wages (Columns 3 and 4), implying that for those variables the pre-1979

---

18. These choices are consistent with Borjas (2017).

**Table 3**
*Miami and Synthetic Control, Regression Estimates 1973–1991*

| Dependent Variable: | Ln (Weekly Wages) of High School Dropouts (1) Figure 2 Panel A | Ln (Hourly Wages) of High School Dropouts (2) Figure 2 Panel B | Ln Wages, 15th Percentile (3) Figure 2 Panel C | Ln Wages, 20th Percentile (4) Figure 3 Panel A | Ln (Weekly Wages) of High School Dropouts, Card Control (5) Figure 3 Panel D | Unemployment Rate of High School Dropouts (6) Figure 2 Panel D |
|---|---|---|---|---|---|---|
| Miami × (1972–1975) | 0.062 (0.037) | 0.030 (0.029) | 0.022 (0.024) | 0.102 (0.024) | 0.115 (0.035) | 0.034 (0.018) |
| Miami × (1976–1978) | −0.070 (0.039) | −0.042 (0.030) | −0.010 (0.025) | 0.022 (0.025) | 0.016 (0.037) | 0.034 (0.019) |
| Miami × (1981–1982) | −0.015 (0.042) | 0.011 (0.033) | 0.078 (0.027) | 0.097 (0.027) | 0.079 (0.040) | 0.046 (0.021) |
| Miami × (1983–1985) | 0.044 (0.037) | 0.076 (0.029) | 0.076 (0.024) | 0.112 (0.024) | 0.135 (0.035) | 0.018 (0.018) |
| Miami × (1986–1988) | 0.087 (0.037) | 0.101 (0.029) | 0.049 (0.024) | 0.053 (0.024) | 0.160 (0.035) | 0.041 (0.018) |
| Miami × (1989–1991) | 0.054 (0.037) | 0.052 (0.029) | −0.046 (0.024) | 0.035 (0.024) | 0.099 (0.035) | 0.023 (0.018) |
| Observations | 36 | 36 | 36 | 36 | 36 | 36 |

Notes: Each column represents a regression of annual observations for Miami and the corresponding synthetic counterfactual between 1973 and 1991. Each specification includes vectors of city and year dummies. The period dummies extend for three years. The bin for 1979 is excluded so as to standardize the value of that interaction to zero. Data for year 1980 is removed before estimation. The interaction coefficients between a dummy variable for Miami and a corresponding year bin are reported. The method of estimation is feasible generalized least squares (FGLS) with AR1 process for the error term assumed.



**Figure 7**

*Miami and 31 Metro Areas, Simulated Permutations*

Notes: The data source is May-ORG CPS. Each graph reports deviations between synthetic control and treated group, assuming a treatment in 1980, for 44 metropolitan areas. The bold line represents Miami. Panel A shows the graph for the logarithm of weekly wages; Panel B shows it for the logarithm of hourly wages. Panel C shows the 15th percentile of log weekly wages, and Panel D the unemployment rate. The sample in Panel A, B, and D includes non-Cuban, high school dropouts, 19–65 years old from the May-ORG CPS. In Panel C the 15th percentile is calculated on all non-Cuban workers between 19 and 65 years old from the May-ORG CPS. Miami is excluded from constructing the synthetic controls. The lines are standardized to the same value in 1979.

Miami–control fit is better. Note that the estimates are simply a quantification of the differences between the Miami–control time series represented in Figures 2 and 3 standardizing the difference to zero in 1979 (which the graphs do not necessarily do). Third, the standard errors for the wage regressions are not small (between 0.03 and 0.04 log points), and differences in the order of few percentage points would be difficult to measure precisely. Year-to-year fluctuations of 5–6 percent seem common both before and after 1979, and it is hard to say whether this is actually due to the Boatlift or measurement error.

### D. Inference Results

Panels A–D of Figure 7 show the simulated differences treatment–control for Miami and the other 43 cities, analyzing non-Cuban high school dropouts' log weekly and hourly wages (Panels A and B), log wages at the 15th percentile of wage distribution (Panel C), and the unemployment rate of non-Cuban high school dropouts (Panel D). The dark line

in each panel corresponds to Miami–control differences, while each of the lighter ones corresponds to one of the 43 cities' difference from the synthetic control.[19] Panels A and B show that Miami's average high school dropout wage in 1981–1982 had a positive difference relative to its synthetic control, and large vis-à-vis the simulated range in 1981–1982, while its differences look within the range of idiosyncratic variation after that year. Panels C and D show that for the 15th wage percentile and for the high school dropout unemployment rate, Miami is rather average and within the range of simulated differences any year post-1979. Notice that the range of simulated idiosyncratic noise in the sample is large. For instance, log weekly and hourly wages show a range of idiosyncratic noise spanning the interval between −20 and +20 log points. Let us emphasize once again that with this degree of noise it may be hard to identify effects on the order of five or six percentage points.[20]

# V. Reconciling Our Results with Borjas (2017)

Readers who are familiar with Borjas (2017) are likely puzzled by the disagreement of the results presented here and those contained in that paper. In this section we bridge the differences between the two. First, we show that the measurement error for average wages of subsamples in the March CPS, as chosen by Borjas (2017), is likely to be very large. Specifically, we show that the key result of Borjas (2017) arises when focusing on the small subgroup of non-Hispanic males, 25–59 years of age, as representative of all native high school dropouts in Miami. By embedding this sample in the 27 possible alternative samples obtained partitioning age, gender, and ethnicity (each in two groups and including all possible combinations), we observe the magnitude of the fluctuations of average wages across subgroups and the number of observations in each of those subsamples. Small samples, such as the one chosen by Borjas (2017), display large fluctuations in all periods (not just post-1979) and have the markings of measurement error rather than the consequence of any specific event.

Even more importantly, when we embed the Borjas (2017) sample in the 1972–1991 period, rather than starting in 1977, we show the strong negative pre-1979 trend of low-skilled wages in Miami. This negative trend is completely missed by Borjas (2017), as his data begin in 1977. This leads us to discuss the importance of choosing an appropriate control group with labor market trends more similar to Miami over the whole 1972–1979 period, rather than only in 1977–1979. Once a longer pre-trend is introduced *and* less noisy samples are considered, there is no evidence of a post-1979 drop of Miami wages from the preexisting trend.

## A. The Figures

### 1. March CPS sample

Panels A and B of Figure 8 show a simple way of visualizing the key finding in Borjas (2017) and reconciling it with our results and those of Card (1990). The dashed line

---

19. Note that when simulating the synthetic control method with other cities we do not include Miami in the donor pool. This avoids contaminating the control group if there is any effect of the Boatlift in Miami.
20. In Appendix Table A1 we test statistics based on the simulations reported in Figure 7. The results are in accordance with the placebo simulation graphs.



**Figure 8**

*Reconciling Borjas (2017)'s Visual Evidence with Ours, March CPS and May-ORG CPS*

Notes: Panels A and C show the log wages (weekly for Panel A and hourly for Panel C) for high school dropouts in Miami as presented in Borjas (2017). The sample is non-Hispanic men, not self-employed, in the labor force, age 25–59. Panel B shows the same time series of 27 different subsamples of dropouts, based along the gender (male, female, or both), ethnicity (Hispanic, non-Hispanic, or both) and age (young/old, prime age or both) dimensions. Borjas (2017)'s sample choice is displayed in dashed line, with ours in black solid line, and the rest 25 subsamples are split depending on the average number of observations for Miami in the period 1978–1982 as follows: very light gray (0–20 observations), gray (20–40 observations), and dark gray (40+ observations). The time series are standardized to the same value in 1979.

shows the average log weekly wage of high school dropouts in Miami from the March CPS sample that includes male, non-Hispanic workers, age 25–59. Panel A reproduces exactly the Miami wage path reported in Figure 6, Panel A of Borjas (2017), with two small modifications. First, we do not "smooth" the data with a moving average. The goal is to find a sharp short-run change in wages right around year 1980. Therefore, we do not want to contaminate the data by averaging observations before and after the Mariel Boatlift. Second, we draw the vertical bar in 1979, the last observation before the Boatlift. The dashed line in Panel A shows the very large dip in wages, which occurs slowly after 1980. This is the fundamental feature of the data that drives Borjas (2017) to

argue in favor of a large effect of the Boatlift. The pre-1979 line is too short to infer the pre-1979 behavior (1977–1979) of wages. However, the fact that one observation (1977) is above and the other one (1978) below the 1979 point produces an impression of no clear (or rather flat) wage trend before 1979.

Panel B reproduces the exact same wage path as Panel A, as a thick dashed line, but now it embeds it into more information about the average wages of high school dropouts in Miami before and after the Boatlift. Specifically, we extend the sample back to 1972, and we add the paths of average log wages of all the comparable subgroups among workers with no high school degree in Miami, standardized to be equal in 1979. Namely, we consider partitions of gender into male and female, of ethnicity into Hispanic-non-Cuban and non-Hispanic, and of age into prime (25–59 years old) and marginal (19–24 and 59–64 years old). Then we consider all 27 possible subgroups within the population of dropout workers in Miami that one can obtain selecting all possible combinations of individuals in one or both of the subgroups for each of the three characteristics.[21] We plot the average weekly log wage of each of these subgroups using light shades of gray for the subgroups with 20 observations or fewer, with mid-gray shades for those with 20–40 observations, and with dark gray for those with 40 or more observations. The only other lines are Borjas' (2017) sample, in thick dashed, and our preferred sample in thick solid. Borjas' (2017) sample belongs to the subgroups with less than 20 observations (light gray). Our preferred sample, by including both groups for each of the three characteristics, is the largest one and belongs to the subgroups with 40 plus observations (dark gray). Finally, with a thick black dashed and dotted line, we denote the linear pre-1979 trend for the wage of the largest (and least noisy) dropout group extended to 1991.

Three clear facts emerge from Panel B of Figure 8. First, all subgroups with fewer than 40 observations (mid-gray and light gray) and particularly those with 20 observations or less (light gray plus the dashed Borjas' [2017] sample) show very large fluctuations, before and after 1979, above and below the average trend of the group. The great dispersion and year-to-year variability of those averages seem to derive from measurement error, as they are more extreme the smaller those groups are, and they are largest in 1984 and 1985, when the Miami March CPS sample is smallest (see Table 1). The larger groups (including our preferred sample, the samples of Hispanic/non-Hispanic and men/women and prime age and that of Non-Hispanic and Men/Women and all ages) have much smaller year-to-year variation and follow a downward trend with much smaller fluctuations around it. The Borjas (2017) sample happens to be one with a large negative difference relative to the trend both before and after 1979, especially in the 1985–1986 period, and then a dramatic reversal with a positive difference in 1989–1991. Other small subgroups have similarly large differences, but some of them are positive in the 1985–1986 period. The Hispanic women group, for instance, is the one with a large double-spiked positive jump in 1983 and 1985. Let us also emphasize that the small sample bias problem, when considering subsamples, applies also to the control cities, not just to

---

21. Table A2 in the Appendix shows the number of observations for each of those subgroups in Miami (averaging the yearly observation between 1978 and 1982) in the March (first column) and in the May-ORG CPS (second column) samples.

Miami. In the Borjas (2017) sample some of the cities in the control group (San Diego and San Jose) have samples with fewer than 15 observations between 1978 and 1982.

Second, Panel B of Figure 8 shows that the average wage of high school dropouts in Miami was on a significant downward trend from 1972–1979. Importantly, in order to capture such a trend, especially for the small and noisy subgroups, it is crucial to consider the whole 1972–1979 period. Limiting one's attention to the behavior of Miami's labor markets in the 1977–1979 period, as Borjas (2017) does when selecting control groups, implies that short-term fluctuations and measurement error can obscure the actual longer-run trend.

Third, if one can identify a group of two to three years in which the differences of the wage of some subgroups, above or below the average preexisting trend, are largest, those would be the years 1984–1986. Some sharp spikes (both upwards and downwards) emerge in those years. The years 1980–1982, which should show the largest short-run effect of the Mariel Boatlift, show instead smaller differences, especially if one excludes the very small subgroups. The years 1984–1986 were those when the Miami sample of the March CPS was smallest (fewer than 60 including all high school dropouts) and hence larger variation may simply come from smaller samples.[22]

In summary, the drop in wages for non-Hispanic men age 25–59 in March CPS relative to its pre-1979 trend, which constitutes Borjas' (2017) key piece of evidence, when embedded in a complete picture of all subgroups, appears to be a likely manifestation of measurement error that affects the smaller subgroups.[23]

### 2. May-ORG sample

Panels C and D of Figure 8 perform the same reconciliation between the Borjas (2017) key result and our analysis using the May-ORG CPS data mirroring Panels A and B. As in Borjas (2017), we use log hourly wages (rather than weekly wages) in these panels. Both graphs show very clearly that the Borjas (2017) figure creates an impression of a downward dip after 1979. Extending it to include the 1972–1979 data shows that wages for the Borjas (2017) sample continued along the pre-1979 trend with only small differences from it. With the May-ORG CPS data, the year-to-year fluctuations of the wages for the subsamples are much smaller than in the March CPS as their sample size is larger (notice the difference in the range of the vertical log scale). In particular, only a few subsamples show large negative or positive wage differences from the pre-1979 trend. Ours and Borjas' (2017) subsamples look much closer to each other. In fact, in Panel D the average wage for the Borjas (2017) sample is pretty close to its pre-1979 trend. This is clearly visible even in Figure 6, Panel B in Borjas (2017), which we do not reproduce here. In that panel, if we align the time series for Miami and the "Card-" or "Employment-" or the "Low Skill-" placebo at 1979, we do not detect any noticeable difference between Miami and the placebos post-1979, up to 1985. The only exception

---

22. Clemens and Hunt (2017) suggest that a change in the March CPS sampling data in 1980 to include a larger fraction of Black Haitians in Miami can be one of the sources of measurement error in small subgroups.
23. Roodman (2015) had already noted the sensitivity of Borjas' results to the choice of subsample when separately analyzing men and women.

000858

is what Borjas calls the "Synthetic Placebo" obtained matching variables in the 1977–1979 period and that appears to diverge from Miami in the post-1980 period. We will discuss this placebo and its consequences in the next two sections.

### B. Choice of the Control Group

The remaining differences between our results and the Borjas (2017) results, which are relevant when looking at the regression analysis particularly for the May-ORG CPS sample, derive from the choice of the control group. Borjas (2017) matches either overall or low-skilled employment growth or these along with low-skilled wage growth between Miami and the controls during the 1977–1979 period. Namely, he pools the 1977–1978 data and the 1979–1980 data and estimates the growth between these two data points (based on four years). The four cities most similar to Miami are then chosen as controls. The year-to-year variability of wage data shown above, however, should warn us of the risk of basing the match only on the three years before the event and the year of the event.

Table 4 illustrates the sensitivity of the relative performance of Miami in terms of employment growth with respect to the choice of the period: 1977–1978 to 1979–1980, a one-year-earlier comparison 1976–1977 to 1978–1979, or the whole 1972–1979 period. The first three columns of Table 4 rank cities according to those three different employment growth rates. Borjas (2017) insists that Miami had robust labor market performance before 1979. However, this is only true when using the 1977–1978 to 1979–1980 growth (first column of Table 4, Miami is ninth out of 32 cities). The rate one year earlier (second column of Table 4) shows much slower growth of Miami (19th out of 32 cities), and the overall 1972–1979 rate shows Miami as one of the slower performers (25th out of 32). Notice also that the four closest cities to Miami (italicized in Table 4) are different depending on which period we consider. A control group based on only three years before 1980 risks selecting cities that do not match at all the Miami labor market trends before 1980. In addition, Miami was the worst performer in the 1972–1979 period among all the available 32 cities in terms of average wage growth (last column of the Table 4). Hence, when considering the full 1972–1979 trend, Miami seems to show slow employment growth, slow overall wage growth, and declining dropout wages.

The synthetic control method, matching variables during the 1972–1979 period, captures a group of cities with similarly slow labor markets. The control group in Borjas (2017), based on three years only, selects cities that are very different from Miami when the whole 1972–1979 performance is considered. The bolded cities (Anaheim, San Diego, and San Jose) appear both in the Borjas (2017) synthetic and employment placebos.[24] However, they experience really strong labor market indicator growth according to all measures except for the one used in his paper. It is then not surprising that wages in Miami are on a lower trajectory post-1980, relative to those.

To show that this matters in the May-ORG CPS analysis, Figure 9 shows the log hourly wages (Panel A) and the log weekly wages (Panel B) for Miami using Borjas'

---

24. The other cities included in these placebos are Rochester and Nassau-Suffolk, but the CPS does not identify these cities consistently back to 1972, and hence they are excluded from this table.

**Table 4**
City Rankings According to Various Growth Measures

| City Ranking | Employment Growth (1977–1978 vs. 1979–1980) | City Ranking | Employment Growth (1976–1977 vs. 1978–1979) | City Ranking | Employment Growth (1972–1973 vs. 1978–1989) | City Ranking | Ave. Wage Growth (1972–1973 vs. 1978–1989) |
|---|---|---|---|---|---|---|---|
| Riverside, CA | 0.21 | **Anaheim, CA** | **0.18** | **Anaheim, CA** | **0.65** | New Orleans, LA | 0.01 |
| Denver, CO | 0.2 | Portland, CO | 0.17 | **San Diego, CA** | **0.59** | **Anaheim, CA** | **−0.02** |
| Philadelphia, PA/NJ | 0.14 | **San Diego, CA** | **0.15** | Seattle–Everett, WA | 0.4 | Kansas City, MO/KS | −0.08 |
| Portland, CO | 0.12 | Boston, MA | 0.13 | Cincinnati, OH/KY/IN | 0.35 | Pittsburg, PA | −0.09 |
| Boston, MA | 0.1 | **San Jose, CA** | **0.13** | Dallas–Fort Worth, TX | 0.33 | Bergen–Passaic, NJ | −0.15 |
| Minneapolis, MN | 0.09 | Philadelphia, PA/NJ | 0.12 | Tampa, FL | 0.29 | Houston–Brazoria, TX | −0.17 |
| *Indianapolis, IN* | *0.09* | *Riverside, CA* | *0.12* | Denver, CO | 0.27 | San Francisco, CA | −0.17 |
| *Chicago–Gary–Lake IL* | *0.09* | *Seattle–Everett, WA* | *0.11* | **San Jose, CA** | **0.27** | Seattle–Everett, WA | −0.18 |
| *San Diego, CA* | *0.07* | *Tampa, FL* | *0.1* | Indianapolis, IN | 0.25 | **San Jose, CA** | **−0.19** |
| *Baltimore, MD* | *0.07* | *Dallas–Fort Worth, TX* | *0.1* | Houston–Brazoria, TX | 0.24 | Denver, CO | −0.21 |
| *Seattle–Everett, WA* | *0.07* | *Indianapolis, IN* | *0.09* | Portland, CO | 0.22 | Washington, DC | −0.22 |
| *Kansas City, MO/KS* | *0.05* | *Denver, CO* | *0.09* | Washington, DC | 0.19 | Indianapolis, IN | −0.22 |
| Los Angeles, CA | 0.05 | *Newark, NJ* | *0.09* | Minneapolis, MN | 0.18 | Dallas–Fort Worth, TX | −0.24 |
| Newark, NJ | 0.05 | Washington, DC | 0.08 | New Orleans, LA | 0.16 | Baltimore, MD | −0.24 |
| *Houston–Brazoria, TX* | *0.05* | Kansas City, MO/KS | 0.08 | Riverside, CA | 0.16 | Philadelphia, PA/NJ | −0.25 |
| | | *Detroit, MI* | *0.05* | *Atlanta, GA* | *0.05* | Portland, CO | −0.26 |

*(continued)*

295

000860

296

**Table 4** *(continued)*

| City Ranking | Employment Growth (1977–1978) vs. 1979–1980) | City Ranking | Employment Growth (1976–1977) vs. 1978–1979) | City Ranking | Employment Growth (1972–1973) vs. 1978–1989) | City Ranking | Ave. Wage Growth (1972–1973) vs. 1978–1989) |
|---|---|---|---|---|---|---|---|
| Tampa, FL | 0.04 | *Cincinnati, OH/KY/IN* | *0.05* | Pittsburg, PA | 0.14 | Chicago–Gary–Lake IL | −0.26 |
| St. Louis, MO/IL | 0.04 | Miami–Hialeah, FL | 0.05 | Baltimore, MD | 0.12 | Newark, NJ | −0.3 |
| **Anaheim, CA** | **0.04** | *Buffalo, NY* | *0.04* | Detroit, MI | 0.11 | Tampa, FL | −0.31 |
| Buffalo, NY | 0.03 | *Baltimore, MD* | *0.04* | Boston, MA | 0.1 | St. Louis, MO/IL | −0.32 |
| Cleveland, OH | 0.03 | Atlanta, GA | 0.04 | San Francisco, CA | 0.08 | Buffalo, NY | −0.32 |
| San Francisco, CA | 0.02 | Chicago–Gary–Lake IL | 0.04 | Los Angeles, CA | 0.07 | Cleveland, OH | −0.33 |
| Dallas–Fort Worth, TX | 0.02 | New York, NY | 0.03 | *Kansas City, MO/KS* | *0.07* | Detroit, MI | −0.34 |
| Bergen–Passaic, NJ | 0.02 | St. Louis, MO/IL | 0.03 | *Buffalo, NY* | *0.05* | Cincinnati, OH/KY/IN | −0.35 |
| Detroit, MI | 0.01 | Houston–Brazoria, TX | 0.02 | Miami–Hialeah, FL | 0.05 | **San Diego, CA** | **−0.35** |
| **San Jose, CA** | **0** | Los Angeles, CA | 0.02 | *Philadelphia, PA/NJ* | *0.04* | New York, NY | −0.35 |
| Washington, DC | 0 | Minneapolis, MN | 0.01 | *Newark, NJ* | *0.03* | Los Angeles, CA | −0.39 |
| New York, NY | −0.01 | San Francisco, CA | −0.02 | Cleveland, OH | 0.02 | *Atlanta, GA* | *−0.4* |
| Pitsburg, PA | −0.02 | Cleveland, OH | −0.03 | St. Louis, MO/IL | 0.01 | *Boston, MA* | *−0.4* |
| New Orleans, LA | −0.05 | Bergen–Passaic, NJ | −0.04 | Chicago–Gary–Lake IL | −0.02 | *Minneapolis, MN* | *−0.41* |
| Atlanta, GA | −0.06 | New Orleans, LA | −0.05 | New York, NY | −0.05 | *Riverside, CA* | *−0.43* |
| Cincinnati, OH/KY/IN | −0.11 | Pitsburg, PA | −0.05 | Bergen–Passaic, NJ | −0.13 | Miami–Hialeah, FL | −0.59 |

Notes: We calculate the employment and average wage growth rate for Miami and the other 31 metropolitan areas using the March CPS sample. The four cities closest to Miami, which would be chosen as control group when minimizing difference in that specific growth rate, are in italics. The bolded cities Anaheim, San Jose, and San Diego are included in the Borjas (2017) synthetic and employment controls.



**Panel A: Log Hourly Wages, May-ORG CPS, Borjas (2017) Sample**



**Panel B: Log Weekly Wages, May-ORG CPS, Borjas (2017) Sample**



**Figure 9**

*Comparison between the Borjas (2017) and Our Synthetic Controls*

Notes: Each panel shows the outcome variable for Miami (solid line), the Borjas (2017) synthetic control (dotted line), and our synthetic control (dashed line) in the period 1972–1991. The outcome variable and the data set are noted in the title of each panel. The sample is non-Hispanic men, not self-employed, in the labor force, age 25–59. The time series are standardized to the same value in 1979.

(2017) sample (solid line). We also present the behavior of our synthetic control, based on matching variables in the whole 1972–1979 period (dashed line), and the Borjas (2017) synthetic control based on matching variables in the 1977–1979 period (dotted line). While our control matches reasonably well the pre-1979 trend and fluctuations of the Miami wages, the Borjas (2017) synthetic control shows very large pre-1979 differences with Miami, especially in 1976 and 1977. These differences continue after 1979, and the Borjas (2017) control group deviates upwards from the continued downward trend that both Miami and our control, once aligned at the 1979 value, show after 1979. Therefore, matching only on the 1977–1979 period tends to select cities whose labor market outcomes and wages do not match properly the negative 1972–1979 Miami trend before the event.

### C. The Regressions

In Table 5, we use the insight gained from the comparisons above to reconcile the regression estimates in Table 5 of Borjas (2017), showing large negative coefficients for $\beta_{81-83}$ dummy with our null or positive coefficient shown in Table 2 above. The table shows the estimates of the Miami period dummies for the March CPS sample (upper panel of the Table) and the May-ORG CPS (lower panel). The first column shows our replication of exactly the regressions performed by Borjas estimating differences of Miami dropouts wages from the synthetic control in the post-1980 subperiods. We include initially, in Column 1, exactly the Borjas sample and specification including the moving-average smoothing, the omission of year 1980 from the regression, and the choice of control group (which we select to be his synthetic control group). The estimate of Column 1 reproduces the large negative estimate for the $\beta_{81-83}$ coefficient (and following years) with relatively small standard errors. We focus on the $\beta_{81-83}$ coefficient as this would be the most likely to be affected by the Boatlift. The estimate of Column 1 is −0.327 (SE 0.068) close to Borjas (2017, Table 5, Panel A, Column 4), which equals −0.257, with SE 0.077. Then, in Column 2 we extend the data back to 1972, and we include dummies to capture differences between Miami and Control in the pre-1979 period, relative to 1979. This establishes 1979 as a reference year and allows us to evaluate whether there were large Miami–control differences before the Boatlift, which is a diagnostic measure on the quality of the control group. The $\beta_{81-83}$ coefficient becomes −0.247 (SE 0.052), and we estimate a large positive coefficient with a small standard error on $\beta_{72-75}$, denoting a quite imprecise match of the pre-1979 trend. Then, in Column 3, we remove the moving-average smoothing of the data. This further reduces the estimate of the $\beta_{81-83}$ coefficient to −0.147 and, most importantly, increases significantly the standard error to 0.103. The data are now much more variable year-to-year, and this is reflected by the standard errors. The moving-average smoothing was artificially reducing those errors by smoothing the year-to-year variation of the data. In Column 4, we introduce our sample including male and female, non-Cuban workers aged 19–65, and, in Column 5, we introduce our synthetic control group, based on 1972–1979 matching of variables. In both cases, the estimates of the $\beta_{81-83}$ coefficient are smaller than in Column 3, and the pre-1979 coefficients are much smaller and within their standard error. The final specification of Column 5 shows a point estimate of −0.11 for the $\beta_{81-83}$ coefficient and a standard error of 0.068. While likely the standard error

**Table 5**
*Reconciling Borjas (2017) and Our Regression Results*

| Dependent Variable: | Ln (Weekly Wages) of High School Dropouts (1) Borjas | Ln (Weekly Wages) of High School Dropouts (2) +Pre-77 Data | Ln (Weekly Wages) of High School Dropouts (3) +No Smooth | Ln (Weekly Wages) of High School Dropouts (4) +Our Sample | Ln (Weekly Wages) of High School Dropouts (5) +Our Control |
|---|---|---|---|---|---|
| **Panel A: March CPS** | | | | | |
| Miami X (1972–1975) | | 0.094 (0.029) | 0.240 (0.087) | −0.011 (0.029) | 0.005 (0.029) |
| Miami X (1976–1978) | | −0.022 (0.018) | 0.053 (0.039) | 0.032 (0.040) | −0.010 (0.027) |
| Miami X (1981–1983) | −0.327 (0.068) | −0.247 (0.052) | −0.147 (0.103) | −0.022 (0.043) | −0.111 (0.068) |
| Miami X (1984–1985) | −0.512 (0.069) | −0.433 (0.054) | −0.337 (0.090) | −0.108 (0.112) | −0.143 (0.049) |
| Miami X (1986–1988) | −0.143 (0.138) | −0.064 (0.132) | 0.036 (0.287) | −0.212 (0.077) | −0.264 (0.065) |
| Miami X (1989–1991) | 0.024 (0.043) | 0.104 (0.003) | 0.201 (0.042) | −0.049 (0.027) | −0.091 (0.016) |

*(continued)*

**Table 5** (*continued*)

| Dependent Variable: | Ln (Weekly Wages) of High School Dropouts (1) Borjas | Ln (Weekly Wages) of High School Dropouts (2) +Pre-77 Data | Ln (Weekly Wages) of High School Dropouts (3) +No Smooth | Ln (Weekly Wages) of High School Dropouts (4) +Our Sample | Ln (Weekly Wages) of High School Dropouts (5) +Our Control |
|---|---|---|---|---|---|
| **Panel B: May-ORG CPS** | | | | | |
| Miami X (1972–1975) | | 0.030 (0.018) | 0.157 (0.037) | 0.061 (0.011) | −0.013 (0.008) |
| Miami X (1976–1978) | | −0.067 (0.021) | 0.020 (0.039) | 0.018 (0.020) | 0.066 (0.043) |
| Miami X (1981–1983) | −0.200 (0.029) | −0.176 (0.021) | −0.109 (0.034) | 0.120 (0.021) | 0.049 (0.048) |
| Miami X (1984–1985) | −0.190 (0.021) | −0.166 (0.003) | −0.046 (0.039) | 0.165 (0.030) | 0.142 (0.015) |
| Miami X (1986–1988) | −0.121 (0.051) | −0.096 (0.047) | −0.019 (0.057) | 0.173 (0.027) | 0.127 (0.007) |
| Miami X (1989–1991) | 0.008 (0.022) | 0.032 (0.009) | 0.142 (0.034) | 0.222 (0.010) | 0.086 (0.010) |
| Observations | 28 | 36 | 36 | 36 | 36 |

Notes: Each column represents a regression of annual observations for Miami and the corresponding synthetic counterfactual between 1973 and 1991. Each specification includes vectors of city and year dummies. The period dummies extend for three years. The bin for 1979 is excluded so as to standardize the value of that interaction to 0. Data for year 1980 is removed before estimation. The interaction coefficients between a dummy variable for Miami and a corresponding year bin are reported. The method of estimation is feasible generalized least squares (FGLS) with AR1 process for the error term assumed. In the first column we attempt to replicate the results of Borjas (2017). In each subsequent one we make a small change (denoted in the header) to the previous specification.

000865

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 873 of 4699 PageID #:  4038

is underestimated because we are not accounting for the fact that the variables are constructed, it is clear that such coefficient would not be significant at standard confidence levels.

The lower part of the table shows the same progression for the estimates obtained from the May-ORG CPS data. Column 1 reproduces the result of Table 6 Panel B Column 4 of Borjas (2017) obtaining a point estimate of −0.200 (SE 0.029) on the $\beta_{81-83}$ coefficient. Then, we see a progressively smaller negative estimate when including the pre-trend coefficients (Column 2) and dropping the moving-average smoothing (Column 3). These specifications also show the large pre-1979 differences between Miami and the control captured by the large point estimates of the dummies. Afterward, using May-ORG CPS we see that the point estimate of the $\beta_{81-83}$ coefficient becomes positive in Columns 4 and 5. Finally, the last coefficient is similar to Column 1 of Table 3 (the differences are due to a slightly different definition of the time dummies). To emphasize the improvement from the introduction of our control, notice that in Column 5 the estimates on both the pre-1979 coefficients is small and nonsignificant. The final specification shows a positive difference for the Miami–control between 1981 and 1983 of about 4.9 percent with a standard error of 4.8 percent.

## VI. The Boatlift that Did Not Happen

A subsequent potential inflow of Cubans in 1994, announced by Castro but eventually diverted to the naval base in Guantanamo Bay, provided an opportunity for a falsification of the Card (1990) results. Angrist and Krueger (1999) show that between 1993 (pre-non-shock) and 1995 (post-non-shock), the unemployment rate for Black workers in Miami increased by 3.6 percentage points, while in the control group of cities in Card (1990) it decreased by 2.7 percentage points. Hence, if a researcher were to analyze the impacts of this *nonevent*, she would estimate a fake treatment effect of +6.3 percentage points. They argue that this "false positive" is a cautionary tale when utilizing a very small number of units in case studies like this one, where differences can occur by pure chance.[25]

We are sympathetic to this methodological caveat and illustrate that the synthetic control method can significantly reduce this problem. By construction, the SCM eliminates the arbitrary choice of a control group, as done by Angrist and Krueger (1999), who simply use the Card (1990) control group, and allows validation of the newly constructed one by checking the fit in the pre-1994 period. Similarly to the results presented in Figures 2, 3, and 4, we apply the SCM using high school dropouts' weekly and hourly wages, as well as weekly and hourly wages at the 15th percentile of the

---

25. Angrist and Krueger's (1999) argument is somewhat crude, and it is simply a cautionary tale. Any serious researcher will at least dig into validating the parallel trends of Miami and the control group assumptions. Reassurance that the control group and Miami had similar labor markets in the mid-1990s (for example, in terms of occupational structure, demographics, etc.) is also necessary for the credibility of this strategy. Importantly, let us also point out that in 1994 the CPS underwent a major redesign and several measures of employment, especially for males and subgroups, were significantly affected (see Polivka and Miller 1995). Hence, focusing on changes exactly around 1994 can be very risky.



**Figure 10**

*The Nonevent of 1994, Miami and Synthetic Control, Wage Measures of Low-Skilled Workers*

Notes: The data source is May-ORG CPS. Each panel shows the outcome variable for Miami (solid line) and the synthetic control (dashed line) in the period 1989–2002. The outcome variable is noted in the title of each panel. The sample is non-Cubans age 19–65, not self-employed and in the labor force. Some time series are standardized to the same value in 1979. The cities with positive weight in the synthetic control are as follows. Panel A: Bakersfield, CA 35.4%; New Orleans, LA 21.8%; El Paso, TX 16.8%; Jackson, MS 13.1%; Visalia-Tulare-Porterville, CA 12.9%. Panel B: Jersey City, NJ 31.8%; Sioux Falls, SD 30.4%; Bakersfield 27.6%; San Antonio, TX 10.2%. Panel C: Bakersfield, CA 38.4%; Lakeland–Winter Haven, FL 28.6%; New Orleans, LA 17.5%; El Paso, TX 10.9%; Jackson, MS 4.4%. Panel D: Jersey City, NJ 50.5%; Sioux Falls, SD 32.1%; San Antonio, TX 17.4%.

respective distribution. We use the ORG CPS data set and our preferred sample of workers.[26]

Figure 10 shows the results. Panels A and B show the behavior of hourly and weekly wages of high school dropouts in Miami and the synthetic control between 1989 and 2001. The rest of the panels do the same for the 15th percentile of the natives' hourly (Panel C) or weekly (Panel D) wage distribution. We include a vertical line on the year 1993, the last year before this nonshock. The solid line shows Miami, and the dashed

26. In this case, to keep computational time within a reasonable amount, we limit the "donor pool" for the control group to cities with at least 20 observations in the relevant group of high school dropouts per year. This produces a pool of about 40 cities. Moreover, in order to have a balanced panel of control cities, we keep the pre-1994 period to six years only. Regression analysis of the presented time series and placebo simulations (not shown here) further confirm the obtained results.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 875 of 4699 PageID #:  4040

one is the constructed control labor market. The footnote lists all the cities with positive weights in the SCM control group. In all graphs of Figure 10, we see a good fit between Miami and its respective control labor market in the years leading up to 1993 and no significant difference immediately afterwards. Overall, these figures do not produce any false evidence of a downward wage movement. Looking at them, we recognize significant noise in the data, but we do not to identify erroneous signs of an effect on wage and employment from the nonexistent 1994 Boatlift.[27]

## VII. Conclusions

We apply the synthetic control method to the well-known Mariel Boatlift episode with the goal of improving on Card's (1990) methods. We analyze a wide variety of labor market outcomes for high school dropouts and for low-wage non-Cubans in Miami, as well as for several subgroups. We look for a significant and sudden difference of Miami labor markets' outcomes from those of its synthetic control in 1981–1983, as potential evidence of an effect of the Boatlift on local labor markets. We do not find any consistent evidence of a short-run depressing effect on low-skilled labor demand, nor any lasting effect later on. The contribution of this paper is to put the Card (1990) estimates on solid ground, showing their robustness and plausibility. Moreover, in light of recent criticism by Borjas (2017), who finds, instead, a large and delayed wage effect, we show that choosing small subsamples and matching Miami with a control group based on only three years of pre-Boatlift history can be misleading.

The lack of a significant wage effect, while in part attributable to measurement error that contributes to the noise of average wage data, is also consistent with the recent literature emphasizing mechanisms that allow absorption of immigrants. These may take place through complementarity, technology adjustment, increases in demand, and efficiency. We also show that, when dealing with small samples, one needs to analyze varying samples, outcome variables, control groups and perform an extensive set of robustness checks. Our analysis exposes the fragility of the results and criticism by Borjas (2017) and Angrist and Krueger (1999). We find that their claims are predicated on narrow choices.

In conclusion, we think that a reasonable reassessment of the labor market effects of the Mariel Cubans (and the findings of Card 1990) that accounts for idiosyncratic and measurement error cannot rule out small wage effects in the order of 3–4 percent. However, the point estimates in most of the samples using the May-ORG CPS data are slightly positive and do not suggest any negative impact. Certainly, there is no consistent evidence of large negative effects such as the ones presented in Borjas (2017), although some specific subsamples or specifications may generate such an impression.

---

27. We show the behavior of the unemployment rate of minorities (Black and Hispanics) vis-à-vis the synthetic control in Figure A2 in the Online Appendix. While the unemployment rate of Black workers still shows an increase relative to the synthetic control in 1994 and 1995, that difference is less dramatic, and it is reversed by 1996. The unemployment of Hispanic individuals actually experienced a decline relative to the synthetic control in 1994–1995.

**Appendix**



**Figure A1**

*High School Dropouts as Share of the Population in Miami*

Notes: The solid line displays the share of high school dropouts in Miami. The long- and short-dashed ones show the share of non-Cuban and Cuban high school dropouts, respectively. All statistics are calculated from May-ORG CPS.



**Figure A2**

*The Nonevent of 1994, Unemployment in Miami and in the Synthetic Control*

Notes: The data source is ORG CPS. Each panel shows the behavior of the outcome variable for Miami (solid line) and for the synthetic control (dashed line) in the period 1989–2001. The vertical line corresponds to year 1993, immediately before the nonevent of 1994. The variables are noted in the title of each panel. The sample includes all non-Cubans, in the labor force, age 19–61 either of Black (Panel A) or of Hispanic (Panel B) ethnicity.

**Appendix Table A1**
*Distribution of 1980–82 Deviations of City Outcomes from their Synthetic Control, May-ORG CPS*

| Dependent Variable | Ln Weekly Wages of High School Dropouts Figure 5 Panel A (1) | Ln Hourly Wages of High School Dropouts Figure 5 Panel B (2) | Ln Weekly 15th Percentile Figure 5 Panel C (3) | Unemployment Rate of High School Dropouts Figure 5 Panel D (4) |
|---|---|---|---|---|
| **Panel A: Analysis Relative to Pre-period 1972–1979** | | | | |
| Ratio of Post–Pre MSPE | 1.09 | 3.14 | 6.08 | 0.11 |
| Rank, lowest to highest | 36/42 | 42/43 | 40/43 | 1/44 |
| $P$-value, one-tailed test $P(\Delta > \Delta_{\text{MIAMI}})$ | 0.14 | 0.02 | 0.07 | 0.98 |
| **Panel B: Analysis Relative to Pre-period 77–79** | | | | |
| Ratio of Post–Pre MSPE | 3.34 | 47.69 | 4.26 | 0.28 |
| Rank, lowest to highest | 39/42 | 43/43 | 28/43 | 4/44 |
| $P$-value, one-tailed test $P(\Delta > \Delta_{\text{MIAMI}})$ | 0.07 | 0.00 | 0.35 | 0.91 |

Notes: The "Ratio of Post-Pre" equals the absolute value of the ratio of the average Miami–synthetic control square deviation in 1980–1982 divided the average Miami–synthetic control square deviation in the pre-period. In the upper panel the pre-period is the whole period 1972–1979; in the lower panel it is the last two years 1977–1979. We also calculate the same ratio for each city in the donor pool and construct a distribution of the 32 ratio statistics. Along the way we implement the correcting technique of Ferman and Pinto (2015), who derive conditions under which inference in synthetic control corrects for heteroskedasticity. Miami is excluded from constructing the synthetic controls. The "rank" entry shows we Miami ranks in the distribution of 44 values (bottom to top) the $p$-value is a test of the probability that a random draw from the donor pool takes a value higher than Miami. A low value of the rank and a value of the $p$-statistics higher than 0.10 indicates that Miami–control differences are not unusual relative to the other cities.

**Table A2**

*Average Number of Observations for the Years 1978–1982 in Subgroups of Miami Dropouts*

| | May-ORG CPS | March CPS |
|---|---|---|
| Non-Hispanic & Men & Prime Age (Borjas 2017) | 47.4 | 19.4 |
| Non-Hispanic & Men & Marginal Age/Prime Age | 67.2 | 28.0 |
| Non-Hispanic & Men & Marginal Age | 22.4 | 10.0 |
| Non-Hispanic & Women/Men & Prime Age | 79.8 | 34.2 |
| Non-Hispanic & Women/Men & Marginal Age/Prime Age | 107.4 | 46.8 |
| Non-Hispanic & Women/Men & Marginal Age | 31.4 | 14.6 |
| Non-Hispanic & Women & Prime Age | 32.4 | 14.8 |
| Non-Hispanic & Women & Marginal Age/Prime Age | 40.2 | 18.8 |
| Non-Hispanic & Women & Marginal Age | 9.0 | 4.6 |
| Hispanic/Non-Hispanic & Men & Prime Age | 60.8 | 28.6 |
| Hispanic/Non-Hispanic & Men & Marginal Age/Prime Age | 85.0 | 39.6 |
| Hispanic/Non-Hispanic & Men & Marginal Age | 27.8 | 12.6 |
| Hispanic/Non-Hispanic & Women/Men & Prime Age | 105.8 | 51.6 |
| Hispanic/Non-Hispanic & Women/Men & Marginal Age/Prime Age (Ours) | 138.8 | 68.4 |
| Hispanic/Non-Hispanic & Women/Men & Marginal Age | 38.2 | 19.4 |
| Hispanic/Non-Hispanic & Women & Prime Age | 45.0 | 23.0 |
| Hispanic/Non-Hispanic & Women & Marginal Age/Prime Age | 53.8 | 28.8 |
| Hispanic/Non-Hispanic & Women & Marginal Age | 10.4 | 6.8 |
| Hispanic & Men & Prime Age | 13.4 | 9.2 |
| Hispanic & Men & Marginal Age/Prime Age | 17.8 | 11.6 |
| Hispanic & Men & Marginal Age | 5.4 | 2.6 |
| Hispanic & Women/Men & Prime Age | 26.0 | 17.4 |
| Hispanic & Women/Men & Marginal Age/Prime Age | 31.4 | 21.6 |
| Hispanic & Women/Men & Marginal Age | 6.8 | 4.8 |
| Hispanic & Women & Prime Age | 12.6 | 8.2 |
| Hispanic & Women & Marginal Age/Prime Age | 13.6 | 10.0 |
| Hispanic & Women & Marginal Age | 1.4 | 2.2 |

Notes: We present the average number of observations for Miami for the period 1978–1982 for various subsamples. "Prime Age" refers to workers age 25–59 and "Marginal Age" to ages 19–24 and 60–65.

000872

## References

Abadie, Alberto, Alexis Diamond, and Jens Hainmueller. 2010. "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program." *Journal of the American Statistical Association* 105:493–505.

———. 2015. "Comparative Politics and the Synthetic Control Method." *American Journal of Political Science* 59(2):495– 510.

Abadie, Alberto, and Javier Gardeazabal. 2003. "The Economic Costs of Conflict: A Case Study of the Basque Country." *American Economic Review* 93(1):113–32.

Angrist, Joshua, and Alan Krueger. 1999. "Empirical Strategies in Labor Economics." In *Handbook of Labor Economics*, Volume 3, ed. O. Ashenfelter and D. Card, 1277–366. New York: Elsevier.

Angrist, Joshua, and Jorn-Steffen Pischke. 2010. "The Credibility Revolution in Empirical Economics: How Better Research Design Is Taking the Con out of Econometrics." *Journal of Economic Perspectives* 24(2):3–30.

Bodvarsson, Orn, Hendrik Van den Berg, and Joshua Lewer. 2008. "Measuring Immigration's Effect on Labor Demand: A Reexamination of the Mariel Boatlift." *Labor Economics* 15(4):560–74.

Bollinger, Christopher. 1998. "Measurement Error in the Current Population Survey: A Nonparametric Look." *Journal of Labor Economics* 16(3):576–94.

Borjas, George. 2012. *Labor Economics*. 6th edition. New York: McGraw-Hill.

———. 2017. "The Wage Impact of the Marielitos: A Reappraisal." *Industrial Relation and Labor Review* 70(5):1077–110.

Borjas, George, and Joan Monras. 2016. "The Labor Market Consequences of Refugee Supply Shocks." NBER w22656. Cambridge, MA: NBER.

Cahuc, Pierre, Stephan Carcillo, and Andre Zylberberg. 2014. *Labor Economics*. 2nd edition. Cambridge, MA: MIT Press.

Cameron, A. Colin, and Douglas L. Miller. 2015. "A Practitioner's Guide to Cluster-Robust Inference." *Journal of Human Resources* 50(2):317–72.

Card, David. 1990. "The Impact of the Mariel Boatlift on the Miami Labor Market." *Industrial and Labor Relations Review* 43(2):245–57.

Card, David. 2001. "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration." *Journal of Labor Economics* 19(1):22–64.

Card, David. 2009. "Immigration and Inequality." *American Economic Review* 99(2):1–21.

Carrington, William, and Pedro De Lima. 1996. "The Impact of 1970s Repatriates from Africa on the Portuguese Labor Market." *Industrial and Labor Relations Review* 49(2):330–47.

Clemens, Michael A., and Jennifer Hunt. 2017. "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results." NBER w23433. Cambridge, MA: NBER.

Doudchenko, Nikolay, and Guido Imbens. 2016. "Balancing, Regression, Difference-In- Differences and Synthetic Control Methods: A Synthesis." NBER w22791. Cambridge, MA: NBER.

Ferman, Bruno, and Christine Pinto. 2015. "Inference in Differences-In-Differences with Few Treated Groups and Heteroskedasticity." Unpublished.

Friedberg, Rachel M. 2001. "The Impact of Mass Migration on the Israeli Labor Market." *Quarterly Journal of Economics* 116(4):1373–408.

Hunt, Jennifer. 1992. "The Impact of the 1962 Repatriates from Algeria on the French Labor Market." *Industrial and Labor Relations Review* 45(3):556–72.

Laing, Derek. 2011. *Labor Economics*. New York: W.W. Norton.

Lemieux, Thomas. 2006. "Increasing Residual Wage Inequality: Composition Effects, Noisy Data, or Rising Demand for Skill?" *The American Economic Review* (96)3:461–98.

Lewis, Ethan. 2004. "How Did the Miami Labor Market Absorb the Mariel Immigrants?" Working Paper 04-3. Federal Reserve Bank of Philadelphia.

Monras, Joan. 2015. "Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisis." No. 2015-04. Paris: Science Po.

Ottaviano, Gianmarco I., and Giovanni Peri. 2012. "Rethinking the Effect of Immigration on Wages." *Journal of the European Economic Association* 10(1):152–97.

Peri, Giovanni. 2016. "Immigrants, Productivity, and Labor Markets." *Journal of Economic Perspectives* 30(4):3–29.

Polivka, Anne E., and Stephen M. Miller. 1995. "The CPS after the Redesign: Refocusing the Economic Lens." Washington, DC: United States Bureau of Census. Available at http://www .bls.gov/ore/abstract/ec/ec950090.htm (accessed November 20, 2015).

Roodman, David. 2015. "Why a New Study of the Mariel Boatlift Has Not Changed Our Views on the Benefits of Immigration." Available at http://blog.givewell.org/2015/10/21/why-a-new -study-of-the-mariel-Boatlift-has-not-changed-our-views-on-the-benefits-of-immigration/ (accessed November 20, 2015).

Copyright of Journal of Human Resources is the property of University of Wisconsin Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

NBER WORKING PAPER SERIES

THE ECONOMIC IMPACT OF MIGRANTS FROM HURRICANE MARIA

Giovanni Peri
Derek Rury
Justin C. Wiltshire

Working Paper 27718
http://www.nber.org/papers/w27718

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
August 2020

Derek Rury and Justin Wiltshire gratefully acknowledge financial support for this project from the Center for Growth and Opportunity. We thank seminar participants at UC Davis and the 2019 EEA Annual Conference for useful comments on early versions of this paper, and particularly thank Marianne Bitler, Brendan Price, and Geoffrey Schnorr for helpful comments. Any errors or omissions are the sole responsibility of the authors. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2020 by Giovanni Peri, Derek Rury, and Justin C. Wiltshire. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

The Economic Impact of Migrants from Hurricane Maria
Giovanni Peri, Derek Rury, and Justin C. Wiltshire
NBER Working Paper No. 27718
August 2020
JEL No. F22,J15,J21,J61

## ABSTRACT

We examine the economic impact of the large migration of Puerto Ricans to Orlando after Hurricane Maria. Using a synthetic control approach, we find that employment in Orlando increased, especially in construction and retail, and find positive aggregate labor market effects for non-Hispanic and less-educated workers. While we find that earnings for these workers decreased slightly in construction, this was balanced by earnings growth in retail and hospitality. These results are consistent with small negative impacts on earnings in sectors exposed to a labor supply shock, offset by positive effects in sectors impacted by an associated positive consumer demand shock.

Giovanni Peri
Department of Economics
University of California, Davis
One Shields Avenue
Davis, CA 95616
and NBER
gperi@ucdavis.edu

Derek Rury
University of California, Davis
derekrury@gmail.com

Justin C. Wiltshire
University of California, Davis
justinwiltshire@gmail.com

A data appendix is available at http://www.nber.org/data-appendix/w27718
An online appendix available at: is available at https://justinwiltshire.com/research-1

# I.   Introduction

In September 2017 Hurricanes Irma and Maria struck Puerto Rico in rapid succession, bringing catastrophic loss in property and lives to hundreds of thousands of families. In the months following the hurricane, over 120,000 individuals and families rapidly fled Puerto Rico for the U.S. mainland. This paper examines the short-run economic impact of this sudden migration event on Orlando, the city which received a plurality of these refugees. Along with studying the impact of this event on the broader labor market, we examine whether there is evidence of effects on employment and earnings for incumbent workers, as well as which sectors were affected and whether there was a firm-creation response. To do so, we employ a synthetic control approach using a data source that provides virtually-complete coverage of county-level employment outcomes at a high frequency throughout our study period. Our results are consistent with a story in which migrants place modest downward pressure on earnings for natives in sectors most exposed to the new migrant labor, while having positive effects on employment and earnings for workers in sectors which meet the consumer demand of migrants.

Measuring the impact of immigrants on local economies has been a focus of economists for decades. Several papers have analyzed the local labor market effects of sudden waves of immigration. Examples include the analysis of the inflow of Soviet Jews to Israel during the 1990s (Cohen-Goldner and Paserman, 2011); the inflow of Syrians to Turkey in 2013-15 (Ceritoglu et al., 2017); and the inflow of Algerians to France in the 1950's (Hunt, 1992)). The only case studied in the U.S.—potentially *over*-studied, given the limited amount of data available and the fact that the event now happened forty years ago—is the Mariel Boatlift.[1] This was an episode in which approximately 100,000 people fled from Cuba, mainly relocating to Miami. While early studies established that this large inflow had no impact on local wages even in the short run Card (1990), recent re-analyses of the event have generated some disagreement on the effects, especially with respect to the impact on the small subgroup of male, less-educated, native workers (Borjas, 2017; Peri and Yasenov, 2019; Clemens and Hunt, 2019). The details of the controversy are centered on measurement, sample choice, and methods used.

For several reasons, the event we study here is much more relevant than the Mariel Boatlift for informing our current understanding of the local labor market impact of im-migration in the U.S. First, the episode we study is much more recent, and the economy

---

[1]Another weather event similar to Maria, Hurricane Katrina, has also been studied quite substantially, although most of the papers focus on the impact on the *out*-migrants who fled New Orleans and the surrounding area (rather than on people in the receiving communities). De Silva et al. (2010) look at the impact on wages of a large relocation of evacuees on Houston, and find that there was an aggregate, small wage depression of 0.7 percent in low-skill industries. Compared to De Silva et al. (2010), our paper uses a more recently developed and, we argue, more appropriate estimation strategy to test a similar set of outcomes.

of Orlando in 2018 is more comparable to current U.S. metropolitan areas than was the economy of Miami in 1980. Second, the impact of this episode is a consequence of migration in response to an extreme weather event—an occurrence likely to become more frequent in the future. Third, the case of immigration from Puerto Rico involves people who have similar levels of education to native mainland U.S. workers, while the Cubans in the Mariel Boatlift (Marielitos) had much lower levels of education. This means that the Hurricane Maria migration closely resembled the sort of immigration the U.S. has received in the last 20 years (i.e. 2000-2018)—which included a large share of college-educated immigrants—while the low-skilled immigration of Marielitos was more similar to the immigration of the 1990s. We also note that, similarly to the Cuban Marielitos, immigrants from Puerto Rico had immediate access to the U.S. labor market and other benefits available to U.S. citizens. This implies that their potential crowding-out impact on native workers would be at a maximum. Hence our findings of no crowding-out and of small overall wage effects, positive in certain sectors and negative in others, are particularly compelling.

Fourth, we employ the more current 'synthetic control' estimating strategy (similarly to Peri and Yasenov (2019)) first proposed by Abadie and Gardeazabal (2003) and further developed in Abadie et al. (2010, 2015), and subject to recent important improvements.[2] A fifth advantage of our study, relative to the Mariel Boatlift literature—which relies on small, weighted samples of survey data from the Current Population Survey (CPS)—is that we use data from the Quarterly Census of Employment and Wages (QCEW) and the Quarterly Workforce Indicators (QWI). These are county-by-industry-level administrative data covering 95+% of all workers, observed on a quarterly basis.[3] The detail and precision of our analysis is therefore significantly greater than in those studies. Sixth, we also analyze the impact on number of firms—an important and under-researched margin of adjustment to immigration (recently, Beerli et al. (2018) show the importance of firms' response to increased availability of immigrants for understanding labor market impacts). Seventh, and finally, we analyze a potential positive labor demand effect generated by local consumption of the immigrants, analyzed through different impacts across sectors (the previous standard for this type of analysis was Bodvarsson et al. (2008)).

Using data from FEMA applications for assistance related to the hurricanes, and with reference to other analyses examining social media usage and air travel of Puerto Ricans in the months after Hurricane Maria hit Puerto Rico, we establish that the Orlando Metropolitan Area almost certainly received people from the Island than any other city.[4]

---

[2]Readers are pointed to Abadie (Forthcoming) for an excellent current review of the synthetic control literature, which is continually expanding.

[3]Employment is observed on a monthly basis in the QCEW. The other variables are observed quarterly.

[4]We take Orlando to be the five counties which comprise the Orlando Commuting Zone: Lake, Orange,

Over 120,000 people left Puerto Rico for the U.S. mainland in the months from September 2017 to March 2018, 24,000 of whom we estimate ended up in Orlando. This represents around 1 percent of Orlando's pre-hurricane population and around 2 percent of its pre-hurricane total employment. Both in levels and as a percentage of the population, Orlando received many more refugees than even the next most-impacted metropolitan areas (New York and Miami). We therefore consider it as the treated unit in our analysis. This sudden out-migration of Puerto Ricans from the Island and into Orlando, as a result of Hurricane Maria, constitutes a good approximation to a *natural experiment*—namely a sudden and unexpected event, uncorrelated with conditions in the Orlando local economy.

We analyze the impact of this migration event between September 2017 and September 2018 on employment and earnings in the Orlando area. We look first at *aggregate* effects, then shift our focus to specific sectors—namely the *construction*, *retail* trade, and accommodations & food services sectors (hereafter, *hospitality*). We do this first for all workers, then specifically for non-Hispanic and less-educated subgroups (those with a high-school degree or less education) as proximate measures, respectively, of the incumbent native-worker population (Orlando non-Hispanic residents are likely to be U.S.-born, i.e. natives) and of those who may be in competition with the new Puerto Rican arrivals if they took manual and less-skilled jobs.

Sector-specific analysis in the short-run helps us to identify potential effects of the shock on labor demand and labor supply. We demonstrate that the construction sector was the most likely to experience a sudden increase in labor supply in the short run. A large share of Hispanics were already employed in the construction sector before the hurricane, and most construction jobs require limited use of the English language—which less than 40% of Puerto Rican residents speak "well". Moreover, while increased demand for new buildings may eventually follow the arrival of immigrants, we see no evidence the housing market was affected in the short run. On the other hand, the retail and hospitality sectors were likely to experience positive demand shocks in the short run, as new additions to a local population require accommodations, retail goods, and food services. While some immigrants were employed in these sectors, the short-run impact of the new arrivals should mainly reflect an increase in demand for retail and hospitality workers, resulting from the increased consumer demand in those sectors. By quantifying the effect on employment and wages in each sector, we learn about the potential labor supply and labor demand shifts as a consequence of immigration.

Additionally, we consider the response of establishments in the area. The speed and magnitude of the response by firms to this expansion is important for understanding the mechanisms through which the labor supply shock was absorbed by the local economy in the short run. While our estimated effects are all positive, their pre-treatment trends are

Osceola, and Seminole—which comprise the Orlando Metropolitan Area—plus Sumter County.

noisy enough that none of them reach a conventional level of significance according to our test statistics.[5] The overall evidence is suggestive of a positive firm-creation response, but not large enough to be significant in the short-run.

Broadly, our results are consistent with a story in which Puerto Rican refugees in Orlando constituted a labor supply shock concentrated in the construction sector, as well as a local demand shock for goods and services in the retail and hospitality sectors which resulted in increased labor demand in those sectors. While we do find evidence of a negative impact on construction sector wages of natives and less-educated workers 12 months after the migration event (-2.5% and -1.5%, respectively), we also find evidence that retail earnings increased for natives and less-educated workers (+2.1% and +1.2%, respectively) over that same period.[6] Looking across all sectors and all workers, despite the large and sudden influx of thousands of new workers into the region, we find no evidence of any negative impact on wages (the point estimates are, in fact, positive yet not robustly significant), suggesting that the sector-specific positive wage effects at least offset the negative ones in the aggregate. This aggregate balancing effect holds for native and less-educated workers as well. In fact, we also estimate a 0.8% increase in aggregate employment for each of those groups 12 months after the hurricane. These results are broadly robust to several controls and specifications, and suggest that this large inflow of workers was quickly absorbed into and grew the local economy.

The rest of this paper proceeds as follows: Section II. describes the demographic and employment trends of immigrants from Puerto Rico in the mainland United States, and justifies focusing on Orlando as (most intensely) treated unit. Section III. describes our data and empirical methodology. Section IV. describes the results from our analyses, and presents a series of robustness checks—including a test for whether our results were impacted by Hurricane Irma's effects on Orlando, and an analysis of housing market conditions before the migrants' arrival. Section V. concludes.

## II.   Characteristics and Trends of Puerto-Rican Immigration

### A.   Historical Migration and Characteristics of Migrants

During the first half of the 20th century and for several decades thereafter, rates of migration from Puerto Rico to the mainland remained low. The Puerto Rican population on the mainland was an estimated 1,513 in 1910 and 226,110 in 1950, respectively constituting 0.002 percent and 0.15 percent of the total population in those years. During the

---

[5]Our 12-month estimate of the impact on construction establishments is significant according to our moving block $p$-value, but not according to our more conservative test statistics.

[6]The construction sector employed between 5 and 6.5% of Orlando workers over the period, while the retail sector typically employed between 12 and 13%.

later half of the 20th century and continuing into the 21st, however, Puerto Rican migration to the mainland United States increased significantly. As of 2015 an estimated 5.4 million Puerto Ricans resided in the mainland U.S. (constituting 1.6 percent of the U.S population). This number is particularly striking when compared to the total population of 3.5 million people residing in Puerto Rico as of 2018 (Whalen and Vazquez-Hernandez, 2005). During these years, large Puerto Rican communities formed in New York City and the surrounding areas, in Philadelphia and Chicago, and in parts of Florida. Migration followed the usual pattern, with new immigrants settling in areas with relatively large Puerto Rican communities.

In recent decades, the most significant concentrations of Puerto Ricans developed in the New York area and in the Orlando area (see online Appendix Figure A1[7]) with Orlando becoming a particularly popular destination in the years leading up to 2017. Puerto Ricans' full access to labor opportunities in the mainland United States suggests that the availability of jobs in the U.S. may have been the largest driver of mobility from the island to the mainland.

Table 1 shows differences in average characteristics of Puerto Rican migrants who arrived in the year preceding Hurricane Maria, compared to reference groups.[8] The first column shows the difference with US natives, the second with residents of Puerto Rico, the third with US natives in Florida.[9] The largest difference between recent Puerto Rican immigrants and US natives is in their average age, as Puerto Rico immigrants are significantly younger and less likely to be married than natives. They are also more likely to be male. On the other hand, education levels are similar. While the difference in average years of schooling compared to U.S. natives is statistically significant, compared to the average Florida native it is *not* significant and it is small—equal to 0.38 and 0.13 years of schooling, respectively. There is no significant difference in the share of college-educated immigrants from Puerto Rico and natives in the U.S. or in Florida. The inflow can therefore be characterized as mostly young, with an education composition similar to that of natives.

---

[7]The figures are constructed using American Community Survey from 2005 to 2017

[7]Migrants coming to the United States are often positively "selected" from their country in terms of education, mainly because of the large skill premium paid in the U.S. relative to countries of origin (Grogger and Hanson, 2011). Borjas (2008), however, documented negative selection of pre-2000 Puerto-rican immigrants, in terms of education.

[8]Individuals are restricted to those who are in the labor force.

[9]A negative value implies that the Puerto Rico migrants have a smaller value for that variable relative to the comparison group.

## B.   Migration After Hurricane Maria

Early estimates put the number of Puerto Ricans who fled to Florida alone in the early months after September 2017 at over 200,000 people. Later estimates, based on Facebook data, substantially revised this number down, to 44,000 people who moved from Puerto Rico to Florida *and stayed* there until at least March 2018 (Alexander et al., 2019). Estimates based on flight passenger lists confirm between 30,000 and 50,000 people moved out of Puerto Rico to Florida in the months after the hurricane (Rayer, 2018). Meanwhile, an analysis of ACS/PRCS data from the U.S. Census Bureau puts the number of net out-migrants from Puerto Rico between July 2017 and July 2018 at 123,399 (U.S. Census Bureau, 2018), and the Center for Puerto Rican Studies estimates this number to be more than 135,000 (Centro, 2018). We complement these estimates with additional evidence to get an idea of the distribution of those evacuees across the US. Data from applications for disaster relief from the Federal Emergency Management Agency (FEMA) are useful to gather a geographic distribution of evacuees. These application data, obtained through a Freedom of Information Act (FOIA) request, represent claims made to FEMA to obtain disaster relief funds, filed by people who had a home in Puerto Rico which was damaged by Hurricanes Irma and/or Maria. By looking at the ZIP code of residence before the hurricane and the ZIP code at the time of filing (after Hurricane Maria occurred), we can identify the likely residence of these Puerto Ricans on the mainland in the months after the hurricane. The distribution of these applications (aggregated to commuting zones and shown in Figure A2 in the online Appendix, in both level and per capita terms) reveals that these FEMA applications were heavily concentrated in relatively few areas. Especially in per capita terms, the Orlando area exhibits by far the largest concentrations: with nearly 4,000 applications, Orlando had more than two-and-a-half times as many applications as the next most heavily affected commuting zones (Fort Lauderdale-Miami and New York-Nassau-Suffolk). These FEMA applications in the Orlando area represent 20 percent of the total received.

Combining the U.S. Census Bureau estimate of 123,399 net out-migrants from Puerto Rico between July 2017 and July 2018 with the FEMA application data as an approximate estimate of the geographic relocation of these migrants, we conservatively estimate that around 24,000 Puerto Ricans relocated to the Orlando area in the months following the hurricanes. This represents over 1 percent of Orlando's population, 1.5 percent of its working-age population (aged 16-64), and around 2 percent of its pre-hurricane total employment. We conservatively estimate that at least half of these migrations are directly attributable to the hurricanes (based on out-migration trends from Puerto Rico in the years prior). This inflow was smaller than that of Cubans arriving in Miami after the Boatlift (which equaled 5-6% of the Miami labor force). Nevertheless, the post-Maria Puerto Ri-

8

can refugee flows provided a significant shock to Orlando's population and labor force, especially as the large majority of this inflow took place within a relatively short period of 1-3 months. To put this in context, an inflow of immigrants equal to one percent of the labor force is larger than the annual inflow of Mexicans during the 1990s, when Mexican immigration into the US was highest. This inflow as a percent of Orlando's labor force is thus comparable to or higher than immigration inflows in the peak years for the US as a whole, and it was concentrated in the months between September 2017 and March 2018. To compare this inflow to another well-known international event, the inflow of Syrian refugees in Turkey was comparable to our setting, at 2.5 percent of the local population over the course of a couple of years (see Tumen (2015)).

### C.   Sector Distribution of Puerto Rican Migrants

Before the hurricanes the distribution of Puerto Rican migrants across sectors of employment in Orlando was not very different from that of natives (online Appendix Table A1). As of 2016, Puerto Rican natives were slightly more concentrated in local services such as *transportation* and retail, and slightly less concentrated in *education* and *management*.[10] However, when we consider the sector distribution of all Hispanics and of Hispanics born abroad, (columns 3 and 4 of online Appendix Table A1) we see a significant over-representation in the construction sector. Because of language and cultural commonalities, this extended group (and not just Puerto Ricans) can be a very important network to find jobs. Moreover the construction sector may have been a particularly industry for those workers in the short run, as a larger share of construction workers in Orlando who do not speak English well than is the case in any other sector (11.8% do not speak English or do not speak it well). The majority of Puerto Rican residents are not fluent in English (only about a third speak English "well" according to the Puerto Rico ACS), hence a job in construction would have been more attainable in the short run. We also note the Bureau of Labor Statistics (2015) also shows that in 2014 Hispanic workers in the U.S. were more likely to work in the construction sector than any other sector in the economy. Finally, we use the QWI to look at employment in Orlando and demonstrate that construction saw substantially larger growth in the Hispanic share of employment between Q2 2017 (before the hurricane hit), and Q2 2018 compared to other industries (online Appendix Figure A3).[11]

---

[10]It is difficult to use the 2017 or 2018 ACS to calculate the sector composition of Puerto Rican migrants in Orlando after Maria, as this group is very small in the ACS and as sampling variation can be quite large. Additionally, because the month of interview is uncertain, it is hard to tell who, among those who arrived in a given year, is an evacuee in the 2017 or the 2018 ACS samples. In our analysis we use the QWI data to identify non-Hispanics, allowing us to study the native response to immigrants

[11]There was growth in the Hispanic employment share in all sectors, as Orlando has in general been experiencing higher growth in its Hispanic population than in its population as a whole

Combining these pieces of information, it is reasonable to think that the evacuees from Maria found in Orlando's construction sector a quickly accessible and attractive source of jobs, at least in the short run, relative to other sectors.

## III.  Data and Methodology

### A.   Overview

The migration push out of Puerto Rico was very sudden and, as triggered by the hurricanes, fully uncorrelated with economic fundamentals in Orlando.  It was the presence of a large community and network of Puerto Ricans already in Orlando that attracted the migrants there much more than to other cities.  Taken together, these features constitute a natural experiment and make this event a good candidate to estimate the causal effects on Orlando's economic outcomes, by comparing them to those of similar and unaffected cities. We focus on the Orlando-area labor market captured by its commuting zone (CZ)— an aggregation of counties constituting the Orlando labor market—to internalize most of the effects.[12]

We call the Orlando CZ our "treated unit" and we adopt a synthetic control approach to estimate the effects on local (log) employment, compensation per worker, and establishment counts.  We analyze the local economy in aggregate, and also focus on three sectors: the construction sector (NAICS 23) which, as argued in the previous section, received potentially the largest labor supply increase from the migrants' arrival; the retail trade sector (NAICS 44-45) and the accommodation & food services, or hospitality, sector (NAICS 72). Retail and hospitality are non-tradable sectors most likely to have experienced a labor demand shock associated with the increased demand for local accommodations, hospitality services and goods for purchase which the migrants would have wanted.  While some immigrants may have worked in these sectors, Puerto Rican employment does not appear to have disproportionately concentrated here. Therefore, while any effects on construction employment and wages are primarily the result of a labor supply shock in that sector, the effects on retail and hospitality should primarily be the result of a labor demand shock (with a possible small labor supply increase).  The aggregate effects, then, are a combination of both the supply of new workers and the expenditures of new consumers in the Orlando economy.

After analyzing overall employment and average wage effects, we turn our attention to a second group of outcomes which approximate the effects on native workers (as done

---

[12]These have become the standard units of analysis when considering labor market impacts (see, for instance, Autor et al. (2013); Autor and Dorn (2013)).  On a county basis (i.e. prior to cross-walking our QCEW and QWI data into 1990 CZs), we combine the five boroughs of New York City, and individually combine Virginia's independent cities with their surrounding counties.

in in Card (1990); Borjas (2017); Peri and Yasenov (2019)). To do this we analyze the employment and wages of non-Hispanic workers, who are very likely to be U.S. born, both in the overall economy and in the specific sectors where separate labor demand and supply effects should be more visible.

We also try to identify effects on the group of workers that is more vulnerable and in the short-run may be more affected by labor market competition from immigrants—who may take jobs that do not require sophisticated language skills and are disproportionately concentrated in the construction sector. These are typically workers with low levels of education (high school or less) and who often receive relatively low pay (on average). While immigrants from Puerto Rico did not have levels of schooling significantly lower than natives, in the short run they may have been willing to "downgrade" their job expectations in order to find work (e.g. if their English language skills were not particularly strong). In such a case, even with a similar education distribution among immigrants and natives, there may still have been stronger competition for less-skilled jobs in the short run.

Finally, we look at changes in the number of local establishments as a proxy of the response of local investment, at least in the short-term. Firm-creation is an important mechanism of adjustment to immigration in the long run, but there has been very little work done studying the rapidity of its response in a local economy.

## B.    Data

Our primary analysis is conducted using data from the Quarterly Census of Employment and Wages (QCEW), published by the U.S. Census Bureau. The QCEW is derived from the Unemployment Insurance (UI) accounting system in each state, and effectively covers 95%+ of all employed individuals from UI-reporting establishments. The data are available at the industry-by-county level down to the 6-digit NAICS level definition, and are observed monthly for employment and quarterly for earnings and establishments. For cells that are particularly small there may be "suppression" of data due to privacy reasons, but there are almost no suppressions at the 2-digit NAICS level. This provides complete coverage of employment and earnings, and the availability of these data each month or quarter (depending on the variable) allow us to conduct a reliable short-run analysis along several dimensions. The complete coverage and high reliability are also substantial advantages relative to studies of the Mariel Boatlift, which are all based on small, weighted samples from the Current Population Survey. Of our variables of interest, employment is observed monthly while compensation, establishments, and the derived compensation-per-worker variables are observed on a quarterly basis. We focus on the period 2014 Q1 - 2018 Q3 for the quarterly-observed variables, and January 2014 - August 2018 for employment. This allows us to include three and a half year of pre-Hurricane data and one year of post-Hurricane data.

Additional analysis is conducted using data from the Quarterly Workforce Indicators (QWI). A product of the U.S. Census Bureau, the QWI data are the result of the Longitudinal Employer-Household Dynamics (LEHD) program, which (as with the QCEW) uses data from state UI accounting systems, as well as other sources. The QWI data report employment and earnings of employees at the industry-by-county level, and they also break the data down by education level and by ethnicity. This, as mentioned above, allows us to measure labor market outcomes for a subset of workers who are likely to be natives in the Orlando labor market (non-Hispanic workers), as well as for workers with a high school degree or less education, who could face more precarious employment. There are some issues with the QWI data relative to the QCEW: all variables including employment are only observed on a quarterly basis; for less-educated workers, only non-youth individuals (aged 25+) are observed; a few states are missing observations for some quarters of interest; and the available data series do not cover all counties in all states for a full year after Hurricane Maria.[13] This final issue somewhat restricts the number of commuting zones that can be used as control in the post-Hurricane Maria period.

### C.   Empirical Approach

### C.1.   Synthetic Control Estimator

Our main econometric analysis follows the synthetic control estimator approach introduced by Abadie and Gardeazabal (2003) and further refined by Abadie et al. (2010, 2015). This method is most often utilized with a single observed unit which experienced a treatment beginning at a single point in time, while a 'donor pool' of potential 'control' units did *not* receive such a treatment.[14] In our case, treatment is the inflow of Puerto Ricans to the city of Orlando, which began immediately after the sudden and unanticipated Hurricanes Irma and Maria devastated Puerto Rico. The innovation of this estimating strategy is that it identifies an appropriate control unit—the *synthetic control*—as a weighted average of a subset of units in the "donor pool" (an appropriate set of untreated units) that best match the pre-treatment values of a set of predictors of the outcome, including linear combinations of the period-specific pre-treatment outcomes. The path of synthetic control outcomes after treatment represents the path of counterfactual outcomes for the Orlando commuting zone, had it not been treated. The difference between the observed value in Orlando and the value for the corresponding synthetic control is the causal estimate of the treatment effect on the outcome of interest .

[13]States missing observations for some or all counties include Arkansas, Maine, Minnesota, Mississippi, Missouri, New Jersey, Pennsylvania, South Dakota, Virginia, and Washington.

[14]Recently the method has been extended to deal with multiple treated units e.g. Cavallo et al. (2013); Abadie and L'Hour (2019); Ben-Michael et al. (2019).

Formally, we observe $N = J + 1$ units (commuting zones), indexed by $j$, where $j = 1$ is the single treated unit (Orlando, in our case) and the remaining $J$ units are the untreated units in the donor pool. Each unit is observed $T$ total periods, indexed by $t$, with $T_0$ total pre-treatment periods and $T - T_0 > 0$ treated periods. $Y_{j,t}^N$ is the potential outcome observed in $\{j, t\}$ if $j$ is *not* treated at $t$, and $Y_{j,t}^I$ is the potential outcome observed in $\{j, t\}$ if $j$ *is* treated at $t$. The treatment effect (also often referred to as the "gap") can be defined as:

$$\alpha_{j,t} = Y_{j,t}^I - Y_{j,t}^N \tag{1}$$

The observed outcome in $j, t$ is: $Y_{j,t} = Y_{j,t}^N + \alpha_{j,t} D_{j,t}$. As only $j = 1$ is treated, we have:

$$D_{jt} = \begin{cases} 1 & \text{if } j = 1 \text{ and } t > T_0 \\ 0 & \text{otherwise} \end{cases}$$

The goal is to estimate the dynamic path of treatment effects, $\alpha_1 = (\alpha_{1,T_0+1}, ..., \alpha_{1,T})$. As $Y_{1,t}^I$ is observable $\forall\, t > T_0$, we need only estimate $Y_{1,t}^N$. The synthetic control estimator for $Y_{1,t}^N$ is a weighted sum of the same outcomes for the non-treated units:

$$\hat{Y}_{1,t}^N = \sum_{j=2}^{J+1} \hat{w}_j Y_{j,t} \quad \forall\ t \tag{2}$$

The weights are obtained by minimizing the distance, between the treated unit and the $J$ non treated ones in the donor pool, of a set of $k$ predictor variables plus $M$ linear combinations of the outcomes before the treatment year. Specifically the synthetic control method selects the vector of weights $\hat{W} = (\hat{w}_2 ... \hat{w}_{J+1})' = \hat{W}(\hat{V})$ on the $J$ units in the donor pool, given the matrix $\hat{V}$ of weights on the $K$ predictor variables[15] that solve the following problem:

$$\hat{W} = \arg\min_{W}\ \sqrt{(X_1 - X_0 W)' V (X_1 - X_0 W)} \quad \text{s.t.} \quad \sum_{j=2}^{J+1} w_j = 1,\ w_j \geq 0\ \forall\ j \in \{2, ..., J+1\} \tag{3}$$

where $X_1$ of dimension $K \times 1$ includes the values of the $r$ selected covariates in the pre-treatment period plus the $M$ linear combinations of the pre-treatment period observations of the outcome variable, while matrix $X_0$ includes in each row $k$ the vector of values for

---

[15]Given the relatively small number of pre-treatment periods, we follow the advice of Abadie et al. (2015) and estimate $V$ using the regression-based method adopted as the default in the `synth` command for Stata Abadie et al. (2011) described in detail in Kaul et al. (2015)

the same variables and time periods as in $X_1$ but for untreated units $j \in \{2, ..., J+1\}$ in the donor pool.[16]

These estimated weights are used to calculate $\hat{Y}_{1,t}^N$, and finally our estimated elements of $\alpha_1$:

$$\hat{\alpha}_{1,t} = Y_{1,t} - \hat{Y}_{1,t}^N \ \ \forall \ t \in \{T_0+1, ..., T\}$$

As it is important that units in the donor pool are not affected by the treatment (see e.g. Cao and Dowd (2019)) we restrict the donor pool by excluding any CZs that received any significant number of Puerto Rican evacuees (10 or more Puerto Rican Irma- or Maria-associated FEMA applications per 100,000 population). When analyzing sector-specific outcomes, to reduce the possibility of interpolation bias (i.e. including in the synthetic control some units which may match well on certain important variables but poorly on others), we further restrict the donor pool to include only those CZs at or above the 75th percentile of sector-specific employment levels. This ensures we are only allowing the synthetic Orlando (for each sector of focus) be comprised of other CZs with large pools of workers in the same sector.[17] For each outcome variable we also drop any commuting zone for which the outcome is not observed in every period.

This yields the group of 148-170 commuting zones[18] (depending on the sector of focus, and including Orlando) in the United States for which data is consistently available at monthly or quarterly frequency for the time period before and after Hurricane Maria (September 2017) and which meets our qualification thresholds for inclusion (see Figure 4). These criteria exclude every commuting zone which borders Orlando, and nearly every CZ in Florida, which also minimizes the risk of any treatment spillover on the control group. Finally in order to increase homogeneity and comparability across commuting zones, for each outcome we cleaned each series of seasonal variation.[19]

---

[16]Our estimator imposes the No-intercept, Adding-up, Non-negativity and Exact-balance constraints considered by Doudchenko and Imbens (2016). These constraints are commonly imposed on synthetic control estimators. Abadie et al. (2015) emphasize the value of the non-negativity condition, in particular, as it ensures estimates are not subject to potential extrapolation bias and helps preserve interpretability (see, also, Abadie and L'Hour (2019)).

[17]As Abadie (forthcoming) notes, "Including in the donor pool units that are regarded by the analyst to be unsuitable controls because of large discrepancies in the values of their observed attributes... or because of suspected large differences in the values of the unobserved attributes... relative to the treated unit is a recipe for bias."

[18]128-137 CZs for the 12-month QWI estimates

[19]For each observed outcome of interest, $\tilde{Y}_{j,t}^{(s)}$, $s \in \{1, ..., S\}$, in each CZ $j$ and each period $t$, our LHS values are the residualized outcomes $Y_{j,t}^{(s)} = \tilde{Y}_{j,t}^{(s)} - \hat{Y}_{j,t}^{(s)}$. This is obtained from $J$ individual OLS regressions of a model $\tilde{Y}_{j,t}^{(s)} = \beta_j^{(s)} + \pi_{j,p}^{(s)} + \varepsilon_{j,t}^{(s)}$, estimated separately for each $j$ and each $s$, where $p$ is the quarter (or month) associated with each $t$, as appropriate for each $\tilde{Y}_{j,t}^{(s)}$ given the data source. $\beta_j^{(s)}$ is the local intercept

September 2017 is the first *treated* period, $T_0 + 1$, for employment (observed monthly); quarter Q3 in 2017 is the first *treated* period for variables observed on a quarterly basis. The pre-treatment period starts at the beginning of 2014, when the recovery from the Great Recession had firmly taken root. This avoids heterogeneous, short-run local labor market dynamics that occurred after the Great Recession.[20] In the analysis using the QCEW data, we have $T_0 = 44$ pre-treatment periods (months) and consider $T - T_0 \in \{6, 12\}$ treated periods corresponding to half a year and one year after the hurricanes hit Puerto Rico, for our outcomes observed on a monthly basis (namely employment). For the quarterly-observed outcomes (earnings and establishments), and when using the QWI data, we have $T_0 = 14$ pre-treatment periods and consider $T - T_0 \in \{2, 4\}$ treated periods.

The predictor variables included in matrix $X_0$ are: average quarterly local construction and hospitality employment, each as proportions of aggregate local employment;[21] and the pre-treatment values of the outcomes at 6-month intervals from 2014 to 2015, and at quarterly intervals from 2016 through Q2 2017.[22] In total we have $K = 11$ predictor variables in our primary specifications.[23]). Figure 4 shows the commuting zones included in the donor pool when analyzing employment in aggregate and in the construction, retail and hospitality sectors. Figure 5 shows those CZs that receive positive weight in the synthetic control for the employment and earnings outcomes, in aggregate and in the construction sector. Note that the Las Vegas, NV commuting zone, the Reno, NV commuting zone, and some commuting zones in the Los Angeles area often receive large positive weights. This is reasonable as their economies, which strongly rely on tourism and construction, and have large numbers of Hispanic workers, each resemble the economy of Orlando.[24]

for each $\bar{Y}_{j,t}^{(s)}$ in commuting zone $j$, and $\pi_{j,p}^{(s)}$ is the seasonal element of $\bar{Y}_{j,t}^{(s)}$ in $j$ associated with $t$. That is, $\pi_{j,p}^{(s)}$ is the quarterly (or monthly) fixed effect associated with $t$ in $j$, for each $\bar{Y}_{j,t}^{(s)}$. Then $\hat{Y}_{j,t}^{(s)} = \hat{\beta}_j^{(s)} + \hat{\pi}_{j,p}^{(s)}$ is the sum of the values of the associated coefficient estimates.

[20]One of our robustness checks extends the pre-treatment period back to the beginning of 2013.

[21]To match the economy of the synthetic Orlando with that of the actual Orlando

[22]Kaul et al. (2015) argue that including the full set of pre-treatment outcomes as predictors will result in certain zero $\hat{v}_k$ weights for some covariates which may actually be important for predicting future values of the outcome variables. This can bias estimated treatment effects; thus we ensure a number are excluded.

[23]For each specification of interest and given $\hat{V}$, the existence of sparse solutions to (3) with no more than $K + 1$ strictly positive weights $\hat{w}_j$ follows from Carathéodory's theorem, while uniqueness obtains with a maximum of $K$ strictly positive weights provided Orlando does not fall within the convex hull of the donor pool units, and provided the columns of the predictor matrix $X_0$ are in general position (see Abadie and L'Hour (2019)

[24]The list of those positively-weighted CZs is also reported for these outcome in online Appendix Table A2.

## C.2.   Inference

Once we have estimated the treatment effects $Y_{1,t} - \hat{Y}_{1,t}^N \ \forall \ t \in \{1,...T\}$ a key question is whether they are significantly different from 0. Hypothesis testing using a synthetic control approach comes with challenges, as this method does not produce standard errors, and large-sample inferential approaches are not appropriate. Most of the proposed approaches involve the construction of a test statistic based on some form of falsification test.[25] The one proposed in Abadie et al. (2015) and endorsed in Firpo and Possebom (2018) as the uniformly most powerful is the ratio of the treated-period mean squared prediction error (MSPE) to the pre-treatment-period MSPE, referred to as the RMSPE. A substantial benefit of a test statistic based on the RMSPE is that, by construction, post-treatment deviations from the null are normalized by the pre-treatment fit, such that large post-treatment deviations are not attributed undue significance if the pre-treatment fit is poor.

Alternatives to the RMPSE are proposed by Hahn and Shi (2017), who argue that permutation tests of this sort may suffer from incorrect statistical size and suggest the Andrews (2003) end-of-sample instability test, and by Chernozhukov et al. (2017), who propose an alternative *moving block* permutation test which may be ideal but is not the current standard. We thus apply all three tests to our estimates and present the corresponding *p*-values in Table 2. We also present the Andrews and moving block *p*-values for our secondary estimates in Table A3 in the online Appendix.[26] As the RMPSE test is the most conservative of these three (as can generally be seen in Table 2) and is the current standard for synthetic control inference, we generally base our claims of statistically significant treatment effects on RMSPE tests and report the results of that test for our secondary estimates in Table 3 and for our robustness checks in online Appendix Tables A4-A6.

The RMSPE *p*-value is constructed by repeating the synthetic control estimation procedure for each commuting zone in our donor pool, effectively conducting falsification or 'placebo' tests by reassigning treatment to each of the $j \in \{2,...,J+1\}$ *untreated* CZs in our donor pool to estimate $\hat{Y}_{j,t}^N \ \forall \ t$. For each $j \in \{1,...,J+1\}$ we then calculate the summary statistic:

$$RMSPE_j = \frac{\sum_{t=T_0+1}^{T}(Y_{j,t} - \hat{Y}_{j,t}^N)^2/(T-T_0)}{\sum_{t=1}^{T_0}(Y_{j,t} - \hat{Y}_{j,t}^N)^2/T_0} \tag{4}$$

Our test statistic is then constructed as a *p*-value based on the empirical distribution of

[25]The literature on conducting inference with synthetic control estimators is relatively young and rapidly evolving. See for instance Abadie et al. (2015); Doudchenko and Imbens (2016); Hahn and Shi (2017); Ferman and Pinto (2017); Chernozhukov et al. (2017); Firpo and Possebom (2018); Abadie and L'Hour (2019)

[26]Andrews *p*-values and moving block *p*-values for our other estimates are available upon request.

these $RMSPE_j$:

$$p = \frac{\sum_{j=1}^{J+1} \mathbb{1}[RMSPE_j \geq RMSPE_1]}{N} \tag{5}$$

$N = J + 1$ is the total number of units and our actual treated unit (Orlando) is $j = 1$. Thus if the deviations between observed post-treatment outcomes and the synthetic control relative to the pre-treatment fit are large enough in Orlando relative to the distribution of differences from our placebo tests, our $p$-values will be small and we will reject our null hypothesis of no effect.

## IV.   Results

### A.   Effects on All Workers

Our primary synthetic control estimates are for all workers. Results for employment are illustrated in the four panels of Figure 1. Each panel of the figure plots the observed (deseasonalized, logarithm of) employment in Orlando against that of its synthetic control, first in aggregate (Panel A) then for the construction (Panel B), retail (Panel C), and hospitality (Panel D) sectors. We set the value to zero at the beginning of our pre-treatment period, which is January 2014. The month in which the hurricane hit (the initial period of treatment), September 2017, is the shaded area. The six months following the shaded area are those in which Orlando experienced the largest inflow of people from Puerto Rico fleeing Hurricane Maria. If they caused any significant effect on Orlando's labor market relative to the synthetic control, it should be visible in the portion to the right of the shaded area. The distance—or "gap"—between the line representing Orlando and that of its synthetic control, after September 2017 represents our estimates of the causal effect of the inflow of Puerto Ricans as a result of the Hurricane. These gaps are shown as percentages in Figure 3, as the solid black line in each panel.

Three facts emerge from inspection of Figure 1. First, for each of our outcomes, the pre-Hurricane match between Orlando and its synthetic control is remarkably good. This implies that the commuting zones constituting our synthetic controls mimic quite well the short run fluctuations and long run trends in Orlando employment before September 2017. Figure 5 shows the commuting zones included in each particular donor pool. In particular, nine donor pool CZs were assigned positive weights for Orlando's aggregate deseasonalized log employment synthetic control. These donor CZs are, in ascending order of weights: Fort Walton Beach-Pensacola, FL (2.7%); Fresno-Visalia-Tulare-Parterville, CA (5.3%); Las Vegas, NV-AZ (6.5%); Boise City, ID (6.7%); El Paso, TX-Las Cruces, NM (7%); Nashville, TN (11%); Provo-Orem, UT (15.3%); Fayetteville-Springdale-Rogers,

AR (18.6%); and Gainesville, GA (26.9%)[27] Second, Figure 1 shows that, for aggregate as well as sector-specific employment, Orlando realized positive employment effects as a result of the migration event.[28] Third, this positive employment effect is largest and most clearly seen in the construction sector. One year after the hurricane hit Puerto Rico, Orlando's construction employment was about four log points (4 percent) larger than its synthetic control.

Treatment effects (the post-treatment gaps) from Figure 1 are quantified in the first two columns of Table 2. The entries are the treatment effects 6 months (column 1) and 12 months (column 2) after September 2017. The table also shows the RMSPE statistics and their *p*-values, as well as the Andrews and the moving block *p*-values described in Section C.2.. These statistics indicate the significance of the treatment effect in Orlando by conducting numerous "placebo" tests in which each CZ in our donor pool is assigned treatment status (none of which were exposed to the inflow of Puerto-Ricans). High positive estimated treatment effects and low *p*-values imply that the treatment effect is positive and significant relative to the placebos.

The treatment effect on aggregate employment 12 months after the hurricane is positive and significant at the 5% level using any of our three *p*-value calculation procedures. Despite the seemingly small effect size, this result is consistent with most evacuees finding jobs in Orlando, and corroborates estimates of the number of evacuees that, at least in the year after the hurricane, remained on the mainland. Specifically, this effect is about 0.4 percent of aggregate employment in Orlando. Approximately 24,000 Puerto Ricans arrived in Orlando over the 6 months following the hurricanes, at least 11,000 of whom can be attributed to the hurricanes, constituting 0.65 percent of the pre-treatment working-age population. In the years preceding the hurricanes, around 75 percent of Puerto Ricans in Orlando (and more widely) were aged 16 and over, around 60 percent of whom were employed (U.S. Census Bureau, 2017). If these patterns held among the 11,000 refugees, this would amount to about a 0.3 percent increase in the local labor force. That is, three-fourths of Orlando's post-treatment growth in aggregate employment (relative to the synthetic control) was due to the new arrivals, with no evidence that local workers were displaced.

The construction sector experienced the largest and most significant increase in employment, perfectly in line with the idea that this sector received a supply "shock" from the inflow. We estimate a 1.5 percent increase in construction employment 6 months into the treated period, although this estimate is not quite significant at the 10 percent level using our most conservative *p*-value calculation. Our estimated treatment effect 12 months

---

[27]online Appendix Table A2 provides these lists for a broader set of synthetic controls. Comparing this map with Figure A2 in the online Appendix, we can see that none of the donor CZs received any meaningful number of evacuees

[28]This is more obviously shown by the black lines in Figure 3.

into the treated period, however, corresponds to 4 percent increase in construction employment and is highly significant (RMSPE *p*-value of 0.01). This growth in construction employment would account for a full 80 percent of the employed refugees if their age and employment patterns were similar to those of the Puerto Ricans who preceded them. retail and hospitality employment show a more modest treatment effect equal to about one percent of their employment. We have argued above that the construction sector was most likely to absorb the immigrants, many of whom were unlikely to be fluent in English.

The retail and hospitality sectors, on the other hand, were much more likely to be affected by this migration event through increased demand for consumer goods and services, which could translate through to increased labor demand. Looking at the retail sector, employment did significantly increase—slowly at first, with a 0.3 percent increase seen after 6 months (RMSPE *p*-value of 0.04) and then a 0.9 percent increase seen after 12 months (RMSPE *p*-value of 0.06). We also estimate a 1.2 percent increase in hospitality sector employment 12 months after treatment, though here significance is only seen using the Andrews and moving block *p*-values (0.02 and 0.05, respectively).

To visualize the significance of the treatment effects on aggregate employment in Orlando and on each sector—especially construction—Figure 3 shows the estimated (treatment-synthetic control) gap for Orlando together with the same gap calculated for all of the other (non-treated) commuting zones in the donor pool. As in Figure 1, Panel A is relative to (residualized logarithm of) aggregate employment, Panel B represents employment in the construction Sector, Panel C employment in retail, and Panel D employment in hospitality. The gaps for the other commuting zones are shown as light grey lines. Additionally, the dark dashed line shows the gap for Los Angeles—a tourism-based, Latino-dense large metropolitan area that provides a useful reference.[29] Note that for aggregate and retail employment and, much more clearly, for construction employment, the Orlando-synthetic control gap in the post-Hurricane period is in the top part of the grey trajectories, while it is not far from the average in the pre-Hurricane period. This means that Orlando had an unusual increase in aggregate and especially construction employment in the post-Hurricane period. We also observe a one-month dip in employment in every sector, but especially construction, exactly in September 2017, before the increases occurred. We will show that this was likely the impact of Hurricane Irma, causing a temporary slow-down in economic activity when it hit Orlando. In section D., below, we consider the possible confounding effects of this event and show that our estimates are likely free of associated bias.

Focusing on earnings, the panels of Figure2 show the plots relative to (de-seasonalized, natural logarithm of) earnings per worker for Orlando relative to synthetic control, and follows a similar structure to Figure 1. The impact on earnings per worker was a combination

---

[29]L.A. and some surrounding CZs, along with Reno, NV and Las Vegas, NV typically receive substantial weighting in the synthetic controls. See Figure 5 as well as Table A2 in the online Appendix.

of the increased labor supply and increased local demand produced by the new arrivals. Our estimates of treatment effects on earnings are reported, 6 and 12 months after the hurricane, in columns 3 and 4 of Table 2. The table also shows the significance of the estimates from each of our three *p*-values.

Interestingly, in spite of the significant increase in aggregate employment driven by the evacuees inflow, earnings per worker was stable in aggregate over the first 6 and 12 months of treatment. Provided labor demand is not perfectly elastic, this implies that labor demand grew along with labor supply. When looking at the sector-level, we do not find any negative treatment effect on earnings per worker in the sectors considered above. In the construction sector, compensation per worker actually grew by 3.3 percent (RMSPE *p*-value of 0.05). Thus the large increase in the construction-sector workforce did not have a negative effect *overall* on construction sector earnings per worker. This may have been a mixture of composition effects, as more people became employed with different effects on incumbent workers of different skills, depending on their complementarity and substitutability with evacuees. We investigate this further in the next section.

The hospitality sector, on the other hand, experienced the most significant effect on earnings per worker (according to the RMPSE *p*-value, and due especially to the particularly good fit in the pre-treatment period). Wages were a significant 1.4 percent higher 12 months after the migration event (RMSPE *p*-value of 0.03).[30] The retail sector estimated effects on earnings per worker are positive but small and not significant. Together with the employment effects on these sectors, these patterns may have emerged because the arrival of the refugees constituted a shock to local demand for consumer goods and services. Employers in the hospitality sector would then have had to raise wages to compete with other sectors to maintain staffing levels as demand increased. While this story is plausible and consistent with the patterns of our estimated treatment effects, our data do not allow us to test it directly. Overall, however, the results suggest a significant labor demand increase, particularly in hospitality and retail, and a labor supply increase in construction that was matched by increased aggregate demand such that aggregate earnings per worker did not decline.

Finally, columns 5 and 6 of Table 2 show the estimated treatment effects on numbers of establishments. In aggregate, the treatment effect on the number of establishments amounted to a positive, though not statistically significant, increase of 0.5 to 0.6 percent. Similarly, for each of our sectors of interest we have positive effects around 1 percent, but no statistical significance. This is suggestive (but not conclusive) evidence that even as quickly as a few months after the arrival of the evacuees, firms may have started to open new local establishments to take advantage of higher labor supply and consumer demand.

---

[30]We estimate earnings per worker grew by a statistically significant 0.1 percent 6 months after treatment began, but view this estimate as too small to be considered economically significant.

The noise in the data—there is a notable dip in Orlando establishments in mid-2015 (see, for example, the Orlando trend in Panels B and D of Figure 6 which eliminates our RMPSE *p*-value significance. If we instead consider the moving block *p*-value for construction, the treatment effect of around 1% is significant (*p*-value of 0.06)—and the short period of time, however, do not allow us to produce robust and conservative statistically significant results on this outcome.

Overall, Table 2 paints a picture of a significant wave of Puerto Rican evacuees being absorbed into the Orlando labor market, with positive effects on employment and per-worker earnings. The estimates suggests significant positive effects even on employment and earnings per worker in sectors which likely did not absorb these new arrivals as workers, but may have been affected by their demand for goods and services. The employment effects of the labor supply shock were particularly large in the construction sector which, as argued earlier, was the most likely place for the refugees to find work. The effects of the consumer demand shock were clear increases in retail employment and in hospitality earnings per worker, and possibly in hospitality employment as well. We find no conclusive evidence of significant changes in the numbers of local establishments—though the point estimates are all positive—and thus cannot draw any conclusions about the impact of this migration event on local investment. We find no evidence of displacement or decline in aggregate wages or in sector wages overall.

### B.    Effects on Non-Hispanic and Less-Educated Workers

One common question addressed in the economics of immigration literature is how migrants impact the wages of natives and of other groups against whom immigrants are thought to compete in the labor market. In order to study this set of questions in our setting, we require data not found in the QCEW, which measure employment and wages of sub-groups of workers in the local economy. We thus turn to the Quarterly Workforce Indicators (QWI), which allow us to view the same labor market outcomes as the QCEW but for various subgroups of workers stratified by ethnicity and educational attainment. Similar to the QCEW data used in our previous analyses, the QWI collects information on employment and wages for each industry and county and offers the same geographical coverage as the QCEW, although all variables are observed at quarterly frequencies. One cost of using the QWI for these analyses is that we lose about 20 percent of our sample when looking one full year after the hurricane, primarily due to issues around data-reporting from particular states.

While we are not able to observe nativity of workers directly, we can approximate the group of native workers quite well by focusing on ethnicity. Using ACS data we calculate that, five years prior to the hurricane, 88 percent of "non-Hispanic" workers were "native", meaning they were born in one of the 50 states in the U.S. We also observe

that the overwhelming majority of people from Puerto Rico (99%) identify as Hispanic. Hence the subgroup of non-Hispanic workers serves as a good proxy for natives, and we can be certain that group will not include the evacuees when observed in the period after the Hurricane.

We thus repeat the analysis performed in the previous section, but using the QWI data and focusing on non-Hispanic workers. The estimates of the treatment effects on log employment (columns 1 and 2) and on log compensation per worker (columns 3 and 4), 6 and 12 months after the Hurricane, are presented in Table 3. We do not find any evidence of a negative effect on non-Hispanic employment either in the aggregate nor in any of the sectors we consider. Rather, the point estimates of the employment effects on non-Hispanic workers are positive and, though not statistically significant in our sectoral analyses, they are significant for the aggregate analysis (the construction employment effect of +0.7 percent is significant according to the moving block $p$-value only). We estimate an increase of 0.8 percent in non-Hispanic employment 12 months after the Hurricane. This may represent some "crowding in" driven by complementarities between immigrants and natives (as in Ottaviano and Peri (2012)). However, given how large this effect is relative to the overall employment increase estimated in the previous section, we should remain cautious when interpreting this result. We also fail to find an effect, either positive or negative, on employment of non-Hispanic workers in the construction, retail, or hospitality sectors. Small positive and non-significant point estimates suggest, again, no crowding out of non-Hispanic workers.

Focusing on earnings per worker of non-Hispanics, we estimate a very small and non-significant increase in the aggregate, both six and 12 months after the hurricane. This null aggregate effect seems to average a significant negative 2.5 percent impact on construction and a positive 2 percent impact on retail sector earnings. The retail sector result is not significant according to the RMSPE $p$-value, but *is* significant according to the Andrews and moving block $p$-values (0.07 and 0.00, respectively, identical to those for the construction estimate) reported in Table A3 in the online Appendix. While a short-run decrease in non-Hispanic construction wages of 2.5 percent in response to a 4 percent increase in construction employment is not impossible, and would imply an elasticity of -0.6, which is certainly plausible, the fact that we do not find any effect on aggregate wages for all workers in Table 2 (which include Hispanics, who should experience the strongest competition effect) casts some doubt on this estimate. It seems unlikely that non-Hispanic wages are more responsive than Hispanic wages to competition from Puerto-Ricans. In general, however, for non-Hispanics there may have been small negative effects on construction wages and small positive effects on retail wages which balanced out in the non-Hispanic aggregate, and the retail effect would be consistent with a positive labor demand shock.

A second group that is often the focus within the immigration-labor literature are

those individuals with a high school degree or less, as their wages have declined in recent decades (Autor et al., 2008) and as competition with immigrants in relatively low skilled jobs may hurt their opportunities Borjas (2003). This group of workers constituted about 40 percent of the US labor force in 2016. In the retail and hospitality sectors in Orlando, 49 percent of workers had a high school degree or less as of 2016 (the year before Hurricane Maria hit Puerto Rico). In the construction sector this share was 60 percent. We repeat our primary analysis using the QWI data, limited to workers with high school degree or less. As noted earlier, the education levels of workers under age 25 are not observed, meaning this part of our analysis is limited to non-youth workers. Columns 5-8 in Table 3 present our results. We find no evidence of a significant impact on overall employment or compensation per worker in this group 6 months after the hurricane. However, 12 months after the Hurricane we see a significant 0.8 percent increase in aggregate employment for this subgroup (*p*-value of 0.04) and a 1.9 percent, significant decrease in their per-worker earnings. We view this latter result with some skepticism, however, as there is nothing to suggest that aggregate per-worker earnings decreased either for all workers or for non-Hispanic workers, and also because that estimate is not particularly precise. The +1.7 percent effect on construction employment is only significant according to the Andrews and moving block *p*-values. Interestingly, the wage effects for less-educated workers in specific sectors range from a positive 1.2 percent effect for retail workers (*p*-value of 0.02. Positive and significant effects in this sector are already evident 6 months after the Hurricane hit) to a 1.5 percent decline in the construction sector (*p*-value of 0.06). The estimate on hospitality earnings is positive 1.3 percent after 12 months, but this is not even close to significant according to the RMSPE or the Andrews *p*-values. These results are again consistent with the idea that retail and hospitality received a positive labor demand shock that put upward pressure on their workers' employment and compensation, while the construction sector received a supply shock which increased employment but possibly reduced wages for incumbent workers.

Putting together the results for all workers (Table 2), and for non-Hispanics and less-educated workers (Table 3), as well as the sector-specific analyses we perform, we are left with three significant findings. First, during the post-Hurricane period the large inflow of evacuees from Puerto Rico led to an increase in total employment and also employment of both non-Hispanic and less-educated workers in Orlando. Second, the retail and hospitality sectors experienced not only employment growth, but also positive growth of compensation per worker, both overall and within the non-Hispanic and less educated subgroups (although this last effect was not significant). We see this as clear evidence of a labor demand increase in those sectors, likely as a consequence of new demand for local goods and services from the evacuees. Finally, the construction sector saw the most significant increase in employment due to the evacuees and potentially also due to increases

in non-Hispanic and less-educated employment. While this increase in labor supply did not seem to produce a depressive wage effect on the average worker in that sector, it may have hurt the earnings of non-Hispanic and less educated construction workers. We interpret these results as evidence that, even in the very short run, this large inflow of migrants likely had an overall positive impact on native and less-educated workers' employment and wages, though native and less-educated workers in the sector most heavily exposed to the labor supply shock did face some downward pressure on earnings.

## C.   Regression-based Estimates

An alternative method to conduct inference, adopted in Peri and Yasenov (2019), is to use the synthetic control method to identify the control units (i.e. those getting positive weight in the distance-minimization problem) and then perform difference-in-differences regression-based estimates considering Orlando as the only treated unit and the other units as control(s). Abadie et al. (2015) note how regression-based estimates implicitly weight the control units in a way similar to how a synthetic control estimator does.[31] While this method allows a very simple and straightforward check of our estimates and is intuitive, the standard errors may not be quite correct, especially when we consider the "synthetic Orlando" as the only control unit in the regression. Moreover, any simple regression model with a single post-treatment period fails to capture any trend-changes post-treatment. For these reasons, we view our regression-based DD estimates with a deal of caution and only as additional evidence on the qualitative findings of our synthetic control approach.

For each regression-based DD model we consider two ways of constructing the control groups. In Table 4, columns (1) and (2), we include in the control group all commuting zones that are positively weighted in the synthetic control unit. In column (3), we instead only include the constructed synthetic control (the weighted composite) as the 'control group'.[32] To implement the difference-in-differences estimate, we regress the outcome variable (alternatively [deseasonalized] log employment, log compensation per worker and log establishments) on a treatment dummy which equals to one for Orlando after September 2017 and zero otherwise, and on time fixed effects (column (1) of Table 4) or on time and unit fixed effects (column (2)). For column (3), where we have only a single treatment and a single control unit, we can include only include time effects. In Table 5, instead

---

[31]The regression approach, however, does not constrain the weights to be non-negative; thus a regression-based approach allows extrapolation outside the support of the data. Additionally, failing to restrict the sample of donor pool units to match the pre-treatment characteristics of the treated unit (conditional on included covariates) increases the probability that the "parallel trends" condition will be violated.

[32]Thus the estimates in columns (1) and (2) of Table 4 more likely suffer from bias realized through interpolation and extrapolation, while those in column (3) are free from extrapolation bias and less-likely to suffer from interpolation bias.

of one single 'post-Hurricane' Orlando treatment dummy, we include an Orlando dummy interacted with each half-year period, both before and after the hurricanes, and estimate against the composite synthetic control (showing results for employment and earnings). This serves to test whether there are deviations from zero in the pre-hurricane period, which would imply non-similar trends between Orlando and the control group. The latter half of 2017 is the period of the "treatment" (when the hurricanes hit Puerto Rico and the migration occurred) and is therefore treated as the reference period in the analysis.

The estimates in Table 4 mostly confirm the synthetic control results. Because the estimates in column (3) are most likely to be free of extrapolation and interpolation bias (see above), we focus primarily on these. First, aggregate employment exhibits a positive and significant treatment effect of 0.3 percent, and the construction sector shows the largest positive employment effect, although now it is only 1.5 percent rather than 4 percent (as this is an average over the entire post-hurricane period). Second, log earnings per worker show extremely small effects, usually non-significant, that vary between positive and negative depending on which control group (column) one chooses. Third, these estimates show significantly positive effects on establishments, especially in aggregate and in the construction sector. In Tables 5 and **??** we show the estimates of the Orlando dummy interacted with each half-year period, showing employment (columns 1-4) and compensation per worker (columns 5-8). The four columns for each outcome variable correspond, left to right, to the aggregate economy, and to the construction, retail, and hospitality sectors. In general, the deviations of Orlando from control, both in employment and per-worker earnings, are small in the pre-Hurricane period. However, there are small but significant deviations which may suggest modest *negative* pre-trends for construction and hospitality employment and for aggregate and hospitality earnings per worker, and possibly a modest positive pre-trend for retail employment. It is also clear that the post-Hurricane employment and earnings effects are positive and significant, especially by Q3 of 2018 (one year after the hurricanes). In general the regression results confirm the findings of the synthetic control method and, while they reveal a certain variability of the pre-Hurricane differences between Orlando and its control, they do not show systematic and significant departures.

D.   Robustness Checks

In addition to our difference-in-differences estimates, we conduct several robustness checks to address three concerns. First, we both use an alternative inference procedure as well as extend the pre-period in our analysis to test the stability of our results. Second, we check whether the impact of Hurricane Irma (which hit Orlando a few weeks before Maria) might have biased our estimates. Finally, we look at housing prices in Orlando to test whether there was a booming real estate market before the migrants arrived which may have driven labor demand in the construction sector. As we show below, our results are robust to each

of these tests.

Our alternative hypothesis testing procedure implies that in our RSMPE and relative *p*-value calculations we correct for possible deviations between treatment and synthetic control at the time of the treatment. Specifically, we define our treatment effects as the difference between observed outcomes and synthetic control outcomes *minus* that difference in the period immediately prior to treatment. This has essentially the flavor of a difference-in-differences estimator on the treated and synthetic control units. That is, we define $f_0 = Y_{j,T_0} - \hat{Y}_{j,T_0}^N \ \forall \ j$ and our alternative estimated treatment effects are then $\hat{\alpha}'_{1,t} = Y_{1,t} - \hat{Y}_{1,t}^N - f_0 \ \forall \ t$. This subtracts from any estimated treatment the gap in $T_0$, defining the relevant statistic as the change in the gap between $T_0$ and $T$. Using this statistic and evaluating the corresponding *p*-value (Table A4 in the online Appendix) shows very similar significance levels as with the usual method. This indicates that there was no significant deviation between Orlando and control at the time of the shock.

Our second robustness check extends the length of the pre-treatment period. In our primary specification, the pre-treatment period begins in the first period of 2014 (quarter or month, as appropriate) and continues through to the period immediately prior to the hurricane. The reason we begin in 2014 involved concerns that the impact and duration of the recovery from the Great Recession was heterogeneous across commuting zones and could pollute pre-2014 data. Still, extending the pre-treatment period to the beginning of 2013 helps test the stability of our results. We conduct this robustness check by extending the pre-treatment period to the beginning of 2013, de-seasonalizing the raw data over this period, and then implementing our estimating strategy as before. The results are presented in online Appendix Table A5 and confirm our primary findings from Table 2, showing very similar treatment effects for all variables considered.

We then consider the role of Hurricane Irma, which hit Florida in September 2017, downing trees and power lines and causing other damage (although the damage was much less severe than either Irma or Maria did in Puerto Rico). The immediate local economic impact was almost certainly negative as a result of Irma and is likely captured in the significant dip in Orlando's employment in September 2017, evident in Figures 1, 2, and 3. It is theoretically possible that the aftermath would yield movement in economic activity in either direction (e.g. Groen et al. (2020)). Damage to infrastructure, for example, could hamper economic activity for months, or there could be a boost to the economy as the result of rebuilding efforts. This motivates our attempt to isolate potential consequences of exposure to Irma. To do this, we consider a large commuting zone which received very few Puerto Rican refugees but which lay approximately the same distance from the path taken by Irma's eye as did Orlando: Jacksonville, FL.

Compared to the 3,972 relevant FEMA applications filed in Orlando, Jacksonville saw fewer than one-seventeenth (221) relevant FEMA applications. On a per-capita basis

(around 17 applications per 100,000 population), Jacksonville saw less than a tenth of those seen in Orlando, which saw 178 applications per 100,000 population.[33] Any robust estimated labor market treatment effect in Jacksonville—particularly in the construction sector, which we view as the most likely to demonstrate any positive post-hurricane impact as a result of reconstruction efforts—is thus much more likely to measure the lingering impact of exposure to Irma rather than the impact of an inflow of Puerto Rican evacuees.

The gap for aggregate employment and for construction employment between treatment and synthetic control for Orlando and Jacksonville, respectively, is shown in Figure 6, Panels A and C (the results are quantified in Table A6 in the online Appendix). The panels also include also the other placebo gaps for all the donor units. Two things clearly emerge from this figures. First, the gaps (vs synthetic control) in Jacksonville experienced very similar dips to those seen in Orlando in September 2017, when both labor markets were directly exposed to Hurricane Irma, both in aggregate employment and in construction sector employment. This confirms the similarity of potential effects of Irma. Second, the employment gaps—both in aggregate and in the construction sector—6 and 12 months after the Hurricane hit are significantly larger for Orlando than for Jacksonville. While we observe some ups and down in the gap for construction employment in Jacksonville before and after Irma, we do not see anything comparable to the significant increase in Orlando (which also has more stable paths of gaps in the pre-Hurricane period). In Jacksonville the estimated treatment effect on construction employment 12 months after Irma is 2.5 percent, but the RMSPE is quite small (1.01), reflecting the substantial amount of noise in the period before the Hurricane relative to the period afterward. The associated RMSPE $p$-value, at 0.81, makes clear this point estimate is not in any way significant when compared to the associated placebo tests (nearly 81 percent of the placebo runs yielded a larger RMSPE).

Overall, Jacksonville seems a valid counterfactual observation of the impact of Irma on Orlando in the absence of the Puerto Rican migrant inflow. These results show that the one-month dip in employment can be attributed to that event, while the one-year surge in employment in Orlando, especially in construction, should be attributed to the impact of the migrants [34] We also plot the results for establishments in Orlando and Jacksonville in Panels B and D. While none of our synthetic control estimates on Orlando establish-

[33]We note this number of applications still disqualified Jacksonville from inclusion in our donor pools for the analyses above.

[34]We note that Jacksonville may be less of a good counterfactual for the retail or hospitality sectors because several large retailers started operations here in the treatment period. Amazon opened a distribution center in September 2017 and another in October 2017, both of which were around 1,000,000 square feet, and opened a sorting center in September 2018; Ikea opened a store in November 2017; and Walmart opened a new Supercenter in June 2018 and began hiring in August 2018 for another new store which opened in November 2018.

ment numbers were significant, they were all positive (around 1 percent) and these Panels demonstrate how the DD estimates (averaged over the whole post-treatment period) were significant. They also show that Jacksonville did not have any apparent establishment response post-Irma, further supporting our claim of no positive bias from Irma in our Orlando estimates.

Finally, to address the possibility that Orlando experienced a housing boom before September 2017, continuing into the treatment period, and whether such a boom might be driving our construction employment results, we conduct two checks. First, in Figure 7 we plot the (log) Zillow Home Value Index of all homes in Orlando and any of the MSAs approximately corresponding to commuting zones which receive positive weights in our construction employment synthetic control unit. We normalize this value to be equal to one in September 2017 for all units and plot the values through May 2020. We see that during the pre- and post- Hurricane periods, Orlando's trend appears to be rather average and is in no way indicative of a housing price boom relative to the control units. We also estimate a difference-in-difference model similar to those mentioned in Section C., using as the outcome the same (log) Zillow Home Value Index but restricting the treatment period through September 2018 for consistency with our 12-month estimates. The regression results confirm the visual inspection and do not show any evidence that Orlando experienced a housing price boom in the periods before or after September 2017. These results give us confidence that there were no secular trends or trend breaks in housing prices in the Orlando area, relative to cities in the construction employment synthetic control, before or around the period of Hurricane Maria. More broadly, the combined results of our robustness checks give us confidence that our estimates reflect the un-confounded causal impacts of the inflow of Puerto Rican migrants.

## V.  Conclusions

We use various sources, including data from FEMA disaster relief applications, to show that a sudden wave of evacuees from Puerto Rico relocated to Orlando after Hurricane Maria struck in September 2017. This provides a unique opportunity to measure with some precision the short-run impact of a sudden, sizeable increase in predominantly Spanish-speaking labor supply on the local labor market outcomes of Orlando—specifically on aggregate and sector-specific employment and wages for all workers, and also for natives and less-educated workers.

We use the QCEW data aggregated by commuting zone, and implement a synthetic control estimation strategy to measure the impact of these migrant inflows on outcomes in Orlando relative to a synthetic control. We find that overall employment in Orlando

[34]Results can be found in Table A7 of the online Appendix.

increased by 0.4 percent one year after the inflow began, and increased by 4 percent in the construction sector. The quantitative increase in employment compared to the estimated arrival of evacuees is consistent with absorption of this wave with no crowding out effects, and with a large share finding employment in the construction sector. We also find that, one year after the inflow began, retail-sector employment rose by nearly 1 percent and earnings per worker in the hospitality sector grew by 1.4 percent. We view these as the results of employers responding to growth in local demand for consumer goods and services which itself resulted from the consumer demand of these new arrivals. These results are broadly robust to a series of checks. We perform additional analysis with the QWI data and find that, when focusing on subgroups like non-Hispanic or less-educated workers, the migration event increased their employment by 0.8 percent with little effect on aggregate earnings per worker for those groups, and with increased earnings for them in the retail sector. We also see a decrease in earnings for likely-native and less-educated workers in the construction sector, which absorbed the majority of the labor supply shock.

Our results support a story in which immigration brought both a positive shock in labor supply and consumer demand shock which spurred greater labor demand in the local economy. Orlando's construction sector, in particular, was exposed to the labor supply shock, while the retail and hospitality portions of the Orlando economy were primarily exposed to the consumer demand shock. The new workers were fully absorbed by the local economy without displacing native workers and without any significant overall negative effect on earnings, though there was some downward pressure on construction earnings for natives and less-educated workers, specifically. However, retail employment and hospitality earnings were both positively impacted, such that the overall effect on natives was to increase their employment without any clear impact on their earnings.

# References

Abadie, A. and J. L'Hour. 2019. A Penalized Synthetic Control Estimator for Disaggregated Data. Working Paper.

Abadie, Alberto. Forthcoming. Using Synthetic Controls: Feasibility, Data Requirements, and Methodological Aspects. *Journal of Economic Literature* .

Abadie, Alberto, Alexis Diamond, and Jens Hainmueller. 2010. Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program. *Journal of the American Statistical Association* 105 (490):493–505.

———. 2011. SYNTH: Stata module to implement Synthetic Control Methods for Comparative Case Studies. *Statistical Software Components S457334* .

———. 2015. Comparative Politics and the Synthetic Control Method. *American Journal of Political Science* 59 (2):495–510.

Abadie, Alberto and Javier Gardeazabal. 2003. The Economic Costs of Conflict: A Case Study of the Basque Country. *American Economic Review* 93 (1):113–132.

Alexander, Monica, Emilio Zagheni, and Kivan Polimis. 2019. The impact of Hurricane Maria on out-migration from Puerto Rico: Evidence from Facebook data. Working Paper, arXiv.

Andrews, Donald W.K. 2003. End-of-Sample Instability Tests. *Econometrica* 71 (6):1661–1694.

Autor, David H. and David Dorn. 2013. The Growth of Low-skill Service Jobs and the Polarization of the US Labor Market. *American Economic Review* 103 (5):1553–97.

Autor, David H., David Dorn, and Gordon H. Hanson. 2013. The China Syndrome: Local Labor Market Effects of Import Competition in the United States. *American Economic Review* 103 (6):2121–2168.

Autor, David H., Lawrence F. Katz, and Melissa S. Kearney. 2008. Trends in US Wage Inequality: Revising the Revisionists. *The Review of Economics and Statistics* 90 (2):300–323.

Beerli, Andreas, Jan Ruffner, Michael Siegenthaler, and Giovanni Peri. 2018. The Abolition of Immigration Restrictions and the Performance of Firms and Workers: Evidence from Switzerland. Working Paper, National Bureau of Economic Research.

Ben-Michael, Eli, Avi Feller, and Jesse Rothstein. 2019. Synthetic Controls and Weighted Event Studies with Staggered Adoption. Working Paper, arXiv:1912.03290.

Bodvarsson, Örn B., Hendrik F. Van den Berg, and Joshua J Lewer. 2008. Measuring Immigration's Effects on Labor Demand: A Reexamination of the Mariel Boatlift. *Labour Economics* 15 (4):560–574.

Borjas, George J. 2003. The Labor Demand Curve is Downward Sloping: Reexamining the Impact of Immigration on the Labor Market. *The Quarterly Journal of Economics* 118 (4):1335–1374.

———. 2008. Labor Outflows and Labor Inflows in Puerto Rico. *Journal of Human Capital* 2 (1):32–68.

———. 2017. The Wage Impact of the Marielitos: A Reappraisal. *ILR Review* 70 (5):1077–1110.

Bureau of Labor Statistics. 2015. Hispanics and Latinos in industries and occupations. `https://www.bls.gov/opub/ted/2015/hispanics-and-latinos-in-industries-and-occupations.htm`.

Cao, Jianfei and Connor Dowd. 2019. Estimation and Inference for Synthetic Control Methods with Spillover Effects. Working Paper, arXiv:1902.07343.

Card, David. 1990. The Impact of the Mariel Boatlift on the Miami Labor Market. *ILR Review* 43 (2):245–257.

Cavallo, Eduardo, Sebastian Galiani, Ilan Noy, and Juan Pantano. 2013. Catastrophic Natural Disasters and Economic Growth. *Review of Economics and Statistics* 95 (5):1549–1561.

Centro. 2018. New Estimates: 135,000+ Post-Maria Puerto Ricans Relocated to Stateside. Tech. rep.

Ceritoglu, Evren, H. Burcu Gurcihan Yunculer, Huzeyfe Torun, and Semih Tumen. 2017. The Impact of Syrian Refugees on Natives' Labor Market Outcomes in Turkey: Evidence from a Quasi-Experimental Design. *IZA Journal of Labor Policy* 6 (1):5.

Chernozhukov, Victor, Kaspar Wuthrich, and Yinchu Zhu. 2017. An Exact and Robust Conformal Inference Method for Counterfactual and Synthetic Controls. Working Paper, arXiv:1712.09089.

Clemens, Michael A. and Jennifer Hunt. 2019. The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results. *ILR Review* 72 (4):818–857.

Cohen-Goldner, Sarit and M. Daniele Paserman. 2011. The Dynamic Impact of Immigration on Natives' Labor Market Outcomes: Evidence from Israel. *European Economic Review* 55 (8):1027–1045.

De Silva, Dakshina G., Robert P. McComb, Young-Kyu Moh, Anita R. Schiller, and Andres J. Vargas. 2010. The Effect of Migration on Wages: Evidence from a Natural Experiment. *American Economic Review* 100 (2):321–26.

Doudchenko, Nikolay and Guido W. Imbens. 2016. Balancing, Regression, Difference-in-Differences and Synthetic Control Methods: A Synthesis. Working Paper, National Bureau of Economic Research.

Ferman, Bruno and Cristine Pinto. 2017. Placebo Tests for Synthetic Controls. Working Paper.

Firpo, Sergio and Vitor Possebom. 2018. Synthetic Control Method: Inference, Sensitivity Analysis and Confidence Sets. *Journal of Causal Inference* 6 (2).

Groen, Jeffrey A., Mark J. Kutzbach, and Anne E. Polivka. 2020. Storms and Jobs: The Effect of Hurricanes on Individuals Employment and Earnings over the Long Term. *Journal of Labor Economics* 38 (3):653–685.

Grogger, Jeffrey and Gordon H. Hanson. 2011. Income Maximization and the Selection and Sorting of International Migrants. *Journal of Development Economics* 95 (1):42–57.

Hahn, Jinyong and Ruoyao Shi. 2017. Synthetic Control and Inference. *Econometrics* 5 (4):52.

Hunt, Jennifer. 1992. The Impact of the 1962 Repatriates from Algeria on the French Labor Market. *ILR Review* 45 (3):556–572.

Kaul, Ashok, Stefan Klößner, Gregor Pfeifer, and Manuel Schieler. 2015. Synthetic control methods: Never Use All Pre-Intervention Outcomes Together With Covariates. Working Paper, MPRA:83790.

Ottaviano, Gianmarco I.P. and Giovanni Peri. 2012. Rethinking the Effect of Immigration on Wages. *Journal of the European Economic Association* 10 (1):152–197.

Peri, Giovanni and Vasil Yasenov. 2019. The Labor Market Effects of a Refugee Wave: Synthetic Control Method Meets the Mariel Boatlift. *Journal of Human Resources* 54 (2):267–309.

Rayer, Stefan. 2018. Estimating the Migration of Puerto Ricans to Florida Using Flight Passenger Data. Tech. rep., Bureau of Economics and Business Research.

Tumen, Semih. 2015. The Use of Natural Experiments in Migration Research. *IZA World of Labor* .

U.S. Census Bureau. 2017. EMPLOYMENT STATUS, 2017 American Community Survey 1-Year Estimates. `https://data.census.gov/cedsci/deeplinks?url=https%3A%2F%2Ffactfinder.census.gov%2Ffaces%2Ftableservices%2Fjsf%2Fpages%2Fproductview.xhtml%3Fpid%3DACS_17_1YR_S2301&prodType=table`.

———. 2018. Estimates of the Components of Resident Population Change: April 1, 2010 to July 1, 2018. `https://data.census.gov/cedsci/deeplinks?url=https%3A%2F%2Ffactfinder.census.gov%2Ffaces%2Ftableservices%2Fjsf%2Fpages%2Fproductview.xhtml%3Fpid%3DPEP_2018_PEPTCOMP&prodType=table`.

Whalen, Carmen and V. Vazquez-Hernandez. 2005. *Puerto Rican Diaspora: Historical Perspectives*. Temple University Press.

## Figures and Tables



FIG. 1.—Log Employment, Orlando vs Synthetic Orlando.  Each panel represents the residualized (after accounting for seasonal component and intercept) logarithm of employment in aggregate (Panel A), in construction (Panel B), retail (Panel C) and hospitality (Panel D) for Orlando and its synthetic control.  The data, from the QCEW, are at a monthly frequency.  The shaded period is September 2017, when Hurricane Maria hit Puerto Rico.



Fig. 2.—Log Earnings per Worker, Orlando vs Synthetic Control. Each panel represents the residualized (after accounting for seasonal component and intercept) logarithm of earnings per worker in aggregate (Panel A), in construction (Panel B), retail (Panel C) and hospitality (Panel D) for Orlando and its synthetic control. The data, from the QCEW, are at quarterly frequency. The shaded period is Q3 2017, when Hurricane Maria hit Puerto Rico.

35



FIG. 3.—Placebo Test Gaps for Employment, Orlando and Donor Pool. Each panel represents the % gap between the 'treated' unit and its control, for Orlando and for each commuting zone in the donor pool (placebo treatments), for each outcome's synthetic control. The variable plotted is $100\times$ the gap in residualized (after accounting for seasonal component and intercept) logarithm of employment in aggregate (Panel A, $N = 165$), in construction (Panel B, $N = 149$), retail (Panel C, $N = 170$) and hospitality (Panel D, $N = 148$). The data, from the QCEW, are at a monthly frequency. The shaded period is September 2017, when Hurricane Maria hit Puerto Rico. The dark line represents Orlando, the dashed dark line represents Los Angeles

000912

36



FIG. 4.—Synthetic Control Donor Pools, by Sector. Each panel represents the entire donor pool of commuting zones for the synthetic Orlando, for the indicated outcome. The donor pools are restricted to exclude *CZs* which received more than .0001 FEMA applications per capita or were below the 75th percentile of industry-specific employment levels.

37

000913



Panel A: Aggregate Employment

Panel B: Construction Employment

Panel C: Aggregate Earnings per Worker

Panel D: Construction Earnings per Worker

FIG. 5.—Synthetic Control Donor Pools, by Weight. Each panel represents the donor pool of the synthetic Orlando for the indicated outcome by its assigned weight. Shown for aggregate and construction-sector employment and earnings. The data, from the QCEW, are at a monthly frequency for employment and a quarterly frequency for earnings.



FIG. 6.—Test for Impact of Hurricane Irma on Orlando Treating Jacksonville as Counterfactual Orlando. Each panel represents the gap between treated unit and control for Jacksonville and for each commuting zone in the Jacksonville donor pool, for each outcome's synthetic Jacksonville. The gap for Orlando vs the outcome's synthetic Orlando is also plotted for comparison. The variable plotted is the gap in residualized (after accounting for seasonal component and intercept) logarithm of aggregate employment (Panel A), aggregate establishments (Panel B), construction employment (Panel C) and construction establishments (Panel D). The data, from the QCEW, are at a monthly frequency for employment and a quarterly frequency for establishments. The shaded period is September 2017 for employment and Q3 2017 for establishments, when Hurricane Maria hit Puerto Rico and Hurricane Irma hit both Orlando and Jacksonville at the same strength and approximately the same distance from its eye. The dark line represents Orlando, the dashed dark line represents Jacksonville. Because Jacksonville's exposure to Irma was comparable to Orlando's, and because Jacksonville did not receive a notable number of Puerto Rican FEMA applications related to Irma or Maria, any significant and robust post-Irma effects seen in Jacksonville may represent the impact of Irma on Orlando, which would confound our estimates of the impact of the Puerto Rican migrants.



FIG. 7.—House Prices, Orlando and Synthetic Control Donors. The lines plot (the natural logarithm of) the Zillow Home Value Index for Orlando and each of the positively weighted MSAs corresponding to the CZs for the construction sector employment synthetic control (normed to September 2017). The synthetic control weights by commuting zone for construction employment are listed in online Appendix Table A2.

**Table 1**
**Difference in Means, Recent Puerto Rican Migrants vs Comparators**

|  | Natives (all mainland) | Puerto Rican Islanders | Natives (Florida only) |
|---|---|---|---|
| Age (years) | -9.383*** | -7.445*** | -8.827*** |
|  | (-18.29) | (-15.83) | (-9.59) |
| Male | 0.0698*** | 0.0675*** | 0.0352 |
|  | (4.07) | (3.90) | (1.16) |
| Married | -0.157*** | -0.0279 | -0.117*** |
|  | (-9.17) | (-1.64) | (-3.84) |
| Yrs. education completed | -0.386*** | -0.253*** | -0.132 |
|  | (-5.27) | (-3.04) | (-1.02) |
| High school graduate | -0.0648*** | -0.0272*** | -0.0469*** |
|  | (-8.17) | (-2.68) | (-3.33) |
| 4+ years of college | -0.0154 | -0.0207 | 0.0292 |
|  | (-0.95) | (-1.27) | (1.03) |
| Comparison observations | 6,431,276 | 48,855 | 333,182 |

NOTE.—Analysis using data from the 2016 ACS five year sample. All results are for recipients that are in the labor force. *t* statistics in parentheses. * Significance at the 10% level; ** significance at the 5% level; *** significance at the 1% level.

**Table 2**
**Estimated Treatment Effects, All Workers**

| Sector | Log Employment | | Log Compensation per Worker | | Log Establishments | |
|---|---|---|---|---|---|---|
| *Aggregate* | 6 months | 12 months | 6 months | 12 months | 6 months | 12 months |
| Treatment effect | 0.0021** | 0.0038** | 0.0005 | 0.0028 | 0.0054 | 0.0062 |
| RMSPE | 9.9813 | 8.4823 | 2.5299 | 3.8088 | 1.0399 | 1.9979 |
| RMSPE *p*-value | 0.0121 | 0.0121 | 0.5273 | 0.4000 | 0.6424 | 0.6061 |
| Andrews *p*-value | 0.2222 | 0.0444 | 0.8000 | 0.2667 | 0.2667 | 0.2667 |
| Moving block *p*-value | 0.0000 | 0.0000 | 0.1875 | 0.1111 | 0.3750 | 0.2778 |
| *N* | 165 | 165 | 165 | 165 | 165 | 165 |
| *Construction* | 6 months | 12 months | 6 months | 12 months | 6 months | 12 months |
| Treatment effect | 0.0153 | 0.0402** | 0.0092 | 0.0331* | 0.0125 | 0.0095 |
| RMSPE | 5.5120 | 11.0658 | 5.2998 | 9.2167 | 3.3304 | 3.6134 |
| RMSPE *p*-value | 0.1141 | 0.0134 | 0.2617 | 0.0537 | 0.3289 | 0.4430 |
| Andrews *p*-value | 0.0889 | 0.0222 | 0.2000 | 0.0667 | 0.1333 | 0.2000 |
| Moving block *p*-value | 0.0000 | 0.0000 | 0.1250 | 0.0000 | 0.1875 | 0.0556 |
| *N* | 149 | 149 | 149 | 149 | 149 | 149 |
| *Retail* | 6 months | 12 months | 6 months | 12 months | 6 months | 12 months |
| Treatment effect | 0.0030** | 0.0090* | 0.0005 | 0.0033 | 0.0037 | 0.0159 |
| RMSPE | 4.6217 | 4.8695 | 0.3605 | 0.7814 | 0.1335 | 2.2044 |
| RMSPE *p*-value | 0.0412 | 0.0588 | 0.9000 | 0.9588 | 0.9765 | 0.6882 |
| Andrews *p*-value | 0.3111 | 0.0222 | 0.4000 | 0.3333 | 0.3333 | 0.1333 |
| Moving block *p*-value | 0.0600 | 0.0000 | 0.5000 | 0.3889 | 0.6875 | 0.3889 |
| *N* | 170 | 170 | 170 | 170 | 170 | 170 |
| *Hospitality* | 6 months | 12 months | 6 months | 12 months | 6 months | 12 months |
| Treatment effect | 0.0009 | 0.0118 | 0.0014** | 0.0141** | 0.0025 | 0.0076 |
| RMSPE | 1.6708 | 2.8762 | 17.1481 | 13.6413 | 0.1277 | 0.6853 |
| RMSPE *p*-value | 0.3986 | 0.2635 | 0.0270 | 0.0338 | 0.9595 | 0.9054 |
| Andrews *p*-value | 0.6444 | 0.0222 | 0.4000 | 0.0667 | 0.6667 | 0.2000 |
| Moving block *p*-value | 0.4000 | 0.0536 | 0.0000 | 0.0000 | 0.8125 | 0.3889 |
| *N* | 148 | 148 | 148 | 148 | 148 | 148 |

NOTE.—Synthetic control estimates of the impact of the immigration inflow on the residualized (after accounting for seasonal component and intercept) logarithms of the indicated outcomes in Orlando (6 and 12 months after Hurricane Maria hit Puerto Rico), using data from the QCEW, unrestricted donor pool. Significance based on RMSPE *p*-values: * significance at the 10% level; ** significance at the 5% level; *** significance at the 1% level.

**Table 3**
**Estimated Treatment Effects, Non-Hispanic and Less-Educated Workers**

| Sector | Non-Hispanic Workers | | | | Less-Educated Workers | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Log Employment | | Log Earnings per Worker | | Log Employment | | Log Earnings per Worker | |
| | 6 month TE | 12 month TE | 6 month TE | 12 month TE | 6 month TE | 12 month TE | 6 month TE | 12 month TE |
| *Aggregate* | | | | | | | | |
| Treatment effect | -0.0003** | 0.0082** | 0.0001 | 0.0009 | -0.0006 | 0.0080** | 0.0008 | -0.0199* |
| RMSPE | 10.9700 | 16.2198 | 0.8780 | 1.9797 | 4.1896 | 9.7029 | 1.7400 | 7.5027 |
| RMSPE *p*-value | 0.0448 | 0.0448 | 0.6791 | 0.6119 | 0.1765 | 0.0441 | 0.3750 | 0.0588 |
| N | 134 | 134 | 134 | 134 | 136 | 136 | 136 | 136 |
| *Construction* | | | | | | | | |
| Treatment effect | 0.0004 | 0.0068 | 0.0004** | -0.0245** | 0.0082 | 0.0166 | 0.0007** | -0.0147* |
| RMSPE | 2.0665 | 3.7870 | 6.7462 | 7.4052 | 3.6389 | 3.8433 | 8.8591 | 8.4125 |
| RMSPE *p*-value | 0.4141 | 0.3203 | 0.0234 | 0.0469 | 0.2857 | 0.3308 | 0.0226 | 0.0602 |
| N | 128 | 128 | 128 | 128 | 133 | 133 | 133 | 133 |
| *Retail* | | | | | | | | |
| Treatment effect | -0.0001 | 0.0009 | 0.0036 | 0.0205 | -0.0004 | 0.0089 | 0.0060** | 0.0119** |
| RMSPE | 1.4148 | 3.4864 | 1.0713 | 3.0396 | 0.1467 | 0.8946 | 6.6239 | 7.1356 |
| RMSPE *p*-value | 0.3869 | 0.2993 | 0.5839 | 0.3577 | 0.9265 | 0.8015 | 0.0221 | 0.0221 |
| N | 137 | 137 | 137 | 137 | 136 | 136 | 136 | 136 |
| *Hospitality* | | | | | | | | |
| Treatment effect | -0.0016 | 0.0120 | -0.0002 | 0.0028 | -0.0041 | 0.0042 | 0.0003 | 0.0134 |
| RMSPE | 0.5137 | 0.9949 | 1.2531 | 3.2994 | 1.3909 | 1.1233 | 0.9401 | 1.1408 |
| RMSPE *p*-value | 0.7883 | 0.8540 | 0.4818 | 0.2993 | 0.4962 | 0.8647 | 0.6165 | 0.8045 |
| N | 137 | 137 | 137 | 137 | 133 | 133 | 133 | 133 |

NOTE.—Synthetic control estimates of the impact of the immigration inflow on the residualized (after accounting for seasonal component and intercept) logarithms of the indicated outcomes in Orlando (6 and 12 months after Hurricane Maria hit Puerto Rico), using data from the QWI. Columns 1–4 show estimates for non-Hispanic workers. Columns 5–8 show estimates for less-educated workers. The donor pool is restricted to include only those commuting zones which are observed for four quarters after the Hurricane, allowing 12-month estimates of the treatment effects. Significance based on RMSPE *p*-values: * significance at the 10% level; ** significance at the 5% level; *** significance at the 1% level.

000918

**Table 4**
**DD Estimated TEs of Hurricane Maria on Orlando**

| Outcome by Sector | (1) | (2) | (3) |
|---|---|---|---|
| *Aggregate* | | | |
| Log employment | 0.0108*** | -0.0009 | 0.0028** |
| | (0.0026) | (0.0080) | (0.0012) |
| Log earnings/worker | -0.0034 | -0.0047 | -0.0039* |
| | (0.0039) | (0.0083) | (0.0021) |
| Log establishments | 0.0001 | 0.0137 | 0.0070*** |
| | (0.0096) | (0.0188) | (0.0016) |
| *Construction* | | | |
| Log employment | 0.0097 | 0.0303* | 0.0148** |
| | (0.0081) | (0.0158) | (0.0058) |
| Log earnings/worker | -0.0009 | -0.0043 | 0.0089 |
| | (0.0092) | (0.0216) | (0.0080) |
| Log establishments | 0.0045 | 0.0010 | 0.0146*** |
| | (0.0071) | (0.0177) | (0.0027) |
| *Retail* | | | |
| Log employment | 0.0064 | -0.0197 | 0.0057*** |
| | (0.0041) | (0.0156) | (0.0014) |
| Log earnings/worker | -0.0028 | -0.0052 | 0.0031** |
| | (0.0031) | (0.0076) | (0.0013) |
| Log establishments | 0.0053 | -0.0143 | 0.0089** |
| | (0.0082) | (0.0162) | (0.0038) |
| *Hospitality* | | | |
| Log employment | 0.0097*** | 0.0098 | 0.0034** |
| | (0.0034) | (0.0096) | (0.0014) |
| Log earnings/worker | -0.0017 | -0.0043 | -0.0087 |
| | (0.0093) | (0.0138) | (0.0063) |
| Log establishments | -0.0059 | 0.0175 | 0.0059* |
| | (0.0065) | (0.0179) | (0.0028) |

NOTE.—Difference-in-differences estimates of the impact of the immigration inflow on the residualized (after accounting for seasonal component and intercept) logarithms of the indicated outcomes in Orlando, in the post-treatment period, relative to the pre-treatment period. Estimated using the QCEW data. All positively-weighted CZs in the synthetic Orlando are individually included as controls in (1) and (2), and the composite synthetic Orlando for each outcome is the only control unit in (3). Authors own analysis using the QCEW. Robust standard errors in parentheses. * Significance at the 10% level; ** significance at the 5% level; *** significance at the 1% level.

000920

**Table 5**
**Difference-in-Differences pre-Trend Tests**

| Year | Period | Employment | | | | Earnings per Worker | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | All sectors | Construction | Retail | Hospitality | All sectors | Construction | Retail | Hospitality |
| **2014** | Q1 - Q2 | -0.0006 (0.0007) | -0.0100** (0.0040) | -0.0019** (0.0008) | -0.0045** (0.0018) | 0.0053 (0.0042) | 0.0006 (0.0017) | -0.0010*** (0.0002) | 0.0023 (0.0015) |
| | Q3 - Q4 | -0.0015 (0.0011) | 0.0006 (0.0020) | -0.0011 (0.0007) | 0.0027 (0.0021) | 0.0007 (0.0020) | 0.0064 (0.0054) | -0.0062 (0.0051) | 0.0010 (0.0011) |
| **2015** | Q1 - Q2 | -0.0012* (0.0006) | -0.0066*** (0.0022) | -0.0030*** (0.0007) | -0.0050*** (0.0016) | 0.0006 (0.0009) | -0.0039 (0.0037) | -0.0038 (0.0029) | 0.0035 (0.0037) |
| | Q3 - Q4 | -0.0001 (0.0008) | -0.0050 (0.0042) | -0.0082*** (0.0006) | -0.0085*** (0.0013) | 0.0038*** (0.0007) | -0.0147*** (0.0013) | 0.0032 (0.0035) | 0.0098*** (0.0013) |
| **2016** | Q1 - Q2 | -0.0006 (0.0007) | -0.0010 (0.0029) | -0.0020* (0.0011) | -0.0033** (0.0014) | 0.0005 (0.0007) | -0.0010 (0.0023) | -0.0005 (0.0004) | 0.0007 (0.0011) |
| | Q3 - Q4 | 0.0006 (0.0008) | -0.0014 (0.0024) | 0.0009 (0.0008) | -0.0020 (0.0014) | 0.0011 (0.0009) | 0.0024* (0.0012) | -0.0003 (0.0004) | 0.0004 (0.0005) |
| **2017** | Q1 - Q2 | -0.0004 (0.0022) | -0.0125** (0.0049) | 0.0001 (0.0030) | -0.0056* (0.0028) | -0.0048*** (0.0010) | -0.0076 (0.0098) | -0.0013 (0.0047) | -0.0173* (0.0078) |
| **2018** | Q1 - Q2 | 0.0026*** (0.0009) | 0.0153*** (0.0044) | 0.0022* (0.0011) | 0.0035 (0.0025) | -0.0038 (0.0051) | 0.0089*** (0.0005) | 0.0029 (0.0027) | -0.0049 (0.0066) |
| | Q3 | 0.0033*** (0.0011) | 0.0323*** (0.0050) | 0.0080*** (0.0009) | 0.0099*** (0.0043) | 0.0031*** (0.0006) | 0.0353*** (0.0001) | 0.0048*** (0.0002) | 0.0149*** (0.0005) |

NOTE.—Difference-in-differences estimates of the impact of the immigration inflow on the residualized (after accounting for seasonal component and intercept) logarithms of the indicated outcomes in Orlando, on two-quarter periods, relative to the last half of 2017 (when the hurricanes hit and the migration from Puerto Rico to Orlando occurred). Columns 1-4 show estimates for the employment. Columns 5-8 show estimates for per-worker earnings. Estimated using the QCEW data with the synthetic Orlando for each outcome as the only control unit. Robust standard errors in parentheses. * Significance at the 10% level; ** significance at the 5% level; *** significance at the 1% level.



(http://www.gob.mx) › Presidencia de la República (/presidencia) › **Prensa**



Publicaciones Recientes

Nuevo 📅 2024-07-15          Versión estenográfica

# En diálogo con su homólogo estadounidense, presidente López Obrador ratifica propuesta en materia migratoria

Manifestamos que cualquier ley que ignore las causas del fenómeno migratorio está condenada a convertirse en letra muerta, afirma primer mandatario

Presidencia de la República | 03 de febrero de 2024 | Comunicado

000921



En diálogo con su homólogo estadounidense, presidente López Obrador ratifica propuesta en materia migratoria

- Manifestamos que cualquier ley que ignore las causas del fenómeno migratorio está condenada a convertirse en letra muerta, afirma primer mandatario

- La plática fue muy provechosa, de mutuo interés, inspirada en la política de buena vecindad, amistad y cooperación

Ciudad de México, 3 de febrero de 2024.- El presidente de la República, Andrés Manuel López Obrador, dio a conocer que, "en la respetuosa conversación que sostuvimos con el presidente Joseph Biden, expresamos que tanto México como Estados Unidos son países libres y soberanos que pueden, naturalmente, definir sus propias políticas en materia de migración.

000922

7/16/24, 8:58 PM                    En diálogo con su homólogo estadounidense, presidente López Obrador ratifica propuesta en materia migratoria | Presidencia de l…

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 930 of 4699 PageID #: 4095

"No obstante, con la sinceridad que nos ha caracterizado, manifestamos al presidente Biden que cualquier ley aprobada en esta materia que ignore las causas del fenómeno migratorio y no las atienda está condenada a convertirse en letra muerta."

Por lo anterior, el primer mandatario ratificó a su homólogo estadounidense la propuesta del gobierno mexicano que se resume en los siguientes puntos:

1. Regularización de los mexicanos que llevan más de cinco años viviendo y trabajando honradamente en Estados Unidos.
2. Aprobar un presupuesto de 20 mil millones de dólares anuales para apoyar a países pobres de América Latina y el Caribe, donde sus pueblos por necesidad se ven obligados a emigrar.
3. Suspender sanciones a Venezuela para aminorar los flujos migratorios.
4. Levantar el bloqueo a Cuba y no obstaculizar su desarrollo, con el fin de reducir los flujos migratorios.
5. Mantener el programa de recepción de migrantes por vías legales, implementado por el actual gobierno de Estados Unidos.
6. No optar por construir muros ni cerrar la frontera, porque no soluciona las causas de la migración ni resuelve el problema. Es pura propaganda política-electoral.
7. Combatir el narcotráfico y el consumo de drogas químicas como el fentanilo.
8. Regular la venta y exportación de armas de Estados Unidos a México.
9. Elaborar un plan de desarrollo conjunto para impulsar la industrialización y el comercio en el marco del T-MEC, para continuar fortaleciendo a América del Norte como región en el mundo, y definir una estrategia para la integración económica en todo el continente.
10. Reafirmar el compromiso de mantener relaciones de cooperación, amistad y respeto a nuestras soberanías.

El presidente López Obrador resaltó:

"La plática fue muy provechosa, de mutuo interés, inspirada en el principio de la política de buena vecindad, amistad y cooperación." --

Contesta nuestra encuesta de satisfacción 📊



# ¿Cómo fue tu experiencia en gob.mx?

Compartir (https://www.facebook.com/sharer/sharer.php?
u=https://www.gob.mx/presidencia/prensa/269024&src=sdkpreparse)

🖶 Imprime la página completa

La legalidad, veracidad y la calidad de la información es estricta responsabilidad de la dependencia, entidad o empresa productiva del Estado que la proporcionó en virtud de sus atribuciones y/o facultades normativas.

000924



 An official website of the United States government

# U.S. General Services Administration

# POV mileage rates (archived)

- Previous airplane reimbursement rates
- Previous motorcycle reimbursement rates
- Previous automobile reimbursement rates
- Previous automobile reimbursement rates when government-owned autos are available

The following are previous mileage reimbursement rates for airplanes:

### Previous airplane rates

| Effective dates | Rate Per mile |
|---|---|
| January 1, 2023 | $1.74 |
| July 1, 2022 | $1.81 |
| January 1, 2022 | $1.515 |
| January 1, 2021 | $1.26 |
| January 1, 2020 | $1.27 |
| January 1, 2019 | $1.26 |
| January 1, 2018 | $1.21 |
| January 1, 2017 | $1.15 |

The following are previous mileage reimbursement rates for motorcycles:

### Previous motorcycle rates

| Effective dates | Rate per mile |
|---|---|
| January 1, 2023 | $0.635 |
| July 1, 2022 | $0.605 |
| January 1, 2022 | $0.565 |
| January 1, 2021 | $0.54 |
| January 1, 2020 | $0.545 |

000925

| Effective dates | Rate per mile |
| --- | --- |
| January 1, 2019 | $0.55 |
| January 1, 2018 | $0.515 |
| January 1, 2017 | $0.505 |

The following are previous privately owned automobile rates:

**Previous automobile rates**

| Effective date | Rate per mile |
| --- | --- |
| January 1, 2023 | $0.655 |
| July 1, 2022 | $0.625 |
| January 1, 2022 | $0.585 |
| January 1, 2021 | $0.56 |
| January 1, 2020 | $0.575 |
| January 1, 2019 | $0.58 |
| January 1, 2018 | $0.545 |
| January 1, 2017 | $0.535 |

The following are previous automobile reimbursement rates when government-furnished autos are available:

**Previous government-furnished auto rates**

| Effective date | Rate per mile |
| --- | --- |
| January 1, 2023 | $0.22 |
| July 1, 2022 | $0.22 |
| January 1, 2022 | $0.18 |
| January 1, 2021 | $0.16 |
| January 1, 2020 | $0.17 |
| January 1, 2019 | $0.20 |
| January 1, 2018 | $0.18 |

000926

| Effective date | Rate per mile |
|---|---|
| January 1, 2017 | $0.17 |

QUESTIONS:

For all travel policy questions, email travelpolicy@gsa.gov

**questions**

Have travel policy questions? Use our 'Have a Question?' site

---

Last updated: Apr 11, 2024



GSA.gov

**An official website of the U.S. General Services Administration**

Accessibility statement                    No FEAR Act

Website Policies                           FOIA Requests

Reports                                    Board of Contract Appeals

Office of the Inspector General

Looking for U.S. government information and services? **Visit USA.gov**

000927

IMMIGRANTS AND IMMIGRATION

**RESEARCH REPORT**

# Upskilling the Immigrant Workforce to Meet Employer Demand for Skilled Workers

*Hamutal Bernstein*          *Carolyn Vilter*

*July 2018*



000928



## ABOUT THE URBAN INSTITUTE

The nonprofit Urban Institute is a leading research organization dedicated to developing evidence-based insights that improve people's lives and strengthen communities. For 50 years, Urban has been the trusted source for rigorous analysis of complex social and economic issues; strategic advice to policymakers, philanthropists, and practitioners; and new, promising ideas that expand opportunities for all. Our work inspires effective decisions that advance fairness and enhance the well-being of people and places.

Copyright © July 2018. Urban Institute. Permission is granted for reproduction of this file, with attribution to the Urban Institute. Cover image courtesy of Shutterstock.

000929

# Contents

Acknowledgments                                                                                       iv

Executive Summary                                                                                     v

**Upskilling the Immigrant Workforce to Meet Employer Demand for Skilled Workers**        **1**

   Need for This Study                                                              2

   Research Approach                                                                4

   Basic Demographics of the Immigrant Workforce                                    8

   Perspectives from Three Local Workforce Systems                                 17

   Lessons for Developing Strong Middle-Skill Workforce Strategies                33

**Appendix.**
**Assigning Skill Requirements to American Community Survey Occupation Codes**            **38**

Notes                                                                                                52

References                                                                                           54

About the Authors                                                                                    57

Statement of Independence                                                                            58

# Acknowledgments

This report was funded by a grant from JPMorgan Chase. We are grateful to them and to all our funders, who make it possible for Urban to advance its mission.

The views expressed are those of the authors and should not be attributed to the Urban Institute, its trustees, or its funders. Funders do not determine research findings or the insights and recommendations of Urban experts. Further information on the Urban Institute's funding principles is available at urban.org/fundingprinciples.

First, we thank our interviewees, who were willing to take time away from their important work serving their communities to share their perspectives on this topic. We thank those who have provided advice as we developed this report, including Audrey Singer, David Dyssegaard Kallick, Rachel Peric, Erica Bouris, Hadya Abdul Satar, Loh-Sze Leung, and Jeanne Batalova, and our partners at JPMorgan Chase. We sincerely thank our reviewers and counselors Amanda Bergson-Shilcock, Pam Loprest, Marcela Montes, and Shayne Spaulding, for their insights and support along the way. Thanks to Sarah Gault for earlier research assistance with the census data. Thanks go to Elizabeth Forney and Serena Lei for their assistance on copyediting.

000931

# Executive Summary

In communities across the country, many employers are having trouble finding enough skilled workers. They may be overlooking an untapped resource. A large share of immigrant workers are in lower-skilled jobs, however, with the right access to education and training they need to advance their careers, many have the potential to meet these labor force needs. Workforce development services could help them develop their skills, earn higher wages to support themselves and their families, and meet employer demand.

Immigrants make up one out of six workers in the United States. They are an often overlooked but vital part of local economies and, therefore, should be a part of local workforce development strategies. Middle-skilled jobs are an avenue for many of these workers to get good jobs without needing a four-year degree. And employers have expressed a need for workers with bilingual and cultural skills to serve an increasingly diverse public. Many cities and organizations are engaged in upskilling their immigrant workforce, though it is challenging to serve this population effectively, and there is not much systematic knowledge about the most effective way to address barriers and design training for this group.

In this report, we examine the size and characteristics of the potentially untapped immigrant workforce and the barriers to and opportunities for education, training, and workforce services. We provide national and metropolitan-level statistics to inform decisionmakers. We also explore strategies that organizations in three cities—Dallas, Miami, and Seattle—are using to support immigrant training and advancement and offer practice and policy recommendations for others.

Here, we focus on immigrants currently employed in lower- and middle-skilled occupations and who are authorized to work in the US. Many of the issues discussed in this report also apply to undocumented workers, who could benefit from upskilling efforts, but they are not eligible for certain federal employment programs.

## Characteristics of the Immigrant Workforce

Understanding the characteristics of the potential immigrant middle-skilled workforce can inform strategies to support education and training efforts. We looked at the educational attainment, occupations, wages, and English proficiency of immigrant workers.

## Educational Attainment

As a whole, immigrant workers have lower educational attainment than native-born workers, although a similar share in both groups has a college or advanced degree.

- 26 percent of immigrant workers have less than a high school diploma or equivalent, compared with 5 percent of native-born workers

- 21 percent of immigrant workers have a high school degree, compared with 26 percent of native-born workers

- 21 percent have some postsecondary education but less than a bachelor's degree, compared with 36 percent of native-born workers

- 31 percent have a college degree or above, compared with 33 percent of native-born workers

## Occupation

Despite having lower educational attainment, foreign-born workers are just as likely as native-born workers to hold middle-skilled jobs. This suggests that immigrant workers may be gaining some middle-skilled jobs through job experience and on-the-job training rather than entering with specific credentials required for entry into a specific job. About 25 percent of both groups have middle-skilled jobs, though immigrant workers are more likely than native-born workers to have lower-skilled jobs (50 percent compared with 44 percent) and less likely to have high-skilled jobs (25 percent compared with 31 percent).

Among foreign-born workers, the most common lower-skilled occupations are maids and housekeeping cleaners, janitors, construction laborers, cashiers, grounds maintenance workers, retail salespersons, agricultural workers, and waiters. The most common middle-skilled occupations are cooks; drivers; nursing, psychiatric, and home health aides; and first-line supervisors of retail workers. Though native-born workers also hold many of these same lower- and middle-skilled occupations, they are more likely to have secretary and customer service representative positions and much less likely to work as maids, grounds maintenance workers, and agricultural workers.

## Wages

Immigrant workers in lower- and middle-skilled jobs earn less than their native-born counterparts. They have a median wage of $21,266 compared with $24,421 among the native born with lower-skilled jobs.

000933

And among those with middle-skilled jobs, immigrants have a median wage of $28,905 compared with $36,041 for native-born workers.

**Limited English Proficiency**

Limited English proficiency is common among immigrant workers, though it is more common for those with lower-skilled jobs (60 percent) compared with those in middle-skilled jobs (52 percent) or in high-skilled jobs (19 percent). Limited English proficiency is correlated with lower wages; in general, the lower-paid occupations are more likely to have workers who are limited English proficient (LEP), and the higher-paid occupations have fewer LEP workers. But there is not a direct relationship between wage and LEP rate. Some higher-paying occupations in construction and related fields have a large majority of LEP workers. There are also LEP workers in some first-line supervisor positions, which tend to be better paid. There are some other well-paying jobs (for the native born) that immigrants are not attaining at comparable rates, which could offer paths to better wages and could be reached with some upskilling in English, career readiness, or technical training.

The results suggest that certain types of training and education are needed to support immigrant upskilling and leverage their unique assets and needs across sectors and occupations. Limited English proficiency is a common issue among immigrants employed in lower- and middle-skilled jobs, suggesting the importance of English language training as part of workforce development strategies for this population.

## Barriers to Education and Training and Better Jobs

We talked with service providers and stakeholders in Dallas, Miami, and Seattle to better understand the challenges that immigrants face in pursuing education and training. Many described the following barriers.

- **Limited English proficiency.** Many service providers said that limited English proficiency is a significant barrier to promotion and higher wages and can make workers vulnerable to abuse in the workplace. In the cities we visited, the demand for English language training is greater than the supply. Service providers said that English as a Second Language (ESL) instruction should be customized for different needs, but existing classes are rarely able to support the wide range of immigrant backgrounds and skill levels. They also noted that employers and policymakers

sometimes have unrealistic expectations about how quickly students can advance in their English proficiency.

- **Difficulty transferring foreign credentials and overseas job experience to the US job market.** Immigrants who have credentials and job experience in their home countries have trouble finding employment in their previous professions. Service providers said that they try to offer alternative training or career paths to immigrants with particular skill sets or try to place them in lower- or middle-skilled jobs where they can get a foot in the door rather than trying to match them with jobs similar to the ones they held in their home countries.

- **Low digital literacy and low basic skills.** Many service providers described how some of their immigrant clients need training in basic computer skills, which matter for a wide range of jobs and for accessing workforce services and tools. Workers with low digital literacy might also have more fundamental basic skills gaps and low literacy in their native languages.

- **High housing costs and lack of transportation and child care.** These three barriers are perhaps the greatest challenges immigrant workers—and native-born workers—face for participating in education and training. Low wages and high housing costs drive many immigrants to work multiple jobs, leaving little time for upskilling. Transportation challenges, such as inadequate public transportation and long commute times, can keep workers from pursuing education and training. And finding affordable quality child care is a major hurdle for many low-wage workers, including immigrant workers.

- **Financial pressures.** Service providers said that many immigrants work in "survival jobs," which allow them to support themselves but are not likely to lead to advancement. The financial pressure of providing for themselves and their families on low wages is a major barrier to investing time and money in education and training.

In addition, service providers grapple with their own challenges to supporting education, training, and workforce services and supports. These include raising funds to develop and maintain programs, managing complex and sometimes contradictory performance reporting requirements from different funding sources, and working with the federal workforce system structure implemented through the Workforce Innovation and Opportunity Act (WIOA).

000935

# Strategies to Support Immigrant Workers and Develop a Strong Middle-Skilled Workforce

Despite these challenges, many organizations are designing workforce development services for immigrant workers and helping them address their barriers to participation. The following strategies include approaches to training that consider workers' needs and solutions to increase immigrant access to education and training.

- **English language skill-building.** Many service providers said that vocational English training that integrates workforce content or combines ESL with technical training is more effective and efficient than classic ESL. Offering instruction at the workplace can make training more accessible and can help workers avoid additional transportation and child care costs.

- **Training supports.** Supportive services, such as help with transportation or child care, can make it easier for workers to enroll and participate in education and training programs.

- **Inclusive staffing.** To make immigrants feel welcome and to provide the support they need to succeed in training, organizational staff should be multilingual, culturally competent, and available to help participants navigate systems.

- **Community outreach.** Many service providers said that community outreach is essential for engaging immigrant communities. This may mean advertising on language-specific media, providing recruitment materials in multiple languages, or tapping into community networks.

- **Trusted providers.** The service providers we interviewed said that a common strategy for outreach is leveraging community organizations and providing services at trusted places, like on location at immigrant-serving community-based organizations.

- **Collaboration with other service organizations.** Collaboration across sectors allows service providers to leverage resources and make training and supports more accessible to students and their families.

# Local Workforce Development Strategy Should Include Immigrant Workers

Immigrant workers play essential roles in local economies but are often not able to access the training that would benefit themselves, their employers, and their communities. Their role in local labor markets

and their needs should be considered in broader decisionmaking and in every community's workforce development goals.

Like native-born workers, many foreign-born workers in lower- and middle-skilled jobs are working hard to support their families, handling high costs of living, and struggling to make ends meet with low-paid work. Given the challenges of balancing life and work on a low income, they have limited opportunity to invest in their own training and enhance their prospects for better-paid work and career advancement.

It is important that communities acknowledge and address the often-overlooked immigrant workforce that sustains their local economies and make sure that immigrants and LEP workers are a part of local economic development and workforce development strategies and conversations. There is still too much division between immigrant-serving organizations and ESL providers, the workforce development board and community colleges, and employers who are relying on immigrant talent. All actors would benefit from bridging that gap and coming together to engage immigrants and employers in workforce development strategies and foster immigrant upskilling

Investing in immigrant workers and their upskilling is important for a range of decisionmakers across sectors, who may or may not have immigrant and LEP issues on their radar.

- **State and local policymakers** making policy and funding decisions can be aware of and sensitive to the key role that immigrant workers are playing in their communities, pushing forward workforce and education issues. Recognizing the contributions of the immigrant community is critical, especially at this time of restrictive immigration policies and toxic national rhetoric. Policymakers can put more resources into English language learning and encourage organizations to serve immigrants and LEP individuals, track information about programs to assess gaps in services, and actively engage immigrant-serving organizations to ensure policy is grounded in community needs.

- **Organizations providing workforce development services and education and training** can work to improve program accessibility and design to serve immigrant community members. Local workforce development boards, community colleges, and school districts, whose mission is to serve the community, can assess the extent to which they are funding immigrant-serving organizations or serving immigrant and LEP communities. They can work to improve the linguistic and cultural competence and accessibility of programs by hiring multilingual staff and partnering with immigrant-serving organizations to fill in gaps in visibility, language access, and cultural knowledge. Organizations should connect with immigrant-serving organizations to

leverage WIOA's opportunity for pressing forward the needs of LEP individuals as a priority of service population, as well as youth in immigrant families.

- **Funders** interested in supporting equity and economic mobility can consider incorporating immigrant populations and English language learning into their funding priorities. They can work to ensure that these issues are reflected in their awarding of grants—that local grantees are reaching this population through direct services or incorporating an immigrant-inclusive lens in systems-level work. This might mean encouraging collaboration across sectors like connecting immigrant-serving ESL providers to local workforce development or economic development organizations or employers, or conducting needs assessments to inform future investment.

- **Employers** who want to recruit and retain workers can invest in improving job quality by recognizing barriers like child care and transportation and providing supports or services to help current employees. They can also invest in upskilling their employees through onsite training to foster English language learning and promote advancement. And they can collaborate with immigrant-serving organizations and other training providers to ensure that training programs are informed by current industry need.

This issue is even more important in our current political climate, when immigrant communities are subject to harsh political rhetoric and are suffering the consequences of heightened immigration enforcement and volatile immigrant policy developments. In the face of this painful debate and as many are suffering uncertainty and family separation, each day immigrant workers continue to work to support their families, employers, and communities. States and local areas that are working to support their immigrant residents need to keep training and education on their agenda as they develop proactive policies and continue to support workers.

# Upskilling the Immigrant Workforce to Meet Employer Demand for Skilled Workers

Immigrants make up one out of six workers in the US, and they support the vitality of local economies across the country. The foreign born are employed at high rates, but a large share have low educational attainment and are limited in their English proficiency. Most immigrant workers with low-paying jobs have limited opportunities to pursue education and training and expand their English and technical skills, steps that might unlock better wages and support career advancement. At the same time, with low rates of unemployment, employers are voicing demand for workers, especially to fill middle-skilled positions that require some postsecondary training but not a four-year college degree. Many employers need skilled workers with bilingual and cultural skills to serve an increasingly diverse public and work in a globalized economy. It has been challenging for many local workforce systems to serve immigrant workers effectively, but many organizations and cities are engaged in upskilling their immigrant workforce to meet this employer demand. "Local workforce systems" here is used broadly to include not just the federally funded public workforce system but the range of organizations across sectors that serve and support individuals and employers,[1] including education and training providers, immigrant-serving organizations, and other organizations. This report examines the size and characteristics of the immigrant workforce at the national and metropolitan levels, and explores key strategies that organizations in three cities are using to support training this population for better jobs.

We explore barriers to and opportunities for education, training, and workforce services, focusing specifically on employed immigrants who could help fill employer demand and should be a target of middle-skill workforce development strategies. Our discussion of education and training considers a range of programming that could foster mobility of working immigrants and limited English proficient (LEP) individuals; this includes English as a second language (ESL), general career readiness and workforce training, and technical training for specific occupations. We use recent census data to provide a demographic profile of the immigrant workforce with national- and metropolitan-level statistics for the largest 100 metropolitan regions. We share insights collected through interviews with service providers and stakeholders in Dallas, Miami, and Seattle to better understand the barriers to training for this population and the experiences of organizations serving immigrant communities. The results point to the ways that local communities focused on the issue of middle-skill workforce

development can account for the important role that immigrants have to play and design appropriate strategies to foster their upskilling. Strategies should address barriers that are preventing many immigrants from advancing out of low-wage jobs, as many immigrant workers are struggling to make ends meet with low-paid lower-skilled or middle-skilled jobs. Limited English proficiency is a major challenge for this group, and English language training must be a component of workforce training for this population. It is also, however, crucial to recognize the linguistic and cultural assets that immigrants can and do contribute, especially in key occupations and sectors that require bilingual skills whether to serve a diverse public or work with a diverse employee base.

We begin with a description of the policy and research context and describe our research design, which draws on quantitative and qualitative data sources. We provide basic statistics on the immigrant workforce and then share perspectives from the field collected through interviews with staff from service provider and stakeholder organizations. We conclude with practice and policy recommendations to inform future decisionmaking to leverage the key role immigrant workers can play for middle-skill workforce strategies.

---

BOX 1

**New Skills at Work**

The Urban Institute is collaborating with JPMorgan Chase over five years to inform and assess JPMorgan Chase's philanthropic investments in key initiatives. One of these is New Skills at Work, a $250 million multiyear workforce development initiative that aims to expand and replicate effective approaches for linking education and training efforts with the skills and competencies employers need. The goals of the collaboration include using data and evidence to inform JPMorgan Chase's philanthropic investments, assessing whether its programs are achieving desired outcomes, and informing the larger fields of policy, philanthropy, and practice. As one of several resources Urban is developing for the field, this report focuses on immigrant workers and effective strategies for upskilling this key segment of many local workforces.

---

# Need for This Study

There is a broad conversation in the workforce development field and among employers about the "middle-skills gap:" the idea is that employers are in need of skilled workers with specific postsecondary credentials but less than a four-year college degree (Holzer 2015; Kochan, Finegold, and Osterman 2012; Modestino 2016).[2] Though not all middle-skilled jobs offer high wages, there is a growing focus

000941

on job quality and the importance of prioritizing workforce and training services to prepare and place individuals in "good jobs." In-demand positions can offer higher wages and desirable work conditions without a lengthy and expensive investment in a four-year degree that may not be in tune with employer demand (Carnevale et al. 2017). The link between the middle-skills gap and the immigrant workforce is rarely voiced explicitly. However, employers in many sectors, such as health care, sales, and customer services, where skilled workers are needed to serve a diverse multilingual public, are articulating the need for a trained immigrant workforce (Callahan and Gándara 2014; Hohn et al. 2016; New American Economy 2017). Immigrant workers offer valuable assets like linguistic and cultural knowledge that are a good match for these needs, but a large share is employed in low-paid lower-skilled work. Alongside the financial and logistical challenges faced by all low-income workers seeking training or employment services, immigrants face additional barriers of limited English language proficiency, lack of knowledge of training and employment options, and challenges in having foreign credentials and experience recognized in the US labor market.

There is not much systematic evidence-based knowledge about the most effective ways to address these barriers and design workforce services and training for low-income immigrant populations, although there are many cases of individual successful projects and best practices in programming and funding (Bergson-Shilcock 2016; Connell 2008; Gershwin et al. 2009; Spence 2010). In fact, much of the discussion on immigrant workforce issues has focused on high-skilled immigrants who have college and advanced degrees and the barriers they face getting recognition of their educational credentials earned abroad and reaching employment aligned with their skills (Batalova, Fix, and Bachmeier 2016; Bergson-Shilcock and Witte 2015; Hall et al. 2011; McHugh and Morawski 2017). Although there has been some research on the middle-skilled part of the labor market and how immigrants fit in (Capps, Fix, and Yi-Ying Lin 2010; National Skills Coalition, n.d. a, n.d. b) and study of key roles that immigrant workers fill in the labor market (Dramski 2017; Espinoza 2017; Paral 2018), there is still a gap in knowledge about effective strategies for upskilling immigrants to reach better jobs.

The division between the immigrant services field and the workforce development field in the US has long been a challenge to developing effective workforce services and systems for this population (Montes and Choitz 2016a, 2016b).[3] In the context of a broader conversation around immigrant integration, there has been a shift in the last few years toward better coordination in some communities and more attention paid to refugees' and other immigrants' access to workforce development resources (Kallenbach and Nash 2016; US Department of Health and Human Services 2014). But there are significant challenges around immigrants' and LEP individuals' access to the federal workforce development system, and many have highlighted the mismatch between immigrants' needs and federal,

state, and local practices (Hamaji and González-Rivera 2016; McHugh and Morawski 2015). Passage of the Workforce Innovation and Opportunity Act (WIOA) in 2014 has created risks and offered opportunities to help address this gap.[4] WIOA updated the structure of the publicly funded workforce system and included requirements that all core programs, including adult basic education and English language literacy programs, track a common set of outcomes. When WIOA was passed, some immigrant advocates and researchers were concerned about the potential negative impacts for serving the immigrant community,[5] fearing that the increased focus on employment outcomes in programs designed to improve basic skills would reduce their access to WIOA-funded adult education services. Others highlighted opportunities such as the potential for the involvement of immigrant-serving organizations in local planning and a focus in the legislation on barriers to service and basic skills deficient individuals, which would include LEP individuals (National Skills Coalition 2016).

As WIOA is implemented and communities continue to address skills gaps, cities and organizations across the country are handling immigrant workforce issues in different ways, so it is important that research be grounded in specific local settings. This report was motivated by the need for practitioners and policymakers to have a better understanding of where immigrants are accessing training, the barriers they face, and what funding streams and resources are supporting this population. We analyze the challenges and opportunities around training immigrant workers that might allow them to attain higher-paying, higher-quality jobs, focusing on a specific target population for policymakers: currently employed immigrant workers who hold lower- and middle-skilled jobs.

## Research Approach

In this report we explore the following key research questions:

1. How big is the immigrant workforce and what are its key characteristics? How much does educational attainment align with occupational skill requirements? How do immigrant workers differ from native-born workers?

2. What are the key barriers to education, training, and advancement for immigrant workers?

3. How are local workforce systems and stakeholders coping with these barriers? What sources of training and workforce development services are immigrants accessing? What funding sources and strategies are local workforce actors using to support immigrant workers?

4.  How can local workforce systems better support immigrant workers to reach better-paid and middle-skilled employment? Have recent changes to WIOA had an impact on strategies on the ground?

To inform middle-skill workforce policy and efforts to train workers for good jobs, we focus on the experiences of immigrants employed in lower- and middle-skilled occupations; this is the potential target population for upskilling efforts to fill employer needs for skilled workers. We use the terms "immigrant" and "foreign born" interchangeably throughout the report. The main focus of this report is on how workforce systems support education and training for immigrant workers and thus it focuses primarily on the experiences of work-authorized immigrants rather than undocumented immigrants. Undocumented immigrants may participate in training and education. Many of the issues we discuss in this report apply to undocumented workers, who could benefit from upskilling efforts, although issues around legal status were not a focus of our work. Other research described above directly addresses the conditions faced by undocumented immigrants, who are ineligible for certain federal employment programs and face barriers to accessing public services for which they are eligible. In the current immigration policy climate, heightened immigration enforcement and political rhetoric have raised the vulnerability and fear across immigrant communities across the US (Cervantes, Ulrich, and Matthews 2018; McHugh 2018). While the immigration policy debates rage on and individuals and communities suffer the consequences of uncertainty and family separation, immigrant workers continue to clock in to support their families, employers, and communities. This report turns a spotlight on the immigrant workers who underlie many local economies in lower- and middle-skilled jobs who should be factored into local workforce development strategies.

## Census Analysis

We provide a demographic profile of the immigrant workforce using recent Census bureau data: the five-year American Community Survey (ACS) sample for 2011–15. (See appendix for further details.) We apply Bureau of Labor Statistics (BLS) classifications of skills requirements to occupations as follows:[6]

- Occupations with limited skills requirements or "lower-skilled jobs:" Require no specific education or work experience and only short- or moderate-term on-the-job training

- Occupations with middle skills requirements or "middle-skilled jobs:" Require a postsecondary nondegree award or associate's degree, some work experience in a related occupation, or long-term on-the-job training or an apprenticeship

- Occupations with high skills requirements or "high-skilled jobs:" Require a bachelor's, master's, doctoral, or professional degree

Each of these broad categories includes a wide range of jobs and occupations that vary greatly in terms of wage level, job quality, and prospects for advancement. Not all middle-skilled jobs are necessarily "good jobs" with high wages, so we focus on both the lower- and middle-skilled occupations and the challenges that workers face to participating in training that would help them advance. Although we use the term "lower-skilled jobs" in this report, we acknowledge that all jobs require certain skills and experience and do not want to diminish the talent and skills involved in all work, including jobs often derided as "low skilled" (Hagan et al. 2015). Though there are limitations with these terms, we use these categories to be able to describe large patterns and to speak to ongoing policy conversations around issues like the middle-skills gap.

One major limitation of the ACS data, similar to the decennial census, is that certain populations, including undocumented immigrants, are difficult to reach and are thus undercounted. The US Office of Immigration Statistics assumes a 10 percent undercount of the undocumented population in the ACS (Baker 2017). This limitation of the ACS data affects the findings of our study since many undocumented immigrants are in occupations with lower- and middle-skills requirements.[7]

## Interviews with Organizations

To complement our quantitative findings that reveal broad patterns in educational attainment and employment, we conducted site visits to three cities, Dallas, Miami, and Seattle, to better understand how local workforce systems and organizations are supporting this population. These cities capture a range of economic and social contexts and are all growing economies with low unemployment rates where immigrants are and will continue to be important for middle-skills workforce strategies. We drew on existing research, consultations with experts, and ACS data to identify cities that had large and diverse immigrant workforces, would be likely to have innovative practices, and had not previously been studied in this context. We looked for variation in terms of geography, mix of industries, local context of immigrant reception, and workforce demographics like skill distribution, English language proficiency, and the ethnic and national background of immigrant workers. See appendix table a.1 for an overview of basic demographic statistics for each metropolitan area.

For each of the cities, we identified organizations and individuals to interview through consultation with experts and internet research, looking for promising practices and evidence of outreach to

immigrant or LEP populations. We identified a range of organizations that are involved in workforce development issues and immigrant services:

- **education and training providers** including community colleges, school districts, and other English as a second language, GED, and technical training providers

- **immigrant-serving organizations** and community-based organizations

- **stakeholders** from local government, the local workforce development board, chambers of commerce or other economic development organizations, and philanthropy

This produced 30 semistructured interviews, through which we gathered perspectives on the strategies and programs in place to reach immigrant workers, assets immigrants offer and barriers they face, challenges the service organizations face, sources of funding, local economic and policy context, including the impact of the WIOA, and other issues. We intentionally engaged a wide range of stakeholders and service providers across sectors that normally remain siloed. We were thus able to capture a rarely seen multisector view across immigrant services, adult basic education, higher education, workforce development, and economic development organizations. We believe that the insights are relevant to other cities and metros in the US. Table 1 lists the organizations we interviewed in each city.

TABLE 1

**Organizations Interviewed**

| | Dallas | Miami | Seattle |
|---|---|---|---|
| Training providers | Dallas County Community College District, El Centro College<br><br>Fort Worth Independent School District, Office of Adult Education | Miami Dade College, Wolfson Campus<br><br>Miami Dade College, REVEST Program<br><br>Miami-Dade County Public Schools, Division of Adult and Workforce Education | Port Jobs<br><br>Seattle Central College, Basic & Transitional Studies |
| Immigrant-serving organizations | Park Cities Presbyterian Church, Northwest Bible Church, For the Nations, New City Fellowship<br><br>International Rescue Committee in Dallas<br><br>Literacy Instruction for Texas (LIFT)<br><br>Transformance USA | ConnectFamilias<br><br>Family Action Network Movement (FANM)<br><br>Hispanic Unity of Florida<br><br>Sant La Haitian Neighborhood Center<br><br>Youth Co-Op, Inc. | El Centro de la Raza<br><br>Literacy Source<br><br>Neighborhood House<br><br>OneAmerica<br><br>Seattle Jobs Initiative |
| Stakeholders | City of Dallas, Office of Welcoming Communities and Immigrant Affairs<br><br>United Way of Metropolitan Dallas<br><br>Workforce Solutions Greater Dallas | Miami-Dade Beacon Council<br><br>South Florida Hispanic Chamber of Commerce<br><br>United Way of Miami-Dade | City of Seattle, Office of Immigrant and Refugee Affairs<br><br>Seattle Metropolitan Chamber of Commerce<br><br>Workforce Development Council of Seattle-King County |

# Basic Demographics of the Immigrant Workforce

Immigrants make up 17 percent of the workforce nationally, with much higher shares in some major metropolitan regions, such as Miami or San Jose (48 percent) or New York (37 percent) (see appendix table a.4). To provide background on what the potential immigrant middle-skilled workforce looks like, we developed a basic statistical profile of the immigrant workforce including information on educational attainment, occupation, wages, and limited English proficiency. We highlight differences and similarities between foreign-born and native-born workers, focusing our analysis on foreign-born individuals ages 16 to 64 who are employed in the civilian labor force:

- Immigrant workers have lower educational attainment than native-born workers, although a similar share in both groups has a college or advanced degree.

000947

- Despite lower educational attainment, immigrant workers are as likely as the native born to work in middle-skilled occupations.

- Immigrant workers in lower- and middle-skilled jobs earn less than their native-born counterparts.

- The majority of immigrant workers are LEP, which is correlated with lower wages.

The results suggest that certain types of training and education are needed to support immigrant upskilling and leverage their unique assets and needs across different sectors and occupations. Limited English proficiency is a common issue among immigrants employed in lower- and middle-skilled jobs, suggesting the importance of English language training as part of workforce development strategies for this population.

## Characteristics of Immigrant Workers

As a whole, foreign-born workers have lower educational attainment than native-born workers (figure 1): about a quarter have less than a high school diploma or equivalent, compared with 5 percent among the native born. On the other hand, about one-third of foreign-born workers have a college or advanced degree, similar to the share among the native born. This diversity within the immigrant workforce—with high numbers at both ends of the educational spectrum—is important context for our focus in this report on opportunities for immigrants employed in lower- and middle-skilled jobs.

To provide some basic information on who we are talking about, most immigrant workers have been in the US for many years (table 2), with a median of 17 years of residence and a median age of 41. Just under half are LEP; this is most prevalent among workers with lower educational attainment and it is relatively low for those with college or advanced degrees. Their median annual wages are low, $29,407 for all immigrant workers and lowest for those with lower educational attainment. These broad trends suggest the importance of investment in education and training for immigrant workers, who could potentially raise their wages and ability to support their families with greater training and investment in their upskilling.

FIGURE 1

**Educational Attainment**



**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Note:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration.

TABLE 2

**Basic Demographics of Foreign-Born Workers by Educational Attainment**

|  | All | Less than high school | High school only | Some college | College or advanced degree |
|---|---|---|---|---|---|
| Median years in country | 17 | 17 | 17 | 19 | 17 |
| Median age | 41 | 42 | 41 | 40 | 41 |
| Share LEP | 48% | 81% | 56% | 35% | 23% |
| Median annual wage | $29,407 | $20,351 | $24,028 | $29,033 | $60,000 |

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Notes:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. Median annual wage data are further restricted to those individuals who reported positive wage and salary income during the year before the survey. Individuals are considered limited English proficient if they report not speaking English, speaking English but not well, or speaking English well. LEP = limited English proficient.

## Characteristics of the Jobs Immigrant Workers Hold

As mentioned above, we divide jobs into three groups based on the entry-level requirements of occupations. Jobs with higher-skill requirements come with higher median wages for both the foreign-

000949

born and the native-born (figure 2). However, foreign-born workers in lower- and middle-skilled jobs earn less than their native-born counterparts. This wage differential is not true for workers in high-skilled jobs.

FIGURE 2
**Median Annual Wages by Occupation Skill-Level Requirement**



■ Native-born workers  ■ Foreign-born workers

URBAN INSTITUTE

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Note:** Data refer to individuals ages 18–64, in the civilian labor force, employed during the week before the survey administration, and reporting positive wage and salary income for the previous year.

Across the entire workforce, slightly less than half of all workers hold lower-skilled jobs, one quarter hold middle-skilled jobs, and the remainder hold high-skilled jobs (figure 3). Despite lower educational attainment, foreign-born workers are just as likely to hold middle-skilled jobs as native-born workers. Immigrant workers are more likely than native-born workers to have lower-skilled jobs (50 percent compared with 44 percent for the native born) and less likely than the native born to have high-skilled jobs (25 percent compared with 31 percent).

FIGURE 3
**Occupation Skill-Level Requirements**



Source: Five-year American Community Survey sample, 2011–15 collected from IPUMS.
Note: Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration.

Figure 4 reinforces what figures 2 and 3 demonstrate—that foreign-born workers are able to attain middle-skilled jobs despite lower educational attainment. Over a quarter (28 percent) of immigrants with middle-skilled jobs have less than a high school credential, compared with only 7 percent among native-born workers with middle-skilled jobs. Secondly, a much smaller share of immigrants in middle-skilled jobs have had some college (26 percent) compared with the native-born (43 percent). There are many possible reasons for these patterns. These figures do not take into account the length of experience a worker has in the occupation, and it may be that workers are moving into some middle-skilled jobs through job experience and on-the-job training rather than entering with specific credentials required for entry into a specific job. This suggests the possibility that immigrant workers with lower educational attainment may be gaining some middle-skilled jobs through additional years of experience.[8] Another issue is that these are large categories, which combine many occupations and jobs within an occupation. The average requirements of an occupation used in this analysis can mask substantial variation among jobs in a skill-level category.

000951

FIGURE 4

**Educational Attainment by Occupation Skill-Level Requirement**

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Note:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration.

The fact is that within lower- and middle-skilled jobs immigrants are in different occupations than native-born workers (table 3). We combine in these tables workers with lower- and middle-skilled jobs, color coding each group. (For a focus on individuals with only middle-skilled jobs, see appendix table a.2). The top 25 occupations we list here make up around half of workers in lower- and middle-skilled jobs (55 percent of foreign born and 48 percent of native born). We also note occupations that appear in the top 25 for one group but not the other.

Among foreign-born workers, the most common lower-skilled occupations (share above 2 percent) are maids and housekeeping cleaners (with the single largest share at 4.3 percent), janitors, construction laborers, cashiers, grounds maintenance workers, retail salespersons, agricultural workers, and waiters. The most common middle-skilled occupations are cooks; drivers and truck drivers; nursing, psychiatric, and home health aides; and first-line supervisors of retail workers. The native born are likely to hold many of these same lower- and middle-skilled occupations, but there are some major differences. The native born are more likely to have secretary and customer service

000952

representative positions and are much less likely to work as maids, grounds maintenance workers, and agricultural workers.

The share of LEP workers varies a lot across occupations, as might be expected depending on the skills required. Limited English proficiency is common among immigrant workers, though it is more common for those with lower-skilled jobs (60 percent) compared with those in middle-skilled jobs (52 percent), or in high-skilled jobs (19 percent). Limited-English speakers fill a number of jobs, indicating that one can still get ahead with limited English proficiency in some jobs. To get a sense of the patterns, we look at the rate of limited English proficiency within occupations. (See appendix table a.3 for immigrant-held occupations listed in order of share who are LEP.)

Limited English proficiency is correlated with lower wages. In general, the lower-paid occupations are more likely to have more LEP workers, and the higher-paid occupations are less likely to have many LEP workers. For example, occupations with the very highest LEP rates, which the native born are not likely to hold (e.g., agricultural workers, grounds maintenance workers, and maids and housekeeping cleaners), where 80 percent or more of immigrant workers with that position are LEP, all have low median annual wages (below $20,000). However, there is not a direct relationship between wage and LEP rate:

- First, the very lowest–paying jobs immigrants hold, in customer service, do *not* have the highest LEP rates. Child care workers, cashiers, and personal care aides, with median annual wages between $13,215 and $15,263, have more moderate LEP rates (between 50 and 60 percent); this makes some sense, since in some places such client-facing jobs would require English and in other cases they would require a foreign language to serve a diverse public. These jobs may also be more likely to be part time, which this analysis does not account for.

- Secondly, there are several higher-paying occupations, in construction and related fields, where a large majority of workers are LEP (over 70 percent). Immigrant construction laborers; painters, construction, and maintenance workers; other production workers; carpenters; and miscellaneous assemblers and fabricators are occupations for which communication in English is likely less central to job function and where LEP workers are earning somewhat higher annual wages (with median annual wages between $23,185 and $25,438).

- There are also many LEP workers in some first-line supervisor positions, which tend to be better paid. Median annual wages are between $42,155 and $49,056 for first-line supervisors of production and operating workers, office and administrative support workers, and nonretail sales positions (see table a.2). Though these positions are less common among the foreign born

than among the native born, they may offer an opportunity for immigrants' linguistic and cultural skills to be an asset in a multilingual and diverse work setting where other employees speak a foreign language.

There are some additional well-paying jobs (for the native born) that immigrants are not attaining at comparable rates, which seem like they could offer paths to better wages. Positions like first-line supervisors of construction (where native-born workers earn a median annual wage of $55,063) or electricians (native-born median annual wage of $46,553) are potential jobs for immigrant workers engaged in construction and maintenance fields who could attain supervisory positions with some upskilling in English, career readiness, or technical training.

These statistics describe the immigrant workforce at the national scale. For information on the immigrant workforce at the metropolitan level for the 100 largest metropolitan areas, see appendix tables a.4 and a.5. Table a.4 provides statistics on the foreign-born workforce at all skill levels, and table a.5 provides more detailed information on only those who are currently in lower- and middle-skilled jobs. These statistics provide a quick overview of the local immigrant workforce to inform local decisionmakers.

This demographic profile simply describes where immigrants are currently employed. We do not explore the reasons for these outcomes, although we offer some potential explanations that require further research. Many issues influence these occupation and wage features of the immigrant workforce, including employer hiring, employment practices, and institutional and policy conditions in addition to worker characteristics and experiences. Employers' hiring and training practices, occupational licensing rules and foreign credential recognition, workers' social networks and access to jobs, patterns of educational attainment, and rates of limited English proficiency all shape these outcomes. These inputs, immigrants' barriers to entry into occupations, as well as immigrants' assets in certain sectors and occupations should be taken into account and inform strategies to develop a stronger immigrant middle-skill workforce.

000955

TABLE 3

**Top Lower- and Middle-Skilled Occupations for Foreign-Born and Native-Born Workers**

| | Foreign-Born Workers | | | | Native-Born Workers | | |
|---|---|---|---|---|---|---|---|
| Rank | Occupation | LEP (%) | Median annual wage | Share | Occupation | Median annual wage | Share |
| 1 | Maids and housekeeping cleaners[a] | 79.5 | $16,018 | 4.3% | Secretaries and administrative assistants | $30,562 | 3.7% |
| 2 | Cooks | 76.3 | $18,000 | 4.0% | Retail salespersons | $17,807 | 3.5% |
| 3 | Janitors and building cleaners | 73.3 | $20,000 | 3.7% | Driver/sales workers and truck drivers | $36,131 | 3.3% |
| 4 | Construction laborers | 76.5 | $24,028 | 3.4% | Cashiers | $10,175 | 3.2% |
| 5 | Driver/sales workers and truck drivers | 59.2 | $31,616 | 3.1% | First-line supervisors of retail sales workers | $36,000 | 3.2% |
| 6 | Cashiers | 52.5 | $14,333 | 3.0% | Customer service representatives | $25,029 | 2.8% |
| 7 | Nursing, psychiatric, and home health aides | 42.8 | $22,900 | 2.7% | Waiters and waitresses | $12,210 | 2.2% |
| 8 | Grounds maintenance workers[a] | 80.8 | $19,098 | 2.7% | Laborers and freight, stock, and material movers, hand | $21,266 | 2.2% |
| 9 | Retail salespersons | 38.7 | $20,000 | 2.4% | Nursing, psychiatric, and home health aides | $20,023 | 2.1% |
| 10 | Miscellaneous agricultural workers[a] | 87.9 | $17,298 | 2.3% | Janitors and building cleaners | $20,351 | 2.1% |
| 11 | First-line supervisors of retail sales workers | 35.7 | $35,614 | 2.2% | Cooks | $12,904 | 1.8% |
| 12 | Waiters and waitresses | 52.4 | $16,517 | 2.1% | Stock clerks and order fillers | $18,112 | 1.6% |
| 13 | Carpenters | 71.7 | $25,438 | 1.9% | Sales representatives, wholesale and manufacturing[a] | $60,000 | 1.5% |
| 14 | Laborers and freight, stock, and material movers, hand | 67.5 | $21,525 | 1.9% | First-line supervisors of office and admin. support workers[a] | $44,390 | 1.5% |
| 15 | Personal care aides | 56.2 | $15,263 | 1.6% | Bookkeeping, accounting, and auditing clerks[a] | $32,037 | 1.3% |
| 16 | Customer service representatives | 31.9 | $25,029 | 1.6% | Office clerks, general[a] | $26,347 | 1.3% |
| 17 | Other production workers | 71.9 | $24,982 | 1.5% | Construction laborers | $28,491 | 1.3% |
| 18 | Secretaries and administrative assistants | 25.1 | $30,969 | 1.5% | Receptionists and information clerks[a] | $20,824 | 1.3% |
| 19 | Child care workers | 57.0 | $13,215 | 1.4% | Child care workers | $11,193 | 1.2% |
| 20 | Painters, construction and maintenance[a] | 75.9 | $23,185 | 1.4% | First-line supervisors of nonretail sales[a] | $60,000 | 1.2% |
| 21 | Food preparation workers[a] | 72.8 | $15,365 | 1.3% | Other production workers | $30,526 | 1.1% |
| 22 | Stock clerks and order fillers | 57.9 | $20,646 | 1.2% | Personal care aides | $15,000 | 1.1% |
| 23 | Miscellaneous assemblers and fabricators[a] | 71.0 | $24,000 | 1.2% | Teacher assistants[a] | $15,808 | 1.1% |
| 24 | Food service managers[a] | 44.7 | $35,614 | 1.2% | Security guards and gaming surveillance officers[a] | $25,029 | 1.0% |
| 25 | Miscellaneous personal appearance workers[a] | 75.1 | $15,808 | 1.1% | Carpenters | $31,747 | 1.0% |
| | **All occupations** | 57.3 | $24,000 | 100.0% | All occupations | $28,032 | 100.0% |

Lower-skilled occupations
Middle-skilled occupations

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.

**Notes:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. The total weighted foreign-born population meeting these conditions and employed in a lower- or middle-skilled occupation is 17,597,817; the total weighted native-born population meeting these conditions and employed in a lower- or middle-skilled occupation is 78,031,181. Median annual wage data are further restricted to those individuals who reported positive wage and salary income during the year before the survey. Individuals are considered limited English proficient if they report not speaking English well, or speaking English but not well, or speaking English not at all. LEP = limited English proficient.
[a] These occupations appear in the top 25 for one group but not the other.

# Perspectives from Three Local Workforce Systems

Many immigrants are working in lower-skilled jobs or in middle-skilled jobs that are low paying, and low educational attainment and limited English proficiency limit job and wage opportunities for many individuals. Education, training, and workforce development supports can help workers develop their skills, advance in their jobs, and potentially earn higher wages to support themselves and their families. To address employer demand for skilled workers, local workforce systems and immigrant-serving and training and education providers can help address this skill gap by supporting immigrant upskilling while recognizing the jobs that immigrant workers are filling and the barriers they face to better jobs and higher wages. To better understand strategies to address some of these challenges, we conducted qualitative data collection during site visits to Dallas, Miami, and Seattle. Although the three cities differ in local development trends and experiences of the immigrant workforce, they share many challenges immigrant workers in lower- and middle-skilled jobs face and have organizations that have led similar efforts to facilitate immigrant training and advancement.

Our conversations touched on issues that affect a range of working immigrant populations, from the recently arrived to long-term residents, with a focus on those with lower- or middle-skilled jobs with low wages and limited mobility. This includes the foreign born in general and in some cases specific subpopulations with unique circumstances, like resettled refugees, who are provided government assistance at the time of their arrival in the US to support them in quickly finding employment and transitioning to host communities.

## Barriers to Education and Training and Better Jobs

We begin with the perspectives service providers and stakeholders shared on the challenges that immigrants face preventing them from pursuing education or training or succeeding in those efforts. The barriers we discuss also stand in the way of better-paid lower- or middle-skilled jobs.

### LIMITED ENGLISH PROFICIENCY AND LANGUAGE LEARNING

The statistics in table 3 suggest, service providers shared that limited English proficiency is a critical barrier that many immigrants face to higher-paid work and career advancement. Although finding initial employment in lower-skilled jobs is often not a challenge for their clients—these are all places with high labor demand—their jobs are limited in wage and quality and often do not provide opportunities for

advancement. Limited English also makes workers vulnerable to abuse in the workplace. One service provider explained,

> Even though they can get jobs without speaking English, they still come back to me and say, "My employer makes me work 80 hours a week," or "they don't let me take lunch breaks," or "if my kid is sick they threaten to fire me and I can't take off." Just that inability to speak English means that they have no other options and just take all this abuse.

Immigrants in lower- and middle-skilled positions who have limited English proficiency may not be able to access better paying positions or they make lower wages than their native-born counterparts. Workers with limited English proficiency may be less likely to be promoted out of lower-skilled jobs; several service providers described clients who had worked as janitors or in grocery stores, worked steadily and loyally, but found that their language ability made it unlikely that they would advance to managerial roles.

Though English language training is key for addressing this barrier, demand for ESL is larger than the supply and resources available in the cities we visited.[9] We heard from service providers that there were ESL courses available in a range of settings, from community-based organizations (CBOs) to faith-based organizations to community colleges and public schools, but that further work is needed to scale up and improve access to meet the huge ESL need. Discussing the findings of a recent needs assessment that her organization conducted, a service provider said, "A lot [of survey respondents] expressed language as a huge barrier, time and again saying we want more ESL classes in the community available and accessible."

Making progress in English language learning may take a lot of time and need to be customized for different individuals' backgrounds. Service providers shared that a one-size-fits-all approach will not work and that available ESL instruction can rarely effectively support the wide range of experiences and skill sets that immigrants arrive with and accommodate how those backgrounds affect their language-learning experience. One service provider reflected on this common trap, saying,

> I think oftentimes programs lump [immigrants] together. That looks very different depending on your background. There are immigrants who don't have English as their first language but have a master's degree and skilled background in their profession, and there are those who attended zero or two years of school and were a farmer. So, it's not the same sort of issue with different people, and they're often lumped together as "it's all immigrants" or "it's all English language" instead of addressing language and literacy separately.

Several service providers observed that organizations outside of the ESL field—employers as well as policymakers—may have an unrealistic sense of how quickly English language training and improvement can be accomplished. Service providers noted that one well-known program in Seattle

assumed that individuals at basic levels of English could learn English, incorporate work-related content, and leave fully equipped for employment after only one academic quarter of instruction; the service providers expressed that this ambitious timeline does not align with the realities of ESL instruction and the pace at which individuals make progress in English language acquisition.[10] Another expressed the importance of setting reasonable expectations for training timelines, especially with the immigrant population:

> I think personally allowing time, understanding that it's not just take a class and [they're] ready to go....For those [who] don't have a long history of education or any education, or other barriers that are in the way, it's not that simple of just "take this class and you're ready," so I think just acknowledging multiple pathways and different lengths of time [is important].

### RECOGNITION OF FOREIGN CREDENTIALS AND HOME-COUNTRY JOB EXPERIENCE

Immigrants who arrive in the US with job experience and foreign-earned educational credentials face barriers in finding employment in their previous profession. Although most mentions of credentials barriers focused on high-skilled jobs, this is also a relevant issue for middle-skilled positions, where work experience or certificates earned in immigrants' home countries are not likely to be transferred smoothly into the US labor market or education system. We heard from service providers that immigrant workers face confusing credentialing systems, high fees for credential recognition or requirements for additional courses, and other barriers to accessing the education or training they may need to supplement or adapt their previously earned education to the US context. Rather than trying to replicate the position they occupied in their home country, service providers explained that they often offer alternative training and employment paths to immigrants who arrive with particular skill sets and try to place them in lower- or middle-skilled jobs that are more attainable despite the mismatch with their earlier employment and skills. That means that clients with foreign credentials often turn to finding entry-level work in industries that may not align with their background but where they find lower barriers to entry. Several service providers described clients with backgrounds in nursing and marketing, for example, taking service-sector jobs to support their families with hopes of eventually seeking training and returning to their areas of expertise sometime in the future. One service provider shared the story of an immigrant arriving with an agricultural sciences research background who was placed in a lower-skilled position selling tickets at the local arboretum, where she was able to "get her foot in the door" in hopes of eventually moving up into more skilled opportunities. These challenges around transferring skills and credentials to the US job market are major barriers for immigrant workers across a wide range of occupations.

In addition to barriers specific to the immigrant population, we also learned in the site visits about fundamental challenges that affect all low-income workers (including immigrants), which we discuss in the next sections. These challenges may be accentuated by immigrant-specific barriers, but they are common barriers for all low-income working individuals who might be part of middle-skill workforce strategies.

### LOW DIGITAL LITERACY AND BASIC SKILLS

Many service providers emphasized a commonly overlooked area that is critical to education and training: low digital literacy and low basic skills, including native language literacy. Many service providers described how many of their immigrant clients require assistance using the computer and training in general computer fundamentals. This is important both for designing training and for understanding barriers to job opportunities or advancement. Difficulty using computers limits workers' access to an increasingly wide array of jobs. As one service provider told us, many occupations that were previously tech-free, like janitorial work, now require the use of technology for such basic tasks as checking room assignments and filling out timecards. The same interviewee described seeing many employers, especially hospitals, introducing new digital systems to wider groups of employees without realizing that a large segment of their workforce might not be digitally literate. The need for digital literacy is growing, but employers may not be prepared to help or hire employees who require assistance. Even when digital literacy problems are recognized, employers may not realize that underlying them are more fundamental basic skills gaps and low native language literacy, which must also be considered in developing effective training. This service provider, who has worked with local hospitals to design curricula to address literacy issues, explained,

> There's the assumption that you just need to teach digital skills and not understanding that the reason they don't have them or can't learn them easily is because they lack basic literacy skills. They can't just plug in, log on, and read the directions—it's not just about the computer but about other skills building up to that.

Outside of the workplace, low digital literacy can also keep individuals from being able to benefit from workforce services and tools developed to assist them. Service providers observed that new online tools, like cost of living calculators, online American Job Center (formerly One-Stop Center) accounts, and online applications for training and jobs, can unintentionally exclude immigrant and other populations who are not well-equipped to handle online activities. One provider explained that on top of this challenge for the target populations, the tools can create significant burden on staff to support individuals who are struggling to interact with online tools and websites. She told us about a new website that requires clients to set up an online profile to determine their eligibility and complete

paperwork for receiving WIOA-funded services, sharing, "It might be easy if you speak English and are computer savvy. If not, it can take a long time, and if you don't use email or use logins it can take a long time and take up a whole lot of staff time."

THE BIG THREE: HIGH HOUSING COSTS, TRANSPORTATION, AND CHILD CARE

As discussed, many immigrant workers are earning low wages. In our site visits, service providers shared that many immigrants are working long hours to support themselves and their families in expensive local contexts. We heard about how low wages and high housing costs drive many immigrants to work multiple jobs, leaving little to no available time to invest in raising their future wages through participation in education and training. When we asked what the greatest challenges were to participation, similar to challenges native-born workers face, we heard that workers have difficulty accessing convenient and affordable housing, transportation, and child care. Service providers and stakeholders consistently cited these three areas as fundamental challenges, reflecting on local trends in economic development and gaps in public transportation that have made life even more expensive and inconvenient for many immigrant workers. Interviewees emphasized Seattle's unprecedented development boom through which rising housing costs have displaced immigrant workers into adjacent suburban communities. Though the tech economy and high-skilled jobs are more visible there, the immigrant lower- and middle-skilled workforce is also top of mind for local organizations. We heard in Miami's deeply immigrant-defined community and local economy, where Spanish is ubiquitous and immigrants make up half of all residents, that there are challenges in supporting the evolving immigrant population there; this "gateway city" receives many new arrivals to the US, whose flows vary, and is also home to diverse longer-term residents. Interviewees shared that rising housing costs have imposed additional pressures recently. In Dallas, rapid growth led to increased demand for construction and service jobs, but even in this relatively low-cost housing market, service providers said wages are not keeping up with housing prices.

Transportation was a common barrier discussed; interviewees spoke of inadequate public transportation systems in their cities, and long travel times and walking distances for potential training participants trying to combine work and training. In Seattle, several providers and stakeholders reported that as rising housing prices have pushed low-income residents out of the city, public transportation has become an even greater challenge for residents who face hours-long commutes. Many immigrant workers do not have access to a car, and though some programs offer refurbished cars to low-income individuals, one service provider described a long waiting list for this service. Even with a car, in spread-out cities like Dallas, commutes take a long time, especially to workplaces in the high-demand trade and logistics industry where companies are often located outside of downtown or far

from affordable housing. These challenges make working more time-consuming and leave less time available to pursue training.

Last, finding child care is a hurdle for many, as it is for all working parents who may want to invest in their own upskilling but face the challenge of balancing work and training with family commitments (Adams, Spaulding, and Heller 2015). We heard some examples of how some community organizations, training programs, and even employers are introducing their own child care programs to meet this need, but service providers emphasized that this continues to be a major barrier.

## FINANCIAL IMPERATIVE

Because of these financial pressures, service providers shared that many immigrants are working in "survival jobs," which allow them to financially support themselves and their families but are not likely to lead to advancement and leave little time to invest in further training. The challenge of keeping food on the table is a massive barrier to taking time away from work to invest in training. One service provider described the issue as such:

> The reality is that people are fighting to put food on the table, pay their rent, and they're in survival mode, and I think most of the service organizations are responding to that, rightfully so, but it's keeping the community and a lot of these families in a cyclical dynamic instead of an opportunity to actually move up and build skills with an investment.

The limitations are both finding time to get to and participate in training, and the costs of training itself. One service provider described the financial pressure and trade-offs that push immigrants with different backgrounds into the job market and discourage them from investing in training and education:

> An immigrant, an asylee, a refugee—they come to this country and they have to support themselves. There are bills to pay; Miami rents are really high. They need to learn English, because if they do, they'll get better jobs. But on the other side, they need to work. Sometimes there's a contradiction between their jobs and their studies, so they have to make a priority, one or the other.

Even when workers choose to begin training courses, they may not complete programs because of the pressure to work or because other barriers get in the way. Most organizations do not have the resources to provide funded courses so that students do not have to pay training costs, nor can they compensate students for their time, which would ease some of the financial burden. Service providers shared that it is often a financial decision for students, who need to decide whether the opportunity cost of time spent in training is worth it. Although students could potentially benefit from additional study, only a minority of immigrant workers find ways to combine work with training and education opportunities that align with their work schedules and other constraints. The pressure to stop training efforts poses a challenge to the type of sustained engagement that is needed to succeed in formal

000961

English language programs and the work required to learn and advance through multiple ESL levels. One service provider explained that she sometimes sees students dropping out around the second-to-last level of ESL, at which point they have improved their English skills considerably and may expect to be able to find a better job. Continued investment might unlock even better job opportunities or possibilities for promotion, but workers must balance the competing demands of work and their upskilling efforts.

## Strategies to Support Immigrant Workers

Our site visits explored what types of services immigrant workers are accessing to further their training, including services funded through public workforce system funds and other sources. Here, we describe perspectives and lessons shared on how organizations are designing programming to suit immigrants' needs for training and education, and strategies they are using to better reach and support immigrant workers.

### APPROACHES TO TRAINING

*Varying Approaches to ESL.* Given how key limited English proficiency is in shaping job opportunities, learning English is an important component of workforce training for many immigrants. English training that integrates workforce content can help immigrants be more successful in their current workplace, avoid mistreatment on the job, attain a better job or move into a different sector, or prepare to enter other academic or vocational training. We heard about different approaches to ESL provision to benefit workers, ranging from the integration of some work or career content into standard ESL classes to fully integrated courses that combine ESL with technical training to the provision of ESL courses onsite at workplaces.

Vocational English incorporates workforce topics into ESL curricula, including job-specific vocabulary, employability skills, and job search and job readiness skills like preparing applications, writing résumés, and participating in mock job interviews. Workforce-oriented English courses can be sector specific, or they can be more general and provide conversational English and workplace "dos and don'ts" to help students leave more prepared for the workplace environment. Many service providers said that this is more effective and efficient than classic ESL training since students can apply what they learn to their workplace immediately and it is more relevant to their lives than English content divorced from their experience. Many service providers also suggested that it is impractical to focus on ESL alone before any workforce content is presented. One interviewee noted that this is a major gap for services targeted for immigrants, explaining,

000962

> The idea of assuming that immigrants have to learn the language before they get into vocational skills program is crazy, it'd take years to master the language then to enroll in a program. By then, you're in debt, you have so many issues....And I make that comment because I know there are best practices across the nation but not enough for the clients we serve in programs that integrate communication and vocational skills. In our community, I don't know any.

Integrated Education and Training approaches combine vocational training with integrated basic skills training. We learned about successful examples of this approach used through an Integrated Basic Education Skills Training (I-BEST) model in a community college setting, where immigrants with higher level English (ESL level 4 or more) could participate in integrated programs. One community college system offers an array of I-BEST courses in different occupations and sectors, which targets both immigrants needing ESL support and native-born individuals with basic skills gaps. Topics include early childhood education, business technology management, accounting, phlebotomy, automotive maintenance and repair, and welding fabrication. The I-BEST model allows students to start a college professional technical program and still work on basic skills like ESL. Students take a classic vocational course along with native speakers, and the course is co-taught by a content and a basic skills instructor, so that LEP students receive content instruction and English support at the same time.

Offering training at workplaces is another promising strategy for making training more accessible to immigrant workers (Burt and Mathews-Aydinli 2007; Enchautegui 2015). We heard about several examples of vocational ESL classes provided onsite at a workplace, which may help workers avoid some of the scheduling, transportation, and cost barriers described above. Some employers further aid workers by arranging shift schedules to be compatible with course times, providing workers with paid release time to attend training, or creating hybrid (online and in-person) offerings. We heard about several examples of worksite ESL offered through partnerships across organizations. One community college is growing its effort to partner with employers to provide ESL onsite at the workplace; it has customized curriculum to provide ESL for employees of a grocery store chain, a hospital, and other local employers. Another college is providing a worksite-based ESL program with a local grocery store chain, which is part of a larger national effort. Another multisite national program offers an onsite English model with partner employers that integrates digital literacy and community organizing principles.

In addition to ESL, we learned about some workplaces experimenting with technical training courses customized for their immigrant employees: these classes develop job skills in a classroom environment that might have smaller enrollment, move more slowly, or be otherwise tailored to fit the needs of immigrant workers with limited English proficiency. One service provider described partnering with a local hospital to provide support around a cleaning skills certification test for its LEP employees. Hospital employees who complete the training receive a pay raise, but, without assistance, some

000963

immigrant workers might not pass the test because of gaps in English, literacy, or digital skills. Her organization is providing hospital staff with a "train the trainers" course to raise their capacity to help immigrant employees succeed. We also learned about a large programming effort based at an airport that provides courses to airport employees, many of whom are immigrants; courses are taught by community college faculty onsite to provide easy access to training for current employees. Implementation of such efforts is complex in the 24-hour work environment. Classes are scheduled during shift changes and altered seasonally to allow maximum access for a wide range of airport employees.

*Small Business Training.* Business ownership offers an employment path for many immigrants, allowing them an opportunity to apply their skills and, in some cases, leverage their linguistic and cultural knowledge to serve a diverse public. Immigrants are more likely than native-born individuals to own businesses, and immigrant-run small businesses animate many neighborhoods and contribute to local development and economic activity (Dyssegaard Kallick 2015). We heard this story loud and clear in Miami, where stakeholders told us that immigrant entrepreneurs are "the backbone of the local economy," playing a critical role in creating and running local businesses. As one stakeholder described it, many immigrants will at least supplement their incomes through small business, initially in an informal capacity. But over time, training programs that equip entrepreneurs with business knowledge can support small business strategies by helping immigrants formalize and take fuller advantage of their entrepreneurial activities and advance their careers. One Seattle service provider has developed a business opportunity center, which provides aspiring entrepreneurs with retail space, carts, tables, access to a commissary kitchen, business education, and one-on-one technical assistance. Although small business ownership can offer a particularly important path for immigrant workers given trends in entrepreneurship, entrepreneurship training is rarely well integrated into workforce development services, which focus on filling the needs of existing employers.

## SOLUTIONS TO INCREASE IMMIGRANT ACCESS

*Training Supports.* Many service providers talked about how supportive services that address some of the challenges described above can increase program participants' likelihood of success. By alleviating some of the challenges with support for transportation, child care, or other services, wraparound services help encourage participants to enroll and begin training programs, as well as persist and complete training programs as they balance competing demands (Hamaji and González-Rivera 2016). One challenge around providing supportive services is the wide range of needs and assistance that an individual may need. This means that clients often need to find and go to multiple service providers to fill different needs that are standing in the way of their participation. In the cities we visited, we heard

about a number of "one-stop" approaches where organizations have grouped supportive services together so that they are readily accessible in one physical space and can address the range of supportive services that may be required for a given client. Examples included a community organization that, in addition to workforce supports, addresses the needs of the whole family through parenting classes, counseling and mental health services, and domestic violence and survivor intervention; foreign-language–specific job clubs that facilitate access to medical services; and a service provider that offers employment services alongside a food pantry, family violence services, mental health services, and children's services. Providing services in one place has the benefit of convenience—participants do not have to wade through multiple organizations' processes or travel from organization to organization to access different services. We also heard about organizations partnering with other organizations but not necessarily providing a "one-stop" approach where all services are offered in the same place. One example is a workforce and financial training provider partnering with a veteran's organization for bus passes, a food pantry for food assistance, and a refugee resettlement affiliate organization for translation services. Another service provider described partnering with a local nonprofit organization to support their ESL students on financial and legal assistance; the service provider suggested that, in their case, they had decided that adding those support services to their ESL program was inefficient and that it made more sense to partner with an outside organization to address students' support needs. She described how her organization had realized that collaboration with other organizations was a better strategy than pivoting toward providing additional services:

> A few years ago, [we considered supplementing our ESL services with other programs], but it wasn't our area of expertise. It watered down our three primary programs and kept pulling our attention from those. So finally, as an organization, we decided not to do all these areas since other organizations are already doing it. [We decided it was best to] let [other organizations] do it well and we can partner.

*Inclusive Staffing.* To make immigrants feel welcome and provide the support they need to succeed in training, we heard again and again that organizational staff should be multilingual, culturally competent, and available to work one-on-one with participants. Having multilingual staff allows organizations to be accessible to clients with a variety of language backgrounds. As clients advance on their training path, multilingual staff can support and retain clients by offering courses and trainings in multiple languages (like Spanish-language GED), or provide services in more than one language (like job circles in different languages). One service provider explained the advantage of bilingual staff:

> Having bilingual staff ability allows us more flexibility in being able to work with people where they're at. We have a range of language capability that makes us able to work with more people right then and there, if they need to make progress on their English proficiency before their next step in their career plans.

Service providers also emphasized that organizational staff needs to be culturally competent to effectively serve immigrants. This means being sensitive to specific preferences communities may have around food and religious observance, child care, and other issues. To provide this cultural competence and encourage immigrant participation, several service providers talked about how important it is to have immigrants themselves in service roles. One service provider said how valuable it is for immigrant students to see other immigrants in staff roles who can be role models for their peers. Stakeholders emphasized their multilingual staff and expressed the importance of having staff reflect the demographics of clients, so that "people…see themselves when they come in our centers."

In addition to linguistic capacity and cultural competence, staff said it is important to take time to help clients navigate complex systems like the community college enrollment process. One service provider described the positive impact of having staff walk students through bureaucratic details like entrance requirements, applications, orientations, schedules, course levels, and credit-bearing versus noncredit-bearing classes and explain to students the potential impact of different training options on their future job opportunities. She described how challenging the setting of the community college can be for a new student, with even higher barriers for immigrants who may have even less familiarity with such educational providers:

> Anybody—native speaker or immigrant—walks in, and you often get sent to five different places. It can be very frustrating. To be an immigrant on top of that when you already don't understand the system, language might be a barrier—it just becomes easier to walk back out the door instead of continuing on.

**Community Outreach.** Many service providers said that community outreach is essential for reaching immigrant communities. This may mean advertising on language-specific media, like Telemundo, and putting out recruitment materials in multiple languages or with simpler English. One service provider advertises technical training programs at school youth fairs, in bus advertisements, on Facebook, TV, and radio, including interviews on Haitian Creole and Spanish stations. Even with all these efforts, this provider still found that their best source of referrals is word of mouth. These outreach strategies may be particularly important for immigrants. One service provider explained how challenging it can be to get newly arrived immigrants to come to unfamiliar places and the crucial issue of accessibility in immigrant-dense neighborhoods:

> Especially with this population it's important to go out to community members, not rely on them coming….Especially the immigrant population that may have recently arrived, they don't know what's available to them when they first get here, so really going out there and doing that specific outreach, letting them know what's available to them is important.

000966

This speaks to the importance of another form of community outreach—personally tapping into community networks. Training providers described forming partnerships with other community-based organizations and conducting outreach about new programs to community stakeholders, like church leaders and community elders in immigrant communities. One service provider explained that "with any population, especially an underserved one, there's a trust issue," and securing support through trusted organizations is an effective strategy. Another service provider shared the same insight and described how outreach efforts to create one-on-one relationships between the program provider and leaders in the immigrant community were important for building trust and building some buy-in; their efforts to attend a monthly "chat and chew" and engage with "churches and elders in the community" were beginning to pay off for their recruitment. We also heard how important it is to engage intentionally with different communities and customize efforts to align with the vast cultural and linguistic diversity across immigrant groups. One service provider explained how challenging it is for organizations to handle this diversity within the immigrant community:

> The communities are so insular; it is so hard to have a generic approach to get into any community. What works great for Somali, Ethiopian, Eritrean [individuals] actually doesn't even necessarily work between those three, and forget about trying to treat [other national] populations the same....I see very few efforts that are actually able to create that universal umbrella with differentiated approach to gather that all together and create something that could cut across [immigrant communities].

**Trusted Providers.** Given the importance of outreach to specific communities and the inability of service providers to always be located in immigrant-dense neighborhoods, a common strategy is leveraging community organizations and providing services at trusted places, such as at immigrant-serving CBOs. Service providers shared that though environments like community colleges or American Job Centers can be intimidating, CBOs, religious organizations, or local public schools are more familiar to immigrant communities. We heard about one example of a workforce development board implementing a "connection site" model, which provides basic workforce services through staff on site at locations, such as CBOs, community colleges, housing authorities, public libraries, and other community sites, that are more accessible or approachable than American Job Centers. This approach responded to changing demographics and feedback from their own staff. Describing the program, one stakeholder discussed this change coming from the client-facing staff, who saw a gap between who they were serving and the demographics of the communities they served:

> I think for a long time the public workforce system hasn't thought about outreach....The staff came up with community outreach, because they were the ones in the offices realizing there are some folks that aren't going to walk through the door.

One service provider discussed a creative partnership that built on the trust that they had developed with their immigrant clients; they worked with a community college, which provided technical training and was "willing to let [clients] start here [onsite at the CBO] for the first class or two to gain confidence and then transition [to the campus]….At least it helps them to start where they feel at home." Another immigrant service provider made the same point about the importance of trusted providers having better access to the target community and the importance of providing workforce development services through these trusted channels, saying, "[workforce services should] use the CBOs as a point of reference. [Immigrants] come here anyway."

*Collaboration with Other Service Organizations.* Service providers shared that coordination between organizations across sectors is important for leveraging resources and making training accessible. They described how coordination helps service providers focus on providing specific services well, avoid overextending staff, and avoid duplication across multiple organizations. One service provider also made the point that a focus on coordination is a common theme in national funding conversations as well as within local provider communities: "They're all talking about collaboration and avoiding overlapping of services." Across our three site visits, we saw a variety of collaborations between different types of organizations, with services going both directions to share expertise and add value. We learned, on the one hand, about CBOs staffing community college basic education programs with career navigators and benefits counselors. On the other hand, we learned of community colleges lending CBOs technical advice for new trainings or, as mentioned above, providing their technical and basic skills training on site at CBOs. Service providers and stakeholders also described efforts to share resources, lessons, and best practices between organizations. One service provider described collaboration between agencies with a common funder that has encouraged a small group of related grantees to meet regularly, receive trainings, and share best practices and tools.

## KEY ISSUES FOR SERVICE PROVIDER ORGANIZATIONS

Service organizations face a number of key issues that limit and enable their efforts to support immigrant education, training, and workforce supports. Many of the issues they discussed are true for all organizations, immigrant specific or not, but here we highlight the perspectives we heard in our interviews.

*Funding.* Funding is a huge challenge for organizations working to develop and maintain training programs for immigrant workers. We heard a lot from organizations about the pressures of fundraising and appealing to the changing priorities of funders. One service provider said that she had seen a shift toward middle-skill strategies from funders. She noted that in the past her organization had been

funded to provide basic employment assistance services for entry-level jobs, but recently they were being encouraged to provide sector-specific programs focused on jobs that require some technical training. Another service provider also observed a shift in local funding priorities from basic skills to employment outcomes and articulated that they are now needing to pitch their ESL services in terms of workforce outcomes. Many organizations shared the perspective that in their experience, immigrant-serving organizations are less likely to receive funds from the local workforce development board; they suggested that adult basic education funds tend to go to community colleges rather than immigrant-serving CBOs in their communities. One shared this point on funding:

> The biggest challenge is just ongoing funding; so much is coming from workforce development councils to the community colleges....It's hard to get a foothold in the adult basic [education] English language world when so much of the funding and airspace is dominated by community colleges.

Similar to other organizations, many of the larger service providers that do receive public workforce system funds described combining or "braiding" multiple sources of funding, which they said allows them to keep their programs stable and more flexibly serve participants. A service provider explained that more sources of funding allow more flexibility, both for the programs and for participants. However, managing braided funds is taxing. The same service provider handles 12 different grants just for the workforce development branch of their services, which requires a great deal of time and energy to manage and budget.

**Performance Reporting.** Braiding funding sources can exacerbate another common challenge that service providers emphasized—the difficulty of handling complex and contradictory performance reporting requirements around client eligibility, timing of services, and completion. Performance metrics can vary slightly or significantly from grant to grant, making it challenging to effectively combine funding sources. One service provider explained that many funding sources impose rigid program structure and eligibility requirements that limit the participants a program can accept and how they can be served. Though some degree of selectivity makes sense for a program, a service provider suggested that slightly broader eligibility criteria could help them support clients more effectively:

> If you have to drive a client through a tiny hole of eligibility, the amount of energy it takes to do that, versus if we had just a little bit more flexibility—some funding sources actually give that....But for some sources, they're very rigid about the requirements.

We heard that short time limits are a major challenge. Funding sources often stipulate short windows during which a client can be served or build in incentives to exit clients from training programs quickly. The result is that programs have to keep their caseloads small and cannot provide meaningful services to people no longer on their active caseload. Service providers expressed that this short

window of service limits participants' possibilities for meaningful upskilling or movement into better jobs. As one provider explained, funding that gives programs multiple years to work with people opens the doors to "huge, lifetime transformations" like becoming a registered nurse; more common, short-term programs do not make that possible. Service providers said that this affects immigrant students differently because of challenges of limited English proficiency and some students' difficulty completing courses on very rapid timelines; although nearly all workforce development efforts face these challenges of showing results on short timelines, and this is not specific to immigrant students. We were told by several service providers, however, that some funding sources incentivize programs not to serve immigrants. One described the link with performance metrics explicitly, pointing out the mismatch between the rapid progress some funding sources demand and the realities of the timeline for English language training:

> Because of the absolute requirements on metrics…that motivates high-volume, light-touch work; ESL with immigrant populations is slow, it takes a long time, and so that's who's not going to get attention, based on the sheer weight of having small numbers, [but the pressure to show] high-volume results.

**WIOA and Local Implementation.** When we raised the issue of WIOA, the federal workforce funds legislation, and its impact for serving immigrant clients, interviewees focused on its increased emphasis on employment-related outcomes for basic skills training programs, namely ESL. Integrated models that bring a workforce focus into basic skills training models are not new to many organizations, but the new requirements have encouraged many to adjust their programming. We heard many references to the direct and indirect effects of these changes on community-based literacy providers, community colleges and school districts, and funders of literacy services. In addition to CBOs, we heard many examples of community colleges and K–12 literacy providers experiencing this shift to a workforce focus. One service provider described a technical college that used to have family- and citizenship-oriented "English for the sake of English" offerings but had moved to a model with a focus on job training. Her view was that this was leaving behind immigrants in need:

> I think contextualized language learning is important, but there's a whole community of folks who aren't being served as a result. I know that previously there was a lot more funding for ESL for citizenship; now a lot of the priority is only to workforce and job placement.

Echoing the changes in funder priorities mentioned above, we heard that the move toward a workforce focus in public-sector funding has had some spillover into private philanthropy; one funder, for example, reframed its adult literacy grantmaking to fall under its "income" grantmaking rather than where it sat previously under its "education" portfolio. A stakeholder confirmed this trend and described their effort

to encourage and support workforce outcomes from their ESL provider grantees, who in some cases do not agree with the new focus:

> We're trying to figure out how to encourage [literacy provider] grantees to think more in terms of employment outcomes, but some feel that their bread and butter is helping people learn English; they don't feel that their mission should be limited to equipping clients for good jobs.

We also heard about other impacts of WIOA on coordination around training for immigrant communities. One stakeholder observed that WIOA's focus on community partnerships can be used to foster community outreach and partnership, which can benefit immigrants if such partnerships include immigrant-serving CBOs and literacy and basic-skills providers. Several interviewees described seeing more partnership in the workforce development community as a result of these aspects of WIOA. This push for partnership was highlighted by one service provider as positive in fostering better coordination between adult basic-skills organizations and workforce development organizations, which for too long have been disconnected:

> I think the workforce development system and basic skills system are only really very recently talking to each other. Nationally that's been a gap. Clearly those two entities should be talking to each other, more of that is happening, probably because of WIOA: it's required now and there are mandates around that.

We also discussed with service providers how effectively their local workforce development boards and job centers were filling the needs of local LEP and immigrant workers. Service providers and stakeholders shared that though there were some positive measures and, in some cases, organizations with experience serving immigrant populations were receiving local workforce funds, there were still major service gaps in effectively reaching immigrant communities. One stakeholder described struggling to find materials put out by the local workforce board that would be appropriate for the immigrant community. As one service provider put it, her immigrant clients do not have the language or technical skills or the ability to navigate the local job centers and the job opportunities they point clients to:

> The [workforce development board] model, based on my understanding at this point, is a model created for individuals who are transitioning from a place of work and will need to know what to do…[where they can learn] which industries are growing and in-demand. The model is not for my typical client who comes in and doesn't understand a thing and could not navigate the process by themselves.…If we had a client [who] could walk into a [workforce development board] center and navigate that process by themselves, that's perfect, but I haven't seen that. It's language, it's understanding what's being offered and being able to assess where they fit in.

*Other Policy Issues.* A range of other policy areas affect the work of organizations engaged in training for immigrants. We learned of a recent example where one state's implementation of new occupational

license standards for early childhood educators affected immigrant women who provide early childhood education in their homes. Although this initially disrupted many child care providers, advocacy organizations were able to add some flexibility to new requirements, convincing the state legislature to accept a certificate in lieu of a high school diploma as the requirement for early child care workers. This policy change and the work to support child care providers catalyzed new coordination between organizations. In fact, the requirement for the new certificate led to the development of relevant programming to fill in this gap at the community colleges. One service provider noted, "This is a place where we've seen really positive partnership with the community colleges—some have started I-BEST programs or different integrated programs specific to this [and have offered some in Somali and Spanish]."

City- and county-level policies, both general and targeted for immigrants, also play a role in shaping immigrant workers' prospects for training and advancement. Many cities have established local offices devoted to supporting welcoming activities and supporting immigrant communities. Although it was a new development in Dallas, where the Mayor's Office of Welcoming Communities and Immigrant Affairs had been recently established at the time of our visit, many stakeholders suggested that this type of institution could have a positive impact. Seattle's parallel office of Immigrant and Refugee Affairs has engaged in research and programming on immigrant workforce topics, alongside other initiatives to promote immigrant integration and well-being in the city. In Seattle, we also heard about the salience of local legislation targeted at the entire low-income population as it applied to immigrant workers. Several stakeholders cited as relevant to the immigrant workforce the recent changes to local labor rights regulations, including the establishment of a $15 minimum wage and investment in local resources to implement new labor rights requirements. This example highlighted the importance of practices and policies that affect the entire workforce and public and how they need to be considered in addition to immigrant-specific measures. Examples gleaned from the site visits suggested that a wide range of different policy levers can affect the immigrant workforce and be used as part of a larger local workforce development strategy.

# Lessons for Developing Strong Middle-Skill Workforce Strategies

Immigrants are an important source of local talent who can meet the demands of employers in need of skilled workers. This report suggests that strategies to develop a middle-skilled workforce should consider how to best support immigrants and leverage their unique assets to fill jobs across different

sectors and occupations. Like native-born workers, many foreign-born workers in lower- and middle-skilled jobs are working hard to support their families, handling high costs of living, and struggling to make ends meet with low-paid work. Given the challenges of balancing life and work on a low income, they have limited opportunity to invest in their own training and enhance their prospects for better paid work and career advancement. At the same time, employers are demanding skilled workers to fill their evolving needs, and in many areas the assets that immigrant workers offer are important for keeping up with demographic change, serving a diverse public, and working in a globalized economy. The demographic profile above showed that a large share of immigrant workers are in lower-skilled jobs and a quarter have middle-skilled jobs, similar to the native-born workers, despite lower educational attainment and limited English proficiency. Immigrants work in different occupations than native-born individuals. Immigrants with limited English proficiency work in many occupations, but their wages and job quality may be lower than for native-born workers, they can be easily exploited, and they have fewer prospects for advancement in many jobs.

Given these challenges, service providers and stakeholders emphasized the role that English learning can play in supporting immigrants' mobility. They shared that even small improvements and gaining very basic English skills can lead to better experiences on the job and protect workers from workplace abuses. This reinforces the importance of English language training for supporting immigrant training and advancement. Our findings suggest a couple of key features for providing effective English language training to maximize the likelihood of students' participation and retention, as well as translation to better jobs:

- Customized content: English language training should integrate workforce and career content and avoid a "one size fits all" approach, so that instruction effectively supports students with different educational backgrounds and employment experiences

- Accessible setting: Programs should be as accessible as possible for individuals who have limited time outside of their working hours. Classes can be provided at the worksite through engagement with employers and coordination with education providers or in trusted spaces, like CBOs that are frequented by immigrant communities and by organizations with inclusive staffing that has linguistic and cultural competence relevant to specific immigrant communities

- Coordination across sectors: Coordination between employers, education providers, and community-serving organizations will help ensure that training is accessible and successful for students and addresses any specific barriers that individuals might face and the range of supports needed to complement training coursework and help students be successful

Local workforce development and training efforts should include programming like ESL to address limited English proficiency among some immigrant workers and be sensitive to the variety of experiences across the immigrant community. It is, however, also important that immigrant workers and their key role in local labor markets be recognized in broader decisionmaking and strategy on local workforce development. There is some tension between the idea of developing customized immigrant-specific initiatives and "mainstreaming" immigrants or LEP individuals into services and conversations about public services and well-being.[11] The experiences of immigrant-serving organizations and the context that immigrants face are naturally similar to the experiences of organizations serving the general public, and native-born workers. Immigrants contend with all the same barriers other workers face, like challenges of access, affordability, and balance with life demands. In addition, they face issues like limited English proficiency, recognition of their previous experience and educational background earned in their home countries, and social networks that limit their knowledge of or access to certain job or education opportunities. Local systems and organizations need to balance the specific needs of different immigrant groups with the universal needs of low-income groups as well as other key populations of concern.

It is important that communities acknowledge and address the often-overlooked immigrant workforce that sustains their local economies and make sure that immigrants and LEP workers are a part of local economic development and workforce development strategies and conversations. There is still too much division between immigrant-serving organizations and ESL providers, the workforce development board and community colleges, and employers who are relying on immigrant talent. All actors would benefit from bridging that gap and coming together to engage immigrants and their employers in workforce development strategies and foster immigrant upskilling. Awareness of how services can be modified or made more accessible to immigrant workers is an area that requires further attention and investment and should engage the employers who are relying on immigrants in a wide range of positions. Immigrant-serving organizations need to be at the table with other key organizations in the workforce and economic development field, helping to inform and make relevant to their communities the range of policy developments in workforce, education, and other fields that affect their constituents, both good and bad.

Investing in immigrant workers and their upskilling is important for a range of decisionmakers across sectors, who may or may not have immigrant and LEP issues on their radar.

- **State and local policymakers** making policy and funding decisions can be aware of and sensitive to the key role that immigrant workers are playing in their communities, pushing forward workforce and education issues. Recognizing the contributions of the immigrant community is

critical, especially at this time of restrictive immigration policies and toxic national rhetoric. Policymakers can put more resources into English language learning and encourage organizations to serve immigrants and LEP individuals, track information about programs to assess gaps in services, and actively engage immigrant-serving organizations to ensure policy is grounded in community needs.

- **Organizations providing workforce development services and education and training** can work to improve program accessibility and design to serve immigrant community members. Local workforce development boards, community colleges, and school districts, whose mission is to serve the community, can assess the extent to which they are funding immigrant-serving organizations or serving immigrant and LEP communities. They can work to improve the linguistic and cultural competence and accessibility of programs by hiring multilingual staff and partnering with immigrant-serving organizations to fill in gaps in visibility, language access, and cultural knowledge. Organizations should connect with immigrant-serving organizations to leverage WIOA's opportunity for pressing forward the needs of LEP individuals as a priority of service population, as well as youth in immigrant families.

- **Funders** interested in supporting equity and economic mobility can consider incorporating immigrant populations and English language learning into their funding priorities. They can work to ensure that these issues are reflected in their awarding of grants—that local grantees are reaching this population through direct services or incorporating an immigrant-inclusive lens in systems-level work. This might mean encouraging collaboration across sectors like connecting immigrant-serving ESL providers to local workforce development or economic development organizations or employers, or conducting needs assessments to inform future investment.

- **Employers** who want to recruit and retain workers can invest in improving job quality by recognizing barriers like child care and transportation and providing supports or services to help current employees. They can also invest in upskilling their employees through onsite training to foster English language learning and promote advancement. And they can collaborate with immigrant-serving organizations and other training providers to ensure that training programs are informed by current industry need.

This issue is even more important in our current political climate, when immigrant communities are subject to harsh political rhetoric and communities are suffering the consequences of heightened immigration enforcement and slowed immigration and citizenship processing. Uncertainty around Deferred Action for Childhood Arrivals (also known as DACA), temporary protected status, interior and

border enforcement, the immigration court system, and disincentives to receive essential public assistance because of public charge regulation developments are among the gamut of immigration policies that are causing uncertainty and hardship for communities across the US. With this onslaught of federal policy change, policies and practices at the state and local level are becoming even more crucial to protecting and supporting the immigrant workers and families who are part of neighborhoods, work places, schools, and communities across the country. States and local areas that are taking action to support their immigrant residents need to keep training and education on their agenda as they develop proactive policies and continue to support workers who are playing essential roles in our economy but are often not able to access the training that would benefit both them and employers.

000976

# Appendix. Assigning Skill Requirements to American Community Survey Occupation Codes

As described above, we used Bureau of Labor Statistics (BLS) occupation skill information to assign lower-, middle-, and high-skilled categories to each of the occupation codes in the American Community Survey (ACS). We chose to use BLS occupation skill information over comparable ONET data because of the closer alignment of ACS codes to BLS codes and following the precedent set by Capps, Fix, and Yi-Ying Lin (2010).

Following Capps, Fix, and Yi-Ying Lin (2010), we categorized each Standard Occupational Classification (SOC) code in the BLS data with a skill requirement level (either lower-, middle-, or high-skilled). First, occupations were labeled lower skilled if short- or moderate-term on-the-job training is typically needed to attain competency in that occupation. Occupations were then labeled middle skilled if they typically require long-term on-the-job training or an apprenticeship to achieve competency, if they require any work experience in a related occupation ("less than five years" or "five years or more," but not "none"), or if they typically require a postsecondary nondegree award or associate's degree for entry. Next, occupations were labeled high skilled if they require a bachelor's, master's, doctoral, or professional degree. Finally, jobs that were not captured by any of these criteria (i.e., were not associated with any of the listed training, experience, or education requirements) were labeled lower skilled.

Having assigned a skill level to each SOC code in the BLS data, we then used an ACS/BLS crosswalk to match each ACS code with an SOC code and corresponding skill level assignment.[12] Because the SOC occupation codes are finer grained and more numerous than the ACS occupation codes, some ACS codes matched with multiple SOC codes. In these "1 to many" merge cases, we took the average of the skill levels assigned to each matched SOC code, weighted by the number of individuals employed in each SOC code, and rounded the result. We then assigned the resulting skill level to the ACS occupation code in question.

TABLE A.1

**Workforce Statistics of Metropolitan Areas Chosen for Site Visits**

| | Dallas-Fort Worth-Arlington | Miami-Fort Lauderdale-West Palm Beach | Seattle-Tacoma-Bellevue |
|---|---|---|---|
| **Unemployment rate** | 3.2% | 4.0% | 4.3% |
| **Population in the civilian labor force** | 3,333,906 | 2,813,144 | 1,857,302 |
| Foreign-born workers | 26.4% | 51.7% | 20.5% |
| **Foreign-born individuals** | | | |
| *Region of birth* | | | |
| Latin America | 62.1% | 86.3% | 20.0% |
| Asia | 25.7% | 5.3% | 50.7% |
| Europe | 4.4% | 5.8% | 16.1% |
| Africa | 6.2% | 0.9% | 7.2% |
| North America | 1.2% | 1.6% | 4.1% |
| Oceania | 0.3% | 0.1% | 1.8% |
| **Foreign-born employed** | 744,558 | 1,211,939 | 360,931 |
| *Educational attainment* | | | |
| College or advanced degree | 25.3% | 28.4% | 41.1% |
| Some college | 16.9% | 27.3% | 24.7% |
| High school only | 20.7% | 29.6% | 18.7% |
| Less than high school | 37.2% | 14.7% | 15.5% |
| *Occupation* | | | |
| High-skilled | 21.5% | 22.0% | 34.1% |
| Middle-skilled | 26.7% | 27.3% | 22.1% |
| Lower-skilled | 51.9% | 50.7% | 43.8% |

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS. Unemployment rates in November 2017 from Bureau of Labor Statistics; national average of 4.1 percent.

**Notes:** Data refer to individuals ages 18–64 and in the civilian labor force. "Employed" individuals are those employed during the week before the survey administration. Median annual wage data are further restricted to those individuals who reported positive wage and salary income during the year before the survey.

TABLE A.2

**Top Middle-Skilled Occupations for Foreign-Born and Native-Born Workers**

| | Foreign-Born Workers | | | | Native-Born Workers | | |
|---|---|---|---|---|---|---|---|
| Rank | Occupation | LEP (%) | Median annual wage | Share | Occupation | Median annual wage | Share |
| 1 | Cooks | 76.3 | $18,000 | 12.1% | Driver/sales workers and truck drivers | $36,131 | 9.1% |
| 2 | Driver/sales workers and truck drivers | 59.2 | $31,616 | 9.4% | First-line supervisors of retail sales workers | $36,000 | 8.9% |
| 3 | Nursing, psychiatric, and home health aides | 42.8 | $22,900 | 8.3% | Nursing, psychiatric, and home health aides | $20,023 | 5.9% |
| 4 | First-line supervisors of retail sales workers | 35.7 | $35,614 | 6.8% | Cooks | $12,904 | 5.1% |
| 5 | Carpenters | 71.7 | $25,438 | 5.7% | First-line supervisors of office and administrative support workers | $44,390 | 4.1% |
| 6 | Food service managers | 44.7 | $35,614 | 3.6% | First-line supervisors of nonretail sales workers | $60,000 | 3.3% |
| 7 | Miscellaneous personal appearance workers[a] | 75.1 | $15,808 | 3.2% | Carpenters | $31,747 | 2.8% |
| 8 | Automotive service technicians and mechanics | 59.5 | $29,508 | 2.9% | First-line supervisors of production and operating workers | $51,640 | 2.6% |
| 9 | First-line supervisors of non-retail sales workers | 35.7 | $49,056 | 2.8% | Food service managers | $31,616 | 2.5% |
| 10 | Chefs and head cooks[a] | 65.9 | $25,000 | 2.4% | Hairdressers, hairstylists, and cosmetologists | $18,316 | 2.4% |
| 11 | First-line supervisors of office and administrative support workers | 25.2 | $42,736 | 2.3% | Automotive service technicians and mechanics | $35,000 | 2.3% |
| 12 | Hairdressers, hairstylists, and cosmetologists | 54.1 | $17,343 | 2.3% | First-line supervisors of construction trades and extraction workers | $55,063 | 2.3% |
| 13 | First-line supervisors of production and operating workers | 50.8 | $42,155 | 2.1% | Electricians | $46,553 | 2.2% |
| 14 | First-line supervisors of construction trades and extraction workers | 49.6 | $47,054 | 1.7% | Licensed practical and licensed vocational nurses | $34,039 | 2.2% |
| 15 | Licensed practical and licensed vocational nurses | 27.2 | $38,000 | 1.7% | Preschool and kindergarten teachers[a] | $19,820 | 1.8% |
| 16 | Electricians | 51.8 | $36,131 | 1.6% | Farmers, ranchers, and other agricultural managers[a] | $36,631 | 1.7% |
| 17 | Pipelayers, plumbers, pipefitters, and steamfitters | 63.3 | $31,616 | 1.5% | First-line supervisors of food preparation and serving workers | $20,023 | 1.6% |
| 18 | First-line supervisors of food preparation and serving workers | 44.7 | $24,428 | 1.4% | Property, real estate, and community association managers[a] | $45,052 | 1.5% |
| 19 | Maintenance and repair workers, general | 58.3 | $34,066 | 1.4% | Maintenance and repair workers, general | $40,047 | 1.5% |
| 20 | Bakers[a] | 72.5 | $20,023 | 1.2% | Pipelayers, plumbers, pipefitters, and steamfitters | $42,155 | 1.5% |
| | All occupations | 52.3 | $28,905 | 100.0% | All occupations | $36,041 | 100.0% |

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Notes:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. The total weighted foreign-born population meeting these conditions and employed in a middle-skilled occupation is 5,783,853; the total weighted native-born population meeting these conditions and employed in a middle-skilled occupation is 27,860,273. Median wage data are further restricted to those individuals who reported positive wage and salary income during the year before the survey. Individuals are considered limited English proficient if they report not speaking English, speaking English but not well, or speaking English well. LEP = limited English proficient.
[a] This occupations appears in the top 20 for one group but not the other.

APPENDIX

40

000979

TABLE A.3

**Top Lower- and Middle-Skilled Occupations for Foreign-Born Workers**

*Sorted by rate of limited English proficiency*

| Rank | Occupation | LEP (%) | Median annual wage | Share |
|------|------------|---------|--------------------|-------|
| 10 | Miscellaneous agricultural workers[a] | 87.9 | $17,298 | 2.3% |
| 8 | Grounds maintenance workers[a] | 80.8 | $19,098 | 2.7% |
| 1 | Maids and housekeeping cleaners[a] | 79.5 | $16,018 | 4.3% |
| 4 | Construction laborers | 76.5 | $24,028 | 3.4% |
| 2 | Cooks | 76.3 | $18,000 | 4.0% |
| 20 | Painters, construction, and maintenance[a] | 75.9 | $23,185 | 1.4% |
| 25 | Miscellaneous personal appearance workers[a] | 75.1 | $15,808 | 1.1% |
| 3 | Janitors and building cleaners | 73.3 | $20,000 | 3.7% |
| 21 | Food preparation workers[a] | 72.8 | $15,365 | 1.3% |
| 17 | Other production workers | 71.9 | $24,982 | 1.5% |
| 13 | Carpenters | 71.7 | $25,438 | 1.9% |
| 23 | Miscellaneous assemblers and fabricators[a] | 71.0 | $24,000 | 1.2% |
| 14 | Laborers and freight, stock, and material movers, hand | 67.5 | $21,525 | 1.9% |
| 5 | Driver/sales workers and truck drivers | 59.2 | $31,616 | 3.1% |
| 22 | Stock clerks and order fillers | 57.9 | $20,646 | 1.2% |
| 19 | Childcare workers | 57.0 | $13,215 | 1.4% |
| 15 | Personal care aides | 56.2 | $15,263 | 1.6% |
| 6 | Cashiers | 52.5 | $14,333 | 3.0% |
| 12 | Waiters and waitresses | 52.4 | $16,517 | 2.1% |
| 24 | Food service managers[a] | 44.7 | $35,614 | 1.2% |
| 7 | Nursing, psychiatric, and home health aides | 42.8 | $22,900 | 2.7% |
| 9 | Retail Salespersons | 38.7 | $20,000 | 2.4% |
| 11 | First-line supervisors of retail sales workers | 35.7 | $35,614 | 2.2% |
| 16 | Customer service representatives | 31.9 | $25,029 | 1.6% |
| 18 | Secretaries and administrative assistants | 25.1 | $30,969 | 1.5% |
| | **All occupations** | **57.3** | **$24,000** | **100.0%** |

| Lower-skilled occupations |
| Middle-skilled occupations |

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.
**Notes:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. Median wage data are further restricted to those individuals who reported positive wage and salary income during the year before the survey. Individuals are considered limited English proficient if they report not speaking English, speaking English but not well, or speaking English well. LEP = limited English proficient.
[a] This occupations appears in the top 25 for one group but not the other.

000980

TABLE A-4

**Characteristics of All Employed Foreign-Born Workers by Metropolitan Area**

| Metropolitan statistical area | N of all workers | Foreign-born | Occupation Skill-Level Requirements | | | Educational Attainment | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Lower-skilled | Middle-skilled | High-skilled | Less than HS | HS only | Some college | College or advanced degree |
| National | 137,074,610 | 17% | 50% | 25% | 25% | 26% | 23% | 21% | 31% |
| Akron, OH | 317,769 | 5% | 39% | 19% | 41% | 11% | 18% | 18% | 53% |
| Albany-Schenectady-Troy, NY | 397,710 | 8% | 38% | 23% | 40% | 12% | 18% | 22% | 48% |
| Albuquerque, NM | 369,721 | 13% | 49% | 31% | 20% | 33% | 27% | 19% | 22% |
| Allentown-Bethlehem-Easton, PA-NJ | 371,433 | 10% | 52% | 22% | 26% | 19% | 25% | 24% | 32% |
| Atlanta-Sandy Springs-Roswell, GA | 2,460,430 | 18% | 47% | 25% | 28% | 24% | 22% | 20% | 34% |
| Austin-Round Rock, TX | 947,700 | 18% | 48% | 24% | 27% | 29% | 22% | 17% | 32% |
| Bakersfield, CA | 314,354 | 30% | 65% | 25% | 10% | 49% | 24% | 16% | 11% |
| Baltimore-Columbia-Towson, MD | 1,263,768 | 13% | 37% | 25% | 39% | 13% | 19% | 20% | 48% |
| Baton Rouge, LA | 365,312 | 5% | 40% | 28% | 32% | 22% | 23% | 17% | 38% |
| Birmingham-Hoover, AL | 468,932 | 6% | 46% | 30% | 24% | 28% | 26% | 18% | 28% |
| Boise City, ID | 286,041 | 9% | 59% | 19% | 21% | 32% | 26% | 18% | 24% |
| Boston-Cambridge-Newton, MA-NH | 2,328,957 | 21% | 43% | 23% | 35% | 15% | 23% | 20% | 41% |
| Bridgeport-Stamford-Norwalk, CT | 428,098 | 28% | 48% | 24% | 28% | 20% | 25% | 20% | 35% |
| Buffalo-Cheektowaga-Niagara Falls, NY | 504,482 | 6% | 44% | 18% | 38% | 13% | 19% | 23% | 45% |
| Cape Coral-Fort Myers, FL | 241,097 | 22% | 59% | 26% | 15% | 29% | 30% | 23% | 18% |
| Charleston-North Charleston, SC | 319,806 | 7% | 45% | 30% | 25% | 26% | 24% | 22% | 29% |
| Charlotte-Concord-Gastonia, NC-SC | 1,055,154 | 13% | 51% | 24% | 25% | 28% | 22% | 21% | 30% |
| Chattanooga, TN-GA | 221,692 | 6% | 48% | 25% | 27% | 33% | 18% | 17% | 32% |
| Chicago-Naperville-Elgin, IL-IN-WI | 4,294,773 | 23% | 52% | 25% | 24% | 24% | 25% | 20% | 31% |
| Cincinnati, OH-KY-IN | 941,446 | 5% | 40% | 21% | 39% | 13% | 21% | 20% | 46% |
| Cleveland-Elyria, OH | 898,554 | 6% | 37% | 24% | 39% | 11% | 20% | 23% | 46% |

APPENDIX

000981

000982

| Metropolitan statistical area | N of all workers | Foreign-born | Occupation Skill-Level Requirements | | | Educational Attainment | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Lower-skilled | Middle-skilled | High-skilled | Less than HS | HS only | Some college | College or advanced degree |
| Colorado Springs, CO | 282,477 | 9% | 45% | 30% | 25% | 23% | 24% | 26% | 27% |
| Columbia, SC | 279,210 | 7% | 43% | 29% | 28% | 30% | 20% | 17% | 33% |
| Columbus, OH | 886,581 | 10% | 41% | 23% | 35% | 14% | 21% | 20% | 45% |
| Dallas-Fort Worth-Arlington, TX | 3,113,487 | 24% | 52% | 27% | 22% | 37% | 21% | 17% | 25% |
| Dayton, OH | 336,241 | 4% | 41% | 21% | 38% | 17% | 17% | 24% | 43% |
| Deltona-Daytona Beach-Ormond Beach, FL | 222,539 | 9% | 45% | 30% | 25% | 16% | 28% | 31% | 25% |
| Denver-Aurora-Lakewood, CO | 1,369,559 | 15% | 52% | 26% | 22% | 30% | 22% | 20% | 28% |
| Des Moines-West Des Moines, IA | 262,005 | 9% | 54% | 24% | 22% | 22% | 23% | 22% | 33% |
| Detroit-Warren-Dearborn, MI | 1,763,843 | 11% | 39% | 22% | 40% | 13% | 18% | 22% | 47% |
| El Paso, TX | 313,191 | 31% | 51% | 30% | 19% | 30% | 26% | 24% | 20% |
| Fresno, CA | 356,627 | 30% | 65% | 24% | 12% | 48% | 20% | 18% | 14% |
| Grand Rapids-Wyoming, MI | 418,038 | 9% | 61% | 18% | 20% | 30% | 23% | 21% | 26% |
| Greensboro-High Point, NC | 338,050 | 11% | 56% | 26% | 17% | 34% | 23% | 20% | 23% |
| Greenville-Anderson-Mauldin, SC | 386,694 | 8% | 52% | 24% | 25% | 27% | 24% | 19% | 29% |
| Harrisburg-Carlisle, PA | 257,081 | 7% | 43% | 26% | 32% | 18% | 23% | 20% | 39% |
| Hartford-West Hartford-East Hartford, CT | 566,874 | 16% | 42% | 26% | 33% | 12% | 23% | 26% | 39% |
| Houston-The Woodlands-Sugar Land, TX | 2,831,820 | 30% | 50% | 27% | 23% | 35% | 21% | 18% | 27% |
| Indianapolis-Carmel-Anderson, IN | 880,366 | 8% | 53% | 21% | 26% | 26% | 24% | 18% | 32% |
| Jackson, MS | 249,878 | 3% | 43% | 17% | 40% | 22% | 16% | 15% | 47% |
| Jacksonville, FL | 587,074 | 11% | 44% | 26% | 30% | 12% | 24% | 29% | 36% |
| Kansas City, MO-KS | 958,378 | 8% | 51% | 23% | 26% | 28% | 20% | 21% | 32% |
| Knoxville, TN | 382,210 | 5% | 49% | 24% | 27% | 26% | 23% | 19% | 33% |
| Lafayette, LA | 221,624 | 4% | 57% | 28% | 16% | 36% | 27% | 18% | 20% |
| Lakeland-Winter Haven, FL | 230,349 | 14% | 61% | 23% | 16% | 33% | 27% | 21% | 19% |

APPENDIX

43

000983

|  | | Occupation Skill-Level Requirements | | | Educational Attainment | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Metropolitan statistical area | N of all workers | Foreign-born | Lower-skilled | Middle-skilled | High-skilled | Less than HS | HS only | Some college | College or advanced degree |
| Lancaster, PA | 236,308 | 5% | 51% | 26% | 23% | 19% | 31% | 21% | 29% |
| Las Vegas-Henderson-Paradise, NV | 878,784 | 29% | 62% | 25% | 12% | 27% | 28% | 26% | 19% |
| Little Rock-North Little Rock-Conway, AR | 303,969 | 5% | 46% | 23% | 31% | 25% | 27% | 17% | 32% |
| Los Angeles-Long Beach-Anaheim, CA | 5,847,570 | 43% | 54% | 24% | 22% | 32% | 21% | 21% | 27% |
| Louisville/Jefferson County, KY-IN | 552,352 | 7% | 52% | 23% | 25% | 21% | 27% | 20% | 32% |
| Mcallen-Edinburg-Mission, TX | 284,422 | 38% | 55% | 32% | 13% | 48% | 21% | 16% | 15% |
| Memphis, TN-MS-AR | 533,051 | 8% | 53% | 23% | 24% | 31% | 21% | 17% | 31% |
| Miami-Fort Lauderdale-West Palm Beach, FL | 2,538,152 | 48% | 51% | 27% | 22% | 15% | 30% | 27% | 28% |
| Milwaukee-Waukesha-West Allis, WI | 726,941 | 9% | 51% | 21% | 28% | 24% | 24% | 19% | 33% |
| Minneapolis-St. Paul-Bloomington, MN-WI | 1,739,049 | 12% | 48% | 21% | 31% | 19% | 20% | 24% | 37% |
| Nashville-Davidson-Murfreesboro-Franklin, TN | 866,108 | 10% | 53% | 26% | 21% | 28% | 26% | 18% | 27% |
| New Haven-Milford, CT | 391,807 | 15% | 45% | 26% | 30% | 16% | 26% | 21% | 37% |
| New Orleans-Metairie, LA | 543,213 | 10% | 54% | 26% | 20% | 25% | 28% | 23% | 25% |
| New York-Newark-Jersey City, NY-NJ-PA | 8,952,613 | 37% | 48% | 26% | 27% | 19% | 25% | 21% | 35% |
| North Port-Sarasota-Bradenton, FL | 266,873 | 16% | 56% | 24% | 20% | 24% | 30% | 23% | 24% |
| Ogden-Clearfield, UT | 242,025 | 9% | 54% | 29% | 17% | 28% | 28% | 25% | 19% |
| Oklahoma City, OK | 613,429 | 11% | 55% | 27% | 18% | 38% | 24% | 16% | 21% |
| Omaha-Council Bluffs, NE-IA | 475,474 | 8% | 58% | 21% | 21% | 40% | 19% | 17% | 24% |
| Orlando-Kissimmee-Sanford, FL | 1,008,438 | 21% | 53% | 26% | 22% | 16% | 26% | 30% | 28% |
| Oxnard-Thousand Oaks-Ventura, CA | 377,626 | 30% | 58% | 21% | 20% | 39% | 18% | 20% | 23% |
| Philadelphia-Camden-Wilmington, PA-NJ-DE | 2,682,015 | 13% | 43% | 24% | 34% | 17% | 22% | 19% | 43% |
| Phoenix-Mesa-Scottsdale, AZ | 1,849,108 | 18% | 54% | 25% | 21% | 33% | 23% | 21% | 23% |

44

APPENDIX

000984

| Metropolitan statistical area | N of all workers | Foreign-born | Occupation Skill-Level Requirements | | | Educational Attainment | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Lower-skilled | Middle-skilled | High-skilled | Less than HS | HS only | Some college | College or advanced degree |
| Pittsburgh, PA | 1,039,229 | 4% | 29% | 19% | 52% | 8% | 13% | 18% | 61% |
| Portland-South Portland, ME | 257,703 | 5% | 52% | 21% | 27% | 13% | 21% | 30% | 35% |
| Portland-Vancouver-Hillsboro, OR-WA | 1,082,365 | 16% | 51% | 24% | 25% | 24% | 22% | 25% | 30% |
| Providence-Warwick, RI-MA | 743,571 | 15% | 51% | 27% | 22% | 25% | 28% | 24% | 24% |
| Provo-Orem, UT | 229,149 | 10% | 56% | 22% | 22% | 23% | 23% | 32% | 22% |
| Raleigh, NC | 597,728 | 15% | 44% | 23% | 33% | 26% | 18% | 17% | 38% |
| Richmond, VA | 560,817 | 10% | 44% | 24% | 33% | 22% | 21% | 19% | 39% |
| Riverside-San Bernardino-Ontario, CA | 1,675,394 | 30% | 55% | 28% | 17% | 35% | 23% | 22% | 19% |
| Rochester, NY | 494,789 | 7% | 44% | 20% | 36% | 13% | 19% | 26% | 41% |
| Sacramento-Roseville-Arden-Arcade, CA | 918,995 | 23% | 50% | 24% | 26% | 21% | 22% | 28% | 30% |
| St. Louis, MO-IL | 1,269,158 | 6% | 39% | 23% | 38% | 14% | 20% | 21% | 45% |
| Salt Lake City, UT | 543,243 | 15% | 56% | 26% | 18% | 30% | 25% | 22% | 23% |
| San Antonio-New Braunfels, TX | 966,557 | 15% | 51% | 30% | 19% | 32% | 24% | 22% | 22% |
| San Diego-Carlsbad, CA | 1,393,639 | 29% | 50% | 24% | 26% | 27% | 19% | 23% | 32% |
| San Francisco-Oakland-Hayward, CA | 2,161,847 | 37% | 44% | 21% | 34% | 19% | 18% | 21% | 43% |
| San Jose-Sunnyvale-Santa Clara, CA | 877,691 | 48% | 36% | 17% | 46% | 16% | 14% | 18% | 53% |
| Santa Rosa, CA | 223,133 | 22% | 60% | 25% | 15% | 36% | 22% | 25% | 17% |
| Scranton-Wilkes-Barre-Hazleton, PA | 223,607 | 7% | 68% | 20% | 13% | 30% | 30% | 18% | 22% |
| Seattle-Tacoma-Bellevue, WA | 1,728,111 | 21% | 44% | 22% | 34% | 16% | 19% | 25% | 41% |
| Spokane-Spokane Valley, WA | 228,292 | 7% | 51% | 27% | 22% | 18% | 28% | 29% | 26% |
| Springfield, MA | 252,533 | 10% | 46% | 26% | 28% | 14% | 25% | 30% | 31% |
| Stockton-Lodi, CA | 266,331 | 33% | 58% | 27% | 15% | 35% | 24% | 23% | 18% |
| Syracuse, NY | 289,246 | 6% | 40% | 22% | 39% | 14% | 19% | 25% | 43% |
| Tampa-St. Petersburg-Clearwater, FL | 1,199,812 | 16% | 48% | 27% | 26% | 17% | 27% | 26% | 31% |

APPENDIX

45

000985

|  |  |  | Occupation Skill-Level Requirements | | | Educational Attainment | | | |
| Metropolitan statistical area | N of all workers | Foreign-born | Lower-skilled | Middle-skilled | High-skilled | Less than HS | HS only | Some college | College or advanced degree |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Toledo, OH | 277,764 | 4% | 39% | 20% | 41% | 14% | 20% | 19% | 48% |
| Tucson, AZ | 396,871 | 16% | 53% | 25% | 23% | 27% | 25% | 24% | 24% |
| Urban Honolulu, HI | 425,080 | 23% | 53% | 26% | 21% | 14% | 26% | 32% | 28% |
| Virginia Beach-Norfolk-Newport News, VA-NC | 709,368 | 8% | 44% | 28% | 28% | 13% | 23% | 29% | 36% |
| Washington-Arlington-Alexandria, DC-VA-MD | 2,919,062 | 29% | 43% | 24% | 34% | 19% | 19% | 20% | 42% |
| Wichita, KS | 266,160 | 10% | 52% | 29% | 19% | 34% | 24% | 18% | 24% |
| Winston-Salem, NC | 264,301 | 11% | 63% | 21% | 17% | 43% | 24% | 13% | 19% |
| Worcester, MA-CT | 420,167 | 13% | 42% | 25% | 33% | 12% | 27% | 24% | 38% |
| Youngstown-Warren-Boardman, OH-PA | 224,231 | 2% | 41% | 21% | 39% | 10% | 23% | 20% | 47% |

**Source:** Five-year American Community Survey sample, 2011–15 collected from IPUMS.

**Notes:** Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. HS = high school.

APPENDIX

46

000986

TABLE A.5

**Characteristics of Foreign-Born Workers Employed in Lower- and Middle-Skilled Jobs by Metropolitan Area**

| Metropolitan statistical area | N | LEP | Less than HS | HS only | Some college | College or advanced degree | Foreign-born | Native-born |
|---|---|---|---|---|---|---|---|---|
| | | | Educational Attainment | | | | Median Annual Wages | |
| National | 17,597,817 | 57% | 33% | 29% | 24% | 15% | $24,000 | $28,032 |
| Akron, OH | 8,400 | 47% | 18% | 30% | 26% | 26% | $26,840 | $26,531 |
| Albany-Schenectady-Troy, NY | 18,434 | 32% | 20% | 29% | 31% | 20% | $26,558 | $30,969 |
| Albuquerque, NM | 38,523 | 60% | 39% | 32% | 20% | 9% | $20,023 | $25,808 |
| Allentown-Bethlehem-Easton, PA-NJ | 28,147 | 48% | 25% | 32% | 27% | 15% | $25,000 | $30,000 |
| Atlanta-Sandy Springs-Roswell, GA | 325,351 | 54% | 32% | 29% | 23% | 17% | $22,000 | $29,192 |
| Austin-Round Rock, TX | 125,813 | 63% | 40% | 29% | 19% | 13% | $22,025 | $29,000 |
| Bakersfield, CA | 83,743 | 69% | 54% | 25% | 16% | 5% | $20,351 | $27,031 |
| Baltimore-Columbia-Towson, MD | 99,633 | 42% | 20% | 28% | 28% | 24% | $26,347 | $33,034 |
| Baton Rouge, LA | 13,096 | 59% | 31% | 33% | 21% | 15% | $22,025 | $28,455 |
| Birmingham-Hoover, AL | 19,770 | 61% | 35% | 33% | 19% | 13% | $18,800 | $27,473 |
| Boise City, ID | 19,501 | 56% | 41% | 30% | 18% | 11% | $21,077 | $25,438 |
| Boston-Cambridge-Newton, MA-NH | 319,314 | 53% | 22% | 34% | 26% | 18% | $26,347 | $33,034 |
| Bridgeport-Stamford-Norwalk, CT | 86,277 | 58% | 27% | 32% | 24% | 17% | $26,030 | $34,066 |
| Buffalo-Cheektowaga-Niagara Falls, NY | 18,041 | 40% | 20% | 29% | 31% | 20% | $21,921 | $28,833 |
| Cape Coral-Fort Myers, FL | 45,457 | 57% | 33% | 33% | 23% | 11% | $21,472 | $25,808 |
| Charleston-North Charleston, SC | 15,476 | 49% | 33% | 28% | 24% | 16% | $21,600 | $27,873 |
| Charlotte-Concord-Gastonia, NC-SC | 100,917 | 59% | 36% | 27% | 24% | 13% | $21,077 | $28,032 |
| Chattanooga, TN-GA | 8,887 | 60% | 45% | 21% | 17% | 17% | $20,351 | $25,830 |
| Chicago-Naperville-Elgin, IL-IN-WI | 752,716 | 60% | 31% | 31% | 22% | 15% | $25,029 | $30,526 |

APPENDIX

47

000987

| Metropolitan statistical area | N | LEP | Educational Attainment | | | | Median Annual Wages | |
| | | | Less than HS | HS only | Some college | College or advanced degree | Foreign-born | Native-born |
|---|---|---|---|---|---|---|---|---|
| Cincinnati, OH-KY-IN | 31,200 | 53% | 22% | 32% | 26% | 20% | $23,185 | $28,032 |
| Cleveland-Elyria, OH | 34,707 | 47% | 18% | 31% | 30% | 20% | $23,185 | $28,032 |
| Colorado Springs, CO | 18,744 | 50% | 30% | 29% | 28% | 13% | $20,646 | $26,347 |
| Columbia, SC | 13,278 | 55% | 41% | 27% | 18% | 14% | $20,000 | $25,808 |
| Columbus, OH | 54,466 | 46% | 22% | 30% | 27% | 22% | $20,824 | $28,982 |
| Dallas-Fort Worth-Arlington, TX | 584,821 | 66% | 46% | 25% | 18% | 11% | $22,386 | $30,526 |
| Dayton, OH | 9,002 | 44% | 27% | 26% | 30% | 18% | $21,077 | $25,029 |
| Deltona-Daytona Beach-Ormond Beach, FL | 15,490 | 42% | 19% | 34% | 34% | 13% | $22,025 | $25,029 |
| Denver-Aurora-Lakewood, CO | 156,780 | 58% | 38% | 27% | 22% | 14% | $24,776 | $31,405 |
| Des Moines-West Des Moines, IA | 18,966 | 55% | 28% | 29% | 27% | 17% | $25,000 | $30,969 |
| Detroit-Warren-Dearborn, MI | 118,511 | 45% | 21% | 29% | 30% | 21% | $23,403 | $27,473 |
| El Paso, TX | 79,218 | 67% | 37% | 30% | 25% | 9% | $18,582 | $21,921 |
| Fresno, CA | 95,050 | 70% | 54% | 22% | 18% | 7% | $18,970 | $24,421 |
| Grand Rapids-Wyoming, MI | 28,712 | 57% | 37% | 28% | 23% | 12% | $22,025 | $26,347 |
| Greensboro-High Point, NC | 31,312 | 53% | 41% | 27% | 21% | 12% | $21,024 | $26,840 |
| Greenville-Anderson-Mauldin, SC | 22,228 | 60% | 35% | 31% | 22% | 13% | $20,023 | $26,030 |
| Harrisburg-Carlisle, PA | 12,731 | 49% | 26% | 32% | 24% | 18% | $25,000 | $30,035 |
| Hartford-West Hartford-East Hartford, CT | 59,730 | 40% | 17% | 33% | 32% | 18% | $30,035 | $33,000 |
| Houston-The Woodlands-Sugar Land, TX | 662,968 | 66% | 44% | 26% | 19% | 11% | $23,000 | $30,526 |
| Indianapolis-Carmel-Anderson, IN | 53,260 | 59% | 35% | 30% | 20% | 15% | $20,351 | $29,000 |
| Jackson, MS | 4,572 | 58% | 35% | 27% | 19% | 19% | $15,017 | $25,438 |
| Jacksonville, FL | 45,688 | 44% | 16% | 32% | 33% | 19% | $24,000 | $27,150 |

48

000988

49

| Metropolitan statistical area | N | LEP | Educational Attainment | | | | Median Annual Wages | |
|---|---|---|---|---|---|---|---|---|
| | | | Less than HS | HS only | Some college | College or advanced degree | Foreign-born | Native-born |
| Kansas City, MO-KS | 58,672 | 57% | 37% | 26% | 23% | 15% | $21,679 | $30,035 |
| Knoxville, TN | 14,054 | 49% | 34% | 31% | 22% | 13% | $17,916 | $25,705 |
| Lafayette, LA | 7,869 | 70% | 42% | 31% | 18% | 9% | $21,165 | $26,347 |
| Lakeland-Winter Haven, FL | 26,919 | 57% | 39% | 31% | 21% | 9% | $20,351 | $25,808 |
| Lancaster, PA | 9,725 | 53% | 24% | 38% | 24% | 14% | $25,029 | $29,508 |
| Las Vegas-Henderson-Paradise, NV | 225,644 | 55% | 31% | 31% | 26% | 12% | $26,840 | $30,000 |
| Little Rock-North Little Rock-Conway, AR | 11,448 | 54% | 35% | 37% | 17% | 11% | $20,351 | $26,347 |
| Los Angeles-Long Beach-Anaheim, CA | 1,926,580 | 65% | 40% | 25% | 22% | 14% | $22,895 | $27,774 |
| Louisville/Jefferson County, KY-IN | 26,806 | 52% | 27% | 33% | 23% | 17% | $23,026 | $28,032 |
| Mcallen-Edinburg-Mission, TX | 94,679 | 71% | 54% | 22% | 16% | 8% | $17,298 | $20,351 |
| Memphis, TN-MS-AR | 30,590 | 58% | 40% | 26% | 20% | 14% | $20,351 | $26,427 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 945,454 | 54% | 18% | 36% | 29% | 17% | $23,026 | $27,473 |
| Milwaukee-Waukesha-West Allis, WI | 44,295 | 57% | 33% | 32% | 23% | 13% | $22,711 | $29,508 |
| Minneapolis-St. Paul-Bloomington, MN-WI | 142,965 | 52% | 26% | 27% | 30% | 17% | $24,000 | $32,670 |
| Nashville-Davidson-Murfreesboro-Franklin, TN | 66,676 | 56% | 35% | 31% | 20% | 14% | $20,646 | $28,000 |
| New Haven-Milford, CT | 41,245 | 51% | 23% | 35% | 26% | 16% | $25,000 | $32,561 |
| New Orleans-Metairie, LA | 42,124 | 59% | 30% | 33% | 25% | 12% | $23,000 | $27,473 |
| New York-Newark-Jersey City, NY-NJ-PA | 2,400,571 | 53% | 25% | 33% | 24% | 18% | $26,000 | $34,066 |
| North Port-Sarasota-Bradenton, FL | 34,129 | 51% | 28% | 34% | 24% | 14% | $21,470 | $26,831 |
| Ogden-Clearfield, UT | 17,126 | 51% | 33% | 32% | 25% | 11% | $22,826 | $26,347 |
| Oklahoma City, OK | 54,777 | 65% | 46% | 29% | 17% | 9% | $20,824 | $27,401 |
| Omaha-Council Bluffs, NE-IA | 29,996 | 63% | 49% | 23% | 18% | 11% | $22,711 | $30,000 |

APPENDIX

| Metropolitan statistical area | N | LEP | Educational Attainment | | | | Median Annual Wages | |
|---|---|---|---|---|---|---|---|---|
| | | | Less than HS | HS only | Some college | College or advanced degree | Foreign-born | Native-born |
| Orlando-Kissimmee-Sanford, FL | 167,849 | 44% | 20% | 32% | 33% | 16% | $21,077 | $25,029 |
| Oxnard-Thousand Oaks-Ventura, CA | 90,395 | 66% | 49% | 21% | 21% | 9% | $21,368 | $30,000 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE | 229,306 | 53% | 25% | 31% | 23% | 21% | $24,569 | $31,616 |
| Phoenix-Mesa-Scottsdale, AZ | 266,004 | 57% | 41% | 27% | 22% | 10% | $22,711 | $30,000 |
| Pittsburgh, PA | 20,610 | 41% | 15% | 26% | 31% | 28% | $24,028 | $29,610 |
| Portland-South Portland, ME | 8,852 | 39% | 18% | 28% | 35% | 20% | $21,077 | $28,455 |
| Portland-Vancouver-Hillsboro, OR-WA | 130,322 | 58% | 31% | 27% | 28% | 14% | $23,743 | $29,614 |
| Providence-Warwick, RI-MA | 86,762 | 49% | 31% | 33% | 25% | 11% | $26,347 | $30,526 |
| Provo-Orem, UT | 18,249 | 54% | 28% | 28% | 32% | 12% | $23,185 | $20,023 |
| Raleigh, NC | 59,960 | 55% | 38% | 25% | 21% | 16% | $19,614 | $29,627 |
| Richmond, VA | 37,699 | 55% | 32% | 29% | 22% | 17% | $22,600 | $ 29,731 |
| Riverside-San Bernardino-Ontario, CA | 413,671 | 59% | 41% | 27% | 22% | 9% | $25,029 | $26,347 |
| Rochester, NY | 22,244 | 42% | 20% | 29% | 34% | 17% | $22,626 | $27,031 |
| Sacramento-Roseville-Arden-Arcade, CA | 157,251 | 58% | 28% | 28% | 32% | 13% | $24,239 | $30,000 |
| St. Louis, MO-IL | 43,033 | 46% | 22% | 31% | 29% | 18% | $23,026 | $28,595 |
| Salt Lake City, UT | 68,490 | 54% | 36% | 29% | 23% | 12% | $23,403 | $27,401 |
| San Antonio-New Braunfels, TX | 117,783 | 62% | 39% | 29% | 22% | 10% | $22,025 | $25,293 |
| San Diego-Carlsbad, CA | 300,714 | 56% | 35% | 24% | 26% | 15% | $24,000 | $28,800 |
| San Francisco-Oakland-Hayward, CA | 519,760 | 58% | 28% | 26% | 26% | 21% | $28,000 | $35,541 |
| San Jose-Sunnyvale-Santa Clara, CA | 223,890 | 60% | 28% | 25% | 26% | 21% | $29,000 | $31,900 |
| Santa Rosa, CA | 40,534 | 61% | 42% | 25% | 26% | 8% | $25,947 | $30,969 |
| Scranton-Wilkes-Barre-Hazleton, PA | 12,957 | 65% | 34% | 34% | 18% | 14% | $21,921 | $28,032 |

APPENDIX

50

| Metropolitan statistical area | N | LEP | Less than HS | HS only | Some college | College or advanced degree | Foreign-born | Native-born |
|---|---|---|---|---|---|---|---|---|
| | | | Educational Attainment | | | | Median Annual Wages | |
| Seattle-Tacoma-Bellevue, WA | 237,707 | 50% | 23% | 27% | 31% | 19% | $26,347 | $34,139 |
| Spokane-Spokane Valley, WA | 12,546 | 50% | 22% | 33% | 33% | 12% | $22,426 | $26,840 |
| Springfield, MA | 18,165 | 44% | 18% | 32% | 35% | 15% | $25,808 | $29,421 |
| Stockton-Lodi, CA | 74,349 | 63% | 41% | 27% | 23% | 9% | $24,776 | $28,905 |
| Syracuse, NY | 10,795 | 38% | 22% | 29% | 29% | 20% | $22,300 | $29,000 |
| Tampa-St. Petersburg-Clearwater, FL | 145,188 | 48% | 22% | 34% | 29% | 16% | $23,227 | $27,131 |
| Toledo, OH | 6,426 | 48% | 23% | 31% | 26% | 19% | $20,646 | $25,808 |
| Tucson, AZ | 50,364 | 54% | 34% | 30% | 26% | 10% | $20,646 | $25,000 |
| Urban Honolulu, HI | 75,396 | 59% | 17% | 32% | 35% | 17% | $27,331 | $31,616 |
| Virginia Beach-Norfolk-Newport News, VA-NC | 41,803 | 41% | 17% | 31% | 33% | 20% | $25,000 | $28,000 |
| Washington-Arlington-Alexandria, DC-VA-MD | 562,778 | 48% | 28% | 27% | 25% | 21% | $26,631 | $36,131 |
| Wichita, KS | 21,681 | 60% | 41% | 29% | 18% | 12% | $24,776 | $27,401 |
| Winston-Salem, NC | 23,751 | 63% | 51% | 28% | 13% | 8% | $20,000 | $27,000 |
| Worcester, MA-CT | 37,219 | 47% | 17% | 37% | 29% | 17% | $26,430 | $31,616 |
| Youngstown-Warren-Boardman, OH-PA | 2,508 | 32% | 14% | 31% | 29% | 27% | $24,421 | $25,000 |

Source: Five-year American Community Survey sample, 2011–15 collected from IPUMS.

Notes: Data refer to individuals ages 18–64, in the civilian labor force, and employed during the week before the survey administration. Median wage data are further restricted to those individuals who reported positive wage and salary income during year before the survey.

# Notes

[1] For more information on the organizations and activities that make up the workforce system, see Eyster et al. 2016.

[2] Many contest the notion of a skills gap and, rather than blaming workers for lacking skills, they put the onus on employers and labor-market intermediaries to invest in skill development through employer-provided training or coordination with education providers. See Andrew Weaver, "The Myth of the Skills Gap," *MIT Technology Review*, August 25, 2017, https://www.technologyreview.com/s/608707/the-myth-of-the-skills-gap/.

[3] "Becoming Bilingual in Immigration & Workforce: What Philanthropic Leaders Need to Know," YouTube video, 1:29:25, Grantmakers Concerned with Immigrants and Refugees, August 2, 2016, https://www.youtube.com/watch?v=s-ls2DBwP6k&feature=youtu.be.

[4] "Ensuring Immigrants' Access to WIOA: Data and Advocacy Tools for Adult Educators." YouTube video, 1:03:02, Coalition on Adult Basic Education, February 22, 2017, https://www.youtube.com/watch?v=qd1MOrfeBo4.

[5] Advocates were concerned in particular about two changes: A new set of six common performance measures emphasizing employment outcomes that apply to Title I workforce services and Title II adult education services alike; and a reconstitution of the former English Language/Civics funding as the new Integrated English Literacy and Civics Education with a greater emphasis on workforce outcomes compared with citizenship outcomes. Though WIOA Title I requires participants to have legal authorization to work in the US, Title II is silent on immigration status. For information on WIOA and its impact for immigrants, see National Skills Coalition, 2016.

[6] The BLS system reports the "1) typical education needed for entry, 2) commonly required work experience in a related occupation, and 3) typical on-the-job training needed to obtain competency in the [each] occupation."

[7] As a point of comparison, recent research finds 7.6 million unauthorized individuals in the labor force, making up 4.7 percent of the total US workforce of 161 million (Paral 2018). That study found that 62 percent of foreign-born workers were employed in lower-skilled jobs (requiring no formal educational credential, or a high school diploma or equivalent) and 12 percent had middle-skilled jobs (requiring some college, a postsecondary nondegree award, or an associate's degree), yet our analysis finds a share of 50 percent in lower-skilled jobs and 25 percent in middle-skilled jobs following BLS classifications. The difference may be because of differences in job classifications, Paral's correction for the undercount of undocumented immigrants (which he addresses using a secondary dataset), and differences in definition of the workforce; ours is limited to 18- to 64-year-olds in the civilian labor force and Paral's includes a broader group (16+ in civilian and military positions).

[8] Immigrants in middle-skilled and high-skilled positions have had more years of residence in the US, on average, than immigrants in lower-skilled occupations, although the difference is not large (median of 18 years compared with 16 years).

[9] For information documenting the insufficient English language training opportunities in another local area, see Soricone et al. 2011. The broader national challenge of limited ESL-training supply to meet demand is discussed in McHugh, Gelatt, and Fix, 2007.

[10] Soricone et al. (2011) noted that the research suggests that considerable time is required for language acquisition; one paper estimated an immigrant with native language literacy would need 500 to 1,000 instructional hours to reach a minimal functional level of English and cited another study that suggested 150 hours were needed to achieve one level gain in ESL.

[11] This issue of "mainstreaming" has been discussed in the European context, where immigrant integration policies including workforce training have treated immigrants' needs explicitly and "developed group-targeted policies,"

that are now increasingly being transformed to incorporate immigrants into broader service systems (Benton, McCarthy, and Collett 2015).

[12] "Employment Projections," US Bureau of Labor Statistics, accessed May 25, 2018, https://www.bls.gov/emp/ep_crosswalks.htm.

# References

Adams, Gina, Shayne Spaulding, and Caroline Heller. 2015. *Bridging the Gap: Exploring the Intersection of Workforce Development and Child Care*. Washington, DC: Urban Institute.

Baker, Bryan. 2017. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014." Washington, DC: US Department of Homeland Security. Office of Immigration Statistics.

Batalova, Jeanne, Michael Fix, and James D. Bachmeier. 2016. *Untapped Talent: The Costs of Brain Waste among Highly Skilled Immigrants in the United States*. Washington, DC: Migration Policy Institute.

Benton, Meghan, Helen McCarthy, and Elizabeth Collett. 2015. *Into the Mainstream: Rethinking Public Services for Diverse and Mobile Populations*. Washington, DC: Migration Policy Institute.

Bergson-Shilcock, Amanda. 2016. *Upskilling the New American Workforce: Demand-Driven Programs that Foster Immigrant Worker Success & Policies that Can Take them to Scale*. Washington, DC: National Skills Coalition.

Bergson-Shilcock, Amanda, and James Witte. 2015. *Steps to Success: Integrating Immigrant Professionals in the U.S.* New York: World Education Service.

Burt, Miriam, and Julie Mathews-Aydinli. 2007. "Workplace Instruction and Workforce Preparation for Adult Immigrants." Center for Adult English Language Acquisition, Center for Applied Linguistics.

Callahan, Rebecca M., and Patricia C. Gándara, eds. 2014. *The Bilingual Advantage: Language, Literacy, and the US Labor Market*. Buffalo, NY: Multilingual Matters.

Capps, Randy, Michael Fix, and Serena Yi-Ying Lin. 2010. *Still an Hourglass? Immigrant Workers in Middle-Skilled Jobs*. Washington, DC: Migration Policy Institute, National Center on Immigrant Integration Policy.

Carnevale, Anthony P., Jeff Strohl, Ban Cheah, and Neil Ridley. 2017. *Good Jobs That Pay without a BA*. Washington, DC: Georgetown University, McCourt School of Public Policy, Center on Education and the Workforce.

Cervantes, Wendy, Rebecca Ulrich, and Hannah Matthews. 2018. *Our Children's Fear: Immigration Policy's Effects on Young Children*. Washington, DC: CLASP.

Connell, Christopher. 2008. "The Vital Role of Community Colleges in the Education and Integration of Immigrants." Sebastopol, CA: Grantmakers Concerned with Immigrants and Refugees.

Dramski, Pavel. 2017. *On the Clock: How Immigrants Fill Gaps in the Labor Market by Working Nontraditional Hours*. New American Economy.

Dyssegaard Kallick, David. 2015. *Bringing Vitality to Main Street: How Immigrant Small Businesses Help Local Economies Grow*. New York: Americas Society/Council of The Americas and the Fiscal Policy Institute.

Enchautegui, Maria. 2015. *Engaging Employers in Immigrant Integration*. Washington, DC: Urban Institute.

Espinoza, Robert. 2017. "Immigrants and the Direct Care Workforce." Bronx, NY: PHI.

Eyster, Lauren, Christin Durham, Michelle Van Noy, and Neil Damron. 2016. "Understanding Local Workforce Systems." Washington, DC: Urban Institute.

Gershwin, Mary, Tammy Coxen, Brian Kelley, and Gary Yakimov. 2009. *Building Tomorrow's Workforce: Promoting the Education & Advancement of Hispanic Immigrant Workers in America*. Ann Arbor, MI: Corporation for a Skilled Workforce.

Hagan, Jacqueline Maria, Rubén Hernandez-León, and Jean Luc Demonsant. 2015. *Skills of the "Unskilled": Work and Mobility among Mexican Migrants*. Berkeley: University of California Press.

Hall, Matthew, Audrey Singer, Gordon F. De Jong, and Deborah Roempke Graefe. 2011. "The Geography of Immigrant Skills: Educational Profiles of Metropolitan Areas." Washington, DC: Brookings Institution.

000993

Hamaji, Kate, and Christian González-Rivera. 2016. *A City of Immigrant Workers: Building a Workforce Strategy to Support All New Yorkers*. New York: Center for an Urban Future and the Center for Popular Democracy.

Hohn, Marcia D., Justin P. Lowry, James C. Witte, and José Ramón Fernández-Pena. 2016. *Immigrants in Health Care: Keeping Americans Healthy through Care and Innovation*. Fairfax, VA: George Mason University Institute for Immigration Research and the Immigrant Learner Center.

Holzer, Harry. 2015. "Job Market Polarization and U.S. Worker Skills: A Tale of Two Middles." Washington, DC: Brookings Institution.

Kallenbach, Silja, and Andy Nash. 2016. *Adult Education and Immigrant Integration: Lessons Learned from the Networks for Integrating New Americans Initiative*. Boston: World Education.

Kochan, Thomas, David Finegold, and Paul Osterman. 2012. "Who Can Fix the 'Middle Skills' Gap? Companies Should Take the Lead in Creating Collaborative Programs to Train Workers." Watertown, MA: Harvard Business Review.

McHugh, Margie. 2018. *In the Age of Trump: Populist Backlash and Progressive Resistance Create Divergent State Immigrant Integration Contexts*. Washington, DC: Migration Policy Institute.

McHugh, Margie, Julia Gelatt, and Michael Fix. 2007. *Adult English Language Instruction in the United States: Determining Need and Investing Wisely*. Washington, DC: Migration Policy Institute.

McHugh, Margie, and Madeleine Morawski. 2015. "Immigrants and WIOA Services: Comparison of Sociodemographic Characteristics of Native- and Foreign-Born Adults in the United States." Washington, DC: Migration Policy Institute, National Center on Immigrant Integration Policy.

———. 2017. "Unlocking Skills: Successful Initiatives for Integrating Foreign-Trained Immigrant Professionals." Washington, DC: Migration Policy Institute.

Modestino, Alicia S. 2016. "The Importance of Middle-Skill Jobs." *Issues in Science and Technology* 33 (1).

Montes, Marcela, and Vickie Choitz. 2016a. *Improving Immigrant Access to Workforce Services: Partnerships, Practices & Policies*. Washington, DC: Aspen Institute, Workforce Strategies Initiative.

———. 2016b. *Working Together to Strengthen America's Immigrant Workforce: Partnerships Between Community Colleges and Immigrant-Serving Organizations*. Washington, DC: Aspen Institute, Workforce Strategies Initiative.

New American Economy. 2017. "Not Lost in Translation: The Growing Importance of Foreign Language Skills in the U.S. Job Market." New American Economy.

National Skills Coalition. n.d. a. "Middle-Skill Credentials and Immigrant Workers: Arizona's Untapped Assets." Washington, DC: National Skills Coalition.

———. n.d. b. "Middle-Skill Credentials and Immigrant Workers: California's Untapped Assets." Washington, DC: National Skills Coalition.

———. 2016. "WIOA Final Regulations and Immigrants." Webinar slides, August 23. Washington, DC: National Skills Coalition.

Paral, Rob. 2018. *Ready to Work: Understanding Immigrant Skills in the United States to Build a Competitive Labor Force*. Chicago Council on Global Affairs.

Soricone, Lisa, Navjeet Singh, Cristine Smith, John Comings, Katherine Shields, Lynne Sacks, and Andrea Tull. 2011. *Breaking the Language Barrier: A Report on English Language Services in Greater Boston*. Boston Foundation and Commonwealth Corporation.

Spence, Robin. 2010. *Sound Investments: Building Immigrants' Skills to Fuel Economic Growth*. New York: Economic Mobility Corporation.

US Department of Health and Human Services. 2014. *Models of Collaboration between Workforce Investment and Refugee Resettlement Stakeholders*. Washington, DC: Administration for Children and Families, Office of Refugee Resettlement.

000995

# About the Authors

**Hamutal Bernstein** is a senior research associate in the Income and Benefits Policy Center at the Urban Institute, where her research focuses on immigration and integration, workforce development and education, and program evaluation. She has wide expertise in mixed-methods research, including original survey development, secondary data analysis, and qualitative data collection and analysis. She is a principal investigator on the Annual Survey of Refugees and Survey Redesign for the US Department of Health and Human Services. Her other areas of research focus on immigrant upskilling, immigrant inclusion at the local level, and other human services topics. Before joining Urban, Bernstein was a program officer at the German Marshall Fund of the United States, managing public opinion survey research in the United States and Europe. This position followed her work on global and US migration research as a research associate at the Institute for the Study of International Migration at Georgetown University and as a migration consultant to international organizations. She has conducted fieldwork in English and Spanish in the United States and abroad, and she speaks fluent French. Bernstein received her BA in international relations from Brown University and her PhD in government from Georgetown University.

**Carolyn Vilter** is a research assistant in the Income and Benefits Policy Center at the Urban Institute, where she primarily works on workforce development and immigration-related issues. Before joining Urban, she interned with the US Department of State in Tijuana, Mexico, and the US House of Representatives. She holds a BA in political economy from Georgetown University.

## STATEMENT OF INDEPENDENCE

The Urban Institute strives to meet the highest standards of integrity and quality in its research and analyses and in the evidence-based policy recommendations offered by its researchers and experts. We believe that operating consistent with the values of independence, rigor, and transparency is essential to maintaining those standards. As an organization, the Urban Institute does not take positions on issues, but it does empower and support its experts in sharing their own evidence-based views and policy recommendations that have been shaped by scholarship. Funders do not determine our research findings or the insights and recommendations of our experts. Urban scholars and experts are expected to be objective and follow the evidence wherever it may lead.



2100 M Street NW
Washington, DC 20037

www.urban.org

Separated at Girth: US Twin Estimates of the Effects of Birth Weight

Author(s): Heather Royer

Source: *American Economic Journal: Applied Economics*, January 2009, Vol. 1, No. 1 (January 2009), pp. 49-85

Published by: American Economic Association

Stable URL: https://www.jstor.org/stable/25760147

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms

 is collaborating with JSTOR to digitize, preserve and extend access to *American Economic Journal: Applied Economics*

*American Economic Journal: Applied Economics 2009, 1:1, 49–85*
*http://www.aeaweb.org/articles.php?doi=10.1257/app.1.1.49*

# Separated at Girth:
# US Twin Estimates of the Effects of Birth Weight[†]

## *By* Heather Royer*

*The fetal origins hypothesis asserts that nutrient deprivation in utero can raise chronic disease risk. Within economics, this hypothesis has gained acceptance as a leading explanation for the correlations between birth weight, a proxy for fetal nutrient intake, and adult outcomes. Exploiting birth-weight differences between twins using (a) a newly-created dataset of twins from 1960–1982 California birth records and (b) the Early Childhood Longitudinal Study Birth Cohort, I find birth weight is related to educational attainment, later pregnancy complications, and the birth weight of the next generation. These effects are generally small. However, the protective effects of birth weight vary across the birth-weight distribution. (JEL: I12, I21, J13)*

Studying the geographic distribution of chronic heart disease in England and Wales in the 1980's, David Barker, an English physician, encountered a striking pattern. The rates of such disease were correlated strongly with infant mortality rates 70 years prior (David Barker et al. 1989). This observation led to his widely-cited fetal origins hypothesis, which claims that: "fetal growth restriction—due to nutritional deprivation in early life—is an important cause of some of the most common, costly, and disabling medical disorders of adult life including coronary heart disease and the related disorders hypertension, stroke, and type 2 diabetes" (Barker Theory 2006). Barker argues that fetal nutrient intake affects physiological development in utero and, thereby, susceptibility to chronic conditions as an adult. Randomized, controlled trials using animals support this hypothesis. For example, relative to fully nourished rats, rats starved in utero have equal-sized brains but less developed nonneurological organ systems (Susan E. Ozanne and C. Nicholas Hales 2002). Economists have interpreted Barker's fetal origins hypothesis broadly and have used it to explain the relationship between early health conditions such as birth-weight and long-run socioeconomic and health outcomes such as wages, human capital acquisition, and disability (e.g., Anne Case, Angela Fertig, and Christina Paxson 2005; Douglas Almond 2006; Sharon Maccini and Dean Yang 2006; Xin Meng and Nancy Qian 2006).

* Department of Economics, Weatherhead School of Management, Case Western Reserve University, 10900 Euclid Avenue, PBL 275, Cleveland, OH 44106 (e-mail: heather.royer@case.edu). I would like to thank Martha Bailey, David Card, Tom Chang, Ken Chay, John DiNardo, Erica Greulich, Mireille Jacobson, Paco Martorell, Justin McCrary, Doug Miller, and Susan Royer, seminar participants at the University of Michigan and Clemson University, and attendees at the annual Robert Wood Johnson Scholars in Health Policy conference and the National Poverty Center Early Life Events conference for their comments and suggestions. I owe all credit for the clever title to Neal Caren. I am grateful to the Robert Wood Johnson Foundation for generous support and for the valuable research assistance of Meghan Cameron, Feng Pan, and Andrew Zhang.

† To comment on this article in the online discussion forum visit the articles page at http://www.aeaweb.org/articles.php?doi=10.1257/app.1.1.49.

001000

The fetal origins hypothesis has many important economic implications. It would suggest that policies that aim to improve the prenatal environment (e.g., Medicaid expansion for pregnant women and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC)) could reap large long-run health, human capital, and wage returns for both current and future generations. Such effects are often ignored in cost-benefit calculations, potentially leading to an underinvestment in these programs. Moreover, tests of the fetal origins hypothesis shed light on research examining the life-cycle evolution of the socioeconomic gradient in health (e.g., Case, Darren Lubotsky, and Paxson 2002; Janet Currie and Mark Stabile 2003).

Empirical tests of the fetal origins hypothesis in humans are difficult because fetal nutrients are not randomly assigned.[1] Simple cross-sectional regressions between birth weight and heart disease mortality provide much of the early evidence on this hypothesis (Barker et al. 1989). But this approach is unlikely to isolate the causal effect of fetal nutrients, as birth weight is strongly associated with socioeconomic status.

Researchers have used two principal empirical strategies to address these limitations. The first involves exploiting historical events (e.g., the 1944 Dutch famine (Lumey and Stein 1997) and the 1918 influenza epidemic (Almond 2006)), which altered the in utero environment through starvation, stress, and/or sickness. The second approach uses twin comparisons, relating within-twin-pair differences in birth weight to differences in the twins' long-run outcomes (e.g., Behrman and Rosenzweig 2004; Black, Devereux, and Salvanes 2007; Oreopoulos et al. 2006). Because recent research argues that variation in fetal nutrient uptake is the primary source of within-twin-pair variation in birth weight (Almond, Kenneth Y. Chay, and David S. Lee 2005; Gary F. Cunningham et al. 2001), this second approach is arguably a more direct test of the fetal origins hypothesis.[2] Barker's original hypothesis is explicitly about the long-run effects of fetal nutrients rather than, for instance, the long-run effects of maternal sickness during pregnancy. Maternal sickness could affect both fetal nutrients and other factors that contribute to long-run outcomes (e.g., socioeconomic status or birth defects).[3] The twins approach is also appealing since one's identical twin is a near-ideal counterfactual. Genetic makeup and family upbringing, two factors that may drive the cross-sectional correlation between birth-weight and long-run outcomes, are as comparable as may be possible in a nonexperimental setting.[4] Most twins studies have found large, positive effects of being the heavier twin.

---

[1] Empirical studies of the relationship between fetal conditions and long-run outcomes include Almond 2006; Barker 1995; Jere R. Behrman and Mark R. Rosenzweig 2004; Sandra E. Black, Paul J. Devereux, and Kjell G. Salvanes 2007; Case, Fertig, and Paxson 2005; Dalton Conley and Neil G. Bennett 2000; Currie and Rosemary Hyson 1999; Currie and Enrico Moretti 2007; Rucker C. Johnson and Robert F. Schoeni 2005; L. H. Lumey and Aryeh D. Stein, 1997; and Phil Oreopoulos et al. 2006.

[2] In the case where the birth-weight discrepancies between twins are due to other factors besides fetal nutrients, it would be incorrect to interpret the twins studies as a test of the fetal origins hypothesis. However, such estimates are still informative about the effects of birth weight.

[3] There is some evidence the influenza epidemic affected the incidence of birth defects (Alice Reid 2005). Also, given the high rate of maternal mortality during the epidemic, many of the infants affected in utero may have grown up motherless.

[4] While twins are alike along many dimensions, they consistently differ in birth weight. The absolute value of the difference in twins' birth weight in my sample is 282 grams, which is larger than the effect of smoking on birth weight (Almond, Chay, and Lee 2005).

Despite the conceptual appeal of the twins approach, the existing twin studies have some limitations. First, these estimates can be quite unstable, even within a study. For instance, Black, Devereux, and Salvanes (2007) estimate a negligible effect of birth weight on high school completion for the 1967–1976 birth cohort, but for individuals born between 1977 and 1986, the estimate is nearly six times as large.[5,6] Second, measurement error may bias some previous estimates. In particular, Behrman and Rosenzweig (2004) use fetal growth (birth weight/gestational length) as their measure of infant health but, because gestational length is measured with considerable error, such estimates can be inconsistent and with an indeterminable direction of bias.[7] Third, the sample of twins used in other studies is quite small, particularly for the United States (e.g., Behrman and Rosenzweig's (2004) sample consists of 402 twin pairs).

This study uses within-twin-pair comparisons to estimate the short- and long-run effects of birth weight. I use data from two sources: (a) a large new sample of twins, which I construct from the universe of 1960–1982 California birth records and (b) the Early Childhood Longitudinal Study, Birth Cohort (ECLS-B), which includes an oversampling of twins and follows them from birth. The birth record data provide information on long-run outcomes. The ECLS-B furnishes data on short-run outcomes including neonatal intensive care unit use and developmental outcomes.

This study makes a number of contributions to the existing literature. First, the datasets include relatively large samples of twins. In the birth record data, there are nearly 3,400 female twin pairs for whom I am able to observe adult outcomes, which is to my knowledge the largest US dataset on twins with information on long-run outcomes. The large sample used in this study adds considerable power to the analysis, facilitating clearer inference about the contribution of birth weight to adult well-being, and overcoming the publication bias criticisms of this literature (Rachel Huxley, Andrew Neil, and Rory Collins 2002).[8]

Second, due to the larger sample size, I am able to test whether the birth-weight effects are nonlinear.[9] Understanding not only whether but also how increases in birth weight at different points in the birth weight distribution impact later life and intergenerational outcomes is crucial for designing targeted, cost-effective policies.

Third, this study focuses on recent cohorts in the United States. It is not clear whether the findings from earlier work pertain to the current US context. Due to changes in immigration and economic conditions as well as other factors, estimates may differ from those obtained using the previously studied Minnesota twins (Behrman and Rosenzweig 2004). Similarly, the relevance of recent estimates based on Norwegian and Canadian data (Black, Devereux, and Salvanes 2007; Oreopoulos et al. 2006) for the United States are unclear. For instance, intergenerational correlations in mobility are considerably smaller in the United States than in Canada

---

[5] These estimates are statistically distinguishable from one another.

[6] In contrast, for all outcomes except diabetes, the effects of birth weight estimated in this study are consistent across cohorts.

[7] I prove this in Web Appendix C.

[8] Due to publication bias in this literature, Huxley, Neil, and Collins (2002) find that across studies, the estimated effect sizes are a decreasing function of sample size.

[9] The studies of Almond, Chay, and Lee (2005) and Currie and Moretti (2007) suggest that there are important nonlinearities in the impact of birth weight on short- and long-run outcomes.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1010 of 4699 PageID #:  4175

and Norway (Jo Blanden, Paul Gregg, and Stephen Machin 2005), and both countries have universally provided health insurance.

Fourth, the data used in this study provide information on some adult chronic conditions, the exact data needed to test the fetal origins hypothesis. Such data are unavailable in the studies of Behrman and Rosenzweig (2004); Black, Devereux, and Salvanes (2007); and Oreopoulos et al. (2006). Finally, this is the first study of these recent twin studies to examine both the short- and long-run effects of birth weight and the extent to which investments made by parents and health care providers are related to birth weight. Doing so helps to give a broader view of the mechanisms by which birth weight affects long-run outcomes.

Consistent with previous studies, I estimate a statistically significant relationship between birth weight and long-run and intergenerational outcomes. In particular, the heavier twin obtains more education, gives birth to heavier children, and has fewer pregnancy complications. In sharp contrast to earlier research, however, these effects tend to be quite small with the exception of pregnancy complications. For a 200 gram increase in birth weight, which likely is an achievable policy manipulation, education would be projected to rise by roughly 0.04 of one year. These negative effects of birth weight do not appear to be persistent across generations, as the estimated intergenerational correlation in birth weight is only 0.07. In contrast to other studies (e.g., Black, Devereux, and Salvanes 2007), I find that the effects of birth weight on long-run outcomes are nonlinear and for educational attainment, in particular, are largest above 2,500 grams, the cutoff for defining low birth weight. These findings suggest that babies with birth weights outside the lower tail of the distribution (i.e., outside the range of low birth weight) should receive more attention.

Although estimating the long-run effects of birth weight via twin comparisons is theoretically appealing, there are several potential threats to validity. First, external investment by parents and health care providers may vary systematically with birth weight.[10] For instance, parents may seek to neutralize the effects of birth weight by investing more in the lighter twin, which could explain the small effects on long-run outcomes. Using the ECLS-B, I estimate a weak within-twin-pair relationship between birth weight and outcomes such as hospital days and neonatal intensive care unit use, suggesting little differential investment on the part of health care providers that is correlated with birth weight.

Second, as in any test of the fetal origins hypothesis, there is a concern about non-random sample selection. This is a direct implication of the hypothesis itself since a lack of fetal nutrients may increase early-age mortality rates. In addition, the construction of the dataset (i.e., the intergenerational match of birth records) may also lead to sample selection. Nearly all of the sample selection appears to be due to birth-weight-related infant mortality, however. Sample selection likely would lead to downward-biased estimates of the effects of birth weight since the low birth-weight

---

[10] If the estimated birth-weight effect is intended to capture the biological effect of birth weight, then one would view parental investment as a confounder. But if one is interested in the reduced-form effect of birth weight inclusive of such parental behaviors, systematic parental investment based on birth-weight differences is not problematic. As the second effect may be less policy amenable, my goal is to estimate the first effect. In either case, the ability to which parents are able to neutralize or exacerbate the harmful effects of low birth weight is an independent outcome of interest and deserves further attention.

children who survive will be relatively robust. To ascertain the magnitude of bias, I perform a series of tests, which essentially amount to using a twin's birth cohort as an instrument for selection into the sample. The results suggest that sample selection does not explain the small estimated birth-weight effects.

Third, like other twin studies (e.g., Almond, Chay, and Lee 2005; Oreopoulos et al. 2006), my twin sample includes both monozygotic (i.e., "identical") and dizygotic (i.e., fraternal) twins.[11] Within-twin-pair birth-weight differences among both monozygotic and dizygotic twins may not be due exclusively to disparities in in utero nutrition but also due to differences in genetic makeup. As genetic advantage is correlated positively with birth weight, as suggested by the data, estimates of the effect of birth weight based on all twins will likely be biased upward. In Black, Devereux, and Salvanes (2007), however, the estimates are similar for monozygotic and dizygotic twins. Thus, this suggests data on zygosity is not critical for estimating the pure effect of birth weight.

This paper proceeds as follows. Section I describes how I estimate the effects of birth weight using within-twin-pair comparisons. I follow with a description of the constructed panel data set of twins in Section II and a presentation of estimates of the effects of birth weight in Section III. In Section IV, I describe how one might interpret the estimated effects in light of postnatal investment and the inability to distinguish between monozygotic and dizygotic twins in the estimation sample. I compare my results to those of Behrman and Rosenzweig (2004); Black, Devereux, and Salvanes (2007); and Oreopoulos et al. (2006) in Section V. I conclude in Section VI.

## I. Identifying the Effect of Birth Weight

To test directly the fetal origins hypothesis, a researcher would need data on the intake of fetal nutrients. Such information is usually unavailable. As a proxy for fetal nutrient intake, I rely on birth weight, arguably the best measure of fetal nutrients. There is a strong cross-sectional relationship between the amount of weight a mother gains during her pregnancy and her infant's birth weight. An extra pound of maternal weight gain results in 0.02 of a pound increase in birth weight based on calculations from the 1995 Detailed Natality File.[12] Although birth weight may be an imperfect proxy for fetal nutrition, within-twin birth-weight differences still provide some signal about the returns to fetal food intake. This is true under the presumption that twin birth-weight disparities result from differences in fetal nutrition uptake. In the case that the birth-weight discrepancies between twins are due to other factors affecting long-run outcomes besides fetal nutrients, it would be incorrect to interpret the twins studies as a test of the fetal origins hypothesis. If this is true, one should interpret the estimates that follow more broadly as estimates of the effects of birth

---

[11] Monozygotic twins, commonly referred to as identical twins, are sometimes not genetically identical (Paul Gringras and Wai Chen 2001). Monozygotic twins are defined as twins arising from the split of one fertilized egg. However, these twins can differ genetically, both at the level of chromosomes and DNA. It is unknown what fraction of monozygotic twins are genetically identical.

[12] The effect size is the same whether or not I include controls for maternal age, maternal education, maternal race/ethnicity, state of residence, and birth order in the regression.

weight. However, the assumption that differences in fetal nutrient uptake drive twin birth-weight differences, which I discuss later in this section, is quite plausible.

To describe the empirical approach, I begin with a simple linear relationship between birth weight and long-run outcomes:

$$(1) \qquad y_{ij} = \alpha + bw_{ij}\beta + x_{ij}\delta + \varepsilon_{ij},$$

where $y_{ij}$ is an adult or intergenerational outcome for individual $j$ born to mother $i$; $bw_{ij}$ is birth weight; $x_{ij}$ is a vector of observable characteristics; and $\varepsilon_{ij}$ is an error term.[13] Cross-sectional estimates of equation (1) likely lead to biased estimates of $\beta$, the parameter of interest, because of the correlation between immeasurable and unobservable determinants of $y_{ij}$, represented by $\varepsilon_{ij}$, and birth weight. Family upbringing and genetics are two examples of such confounding influences.

As noted by Almond, Chay, and Lee (2005), the interest in birth weight as a policy target is not due to its correlation with other factors but to its direct effect. Indeed, if the correlation between birth weight and $y_{ij}$ is due entirely to family background, policies aimed at increasing birth weight, which are unlikely to change family background, would be ineffective. Therefore, a desirable estimate of $\beta$ captures the effect of birth weight holding constant omitted and hard-to-measure variables like socioeconomic status.

Suppose that the only confounders leading to an inconsistent estimate of $\beta$ are family background and genetics. As long as there are no interactive effects of family background and genetic factors with birth weight and other observable characteristics, one can rewrite the error term as follows:

$$(2) \qquad \varepsilon_{ij} = h(f_i, g_{ij}) + u_{ij},$$

where $h$ is a flexible function of family background $f_i$ and genetics $g_{ij}$, and $u_{ij}$ is an error term assumed to be uncorrelated with the included variables of equation (1).

If identical twins share the same genetic composition and family background, $f_i$ is the same for both twins and $g_{i2}$ equals $g_{i1}$. Under these assumptions, by taking twin differences of equation (1), one can consistently estimate $\beta$.[14] That is,

$$(3) \qquad y_{i2} - y_{i1} = (bw_{i2} - bw_{i1})\beta + (x_{i2} - x_{i1})\delta + u_{i2} - u_{i1}.$$

---

[13] I could estimate a more general model that allows the effects of birth weight to vary by birth order, effectively indexing $\beta$ by $j$ (see Royer 2004 for more information). However, when I estimate this less restrictive model for the sample of twins, I find that the twins are exchangable (i.e., I cannot reject the hypothesis that $\beta$ is the same for the first- and second-born twin). Thus, I assume that $\beta$ does not vary by parity.

[14] This, of course, assumes that there are no interactive effects of birth weight across twins. For instance, there could be a psychological impact of twin size differentials. If, as others have shown, birth weight is related to later height and weight, the lighter twin may always be smaller and may feel inferior to the heavier twin. This inferiority complex may affect outcomes such as educational attainment. This suggests that the degree of birth-weight discordance should also be included as a regressor as a bigger discordance, if it leads to a larger adult size discordance may be more traumatic. However, when stratifying based on birth-weight discordance, I find, if anything, that the larger birth-weight discordance is associated with smaller birth-weight effects. The statistical relationship between the estimated birth-weight effect and birth-weight discordance is not statistically significant.

In this setup, the effect of birth weight on $y_{ij}$ is identified based on differences in birth weight within each twin pair holding fixed factors that are shared by the twin pair. Such fixed factors include gestational length and maternal prenatal behavior. Birth weight and gestational length are highly correlated and policies that aim to increase birth weight (e.g., WIC) may also raise gestational length. However, birth weight appears to affect outcomes independent of gestation; OLS estimates of the effect of birth weight holding constant gestational length are larger in magnitude than OLS estimates not controlling for gestational length.

Equation (3) highlights several important points. First, $\beta$ is a reduced-form parameter. It represents the life-course effect of birth weight. For instance, if birth-weight differences between twins result in differences in IQ (William H. James 1982), the observed twin differences in education may be a direct result of these differences in IQ. To the extent that the determination of birth weight occurs before the determination of these other outcomes (e.g., education, IQ, adult health), one should not control for these outcomes when estimating equation (3). Thus, an appropriate interpretation of $\beta$ is the long-run effect of birth weight through many possible pathways. By looking at a plethora of outcomes, I attempt to distinguish the mechanisms through which birth-weight differences translate into differences in adult outcomes.

Second, twin comparisons improve upon simple sibling comparisons. The choice to have a second child may be endogenous to the first birth outcome (Rosenzweig and Kenneth I. Wolpin 1995). Royer (2004) estimates that the probability of having a second child is strongly correlated with whether the first birth was premature. Another potential trouble with the sibling estimator is that several factors kept constant in the twins setting vary in the sibling setting. For example, siblings that are not twins will develop at differing points of their parents' lifecycle. As wages vary with age, these siblings will be subject to different parental resources at each age.[15]

Third, $\beta$ is still identifiable from within-twin-pair birth-weight differences if the function $h$ in equation (2), which describes the role of immeasurable and unobservable factors, includes other arguments besides genetics and family background. The crucial assumption is that these confounders are twin invariant. Note, that any twin-varying unobservables that are correlated with birth-weight differences and can explain differences in adult outcomes will bias estimates of $\beta$. One such factor is a congenital anomaly. Since the California twin data include information on congenital anomalies, I can control for these differences.[16]

Fourth, if there are interactions between unobservable factors and birth weight, estimates of $\beta$ will no longer be consistent. For instance, suppose that parental investment is a function of birth weight. A mathematical characterization of parental investment could have the following form:

$$(4) \qquad\qquad y_{ij} = \alpha + bw_{ij}\beta + bw_{ij}f_i\gamma + \boldsymbol{x}_{ij}\boldsymbol{\delta} + \varepsilon_{ij},$$

---

[15] Some may prefer the sibling comparison because of external validity concerns about twin comparisons, however.

[16] As a robustness check, I drop all twin pairs in which one or both twins have a congenital anomaly, rather than controlling for these anomalies.

where I have augmented equation (1) with the $bw_{ij}f_i$ term. Then, taking the within-twin difference,

$$(5) \qquad y_{i2} - y_{i1} = (bw_{i2} - bw_{i1})\beta + (bw_{i2} - bw_{i1})f_i\gamma + (\mathbf{x}_{i2} - \mathbf{x}_{i1})\boldsymbol{\delta} + u_{i2} - u_{i1}.$$

In this scenario, without appropriate controls for family background, $f_i$, estimates of $\beta$ will be inconsistent. As mentioned earlier, I will address the possibility that parental involvement is a systematic function of birth-weight differences between twins. To do so, I investigate whether the effects of birth weight vary across different types of families. For instance, given limited resources, one might expect that differential parental investment across twins is more feasible in a small family.

Finally, if the effects of birth weight are nonlinear, equation (3) will be misspecified since its explicit assumption is one of linear birth-weight effects. To allow for nonlinear effects, I estimate piecewise linear spline regressions, which have the general form:

$$(6) \qquad y_{i2} - y_{i1} = \sum_{m=1}^{k-1} (D_{i2}^m bw_{i2}^* - D_{i1}^m bw_{i1}^*)\beta^m + (\mathbf{x}_{i2} - \mathbf{x}_{i1})\boldsymbol{\delta} + u_{i2} - u_{i1},$$

where $k$ is the number of knot points; $D_{ij}^m$ is a dummy variable equal to one if the birth weight of twin $j$ born to mother $i$ is greater than the knot point $m$; and $bw^*$ is birth-weight knot point for the spline segment (e.g., 1000 grams).[17]

## A. The Causes of Birth-Weight Differences Among Twins

The identification strategy outlined above requires within-twin-pair variation in birth weight. But if twins are so alike, why do they have different birth weights? First note that birth weight is generally thought to be a function of both gestational length and fetal growth for a fixed gestational length. Hence, an infant can be low birth weight either because of a short gestational period or because of slow fetal growth, otherwise known as intrauterine growth retardation (IUGR). Twin gestational lengths are identical, so all variation in birth weight among twins is attributable to differences in fetal growth.[18]

The fetal growth rate of twins within the womb is governed by different factors, depending on the twin type. For monozygotic twins who are monochorionic (i.e., share the same placenta), the vascular arrangement of the placenta influences nutrient and blood flow, and thereby affects birth weight (Rekha Bajoria et al. 2001). Also, structural anomalies resulting from the splitting of the embryo may lead one twin to receive more nutrients and oxygen than the other.

Among all other twins, dizygotic and dichorionic, the causes of birth-weight differences are more disputed. While the exact mechanisms for birth-weight

---

[17] Note, the coefficients from this regression specification are not interpretable directly as slopes of the relationship between birth weight and later outcomes. However, the marginal effects are linear functions of the estimated coefficients. For example, for a spline with three segments, the slope of the first segment is $\beta^1$; the slope of the second segment is $\beta^1 + \beta^2$; and the slope of the last segment is $\beta^1 + \beta^2 + \beta^3$.

[18] For some small subset of twins, gestational lengths differ.

001007

differences are highly debated, the disparity in nutrient uptake resulting from the structural arrangement of the fetuses (e.g., placenta placement) is the leading explanation for within-twin-pair birth-weight differences (Almond, Chay, and Lee 2005; Cunningham 2001).[19]

## II. Data

### A. *Birth Record Data*

I create the primary twins dataset using confidential individual California birth records for the period of 1960–2002. These data, a census of California births, are compiled from forms completed at birth. These forms include questions on maternal and paternal demographics (e.g., age), infant health (e.g., birth weight and gestational length), birth order, and plurality (i.e., whether the birth was a multiple birth). The confidential version of these data also includes the mother's and child's name, which are used for matching.[20] I describe the creation and matching processes in Web Appendix A.

The final dataset consists of same sex, female twins born between 1960 and 1982. As outlined in Web Appendix A, I observe adult outcomes measured at the time of motherhood, only for those twins who have a birth observed in California between 1989 and 2002.[21] Thus, adult outcomes will be missing for the following potentially overlapping groups: women who have died, women who have moved from California, women who did not give birth between 1989 and 2002, and women for whom birth information (i.e., name and birthdate) is reported incorrectly on the birth certificate.[22]

This selection is problematic only to the extent that within-twin-pair differences in birth weight are correlated highly with within-twin-pair differences in the probability of later observation. Adult twins usually live near one another (30 percent of twins observed as adults in the California data live in the same zip code as their twin), so concerns about differential mobility within twin pairs may be moot. Additionally, as twins often have similar names, it may be reasonable to assume that child-mother matching differences within twin pairs are nonsystematic. Sample selection due to death or lack of childbearing, however, may be more disconcerting. Later, I will assess the importance of these potential selection biases by testing whether birth-

---

[19] Arguably, an ideal twin study of the effects of birth weight on long-run outcomes would focus on monochorionic twins because their birth-weight differences are due more likely to differences in nutrient uptake rather than genetic differences. Identification of such twins rarely is possible. Moreover, monochorionic twins may suffer from twin-twin transfusion syndrome in which blood flow is distributed unevenly among the two twins (Alejandro Victoria, Gerardo Mora, and Fernando Arias 2001). This condition is rare. Such circulatory problems can result in large birth weight discordance between twins. As this condition affects only monochorionic twins, estimates of the long-run effects of birth weight using such twins may not be externally valid and, thus, not desirable. However, since the incidence of this syndrome is low, the monochorionic twins estimates may be generalizable to the singleton population.

[20] A mother's maiden name, not her married name, is reported in the data.

[21] As adult outcomes are only observed from the birth certificate, the analysis only focuses on female twins who are mothers.

[22] I estimate that 20 percent of missed matches are due to bad data. This is the percentage of 1989–2002 California births to mothers who themselves reportedly were born in California between 1960–1982 but are unmatchable to the mother's own birth.

weight differences among twins predict differences in the probability of later observation. Although I do find differences in the probability of having an observed birth that are related to birth-weight differences, the differential probabilities are small. I assess the degree of sample selection bias and show that this bias tends to be small.

On a related note, one might question the generalizability of results using the sample of same sex, female twins born in California between 1960 and 1982 and who gave birth in California between 1989 and 2002. In particular, one may wonder (a) how twins born in California compare to twins born elsewhere and (b) how California-born twins giving birth in California between 1989 and 2002 compare to other California-born twins.[23] Unfortunately, there exist no ideal data to address this because adult twins are usually impossible to identify in standard datasets. As an alternative, I look at women born between 1960 and 1982, regardless of twin status, using the 2003 American Community Survey (ACS), the survey conducted in noncensus years intended to cover census-type questions (Web Appendix A, Table A2).[24] In the top panel of Web Appendix A, Table A2, I categorize women into three groups: (a) born in California, gave birth between 1989 and 2002, and currently live in California (the group labeled "Born in CA between 1960 and 1982 and meets twin sample criteria"), (b) born in California but either did not give birth between 1989 and 2002 or does not currently live in California (the group labeled "Born in CA between 1960 and 1982 and does not meet twin sample criteria"), and (c) born in a state other than California (the group labeled "Born outside of CA between 1960 and 1982 and meets twin sample criteria"). The sample comparable to that used in this paper is sample (1).

It is important to note there are few differences between the sample of women born in California and women born outside of California. The women meeting the twin criteria (i.e., born in California, still living in California, and gave birth between 1989 and 2002) are slightly less educated than the women born outside California. Similarly, comparing the two populations born in California (the first and second columns), I find the women meeting the sample criteria for the twins sample are less likely to have progressed beyond a high school degree. There are also some differences in the marital status of these two populations, as expected given that selection into the twins sample is based on childbearing behaviors. Extrapolating from these statistics, it appears that the socioeconomic status of the twins sample is lower than that of the overall population of women. Birth weight interventions such as WIC often target such groups, making the twins sample particularly relevant.

## B. *Early Childhood Longitudinal Study, Birth Cohort*

To understand further the effects of birth weight, I also use the Early Childhood Longitudinal Study, Birth Cohort (ECLS-B), which follows from birth a nationally representative sample of infants born in 2001. Fortunately, for my purposes, the

---

[23] There are other generalizability issues involved such as (a) how twins compare to singletons (an issue I discuss later); and (b) how twins born in 1960 and 1982 compare to twins born outside this period, which is probably a secondary issue.

[24] In the 2003 ACS, I am best able to identify women who have given birth between 1989 and 2002 (one of the selection criteria for inclusion in the twins sample).

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1017 of 4699 PageID #:  4182

TABLE 1—DESCRIPTIVE STATISTICS AS MEASURED AT BIRTH
(*1960–1982 California Births*)

| | Unconditional on later observation | | | Conditional on later observation | | | |
| | | | | Singleton female births | | Same sex female twin births | |
| | Singleton female births | Twin births | Same sex female twin births | 1st birth observed | 2nd birth observed | 1st birth observed | 2nd birth observed |
|---|---|---|---|---|---|---|---|
| Proportion white | 0.85 | 0.84 | 0.84 | 0.86 | 0.87 | 0.84 | 0.87 |
| Proportion black | 0.09 | 0.11 | 0.11 | 0.10 | 0.10 | 0.12 | 0.10 |
| Year of birth | 1971.2 | 1971.2 | 1971.5 | 1971.5 | 1969.3 | 1971.8 | 1969.4 |
| Parity | 2.30 | 3.01 | 2.98 | 2.34 | 2.49 | 3.07 | 3.32 |
| Proportion with birth weight < 1,000 grams | 0.001 | 0.009 | 0.009 | 0.000 | 0.000 | 0.001 | 0.000 |
| Proportion with birth weight < 1,500 grams | 0.003 | 0.033 | 0.035 | 0.002 | 0.001 | 0.014 | 0.015 |
| Proportion with birth weight < 2,500 grams | 0.053 | 0.453 | 0.496 | 0.047 | 0.048 | 0.478 | 0.473 |
| Birth weight (grams) | 3,298.1 (508.0) | 2,533.2 (556.8) | 2,475.1 (538.5) | 3,304.6 (492.1) | 3,296.9 (489.6) | 2,524.6 (485.9) | 2,533.2 (482.5) |
| Proportion premature | 0.07 | 0.33 | 0.33 | 0.07 | 0.07 | 0.30 | 0.30 |
| Gestation (weeks) | 39.6 (2.8) | 37.3 (3.4) | 37.4 (3.5) | 39.7 (2.7) | 39.7 (2.6) | 37.6 (3.0) | 37.7 (3.0) |
| Fetal growth (grams/week) | 83.7 (30.0) | 68.0 (21.3) | 66.3 (18.6) | 83.7 (27.6) | 83.6 (28.2) | 67.2 (11.6) | 67.2 (11.5) |
| Proportion with congenital defects | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.00 | 0.01 |
| Observations | 3,823,491 | 139,822 | 49,592 | 945,309 | 678,804 | 5,670 | 3,028 |

*Notes:* Table reports means and standard deviations (in parentheses). The twin births include twins of both genders, including mixed sex twins.

study oversamples twins. There are 1,496 twins in the estimation sample. The data provide very detailed information on neonatal intensive care use, parental investment, and measures of development.

### C. *Descriptive Statistics*

Table 1 presents summary statistics from the birth record data, measured at the time of birth, for singleton females, all twins, and same sex, female twins. The statistics in the first three columns are not conditional on whether the twin is observed giving birth, while the statistics in the last four columns include only those females observed giving birth. As expected, the chief characteristic that distinguishes singletons and twins is birth weight. Nearly 50 percent of all same sex, female twins are low birth weight (i.e., weigh less than 2,500 grams), while roughly only 5 percent of singleton females are low birth weight. Figure 1, which plots the singleton and twin

001010

FIGURE 1. DISTRIBUTION OF BIRTH WEIGHT—FEMALE SINGLETONS AND FEMALE TWINS

*Notes:* The sample includes females born between 1960 and 1982 in California unconditional on whether they had a later observed birth.

birth-weight distributions, further highlights these differences. Shifting the twin distribution to the right by 700 grams, the two distributions would nearly overlap.[25]

The differences between the singleton and twin birth-weight distributions naturally calls in to question the external validity of the twin estimates. In particular, if twins are naturally small, one might worry that the results are not generalizable to the larger non-twin population, arguably the main population of interest. However, as discussed later, the cross-sectional relationships between birth weight and adult outcomes, such as education, tend to be similar for singletons and twins (see Figures 3–5). As such, these results may be applicable to singletons.

The final two columns of Table 1 provide at-birth summary statistics for the estimation population (same sex, female twins for whom I observe a first or second birth). As a matter of comparison, I also provide the analogous statistics for singleton female births that have been matched to either a first birth (first birth observed column) or a second birth (second birth observed column). The subset of the same-sex, female twins who are observed later is similar to the overall same-sex, female twins sample except in terms of birth outcome characteristics. In particular, twins in the estimation sample are less likely to have birth weights in the lower tail of the birth weight distribution than the unconditional population of same-sex, female twins. This is not

---

[25] The maximum reported birth weight changed over the sample period. So to create a consistent birth weight measure, I top coded birth weight to 4,517 grams (9 lbs 15 ounces). This top coding accounts for the small spike in the upper tail of the singleton birth-weight distribution. Since the top code is high, the regression results should be minimally affected.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1019 of 4699 PageID #:  4184

TABLE 2—DESCRIPTIVE STATISTICS AS MEASURED WHEN GIVING BIRTH
(*1960–1982 California Births*)

| | Conditional on later observation | | | |
| | Singleton female births | | Same-sex, female twin births | |
| | 1st birth observed | 2nd birth observed | 1st birth observed | 2nd birth observed |
|---|---|---|---|---|
| Mother's maximum education | 13.2 (2.1) | 13.2 (2.1) | 13.1 (2.1) | 13.2 (2.0) |
| Mother's mean education | 13.0 (2.1) | 12.9 (2.1) | 12.9 (2.1) | 12.9 (2.0) |
| Mother's education at birth | 12.9 (2.3) | 13.0 (2.1) | 12.8 (2.3) | 12.9 (2.1) |
| Mother's age | 23.9 (5.4) | 26.6 (5.0) | 23.6 (5.3) | 26.4 (5.0) |
| Father's age | 26.8 (6.3) | 29.3 (6.0) | 26.6 (6.2) | 29.2 (5.9) |
| Proportion with father present | 0.95 | 0.97 | 0.95 | 0.97 |
| Father's education at birth | 12.7 (2.8) | 12.9 (2.5) | 12.7 (2.8) | 13.0 (2.5) |
| Birth weight of child (grams) | 3,338.2 (563.6) | 3,435.9 (541.0) | 3,363.3 (550.5) | 3,460.8 (533.5) |
| Gestational length of child (weeks) | 39.7 (2.7) | 39.6 (2.6) | 39.7 (2.7) | 39.6 (2.5) |
| Fetal growth of child (grams/week) | 85.3 (29.6) | 88.1 (29.1) | 86.5 (45.9) | 88.7 (15.0) |
| Number of infant abnormalities | 0.09 | 0.07 | 0.08 | 0.07 |
| Proportion diabetic | 0.01 | 0.02 | 0.01 | 0.02 |
| Proportion hypertensive | 0.03 | 0.01 | 0.03 | 0.02 |
| Proportion anemic | 0.01 | 0.01 | 0.00 | 0.01 |
| Number of pregnancy complications | 0.12 | 0.11 | 0.12 | 0.10 |
| Number of labor complications | 0.56 | 0.38 | 0.58 | 0.38 |
| Proportion receiving neonatal intensive care | 0.03 | 0.02 | 0.03 | 0.02 |
| Poverty rate of residential zipcode in 1999 | 0.15 | 0.15 | 0.15 | 0.15 |
| Median household income of residential zipcode in 1999 | 47,844.2 (17,283.3) | 47,782.5 (17,421.5) | 47,420.0 (17,664.6) | 47,681.6 (17,653.3) |
| Observations | 945,309 | 678,804 | 5,670 | 3,028 |

*Notes:* The table reports means and standard deviations (in parentheses). Father presence is ascertained from the presence of both his date of birth and educational attainment on the birth certificate data.

particularly surprising given the findings of Almond, Chay, and Lee (2005), which suggest that, at least at the lower extreme tail of the birth-weight distribution, birth weight is a strong predictor of infant mortality. Hence, some nontrivial share of extremely low birth-weight infants likely dies before reaching adulthood.

For those twins observed giving birth, I also observe adult outcomes such as their education at motherhood and the birth weight of their offspring. In Table 2, I compare adult outcomes for singleton female mothers with outcomes for same-sex,



FIGURE 2. DISTRIBUTION OF ABSOLUTE BIRTH-WEIGHT DIFFERENCES BETWEEN TWINS

*Notes:* The sample includes twins born in California between 1960 and 1982. The "all twins" sample includes twins of both genders, including mixed-sex twin pairs.

female twin mothers. The first three rows display the means and standard deviations for three measures of education: maximum level reported across births, mean level reported across births, and education at birth. Since a mother may obtain additional schooling after her first (and subsequent) births, her education as measured when giving birth may be a noisy measure of her completed education. However, within-twin-pair differences in education are informative at any point in time, even before the completion of schooling. These differences may reflect differences in grade progression in addition to differences in eventual educational attainment.[26] In terms of adult outcomes, the twin mothers are very comparable to the singleton mothers.[27] Despite the fact that the twins themselves were likely to be of low birth weight, twin mothers give birth to infants of roughly the same weight as singleton mothers.

As a final useful set of summary statistics, Figure 2 plots the distribution of birth-weight differences within twin pairs, which will later be exploited as a means of identifying the effect of birth weight. The gap in birth weight between twins is non-trivial. For over half of the twin sample, this difference exceeds 200 grams. The distribution of birth-weight differences is nearly identical for same-sex, female twins as for all twins.

---

[26] This is true as long as the twins are observed at the same age. It is conceivable that birth weight affects fertility timing, so observed differences in education could be due to differences in age at childbirth. As discussed later, there are no statistically significant differences of twins' age at childbirth, thus mitigating that potential source of misinterpretation of the within-twin educational difference.

[27] Two outlier observations account for the large standard deviation in fetal growth for same-sex, female twins giving birth for the first time. For these observations, it appears that gestational length is severely misreported. For example, a gestational length of seven days is reported. These outliers do not affect the later regression results, however.

## III. Results

### A. *Birth Record Data*

*Plots of Relationships between Birth-weight and Long-Run Outcomes.*—Figures 3–5 present plots of educational attainment, birth weight of offspring, and the number of pregnancy complications by the mother's birth weight (as measured in 100-gram increments) to give a sense of the relationships between birth weight and long-run outcomes for the birth record data.[28] The solid lines represent twin mothers and the dashed lines represent singleton mothers. The sample consists of females whose first or second birth is observed. If both the first and second births are observed, then the second birth value is assigned. While this sample will be the main estimation sample, the results are robust to the use of other samples (e.g., twins with a first birth observed) as shown later.

In Figure 3, there is a clear relationship between birth weight and education.[29] The heavier a female is at birth, the more education she obtains. This is true for both singletons and twins. Moreover, the response functions for each subpopulation are nearly identical. The cross-sectional relationship between the twin mother's birth weight and the birth weight of her offspring in Figure 4 also reveals a strong positive correlation. Note, that conditional on birth weight, the birth weight of a twin's offspring exceeds the birth weight of a singleton's offspring. Most importantly, however, the response functions for the two populations have the same slopes. This pattern is likely reflective of differences in twin and singleton gestational lengths. For a given birth weight, singletons spend less time in the womb than do twins. The final graph, Figure 5, plots the number of pregnancy complications by birth weight.[30] A heavier birth weight is associated with a lower risk of pregnancy complications. Across all three outcomes, these response functions are strikingly alike for both singletons and twins, suggesting that twin-based estimates of the effect of birth weight may be externally valid.

*Regression Estimates.*—Table 3 presents the main fixed-effect estimation results relating within-twin-pair birth-weight differences to differences in adult outcomes, as measured at the time of childbearing for the birth record data. I also present pooled OLS estimates, which do not control for twin fixed effects. The pooled OLS regressions control for the twins' birth order, the twins' year of birth, and the twins'

---

[28] These outcomes were selected based on the fixed effects regressions in Table 3.

[29] Figures 3–5 provide raw, unadjusted means by birth weight. I present such figures as a means of assessing the external validity of the twin estimates. Since the cross-sectional patterns are sensitive to the controls included (results not shown) and furthermore, divergent from the fixed-effects relationships (see Table 3), it is unclear whether the estimates in Figures 3–5 should be adjusted for covariates and if so, which covariates. However, as external validity is ultimately untestable, Figures 3–5 should be interpreted as suggestive and not conclusive evidence of external validity.

[30] Pregnancy complications include hypertension, eclampsia (seizures during pregnancy), renal disease, kidney infection, cardiac disease, sexually transmitted diseases, diabetes, hepatitis, rubella, Rh sensitization (the compatibility of Rh factor of the mother and the infant), hemoglobinopathy (presence of abnormal hemoglobins), uterine bleeding before labor, lung disease, polyhydramnios/oligohydramnios (excess/deficient amount of amniotic fluid), incompetent cervix, cervical circlage (tying the cervix closed in response to an incompetent cervix), and premature labor.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1022 of 4699 PageID #:  4187



FIGURE 3. CROSS-SECTIONAL RELATIONSHIP BETWEEN BIRTH WEIGHT AND EDUCATION

*Notes:* This figure is a plot of education averages by birth weight where birth weight is categorized into 100 gram intervals starting with the interval 1,400–1,500 grams. The sample used in this figure includes those mothers observed having a first or second birth and whose birth weight was between 1,400 and 3,700 grams. Within the twins sample, there are only 42 observations with birth weights falling below 1,400 grams and 59 observations with birth weights exceeding 3,700 grams. In the case of the twins sample, both twin mothers must be observed for their first or second births. If they are observed for both births, then only their second birth is used in the calculations. The education measure is education reported at time of motherhood.

race. In these models, the effect of birth weight is independent of the length of gestation. The data suggest that this is an accurate representation. For all of the outcomes shown in  Table 3, I am able to reject the hypothesis that the effect of birth weight depends on gestational length.[31] I present the estimates in Table 3 such that the outcomes located at the top of the table are outcomes that birth weight may affect more directly (e.g., infant mortality, education, birth outcomes of the next generation, and health status). Outcomes for which the effect of birth weight may be less direct (e.g., age at motherhood when the twin gives birth and characteristics of the twins' mate) are at the bottom of the table.

As a means of comparison to other studies (e.g., Almond, Chay, and Lee 2005), I also present the effects of birth weight on infant mortality within the first year of life. As in Almond, Chay, and Lee (2005), the estimates suggest that there is a strong cross-sectional bias in the birth weight-infant mortality relation. The twin fixed-effect

---

[31] This is accomplished by including a birth weight and gestational length interaction variable in the regressions.



FIGURE 4. CROSS-SECTIONAL RELATIONSHIP BETWEEN OWN BIRTH WEIGHT AND OFFSPRING'S BIRTH WEIGHT

*Notes:* This figure is a plot of birth weight of offspring averages by own birth weight where own birth weight is categorized into 100 gram intervals starting with the interval 1,400-1,500 grams. The sample used in this figure includes those mothers observed having a first or second birth whose birth weight was between 1,400 and 3,700 grams. Within the twins sample, there are only 42 observations with birth weights falling below 1,400 grams and 59 observations with birth weights exceeding 3,700 grams. In the case of the twins sample, both twin mothers must be observed for their first or second births. If they are observed for both births, then only their second birth is used in the calculations.

estimate is one-tenth the size of the cross-sectional estimate and is nearly identical to the Almond, Chay, and Lee (2005) estimate of $-0.0222$.[32]

In this same row of Table 3, the fixed-effects estimates for education imply that a one kilogram increase in birth weight leads to a 0.13 to 0.16 of a year increase in educational attainment. These coefficients are 15 to 30 percent smaller than the cross-sectional coefficients.[33] The direction of bias in the cross-sectional estimates is as predicted. However, the size of both the OLS and fixed-effects estimates are small in light of the fact that any reasonable birth weight manipulation is unlikely to alter birth weight by one kilogram. A foreseeable manipulation ranges from 200 to 250 grams. Thus, the fixed-effects estimates indicate that while birth weight affects

---

[32] The data used to estimate the effect of birth weight on infant mortality are the 1960 and 1965–1980 California Birth Cohort files as opposed to the 1960–1982 California natality data. This results in a slightly different sample than the sample used in the remainder of the table. However, if I use 1960 and 1965–1980 California natality data for the noninfant mortality outcomes, the results are similar to those presented in Table 3.

[33] Currie and Moretti (2007) use the California birth records to look at the intergenerational transmission of birth weight. For mothers born between 1970 and 1974, they estimate that a one kilogram increase in birth weight results in a 0.1548 increase in educational attainment. After they include grandmother fixed effects (i.e., compare mothers who are siblings), this point estimates drops in size to 0.0836, or about half the size of my twin fixed-effect estimates in Table 3.



FIGURE 5. CROSS-SECTIONAL RELATIONSHIP BETWEEN BIRTH WEIGHT AND PREGNANCY COMPLICATIONS

*Notes:* This figure is a plot of the average number of pregnancy complications by own birth weight, where own birth weight is categorized into 100 grams intervals starting with the interval 1,400–1,500 grams. The sample used in this figure includes those mothers observed having a first or second birth whose birth weight was between 1,400 and 3,700 grams. Within the twins sample, there are only 42 observations with birth weights falling below 1,400 grams and 59 observations with birth weights exceeding 3,700 grams. In the case of the twins sample, both twin mothers must be observed for their first or second births. If they are observed for both births, then only their second birth is used in the calculations.

years of schooling, a realistic policy would only lead to a 0.03 to 0.04 increase in years of schooling. Assuming no other benefits to increasing birth weight, this hardly seems like a cost-effective investment.

It should be noted that education at motherhood is not necessarily completed education. For women 24 years old or older, education at motherhood is likely completed education.[34] The estimated effects of birth weight for this older sample are essentially identical to those in Table 3. Hence, the effects of birth weight on educational attainment in Table 3 are reflective of within-twin differences in completed education and not simply differences in educational progression.[35]

Table 3, panel B investigates whether birth weight affects one's own health and the health of one's offspring. Of all the outcomes presented in Table 3, these outcomes test most directly the fetal origins hypothesis (i.e., the effect of birth weight on chronic conditions). It may be too early in the lifecycle to observe the impact of birth weight on chronic conditions. Barker's studies usually look at individuals in their sixties and seventies (Barker 2006). Although disputed in the epidemiological literature, some studies have found that birth weight predicts adult outcomes such

---

[34] In the 2000 Census, female school enrollments by age flatten at age 24.        001017
[35] This interpretation is appropriate as long as the twins give birth at the same age, which is the case.

TABLE 3—POOLED OLS AND FIXED-EFFECT ESTIMATES: EFFECTS OF BIRTH WEIGHT IN KILOGRAMS
*(Female Twins with First or Second Birth Observed)*

*Panel A*

| Infant mortality | | Education | | | | | |
|---|---|---|---|---|---|---|---|
| Death within first year | | Maximum education | | Mean education | | Education at birth | |
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| −0.18 | −0.02 | 0.19 | 0.13 | 0.19 | 0.16 | 0.19 | 0.16 |
| (0.004) | (0.004) | (0.05) | (0.08) | (0.05) | (0.07) | (0.06) | (0.08) |
| Mean: 0.06 | | Mean: 13.09 | | Mean: 12.87 | | Mean: 12.87 | |

*Panel B*

Birth and adult health outcomes

| Child's birth weight (in grams) | | Gestational length (in days) | | Hypertension | | Diabetes | |
|---|---|---|---|---|---|---|---|
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| 177.87 | 70.42 | 2.42 | 0.87 | −0.004 | −0.02 | −0.005 | −0.002 |
| (14.72) | (30.67) | (0.49) | (1.18) | (0.004) | (0.01) | (0.003) | (0.007) |
| Mean: 3,399.89 | | Mean: 277.19 | | Mean: 0.02 | | Mean: 0.01 | |

| Anemia | | Number of pregnancy complications | | Number of labor complications | | Neonatal intensive care unit transfer | |
|---|---|---|---|---|---|---|---|
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| 0.000 | −0.003 | −0.01 | −0.05 | 0.01 | 0.01 | −0.004 | 0.000 |
| (0.0023) | (0.006) | (0.01) | (0.02) | (0.02) | (0.05) | (0.004) | (0.01) |
| Mean: 0.01 | | Mean: 0.11 | | Mean: 0.49 | | Mean: 0.02 | |

*Panel C*

| Birth delivery | | | | Residential location | | | |
|---|---|---|---|---|---|---|---|
| C-Section delivery | | Public payment for delivery | | Median household income (1999) of zip code | | Poverty rate (1999) of zip code | |
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| −0.02 | −0.03 | −0.03 | −0.04 | 1042.47 | 219.55 | −0.003 | −0.003 |
| (0.01) | (0.02) | (0.01) | (0.02) | (470.53) | (770.99) | (0.002) | (0.004) |
| Mean: 0.24 | | Mean: 0.37 | | Mean: 47,418.04 | | Mean: 0.15 | |

*Panel D*

Maternal and paternal characteristics

| Maternal age (in days) | | Father present | | Paternal age (in days) | | Paternal education | |
|---|---|---|---|---|---|---|---|
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| −5.83 | 75.56 | 0.01 | −0.003 | 24.73 | 69.34 | 0.27 | 0.19 |
| (33.92) | (66.28) | (0.01) | (0.012) | (53.79) | (110.39) | (0.07) | (0.14) |
| Mean: 9,125.28 | | Mean: 0.96 | | Mean: 10,283.04 | | Mean: 12.89 | |

*Notes:* Robust standard errors adjusted for within-twin-pair correlation are shown in parentheses. All regressions are based on the sample of twins observed having a first or second birth in California between 1989 and 2002 (3,396 twin pairs) with the exception of the infant mortality results. The infant mortality results are based on all same-sex female twins in the 1960 and 1965–1980 California birth cohort files (18,628 twin pairs). For those twins whose first and second births are both observed, only the second birth is included in the regressions. The reported mean is the mean of the dependent variable. The pooled OLS regressions include controls for year of birth, birth order, and race.

as hypertension (Neil R. Poulter et al. 1999), coronary heart disease (J. G. Eriksson et al. 1999), and diabetes (Hales et al. 1991). The cross-sectional estimates in Table 3 imply that a 100 gram increase in a mother's birth weight leads to an 18 gram rise in her child's birth weight. Meanwhile, the fixed-effects estimates of Table 3

suggest that this intergenerational transmission is much smaller—roughly one-third the size of the cross-sectional OLS estimate.[36, 37] Gestational length is unaffected by a mother's birth weight.

In terms of one's own health, none of the estimated effects of birth weight on adult health outcomes (e.g., hypertension, diabetes, and anemia) shown in panel C of Table 3 are statistically significant at the 5 percent level, but the magnitude of the hypertension estimate is sizable. A birth weight increase of 250 grams decreases the probability of hypertension by about 0.4 of a percentage point, a decline of 14 percent. The effects on diabetes and anemia are much smaller. The most notable estimate within this set of estimates is that for pregnancy complications. A birth weight increase of 250 grams implies an 11 percent fall in pregnancy complications. These estimates may be downward biased due to misreporting of these conditions on the birth certificate. The accurate reporting of clinical measures on the birth certificate can be poor (P. A. Buescher et al. 1993, and David L. DiGiuseppe et al. 2002). The general findings of the literature suggest that the measurement error in variables related to obstetric history, birth weight, and delivery type is small but for other outcomes, such as maternal risk factors and comorbidities, measurement error may be more problematic.[38]

Since these pregnancy complications include a heterogeneous group of conditions, I have disaggregated these complications as those reflective of long-term health complications (e.g., anemia and diabetes) versus those indicative of predominately pregnancy-related health (e.g., premature labor and eclampsia). Birth weight appears to have a larger impact on pregnancy-related conditions as opposed to long-term health (results not shown).

Panel C of Table 3 examines whether there are any birth weight-induced differences in income-related outcomes. Unfortunately, California birth records have no direct income information. As a next best alternative, I look at four different outcomes that are related indirectly to a mother's income. Looking first at the C-section results and considering the high prevalence of this type of delivery among more affluent mothers, one might expect to observe a positive relationship between birth weight and C-section rates. But lighter twins have higher risks of pregnancy complications, which would likely result in a negative association between birth weight and C-section rates. However, the influence of birth weight on C-section delivery

---

[36] In Currie and Moretti's (2007) comparison of California-born siblings, the intergenerational transmission of birth weight is estimated as 0.2 (or an increase of 200 grams in the child's birth weight for every one kilogram increase in the mother's birth weight). This estimate is statistically indistinguishable from the OLS pooled twins estimate.

[37] If the variance of maternal birth weight equals the variance of the birth weight of the mothers' offspring, or in other words, birth weight across generations follows a stationary process, the coefficient from a regression of child's birth weight on mother's birth weight is directly interpretable as the intergenerational correlation in birth weight. In the data, there are slight differences in these variances. However, after taking into account these differences, the estimated intergenerational correlation in birth weight is larger only by a factor of 1.12 relative to the coefficient reported in Table 3.

[38] The health-related estimates may be prone to measurement error due to the dichotomous nature of the dependent variable. In the standard measurement error model, measurement error in these discrete clinical measures (e.g., diabetes) will lead to attenuation bias where the attenuation factor is 1—probability of a false positive—probability of a false negative), Jerry Hausman, Jason Abrevaya, and F. M. Scott Morton (1998), under the assumption that the misclassification rates are uncorrelated with birth weight. The estimates from DiGiuseppe et al. (2002) imply that we should inflate the estimates in Table 3 by about a factor of two to three for most health-related outcomes except for anemia, which we should inflate by ten.

001019

rates is weak at best, possibly reflecting the interaction of these two countervailing mechanisms. None of the other income-related outcomes—public payment for delivery (e.g., Medicaid-financed birth), the income in the zipcode of residence, or the poverty rate in the zipcode of residence—is strongly related to birth weight.

Suppose that as theories of fertility and mating predict, and as empirical studies show, that a rise in a mother's education level leads to fertility delays and higher "quality" mates.[39,40] Then one might expect that the improvements in education associated with increases in birth weight would lead to delayed childbearing and maternal selection of older and more educated mates. The final panel of estimates in Table 3 tests this conjecture. The lighter and heavier twin give birth at the same age. While this estimate is informative about the effects of birth weight on fertility timing, it is also instructive about selection bias. If the twins have children at different ages, then age could potentially confound the estimated returns to birth weight because I only observe women at their chosen time of motherhood. None of the effects of birth weight on mate "quality" are significant or large, but the effect of birth weight on paternal education parallels the analogous effect on maternal education, suggesting a large mating market effect of education.

While the regressions in Table 3 are based on the sample of female twins with an observed first or second birth, as a robustness check, I replicate Table 3 in Web Appendix A, Table A3, using the sample of female twins with an observed first birth and not necessarily an observed second birth. The estimates are consistent with those in Table 3, and as such, I use the larger sample of twins.

Another concern, in addition to the estimation sample, is that within-twin-pair differences in the incidence of congenital anomalies (i.e., birth defects) could potentially explain the persistence of birth weight. Suppose one twin is born with a congenital anomaly and the other is not. This congenital anomaly discordance could cause a within-twin birth-weight difference. Then, it would be inappropriate to attribute the within-twin differences in long-run outcomes to their differences in birth weight via fetal nutrition. As such, it may be more appropriate to exclude twins with a congenital anomaly from the estimation. For twins born between 1960 and 1967 or between 1978 and 1982, I can identify whether a twin had a congenital anomaly. Web Appendix A, Table A4 replicates Table 3, restricting the estimation sample to twins born in years in which congenital anomalies were recorded on birth certificates. Web Appendix A, Table A5 also duplicates Table 3 but further excludes any twins with a congenital anomaly. Overall, the estimates in Web Appendix A, Table A4 are somewhat larger although statistically indistinguishable from the estimates in Web Appendix A, Table A5. Both sets of estimates are roughly of the same magnitude as the estimates for the overall sample in Table 3. Thus, the within-twin-pair variation in birth weight exploited in Table 3 does not appear to be due to within-twin-pair variation in congenital anomalies.[41]

---

[39] For these theories of fertility and mating, see Gary S. Becker (1960), Becker and H. Gregg Lewis (1973), and Jacob Mincer (1963).

[40] For empirical studies of fertility and mating, see Currie and Moretti (2003) and Justin McCrary and Royer (2006).

[41] This bias may also be small simply because the number of twins with congenital anomalies is small. The percent of twins with a congenital anomaly is 1.3 percent for the overall twins sample. In comparison, this percent

*Nonlinear Effects of Birth Weight.*—Prior studies suggest that birth weight has non-linear effects on later outcomes. In fact, some studies (e.g., Johnson and Schoeni 2005) focus exclusively on the lower tail of the birth-weight distribution implicitly arguing that birth weight only matters when it falls below a certain threshold. If the effects of birth weight are a function of the level of birth weight, the regression estimates in Table 3 may not be representative of the effects throughout the distribution.

While recent economic studies (Almond, Chay, and Lee 2005; Behrman and Rosenzweig 2004; and Currie and Moretti 2007) agree about the existence of nonlinear birth-weight effects, they find disparate locations of these nonlinearities. Almond, Chay, and Lee (2005) argue that for infant mortality, birth weights at the bottom end of the distribution matter. In their study, the effect of birth weight on infant mortality is only sizable for birth weights below 1,500 grams. For birth weight of one's offspring, Currie and Moretti (2007) find that the marginal return to birth weight is largest for mid-range birth weights. These seemingly contradictory results may reflect the different mechanisms through which birth weight affects different outcomes.[42]

To allow for the possibility of nonlinear birth-weight effects, I estimate a piece-wise linear spline with a knot at 2,500 grams in Table 4.[43] The reported $F$-statistics test whether the two segments of the linear spline have equal slopes.[44] The first set of estimates, shown in the top panel, indicates that the effect of birth weight on education and infant mortality is highly nonlinear. Consistent with earlier work (Almond, Chay, and Lee 2005), the relationship between birth weight and infant mortality is strongest for the lower birth weight births. While there is some indication of nonlinearity in the effect of birth weight on infant death in both the OLS and fixed-effects specifications, the inclusion of twin fixed effects dampens the nonlinearity of the relationship. Meanwhile for education, the marginal benefit of birth weight on education is strongest in the 2,500+ gram range according to the cross-sectional OLS estimates. The fixed-effect estimates confirm these cross-sectional relationships, but the suggested degree of nonlinearity is slightly magnified. In particular, with education at birth as the dependent variable, the two segments of the linear spline have statistically distinct slopes. The estimated effects on education in the <2,500 gram range are negative but insignificant. However, at the upper end of the birth-weight distribution, the effects on education are nearly twice as large as those reported in Table 3. An increase in birth weight of 200–250 grams in this part of the distribution is associated with an increase in educational attainment on the order of 0.08–0.10 of a year.

Panel B of Table 4 shows that the effects of birth weight on adult health are largest for mothers whose birth weight was low. Hypertension, diabetes, and pregnancy

---

is 2.7 for the Almond, Chay, and Lee (2005) sample of infants born in the United States in 1989.

[42] Other possible explanations for the disparate findings are varying samples and identification strategies.

[43] The use of 2,500 grams as the knot point was chosen because 2,500 grams is approximately the median birth weight. The choice is also based on the patterns found in Figures 3–5. I have experimented with other knot points and the substantive conclusions remain unchanged.

[44] For these $F$-statistics, the numerator degrees of freedom is one and the denominator degrees of freedom is the number of twin pairs minus two.

TABLE 4—LINEAR SPLINE ESTIMATES OF THE EFFECT OF BIRTH WEIGHT IN KILOGRAMS
*(Female twins with first or second birth observed)*

| Panel A | Infant mortality | | Education | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Death within first year | | Maximum education | | Mean education | | Education at birth | |
| | OLS | FE | OLS | FE | OLS | FE | OLS | FE |
| <2,500 g | −0.33 | −0.044 | 0.03 | −0.07 | 0.03 | −0.02 | −0.01 | −0.10 |
| | (0.01) | (0.006) | (0.11) | (0.13) | (0.11) | (0.13) | (0.11) | (0.14) |
| 2,500 g+ | 0.11 | 0.004 | 0.32 | 0.29 | 0.33 | 0.31 | 0.38 | 0.38 |
| | (0.003) | (0.006) | (0.10) | (0.12) | (0.10) | (0.11) | (0.10) | (0.12) |
| F-stat of equal slopes | 2,561.37 | 23.15 | 2.80 | 3.25 | 3.06 | 2.97 | 4.45 | 5.13 |

| Panel B | Birth and adult health outcomes | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Child's birth weight (in grams) | | Gestational length (in days) | | Hypertension | | Diabetes | |
| | OLS | FE | OLS | FE | OLS | FE | OLS | FE |
| <2,500 g | 108.78 | 75.71 | 1.78 | −0.17 | −0.011 | −0.035 | −0.012 | −0.015 |
| | (29.48) | (54.04) | (1.00) | (2.09) | (0.009) | (0.017) | (0.007) | (0.013) |
| 2,500 g+ | 239.51 | 66.10 | 2.98 | 1.71 | 0.002 | −0.003 | 0.001 | 0.009 |
| | (26.36) | (47.51) | (0.91) | (1.82) | (0.007) | (0.015) | (0.006) | (0.011) |
| F-stat of equal slopes | 7.57 | 0.01 | 0.54 | 0.36 | 0.83 | 1.61 | 1.43 | 1.59 |

| Panel C | Anemia | | Number of pregnancy complications | | Number of labor complications | | Neonatal intensive care unit transfer | |
|---|---|---|---|---|---|---|---|---|
| | OLS | FE | OLS | FE | OLS | FE | OLS | FE |
| <2,500 g | 0.002 | 0.003 | −0.05 | −0.107 | 0.01 | −0.02 | −0.001 | −0.002 |
| | (0.004) | (0.010) | (0.02) | (0.040) | (0.04) | (0.09) | (0.009) | (0.017) |
| 2,500 g+ | −0.001 | −0.008 | 0.02 | −0.004 | 0.02 | 0.03 | 0.002 | 0.002 |
| | (0.004) | (0.009) | (0.02) | (0.035) | (0.04) | (0.07) | (0.008) | (0.015) |
| F-stat of equal slopes | 0.28 | 0.48 | 4.87 | 3.07 | 0.00 | 0.16 | 0.73 | 0.03 |

| Panel D | Birth delivery | | | | Residential location | | | |
|---|---|---|---|---|---|---|---|---|
| | C-Section delivery | | Public payment for delivery | | Median household income (1999) of zipcode | | Poverty rate (1999) of zipcode | |
| | OLS | FE | OLS | FE | OLS | FE | OLS | FE |
| <2,500 g | −0.04 | −0.03 | −0.02 | −0.05 | 1985.79 | 2733.55 | −0.004 | −0.001 |
| | (0.02) | (0.04) | (0.02) | (0.04) | (908.37) | (1,353.61) | (0.005) | (0.007) |
| 2,500 g+ | −0.01 | −0.03 | −0.05 | −0.03 | 192.31 | −1833.57 | −0.002 | 0.003 |
| | (0.02) | (0.04) | (0.02) | (0.04) | (855.91) | (1,191.54) | (0.004) | (0.006) |
| F-stat of equal slopes | 0.72 | 0.00 | 0.32 | 0.17 | 1.44 | 5.10 | 0.06 | 1.52 |

| Panel E | Maternal and paternal characteristics | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Maternal age (in days) | | Father present | | Paternal age (in days) | | Paternal education | |
| | OLS | FE | OLS | FE | OLS | FE | OLS | FE |
| <2,500 g | −32.63 | −28.52 | 0.04 | 0.03 | −117.06 | −354.70 | 0.13 | 0.22 |
| | (66.53) | (116.77) | (0.01) | (0.02) | (111.53) | (196.46) | (0.16) | (0.24) |
| 2,500 g+ | 18.09 | 160.42 | −0.01 | −0.03 | 145.87 | 408.31 | 0.39 | 0.17 |
| | (60.49) | (102.65) | (0.01) | (0.02) | (96.31) | (170.45) | (0.13) | (0.21) |
| F-stat of equal slopes | 0.22 | 1.17 | 5.87 | 3.81 | 2.19 | 6.80 | 1.17 | 0.01 |

*Notes:* The point estimates represent the estimated slope within the relevant birth-weight interval (e.g., 0–2,500g and 2,500g+). Robust standard errors adjusted for within-twin-pair correlation are reported in parentheses. The reported *F*-stat tests whether the two segments of the linear spline have equal slopes. All regressions are based on the sample of twins having first or second births in California between 1989 and 2002 (3,396 twin pairs) with the exception of the infant mortality results. For those twins whose first and second births are both observed, only the second birth is included in the regressions. The infant mortality results are based on all same-sex female twins in the 1960, 1965–1980 California birth cohort files (18,628 twin pairs). The reported mean is that of the dependent variable. The pooled OLS regressions include controls for year of birth, birth order, and race.

complications are declining functions of birth weight among low birth weight female twins. There is little, if any, adult health effects for mothers whose birth weight exceeded 2,500 grams.

Looking at the intergenerational effects of birth weight, in the cross section, the effect of a mother's birth weight on her child's birth weight is twice as large if the mother's birth weight was greater than 2,500 grams than if it was below this threshold. These cross-sectional estimates are consistent with the findings of Currie and Moretti (2007). This nonlinearity disappears after controlling for twin fixed effects.

Panel C of Table 4 shows the effects of birth weight on indirect measures of income. Except for the effect of birth weight on the median household income in the mother's residential zipcode, the birth-weight effects appear to be independent of birth-weight levels. Given the positive wage returns to education and the positive estimated effects of birth weight on education, one would expect that the effect of birth weight on income would be largest among mothers in the upper half of the twin birth-weight distribution. Instead, one sees the same pattern as observed for the health effects. The returns to birth weight as measured by residential median income are positive and statistically significant for mothers with birth weights below 2,500 grams but negative and statistically insignificant for birth weights above this threshold. However, the effects of birth weight for low birth weight mothers are economically small. An increase of one standard deviation in birth weight leads to an increase of approximately $1,300 in the median income in a mother's residential area. This is equivalent, for example, to moving from Santa Cruz County to San Francisco County.[45]

The effects of birth weight on fertility and mating market opportunities in the final panel of Table 4 are consistent with the effects on education. They too are largest among mothers who weighed over 2,500 grams at birth. For these "high" birth-weight mothers, being heavier is correlated with delays in fertility and maternal partnering with an older and more educated mate. The only effect that is statistically significant within this set of estimates is that of paternal age.

To further pinpoint the location of these nonlinearities, I add two additional knot points at 1,500 grams and 3,000 grams to the linear spline specification used in Table 4. Web Appendix A, Table A6 presents these additional regression results. The main insight provided by this closer look is that the pregnancy complication risks of birth weight are only present for mothers with birth weights falling between 1,500 grams and 2,500 grams. Meanwhile, the impact of birth weight on the birth weight of one's offspring and educational attainment are roughly in agreement with the earlier spline estimates in Table 4.[46]

---

[45] This example is based on a cross-county move, although the household median income data is measured at the zip code level.

[46] The linear spline specification is one of several ways to model the nonlinear effects of birth weight. Studies such as Case, Fertig, and Paxson (2005); Conley and Bennett (2000); and Johnson and Schoeni (2005) have focused on the long-run effects of low birth weight. Implicit in such a specification is that the effects of birth weight are negligible for birth weights exceeding the low birth weight threshold of 2,500 grams. The results in Table 4 suggest that this assumption is too strong. To better compare my estimates to those in this other literature, Web Appendix A, Table A7 reports the pooled OLS and twin fixed-effect estimates of low birth weight. The estimates suggest that low birth weight has a detrimental effect on educational attainment but little effect

*Sample Selection.*—A credible empirical test of the fetal origins hypothesis is difficult because of sample selection. In particular, this hypothesis predicts that individuals experiencing unfavorable in utero conditions may not survive into adulthood and thus, would not be observed in the data. Additionally, given the construction of the data, there are three other reasons why long-run outcomes may be missing: (a) the twin moved away from California; (b) she did not have a child between 1989 and 2002; and (c) there were data errors in her birth records that prevented matching. If a woman's birth weight affects her probability of later observation, the fixed-effect estimates could be subject to sample selection bias. Estimates from the 2000 Census suggest that migration out of California is not related strongly to educational attainment. Hence, it is unlikely that birth weight has an impact on migration out of California. Because I am using within-twin-pair variation, sample selection bias due to mortality and fertility is probably the most disconcerting. In this section, I assess the degree to which sample selection bias affects the estimates. While there is a correlation between birth weight and the probability of being observed, sample selection bias is minimal.

Table 5 presents estimates of the effect of birth weight on the probability of later observation.[47] A priori one would predict that selection into the sample would be an increasing function of birth weight. This is exactly what is found. The baseline fixed-effects estimates, shown in panel A, imply that a birth weight increase of 200 grams increases the probability of a later observed birth by 0.5 percentage points. These estimates seem small and inconsequential. In panel B, selection appears to be strongest among fairly normal-sized twins (i.e., those with birth weights between 2,500 grams and 3,000 grams). To further gauge the size of these effects, one can compare these estimates to the effect of birth weight on infant mortality. The effect of birth weight on infant mortality on the probability of later observation is about two-thirds of the size of the effect of birth weight on the probability of selection into the sample. As such, most of the sample selection appears to be the result of low birth weight infants dying in the first year of life.

To measure the extent to which this sample selection potentially biases the twin fixed-effects estimates, I perform a series of "nonparametric" tests, which I describe in full detail in Web Appendix B.[48] First, I test whether the effect of birth weight on the probability of later observation is the same across birth cohorts. Then, I test whether the effect of birth weight on long-run outcomes is identical for these same cohorts. The intuition is that if I find that the effect of birth weight on the probability of being observed later differs across cohorts, there should be heterogeneous effects of birth weight on long-run outcomes across birth cohorts in the presence of sample selection bias. This is assuming that the effect of birth weight on long-run outcomes is the same

---

on other outcomes. The effects of low birth weight on the likelihood of being a high school dropout are about one-fifth of the magnitude of the effects found by Johnson and Schoeni (2005) using sibling comparisons (results not shown).

[47] Although the outcomes are dichotomous, I estimate linear probability models for ease of interpretation.

[48] Alternatively, I could estimate the model with a sample selection correction. To do so, one would have to overcome the difficulty of finding a variable that affects the probability of later observation but not the outcome variable. The difficulty of this task is exacerbated in the context of twins because the requested variable must be measured at birth, must differ within-twin-pairs, and also must affect the probability of later observation in the 1989–2002 California birth records.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1032 of 4699 PageID #:  4197

TABLE 5—PROBABILITY OF OBSERVATION OF A LATER BIRTH AS A FUNCTION OF BIRTH WEIGHT

| Dependent variable | At least one birth observed | | First birth observed | | Second birth observed | | First or second birth observed | |
|---|---|---|---|---|---|---|---|---|
| | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| *Panel A: Linear model* | | | | | | | | |
| Birth weight | 0.025 (0.004) | 0.025 (0.008) | 0.022 (0.004) | 0.025 (0.008) | 0.017 (0.003) | 0.013 (0.007) | 0.025 (0.004) | 0.028 (0.008) |
| *Panel B: Linear spline model* | | | | | | | | |
| Birth weight segment: | | | | | | | | |
| <1,500 g | 0.12 (0.02) | −0.01 (0.10) | 0.13 (0.01) | −0.08 (0.09) | 0.01 (0.01) | −0.04 (0.08) | 0.12 (0.02) | −0.09 (0.10) |
| 1,500–2,500 g | 0.05 (0.01) | 0.03 (0.02) | 0.04 (0.01) | 0.02 (0.01) | 0.04 (0.01) | 0.02 (0.01) | 0.05 (0.01) | 0.02 (0.02) |
| 2,500–3,000 g | −0.02 (0.02) | 0.04 (0.02) | −0.01 (0.01) | 0.05 (0.02) | −0.01 (0.01) | 0.02 (0.02) | −0.02 (0.02) | 0.04 (0.02) |
| 3,000g+ | −0.02 (0.02) | 0.002 (0.026) | −0.02 (0.02) | 0.01 (0.02) | −0.01 (0.01) | −0.02 (0.02) | −0.01 (0.02) | 0.02 (0.03) |

*Notes:* The coefficient estimates presented in this table represent the effect of a one kilogram increase in birth weight on the probability of observation. The probability of observation is the probability that the twin is observed giving birth in California between 1989 and 2002. Robust standard errors, adjusted for within-twin-pair correlation, are in parentheses. The estimation sample includes all same-sex, female twin pairs born in California between 1960 and 1982. All regressions are based on 49,592 twin observations. The pooled OLS regressions include controls for year of birth, birth order, and race.

across cohorts, which may be justified given that the effect of birth weight on infant mortality is similar across cohorts in the sample. If instead the effects of birth weight on long-run outcomes are identical across cohorts but the effects of birth weight on selection into the sample are not, then sample selection bias may not be an issue.

In this case, I am able to reject strongly that the effect of birth weight on the probability of later observation is the same across cohorts. And, for all outcomes excluding diabetes, I am unable to reject the null hypothesis that the long-run effects of birth weight are identical across cohorts. Thus, the results of this nonparametric test suggest that sample selection bias is not problematic.

*National Childhood Longitudinal Study, Birth Cohort Data.*—To understand how birth weight affects long-run outcomes, it is important to examine the effect of birth weight earlier in the life cycle. Table 6 displays results for the twins sample for the ECLS-B. The first two sets of results examine the relationship between birth weight and neonatal intensive care use (NICU) and days in the hospital following birth. The OLS relationships indicate a strong correlation between birth weight and post-birth care. For instance, a typical within-twin-pair difference in birth weight would lead to a within-twin-pair difference in the probability of NICU use of 0.1, which is quite large given that the mean NICU use is 0.35. For both NICU use and days in the hospital, however, the estimated effect of birth weight falls quite dramatically with the inclusion of twin fixed effects.

001025

TABLE 6—POOLED OLS AND FIXED-EFFECT ESTIMATES
*(Effects of birth weight in kilograms ECLS-B data, twins only)*

| Post-birth care | | | | Developmental outcomes | | | |
|---|---|---|---|---|---|---|---|
| NICU use | | Days in hospital | | Standardized mental score | | Standardized motor score | |
| Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE | Pooled OLS | FE |
| −0.44 | −0.04 | −24.10 | −3.29 | 0.31 | 0.09 | 0.46 | 0.15 |
| (0.02) | (0.04) | (1.32) | (1.58) | (0.03) | (0.05) | (0.04) | (0.07) |
| Mean: 0.35 | | Mean: 11.63 | | Mean: −0.30 | | Mean: −0.32 | |

*Notes:* Robust standard errors adjusted for within-twin-pair correlation are shown in parentheses. All regressions are based on the sample of twins in the Early Childhood Longitudinal Study, Birth Cohort (1,496 twins; 748 twin pairs). The motor and mental scores have been standardized using the mean and standard deviation for the entire sample (i.e., the sample that includes singletons). The reported mean is the mean of the dependent variable. The pooled OLS regressions include controls for birth order, race, and age at assessment.

The developmental outcomes suggest a similar pattern. That is, the effect of birth weight in the short run is negligible. These outcomes measure infant's skills such as the ability to recognize the source of a sound and the ability to hold a ball. The mental and motor scores are standardized. The estimates of the effect of birth weight on these outcomes are quite small. A 250 gram increase in birth weight only translates into a 0.02–0.04 of a standard deviation increase in these scores. Overall, consistent with the earlier finding using the birth records, these results suggest that the effects of birth weight on short- and long-run outcomes are negligible. Although not displayed, estimates are similar when the sample is confined to identical twins and female twins.

## IV. Understanding the Effects of Birth Weight

### A. *Postnatal Investments*

The long-run effects of birth weight presented in Tables 3 and 4 are reduced-form estimates. They represent the effects of birth weight throughout a woman's life, including postnatal investment by her parents and her health care providers. Such parental investments may obfuscate identification of the biological effect of birth weight. For example, parents may seek to equalize the opportunities of their children, and thus invest more heavily in the lighter, disadvantaged twin.[49] Such behavior would dampen the long-run effects of birth weight. On the other hand, recognizing that there are potentially larger average returns to investing in the heavier twin, parents may favor the heavy twin. This would exacerbate the twin differences.

---

[49] To discern whether parents invest differentially in their children, an extensive public finance literature has examined gift giving and bequests from parents (see B. Douglas Bernheim and Sergei Severinov 2003 for citations). Bequests are usually split equally between children, but gifts before death tend to be unequal. Bernheim and Severinov (2003) develop a model to explain this puzzle. They argue that gifts can be unequal because children cannot directly observe the degree to which their parents love them, so gift giving acts as a signal. If gift giving is observable, siblings who do not receive gifts will infer that their parents do not love them as much. However, if gift giving is secret, parents make unequal gifts to their children without their children's knowledge. In the context of this study, parental investment during childhood may be most important for adult outcomes. Differential parental investment is unlikely to be secret if the twins are living together.

In addition, the lighter twin may receive more medical care because of the risks associated with low birth weight. Under this scenario, the estimated effects would be a downward-biased estimate of the biological effects of birth weight. Without knowing whether compensatory or reinforcing investment is more common, it is impossible to know the direction of bias due to postnatal investments. However, independent of this potential bias, the degree to which postnatal interactions offset the long-term effects of birth weight is of interest to both parents and policymakers.

Using the ECLS-B (results in Table 6), I estimate a weak relationship between birth weight and early medical care, which may be a postnatal investment decision made by health care professionals as opposed to by parents. These results hold along other dimensions such as breastfeeding, which is not surprising. However, parents and health care providers can participate in compensatory or equalizing behaviors that may be difficult to measure in a survey. For example, the quality and length of time spent with each child may not be accurately reported or remembered. But these estimates suggest that, along observable dimensions, there is little evidence of either compensatory or reinforcing behavior.

Measuring postnatal investments is more difficult in the birth records. For this reason, rather than measuring whether investments are responsive to birth weight, I use the birth records to examine whether the effects of birth weight differ across different families that may have varying abilities to invest in one twin versus another. For instance, it is plausible that the potential for parents to treat each twin differently varies by family size. A large family with limited resources may be unable to treat each twin differently, and thus, estimates based on large families may be closer to the true biological effect of birth weight. In results not shown, the birth-weight effects on education tend to be smaller but nonnegligible in larger families (i.e., families where the twins have at least two older siblings). The effects of birth weight on pregnancy complications are larger in bigger families. These educational attainment results support the theory that parents offer more resources to the heavier twin. This leads to upward-biased estimates of the effect of birth weight. These results are only suggestive since the imprecision of these estimates does not allow me to differentiate these new estimates from the estimates in Table 3.

While the two data sources suggest that equal resources are devoted to each twin, it is important to put these estimates in context with findings from other studies. David S. Loughran, Ashlesha Datar, and M. Rebecca Kilburn (2004); and Datar, Kilburn, and Loughran (2006) test whether parental investments vary with birth weight. Both of these studies take advantage of sibling comparisons from the National Longtitudinal Survey of Youth-Child File and correlate differences in birth weight with differences in parental investments (i.e., age at school entry, maternal labor supply, and family size in Loughran, Datar, and Kilburn 2004; and breastfeeding, well-baby visits, immunizations, preschool attendance, and kindergarten entry age in Datar, Kilburn, and Loughran 2006).[50] For the relevance of this study, these estimates are probably upward-biased estimates of the effect on the level of parental investment as it is likely easier for parents to invest differentially in nontwin siblings

001027

[50] Some of these outcomes (e.g., age at school entry) are very unlikely to differ among twins.

relative to twins.[51] Along all measured dimensions except kindergarten entrance age, the results of Datar, Kilburn, and Loughran (2006) suggest that parents participate in reinforcing behavior very early on in life. The results of Loughran, Datar, and Kilburn (2004) are less clear. Using Chinese twins, Rosenzweig and Junsen Zhang (2006) also find some supportive evidence that parents participate in reinforcing behaviors in terms of schooling expenditures. Given all of these results, we might interpret the twins estimates of the returns to birth weight as upward-biased estimates of the biological effect of birth-weight on long-run outcomes although results from the birth records and the ECLS-B suggest that this degree of bias is negligible.

### B. *Monozygotic versus Dizygotic Twins*

As in many other twin studies (e.g., Almond, Chay, and Lee 2005; Oreopoulos et al. 2006; Conley, Kate Strully, and Bennett 2006), I cannot distinguish between monozygotic and dizygotic twins in these data.[52] Genetic advantage likely is correlated positively with birth weight as the incidence of congenital anomalies, many of which are genetic, is decreasing with birth weight.[53] Therefore, the twin fixed-effects estimates of the long-run effects of birth weight, calculated using data on both dizygotic and monozygotic twins, likely will provide an upper bound of the effect of birth weight via prenatal nutritional deprivation.[54,55] It should be noted that for Black, Devereux, and Salvanes (2007), the estimates for monozygotic twins

---

[51] If resources are fixed, then an increased investment in one sibling mechanically leads to a decrease in the investment in the other sibling. As such, the sibling estimator is likely an upper bound of the effect of birth weight on parental investment.

[52] Roughly 60 percent to 80 percent of all twins (and a lower percent of same-sex, female twins) are dizygotic. This percentage has grown recently with the increasing popularity of assisted reproductive technologies such as in vitro fertilization (Cunningham et al. 2001). The first successful use of in vitro fertilization in the United States occurred in 1981 (Kasey Buckles 2007) and thus, only the youngest cohorts in the twins sample could have been born to mothers with access to such technologies. But, as seen in Web Appendix A, Figure A2, both the overall twinning rate and the fraction of births that are same-sex, female twins remain relatively constant over the 1960–1982 period. Moreover, in US natality data, the rise in multiple births per pregnancy is only evident in the late 1980's (Buckles 2007). These facts provide assurance that while most of the twins in the sample are likely dizygotic, the fraction that is monozygotic is not changing substantially over the sample period.

[53] By definition, congenital anomalies are defects at time of birth. They can be genetic defects or damage incurred in the uterus or at the time of birth.

[54] To determine the extent to which the birth-weight differences signal differences in underlying health rather than genetic differences, other studies (Almond, Chay, and Lee 2005; Black, Devereux, and Salvanes 2007; Conley, Strully, and Bennett 2006) contrast estimates based on opposite-sex twins to those based on same-sex twins. The underlying assumption is that sex composition does not have an independent effect on the outcome. For the Almond, Chay, and Lee (2005) and the Conley, Strully, and Bennett (2006) studies, which relate birth-weight differences to differences in infant mortality, this assumption may be innocuous. However, when looking at adult outcomes, as Black, Devereux, and Salvanes (2007) do, it is not. Moreover, as working behaviors of males and females differ dramatically, it is not surprising that the estimated effects of birth weight on earnings and education in Black, Devereux, and Salvanes (2007) differ by twin type.

[55] To assess the degree of bias due to genetic factors, I compare the effects of birth weight by race. From other studies, it is clear that the rate of dizygosity varies by race. Conditional on a twin birth, blacks are more likely to give birth to dizygotic twins relative to whites (Cunningham et al. 2001). Surprisingly, when comparing black and white twins, the within-twin-pair estimates of the effect of birth weight on education are smaller among black twins than among the full sample. However, the effects on pregnancy complications are larger among black twins. Given that the implied direction of bias, at least for the effects on education, is opposite of that predicted, the differences between these estimates and the main set of estimates may be due to heterogeneous birth-weight effects across racial groups.

are quite similar to those for dizygotic twins, which suggests that the genetic bias is small.

## V. Comparison to Existing Literature

There is a plethora of mainly small-scale epidemiological studies examining the long-run effects of birth weight.[56] However, publication bias may be a concern in such studies. Huxley, Neil, and Collins (2002) document a strong inverse relationship between estimated effect sizes and sample size. Recently economists have estimated such long-run relations, focusing mainly on human capital outcomes, which are usually ignored in epidemiological studies. While this economics literature improves upon the earlier epidemiological studies, particularly by employing large samples, the results can be very inconsistent across and even within studies. For example, Black, Devereux, and Salvanes (2007) estimate substantial and statistically significant differences in the effect of birth weight across different birth cohorts. One potential explanation for such inconsistencies is sample selection bias. The effects of birth weight on education are largest for the cohorts who are less likely to be observed as adults.[57]

The purpose of this section is to directly compare the estimates across these studies. Unfortunately, simple comparisons across studies are nearly impossible due to a lack of a unifying regression framework across these studies (e.g., differing functional form and dependent and independent variables). Overall, my estimates in relation to other economic studies (e.g., Behrman and Rosenzweig 2004; Black, Devereux, and Salvanes 2007; and Oreopoulos et al. 2006), are much smaller.

Behrman and Rosenzweig (2004) is the only study of this group using US twins. They use the Minnesota Twins Registry consisting of monozygotic twins born in Minnesota between 1936 and 1955, who were resurveyed as adults. Of the 10,400 surviving twins born within these years, Behrman and Rosenzweig have complete data for 804 female twins.[58,59] In the bottom panel of Table 7, I replicate Behrman and Rosenzweig's estimates. In the top panel of Table 7, the sample means of the two samples are similar with the exception of educational attainment. Behrman and Rosenzweig use fetal growth as their measure of healthiness of birth because

---

[56] Such studies include Terence Dwyer et al. (1999); Richard G. Ijzerman, Dorret I. Boomsma, and Coen D. A. Stehouwer (2005); Ruth J. F. Loos et al. (2001); Poulter et al. (1999); and Zhang, Ruth A. Brenner, and Mark A. Klebanoff (2001).

[57] Usually we would believe that selection bias would lead to downward-biased estimates based on selection into the sample being an increasing function of birth weight. Black, Devereux, and Salvanes (2007), however, do not present such estimates.

[58] The 10,400 total does not include those twins born and dying during infancy. Only roughly 80 percent of the live-born twin pairs born during this period were alive after one year (i.e., neither of the twins died within the first year of life) (D. T. Lykken et al. 1990).

[59] Behrman and Rosenzweig do not explicitly address the potential selection bias due to this response and reporting bias. They recognize that birth weight could potentially affect infant mortality and lead to selection bias. They argue that such a worry is unfounded, given the results of Almond, Chay, and Lee (2005). However, the cohorts studied in Almond, Chay, and Lee (2005) were born 30 years later than the cohorts examined by Behrman and Rosenzweig (2004). Between the births of these two cohorts, there were significant improvements in infant mortality for low birth weights (David Cutler and Ellen Meara 1999), suggesting that the effects of birth weight on infant mortality are time-variant. Almond, Chay, and Lee (2005) estimate comparable effects of birth weight on infant mortality for twins born in the 1980s and 1990s. But the sharpest reductions in infant mortality occurred in the 1960s and 1970s.

TABLE 7—COMPARISON WITH BEHRMAN AND ROSENZWEIG (2004) ESTIMATES

*Panel A: Descriptive statistics*

|  | This study's sample | B&R sample | B&R sample of first born |
|---|---|---|---|
| Fetal growth (oz. per week) | 2.36 | 2.34 | 2.34 |
| Birth weight (oz.) | 89.08 | 90.2 | 90.1 |
| Schooling | 12.93 | 13.8 | — |
| Birth weight of 1st child (oz.) | 118.87 | — | 118.1 |
| Observations | 5,754 | 1,418 | 1,207 |

*Panel B: Regression estimates*

|  | Education at birth | | | Offspring's birth weight (oz) | | |
|---|---|---|---|---|---|---|
| This study | OLS | OLS | FE | OLS | OLS | FE |
| Fetal growth (oz./week) | 0.30 (0.08) | 0.21 (0.06) | 0.10 (0.09) | 8.01 (0.68) | 7.89 (0.67) | 2.30 (1.30) |
| Age |  | 0.25 (0.01) |  |  | 0.37 (0.05) |  |
| Observations | 5,604 | 5,604 | 5,604 | 5,604 | 5,604 | 5,604 |
| Behrman and Rosenzweig (2004) |  |  |  |  |  |  |
| Fetal growth (oz./week) |  | 0.313 (0.152) | 0.657 (0.211) |  | 7.48 (1.50) | 1.87 (3.67) |
| Age |  | −0.0429 (0.012) | NA |  | −0.198 (0.105) | NA |
| Observations |  | 1,418 | 804 |  | 1,207 | 608 |

*Notes:* Standard errors adjusted for within-twin-pair correlation are in parentheses. My estimation sample includes all mothers observed having first or second births between 1989 and 2002, who were themselves born in California between 1960 and 1982. The reported number of observations is the number of females: each twin pair constitutes two observations. For those twins who are observed giving first and second births, only the second birth is included in the regressions. For the birth weight regressions, the age variable in the Behrman and Rosenzweig regressions is mother's current age at survey. My measure of education is education at time of motherhood. Other measures of education—mean education across births and maximum education across births—produce similar results.

fetal growth is arguably a better measure than gestation or birth weight alone. But dividing birth weight by gestational length likely introduces substantial measurement error and thus leads potentially to inconsistent estimates, which may be either upward- or downward-biased (see Web Appendix C for the proof).[60]

The OLS estimates, particularly that of offspring's birth weight, are of the same magnitude after accounting for the sampling variation. Nevertheless, once I control for twin fixed effects, the effect of fetal growth on education at birth is halved. In contrast, the fixed-effects estimate for education of Behrman and Rosenzweig greatly exceeds the OLS estimate and is more than six times the size of my fixed-effects estimate. Given that their sample contains only 804 twins, this estimate is relatively

---

[60] Gestational length is usually calculated from a woman's reported date of last menses, which may be easily forgotten and misreported and is only an approximation of the date of conception while birth weight is measured with considerably less error (Cunningham et al. 2001). New technologies such as sonograms provide more accurate estimates of gestational age than do imputations based on date of last menses, but the estimates using these advanced technologies are rarely reported in the natality files.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1038 of 4699 PageID #: 4203

imprecise. My fixed-effect estimate of the effect of fetal growth on the birth weight of one's offspring is extremely similar to that of Behrman and Rosenzweig.

Black, Devereux, and Salvanes (2007) use Norwegian data created from the merger of several administrative datasets and rely on an estimation sample over 13,000.[61] In Table 8, one can observe that the sample means for fetal growth and birth weight are nearly identical in the two studies, but the birth-weight and fetal growth variances are larger in the Black, Devereux, and Salvanes sample. The birth-weight and infant mortality relationships (middle panel of Table 8) are quite similar although the birth-weight and infant mortality relation is stronger in the United States.

In terms of long-run outcomes, Black, Devereux, and Salvanes (2007) focus on the returns to birth weight on high school degree completion rather than years of education because of worries of sample size restrictions.[62] My OLS estimate of the educational return to birth weight is roughly comparable to the size of the Black, Devereux, Salvanes (2007) OLS estimate. Once controlling for twin fixed effects, a large difference immerges—the Black, Devereux, and Salvanes (2007) estimates are roughly two times larger than my own.[63]

Although not displayed in Table 8, the estimates of Black, Devereux, and Salvanes (2007) vary considerably across cohorts. For instance, the effect of a one kilogram increase in birth weight on high school completion in Black, Devereux, and Salvanes (2007) is 0.04 for the 1967–1976 cohort (number of observations = 9,500) and 0.22 for the 1977–1986 cohort (number of observations = 3,622).[64] Sample selection appears to be strongest for the cohort with the largest birth weight effects. As the effects of birth weight on infant mortality are bigger for the 1977–1986 cohort.[65] However, looking across cohorts in my sample with the exception of diabetes, I find no differential effects of birth weight.

The last study, Oreopoulos et al. (2006) focuses on Canadian twins and siblings from the Manitoba province born between 1979 and 1985. In total, there are approximately 40,000 siblings and 1,300 twins (650 twin pairs) in their sample.[66] In the top panel of Table 9, I contrast estimates from linear models (i.e., models in which an indicator for high school completion is regressed on birth weight). While the Oreopoulos et al. (2006) OLS estimates greatly exceed the analogous California estimates, the twin fixed effects estimates are quite comparable. In the nonlinear regressions, the birth-weight effects exhibit similar patterns across the birth-weight distribution, but the magnitudes of birth weight effects are larger for the sample of Canadian twins. However, given that Oreopoulos et al. (2006) do not have many twin pairs, their estimates are comparatively imprecisely measured.

---

[61] About one-third of these twins are same-sex female twins.

[62] Black, Devereux, and Salvanes (2007) note that in order to use years of education as the dependent variable, they must restrict the sample to individuals 25 years old and older. This sample restriction apparently results in very imprecise estimates.

[63] To further understand these differing results, I have estimated the effects of birth weight across the educational distribution. For the California twins, the biggest effects are observed along the margin of a high school degree. The nonlinear effects of birth weight on educational attainment are driven by the effects of birth weight on college completion.

[64] These estimates are statistically distinguishable from one another.

[65] However, intuitively, it seems that sample selection would bias the estimates downward.

[66] These sample sizes come from table 8 of their paper.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1039 of 4699 PageID #:  4204

TABLE 8—COMPARISON WITH BLACK, DEVEREUX, AND SALVANES (2007) ESTIMATES

| Descriptive statistics | This study's sample | Black, Devereux, Salvanes sample |
|---|---|---|
| Fetal growth (grams/week) | 66.95 (11.55) | 68.06 (13.47) |
| Birth weight (grams) | 2,526 (488) | 2,540 (599) |
| Percent completing high school | 0.82 | 0.75 |
| Observations | 5,604 | 11,284 |

| *Regression estimates* | This study's estimates | | Black, Devereux, Salvanes estimates | |
|---|---|---|---|---|
| | OLS | FE | OLS | FE |
| Dependent variable: death in first year of life ln(birth weight) | −396.54 (7.45) | −57.90 (9.45) | −390.56 (27.62) | 5.84 (23.57) |
| Observations | 31,042 | 31,204 | 3,804 | 3,804 |
| Dependent variable: completion of high school ln(birth weight) | 0.04 (0.03) | 0.05 (0.05) | 0.03 (0.04) | 0.11 (0.06) |
| Observations | 5,604 | 5,604 | 3,466 | 3,466 |

*Notes:* In the top descriptive statistics panel, standard deviations are in parentheses. In the bottom regression estimates panel, standard errors adjusted for within-twin-pair correlation are in parentheses. With the exception of the infant mortality regressions, the estimates from this study are based on the sample of twins whose first or second births are observed in California between 1989 and 2002 (2,802 twin pairs) with nonmissing information on fetal growth. The infant mortality estimates come from the sample of same-sex, female twins born in California in 1960 or between 1965 and 1980. For those twins whose first and second births are both observed, only the second birth is included in the regressions. In these regressions, the education measure is education as measured at time of motherhood. A mother is considered to have completed high school if she reports 12 or more years of education. For the top panel of descriptive statistics, the Black, Devereux, and Salvanes sample consists of same-sex, female twins born between 1967 and 1997 with the exception the high school completion (measured for 1967 to 1981 cohorts). For the bottom panel, the Black, Devereux, and Salvanes sample consists of same-sex, female twins born between 1967 and 1977.

Overall, the estimates presented in this study suggest a much more muted role for birth weight in predicting long-run and intergenerational outcomes. While I have presented reasons for the disparities in results across studies, it is not entirely clear that one would expect similar estimates across studies, especially across countries. Even if the biological mechanisms by which birth weight affects long-run outcomes are invariant, it is not necessarily true that the social factors that can intensify or weaken this relationship do not have a country-specific or a time-specific component. In particular, we might think of the United States as a less egalitarian society when compared to Canada or Norway. Given this observation, we may expect that parents in the United States participate in less compensatory behavior. This would lead one to believe that the birth-weight effects would be bigger in the United States than in these other countries. But this is not the case. With the available data though, we know little about cross-country differences in these parental behaviors. Hopefully, with a growing interest in this field of research, researchers will collect such data in the future.

001032

TABLE 9—COMPARISON WITH OREOPOULOS, STABILE, WALLD, AND ROOS (2006) ESTIMATES

*Dependent variable: completion of high school*

| | This study's estimates | | Oreopoulos et al. estimates | |
|---|---|---|---|---|
| Linear model | OLS | FE | OLS | FE |
| Birth weight (kg) | 0.02 | 0.02 | 0.0741 | 0.0271 |
| | (0.01) | (0.02) | (0.0214) | (0.0319) |
| | This study's estimates | | Oreopoulos et al. estimates | |
| Nonlinear model | OLS | FE | OLS | FE |
| Birth weight < 1,000g | 0.11 | 0.02 | −0.3346 | −0.0837 |
| | (0.21) | (0.41) | (0.1968) | (0.3434) |
| Birth weight 1,000–1,500g | −0.10 | −0.10 | −0.2708 | −0.2315 |
| | (0.05) | (0.07) | (0.0874) | (0.0954) |
| Birth weight 1,500–2,500g | −0.01 | 0.02 | −0.1284 | −0.0685 |
| | (0.03) | (0.04) | (0.0621) | (0.0607) |
| Birth weight 2,500–3,000g | 0.005 | 0.03 | −0.1094 | −0.0921 |
| | (0.034) | (0.04) | (0.0624) | (0.0570) |
| Birth weight 3,000–3,500g | 0.002 | 0.02 | −0.0639 | −0.0488 |
| | (0.035) | (0.04) | (0.0656) | (0.0533) |
| Observations | 6,676 | 6,676 | 1,354 | 1,354 |

*Notes:* This study's estimates are based on the sample of twins whose first or second births are observed in California between 1989 and 2002. For those twins whose first and second births are both observed, only the second birth is included in the regressions. In these regressions, the education measure is education as measured at time of motherhood. A mother is considered to have completed high school if she reports 12 or more years of education. The Oreopoulos et al. regressions are based on a sample of Canadian twins, which includes male/male twins, male/female twins, and female/female twins. The dependent variable is an indicator for whether the twin reached grade 12 by age 17.

## VI. Conclusion

This paper uses a new, large sample of California-born twins to estimate the long-run and intergenerational effects of birth weight, a prime important measure of infant health. To do this, I exploit the fact that twins, even monozygotic twins, frequently have unequal birth weights. I measure the extent to which these differences in birth weight translate into differences in adult and intergenerational outcomes. This approach is appealing because it controls for unobserved heterogeneity across individuals, a potential confounder in cross-sectional analyses.

While birth weight does have a statistically significant impact on many long-run outcomes—education, birth weight of one's offspring, and pregnancy complications—the estimated effects are typically small. Increasing birth weight by a conceivable 250 grams only leads to 0.03–0.04 of a year of additional schooling. Additionally, the short-run effects of birth weight are quite small. In terms of development and health care investment, I observe no substantial differences between the lighter and heavier twin. However, I do find large effects for pregnancy complications. Specifically, a 250 gram increase in birth weight is associated with a 1.3 percentage point, or an 11.4 percent, decline in the number of such complications but

these complications are reflective of pregnancy-related rather than long-run health problems.

These mean effects mask the effects of birth weight at different points of the birth weight distribution. The positive effect of birth weight on education is largest for births exceeding 2,500 grams, a range where outcomes are often assumed to be unaffected by birth weight. This is a new and important finding suggesting that returns to increases in birth weight may be reaped from "normal-weight" births. As such, the concentration on low birth weight may be misplaced. On the other hand, the negative effects of birth weight on pregnancy complications are concentrated among low birth-weight women.

While it is not surprising that these effects are nonlinear, it is unanticipated that the shape of the birth-weight response function differs across outcomes. As such, a uniform theory such as the fetal origins hypothesis is unlikely to be a completely satisfactory explanation for the long-run effects of birth weight. Many different mechanisms may be at work. This is an important area for future research.

Establishing the existence and determinants of the nonlinear effects of birth weight is important for policy decisions. Policies with goals of increasing birth weight (e.g., Medicaid expansions) often target only women at risk of delivering low birth weight babies. This research suggests that benefits, in the form of increases in educational attainment, may be reaped by raising birth weights for other populations. The robustness analyses suggest that, if anything, these estimated birth-weight effects are upward biased, implying an even more muted role of birth weight in the determination of short- and long-run outcomes.

## REFERENCES

Almond, Douglas. 2006. "Is the 1918 Influenza Pandemic Over? Long-Term Effects of In Utero Influenza Exposure in the Post-1940 US Population." *Journal of Political Economy*, 114(4): 672–712.

Almond, Douglas, Kenneth Y. Chay, and David S. Lee. 2005. "The Costs of Low Birth Weight." *Quarterly Journal of Economics*, 120(3): 1031–83.

Bajoria, Rekha, Suren R. Sooranna, Stuart Ward, Stephen D'Souza, and Maggie Hancock. 2001. "Placental Transport Rather Than Maternal Concentration of Amino Acids Regulates Fetal Growth in Monochorionic Twins: Implications for Fetal Origin Hypothesis." *American Journal of Obstetrics and Gynecology*, 185(5): 1239–46.

Barker, D. J. P., P. D. Winter, C. Osmond, B. Margetts, and S. J. Simmonds. 1989. "Weight in Infancy and Death from Ischaemic Heart Disease." *Lancet*, 2(8663): 577–80.

Barker, D. J. P. 1995. "Fetal Origins of Coronary Heart Disease." *British Medical Journal*, 311(6998): 171–74.

Barker Theory. 2006. http://www.barkertheory.com/press.html. (accessed July 7, 2006).

Becker, Gary S. 1960. "An Economic Analysis of Fertility." In *Demographic and Economic Change in Developed Countries*, ed. Richard A. Easterlin, 209–40. Princeton: Princeton University Press.

Becker, Gary S., and H. Gregg Lewis. 1973. "On the Interaction between the Quantity and Quality of Children." *Journal of Political Economy*, 81(2): S279–88.

Behrman, Jere R., and Mark R. Rosenzweig. 2004. "Returns to Birthweight." *Review of Economics and Statistics*, 86(2): 586–601.

Bernheim, B. Douglas, and Sergei Severinov. 2003. "Bequests as Signals: An Explanation for the Equal Division Puzzle." *Journal of Political Economy*, 111(4): 733–64.

Black, Sandra E., Paul J. Devereux, and Kjell G. Salvanes. 2007. "From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes." *Quarterly Journal of Economics*, 122(1): 409–39.

Blanden, Jo, Paul Gregg, and Stephen Machin. 2005. "Educational Inequality and Intergenerational Mobility" In *What's the Good of Education? The Economics of Education in the United Kingdom*, ed. Stephen Machin and Anna Vignoles, 99–113. Princeton: Princeton University Press.

**Buckles, Kasey.** 2007. "Stopping the Biological Clock: Infertility Treatments and the Career-Family Tradeoff." http://www.nd.edu/~kbuckles/natality.pdf.

**Buescher, P. A., K. P. Taylor, M. H. Davis, J. M. Bowling.** 2003. "The Quality of the New Birth Certificate Data: A Validation Study in North Carolina." *American Journal of Public Health*, 83(8): 1163–65.

**Case, Anne, Angela Fertig, and Christina Paxson.** 2005. "The Lasting Impact of Childhood Health and Circumstance." *Journal of Health Economics*, 24(2): 365–89.

**Case, Anne, Darren Lubotsky, and Christina Paxson.** 2002. "Economic Status and Health in Childhood: The Origins of the Gradient." *American Economic Review*, 92(5): 1308–34.

**Conley, Dalton, and Neil G. Bennett.** 2000. "Is Biology Destiny? Birth Weight and Life Chances." *American Sociological Review*, 65(3): 458–67.

**Conley, Dalton, Kate W. Strully, and Neil G. Bennett.** 2006. "Twin Differences in Birth Weight: The Effects of Genotype and Prenatal Environment on Neonatal and Post-Neonatal Mortality." *Economics & Human Biology*, 4(2): 151–183.

**Cunningham, F. Gary, Norman F. Gant, Kenneth J. Leveno, Larry C. Gilstrap III, John C. Hauth, and Katharine D. Wenstrom.** 2001. *Williams Obstetrics.* 21st ed. New York: McGraw–Hill.

**Currie, Janet, and Rosemary Hyson.** 1999. "Is the Impact of Health Shocks Cushioned by Socioeconomic Status? The Case of Low Birthweight." *American Economic Review*, 89(2): 245–50.

**Currie, Janet, and Enrico Moretti.** 2003. "Mother's Education and the Intergenerational Transmission of Human Capital: Evidence from College Openings." *Quarterly Journal of Economics*, 118(4): 1495–1532.

**Currie, Janet, and Enrico Moretti.** 2007. "Biology as Destiny? Short- and Long-Run Determinants of Intergenerational Transmission of Birth Weight." *Journal of Labor Economics*, 25(2): 231–63.

**Currie, Janet, and Mark Stabile.** 2003. "Socioeconomic Status and Child Health: Why Is the Relationship Stronger for Older Children?" *American Economic Review*, 93(5): 1813–23.

**Cutler, David M., and Ellen Meara.** 1999. "The Technology of Birth: Is It Worth It?" National Bureau of Economic Research Working Paper 7390.

**Datar, Ashlesha, M. Rebecca Kilburn, and David S. Loughran.** 2006. "Health Endowments and Parental Investments in Infancy and Early Childhood." RAND Working Paper WR-367.

**DiGiuseppe, David L., David C. Aron, Lorin Ranbom, Dwain L. Harper, and Gary E. Rosenthal.** 2002. "Reliability of Birth Certificate Data: A Multi-Hospital Comparison to Medical Records Information." *Maternal and Child Health Journal*, 6(3): 169–79.

**DiNardo, John, Justin McCrary, and Lisa Sanbonmatsu.** 2006. "Constructive Proposals for Dealing with Attrition: An Empirical Example." http://www-personal.umich.edu/~jdinardo/DMS_v9.pdf.

**Dwyer, Terence, Leigh Blizzard, Ruth Morley, and Anne-Louise Ponsonby.** 1999. "Within Pair Association Between Birth Weight and Blood Pressure at Age 8 in Twins from a Cohort Study." *British Medical Journal*, 319(7221): 1325–29.

**Eriksson, J. G., T. Forsén, J. Tuomilehto, P. D. Winter, C. Osmond, and D. J. P. Barker.** 1999. "Catch-up Growth in Childhood and Death from Coronary Heart Disease: Longitudinal Study." *British Medical Journal*, 318(7181): 427–31.

**Gringras, Paul and Wai Chen.** 2001. "Mechanisms for Differences in Monozygous Twins." *Early Human Development*, 64(2): 105–17.

**Hales C. N., D. J. P. Barker, P. M. S. Clark, L. J. Cox, C. Fall, C. Osmond, and P. D. Winter.** 1991. "Fetal and Infant Growth and Impaired Glucose Tolerance at Age 64." *British Medical Journal*, 303(6809): 1019–22.

**Hausman, J. A., Jason Abrevaya, and F. M. Scott-Morton.** 1998. "Misclassification of the Dependent Variable in a Discrete-Response Setting." *Journal of Econometrics*, 87(2): 239–69.

**Heckman, James J.** 1979. "Sample Selection Bias as a Specification Error." *Econometrica*, 47(1): 153–61.

**Huxley, Rachel, Andrew Neil, and Rory Collins.** 2002. "Unravelling the Fetal Origins Hypothesis: Is There Really an Inverse Association Between Birthweight and Subsequent Blood Pressure?" *Lancet*, 360(9350): 659–65.

**Ijzerman, Richard G., Dorret I. Boomsma, and Coen D. A. Stehouwer.** 2005. "Intrauterine Environmental and Genetic Influences on the Association Between Birthweight and Cardiovascular Risk Factors: Studies in Twins as a Means of Testing the Fetal Origins Hypothesis." *Paediatric and Perinatal Epidemiology*, 19(Suppl. 1): 10–14.

**James, Williams H.** 1982. "The IQ Advantage of the Heavier Twin." *British Journal of Psychology*, 73(4): 513–17.

**Johnson, Rucker C. and Robert F. Schoeni.** 2007. "Early-Life Origins of Adult Disease: The Significance of Poor Infant Health and Childhood Poverty." http://socrates.berkeley.edu/~ruckerj/johnson_schoeni_EarlylifeOriginsAdultDisease_9-07.pdf.

001035

**Loughran, David S., Ashlesha Datar, and M. Rebecca Kilburn.** 2004. "The Interactive Effect of Birth Weight and Parental Investment on Child Test Scores." RAND Labor and Population Working Paper 168.

**Lumey, L. H. and Aryeh D. Stein.** 1997. "In Utero Exposure to Famine and Subsequent Fertility: The Dutch Famine Birth Cohort Study." *American Journal of Public Health*, 87(12): 1962–66.

**Loos, Ruth J. F., Robert Fagard, Gaston Beunen, Catherine Derom, and Robert Vlietinck.** 2001. "Birth Weight and Blood Pressure in Young Adults: A Prospective Twin Study." *Circulation*, 104: 1633–38.

**Lykken D. T., T. J. Bouchard Jr, M. McGue, and A. Tellegen.** 1990. "The Minnesota Twin Family Registry: Some Initial Findings." *Acta Genetica Medicae et Gemellologiae (Roma)*, 39(1): 35–70.

**Maccini, Sharon and Dean Yang.** 2006. "Under the Weather: Health, Schooling, and Socioeconomic Consequences of Early-Life Rainfall." http://www-personal.umich.edu/~smaccini/.

**McCrary, Justin, and Heather Royer.** 2006. "The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Policies Using Exact Date of Birth." National Bureau of Economic Research Working Paper 12329.

**Meng, Xin and Nancy Qian.** 2006. "The Long Run Health and Economic Consequences of Famine on Survivors: Evidence from China's Great Famine." I2A Discussion Paper 2471, http://rspas.anu.edu.au/economics/staff/meng/.

**Mincer, Jacob.** 1963. "Market Prices, Opportunity Costs, and Income Effects." In *Measurement in Economics: Studies in Mathematical Economics and Econometrics in Memory of Yehund Grunfeld*, ed. Carl Christ. Stanford: Stanford University Press, 67–82.

**Oreopoulos, Phil, Mark Stabile, Randy Walld, and Leslie Roos.** 2006. "Short, Medium, and Long Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins." National Bureau of Economic Research Working Paper 11998.

**Ozanne, Susan E., and C. Nicholas Hales.** 2002. "Early Programming of Glucose-Insulin Metabolism." Trends in Endocrinology & Metabolism, 13(9): 368–73.

**Poulter, N. R., C. L. Chang, A. J. Mac Gregor, H. Snieder, and T. D. Spector.** 1999. "Association Between Birth Weight and Adult Blood Pressure in Twins: Historical Cohort Study." *British Medical Journal*, 319(7221): 1330–33.

**Reid, Alice.** 2005. "The Effects of the 1918–1919 Influenza Pandemic on Infant and Child Health in Derbyshire." *Medical History*, 49(1): 29–54.

**Rosenzweig, Mark R., and Kenneth I. Wolpin.** 1995. "Sisters, Siblings, and Mothers: The Effect of Teen-Age Childbearing on Birth Outcomes in a Dynamic Family Context." *Econometrica*, 63(2): 303–26.

**Rosenzweig, Mark R. and Junsen Zhang.** 2006. "Do Population Control Policies Induce More Human Capital Investment? Twins, Birthweight, and China's 'One Child' Policy." IZA Discussion Paper 2082.

**Royer, Heather.** 2004. "What All Women (and Some Men) Want to Know: Does Maternal Age Affect Infant Health?" University of California-Berkeley Center for Labor Economics Working Paper 68.

**Victoria, Alejandro, Gerardo Mora, and Fernando Arias.** 2001. "Perinatal Outcome, Placental Pathology, and Severity of Discordance in Monochorionic and Dichorionic Twins." *Obstetrics and Gynecology*, 97(2): 310–15.

**Zhang, Jun, Ruth A. Brenner, and Mark A. Klebanoff.** 2001. "Differences in Birth Weight and Blood Pressure at Age 7 among Twins." *American Journal of Epidemiology*, 153(8): 779–82.

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]
BILLING CODE 9111–97–P; 9111–14–P

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]

RIN 1615–ZB99

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)

Continued

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at

the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program; [15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

*https://www.whitehouse.gov/wp-content/uploads/ 2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/ wp-content/uploads/2021/07/Collaborative- %20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https:// www.whitehouse.gov/briefing-room/statements- releases/2022/06/10/los-angeles-declaration-on- migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including

updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us- government-announces-sweeping-new-actions- manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/01/joint-statement- from-the-united-states-and-guatemala-on- migration/* and *https://www.state.gov/u-s-colombia- joint-commitment-to-address-the-hemispheric- challenge-of-irregular-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https:// www.state.gov/u-s-colombia-joint-commitment-to- address-the-hemispheric-challenge-of-irregular- migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https:// www.whitehouse.gov/briefing-room/statements- releases/2023/06/11/readout-of-principal-deputy- national-security-advisor-jon-finers-meeting-with- colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint- commitment-to-address-the-hemispheric-challenge- of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non- agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H– 2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''[18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Colombians

As in the CFRP and HFRP processes, this FRP process for Colombians will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Colombia who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Colombian principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Colombians, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Colombia in the United

---

additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

States. Currently, nationals of Colombia with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

### B. Furthering Important Foreign Policy Objectives

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Colombian married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Colombian married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2022 (FY22), migration from Colombia significantly increased, with border enforcement encounters at the SWB more than 20 times greater in FY22 than in the prior year (6,202 in FY21 compared to 125,172 in FY22).[44] Encounters in FY23, through April 2023, were already at more than 107,000.[45] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Colombia to the United States.[46]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[47] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Colombia and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

## D. Reducing Strain on Limited U.S. Resources

The increase in monthly encounters of Colombians, from approximately 7,500 per month in the first seven months of Fiscal Year (FY) 2022 to more than 15,300 per month in the first seven months of FY 2023 has contributed to the strain on DHS's reception and processing capacity at the SWB.[48] By establishing a lawful pathway for some of these migrants from Colombia, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[49] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[50]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 8, 2023).

[45] *Id.*

[46] U.S. Dep't of State, 2022 Country Reports on Human Rights Practices: Colombia (Apr. 2023) *https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/colombia/;* World Report 2023, Events of 2022 Colombia, Human Rights Watch (Jan. 2023) *https://www.hrw.org/world-report/2023/country-chapters/colombia;* ACAPS, Colombia Humanitarian overview: protection concerns and community protection responses (Nov. 17, 2022), *https://www.acaps.org/sites/acaps/files/products/files/20221117_acaps_colombia_analysis_hub_protection.pdf;* Reuters, More than 15 mln Colombians suffer food insecurity—UN (Feb. 16, 2023) *https://www.reuters.com/world/americas/more-than-15-mln-colombians-suffer-food-insecurity-un-2023-02-16/; see also* Paulina Villegas & Samantha Schmidt, *Two siblings tried reaching the U.S. by sea to reunite with their mother. Only one of them made it,* Wash. Post, Jan. 28. 2022, *https://www.washingtonpost.com/world/2022/01/28/siblings-bahamas-colombia/.*

[47] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[48] U.S. Customs and Border Protection, Nationwide Encounters, May 17, 2023, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited June 9, 2023).

[49] As of late May 2023, there are currently an estimated 17,400 Colombian nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Colombian nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[50] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

with irregular migration.[51] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[52] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[53] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic concerns in Colombia, which may be a factor driving the increasing numbers of Colombians crossing the Darién Gap.[54] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[55] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[56]

Additional remittances sent back to Colombia, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[57] Remittances from Colombian migrants already play an important role in the Colombian economy.[58] For the first nine months of 2022, remittances to Colombia increased 9 percent.[59] Additionally, Colombia receives the highest income from remittances in South America.[60] Overall, remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Colombia, potentially impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Colombian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[61] Form I–130 filed on behalf of a Colombian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Colombian principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Colombia (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United

[51] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[52] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[53] *Id.*

[54] The number of Colombians crossing from Colombia into Panama has increased from approximately 300 in January 2023 to over 1,600 in April 2023. Servicio Nacional de Migración de Panamá, Tránsito Irregular por Darién 2023 (last visited June 9, 2023), *https://www.migracion.gob.pa/images/img2023/pdf/IRREGULARES_%20POR_%20DARI%C3%89N_ABRIL_2023.pdf.*

[55] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending

Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[56] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[57] *See* Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf;* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020), *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[58] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[59] The World Bank, *Remittances Grow 5% in 2022, Despite Global Headwinds* (Nov. 30, 2022), *https://www.worldbank.org/en/news/press-release/2022/11/30/remittances-grow-5-percent-2022.*

[60] Bloomberg Línea, *Remittances Remain Vital Source of Revenue for Latin America's Economies* (Oct. 27, 2022), *https://www.bloomberglinea.com/english/remittances-remain-vital-source-of-revenue-for-latin-americas-economies/.*

[61] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

States to seek a discretionary grant of parole at the POE, a beneficiary must:
- be outside the United States;
- be the principal beneficiary (or a derivative beneficiary spouse or child)[62] of an approved Form I–130, Petition for Alien Relative;
- be a national of Colombia or be a non-Colombian derivative beneficiary spouse or child[63] of a Colombian principal beneficiary;
- have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
- have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
- have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
- have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

- has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
- has been interdicted at sea[64] after July 10, 2023; or
- has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[65]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Colombia. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[66]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and

will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[67] expedited removal proceedings,[68] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[69] or for an immigrant visa[70] as a result of entering without inspection and not having been admitted or paroled.[71]

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online,

---

[62] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[63] Certain non-Colombians may use this process if they are a derivative beneficiary of a Colombian principal beneficiary and traveling with that Colombian beneficiary.

[64] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[65] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[66] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[67] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[68] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[69] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[70] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[71] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[72] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by

CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[73]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[72] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[73] 8 CFR 274a.12(c)(11).

001044

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[74]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Colombia still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Colombian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[75] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [76] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[77] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [78] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[79] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[80]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[81] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[74] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[75] 5 U.S.C. 553(b)(A).

[76] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[77] 5 U.S.C. 553(a)(1).

[78] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[79] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[80] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[81] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways which will continue to remain a central topic of bilateral relations.[82] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[83] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[85] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[86]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[87] The goal is to prevent irregular migration to the United States or other places in the hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[88] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[89]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[90] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries,

including expedited refugee processing and other humanitarian and labor pathways.[91] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[92]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful

---

[82] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[83] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-*

*from-the-united-states-and-guatemala-on-migration/*.

[84] Id.

[85] Id.

[86] Id.

[87] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[88] Id

[89] Id.

[90] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[91] Id.

[92] Id.

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]**

**RIN 1615–ZC02**

## Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:**
Renâ Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*.[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

# DEPARTMENT OF HOMELAND SECURITY

**[Docket No. CISA–2023–0012]**

## Notice of President's National Infrastructure Advisory Council Meeting

**AGENCY:** Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS).

**ACTION:** Notice of open *Federal Advisory Committee Act* (FACA) meeting; request for comments.

**SUMMARY:** CISA is publishing this notice to announce the following President's National Infrastructure Advisory Council (NIAC) meeting.

**DATES:** *Meeting Registration:* Registration is required to attend the meeting and must be received no later than 5 p.m. eastern standard time (EST) on December 6, 2023. For more information on how to participate, please contact *NIAC@cisa.dhs.gov.*

*Speaker Registration:* Registration to speak during the meeting's public comment period must be received no later than 5 p.m. EST on December 6, 2023.

*Written Comments:* Written comments must be received no later than 5 p.m. EST on December 6, 2023.

*Meeting Date:* The NIAC will meet on December 12, 2023, from 1 p.m. to 4 p.m. EST. The meeting may close early if the council has completed its business.

**ADDRESSES:** The National Infrastructure Advisory Council's open session will be held in-person at 1650 Pennsylvania Ave. NW, Washington, DC; however, members of the public may participate via teleconference only. Requests to participate will be accepted and processed in the order in which they are received. For access to the conference call bridge, information on services for individuals with disabilities, or to request special assistance, please email *NIAC@cisa.dhs.gov* by 5 p.m. EST on December 6, 2023. The NIAC is committed to ensuring all participants have equal access regardless of disability status. If you require a reasonable accommodation due to a disability to fully participate, please contact Celinda Moening at *NIAC@cisa.dhs.gov* as soon as possible.

*Comments:* The council will consider public comments on issues as listed in the **SUPPLEMENTARY INFORMATION** section below. Associated materials for potential discussions during the meeting will be available for review at *https://www.cisa.gov/niac* by December 5, 2023. Comments should be submitted by 5:00 p.m. EST on December 6, 2023 and must be identified by Docket Number CISA–2023–0012. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal: www.regulations.gov.* Please follow the instructions for submitting written comments.

• *Email: NIAC@cisa.dhs.gov.* Include the Docket Number CISA–2023–0012 in the subject line of the email.

*Instructions:* All submissions received must include the words ''Department of Homeland Security'' and the Docket Number for this action. Comments received will be posted without alteration to *www.regulations.gov,* including any personal information provided. You may wish to read the Privacy & Security Notice which is available via a link on the homepage of *www.regulations.gov.*

*Docket:* For access to the docket and comments received by the National Infrastructure Advisory Council, please go to *www.regulations.gov* and enter docket number CISA–2023–0012.

A public comment period will take place from 2:30 p.m. to 2:40 p.m. Speakers who wish to participate in the public comment period must email *NIAC@cisa.dhs.gov* to register. Speakers should limit their comments to 3 minutes and will speak in order of registration. Please note that the public comment period may end before the time indicated, depending on the number of speakers who register to participate.

**FOR FURTHER INFORMATION CONTACT:** Celinda Moening, 571–532–4119, *NIAC@cisa.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The NIAC is established under section 10 of E.O. 13231 issued on October 16, 2001, as amended and continued under the authority of E.O. 14109, dated September 30, 2023. Notice of this meeting is given under the Federal Advisory Committee Act (FACA), 5 U.S.C. Ch. 10 (Pub. L. 117–286). The NIAC provides the President, through the Secretary of Homeland Security, advice on the security and resilience of the Nation's critical infrastructure sectors.

*Agenda:* The National Infrastructure Advisory Council will meet in an open session on Tuesday, December 12, 2023, from 1 p.m. to 4 p.m. EST to discuss NIAC activities. The open session will include: (1) a period for public comment; (2) a keynote address on critical infrastructure security and resilience; (3) a report to the Council from the NIAC's Electrification Subcommittee; (4) deliberation and vote on Electrification Subcommittee recommendations; and (5) Additional Topics Discussion.

Dated: November 13, 2023.

**Celinda E. Moening,**
*Alternate Designated Federal Officer, National Infrastructure Advisory Council, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–25348 Filed 11–15–23; 8:45 am]

**BILLING CODE 9110–9P–P**

# DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2758–23; DHS Docket No. USCIS–2023–0014]**

**RIN 1615–ZC07**

## Implementation of a Family Reunification Parole Process for Ecuadorians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Ecuadorians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole (FRP) process for Ecuadorians. Under this process, certain Ecuadorian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Ecuador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and to reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a

001048

Supporter and Declaration of Financial Support, for this process on November 16, 2023.

**FOR FURTHER INFORMATION CONTACT:**
Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Ecuadorian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing an avenue for certain Ecuadorians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to collaboratively manage migration with its partners in the Western Hemisphere.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of noncitizens encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of access to lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. On October 12, 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[8] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[9] Implementation of the parole process for Venezuelans

was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, would be subject to expulsion or removal.[10] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the existing parole process for Venezuelans to allow for its continued operation.[11]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[12] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[13]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program [14] and

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order (E.O.) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021) *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2, 4.

[4] *See* National Security Council (NSC), *U.S. Strategy for Addressing the Root Causes of*

*Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[9] *See id.*

[10] *Id.*

[11] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[12] 88 FR 31314 (May 16, 2023).

[13] *See id.* at 31325.

[14] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. *See* U.S. Department of State, Restarting the Central American Minors Program, March 10, 2021, *https://www.state.gov/restarting-the-central-american-minors-program/* (last visited Aug. 3, 2023). In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). *See* U.S. Department. of State, Joint

Continued

expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[15] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for noncitizens in the region while enhancing worker protections.[16]

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to noncitizens who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Secretary of Homeland Security (the Secretary) has the discretionary authority under the Immigration and Nationality Act (INA) to parole an applicant for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [17] Parole is not an admission of the noncitizen to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[18] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[19] DHS may terminate parole upon notice in its discretion at any time.[20] By regulation, parolees may apply for and be granted

employment authorization to work lawfully in the United States.[21]

Past Secretaries have similarly exercised parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, Cuban Family Reunification Parole (CFRP) as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130.[22] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[23] Similarly, in 2014, Haitian Family Reunification Parole (HFRP) was established, which allows USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[24] On July 10, 2023, DHS announced the implementation of four new FRP processes for certain nationals from Colombia, El Salvador, Guatemala, and Honduras, and their immediate family members, who have approved family-based petitions filed on their behalf by a U.S.C. or LPR.[25] On August 11, 2023, DHS announced updates to modernize the CFRP and HFRP processes by adopting the new, mostly

Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central America Minors Program, June 15, 2021, *https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/* (last visited Aug. 3, 2023). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[15] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration;* U.S Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[16] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from NCA countries. As part of those efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B temporary visas by up to 64,716 for the entirety of FY 2023. *See*

Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were reserved for nationals of the NCA countries and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[17] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 8 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[18] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[19] *See* 8 CFR 212.5(c).

[20] *See* 8 CFR 212.5(e).

[21] *See* 8 CFR 274a.12(c)(11).

[22] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[23] *Id.*

[24] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

[25] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

online, processing steps implemented for the four new FRP processes.[26]

## III. The FRP Process for Ecuadorians

As in all other FRP processes, the FRP process for Ecuadorians will allow U.S.C. and LPR petitioners who have been invited to file a request and initiate this process for certain eligible family members to receive advance authorization to travel to the United States to seek parole at an interior POE (*i.e.*, an airport). Individuals who are eligible to be considered for parole under this process include nationals of Ecuador who are principal beneficiaries of approved Form I–130 family-based immigrant petitions, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. This process requires that the Form I–130 petitioner first receive an invitation to be able to initiate the process on behalf of the Form I–130 principal beneficiary and their immediate family members. As in other FRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If U.S. Customs and Border Protection (CBP) issues an advance authorization to travel to a beneficiary, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the other FRP processes. If paroled into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with all parole requests, under this FRP process for Ecuadorians, parole will be authorized only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process— Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens who are beneficiaries of approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

The case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite in the United States with their family members from Ecuador. Currently, nationals of Ecuador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[27] While they wait for an immigrant visa to be issued, security concerns and uncertainty in their home country, combined with a desire to reunify with family in the United States, could cause many to choose irregular migration in the absence of an alternative, near-term path to come to the United States for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the expeditious reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

---

[26] *See* Implementation of Changes to the Cuban Family Reunification Parole Process, 88 FR 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 FR 54635 (Aug. 11, 2023).

[27] For example, under the October 2023 Department of State Visa Bulletin, an Ecuadorian unmarried son or daughter of a U.S.C.—F1 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 8 years ago. *See* DOS, Visa Bulletin for October 2023, Number 82, Volume X (Oct. 2023), *https:// travel.state.gov/content/travel/en/legal/visa-law0/ visa-bulletin/2024/visa-bulletin-for-october-2023.html*. However, these dates are not predictive. Due to increases in volume of Form I–130 filings, an Ecuadorian unmarried son or daughter of a U.S.C. for whom a Form I–130 is filed today will likely have an even longer wait before an immigrant visa becomes available.

## B. Furthering Important Foreign Policy Objectives

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[28] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[29] establishing SMOs in key locations throughout the Western Hemisphere,[30] joining Mexico to announce and develop a humanitarian plan on migration,[31] issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America,[32] and, most recently, announcing full support for an initiative that the Government of Mexico plans to start in southern Mexico to offer new refugee and labor pathways.[33] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively, at great financial, staffing, and domestic political costs, to: (1) create and expand access to lawful pathways in their respective countries, (2) increase enforcement measures along the migratory routes, and (3) introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela. Implementation of this FRP process is one response to such requests and, thereby, will build goodwill with regional partners and secure cooperation and strengthen bilateral relations in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger foreign policy objectives of this Administration and fits within a framework of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[34] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[35] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[36] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in Spring 2023 as the date on which the CDC Title 42 public health Order[37] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[38] For instance, on April 11, 2023, consistent with the spirit of the L.A. Declaration, in anticipation of the end of the Title 42 public health Order, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[39] Implementing this process fulfills one of the commitments the United States made with its regional partners to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [40]

The United States also continues to encourage regional governments to continue to expand lawful pathways for migrants, including providing legal status to migrants residing in their countries, as well as to establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[41] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.

---

[28] See The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

[29] Trilateral Joint Statement, April 11, 2023, https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.

[30] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.

[31] See The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[32] See DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.

[33] See The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.

[34] The White House, Los Angeles Declaration on Migration and Protection (June 10, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.

[35] Id.

[36] Id.

[37] See Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[38] See 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.

[39] Trilateral Joint Statement, Apr. 11, 2023, https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.

[40] See id.

[41] See Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—U.S. Department of State ("Blinken-Mayorkas Joint Press Availability"), Apr. 27, 2023, https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.

Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43]

Expanding cooperation with Ecuador can help achieve migration goals within Ecuador, regionally, and around the globe.[44] Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities,[45] providing life-saving assistance to Venezuelan and Colombian refugees and migrants within its borders, and strengthening its border security and controls.[46] Ecuador, along with Costa Rica, Belize, and Peru, is undertaking efforts to regularize migrants from Venezuela and Nicaragua.[47] Ecuador's program for Venezuelans in the country has provided an opportunity for stability and integration for more than 500,000 displaced Venezuelans.[48] Furthermore, establishing an FRP process for certain nationals of Ecuador furthers the USG's efforts to set up SMOs in Ecuador. As part of ongoing negotiations over the establishment of SMOs in Ecuador, the Government of Ecuador has repeatedly emphasized the critical importance of lawful pathways to the United States for nationals of Ecuador, including labor and family reunification pathways.[49]

After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador to guide migrants and refugees towards lawful migration pathways.[50]

## C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In Fiscal Year 2023 (FY23), CBP encounters with Ecuadorians totaled 117,487 as compared to 24,936 encounters in FY22, a 371% increase.[51] In FY21, CBP encountered a total of 97,074 Ecuadorian nationals, and in all of FY20, CBP encountered 12,892 Ecuadorian nationals.[52] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from Ecuador to the United States.[53]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[54]

While beneficiaries of this FRP process will still need to wait to apply to become an LPR, it will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Ecuador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration.

## D. Reducing Strain on Limited U.S. Resources

Increases in irregular migration from Ecuador have strained DHS's reception and processing capacity at the SWB. From FY20 to FY23, encounters of Ecuadorians at the SWB totaled approximately 252,389.[55] By establishing a lawful pathway for some nationals of Ecuador and their immediate family members, on a case-by-case basis, to be paroled into the United States before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB. This would thereby provide a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of noncitizens to interior POEs.

Paroling noncitizens through this process will be significantly less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, preserving space and resources for managing irregular migration.

Furthermore, by establishing a meaningful, near-term lawful pathway that certain noncitizens, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to

---

[42] *See id.*

[43] *See id.*

[44] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf.*

[45] Ministry of Foreign Affairs of Ecuador, LISTA DE PAÍSES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https://www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023). Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan. The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for nationals arriving from Albania, Tajikistan, and Uzbekistan.

[46] *Id.*

[47] *See supra* note 41.

[48] The White House, Readout of Los Angeles Declaration Implementation Launch, Sept. 27, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/27/readout-of-los-angeles-declaration-implementation-launch/.*

[49] *See, e.g.,* The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023. Gustavo Manrique: ''Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar'' (Gustavo Manrique: ''We are in dialogue with the U.S. so that migrants can have family reunification''), July 10, 2023, *https://www.ecuavisa.com/noticias/politica/*

gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.

[50] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

[51] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

[52] *Id.*

[53] Genevieve Glatsky and José María León Cabrera, *Security is the Main Worry as Ecuador Votes on Sunday. Here's What to Know,* New York Times, Aug. 20, 2023, *https://www.nytimes.com/2023/08/20/world/americas/ecuador-election-assassination-explainer.html;* Genevieve Glatsky and José María León Cabrera, *How Narco Traffickers Unleashed Violence and Chaos in Ecuador,* New York Times, Aug 17, 2023, *https://www.nytimes.com/2023/08/17/world/americas/ecuador-drug-trafficking-election.html?searchResultPosition=16;* Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles,* Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52;* Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sep. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration;* Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.,* The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/.*

[54] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for

October 2023, Number 82, Volume X (Oct. 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2024/visa-bulletin-for-october-2023.html.*

[55] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters* (last visited Nov. 2, 2023).

enter the United States irregularly, the process could redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the Northern Central America region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[56] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[57] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[58] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and non-governmental organizations along the SWB. Beneficiaries will be required to fly at their own expense to an interior POE, rather than arriving at the SWB and transiting through border communities. Beneficiaries will only be authorized to come to the United States if they have a U.S.-based supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries will also be immediately eligible to apply for employment authorization, enabling them to support themselves.

### E. Addressing Root Causes of Migration Through Remittances

The case-by-case parole into the United States of noncitizens under this FRP process will also serve a significant

public benefit by aiding U.S. efforts to address economic insecurity in Ecuador, which is a key factor that drives out-migration.[59] Unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that, if granted, they may maintain throughout the duration of their parole period, allowing them to support themselves and to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[60] Noncitizens with employment authorization also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[61]

Additional remittances sent back to Ecuador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[62]

[56] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019), *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[57] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[58] *Id.*

[59] U.S. Department of State, Integrated Country Strategies—Ecuador, Apr. 20, 2023, *https://www.state.gov/wp-content/uploads/2022/07/ICS_WHA_Ecuador_Public-1.pdf*; Gonzalo Solano and Michael Weissenstein, *More Ecuadorians move to US, spared many others' hurdles*, Associated Press, Apr. 2, 2023, *https://apnews.com/article/ecuador-migrants-migration-us-immigration-policy-86a8009efa8d357e7cb4dc0cff40fb52*; Vincent Ricci, *More Ecuadorians leaving for US amid 'burst in migration,'* Aljazeera, Sept. 23, 2021, *https://www.aljazeera.com/news/2021/9/23/more-ecuadorians-leaving-for-us-amid-burst-in-migration*; Adriana Pérez and Alfredo Corchado, *A heartbreaking exodus: More people from Ecuador feel forced to migrate to the U.S.*, The Dallas Morning News, Aug. 13, 2021, *https://www.dallasnews.com/news/immigration/2021/08/13/a-heartbreaking-exodus-more-people-from-ecuador-feel-forced-to-migrate-to-the-us/*.

[60] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration*; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/*.

[61] George I. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[62] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018), *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes*

In total, remittances sent to Ecuador amounted to $603.97 million in 2021, a significant contribution to development in communities in Ecuador.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Ecuador, impacting individual decisions on whether to leave the country. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, noncitizens are more likely to turn to irregular migration in the short-term.

### V. Eligibility

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of an Ecuadorian principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of an Ecuadorian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf

*of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*; Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies*, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/*.

[63] Statista, Personal remittances paid in Ecuador from 1999 to 2021, *https://www.statista.com/statistics/1390805/personal-remittances-paid-ecuador/#:~:text=The%20personal%20remittances%20paid%20in,have%20been%20subject%20to%20fluctuation* (last visited July 6, 2023). *See also* The World Bank, Data, GDP (current US$)—Ecuador, *https://data.worldbank.org/indicator/NY.GDP.MKTP.CD?end=2021&locations=EC&start=2019* (last visited July 31, 2023), which indicates that the 2021 GDP for Ecuador was 106.17 billion US dollars.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

of an Ecuadorian principal beneficiary of an approved Form I–130, and separate requests for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of their parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationships between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of Ecuador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE under this process, a beneficiary must:

• Be outside the United States;

• Be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;

• Be a national of Ecuador or be a non-Ecuadorian derivative beneficiary spouse or child [66] of an Ecuadorian principal beneficiary;

• Have a petitioning relative in the United States who received an invitation to initiate this FRP process on the beneficiary's behalf by filing a Form I–134A;

• Have a U.S.-based petitioning relative who filed a Form I–134A on the beneficiary's behalf that USCIS has vetted and confirmed;

• Have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• Have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting by CBP prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting and collection of additional biometrics at the POE by CBP upon inspection, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary approvals of advance authorization to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary has:

• Crossed irregularly into the United States, between POEs, after November 16, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• Been interdicted at sea [67] after November 16, 2023; or

• Been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on urgent humanitarian reasons or significant public benefit, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant

parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Ecuador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after November 16, 2023, rather than being considered for parole under this process, will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. These "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Ecuadorans may use this process if they are a derivative beneficiary of an Ecuadorian principal beneficiary and traveling with that Ecuadorian beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] INA secs. 275 and 276, 8 U.S.C. 1325 and 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

entering without inspection and not having been admitted or paroled.[74]

### C. Processing Steps

This FRP process will be implemented in light of lessons learned from the original CFRP and HFRP programs and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except certain medical requirements, and the ultimate parole determination made in person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

### Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner be permitted to file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they

wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

### Step 2: Petitioner Files Form I–134a Online To Initiate This Process

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries may submit a Form I–134A for each beneficiary with USCIS through the USCIS online system to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, then the request proceeds to the next step.

### Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, then the beneficiary named on the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

### Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through USCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric

information—including a "live" facial photograph—into CBP One.

### Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

### Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole under this process and will be processed consistent with established policy and procedure. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate

---

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis in the exercise of discretion for urgent humanitarian reasons or significant public benefit, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions of parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate this FRP process at any point. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**VI. Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes or forms such as parole-related employment authorization applications. Beneficiaries who are paroled into the

United States under this FRP process may have to wait before being authorized to work in the United States, depending on the amount of time it takes USCIS to process beneficiaries' requests for employment authorization.[77] However, the impact of that waiting period is to some extent mitigated by the requirements of this process. Beneficiaries may not be paroled under this process unless their Form I–130 petitioner has filed on their behalf to initiate the FRP process, requesting to be a supporter and declaring their ability to financially support the beneficiary. As noted above, the petitioner must provide evidence to demonstrate their ability to support the beneficiary or must include similar evidence establishing that with the help of a co-supporter, they have the financial means to support the beneficiary.

Although personnel and resources may be diverted from other similar processes and programs or for the adjudication of forms such as parole-related employment authorization applications, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure as resource limitations require. Therefore, for the processing of employment authorization applications, for example, the adjudication burden on USCIS can be controlled and limited as needed under this FRP process. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. As explained in detail above, DHS has determined that there are significant public benefits of the case-by-case parole of noncitizens under this process. DHS also recognizes there are costs that may be incurred, such as for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant

visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants). Ultimately, DHS has determined that the significant public benefits of the case-by-case parole of noncitizens under this FRP process to the United States, and to other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, justify the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence.[78]

Alternatively, as discussed below, a decision to forego establishing this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation from foreign partners with respect to removals and ensure continued collaboration on migration management. In addition, certain nationals of Ecuador still waiting for their immigrant visas to become available would remain separated from their family members for an extended period of time and could resort to irregular migration without this process. For any such Ecuadorian nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of noncitizens living in the United States without authorization, unable to legally seek employment. The states in which they settle may be less likely to benefit from additional tax revenues and other positive economic contributions these noncitizens would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

---

[76] 8 CFR 274a.12(c)(11).

[77] USCIS, Check Case Processing Times, *https://egov.uscis.gov/processing-times/* (last visited Oct. 25, 2023). This website provides the approximate processing time a parolee can expect when filing Form I–765, Application for Employment Authorization.

[78] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

First, DHS is merely adopting a general statement of policy,[79] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [80] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

Second, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[81] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [82] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[83]

This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure our partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[84] Since the April 27, 2023 announcement,[85] the

United States has engaged in ongoing negotiations to implement the announced initiatives in close coordination with regional partners including establishing SMOs in Colombia, Guatemala, and Costa Rica as part of its strategy to manage migration collaboratively in the Western Hemisphere.

As with the four recently implemented FRP processes and the modernization of the CFRP and HFRP processes, delaying issuance and implementation of this process to undertake rulemaking would complicate broader discussions and ongoing negotiations with key foreign partners about migration management. Ongoing negotiations with regional partners involve the implementation of a range of new measures, including establishing SMOs in key locations throughout the Western Hemisphere to manage and reduce irregular migration and improve qualified noncitizens' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including FRP processes that will benefit nationals in countries identified to host SMOs.

Ecuador is committed to diminishing the flow of irregular migrants from Ecuador northward by imposing additional visa requirements for certain nationalities. To that end, Ecuador unilaterally has taken two very critical actions to prevent certain nationalities from abusing Ecuador's visa regime to irregularly travel to the Western Hemisphere. Ecuador passed new legislation imposing additional visa requirements on nationals arriving from Chad, Guinea-Bissau, Kyrgyzstan, Mauritania, Sierra Leone, Sudan, and South Sudan.[86] The new law went into effect on August 3, 2023, and since then, all new travelers from the seven countries must have visas prior to arrival in Ecuador. These additional nationalities follow Ecuador's late 2022 decision to add visa requirements for

nationals arriving from Albania, Tajikistan, and Uzbekistan.[87] While Ecuador is taking this action unilaterally, representatives of the Government of Ecuador have emphasized the critical importance of availability of lawful pathways for Ecuadorian nationals, including labor pathways and processes for nationals of Ecuador to reunify with their family members in the United States.[88] Similarly, Foreign Minister Gustavo Manrique shared with local press that Ecuador is negotiating with the United States on hosting SMOs and noted their position on family reunification and labor pathways for Ecuadorians.[89] After months of negotiations, on October 19, the USG and the Government of Ecuador announced the establishment of SMOs in Ecuador.[90] In DHS's judgment, the delay associated with a public rulemaking process involving notice and comment and a delayed effective date would negatively impact ongoing efforts to operationalize SMOs in Ecuador to channel migrants to lawful pathways.

Such a delay would also be inconsistent with the dispatch with which DHS has appropriately implemented other FRP processes. Such processes support a series of efforts that the United States has been pursuing in the hemisphere to increase the availability of lawful pathways for migration and involve additional countries with destination pathways and as host countries for certain processing initiatives. The ability to implement such processes rapidly is critical for supporting the Administration's overall goals as part of these efforts, which include multi-faceted negotiations with a range of regional partners.

For instance, on May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that

---

[79] 5 U.S.C. 553(b)(A).

[80] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[81] 5 U.S.C. 553(a)(1).

[82] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[83] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[85] *Id.*

[86] Ministry of Foreign Affairs of Ecuador, LISTA DE PAISES QUE DEBEN PRESENTAR VISA AL INGRESAR AL ECUADOR, *https:// www.cancilleria.gob.ec/2020/06/30/lista-de-paises-que-deben-presentar-visa-al-ingresar-al-ecuador/* (last visited Sept. 21, 2023).

[87] *Id.*

[88] The Department of State, Quito PRM Regional Refugee Coordinator Report, 23 QUITO 648, July 21, 2023.

[89] Gustavo Manrique: "Dialogamos con EE.UU. para que los migrantes puedan tener una reunificación familiar" (Gustavo Manrique: "We are in dialogue with the US so that migrants can have family reunification"), July 10, 2023, *https:// www.ecuavisa.com/noticias/politica/gustavo-manrique-dialogamos-con-ee-uu-para-que-los-migrantes-puedan-tener-una-reunificacion-familiar-YK5509735.*

[90] The Department of State, Announcement of Safe Mobility Office in Ecuador, Oct. 19, 2023, *https://www.state.gov/announcement-of-safe-mobility-office-in-ecuador/.*

consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, which will continue to remain a central topic of bilateral relations.[91] Specifically, the United States stated its intention to welcome as many as 100,000 noncitizens from El Salvador, Guatemala, and Honduras under the FRP processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success.[92] Mexico concurrently agreed to continue to implement the joint initiative whereby the United States provides a lawful pathway through parole for nationals of Cuba, Haiti, Nicaragua, and Venezuela, while Mexico would accept the return of certain third-country migrants on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.[93]

Similarly, on July 28, 2023, building on a series of successful lawful pathway initiatives the United States and the Government of Mexico agreed to launch last year,[94] the United States announced additional steps to expand access to safe, orderly, and lawful pathways for migration.[95] On July 28, the United States noted its full support to the Government of Mexico of efforts to establish international multipurpose space in Mexico to offer protection and labor pathways, including accepting refugee resettlement referrals to the U.S. Refugee Admissions Program from qualified noncitizens from Cuba, Haiti, Nicaragua, and Venezuela.[96] The United States and the Government of Mexico are working to implement this new commitment to expand access to lawful pathways. As stated in the **Federal Register** Notices implementing family reunification processes for certain

nationals of Colombia,[97] El Salvador,[98] Guatemala,[99] and Honduras,[100] a delay in implementation of the U.S. commitment to family reunification pathways risks undermining Mexico's commitments, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the L.A. Declaration.[101] As the first step of a comprehensive program to manage irregular migration, both countries are implementing a six-month pilot phase of SMOs.[102] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[103] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[104]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[105] The Safe Mobility initiative launched in Colombia on June 28, 2023, with SMOs

currently operational in three cities throughout the country. SMOs in Colombia serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[106] The U.S. government also reaffirmed its commitment to expand lawful pathways for Colombians with temporary work visas and expanded family reunification.[107]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, launched an exploratory six-month implementation of SMOs.[108] SMOs in Costa Rica serve to facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian pathways.[109] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[110]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing negotiations with the Government of Ecuador, specifically, and overall U.S. efforts to manage migration together with foreign partners. Because this FRP process is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining partner countries' multilateral and unilateral efforts, and in the case of Ecuador, putting at risk multiple efforts, including the United States' ability to continue SMO operations in Ecuador and Ecuador's willingness to unilaterally impose certain visa restrictions, which are critical to the U.S. foreign policy approach to migration management in the Western Hemisphere.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would

---

[91] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[92] *Id.*

[93] *Id.*

[94] *See* The White House, Remarks by President Biden and President López Obrador of Mexico Before Bilateral Meeting, July 12, 2022, *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/07/12/remarks-by-president-biden-and-president-lopez-obrador-of-mexico-before-bilateral-meeting-2/.*

[95] *See* The White House, Statement from National Security Advisor Jake Sullivan on Legal Pathways Initiative with Mexico, July 28, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/07/28/statement-from-national-security-advisor-jake-sullivan-on-legal-pathways-initiative-with-mexico/.*

[96] *Id.*

[97] *See* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[98] *See* Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[99] *See* Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[100] *See* Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[101] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[106] *Id.*

[107] *Id.*

[108] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[109] *Id.*

[110] *Id.*

adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals. In diplomatic engagements, regional partner countries have repeatedly requested additional lawful pathways in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. As encounters of Ecuadorians along the SWB have remained high compared to the same months last year, maintaining and expanding their cooperation on removals is necessary to effectively manage irregular migration. Demographics and dynamics are evolving and difficult to predict, requiring flexibility in the responses of all governments involved. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[111] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes [112] and family reunification parole processes for certain nationals of Colombia, El Salvador, Guatemala, and Honduras announced on July 10, 2023.[113]

[111] *See* Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[112] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[113] *See* DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras, July 17, 2023, *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala;* Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023); Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Ecuadorians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143); the revision to the ATA collection will add Ecuador to the list of countries authorized to utilize ATA. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization for OMB approval of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. USCIS and CBP will issue respective **Federal Register** notices seeking comment on these changes.[114]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–25313 Filed 11–15–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

---

# DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–7075–N–14]**

## 60-Day Notice of Proposed Information Collection: Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion OMB Control No.: 2528–0328

**AGENCY:** Office of Policy Development and Research, HUD.
**ACTION:** Notice.

**SUMMARY:** HUD is seeking approval from the Office of Management and Budget (OMB) for the information collection described below. In accordance with the Paperwork Reduction Act, HUD is requesting comment from all interested parties on the proposed collection of information. The purpose of this notice

43611 (July 10, 2023); Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023); and Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[114] Per the normal clearance procedures at 5 CFR 1320.10(e).

is to allow for 60 days of public comment.

**DATES:** *Comments Due Date:* January 16, 2024.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal.

Written comments and recommendations for the proposed information collection can be submitted within 60 days of publication of this notice to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting, ''Currently under 60-day Review—Open for Public Comments'' or by using the search function. Interested persons are also invited to submit comments regarding this proposal by name and/or OMB Control Number and can be sent to: Anna Guido, Reports Management Officer, REE, Department of Housing and Urban Development, 451 7th Street SW, Room 8210, Washington, DC 20410–5000 or email at *PaperworkReductionActOffice@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Anna Guido, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street SW, Washington, DC 20410; email; *Anna.P.Guido@hud.gov;* telephone (202) 402–5535 (this is not a toll-free number). HUD welcomes and is prepared to receive calls from individuals who are deaf or hard of hearing, as well as individuals with speech or communication disabilities. To learn more about how to make an accessible telephone call, please visit *https://www.fcc.gov/consumers/guides/telecommunications-relay-service-trs.*

Copies of available documents submitted to OMB may be obtained from Ms. Guido.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

## A. Overview of Information Collection

*Title of Information Collection:* Evaluation of Cohort 1 of the Moving to Work Demonstration Program Expansion.

*OMB Approval Number:* 2528–0328.
*Type of Request:* Extension of currently approved collection.
*Form Number:* N/A.

*Description of the need for the information and proposed use:* The Office of Policy Development and Research (PD&R), at the U.S. Department of Housing and Urban Development (HUD), is proposing this collection of information for the

changes to their current operations and will remain in effect through July 31, 2024.

CDC has further determined that good cause exists for a one-year extension of the temporary suspension through July 31, 2024, to address public health concerns regarding importation of dogs infected with rabies. Moreover, in parallel to this notice announcing the extension of the temporary suspension, CDC is proposing a rule revising entry requirements to address these concerns regarding importation of rabid dogs and fraudulent vaccination documentation. The proposed rule outlines a framework and set of operations that would mitigate the need for further extensions of the temporary suspension, should these procedures be adopted. In consideration of both the anticipated needs for global rabies vaccine campaigns to return to pre-pandemic levels and to avoid disruption to importers' and the travel industry's operations, CDC has determined that a one-year extension of the temporary suspension through July 31, 2024, is required to protect the public's health and is therefore in the public's interest. In the absence of further extension of the temporary suspension, dog importation requirements would return to procedures that proved inadequate to prevent the import of rabid dogs into the United States. A one-year extension provides time for CDC to continue to build a robust dog importation system while global rabies vaccination efforts continue to rebound. It will also avoid potential public confusion regarding changing dog importation requirements and better address the needs of importers, the animal care and transport industry, and Federal partners who have indicated they would need time to adequately prepare for any changes to their current operations. The proposed rule published in parallel with this extension provides an opportunity for public comment and input on any new procedures.

This temporary suspension will enter into effect on August 1, 2023, and remain in effect through July 31, 2024, unless modified or rescinded by the CDC Director based on public health or other considerations.

**Kathryn Wolff,**
*Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2023–14342 Filed 7–6–23; 4:15 pm]

**BILLING CODE 4163–18–P**

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2751–23; DHS Docket No. USCIS–2023–0008]**

**RIN 1615–ZC01**

## Implementation of a Family Reunification Parole Process for Guatemalans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Guatemalans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Guatemalans. Under this process, certain Guatemalan principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Guatemala to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Guatemalan nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Guatemalans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*.[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy*, which described U.S. strategy to collaboratively manage migration

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf*.

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January

2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG

efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to

them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Guatemalans

As in the CFRP and HFRP processes, this FRP process for Guatemalans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Guatemala who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Guatemalan principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Guatemalans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Guatemala in the United States. Currently, nationals of Guatemala with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26]

---

DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as "reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States," and stating that whether to parole a particular alien "remains, however, a case-by-case, discretionary determination.").

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) ("By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.").

[26] For example, under the May 2023 Department of State Visa Bulletin, a Guatemalan married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for

Continued

While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29]

joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration

acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process

May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Guatemalan married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June

4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://*

*www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order'"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

[37] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Guatemalans at the SWB increased by about 112 percent as compared to FY18,

and 4.8 percent as compared to FY19, with encounters totaling approximately 283,000 in FY21 as compared to 133,200 and 270,100 in FY18 and FY19, respectively.[44] Encounters with Guatemalans dropped in FY22, but still remained high with 231,500 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Guatemalans accounting for approximately 11.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Guatemala, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Guatemala and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular

migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from Guatemala, has strained DHS's reception and processing capacity at the SWB.[49] By establishing a lawful pathway for some of these migrants from Guatemala, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit

---

[38] See id.

[39] See Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/*.

[40] See id.

[41] See id.

[42] See id.

[43] See id.

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] Id.

[46] Id.

[47] See Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also NSC, U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[48] See William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145; DOS, Visa Bulletin for May 2023*, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*.

[49] See Migration Policy Institute, Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story, (Oct. 2022) *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border*.

[50] As of late May 2023, there are currently an estimated 12,800 Guatemalan nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Guatemalan nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] See, e.g., INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also DHS, Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022)

Continued

irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

### E. Addressing Root Causes of Migration Through Remittances

This FRP process will also aid U.S. efforts in addressing economic insecurity in Guatemala, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Guatemala, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Guatemala already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 12 percent of Gross Domestic Product (GDP) in Guatemala.[60] Remittances remained stable in 2019, at 13.8 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Guatemala specifically, remittances were equivalent to 18 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased 16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Guatemala, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and

the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

## V. Eligibility

### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Guatemalan principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Guatemalan principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Guatemalan principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

A beneficiary is a national of Guatemala (or their immediate family member of any nationality) who is outside the United States and who may

https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] Id.

[55] U.S. Department of State, Integrated Country Strategies—Guatemala, Apr. 29, 2022, https://www.state.gov/wp-content/uploads/2022/08/ICS_WHA_Guatemala_Public.pdf.

[56] See generally, e.g., National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration; Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), https://

www.nber.org/papers/w23236 (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, Remittances from Abroad are major economic assets for some developing countries (Jan. 29, 2018) https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also NSC, U.S. Strategy for Addressing the Root Causes of Migration in Central America (July 2021) https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.

[59] See Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also Council on Foreign Relations, Central America's Turbulent Northern Triangle (July 1, 2021) https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.

[60] Congressional Research Service, U.S. Strategy for Engagement in Central America: Policy Issues for Congress (Nov. 12, 2019) https://fas.org/sgp/crs/row/R44812.pdf.

[61] The World Bank, Personal Remittances, received (% of GDP)—Guatemala (last visited June 9, 2023) https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=GT.

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.

[63] Id.

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (e.g., the petitioner is no longer an LPR or USC), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Guatemala or be a non-Guatemalan derivative beneficiary spouse or child [66] of a Guatemalan principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making

these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea [67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order. [68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Guatemala. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children. [69]

A potential beneficiary of this process who enters the United States between

POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

## C. Processing Steps

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process,

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. Such "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Guatemalans may use this process if they are a derivative beneficiary of a Guatemalan principal beneficiary and traveling with that Guatemalan beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.*, INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the USC or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the individual is a discretionary, case-by-case determination made by

CBP at the time the individual arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights,

---

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

001068

substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon

thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Guatemala still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Guatemalan nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

---

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

**43590** **Federal Register** / Vol. 88, No. 130 / Monday, July 10, 2023 / Notices

accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website *movilidadsegura.org* on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and

---

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/.*

[87] *Id*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/. See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/.*

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[94] *Id.*

[95] *Id.*

enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Guatemalans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14473 Filed 7–7–23; 8:45 am]

BILLING CODE 9111–97–P; 9111–14–P

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2749–23; DHS Docket No. USCIS–2023–0006]

RIN 1615–ZB99

## Implementation of a Family Reunification Parole Process for Colombians

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of a family reunification parole process for Colombians.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Colombians. Under this process, certain Colombian principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Colombia to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

This notice describes the implementation of a new parole process for certain Colombian nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Colombians and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021)
Continued

**43601**

entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[93] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[94]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Colombians and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register**

notices seeking comment on these changes.[95]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–14472 Filed 7–7–23; 8:45 am]
**BILLING CODE 9111–97–P; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2752–23; DHS Docket No. USCIS–2023–0009]

RIN 1615–ZC02

### Implementation of a Family Reunification Parole Process for Hondurans

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Hondurans.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Hondurans. Under this process, certain Honduran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from Honduras to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial

Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This notice describes the implementation of a new parole process for certain Honduran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Hondurans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes of Migration in Central America.*[4] This

---

[93] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[94] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[95] Per the normal clearance procedures at 5 CFR 1320.10(e).

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States, as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the

parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15]

and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

---

Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/;* *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/;* *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/;* *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022) (authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation

---

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/ wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https:// www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Hondurans

As in the CFRP and HFRP processes, this FRP process for Hondurans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of Honduras who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Honduran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Hondurans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process— Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives; (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family members from Honduras in the United States. Currently, nationals of Honduras with approved family-based petitions often wait many years before their immigrant visas can be issued and they

for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

### B. Furthering Important Foreign Policy Objectives

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Honduran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.* However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Honduran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[28] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america.*

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html.*

economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, "[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration." [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Hondurans at the SWB were 262 percent of the FY18 level and over 22 percent as compared to FY19, with encounters totaling approximately 319,200 in FY21 as compared to approximately 88,100 and 261,000 in FY18 and FY19, respectively.[44] Encounters of Hondurans dropped in FY22, but still remained high with about 212,900 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Hondurans accounting for approximately 11.4 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, gang violence, corruption, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including Honduras, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of Honduras and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available.

The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from Honduras, has strained DHS's reception and processing capacity at the SWB. Between FY20 and May 2023, encounters of Hondurans at the SWB exceeded half a million.[49] By establishing a lawful pathway for some of these migrants from Honduras, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling along the route from the NCA region to the United States earn hundreds of

---

[37] Trilateral Joint Statement, April 11, 2023, https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.

[38] See id.

[39] See Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.

[40] See id.

[41] See id.

[42] See id.

[43] See id.

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] Id.

[46] Id.

[47] See Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also NSC, U.S. Strategy for Addressing the Root Causes of Migration in Central America (July 2021) https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.

[48] See William Kandel, Congressional Research Service, U.S. Family-Based Immigration Policy (Feb. 9, 2018), https://crsreports.congress.gov/product/pdf/R/R43145; DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.

[49] CBP, Nationwide Encounters (last visited June 9, 2023); https://www.cbp.gov/newsroom/stats/nationwide-encounters. Total SWB encounters between FY20 and May 2023 sum to 662,470 as of date accessed.

[50] As of late May 2023, there are currently an estimated 10,700 Honduran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Honduran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] See, e.g., INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

### E. Addressing Root Causes of Migration Through Remittances

This FRP process will also aid U.S. efforts in addressing economic insecurity in Honduras, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to Honduras, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns, may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including Honduras already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to 20 percent of Gross Domestic Product (GDP) in Honduras.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In Honduras specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in Honduras, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

### V. Eligibility

#### A. Petitioners

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Honduran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Honduran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Honduran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review process, the petitioner must pass

---

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, *Fact Sheet: Counter Human Smuggler Campaign Update* (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—Honduras, April 4, 2022, *https://www.state.gov/wp-content/uploads/2022/06/ICS_WHA_Honduras_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-*

*economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, "The Earnings of Undocumented Immigrants," National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] USAID, Economic Analysis of the Honduras Remittances Ecosystem: An Assessment of the Role Remittances have on Financial Inclusion and Development Outcomes (2022) *https://pdf.usaid.gov/pdf_docs/PA00Z69J.pdf.*

[62] Bloomberg Línea, Remittances to Central America on Track to Break Records (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records/.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

A beneficiary is a national of Honduras (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;

• be the principal beneficiary (or a derivative beneficiary spouse or child)[65] of an approved Form I–130, Petition for Alien Relative;

• be a national of Honduras or be a non-Honduran derivative beneficiary spouse or child[66] of a Honduran principal beneficiary;

• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;

• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and

• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the processing steps for this FRP process.

CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);

• has been interdicted at sea[67] after July 10, 2023; or

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68] DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in Honduras. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to

ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status[72] or for an immigrant visa[73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] See INA sec. 203(d), 8 U.S.C. 1153(d); see also INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. The term "add-on derivatives" is included within the term "derivative" in this notice.

[66] Certain non-Hondurans may use this process if they are a derivative beneficiary of a Honduran principal beneficiary and traveling with that Honduran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] See, e.g., INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] See 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within periods of time thereafter is inadmissible and

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP.All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a ''live'' facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

001079

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

### D. Termination and No Private Rights

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## VI. Other Considerations in the Establishment of This FRP Process

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case by

case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of Honduras still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Honduran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

## VII. Regulatory Requirements

### A. Administrative Procedure Act (APA)

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole

decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities like the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

---

[85] *See* Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/05/02/mexico-and-united- states-strengthen-joint-humanitarian-plan-on- migration/*.

[86] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/01/joint-statement- from-the-united-states-and-guatemala-on- migration/*.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *See* United States Department of State, U.S.- Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint- commitment-to-address-the-hemispheric-challenge- of-irregular-migration*. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/ statements-releases/2023/06/11/readout-of- principal-deputy-national-security-advisor-jon- finers-meeting-with-colombian-foreign-minister- alvaro-leyva/*.

[91] *Id.*

[92] *Id.*

[93] *See* United States Department of State, U.S.- Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica- joint-commitment-to-address-the-hemispheric- challenge-of-irregular-migration/*.

[94] *Id.*

[95] *Id.*

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

**RIN 1615–ZC00**

**Implementation of a Family Reunification Parole Process for Salvadorans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Renâ Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf; see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Hondurans and is being revised in connection with this notice by increasing the burden estimate. This process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes

(under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14474 Filed 7–7–23; 8:45 am]

**BILLING CODE P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2750–23; DHS Docket No. USCIS–2023–0007]

**RIN 1615–ZC00**

**Implementation of a Family Reunification Parole Process for Salvadorans**

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of Implementation of a Family Reunification Parole Process for Salvadorans.

---

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) creation and implementation of a family reunification parole process (FRP) for Salvadorans. Under this process, certain Salvadoran principal beneficiaries of an approved Form I–130, Petition for Alien Relative, and their immediate family members, will be issued advance authorization to travel to the United States to seek a discretionary grant of parole into the United States for a period of up to three years, rather than remain outside the United States while awaiting availability of their immigrant visas. This process will allow family members to reunite in the United States while they wait for their immigrant visas to become available. This process is voluntary and intended to provide an additional lawful, safe, and orderly avenue for migration from El Salvador to the United States as an alternative to irregular migration to help relieve pressure at the Southwest Border (SWB) and reunite families, consistent with U.S. national security interests and foreign policy priorities. The process complements other efforts to collaboratively manage migration in the Western Hemisphere and at the SWB as the U.S. Government (USG) continues to implement its broader, multi-pronged, and regional strategy to address the challenges posed by irregular migration.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on July 10, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

This notice describes the implementation of a new parole process for certain Salvadoran nationals and their immediate family members,[1] including the eligibility criteria and filing process. The parole process is intended to reunite families more quickly and offer an alternative to dangerous irregular migration routes through North and Central America to the United States by providing a process for certain Salvadorans and their immediate family members to lawfully enter the United States in a safe and orderly manner.

The USG is committed to implementing a comprehensive framework to manage migration through North and Central America.[2] Executive Order (E.O.) 14010 called for a four-pronged approach, including: addressing the root causes of irregular migration; managing migration throughout the region collaboratively with other nations and stakeholders; restoring and enhancing the U.S. asylum system and the process for migrants at the SWB to access this system; and creating and expanding lawful pathways for migrants to enter the United States and seek protection.[3]

In July 2021, the National Security Council (NSC) published the *U.S. Strategy for Addressing the Root Causes*

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

---

[1] Throughout this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age").

[2] *See generally* Executive Order 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border* (Feb. 2, 2021). *https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02561.pdf*; *see also* NSC, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf.*

[3] *See* E.O. 14010 at secs. 2–4.

*of Migration in Central America.*[4] This strategy outlined a comprehensive framework within which federal government agencies would work collaboratively to address the root causes of irregular migration through Central America, noting long-standing political instability, insecurity, and climate change in the region. Also in July 2021, the NSC published the *Collaborative Migration Management Strategy,* which described U.S. strategy to collaboratively manage migration through Central America.[5] Further, in March 2022, DHS published an interim final rule (IFR) intended to allow U.S. immigration officials to consider more promptly the asylum claims of individuals encountered at or near the SWB while ensuring the fundamental fairness of the asylum process.[6] In June 2022, through the Los Angeles Declaration on Migration and Protection (L.A. Declaration), the United States, along with several countries in the Western Hemisphere, committed to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration, and signaled their intent to work together to expand access to regular pathways for migrants and international protection, including through family reunification options, where appropriate and feasible, in accordance with national legislation.[7]

A critical component of this migration framework is the creation and expansion of lawful pathways through which migrants can come to the United States as one means of reducing irregular migration flows. Building on the success of Uniting for Ukraine,[8] in October 2022, the United States announced a parole process for certain Venezuelan nationals and their immediate family members to lawfully enter the United States in a safe and orderly manner.[9] The process for Venezuelans was designed to immediately address the humanitarian need and the increasing number of encounters of Venezuelan nationals at the SWB.[10] Implementation of the parole process for Venezuelans was dependent on Mexico continuing to accept the return of Venezuelan nationals seeking to irregularly enter the United States between the ports of entry (POEs), and the announcement made clear that Venezuelans who did not avail themselves of this process, and who instead entered the United States without authorization, were subject to expulsion or removal.[11] In January 2023, DHS implemented similar parole processes for Cubans, Haitians, and Nicaraguans, and their immediate family members, to address the increasing numbers of encounters of nationals of those countries at the SWB, and announced changes to the parole process for Venezuelans to allow for its continued operation.[12]

On May 12, 2023, following the termination of the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order, DHS and the Department of Justice (DOJ) implemented a joint final rule, *Circumvention of Lawful Pathways,* which incentivizes migrants to avail themselves of identified lawful, safe, and orderly pathways into the United States, or otherwise to seek asylum or other protection in another country through which they travel.[13] That rule reflects the position that an increase in the availability of lawful pathways paired with consequences for migrants who do not avail themselves of such pathways can encourage the use of lawful pathways and undermine transnational criminal organizations (TCOs), such as smuggling operations.[14]

In addition, DHS and the Department of State (State) have collaborated on a number of efforts to address the challenges of irregular migration by expanding access to lawful pathways, including: restarting and expanding eligibility criteria to the Central American Minors (CAM) Program;[15] and expanding refugee processing in South and Central America, including by working to establish Safe Mobility Offices (SMOs) in key locations.[16] USG efforts have also expanded access to H–2 temporary nonimmigrant worker visas for individuals in the region while enhancing worker protections.[17]

U.S.-based relatives who can request access for their children in Northern Central America (NCA). In April 2023, the United States announced enhancements to the CAM Program, including updates to certain eligibility criteria for program access. *See* Bureau of Population, Refugees, and Migration; Central American Minors Program, 88 FR 21694 (Apr. 11, 2023).

[16] *See* DHS, Fact Sheet, U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https:// www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries. *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/; See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[17] While focusing attention on improvements to recruitment practices and educating workers on their rights in the NCA countries and labor conditions in the United States, the United States Government has been engaging in efforts to substantially increase the number of H–2 temporary workers from the NCA countries. As part of these efforts, the Secretary of Homeland Security, in consultation with the Secretary of Labor, has exercised the authority given by Congress to allocate additional H–2B temporary non-agricultural worker visas under the supplemental cap. Most recently, on December 15, 2022, DHS and DOL jointly published a temporary final rule increasing the number of H–2B nonimmigrant visas by up to 64,716 for the entirety of FY 2023. *See* Exercise of Time-Limited Authority to Increase the Numerical Limitation for FY 2023 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 76816 (Dec. 15, 2022). 20,000 of these H–2B visas are reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti. *Id.* DHS and DOL similarly exercised this authority in other recent FYs, with specific allocations for NCA countries. *See* Exercise of Time-Limited Authority To Increase the Numerical Limitation for Second Half of FY 2022 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers, 87 FR 30334 (May 18, 2022)

---

[4] *See* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[5] *See* NSC *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-%20Migration-%20Management-%20Strategy.*

[6] Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022).

[7] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[8] Implementation of the Uniting for Ukraine Parole Process, 87 FR 25040 (Apr. 27, 2022).

[9] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[10] *See id.*

[11] *Id.*

[12] *See* Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1279 (Jan. 9, 2023).

[13] 88 FR 31314 (May 16, 2023).

[14] *See id.* at 31325.

[15] The United States announced in March 2021 that the CAM Program would reopen and continue with processing for cases that were closed in 2018 when the program was terminated. In June 2021, the United States announced the program would be expanded by increasing the categories of eligible

Consideration of noncitizens for parole on a case-by-case basis under the process outlined here will meaningfully contribute to the broader USG strategy of expanding access to lawful pathways to individuals who may otherwise undertake an irregular migration journey to the United States.

## II. Parole Authority

The Immigration and Nationality Act (INA) provides the Secretary of Homeland Security (the Secretary) with the discretionary authority to parole applicants for admission ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [18] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during their period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose appropriate conditions on parole.[20] DHS may terminate parole upon notice in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22]

Past Secretaries have similarly exercised the parole authority to establish other family reunification parole processes administered by U.S. Citizenship and Immigration Services (USCIS). For example, the Cuban Family Reunification Parole (CFRP) Program, as established in 2007, allows U.S. citizens (USCs) and lawful permanent residents (LPRs) to request parole for certain

eligible family members in Cuba who are beneficiaries of approved Form I–130s.[23] If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current.[24] Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing USCs and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Form I–130s, who may subsequently come to the United States and seek parole before their immigrant visa priority dates are current.[25]

## III. The FRP Process for Salvadorans

As in the CFRP and HFRP processes, this FRP process for Salvadorans will allow USCs and LPRs to request for certain family members to receive advance authorization to travel to the United States to seek parole at an interior POE. Individuals who are eligible to be considered for parole under this process include nationals of El Salvador who are beneficiaries of an approved Form I–130 family-based immigrant petition, as well as their immediate family members, who are outside the United States and who have not yet received an immigrant visa. Like the CFRP and HFRP processes, this process requires that the Form I–130 petitioner first receive an invitation to request consideration for advance authorization to travel and parole on behalf of the Salvadoran principal beneficiary of the approved Form I–130 and the principal beneficiary's immediate family members. As in the CFRP and HFRP processes, this invitation requirement will allow DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. If issued advance authorization to travel, the

beneficiary will be permitted to travel to the United States to be considered for a discretionary grant of parole on a case-by-case basis at an interior POE. Noncitizens paroled into the United States under this FRP process will generally be paroled for up to three years, consistent with the HFRP process. If granted parole into the United States, parolees will be able to request employment authorization while they wait for their immigrant visa to become available and to apply for adjustment of status to that of an LPR once an immigrant visa becomes available to them. As with the CFRP and HFRP processes, under this FRP process for Salvadorans, parole will only be authorized on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Noncitizens paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit.

## IV. Justification for the Process—Significant Public Benefit

As noted above, section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), confers upon the Secretary the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.''

The case-by-case parole of noncitizens with approved family-based immigrant visa petitions under this process will, in general, provide a significant public benefit by furthering the USG's holistic migration management strategy, specifically by: (1) promoting family unity; (2) furthering important foreign policy objectives, (3) providing a lawful and timely alternative to irregular migration; (4) reducing strain on limited U.S. resources; and (5) addressing root causes of migration through economic stability and development supported by increased remittances.

### A. Promoting Family Unity

Consistent with Section 3(b)(ii) of E.O. 14010, the case-by-case parole of noncitizens under this FRP process will provide the significant public benefit of promoting family unity by providing a more expeditious pathway for USCs and LPRs to reunite with their family

(authorizing the issuance of no more than 35,000 additional H–2B visas during the second half of FY 2022, of which 11,500 H–2B visas were reserved for nationals of El Salvador, Guatemala, Honduras, and Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2022 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 87 FR 4722 (Jan. 28, 2022) (DHS and DOL authorized an additional 20,000 H–2B visas, of which 6,500 were again reserved for nationals of the NCA countries, with the addition of Haiti); Exercise of Time-Limited Authority to Increase the Fiscal Year 2021 Numerical Limitation for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking to Change Employers, 86 FR 28198 (May 25, 2021) (DHS and DOL authorized a total of 22,000 supplemental visas, of which 6,000 visas were reserved for nationals of the NCA countries).

[18] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(a)(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole'').

[19] INA secs. 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B) and 1182(d)(5)(A).

[20] *See* 8 CFR 212.5(c).

[21] *See* 8 CFR 212.5(e).

[22] *See* 8 CFR 274a.12(c)(11).

[23] *See* Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 21, 2007) (Noting that granting parole to eligible aliens under the CFRP Program serves the significant public benefit of enabling the United States to meet its commitments under the Migration Accords as well as ''reducing the perceived need for family members left behind in Cuba to make irregular and inherently dangerous attempts to arrive in the United States through unsafe maritime crossings, thereby discouraging alien smuggling as a means to enter the United States,'' and stating that whether to parole a particular alien ''remains, however, a case-by-case, discretionary determination.'').

[24] *Id.*

[25] *See* Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014) (''By expanding existing legal means for Haitians to immigrate, the HFRP Program serves a significant public benefit by promoting safe, legal, and orderly migration to the United States. Furthermore, it supports U.S. goals for Haiti's long-term reconstruction and development.'').

members from El Salvador in the United States. Currently, nationals of El Salvador with approved family-based petitions often wait many years before their immigrant visas can be issued and they can travel to the United States to apply for admission as immigrants.[26] While waiting for an immigrant visa to be issued, security concerns and uncertainty in their home countries, combined with a desire to reunify with family in the United States, could cause many to undertake irregular migratory routes in the absence of an alternative path to come to the United States in the near term for family reunification.

By facilitating quicker reunification of USCs and LPRs with their family members in the United States, this FRP process will improve the social and economic stability and well-being of these families, as well as their communities at large. Additionally, facilitating reunification in the short-term through a lawful, safe, and orderly pathway will provide the significant public benefit of promoting the reception and integration of arriving noncitizens into American society. New arrivals will be introduced sooner to the networks already built by family members living in the United States, providing them an opportunity to familiarize themselves with the United States, establish stable financial foundations, find housing and transportation, and enroll in school and find childcare for their children as they wait for their immigrant visas to become available.

*B. Furthering Important Foreign Policy Objectives*

The United States has been engaging with international partners to manage irregular migration through various lines of effort, including bringing together leaders from nations across the Western Hemisphere to endorse the L.A. Declaration,[27] joining Colombia and Panama to ramp up efforts to address

irregular flows through the Darién,[28] working to establish SMOs in key locations in the Western Hemisphere,[29] joining Mexico to announce and develop a humanitarian plan on migration,[30] and issuing a trilateral statement with Canada and Spain to announce our intent to partner together to deepen engagement in Latin America.[31] A central theme of all these efforts is, as further articulated below, expanding and strengthening access to lawful pathways for migration. Many countries have cooperated extensively to: (1) create and expand access to lawful pathways in their respective countries; and (2) increase enforcement measures along the migratory routes and introduce policies that seek to reduce irregular migration from or through their countries. In turn, regional partner countries have consistently requested that the United States expand and strengthen access to lawful pathways, even following implementation of the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela (CHNV). Implementation of this parole process is one way of responding to such requests. Therefore, the parole of noncitizens, on a case-by-case basis, under this process will secure cooperation and strengthen bilateral relations with regional partners in furtherance of U.S. national interests.

This process is not only responsive to the requests and interests of key foreign partners—and necessary for addressing

migration challenges requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a network of carefully negotiated actions by multiple governments, as reflected in the L.A. Declaration and the aforementioned actions.[32] The L.A. Declaration acknowledges the endorsees' shared responsibility on migration and commitment to strengthen national, regional, and hemispheric efforts to create the conditions for safe, orderly, humane, and regular migration.[33] All 21 countries that endorsed the declaration reaffirmed their shared commitment to strengthening and expanding regular pathways and promoting principles of safe, orderly, humane, and regular migration.[34] As such, it is the view of the United States that this process advances the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong relationships with key partners to manage migration collaboratively.

The USG further intensified its international engagement in recent months and weeks as the date on which the CDC Title 42 public health Order[35] would terminate neared and DHS anticipated a significant potential further increase in irregular migration.[36] For instance, consistent with the goals of the L.A. Declaration and in anticipation of the end of the Title 42 public health Order, on April 11, 2023, and at the request of the United States, the United States, jointly with the Governments of Panama and Colombia, committed to three goals—a counter-

---

[26] For example, under the May 2023 Department of State Visa Bulletin, a Salvadoran married child of a U.S. citizen—F3 Preference Relative category—will only have an immigrant visa available to them if their relative filed the Form I–130 on their behalf more than 14 years ago. *See* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html*. However, these dates are not predictive. Due to increases in Form I–130 volumes, it is likely that a Salvadoran married child of a U.S. citizen for whom a Form I–130 is filed today will have even longer to wait before an immigrant visa becomes available.

[27] *See* The White House, Los Angeles Declaration on Migration and Protection, June 10, 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[28] *Trilateral Joint Statement*, April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[29] *See* The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*; *See* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*; *See* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*; *See* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[30] *See* The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[31] *See* DHS, Trilateral statement on joint commitment to Latin America, May 3, 2023, *https://www.dhs.gov/news/2023/05/03/trilateral-statement-joint-commitment-latin-america*.

[32] The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

[33] *Id.*

[34] *Id.*

[35] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ ] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

[36] *See* 88 FR 11704, 11704–08 (Feb. 23, 2023) (describing "concern about the possibility of a surge in irregular migration upon, or in anticipation of, the eventual lifting of the Title 42 public health Order"); CNN, Southern border braces for a migrant surge with Title 42 set to expire this week, May 8, 2023, *https://www.cnn.com/2023/05/08/us/title-42-expires-border-immigration/index.html*.

human smuggling effort in both the land and maritime domain; an expansion of lawful pathways as an alternative to irregular migration; and increased economic investment in impacted border communities—as part of a coordinated 60-day campaign and sustained cooperation beyond the initial two-month campaign to reduce irregular migration.[37] Implementing this process fulfills one of the commitments the United States made with its regional partners to seek to, among all three governments, ''[o]pen new lawful and flexible pathways for tens of thousands of migrants and refugees as an alternative to irregular migration.'' [38]

The USG also continues to encourage regional governments to continue to expand lawful pathways that they make available for migrants, including providing status to migrants residing in their countries, as well as establish removal programs. Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, study, and access public services.[39] Ecuador, Costa Rica, Belize, and Peru are also undertaking similar efforts to regularize migrants from Venezuela and Nicaragua.[40] Partner countries have also taken actions to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization.[41] Brazil's ''Operation Welcome'' helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity.[42] Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.[43] The implementation of this parole process will demonstrate to these regional governments the commitment of the United States government to continue to expand lawful, safe, and orderly pathways as an alternative to irregular migration.

### C. Lawful Alternative to Irregular Migration

In addition to existing lawful pathways, implementation of this FRP process will provide another lawful, safe, and orderly alternative to irregular migration in the near term. In the past several years, out-migration from the countries of Northern Central America (NCA), including El Salvador, Guatemala, and Honduras, has accounted for a significant proportion of individuals seeking to irregularly migrate to the United States. In Fiscal Year (FY) 2021, CBP encounters with Salvadorans at the SWB increased by about 168 percent as compared to FY18, and about 7.0 percent as compared to FY19, with encounters totaling approximately 98,600 in FY21 as compared to 36,800 and 92,200 in FY18 and FY19, respectively.[44] In FY22, the encounters remained at the high levels of the previous fiscal year, with 97,000 encounters.[45] For FY21 through April 2023 of FY23, migrants from the NCA accounted for more than 27 percent of all encounters at the SWB, with Salvadorans accounting for approximately 4.3 percent of all encounters.[46] Economic insecurity and high levels of poverty, food insecurity, and sexual and gender-based violence, coupled with the desire to reunite with family members already in the United States, are driving migrants from NCA countries, including El Salvador, to the United States.[47]

Some beneficiaries of approved family-based immigrant visa petitions may have to wait many years for an immigrant visa to become available.[48] While beneficiaries will still need to wait to apply to become an LPR, this FRP process will allow certain noncitizens to spend part of that waiting time with family in the United States. The process will create a lawful, safe, and orderly pathway to travel to the United States for certain nationals of El Salvador and their immediate family members, who have already followed established channels to begin seeking lawful status in the United States, whose immigrant visa petitions have been approved, and who are waiting for an immigrant visa to become available. The availability of this FRP process could discourage beneficiaries whose immigrant visas are not expected to become available soon from engaging in irregular migration by providing a hope and expectation that they will soon have access to a reasonably foreseeable, safe, and orderly alternative to irregular migration for which they may choose to wait.

### D. Reducing Strain on Limited U.S. Resources

Substantial irregular migration, including from El Salvador, has strained DHS's reception and processing capacity at the SWB. Between FY20 and April 2023, encounters of Salvadorans at the SWB totaled approximately a quarter million.[49] By establishing a lawful pathway for some of these migrants from El Salvador, on a case-by-case basis, to enter the country before an immigrant visa becomes immediately available to them, this FRP process is expected to reduce the number of irregular migrants encountered at the SWB,[50] thereby providing a significant public benefit by reducing the strain on border reception and processing capacity, including by diverting the processing of individuals to interior POEs.

Paroling individuals through this process will be less resource-intensive than processing individuals who irregularly migrate. Noncitizens who arrive through this FRP process will generally not require placement in DHS custody or removal proceedings, allowing more space and resources to be used for managing irregular migration.[51]

Furthermore, by establishing a meaningful, near-term lawful pathway that certain individuals, if found to be eligible on a case-by-case basis, may choose to use in lieu of attempting to enter the United States irregularly, the process will redirect such intending migrants away from irregular migratory routes that funnel money into TCOs. TCOs engaged in human smuggling

---

[37] *Trilateral Joint Statement,* April 11, 2023, *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[38] *See id.*

[39] *See* Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability—United States Department of State, Apr. 27, 2023, *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.*

[40] *See id.*

[41] *See id.*

[42] *See id.*

[43] *See id.*

[44] Data as of May 4, 2023. OIS analysis of CBP data.

[45] *Id.*

[46] *Id.*

[47] *See* Migration Policy Institute, Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration (Nov. 2021) *https://www.migrationpolicy.org/research/motivations-costs-central-american-migration; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[48] *See* William Kandel, Congressional Research Service, *U.S. Family-Based Immigration Policy* (Feb. 9, 2018), *https://crsreports.congress.gov/product/pdf/R/R43145;* DOS, Visa Bulletin for May 2023, Number 77, Volume X (May 2023), *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-may-2023.html.*

[49] CBP, Nationwide Encounters (last visited June 9, 2023) *https://www.cbp.gov/newsroom/stats/nationwide-encounters.*

[50] As of late May 2023, there are currently an estimated 32,600 Salvadoran nationals with an approved Form I–130 waiting to travel to the United States. Individuals in this population may need to wait over 15 years for an immigrant visa to become available. Although DHS does not expect to issue invitations corresponding to all such Salvadoran nationals, this process may result in a significant reduction in wait times outside the United States for a substantial portion of this population, reducing incentives for irregular migration.

[51] *See, e.g.,* INA secs. 235, 240, 8 U.S.C. 1225, 1229a.

along the route from the NCA region to the United States earn hundreds of millions to billions of dollars each year from smuggling activities associated with irregular migration.[52] TCOs exploit irregular migration for financial gain, either by charging migrants to cross the border, forcing migrants to carry contraband as they cross, or forcing and coercing migrants into a sex or labor trafficking situation.[53] This money can then be used to fund additional human smuggling, drug trafficking, and human trafficking, to buy weapons, or to engage in other illicit activities in the region, all of which are competing priorities for limited U.S. border resources to confront and manage.[54] This FRP process is expected to reduce the number of irregular migrants who may be exploited by TCOs engaged in human smuggling, serving a significant public benefit.

*E. Addressing Root Causes of Migration Through Remittances*

This FRP process will also aid U.S. efforts in addressing economic insecurity in El Salvador, which is a key factor that drives out-migration.[55] Unlike many individuals who irregularly migrate, noncitizens who are paroled into the United States through this process will be immediately eligible to apply for employment authorization that they may maintain throughout the duration of their parole period, allowing them to contribute to the U.S. economy through the labor they provide, taxes they pay, and consumption of goods or payment of rent and utilities in their new U.S. communities.[56] Noncitizens

with authorization to work also typically enjoy higher wages than those without employment authorization, providing them with the resources to send additional money to their home country as remittances.[57]

Additional remittances sent back to El Salvador, together with other efforts to improve the investment climate and infrastructure in the country and address security concerns may promote economic development and address some of the root causes of migration.[58] Remittances from migrants from NCA countries including El Salvador already play a crucial role in their economies.[59] In 2018, remittances from migrants living abroad were equivalent to nearly 21 percent of Gross Domestic Product (GDP) in El Salvador.[60] Remittances remained stable in 2019, at 21 percent.[61] Following the onset of the COVID–19 pandemic in 2020, remittances to the NCA countries increased dramatically as a percentage of GDP in 2021. In El Salvador specifically, remittances were equivalent to 26 percent of the country's 2021 GDP.[62] For the first eight months of 2022, remittances to El Salvador, Guatemala, and Honduras increased

16.5 percent.[63] Remittances provide a crucial financial lifeline that enhances economic development and promotes economic stability for many individuals, families, and communities in El Salvador, impacting individual decisions on whether to leave the region. In the absence of timely alternative options for lawful pathways, such as parole under this process, and the additional remittances that are anticipated to result from implementation of this process, individuals are more likely to turn to irregular migration in the short-term.

**V. Eligibility**

*A. Petitioners*

Invitations to participate in this process will be issued to certain petitioners who have an approved Form I–130 filed on behalf of a Salvadoran principal beneficiary. Invitations will be issued based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the policy aims of this process as described in this Notice. Petitioners who have an approved[64] Form I–130 filed on behalf of a Salvadoran principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request with USCIS that initiates this FRP process on behalf of a Salvadoran principal beneficiary of an approved Form I–130, and a separate request for any immediate family members of the principal beneficiary. As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the length of parole by submitting Form I–134A online. Petitioners will also be required to provide evidence to verify the family relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request under this process. As part of the review

[52] Homeland Security Operational Analysis Center, *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States* (2019) *https://www.rand.org/content/dam/rand/pubs/research_reports/RR2800/RR2852/RAND_RR2852.pdf; see also* DHS, Fact Sheet: Counter Human Smuggler Campaign Update (Oct. 6, 2022) *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th.*

[53] DHS's Efforts to Disrupt Transnational Criminal Organizations in Central America: Hearing before the Subcommittee on Oversight, Management, and Accountability of the Committee of Homeland Security of the House of Representatives, 117th Cong. (2021).

[54] *Id.*

[55] U.S. Department of State, Integrated Country Strategies—El Salvador, Apr. 21, 2023, *https://www.state.gov/wp-content/uploads/2023/04/ICS_WHA_El-Salvador_Public.pdf.*

[56] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, ''The Economic and Fiscal Consequences of Immigration'' (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, The White House Blog: The Economic Benefits of Extending Permanent Legal Status to Unauthorized

Immigrants (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[57] George J. Borjas, ''The Earnings of Undocumented Immigrants,'' National Bureau of Economic Research (Mar. 2017), *https://www.nber.org/papers/w23236* (providing that noncitizens without authorization to work earn less than those with employment authorization).

[58] Pew Research Center, *Remittances from Abroad are major economic assets for some developing countries* (Jan. 29, 2018) *https://www.pewresearch.org/fact-tank/2018/01/29/remittances-from-abroad-are-major-economic-assets-for-some-developing-countries/; see also* NSC, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* (July 2021) *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf; see also* Atlas of Sustainable Development Goals, *Remittances: a lifeline for many economies,* The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/.*

[59] *See* Atlas of Sustainable Development Goals, Remittances: a lifeline for many economies, The World Bank (2020) *https://datatopics.worldbank.org/sdgatlas/goal-17-partnerships-for-the-goals/; see also* Council on Foreign Relations, *Central America's Turbulent Northern Triangle* (July 1, 2021) *https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.*

[60] Congressional Research Service, *U.S. Strategy for Engagement in Central America: Policy Issues for Congress* (Nov. 12, 2019) *https://fas.org/sgp/crs/row/R44812.pdf.*

[61] The World Bank, Personal Remittances, received (% of GDP)—El Salvador (last visited June 9, 2023) *https://data.worldbank.org/indicator/BX.TRF.PWKR.DT.GD.ZS?locations=SV.*

[62] *Id.; also see* Bloomberg Línea, *Remittances to Central America on Track to Break Records* (Nov. 1, 2022) *https://www.bloomberglinea.com/english/remittances-to-central-america-on-track-to-breaking-records.*

[63] *Id.*

[64] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice.

process, the petitioner must pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

*B. Beneficiaries*

A beneficiary is a national of El Salvador (or their immediate family member of any nationality) who is outside the United States and who may be considered for a discretionary grant of parole under this FRP process. To ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, a beneficiary must:

• be outside the United States;
• be the principal beneficiary (or a derivative beneficiary spouse or child) [65] of an approved Form I–130, Petition for Alien Relative;
• be a national of El Salvador or be a non-Salvadoran derivative beneficiary spouse or child [66] of a Salvadoran principal beneficiary;
• have a petitioning relative in the United States who received an invitation to initiate this FRP process on their behalf by filing a Form I–134A;
• have a U.S.-based petitioning relative who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;
• have not yet been issued an immigrant visa at the time the invitation is issued to the petitioning relative; and
• have an unexpired passport valid for international travel, or possess alternative acceptable documentation as described in the invitation letter issued to the petitioning relative.

In addition, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. This includes vetting prior to issuance of advance authorization to travel to an interior POE to seek parole, as well as additional vetting completed by CBP upon inspection and collection of biometrics at the POE, as described in the section of this Notice that details the

processing steps for this FRP process. CBP will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of screening and vetting when determining eligibility to be issued advance authorization to travel to the United States, as well as when determining, on a case-by-case basis, whether to grant parole to the beneficiary at the POE. When making these discretionary advance authorizations to travel and parole determinations, DHS will consider a beneficiary to be ineligible for this process if the beneficiary:

• has crossed irregularly into the United States, between the POEs, after July 10, 2023, except DHS will not consider a beneficiary to be ineligible based on a single instance of voluntary departure pursuant to section 240B of the INA, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to section 235(a)(4) of the INA, 8 U.S.C. 1225(a)(4);
• has been interdicted at sea [67] after July 10, 2023; or
• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order.[68]

DHS also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Each beneficiary must demonstrate that a grant of parole is warranted based on a significant public benefit or urgent humanitarian reasons, and that the beneficiary merits a favorable exercise of discretion in order for CBP to grant parole upon arrival at the POE. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines.

Participation in this process is not limited to those beneficiaries currently living in El Salvador. However, as noted above, beneficiaries must be outside the United States to participate in the process. In order to use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.*, international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in

coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[69]

A potential beneficiary of this process who enters the United States between POEs after July 10, 2023 rather than being considered for parole under this process will be ineligible for this process, except as indicated above, and will be processed under Title 8 of the U.S. Code and face appropriate consequences for that choice. For example, they may be subject to potential criminal prosecution,[70] expedited removal proceedings,[71] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, potential beneficiaries who enter the United States between POEs rather than be considered for parole under this process may be or may become ineligible for adjustment of status [72] or for an immigrant visa [73] as a result of entering without inspection and not having been admitted or paroled.[74]

---

[65] *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child," in general, as meaning "an unmarried person under twenty-one years of age"). If a principal beneficiary married or had a child after USCIS approved the underlying Form I–130, that spouse or unmarried child under 21 may in some circumstances become a derivative beneficiary and may be eligible for parole based on their relationship to the principal beneficiary. The term "add-on derivatives" are included within the term "derivative" in this notice.

[66] Certain non-Salvadorans may use this process if they are a derivative beneficiary of a Salvadoran principal beneficiary and traveling with that Salvadoran beneficiary.

[67] For purposes of this notice, "interdicted at sea" refers to migrants directly interdicted by the U.S. Coast Guard from vessels subject to U.S. jurisdiction or vessels without nationality, or migrants transferred to the U.S. Coast Guard.

[68] *See, e.g.*, INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[69] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[70] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[71] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[72] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that, absent the granting of an available waiver, render applicants for adjustment of status ineligible).

[73] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[74] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain

Continued

*C. Processing Steps*

This FRP process will be implemented in light of lessons learned through the CFRP and HFRP processes and will build on technological advancements and efficiencies developed since the inception of CFRP and HFRP. All steps of the process, except for the ultimate parole determination made in-person, on a case-by-case basis, by CBP at the POE, will generally be completed online, including individualized, case-by-case identity and eligibility determinations and robust security vetting.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the potential principal and derivative beneficiaries. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice. Only after receiving an invitation may the petitioner file a request and initiate consideration under this FRP process. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter and to initiate consideration for advance authorization to travel to the United States to seek parole at an interior POE.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the online myUSCIS web portal to initiate this process. The Form I–134A identifies and collects information on both the petitioner and the beneficiary. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner must submit evidence establishing their income and

assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries. USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their myUSCIS account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization to travel from CBP, facilitating their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE. The beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel

via commercial air to an interior POE.[75] Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the Poe

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years.

Upon arrival at the interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion. A beneficiary who is determined to pose a national security or public safety threat will generally be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[76]

All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds. Parole may be terminated upon notice at DHS discretion, and the noncitizen may be placed into removal proceedings and/or

---

periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[75] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[76] 8 CFR 274a.12(c)(11).

detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period.

*D. Termination and No Private Rights*

The Secretary retains the sole discretion to terminate this FRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**VI. Other Considerations in the Establishment of This FRP Process**

DHS has considered the potential impact of this FRP process on individuals applying for benefits under other immigration programs or processes, given that USCIS and CBP may reassign employees and reallocate resources to administer this process. This reassignment or reallocation could potentially impact processing times for USCIS- or CBP-administered immigration programs and processes. Although personnel and resources may be diverted from other similar processes and programs, participation in this process is by invitation only. DHS can adjust the number of invitations issued to alleviate pressure on other programs and processes as resource limitations require. As detailed above, each beneficiary of this process who is diverted away from irregular migration will also reduce the strain on border reception and processing capacity. Therefore, these costs are not significant enough to outweigh the benefits of the process.

DHS also considered the alternative approach of not establishing this process. As stated throughout this Notice, this process will provide many benefits and has few drawbacks. DHS has made an effort to identify and consider any reliance interests of the parties affected by establishment of this process. Ultimately, DHS has determined that the significant public benefit of the case-by-case parole of individuals under this FRP process to the United States, and other affected parties, including the reduction in irregular migration expected to be accomplished in connection with this process, outweigh the costs that may be incurred, while noting that this FRP process will not increase the total number of individuals eligible to enter the United States, as the potential beneficiaries already have a pathway to lawful permanent residence. For example, DHS has determined that the significant public benefits of the case-by-case parole of individuals under this process outweighs any costs incurred for schools and social services (such as health care) in the period between their parole into the United States and the time when a beneficiary's immigrant visa already would have become available (at which point they soon thereafter would, in general, have been admitted as immigrants).[77]

Alternatively, as discussed below, a decision to not establish this process would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals and ensure foreign partners' continued collaboration. In addition, certain nationals of El Salvador still waiting for their immigrant visas to become available would remain separated from their family members and could resort to irregular migration without this process. For any such Salvadoran nationals, the USG would need to commit resources to respond to their arrival, processing, and removal pursuant to the INA. Those who manage to cross the border without being encountered by CBP would join the population of individuals living in the United States without authorization, unable to legally seek employment. The states in which they settle would be less likely to benefit from additional tax revenues and other positive economic contributions these individuals would have provided if they had a lawful pathway like this FRP process through which they may apply for employment authorization while they wait to apply to adjust to LPR status.

**VII. Regulatory Requirements**

*A. Administrative Procedure Act (APA)*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and is therefore amenable to immediate issuance and implementation.

*First,* DHS is merely adopting a general statement of policy,[78] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[79] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions.

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[80] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[81] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[82] This process satisfies both standards. Specifically, as discussed in the section above entitled, *Furthering Important Foreign Policy Objectives,* this FRP process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. As discussed in that section, and as further explained below, the expansion of lawful pathways for noncitizens to enter the United States is necessary to ensure partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the timely establishment of SMOs.[83]

Delaying issuance and implementation of this process to undertake notice-and-comment rulemaking and a delayed effective date would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management, including the new measures the United States announced on April 27, 2023, in anticipation of the May 11 lifting of the Title 42 public health Order.[84] These measures are

---

[77] *See, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration" (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.*

[78] 5 U.S.C. 553(b)(A).

[79] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281,302 n.31 (1979)).

[80] 5 U.S.C. 553(a)(1).

[81] *See, e.g., Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[82] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[83] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[84] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration, Apr. 27, 2023, *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

being implemented in close coordination with partner countries. Ongoing negotiations with partner countries involve the implementation of a range of new measures, including establishing SMOs in key locations in the Western Hemisphere to manage and reduce irregular migration and improve qualified individuals' access to accelerated refugee processing, family reunification, and labor pathways in the United States. As a key part of these negotiations, the United States and its partners are providing meaningful alternatives to irregular migration, including through lawful pathways to the United States, Canada, and Spain, as well as integration in host countries closer to home. The success of SMOs and other new measures to reduce irregular migration to the SWB is therefore connected to the United States expanding access to lawful pathways, including family reunification parole processes that will benefit nationals in countries identified to host SMOs. The USG also continues to engage with and ask additional governments to consider connecting their lawful pathways to SMO efforts and is building goodwill and momentum to seek SMOs in still more countries in the region.

On May 2, 2023, the United States and Mexico jointly announced a number of measures to address the humanitarian situation caused by unprecedented migration flows in the hemisphere by creating incentives for migrants to use lawful pathways, while announcing that consequences for unlawful entry would continue once the Title 42 public health Order was lifted. The announcements emphasized the importance of strengthening and expanding access to lawful pathways, including in Central America, which will continue to remain a central topic of bilateral relations.[85] Specifically, the United States stated its intention to welcome as many as 100,000 individuals from El Salvador, Guatemala, and Honduras under the family reunification parole processes, while the Government of Mexico recognized the value in SMOs and is considering how it can contribute to their success. Mexico concurrently committed to continue to accept the return of certain CHNV nationals on humanitarian grounds beyond the lifting of the Title 42 public health Order on May 11, 2023.

Additionally, after a series of negotiations, on June 1, 2023, the

United States and Guatemala issued a joint statement to commit to take a series of critical steps to humanely reduce irregular migration and expand lawful pathways under the LA. Declaration.[86] As the first step of a comprehensive program to manage irregular migration, both countries intend to implement a six-month pilot phase of SMOs, which facilitate access to lawful pathways to the United States and other countries, family reunification, and access to temporary work visas.[87] These offices began accepting appointments on the website movilidadsegura.org on June 12, 2023.[88] In the same announcement, the United States and Guatemala stated that they will also deepen cooperation on border security and will continue to address the root causes of irregular migration.[89]

In addition, on June 4, 2023, the United States and Colombia announced the impending establishment of SMOs that would identify, register, and categorize the reasons for irregular migration and channel those who qualify through lawful pathways from Colombia to the United States.[90] The goal is to prevent irregular migration to the United States or other places in the Hemisphere. The U.S. government also reaffirmed its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification.[91] As stated in the announcement, the USG is working with the government of Colombia to promptly implement processing through SMOs to ensure the success of this initiative.[92]

Furthermore, on June 12, 2023, the USG and the Government of Costa Rica, in furtherance of bilateral partnership and addressing hemispheric challenge of irregular migration, announced an

exploratory six-month implementation of SMOs.[93] SMOs in Costa Rica will facilitate access to lawful pathways to the United States and other countries, including expedited refugee processing and other humanitarian and labor pathways.[94] In addition to starting the SMOs initiative, the USG and the Government of Costa Rica reaffirmed their commitment to work with all countries across the region to promote integration of refugees and migrants, expand lawful pathways, and promote humane border management.[95]

Overall, delaying issuance and implementation of this process to undertake rulemaking would complicate these and future U.S. efforts to manage migration together with foreign partners. Because this FRP is an example of the United States' shared commitment to managing migration consistent with the L.A. Declaration and has been a key point in ongoing negotiations and partnerships, such a delay would risk undermining these partner countries' continued efforts, which are critical to the U.S. foreign policy approach to migration management.

Furthermore, the delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate for and request additional enforcement measures and increased cooperation with removals, which is timely and urgent given the conclusion of Title 42 enforcement on May 11. Regional partner countries have repeatedly requested additional lawful pathways in diplomatic engagements in return for increased law enforcement measures throughout the migratory routes, imposing additional requirements on key nationalities using their countries as a gateway to make irregular journeys to the SWB, and accepting additional removal flights with significantly reduced manifest times. Coordinated USG efforts with partner countries in the Western Hemisphere, following the lifting of the CDC's Title 42 public health Order on May 11, 2023, and transition to processing under Title 8 of U.S. Code have led to a reduction of irregular migration flows throughout the region and at the SWB. However, the USG's assessment is that this might be a temporary shift if the United States and partner countries do not sustain their

---

[85] See Mexico and United States Strengthen Joint Humanitarian Plan on Migration, May 2, 2023, *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[86] See The White House, Joint Statement from the United States and Guatemala on Migration (June 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/*.

[87] Id.

[88] Id.

[89] Id.

[90] See United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*. See The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/*.

[91] Id.

[92] Id.

[93] See United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/*.

[94] Id.

[95] Id.

efforts to expand access to lawful pathways and enforcement measures along the migratory routes as our regional partner countries and international organization partners report skyrocketing inquiries from migrants about availability of, and requirements for lawful pathways and enforcement penalties for unlawful entry into the United States. A key means of delivering on these partnerships, in keeping with the U.S. strategy and approach on migration management overall, is to make available lawful pathways to provide safe and orderly alternatives to the danger and consequences of irregular migration.

The invocation of the foreign affairs exemption is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[96] DHS similarly invoked the foreign affairs exemption more recently, in connection with the CHNV parole processes.[97]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to the collections of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), which will be used for the FRP process for Salvadorans and is being revised in connection with this notice by increasing the burden estimate. This

process also requires changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted and OMB has approved requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A and ATA for a period of 6 months. Within 45 days, USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes.[98]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–14475 Filed 7–7–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

**[Docket No. FWS–R7–ES–2023–0008; FF07CAMM00–FX–ES111607MRG01]**

### Marine Mammals; Letters of Authorization To Take Pacific Walruses and Polar Bears in the Beaufort Sea, Alaska, in 2022

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of issuance.

**SUMMARY:** In accordance with the Marine Mammal Protection Act of 1972, as amended, the U.S. Fish and Wildlife Service issued letters of authorization (LOA) for the nonlethal take of polar bears and Pacific walruses incidental to oil and gas industry exploration, development, and production activities in the Beaufort Sea and the adjacent northern coast of Alaska in 2022. This notice announces the LOAs issued in calendar year 2022. The LOAs stipulate conditions and methods that minimize impacts to polar bears and Pacific walruses from these activities.

**ADDRESSES:** *Document availability:* You may view the letters of authorization at *https://www.regulations.gov* under Docket No. FWS–R7–ES–2023–0008, or you may request them from the contact in **FOR FURTHER INFORMATION CONTACT**.

**FOR FURTHER INFORMATION CONTACT:** Charles Hamilton, via U.S. mail at

Marine Mammals Management, U.S. Fish and Wildlife Service, MS 341, 1011 East Tudor Road, Anchorage, AK 99503; by email at *R7mmmRegulatory@fws.gov*, or by telephone at 1–800–362–5148. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On August 5, 2021, the U.S. Fish and Wildlife Service (Service) published in the **Federal Register** a final rule (86 FR 42982) establishing regulations that allow us to authorize the nonlethal, incidental, unintentional take of small numbers of polar bears (*Ursus maritimus*) and Pacific walruses (*Odobenus rosmarus divergens*) during year-round oil and gas industry exploration, development, and production activities in the Beaufort Sea and adjacent northern coast of Alaska. These incidental take regulations are located in subpart J in part 18 of title 50 of the Code of Federal Regulations (CFR) and are effective through August 5, 2026. The rule prescribed a process under which we issue letters of authorization (LOA) to applicants conducting activities as described under the provisions of the regulations.

Each LOA stipulates conditions and methods that are specific to the activity and location. Holders of the LOAs must use methods and conduct activities in a manner that minimizes to the greatest extent practicable adverse impacts on Pacific walruses and polar bears and their habitat, and on the availability of these marine mammals for subsistence purposes. No intentional take or lethal incidental take is authorized under these regulations.

In accordance with section 101(a)(5)(A) of the Marine Mammal Protection Act (16 U.S.C. 1361 *et seq.*) and our regulations at 50 CFR part 18, subpart J, in 2022, we issued LOAs to the companies in the Beaufort Sea and adjacent northern coast of Alaska shown in the table. The Service includes in the table all LOAs issued in 2022.

---

[96] *See* DHS, Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR 4902 (Jan. 17, 2017).

[97] *See* DHS, Implementation of a Parole Process for Cubans, 88 FR 1266 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Haitians, 88 FR 1243 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Nicaraguans, 88 FR 1255 (Jan. 9, 2023); DHS, Implementation of Changes to the Parole Process for Venezuelans, 88 FR 1282 (Jan. 9, 2023); DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[98] Per the normal clearance procedures at 5 CFR 1320.10(e).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

---

[101] Id.

[102] Id.

[103] Id.; accord, e.g., Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA, is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

of our Southwest Border (SWB) by reducing the number of encounters of Cuban nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Cubans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Cuban nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Cuban Parole Process

This notice describes the implementation of a new parole process for certain Cuban nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Cuban nationals

entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

Building on the success of the Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Cuban nationals at the SWB and at sea, which have reached record levels over the past six months. Similar to Venezuela, Cuba has restricted DHS's ability to remove

individuals to Cuba, which has constrained the Department's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Cubans will reduce the number of Cubans seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Cubans is

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Cuban Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

contingent on the GOM accepting the return, departure, or removal to Mexico of Cuban nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Cuban national (and certain non-Cuban nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Cuban nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Cubans from the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits, including adjustment of status pursuant to the Cuban Adjustment Act, Public Law 89–732, 80 Stat. 1161 (1966) (8 U.S.C. 1255 note), for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Cuban nationals pursuant to this process will provide a significant public benefit for the United States, by reducing unauthorized entries along our SWB, while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Cubans to flee their home country, to include crippling economic conditions and dire food shortages, widespread social unrest, and the Government of Cuba's (GOC) violent repression of dissent.[6] Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

*B. Conditions at the Border*

1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500. Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[7] Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society. Other migrants who were about to enter the Darién Gap have turned around and headed back south. Still others who were intending to migrate north are staying where they are to apply for this parole process. Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Cuban Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[9] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[10] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[11]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and

---

[6] Washington Office on Latin America, *U.S.-Cuba Relations: The Old, the New and What Should Come Next,* Dec. 16, 2022, *https://www.wola.org/analysis/us-cuba-relations-old-new-should-come-next/* (last visited Dec. 17, 2022).

[7] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[9] OIS analysis of historic CBP data.

[10] *Id.*

[11] *Id.*

1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[12] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [13] (NCA) and, since the late 2010s, from countries throughout the Americas.[14] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[15]

Cubans are fleeing the island in record numbers, eclipsing the mass exodus of Cuban migrants seen during the Mariel exodus of 1980.[16] In FY 2022, DHS encountered about 213,709 unique Cuban nationals at the SWB, a seven-fold increase over FY 2021 rates, and a marked 29-fold increase over FY 2020.[17] FY 2022 average monthly unique encounters of Cuban nationals at the land border totaled 17,809, a stark increase over the average monthly rate of 589 unique encounters in FYs 2014–2019.[18] These trends are only accelerating in FY 2023. In October and November 2022, DHS encountered 62,788 unique Cuban nationals at the border—almost one third FY 2022's record total.[19] The monthly average of 31,394 unique Cuban nationals is a 76 percent increase over the FY 2022 monthly average.[20] The first 10 days of December 2022 saw 15,657 encounters of Cubans at the SWB.[21] In FY 2023, Cuban nationals have represented 16.5 percent of all unique encounters at the SWB, the second largest origin group.[22]

Maritime migration from Cuba also increased sharply in FY 2022 compared to FY 2021. According to DHS data, in FY 2022, a total of 5,740 Cuban nationals were interdicted at sea, the top nationality, compared to 827 in FY 2021, an almost 600 percent increase in a single fiscal year.[23]

In addition to the increase of Cuban nationals in U.S. Coast Guard (USCG) interdictions at sea and U.S. Customs and Border Protection (CBP) encounters at the SWB, USBP encounters of Cubans in southeast coastal sectors are also on the rise.[24] In FY 2022, DHS encountered 2,657 unique Cuban nationals (46 percent of total unique encounters), an increase of 1,040 percent compared to FY 2021.[25] This trend also has accelerated sharply in FY 2023, as CBP has made 1,917 unique encounters of Cuban nationals in the first two months of the FY—almost three-quarters of FY 2022's total.[26] Cuban nationals are 72 percent of all unique encounters in these sectors in October and November.[27]

**3. Push and Pull Factors**

DHS assesses that the high—and rising—number of Cuban nationals encountered at the SWB and interdicted at sea is driven by three key factors: First, Cuba is facing its worst economic crisis in decades due to the lingering impacts of the COVID–19 pandemic, high food prices, and economic sanctions.[28] Second, the government's response has been marked by further political repression, including widespread arrests and arbitrary detentions in response to protests.[29] Third, the United States faces significant limits on the ability to return Cuban nationals who do not establish a legal basis to remain in the United States to Cuba or elsewhere; absent the ability to return Cubans who do not have a lawful basis to stay in the United States, more individuals are willing to take a chance that they can come—and stay.

Further, in November 2021, the Government of Nicaragua announced visa-free travel for Cubans.[30] This policy provided Cubans a more convenient and accessible path into the continent, facilitating their ability to begin an irregular migration journey to the SWB via land routes.[31] Many such Cuban migrants fall victim to human smugglers and traffickers, who look to exploit the most vulnerable individuals for profit with utter disregard for their safety and wellbeing, as they attempt the dangerous journey northward through Central America and Mexico.[32]

**i. Factors Pushing Migration From Cuba**

There are a number of economic and other factors that are driving migration of Cuban nationals. Cuba is undergoing its worst economic crisis since the 1990s [33] due to the lingering impact of the COVID–19 pandemic, reduced foreign aid from Venezuela because of that country's own economic crisis, high food prices, and U.S. economic sanctions.[34] In July 2022, the

---

[12] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, ''The New Era of Mexican Migration to the United States,'' *The Journal of American History* Vol. 86, No. 2, 518–536 (Sept. 1999).

[13] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[14] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[15] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[16] El País, *The Cuban Migration Crisis, Biggest Exodus in History Holds Key to Havana-Washington Relations,* Dec. 15, 2022, *https://english.elpais.com/ international/2022-12-15/the-cuban-migration-crisis-biggest-exodus-in-history-holds-key-to-havana-washington-relations.html* (last visited Dec. 17, 2022).

[17] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] OIS analysis of CBP Unified Immigration Portal (UIP) data pulled on December 12, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[24] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[25] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[26] *Id.*

[27] *Id.*

[28] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s,* July 1, 2021, *https://* *www.economist.com/the-americas/2021/07/01/ cuba-is-facing-its-worst-shortage-of-food-since-the-1990s* (last visited Dec. 17, 2022).

[29] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests,* October 2, 2022, *https:// www.miamiherald.com/news/nation-world/world/ americas/cuba/article266767916.html* (last visited Dec. 17, 2022).

[30] Reuters, Nicaragua Eliminates Visa Requirement for Cubans, November 23, 2021, *https://www.reuters.com/world/americas/ nicaragua-eliminates-visa-requirement-cubans-2021-11-23/* (last visited Dec. 17, 2022).

[31] The New York Times, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat,* May 4, 2022, *https://www.nytimes.com/2022/05/03/ world/americas/cuban-migration-united-states.html* (last visited Dec. 17, 2022).

[32] CNN, *Cubans are Arriving to the U.S. in Record Numbers. Smugglers are Profiting from Their Exodus, https://www.cnn.com/2022/05/12/ americas/cuba-mass-migration-intl-latam/ index.html,* May 12, 2022 (last visited Dec. 17, 2022).

[33] The Economist, *Cuba is Facing Its Worst Shortage of Food Since 1990s,* July 1, 2021, *https:// www.economist.com/the-americas/2021/07/01/ cuba-is-facing-its-worst-shortage-of-food-since-the-1990s* (last visited Dec. 17, 2022).

[34] Congressional Research Service, *Cuba: U.S. Policy in the 117th Congress,* Sept. 22, 2022, *https://*
Continued

001097

Government of Cuba (GOC) reported the economy contracted by 10.9% in 2020, grew by 1.3% in 2021, and is projected to expand by 4% in 2022.[35] However, this projected expansion is unlikely to respond to the needs of the Cuban people. Mass shortages of dairy and other basic goods continue to persist, and Cubans wait in lines for hours to receive subsidized cooking oil or other basic goods.[36] Deepening poverty, exacerbated by the COVID–19 pandemic, has led to food shortages and rolling blackouts, and continues to batter the economy.[37] This combination of factors has created untenable economic conditions on the island that are likely to continue to drive Cubans to travel irregularly to the United States in the immediate future.[38]

The GOC has not been able to effectively address these issues to date, and has instead taken to repressive tactics to manage public discontent. Cuba remains a one-party authoritarian regime under the Communist Party of Cuba (PCC) government, which continues to restrict freedoms of expression, association, peaceful assembly, and other human rights.[39] The GOC employs arbitrary detention to harass and intimidate critics, independent activists, political opponents, and others.[40] While the Cuban constitution grants limited freedoms of peaceful assembly and association, the GOC restricts these freedoms in practice.[41] The government routinely blocks any attempts to peacefully assemble that might result in opposition to, or criticism of, the government.[42] This was evident when the human rights situation in Cuba began to decline significantly in 2020.[43]

In November 2020, the government cracked down on the San Isidro Movement (MSI), a civil society group opposed to restrictions on artistic expression.[44] This crackdown, coupled with deteriorating economic conditions (food and medicine shortages and blackouts), led to demonstrations in Havana and throughout the country.[45]

According to a Human Rights Watch report, the GOC also committed extensive human rights violations in response to massive anti-government protests in July 2021 with the apparent goal of punishing protesters and deterring future demonstrations.[46] The report documents a wide range of human rights violations against well-known government critics and ordinary citizens, including, arbitrary detention, prosecutions without fair trial guarantees, and cases of physical ill treatment, including beatings that in some cases constitute torture.[47] Several organizations reported countrywide internet outages, followed by erratic connectivity, including restrictions on social media and messaging platforms.[48]

Protests over the challenges of obtaining basic necessities have continued as have heavy-handed government responses. In September 2022, a prolonged blackout caused by Hurricane Ian led to protests in Havana and other cities.[49] Cuban President Miguel Díaz-Canel denounced the peaceful gatherings as ''counterrevolutionary'' and ''indecent,'' remarking that ''[d]emonstrations of this type have no legitimacy.'' [50] Amnesty International received reports of the GOC deploying the military and police to repress these protests as well as reports of arbitrary detention.[51]

The government's repression and inability to address the underlying shortages that inspired those lawful demonstrations have generated a human rights and humanitarian crisis that is driving Cubans from the country. On June 2, 2022, the Inter-American Commission on Human Rights (IACHR) in its 2021 Annual Report stated that no guarantees currently exist for exercising freedom of expression in Cuba.[52] Although the forms of harassment of independent journalists, artists, activists, and any who question government officials are not new, the 2021 Annual Report notes that they are worsening quickly.[53] The government controls formal media and closely monitors and targets perceived dissidents within the artistic community, mainstream artists, and media figures who express independent or critical views.[54] GOC frequently blocks access to many news websites and blogs and has repeatedly imposed targeted restrictions on critics' access to cellphone data.[55]

Cuba's deteriorating economic conditions and political repression continue to increasingly drive Cubans out of their country. As a result, many have taken dangerous journeys, including through maritime means, often costing their lives at sea and on land while trying to reach the United States.

ii. Return Limitations

Due to the global COVID–19 pandemic, the GOC stopped accepting regular returns of their nationals via U.S. Immigration and Customs Enforcement (ICE) aircraft after February 28, 2020. The U.S. Government has been engaged in discussions with the GOC to reactivate the Migration Accords, which specify that the United States will process 20,000 Cuban nationals—not including immediate relatives of U.S. citizens—to come to the United States through immigrant visas and other lawful pathways, such as the Cuban Family Reunification Parole (CFRP) program, and that the Cuban government will accept the repatriation of its nationals who are encountered entering the United States without authorization. A limited number of removal flights will not, absent other efforts, impose a deterrent to Cuban nationals seeking to cross, unauthorized, into the United States.

crsreports.congress.gov/product/pdf/R/R47246 (last visited Dec. 17, 2022).

[35] Caribbean Council, *Gil Says Economic Recovery Gradual, Inflation Must Be Better Addressed,* Cuba Briefing, July 25, 2022, *https://www.caribbean-council.org/gil-says-economic-recovery-gradual-inflation-must-be-better-addressed/* (last visited Sept. 25, 2022).

[36] Washington Post, *In Cuba, a Frantic Search for Milk,* May 21, 2022, *https://www.washingtonpost.com/world/interactive/2022/cuba-economy-milk-shortage/* (last visited Sept. 25, 2022).

[37] New York Times, *'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future,* Dec. 10, 2022. *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html* (last visited Dec. 16, 2022).

[38] *Id.*

[39] U.S. Department of State, *2021 Country Reports on Human Rights Practices: Cuba, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/cuba/* (last visited Dec. 17, 2022).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Congressional Research Service, Cuba: U.S. Policy Overview, Aug. 5, 2022, *https://*

crsreports.congress.gov/product/pdf/IF/IF10045 (last visited Dec. 17, 2022).

[44] *Id.*

[45] *Id.*

[46] Human Rights Watch, Prison or Exile: Cuba's Systematic Repression of July 2021 Demonstrators, July 11, 2022. *https://www.hrw.org/report/2022/07/11/prison-or-exile/cubas-systematic-repression-july-2021-demonstrators.*

[47] *Id.*

[48] Human Rights Watch, World Report 2022—Cuba. See *https://www.hrw.org/world-report/2022/country-chapters/cuba.*

[49] Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian blackouts, *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/.*

[50] Miami Herald, *As Cubans Demand Freedom, President Díaz-Canel Says He Will Not Tolerate 'Illegitimate' Protests,* October 2, 2022, *https://www.miamiherald.com/news/nation-world/world/americas/cuba/article266767916.html* (last visited Dec. 17, 2022).

[51] Amnesty International, *Cuba: Tactics of Repression Must Not be Repeated,* Oct. 5, 2022, *https://www.amnesty.org/en/latest/news/2022/10/cuba-repression-must-not-be-repeated/* (last viewed Dec. 19, 2022).

[52] IACHR, Annual Report 2021—Chapter IV.B—Cuba, p.678, June 2, 2022, *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021* (last visited Dec. 19, 2022).

[53] *Id.*

[54] *Id.*

[55] *Id.*

As a result, the U.S. did not return any Cuban nationals directly to Cuba in FY 2022. In addition, other countries, including Mexico, have generally refused to accept the returns of Cuban nationals, with limited exceptions including Cubans who have immediate family members who are Mexican citizens or who otherwise have legal status in Mexico. In FY 2022, DHS expelled 4,710 Cuban nationals to Mexico, equivalent to 2 percent of Cuban encounters for the year.[56]

Like the Venezuela process, the Cuba process will require a significant expansion of opportunities for return or removal, to include the GOM's acceptance of Cuban nationals encountered attempting to irregularly enter the United States without authorization between POEs.

Returns alone, however, are not sufficient to reduce and divert the flows of Cubans. The United States will combine a consequence for Cuban nationals who seek to enter the United States irregularly at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

### 4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Cuban nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations

that were designated for SWB enforcement and processing capacities.[57]

The impact has been particularly acute in certain border sectors. The increased flows of Cuban nationals are disproportionately occurring within the remote Del Rio and Yuma sectors, both of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 73 percent of unique encounters of Cuban nationals occurred in these two sectors.[58] Thus far in FY 2023, Del Rio and Yuma sectors have accounted for 72 percent of unique encounters of Cuban nationals.[59] In FY 2022, Del Rio and Yuma sectors encountered over double (137 percent increase) the number of migrants as compared to FY 2021, a fifteen-fold increase over the average for FY 2014–FY 2019, in part as a result of the sharp increase in Cuban nationals being encountered there.[60]

The focused increase in encounters within those two sectors is particularly challenging. Del Rio sector is geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering irregularly, it has limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[61]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove noncitizens in its custody by sending the message that there is no consequence for illegal entry.

The sharp increase in maritime migration has also had a substantial impact on DHS resources. USCG has surged resources and shifted assets from other missions due to this increased irregular maritime migration. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[62] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. For example, between July 2021 and August 2022, Coast Guard operational planners surged three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States. USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[63] Moreover, USCG had to almost double its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Cuban nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly

---

[56] OIS analysis of OIS Persist Dataset and CBP subject-level data through November 30, 2022.

[57] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[58] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[59] *Id.*

[60] *Id.*

[61] Data from SBCC, as of December 11, 2022.

[62] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum for the Secretary from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[63] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

process and, as appropriate, return or remove those who do not have a lawful basis to stay, or repatriate those encountered at sea while also delivering on other maritime missions.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [64] Parole is not an admission of the individual to the United States, and a parolee remains an ''applicant for admission'' during the period of parole in the United States.[65] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[66] DHS may terminate parole in its discretion at any time.[67] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[68]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Cuban nationals to remain where they are and use a lawful process to request authorization to travel to air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens ''into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'' [69]

### A. Significant Public Benefit

The parole of Cuban nationals and their immediate family members under this process—which imposes new consequences for Cubans who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Cuban nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Cuban nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Cuba; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhance Border Security by Reducing Irregular Migration of Cuban Nationals

As described above, Cuban nationals make up a significant and growing number of those encountered seeking to cross between POEs irregularly. DHS assesses that without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Cubans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Cuban individuals along the SWB and at sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Cuban nationals who voluntarily depart the United States, those who voluntarily withdraw their applications for admission, and those subject to expedited removal who cannot be removed to Cuba or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Cuban nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Cuban parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes before they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Cuban nationals encountered at sea or at the SWB, and channeling decreased flows of Cuban nationals to interior POEs, we anticipate that the process could relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a

---

[64] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for ''[e]stablishing and administering rules . . . governing . . . parole''). Cubans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[65] INA sec. 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[66] *See* 8 CFR 212.5(c).

[67] *See* 8 CFR 212.5(e).

[68] *See* 8 CFR 274a.12(c)(11).

[69] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

001100

case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Cubans who seek to enter the United States by sea, and will allow USCG to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Cuban nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Cuban nationals in substantial numbers, DHS is currently conditionally releasing 87 percent of the Cuban nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Cuban nationals accounted for 23 percent of all encounters released at the border in November 2022.[70] The increased volume of provisional releases of Cuban nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Cuban nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and

constructing tent shelters to address the increased need.[71] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[72] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[73] Since Cuban nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Cuban nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of migrants arriving at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

### 5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a

key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[74]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[75] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[76] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[77] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[78] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[79] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[80] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[81] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area,

---

[70] OIS analysis of CBP subject-level data and OIS Persist Dataset based on data through November 30, 2022.

[71] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States*, Sept. 21, 2022, *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office*.

[72] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave*, Apr. 27, 2022, *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/*.

[73] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, Sept. 23, 2022, *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day*.

[74] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[77] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[79] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream*.

[80] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[81] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[82]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.[83]

The increase in migrants taking to sea, under dangerous conditions, has led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the Coast Guard located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel, who were not in the vicinity of the capsized vessel and survivor.[84] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants; the others were presumed lost at sea.[85]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human-smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures— including the largest-ever surge of resources against human-smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[86]

**6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere**

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[87] the Collaborative Migration Management Strategy (CMMS);[88] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[89] The CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[90] The L.A. Declaration specifically lays out the goal of collectively ''expand[ing] access to regular pathways for migrants and refugees.'' [91]

The U.S. Government has been working with the GOC to restart the Cuba Migration Accords. On November 15, 2022, U.S. and Cuban officials met in Havana to discuss the implementation of the Accords and to underscore our commitment to pursuing safe, regular, and humane migration between Cuba and the United States.[92] These Migration Talks provide an opportunity for important discussions on mutual compliance with the Migration Accords—composed of a series of binding bilateral agreements between the United States and Cuba signed in 1984, 1994, 1995, and 2017— which establish certain commitments of the United States and Cuba relating to safe, legal, and orderly migration.

In September 2022, the U.S. Government announced the resumption of operations under the CFRP program, which allows certain beneficiaries of family-based immigrant petitions to seek parole into the United States while waiting for a visa number to become available. Beginning in early 2023, U.S. Embassy Havana will resume full immigrant visa processing for the first time since 2017, which will, over time, increase the pool of noncitizens eligible for CFRP.[93] Approved beneficiaries through this process will enter the United States as parolees but will be eligible to apply for adjustment to lawful permanent resident (LPR) status once their immigrant visas become available. Also during this period, Cubans may be eligible to apply for lawful permanent residence under the Cuban Adjustment Act.[94]

While these efforts represent important progress for certain Cubans who are the beneficiaries of a family-based immigrant petition, CFRP's narrow eligibility, challenges faced

[82] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[83] Email from U.S. Coast Guard to DHS Policy, Re: heads up on assistance needed, Dec. 13, 2022.

[84] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019.*

[85] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239.*

[86] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42, Dec. 13, 2022, *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42* (last visited Dec. 18, 2022).

[87] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[88] National Security Council, *Collaborative Migration Management Strategy,* July 2021, *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email#utm_source=govdelivery.*

[89] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration), June 2022, *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[90] *Id.*

[91] *Id.*

[92] Department of State, *Migration Talks with the Government of Cuba,* Nov. 15, 2022; *https://www.state.gov/migration-talks-with-the-government-of-cuba-2/.*

[93] USCIS, *USCIS Resumes Cuban Family Reunification Parole Program Operations, https://www.uscis.gov/newsroom/alerts/uscis-resumes-cuban-family-reunification-parole-program-operations,* Sept. 9, 2022 (last visited Dec. 10, 2022).

[94] Public Law 89–732, Cuban Adjustment Act of 1966 (CAA), Nov. 2, 1966, *https://www.gpo.gov/fdsys/pkg/STATUTE-80/pdf/STATUTE-80-Pg1161.pdf* (last viewed Dec. 16, 2022).

operating in Cuba, and more modest processing throughput mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process helps achieve these goals by providing an immediate and temporary orderly process for Cuban nationals to lawfully enter the United States while we work to improve conditions in Cuba and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico, Honduras, Guatemala, and Costa Rica—are affected by the increased movement of Cuban nationals and have been seeking greater U.S. action to address these challenging flows for some time. Cuban flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Cuba will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Cuban nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United

States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to U.S. actions in this regard, and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Cuban nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more immigration and refugee pathways in the region, including to the United States.

*B. Urgent Humanitarian Reasons*

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba. The GOC continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions.[95] This process provides a safe mechanism for Cuban nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

*A. Supporters*

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Cuban national and, if applicable, the national's immediate

family members.[96] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

*B. Beneficiaries*

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Cuba or be a non-Cuban immediate family member [97] and traveling with a Cuban principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

---

[95] *Id.;* Congressional Research Service, Cuba: U.S. Policy in the 117th Congress, Sept. 22, 2022, *https://crsreports.congress.gov/product/pdf/R/R47246.*

[96] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[97] Certain non-Cubans may use this process if they are an immediate family member of a Cuban beneficiary and traveling with that Cuban beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Cuban national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Cuba, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[98]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[99]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023, except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[100]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements

for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

*C. Processing Steps*

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Cubans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United

States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to an interior POE of the United States.[101] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization under existing regulations. Individuals may request employment authorization from USCIS. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

---

[98] This limitation does not apply to immediate family members traveling with a Cuban national.

[99] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[100] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

[101] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Cubans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Nicaraguans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[102] *i.e.*, a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [103] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[104] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [105] In addition, although the text of the Administrative Procedure Act

does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[106] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Cuban nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Cuban nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Cuban nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to this independent U.S. action and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Cuban nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Cuba to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the

implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[107] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[108]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[109] The numbers of Cubans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge, and would miss a critical opportunity to reduce and divert the flow of irregular migration.[110]

Undertaking notice-and-comment rulemaking procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Cuban nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[111] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment

---

[102] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[103] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[104] 5 U.S.C. 553(a)(1).

[105] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[106] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[107] *See* 82 FR 4902 (Jan. 17, 2017).

[108] *See* 87 FR 63507 (Oct. 19, 2022).

[109] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[110] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the 'very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[111] *See* 5 U.S.C. 553(b)(B).

process.[112] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[113] A number of cases follow this logic in the context of economic regulation.[114]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[115] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Cuban nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[116] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[117] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations."[118] DHS concluded that "a surge could result in significant loss of human life."[119]

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Cuban parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Cuban nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP

---

[112] See, e.g., Mack Trucks, Inc. v. EPA, 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); DeRieux v. Five Smiths, Inc., 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[113] See, e.g., Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[114] See, e.g., Chamber of Commerce of U.S. v. SEC., 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[115] See, e.g., Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media, July 26, 2022 (last viewed Dec. 6, 2022).

[116] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[117] Id.

[118] Id.

[119] Id.; accord, e.g., Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

## DEPARTMENT OF HOMELAND SECURITY

## Implementation of Changes to the Parole Process for Venezuelans

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into

a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### I. Background—Venezuelan Parole Process

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

### Eligibility To Participate in the Process

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

### II. Assessment of Venezuela Parole Process to Date

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

include: (1) remarks from the administration and CISA leadership on salient NS/EP and cybersecurity efforts; (2) a status update on the NSTAC Addressing the Misuse of Domestic Infrastructure by Foreign Malicious Actors Subcommittee; and (3) a deliberation and vote on the *NSTAC Report to the President on a Strategy for Increasing Trust in the Information and Communications Technology and Services Ecosystem.*

Dated: January 3, 2023.

**Christina Berger,**

*Designated Federal Officer, NSTAC, Cybersecurity and Infrastructure Security Agency, Department of Homeland Security.*

[FR Doc. 2023–00181 Filed 1–6–23; 8:45 am]

**BILLING CODE 9110–9P–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of a Parole Process for Haitians**

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to respond to and protect against a significant increase in the number of Haitian nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by irregular migration. Haitians who do not avail themselves of this process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Haitian nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Haitian Parole Process**

This notice describes the implementation of a new parole process for certain Haitian nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

*A. Overview*

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations as well as their facilitators and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to and arriving, without authorization, at the SWB.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior points of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) made an independent decision for the first time to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 a day to under 200 a day, and as of the week ending December 4, to an average of 86 a day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Haitian Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_*

Continued

DHS anticipates that implementing a similar process for Haitians will reduce the number of Haitians seeking to irregularly enter the United States between POEs along the SWB or by sea by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process.

Instituting a similar process for Haitians is critical to responding to and protecting against a significant increase of irregular migration by Haitians to the United States via dangerous routes that pose serious risks to migrants' lives and safety. At the end of FY 2021, DHS experienced a focused surge in Haitian migration in the Del Rio sector of the border that strained its capacity to process individuals in a timely manner, necessitating an all-of-government response. In FY 2022, DHS encounters of Haitians at the SWB increased to unprecedented levels, with 48,697 unique encounters, as compared to the annual average of 3,242 unique encounters for FY 2014 to FY 2019.[6] In addition, the number of Haitian nationals entering Panama through the Darién Gap has been steadily increasing in recent months—something that has been a key predictor of migrant movement towards the SWB in the past, including with nationals of Venezuela a few months ago. Haitians represented the third highest nationality encountered in the Darién Gap between January and November 2022, at 16,933 encounters, and the number of Haitian encounters in Panama doubled between September and November 2022.[7]

Haitian migrants are also increasingly taking to the sea in makeshift boats. Maritime migration from Haiti also increased sharply in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[8] While attempted irregular entry of Haitians between POEs has waned since June 2022, DHS assesses that this trend could

quickly shift again, given the prevalence of displaced Haitian communities gathered in Mexico and the increasing volume of Haitians traversing the Darién Gap on their way north.

DHS anticipates that instituting a Venezuela-like process for nationals of Haiti will reduce the irregular migration of Haitians in the hemisphere, disincentivize Haitians in northern Mexico from seeking to enter along the SWB of the United States without authorization, and reduce dangerous attempts to travel to the United States by sea. This will be accomplished by coupling a meaningful incentive to seek a safe, orderly means of traveling by air to interior ports of entry in the United States with the imposition of consequences for those who seek to enter without authorization between POEs along the SWB. Individuals can access this lawful process from safe locations in Haiti or in third countries. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Haitians is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Haitian national (and certain non-Haitian nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Haitian nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the

region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region. These strategies will support efforts to stabilize conditions in Haiti, thus diminishing the push factors and enabling more regular removals of those Haitians who nonetheless enter the United States or partner nations unauthorized and who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefits during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Haitian nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that have displaced hundreds of thousands of Haitians throughout the Western Hemisphere, to include concurrent health, economic, and political crises. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the process at any point.

## B. Conditions at the Border

### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the

---

%20DARI%C3%89N_NOVIEMBRE_2022.pdf (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[7] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf, (last viewed Dec. 11, 2022).

[8] OIS analysis of United States Coast Guard (USCG) data provided October, 2022; Maritime Interdiction Data from USCG, October 5, 2022.

SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[9] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, an average of 86 per day.[10]

Panama's daily encounters of Venezuelans also declined significantly, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[11]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap have returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[12] Other migrants who were about to enter the Darién Gap have turned around and headed back south.[13] Still others who were intending to migrate north are staying where they are to apply for this parole process.[14] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

**2. Trends and Flows: Increase of Haitian Nationals Arriving at the Southwest Border**

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[15] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[16] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[17]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[18] Beginning in the 2010s, a growing share of migrants have come from Northern Central America [19] (NCA) and, since the late 2010s, from countries throughout the Americas.[20] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[21]

*C. Trends in Haitian Migration*

1. Migration by Land

Since 2019, increasing numbers of Haitians have sought to enter the United States at the land border. In FY 2019, DHS encountered just 3,039 Haitian nationals at the SWB.[22] This number grew to 4,431 unique encounters in FY 2020, and then sharply increased by 881 percent to 43,484 unique encounters in FY 2021.[23]

In September 2021, the U.S. experienced a mass migration event involving approximately 15,000 Haitians crossing into Del Rio, Texas, within a matter of days. The group included many thousands who had left Haiti years before, spent time living and working in countries like Chile and Brazil, and then traveled up to our border through Panama.[24] This led to thousands of Haitian nationals living in a makeshift camp under a bridge in Del Rio and placed immense strain on U.S. government resources that were employed to respond to the event.

Unique encounters of Haitian nationals at the SWB continued to increase in FY 2022 to 48,697, with a peak of 9,753 unique encounters in a single month in May 2022.[25] While encounters of Haitian migrants at our border have declined since June 2022, the Government of Panama, which tracks irregular migration through the Darién Gap, has observed a surge in

[9] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[10] Office of Immigration Statistics (OIS) analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[11] Servicio Nacional de Migración de Panamá, *Irregulares en Tránsito Frontera Panamá-Colombia 2022*, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[12] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama*, *https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[13] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route*, *https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[14] Axios, *Biden's new border policy throws Venezuelan migrants into limbo*, *https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7 2022 (last viewed Dec. 8, 2022).

[15] OIS analysis of historic CBP data.

[16] *Id.*

[17] *Id.*

[18] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. OIS Yearbook of Immigration Statistics, various years. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[19] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[20] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[21] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[22] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[23] *Id.*

[24] The Texan, *Many Haitian Nationals Came From Chile and Brazil Before Heading to Del Rio*, Oct. 7, 2021, *https://thetexan.news/many-haitian-nationals-came-from-chile-and-brazil-before-heading-to-del-rio/*.

[25] CBP, Nationwide Encounters, *https://www.cbp.gov/newsroom/stats/nationwide-encounters*, (last visited, Dec. 17, 2022; OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

land-based encounters of Haitian nationals migrating north in recent months. Encounters of Haitian nationals in Panama jumped from 1,021 in July 2022, to 2,170 in September, to 4,607 in November.[26]

Those numbers are rising at a time when Haitians are already concentrated in Mexico. UNHCR estimates that there were 62,680 Haitians in Mexico in 2022 and projects that this population will grow to 104,541 in 2023.[27] From October 2021 to October 2022, approximately 55,429 Haitian nationals were granted 12-month temporary humanitarian visitor status in Mexico, the highest of any nationality and almost twice as many as the second-highest nationality.[28] Some Haitians migrating north have sought asylum in Mexico—a number that peaked in 2021—and may be planning to settle there permanently.[29] However, DHS assesses that many thousands of Haitians are waiting in Mexico with the ultimate goal of entering the United States, with many reporting they are waiting until the Centers for Disease Control and Prevention (CDC) Title 42 Order is lifted.

2. Migration by Sea

Increasing numbers of Haitian migrants also continue to attempt migration to the United States via maritime routes, often endangering their own lives in precarious and unseaworthy vessels. Maritime migration from Haiti more than tripled in FY 2022, with a total of 4,025 Haitian nationals interdicted at sea compared to 1,205 in FY 2021 and 398 in FY 2020.[30]

The southeast coastal border sectors also have seen increases in unique encounters of Haitian nationals who arrived in the United States by sea.[31] In FY 2021, those sectors encountered 593 unique Haitian nationals, a 411 percent increase compared to 116 in FY 2020.[32]

In FY 2022, unique encounters of Haitian nationals in coastal sectors tripled from FY 2021 to 1,788—composing 31 percent of total unique encounters by USBP in the southeast coastal sectors.[33]

3. Push and Pull Factors

DHS assesses that the high number of Haitian nationals encountered at the land border and interdicted at sea is driven primarily by two key factors: First, the displacement of Haitians throughout the Western Hemisphere caused by years of political, health, and economic crises, as well as the explosion of gang violence in Haiti—exacerbated by events that took place in the summer of 2021—are causing thousands to leave the country. Second, the precarious security situation in Haiti is having an impact on DHS's ability to remove Haitian nationals who do not establish a legal basis to remain in the United States; absent such an ability, more individuals may be willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Haiti

In recent years, Haiti has experienced a series of events, including natural disasters, economic stagnation, pervasive hunger, gang violence, and political assassinations that have devastated the country. This has led tens of thousands of Haitians to lose hope and attempt to migrate.[34]

On August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure.[35] Just days later, Tropical Storm Grace hit Haiti, with heavy downpours hampering the continuing rescue efforts for those impacted by the earthquake.[36] Within a month, over 650,000 Haitians required humanitarian assistance, including 260,000 children.[37] The World Bank estimates

that the August 2021 earthquake caused damages and losses in excess of more than $1.6 billion, roughly 11 percent of GDP.[38]

Amidst the political, security, and environmental crises, Haiti's economy has collapsed. Even before the events of 2021, Haiti already stood as the poorest country in the Americas and one of the poorest in the world.[39] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean region, ranking 170 out of 189 on the UN's Human Development Index.[40] The situation has deteriorated to such a point that the Haitian Government itself, on October 7, 2022, asked for international military assistance to help address the converging crises.[41]

In addition to the economic turmoil the island has confronted, the security situation in Haiti has been problematic for some time. Violence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse.[42] The President's death exacerbated political instability on the island, undermining state institutions and generating a power vacuum that has been occupied by gangs. Between January and June 2022, gangs have carried out approximately 930 killings, 680 injuries, and 680 kidnappings in Port-au-Prince alone, with more than 1,200 kidnappings occurring in 2021, almost twice the number reported in 2020 and five times more than in 2019.[43] This recent surge in gang

[26] Servicio Nacional de Migración de Panamá, *Irregulares Por Darien*, November 2022.

[27] UNHCR Global Focus, *Mexico*, See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[28] OIS analysis of *Instituto Nacional de Migracion* data.

[29] Estadísticas Comisión Mexicana de Ayuda a Refugiados, *Mexico Commission for Assistance of Refugee data show that about 6,000 Haitians applied for asylum in Mexico in 2020, 50,000 in 2021, and nearly 16,000 in 2022 (through November), https://www.gob.mx/cms/uploads/attachment/file/783226/Cierre_Noviembre-2022__1-Dic._.pdf,* (last visited Dec. 17, 2022).

[30] OIS analysis of United States Coast Guard (USCG) data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[31] Includes Miami, FL; New Orleans, LA; and Ramey, PR sectors where all apprehensions are land apprehensions not maritime.

[32] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[33] *Id.*

[34] Diana Roy, Council on Foreign Relations, *Ten Graphics That Explain the U.S. Struggle With Migrant Flows in 2022* (Dec. 1, 2022). *https://www.cfr.org/article/ten-graphics-explain-us-struggle-migrant-flows-2022.*

[35] UNICEF, *Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families, https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti* (last viewed Dec. 12, 2022).

[36] The Washington Post, *Tropical Depression Grace Drenching Haiti Days After Major Earthquake,* Aug. 16, 2021, *https://www.washingtonpost.com/weather/2021/08/16/tropical-depression-grace-haiti-flooding/,* (last viewed Dec. 19, 2022).

[37] UNICEF, *One Month After Haiti Earthquake: 260,000 Children Still Need Humanitarian Assistance,* Sept. 15, 20221, *https://www.unicef.org.uk/press-releases/one-month-after-*

[38] *haiti-earthquake-260000-children-still-need-humanitarian-assistance-unicef/,* (last visited Dec. 19, 2022).

[38] The World Bank, *Haiti Overview,* Updated Nov. 8, 2022, *https://www.worldbank.org/en/country/haiti/overview#:~:text=The%20results%20of%20the%20assessment%20of%20the%20effects,in%20damage%20and%20losses%2C%20or%2011%25%20of%20GDP,* (last visited Dec. 19, 2022).

[39] *Id.*

[40] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living.

[41] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html* (last viewed Dec. 17, 2022).

[42] Catherine Porter, Michael Crowley, and Constant Méheut, The New York Times, *Haiti's President Assassinated in Nighttime Raid, Shaking a Fragile Nation* (July 7, 2021). *https://www.nytimes.com/2021/07/07/world/americas/haiti-president-assassinated-killed.html.*

[43] *See* International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists* (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists;* Office of the High Commissioner for Human Rights, *Sexual violence in Port-au-Prince: A weapon used by gangs to instill*

violence has destroyed infrastructure and caused businesses to close, leaving Haitians struggling to find basic products including food, water, and medicines.[44] Armed clashes with gangs have destroyed water networks, severely restricting access to potable drinking water and further hampering the attempts to control a cholera outbreak that, as of November 15, 2022, had caused 8,146 hospitalizations and 188 deaths.[45]

The situation has deteriorated to such a point that the Haitian Government, on October 7, 2022, asked for international military assistance to help address the converging crises.[46]

Over the past two years, many of the Haitian nationals encountered at our SWB actually left Haiti for opportunities in South America many years before.[47] This Haitian diaspora in South America developed after the January 2010 earthquake in Haiti that killed more than 217,000 and displaced more than 1.5 million people. Many migrated to Brazil, which offered employment opportunities, humanitarian protection, and support from large and growing Haitian diaspora communities.[48] Others migrated to Chile, where Haitian nationals could, until 2020, enter visa-free. As of 2020, there were an estimated 143,000 Haitians living in Brazil and 180,000 in Chile.[49] However, over the past two years, declining economic conditions in Chile and Brazil, which were exacerbated by the COVID–19 pandemic, have led many Haitian migrants to leave those countries to head north.[50]

As noted above, UNHCR estimates 62,680 Haitians were in Mexico in 2022, and projects that this population will grow to 104,541 in 2023.[51] Many thousands more are between Mexico and South America.

### ii. Return Limitations

While the Government of Haiti generally accepts repatriations, gang activity and conditions in the country have created significant instability, at times curtailing DHS's ability to repatriate Haitians, either by air or maritime repatriations by sea. For example, in early September 2022, destabilizing events, including gangs seizing control of a key fuel terminal, led to a pause in repatriation flights. The ability of our on-the-ground partners to help receive migrants that provide services for individuals returned to Haiti is evaluated on a day-to-day basis.[52] The ability to conduct returns is tenuous, and not something that can be counted on at scale should large numbers of Haitian nationals once again start crossing our SWB.

The maritime environment is similarly affected by the limitation on returns. Even a temporary inability of DHS to repatriate Haitians interdicted at sea could have a cascading effect on U.S. Government resources. U.S. Coast Guard (USCG) uses its vessels to conduct direct repatriations, yet these have limited capacity to hold migrants; they cannot continue to hold migrants for extended periods of time if repatriations are not possible.

### 4. Impact on DHS Resources and Operations

#### i. Impact on DHS Resources

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Haitian nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021, DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. CBP and ICE detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[53]

#### ii. Impact on Border Operations

The impact has been particularly acute in certain border sectors. In FY 2021, 81 percent of unique Haitians encountered occurred in the Del Rio sector.[54] In FY 2022, flows shifted disproportionately to the El Paso and Yuma sectors, which accounted for 82 percent of unique encounters in that year, while Del Rio fell to 13 percent.[55] All three sectors remain at risk of operating, or are currently operating, over capacity.[56] In FY 2022, El Paso and Yuma sector encounters increased by 161 percent, a seven-fold increase over the average for FY 2014–FY 2019, in part as a result of the increases in Haitian nationals being encountered there.[57]

The focused increase in encounters within those three sectors is particularly challenging. Yuma and Del Rio sectors are geographically remote, and because—up until the past two years—they have not been a focal point for large numbers of individuals entering irregularly, have limited infrastructure and personnel in place to safely process the elevated encounters that they are seeing. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such

*fear* (Oct. 14, 2022), *https://www.ohchr.org/en/documents/country-reports/sexual-violence-port-au-prince-weapon-used-gangs-instill-fear.* Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[44] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[45] Pan American Health Organization, *Cholera Outbreak in Hispaniola Situation Report #6* (Nov. 17, 2022), *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[46] CNN, *Haiti government asks for international military assistance,* Oct. 7, 2022, *https://www.cnn.com/2022/10/07/americas/haiti-international-military-assistance-humanitarian-crisis-intl/index.html,* (last viewed Dec. 17, 2022).

[47] Migration Policy Institute, *Haitian Migration through the Americas: A Decade in the Making,* (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas;* Council on Foreign Relations, *Why Are Haitian Migrants Gathering at the U.S. Border?* October 1, 2021, *https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border,* (last visited Dec. 19, 2022).

[48] *Id.*

[49] Migration Policy Institute, *Chile's Retooled Migration Law Offers More Restrictions, Less Welcome,* (May 2021), *https://www.migrationportal.org/insight/chiles-retooled-migration-law-offers-more-restrictions-less-welcome/,* (last visited Dec. 19, 2022).

[50] *Id.* Migration Policy Institute.

[51] UNHCR Global Focus, *Mexico,* See countries of origin data for 2022 and 2023, *https://reporting.unhcr.org/mexico?year=2022.*

[52] International Organization for Migration, *IOM condemns violence and looting of humanitarian supplies in Haiti* (Sept. 24, 2022). *https://haiti.iom.int/news/iom-condemns-violence-and-looting-humanitarian-supplies-haiti.*

[53] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness,* Apr. 26, 2022, *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf.*

[54] OIS analysis of OIS Persist Dataset based on data through November 30, 2022.

[55] *Id.*

[56] OIS analysis of data pulled from CBP UIP December 7, 2022.

[57] *Id.*

as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, USBP sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[58]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources.

iii. Impact on Maritime Operations

In FY 2022, interdictions of Haitians surged to 4,025, compared to just 824 interdictions at sea in FY 2019.[59] While these numbers are significantly smaller than those encountered at the land border, they are high for the maritime environment where the safety risk is particularly acute.

Responding to this increase requires significant resources. In response to the persistently elevated levels of irregular maritime migration across all southeast vectors, the Director of Homeland Security Task Force-Southeast (HSTF–SE) elevated the operational phase of DHS's maritime mass migration plan (Operation Vigilant Sentry) from Phase 1A (Preparation) to Phase 1B (Prevention).[60] Operation Vigilant Sentry is HSTF–SE's comprehensive, integrated, national operational plan for a rapid, effective, and unified response of federal, state, and local capabilities in response to indicators and/or warnings of a mass migration in the Caribbean.

The shift to Phase 1B triggered the surge of additional DHS resources to support HSTF–SE's Unified Command staff and operational rhythm. Between July 2021 and December 2022, Coast Guard deployed three times the number of large cutters to the South Florida Straits and the Windward Passage, four times the number of patrol boats and twice the number of fixed/rotary-wing aircraft to support maritime domain awareness and interdiction operations in the southeastern maritime approaches to the United States.[61] USCG also added two MH–60 helicopters to respond to increased maritime migration flows in FY 2022.[62] USCG almost doubled its flight hour coverage per month to support migrant interdictions in FY 2022. Increased resource demands translate into increased maintenance on those high demand air and sea assets.

DHS assesses that a reduction in the flow of Haitian nationals arriving at the SWB or taking to sea would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

## II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [63] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[64] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[65] DHS may terminate parole in its discretion at any time.[66] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[67]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Haitian nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for discretionary grant of parole into, the United States for a period of up to two years.

## III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [68]

### A. Significant Public Benefit

The parole of Haitian nationals and their immediate family members under this process—which imposes new consequences for Haitians who seek to enter the United States irregularly between POEs, while providing an alternative opportunity for eligible Haitian nationals to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Haitian nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Haiti; (v) provide a disincentive to undergo the dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhance Border Security by Reducing Irregular Migration of Haitian Nationals

As described above, in FY 2022, Haitian nationals made up a significant and growing number of those encountered seeking to cross, unauthorized, into the United States by land or who are intercepted after taking to the sea. While the number of Haitian encounters at our land border have

---

[58] Data from SBCC, as of December 11, 2022.

[59] OIS analysis of USCG data provided October 2022; Maritime Interdiction Data from USCG, October 5, 2022.

[60] Operation Vigilant Sentry (OVS) Phase 1B, Information Memorandum from the Honorable from RADM Brendon C. McPherson, Director, Homeland Security Task Force—Southeast, August 21, 2022.

[61] Id.

[62] Joint DHS and DOD Brief on Mass Maritime Migration, August 2022.

[63] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 8 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Haitians paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[64] INA 101(a)(13)(B), 212(d)(5)(A), 8 U.S.C. 1101(a)(13)(B), 1182(d)(5)(A).

[65] See 8 CFR 212.5(c).

[66] See 8 CFR 212.5(e).

[67] See 8 CFR 274a.12(c)(11).

[68] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

001113

decreased in recent months, they could quickly rise again due to the conditions in Haiti, the significant number of Haitians present in Mexico, and the increasing number of Haitians crossing into Panama from South America.

By incentivizing individuals to seek a lawful, orderly means of traveling to the United States, while imposing consequences to irregular migration, DHS assesses that the new parole process will mitigate anticipated future surges of Haitians seeking to cross into the United States without authorization, whether by land or by sea. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives to travel in a lawful and orderly manner can meaningfully shift migration patterns in the region and to the SWB.

Implementation of the parole process is contingent on the GOM's independent decision to accept the return of Haitian nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Haiti or elsewhere. The ability to effectuate voluntary departures, withdrawals, and removals of Haitian nationals to Mexico will impose a consequence on irregular entry that may not exist should the security situation in Haiti continue to deteriorate to the extent that DHS cannot effectuate sufficient returns in a safe manner.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Haitian parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny them travel before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By mitigating an anticipated increase in encounters of Haitian nationals along the SWB as well as maritime interdictions, and channeling decreased flows of Haitian nationals to interior POEs, we anticipate the process will relieve some of the forecasted impact increased migratory flows could have on the DHS workforce, resources, and other missions.

In the Caribbean, DHS also has surged significant resources—mostly from USCG—to address the heightened rate of maritime encounters. Providing a safe and orderly alternative path is expected to also reduce the number of Haitians who seek to enter the United States by sea and will allow USCG, in particular, to better balance its other important missions, including its counter-drug smuggling operations, protection of living marine resources, support for shipping navigation, and a range of other critical international engagements.

In addition, permitting Haitian nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

### 4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Recent experience, including the Del Rio incident in August 2021, show that migratory surges can happen suddenly and quickly overwhelm U.S. government and partner resources. Given the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted. The Haiti process directly mitigates against such a surge—and the impact it would have on State and local governments and civil society stakeholders—by providing a substantial incentive for Haitians to use a lawful process to fly directly to the United States, and a significant consequence for those who do not.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have provided services and assistance to Haitian nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[69] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[70] and stakeholders in the border region have expressed concern that shelters will eventually reach full bed space capacity and not be able to host any new arrivals.[71] As Haitian nationals are amongst those being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Haitian nationals into an orderly and lawful process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide

[69] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office*.

[70] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/*.

[71] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day*.

basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[72]

In FY 2022, more than 750 migrants died attempting to enter the United States,[73] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[74] The approximate number of migrants rescued by CBP in FY 2022 (almost 19,000 rescues)[75] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[76] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[77] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[78] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of

death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[79] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey. Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs engaged in human smuggling prioritize profit over safety.[80]

Migrants who travel via sea also face perilous conditions, including at the hands of smugglers. Human smugglers continue to use unseaworthy, overcrowded vessels that are piloted by inexperienced mariners. These vessels often lack any safety equipment, including but not limited to: personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons. USCG and interagency consent-based interviews suggest that human-smuggling networks and migrants consider the attempts worth the risk.

The increase in migrants taking to sea, under dangerous conditions, has also led to devastating consequences. In FY 2022, the USCG recorded 107 noncitizen deaths, including presumed dead, as a result of irregular maritime migration. In January 2022, the USCG located a capsized vessel with a survivor clinging to the hull. USCG crews interviewed the survivor who indicated there were 34 others on the vessel who were not in the vicinity of

the capsized vessel and survivor.[81] The USCG conducted a multi-day air and surface search for the missing migrants, eventually recovering five deceased migrants, while the others were presumed lost at sea.[82] In November 2022, USCG and CBP rescued over 180 people from an overloaded boat that became disabled off the Florida Keys.[83] They pulled 18 Haitian migrants out of the sea after they became trapped in ocean currents while trying to swim to shore.[84]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey.

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[85] the Collaborative Migration Management Strategy (CMMS);[86] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[87] The

---

[72] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[73] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[74] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[75] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the US-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[76] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[77] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream*.

[78] DHS, CBP, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress.*

[79] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[80] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R*; Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X*.

[81] Adriana Gomez Licon, Associated Press, Situation 'dire' as Coast Guard seeks 38 missing off Florida, Jan. 26, 2022, *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe0643047d0c3a3019*.

[82] Adriana Gomez Licon, Associated Press, Coast Guard suspends search for migrants off Florida, Jan. 27, 2022, *https://apnews.com/article/florida-lost-at-sea-79253e1c65cf5708f19a97b6875ae239*.

[83] Ashley Cox, CBS News CW44 Tampa, More than 180 people rescued from overloaded vessel in Florida Keys, Nov. 22, 2022, *https://www.cbsnews.com/tampa/news/more-than-180-people-rescued-from-overloaded-vessel-in-florida-keys/*.

[84] *Id.*

[85] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[86] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery*.

[87] *Id.*; The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[88] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."[89]

In June 2022, the U.S. Government announced the planned resumption of operations under the Haitian Family Reunification Parole (HFRP) program.[90] Approved HFRP beneficiaries enter the United States as parolees but are eligible to apply for lawful permanent residence (LPR) status once their immigrant visas become available. However, the security situation in Haiti makes it virtually impossible to resume the program in a timely manner and with enough resources to process meaningful numbers of beneficiaries. Furthermore, the Department of State temporarily reduced presence in Haiti due to the security situation, hampering its ability to process parents, spouses, and children of U.S. citizens and lawful permanent residents for more than 20,000 beneficiaries with immigrant visas currently available.

While HFRP and other efforts represent important progress for certain Haitians who are the beneficiaries of family-based immigrant petitions, HFRP's narrow eligibility criteria, coupled with the operational challenges posed by the security situation in Haiti and Department of State's limited family-based visa processing, result in modest processing throughput and mean that additional pathways are required to meet the current and acute border security and irregular migration mitigation objective. This new process will help achieve these goals by providing an immediate, temporary, and orderly process for Haitian nationals to lawfully enter the United States while

we work to improve conditions in Haiti and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries.

The process also will respond to an acute foreign policy need complementary to regional efforts. Many countries in the region are affected by the surge in migration of Haitian nationals, and some are eagerly seeking greater United States action to address these challenging flows. The Dominican Republic, which shares a border with Haiti, hosts thousands of Haitian migrants. Brazil and Chile, which had provided Haitians a legal pathway allowing them to reside there, saw Haitians leaving in very high numbers as a result of declining economic conditions, which were only exacerbated by the COVID–19 pandemic.[91] Peru, Ecuador, and Colombia have observed Haitian migrants who had been residing in South America for some time transiting their countries in order to reach the SWB. Panama has been particularly hard-hit by these migratory flows given its geographic location; additionally, the Darién Gap serves as a bottleneck and also creates a humanitarian challenge for the country as it seeks to provide shelter, medical care, food, and other services to migrants exiting the jungle.[92]

Along with the Venezuelan process, this new process will add to these efforts and enable the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regards to this population, as part of a regional response. Any effort to meaningfully address the crisis in Haiti will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to return or remove to

Mexico Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process— which is dependent on GOM's actions— will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter irregularly along the SWB. The goal of this process is to reduce the irregular migration of Haitian nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

### B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process also will address the urgent humanitarian needs of many Haitian nationals. As described above, escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak have worsened already concerning political, economic, and social conditions in Haiti.[93] This process provides a safe mechanism for Haitian nationals who

---

[88] Id.

[89] Id.

[90] White House, Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables (June 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.

[91] Council on Foreign Relations, Why Are Haitian Migrants Gathering at the U.S. Border? October 1, 2021, https://www.cfr.org/in-brief/why-are-haitian-migrants-gathering-us-border, (last visited Dec. 19, 2022).

[92] Reuters, Thousands of mostly Haitian Migrants Traverse Panama on Way to United States, Sept. 26, 2021, https://www.reuters.com/world/americas/thousands-mostly-haitian-migrants-traverse-panama-way-united-states-2021-09-26/, (last viewed Dec. 19, 2021).

[93] Congressional Research Service, Haiti: Political Conflict and U.S. Policy Overview (Aug. 2, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12182.

seek to enter the United States for urgent humanitarian reasons without having to make a dangerous journey by land or sea.

## IV. Eligibility

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Haitian national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek a discretionary grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Haiti or be a non-Haitian immediate family member[81] and traveling with a Haitian principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Haitian national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Haiti, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[94]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with CDC, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

---

[94] This limitation does not apply to immediate family members traveling with a Haitian national.

## C. Processing Steps

### Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Haitians' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

### Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

### Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

### Step 4: Approval To Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel

via commercial air to an interior POE of the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

Step 5: Seeking Parole at the POE

Each individual arriving under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

*D. Scope, Termination, and No Private Rights*

The Secretary retains the sole discretion to terminate the Parole Process for Haitians at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Nicaraguans, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the

Federal Register) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[95] *i.e.,* a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [96] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[97] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function." [98] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[99] This rule satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Haitian nationals to enter the United States. The United States will only implement the

new parole process while able to return or remove Haitian nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Haitian nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Haitian nationals. That willingness could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Haiti to Mexico at a future date would likely result in a surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process would advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs

---

[95] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[96] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[97] 5 U.S.C. 553(a)(1).

[98] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[99] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

exemption because the change was central to ongoing negotiations between the two countries.[100] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[101]

*Third,* DHS assesses that there is good cause to find that the delay associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[102] The numbers of Haitians encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[103]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Haitian nationals seeking to enter the United States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[104] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[105] If, for example, advance notice of a coming price increase would immediately produce market

dislocations and lead to serious shortages, advance notice need not be given.[106] A number of cases follow this logic in the context of economic regulation.[107]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[108] For example, as detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in

response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo is likely to contribute to more Haitians attempting to enter irregularly either at the SWB or by sea, at a time when DHS has extremely limited options for processing, detaining, or quickly removing such migrants safely and in sufficient numbers. Inaction would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." [109] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." [110] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." [111] DHS concluded that "a surge could result in significant loss of human life." [112]

---

[100] *See* 82 FR 4902 (Jan. 17, 2017).

[101] *See* 87 FR 63507 (Oct. 19, 2022).

[102] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[103] *See Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[104] *See* 5 U.S.C. 553(b)(B).

[105] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[106] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[107] *See, e.g., Chamber of Commerce of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[108] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022, (last viewed Dec. 6, 2022).

[109] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[110] *Id.*

[111] *Id.*

[112] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

# DEPARTMENT OF HOMELAND SECURITY

## Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

## B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Haiti parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Haitian nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00255 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Nicaraguans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security of our Southwest Border (SWB) by reducing the number of encounters of Nicaraguan nationals crossing the border without authorization, as the U.S. Government continues to implement its broader, multi-pronged and regional strategy to address the challenges posed by a surge in migration. Nicaraguans who do not avail themselves of this new process, and instead enter the United States without authorization between ports of entry (POEs), generally are subject to removal—including to third countries, such as Mexico. As part of this effort, the U.S. Department of Homeland Security (DHS) is implementing a process—modeled on the successful Uniting for Ukraine (U4U) and Process for Venezuelans—for certain Nicaraguan nationals to lawfully enter the United States in a safe and orderly manner and be considered for a case-by-case determination of parole. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support for the duration of the beneficiary's parole period, pass national security and public safety vetting, and fly at their own expense to an interior POE, rather than entering at a land POE. Individuals are ineligible for this process if they have been ordered removed from the United States within the prior five years; have entered unauthorized into the United States between POEs, Mexico, or Panama after the date of this notice's publication, with an exception for individuals permitted a single instance of voluntary departure or withdrawal of their application for admission to still maintain their eligibility for this process; or are otherwise deemed not to merit a favorable exercise of discretion.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background—Nicaraguan Parole Process

This notice describes the implementation of a new parole process for certain Nicaraguan nationals, including the eligibility criteria and filing process. The parole process is intended to enhance border security by reducing the record levels of Nicaraguan nationals entering the United States between POEs, while also providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner.

The announcement of this new process followed detailed consideration of a wide range of relevant facts and alternatives, as reflected in the Secretary's decision memorandum dated December 22, 2022.[1] The complete reasons for the Secretary's decision are included in that memorandum. This **Federal Register** notice is intended to provide appropriate context and guidance for the public regarding the policy and relevant procedures associated with this policy.

### A. Overview

The U.S. Government is engaged in a multi-pronged, regional strategy to address the challenges posed by irregular migration.[2] This long-term strategy—a shared endeavor with partner nations—focuses on addressing the root causes of migration, which are currently fueling unprecedented levels of irregular migration, and creating safe, orderly, and humane processes for migrants seeking protection throughout the region. This includes domestic efforts to expand immigration processing capacity and multinational collaboration to prosecute migrant-smuggling and human-trafficking criminal organizations, as well as their facilitators, and money-laundering networks. While this strategy shows great promise, it will take time to fully implement. In the interim, the U.S. government needs to take immediate steps to provide safe, orderly, humane pathways for the large numbers of individuals seeking to enter the United States and to discourage such individuals from taking the dangerous journey to, and arriving without authorization at, the SWB.

---

[1] *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Parole Process for Certain Nicaraguan Nationals (Dec. 22, 2022).

[2] In this notice, irregular migration refers to the movement of people into another country without authorization.

**1256** **Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices

Building on the success of the successful Uniting for Ukraine (U4U) process and the Process for Venezuelans, DHS is implementing a similar process to address the increasing number of encounters of Nicaraguan nationals at the SWB, which have reached record levels over the past six months. Similar to Venezuela, Nicaragua has restricted DHS's ability to remove individuals to Nicaragua, which has constrained DHS's ability to respond to this surge.

In October 2022, DHS undertook a new effort to address the high number of Venezuelans encountered at the SWB.[3] Specifically, DHS provided a new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by flying to interior ports of entry—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the Government of Mexico (GOM) for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, thus imposing a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced Parole Process. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and, as of the week ending December 4, to an average of 86 per day.[4] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in irregular migration of Venezuelans throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién Gap—an inhospitable jungle that spans between Panama and Colombia—was down from 40,593 in October 2022 to just 668 in November.[5]

DHS anticipates that implementing a similar process for Nicaraguans will reduce the number of Nicaraguans seeking to irregularly enter the United States between POEs along the SWB by coupling a meaningful incentive to seek a safe, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization pursuant to this process. Only those who meet specified criteria and pass national security and public safety vetting will be eligible for consideration for parole under this process. Implementation of the new parole process for Nicaraguans is contingent on the GOM accepting the return, departure, or removal to Mexico of Nicaraguan nationals seeking to enter the United States without authorization between POEs on the SWB.

As in the process for Venezuelans, a supporter in the United States must initiate the process on behalf of a Nicaraguan national (and certain non-Nicaraguan nationals who are an immediate family member of a primary beneficiary), and commit to providing the beneficiary financial support, as needed.

In addition to the supporter requirement, Nicaraguan nationals and their immediate family members must meet several eligibility criteria in order to be considered, on a case-by-case basis, for advance travel authorization and parole. Only those who meet all specified criteria are eligible to receive advance authorization to travel to the United States and be considered for a discretionary grant of parole, on a case-by-case basis, under this process. Beneficiaries must pass national security, public safety, and public health vetting prior to receiving a travel authorization, and those who are approved must arrange air travel at their own expense to seek entry at an interior POE.

A grant of parole under this process is for a temporary period of up to two years. During this two-year period, the United States will continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and allow for increased removals of Nicaraguans from both the United States and partner nations who continue to migrate irregularly but who lack a valid claim of asylum or other forms of protection. The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States. Those who are not granted asylum or any other immigration benefit during this two-year parole period generally will need to depart the United States prior to the expiration of their authorized parole period or will be placed in removal proceedings after the period of parole expires.

The temporary, case-by-case parole of qualifying Nicaraguan nationals pursuant to this process will provide a significant public benefit for the United States by reducing unauthorized entries along our SWB while also addressing the urgent humanitarian reasons that are driving hundreds of thousands of Nicaraguans to flee their home country, to include widespread and violent repression and human rights violations and abuses by the Ortega regime. Most significantly, DHS anticipates this process will: (i) enhance the security of the U.S. SWB by reducing irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) enhance border security and national security by vetting individuals prior to their arrival at a U.S. POE; (iii) reduce the strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) disincentivize a dangerous irregular journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

The Secretary retains the sole discretion to terminate the Nicaragua process at any point.

## B. Conditions at the Border

### 1. Impact of Venezuela Process

This process is modeled on the Venezuela process—as informed by the way that similar incentive and disincentive structures successfully decreased the number of Venezuelan nationals making the dangerous journey to and being encountered along the SWB. The Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use a safe, orderly process to come to the United States can change migratory flows. Prior to the October 12, 2022 announcement of the Venezuela process, DHS encountered approximately 1,100 Venezuelan nationals per day between POEs—with peak days exceeding 1,500.[6] Within a week of the announcement, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under

---

[3] Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[4] DHS Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[5] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20PDF_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

[6] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

001122

**Federal Register** / Vol. 88, No. 5 / Monday, January 9, 2023 / Notices  **1257**

200 per day, and as of the week ending December 4, an average of 86 per day.[7]

Panama's daily encounters of Venezuelans also declined significantly over the same time period, falling some 88 percent, from 4,399 on October 16 to 532 by the end of the month—a decline driven entirely by Venezuelan migrants' choosing not to make the dangerous journey through the Darién Gap. The number of Venezuelans attempting to enter Panama through the Darién Gap continued to decline precipitously in November—from 40,593 encounters in October, a daily average of 1,309, to just 668 in November, a daily average of just 22.[8]

The Venezuela process fundamentally changed the calculus for Venezuelan migrants. Venezuelan migrants who had already crossed the Darién Gap returned to Venezuela by the thousands on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[9] Other migrants who were about to enter the Darién Gap turned around and headed back south.[10] Still others who were intending to migrate north are staying where they are to apply for this parole process.[11] Put simply, the Venezuela process demonstrates that combining a clear and meaningful consequence for irregular entry along the SWB with a significant incentive for migrants to wait where they are and use this parole process to come to the United States can yield a meaningful change in migratory flows.

2. Trends and Flows: Increase of Nicaraguan Nationals Arriving at the Southwest Border

The last decades have yielded a dramatic increase in encounters at the SWB and a dramatic shift in the demographics of those encountered. Throughout the 1980s and into the first decade of the 2000s, encounters along the SWB routinely numbered in the millions per year.[12] By the early 2010s, three decades of investments in border security and strategy contributed to reduced border flows, with border encounters averaging fewer than 400,000 per year from 2011–2017.[13] However, these gains were subsequently reversed as border encounters more than doubled between 2017 and 2019, and—following a steep drop in the first months of the COVID–19 pandemic—continued to increase at a similar pace in 2021 and 2022.[14]

Shifts in demographics have also had a significant effect on migration flows. Border encounters in the 1980s and 1990s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[15] Beginning in the 2010s, a growing share of migrants have come from Northern Central America[16] (NCA) and, since the late 2010s, from countries throughout the Americas.[17] Migrant populations from these newer source countries have included large numbers of families and children, many of whom are traveling to escape violence, political oppression, and for other non-economic reasons.[18]

Historically, Nicaraguans migrated south to Costa Rica, resulting in relatively few Nicaraguan encounters at the SWB. Consistent with this trend, the number of Nicaraguans seeking asylum in Costa Rica has grown rapidly in recent years, putting immense pressure on the country's asylum system and causing many asylum seekers to wait years for an initial interview.[19] According to United Nations High Commissioner for Refugees (UNHCR), as of February 2022, "more Nicaraguans are currently seeking protection in Costa Rica than all the refugees and asylum seekers combined, during Central America's civil wars in the 1980s, when Costa Rica was a sanctuary for those fleeing violence."[20] The Government of Costa Rica recently announced its intention to regularize the status of more than 200,000 Nicaraguan migrants and asylum seekers providing them with access to jobs and healthcare as part of the process.[21]

Despite Costa Rica's efforts, increasing numbers of Nicaraguans are traveling north to the SWB due to renewed unrest in Nicaragua and the strained asylum system in Costa Rica. As a result, the United States and Mexico saw surges in migration from Nicaragua, with Nicaraguans claiming asylum in Mexico at three times the rate through October 31 of this year than the previous year and with a surge in migration having significantly contributed to the rising number of encounters at the SWB.[22] Unique encounters of Nicaraguan nationals increased throughout fiscal year (FY) 2021, totaling 47,300,[23] and increased further—and sharply—in FY 2022. DHS encountered an estimated 157,400 unique Nicaraguan nationals in FY 2022, which composed nine percent

---

[7] OIS analysis of data pulled from CBP UIP December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[8] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20POR_%20DARI%C3%89N_NOVIEMBRE_2022.pdf*, (last viewed Dec. 11, 2022).

[9] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/*, Nov. 9 2022 (last viewed Dec. 8, 2022).

[10] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html*, Oct. 14, 2022 (last viewed Dec. 8, 2022).

[11] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap*, Nov. 7, 2022 (last viewed Dec. 8, 2022).

[12] OIS analysis of historic CBP data.

[13] *Id.*

[14] *Id.*

[15] According to historic OIS Yearbooks of Immigration Statistics, Mexican nationals accounted for 96 to over 99 percent of apprehensions of persons entering without inspection between 1980 and 2000. On Mexican migrants from this era's demographics and economic motivations see Jorge Durand, Douglas S. Massey, and Emilio A. Parrado, "The New Era of Mexican Migration to the United States," *The Journal of American History* Vol. 86, No. 2 (Sept. 1999): 518–536.

[16] Northern Central America refers to El Salvador, Guatemala, and Honduras.

[17] According to OIS analysis of CBP data, Mexican nationals continued to account for 89 percent of total SWB encounters in FY 2010, with Northern Central Americans accounting for 8 percent and all other nationalities for 3 percent. Northern Central Americans' share of total encounters increased to 21 percent by FY 2012 and averaged 46 percent in FY 2014–FY 2019, the last full year before the start of the COVID–19 pandemic. All other countries accounted for an average of 5 percent of total SWB encounters in FY 2010–FY 2013, and for 10 percent of total encounters in FY 2014–FY 2019.

[18] Prior to 2013, the overall share of encounters who were processed for expedited removal and claimed fear averaged less than 2 percent annually. Between 2013 and 2018, the share rose from 8 to 20 percent, before dropping with the surge of family unit encounters in 2019 (most of whom were not placed in expedited removal) and the onset of T42 expulsions in 2020. At the same time, between 2013 and 2021, among those placed in expedited removal, the share making fear claims increased from 16 to 82 percent. OIS analysis of historic CBP and USCIS data and OIS Enforcement Lifecycle through June 30, 2022.

[19] AP News, Fleeing Nicaraguans Strain Costa Rica's Asylum System (Sept. 2, 2022), *https://apnews.com/article/covid-health-elections-presidential-caribbean-52044748d15dbbb6ca706c66cc7459a5*.

[20] UNHCR, 'Sharp rise' in Nicaraguans fleeing to Costa Rica, strains asylum system, *https://news.un.org/en/story/2022/03/1114792*, Mar. 25, 2022 (last viewed Dec. 9, 2022).

[21] Reuters, Costa Rica prepares plan to regularize status of 200,000 mostly Nicaraguan migrants, *https://www.reuters.com/world/americas/costa-rica-prepares-plan-regularize-status-200000-mostly-nicaraguan-migrants-2022-08-10/*, Aug. 10, 2022 (last viewed Dec. 4, 2022).

[22] Boris Cheshirkov, Number of displaced Nicaraguans in Costa Rica doubles in less than a year, *https://www.unhcr.org/news/briefing/2022/3/623d894c4/number-displaced-nicaraguans-costa-rica-doubles-year.html*, Mar. 25, 2022 (last viewed Dec. 7, 2022).

[23] OIS analysis of OIS Persist Dataset based on data through October 31, 2022. Unique encounters include encounters of persons at the Southwest Border who were not previously encountered in the prior 12 months. Throughout this memo unique encounter data are defined to also include OFO parolees and other OFO administrative encounters.

of all unique encounters and was the fourth largest origin group.[24] Between FY 2021 and FY 2022, unique encounters of Nicaraguan nationals rose 232 percent while unique encounters of all other nationalities combined increased just 47 percent.[25] FY 2022 average unique monthly encounters of Nicaraguan nationals at the land border totaled 13,113 as opposed to an average monthly rate of 316 encounters in FYs 2014–2019, a 41-fold increase.[26]

These trends thus far are only accelerating in FY 2023. In October and November of 2022, DHS encountered 51,000 Nicaraguan nationals at the border—nearly one third the record total of Nicaraguan encounters in FY 2022.[27]

3. Push and Pull Factors

DHS assesses that the high—and rising—number of Nicaraguan nationals encountered at the SWB is driven by two key factors: First, a confluence of political, economic, and humanitarian crises in Nicaragua—exacerbated by the widespread and violent crackdown on democratic freedoms by the Ortega regime and the government's numerous human rights violations against its own population—are causing thousands to leave the country. This situation is compounded by the fact that increasingly sophisticated human smugglers often target migrants in such circumstances to offer them a facilitated opportunity to travel to the United States—at a cost. Second, the United States faces significant limits on the ability to remove Nicaraguan nationals who do not establish a legal basis to remain in the United States to Nicaragua or elsewhere; absent such an ability, more individuals are willing to take a chance that they can come—and stay.

i. Factors Pushing Migration From Nicaragua

Current political, economic, and humanitarian crises in Nicaragua are driving migration of Nicaraguans throughout the hemisphere as well as to our border.[28] As conditions have deteriorated in Nicaragua due to this confluence of factors, the Government of Nicaragua has shown little tolerance for those who openly criticize their regime

and moves swiftly to brazenly silence dissent.[29]

Since 2007, Daniel Ortega and his party, the Sandinista National Liberation Front (FSLN), have gradually consolidated control over the country's institutions and society, including by eliminating presidential term limits.[30] Human Rights Watch (HRW) reported in July 2022 that "[s]ince taking office in 2007, the Ortega administration has dismantled all institutional checks on presidential power, including the judiciary." [31] According to the Inter-American Commission on Human Rights (IACHR), this consolidation of power in the executive "has facilitated Nicaragua's transformation into a police state in which the executive branch has instituted a regime of terror and of suppression of all freedoms. . . . supported by the other branches of government." [32] The IACHR reported in June 2022 that "the state's violent response to the social protests that started on April 18, 2018, triggered a serious political, social, and human rights crisis in Nicaragua," [33] and that as of late September, "more than 2,000 organizations of civil society—linked to political parties, academic, and religious spaces—have been cancelled" since April 2018.[34] Further, HRW reported that the shutting down of non-governmental organizations in Nicaragua "is part of a much broader effort to silence civil society groups and independent media through a combination of repressive tactics that include abusive legislation,

intimidation, harassment, arbitrary detention, and prosecution of human rights defenders and journalists." [35]

Since early 2021, the IACHR has observed the escalation of repression by the Nicaraguan government, characterized by a series of state actions leading to the elimination of the opposition's participation in the elections even before they were held.[36] In December 2021, the IACHR expressed its concern "about the increasing number of people who have been forced to flee Nicaragua and to request international protection in the context of the ongoing serious human rights crisis in the country." [37] In August 2022, Ortega had a bishop, five priests, and two seminarians arrested, claiming that the bishop "persisted in destabilizing and provocative activities." [38] Prior to the November 2022 municipalities election, the government closed 200 nongovernmental groups and over 50 media outlets.[39]

Exacerbated by political repression, Nicaragua is one of the poorest countries in Latin America. According to the World Bank, Nicaragua's gross domestic product (GDP) per capita in 2021 was only $2,090.80, the second lowest in the region, above Haiti.[40] According to the World Food Program, almost 30 percent of Nicaraguan families live in poverty in the country, "over 8 percent struggle in extreme poverty, surviving on less than $1.25 daily," and "17 percent of children aged under five suffer from chronic malnutrition." [41] Migrants often seek economic opportunities to be able to support their families that remain in Nicaragua. Remittances from the United

---

[24] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[25] *Id.*

[26] *Id.*

[27] *Id.*; OIS analysis of UIP CBP data pulled on November 28, 2022.

[28] Voice of America, *With Turmoil at Home, More Nicaraguans Flee to the U.S.* (July 29, 2021), *https://www.voanews.com/a/americas_turmoil-home-more-nicaraguans-flee-us/6208907.html.*

[29] Los Angeles Times, *Sandinistas Complete Their Political Domination of Nicaragua Following Local Elections* (Nov. 8, 2022), *https://www.latimes.com/world-nation/story/2022-11-08/sandinistas-complete-political-domination-nicaragua-local-elections.*

[30] Reuters, *Ortega's Path to Run for Fourth Straight Re-election as Nicaraguan President* (Nov. 3, 2021), *https://www.reuters.com/world/americas/ortegas-path-run-fourth-straight-re-election-nicaraguan-president-2021-11-03/.*

[31] Office of the United Nations High Commissioner for Human Rights (OHCHR), *Human Rights Situation in Nicaragua* 2 (Sept. 2, 2022), *https://reliefweb.int/report/nicaragua/human-rights-situation-nicaragua-report-united-nations-high-commissioner-human-rights-ahrc5142-unofficial-english-translation.*

[32] Inter-American Commission On Human Rights, *Nicaragua: Concentration of Power and the Undermining of the Rule of Law*, OEA/Ser.L/V/II, Doc. 288, 65 (Oct. 25, 2021), *https://www.oas.org/en/iachr/reports/pdfs/2021_nicaragua-en.pdf.*

[33] Inter-American Commission On Human Rights, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775, (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[34] In light of serious allegations regarding the closure of civic spaces in Nicaragua, UN and IACHR Special Rapporteurs urge authorities to comply with their international obligations to respect and guarantee fundamental freedoms, IACHR, Sept. 28, 2022, *https://www.oas.org/en/iachr/expression/showarticle.asp?IID=1&artID=1257.*

[35] Nicaragua: Government Dismantles Civil Society, Human Rights Watch, July 19, 2022, *https://www.hrw.org/news/2022/07/19/nicaragua-government-dismantles-civil-society.*

[36] IACHR, *Annual Report 2021,* Chapter IV.B—Nicaragua, 775 (June 2, 2022), *https://www.oas.org/en/iachr/reports/ia.asp?Year=2021.*

[37] Inter-American Commission On Human Rights, *IACHR Calls for International Solidarity, Urges States to Protect the People Who Have Been Forced to Flee from Nicaragua* (Dec. 20, 2021), *http://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/media_center/PReleases/2021/346.asp.*

[38] The Washington Post, *Nicaragua Detains Catholic Bishop in Escalating Crackdown on Dissent* (Aug. 19, 2022), *https://www.washingtonpost.com/world/2022/08/19/nicaragua-bishop-rolando-alvarez-arrest-ortega/.*

[39] Politico, *Sandinistas Complete Their Political Domination of Nicaragua* (Nov. 8, 2022), *https://www.politico.com/news/2022/11/08/nicaragua-sandinistas-ortega-repression-00065603.*

[40] The World Bank, *GDP per Capita (Current U.S. $)—Latin America & Caribbean, Nicaragua, https://data.worldbank.org/indicator/NY.GDP.PCAP.CD?locations=ZJ-NI&most_recent_value_desc=false* (last visited Dec. 6, 2022).

[41] World Food Programme, *Nicaragua, https://www.wfp.org/countries/nicaragua* (last visited: Sept. 26, 2022).

States to Nicaragua from January–September 2022 have surpassed the total remittances sent in all of 2021.[42]

According to the UNHCR, approximately 200,000 Nicaraguans have sought international protection worldwide.[43] More than 100,000 filed asylum applications in 2021; this is a five-fold increase from 2020.[44] Daniel Ortega's repressive policies, coupled with widespread poverty, have pushed thousands of Nicaraguans to seek humanitarian relief in the Western Hemisphere, including increasingly in the United States.[45]

ii. Return Limitations

The Government of Nicaragua is not accepting returns or removals of their nationals at a volume that allows the United States to effectively manage the number of encounters of Nicaraguans by the United States. Additionally, the GOM has generally not allowed returns of Nicaraguan nationals pursuant to Title 42 authorities, or their removal from the United States pursuant to Title 8 authorities.[46] Other countries have similarly refused to accept Title 8 removals of Nicaraguan nationals. As a result, DHS was only able to repatriate a small number of Nicaraguan nationals to Nicaragua in FY 2022.

Moreover, returns alone are not sufficient to reduce and divert irregular flows of Nicaraguans. The United States will combine a consequence for Nicaraguan nationals who seek to enter the United States without authorization at the land border with an incentive to use the safe, orderly process to request authorization to travel by air to, and seek parole to enter, the United States, without making the dangerous journey to the border.

4. Impact on DHS Resources and Operations

To respond to the increase in encounters along the SWB since FY 2021—an increase that has accelerated in FY 2022, driven in part by the number of Nicaraguan nationals encountered—DHS has taken a series of extraordinary steps. Since FY 2021,

DHS has built and now operates 10 soft-sided processing facilities at a cost of $688 million. U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) detailed a combined 3,770 officers and agents to the SWB to effectively manage this processing surge. In FY 2022, DHS had to utilize its above threshold reprogramming authority to identify approximately $281 million from other divisions in the Department to address SWB needs, to include facilities, transportation, medical care, and personnel costs.

The Federal Emergency Management Agency (FEMA) has spent $260 million in FYs 2021 and 2022 combined on grants to non-governmental organizations (NGO) and state and local entities through the Emergency Food and Shelter Program—Humanitarian (EFSP–H) to assist with the reception and onward travel of irregular migrants arriving at the SWB. This spending is in addition to $1.4 billion in additional FY 2022 appropriations that were designated for SWB enforcement and processing capacities.[47]

The impact has been particularly acute in certain border sectors. The increased flows of Nicaraguan nationals are disproportionately occurring within the remote Del Rio and Rio Grande Valley sectors, all of which are at risk of operating, or are currently operating, over capacity. In FY 2022, 80 percent of unique encounters of Nicaraguan nationals occurred in these two sectors.[48] There have also been a growing number of encounters in El Paso sector since September 2022. In FY 2023, Del Rio, El Paso, and Rio Grande Valley sectors have accounted for 88 percent of encounters of Nicaraguan nationals.[49] In FY 2022, Del Rio sector encountered almost double (85 percent increase) the number of migrants as compared to FY 2021. Driven in part by the sharp increase in Nicaraguan nationals being encountered in this sector, this was an eighteen-fold increase over the average for FY 2014–FY 2019.[50]

The focused increase in encounters within those three sectors is particularly challenging. Del Rio sector is

geographically remote, and because—up until the past two years—it has not been a focal point for large numbers of individuals entering without authorization, has limited infrastructure and personnel in place to safely process the elevated encounters that CBP is now seeing there. The Yuma Sector is along the Colorado River corridor, which presents additional challenges to migrants, such as armed robbery, assault by bandits, and drowning, as well as to the U.S. Border Patrol (USBP) agents encountering them. El Paso sector has relatively modern infrastructure for processing noncitizens encountered at the border but is far away from other CBP sectors, which makes it challenging to move individuals for processing elsewhere during surges.

In an effort to decompress sectors that are experiencing surges, DHS deploys lateral transportation, using buses and flights to move noncitizens to other sectors that have additional capacity to process. In November 2022, U.S. Border Patrol (USBP) sectors along the SWB operated a combined 602 decompression bus routes to neighboring sectors and operated 124 lateral decompression flights, redistributing noncitizens to other sectors with additional capacity.[51]

Because DHS assets are finite, using air resources to operate lateral flights reduces DHS's ability to operate international repatriation flights to receiving countries, leaving noncitizens in custody for longer and further taxing DHS resources. Fewer international repatriation flights in turn exacerbates DHS's inability to return or remove Nicaraguans and other noncitizens in its custody by sending the message that there is no consequence for illegal entry. DHS assesses that a reduction in the flow of Nicaraguan nationals arriving at the SWB would reduce pressure on overstretched resources and enable the Department to more quickly process and, as appropriate, return or remove those who do not have a lawful basis to stay.

II. DHS Parole Authority

The Immigration and Nationality Act (INA or Act) provides the Secretary of Homeland Security with the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or

---

[42] Banco Central de Nicaragua, Remesas Por País de Origen, *https://www.bcn.gob.ni/sites/default/files/estadisticas/siec/datos/remesas_origen.htm* (last visited Dec. 6, 2022).

[43] UNHCR USA, Displacement in Central America, *https://www.unhcr.org/en-us/displacement-in-central-america.html*.

[44] UNHCR, 2021 Global Trends Report, June 16, 2022, *https://www.unhcr.org/62a9d1494/global-trends-report-2021*.

[45] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[46] There are some limited exceptions to this prohibition, including Nicaraguan nationals that have Mexican family members.

[47] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[48] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[49] *Id.*, and CBP UIP data for November 1–27 pulled on November 28, 2022.

[50] OIS analysis of OIS Persist Dataset based on data through October 31, 2022.

[51] Data from SBCC, as of December 11, 2022.

001125

significant public benefit." [52] Parole is not an admission of the individual to the United States, and a parolee remains an "applicant for admission" during the period of parole in the United States.[53] DHS may set the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[54] Individuals may be granted advance authorization to travel to the United States to seek parole.[55] DHS may terminate parole in its discretion at any time.[56] Individuals who are paroled into the United States generally may apply for and be granted employment authorization.[57]

This process will combine a consequence for those who seek to enter the United States irregularly between POEs with a significant incentive for Nicaraguan nationals to remain where they are and use a lawful process to request authorization to travel by air to, and ultimately apply for a discretionary grant of parole into, the United States for a period of up to two years.

### III. Justification for the Process

As noted above, section 212(d)(5)(A) of the INA confers upon the Secretary of Homeland Security the discretionary authority to parole noncitizens "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [58]

#### A. Significant Public Benefit

The parole of Nicaraguan nationals and their immediate family members under this process—which imposes new consequences for Nicaraguans who seek to enter the United States without authorization between POEs, while providing an alternative opportunity for eligible Nicaraguan nationals and their immediate family members to seek advance authorization to travel to the United States to seek discretionary parole, on a case-by-case basis, in the United States—serves a significant public benefit for several, interrelated

reasons. Specifically, we anticipate that the parole of eligible individuals pursuant to this process will: (i) enhance border security through a reduction in irregular migration of Nicaraguan nationals, including by imposing additional consequences on those who seek to enter between POEs; (ii) improve vetting for national security and public safety; (iii) reduce strain on DHS personnel and resources; (iv) minimize the domestic impact of irregular migration from Nicaragua; (v) provide a disincentive to undergo the dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and (vi) fulfill important foreign policy goals to manage migration collaboratively in the hemisphere and, as part of those efforts, to establish additional processing pathways from within the region to discourage irregular migration.

### 1. Enhanced Border Security by Reducing Irregular Migration of Nicaraguan Nationals

As described above, Nicaraguan nationals make up a significant and growing number of those encountered seeking to cross between POEs without authorization. Without additional and more immediate consequences imposed on those who seek to do so, together with a safe and orderly process for Nicaraguans to enter the United States, without making the journey to the SWB, the numbers will continue to grow.

By incentivizing individuals to seek a safe, orderly means of traveling to the United States through the creation of an alternative pathway to the United States, while imposing additional consequences to irregular migration, DHS assesses this process could lead to a meaningful drop in encounters of Nicaraguan individuals along the SWB. This expectation is informed by the recently implemented process for Venezuelans and the significant shifts in migratory patterns that took place once the process was initiated. The success to date of the Venezuela process provides compelling evidence that coupling effective disincentives for irregular entry with incentives for a safe, orderly parole process can meaningfully shift migration patterns in the region and to the SWB.

Implementation of this parole process is contingent on the GOM's acceptance of Nicaraguan nationals who voluntarily depart the United States, those who voluntarily withdraw their application for admission, and those subject to expedited removal who cannot be removed to Nicaragua or another designated country. The ability to effectuate voluntary departures,

withdrawals, and removals of Nicaraguan nationals to Mexico will impose a consequence on irregular entry that currently does not exist.

### 2. Improve Vetting for National Security and Public Safety

All noncitizens whom DHS encounters at the border undergo thorough vetting against national security and public safety databases during their processing. Individuals who are determined to pose a national security or public safety threat are detained pending removal. That said, there are distinct advantages to being able to vet more individuals before they arrive at the border so that we can stop individuals who could pose threats to national security or public safety even earlier in the process. The Nicaraguan parole process will allow DHS to vet potential beneficiaries for national security and public safety purposes *before* they travel to the United States.

As described below, the vetting will require prospective beneficiaries to upload a live photograph via an app. This will enhance the scope of the pre-travel vetting—thereby enabling DHS to better identify those with criminal records or other disqualifying information of concern and deny authorization to travel under this process before they arrive at our border, representing an improvement over the status quo.

### 3. Reduce the Burden on DHS Personnel and Resources

By reducing encounters of Nicaraguan nationals at the SWB, and channeling decreased flows of Nicaraguan nationals to interior POEs, we anticipate that the process will relieve some of the impact increased migratory flows have had on the DHS workforce along the SWB. This process is expected to free up resources, including those focused on decompression of border sectors, which in turn may enable an increase in removal flights—allowing for the removal of more noncitizens with final orders of removal faster and reducing the number of days migrants are in DHS custody. While the process will also draw on DHS resources within U.S. Citizenship and Immigration Services (USCIS) and CBP to process requests for discretionary parole on a case-by-case basis and conduct vetting, these requirements involve different parts of DHS and require fewer resources as compared to the status quo.

In addition, permitting Nicaraguans to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process also will reduce the burden

---

[52] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* 6 U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole"). Nicaraguans paroled into the United States through this process are not being paroled as refugees, and instead will be considered for parole on a case-by-case basis for a significant public benefit or urgent humanitarian reasons. This parole process does not, and is not intended to, replace refugee processing.

[53] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[54] *Id.*

[55] *See* 8 CFR 212.5(f).

[56] *See* 8 CFR 212.5(e).

[57] *See* 8 CFR 274a.12(c)(11).

[58] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

4. Minimize the Domestic Impact

Though the Venezuelan process has significantly reduced the encounters of Venezuelan nationals, other migratory flows continue to strain domestic resources, which is felt most acutely by border communities. Given the inability to remove, return, or repatriate Nicaraguan nationals in substantial numbers, DHS is currently conditionally releasing 96 percent of the Nicaraguan nationals it encounters at the border, pending their removal proceedings or the initiation of such proceedings, and Nicaraguan nationals accounted for 18 percent of all encounters released at the border in October 2022.[59] The increased volume of provisional releases of Nicaraguan nationals puts strains on U.S. border communities.

Generally, since FY 2019, DHS has worked with Congress to make approximately $290 million available through FEMA's EFSP to support NGOs and local governments that provide initial reception for migrants entering through the SWB. These entities have engaged to provide services and assistance to Nicaraguan nationals and other noncitizens who have arrived at our border, including by building new administrative structures, finding additional housing facilities, and constructing tent shelters to address the increased need.[60] FEMA funding has supported building significant NGO capacity along the SWB, including a substantial increase in available shelter beds in key locations.

Nevertheless, local communities have reported strain on their ability to provide needed social services. Local officials and NGOs report that the temporary shelters that house migrants are quickly reaching capacity due to the high number of arrivals,[61] and stakeholders in the border region have expressed concern that shelters will

eventually reach full bed space capacity and not be able to host any new arrivals.[62] Since Nicaraguan nationals account for a significant percentage of the individuals being conditionally released into communities after being processed along the SWB, this parole process will address these concerns by diverting flows of Nicaraguan nationals into a safe and orderly process in ways that DHS anticipates will yield a decrease in the numbers arriving at the SWB.

DHS anticipates that this process will help minimize the burden on communities, state and local governments, and NGOs who support the reception and onward travel of arriving migrants at the SWB. Beneficiaries are required to fly at their own expense to an interior POE, rather than arriving at the SWB. They also are only authorized to come to the United States if they have a supporter who has agreed to receive them and provide basic needs, including housing support. Beneficiaries also are eligible to apply for work authorization, thus enabling them to support themselves.

5. Disincentivize a Dangerous Journey That Puts Migrant Lives and Safety at Risk and Enriches Smuggling Networks

The process, which will incentivize intending migrants to use a safe, orderly, and lawful means to access the United States via commercial air flights, cuts out the smuggling networks. This is critical, because transnational criminal organizations—including the Mexican drug cartels—are increasingly playing a key role in human smuggling, reaping billions of dollars in profit and callously endangering migrants' lives along the way.[63]

In FY 2022, more than 750 migrants died attempting to enter the United States across the SWB,[64] an estimated 32 percent increase from FY 2021 (568 deaths) and a 195 percent increase from FY 2020 (254 deaths).[65] The approximate number of migrants

rescued by CBP in FY 2022 (almost 19,000 rescues)[66] increased 48 percent from FY 2021 (12,857 rescues), and 256 percent from FY 2020 (5,336 rescues).[67] Although exact figures are unknown, experts estimate that about 30 bodies have been taken out of the Rio Grande River each month since March 2022.[68] CBP attributes these rising trends to increasing numbers of migrants, as evidenced by increases in overall U.S. Border Patrol encounters.[69] The increased rates of both migrant deaths and those needing rescue at the SWB demonstrate the perils in the migrant journey.

Meanwhile, these numbers do not account for the countless incidents of death, illness, and exploitation migrants experience during the perilous journey north. These migratory movements are in many cases facilitated by numerous human smuggling organizations, for which the migrants are pawns;[70] the organizations exploit migrants for profit, often bringing them across inhospitable deserts, rugged mountains, and raging rivers, often with small children in tow. Upon reaching the border area, noncitizens seeking to cross into the United States generally pay transnational criminal organizations (TCOs) to coordinate and guide them along the final miles of their journey.[71] Tragically, a significant number of individuals perish along the way. The trailer truck accident that killed 55 migrants in Chiapas, Mexico, in December 2021 and the tragic incident in San Antonio, Texas, on June 27, 2022, in which 53 migrants died of the heat in appalling conditions, are just two examples of many in which TCOs

[59] OIS analysis of and CBP subject-level data and OIS Persist Dataset based on data through October 31, 2022.

[60] CNN, *Washington, DC, Approves Creation of New Agency to Provide Services for Migrants Arriving From Other States* (Sept. 21, 2022), *https://www.cnn.com/2022/09/21/us/washington-dc-migrant-services-office*.

[61] San Antonio Report, *Migrant aid groups stretched thin as city officials seek federal help for expected wave* (Apr. 27, 2022), *https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/*.

[62] KGUN9 Tucson, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day* (Sept. 23, 2022), *https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day*.

[63] CBP, Fact Sheet: Counter Human Smuggler Campaign Updated (Oct. 6, 2022), *https://www.dhs.gov/news/2022/10/06/fact-sheet-counter-human-smuggler-campaign-update-dhs-led-effort-makes-5000th*.

[64] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[65] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[66] CNN, *First on CNN: A Record Number of Migrants Have Died Crossing the U.S.-Mexico Border* (Sept. 7, 2022), *https://www.cnn.com/2022/09/07/politics/us-mexico-border-crossing-deaths/index.html*.

[67] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[68] The Guardian, *Migrants Risk Death Crossing Treacherous Rio Grande River for 'American Dream'* (Sept. 5, 2022), *https://www.theguardian.com/us-news/2022/sep/05/migrants-risk-death-crossing-treacherous-rio-grande-river-for-american-dream*.

[69] Department of Homeland Security, U.S. Customs and Border Protection, *Rescue Beacons and Unidentified Remains: Fiscal Year 2022 Report to Congress*.

[70] DHS Memorandum from Alejandro N. Mayorkas, Secretary of Homeland Security, to Interested Parties, *DHS Plan for Southwest Border Security and Preparedness* (Apr. 26, 2022), *https://www.dhs.gov/sites/default/files/2022-04/22_0426_dhs-plan-southwest-border-security-preparedness.pdf*.

[71] New York Times, *Smuggling Migrants at the Border Now a Billion-Dollar Business,* (July 25, 2022), *https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html*.

engaged in human smuggling prioritize profit over safety.[72]

DHS anticipates this process will save lives and undermine the profits and operations of the dangerous TCOs that put migrants' lives at risk for profit because it incentivizes intending migrants to use a safe and orderly means to access the United States via commercial air flights, thus ultimately reducing the demand for smuggling networks to facilitate the dangerous journey to the SWB. By reducing the demand for these services, DHS is effectively targeting the resources of TCOs and human smuggling networks that so often facilitate these unprecedented movements with utter disregard for the health and safety of migrants. DHS and federal partners have taken extraordinary measures—including the largest-ever surge of resources against human smuggling networks—to combat and disrupt the TCOs and smugglers and will continue to do so.[73]

6. Fulfill Important Foreign Policy Goals To Manage Migration Collaboratively in the Hemisphere

Promoting a safe, orderly, legal, and humane migration strategy throughout the Western Hemisphere has been a top foreign policy priority for the Administration. This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America (Root Causes Strategy);[74] the Collaborative Migration Management Strategy (CMMS);[75] and the Los Angeles Declaration on Migration and Protection (L.A. Declaration), which was endorsed in June 2022 by 21 countries.[76] The

CMMS and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.[77] The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees." [78]

This new process helps achieve these goals by providing an immediate and temporary orderly process for Nicaraguan nationals to lawfully enter the United States while we work to improve conditions in sending countries and expand more permanent lawful immigration pathways in the region, including refugee processing and other lawful pathways into the United States and other Western Hemisphere countries. It thus provides the United States another avenue to lead by example.

The process also responds to an acute foreign policy need. Key allies in the region—including specifically the Governments of Mexico and Costa Rica—are affected by the increased movement of Nicaraguan nationals and have been seeking greater U.S. action to address these challenging flows for some time. These Nicaraguan flows contribute to strain on governmental and civil society resources in Mexican border communities in both the south and the north—something that key foreign government partners have been urging the United States to address.

Along with the Venezuelan process, this new process adds to these efforts and enables the United States to lead by example. Such processes are a key mechanism to advance the larger domestic and foreign policy goals of the U.S. Government to promote a safe, orderly, legal, and humane migration strategy throughout our hemisphere. The new process also strengthens the foundation for the United States to press regional partners—many of which are already taking important steps—to undertake additional actions with regard to this population, as part of a regional response. Any effort to meaningfully address the crisis in

Nicaragua will require continued efforts by these and other regional partners.

Importantly, the United States will only implement the new parole process while able to remove or return to Mexico Nicaraguan nationals who enter the United States without authorization across the SWB. The United States' ability to execute this process thus is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization.

For its part, the GOM has made clear its position that, in order to effectively manage the migratory flows that are impacting both countries, the United States needs to provide additional safe, orderly, and lawful processes for migrants who seek to enter the United States. The GOM, as it makes its independent decisions as to its ability to accept returns of third country nationals at the border and its efforts to manage migration within Mexico, is thus closely watching the United States' approach to migration management and whether it is delivering on its plans in this space. Initiating and managing this process—which is dependent on GOM's actions—will require careful, deliberate, and regular assessment of GOM's responses to independent U.S. actions and ongoing, sensitive diplomatic engagements.

As noted above, this process is responsive to the GOM's request that the United States increase lawful pathways for migrants and is also aligned with broader Administration domestic and foreign policy priorities in the region. The process couples a meaningful incentive to seek a lawful, orderly means of traveling to the United States with the imposition of consequences for those who seek to enter without authorization along the SWB. The goal of this process is to reduce the irregular migration of Nicaraguan nationals while the United States, together with partners in the region, works to improve conditions in sending countries and create more lawful immigration and refugee pathways in the region, including to the United States.

B. Urgent Humanitarian Reasons

The case-by-case temporary parole of individuals pursuant to this process will address the urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua. The Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against

---

[72] Reuters, *Migrant Truck Crashes in Mexico Killing 54* (Dec. 9, 2021), *https://www.reuters.com/article/uk-usa-immigration-mexico-accident-idUKKBN2IP01R;* Reuters, *The Border's Toll: Migrants Increasingly Die Crossing into U.S. from Mexico* (July 25, 2022), *https://www.reuters.com/article/usa-immigration-border-deaths/the-borders-toll-migrants-increasingly-die-crossing-into-u-s-from-mexico-idUSL4N2Z247X.*

[73] *See* DHS Update on Southwest Border Security and Preparedness Ahead of Court-Ordered Lifting of Title 42 (Dec. 13, 2022), *https://www.dhs.gov/publication/update-southwest-border-security-and-preparedness-ahead-court-ordered-lifting-title-42.*

[74] National Security Council, *Root Causes of Migration in Central America* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[75] National Security Council, *Collaborative Migration Management Strategy* (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Collaborative-Migration-Management-Strategy.pdf?utm_medium=email&utm_source=govdelivery.*

[76] *Id.;* The White House, *Los Angeles Declaration on Migration and Protection* (LA Declaration) (June 10, 2022) *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[77] *Id.*

[78] *Id.*

those who oppose its positions.[79] This process provides a safe mechanism for Nicaraguan nationals who seek to leave their home country to enter the United States without having to make the dangerous journey to the United States.

## IV. Eligibility To Participate in the Process and Processing Steps

### A. Supporters

U.S.-based supporters must initiate the process by filing Form I–134A on behalf of a Nicaraguan national and, if applicable, the national's immediate family members.[80] Supporters may be individuals filing on their own, with other individuals, or on behalf of non-governmental entities or community-based organizations. Supporters are required to provide evidence of income and assets and declare their willingness to provide financial support to the named beneficiary for the length of parole. Supporters are required to undergo vetting to identify potential human trafficking or other concerns. To serve as a supporter under the process, an individual must:

• be a U.S. citizen, national, or lawful permanent resident; hold a lawful status in the United States; or be a parolee or recipient of deferred action or Deferred Enforced Departure;

• pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns; and

• demonstrate sufficient financial resources to receive, maintain, and support the intended beneficiary whom they commit to support for the duration of their parole period.

### B. Beneficiaries

In order to be eligible to request and ultimately be considered for a discretionary issuance of advance authorization to travel to the United States to seek advance grant of parole at the POE, such individuals must:

• be outside the United States;

• be a national of Nicaragua or be a non-Nicaraguan immediate family member [81] and traveling with a Nicaraguan principal beneficiary;

• have a U.S.-based supporter who filed a Form I–134A on their behalf that USCIS has vetted and confirmed;

• possess an unexpired passport valid for international travel;

• provide for their own commercial travel to an air U.S. POE and final U.S. destination;

• undergo and pass required national security and public safety vetting;

• comply with all additional requirements, including vaccination requirements and other public health guidelines; and

• demonstrate that a grant of parole is warranted based on significant public benefit or urgent humanitarian reasons, as described above, and that a favorable exercise of discretion is otherwise merited.

A Nicaraguan national is ineligible to be considered for advance authorization to travel to the United States as well as parole under this process if that person is a permanent resident or dual national of any country other than Nicaragua, or currently holds refugee status in any country, unless DHS operates a similar parole process for the country's nationals.[82]

In addition, a potential beneficiary is ineligible for advance authorization to travel to the United States as well as parole under this process if that person:

• fails to pass national security and public safety vetting or is otherwise deemed not to merit a favorable exercise of discretion;

• has been ordered removed from the United States within the prior five years or is subject to a bar to admissibility based on a prior removal order;[83]

• has crossed irregularly into the United States, between the POEs, after January 9, 2023 except individuals permitted a single instance of voluntary departure pursuant to INA section 240B, 8 U.S.C. 1229c or withdrawal of their application for admission pursuant to INA section 235(a)(4), 8 U.S.C. 1225(a)(4) will remain eligible;

• has irregularly crossed the Mexican or Panamanian border after January 9, 2023; or

• is under 18 and not traveling through this process accompanied by a parent or legal guardian, and as such is a child whom the inspecting officer would determine to be an unaccompanied child.[84]

*Travel Requirements:* Beneficiaries who receive advance authorization to travel to the United States to seek parole into the United States will be responsible for arranging and funding their own commercial air travel to an interior POE of the United States.

*Health Requirements:* Beneficiaries must follow all applicable requirements, as determined by DHS's Chief Medical Officer, in consultation with the Centers for Disease Control and Prevention, with respect to health and travel, including vaccination and/or testing requirements for diseases including COVID–19, polio, and measles. The most up-to-date public health requirements applicable to this process will be available at *www.uscis.gov/CHNV.*

### C. Processing Steps

Step 1: Declaration of Financial Support

A U.S.-based supporter will submit a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, with USCIS through the online myUSCIS web portal to initiate the process. The Form I–134A identifies and collects information on both the supporter and the beneficiary. The supporter must submit a separate Form I–134A for each beneficiary they are seeking to support, including Nicaraguans' immediate family members and minor children. The supporter will then be vetted by USCIS to protect against exploitation and abuse, and to ensure that the supporter is able to financially support the beneficiary whom they agree to support. Supporters must be vetted and confirmed by USCIS, at USCIS' discretion, before moving forward in the process.

Step 2: Submit Biographic Information

If a supporter is confirmed by USCIS, the listed beneficiary will receive an email from USCIS with instructions to create an online account with myUSCIS and next steps for completing the application. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting the eligibility requirements.

As part of confirming eligibility in their myUSCIS account, individuals who seek authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 3: Submit Request in CBP One Mobile Application

After confirming biographic information in myUSCIS and

---

[79] OHCHR, Presentation of Report on the Human Rights Situation in Nicaragua, Human Rights Council Resolution 49/3 (Sept. 13, 2022), *https://www.ohchr.org/en/speeches/2022/09/presentation-report-human-rights-situation-nicaragua.*

[80] Certain non-Nicaraguans may use this process if they are an immediate family member of a Nicaraguan beneficiary and traveling with that Nicaraguan beneficiary. For purposes of this process, immediate family members are limited to a spouse, common-law partner, and/or unmarried child(ren) under the age of 21.

[81] See preceding footnote.

[82] This limitation does not apply to immediate family members traveling with a Nicaraguan national.

[83] *See, e.g.,* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

[84] As defined in 6 U.S.C. 279(g)(2). Children under the age of 18 must be traveling to the United States in the care and custody of their parent or legal guardian to be considered for parole at the POE under the process.

completing required eligibility attestations, the beneficiary will receive instructions through myUSCIS for accessing the CBP One mobile application. The beneficiary must then enter limited biographic information into CBP One and submit a live photo.

### Step 4: Approval to Travel to the United States

After completing Step 3, the beneficiary will receive a notice in their myUSCIS account confirming whether CBP has, in CBP's discretion, provided the beneficiary with advance authorization to travel to the United States to seek a discretionary grant of parole on a case-by-case basis. If approved, this authorization is generally valid for 90 days, and beneficiaries are responsible for securing their own travel via commercial air to the United States.[85] Approval of advance authorization to travel does not guarantee parole into the United States. Whether to parole the individual is a discretionary determination made by CBP at the POE at the time the individual arrives at the interior POE.

All of the steps in this process, including the decision to grant or deny advance travel authorization and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

### Step 5: Seeking Parole at the POE

Each individual arriving at a POE under this process will be inspected by CBP and considered for a grant of discretionary parole for a period of up to two years on a case-by-case basis.

As part of the inspection, beneficiaries will undergo additional screening and vetting, to include additional fingerprint biometric vetting consistent with CBP inspection processes. Individuals who are determined to pose a national security or public safety threat or otherwise do not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), and as a matter of discretion upon inspection, will be processed under an appropriate processing pathway and may be referred to ICE for detention.

### Step 6: Parole

If granted parole pursuant to this process, each individual generally will be paroled into the United States for a period of up to two years, subject to

applicable health and vetting requirements, and will be eligible to apply for employment authorization from USCIS under existing regulations. USCIS is leveraging technological and process efficiencies to minimize processing times for requests for employment authorization. All individuals two years of age or older will be required to complete a medical screening for tuberculosis, including an IGRA test, within 90 days of arrival to the United States.

### D. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the process at any point. The number of travel authorizations granted under the Parole Process for Nicaraguans shall be spread across this process and the separate and independent Parole Process for Cubans, the Parole Process for Haitians, and Parole Process for Venezuelans (as described in separate notices published concurrently in today's edition of the **Federal Register**) and shall not exceed 30,000 each month in the aggregate. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## V. Regulatory Requirements

### A. Administrative Procedure Act

This process is exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds, and is therefore amenable to immediate issuance and implementation.

*First,* the Department is merely adopting a general statement of policy,[86] *i.e.,* a "statement[ ] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[87] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment

rulemaking and a delayed effective date, the process would be exempt from such requirements because it involves a foreign affairs function of the United States.[88] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[89] In addition, although the text of the Administrative Procedure Act does not expressly require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[90] This process satisfies both standards.

As described above, this process is directly responsive to requests from key foreign partners—including the GOM—to provide a lawful process for Nicaraguan nationals to enter the United States. The United States will only implement the new parole process while able to return or remove to Mexico Nicaraguan nationals who enter without authorization across the SWB. The United States' ability to execute this process is contingent on the GOM making an independent decision to accept the return or removal of Nicaraguan nationals who bypass this new process and enter the United States without authorization. Thus, initiating and managing this process will require careful, deliberate, and regular assessment of the GOM's responses to U.S. action in this regard, and ongoing, sensitive diplomatic engagements.

Delaying issuance and implementation of this process to undertake rulemaking would undermine the foreign policy imperative to act now. It also would complicate broader discussions and negotiations about migration management. For now, the GOM has indicated it is prepared to make an independent decision to accept the return or removal of Nicaraguan nationals. The GOM's willingness to accept the returns or removals could be impacted by the delay associated with a public rulemaking process involving advance notice and comment and a delayed effective date. Additionally, making it publicly known that we plan to return or remove nationals of Nicaragua to Mexico at a future date would likely result in an even greater surge in migration, as migrants rush to the border to enter before the process begins—which would adversely impact each country's border security and

---

[85] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[86] 5 U.S.C. 553(b)(A); *id.* 553(b)(2).

[87] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[88] 5 U.S.C. 553(a)(1).

[89] *Mast Indus.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).

[90] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

further strain their personnel and resources deployed to the border.

Moreover, this process is not only responsive to the interests of key foreign partners—and necessary for addressing migration issues requiring coordination between two or more governments—it is also fully aligned with larger and important foreign policy objectives of this Administration and fits within a web of carefully negotiated actions by multiple governments (for instance in the L.A. Declaration). It is the view of the United States that the implementation of this process will advance the Administration's foreign policy goals by demonstrating U.S. partnership and U.S. commitment to the shared goals of addressing migration through the hemisphere, both of which are essential to maintaining strong bilateral relationships.

The invocation of the foreign affairs exemption here is also consistent with Department precedent. For example, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[91] DHS similarly invoked the foreign affairs exemption more recently, in connection with the Venezuela parole process.[92]

*Third,* DHS assesses that there is good cause to find that the process associated with implementing this process through notice-and-comment rulemaking and with a delayed effective date would be contrary to the public interest and impracticable.[93] The numbers of Nicaraguans encountered at the SWB are already high, and a delay would greatly exacerbate an urgent border and national security challenge and would miss a critical opportunity to reduce and divert the flow of irregular migration.[94]

Undertaking notice-and-comment rule making procedures would be contrary to the public interest because an advance announcement of the process would seriously undermine a key goal of the policy: it would incentivize even more irregular migration of Nicaraguan nationals seeking to enter the United

States before the process would take effect. There are urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[95] It has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[96] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[97] A number of cases follow this logic in the context of economic regulation.[98]

The same logic applies here, where the Department is responding to exceedingly serious challenges at the border, and advance announcement of that response would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. It is well established that migrants may change their behavior in response to perceived imminent changes in U.S. immigration policy.[99] For example, as

detailed above, implementation of the parole process for Venezuelans was associated with a drastic reduction in irregular migration by Venezuelans. Had the parole process been announced prior to a notice-and-comment period, it likely would have had the opposite effect, resulting in many hundreds of thousands of Venezuelan nationals attempting to cross the border before the program went into effect. Overall, the Department's experience has been that in some circumstances when public announcements have been made regarding changes in our immigration laws and procedures that would restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States. Smugglers routinely prey on migrants in response to changes in domestic immigration law.

In addition, it would be impracticable to delay issuance of this process in order to undertake such procedures because—as noted above—maintaining the status quo, which involves record numbers of Nicaraguan nationals currently being encountered attempting to enter without authorization at the SWB, coupled with DHS's extremely limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions. At current rates, a delay of just a few months to conduct notice-and-comment rulemaking would effectively forfeit an opportunity to reduce and divert migrant flows in the near term, harm border security, and potentially result in scores of additional migrant deaths.

The Department's determination here is consistent with past practice in this area. For example, in addition to the Venezuelan process described above, DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[100] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting

---

[91] *See* 82 FR 4902 (Jan. 17, 2017).

[92] *See* 87 FR 63507 (Oct. 19, 2022).

[93] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

[94] *See Chamber of Commerce of U.S.* v. *SEC,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)).

[95] *See* 5 U.S.C. 553(b)(B).

[96] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 94–95 (D.C. Cir. 2012) (noting that the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1975) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of section 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline." (cleaned up)).

[97] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.").

[98] *See, e.g., Chamber of Commerce of U.S.* v. *SEC.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ["good cause"] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[99] *See, e.g.,* Tech Transparency Project, Inside the World of Misinformation Targeting Migrants on

Social Media, *https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media,* July 26, 2022 (last viewed Dec. 6, 2022).

[100] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule.'' [101] DHS found that ''[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations.'' [102] DHS concluded that ''a surge could result in significant loss of human life.'' [103]

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires changes to two collections of information, as follows.

OMB has recently approved a new collection, Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will be used for the Nicaragua parole process, and is being revised in connection with this notice, including by increasing the burden estimate. To support the efforts described above, DHS has created a new information collection that will be the first step in these parole processes and will not use the paper USCIS Form I–134 for this purpose. U.S.-based supporters will submit USCIS Form I–134A online on behalf of a beneficiary to demonstrate that they can support the beneficiary for the duration of their temporary stay in the United States. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has previously approved an emergency request under 5 CFR 1320.13 for a revision to an information collection from CBP entitled Advance Travel Authorization (OMB control

number 1651–0143). In connection with the implementation of the process described above, CBP is making multiple changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate and adding Nicaraguan nationals as eligible for a DHS established process that necessitates collection of a facial photograph in CBP One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov*.

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00254 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–9M–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Internal Agency Docket No. FEMA–4679–DR; Docket ID FEMA–2022–0001]**

### West Virginia; Major Disaster and Related Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4679–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the ''Stafford Act''), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of August 14 to August 15, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the

''Stafford Act''). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA, is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

Fayette County for Public Assistance.

All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.

The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00178 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Implementation of a Parole Process for Cubans

**ACTION:** Notice.

**SUMMARY:** This notice describes a new effort designed to enhance the security

---

[101] *Id.*

[102] *Id.*

[103] *Id.; accord, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of similar short-run incentive concerns).

procedural updates announced in this notice.

## III. Regulatory Requirements

### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]**

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

**54640** **Federal Register** / Vol. 88, No. 154 / Friday, August 11, 2023 / Notices

MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

## I. Background

In 2007, U.S. Citizenship and Immigration Services (USCIS) launched CFRP in furtherance of the United States' commitment under the U.S.-Cuba Migration Accords [1] to direct Cuban migration into lawful, safe, and orderly channels and to continue regular review of the migration situation and proper implementation of the Accords.[2] Under CFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Cuba who are the beneficiaries of an approved Form I–130, Petition for Alien Relative.[3]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[4] If granted parole into the United States, CFRP parolees may apply for employment authorization while they wait to apply to adjust to LPR status.[5] Unlike parolees under similar family reunification parole (FRP) processes, CFRP beneficiaries may apply for adjustment one year after their parole into the United States under the Cuban Adjustment Act.[6] They do not need to wait for their immigrant visas to become available to apply for adjustment.[7]

Beneficiaries must have a petitioner who filed a Form I–130 on behalf of a principal beneficiary and has been invited to participate in the CFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's Form I–130 must be a Cuban national. Consistent with a **Federal Register** notice updating the CFRP process in 2014, beginning February 17, 2015, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary.[8] Also consistent with that notice, USCIS required that USCIS officers or U.S. Department of State (State) consular officers interview beneficiaries in Havana, Cuba, to verify their eligibility for the program.[9] If USCIS issued a travel document to a given beneficiary, that individual could then travel to the United States to seek parole.

In May 2022, the United States announced the resumption of CFRP operations following suspension of CFRP interviews in September 2017 [10] and closure of the USCIS Havana Field Office on December 10, 2018.[11] In August 2022, USCIS began mailing CFRP interview notices to petitioners with instructions for the beneficiary interview. On August 18, 2022, USCIS restarted interviews at the U.S. Embassy in Cuba. However, USCIS has had limited capacity to conduct interviews due to operational constraints in Cuba. Specifically, while both State and USCIS are working to fully resume operations in Havana, these efforts are taking time to fully realize, which is one reason DHS is implementing these operational changes. Furthermore, the economic and political crisis in Cuba, which has been marked by food shortages, rolling blackouts, and countrywide internet outages,[12] impacts

the USG capacity to process parole requests in Cuba for Cuban nationals and their immediate family members [13] under CFRP.

In short, interview capacity limitations in Cuba, resource constraints within DHS and State, and the pending application caseload have made the process inefficient and inaccessible to many beneficiaries in Cuba. Many applications are pending, and no new invitations to access CFRP have been sent since August 23, 2016.

In the meantime, technology has evolved since the launch of the CFRP process in 2007. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for CFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to CFRP but that follow different procedures that utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 CFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented FRP processes for certain Colombians,[14] Guatemalans,[15]

---

[1] *See generally* U.S. Department of State archived website on Cuban migration, *https://1997-2001.state.gov/regions/wha/cuba/migration.html.* Under the Accords, the United States committed itself to total legal migration to the United States from Cuba of a minimum of 20,000 Cubans each year, not including immediate relatives of U.S. citizens (USCs). *See* Joint Communiqué on Migration, U.S.-Cuba (Sept. 9, 1994) (known together with the Joint Statement With the Republic of Cuba on Normalization of Migration (May 2, 1995) as the U.S.-Cuba Migration Accords).

[2] Cuban Family Reunification Parole Program, 72 FR 65588 (Nov. 15, 2007). Note that, consistent with other processes described in this notice, DHS now refers to CFRP as a process rather than a program.

[3] *Id.; see also* USCIS, The Cuban Family Reunification Parole Program (Sept. 1, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program.*

[4] *Id.*

[5] *See* 8 CFR 274a.12(c)(11).

[6] *See* Public Law 89–732, 80 Stat. 1161 (Nov. 2, 1966), as amended (Immigration and Nationality Act (INA), sec. 245, Note 1, 8 U.S.C. 1255, Note 1).

[7] *Id.*

[8] *Notice of Changes to Application Procedures for the Cuban Family Reunification Parole Program,* 79 FR 75579 (Dec. 18, 2014).

[9] 79 FR 75581.

[10] *See* U.S. Department of State, Biden Administration Measures to Support the Cuban People (May 16, 2022), *https://www.state.gov/biden-administration-measures-to-support-the-cuban-people/. See also* U.S. Embassy in Cuba, USCIS Resumes Cuban Family Reunification Parole Program Operations (September 1, 2022), *https://cu.usembassy.gov/uscis-resumes-cuban-family-reunification-parole-program-operations/#:~:text=CFRP%20processing%20was%20around%20due,office%20in%20Havana%20in%202018.*

[11] *See* USCIS, USCIS Closes Havana Field Office on December 10, 2018 (December 10, 2018), *https://www.uscis.gov/archive/uscis-closes-havana-field-office-on-dec-10-2018.*

[12] New York Times, 'Cuba Is Depopulating': Largest Exodus Yet Threatens Country's Future, Dec. 10, 2022, *https://www.nytimes.com/2022/12/10/world/americas/cuba-us-migration.html;* Dave Sherwood, Reuters, Oct. 1, 2022, Banging pots, Cubans stage rare protests over Hurricane Ian

blackouts. *https://www.reuters.com/world/americas/cubans-havana-bang-pots-protest-days-long-blackout-after-ian-2022-09-30/;* The Economist, Cuba is Facing Its Worst Shortage of Food Since the 1990s (July 1, 2021), *https://www.economist.com/the-americas/2021/07/01/cuba-is-facing-its-worst-shortage-of-food-since-the-1990s.*

[13] Within this notice, "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* INA sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child", in general, as meaning "an unmarried person under twenty-one years of age").

[14] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[15] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

Hondurans,[16] and Salvadorans [17] along these lines. DHS is now conforming the CFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

As done under the 2007 process and the revised process in 2014, invitations to participate in the CFRP process will issue to certain petitioners who have an approved Form I–130 filed on behalf of a Cuban principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available, and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [18] Form I–130 filed on behalf of a Cuban principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's National Visa Center (NVC), as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Cuban principal beneficiary of an approved Form I–130, and how to file separate requests for any immediate family members of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As part of the review process, the petitioner must also pass security and background vetting, including for public safety,

national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

The threshold eligibility criteria for participation in the CFRP continue to apply. Principal beneficiaries must be Cuban nationals who have a petitioner who has been invited to participate. However, DHS is implementing an update for the petitioner to initiate this process so the beneficiary can be considered for issuance of advance authorization to travel to the United States where the beneficiary can seek a discretionary grant of parole at an interior POE.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2007 process and the revised 2014 process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States. For consistency with other FRP processes, parole will generally be granted for a period of up to three years, rather than the two years under the previous CFRP process.

Participation in this process is not limited to beneficiaries currently living

in Cuba.[19] However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Cuban nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[20] expedited removal proceedings,[21] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be or may become ineligible for adjustment of status [22] or for an immigrant visa [23] as a result of entering without inspection and not having been admitted or paroled.[24]

---

[16] See Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[17] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[18] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (e.g., the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[19] DHS recognizes that permitting Cubans to be processed under the CFRP process when not physically present in Cuba means that not all Cubans who are paroled under the CFRP process would count towards the U.S. Government's annual obligation under the U.S.-Cuba Migration Accords.

[20] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[21] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[22] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[23] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) grounds of inadmissibility that render applicants for immigrant visas ineligible).

[24] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180 days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

*C. Description of Updated Process for CFRP*

DHS announces these updates to the CFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since CFRP's inception in 2007. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated CFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this Notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this CFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S.C. or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information— including a ''live'' facial photograph— into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to

the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[25]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[26]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and

---

[25] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[26] *See* 6 U.S.C. 279(g)(2) (defining ''unaccompanied alien child'').

Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[27]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

*D. Termination, No Private Rights, and Severability*

The Secretary retains the sole discretion to terminate this CFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2007 decision to implement this process remains unchanged and is severable from the procedural updates announced in this notice.

### III. Regulatory Requirements

*A. Administrative Procedure Act*

The changes to the CFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the CFRP process, and these updates to that process, constitute a general statement of policy,[28] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [29] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [30] because it sets forth updates to how agencies will implement the CFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[31] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[32] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[33] Improving the efficiency and accessibility of CFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[34] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Cuban nationals.

*B. Paperwork Reduction Act (PRA)*

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the CFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this CFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[35]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17376 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P; 9111–14–P**

---

[27] 8 CFR 274a.12(c)(11).

[28] 5 U.S.C. 553(b)(A).

[29] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[30] 5 U.S.C. 553(b)(A).

[31] 5 U.S.C. 553(a)(1).

[32] See footnotes 14, 15, 16, and 17; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[33] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[34] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the MovilidadSegura.org website and the announcements with hosting countries.

[35] Per the normal clearance procedures at 5 CFR 1320.10(e).

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to ''survey customers to determine the kind and quality of services they want.'' In addition, the Foundations for Evidence-Based Policymaking Act of 2018 (''Evidence Act'') enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

**Collection of Information**

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

**Comments**

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

**Implementation of Changes to the Haitian Family Reunification Parole Process**

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful,

safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

---

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visa to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new

invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded capacity to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9]

Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved [12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members [13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

[2] Id.; see also USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program. To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] See Implementation of Haitian Family Reunification Parole Program, 79 FR 75581 (Dec. 18, 2014). See also USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. See USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs. In June 2022, USCIS reversed its 2019 announcement. See also The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. See Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-3-2-2-4-3-2-2-2-2-5-2-2-2/.

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic

instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. See Implementation of a Parole Process for Haitians, 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. See Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80. To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. See UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.

[8] See Implementation of a Family Reunification Parole Process for Colombians, 88 FR 43591 (July 10, 2023).

[9] See Implementation of a Family Reunification Parole Process for Guatemalans, 88 FR 43581 (July 10, 2023).

[10] See Implementation of a Family Reunification Parole Process for Hondurans, 88 FR 43601 (July 10, 2023).

[11] See Implementation of a Family Reunification Parole Process for Salvadorans, 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (e.g., the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice "immediate family members" is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. See the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); see also INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining "child" in general, as meaning "an unmarried person under twenty-one years of age").

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (*e.g.,* international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider

other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status[16] or for an immigrant visa[17] as a result of entering without inspection and not having been admitted or paroled.[18]

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. *See* INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180

### C. Description of Updated Process for HFRP

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. *See* INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. *See* INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

### Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

### Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information— including a "live" facial photograph— into CBP One.

### Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

### Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (*e.g.,* international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric

information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

### Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

### D. Termination, No Private Rights, and Severability

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

---

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] *See* 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

## III. Regulatory Requirements

### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143]. USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]

**RIN 1615–ZC04**

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

One™. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about both collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00252 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Implementation of Changes to the Parole Process for Venezuelans**

**ACTION:** Notice

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to the Parole Process for Venezuelans that was initiated in October 2022. The Venezuela process provides a safe and orderly pathway for certain individuals to seek authorization to travel to the United States to be considered for parole at an interior port of entry, contingent on the Government of Mexico (GOM) making an independent decision to accept the return or removal of Venezuelan nationals who bypass this new process and enter the United States without authorization. Pursuant to this notice, the Secretary has removed the limit of 24,000 total travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). The Secretary also has updated the eligibility criteria for the Venezuela process by including an exception that will enable Venezuelans who cross without authorization into the United States at the Southwest Border (SWB) and are subsequently permitted a one-time option to voluntarily depart or voluntarily withdraw their application for admission to maintain eligibility to participate in this parole process. DHS believes that these changes are needed to ensure that the Venezuela process continues to deliver the already-realized benefits of reducing the number of Venezuelan nationals crossing our border without authorization and the surge in migration throughout the hemisphere and channels migrants into a safe and orderly process that enables them to enter the United States without making the dangerous journey to the SWB.

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on January 6, 2023. DHS will apply the changes to the process beginning on January 6, 2023.

**FOR FURTHER INFORMATION CONTACT:** Daniel Delgado, Acting Director, Border and Immigration Policy, Office of Strategy, Policy, and Plans, Department of Homeland Security, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528–0445; telephone (202) 447–3459 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**I. Background—Venezuelan Parole Process**

On October 19, 2022, DHS published a **Federal Register** Notice describing a new effort to address the high number of Venezuelans encountered at the SWB.[1] Since the announcement of that process, Venezuelans who have not availed themselves of the process, and instead entered the United States without authorization, have been expelled to Mexico pursuant to the Centers for Disease Control and Prevention (CDC) Title 42 public health Order or, if not expelled, processed for removal or the initiation of removal proceedings.

Once the Title 42 public health Order is lifted, DHS will no longer expel noncitizens to Mexico, but rather all noncitizens will be processed pursuant to DHS's Title 8 immigration authorities. The United States' continued operation of this process will continue to be contingent on the GOM's independent decision to accept the return of removal of individuals, including under Title 8 authorities.

*Eligibility To Participate in the Process*

As described in the October 19 **Federal Register** Notice, the Department of Homeland Security (DHS) implemented a process—modeled on the successful Uniting for Ukraine (U4U) parole process—for certain Venezuelan nationals to lawfully enter the United States in a safe and orderly manner. To be eligible, individuals must have a supporter in the United States who agrees to provide financial support, such as housing and other needs; must pass national security and public safety vetting; and must agree to fly at their own expense to an interior U.S. port of

entry (POE), rather than entering at a land POE.

Individuals are ineligible if they have been ordered removed from the United States within the prior five years or have entered unauthorized into the United States, Mexico, or Panama after October 19, 2022. Venezuelan nationals also are generally ineligible if they are a permanent resident or dual national of any country or hold refugee status in any country other than Venezuela, though per the conforming change described below, they will now remain eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. Only those who meet all specified criteria will be eligible to receive advance authorization to travel to the United States and be considered for parole, on a case-by-case basis, under this process. The process originally limited the number of Venezuelans who could receive travel authorization to 24,000.

**II. Assessment of Venezuela Parole Process to Date**

The success of the Venezuela process demonstrates that combining a clear and meaningful consequence for unauthorized entry along the SWB with a significant incentive for migrants to wait where they are and use a lawful process to come to the United States can change migratory flows. Within a week of the October 12, 2022 announcement of that process, the number of Venezuelans encountered at the SWB fell from over 1,100 per day to under 200 per day, and as of the week ending December 4, to an average of 86 per day.[2] The new process and accompanying consequence for unauthorized entry also led to a precipitous decline in Venezuelan irregular migration[3] throughout the Western Hemisphere. The number of Venezuelans attempting to enter Panama through the Darién was down from 40,593 in October 2022 to just 668 in November.[4] DHS provided the new parole process for Venezuelans who are backed by supporters in the United States to come to the United States by

---

[1] 87 FR 63507 (Oct. 19, 2022).

[2] Office of Immigration Statistics (OIS) analysis of data pulled from CBP Unified Immigration Portal (UIP) December 5, 2022. Data are limited to USBP encounters to exclude those being paroled in through ports of entry.

[3] In this notice, irregular migration refers to the movement of people into another country without authorization.

[4] Servicio Nacional de Migración de Panamá, Irregulares en Tránsito Frontera Panamá-Colombia 2022, *https://www.migracion.gob.pa/images/img2022/PDF/IRREGULARES_%20PDF_%20DARI%C3%89N_NOVIEMBRE_2022.pdf* (last viewed Dec. 11, 2022).

flying to interior POEs—thus obviating the need for them to make the dangerous journey to the SWB. Meanwhile, the GOM for the first time made an independent decision to accept the returns of Venezuelans who crossed the SWB without authorization pursuant to the Title 42 public health Order, which imposed a consequence on Venezuelans who sought to come to the SWB rather than avail themselves of the newly announced parole process. With the vast majority of those encountered returned to Mexico, fewer releases have freed up DHS resources that would otherwise be used to process these individuals; this has also reduced the number of individuals state and local governments, as supported by civil society, have had to receive and assist.

The effects have been felt throughout the Western Hemisphere, not just in the United States. Thousands of Venezuelans who had already crossed the Darién have flown back to Venezuela on voluntary flights organized by the governments of Mexico, Guatemala, and Panama, as well as civil society.[5] Other migrants who were about to enter the Darién have turned around and headed back south.[6] Still others who were intending to migrate north are staying where they are to apply for this lawful process, rather than make the dangerous journey to the SWB.[7]

DHS has seen strong interest in this parole process. As of December 27, 2022, DHS had authorized travel for more than 15,700 Venezuelan beneficiaries, already more than half of the available number of travel authorizations.[8] Of those authorized to travel to the United States, more than 10,600 have arrived and been paroled into the country.[9] More than 3,600 of those Venezuelans who have flown into the United States and were paroled through this process arrived from Colombia; another 2,300 came from Venezuela, 1,500 from Mexico, and

3,100 from other countries. Those figures show that the process is reaching both people in Venezuela and Colombia *before* they seek to irregularly migrate, and those who are displaced in transit countries, like Mexico.[10]

## III. Changes

Given the early success of the process, the Secretary has authorized two changes to the process to ensure its continued viability, particularly as DHS prepares for an eventual transition from Title 42 processing to full Title 8 processing at the border.[11]

### A. Removal of the 24,000 Limit on Travel Authorizations and Replacement With a 30,000 Monthly Limit Spread Across Separate and Independent Parole Processes

The process announced in the October 19 **Federal Register** Notice was subject to a numerical limit. Demand for the Venezuela process has far exceeded the 24,000 limit set in the first **Federal Register** Notice. In just two months of operation, DHS received thousands of applications from supporters and has already approved well more than half of the available travel authorizations. Were DHS to reach the numerical limit, prospective migrants would no longer be eligible for this process, which serves as a meaningful alternative to irregular migration. DHS anticipates that we would then see increased irregular migration of Venezuelans.

Accordingly, the Secretary has removed the 24,000 numerical limit on travel authorizations and replaced it with a monthly limit of 30,000 travel authorizations in the aggregate spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**). This change gives DHS the flexibility to continue the process for Venezuelans, thereby providing more certainty to the public and supporting partners. It also preserves the flexibility to extend or terminate the process, as the circumstances warrant. DHS will continue to evaluate this monthly limit and make adjustments if needed over time.

### B. Updated Eligibility Criteria

Following the GOM's independent decision to accept returns of Venezuelans, DHS began expelling Venezuelans who were encountered after entering the United States without authorization, pursuant to the Title 42 public health Order. Currently, a Venezuelan (or qualifying immediate family member) is ineligible to participate in the parole process if, among other things, they crossed irregularly into the United States after October 19, 2022—regardless of whether they were expelled, ordered removed, or departed voluntarily.[12]

After the Title 42 Order ceases to be in effect, DHS will resume Title 8 immigration processing of all individuals, including Venezuelans. Pursuant to Title 8, noncitizens who have entered the United States without authorization may be permitted to voluntarily depart pursuant to Immigration and Nationality Act (INA) 240B, 8 U.S.C. 1229c, may be permitted to voluntarily withdraw their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), or may be ordered removed, regardless of whether Title 42 remains in effect.

Individuals continue to be generally ineligible for consideration for parole pursuant to this process if they have crossed into the United States without authorization between POEs along the SWB since October 20, 2022. There will now be the following exception: individuals who have crossed without authorization into the United States after December 20, 2022, and have been permitted a single instance of voluntary departure pursuant to INA 240B, 8 U.S.C. 1229c, or withdrawal of their application for admission pursuant to INA 235(a)(4), 8 U.S.C. 1225(a)(4), will remain eligible to participate in the parole process. If such an individual crossed without authorization between POEs along the SWB from October 20, 2022 through December 20, 2022, they would remain ineligible to participate and the exception would not apply. Permitting Venezuelan nationals to voluntarily depart or withdraw their application for admission one time and still be considered for parole through the process will reduce the burden on DHS personnel and resources that would otherwise be required to obtain and execute a final order of removal. This includes reducing strain on detention and removal flight capacity, officer resources, and reducing costs associated with detention and monitoring.

---

[5] La Prensa Latina Media, *More than 4,000 migrants voluntarily returned to Venezuela from Panama, https://www.laprensalatina.com/more-than-4000-migrants-voluntarily-returned-to-venezuela-from-panama/,* Nov. 9 2022 (last viewed Dec. 8, 2022).

[6] Voice of America, *U.S. Policy Prompts Some Venezuelan Migrants to Change Route, https://www.voanews.com/a/us-policy-prompts-some-venezuelan-migrants-to-change-route/6790996.html,* Oct. 14, 2022 (last viewed Dec. 8, 2022).

[7] Axios, *Biden's new border policy throws Venezuelan migrants into limbo, https://www.axios.com/2022/11/07/biden-venezuela-border-policy-darien-gap,* Nov. 7 2022 (last viewed Dec. 8, 2022).

[8] Department of Homeland Security, Daily Venezuela Report, Dec. 27, 2022.

[9] *Id.*

[10] *Id.*

[11] The Secretary authorized the changes following considerations reflected in the Secretary's decision memorandum dated December 22, 2022. *See* Memorandum for the Secretary from the Under Secretary for Strategy, Policy, and Plans, Acting Commissioner of U.S. Customs and Border Protection, and Director of U.S. Citizenship and Immigration Services, Updates to the Parole Process for Certain Venezuelan Nationals (Dec. 22, 2022).

[12] 87 FR 63507 (Oct. 19, 2022).

The Secretary has also approved a conforming change to provide that a Venezuelan national who is a permanent resident or dual national of any country or holds refugee status in any country other than Venezuela remains eligible to be considered for parole under this process if DHS operates a similar parole process for nationals of that other country. All other eligibility requirements described in the October 19, 2022 Notice remain the same.

These changes are responsive to our multilateral commitments to address irregular migration throughout the Hemisphere. In this case, the United States is making two changes to this process that will support our commitment to creating additional lawful pathways. For its part, the GOM has made an independent decision to accept the return or removal, including under Title 8, of Venezuelan nationals who bypass this new process and enter the United States without authorization. The United States' continued operation of this process is contingent on the GOM's independent decision in this regard.

## C. Scope, Termination, and No Private Rights

The Secretary retains the sole discretion to terminate the Parole Process for Venezuelans at any point. The number of travel authorizations granted under this process shall be spread across this process and the separate and independent Parole Process for Cubans, Parole Process for Haitians, and Parole Process for Nicaraguans (as described in separate notices published concurrently in today's edition of the **Federal Register**), and shall not exceed 30,000 each month. Each of these processes operates independently, and any action to terminate or modify any of the other processes will have no bearing on the criteria for or independent decisions with respect to this process.

This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal.

## IV. Regulatory Requirements

### A. Administrative Procedure Act

The October 19 **Federal Register** Notice describing this process explained that this process is exempt from notice-and-comment rulemaking requirements because (1) the process is a general statement of policy,[13] (2) the process

pertains to a foreign affairs function of the United States,[14] and (3) even if notice-and-comment were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[15] The changes described in this Notice are amenable to immediate issuance and implementation for the same reasons.

First, these changes relate to a general statement of policy,[16] *i.e.,* a "statement[] issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [17] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."

Second, even if these changes were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, these changes—like the implementation of the process itself—pertain to a foreign affairs function of the United States, as described in the October 19 notice, and are directly responsive to ongoing conversations with, and requests from, foreign partners.[18] Specifically, the GOM has urged the United States to consider lifting the 24,000 limit,[19] which would allow more Venezuelans to participate in and engage the process and further disincentivize irregular migration, enhancing the security of both of our borders. Delaying implementation of these changes to conduct notice-and-comment rulemaking would directly implicate the GOM's independent decision to accept returns, including under Title 8 processes, and produce undesirable international consequences. Absent these changes, DHS would soon reach the 24,000 cap and GOM no longer accept the returns of Venezuelan nationals. Thus, without these changes,

DHS would no longer have the ability to return Venezuelan nationals to Mexico, and the Venezuela process would no longer be viable. That would then, in all likelihood, lead to another surge in migration of Venezuelan nationals throughout the hemisphere and to our border.

Finally, even if notice-and-comment and a delayed effective date were required, DHS would for good cause find that the delay associated with implementing these changes through notice-and-comment rulemaking would be impracticable and contrary to the public interest because of the need for coordination with the GOM, and the urgent border and national security and humanitarian interests in reducing and diverting the flow of irregular migration.[20] As noted above, absent immediate action, there is a risk that DHS meets the 24,000 cap, which would in turn cause the GOM to no longer accept the returns of Venezuelan nationals and end the success of the parole process to date at reducing the number of Venezuelan nationals encountered at the border.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice involves three collections of information, as follows.

In connection with the process for Venezuelans, OMB has previously approved a revision to USCIS Form I–134, *Declaration of Financial Support* (OMB control number 1615–0014) under the PRA's emergency processing procedures at 5 CFR 1320.13. OMB has recently approved a new collection, Form I–134A, Online Request for Consideration to be a Supporter and Declaration of Financial Support (OMB control number 1615–NEW). This new collection will now be used for the Venezuela parole process and is being revised in connection with this notice, including by increasing the burden estimate. USCIS has submitted and OMB has approved a request for emergency authorization of the required changes (under 5 CFR 1320.13) for a period of 6 months. Within the next 90 days, USCIS will immediately begin normal clearance procedures under the PRA.

OMB has also previously approved an emergency request under 5 CFR 1320.13 for a revision to an information

---

[13] 5 U.S.C. 553(b)(A); *see also id.* 553(d)(2).

[14] 5 U.S.C. 553(a)(1).

[15] 5 U.S.C. 553(b)(B).

[16] 5 U.S.C. 553(b)(A); *id.* 553(d)(2).

[17] *Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[18] 5 U.S.C. 553(a)(1).

[19] *See* Dallas Morning News, *Ahead of Title 42's end, U.S.-Mexico negotiations called 'intense,' 'round-the-clock' https://www.dallasnews.com/news/2022/12/13/ahead-of-title-42s-end-us-mexico-negotiations-called-intense-round-the-clock/,* Dec. 13, 2022 (last viewed Dec. 14, 2022).

[20] *See* 5 U.S.C. 553(b)(B); *id.* 553(d)(3).

collection from CBP entitled Advance Travel Authorization (OMB control number 1651–0143). In connection with the changes described above, CBP is making further changes under the PRA's emergency processing procedures at 5 CFR 1320.13, including increasing the burden estimate. OMB has approved the emergency request for a period of 6 months. Within the next 90 days, CBP will immediately begin normal clearance procedures under the PRA.

More information about these collections can be viewed at *www.reginfo.gov.*

**Alejandro N. Mayorkas,**
*Secretary of Homeland Security.*
[FR Doc. 2023–00253 Filed 1–5–23; 4:15 pm]
**BILLING CODE 9110–09–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

[Internal Agency Docket No. FEMA–4678–DR; Docket ID FEMA–2022–0001]

**West Virginia; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of West Virginia (FEMA–4678–DR), dated November 28, 2022, and related determinations.

**DATES:** The declaration was issued November 28, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 28, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of West Virginia resulting from severe storms, flooding, landslides, and mudslides during the period of July 12 to July 13, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of West Virginia.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance and Hazard Mitigation will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Jeffrey L. Jones, of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of West Virginia have been designated as adversely affected by this major disaster:

McDowell County for Public Assistance.
All areas within the State of West Virginia are eligible for assistance under the Hazard Mitigation Grant Program.
The following Catalog of Federal Domestic Assistance Numbers (CFDA) are to be used for reporting and drawing funds: 97.030, Community Disaster Loans; 97.031, Cora Brown Fund; 97.032, Crisis Counseling; 97.033, Disaster Legal Services; 97.034, Disaster Unemployment Assistance (DUA); 97.046, Fire Management Assistance Grant; 97.048, Disaster Housing Assistance to Individuals and Households In Presidentially Declared Disaster Areas; 97.049, Presidentially Declared Disaster Assistance—Disaster Housing Operations for Individuals and Households; 97.050, Presidentially Declared Disaster Assistance to Individuals and Households—Other Needs; 97.036, Disaster Grants—Public Assistance (Presidentially Declared Disasters); 97.039, Hazard Mitigation Grant.

**Deanne Criswell,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2023–00177 Filed 1–6–23; 8:45 am]
**BILLING CODE 9111–23–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Federal Emergency Management Agency**

[Internal Agency Docket No. FEMA–4677–DR; Docket ID FEMA–2022–0001]

**South Carolina; Major Disaster and Related Determinations**

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** This is a notice of the Presidential declaration of a major disaster for the State of South Carolina (FEMA–4677–DR), dated November 21, 2022, and related determinations.

**DATES:** The declaration was issued November 21, 2022.

**FOR FURTHER INFORMATION CONTACT:** Dean Webster, Office of Response and Recovery, Federal Emergency Management Agency, 500 C Street SW, Washington, DC 20472, (202) 646–2833.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that, in a letter dated November 21, 2022, the President issued a major disaster declaration under the authority of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"), as follows:

I have determined that the damage in certain areas of the State of South Carolina resulting from Hurricane Ian during the period of September 25 to October 4, 2022, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 *et seq.* (the "Stafford Act"). Therefore, I declare that such a major disaster exists in the State of South Carolina.

In order to provide Federal assistance, you are hereby authorized to allocate from funds available for these purposes such amounts as you find necessary for Federal disaster assistance and administrative expenses.

You are authorized to provide Individual Assistance and Public Assistance in the designated areas and Hazard Mitigation throughout the State. Consistent with the requirement that Federal assistance be supplemental, any Federal funds provided under the Stafford Act for Public Assistance, Hazard Mitigation, and Other Needs Assistance under section 408 will be limited to 75 percent of the total eligible costs.

Further, you are authorized to make changes to this declaration for the approved assistance to the extent allowable under the Stafford Act.

The time period prescribed for the implementation of section 310(a), Priority to Certain Applications for Public Facility and Public Housing Assistance, 42 U.S.C. 5153, shall be for a period not to exceed six months after the date of this declaration.

The Federal Emergency Management Agency (FEMA) hereby gives notice that pursuant to the authority vested in the Administrator, under Executive Order 12148, as amended, Kevin A. Wallace, Sr., of FEMA is appointed to act as the Federal Coordinating Officer for this major disaster.

The following areas of the State of South Carolina have been designated as adversely affected by this major disaster:

Specialist, Marketing & Outreach, Federal Insurance, Federal Insurance and Mitigation Administration, 202–322–6215, *joshua.heath@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** E.O. 12862 directs Federal Agencies to provide service to the public that matches or exceeds the best service available. Section 1(b) of E.O. 12862 requires government agencies to "survey customers to determine the kind and quality of services they want." In addition, the Foundations for Evidence-Based Policymaking Act of 2018 ("Evidence Act") enables agencies to collect and analyze data to use as evidence in policymaking, as well as assess the effectiveness and efficiency of current programs. To work continuously to ensure that our programs are effective and meet our customers' needs, FEMA seeks to obtain the Office of Management and Budget's (OMB) approval of a generic clearance to collect information through mixed methods (quantitative and qualitative) to improve marketing, outreach, and other promotional activities of services, programs, and opportunities offered by FEMA.

This proposed information collection previously published in the **Federal Register** on May 5, 2023, at 88 FR 29143 with a 60-day public comment period. No comments were received. The purpose of this notice is to notify the public that FEMA will submit the information collection abstracted below to the Office of Management and Budget for review and clearance.

**Collection of Information**

*Title:* Generic Clearance for the Multi-Modal Mixed Methods Collection of Information to Inform Agency Marketing and Outreach.

*Type of Information Collection:* New information collection.

*OMB Number:* 1660–NW131.

*FEMA Forms:* Not applicable.

*Abstract:* In accordance with the Evidence Act, the collected information will equip FEMA with vital feedback from the general public and stakeholders that will allow for evidence-based improvements to FEMA's programs and services. FEMA will collect, analyze, and interpret information to identify strengths and weaknesses of programs based on current stakeholder experience and make improvements in the marketing and other promotional activities based on feedback.

*Affected Public:* Individuals and households, business or other for-profit, Federal Government, State, local or Tribal government, non-profit institutions.

*Estimated Number of Respondents:* 45,600.

*Estimated Number of Responses:* 45,600.

*Estimated Total Annual Burden Hours:* 7,861.

*Estimated Total Annual Respondent Cost:* $374,020.

*Estimated Respondents' Operation and Maintenance Costs:* $0.

*Estimated Respondents' Capital and Start-Up Costs:* $0.

*Estimated Total Annual Cost to the Federal Government:* $748,830.

**Comments**

Comments may be submitted as indicated in the **ADDRESSES** caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the Agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the Agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Millicent Brown Wilson,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2023–17281 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–52–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**[CIS No. 2754–23; DHS Docket No. USCIS–2014–0013]**

**RIN 1615–ZC03**

**Implementation of Changes to the Haitian Family Reunification Parole Process**

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Haitian Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Haitian Family Reunification Parole (HFRP). HFRP provides a lawful,

safe, and orderly pathway for certain Haitians to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to HFRP in light of technological advancements and process efficiencies created since the HFRP's inception in 2014. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

In 2014, U.S. Citizenship and Immigration Services (USCIS) launched HFRP to expedite family reunification through lawful, safe, and orderly channels of migration to the United States, increase existing avenues for lawful migration from Haiti, and help Haiti in its recovery from the long-term impacts of the January 12, 2010 earthquake that devastated the country.[1] Under HFRP, the U.S. Government (USG) invites certain eligible United States citizen (U.S.C.) and LPR petitioners to file a request and initiate consideration for parole for certain family members in Haiti who are the beneficiaries of an approved Form I–130, Petition for Alien Relative. Since it was established in 2014, HFRP has allowed certain beneficiaries of family-based immigrant petitions that were approved on or before December 18, 2014 to request a discretionary grant of parole to enter the United States up to approximately two years before their immigrant visas become available,

---

[1] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). Note that, consistent with other processes described in this notice, DHS now refers to HFRP as a process rather than a program.

**54636** **Federal Register** / Vol. 88, No. 154 / Friday, August 11, 2023 / Notices

rather than remain in Haiti awaiting availability of their immigrant visas.[2]

If travel is authorized for the beneficiaries, these family members are allowed to travel to the United States before their immigrant visas become available and seek parole on a case-by-case basis upon arrival at a port of entry (POE) in the United States.[3] If granted parole into the United States, HFRP parolees may apply for employment authorization while they wait for their immigrant visa to become available so they may apply to adjust to LPR status.[4]

As launched in 2014, USCIS required invited petitioners to file a completed Form I–131, Application for Travel Document, and submit the required fee(s) or fee waiver request for consideration of parole for each beneficiary. USCIS also required that USCIS officers interview beneficiaries in Port-au-Prince, Haiti, to verify their eligibility for HFRP. The National Visa Center (NVC) at the U.S. Department of State (State) first issued invitations to eligible petitioners to apply for HFRP in March 2015. Due to several factors, including anticipated policy changes,[5] a change in Administrations, the permanent closure of USCIS's field office in Port-au-Prince, Haiti, on December 20, 2019, extremely limited visa processing due to COVID–19,[6] and severe insecurity in the country,[7] new

invitations to the HFRP process have not issued since June 2016 and interviews have not taken place since December 2019.

In the meantime, technology has evolved since the launch of HFRP in 2014. DHS is now able to electronically collect biographic information and evidentiary documents to facilitate identity verification, national security checks, and public safety vetting. DHS has expanded processes to intake forms through online processes and allow individuals to upload supporting documentation directly online as part of the application process. The updated process for HFRP utilizes these technological developments to make the advance travel authorization and parole process more efficient and accessible while maintaining national security and public safety vetting measures as well as other measures for case-by-case adjudication.

In addition, DHS has recently implemented parole processes that are similar to HFRP but that follow different procedures, which utilize these recent technological developments. These include the filing of a Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, the use of a fully electronic request for advance travel authorization (as opposed to the petitioner's use of the Form I–131 under the 2014 HFRP procedures), and processing without a requirement for an in-person interview abroad. Most recently, on July 10, 2023, DHS implemented family reunification parole (FRP) processes for certain Colombians,[8] Guatemalans,[9]

Hondurans,[10] and Salvadorans[11] along these lines. DHS is now conforming the HFRP process to these recently announced processes.

## II. Modernized Process

### A. Petitioners

Invitations to participate in the HFRP process will continue to issue to certain petitioners who have an approved Form I–130 filed on behalf of a Haitian principal beneficiary. Invitations will continue to issue at the USG's discretion, based on operational capacity, the expected period of time until the principal beneficiary's immigrant visa becomes available and in a manner calibrated to best achieve the foreign policy aims of this process.

Petitioners who have an approved[12] Form I–130 filed on behalf of a Haitian principal beneficiary outside the United States should ensure that their mailing address and other contact information are up to date with State's NVC as this is the information that will be used to issue invitations. The invitations will provide information about how the petitioner may file a request to be a supporter with USCIS to initiate this process on behalf of a Haitian principal beneficiary of an approved Form I–130 and how to file separate requests for any immediate family members[13] of the principal beneficiary.

As part of the request process, the petitioner will be required to provide evidence of their income and assets and commit to provide financial support to the beneficiary named in the request for the period of parole. Petitioners will also be required to provide evidence to verify the familial relationship between the principal beneficiary of the Form I–130 and all immediate family members of the principal beneficiary for whom the petitioner will be filing a request to be a supporter under this process. As

---

[2] *Id.; see also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.* To participate in HFRP, beneficiaries must have a petitioner who filed a Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary, and was invited to participate in the HFRP process after the Form I–130 was approved. The principal beneficiary of that petitioner's approved Form I–130 must be a Haitian national.

[3] *See Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014). *See also* USCIS, The Haitian Family Reunification Parole Program (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[4] 8 CFR 274a.12(c)(11).

[5] In August 2019, USCIS announced an intention to terminate HFRP, although USCIS never formally terminated the process. *See* USCIS to End Certain Categorical Parole Programs (Aug. 2, 2019), *https://www.uscis.gov/archive/uscis-to-end-certain-categorical-parole-programs.* In June 2022, USCIS reversed its 2019 announcement. *See also* The Haitian Family Reunification Parole (HFRP) Program: Alert (June 22, 2022), *https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program.*

[6] On March 19, 2020, the U.S. Embassy Port-au-Prince, Haiti, issued a Health Alert and suspended all non-emergency consular services. *See* Health Alert—U.S. Embassy Port-au-Prince, Haiti (March 19, 2020), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-january-8-2020-4-3-2-2-3-2-2-2-3-3-2-2-2-2-2-2-3-2-2-4-3-2-2-2-5-2-2-2/.*

[7] The assassination of Haiti's late President Jovenel Moïse exacerbated political and economic

instability in Haiti, undermining state institutions and generating a power vacuum that has since been occupied by gangs. *See Implementation of a Parole Process for Haitians,* 88 FR 1243, 1246–47 (Jan. 9, 2023) (discussing conditions in Haiti). Due to the lawlessness in the country, the U.S. Embassy in Haiti temporarily suspended visa processing and continues to operate at a limited capacity. *See* Security Alert: U.S. Embassy Port-au-Prince, Haiti (Feb. 5, 2023), *https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-80.* To further complicate matters, on August 14, 2021, a 7.2 magnitude earthquake hit Haiti, killing more than 2,200 people, injuring over 12,000 more, destroying tens of thousands of homes, and crippling Haiti's already fragile infrastructure. *See* UNICEF, Massive earthquake leaves devastation in Haiti: UNICEF and partners are on the ground providing emergency assistance for children and their families (Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[8] *See Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[9] *See Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[10] *See Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[11] *See Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[12] In certain circumstances, such as if the beneficiary is no longer eligible for the Form I–130 (*e.g.,* the petitioner is no longer an LPR or U.S.C.), parole would be denied, and the Form I–130 approval would be revoked. If DHS revokes Form I–130 approval, the beneficiary will no longer be eligible for an immigrant visa. DHS will make these determinations on a case-by-case basis and will provide a written notice of the revocation of the approved Form I–130.

[13] Throughout this notice ''immediate family members'' is used as a shorthand for the derivative beneficiary spouse and children of a principal beneficiary. *See* the Immigration and Nationality Act (INA), sec. 203(d), 8 U.S.C. 1153(d); *see also* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) (defining ''child'' in general, as meaning ''an unmarried person under twenty-one years of age'').

part of the review process, the petitioner must also pass security and background vetting, including for public safety, national security, human trafficking, and exploitation concerns.

### B. Beneficiaries

Previously, the HFRP process limited eligibility to Haitian principal beneficiaries of Forms I–130 and their immediate family members that were approved by USCIS on or before December 18, 2014 and for whom an immigrant visa was not currently available. The volume of invitations issued was limited based on operational capacity and other factors, as described above. The revised process is open to all Haitian principal beneficiaries of an approved Form I–130 and their immediate family members who have not yet received an immigrant visa regardless of the date on which USCIS approved the Form I–130. However, as mentioned above, the process will still be available on an invitation-only basis.

In addition, individuals whose immigrant visas were not available but were expected to become available within a specific time range were previously sent invitations to participate in the HFRP process. USCIS will no longer apply a time limit for expected immigrant visa availability. However, USCIS will consider when a beneficiary's immigrant visa is expected to become available when determining which petitioners will receive invitations to initiate this process on behalf of the beneficiary of their approved Form I–130.

To be eligible to be considered under this process, a beneficiary must not have been issued an immigrant visa at the time the invitation issues to the petitioner and, if authorized to travel, must now travel by commercial air with sufficient documentation (e.g., international passport) to an interior POE.

In addition, as with the 2014 HFRP process, each beneficiary must undergo and pass national security and public safety vetting and must demonstrate that they otherwise merit a favorable exercise of discretion by DHS. Under this updated process, U.S. Customs and Border Protection (CBP) will consider a beneficiary's previous immigration history, encounters with USG entities, and the results of national security and public safety vetting when determining a beneficiary's eligibility to be issued advance authorization to travel to the United States. CBP will determine, on a case-by-case basis, whether to exercise discretion to grant parole to the beneficiary at an interior POE upon their arrival. CBP also will consider

other factors in making discretionary determinations consistent with long-standing policy and practice.

Upon arrival at an interior POE, each beneficiary must demonstrate to CBP that a grant of parole is warranted based on a significant public benefit or for urgent humanitarian reasons and that the beneficiary merits a favorable exercise of discretion. Each beneficiary must also comply with all additional requirements, including vaccination requirements and other public health guidelines, prior to traveling to the United States.

Participation in this process is not limited to beneficiaries currently living in Haiti. However, as noted above, beneficiaries must be outside the United States to participate in the process, and the principal beneficiaries must be Haitian nationals.

A beneficiary of this process who enters the United States between POEs rather than being considered for parole under this process will be processed under Title 8 of the U.S. Code and face appropriate consequences. For example, they may be subject to potential criminal prosecution,[14] expedited removal proceedings,[15] or removal proceedings under section 240 of the INA, 8 U.S.C. 1229a. In addition, beneficiaries who enter the United States between POEs rather than being considered for parole under this process may already be, or may become, ineligible for adjustment of status[16] or for an immigrant visa[17] as a result of entering without inspection and not having been admitted or paroled.[18]

---

[14] 8 U.S.C. 1325, 1326 (for illegal entry and reentry, respectively).

[15] INA sec. 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).

[16] INA sec. 245(a), 8 U.S.C. 1255(a) (requiring adjustment of status applicants to be inspected and admitted or inspected and paroled, as well as be admissible); INA sec. 245(c), 8 U.S.C. 1255(c)(2) (adjustment of status applicants are ineligible if they are in unlawful immigration status on the date of filing the application for adjustment of status or fail to maintain continuously a lawful status since entry into the United States); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for adjustment of status ineligible).

[17] INA sec. 221(g), 8 U.S.C. 1201(g) (immigrant visa applicants are ineligible for immigrant visas if inadmissible under INA sec. 212(a), 8 U.S.C. 1182(a)); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility that render applicants for immigrant visas ineligible).

[18] For example, an applicant for adjustment of status who previously accrued more than one year of unlawful presence, departed, and thereafter reentered the United States without admission or parole is inadmissible and ineligible for adjustment unless they apply for and obtain consent to reapply for admission from outside the United States after waiting ten years after their last departure from the United States. See INA sec. 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(C)(i)(I). In addition, an applicant for an immigrant visa who accrued more than 180

### C. Description of Updated Process for HFRP

DHS announces these updates to the HFRP process in light of lessons learned, technological advancements made, and efficiencies created in parole processes developed and implemented since HFRP's inception in 2014. Except for the medical exam by a panel physician and the ultimate parole determination made in person, on a case-by-case basis, by CBP at an interior POE, all steps of the updated HFRP process will generally be completed online. As a result, the process will no longer require an in-country interview for each beneficiary.

Step 1: Invitation Sent to Petitioner

An invitation may be sent to a petitioner who has filed an approved Form I–130 on behalf of the principal beneficiary and any derivative beneficiaries listed on the Form I–130. The decision whether to send the invitation is based on multiple discretionary factors. Such factors may include operational capacity considerations, the expected period of time until the beneficiary's immigrant visa becomes available, as well as other measures calibrated to best achieve the policy aims of this process as described in this notice.

Only after receiving an invitation may the petitioner file a Form I–134A request to initiate consideration under this HFRP process. Participation in the process will continue to be voluntary. The invitation will instruct the petitioner on next steps to initiate this process on behalf of the beneficiaries, including instructions on documentation to include in their Form I–134A filing. Each invitation will include an identifying number that the petitioner must include in the Form I–134A for each beneficiary on whose behalf they wish to request to be a supporter.

Step 2: Petitioner Files Form I–134A Online

After receiving an invitation to initiate this process, the U.S. citizen

---

days of unlawful presence in the United States, departed (or is removed, as applicable), and again seeks admission (by filing an immigrant visa application) within 3 or 10 years of departure (or removal) is inadmissible and ineligible for an immigrant visa unless they apply for and obtain a waiver of inadmissibility. See INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Additionally, an applicant for an immigrant visa who was ordered removed, departed, and again seeks admission within certain periods of time thereafter is inadmissible and therefore ineligible for an immigrant visa unless they apply for and obtain consent to reapply for admission. See INA sec. 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A).

(U.S.C.) or LPR petitioner who filed the approved Form I–130 on behalf of the beneficiaries will submit a Form I–134A for each beneficiary with USCIS through the USCIS online web portal. The petitioner must submit a separate Form I–134A for each beneficiary, including derivatives of the principal beneficiary. The petitioner will not be required to pay a fee to file Form I–134A. The Form I–134A identifies and collects information on both the petitioner and the beneficiary.

The petitioner must submit evidence establishing their income and assets and commit to provide financial support to the beneficiary for the duration of parole. The petitioner must also submit evidence establishing the family relationships between the principal beneficiary and all derivative beneficiaries.

USCIS will perform background checks on the petitioner and verify their financial information to ensure that the petitioner is able to financially support the beneficiary. If the petitioner's Form I–134A is confirmed, the request proceeds to the next step.

Step 3: Beneficiary Electronically Provides Information To Support the Request

If a petitioner's Form I–134A is confirmed by USCIS, the beneficiary named in the Form I–134A will receive an email from USCIS with instructions to create a USCIS online account and next steps for completing the request. The beneficiary will be required to confirm their biographic information in their online account and attest to meeting eligibility requirements.

As part of confirming eligibility in their USCIS online account, a beneficiary who seeks advance authorization to travel to the United States will need to confirm that they meet public health requirements, including certain vaccination requirements.

Step 4: Beneficiary Submits Request in CBP One Mobile Application

After confirming biographic information in their USCIS online account and completing required eligibility attestations, the beneficiary will receive instructions through their USCIS online account for accessing the CBP One mobile application. The beneficiary must enter certain biographic and biometric information—including a "live" facial photograph—into CBP One.

Step 5: Approval To Travel to the United States

A beneficiary who establishes eligibility for this process, passes all the requisite vetting, and demonstrates that they otherwise warrant a favorable exercise of discretion, may receive an electronic advance authorization from CBP to travel to the United States. This will facilitate their ability to travel to the United States to seek a discretionary grant of parole, on a case-by-case basis, at an interior POE.

The beneficiary will receive a notice in their USCIS online account confirming whether CBP has, in its discretion, provided the beneficiary with advance authorization to travel to the United States. If approved, the beneficiary is responsible for securing their own travel via commercial air to an interior POE inside a U.S. airport.[19]

Approval of advance authorization to travel does not guarantee a beneficiary will be paroled into the United States upon inspection at the POE. Whether to parole the beneficiary is a discretionary, case-by-case determination made by CBP at the time the beneficiary arrives at the interior POE.

Step 6: Beneficiary Seeks Parole at the POE

To use the advance authorization to travel to the United States, the beneficiary must have sufficient documentation (e.g., international passport) to travel on a commercial airline. Beneficiaries under the age of 18 to whom CBP issues advance authorization to travel under this process may be subject to additional screening and/or travel parameters in coordination with U.S. authorities to ensure appropriate travel arrangements and coordination with their parent(s) or legal guardian(s). This FRP process does not affect CBP's legal obligations regarding the identification and processing of unaccompanied children.[20]

CBP will inspect each beneficiary arriving at an interior POE under this process and consider each individual, on a case-by-case basis, for a grant of discretionary parole for a period of up to three years. Upon arrival at an interior POE, the beneficiary will be required to submit additional biometrics to DHS, including another photograph and fingerprints. This biometric

information will support additional vetting against available databases to inform an independent determination by CBP officers as to whether parole is warranted on a case-by-case basis and whether the beneficiary merits a favorable exercise of discretion.

A beneficiary who is determined to pose a national security or public safety threat will be denied parole. A beneficiary who otherwise does not warrant parole pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), as a matter of discretion upon inspection, will be processed under an appropriate disposition and may be referred to U.S. Immigration and Customs Enforcement (ICE) for detention.

Step 7: Parole

If granted parole at the POE, on a case-by-case basis, parole will generally be granted for a period of up to three years, subject to satisfying applicable health and vetting requirements, and the parolee will be eligible to apply for employment authorization for the duration of the parole period.[21]

Parole may be terminated upon notice at DHS's discretion, and the noncitizen may be placed into removal proceedings and/or detained if, for example, the parolee fails to maintain the conditions for the parole or other derogatory information emerges during the parole period. A noncitizen paroled into the United States under this process may request additional periods of parole. DHS will determine whether an additional period is warranted, on a case-by-case basis, for urgent humanitarian reasons or significant public benefit. All of the steps in this process, including the decision to confirm or non-confirm the Form I–134A, as well as the decision whether to issue advance authorization to travel and make the parole decision at the interior POE, are entirely discretionary and not subject to appeal on any grounds.

D. Termination, No Private Rights, and Severability

The Secretary retains the sole discretion to terminate this HFRP process at any point. This process is being implemented as a matter of the Secretary's discretion. It is not intended to and does not create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal. The 2014 decision to implement this process remains unchanged and is severable from the

---

[19] Air carriers can validate an approved and valid travel authorization submission using the same mechanisms that are currently in place to validate that a traveler has a valid visa or other documentation to facilitate issuance of a boarding pass for air travel.

[20] See 6 U.S.C. 279(g)(2) (defining "unaccompanied alien child").

[21] 8 CFR 274a.12(c)(11).

procedural updates announced in this notice.

## III. Regulatory Requirements

### A. Administrative Procedure Act

The changes to the HFRP process announced in this notice are exempt from notice-and-comment rulemaking and delayed effective date requirements on multiple grounds and are therefore amenable to immediate issuance and implementation.

*First,* the HFRP process, and these updates to that process, constitute a general statement of policy,[22] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [23] As section 212(d)(5)(A) of the INA, 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary "in his discretion." This policy creates a process for making discretionary, case-by-case parole decisions. The updates to the process do not change the nature of the policy and fall under the exception for general statements of policy. Additionally, this falls under the separate exception for rules of agency organization, procedure, or practice [24] because it sets forth updates to how agencies will implement the HFRP process.

*Second,* even if the updates to this process were considered to be a legislative rule that will normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the updates are exempt from such requirements because they involve a foreign affairs function of the United States.[25] As discussed in the July 10, 2023 notices announcing four new family reunification processes,[26] the United States continues to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration.[27] Improving the

efficiency and accessibility of HFRP is necessary to ensure our foreign partners' continued collaboration on migration issues, including the ability of the United States to meet other immigration-management priorities such as the implementation of the initial phases of Safe Mobility Offices (SMOs) in Guatemala, Costa Rica, and Colombia.[28] Also, as with the four new processes, delays in implementing these procedural changes would complicate broader ongoing and future discussions and negotiations with key foreign partners about migration management. As such, foreign partners have requested that the United States ensure that functional, efficient lawful pathways exist for Haitian nationals.

### B. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The updates to the HFRP process announced by this notice require changes to the collection of information on Form I–134A, Online Request to be a Supporter and Declaration of Financial Support (OMB control number 1615–0157), and the collection of information on Form I–131, Application for Travel Document (OMB control number 1615–0013), which will be used for this HFRP process and are being revised in connection with this notice by adjusting the burden estimate. The updates to this process also require changes to the collection of information for Advance Travel Authorization (ATA) (OMB

Control Number 1651–0143). USCIS and CBP have submitted, and OMB has approved, requests for emergency authorization of the required changes (under 5 CFR 1320.13) to Form I–134A, Form I–131, and ATA for a period of six (6) months. USCIS and CBP will issue respective 60-day **Federal Register** notices seeking comment on these changes on or before August 25, 2023.[29]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2023–17344 Filed 8–10–23; 8:45 am]

**BILLING CODE 9111–97–P ; 9111–14–P**

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2753–23; DHS Docket No. USCIS–2007–0043]

RIN 1615–ZC04

## Implementation of Changes to the Cuban Family Reunification Parole Process

**AGENCY:** Department of Homeland Security (DHS).

**ACTION:** Notice of changes to Cuban Family Reunification Parole.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) has authorized updates to modernize Cuban Family Reunification Parole (CFRP). CFRP provides a lawful, safe, and orderly pathway for certain Cubans to seek parole into the United States, allowing them to reunite with family as they wait for their immigrant visas to become available so they may apply to adjust status to lawful permanent resident (LPR). The Secretary has authorized these updates to CFRP in light of technological advancements and process efficiencies created since the CFRP's inception in 2007. Every step of the updated process will be completed online with the exception of a medical exam by a panel physician and the parole determination made upon arrival at an interior U.S. port of entry (POE).

**DATES:** DHS will begin using the Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, for this process on August 11, 2023.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs,

---

[22] 5 U.S.C. 553(b)(A).

[23] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[24] 5 U.S.C. 553(b)(A).

[25] 5 U.S.C. 553(a)(1).

[26] *See* footnotes 8, 9, 10, and 11; *see also* DHS press release "DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras" (July 7, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala.*

[27] *See* The White House, Joint Statement from the United States and Guatemala on Migration (Jun 1, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/01/joint-statement-from-the-united-states-and-guatemala-on-migration/* and *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* United States Department of State, U.S.-Colombia Joint

Commitment to Address the Hemispheric Challenge of Irregular Migration (June 4, 2023), *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see* The White House, Readout of Principal Deputy National Security Advisor Jon Finer's Meeting with Colombian Foreign Minister Alvaro Leyva (June 11, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/11/readout-of-principal-deputy-national-security-advisor-jon-finers-meeting-with-colombian-foreign-minister-alvaro-leyva/; see* United States Department of State, U.S.-Costa Rica Joint Commitment to Address the Hemispheric Challenge of Irregular Migration (June 12, 2023), *https://www.state.gov/u-s-costa-rica-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/.*

[28] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (April 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.* DHS has previously announced the intention to establish Regional Processing Centers (RPCs) but will now refer to them as Safe Mobility Offices (SMOs) following the launch of the *MovilidadSegura.org* website and the announcements with hosting countries.

[29] Per the normal clearance procedures at 5 CFR 1320.10(e).

Legal Op. No. 98-10 (INS), 1998 WL 1806685
U.S. Department of Justice
Immigration and Naturalization Service
General Counsel's Office
MEMORANDUM FOR: EXECUTIVE ASSOCIATE COMMISSIONER FOR POLICY AND
PLANNING, EXECUTIVE ASSOCIATE COMMISSIONER FOR FIELD OPERATIONS,
ALL REGIONAL COUNSELS, ALL DISTRICT COUNSELS, and ALL SECTOR COUNSELS

**FROM: Paul W. Virtue /s/ Bo Cooper for General Counsel**

## SUBJECT: Authority to parole applicants for admission who are not also arriving aliens

HQCOU 120/17-P
August 21, 1998

### I. QUESTION

**\*1** This memorandum addresses the following issue, which has arisen recently in several cases in the Miami district:

> Does the Service have authority to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q)?

### II. SUMMARY CONCLUSION

Aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The Service has authority, therefore, to parole an applicant for admission who is not also an "arriving alien," as defined by 8 C.F.R. § 1.1(q). It remains the case, however, that parole is an act of discretion, not an entitlement. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

### III. ANALYSIS

This question over the extent of the parole authority arises because of two significant amendments to the immigration laws enacted in 1996. INA § 212(a)(6)(A)(i) and 235, 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225, *as amended by* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Division C, §§ 301(c) and 302(a), 110 Stat. 3009-546, 3009-578, 3009-579. First, aliens who are present in the United States without having been admitted or paroled are now deemed to be applicants for admission, *id.* § 235(a)(1), 8 U.S.C. § 1225(a)(1), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Before this amendment, of course, aliens who had entered the United States without having been inspected were amenable to deportation, rather than to exclusion, proceedings. 8 U.S.C. § 1251(a)(1)(B) (1994). Second, Congress has now provided for an expedited removal proceeding, conducted by a Service officer, rather than an immigration judge.

INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A). The Service may invoke this procedure if an alien "who is arriving in the United States" is inadmissible because the alien does not have the required passport or visa, or because the alien obtained a passport or visa by fraud or material misrepresentation. The Service has defined by regulation which aliens are to be considered "arriving aliens." 8 C.F.R. § 1.1(q), *as amended,* 63 *Fed. Reg.* 19,382, 19,383 (1998). The consequence of these two amendments is that there are now two categories of applicants for admission: those who are arriving aliens, and those who are not. *See, e.g.,* 62 *Fed. Reg.* 444, 444-5 (1997).[1]

INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), gives the Attorney General authority to parole from custody "an alien applying for admission" who would otherwise be held in custody until the Attorney General had resolved whether to admit or remove the alien. In order to exercise this authority, the Attorney General must find, on a case-by-case basis, either that "urgent humanitarian reasons" justify the parole, or that paroling the alien will yield a "significant public benefit." *Id.* Even if the Attorney General finds that either factor exists, parole remains a matter of discretion. In fact, there is no judicial review of the exercise of this discretion. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii). The Attorney General has delegated this parole authority to the Service. 8 C.F.R. § 2.1.

**\*2** As we have already noted, aliens who were once deportable for having entered without inspection are now considered in law to be applicants for admission, *id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A), who are inadmissible, *id.* § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). As aliens applying for admission, they are within the scope of the statutory parole authority. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

The question whether there is authority to parole these aliens arises not from the statute itself, but from an implementing regulation. 8 C.F.R. § 212.5. Section 212.5(a) specifies circumstances in which it is, generally, appropriate to parole aliens "detained in accordance with § 235.3(b) or (c)." *Id.* Sections 235.3(b) and (c), in turn, refer not to the universal set of all applicants for admission, but to the subset of arriving aliens. 8 C.F.R. § 235.3(b) (arriving aliens subject to expedited removal) and (c) (arriving aliens subject to § 240 removal proceedings).[2] Section 212.5(b) refers to "all other arriving aliens." 8 C.F.R. § 212.5(b). Neither § 212.5(a) nor § 212.5(b) addresses the parole of applicants for admission who are not also "arriving aliens." Neither provision, therefore, purports to prohibit the Service from exercising the Attorney General's broad statutory parole authority in the case of an applicant for admission who is not an "arriving alien."

For two reasons, we conclude that § 212.5 cannot correctly be read as exhausting the Service's parole authority. First, nothing in § 212.5 expressly purports to forbid the parole of applicants for admission who are not also arriving aliens. Section 212.5 simply says nothing at all about that issue. Second, as we have noted, the Attorney General has delegated to the Commissioner the fullness of the Attorney General's statutory authority under the INA, except for matters delegated to the Executive Office for Immigration Review. 8 C.F.R. § 2.1. The Service, therefore, may parole anyone whom the Attorney General may parole.

We are mindful of the protracted litigation that resulted in the Supreme Court's judgment in *Jean v. Nelson,* 472 U.S. 846 (1985). But our reading of § 212.5 is an expansive, not a restrictive, application of the parole authority. A rule that said, in effect, that the parole authority is as broad as the statute says it is, would clearly be an interpretative rule. There is no obligation to publish interpretative rules in accordance with the APA. 5 U.S.C. § 553(b)(A) and (d)(2).

We are also aware of the argument that our conclusion, in effect, gives an inadmissible applicant for admission who is not an arriving alien "two bites at the apple" in seeking release from custody. If the Service denies a parole request, the alien may seek release from the immigration judge. 8 C.F.R. § 236.1(d)(1). The restrictions on the immigration judge's authority would not apply, since the alien is not an "arriving alien." *Cf.* 8 C.F.R. §§ 3.19(h)(1)(B) and (2)(I)(B) and 236.1(c)(11), *as amended,* 63 *Fed. Reg.* 27,441, 27,448-49 (1998). But release under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. *See* INA §§ 101(a)(13)(B) and 212(d)(5)(A), 8 U.S.C. §§ 1101(a)(13)(B) and 1182(d)(5)(A); *Leng May Ma v. Barber,* 357 U.S. 185, 189 (1958); *Matter of L- Y- Y-,* 9 I &N Dec. 70, 71 (BIA 1960). In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms. We realize that the traditional rule has been that neither the Board nor an immigration judge had authority to exercise the parole authority. *Matter of Conceiro,* 14 I &N Dec. 278, 281 (BIA 1973). But the Board based this rule on the fact that the Attorney General had established by regulation that only the Service could exercise the parole authority on the Attorney General's behalf. *Id.* The statute itself does not forbid delegation of the parole authority to officials who are not Service officers. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

**\*3** The Service may consider it imprudent, as a matter of policy, to permit an immigration judge to adjudicate requests for release made by applicants for admission who are not arriving aliens. The way to achieve this policy, however, is to ask the Attorney General to amend 8 C.F.R. §§ 3.19 and 236.1. Taking the position that the Service has no authority to parole in these cases does not amend the regulations that appear to permit an immigration judge to adjudicate a request for release, if the applicant for admission is not an arriving alien.

We conclude that the Service may, in the exercise of discretion, parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit. INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 2.1. Aliens present in the United States without having been admitted or paroled are applicants for admission. *Id.* § 235(a)(1)(A), 8 U.S.C. § 1225(a)(1)(A). To say that these aliens are *eligible* for parole, of course, does not mean that they are *entitled* to parole. Whether to parole any particular alien remains a matter entrusted to the exercise of discretion. *Id.* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). The exercise of this discretion is not subject to judicial review. *Id.* § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii).

Paul W. Virtue for Bo Cooper
General Counsel

**Footnotes**

1

The Attorney General has the authority to invoke the expedited removal proceeding against an alien who is inadmissible because he or she is present in the United States without admission or parole, if the alien has been physically present for less than 2 years. INA § 235(b)(1)(A)(iii), 8 U.S.C. § 1225(b)(1)(A)(iii). To date, neither the Attorney General nor the Commissioner has chosen to exercise this authority. 8 C.F.R. § 235.3(b)(1)(ii); *cf.* 62 *Fed. Reg.* 10,312, 10,313 (1996).

2

Section 235.3(b) also refers to applicants for admission who are not arriving aliens, but who are inadmissible, and subject to expedited removal, because they are present without admission or parole, but have been present for less than two years. 8 C.F.R. § 235.3(b)(1)(ii). No aliens currently belong to this subset, since neither the Attorney General nor the Commissioner has provided for the use of expedited removal proceedings for these aliens.

Legal Op. No. 98-10 (INS), 1998 WL 1806685

1998 WL 1806685, 1-3



# Federal income tax rates and brackets

You pay tax as a percentage of your income in layers called tax brackets. As your income goes up, the tax rate on the next layer of income is higher.

When your income jumps to a higher tax bracket, you don't pay the higher rate on your entire income. You pay the higher rate only on the part that's in the new tax bracket.

## 2023 tax rates for a single taxpayer

For a single taxpayer, the rates are:

| Tax rate | on taxable income from . . . | up to . . . |
|----------|------------------------------|-------------|
| 10% | $0 | $11,000 |
| 12% | $11,001 | $44,725 |
| 22% | $44,726 | $95,375 |
| 24% | $95,376 | $182,100 |
| 32% | $182,101 | $231,250 |
| 35% | $231,251 | $578,125 |
| 37% | $578,126 | And up |

Here's how that works for a **single person earning $58,000 per year**:

## 2023 tax rates for other filers

Find the current tax rates for other filing statuses.

⊕ **Married filing jointly or qualifying surviving spouse**

001156

⊕ **Married filing separately**

⊕ **Head of household**

See the tax rates for the 2024 tax year.

# Related

Taxable income

How to file your taxes: step by step

IRS provides tax inflation adjustments for tax year 2024

Full 2023 tax tables

Publication 17 (2023), Your Federal Income Tax

*Page Last Reviewed or Updated: 01-Jul-2024*

001157



# Topic no. 751, Social Security and Medicare withholding rates

Taxes under the Federal Insurance Contributions Act (FICA) are composed of the old-age, survivors, and disability insurance taxes, also known as Social Security taxes, and the hospital insurance taxes, also known as Medicare taxes. Different rates apply for these taxes.

## Social Security and Medicare withholding rates

The current tax rate for Social Security is 6.2% for the employer and 6.2% for the employee, or 12.4% total. The current rate for Medicare is 1.45% for the employer and 1.45% for the employee, or 2.9% total. Refer to Publication 15 (Circular E), Employer's Tax Guide for more information.

## Additional Medicare tax withholding rate

Additional Medicare tax applies to an individual's Medicare wages that exceed a threshold amount based on the taxpayer's filing status. Employers are responsible for withholding the 0.9% Additional Medicare tax on an individual's wages paid in excess of $200,000 in a calendar year, without regard to filing status. An employer is required to begin withholding Additional Medicare tax in the pay period in which it pays wages in excess of $200,000 to an employee and continue to withhold it each pay period until the end of the calendar year. There's no employer match for Additional Medicare tax. For more information, see the Instructions for Form 8959 and Questions and answers for the Additional Medicare tax.

## Wage base limits

Only the Social Security tax has a wage base limit. The wage base limit is the maximum wage that's subject to the tax for that year. For earnings in 2024, this base is $168,600. Refer to "What's New" in Publication 15 for the current wage limit for Social Security wages.

There's no wage base limit for Medicare tax. All covered wages are subject to Medicare tax.

*Page Last Reviewed or Updated: 13-Feb-2024*

001158

# RETURNS TO BIRTHWEIGHT

### Jere R. Behrman and Mark R. Rosenzweig*

*Abstract*—We use data on monozygotic twins to obtain improved estimates of the effect of intrauterine nutrient intake on adult health and earnings and thus to evaluate the efficacy of programs aimed at increasing birthweight. We use the results to evaluate the bias in cross-sectional estimates and to assess the proposition that health conditions play a major role in determining the world distribution of income. We show that there is considerable variation in the incidence of low birthweight across countries, and our estimates suggest that there are real payoffs to increasing body weight at birth. Increasing birthweight increases adult schooling attainment and adult height for babies at most levels of birthweight, but has no effect on adult body mass. The effect of increasing birthweight on schooling, moreover, is underestimated by 50% if there is no control for genetic and family background endowments as in cross-sectional estimates. We also find evidence that augmenting birthweight among lower-birthweight babies, but not among higher-birthweight babies, has significant labor market payoffs. However, shifting the distribution of birthweights in developing countries to that in the United States would reduce world earnings inequality by less than 1%, far less than indicated by the cross-country correlation between per-worker GDP and birthweight.

## I.  Introduction

A major health-related policy objective in most developed countries is to increase the birthweights of children in low-birthweight populations. Many low-birthweight infants who survive infancy, for example, are claimed to suffer cognitive and neurological impairment that limits the returns to human capital investments in them, their productivities, and their earnings as adults, and that, for females, increases the probability of having low-birthweight babies.[1] The effects of birth outcomes and other physical attributes on human capital and wages have also been the concern of a recent economics literature and of much bigger literatures in other disciplines.[2]

Received for publication July 16, 2002. Revision accepted for publication June 19, 2003.

* University of Pennsylvania and Harvard University, respectively.

This research was supported in part with funds from the National Center on the Educational Quality of the Workforce, the Economics Institute Research Fund, the Boettner Research Fund, the Population Study Center NIA Supplement, and the University Research Foundation—all of the University of Pennsylvania—and from NIA R01 AG11725-01A1 and NSF SBR95-11955. We are grateful to Ann Facciolo for efforts in data inputting; to David T. Lykken, former Director of the Minnesota Twin/Family Registry (MTR), and the staff of the MTR for assistance in collecting the data that we use in this study; to audiences in presentations at the Arne Ryde Workshop on the Economics of Family, Health, and Labour; the Chinese University of Hong Kong; Rand; Harvard; the Population Council; the University of Washington; and the Universidad de Chile; and to Daron Acemoglu, Harold Alderman, and Michael Grossman and the referees for helpful comments on an earlier draft of this paper.

[1] In the epidemiological literature, for instance, Barker and others, whose research is summarized in Barker (1992, 1998), increasingly have emphasized the associations between low birthweight and stunting or wasting at birth on the one hand and adult health on the other, with possible effects through adult health on adult productivity. Based on animal and epidemiological studies, they find that malnourishment at birth is associated with coronary heart disease, hypertension, non-insulin-dependent diabetes, raised serum cholesterol, and abnormal blood clotting in later life.

[2] Pojda and Kelley (2000), for example, cite 198 references in their survey on the determinants of and the effects of low birth weight.

A number of studies have identified the determinants of birthweight within the context of behavioral models that incorporate endowment heterogeneity and evaluated major policy changes in terms of their effect on weight at birth (Rosenzweig & Schultz, 1983; Grossman & Joyce, 1990; Rosenzweig & Wolpin, 1995; Currie & Gruber, 1996; Currie & Hyson, 1999). However, the literatures concerned with the consequences of weight gain at birth generally do not distinguish between the policy-relevant effects of increasing the nutrients received by a fetus and possible genetic and family background influences on fetal development. It is possible that infants with genetically determined low weights at birth also have genetic endowments that make them less healthy as adults, and that increasing their weight at birth would have little lasting effect on adult life achievements. It also is possible that the genetic endowments of such infants are correlated with those of their parents and thereby associated with the household resources available to support child development. What is of policy interest is the effect of increasing the birthweight of a child with given genetic endowments and family background. Conventional cross-sectional and longitudinal data sets cannot answer that question unambiguously.

Obtaining improved estimates of the effect of intrauterine nutrient intake on adult health and earnings is also potentially useful for shedding light on the proposition that health conditions play a major role in determining the world distribution of income (Bloom & Sachs, 1998; Gallup, Sachs, & Mellinger, 1999). There is considerable variation in the incidence of low birthweight across countries. We have assembled a data set for 112 countries by merging country-specific information on rates of low birthweight (birthweight < 2500 g) in the decade of the 1990s, put together by UNICEF (2001) from official governmental sources and surveys, with information on country-specific, per-worker PPP-adjusted GDP in 1989. Figure 1, which plots these two variables, indicates that there is a strong negative association between the log of PPP per-worker GDP and the percentage of low-birthweight babies. Although it is doubtful that this association largely reflects cross-country genetic differences, it confounds the effects of the health of babies on their adult productivity with the effects of income on child health and the influence of common factors, such as institutions, that both improve health outcomes and augment incomes. Recent work has used micro evidence on the productivity effects of health to separate out the contribution of health in determining cross-country differences in incomes and to estimate the returns to increasing birthweights in low-income countries (Acemoglu, Johnson, & Robinson, 2001, 2003; Alderman & Behrman, 2003; Shastry & Weil, 2003). Such explorations using micro data are obviously also dependent on the appropriate



FIGURE 1.—LOW BIRTHWEIGHT AND LOG PER-WORKER GDP AROUND THE WORLD



identification of health effects, including those of better fetal nutrition.

Despite the importance of understanding the impact of improved nutrition in the womb on micro and aggregate outcomes, researchers generally have ignored the estimation problems that arise from endowment heterogeneity in assessing the effects of birthweight. Two recent exceptions are Conley and Bennet (2000) and Almond, Chay, and Lee (2002). Conley and Bennett, using sibling data from the PSID, find that conventional estimates substantially understate the negative effect of low birthweight on the probability of timely high school graduation. A problem with their approach, however, is that it assumes that prenatal input differences between siblings are orthogonal to their endowment differences, contrary to the evidence in Rosenzweig and Wolpin (1995). Almond et al. match the birth records of twins with death records to examine how differences in the birthweight of twins affect the probability of infant mortality. However, they cannot identify those twin pairs that share the same genetic endowments, so that their within-twin estimates confound in part the effects of nutrient intake and genetic endowments.

In this paper we obtain estimates of the impacts of in utero nutrient intake on adult outcomes within a context in which individuals are born with contemporaneously and intergenerationally correlated health and earnings endowments and resource allocations may be attentive to endowments. We show in particular that with information on the birthweights of genetically identical twins it is possible, with fewer assumptions than are needed to identify schooling returns using twins (Ashenfelter & Krueger, 1994;

Behrman, Rosenzweig, & Taubman, 1994), to identify the causal effect of increasing birthweight on adult anthropometrics, schooling, and earnings and to draw inferences about the role of endowments in affecting resource allocation behavior.

In obtaining our estimates we use new survey data on monozygotic (MZ) female twins collected by the authors from a sample from the Minnesota Twins Registry, the largest birth-certificate-based twins registry in the United States. We focus on women in this paper because of the suggestion in most previous studies that the earnings of women are more sensitive to anthropometrics and the claim that lack of sufficient weight for women at birth has important effects across generations (Averett & Korenman, 1996; Conley & Bennett, 2000; Gortmaker et al., 1993; Haskins & Ransford, 1999; Sarlio-Lahteenkorva & Lahelma, 1999). In particular we look at the effects of increasing birthweight on schooling attainment and on adult body mass, height, and earnings, comparing estimates that control for endowment effects with those that do not, to assess the confounding role of genetic influences and other family endowments. We also estimate the extent to which the intergenerational birthweight relation is due to the heritability of body mass and preferences. Finally, we use our estimation methodology to estimate how reducing the birthweight gap between low- and high-income countries would reduce world earnings disparities.

Our estimates provide a number of clear results. First, they indicate that increasing fetal growth has a significant positive effect on schooling attainment that is underestimated by 50% if there is no control for genetic and family

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1168 of 4699 PageID #:  4333

background endowments as in cross-sectional estimates. Second, our estimates indicate that intrauterine nutrient consumption does not have any persistent effects on adult BMI—increasing birthweight is not a cause of adult obesity. Third, our results indicate that the heritable component of birthweight plays the dominant role in the intergenerational correlation of birthweights. Fourth, the estimates indicate that intrauterine nutrient intake significantly affects adult height, consistent with the literature that makes use of height statistics to gauge childhood nutritional investments over time and across countries (Fogel, 1994; Schultz, 1999; Steckel, 1995; Strauss & Thomas, 1998). Fifth, although we find evidence that augmenting birthweight, particularly among lower-birthweight babies, would have significant labor-market payoffs, we show that the strong cross-country correlation between incomes and birthweight substantially overstates the reduction in world earnings inequality that would arise from reducing cross-country disparities in birthweights.

## II.    Identification of Prebirth Nutrient Intake Effects on Adult Outcomes

We discuss how information on the birthweights of MZ twins can be used to identify the effects of an exogenous increase in intrauterine nutrient consumption on schooling, adult physical characteristics, adult wages, and birthweights for one's children when there is endowment heterogeneity among individuals that is correlated across generations.[3] The key identifying assumption is that although the average of the nutrient intakes for any twin pair may be correlated with their common endowment, which may reflect their genetic heritage and resource allocation decisions of their parents, the birthweight difference within an MZ twin pair reflects purely random differences in nutrient intakes that may arise, for example, from differences in womb position. Twin-specific intakes that are expressed in birthweight differences are thus orthogonal to their identical endowments.

Consider a linear representation of the birthweight production function expanded to distinguish between common and specific nutrient intakes for each twin in a pair:

$$B_{jk} = C_{jk} + C_k + B_{0k}, \qquad (1)$$

where $B_{jk}$ = birthweight for twin $j$ in twin pair $k$, $C_{jk}$ = deviation in nutrient intake for twin $j$ from average (common) nutrient intake of pair $k$, $C_k$ = nutrient intake common to both twins in pair $k$, and $B_{0k}$ = common genetic endowment to the pair. In any model in which parents care about the consequences of the health of their children, the covariance between $C_k$ and $B_{0k}$ will be nonzero due to

optimizing behavior as long as either (i) parents, who can (only) choose the average or common level of inputs, know $B_{0k}$,[4] or (ii) the child's health endowment is correlated with the parents' endowments and that affects their resource constraint. However, differences in the twin-specific intakes $C_{jk}$ cannot be functions of $B_{0k}$ or of $C_k$.

The reduced-form linear relation between an adult twin's log wage (or any other adult outcome) and his or her intrauterine nutrient intake for twin $j$ in family $k$ is given by

$$\ln W_{jk} = \alpha_1(C_{jk} + C_k) + \alpha_2 B_{0k} + \mathbf{Z}_k \boldsymbol{\alpha}_3 + \mu_k + v_{jk}, \quad (2)$$

where the $\alpha$'s are coefficients, $\mathbf{Z}_k$ is a vector of exogenous family and community characteristics determining postbirth human capital investments in the twin (such as income and prices of inputs like schooling), $\mu_k$ is the common earnings endowments of the twins, and $v_{jk}$ is a random, twin-specific error. Neither the nutrient inputs nor the endowments are observed in equations (1) and (2), only birthweights. However, the effect of in utero nutrient intake $\alpha_1$ can be identified if we substitute for the unobserved inputs in equation (2) the observed birthweight using equation (1) and the difference across the twins. We then get the simple difference regression in terms of the observable birth outcome:

$$\Delta \ln W_{jk} = \alpha_1 \Delta B_{jk} + \Delta v_{jk}, \qquad (3)$$

where $\Delta$ is the twin difference operator.

To highlight the identification problem using conventional cross-sectional data, it is useful to relate the observed variable moments to the unmeasured variables and the coefficients in equation (2). The regression coefficient in equation (3) exploiting twin differences is $\operatorname{cov}(\ln \Delta W_{jk}, \Delta B_{jk})/\sigma^2(\Delta B_{jk})$, where $\operatorname{cov}(\Delta \ln W_{jk}, \Delta B_{jk}) = \alpha_1 \sigma^2(\Delta C_{jk})$ and $\sigma^2(\Delta B_{jk}) = 2\sigma^2(\Delta C_{jk})$, which can be solved for $\alpha_1$. In contrast, the coefficient obtained from a cross-sectional regression of the log wage on birthweight for nonidentical individuals or siblings neither identifies the effect of variation in nutrient intake nor provides insights into the roles of endowments in input choices. To see this, note that the regression coefficient in this case is $\operatorname{cov}(\ln W_{jk}, B_{jk})/\sigma^2(B_{jk})$, which is given by[5]

$$\{\alpha_1[\sigma^2(C_{jk}) + \sigma^2(C_k) + \operatorname{cov}(C_k, B_{0k})] + \alpha_2[\sigma^2(B_{0k})$$
$$+ \operatorname{cov}(C_k, B_{0k})] + \alpha_2[\operatorname{cov}(B_{0k}, \mu_k) + \operatorname{cov}(C_k, \mu_k)]\}/$$
$$[\sigma^2(C_{jk}) + \sigma^2(C_k) + \operatorname{cov}(C_k, B_{0k}) + \sigma^2(B_{0k})]. \quad (4)$$

It is clear from equation (4) that a cross-sectional regression of wages on birthweight does not identify the effect $\alpha_1$ of increasing nutrient intake on wages, and indeed, depending on the covariances between endowments and the response

---

[3] We broadly define nutrient consumption to include all factors contributing to fetal development, including, for example, oxygen. We have not been able to find in the biomedical literature any evidence that birthweight differences between members of MZ twinships reflect other differences, such as mutations just after cells divide or random deformities, that are unrelated to nutrient consumption differences.

[4] Or parents are uncertain about $B_{0k}$ and parental expectations of $B_{0k}$ are positively correlated with the actual values of $B_{0k}$.

[5] For simplicity, we have dropped from this expression the price and income terms (which are presumably observables).

of inputs to endowments, the sign of the regression coefficient could be opposite that for $\alpha_1$.

The contrast between the cross-sectional relationship between birthweight and the wage in equation (4) and the effect obtained using the within-MZ estimator, which provides $\alpha_1$, can provide some information on the existence of endowment effects. First, if there were no endowment influences—no effect of variation in $B_0$ or in $\mu_k$—the cross-sectional and within-MZ estimates would be identical. If they are different, two comparisons of the cross-sectional and within-MZ estimators are of particular interest. One may find from the within-MZ estimator that $\alpha_1$ is positive while the cross-sectional birthweight estimated effect is zero. In that case it must be true that, assuming that both the birthweight and earnings endowments positively contribute to earnings ($\alpha_2$, $\mu_k > 0$), either the birthweight and earnings endowments are negatively correlated or nutrient intakes are provided less to those with higher endowments, or both. A second polar case is when $\alpha_1$ is zero. In that case the cross-sectional birthweight relationship arises solely from endowment-allocation effects and covariances, which are thus identified.

Note that an alternative estimation scheme using parental characteristics as instruments to predict intrauterine nutrient consumption and thus the effect of birthweight on the child's adult wage is ruled out for two reasons: First, parental characteristics affect postbirth human capital investments and thus belong in the reduced-form wage equation. Second, parental characteristics may be correlated with the child's endowments, as is consistent with the empirical estimates for the determination of child schooling in Behrman and Rosenzweig (2002). We show empirically below that there is an intergenerational correlation in birthweight endowments.

Finally, there is a relatively large literature exploiting differences between MZ twins in schooling attainment to identify schooling effects on earnings in the presence of unmeasured earnings endowments (for example, Ashenfelter & Krueger, 1994; Behrman et al., 1994). The problem with this application of twinning is that postbirth differences in resources allocated across genetically identical twins such as schooling may reflect postconception, earnings-relevant differences in twin characteristics unobservable to the researcher but apparent to the parents. The evidence on birthweight differences across MZ twins suggests that such twins are no longer identical after conception, and these differences may influence postbirth parental resource allocations. Evidence of significant effects of birthweight on adult outcomes thus would call into question the estimates from twin-based schooling studies, which assume that schooling differences across genetically identical twins are orthogonal to other unmeasured human capital attributes of the twins. In contrast, differences in intrauterine growth across MZ twins cannot be due to parental choice—they are random with respect to parental and child endowments.

## III. Data

To implement the twins-based methodology to identify the long-term consequences of intrauterine nutrition, we use information from a recent survey of twins that we undertook. The twins data were obtained by resurveying a subset of the twins from the Minnesota Twin Registry (MTR) based on a survey instrument designed by us in collaboration with the Temple University Institute of Survey Research. The MTR is the largest birth-record-based twins registry in the United States, assembled between 1983 and 1990 starting with birth records on all twins [both MZ and dizygotic (DZ)] born in Minnesota in 1936–1955. Details of the sample and its characteristics are in Lykken et al. (1990). The MTR staff obtained from the Minnesota State Health Department all birth certificates reporting multiple births. These birth certificates provide information on both the birthweights and the gestation of the twins. The MTR staff located over 80% of the twins and sent them a four-page biographical questionnaire (BQ) in the mid 1980s, with an introductory newsletter describing the project and a letter signed by Minnesota's governor urging participation.[6] 80% of the individuals contacted, 71% of concordant pairs, supplied information for the BQ.

Our survey instrument was mailed out in May 1994 to the 5,862 members of same-sex twin pairs who had filled out the BQ and for whom the MTR had current addresses. An additional 776 members of same-sex pairs for whom updated addresses had been located between May and September 1994 were sent questionnaires in November 1994. Altogether 3,682 twins returned completed questionnaires, for a response rate of surviving twins of over 60%. Information obtained included the height and weight of the twins at the time of the survey, their schooling attainment, their work experience and wages on the last job, their parents' characteristics, and the birthweights for their first four children.[7] The estimates in this paper are based on the returned questionnaires from (i) all women ($N = 1418$), (ii) women in MZ twin pairs ($N = 804$), (iii) twin mothers ($N = 1207$), and (iv) MZ-twin–mother pairs ($N = 608$) for whom the key birthweight, gestation, and self-reported height, weight, and earnings variables are available.

---

[6] Among the first six birth cohorts studied (birth years 1936, 1937, 1938, 1949, 1954, and 1955), 27% of the same-sex pairs identified through birth certificates are known to have been broken by the death of at least one of the members prior to our survey. This raises the issue of whether the sample of intact adult twin pairs is selective. Almond et al. (2002) show, using matched birth and death records, that differences in the birthweights of twins do not importantly affect differences in their likelihood of dying within the first year of life. This suggests that death may not be selective, although in Almond et al.'s study identical and nonidentical twins could not be distinguished, so that the pure effect of in utero intake on infant mortality is not identified.

[7] The item response on returned questionnaires is very high, exceeding that on recent Current Population Surveys and the 1990 Census. For example, only 9% of ever employed workers in our sample did not answer the questions on earnings or self-employment income; on the CPS more than 20% do not.

FIGURE 2.—DISTRIBUTION OF THE ABSOLUTE VALUE OF BIRTHWEIGHT
DIFFERENTIALS (OZ.) AMONG IDENTICAL TWINS



There are two features of the data that are particularly relevant to the analysis of birthweight effects on adult outcomes using within-twin differences across twins. First, the birthweight information is based on measures from birth certificates, and thus the birthweights for the twins are not subject to recall error. It is well known that estimates based on within-twin or sibling-pair differences (Bishop, 1976; Griliches, 1979) are particularly prone to bias from measurement error, so that accurate measures of birthweight are critical. Moreover, because the birthweights of twins are assessed at the same time and by the same measurer, most of the measurement error will be common to the twins and thus will be eliminated using within-twin estimators. The second feature of the sample, and of twins in general, relevant to the identification of birthweight effects is that there is substantial variation in birthweight between genetically identical twins, variation that is not correlated with their common environment or genes. In our sample, the average absolute value of the difference in birthweights within pairs of MZ twins is 10.5 ounces, with substantial variation across pairs (figure 2).[8] The corresponding figure for same-sex nonidentical twin pairs is 11.2 ounces. Thus there is ample and real within-twin variation to obtain precise estimates of birthweight input effects using twin difference methods.

For each twin we have constructed a measure of fetal growth based on the birth certificate information—birthweight divided by gestation. We use this measure rather than birthweight in obtaining our initial estimates for two reasons. First, the literature has suggested that this measure better reflects the healthiness of a child, as the leading proximate cause of low birthweight in the United States and other developed countries is preterm births (Pojda & Kelley, 2000; Strauss, 2000). In our sample, 20.5% of the twins were, by the standard definition (less than 37 weeks of

gestation), preterm births. Second, although within-twin differences in birthweight are by definition for the same gestation, variation in birthweight across nontwin births also reflects variation in gestation. Normalizing birthweight by gestation makes the two estimates comparable.[9]

Another important feature of the survey is that, to maximize the size of the sample of female twins that could be used for analysis of wage determination and to avoid sample selectivity in recognition of the intermittent labor force participation of women, the earnings on the last job were elicited rather than only earnings in the year prior to the survey. A well-known problem in analyzing the wages of women is that at any given survey date many women may not be in the labor force, resulting in a selective sample of female earners (Gronau, 1974; Heckman, 1974). Only 82% of the women in the sample, for example, worked in 1993, the survey reference year. But 97% of the sample members worked at some point in their lives, 91% in the five years preceding the survey. Finally, to take into account the variability in work time during the year in which earnings are reported, the wage, earnings, and time-worked information was used to construct full-time annual earnings based on either earnings in 1993 or on the last job, inflated in the latter case by the relevant CPI.

The existence of information on standard family background characteristics—parental schooling and occupation—permits us to explore to what extent the differences between the cross-sectional and within-MZ estimates of the effect of fetal growth is changed with control for these characteristics. For this purpose we converted the occupation information for the twins' fathers into a singulate measure of lifetime earnings by using information from the 6% sample from the 1990 Census on all men aged 40 through 59 who worked in 1989 and resided in the states of Minnesota and Wisconsin, reflecting the principal residence states of the twins' parents.[10] The occupational earnings equation we estimated ($n = 19,183$) is of the following form:

$$\ln y_{ik} = \eta_{0k} + \sum_k \eta_{1k} O_k + \sum_k \eta_{2k} O_k age_i + \eta_3 age_i$$
$$+ \sum_k \eta_{4k} O_k S_i + \eta_5 S_i + \eta_5 S_i age_i + u_{ik}, \quad (5)$$

where $\ln y_{ik}$ = log wage and salary plus self-employment earnings for individual $i$ in occupation $k$, $O_k$ = indicator for occupation $k$, $S_i$ = schooling attainment, and $u_{ik}$ is a

---

[8] Having a greater birthweight in a twin pair is not correlated with being first-born in our data. The average difference between first- and second-born twins in our sample is a statistically insignificant 0.5 ounces.

[9] We could make the cross-sectional and within-twin estimates of birthweight comparable by also including gestation in the cross-sectional specifications, but the birthweight coefficient would then in any case reflect fetal growth. Estimates of the effects of variation in birthweight in which gestation is included as a separate variable do not differ importantly from the fetal growth estimates reported here.

[10] 74.9% of the surviving parents of the respondents resided in Minnesota and Wisconsin at the time of the survey. The next most represented state (California) was the residence of only 3.2% of parents. We do not make similar estimates for the twins' mothers, because high proportions were housewives or worked in family enterprises (including farms).

TABLE 1.—MEANS AND STANDARD DEVIATIONS: MINNESOTA TWINS SAMPLE

| | Mean | Standard Deviation |
|---|---|---|
| **All female twins ($N = 1418$):** | | |
| Fetal growth (oz. per week of pregnancy) | 2.34 | .420 |
| Birthweight (oz.) | 90.2 | 17.9 |
| BMI (lb./in.²) | 0.0361 | 0.00738 |
| BMI (kg/m²) | 25.4 | 5.20 |
| Height (in.) | 64.7 | 2.67 |
| Weight (lb.) | 150.9 | 33.0 |
| Schooling (yr.) | 13.8 | 2.20 |
| Hourly wage (1993 $) | 11.45 | 7.20 |
| Age | 45.6 | 5.45 |
| Mother's schooling (yr.) | 11.4 | 2.66 |
| Father's schooling (yr.) | 10.7 | 3.26 |
| Father's occupational earnings ($) | 28,637 | 14,298 |
| **Female twins with at least one own (biological) child ($N = 1207$):** | | |
| Birthweight of twin's first child (oz.) | 118.1 | 19.7 |
| Fetal growth of mother | 2.34 | .426 |
| Birthweight of mother | 90.1 | 18.0 |
| Age | 45.9 | 5.51 |

random disturbance term. Based on these estimates and the information on the principal occupation and schooling attainment of each father of the twins available in the data, we computed the occupational earnings of each father at age 50.[11]

### IV. Generalizability and Validity of Twins-Based Birth Outcome Estimates

It is important to consider whether the analysis of twins can be generalized to larger populations of interest. For example, twins are significantly smaller at birth than are nontwins. Table 1 reports descriptive statistics for the two samples of female twins that we use. As seen in table 1, the average birthweight of twins is 5 lb. 10 oz. The average birthweight in the general population is 7 lb. 6 oz. Moreover, by the standard definition of low birthweight—below 5 lb. 8 oz. (2.5 kg)—almost half of the twins were low-birthweight.

There are two issues with respect to the size differences between twin and nontwin births. The first is whether these differences at birth reflect genetic differences between twins and nontwins. The evidence suggests, however, that the smallness of twins at birth is the result of twinning rather than the selectivity of parents who produce twins. Figure 3 displays the average birthweights of the twins in the sample who are mothers, the birthweights of their first-born children (almost none of whom are twins themselves), and the average birthweights of the first-borns of white mothers in the 1998 round of the NLSY. As can be seen, the average birthweight of the (nontwin) children of the twins, 7 lb.

6 oz., is the same as that of the nontwin children of nontwin mothers in the general population.[12]

A second issue with respect to the size differences between twins and nontwins at birth relates to whether or not the relationship between birthweight and/or fetal growth and adult outcomes is nonlinear. If, for example, the effects of increasing fetal growth on adult outcomes are stronger at low levels of fetal growth and perhaps even monotonic, then estimates based on the twin population may overstate the average treatment effect for the general population of singletons in developed countries such as the United States. Figure 4 provides the distribution of fetal growth rates for the twins sample and for the singleton births of white mothers occurring between 1979 and 1983 in the NLSY. As can be seen, more than three-fourths of twin births are in the lower half of the singleton distribution. To obtain estimates that are more relevant to the general United States population and to assess whether the effects of birthweight on outcomes are nonlinear, we will estimate the birthweight-outcome relationships both using the unweighted twins sample and using sample weights based on the distribution of singleton births as given in figure 4. Given that the supports of the two distributions overlap except for the very highest-fetal-growth births, the weighted within-twin estimates will be more generalizable to the general population in the presence of nonlinearities.

The possibility of heterogeneous treatment effects by birth outcome levels may also create problems for inferences about the source of bias between OLS and within-MZ-twins estimates of birth outcome effects obtained from the same population. Because differences in birth outcomes within a twin pair are relatively small, the within-twin estimator provides a local average treatment effect (LATE) over the support of the distribution of (within-twin) average birth outcomes. In particular, if the true relationship between nutrient intake in the womb and adult outcomes differs by the level of the within-twin average nutrient intake, then the full-sample within-twin estimate of $\alpha_1$ is

$$\alpha_1 = \sum_i f_i \alpha_{1i}, \tag{6}$$

where $f_i$ is the proportion of twin pairs whose average fetal growth is $B_i$. The OLS cross-sectional estimate, however, imposes a linear functional form over the support of the birth-outcome distribution. We will thus estimate nonparametric regressions to assess whether or not nonlinearities can account for the difference between the OLS and within-MZ-twins estimates. An advantage of the within estimator is that we can obtain unbiased within-twin LATE estimates for any interval of the *average* birth outcomes of twin pairs (for example, in the low-birthweight range) because all

[11] The estimates are available on request from the authors.

[12] This is not because the twins who are mothers had higher birthweights than the twins who did not have any children. Indeed, the mean birthweight of the twin mothers was 3 oz. less than that of the total sample of female twins.

Figure 3.—Average Birthweights (oz.): Twins, Their First-Borns, and White NLSY79 Mothers' First-Borns



endogenous sources of selectivity for the pair are common to the twins and thus are swept out.

Another aspect of the issue of whether or not estimates based on differences between twins are generalizable to the general population concerns the effect of twinning on parental resource allocation behavior. Life cycle birth outcome effects reflect in part decisions by parents to allocate resources in response to birth outcome differences. In any family with more than one birth, given a common resource constraint, the allocation of resources to children reflects a competition between siblings, with at the margin one child obtaining more resources at the expense of another. The issue is thus whether the competition among twins for parental resources is significantly different than among siblings whose births are separated over time.[13] In an environment with no credit constraints and forward-looking parents, decisions even about a first child are based on expectations about the characteristics of subsequent children, and the resource allocations for twins and nontwin siblings may not be very different. Given credit constraints, however, the possibility arises that the competition between twins may be more acute than among spaced siblings and thus within-twin estimates overstate the effects of birth outcome differences across the general population.

Empirical evidence suggests that the spacing between nontwin siblings does not affect within-sibling estimates.

Olneck (1977) compared the correlations between 375 siblings for earnings, test scores, schooling, and occupation at two life cycle points between siblings with age differences of 3 years or less and more than 3 years, found no statistically significant difference in any but current occupation, and concluded that exception to be due to "error." We examined the relationship between birthweight and height for 494 sibling pairs aged 15–21 in the 1998 round of the NLSY. We used a within-sibling estimator, interacting the interval in years between each siblings's birth and his or her birthweight. The estimates we obtained are

$$\text{height (in.)} = 0.0319 \times \text{birthweight (oz.)} - 0.0069$$
$$\hphantom{\text{height (in.)} = }{\scriptstyle(3.75)}\hphantom{\times \text{birthweight (oz.)} } {\scriptstyle(0.49)}$$
$$\times \text{birthweight} \times \text{spacing}, \qquad (7)$$

where the absolute values of the $t$-ratios are in the parentheses. Estimates of the birthweight relationship for closely spaced siblings and those spaced up to 6 years evidently do not differ.[14]

The final issue we consider about the generalizability of twins-based estimates of birth outcome effects is whether birth outcome differences between MZ twins reflect the same in utero growth factors, other than genetic factors, that affect the development of single fetuses. There is evidence that the increased fetal stress associated with sharing the womb results in acceleration of the maturation of the lung and other organs, notably the brain (Amiel-Tison & Gluck,

---

[13] Because of intrafamily responses to sib differences, no estimator based on siblings may be relevant to households with only one child. One-child (completed) families are rare. In the 1990 U.S. Census, among ever-married white women aged 45–60 who had any children, only 10% had only one child.

[14] Over 28% of the sibling pairs were born approximately 1.5 years apart; 16% were born 4 or more years apart.

FIGURE 4.—DISTRIBUTION OF FETAL GROWTH RATES (LB./IN.$^2$): FEMALE TWINS AND SINGLETONS



1995). This might mean that a shorter gestation for twins may have less deleterious effects than for singleton births and twins-based estimates will understate the effect of intrauterine development. There is also some evidence that the larger of two twins may be more susceptible to diabetes. If this does not hold for singletons, it again means that ceteris paribus the effect of twins' birthweight may be an underestimate of the effect of singletons' birthweight. Differences in the intake of nutrients and oxygen within the womb will most likely reflect differences in fetal positions, which may be more unusual than those for single births and which may affect oxygenation more than nutrients. In that case the within-twin estimates may overstate the efficacy of programs that emphasize increased nutrient consumption by the mother compared with initiatives that discourage maternal smoking. Clearly more research on the fetal development of twins and nontwins is needed for a more precise interpretation of birth outcome effects, however they are estimated.

## V. Estimates

### A. Fetal Nutrient Intake Effects on Human Capital, Physical Attributes, and Earnings

Table 2 reports OLS and within-MZ estimates of the relationships between fetal growth and, in the order of the table, subsequent adult schooling attainment, adult BMI,[15]

adult height, and the log wage, using the unweighted twins sample. Two OLS estimates are given. The first includes only fetal growth and age (which controls for secular trends, for example, in schooling). The second in addition includes mother's and father's schooling and father's occupational earnings.

The estimates for schooling in the first three columns indicate that, whatever the estimation procedure, a child's fetal growth and his or her subsequent schooling attainment are significantly and positively related. However, the OLS estimate understates $\alpha_1$ for schooling attainment by more than 50%. This is the case whether or not the observed family background controls are included in the OLS estimates. In fact, though the observed family background estimates have significant positive coefficient estimates, their inclusion reduces the gap between the OLS and the within-MZ estimate of the effect of fetal growth only by approximately a fifth. Most of the difference between the simple OLS estimates and the within-MZ estimates is evidently not due to the failure to control for these standard family background variables. The difference between the OLS and the within-MZ estimates suggest that in the population either human capital inputs tend to be negatively correlated with health endowments or health and ability endowments are negatively correlated. The within-MZ point

---

[15] The relation between BMI and health is nonlinear. For very undernourished populations, increases in BMI indicate better health. But for increases above the normal range, increases in BMI indicate being overweight or obese. For the population that we study, however, undernourishment is not an issue. The mean BMI is in the overweight range (>25 kg/m$^2$; see table 1), so increases in BMI for this sample basically imply moving from normal to overweight to obese status.

TABLE 2.—OLS AND WITHIN-MZ TWIN ESTIMATES OF FETAL GROWTH ON OWN SCHOOLING ATTAINMENT, BMI, HEIGHT, AND ln WAGE

| Variable | Schooling | | | BMI ($\times 10^{-3}$) | | | Height | | | ln Wage | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ |
| Fetal growth | 0.313 (2.06)[a] | 0.385 (2.76)[a] | 0.657 (3.11)[b] | 1.06 (2.04)[a] | 0.903 (1.76)[a] | 0.292 (0.39)[b] | 1.52 (8.06)[a] | 1.50 (8.07)[a] | 1.48 (8.72)[b] | 0.0269 (0.81)[a] | 0.0329 (1.01)[a] | 0.190 (2.47)[b] |
| Age | −0.0429 (3.53) | −0.0054 (0.47) | — | 0.130 (3.20) | 0.0904 (2.15) | — | 0.0261 (1.77) | 0.0282 (1.80) | — | −0.00657 (2.58) | −0.0031 (1.19) | — |
| Mother's schooling | — | 0.166 (5.35) | — | — | −0.0267 (0.25) | — | — | 0.0388 (1.02) | — | — | 0.0176 (2.71) | — |
| Father's schooling | — | 0.112 (3.70) | — | — | −0.216 (2.03) | — | — | −0.0257 (0.66) | — | — | 0.00598 (0.89) | — |
| Father's earnings ($\times 10^{4}$) | — | 0.160 (3.38) | — | — | −0.317 (1.51) | — | — | 0.0072 (0.89) | — | — | 0.00345 (1.98) | — |
| Constant | 15.0 (22.4) | 9.60 (12.8) | — | 27.7 (12.2) | 33.3 (11.8) | — | 59.9 (72.1) | 59.5 (58.1) | — | 2.55 (17.7) | 2.01 (11.9) | — |
| N | 1418 | 1418 | 804 | 1418 | 1418 | 804 | 1418 | 1418 | 804 | 1418 | 1418 | 804 |

[a]Absolute value of robust $t$-statistic with clustering by twin pairs.
[b]Absolute value of robust $t$-statistic.

estimate of $\alpha_1$ indicates that efforts taken by a mother to increase fetal growth such that birthweight is increased by 1 lb. at birth (an increase in fetal growth of 0.4 oz./week) would result in almost a third of a year more of schooling for her child.

The results for BMI suggest clearly that genetics play a role in BMI, though there is some inverse association with family background. The within-MZ estimate of $\alpha_1$ for body mass is essentially zero—fetal inputs that increase birthweight (and schooling attainment) do not result in additional body fat later in life. Thus the primary reason for the positive association between fetal growth and adult BMI is evidently the influence of genetic endowments, as indicated in the expression (4).[16] This suggests that increasing birthweight, for given genetic endowments, does not result in obesity of the child later in life. However, increasing birthweight does result in increased adult height. The within-MZ point estimate, which is not different from the OLS estimate, suggests that a 1 lb. increase in birthweight brought about by increased womb nutrients would increase adult height by 0.6 in.

Finally, the within-MZ point estimate of the reduced-form effect of fetal growth on wages indicates that augmenting a child's birthweight by a 1 lb. increases her adult earnings by over 7%. That increasing fetal growth and birthweight increases earnings is not surprising given the estimates suggesting that increasing birthweight increases schooling. However, the OLS estimate of the fetal-growth–earnings relationship indicates the absence of any correla-

tion between fetal growth and the wage.[17] This is also consistent with the results for schooling, suggesting a general negative correlation between the genetic component of birthweight and ability endowments or inputs. These relationships and variation in endowments in the population evidently obscure the fact that increasing fetal growth augments human capital and earnings.

### B.  Are There Important Nonlinearities in Birth Outcome Effects?

As discussed, the comparisons between the OLS and within-MZ estimates that shed light on the role of endowments may be misleading if there are important nonlinearities between fetal growth and the adult outcomes in the cross section. We estimated nonparametric regressions, using a sensitive bandwidth of 0.4, for each of the four dependent variables in table 2. The cross-sectional nonparametric and OLS relationships between fetal growth and schooling, BMI, height, and the log wage are depicted in figures 5–8, respectively. The graphs suggest that for schooling, height, and BMI the relationship is monotonic and, over most of the range of fetal growth values, linear, although the slopes for schooling and height appear to be slightly larger in the bottom quarter of the distribution of fetal growth rates. Spline estimates indicate, however, that these slope differences are not statistically different for either outcome. The differences between the OLS and within-MZ estimates for schooling, BMI, and height thus

---

[16] This result is consistent with the findings in the literature on the heritability of adult BMI based on adoptions, MZ twins reared apart, and comparisons of MZ and DZ twins (Vogler et al., 1995; Allison et al., 1996; Herskind et al., 1996).

[17] This is the case for both the simple and extended OLS estimates. However the comparison between the point estimates of the two provides an illustration of the possibility that the estimate of the effect of fetal growth in the extended OLS estimate need not be between the estimates in the simple OLS and the within-MZ cases.

FIGURE 5.—ADULT SCHOOLING ATTAINMENT (YR.) AND FETAL GROWTH (LB./IN.²): OLS AND NONPARAMETRIC ESTIMATES



FIGURE 7.—ADULT HEIGHT (IN.) AND FETAL GROWTH (LB./IN.²): OLS AND NONPARAMETRIC ESTIMATES



FIGURE 6.—ADULT BMI (LB./IN.²) AND FETAL GROWTH (LB./IN.²): OLS AND NONPARAMETRIC ESTIMATES



FIGURE 8.—LOG WAGE ($/YR.) AND FETAL GROWTH (LB./IN.²): OLS AND NONPARAMETRIC ESTIMATES



appear solely to reflect biases due to endowment heterogeneity.

The cross-sectional fetal growth effect on the log wage, however, is nonmonotonic—positive through the bottom quarter of the fetal growth distribution of the sample, and negative in the top quarter. If the within-MZ estimator just provided an estimate of the average of local OLS slope coefficients seen in figure 8, the within-MZ estimate would be smaller than the OLS estimate. The fact that it is larger for the same sample when the effects of endowments are eliminated reinforces our interpretation as endowment heterogeneity bias.

Figures 5–8 do not say anything about the shape of the relationships between fetal growth rates and the adult outcomes based on within-twin differences. Indeed, if the within-MZ relationship between fetal growth and the log wage is similar to that depicted in figure 8, the estimate in table 2 may substantially overstate the fetal growth effect on earnings for singleton births, given that most of the fetal growth rates for twins are clustered in the bottom half of the

distribution for singletons. To explore the shape of the relationship between fetal growth and adult outcomes net of endowment heterogeneity we first test whether it is only crossing the low-birthweight threshold that matters for adult outcomes, as assumed in many if not most studies of the effects of birthweight effects. Appendix table A1 reports within-MZ estimates of the effects of low birthweight, as conventionally defined, on the same set of dependent variables with and without the fetal growth measure included in the specification. These estimates suggest that the continuous birthweight specification dominates—in no case is the coefficient on the indicator of low birthweight statistically significant when fetal growth was also included in the specification.[18]

To further assess the importance of nonlinearities and the generalizability of the twin-based results to the singleton population of births, we reestimated the fetal growth

18 Richards et al. (2001) also find that birthweight is positively correlated with adult outcomes above the low-birthweight threshold, although their results are based on cross-sectional estimates.

TABLE 3.—OLS AND WITHIN-MZ TWIN ESTIMATES OF FETAL GROWTH ON OWN SCHOOLING ATTAINMENT, BMI, HEIGHT, AND ln WAGE: SAMPLE WEIGHTED USING U.S. SINGLETON DISTRIBUTION OF FETAL GROWTH RATES

| Variable | Schooling | | | BMI ($\times 10^{-3}$) | | | Height | | | ln Wage | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ | OLS | OLS | Within-MZ |
| Fetal growth | 0.152 (0.67)[a] | 0.278 (1.36)[a] | 0.625 (2.72)[b] | 1.34 (1.61)[a] | 1.02 (1.27)[a] | 0.351 (0.04)[b] | 1.62 (6.18)[a] | 1.62 (6.26)[a] | 1.14 (7.13)[b] | 0.00585 (0.12)[a] | 0.0231 (0.49)[a] | 0.143 (1.78)[b] |
| Age | −0.0435 (2.71) | 0.0051 (0.32) | — | 0.147 (3.01) | 0.0867 (1.68) | — | 0.0185 (0.96) | 0.0256 (1.25) | — | −0.00328 (1.40) | −0.00269 (0.82) | — |
| Mother's schooling | — | 0.214 (5.83) | — | — | −0.0357 (0.26) | — | — | 0.0529 (1.12) | — | — | 0.0199 (2.55) | — |
| Father's schooling | — | 0.0890 (2.32) | — | — | −0.363 (2.49) | — | — | −0.0161 (0.33) | — | — | 0.0141 (1.83) | — |
| Father's earnings ($\times 10^4$) | — | 0.138 (2.31) | — | — | −0.119 (0.50) | — | — | 0.0601 (0.57) | — | — | 0.00165 (0.81) | — |
| Constant | 15.4 (17.2) | 9.15 (8.89) | — | 26.1 (8.7) | 34.2 (9.31) | — | 60.0 (58.2) | 59.1 (46.0) | — | 2.36 (17.5) | 1.97 (9.62) | — |
| N | 1,418 | 1,418 | 804 | 1,418 | 1,418 | 804 | 1,418 | 1,418 | 804 | 1,418 | 1,418 | 804 |

[a]Absolute value of robust $t$-statistic with clustering by twin pairs.
[b]Absolute value of robust $t$-statistic.

equations, using both OLS and the within-MZ estimator, weighting the sample using the U.S. singleton distribution of fetal growth rates shown in figure 4. Table 3 reports the weighted estimates. Given that the weighting gives substantially more prominence to higher fetal growth rates and given the decline in the cross-sectional slopes seen for schooling and the log wage as fetal growth increases observed in figures 5 and 8, it is not surprising to find that the weighted OLS estimates of fetal growth rates for these dependent variables are substantially lower than their unweighted counterparts, by 28% for schooling and by 30% for the log wage in the specifications including the parental controls, and by 49% and 78% in the simple specifications. The within-MZ estimates of $\alpha_1$ are, however, more robust to the reweighting—the coefficient for schooling drops by less than 5%, and the coefficient for BMI remains statistically insignificant. The coefficients for height and the log wage drop by less than 25%. Inferences about biases due to endowment heterogeneity are thus robust to the reweighting of the sample.

The within-MZ coefficient on the log wage loses statistical significance through reweighting. Inspection of the within-MZ log wage coefficients across the range of the weighted distribution of twin-pair average fetal growth rates indicates that the relationship is positive and monotonic but the slope declines monotonically as average fetal growth increases. The within-MZ estimate of the birthweight effect on log earnings for the bottom third of the U.S. singleton distribution of fetal growth rates (fetal growth rate = 2.45) is statistically significant—$\alpha_1 = 0.2$ ($t = 2.17$); but $\alpha_1 =$ 0.08 for the top third ($t = 0.33$). These results thus imply that focusing policy on lower-birthweight populations is warranted if the criterion is to increase overall productivity, but not if the goal is to increase overall levels of schooling.

C. How Much Will Reducing World Birthweight Inequality Reduce World Earnings Inequality?

We can use our data on twins and our within-twin estimator to assess how reducing differences in birthweight across low- and high-income countries would contribute to the reduction in world income inequality. In particular, we provide illustrative estimates of how much eliminating the birthweight gap between a low-income country and the United States reduces the disparity in their incomes, estimate how much the world variation in country-specific birthweights affects worldwide income inequality, and assess the extent to which the cross-country relationship between birthweight and income observed in figure 1 overstates the productivity effect of birthweight enhancement due to the existence of confounding unmeasured factors affecting birthweight and incomes.

The formula for computing the percentage earnings gain for a country $j$ from closing the birthweight gap between it and some target country is

$$\%earnings\ gain_j = \sum_i f_{ij} \alpha_{1i} \cdot birthweight\ gap_j. \quad (8)$$

Given the nonlinearities we have identified in the effects of intrauterine consumption on adult earnings, the estimated birthweight gap effect will depend on the country's birthweight distribution, the set of country-specific $f_i$'s. To illustrate these estimated effects, we picked two countries with available information on birthweights—Malaysia and India. We chose Malaysia because it is in the middle range of all countries with respect to income and birthweight and because there are good data on birthweights (but less good data on gestation), from the Malaysia Family Life Survey (MFLS) for 1976–1977, that have been analyzed in other

TABLE 4.—PERCENT LOW-BIRTHWEIGHT BIRTHS AND MEAN BIRTHWEIGHT FOR SELECTED COUNTRIES

| Country | % Low Birthweight | Mean Birthweight | Number of Births | Source |
|---|---|---|---|---|
| India | 22.6 | 98.3 (24.5)[a] | 8650 | 1998/99 DHS |
| Philippines | 16.2 | 111.0 (26.3) | 4337 | 1998 DHS |
| Pakistan | 16.0 | 111.9 (28.8) | 607 | 1991 DHS |
| Malaysia | 14.3 | 108.3 (19.2) | 3941 | 1976/77 MFLS |
| Senegal | 11.2 | 110.9 (26.5) | 2239 | 1997 DHS |
| Uganda | 11.2 | 113.5 (28.2) | 1889 | 1995 DHS |
| Brazil | 9.1 | 114.3 (21.4) | 4427 | 1996 DHS |
| Peru | 9.0 | 114.6 (23.4) | 10654 | 1996 DHS |
| United States— whites | 8.9 | 118.2 (20.9) | 1711 | NLSY79, 1988 round |

[a] Standard errors in parentheses.

work studying the determinants of birthweight (Rosenzweig & Wolpin, 1988). We chose India because India appears to have the world's highest incidence of low birthweight among countries for which there is available nationally representative information on birthweights [Demographic and Health Surveys (DHS), 1998–1999].[19]

Because of the absence of accurate worldwide information on gestation, we use estimates based on birthweight data. Table 4 provides the percentage of low-birthweight babies and mean birthweight that we have computed for a number of countries with available survey data on birthweight. The table indicates that the United States–Malaysia mean birthweight gap is about 10 oz. (9.2%)—comparable to between the United States and a number of African and Asian countries in the 1990s—and that for India in 1999 is 20 oz. (20.3%). Neither the U.S. distribution of birthweights for singleton births nor the distribution for twin births measures well the birthweight distribution for Malaysia or India. Indeed, the proportion of low-birthweight babies among the U.S. twins (49.7%) is more than twice as high as that for India (22.6%). The 1976–1977 birthweight distribution for Malaysia is between that for the U.S. twins and singletons, as depicted in figure 9. Given the evident nonlinearities in birthweight effects, we use the Malaysia birthweight distribution to estimate the birthweight effect for Malaysia, and the India birthweight distribution to obtain the India birthweight effect based on the within-MZ estimator.

Table 5 reports the within-MZ estimates of the effect of birthweight on log earnings based on the twins sample using no weights, the Malaysia weights, and the India weights. The estimates are also reported for the low-birthweight

population within each distribution and, for Malaysia and India, for the bottom half of their birthweight distributions. Similar to the estimates for fetal growth on log earnings, the estimates for birthweight by weighting scheme and by location in the distribution within a country's birthweight distribution indicate that birthweight effects on log earnings are stronger at lower birthweights. Interestingly, the strongest birthweight effect is within the low-birthweight part of the distribution for India, with an average 20-oz. increase in birthweight resulting in a 14.8% increase in earnings.

The estimates reported in table 5 based on the relation (8) indicate that closing the average U.S.-Malaysia and U.S.-India birthweight gaps by a uniform increase in birthweight across the birthweight distribution for each country would increase earnings per worker by 4.1% and 8.6%, respectively. More realistically, confining the increase in birthweight to the bottom half of the birthweight distribution to make up the average gap would increase earnings by 4.8% and 9.2% in the two countries. These are not trivial effects. However, the U.S. per-worker GDP gap in PPP dollars for both countries is substantial—287% for Malaysia (1977) and more than an order of magnitude for India using 1989 GDP figures. Thus the birthweight gap plays a very small role in explaining the earnings gap for either Malaysia or India.

To estimate how much the worldwide variation in birthweight can account for world inequality in GDP per worker, we need to convert the available low-birthweight percentages by country to mean birthweights. The accurate, birth-record-based information on birthweights from our twins survey indicates that the distribution of birthweights is normal. Figure 10 shows the quantile plot of the birthweight distribution of twins against the normal, which exhibits a very close fit. Given the assumption of normality, we then need only assume a value for the standard deviation $\sigma$. To obtain this we used the empirical country-specific low-birthweight proportions and mean birthweights for the nine countries reported in table 4 to estimate $\sigma$, using the relationship

$$B_i = 88.18 - \Phi^{-1}(P_i)\sigma, \qquad (9)$$

where $\Phi^{-1}$ is the inverse normal distribution, $P_i$ is the proportion of low-birthweight births in each country, $B_i$ is the country's mean birthweight, and 88.18 is the 2500 g low-birthweight cutoff in ounces. The regression estimate of $\sigma$ is 20.3 ($t = 25.3$), with an $R^2$ of 0.988.[20] Using equation (9) and the estimated $\sigma$ to estimate the mean birthweight for the 112 countries for which we have both low-birthweight proportions and PPP GDP per worker, we obtain an estimate of the cross-country world variance in birthweight of 32.6 and a mean birthweight for the world of 115.0 oz.[21]

[19] In figure 1 the incidence of low birthweight in India is exceeded in Haiti and Bangladesh, but there are no available data on birthweights for Bangladesh or for Haiti for nationally representative samples of mothers.

[20] This is close to the standard deviation of the U.S. white birthweight distribution of 20.9 in table 4.

[21] If the countries are weighted by population, the average world birthweight is 112.9 oz., almost two-thirds of a pound less than the average birthweight in Sweden.

FIGURE 9.—DISTRIBUTION OF BIRTHWEIGHTS (OZ.) BY COUNTRY AND BIRTH TYPE



There are two methods of estimating the contribution of the inequality in birthweight to world earnings inequality. The first is to estimate a regression of log PPP per-worker GDP on mean birthweight across the 112 countries. Such a regression yields an $R^2$ of 0.443.[22] This method assumes that all of the observed correlation between mean birthweights and earnings across the world corresponds to the causal effect of birthweight on earnings. If we use instead the within-MZ estimated effect of birthweight on log earnings based on the Malaysia birthweight distribution in table 5, which eliminates any role for reverse causation or corre-

lated endowments, we find that the world inequality in birthweight could account for less than 1% of world earnings inequality, measured by the log variance in GDP per worker $[(0.00413)^2 \times 32.6/1.16]$.

### D. Does Increasing Birthweight Affect the Birthweight of the Next Generation of Children?

The literature also suggests that improving birth outcomes will produce healthier children in the next generation. We can assess this proposition using the information on the birthweights of the biological children of the twins. The reduced-form correlation between maternal and child birthweight reflects the heritability of endowments, the

[22] The regression estimate is log real PPP GDP/worker $= -6.69(t = 4.06) + 0.136(t = 9.45) \times$ birthweight.

TABLE 5.—WITH-MZ ESTIMATES OF BIRTHWEIGHT EFFECTS ON THE LN WAGE, BY COUNTRY-SPECIFIC SAMPLE WEIGHTS

|  | No Weights | | Malaysia Weights | | | India Weights | | |
|---|---|---|---|---|---|---|---|---|
|  | Full Sample | L.B. | Full Sample | L.B. | <50% | Full Sample | L.B. | <50% |
| Birthweight | 0.00478 (2.41)[a] | 0.00643 (2.35) | 0.00413 (2.04) | 0.00612 (2.23) | 0.00502 (2.33) | 0.00430 (2.24) | 0.00736 (2.45) | 0.00452 (2.10) |
| $N$ | 812 | 404 | 812 | 404 | 632 | 812 | 404 | 616 |

[a] Absolute value of $t$-ratio in parentheses.

FIGURE 10.—Q-Q PLOT OF THE BIRTHWEIGHT DISTRIBUTION AGAINST THE NORMAL: ALL TWINS

FIGURE 10.—Q-Q PLOT OF THE BIRTHWEIGHT DISTRIBUTION AGAINST THE NORMAL: ALL TWINS



intergenerational transmission of nutritional habits and preferences, and the fact that the mother's birthweight may affect her choices of inputs that affect her child's birthweight. The last is the policy-relevant effect. For example, we have seen that higher birthweight is associated with higher schooling levels. If more-educated mothers make more investments in fetal development (in part because they marry more-educated husbands), then this will be reflected in the intergenerational birthweight correlation. By estimating the intergenerational effect of birthweight across mothers who are identical twins, both the mother's genetic contribution and any common preferences for child investments "inherited" from the twin's parents are eliminated. What remains in the maternal birthweight difference is only that part of birthweight that reflects different inputs, which are neither heritable nor reflective of maternal preferences. Thus, the differences between the mothers' own fetal growth rates within a twin pair can only affect the difference in their children's birth outcomes by either influencing input choices made by the mothers while pregnant or influencing the heritable endowment of the fathers via the marriage market (for example, through the schooling effect). To the extent that assortative mating by endowments is strong, this latter effect will be negligible.

The first two columns of table 6 report the OLS and within-MZ estimates of the effects of the mother's fetal growth on her first own biological child's birthweight for the unweighted sample of MZ twin mothers. The last two columns report the estimates using the U.S. singleton frequency weights. Both OLS estimates indicate that the mother's fetal growth and her child's birthweight are significantly and positively associated. The point estimates suggest that a 1 lb. increase in the mother's birthweight is associated with a 2.3 oz. (unweighted) to 2.8 oz. (weighted) increase in her child's birthweight. Differencing out the common input components of birthweight for the two twin mothers (reflecting both genes and the preferences of their

family for prenatal investments), however, reduces the relationship between the mother's birthweight and her child's birthweight by 75%, to insignificance, in the unweighted sample and changes the coefficient sign to negative in the weighted sample. The within-MZ estimates of the intergenerational birthweight effect thus suggest the lack of importance of birthweight inputs correlated with differences in the twin mother's weight at birth. Evidently, improving fetal growth in today's generation will not significantly impact the birth outcomes of the next generation.

## VI. Conclusion

In this paper we have used data on female twins to estimate the relationships between fetal growth and schooling, adult physical characteristics, and wages. We demonstrated that differences in birthweights between identical twins can be used to identify the life cycle consequences for physical attributes, schooling, and earnings from increasing fetal nutrient intake and show that these intrauterine nutritional effects are confounded in cross-sectional estimates with variations in genetic and in family background endowments. Our empirical results suggest that there are real payoffs to increasing body weight at birth. Increasing birthweight increases adult schooling attainment and adult height for babies at most levels of birthweight, but has no effect on adult body mass. The effect of increasing birthweight on schooling, moreover, is underestimated by 50% if there is no control for genetic and family background endowments as in cross-sectional estimates, and the use of standard family background variables—parental schooling and father's earnings—to reduce endowment heterogeneity does not reduce these biases significantly.

We also find evidence that augmenting birthweight among lower-birthweight babies, but not among higher birthweight babies, has significant labor market payoffs. For example, our estimates indicate that increasing the average birthweight of U.S. babies in the bottom half of the birthweight distribution to the U.S. mean (about 17 oz.) would increase their lifetime earnings by 6%. Increasing the

TABLE 6.—OLS AND WITHIN-MZ TWIN MOTHER ESTIMATES: THE INTERGENERATIONAL EFFECT OF MOTHER'S OWN FETAL GROWTH ON HER CHILD'S BIRTHWEIGHT

| Variable | Unweighted Sample | | Weighted Sample | |
|---|---|---|---|---|
| | OLS | Within-MZ | OLS | Within-MZ |
| Mother's fetal growth | 7.48 (5.00)[a] | 1.87 (0.51)[b] | 8.84 (3.93) | −1.56 (0.40) |
| Current age of mother | −0.198 (1.88) | — | −0.259 (1.82) | — |
| Constant | 109.6 (19.1) | — | 109.7 (14.9) | — |
| N | 1,207 | 608 | 1,207 | 608 |

[a] Absolute value of robust t-statistic with clustering by twin pairs.
[b] Absolute value of t-statistic.

average birthweight of low-birthweight babies by the same amount would increase their earnings by almost 10%, and further increasing their average birthweight to the U.S. mean would increase earnings by 26%. However, our estimates also suggest that the cross-country correlation between incomes and birthweight substantially overstates the reduction in world earnings inequality that would arise from reducing cross-country disparities in birthweight.

Our findings have some important implications for policy. The significantly positive effects of fetal growth on schooling, adult height, and earnings support programs that serve to increase weight at birth, such as Medicaid in the United States (Currie and Gruber, 1996), and the use of public resources to do so from an efficiency perspective if schooling has positive externalities, as usually is assumed. Moreover, our results suggest that targeting populations with the potential for low birthweight will be particularly efficacious in enhancing the earnings prospects of the next generation. Our results indicate, moreover, that such efforts will not increase the incidence of obesity among adults. However, our findings do not indicate any support for policies increasing fetal growth on the grounds of intergenerational nutritional links between mothers and their children.

Our results also have implications for countries in which couples increasingly rely on medical procedures that augment fertility in part as a consequence of fertility postponement. Our findings suggest that such procedures, to the extent that they increase multiple births, impose nontrivial costs on children's subsequent development. On average, twins have 28 oz. less birthweight than singletons, which our estimates indicate translates into a reduction in lifetime earnings for such children of over 12%.

Finally, while these policy implications are important for countries such as the United States, they are potentially more important for many developing countries, which have substantially lower distributions of birthweights. Our estimates suggest that the gains to per-worker GDP from reducing the developed–developing-country birthweight gap can be as high as 9% in low-birthweight countries. However, shifting the distribution of birthweights in developing countries to that in the United States would reduce world earnings inequality by less than 1%, far less than indicated by the cross-country correlation between per-worker GDP and birthweight.

REFERENCES

Acemoglu, Daron, Simon Johnson, and James Robinson, "Colonial Origins of Comparative Development," *American Economic Review* 91:5 (2001), 1369–1401.

——— "Disease and Development in Historical Perspective," *Journal of the European Economic Association* 1:2/3 (2003), 397–405.

Alderman, Harold, and Jere R. Behrman, "Estimated Economic Benefits of Reducing LBW in Low-Income Countries," Philadelphia, PA: University of Pennsylvania mimeograph (written for Human Development Network/Nutrition, World Bank) (2003).

Allison, D. B., J. Kaprio, M. Korkeila, M. Koskenvuo, M. C. Neale, and K. Hayakawa, "The Heritability of Body Mass Index among an International Sample of Monozygotic Twins Reared Apart," *International Journal of Obesity* 20 (1996), 501–506.

Almond, Douglas, Kenneth Chay, and David Lee, "Does Low Birth Weight Matter? Evidence from the U.S. Population of Twin Births," Center for Labor Economics, University of California, Berkeley, working paper no. 53 (2002).

Amiel-Tison, C., and L. Gluck, "Fetal Brain and Pulmonary Adaptation in Multiple Pregnancy," (pp. 585–598), in Louis G. Keith, Emile Papiernik, Donald M. Keith, and Barbara Luke (Eds.), *Multiple Pregnancy: Epidemiology, Gestation, and Perinatal Outcome* (London and New York: Parthenon, 1995).

Ashenfelter, Orley, and Alan Krueger, "Estimates of the Economic Return to Schooling from a New Sample of Twins," *American Economic Review* 84:5 (1994), 1157–1174.

Averett, Susan, and Sanders Korenman, "The Economic Reality of the Beauty Myth," *Journal of Human Resources* 31 (1996), 304–330.

Barker, D. J. P. (Ed.), *Fetal and Infant Origins of Adult Disease: Papers Written by the Medical Research Council Environmental Epidemiology Unit,* University of Souththampton (London: British Medical Journal, 1992).

Barker, D. J. P., *Mothers, Babies and Health in Later Life, 2nd ed.* (Edinburgh, London, New York, Philadelphia, San Francisco, Sydney, Toronto: Churchill Livingstone, 1998).

Behrman, Jere R., and Mark R. Rosenzweig, "Does Increasing Women's Schooling Raise the Schooling of the Next Generation?" *American Economic Review* 92:1 (2002), 323–334.

Behrman, Jere R., Mark R. Rosenzweig, and Paul Taubman, "Endowments and the Allocation of Schooling in the Family and in the Marriage Market: The Twins Experiment," *Journal of Political Economy* 102:6 (1994), 1131–1174.

Bishop, John, "Reporting Errors and the True Return to Schooling," Madison, WI: University of Wisconsin mimeograph (1976).

Bloom, David E., and Jeffrey D. Sachs, "Geography, Demography, and Economic Growth in Africa," *Brookings Papers on Economic Activity* 1998:2 (1998), 207–295.

Conley, Dalton, and Neil G. Bennett, "Is Biology Destiny? Birth Weight and Life Chances," *American Sociological Review* 65 (June 2000), 458–467.

Currie, Janet, and Jonathan Gruber, "Saving Babies: The Efficacy and Cost of Recent Changes in the Medicaid Eligibility of Pregnant Women," *Journal of Political Economy* 104:6 (1996), 1263–1296.

Currie, Janet, and Rosemary Hyson, "Is the Impact of Health Shocks Cushioned by Socioeconomic Status? The Case of Low Birthweight," *American Economic Review* 89:2 (1999), 245–250.

Fogel, Robert W., "Economic Growth, Population Theory, and Physiology: The Bearing of Long-Term Processes on the Making of Economic Policy," *American Economic Review* 84 (1994), 369–395.

Gallup, John Luke, and Jeffrey D. Sachs with Andrew D. Mellinger, "Geography and Economic Development," Cambridge, MA: CID working paper no. 1 (Center for International Development, Harvard University, 1999).

Gortmaker, Steven L., Aviva Must, James M. Perrin, Arthur M. Sobol, and William H. Dietz, "Social and Economic Consequences of Overweight in Adolescence and Young Adulthood," *New England Journal of Medicine* 329:14 (1993), 1008–1012.

Griliches, Z., "Sibling Models and Data in Economics: Beginning of a Survey," *Journal of Political Economy* 87 (1979), S37–S64.

Gronau, Reuben, "Wage Comparisons—A Selectivity Bias," *Journal of Political Economy* 82:6 (1974), 1119–1143.

Grossman, Michael, and Theodore Joyce, "Unobservables, Pregnancy Resolutions, and Birth Weight Production Functions in New York City," *Journal of Political Economy* 98 (1990), 983–1007.

Haskins, K. M., and H. E. Ransford, "The Relationship between Weight and Career Payoffs among Women," *Sociological Forum* 14:2 (1999), 295–318.

Heckman, James, "Shadow Prices, Market Wages, and Labor Supply," *Econometrica* 42 (July 1974), 679–694.

Herskind, A. M., McGue, T. I. A. Sorensen, and B. Harvald, "Sex and Age Specific Assessment of Genetic and Environmental Influences on Body Mass Index in Twins," *International Journal of Obesity* 20:2 (1996), 106–113.

Lykken, D. T., T. J. Bouchard, M. McGue, and A. Tellegen, "The Minnesota Twin Family Registry: Some Initial Findings," *Acta Genetica Medicae et Gemellologiae (Roma)* 39 (1990), 35–70.

Olneck, Michael, "On the Use of Sibling Data to Estimate the Effects of Family Background, Cognitive Skills, and Schooling: Results from the Kalamazoo Brothers Study" (pp. 125–163), in Paul Taubman (Ed.), *Kinometrics: Determinants of Socioeconomic Success Within and Between Families* (Amsterdam: North-Holland, 1977).

Pojda, Judith, and Laura Kelley, "Low Birthweight," ACC/SCN (Administrative Committee on Coordination/Sub-Committee on Nutrition), nutrition policy paper no. 18 (2000).

Richards, Marcus, Rebecca Hardy, Diana Kuh, and Michael J. Wadsworth, "Birth Weight and Cognitive Function in the British 1946 Birth Cohort: Longitudinal Population Based Study," *British Medical Journal* 322 (January 2001), 199–203.

Rosenzweig, Mark R., and T. Paul Schultz, "Estimating a Household Production Function: Heterogeneity, the Demand for Health Inputs, and Their Effects on Birth Weight," *Journal of Political Economy* 91:5 (1983), 723–746.

Rosenzweig, Mark R., and Kenneth I. Wolpin, "Heterogeneity, Intrafamily Distribution and Child Health," *Journal of Human Resources* (Fall 1988).

——— "Sisters, Siblings and Mothers: The Effects of Teen-Age Childbearing on Birth Outcomes in a Dynamic Family Context," *Econometrica* (March 1995).

Sarlio-Lahteenkorva, S., and E. Lahelma, "The Association of Body Mass Index with Social and Economic Disadvantage in Women and Men," *International Journal of Epidemiology* 28:3 (1999), 445–449.

Schultz, T. Paul, "Health and Schooling Investments in Africa," *Journal of Economic Perspectives* 13:3 (1999), 67–88.

Shastry, Gauri Kartini, and David N. Weil, "How Much of Cross-Country Income Variation is Explained by Health?" *Journal of the European Economic Association* 1:2 (2003), 387–396.

Steckel, Richard H., "Stature and the Standard of Living," *Journal of Economic Literature* 33 (December 1995), 1903–1940.

Strauss, John, and Duncan Thomas, "Health, Nutrition, and Economic Development," *Journal of Economic Literature* 36 (June 1998), 766–817.

Strauss, Richard S., "Adult Functional Outcome of Those Born Small for Gestational Age," *Journal of the American Medical Association* 283:5 (2000), 625–632.

UNICEF, 2001, LBW data base at http//www.childinfo.org/eddb/lbw/database.htm.

Vogler, George P., Thorkild, I. A. Sorensen, Albert J. Stunkard, M. R. Srinivasan, and D. C. Rao, "Influences of Genes and Shared Family Environment on Adult Body Mass Index Assessed in an Adoption Study by a Comprehensive Path Model," *International Journal of Obesity* 19 (1995), 40–45.

## APPENDIX

TABLE A1.—WITHIN-MZ TWIN ESTIMATES OF LOW BIRTHWEIGHT AND FETAL GROWTH ON OWN SCHOOLING ATTAINMENT, BMI, HEIGHT, AND ln WAGE, WITHOUT AND WITH FETAL GROWTH INCLUDED IN SPECIFICATION

| | Schooling | | BMI ($\times 10^{-3}$) | | Height | | ln Wage | |
|---|---|---|---|---|---|---|---|---|
| | Without | With | Without | With | Without | With | Without | With |
| Low birthweight | −0.270 | 0.0326 | 0.0279 | 0.258 | −0.608 | −0.0106 | −0.0384 | 0.0744 |
| | (1.80) | (0.17) | (0.05) | (0.38) | (5.11) | (0.07) | (0.70) | (1.07) |
| Fetal growth | — | 0.686 | — | 0.522 | — | 1.40 | — | 0.256 |
| | | (2.53) | | (0.54) | | (6.83) | | (2.60) |
| N | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 |

[a] Absolute value of robust *t*-statistic with clustering by individuals.
[b] Absolute value of robust *t*-statistic.

Copyright of Review of Economics & Statistics is the property of MIT Press and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



TOPICS    BLOGS

HOME

CATEGORIES

AUTHORS

ENGLISH

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here



001176



# Migrant wages and remittances to Latin America and the Caribbean in 2023

May 15, 2024 por Jeremy Harris - René Maldonado — Leave a Comment

**In 2023, the remittances received by the countries of Latin America and the Caribbean reached 154,511 million dollars.** This value is slightly lower (0.9%) than what we had predicted in our annual projection. The difference is largely due to **lower-than-expected growth in the total wage bill of migrant workers in the United States during the final months of 2023.**

**REMITTANCES TO LATIN AMERICA AND THE CARIBBEAN (2001-2023)**
**Billions of US Dollars**

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser. To learn more about cookies, click here

X

001177



*Source: Authors' calculations based on official data published by the central banks of LAC countries*

# The impact of employment and salaries of migrants on remittances

**One of the determining factors for remittances is undoubtedly the employment and income of migrants** (although clearly not the only factor). As an example, it is observed that the total wage bill, composed of the average income and the number of employed workers, for Mexican migrants in the United States has a positive and very strong relationship with the remittances sent by these migrants to their country of origin.

According to monthly data from the last 5 years, **Mexicans send on average 17.3% of the salary they generate each month.** This percentage is affected by other factors that usually modify remittances sent, such as the income and economic situation of the receiving families, extraordinary needs that arise from national disasters and other types of crises, among others.

**Total wage bill and remittances of Mexican migrants in the United States** (2019-2024)
Billions of US dollars



This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001178

*Source: Authors' calculations based on the Current Population Survey (CPS) and the Mexican Central Bank*

During the last quarter of 2023, especially in the month of November, a decrease was observed in employment and wages of some groups of migrant workers from Latin America and the Caribbean residing in the United States, especially those of Mexican origin. The total wage bill of these workers decreased by 11.9% between October and November, mainly due to a reduction in full-time workers towards the end of the year. In contrast, the number of part-time migrant workers remained constant or grew slightly.

## Correlation (2019-2024)
Monthly values



*Source: Authors' calculations based on the Current Population Survey (CPS) and the Mexican Central Bank*

Meanwhile, the average monthly salaries of part-time and full-time employed migrants during the last

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001179

**Average monthly income and monthly wage bill of Latin American and Caribbean immigrants in the United States** (December 2023)



*Source: Authors' calculations based on data from the Current Population Survey (CPS)*

Despite the decrease observed in the last months of the year, t**he average monthly income in 2023 for Mexican migrants in the United States reached US$3,738**, which is 3.4% higher than what was observed a year earlier, which largely explains the record remittances for the year. This is especially true when taking into account that the employed labor force of LAC migrants in the United States was 15.8 million people, similar to that observed a year earlier.

During the last quarter of 2023, a 3.6% decrease was also observed in the growth rate of LAC migrants employed in Spain, compared to what had been observed in previous quarters. This also affected the wage bill of migrants from the region in Spain, and therefore slightly reduced their ability to send remittances.

**Employed migrants by nationality in Spain 2022-2024**
(Thousands)

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001180

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1188 of 4699 PageID #:   4353



*Source: Authors' calculations based on information from the National Statistical Institute of Spain (INE)*

The decrease in the growth rate of migrants' income in their main destination countries caused a slightly lower growth in remittances than expected at the end of the year. **At the annual growth rate level, remittances showed a growth of 8.5% compared to the values of 2022** (less than the 9.5% that we had estimated), which reinforces the conclusions of the annual report on the recovery of these flows towards the trend levels that had been observed before the pandemic.

## Remittances by subregion in 2023

At the subregion level, the greatest growth in remittances received was recorded in Central America, reaching a growth rate of 12.2%, lower than that observed the previous year, although higher than that observed for the entire LAC region.

**These are the countries that received the highest levels of remittances in Central America**:

- El Salvador received US$8.182 billion in remittances in 2023.
- Guatemala received US$19.804 billion in remittances in 2023.
- Honduras received US$9.177 billion in remittances in 2023.

These three countries combined for 85% of the total remittances that the Central American region

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001181

throughout Latin America and the Caribbean.

### REMITTANCES TO LATIN AMERICA AND THE CARIBBEAN (2013-2023)
(Millions of US dollars)



*Source: Authors' calculations based on official data published by the central banks of LAC countries*

Remittances received by the countries of South America reached 29.397 billion dollars, for growth of 7.5% compared to the previous year, less than that observed a year before, but above the average over the last decade. Colombia was the country that received the most significant amount in the South American region (US$10.091 billion) and constitutes 34.3% of the total remittances received in South America.

In the case of the Caribbean countries, they received a total of 18.209 billion dollars, which represented growth of 2.8%, significantly higher than that observed the previous year (which had been negative), even without reaching the average rate of growth of the last 10 years. The Dominican Republic received 55.8% of the total remittances received in the Caribbean, for an income of 10.157 billion dollars.

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

compared to the same quarter of the previous year. This will mean an approximate inflow of $36.124 billion during the first quarter of 2024.

Income in the countries where LAC migrants reside is expected to maintain current trends, so remittances will depend on changes in the salaries and labor structure of emigrants from the region. In this sense, it is expected that the growth rates observed in the first quarter of the year will accelerate during the second quarter of the year, following their usual seasonal patterns.

Filed Under:   Remittances

Tagged With:   Employment   ,   Latin America   ,   migrante   ,   Migrants   ,   Migration   ,   Migrants   ,   United States



### Jeremy Harris

Jeremy Harris ha trabajado en el BID por 20 años, desempeñándose como Economista y Especialista en Comercio del Sector de Integración y Comercio del Banco desde 2009. En el BID, ha trabajado en varios procesos de apoyo a las negociaciones comerciales de América Latina, incluyendo el CAFTA y el ALCA, con énfasis en las reglas de origen y acceso a mercados. También ha participado en el diseño y desarrollo de varias bases de datos y sistemas informáticos sobre acceso a mercados, y ha realizado estudios analíticos sobre los acuerdos comerciales y sus efectos sistémicos sobre el comercio regional y global. Fuera del BID, ha trabajado como consultor de la CEPAL, la CARICOM, el Departamento para el Desarrollo Internacional del Reino Unido (DFID) y la Agencia Alemana de Cooperación Técnica (GTZ). Tiene un PhD en Economía de la Universidad de Maryland.

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001183

**René Maldonado**

Es Consultor de la Unidad de Migración del BID. Durante los últimos 15 años ha dirigido programas sobre Remesas e Inclusión Financiera para países de América Latina y el Caribe. Es economista de la Universidad Católica Boliviana (UCB), con Maestría en Administración de Empresas de Maestrías para el Desarrollo de la UCB y el Harvard Institute for International Development (HIID) y Maestría en Economía de la UASB y la Universidad de Ginebra, así como con postgrado superior en Evaluación Cuantitativa de Políticas Económicas de la Universidad Andina Simón Bolívar (UASB).

## Leave a Reply

Your email address will not be published. Required fields are marked *

Comment *

Name *

Email *

Website

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser.
To learn more about cookies, click here

X

001184

POST COMMENT

FOLLOW US

Subscribe

SEARCH

Search the site ...

RECENT POSTS

Migrant wages and remittances to Latin America and the Caribbean in 2023

4 answers to myths about migration

Measuring the Socio-economic Integration of Migrants in Latin America and the Caribbean

Using Artificial Intelligence to promote migrant integration

Challenges and opportunities of migration in the Caribbean

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser. To learn more about cookies, click here

X

001185

related to the use of the works of the IDB that cannot be settled amicably shall be submitted to arbitration pursuant to the UNCITRAL rules. The use of the IDB's name for any purpose other than for attribution, and the use of IDB's logo shall be subject to a separate written license agreement between the IDB and the user and is not authorized as part of this CC- IGO license. Note that link provided above includes additional terms and conditions of the license.

## For blogs written by external parties:

For questions concerning copyright for authors that are not IADB employees please complete the contact form for this blog.

The opinions expressed in this blog are those of the authors and do not necessarily reflect the views of the IDB, its Board of Directors, or the countries they represent.

Attribution: in addition to giving attribution to the respective author and copyright owner, as appropriate, we would appreciate if you could include a link that remits back the IDB Blogs website.

**Privacy Policy**

This site uses cookies to optimize functionality and give you the best possible experience. If you continue to navigate this website beyond this page, cookies will be placed on your browser. To learn more about cookies, click here

X

001186

# Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisis

## Joan Monras

*Universitat Pompeu Fabra, Centre de Recerca en Economia Internacional, Barcelona Graduate School of Economics, and Centre for Economic Policy Research*

How does the US labor market absorb low-skilled immigration? In the short run, high-immigration locations see their low-skilled labor force increase, native low-skilled wages decrease, and the relative price of rentals increase. Internal relocation dissipates this shock spatially. In the long run, the only lasting consequences are (a) worse labor market conditions for low-skilled natives who entered the labor force in high-immigration years, and (b) lower housing prices in high-immigrant locations, when immigrant workers disproportionately enter the construction sector and lower construction costs. I use a quantitative dynamic spatial equilibrium many-region model to obtain the policy-relevant counterfactuals.

## I. Introduction

Despite large inflows of immigrants into many OECD countries in the last 20 or 30 years, there is no consensus on the causal impact of immigration on labor market outcomes. Two reasons stand out. First, immigrants

I would like to thank Don Davis, Eric Verhoogen, and Bernard Salanié for guidance and encouragement, my editor James Heckman and three anonymous referees for helping me substantially improve the paper, and Paula Bustos, Antonio Ciccone, Jonathan Dingel, Hadi Elzayn, Laurent Gobillon, Jessie Handbury, Gregor Jarosch, Pablo Ottonello, Laura Pilossoph, Giacomo Ponzetto, Keeyoung Rhee, Harold Stolper, Sebastien Turban, Miguel Urquiola, Jaume Ventura, Jonathan Vogel, and David Weinstein for useful comments and discussions. Alba Miñano and Ana Moreno provided excellent research assistance. I would also like to thank the audience at a number of seminars, workshops, and conferences. This work is in part supported by a public grant overseen by the French National Research Agency (ANR) as part of the "Investissements d'Avenir" program LIEPP (reference: ANR-11-LABX-0091, ANR-11-IDEX-0005-02). I also acknowledge funding from the Fundación

Electronically published July 8, 2020
[ *Journal of Political Economy*, 2020, vol. 128, no. 8]
© 2020 by The University of Chicago. All rights reserved. 0022-3808/2020/12808-0005$10.00

001187

decide both where and when to migrate given the economic conditions in the source and host countries. Second, natives may respond by exiting the locations receiving these immigrants or reducing inflows to them. The combination of these two endogenous decisions makes it hard to estimate the causal effect of immigration on native labor market outcomes.

Various strategies have been used to understand the consequences of immigration on labor markets. Altonji and Card (1991) and Card (2001) compare labor market outcomes or changes in labor market outcomes in response to local immigrant inflows across locations. To account for the endogenous sorting of migrants across locations, they use what is known as the immigration networks instrument: past stocks of immigrants in particular locations are good predictors of future flows. Using this strategy the literature typically finds that immigration has only limited effects on labor market outcomes in the cross section or in 10 year first differences: a 1% higher share of immigrants is associated with a 0.1%–0.2% wage decline.[1] Also doing an across-location comparison, Card (1990) reports that the large inflow of Cubans to Miami in 1980 (during the Mariel boatlift) had a very limited effect on the Miami labor market when compared to four other unaffected metropolitan areas, although this evidence has recently been challenged (Borjas 2017).[2]

In contrast to Altonji and Card (1991) and Card (2001), Borjas, Freeman, and Katz (1997) argue that local labor markets are sufficiently well connected in the United States that estimates of the effect of immigration on wages using spatial variation are likely to be downward biased because workers relocate across space. Instead, Borjas (2003) suggests comparing labor market outcomes across education and experience groups, abstracting from geographic considerations. Using this methodology with US decennial census data between 1960 and 1990, he reports significantly larger effects of immigration on wages. A 1% immigration-induced

Ramón Areces and financial support from the Spanish Ministry of Economy and Competitiveness, through the Severo Ochoa Programme for Centres of Excellence in R&D (SEV-2015-0563). All errors are mine. Data are provided as supplementary material online.

[1] Altonji and Card (1991) estimates using first differences between 1970 and 1980 and instruments result in a significantly higher effect. The same exercise, using other decades, delivers lower estimates.

[2] I discuss in detail the similarities and differences between this paper and Card (1990) when I discuss the main short-run wage results and I provide a longer discussion in app. A.8. In a recent paper, Borjas (2017) has challenged the results of Card (1990). Borjas's findings are very much in line with the findings reported in this paper. Relative to Borjas (2017) I document the full path of adjustment to the unexpected inflow of Mexican workers, by documenting internal migration responses and by providing evidence on the longer-run effects. Moreover, in this paper I use the short-run estimates in a structural spatial equilibrium model to study counterfactual scenarios. To complement this body of evidence, in Monras (2019) I analyze both the wage and internal migration responses during the Mariel boatlift and feed the results into a simpler version of the structural model developed in this paper.

increase in the labor supply in an education-experience cell is associated with a 0.3%–0.4% decrease in wages on average, and as much as 0.9% for the least-skilled workers. Borjas's (2003) identification strategy, however, relies on the exogeneity of immigrant flows into skill-experience cells. Indeed, this has been the main controversy in the immigration debate: whether we should look at local labor markets or should instead focus on the national market.

This paper builds on previous literature to better understand the effects of low-skilled immigrants on labor market outcomes in the short run, the transition path, and the longer run. For this, I concentrate on Mexican migration over the 1990s. I start by using the Mexican peso crisis of 1995 as a natural experiment that increased unexpectedly the number of Mexican arrivals in the United States. This allows me to identify key short-run labor and housing market elasticities that have been the focus of much of the previous literature. The key innovation is to use an identification strategy that combines the standard networks instrument with an exogenous push factor, which I argue is crucial for identification when there is persistence in labor market dynamics. I then turn to analyzing longer-run patterns over the entire decade using decennial census data. My contribution in this part of the paper is to develop a new instrumental variable (IV) strategy for Borjas (2003) type regressions—based on the age distribution of the unexpectedly large arrival of Mexicans following the peso crisis—and to explain why using cross-experience variation and cross-location variation leads to seemingly different results. Finally, I use the short-run estimates in a dynamic structural spatial equilibrium model to study transitional dynamics, the general equilibrium, and a number of policy-relevant counterfactuals, also an innovation in this literature.

My findings emphasize that in order to evaluate the labor market impact of immigration, it is crucial to think about time horizons and the dynamics of adjustment. These results help to reconcile previous findings in the literature: I document how local shocks have large effects on impact but quickly dissipate across locations and affect the national-level market outcomes of only some cohorts of workers. This connects the "spatial correlations" approach, pioneered by Card, and the "national labor market" approach, defended by Borjas, using as a starting point a new "natural" experiment that affected multiple locations instead of just one, as is common in most of the literature using natural experiments, since it was driven by the largest immigrant group in the United States: Mexicans. The results also highlight the relative importance of internal migration, local technologies, and the housing market in the absorption of immigrant shocks.

In December 1994, the Mexican government, led by Ernesto Zedillo, allowed greater flexibility of the peso vis à vis the dollar. This resulted in

an attack on the peso that caused Mexico to abandon the peg. It was followed by an unanticipated economic crisis known as "the peso crisis" or the "Mexican tequila crisis" (Calvo and Mendoza 1996). Precise estimates on net Mexican immigration are hard to obtain (see Passel 2005; Hanson 2006; Passel, Cohn, and Gonzalez-Barrera 2012). Many Mexicans enter the United States illegally, potentially escaping the count of US statistical agencies. However, as I show in detail in section II, all sources agree that 1995 was an unexpectedly high immigration year.[3] As a result of the Mexican crisis, migration flows to the United States were at least 40% higher, with 200,000 to 300,000 more Mexicans immigrating in 1995 than in a typical year of the 1990s. I can thus use geographic (states and metropolitan areas), skill, and time variations to see whether workers more closely competing with these net Mexican inflows suffered more from the shock and to study the adjustment mechanisms.[4]

The results are striking. I show that a 1% immigration-induced low-skilled labor supply shock reduces low-skilled wages at the state or metropolitan area level by around 0.7%–1.4% and widens the rental price gap (i.e., the gap between rental prices and housing prices) by 0.5% on impact. Soon after, wage and rental gap spatial differences dissipate. This is due to significant worker relocation across locations. While in the first year the immigration shock increases the share of low-skilled population almost one-to-one in high-immigration locations, these differences dissipate in around 2 years.[5] This helps to understand why, while the effect is large on impact, it quickly dissipates across space. By 1999, the fifth year after the shock, wages of low-skilled workers in high- relative to low-immigration locations were only slightly lower than they were before the shock. Thus the US labor market for low-skilled workers adjusts to unexpected supply shocks quite rapidly.

Housing markets also react differently to Mexican immigration depending on the time horizon. In the short run, the rental gap increases in high- relative to low-immigrant locations. This is a likely consequence of the relative increase in the demand for rentals given that more than

[3] Using data from the 2000 US census and the US Department of Homeland Security (documented immigrants), estimates of undocumented immigrants from the Immigration and Naturalization Service (INS) as reported in Hanson (2006), estimates from Passel, Cohn, and Gonzalez-Barrera (2012), and apprehensions data from the INS, we see an unusual spike in the inflow of immigrants in 1995.

[4] A similar instrumental strategy based on push factors and previous settlement patterns is used in Boustan's (2010) study of the black migration. Also, Foged and Peri (2016) use a similar strategy using negative political events in source countries.

[5] Over the 1990s the share of low-skilled workers in high-immigration locations increased with immigration (Card and Lewis 2007). The relocation documented in this paper explains how unexpected labor supply shocks are absorbed into the national economy. Changes in the factor mix, absent unexpectedly large immigration-induced shocks, can be explained through technology adoption in Lewis (2012). I discuss this point in detail in secs. III.F, IV.E, and VI.C.

80% of Mexicans live in a rented unit upon arrival, compared to 30% of natives. However, the short-run increase quickly dissipates. In the longer run, that is, over the period 1990–2000, the rental gap did not increase more in high relative to low Mexican immigrant locations. This a consequence of the fact that over this 10 year horizon high Mexican immigrant locations experienced similar relative decreases in both housing prices and rents. A 1% Mexican-immigration-induced increase in low-skilled workers led to a relative decline in housing and rental prices of around 1%. This, in turn, is explained by the fact that a very large fraction of Mexican workers entered the construction sector over the 1990s, displacing many natives and putting downward pressure on native wages in the sector. As an example, in California more than 100,000 low-skilled Mexicans entered the construction sector, while around 80,000 native low-skilled workers left it. Since the bulk of the construction costs are labor costs (Gyourko and Saiz 2006), this is a likely explanation for the smaller increase in housing prices and rents in high-immigrant locations such as California. This evidence adds to previous literature a new reason why immigration may lead to house price declines over the long run, which had previously suggested that native preferences for avoiding high-immigrant neighborhoods was the main reason behind similar-looking results (Saiz and Wachter 2011; Sa 2015).

Given that there are spillovers across locations through internal migration, I cannot use the cross-location comparisons arising from the natural experiment to investigate the longer-run effects of immigration on labor market outcomes. I take two avenues to try to shed some light on longer-run effects and on the transition path. First, I show that the estimates obtained using cross-space and cross-age cohort comparisons are remarkably different when comparing changes in labor market outcomes between 1990 and 2000. Across space, wage and employment outcomes become only slightly worse in locations that received large Mexican inflows compared to locations receiving fewer inflows, even after instrumenting the regressions using the standard networks instrument. This is fully in line with the previous literature and confirms that local shocks dissipate quickly. However, when abstracting from locations, the wage increase between 1990 and 2000 for workers who entered the low-skilled labor market in particularly high immigration years during the 1990s is significantly smaller than for those who entered in lower immigration years. Similar results are obtained for employment rates. This is in line with what Oreopoulos, von Wachter, and Heisz (2012) document for college graduates who enter the labor market in bad economic years: entering the labor market in a difficult year may have long-lasting consequences. This is in the spirit of Borjas (2003) regressions but, importantly, I use the peso crisis as a factor generating exogenous variation in immigration inflows across experience-skill cells. Crucial for this exercise is the fact that

the age distribution of Mexican arrivals is very similar across years and does not seem to change with the peso crisis, which allows me to build a new IV strategy for Borjas (2003) type regressions.

A second avenue to study the long-run consequences of immigration is through the lens of a structural dynamic spatial equilibrium model, which allows me to study the general equilibrium and counterfactual scenarios. The model has many locations, two factor types (low- and high-skilled workers), and two types of housing (rented and owned units). Workers can with cost move across space and housing markets. Workers take as given current and future local prices, and decide where to locate in the following period. Only a fraction of workers in the model decide where to locate in the following period, which adds, potentially, some stickiness to the evolution of both wages and housing prices. The model features two types of workers and two types of housing markets. High- and low-skilled workers are imperfect substitute factors in production, but compete in the housing markets. Both high- and low-skilled workers have heterogeneous preferences over rental and homeowned units, which makes the rental and homeownership units look like imperfect substitutes at the location level.

To estimate the model I use two sets of moments. First, I use the natural experiment to estimate the short-run responses of labor market outcomes to local shocks. Second, given that in the long run the model collapses to a standard spatial equilibrium model, I apply methods that have been used in recent static spatial equilibrium literature to estimate the economic fundamentals in each location (Allen and Arkolakis 2014; Ahlfeldt et al. 2015; Redding and Rossi-Hansberg 2018). More specifically, I compute the value of local amenities and local productivity that rationalize the distribution of people and prices across locations in the year 1990, that is, before the Mexican inflows of the 1990s. Starting from this 1990 spatial equilibrium, I can then simulate wage and house price dynamics by shocking the model with the flows of Mexican immigrants observed each of the years during the 1990s. How the economy reacts depends on the elasticities estimated using the natural experiment. Thus, the model generates wage and adjustment dynamics exclusively from the Mexican inflows, given the parameter estimates. The model correctly generates dynamics in local labor and housing markets that are fully in line with the data.

I then use the model to perform three counterfactuals. First, I simulate the evolution of wages and housing prices at the local level had the peso crisis not occurred. This allows me to study the role of geographic mobility and local technological change in absorbing Mexican immigration. I show that a model where local technologies adapt to expected local factor endowments matches the data better than a model with fixed technologies: when local technologies adapt to expected inflows, internal

migration plays a smaller role in the adjustment process over the longer run. This is in line with Lewis's (2012) seminal contribution. Relative to Lewis (2012), this paper shows that internal migration is an effective mechanism to dissipate unexpected immigrant inflows, while local technologies help to absorb expected inflows. This helps to explain why previous research only found partial internal migration responses to immigrant shocks (see, e.g., Card and DiNardo 2000; Peri and Sparber 2011), while I find that internal migration likely plays a bigger role in unexpected immigrant shocks.

Second, I study the role of restrictive immigration laws unilaterally applied by one US state. In particular, I study the counterfactual evolution of wages and other outcomes in the hypothetical case that Arizona effectively managed to stop all Mexican immigrants from entering the state. The protective effects of these policies are likely to be small. This is due to the existing links across US states generated through internal migration. The gains for low-skilled workers in Arizona are on the order of 1%–3% higher wages during the immigration wave and the following 4 or 5 years.

Finally, I use the model to study the role of housing markets. Empirically, I show that Mexican immigrants play two different roles in housing markets. On one hand, they demand housing, primarily rental units, and so exert pressure on rental markets. On the other hand, they disproportionately enter the construction sector, creating downward pressure on labor costs and thus on overall construction costs. This generates a downward trend in housing market prices in high relative to low Mexican immigrant locations. The model captures these two facts. It also captures the fact that by 1999 (i.e., 5 years after the initial shock), the rental gap is back in equilibrium. By switching off the expenditure on housing, the model shows the counterfactual evolution of the value of living across locations when housing markets are taken into account and when they are not, which largely reflects the weight of housing expenditures on total income and whether a person is a renter or a homeowner. Not taking into account that immigration disproportionately affects renters understates the real wage effects for this group of workers.

Overall, this paper offers a much more complete picture of how immigration affects the host economy. It shows, by combining a new natural experiment and recent developments in quantitative spatial equilibrium models, that time horizons and adjustment processes are crucial to understand the seemingly diverging estimates in previous literature.

*Related literature.*—This paper contributes to three important literatures. First, it contributes to the understanding of the effects of low-skilled immigration in the United States. Following the pioneering work by Card (1990) and Altonji and Card (1991), I use variation across local labor markets to estimate the effect of immigration. I extend their work

by combining Card's immigration networks instrument with the Mexican peso crisis as a novel exogenous push factor that brought more Mexicans than expected to many—not just to one as in Card (1990) or Borjas (2017)—US local labor markets.[6] This unexpectedly large inflow allows me to understand the timing and sequence of events in response to an immigration shock. When more immigrants than expected enter specific local labor markets, wages decrease more than is suggested in either Card (2001) or Borjas (2003). The decrease in wages prompts net interstate labor relocation that leads the shock to dissipate across space. This explains why in the longer run, as I document, the effect of immigration on wages is small across local labor markets but larger across age cohorts (Borjas 2003). This paper adds to Borjas's (2003) longer-run results an instrumental variable strategy based on the age distribution of the unexpected inflow of Mexican workers that resulted from the Mexican peso crisis.

More broadly there are a substantial number of papers using natural experiments to assess the labor market impacts of immigration on labor market outcomes (Card 1990; Hunt 1992; Friedberg 2001; Angrist and Kugler 2003; Cohen-Goldner and Paserman 2011; Glitz 2012; Borjas 2017; Borjas and Monras 2017; Dustmann, Schonberg, and Stuhler 2017). None of these papers use their natural experiment to estimate a structural model. Thus, their focus is mainly on short-run effects. Among these papers, Dustmann, Schonberg, and Stuhler (2017) and Cohen-Goldner and Paserman (2011) stand out as being closely related to this paper. Dustmann, Schonberg, and Stuhler (2017) consider the role of both local labor markets and internal migration in the adjustment process. However, given the nature of their experiment, their analysis is on the effect of foreign-born commuters, not immigrants. In addition, since they focus on commuters, they do not consider the role of housing markets as I do, and given that they do not structurally estimate their model, they cannot use it to perform counterfactual exercises that inform about how immigration affects host economies. Cohen-Goldner and Paserman (2011) also study wage dynamics generated by immigration shocks using a natural experiment. However, they do not use their estimates in a structural model and they focus on high-skilled migration—Soviet émigrés toward Israel in the 1990s—rather than low-skilled workers.

Second, it contributes to the literature of spatial economics. A number of recent papers, using various strategies, have looked at the effects of negative shocks on local labor demand (see Beaudry, Lewis, and Doms 2010; Hornbeck 2012; Autor, Dorn, and Hanson 2013a, 2013b; Hornbeck

---

[6] All these papers can only compare one treated location (e.g., Miami in 1990) to a number of control locations, and there is a long debate on how to best construct these control locations (Borjas 2017; Clemens and Hunt 2018; Peri and Yasenov 2019). Instead, in this paper there are many locations affected, allowing me to build a continuous treatment strategy.

and Naidu 2014; Diamond 2015; Notowidigdo 2020). In line with most spatial models (see Blanchard and Katz 1992; Glaeser 2008), I report how negatively affected locations lose population after a shock, something that helps markets to equilibrate. The relocation of labor leads to a labor supply shock in locations that were not directly affected. This creates spillovers from treated to control units, something that is also emphasized in Monte, Redding, and Rossi-Hansberg (2018) when studying commuters, which are an important source of bias in immigration studies doing cross-location comparisons using decennial census data. Together with Allen and Donaldson (2018), Caliendo et al. (2018), Monras (2018), Nagy (2018), and Caliendo, Dvorkin, and Parro (2019), this is one of the first papers to introduce dynamics in a quantitative spatial equilibrium model. Relative to these papers, I allow in the model a separate role for labor and housing markets and interactions of different types of agents across them, something that is new in this literature.

Finally, this paper contributes to the literature that investigates the role of immigration in housing markets. This literature has found mixed results, which largely depend on the geographic unit of analysis. At the neighborhood level, studies usually find that immigration leads to house price declines (see Saiz and Wachter 2011; Sa 2015). This has been explained mostly by the unwillingness of natives to live in these neighborhoods, which, together with income effects, has dropped the demand for housing in high-immigrant neighborhoods relative to low-immigrant ones. Using broader geographies, Saiz (2007) finds that immigrants tend to put pressure on the housing market, which results in house price increases. Saiz (2007) considers legal immigrants only, given that he relies on Immigration and Naturalization Service (INS) data. Mexicans differ from average legal migration in a number of dimensions: they are disproportionately low-skilled, undocumented, and work in the construction sector. This can explain the difference in the results in this paper relative to Saiz (2007). Instead, my findings are fully comparable to Saiz (2003). Using the Mariel boatlift as a natural experiment, and relying on the fact that most Cubans entered the rental market in Miami, Saiz (2003) reports rental price increases in Miami, relative to a comparison group, of the same magnitude as the relative increase in rental gaps reported in this paper. This literature has not investigated the role that certain groups of immigrants may play in the construction sector, which I argue is important to understand the longer-run house price dynamics.

In what follows I first present a brief description of the large Mexican immigrant wave of the 1990s, in section II. Then, I analyze the short-run evidence in section III and the long-run evidence in section IV. In section V I introduce a quantitative dynamic spatial equilibrium model of the labor and housing markets in the United States. I discuss how I bring the model to the data and perform counterfactual exercises in section VI.

001195

## II. Historical Background and Data

### A. Mexican Immigration in the 1990s

As reported in Borjas and Katz (2007), in 1990 the great majority of Mexican immigrants were in California (57.5%). During the decade of the 1990s, the largest increases in the share of Mexicans in a state's labor force were in Arizona, Colorado, California, New Mexico, and Texas. Within the 1990s, however, there was important variation in the number of Mexicans entering each year. There are a number of alternatives with which to try to obtain estimates on yearly flows between Mexico and the United States. A first set of alternatives is to use various data sources to obtain a direct estimate of the Mexican (net) inflows. A second set of alternatives is to look at indirect data, such as apprehensions at the US-Mexico border. I discuss these in what follows and in appendix B.1 (apps. A–D are available online).

   The first natural source is the March Current Population Survey (CPS) from Ruggles et al. (2016). The CPS only started to report birthplaces in 1994. Before 1994, however, the CPS data report whether the person is of Mexican origin. These two variables allow us to track the stock of Mexican workers in the United States quite well.[7] Figure 1 clearly shows that a significant number of Mexicans entered the US labor force in 1995. Using either the "Mexican origin" variable or the "birth place" definition, figure 1 shows that in 1994 Mexicans represented around 5% of the low-skilled labor force. By 1996 this increased to over 6%. In levels, around 500,000 low-skilled Mexicans entered the United States in 1995 and 1996, up from around 200,000 or 300,000 a year before 1995.[8] It is also worth emphasizing that, as I show explicitly in appendix A.1, see figure D.2 and table D3 (figs. D.1–D.9 and tables D1–D11 are available online), the observable characteristics of the Mexican immigrants in the United States do not change significantly before and after 1995. In sum, as the top-right graph

   [7] These two variables identify more or less the same number of Mexicans. This can be seen in the top-left graph of fig. 1, which shows the share of Mexicans using the birth place and the Mexican origin information. In table D3 discussed in app. A.1 I show that around 83% of the workers who have value 108 in the "hispan" variable are born in Mexico.
   [8] In the CPS data there is a significant change in the weights of Mexicans relative to non-Mexicans between 1995 and 1996. In fact, using the supplement weights, the increase in the Mexican low-skilled labor force only occurs in 1995. Using the supplement weights for 1996 results in a drop in the share of Mexican workers. This is entirely driven by the change in weights between 1995 and 1996 and unlikely to be the case in reality: it is hard to defend that net flows move from around 500,000 to a negative number. Note that this only affects the comparisons between periods before 1995 and after 1996. When I show graphs that contain pre- and post-1995 data I use as weights the average weight of Mexicans and non-Mexicans for all the sample period. When I run regressions using data from before and after 1995 I do not use the supplement weights. Using the supplement weights does not change any result, as can be seen in the old working paper version of this paper (Monras 2015), but it increases the noise in the results. I document in detail this change in the weights in app. B.

001196



Fig. 1.—Share of Mexicans in the US low-skilled (LS) labor force and Mexican inflows. The top-left graph plots the share of Mexicans among low-skilled workers in each year of the 1990s using various definitions of "Mexican." I use two different variables, the "birth place," which is available starting in 1994 (and for which I show the weighted and nonweighted series), and the "Mexican origin" to identify Mexicans. The top-right graph compares the share of Mexicans in the data to the share predicted by fitting a linear trend in the preshock periods. The bottom-left graph shows the overall (net) Mexico inflows using CPS data. The bottom-right graph shows apprehensions at the US-Mexico border using data provided in Hanson (2006). More details can be found in the text and in appendix B.

of figure 1 clearly shows, relative to the trend in Mexican arrivals, there is a clear increase in 1995 and 1996. In the bottom-left graph of figure 1 I show the CPS estimate of these inflows. In table D1 I show that these numbers are consistent with the numbers in US census data.[9]

There are a number of ways to obtain alternative yearly estimates other than by exclusively using the CPS. They all coincide to a large extent in the magnitude of the increased Mexican inflows, particularly for 1995, but they diverge somewhat in later years. Many of these alternative estimates rely on the question in the 2000 census: "When did this person come to live in the United States?" (Ruggles et al. 2016). This yields

[9] I use census data to compute stocks of Mexican workers in the United States in 1990 and 2000. For 1995 I combine information on the US census and the Mexican census of 2000, since they both contain locational information 5 years prior to the survey. Using this information I can then compute average inflows of Mexicans every 5 years. These averages are in line with the yearly inflows obtained from the CPS.

an estimate of the number of Mexicans still residing in the United States in 2000 who arrived in each year of the 1990s. This is shown in the middle graph of figure D.1. Passel, Cohn, and Gonzalez-Barrera (2012) use this information to build their estimates, shown in the right graph of figure D.1.

Another piece of evidence suggesting higher inflows in 1995 is the evolution of the number of apprehensions over the 1990s (data from Gordon Hanson's website; see Hanson and Spilimbergo 1999; Hanson 2006). The bottom-right graph of figure 1 shows the (log) monthly adjusted apprehensions.[10] The spike in September 1993 coincides with the launching of Operation Hold the Line in El Paso, Texas. At the beginning of 1995 there is a clear increase in the number of apprehensions that lasts at least until late 1996. This seems to coincide with the estimates of the flow of Mexicans from the CPS that I use for my estimation.

### B. Labor Market Outcome Variables

I use standard CPS data to compute weekly wages at the individual level. I compute them by dividing the yearly wage income (from the previous year) by the number of weeks worked.[11] I only use wage data of full-time workers, determined by the weeks worked and usual hours worked in the previous year. From individual-level information on wages, I can easily construct aggregate measures of wages. I use both men and women to compute average wages.[12] I also use the CPS data to compute other labor market outcome variables. I use CPS data to count full-time employment levels and employment rates, and I use population counts to look at relocation. For employment levels, I simply compute the number of individuals who are in full-time employment. For relocation, I compute the share of low-skilled individuals, that is, irrespective of whether they are working or not. I define high-skilled workers as workers having more than a high school diploma, while I define low-skilled workers as having a high school diploma or less.

I consider all Mexicans in the CPS as workers, since some may be illegal and may be working more than is reported in the CPS. This makes the estimates I provide below conservative estimates. I define natives as all those who are non-Mexicans or non-Hispanics, and use the two interchangeably in the paper. I provide evidence considering only US-born as natives in appendix A.5.

---

[10] To build this figure I first regress the number of apprehensions on month dummies and I report the residuals.

[11] An alternative to the March CPS data is the CPS Merged Outgoing Rotation Group files. I obtain similar estimates when using this alternative data set.

[12] Results are stronger when I only use males, in line with the fact that Mexican migrants tend to be disproportionately males.

Throughout the paper I use two different geographic units of analysis: states and metropolitan areas. The advantage of using states is that all population is covered and state boundaries are well defined. The most important advantage of using metropolitan areas is that they better represent local markets; however, they have the disadvantage that rural population is lost. In particular, I can follow 163 metropolitan areas (identifiable on IPUMS) for which average wages can be computed for each year of the 1990s and are covered by both the CPS and the censuses of 1980 and 2000. Among those, there are six metropolitan areas that are not covered in the 1990 US census, which is why the number of observations drops to 157 when using 1990 census data. While metropolitan areas are urban commuting zones, I cannot use rural commuting zones for most of the analysis because the CPS did not register the county of residence prior to 1996.[13]

Another disadvantage of using metropolitan areas is that the number of Mexicans observed in each metropolitan area is small and measured with error. This hurts the strength of the first stage. To avoid this, I complement CPS data at the metropolitan level with data from the 2000 census. Specifically, I combine the Mexican flows between 1994 and 1995 with the geographic distribution in 1995 of Mexicans who in 2000 responded that they arrived in the United States in 1995. This is possible thanks to the questions in the US census on the year of arrival and the residence 5 years prior to the interview.[14]

### C.   Housing Market Outcome Variables

To study the housing market I use the data from the Department of Housing and Urban Development's Fair Market Rent series (FMR) and price indexes from the Federal Housing Finance Agency's (FHFA) House Price Indexes (HPIs), which are computed at both the state and metropolitan area level.

I follow Saiz (2007) when using the fair market rents data. The FMR records the price of a vacant two-bedroom rental unit at the 45th percentile of the MSA's distribution. To obtain state-level rental prices I simply aggregate metropolitan areas to the state level using population in the

---

[13] In the United States there are a bit over 700 commuting zones (the number depends on whether we take the definition for 1990 or 2000) that should capture local labor markets beyond the metropolitan area. A description of commuting zone data is provided at https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas and in the work by Autor, Dorn, and Hanson (2013a). See the CPS coverage of the variable "county" at https://cps.ipums.org/cps-action/variables/COUNTY (last visited October 2018). Further details are explained in app. B.2.

[14] We use a similar strategy in Borjas and Monras (2017) to obtain estimates of Cubans across locations in the early 1980s during the Mariel boatlift.

metropolitan area as weights. Housing price indexes are provided by the FHFA independently at the metropolitan area and state levels. They are built from transaction data for the period 1975 to 2015, and take into account the internal structure of cities. As is well known, there is a gradient in land values in rays departing from the central business district. More details about these price indexes are reported in Bogin, Doerner, and Larson (2016). I use the series with base year 1990. This means that the price index is equal to 100 in each location in 1990, which means, in turn, that there is no variation in housing prices across states or metropolitan areas in that year. I discuss this in more detail when I report yearly standard errors in the estimation. See section III.E.

### D. Summary Statistics

Table 1 shows a number of characteristics of Mexicans in the United States. It is divided into three panels. Panel A shows the distribution of Mexicans by skill in the United States and in California—the highest Mexican immigration state. It is evident from this table that Mexican immigrants compete mostly in the low-skilled market. In 1994, Mexican workers represent around 6% of the low-skilled labor force in the United States, while they represent only 1% of the high-skilled. In California, Mexicans represent as much as 30% of the low-skilled labor force, while only 7% of the high-skilled. This suggests that an unexpected increase in the number of Mexicans workers is likely to affect low-skilled workers, and can be considered almost negligible for the high-skilled. This is important since it provides an extra source of variation. As argued in Dustmann, Frattini, and Preston (2013) it is sometimes difficult to allocate immigrants to the labor market they work in, given that education may be an imperfect measure when there is skill downgrading. In this case, a large fraction of Mexican workers are low skilled and likely to compete with the low-skilled natives, so this is not an issue for this study.

Panel B shows the importance that Mexicans have in the construction sector, particularly in high-immigration states such as California. In 1990 roughly 9% of low-skilled Mexicans and natives worked in construction. However, over the 1990s many Mexicans started to flow into this sector. The share of Mexicans in construction moved from 5% of the overall workforce in construction in 1990 to 12% by 2000. In California it moved from 21% to 33%. Perhaps more strikingly, while around 100,000 Mexicans entered the construction sector in California over the decade, 76,000 natives left the sector. This table also reports average wages of natives and Mexicans in the sector.

Finally, panel C shows the importance that Mexicans have in the rental market. Above 60% of low-skilled Mexicans lived in rental units by the year 1990. This is double the same figure for natives. Among Mexicans

TABLE 1
Characteristics of Mexican Workers

| | United States | California |
|---|---|---|
| | A. Skill Distribution (CPS Data 1994) | |
| Low-skilled Mexicans (bpl) / low-skilled population | .057 | .315 |
| Low-skilled Mexicans (hispan) / low-skilled population | .058 | .324 |
| High-skilled Mexicans (bpl) / high-skilled population | .013 | .068 |
| High-skilled Mexicans (hispan) / high-skilled population | .015 | .076 |
| Low-skilled / total population | .521 | .517 |
| | B. Construction Sector (Low-Skilled Workers) | |
| Mexicans in construction / total Mexicans (1990 census) | .09 | .08 |
| Natives in construction / total natives (1990 census) | .08 | .09 |
| Δ Mexicans in construction (1990–2000) | 592,868 | 110,028 |
| Δ natives in construction (1990–2000) | 1,138,228 | −76,962 |
| Mexicans in construction / total workers in construction (1990) | .05 | .21 |
| Mexicans in construction / total workers in construction (2000) | .12 | .33 |
| Average weekly wage in construction, natives (1990; USD) | 502.9 | 634.4 |
| Average weekly wage in construction, Mexican (1990; USD) | 367.8 | 400.2 |
| Average weekly wage in construction, natives (2000; USD) | 700.3 | 829.1 |
| Average weekly wage in construction, Mexican (2000; USD) | 479.1 | 539.3 |
| | C. Rental Market (Low-Skilled Workers) | |
| Mexicans in rented units / total Mexicans (1990 census) | .63 | .67 |
| Natives in rented units / total natives (1990 census) | .32 | .43 |
| Mexicans in rented units / total Mexicans (1990 census; 1987–1990 arrivals) | .82 | .84 |

Note.—This table shows various characteristics of Mexican workers in the United States using CPS and census data. Panel A reports the share of Mexicans using the variables "bpl" and "hispan" from the CPS among high- and low-skilled workers (defined as above and below high school diploma) in the United States and in the highest Mexican migration state, California. It also reports the relative distribution of skills nationwide and in California. Panel B focuses on low-skilled workers in the construction sector. It reports the share of Mexican workers among total Mexican workers, and relative to all construction workers. It also reports the change in native construction workers and Mexican construction workers between 1990 and 2000. Panel C reports characteristics of the housing market. In particular, it reports the share of Mexicans and natives living in rented units.

who just arrived in the United States this number is even larger, as shown in the table, and jumps to 82%.[15]

Table D2 reports summary statistics for the main variables used for the estimation. It is divided into two panels. Panel A shows state-level statistics, while panel B shows metropolitan area ones. The table reports average labor market outcomes in 1994 and 1995.

[15] Recent arrivals are defined as Mexican immigrants arriving in the United States between 1987 and 1990 observed in the 1990 US census. I obtain similar numbers using the equivalent information in the 2000 census.

## III.   Short-Run Effects of Mexican Immigration

### A.   Short-Run Identification Strategy

To investigate the short-run effects of immigration on labor market outcomes, I compare the changes in labor market outcomes across states or metropolitan areas, given the change in the share of Mexican immigrants among low-skilled workers:[16]

$$\Delta \ln y_s = \alpha + \beta \times \Delta \frac{\text{Mex}_s}{N_s} + \Delta X_s \times \gamma + \varepsilon_s, \qquad (1)$$

where $y_s$ is our labor market outcome of interest, $s$ are states or metropolitan areas, $\text{Mex}_s/N_s$ is the share of Mexicans divided by low-skilled workers in the labor market of interest, $X_s$ are time-varying state or metropolitan area controls, and $\varepsilon_s$ is the error term. I follow Bertrand, Duflo, and Mullainathan (2004) in first-differencing the data. This is the recommended strategy when there is potential serial correlation and when clustering is problematic because of the different size of the clusters (MacKinnon and Webb 2017) or an insufficient number of clusters (Angrist and Pischke 2009). It also highlights the exact source of variation.

In the baseline specification, I simply compare 1994 to 1995, as postshock period. I also use different sets of years as the preshock period and group them as one period, as an alternative strategy. Looking at the difference between the preshock period and the year 1995 allows me to estimate the effect of immigration before the spillovers between regions due to labor relocation contaminate my strategy. In my preferred specification, I control for possibly different linear trends across states and individual characteristics by netting them out before aggregating the individual observations to the post- and preshock periods.

Crucially, I run the regression in equation (1) in a period when Mexican migrants moved to the United States for arguably exogenous

---

[16] Given that the population does not change very much in the short-run horizons, using $\Delta \text{Mex}_s/N_{s,1994}$ (the change in Mexicans divided by the number of workers in 1994) instead of $\Delta(\text{Mex}_s/N_s)$ does not matter very much for the estimates of $\beta$. This matters more for the estimates of the longer-run local labor demand elasticity shown in table 9. Note also that this specification for wages as dependent variable is obtained directly from a local CES (constant elasticity of substitution) production function that combines high- and low-skilled workers. That is, starting from the demand curve for low-skilled workers, we obtain $\ln(\text{wage low-skilled}) = \alpha - (1/\sigma) \ln(\text{low-skilled}) + (1/\sigma) \ln(\text{gdp}) = \alpha - (1/\sigma) \ln(\text{Mexicans} + \text{non-Mexican low-skilled}) + (1/\sigma) \ln(\text{gdp}) = \alpha - (1/\sigma) \ln[1 + (\text{Mexicans}/\text{non-Mexican low-skilled})] - (1/\sigma) \ln(\text{Non-Mexican low-skilled}) + (1/\sigma) \ln(\text{gdp}) \approx \alpha - (1/\sigma)(\text{Mexicans}/\text{non-Mexican low-skilled}) - (1/\sigma) \ln(\text{non-Mexican low-skilled}) + (1/\sigma) \ln(\text{gdp}).$

reasons.[17] Even if the reasons to emigrate were arguably exogenous, Mexican immigrants potentially chose what locations to enter based on local economic conditions. To address this endogenous location choice I rely on the immigration networks instrument. I use the share of Mexicans in the labor force in each state in 1980 to predict where Mexican immigrant inflows are likely to be more important. This is the case if past stocks of immigrants determine where future inflows are moving to. The first-stage regressions are reported in table 2. In particular, I show the results of estimating the following equation:

$$\Delta \frac{\text{Mex}_s}{N_s} = \alpha + \beta \times \frac{\text{Mex}_s^{1980}}{N_s^{1980}} + \Delta X_s \times \gamma + \varepsilon_s, \tag{2}$$

where the variables are defined as before, and where the superscript 1980 refers to that year. The share of 1980 refers to the entire population, but nothing changes if I use the share of Mexicans in 1980 among low-skilled workers exclusively. I choose the former because immigration networks can be formed between individuals of different skills.

Column 1 in table 2 shows that the initial share of Mexicans in 1980 was 4–6 times larger at the state level (panel A) and in metropolitan areas (panel B) by 1995. This is a natural consequence of the massive Mexican inflows over the 1980s and early 1990s and the concentration of these flows into particular states and, to a large extent, metropolitan areas. Column 2 shows that the flows of Mexican workers between 1994 and 1995 also concentrated in these originally high immigration states and metropolitan areas.

Columns 3 and 4 of table 2 report the same regressions but for high-skilled workers. Column 4 shows that it is also true that the share of Mexicans among the high-skilled is higher in the states that originally attracted more Mexicans. It is not true, however, that the change of high-skilled Mexicans between 1994 and 1995 is also well predicted by the importance of Mexicans in the state labor force in 1980. Similar results apply to metropolitan areas; see panel B and figure D.4.

In appendix A.2, I discuss the threats to my identification strategy in detail. In particular, I discuss potential confounders like the effect of the depreciation of the peso on international trade flows, selection into migration following the peso crisis, and changes in the labor supply and

---

[17] Note that an alternative specification would be a difference in difference in levels where the continuous treatment is instrumented by the past importance of Mexicans in each location, and where the first difference distinguishes before and after the shock. This specification has some problems with the estimation of the standard errors (see Bertrand, Duflo, and Mullainathan 2004), which is why I use the one I report in this section. This specification also addresses concerns raised in recent papers (see Borusyak, Hull, and Jaravel 2018; Goldsmith-Pinkham, Sorkin, and Swift 2018; Jaeger, Ruist, and Stuhler 2018; Adao, Kolesar, and Morales 2019) related to the identification strategy and inference.

TABLE 2
First-Stage Regressions for the Estimation of the Causal Effect
of Mexican Immigration on Wages

| | Share Mexican, LS, OLS | | Share Mexican, HS, OLS | |
| --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) |
| A. State-Level Regressions | | | | |
| Share of Mexicans in 1980, LS | 6.116<br>(.270) | .452<br>(.0896) | | |
| Share of Mexicans in 1980, HS | | | 5.405<br>(.356) | −.197<br>(.399) |
| Observations | 51 | 51 | 51 | 51 |
| $R^2$ | .967 | .240 | .939 | .012 |
| First-differenced | No | Yes | No | Yes |
| B. Metropolitan Area–Level Regressions | | | | |
| Share of Mexicans in 1980, LS | 4.232<br>(.512) | .298<br>(.0656) | | |
| Share of Mexicans in 1980, HS | | | 3.480<br>(.546) | .247<br>(.546) |
| Observations | 163 | 163 | 163 | 163 |
| $R^2$ | .813 | .684 | .766 | .014 |
| First-differenced | No | Yes | No | Yes |

Note.—Columns 1 and 3 show the regression of the share of Mexicans in the labor force in 1995 on the same variable in 1980. Columns 2 and 4 show the same regression but first-differencing the dependent variable. This table is the first-stage regression for the IV in table 3. Robust standard errors are reported. Panel A uses cross-state variation, while panel B uses cross-metropolitan-area variation. LS refers to low-skilled workers and HS refers to high-skilled workers.

remittance behavior of Mexicans already in the United States as a response to exchange rate changes (Nekoei 2013).

## B. Wages

In this section I estimate the causal effect of immigration on US local wages, using equation (1). A simple graphical representation using raw data gives the intuition of the estimates I later report. Figure 2 shows the evolution of the average low- and high-skilled wages in California and the evolution of low-skilled wages in a lower Mexican immigration state like New York.[18] Wages are normalized to 1 in 1994 to make the comparisons simpler. A few things are worth noting from figure 2. First, low-skilled wages decreased in 1993. In some states, unlike in California, high-skilled wages also decreased in that year. This is probably a result of the economic downturn in 1992. Second, when comparing low- and high-skilled wages in California we see that low-skilled wages clearly decreased in 1995 and 1996 and then recovered their preshock trend, while,

[18] New York and California are comparable in terms of overall immigrant population, but Mexicans are much more prevalent in California than in New York.



Fig. 2.—Evolution of wages (raw data). The top graph reports the low- and high-skilled average wage in California, a high Mexican immigration state. The bottom graph shows average low-skilled wages in a high-immigration state such as California and a low-immigration state such as New York. I exclude Hispanics from the average low-skilled wage computations.

if anything, high-skilled wages increased slightly in 1995. By the end of the decade high-skilled wages increased in California, probably showing the beginning of the dot-com bubble. When instead we compare low-skilled wages in California and New York, we observe that the decrease in California is more pronounced than that of New York, where Mexican immigration was much less important. The estimation exercise identifies the effect of immigration on wages by comparing the sharp decrease in low-skilled wages in high-immigration states such as California relative to lower-immigration states such as New York in 1995.

Panel A of table 3 reports the results of estimating equation (1) using cross-state variation. In columns 1 and 2, I report the results of the regression of native low-skilled average wages on the share of low-skilled Mexican workers among the low-skilled labor force in 1995. We observe in column 1 that there is no correlation in the cross section between wages and immigration. In column 2, I instrument the share of low-skilled Mexicans by the share of Mexicans in the labor force in 1980. The IV result in the cross section is very similar. It points to the fact that in the cross section there is no systematic relationship between higher stocks of immigrants and lower wages. Many things can explain this result. A simple explanation, although not the only one, is that the US labor market may have

TABLE 3
CAUSAL EFFECT OF IMMIGRATION ON WAGES

| | WAGE, NON-MEXICAN, OLS | WAGE, NON-MEXICAN, IV | Δ WAGE, NON-MEXICAN, OLS | | Δ WAGE, NON-MEXICAN, IV | | Δ WAGE, INDIVIDUAL CONTROLS, IV |
|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| **A. State-Level Regressions, Low-Skilled Workers** | | | | | | | |
| Share of Mexicans, LS | .00499 (.0620) | −.000791 (.0645) | | | | | |
| Δ share of Mexicans, LS | | | −.602 (.234) | −.733 (.265) | −.832 (.439) | −.721 (.381) | −.708 (.307) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .000 | | .077 | .125 | | | |
| Controls | No | No | No | Yes | Yes | Yes | Yes |
| Wages detrended | No | No | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 511.5 | | | 26.73 | 26.73 | 26.73 |
| **B. Metropolitan Area-Level Regressions, Low-Skilled Workers** | | | | | | | |
| Share of Mexicans, LS | −.115 (.0525) | −.186 (.0383) | | | | | |
| Δ share of Mexicans, LS | | | −1.397 (.549) | −1.518 (.544) | −2.295 (.374) | −2.218 (.368) | −1.418 (.331) |
| Observations | 163 | 163 | 163 | 163 | 163 | 163 | 163 |
| $R^2$ | .046 | | .055 | .082 | | | |
| Controls | No | No | No | Yes | Yes | Yes | Yes |
| Wages detrended | No | No | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 68.33 | | | 19.14 | 19.14 | 19.14 |

3036

001206

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| **C. State-Level Regressions, High-Skilled Workers** | | | | | | | |
| Share of Mexicans, LS | .109 (.0940) | .127 (.0810) | | | | | |
| Δ share of Mexicans, LS | | | −.246 (.273) | −.301 (.288) | .114 (.414) | .119 (.441) | .170 (.229) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .025 | | .013 | .062 | | | |
| Controls | No | No | No | Yes | Yes | Yes | Yes |
| Wages detrended | No | No | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 511.5 | | | 26.73 | 26.73 | 26.73 |
| **D. Metropolitan Area-Level Regressions, High-Skilled Workers** | | | | | | | |
| Share of Mexicans, LS | −.00828 (.0529) | −.0165 (.0699) | | | | | |
| Δ share of Mexicans, LS | | | −.661 (.368) | −.426 (.381) | −.744 (.435) | −.719 (.437) | −.0111 (.417) |
| Observations | 163 | 163 | 163 | 163 | 163 | 163 | 163 |
| $R^2$ | .000 | | .011 | .034 | | | |
| Controls | No | No | No | Yes | Yes | Yes | Yes |
| Wages detrended | No | No | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 68.33 | | | 19.14 | 19.14 | 19.14 |

Note.—Columns 1 and 2 show the cross-sectional regression of the average low-skilled native wage on the share of low-skilled Mexicans relative to low-skilled workers in 1995. In col. 2 the regression is instrumented using the immigration networks IV. The following columns show the first-differenced (using 1994 data) regressions, i.e., a comparison of the pre- and postshock periods. The instrument in these subsequent columns is also the immigration networks IV. Column 7, which is my preferred estimate, reports average wages controlling for individual characteristics using Mincerian regressions. It also uses 1992–1994 (instead of only 1994) as the preshock wage levels. Controls include the change in (log) high-skilled labor, (log) low-skilled labor, (log) state GDP, and (log) exports to Mexico. Panels A and C use cross-state variation, while panels B and D use cross-metropolitan-area variation. Robust standard errors are reported. LS refers to low-skilled workers.

3037

001207

systematic ways of equilibrating the labor market returns across regions. This is in line with previous literature, and cannot be interpreted as evidence that immigration has no effect on wages.

In column 3, I make an important first step toward identifying the effects of Mexican immigration on US low-skilled workers. When first-differencing the data, we observe that between 1994 and 1995, when for exogenous reasons the inflow of Mexicans was larger, native wages decreased more in states where the share of Mexicans increased more. Column 4 introduces as controls the change in (log) GDP, the change in (log) exports to Mexico, and changes in (log) employment levels by skill group, which could be potential confounders. The coefficient in column 4 is similar to that of column 3.

A threat to identification is that Mexican migrants endogenously decided where to migrate within the United States in 1995 based on the labor market conditions at destination. To address this concern, I use the share of Mexicans in the labor force in 1980 to know where the Mexican immigration shock is more likely to be more important. Column 5 shows that this is important. It increases the size of the negative coefficient by more than 10%, suggesting either that Mexican workers do indeed decide based on local labor market conditions or that there is some classical measurement error in how the share of Mexican workers is computed in the CPS, which attenuates the ordinary least squares (OLS) estimates. Another concern for identification is addressed in column 6. It could be that the trend of low-skilled workers is different between states. To address this, I first regress wages on location-specific linear trends and I use the residuals to compute the change in wages between 1994 and 1995. This reduces the size of the negative estimate, but by little. A final concern is that given the fact that the CPS is a repeated cross section, it can be that the workers in different years systematically differ, creating differences in wages that are unrelated to the effect of Mexicans, but rather due to the data. Column 7 shows that when controlling for individual characteristics in a first-stage Mincerian regression, and allowing for state-specific linear trends, we obtain an estimate of around −0.7.[19] In this column, the pre-shock period is 1992–1994. This is also another reason why the estimated coefficient is slightly smaller, since in 1993, wages in California—the

---

[19]  This estimate, however, is a conservative estimate. There are two reasons for this. First, I consider all Mexican as potential workers, and measure the shock relative to the full-time non-Mexican labor force. If I were to consider the shock as the Mexicans who are working in 1995, the Mexican immigration shock would be smaller, and thus the estimated inverse local labor demand elasticity larger. Second, among the many estimates of the size of the shock I discussed earlier, I use the largest one. This is the natural one since it is obtained from the CPS data. Using the other estimates of the yearly inflows of Mexicans would result, again, in a larger inverse local labor demand elasticity.

highest Mexican immigration state—were slightly lower, as discussed previously. This is my preferred estimate.[20]

In panel B of table 3 I repeat the exact same exercise as in panel A, but using cross-metropolitan-area variation. Qualitatively the results are the same as in panel A. Quantitatively the estimates suggest larger effects than when using cross-state variation. A possible reason for this difference is that immigration is, primarily, an urban phenomenon. As documented in Albert and Monras (2019) most immigrants concentrate in cities, and among them, in larger ones—something that is also true for Mexican immigrants. This may generate a negative trend in wages in urban relative to rural areas in high-immigration states, which results in a more negative estimate when using metropolitan area variation. Panels A and B give a range of estimates of the inverse demand elasticity that goes from −0.7 to −01.4.

In panels C and D of table 3 I repeat the exact same regressions of panels A and B but using the high-skilled workers' wages instead. The results show that low-skilled Mexican immigration did not affect the wages of high-skilled native workers. In the cross section, as shown in columns 1 and 2, high-skilled wages in high-immigration states are slightly higher. When first-differencing, independently of the specification used in table 3, we observe that the unexpectedly large inflow of Mexican workers in 1995 did not decrease the wages of native high-skilled workers in high-immigration locations. This can be thought as a third difference-in-difference estimate or as a placebo test.

We can combine the results shown in panels A, B, C, and D of table 3 into a single equation using $\Delta \ln(h_s/w_s)$ as dependent variable in equation (1), where $h_s$ indicates the average wage of high-skilled workers, so that $h_s/w_s$ represents the wage gap between high- and low-skilled workers. This specification directly identifies the inverse of the elasticity of substitution in a model of perfect competition and two factors of production (high- and low-skilled workers). I present such a model in section V. This is also the inverse of the relative local labor demand curve, something that I discuss further in section V.C and in appendix A.6.[21]

---

[20] Throughout, the $R^2$ values of these regression are a bit low. This is due to the large variance in small low-immigration states.

[21] An alternative specification is to use the Mexican shock to estimate the relative increase in the ratio of low- to high-skilled workers, and with this variation, estimate how the change in relative wages between low- and high-skilled workers changes with the change in the relative supply induced by migration. This is like a three-stage strategy. Because of these three steps, there is more noise in this specification. Point estimates are, however, identical. I report this alternative specification in table D8. Another advantage of the specification in the main text is that it directly reports the effect of immigration on the relative wage of the main two labor factors in the economy. I discuss table D8 and these points in app. A.6.

As before, I report in table 4 results using cross-state (panel A) and cross-metropolitan-area (panel B) variation. Estimates of the inverse of the elasticity of substitution between high- and low-skilled workers cluster around 1. I use this estimate when I bring the model to the data.

In appendix A, I discuss several robustness checks. First, I show that the results presented in this section are robust to excluding California or Texas, in both OLS and IV specifications (see table D5) and using both cross-state and cross-metropolitan-area variation. This is important since in this paper I use an exogenous migration inflow that affects various regions in the United States, something that Card (1990) or Borjas (2017) does not have with the Cuban Mariel boatlift migrants; these papers essentially rely on five observations (the difference in average wages in five cities over two periods). I also show in the appendixes (see table D6) that I obtain similar results if I consider the high school dropouts or the high school graduates exclusively as the group of workers competing with the Mexicans. This is in contrast to what Borjas (2017) finds. In Borjas (2017) it is shown that only high school dropouts are affected by the inflow of Marielitos, while in this paper both high school dropouts and high school graduates seem to be affected by the inflow of Mexicans. Many reasons can explain this divergence. First, Miami can be a special labor market, a bit different from the average local labor markets in the United States, and in that local labor market the difference between high school dropouts and graduates may be larger. Second, Cuban migrants might have been a bit special. Many sources claim that an important part of the Marielitos were Cubans released from Cuban prisons, and so perhaps less prepared to enter the labor market. And third, maybe the difference between high school dropouts and graduates was more relevant in the early 1980s than in the mid-1990s. I also show in the appendixes that the results are very similar if I include or exclude all foreign-born people when defining natives—in the previous tables I only exclude Mexicans and define natives as the rest; see table D7.

### C. Employment

I have focused in tables 3 and 4 on the short-run impact of immigration on wages. However, if wage adjustments are not fully flexible, some labor market consequences of immigration may only be seen in employment outcomes (within the region under study) or in internal migration, as I explore in the following section. To estimate the effect of immigration on employment within locations I substitute in the previous specification wage changes by (log) employment rate changes.

Table 5 shows the results. This table displays results for low- and high-skilled workers using cross-state and cross-metropolitan-area variation. In general, wages seem to respond more strongly than employment rates,

TABLE 4
Wage Gap between High- and Low-Skilled Workers

| | Wage Gap, OLS (1) | Wage Gap, IV (2) | Δ Wage Gap, OLS | | | Δ Wage Gap, IV | | |
|---|---|---|---|---|---|---|---|---|
| | | | (3) | (4) | (5) | (6) | (7) | (8) |
| **A. State-Level Regressions** | | | | | | | | |
| Share of Mexicans, LS | .0037 (.0355) | .0423 (.0279) | | | | | | |
| Δ share of Mexicans, LS | | | .381 (.331) | .434 (.358) | .485 (.334) | .776 (.415) | .795 (.387) | .883 (.408) |
| Δ relative labor supply | | | | .0431 (.0928) | .0456 (.0941) | | .0701 (.0913) | .0719 (.0908) |
| Δ (log) state GDP | | | | | −.271 (.478) | | | −.407 (.545) |
| Δ (log) exports to Mexico | | | | | −.000241 (.00994) | | | −.00155 (.00954) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| R² | .001 | | .026 | .031 | .037 | | | |
| First-stage F-statistic | | 511.5 | | | | 25.47 | 57.05 | 27.51 |
| **B. Metropolitan Area-Level Regressions** | | | | | | | | |
| Share of Mexicans, LS | .0288 (.0387) | .0625 (.0276) | | | | | | |
| Δ share of Mexicans, LS | | | .822 (.434) | .838 (.425) | 1.008 (.407) | 1.181 (.367) | 1.202 (.362) | 1.395 (.387) |
| Δ relative labor supply | | | | .0928 (.0370) | .0929 (.0372) | | .0932 (.0367) | .0932 (.0367) |
| Δ (log) state GDP | | | | | −.564 (.614) | | | −.644 (.617) |
| Δ (log) exports to Mexico | | | | | −.0140 (.0121) | | | −.0168 (.0119) |
| Observations | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 |
| R² | .004 | | .014 | .049 | .058 | | | |
| First-stage F-statistic | | 68.33 | | | | 20.70 | 20.77 | 19.22 |

Note.—This table shows the regression of the change in the wage gap between high- and low-skilled workers on the share of Mexicans in the low-skilled labor force between 1994 and 1995. The wage gap is computed as the adjusted average wage of high-skilled workers, divided by the adjusted average wage of low-skilled workers. The table also identifies the elasticity of substitution between high- and low-skilled workers. LS refers to low-skilled workers. An alternative estimate of this elasticity is reported in table D8. The structure of this table follows table 3. Panel A uses cross-state variation, while panel B uses cross-metropolitan-area variation. Robust standard errors are reported.

TABLE 5
THE SHORT-RUN EMPLOYMENT RESPONSE

| | (log) EMPLOYMENT RATE, NATIVE, OLS (1) | (log) EMPLOYMENT RATE, NATIVE, IV (2) | Δ (log) EMPLOYMENT RATE, NATIVE, OLS | | Δ (log) EMPLOYMENT RATE, NATIVE, IV (5) |
|---|---|---|---|---|---|
| | | | (3) | (4) | |
| A. State-Level Regressions, Low-Skilled Workers | | | | | |
| Share of Mexicans, LS | −.176 (.0473) | −.169 (.0511) | | | |
| Δ share of Mexicans, LS | | | −.0840 (.238) | −.0276 (.232) | .131 (.323) |
| Observations | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .112 | | .002 | .020 | |
| Controls | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 511.5 | | | 19.26 |
| B. Metropolitan Area–Level Regressions, Low-Skilled Workers | | | | | |
| Share of Mexicans, LS | −.195 (.0402) | −.199 (.0440) | | | |
| Δ share of Mexicans, LS | | | −.402 (.386) | −.379 (.389) | .0308 (.554) |
| Observations | 163 | 163 | 163 | 163 | 163 |
| $R^2$ | .114 | | .003 | .003 | |
| Controls | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 68.33 | | | 19.15 |
| C. State-Level Regressions, High-Skilled Workers | | | | | |
| Share of Mexicans, LS | −.0391 (.0235) | −.0371 (.0228) | | | |
| Δ share of Mexicans, LS | | | −.0525 (.215) | .00576 (.204) | .749 (.440) |
| Observations | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .016 | | .001 | .026 | |
| Controls | No | No | No | Yes | Yes |
| First-stage $F$-statistic | | 511.5 | | | 19.26 |
| D. Metropolitan Area–Level Regressions, High-Skilled Workers | | | | | |
| Share of Mexicans, LS | −.0627 (.0316) | −.199 (.0440) | | | |
| Δ share of Mexicans, LS | | | .229 (.263) | .314 (.273) | .381 (.250) |
| Observations | 163 | 163 | 163 | 163 | 163 |

001212

TABLE 5 (*Continued*)

| | (log) EMPLOYMENT RATE, NATIVE, OLS | (log) EMPLOYMENT RATE, NATIVE, IV | Δ (log) EMPLOYMENT RATE, NATIVE, OLS | | Δ (log) EMPLOYMENT RATE, NATIVE, IV |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| $R^2$ | .023 | | .002 | .011 | |
| Controls | No | No | No | Yes | Yes |
| First-stage *F*-statistic | | 68.33 | | | 19.15 |

Note.—This table estimates the employment responses to the unexpected inflow of Mexican immigrants following the Mexican peso crisis. The table follows the structure explained in table 3. Panels A and B show the results for low-skilled workers at the state and metropolitan area level, respectively. Panels C and D report the estimates for the high-skilled workers. LS refers to low-skilled workers. Robust standard errors are reported. Controls include the change in (log) state GDP and in (log) exports to Mexico.

since employment rates did not differentially change in high- relative to low-immigrant locations when I use state-level variation and metropolitan area–level variation; see panels A and B. Given that employment rates seem to be less responsive than wages I abstract from them in the model of section V.

### D. Rental Prices

A potentially important consequence of immigrant shocks is that they may affect local housing, which typically consists of rental and home-owned units.[22] Most low-skill Mexican workers enter the rental market, thus likely affecting the rental price more than housing prices. For example, among Mexicans that arrived in the United States between 1987 and 1990, over 80% were living in rental units according to the 1990 US census; see table 1. In the short run, rental markets are thus much more likely to be affected by immigration than housing prices. I concentrate in this section on the rental market, leaving a longer-run analysis of both markets (i.e., rentals and housing prices) for section IV.D.

To estimate the effect of Mexican migration on housing markets I adopt the same estimating equation and strategy as before but with rental

---

[22] If rental units and homeowned units are the same good and there are no frictions in the economy, then rental and selling prices should move in parallel. It is very likely, however, that there are heterogeneous preferences for owning vs. renting an apartment that make the two types of homes look like imperfect substitutable goods. I explain this in more detail in sec. V.

prices as outcome variable. Table 6 shows the results. As before, columns 1–3 show cross-sectional evidence. It is quite clear, using both cross-state and cross-metropolitan-area variation with both OLS and IV, that rental prices are higher in higher Mexican immigration locations. The magnitude of the estimates suggest that a 10 percentage point higher Mexican immigrant share among low skilled is associated with 4% higher rental prices, and a higher gap in rental prices relative to the location house price index (col. 3).

This positive correlation between rental prices and immigrant shares could be driven by a number of factors. As explained in Albert and Monras (2019), immigrants care relatively less about local prices because part of what they consume is not related to where they live but rather to where they come from. This could explain the positive correlation between immigrant shares and rentals that we see in the data, but this does not necessarily imply that immigrants lead to rental price increases.[23]

Columns 4–7 show first-differenced specifications, akin to the ones shown in table 3. The OLS regressions already suggest that unexpected increases in immigrant population tend to increase local rental prices. This is true when looking at both cross-state and cross-metropolitan-area variation regardless of whether controls are introduced or not. Columns 6 and 7 show the IV estimate of the effect of immigration on rental prices and the gap in rental prices relative to housing prices. The IV estimate effectively puts higher weight on locations with higher past Mexican immigrant settlements. This tends to lower the IV estimate on rentals, mainly because some high Mexican immigrant locations such as California experienced drops in both house prices and rentals during the 1990s—something that can be at least in part explained by the disproportionate entry of Mexican workers into the construction sector, as I explain in detail in section IV.D. One simple way to control for this is to look at the gap between rentals and housing prices, which is akin to using the gap in wages between low- and high-skilled workers shown in table 4. This is shown in column 7. This IV estimate suggests that unexpected increases in migration lead to relative increases in the part of the housing market most heavily used by Mexican immigrants (i.e., rentals) relative to housing prices. Quantitatively the estimate implies that an increase of the low-skilled workforce in a location of 10% leads to a short-run increase in rentals relative to housing prices of around 5% or 6%, or, given that low-skilled population is on average half of the population, an increase of 1% of the population in a city leads to around 1% increase in rental prices. This estimate is similar to previous estimates in the literature, particularly in the United States (see Saiz 2003).

[23] Not even in the cross-sectional IV regressions since past immigrants also had a comparative advantage relative to natives on expensive locations.

TABLE 6
CAUSAL EFFECT OF IMMIGRATION IN THE HOUSING MARKET

| | (log) Rentals, OLS (1) | (log) Rentals, IV (2) | (log) Rental Gap (3) | Δ (log) Rentals, OLS (4) | Δ (log) Rentals, OLS (5) | Δ (log) Rentals, IV (6) | Δ (log) Rental Gap, IV (7) |
|---|---|---|---|---|---|---|---|
| **A. State-Level Regressions** | | | | | | | |
| Δ share of Mexicans, LS | | | | .279 (.399) | .223 (.378) | .0449 (.272) | .676 (.346) |
| Δ (log) exports to Mexico | | | | | −.00028 (.00342) | −.00296 (.00320) | −.0342 (.00659) |
| Δ (log) state GDP | | | | | .167 (.145) | .193 (.147) | −.431 (.236) |
| Share of Mexicans, LS | .402 (.172) | .382 (.186) | .422 (.185) | | | | |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .083 | | | .035 | .074 | | |
| widstat | | 511.5 | 511.5 | | | 399.6 | 399.6 |
| **B. Metropolitan Area-Level Regressions** | | | | | | | |
| Share of Mexicans, LS | .335 (.143) | .338 (.158) | .380 (.159) | | | | |
| Δ share of Mexicans, LS | | | | .205 (.229) | .190 (.191) | .0304 (.153) | .555 (.165) |
| Δ (log) exports to Mexico | | | | | −.00715 (.00833) | −.00598 (.00795) | −.0866 (.0127) |
| Δ (log) state GDP | | | | | .505 (.281) | .535 (.278) | −.834 (.403) |
| Observations | 141 | 141 | 141 | 141 | 141 | 141 | 141 |
| $R^2$ | .121 | | | .023 | .140 | | |
| First-stage $F$-statistic | | 377.4 | 377.4 | | | 83.67 | 83.67 |

NOTE.—This table reports estimates on the rental market and the rental market relative to the selling prices, to the unexpected inflow of Mexican immigrants following the Mexican peso crisis. Panel A reports estimates at the state level, while panel B reports estimates at the metropolitan area level. Columns 1, 2, and 3 report crosssectional results, while cols. 4, 5, 6, and 7 report first-differenced specifications. The number of metropolitan areas is 141 because there are 22 metropolitan areas that are in the CPS data that are not covered by the FHFA price indexes. LS refers to low-skilled workers. Robust standard errors are reported.

*E.    Wage and Rental Price Dynamics*

At first sight, the estimated local labor demand elasticity may seem large. There is a large literature suggesting that over longer time horizons it is not the case that locations receiving higher shares of immigrants experienced lower wage increases.[24] Similarly, it may seem strange that if rental prices increase, there are not more people buying, which should equilibrate rentals and housing prices over the longer run.

In fact, time horizons matter enormously. To show this, I do two exercises. First, I plot the relative wage of low-skilled workers and the rental gap in high- relative to low-immigration states; see figure 3.[25] This is a simple difference-in-difference exercise that helps to see how the treatment changes over time, and serves as a visual check on pretrends for the regressions shown above. The patterns are clear. For wages, there seems to be a slight, negative trend in the series, which in the regression framework is taken into account by the location of specific year trends. The estimate for 1995, however, is significantly lower than what would have been predicted by this small negative trend. Wages in high-immigration states stay lower for around 3 years, before returning to the preshock trend. This suggests that if we expand the postshock period in the empirical specifications discussed in the previous section we will obtain increasingly smaller estimates of the inverse of the local labor demand elasticity for low-skilled workers. I come back to this in table 7.

The right graph of figure 3 shows the dynamics for the rental gap. The graph looks almost like the mirror image of the figure for wages. While there is no significant difference in the evolution of the rental gap between high- and low-immigrant locations, the gap significantly increases in 1995. It remains significantly high for 3 years and then returns to equilibrium.[26]

[24] Llull (2018) is an important exception. He also uses push factors to estimate wage effects. It is less clear whether in his case, however, he can correctly distinguish whether workers escaping from adverse conditions at origin, such as wars, enter the labor market corresponding to their education level or whether the circumstances push them to disproportionately enter the low-skilled labor market irrespective of their education. This is crucial for estimation of the causal effect of migration on wages, and is not a concern in the concrete case of Mexican immigrants.

[25] High-immigration states include Arizona, California, Nevada, New Mexico, Texas, and Utah. I build the figure by running individual-level regressions and interactions of a high-immigration state dummy and time dummies. The confidence intervals are constructed using standard errors clustered at the metropolitan level. I also control in these regressions for individual characteristics.

[26] The figure displays 90% confidence intervals allowing errors to be heteroskedastic across states and years. Given that the housing price data is an index reference to 1990 for each state independently, this means that there is no variation across states in 1990 and that variation grows over time. Not taking this into account results in standard errors that increase over time. Note also the level difference in rental gaps between high- and low- immigrant locations reported in cols. 1–3 of table 6. Specifically, I use the generalized least squares command "xtgls" in Stata allowing for heteroskedastic and correlated error structure.



Fig. 3.—Differential effect on wages and rental gaps by year. The graph on the left shows the relative low-skilled wage in all the high-immigration states (HIS) relative to the low-immigration states. The vertical dashed lines are 90% confidence intervals constructed using standard errors clustered at the metropolitan area. The graph on the right shows the rental gap, i.e., the (log) price of rentals minus the (log) housing price index in all the high-immigration states relative to the low-immigration states. The vertical dashed lines show 90% confidence intervals constructed on standard errors allowing for serial correlation and heteroskedasticity. See further details in the main text.

001217

TABLE 7
TIME HORIZONS

| Time Horizon | Inverse-Elasticity Estimate | 95% Confidence Interval | |
|---|---|---|---|
| | A. Low-Skilled Wages: State Variation | | |
| Change in wages: | | | |
| From 1992–94 to 1991 (placebo) | −.0779 | .163 | −.318 |
| From 1992–94 to 1995 (main estimate) | −.708 | −.401 | −1.015 |
| From 1992–94 to 1995–96 | −.639 | −.029 | −1.249 |
| From 1992–94 to 1995–97 | −.637 | −.191 | −1.083 |
| From 1992–94 to 1995–98 | −.413 | −.0239 | −.803 |
| From 1990 to 1999 | −.255 | .0586 | −.569 |
| | B. Low-Skilled Wages: Metropolitan Area Variation | | |
| Change in wages: | | | |
| From 1992–94 to 1991 (placebo) | −.696 | −.180 | −1.213 |
| From 1992–94 to 1995 (main estimate) | −1.418 | −.769 | −2.066 |
| From 1992–94 to 1995–96 | −1.255 | −.574 | −1.935 |
| From 1992–94 to 1995–97 | −1.237 | −.728 | −1.746 |
| From 1992–94 to 1995–98 | −.945 | −.541 | −1.348 |
| From 1990 to 1999 | −.384 | .007 | −.839 |
| | C: Rental Gaps: State Variation | | |
| Change in rental gap: | | | |
| From 1994 to 1992 (placebo) | −.368 | .456 | −1.193 |
| From 1994 to 1995 (main estimate) | .584 | 1.235 | −.0663 |
| From 1994 to 1995–96 | .639 | 1.456 | −.178 |
| From 1994 to 1995–97 | .561 | 1.640 | −.519 |
| From 1994 to 1995–98 | .231 | 1.702 | −1.240 |
| From 1994 to 1995–99 | −.157 | 1.792 | −2.106 |
| | D. Rental Gaps: Metropolitan Area Variation | | |
| Change in rental gap: | | | |
| From 1994 to 1992 (placebo) | −.545 | .0802 | −1.170 |
| From 1994 to 1995 (main estimate) | .555 | .878 | .232 |
| From 1994 to 1995–96 | .604 | 1.006 | .202 |
| From 1994 to 1995–97 | .560 | 1.077 | .0431 |
| From 1994 to 1995–98 | .259 | 1.933 | −.415 |
| From 1994 to 1995–99 | −.469 | −.0358 | −.902 |

NOTE.—This table shows estimates of inverse low-skilled labor demand elasticities and rental price elasticities using various time horizons. All regressions follow col. 7 of table 3 and col. 7 of table 6, but while in those tables the postshock period is always 1995, in this table I show estimates in which the postshock period takes progressively more years into account, and placebo estimates in which the postshock year is a preshock year.

An alternative strategy to look at how time horizons matter is to run the same specification used in the previous sections, see column 7 of table 3 and column 7 of table 6, but expanding the postshock period or taking the difference with respect to a preshock period, which can be seen as a placebo exercise. That is, while in the estimates shown in tables 3–6 the postshock period is only 1995, we can extend it to include also 1996,

or 1996 and 1997, etc., or we can use 1991 or 1992 as a placebo postshock year. This is what I report in table 7.

In panels A and B of table 7 I report the effect of the immigration shocks using different numbers of postshock horizons using state-level and metropolitan area–level variation. We can see in this table that first, when I expand the postshock time period the inverse local low-skilled labor demand elasticities tend to be smaller. They are the lowest when considering variation across the entire decade, as seen in the last row of each panel, and as I will discuss in section IV. This suggests that there are mechanisms that help to absorb these local shocks. Second, when I use instead preshock data as placebo postshock years, I obtain estimates that are statistically indistinguishable from 0. As before, estimates tend to be larger when using cross-metropolitan-area variation than with cross-state variation, a likely consequence of the fact that immigrants cluster more in metropolitan areas than in rural areas, as discussed in Albert and Monras (2019).[27]

In panels C and D I investigate the dynamics in the rental gap, using state-level and metropolitan area–level variation. These dynamics are, as has been suggested already, the mirror image of the wage dynamics. The effect of immigration on the rental gap is positive on impact, but it attenuates over time. As before, when using preshock data to construct a placebo postshock period, I obtain estimates that are statistically indistinguishable from 0.

*F.  Relocation of Workers*

Why do these wage effects dissipate over time? Or in other words, how do these labor market effects spill over between high- and low-immigration states? Does labor relocate across space in response to local shocks? This is what the spatial equilibrium literature would suggest. The exogenous immigration shock of 1995 is unevenly distributed across US states, offering an opportunity to see how workers relocate from high-immigration locations to low-immigration locations when hit by an unexpected inflow of low-skilled workers.[28]

---

[27] Especially with metropolitan area variation there seems to be a slight, negative relationship between wage changes and the migration shock prior to the shock that is not fully controlled for by the linear location-specific trends fitted over various years. One way to control for this in postshock data is to include as a control baseline wage levels in the regressions. In table D4 I report this. This table shows that when controlling for baseline wage levels, the estimates using metropolitan area variation and state-level variation are more similar. The estimates using state-level variation are unaffected by the inclusion of baseline controls.

[28] Another paper that documents spillovers across local labor markets from internal migration in a very different country (India) and setting (rural-urban migration) is Imbert and Papp (2020).

Figure 4 shows evidence suggesting that this is the case. In this figure I plot the evolution of the share of native low-skilled population and the overall share of low-skilled population in high- and low-immigration states.[29] First, figure 4 shows that the share of native low-skilled workers keeps decreasing over the decade both in high- and low-immigration states. This reflects the well-known secular increase in education levels in the entire United States which has been documented in the literature on skill-biased technological change; see Katz and Murphy (1992) or Acemoglu and Autor (2011). This is also true for the overall share of low-skilled population, even if it decreases less fast in high-immigration states (due to immigration). Effectively, Mexican workers seem to be replacing native low-skilled workers in high-immigration states. This is reinforced by the observation, not directly observable in the graph because I normalize the different shares to 1 in 1994, that the share of native low-skilled population is larger in low-immigration states. This is perhaps not surprising, but it has not been emphasized in other papers. In the left graph, we observe how the overall share of low-skilled workers (dashed line) increases in 1995 in high-immigration states. This is entirely driven by Mexican workers. When we exclude them from the computation of low-skilled population, we observe how the share of native low-skilled workers is closer to following its trend. In the right graph we see that this does not happen in 1995 in the low-immigration states. Instead, in 1995 the share of low-skilled workers keeps decreasing in the low-immigration states. This trend, however, changes in 1996 and 1997, reflecting the effect of internal relocation after the immigration shock.

In what follows, I simply quantify the relocation responses shown in figure 4, following the recommended approach established in the literature; see Peri and Sparber (2011) for a discussion. More specifically, I follow Card (2005) and run the following regression:

$$\Delta \text{ share low-skilled}_s = \alpha + \beta \times \Delta \text{ share Mexicans}_s + \Delta X_s + \varepsilon_s, \quad (3)$$

where the share of low-skilled is the share (among the entire population) of low-skilled individuals and is computed using both natives and immigrants. In this case, the inflow of low-skilled workers should increase one-to-one the overall share of low-skilled workers in the first year (if there is no immediate relocation) and then decrease in the subsequent year or years if there is some relocation.

---

[29] In this graph, since I use pre-1994 data, I define Mexican workers using the variable Hispanic from the CPS. Also, given the change in the weights between 1995 and 1996 I do not use the supplement weights to compute these shares. See more details in sec. II, app. B, and fig. D.7.



FIG. 4.—Share of low-skilled population in high- and low-immigration states. The two graphs show the overall share of low-skilled and the non-Hispanic share of low-skilled population in high- (*left*) and low-immigration states (*right*). High-immigration states include Arizona, California, Nevada, New Mexico, Texas, and Utah. Low-immigration states are the rest of the United States.

001221

TABLE 8
The Short-Run Relocation Response

| | Share of Low-Skilled Population, 1995 | | Δ Share of Low-Skilled Population | | | | | | | |
| | | | Change between 1994 and 1995 | | | | Change between 1995 and 1996 | | | |
| | | | OLS | | IV | | OLS | | IV | |
| | OLS | IV | | | | | | | | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | A. State-Level Regressions | | | | | | |
| Share of Mexicans (over population) | .118 (.0814) | .119 (.0805) | | | | | | | | |
| Δ share of Mexicans | | | 1.230 (.233) | 1.244 (.254) | 1.253 (.217) | 1.077 (.293) | −.153 (.383) | −.111 (.397) | −.791 (.373) | −.741 (.412) |
| Δ share of low-skilled natives | | | | | | .876 (.0586) | | | | −.246 (.168) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .019 | .019 | .249 | .255 | | | .004 | .025 | | |
| Controls | | | | Yes | Yes | Yes | | Yes | Yes | Yes |
| First-stage $F$-statistic | | 972.5 | | | 36.33 | 50.10 | | | 36.33 | 50.10 |
| | | | | B. Metropolitan Area-Level Regressions | | | | | | |
| Share of Mexicans (over population) | .357 (.0730) | .430 (.0833) | | | | | | | | |
| Δ share of Mexicans | | | .290 (.244) | .290 (.254) | 2.102 (.484) | 1.112 (.571) | −.0631 (.159) | −.0722 (.162) | −.642 (.874) | −.522 (.911) |
| Δ share of low-skilled natives | | | | | | .912 (.0501) | | | | −.111 (.0863) |
| Observations | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 |
| $R^2$ | .125 | .119 | .013 | .013 | | | .001 | .002 | | |
| First-differenced | | | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Controls | No | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| First-stage $F$-statistic | | 8.556 | | | 8.392 | 8.416 | | | 8.392 | 8.416 |

Note.—This table shows three sets of regressions. In cols. 1 and 2 it shows the cross-section regressions of the share of low-skilled population on the share of Mexicans. Columns 3–6 show the change in the share of low-skilled population between 1994 and 1995 on the change in the share of Mexicans. In cols. 7–10 the change in the share of low-skilled population is from 1995 to 1996. Controls include Δ (log) state GDP and Δ (log) exports to Mexico. Robust standard errors are reported. See more details in the text.

Table 8 shows the results of estimating (3) in 1995 and 1996, that is, the year of the shock and the year after. As before, columns 1 and 2 show the cross-sectional regressions. They show that states with more Mexican migrants tended to have a slightly higher share of low-skilled workers in 1995. This is entirely driven by immigrants. If we used the share of native low-skilled workers as dependent variable, we would obtain a negative coefficient.

In columns 3–6 I investigate what happens in 1995. An estimated coefficient equal to 1 would mean that there is no sign of immediate relocation. That is, in 1995, the share of low-skilled workers increases one-to-one with the Mexican inflows. As before, panel A shows the results at the state level, while panel B repeats the exercise at the metropolitan area level. In column 3 I show that even with a simple OLS regression I obtain a coefficient that is already close to 1 when using cross-state variation. Across metropolitan areas the coefficient is lower than 1, suggesting that there may be some interesting within-state, urban-rural internal migration that I do not explore in this paper. In column 4 I include controls and in column 5 I use an IV specification. Coefficients stay quite constant when using cross-state variation and tend to increase when using cross-metropolitan-area variation. My preferred estimate is shown in column 6.[30] There I show the estimate using an IV strategy and controlling for the change in native low-skilled population. This allows for different trends in the native low-skilled population across space. In this specification, I obtain a tight estimate very close to 1, both using cross-state and cross-metropolitan-area variation. This estimate suggests that once we take into account state or metropolitan area specific trends, the unexpected inflow of Mexican workers in 1995 led to a one-to-one increase in the share of low-skilled population.

Columns 7–10 investigate what happened in 1996, 1 year after the unexpectedly large inflow of Mexicans that increased the share of low-skilled workers in the high-immigration states. We immediately see that with the OLS estimates we already obtain an estimate significantly smaller than 1. The IV estimate, suggests, in fact, that the share of low-skilled workers almost reverts back to where it was before the unexpected inflow of Mexican workers. This is the case when I use cross-state variation and when I use cross-metropolitan-area variation, although in the latter case, estimates are much more noisy. The negative coefficients are evidence that there was some labor relocation taking place the year after the unexpectedly large inflow of Mexican workers of 1995 and is in line with

---

[30] An alternative to this column is to run two separate regressions, one using as dependent variable the share of low-skilled population, and the other one using the share of native low-skilled population (where the estimate would show a 0). In order to save some space I opted for simply including the change in the share of native population as a control.

figure 4. This strong response can generate the wage dynamics previously discussed, something that becomes even more clear when I discuss the model in section V.[31]

## IV.   Longer-Run Effects of Mexican Immigration

The fact that there is some relocation of low-skilled workers away from high-immigration states as a response to a negative shock to wages and rental gaps, and convergence across space, makes it more difficult to evaluate the longer-run effects of immigration on labor and housing market outcomes. Simply put, internal migration generates spillovers between treatment and control units that tends to attenuate the estimated effect. There are a number of alternatives one can adopt to shed more light on the longer-run consequences of immigration. These can be divided between longer-run empirical comparisons and counterfactual wage and housing price evolutions from a structural model. I present the empirical long-run results in this section, and move to the structural modeling in sections V and VI.

### A.   Long-Run Identification Strategy

To investigate the long-run impact of immigration across locations I use the following regression:

$$\Delta^{00-90} \ln y_s = \alpha + \beta \times \frac{\Delta^{00-90} \text{Mex}_s}{N_{s,90}} + \varepsilon_s, \qquad (4)$$

where $\Delta^{00-90}$ indicates the difference between 1990 and 2000 of the relevant variable. It is important to note that in this specification, I use the relative inflow of Mexican workers instead of the change in the share because I consider the population at the beginning of the period to be the size of the relevant labor market. Given the population growth over the 1990s in the United States, this strategy obtains a smaller estimate (in absolute value) than using the change in the share of Mexican workers. Thus, the results shown in what follows are conservative estimates.[32]

This specification is very similar to the ones used in Card (2001) and especially Altonji and Card (1991). As mentioned before, the presumption that Mexicans may be choosing where to migrate within the United

---

[31] There are various internal and international migration responses that could explain these internal migration patterns. I discuss them in detail in app. A.7.

[32] In the previous short-run regressions, this distinction does not matter so much because the population growth in a given year is significantly less pronounced than over an entire decade. Note that without population growth, the two specifications are identical.

States motivated the construction of the networks instrument. The validity of the immigrant network instrument requires that new inflows of Mexican workers be strongly influenced by the past stock of Mexicans in the United States and that there be no spillovers across states. I report the results in table 9, commented on below. The exact formulation of the instrument follows equation (2), but applied to the 10 year differences.

An alternative specification for investigating the long-run impact of immigration is used by Borjas (2003). He assumes that there are spillovers between geographic units and completely forgets about them in his main specifications. Instead, Borjas (2003) uses cross-cohort or cross-age (denoted by $a$) variation to study the long-run effect of immigration. That is,

$$\Delta^{00-90} \ln y_a = \alpha + \beta \times \frac{\Delta^{00-90} \text{Mex}_a}{N_{a,90}} + \varepsilon_a. \qquad (5)$$

The assumption in this case is that different age cohorts of potential migrants do not take into account the labor market outcomes of their own group when migrating. Under this assumption, an OLS regression would estimate the causal effect of immigration on outcomes $y_a$ if workers of different age groups are imperfect substitutes. It is likely, however, that migrants at least in part look at their relevant labor market opportunities when deciding to migrate, and this includes any of their own characteristics, among which is experience. This last concern also suggests that we must find a valid instrument for this regression so as to interpret the estimate causally. I build such an instrument based on the unexpectedly large inflow of Mexicans in 1995 and on the fact that the age distribution of Mexican immigrants was very constant over the entire 1990–2000 decade, as shown in figure D.2. Specifically, I construct the following:[33]

$$\text{predicted migrants}_a = \sum_{j=1991}^{2000} \frac{\text{Mexican migrants aged } a \text{ at arrival}}{\text{total Mexican arrivals}} \times \text{Mex}_j. \qquad (6)$$

That is, I assign the inflow of Mexicans at year $t$ using the age distribution of the entire decade to match the particular age cohort that receives the shock. If there are some years with an unexpectedly large inflow of immigrants and the age distribution of this inflow is not affected, then there will be some native cohorts with unexpectedly large competition. This is the nature of this IV. Given that the age distribution of Mexican arrivals

---

[33] In the regression I use 46 age categories that include ages between 20 and 65 years old, both included. When looking at high-skilled workers I use ages between 25 and 65, also both included.

TABLE 9
Long-Run Effect of Mexican Immigration on Low-Skilled Wages and Employment

| | Source of Variation | | | | | |
| | Cross State | | Cross MSA | | Cross Age | |
| | OLS (1) | IV (2) | OLS (3) | IV (4) | OLS (5) | IV (6) |
|---|---|---|---|---|---|---|
| **A. Dependent Variable: Δ (log) Native Low-Skilled Wage** | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | −.00831 | −.255 | .0312 | −.384 | −.235 | −.533 |
| | (.168) | (.160) | (.103) | (.232) | (.0939) | (.130) |
| Observations | 51 | 51 | 157 | 157 | 46 | 46 |
| $R^2$ | .000 | | .003 | | .088 | |
| First-stage $F$-statistic | | 42.73 | | 24.18 | | 53.59 |
| **B. Dependent Variable: Δ (log) Native High-Skilled Wage** | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | .225 | .133 | .160 | −.0931 | .297 | .241 |
| | (.0748) | (.0745) | (.0634) | (.109) | (.160) | (.177) |
| Observations | 51 | 51 | 157 | 157 | 41 | 41 |
| $R^2$ | .281 | | .097 | | .061 | |
| First-stage $F$-statistic | | 42.73 | | 24.18 | | 33.59 |
| **C. Dependent Variable: Δ (log) Native Low-Skilled Employment Rate** | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | −.0890 | −.0689 | −.0898 | −.185 | −.714 | −.572 |
| | (.0713) | (.0657) | (.0645) | (.110) | (.135) | (.142) |
| Observations | 51 | 51 | 147 | 147 | 46 | 46 |
| $R^2$ | .021 | | .029 | | .446 | |
| First-stage $F$-statistic | | 42.73 | | 24.18 | | 53.59 |
| **D. Dependent Variable: Δ (log) Native High-Skilled Employment Rate** | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | −.0721 | −.0809 | −.0605 | −.140 | −.457 | .124 |
| | (.0315) | (.0340) | (.0182) | (.0423) | (.134) | (.126) |
| Observations | 51 | 51 | 147 | 147 | 41 | 41 |
| $R^2$ | .077 | | .056 | | .319 | |
| First-stage $F$-statistic | | 42.73 | | 24.18 | | 33.59 |

Note.—This table shows the results of regressing the (log) change in native low- and high-skilled weekly wage and the (log) change in native low- and high-skilled employment rate on the change in labor supply due to Mexicans arriving in the United States between 1990 and 2000. The IV for the cross-state and cross-metropolitan-statistical-area comparisons is the immigration networks, while the IV for the cross-age comparisons is the interaction between the age distribution of immigrants and the aggregate yearly inflows in the 1990s. I use 46 age categories for low-skilled workers (ages 20–65, both included) and 41 age categories for high-skilled workers (ages 25–65, both included), 50+1 states, and 147 metropolitan areas. There are six metropolitan areas that are covered in the CPS and 2000 census that are not covered in the 1990 census. Robust standard errors are reported.

001226

is tilted toward entry-level positions, this IV will rely on the evolution of labor market outcomes of different cohort entries observed in 2000 relative to the cohorts observed in 1990.

As before, the first stages are strong, as shown in table D9. The past importance of Mexicans in a location or age group is a good predictor of larger inflows over the 1990s.

### B.  Wages

Table 9 shows the empirical results of the effect of Mexican migration in the long run on labor market outcomes. Each panel of this table is divided in three parts. The first one shows cross-state, the second cross-metropolitan-area, and the third cross-age comparisons. Panel A shows the effect on low-skilled native wages, while panel B shows the exact same regressions but using the change in high-skilled wages instead. Panels C and D report results on employment.

As in previous literature, across-location OLS estimates of Mexican inflows and wage changes are not statistically different from zero, as can be seen in panels A and B of table 9. In columns 2 and 4, I instrument the OLS regression with the immigration networks instrument. The coefficient becomes slightly more negative, suggesting a long-run local labor demand elasticity of around $-0.3$ when using cross-state and around $-0.4$ when using cross-metropolitan-area variation. This is the slightly negative trend in high- relative to low-immigration locations discussed in figures 2 and 3 and is similar to previous studies. Note that columns 1–4 simply follow the literature initiated by Altonji and Card (1991), but applying the regression specifically to Mexican immigrants. Columns 5 and 6 instead follow Borjas (2003). Like him, I find a negative estimate of around $-0.3$ when using OLS (col. 5). In column 6, I use the instrument proposed in equation (6). When instrumenting to take into account the possible selected immigration in particular years and selected return migration by Mexicans, I obtain an estimate of around $-0.53$.

Panel B of table 9 shows the exact same regressions as in panel A but using the change of high-skilled wages instead of low-skilled. All the estimates in this part of the table are close to 0. In other words, Mexican immigration seems to have affected only low-skilled workers in the long run. And among those, the ones that suffered larger shocks when young seem to have suffered more lasting consequences.

### C.  Employment

If there is some wage stickiness or some endogenous (intensive margin) labor supply response, part of the effect of Mexican immigration over the decade may be observable in the employment rate. As with the short-run

estimates, I also analyze the effect of immigration on employment within locations and age groups.

Following panels A and B, panels C and D report the results for employment rates. Qualitatively the results are almost identical across panels. Cross-space high Mexican immigration locations experience only very small declines in the employment rate, when comparing both states and metropolitan areas. In columns 5 and 6 I report the cross-age regressions. These columns suggest that low-skilled Mexican immigration decreases employment rates of low-skilled natives substantially. Both in the OLS and in the IV specifications a 10% immigration-induced labor supply shock decreases employment rates by around 6% or 7%. Very importantly too, when I repeat the exercise using high-skilled native employment rates I obtain an IV estimate close to 0.

This evidence suggests that part of the effect of immigration on labor market outcomes is observed on wages and part on employment rates. In both cases, however, estimates are lower when comparing across space than when comparing across age or experience groups. This is in line with and complements prior literature. Overall, I take this as evidence that labor market effects dissipate to a large extent across space, but that there are particular cohorts of low-skilled workers—those that enter the labor market in high-immigration years—that are affected over longer time horizons.

### D.   Housing Market

The third piece of longer-run evidence is on housing market prices. For this I can only use cross-space comparisons. Mexican workers may affect housing prices and rents in a number of different ways and, also in this case, time horizons may matter. For instance, as explained in Saiz and Wachter (2011) and in Sa (2015), immigrants may increase the demand for housing, thus putting pressure on housing prices and rents. This is likely to happen over short time horizons, which is what I showed in section III.D. Over longer time horizons there are other forces. First, maybe natives prefer to live in different neighborhoods or locations as a response to immigrant inflows. Depending on this response, this may lower the demand for housing in high-immigrant locations. Second, immigrants may affect the quality of local public goods, thus reducing the amenity value of living in certain locations. And third, maybe they affect the quality of housing. Both Saiz and Wachter (2011) and Sa (2015) concentrate on these three mechanisms and suggest that natives' preferences for not living with immigrants is the main driver of the negative relation between housing prices and rents and immigrant inflows at the neighborhood level that they document.

However, there may be other important reasons as well. Something particular about Mexican low-skilled workers is that they disproportionately enter the construction sector, potentially affecting the construction costs.

In turn, given that labor costs account for the bulk of construction costs as documented in Gyourko and Saiz (2006), this may affect housing prices. I show that this possibility is very much in line with the evidence on Mexican migration over the 1990s. In table D10, further discussed in appendix A.9, I show that around half of Mexicans enter the construction sector, fully displacing natives in that sector, which is something that can also be seen in the summary statistics data presented in table 1. This leads to a very significant reduction of native wages in the construction sector in high- relative to low-immigration locations. Moreover, Mexicans earn, on average, lower wages than natives, further decreasing construction costs.

Thus, there are a number of forces that may lead housing prices to decline in high Mexican immigrant locations relative to low Mexican immigrant locations. These may prevail over the short-run pressure on rental prices, even if this pressure spills over to selling prices so that the gap between the two does not persist over time as shown in section III.E, figure 3.

Using longer-run cross-space comparisons I show evidence that is in line with these ideas. When comparing changes in the housing price index or in rental prices between 1990 and 2000 across locations we see that locations that over the 1990s received large inflows of Mexican workers experienced declines in housing and rental prices. These results are shown in table 10. Using both cross-state and cross-metropolitan-area variation, the IV estimates in columns 2 and 4 suggest that higher inflows of Mexican immigrants led to both lower housing prices and lower rental prices, with an elasticity of around $-1$. The drop in both cases is of the same magnitude as and slightly larger than the OLS estimate presented in columns 1 and 3, making the change in the rent gap, shown in columns 5 and 6, statistically indistinguishable from 0.

To assess whether these results may be driven by a cost reduction in construction I show in appendix A.10 that in a perfectly competitive construction sector, house price declines can be approximated by the cost share of labor in the sector times the local labor demand elasticity adjusted for composition effects.[34] This would imply, as illustrated in appendix A.10, an elasticity of around $-0.84$, which is in line with the estimates in table 10. A second corroborating piece of evidence is that this reduction in housing prices should lead to an increase in construction according to the price elasticity of the local demand for housing. In appendix A.10, I show data on new construction across states that suggest

---

[34] I estimate the local labor demand elasticity to be around $-1$. Gyourko and Saiz (2006) argue that the construction sector is well approximated by a perfectly competitive model and that the cost share of labor is at least 60%. Note also that Mexican inflows can lead to a decline in wages for two reasons: the first is a direct effect of the shock on native wages; the second is that if Mexican workers earn on average less than natives as shown in table 1, they can lead to a further reduction in average wages due to a composition effect. The composition adjustment is given by the difference in native and Mexican wages divided by the average wage. In the data this is typically around 40%.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1237 of 4699 PageID #:  4402

TABLE 10
Long-Run Effect of Mexican Immigration on Housing Prices

|  | Δ (ln) Rent | | Δ (ln) HPI | | Δ (ln) Rental Gap | |
|---|---|---|---|---|---|---|
|  | OLS (1) | IV (2) | OLS (3) | IV (4) | OLS (5) | IV (6) |
| A. State-Level Regressions | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | −.244 | −.548 | −.0866 | −.780 | −.157 | .231 |
|  | (.336) | (.366) | (.497) | (.424) | (.384) | (.284) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .036 |  | .002 |  | .004 |  |
| First-stage $F$-statistic |  | 42.73 |  | 42.73 |  | 42.73 |
| B. Metropolitan Area–Level Regressions | | | | | | |
| Relative inflow of Mexicans, 1990–2000 | −.284 | −1.171 | −.202 | −1.430 | −.0815 | .259 |
|  | (.291) | (.518) | (.294) | (.704) | (.304) | (.423) |
| Observations | 135 | 135 | 135 | 135 | 135 | 135 |
| $R^2$ | .034 |  | .013 |  | .002 |  |
| First-stage $F$-statistic |  | 15.89 |  | 15.89 |  | 15.89 |

Note.—This table reports estimates of the relative inflow of Mexican immigrants during the decade 1990–2000 on housing prices and rents. Panel A reports estimates at the state level, while panel B reports estimates at the metropolitan area level. In this table I only use 135 metropolitan areas because these are the 141 covered in the FHFA data and the CPS, six of which are not covered by the census data in 1990. Robust standard errors are reported.

that this elasticity is between −0.3 and −0.4, in line with Hanushek and Quigley (1980) and Mayo (1981).

Taken together, the evidence presented in figure 3, tables 10 and D.10, and appendix A.10 shows that Mexican migration created a decline in housing prices and rents over the 1990s, to a large extent driven by the impact of Mexican migration on the construction sector, but that at the same time, unexpectedly large inflows such as the one occurring right after the Mexican peso crisis temporarily increase rental prices, since Mexicans disproportionately use this housing market.

### E.   Relocation

The final piece of evidence using 1990 and 2000 census data is on long-run spatial relocation. I stressed before that over the short run there is an important internal migration response to the unexpectedly large inflow of Mexican workers in 1995 that helps local shocks to dissipate spatially. There is some literature, however, that suggests that internal migration does not seem to respond strongly using longer time horizons. To reconcile these results it is important to realize that there may be different ways in which expected and unexpected immigrant flows are absorbed. Unexpected inflows put pressure on both labor and housing markets, and as a

001230

consequence internal migration responds. When inflows are expected, as was the case with most of the years with Mexican migration during the 1990s, local technologies or capital may adjust to help absorb labor supply shocks. The more local technologies adjust, the less internal migration is needed to equilibrate the value of living across local labor markets. I use these ideas when discussing counterfactuals in section VI.

Table 11 shows the results. Columns 1–3 show that in 1980 Mexicans entered states where the share of low-skilled workers was lower. Over the following two decades, the share of low-skilled workers increased more in initially high immigration states, as can be seen in columns 2 and 3. Column 4 is yet another way of looking at the first-stage regression of the immigration networks instrument used in the immigration literature. We observe that the importance of Mexicans in the low-skilled labor force in 1980 is a good predictor of where the share of Mexicans would increase more during the 1990s. This is the instrument used in columns 6 and 8. Columns 5 and 6 estimate the relocation equation (3). The OLS and IV estimates of columns 5 and 6 suggest that for every low-skilled Mexican entering a high-immigration state, the state gains 0.8 low-skilled workers. This estimate decreases to 0.6 when controlling for the 1980 distribution of low-skilled workers in the United States, which effectively allows for different trends to depend on the baseline importance of Mexican workers. This is consistent with the estimates in Wozniak and Murray (2012). This is also certainly consistent with figure 4 and with the story that while high-immigration locations absorb an important share of low-skilled Mexicans by increasing the use of this factor locally, unexpected shocks can be accommodated through internal migration. Monras (2018) suggests that this is a consequence of reduced in-migration into shocked locations, which explains the fast response, but CPS data are too limited to explore this further in this paper.[35] As before, results using cross-state (panel A) and cross-metropolitan-area (panel B) variation are very similar. If anything, cross-metropolitan-area variation suggests a more important role for internal migration than cross-state variation.

## V.   A Structural Model of the Local Adjustment to Immigration

While it is possible to evaluate the short-run effects using a clear natural experiment, spillovers across locations due to labor relocation make it more difficult to evaluate longer-run effects using cross-space comparisons. Cross-age comparisons help to overcome some of the limitations of the spatial reallocation; however, they are not useful for thinking about the general equilibrium, nor for some outcomes such as housing prices.

---

[35] The question on the residence in the previous year is not asked in the CPS in 1995.

TABLE 11

THE EFFECT OF MEXICAN IMMIGRATION ON THE SHARE OF LOW-SKILLED WORKERS ACROSS STATES IN THE LONG RUN

| | Share LS, OLS | | | Δ Mexicans LS 1990–2000, OLS | Δ Share LS 1990–2000 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 1980 (1) | 1990 (2) | 2000 (3) | (4) | OLS (5) | IV (6) | OLS (7) | IV (8) |
| A. State-Level Regressions | | | | | | | | |
| Share of Mexicans in 1980 | −1.406 (.247) | | | | | | | |
| Share of Mexicans in 1990 | | −.567 (.121) | | | | | | |
| Share of Mexicans in 2000 | | | −.0977 (.104) | | | | | |
| Δ Mexicans LS 1990–2000 | | | | .914 (.0960) | | | | |
| Change in share Mexican, 1990–2000 | | | | | .782 (.0544) | .794 (.0513) | .632 (.0913) | .613 (.0988) |
| Share of low skilled, 1980 | | | | | | | −.115 (.0416) | −.119 (.0423) |
| Observations | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| $R^2$ | .335 | .177 | .018 | .822 | .664 | .664 | .716 | .716 |
| First-stage $F$-statistic | | | | | | 90.49 | | 65.32 |

3062

001232

### B. Metropolitan Area-Level Regressions

|  | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| Share of Mexicans in 1980 | -.244 (.194) | | | | | | | |
| Share of Mexicans in 1990 | | .126 (.0882) | | | | | | |
| Share of Mexicans in 2000 | | | .218 (.0579) | | | | | |
| Change in share Mexican, 1990–2000 | | | | | .577 (.0740) | .415 (.0790) | .519 (.0766) | .380 (.0666) |
| Share of low skilled, 1980 | | | | .581 (.0715) | | | -.110 (.0297) | -.127 (.0292) |
| Observations | 163 | 157 | 163 | 157 | 157 | 157 | 157 | 157 |
| $R^2$ | .020 | .016 | .096 | .559 | .425 | .392 | .486 | .463 |
| First-stage $F$-statistic | | | | | | 66.20 | | 71.45 |

Note.—This table shows the effect of immigration on internal relocation. Columns 1–3 show the cross-sectional correlation of the share of Mexican immigrants with the share of low-skilled workers in different decades. Column 4 is the first-stage regression showing that the share of low-skilled Mexicans in 1980 is a good predictor of the change in the share of low-skilled Mexicans between 1990 and 2000. Columns 5–8 estimate the effect of the change of low-skilled Mexicans on the change in the share of low-skilled workers. Robust standard errors are reported.

001233

For this reason, I introduce in this section a spatial equilibrium model that I then bring to the data.

In the very short run, each local labor market, in this case states or metropolitan areas, is closed, so standard models of the aggregate labor market apply (see the canonical model discussed in Katz and Murphy [1992] or Acemoglu and Autor [2011]). In the longer-run, internal migration flows link the various local labor markets, spreading local shocks to the rest of the economy, either through affecting local wages or local housing prices. Standard models in the spatial economics literature in the spirit of Rosen (1974) and Roback (1982) are suited to analyzing the long run, once adjustment has taken place (see also Glaeser 2008; Moretti 2011; Allen and Arkolakis 2014). Fewer models in this literature are suited to studying the transition dynamics.

Two seminal contributions introduced transition dynamics into a model with many regions: Blanchard and Katz (1992) and Topel (1986). For instance, Blanchard and Katz (1992) report that wages seem to converge spatially after around 8 years, while unemployment rates converge faster. In the estimation of their model, they rely mainly on time series variation, although they also use Bartik (1991) type instruments, like subsequent literature (see Diamond 2015; Notowidigdo 2020). They do not microfound, however, the migration decisions.

The seminal contribution of Kennan and Walker (2011) introduces a dynamic microfounded migration model. The multiple locations and migration histories that workers can choose make this problem particularly hard. Kennan and Walker simplify in two respects. First, they only take into account a subset of the possible choices of workers. Second, their model is, in nature, partial equilibrium. They do not model the rest of the economy and the interactions between the different states as I do in what follows. In exchange, in the model that I present here I simplify the location decision by allowing only a fraction of the population to move, which is the empirical relevant special case of the discrete choice model presented in Monras (2018). Relative to Monras (2018) I allow for different types of housing and different skill types.

The model has $S$ regions representing US states or metropolitan areas. There is a single final consumption good that is freely traded across regions, at no cost. It is relatively simple to introduce trade in this context since it simply determines a particular price index for tradable goods prevailing in each local economy. Assuming free trade equalizes this price index of tradable goods to 1. I leave costly trade outside the model for simplicity.[36]

---

[36] Adding a richer trade model would simply create a location-specific price index for tradable goods in each local market.

Workers can be either high or low skilled. They are the two factors of production of a representative firm in every local market. The only difference between firms in different locations is the underlying productivity of each factor and a Hicks-neutral technology parameter. For simplicity, I assume in this model that the Hicks-neutral technological parameter is not affected by international or internal migration. This is perhaps an unrealistic assumption, since many papers in urban economics have estimated that local productivity is increasing in population (Combes and Gobillon 2015), with an elasticity of almost 5%. In the context of the model, including this technological adjustment would lead to a uniform increase in the wage levels of each factor type if the location gains population. However, given that the most important aspect is how immigrants affect skill-specific types and that the implied elasticity of substitution between those is estimated to be around 1, considering endogenous agglomeration forces is unlikely to be quantitatively very important in this context.

Labor markets are perfectly competitive. Every worker lives in either a rented or an owned housing unit. Rented and owned housing units are treated as two separate housing services that satisfy workers' demands for shelter. Workers live for infinitely many periods and are small relative to the labor market.

The timing of the model is as follows. At the beginning of each period, workers observe amenity levels, wages, and housing prices in every location. A fraction of them are allowed to move across locations and get an idiosyncratic taste draw from a known distribution over potential destinations and types of housing. The nonmovers get a draw for the different types of housing within the location. Based on this, everyone decides where to relocate. Hence, by the end of the period, there is a new distribution of people across locations and housing market types. In the following period, this new distribution of people determines new wages and new housing prices at the local level through market clearing, something that I label as the short-run equilibrium. Once these are determined, we are at the beginning of the new period.

The long-run equilibrium is defined as a short-run equilibrium with zero net flows of workers across locations. Hence, in the long run the distribution across locations of workers of each type is stable. The long-run equilibrium coincides with the equilibrium in standard spatial equilibrium models, in which indirect utility of the marginal mover is equalized across space. The main difference between this model and standard quantitative static spatial equilibrium models is that taste heterogeneity—modeled with the idiosyncratic taste draws—shapes the flows of workers across locations instead of directly its final distribution. In this model's long-run equilibrium there are always positive gross flows of workers between any two locations that exactly cancel each other out.

To summarize, in the model there are essentially four types of workers: high- and low-skilled workers that either rent or buy housing units. High- and low-skilled workers are imperfect substitutes in production, but they may be competing for housing units in either the rental or homeownership markets. "Sticky" mobility—from rental to homeowned units and internal migration—links the experiences of the various workers across space, local housing, and labor markets. This sticky mobility is what generates the dynamics in both local labor and housing markets. It crucially depends on two elements: the equilibrium internal mobility (which I take from 1990 census data) and the responses to shocks.

### A.   Indirect Utility Function

Workers of each skill type earn the market wage of the location they reside in. Since there is only one tradable good, housing, and no savings, they spend all of their wage on this good and on housing. In what follows I present the indirect utility and location choice part of the model only for native low-skilled workers. The model for high-skilled workers is exactly the same except that the relevant wages are the high-skilled wages ($h_s$ in the empirical section). When I need to distinguish Mexican and native workers, or native workers of different skills, I follow the notation from the previous sections. That is, I denote by $N_s$ native low-skilled workers, by $L_s = \text{Mex}_s + N_s$ all low-skilled workers, and by $H_s$ high-skilled workers. Here $\text{Mex}_s$ denotes Mexican low-skilled workers who just arrived in the United States. After one period in the United States they behave like low-skilled natives.

Indirect utility of low-skilled workers who consider $s'(r)$ as a potential residential choice is given by the local wage $w_{t,s'}$, the amenities $A_{s'(r)}$ (which are also skill specific and depend on the housing market choice), the housing price $p_{t,s'(r)}$ that they will face at destination (where $r$ determines whether it is a rental unit or an owned unit), the continuation value of being at $s'$, and the idiosyncratic draw they get for location $s'$ and housing market type $r$:[37]

$$\ln V^i_{t,s'(r)} = \ln V_{t,s'(r)} + \epsilon^i_{t,s'(r)} = \ln A_{s'(r)} + \ln w_{t,s'} - \alpha \ln p_{t,s'(r)} \\ + \beta E_t \ln V_{t+1,s'} + \epsilon^i_{t,s'(r)}. \tag{7}$$

Note that the indirect utility has a common component to all (low-skilled) workers in housing market type $r$ and location $s'$, given by $\ln V_{t,s'(r)}$, which is the value of living in $s'(r)$, and an idiosyncratic component

---

[37] This indirect utility function can be easily derived from a Cobb-Douglas utility function with two goods, housing and a tradable good. A greater quantity of housing can be reinterpreted as higher quality housing (or bigger apartments). See app. C.1.

$\epsilon_{t,s'(r)}^i$ specific to each worker.[38] Intuitively, the variance of $\epsilon$ determines whether the common component or the idiosyncratic component has a higher weight in this decision. Finally, $\alpha$ is the share of spending that goes into housing. While this may, in principle, vary across local labor markets and between homeowners and renters, it is fairly stable in the data at around 25% of total income (Davis and Ortalo-Magne 2011). For simplicity I make this a common constant across locations and types of household.

### B. Location Choice

Each period, workers decide where they want to reside, given the indirect utility they get in each place. That is, each worker $i$ maximizes

$$\max_{s' \in S, r \in R} \left\{ \ln V_{t,s'(r)} + \epsilon_{t,s'(r)}^i \right\}. \tag{8}$$

The general solution to this maximization problem gives the probability that an individual $i$ residing in $s$ moves to $s'(r)$ in housing market type $r$:

$$\pi_{t,s,s'(r)}^i = \pi_{t,s,s'(r)}(V_{t,s'(r)}; s' \in S, r \in R). \tag{9}$$

As mentioned before, I further assume that only a fraction $\eta$ of workers decide on cross-space relocation each period, while the other fraction can only change apartment types within a location. This fraction $\eta$ can be endogenized. I do this in Monras (2018) and show that it is empirically not very relevant.[39] This parameter $\eta$ is important for the quantitative exercise, since the model would otherwise overpredict yearly bilateral mobility in the absence of shocks. It plays a very similar role to fixed costs of moving, but introducing it in this way makes the model much more tractable. The nonmovers do decide, however, what type of housing market to be in the following period.[40]

By the law of large numbers we can then use equation (9) to obtain the flow of people between $s$ and $s'(r)$. I also assume that $\epsilon$ is drawn from a nested logit extreme-value distributed.[41] This has the nice property that

---

[38] Like in many papers in the spatial equilibrium literature I view this parameter $\epsilon$ as capturing taste heterogeneity for living in different locations. Other papers have used this idiosyncratic shock to study unobserved skill heterogeneity (see Morten and Bryan 2019). I abstract from this view of the idiosyncratic variable in this paper.

[39] In order to identify the parameters of an endogenized $\eta$ I need data on both in- and out-migration rate responses to local shocks. This is not available in the CPS for 1995. I refer the reader to Monras (2018).

[40] It is also easy to induce more "stickiness" in the housing market by allowing only a (potentially endogenous) fraction of residents to switch housing markets. Given that in the data housing dynamics evolve relatively quickly and that it is probably not very costly to move to a new apartment within a location, I do not include this extra "stickiness." I discuss these issues in more detail in app. C.5.

[41] Two classes of distributions admit closed-form solutions. One is extreme-value distributions and the other is a uniform distribution. See Moretti (2011) for an example of the latter.

001237

the difference in $\epsilon$ is also extreme-value distributed resulting in a closed-form solution for the probability of an individual moving from $s$ to $s'$ and entering housing market $r$. We can use this property to write the bilateral flows as follows:

$$\Pi_{t,s,s'(r)} = \eta N_{t,s} \frac{V_{t,s'}^{1/\lambda}}{\sum_j V_{t,j}^{1/\lambda}} \frac{V_{t,s'(r)}^{1/\gamma}}{\sum_r V_{t,s'(r)}^{1/\gamma}}, \text{ for } s \neq s', \tag{10}$$

where $\lambda$ and $\gamma$ govern the variance of the error term, and where $V_{t,s'}$ is the expected value of living in $s'$ on either a rental unit or on an owned unit: $V_{t,s'} = (\sum_r V_{t,s'(r)}^{1/\gamma})^{1/\gamma}$. This expected value is obtained from the distributional assumption on $\epsilon$.[42] This equation says that a fraction $\eta V_{t,s'}^{1/\lambda}/\sum_j V_{t,j}^{1/\lambda}$ of workers in $s$ will move to $s'$; $\eta$ is the fraction of workers in $s$ that consider relocating, and among those, the fraction $V_{t,s'}^{1/\lambda}/\sum_j V_{t,j}^{1/\lambda}$ decides on $s'$. Among the movers toward $s'$, a fraction $V_{t,s'(r)}^{1/\gamma}/\sum_r V_{t,s'(r)}^{1/\gamma}$ will enter housing market $r \in \{\text{rental, owner}\}$.

Furthermore, the nested logit error term results in a simple equation for the evolution of the common component of the value of living in each location's housing market $r$:

$$V_{t,s'(r)} = \left(\frac{A_{s'(r)} w_{t,s'}}{p_{t,s'(r)}^{\alpha}}\right) V_{t+1}^{\beta\eta} V_{t+1,s'}^{\beta(1-\eta)}, \tag{11}$$

where $V_{t+1} = (\sum_j V_{t+1,j}^{1/\lambda})^{\lambda}$ is the overall value of the economy for the low-skilled workers. This equation means that the value of living in location $s'$ and housing market $r$ is given by the value of wages and amenities relative to housing costs (weighted by the share of income devoted to housing $\alpha$) and the value of being in that location in the future, discounted by $\beta$. In turn, the value of living in location $s'$ in the following period is a weighted average of being a mover in the following period and searching for a new destination and staying put in location $s'$.

Another of the key aspects of the model is that it delivers simple and intuitive population dynamics across local labor and housing markets. Integrating over destinations using the definition of $\Pi_{t,s,s'(r)}$ we obtain that

$$N_{t+1,s'(r)} = \eta \left(\frac{V_{t,s'}}{V_t}\right)^{1/\lambda} \left(\frac{V_{t,s'(r)}}{V_{t,s'}}\right)^{1/\gamma} N_t + (1-\eta) \left(\frac{V_{t,s'(r)}}{V_{t,s'}}\right)^{1/\gamma} N_{t,s'}. \tag{12}$$

[42] It is relatively simple to introduce more flexibility into the model to explain the data even better. For example, one can have "weights" such that instead of $(V_{t,s'(r)}^{1/\gamma})/(\sum_r V_{t,s'(r)}^{1/\gamma})$ we have $(\nu_r V_{t,s'(r)}^{1/\gamma})/(\sum_r \nu_r V_{t,s'(r)}^{1/\gamma})$ to capture why it is more common to move to a particular housing market (when arriving in a city), e.g., the rental market, than to another. Similarly, there may be some locations that attract a disproportionate share of movers (beyond what is captured already by this model), which could be accommodated with weights in the upper nest. I abstract from this richness since it is not of first-order importance to explain the data.

001238

This equation means that the number of people in location $s'$ and housing type $r$ is a weighted average between the number of people in this location in the previous period times the value of housing market type $r$, the second term, and the share of movers that decide to move into location $s'$ using housing market type $r$, the first term.

Equations (11) and (12) define a dynamic system of two equations and two unknowns for each of the locations and housing market types in the economy for low-skilled workers.[43] The equations depend on local prices, i.e., wages and housing markets, which are determined locally as I explain below. A similar set of equations applies to high-skilled workers. Hence, I have four types in the economy: high-skilled owners, high-skilled renters, low-skilled owners, and low-skilled renters. The interaction between the labor and housing market defines the value in each location for the four worker types.

Under these assumptions one can prove that the derivative of (net) in-migration rates in $s$ with respect to (log) wages in $s$ is approximately $\{1/[1-\beta(1-\eta)]\}(1/\lambda)(I_s/N_s)$, where $(I_s/N_s)$ is the in-migration rate (around 3%–5% in US data, depending on the geographic unit of analysis), where I drop the time subscript $t$ since this "response" does not depend on the time period, but rather to an unexpected change in wages. This can be expressed more concisely as follows:

PROPOSITION 1. If $\epsilon^i_{s(r)}$ are iid and follow a nested logit distribution with shape parameters $\lambda$ and $\gamma$ then, in the environment defined by the model, we have that $\partial(\ln N_s)/\partial \ln w_s \approx \{1/[1-\beta(1-\eta)]\}(1/\lambda)(I_s/N_s)$.

*Proof.*   See appendix C.2.

This is the first key elasticity of the model. It captures how much internal migration reacts to local shocks. Above I have implicitly estimated this elasticity by estimating the response of the share of low-skilled workers to the Mexican inflow. See section III.F.

### C.   Production Function and Labor Market

The production function is given by a perfectly competitive representative firm producing according to

$$Q_s = B_s[\theta_s H_s^\rho + (1-\theta_s)L_s^\rho]^{1/\rho}, \tag{13}$$

where $L_s = N_s + \text{Mex}_s$ is low-skilled labor (Mexicans plus natives) and $H_s$ is high-skilled labor. The term $\theta_s$ represents the different weights that the

---

[43] This formulation is quite flexible to introducing different types of assumptions, and in particular, different degrees of "stickiness." For instance, it is easy to accommodate the idea that only a fraction $\bar{\eta}$ of the population within a location may be considering switching from a rental unit to an owned unit. I discuss this in more detail in app. C.5.

two factors have in the production function, while $\rho$ governs the elasticity of substitution between low- and high-skilled workers; $B_s$ is total factor productivity (TFP) in each state. Here $\theta_s$ are factor-augmenting technologies, as in Acemoglu and Autor (2011).[44] Firms do not take into account the future since they can adjust factor inputs instantaneously conditional on the factors that are available in location $s$.

The marginal product of low-skilled workers is

$$w_s = \tilde{p}_s (1 - \theta_s) B_s^{(\sigma-1)/\sigma} Q_s^{(1/\sigma)} L_s^{(-1/\sigma)}, \tag{14}$$

where $\sigma = 1/(1 - \rho)$ is the elasticity of substitution between high- and low-skilled workers and $\tilde{p}_s$ is the price of the good. This defines the labor demand curve. We obtain a similar equation for the high-skilled. Note that we can normalize $\tilde{p}_s = 1$. Free trade will guarantee that prices are the same across regions.[45] We can also obtain the relative demand for labor by dividing the demands for each factor type. From the relative demand for labor equation we obtain a simple estimating equation that allows us to recover $\sigma$ from immigrant shocks:[46]

$$\Delta \ln \frac{w_s}{h_s} = \Delta \ln \frac{1 - \theta_s}{\theta_s} - \frac{1}{\sigma} \Delta \frac{\text{Mex}_s}{N_s} - \frac{1}{\sigma} \Delta \ln \frac{N_s}{H_s}.$$

Note that this is the estimation equation introduced in section III.B and estimated in table 4.[47]

### D.   Housing Market

The housing market consists of rental units and owned units. There is an elastic supply of housing that creates a positive relationship between the price of housing market $r$ and the number of people living in market $r$ in each location, governed in equation (15) by parameter $\phi_s$. I also allow for an indirect effect of Mexican migration on housing prices ($\psi$ in the equation), which I already estimated using long-run comparisons in section IV.D. This indirect effect captures the fact that many Mexicans, as discussed above, work in construction and lower the costs of both maintenance and new building construction. The indirect effect also captures potential neighborhood spillovers. Some natives might like or dislike living

---

[44] See also Card and Lewis (2007), Lewis (2012), and more recently Clemens, Lewis, and Postel (2018).

[45] Costly trade would result in $\tilde{p}_s$ being specific to each location. In this alternative, $\tilde{p}_s$ would be a function of prices and workers in each location and transport costs.

[46] From the relative demand for labor, $\ln(w_s/h_s) = \ln[(1 - \theta_s)/\theta_s] - (1/\sigma)(\text{Mex}_s/N_s) - (1/\sigma) \ln(N_s/H_s)$, it is easy to derive the expression in changes shown below.

[47] See a longer discussion of this derivation in Borjas and Monras (2017) or in Dustmann, Frattini, and Preston (2013).

near Mexican immigrants, something that I capture in a reduced form fashion. Thus, I assume that

$$\ln p_{s(r)} = \chi_{s(r)} + \phi_s \ln N_{s(r)} + \psi \frac{\text{Mex}_s}{N_s}. \qquad (15)$$

This is a reduced form equation that can be microfounded (see Saiz 2010). The relationship between housing markets $r$ and $r'$ is given by the demand for housing, which arbitrages away potential differences in the price of housing in different markets. In this equation $\phi_s$ captures the housing supply elasticity and $\chi_{s(r)}$ is the productivity of location $s$ in producing housing of type $r$. Potentially, the housing supply elasticity is specific to each location: Saiz (2010) provides one estimate for each metropolitan area.

Note that with this specification, Mexican immigrants may affect differently the rental and ownership markets if Mexican arrivals disproportionately enter the rental market, as was discussed in table 1. To obtain an estimation equation close to what I used before we only need to take first differences from equation (15),

$$\Delta \ln \frac{p_{s(r)}}{p_{s(r')}} = \frac{\chi_{s(r)}}{\chi_{s(r')}} + \phi_s \Delta \ln N_{s(r)} \approx \chi + \phi_s \Delta \frac{\text{Mex}_s}{N_{s(r)}}, \qquad (16)$$

where I have assumed that all Mexican entrants into location $s$ enter the rental market $r$ and none enters the homeownership market $r'$. Note that this is very close to the equation estimated in section III.D.[48]

### E.   Equilibrium

The definition of the equilibrium has two parts. I start by defining the equilibrium in the short run. It satisfies three conditions. First, given the amenity levels, wages, and housing prices in each location, workers maximize their utility and decide where to live. Second, firms take as given the productivity $B_s$, the productivity of each factor $\theta_s$, and factor prices in each location to maximize profits. Finally, labor and housing markets clear in each location. This equates the supply and the demand for labor and housing and determines the wage and housing prices in every local labor market. More formally:

DEFINITION 1.   A short-run equilibrium is defined by the following decisions:

1. Given $\{A_{s(r)}^l, A_{s(r)}^h, w_s, h_s, p_{s(r)}\}_{\forall s \in S, r \in R}$, consumers maximize utility and location choice.

---

[48] The only difference is in the denominator, where I used the number of low-skilled workers instead of the number of renters in the local economy. The two are quantitatively similar. I have used the number of low-skilled workers in order to use the same specification that I use for the labor market.

2. Given $\{\theta_s, B_s, \sigma, w_s, h_s\}_{\forall s \in S}$, firms maximize profits.
3. Labor and housing markets clear in each $s \in S$ so that $\{w_s, h_s, p_{s(r)}\}$ are determined.

We can define the long-run equilibrium by adding another condition. In words, I say the economy is in a long-run equilibrium when bilateral flows of people of each skill type are equalized between regions.

DEFINITION 2. Given $\{\theta_s, B_s, \sigma, A_s^l, A_s^h\}_{s \in S}$, a long-run equilibrium is defined as a short-run equilibrium with constant population within locations and housing markets. That is,

$$N_{s,s'(r),t+1} = N_{s,s'(r),t} \text{ and } H_{s,s'(r),t+1} = H_{s,s'(r),t}, \qquad \forall \ s, s' \in S \text{ and } r \in R.$$

Note that in the definition above, Mexican low-skilled workers do not seem to appear anywhere. I distinguish between Mexicans and native or non-Mexican low-skilled workers only when Mexicans arrive in the United States unexpectedly. Once in the United States, Mexican workers behave like natives.

### F.   Properties of the Model

Only a share $\eta$ of workers consider relocating each period. This implies that, depending on the size of the local shock and the sensitivity of workers to local shocks, relocation may take some time to materialize. In the long run, in the absence of changes in the location-specific variables, the economy converges to a situation in which the marginal worker is indifferent across locations and where factor prices, net of amenities per capita, are equalized across locations. Initial conditions and labor flows determine the size of each location and the relative size of each skill in each location, determining the long-run equilibrium. In this long-run equilibrium there are still positive flows of internal migrants between the different regions. Net flows are, however, zero.

When the steady state receives an unexpected shock, the economy changes and reaches a new steady state. The speed of convergence crucially depends on the relative importance that workers give to idiosyncratic tastes versus working conditions, governed by the variance of $\epsilon$. If this variance is larger, then idiosyncratic tastes become more important, while if it is zero, only labor market conditions matter and adjustment takes place instantaneously.

The case of interest for the current paper is an unexpected increase in the size of the low-skilled labor force in location $s$ due to Mexican immigration. Furthermore, I assume that all Mexicans enter the rental market. In this case, the increase in $L_s(r)$ driven by the Mexican inflows instantaneously puts pressure on wages of low-skilled workers and rental prices. This makes location $s$ attractive to high-skilled workers, while it makes

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1250 of 4699 PageID #:  4415

it less attractive for low-skilled workers in *s*. Similarly it makes housing market *r* less attractive than *r′*. Thus, some high-skilled workers move toward *s* while some low-skilled workers move away from *s*, and some workers within and across locations move from rental units to home-owned units. We can summarize this process as follows:

PROPOSITION 2.  An (unexpected) increase in $L_{s(r)}$ in $s(r)$ leads to (a) an instantaneous decrease in $w_s$, (b) an instantaneous increase in $h_s$, (c) an instantaneous increase in the relative price of housing market *r*, (d) a re-location of low-skilled workers away from *s*, (e) a relocation of high-skilled workers toward *s*, (f) a relocation of households from housing market *r* to *r′*, (g) a gradual convergence of indirect utility across regions, and (h) a gradual convergence in the rental and homeownership markets.

*Proof.*   See appendix C.3.

## VI.   Estimation and Counterfactuals

To bring this model to the data we need essentially two sets of moments. First, to obtain dynamics that resemble what we observe in the data we need to estimate the key elasticities governing the response of the labor and housing markets to unexpected inflows of workers. This is precisely the exercise I did in the first part of the paper using the unexpectedly large inflow of Mexicans following the peso crisis.

Second, in order to explain the levels of the various labor and housing market variables we need estimates of the fundamentals in the economy. These are essentially the amenity levels (which I allow to be location, skill, and housing market specific), the housing market constants (in some locations building may be more expensive or difficult), the under-lying productivity in each location, and the equilibrium internal migration rate. To estimate these various fundamentals, I assume that the economy is in long-run spatial equilibrium in 1990 and use the structure of the model to exactly explain the data in that year.

Combining the baseline fundamentals and the key elasticities with the Mexican flows over the 1990s I can then use the model to predict wage, housing price, and internal migration dynamics throughout the decade.

### A.   Estimates of the Fundamentals in the Economy

In this subsection I explain how I bring the model to match 1990 US census data, using as before the equations for low-skilled workers. Similar equations apply for the high-skilled.[49] The first task is to obtain the initial

[49]  It is not important whether I match 1990 US census data or 1980 US census data since there is a tight relationship in the cross section between wage and population levels of the various skill groups, hence leading to similar estimates of the productivity and amenity parameters.

conditions of the dynamic system defined by equations (11) and (12). For this, all I need to do is to impose that $V_{t+1,s(r)} = V_{t,s(r)}$ and $N_{t+1,s(r)} = N_{t,s(r)}$. This is as follows:

$$N_{s(r)} = \eta \left(\frac{V_s}{V}\right)^{1/\lambda} \left(\frac{V_{s(r)}}{V_s}\right)^{1/\gamma} N + (1-\eta) \left(\frac{V_{s(r)}}{V_s}\right)^{1/\gamma} N_s, \qquad (17)$$

$$V_{s(r)} = \left(\frac{A_{s(r)} w_s}{p_{s(r)}^\sigma}\right) V^{\beta\eta} V_s^{\beta(1-\eta)}, \qquad (18)$$

where $V = (\Sigma_j V_j^{1/\lambda})^\lambda$ and $V_s = (\Sigma_r V_{s(r)}^{1/\gamma})^\gamma$.

From the population dynamics equation we obtain a number of interesting relationships between location valuations and populations that make the model particularly tractable. First, it is easy to show that $(N_s/N) = (V_s/V)^{1/\lambda}$.[50] This relationship simply states that the fraction of workers in a location reflects the value of living in that location relative to the value of living in other locations, with an elasticity $\lambda$ that is governed by the response of internal migration to local shocks, previously estimated.

It is also easy to show that in the long run, $N_{s(r)}/N = (V_s/V)^{1/\lambda}$ $(V_{s(r)}/V_s)^{1/\gamma}$; that is, the share of workers living in housing market $r$ in location $s$ is driven by the share of value of $s$ relative to the rest of the economy times the share of value of housing market type $r$ in the location $s$, with an elasticity governed by $\gamma$, which is the response of housing prices in market $r$ relative to market $r'$, also estimated before. From these conditions we can back out the amenity levels that are given by the following expression, as shown in appendix C.4:

$$A_{s(r)} = A_{s'(r')} \left(\frac{N_s}{N_{s'}}\right)^{\lambda[1-\beta(1-\eta)]-\gamma} \left(\frac{N_{s(r)}}{N_{s'(r')}}\right)^\gamma \frac{w_{s'}}{w_s} \left(\frac{p_{s(r)}}{p_{s'(r')}}\right)^\alpha. \qquad (19)$$

Note that with equation (19) we can express all the amenity levels across all locations and housing market types simply in terms of amenities in one particular housing market in one location, that is, for example, in terms of $A_{1(1)}$, which we can normalize to 1. Thus, from the long-run equilibrium we can back out the level of amenities that exactly rationalizes the distribution of prices and workers observed in the data. Recent literature usually refers to this exercise as inverting the model (Redding and Rossi-Hansberg 2018).

In order to obtain the housing market prices and wages in counterfactual scenarios we also need all the technology parameters which in the

---

[50] Aggregating $N_{s(r)}$ over $r$, we have $N_s = \eta \Sigma_r (V_s/V)^{1/\lambda} (V_{s(r)}/V_s)^{1/\gamma} N + (1-\eta) \Sigma_r (V_{s(r)}/V_s)^{1/\gamma} N_s = \eta (V_s/V)^{1/\lambda} N + (1-\eta) N_s$.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1252 of 4699 PageID #:  4417

model were presented as $B_s$, $\theta_s$, $\chi_{s(r)}$, and $\phi_s$. Here $\theta_s$ is the Cobb-Douglas weight of low-skilled labor prevailing in location $s$. This is obtained from the relative wage bill in the location.[51] Given $\theta_s$, it is easy to obtain $B_s$, which is the level of productivity or TFP in location $s$, from comparing the total output produced given the production function without the $B_s$ term to the total wage bill, under the assumption that the representative firm in location $s$ has 0 profits.[52]

In order to obtain $\chi_{s(r)}$ and $\phi_s$, I combine Saiz (2010) estimates of housing supply elasticities with the fact that I observe population levels and prices in each housing market type $r$. Using this information in equation (15) allows me to recover $\chi_{s(r)}$, if I know $\psi$. To estimate $\psi$ I use the long-run effect of Mexican migration on housing prices estimated in section IV.D.

Given these initial conditions, it is also easy to use the steady-state conditions to obtain the final distribution of people across space and housing markets given the fundamentals and the total number of workers in the economy. Computationally, this is useful in order to check that the dynamics bring the economy from the initial conditions to the new long-run steady state.

Note that with these estimates, which are the initial conditions of the dynamic system, it is easy to characterize the dynamics using equations (11) and (12). This fully determines the evolution of the economy. Moreover, these estimates deliver a number of sensible cross-location relationships.[53]

### B. Key Elasticities: Labor and Housing Markets

There are three key labor market moments, which I implicitly estimated using the unexpected immigrant shock. In this subsection I just make more explicit how we can recover the relevant model estimates from the IV regressions presented before.

In order to obtain an estimate of $\sigma$ we can use the relative demand for labor. From it, as I explained above in section V.C, we can easily derive the following equation:

$$\Delta \ln \frac{w_s}{h_s} = \Delta \ln \frac{1 - \theta_s}{\theta_s} - \frac{1}{\sigma} \Delta \frac{\text{Mex}_s}{N_s} - \frac{1}{\sigma} \Delta \ln \frac{N_s}{H_s}.$$

This is the estimation equation used in table 4, where I obtained an estimate of $\sigma \approx 1$.

---

[51] More specifically, $\theta_s = 1/(1 + w_s L_{rs}/h_s H_s)$.

[52] More specifically, $B_s = [\theta_s H_s^\rho + (1 - \theta_s)L_s^\rho]^{1/\rho}/(w_s L_{rs} + h_s H_s)$.

[53] In figs. D.8 and D.9, I show that there is a strong correlation between the share of high-skilled workers in a location and the implied $\theta$ from the estimation. Similarly, I show that the wage of both high- and low-skilled workers is strongly related with the estimated underlying productivity.

The second key elasticity is the internal migration response to local shocks. Obtaining λ from the instrumental variable estimates previously shown is less straightforward than for wages. This is because I follow the literature in estimating mobility as a response to Mexican inflows, instead of estimating it relative to wage changes, or location value changes, which is what the model requires. It is, however, possible to recover λ from the estimates presented already. For this we start from the fact that

$$\partial(\ln N_s)/\partial \ln w_s \approx \frac{1}{1 - \beta(1 - \eta)} \frac{1}{\lambda} \frac{I_s}{N_s}.$$

Instead of estimating this equation I estimated the more common in the literature $\partial[L_s/(L_s + H_s)]/\partial[\text{Mex}_s/(L_s + H_s)]$, which gives an estimate of how many low-skilled workers relocate per Mexican arrival; that is, $\partial L_s/\partial \text{Mex}_s \approx 0.5$ (see col. 10 of table 8).[54] That is, an increase of 1% in the supply of labor due to low-skilled Mexican migration decreases wages by 0.7% (see col. 7 in table 3) and reduces labor in the following year by at least 0.5% of the workers.

So,

$$0.7 \times 0.5 = 0.35 \approx \frac{1}{1 - \beta(1 - \eta)} \frac{1}{\lambda} \frac{I_s}{N_s}.$$

In order to obtain λ we need to assume particular parameters for $\beta$ and $\eta$. I take $\beta$ from the literature and I assume, following Kennan and Walker (2011), that $\beta = 0.95$. I set $\eta = 0.05$, which matches the average internal migration rate (in equilibrium). Thus, $\hat{\lambda} = 1/[1 - \hat{\beta}(1 - \hat{\eta})] \times 0.05 \times (1/0.35) \approx 1/[1 - 0.95 \times (1 - 0.05)] \times 0.05 \times (1/0.35) \approx 1.47$.

Note that I also estimated the response of rental prices relative to homeowned units. This estimate is between 0.5 and 0.6. This is the average housing supply elasticity across locations. In the model, instead of using this estimate, I prefer to use the estimates in Saiz (2010) since these allow for heterogeneity in the response of housing prices. The fact that the average of the housing supply elasticities estimated by Saiz (2010) is very close to this 0.5–0.6 estimate implies that results do not change substantially if we use the latter instead of the former.

### C. Counterfactual 1: Wage Dynamics, Immigration Shocks, and Local Technology Adoption

While right after an immigration shock wage differences across space might be informative about the causal effect of immigration on wages,

---

[54] I take the most conservative estimate. At the state level, the relocation response is 0.7 workers per Mexican arrival in the preceding period.

the shock then spreads to the rest of the economy leaving little spatial differences. The model introduced can help us think about what the longer-run effects of immigration might be in a (spatial) general equilibrium framework.

To highlight the role of local technology adoption in generating wage dynamics, I present the results under two extreme scenarios. On the one hand, I show what happens according to the model if nothing else other than relocation accommodates Mexican immigration. As emphasized in Card and Lewis (2007), technology could have adapted to absorb changes in factor endowments, something ruled out here by keeping $\theta_s$ constant. In the model, this implies that positive Mexican inflows during the 1990s directly translate into decreases in the wages of low-skilled workers in every state during this decade. An alternative assumption is that only unexpectedly large immigrant inflows matter. This is equivalent to assuming that "normal" Mexican inflows are absorbed through changes in the technology (i.e., changes in $\theta_s$).[55]

In this quantitative exercise, I assign the aggregate yearly inflows reported in figure 1 using the distribution of Mexicans across states in 1980 US census data, starting from a long-run equilibrium in the model calibrated to 1990. To show the results, I use the comparison between California, a high Mexican immigration state, and New York, a lower Mexican immigration state, to provide intuition, something I also did with the raw data shown in figure 2. Figure 5 shows the wage evolutions with and without the shock induced by the peso crisis in late 1994 under the assumption that local technologies are fixed. For this I assume that the flows of Mexicans in 1995 and 1996 would have remained at the average inflows of the decade excluding these 2 years. The series showing the wage dynamics with the actual flows serve, also, as check of the estimated model, since they are generated only from the fundamentals in the economy estimated using 1990 data and the response of local economies to shocks estimated from the "natural experiment" and examined in the first part of the paper, and hence, are not a direct target of the estimation.

Figure 5A shows how the wages of low-skilled workers decrease over the decade. They especially do so in high-immigration states like California, but internal migration ensures that wage decreases spill over to other states. In the long run, immigration affects all locations equally. Wage decreases of low-skilled workers vary from 10% in California to 2% in New York or even slightly lower in other states.

---

[55] I also investigate the relative importance of local technology adoption and internal migration in Monras (2019) using variation from the Mariel boatlift. As I explained above, I abstract here from the potential effect of immigration on the Hicks neutral technology parameter $B_s$.



Fig. 5.—Counterfactual wage evolution. This figure shows the evolution of wages in the model with the actual aggregate inflows of Mexicans over the 1990s distributed according to the distribution of Mexicans across locations in the year 1980 and under the alternative that the peso crisis had not occurred. This graph shows the series under the assumption that technologies are fixed (*left*) or allowing local technologies to adapt to expected flows of Mexican lowskilled workers (*right*). The top graphs show the series for California, a high Mexican immigration state, while the bottom graphs show the series for New York, a comparable state with lower levels of Mexican immigration.

Figure 5*B* shows the series under the assumption that local technologies adapt to expected Mexican inflows, measured as average flows over the decade excluding 1995–1997. In other words, in this case only unexpectedly large inflows matter for prices. This is in line with the absorption mechanisms emphasized in Lewis (2012). The figure shows that the unexpected large inflow of Mexican workers starting in 1995 decreased wages by at least 3% in California and that wages started to recover in 1997. The drop is slightly smaller than in the observed data due to the fact that I calibrated the model to a slightly higher elasticity of substitution, but it captures very tightly the wage dynamics.

Overall, figures 5*A* and 5*B* give two main insights. First, absent the peso crisis, wages across US states would have followed their preshock (location-specific linear) trends, irrespective of the evolution of local technologies. Unexpected Mexican inflows generate deviations from this trend. Second, by comparing figures 5*A* and 5*B* we observe the important role of local technologies in shaping local wage trends. If local technologies do no adapt, then the wage trends of low-skilled workers generated by immigration are necessarily steeper and the overall impact of immigration on the national labor market stronger. Instead, if technologies adapt, they attenuate the differential trend in the evolution of native low-skilled wages in high- relative to low-immigrant locations.

The role of local technologies over the longer run can be grasped by looking back at the role of internal migration over the entire decade; see section IV.E. The fact that initially high Mexican immigration states gain low-skilled workers by the end of the decade suggests that local technologies adapt to changes in factor endowments and so that the scenario shown in figure 5*B* is closer to the data. Even in this case, internal migration plays a role by reacting to unexpectedly large inflows.

### D.   Counterfactual 2: Migration with a Restrictive Policy in Arizona

In 2010, Arizona tried to adopt a law, the most controversial aspect of which was to allow officials to ask for residence permits if they had some suspicion that particular individuals were not legal residents. Given that a large fraction of Mexican immigrants in the United States are undocumented, to some extent this is a policy that greatly reduces the incentives of Mexicans to move to Arizona.

Motivated by this policy, in this section I try to answer what would have happened in Arizona if the state had had a policy that had effectively stopped Mexican immigration directly entering the state during the 1990s. The link between the different states through internal migration suggests that in the long run a single state can do little to avoid being affected by immigration. In this section, I investigate what would be the

short-run gains of such controversial policies. I suggest in what follows that these policies are likely to do very little to "protect" local low-skilled workers.

As in the previous counterfactuals, I consider two alternative scenarios. In the first case I assume that technologies are fixed, while in the second case local technologies absorb expected immigrant inflows. I study the Mexican inflows of the 1990s, and then I assume that they stop in 2000 to see the long-run consequences. Figure 6 shows these different wage dynamics. The exercises show that in the short run, in the highest inflow years, Arizona's low-skilled wage was maybe 2% lower than what it would have been with a more restrictive immigration law. Wages were back to equilibrium soon after 2000. Whether technologies adapt to usual inflows of Mexican immigrants or not matters only to the extent that fixed technologies result in a lower level of low-skilled wages in every state, but it does not matter when making cross-location comparisons.

Overall this counterfactual exercise suggests limited benefits from a unilateral law in one particular state to limit the number of immigrants in that state.[56] Links between the labor markets in different locations in the United States imply that policies that deal with immigration at the local level are likely to have a very small impact.

### E.   Counterfactual 3: The Role of the Housing Market

In the final exercise I investigate the role of housing markets in the adjustment process. To do so, I present two different exercises. In the first one, I compare the predictions of the model presented before to the ones of a model where housing markets do not play any role. This highlights the role of housing markets in dissipating local shocks. The second exercise studies how the possibility to choose from rental and owned units generates dynamics in the housing market that are in line with the evidence presented before in sections III.D and IV.D.

For the first exercise I use the model introduced above and I compare it to the evolution of variables in a model where housing does not play any role, that is, in a situation where $\alpha$ is set to 0. In this case, we can look at the evolution of the value of living in a location with and without the immigration shock when housing markets play a role and when they do not. This exercise highlights the importance of housing markets when analyzing local shocks.

Figure 7 shows the evolution of the value of renting a unit in California and in New York for low-skilled individuals. It is easy to see that California and New York are, in some sense, the mirror image of each other,

---

[56] A recent paper (Watson 2013) analyzes how immigrants respond to these types of policies by relocating within the United States.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1258 of 4699 PageID #:  4423



Fig. 6.—Counterfactual wage evolution with and without restrictive (restr.) immigration law in Arizona. The figure shows the evolution of wages in Arizona with actual inflows of Mexicans and under the alternative that Arizona had not received any Mexican immigrants. The top graph assumes fixed technologies. The bottom graph assumes that local technologies adapt to expected inflows of Mexican workers.

given that California is a high Mexican immigration state while New York is a low Mexican immigration state. In the model, the unexpected arrival of Mexican immigrants during the peso crisis leads to a decrease in the value of living in California for low-skilled workers, which is particularly strong in the renting market, while it leads to a relative increase in the value of living in New York. The role of housing in the model is clear when we compare the darker gray and lighter gray lines. Housing is roughly 25% of total expenditure. This means that if immigration affected wages and housing prices in the same way, omitting the housing market would underestimate the effect of immigration by this 25%. The elasticities of wages and housing prices to immigration shocks need not be the same, but the 25% is a good reference point to grasp the importance of the housing sector.

The second exercise sheds light on the specific role of separating the housing market between rental units and homeowned units. The fact that upon arrival Mexican immigrants likely enter the rental market means that they exert more pressure in this market within high-immigrant locations, and hence the effect on natives' real wages is different across locations and between renters and homeowners within locations.

001251



Fig. 7.—Evolution of the value of living in selected locations with and without housing sector. The top graph shows the evolution of the value of living in a rented unit in California for low-skilled workers with and without the unexpected arrival of Mexican immigrants following the Mexican peso shock. In lighter gray, the graph shows the same evolution when the housing market is absent from the model. The bottom graph shows the evolution of the value of living in a rented unit in New York.

Given this, workers in the economy reoptimize and decide where to live in the following periods both within and across cities. The fact that workers can switch housing markets within cities necessarily implies that housing dynamics help the economy to return faster to the equilibrium.

We see the dynamics generated by the model in figure 8. The top graph shows the relative gap in rental prices relative to selling prices in California predicted by the model with and without the Mexican immigrant shock of 1995. The relative gap fluctuates around 1 when there is no unexpected arrival of immigrants. This can be seen both in the solid line before 1995 and in the dashed line throughout the decade. When more Mexicans than expected arrived in 1995, the gap in rental prices increases, matching the evidence presented in table 6 and figure 3 and discussed in sections III.D and III.E. This increase, however, dissipates fast, reflecting both the within-location mobility in the housing market and the fact that new arrivals in the location disproportionately enter the (relatively) cheaper housing market.

The bottom graph of figure 8 shows the evolution of the level of rental prices. It is interesting to see that the constant arrival of Mexicans in



Fig. 8.—Evolution of rental prices with and without the Mexican immigrant shock. The top graph shows the evolution of the gap between rental prices and selling prices in California with and without immigrants from the Mexican peso shock, normalized to 1990 levels, predicted by the model. The bottom graph shows the evolution in the level of rental prices under the same counterfactuals.

California decreases the overall price of housing, as we see in the data; see table 10, which is discussed in section IV.D. At the same time, when we compare the evolution of the dashed and solid lines we see that rental prices increase with the unexpected arrival of Mexicans.

These dynamics show the two roles that Mexicans play in the housing market. On one hand, they consume housing, mainly rentals, putting pressure on the rental market. On the other hand, they decrease construction costs, creating a downward longer-run trend in housing prices in high- relative to low-immigrant locations, something that the model captures well and is very much in line with the data.

## VII.  Conclusion

Existing literature on the causal effect of immigration on native wages seems to find contradictory evidence. On one hand, evidence presented in various papers by Card and some other authors would suggest that immigration has a small effect on native wages. On the other hand, Borjas (2003) and some earlier papers question the evidence coming from

comparisons of local labor markets because they argue that the US labor market is well integrated. When abstracting from geographic considerations, Borjas (2003) concludes that the effect of immigration on native workers is significantly larger than what we would conclude from Card (2009) or Ottaviano and Peri (2012).

The controversy expands to housing markets. Some papers, such as Saiz (2007), suggest that immigration puts pressure on housing prices, as it expands the demand for housing, which is not met by a similar expansion in the supply. However, other papers looking at more disaggregate data (see Saiz and Wachter 2011; Sa 2015) also report that immigrant inflows lead to a decrease in housing prices. In both cases, however, it is not clear how the inflow of low-skilled workers, entering disproportionately in the construction sector, affects housing prices, in both the short and long runs.

In this paper, I use the Mexican crisis of 1995 as a novel push factor that brought more Mexicans than expected to historically high immigration states to document the causal effect of immigration on native wages and housing markets. Using this natural experiment I show that a 1% immigration-induced supply shock decreases wages by at least 0.7% on impact. This is substantially higher than was reported either by Card (2009) or by Borjas (2003). Similarly, Mexican immigrants, who disproportionately enter the rental market for housing, increase the rental gap. It is important to keep in mind that these are short-run effects.

Labor relocation as a response to unexpected wage decreases ensures that immigration shocks spread across US regions. When the relative inflow of Mexicans increases by 1 percentage point, the share of low-skilled workers increases almost by 1% in the first year. This increase reverses in subsequent years. Thus, labor relocation dissipates the shock across space, helping to explain why low-skilled wage growth between 1990 and 2000 was only slightly lower in initially high-immigration locations.

At the same time, I have shown evidence that when abstracting from geographic considerations such as in Borjas (2003), age cohorts entering the labor markets in high-immigration years had significantly lower wage growth in the decade of the 1990s, which is in line with Oreopoulos, von Wachter, and Heisz (2012). In other words, this paper documents how local shocks become national, an important step absent in Borjas (2003), and documents the causal effect of immigration in the short and long runs.

In the second part of the paper I build a structural dynamic spatial equilibrium to study the general equilibrium, the transition dynamics, and a number of policy-relevant counterfactuals. The first counterfactual that I analyze is the wage evolution that would have occurred without the immigration shock. This allows me to evaluate over longer time horizons the effect of immigration on low-skilled wages in every local labor market, taking into account internal relocation.

The second policy-relevant experiment studied in the paper analyzes how effective a policy stopping Mexican migration in a particular state would be. The main insight from this exercise is to show how rapid internal relocation spreads immigration shocks and, thus, how the effects of such policies are likely to be limited. This highlights, again, the importance of taking into account the general equilibrium effects when thinking about immigration policies.

The third counterfactual studies the role of housing markets in absorbing immigrant shocks. Mexican low-skilled immigrants play two roles in this case. On one hand, they put pressure on the market for rentals. Upon arrival as many as 82% of them enter this market, compared to around 30% of low-skilled natives. On the other hand, many of them enter the construction sector, decreasing costs, and generating a downward trend in housing prices and rents in high- relative to low-immigrant locations.

## References

Acemoglu, D., and D. Autor. 2011. "Skills, Tasks, and Technologies: Implications for Employment and Earnings." In *Handbook of Labor Economics*, vol. 4, edited by Orley Ashenfelter and David E. Card. Amsterdam: Elsevier.

Adao, R., M. Kolesar, and E. Morales. 2019. "Shift-Share Designs: Theory and Inference." *Q.J.E.* 134 (4): 1949–2010.

Ahlfeldt, G., S. Redding, D. Sturm, and N. Wolf. 2015. "The Economics of Density: Evidence from the Berlin Wall." *Econometrica* 83 (6): 2127–89.

Albert, C., and J. Monras. 2019. "Immigration and Spatial Equilibrium: The Role of Expenditures in the Country of Origin." Working paper, Center Growth and Opportunity, Utah State Univ.

Allen, T., and C. Arkolakis. 2014. "Trade and the Topography of the Spatial Economy." *Q.J.E.* 129 (3): 1085–140.

Allen, T., and D. Donaldson. 2018. "Geography and Path Dependence." Working paper, Dept. Econ., Stanford Univ.

Altonji, J., and D. Card. 1991. "The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives." In *Immigration, Trade, and the Labor Market*, edited by John Abowd and Richard Freeman. Chicago: Univ. Chicago Press.

Angrist, J., and A. Kugler. 2003. "Protective or Counter-Productive? European Labor Market Institutions and the Effect of Immigrants on EU Natives." *Econ. J.* 113 (June): F302–31.

Angrist, J., and S. Pischke. 2009. *Mostly Harmless Econometrics: An Empiricist's Companion*. Princeton, NJ: Princeton Univ. Press.

Autor, D., D. Dorn, and D. Hanson. 2013a. "The China Syndrome: Local Labor Market Effects of Import Competition in the United States." *A.E.R.* 103 (6): 2121–68.

———. 2013b. "The Geography of Trade and Technology Shocks in the United States." *A.E.R.* 103 (3): 220–5.

Bartik, T. J. 1991. *Who Benefits from State and Local Economic Development Policies?* Kalamazoo, MI: Upjohn Inst. Employment Res.

Beaudry, P., E. Lewis, and M. Doms. 2010. "Should the PC Be Considered a Technological Revolution? Evidence from US Metropolitan Areas." *J.P.E.* 118 (5): 988–1036.

Bertrand, M., E. Duflo, and S. Mullainathan. 2004. "How Much Should We Trust Differences-In-Differences Estimates?" *Q. J.E.* 119 (1): 249–75.

Blanchard, O., and L. Katz. 1992. "Regional Evolutions." *Brookings Papers Econ. Activity* 1992 (1): 1–75.

Bogin, A., W. M. Doerner, and W. D. Larson. 2016. "Local House Price Dynamics: New Indices and Stylized Facts." FHFA Working Paper no. 16-01, Federal Housing Finance Agency, Washington, DC.

Borjas, G. 2003. "The Labor Demand Curve Is Downward Sloping: Reexamining the Impact of Immigration on the Labor Market." *Q. J.E.* 118 (4): 1335–74.

———. 2017. "The Wage Impact of the Marielitos: A Reappraisal." *Indus. and Labor Relations Rev.* 70 (5): 1077–110.

Borjas, G., R. Freeman, and L. Katz. 1997. "How Much Do Immigration and Trade Affect Labor Market Outcomes?" *Brookings Papers Econ. Activity* 1997 (1): 1–67.

Borjas, G., and L. Katz. 2007. "The Evolution of the Mexican Born Workforce in the United States." In *Mexican Immigration to the United States*, edited by G. Borjas. Chicago: Univ. Chicago Press.

Borjas, G., and J. Monras. 2017. "The Labor Market Consequences of Refugee Supply Shocks." *Econ. Policy* 32 (91): 361–413.

Borusyak, K., P. Hull, and X. Jaravel. 2018. "Quasi-Experimental Shift-Share Designs." Working Paper no. 24997 (September), NBER, Cambridge, MA.

Boustan, L. P. 2010. "Was Postwar Suburbanization 'White Flight'? Evidence from the Black Migration." *Q. J.E.* 125 (1): 417–43.

Caliendo, L., M. Dvorkin, and F. Parro. 2019. "Trade and Labor Market Dynamics: General Equilibrium Analysis of the China Trade Shock." *Econometrica* 87 (3): 741–835.

Caliendo, L., F. Parro, E. Rossi-Hansberg, and P-D. Sartre. 2018. "The Impact of Regional and Sectoral Productivity Changes on the U.S. Economy." *Rev. Econ. Studies* 85 (4): 2042–96.

Calvo, G., and E. Mendoza. 1996. "Petty Crime and Cruel Punishment: Lessons from the Mexican Debacle." *A.E.R.* 86 (2): 170–5.

Card, D. 1990. "The Impact of the Mariel Boatlift on the Miami Labor Market." *Indus. and Labor Relations Rev.* 43 (2): 245–57.

———. 2001. "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration." *J. Labor Econ.* 19 (1): 22–64.

———. 2005. "Is the New Immigration Really So Bad?" *Econ. J.* 115 (November): F300–23.

———. 2009. "Immigration and Inequality." *A.E.R.* 99 (2): 1–21.

Card, D., and J. DiNardo. 2000. "Do Immigrant Inflows Lead to Native Outflows?" *A.E.R.* 90 (2): 360-7.

Card, D., and E. Lewis. 2007. "The Diffusion of Mexican Immigrants during the 1990s: Explanations and Impacts." *Mexican Immigration to the United States*, edited by George J. Borjas. Chicago: Univ. Chicago Press.

Clemens, M., and J. Hunt. 2018. "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results." *Indus. and Labor Relations Rev.* 72 (4): 818–57.

Clemens, M., E. Lewis, and H. Postel. 2018. "Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican Bracero Exclusion." *A.E.R.* 108 (6): 1468–87.

Cohen-Goldner, S., and D. Paserman. 2011. "The Dynamic Impact of Immigration on Natives' Labor Market Outcomes: Evidence from Israel." *European Econ. Rev.* 55 (8): 1027–45.

Combes, P-P., and L. Gobillon. 2015. "The Empirics of Agglomeration Econo-
  mies." In *Handbook of Regional and Urban Economics*, vol. 5, edited by Gilles
  Duranton, 247–348. Amsterdam: North-Holland.

Davis, M., and F. Ortalo-Magne. 2011. "Household Expenditures, Wages, Rents."
  *Rev. Econ. Dynamics* 14:248–61.

Diamond, R. 2015. "The Determinants and Welfare Implications of US Workers'
  Diverging Location Choices by Skill: 1980–2000." *A.E.R.* 106 (3): 479–524.

Dustmann, C., T. Frattini, and I. Preston. 2013. "The Effect of Immigration along
  the Distribution of Wages." *Rev. Econ. Studies* 80 (1): 145–73.

Dustmann, C., U. Schonberg, and J. Stuhler. 2017. "Labor Supply Shocks and the
  Dynamics of Local Wages and Employment." *Q.J.E.* 132 (1): 435–83.

Foged, M., and G. Peri. 2016. "Immigrants and Native Workers: New Analysis Us-
  ing Longitudinal Employer-Employee Data." *American Econ. J.: Appl. Econ.* 8
  (2):1–34.

Friedberg, R. 2001. "The Impact of Mass Migration on the Israeli Labor Market."
  *Q.J.E.* 116 (4): 1373–408.

Glaeser, E. 2008. *Cities, Agglomeration, and Spatial Equilibrium.* Oxford: Oxford
  Univ. Press.

Glitz, A. 2012. "The Labor Market Impact of Immigration: A Quasi-Experiment
  Exploiting Immigrant Location Rules in Germany." *J. Labor Econ.* 30 (1): 175–
  213.

Goldsmith-Pinkham, P., I. Sorkin, and H. Swift. 2018. "Bartik Instruments: What,
  When, Why, and How." Working Paper no. 24408 (March), NBER, Cambridge,
  MA.

Gyourko, J., and A. Saiz. 2006. "Construction Costs and the Supply of Housing
  Structure." *J. Regional Sci.* 46 (4): 661–80.

Hanson, G. 2006. "Illegal Migration from Mexico to the United States." *J. Econ.
  Literature* 44 (4): 869–924.

Hanson, G., and A. Spilimbergo. 1999. "Illegal Migration, Border Enforcement,
  and Relative Wages: Evidence from Apprehensions at US-Mexico Border."
  *A.E.R.* 89 (5): 1337–57.

Hanushek, E., and J. Quigley. 1980. "What Is the Price Elasticity of Housing De-
  mand?" *Rev. Econ. and Statis.* 62 (3): 449–54.

Hornbeck, R. 2012. "The Enduring Impact of the American Dust Bowl: Short-
  and Long-Run Adjustments to Environmental Catastrophe." *A.E.R.* 102 (4):
  1477–507.

Hornbeck, R., and S. Naidu. 2014. "When the Levee Breaks: Black Migration and
  Economic Development in the American South." *A.E.R.* 104 (3): 963–90.

Hunt, J. 1992. "The Impact of the 1962 Repatriates from Algeria on the French
  Labor Market." *Indus. and Labor Relations Rev.* 45 (3): 556–72.

Imbert, C., and J. Papp. 2020. "Short-Term Migration, Rural Public Works, and
  Urban Labor Markets: Evidence from India." *J. European Econ. Assoc.* 18 (2):
  927–63.

Jaeger, D., J. Ruist, and J. Stuhler. 2018. "Shift-Share Instruments and the Impact
  of Immigration." Working Paper no. 24285 (February), NBER, Cambridge,
  MA.

Katz, L., and K. Murphy. 1992. "Changes in Relative Wages, 1963–1987: Supply
  and Demand Factors." *Q.J.E.* 107 (1): 35–78.

Kennan, J., and J. Walker. 2011. "The Effect of Expected Income on Individual
  Migration Decisions." *Econometrica* 79 (1): 211–51.

Lewis, E. 2012. "Immigration, Skill Mix, and Capital-Skill Complementarity."
  *Q.J.E.* 126 (1):1029–69.

Llull, J. 2018. "The Effect of Immigration on Wages: Exploiting Exogenous Variation at the National Level." *J. Human Resources* 53 (3): 608–62.

MacKinnon, J., and M. Webb. 2017. "Wild Bootstrap Inference for Wildly Different Cluster Sizes." *J. Appl. Econometrics* 32 (2): 233–54.

Mayo, S. K. 1981. "Theory and Estimation in the Economics of Housing Demand." *J. Urban Econ.* 10 (1): 95–116.

Monras, J. 2015. "Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisis." IZA Discussion Paper no. 8924, Inst. Study Labor, Bonn.

———. 2018. "Economic Shocks and Internal Migration." CEPR Discussion Paper no. 12977, Centre Econ. Policy Res., London.

———. 2019. "Immigration, Internal Migration, and Technology Adoption." CEPR Discussion Paper no. 13998, Centre Econ. Policy Res., London.

Monte, F., F. Redding, and E. Rossi-Hansberg. 2018. "Commuting, Migration, and Local Employment Elasticities." *A.E.R.* 108 (12): 3855–90.

Moretti, E. 2011. "Local Labor Markets." In *Handbook of Labor Economics*, vol. 3, edited by Orley Ashenfelter and David E. Card, 1238-313. Amsterdam: Elsevier.

Morten, M., and G. Bryan. 2019. "The Aggregate Productivity Effects of Internal Migration: Evidence from Indonesia." *J.P.E.* 127 (5): 2229–68.

Nagy, D. 2018. "City Location and Economic Development." Working paper, Dept. Econ., Princeton Univ.

Nekoei, A. 2013. "Immigrants' Labor Supply and Exchange Rate Volatility." *American Econ. J.: Appl. Econ.* 5 (4): 144–64.

Notowidigdo, M. 2020. "The Incidence of Local Labor Demand Shocks." *J. Labor Econ.* 38 (3): 687–725.

Oreopoulos, P., T. von Wachter, and A. Heisz. 2012. "Short- and Long-Term Career Effects of Graduating in a Recession." *Am. Econ. J.: Appl. Econ.* 4 (1): 1–29.

Ottaviano, G., and G. Peri. 2012. "Rethinking the Effect of Immigration on Wages." *J. European Econ. Assoc.* 10 (1): 152–97.

Passel, J. 2005. "Estimates of the Size and Characteristics of the Undocumented Population." Hispanic Trends, Pew Res. Center, Washington, DC.

Passel, J., D. Cohn, and A. Gonzalez-Barrera. 2012. "Net Migration from Mexico Falls to Zero and Perhaps Less." Hispanic Trends, Pew Res. Center, Washingon, DC.

Peri, G., and C. Sparber. 2011. "Assessing Inherent Model Bias: An Application to Native Displacement in Response to Immigration." *J. Urban Econ.* 69 (1): 82–91.

Peri, G., and V. Yasenov. 2019. "The Labor Market Effects of a Refugee Wave: Applying the Synthetic Control Method to the Mariel Boatlift." *J. Human Resources* 54 (2): 267–309.

Redding, S., and E. Rossi-Hansberg. 2018. "Quantitative Spatial Economics." *Ann. Rev. Econ.* 9:21–58.

Roback, J. 1982. "Wages, Rents, and the Quality of Life." *J.P.E.* 90 (6): 1257–78.

Rosen, S. 1974. "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition." *J.P.E.* 82:34–55.

Ruggles, S., M. Sobek, T. Alexander, et al. 2016. "Integrated Public Use Microdata Series, Version 4.0." Machine-readable database, Minnesota Population Center, Minneapolis.

Sa, F. 2015. "Immigration and Housing Prices in the UK." *Econ. J.* 125:1393–1424.

Saiz, A. 2003. "Room in the Kitchen for the Melting Pot: Immigration and Rental Prices." *Rev. Econ. and Statis.* 85 (3): 502–21.

———. 2007. "Immigration and Housing Rents in American Cities." *J. Urban Econ.* 61 (2): 345–71.

001258

———. 2010. "The Geographic Determinants of Housing Supply." *Q.J.E.* 125 (3): 1253–96.

Saiz, A., and S. Wachter. 2011. "Immigration and the Neighborhood." *American Econ. J.: Econ. Policy* 3 (2): 169–88.

Topel, R. 1986. "Local Labor Markets." *J.P.E.* 94 (3): S111–43.

Watson, M. 2013. "Enforcement and Immigrant Location Choice." Working Paper no. 19626, NBER, Cambridge, MA.

Wozniak, A., and T. Murray. 2012. "Timing Is Everything: Short-Run Population Impacts of Immigration in U.S. Cities." *J. Urban Econ.* 72 (1): 60–78.

Copyright of Journal of Political Economy is the property of University of Chicago and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.



Center for the U.S. and Mexico | Research Paper

# An Economic Lifeline? How Remittances From the US Impact Mexico's Economy

November 13, 2023 | Jose Ivan Rodriguez-Sanchez

## Introduction

When international migrants, primarily workers, send money to their family members in their home countries, these transfers are known as remittances. In recent years, remittances have grown substantially, becoming one of the main contributors to the economies of recipient countries. By the end of 2023, remittances sent by workers to low- and middle-income countries are expected to reach approximately $639 trillion dollars — about 78% of total remittances across the globe.[1] The main recipient countries include India (12.6% of the total sent), Mexico (7.5%), China (6.4%), and the Philippines (4.8%).[2] The largest source of remittances is the United States, with more than 25% of all transfers; Saudi Arabia is second with 6.6%.[3] Given the large population of Mexican immigrants — both documented and undocumented —

001261

living in the United States, it is unsurprising that Mexico receives a high percentage of the remittances from the U.S.

For low- to middle-income countries, remittances have become so important that in many cases they have surpassed foreign direct investment (FDI) in generating economic growth and reducing poverty. However, the extent to which remittances drive this growth depends on how recipient households use them. In many cases, it is hard to determine exactly how remittances contribute to economic growth in a country, given the complexity of their use.[4] Thus, fully depending on remittances to drive economic growth should be avoided, especially since these resources are not generated by the internal economic policies of recipient countries. Moreover, workers who left their countries and send money home are now generating economic growth for another nation — meaning their home country has lost a valuable source of human capital.

Remittances should instead be considered a supplementary — but not essential — variable in the economic growth of the receiving country. Mexican workers in the U.S., for example, not only support the Mexican economy through remittances, but they also contribute to the American economy through their work in essential sectors such as agriculture, food processing, construction, health care, etc. In addition, these workers are consumers and pay federal, local, and state taxes, thereby generating economic growth in the United States.[5]

To determine how remittances impact an economy, it is important to know how recipient households use the resources they are sent. Remittances can be used to purchase goods and services, save, or invest in physical or human capital. When remittances are used to purchase goods and services, this increased consumption has a positive impact on aggregate demand and generates economic growth. And when used to invest in human capital (e.g., in education), remittances can contribute to economic development in the medium and long terms.

However, in low- and middle-income countries, remittances seem to be largely used for consumption and not for investment. In general, recipient households are in the poorest deciles and therefore primarily use the money they receive to alleviate their poverty. In fact, past studies have shown that remittances do help alleviate poverty in recipient countries, but believing that remittances alone can eradicate poverty is a mistake. [6]

Understanding the impact of remittances in the short and long terms is also complex. In theory, if remittances help households increase consumption, this would lead to economic growth in the short term, which can generate greater growth in the long term. The idea is that to satisfy the greater aggregate demand, companies would have to increase their production capacity. Although this makes sense theoretically, it doesn't always work in practice due to the interplay of other variables. In fact, some research shows that remittances contribute little to economic growth in receiving countries and may have no impact on economic growth in the long term.[7]

However, when analyzing groups of countries that receive the greatest number of remittances — as was done by Mohammad Salahuddin and Jeff Gow (2015) with Bangladesh, India, Pakistan, and the Philippines — a strong positive relationship was confirmed between remittances and economic growth in the long

001262

term, but not in the short term.[8] This would imply that low- and middle-income countries can indeed experience long-term benefits from remittances.

Based on these findings and considering that Mexico is also a low- to middle-income country, this paper explores how remittances from the U.S. have impacted Mexico's economy in both the short and long terms. Have remittances generated economic growth, and should Mexico continue to rely on them in the future?

To analyze the complex relationship between remittances and economic growth, this paper first looks at the evolution and trends of remittances in recent years at the national, state, and municipal levels in Mexico, comparing their numbers before and after the COVID-19 pandemic. Second, it looks at the characteristics of Mexican households receiving remittances. Given that the vast majority of remittances are sent from the United States, the U.S. wages of Mexican immigrant workers and the relationship between remittances and their wages are then discussed. Finally, the paper explores the overall impact of remittances on economic growth and development in Mexico, as well as the prospects for the flow of remittances in the coming years.

## Remittances at the National, State, and Municipal Levels in Recent Years

This section analyzes recent trends in remittances at the national, state, and municipal levels in Mexico and their significance for its economy during the COVID-19 pandemic.[9]

Total remittances sent to Mexico have grown exponentially since 2013 (Figure 1), and their levels have not decreased since then. In fact, it was predicted that remittances would decline worldwide due to the pandemic, but this was not the case. In fact, in Mexico, remittances reached historic highs.

In 2022, remittances to Mexico reached $58.497 billion, according to data from the Banco de Mexico (BANXICO), despite a complicated economic environment with high inflation and high interest rates set by the central bank. This represents a 13.4% increase over 2021, and a 162.3% increase since 2013. The highest annual growth in remittances since 2013 was 27% in 2021 as compared to 2020, partly motivated by a reactivation of labor markets in the U.S. (Figure 2). However, given the bleak global economic outlook in the coming years, remittances are expected to plateau or grow at decreasing rates. But in Mexico, if there is a lower rate of economic growth, low- and extremely low-income households may send more migrants to the U.S. in search of work, causing remittances to continue growing instead. Security conditions in Mexico could also contribute to increased migration flows to the U.S., which could further alter the growth of remittances.

**Figure 1 — Remittances, 2000–22 (Dollars)**

**Figure 2 — Growth Rate of Remittances, 2000–22**

001263



**Source** Data from BANXICO, prepared by author.



**Source** Data from BANXICO, prepared by author.

If remittances are viewed as a percentage of the gross domestic product (GDP) in Mexico, this percentage has also been growing considerably since 2013, though in the last few years it has remained constant. In 2022, remittances represented approximately 4.1% of the national GDP, an increase of 2.4 percentage points as compared to 2013 (Figure 3). These numbers show the importance of remittances in the Mexican economy, particularly in the last decade.

001264

Remittances have, in fact, surpassed foreign direct investment in Mexico, mainly since 2018 (Figure 3). This places remittances as the second largest source of income in the country, falling only below automotive industry exports. Remittances also recently surpassed Mexican oil exports, suggesting that the Mexican economy depends heavily on the transfer of these funds. Without them, the nation's recent economic contraction, which started with the election of President Andrés Manuel López Obrador in 2018, may have been greater — particularly in 2020, when there was a GDP drop of around 8%.

**Figure 3 — Income from Remittances and FDI as a percentage of GDP, 2010–22**

**Source**  Data from BANXICO, prepared by author.

Along with the increase in the dollar amount of remittances sent to Mexico, the number of individual money transfers has also risen significantly since 2013. In fact, this number rose from 76.75 million in 2013 to 149.97 million in 2022 — a 95% increase.

The most common way to send money is through electronic transfers. In recent years, this method was used for 99% of the total number of transfers. The average amount sent per month was $390 dollars (around 7,800 pesos) in 2022 — the largest amount ever and a growth of 34% compared to 2013. As a point of reference, the general minimum wage in 2022 was 172.87 pesos per day (and 260.34 pesos per day along the border), or approximately 5,258 pesos (and 7,919 pesos at the border) per month.[10]  Thus,

001265

on average, remittances equate to more than the minimum income a worker in Mexico earns for his or her work per month and a little less than what workers at the border earn per month.

## Remittances from the United States

The majority of remittances sent to Mexico come from the U.S., which makes sense given that 97% of total Mexican emigrants live there.[11] In recent years, the amount of money transferred from the U.S. to Mexico represented more than 95% of Mexico's total remittances. In 2022 alone, that amount was $55,864 million. Canada falls second in terms of the number of remittances sent to Mexico, but at only 1.5%.

In 2022, the states that sent the highest number of remittances from the United States to Mexico were California with $18.432 billion (33% of the total sent) and Texas with $8,491 million (15.1% of the total sent). It is worth mentioning that these states have, for years, sent the most remittances to Mexico — not a surprising fact given that they are the two states with the largest Mexican immigrant population. California has a Mexican immigrant population of approximately of 3.9 million (36% of total immigrants from Mexico), while Texas has 2.4 million (22% of total immigrants from Mexico).[12]

Other states are catching up. One state that has seen a significant increase in the number of remittances is Minnesota. Minnesota went from sending only $420 million dollars to Mexico in 2013, 1.9% of the total, to $4,708 million in 2022, 8.4% of the total. That is, transfers from this state grew by 1,020% from 2013 to 2022 despite the fact that its Mexican immigrant population is only 58,000 (1% of the total immigrants from Mexico). The factors generating this large increase in remittances from Minnesota warrant further investigation. A possible hypothesis is that there has been a considerable increase in temporary immigrant workers in its agricultural sector in recent years. A more pessimistic hypothesis is that these resources come from criminal groups that use remittances to launder money.

The states that sent the lowest number of remittances in 2022 were Maine (0.1%), Rhode Island (0.04%), and Vermont (0.02%).

**Figure 4 — States with the Highest Number of Remittances Sent from the United States, 2013 and 2022 (Millions of Dollars)**



001266

**Source**  Data from the BANXICO, prepared by author.

## Remittances Received in Mexico by States and Municipalities

### States

When examining the 32 states in Mexico and the distribution of total remittances by state, there is a correlation among states that have sent more Mexican workers abroad and the destination of remittances. Zacatecas, Guanajuato, Michoacán, and Oaxaca are the states with the highest number of emigrants to the United States in recent years. It should be expected that these workers send money to their relatives who reside in those states.[13] Indeed, of these states, Michoacán is the state that receives the highest number of remittances with a total of $5,285 million in 2022. Michoacán has ranked first and second among the states that receive the most remittances in the last decade (Figure 5). Guanajuato has ranked second and third in terms of the most remittances received in the last decade, and in 2022, it received a total of $5,059 million. Oaxaca obtained about $2,903 million in 2022 and has occupied sixth to eighth place in recent years. Zacatecas totaled $1,724 million and has ranked between eleventh and thirteenth place among the states that have received the most remittances in the last decade. Finally, since 2020, Jalisco has become the state with the highest number of remittances received with a total of $5,402 million.

It's worth mentioning that the gap between the first three places has recently been increasing with respect to the other states. Today, Jalisco, Michoacán, and Guanajuato are the states that receive the most remittances in absolute terms. On the other hand, the states that receive the least remittances include Tabasco, Yucatán, Quintana Roo, Tlaxcala, Baja California Sur, and Campeche with an average of approximately $328 million dollars in 2022.

**Figure 5 — States that Receive the Highest Number of Remittances in Mexico, 2010–22 (Millions of Dollars)**

When looking at the states that receive the most remittances, it is important to analyze the relative value that these states have when comparing their remittances with their total production or GDP. This helps verify the impact of these resources on these states' economies as well as their possible dependence on remittances.

By establishing the level of remittances that a state receives as a percentage of its real GDP,[14] we can see that, on average, this percentage has increased from 4.1% in 2010 to 8.3% in 2021. This indicates the importance of remittances for these state economies, especially considering that remittances have increased considerably in the last few years.

Having analyzed the remittances received by Jalisco, Michoacán, and Guanajuato in relative terms to their respective GDPs, we can see that Michoacán is consistently at the top of the list. In 2010, this percentage

001267



**Source** Data from the BANXICO, prepared by author.

was nearly 13%, and in 2021, it increased to 24.5% (Figure 6). Guerrero follows behind Michoacán with 11.3% in 2010 and 23.1% in 2021; Zacatecas increased from 8% to 20.9% in the same period; and Oaxaca's percentage grew from 11.4% to 19.3%. For Jalisco, this percentage went from 3.8% to 8.8% between 2010 and 2021, and Guanajuato's percentage rose from 7.7% in 2010 to 12.6% in 2021. The states that have had the lowest average percentage in the last few years include Mexico City (1.1%), Nuevo León (1.1%), Baja California Sur (1.0%), Tabasco (0.7%), and Campeche (0.3%). Therefore, it seems that these last states do not depend as heavily on the resources that are sent by Mexican workers in the U.S.

### Figure 6 — States that Receive the Highest Number or Remittances as a Percentage of GDP in Mexico, 2010–22

Another way to test the importance of remittances on the various Mexican states is by comparing them with each state's public income. This analysis shows that remittances have, in fact, a significant weight in relation to public income. For example, remittances received by Michoacán exceeded public income, which totaled 84,016 million pesos or approximately $4.199 billion in 2021 (Table 1). The income from remittances that this state obtained was approximately $4.984 billion. That is, each dollar of public income

001268



**Source** Data from BANXICO, prepared by author.

was matched by $1.19 in remittances (Figure 7). This is the only state in which remittances are higher than public income (119%).

Other states where remittances were very important with respect to their state income in 2021 were Zacatecas (92.8%), Guanajuato (90.9%), Jalisco (80.4%), and Guerrero (73.7%). In total, there are 13 states where remittances represented more than 50% of public income. On average, this percentage represents 45.3% of all states. This is a high percentage, and in recent years, it's been growing even higher. For the states with the lowest percentage, Mexico City stands out, likely because public income is not proportionally as high. There, remittances represented 26% of public income. Remittances were also a lower proportion of public income in Yucatán (16.8%), Quintana Roo (16.8%), Baja California Sur (14.5%), Tabasco (13.7%), and Campeche (12.7%).

**Table 1 — State Public Income and Remittances in Mexico, 2021 (Millions of Dollars)**

**Figure 7 — Remittances by State (% Public income), 2021**

| State | Public Income | Remittances | State | Public Income | Remittances |
|---|---|---|---|---|---|
| Jalisco | 6,507.5 | 5,235.3 | Durango | 1,953.6 | 1,243.6 |
| Michoacán | 4,198.7 | 4,984.1 | Sinaloa | 3,006.4 | 1,161.9 |
| Guanajuato | 4,736.9 | 4,308.1 | Tamaulipas | 3,372.8 | 1,128.6 |
| State of México | 16,125.7 | 3,145.5 | Querétaro | 2,011.3 | 1,012.6 |
| Mexico City | 11,307.2 | 2,942.9 | Morelos | 1,942.5 | 1,007.1 |
| Guerrero | 3,556.9 | 2,621.1 | Coahuila | 2,904.6 | 904.2 |
| Oaxaca | 4,063.0 | 2,404.8 | Sonora | 3,606.3 | 865.9 |
| Puebla | 4,933.6 | 2,138.1 | Nayarit | 1,307.6 | 854.1 |
| Veracruz | 7,455.9 | 2,034.3 | Aguascalientes | 1,326.9 | 696.5 |
| Chiapas | 5,225.1 | 1,893.5 | Colima | 951.8 | 434.8 |
| San Luis Potosí | 2,511.8 | 1,721.6 | Tabasco | 3,129.0 | 430.1 |
| Chihuahua | 4,001.8 | 1,588.2 | Yucatán | 1,989.2 | 335.1 |
| Zacatecas | 1,697.6 | 1,575.3 | Tlaxcala | 1,166.4 | 317.1 |
| Baja California | 3,507.4 | 1,398.2 | Quintana Roo | 1,851.2 | 310.6 |
| Nuevo León | 5,733.4 | 1,314.8 | Campeche | 1,158.9 | 147.5 |
| Hidalgo | 2,558.7 | 1,296.5 | Baja California Sur | 920.9 | 133.8 |

**Source** Data from BANXICO and the Instituto Nacional de Estadística y Geografía (INEGI), prepared by author.

## Municipalities

Mexico has 32 states and 2,471 municipalities.[15] The state with the largest number of municipalities is Oaxaca with 570, followed by Puebla with 217, and Veracruz with 212. The state with the smallest number of municipalities is Baja California Sur with five, followed by Baja California with five, and Colima with 10.[16]

The municipality of Tijuana in the state of Baja California has been the top receiver of remittances since 2015. In 2022, the Tijuana municipality received $753 million (52.7% of the total received by the state of Baja California), a growth of 95.4% from 2015 to 2022.

Other municipalities that are also at the top of receiving remittances include Guadalajara, Jalisco with $631.5 million (11.7% of the total received by Jalisco); Morelia, Michoacán with $597.3 million (11.3% of the total received by Michoacán); León, Guanajuato with $535.5 million (10.6% of the total received by Guanajuato); and Puebla, Puebla with $519.7 million (18.9% of the total received by the state of Puebla) (Table 2).

Municipalities that receive the most remittances compared to the total of their states include Tijuana, Baja California (52.7% in 2022) and Aguascalientes, Aguascalientes (59.9% in 2022). These municipalities have

001270



**Source** Data from BANXICO and INEGI, prepared by author.

maintained this trend in recent years. However, it is pertinent to mention that these municipalities belong to states that have a small number of municipalities — only five in the case of Baja California and 11 for Aguascalientes. In 2022, the five municipalities that received the most remittances totaled around $3.037 billion (5.2% of the total sent to Mexico).

**Table 2 — Municipalities that Receive the Largest Number of Remittances in Mexico, 2016–22 (Millions of Dollars)**

A municipality that has become a major recipient of remittances in recent years is San Cristóbal de las Casas, Chiapas. This municipality is not in the previous table as it was not until 2022 that it became one of the most important recipients of remittances at the national level. This municipality went from receiving $51.9 million dollars in 2013 to $540.8 million dollars in 2022 — a growth of 942% in that period. This meant that Chiapas went from 19th place out of 32 states in 2013 to sixth place in 2022. This spike in remittances may be attributed to increased transit migration, mainly from Central America. As Central Americans travel across Mexico to reach the U.S., they often pass through Chiapas where many become stuck and are sent money from their relatives who already live in the United States to help them subsist while they continue to travel north.

## Characteristics of Mexican Households That Receive Remittances

001271

| Municipality, State | 2016 | % State Total | 2018 | % State Total | 2020 | % State Total | 2022 | % State Total |
|---|---|---|---|---|---|---|---|---|
| Tijuana, Baja California | 380.8 | 54.5% | 455.9 | 51.2% | 626.2 | 50.7% | 753.3 | 52.7% |
| Guadalajara, Jalisco | 352.5 | 14.0% | 424.8 | 12.9% | 531.3 | 12.8% | 631.5 | 11.7% |
| Morelia, Michoacán | 331.6 | 12.1% | 428.4 | 12.6% | 474.5 | 11.7% | 597.3 | 11.3% |
| León, Guanajuato | 233.9 | 9.7% | 304.5 | 10.0% | 358.8 | 10.3% | 535.5 | 10.6% |
| Puebla, Puebla | 367.7 | 25.2% | 438.3 | 25.7% | 527.0 | 28.1% | 519.7 | 18.9% |
| Monterrey, Nuevo León | 208.0 | 31.7% | 287.4 | 30.1% | 312.4 | 30.5% | 512.1 | 35.2% |
| Aguascalientes, Aguascalientes | 224.1 | 56.6% | 270.1 | 57.1% | 303.6 | 56.2% | 510.7 | 59.9% |
| Juárez, Chihuahua | 195.6 | 27.7% | 270.6 | 27.3% | 396.4 | 31.0% | 504.5 | 31.0% |
| Durango, Durango | 195.2 | 32.3% | 278.0 | 34.4% | 302.9 | 31.7% | 465.7 | 34.6% |
| Culiacán, Sinaloa | 241.1 | 38.7% | 331.8 | 41.1% | 369.8 | 35.6% | 464.8 | 38.4% |
| Oaxaca de Juárez, Oaxaca | 290.2 | 20.4% | 322.6 | 18.6% | 327.0 | 17.2% | 453.3 | 15.6% |
| Zapopan, Jalisco | 184.9 | 7.3% | 294.3 | 8.9% | 332.8 | 8.0% | 433.0 | 8.0% |
| Álvaro Obregón, Mexico City | 244.9 | 17.4% | 284.9 | 19.8% | 442.6 | 20.7% | 421.2 | 13.3% |
| San Luis Potosí, San Luis Potosí | 224.8 | 23.4% | 285.4 | 23.0% | 304.5 | 21.4% | 414.1 | 20.9% |

**Source**  Data from the BANXICO, prepared by author.

Remittances received by Mexican households have increased exponentially since 2013. Approximately 1.77 million households received remittances in 2020, corresponding to 5.1% of total households in Mexico.[17] This percentage has not changed much in recent years; in 2016 the percentage was 4.8%.[18]

What are the general characteristics of these households? Of the households receiving remittances, those with a male at the head of the household represented 54.3%, while those with a female at the helm represented 45.7%.[19] Taking into consideration their age distribution, differences can be observed between these two groups. In the case of households with a male head-of-family, his age ranged between 40 and 79 years. In the case of households with a female head-of-family, her age ranged between 40 and 69 years of age (Figure 8).

### Figure 8 — Households Receiving Remittances by Gender of the Head of Household, 2020 (People)

As for the average income derived from remittances, households with a male head received 14.7% more than those with a female head-of-household. For the former, the average income was 12,000 current pesos



**Source** BBVA data.

per month, while for the latter it was 10,633 pesos per month in 2020 (Figure 9).

Finally, nuclear households — i.e., those made up of only parents and children (or a couple without children) — received the majority of remittances in 49% of instances.[20]

### Figure 9 — Average Monthly Income of Remittance-Receiving Households by Gender of the Head-of-Household, 2020



**Source** BBVA data.

001273

## Salaries of Mexican Immigrant Workers in the United States

Mexican immigrants' main destination is the United States. Mexicans living in the U.S. represent 97% of all Mexican emigrants abroad.[21] This is due to the proximity between the two nations and the opportunities for increased income and quality of life in the U.S. Additionally, many immigrants have relatives who already live in America and encourage them to migrate northward.

Although there have always been employment opportunities in the U.S., these have increased due to severe labor shortages since 2018.[22] These shortages are generated by the aging of the American population and a decrease in birth rates. Thus, in 2021, about 10.7 million Mexico-born immigrants lived in the U.S.[23] Even so, between 2010 and 2021, this immigrant population decreased by around 9%.[24] In fact, Mexico stopped being the country with the highest number of immigrants to the U.S. in 2013 when it was surpassed by India and China.[25] This was so until the outbreak of the COVID-19 pandemic, which worsened the economic and social situation in Mexico. The López Obrador administration has also failed to develop pro-growth policies, leading many Mexicans to once again leave their homes and migrate north to the United States. The majority of Mexican immigrants (69%) live in California, Texas, Illinois, and Arizona.[26]

It is estimated that approximately 7.4 million Mexican immigrants were working in the U.S. in 2022.[27] Not surprisingly, the states where the majority of Mexicans reside (mentioned above) are also the states where the majority of Mexican immigrants work. These states have attracted 4.7 millions of these workers, or 63.6%.[28] This Mexican migrant population works mostly in the construction sector (20.9%), professional and administrative services (12.8%), manufacturing (12.6%), hospitality and recreation (12.2%), commerce (11.3%), education and health (9.8%), transportation (5.7%), and agriculture (5.3%).[29] Therefore, if it is assumed that this distribution also determines the distribution of remittances, we can surmise that for every five pesos received in remittances, one peso would come from Mexican migrants working in the construction sector.

The salary scale paid to Mexican immigrant workers in the United States increased considerably before the start of the COVID-19 pandemic. In 2020, there was a reduction in the salary scale due to a strong economic contraction generated by the closure of economies worldwide. Once economies began reopening, this salary scale began to increase, reaching a value of $319.942 billion (Figure 10).[30] Despite a tough 2020, from 2013 to 2022, the salary scale of this group of immigrants totaled $206.234 billion (64.5% of the total salary scale).

**Figure 10 — Salary Mass of Mexican Immigrant Workers, 2022 (Millions of Dollars)**

California, Texas, Illinois, and Arizona — the states with a large participation of Mexican immigrants in their economies — cumulatively represent $30.506 billion, which is 54.6% of the total remittances received by

001274



**Sources** Data from CEMLA.[31]

Mexico. In those states, the salary scale totaled $206.234 billion. Therefore, remittances received by these states represent 14.8% of the salary scale. At the national level, the transfer of remittances in relation to the salary scale of Mexican immigrant workers in the United States has increased considerably in recent years. This percentage was only 10.5% in 2015 and became 17.5% in 2022 (Figure 11). A key factor in ensuring that this percentage did not decrease during the COVID-19 pandemic was the financial support of the American government to all households, including Mexican immigrants.

In addition, Mexican immigrants in the U.S. may have increased the amount they send to their families due to the poor economic growth in Mexico. Mexico's economic stagnation has affected the poorest households, which use remittances for their subsistence and basic consumption. In fact, the rate of economic growth in Mexico has been historically low, averaging around 2% from 2008 to 2018.[32] Nevertheless, this rate has decreased even further since the arrival of President López Obrador, with an average growth rate of -0.12% from 2019 to 2022. This negative value is due in part to the COVID-19 pandemic, but also to the uncertainty that the López Obrador administration has generated in the business environment — especially following the cancellation of construction plans for the new international airport intended to be built in Mexico City. The López Obrador administration also failed to develop an economic strategy that would attract investment, generate jobs, and foster greater productivity. His six-year term will end in 2024 with a very low economic growth rate — estimated at 0.6% — and high levels of poverty and inequality across Mexico.[33] Because of this, remittances will continue to be an important pillar of the economy, especially for the most vulnerable.

001275

**Figure 11 — Remittances from the United States in Relation to the Salary Mass of Mexican Immigrant Workers, 2015–22 (%)**



Sources  Data from CEMLA.[34]

# Impact of Remittances on Economic Growth and Development in Mexico: A Review of Past Literature

Considering how remittances have significantly increased in recent years, it is important to ask, have they have really led to economic growth and development in Mexico?

Remittances can generate economic growth if they are invested in physical or human capital or if they are used to finance new businesses. However, for poor households in marginalized communities, remittances are primarily used to satisfy basic needs and alleviate poverty.

Still, given the recent historic growth of remittances received in Mexico — even during the COVID-19 pandemic — it is important to look at their overall economic effects. For example, as more money flows into the country and consumption increases, it is reasonable to assume that this has generated short-term economic growth via an increase in aggregate demand. But if remittances are not used in investment or in consumption beyond subsistence, their long-term impact on economic growth could be null or very low. If this is the case, remittances would be generating an economic trap by causing economic stagnation through low growth and high emigration.[35] Thus, it is important to know how households are using the

001276

remittances they receive to identify whether or not this economic trap exists. Are households investing their resources in physical or human capital, consumption of goods and services, savings, or merely using them to survive?

Furthermore, if households use remittances to finance investments and productive activities, they can improve or soften their income over time, which is of vital importance for marginalized and rural areas in developing countries such as Mexico.[36]

The empirical evidence on remittances and economic growth varies from country to country, but most studies have found that remittances do, in fact, boost economic growth[37] and reduce poverty and inequality.[38] However, given the complexity of these relationships due to the existence of other variables, researchers have drawn a variety of different conclusions.

For example, Adolfo Barajas et al. (2009) concludes that remittances have a low impact on economic growth in recipient countries and in some cases even produce negative impacts.[39] Salahuddin and Gow (2015), who analyze some of the main countries receiving remittances — such as Bangladesh, India, Pakistan, and the Philippines — find a significant and positive relationship in the long term between remittances and economic growth, but not a significant relationship in the short term.[40] Zahid Hussain (2014) establishes that the expenditure of remittances can generate a positive multiplier effect on income and productivity in an economy — if there is a connection between the localities that receive remittances and the national economy. If these resources are concentrated only in those localities, it is unlikely that the multiplier effect exists.[41]

Soma Rani Sutradhar (2020) finds that remittances can generate a negative externality since households receiving remittances may have fewer incentives to work, which thereby affects their participation rates in the labor force and their economic activity, negatively impacting economic growth.[42] Hector Perez-Saiz et al. (2019) establishes that increasing levels of remittances could be harmful to the long-term growth of recipient economies due to an appreciation of the real exchange rate, which causes these economies to be less competitive in international trade.[43]

However, in developing countries, which generally have inefficient and low-quality health and education systems, researchers have found that remittances can play a key role in counteracting poverty. In fact, Maria Cristina Zhunio, Sharmila Vishwasrao, and Eric P. Chiang (2012) find that developing countries are positively impacted by remittances.[44] They use a sample of low- and middle-income countries to show that the relationship between remittances and development variables, such as education and health, is robust at aggregate levels.[45] Similarly, Aysen Ustubici and Darja Irdam (2012) find that there is a positive correlation between levels of human development and remittances, particularly in middle-income countries.[46] Their results also reveal that remittances have a greater impact than foreign direct investment and public spending on the economic development of these countries.[47]

In the case of Mexico, Catalina Amuedo-Dorantes (2014) explains how remittances have helped smooth household income and improve living conditions, especially for those who have savings restrictions.[48]

001277

Lidia Carvajal Gutiérrez and Leobardo de Jesús Almonte (2011) find that remittances in Mexico can have a positive impact on economic development if credit restrictions are relaxed.[49]

A number of the studies that focus on the impact of remittances on the Mexican economy focus on state-wide impacts and use everything from cross-sectional data to panel data. And, in many cases, these studies have concluded that remittances positively impact economic growth.[50] For example, Jorge Eduardo Mendoza-Cota and Víctor Hugo Torres-Preciado (2020) investigate the short- and long-term impact of remittances on regional economic growth in Mexico and determine that remittances have a positive impact on the states receiving them. They also conclude that the regional economic impact of remittances is greater when there is a simultaneous increase in private credit. Miguel D. Ramirez (2014) finds that in the short term, remittances had a small positive effect on the growth rate of real GDP and labor productivity during the period from 1980 to 2010.[51] José Jorge Mora Rivera and Jesús Arellano González (2016) analyze the impact of remittances on the spending patterns of rural households in Mexico, finding that remittances can stimulate investments in physical capital and education. If this is true, a positive impact on economic growth and development in rural areas can be reasonably expected.[52]

In terms of economic development, Pia M. Orrenius et al. (2010) determine that remittances play an important role for Mexican states.[53] They conclude that remittances have a positive impact on the distribution of salaries in the states and that remittances seem to shift the wage distribution upward, reinforcing the middle part of the distribution.

Studies that analyze the impact of remittances at the municipal level are scarcer, but a seminal article on the matter is that of Ernesto López-Córdova, Andrea Tokman R., and Eric A. Verhoogen (2005).[54] They find that an increase in remittances received by households reduces infant mortality and illiteracy in children ages 6 to 14 years. Furthermore, they reveal that remittances can improve the living conditions of recipient households and keep these households out of poverty in some of its dimensions.

Jose Ivan Rodriguez-Sanchez (2022) finds no relationship between remittances and economic growth and development at the state level. However, in the case of municipalities, remittances seem to have a positive effect on economic growth and development.[55] An important finding was that if more than 90% of a municipality's population is in poverty, it will experience more economic development if it receives remittances than it would have otherwise. This means that poor municipalities are using remittances to generate economic development since it is their only way to promote education and health.

Considering the wide variety of past research on this topic, it can generally be said that remittances have been of vital importance to the Mexican economy, helping the most marginalized and poor communities not only to survive, but also to grow and develop economically.

However, remittances are an external variable and depend largely on what happens abroad, mainly in the United States economy. Because of this, they should be considered merely as additional income for households — not as key drivers of economic growth. In conjunction with better internal economic policies, greater democracy, a stronger rule of law, and enhanced security, remittances could give certainty

001278

to investors and generate jobs with better salaries for Mexican workers. This, in turn, would increase productivity and boost Mexico's economic growth — both in the short and long terms.

## Perspectives on Remittance Flows: Will Remittances Continue to Grow?

Remittances sent by Mexican immigrants working in the United States have seen an upward trend in recent years, even reaching new record highs. This is despite the closure of the U.S. and Mexican economies that came with the COVID-19 pandemic. The initial hypothesis was that these closures would negatively impact employment and, therefore, reduce the incomes of immigrant workers in the United States. At the beginning of the pandemic, it appeared as though that would indeed happen; the month of April 2020 saw the greatest reduction in the number of remittances sent. After that month, however, remittances increased significantly, with the usual seasonal drops that have always accompanied certain months.

After the start of the pandemic, the increase in remittances was due to a change in sending patterns. That is, the number of individual transitions increased considerably, as well as the average amount of each transaction (Figure 12). For example, between 2013 and 2019, the average increase in the number of transactions was 6.5%, but from 2020 to 2022, the increase was far greater — at 10.3%. Likewise, from 2013 to 2019, the average amount of each transaction increased by 1.9%, while from 2020 to 2022, this increase was much higher — 6.3% on average. Therefore, before the pandemic, the number of transactions was a key factor in determining how much was sent abroad. But as of 2020, the average amount sent in each transaction, coupled with the number of transactions, generated the significant increase in remittances sent to Mexico.

**Figure 12 — Remittances, Transactions, and Average Amount Sent (Index: 2019 = 100)**



**Source** Data from BANXICO, prepared by author.

001279

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1287 of 4699 PageID #:  4452

This increase in the number of money transfers may have been due in large part to an increase in the number of people sending remittances to Mexico rather than a rise in the number of new Mexican immigrants arriving in the United States. Additionally, given that many places where remittances are sent in person closed at the beginning of the pandemic, Mexican immigrants had to adapt and make use of digital remittances, which have since grown significantly.

The increase in wages in the United States, due in part to labor shortages during the pandemic, also had a strong impact on remittances. Mexican immigrants were able to establish themselves in better-paying jobs and send more money to their relatives in Mexico. This was likely reinforced by the support from the United States government through unemployment insurance and economic stimulus checks at the beginning of the pandemic. Additionally, as United States labor markets recovered and wages grew toward the end of the pandemic, remittances also continued to increase.[56] However, it is important to mention that the recovery of remittances starting in May 2020 occurred at a stronger pace than could be explained by the recovery in Hispanic unemployment in the U.S. (Figure 13). Starting in 2021, the increase in remittances has depended in part on the lower unemployment of this group in the United States and the improvement in labor markets.

**Figure 13 — Remittances to Mexico and Hispanic Unemployment Rate in the United States, Seasonally Adjusted (Millions of Dollars and %), 2017–22**



**Sources** Data from BANXICO and the U.S. Bureau of Labor Statistics.

In the medium and long terms, remittances can be expected to continue growing but at decreasing rates. Their growth will depend on the increase in Mexican immigration to the United States in the coming years and the growth of wages for Mexican immigrants. If there are no setbacks and employment and wages remain strong, we can expect the increase in remittances to continue and even reach new records. Furthermore, if the Mexican economy continues to have low levels of growth and generates more poverty in all its dimensions, we can expect that Mexican immigrants in the United States will send more money to their families to help them subsist.

Estimating the growth of remittances and establishing their value in the future is complicated, as previously noted. Some assumptions have to be made to be able to project this value. A simple scenario would be to assume that this growth will be the same or very similar to what has occurred historically. In this case, the behavior of the U.S. and Mexican economies for a certain historical period would be implicit in this assumption, but there could be unforeseen "black swan" events that shift future estimates drastically.

The estimate that will be used for this paper assumes that the total value of remittances sent from the United States is primarily determined by demographic forces. Therefore, remittances can be projected based on per capita terms. That is, remittances divided by the Mexican immigrant population in the United States, it is assumed, will be similar to that seen in the recent past. This creates three potential scenarios.

1. **Scenario 1:** This scenario uses the period from 2010 to 2015 with an average annual per capita growth rate of 3.2% that is assumed to be maintained until 2030.[57] In this case, the total remittances sent from the United States would reach a value of $72.040 billion by 2030.

2. **Scenario 2:** In this scenario, we use the period from 2015 to 2019, before the COVID-19 pandemic, with an average annual per capita growth rate of 10.6%. This implies that the total remittances sent from the United States would be $124.882 billion in 2030.

3. **Scenario 3:** In the third scenario, we use the period from 2010 to 2021 with an average annual per capita growth rate of 8.6%. In this case, the total remittances sent would be around $108.026 billion.

Of these three scenarios, the third one — the period from 2010 to 2021 — likely offers the best estimate due to the fact that it includes years with both low and high emigration. Compared to 2022, it represents a 94% increase in remittances. In fact, all three scenarios lead to the conclusion that remittances will continue to increase into the future, but this increase will depend on the growth of the Mexican immigrant working population and the economies of the United States and Mexico. It can also be assumed that the growth in remittances will continue at a decreasing rate, but some years may still see historic highs.

## Conclusion

This analysis reveals that remittances by Mexican immigrant workers in the United States have been a key factor in the Mexican economy for years. Not only do they support and supplement the incomes of

households that receive them — especially those in the poorest deciles — but in aggregate, they also promote economic growth and development in recipient states and municipalities. In fact, remittances represent an important inflow of foreign currency to Mexico, even surpassing foreign direct investment and Mexican oil exports in recent years. This has made remittances increasingly important for the Mexican economy.

Mexican immigrant workers have maintained high levels of remittance transfers to their relatives in Mexico for years, in part because they know that their relatives face economic difficulties due to low economic growth in Mexico. To a great extent, this has helped the poorest Mexican households, which are quickly growing in number. In fact, the percentage of people in poverty increased between 2018 and 2020 from 41.9% to 43.9%. In those two years, another 3.8 million Mexicans started experiencing extreme poverty.[58] The only way for this population to survive is by receiving these resources from their relatives abroad.

However, remittances are themselves becoming a strategy of the Mexican government. That is, remittances are presented as if they were an achievement of the government, when obviously they are not. This dependence can be problematic given that these resources are generated by Mexican workers abroad and not by the public policies of the Mexican government.

Assuming that migration from Mexico to the United States continues due to the lack of job opportunities, low salaries, a weak rule of law, and high insecurity in Mexico, remittances are expected to continue rising although at decreasing rates. Of the scenarios established above, considering that the period from 2010 to 2021 offered the best estimate due to the fact that it includes years with both low and high emigration, the total remittances sent from the United States could reach a maximum level of $108.026 billion in 2030. Compared to 2022, this would be a 94% increase. However, it is important to note that this value is a maximum limit, since the growth in remittances is expected to continue at a decreasing rate.

Remittances should be seen as a form of supplemental support that allows Mexican families to purchase necessary goods and services or invest in education and health. Due to the large volume of remittances sent to Mexico, they have had a positive impact on economic growth and development, but the Mexican economy should not solely depend on these resources to continue growing. The best way to have long-term economic growth and development is to invest in physical and human capital. Therefore, better public policies must be designed and established to improve education, health, security, the rule of law, and financial inclusion in Mexico. Remittances must go hand in hand with a better economic strategy that allows Mexico to attract more investment and create jobs to reduce poverty and inequality. This does not mean that remittances shouldn't be used, but it is important not to solely rely on these resources as a key driver of the Mexican economy.

Given the importance of remittances for the well-being of millions of Mexican families, channels must also be sought to multiply their positive effects. As of now, there are no programs that enhance the effect of remittances for the communities that receive them. The Mexican government must resume programs such as the Three-For-One Collective Remittance Program, which aimed to direct funds toward community projects that generate long-term economic growth and development. In this program, each Mexican peso contributed by migrants was matched by the federal, state, and local governments,

multiplying the beneficial impacts for the community.[59] Improving such programs and designing effective measures to encourage and promote better use of these monetary flows should be a priority for Mexican policymakers. Finally, it is important that U.S. and Mexican authorities cooperate with one another and with private institutions to limit organized crime (e.g., money laundering) related to remittance activities.

*This paper was originally published in Spanish as a chapter in Revista de Economía Mexicana – Anuario UNAM, published by the Universidad Nacional Autónoma de México.*

# Notes

[1] KNOMAD-World Bank, "Remittances Brave Global Headwinds," special focus, *Migration and Development Brief* 37 (November 2022), https://www.knomad.org/sites/default/files/publication-doc/migration_and_development_brief_37_nov_2022.pdf.

[2] KNOMAD-World Bank, "Remittances Brave Global Headwinds."

[3] Fundación BBVA Bancomer, A.C. and Consejo Nacional de Població, *Anuario de Migración y Remesas México 2022* (July 2022), https://www.bbvaresearch.com/wp-content/uploads/2022/09/Anuario_Migracion_y_Remesas_2022.pdf.

[4] Ralph Chami et al., "¿Son Una Trampa las Remesas?" International Monetary Fund, September 2018, https://www.imf.org/external/pubs/ft/fandd/spa/2018/09/pdf/chami.pdf.

[5] Jose Ivan Rodriguez-Sanchez, "Immigrants in Strategic Sectors of the U.S. Economy and America's Labor Shortage Crisis" (Houston: Rice University's Baker Institute for Public Policy, June 14, 2022), https://doi.org/10.25613/Y6RY-AY18.

[6] Chami et al., "¿Son Una Trampa las Remesas?"

[7] Adolfo Barajas et al., "Do Workers' Remittances Promote Economic Growth?" International Monetary Fund, July 2009, https://www.imf.org/external/pubs/ft/wp/2009/wp09153.pdf.

[8] Mohammad Salahuddin and Jeff Gow, "The Relationship Between Economic Growth and Remittances in the Presence of Cross-sectional Dependence," *The Journal of Developing Areas* 49, no. 1 (Winter 2015): 207–21, https://www.jstor.org/stable/24241287.

[9] Remittances data was obtained from the Banco de México's Sistema De Información Económica at https://www.banxico.org.mx/SieInternet/consultarDirectorioInternetAction.do?&sector=1&accion=consultarDirectorioCuadros&locale=es.

001283

[10] Comisión Nacional de los Salarios Mínimos, "Incremento a los Salarios Mínimos para 2022," Gobierno de México, December 1, 2021, https://www.gob.mx/conasami/es/articulos/incremento-a-los-salarios-minimos-para-2022?idiom=es.

[11] Raquel Rosenbloom and Jeanne Batalova, "Mexican Immigrants in the United States," Migration Policy Institute, October 13, 2022, https://www.migrationpolicy.org/article/mexican-immigrants-united-states.

[12] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

[13] Rafael López Vega et al., "Índices de intensidad Migratoria México-Estados Unidos 2020," Consejo Nacional de Población, June 2022, https://www.gob.mx/cms/uploads/attachment/file/789092/IIMMexEEUU2020.pdf.

[14] Instituto Nacional de Estadística y Geografía (INEGI), "Producto Interno Bruto Por Entidad Federativa. Año Base 2013," https://www.inegi.org.mx/app/tabulados/default.aspx?pr=17&vr=6&in=2&tp=20&wr=1&cno=2.

[15] "División Territorial," Cuéntame de México, http://cuentame.inegi.org.mx/territorio/division/default.aspx?tema=T.

[16] "Selecciona una Entidad Federativa," Cuéntame de México, https://cuentame.inegi.org.mx/monografias/default.aspx?tema=me.

[17] Fundación BBVA Bancomer, A.C. and Consejo Nacional de Población, *Anuario de Migración y Remesas México 2022*.

[18] Fundación BBVA Bancomer, A.C. and Consejo Nacional de Población, *Anuario de Migración y Remesas México 2018* (July 2018), https://www.bbvaresearch.com/wp-content/uploads/2018/09/1809_AnuarioMigracionRemesas_2018.pdf.

[19] Fundación BBVA Bancomer, A.C. and Consejo Nacional de Población, *Anuario de Migración y Remesas México 2022*.

[20] Fundación BBVA Bancomer, A.C. and Consejo Nacional de Población, *Anuario de Migración y Remesas México 2022*.

[21] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

[22] Rodriguez-Sanchez, "Immigrants in Strategic Sectors of the U.S. Economy."

[23] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

[24] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

[25] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

001284

[26] Rosenbloom and Batalova, "Mexican Immigrants in the United States."

[27] Jesús A. Cervantes González, Denisse Jiménez, and Rodolfo Ostolaza, "Determinantes del Porcentaje de su Ingreso que Envían Como Remesas los Mexicanos Inmigrantes en Estados Unidos a sus Familiares en México," CEMLA, February 2023, https://www.cemla.org/foroderemesas/notas/2023-03-notas-de-remesas.pdf.

[28] Cervantes González, Jiménez, and Ostolaza, "Determinantes del Porcentaje de su Ingreso que Envían Como Remesas los Mexicanos Inmigrantes en Estados Unidos a sus Familiares en México."

[29] Juan Jose Li Ng, "Mexico | Does 1 in 5 Pesos of Remittances Come From Mexicans in the Construction Sector?" BBVA Research, January 3, 2022, https://www.bbvaresearch.com/en/publicaciones/mexico-does-1-in-5-pesos-of-remittances-come-from-mexicans-in-the-construction-sector/.

[30] Cervantes González, Jiménez, and Ostolaza, "Determinantes del Porcentaje de su Ingreso que Envían Como Remesas los Mexicanos Inmigrantes en Estados Unidos a sus Familiares en México."

[31] Cervantes González, Jiménez, and Ostolaza, "La Masa Salarial De Los Trabajadores Mexicanos Inmigrantes En Estados Unidos Alcanzó 283 Mil Millones De Dólares En 2021," CEMLA, March 2022, https://www.cemla.org/foroderemesas/notas/2022-02-notasderemesas-02.pdf; Cervantes González, Jiménez, and Ostolaza, "Determinantes Del Porcentaje De Su Ingreso Que Envían Como Remesas Los Mexicanos Inmigrantes En Estados Unidos A Sus Familiares En México."

[32] World Bank, "GDP Growth (Annual %) – Mexico," https://data.worldbank.org/indicator/NY.GDP.MKTP.KD.ZG?locations=MX.

[33] Enrique Hernández, "Crecimiento Económico Del Gobierno De Amlo Es Muy Bajo, Una Tragedia: Ernesto Revilla," *Forbes*, January 6, 2023, https://www.forbes.com.mx/crecimiento-economico-del-gobierno-de-amlo-es-una-tragedia-ernesto-revilla/.

[34] Cervantes González, Jiménez, and Rodolfo Ostolaza, "La Masa Salarial De Los Trabajadores Mexicanos Inmigrantes En Estados Unidos Alcanzó 283 Mil Millones De Dólares En 2021"; Cervantes González, Jiménez, and Ostolaza, "Determinantes Del Porcentaje De Su Ingreso Que Envían Como Remesas Los Mexicanos Inmigrantes En Estados Unidos A Sus Familiares En México."

[35] Chami et al. "¿Son una trampa las remesas?"

[36] Oded Stark, J. Edward Taylor, and Shlomo Yizhaki, "Migration, Remittances and Inequality," *Journal of Development Economics* 28, no. 3 (May 1988): 309–22, https://doi.org/10.1016/0304-3878(88)90002-8; Inayah Hidayati, "Migration and Rural Development: The Impact of Remittance," *IOP Conference Series: Earth and Environmental Science* 561, no. 1 (September 2020): 1-6, https://doi.org/10.1088/1755-1315/561/1/012018.

[37] Alina Cazachevici, Tomas Havranek, and Roman Horvath, "Remittances and Economic Growth: A Meta-analysis," *World Development* 134 (October 2020), https://doi.org/10.1016/j.worlddev.2020.105021.

001285

[38] Catalina Amuedo-Dorantes, "The Good and the Bad in Remittance Flows," IZA World of Labor, November 2014, https://wol.iza.org/uploads/articles/97/pdfs/good-and-bad-in-remittance-flows.pdf?v=1.

[39] Barajas et al., "Do Workers' Remittances Promote Economic Growth?"

[40] Salahuddin and Gow, "The Relationship Between Economic Growth and Remittances."

[41] Zahid Hussain, "Can International Remittances Be Unproductive in Recipient Countries? Not Really!" *End Poverty in South Asia* (World Bank blog), February 16, 2014, https://blogs.worldbank.org/endpovertyinsouthasia/can-international-remittances-be-unproductive-recipient-countries-not-really.

[42] Soma Rani Sutradhar, "The Impact of Remittances on Economic Growth in Bangladesh, India, Pakistan and Sri Lanka," *International Journal of Economic Policy Studies* 14, no. 1 (January 31, 2020): 275–95, https://doi.org/10.1007/s42495-020-00034-1.

[43] Hector Perez-Saiz et al., "The Impact of Remittances on Economic Activity: The Importance of Sectoral Linkages," International Monetary Fund, August 16, 2019, https://www.imf.org/en/Publications/WP/Issues/2019/08/16/The-Impact-of-Remittances-on-Economic-Activity-The-Importance-of-Sectoral-Linkages-47091.

[44] Maria Cristina Zhunio, Sharmila Vishwasrao, and Eric P. Chiang, "The Influence of Remittances on Education and Health Outcomes: A Cross Country Study," *Applied Economics* 44, no. 35 (December 2012): 4605–16, https://doi.org/10.1080/00036846.2011.593499.

[45] Zhunio, Vishwasrao, and Chiang, "The Influence of Remittances on Education and Health Outcomes."

[46] Aysen Ustubici and Darja Irdam, "The Impact of Remittances on Human Development: A Quantitative Analysis and Policy Implications," *Economics & Sociology* 5, no. 1 (May 20, 2012): 74–95, https://doi.org/10.14254/2071-789X.2012/5-1/6.

[47] Ustubici and Irdam, "The Impact of Remittances on Human Development."

[48] Amuedo-Dorantes, "The Good and the Bad in Remittance Flows."

[49] Lidia Carvajal Gutiérrez and Leobardo de Jesús Almonte, "Remesas y Crecimiento: Un Análisis Estructural Para México," *Análisis Económico* XXVI, no. 62 (2011): 209–28, https://www.redalyc.org/pdf/413/41319914011.pdf.

[50] Jorge Eduardo Mendoza-Cota and Víctor Hugo Torres-Preciado, "The Impact of Regional Remittances on Economic Growth in Mexico: A Dynamic Space-time Panel Approach," *Papeles de Población* 25, no. 101 (2019): 113–44, https://doi.org/10.22185/24487147.2019.101.25; Miguel Ángel Mendoza González and Marcos Valdivia López, "Remesas, Crecimiento y Convergencia Regional en Mexico: Aproximación con un Modelo Panel-espacial," *Estudios Economicos* 31, no. 1 (June 2016), https://www.scielo.org.mx/scielo.php?script=sci_arttext&pid=S0186-72022016000100125#fn3.

001286

[51] Miguel D. Ramirez, "Remittances and Economic Growth in Mexico: An Empirical Study with Structural Breaks, 1970–2010," *Business and Economic Research* 4, no. 1 (2014), https://digitalrepository.trincoll.edu/cgi/viewcontent.cgi?article=1124&context=facpub.

[52] José Jorge Mora Rivera and Jesús Arellano González, "Las Remesas Como Determinantes del Gasto en las Zonas Rurales de México," *Estudios Fronterizos* 17, no. 33 (2016): 1–27, https://www.redalyc.org/articulo.oa?id=53043185009.

[53] Pia M. Orrenius et al., "Do Remittances Boost Economic Development? Evidence from Mexican States," Federal Reserve Bank of Dallas, Working Paper 1007 (October 2010), https://www.dallasfed.org/~/media/documents/research/papers/2010/wp1007.pdf.

[54] Ernesto López-Córdova, Andrea Tokman R. and Eric A. Verhoogen, "Globalization, Migration, and Development: The Role of Mexican Migrant Remittances," *Economía* 6, no. 1 (2005): 217–56, https://www.jstor.org/stable/20065489.

[55] Rodriguez-Sanchez, "How Remittances Impact the Economies of Mexican States and Municipalities" (Houston: Rice University's Baker Institute for Public Policy, November 28, 2022), https://doi.org/10.25613/J3XZ-7P32.

[56] Bureau of Labor Statistics, "Employment Cost Index — December 2022," news release, July 28, 2023, https://www.bls.gov/news.release/archives/eci_01312023.htm.

[57] To obtain this value in per capita terms, information from the Bank of Mexico is used for remittances, and information from the Migration Policy Institute is used for the Mexican immigrant population in the United States.

[58] CONEVAL (Consejo Nacional de Evaluación de la Política de Desarrollo Social), "Informe de Evaluación de la Política de Desarrollo Social 2022," February 2023, https://www.coneval.org.mx/Evaluacion/Documents/Informes/IEPDS_2022_Presentacion.pdf.

[59] CONEVAL, "Programa 3 × 1 Para Migrantes," 2013, https://www.coneval.org.mx/Informes/Evaluacion/Ficha_Monitoreo_Evaluacion_2013/SEDESOL/20_S061.pdf.

*This material may be quoted or reproduced without prior permission, provided appropriate credit is given to the author and Rice University's Baker Institute for Public Policy. The views expressed herein are those of the individual author(s), and do not necessarily represent the views of Rice University's Baker Institute for Public Policy.*

*© 2023 by Rice University's Baker Institute for Public Policy*
https://doi.org/10.25613/RDAS-MX20

001287

001288

# Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population

Sherrie A. Kossoudji, *University of Michigan*

Deborah A. Cobb-Clark, *Australian National University*

The 1986 Immigration Reform and Control Act (IRCA) granted amnesty to approximately 1.7 million long-term unauthorized workers in an effort to bring them "out of the shadows" and improve their labor market opportunities. An analysis of wages using panel data for a sample of legalized men provides evidence that wage determinants are structurally different after amnesty for them but not for the comparison group as measured during the same time periods. The wage penalty for being unauthorized is estimated to range from 14% to 24%. The wage benefit of legalization under IRCA was approximately 6%.

## I. Introduction

Unauthorized workers are an enduring component of the U.S. work force despite attempts by the U.S. government to restrict their migration. In 1986, Congress moved to reduce unauthorized migration by eliminating U.S. employment opportunities for unauthorized workers. For the first time, the Immigration Reform and Control Act (IRCA) imposed

The authors alternate first authorship from paper to paper as they are written. The authors have benefited from the comments made by seminar participants at the 1997 Society of Labor Economists annual meeting, the Australian National University, the University of Queensland, Melbourne University, the University of New South Wales, Michigan State University, McMaster University, and the University of Michigan. All errors remain our own.

[*Journal of Labor Economics*, 2002, vol. 20, no. 3]
© 2002 by The University of Chicago Press. All rights reserved.
0734-306X/2002/2003-0006$10.00

001289

fines on U.S. employers who hired unauthorized workers. However, to recognize the commitment that many unauthorized workers had already made to the U.S. labor market, amnesty (and permanent legal resident status) was granted to approximately 1.7 million unauthorized immigrants who could demonstrate continuous U.S. residence since 1982.[1] Amnesty would bring these workers "out of the shadows." People granted amnesty are referred to as "the legalized population."

The uniqueness of the amnesty program and the magnitude of the legalized population beg for an understanding of the impact of legalization on amnesty recipients, themselves. At the same time, the fact that IRCA appears to have been unsuccessful in deterring unauthorized migration leaves us still contemplating the general role of legal status in U.S. labor markets.[2] We use this change in U.S. policy to analyze the economic question of whether and how legal status influences wages. In particular, we ask the following questions: Is the process generating wages different for legal and unauthorized workers? If so, how has legalization changed wage determinants? We take advantage of panel data for a sample of young Latino men from Mexico and Central America who came to the United States as unauthorized workers and who received amnesty under IRCA. A panel of Latino men from the National Longitudinal Survey of Youth (NLSY) is used as a comparison group.

The rest of the article is organized as follows. In Section II, we explore the relationship between legal status and wages. In Section III, we explain the quasi-experimental technique, the use of an appropriate comparison group, and the random effects wage model. The estimation results are discussed in Section IV. In Section V, we conclude by speculating about some of the current policy implications of this analysis.

## II. Legal Status and Wages: The Issues

Wages have consistently been shown to be lower for unauthorized workers than for legal workers in the United States (see North and Houston 1976 or Borjas and Tienda 1993). Wage differentials could be due to differences in observed productivity-related characteristics, differences in the economic returns to those characteristics, or differences in unobserved characteristics related to the selection of unauthorized and legal immigrants. Researchers attempting to understand the source of these wage

---

[1] IRCA provided for two legalization programs: the "General" legalization program (1.7 million people), noted above, and a Special Agricultural Workers program (SAW—1.3 million people) for individuals who could demonstrate 60 days of seasonal agricultural work in certain crops between May 1985 and May 1986. The SAW population was not surveyed and it is outside the purview of this paper.

[2] See Donato, Durand, and Massey (1992b) for an assessment of IRCA's deterrent effect on the flow of unauthorized migrants.

differentials face the same difficulties as researchers studying similar issues, but they are also severely limited because of the clandestine nature of unauthorized migration. Much of the literature on unauthorized workers is based on nonrandom samples of unauthorized migrants, such as apprehended migrants or those who returned to Mexico or legal immigrants.[3] Many studies are cross-sectional, comparing the wages of legal and unauthorized workers. The question that has never been effectively answered, then, is whether the differences in observed outcomes are due to legal status itself, to an unobserved selection process that characterizes legal and unauthorized immigration, or to problems associated with nonrandom sampling of the unauthorized population.

A large legalization program like that of the Immigration Reform and Control Act (IRCA) alters the relative supplies of legal and unauthorized workers. The IRCA's legalization programs were designed to change the legal status of a group of workers who had already been present in the U.S. labor market for some time. This, along with the fact that the other human capital characteristics of workers—in particular, English ability and education—would remain unchanged in the short run, led Bailey (1985, p. 22) to predict that "the replacement of all illegals with resident aliens who are otherwise similar would have only weak effects on the labor market." At the same time, however, there is some evidence that IRCA's legalization provisions may have resulted in an increased supply of migrant labor. Martin and Taylor (1988), for example, estimate that the number of Special Agricultural Workers (SAW) program applications received—1.3 million—was approximately four times the expected number based on previous calculations of the number of unauthorized farm workers in the United States.

Legal status can have a direct impact on wages because of explicit employer discrimination (see Portes and Bach 1985). While not specifically exempt from U.S. labor laws, unauthorized workers are less likely to know or exercise their rights in the face of employer exploitation. But employer exploitation is not required for wage differentials to arise. A lack of legal status may alter workers' behavior.[4] Further, unauthorized workers are highly concentrated in a few specific low-paying jobs that have become identified as traditional migrant or illegal workers' jobs (Cornelius 1976; Gill and Long 1989; Taylor 1992). Migration networks provide information and combine with constraints on job search and acquisition to produce this concentration (Massey et al. 1987; Kossoudji

---

[3] See North and Houston (1976); Chiswick (1984, 1988); Jones and Murray (1986); Kossoudji and Ranney (1986); Massey et al. (1987); and Bean, Lowell, and Taylor (1988).

[4] In particular, unauthorized workers may have lower reservation wages (Bailey 1985).

and Cobb-Clark 1996). Unauthorized workers are agricultural workers, dishwashers, busboys, or construction and day laborers not just because of their low levels of human capital but also because their friends, relatives, or coyotes helped them get those jobs.[5]

In addition, when unauthorized workers enter the U.S. labor market, they may be less likely to maximize wages than to minimize the risk of apprehension by the Immigration and Naturalization Service (INS). The inability to move freely throughout the U.S. labor market makes it more difficult for unauthorized workers to maximize the returns to their human capital over time (Calavita 1992), making returns and wage growth lower than for legal workers (Borjas and Tienda 1993). The risk of apprehension by the INS provides incentives for unauthorized workers to work in jobs that require little investment and training, and these workers, therefore, tend to have flat experience profiles. These features of employment impede future investment—perpetuating and exacerbating wage differences.

Recent studies analyze IRCA's legalization programs in an attempt to address some of these issues. Singer (1994) estimates cross-sectional earnings equations for amnesty recipients before and after legalization and points to important changes in wage determinants after legalization. Rivera-Batiz (1999) undertakes a longitudinal analysis of the impact of amnesty on the wages of formerly unauthorized workers and concludes that they enjoyed significant wage growth in the first 4 years after legalization. Both of these studies suggest that not only did a lack of legal status play a role in producing the wage gap between legal and unauthorized workers but to some extent newly legalized workers were able to make up for low unauthorized wages through faster wage growth after amnesty. Without a comparison group, however, it is not possible to definitively attribute these changes to legalization.

Our goal is to assess whether these changes are the result of a change in legal status or are due to fluctuations in U.S. labor market conditions that affect workers generally.[6] We will also present evidence on the magnitude of the wage gap associated with a lack of legal status and an estimate of the wage returns to amnesty. While we cannot say conclusively how wages would have changed if the specifics of IRCA's legalization programs had differed or if a new amnesty initiative were adopted today, we can use the results to speculate about the overall role of legal status in the U.S. labor market.

---

[5] Coyotes are agents who help migrants cross the border and sometimes act as labor agents. See Kossoudji (1992).

[6] Rivera-Batiz (1999) uses a cross-section of authorized workers from the 1990 Census to assess the extent to which the wage gap between authorized and unauthorized workers is explained by differences in returns rather than differences in characteristics.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1300 of 4699 PageID #:  4465

### III. Methodology and Data

#### A. Data Samples and Variable Definitions

To assess the impact of legalization, Congress authorized the INS to survey a random sample of unauthorized aliens applying for amnesty under the General Legalization Program. Detailed information was collected in 1989 about the job held immediately after first migrating to the United States to stay as well as the job held the week before the amnesty application was filed. Two-thirds of the respondents were reinterviewed in a follow-up survey in 1992. The merged data from these two Legalized Population Surveys (LPS) are used in this analysis.[7]

The IRCA's general legalization program included a continuous residency requirement to ensure that amnesty was granted to long-term immigrants rather than to temporary or commuting migrants. As a result, the LPS sample generalizes to the population of general amnesty recipients (within the restrictions below) but not to the unauthorized population as a whole.[8] Conclusions drawn from this analysis should not be strictly applied to either temporary or commuting migrants. Even so, the legalized population represents an important component of the unauthorized population, and its members' experiences while unauthorized, although not representative of all unauthorized workers, are common. Given that these workers represent long-term migrants dedicated to remaining in the United States, it is possible that any estimates of an unauthorized wage penalty based on this group underestimate the penalty for the population of unauthorized workers.

Men of similar ethnic background and immigration histories were chosen to reduce cultural differences that are correlated with wages. The LPS sample consists of Mexican and Central American men who came to the United States to stay after 1975, who were born after 1944, and who worked prior to legalization. The sample was further restricted to individuals who entered the United States without inspection (EWI), by far the most common means of entry for Mexican (96% EWI) and Central

---

[7] Individuals born before February 2, 1971 and granted temporary residence under section 245A of IRCA were interviewed in LPS1. Of the original 6,193 LPS1 respondents, 5,691 were eligible for LPS2. The majority (471) of those ineligible for LPS2 were removed from the sampling frame because they were still awaiting a decision on amnesty. Only four individuals were dropped because they had been denied amnesty. The INS randomly selected 5,000 (excluding 691 as a cost-cutting measure), and 890 respondents were not reinterviewed because they could not be found. See Singer (1994) for more detailed information on the survey methodology.

[8] About 5% of those who applied were denied amnesty, usually because they had not been resident since 1982 or because they could not provide adequate documentation (Woodrow and Passel 1990). Not all individuals who were eligible applied (Baker 1997).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1301 of 4699 PageID #:  4466

American men (86% EWI) during this period.[9] The sample size is 1,375, with 689 men observed in all three time periods.

A comparison group is necessary to isolate the effects of legal status from other factors. Since unauthorized migrants are typically young with little or no labor market experience at the time they enter the U.S. labor market, it is sensible to contrast their experiences with the experiences of other young new labor market entrants. The NLSY comparison sample is composed of Latino men (natives and immigrants) who were not in the NLSY military sample and who were new labor market entrants between 1979 and 1986.[10] Since 1979 was the first year of the NLSY panel, LPS men could enter the labor market as much as 3 years before NLSY men. The other two time periods are the same for both groups. Everyone in the NLSY was between the ages of 14 and 22 in 1979. The comparison sample size is 792, with 578 men observed in all three time periods.[11] In order to provide evidence on the robustness of the comparison sample results, we also discuss other subsamples of the NLSY.

Our method is quasi-experimental and uses the non–equivalent group technique. The NLSY men represent a comparison sample and not a control group. A control group would consist of long-term unauthorized immigrants who were randomly denied amnesty. Panel data on this group, of course, do not exist. The principal purpose of the comparison group is to help establish that postlegalization changes in wage determinants for LPS respondents do not simply reflect macroeconomic shifts in the economy that affect other workers as well. To this end, NLSY men do not have to be exactly like LPS men as long as the basic relationship between them would have been consistent in the absence of the policy change. Meyer (1995) notes that choosing a comparison group that is as similar as possible to the treatment group and considering multiple comparison

---

[9] To be eligible for amnesty, applicants had to have been continuously resident in the United States since 1982. Mexicans and Central Americans are 83% of the legalized population (North 1990) and are similarly represented in the overall illegal resident population (Woodrow and Passell 1987). Overall, 75% of the legalized population entered without inspection. For Mexicans and Central Americans, those who did overstay visas were much more likely to be from the educated elite and were very different from the mostly uneducated economic immigrants who constitute the bulk of the unauthorized population during this time period (for visa figures, see U.S. Department of Labor 1996).

[10] New labor market entrants are individuals who, for the first time, were not currently enrolled in school and who worked in the labor market more than 10 hours during the survey week.

[11] The LPS men reported wages in 1987 or 1988, depending on when they applied for amnesty. If NLSY respondents were employed in both 1987 and 1988, a random number generator was used to choose between the jobs.

groups can strengthen this type of methodology.[12] The NLSY provides the best data source for constructing comparison groups because it follows a cohort of young legal workers as they enter the U.S. labor market over the same period. The specific LPS and NLSY sampling restrictions were chosen so as to make the two samples as comparable as possible in terms of characteristics such as age and cultural background, while at the same time maintaining a sample size adequate for estimation.

Table 1 documents the variable definitions. In spite of the fact that the data come from two distinct sources, comparable variables were defined for both samples. Perhaps the most important exception is the way in which English language ability was measured in the two data sources. Legalized workers were asked which language they spoke best and about their ability to conduct six specific tasks in English. Individuals in the NLSY sample were asked specifically about their inability to speak English.[13] There were also some differences in measuring additional human capital investments.[14] An education interaction term for foreign schooling was used to discern whether the location of schooling matters.[15]

Employment in traditional unauthorized migrant labor markets was constructed using 3-digit occupation codes. The definition is identical for the two samples. Using the entire sample of unauthorized Latino men in LPS, we calculated the proportion that entered the U.S. labor market in each 3-digit occupation and industry. Occupations with higher than the median proportion of unauthorized workers were coded traditional migrant occupations, and eight sectors were identified as traditional migrant

[12] Meyer (1995) refers to this methodology as "the before and after design with an untreated comparison group."

[13] For LPS men, the tasks were to read newspapers, magazines, or recipes written in English and to speak English with sales clerks, professionals, or on the telephone. If they spoke English best or reported that they could do all six tasks, they were coded "speaking English." If they were able to perform three to five English tasks (two or fewer), they were coded speaking "some English" ("no English"). The NLSY men are coded as having an "English problem" if they reported in either 1979 or 1982 that a lack of English ability limited their chance of getting a good job.

[14] The LPS men who responded in period 2 that their last year of education had taken place in the United States were coded as having some U.S. education, while for NLSY men it was possible to directly identify when additional education was received. English language ability, total education, and marital status were assessed in periods 2 and 3 but not period 1 for LPS respondents. Period 1 variables were created using additional information from the survey.

[15] Foreign schooling is interacted with education 0–11 only. Since NLSY respondents were young at the time of the first interview, none of them who were high school graduates or had some college obtained all of their schooling in a foreign country.

industries (Cobb-Clark and Kossoudji 1994).[16] Four dummy variables identify jobs: traditional occupation but nontraditional industry, traditional industry but nontraditional occupation, traditional occupation and traditional industry, and neither a traditional occupation nor a traditional industry.

Descriptive statistics and wage rates for the unbalanced samples of LPS and NLSY men are presented in table 2.[17] As expected, legal Latino workers earned more on average in all periods than did legalized workers. Also as expected, LPS men were much more likely than NLSY men to be employed in traditional migrant jobs. Both move out of these jobs over time, but in 1992 LPS men were still three times more likely to be in a traditional migrant job. Over all the years covered, real individual wages rose an average of 26% for LPS men and 36% for NLSY men. This corresponds to an annual average wage growth of 2.3% for LPS men and 3.6% for NLSY men. Differences in the timing of wage growth are quite stark. In the prelegalization era, annual wage growth was 5.9% for NLSY men and 2.3% for LPS men. In contrast, LPS men's wages grew at an annual rate of 2.1% (9% overall), while NLSY mens' wages grew at only 1.1% (5% overall) during the postlegalization era.[18]

## B. The Empirical Model

We test the hypothesis that a change in legal status affects wages through the returns to productivity-related characteristics. We avoid any possible heterogeneity between legal and illegal workers by using panel data for men who began in the United States as unauthorized workers and then changed legal status. The data contain information for three points in time: entry into U.S. labor markets (1976–85), ongoing unauthorized work (1987–88), and ongoing legal work (1992). Wages are assumed to be a function of both time-varying and time-invariant characteristics. Specifically,

$$w_{it} = \beta_t X_{it} + \gamma_t \mathbf{X}_i^* + \delta_t \mathbf{D_i} + \theta_t t + v_{it}, \qquad (1)$$

[16] The eight industrial sectors are agriculture, construction, apparel manufacturing, eating and drinking establishments, auto repair shops, private household services, services to hotels, and services to other dwellings.

[17] Descriptive statistics for the balanced samples are essentially the same. They, and full descriptive tables with standard errors included, are available from the authors upon request until January 2003.

[18] Wage growth between 1988 and 1992 for the NLSY sample is consistent with that for other workers. U.S. Bureau of Labor Statistics reports (1989–96) show that real hourly wages fell 4% between 1988 and 1992 for all production and nonsupervisory workers on private nonfarm payrolls. Real wages also fell for young (age 16–24) full-time workers (by 12%) but increased for young part-time workers (by 9%).

001297

606                                                                 Kossoudji/Cobb-Clark

**Table 1**
**Variable Definitions**

| | LPS Sample | | NLSY Sample |
|---|---|---|---|
| Variable/Categories | Explanation | Variable/Categories | Explanation |
| **Wage:** | | | |
| Wage | Log of real hourly wage. | Wage | See LPS sample. |
| **English ability:** | | | |
| Speak English | Speak English "Best" or can do all 6 English tasks. | Problem | Lack of English ability limited job opportunities in 1979 or 1982. |
| Some English | Do not speak English "Best"; can do 3–5 English tasks. | | |
| No English | Do not speak English "Best"; can do < 3 English tasks. | | |
| **Education:** | | | |
| 0–5 | Years of schooling < 5. | 0–11 | 0 < years of schooling < 11. |
| 6–11 | Years of schooling < 11. | 12 | Years of schooling = 12. |
| 12 | Years of schooling = 12. | >12 | Years of schooling > 12. |
| >12 | Years of schooling > 12. | Foreign × 0–11 | Years of schooling < 11 and all schooling foreign. |
| **Additional education and training:** | | | |
| U.S. education | Received some U.S. education. | More education | Received additional education. |
| U.S. training | Attended vocational, trade, or business school. | More training | Attended training or O-J-T program designed to help get a job. |
| English class | Attended English classes beyond 40 hours required by IRCA. | | |
| **Geographic location:** | | | |
| Texas | Job located in Texas. | South | Census region (including TX) |
| California | Job located in California. | West | Census region (including CA) |

2 of 4699 PageID #: 4470

ірldefine

001298

Legal Status and Wages of Legalized Immigrants                607

**Traditional migrant labor market:**

| | | | |
|---|---|---|---|
| Occupation only | Occupation has more than median number of undocumented migrants. Industry is not in eight sectors. | Occupation only | See LPS sample. |
| Industry only | Occupation has less than median number of undocumented migrants. Industry is in eight sectors. | Industry only | See LPS sample. |
| Both | Occupation has more than median number of undocumented migrants. Industry is in eight sectors. | Both | See LPS sample. |
| Neither | Occupation has less than median number of undocumented migrants. Industry is not in eight sectors. | Neither | See LPS sample. |

**Demographics:**

| | | | |
|---|---|---|---|
| Mexican | Mexican | Mexican | See LPS sample. |
| Non-Mexican | Not a Mexican | Non-Mexican immigrant | See LPS sample. Respondent is an immigrant. |
| Married | Currently married | Married | See LPS sample. |
| Age | Current age | Age | See LPS sample. |

**Year of labor market entry:**

| | | | |
|---|---|---|---|
| 1976–83 | Single year dummies 1983 = 1983–86 | 1979–86 | Single year dummies |

**Table 2**
**Descriptive Characteristics**

| Variable | LPS Period 1 | LPS Period 2 | LPS Period 3 | NLSY Period 1 | NLSY Period 2 | NLSY Period 3 |
|---|---|---|---|---|---|---|
| Wage rates ($) | 4.66 | 5.48 | 6.12 | 5.37 | 7.59 | 8.15 |
|  | (2.32) | (2.76) | (3.03) | (3.85) | (4.59) | (4.89) |
| Ability in English: |  |  |  |  |  |  |
|   Speak English | 16.3 | 47.1 | 50.8 |  |  |  |
|   Some English | 41.3 | 20.6 | 27.7 |  |  |  |
|   English problem |  |  |  | 17.6 | 14.9 | 15.2 |
| Education (years): |  |  |  |  |  |  |
|   0–5 | 25.3 | 25.2 | 23.1 |  |  |  |
|   6–11 | 55.3 | 54.4 | 54.6 |  |  |  |
|   0–11 |  |  |  | 41.4 | 31.0 | 26.8 |
|   > 12 | 5.2 | 5.4 | 8.1 | 19.7 | 25.5 | 27.9 |
|   Foreign × 0–11 |  |  |  | 5.6 | 4.7 | 4.0 |
|   U.S. education | 6.8 | 8.0 | 16.3 |  |  |  |
|   More education |  |  |  | 18.9 | 11.4 |  |
|   More training |  | 8.3 | 20.2 | 40.0 | 33.4 |  |
|   More English |  |  | 38.0 |  |  |  |
| Location: |  |  |  |  |  |  |
|   Texas | 19.5 | 18.0 | 15.2 |  |  |  |
|   California | 60.5 | 58.4 | 58.3 |  |  |  |
|   South |  |  |  | 26.1 | 27.4 | 28.0 |
|   West |  |  |  | 48.5 | 51.0 | 50.9 |
| Traditional job: |  |  |  |  |  |  |
|   Occupation only | 10.1 | 9.1 | 12.2 | 9.2 | 10.3 | 10.2 |
|   Industry only | 19.6 | 30.4 | 30.6 | 17.3 | 16.4 | 20.1 |
|   Both | 42.0 | 20.8 | 16.8 | 15.5 | 8.1 | 5.9 |
| Demographics: |  |  |  |  |  |  |
|   Mexican | 63.5 | 63.3 | 64.3 | 36.0 | 36.3 | 36.3 |
|   Immigrant |  |  |  | 28.4 | 27.0 | 26.6 |
|   Married | 45.6 | 64.9 | 80.7 | 14.9 | 44.2 | 57.6 |
|   Age | 21.5 | 29.9 | 32.7 | 19.9 | 26.3 | 30.8 |
| First U.S. job: |  |  |  |  |  |  |
|   1976, 1977, or 1978 | 23.2 | 23.0 | 23.0 |  |  |  |
|   1979 | 13.5 | 13.5 | 13.2 | 26.4 | 25.4 | 25.6 |
|   1981 | 31.2 | 31.7 | 31.1 | 13.9 | 13.6 | 13.3 |
|   1982 | 9.3 | 9.3 | 9.4 | 18.6 | 18.7 | 18.7 |
|   1983 | 4.9 | 4.8 | 6.0 | 9.8 | 10.6 | 10.7 |
|   1984, 1985, or 1986 |  |  |  | 16.2 | 16.7 | 16.2 |
| $N$ | 1,375 | 1,297 | 689 | 792 | 678 | 578 |

NOTE.—Wage rates are measured in real 1983/1984 dollars, and age is measured in years. The rest of the variables represent the percentage of the sample in each category. Omitted categories make percentages add to 100%. For definition of variables, see table 1. Standard errors are in parentheses.

where $i$ indexes individuals and $t$ indexes time (1, 2, 3). In the model, $\mathbf{X}_{it}$ includes individual characteristics that vary over time, $\mathbf{X}_i^*$ is a vector of time-invariant characteristics, and $\mathbf{D}_i$ is a vector of dummy variables for year of labor market entry. Unmeasured period effects are captured by $t$. The error term, $v_{it}$ is assumed to be composed of two components, a random error term ($\epsilon_{it}$) and an individual-specific disturbance ($u_i$) that persists over time.

   Experience, cohort, and period effects receive a great deal of attention

in the immigrant assimilation literature, and many immigrant wage equations look like standard wage equations with additional variables that attempt to isolate these effects.[19] Although not often highlighted for natives, these three effects are equally important when one interprets the determinants of wages for legal workers. Separately identifying these effects, however, is impossible without imposing an identifying restriction. Borjas (1989), for example, identifies these effects in his wage model by restricting the impact of aggregate economic conditions to be the same for immigrants and natives. We are specifically interested in the way that legal status, which changes by time period in our sample, affects wage rates, so we have chosen a different method of incorporating these effects into the analysis. In our estimations, U.S. labor market experience and labor market entry cohort are captured in a vector of single year dummies for the year of U.S. labor market entry. Thus, experience and cohort effects are not separately identified.[20] This strategy is appealing for this analysis because the small migration window (1975–82) means that there are not large cohort differences to measure and because we are not comparing workers with vastly different amounts of U.S. labor market experience. In the first period, coefficients on the year of labor market entry can be interpreted solely as cohort effects since there is no U.S. experience. In periods 2 and 3, the coefficient on the year of labor market entry is interpreted as the lingering effect of having entered the labor market in a specific year (the cohort effect) and having a specific number of years of experience (the experience effect).

## IV. Legal Status and Wages: Empirical Results

### A. Specification Issues

Since we are interested in the legalized population, we gave precedence to correctly specifying the model for the LPS sample. Corresponding tests were conducted for the NLSY sample to provide information about differences between the two groups. We paid particular attention to two specification issues that are typically associated with the use of a panel model.[21] The first is whether correlation of the individual effects with the regressors in the model leads random effects estimation to be inconsistent.

---

[19] Borjas (1989), e.g., includes age, years of U.S. residence, and a continuous measure of the calendar year of migration, along with a dummy variable for the year in which wages were observed.

[20] Year of entry into the United States is not included because crossing the border and entry into labor markets are usually simultaneous for unauthorized workers. In the sample, 70% began their first U.S. job in the same calendar year as the year of migration, and 90% held their first job by the next calendar year.

[21] For both the balanced and unbalanced NLSY and LPS samples, a Breusch-Pagan test (1980) strongly rejected the hypothesis that individual-specific effects were not present in the data.

The second is whether it is more appropriate to use a balanced (only those present in all periods) or unbalanced sample for the estimation.

Hausman (1978) specification tests revealed no problem for LPS men, but test statistics for the NLSY sample pointed to the traditional specification problem: the correlation between schooling and the individual effects (usually interpreted as ability). We could find no suitable instrument for schooling and no means of measurement that would reduce the Hausman statistic substantially for the NLSY sample.[22] In order to maintain comparability, we chose to continue to estimate a random effects model, despite the possible correlation problem in the NLSY sample, following most researchers in the literature.

We also considered the possibility that sample attrition would lead to bias in our estimates. A dummy variable indicating responses in all three time periods was included in the unbalanced regressions, but this was consistently insignificant. Quasi-Hausman tests for this type of bias (Verbeek and Nijman 1992) also failed to find evidence of selectivity.[23] These calculations and inspection of the descriptive statistics of the two samples convinced us that sample attrition did not bias the estimates. The unbalanced sample regressions are presented in what follows.[24]

### B. Structural Change in the Wage Generating Process

Our goal is to test whether the wage generating process changes as workers move from being unauthorized to legalized. Equation (1) was estimated restricting coefficients to be the same in all periods. These coefficients were compared with estimates obtained from the unrestricted version of equation (1) in which all coefficients were allowed to vary over time.[25] These estimates are used to test the following hypotheses:

HYPOTHESIS 1.    $\kappa_1 = \kappa_2 = \kappa_3$,
HYPOTHESIS 2.    $\kappa_1 = \kappa_2$,
HYPOTHESIS 3.    $\kappa_2 = \kappa_3$,

where $\kappa = [\beta, \delta, \gamma, \theta]$ and the subscripts refer to the three time periods.

If legal status influences wages by changing the returns to productivity-related characteristics, then the wage generating process will change after LPS men become legal workers. A rejection of no change in the wage

---

[22] If we assume that ability is an individual attribute and that ability and schooling are positively correlated, then the schooling coefficients are biased upward for the NLSY men.

[23] The $\chi^2$-test statistic from the quasi-Hausman tests comparing the random effects estimators for the balanced and unbalanced LPS sample was 25.7 with 26 degrees of freedom. For the NLSY sample, it was 24.5 with 23 degrees of freedom.

[24] Balanced sample results are available upon request from the authors until January 2003.

[25] These tests correspond to Chow tests and provide information about the extent to which the data can be pooled across periods (Baltagi 1995).

Table 3
**Tests of Structural Change: LPS and NLSY Samples**

|  | Hypothesis 1 | Hypothesis 2 | Hypothesis 3 | Sample Size |
|---|---|---|---|---|
| LPS sample: |  |  |  |  |
|   Balanced: |  |  |  |  |
|     Test result | Reject | Reject | Reject | 689 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 118.61 (46) | 44.20 (22) | 44.11 (24) |  |
|   Unbalanced: |  |  |  |  |
|     Test result | Reject | Reject | Reject | 1,375 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 150.99 (46) | 69.15 (22) | 43.98 (24) |  |
| NLSY sample: |  |  |  |  |
|   Balanced: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 578 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 85.94 (41) | 58.80 (19) | 26.97 (22) |  |
|   Unbalanced: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 792 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 86.60 (41) | 41.91 (19) | 29.50 (22) |  |
| Additional NLSY samples (all |  |  |  |  |
|   unbalanced): |  |  |  |  |
|   Hispanic immigrants and |  |  |  |  |
|     first generation native |  |  |  |  |
|     born: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 396 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 82.80 (41) | 36.99 (19) | 29.97 (22) |  |
|   Hispanic immigrants: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 225 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 54.17 (33) | 25.58 (15) | 25.33 (18) |  |
|   Mexican and Central Ameri- |  |  |  |  |
|     can immigrants: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 153 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 52.78 (31) | 25.28 (14) | 25.41 (17) |  |
|   Hispanic natives: |  |  |  |  |
|     Test result | Reject | Reject | Do not reject | 567 |
|     Statistic (degrees of |  |  |  |  |
|       freedom) | 68.24 (35) | 31.31 (16) | 27.65 (19) |  |

Note.—Hypotheses were tested at $\alpha = 5\%$.

structure of LPS men, however, is insufficient evidence that the change in legal status drives the difference. It could simply reflect specific features of the economy during the years represented in the panel. Since there are no similar a priori expectations for the NLSY men, the interpretation issue is resolved by comparing the structural change tests in the two samples. These test statistics are reported in table 3.

The first test corresponds to the simple hypothesis that the wage generating process does not vary across time. This hypothesis was rejected for the balanced and unbalanced LPS and NLSY samples. The second test examines whether the determinants of wages were the same for the

first job and the job held in 1987–88. This hypothesis is also rejected for all four samples, indicating that labor market entry wages and wages for experienced workers are structurally different whether the workers are unauthorized or legal. The third test compares 1987–88 wages (the week before the amnesty application was filed) with those earned in 1992 (the postlegalization period). We reject the hypothesis that the wage determinants were the same in these two periods for both the balanced and unbalanced samples of LPS men but fail to reject it for either group of NLSY men. This suggests that a change in legal status (and not just the timing of the data or macroeconomic conditions) spurred a significant change in the wage generating process for the legalized population.

To determine the robustness of these results, we follow the standard procedure and replicate the analysis for other comparison groups (Card and Kruger 1994; Meyer 1995). The bottom panel of table 3 reports on the structural change tests for several alternative comparison samples. There is always a significant shift between entry wages and wages in 1987–88 but never a significant shift in wage structures between 1987–88 and 1992. For each of these NLSY samples, but not for the LPS sample, the data in those two periods could be pooled and a single coefficient estimated.

The consistency of these results suggests that legalization did provide the impetus for structural change for legalized men. In July of 1988, however, the California minimum wage rose to $4.25, which was above the federal minimum of $3.35. We controlled for geographic location in our regressions, yet this change may influence the wage growth of LPS men differentially because a higher proportion of them live in California. We reestimated the basic equations for LPS and NLSY separately for California (West) and non-California (non-West) leading to much smaller samples and more collapsing of variables. Structural change tests were inconclusive, showing definite postlegalization structural change for LPS men in California, less consistently measured structural change for other LPS men, and, as usual, no structural change for NLSY men in any geographic locale. In addition, surprisingly few LPS or NLSY men were subject to the California minimum wage increase, and postlegalization wage growth did not depend on location. Even if we assumed that all of the wage increase for low-wage workers in California (the West) for LPS (NLSY) men came from the California minimum wage change and not IRCA, IRCA still accounts for more than 53% of the difference in wage growth between these two groups.[26]

[26] Only 16% of LPS men in California earned less than $4.25 at any time in 1987–88, as did 8% of NLSY men who lived in the western region. Wage growth, however, was principally differentiated by whether or not workers earned less than $4.25 in period 2, not by their location. Of those who earned below $4.25

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1311 of 4699 PageID #:  4476

## C. Wage Generating Processes for Unauthorized and Legal Workers

The structural change tests discussed above provide important evidence that amnesty resulted in a significant change in the wage generating process for the legalized population. Our focus now turns to developing a better understanding of the source of that structural change. In particular, we are interested in how the determinants of wages changed when the LPS sample changed legal status. Amnesty gave previously unauthorized workers the ability to move freely throughout the U.S. labor market—for the first time—allowing them to maximize the returns to their human capital. In order to isolate the effects of legalization from the effects of macroeconomic changes in the broader labor market, we will compare the changes in wage determinants for LPS workers with those for NLSY workers.

Columns 1–3 of table 4 report the estimated coefficients from the unrestricted wage model (eq. [1]) for the LPS sample. Each of these first three columns reports the coefficients for a specific time period. Column 4 presents the estimates from a restricted version of equation (1) in which the determinants of wages are constrained to be the same over time. The same estimates for NLSY men are presented in table 5.

*Wages for labor market entrants.*—We have suggested that unauthorized workers minimize the risk of apprehension in their first jobs rather than maximize wages and that this weakens the relationship between human capital and wages. In fact, there is no evidence that human capital characteristics (including English language ability) have an impact on the entry wages of unauthorized workers. In unauthorized labor markets, entry wages exhibit much of the character of competitive wage markets for undifferentiated labor. There is no significant difference in the wages of workers who speak English well and those who do not speak English at all, and there is no significant wage gain associated with higher levels of formal education. Workers in traditional migrant jobs do have wages that are 5% lower and significantly different from the wages of workers in nontraditional jobs.

The timing of labor market entry is, however, related to wages in the first U.S. job. The interpretation of the year of entry dummies is straightforward for the first job; it measures a pure entry cohort effect. Workers who entered earliest (1976 or 1977) have higher wages than those who entered in 1980 (the beginning of the U.S. recession and the omitted year). Workers entering after 1980 have lower wages than 1980 enterers, with the lowest entry wages being for 1982, the deepest part of the U.S. re-

---

in period 2, total real wage growth between periods 2 and 3 was 40.4% (LPS men in California), 36.7% (LPS outside of California), 36.8% (NLSY in the west), and 40.2% (NLSY outside of the west). Of those who earned at least $4.25 in period 2, no group had total real wage growth higher than 5.0%.

**Table 4**
**Determinants of Log Wages for LPS Men (Unbalanced Sample)**

| | Unrestricted | | | Restricted |
|---|---|---|---|---|
| | Period 1 | Period 2 | Period 3 | |
| Some English | −.0502 | −.0604* | −.0632* | −.0702* |
| | (.0318) | (.0277) | (.0353) | (.0173) |
| No English | −.0079 | −.0490** | −.1450* | −.0468* |
| | (.0333) | (.0258) | (.0394) | (.0193) |
| Education (0–5) | −.0305 | −.0660* | −.1640* | −.0653* |
| | (.0359) | (.0373) | (.0505) | (.0258) |
| Education (6–11) | −.0088 | −.0276 | −.1176* | −.0349 |
| | (.0309) | (.0316) | (.0423) | (.0217) |
| Education (>12) | .0547 | .0274 | .1119* | .0810* |
| | (.0510) | (.0513) | (.0609) | (.0339) |
| U.S. education | .0268 | .0718* | .0672 | .0595* |
| | (.0454) | (.0423) | (.0425) | (.0277) |
| U.S. training | | −.0054 | −.0177 | .0141 |
| | | (.0375) | (.0359) | (.0256) |
| U.S. English class | | | −.0245 | −.0160 |
| | | | (.0291) | (.0286) |
| Occupation only | −.0259 | −.0378 | .0128 | −.0288 |
| | (.0356) | (.0371) | (.0453) | (.0232) |
| Industry only | −.0235 | .0397 | −.0115 | .0057 |
| | (.0290) | (.0244) | (.0334) | (.0171) |
| Both | −.0545* | −.1180* | −.1126* | −.0764* |
| | (.0241) | (.0279) | (.0408) | (.0173) |
| First job: | | | | |
| 1976 | .1760* | .0804 | .0928 | .1281* |
| | (.0490) | (.0509) | (.0713) | (.0366) |
| 1977 | .1543* | .0952* | .0397 | .1124* |
| | (.0436) | (.0458) | (.0623) | (.0327) |
| 1978 | .0761 | .0311 | −.0107 | .0404 |
| | (.0402) | (.0425) | (.0572) | (.0303) |
| 1979 | .0132 | .0113 | −.0097 | .0103 |
| | (.0366) | (.0380) | (.0523) | (.0274) |
| 1981 | −.1197* | −.1041* | −.1430* | −.1220* |
| | (.0300) | (.0311) | (.0425) | (.0225) |
| 1982 | −.2307* | −.0650 | −.1761* | −.1626* |
| | (.0411) | (.0425) | (.0574) | (.0305) |
| 1983 | −.1970* | −.1354* | −.1826* | −.1907* |
| | (.0545) | (.0569) | (.0725) | (.0396) |
| $t$ = period 2 | | −.7761* | | .1177* |
| | | (.3893) | | (.0209) |
| $t$ = period 3 | | | .0008 | .2120* |
| | | | (.6003) | (.0286) |
| $N$ | 1,375 | 1,297 | 689 | 3,361 |

Note.—The following variables are in the equation but are not documented above: Mexican, marital status, residence, age, age squared, a dummy for presence in all waves, and a constant term. Standard errors are in parentheses.

* Significant at $\alpha = 5\%$. Tests are two-tailed except for the education and English variables.

**Table 5**
**Determinants of Log Wages for NLSY Men (Unbalanced Sample)**

| | Unrestricted | | | Restricted |
|---|---|---|---|---|
| | Period 1 | Period 2 | Period 3 | |
| English a problem | −.0895* | −.1255* | −.1083* | −.1056* |
| | (.0462) | (.0533) | (.0568) | (.0359) |
| Education (0–11) | −.0561 | −.1631* | −.0706 | −.0917* |
| | (.0352) | (.0415) | (.0450) | (.0267) |
| Education (>12) | .2121* | .3059* | .2155* | .2483* |
| | (.0428) | (.0422) | (.0447) | (.0292) |
| Foreign education × 0–11 | −.0075 | −.0306 | −.0811 | −.0241 |
| | (.0817) | (.0953) | (.1100) | (.0642) |
| More U.S. education | | −.1231* | −.0505 | −.0785* |
| | | (.0422) | (.0554) | (.0332) |
| U.S. training | | .0840* | .1499* | .1340* |
| | | (.0332) | (.0367) | (.0246) |
| Occupation only | −.0677 | −.0847 | −.2162* | −.1172* |
| | (.0513) | (.0528) | (.0579) | (.0319) |
| Industry only | −.0211 | .0261 | −.0660 | −.0185 |
| | (.0395) | (.0436) | (.0432) | (.0256) |
| Both | −.0239 | −.1486* | −.2693* | −.0940* |
| | (.0428) | (.0601) | (.0734) | (.0325) |
| First job: | | | | |
| 1979 | .0888 | .1023 | .0300 | .0719 |
| | (.0503) | (.0542) | (.0574) | (.0381) |
| 1981 | −.0443 | .0299 | −.0407 | −.0148 |
| | (.0562) | (.0611) | (.0658) | (.0430) |
| 1982 | −.1443* | −.0439 | .0517 | −.0554 |
| | (.0523) | (.0564) | (.0598) | (.0397) |
| 1983 | −.2825* | −.2393* | −.1954* | −.2384* |
| | (.0621) | (.0659) | (.0700) | (.0468) |
| 1984 | −.1178 | −.0317 | −.1552 | −.0961 |
| | (.0727) | (.0763) | (.0806) | (.0542) |
| 1985 | −.2465* | −.1750* | −.1358 | −.2006* |
| | (.0727) | (.0808) | (.0889) | (.0561) |
| 1986 | −.0863 | −.1608 | −.2149* | −.1418* |
| | (.0912) | (.0954) | (.1002) | (.0675) |
| *t* = period 2 | | .2452* | | .2002* |
| | | (.0723) | | (.0231) |
| *t* = period 3 | | | .2558* | .2387* |
| | | | (.0741) | (.0241) |
| *N* | 792 | 678 | 578 | 2,048 |

Note.—The following variables are in the equation but are not documented above: ethnicity, marital status, residence (South, West), dummy for presence in all waves, dummy for immigrant status, and a constant term. Standard errors are in parentheses.
* Significant at α = 5%. Tests are two-tailed except for the education and English variables.

cession. Thus, U.S. macroeconomic conditions appear to have a strong impact on the entry wages of unauthorized workers. Real wages for those entering in 1982 were 23% lower than for those entering in 1980 and 41% lower than for 1976 entrants.

In contrast, the wages of NLSY men at labor market entry are more consistent with standard human capital theory. Specifically, those workers having problems with English face a 9% wage reduction and those having more education than a high school diploma earn a 21% wage premium.

There is no wage disadvantage, at first job, of having less than a high school diploma. Nor is there a disadvantage from holding jobs like those of traditional migrants. The year of labor market entry has no significant positive impact before 1980 and no significant negative impact on real wages except in 1982 and 1985.

*Wages for ongoing workers (1987–88).*—Once unauthorized workers have gained some U.S.-specific work experience—and have established a certain facility at avoiding the INS—they begin to become differentiated workers. This differentiation, however, is based on easily observable skills and actions that are likely to be seen by employers in casual contact. A facility with English may prove to be especially useful for moving into higher level positions with the same employer, and unauthorized workers who speak English well earn a small (5%–6%) wage premium relative to workers who speak some or no English. Employers who are concerned about INS raids may only choose to promote (say, from dishwasher to waiter) or use the best English speakers for jobs that require dealing with the public. In addition, acquiring some U.S. schooling (no matter what the level) is also associated with higher wages (7%). At the same time, higher levels of schooling do not bring wage rewards. There is a reduction (7%) in wages associated with the very lowest schooling category (0–5 years), but neither having 6–11 years nor having at least some college distinguishes wages from those of high school graduates.[27] The pattern of these coefficients is consistent with the notion that, in unauthorized labor markets, employers are rewarding workers on the basis of easily observable traits such as literacy, numeracy, and oral skills. Overall, however, the relationship between human capital characteristics and wages is still relatively weak.

The type of job a worker holds doubles in impact during this ongoing phase of an unauthorized worker's career, and LPS men who still work in a traditional migrant job earn 12% less than other workers. There was a high rate of "occupational churning" through a limited set of occupations between the first job and the ongoing unauthorized job (Kossoudji and Cobb-Clark 1996). This job changing activity may partially reflect the onset of wage maximizing behavior as these workers become more established, gain information about alternative job possibilities, and become savvy about U.S. employment in general. It is the joint impact of working in these traditional jobs and in the industries where unauthorized employment is high that reduces their wages. Also, workers who are still employed in traditional markets after several years of U.S. employment

---

[27] For unauthorized Mexican and Central American men, high levels of schooling may be less indicative of ability and motivation than of class and residence in the home country.

may be less motivated, less able, or more risk averse than those who move on.

The effects of entry cohort and U.S. labor market experience combine to produce fewer wage differences among unauthorized workers in the period 1987–88. The effects of year of labor market entry are smaller than they were for the entry wage—suggesting that initial wage losses incurred from entering in a bad year are, to some extent, made up with experience. With the exception of a few specific years, 1987–88 real wages are generally unaffected by year of entry.

In comparison, after being in the labor market for several years, NLSY men have very standard-looking wage equations. Workers who have problems with English or lack a high school degree face significant wage penalties (13% and 16%, respectively), while those who have education above a high school degree or new training enjoy significant wage premiums (31% and 8%, respectively). The NLSY workers employed in traditional migrant jobs earn significantly lower wages (15%), but, as was the case for unauthorized workers, the initial impact of entry cohort appears to have been mitigated by experience.

*Wages for ongoing legalized workers (1992).*—By 1992, LPS men have been legal residents for about 4 years. There are several important changes in the way in which wages are generated that are consistent with a formalization of employment relations. The premium for speaking English well remains much the same as it was in 1987–88, but there is also now a large penalty for not speaking English at all. In 1992, unauthorized men who speak no English earn 15% less than those who speak English well and 8% less than those who speak some English. This English penalty may reflect the new job opportunities that arose after amnesty for those with reasonable communication skills in English. Employers who had employed only the best unauthorized English speakers in public jobs because of the fear workers' illegal status would be recognized can now, with confidence, promote good newly legalized workers whose English skills are sufficient for basic communication needs. Similarly, workers with some English skills are in a better position to seek out and move on to new (and better paying) jobs.

For the first time, legalized workers find that having a high school diploma or education beyond high school now pays off in higher wages. Legalized workers who potentially lack basic literacy and numeracy skills (0–5 years of school) face a 16% wage reduction as compared with workers who have a high school diploma. Those with 6–11 years of education face a 12% wage reduction. Furthermore, workers with more than a high school education earn a wage premium of 11%. This strengthening of the role of education in determining wages almost certainly does not come about because employers suddenly realize the value of their employees' abilities. Rather, legal resident status has given these workers the ability

to find jobs that require or reward education credentials. The freedom to move freely throughout the labor market without the risk of apprehension offers legalized workers higher returns to education.

Simply acquiring additional training or attending English language classes between 1987–88 and 1992 does not result in higher wages for legalized men. For them, it is the level of skills that matter. This is in contrast with NLSY workers, who continue to receive large benefits from occupational training. One possibility is that this difference results from the types of training programs to which the two groups had access. As part of the legalization hurdle, IRCA required that applicants demonstrate that they had attended an INS-approved English/civics course for a minimum of 40 hours. These courses were severely underfunded and were felt by many observers to be completely inadequate for providing even the most basic skills (Baker 1997).[28] Alternatively, LPS workers may have simply lacked the skills necessary to take advantage of the training they received.

Finally, a bifurcation in wages separates LPS workers who entered the U.S. labor market before 1980 from those who entered later. In 1992, the later arrivals' wages are still 14%–18% lower than the earlier arrivals' wages. The lingering impact of beginning one's U.S. work life during a major recession is still strong for legalized workers.

One major change for NLSY men in 1992 is that working in traditional migrant markets is now associated with a 27% wage penalty, almost double the penalty that existed in 1987–88. In addition, working in a traditional occupation, no matter what the industry, results in a 22% wage penalty. After a number of years in the labor market, the type of job, whether or not it is in the traditional migrant labor market, matters for NLSY men.

Overall, the postlegalization changes in wage determinants for legalized workers are consistent with labor market mobility, which provides workers with an opportunity to move into jobs that reward existing human capital. In particular, legalized workers who speak English or who have higher levels of education begin to earn a significant wage premium after legalization. The wage generation process for legalized workers begins to mirror that of other workers. These results stand in contrast to the prelegalization period during which there was little or no relationship between human capital and wage rates for unauthorized workers.

[28] Applicants were not required to be proficient enough to pass the English and civics test; they were simply required to attend. Baker quotes one official as saying, "Most of them require at least 90 to 150 hours of English training for even the most limited skills. All 40 hours does is keep them in their present low-wage job and social position" (Baker 1997, p. 16).

### D. Expected Wages, Wage Growth, Unauthorized Penalties, and Legalization Gains

Did IRCA bring long-term unauthorized workers "out of the shadows"? To discuss the role of legal status in wages and wage growth, one must consider both the penalty of unauthorization and the gain from legalization. Differential wage growth is integrally bound up with the losses incurred by LPS men because of their relative lack of human capital while LPS men were unauthorized and NLSY men were legal workers. But a turnaround can come after legalization, when previously unauthorized workers can freely invest in new human capital and maximize the returns to existing human capital without the constraint of being discovered by the INS. There is no simple way to measure the magnitude of either of these values, but we provide some rough benchmarks in this section.[29]

These calculations are in table 6. The left panel reports wages in each period, while the right panel reports the growth in average wages. The first two rows document actual average wages and the growth in average wages. In row 3 we ask what wages would have been if legalized men had always been receiving the returns of the legal (NLSY) labor market. Similarly, row 4 predicts NLSY wages if NLSY men (even with the legal market's incentives for the timing of their human capital changes) were earning the same returns as unauthorized workers. The exact numbers in rows 3 and 4 should be treated with caution because not all variables are defined in the same way in the two samples and because these are two different groups of workers. In particular, since NLSY men were more likely to have U.S. schooling (which is better rewarded in U.S. markets), we believe that the figures in row 3 are too high and the figures in row 4 are too low. They are estimates only.

How much did LPS men lose simply because they were getting low returns to their existing human capital while unauthorized? Our benchmark calculations (row 5) suggest that, in their first U.S. job, unauthorized men's wages would have been 14% higher if they had been legal workers. This 14% increase comes in spite of the relatively low levels of human capital at labor market entry for the LPS sample. After a number of years

---

[29] To set boundaries on the wage penalty for being undocumented, we make an across-sample comparison. Specifically, we consider how wages would have changed if LPS and NLSY workers retained their own characteristics but had faced the returns of the other sample. We provide benchmarks of the gain to legalization through within sample comparisons. We first ask how 1992 wages would have changed if workers had their own 1992 characteristics but those characteristics were evaluated at their own 1987–88 returns. We then ask how 1992 wages would have changed if workers 1987–88 characteristics were evaluated at their own 1992 returns. These methods take into account observed characteristics and individual heterogeneity.

**Table 6**
**Average Wages and Wage Growth Calculations of IRCA Benefits and the Penalty of Being Unauthorized**

|  | Wage Levels by Period ($) | | | Growth in Average Wages by Period (%) | | |
|---|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (1–2) | (2–3) | (1–3) |
| (1) LPS | 4.66 | 5.48 | 6.12 | 16.2 | 11.1 | 27.3 |
| (2) NLSY | 5.37 | 7.59 | 8.15 | 34.6 | 7.1 | 41.7 |
| (3) LPS in NLSY market* | 5.32 | 6.68 | 7.59 | 22.8 | 12.8 | 35.6 |
| (4) NLSY in LPS market* | 4.68 | 5.54 | 6.57 | 16.9 | 17.1 | 34.0 |
| Rough benchmark of penalty: | | | | | | |
| (5) LPS earning NLSY returns relative to earning their own returns (row 3/row 1) | 1.14 | 1.22 | 1.24 | | | |
| (6) NLSY earning LPS returns relative to earning their own returns (row 4/row 1) | 1 | 1.01 | 1.07 | | | |
| Rough benchmark of gain: | | | | | | |
| LPS men: 1987–88 to 1992 | | | | | | |
| (7) Calculated wage ($) using period 2 returns and period 3 characteristics | | | 5.63 | | | |
| (8) LPS period 3 wages relative to period 2 returns with period 3 characteristics (row 1/row 7) | | | 1.09 | | | |
| (9) Calculated wage ($) using period 3 returns and period 2 characteristics | | | 5.90 | | | |
| (10) LPS period 3 wages relative to period 3 returns with period 2 characteristics (row 1/row 9) | | | 1.04 | | | |
| NLSY men: 1987–88 to 1992 | | | | | | |
| (11) Calculated wage ($) using period 2 returns and period 3 characteristics | | | 7.90 | | | |
| (12) NLSY period 3 wages relative to period 2 returns with period 3 characteristics (row 2/row 11) | | | 1.03 | | | |
| (13) Calculated wage ($) using period 3 returns and period 2 characteristics | | | 7.92 | | | |
| (14) NLSY period 3 wages relative to period 3 returns with period 2 characteristics (row 2/row 13) | | | 1.03 | | | |

\* Denotes items in the row represent calculations made by using the sample's own characteristics but the returns for the other sample.

in the unauthorized market, the penalty has increased to 22%. Changing returns after legalization for legalized men arrest, but do not lessen, the penalty that results from lower returns in unauthorized markets. If they had been legal workers for all of their U.S. working lives, wages in 1992 would have been 24% higher than were actual wages.

We suspect that legalized men had little incentive to invest in human capital while unauthorized and then had large incentives to invest once legalized. If we assume that they would have invested along a time path

like that of NLSY men (heavy investment early in one's career, less later on) if they had been legal workers, we can also estimate the cost of the delay in human capital investment that comes from being unauthorized. Without accounting for different returns, we note that if both LPS and NLSY men start out in the same market (comparing rows 2 and 3 or rows 1 and 4), their starting wages are almost exactly the same. If we compare actual wages of legalized men to the predicted wages of NLSY men, assuming they had LPS returns but their own actual human capital investment path, we find that, by 1992, NLSY wages would have been 7% higher than LPS wages (row 6). Similarly, if we compare both groups in the NLSY market, wages for NLSY men would have been only 7% higher (comparing rows 2 and 3). That is, the delay in human capital investment alone may have cost legalized men significantly.

On the other hand, if IRCA's amnesty provision were not passed, legalized men would still be employed as unauthorized workers. Overall, average real wages increased by 11.1% for legalized men after legalization but only increased for NLSY men by 7.1%. Actual wages for legalized men were 9% higher than they would have been if there had been no changes in returns in the postlegalization period (row 8). The NLSY men were not subject to legalization, but they experienced changes in returns that resulted in their wages being 3% higher than they would have been if there had been no change in returns (row 12). This suggests that the additional wage growth associated with changes in the return to human capital after legalization was on the order of 6%. It does not appear that legalized men received any additional wage growth from the ability to freely invest in human capital after legalization (but relatively late in their careers). Comparing row 10 with row 14 shows only a one percentage point difference.

Similar ratios were calculated to compare legalized men with the very small sample of the NLSY Mexican and Central American immigrants ($n = 153$; see table A1 in the appendix for regression estimates). We estimate the equations much less precisely for this small NLSY subsample, and many categories are collapsed. Even when we compare legalized men with this group of NLSY immigrants, however, the penalty for unauthorized work is high. Legalized men would still earn 1.18 times the 1992 LPS wage if working in this group's market (as compared with the 1.24 in row 5). Even though the penalties for working illegally show up in this comparison, the extra gains from legalization disappear when LPS men are compared with this very similar group of workers.

These results are consistent with those of Rivera-Batiz (1999), who also concludes that legalized Mexican workers enjoyed significant wage gains after legalization. At the same time, however, the "true" effect of legalization may be understated because the effect of legalization and the effect of employer sanctions are confounded. Empirical research generally sug-

gests that IRCA led to deterioration in the wages and working conditions of those workers who remained unauthorized (Donato, Durand, and Massey 1992*a*; Donato and Massey 1993; Phillips and Massey 1999; Bansak and Raphael 2001). Thus, if employer sanctions had been adopted but amnesty had not, it is possible that the wage gap between our LPS and NLSY samples would have widened even further relative to the prelegalization period.

## V. Conclusion

Our objective has been to use IRCA's legalization provisions as an opportunity to assess whether and how legal status per se affects wages in the U.S. labor market. The sample used in this analysis consists only of Mexican and Central American legalized men, and the additional restrictions on the timing of migration and the age at migration prevent us from generalizing these findings to the entire legalized population. At the same time, Mexicans and Central Americans did, in fact, represent 83% of the legalized population, and unauthorized migration was at its peak during the years when these men migrated. The lack of a control group prevents us from making definitive statements about the impact of legal status. In order to strengthen our results, we have carefully chosen the samples to be as similar as possible and have considered a variety of comparison samples. Although they are not definitive, our results provide strong evidence that IRCA's amnesty provisions improved the labor market opportunities of legalized workers.

The evidence in Section III showed that there was structural change in wage determinants for both LPS and NLSY men between their first U.S. job and 1987–88. Not evident from the structural change tests, however, is the size of the changing returns for NLSY men early in their work lives. The NLSY men experienced a 34.6% rate of growth in average wages in the prelegalization period, but they would have experienced only 16.9% growth if they had been receiving LPS returns. This wage growth is most likely closely related to job mobility. Topel and Ward (1992), for example, find that one-third of wage growth in the first 10 years after labor market entry stemmed from job changing activity. The NLSY men are free during the prelegalization era to move out of poorly matched jobs and seek new jobs that maximize their wages. Their wages grow quickly as they eliminate job mismatches. The LPS men, on the other hand, are not free to pursue job opportunities until after legalization. After legalization, their wages also begin to grow.

The postlegalization gains for the LPS sample appear to result primarily from changes in returns to human capital. Structural change tests for legalized workers soundly reject the hypothesis that the structure of wage determinants was constant over this policy shift. They also reveal that the

structure of wage determinants did not change for any comparison sample of legal workers, providing evidence that the changes occurring for legalized men did result from their new legal status rather than from the macroeconomic conditions associated with the particular timing of the data. However, further investigation into the role of the California labor market in producing these results is warranted because, of all workers, the shift was most pronounced for those in California. We do not know if these changes were completely separate from the effects of legalization or if California's more liberal labor market environment simply created a more hospitable environment in which legalization could operate.

The size of the legalized population (1.7 million), their eligibility for citizenship, and the unique policy experiment that changed their legal status make them an interesting case study. This legislation does appear to have brought these workers "out of the shadows." Once legalized, LPS men gained more from investing in their human capital, and from changing returns to human capital, than NLSY men. While NLSY men follow the traditionally observed path of early high investment and high wage growth with a tapering off for both later on, LPS men engage in these activities only after legalization. Because of the delay, the ultimate value of the investments is altered and, by any calculation, wages are lower than they would be if LPS men had never been unauthorized workers.

We can only speculate about how our estimated returns to legalization would have differed if IRCA's legalization provisions had been broader or, alternatively, if another legalization program were adopted today. The IRCA's legalization provisions and employer-sanctions provisions themselves appear to have altered the labor market for undocumented workers in the United States. Legalization seems to have altered the national origin mix of the remaining unauthorized population (Baker 1997). In addition, there is evidence that discrimination has grown in response to IRCA's employer sanctions provisions (U.S. General Accounting Office 1990; Lowell, Teachman, and Jing 1995) and employers have turned to subcontracting (particularly in agriculture) as a means of avoiding prosecution and reducing the paper work associated with IRCA (Martin and Taylor 1991; Martin 1996). The deterioration in the U.S. wages and working conditions of undocumented workers after IRCA implies that the gain to amnesty would be larger today than it was when legal status was granted under IRCA.

Despite IRCA, unauthorized migration has continued unabated. Donato, Durand, and Massey (1992*b*), for example, conclude that IRCA has not affected the probability of initially migrating without documents, of making subsequent illegal trips, or of being apprehended at the border. Chau (2001) provides one explanation for this, noting that the effectiveness of employer sanctions depends on employers' and immigrants' ex-

pectations about the probability of workplace apprehensions. In the first 8 years after IRCA, the resources devoted to enforcing employer sanctions appear to have been as low as one-quarter to one-third what Congress intended (Chau 2001). Consequently, employers and immigrants seem to have learned that, without adequate funding for internal apprehensions, there is little reason to alter their behavior.

Differences in wages will probably always exist between unauthorized and legal workers because legal workers tend to have more skills. This article provides strong evidence that these differences in labor market outcomes are also due, in part, to legal status itself. Lower entry wages combined with differential wage growth imply that the inequality between most workers in the United States and the unauthorized workers who dominate in some labor markets will worsen over time. If the wage impact of IRCA's employer sanctions provision lingers, wage gaps between authorized and unauthorized workers will be larger than what we have measured here. New policy questions are already being raised about the ongoing presence of unauthorized workers in the U.S. labor market. Further, new concerns are being expressed about the social impact of growing inequality between legal and unauthorized workers. These concerns may open the door to new legislation—including, perhaps, another amnesty—targeted at unauthorized workers.

## Appendix

**Table A1**
**Determinants of Log Wages for NLSY Mexican and Central American Immigrants (Unbalanced Sample)**

|  | Unrestricted | | | |
|  | Period 1 | Period 2 | Period 3 | Restricted |
| --- | --- | --- | --- | --- |
| English a problem | −.0738 | −.1321 | −.1458 | −.1033* |
|  | (.0749) | (.0885) | (.0904) | (.0527) |
| Education (0–11) | .0254 | −.1807* | .0844 | −.0359 |
|  | (.0797) | (.0929) | (.1058) | (.0572) |
| Education (>12) | .2285* | .1536 | .3344* | .2332* |
|  | (.1120) | (.1052) | (.1117) | (.0687) |
| Foreign education 0–11 | −.0345 | −.0225 | −.2251 | −.0920 |
|  | (.0928) | (.1154) | (.1421) | (.0695) |
| More U.S. education |  | −.0723 | −.0886 | −.0582 |
|  |  | (.0946) | (.1416) | (.0765) |
| U.S. training |  | .1254 | −.0012 | .0817 |
|  |  | (.0729) | (.0787) | (.0518) |
| Occupation only | −.0886 | −.2029 | −.1924 | −.1607* |
|  | (.0966) | (.1112) | (.1269) | (.0632) |
| Industry only | .1138 | −.0875 | −.1706 | −.0601 |
|  | (.0917) | (.0916) | (.0890) | (.0533) |
| Both | −.0526 | −.1709* | −.4098 | −.1561* |
|  | (.0767) | (.1426) | (.1499) | (.0631) |

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1323 of 4699 PageID #:  4488

**Table A1 (*Continued*)**

| First job: | Unrestricted | | | Restricted |
|---|---|---|---|---|
| | Period 1 | Period 2 | Period 3 | |
| 1979 | .1017 | .1935 | .1710 | .1611* |
| | (.1072) | (.1167) | (.1267) | (.0747) |
| 1981–82 | −.0814 | .0073 | −.1363 | −.0741 |
| | (.1062) | (.1150) | (.1289) | (.0739) |
| 1983–84 | −.1443 | −.1327 | −.2069 | −.1766* |
| | (.1226) | (.1310) | (.1377) | (.0839) |
| 1985–86 | −.2958 | −.0484 | −.2996 | −.2170* |
| | (.1549) | (.1656) | (.1872) | (.1076) |
| $t$ = time 2 | | .0537 | | .1659* |
| | | (.1985) | | (.0502) |
| $t$ = time 3 | | | .4953* | .3093* |
| | | | (.2192) | (.0536) |
| $N$ | 153 | 125 | 106 | 384 |

Note.—Standard errors are in parentheses. The following variables are in the equation but not displayed above: marital status, residence (South, West), dummy for presence in all waves, and a constant term.

\* Significant at $\alpha$ = 5%. Tests are two-tailed except for the education and English variables.

## References

Bailey, Thomas. "The Influence of Legal Status on the Labor Market Impact of Immigration." *International Migration Review* 19, no. 2 (Summer 1985): 220–38.

Baker, Susan Gonzalez. "The Amnesty Aftermath: Current Policy Issues Stemming from the Legalization Programs of the 1986 Immigration Reform and Control Act." *International Migration Review* 31, no. 1 (Spring 1997): 5–27.

Baltagi, Badi H. *Econometric Analysis of Panel Data.* New York: Wiley & Sons, 1995.

Bansak, Cynthia, and Raphael, Steven. "Immigration Reform and the Earnings of Latino Workers: Do Employer Sanctions Cause Discrimination?" *Industrial and Labor Relations Review* 52, no. 2 (January 2001): 275–95.

Bean, Frank D.; Lowell, B. Lindsay; and Taylor, Lowell J. "Undocumented Mexican Immigrants and the Earnings of Other Workers in the United States." *Demography* 25, no. 1 (February 1988): 35–49.

Borjas, George J. "Immigrant and Emigrant Earnings: A Longitudinal Study." *Economic Inquiry* 27, no. 1 (January 1989): 21–37.

Borjas, George J., and Tienda, Marta. "The Employment and Wages of Legalized Immigrants." *International Migration Review* 27, no. 1 (December 1993): 712–47.

Breusch, Trevor, and Pagan, Adrian. "The Lagrange Multiplier Test and Its Applications to Model Specification in Econometrics." *Review of Economic Studies* 47, no. 1 (January 1980): 239–53.

Calavita, Kitty. *Inside the State: The Bracero Program, Immigration, and the INS.* New York: Routledge, 1992.

Card, David, and Krueger, Alan. "Minimum Wages and Employment: A

Case Study of the Fast-Food Industry in New Jersey and Pennsylvania." *American Economic Review* 84, no. 4 (December 1994): 772–93.

Chau, Nancy H. "Strategic Amnesty and Credible Immigration Reform." *Journal of Labor Economics* 19, no. 3 (July 2001): 604–34.

Chiswick, Barry R. "Illegal Aliens in the United States Labor Market: Analysis of Occupational Attainment and Earnings." *International Migration Review* 18, no. 3 (Autumn 1984): 714–32.

———. *Illegal Aliens: Their Employment and Employers.* Kalamazoo, MI: W. E. Upjohn Institute for Employment Research, 1988.

Cobb-Clark, Deborah A., and Kossoudji, Sherrie A. *IRCA, Legalization and the Occupational Concentration and Mobility of Amnestied Immigrants.* Washington, DC: U.S. Department of Labor, 1994.

Cornelius, Wayne (with Juan Diez-Canedo). *Mexican Migration to the United States: The View from Rural Sending Communities.* Cambridge, MA: Massachusetts Institute of Technology, Migration and Development Study Group, Center for International Studies, 1976.

Donato, Katharine M.; Durand, Jorge; and Massey, Douglas. "Changing Conditions in the U.S. Labor Market: Effects of the Immigration Reform and Control Act of 1986." *Population Research and Policy Review* 11, no. 2 (April 1992): 93–115. (*a*)

———. "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act." *Demography* 29 (May 1992): 139–57. (*b*)

Donato, Katherine M., and Massey, Douglas. "Effect of the Immigration Reform and Control Act on the Wages of Mexican Migrants." *Social Science Quarterly* 74 (September 1993): 523–41.

Gill, Andrew, and Long, Stewart. "Is There an Immigration Status Wage Differential between Legal and Undocumented Workers? Evidence from the Los Angeles Garment Industry." *Social Science Quarterly* 70, no. 1 (March 1989): 164–73.

Hausman, Jerry A. "Specification Tests in Econometrics." *Econometrica* 46, no. 6 (November 1978): 1251–70.

Jones, Richard C., and Murray, William B. "Occupational and Spatial Mobility of Temporary Mexican Migrants to the U.S.: A Comparison Analysis."*International Migration Review* 20 (Winter 1986): 973–85.

Kossoudji, Sherrie A. "Playing Cat and Mouse at the U.S.–Mexican Border." *Demography* 29, no. 2 (May 1992): 159–92.

Kossoudji, Sherrie A., and Cobb-Clark, Deborah A. "Finding Good Opportunities in Undocumented Markets: U.S. Occupational Mobility for Male Latino Workers." *International Migration Review* 30, no. 4 (December 1996): 901–24.

Kossoudji, Sherrie A., and Ranney, Susan I. "Wage Rates of Temporary Mexican Migrants to the U.S.: The Role of Legal Status." Discussion paper. Ann Arbor: University of Michigan, Population Studies Center, 1986.

Lowell, B. Lindsay; Teachman, Jay; and Jing, Zhongren. "Unintended Consequences of Immigration Reform: Discrimination and Hispanic Employment." *Demography* 32, no. 4 (November 1995): 617–28.

Martin, Phillip L. *Promises to Keep: Collective Bargaining in California Agriculture.* Ames: University of Iowa Press. 1996.

Martin, Phillip L., and Taylor, Edward. *Harvest of Confusion: SAWs, RAWs, and Farmworkers.* PRIP-UI-4. Washington, DC: Urban Institute Press, 1988.

———. "Immigration Reform and Farm Labor Contracting in California." In *The Paper Curtain: Employer Sanctions' Implementation, Impact, and Reform,* edited by Michael Fix, pp. 239–61. Washington, DC: Urban Institute Press, 1991.

Massey, Douglas; Alarcon, Rafael; Durand, Jorge; and Gonzalez, Humberto. *The Return to Azatlan.* Berkeley: University of California Press, 1987.

Meyer, Bruce D. "Natural and Quasi-Experiments in Economics." *Journal of Business and Economic Statistics* 13, no. 2 (April 1995): 151–61.

North, David S. *Ten Years in America: A Report on the Aliens Legalized by the Immigration Reform and Control Act of 1986.* Washington, DC: Immigration and Naturalization Service, U.S. Department of Justice, 1990.

North, David S., and Houston, Marion F. *The Characteristics and Role of Illegal Aliens in the United States Labor Market: An Exploratory Study.* Washington, DC: Lindon & Co., 1976.

Phillips, Julie A., and Massey, Douglas S. "The New Labor Market: Immigrants and Wages after IRCA." *Demography* 36, no. 2 (May 1999): 234–46.

Portes, Alejandro, and Bach, Robert. *Latin Journey.* Berkeley: University of California Press, 1985.

Rivera-Batiz, Francisco L. "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States." *Journal of Population Economics* 12 (Spring 1999): 91–116.

Singer, Audrey. *Changes in the Employment and Earnings of the Legalized Population.* Washington, DC: U.S. Department of Labor, 1994.

Taylor, J. Edward. "Earnings and Mobility of Legal and Illegal Immigrant Workers in Agriculture." *American Journal of Agricultural Economics* 74, no. 4 (November 1992): 889–96.

Topel, Robert H., and Ward, Michael P. "Job Mobility and the Careers of Young Men." *Quarterly Journal of Economics* 107 (May 1992): 439–79.

U.S. Bureau of Labor Statistics. *Employment and Earnings.* Washington DC: U.S. Government Printing Office, 1989–96.

U.S. Department of Labor. *Characteristics and Labor Market Behavior of the Legalized Population Five Years Following Legalization.* Washington, DC: U.S. Government Printing Office, 1996.

U.S. General Accounting Office. *Immigration Reform: Employer Sanctions and the Question of Discrimination.* Washington, DC: U.S. Government Printing Office, 1990.

Verbeek, Marno, and Nijman, Theo. "Testing for Selectivity Bias in Panel

Data Models." *International Economic Review* 33, no. 3 (August 1992): 681–703.

Woodrow, Karen A., and Passel, Jeffrey S. "Preliminary Estimates of Undocumented Immigration to the United States, 1980–86: Analysis of the June 1986 Current Population Survey." Paper presented at the annual meeting of the American Statistical Association, San Francisco, CA, 1987.

_____. "Post–IRCA Undocumented Migration to the United States: An Assessment Based on the June 1988 CPS." In *Undocumented Migration to the United States: IRCA and the Experience of the 1980's,* edited by Frank D. Bean, Barry Edmonston, and Jeffrey S. Passel, pp. 46–75. Santa Monica, CA, and Washington, DC: RAND and Urban Institute, 1990.

Copyright © 2002 EBSCO Publishing

Psychological Trauma: Theory, Research, Practice, and Policy
2017, Vol. 9, No. 3, 352–361

© 2016 American Psychological Association
1942-9681/17/$12.00   http://dx.doi.org/10.1037/tra0000177

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation

Lisseth Rojas-Flores, Mari L. Clements,
and J. Hwang Koo
Fuller Theological Seminary

Judy London
Public Counsel's Immigrants' Rights Project, Los
Angeles, California

The mental health impact of parental detention and deportation on citizen children is a topic of increasing concern. Forced parent–child separation and parental loss are potentially traumatic events (PTEs) with adverse effects on children's mental health. **Objective:** This study examines posttraumatic stress disorder (PTSD) symptoms and psychological distress among 91 Latino U.S.-born children (ages 6 to 12), living in mixed-status families with a least 1 undocumented parent at risk for detention or deportation. **Method:** Multiagent (child, parent, teacher, clinician) and standardized assessments were conducted at baseline to assess for child trauma and psychological distress. **Results:** Analyses indicate that PTSD symptoms as reported by parent were significantly higher for children of detained and deported parents compared to citizen children whose parents were either legal permanent residents or undocumented without prior contact with immigration enforcement. Similarly, findings revealed differences in child internalizing problems associated with parental detention and deportation as reported by parent as well as differences in overall child functioning as reported by clinician. In addition, teachers reported higher externalizing for children with more exposure to PTEs. **Conclusions:** These findings lend support to a reconsideration and revision of immigration enforcement practices to take into consideration the best interest of Latino citizen children. Trauma-informed assessments and interventions are recommended for this special population.

*Keywords:* PTSD, Latino children, citizen children, immigration, deportation, detention

Adverse childhood experiences (Alegría, Green, McLaughlin & Loder, 2015) and immigration status (Castañeda et al., 2015) are important social determinants of mental disorders. In children, potentially traumatic events (PTEs) may lead to the development of posttraumatic stress disorder (PTSD; Finkelhor, Ormrod, & Turner, 2009). PTSD has debilitating effects on child development and functioning and is a costly public health issue (U.S. Department of Health & Human Services, 2003). This study examines the intersection of parental immigration status and children's mental health. Specifically, we examined U.S.-born Latino children's mental health, including PTSD and psychological distress, following parental detention or deportation.

Children of immigrants represent 25% of the 69.9 million children in the United States (Zong & Batalova, 2015). Over 88% of immigrant-origin children (4.5 million) are U.S.-born with a foreign-born parent (Passel, Cohn, Krogstad, & Gonzalez-Barrera, 2014). Many of these foreign-born parents are unauthorized immigrants at chronic risk of arrest, detention, and/or deportation. Enforcement efforts have taken the form of worksite and home raids that sweep undocumented immigrants from families and communities. From 2002 to 2014, the Office of Immigration Statistics (2013) reported record-high deportations. In just over 2 years (July 2010 to September 2012), nearly 250,000 parents of citizen children were deported (Wessler, 2012). The majority of the deportees had migrated from Latin American countries, including Mexico, Honduras, El Salvador, Guatemala, Cuba, and Brazil (Office of Immigration Statistics, 2013).

Forced parent–child separation and parental loss are PTEs with adverse effects on child mental health and academic functioning (Finkelhor et al., 2009). Children may experience the loss or potential loss of a parent as particularly traumatic if it occurs in the context of contact with legal authorities, such as in the case of incarceration or deportation. Parental incarceration, a recognized PTE in childhood (Felitti, 2009), is distinguished from other adverse childhood experiences by the unique combination of trauma, ambiguity, lack of social support, shame, and stigma (Hairston,

This article was published Online First August 8, 2016.

Lisseth Rojas-Flores, Mari L. Clements, and J. Hwang Koo, Graduate School of Psychology, Fuller Theological Seminary; Judy London, Public Counsel's Immigrants' Rights Project, Los Angeles, California.

This article was developed with a generous grant from the Foundation for Child Development's Young Scholars Program to the first author. The views, policies, and opinions expressed are those of the authors and do not necessarily reflect those of the Foundation. We would like to acknowledge the many churches, community centers, and immigration advocacy centers that referred families to us; our committed research assistants; and the brave Latino citizen children and their families who have contributed to our growing understanding of child traumatic stress and the impact of immigration enforcement policies on children.

Correspondence concerning this article should be addressed to Lisseth Rojas-Flores, Graduate School of Psychology, Fuller Theological Seminary, 180 North Oakland Avenue, Pasadena, CA 91101. E-mail: lrojas@fuller.edu

001321

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

2007). Mounting evidence has indicated that arrest and imprisonment of a parent disrupts parent–child relationships, alters familial support networks, and impairs children's mental health (Roberts et al., 2014). We speculate that the detention and deportation of unauthorized parents may have similar unintended negative effects on their U.S.-born progeny.

Emerging research has indicated that parental detention and deportation increase risk for mental health problems such as severe psychological distress, anxiety, and depression (Allen, Cisneros, & Tellez, 2015; Zayas, Aguilar-Gaxiola, Yoon, & Rey, 2015); for underutilization of care (Chen & Vargas-Bustamante, 2011); and for involvement with Child Welfare (Rabin, 2011). A few empirical and qualitative studies have examined the effects of parental legal status on child and adolescent development (e.g., Allen et al., 2015; Brabeck & Xu, 2010; Dreby, 2012), but this research has been largely descriptive or retrospective, relying primarily on parent report of child outcomes (Allen et al., 2015; Brabeck & Xu, 2010; Chaudry et al., 2010).

To the best of our knowledge, only two empirical studies have examined citizen children and their increased risk for psychological distress subsequent to parental detention or deportation (Allen et al., 2015; Zayas et al., 2015). Allen and colleagues (2015) recruited immigrant caregivers who either were in deportation legal proceedings, had been deported, or were unauthorized without contact with immigration enforcement. In this sample of primarily U.S.-born children, Allen et al. found that children with a deported parent exhibited more internalizing problems after controlling for trauma history than did children without a deported parent.

In a recent binational study using child self-report, Zayas and colleagues (2015) examined the psychological distress of three groups of citizen children (ages 8–15 years) who had at least one parent of Mexican origin. The groups consisted of (a) children living in Mexico with their deported parents, (b) children living in the United States with parents affected by detention or deportation, and (c) children living in the United States whose undocumented parents were not affected by detention or deportation. Two significant group differences emerged. First, children with a parental history of detention or deportation reported possible attention deficits. Second, citizen children living in Mexico with deported parents displayed more depressive symptoms than did other children. Furthermore, all three groups scored within the range of probable anxiety problems. Notably, no measures of trauma were reported. To the best of our knowledge, no studies have systematically assessed child PTSD symptoms and overall psychological distress in this vulnerable population using extrafamilial informants. Using multiple informants (i.e., child, parent, teacher, clinician) and standardized measures, the present study was designed to examine the psychological impact of parental detention and deportation on U.S.-born Latino children.

Children of unauthorized parents have been shown to be disproportionally poor and in disadvantaged neighborhoods at risk for exposure to violence, victimization, and further marginalization (e.g., Ross & Mirowsky, 2009). In fact, unauthorized status is highly associated with poverty and low parental education (Yoshikawa, Kholoptseva, & Suárez-Orozco, 2013). Emerging evidence, however, has proposed that precarious parental immigration status puts citizen children at risk for a gamut of socioemotional disadvantages beyond the ill effects of poverty and related risk factors (Yoshikawa et al., 2013). Immigration enforcement is a multifaceted social issue, and its effects on Latino children's development need further research.

## The Present Study

This study sought to build on prior research on the unintended mental health consequences of immigration enforcement on Latino citizen children. To address the intersectional nature of cumulative risks, we included two comparison groups of citizen children whose immigrant parents had no contact with U.S. Immigration and Customs Enforcement (ICE): (a) children of unauthorized parents with no history of detention or deportation and (b) children of U.S. legal permanent residents (LPRs). We planned to control for child lifetime exposure to PTEs and for maternal education as the best indicator of family's socioeconomic status (SES). Income was not included as an SES indicator, because family income was expected to be substantially reduced following parental detention or deportation. We examined baseline multiple informant assessment data to test the central hypothesis that Latino U.S.-citizen children whose parents have been detained and/or deported would have significantly more psychological distress and PTSD symptoms than would children of parents who had no contact with ICE.

## Method

### Study Sample

From 2013 through early 2015, undocumented and legal permanent resident parents born in Mexico or Central America (e.g., Nicaragua, Honduras, El Salvador, Guatemala), regardless of race or socioeconomic status, were recruited. Specifically, this study targeted mixed-status Latino families with U.S.-born citizen children between ages 6 and 12 living in the Southwest. Citizen children with a current major medical, neurological, or mental health disorder (e.g., psychosis, autism, Down's syndrome) were excluded.

### Procedures

Families with precarious legal status were recruited through a broad network of trusted immigration advocacy agencies, community-based programs, and churches that work with such families. Three primary methods were used in recruiting mixed-status families: (a) individual agency referral, (b) oral presentations at various community-based programs and Latino churches serving the immigrant community, and (c) a short video advertising the study. Staff at these agencies identified potential study participants. Using provided scripts, staff invited caregivers who had at least one child who was born in the United States to participate. Once a release of information was obtained, contact information was passed on to the research staff, who then contacted potential participants by phone to explain the study, validate the child's age, and schedule the initial visit. Caregivers and children were interviewed simultaneously in separate rooms at trusted community agencies or churches. Interviewers were bilingual or bicultural (English or Spanish) master's-level clinicians. Interviews lasted approximately 2 hr, including snack breaks.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Consent and assent forms were reviewed and signed, including parental consent to obtain school records and to mail a survey to the child's teacher. Adult and child participants were informed that they could choose not to answer any question or to stop the interview at any time. Confidentiality was discussed, including the exception for reporting child abuse and neglect. Given the vulnerable legal status of this study's participants, a "certificate of confidentiality" was deemed important and obtained. Participants were compensated with $30 for parents or caregivers, $10 gift card for teachers, and $15 gift cards for children. All parent and child measures were available in Spanish and English and were read to participants.

## Measures

**Child report.** Children were assessed using the UCLA Posttraumatic Stress Disorder Reaction Index (UCLA PTSD-RI; Steinberg, Brymer, Decker, & Pynoos, 2004). This 22-item, clinician-administered measure is among the more extensively studied and widely used assessments of childhood PTSD. The UCLA PTSD-RI has strong convergent validity with the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.; *DSM–IV*; American Psychiatric Association, 1994) diagnosis criteria of experiencing a traumatic event (Criterion A) and reporting symptoms related to reexperiencing/intrusive thoughts (Criterion B), avoidance (Criterion C), and hyperarousal (Criterion D). This measure has excellent psychometric properties, with internal consistencies of .82 (Criterion B), .83 (Criterion C), and .71 (Criterion D). It has been used across a variety of trauma types, age ranges, settings, and languages, including Spanish (Rodriguez, Steinberg, & Pynoos, 1999; Steinberg et al., 2013). The UCLA PTSD-RI provides PTSD symptom severity and screens for 13 PTEs among children of 7–18 years of age, including accidents, physical and sexual abuse, and domestic violence. In our sample, PTEs were positively skewed (1.50), with observed scores ranging from 0 to 8. To normalize this distribution, we recoded the five scores above 4 to 4.

Children also completed the Center for Epidemiologic Studies Depression Scale for Children (CES-DSC), a 20-item self-report depression inventory with scores ranging from 0 to 60 and a clinical cutoff of ≥15 (Weissman, Orvaschel, & Padian, 1980). The Spanish version of the CES-DSC has been widely used in epidemiological research (González et al., 2016). Cronbach alpha in this study was .81.

**Parent report.** Parents completed the Behavior Assessment System for Children–2nd Edition, Parent Rating Scales–Child (BASC-2 PRS-C; Reynolds & Kamphaus, 2004). The BASC-2 PRS-C is a widely used and well-validated caregiver-report measure of 160 items on a Likert-type scale ranging from 1 (*never*) to 4 (*almost always*). It yields scores on a wide range of empirically based syndrome scales and two composite scores (Internalizing and Externalizing Problems). Scores are reported in *T* scores, and percentiles based on age-specific norms (clinical cutoff ≥70), standardized using samples of clinical and nonclinical populations sampled to reflect the general population (Reynolds & Kamphaus, 2004). The Spanish version of the BASC-2 PRS-C has reliability and validity support with Spanish-speaking parents (McCloskey, Hess, & D'Amato, 2003). In the current study, composite score reliabilities for the BASC-2 PRS-C Externalizing Problems and Internalizing Problems were strong, with Cronbach alphas of .88 and .76, respectively.

Parents also completed the Trauma Symptom Checklist for Young Children—Spanish Version (TSCYC–SP; Briere, 2005), a standardized 90-item caregiver report developed to assess trauma-related symptoms in children ages 3–12 (*T* scores with clinical cutoff ≥70). The reliability and validity of the TSCYC–SP has been established in a sample of outpatient children from Spanish-speaking families, with reported Cronbach alphas from .67 to .93 (Wherry et al., 2014). Reliability for the TSCYC–SP scales in the current study were strong (alphas of .79 to .85).

**Teacher report.** Teachers completed the BASC-2 Teacher Rating Scales–Child (BASC-2 TRS-C; Reynolds & Kamphaus, 2004). The BASC-2 TRS-C is a 139-item scale that evaluates children's behavioral and emotional functioning. Like the BASC-2 PRS-C, scale scores are reported as *T* scores, and percentiles are based on normative data (clinical cutoff score ≥70). In this study, composite score reliabilities for BASC-2 TRS-C Externalizing Problems and Internalizing Problems were strong, with Cronbach alphas of .89 and .82, respectively.

**Clinician evaluation.** Clinicians used the Child and Adolescent Functional Assessment Scale (CAFAS; Hodges, 2006) to rate the child's lowest level of day-to-day functioning across critical life domains (School, Home, Community, Moods/Emotions, and Total Dysfunction). Cutoff scores indicating severe, moderate, and mild impairment are 30, 20, and 10, respectively. The CAFAS has been widely used in community mental health across the United States as part of statewide assessments of mental health outcomes (Bates, 2001). After being trained to 80% agreement using CAFAS training materials and assessment (Hodges, 2006), two master's-level clinicians jointly rated each child participant on the basis of information collected in the structured interviews with parent and child, as well as the BASC-2 TRS-C scale (teacher report) and school records.

## Results

Descriptive data and correlations for main study variables are presented in Table 1. Gender was not significantly related to outcome variables, so it was dropped from all analyses. Surprisingly, neither maternal education nor family income was correlated with most outcome variables. Higher maternal education was associated with lower parental TSCYC–SP depression reports ($p = .01$), and lower income was significantly correlated with more PTEs ($p = .03$). Thus, these SES variables were included as covariates in analyses of only those specific outcomes. Demographic characteristics of the participant children, grouped by parental immigration status comparisons, are presented in Table 2. As expected, groups significantly differed on family income ($p = .002$), with legal permanent resident (LPR) families reporting significantly higher incomes than did either unauthorized group, and families with a detained or deported parent having both lower maternal education than did LPR families and more father unemployment than did either LPR or unauthorized without ICE contact families ($p = .002$ and $p < .001$, respectively).

### Risk Exposure for PTEs

After controlling for family income, the groups significantly differed on lifetime exposure to PTEs on the UCLA PTSD-RI index by parental immigration status, as shown in Table 3, with

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 1

*Bivariate Correlations, Means, and Standard Deviations for Major Study Variables*

| Variable | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Sex[a] | — | | | | | | | | | | | | | | | | |
| 2. Education[b] | .04 | — | | | | | | | | | | | | | | | |
| 3. Income[c] | .12 | .10 | — | | | | | | | | | | | | | | |
| 4. PTE | .11 | .02 | .22** | — | | | | | | | | | | | | | |
| 5. PTSD | −.19* | .05 | .10 | .26** | — | | | | | | | | | | | | |
| 6. CES-DSC | −.09 | .01 | .06 | .26** | .52*** | — | | | | | | | | | | | |
| 7. PTS total | .00 | −.17 | .01 | .08 | .02 | .08 | — | | | | | | | | | | |
| 8. Anxiety | .03 | −.19* | .05 | .07 | −.08 | −.06 | .71*** | — | | | | | | | | | |
| 9. Depression | −.06 | −.12 | −.04 | .06 | −.02 | .08 | .77*** | .59*** | — | | | | | | | | |
| 10. Parent int | .03 | .10 | .09 | .04 | −.03 | .04 | .40*** | .32** | .54*** | — | | | | | | | |
| 11. Parent ext | .01 | .00 | .11 | .34*** | .21* | .13 | .27** | .07 | .27** | .48*** | — | | | | | | |
| 12. Teacher int | −.02 | .08 | −.04 | −.07 | .01 | −.03 | −.13 | −.14 | −.12 | −.03 | .22* | — | | | | | |
| 13. Teacher ext | .01 | −.04 | −.13 | .21 | .10 | −.07 | −.03 | −.01 | .01 | .03 | .38*** | .55*** | — | | | | |
| 14. Total dys | −.01 | −.08 | .10 | .11 | .21* | .17 | .47*** | .43*** | .53*** | .16 | .42*** | −.02 | .27** | — | | | |
| 15. Home | .04 | −.08 | .11 | .20 | .05 | .04 | .26* | .16 | .35*** | .24* | .57*** | −.01 | .27** | .77*** | — | | |
| 16. School | .13 | −.07 | .10 | .10 | .02 | .05 | .49*** | .37*** | .46*** | .08 | .31** | −.15 | .37*** | .57*** | .26* | — | |
| 17. Mood | −.07 | −.20* | .09 | .22* | .42*** | .31** | .35*** | .41*** | .33** | .06 | .19* | −.14 | .10 | .75*** | .37*** | .29** | — |
| M | .61 | 1.27 | 1.35 | 1.69 | 20.40 | 22.97 | 51.72 | 54.51 | 50.32 | 51.16 | 47.41 | 48.17 | 49.49 | 13.59 | 1.74 | 2.07 | 6.52 |
| SD | .49 | .42 | 1.35 | 1.27 | 16.01 | 10.12 | 10.68 | 11.89 | 10.82 | 11.43 | 10.49 | 10.56 | 10.51 | 19.08 | 4.83 | 5.04 | 7.77 |
| n | 97 | 95 | 95 | 97 | 96 | 97 | 92 | 92 | 92 | 96 | 96 | 83 | 83 | 92 | 92 | 92 | 92 |

*Note.* PTE = potentially traumatic event; PTSD = UCLA PTSD Reaction Index total score; CES-DSC = Center for Epidemiological Studies Depression Scale for Children; PTS total = Trauma Symptom Checklist for Young Children (TSCYC) posttraumatic stress total score; Anxiety = TSCYC anxiety score; Depression = TSCYC depression score; Parent int = Behavior Assessment System for Children—2nd Edition, Parent Rating Scales–Child (BASC-2 PRS-C) internalizing score; Parent ext = BASC-2 PRS-C externalizing score; Teacher int = BASC-2 Teacher Rating Scales–Child (BASC-2 TRS-C) internalizing score; Teacher ext = BASC-2 TRS-C externalizing score; Total dys = clinician report of Total Dysfunction score from the Child and Adolescent Functional Assessment Scale (CAFAS); Home = clinician report of Home Behavior score from the CAFAS; School = clinician report of School Behavior score from the CAFAS; Mood = clinician report of Mood score from the CAFAS).

[a] Child gender (0 = female, 1 = male).   [b] Maternal education (0 = less than high school, 1 = high school, GED, or some college).   [c] Parental income (1 = *less than $15,000*, 2 = *$15,000–34,999*, 3 = *$35,000 or more*).

* $p < .05$.   ** $p < .01$.   *** $p < .001$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 2
*Demographic Characteristics of Citizen Children and Their Families*

| Variable | Detained or deported ($n = 39$) | Unauthorized no history of detention or deportation ($n = 42$) | Legal permanent resident ($n = 16$) | Inferential statistic |
|---|---|---|---|---|
| Child sex | | | | 2.13 |
| Male | 21 | 29 | 9 | |
| Female | 18 | 13 | 7 | |
| Mother education | | | | 12.69*** |
| <High school | 29 | 22 | 4 | |
| High school or higher | 9 | 19 | 12 | |
| Family income | | | | 17.11** |
| <$15,000 | 19 | 24 | 2 | |
| $15,000–$34,999 | 16 | 13 | 7 | |
| ≥$35,000 | 4 | 3 | 7 | |
| Father current employment | | | | 50.43*** |
| Full-time | 4 | 28 | 11 | |
| Part-time | 3 | 8 | 3 | |
| Unemployed | 29 | 3 | 1 | |
| Mother current employment | | | | 4.48 |
| Full-time | 9 | 5 | 4 | |
| Part-time | 12 | 10 | 5 | |
| Unemployed | 16 | 27 | 7 | |
| Parents' marital status | | | | 5.16† |
| Married | 23 | 33 | 14 | |
| Never married | 14 | 8 | 2 | |
| Father's country of origin[a] | | | | 2.16 |
| Mexico | 23 | 28 | 10 | |
| El Salvador | 9 | 3 | 2 | |
| Guatemala | 4 | 6 | 2 | |
| Honduras | 3 | 1 | 0 | |
| Nicaragua | 0 | 1 | 0 | |
| United States | 0 | 2 | 1 | |
| Mother's country of origin[a] | | | | 9.89** |
| Mexico | 14 | 33 | 8 | |
| El Salvador | 3 | 2 | 3 | |
| Guatemala | 4 | 4 | 3 | |
| Honduras | 10 | 2 | 0 | |
| Nicaragua | 0 | 0 | 0 | |
| United States | 6 | 1 | 2 | |
| Parent years in U.S. | | | | 2.75† |
| $M$ | 14.79 | 17.67 | 20.00 | |
| $SD$ | 9.91 | 5.41 | 8.42 | |
| Child age | | | | .40 |
| $M$ | 9.05 | 9.12 | 8.63 | |
| $SD$ | 1.82 | 2.03 | 1.78 | |

*Note.* Inferential statistics are $\chi^2$ for count data and $F(2, 94)$ for means.
[a] Due to small cell counts, $\chi^2$ was computed on Mexico versus Central America countries.
† $p < .10$. * $p < .05$. ** $p < .01$. *** $p < .001$.

children of detained or deported parents experiencing significantly more lifetime PTEs than did children of LPRs ($p = .02$). Even when child reports of parental deportation or detention as a PTE were excluded, the groups significantly differed on PTEs, $F(2, 91) = 3.62$, $p = .03$, $\eta_p^2 = .07$, again with children of detained or deported parents reporting significantly more PTEs than did children of LPRs ($p = .03$). Children of unauthorized parents with no contact with ICE were not significantly different from children with detained or deported parents but tended to have more PTEs than did children of LPRs ($p = .06$). Overall, exposure was high across groups, with 35% of the sample reporting exposure to one PTE, 21% to two, 14% to three, and 12% to four or more PTEs in their lifetime, with an average exposure of 1.69 PTEs ($SD = 1.27$).

## PTSD and Psychological Distress

Child outcomes by parental immigration status were examined in a series of univariate and multivariate analyses of variance (ANOVAs), controlling for maternal education when indicated, with Bonferroni pairwise post hoc comparisons (see Table 3). Analyses were conducted both with and without controlling for lifetime exposure to PTEs, and the results were essentially identical. Thus, for ease of interpretation, only analyses not controlling for lifetime exposure are presented here.

**Child report of PTSD symptoms.** Per the UCLA PTSD-RI child report, 29% of all child participants met criteria for full (19%) or partial (10%) PTSD diagnoses. There were no significant

Table 3

*Citizen Children PTSD and Psychological Distress by Parental Immigration Status*

| Measure | Detained or deported | | | Unauthorized no history of detention or deportation | | | Legal permanent resident | | | $F$ | $\eta_p^2$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | $n$ | $M$ | $SD$ | $n$ | $M$ | $SD$ | $n$ | $M$ | $SD$ | | |
| | | | | | Child reports | | | | | | | |
| UCLA PTSD-RI | 38 | | | 42 | | | 16 | | | | |
| Lifetime PTEs[a] | | $1.97_a$ | 1.33 | | 1.67 | 1.23 | | $1.19_b$ | 1.11 | 3.84* | .08 |
| Total severity score | | 21.92 | 14.39 | | 20.12 | 16.92 | | 17.50 | 18.11 | .43 | .01 |
| Criterion B | | 6.92 | 4.45 | | 5.90 | 5.84 | | 5.19 | 6.67 | .66 | .01 |
| Criterion C | | 7.68 | 6.54 | | 7.79 | 7.13 | | 6.63 | 7.02 | .18 | <.01 |
| Criterion D | | 7.32 | 4.99 | | 6.43 | 4.99 | | 5.69 | 5.55 | .65 | .01 |
| CES-DCS | | 23.95 | 11.33 | | 23.32 | 9.94 | | 19.69 | 6.77 | 1.05 | .02 |
| | | | | | Parent reports | | | | | | | |
| TSCYC[b] | 37 | | | 39 | | | 14 | | | | |
| PTS overall total | | $57.62_a$ | 12.40 | | $48.56_b$ | 7.64 | | $46.14_b$ | 5.35 | 9.70*** | .18 |
| Anxiety | | $60.57_a$ | 14.44 | | 51.54b | 7.97 | | $48.07_b$ | 6.04 | 7.73*** | .15 |
| Depression | | $56.59_a$ | 11.76 | | $47.18_b$ | 8.64 | | $43.79_b$ | 4.04 | 10.21*** | .19 |
| Anger/Aggression | | $51.59_a$ | 8.37 | | $47.15_b$ | 5.23 | | 45.93 | 3.85 | 4.67* | .10 |
| PTS Intrusion | | $56.49_a$ | 14.27 | | $47.41_b$ | 8.13 | | 47.36 | 6.59 | 5.90** | .12 |
| PTS Avoidance | | $55.62_a$ | 11.09 | | $49.44_b$ | 7.83 | | $47.36_b$ | 5.40 | 6.08** | .12 |
| PTS Arousal | | $57.92_a$ | 11.69 | | $49.41_b$ | 8.18 | | $45.71_b$ | 5.92 | 9.96*** | .19 |
| Dissociation | | 48.22 | 8.00 | | 47.69 | 6.74 | | 44.93 | 3.36 | 1.23 | .03 |
| BASC-2 PRS-C | 39 | | | 42 | | | 15 | | | | |
| Int Prob total | | $54.67_a$ | 12.45 | | 49.90 | 10.78 | | $45.53_b$ | 7.25 | 4.17* | .08 |
| Anxiety | | 58.00 | 11.73 | | 54.12 | 11.45 | | 53.07 | 11.00 | 1.56 | .03 |
| Depression | | $54.13_a$ | 10.84 | | 49.17 | 10.84 | | $44.47_b$ | 7.46 | 5.24** | .10 |
| Somatization | | $49.05_a$ | 11.92 | | 46.69 | 9.69 | | $41.33_b$ | 4.85 | 3.14* | .06 |
| Ext Prob total | | 49.41 | 10.37 | | 46.81 | 11.15 | | 43.87 | 8.07 | 1.66 | .03 |
| Hyperactivity | | 50.59 | 11.97 | | 48.64 | 11.73 | | 45.87 | 10.69 | .92 | .02 |
| Aggression | | 47.62 | 8.39 | | 44.98 | 9.16 | | 43.73 | 6.24 | 1.54 | .03 |
| Conduct problems | | 50.28 | 10.50 | | 47.74 | 11.59 | | 44.00 | 6.59 | 2.00 | .04 |
| | | | | | Teacher reports | | | | | | | |
| BASC-2 TRS-C | 33 | | | 37 | | | 13 | | | | |
| Int Prob total | | 49.61 | 13.54 | | 47.49 | 8.36 | | 46.46 | 7.24 | .55 | .01 |
| Anxiety | | 47.52 | 9.57 | | 47.35 | 7.95 | | 46.62 | 9.00 | .05 | <.01 |
| Depression | | 50.18 | 10.65 | | 47.59 | 7.06 | | 46.31 | 6.10 | 1.26 | .03 |
| Somatization | | 51.30 | 15.98 | | 49.35 | 8.42 | | 48.38 | 9.07 | .36 | .01 |
| Ext Prob total | | 52.48 | 13.53 | | 48.24 | 8.15 | | 49.49 | 10.51 | 2.66† | .06 |
| Hyperactivity | | 52.88 | 13.49 | | 48.68 | 9.31 | | 47.54 | 6.17 | 1.76 | .04 |
| Aggression | | 51.42 | 12.47 | | 48.24 | 7.47 | | 45.00 | 4.16 | 2.35 | .06 |
| Conduct problems | | 52.36 | 13.39 | | 48.19 | 7.87 | | 44.46 | 3.48 | 3.25* | .08 |
| | | | | | Clinician reports | | | | | | | |
| CAFAS | 35 | | | 42 | | | 15 | | | | |
| Overall dysfunction | | $25.14_a$ | 23.44 | | $7.38_b$ | 12.31 | | $4.00_b$ | 6.32 | 13.41*** | .23 |
| Home | | 2.86 | 6.23 | | 1.19 | 3.95 | | .67 | 2.58 | 1.60 | .03 |
| School | | $4.00_a$ | 6.95 | | $1.19_b$ | 3.23 | | $.00_b$ | .00 | 4.86** | .10 |
| Mood/Emotions | | $11.71_a$ | 8.22 | | $3.33_b$ | 5.26 | | $3.33_b$ | 6.17 | 17.10*** | .28 |

*Note.* Means with differing subscripts are significantly different in Bonferroni corrected pairwise comparisons. PTSD = posttraumatic stress disorder; UCLA PTSD-RI = UCLA PTSD Reaction Index; PTEs = potentially traumatic events; CESD-DSC = Center for Epidemiologic Studies Depression Scale for Children; TSCYC = Trauma Symptom Checklist for Young Children; PTS = posttraumatic stress; BASC-2—PRS = Behavior Assessment System for Children—2nd Edition, Parent Rating Scales-Child; Int Prob = Internalizing Problems; Ext Prob = Externalizing Problems; BASC-2 TRS = BASC-2 Teacher Rating Scales–Child; CAFAS = Child and Adolescent Functional Assessment Scale.
[a] Analysis of covariance (ANCOVA) controlling for family income was conducted. Raw means and standard deviations reported.   [b] ANCOVA of the total score and multivariate analysis of variance of the scale scores were conducted for TSCYC, controlling for maternal education. Raw means and standard deviations are presented here.
† $p < .10$.   * $p < .05$.   ** $p < .01$.   *** $p < .001$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ROJAS-FLORES, CLEMENTS, HWANG KOO, AND LONDON

differences by parental immigration status on total PTSD symptoms, $F(2, 93) = 0.43$, $p = .65$, $\eta^2_p = .01$, or individual criteria (Wilks's $\lambda = .96$), $F(6, 184) = 0.68$, $p = .67$, $\eta^2_p = .02$.

**Parent report of PTSD child symptoms.** Five families had invalid TSCYC–SP Response Level and Atypical Response Scale scores and were dropped from TSCYC–SP analyses. Controlling for maternal education, total symptoms differed by parental immigration status, $F(2, 86) = 9.70$, $p < .001$, $\eta^2_p = .18$. Similarly, a multivariate analysis of covariance of TSCYC–SP Anxiety, Depression, Anger/Aggression, Intrusion, Avoidance, Arousal, and Dissociation controlling for maternal education indicated a significant multivariate effect of parental immigration status (Wilks's $\lambda = .64$), $F(12, 168) = 3.53$, $p < .001$, with significant univariate effects for all scales except Dissociation. In each case, per parent report, children of detained and deported parents demonstrated higher levels of trauma symptoms than did children of either LPR parents ($ps$ ranging from $< .001$ to $.03$) or unauthorized parents with no ICE contact ($ps$ ranging from $< .001$ to $.01$; see Table 3).

**Child reports of psychological distress.** There was no effect of parent immigration status on child self-reports of depression on the CES-DSC, $F(2, 94) = 1.05$, $p = .35$, $\eta^2_p = .02$.

**Parent report of child psychological distress.** As shown in Table 3, there was a significant univariate effect of parent immigration status on BASC-2 PRS-C total internalizing, $F(2, 93) = 4.17$, $p = .02$, $\eta^2_p = .08$, with children of detained or deported parents reported to have more internalizing problems than did children of LPRs ($p = .02$). Multivariate analysis of variance (MANOVA) analyses revealed a marginal main effect of parent immigration status on the three BASC-2 PRS-C internalizing subscales (Wilks's $\lambda = .88$), $F(6, 182) = 2.05$, $p = .06$, with children of detained or deported parents scoring higher on Depression ($p = .009$) and Somatization ($p = .04$) per parent report than did children of LPRs.

In contrast, there were no significant effects of parent immigration status on parent-reported total externalizing, $F(2, 93) = 1.67$, $p = .20$, $\eta^2_p = .03$, or on Hyperactivity, Aggression, or Conduct Problems (Wilks's $\lambda = .95$), $F(8, 182) = 0.83$, $p = .55$.

**Teacher report of child psychological distress.** Univariate and MANOVA results demonstrated no significant effects for parental immigration status on teacher BASC-2-TRS total internalizing score, $F(2, 80) = 0.55$, $p = .58$, $\eta^2_p = .01$, or on the Anxiety, Depression, or Somatization scales (Wilks's $\lambda = .95$), $F(6, 156) = 0.61$, $p = .72$ (see Table 3).

Teacher reports of total externalizing symptoms were only marginally different by group, $F(2, 80) = 2.66$, $p = .08$, $\eta^2_p = .06$. A MANOVA analysis of Hyperactivity, Aggression, and Conduct Problems was also not significant (Wilks's $\lambda = .90$), $F(6, 156) = 1.35$, $p = .24$, but a significant univariate effect was found for Conduct Problems, with children of detained or deported parents tending to have more of these problems than did children of LPRs ($p = .06$).

**Clinician report of overall child functioning.** There was a significant univariate main effect for parental immigration status on clinician's CAFAS overall child dysfunction, $F(2, 89) = 13.41$, $p < .001$, $\eta^2_p = .23$, with children of detained or deported parents exhibiting poorer functioning than did children of both LPRs and unauthorized parents with no ICE contact ($ps < .001$). Similarly, MANOVA analyses of the Home, School, and Moods scales revealed a significant effect of parent immigration status (Wilks's $\lambda = .69$), $F(6, 176) = 5.87$, $p < .001$, with children of detained or deported

parents having poorer scores on School Behavior than did children of LPRs ($p = .03$) or unauthorized parents with no ICE contact ($p = .04$), and poorer scores on Moods than did children of either LPRs or unauthorized parents with no ICE contact ($ps < .001$).

## Multiple Informant Comparisons

The correlations between ratings of internalizing constructs were typically modest. For instance, teacher, parent, and child ratings of depression were uncorrelated, as were parent and child reports of PTSD symptoms. In contrast, clinician CAFAS ratings of Moods and Emotions were significantly correlated with both parent TSCYC–SP Depression, $r(92) = .36$, $p < .001$, and child CES-DSC, $r(92) = .31$, $p = .003$. Adult reports of externalizing problems were more consistently and strongly related, with correlations among parent and teacher BASC-2 Total Externalizing and between BASC-2 and clinician CAFAS Home Behavior and School Behavior ranging from .37 to .57 (all $ps < .001$). Direct comparisons of means were possible for only parent and teacher BASC-2 scores. Parents reported higher Total Internalizing than did teachers, $t(83) = 3.70$, $p = .03$, but reports of Total Externalizing did not differ, $t(83) = -1.40$, $p = .17$.

## Discussion

The need to detect children with PTSD-related symptoms and psychological distress is pertinent given the evidence for the detrimental effects of early childhood adversity in the overall mental health of children. This is significant for Latino citizen children whose parents are undocumented and at high risk for detention or deportation, which often lead to forced parent–child separation. In light of complex immigration policies, our findings provide some support for the need for clinical and public policy interventions on behalf of this vulnerable child population.

## Impact of Parental Detention or Deportation on Citizen Children's PTSD

Taken together, the reports of multiple informants (parent, teacher, clinician, and child) indicate that citizen children of detained and deported parents experience more psychological distress and trauma compared to peers whose parents had no involvement with immigration enforcement. Higher levels of parent-reported PTSD symptoms in children of detained and deported parents imply that forced parental separation resulting from immigration enforcement is particularly detrimental to children's mental health. The unpredictability and uncertainty associated with such separations may have exacerbated PTSD symptoms (see Grillon et al., 2009). As such, our findings suggest that the current and heightened enforcement of immigration laws poses a serious public health challenge to U.S.-born children of undocumented parents. Not only is PTSD recognized as a high priority public health issue (U.S. Department of Health & Human Services, 2003), but child PTEs, such as losing a parent, pose serious risks for lifelong mental and medical illnesses (Felitti, 2009; Putnam, Harris, & Putnam, 2013).

Specifically, the children of detained and deported parents were rated on the TSCYC–SP as endorsing more symptoms in all three *DSM–IV* PTSD criterion domains as well in total posttraumatic

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

symptoms. Although to the best of our knowledge, no other study has used the TSCYC–SP with this population, our results seem congruent with those of prior studies reporting on the validity of the TSCYC–SP (e.g., Wherry et al., 2014). TSCYC–SP scores were significantly correlated with BASC-2 internalizing problems but not with child self-ratings, consistent with research documenting divergence in such child and parent reports (Briere, 2005; De Los Reyes & Kazdin, 2005).

## Impact of Parental Detention or Deportation on Citizen Child Psychological Distress

Children of detained or deported parents were rated by parents and clinicians as higher in internalizing problems and in negative moods and emotions compared to children of LPRs and parents who had no contact with ICE. The overlap of depressive and anxious symptoms with PTSD is significant, and thus these findings are consistent with the findings of prior empirical research in showing significantly increased rates of depression and anxiety problems among children with PTSD symptomatology (Samuelson, Krueger, Burnett, & Wilson, 2010). Depression and anxiety pose immediate developmental challenges to child functioning (Kendall et al., 2010) and pose higher risk for future mental health problems (Lopez, Turner, & Saavedra, 2005). Furthermore, our findings corroborate and extend those of Zayas et al. (2015) and Allen et al. (2015) and are also congruent with findings of previous studies documenting the negative mental health outcomes associated with parental separation (Chaudry et al., 2010; Suárez-Orozco, Bang, & Kim, 2011).

Children with more PTEs were also rated by parents and teachers as having more externalizing problems (BASC-2) and by clinicians as having more total dysfunction (CAFAS). This finding aligns with previous research showing that children with trauma-related symptoms are at risk of misdiagnosis (e.g., with attention deficit/hyperactivity disorder or conduct difficulties), particularly in the absence of assessments for complex trauma (e.g., Kletzka & Siegfried, 2008). Our findings underscore the need for educating parents and teachers on symptoms associated with PTEs.

## Intersection Between Poverty, Exposure to PTEs, and the Loss of a Parent

Exposure to multiple PTEs was common across our sample, with 35% of the children reporting experiencing one PTE and 47% endorsing two or more PTEs. This high prevalence of PTE exposure is concerning given the negative short- and long-term consequences of childhood PTE exposure (Appleyard, Egeland, van Dulmen, & Sroufe, 2005). Consistent with the literature, more PTEs were related to increased child PTSD scores. Although there were no differences by parental immigration status, the PTSD prevalence in our sample was high (19% of the children meeting all *DSM–IV* criteria and 10% meeting partial criteria) per child report.

Emerging research in childhood adversity describes synergy as the interaction of two or more PTEs, or adverse events, so that their combined effect is greater than the sum of their individual effects (Putnam et al., 2013). Putnam and colleagues (2013) documented the synergy of adverse events with loss of a parent among adult males with three or more PTEs. They found that poverty, the

most potent adverse childhood event in males, is synergistic with the loss of a parent. Putnam and colleagues' research is particularly relevant to citizen children of detained or deported parents who have lost, or have the impending possibility of losing, a parent due to U.S. immigration enforcement. These findings thus call for a reconsideration and reduction of unnecessary detainment of undocumented parents and consequent parent–child separation.

## Implications for Health Services, Policies, and Future Directions

Researchers have argued that child PTEs are the most preventable causes of debilitating mental illnesses, such as PTSD, depression, and anxiety (Finkelhor, Ormrod, & Turner, 2007; National Research Council & Institute of Medicine, 2009). Particularly for children who have been multiply victimized, preventing future PTEs may be the most effective intervention (Finkelhor et al., 2007). This is notable for our sample of citizen children. A call for action to prevent forced parental separation and constant threat of potential loss of a parent due to immigration enforcement is gravely needed.

Given the high endorsement of PTEs in our sample, more trauma-informed, developmentally appropriate systems placed at multiple levels (e.g., home, school) would assist Latino citizen children and their families. Trauma-informed intervention and prevention programs for this vulnerable population should target synergistic adverse events, such poverty and loss of a parent. Furthermore, affordable and culturally relevant services are warranted not only for children of detained or deported parents but also for citizen children of parents living in the shadows. A reevaluation of immigration policies that have significant effects on access to health services is also extremely relevant to the well-being of Latino citizen children (for a review see Rodríguez, Young, & Wallace, 2015).

On the basis of findings with children of incarcerated parents (Roberts et al., 2014), we suspect that witnessing parental detainment may be particularly detrimental. Future research should investigate the effects of witnessing the arrest or detention of undocumented parents on child PTSD symptoms, and this information should be used in reviewing policies involving undocumented immigrants with children. Arrest protocols should consider the children's best interest.

## Study Strengths and Limitations

The cross-sectional nature of this study and its relatively small sample size limit the ability to infer causation and to generalize findings to other ethnic and racial immigrant groups. Future studies should also examine South American Latino groups. Statistics show undocumented South American immigrants tend to fare better economically in the United States, in part due to higher levels of education and different migratory routes than for immigrants coming from the Central American cone (Stoney, Batalova & Russell, 2013). Such SES dynamics would be important to understand in their interaction with immigration enforcement and child well-being.

Finally, some children exposed to PTEs, including parental detention or deportation, do not exhibit high levels of mental

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

health symptoms. These findings highlight an underlying resilience in the face of adversity that should be understood and supported in all children of immigrants, regardless of parental legal status. Future research should explore mediating factors, such as family or community support, religious coping, hope, and cognitive processing of PTEs.

## References

Alegría, M., Green, G. J., McLaughlin, K., & Loder, S. (2015). *Disparities in child and adolescent mental health and mental health services in the U.S.* Retrieved from https://philanthropynewyork.org/sites/default/files/resources/Disparities_in_child_and_adolescent_health.pdf

Allen, B., Cisneros, E. M., & Tellez, A. (2015). The children left behind: The impact of parental deportation on mental health. *Journal of Child and Family Studies, 24,* 386–392. http://dx.doi.org/10.1007/s10826-013-9848-5

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

Appleyard, K., Egeland, B., van Dulmen, M. H., & Sroufe, L. A. (2005). When more is not better: The role of cumulative risk in child behavior outcomes. *Journal of Child Psychology and Psychiatry, 46,* 235–245. http://dx.doi.org/10.1111/j.1469-7610.2004.00351.x

Bates, M. P. (2001). The Child and Adolescent Functional Assessment Scale (CAFAS): Review and current status. *Clinical Child and Family Psychology Review, 4,* 63–84. http://dx.doi.org/10.1023/A:1009528727345

Brabeck, K. M., & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioral Sciences, 32,* 341–361. http://dx.doi.org/10.1177/0739986310374053

Briere, J. (2005). *Trauma Symptom Checklist for Young Children (TSCYC): Professional manual.* Odessa, FL: Psychological Assessment Resources.

Castañeda, H., Holmes, S. M., Madrigal, D. S., Young, M. E., Beyeler, N., & Quesada, J. (2015). Immigration as a social determinant of health. *Annual Review of Public Health, 36,* 375–392. http://dx.doi.org/10.1146/annurev-publhealth-032013-182419

Chaudry, A., Capps, R., Pedroza, J. M., Castaneda, R. M., Santos, R., & Scott, M. M. (2010). *Facing our future: Children in the aftermath of immigration enforcement.* Retrieved from http://www.urban.org/uploadedpdf/412020_FacingOurFuture_final.pdf

Chen, J., & Vargas-Bustamante, A. (2011). Estimating the effects of immigration status on mental health care utilizations in the United States. *Journal of Immigrant and Minority Health, 13,* 671–680. http://dx.doi.org/10.1007/s10903-011-9445-x

De Los Reyes, A., & Kazdin, A. E. (2005). Informant discrepancies in the assessment of childhood psychopathology: A critical review, theoretical framework, and recommendations for further study. *Psychological Bulletin, 131,* 483–509. http://dx.doi.org/10.1037/0033-2909.131.4.483

Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family, 74,* 829–845. http://dx.doi.org/10.1111/j.1741-3737.2012.00989.x

Felitti, V. J. (2009). Adverse childhood experiences and adult health. *Academic Pediatrics, 9,* 131–132. http://dx.doi.org/10.1016/j.acap.2009.03.001

Finkelhor, D., Ormrod, R. K., & Turner, H. A. (2007). Re-victimization patterns in a national longitudinal sample of children and youth. *Child Abuse & Neglect, 31,* 479–502. http://dx.doi.org/10.1016/j.chiabu.2006.03.012

Finkelhor, D., Ormrod, R. K., & Turner, H. A. (2009). Lifetime assessment of poly-victimization in a national sample of children and youth. *Child Abuse and Neglect, 33,* 403–411. http://dx.doi.org/10.1016/j.chiabu.2008.09.012

González, P., Nuñez, A., Merz, E., Brintz, C., Weitzman, O., Navas, E. L., . . . Gallo, L. C. (2016). Measurement from properties of the Center for Epidemiologic Studies Depression Scale (CES-D 10): Findings HCHS/SOL. *Psychological Assessment.* Advance online publication. http://dx.doi.org/10.1037/pas0000330

Grillon, C., Pine, D. S., Lissek, S., Rabin, S., Bonne, O., & Vythilingam, M. (2009). Increased anxiety during anticipation of unpredictable aversive stimuli in posttraumatic stress disorder but not in generalized anxiety disorder. *Biological Psychiatry, 66,* 47–53. http://dx.doi.org/10.1016/j.biopsych.2008.12.028

Hairston, C. F. (2007). *Focus on the children with incarcerated parents: An overview of the research literature.* Retrieved from http://www.f2f.ca.gov/res/pdf/FocusOnChildrenWith.pdf

Hodges, K. (2006). *CAFAS self-training manual and blank scoring forms.* Ypsilanti, MI: Eastern Michigan University.

Kendall, P. C., Compton, S. N., Walkup, J. T., Birmaher, B., Albano, A. M., Sherrill, J., . . . Piacentini, J. (2010). Clinical characteristics of anxiety disordered youth. *Journal of Anxiety Disorders, 24,* 360–365. http://dx.doi.org/10.1016/j.janxdis.2010.01.009

Kletzka, N. T., & Siegfried, C. (2008). Helping children in child welfare systems heal from trauma: A systems integration approach. *Juvenile & Family Court Journal, 59,* 7–20. http://dx.doi.org/10.1111/j.1755-6988.2008.00018.x

Lopez, B., Turner, R. J., & Saavedra, L. M. (2005). Anxiety and risk for substance dependence among late adolescents/young adults. *Journal of Anxiety Disorders, 19,* 275–294. http://dx.doi.org/10.1016/j.janxdis.2004.03.001

McCloskey, D. M., Hess, R. S., & D'Amato, R. C. (2003). Evaluating the utility of the Spanish version of the Behavior Assessment System for Children-Parent Report System. *Journal of Psychoeducational Assessment, 21,* 325–337. http://dx.doi.org/10.1177/073428290302100402

National Research Council & Institute of Medicine. (2009). *Preventing mental, emotional, and behavioral disorders among young people: Progress and possibilities.* Washington, DC: The National Academies Press.

Office of Immigration Statistics. (2013). *Immigration enforcement actions: 2013.* Retrieved from http://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2013.pdf

Passel, J. S., Cohn, D., Krogstad, J. M., & Gonzalez-Barrera, A. (2014). *As growth stalls, unauthorized immigrant population becomes more settled.* Retrieved from http://www.pewhispanic.org/2014/09/03/as-growth-stalls-unauthorized-immigrant-population-becomes-more-settled/

Putnam, K. T., Harris, W. W., & Putnam, F. W. (2013). Synergistic childhood adversities and complex adult psychopathology. *Journal of Traumatic Stress, 26,* 435–442. http://dx.doi.org/10.1002/jts.21833

Rabin, N. (2011). Disappearing parents: Immigration enforcement and the child welfare system (Arizona Legal Studies Discussion Paper No. 11–26). *Connecticut Law Review, 44, No. 1.* Retrieved from http://ssrn.com/abstract=1794263

Reynolds, C. R., & Kamphaus, R. W. (2004). *Behavior Assessment System for Children* (BASC-2; 2nd ed.). Bloomington, MN: Pearson.

Roberts, Y. H., Snyder, F. J., Kaufman, J. S., Finley, M. K., Griffin, A., Anderson, J., . . . Crusto, C. A. (2014). Children exposed to the arrest of a family member: Associations with mental health. *Journal of Child and Family Studies, 23,* 214–224. http://dx.doi.org/10.1007/s10826-013-9717-2

Rodríguez, M. A., Young, M. E., & Wallace, S. P. (2015). *Creating conditions to support healthy people: State policies that affect the health of undocumented immigrants and their families.* Los Angeles, CA: University of California Global Health Institute.

Rodriguez, N., Steinberg, A., & Pynoos, R. S. (1999). *UCLA PTSD Index for DSM–IV instrument information: Child version, parent version, adolescent version.* Los Angeles, CA: UCLA Trauma Psychiatry.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Ross, C. E., & Mirowsky, J. (2009). Neighborhood disorder, subjective alienation, and distress. *Journal of Health and Social Behavior, 50,* 49–64. http://dx.doi.org/10.1177/002214650905000104

Samuelson, K. W., Krueger, C. E., Burnett, C., & Wilson, C. K. (2010). Neuropsychological functioning in children with posttraumatic stress disorder. *Child Neuropsychology, 16,* 119–133. http://dx.doi.org/10.1080/09297040903190782

Steinberg, A. M., Brymer, M. J., Decker, K. B., & Pynoos, R. S. (2004). The University of California at Los Angeles Post-Traumatic Stress Disorder Reaction Index. *Current Psychiatry Reports, 6,* 96–100. http://dx.doi.org/10.1007/s11920-004-0048-2

Steinberg, A. M., Brymer, M. J., Kim, S., Briggs, E. C., Ippen, C. G., Ostrowski, S. A., . . . Pynoos, R. S. (2013). Psychometric properties of the UCLA PTSD Reaction Index: Part I. *Journal of Traumatic Stress, 26,* 1–9. http://dx.doi.org/10.1002/jts.21780

Stoney, S., Batalova, J., & Russell, J. (2013). South American immigrants in the United States. *Migration Information Source.* Retrieved from http://www.migrationpolicy.org/article/south-american-immigrants-united-states

Suárez-Orozco, C., Bang, H. J., & Kim, H. Y. (2011). I felt like my heart was staying behind: Psychological implications of immigrant family separations & reunifications for immigrant youth. *Journal of Adolescent Research, 21,* 222–257. http://dx.doi.org/10.1177/0743558410376830

U.S. Department of Health & Human Services. (2003). *President's New Freedom Commission: Achieving the promise—Transforming mental health in America.* Retrieved from http://govinfo.library.unt.edu/mentalhealthcommission/reports/FinalReport/downloads/downloads.html

Weissman, M. M., Orvaschel, H., & Padian, N. (1980). Children's symptom and social functioning self-report scales: Comparison of mothers'

and children's reports. *Journal of Nervous and Mental Disease, 168,* 736–740. http://dx.doi.org/10.1097/00005053-198012000-00005

Wessler, S. F. (2012, December 17). *Nearly 250,000 deportations of parents of U.S. citizens in just over two years.* Retrieved from http://colorlines.com/archives/2012/12/us_deports_more_than_200k_parents.html

Wherry, J. N., Hunsaker, S. F., Pettigrew, H. V., Conaway, I., Trejos-Castillo, E., Caldera, Y., . . . Cordero, L. (2014). Reliability and validity of the Trauma Symptom Checklist for Young Children—Spanish version. *Journal of Child & Adolescent Trauma, 7,* 3–12. http://dx.doi.org/10.1007/s40653-014-0003-2

Yoshikawa, H., Kholoptseva, J., & Suárez-Orozco, C. (2013). The roles of public policies and community-based organization in the developmental consequences of parent undocumented status. *Society for Research in Child Development Social Policy Report, 27,* 1–23. Retrieved from http://www.srcd.org/sites/default/files/documents/E-News/spr_273.pdf

Zayas, L. H., Aguilar-Gaxiola, S., Yoon, H., & Rey, G. N. (2015). The distress of citizen-children with detained and deported parents. *Journal of Child and Family Studies, 24,* 3213–3223. http://dx.doi.org/10.1007/s10826-015-0124-8

Zong, J., & Batalova, J. (2015). *Frequently requested statistics on immigrants and immigration in the United States.* Retrieved from http://www.migrationpolicy.org/article/frequently-requested-statisticsimmigrants-and-immigration-united-states#Children%20with%20Immigrant%20Parents

Received November 6, 2015
Revision received June 28, 2016
Accepted July 1, 2016 ∎

Journal of Public Economics 234 (2024) 105119



Contents lists available at ScienceDirect

# Journal of Public Economics

journal homepage: www.elsevier.com/locate/jpube



Short communication



# Does granting refugee status to family-reunified women improve their integration?☆

## Linea Hasager

*University of Copenhagen, Øster Farimagsgade 5 Building 26, DK 1353 Copenhagen, Denmark*

| ARTICLE INFO | ABSTRACT |
|---|---|
| *JEL classification:*<br>J12<br>J15<br>J61<br>K37<br><br>*Keywords:*<br>Refugees<br>Asylum recognition<br>Family reunification<br>Female integration<br>Violence against women<br>Staggered difference-in-differences design | In most countries, men are the principal asylum applicants, while women are admitted through family-reunification procedures. Family reunification implies that women's residence permits are contingent on remaining married to their husbands. Using a staggered Difference-in-Differences (DID) Design, I document that granting asylum to family-reunified women improves their economic integration, increases the probability of divorce and decreases their risk of being victims of violence. I find significant impacts on victimization and economic integration regardless of whether the woman remains married or not. |

## 1. Introduction

Refugee migration flows exhibit a systematic pattern across gender worldwide: men are mostly admitted as refugees, while women are admitted through the family-reunification system (Eurostat, 2020; Statista, 2020). Family-reunification status may put immigrant women at disadvantage in the host country, because their residence permit is contingent on their partner. In case of divorce or death of her partner, the woman will lose her residence permit, which implies that a woman who has fled similar conditions to those her partner faced has a higher risk of being returned to the origin country due to the type of residence permit she holds. The increased risk could impact integration of women negatively.

It is well established that labor market integration of refugee women is poor in comparison with other groups. In high-income countries, the refugee-native employment gap is 50 percentage points ten years after immigration, while the wage ratio is 0.55, and these gaps are

even larger for refugee women (Brell et al., 2020; Foged et al., 2022). Evidence from the Nordic countries shows that traditional measures, such as welfare benefit reductions and active labor market programs are less effective in pushing female refugees into work (Arendt and Schultz-Nielsen, 2019; Dustmann et al., 2024; Arendt et al., 2022), while investments in their human capital have significant returns (Foged et al., 2024).

Besides the disadvantageous labor market outcomes, family-reunified women also have a higher risk of being subject to intimate partner violence. Roughly, 0.2 percent of women who are family reunified to a refugee spouse, are victimized by their partner each year in Denmark. In comparison, 0.1 percent of other refugee women and less than 0.1 percent of native women experience intimate partner violence annually.[1] The elevated risk of intimate partner violence for family-reunified women may partly reflect the high dependence on husbands,

---

☆ I am thankful to Mette Foged, Tommaso Frattini, Nikolaj Harmon, Oddbjørn Raaum, Giovanni Peri, Jakob Roland Munch, Miriam Wüst, Johanna Rickne, Mia Jørgensen, Mikkel Mertz and Petra Gram Cavalca for helpful comments and discussions. The project benefited from comments by participants at CReAM-RFBerlin workshop, EALE 2023, the "Immigration in OECD Countries - 10th Annual International Conference" (CEPII), CEMIR Junior Economist Workshop on Migration Research (CESifo), and researchers at the Rockwool Foundation's Research Unit, CoLab (University of Copenhagen) and CReAM (University College London). I gratefully acknowledge support from the Economic Assimilation Research Network (EARN) at the University of Copenhagen, financed by the Innovation Fund Denmark (grant #6149-00024B).

*E-mail address:* tlh@econ.ku.dk.

[1] These numbers are based on police registers. Ottosen and Østergaard (2018) show that 1.5 percent of native women and 2.7 percent of immigrant women experience intimate partner violence (IPV) annually based on survey data from Denmark in 2012, while Ottosen and Østergaard (2020) estimate that 10 percent of cases are reported to the police.

https://doi.org/10.1016/j.jpubeco.2024.105119
Received 13 September 2022; Received in revised form 22 March 2024; Accepted 31 March 2024
Available online 9 April 2024
0047-2727/© 2024 The Author(s). Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

since these women are only allowed to stay in the host country as long as they remain married. Previous research has shown that women's risk of suffering intimate partner violence is linked to their economic dependence on husbands in both developed and developing countries (Aizer, 2010; Hidrobo et al., 2016).

In this paper I study the consequences of recognizing family-reunified women as refugees. To estimate the impact of asylum recognition for this group, I use a staggered Difference-in-Differences (DID) Design. This approach exploits exogenous variation in the timing of receiving asylum by comparing outcomes for women who are granted refugee status with the outcomes of women who are granted refugee status a few quarters later.[2] The decision to apply for asylum may be endogenous to the women's integration, but the immigration authorities assess the asylum application solely based on the individual's need for protection from origin country conditions — and not their labor market integration or family situation in Denmark. Therefore, the receipt of asylum is not directly determined by their integration or being in abusive relationships in Denmark. Moreover, for identification I rely on quasi-randomness in the timing of receiving asylum, conditional on having applied. The main assumption behind the empirical strategy is that in absence of the event occurring, the treated group would have followed the same trend as the not-yet-treated group. The discontinuous changes in outcomes around the event are attributed to asylum recognition, and measure the impact of refugee status relative to family-reunification status.

The results show that the divorce rate increases by 3 percentage points following asylum recognition. The risk of suffering violent victimization decreases by 0.8 percentage points (approximately 100 percent relative to the baseline period), while the employment rate increases by 2.4 percentage points (53 percent relative to the baseline period). Quarterly work hours and earnings increase gradually following asylum recognition and increase, on average, by 14 h and USD 270, which is more than a doubling of hours and earnings relative to the pre-asylum periods. Labor market outcomes and victimization are significantly affected, regardless of whether the woman remains married or not.

There exist multiple potential explanations behind the empirical findings. For instance, the findings can be rationalized in a household bargaining model.[3] An autonomous asylum status can reduce the risk of return to the origin country and increase female bargaining power. Another possible explanation behind the empirical findings is that decreasing the risk of return to the origin country can improve economic outcomes, because the expected value of finding a job increases for the job seeker and the employer. Moreover, applying for an autonomous asylum status for the wife can be a joint household strategy to improve the family's situation. Improvements in the family's economic situation and security may reduce violence against women, for instance, if family stress is reduced following the wife's asylum recognition. It is beyond the scope of this study to disentangle possible mechanisms, and several mechanisms may be at play at once.

My work relates to a growing literature studying how immigrants' residence permits affect their economic performance and well-being. One strand of literature has considered the effect of having legal status, which provides more certainty about remaining in the host country and gives access to the formal sector, which typically pays higher wages than the informal sector (Amuedo-Dorantes et al., 2007; Orrenius and Zavodny, 2015; Hainmueller et al., 2017b; Kuka et al., 2019). Another strand of literature has studied the integration of immigrants (Hainmueller et al., 2015, 2017a; Gathmann and Keller, 2018; Govind, 2021; Dahl et al., 2022). Similar to having legal

immigration status, citizenship increases certainty about staying in the host country and it may give access to a wider range of jobs, since civil service occupations can be restricted to citizens. In comparison, asylum status gives access to the same kinds of jobs as family-reunification status, but asylum status reduces the uncertainty about remaining in the host country. Relative to previous work, my paper therefore sheds light on the latter channel.

Most closely related to my work are three studies considering refugees' access to permanent residency. Kilström et al. (2023) find that a decrease in the probability of receiving permanent status coupled with an incentive to achieve more labor market attachment and education resulted in increased education enrollment rates and lower earnings for refugee women. A related study documents that temporary status coupled with work incentives decreased participation in language training (Blomqvist et al., 2018). Finally, Arendt et al. (2024) show that tightening the criteria for permanent residency for refugees, by requiring higher levels of employment and language proficiency, increased participation in language training and labor market attachment for high-performance individuals, but did not benefit low-performance individuals. Relative to these studies, I focus on a residence status that reduces uncertainty and relaxes females' dependence on their husbands without providing additional incentives to participate in the labor market or educational system. To the best of my knowledge, I provide the first evidence of the impact of refugee status relative to family-reunification status. This distinction is important, because many women are granted family-reunification status as opposed to refugee status. My results provide one explanation for why women from refugee-sending countries lag behind their male counterparts in economic integration. Moreover, I show that the current practice puts women at risk of becoming victims of violence and it may lock some family-reunified women in undesired marriages.

## 2. Institutional context

### 2.1. Refugee admissions to Denmark, 2001–2017

During the period 2001 to 2017 Denmark admitted approximately 44,000 persons aged 18 to 64 as refugees or spouses who were family reunified to a refugee. The majority (43 percent) were granted asylum in accordance with the UN Refugee Convention (United Nations Human Rights Council, 2010). The UN Refugee Convention applies to individuals persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion. In addition, the Danish state grants asylum to individuals at risk of torture, the death penalty or persecution in the home country, which amounts to approximately 18 percent of the admitted persons ("de facto-" or "B-status").[4] Another 8 percent are resettled through the international UN quota system. Refugees are ensured the right to family reunification which implies that 23 percent of those admitted in 2001 to 2017 arrived through the family-reunification system.[5] The remaining persons were admitted on temporary protection grounds and for other humanitarian concerns.

Studying the admissions by gender reveals that 25,000 men and 19,000 women arrived in this period. Men mostly hold a refugee permit (95 percent), while for women the split between refugee status and family-reunification status is more even, as 54 percent of the 19,000 women have refugee status. When zooming in on the 10,000 persons with family-reunification status, the numbers show that 87 percent are female.[6] Taken together, this reveals a remarkable pattern in refugee

---

[2] Hainmueller et al. (2016) and Hvidtfeldt et al. (2018) argue that features of the asylum system generate quasi-random variation in asylum wait times in Switzerland and Denmark.

[3] See Appendix A for details.

[4] On occasion special laws are passed for groups that are not individually persecuted (Hvidtfeldt and Schultz-Nielsen, 2017).

[5] To have a spouse family reunified, the couple must prove that they are in a valid marriage based on conditions, such as previous cohabitation, children etc. (The Danish Immigration Service, 2020).

[6] In comparison, 71 percent of family reunified to other immigrants and natives are women.

L. Hasager

Journal of Public Economics 234 (2024) 105119

migration, which resembles that of other countries in Europe and the United States (Eurostat, 2020; Statista, 2020): Women are more likely to arrive through the family-reunification system than men. The observed pattern may reflect individual preferences and abilities to migrate, along with family-based decision-making and gender differences in qualifying as a refugee.

### 2.2. Institutional setting: Family-reunification, the asylum application process and labor market access

In the Danish refugee admission system the residence permit for the family-reunified woman is contingent on her spouse.[7] This means that the family-reunified spouse will lose her permit if the refugee husband loses his permission to stay, if the couple is divorced or in the event of death of the partner (The Danish Immigration Service, 2024). This poses a disadvantage to the group of women admitted through the family-reunification system by increasing uncertainty about residency and shifting intra-household bargaining power in favor of the husband.[8] Qualitative evidence suggests that uncertainty about residency if divorcing a partner is an important concern for family-reunified women in Denmark (Liversage and Petersen, 2020). The perceived risk – not necessarily the actual risk – of losing residency should influence family behavior. Two pieces of empirical evidence based on the administrative registers suggest that family-reunified women are concerned about residency. First, family-reunified women who do not change residence status are less likely to divorce than the women who change to an autonomous refugee permit (7 percent vs. 17 percent). Second, for those who divorce or lose their husband within four years after immigration, the probability of emigration from Denmark is three times higher for the group of women without an autonomous permit relative to those who gain their own permit.[9]

Family-reunified persons in Denmark can apply for asylum at their local police station and will undergo the same application procedures as other asylum seekers. The Danish Immigration Service (DIS) will interview the applicant 2–3 times to establish the asylum motive and assess credibility of the application. The DIS assesses whether the applicant is in need of protection from conditions in the country of nationality due to individual persecution or general unsafe conditions, such as civil war. Vulnerability due to abusive marriages and labor market credentials does not affect eligibility for refugee status. Likewise, the processing time of applications depends mainly on collection of information about origin country conditions (Hvidtfeldt et al., 2018), while it is not determined by labor market prospects or abusive marriages in Denmark. Recognized refugees and their reunified family members have the right to work, have free access to the Danish health care system, and after four consecutive years of residency they can vote in municipal elections. Additional details about the asylum process can be found in Appendix B.

## 3. Data

The analysis is based on administrative data on the full population in Denmark from 2001 to 2019. I use unique individual identifiers to track individuals over time and across different registers, and individuals can be linked to their spouses. To study the patterns in refugee migration and changes to residency, I use information from the admission register, which carries detailed information on immigrant status as well as dates of application for and approval of residence permits. I link this data to labor market outcomes from the Danish tax authorities, police registers on victimization and criminal convictions, hospital admissions data, and other demographic variables from the central population register. The data on hours worked and earnings is available since 2008, while all other data is available since 2001.

### 3.1. Descriptive statistics

I study a population of 1349 adult women (18 years or older) who are initially family reunified to their refugee spouse between 2001 to 2017, but then apply for and obtain their own refugee status. This amounts to 7 percent of all women admitted either as refugees or family reunified to a refugee spouse during the period. The women who change to asylum status constitute 16 percent of all women who were family reunified to a refugee spouse. The majority of these women are granted asylum based on an individual need for protection from persecution in their home countries. Most of them are granted UN Refugee Convention status (50 percent) or "de facto-status/B-status" (26 percent), while the remaining 24 percent are granted temporary protection status. I do not observe unsuccessful asylum applications at the individual level, but aggregated data from the DIS shows that 50–75 percent of asylum applications from family-reunified women are rejected.[10] This suggests that women face significant uncertainty about their residence status after having lodged their asylum application.

The women who change status are, on average, 32 years old with two children at immigration, and most have attained a basic level of education upon arrival (Table 1). Many come from Syria (32 percent), followed by Eritrea (26 percent) and Afghanistan (25 percent). The women whose asylum applications are approved are a selected group compared with women who did not apply or had their applications rejected. For all groups of women, Syria is the largest country of origin, but there are substantial differences in the distribution across origin countries (see Table 1 and Appendix Table D.1). The women who change status are more likely to originate from Eritrea and Afghanistan. They are of similar age as other female refugees and family-reunified women, but have more children at immigration. The educational attainment at arrival for those who change status is similar to the level of the women who are admitted directly as refugees, but relative to other family-reunified women, they have lower levels of education. At the time of the wife's immigration, the husbands of women who change status have lower employment rates and earnings than the husbands of other women. This suggests that the women in this study are among the most disadvantaged immigrant women.

Fig. 1 illustrates the distribution of immigration, applications and asylum recognition across calendar months. Panel a shows that the distribution of family reunification is fairly uniform over the calendar year. There are slightly more applications for asylum towards the end of the calendar year (Panel b), and this is also the time where most are recognized as refugees (Panel c). This reflects that the average processing time of an asylum application is just above one year. The bulk of the successful asylum applications is lodged within four months of family reunification, but a few are lodged before and some have applied after several years in Denmark (Panel d). The average wait time for asylum recognition is more than a year, but many cases are

---

[7] This is similar to other countries, such as the United Kingdom and Sweden. According to EU legislation, persons who are family reunified to a refugee sponsor are not automatically granted an autonomous residence permit in case of divorce or death of the sponsor. This is up to national law in each member state. In the U.S., refugees and their spouses may apply for permanent residency one year after entry. If the principal applicant dies before permanent residency is achieved, the refugee spouse can still apply for adjustment of her status. If the spouses divorce before achieving permanent status, the derivative refugee spouse cannot apply for permanent status based on the former spouse.

[8] Since 2013 family-reunified persons may be able to extend their family-reunification residence permit if they divorce their partner due to partner violence. If they use this option they will not switch to refugee status, and reports suggest that few women use this strategy in practice (Liversage and Petersen, 2020; Danner, 2018).

[9] The emigration rate is 4 percent for those with an autonomous permit and 14 percent for those without. Those without an autonomous permit may have an open residency case being processed which is not observed in the data and could therefore possibly remain in Denmark while waiting for their case to be decided.

[10] Based on numbers from DIS 2015–2019 and own calculations.

*Journal of Public Economics 234 (2024) 105119*

processed within 400 days (Panel e), which implies that a large fraction of cases are resolved within three years of family reunification (Panel f). For the empirical analysis, I rely on an unbalanced panel of individuals, following the women up to three years before asylum recognition and 1.5 years after being granted asylum.

### 3.2. Definition of main outcomes

The main outcomes of interest are quarterly indicators for being employed, quarterly hours of work and earnings deflated to 2015-level using the Consumer Price Index (CPI) from Statistics Denmark and converted to 1000 USD.[11] The employment indicator is available between 2001–2019, while hours of work and earnings can be measured from 2008–2019. Second, I analyze intimate partner violence based on information from police registers and hospital records. This indicator takes the value one if police records show that the woman was a victim of violence or sexual assault or if she was hospitalized due to assault based on physician classification of injury.[12] Finally, I study divorce as an outcome. In this case I use an indicator that takes the value one if the woman is divorced. Panel B of Table 1 presents summary statistics for the main outcomes, as well as quarterly victimization rates separately for the two data sources (police records and hospitalization).[13] Fig. 2 shows the means of the outcomes by quarters indexed to quarter of asylum recognition. The graphs show discontinuous changes in outcomes at the time of asylum recognition, which suggests that the women change their behavior when they are granted asylum. Appendix Figure D.1 shows that this is not the case when they lodge their asylum application, where no discontinuities are found for divorce or labor market outcomes. Furthermore, Appendix Figure D.1 Panel b shows that violence against women peaks in the quarter of asylum recognition, which suggests that the women experience some backlash once they lodge their asylum application.

## 4. Empirical strategy

The ideal experiment to study the impact of granting women refugee status as opposed to family reunification would be to randomize refugee status. Such an experiment does not exist because refugee status is granted to those in need of international protection. This poses a challenge to identifying the causal impact of one type of residency versus another, because the decision to apply for asylum is likely not orthogonal to individual characteristics. However, given application for asylum, it is uncertain whether the application will be successful, and if successful, the timing of being recognized as a refugee is unpredictable for the asylum seeker. Hvidtfeldt et al. (2018) argue that there is substantial exogenous variation in asylum wait times in Denmark caused by batch processing, holidays, and delays in evaluation of new conflicts by the Danish Immigration Services.[14] Relying on the quasi-randomness in timing of being granted asylum, I can estimate whether this event generates discontinuous changes in labor market performance and other outcomes that would otherwise have evolved smoothly over time. Therefore, the research question posed in this paper is well-suited for a staggered Difference-in-Differences (DID) design.

A recent series of studies demonstrate that the OLS two-way fixed effects estimator (OLS TWFE) can suffer from bias if there are heterogeneous treatment effects in DID designs with staggered treatment adoption (Borusyak et al., 2023; Callaway and Sant'Anna, 2021; De Chaisemartin and d'Haultfœuille, 2020; Sun and Abraham, 2021). This bias arises because negative weights may be invoked, due to the assumption of homogeneous treatment effects imposed by OLS. Even if all the weights are positive, TWFE coefficients may not always correspond to the most policy-relevant parameter, because OLS weigh cohort-specific effects proportional to the variance of the treatment indicator instead of cohort size or another relevant weight specified by the researcher Roth et al. (2023). Different methods have been proposed to circumvent such issues. In the main empirical specification I follow the methodology from Borusyak et al. (2023), since their estimator provides efficient treatment effect estimates in the first period, if errors are serially uncorrelated, compared with other unbiased DID estimators, such as Callaway and Sant'Anna (2021) and De Chaisemartin and d'Haultfœuille (2020).[15] Errors will have little serial correlation if units in the data experience temporary shocks, while the opposite will be the case if shocks are permanent. Therefore, my choice of estimator is guided by whether the units in the data experience temporary or permanent shocks, which may differ between the outcomes. I therefore also show results based on other robust DID estimators.[16]

To estimate a counterfactual for individuals who are granted asylum, I use women who have not yet been granted asylum. I restrict the sample to follow women at most three years before the event and 1.5 years after the event of being granted asylum. This means that, as controls, I only use women who received asylum at most three years later than the treatment group. I index all quarters relative to the event of receiving asylum ($k = t - E$) and report quarterly outcomes six quarters after this event. The model of interest takes the following form for the quarters after asylum recognition:

$$y_{it} = \sum_{j=0}^{5} \beta_j \cdot \mathbb{1}[j = k] + \gamma_t + \alpha_i + \epsilon_{it}. \tag{1}$$

Here $y_{it}$ denotes an outcome for individual $i$ in quarter $t$ at event time $k$. The six event time indicators (first term on the right-hand side) capture the dynamic treatment effects. The quarter fixed effects, $\gamma_t$, control nonparametrically for any time trends and business cycles, and $\alpha_i$ denotes individual fixed effects, taking account of the unbalanced panel of individuals. Because there is variation in the number of quarters elapsed between family reunification and asylum recognition, the dynamics of the event time indicators are distinct from the assimilation pattern related to time since immigration.

The main assumption for identification of a causal treatment effect is, that in the absence of treatment, the women who are granted asylum would have followed the same trend as the women who are granted asylum a few quarters later. Second, I assume that there is no anticipation of asylum recognition in a subset of the pre-period, i.e., that in the three years leading up to the event the women do not change behavior in anticipation of receiving asylum.

Following Borusyak et al. (2023), I first estimate the time fixed effects, $\gamma_t$, and the unit fixed effects, $\alpha_i$, using only data from periods where the persons are not yet treated:

$$y_{it} = \gamma_t + \alpha_i + \epsilon_{it}. \tag{2}$$

I then use the estimates for the unit and time fixed effects to impute the untreated potential outcomes, $\hat{y}_{it}(0)$, and obtain an estimated treatment

---

[11] I use the exchange rate from the Danish Central Bank on March 27, 2019.

[12] This measure is similar to the one proposed by Aizer (2010). It likely only captures the most severe cases if less severe cases are not reported to the police or not treated in hospital. The measure will also capture non-intimate partner violence, but potential bias from this measurement error is limited, since the majority of violence against women in Denmark is intimate (KVINFO, 2023).

[13] Note that there is overlap between the two sources. For 72 percent of the hospitalizations there is also a police record.

[14] This is similar to the case of Switzerland (Hainmueller et al., 2016).

[15] The imputation estimator in Borusyak et al. (2023) is efficient if errors are serially uncorrelated over time. Harmon (2022) shows that DID estimators, such as De Chaisemartin and d'Haultfœuille (2020) and Callaway and Sant'Anna (2021), are efficient if errors are strongly correlated over time and the researcher wants to estimate the effect only at one specific time horizon.

[16] In Appendix C, I describe the approach and estimation equations for the alternative estimators in detail.

001334

L. Hasager

*Journal of Public Economics 234 (2024) 105119*

effect for each treated observation, which is the difference between their observed outcome and their imputed untreated potential outcome in every time period, $\hat{\tau}_{it} = y_{it} - \hat{y}_{it}(0)$. Finally, I take a weighted average of these individual treatment effects, where all treated units have equal weight within a relative time period. This means that larger treatment cohorts receive more weight when calculating the weighted average treatment effects. The dynamic treatment effects are interpreted as changes relative to the three years before asylum recognition, and I cluster standard errors at the individual level.[17]

## 5. Results

### 5.1. Testing for parallel trends and no-anticipation

Fig. 3 presents the empirical tests for parallel trends and no-anticipation in the outcomes of interest as outlined in Borusyak et al. (2023), depicted by red cross markers in the graph. To carry out these tests, I only use data from periods before the women change status. I estimate the following model by OLS and cluster standard errors by individuals:

$$y_{it} = \kappa + \sum_{j=-6}^{-1} \beta_j \cdot \mathbb{1}[j=k] + \gamma_t + \alpha_i + \varepsilon_{it}, \qquad (3)$$

where the $\beta_j's$ capture indicators for the six quarters before asylum recognition, and $\kappa$ captures the mean of the relevant outcome in relative time periods $k \in [-12, -7]$. Fig. 3 presents the estimates of each of the event time indicators, which shows that none of them are statistically different from zero. In Table 2 I report the $F$-test of joint insignificance of the event time indicators. The $F$-test cannot reject that the pre-period indicators are statistically equal to zero for any of the five outcomes. The $F$-statistics are small (between 0.16 and 0.97), and their corresponding $p$-values are between 0.99 and 0.44. This supports the assumption that the women are on similar trends prior to treatment and that they cannot anticipate the event within this period; thus, they do not alter their behavior in anticipation of asylum recognition in the quarters leading up to it.

In addition, whether for asylum is not significantly correlated with individual observed demographic characteristics, such as age, having children, educational attainment and the husband's education measured at immigration (Appendix Table D.3). This further supports the assumption of no-anticipation of asylum recognition, and it shows that asylum processing times do not differ systematically across groups of women, beyond origin country groups.[18] These results suggest that specific groups, such as more vulnerable women, do not have their cases processed faster or slower. If the most vulnerable women have longer asylum processing times, they will serve as control units in more time periods which could affect the imputation of counterfactual outcomes. However, the pre-trends tests from Eq. (3) show that outcomes do not diverge before treatment onset. Furthermore, the raw means depicted in Fig. 2 also present discontinuous changes in outcomes at the time of asylum, when no comparison is made between the early and the later treated women.

As a further test of the identifying assumptions, Appendix Figure D.2 shows the probability of a criminal conviction and labor market performance for the husbands of the women who change status. This graph also suggests that households do not anticipate the event and that outcomes for the treated and not-yet-treated groups evolve in parallel over time.

Alternative tests based on De Chaisemartin and d'Haultfœuille (2020), Callaway and Sant'Anna (2021) and OLS TWFE, depicted in

Fig. 3, also support the identifying assumptions. The parallel trends assumption differs somewhat between the different estimators. Borusyak et al. (2023) and De Chaisemartin and d'Haultfœuille (2020) require parallel trends for all groups and time periods, while Callaway and Sant'Anna (2021) require parallel trends in post-treatment periods. Nevertheless, all estimators support the parallel trends and no-anticipation assumptions.[19]

### 5.2. Main results

Fig. 3 and Table 2 present the main results. In the first quarter after asylum recognition there is a significant 1.4 percentage point increase in the divorce rate, which increases further in the following quarters, such that the divorce rate increases by 3 percentage points, on average, in the first 1.5 years. The gradual increase may reflect that some couples are undergoing a separation period before they can divorce. The risk of being subject to intimate partner violence drops by 0.8 percentage points on average throughout the time period, and by the end of the period, this risk is 2 percentage points lower relative to the pre-asylum period. The women also benefit from having their own refugee status in terms of labor market outcomes. Their employment rate increases gradually in the first 1.5 years by, on average, 2.4 percentage points, relative to 4.5 percent being employed pre-asylum. They also work 23 h more and earn an additional 500 USD per quarter in the second year after asylum recognition, while the average increase in the first 1.5 years is 14 h and 270 USD.[20] These are large effects compared to the low baseline. Average quarterly work hours and earnings in the three years leading up to asylum recognition are a modest 12 h and 240 USD per quarter.

### 5.3. Heterogeneity in estimated impacts

It is informative to split the results by marital status. Table 2 shows that the reduction in violent victimization prevails both for women who are not divorced (Panel B) and for women who divorce their husbands at some point throughout the period (Panel C). The results in Panel C are less precisely estimated, since only 17 percent of the sample divorce their spouse in this time period. These findings show that the observed decrease in violence is not entirely driven by increased divorce rates. The decreased probability of return to the woman's home country also affects the level of violence within the marriage, possibly by increasing her utility from divorce, and thereby changing her threat point. The improvements in employment and earnings are also observed regardless of marital status, although the impacts on employment and earnings emerge more slowly and are larger for the women who are divorced by the end of the period. This shows that the labor market response is not driven entirely by divorce, but those who divorce may face a stronger work incentive.

Additional heterogeneity analysis by immigration cohort and origin region is available in Online Appendix Tables D.4 and D.5. These results suggest that the improvements in the labor market apply to all groups, while the increase in divorce and decrease in violence are mostly driven by the later arriving cohorts and women from countries in the Middle East, such as Syria, of whom many were granted "Temporary Protection Status". These heterogeneous impacts likely arise because of differences in the populations and residence permits.

---

[17] Appendix Table D.2 shows that the main results are robust to clustering by treatment cohorts.

[18] Consistent with Hvidtfeldt et al. (2018), I find that origin country is correlated with asylum processing time.

[19] Appendix C describes the specifications for the alternative estimators.

[20] This is not conditional on employment and thus reflects that a significant share of these women do not find (full-time) employment.

*L. Hasager*                                                                                           *Journal of Public Economics 234 (2024) 105119*

**Table 1**
Summary statistics.

| | Mean | S.D. |
|---|---|---|
| *Panel A. Characteristics at Immigration* | | |
| Age | 31.907 | 7.911 |
| Number of Children | 2.009 | 1.897 |
| Days between Family Reunification and Asylum Application | 170.736 | 404.374 |
| Days between Asylum Application and Asylum Recognition | 452.429 | 488.386 |
| Days between Family Reunification and Asylum Recognition | 625.329 | 535.079 |
| *Education Surveyed* | | |
| Basic Education | 0.792 | 0.406 |
| Vocational Education | 0.058 | 0.233 |
| Academic Education | 0.150 | 0.358 |
| Education Not Surveyed | 0.280 | 0.449 |
| *Origin Country* | | |
| Syria | 0.318 | 0.466 |
| Eritrea | 0.265 | 0.441 |
| Afghanistan | 0.246 | 0.431 |
| Iraq | 0.078 | 0.268 |
| *Characteristics of Husband at Wife's Immigration* | | |
| Same Origin Country | 0.640 | 0.480 |
| Employment Probability | 0.183 | 0.387 |
| Annual Earnings (1000 USD) | 4.372 | 11.167 |
| *Husband's Education Surveyed* | | |
| Basic Education | 0.582 | 0.494 |
| Vocational Education | 0.140 | 0.348 |
| Academic Education | 0.277 | 0.448 |
| Education Not Surveyed | 0.498 | 0.500 |
| *Panel B. Outcomes* | | |
| *Quarterly Outcomes* | | |
| Divorce | 0.052 | 0.223 |
| Victim of Violence | 0.007 | 0.081 |
| Victim of Violence (Police Record) | 0.006 | 0.077 |
| Victim of Violence (Hospitalization) | 0.002 | 0.046 |
| Employment Probability | 0.063 | 0.243 |
| Hours Worked | 19.483 | 78.858 |
| Earnings (1000 USD) | 0.382 | 1.585 |

*Notes:* Summary statistics for the population of females who were family reunified to a refugee spouse and subsequently obtained their own refugee status. Age and number of children are measured at family reunification. Educational attainment acquired abroad shows the distribution across different education levels for those who were surveyed about this. The characteristics of the husband are measured in the year of the wife's immigration. In Panel A the number of person observations is 1349. In Panel B the number of person-quarter observations is 14,945 for divorce, victimization and employment probability, and 10,112 for hours worked and earnings.

### 5.4. Robustness checks

A potential concern is whether the estimated effects can be explained by the typical immigrant assimilation pattern observed in many countries.[21] To address this, I show that the estimated pattern is not found when assigning the women random asylum dates, that mimic the actual distribution of wait time. I assign them a random placebo event date of being recognized as a refugee within four years of their actual immigration.[22] Appendix Figure D.3 shows that there are no significant discontinuous changes in the evolution of outcomes around the placebo event. This supports the interpretation that asylum recognition generates significant causal impacts on the women's integration, and suggests that the observed pattern in outcomes is not arising simply due to time since immigration. As a further robustness test of this, I include a matched sample of never treated refugee women, who were married at immigration. The never treated women are matched to the treated sample based on origin country and immigration quarter, and I only keep cells where there is common support. This approach allows me to compare the evolution of outcomes for treated women to a large

sample of never treated women who arrived from the same countries in the same time period. The results from this exercise also show that there is a significant increase in the probability of divorce, a reduction in violence against women and some improvements in labor market outcomes following asylum recognition (Appendix Table D.6).

Moreover, Fig. 3 shows that the results are robust to using other DID estimators, such as the ones proposed by Callaway and Sant'Anna (2021), De Chaisemartin and d'Haultfœuille (2020), and a TWFE model estimated by OLS. Finally, Fig. 3 shows that estimation of treatment effects is efficient when using the method by Borusyak et al. (2023) when considering the contemporaneous probability of victimization or divorce. The parameter estimates are similar across different estimators for all outcomes, but the estimated impact on victimization is not significant when using the methods by Callaway and Sant'Anna (2021) and De Chaisemartin and d'Haultfœuille (2020). For the estimated impact on labor market outcomes, all estimators yield significant effects. The outcomes related to victimization and divorce likely have less serially correlated errors, because the shocks are of a more temporary nature. The labor market outcomes may have more serially correlated errors, since the shocks are of a more permanent nature. Therefore, in line with the work by Harmon (2022), the best unbiased estimator differs between outcomes.

### 6. Conclusions

This study estimates the impact of recognizing women, who are initially admitted through family-reunification procedures, as refugees.

---

[21] See Brell et al. (2020) for assimilation profiles of immigrants in several Western countries.

[22] I use a chi-square distribution with three degrees of freedom for placebo application dates within one year of immigration. Second, I assign placebo recognition dates using a chi-square distribution with three degrees of freedom from the placebo application until three years after this date.

*L. Hasager*

*Journal of Public Economics 234 (2024) 105119*



**Fig. 1.** Timing of family reunification, asylum application and recognition of refugee status.
*Notes:* Panels a–c show the distribution of family reunification, asylum application and asylum recognition across calendar months for the analysis sample. Panels d–f show the distribution of days elapsed between family reunification and asylum application, days from asylum application to recognition and days from family reunification to asylum recognition.

By exploiting quasi-random variation in the timing of receiving asylum in a staggered DID design, I show that the divorce rate increases and the risk of victimization decreases following asylum recognition. Moreover, asylum recognition has positive consequences for females' employment and earnings trajectories. Possible explanations behind the empirical findings include changes in intra-household bargaining power, incentives to invest in human capital and improvements in the household's circumstances.

I document that women are more likely to have family reunification status than men, and this contributes to gender inequality among a disadvantaged group of immigrants. The impacts of the different types of residence permits are important for policymakers interested in designing immigration policies that can improve integration of immigrant women. Whether the results in this study are valid for other groups of immigrants is an open question. However, the issues related to family reunification potentially extend to women who are family reunified to non-refugee immigrants and natives.

## 7. Tables and graphs

See Tables 1 and 2 and Figs. 1–3.

001337

L. Hasager

Journal of Public Economics 234 (2024) 105119



**Fig. 2.** Means of outcomes by quarters since asylum recognition. *Notes:* The panels show the means of the outcomes by quarters since asylum recognition.

001338

L. Hasager

*Journal of Public Economics 234 (2024) 105119*



**Fig. 3.** Estimated effects of asylum recognition relative to family-reunification status by quarters since asylum recognition.
*Notes:* Each panel shows event study estimates based on the methods proposed by Borusyak et al. (2023) (in red with cross markers), Callaway and Sant'Anna (2021) (in blue with circle markers), De Chaisemartin and d'Haultfœuille (2020) (in green with diamond markers), and two-way fixed effects models estimated by OLS (in purple with triangle markers). The bars represent the 95-percent confidence intervals. Standard errors are clustered at individual level.

001339

*Journal of Public Economics 234 (2024) 105119*

**Table 2**
Estimated effects.

| | (1) Divorce | (2) Victim of violence | (3) Employment probability | (4) Hours worked | (5) Earnings (1000 USD) |
|---|---|---|---|---|---|
| | | | Panel A. All | | |
| 0 | 0.014*** | −0.001 | 0.020*** | 5.572** | 0.097** |
| | (0.005) | (0.003) | (0.006) | (2.229) | (0.042) |
| 1 | 0.027*** | −0.006*** | 0.012 | 7.197** | 0.111** |
| | (0.007) | (0.002) | (0.006) | (2.915) | (0.054) |
| 2 | 0.033*** | −0.004 | 0.016** | 12.620*** | 0.205*** |
| | (0.008) | (0.003) | (0.007) | (3.570) | (0.065) |
| 3 | 0.039*** | −0.009** | 0.029*** | 19.735*** | 0.361*** |
| | (0.009) | (0.004) | (0.008) | (4.128) | (0.078) |
| 4 | 0.040*** | −0.011*** | 0.038*** | 22.826*** | 0.452*** |
| | (0.010) | (0.004) | (0.009) | (4.469) | (0.087) |
| 5 | 0.027*** | −0.020*** | 0.034*** | 23.077*** | 0.503*** |
| | (0.010) | (0.006) | (0.010) | (4.800) | (0.100) |
| Pre-Asylum Recognition Mean | 0.023 | 0.008 | 0.045 | 11.888 | 0.238 |
| *F*-Statistic | 0.16 | 0.58 | 0.61 | 0.66 | 0.97 |
| *Pr > F* | 0.99 | 0.74 | 0.72 | 0.68 | 0.44 |
| Average Effect | 0.030*** | −0.008*** | 0.024*** | 14.215*** | 0.266*** |
| | (0.007) | (0.002) | (0.006) | (2.956) | (0.057) |
| N | 14,945 | 14,945 | 14,945 | 10,112 | 10,112 |
| | | | Panel B. Never Divorced | | |
| 0 | | −0.000 | 0.019*** | 6.293** | 0.107** |
| | | (0.002) | (0.006) | (2.476) | (0.045) |
| 1 | | −0.002 | 0.014** | 9.015*** | 0.138** |
| | | (0.002) | (0.007) | (3.370) | (0.059) |
| 2 | | −0.000 | 0.018** | 13.739*** | 0.219*** |
| | | (0.002) | (0.008) | (4.072) | (0.072) |
| 3 | | −0.000 | 0.030*** | 20.564*** | 0.353*** |
| | | (0.003) | (0.009) | (4.729) | (0.086) |
| 4 | | −0.004* | 0.041*** | 22.167*** | 0.418*** |
| | | (0.002) | (0.010) | (4.992) | (0.094) |
| 5 | | −0.004 | 0.031*** | 19.753*** | 0.416*** |
| | | (0.002) | (0.010) | (5.295) | (0.108) |
| Pre-Asylum Recognition Mean | | 0.003 | 0.046 | 12.248 | 0.239 |
| *F*-Statistic | | 2.81 | 0.65 | 0.24 | 0.38 |
| *Pr > F* | | 0.01 | 0.69 | 0.96 | 0.89 |
| Average Effect | | −0.002 | 0.025*** | 14.387*** | 0.256*** |
| | | (0.002) | (0.006) | (3.328) | (0.062) |
| N | | 12,181 | 12,181 | 8,197 | 8,197 |
| | | | Panel C. Ever Divorced | | |
| 0 | | 0.000 | 0.027** | 2.068 | 0.050 |
| | | (0.011) | (0.013) | (4.768) | (0.103) |
| 1 | | −0.027*** | −0.000 | 1.462 | 0.037 |
| | | (0.008) | (0.015) | (5.106) | (0.119) |
| 2 | | −0.018 | 0.011 | 10.816 | 0.200 |
| | | (0.009) | (0.016) | (7.201) | (0.148) |
| 3 | | −0.032*** | 0.024 | 18.514** | 0.424** |
| | | (0.012) | (0.021) | (7.948) | (0.169) |
| 4 | | −0.021** | 0.026 | 25.480*** | 0.575*** |
| | | (0.010) | (0.023) | (9.136) | (0.183) |
| 5 | | −0.045*** | 0.064*** | 39.338*** | 0.892*** |
| | | (0.010) | (0.025) | (10.762) | (0.232) |
| Pre-Asylum Recognition Mean | | 0.030 | 0.044 | 10.248 | 0.235 |
| *F*-Statistic | | 0.90 | 0.46 | 0.84 | 0.93 |
| *Pr > F* | | 0.50 | 0.84 | 0.54 | 0.48 |
| Average Effect | | −0.023*** | 0.024 | 15.316** | 0.341*** |
| | | (0.007) | (0.014) | (6.163) | (0.131) |
| N | | 2764 | 2764 | 1915 | 1915 |

*Notes:* Standard errors clustered at individual level in parenthesis. In all columns the coefficients denote the estimated impact relative to the pre-treatment period ($k \in [−12, −1]$) using the estimation method proposed by Borusyak et al. (2023), conditional on unit and calendar quarter fixed effects. The *F*-statistic and the *p*-value (*Pr>F*) for the joint insignificance of the pre-event dummies are shown in the bottom of each panel. The pre-asylum recognition mean denotes the mean of the outcome in quarters $k \in [−12, −1]$. The average effect denotes the estimated average effect in the first six quarters after asylum recognition. Hours worked (column (4)) and earnings (column (5)) are available from 2008. All other outcomes are available from 2001. Panel A shows estimated results for all women. Panel B shows estimated results for women who do not divorce their husbands during the period. Panel C shows estimated results for women who do divorce their husbands during the period.

** *p* < 0.05.

*** *p* < 0.01.

L. Hasager

Journal of Public Economics 234 (2024) 105119

## Declaration of competing interest

The author acknowledges funding from the Innovation Fund Denmark (grant no. 6149-00024B). The author has no relevant or material financial interests that relate to the research described in this paper.

## Data availability

The data that has been used is confidential.

## Appendix A. Supplementary data

Supplementary material related to this article can be found online at https://doi.org/10.1016/j.jpubeco.2024.105119.

## References

Aizer, A., 2010. The gender wage gap and domestic violence. Amer. Econ. Rev. 100 (4), 1847–1859.

Amuedo-Dorantes, C., Bansak, C., Raphael, S., 2007. Gender differences in the labor market: Impact of IRCA. Am. Econ. Rev.: Pap. Proc. 97 (2), 412–416.

Arendt, J.N., Dustmann, C., Ku, H., 2022. Refugee migration and the labour market: Lessons from 40 years of post-arrival policies in Denmark. Oxford Rev. Econ. Policy 38 (3), 531–556.

Arendt, J.N., Dustmann, C., Ku, H., 2024. Permanent residency and refugee immigrants' skill investment. J. Labor Econ. (forthcoming).

Arendt, J.N., Schultz-Nielsen, M.L., 2019. Employment effects of welfare policies for non-western immigrant women. In: Calmfors, L., Gassen, N.S. (Eds.), Integrating Immigrants Into the Nordic Labour Markets. The Nordic Council of Ministers, pp. 159–184.

Blomqvist, M., Thoursie, P.S., Tyrefors, B., 2018. Restricting residence permits: Short-run evidence from a Swedish reform. Working Paper.

Borusyak, K., Jaravel, X., Spiess, J., 2023. Revisiting event study designs: Robust and efficient estimation. arXiv preprint arXiv:2108.12419.

Brell, C., Dustmann, C., Preston, I., 2020. The labor market integration of refugee migrants in high-income countries. J. Econ. Perspect. 34 (1), 94–121.

Callaway, B., Sant'Anna, P.H., 2021. Difference-in-differences with multiple time periods. J. Econometrics 225 (2), 200–230.

Dahl, G.B., Felfe, C., Frijters, P., Rainer, H., 2022. Caught between cultures: Unintended consequences of improving opportunity for immigrant girls. Rev. Econom. Stud. 89 (5), 2491–2528.

Danner, 2018. Vold mod migrantkvinder i Danmark. Erfaringer og data fra Danners opsøgende arbejde blandt en særligt isoleret gruppe: 2012 til 2018. Danner.

De Chaisemartin, C., d'Haultfœuille, X., 2020. Two-way fixed effects estimators with heterogeneous treatment effects. Amer. Econ. Rev. 110 (9), 2964–2996.

Dustmann, C., Landersø, R., Andersen, L.H., 2024. Refugee benefit cuts. Am. Econ. J.: Econ. Policy (forthcoming).

Eurostat, 2020. Asylum statistics.

Foged, M., Hasager, L., Peri, G., 2022. Comparing the effects of policies for the labor market integration of refugees. NBER Working Paper No. 30534.

Foged, M., Hasager, L., Peri, G., Arendt, J.N., Bolvig, I., 2024. Language training and refugees' integration. Rev. Econ. Stat. (forthcoming).

Gathmann, C., Keller, N., 2018. Access to citizenship and the economic assimilation of immigrants. Econ. J. 128 (616), 3141–3181.

Govind, Y., 2021. Is naturalization a passport for better labor market integration? Evidence from a quasi-experimental setting. halshs-03265055f.

Hainmueller, J., Hangartner, D., Lawrence, D., 2016. When lives are put on hold: Lengthy asylum processes decrease employment among refugees. Sci. Adv. 2 (8), e1600432.

Hainmueller, J., Hangartner, D., Pietrantuono, G., 2015. Naturalization fosters the long-term political integration of immigrants. Proc. Natl. Acad. Sci. 112 (41), 12651–12656.

Hainmueller, J., Hangartner, D., Pietrantuono, G., 2017a. Catalyst or crown: Does naturalization promote the long-term social integration of immigrants? Am. Political Sci. Rev. 111 (2), 256–276.

Hainmueller, J., Lawrence, D., Black, B., Figueroa, L., Hotard, M., Jiménez, T.R., Mendoza, F., Rodriguez, M.I., Swartz, J.J., Laitin, D.D., 2017b. Protecting unauthorized immigrant mothers improves their children's mental health. Science 357 (6355), 1041–1044.

Harmon, N.A., 2022. Difference-in-differences and efficient estimation of treatment effects. Working paper.

Hidrobo, M., Peterman, A., Heise, L., 2016. The effect of cash, vouchers, and food transfers on intimate partner violence: Evidence from a randomized experiment in northern ecuador. Am. Econ. J.: Appl. Econ. 8 (3), 284–303.

Hvidtfeldt, C., Schultz-Nielsen, M.L., 2017. Flygtninge og asylansøgere i Danmark 1992–2016. Antal, ventetid, bosætning og lovgivning. The Rockwool Foundation's Research Unit. Working Paper 50.

Hvidtfeldt, C., Schultz-Nielsen, M.L., Tekin, E., Fosgerau, M., 2018. An estimate of the effect of waiting time in the Danish asylum system on post-resettlement employment among refugees: Separating the pure delay effect from the effects of the conditions under which refugees are waiting. PLoS One 13 (11), e0206737.

Kilström, M., Larsen, B., Olme, E., 2023. Temporary refugee protection and labor-market outcomes. Empir. Econ. 1–35.

Kuka, E., Shenhav, N., Shih, K., 2019. A reason to wait: The effect of legal status on teen pregnancy. AEA Pap. Proc. 109, 213–217.

KVINFO, 2023. Viden: Kønsbaseret vold.

Liversage, A., Petersen, J., 2020. Etniske minoritetskvinder og skilsmisse – med fokus på muslimske praksisser. VIVE.

Orrenius, P.M., Zavodny, M., 2015. The impact of temporary protected status on immigrants' labor market outcomes. Am. Econ. Rev.: Pap. Proc. 105 (5), 576–580.

Ottosen, M.H., Østergaard, S.V., 2018. Psykisk partnervold – En kvantitativ kortlægning. VIVE.

Ottosen, M.H., Østergaard, S.V., 2020. Partnervold i Danmark 2020. VIVE.

Roth, J., Sant'Anna, P.H., Bilinski, A., Poe, J., 2023. What's trending in difference-in-differences? A synthesis of the recent econometrics literature. J. Econometrics 235 (2), 2218–2244.

Statista, 2020. Number of refugees arriving in the United States in 2018, by gender.

Sun, L., Abraham, S., 2021. Estimating dynamic treatment effects in event studies with heterogeneous treatment effects. J. Econometrics 225 (2), 175–199.

The Danish Immigration Service, 2020. New to Denmark: Apply for family reunification as spouse/partner of a refugee in Denmark. https://nyidanmark.dk/en-GB/Applying/Familie/Familiesammenforing/Aegtefaelle%20eller%20fast%20samlever%20til%20flygtning%20i%20Danmark?anchor=canyouapply. (Accessed 04 June 2020).

The Danish Immigration Service, 2024. New to Denmark: Divorce or end of cohabitation. https://www.nyidanmark.dk/en-GB/SituationChange/Family/Family%20reunification/Divorce. (Accessed 14 March 2024).

United Nations Human Rights Council, 2010. Convention and protocol relating to the status of refugees.

001341

8/19/24, 2:08 PM
Colombia asks for legal status for its people already in US
Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1349 of 4699 PageID #:  4514

EVEN WHEN THE NEWS IS FREE, JOURNALISM IS NOT.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.    DONATE

## Colombia asks for legal status for its people already in US



FILE - President of Colombia Gustavo Petro arrives for a diner at the Elysee Palace to close the Peace Forum event, Friday, Nov. 11, 2022 in Paris. In a letter released Tuesday Nov. 29, Colombia said that it wants the Biden administration to grant temporary legal status to its citizens now living in the United States, noting its own efforts to address regional migration by hosting 2 million Venezuelans who fled their homes. (AP Photo/Christophe Ena, File)

Read More

BY MANUEL RUEDA AND ELLIOT SPAGAT
Published 7:17 PM PDT, November 29, 2022

BOGOTA, Colombia (AP) — Colombia wants the Biden administration to grant temporary legal status to its citizens now living in the United States, noting its own efforts to address regional migration by hosting 2 million Venezuelans who fled their homes.

Gustavo Petro, who was elected Colombia's first leftist president in June, is committed to the "incredibly generous policies" of his predecessor, which includes temporary status for 1.8 million people who fled neighboring Venezuela, said Luis Alberto Murillo Urrutia, Colombia's ambassador to the U.S.

But the diplomat asked the United States for help, saying that in addition to Venezuelans who stay and work, more than 80,000 migrants pass through Colombia each year on their way to other countries.

In a letter to U.S. Secretary of State Antony Blinken and Homeland Security Secretary Alejandro Mayorkas, he asks President Joe Biden to grant Colombians already in the U.S. a form of temporary status called Deferred Enforced Departure.

"Migration is a regional issue that should be addressed under the principle of shared responsibility, strengthening regional cooperation to ensure migratory regularization," Murillo Urrutia wrote in a letter dated Nov. 17 and released Tuesday by Colombian officials.

That language echoes an agreement that Biden struck in June in Los Angeles among Western Hemisphere countries, including Colombia under then-President Iván Duque. "The Los Angeles Declaration" was billed as a roadmap for countries to host large numbers of migrants and refugees.

The White House and Homeland Security Department had no immediate comment late Tuesday on Colombia's request.

It is unclear how many Colombians are living in the United States without legal status. The Migration Policy Institute estimated 171,000 in 2019 but that was before tens of thousands arrived at the U.S. border with Mexico this year, many of them released to pursue their cases in immigration court.

U.S. authorities have stopped Colombians 131,890 times at the Mexican border during the first 10 months of this year, including 17,195 times in October, a sharp increase that has made them one of the largest nationalities at the border. Few have been subject to Trump-era asylum restrictions, which have largely applied to migrants that Mexico agrees to take — Guatemalans, Hondurans, El Salvadorans and, more recently, Venezuelans, in addition to Mexicans.

Murillo Urritia said there are nearly 2 million Colombians living in the United States, without elaborating on their immigration status. Many fled decades-old conflicts that he said the new government is committed to ending under 2016 peace accords.

001343

Last week, the Colombian government and the National Liberation Army [resumed peace talks](#) after a roughly four-year hiatus during which the rebels have expanded the territory where they operate.

"For more than 60 years, hundreds of thousands of Colombian citizens have been forced to leave the country because of the conflict seeking to rebuild their lives, many of the more recently arrived still remain vulnerable and unprotected in the United States," Murillo Urrutia wrote.

The Biden administration has extended temporary status for some countries and added Afghanistan, Ukraine, Myanmar, Cameroon and Venezuela, reversing a Trump-era trend to cut back on protections for those already in the United States.

The Colombian diplomat said his government's goal "is for our people to return to Colombia in a dignified manner if they choose to or adjust their immigration status in the United States if they have the legal avenues to do so."

_____

Spagat reported from San Diego, California.

ADVERTISEMENT

001344

ADVERTISEMENT

001345



# HHS Public Access

Author manuscript

*Am J Hum Biol*. Author manuscript; available in PMC 2020 July 07.

Published in final edited form as:

*Am J Hum Biol*. 2017 November ; 29(6): . doi:10.1002/ajhb.23044.

# Household fear of deportation in Mexican-origin families: Relation to body mass index percentiles and salivary uric acid

**Airín D. Martínez**[1,2], **Lillian Ruelas**[1], **Douglas A. Granger**[3,4,5]

[1]School of Transborder Studies, Arizona State University, Tempe, Arizona [2]The Ethnicity, Race and Migration Program & American Studies, Yale University, New Haven, Connecticut [3]Institute for Interdisciplinary Salivary Bioscience Research, University of California, Irvine, Irvine, California [4]School of Nursing, School of Medicine, and Bloomberg School of Public Health, Johns Hopkins University, Baltimore, Maryland [5]Saliva Bioscience Laboratory and Department of Psychology, University of Nebraska, Lincoln, Nebraska

## Abstract

**Objective:** Fear of deportation (FOD) is a prevalent concern among mixed-status families. Yet, our understanding of how FOD shapes human health and development is in its infancy. To begin to address this knowledge gap, we examined the relationship between household FOD, body mass index (BMI) percentiles and salivary uric acid (sUA), a biomarker related to oxidative stress/ hypertension/metabolic syndrome, among 111 individuals living in Mexican-origin families.

**Methods:** Participants were 65 children (2 months-17 years, 49% female) and 46 adults (20–58 years, 71% female) living in 30 Mexican-origin families with at least one immigrant parent in Phoenix, AZ. We recruited families using cluster probability sampling of 30 randomly selected census tracts with a high proportion of Hispanic/Latino immigrants. The head of household completed a survey containing demographic, FOD, and psychosocial measures. All family members provided saliva (later assayed for sUA) and anthropometric measures. Relationships between household FOD, BMI percentile, and sUA levels were estimated using multilevel models.

**Results:** Higher levels of household FOD were associated with lower BMI percentiles and lower sUA levels between families, after controlling for social support and socioeconomic proxies.

**Correspondence:** Airín D. Martínez, Arizona State University, School of Transborder Studies, College of Liberal Arts & Sciences, Tempe AZ 85782-6303. admarti1@mainex1.asu.edu.

AUTHOR CONTRIBUTIONS

*Designed and led the research study:* Airín D. Martínez.

*Collected the data:* Airín D. Martínez and Lillian Ruelas.

Douglas A. Granger's laboratory at the Institute for Interdisciplinary Salivary Bioscience Research assayed the saliva samples for salivary uric acid.

Airín D. Martínez completed the statistical analyses.

All authors were involved in the preparation of manuscript. All authors have reviewed the manuscript and approved the manuscript for submission.

DISCLOSURE STATEMENT

In the interest of full disclosure we note that DAG is the founder and chief scientific and strategy advisor at Salimetrics LLC and Salivabio LLC and that the nature of these relationships is managed by the policies of the committees on conflict of interest at the Johns Hopkins University School of Medicine and the University of California at Irvine.

**Conclusion:** Key features of the social ecology in which mixed-status families are embedded are associated with individual differences in biological processes linked to increased risk for chronic disease.

## 1 | INTRODUCTION

Fear of immigration enforcement remains a persistent stressor for Latinos in the US (Becerra, Androff, Cimino, Wagaman, & Blanchard, 2013; Cavazos-Rehg, Zayas, & Spitznagel, 2007; Theodore, 2013). Immigration enforcement policies in the US entail high surveillance from local law enforcement and exclusion from participation in public life among immigrants and their children (Nuñez & Heyman, 2007; Rodríguez, Young, & Wallace, 2015; Suro, Suárez-Orozco, & Canizales, 2015; Yoshikawa, Godfrey, & Rivera, 2008; Yoshikawa & Kholoptseva, 2013). Fear and anxiety result from the possibility of a family member's detention by Immigration Customs and Enforcement (ICE), financial hardship resulting from a family member's detention or deportation, and adversity from discrimination. In Arizona, immigration enforcement policies restrict families' access to adequate transportation, secure employment, and participation in federal social welfare programs (Rodríguez, Young, & Wallace, 2015; Suro et al., 2015; Yoshikawa et al., 2008). Senate Bill 1070 (SB 1070) "Support Our Law Enforcement and Safe Neighborhoods Act" passed in the Arizona state senate in 2010 to allow local law enforcement to arrest persons they suspect to be unauthorized immigrants during lawful stops, detentions, and arrests.

Immigration enforcement policies often target Mexican-origin and Latino communities in the US (Aranda & Vaquera, 2015; Magãna & Lee, 2013). Since the implementation of SB 1070, the enforcement of this policy has created levels of fear and mistrust such that even US-born Latinos feel vulnerable and report poorer psychosocial wellbeing (Moya-Salas, Ayón, & Gurrola, 2013; Szkupinski-Quiroga, Medina, & Glick, 2014). Moreover, the criminalization of undocumented Latinos has been amplified during Donald J. Trump's tenure as President of the United States, where he has signed an executive order to build a militarized wall along the US-Mexico border and seeks to increase the deportation of unauthorized immigrants by including those with minor criminal infractions (Executive Order No. 13767, 2017). Despite our understanding of the effects of immigration enforcement policies on fear and anxiety, mistrust and vulnerability, financial hardship, and adversity from discrimination, research examining the relationship between fear from immigration enforcement and biobehavioral health has been limited (see Holmes & Marcelli, 2012; Landale, Hardie, Oropesa, & Hillemeier, 2015; for exceptions). In this study, we begin to address this knowledge gap.

### 1.1 | Conceptual issues

There are direct and indirect reasons to expect a relationship between fear of deportation and biobehavioral health. In contrast to their Latino and immigrant peers, families living with an undocumented immigrant are more likely to be living in poverty, experience adversity related to discrimination, have restricted access to social services (Rodríguez et al., 2015; Suro et al., 2015; Van Hook & Balistreri, 2006; Yoshikawa et al., 2008), have high food insecurity (Kalil & Chen, 2008), and face chronic uncertainty and concern about deportation

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

of undocumented family members. In sum, given shifting policies at the state and federal level, now more than ever, the social ecologies of families living with an undocumented immigrant increase an individual's risk for negative health outcomes.

In recent decades, technical advances have enabled the minimally invasive measurement of a broad spectrum of biological variables in oral fluid samples. Importantly, within the context of research on immigrants in particular, saliva collection is perceived as more culturally acceptable than traditional biospecimens such as blood, urine, hair, or tissue (Gorodischer, Burtin, Hwang, Levine, & Koren, 1994; McClure, Snodgrass, Martínez, & Eddy, 2013). The measurement of uric acid in saliva is among the most recent developments in salivary bioscience.

Uric acid (UA) is the end product of the metabolic break-down of purine nucleotides. High levels of UA may be caused by consumption of high fructose corn syrup, table sugar, or purine-rich proteins, rapid weight loss, and/or reduced excretion from the kidneys (Mueller, Kasl, Brooks, & Cobb, 1970). Higher levels of UA can be indicative of oxidative stress (Aschbacher et al., 2013; Baldree & Stapleton, 1997; De Oliveira & Burini 2012; De Oliveira, Moreto, Silveira, & Burini, 2013; Ishizaka, Yamakado, Toda, Tani, & Ishizaka, 2014), which has the potential to accelerate cellular aging (Epel, 2009). UA is a well-established biomarker associated with hypertension, metabolic syndrome (MetS), gout, and kidney stones (Zhao & Huang, 2015), and a suitable predictor of individual differences in chronic disease risk in adolescence and adulthood (Jones, Richey, Alpert, & Li, 2008; Mellen et al., 2006; Sun, Pei, Lue, & Chen, 2015; Wang et al., 2012). Studies report a strong positive association between UA measured in serum and in saliva (Zhao & Huang, 2015).

Evidence also suggests that psychosocial factors are related to UA levels via adverse health behaviors. Recent research has indicated that there is a relationship between UA and acute stress, temperament, disinhibition and psychiatric disorders characterized by impulsivity. For example, Kesebir, Yaylacı, Süner, and Gültekin (2014) examined serum UA in relation to self-reported temperament data in patients with bipolar disorder (BD), major depressive disorder (MDD) and healthy controls. They found elevated UA in those with BD and significantly lower UA among those with MDD. Lorenzi and colleagues (2010) examined serum UA in relation to temperament in Brazilian adult men and women, finding that elevated serum UA levels were significantly correlated with disinhibition (no fear) in both men and women. Related to these results, Sutin and colleagues (2014) found that elevated levels of serum UA were related to impulsivity and excitement-seeking in men and women. Lyngdoh and colleagues (2013), in the only longitudinal study of serum UA in adults, found a quadratic relationship between serum UA and social phobia (a form of chronic stress), where elevated levels of serum UA were related to lower social phobia only up to a certain concentration and period of time, after which increasing serum UA levels were no longer protective and were correlated with increased odds of patients reporting social phobia. There is also some indication that there is a difference in serum UA levels if people anticipate the stress, where unanticipated stress is significantly related to lower levels of serum UA (Rahe & Arthur, 1967; Rahe, Arthur & Clark 1968; Zir, McHugh, Rahe, Arthur, & Rubin, 1973). Although researchers are not sure whether UA is a cause or consequence of emotion-related

001348

psychopathology, Goodman and colleagues (2016) found that salivary uric acid (sUA) levels predicted hippocampal regulation of emotion during acute psychosocial stress.

Monitoring sUA levels in persons of Mexican-origin may also be of empirical interest because of the high prevalence of chronic disease in this population. For example, in the US, obesity among Mexican children ages 2–11 is the highest at 20.9%, in comparison to Whites (13.3%) and Blacks (18.8%) (Kaur, Lamb, & Ogden, 2015). Similarly, Latino adults have a higher prevalence of obesity than non-Hispanic Whites (Flegal, Carroll, Ogden, & Curtin, 2010). In comparison to other US-based racial and ethnic groups, Latino adolescents have the highest prevalence of MetS (Cook, Weitzman, Auinger, Nguyen, & Dietz, 2003; Sun et al., 2015). Having higher levels of UA in youth is associated with MetS in children and adolescents (Ford, Li, Cook, & Choi, 2007). Moreover, according to 2007–2010 NHANES data, Latino adults have 0.60 higher odds of having a history of passing kidney stones, than other racial and ethnic minority groups in the United States (Juraschek, Miller, & Gelber, 2013). In relation to mental health, although Hispanics/Latinos in the US have a similar susceptibility to mental health illness as the general population, they have disparities in access to mental health treatment and in the quality of that treatment.

### 1.2 | Theoretical approach

The biopsychosocial approach to racial health disparities emphasizes the examination of acute and chronic stressors associated with the experiences of perceived racism (Dressler, Oths, & Gravlee, 2005). For the purposes of this article, we will use Andersen, Clark, and Williams (2012) definition of racism, which refers to "beliefs, attitudes, institutional arrangements, and acts that tend to denigrate individuals or groups because of phenotypic characteristics or ethnic group affiliation…[it can be] held by or perpetuated by members of a different racial/ethnic group (intergroup racism) and by members of the same racial/ethnic group (intragroup racism)" (p. 79). It builds on the stress-coping model proposed by Lazarus and Folkman (1984) and Selye's (1976) theory of stress on the hypothalamic-pituitary-adrenal axis.

Specifically, the biopsychosocial approach posits that there are physiological and psychological responses to stress from perceived racism (Anderson, McNeilly, & Myers, 1991; Andersen, Kiecolt-Glaser, & Glaser, 1994; Dressler et al., 2005), but also the material deprivation from institutionalized forms of racism can create negative health outcomes in racial and ethnic minorities (Krieger, 2012). Our perspective emphasizes the biobehavioral effects of stress associated with the experiences of racism from immigration enforcement policies targeting people of Latino- and Mexican-origin as forms of institutionalized racism (Aranda & Vaquera, 2015; Massey, 2015). Biospecimens are often used in biopsychosocial research of racial and ethnic health disparities to demonstrate how diverse acute and chronic stressors from institutionalized and interpersonal racial discrimination are related to physiological responses to stress and the etiology of chronic disease (Harrell et al., 2011). However, in comparison to other racial/ethnic groups, there has been little biopsychosocial research examining how Latinos, including Mexicans, embody racial discrimination (e.g., McClure et al., 2010), much less from the institutional racism emanating from immigration enforcement policies.

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1357 of 4699 PageID #:  4522

### 1.3 | Present study

In the present study, we explore the relationship between household fear of deportation (FOD) and sUA in 30 families of Mexican-origin with at least one immigrant parent. We examine whether household FOD is associated with sUA levels in Mexican-origin, mixed-status families because the precarious nature of immigration detention and deportation is a form of unanticipated psychosocial stress (Arbona et al., 2010; Cavazos-Reg et al., 2007; De Genova, 2002) and UA has been found to be inversely associated with unanticipated stress (Rahe & Arthur, 1967; Rahe, Rubin, Arthur, & Clark, 1968; Zir et al., 1973) and fear (Lorenzi, Borba, Dutra, & Lara, 2010). Moreover, FOD may be associated with UA because UA is a regulator of hippocampal activity (HCA), or one's emotional response to stress (Goodman et al., 2016). As such, people who report more household fear of deportation may have less UA regulating their emotional response to the stress of having their family members (or themselves) detained and/or deported by immigration authorities.

### 1.4 | Methods

Data are from a cross-sectional exploratory study of Latino families, with at least one immigrant parent, to examine household fear of deportation in relation to anthropometric, demographic, psychosocial, and salivary analyte data. Families were recruited during the summer/fall of 2014. We employed cluster probability sampling—the research team recruited families by going door-to-door in 30 randomly selected census tracts, with a high location quotient of foreign-born Hispanics/Latinos between 1.8 and 3.5 (range 0.4–3.6).

Families were eligible if they self-identified as Hispanic/ Latino and had at least one parent who was a Latin American immigrant. We excluded families if the head of household was <18 years of age, or if the head of household was incapable of providing consent for themselves or their children. Following recommendations by Granger et al. (2012) we excluded families who had one family member that had just visited the dentist in the last 24 hours; smoked or chewed tobacco; had open mouth sores or abrasions; was ill with an acute condition or chronic disease or a had a fever. Certain medications can also affect UA levels (see Moriwaki, 2014 for review), so we also excluded families in which anyone was taking prescription or over-the-counter medications, including NSAIDs, hormonal contraceptives, or beta-blockers. After the head of household and individual family members consented to participate, we gave each family a $50 gift card. Children under the age of 6 provided oral assent and children older than 6 years provided written assent. The university Institutional Review Board approved this study.

### 1.5 | Participants

Participants ($N$ = 111) were members of 30 Mexican-origin, low-income families among whom 48% reported an annual family income of <$20,000/year. Given the demographic makeup of Latinos in the City of Phoenix, all of the participating families were Mexican-origin. The typical family size was three to four persons, with the largest family having eight persons. The average number of children in each home was two to three. Although these families were typically headed by a single-mother, half lived with a male partner, who may not have been the biological father of the child (ren). The majority of families identified as mestizo (Indian and White). Fourteen families reported one or more fears of being deported;

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

001350

with obtaining a driver's license being the most commonly reported fear (23.3%) (See Table 1). In this sample, there were 65 females and 46 males, 65 were children (2 months-17 years, 49% female) and 46 adults (20–58 years, 71% female).

## 1.6 I   Measures

**Saliva Collection and Assay:** Following recommendations by Granger and colleagues (Granger et al., 2007, 2012), participants were instructed not to have consumed food or liquids, or brushed their teeth prior to an hour of providing samples and they rinsed their mouth with water 10 minutes prior to sample donation. We collected 1.0–1.8 mL of whole saliva from family members older than 6 years of age by passive drool. For the youngest children, ages 2 months-5 years, saliva was collected while they sat on their parent's lap as a research assistant held a saliva collection swab in their mouth for three minutes. To confirm sample volumes were sufficient, children's saliva was expressed immediately after collection from each swab using a 5cc needleless syringe. All samples were then frozen on dry ice and transported to the University where they were stored at –80°C until the day of assay.

On the day of assay, samples were thawed, centrifuged to remove mucins, and assayed in duplicate for sUA using a commercially available enzymatic reaction kit specifically designed for use with saliva (Salimetrics, Carlsbad, CA). The assay used 10 µl test volume, had a range of sensitivity from 0.78 to 25 mg/dl, and average inter- and intra-assay coefficients of variation were 10% and 5%. The average of the duplicate tests were used in the descriptive analyses and for the multilevel models to assess the measurement error.

**Anthropometric Measures:** After collecting the saliva samples, we measured each family member's weight with a SECA 876 Portable Scale and their height with a SECA Portable Stadiometer to calculate their BMI. We also measured the smallest part of their waist and the widest part of their hips with a Gulick II measuring tape to calculate waist-to-hip circumference ratio, to assess abdominal adiposity. The participants retained form-fitting clothing when we weighed and measured them, but took off their shoes and heavier clothing. All measures were recorded in metric units.

**Survey Measures:** After collecting the salivary and anthropometric measures, we administered an 80-item questionnaire to the head of household in the language of their choice. We used a tablet-based, interviewer-administered survey that included demographic items on family composition, total annual household income, home ownership, language use in multiple contexts for all family members, self-rated health of each family member, and each family member's health insurance status. We also queried the head of household's current employment status, highest educational attainment, and Spanish/English literacy.

In order to assess the family's ancestry, we first asked the head of household's country of origin. If the head of household was US-born then we asked for the immigrant family member's country of origin. We modified the race/ ethnicity item on the survey to include the four US Office of Management and Budget categories (i.e., "White non-Hispanic") and the Latin American caste categories, which take into consideration racial inter-marriage. For example, persons of White and Black admixture self-identify as mulatto, those mixed with White and Indian identify as mestizo, those mixed with Indian and African descent

identified as zambo, and those that identified as African descent were moreno (Candelario, 2007).

**Social Support Scale:** The social support scale administered in this study was Boehnert, Bradshaw, and Latkin's (2009) adaptation of the Arizona Social Support Inventory by Barrera and Gottlieb (1981). The scale consisted of six items discerning instrumental forms of social support along four dimensions: personal advice, informational, health, and financial support using a 5-point Likert-type scale (0 = Definitely not/4 = Definitely yes). The scale was administered by the first author in a cardiovascular risk assessment of Latina/o immigrants in Baltimore in 2011–2012 and had face and construct validity in that sample (Martínez, Juon, Levine, Lyford-Pike, & Peters, 2014) and in the present study, had a high Cronbach's alpha ($\alpha = 0.84$), indicating reliability.

**Fear of Deportation Questionnaire:** To assess fear of deportation at the household level, we modified an existing seven-item questionnaire, the Fear of Deportation Questionnaire ($\alpha = 0.70$) created by Arbona and colleagues at multiple Texas universities (2010). The fear of deportation questionnaire discerns if the respondent avoided seeking government services, attending court, reporting crimes done to others or oneself, or being in public for fear of deportation. Every affirmative answer receives a one point (0 = no avoidance of the activity for fear of deportation/1 = yes avoidance of the activity for fear of deportation) with a maximum of seven points. We modified the Arbona and colleagues fear of deportation questionnaire to a family-level variable by asking whether the respondent or someone in their family avoided the above activities for fear of deportation. For example, "Have you or someone in your family avoided asking for help from government agencies for fear of being deported?"

Arbona and colleagues sampled mostly Mexican and some Central America immigrants from two major cities in Texas. Arizona and Texas share similar histories and demographics as Southwestern borderland states with a strong presence of border patrol and primarily Mexican immigrants and Mexican Americans. Given that our sample in Phoenix is similar to the one in Arbona and colleagues' study, we believe this questionnaire was culturally appropriate. An exploratory factor analysis revealed that all seven items had strong factor loadings (≥0.5) along two factors that explained 90% and 28% of the variance respectively (results not shown here).

### 1.7 |   Analytic strategy

To discern the relationship between sUA with household fear of deportation we estimated an exploratory multilevel mediation model in which age, gender, log BMI percentile and identifying as zambo predicted log mean SUA levels within families. At the second level we estimated whether household fear of deportation (FOD) predicted family's log BMI percentiles and social support score, and in turn, sUA mean levels between families (see Figure 1). In order to account for the developmental and gender differences in sUA levels among family members (Martínez, Ruelas, & Granger, 2016), we estimated two additional models that utilized the difference of an individual's mean sUA levels from the sample mean sUA level for their gender and age category (infants <2, early childhood 2–5, middle

childhood 6–12, adolescence 13–18, and adulthood 191). We called this adjusted variable DiffsUA in the tables. We compared results between log mean sUA levels and the DiffsUA levels as an additional check of robustness.

Since epidemiological studies report lower levels of serum UA in adults who have more social support (Thomas, Goodwin, & Goodwin, 1985), we examined whether social support mediated the effects of household FOD on mean sUA levels. Given that obesity is a key mediator in the pathway between stress-induced oxidative stress (Baldree & Stapleton, 1997; Epel, 2009) we also included it as a mediator between families, while controlling for socioeconomic proxies (e.g., total annual household income, head of household's highest educational level, and employment status) as covariates of sUA. The proxies for household socioeconomic status were not estimated as covariates of household fear of deportation because they were not strongly correlated (See Table 2).

With regard to controlling for adiposity within families, we estimated the model using individual BMI percentiles, as designated by the Centers for Disease Control (Flegal et al., 2010; Kuczmarski et al., 2000) instead of raw BMI scores because the standards that designate normal, overweight and obese are different between children and adults, and are age- and-gender-specific among children. Since there was very little variance in waist-to-hip circumference ratio ($0.97 \pm 0.04 \text{ cm}^2$), this variable was excluded from the within-level models (Table 3). Since mean sUA levels were positively skewed, we used the natural log transformation for statistics where a normal distribution was needed. The adjusted variable, DiffsUA, was normally distributed and did not require transformation. The models were estimated using full information maximum likelihood (Enders, 2010) and the fit between the model and observed data was acceptable (i.e., CFI was greater than .95 (.90), RMSEA was less than .05 (.08), and SRMR was less than (.05). Descriptive statistics were conducted using Stata 12.1, and multilevel mediation models were estimated using MPlus 7.2.

## 2 |  RESULTS

Individual log mean sUA levels were correlated with log BMI ($\rho = 0.28$, $P < .05$) and marginally related to BMI percentiles ($\rho = 0.18$, $P = .06$), identification as zambo ($\rho = 0.18$, $P < .10$), and educational level ($\rho = 0.18$, $P < .10$). There were inverse relationships between household fear of deportation (FOD) with the main dependent variables, individual log mean sUA levels ($\rho = -0.31$, $P < .05$) and the different mean age-gender-specific sUA levels (DiffsUA: $\rho = -0.27$, $P < .05$). Household fear of deportation was also inversely related to identifying as zambo ($\rho = -0.23$, $P < .05$) and male ($\rho = 20.25$, $P < .05$) (See Table 2).

Before running our comprehensive multilevel models, we conducted further exploratory analyses on some variables in relationship to individual log BMI percentiles and log mean sUA levels. First, we examined the relationship between each fear of deportation dimension (e.g., fear of being in public, seeking help from government agencies, obtaining a driver's license, reporting infractions to the police, and going to court) in relation to individual BMI percentiles and mean sUA levels to discern whether this inverse relationship was present among all items. Five of the seven fear of deportation items were inversely related to BMI percentile and sUA levels.

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1361 of 4699 PageID #:  4526

Second, we decided to estimate racial self-identification at the within- instead of between-family level because some family members did not identify with the same race/ethnicity as their kin. The multilevel model that included all of the individual race/ethnicity categories did not converge, so we estimated the model with each race/ethnicity category separately. Third, we examined whether time in the US or Phoenix was related to any of the anthropometric measures, social support, and household fear of deportation. Time in the US and time in Phoenix were not significantly related to BMI, BMI percentiles, sUA levels, or fear of deportation, so they were excluded from the multilevel models (analyses not shown here).

In the comprehensive multilevel model (Table 4, Model 1), an individual family member's age, log BMI percentile, gender, or race/ethnicity, were not related to another family member's log sUA levels within families. Social support was not related to log mean sUA levels ($\beta = 0.01$, $P = .99$) between families, nor was the presence of social support related to other variables' relationship to log mean sUA levels. Between families, household FOD was inversely related to log BMI percentiles ($\beta = -0.04$, $P = .03$) and log mean sUA levels ($\beta = -0.12$, $P = .02$), after controlling for the head of household's education and employment status and total household annual income (Table 4, Model 1). In the comprehensive model with DiffsUA as the dependent variable, family BMI percentile was not related to sUA or household FOD (Table 4, Model 4).

In Model 2, we omitted social support as a mediating variable between household FOD and log mean sUA levels. We also excluded the head of household's employment status as a covariate of log mean sUA levels because of its low correlation ($\rho = 0.09$, Table 2) and high $P$-value ($P = .47$, Table 4, Model 1). Similar to Model 1, an individual family member's age, BMI percentile, gender, or race/ethnicity are not related to another family member's log sUA levels within families. In the absence of social support and the head of household's employment status, the association between household FOD and log BMI percentile on family's log mean sUA levels were similar to Model 1.

In Model 3, we examine the total direct and total indirect effect of household FOD and log BMI percentiles between families to determine whether BMI percentile is a mediator between household FOD and log mean sUA levels. Age, gender, and self-identifying as zambo were omitted because of their weak beta coefficients and high p-values within families' sUA levels. The total direct effect of household fear of deportation on log mean sUA levels was significant ($\beta = -0.17$, $P < .01$). The estimate of the direct effect between household FOD and log mean sUA levels declined ($\gamma xy = -0.09$, $P < .05$) as the estimated paths for indirect effects ($\beta xz = -0.04$, $P = .04$, $\gamma zy = 1.85$, $P = .02$) increased (Figure 2). Log BMI percentile appears to be a partial mediator for the relationship between household FOD and log mean sUA levels between families of Mexican-origin, as the direct path between household FOD and sUA levels remained significant (Table 4, Model 3). Between families, for every item answered affirmatively on the FOD questionnaire, log BMI percentile decreased by 4%, in turn, decreasing log mean sUA levels by 15%. Nevertheless, in comparing Model 2 to Model 3, lower annual household income and head of household's higher educational attainment strengthened the direct effect of household FOD on log mean sUA levels ($\beta = -0.12$, $P = .02$ vs. $\beta = -0.09$, $P = .05$), and weakened the effect of family's

001354

log BMI percentile on log mean sUA levels between families ($\beta = 1.28$, $P = .07$ vs. $\beta = 1.85$, $P = 0.02$) (Table 4, see Models 2 and 3).

However, when we examine the adjusted DiffsUA results, family BMI percentile is not a mediator between household FOD and sUA levels because they are not related to one another ($\beta.xz = -0.06$, $P = .78$). Even with the adjustment of individual and family sUA levels to reflect developmental- and gender-specific differences between family members, we find that BMI percentile ($\beta = 0.71$, $P = .05$) and household FOD ($\beta = -0.63$, $P = 0.01$) continue to be related to differences in sUA levels between families (see Table 4, Model 5).

The residual variance for both log BMI percentiles (RV = 0.01, $P = .23$) and log mean sUA levels (RV = 0.001, $P = .99$) in Model 3 were low and insignificant, indicating that household FOD and BMI percentile account for much of the variance in log sUA levels between families, even after controlling for socioeconomic indicators and social support. Nevertheless, other variables are worth exploring in understanding the relationship between household fear of deportation, BMI percentiles and sUA levels, which we will discuss below. The final mediation model (Table 4, Model 3) and adjusted DiffsUA model (Table 4, Model 5) showed good model fit with an RMSEA = 0.00, CFI/TLI = 1.00, and SRMR$_{within}$ =0.000, SRMR$_{between}$ =0.000

## 3 I   DISCUSSION

In a multilevel analysis with families as the main unit of analysis, we consistently found that more psychosocial stress from household fear of deportation was related to lower BMI percentiles and lower sUA levels between families. These findings support prior research finding adverse health effects from fear of immigration enforcement policies (Aranda & Vaquera, 2015; Arbona et al., 2010; Cavazos-Rehg et al., 2007; Vargas, Sanchez, & Juárez, 2017). Similar to extant research finding lower levels of UA in relation to fear (Lorenzi et al., 2010) and unanticipated stress (Rahe & Arthur, 1967; Rahe et al., 1968; Zir et al., 1973), we found that more household fear of deportation was related to lower sUA levels between families. However, we are cautious to relegate causality to these findings because sUA is also mediated by health behaviors and material conditions; there are several factors that need to be taken into consideration when interpreting these results.

First, we found that more household fear of deportation was related to lower BMI percentiles between families. There are studies that demonstrate that anxiety and enduring negative emotional situations are strongly related to undereating and unconscious appetite (Macht, 2008). It is possible that fear of deportation of another family member or oneself, along with other stressors related to migrant illegality (De Genova, 2002), may lead to negative emotions that suppress appetite. Moreover, persons living in homes reporting more fear of deportation may also have fewer material resources. Given that undocumented immigrants are unauthorized to work, have a driver's license (with the exception of DACA recipients), or participate in publicly-funded welfare programs (e.g., SNAP) in Arizona, they may have less disposable income to buy food, partly explaining the lower BMI percentiles in these families.

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

Author Manuscript

Related to the lower BMI percentiles, Mexican-origin families often live in "entrapped communities" (Nuñez & Heyman, 2007) to avoid chronic surveillance from police and immigration enforcement. These communities tend to have fewer retail food environments (Nuñez & Heyman, 2007; Sharkey & Dean, 2012). Therefore, state immigration policies may indirectly shape food environments, healthy food access, purchasing behaviors and dietary practices. Future studies should inquire about food security, participation in food assistance programs, and the proportion of household income used toward food in order to provide a comprehensive examination of the social determinants of BMI percentiles in mixed-status families in relationship to household fear of deportation.

Second, in this study social support was not related to household fear of deportation or sUA levels, despite other research (Thomas et al., 1985) finding that stronger social support was related to lower serum UA levels, independent of age and weight. For the future, we will consider examining whether other protective factors may mitigate the effect of fear of deportation on salivary biomarkers, such as religious coping (Read-Wahidi & DeCaro, 2017) and civic engagement. The social support scale we used may not capture other ways that members of mixed-status Latino families receive support from others in the context of restrictions shaped by local immigration enforcement policies.

Third, individual serum UA levels can increase after vigorous exercise, the consumption of alcohol, purine-rich proteins, and fructose (Choi, Ford, Gao, & Choi, 2008; Choi et al., 2005; Viazzi, Genovesi, Ambruzzi, and Giussani, 2015), and decreases with the consumption of dairy in adults (Choi et al., 2005) and breast milk in infants (Kuchan, Ostrom, Smith, & Hu, 2000). Given the strong association between serum and salivary UA levels, it is possible that sUA levels are also influenced by diet. Logistical and practical constraints coordinating home visits with these families made it difficult to expect families in the study to fast before saliva collection. Nevertheless, an inclusion criterion was for no participant to have consumed food or beverages, other than water, the hour before we collected the first saliva sample. For future studies of sUA, it would be valuable to incorporate diet quality data, require participants to fast, or both.

### 3.1 |   Limitations

Some of the limitations include the small sample size, the lack of longitudinal data, and the lack of established population means for sUA in children and adults. This was a cross-sectional study, and we need longitudinal data to ascertain: (i) at what point immigration enforcement policies are considered anticipated stressors by mixed-status families, and (ii) at what point sUA manifests reduced hippocampal activity or chronic disease. One limitation of using the difference of an individual's sUA levels from the sample mean sUA level for their gender and age category is that, unlike body mass index, there are no population-based studies documenting mean sUA levels in adults or children. We are one of the first researchers examining this novel salivary biomarker. Ideally, we would compare the distribution of sUA in our sample to the ones in the population to account for the developmental differences in the family sUA levels in the multilevel model.

### 3.2 | New contribution to the literature

We address recent requests to examine how immigration enforcement policies are related to the health outcomes (Hardy et al., 2012; Martinez et al., 2015; Rhodes et al., 2015) of family members living with unauthorized immigrants, such as children in mixed-status households (Landale et al., 2015; Suro et al., 2015). We also contribute to the biopsychosocial approach to racial disparities by demonstrating that household fear of deportation may also be related to biobehavioral health, through sUA. In conclusion, the relationship between household fear of deportation and physiological health outcomes between families is complex, and must take into consideration anthropometric, demographic, and socio-environmental variables.

## ACKNOWLEDGMENTS

We would like to thank the laboratory staff at the Institute for Interdisciplinary Salivary Bioscience Research and the reviewers who provided valuable feedback on this manuscript. We also would like to thank the families who participated in this study, and Salimetrics for the donation of some of the reagents.

**Funding information** This project received funding from the ASU College of Liberal Arts and Sciences Seed Funding Mechanism, the Program for Transborder Communities seed grant, and the NIH Loan Repayment Program 2018-2020 (L60 MD011867).

## REFERENCES

Andersen BL, Kiecolt-Glaser JK, & Glaser R (1994). A biobehavioral model of cancer stress and disease course. American Psychologist, 49(5), 389–404. [PubMed: 8024167]

Anderson NB, McNeilly M, & Myers H (1991). Autonomic reactivity and hypertension in Blacks: A review and proposed model. Ethnicity and Disease, 1(2), 154–170. [PubMed: 1842532]

Aranda E, & Vaquera E (2015). Racism, the immigration regime, and the implications for racial inequality in the lives of undocumented young adults. Sociology of Race and Ethnicity, 1, 88–104.

Arbona C, Olvera N, Rodriguez N, Hagan J, Linares A, & Wiesner M (2010). Acculturative stress among undocumented Latino immigrants in the United States. Hispanic Journal of Behavioral Sciences, 32(3), 362–384. [PubMed: 25484488]

Aschbacher K, O'donovan A, Wolkowitz OM, Dhabhar FS, Su Y, & Epel ES (2013). Good stress, bad stress and oxidative stress: Insights from anticipatory cortisol reactivity. Psycho-neuroendocrinology, 38(9), 1698–1708.

Baldree LA, & Stapleton FB (1997). Uric acid metabolism in children. Pediatric Clinical Nutrition of America, 37(1), 391–418.

Barrera MJ, & Gottlieb BH (1981). Social support in the adjustment of pregnant adolescents: Assessment issues In Gottlieb BH (Ed.), Social networks and social support (pp. 69–96).

Beverly Hills CA: Sage Publications. Becerra D, Androff D, Cimino A, Wagaman MA, & Blanchard KN (2013). The impact of perceived discrimination and immigration policies upon perceptions of quality of life among Latinos in the United States. Race and Social Problems, 5(1), 65–78.

Boehnert A,SB, Bradshaw CP, & Latkin CA (2009). A social network perspective on heroin and cocaine use among adults: Evidence of bidirectional influences. Addiction, 104(7), 1210–1218. [PubMed: 19563564]

Candelario GEB (2007). Color matters: Latina/o racial identities and life chances In Flores J & Rosaldo R (Eds.), A companion to Latina/O studies (pp. 337–350). Malden, MA: Blackwell Publishing.

Cavazos-Rehg PA, Zayas LH, & Spitznagel EL (2007). Legal status, emotional well-being and subjective health status of Latino immigrants. Journal of the National Medical Association, 99(10), 1126. [PubMed: 17987916]

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

001357

Choi HK, Liu S, & Curhan G (2005). Intake of purine-rich foods, protein, and dairy products and relationship to serum levels of uric acid: The Third National Health and Nutrition Examination Survey. Arthritis & Rheumatism, 52(1), 283–289. [PubMed: 15641075]

Choi JWJ, Ford ES, Gao X, & Choi HK (2008). Sugar-sweetened soft drinks, diet soft drinks, and serum uric acid level: The Third National Health and Nutrition Examination survey. Arthritis Care & Research, 59(1), 109–116. [PubMed: 18163396]

Clark R, Andersen NB, Clark VR, & Williams DR (2012). Racism as a stressor for African Americans: A biopsychosocial approach In LaVeist TA & Isaac LA (Eds.), Race, ethnicity and health: A public health reader. (pp. 79–103). San Francisco: Jossey-Bass.

Cook S, Weitzman M, Auinger P, Nguyen M, & Dietz WH (2003). Prevalence of a metabolic syndrome phenotype in adolescents: Findings from the third National Health and Nutrition Examination Survey, 1988–1994. Archives of Pediatric Adolescent Medicine, 15(3), 821–827.

De Genova N (2002). Migrant "illegality" and deportability in everyday life. Annual Review of Anthropology, 31(1), 419–447.

De Oliveira EP, & Burini RC (2012). High plasma uric acid concentration: Causes and consequences. Diabetes and Metabolic Syndrome, 4(1), 12–19.

De Oliveira EP, Moreto F, Silveira LV, & Burini RC (2013). Dietary, anthropometric, and biochemical determinants of uric acid in free-living adults. Nutrition Journal, 12, 11. [PubMed: 23311699]

Dressler W, Oths KS, & Gravlee CC (2005). Race and ethnicity in public health research: Models to explain health disparities. American Review of Anthropology, 34, 231–252.

Enders CK (2010). Applied missing data. New York: The Guilford Press.

Epel ES (2009). Psychological and metabolic stress: A recipe for accelerated cellular aging? Hormones, 8(1), 7–22. [PubMed: 19269917]

Executive Order, No. 13767. 82 FR 8793. Border Security and Immigration Enforcement Improvements 25 1 2017.

Flegal KM, Carroll MD, Ogden CL, & Curtin LR (2010). Prevalence and trends in obesity among US adults, 1999–2008. Journal of the American Medical Association, 303, 235–241. [PubMed: 20071471]

Ford ES, Li C, Cook S, & Choi HK (2007). Serum concentrations of uric acid and the metabolic syndrome among US children and adolescents. Circulation, 115(19), 2526–2532. [PubMed: 17470699]

Goodman AM, Wheelock MD, Harnett NG, Mrug S, Granger DA, & Knight DC (2016). The hippocampal response to psychosocial stress varies with salivary uric acid level. Neuroscience, 339, 396–401. [PubMed: 27725214]

Gorodischer R, Burtin P, Hwang P, Levine M, & Koren G (1994). Saliva versus blood sampling for therapeutic drug monitoring in children: Patient and parental preferences and an economic analysis. Therapeutic Drug Monitor, 16(5), 437–443.

Granger DA, Fortunato CK, Beltzer EK, Virag M, Bright MA, & Out D (2012). Focus on methodology: Salivary bioscience and research on adolescence: An integrated perspective. Journal of Adolescence, 35(4), 1081–1095. [PubMed: 22401841]

Granger DA, Kivlighan KT, Fortunato C, Harmon AG, Hibel LC, Schwartz EB, & Whembolua GL (2007). Integration of salivary biomarkers into developmental and behaviorally-oriented research: Problems and solutions for collecting specimens. Physiology & Behavior, 92(4), 583–590. [PubMed: 17572453]

Hardy LJ, Getrich CM, Quezada JC, Guay A, Michalowski RJ, & Henley E (2012). A call for further research on the impact of state-level immigration policies on public health. American Journal of Public Health, 102(7), 1250–1253. [PubMed: 22594736]

Harrell JP, Burford TI, Cage BN, Nelson TM, Shearon S, Thompson A, & Green S (2011). Multiple pathways linking racism to health outcomes. DuBois Review: Social Science Research on Race, 8(1), 143–157.

Holmes LM, & Marcelli EA (2012). Neighborhoods and systemic inflammation: High CRP among legal and unauthorized Brazilian migrants. Health & Place, 18(3), 683–693. [PubMed: 22401803]

Ishizaka Y, Yamakado M, Toda A, Tani M, & Ishizaka N (2014). Relationship between serum uric acid and serum oxidative stress markers in the Japanese general population. Nephron Clinical Practice, 128(1–2), 49–56. [PubMed: 25342428]

Jones DP, Richey PA, Alpert BS, & Li R (2008). Serum uric acid and ambulatory blood pressure in children with primary hypertension. Pediatric Research, 64(5), 556–561. [PubMed: 18596575]

Juraschek SP, Miller ER, & Gelber AC (2013). Body mass index, obesity, and prevalent gout in the United States in 1988–1994 and 2007–2010. Arthritis Care & Research, 65(1), 127–132. [PubMed: 22778033]

Kalil A, & Chen J (2008). "Mother's citizenship status and household food insecurity among low-income children of immigrants" In Yoshikawa Hand Way N, (Eds.) "Beyond the Family: Contexts of Immigrant Children's Development." New Directions for Child and Adolescent Development, 121, 43–62.

Kasl SV, Gore S, & Cobb S (1975). The experience of losing a job: Reported changes in health, symptoms and illness behavior. Psychosomatic Medicine, 37(2), 106–122. [PubMed: 1135358]

Kaur J, Lamb MM, & Ogden CL (2015). The association between food insecurity and obesity in children—The National Health and Nutrition Examination Survey. Journal of the Academy of Nutrition and Dietetics, 115(5), 751–758. [PubMed: 25737437]

Kesebir S, Yaylacı ET, Süner Ö, & Gültekin BK (2014). Uric acid levels may be a biological marker for the differentiation of unipolar and bipolar disorder: The role of affective temperament. Journal of Affective Disorders, 165, 131–134. [PubMed: 24882190]

Krieger N (2012). Methods for the scientific study of discrimination and health: An ecosocial approach. American Journal of Public Health, 102(5), 936–944. [PubMed: 22420803]

Kuchan MJ, Ostrom KM, Smith C, & Hu PE (2000). Influence of purine intake on uric acid excretion in infants fed soy infant formulas. Journal of the American College of Nutrition, 19, 16. [PubMed: 10682871]

Kuczmarski RJ, Ogden CL, Grummer-Strawn LM, Flegal KM, Guo SS, Wei Z, … Johnson CL (2000). CDC growth charts: United States. Advance Data, 314, 1–27.

Landale NS, Hardie JH, Oropesa RS, & Hillemeier MM (2015). Behavioral functioning among Mexican-origin children does parental legal status matter? Journal of Health and Social Behavior, 56(1), 2–18. [PubMed: 25722124]

Lazarus RS, & Folkman S (1984). Stress, appraisal, and coping. New York: Springer.

Lorenzi TM, Borba DL, Dutra G, & Lara DR (2010). Association of serum uric acid levels with emotional and affective temperaments. Journal of Affective Disorders, 121(1), 161–164. [PubMed: 19524303]

Lyngdoh T, Bochud M, Glaus J, Castelao E, Waeber G, Vollenweider P, & Preisig M (2013). Associations of serum uric acid and SLC2A9 variant with depressive and anxiety disorders: A population-based study. PloS One, 8(10), e76336. [PubMed: 24204615]

Macht M (2008). How emotions affect eating: A five-way model. Appetite, 50(1), 1–11. [PubMed: 17707947]

McClure HH, Snodgrass JJ, Martínez CR, & Eddy JM (2013). Integrating biomarkers into research with Latino immigrants in the United States. Advances in Anthropology, 3, 112–120.

McClure HH, Snodgrass JJ, Martinez CR, Eddy JM, Jiménez RA, & Isiordia LE (2010). Discrimination, psychosocial stress, and health among Latin American immigrants in Oregon. American Journal of Human Biology, 22(3), 421–423. [PubMed: 19844904]

Magaña L, & Lee E (2013). Latino politics and Arizona's immigration law SB 1070. New York: Springer.

Martínez AD, Juon HS, Levine DM, Lyford-Pike V, & Peters S (2014). The association between nutrition transition score and measures of obesity: Results from a cross-sectional study among Latina/o immigrants in Baltimore. Globalization and Health, 10(1), 57. [PubMed: 25001844]

Martínez AD, Ruelas L, & Granger DA (2016). Association between body mass index and salivary uric acid among Mexican-origin infants, youth and adults: Gender and developmental differences. Developmental Psychobiology, 59(2), 225–234. [PubMed: 27888639]

Martinez O, Wu E, Sandfort T, Dodge B, Carballo-Dieguez A, Pinto R, … Chavez-Baray S (2015). Evaluating the impact of immigration policies on health status among undocumented immigrants:

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

001359

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

A systematic review. Journal of Immigrant and Minority Health, 17(3), 947–970. [PubMed: 24375382]

Massey D (2015). The real hispanic challenge. Pathways: A magazine on poverty, inequality, and social policy. Volume 7 (Spring), 3–7.

Mellen PB, Bleyer AJ, Erlinger TP, Evans GW, Nieto FJ, Wagenknecht LE, … Herrington DM (2006). Serum uric acid predicts incident hypertension in a bi-ethnic cohort: The atherosclerosis risk in communities in communities study. Hypertension, 49, 1037–1042.

Moriwaki Y (2014). Effects on uric acid metabolism of the drugs except the anti-hyperuricemics. Journal of Bioequivalence & Bio-availability, 6(1), 10.

Moya-Salas L, Ayón C, & Gurrola M (2013). Estamos traumados: The effect of anti-immigrant sentiment and policies on the mental health of Mexican immigrant families. Journal of Community Psychology, 41(8), 1005–1020.

Mueller EF, Kasl SV, Brooks G, & Cobb S (1970). Psychosocial correlates of serum urate levels. Psychological Bulletin, 73 (4), 238. [PubMed: 5485505]

Nuñez GG, & Heyman JM (2007). Entrapment processes and immigrant communities in a time of heightened border vigilance. Human Organization, 66(4), 354–265.

Ogden CL, Carroll MD, Kit BK, & Flegal KM (2012). Prevalence of obesity and trends in body mass index among US children and adolescents, 1999–2010. JAMA, 307(5), 483–490. [PubMed: 22253364]

Overview of the CDC Growth Charts. Centers for Disease Control and Prevention, National Center for Health Statistics, Division of Health Examination statistics. Retrieved from http://www.cdc.gov/nccdphp/dnpa/growthcharts/training/modules/module2/text/module2

Rahe RH, & Arthur RJ (1967). Stressful underwater demolition training: Serum urate and cholesterol variability. JAMA, 202, 1052–1054. [PubMed: 6072605]

Rahe RH, Rubin RT, Arthur RJ, & Clark BR (1968). Serum uric acid and cholesterol variability: A comprehensive view of underwater demolition team training. JAMA, 206, 2875–2880. [PubMed: 5755010]

Read-Wahidi MR, & DeCaro JA (2017). Guadalupan devotion as a moderator of psychosocial stress among Mexican immigrants in the rural Southern United States. Medical Anthropology Quarterly. DOI: 10.1111/maq.12372.

Rhodes S, Mann L, Siman FM, Song E, Alonzo J, Downs M, … Hall M. (2015). The impact of local immigration enforcement policies on the health of immigrant Hispanic/Latinos in the United States. American Journal of Public Health, 105(2), 329–335. [PubMed: 25521886]

Rodríguez MA, Young M, & Wallace SP (2015, April). Creating conditions to support healthy people: State policies that affect the health of undocumented immigrants and their families. Los Angeles, California University of California Global Health Institute.

Salimetrics. Salivary uric acid enzymatic assay kit. Carlsbad, CA Retrieved on 2 February 2016 at: https://www.salimetrics.com/assets/documents/1-3802.pdf

Selye H (1976). The stress of life. New York: McGraw-Hill.

Sharkey J, & Dean WR (2012). The Influence of Community Retail Food Environment on Household Food Access, Food Choice, and Dietary Intake of Mexican-origin Children in Colonias along the South Texas Border with Mexico. Retrieved on February 21, 2015 at: http://srdc.msstate.edu/ridge/projects/recipients/12_sharkey_final.pdf

Sun HL, Pei D, Lue KH, & Chen YL (2015). Uric acid levels can predict metabolic syndrome and hypertension in adolescents: A 10-year longitudinal study. PLoS One, 10(11),

Suro R, Suárez-Orozco MM, & Canizales S (2015, 4). Removing insecurity: How American children will benefit from President Obama's Executive Action on Immigration. University of Southern California Sol Price School of Public Policy, Tomás Rivera Policy Institute, USC/UCLA. Retrieved on April 27, 2015 from: http://trpi.org/pdfs/research_report.pdf.

Sutin AR, Cutler RG, Camandola S, Uda M, Feldman NH, Cucca F, … Terracciano A (2014). Impulsivity is associated with uric acid: Evidence from humans and mice. Biological Psychiatry, 75(1), 31–37. [PubMed: 23582268]

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Szkupinski-Quiroga SS, Medina DM, & Glick J (2014). In the belly of the beast effects of anti-immigration policy on Latino Community members. American Behavioral Scientist, 58(13), 1723–1174.

Theodore N (2013, May). Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement. Policy Link. Retrieved at: http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF

Thomas PD, Goodwin JM, & Goodwin JS (1985). Effect of social support on stress-related changes in cholesterol level, uric acid level, and immune function in an elderly sample. American Journal of Psychiatry, 142(6), 735–737. [PubMed: 4003594]

Van Hook J & Balistreri KS (2006). Ineligible parents, eligible children: food stamps receipt, allotments, and food insecurity among children of immigrants. Social Science Research, 35, 228–251.

Vargas ED, Sanchez GR, & Juárez M (2017). Fear by association: Perceptions of anti-immigrant policy and health outcomes. Journal of Health Politics, Policy and Law, 42(3), 459–483.

Viazzi F, Genovesi S, Ambruzzi M, & Giussani M (2015). Sugar, fructose, uric acid and hypertension in children and adolescents. Italian Journal of Pediatrics, 41, 72–76. [PubMed: 26444666]

Wang JY, Chen YL, Hsu CH, Tang SH, Wu CZ, & Pei D (2012). Predictive value of serum uric acid levels for the diagnosis of metabolic syndrome in adolescents. The Journal of Pediatrics, 161(4), 753–756. [PubMed: 22575243]

Yoshikawa H, Godfrey EB, & Rivera AC (2008). Access to institutional resources as a measure of social exclusion: Relations with family process and cognitive development in the context of immigration. New Directions in Child and Adolescent Development, 121, 73–96.

Yoshikawa H, & Kholoptseva J (2013, March). Unauthorized immigrant parents and their children's development: A summary of the evidence. Washington, DC: Migration Policy Institute.

Zhao J, & Huang Y (2015). Salivary uric acid as a noninvasive biomarker for monitoring the efficacy of urate-lowering therapy in a patient with chronic gouty arthropathy. Clinical Chimica Acta, 450, 115–120.

Zir LM, McHugh WB, Rahe RH, Arthur RJ, & Rubin RT (1973). Renal excretion of uric acid. Alterations during stressful underwater demolition-team training. Archives of Internal Medicine, 132, 808–812. [PubMed: 4757252]

Author Manuscript



**FIGURE 1.**
Exploratory Multilevel Mediation: Fear of Deportation in relation to BMI Percentile, Social Support, Socioeconomic Status and sUA

Author Manuscript

Author Manuscript

Author Manuscript

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

Martínez et al.                                                                 Page 18



**FIGURE 2.**
Exploratory Multilevel Mediation of Household Fear of Deportation in relation to BMI
Percentile and sUA between Mexican-origin Families

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**TABLE 1**

Family characteristics

|  | Families $N = 30$ |
|---|---|
| Family Size [R, (M)] | 2–8 persons (4.2) |
| Number of Children | 1–6 children (2.3) |
| Years in USA [M ± SD] | 10.69 ± 7.49 |
| Years in Phoenix | 9.91 ± 6.75 |
| Race/Ethnicity |  |
| White | 7 (23.3%) |
| Moreno (Black, Hispanic-origin) | 5 (16.7%) |
| Mestizo (Indian & White) | 11 (36.7%) |
| Zambo (Black & Indian) | 7 (23.3%) |
| Marital Status |  |
| Married | 23 |
| Living w/partner | 3 |
| Divorced/Separated | 4 |
| Annual Family Income |  |
| <$20,000 | 16 (53.5%) |
| $20,000–$34,999 | 11 (36.7%) |
| $35,000–$49,999 | 3 (10.0%) |
| Home Ownership |  |
| Rent | 28 (93.3%) |
| Own | 2 (6.7%) |
| Fear of Deportation |  |
| Walking in public | 2 (6.7%) |
| Seeking help from government agencies | 4 (13.3%) |
| Reporting incidents to the police | 3 (10%) |
| Reporting personal incidents to police | 3 (10%) |
| Reporting to court (even with a summons) | 2 (6.7%) |
| Obtaining a driver's license | 7 (23.3%) |
| Waiting at the corner for work | 3 (10%) |
| Had ≥1 fear | 14 families (47%) |

Author Manuscript        Author Manuscript        Author Manuscript        Author Manuscript

**TABLE 2**

Correlations between natural log of mean sUA levels and study covariates

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. LsUA | - | | | | | | | | | | |
| 2. sUADiff | 0.80** | - | | | | | | | | | |
| 3. LBMI Percentile | 0.28** | 0.24** | - | | | | | | | | |
| 4. BMI Percentile | 0.18* | 0.12 | 0.43** | - | | | | | | | |
| 5. Age | 0.15 | 0.07 | 0.75** | 0.04 | - | | | | | | |
| 6. Fear of Deportation | -0.31** | -0.27** | -0.17* | -0.02 | -0.16* | - | | | | | |
| 7. Social Support | -0.12 | -0.18* | -0.15 | -0.20** | 0.17* | 0.08 | - | | | | |
| 8. Income | -0.14 | -0.14 | 0.09 | 0.06 | 0.17* | 0.07 | 0.39** | - | | | |
| 9. Un/Employment[a] | 0.09 | -0.06 | 0.17* | 0.01 | 0.18* | -0.08 | 0.12 | 0.31** | - | | |
| 10. Educational Level | 0.18* | 0.01 | 0.13 | -0.03 | 0.10 | 0.17* | 0.11 | 0.08 | 0.24** | - | |
| 11. Gender[b] | 0.02 | 0.03 | 0.19** | 0.04 | 0.15 | -0.21** | -0.03 | 0.03 | 0.02 | -0.11 | - |
| 12. Black[c] | -0.14 | -0.13 | -0.04 | -0.13 | 0.04 | 0.12 | 0.02 | 0.09 | 0.08 | -0.07 | 0.08 |
| 13. Mestizo[c] | -0.17 | -0.18* | 0.01 | 0.26** | -0.12 | 0.07 | 0.04 | 0.04 | 0.22** | 0.07 | -0.05 |
| 14. Moreno[c] | -0.04 | 0.04 | 0.01 | -0.04 | 0.04 | 0.13 | 0.08 | 0.24** | 0.07 | 0.15 | -0.16 |
| 15. Zambo[c] | 0.18* | 0.18* | -0.01 | -0.08 | -0.12 | -0.23** | -0.24** | -0.35** | -0.25** | 0.09 | 0.03 |

[a] Employment (0 = Unemployed, 1 = employed ≥20 hours/week).

[b] Gender (0 = Male, 1 = Female).

[c] Spearman rank correlation.

L: log transformation.

Diff sUA: (Individual sUA levels – age-and-gender-specific mean sUA level).

**
 P<.05,

*
 P<.10.

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

**TABLE 3**

Anthropometric measures and sUA levels by age and gender, $N = 111$

| Age | <2 years | | 2–5 years | | 6–12 years | | 13–18 years | | 19+ years | |
|---|---|---|---|---|---|---|---|---|---|---|
| Gender | M | F | M | F | M | F | M | F | M | F |
| $N$ | 4 | 3 | 9 | 12 | 12 | 12 | 8 | 5 | 13 | 33 |
| BMI (kg/m²) [M ± SD] | 18.34 ± 4.00 | 18.34 ± 2.55 | 15.94 ± 1.57 | 18.44 ± 3.64 | 20.05 ± 5.26 | 19.08 ± 4.63 | 23.5 ± 5.80 | 20.98 ± 3.84 | 29.98 ± 2.37[a] | 32.51 ± 7.76 |
| (Range) | (16.0–24.3) | (15.4–20.1) | (13.8–18.3) | (13.1–25.8) | (14.3–32.2) | (15.4–31.2) | (18.8–37.1) | (16.4–25.8) | (26.3–34.9) | (20.1–50) |
| BMI Percentile[a,b] [M ± SD] | 0.43 ± 0.38 | 0.82 ± 0.23 | 0.55 ± 0.36 | 0.73 ± 0.33 | 0.71 ± 0.32 | 0.71 ± 0.21 | 0.66 ± 0.17 | 0.59 ± 0.41 | 0.70 ± 0.20 | 0.71 ± 0.23 |
| (Range) | (0.13–0.99) | (0.55–0.97) | (0.02–0.95) | (0.03–0.99) | (0.04–0.99) | (0.39–0.99) | (0.45–0.99) | (0.05–0.94) | (0.23–0.93) | (0.19–0.99) |
| Waist:Hip(cm) [M ± SD] | 0.99 ± 0.04 | 0.96 ± 0.03 | 0.95 ± 0.05 | 0.95 ± 0.06 | 0.92 ± 0.07 | 0.87 ± 0.05 | 0.91 ± 0.07 | 0.86 ± 0.04 | 0.97 ± 0.04 | 0.87 ± 0.06 |
| (Range) | (0.932–1.02) | (0.927–0.98) | (0.89–1.03) | (0.86–1.06) | (0.79–1.02) | (0.79–0.99) | (0.79–0.98) | (0.81–0.90) | (0.92–1.06) | (0.69–1.02) |
| sUA (µg/mL) [M ± SD] | 2.12 ± 0.98 | 1.11 ± 0.68 | 2.06 ± 1.35 | 3.09 ± 1.09[a] | 1.52 ± 1.03 | 1.53 ± 1.12 | 1.98 ± 1.30 | 1.51 ± 0.75 | 3.10 ± 2.00 | 2.17 ± 1.29 |
| (Range) | (1.31–3.51) | (0.46–1.82) | (0.70–5.09) | (1.18–5.34) | (0.37–4.04) | (0.35–4.38) | (0.096–3.81) | (0.80–2.72) | (0.81–7.86) | (0.41–5.45) |

Descriptive statistics calculated in Stata 12.1.

Body Mass Index (BMI).

M (Male) F (Female).

[a] CDC/NCHS age-sex-specific growth charts youth 2–20 years of age, available at: http://www.cdc.gov/nccdphp/dnpa/growthcharts/training/modules/module2/text/module2print.pdf.

[b] Adult BMI percentiles based on NHANES 2007–2008 data available at: https://www.cdc.gov/nchs/data/hestat/obesity_adult_07_08/obesity_adult_07_08.pdf.

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

**TABLE 4**

Exploratory Multilevel Models of household fear of deportation in relation to salivary uric acid (sUA) in Mexican-origin families

| | Model 1 | | | Model 2 | | | Model 3 | | | Model 4 | | | Model 5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | β | SE | P | β | SE | P | β | SE | P | β | SE | P | β | SE | P |
| **Within Y=Ln(UA)[c]** (M1–3) / **Within Y=Diff sUA[d]** (M4–5) | | | | | | | | | | | | | | | |
| Age | 0.003 | 0.004 | .45 | 0.003 | 0.004 | .43 | | | | −0.02 | 0.17 | .90 | −0.06 | 0.16 | .68 |
| Gender[a] | −0.11 | 0.14 | .42 | −0.11 | 0.14 | .44 | | | | −0.14 | 0.10 | .17 | −0.11 | 0.10 | .26 |
| LBMIP / BMIP | 0.31 | 0.26 | .23 | 0.30 | 0.26 | .24 | 0.30 | 0.29 | .29 | 0.08 | 0.20 | .71 | 0.08 | 0.19 | .67 |
| Zambo | 0.08 | 0.15 | .41 | 0.10 | 0.14 | .48 | | | | −0.02 | 0.12 | .95 | | | |
| | RV = 0.42 | | | RV = 0.42 | | | RV = 0.44 | | | RV = 0.98 | | | RV = 0.98 | | |
| **Between[§] Y=Ln(UA)** (M1–3) / **Between[§] Y=Diff sUA** (M4–5) | | | | | | | | | | | | | | | |
| Social Support | 0.01 | 0.16 | .99 | | | | | | | 0.03 | 0.43 | .94 | | | |
| Household Fear of Deportation | −0.12 | 0.05 | .02 | −0.12 | 0.05 | .02 | −0.09 | 0.05 | .05 | −0.68 | 0.27 | .01 | −0.63 | 0.25 | .01 |
| LBMIP / BMIP | 1.23 | 0.78 | .11 | 1.28 | 0.72 | .07 | 1.85 | 0.81 | .02 | 0.59 | 0.56 | .29 | 0.71 | 0.36 | .05 |
| Education | 0.12 | 0.05 | .02 | 0.13 | 0.05 | .01 | | | | 0.17 | 0.22 | .46 | | | |
| Income | −0.42 | 0.30 | .09 | −0.16 | 0.10 | .11 | | | | −0.31 | 0.31 | .31 | | | |
| Employment[b] | 0.15 | 0.25 | .47 | | | | | | | −0.14 | 0.27 | .60 | | | |
| | RV = 0.001 | | | RV = 0.001 | | | RV = 0.001 | | | RV = 0.05 | | | RV = 0.05 | | |
| **Y=BMIP** | | | | | | | | | | | | | | | |
| Social Support | 0.10 | 0.68 | .95 | | | | | | | 0.16 | 0.14 | .26 | | | |
| Household Fear of Deportation | −0.04 | 0.02 | .03 | −0.04 | 0.02 | .03 | −0.04 | 0.02 | 0.05 | −0.06 | 0.20 | .78 | | | |
| | RV 0.01 | | | RV 0.01 | | | RV 0.01 | | | RV = 0.05 | | | RV = 0.05 | | |

§ Between families, as in Figure 1.

β= beta coefficient  RV = Residual Variance.

SE = standard error  P = P-value.

Author Manuscript   Author Manuscript   Author Manuscript   Author Manuscript

001367

Author Manuscript

[a] Gender (0 = Male, 1 = Female).

[b] Head of Household Employment (0 = Unemployed, 1 = employed ≥20 hours/week).

[c] Natural log transformation for sUA.

[d] Diff sUA: (Individual sUA level − age category-and-gender-specific mean sUA level).

Author Manuscript

Author Manuscript

Author Manuscript

*Am J Hum Biol.* Author manuscript; available in PMC 2020 July 07.

001368



Office of Strategy,
Policy, and Plans

June 17, 2024

**MEMORANDUM TO FILE**

FROM:          Royce Bernstein Murray   ROYCE B MURRAY  Digitally signed by ROYCE B MURRAY
                                                      Date: 2024.06.17 11:51:17 -04'00'
               Acting Assistant Secretary for Border and Immigration Policy
               Office of Strategy, Policy, and Plans

SUBJECT:       Requests of Foreign Partners and Parole in Place Process

Purpose

This memorandum documents information considered by the Department of Homeland
Security's (DHS) Office of Strategy, Policy, and Plans (PLCY) in connection with the
development of a new parole in place process for certain noncitizen spouses of U.S. citizens.

Given the particular challenges facing the United States and its regional partners at this time, it is
critical that the United States continues to lead the way in response to ever-changing and historic
hemispheric migratory flows.  Continued engagement and collective action are critical elements
of the United States' ongoing diplomatic approach to migration management with partners in the
region.  These have been key components of our diplomacy, as regional partner countries have
regularly encouraged DHS to take steps to address migratory flows, including by channeling
intending migrants into expanded lawful pathways and processes.  This includes, on a number of
occasions, foreign partners calling on the United States to provide access to temporary or durable
immigration status for nationals of their respective countries who are already located in the
United States.

The U.S. Government continues to hold regular, high-level conversations with our closest
partner, the Government of Mexico (GOM), to deepen collaboration, identify emerging trends,
share intelligence, and coordinate additional steps needed to address dynamic migratory flows at
our shared border and within the region.  This includes the unprecedented expansion of lawful
pathways and processes, such as the parole processes for Cuban, Haitian, Nicaraguan, and
Venezuelan (CHNV) nationals, who have irregularly migrated through Mexico in large numbers
in recent years; the deployment of the CBP One mobile app for noncitizens (including Mexican
nationals) in certain areas of Mexico to schedule appointments to present themselves at a land
port of entry; and the implementation of seven country-specific family reunification parole
processes (Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras).

These efforts have been paired with the imposition of strengthened enforcement consequences
for individuals encountered at the southern border who fail to use lawful pathways and do not
establish a lawful basis to remain in the United States.  For example, on June 3, 2024, President
Biden signed a Proclamation, *Securing the Border*, which imposed a suspension and limitation

001369

on entry for certain noncitizens encountered between the ports of entry.  Soon thereafter, DHS and the Department of Justice issued an interim final rule that restricts asylum eligibility and further enhances consequences at the border.  This followed the publication of a new rule in May 2023, *Circumvention of Lawful Pathways,* to address the projected increase in migration at the Southwest border following the end of the Title 42 public health Order.  For their part, the GOM independently decided to accept the returns of certain CHNV nationals from the United States recognizing the need to deliver consequences for certain nationals of countries to where it is difficult to remove them.  The GOM also continues to engage in significant enforcement operations throughout Mexico to impede and deter the flow of unauthorized migrants headed northward.

As part of this partnership on migration, the GOM has regularly expressed its interest in protection of its nationals in the United States.  For example, following a conversation between President Joseph R. Biden and President of Mexico Andrés Manuel López Obrador on February 3, 2024,[1] the GOM summarized a list of ten key actions they had requested of the United States.  Of the ten points outlined by GOM, the first point on their list was that the United States consider the "regularization of Mexicans who have been living and working honestly in the United States for more than five years."[2]

Similarly, the Governments of Colombia, Ecuador, and Guatemala, have all been strong regional partners in migration management.  This includes efforts such as cracking down on visa-free transit of certain migrants through their airports, as Ecuador is about to initiate for nationals of the People's Republic of China, or supporting lawful pathways and local integration efforts.  Each of these countries has become a host to the U.S. Government's Safe Mobility Initiative, providing migrants from other countries access to the U.S. Refugee Admissions Program and other safe, orderly, and lawful pathways to the United States.[3]  The Government of Ecuador has also taken steps to increase the number of temporary resident visas provided to more migrants in Ecuador.  The Government of Colombia has made significant efforts to attack smuggling networks operating in and around the Darién Gap by deploying historic levels of law enforcement and military personnel on an ongoing basis to conduct enforcement along its southern border and the transit routes north.  These enforcement campaigns have been implemented at substantial cost for those governments and are, as with United States Government actions, inspired by the principle of our shared regional responsibility to manage migration.

And much like the GOM, each of these countries has requested that the United States provide their nationals the opportunity to remain in the United States for a period of time, at a minimum, and employment authorization through a Temporary Protected Status or Deferred Enforced Departure designation of their respective countries.  PLCY understands that providing

---

[1] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico*. https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3. (Feb. 3, 2024).
[2] *See* Government of Mexico, *En diálogo con su homólogo estadounidense, presidente López Obrador ratifica propuesta en materia migratoria.* https://www.gob.mx/presidencia/prensa/en-dialogo-con-su-homologo-estadounidense-presidente-lopez-obrador-ratifica-propuesta-en-materia-migratoria. (Feb. 3, 2024).
[3] *See* U.S. Department of State, *Safe Mobility Initiative.* https://www.state.gov/refugee-admissions/safe-mobility-initiative. (Last visited on June 13, 2024).

employment authorization to significant numbers of their nationals enables them to send increased remittances that contribute to the foreign country's economic growth and are an important factor in the development of communities of origin, thereby reducing push factors for migration.  Providing opportunities to apply for benefits like these to nationals of countries in the hemisphere would markedly strengthen our diplomatic relationships.

Under the proposed parole process, the DHS Office of Homeland Security Statistics estimates that more than half of beneficiaries will be Mexican nationals (approximately 320,000 individuals) and approximately one-fifth will be nationals of Northern Central American countries (approximately 100,000).  We expect that this announcement will be received very positively and as a sign of mutual respect by the GOM, the Northern Central American governments, and the governments of other countries whose nationals stand to benefit from this process, albeit in smaller numbers.  In turn, we anticipate stronger working relationships with each of these critical foreign partners.  We risk losing this valuable opportunity and undermining these relationships if we fail to take prompt action.

Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: United States

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 11,047,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 5,313,000 | 48% |
| El Salvador | 741,000 | 7% |
| Guatemala | 724,000 | 7% |
| India | 553,000 | 5% |
| Honduras | 490,000 | 4% |
| **Regions of Birth** | | |
| Mexico and Central America | 7,381,000 | 67% |
| Caribbean | 327,000 | 3% |
| South America | 907,000 | 8% |
| Europe/Canada/Oceania | 440,000 | 4% |
| Asia | 1,697,000 | 15% |
| Africa | 295,000 | 3% |
| **Years of U.S. Residence** | | |
| Less than 5 | 2,370,000 | 21% |
| 5 to 9 | 1,744,000 | 16% |
| 10 to 14 | 2,132,000 | 19% |
| 15 to 19 | 2,368,000 | 21% |
| 20 or more | 2,433,000 | 22% |
| **Age** | | |
| Under 16 | 606,000 | 5% |
| 16 to 24 | 1,577,000 | 14% |
| 25 to 34 | 2,986,000 | 27% |
| 35 to 44 | 3,084,000 | 28% |
| 45 to 54 | 1,772,000 | 16% |
| 55 and over | 1,023,000 | 9% |
| **Gender** | | |
| Female | 5,062,000 | 46% |
| **Family** | **Estimate** | **% of Total** |

**Sidebar:**
- DEMOGRAPHICS
- FAMILY
- EDUCATION AND LANGUAGE
- WORKFORCE
- ECONOMICS

001372

**Parental Status**

| | | |
|---|---|---|
| Reside with at least one U.S.-citizen child under 18 | 3,521,000 | 33% |
| Reside with noncitizen children only under 18 | 806,000 | 8% |
| Reside with no children | 6,185,000 | 59% |
| **Marital Status** | | |
| Population ages 15 and older | 10,513,000 | 100% |
| Never married | 4,057,000 | 39% |
| Married to a U.S. citizen | 1,314,000 | 12% |
| Married to a legal permanent resident (LPR) | 654,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 2,822,000 | 27% |
| Divorced, separated, widowed | 1,665,000 | 16% |

| **Education and Language** | **Estimate** | **% of Total** |
|---|---|---|
| **School Enrollment of Children and Youth** | | |
| Population ages 3 to 17 | 733,000 | 100% |
| Enrolled | 651,000 | 89% |
| Not enrolled | 83,000 | 11% |
| Population ages 3 to 12 | 381,000 | 100% |
| Enrolled | 324,000 | 85% |
| Not enrolled | 57,000 | 15% |
| Population ages 13 to 17 | 352,000 | 100% |
| Enrolled | 327,000 | 93% |
| Not enrolled | 25,000 | 7% |
| Population ages 18 to 24 | 1,411,000 | 100% |
| Enrolled | 569,000 | 40% |
| Not enrolled | 842,000 | 60% |
| **Educational Attainment of Adults** | | |
| Population ages 25 and older | 8,864,000 | 100% |
| 0-5 grade | 1,330,000 | 15% |
| 6-8 grade | 1,444,000 | 16% |
| 9-12 grade | 1,334,000 | 15% |
| High school diploma or equivalent | 2,136,000 | 24% |
| Some college or associate's degree | 1,062,000 | 12% |
| Bachelor's, graduate, or professional degree | 1,558,000 | 18% |
| **English Proficiency** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Speak only English | 773,000 | 7% |
| Speak English "very well" | 2,734,000 | 25% |
| Speak English "well" | 2,450,000 | 22% |
| Speak English "not well"/"not at all" | 4,994,000 | 46% |
| **Top 5 Languages Spoken at Home** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Spanish | 7,919,000 | 72% |

| English | 780,000 | 7% |
| Tagalog | 290,000 | 3% |
| Portuguese | 166,000 | 2% |

| Workforce | Estimate | % of Total |
|---|---|---|
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 10,434,000 | 100% |
| Employed | 6,829,000 | 65% |
| Unemployed | 448,000 | 4% |
| Not in the labor force | 3,157,000 | 30% |
| **Top Industries of Employment** | | |
| Civilian employed population ages 16 and older | 6,829,000 | 100% |
| Construction | 1,403,000 | 21% |
| Accommodation and food services, arts, entertainment, and recreation | 1,092,000 | 16% |
| Professional, scientific, management, administrative, and waste management services | 946,000 | 14% |
| Manufacturing | 694,000 | 10% |
| Retail trade | 547,000 | 8% |

| Economics | Estimate | % of Total |
|---|---|---|
| **Family Income** | | |
| Below 50% of the poverty level | 1,344,000 | 12% |
| 50-99% of the poverty level | 1,542,000 | 14% |
| 100-149% of the poverty level | 1,824,000 | 17% |
| 150-199% of the poverty level | 1,575,000 | 14% |
| At or above 200% of the poverty level | 4,762,000 | 43% |
| **Access to Health Insurance** | | |
| Uninsured | 5,823,000 | 53% |
| **Home Ownership*** | | |
| Homeowner | 3,069,000 | 28% |

*Source*: These 2019 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2015-19 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S. and state estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

Data-related notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

001374

Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

"School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

"-" estimates are zero, not applicable, or not displayed due to small sample size.

Percentages may not add up to 100 due to rounding.

*Methodology in Brief*:
MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.



RESEARCH & INITIATIVES | PUBLICATIONS | EVENTS | NEWS | ABOUT US | CONTACT US | SITE MAP | PRIVACY POLICY | EXPERTS

1275 K St. NW, Suite 800, Washington, DC 20005 | ph. 202-266-1940 | fax. 202-266-1900



Copyright © 2001-2024 Migration Policy Institute. All rights reserved.



SECRETARÍA DE RELACIONES EXTERIORES

EMBAJADA DE MÉXICO EN EL PERÚ

# Visas

**INFORMACIÓN IMPORTANTE**

Las personas peruanas necesitan visa para ingresar a México. El otorgamiento de visa es con previa cita. No se brinda atención en ventanilla sin cita.

La apertura del calendario de citas es el último día hábil de cada mes. El día y el horario exacto de apertura se anuncia por medio de las redes sociales de la Embajada.

Si usted ingresó al calendario de citas y no aparece la opción de visas es porque las citas para el mes se agotaron y debe esperar a una nueva apertura.

El tiempo de entrega normal de visas es de un día después de la entrevista consular. En algunos casos puede demorar hasta diez días hábiles.



CITAS

Para trámites y servicios consulares.

Presione aquí

**FACILIDADES MIGRATORIAS**

**NO** requieren visa aquellas personas que:

- Sean portadoras de una Visa **válida y vigente de entradas múltiples** de Canadá, Estados Unidos de América, Japón, Reino Unido de la Gran Bretaña e Irlanda del Norte o cualquier país que pertenezca al espacio Schengen.
- Tarjeta de **residente permanente** de Canadá, Chile, Colombia, Estados Unidos de América, Japón, Reino Unido de la Gran Bretaña e Irlanda del Norte o cualquier país que pertenezca al espacio Schengen.

Las personas con residencia temporal de los países mencionados o con cualquier otra calidad migratoria, requieren visa. Los portadores de *laissez-passer* en cualquier caso requieren visa.

Independientemente de la nacionalidad, **la internación a México está condicionada a la aprobación de las autoridades migratorias en el puerto de entrada**, no de la Embajada. Las autoridades migratorias podrán revisar el motivo del viaje, reservaciones de hotel, itinerarios de viaje, carta invitación en caso de que proceda, actividades que se desarrollan en el país de origen, etc.

**NOTAS:**

- Todos los trámites requieren cita programada exclusivamente en este portal: MI CONSULADO. La programación de la cita es GRATUITA. Citas gestionadas por tramitadores serán canceladas Prepare USD $53.00 en cambio exacto para el trámite de la visa.
- Se recomienda obtener la visa por lo menos cinco semanas previas a su viaje y que los gastos de viaje se efectúen únicamente después de que la visa haya sido emitida.
- La presentación de documentación apócrifa automáticamente descalifica al solicitante y se le puede imponer una alerta migratoria hasta por cinco años.

- La solicitud de visa se descarga AQUÍ

**TIPOS DE VISA**

En los siguientes vínculos podrás obtener la información sobre los diferentes tipos de visa según tus requerimientos:

1. Visa "de turismo" para estancias menores a 180 días por turismo o negocios sin percibir remuneración alguna. Incluye si sólo se está en tránsito por México.
2. Visa por carta responsiva para estancias menores a 180 días por invitación de una organización o institución mexicana, sin percibir remuneración alguna.
3. Visa para cursar estudios en una institución educativa mexicana, por menos de 180 días, sin percibir remuneración alguna.
4. Visa para ministros de culto o misioneros para efectuar actividades amparadas por una entidad religiosa debidamente registrada ante la Secretaría de Gobernación.
5. Visa de residencia temporal por oferta de empleo para trabajar con un empleador en México que ya tramitó tu permiso de trabajo ante el Instituto Nacional de Migración.
6. Visa de residencia temporal estudiante para cursar estudios en una institución educativa mexicana por más de 180 días.
7. Visa de residencia temporal para familiares de residentes temporales o residentes temporales estudiantes para estancias mayores a 180 días.
8. Visa de residencia temporal para familiares de mexicanos o de residentes permanentes para estancias mayores a 180 días.

## Consultas sobre Visas

Sólo se responderán consultas cuando la información no esté contenida en este sitio web.

Para consultas sobre casos especiales, favor de escribir a: consularper@sre.gob.mx, o llamar a los números. +51 1612 1619 y +51 1612 1626, entre 14:00 y 17:00 horas.

Brief

# States Offering Driver's Licenses to Immigrants

Updated March 13, 2023

**Related Topic:**     **Immigration**

States issue driver's licenses under the constitutional authority of the 10th Amendment. Congress enacted Real ID in 2005, creating standards for state-issued driver's licenses, including evidence of lawful status. This brief provides a summary of state legislation authorizing driver's licenses or authorization cards for unauthorized immigrants. Nineteen states and the District of Columbia have enacted laws to allow unauthorized immigrants to obtain driver's licenses. These states—California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Utah, Vermont, Virginia and Washington—issue a license if an applicant provides certain documentation, such as a foreign birth certificate, foreign passport, or consular card and evidence of current residency in the state.

In 2022, Rhode Island enacted legislation extending driver's licenses and identification cards to those without proof of lawful presence (SB 2006/HB 7939). In addition to Rhode Island, the Massachusetts legislature overrode the Governor's veto of their bill allowing those without proof of lawful presence to obtain driver's licenses (SB 4822/HB 4805). In the 2022 midterm election, Massachusetts voters were asked via ballot measure (Q4) whether the state should keep or repeal the new immigrant driver's license law, and voters ultimately elected to uphold it.

In 2023, Minnesota became the most recent state to enact legislation allowing individuals to get driver's licenses without proof of lawful presence (HB 4/SB 27).

001378

## Immigrants and Driver's Licenses



<span style="color:#8faa6f">■</span> Does not offer driving privileges to unauthorized immigrants

<span style="color:#6a9cc4">■</span> Offers driving privleges to unauthorized immigrants

## Enacted Legislation

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| California | A 60 | 2013 | This law requires the Department of Motor Vehicles to issue driver's | Jan. 1, 2015 |

001379

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | licenses to individuals who are ineligible for a Social Security number, if the required documentation is provided. | |
| Colorado | S 251 | 2013 | This law allows individuals to qualify for a driver's license, instruction permit or identification card, despite the individual not being lawfully present or being only temporarily lawfully present in the United States if certain conditions are met, such as providing state tax returns. | Aug. 1, 2014 |
| Connecticut | H 6495 | 2013 | This law provides driver's licenses to applicants who submit a valid foreign passport or consular identification and proof of residency, regardless of legal presence in the United States. Applicants must file to legalize as soon as he or she is eligible. | Jan. 1, 2015 |
| Delaware | S 59 | 2015 | This law creates the means for an undocumented immigrant to obtain a driving privilege card in Delaware. A driving privilege card or permit applicant must provide the state with satisfactory documentary evidence and that the applicant has filed a Delaware income tax return or resided in Delaware and been claimed as a dependent by an individual who has filed a state income tax return for the preceding two years. The card is not considered a valid form of identification due to | Dec. 27, 2015 |

001380

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | the applicant's inability to prove legal presence in the U.S. | |
| Hawaii | H 1007 | 2015 | This law authorizes the issuance of driver's licenses to residents of Hawaii who cannot provide proof of authorized presence in the United States. Applicants must provide satisfactory proof of identity and Hawaii residency. | Jan. 1, 2016 |
| Illinois | S 957 | 2012 | This law allows the Secretary of State to issue a temporary visitor's driver's license to an individual who has resided in Illinois for a specified time but is ineligible to obtain a Social Security number, and unable to prove lawful presence. A valid unexpired foreign passport or consular identification document from their country of citizenship are acceptable forms of identification. | Nov. 28, 2013 |
| Maryland | S 715 | 2013 | This law authorizes the issuance of driver's licenses to those who do not have lawful status or a valid Social Security number. New applicants must provide evidence that the applicant has filed two years of Maryland income tax returns or proof of residency or have been claimed as a dependent by an individual who has filed Maryland income tax returns. The licenses are not valid for Federal identification purposes. | Jan. 1, 2014 |

001381

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| Massachusetts | HB4805 | 2022 | This law authorizes the issuance of driver's licenses to applicants even if they cannot provide proof of lawful presence or if they are ineligible for a social security number. | July 1, 2023 |
| Minnesota | HB 4/SB 27 | 2023 | This law allows undocumented immigrants to take the driver's skills test and receive a driver's license. The applicant must submit proof of identification which can include a foreign passport, birth certification or adoption certificate, as well as a secondary document proving residence in the state. The license must be marked "not for federal identification" and contain no information regarding the lawful presence of the driver's license holder. | October 1, 2023 |
| New Jersey | A4743 | 2019 | This law creates a standard driver's license or identification that does not require proof of lawful presence. The law prohibits the motor vehicle commission from disclosing information to any federal, state or local law enforcement agency for immigration purposes without the consent of the individual, a warrant, court order or subpoena, unless such restriction is contrary to federal law. The commission may not retain copies of documents submitted to establish eligibility for a license or identification card. | June 1, 2020 |
| New Mexico | H 173 | 2003 | This law allows the Department of Motor Vehicles to accept tax identification numbers as a | 2003 |

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | substitute for a Social Security number regardless of immigration status. | |
| New York | S 1747 | 2019 | This law authorizes the Department of Motor Vehicles to issue standard drivers' licenses and restricts what information can be retained and given out on those applying or holding licenses. | June 17, 2019 |
| New York | A3675 | 2019 | This legislation allows for the issuance of a driver's license to undocumented residents and protects the data of those applying for such privilege from unwarranted release. The Department of Motor Vehicles may not disclose records to any agency that primarily enforces immigration law without a lawful court order or judicial warrant. The law requires that any person or entity that has access to information from the department to certify that the information will not be used for civil immigration purposes. Application forms for non-commercial drivers' licenses and learners' permits which do not meet federal standards for identification may not state: the documents an applicant used to prove age or identity; an applicant's ineligibility for a social security number where applicable; or an applicant's citizenship or immigration status. A non-commercial driver's license or learner's permit which does not meet federal standards for | Dec. 14, 2019 |

001383

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | identification may not be used as evidence of a person's citizenship or immigration status, and may not be the basis for investigating, arresting, or detaining a person. Such licenses must be visually identical to federal-purpose driver's licenses except that such licenses may state "Not for Federal Purposes". | |
| Nevada | S 303 | 2013 | This law creates a driver's authorization card and allows applicants, regardless of legal status, to provide birth certificates or passports issued by a foreign country as proof of identity. This law also prohibits the release of information relating to legal status for purposes relating to the enforcement of immigration laws. | Jan. 1, 2014 |
| Oregon | H2015 | 2019 | This law eliminates the requirement that a person provide proof of legal presence before the Department of Transportation issues a noncommercial driver license, noncommercial driver permit or identification card. Acceptable documents to prove identity, date of birth or address when a person is applying for a driver license, driver permit or identification card that is not a Real ID, a commercial driver license, or a commercial learner driver permit, include: (a) An unexpired valid passport from the person's country of citizenship; (b) An unexpired valid consular | Aug. 9, 2019 |

001384

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | identification document issued by the consulate of the person's country of citizenship; (c) A driver license, driver permit or identification card issued by Oregon that expired less than 13 years before the current application; or (d) A driver license, driver permit or identification card issued by another state that is unexpired or expired less than a year before the current application. | |
| Rhode Island | S 2006/ H 7939 | 2022 | This law allow any person who is unable to establish legal presence in the U.S. but meets requirements such as presenting proof of identity, proof of residency and not violating insurance requirements, to receive a driver's license or permit if the Division of Motor Vehicles deems them eligible. | July 1, 2023 |
| Utah | S 227 | 2005 | This law establishes a one-year driving privilege card for unauthorized immigrants. Applicants without a Social Security number must prove Utah residency for six months and provide a tax identification number. The card is expressly prohibited from being used for any identification purposes by a governmental entity. | March 8, 2005 |
| Vermont | S 38 | 2013 | This law allows those Vermont residents unable to establish lawful presence in the United States to be eligible for a motor vehicle operator's | Jan. 1, 2014 |

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| | | | privilege card or alternate identification card. | |
| Virginia | HB 1211/SB 34 | 2020 | This law creates a driving privilege card or permit for applicants who do not meet the requirements for a driver's license or permit. The applicant must have reported income and deductions from Virginia sources, or been claimed as a dependent, on an individual income tax return filed in the preceding 12 months and may not be in violation of the insurance requirements. Applicants may not be required to present proof of legal presence in the United States. A driver privilege card or permit will expire on the applicant's second birthday following the date of issuance. The front of a driver privilege card or permit must be identical in appearance to a driver's license or permit that is not a REAL ID credential and the back of the card or permit must be identical in appearance to the restriction on the back of a limited-duration license, permit or special identification card. | Jan. 1, 2021 |
| Washington | H 1444 | 1993 | This law allows drivers license applicants without Social Security numbers to provide alternate documentation to show proof of residence in the state of Washington such as home utility bills and tax identification numbers. | July 25, 1993 |

001386

| State | Bill | Year Enacted | Summary | Effective Date |
|-------|------|--------------|---------|----------------|
| District of Columbia | B 275 | 2013 | This law creates a limited purpose driver's license, permit, or identification card for a District resident who has not been assigned a Social Security number or cannot establish legal presence in the United States. | May 1, 2014 |

## Related Resources

Updated April 16, 2024

### State of Play | Navigating Immigration Policy at the State Level

Immigration is historically a federal issue, but an increase in the number of people coming to the U.S. has brought renewed attention to the way immigration affects state policies.

**Immigration**

*State Legislatures News*

Updated January 23, 2024

### Justices Allow Removal of Texas' Razor Wire on US–Mexico Border

A U.S. Supreme Court ruling allows U.S. border agents to remove razor wire installed by the state of Texas to stem the flow of illegal border crossings.

**Immigration, State-Federal**

*State Legislatures News*

001387

Updated December 23, 2023

# Immigration Legislation Database

This database covers bills and resolutions related to immigration and immigrants, including a wide range of topics such as education, employment, health, licensing and public benefits, among others.

**Immigration**

Database

# NATIONAL TAXPAYER ADVOCATE

# ANNUAL REPORT TO CONGRESS

Volume 1

2015

001390

*This report is dedicated to*
*my good friend*

## *Chris Bergin,*

*for his tireless advocacy for*
*transparency*
*in the tax system*
*and of*
*taxpayer rights*
*as fundamental to*
*the fairness of that system.*

*This page intentionally left blank.*

# Contents

**PREFACE: Introductory Remarks by the National Taxpayer Advocate** . . . . . . . . . . . . . . . . . . . . . . . vii

**TAXPAYER RIGHTS ASSESSMENT: IRS Performance Measures and Data Relating to
Taxpayer Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

**THE MOST SERIOUS PROBLEMS ENCOUNTERED BY TAXPAYERS**

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    **IRS Future State Vision: Implications for Today and Tomorrow**

    1. TAXPAYER SERVICE: The IRS Has Developed a Comprehensive "Future State" Plan
That Aims to Transform the Way It Interacts With Taxpayers, But Its Plan May Leave
Critical Taxpayer Needs and Preferences Unmet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2. IRS USER FEES: The IRS May Adopt User Fees to Fill Funding Gaps Without Fully
Considering Taxpayer Burden and the Impact on Voluntary Compliance . . . . . . . . . . . . . . . . . . . 14

    3. FORM 1023-EZ: Recognition As a Tax-Exempt Organization Is Now Virtually
Automatic for Most Applicants, Which Invites Noncompliance, Diverts Tax Dollars
and Taxpayer Donations, and Harms Organizations Later Determined to Be Taxable . . . . . . . . . 36

    4. REVENUE PROTECTION: Hundreds of Thousands of Taxpayers File Legitimate Tax
Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving
Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's
Pre-Refund Wage Verification Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    5. TAXPAYER ACCESS TO ONLINE ACCOUNT SYSTEM: As the IRS Develops an
Online Account System, It May Do Less to Address the Service Needs of Taxpayers
Who Wish to Speak With an IRS Employee Due to Preference or Lack of Internet
Access or Who Have Issues That Are Not Conducive to Resolution Online . . . . . . . . . . . . . . . . 56

    6. PREPARER ACCESS TO ONLINE ACCOUNTS: Granting Uncredentialed
Preparers Access to an Online Taxpayer Account System Could Create Security Risks
and Harm Taxpayers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

    7. INTERNATIONAL TAXPAYER SERVICE: The IRS's Strategy for Service on
Demand Fails to Compensate for the Closure of International Tax Attaché Offices and
Does Not Sufficiently Address the Unique Needs of International Taxpayers . . . . . . . . . . . . . . . 72

    **Problems That Undermine Taxpayer Rights and Impose Taxpayer Burden**

    8. APPEALS: The Appeals Judicial Approach and Culture Project Is Reducing the Quality
and Extent of Substantive Administrative Appeals Available to Taxpayers . . . . . . . . . . . . . . . . . 82

    9. COLLECTION APPEALS PROGRAM (CAP): The CAP Provides Inadequate Review
and Insufficient Protections for Taxpayers Facing Collection Actions . . . . . . . . . . . . . . . . . . . . 91

    10. LEVIES ON ASSETS IN RETIREMENT ACCOUNTS: Current IRS Guidance
Regarding Levies on Retirement Accounts Does Not Adequately Protect Taxpayer
Rights and Conflicts With Retirement Security Public Policy . . . . . . . . . . . . . . . . . . . . . . . . . . 100

11. NOTICES OF FEDERAL TAX LIEN (NFTL): The IRS Files Most NFTLs Based
    on Arbitrary Dollar Thresholds Rather Than on a Thorough Analysis of a Taxpayer's
    Financial Circumstances and the Impact on Future Compliance and Overall Revenue
    Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

12. THIRD PARTY CONTACTS: IRS Third Party Contact Procedures Do Not Follow
    the Law and May Unnecessarily Damage Taxpayers' Businesses and Reputations . . . . . . . . . . 123

13. WHISTLEBLOWER PROGRAM: The IRS Whistleblower Program Does Not
    Meet Whistleblowers' Need for Information During Lengthy Processing Times
    and Does Not Sufficiently Protect Taxpayers' Confidential Information From
    Re-Disclosure by Whistleblowers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

14. AFFORDABLE CARE ACT (ACA) – BUSINESS: The IRS Faces Challenges in
    Implementing the Employer Provisions of the ACA While Protecting Taxpayer Rights
    and Minimizing Burden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

15. AFFORDABLE CARE ACT (ACA) – INDIVIDUALS: The IRS Is Compromising
    Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual
    Shared Responsibility Payment Provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

**Problems That Waste IRS Resources and Impose Taxpayer Burden**

16. IDENTITY THEFT (IDT): The IRS's Procedures for Assisting Victims of IDT, While
    Improved, Still Impose Excessive Burden and Delay Refunds for Too Long . . . . . . . . . . . . . . 180

17. AUTOMATED SUBSTITUTE FOR RETURN (ASFR) PROGRAM: Current
    Selection Criteria for Cases in the ASFR Program Create Rework and Impose Undue
    Taxpayer Burden. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

18. INDIVIDUAL TAXPAYER IDENTIFICATION NUMBERS (ITINs): IRS
    Processes Create Barriers to Filing and Paying for Taxpayers Who Cannot Obtain
    Social Security Numbers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

19. PRACTITIONER SERVICES: Reductions in the Practitioner Priority Service Phone
    Line Staffing and Other Services Burden Practitioners and the IRS. . . . . . . . . . . . . . . . . . . . 213

20. IRS COLLECTION EFFECTIVENESS: The IRS's Failure to Accurately Input
    Designated Payment Codes for All Payments Compromises Its Ability to Evaluate
    Which Actions Are Most Effective in Generating Payments . . . . . . . . . . . . . . . . . . . . . . . . . . 221

21. EXEMPT ORGANIZATIONS (EOs): The IRS's Delay in Updating Publicly Available
    Lists of EOs Harms Reinstated Organizations and Misleads Taxpayers . . . . . . . . . . . . . . . . . . 227

**Problems That Contribute to Earned Income Tax Credit
Noncompliance and Recommendations for Improvement**

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

22. EARNED INCOME TAX CREDIT (EITC): The IRS Does Not Do Enough Taxpayer
    Education in the Pre-Filing Environment to Improve EITC Compliance and Should
    Establish a Telephone Helpline Dedicated to Answering Pre-Filing Questions From
    Low Income Taxpayers About Their EITC Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

23. EARNED INCOME TAX CREDIT (EITC): The IRS Is Not Adequately Using the
    EITC Examination Process As an Educational Tool and Is Not Auditing Returns With
    the Greatest Indirect Potential for Improving EITC Compliance . . . . . . . . . . . . . . . . . . . . . . 248

24. EARNED INCOME TAX CREDIT (EITC): The IRS's EITC Return Preparer
    Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance . . . . . . . 261

## LEGISLATIVE RECOMMENDATIONS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284

**National Taxpayer Advocate Legislative Recommendations with Congressional Action** . . . . 292

**Recommendations to Protect Taxpayer Rights and Reduce Taxpayer Burden**

1.  STATUTE OF LIMITATIONS: Repeal or Fix Statute Suspension Under IRC § 7811(d) . . . . . 316

2.  MATH ERROR AUTHORITY: Authorize the IRS to Summarily Assess Math and "Correctable" Errors Only in Appropriate Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329

3.  LEVIES ON RETIREMENT ACCOUNTS: Amend IRC § 6334 to Include a Definition of Flagrancy and Require Consideration of Basic Living Expenses at Retirement Before Levying on Retirement Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

4.  CHAPTER 3 AND CHAPTER 4 CREDITS AND REFUNDS: Protect Taxpayer Rights by Aligning the Rules Governing Credits and Refunds for Domestic and International Withholding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346

5.  FOREIGN ACCOUNT REPORTING: Eliminate Duplicative Reporting of Certain Foreign Financial Assets and Adopt a Same-Country Exception for Reporting Financial Assets Held in the Country in Which a U.S. Taxpayer Is a *Bona Fide* Resident . . . . . . . . . . . . . . 353

6.  INDIAN TRIBAL GOVERNMENTS (ITGs): Treat ITGs as States for Social Security Tax Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363

7.  TAXPAYER RIGHTS: Toll the Time Period for Financially Disabled Taxpayers to Request Return of Levy Proceeds to Better Protect Their *Right to a Fair and Just Tax System* . . . . 368

8.  THE FRIVOLOUS RETURN PENALTY: Protect Good Faith Taxpayers by Expanding the Availability of Penalty Reductions, Establishing Specific Penalty Abatement Procedures, and Providing Appeal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376

**Recommendations to Minimize IRS Wasted Resources and Reduce Taxpayer Burden**

9.  AFFORDABLE CARE ACT INFORMATION REPORTING: Allow Taxpayer Identification Number Matching for Filers of Information Returns Under IRC §§ 6055 and 6056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

10. EXEMPT ORGANIZATIONS (EOs): Require More Frequent Updates to Publicly Available Databases of EOs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 389

11. BASIS REPORTING: Reduce Taxpayer Burden and Improve Tax Compliance by Requiring Partnerships and S Corporations to Report Each Partner's or Shareholder's Adjusted Basis Annually on Schedules K-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 394

12. HARDSHIP WITHDRAWALS: Provide a Uniform Definition of a Hardship Withdrawal From Tax-Advantaged Retirement Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 401

**Recommendations to Improve the Whistleblower Program**

13. WHISTLEBLOWER PROGRAM: Enact Anti-Retaliation Legislation to Protect Tax Whistleblowers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 409

14. WHISTLEBLOWER PROGRAM: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 413

15.  WHISTLEBLOWER PROGRAM: Amend IRC §§ 7623 and 6103 to Provide
     Consistent Treatment of Recovered Foreign Account Tax Compliance Act (FATCA)
     and Report of Foreign Bank and Financial Accounts (FBAR) Penalties for
     Whistleblower Award Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 419

## MOST LITIGATED ISSUES

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 426

Significant Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 431

1.  Accuracy-Related Penalty Under IRC § 6662(b)(1) and (2) . . . . . . . . . . . . . . . . . . . . . . . . . . 446

2.  Trade or Business Expenses Under IRC § 162 and Related Sections . . . . . . . . . . . . . . . . . . . . . 459

3.  Summons Enforcement Under IRC §§ 7602, 7604, and 7609 . . . . . . . . . . . . . . . . . . . . . . . . . 467

4.  Gross Income Under IRC § 61 and Related Sections  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 476

5.  Appeals from Collection Due Process Hearings Under IRC §§ 6320 and 6330 . . . . . . . . . . . . 481

6.  Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as
    Tax on Return Penalty Under IRC § 6651(a)(2), and Failure to Pay Estimated Tax
    Penalty Under IRC § 6654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 499

7.  Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax
    Under IRC § 7403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 509

8.  Charitable Deductions Under IRC § 170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 515

9.  Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions . . . . . . . . . 523

10. Relief from Joint and Several Liability Under IRC § 6015  . . . . . . . . . . . . . . . . . . . . . . . . . . . 527

## TAS CASE ADVOCACY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 537

## APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 567

# Volume Two: TAS Research and Related Studies

1.  Study of Taxpayers That Obtained Recognition as IRC § 501(c)(3) Organizations on
    the Basis of Form 1023-EZ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.  IRS Collectibility Curve . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3.  Audit Impact Study. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

4.  Understanding the Hispanic Underserved Population. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

# PREFACE: Introductory Remarks by the National Taxpayer Advocate

## HONORABLE MEMBERS OF CONGRESS:

I respectfully submit for your consideration the National Taxpayer Advocate's 2015 Annual Report to Congress. Section 7803(c)(2)(B)(ii) of the Internal Revenue Code requires the National Taxpayer Advocate to submit this report each year and in it, among other things, to identify at least 20 of the most serious problems encountered by taxpayers and to make administrative and legislative recommendations to mitigate those problems.

The year 2015 has been a memorable one for taxpayer rights. On November 19 through 21, over 160 people from 22 countries gathered at the National Archives and the Internal Revenue Service to partici-pate in the Inaugural International Conference on Taxpayer Rights. The conference was convened by the National Taxpayer Advocate and co-sponsored by the American Bar Association Section of Taxation, the American College of Tax Counsel, the American Tax Policy Institute, the International Association of Tax Judges, the International Fiscal Association — USA Branch, and Tax Analysts. It included two days of presentations by speakers from countries as diverse as South Africa, Greece, Mexico, Sweden, Canada, England, Australia, and the United States, as well as a mini-conference on the third day with a panel of, and discussions by, taxpayer advocates and ombuds from around the world. The conference laid a foundation for continuing work and scholarship in the area of taxpayer rights, particularly as they derive from human rights' conventions, constitutional law, and statutes.[1]

On the evening of the first day of the International Conference on Taxpayer Rights, I stood in the Rotunda of the National Archives and viewed the documents on which the United States is founded — the Declaration of Independence, the Constitution, and the Bill of Rights. I was struck by James Madison's language quoted in a display about our nation's path to adopting a Bill of Rights:

> I think we should obtain the confidence of our fellow citizens in proportion as we fortify the rights of the people against the encroachments of the government.

It is fitting that, less than one month after I read this statement at the historic conference, Congress passed and the President signed into law legislation that codified the provisions of the Taxpayer Bill of Rights (TBOR), an act I have been advocating for since 2007.[2] The need for and protections afforded by the TBOR cannot be overstated. In today's environment of low confidence and even distrust of the federal government and the IRS, the agency's adherence to the principles of the TBOR will demonstrate to taxpayers that they have reason to trust that it will administer the nation's tax laws fairly and justly.

---

1   To see the conference agenda and abstracts of papers, visit www.taxpayerrightsconference.com. As papers from the confer-ence are formally published in Tax Notes, The Tax Lawyer, and other journals, we will make them publicly available on this website. Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 401 (2015). The law requires the Commissioner to "ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title." The bill provides that these rights include the *right to be informed*, the *right to quality service*, the *right to pay no more than the correct amount of tax*, the *right to challenge the position of the Internal Revenue Service and be heard*, the *right to appeal a decision of the Internal Revenue Service in an independent forum*, the *right to finality*, the *right to privacy*, the *right to confidentiality*, the *right to retain representation*, and the *right to a fair and just tax system*. To its credit, the IRS itself announced its adoption of the Taxpayer Bill of Rights in June 2014. However, congressional action carries the force of law and makes a significant statement about the value our elected representatives place on taxpayer rights.

2   The National Taxpayer Advocate has been recommending that Congress codify the Taxpayer Bill of Rights since 2007. *See* National Taxpayer Advocate 2007 Annual Report to Congress 478-98 (Legislative Recommendation: *Taxpayer Bill of Rights and De Minimis "Apology" Payment*).

001397

The Taxpayer Bill of Rights is the roadmap to effective tax administration.  Congress has set the IRS on this path by codifying the TBOR.  It is now up to the IRS to more fully incorporate taxpayer rights into everything it does.  However, I have significant concerns that the IRS is embarking on a path that will unintentionally undermine taxpayer rights rather than enhance them, thereby eroding taxpayer trust further.  I discuss these concerns in the remainder of this preface, and specifically in the first Most Serious Problem: *Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts With Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet.*

### The IRS Future State Vision and Its Implications for Taxpayer Rights

In response, in part, to significant budget cuts since 2010, the IRS has undertaken a multi-year exercise to develop a concept of operations (CONOPS) or "future state vision."  This exercise is long overdue and I commend the IRS for undertaking it.  Not surprisingly, the IRS future state now under internal discussion proposes changes in agency operations that assume a constrained funding environment and therefore minimizes agency costs.  As a result, these proposed changes have serious ramifications for taxpayers and taxpayer rights.  Most significantly, the IRS future state vision redefines tax administration into a class system, where only taxpayers who are the most *non*compliant or who can "pay to play" will receive concierge-level service or personal attention.[3]  The compliant or trying-to-comply taxpayers will be left either struggling for themselves or paying for assistance they formerly received for free from the IRS.

The language in the few future state documents that are publicly available is commendable enough.[4]  For example, there is laudatory language about improving taxpayer service by giving taxpayers self-service options ("Facilitate voluntary compliance by empowering taxpayers with secure innovative tools and support") and by working with third parties such as software companies, Circular 230 tax professionals, and other preparers ("Leverage and collaborate with external stakeholders").  There is discussion about being data-driven ("Select highest value work using data analytics and a [sic] robust feedback loops") and conducting behavioral research ("Understand non-compliant taxpayer behavior and develop approaches to deter and change it").  I note, however, that there is no stated commitment to understanding *compliant* taxpayer behavior and developing approaches to *maintain and enhance it.*  The focus of this document is primarily on enforcement challenges.

Yet even as the IRS has been and is now holding internal discussions, it is eliminating services without any future state substitutes for those services in place.  As we describe in the #1 Most Serious Problem and throughout this report, the IRS is reducing assistance to taxpayers despite the absence of significant research into taxpayers' needs and preferences for assistance or the effect of service reductions on taxpayers' willingness or ability to comply voluntarily with their tax obligations.  The implications of these decisions and actions are far-reaching and should be discussed publicly *before* the IRS implements them.

### A Brief Level-Setting: The Current State of Tax Administration Today

For fiscal year (FY) 2015, the IRS collected over $2.8 trillion dollars (net of refunds), or over 90 percent of federal receipts.  Figure 1 below shows the breakdown of contributors to the public fisc by type of tax payment.

---

3   I am indebted to Professor Keith Fogg, Visiting Professor of Law and Director of Federal Tax Clinic Legal Services Center at Harvard Law School, for his inspired use of the phrase "concierge service."

4   *See, e.g., Tax Enforcement in a Resource-Challenged World* (32nd Annual National Institute on Criminal Tax Fraud and the Fifth National Institute on Tax Controversy, Las Vegas, NV, Dec. 9-11, 2015) slide 7.  All quotes in this paragraph are from this document.

**FIGURE 1, Federal Tax Receipts by Type of Tax, FY 2015**[5]

| Tax Type | Trillions of Dollars | Percent of Revenue |
|---|---|---|
| Individual Income Taxes | $1.541 | 47% |
| Corporate Income Taxes | $0.344 | 11% |
| Social Security/Retirement Benefits | $1.065 | 33% |
| Excise Taxes | $0.098 | 3% |
| Other | $0.201 | 6% |

Almost half of federal tax receipts are from individuals, including sole proprietors.  Another third are paid by employers — many of which are small businesses.  Yet the tax administration issues impacting these taxpayers get very little attention these days — particularly the needs and preferences of individual taxpayers.  Note that about 45 percent of individual taxpayers have income at or below 250 percent of the Federal Poverty Level and thus are considered by Congress as unable to afford professional representation in tax disputes.[6]  Keep this in mind as I describe the reality of tax administration for the masses of individual and small business/self-employed taxpayers.

During FY 2015, the IRS received over 100 million phone calls from taxpayers or their representatives.[7]  Here is a snapshot of what they experienced:

**FIGURE 2, IRS Telephone Performance on Accounts Management and Select Lines**[8]

| Phone Line | Level of Service | Average Speed of Answer (minutes) |
|---|---|---|
| Accounts Management | 38.1% | 30.5 |
| Taxpayer Protection Unit | 24.6% | 29.6 |
| Installment Agreements/Balance Due | 37.0% | 34.8 |
| NTA Toll-Free | 43.7% | 16.2 |
| Practitioner Priority Service | 47.6% | 46.6 |

The "Level of Service" (or LOS) refers to the percentage of calls the IRS answers among all calls routed to customer service representatives.  On all Accounts Management telephone lines combined, the IRS answered only about 38 percent of its calls — meaning about 62 percent of calls simply didn't get through.  The 38 percent of taxpayers who spoke with an assistor waited on hold an average of over 30 minutes before reaching a representative.  But there was considerable variation among the IRS's dozens of phone lines, as Figure 2 indicates.

---

5   Congressional Budget Office, *The Budget and Economic Outlook 2012-2025*, 95; IRS FY 2016 Budget in Brief.

6   IRS Compliance Data Warehouse (CDW), Individual Returns Transaction File (Tax Year 2014).  Internal Revenue Code (IRC) § 7526 provides that taxpayers with incomes at or below 250 percent of the Federal Poverty Level who are in controversies with the IRS are eligible for *pro bono* or nominal fee assistance from Low Income Taxpayer Clinics.

7   IRS, Joint Operations Center (JOC), *Snapshot Reports: Enterprise Snapshot, IRS Enterprise Total* (Sept. 30, 2015).

8   IRS, JOC, *Snapshot Reports: Product Line Detail* (Sept. 30, 2015).

As we have described in this year's Most Serious Problems about revenue protection and identity theft,[9] IRS fraud detection filters in FY 2015 had false positive rates ranging from 30 to 37 percent.  In the Taxpayer Protection Program (TPP), IRS filters suspend return processing  when they identify a risk of identity theft.  To verify one's identity and continue return processing, a taxpayer can either call the IRS or try to authenticate online.  The IRS detected and stopped approximately 4.8 million suspicious tax returns from January 1 through November 30, 2015.  Well over 40 percent of these suspended returns are a result of the TPP, which had a false positive rate of 36.2 percent for this same timeframe.  (This false positive rate is up from 19.8 percent for calendar year 2014).[10]  All of these legitimate taxpayers were desperately attempting to free up their refunds, yet at one point during the filing season the level of service on the TPP line was below ten percent for three consecutive weeks — meaning more than 90 percent of the calls were not answered![11]  At another point the wait time was 60 minutes.[12]  By the end of the fiscal year, the service levels were somewhat improved but still abysmal — 24.6 percent LOS and a 29.6 minute wait time.

Taxpayers who filed a balance due return and attempted to call the IRS during 2015 to make payment arrangements faced another daunting task.  The IRS sends these taxpayers a series of notices that list a phone number to call; this is the same phone line a taxpayer selects to make payment arrangements if he or she calls the main toll-free "1040" number.  Yet in FY 2015, the LOS on that line was 37.0 percent, and the average speed of answer (ASA) was 34.8 minutes.  That is, *almost two-thirds* of these calls went unanswered.  Now, these are taxpayers who owe the federal government money.  They are calling to pay their taxes, or they are calling to tell the IRS they can't pay their taxes because they are experiencing economic hardship.  Yet the IRS isn't able to pick up the phone to talk to them!

What happens to these taxpayers when the IRS doesn't pick up the phone?  Well, after a certain period of time, the taxpayer's account is moved to the Automated Collection System (ACS), which, true to its name, searches out lien and levy sources so it can *automatically* file a Notice of Federal Tax Lien against the taxpayer's property or levy upon the taxpayer's bank account or wages.  The IRS doesn't know the taxpayer has been trying to call it.  Nor does the IRS make any effort to call the taxpayer before it automatically takes enforcement action against the taxpayer.  By the time the taxpayer gets assigned to ACS, the IRS assumes the taxpayer has been unresponsive and is not trying to comply — despite the lousy levels of service on the pre-ACS phone lines.

How do these taxpayers feel when the first contact they actually have with the IRS is a lien filing or a levy on their wages?  How will they behave with respect to their tax obligations in the future?  What message is the IRS sending when it doesn't engage with the taxpayer and then takes an enforcement action?  These are not theoretical questions.  They go to the heart of the relationship the taxpayer has with his or her government (as represented by the IRS), and they have everything to do with the degree to which a taxpayer is willing to comply with the tax laws.

---

9   *See* Most Serious Problem: *Revenue Protection: Hundreds of Thousands of Taxpayers File Legitimate Tax Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's Pre-Refund Wage Verification Program, infra*; Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, infra*.

10   IRS, *Global Identity Theft Report* (Nov. 2015).

11   IRS, JOC, *FY 2015 Weekly TPP Snapshot* (weeks ending Feb. 28, 2015 [9.7 percent], Mar. 7, 2015 [7.6 percent], and Mar. 14, 2015 [9.8 percent]).

12   IRS, JOC, *FY 2015 Weekly TPP Snapshot* (week ending Feb.28, 2015).

Before I discuss taxpayer or tax morale,[13] consider these data points.  Ninety-eight percent of all tax revenue collected by the IRS is paid voluntarily.  Less than two percent is collected through direct enforcement action.[14]  If the IRS were to collect ten percent less in enforcement revenue, tax revenue would drop by less than $6 billion.  But if voluntary payments were to decrease by ten percent, tax revenue would drop by more than $280 billion.[15]  In light of this data, just where should we be putting our attention and our resources?

## A Discussion of First Principles: What Is Taxation About?

Simply put, taxation involves taking money from one person and applying that taking to the greater good of many, if not all.  That is an extraordinary thing to ask of people.  A tax system depends on taxpayers being willing to offer up their hard-earned or saved dollars and let their money be applied to everyone's — or someone else's — benefit.

So the central question in tax administration is: How do we promote that willingness?  What does the tax administrator need to do to maintain and expand taxpayers' willingness to pay their taxes?  Stated another way, how should the tax administrator behave so it doesn't undermine or lose taxpayers' willingness to comply with the tax laws?  The answers to these questions should drive both the current and future state of the IRS.

## The Dynamics Between Power and Trust, Taxpayer and the Tax Agency

When we talk about taxpayers' willingness to comply, we really have to consider the relationship between the taxpayer and the government.  This essentially involves an analysis of the dynamics between power and trust.  Specifically, the government — and by extension, the tax agency — holds the awesome power of the state.  For the tax system to work, the taxpayer has to trust that the government will use its power wisely and legitimately.  If it does, taxpayers will be more willing to comply with the tax laws and meet their tax obligations.[16]

Power can be either coercive or legitimate.[17]  Trust can be reason-based or learned.  The dynamics between the type of power and the type of trust define and influence the climate of government-taxpayer interaction.  We can have an antagonistic environment, or one that is service-oriented, or one that is cooperative.  These climates of interaction define the kind of compliance we can achieve.  In an antagonistic environment, you will have enforced compliance — which is very expensive, and often involves the use of both

---

13   "Tax Morale" is the "collective name for all the non-rational factors and motivations — such as social norms, personal values and various cognitive processes — that strongly affect an individual's voluntary compliance with laws."  National Taxpayer Advocate 2007 Annual Report to Congress vol. 2, 139  (Marjorie E. Kornhauser, *Normative and Cognitive Aspects of Tax Compliance: Literature Review and Recommendations for the IRS Regarding Individual Taxpayers*).

14   In FY 2015, the IRS collected total tax revenue of about $3.3 trillion and refunded about $400 billion.  Only $54.2 billion (about 1.9 percent) is classified as "Enforcement Revenue." Government Accountability Office (GAO), GAO-16-146, *Financial Audit: IRS's Fiscal Years 2015 and 2014 Financial Statements* 25 (Nov. 2015), *available at* www.gao.gov/assets/680/673614.pdf.

15   About $3.3 trillion in gross revenue collections less refunds of $403 billion and less enforcement revenue of $54.2 billion comes to about $2.84 trillion in net taxes voluntarily paid.  Ten percent of $2.84 trillion is more than $280 billion.  By contrast, ten percent of IRS enforcement revenue is only slightly greater than $5.4 billion.  *See* GAO, GAO-16-146, *Financial Audit: IRS's Fiscal Years 2015 and 2014 Financial Statements* 25 (Nov. 2015).

16   *See* Tom R. Tyler, *Why People Obey the Law* (Princeton, Princeton University Press) 2006.  For a more recent exploration of the role of procedural justice in shaping perceptions of legitimacy of law enforcement agencies and actions, see Tom R. Tyler, Phillip Atiba Goff & Robert J. MacCoun, *The Impact of Psychological Science on Policing in the United States: Procedural Justice, Legitimacy, and Effective Law Enforcement*, Psychological Science in the Public Interest, Vol. 16(3), 75-109 (2015).

17   For a detailed analysis of the dynamic between power, trust, and the compliance environment, see Katharina Gangl, Eva Hofmann & Erich Kirchler, *Tax Authorities' Interaction with Taxpayers: A Conception of Compliance in Social Dilemmas by Power and Trust*, New Ideas in Psychology 37, 13-23 (2015).  *See also* Erich Kirchler, *The Economic Psychology of Tax Behaviour* (Cambridge, Cambridge University Press) (2007).

001401

coercive and legitimate power, but very little trust.  In a service-oriented environment, you will have voluntary compliance — but it is still a choice by the taxpayer; the taxpayer is learning that the government can be trusted to apply its power legitimately.  The holy grail for tax administration is a cooperative environment of committed compliance — where compliance has become a way of life.  The taxpayer trusts and expects the government will use its power appropriately and wisely (legitimately) and thus is willing to come forward when he or she makes mistakes, knowing that the government will listen and engage with the taxpayer.[18]  The taxpayer, in turn, is willing to make the personal sacrifice of paying taxes for the greater good.

### The IRS Is Increasingly a Pay-to-Play System, Which Erodes Trust in the Tax System

Reading between the lines of the IRS future state vision, the IRS appears to replace traditional IRS employee-to-taxpayer interaction with online and third-party interactions.  That is, the vision essentially eliminates IRS-taxpayer personal interaction except in the context of enforcement actions.  Now, I understand that virtually all taxpayers would love to live their lives without *any* interaction with the IRS.  But as I noted earlier, tens of millions of taxpayers need to contact and interact with the IRS every year.  Over nine million taxpayers receive post-refund notices and experience refund delays every year.[19]  The issues underlying those interactions are vitally important to each of those taxpayers — and the resolution of those contacts could literally impact the livelihood or survival of a person or a business.[20]

In the IRS future state, if a taxpayer wants to talk with the IRS about his concerns, he will be pretty much out of luck.  He will be directed first to a website or an online account, the outlines of which are very vague and the creation of which may undermine significant taxpayer protections.[21]  The online account will not provide for the kind of discussion necessary to ensure the IRS understands the details of the taxpayer's circumstances, or whether the taxpayer understands what the IRS is telling him or her.

---

18   This is why the Taxpayer Bill of Rights, adopted by the IRS in 2014 and codified on December 18, 2015, by the Consolidated Appropriations Act, 2016, includes the *right to challenge the IRS's position and be heard*.  It is not enough for the taxpayer to have the right to challenge the IRS; the IRS must also *listen* to the taxpayer and *hear* his complaint.

19   For a breakdown of these notices, see Most Serious Problem: *Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet, infra.*

20   In the Most Serious Problems section of this Annual Report, we have provided numerous examples of the harm that can befall taxpayers if they are unable to make personal contact with the IRS.  *See, e.g.,* Most Serious Problems: *Practitioner Services: Reductions in the Practitioner Priority Service Phone Line Staffing and Other Services Burden Practitioners and the IRS, infra; Revenue Protection: Hundreds of Thousands of Taxpayers File Legitimate Tax Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's Pre-Refund Wage Verification Program, infra; Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, infra; Automated Substitute for Return (ASFR) Program: Current Selection Criteria for Cases in the ASFR Program Create Rework and Impose Undue Taxpayer Burden, infra; International Taxpayer Service: The IRS's Strategy for Service on Demand Fails to Compensate for the Closure of International Tax Attaché Offices and Does Not Sufficiently Address the Unique Needs of International Taxpayers, infra; Individual Taxpayer Identification Numbers (ITINs): IRS Processes Create Barriers to Filing and Paying for Taxpayers Who Cannot Obtain Social Security Numbers, infra; Earned Income Tax Credit (EITC): The IRS Does Not Do Enough Taxpayer Education in the Pre-Filing Environment to Improve EITC Compliance and Should Establish a Telephone Helpline Dedicated to Answering Pre-filing Questions From Low Income Taxpayers About Their EITC Eligibility, infra; Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance, infra.*

21   For a detailed discussion about individual and tax professional access to online accounts, *see* Most Serious Problem: *Taxpayer Access to Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues That Are Not Conducive to Resolution Online, infra;* and Most Serious Problem: *Preparer Access to Online Accounts: Granting Uncredentialed Preparers Access to an Online Taxpayer Account System Could Create Security Risks and Harm Taxpayers, infra.* For a discussion of our concerns about "self-service" and "just-in-time" options, see National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical As the IRS Develops a Real-Time Tax System*).

> When you add on the additional burden of paying "user fees" for actions and services that are rightly considered core duties and responsibilities of tax administration officials, the financial burden and consequence of pay-to-play becomes even greater.  Fundamental rights are now up for sale.

Alternatively, the taxpayer will have to pay a tax professional or purchase a tax software add-on for services the taxpayer previously received for free from the government in exchange for his willingness to cooperate and comply with the tax laws.

What is being lost in this vision of the future is the interest in and relationship with actual taxpayers — a dialogue with taxpayers.  The IRS is designing its system so it can deal with taxpayers *en masse*.  I understand how budget and workload constraints could drive the IRS to adopt this approach.  In fact, the IRS performs "mass processing" responsibilities well — it will likely have processed about 150 million individual income tax returns, almost 11 million business entity returns, and over 2.1 billion information returns last year.[22]  But *taxpayers* are not returns — they are *people* (or businesses run by people).  If the *taxpayer* has a problem or needs some particular information, that's where the system (and the vision) breaks down.  That taxpayer in the future will have to undertake "self-service" or obtain "for-fee" third-party assistance.

This approach transforms our tax system into a pay-to-play system.  Those who are sophisticated enough to understand their tax problem or their tax needs and can navigate the self-help options well enough to protect their rights will be able to do so.  Those who have the ability to pay a third party to navigate the IRS and protect their rights will do so.  But for those who have neither the expertise, the time, nor the resources to navigate these options — they will be up a creek.  They will make mistakes with self-help; they will agree to assessments and adjustments they never should; and they will forfeit significant due process protections like the right to go to the United States Tax Court or have a Collection Due Process hearing — all because they can't talk with an IRS employee about their situation or because they can't afford to pay someone to help them.  This creates a two-class tax system — those who can pay and those who can't.  It undermines the fundamental *right to a fair and just tax system*.  When you add on the additional burden of paying "user fees" for actions and services that are rightly considered core duties and responsibilities of tax administration officials, the financial burden and consequence of pay-to-play becomes even greater.  Fundamental rights are now up for sale.[23]

### An Online Account Will Be Helpful But Comes With Significant Risks and Is No Replacement for Person-to-Person Interaction

I am fully in support of robust online services.  Since 2009, I have been calling for the IRS to create online taxpayer accounts with full information about a taxpayer's tax returns, with the ability to export W-2 and 1099 information to software programs, check on the status of return and refund processing, correspondence, and other account transactions, and receive electronic acknowledgements.  I also support Circular 230 tax professionals' and preparers' access to those accounts, with proper taxpayer authorization and so long as the taxpayer is informed of his right to receive, electronically or otherwise, notification of every online transaction made on his or her behalf.  A well-designed taxpayer account will send due date notifications and updates on relevant current guidance.  It will give taxpayers and their representatives the

---

22   IRS Pub. 6187, *Calendar Year Projections of Returns by Major Processing Category* (Fall 2015); IRS Pub. 6292, *Fiscal Year Return Projections for the United States 2015-2022* (Fall 2015); IRS Pub. 6961, *Calendar Year Projections of Withholding and Information Return Documents for the United States and IRS Campuses* (2015 Update).
23   *See Most Serious Problem: IRS User Fees: The IRS May Adopt User Fees to Fill Funding Gaps Without Fully Considering Taxpayer Burden and the Impact on Voluntary Compliance, infra.*

ability to communicate by email, to schedule appointments for phone conferences with the IRS, and to conduct virtual face-to-face conferences via computer.

But when you expand that access to unregulated preparers or to other third parties, I have significant concerns. We already see the problems in this population of preparers relating to the Earned Income Tax Credit (EITC),[24] where certain unregulated, untrained preparers prey on vulnerable taxpayers.[25] Why would we want to give these preparers even more access to taxpayer information? And yet, if we don't provide these preparers access to taxpayer accounts, it is very likely the tens of millions of taxpayers who use these preparers won't be able or won't want to utilize their own online accounts, thereby carving a big hole in the IRS's online strategy. Thus, through its single-minded emphasis on online accounts, the IRS creates a situation where it will face enormous pressure to open up taxpayer account access to all unregulated return preparers.

Moreover, not every activity can or should be done online. Many things relating to tax require a conversation. People want to talk about the things that matter to them. And few things matter more to people than talking about what is going to happen to their money.

### Less Secrecy and More Transparency: The IRS Needs to Start Its Future State Visions Now by Engaging With Taxpayers About Its Proposals and Plans

What is driving the IRS to think this way and go down this path of a two-class tax system? To some extent, the IRS is a victim of its own apparent efficiency at moving masses of data and work, as evidenced by the fact that Congress has continued to hand it major new programs to administer including the Patient Protection and Affordable Care Act (ACA)[26] and the Foreign Account Tax Compliance Act (FATCA).[27] After five years of overall budget decreases, the IRS FY 2016 budget provides for much needed increases in taxpayer service funding, but it still leaves the IRS budget almost 19 percent below its FY 2010 funding level in inflation-adjusted terms,[28] and it does not even begin to account for the additional costs the IRS incurred to implement the ACA and FATCA.

In this environment of more work and inadequate funding, it is easy to bash the IRS. This bashing, in turn, can produce a bunker mentality in the IRS that makes it wary of sharing things with the public until

---

24   See IRC § 32.

25   See Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, infra.*

26   Pub. L. No. 111-148, 124 Stat. 119 (2010). For detailed discussion of current issues in ACA administration, *see* Most Serious Problem: *Affordable Care Act (ACA) – Business: The IRS Faces Challenges in Implementing the Employer Provisions of the ACA While Protecting Taxpayer Rights and Minimizing Burden, infra*; Most Serious Problem: *Affordable Care Act – Individuals: The IRS Is Compromising Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions, infra*: Legislative Recommendation: *Affordable Care Act Information Reporting: Allow Taxpayer Identification Number Matching for Filers of Information Returns Under IRC §§ 6055 and 6056, infra.*

27   Pub. L. No. 111-147, Title V, Subtitle A, 124 Stat. 71, 97 (2010). For detailed discussion of our concerns regarding IRS FATCA implementation, *see* Most Serious Problem: *International Taxpayer Service: The IRS's Strategy for Service on Demand Fails to Compensate for the Closure of International Tax Attaché Offices and Does Not Sufficiently Address the Unique Needs of International Taxpayers, infra*; Legislative Recommendation: *Foreign Account Reporting: Eliminate Duplicative Reporting of Certain Foreign Financial Assets and Adopt a Same-Country Exception for Reporting Financial Assets Held in the Country in which a U.S. Taxpayer Is a Bona Fide Resident, infra*; Legislative Recommendation: *Chapter 3 and Chapter 4 Credits and Refunds: Protect Taxpayer Rights by Aligning the Rules Governing Credits and Refunds for Domestic and International Withholding, infra.*

28   In FY 2010, the agency's appropriated budget stood at $12.1 billion. In FY 2016, its budget was set at $11.2 billion, a reduction of nearly eight percent over the six-year period. Inflation over the same period is estimated at nearly 11 percent. *See* Office of Management and Budget, *Fiscal Year 2016 Budget of the U.S. Government, Historical Tables*, Table 10.1 (showing Gross Domestic Product (GDP) and year-to-year increases in the GDP), *available at* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/hist.pdf.

they are absolutely finalized.[29]  But that means the IRS will almost certainly miss things and get things wrong, precisely because it hasn't engaged the public and floated proposals publicly before they become set in stone.[30]

> This bashing, in turn, can produce a bunker mentality in the IRS that makes it wary of sharing things with the public until they are absolutely finalized.  But that means the IRS will almost certainly miss things and get things wrong, precisely because it hasn't engaged the public and floated proposals publicly before they become set in stone.

For any vision of the future to work, the IRS needs to engage taxpayers in the process.  Taxpayers, in turn, need to speak up, get engaged, and hold the IRS accountable for responding to their needs.  They need to contact their representatives in Congress and explain to them in real terms what it is like to interact with the IRS — the good and the bad.  Tax professionals need to insist on a dialogue with the tax agency and push, push, push for greater transparency.  They need to explain to their elected representatives why the current trajectory in tax administration is bad for tax compliance and just what it means for the representatives' constituents.  Most importantly, Congress needs to assert its oversight authority and insist that the IRS come now, sooner not later, to explain the specifics of its future state vision.  And those same hearings should include representatives of taxpayer segments as well as tax professionals.  It is important that these hearings be kept separate from the hearings Congress has conducted in recent years on actual or perceived IRS shortcomings.  Developing a consensus about the future state vision for our nation's tax system requires a single-minded focus on assessing the objectives of the tax system, what taxpayers need to comply with their tax obligations, and how to balance competing objectives.  Finally, I believe the IRS should put its plan for the future out to the public for notice and comment.

Now, here is what I am going to do in 2016 to further the discussion of the IRS future state vision and to ensure that U.S. taxpayers have a voice in the process.  I will be going around the country and holding public hearings on this topic.  I will invite members of Congress and representatives of different taxpayer populations and stakeholders to join me so we can consider diverse viewpoints, and gather suggestions and descriptions of taxpayers' needs.

I am also going to highlight why taxpayers should care about what kind of IRS we have.  There is no other federal agency that interacts as often with United States citizens and residents (and increasingly, non-residents).  It is in taxpayers' best interests that they speak up about what kind and manner of assistance they need from the tax agency.

---

29  Indeed, as we obtained information from the IRS to produce this Annual Report to Congress, the IRS has asserted that numerous data points and documents we intended to include in the report are "official use only" and may not be made public.  Never before has the IRS made this assertion in so many instances, and never before have we ultimately failed to come to agreement on some disputed items.  To avoid the risk my staff or I could be subject to disciplinary action for unauthorized disclosure, we have been forced to redact portions of text in some sections, and we have omitted relevant information in others.  *See, e.g.*, Most Serious Problem: *IRS User Fees: The IRS May Adopt User Fees to Fill Funding Gaps Without Fully Considering Taxpayer Burden and the Impact on Voluntary Compliance, infra*; Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, infra*.

30  One area in which the IRS is sharing its vision of the future is its plans to reorganize the Large Business & International (LB&I) Operating Division.  Senior IRS officials have discussed and shared materials about the reorganization at several practitioner meanings in recent months.  While this is to be commended, I note that LB&I caters to the part of the taxpayer population that can "pay to play" and expects (and receives) concierge-level service.  No such plans have been shared about the IRS future state plans for the approximately 150 million individual taxpayers, much less the approximately 54 million small business taxpayers.

001405

## Conclusion

Every day, the IRS faces the daunting task of juggling an increasing and diverse workload involving both revenue collection and benefits payments, with the relentless demands of doing everything in as cost-efficient a manner possible.  But for the IRS to do its job well, it must start from the perspective of what government is about — namely, it is of the people, by the people, and for the people.  The government is funded by taxes paid by the people.  Therefore, the future state vision of the IRS needs to be designed around the needs of the people.  If it is, it will be effective and efficient.  Most importantly, it will be trusted by the people.  As always, I look forward to working with Congress and the IRS to make this so.

Respectfully submitted,

Nina E. Olson
National Taxpayer Advocate
31 December 2015

# TAXPAYER RIGHTS ASSESSMENT: IRS Performance Measures and Data Relating to Taxpayer Rights

In the 2013 Annual Report to Congress, the National Taxpayer Advocate proposed a "report card" of measures that "...provide a good indication whether the IRS is treating U.S. taxpayers well and furthering voluntary compliance."[1]

On June 10, 2014, the IRS adopted a Taxpayer Bill of Rights (TBOR), a list of ten rights that the National Taxpayer Advocate recommended to help taxpayers and IRS employees alike gain a better understanding of the dozens of discrete taxpayer rights scattered throughout the multi-million word Internal Revenue Code.[2] While this was a significant achievement for increasing taxpayers' awareness of their rights, and an important first step toward integrating taxpayer rights into all aspects of tax administration, more can be done. The *Taxpayer Rights Assessment* contains selected performance measures and data organized by the ten taxpayer rights and is one step integrating taxpayer rights into tax administration.

This *Taxpayer Rights Assessment* is a work in progress. The following data provide insights into IRS performance; however, they are by no means comprehensive. In some instances, data is not readily available. In other instances we may not yet have sufficient measures in place to address specific taxpayer rights. And, despite what the numbers may show, we must be concerned for those taxpayers who still lack access to services and quality service even when performance metrics are increasing. This *Taxpayer Rights Assessment* will grow and evolve over time as data becomes available and new concerns emerge.

**1. THE RIGHT TO BE INFORMED** – Taxpayers have the right to know what they need to do to comply with the tax laws. They are entitled to clear explanations of the laws and IRS procedures in all tax forms, instructions, publications, notices, and correspondence. They have the right to be informed of IRS decisions about their tax accounts and to receive clear explanations of the outcomes.

| Measure/Indicator | Fiscal Year (FY) 2014 | FY 2015 |
|---|---|---|
| Individual Correspondence Volume (adjustments) [a] | 5,700,132 | 4,957,442 |
| Average cycle time to work Individual Master File (IMF) Correspondence (non-Identity Theft) [b] | 80 days | 80 days |
| Inventory Overage (non-Identity Theft) [c] | 67.0% | 60.5% |
| Average cycle time to work IMF Correspondence (Identity Theft) [d] | 106 days | 80 days |
| Inventory Overage (Identity Theft) [e] | 4.0% | 0.7% |
| Business Correspondence Volume (adjustments) [f] | 3,471,571 | 2,952,329 |
| Average cycle time to work BMF Correspondence [g] | 54 days | 46 days |
| Inventory Overage [h] | 17.5% | 17.3% |
| Total Correspondence (all types) | TBD | TBD |
| Quality of IRS Forms & Publications | TBD | TBD |
| IRS.gov Web Page Ease of Use | TBD | TBD |
| IRS Outreach | TBD | TBD |

---

1    See National Taxpayer Advocate 2013 Annual Report to Congress xvii-xviii (Preface: *Taxpayer Service Is Not an Isolated Function But Must Be Incorporated Throughout All IRS Activities, Including Enforcement*).

2    IRS, IR-2014-72, *IRS Adopts "Taxpayer Bill of Rights;" 10 Provisions to Be Highlighted on irs.gov, in Publication 1* (June 10, 2014).

001407

a  IRS, Joint Operations Center (JOC), *Adjustments Inventory Reports: July-September Fiscal Year Comparison* (FY 2014 - FY 2015).  These data on correspondence are also repeated under Right 4 – *The Right to Challenge the IRS's Position and Be Heard*.

b  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures.  This new metric reflects the average number of days the IRS actually took to work correspondence.

c  IRS, *Weekly Enterprise Adjustments Inventory Report*, FY 2014 (week ending Sept. 27, 2014); IRS, *Weekly Enterprise Adjustments Inventory Report*, FY 2015 (week ending Sept. 26, 2015).  Beginning in FY 2015, the IRS began to report separate figures for Identity Theft correspondence.  The figure we reported in the 2014 Annual Report to Congress for IMF correspondence overall was 63.6 percent.

d  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures.  This new metric reflects the average number of days the IRS actually took to work correspondence.

e  IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2014* (week ending Sept. 27, 2014); IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2015* (week ending Sept. 26, 2015).  Beginning in FY 2015, the IRS began to report separate figures for Identity Theft correspondence.  The figure we reported in the 2014 Annual Report to Congress for IMF correspondence overall was 63.6 percent.

f  IRS, JOC, *Adjustments Inventory Reports: July-September Fiscal Year Comparison* (FY 2014 - FY 2015).

g  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures.  This new metric reflects the average number of days the IRS actually took to work correspondence.

h  IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2014* (week ending Sept. 27, 2014); IRS, Weekly Enterprise Adjustments Inventory Report, FY 2015 (week ending Sept. 26, 2015).

## 2.  THE RIGHT TO QUALITY SERVICE – Taxpayers have the right to receive prompt, courteous, and professional assistance in their dealings with the IRS, to be spoken to in a way they can easily understand, to receive clear and easily understandable communications from the IRS, and to speak to a supervisor about inadequate service.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Number of Returns Filed (projected, all types) [a] | 242,404,425 | 246,523,200 |
| Total Individual Income Tax Returns [b] | 147,444,789 | 149,288,400 |
| E-file Receipts (Received by 11/21/14, 11/20/15) [c] | 125,821,000 | 128,784,000 |
|     E-file: Tax Professional [d] | 62% | 61% |
|     E-file: Self Prepared [e] | 38% | 39% |
| **Returns Prepared by:** | | |
|     VITA/TCE/AARP [f] | 3,322,582 | 3,519,006 |
|     Free File Consortium [g] | 2,406,465 | 2,588,934 |
|     Fillable Forms [h] | 478,501 | 355,080 |
|     IRS Taxpayer Assistance Centers (TACs) [i] | 376 | 366 |
| Number of Taxpayer Assistance ("Walk-In") Centers [j] | 382 | 380 |
| Number of TAC Contacts [k] | 5,477,291 | 5,643,772 |
| Total Calls to IRS [l] | 100,667,411 | 116,679,405 |
|     Number of Attempted Calls to IRS Customer Service Lines [m] | 86,171,857 | 101,507,150 |
|     Toll Free: Percentage of calls answered [n] (LOS) | 64.4% | 38.1% |
|     Toll Free: Average Speed of Answer [o] | 19.6 minutes | 30.5 minutes |
|     NTA Toll Free: Percentage of calls answered (LOS) | 68.9% | 43.7% |
|     NTA Toll Free: Average Speed of Answer [p] | 7.0 minutes | 16.2 minutes |
|     Practitioner Priority: Percentage of calls answered (LOS) | 70.4% | 47.6% |
|     Practitioner Priority: Average Speed of Answer [q] | 27.4 minutes | 46.6 minutes |
|     Tax Exempt/Government Entities Percentage of calls answered [r] (LOS) | 67.6% | 60.2% |
|     Tax Exempt/Government Entities: Average Speed of Answer [s] | 18.7 minutes | 23.4 minutes |
| Toll Free Customer Satisfaction [t] | 89.0% | 87.0% |
| Awareness of Service (or utilization) | TBD | TBD |
| IRS Issue Resolution – Percentage of taxpayers who had their issue resolved as a result of the service they received | TBD | TBD |
| Taxpayer Issue Resolution – Percentage of taxpayers who reported their issue was resolved after receiving service | TBD | TBD |

a  IRS Pub. 6292, *Fiscal Year Return Projections for the United States 2015-2022* (June 2015), at 4.  The FY 2014 figure is actual and is updated from the figure reported in the 2014 Annual Report to Congress.  The number of returns and related metrics are proxies for IRS workload and provide context for the environment in which taxpayers seek Quality Service and other rights.
b  IRS Pub. 6292, *Fiscal Year Return Projections for the United States 2015-2022* (June 2015), at 4.  The FY 2014 figure is actual, and is updated from the figure reported in the 2014 Annual Report to Congress.
c  IRS, Filing Season Statistics, available at https://www.irs.gov/uac/Newsroom/Filing-Season-Statistics-for-Week-Ending-November-20-2015 (last visited Dec. 5, 2015).
d  *Id.*
e  *Id.*
f  IRS, Compliance Data Warehouse, Electronic Tax Administration Marketing Database.  We used Tax Year 2013 (returns filed in FY 2014) for the FY 2014 data point and Tax Year 2014 (returns filed in FY 2015) for the FY 2015 data point.  Free, in-person return preparation is offered to low income and older taxpayers by non-IRS organizations through the Volunteer Income Tax Assistance (VITA), Tax Counseling for the Elderly, and AARP Tax-Aide programs.
g  *Id.*
h  *Id.*
i  IRS, E-File Reports, *Field Assistance Report, Current Year Accepted* (Jan. – Dec. 2015).
j  Information received from Senior Advisor, Wage and Investment Division (W&I) (Dec. 23, 2104).  Three hundred eighty-nine Taxpayer Assistance Centers were open during the filing season, and 382 were open at the end of the fiscal year.  FY 2015 data from Selected Taxpayer Assistance Centers Were Professional and Organized, and Sensitive Information and Equipment Were Properly Secured, TIGTA 2016-IE-R001 (Oct. 2, 2015)
k  W&I, Business Performance Review (BPR), 4th Quarter, FY 2015 (Nov. 2, 2015) at 7.  The 2014 figure is updated from the figure reported in the 2014 Annual Report to Congress.
l  IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2015; report generated Dec. 19, 2015).
m  IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2014; report generated Dec. 19, 2015).  Number of calls to Accounts Management (formerly Customer Services, now Accounts Management) - Sum of 30 lines (0217, 1040, 4933, 1954, 0115, 8374, 0922, 0582, 5227, 1778, 9887, 9982, 2942, 4184, 7388, 0452, 0352, 7451, 9946, 5215, 3536, 2050, 4017, 2060, 4778, 4259, 8482, 8775, 5500 and 4490).  The IRS determines its level of service based on calls to Accounts Management, not total calls.
n  IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2014; report generated Oct. 16, 2014).  Calls answered include reaching live assistor or selecting options to hear automated information messages.
o  *Id.*
p  *Id.*
q  *Id.*
r  *Id.*
s  *Id.*
t  W&I, BPR, 4th Quarter, FY 2015 (Nov. 2, 2015), at 13.

### 3.  THE RIGHT TO PAY NO MORE THAN THE CORRECT AMOUNT OF TAX – Taxpayers have the right to pay only the amount of tax legally due, including interest and penalties, and to have the IRS apply all tax payments properly.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Toll-Free Tax Law Accuracy [a] | 95.0% | 95.0% |
| Toll-Free Accounts Accuracy [b] | 96.2% | 95.5% |
| Scope of Tax Law Questions Answered | TBD | TBD |
| **Correspondence Examinations (Form 1040 Series)** | | |
| No change rate [c] | 17.3% | 17.3% |
| Agreed rate [d] | 17.2% | 16.3% |
| Non-response rate [e] | 44.4% | 48.3% |
| Percentage of cases appealed | TBD | TBD |
| **Field Examinations (Form 1040 Series)** | | |
| No change rate [f] | 15.5% | 15.3% |
| Agreed rate [g] | 46.6% | 45.7% |
| Non-response rate [h] | 0.3% | 0.3% |
| Percentage of cases appealed | TBD | TBD |

| Office Examinations | | |
|---|---|---|
| No change rate [i] | 13.7% | 13.5% |
| Agreed rate [j] | 45.0% | 44.7% |
| Non-response rate [k] | 19.0% | 19.8% |
| Percentage of cases appealed | TBD | TBD |
| Math Error Adjustments | TBD | TBD |
| Math Error Abatements | TBD | TBD |
| Number of Statutory Notices of Deficiency Issued | TBD | TBD |
| Number of Statutory Notices of Deficiency Appealed | TBD | TBD |
| Number of Collection Appeals Program Conferences | TBD | TBD |
| Number of Collection Appeals Program Conferences Reversing IRS position | TBD | TBD |
| Number of Collection Due Process Conferences | TBD | TBD |
| Number of Collection Due Process Conferences Reversing IRS position | TBD | TBD |

a   W&I, BPR, 4th Quarter, FY 2015 (Nov. 2, 2015), at 4.
b   *Id.*
c   IRS, Audit Information Management System, Closed Case Database.
d   *Id.*
e   *Id.*
f   *Id.*
g   *Id.*
h   *Id.*
i   *Id.*
j   *Id.*
k   *Id.*

**4.   THE RIGHT TO CHALLENGE THE IRS'S POSITION AND BE HEARD** – Taxpayers have the right to raise objections and provide additional documentation in response to formal IRS actions or proposed actions, to expect that the IRS will consider their timely objections and documentation promptly and fairly, and to receive a response if the IRS does not agree with their position.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Individual Correspondence Volume (adjustments) [a] | 5,700,132 | 4,957,442 |
| Average cycle time to work Individual Master File (IMF) Correspondence (non-Identity Theft) [b] | 80 days | 80 days |
| Inventory Overage (non-Identity Theft) [c] | 67.0% | 60.5% |
| Average cycle time to work IMF Correspondence (Identity Theft) [d] | 106 days | 80 days |
| Inventory Overage (Identity Theft) [e] | 4.0% | 0.7% |
| Business Correspondence Volume (adjustments) [f] | 3,471,571 | 2,952,329 |
| Average cycle time to work BMF Correspondence [g] | 54 days | 46 days |
| Inventory Overage [h] | 17.5% | 17.3% |
| Percentage of Math Error Adjustments Abated | TBD | TBD |
| Percentage of Statutory Notices of Deficiency Appealed to Tax Court | TBD | TBD |
| Number of Collection Appeal Program Conferences Requested by Taxpayers [i] | TBD | TBD |
| Percentage of CAP Conferences that Reversed the IRS Position | TBD | TBD |
| Number of Collection Due Process Hearings Requested by Taxpayers | TBD | TBD |
| Percentage of Collection Due Process Hearings that Reversed the IRS Position | TBD | TBD |

001410

a  IRS, Joint Operations Center (JOC), *Adjustments Inventory Reports: July-September Fiscal Year Comparison* (FY 2014 - FY 2015).  These data on correspondence are also listed under Right 1 - *The Right to Be Informed.*

b  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures. This new metric reflects the average number of days the IRS actually took to work correspondence.

c  IRS, *Weekly Enterprise Adjustments Inventory Report*, FY 2014 (week ending Sept. 27, 2015); IRS, *Weekly Enterprise Adjustments Inventory Report*, FY 2015 (week ending Sept. 26, 2015).  Beginning in FY 2015, the IRS began to report separate figures for Identity Theft correspondence.  The figure we reported in the 2014 Annual Report to Congress for IMF correspondence overall was 63.6 percent.

d  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures.  This new metric reflects the average number of days the IRS actually took to work correspondence.

e  IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2014* (week ending Sept. 27, 2014); IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2015* (week ending Sept. 26, 2015).  Beginning in FY 2015, the IRS began to report separate figures for Identity Theft correspondence.  The figure we reported in the 2014 Annual Report to Congress for IMF correspondence overall was 63.6 percent.

f  IRS, JOC, *Adjustments Inventory Reports: July-September Fiscal Year Comparison* (FY 2014 - FY 2015).

g  IRS, JOC, *Adjustments Inventory Reports: CIS Closed Case Cycle Time* (FY 2015).  In the 2014 Annual Report to Congress, we reported a different metric – the Average Days of Inventory – which projects the number of days to work the inventory based on the current rate of closures.  This new metric reflects the average number of days the IRS actually took to work correspondence.

h  IRS, *Weekly Enterprise Adjustments Inventory Report, FY 2014* (week ending Sept. 27, 2014); IRS, Weekly Enterprise Adjustments Inventory Report, FY 2015 (week ending Sept. 26, 2015).

i  Taxpayers may request a Collection Appeals Process review as the result of IRS actions such filing a Notice of Federal Tax Lien, an IRS levy or seizure of property, and termination, rejection, or modification of an installment agreement. *See* IRS Pub. 1660, *Collection Appeal Rights.*

**5.  THE RIGHT TO APPEAL AN IRS DECISION IN AN INDEPENDENT FORUM** – Taxpayers are entitled to a fair and impartial administrative appeal of most IRS decisions, including many penalties, and have the right to receive a written response regarding the Office of Appeals' decision.  Taxpayers generally have the right to take their cases to court.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Number of Cases Appealed [a] | 113,608 | 113,870 |
| Appeals Staffing (On-rolls) [b] | 1,708 | 1,569 |
| Number of States without an Appeals or Settlement Officer [c] | 12 | 11 |
| Customer Satisfaction of service in Appeals [d] | 68% | TBD |
| Average Days in Appeals to Resolution | TBD | TBD |
| Percentage of cases appealed | TBD | TBD |
| Percentage of Statutory Notices of Deficiency Appealed to Tax Court | TBD | TBD |

a  Office of Appeals, BPR, 4th Quarter FY 2015 (Nov. 16, 2015), at 8.

b  Office of Appeals, BPR, 4th Quarter FY 2015 (Nov. 16, 2015), at 10.  The 2014 figure is updated from the figure reported in the 2014 Annual Report to Congress.

c  IRS, Human Resources Reporting Center, *available at* https://persinfo.web.irs.gov/posrpt.htm.  Employee Position (OF8) Listing for weeks ending October 4, 2015, and October 3, 2015.

d  Office of Appeals, BPR, 4th Quarter FY 2015 (Nov. 16, 2015), at 6.

**6.  THE RIGHT TO FINALITY** – Taxpayers have the right to know the maximum amount of time they have to challenge the IRS's position as well as the maximum amount of time the IRS has to audit a particular tax year or collect a tax debt.  Taxpayers have the right to know when the IRS has finished an audit.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Average Days to Complete Correspondence Examination (non-EITC) [a] | 225 days | 231 days |
| Average Days to Complete Correspondence Examination (EITC) [b] | 243 days | 221 days |
| Average Days to Reach Determination on Applications for Exempt Status [c] | 291 days | 83 days |
| Average Days for Exempt Organization Function to Respond to Correspondence [d] | 207 days | 175 days |
| Percentage of calls/letters/issues resolve in a single 2-way communication (single call, single meeting, or single exchange of correspondence) | TBD | TBD |

a   W&I, Business Performance Review, 4th Quarter, FY2015 (Nov. 2, 2015), at 8.
b   *Id.*
c   Tax Exempt and Government Entities (TE/GE), Business Performance Review, 4th Quarter FY 2015 (Dec. 9, 2015), at 17.  The 2014 figure is updated from the figure reported in the 2014 Annual Report to Congress.
d   TE/GE, Business Performance Review, 4th Quarter FY 2015 (Dec. 9, 2015), at 19.  The 2014 figure is updated from the figure reported in the 2014 Annual Report to Congress.

**7.  THE RIGHT TO PRIVACY** – The right to privacy goes to the right to be free from unreasonable searches and seizures and that IRS actions would be no more intrusive than necessary.  Taxpayers have the right to expect that any IRS inquiry, examination, or enforcement action will comply with the law and be no more intrusive than necessary, and will respect all due process rights, including search and seizure protections and will provide, where applicable, a collection due process hearing.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Number (or percentage) of Collection Due Process cases where IRS cited for Abuse of Discretion | TBD | TBD |
| Number of Offers in Compromise Submitted using 'Effective Tax Administration' as Basis | TBD | TBD |
| Percentage of Offers in Compromise Accepted that used 'Effective Tax Administration' as Basis | TBD | TBD |
| Number of cases where taxpayer received repayment of attorney fees as result of final judgment. | TBD | TBD |

**8.  THE RIGHT TO CONFIDENTIALITY** – Taxpayers have the right to expect that any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law.  Taxpayers have the right to expect appropriate action will be taken against employees, return preparers, and others who wrongfully use or disclose taxpayer return information.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Number of Unauthorized Access of Taxpayer Account (UNAX) Violations | TBD | TBD |
| Percentage of UNAX Violations Determined to be Inadvertent | TBD | TBD |
| Percentage of UNAX Violations Determined that Resulted in Discipline or Removal | TBD | TBD |

001412

**9.  THE RIGHT TO RETAIN REPRESENTATION** – Taxpayers have the right to retain an authorized representative of their choice to represent them in their dealings with the IRS.  Taxpayers have the right to seek assistance from a Low Income Taxpayer Clinic if they cannot afford representation.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Percentage of Power of Attorney Requests Overage [a] | 0% | 0% |
| Number of Low Income Taxpayer Clinics Funded [b] | 131 | 132 |
| Funds Appropriated for Low Income Tax Clinics [c] | $10 million | $10.3 million |
| Number of States and other jurisdictions with a Low Income Tax Clinic [d] | 48 | 50 |
| Number of Low Income Tax Clinic Volunteer Hours [e] | 60,229 | 54,164 |

a   IRS, JOC, *Customer Account Services, Accounts Management Paper Inventory Inventory Reports,* weeks ending 9/27/2014 and 9/26/2015.
b   IRS Pub. 5066, *Low Income Tax Clinics Program Report* (Dec. 2014 and Dec. 2015).
c   Consolidated Appropriations Act, Pub. L. No. 113-76, enacted Jan. 17, 2014.
d   Includes states and the District of Columbia that have at least one Low Income Tax Clinic.  IRS Pub. 5066, *Low Income Tax Clinics Report* (Dec. 2014 and Dec. 2015).
e   IRS Pub. 5066, *Low Income Tax Clinics Program Report* (Dec. 2014 and Dec. 2015).

**10.  THE RIGHT TO A FAIR AND JUST TAX SYSTEM** – Taxpayers have the right to expect the tax system to consider facts and circumstances that might affect their underlying liabilities, ability to pay, or ability to provide information timely.  Taxpayers have the right to receive assistance from TAS if they are experiencing financial difficulty or if the IRS has not resolved their tax issues properly and timely through its normal channels.

| Measure/Indicator | FY 2014 | FY 2015 |
|---|---|---|
| Offer in Compromise: Number of Offers Submitted [a] | 67,935 | 66,600 |
| Offer in Compromise: Percentage of Offers Accepted [b] | 41.9% | 42.5% |
| Installment Agreements: Number of Individual & Business IAs [c] | 3,011,636 | 2,986,121 |
| Streamlined Installment Agreements Number of Individual & Business IAs [d] | 2,857,043 | 2,567,623 |
| Installment Agreements (CFf):  Number of Individual & Business IAs [e] | 52,619 | 52,053 |
| Streamlined Installment Agreements (CFf): Number of Individual & Business IAs [f] | 10,680 | 10,679 |
| Number of OICs Accepted per Revenue Officer [g] | 6.7 | 7.4 |
| Number of IAs Accepted per Revenue Officer [h] | 13.1 | 14.0 |
| Percentage of Cases in the Queue (Taxpayers) [i] | 15.6% | 15.7% |
| Percentage of cases in the Queue (Modules) | 25% | 24.7% |
| Percentage of TDAs reported Currently Not Collectible - Tolerance [j] | 18.2% | 16.3% |
| Age of Delinquencies in the Queue [k] | 4.4 years | 4.5 years |
| Percentage of Modules in Queue prior to three tax years ago | 80.2% | 79.2% |
| Percentage of cases where the taxpayer is fully compliant after five years [l] | 42% | 44% |

a   IRS, Collection Activity Report No. 5000-108, FY 2014 (Sep. 29, 2014).
b   *Id.*
c   IRS, Collection Activity Report No. 5000-6, FY 2014 (Sep. 29, 2014).
d   *Id.*
e   *Id.*
f   *Id.*
g   *Id. See also* IRS Human Resources Reporting Center – number of revenue officers in SB/SE as of the end of FY 2014 and FY 2015 (pay period 19).
h   *Id.*
i   IRS, Collection Activity Report No. 5000-2, FY 2014  (Sep. 29, 2014).
j   *Id.*
k   *Id.*
l   Calculation by TAS Research.  Percentage of taxpayers with tax delinquent accounts in 2009 and 2010, respectively, and who have no new delinquencies five years later.  IRS, IMF.

001413

*This page intentionally left blank.*

001414

# INTRODUCTION: The Most Serious Problems Encountered by Taxpayers

Internal Revenue Code (IRC) § 7803(c)(2)(B)(ii)(III) requires the National Taxpayer Advocate to prepare an Annual Report to Congress that contains a summary of at least 20 of the most serious problems encountered by taxpayers each year. For 2015, the National Taxpayer Advocate has identified, analyzed, and offered recommendations to assist the IRS and Congress in resolving 24 such problems.

As in earlier years, this report discusses at least 20 of the most serious problems encountered by taxpayers — but not necessarily *the top 20* most serious problems. That is by design. Since there is no objective way to select the 20 most serious problems, we consider a variety of factors when making this determination. Moreover, while we carefully rank each year's problems under the same methodology (described below), the list remains inherently subjective in many respects.

To simply report on the top 20 problems would limit our effectiveness in focusing congressional, IRS, and public attention on critical issues. It would require us to repeat much of the same data and propose many of the same solutions year to year. Thus, the statute gives the National Taxpayer Advocate flexibility in selecting both the subject matter and the number of topics to be discussed and to use the report to put forth actionable and specific solutions instead of mere criticism and complaints.

## METHODOLOGY OF THE MOST SERIOUS PROBLEM LIST

The National Taxpayer Advocate considers a number of factors in identifying, evaluating, and ranking the most serious problems encountered by taxpayers. In many years, the National Taxpayer Advocate identifies a theme for the report that is reflected in the selection of issues. For example, this year's themes are:

- *IRS Future State Vision: Implications for Today and Tomorrow;*
- *Problems that Undermine Taxpayer Rights and Impose Taxpayer Burden;*
- *Problems that Waste IRS Resources and Impose Burden on Taxpayers; and*
- *Recommendations to Improve Earned Income Tax Credit Compliance.*

The 24 issues in this year's report are ranked according to the following criteria:

- Impact on taxpayer rights;
- Number of taxpayers affected;
- Interest, sensitivity, and visibility to the National Taxpayer Advocate, Congress, and other external stakeholders;
- Barriers these problems present to tax law compliance, including cost, time, and burden;
- The revenue impact of noncompliance; and
- Taxpayer Advocate Management Information System (TAMIS) and Systemic Advocacy Management System (SAMS) data.

Finally, the National Taxpayer Advocate and the Office of Systemic Advocacy examine the results of the ranking on the remaining issues and adjust it where editorial or numerical considerations warrant a particular placement or grouping.

001415

## TAXPAYER ADVOCATE MANAGEMENT INFORMATION SYSTEM LIST

The identification of the Most Serious Problems reflects not only the mandates of Congress and the IRC, but TAS's integrated approach to advocacy — using individual cases as a means for detecting trends and identifying systemic problems in IRS policy and procedures or the Code.  TAS tracks individual taxpayer cases on TAMIS.  The top 25 case issues, listed in Appendix 1, reflect TAMIS receipts based on taxpayer contacts in fiscal year 2015, a period spanning October 1, 2014, through September 30, 2015.

## USE OF EXAMPLES

The examples presented in this report illustrate issues raised in cases handled by TAS.  To comply with IRC § 6103, which generally requires the IRS to keep taxpayers' returns and return information confidential, the details of the fact patterns have been changed.  In some instances, the taxpayer has provided written consent for the National Taxpayer Advocate to use facts specific to that taxpayer's case.  These exceptions are noted in footnotes to the examples.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1424 of 4699 PageID #: 6589

Most Serious
Problems

Most Serious
Issues

Legislative
Recommendations

## TAXPAYER SERVICE: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts With Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet

### RESPONSIBLE OFFICIALS

John A. Koskinen, Commissioner of Internal Revenue, and Members of the IRS Senior Leadership Team

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Finality*
- *The Right to Privacy*
- *The Right to Confidentiality*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF PROBLEM

During the past year-and-a-half, the IRS has devoted significant resources to creating a "future state" plan that details how the agency will operate in five years. The plan is explained and developed in a document known as a Concept of Operations (CONOPS). There are many positive components of the plan, including the goal of creating online taxpayer accounts through which taxpayers will be able to obtain information and interact with the IRS.[2]

However, the CONOPS also raise significant questions and concerns. Implicit in the plan — and explicit in internal discussion — is an intention on the part of the IRS to substantially reduce telephone and face-to-face interaction with taxpayers. The IRS is hoping that taxpayer interactions with the IRS through online accounts will address a high percentage of taxpayer needs. It is also developing plans to enable third parties like tax return preparers and tax software companies to do more to assist taxpayers for whom online accounts are insufficient — an approach that will increase compliance costs for millions of taxpayers.

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights. The only right in the Taxpayer Bill of Rights that is not directly affected by the IRS's future state planning is *the right to retain representation.*

2   For a more detailed assessment of online taxpayer accounts, see Most Serious Problem: *Taxpayer Access to Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues That Are Not Conducive to Resolution Online, infra.*

001417

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1425 of 4699 PageID #: 4590

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

While online accounts should reduce taxpayer demand for telephone and face-to-face interaction to some degree, they are unlikely to reduce taxpayer demand dramatically. This is true for several reasons, including that millions of taxpayers do not have Internet access, millions of taxpayers with Internet access do not feel comfortable trying to resolve important financial matters over the Internet, and many taxpayer problems are not "cookie cutter," thus requiring a degree of back-and-forth discussion that is better suited for conversation and that taxpayers will insist upon.

Taxpayer demand for IRS services and assistance is high and has remained so for many years:

- Taxpayers place more than 100 million telephone calls to the IRS each year and have done so in every year since FY 2008.[3]

- Taxpayers make more than five million visits to the IRS's walk-in sites (known as Taxpayer Assistance Centers, or TACs) each year.[4]

- Taxpayers send an average of about ten million pieces of correspondence to the IRS in response to proposed adjustment notices each year to which the IRS must respond.[5]

> The Concept of Operations (CONOPS) have the potential to bring about a fundamental transformation in the way our government treats its taxpayers and interacts with them. The CONOPS and associated documents speak of contemplated changes in very positive tones. They say little about reductions in core taxpayer services. They say nothing about the increased taxpayer costs and security risks created by relying more on tax return preparers and other third parties for assistance and interacting with the IRS.

Many of the telephone and walk-in contacts take place as taxpayers are trying to prepare their tax returns. But a large number of contacts take place in the post-filing environment, where the IRS has proposed to adjust a taxpayer's tax liability or the IRS has delayed issuing the taxpayer's refund. While some pre-filing contacts may require only generic answers, post-filing contacts are almost always account-specific and require IRS employees to study the details of the taxpayer's account to respond.

If the IRS substantially reduces the opportunity for taxpayers to talk with IRS employees, many taxpayers will find it much harder to resolve their problems and will have to pay third parties to assist them. This will generate a great deal of additional taxpayer frustration with the IRS. As a result, confidence in the fairness of the tax system will erode, and taxpayer frustration and alienation may lead over time to a lower rate of voluntary compliance.

In the National Taxpayer Advocate's mid-year report to Congress, we recommended that the IRS make the CONOPS available for public review and comment.[6] To date, the IRS has not provided comprehensive information about its future state plans to the public, and it has not solicited public comment.

---

3   See IRS, Joint Operations Center, *Snapshot Reports: Enterprise Snapshot, IRS Enterprise Total* (final week of each fiscal year for FY 2008 through FY 2015).

4   IRS Wage & Investment Division, Business Performance Review 7 (4th Quarter – FY 2015, Nov. 2, 2015); Government Accountability Office (GAO), GAO-15-163, *Tax Filing Season: 2014 Performance Highlights the Need to Better Manage Taxpayer Service and Future Risks* 21 (Dec. 2014) (showing the number of TAC visits in each year from FY 2009 through FY 2014). During the 2015 filing season, the IRS maintained 380 TACs. See Treasury Inspector General for Tax Administration, Ref. No. 2016-IE-R001, *Selected Taxpayer Assistance Centers Were Professional and Organized, and Sensitive Information and Equipment Were Properly Secured* 1 (Oct. 2015).

5   Over the past decade, annual taxpayer correspondence in response to proposed adjustments has ranged from a low of 7.9 million letters to a high of 11.8 million letters and has averaged just over ten million per year. See IRS, Joint Operations Center, *Adjustments Inventory Reports: July-September Fiscal Year Comparison* (FY 2006 through FY 2015).

6   National Taxpayer Advocate FY 2016 Objectives Report to Congress 7.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1426 of 4699 PageID #: 6591

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

The National Taxpayer Advocate is designating the future of taxpayer service as the #1 most serious problem for taxpayers for purposes of this year's report because the CONOPS have the potential to bring about a fundamental transformation in the way our government treats its taxpayers and interacts with them. The CONOPS and associated documents speak of contemplated changes in very positive tones. They say little about reductions in core taxpayer services. They say nothing about the increased taxpayer costs and security risks created by relying more on tax return preparers and other third parties for assistance and interacting with the IRS.

But trade-offs are inevitable if new services are to be developed and rolled out in a tight budgetary environment. Therefore, we believe it is critical that the IRS share its plans in detail with Congress and outside stakeholders and then engage in a dialogue about the extent to which it intends to curtail or eliminate various categories of telephone service and face-to-face service, whether it will provide sufficient support for taxpayers — and how — as it transitions to its future state, and whether it has an adequate "Plan B" if taxpayer demand for telephone and face-to-face service remains higher than the IRS anticipates. We also believe the IRS should estimate the additional financial burden its plan will impose on various categories of taxpayers — including elderly, low income, disabled, and limited English proficiency taxpayers and small businesses — as well as the impact its plan is likely to have on voluntary compliance.

These concerns are detailed below. In addition, the National Taxpayer Advocate provides a broader assessment of the IRS's future state planning in her preface to this report.

## ANALYSIS OF PROBLEM

Long-term strategic planning is critical to the success of any organization, particularly one as large and complex as the IRS. In recent years, significant reductions to the agency's funding level have forced it to scale back its activities in almost every area and to rethink its priorities.[7]

Beginning in 2014, each of the IRS's four IRS Business Operating Divisions developed a CONOPS to articulate its vision and strategic approach for the following five-year period. Later, some of the other IRS functions developed a CONOPS, and the discrete CONOPS documents developed by the business units were ultimately consolidated into a single, enterprise-wide CONOPS.[8]

The IRS senior leadership team and IRS personnel in every business unit have devoted substantial time to this effort. The IRS also has entered into contracts with management consultants, costing the agency several million dollars, for support.

The CONOPS encompass both taxpayer service and enforcement activities, and they describe many initiatives that will both benefit taxpayers and make IRS operations more efficient. Because the IRS has chosen not to release the CONOPS, we are limited in our ability to provide much detail. However, the

---

7   Since FY 2010, the IRS budget has been reduced by about 19 percent in inflation-adjusted terms. In FY 2010, the agency's appropriated budget stood at $12.1 billion. For FY 2016, its budget has been set at $11.2 billion, a reduction of nearly 8 percent over the six-year period. Inflation over the same period is estimated at nearly 11 percent. *See* Office of Management and Budget, Fiscal Year 2016 Budget of the U.S. Government, *Historical Tables* (230-31), Table 10.1, *available at* https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/hist.pdf (showing Gross Domestic Product (GDP) and year-to-year increases in the GDP). In addition, the IRS has had to implement the statutory requirements of the Patient Protection and Affordable Care Act and the Foreign Account Tax Compliance Act during this time, causing a further drain on its resources.

8   The four IRS Business Operating Divisions are the Wage & Investment Division, the Small Business/Self-Employed Division, the Tax Exempt & Government Entities Division, and the Large Business & International Division. Other functions that developed CONOPS include the Office of Appeals and the Criminal Investigation function.

001419

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1427 of 4699 PageID #:  4592

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

IRS Chief Counsel recently articulated the following seven themes for the IRS's future state in a written document distributed at a public event:

- Facilitate voluntary compliance by empowering taxpayers with secure innovative tools and support.

- Understand non-compliant taxpayer behavior and develop approaches to deter and change it.

- Leverage and collaborate with external stakeholders.

- Cultivate a well-equipped, diverse, skilled, and flexible workforce.

- Select highest value work using data analytics and robust feedback loops.

- Drive more agility, efficiency, and effectiveness in IRS operations.

- Strengthen cyber defense and prevent identity theft and refund fraud.[9]

These are laudable goals, but they are very general. As always, the devil is in the details, and unless and until the IRS releases the CONOPS, neither the public nor Congress will have access to the details.

> In the National Taxpayer Advocate's mid-year report to Congress, we recommended that the IRS make the Concept of Operations available for public review and comment. To date, the IRS has not provided comprehensive information about its future state plans to the public, and it has not solicited public comment.

### Online Taxpayer Accounts Are Unlikely to Produce a Substantial Reduction in Taxpayers' Needs for Telephone and Face-to-Face Assistance

One specific initiative that IRS officials have described publicly is the creation of online taxpayer accounts through which taxpayers can interact with the agency.[10] We have recommended in the past that the IRS develop this capability,[11] provided the agency can work through security risks.[12]

Of considerable concern, however, is what is *not* stated in the CONOPS. Nowhere in the CONOPS is there a statement that the IRS plans to reduce telephone service or close walk-in sites, even though that is a central component of its strategy. By proposing to add new services and continuing to note the impact of funding constraints, it is implicit that some existing services will be reduced or eliminated.

---

9   William J. Wilkins, Chief Counsel, Internal Revenue Service, *Tax Enforcement in a Resource-Challenged World* 7 (written outline distributed in conjunction with address before the 32nd Annual National Institute on Criminal Tax Fraud and the Fifth National Institute on Tax Controversy, Dec. 11, 2015, Las Vegas, Nevada).

10   Luca Gattoni-Celli, *IRS to Roll Out Online Taxpayer Accounts*, 2015 TNT 213-3, TAX NOTES TODAY (Nov. 4, 2015) (quoting Karen Schiller, Commissioner of the IRS's Small Business/Self-Employed Division, as saying: "Our future vision is, interacting with the IRS will be similar to how the interaction is with a financial institution or a bank … more online access, more self-service capability"). *See also* Matthew R. Madara, *IRS to Expand Online Access As Agency Looks to the Future*, 2015 TNT 240-2, TAX NOTES TODAY (Dec. 14, 2015) (reporting on remarks of William J. Wilkins, Chief Counsel, Internal Revenue Service).

11   *See* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 67-96 (Research Study: *Fundamental Changes to Return Filing and Processing Will Assist Taxpayers In Return Preparation and Decrease Improper Payments*); National Taxpayer Advocate 2012 Annual Report to Congress 251-61 (Most Serious Problem: *The IRS Is Striving to Meet Taxpayers' Increasing Demand for Online Services, Yet More Needs to Be Done*) and 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical As the IRS Develops a Real-Time Tax System*); National Taxpayer Advocate 2009 Annual Report to Congress 338-45 (Legislative Recommendation: *Direct the Treasury Department to Develop a Plan to Reverse the "Pay Refunds First, Verify Eligibility Later" Approach to Tax Return Processing*).

12   The "Get Transcript" problems involving unauthorized access to taxpayer account information that came to light during 2015 have caused widespread concerns. For more details about those problems, see IRS, *IRS Statement on the "Get Transcript" Application* (May 26, 2015), *available at* https://www.irs.gov/uac/Newsroom/IRS-Statement-on-the-Get-Transcript-Application. The IRS must redouble its efforts to ensure it takes all appropriate steps to guarantee data security and reassure the public it has done so before it rolls out online accounts.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1428 of 4699 PageID #: 6893

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

The key unanswered question is by how much. In general, IRS leaders are only indirectly alluding to the possibility of service reductions. In a recent all-employee email, the Commissioner wrote about offering "more online and self-service options to build on our in-person options … [f]or those taxpayers with the ability and interest."[13] An accompanying summary stated that "[t]his approach also has a goal of freeing up limited IRS in-person resources — such as our phone lines — to more easily serve people and tax professionals who need one-on-one assistance."[14]

However, the widespread expectation is that traditional taxpayer services – telephone assistance and face-to-face assistance — will be scaled back dramatically. Based on our internal discussions with IRS officials, TAS has been left with the distinct impression that the IRS's ultimate goal is 'to get out of the business of talking with taxpayers.'

There is an enormous difference between developing online accounts with the hope that they will reduce taxpayer demand for personal service, on the one hand, and making plans to reduce personal service now. It is incumbent upon the IRS to be much more specific about how much personal taxpayer assistance it expects to provide in its "future state."

There are three reasons why we are not optimistic online accounts will dramatically reduce taxpayer demand for telephone or face-to-face service:

1. **Millions of taxpayers do not use the Internet.** A Pew Research Center study published in 2015 found the percentage of American adults who do not use the Internet is about 16 percent.[15]

2. **Millions of taxpayers who use the Internet do not want to handle complex financial transactions online.** According to a Forrester Research study published in 2015, 37 percent of survey respondents said they do not trust the federal government to secure their personal data, and the majority uses non-digital channels more than digital ones.[16] Moreover, a 2014 TAS study of taxpayers with incomes of less than 250 percent of the federal poverty level ($29,175 for a single person in the 48 contiguous states, D.C., or Puerto Rico) found that more than 70 percent of these taxpayers preferred communicating in person, and only about ten percent were willing to interact by computer.[17]

   **Example:** Assume a taxpayer has been victimized by identity theft or has been asked to supply identity information after IRS filters have flagged his return and frozen his refund pending verification. Many taxpayers whose personal information has been actually or potentially compromised will not feel comfortable entering the very same personal information into an Internet site. Moreover, many taxpayers waiting for a much-needed refund will want to resolve the problem directly with an IRS employee so they know, when the call ends, whether the documentation they are providing is sufficient and when they can expect to receive their refund.

---

13  Email from John A. Koskinen, Commissioner of IRS, to all employees, *Update on IRS changes, Future State work* (Dec. 16, 2015).

14  Summary explanation titled "A future vision for taxpayers and employees." *Id.*

15  Andrew Perrin & Maeve Duggan, Pew Research Center, *American's Internet Access: 2000-2015* (June 26, 2015).

16  Rick Parrish, Forrester Research, *Washington Must Work Harder to Spur the Public's Interest in Digital Government: Federal Agencies Are Spending Millions on Digital CX That Customers May Not Want* (Apr. 28, 2015).

17  *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2 § 1, 9 (Research Study: *Low Income Taxpayer Clinic Program: A Look at Those Eligible to Seek Help From the Clinics*). About 45 percent of taxpayers have incomes at or below 250 percent of the Federal Poverty Level. IRS CDW, Individual Returns Transaction File, tax year 2014

001421

Case 1:17-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1429 of 4699 PageID #: 4594

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

3. **Even among taxpayers who have Internet access and skills and are comfortable handling financial transactions online, the complexity of tax issues and the amount of money at stake will make online resolution impractical or undesirable from the taxpayer's perspective in many cases.** Online resolution will be difficult partly due to the complexity of the transaction and partly due to the difficulty in designing a website that is both easily navigable by first-time users and capable of handling a wide range of transactions. Online accounts work well for "cookie cutter" transactions. For example, a bank website can be easy to use if the account holder is solely seeking to pay bills; an airline website can be easy to use if a passenger is solely seeking to purchase tickets; and a retailer's website can be easy to use if a customer is seeking solely to make a purchase. But if the account holder wishes to dispute an erroneous charge, the passenger is seeking a refund, or the purchaser of retail goods has not received his order by the promised date, a telephone call is often necessary. When dealing with the IRS, little is "cookie cutter" and much is case-specific.

> **Example:** A taxpayer may claim the earned income tax credit with respect to a child only if the child lives with her for more than one-half of the year.[18] Where parents have been divorced or otherwise live separately and the child lives part-time with each parent, it can be difficult for the parent claiming the credit to substantiate that the child lived with her for more than one-half of the year. An online account cannot substitute for a conversation with an IRS employee in which the parent describes the kinds of records she possesses and can talk through which ones the IRS will accept.

> **Example:** The IRS denies business deductions claimed by a small business, such as a sole proprietor. Businesses keep expense records in different formats, and it is often not clear to a small business owner what documentation the IRS will accept. Rather than uploading large volumes of records through an online account, the business owner may wish to speak with an IRS employee to clarify the documentation requirements.

In light of the complexity of the tax code and the wide variation in taxpayer circumstances, these are typical problems that arise. Where substantial money is at stake and particularly where a taxpayer is experiencing a financial hardship, an online account will neither resolve issues like these nor provide the taxpayer with the certainty he seeks.

**Pre-Filing Requests for Assistance.** In 2015, the IRS received about 150 million income tax returns from individuals.[19] It also received more than ten million returns from business entities (corporations and partnerships).[20] Many of these taxpayers seek assistance from the IRS in the course of preparing or filing their returns. Requests for assistance range from the general (*e.g.,* a request for a form or a tax-law

---

18   *See* IRC § 32(c)(3)(A) (incorporating the definition of a qualifying child in IRC § 152(c)(1)(B)).

19   In calendar year 2015, the IRS received slightly more than 150 million individual income tax returns.  *See* IRS, *Filing Season Statistics for Week Ending Nov. 20, 2015, available at* https://www.irs.gov/uac/Newsroom/Filing-Season-Statistics-for-Week-Ending-November-20-2015.  For fiscal year 2015, the IRS projected it would receive just under 150 million returns but has not released the final count.  *See* IRS Pub. 6292, *Fiscal Year Return Projections for the United States 2015-2022,* Table 1 (Rev. Aug. 2015).

20   *See* IRS Pub. 6292, *Fiscal Year Return Projections for the United States 2015-2022,* Table 1 (Rev. Aug. 2015). (projecting the IRS would receive about 6.9 million corporation income tax returns and 3.8 million partnership returns in FY 2015, a slight increase in both categories as compared with FY 2014).

> Offloading work to third parties will substantially increase compliance costs for many taxpayers who now work directly with the IRS. Taxpayers deserve better. Having written a tax code so widely and rightly criticized for its complexity, the government has a practical and moral obligation to help taxpayers comply. It should not withdraw existing taxpayer service to the point where taxpayers have to incur additional compliance costs just to file their returns and pay their taxes.

question) to account-specific matters (*e.g.,* a request for a replacement Identity Protection (IP) PIN where a taxpayer has lost the IP PIN the IRS sent him by letter and cannot file his return without it).[21]

**Post-Filing Contacts**. In FY 2015, the IRS had actual or possible post-filing contacts with more than nine million taxpayers. Most arose because of proposed tax adjustments the IRS made. Others arose because the IRS temporarily or indefinitely froze tax returns and withheld refunds, generating taxpayer inquiries and attempts to provide substantiation.

If one were to focus solely on the individual audit rate of less than one percent,[22] one might assume that fewer than 1.5 million individual taxpayers have contacts with the IRS after filing a tax return. In fact, the number of taxpayers who have post-filing contacts with the IRS is vastly larger. For example:

- The IRS makes adjustments to taxpayer accounts under "math error" authority that do not count as audits.[23]

- The IRS makes adjustments to taxpayer accounts based on document-matching between information a taxpayer reports on his tax return and information the taxpayer's employer reports on a Form W-2 or a payor reports on a Form 1099. These adjustments also do not count as audits.[24]

- The IRS operates an Automated Substitute for Return program in which it creates tax returns for taxpayers who did not file and who the IRS believes should have filed a return.[25]

---

21  An IP PIN is a number assigned to an eligible taxpayer to help prevent the misuse of his Social Security number on fraudulent federal income tax returns. Once the IRS issues an IP PIN to a taxpayer, the taxpayer currently is required to use an IP PIN to file returns for the rest of his life. According to the IRS website:  "You currently can't opt out once you get an IP PIN.  You must use an IP PIN to confirm your identity on all federal tax returns you file this year and in subsequent tax years.  If you e-file your return and your IP PIN is missing or incorrect, our system will reject your return.  Filing a paper return with a missing or incorrect IP PIN delays its processing."

22  In FY 2014, the individual audit rate was 0.86 percent.  *See* IRS, *FY 2014 Enforcement and Service Results* 2, *available at* https://www.irs.gov/PUP/newsroom/FY-2014%20Enforcement%20and%20Service%20Results%20-%20web%20version.pdf.  At this writing, the individual audit rate for FY 2015 has not yet been released.

23  IRC § 6213(b) & (g).

24  *See* IRC § 7605 and Rev. Proc. 2005-32, 2005-1 C.B. 1206, regarding contacts with taxpayers and other actions taken by the IRS that are not treated as "examinations."  In general, an examination involves the IRS's inspection of a taxpayer's books and records.  Among contacts not treated as examinations are those resulting from the matching of information on a tax return with information already in the IRS's possession and considering any records the taxpayer provides voluntarily to explain a discrepancy between a filed return and information furnished by third parties that is used as part of a data-matching program. *See* § 4.03(1)(b) & (c) of Rev. Proc. 2005-32.

25  *See* IRC § 6020.  For additional information regarding the automated substitute for return program, see Most Serious Problem: *Automated Substitute for Return (ASFR) Program: Current Selection Criteria for Cases in the ASFR Program Create Rework and Impose Undue Taxpayer Burden*, *infra*.

001423

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1431 of 4699 PageID #: 4596

Most Serious
Problems

Most Litigated
Issues

Recommendations

- The IRS employs a wide variety of anti-fraud filters to screen out fraudulent tax returns and refund claims. However, these filters are inherently both under-inclusive and over-inclusive. Where filters are over-inclusive, the IRS sometimes notifies taxpayers it has frozen their returns and requires them to submit additional documentation before it can proceed, and it sometimes temporarily suspends the processing of their returns (and the issuance of refunds) pending internal verification measures. Even where the IRS is solely performing internal verification, taxpayers experiencing refund delays will often call the IRS to find out why.

Thus, the number of taxpayers who receive notices and may have to get into a dialogue with the IRS about their unique facts and circumstances is as follows:

**FIGURE 1.1.1, Post-Filing Notices and Refund Delays That Generate Taxpayer Contacts**[26]

| | |
|---|---|
| Individual Audits | 1,228,693 |
| Document Matching (AUR) Notices | 3,836,216 |
| Math Error Notices | 1,886,216 |
| Automated Substitute for Returns | 184,776 |
| Refund Delays | 2,078,311 |
| **Total** | **9,214,212** |

It is not realistic to expect that taxpayers who are told they owe more tax or whose refunds have been significantly delayed are going to be satisfied resolving their problems with the IRS exclusively through an online account. A high percentage of taxpayers in this situation will want to speak with an IRS employee so they can be certain they understand the source of the problem and what more they need to do — and try to obtain reassurance about when they can expect a final resolution.

### *IRS Technology Advancements Historically Have Not Reduced Taxpayer Demand for Personal Services Despite Hopes to the Contrary*

Ever since Congress enacted the IRS Restructuring and Reform Act of 1998,[27] the IRS has been speaking about harnessing technology to improve efficiency and reduce the need for personal service. In fact, the IRS has succeeded in dramatically increasing the percentage of taxpayers who file their returns electronically, it has vastly expanded and improved its website to provide more information to taxpayers, and it

---

26  Sources for data on audit and similar contacts are as follows: IRS Audit Information Management System, Closed Case Database (showing number of individual examinations closed in FY 2015); IRS Compliance Data Warehouse, Notice Delivery System (showing number of CP2000 and CP2501 document-matching notices mailed to distinct taxpayers by the IRS's Automated Underreporter Program in FY 2015); IRS Individual Master File (showing number of math error notices mailed to distinct taxpayers in FY 2015); IRS Collection Activity Report NO-5000-139 (Oct. 5, 2015) (showing number of automated substitute for return (ASFR) notices issued in FY 2015; ASFRs are created with respect to taxpayers that did not file tax returns but that the IRS believes should have filed tax returns). Sources for data on refund delays are as follows: IRS Generalized Unpostable Framework (GUF) Report, GUF5740 Closed Inventory Summary (Dec. 17, 2015) (showing that 729,487 returns were initially deemed unpostable for inconsistency with ID theft business rules but were later processed in calendar year 2015 through Dec. 17); IRS Return Integrity & Compliance Services (RICS), *Update of the Taxpayer Protection Program (TPP)* 8, (Dec. 9, 2015) (showing that 649,915 returns were stopped by Taxpayer Protection Program filters but were later found to be legitimate in calendar year 2015 through Dec. 9); IRS Individual Master File (showing that 179,459 returns were stopped due to suspected fraudulent income documents that later were found to be legitimate and 155,103 returns were frozen from Jan. 1 through Sept. 30, 2015 because an identity theft return in the taxpayer's name had previously been submitted and posted; refund delays of less than two weeks are generally excluded from these totals). The number of refund delays shown in this figure is under-inclusive overall because there are additional sources of refund delays. However, a small number of returns may fit into more than one category and therefore be double-counted.

27  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685 (1998).

has launched "Where's My Refund" to reduce telephone calls. The hope and expectation was that these measures would have substantially reduced taxpayer demand for personal service by phone or in person.

In fact, taxpayer demand for personal service has *increased* over time. The number of calls the IRS received on its Accounts Management lines over the past decade has risen from about 64 million in FY 2006 to about 102 million in FY 2015, an increase of about 59 percent, as shown in the following figure:

**FIGURE 1.1.2**[28]



**Taxpayer Calls to IRS Accounts Management Telephone Lines**

151 mil

59% increase in calls from FY 2006-FY 2015

108 mil

102 mil

94 mil

86 mil

64 mil

FY 2006          FY 2009          FY 2012          FY 2015

(The one-time spike in telephone calls in FY 2008 was attributable to widespread confusion concerning payments under the Economic Stimulus Act of 2008.)[29]

Taxpayer demand for face-to-face service at the IRS's walk-in sites has also remained high — above 5.6 million visits in FY 2015 — despite IRS service reductions, such as directing employees to refrain from answering tax-law questions and discontinuing the preparation of tax returns.[30]

These results are hardly surprising. The continuing demand for personal service despite greater online functionality is not unique to tax administration. For example, the Board of Governors of the Federal Reserve System conducts an annual survey of bank customers who use mobile phones to conduct their banking. The most recent survey found that 72 percent of bank customers reported they had visited a branch and spoken with a teller within the preceding month (an average of two times), and 68 percent reported they had used telephone banking within the preceding month (also an average of two times).

---

28  IRS, Joint Operations Center, *Snapshot Reports: Enterprise Snapshot* (final week of each fiscal year for FY 2006 through FY 2015). The majority of the additional calls were handled by automation. The increase in calls seeking to speak with an IRS customer service representative (CSR) was 20 percent. The IRS's Snapshot Reports do not specify the number of calls routed to CSRs, but that number can be roughly computed by dividing the number of calls answered by CSRs by the percentage of calls answered by CSRs (known as the "CSR Level of Service"). The number of calls routed to CSRs on the Account Management telephone lines increased from about 39.8 million in FY 2006 to about 47.9 million in FY 2015. The percentage increase in calls seeking to reach a CSR likely would have been considerably higher absent IRS policies designed to limit the scope of CSR-eligible subjects, such as sharply restricting the scope of tax-law questions CSRs may answer.

29  Pub. L. No. 110-185, 122 Stat. 613 (2008).

30  IRS Wage & Investment Division, Business Performance Review 7 (4th Quarter – FY 2015, Nov. 2, 2015).

001425

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1433 of 4699 PageID #: 4598

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

In addition, 85 percent reported they had used an automated teller machine (ATM) within the preceding month (an average of three times).

Summarizing these survey results, the report concluded:

> Taken together, these estimates indicate that while mobile banking users are utilizing techno-logical platforms at a high rate and on a consistent basis, they have also maintained connec-tions to their banks through the more traditional branch and ATM channels.[31]

There is no doubt that secure online taxpayer accounts will be a positive development for both taxpayers and the IRS. But the IRS's own experience with technology improvements and data from other sectors suggest online accounts are unlikely to substantially meet taxpayer demand for telephone and face-to-face service. Therefore, the open question is whether, and to what extent, online accounts will allow the IRS to achieve costs savings without leaving taxpayer needs unmet.

### Requiring Taxpayers to Rely More on Tax Return Preparers and Other Third Parties Will Increase Taxpayer Costs and Create Data Security Risks

The CONOPS highlight a second concern. The IRS recognizes that not all taxpayers will be able to resolve problems through online accounts. To address the needs of these taxpayers, the IRS envisions giv-ing tax practitioners, noncredentialed preparers, and tax software companies access to additional taxpayer information so they can assist taxpayers without the need for direct IRS involvement. That may work in some instances, but we have two reservations about this approach.

1. Offloading work to third parties will substantially increase compliance costs for many taxpayers who now work directly with the IRS. Taxpayers deserve better. Having written a tax code so widely and rightly criticized for its complexity, the government has a practical and moral obliga-tion to help taxpayers comply. It should not withdraw existing taxpayer service to the point where taxpayers have to incur additional compliance costs just to file their returns and pay their taxes.

2. Tax return preparers are currently unregulated. Anyone, including individuals with no tax back-ground and even individuals with criminal convictions, can obtain a Preparer Tax Identification Number from the IRS and hang out a shingle as a tax return preparer. Many are competent and conscientious, but as Government Accountability Office (GAO) and Treasury Inspector General for Tax Administration (TIGTA) studies have shown, others are not.[32] The IRS should not even consider giving tax return preparers access to taxpayer account information until it is able to establish minimum standards for competence, to suspend preparers who engage in improper conduct, and to conduct background checks to weed out preparers with criminal records. To grant all preparers access to taxpayer accounts is to put taxpayers' confidential tax information at risk.

Referring taxpayers to third party providers raises important issues — both policy issues regarding the role government should play in assisting taxpayers who are trying to comply with their tax obligations and practical issues regarding data security. These issues deserve a thorough public discussion before the IRS begins to downsize its existing taxpayer service operations and outsource taxpayer assistance to third

---

31  Board of Governors of the Federal Reserve System, *Consumers and Mobile Financial Services 2015*, at 11 (Mar. 2015), *available at* http://www.federalreserve.gov/econresdata/consumers-and-mobile-financial-services-report-201503.pdf.

32  *See* GAO, GAO-14-467T, *Paid Tax Return Preparers: In a Limited Study, Preparers Made Significant Errors* (Apr. 2014); TIGTA, Ref. No. 2008-40-171, *Most Tax Returns Prepared by a Limited Sample of Unenrolled Preparers Contained Significant Errors* (Sept. 2008); GAO, GAO-06-563T, *Paid Tax Return Preparers: In a Limited Study, Chain Preparers Made Serious Errors* (Apr. 2006).

parties, which will have the effect of introducing a third-party intermediary between the IRS and taxpayers, and increasing taxpayers' compliance costs.

## CONCLUSION

The IRS's future state plan has been driven by two considerations.  First, long-range strategic planning is always important to ensure an organization achieves its objectives as effectively and efficiently as possible.  Second, significant reductions in the IRS's budget since FY 2010 have forced the agency to look for ways to scale back its operations in order to deliver on its tax-collection mission more cheaply.

The National Taxpayer Advocate has been recommending against significant reductions in the IRS's budget because reductions of this magnitude have harmed taxpayers.  Moreover, while this report identifies numerous areas where we believe the IRS can and should improve, it is important to acknowledge that the IRS generally speaking is an efficient agency.  In FY 2015, the IRS collected about $3.3 trillion on a budget of $10.945 billion, which translates to a return-on-investment of about 300:1.[33]

There is much in the CONOPS that is positive for taxpayers and the IRS.  However, the implicit intent to make substantial reductions in telephone and face-to-face taxpayer service — particularly when coupled with the implicit intent to refer more taxpayers to for-profit practitioners and preparers for help that the IRS currently provides — raises concerns about whether the government will continue to meet its responsibilities to taxpayers.

Because the CONOPS lay out proposals that will be transformational for taxpayer service, we believe the IRS should publish its proposed plans and seek public comments and suggestions before it adopts any proposals and before, even if it has not formally adopted them, any of these proposals becomes a *fait accompli*.  U.S. taxpayers pay the bills for our government.  U.S. taxpayers deserve a say in how the tax collection agency will treat them.

## RECOMMENDATIONS

1. The National Taxpayer Advocate recommends that the IRS immediately publish its CONOPS, publicize them widely, and seek comments and suggestions from the public.

2. The National Taxpayer Advocate recommends that Congress hold hearings during the next few months on the future state of IRS operations.  These hearings will help foster better communication between the IRS and Congress on the front-end, potentially reducing the risk of continuing conflict in the future.  These hearings should seek testimony from groups representing the interests of individual taxpayers (including elderly, low income, disabled, and limited English proficiency taxpayers), sole proprietors, other small businesses, and Circular 230 practitioners and unenrolled tax return preparers.  They should also include witnesses who can address the additional compliance burden the CONOPS will impose on various categories of taxpayers as well as the likely impact of the CONOPS on the overall rate of voluntary tax compliance.

---

33  GAO, GAO-16-146, GAO-16-146, *Financial Audit: IRS's Fiscal Years 2015 and 2014 Financial Statements* 25 (Nov. 2015), *available at* www.gao.gov/assets/680/673614.pdf (showing the IRS collected total tax revenue of about $3.3 trillion in FY 2015); IRS, *IRS FY 2016 Budget-in-Brief, available at* https://www.irs.gov/PUP/newsroom/IRS%20Budget%20in%20FY%202016.pdf (showing the IRS's enacted FY 2015 IRS appropriation was $10,945,000,000).

001427

Case 1:20-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1435 of 4699 PageID #: 4600

Most Serious
Problems

Most Serious
Issues

Recommendations

**MSP #2**

## IRS USER FEES: The IRS May Adopt User Fees to Fill Funding Gaps Without Fully Considering Taxpayer Burden and the Impact on Voluntary Compliance

### RESPONSIBLE OFFICIALS

Karen Schiller, Commissioner, Small Business/Self-Employed Division
Debra Holland, Commissioner, Wage and Investment Division
Sunita Lough, Commissioner, Tax Exempt and Government Entities Division
Douglas W. O'Donnell, Commissioner, Large Business and International Division
Kirsten Wielobob, Chief, Appeals
William J. Wilkins, Chief Counsel
Jeffrey S. Wallbaum, Acting Chief Financial Officer

### TAXPAYER RIGHTS IMPACTED[1]

- ◾ *The Right to Quality Service*
- ◾ *The Right to Privacy*
- ◾ *The Right to a Fair and Just Tax System*

### DEFINITION OF PROBLEM

Between fiscal years (FY) 2010 and 2015, the IRS's appropriation declined by about ten percent (from $12.15 billion to $10.95 billion), and its user fee revenue increased by about 34 percent (from $290 million to $391 million).[2]  The IRS is actively considering user fee increases that would mitigate cuts to its appropriation.[3]  The IRS's need for user fee revenue heightens the importance of requiring employees to:

- ◾ Avoid fees that impair its service-oriented mission, voluntary compliance, or taxpayer rights;

- ◾ Estimate the effect of the fee on demand for service; and

- ◾ Publish its user fee analysis and address any comments from internal and external stakeholders before adopting or increasing a fee.

Even user fees that seem reasonable to the IRS in a vacuum may seem outrageous to taxpayers when added to the costs of recordkeeping, filing and paying taxes, and paying professionals for help in navigating complicated rules and procedures that the government created.  They may seem even more outrageous

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Treasury Department, *Congressional Justification* (FY 2010-2016), *available at* http://www.treasury.gov/about/budget-performance/Pages/cj-index.aspx; IRS response to TAS information request (May 20, 2015); IRS response to TAS information request (Oct. 22, 2015).

3   IRS response to TAS information request (Oct. 22, 2015).  For a discussion of the effect of these cuts, see, *e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 20-39 (Most Serious Problem: *The IRS Desperately Needs More Funding to Serve Taxpayers and Increase Voluntary Compliance*).

001428

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1436 of 4699   PageID #: 16601

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

when combined with the IRS's plans to reduce services it previously provided for free, shifting more tax compliance burdens to taxpayers.[4]

Shifting compliance burdens to taxpayers is inconsistent with the IRS mission and taxpayer rights, and may reduce voluntary tax compliance. The IRS's mission is to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the tax law with integrity and fairness to all."[5] User fees discourage taxpayers from obtaining services that could help them "understand and meet their responsibilities."

> The IRS is not a business selling rights only to those willing to pay.

User fees may also erode taxpayer rights, such as the *right to quality service.* This "right" to quality service may be inconsistent with requiring taxpayers to pay a fee for it. The IRS is not a business selling rights only to those willing to pay. If some are able to pay and others are not, then the fee may also erode the *right to a fair and just tax system.*

In addition, IRS services often promote voluntary compliance.[6] Thus, if a fee discourages taxpayers from using services, it may erode tax compliance, particularly if it combines with other burdens to make them lose interest in trying to comply.

## ANALYSIS OF PROBLEM

### The IRS Has Discretion in Setting User Fees

The Independent Offices Appropriation Act of 1952 (IOAA) generally requires federal agencies to establish user fees at "full cost" for services that convey "special benefits."[7] However, fees must be "fair" and based, in part, on the "public policy or interest served," and agencies can seek a waiver of this requirement from the Office of Management and Budget (OMB).[8] Various other laws give the IRS discretion to set a "reasonable" fee for specific items.[9] Thus, the IRS does not have to impose user fees that have undesirable consequences.

### The IRS Seems to Prioritize User Fee Revenue

It took the IRS the 43 years between 1952 and 1995 to charge any fees based on the IOAA. In 1995, after Congress allowed it to retain some of its user fee revenue,[10] the IRS imposed a new $43 user fee to

---

4   *See, e.g.,* Most Serious Problem: *Taxpayer Access to Online Accounts: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues that Are Not Conducive to Resolution Online, infra.*

5   Internal Revenue Manual (IRM) 1.1.1.2, *IRS Mission* (June 2, 2015).

6   See, e.g., Dept. of Treasury, *Reducing the Federal Tax Gap a Report on Improving Voluntary Compliance* (Aug. 2, 2007), *available at* http://www.irs.gov/pub/irs-news/tax_gap_report_final_080207_linked.pdf.

7   31 U.S.C. § 9701.

8   *Id.*; OMB, Circular A-25, 58 Fed. Reg. 38,142 (July 15, 1993) (hereinafter "Circular A-25") (directing that an agency may apply for a user fee exception based on anything that "in the opinion of the agency head or his designee, justifies an exception.").

9   *See, e.g.,* Internal Revenue Code (IRC) § 6103(P) (reproduction of returns and the disclosure of return information, such as a U.S. Residency Certification, Income Verification Express Service (IVES), and copies); IRC § 7528 (letter rulings, opinion letters, determination letters, art valuation, and similar requests); IRC § 6104 (copying and mailing exempt organization (EO) materials and returns); IRC § 6108 (statistical studies); 5 U.S.C. § 552(a)(4)(A) (FOIA document search, duplication, and review); IRC § 6110(k) (reproduction of Chief Counsel Advice); 29 U.S.C. 1202a (Employee Plan Compliance Resolution System); IRM 1.32.19.21, *Types of User Fees* (Nov. 8, 2012). The IRS must also collect a $500 user fee from any person claiming a deduction for a historical preservation easement. *See* IRC § 170.

10  31 U.S.C. § 3302(b) (requiring user fees to be deposited with the Treasury, absent specific statutory authority); Treasury Postal Service and General Government Appropriations Act of 1995, Pub. L. No. 103-329, § 3, 108 Stat. 2,382 (1994) (codified at IRC § 7801 (note)) (allowing the IRS to retain certain user fee receipts).

001429

Case 1:20-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1437 of 4699 PageID #: 4602

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

enter into an installment agreement (IA).[11]  In 2006, Congress removed the limit on the amount of fee revenue the IRS could keep.[12]  User fee receipts immediately increased, and the IRS has acknowledged that with the reductions in enacted appropriations beginning in FY 2011, it has increasingly relied on user fees for funding, as shown in Figure 1.2.1.[13]

**FIGURE 1.2.1**



IRS User Fee Revenue

Between FYs 2010 and 2015, the IRS's appropriation declined by about ten percent (from $12.15 billion to $10.95 billion), and its user fee revenue increased by about 34 percent (from $290 million to $391 million).

Between FYs 2010 and 2015, the IRS's appropriation declined by about ten percent (from $12.15 billion to $10.95 billion), and its user fee revenue increased by about 34 percent (from $290 million to $391 million).[14]  Although user fees were historically used, in large part, to fund services, beginning in FY 2015, the IRS shifted user fee revenue expenditures from taxpayer service to operations support, primarily information technology infrastructure to implement the Affordable Care Act (ACA).[15]  User fees applied to service expenditures declined by 75.4 percent (from $183 million in FY 2014 to $45 million in FY 2015), while user fees applied to operations support expenditures increased by 77.0 percent (from $222 million in FY 2014 to $393 million in FY 2015), and the IRS plans to allocate more user fee revenue to operations support than to services in FY 2016, as shown in Figure 1.2.2.[16]

---

11  T.D. 8589, 60 Fed. Reg. 8298 (Feb. 14, 1995); Treas. Reg. § 300.0-300.2.

12  Pub. L. No. 109-115 § 209, 119 Stat. 2439 (2006) (codified at IRC § 7801 (note)).  OMB Circular A-25 also requires agencies to update user fees every two years.

13  IRS response to TAS fact check (Nov. 13, 2015).  Even though user fee revenue has been rising, the IRS has spent more of its user fee collections every year since FY 2010 (spending $481,882,027 in FY 2015 (planned), up from $148,124,769 in FY 2010), causing the carryover balance in its user fee account to decline from its high-water mark of $352,928,852 at the beginning of FY 2013 to $193,074,529 as of September 30, 2015.  *Id.*

14  Treasury Department, *Congressional Justification* (FY 2010-2016), *available at* http://www.treasury.gov/about/budget-performance/Pages/cj-index.aspx; IRS response to TAS information request (May 20, 2015); IRS response to TAS information request (Oct. 22, 2015).

15  The House Ways and Means Committee expressed concern about this shift.  House Ways and Means Committee, *Majority Staff Report, Doing Less with Less: IRS's Spending Decisions Harm Taxpayers*, 114th Cong. (Apr. 22, 2015).

16  IRS response to TAS information request (Oct. 22, 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1438 of 4699   PageID #: 11603

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

**FIGURE 1.2.2, User Fee Spending by Account**[17]

| Account | FY 2013 | | FY 2014 | | FY 2015 | | FY 2016 (Plan) | |
|---|---|---|---|---|---|---|---|---|
| Taxpayer Services | $191 mil | 48.3% | $183 mil | 43.6% | $45 mil | 9.7% | $97 mil | 22.9% |
| Enforcement | $20 mil | 5.2% | $15 mil | 3.5% | $21 mil | 4.5% | $10 mil | 2.4% |
| Operations Support | $184 mil | 46.6% | $222 mil | 52.9% | $393 mil | 85.8% | $316 mil | 74.7% |
| **Total** | **$396 mil** | | **$419 mil** | | **$459 mil** | | **$423 mil** | |

The IRS's reliance on user fee revenue to offset cuts creates a conflict of interest.  This conflict is stronger when the IRS appropriation declines.  Agencies are supposed to reevaluate user fees every two years, but the IRS has asked its business units (BUs) to reevaluate them more often in the last few years due to its declining appropriation.[18]

### User Fees Can Undermine the IRS Mission, Voluntary Compliance, and Taxpayer Rights

If fees discourage taxpayers from using IRS services, they may undermine the IRS mission, voluntary compliance, and taxpayer rights.  For example, in addition to penalties and interest for late payments, the IRS charges taxpayers a fee to set up an IA, which it increased from $105 to $120 in 2014.[19]  It is considering further increases to the IA fee.[20]  If this fee discourages taxpayers who cannot pay in full from making arrangements to pay, then it:

1. Reduces voluntary compliance, potentially prompting the IRS to issue more wage levies or classify more accounts as uncollectible;

2. Is inconsistent with the IRS mission to help taxpayers "meet their tax responsibilities;"[21] and

3. Is inconsistent with the taxpayer's *right to privacy*, *i.e.*, that enforcement be "no more intrusive than necessary."[22]  Paying in installments would be less intrusive than a levy.  It may also be inconsistent with the *right to a fair and just tax system*, which requires the tax system to "consider facts and circumstances that might affect … ability to pay."[23]  Similarly, it may be inconsistent with the idea that *quality service* is a fundamental taxpayer right, which should not be subject to a fee.[24]

---

17  IRS response to TAS fact check (Nov. 13, 2015).  The FY 2016 projections are preliminary and subject to change.  The IRS increased the user fees allocated to operations support, in large part, to implement the ACA.  IRS response to TAS information request (Oct. 22, 2015).

18  Circular A-25 § 8(e) (two years).  The IRS held its biennial user fee review process in 2007, 2009, 2011, 2013, and 2015, as well as an out-of-cycle review in 2014.  IRS response to TAS information request (May 20, 2015).  The IRS also sought revenue-raising ideas in connection with a resource realignment effort in early 2015.

19  T.D. 9647, 78 FR 72016 (2014); Treas. Reg. § 300.1 (IA fee).

20  IRS response to TAS information request (Oct. 22, 2015) (FY 2015 Biennial Review of User Fee Charges, Attachment 2).

21  IRM 1.1.1.2, *IRS Mission* (June 2, 2015).

22  IRS Pub 1, *Your Rights as a Taxpayer* (2014).

23  *Id.*

24  *Id.  Cf., Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (holding unconstitutional a state-imposed $1.50 poll tax) and *Bullock v. Carter*, 405 U.S. 134 (1972) (holding unconstitutional a state-imposed filing fee of between $1 and $8,900 to register as a candidate in the primary election, even as to fees that were limited to less than ten percent of the candidate's gross income).  If an IA fee does not actually discourage any taxpayers from obtaining an IA, then it should not be imposed under existing criteria, because it is not really voluntary.  *See, e.g.*, IRM 1.32.19.20, *Review and Implementation of New User Fees* (Nov. 8, 2012).  Moreover, the National Taxpayer Advocate questions whether an IA or offer in compromise (OIC) is actually a "special" service, as some people will simply not be able to pay and the IRS will need to deal with them in some way.

001431

Case 1:17-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1439 of 4699 PageID #: 4604

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

As another example, the Private Letter Ruling (PLR) fee increased from $10,000 to $28,300 in 2015 for an exempt organization (EO) with gross income of $1 million or more.[25]  If only some taxpayers who need guidance can afford a PLR, the PLR fee is inconsistent with the taxpayer *right to a fair and just tax system*, which includes the right to expect the tax system to "consider facts and circumstances that might affect their underlying liabilities."[26]  Although lower PLR fees apply to those with lower gross income, when combined with the amount taxpayers have to pay to an advisor to help with a PLR submission, the PLR fee may discourage taxpayers from obtaining the information they need (*i.e.*, a PLR) to voluntarily comply.  According to some practitioners, for the first time in history the $28,000 PLR filing fee may now exceed the legal costs of preparing the PLR request.[27]

### The Internal Revenue Manual (IRM) Provides Limited Guidance About How to Evaluate User Fees

The IRM requires IRS employees to consider the following factors in setting user fees:

- The voluntary nature of the user fee activities.  The IRS does not charge taxpayers for special services that they do not request.

- The benefit must be identifiable to a specific taxpayer.

- The cost of administering the user fee, as this cannot be a substantial amount of the fee.

- The impact of the user fee on low income taxpayers.[28]

The IRM does not require employees to consider the effect of user fees on the IRS's service-oriented mission, voluntary compliance, taxpayer burden, or taxpayer rights.[29]  Nor does it require them to estimate the effect of fees on the demand for service or downstream costs so that they can make better informed decisions about these effects.[30]

User fees that seem reasonable to the IRS in a vacuum may seem outrageous to taxpayers when added to the costs of recordkeeping, filing, and paying taxes, and paying professionals for help in navigating complicated rules and procedures that the government created.  They may seem even more outrageous when combined with the IRS plans to reduce services it historically provided for free, shifting even more

---

25  Previously, the fee for PLRs from Tax Exempt/Government Entities (TE/GE) was a flat $10,000 for all organizations.  Rev. Proc. 2014-8, § 6.08, 2014-1 I.R.B. 242 (2014).  In form, the 2015 fee for PLRs from IRS Counsel only increased from $19,000 to $28,300 for EOs with gross income of $1 million or more.  Rev. Proc. 2015-1, App'x A(3), 2015-1 I.R.B. 1 (2015).  However, due to an IRS realignment in 2014, EOs seeking PLRs now pay the rates applicable to IRS Counsel.  Rev. Proc. 2015-1, § 6, 2015-1 I.R.B. 235 (2015).  As a result, the fee effectively increased from $10,000 to $28,300.  EOs with high gross income may have little net income with which to pay a fee.  They may also divert funds to pay the user fee that would otherwise be used to provide important services to the public.

26  IRS Pub 1, *Your Rights as a Taxpayer* (2014).  Although the fee is lower for those with lower gross income, there is no low income waiver for PLRs.  *See, e.g.*, Rev. Proc. 2015-1, App'x A(3), 2015-1 I.R.B. 1 (2015).

27  Paul Streckfus, EO Tax Journal, *Email Update 2015–102* (May 27, 2015) (quoting comments by Rob Wexler at an American Bar Association Tax Section meeting).

28  IRM 1.32.19.20(1), *Review and Implementation of New User Fees* (Nov. 8, 2012).  In 2007, the National Taxpayer Advocate reported the IRS did not have a consistent methodology for determining whether to charge a fee.  National Taxpayer Advocate 2007 Annual Report to Congress 66-82.  The IRS subsequently documented the process for setting fees.

29  As noted above, however, 31 U.S.C. § 9701 generally requires user fees to be "fair" and based, in part, on the "public policy or interest served," and OMB Circular A-25 provides that an agency may apply for a user fee exception based on anything that "in the opinion of the agency head or his designee, justifies an exception."

30  The IRS generally estimates the impact of fees on demand for services only after they are imposed or increased.  TAS midpoint call with responsible officials (Sept. 17, 2015).  It does not isolate the effect of the fee from other factors that may affect demand.  *Id.*

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1440 of 4699    PageID #: 8005

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

of the burden of tax compliance to taxpayers.[31]   In such cases, they may be even more likely to discourage taxpayers from using IRS services.

### IRS Employees Sometimes Consider the Downstream Effects of Fees

In its biennial user fee reviews, the IRS sometimes considers the effect of a fee increase on service and compliance.[32]   For example, in the FY 2011 Biennial Review the Small Business/Self-Employed Division (SB/SE) recommended retaining the existing IA fee, which was below full cost, because, among other things:

- Keeping the present rates encourages taxpayers to enter into an IA and pay down the current liability; and

- Increasing the rate may discourage taxpayers from using the IA  process, age our accounts receivable and move us closer to the statute expiration date without resolution of the account.[33]

In the FY 2013 Biennial Review, the IRS's National Public Liaison (NPL) office — an office that facilitates communications between the IRS and external stakeholders — opposed a user fee for the Nationwide Tax Forums, in part, because there is "significant value in providing a national platform for education and outreach activities."[34]   Similarly, the Large Business and International Division (LB&I) opposed a fee for the Compliance Assurance Process (CAP) because CAP encourages voluntary compliance and benefits the IRS.[35]   It also opposed increasing the $50,000 fee for Pre-Filing Agreement (PFAs) to the IRS's full cost of $265,475.[36]   LB&I reasoned that PFAs "enhance compliance," and as part of its mission to provide taxpayer service, it believes the PFA program helps to prepare taxpayers to become a part of CAP."[37]

> Without express guidance that IRS employees should consider the effect of fees on service, the IRS mission, taxpayer rights and burden, and voluntary compliance, they may feel pressure to ignore these considerations.

In the 2011 review, the Tax Exempt and Government Entities Division (TE/GE) opposed charging full cost to issue a PLR to individuals who need guidance about Roth IRA recharacterizations.[38]   It reasoned that the fee can be prohibitive for individuals and negatively affect retirement savings.  In the 2009 review, it also recommended a less-than-full-cost fee for approving

---

31   *See, e.g.,* Most Serious Problem: *Taxpayer Access to Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues that Are Not Conducive to Resolution Online, infra.*

32   IRS response to TAS information request (May 20, 2015) (attachments A and G).

33   *Id.* (attachment G).  SB/SE used a similar justification to avoid increasing the fee for OICs in the FY 2011 Review.  *Id.*

34   IRS response to TAS information request (May 20, 2015) (attachment A); IRM 1.1.11.4, *Office of National Public Liaison* (Feb. 12, 2015).

35   CAP is a program that allows large businesses under continuous audit to, in effect, have the IRS audit the return before it is filed, increasing voluntary compliance and reducing the burden of post-filing examinations for both the IRS and taxpayers.  *See, e.g.,* IRM 4.51.8 (June 15, 2012).

36   IRS response to TAS information request (May 20, 2015) (attachment A).

37   Similarly, LB&I argued that Advanced Pricing Agreements (APAs) are deliberately set at 50 percent of their total cost because they help reduce enforcement costs while providing a benefit to taxpayers.  IRS response to TAS information request (May 20, 2015) (attachment A).  In the 2011 review, LB&I also "considered but rejected a user fee for Qualified Intermediaries because the IRS wants to encourage foreign intermediaries to become qualified intermediaries and a user fee would have a negative impact on this process."  IRS response to TAS information request (May 20, 2015) (attachment G).  As the Business Units (BU) proposed to increase the APA and PFA fees in 2015, LB&I either did not voice these concerns or they were minimized in the latest review.  IRS response to TAS information request (Sept. 22, 2015) (Executive Summary).

38   IRS response to TAS information request (May 20, 2015) (attachment G).

001433

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1441 of 4699 PageID #: 4606

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

certain (master and prototype volume submitter) employee plans.[39]  It reasoned that because these pre-approved plans are ultimately adopted by thousands of employers, they help TE/GE manage its workload by reducing requests for plan approvals.

> User fees that seem reasonable to the IRS in a vacuum may seem outrageous to taxpayers when added to the costs of recordkeeping, filing, and paying taxes, and paying professionals for help in navigating complicated rules and procedures that the government created.

In some cases the IRS also recommended that fees depart from its full-cost estimates when those estimates were in flux.  The IRS's cost estimates depend on assumptions about what overhead costs should be included and how many taxpayers use the service (*e.g.*, when more taxpayers use a service, unit costs decline).[40]  Taxpayers should not have to pay excessive user fees simply because there are not enough other taxpayers using a service to lower unit costs, particularly when demand for the service is in flux, or fixed or indirect costs seem excessive.[41]  For example, if PLR unit costs increase because fewer taxpayers request them (*e.g.*, because the IRS has increased the fee), the IRS should not use its increased unit costs to justify increasing the fee even further.  In such cases, employees should be required to recommend fees based on either the maximum demand expected for the service or on marginal costs, as they may have done in some cases.

### Without Additional Guidance, the IRS May Not Consistently Evaluate User Fees, Resulting in Disparate Treatment of Taxpayers

Without express guidance that IRS employees should consider the effect of fees on service, the IRS mission, taxpayer rights and burden, and voluntary compliance, they may feel pressure to ignore these considerations.[42]  Alternatively, they may ignore them in some cases and not others, resulting in disparate treatment of taxpayers.  For example, the fees for CAP, which is used by the largest businesses may be below cost because LB&I employees raised concerns about voluntary compliance, whereas the fee for regular IAs may be at full cost because SB/SE employees did not.[43]  The IRS may also begin to charge full costs for services, even when excessive overhead is included, a service is underutilized, or volume estimates are in flux.  As noted above, the pressure to ignore or minimize these considerations is likely greater now that the IRS budget is constrained and it relies on user fees to replace its reduced appropriation.

---

39  IRS response to TAS information request (May 20, 2015).

40  "Full cost" fees can seem disproportionate to the value provided because they include direct and indirect costs such as "salaries and fringe benefits such as medical insurance and retirement....  Physical overhead, consulting … material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment."  Circular 25-A, § d(1).

41  We understand the IRS's costs estimates spread start-up costs over a multi-year period.  TAS midpoint call with responsible officials (Sept. 17, 2015).  Nonetheless, the IRS's resulting full-cost estimates may still seem disproportionate and discourage taxpayers from utilizing a new or underutilized service.

42  Such considerations are consistent with OMB Circular A-4 (Sept. 17, 2003).

43  It is possible that SB/SE's concerns in this regard may not have been documented.

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1442 of 4699 PageID #: 11507

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

### The IRS Does Not Fully Disclose What It Considers

When IRS employees analyze user fees, they do not fully disclose their analysis to the public (*e.g.*, the biennial review documents).[44]  Discussing the rationale for and computation of proposed increases in public before they are adopted would ensure the IRS is better informed about the consequences.  Stakeholders can provide relevant and helpful information about the impact of the fees on taxpayers and practitioners.  The IRS should disclose everything it considers in connection with its user fee reviews and ask the public for comments before deciding to increase fees.

### CONCLUSION

Rather than reactively applying user fees to fill a short-term funding deficit, the IRS should consider whether new and existing fees will discourage voluntary compliance, burden taxpayers excessively, or impair the IRS's service-oriented mission.  If the IRS makes compliance too difficult or expensive, then compliance will decline.  If a fee for service or a lack of service erodes compliance, the IRS will have to accept more noncompliance or spend more resources on (expensive) enforcement activities.[45]  The IRS should quantify and explain these considerations and disclose them to the public.[46]

It may be less expensive in the long run (for the government but not necessarily the IRS) to provide IRS services without a fee, even if that means the IRS needs to reduce the resources it devotes to enforcement activity.  About 98 percent of all revenue the IRS collects results from voluntary compliance, as compared to about two percent in enforcement revenue.[47]  Moreover, Congress obviously intended for the IRS to focus on service, as it has reduced the IRS's budget for enforcement more severely than its budget for services in recent years.[48]  Congress has long urged the IRS to focus on service.  In 1998, it went so far as to direct the IRS to "restate its mission to place a greater emphasis on serving the public and meeting taxpayers' needs."[49]

---

44  *See, e.g.*, Government Accountability Office, GAO-12-193, *User Fees: Additional Guidance and Documentation Could Further Strengthen IRS's Biennial Review of Fees* 18-19 (Nov. 2011) ("IRS officials consider factors other than cost recovery in setting fee rates.  However, we found that IRS has not thoroughly documented these factors, corroborated anecdotal support with data analysis, or studied the effect of user fees on taxpayer behavior."); T.D. 9647, 78 Fed. Reg. 72016 (2014) (briefly referencing the goal of "encouraging the use of installment agreements"); Rev. Proc. 2015-8, § 6, 2015-1 I.R.B. 235 (2015) (no discussion of the basis for master and prototype volume submitter plan fees; no discussion of basis for Roth IRA recharacterization fee); Rev. Proc. 2015-1, App'x A(3), 2015-1 I.R.B. 1 (2015) (same); Rev. Proc. 2006-9, § 4.12, 2006-1 C.B. 278 (no discussion of basis for APA fee).  The IRS did not publish the biennial reviews described above or any similarly detailed analysis.

45  Department of Treasury, *Congressional Justification for Appropriation and Annual Performance Report and Plan*, IRS-7 (2015) ("By assisting taxpayers with their tax questions before they file their returns, the IRS helps prevent inadvertent noncompliance and reduces burdensome post-filing notices and other correspondence from the IRS.").

46  This recommendation is generally consistent with OMB Circular A-4 (Sept. 17, 2003).

47  In FY 2015, the IRS collected total tax revenue of about $3.3 trillion.  Of that amount, it collected $54.2 billion through enforcement actions.  GAO, GAO-16-146, *Financial Audit: IRS's Fiscal Years 2015 and 2014 Financial Statements* 25 (Nov. 2015), *available at* www.gao.gov/assets/680/673614.pdf.

48  *Compare* Department of Treasury, *Congressional Justification for Appropriation and Annual Performance Report and Plan*, Table 2.3 (2011) (reflecting an appropriation of $2,278,830,000 for service and $5,504,000,000 for enforcement for FY 2010), *with* Department of Treasury, *Congressional Justification for Appropriation and Annual Performance Report and Plan*, Table 2.3 (2016) (reflecting an appropriation of $2,156,554 for service and $4,860,000 for enforcement for FY 2015).

49  The IRS Restructuring and Reform Act of 1998 (RRA 98), Pub. L. No. 105-206, 112 Stat. 722, Title I, § 1002 (1998).

001435

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1443 of 4699 PageID #: 4608

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise the IRM to require the IRS to avoid adopting (or retaining) a fee that would:

   - Have a significant negative impact on the IRS's service-oriented mission, voluntary compliance, or taxpayer rights and burden (including other compliance burdens taxpayers may face, such as the costs of hiring preparers or other third parties); or

   - Include fixed or indirect costs when demand for a service is in flux or that make the fee disproportionate to the value received.

2. Before establishing or raising any user fee, estimate the effect of the fee on demand for service, as needed to determine if the fee would impair the IRS mission, voluntary compliance, or taxpayer rights.  This analysis should also demonstrate that the proposed fee does not pass along indirect or fixed costs or combine with other costs that would make it seem excessive from the taxpayer's perspective.

3. Publish the user fee analysis (described above) and address any comments from internal and external stakeholders before adopting or increasing a fee.

*User Fees Memo*

*In the memo below, the National Taxpayer Advocate analyzes the most recently proposed fee increases under the principles described in the Most Serious Problem.  However, the IRS has requested the redactions shown below.*



THE OFFICE OF THE TAXPAYER ADVOCATE OPERATES INDEPENDENTLY OF ANY OTHER IRS OFFICE AND REPORTS DIRECTLY TO CONGRESS THROUGH THE NATIONAL TAXPAYER ADVOCATE.

December 4, 2015

MEMORANDUM FOR JOHN A. KOSKINEN
Commissioner of Internal Revenue

FROM:        Nina E. Olson
             National Taxpayer Advocate

SUBJECT:     IRS User Fee Increases

You recently received recommendations to increase various user fees, which were developed by IRS business units (BUs) in connection with the IRS's FY 2015 Biennial User Fee Review.  Particularly in light of the current budget situation, I am concerned that the BUs have not quantified or sufficiently considered:

- The indirect costs that are likely to result from fee increases;

- The effect of fee increases on taxpayer rights or burden;

- Any resulting reductions in voluntary compliance; or

- Any impairment of the IRS mission to "[p]rovide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all."[1]

Although the sections below discuss TAS's concerns with each of the major user fee proposals, other internal and external stakeholders may have additional concerns.  Thus, the IRS should engage in an open dialog with the public before determining whether to submit fee increases for approval, or at least before they are approved.

---

1    *See, e.g.,* IRS, Publication 1, *Your Rights as a Taxpayer* (2014); IRM 1.1.1.2, *IRS Mission* (June 2, 2015).  In addition, if TAS (rather than the taxpayer) requests or orders the IRS to provide a service (*e.g.,* under IRC § 7811) on the basis that the taxpayer would otherwise suffer a significant hardship, it is not clear that the IRS would be authorized to withhold service if the taxpayer did not pay the fee.  For example, to avoid a significant hardship, a taxpayer may need Appeals to expedite calculations or for Collection to withdraw a Notice of Federal Tax Lien (NFTL), but the IRS is considering fees for these services, as described below.

001437

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1445 of 4699 PageID #: 4610

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

### Offer in Compromise Fee Increase

███████████████████████████████████████████████ When the IRS determines a taxpayer is unlikely to be able to repay a delinquent tax debt, it may accept an offer to compromise the debt based upon "doubt as to collectibility."[3]  The goal of the OIC program is for the IRS to collect what is reasonably collectible at the least cost and at the earliest possible time, and to promote future compliance by providing taxpayers with a "fresh start."[4]  An accepted OIC also provides an extra incentive to report and pay future tax liabilities by requiring, as a condition of the OIC agreement, that the taxpayer file returns and pay taxes for the following five years.[5]  Thus, an acceptable OIC is a good deal for both taxpayers and the government, and enhances voluntary compliance, furthering the IRS's mission to help taxpayers "meet their responsibilities."  It is also consistent with the taxpayer *right to finality*, *to quality service*, and *to privacy*, which includes the right to expect that enforcement action will "be no more intrusive than necessary."[6]

When combined with the requirement for applicants to submit a down payment with an OIC,[7] the substantial OIC fee increase being considered — ███████████████████ — will almost certainly reduce utilization of the OIC program, thereby reducing voluntary compliance and impairing the IRS mission.[8]  Because taxpayers generally have to fund an offer by selling illiquid assets that the IRS could not otherwise reach or convincing a non-liable party to make this effort unless they are sure the IRS will accept the offer.  They cannot be sure the IRS will accept the offer up front when the fee is due.

As the IRS has acknowledged, "the fee for an offer in compromise could dissuade a low-income taxpayer from making an offer because the taxpayer cannot be assured of reaching an agreement."[9]  The OIC fee could also dissuade taxpayers in every other income category from making offers. ██████████████████ ████████████████  Indeed, when the IRS first imposed a $150 OIC fee in 2003, OIC submissions declined by over 20 percent among taxpayers at every income level.[10]  Further, in FY 2016 the Administration proposed to repeal the OIC down payment requirement based its conclusion that repealing the requirement

---

2   ██████████████████████████████████████████████████████████

3   *See* IRC § 7122; Treas. Reg. § 301.7122-1; Form 656, *Offer in Compromise* (2015).

4   Policy Statement P-5-100, *reprinted at*, IRM 1.2.14.1.17, *Policy Statement 5-100* (Jan. 30, 1992).

5   Form 656, *Offer in Compromise* (2015).  An IRS study found that about 80 percent of taxpayers in its sample with accepted OICs remained substantially compliant during the requisite period.  Small Business/Self-Employed (SB/SE) Payment Compliance and Office of Program Evaluation and Risk Analysis (OPERA), *IRS Offers in Compromise Program, Analysis of Various Aspects of the OIC Program*, 6 (Sept. 2004).

6   *See, e.g.*, IRS, Publication 1, *Your Rights as a Taxpayer* (2014).

7   Section 509 of the *Tax Increase Prevention & Reconciliation Act of 2005 (TIPRA)*, P.L. 109-223, effective July 16, 2006, imposed a requirement to submit a down payment with offer submissions.

8   Further, such a steep fee increase seems inconsistent with the Conference Report for the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA98), which states "the conferees believe that the IRS should make it easier for taxpayers to enter into offer-in-compromise agreements."  H.R. Rep. No. 105-599, at 288-89 (1998) (Conf. Rep.).

9   T.D. 9647, 78 F.R. 72016, 72017 (Dec. 2, 2013).

10  The Treasury Inspector General for Tax Administration (TIGTA) has concluded that the $150 OIC user fee, imposed in November 2003, was responsible for reducing OIC submissions by 28 percent overall.  *See* TIGTA, Ref. No. 2005-30-096, *The Implementation of the Offer in Compromise Application Fee Reduced the Volume of Offers Filed by Taxpayers at All Income Levels* (June 2005).  The smaller $36 increase in 2014 (from $150 to $186) would be less likely to trigger a significant reduction in OICs.  *See* T.D. 9647, 78 F.R. 72016 (Dec. 2, 2013).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1446 of 4699   PageID #: 8611

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

would raise revenue by improving access to the OIC program, which is less costly than other collection avenues.[11]

The IRS should estimate the effect of a ▮▮▮▮▮▮ increase on demand for OICs, the resulting decline in future compliance, and the costs of trying to collect these debts (and future debts, which will continue to accrue) in some other way before considering an OIC fee increase.  Any such analysis would probably find that it is less costly and burdensome to eliminate the OIC fee altogether than to increase it.  The IRS should use such projections to help justify a full OIC fee waiver from the Office of Management and Budget (OMB).

Moreover, because the OIC fee reduces the amount the taxpayer can afford to pay on the offer, the OIC fee may be viewed as an accounting gimmick that elevates form over substance — like a tax shelter — allowing the IRS to retain and use funds that would otherwise return to the U.S Treasury in the form of higher offer amounts.  The IRS should avoid giving this impression, which can only reduce respect for the IRS and the government — views which research shows correlate with noncompliance.[12]

If the IRS nonetheless pursues the OIC fee increase, it should minimize taxpayer burden by collecting the fee from the last OIC payment or at least in installments (for OICs structured that way), as it does when collecting the Installment Agreement (IA) fee.  It should also waive the fee to the extent it would otherwise exceed the total OIC amount.  For example, where the taxpayer can only pay $500, the fee should not exceed $500 and the IRS should accept an offer for $0, rather than rejecting the offer as insufficient or declining to process it because the taxpayer did not pay the fee.  Although the OIC fee under consideration would not apply to low income taxpayers, rejecting or refusing to process such an offer would undermine IRC § 7122(d)(3)(A), which provides that "an officer or employee of the Internal Revenue Service shall not reject an offer-in-compromise from a low-income taxpayer solely on the basis of the amount of the offer."

### Installment Agreement Fee Increase

The FY 2015 Biennial Review ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

11   Department of the Treasury, *General Explanations of the Administration's Fiscal Year 2016 Revenue Proposals* 237 (Feb. 2015), *available at* http://www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx ("Requiring nonrefundable payments with an offer-in-compromise may substantially reduce access to the offer-in-compromise program.  The offer-in-compromise program is designed to settle cases in which taxpayers have demonstrated an inability to pay the full amount of a tax liability.  The program allows the IRS to collect the portion of a tax liability that the taxpayer has the ability to pay.  Reducing access to the offer-in-compromise program makes it more difficult *and costly* to obtain the collectible portion of existing tax liabilities." (Emphasis added)).  The administration's analysis must have applied to high income taxpayers because low income taxpayers are exempt from the down payment requirement.  *See, e.g.*, IRC § 7122(c)(2)(C); IRS, Form 656, *Offer in Compromise* (2015).

12   *See, e.g.*, National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 1-70 (*Factors Influencing Voluntary Compliance by Small Businesses: Preliminary Survey Results*); National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 33-56 (*Small Business Compliance: Further Analysis of Influential Factors*).

13   IRS response to TAS information request (Nov. 9, 2015). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

14   IRS response to TAS information request (Nov. 9, 2015).

001439

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1447 of 4699 PageID #:  4612

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

Appendices

While an IA fee may seem reasonable on the basis that creditors charge financing fees to allow customers to pay over time, the IRS is not a commercial creditor.  For taxpayers who cannot afford to pay their taxes timely and in full, the choice is to either pay their taxes (plus penalties and interest) using an IA or not to pay them.  The choice for the IRS is to accept the IA, pursue enforced collection, or collect nothing.  If enforced collection (or placing the taxpayer into currently not collectible (CNC) status) is more expensive, the government is the primary beneficiary when taxpayers agree to pay using IAs – at least they agreed to pay.[15]

The IRS should not discourage taxpayers from utilizing IAs by charging a fee that is difficult to avoid, particularly when they feel they cannot use the lower cost IA options.  For example, some do not have bank accounts they could use to set up an online direct debit IA.  Some do not have internet access or the computer literacy that would enable them to use the online IA application.[16]  According to the U.S Census Bureau, more than 50 percent of the U.S. population with household income below $25,000 had no Internet access in 2013.[17]  About 40 percent of the returns the IRS received for tax year (TY) 2013 (or 59.0 million out of 147.4 million) reported adjusted gross income of less than that amount.[18]

Even those with access may be concerned about entering their most sensitive financial information into a web application.  Security breaches of the IRS's "Get Transcript" online application and the Office of Personnel Management (OPM)'s federal employee records have likely increased the public's anxiety in this area.[19]

Like offers, IAs promote voluntary compliance, furthering the IRS's mission to help taxpayers "meet their tax responsibilities."  IAs are also consistent with the *right to quality service* and *to privacy*, which includes the right to expect that enforcement action will "be no more intrusive than necessary," as enforced collection would be more intrusive than an IA.[20]

To the extent that IA fees reduce IA utilization, they are likely to reduce voluntary compliance and damage the IRS's ability to further its mission.  In theory, one might construe many routine IRS services as being eligible for a user fee, such as answering the telephone, processing a tax return, or sending a refund.  Presumably, the IRS has decided that charging fees for these services does not make sense or would impair its mission.  However, the IRS has not analyzed how IA fees make any more sense or impair its mission any less.

Even if the IRS does not believe an IA fee undermines its mission or reduces voluntary compliance, it should nonetheless project the effect of proposed IA fee increases on IA applications, voluntary compliance, and the cost to the IRS of dealing with these delinquencies in some other way before it decides whether to approve them.  It could use such analysis to help justify a fee waiver from OMB.

---

15   Taxpayers sometimes even ask the IRS to levy their wages to avoid the IA user fee.

16   Only about 84 percent of American adults had Internet access in 2015, and those who are minorities, low income, poor, elderly, or who live in rural areas are less likely to have access.  *See* Pew Research Center, *Americans' Internet Access:* 2000-2015 (June 26, 2015), http://www.pewinternet.org/files/2015/06/2015-06-26_internet-usage-across-demographics-discover_FINAL.pdf.

17   U.S. Census Bureau, ACS-28, *Computer and Internet Use in the United States: 2013*, 5 (Nov. 2014), *available at* http://www.census.gov/history/pdf/2013computeruse.pdf.

18   IRS Data Book, Table 1.1, *All Returns: Selected Income and Tax Items, by Size and Accumulated Size of Adjusted Gross Income* (TY 2013), *available at* http://www.irs.gov/uac/SOI-Tax-Stats---Individual-Statistical-Tables-by-Size-of-Adjusted-Gross-Income.

19   IRS, *IRS Statement on the "Get Transcript" Application* (May 26, 2015); OPM, *OPM to Notify Employees of Cybersecurity Incident* (June 4, 2015).

20   *See, e.g.*, IRS, Publication 1, *Your Rights as a Taxpayer* (2014).

*User Fees Memo*



21   IRS response to TAS information request (Oct. 22, 2015) ▮▮▮▮▮▮ *2015 Biennial Review of SB/SE User Fees* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

22   Program Manager Technical Advice (PMTA) 2009-158 (Oct. 8, 2009), *available at* http://www.irs.gov/pub/lanoa/pmta_2009-158.pdf ("[t]axpayers seek post-release withdrawals in order to improve their credit. This reason alone would not support a withdrawal under the first three sub-elements of section 6323(j)(1)… withdrawal can be said to be in the United States' best interests insofar as the improvement in the taxpayer's credit history assists him with future tax compliance.")

23   *See, e.g.*, National Taxpayer Advocate 2009 Annual Report to Congress 17, 29-30 (Most Serious Problem: *One-Size-Fits-All Lien Filing Policies Circumvent the Spirit of the Law, Fail to Promote Future Tax Compliance, and Unnecessarily Harm Taxpayers*); PMTA 2009-158 (Oct. 8, 2009).

24   IRM 1.1.1.2, *IRS Mission* (June 2, 2015).

25   IRS response to TAS information request (Nov. 9, 2015). For further discussion of this recommendation, *see, e.g.*, National Taxpayer Advocate 2012 Annual Report to Congress 402-25; National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 108-30; National Taxpayer Advocate 2011 Annual Report to Congress 109-28; National Taxpayer Advocate 2011 Annual Report to Congress vol. 2, 91-111; National Taxpayer Advocate 2010 Annual Report to Congress 302-10; National Taxpayer Advocate 2009 Annual Report to Congress 17-40; National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 1-18.

001441

User Fees Memo

26   IRS response to TAS information request (Oct. 22, 2015)

27   *See* IRC § 6109; Treas. Reg. § 301.6109-1(d)(3); Instructions to IRS Form W-7, *Application for IRS Individual Taxpayer Identification Number* (Feb. 2012).  For the Bank Secrecy Act requirement, see *generally* Bank Secrecy Act, 31 U.S.C. §§ 5311-5314, 5316-5322; 12 U.S.C. § 1829(b); USA Patriot Act, § 326, Pub. L. No. 107-56, 115 Stat. 307 (2001); 31 C.F.R. §§ 1010.410, 1010.620, 1022.400.

28   IRS, *IRS Strengthens ITIN Application Requirements; Interim Changes Will Protect the Integrity of the ITIN Process*, IR-2012-62 (June 22, 2012), *available at* https://www.irs.gov/uac/Newsroom/IRS-Strengthens-ITIN-Application-Requirements;-Interim-Changes-Will-Protect-the-Integrity-of-the-ITIN-Process; National Taxpayer Advocate 2012 Annual Report to Congress 152, 163.

29   If the applicant is a dependent (other than a military dependent), the AA will still send the identifying document to Austin.  *See* IRS, *Instructions for Form W-7, Application for IRS Individual Taxpayer Identification Number*, 3 (2014).  If the applicant is using anything other than an original passport or national identification card (*e.g.*, a copy of an original document certified by the issuing agency) at least some TACs will still send the document to Austin.  *See*, IRS, *Individual Taxpayer Identification Number (ITIN) Authenticating Taxpayer Assistance Centers* (Mar. 12, 2015), *available at* http://www.irs.gov/uac/ITIN-Authenticating-TACs-Link (last visited Nov. 10, 2015).

30   IRS, *2012 ITIN Review, Frequently Asked Questions* (Apr. 23, 2015), *available at* http://www.irs.gov/uac/2012-ITIN-Review-Frequently-Asked-Questions-1 (last visited Sept. 24, 2015).

31   The IRS has a responsibility to ensure it returns these original documents safely and promptly, but returning them by express mail could cost in the range of $1.2 to $4.1 million, making it more economical for the IRS to review the documents at a TAC or to allow a AA to review them.  Conference call between TAS and IRS W&I, discussing *Authenticating Identification Documents at SPEC, AA and VITA Sites* (Oct. 29, 2015).

32   IRS response to TAS information request (Oct. 22, 2015) (Memo from Commissioner, W&I Division to CFO, B*iennial Review of User Fee Charges* (June 19, 2015)).

001442

*User Fees Memo*



---

33  During calendar year 2015 dependents made up 43.8 percent of ITIN applicants, but they cannot use AAs to avoid parting with their documents because, as noted above, the AAs have to mail their original documents to the IRS.  IRS, Compliance Data Warehouse, Form W-7 Database (Oct. 2, 2015).  Moreover, only 21 countries around the world have AAs, with some big countries like India or Brazil only having one or two.  IRS, *Acceptance Agent Program, available at* https://www.irs.gov/Individuals/Acceptance-Agent-Program (Oct. 27, 2015).

34  *See* National Taxpayer Advocate 2012 Annual Report to Congress 152, 159.  In evaluating the pros and cons of this fee, the IRS acknowledges that it "may reduce voluntary tax compliance."  IRS response to TAS information request (Oct. 22, 2015).

35  IRM 1.1.1.2, *IRS Mission* (June 2, 2015).

36  IRS response to TAS information request (Oct. 22, 2015) (CFO Briefing).

37  IRS response to TAS information request (Oct. 22, 2015) (Memo from SB/SE Commissioner to CFO, *2015 Biennial Review of SB/SE User Fees* (June 18, 2015)).

38  IRS, Letter 627, *Estate Tax Closing Letter* (2007) ("This letter is evidence that the Federal Estate Tax Return has either been accepted as filed or has been accepted after an adjustment to which you have agreed.  You should keep this letter as a permanent record.  You may need it to close probate proceedings, transfer title to property and/or settle state taxes.…  We will not reopen or examine this return unless you notify us of changes to the return or there is: (1) evidence of fraud, malfeasance, collusion, concealment, or misrepresentation of a material fact; (2) a clearly defined substantial error based upon established Internal Revenue Service position; or (3) a serious administrative error.  (See Revenue Procedure 2005-32, 2005-1 Cumulative Bulletin 1206.)").

39  *See, e.g.*, IRS, Publication 1, *Your Rights as a Taxpayer* (2014).

001443

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1451 of 4699 PageID #: 4616

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

*User Fees Memo*



---

40   IRS response to TAS information request (Oct. 22, 2015).

41   *Id.*  The IRS could waive the fee if the government caused a delay that resulted in the need for expedited calculations.  *Id.*  The IRS has also suggested that the processing time is almost always shorter for low-dollar disputes, obviating the need for an expedite fee.  IRS response to TAS fact check (Nov. 13, 2015).

42   IRS response to TAS information request (Nov. 9, 2015).  According to the IRS, this estimate is an approximation.  IRS response to TAS fact check (Nov. 13, 2015).

43   IRM 8.1.1.1(1) *Accomplishing the Appeals Mission* (Feb. 10, 2012).

44   IRS response to TAS information request (Oct. 22, 2015).  Appeals proposed to apply the fee only to examination cases because taxpayers already pay a fee for offers.  *Id.*  Its revenue estimate assumes the fee would not discourage any taxpayers from mediation.  *Id.*

45   IRC § 7123(b)(1) ("The Secretary shall prescribe procedures under which a taxpayer or the Internal Revenue Service Office of Appeals may request non-binding mediation on any issue unresolved at the conclusion of— (A) appeals procedures; or (B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.")

*User Fees Memo*



46   See IRM 8.1.1.1(1), *Accomplishing the Appeals Mission* (Feb. 10, 2012) ("The Appeals Mission is to resolve tax controversies, without litigation, on a basis which is fair and impartial to both the Government and the taxpayer and in a manner that will enhance voluntary compliance and public confidence in the integrity and efficiency of the Service.").

47   Rev. Proc. 2015-44, 2015-38 I.R.B. 354 ("Although Appeals arbitration is being eliminated, taxpayers may be eligible to request mediation for unresolved issues that remain after completion of settlement discussions in Appeals. *See* Rev. Proc. 2014-63, 2014-53 I.R.B. 1014.")

48   Rev. Proc. 2014-63, § 9.01, 2014-53 I.R.B. 1014.

49   IRS response to TAS information request (Oct. 22, 2015).

50   See Rev. Proc. 2012-31, 2012-33 I.R.B. 256.

51   IRS, *FOIA Guidelines* (Appendix B, Fee Schedule), *available at* https://www.irs.gov/uac/Freedom-of-Information-Act-(FOIA)-Guidelines#Fees (last updated Sept. 3, 2015).

52   Memo for Distribution from Deputy Commissioner for Operations Support and Deputy Commissioner for Services and Enforcement, *Freedom of Information Act (FOIA) Obligations* (Aug. 24, 2011); IRS, Routine Access to IRS Records" *available at* http://www.irs.gov/uac/Routine-Access-to-IRS-Records ("If you [taxpayer] are working with an IRS employee on an open case, you may request information from the case file (such as copies of workpapers or other records) directly from the IRS employee assigned to the matter."). *See also* IRM 4.26.14.4(2)(b) (July 24, 2012).

53   See TIGTA, Ref. No. 2015-30-084, *Fiscal Year 2015 Statutory Review of Compliance With the Freedom of Information Act* 12 (Sept. 18, 2015) (showing the FOIA backlog).

001445

*User Fees Memo*



### Pre-Filing Agreements and Advance Pricing Agreement Fees

The PFA procedure allows taxpayers under the jurisdiction of the Large Business and International Division (LB&I) to undergo an examination and reach an agreement (a

---

54   Treas. Reg. §§ 601.702(c)(12)-(c)(13).

55   IRS response to TAS information request (May 20, 2015).

56   IRS response to TAS information request (Oct. 30, 2015).

57   IRS response to TAS information request (May 20, 2015) (attachment G).

58   IRS response to TAS information request (Oct. 30, 2015) (Memo from Commissioner, TE/GE to CFO, *FY 2015 Biennial Review of User Fee Charges* (July 21, 2015)).

59   IRS response to TAS information request (Oct. 22, 2015) (FY 2015 Biennial Review of User Fee Charges, Attachment 2).

001446

*User Fees Memo*

PFA) with the IRS about how specific items should be reported before the returns are filed.[60]  Similarly, the IRS describes the APA program as "a voluntary process whereby the IRS and taxpayers may resolve transfer pricing issues and issues for which transfer pricing principles may be relevant in a principled and cooperative manner on a prospective basis."[61]  In other words, both of these agreement programs further the IRS mission, improve voluntary compliance, reduce controversy, save resources, and implement the taxpayer rights *to be informed*, *to quality service*, *to pay no more than the correct amount of tax*, *to finality*, *to privacy*, and *to a fair and just tax system*.  Yet, the IRS only offers them to taxpayers willing to pay a very steep fee.

While the taxpayers who use these programs can mostly afford to pay the fees being considered, ability to pay should not be the sole basis for imposing a fee.  If it charges a fee, the IRS should articulate a basis for doing so that does not, in essence, charge taxpayers for services that further the IRS mission (*i.e.*, charge them when it is simply doing its job more effectively than usual).

Although only the government can audit returns and sign closing agreements with taxpayers, one potential basis for imposing a fee for these programs may be that the IRS would otherwise compete with tax practitioners and accounting firms, who may also examine a taxpayer's records and provide opinions about the accuracy/certainty of the tax treatment of the items it reflects.[62]  On that basis it might be reasonable for the government to charge for its fact-finding or examination activities (assuming these taxpayers were not certain to be examined in any event), but not for executing the closing agreement itself, which only the government can do.  This might also provide a basis for the IRS to explain to the public why the agreement programs that it charges for (*i.e.*, the PFA and APA programs) are different from a similar agreement program that LB&I does not charge for — the Compliance Assurance Process (CAP).[63]  Specifically, taxpayers eligible for CAP are already under continuous audit — a function only the government can undertake — making it even less reasonable for the IRS to charge for the audit or fact-finding component of the program.  Moreover, the IRS should explain to the public why — aside from its own budget situation — it is suddenly increasing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

60  Rev. Proc. 2009-14, 2009-3 I.R.B. 324; IRM 4.60.8.3.4, *IMS Procedures in APA Cases* (June 5, 2014); IRM 4.30.1.1(1) (Jan. 9, 2002) ("The pilot demonstrated that PFAs were cost efficient, they allowed taxpayers to file more compliant tax returns within prescribed time frames, taxpayer burden decreased and both the IRS and taxpayers conserved resources.").

61  Rev. Proc. 2015-41 § 2.02(2), 2015-35 I.R.B. 263 (also noting "[T]he APA process increases the efficiency of tax administration by encouraging taxpayers to come forward and present all the facts necessary for a proper evaluation of their proposed covered issues and to work towards a resolution of such issues in a spirit of openness and cooperation.").  *See also* IRM 4.60.8.3.3, *Advance Pricing Agreement (APA) Cases* (June 5, 2014).

62  *See* National Taxpayer Advocate 2007 Annual Report to Congress 66, 68 ("[W]hen government and private businesses provide the same services, user fees may also help keep the government from stifling private-sector competition.").

63  CAP is a program that allows large businesses under continuous audit to, in effect, have the IRS audit the return before it is filed, increasing voluntary compliance and reducing the burden of post-filing examinations for both the IRS and taxpayers.  *See*, *e.g.*, IRM 4.51.8, *Compliance Assurance Process (CAP) Examinations* (Sept. 25, 2015).

64  ▮▮ response to TAS information request (Nov. 9, 2015).

001447

*User Fees Memo*



---

65   IRS response to TAS information request (May 20, 2015) (attachment A); IRM 1.1.11.4, *Office of National Public Liaison* (Feb. 12, 2015).

66   IRS response to TAS information request (Oct. 22, 2015) (2015 Biennial Review, Attachment 2); IRS response to TAS information request (Nov. 3, 2015).

67   

68   

69   

70   IRM 1.32.19.20, *Review and Implementation of New User Fees* (Nov. 8, 2012).

*User Fees Memo*



71  IRS response to TAS fact check (Nov. 13, 2015).

72  Ann. 2006-74, 2006-2 C.B. 746 (Oct. 16, 2006); IRS, *IRS Income Verification Express Service* (Sept. 14, 2015), *available at* https://www.irs.gov/Individuals/Income-Verification-Express-Service.

73  *See, e.g.,* Form 4506T, *Request for Transcript of Tax Return* (2015); Form 4506T-EZ, *Short Form Request for Individual Tax Return Transcript* (2014).

74  *See, e.g.,* National Taxpayer Advocate 2012 Annual Report to Congress 553-59 (Legislative Recommendation: *Protect Taxpayers and the Public Fisc from Third-Party Misappropriation of Payroll Taxes*); National Taxpayer Advocate 2007 Annual Report to Congress 538-44 (Legislative Recommendation: *Taxpayer Protection From Third Party Payer Failures*); National Taxpayer Advocate 2004 Annual Report to Congress 394-99 (Legislative Recommendation: *Protection from Payroll Service Provider Misappropriation*).

75  The Tax Increase Prevention Act of 2014, Tax Technical Corrections Act of 2014, and Achieving a Better Life Experience (ABLE) Act of 2014, Pub. L. No. 113-295 § 206, 128 Stat. 4010, 4065-4073 (Dec. 19, 2014) (codified at IRC §§ 3511, 7705, 3302, 3303, 6053, 6652, and 7528(b)(4)).

76  IRC § 7528(b)(4).

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

**MSP #3**

# FORM 1023-EZ: Recognition As a Tax-Exempt Organization Is Now Virtually Automatic for Most Applicants, Which Invites Noncompliance, Diverts Tax Dollars and Taxpayer Donations, and Harms Organizations Later Determined to Be Taxable

## RESPONSIBLE OFFICIAL

Sunita Lough, Commissioner, Tax Exempt and Government Entities Division

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Finality*

## DEFINITION OF PROBLEM

In 2014, over the objections of the National Taxpayer Advocate and other stakeholders, the IRS began addressing backlogs in its inventory of applications for tax-exempt status by allowing certain organizations to use new Form 1023-EZ, *Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*.[2] Form 1023-EZ adopts a "checkbox approach," requiring applicants merely to attest, rather than demonstrate, that they meet fundamental aspects of qualification as an exempt entity.

Unlike Form 1023, *Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code*, Form 1023-EZ does not solicit any narrative of the organization's activities, any financial data, any substantiating documents, or any explanatory material.[3] With the adoption of Form 1023-EZ, the IRS effectively abdicated its responsibility to *determine* whether an organization is organized and operated for an exempt purpose.[4]

Experience thus far with the "streamlined" application procedures that Form 1023-EZ exemplifies has not been encouraging:

- IRS audits demonstrate that eight percent of Internal Revenue Code (IRC) § 501(c)(3) organizations do not make required changes to their organizing documents even after they attest they have done so;[5]

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See* National Taxpayer Advocate Fiscal Year (FY) 2015 Objectives Report to Congress 54-7.  Among other things, organizations eligible to submit Form 1023-EZ must generally have annual gross receipts of less than $50,000 and assets of less than $250,000.

3   Form 1023-EZ applicants, who must file electronically, cannot submit anything with the application other than the three-page form itself, even if they want to.

4   *See* Patricia Cohen, *I.R.S. Shortcut to Tax-Exempt Status Is Under Fire*, N.Y. Times (Apr. 9, 2015) (noting "[a]n unlikely coalition of tax lawyers, state enforcement agents and even many nonprofits that favor simpler rules say that the agency — by not asking any questions about governance, conflicts of interest or function, and saying applicants don't have to reveal any such issues — is making it too easy to commit fraud").

5   Tax Exempt and Government Entities (TE/GE) Division Second Qtr Business Performance Review (BPR) 2015 at 2 (May 2015).

- The IRS's own analysis of a representative sample of Form 1023-EZ filers shows that the IRS approves a significant number of applications it would have rejected had the applications been subject to a slight amount of scrutiny;[6]

- TAS's analysis of a representative sample of Form 1023-EZ applicants whose applications were approved by the IRS shows that 37 percent were not, as a matter of law, IRC § 501(c)(3) organizations; and[7]

- The frequency at which IRC § 501(c)(3) organizations were referred to the Exempt Organization (EO) Examination function increased almost ninefold from FY 2014 to FY 2015.[8]

As the Tax Exempt and Government Entities division (TE/GE) acknowledges, the IRS intends to address the "perceived inadequate oversight" that stems from its new Form 1023-EZ procedures by shifting more resources to audits.  This back-end, labor-intensive approach invites noncompliance, diverts tax dollars and taxpayer donations, and harms taxpayers that could have adjusted their organizing documents or the activities they pursued if the IRS had advised them of the need to do so from the outset.[9]  While audits serve a role in furthering taxpayer compliance, they are no substitute for preventive, front-end efforts to avoid compliance issues in the first place.  Thus, the proposed 1023-EZ audit strategy is a misallocation of IRS resources and an unnecessary burden on compliant exempt organizations.

## ANALYSIS OF PROBLEM

### The Law Requires an Exempt Entity's Organizing Document to Contain Key Elements, and It Is Not Difficult to Determine Whether the Requirements Are Met

In order to be exempt from tax as an IRC § 501(c)(3) organization, an entity's organizing documents must establish that it is "organized and operated exclusively" for one of eight enumerated exempt purposes.[10]  Form 1023 requires applicants to submit their organizing documents; instructions for the form explain the need for and provide examples of appropriate purpose and dissolution clauses.[11]  By inspecting organizing documents and withholding exempt status until the organization's documents meet the legal

---

6  TE/GE, *Form 1023-EZ First Year Report* 5; EO Response to TAS information request (Oct. 29, 2015).

7  *See Study of Taxpayers that Obtained Recognition as IRC § 501(c)(3) Organizations on the Basis of Form 1023-EZ*, vol. 2, *infra*, (describing TAS's analysis of a representative sample of 408 corporations obtaining exempt status on the basis of Form 1023-EZ located in one of 20 states that make articles of incorporation available online at no cost).  Reports of increased levels of customer satisfaction with Form 1023-EZ are not surprising, given that recognition as an IRC § 501(c)(3) organization is now easily available to some organizations that do not actually qualify for that status.  *See* Diane Freda, *Exempt Organizations: First Year Survey of Form 1023-EZ Confirms Popularity*, BNA Daily Tax Report (Dec. 5, 2015).

8  TE/GE responses to TAS information request (June 11, 2015; Nov. 25, 2015).

9  TE/GE BPR First Qtr 2015 Appx. B, TE/GE Risk Register (Feb. 2015) (noting that "[p]erceived inadequate oversight of the tax-exempt sector as we undertake strategic shifts in how we conduct the up-front review of applications for tax-exempt status..." will be mitigated by "[e]xpanded compliance efforts.").

10  IRC § 501(c)(3); Treas. Reg. § 1.501(c)(3)-1(b)(1)(i) (providing "[a]n organization is organized exclusively for one or more exempt purposes *only if its articles of organization*," among other things, limit the purposes of such organization to one or more exempt purposes); Treas. Reg. § 1.501(c)(3)-1(b)(4) (providing "[a]n organization is not organized exclusively for one or more exempt purposes unless its assets are dedicated to an exempt purpose.  An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, *by reason of a provision in the organization's articles* or by operation of law, be distributed for one or more exempt purposes..." (emphasis added)).  In nine states, sometimes referred to as *cy pres* states, a dissolution clause is not required because by operation of state law, the organization's assets would be distributed upon dissolution for one or more exempt purposes, or to the federal government, or to a state or local government, for a public purpose.  *See* Rev. Proc. 82-2, 1982-1 C.B. 367; Tex. Bus. Orgs. Code Ann. § 22.304(a)(2) (2012).

11  *See* Part II of Form 1023; Instruction, Form 1023 at 7 (providing examples of acceptable purpose and dissolution clauses).

requirements, EO can correct noncompliance and avert noncompliance that might otherwise arise as the organization operates.

On the other hand, when EO fails to inspect articles of incorporation, it risks recognizing as IRC § 501(c)(3) organizations those that do not meet the legal requirements. For example, the IRS recognized as tax-exempt a Form 1023-EZ applicant whose articles of incorporation describe its purpose as:

> My father [named individual], suffered [sic] a spinal cord injury in February 2013, which left him a quadriplegic [sic]. His physicians and physical therapists say he is capable of recovering and walking again but his insurance ([name of State] Medicaid) will not cover the expense, so we are hosting fundraisers/benefits to try to raise the money on our own to pay for his therapy out of pocket.[12]

This description raises serious doubts about whether the applicant intends, or would even be permitted by its articles, to serve a public, as opposed to a private, interest. Presumably, if EO had reviewed these articles of incorporation before conferring exempt status, it would have required additional information and insisted on changes to the articles before granting exempt status.

As another example, the IRS recognized as exempt a corporation whose articles are devoid of any purpose clause or description of current or planned activities (and do not allow any insight about what those activities may be), and contain the following dissolution clause: "Assets will be distributed to registrant of entity [individual taxpayer's name], if this nonprofit dissolves."[13] Assets that are ultimately destined for the founder's or some other individual's pocket cannot be viewed as dedicated to an exempt purpose. Had EO reviewed these articles of incorporation before it conferred exempt status, it presumably would have required their amendment.

> It appears that reviewing an applicant's case file and its articles of incorporation and then requesting amendments to the articles of incorporation takes the Tax Exempt and Government Entities Exempt Organizations function about an hour. This is a small price to pay to prevent waste, error, and abuse.

TAS evaluated articles of incorporation of a representative sample of approved Form 1023-EZ filers incorporated in the 20 states in which the Secretary of State maintains a website that permitted TAS to view legible copies of articles of incorporation at no charge to determine whether they meet the organizational test. Such review took about three minutes on average and identified a significant portion of organizations whose applications have been erroneously approved.[14] It appears that reviewing an applicant's case file and its articles of incorporation and then requesting amendments to the articles of incorporation takes EO about an hour.[15] This is a small price to pay to prevent waste, error, and abuse.

---

12  This is the entire text that appears as the "purposes/nature of the business" in the articles of incorporation of an organization included in a representative sample of corporations whose Form 1023-EZ application was approved.  *See Study of Taxpayers That Obtained Recognition as IRC § 501(c)(3) Organizations on the Basis of Form 1023-EZ*, vol. 2, *infra*.

13  This is the actual entire dissolution clause in the articles of incorporation of an organization included in a representative sample of corporations whose Form 1023-EZ application was approved.  *Id.*

14  *Id.*

15  TE/GE response to TAS information request (June 11, 2015), noting "anecdotally, employees charge approximately one hour to review a case file, check the state website, and write an additional information letter which would include the request for the Articles of Incorporation and/or amendments, as needed."

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1460 of 4699 PageID #: 6825

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

### For Years, the Form 1023 Application Process Was Plagued by Delay

In the decade prior to the introduction of Form 1023-EZ, the National Taxpayer Advocate voiced concerns about delays in processing applications submitted on Form 1023.[16]  By 2012, the volume of EO's open inventory was 36,034 cases, applications requiring little or no development were taking four months to close, and applications requiring assignment to a reviewer were taking nine months just to be assigned.[17]  By 2013, the application inventory backlog stood at about 66,000 cases, and applications requiring review took a year and a half to be assigned.[18]

The National Taxpayer Advocate has, since 2011, recommended that the IRS develop a Form 1023-EZ for use by small organizations.[19]  Little did she know that the IRS, after initially dismissing the suggestion outright, would ultimately take that idea and run with it to the point of absurdity.

### EO Implemented Streamlined Procedures That Addressed the Form 1023 Inventory Backlog But at the Price of Actual Oversight

The Tax Exempt and Government Entities Exempt Organizations function approved Form 1023-EZ applications much less frequently — 77 percent of the time, compared to 95 percent of the time — when it requested documents or basic information from the applicants, rather than relying on the attestations contained in the form.

In October and November of 2013, as part of a three-week pilot project, EO adopted "streamlined procedures" to address its existing inventory backlog of applications submitted on the 12-page Form 1023 that needed further development. These procedures allowed some applicants to provide "assurance of meeting the organizational and operational tests through representational attestations" rather than by submitting substantiating documents.[20]  EO expanded the project in January of 2014 and now uses streamlined procedures to evaluate *all* Form 1023 applications.[21]  For example, if the applicant is a corporation and does not submit its articles of incorporation as required, the agent reviewing the application may retrieve the articles from official online State records, and if the corporation is legally formed and appears to otherwise qualify for favorable determination under IRC § 501(c)(3), the agent simply asks the organization for confirmation.[22]  On the other hand, if the articles of incorporation do not meet the organizational test, but the applicant appears to otherwise qualify for favorable determination and no other organizing document issues need to be addressed, the agent merely asks the applicant to attest that the articles have been amended to correct the deficiency (but the organization is not required to submit amended articles).[23]

---

16  *See, e.g.*, National Taxpayer Advocate 2004 Annual Report to Congress 193 (Most Serious Problem: *Application and Filing Burdens on Small Tax-Exempt Organizations*); National Taxpayer Advocate 2007 Annual Report to Congress 210 (Most Serious Problem: *Determination Letter Process*); National Taxpayer Advocate 2011 Annual Report to Congress 437 (Status Update: *The IRS Makes Reinstatement of an Organization's Exempt Status Following Revocation Unnecessarily Burdensome*).

17  National Taxpayer Advocate 2012 Annual Report to Congress 192, 196, 205.

18  National Taxpayer Advocate 2013 Annual Report to Congress 165 (Most Serious Problem: *Exempt Organizations: The IRS Continues to Struggle with Revocation Processes and Erroneous Revocations of Exempt Status*).

19  National Taxpayer Advocate 2011 Annual Report to Congress 437, 444, 562.

20  *See Proposal to Apply the Concepts from the Streamlined Application Process Pilot to Existing Inventory*, attached to TEGE-07-0215-0005, *Reissued Streamlined Processing Guidelines for All Cases* (Feb. 27, 2015).

21  *Id.*

22  TEGE-07-0315-0006, *Streamlined Processing Guidelines for All Cases* (Mar. 12, 2015).  More than 20 states currently make corporations' articles of incorporation viewable online free of charge.  TE/GE Third Qtr BPR 2015 at 5 (Aug. 2015).

23  TEGE-07-0315-0006, *Streamlined Processing Guidelines for All Cases* (Mar. 12, 2015).

001453

TE/GE has begun to audit some filers that obtained exempt status using streamlined procedures.[24]  As of March 27, 2015, TE/GE had started 284 audits and closed 51.[25]  Of the closed audits of IRC § 501(c)(3) organizations, eight percent failed to meet the organizational test at the time the examination commenced, even though they had already interacted with TE/GE after they had filed Form 1023 — *i.e.*, assuming that TE/GE followed its own procedures, after reviewing the Form 1023, it notified the organizations of the deficiencies in their organizing documents and the organizations attested that those deficiencies had been corrected.[26]  For the amount of time it took to correspond with and audit these organizations, EO could have required a copy of the amended articles after its initial review in the application phase, making certain, while it had the organizations' attention and leverage over them, that they met the organizational test.  Instead, the IRS substituted an exchange of correspondence (and issued a favorable determination letter) for actual oversight of organizations it knew were not compliant.

### The IRS Approved Virtually All Form 1023-EZ Applications, Despite Its Own Analysis Showing Form 1023-EZ Provides Insufficient Information

In the first year after introduction, EO approved 95 percent of applications submitted on Form 1023-EZ.[27]  When it introduced Form 1023-EZ, TE/GE committed to review a sample of Form 1023-EZ applications in greater detail before making a determination.[28]  As of June 26, 2015, EO had selected 1,191 organizations for pre-determination review, and had closed 965 of these 1,191 cases.[29]  EO agents requested additional information from these applicants, such as "the organizing document with language required to meet the organizational test" and "a detailed description of past, present, and future activities; revenues and expenses."[30]  As Figure 1.3.1 shows, EO approved Form 1023-EZ applications much less frequently — 77 percent of the time, compared to 95 percent of the time — when it requested documents or basic information from the applicants, rather than relying on the attestations contained in the form.

24  In 2014, TE/GE began a post-determination audit program of organizations (both Form 1023 filers and those that filed Form 1024, *Application for Recognition of Exemption Under Section 501(a)*) that received exempt status from April - September 2014 under the streamlined procedures.  Correspondence audits of a statistical sample of these organizations began in October 2014, with the plan of starting 1,400 new audits and closing 1,200 in FY 2015.  *See Post-Determination Compliance (PDC) Examinations*, TE/GE BPR Second Qtr 2015 at 2 (May 2015).

25  TE/GE Second Qtr BPR 2015 at 2 (May 2015).

26  TE/GE's third quarter BPR reports that as of June 26, 2015, TE/GE had closed 204 audits, but does not report how many organizations failed to meet the organizational test at the time the audit commenced.  TE/GE Third Qtr BPR 2015 at 7 (Aug. 2015).  TE/GE requests any necessary amendments to organizing documents during the audit process.  TE/GE response to TAS information request (June 11, 2015).

27  TE/GE Third Qtr BPR 2015 at 4 (Aug. 2015) (reporting that in the year since it introduced Form 1023-EZ, EO received 43,157 Form 1023-EZ applications).  It closed 42,089, of which it approved 39,907, an approval rate of 95 percent.

28  *See* Rev. Proc. 2014-40, § 5.03, 2014-30 I.R.B. 229 (providing that "the Service will select a statistically valid random sample of Forms 1023-EZ for pre-determination reviews"); Rev. Proc. 2015-5, § 5.03, 2015-1 I.R.B. 186 (providing the same).  Interim guidance to employees describes as the goals of the review to: "Identify applicants that do not qualify for exemption; Identify applicants that are not eligible to file Form 1023-EZ (those that should have completed the full Form 1023); Gauge the effectiveness of Form 1023-EZ (*i.e.*, identify situations in which a streamlined application was not appropriate such as where the activities should have been addressed in full development); Learn about the population of organizations applying for exemption using Form 1023-EZ; Enhance public trust by reinforcing that submission of Form 1023-EZ does not guarantee tax exemption will be recognized."  TEGE-07-0714-0017, *Interim Guidance on Processing Form 1023-EZ* (July 1, 2014).

29  TE/GE, *Form 1023-EZ First Year Report* 5-6, EO Response to TAS information request (Oct. 29, 2015).

30  *Id.*

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1462 of 4699 PageID #: 16627

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

**FIGURE 1.3.1**[31]

### Form 1023-EZ Approval Rates



95%
Form 1023-EZ applications

77%
Form 1023-EZ applications subject
to predetermination review

EO rejected 152 applications included in the pre-determination review sample because the organiza-
tion was ineligible to apply using Form 1023-EZ (even though Form 1023-EZ applicants attest they
have completed an Eligibility Worksheet included in the instructions to the form and are eligible to use
the form), or because the organization did not respond to the request for additional information.[32]  It is
possible that these applicants would qualify as IRC § 501(c)(3) organizations.  However, as of March 27,
2015, EO had also identified 181 cases in which a review of the organization's articles of incorporation
revealed that the applicant did not initially meet the organizational test, despite their attestations to the
contrary.[33]  Even assuming that no further such organizations were identified by the time TE/GE made its
determinations in all 965 cases it had closed by June 26, 2015, the 181 organizations that did not initially
meet the organizational test represent a rate of noncompliance of almost 20 percent.[34]

---

31  TE/GE, *Form 1023-EZ First Year Report* 5, EO Response to TAS information request (Oct. 29, 2015).

32  *Id.* at 5-6, EO Response to TAS information request (Oct. 29, 2015) (reporting that 68 applications were rejected because the
    applicant was not eligible to apply using Form 1023-EZ and 84 applications were rejected because the organization did not
    respond to a request for additional information).  Because TE/GE adopted the practice of making follow-up calls to nonrespon-
    sive organizations, the rate of nonresponse has declined from 12 percent of all applications (in the first six months of Form
    1023-EZ processing) to six percent (in the second six months of Form 1023-EZ processing), which has presumably resulted in
    an increase in the approval rate.

33  TE/GE response to TAS information request (June 11, 2015).  In those cases, EO requested the organizations to amend their
    organizational documents and accepted an attestation, under penalties of perjury, that the document had been amended to
    include the required provisions.

34  Moreover, EO's initial review of the description of the organization's activities identified 40 organizations that did not meet the
    operational test.  To the extent these 40 organizations were not already counted among those that failed the organizational
    test, the rate of noncompliance was greater than 20 percent.  In these cases, EO requested clarification in an additional
    information letter, or, as happened in four cases, if the description indicated the applicant could qualify under a different
    subsection of the Code, such as IRC § 501(c)(4), EO asked the organization to reapply on Form 1024.  In one case, the
    description indicated the applicant did not qualify for recognition of exemption, and EO advised the applicant it would propose
    an adverse determination.  TE/GE response to TAS information request (June 11, 2015).  Ultimately, 21 of the 40 applications
    were approved.  Fifteen applications were rejected (eight because the organization did not respond to the request for informa-
    tion, six were not eligible to use Form 1023-EZ, and one had an invalid EIN.  Four organizations appeared to not qualify as
    IRC § 501(c)(3) organizations and withdrew their applications (three of these four were encouraged to reapply by submitting
    Form 1024). TE/GE response to TAS information request (Oct. 27, 2015).

001455

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1463 of 4699 PageID #:  4628

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

Appendices

Figure 1.3.2 summarizes the rate at which EO's own analyses showed that organizations did not meet the organizational test, as demonstrated by the two separate review or audit programs:

- EO's post-determination audits of organizations whose Form 1023 was approved using streamlined procedures; and

- EO's pre-determination review of a representative sample of organizations that submitted Form 1023-EZ.

**FIGURE 1.3.2**[35]

**Rate at Which Applicants for Exempt Status Did Not Meet Organizational Test for Qualification as an IRC § 501(c)(3) Organization**



| | |
|---|---|
| ■ EO Post-Determination Audits of Organizations Whose Form 1023 Was Approved Using Streamlined Procedures | ■ EO Pre-Determination Review of Form 1023-EZ Applicants |

**TAS Analysis of Approved Organizations Shows Many Did Not Meet the Requirements for Exempt Status, Often for Reasons They Could Have Easily Corrected Had EO Reviewed Their Documents**

From July through September 2015, TAS reviewed a representative sample of 408 organizations whose Form 1023-EZ applications were approved.[36]  The analysis showed that 149, or 37 percent, of the organizations in the sample did not satisfy the organizational test.  Of these 149 organizations, 22 appeared to have an adequate purpose clause, but lacked a sufficient dissolution clause (where one was required), a condition the organizations could have easily corrected had they been advised to do so.  For some organizations, an exempt purpose could be inferred even though the articles did not have an adequate purpose clause.  These organizations might very well have been able to craft an accurate, tax-compliant purpose clause had they been advised of the need to do so, and correcting that deficiency might have averted future noncompliance as they commenced or continued their operations.

The numbers show that the IRS is actually undermining compliance by failing to take simple prophylactic measures, such as requesting and reviewing an applicant's organizing documents, before conferring exempt status.

---

35   TE/GE Second Qtr BPR 2015 at 2 (May 2015); TE/GE response to TAS information request (June 11, 2015).

36   *See Study of Taxpayers That Obtained Recognition as IRC § 501(c)(3) Organizations on the Basis of Form 1023-EZ*, vol. 2, *infra* (describing TAS's analysis of a representative sample of 408 corporations obtaining exempt status on the basis of Form 1023-EZ located in one of 20 states that make articles of incorporation available online at no cost).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1464 of 4699 PageID #: 6529

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

From July through September 2015, TAS reviewed a representative sample of 408 organizations whose Form 1023-EZ applications were approved. The analysis showed that 149, or 37 percent, of the organizations in the sample did not satisfy the organizational test.

### The IRS Intends to Audit Its Way Out of the Potential Noncompliance It Helped Create

TE/GE will begin correspondence audits of Form 1023-EZ filers in FY 2016, selecting cases through a statistical sample of organizations that have operated for a complete tax year after receiving a determination letter.[37] However, TE/GE, rather than sampling from all organizations that received exempt status on the basis of Form 1023-EZ, will only sample from approved Form 1023-EZ filers that filed a 990-series return.[38] E-Postcard submitters are required to submit the e-Postcard annually, and will lose their exempt status if they fail to do so, but only if the failure persists for three consecutive years.[39] To the extent organizations required to submit an e-Postcard do not do so every year, TE/GE will have an incomplete sample of approved Form 1023-EZ filers. It remains to be seen whether, if the post-determination audits of Form 1023-EZ filers show high levels of noncompliance, TE/GE will adjust its procedures by strengthening its initial review process.

We also note that from FY 2014 to FY 2015, the frequency with which EO Determinations employees referred IRC § 501(c)(3) organizations to TE/GE's EO Examination function increased almost ninefold.[40] In view of the fact that this surge in referrals coincided with the introduction of Form 1023-EZ, TE/GE might gain further insight into compliance levels of Form 1023-EZ filers by analyzing these referrals in greater detail.

To its credit, TE/GE is implementing a broader compliance risk framework, expected to unfold over several years, that entails defining and measuring compliance for the exempt organization population. It plans to divide the population into meaningful market segments, grouped by common traits, behavior, and interactions with the IRS. It will then (1) select a random sample for each market segment, both to establish an initial baseline compliance rate and to develop a market segment-specific compliance risk model; (2) assign different treatment types to each organization based on its risk score; and (3) re-evaluate the model and treatments based on the results.[41] The National Taxpayer Advocate has long advocated for more research into the behavior, needs, and preferences of exempt organizations.[42] This work is very important, as the National Taxpayer Advocate noted in 2007 and 2009, and it is not mutually exclusive with the pre-determination oversight we recommend. In fact, the approaches work hand in hand.

---

37  TE/GE response to TAS information request (June 11, 2015).

38  TE/GE, *Form 1023-EZ First Year Report* 9, EO Response to TAS information request (Oct. 29, 2015).

39  IRC § 6033(j).

40  In FY 2014, EO Exam received 19 referrals from EO Determinations employees for all IRC § 501(c)(3) organizations, without distinction between Form 1023 and Form 1023-EZ filers. For FY 2015, EO Exam received 184 such referrals, an almost nine-fold increase. TE/GE responses to TAS information request (June 11, 2015; Nov. 25, 2015).

41  TE/GE response to TAS information request (June 11, 2015).

42  *See, e.g.*, National Taxpayer Advocate 2007 Annual Report to Congress 197, 209 (recommending that the IRS conduct an exempt organization Taxpayer Assistance Blueprint (TAB) to study exempt organizations' service needs and preferences (by size and type of organization) and develop a plan to improve service to these organizations, followed by further research of the tax exempt sector, and that it "[d]edicate a group of employees, from both outreach and compliance functions, entirely to small EOs. Such entities have very different needs from mid-sized and large EOs and require a different approach."). *See also* National Taxpayer Advocate 2009 Annual Report to Congress 287, 299 (reiterating the recommendation that the IRS design and implement an exempt organization TAB in order to formulate a targeted outreach plan based on research).

001457

## CONCLUSION

By adopting Form 1023-EZ to address inventory backlogs, the IRS relinquished its power to effectively determine whether applicants qualify as IRC § 501(c)(3) organizations.  The IRS's own analysis shows a significant discrepancy between the rate at which Form 1023-EZ filers obtain exempt status and the rate of approval when the IRS subjects their applications to a slight amount of scrutiny.  TAS's review of Form 1023-EZ filers that obtained exempt status confirms there is a significant level of erroneous approvals.  Rather than auditing its way out of the noncompliance it helped create, the IRS should reconsider its decision to use Form 1023-EZ in its present form.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise Form 1023-EZ to require applicants, other than corporations in states that make articles of incorporation publicly available online at no cost, to submit their organizing documents.

2. Revise Form 1023-EZ to require applicants to provide a description of their actual or planned activities and submit summary financial information such as past and projected revenues and expenses.

3. Make a determination only after reviewing the Form 1023-EZ application, the applicant's organizing documents, its description of actual or planned activities, and its financial information.

4. Where there is a deficiency in an organizing document, require an applicant to submit a copy of an amendment to its organizing document that corrects the deficiency and has been approved by the state, even where the documents are available online at no cost, before conferring exempt status.

**MSP #4**

## REVENUE PROTECTION: Hundreds of Thousands of Taxpayers File Legitimate Tax Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's Pre-Refund Wage Verification Program

### RESPONSIBLE OFFICIAL

Debra Holland, Commissioner, Wage & Investment Division
Ken Corbin, Director, Return Integrity & Compliance Services

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF THE PROBLEM

In general, the IRS uses the Pre-Refund Wage Verification Program (hereinafter - Income Wage Verification or IWV) to temporarily freeze an individual's refund (also called "refund holds") when it detects potentially false wages and withholding. The National Taxpayer Advocate first expressed concerns with the IRS's inability to properly identify, process, and timely release refund freezes in 2003.[2] Despite certain improvements, such as technological advances, and procedural and policy changes, the IRS's screening processes in this program continue to harm taxpayers with legitimate returns. For example:

- TAS's analysis of the population of taxpayers filing for tax year (TY) 2014, whose returns the Electronic Fraud Detection System (EFDS) selected for review in 2015 (through October), showed that nearly 180,000 such taxpayers who finally received their refunds experienced delays of nearly 18 weeks on average.

- EFDS had a "false positive" rate of almost 35 percent in fiscal year (FY) 2015.[3]

- In 2015, the IRS moved potential identity theft returns identified by EFDS from the IWV to the Taxpayer Protection Program (TPP) for processing. The TPP's false positive rate jumped from 19.8 percent in calendar year (CY) 2014 to 36.2 percent in CY 2015, while the Level of Service

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   The National Taxpayer Advocate initially expressed concerns regarding the increase in Criminal Investigation (CI) control, or "freeze," by the IRS's CI Fraud Detection Units in her 2003 Annual Report to Congress. *See* National Taxpayer Advocate 2003 Annual Report to Congress 175 (Most Serious Problem: *Criminal Investigation Freezes*). This program preceded the current IWV Program operated by the IRS's Integrity & Verification Operation unit.

3   A false positive occurs when a system selects a legitimate return and delays the refund past the prescribed review period. IRS response to TAS information request (Oct. 20, 2015). The IRS did not track the false positive rates, also called detection rates, for EFDS. However, in FY 2015, it began tracking the false positive rate for EFDS related to the TPP.

001459

(LOS) for taxpayers trying to contact the IRS to verify their identity plummeted.  At one point during the peak of the filing season, only one out of ten calls got through to a live assistor.[4]

- The IRS also increased the testing of another application it uses to detect identity theft or fraud, the Return Review Program (RRP), which experienced an over 500 percent increase in stopping legitimate tax returns this year.

The workload in the Integrity & Verification Operation (IVO) unit, which operates the IWV program, decreased by 47 percent in CY 2015.  Yet TAS received 36,752 IWV cases in the first nine months of CY 2015, or nearly 15 percent more as compared to the prior year, making it the second most common reason taxpayers came to TAS.  TAS provided full or partial relief for almost four out of five taxpayers who contacted TAS about delayed refunds flagged under the IWV program and IWV holds, spending an average of 8.2 weeks to resolve these cases.[5]

The National Taxpayer Advocate acknowledges that any effective screening method will result in false positives, no matter how well designed.  However, the high false positive rates in all of these programs are unnecessarily high; moreover, she remains concerned that:

- The IRS does not track the false positive rates for the IWV program, and thus, is unable to determine the precise filters or screens stopping legitimate refunds;

- The IRS does not have adequate procedures to promptly review and adjust its fraud detection filters, rules, and models; and

- Taxpayers whose refunds are frozen by the IWV program cannot reach a live assistor in the IVO unit.

These shortcomings burden taxpayers whose legitimate refunds are substantially delayed.  As a result, the taxpayers' *rights to be informed, to quality service, to challenge the IRS's position and be heard, to privacy*, and *to a fair and just tax system* are jeopardized.

## ANALYSIS OF PROBLEM

### Background

The return integrity program, a process critical to the IRS's strategy to address identity theft and detect and prevent improper fraudulent refunds, is complex and multifaceted.[6]  The Return Integrity & Compliance Services (RICS) IVO — a part of the Wage & Investment (W&I) Division — uses filters, rules, data mining models, and manual reviews to identify potentially false returns, usually through wages or withholding reported on the returns, to stop fraudulent refunds before the IRS issues them.[7]  It electronically screens tax returns using three independent systems: the Dependent Database (DDb), the RRP, and the EFDS.  If one of the systems flags a return as potentially fraudulent, the return goes to the TPP or the IWV program.  Figure 1.4.1 provides a simplified flow chart of the complicated processes IVO uses to screen returns claiming refunds.

---

4   See Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, infra.*

5   Data obtained from the Taxpayer Advocate Management Information System (TAMIS) (Oct. 6, 2015).  Closed IVO refund holds cases through Sept. 30, 2015 were open an average of 58.33 days.  TAS Case Assistance by Issue Code (CABIC) 045.

6   IRM 25.25.1.1 (Feb. 19, 2015).

7   IRM 25.25.2.1(1) (Aug. 20, 2015).

001460

001461

FIGURE 1.4.1

Flow Chart of Refund Return Processing in IVO

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

## Taxpayer Protection Program

The TPP uses the DDb to look for returns that exhibit characteristics of identity theft. When it deems a taxpayer's return suspicious, the TPP freezes the return and advises the taxpayer via letter he or she must authenticate his or her identity by calling the TPP toll-free number or self-authenticate through the TPP's Out of Wallet website.[8] If the taxpayer is unable to authenticate, the IRS does not process his or her return, and the taxpayer may have to provide additional information, including a paper copy of the return filed.[9] In addition to the DDb, IRS analysts manually select returns using pattern-matching techniques to detect potential identity theft returns in mass batches. TPP has had a significant increase in its false positive rates, from 19.8 percent in CY 2014 to 36.2 percent in CY 2015 (year to date).[10] According to the IRS, the TPP stopped almost two million refunds in CY 2015, compared to almost 1.6 million refunds stopped in CY 2014.[11]

## IWV Program

Next, the IRS processes returns claiming refunds, and it sends them through the EFDS. EFDS uses data mining models to score each Form W-2 and 1099 on refund returns for fraud potential based on business rules that consider return and filing characteristics.[12] For returns that score high enough on the EFDS, the IRS places an indicator on the account and delays posting for two weeks.[13] It sends potential identity theft returns back to the TPP and potentially fraudulent income/withholding returns to IVO for income verification. If the EFDS does not select returns, it posts and releases them for continued processing and does not include them in its false positive computation.[14]

When the IRS flags a refund return as having questionable income or withholding, it freezes the taxpayer's refund for a minimum of 11 weeks[15] while IVO employees attempt to contact the taxpayer's employers

---

8   IRM 25.25.6.1 (May 26, 2015). Out of Wallet questions are knowledge-based questions about private information not readily available that only the user will know.

9   IRM 25.25.6.5.1 (May 5, 2015).

10  *See* W&I Business Performance Review (May 15, 2015); IRS RICS, Update of the Taxpayer Protection Program (TPP) (Dec. 2, 2015).

11  Data obtained from IRS Global ID Theft Report (Sept. 30, 2015). The IRS stopped 1,987,714 refunds in year to date (YTD) 2015 and 1,593,457 cases in YTD 2014. For a full discussion of the National Taxpayer Advocate's concerns about identity theft, see Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, infra.*

12  IRS response to TAS information request (Aug. 20, 2015). IRM 25.25.2.1 (Aug. 20, 2015).

13  The two-week hold allows IVO to screen the tax returns and look for fraud or potential identity theft issues.

14  Posting occurs when the tax return is posted to the customer account to reflect the filing of the return and includes tax computation to determine the tax obligation for this period.

15  IRM 25.25.2.4 (Aug. 20, 2015). The initial suspense period is ten days to allow for the IRS to send a letter to the taxpayer, which advises the taxpayer of the 60-day review period. The IRS sends Notice CP05, *Information Regarding Your Refund*, or Letter 4464C, *Questionable Refund 3rd Party Notification Letter. See* IRS response to TAS information request (Aug. 20, 2015). This 11-week "soft-hold" was negotiated by the National Taxpayer Advocate and the IRS post-2005 after the National Taxpayer Advocate showed in the 2005 Annual Report to Congress that the IRS was permanently freezing legitimate taxpayer refunds without reviewing them, resulting in an egregious abridgement of taxpayer rights and leading to the removal of the Questionable Refund Program (QRP) from CI to W&I, resulting in the creation of IVO. Although the initial hold is 11 weeks by default there are instances when a refund is released earlier. *See* National Taxpayer Advocate 2005 Annual Report to Congress 25 (Most Serious Problem: *Criminal Investigation Refund Freezes*); National Taxpayer Advocate 2005 Annual Report to Congress vol. 2 (*Criminal Investigation Refund Freeze Study*); National Taxpayer Advocate 2011 Annual Report to Congress 41 (Most Serious Problem: *The IRS's Wage and Withholding Verification Procedures May Encroach on Taxpayer Rights and Delay Refund Processing*).

to verify wages and withholdings reported.[16]  If the employer verifies the information and IVO is satisfied the return is valid, the IRS will release the refund.  If IVO cannot verify the return information through the Individual Master File (IMF) or employer contact, the IRS sends a letter to the taxpayer requesting documentation to substantiate the information.[17]  It is unknown how long this process takes because the IRS does not track this information.[18]  EFDS had a false positive rate of almost 35 percent in FY 2015 for returns the IRS sent to IVO for a determination.[19]

### Return Review Program Models

The RRP application enhances the IRS's capabilities to detect, resolve, and prevent criminal and civil noncompliance, thereby reducing the issuance of fraudulent tax refunds.[20]  RRP selects all potential issues related to identity theft or fraud on the return through initial processing and routes it to the proper treatment stream in pre-refund status.  It then generates 15 scores that relate to the predictive value of possible identity theft or fraud.[21]  The IRS planned for RRP to replace EFDS but is currently using both systems, which leads to more taxpayers experiencing refund delays because their refund returns have a higher chance of the filters stopping them.  The Treasury Inspector General for Tax Administration (TIGTA) noted in a September 2015 report that the failure by the IRS to retire the EFDS program could result in an estimated $18.2 million in additional operation and maintenance costs.  TIGTA recommended that the IRS retire EFDS, and the IRS agreed.[22]  In FY 2014, the RRP false positive rate was five percent, which increased to 30.4 percent for FY 2015, an increase of over 500 percent.[23]  One benefit of RRP over EFDS is that the IRS can adjust the RRP rules and models in real-time if systemic issues are identified, so improvements in this system will be essential to meet its objectives.

### The IRS Does Not Track the False Positive Rates for the Pre-Refund Verification Program and Thus Is Unable to Determine What Stops Legitimate Refunds

As stated earlier, TAS considers any legitimate refund return that an IRS system selects and delays past the programs predetermined review period as false positive.  The IRS fraud prevention units only track the false positive rates associated with identity theft.  This includes programs such as TPP, EFDS, RRP, Manual Analyst, and DDb.[24]  Somehow, the IRS has false positive data for TPP, EFDS, and RRP; however, false positive rates are not tracked for returns forwarded to the IWV program.  False positive data, if monitored and analyzed in real-time, can be used by the IRS to improve its fraud prevention and IWV programs, minimize harm to taxpayers making legitimate refund claims, and preserve IRS resources.

---

16  IRM 25.25.3.1 (May 21, 2015).  The IRS employs several methods to contact employers for verification of wages based on the information listed on the verification of income documents attached to the IMF returns, adhering to the employer preference if one exists.  The IRS sends letters annually to certain large employers requesting they provide wage information on a computer disc.  Requests for verification are automatically generated by fax; phone calls are made based on employer preference.  The IRS employee makes three attempts to verify the information.  IRS response to TAS information request (Aug. 20, 2015).

17  The IRS sends Notice CP05A, *Information Regarding Your Refund - Refund Being Held Pending More Thorough Review.*

18  IRS response to TAS information request (Aug. 20, 2015).

19  IRS response to TAS information request (Oct. 20, 2015).  The IRS did not track the false positive rates for EFDS prior to FY 2015.  However, in FY 2015, it began tracking the false positive rate for EFDS related to the TPP.

20  Privacy Impact Assessment (PIA) 1067 (Jan. 23, 2015), *available at* http://www.irs.gov/pub/irs-utl/RRP_TS_pia.pdf.  A PIA is a process for examining the risks and ramifications of using information technology to collect, maintain, and disseminate information in identifiable forms about members of the public and agency employees.

21  *See* TIGTA, Ref. No. 2015-20-060, *The Return Review Program Enhances the Identification of Fraud; However, System Security Needs Improvement* (July  2, 2015).

22  *See* TIGTA, Ref. No. 2015-20-093, *Review of the Electronic Fraud Detection System* (Sept. 29, 2015).

23  IRS response to TAS information request (Oct. 20, 2015).

24  IRS response to TAS information request (Aug. 20, 2015).

001463

Case 1:23-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1471 of 4699 PageID #: 4636

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

In 2015 (January through September), TAS provided full or partial relief in about 78.5 percent of cases closed for taxpayers who contacted TAS about delayed refunds flagged under the IWV Program.  IWV cases constituted 19.3 percent of all TAS cases, or the second most common reason that taxpayers came to TAS for assistance.[25]  TAS receipts of IWV cases have increased over 14.6 percent while the volume of the IRS's IWV holds has decreased over 47 percent, comparing the January through September periods from 2014 to 2015, as shown in Figure 1.4.2.[26]

**FIGURE 1.4.2**

**TAS IWV Cases Increased Even Though IVO Inventory Decreased, January-September 2014-2015**



The increase in the number of taxpayers seeking TAS assistance with IWV holds combined with the high relief rate of almost 80 percent is an indicator of serious problems with the IWV program.  In other words, the IRS delayed, and, in some cases stopped, legitimate refunds to taxpayers because of over-inclusive filters or cross-competing rules.

Inexplicably, the IRS does not track the false positive rates for IWV holds, and thus is unable to determine what is causing the greater percentage of stopped legitimate refunds.[27]  By applying findings from analysis of false positive returns, the IRS could prioritize identification of legitimate refunds at the earliest stage possible and develop better filters and models in real time.

Investing in tracking the IVO false positive rates by model or filter during the filing season, performing regular global reviews, and quickly adapting filters, rules, and models based on levels of confidence in each, would result in a more efficient utilization of resources and fewer delays for taxpayers with legitimate returns, thereby reducing taxpayer burden.  The IRS should also establish target false positive rates for

---

25  Data obtained from TAMIS (Jan. 1, 2014; Oct. 1, 2014; Jan. 1, 2015; and Oct. 1, 2015).

26  *Id*.  Data obtained from IRS Global ID Theft Report (Sept. 30, 2015).  TAS received 32,078 cases in CY 2014 (January through September) and 36,752 cases in CY 2015.  The IRS identified 1,549,076 cases in IVO for CY 2014 and 820,085 cases in CY 2015.  This decrease in IRS IVO volume is significant because it may be an indicator that the IRS is not clearing cases in a timely manner.

27  IRS responses to TAS information requests (Aug. 20, 2015; Sept. 14, 2015).  The IRS does track the false positive rates for TPP.

each process and filter in addition to creating a process to adjust selection rates so that the false positive rates do not exceed target level.

In CY 2014, RICS adjusted its filters and rules, which increased returns in TPP, flagged for identity theft and decreased refund returns sent to the Pre-Refund Wage Verification Program.[28]  These adjustments did not resolve the substantial delays of legitimate taxpayer refunds.[29]  For example, taxpayers whose returns were flagged and sent to TPP experienced the worst LOS on the TPP phone line in recent history — at one point during the peak of the filing season the LOS was ten percent.[30]  Moreover, the sequential processing of returns through various filters resulted in taxpayers being subjected to multiple reviews of the same return.  Recent submissions to TAS's Systemic Advocacy Management System (SAMS) indicate the IRS cleared some returns from identity theft via TPP but then selected the same returns via the IWV program, which extended the refund hold resulting in unnecessary taxpayer callbacks.[31]

> By applying findings from analysis of false positive returns, the IRS could prioritize identification of legitimate refunds at the earliest stage possible and develop better filters and models in real time.

### IVO Does Not Have Adequate Procedures to Promptly Review and Adjust Its Fraud Detection Filters, Rules, and Models

Recently Congress acted on the National Taxpayer Advocate's legislative recommendation to accelerate information reporting, and passed legislation requiring that returns and statements related to employee wage information and nonemployee compensation be filed on or before January 31.[32]  The IRS should collaborate with TAS on implementing this legal requirement that will improve the screening and matching of third-party reporting with the information on taxpayers' returns.

Currently, IVO has no procedures or safeguards in place to promptly review and adjust its filters, rules, and models.  For instance, the RRP erroneously flagged a group of returns and froze refunds that had previously cleared two systems and had historical data verifying their legitimacy.[33]  At the time, RRP lacked access to the historical data and was unable to verify the results of prior screenings.  Although the IRS can update RRP in real time, it needs approval from the Business Rules and Requirements Management

---

28   TAS believes that although the TPP is flagging more returns for identity theft, these refunds may still end up requiring wage verification treatment.  The IRS is not flagging fewer returns overall in wage verification, rather it is flagging them with a different program.

29   Teleconference between the National Taxpayer Advocate and the RICS Director (Feb. 2, 2015).  Discussion about the spike in IWV holds and the changing of TPP filters.

30   See Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, infra.*

31   SAMS is a database of issues submitted to the TAS Office of Systemic Advocacy and the advocacy projects developed from some of these submissions.  The issues come from a variety of sources.  These include TAS, other IRS employees, and external stakeholders, including individual and business taxpayers, practitioners, research and professional organizations.  *See* SAMS submission, Issue 32977 (May 18, 2015).

32   Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 201 (2015).  *See also* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 86-8 (*Fundamental Changes: Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*); National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical as the IRS Develops a Real-Time Tax System*); National Taxpayer Advocate 2011 Annual Report to Congress 284-95 (Most Serious Problem: *Accelerated Third-Party Information Reporting and Pre-Populated Returns Would Reduce Taxpayer Burden and Benefit Tax Administration But Taxpayer Protections Must Be Addressed*); National Taxpayer Advocate 2009 Annual Report to Congress 338-45 (Legislative Recommendation: *Direct the Treasury Department to Develop a Plan to Reverse the 'Pay Refunds First, Verify Eligibility Later' Approach to Tax Return Processing*).

33   SAMS submission 32694 (Mar. 26, 2015).

001465

Case 1:25-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1473 of 4699 PageID #: 4638

Most Serious
Problems

Most Serious
Recommendations

Most Litigated
Issues

(BRRM) office.[34]  BRRM does not meet regularly; therefore, any change request that needs immediate attention must go through a time-consuming approval process resulting in more refund delays.  Creating a sub-approval group authorized to implement real-time modifications to screening rules and filters would allow a quicker resolution of systemic issues and minimization of taxpayer harm.  The sub-group should include a TAS representative, since TAS often sees cases that are early-warning indicators of problems with filters.

At the end of FY 2012, the IRS eliminated the Pre-Refund Program Executive Steering Committee (ESC), leaving no overarching governance of the implementation of new filters, rules, and models or coordination of work involving multiple IRS functions.  With the elimination of the ESC, the IRS cannot discuss problems associated with fraud detection data mining rules and filters at a servicewide level, resulting in additional delays for any necessary changes in screening rules and filters.  In 2013, the National Taxpayer Advocate recommended that the IRS reinstate the ESC.[35]  However, the IRS refused, stating, "The FY 2013 Return Integrity and Correspondence Service (RICS) reorganization established a centralized structure for the refund fraud program, and eliminated the need for an Executive Steering Committee (ESC)."[36]

> If the IRS were to add staff to review returns on the front-end and answer taxpayer calls in the Integrity Verification Operation (IVO) unit, then more returns with legitimate refunds would be processed with fewer delays and less burden to the taxpayer, saving both the IRS and TAS resources from reworking these cases on the back-end.

The high rate of false positives in the IWV program in the absence of a forum to discuss potential flaws in filters and models suggests that the IRS's decision to eliminate the ESC was not well-founded.  The IRS should reinstate the pre-refund program ESC as a forum for the exchange of information about systemic issues among IRS functions and for ideas about how to resolve these issues, as well as include TAS as a chartered voting member of the ESC.

### Taxpayers Whose Refunds Are Frozen by the IWV Program Cannot Reach a Live Person in IVO

Unlike the TPP, IWV program does not have a dedicated phone number for taxpayers to call.  As a result, taxpayers whose refunds are frozen face lengthy hold times and courtesy disconnects trying to reach IRS Customer Service representatives (CSRs) on a general line.[37]  The CSR LOS for FY 2015 was 38.10 percent, compared to the FY 2014 LOS of 64.39 percent, representing a 40.8 percent decline.[38]  If a taxpayer tries to get information from *Where's My Refund,* he or she will receive a generic message prompting a call to the IRS.  Even if the taxpayer does reach a CSR, he or she will find the CSR

---

34  IRM 1.1.13.5.3.4 (Oct. 7, 2013).  The office is responsible for the coordination and execution of the activities required to define, develop, maintain, and control business requirements and rules.

35  National Taxpayer Advocate 2013 Annual Report to Congress 173 (Most Serious Problem: *Revenue Protection: Ongoing Problems with IRS Refund Fraud Programs Harm Taxpayers by Delaying Valid Refunds*).

36  Email from Chief of Staff, Office of the Commissioner of Internal Revenue (May 23, 2014) (on file with the National Taxpayer Advocate).  Although the IRS does have a Revenue Protection Technology Governance Board which provides input and recommendations to the IRS Revenue Protection Technology ESC neither appear to have the overreaching governance and implementation power of the Pre-Refund Program Executive Steering Committee.

37  A courtesy disconnect is when the IRS phone line is overloaded and the caller is disconnected after a certain amount of time.  For a full discussion of the National Taxpayer Advocate's concerns regarding taxpayer account access, see Most Serious Problem: *Taxpayer Access to Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues that Are Not Conducive to Resolution Online, infra.*

38  *See* IRS, Accounts Management (AM) (Sept. 30, 2015).

does not have access to the EFDS or RRP histories and cannot give specific responses to taxpayer inquiries.[39]  CSRs take down information and route it to the IWV group in IVO.  IVO, however, does not call back or correspond with a taxpayer based on referral from a CSR.  If the information forwarded by the CSR is not verifiable, IVO will simply close out the referral on Account Management Services (AMS) application.[40]

### Taxpayers Whose Refunds Are Frozen by the IWV Program Suffer From Delays and Inaction

Taxpayers with frozen refunds experience significant delays of 18 weeks on average while IVO employees attempt to verify wages and withholding.[41]  TAS's analysis of the population of taxpayers filing for TY 2014, whose returns were selected by EFDS for review in 2015 (through October), showed that nearly 180,000 such taxpayers who finally received their refunds, experienced delays of nearly 18 weeks on average.  Several examples illustrate the frustrations of taxpayers with legitimate refunds who were unable to reach a live assistor with access to their IVO accounts:[42]

- Taxpayers, who successfully authenticated their identity after their returns were stopped by the identity theft filters, were under the impression their refunds would be released.  They were not notified by the IRS that there would be a second delay to their refunds, as their returns were then selected by the IWV program due to the IRS subsequently questioning reported wages and withholdings.  A programming problem in IVO prevented the issuance of a Notice CP05, *Information Regarding Your Refund – We Have Received Your Income Tax Return and Are Holding Your Refund*.  Multiple taxpayers contacted TAS after being unable to reach the IRS or to receive an explanation of the delay.  TAS Office of Systemic Advocacy elevated this systemic issue, and the IRS committed to resolving this issue for the 2016 filing season.[43]

- In several instances, taxpayers were also subject to additional refund delays when IVO verified their wages and withholding but did not correctly input closing actions to release the refund.  To release the refund, an employee must input the closing action into two separate IRS systems.  If employees only input the action into one system, the IRS continues to hold the refund.  IVO was not monitoring its inventory to ensure refunds were correctly and timely issued once verification took place.  Taxpayers had to contact the IRS to inquire why they had not received their refund or request TAS assistance.

- In one instance, the IWV hold languished over a year without any contact from the IRS or action by IVO.  It was only when an inquiry was referred to TAS that the hold was resolved in seven days.[44]

---

39  IRM 21.5.6.4.35.3 (Nov. 2, 2015).

40  IVO does not correspond with a taxpayer based on a referral from a CSR.  To the contrary, if it is just a refund status inquiry not associated with any verifiable information, IVO employees will just close out the referral on AMS.  IRM 25.25.5.2 (July 27, 2015); IRM 25.25.5.4 (July 27, 2015); IRM 25.25.5.4.1 (July 27, 2015).

41  "Significant delay" was quantified by TAS by analyzing the population of taxpayers filing for TY 2014 selected using EFDS for review in 2015.  Through October, we found nearly 180,000 such taxpayers who finally received their refunds but were delayed on average nearly 18 weeks (median of 19 weeks).  Additional taxpayers may still face delays, and future analysis will show how many taxpayers were affected and for how much longer.  IRS CDW, TY 2014 filings received from January through October of 2015.  Results quantify time elapsed between selection for review and receipt of refund (Dec. 2015).

42  These examples are compilation of facts from several SAMS submissions.  SAMS issues 32694 (Mar. 26, 2015), 32900 (May 1, 2015), 33183 (July 9, 2015), and 33239 (July 22, 2015).

43  SAMS submission 32694 (Mar. 26, 2015).

44  SAMS submission 32900 (May 1, 2015), 33183 (July 9, 2015), and 33239 (July 22, 2015).

001467

Even though IVO staffing has consistently increased, it appears the growth has not had a positive impact on the expedited screening and verification of the volume of cases the IVO program selects.[45]  In CY 2015, the IRS selected 43 percent fewer returns for IWV, compared to CY 2014,[46] while the IVO staffing increased by over 12 percent from FY 2014 to FY 2015.[47]  As stated above, IVO does not have a direct phone number for taxpayers to respond to IWV inquiries.  Thus, the increase in staffing is not allocated to speeding up the verification process by accepting direct calls from affected taxpayers.  Moreover, the increase in staffing did not result in a reduction of taxpayer burden as evidenced by the 14.6 percent increase in TAS cases during the same period.[48]

As stated earlier, the IRS has a period of time within which to look at a return before the grace period expires and the refund return is frozen for further review.  If the IRS were to add staff to review returns on the front-end and answer taxpayer calls in the IVO unit, then more returns with legitimate refunds would be processed with fewer delays and less burden to the taxpayer, saving both the IRS and TAS resources from reworking these cases on the back-end.  Implementing a front-end communication strategy, including live taxpayer assistance in the IVO unit, would reduce refund hold times and free more employees for further examination of fraudulent returns.

## CONCLUSION

The National Taxpayer Advocate recognizes the importance of revenue protection screening techniques in protecting the tax system and the rights of taxpayers.  Over the past 12 years, she has reported problems facing taxpayers whose legitimate refunds were frozen by the IRS and she has recommended improvements to reduce taxpayer burden while preventing refund fraud.  Despite certain improvements, the IRS has not adopted several recommendations.[49]  The IRS needs to balance its need to detect refund fraud with the taxpayers' *rights to be informed*, *to quality service*, *to privacy*, and *to fair and just tax system*.

---

45   IRS response to TAS information request (Oct. 20, 2015).  For a full discussion of the National Taxpayer Advocate's concerns about third-party acceleration, see National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 67-96 (*Fundamental Changes: Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*).

46   IRS response to TAS information request (Oct. 20, 2015).  In CY 2014, the IRS selected 1,925,671 items and the amount decreased in CY 2015 to 1,091,512 items selected.  Even with the volume decrease, the IRS is still unable to manage the volume despite the increase in staff.

47   IRS response to TAS information request (Oct. 20, 2015).  In FY 2014, the staffing level was 546, and in FY 2015 the staffing level was 612.

48   Data obtained from TAMIS (Jan. 1, 2014; Oct. 1, 2014, Jan. 1, 2015, and Oct. 1, 2015).

49   *See* National Taxpayer Advocate 2014 Annual Report to Congress 536 (*TAS Case Advocacy*); National Taxpayer Advocate FY 2015 Objectives Report to Congress 143-45 (*TAS Receipts Suggest the IRS Needs to Enhance Efforts to Detect and Prevent Refund Fraud*); National Taxpayer Advocate 2013 Annual Report to Congress 173 (Most Serious Problem: *Revenue Protection: Ongoing Problems with IRS Refund Fraud Programs Harm Taxpayers by Delaying Valid Refunds*); National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical as the IRS Develops a Real-Time Tax System*); National Taxpayer Advocate 2011 Annual Report to Congress 41 (Most Serious Problem: *The IRS's Wage and Withholding Verification Procedures May Encroach on Taxpayer Rights and Delay Refund Processing*); National Taxpayer Advocate 2006 Annual Report to Congress 408 (Status Update: *Major Improvements in the Questionable Refund Program and Some Continuing Concerns*); National Taxpayer Advocate 2005 Annual Report to Congress 25 (Most Serious Problem: *Criminal Investigation Refund Freezes*); National Taxpayer Advocate 2005 Annual Report to Congress vol. 2 (*Criminal Investigation Refund Freeze Study*); National Taxpayer Advocate 2003 Annual Report to Congress 175 (Most Serious Problem: *Criminal Investigation Freezes*).

001468

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Begin tracking the IVO false positive rates by model or filter during the filing season, perform regular global reviews, and quickly adapt filters, rules, and models based on levels of confidence in each similar to the TPP.

2. Establish target false positive rates for each process and filter and create a process to adjust selection rates so that the false positive rates do not exceed target level.

3. Collaborate with TAS on implementing the new legal requirement to file returns and statements related to employee wage information and nonemployee compensation on or before January 31 of the year following the calendar year to which such returns relate.

4. Reinstate the Pre-Refund Program Executive Steering Committee to coordinate policy and other servicewide processes and business rules and include TAS in the steering committees as a charter voting member.

5. Create a sub-committee under the Business Rules and Requirements Management office with the authority to implement real-time modifications to screening rules and filters pertaining to tax fraud detection, resolution, and prevention, which directly affect RRP systems development; include a TAS representative as a member of this sub-committee.

6. Create a Taxpayer Call Area in IVO, which will include front-end outgoing verification calls to taxpayers from the IVO unit and the answering of direct taxpayer calls about refunds.

001469

**MSP #5**

## TAXPAYER ACCESS TO ONLINE ACCOUNT SYSTEM: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak With an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues That Are Not Conducive to Resolution Online

### RESPONSIBLE OFFICIALS

Terry Milholland, Chief Technology Officer
Edward Killen, Director, Privacy, Governmental Liaison and Disclosure
Debra Holland, Commissioner, Wage and Investment Division
Rene Schwartzman, Business Modernization Executive, Wage and Investment Division
Rajive Mathur, Director, Office of Online Services

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*

### DEFINITION OF PROBLEM

The National Taxpayer Advocate has advocated for years that the Internal Revenue Service (IRS) develop an online account system for taxpayers.[2] In fact, the IRS is now planning an online account system and even identified taxpayer online account access as one of the key capabilities to achieve its compliance vision.[3] We are pleased that the IRS is moving forward with plans to develop such a system, due to the benefits to both taxpayers and the IRS. Taxpayers with access to the system will be more informed about their tax accounts and have the tools to interact with the IRS in a convenient manner. The IRS, in turn, may benefit from both reduced and more fruitful phone calls because many of the callers will be more prepared to discuss relevant issues or ask pointed questions due to the information available on the online account system.[4] However, the IRS cannot ignore the service needs of a significant portion of the taxpayer population who still require more personalized service options, such as face-to-face or telephone services, due to preference or lack of access to the Internet. In addition, even the most technologically savvy taxpayers may at times need to use personal services because the issue they have is not conducive to resolve online. While in the current budget environment it may be tempting to move taxpayer service toward superficially lower-cost self-assistance options, any efforts to significantly reduce personal service

---

1  *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2  *See, e.g.*, National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 67-96 (Research Study: *Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*).

3  IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5 (July 28, 2015) (on file with the National Taxpayer Advocate).

4  As of May 2, 2015, approximately 83.2 million taxpayers contacted the IRS by calling the various Customer Account Services function toll-free telephone assistance lines. IRS assistors have answered approximately 8.3 million calls and provided a 37.6 percent Level of Service with a 23.5 minute Average Speed of Answer. Treasury Inspector General for Tax Administration, Ref. No. 2015-40-080, *Results of the 2015 Filing Season* 17 (Aug. 31, 2015).

001470

options may ultimately impair voluntary compliance and undermine the taxpayers' *right to quality service*, *right to be informed*, and *right to pay no more than the correct amount of tax*.[5]

Research has shown individuals and businesses prefer multi-channel service delivery for government services. For example, a survey of German taxpayers showed that even those who ordinarily demand online services prefer to interact in person when they need more individualized services.[6] While the delivery of online services may appear cost-effective at first glance, focusing solely on one method of service delivery is short-sighted, because it does not properly address the actual service needs of taxpayers. Ignoring the service needs of a significant segment of the population will likely impact voluntary compliance and have far more costly downstream consequences for the IRS.

Finally, the National Taxpayer Advocate remains concerned about the scope of the self-correction authority set forth in the draft Concept of Operations (CONOPS). It is unclear whether the self-corrections could address adjustments made pursuant to the agency's math error authority or whether they will extend beyond math error so that they constitute an abbreviated audit.[7] More importantly, it is unclear if these corrections will constitute an amended return or if the original return remains unprocessed until corrected. All of these options have legal consequences to the taxpayer with potential negative impacts on taxpayer rights.

> While in the current budget environment it may be tempting to move taxpayer service toward superficially lower-cost self-assistance options, any efforts to significantly reduce personal service options may ultimately impair voluntary compliance and undermine the taxpayers' *right to quality service*, *right to be informed*, and *right to pay no more than the correct amount of tax*.

## ANALYSIS OF PROBLEM

### Background

The IRS's Enterprise CONOPS is a formal servicewide plan developed to define the future direction of the agency and identify the capabilities it needs to achieve this vision.[8] One of the main themes of the CONOPS is to empower taxpayers with the tools they need to facilitate compliance. In order to achieve this goal, the IRS has identified digital taxpayer account management and self-correction as key capabilities.[9] According to the IRS draft CONOPS, online account access would enable taxpayers, preparers, and authorized third parties to securely interact with the IRS to obtain return information, submit payments, and receive status updates. It would also enable them to perform "self-correction" functions such as verifying return changes made by the IRS, updating or amending returns, and providing additional documents.[10]

---

5   For a detailed discussion of the Taxpayer Bill of Rights, see http://www.taxpayeradvocate.irs.gov/About-TAS/Taxpayer-Rights.

6   Julia Klier, Regina Pfleger & Lea Thiel, *Just Digital or Multi-Channel? The Preferences of E-Government Service Adoption by Citizens and Business Users*, Wirtschaftsinformatik Proceedings 2015 180, 190 (2015), *available at* http://aisel.aisnet.org/cgi/viewcontent.cgi?article=1012&context=wi2015.

7   *See* IRC §§ 6213(b)(1),(g)(2).

8   *See* Most Serious Problem: *Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet, supra*.

9   IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5 (July 28, 2015) (on file with the National Taxpayer Advocate).

10   Draft IRS Compliance Concept of Operations (CONOPS) 3, 19-22 (June 8, 2014) (on file with TAS).

001471

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1479 of 4699 PageID #: 4644

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

## The IRS Cannot Drastically Reduce Both Face-to-Face and Telephone Services As It Focuses on Online Services Because Taxpayers Will Still Continue to Require Personal Services

Based on a 2014 survey, Forrester Research concluded that the public still uses non-digital channels more than digital ones. In fact, 37 percent of these survey participants indicated they do not trust the federal government to secure their personal data. Based on the survey findings, Forrester concluded that "[f]ederal agencies must act more strategically. They can win trust by perfecting existing [channels] before expanding and explaining the benefits of new channels as they roll out."[11] The recent security breaches pertaining to the IRS's "Get Transcript" online application and the Office of Personnel Management's (OPM) breach of federal employee records will only serve to undermine taxpayers' trust in communicating with the IRS and government online.[12]

Furthermore, additional research has shown individuals and businesses prefer multi-channel service delivery for government services.[13] Individuals prefer online services for information services, because they can gather and receive information or data on their own schedule and without a need for further discussion. However, they prefer to interact in-person when they need more individualized services. This multi-channel preference even exists for younger and well-educated individuals who typically have greater preferences for online services.[14] As for businesses, the medium to large companies prefer online services more than small businesses.[15]

It is not surprising that taxpayers continue to demand more personalized services considering the complexity of the tax law.[16] For those taxpayers comfortable using self-service options online, they must still struggle with understanding the substance of the tax law and how it applies to their unique circumstances. While the IRS official website is helpful and extensive, it currently has approximately 140,000 pages which can be overwhelming to taxpayers unfamiliar with the tax law.[17] Moreover, the website is not currently easy to navigate when using a mobile device, which could be a serious access issue for the increasing taxpayer population using smartphones.[18]

---

11  Rick Parrish, Forrester Research, *Washington Must Work Harder to Spur the Public's Interest in Digital Government: Federal Agencies Are Spending Millions on Digital CX That Customers May Not Want* (Apr. 28, 2015) (in response to the survey question "In which of the following ways do you interact with US federal government agencies?" respondents chose the following digital methods: 41 percent indicated website, 16 percent indicated email, four percent chose Facebook, three percent chose mobile app, three percent chose online chat (text), two percent chose online chat (video), two percent chose Twitter, one percent chose Instagram, and one percent chose other social media. Respondents chose the following nondigital methods: 37 percent chose in person, 33 percent chose postal mail, and 32 percent chose phone).

12  IRS, IRS *Statement on the "Get Transcript" Application* (June 2, 2015); OPM, Announcements, *Information About the Recent Cybersecurity Incidents* (June 23, 2015).

13  As noted above, this was a survey of German taxpayers published in 2015. *See* Julia Klier, Regina Pfleger & Lea Thiel, *Just Digital or Multi-Channel? The Preferences of E-Government Service Adoption by Citizens and Business Users*, Wirtschaftsinformatik Proceedings 2015, 180, 190 (2015), *available at* http://aisel.aisnet.org/cgi/viewcontent.cgi?article =1012&context=wi2015.

14  In fact, the 2013 Taxpayer Experience Survey conducted by IRS W&I Research and Analysis (WIRA) found that for all age categories of taxpayers (not just the elderly), only 34 percent felt secure sharing personal financial information over the Internet. IRS, W&I, *Use of Technology among Elderly and Low-income Taxpayers, Research Support for Fiscal Year (FY) 2015 Services Approach Efforts* 34 (May 2015).

15  Julia Klier, Regina Pfleger & Lea Thiel, *Just Digital or Multi-Channel? The Preferences of E-Government Service Adoption by Citizens and Business Users*, Wirtschaftsinformatik Proceedings 2015, 180, 190 (2015), *available at* http://aisel.aisnet.org/cgi/viewcontent.cgi?article=1012&context=wi2015.

16  For a discussion of tax law complexity, see National Taxpayer Advocate 2012 Annual Report to Congress 3-23.

17  Information provided from IRS Office of Online Services, Online Engagement, Operations and Media (Sept. 25, 2015).

18  Aaron Smith, Pew Research Center, *U.S. Smartphone Use in 2015* 1 (April 1, 2015).

001472

The IRS can partially address the demand for more individualized service by offering personalized digital services, such as live chat. Live chat has been found to successfully meet the needs of those who need immediate answers to simple questions.[19] However, a recent survey found demand for live chat falls short of demand for telephone services when addressing complex financial questions.[20]

### The IRS Must Balance the Added Convenience of Expanding Online Services Against the Inherent Security Risks

The IRS is planning to expand its online service offerings to include more convenient methods for taxpayers to interact with the tax agency.[21] However, there is a risk involved in expanding online services, given the sensitive nature of the information entrusted with the IRS. The recent unauthorized access by cybercriminals of the IRS's "Get Transcript" application and resulting theft of the confidential tax return information of more than three hundred thousand taxpayers highlights the importance of cybersecurity considerations.[22] The OPM announcement earlier in the year concerning the hacking of its database, making vulnerable the personal information, and in some cases the fingerprints, of an estimated 21.5 million current and former federal employees, applicants, and their families has further undermined public trust in government online applications.[23] The continuing discovery of the depth of the breach will likely erode taxpayer confidence in using online services offered by the government.

> Individuals prefer online services for information services, because they can gather and receive information or data on their own schedule and without a need for further discussion. However, they prefer to interact in-person when they need more individualized services.

In the wake of these recent cybersecurity breaches, the IRS should take time to investigate how taxpayers will respond to the necessary cybersecurity-related barriers to entry. Most taxpayers are fully aware that IRS systems contain extremely confidential tax return information and may be willing to tolerate extra security measures to access their accounts. In fact, the IRS has one of the most important and valuable stores of information in the world. Because the information it stores is a major asset of the United States and the stakes are high if the system is compromised, the IRS needs to take significant measures to protect its data. However, it is unclear at what point taxpayers decide the extra security precautions are too burdensome and avoid online account access as a result.

Further, the IRS should conduct a biennial nationwide survey of taxpayers to gauge what specific types of transactions or other activities they would be willing to conduct with the IRS digitally. By conducting the survey every other year, the IRS will have the ability to identify trends in IRS-specific digital needs and respond accordingly. In addition, the survey should include oversamples of low

---

19  The IRS has researched taxpayer demand for a potential secure online chat feature or "live chat" and a 2014 IRS study shows that taxpayers are interested in using this feature for the following transactions: submitting documentation, obtaining the status of a case, and discussing case details. IRS, WIRA, *Compliance TDC Conjoint: Findings and Recommendations* (Sept. 2014).

20  A survey conducted by Software Advice found 74 percent of respondents prefer telephone for complex financial questions. Craig Borowski, *The Impact of Demographics on Live Chat Customer Service*, Software Advice (Jan. 6, 2015).

21  IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5 (July 28, 2015) (on file with the National Taxpayer Advocate).

22  IRS, *Additional IRS Statement on the "Get Transcript" Incident* (Aug. 17, 2015).

23  OPM Statement, *Statement by OPM Press Secretary Sam Schumach on Background Investigations Incident* (Sept. 23, 2015); Devlin Barrett and Damian Paletta, *Officials Masked Severity of Hack*, Wall St. J., June 24, 2015, *available at* http://www.wsj.com/articles/hack-defined-as-two-distinct-breaches-1435158334; Ellen Nakashima, *Chinese Hackers Breach Data of 4 Million Federal Workers*, Wash. Post, June 4, 2015, *available at* http://www.washingtonpost.com/world/national-security/chinese-hackers-breach-federal-governments-personnel-office/2015/06/04/889c0e52-0af7-11e5-95fd-d580f1c5d44e_story.html.

001473

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1481 of 4699 PageID #: 4646

Most Serious
Problems

Most Litigated
Recommendations

Legislative
Issues

income, Spanish-speaking and small business taxpayers to ensure that the IRS tracks the needs of these populations.[24]

### Comprehensive Studies Demonstrate Low Income and Other Vulnerable Taxpayer Populations Need Person-to-Person Assistance to Comply with Their Federal Tax Obligations

In 2014, TAS, which oversees and administers the Low Income Taxpayer Clinic (LITC) grant program for the IRS,[25] commissioned a survey by Russell Research to better understand the needs and circumstances of taxpayers eligible to use the clinics. The survey found 15 percent of LITC-eligible taxpayers reported receiving notices from the IRS. In response, 55 percent called the IRS, 29 percent replied by letter, 24 percent contacted their preparers, and nearly 20 percent did nothing (the survey allowed more than one response).[26]

Further, Pew Research Center periodically conducts surveys to determine Internet usage by American adults. While the survey results clearly show a steady rise in Internet usage among all populations, some populations adopt at a slower pace than others. Significant percentages of certain populations still fall behind and will need to use methods that do not involve Internet usage to interact with the IRS. The following figure shows categories of taxpayers with lower Internet usage rates, as of May 2015:[27]

### FIGURE 1.5.1, 2015 Pew Research Center Survey Results of Internet Use Among Different Categories of Taxpayers

| Category | Percent |
|---|---|
| Overall American adult population | 84% |
| Age: American adults 65+ | 58% |
| Education Attainment: Less than high school degree | 66% |
| Household Income: Less than $30,000 | 74% |
| Race or Ethnicity: African Americans | 78% |
| Race or Ethnicity: Hispanics | 81% |
| Community Type: Rural | 78% |

---

24   This recommended survey is envisioned to be more comprehensive than the Compliance TDC Conjoint study conducted by the IRS in 2014. It should specifically address the reasons why taxpayers would or would not use a particular service channel for each type of transaction conducted with the IRS, with a particular focus on low income and small business taxpayers. IRS, WIRA, *Compliance TDC Conjoint: Findings and Recommendations* (Sept. 2014). "Low income taxpayer" is generally defined as a taxpayer who has a household income that does not exceed 250% of the federal poverty level (FPL), based on the annual poverty guidelines published by the Department of Health and Human Services.

25   The IRS awards matching grants to organizations that provide representation to low income individuals who need help resolving tax problems with the IRS. *See* IRC § 7526. At least 90 percent of the taxpayers represented by an LITC must have incomes that do not exceed 250 percent of the federal poverty level. *See* IRC § 7526(b)(1)(B)(i). The U.S. Department of Health and Human Services publishes yearly poverty guidelines in the Federal Register, which the IRS uses to establish the 250 percent threshold for LITC representation. For the 2015 poverty guidelines, see 80 F.R. 3236-3237 (Jan. 22, 2015).

26   This Random-Digit Dialed (RDD) telephone survey utilized both cell phone numbers and landline numbers to reach participants. This approach was used to make sure all groups of the LITC-eligible taxpayers were represented in the survey. The survey included more than 1,100 individuals and gathered information on eligible taxpayers' awareness and use of LITC services, the types of issues for which they would consider using clinic services, and other items including demographic information. *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 1-26 (Research Study: *Low Income Taxpayer Clinic Program: A Look at Those Eligible to Seek Help from the Clinics*).

27   Andrew Perrin and Maeve Duggan, Pew Research Center, *Americans' Internet Access: 2000–2015* (June 26, 2015).

A 2015 online survey by Forrester Research explored the use of certain devices to conduct various transactions online. While this study was conducted online and thus excluded responses from offline individuals or those with limited online capabilities, it produced some noteworthy findings:[28]

- On average, only 19 percent of adults search for government services and policies with a personal computer or laptop. This rate drops to 11 percent when using personal tablets and to seven percent when using a mobile phone.

- With few exceptions, those in lower income brackets used all devices to conduct online financial transactions less frequently than the national average.

- On average, 22 percent of adults use their mobile phones to check financial statements. Only 16 percent use their mobile phones to pay bills and 16 percent used their mobile phones to transfer money between accounts.

In fiscal year (FY) 2015, the Wage and Investment (W&I) Operating Division compiled existing research on American technology usage to determine the impact reductions in the Taxpayer Assistance Center (TAC) budget and IRS printed forms and publications would have on the elderly, low income, and rural communities.[29] The research found that, while each community saw a steady increase in Internet usage, these communities had lower computer ownership and Internet usage rates. Interestingly, the research also found that southern states are more likely to have lower percentage of households that own a computer. The research emphasized that offline taxpayers are equally as likely to access face-to-face services at TACs as they are to use irs.gov, and that they are more likely to use the IRS toll-free line compared to TACs and irs.gov.[30] The research also noted that the 2013 Taxpayer Experience Survey conducted by IRS W&I Research and Analysis (WIRA) found that for all age categories of taxpayers (not just the elderly), only 34 percent of taxpayers felt secure sharing personal financial information over the Internet.[31]

> While the IRS official website is helpful and extensive, it currently has approximately 140,000 pages which can be overwhelming to taxpayers unfamiliar with the tax law. Moreover, the website is not currently easy to navigate when using a mobile device, which could be a serious access issue for the increasing taxpayer population using smartphones.

Finally, the IRS conducted a survey in 2014 to determine taxpayer usage of existing service channels as well as planned future service channels for different types of transactions. The findings showed migration for each type of transaction toward future service channels, including secure message, secure online chat, the online account program, smartphone applications, and automatic email or text notifications. However, the results showed that some taxpayers prefer to stay with existing service channels. The following figure illustrates the percentages of taxpayers who would prefer to use existing service channels, when compared with a potential future state service configuration, by type of transaction.[32]

---

28  Because this survey was conducted online, the reported usage rates may be higher than for the general population. Forrester Research, *North American Consumer Technographics Online Benchmark Survey*, Part 1 (2015) (on file with TAS).

29  IRS, Wage & Investment, *Use of Technology among Elderly and Low-income Taxpayers, Research Support for Fiscal Year (FY) 2015 Services Approach Efforts* (May 2015).

30  *Id.* at 23.

31  *Id.* at 13.

32  IRS, W&I Research & Analysis, *Compliance TDC Conjoint: Findings and Recommendations* (Sept. 2014).

001475

FIGURE 1.5.2, Percentage of Taxpayers Choosing to Remain with Existing Service Channels Despite the Introduction of New Channels, By Type of Transaction

| Type of Transaction | Percentage of Taxpayers Choosing to Stay With Existing Service Channel |
|---|---|
| Status of Case | Phone (Customer Service Representative (CSR)): 11% |
| Sign a Document | Phone (CSR): 13%<br>Fax: 15%<br>Regular Mail: 16% |
| Discuss Case Details | Phone (CSR): 43%<br>Regular Mail: 15% |
| Request an Extension | Phone (CSR): 30%<br>Regular Mail: 23% |

The LITC-eligible taxpayer survey, the Pew and Forrester findings, as well as the IRS's own research support the need for the IRS to design a taxpayer service strategy based on the actual requirements of the taxpayer population rather than focusing on initially attractive but ultimately short-term resource savings. The survey findings and studies show a significant portion of taxpayers may not use online or self-assistance services. While online self-help tools certainly have significant benefits in that they address the needs of an increasing portion of the population in a lower-cost manner, the IRS is harming offline taxpayers when it significantly decreases the face-to-face and person-to-person telephone services. The IRS has already begun to reduce the amount of full-time equivalent employee (FTE) resources to the phones and to the TACs. Figure 1.5.3 illustrates the budgeted FTE for both types of services between FY 2013 to FY 2015.[33]

FIGURE 1.5.3, W&I Full-Time Equivalent Employee Expenditures for Toll-Free and Field Assistance

| | FY 2013 | FY 2014 | FY 2015 | FYs 2013 to 2015 % Change |
|---|---|---|---|---|
| Toll-Free | 7,726 | 6,915 | 4,591 | -40.6% |
| Field Assistance | 1,892 | 1,927 | 1,868 | -1.3% |

Questions Remain Concerning the Legal Implications of Self-Correction Authority

The National Taxpayer Advocate remains concerned about the scope of the self-correction authority set forth in the draft CONOPS. For example, it is unclear whether the self-corrections could address adjustments made pursuant to the agency's math error authority or whether they will extend beyond math error so that they constitute an abbreviated audit.[34] More importantly, it is unclear what these corrections will constitute. If the taxpayer corrects the return pursuant to the new self-correction authority, will the correction constitute an amended return or is the return still an original return that the IRS has not yet completely processed? All of these possible options have legal consequences to the taxpayer and all have potential negative impacts on taxpayer rights.

---

33   IRS, W&I Division response to TAS information request (Sept. 22, 2015) (Field Assistance numbers include management and headquarters; for FY 2015, Field Assistance FTE is projected and Toll-free is through Aug. 15, 2015).

34   The IRS is currently authorized to correct mathematical or clerical errors — arithmetic mistakes and the like — and assess any tax increase using summary assessment procedures that do not provide the taxpayer an opportunity to challenge the proposed deficiency in the United States Tax Court before the tax is assessed. See IRC §§ 6213(b)(1),(g)(2). Consequently, the use of math error bypasses critical procedural taxpayer rights protections.

Even more disturbing is the Administration's proposed legislation to give the IRS more flexibility to address "correctable errors" (by regulation); this new category of "correctable errors" would give the IRS the authority to make adjustments not covered by existing math error authority.[35] It is unclear if the IRS will give preparers and third parties the authority to address these correctable errors.[36] The National Taxpayer Advocate will seek a Counsel opinion to determine the boundaries and corresponding legal implications of such authority.

## CONCLUSION

As the IRS migrates toward more digital interactions with the taxpayers, it is essential that it continues to offer personal services to those taxpayers who either (1) do not have the ability to use digital services, (2) have a strong preference to conduct certain transactions by phone or face-to-face, or (3) have an issue that is not conducive for resolution through digital means. The various studies discussed herein show that a significant segment of the taxpayer base may not be ready to interact with the IRS digitally. Furthermore, recent cybersecurity attacks on both IRS applications and OPM databases highlight the need to balance security risks with any online benefits applicable to both taxpayers and the IRS.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Conduct a biennial nationwide survey of taxpayers to identify trends and determine the types of transactions or other activities taxpayers would be willing to conduct with the IRS digitally. The survey should include oversamples of low income, Spanish-speaking, and small business taxpayers to ensure that the IRS tracks their needs.

2. Conduct research to identify the taxpayer base who will utilize the online taxpayer account system as well as other online service offerings. For those taxpayers likely to use the online services, the research should break it down by specific types of transaction or interaction with the IRS. Further, if a taxpayer has indicated that he or she will not use the program, the research should address the reasons for not using the program.

3. Incorporate into the CONOPS, budget initiatives, and in the strategic plan a recognition and plan for meeting the service needs of those taxpayers who are not likely to use online service offerings. Such plan should take into account the reasons for the taxpayer's behavior and potentially tailor the personal services to meet those needs.

4. Research taxpayer response to the necessary online account system cybersecurity and authentication measures to determine the percentage of taxpayers who decide the necessary barriers to entry are too burdensome and avoid online account access as a result.

---

35  The proposed correctable error authority would enable the IRS to assess tax without using the deficiency procedures in the following situations: (1) the information provided by the taxpayer does not match the information in government databases; (2) the taxpayer has exceeded the lifetime limit for claiming a deduction or credit; or (3) the taxpayer has failed to include with his or her return documentation required by statute. Department of the Treasury, *General Explanations of the Administration's Fiscal Year 2016 Revenue Proposals* 245-46 (Feb. 2015), *available at* http://www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx.

36  For more detail on the National Taxpayer Advocate's position on the proposed correctable error legislation, see *The National Taxpayer Advocate's 2014 Annual Report to Congress: Hearing Before the H. Comm. on Oversight and Government Reform, Subcomm. on Government Operations*, 114th Cong. 34-35 (2015) (written testimony of Nina E. Olson, National Taxpayer Advocate).

001477

Most Serious
Problems

**MSP**
**#6**

## PREPARER ACCESS TO ONLINE ACCOUNTS: Granting Uncredentialed Preparers Access to an Online Taxpayer Account System Could Create Security Risks and Harm Taxpayers

### RESPONSIBLE OFFICIALS

Terry Milholland, Chief, Technology Officer
Edward Killen, Director, Privacy, Governmental Liaison and Disclosure
Debra Holland, Commissioner, Wage and Investment Division
Rene Schwartzman, Business Modernization Executive, Wage and Investment Division
Rajive Mathur, Director, Office of Online Services
Carol Campbell, Director, Return Preparer Office
Stephen Whitlock, Director, Office of Professional Responsibility

### TAXPAYER RIGHTS IMPACTED[1]

- ◾ *The Right to Be Informed*
- ◾ *The Right to Quality Service*
- ◾ *The Right to Pay No More Than the Correct Amount of Tax*
- ◾ *The Right to Confidentiality*

### DEFINITION OF PROBLEM

The National Taxpayer Advocate has advocated for years that the IRS develop an online account system for taxpayers.[2]  A recent draft of the IRS Compliance Concept of Operations (CONOPS) identified online account access as one of the top ten initatives needed to achieve its compliance vision.[3]  Pursuant to the draft CONOPS, online account access would enable taxpayers, preparers, and authorized third parties to securely interact with the IRS to obtain return information, submit payments, and receive status updates.[4]  Accordingly, the National Taxpayer Advocate has the following concerns regarding preparer access to taxpayers' online accounts:

- ◾ Only preparers who are subject to IRS oversight should have access to taxpayers' online accounts;
- ◾ The IRS should clearly define the scope of preparers' access to online accounts;

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See, e.g.,* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 67-96 (Research Study: *Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*); Most Serious Problem: *Taxpayer Access to Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues that Are Not Conducive to Resolution Online, supra.*

3   IRS, *IRS Enterprise Concept of Operations (CONOPS): Overview of SB/SE and W&I, LB&I, and TE/GE CONOPS* 25 (Jan. 15, 2015); *See* Most Serious Problem: *Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet, supra.*

4   IRS, *Compliance Capabilities Initiative: Draft Blueprint for the Vision* 10-2, 21-30 (June 19, 2014); IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5, 10-2 (July 28, 2015) (on file with the National Taxpayer Advocate).

001478

- The online account system should enable the taxpayer to maintain strict control over preparer authorizations, including approved actions; and

- The IRS should develop and implement procedures to ensure that preparers do not exceed their authority when accessing taxpayers' online accounts.

We are also concerned that the IRS plans to expand the third-party designee authorization on Form 1040 to include e-file software providers and Electronic Return Originators (EROs). By checking off the box, taxpayers would give these entities broad authorizations to perform actions that are likely beyond what most taxpayers realize.

## ANALYSIS OF PROBLEM

### Background

A recent draft of the IRS Compliance CONOPS envisions that the IRS will develop an online account system that enables taxpayers, preparers, and authorized third parties to securely interact with the IRS to obtain return information, submit payments, and receive status updates. It will also enable those taxpayers and authorized preparers to perform "self-correction" functions such as verifying return changes the IRS made, updating or amending returns, and providing additional documents.[5]

### The IRS Should Permit Online Account Access to Only Preparers Subject to IRS Oversight

The IRS currently plans to enable the taxpayer to maintain control over whom can gain access to the account.[6] However, the IRS does not have any plans currently in development to restrict preparer access to the online account system by type of preparer. The National Taxpayer Advocate is concerned that the IRS will expose taxpayers to potential harm due to preparer incompetence or misconduct if it does not restrict access to only those preparers subject to IRS oversight pursuant to Circular 230.[7]

Preparers subject to IRS oversight under Circular 230 include attorneys, certified public accountants, enrolled agents, enrolled actuaries, and enrolled retirement plan agents.[8] In addition, pursuant to Revenue Procedure 2014-42, preparers who have obtained the voluntary Annual Filing Season Program (AFSP) Record of Completion can represent taxpayers before the IRS during an examination of a tax return or claim for refund they prepared. Preparers can voluntarily obtain an AFSP Record of Completion each calendar year if they successfully complete 18 hours of continuing education (CE) from IRS-approved CE providers, which includes a six-hour Annual Federal Tax Refresher (AFTR) course, obtain a score of at least 70 percent in the associated AFTR examination,[9] and agree to be subject to the duties and restrictions relating to practice before the IRS in Subpart B & § 10.51 of Circular 230 for the entire period covered by the AFSP Record of Completion.[10] After December 31, 2015, the IRS will no longer allow non-credentialed preparers without the AFSP Record of Completion to engage in limited practice on

---

5    IRS, *IRS Enterprise Concept of Operations (CONOPS): Overview of SB/SE and W&I, LB&I, and TE/GE CONOPS* 25 (Jan. 15, 2015); IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5, 10-12 (July 28, 2015) (on file with the National Taxpayer Advocate).

6    IRS, *Compliance Capabilities Initiative: Draft Blueprint for the Vision* 19 (June 19, 2014); IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5, 10-2 (July 28, 2015) (on file with the National Taxpayer Advocate).

7    31 U.S.C. § 10.3.

8    *Id.*

9    Rev. Proc. 2014–42, § 4.05(2)(a), I.R.B. 2014-29 (July 14, 2014).

10    *Id.*

001479

Case 1:22-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1487 of 4699 PageID #: 4652

Most Serious
Problems

Most Serious
Recommendations

Most Litigated
Issues

returns they prepare after that date. Accordingly, the National Taxpayer Advocate believes that the IRS should restrict access to the online account to only preparers subject to Circular 230 oversight. As set forth below, the IRS has the ability to monitor and enforce this requirement because it has preparer tax identification numbers (PTINs) for these individuals. If the IRS does not limit online account access to only preparers subject to Circular 230 oversight, it could harm taxpayers and consequently, increase compliance issues. Without instituting safeguards on access to the system, the IRS could inadvertently facilitate or perpetuate preparer misconduct. Uncredentialed preparers could gain access, interact with the IRS on the taxpayer's behalf, and potentially address notices, proposed adjustments, or even proposed correctable errors without the taxpayer's consent or knowledge.[11] Although the vast majority of return preparers are conscientious and ethical, the IRS has ample evidence and experience to show that there are some return preparers who are committing refund fraud[12] or are negligent, and that certain payroll service providers who have access to employer accounts also embezzle funds and cover their tracks by changing account information.[13]

> If the IRS does not limit online account access to only preparers subject to Circular 230 oversight, it could harm taxpayers and consequently, increase compliance issues.

Further, in 2014, TAS commissioned a survey by Russell Research to better understand the needs and circumstances of taxpayers eligible to use the low income taxpayer clinics (LITCs).[14] The survey findings raise fundamental questions about the appropriateness of relying on preparers as intermediaries for the low income population, especially the Spanish speakers in this category, and particularly with the unregulated return preparer population. Nearly half of all LITC-eligible taxpayers used return preparers, as did approximately 75 percent of Spanish-speaking eligible taxpayers. However, the survey participants reported that a significant percentage of these preparers did not satisfy the very basic statutory requirements

---

11   For more detail on the National Taxpayer Advocate's position on the proposed correctable error legislation, see *The National Taxpayer Advocate's 2014 Annual Report to Congress: Hearing Before the H. Comm. on Oversight and Government Reform, Subcomm. on Government Operations*, 114th Cong. 34-5 (2015) (written testimony of Nina E. Olson, National Taxpayer Advocate).

12   *Id.*; see National Taxpayer Advocate 2014 Annual Report to Congress 543-44; National Taxpayer Advocate Fiscal Year 2015 Objectives Report to Congress 71-8; and National Taxpayer Advocate 2013 Annual Report to Congress 61-74 (Most Serious Problem: *Regulation of Return Preparers: Taxpayers and Tax Administration Remain Vulnerable to Incompetent and Unscrupulous Return Preparers While the IRS Is Enjoined from Continuing Its Efforts to Effectively Regulate Return Preparers*).

13   *The National Taxpayer Advocate's 2014 Annual Report to Congress: Hearing Before the H.R. Comm. on Oversight and Government Reform, Subcomm. on Government Operations*, 114th Cong. 20-3 (Apr. 15, 2015) (written testimony of Nina E. Olson, National Taxpayer Advocate); National Taxpayer Advocate 2014 Annual Report to Congress 218-24 (Most Serious Problem: *Offers in Compromise: The IRS Needs to Do More to Comply With the Law Regarding Victims of Payroll Service Provider Failures*); National Taxpayer Advocate 2012 Annual Report to Congress 426-44 (Most Serious Problem: *Early Intervention, Offers in Compromise, and Proactive Outreach Can Help Victims of Failed Payroll Service Providers and Increase Employment Tax Compliance*); National Taxpayer Advocate 2012 Annual Report to Congress 553-59 (Legislative Recommendation: *Protect Taxpayers and the Public Fisc from Third-Party Misappropriation of Payroll Taxes*); National Taxpayer Advocate 2007 Annual Report to Congress 337-54 (Most Serious Problem: *Third Party Payers*); National Taxpayer Advocate 2007 Annual Report to Congress 538-44 (Legislative Recommendation: *Taxpayer Protection From Third Party Payer Failures*); National Taxpayer Advocate 2004 Annual Report to Congress 394-99 (Legislative Recommendation: *Protection from Payroll Service Provider Misappropriation*).

14   Russell Research, *Topline Findings from a Taxpayer Advocate Service Survey of Taxpayers Who Are Eligible to Use IRS's Low Income Taxpayer Clinics (LITC)* 5 (July 2014). TAS oversees and administers the LITC grant program for the IRS. The IRS awards matching grants to organizations that provide representation to low income individuals who need help resolving tax problems with the IRS. *See* IRC § 7526. At least 90 percent of the taxpayers represented by an LITC must have incomes that do not exceed 250 percent of the federal poverty level. *See* IRC § 7526(b)(1)(B)(i). The U.S. Department of Health and Human Services publishes yearly poverty guidelines in the *Federal Register*, which the IRS uses to establish the 250 percent threshold for LITC representation. For the 2015 poverty guidelines, see 80 Fed. Reg. 3236-3237 (Jan. 22, 2015).

001480

under IRC §§ 6695(a) and (b).[15]  For example, the participants reported that the preparer did not sign the return or did not give the taxpayer a copy more than 15 percent of the time.  This percentage rose to more than 30 percent for Spanish-speaking eligible taxpayers.[16]  Accordingly, TAS will continue to advocate to protect taxpayers from any harm imposed by giving third parties access to taxpayers' online accounts.

### The IRS Should Clearly Define the Scope of Preparers' Access to Online Accounts

The IRS has not yet defined exactly what a preparer can do on behalf of the taxpayer upon gaining access to the taxpayer's online account.  According to the CONOPS, preparers would be able to securely interact with the IRS to obtain return information, submit payments, and receive status updates.  Authorized preparers would also be able to perform "self-correction" functions such as verifying return changes made by the IRS, updating or amending returns, and providing additional documents.[17]  TAS remains concerned about the scope of this self-correction authority.  For example, it is unclear whether these self-correction actions could include addressing adjustments made pursuant to the agency's math error authority.[18]  Of particular concern is the planned ability of preparers to verify return changes made by the IRS as well as update or amend returns on behalf of the taxpayer, especially if the IRS does not limit access only to those preparers subject to IRS oversight.

Without any restrictions on type of preparer, there is a greater chance that vulnerable taxpayers could be harmed by preparers who prey upon the elderly, low income, and taxpayers with disabilities.  Consider the possibility that preparers will develop a boilerplate form for the taxpayer to sign to authorize the preparer to conduct the above-referenced actions.  If the preparer either fraudulently or negligently prepares an inaccurate return, the IRS may have just given the preparer the ability to cover his or her tracks.  It is also possible that the taxpayer will not become aware of the problem for a long time.  Finally, the preparer's actions could severely prejudice the taxpayer's procedural rights.  For example, if the preparer accepts math error adjustments without the taxpayer's knowledge, the taxpayer may lose the right to contest the change in the U.S. Tax Court.[19]

### The Online Account System Should Enable the Taxpayer to Maintain Strict Control Over Preparer Authorizations

TAS believes that the IRS should give the taxpayer strict and detailed control over preparer authorizations and develop procedures for the taxpayer to fine-tune them on the online account.  While some

---

15  IRC § 6695(a) imposes a penalty on a tax return preparer for failure to provide a copy of the return to the taxpayer, unless the failure is due to reasonable cause and not to willful neglect.  IRC § 6695(b) imposes a penalty on a tax return preparer for failure to sign a return when required by regulation to do so, unless the failure is due to reasonable cause and not to willful neglect.

16  Russell Research, *Topline Findings from a Taxpayer Advocate Service Survey of Taxpayers Who Are Eligible to Use IRS's Low Income Taxpayer Clinics (LITC)* 5 (July 2014).  For more information on the LITC-eligible taxpayer study, see National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 1-26 (Research Study: *Low Income Taxpayer Clinic Program: A Look at Those Eligible to Seek Help From the Clinics*).

17  IRS, *IRS Enterprise Concept of Operations (CONOPS): Overview of SB/SE and W&I, LB&I, and TE/GE CONOPS* 25 (Jan. 15, 2015); IRS, *Compliance Capabilities Initiative: Draft Blueprint for the Vision* 10-2, 21-30 (June 19, 2014); IRS, *IRS Enterprise Concept of Operations (CONOPS): Taxpayer Advocate Service Briefing* 5, 10-2 (July 28, 2015) (on file with the National Taxpayer Advocate).

18  The National Taxpayer Advocate has written extensively about her various concerns regarding the expansion of math error authority under IRC § 6213(g).  See, e.g., National Taxpayer Advocate 2014 Annual Report to Congress 163-71 (Most Serious Problem: *Math Error Notices: The IRS Does Not Clearly Explain Math Error Adjustments, Making It Difficult for Taxpayers to Understand and Exercise Their Rights*).

19  IRC § 6213(b)(1) provides that a taxpayer has no right to petition the Tax Court upon receiving a math error notice.  IRM 21.5.4.1, *General Math Error Procedures Overview* (Oct. 1, 2014).  In math or clerical error cases, the service may assess and send a notice of assessment of additional tax without using deficiency procedures.

001481

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1489 of 4699 PageID #:  4654

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

taxpayers may not have close relationships with their preparers, others have long-term relationships and completely trust their preparer to interact with the IRS on their behalf.  A taxpayer can decide the limits of the authority he or she wants to convey to a preparer but must avoid signing boilerplate forms giving the preparer broad access to the online account system with minimal restrictions.  The IRS should bring IRS Form 2848, *Power of Attorney and Declaration of Representative*, into the 21st century by building the online account system to provide specific checkboxes addressing authorizations for each type of action a preparer could take on behalf of the taxpayer on the online account system.  For example, the checkboxes could include some of the following actions:[20]

- Provide the IRS any information that is missing from the taxpayer's return;
- Obtain from the IRS information about the processing of the taxpayer's return or the status of the taxpayer's refund or payment(s);
- Receive copies of notices or transcripts related to the taxpayer's return, upon request; and
- Respond to certain IRS notices about math errors, offsets, and return preparation.

> TAS believes that the IRS should give the taxpayer strict and detailed control over preparer authorizations and develop procedures for the taxpayer to fine-tune them on the online account.

These proposed checkboxes are also relevant to the current plans of the IRS to expand the third-party designee authorization on Form 1040 to include e-file software providers and EROs.  By checking off one box, the taxpayer would give the software provider or ERO, whichever is applicable, the blanket authority to perform any or all of the actions included in the four bullets above.  The rationale for this expansion is to enable the parties to obtain refund status information from the IRS, so that they can inform the taxpayer and subsequently, the IRS will receive fewer calls from the taxpayers seeking this information.  However, there is no reason the software provider or ERO should have the authority to perform all of the actions listed.  In fact, the taxpayer, if given the choice, probably would not agree to provide the authority to these parties to perform most of the actions listed.

### The IRS Should Develop and Implement Procedures to Track Preparer Access and Restrict Unauthorized Activities

Once the taxpayer specifies the preparer's authorities for the online account system, the IRS must develop a method to track preparer access and restrict all unauthorized activities.  The IRS should build the system to prevent unauthorized activities from happening in the first place.  As discussed above, the system should first restrict access to only those preparers subject to IRS oversight pursuant to Circular 230.  It also should build the online account system so it validates the preparer's PTIN information.  If the system determines the preparer is unregulated and did not take part in the voluntary AFSP, then it could automatically block certain authorization checkboxes.  The checkboxes ensure that everyone involved in a transaction knows exactly what the taxpayer has authorized the preparer to do.

Under agency law, the preparer is acting as the taxpayer's agent.  Accordingly, pursuant to the Doctrine of Apparent Authority (sometimes referred to as the Doctrine of Ostensible Authority), any reasonable third party is allowed to rely on the agent's actions, unless the third party has reason to know that the agent's

---

20  The four bullets listed are the actions for which the taxpayer designates a third party after Line 79 of tax year 2014 Form 1040, *U.S. Individual Income Tax Return*.  IRS Form 1040 Instructions 2014.  However, ideally, the check boxes should have plain language explanations that have been reviewed by members of the Taxpayer Advocacy Panel (TAP) and LITCs, who have experience communicating with vulnerable populations and also represent them in situations where preparers have taken unauthorized actions.

001482

actions are unauthorized. Therefore, the IRS is allowed to rely on the preparer's actions, unless it has reason to know that the taxpayer did not grant the preparer authority to conduct certain transactions. In fact, under agency law and the Doctrine of Apparent Authority, the taxpayer may be liable for any of the preparer's unauthorized actions if he or she granted a blanket authorization on the online account system, even if the taxpayer had an agreement with the preparer to conduct only one specific type of transaction.[21] The taxpayer would then have to seek recourse against the preparer and may be left to correct those errors, made by the preparer's unauthorized transaction conducted by the preparer, on his or her own.

The Doctrine of Apparent Authority assumes that the third party, the IRS, did not have reason to know that the agent, the preparer, was conducting an unauthorized action. However, the significant occurrence of return preparer fraud may be enough to give the IRS reason to know or appreciate the potential risk for unauthorized actions by unscrupulous preparers.[22] Therefore, there is a possibility that the taxpayer will not be liable for the unauthorized actions of the preparer if the IRS has reason to know of the potential risk. Further, if the IRS creates the online account system with blanket authorizations as the only available option, the IRS may have difficulty holding the taxpayer liable because it is not making an effort to protect its interests by mitigating the known risk of unauthorized actions.[23] The IRS should give serious consideration to this issue as it develops the process for taxpayer authorizations on the system.

> Because the taxpayer may be held responsible for the preparer's actions, whether authorized or not, it is crucial that the taxpayer is aware of *all* the actions taken by the preparer on the taxpayer's online account.

Because the taxpayer may be held responsible for the preparer's actions, whether authorized or not, it is crucial that the taxpayer is aware of *all* the actions taken by the preparer on the taxpayer's online account. Therefore, whenever a preparer takes any type of action on the online account system, including merely accessing the account, the system should alert the taxpayer, in a manner specified by the taxpayer, such as by email or text. Though TAS anticipates IRS hesitation to bombard the taxpayer with messages from the system, it believes the taxpayer needs to know when the preparer accesses the system and exactly what type of transaction the preparer conducted. If the taxpayer feels uncomfortable with the action taken, he or she should then have the ability to report a grievance based on information provided in each system alert communication. Most importantly, this alert system would provide notice to the taxpayer of unauthorized actions and enable the taxpayer to take immediate steps to undo them.

In addition, if the system does not prevent unauthorized actions, the IRS could violate IRC § 6103 if it inappropriately discloses taxpayer information to an unauthorized preparer accessing the system. Unauthorized access also infringes upon the taxpayer's *right to confidentiality*.[24] While the IRC provides civil and criminal penalties for inappropriate uses and disclosures by preparers of tax return information, the IRS should issue guidance specifically applying the provisions to unauthorized access to the online

---

21 RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006).

22 For a recent discussion on return preparer fraud issues, see National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 34-7 (Area of Focus: *The IRS Agrees It Should Issue Refunds to Victims of Return Preparer Fraud, But It Has Been Slow to Develop Necessary Procedures*). At the end of FY 2015, TAS had 272 return preparer fraud cases in total inventory. Data obtained from TAMIS for FY 2015 (Nov. 1, 2015) (Data represents open cases with Special Case Code PF). The current inventory of return preparer fraud cases includes unresolved cases received in prior FYs.

23 RESTATEMENT (SECOND) OF TORTS § 918 (1979) ("One is not prevented from recovering damages for a particular harm resulting from a tort if the tortfeasor intended the harm or was aware of it and was recklessly disregardful of it, unless the injured person with knowledge of the danger of the harm intentionally or heedlessly failed to protect his own interests.").

24 Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

001483

account system.[25]  In addition, the IRS should revise Circular 230 sanctions to include sanctions for those preparers who conduct, or attempt to conduct, unauthorized transactions on the online account system.

The IRS should develop procedures to enable the taxpayer to undo any unauthorized transactions conducted by the preparer.  For example, if the preparer accepts a math error adjustment without the authorization of the taxpayer, the taxpayer could lose the opportunity to seek independent review by the U.S. Tax Court.  The IRS should develop procedures to reverse the unauthorized acceptance of the math error adjustment and institute deficiency procedures.[26]

### CONCLUSION

As the IRS develops a new online account system for taxpayers, the National Taxpayer Advocate has concerns about preparer access to such system.  First, due to the potential for incompetent or unscrupulous preparers to use the system to impose significant harm on taxpayers, it is prudent to restrict access to only those preparers who are already subject to IRS oversight.  If the IRS does not restrict access to preparers subject to Circular 230 oversight, it should evaluate the actions preparers can take on the system to protect taxpayers from harm imposed by preparer misconduct.  Furthermore, taxpayers are the best equipped to determine the boundaries of the preparer's online access and should have the ability to maintain strict control over preparer authorizations.  Finally, such safeguards are meaningless unless the IRS can ensure that preparers do not go beyond those specific authorized activities.

---

25  IRC §§ 7216, 6713.

26  Treasury should revise Circular 230 to include a sanction for unauthorized access to the online account system.  We recommend Treasury revise § 10.51, *Incompetence and Disreputable Conduct*, 31 C.F.R. Part 10, to include specific reference to unauthorized access to the online account system.  However, such sanctions may not be applicable to preparers who are not subject to IRS oversight under Circular 230.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends the IRS:

1. Limit preparer access to the taxpayer online account system to only those preparers subject to IRS oversight under Circular 230.

2. Develop the online account system so it validates the preparer's PTIN information. If the preparer is not subject to Circular 230 oversight, the system should block certain authorization checkboxes automatically.

3. Develop the online account system so that the taxpayer can adjust preparer authorizations by checking a separate box for each type of action the designated preparer can take on the taxpayer's behalf. The checkboxes should use plain language explanations that Taxpayer Advocacy Panel members and Low Income Taxpayer Clinics have reviewed.

4. Develop procedures to track preparer access to the taxpayer's online account and verify the taxpayer authorized the actions taken.

5. Develop procedures to automatically alert the taxpayer of any preparer activities on the online account system and provide information to the taxpayer on how to report unauthorized access.

6. Work with the Department of Treasury to issue guidance specifically applying the provisions of IRC §§ 6713 and 7216 to unauthorized access to the online account system.[27] In addition, the IRS should work with Treasury to revise Circular 230 sanctions to include sanctions for preparers who conduct, or attempt to conduct, unauthorized transactions on the online account system.

---

27   IRC §§ 7216, 6713.

001485

Case 3:17-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1493 of 4699 PageID #: 4658

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

Most Serious
Problems

**MSP #7**

# INTERNATIONAL TAXPAYER SERVICE: The IRS's Strategy for Service on Demand Fails to Compensate for the Closure of International Tax Attaché Offices and Does Not Sufficiently Address the Unique Needs of International Taxpayers

## RESPONSIBLE OFFICIALS

Douglas W. O'Donnell, Commissioner, Large Business & International Division
Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- The Right to Be Informed
- The Right to Quality Service
- The Right to a Fair and Just Tax System

## DEFINITION OF PROBLEM

Despite an increase in the number of international taxpayers, the IRS has significantly decreased its overseas taxpayer service presence in recent years.[2] While it has plans to expand international criminal investigation locations,[3] during late 2014 and 2015, the IRS eliminated the last four tax attaché posts abroad, citing a multi-year decrease in its appropriations.[4] Taxpayers who benefitted from these offices now must either call an overwhelmed, tolled IRS telephone number in the United States or obtain information from the irs.gov website.

Apart from the attachés, the only free option[5] for taxpayers to ask a specific question and receive a response from an IRS employee was the Electronic Tax Law Assistance Program (ETLA), which the IRS terminated in October 2015. ETLA allowed the IRS to learn directly from taxpayers what problems and questions they had, and how it needed to update its webpages and publications to provide the necessary information. In conjunction with terminating ETLA, the IRS also discontinued R-mail, a system that allowed customer service representatives to refer taxpayer questions to employees with specific expertise. By eliminating ETLA and R-mail, the IRS has shut itself off from taxpayers with no way of knowing (unless the taxpayer makes a mistake or the IRS selects his or her return for audit) whether it is providing the

---

1 See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2 National Taxpayer Advocate 2011 Annual Report to Congress 156, fn. 39. *See also* National Taxpayer Advocate 2009 Annual Report to Congress 134-54.

3 *See* Internal Revenue Service FY 2016 President's Budget 81 (Feb. 2, 2015), *available at* http://www.treasury.gov/about/budget-performance/CJ16/02-06.%20IRS%20FY%202016%20CJ.pdf.

4 There were originally fifteen foreign tax attaché posts. *See id.* On November 30, 2014, the IRS closed its Beijing office. Memorandum from Acting Deputy Commissioner, International (LB&I) to LB&I, Commissioner; SB/SE, Commissioner; W&I, Commissioner; Director, IBC; Director, IIC; Director, PGLD; Director Taxpayer Advocate Services; Office of the Chief Technology Officer; Chief Criminal Investigations; Chief Financial Officer (Oct. 16, 2014). The IRS closed tax attaché offices in Frankfurt, Germany, London, UK, and Paris, France, on June 26, 2015, Sept. 19, 2015, and Dec. 26, 2015, respectively. Memorandum from Acting Deputy Commissioner, International (LB&I), *Post Closures of Frankfurt, London and Paris* (Feb. 18, 2015).

5 Because taxpayers calling abroad may have to pay long distance toll charges, the international taxpayer assistance line is not considered a free option.

001486

service taxpayers need. The net effect is a reversion back to a "push" approach to taxpayer information, as opposed to a dialogue.

The National Taxpayer Advocate has repeatedly written about the unique needs of international taxpayers, which the IRS has been slow to address.[6] Given the overwhelming complexity of international tax rules and reporting requirements and the potentially devastating penalties for even inadvertent noncompliance,[7] the IRS's withdrawal of dialogue makes it more likely taxpayers will get it wrong. The IRS creates an end-less cycle of more noncompliance breeding more enforcement, without more proactive taxpayer service through education and interaction, which would help avoid these problems. In addition to the closure of the attachés and the termination of ETLA, the National Taxpayer Advocate remains concerned that:

- Telephone and correspondence service for international taxpayers is inadequate;
- The IRS's plans for expanding self-service options, which although having the potential to benefit international taxpayers, cannot fully replace personal service options, either by phone, face-to-face, or an online chat function; and
- The IRS has no permanent servicewide team focused on service for taxpayers abroad.

With its international taxpayer service strategy, the IRS is limiting the opportunity for interaction and will no longer be able to learn firsthand what taxpayers need. Without a two-way dialogue, information will be filtered and the IRS will decide what it thinks taxpayers need to hear, instead of hearing what information taxpayers want and need. This interaction is vital, and any system of taxpayer service worthy of that name must have avenues for learning from its participants, instead of just telling them.

## ANALYSIS OF PROBLEM

### International Taxpayers Comprise a Significant Group With Unique Needs and Burdens

The number of U.S. citizens abroad continues to grow, while the numbers of other international taxpayers remain steady. In mid-2015, approximately 8.7 million U.S. citizens lived abroad, compared with about 7.6 million in mid-2014.[8] The number of U.S. military service personnel and dependents stationed over-seas as of June 2015 was 174,100 compared to 149,600 in 2014, an increase of over 16 percent.[9] There were also many international U.S. taxpayers who were neither residents nor citizens of the United States,

---

6   *See, e.g.*, National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 77-82 (Area of Focus: *International Local Taxpayer Advocates Would Provide Valuable Assistance to Taxpayers and Protect Their Rights*); National Taxpayer Advocate 2012 Annual Report to Congress 262-80 (Most Serious Problem: *Challenges Persist for International Taxpayers as the IRS Moves Slowly to Address Their Needs*); National Taxpayer Advocate 2013 Annual Report to Congress 205-13 (Most Serious Problem: *International Taxpayer Service: The IRS Is Taking Important Steps to Improve International Taxpayer Service Initiatives, But Sustained Effort Will Be Required to Maintain Recent Gains*).

7   *See* National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 48-52 (Area of Focus: *The IRS's Implementation of FATCA Has in Some Cases Imposed Unnecessary Burdens and Failed to Protect the Rights of Affected Taxpayers*).

8   *See* U.S. Department of State, Bureau of Consular Affairs, *Who We Are and What We Do: Consular Affairs by the Numbers* (May 2014), *available at* http://travel.state.gov/content/dam/travel/CA%20Fact%20Sheet%202014.pdf; U.S. Department of State, Bureau of Consular Affairs, *Who We Are and What We Do: Consular Affairs by the Numbers* (Apr. 2015), *available at* http://travel.state.gov/content/dam/travel/CA%20by%20the%20Numbers-%20May%202015.pdf.

9   U.S. Department of Defense, *Active Duty Military Personnel, Strength by Regional Area and by Country* (Mar. 31, 2015); U.S. Department of Defense, Active Duty Military Personnel, Strength by Regional Area and by Country (Mar. 31, 2014), *available at* https://www.dmdc.osd.mil/appj/dwp/dwp_reports.jsp; U.S. Department of Defense, Active Duty Military Personnel, Strength by Regional Area and by Country (Mar. 31, 2013), *available at* https://www.dmdc.osd.mil/appj/dwp/dwp_reports.jsp.

001487

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1495 of 4699 PageID #:  4660

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

evidenced by the approximately 231,000 U.S. individual tax returns filed by nonresident aliens in 2014, compared to 214,000 in 2013.[10]

International taxpayers face unique filing burdens.  For example, taxpayers who are not U.S. citizens must apply for an Individual Taxpayer Identification Number (ITIN), an arduous process that often requires mailing original identification documents.[11]  U.S citizens, resident aliens, and certain non-resident aliens that have an interest in specified foreign financial assets and meet the reporting threshold, must report their foreign financial assets under the Foreign Account Tax Compliance Act (FATCA).[12]  Furthermore, all U.S. persons, that have an interest of $10,000 or more in foreign financial accounts, must file Financial Crime Enforcement Network Form 114, *Report of Foreign Bank and Financial Accounts* (FBAR).[13]

### The Closure of Tax Attaché Offices Abroad, Concurrent With the Expansion of the IRS's International Enforcement Presence, Harms Taxpayers and Fails to Provide the Assistance They Need

The closure of the last four overseas tax attachés deprives taxpayers abroad of valuable and necessary services.[14]  In 2014 and 2015, the attachés collectively held 19 formal outreach events, with approximately 1,500 attendees.[15]  These events focused on topics such as filing requirements, the foreign tax credit, FBAR, and tax law changes; and they included a question and answer portion with the opportunity for one-on-one questions after.  In fiscal year (FY) 2014, approximately 5,442 taxpayers walked-in to the London attaché office to seek assistance or ask questions, and the Frankfurt office had over three thousand phone contacts.[16]  By providing accessible information about what international taxpayers need to do to comply with the tax laws, the attachés supported taxpayers' *rights to be informed* and *to quality service*.

The interaction between the attachés and taxpayers created a perfect feedback loop: taxpayers came to the attachés for help, and in addition to providing assistance, the attachés learned about issues taxpayers found confusing or about systemic problems.  The attachés then incorporated this information into their future presentations and shared it with other IRS employees who were

> Without a two-way dialogue, information will be filtered and the IRS will decide what it thinks taxpayers need to hear, instead of hearing what information taxpayers want and need.  This interaction is vital, and any system of taxpayer service worthy of that name must have avenues for learning from its participants, instead of just telling them.

---

10  TAS Research & Analysis query of Compliance Data Warehouse (Dec. 15, 2015).

11  *See* Most Serious Problem: *Individual Taxpayer Identification Numbers (ITINs): IRS Processes Create Barriers to Filing and Paying for Taxpayers Who Cannot Obtain Social Security Numbers*, *infra*.

12  For more information about the burdens on taxpayers associated with FATCA, see National Taxpayer Advocate FY 2016 Objectives Report to Congress 48-52 (Area of Focus: *The IRS's Implementation of FATCA Has in Some Cases Imposed Unnecessary Burdens and Failed to Protect the Rights of Affected Taxpayers*).

13  *See* 31 C.F.R. §§ 1010.350(a), 1010.306(c).  All U.S. persons includes U.S. citizens, resident aliens, trusts, estates, and domestic entities.

14  In 1993, the IRS had staff members attached to or located at more than a dozen U.S. embassies abroad.  *See* David Kocieniewski, IRS Will Shut Last Overseas Taxpayer Assistance Centers (Jan. 14, 2015), *available at* http://www.bloomberg.com/news/articles/2015-01-14/irs-will-shut-last-overseas-taxpayer-assistance-centers.  The Commissioner listed growing the attaché presence as one of the many actions the IRS could take if provided with additional funding of $40.7 million in order to address offshore tax evasion.  *See* FY 16 *Treasury Department Budget: Hearing Before the Senate Appropriations Committee, Subcommittee on Financial Services and General Government*, 113th Cong. (2015) (statement of John A. Koskinen, Commissioner, IRS).

15  IRS response to TAS information request (July 22, 2015).

16  *Id.*

001488

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1496 of 4699    PageID #: 7361

Most Serious
Problems

Legislative
Recommendations

Most Serious
Issues

responsible for content on irs.gov, or who might be in a position to influence policies or procedures. The following examples illustrate this:

- The Paris attaché received numerous questions about renunciation, so it posted information on this issue on the embassy website and in its brochures.

- The Paris attaché wrote letters to IRS service centers to resolve systemic problems.

- The Beijing attaché reached out to the Affordable Care Office to recommend it add a Frequently Asked Question to its website, which it did, based on recurring questions from international taxpayers.

- The Beijing attaché elevated to the IRS the issue of taxpayers with foreign addresses being unable to use the online transcript request.

- Upon noticing a large number of returns filed that appeared to be part of a fraudulent scheme, the London attaché elevated the issue to Deputy Large Business & International (LB&I) Commissioner, International, and it was referred to the appropriate office.[17]

The attachés also sent monthly reports to IRS headquarters, reporting on trends and the prevailing issues.[18] In this way, the attachés were highly efficient and cost effective because they likely benefited many more taxpayers than just the ones who contacted them.

The attachés also acted as a liaison to community organizations, professional associations, financial institutions, and the embassy and consulate offices in the surrounding region.[19] The Paris attaché reported meeting with practitioners annually to hear about their issues and problems, and incorporated this information into its annual taxpayer service plan. The attachés also had relationships with treaty partners and spent ample time on exchange of information issues. The attachés used their expertise to provide information about laws and overseas procedures to other IRS offices.[20]

> The interaction between the attachés and taxpayers created a perfect feedback loop: taxpayers came to the attachés for help, and in addition to providing assistance, the attachés learned about issues taxpayers found confusing or about systemic problems.

Unique to the attachés activities was the direct, two-way interaction between them and taxpayers or stakeholders. Although virtual outreach may be beneficial in the future, and the Paris attaché successfully held two virtual outreach events for expatriates in Nairobi and Barcelona during 2015, these did not provide the opportunity for one-on-one interaction. Furthermore, the IRS relied on the partnership of the Department of State in conducting these events, and has recently cited rejections by the Department of State as reasons for stalled progress on plans to conduct similar outreach events during the next filing season.[21] Even if the IRS is able to orchestrate future virtual sessions without the attachés, providing a one-time brief window will not replace the dialogue that taxpayers had with the attachés throughout the year.

---

17  TAS conference call with IRS tax attachés (Sept. 24, 2015).

18  Id.

19  For example, the Paris office had collaborative relationships with the Organization of Economic Cooperation and Development (OECD) and traveled to meet with treaty partners, embassy officials, and consulates to see what their needs were. See Id. The London office had active relationships with a number of expatriate community organizations, as well as professional groups such as the Entertainment Industry Workshop Group and the British-American Business Roundtable. See IRS response to TAS information request (July 22, 2015).

20  TAS conference call with IRS tax attachés (Sept. 24, 2015).

21  Id.

The National Taxpayer Advocate is concerned that the IRS did not analyze the impact of closing the attachés prior to making its decision. The IRS stated "these closures have relatively little impact on taxpayers and treaty partners;" however, the IRS did not conduct any impact studies to determine the potential effects on taxpayers, compliance, or revenue. The IRS estimated the closures would save $4 million per year.[22] However, at the same time, the IRS has asked for $8.4 million to expand offshore criminal investigations, including opening two additional posts.[23] Impact studies may have considered the effects on voluntary compliance, especially encouraging voluntary payments.[24] Instead of closing the existing attachés, the IRS should analyze the impact of reopening additional attaché offices. In addition, each IRS office abroad should include a Local Taxpayer Advocate (LTA) to provide international taxpayers with better access to TAS, foster increased communication and information sharing, and encourage reporting of systemic issues.[25] Increases in voluntary compliance resulting from better service for taxpayers abroad would more than offset the additional costs.[26]

### Shutting Down the Electronic Tax Law Assistance Program Removed the Only Free Option for International Taxpayers to Meaningfully Interact With the IRS

On October 1, 2015, the IRS shut down the ETLA program, the only free method for taxpayers abroad to ask and receive answers to their specific tax law questions without paying toll phone or fax charges.[27] An internal email indicates that a drop in usage since its initiation drove the IRS's decision.[28] However, low usage was by design, as the irs.gov website includes little mention of ETLA.[29] Furthermore, ETLA inquiries have actually increased in recent years, with an average of almost 32,000 inquiries per year during the last four years, compared with an average of only about 13,500 inquiries per year during the prior four years.[30] Inquiries from aliens and U.S. citizens living abroad have grown substantially, up 39 percent since FY 2013.[31]

---

22  See David Kocieniewski, IRS Will Shut Last Overseas Taxpayer Assistance Centers (Jan. 14, 2015), available at http://www.bloomberg.com/news/articles/2015-01-14/irs-will-shut-last-overseas-taxpayer-assistance-centers. The IRS requested $283 million for international enforcement resources for FY 2014, and only about $8.5 million for all field assistance for the LB&I Operating Division, which includes a Headquarters office and one other domestic office. IRS response to TAS information request (July 10, 2015).

23  IRS FY 2016 President's Budget 81 (Feb. 2, 2015), available at http://www.treasury.gov/about/budget-performance/CJ16/02-06.%20IRS%20FY%202016%20CJ.pdf. Currently, the IRS maintains ten criminal investigation offices overseas. IRS, Criminal Investigation, Fiscal Year 2014 National Operations Annual Business Report, 27, available at http://www.irs.gov/pub/foia/ig/ci/REPORT-FY2014-IRS-CI-Annual-Report.pdf.

24  As an example, taxpayer remittances received by the London attaché in FY 2014 totaled almost $27 million. IRS response to TAS information request (July 22, 2015).

25  For a detailed discussion of the need for LTAs abroad, see National Taxpayer Advocate FY 16 Objectives Report to Congress 77-82 (Area of Focus: International Local Taxpayer Advocates Would Provide Valuable Assistance to Taxpayers and Protect Their Rights). See also National Taxpayer Advocate 2013 Annual Report to Congress 213; National Taxpayer Advocate 2011 Annual Report to Congress 190.

26  More than 98 percent of all tax revenue collected by the IRS is paid voluntarily and timely. In FY 2014, the IRS collected total tax revenue of about $3.1 trillion. Of that amount, it collected $57.1 billion through enforcement actions. Government Accountability Office (GAO), GAO-15-173, Financial Audit: IRS's Fiscal Years 2014 and 2013 Financial Statements 29 (Nov. 2014), available at http://www.gao.gov/assets/670/666863.pdf.

27  See SERP Alert 15A0387 (Aug. 18, 2015).

28  See email from Chief, Electronic Services and Programs, SE:W:CAS:AM:ESP (Aug. 13, 2015).

29  A search on irs.gov on August 18, 2015, for "ETLA" or "Electronic Tax Law Assistance" turned up only two web pages on irs.gov, neither of which actually had a link that taxpayers could use to access the ETLA system.

30  ETLA Fiscal Year Reports, FY 2008-2015.

31  Id.

**FIGURE 1.7.1**[32]

Growth in ETLA Inquiries Received From Aliens and U.S. Citizens Living Abroad



Although some ETLA inquires resulted in long wait times for taxpayers,[33] the average response time during FY 2015 for questions related to aliens and U.S. citizens living abroad was only 3.9 days,[34] meaning the IRS was able to manage its resources in a way to efficiently answer these questions. In addition to the superficially low usage rate, the IRS also cites cost as a reason for discontinuing ETLA, comparing the cost per contact of $116 with the cost per contact for toll free assisted calls of $42.[35] However, one ETLA submission is not equal to one telephone call. ETLA questions are usually those that are not covered in online applications or are difficult to understand or interpret in the context of a taxpayer's specific circumstances, meaning they are inherently likely to be more difficult and thus more expensive to answer. Taxpayers could also ask questions 24 hours a day, which is crucial for taxpayers in international time zones.

In conjunction with terminating ETLA, the IRS also discontinued its R-mail program, which was an automated system used to refer specific tax law questions received through ETLA to headquarters employees to clarify confusing issues or instructions. The IRS cited low usage for this program, which is a self-fulfilling proposition, a result of the IRS not answering "out of scope" questions, precisely the type of question that might require a referral.[36] R-mail could have provided a valuable feedback loop between international taxpayers who are experiencing confusion regarding an issue or instruction, and the IRS employee receiving the referral, who can recommend changes to the instructions or procedures based on what the taxpayer identifies as confusing.

---

32  ETLA Fiscal Year Reports, FY 2005-2015.

33  For example, questions involving the Child Care Credit and Other Credits handled by the Dallas office had an average wait time of nearly 30.1 days for inquiries worked during FY 2015. ETLA Fiscal Year 2015 Report. The IRS has a goal of answering all ETLA inquiries within three business days. Internal Revenue Manual (IRM) 21.3.2.1, *Electronic Tax Law Assistance Overview* (Dec. 10, 2014).

34  ETLA Fiscal Year Reports for inquiries received between October 1, 2014 and September 30, 2015.

35  *See* Briefing Document, *Retiring Electronic Tax Law Assistant (ETLA) and Referral Mail (R-Mail)* (sent by email from Wage and Investment Senior Advisor to TAS, Aug. 31, 2015).

36  IRM 21.2.1.57.2, *Procedures* (Mar. 15, 2012), provides procedures for R-mail telephone referrals and states: "Depending on the complexity of the message, you may determine that a question is outside the scope of the service. IRM 21.2.1.57.2.2.7, "Out of Scope" Procedures."

001491

None of the alternatives to ETLA provide real interaction. The IRS cites various tools on its website,[37] but even the so called "interactive" tools only provide canned responses to questions the IRS has come up with, leaving taxpayers unable to ask their actual questions and the IRS oblivious as to what issues taxpayers have. Contingent on funding, the IRS has proposed two options for virtual webcasts to assist taxpayers abroad who no longer have the benefit of ETLA or virtual outreach conducted by the attachés. The first option includes a live webcast with up to 20,000 attendees where questions can be asked and answered during the webcast. The second option is for a PowerPoint slide webcast with audio that is envisioned to  accommodate at least 2,000 attendees and can be recorded for subsequent viewing, but without audience interaction and the capability to respond to audience questions.[38] Even if the IRS is able to achieve the first option, it would provide only a single opportunity for dialogue with a limited number of taxpayers at a time that may not be convenient or when taxpayers even have questions. Given the reliance on ETLA by taxpayers abroad, terminating ETLA as a whole reflects poor decision-making and disregard for international taxpayers' needs.

### Telephone and Correspondence Service for International Taxpayers Is Inadequate

Although an increasing number of international taxpayers prefer online services over telephone, non-filers were significantly more likely than filers to want more IRS resources devoted to telephone service as opposed to online service improvements, according to a 2012 IRS survey.[39] This may be because only 58 percent of non-filers surveyed reported having Internet access at home, and 35 percent reported having no Internet access at all.[40] Foreign taxpayers face burdens in calling the IRS, primarily because they must call a domestic IRS office, which may be many time zones away, and pay significant tolls depending on the length of the call. This is especially problematic given the decline in phone service over recent year. In FY 2013, the average wait time on the international phone line was 10.5 minutes, compared to 19.9 minutes in FY 2015, a 90 percent increase.[41] Furthermore, the average level of service on the international phone line in FY 2015 was only 55 percent.[42]

The IRS could accommodate the international taxpayer service need driven by the increase in international enforcement by allocating additional funding for international taxpayer phone lines. Using Voice over Internet Protocol (VOIP) technology could potentially allow the IRS to reduce its phone costs and provide toll-free service to overseas taxpayers. When asked about barriers to using this technology, the IRS response was based solely on its experience as a tenant of the U.S. embassy in London, where the Department of State used such technology, reflecting that the IRS has not researched this possibility.[43]

---

37   The IRS cites Tax Topics, Tax Trails, and the Interactive Tax Assistant as alternatives, although additions to the Interactive Tax Assistant are contingent on funding. *See* IRS Briefing Document, *Retiring Electronic Tax Law Assistance and Referral Mail* (sent by email from Wage and Investment Senior Advisor to TAS on Aug. 31, 2015).

38   *See* IRS Briefing Document, *Retiring Electronic Tax Law Assistance and Referral Mail* (sent by email from Wage and Investment Senior Advisor to TAS on Aug. 31, 2015).

39   Forty-six percent of nonfilers favored improving telephone service over online service, as opposed to only 30 percent of filers who favored telephone service. IRS, Wage and Investment Research and Analysis, *2012 Taxpayer Experience of Individuals Living Abroad: Service Awareness, Use, Preferences, and Filing Behaviors* 10 (Aug. 2012).

40   IRS, Wage and Investment Research and Analysis, *2012 Taxpayer Experience of Individuals Living Abroad: Service Awareness, Use, Preferences, and Filing Behaviors* 10 (Aug. 2012).

41   IRS, JOC Snapshot Reports for weeks ending Sept. 30, 2013 and Sept. 30, 2015.

42   IRS, JOC Snapshot Report for week ending Sept. 30, 2015.

43   *See* IRS response to TAS information request (July 22, 2015).

Although many questions can be answered from an online article or the Interactive Tax Assistant (ITA), questions about a taxpayer's account or requests for a manager to explain an employee's handling of their case must be answered over the phone. Furthermore, the term "interactive" in describing the ITA is misleading because the taxpayer only receives one of a number of canned answers to questions the IRS has created on its own.

Although many questions can be answered from an online article or the Interactive Tax Assistant (ITA),[44] questions about a taxpayer's account or requests for a manager to explain an employee's handling of their case must be answered over the phone. Furthermore, the term "interactive" in describing the ITA is misleading because the taxpayer only receives one of a number of canned answers to questions the IRS has created on its own. There is no two-way interaction between the taxpayer and an employee where the taxpayer could receive a specific answer to his or her question and the IRS could learn about how to improve its taxpayer resources based on the taxpayer's question.

The lack of phone service is especially critical given barriers to receiving correspondence abroad. The Treasury Inspector General for Tax Administration (TIGTA) recently found that typographical errors and systemic address limitations lead to undeliverable international mail and registered mail may not be delivered to its intended recipients abroad.[45] TIGTA noted that approximately 855,000 notices and letters were sent to U.S. taxpayers abroad during 2014, but the IRS could not determine how many taxpayers responded.[46] Without effective correspondence or accessible phone service, the IRS infringes a taxpayer's *right to be informed*. Taxpayers abroad may not receive crucial information about their accounts, as well as learn when they need to take actions to exercise their rights. For example, without receiving a Statutory Notice of Deficiency, a taxpayer abroad may not know he or she must petition Tax Court within 150 days to challenge the deficiency in court.[47]

### The IRS's Plans for Expanding Self-Service Options, Which Although Having the Potential to Benefit International Taxpayers, Cannot Fully Replace Personal Service Options, Either by Phone, Face-to-Face, or an Online Chat Function

The IRS has improved some self-service resources for international taxpayers; however, most only provide static information, with no way for taxpayers to interact with an IRS employee. In June 2015, the IRS released three YouTube videos for international taxpayers on the topics of filing requirements, the foreign earned income tax exclusion, and ITINs.[48] It also added two new international "Tax Trails," which are a series of "interactive" questions that allow a taxpayer to find canned answers to tax law and tax filing questions chosen by the IRS.[49] The IRS also expanded its coverage of international issues on its "Tax Map," which now includes an index of international issues and provides links to various IRS online articles about specific topics, such as tax treaties or FATCA. In FY 2015, the international pages received 15,484 total

---

44  The Interactive Tax Assistant is a tax law resource that takes a taxpayer through a series of questions on a limited number of topics and provides responses. *See* http://www.irs.gov/uac/Interactive-Tax-Assistant-(ITA)-1. The term "interactive" is misleading, as the taxpayer only receives one of a number of canned answers to questions the IRS has created on its own, as opposed to interacting with an employee who could answer the taxpayer's specific question.

45  *See* TIGTA, Ref. No. 2015-30-072, *Planned Improvements Have Not Been Made to Manage and Track Correspondence With International Taxpayers* (Sept. 8, 2015).

46  *Id.*

47  IRC § 6213 provides that within 90 days (or 150 days if the notice is addressed to a person outside the United States) after a notice of deficiency is mailed, a taxpayer can petition Tax Court to challenge the deficiency.

48  *See* IRS, IR 2015-85, *New YouTube Videos, Online Resources Help Taxpayers Abroad* (June 4, 2015), *available at* http://www.irs.gov/uac/Newsroom/New-YouTube-Videos,-Online-Resources-Help-Taxpayers-Abroad.

49  *See id.*

hits through June 29, 2015, with the top five non-U.S. visitor countries of origin being: China, UK, Canada, Germany, and Spain.[50]

TAS asked the IRS about its progress during the last two fiscal years on expanding online resources for international taxpayers, including secure messaging portals, Free File fillable forms, e-filing, and improvements to irs.gov. The IRS response reflected the main actions were improvements to irs.gov, which primarily consisted of updating informational webpages. The only significant action was to develop a registration page allowing foreign financial institutions to register with the IRS regarding their participation in FATCA and obtain a Global Intermediary ID Number to use for FATCA reporting.[51]

The IRS should invest in catching up with technology already developed by the private sector to create a secure internet connection for taxpayers abroad so they could communicate with the IRS via an "e-chat" system. The IRS can also pilot the Virtual Service Delivery (VSD) technology it successfully uses for in-person interaction with taxpayers domestically.[52] To avoid security concerns involving foreign Internet Protocol addresses, the IRS could partner with the U.S. Department of State to install VSD terminals at U.S. embassies and consulates. However, before the IRS develops alternatives for taxpayers abroad to interact with IRS employees virtually, it is vital for the IRS to reinstate and maintain the services offered by the tax attachés.[53]

Furthermore, the IRS should not focus its entire international taxpayer service strategy on web-based self-service options. Currently, some taxpayers do not have access to several existing online services. For example, the Get Transcript application cannot be used by taxpayers with ITINs, which are used by individuals not eligible for Social Security numbers. Nonresident alien taxpayers cannot file Form 1040-NR or Form W-7, *Application for IRS Individual Taxpayer Identification Number*, electronically. As explained above, a significant number of taxpayers abroad who did not file returns lack internet access.

### The IRS Needs a Permanent Servicewide Team Focused on the Unique Service Needs of International Taxpayers

To specifically address the needs of international taxpayers, in 2012 the IRS created the International Individual Taxpayer Assistance (IITA) team with representatives from the LB&I, the Wage & Investment Division (W&I), the Office of Online Services (OLS) and TAS. Although the team was initially instrumental in updating and streamlining various international IRS webpages, the team's efforts have flagged in recent years. The IRS declined to adopt the National Taxpayer Advocate's 2012 recommendations to make the team permanent with a formal charter and required periodic reporting,[54] and not surprisingly, the team has been largely inactive recently. The team's main actions during the last two fiscal years have been limited to adding content to international taxpayer web pages, with the exceptions of preparing a 2015 filing season information document for U.S. embassies and convening an ad-hoc team in 2015 to

---

50   *See* IRS response to TAS information request (July 22, 2015).

51   IRS response to TAS information request (July 10, 2015).

52   Virtual service delivery enables taxpayers to interact directly with IRS employees using videoconferencing equipment and allows taxpayers to transmit and discuss documents in real time. Currently, the IRS employs VSD technology at only brick and mortar locations, as opposed to allowing taxpayers to use their own technology equipment at home. The National Taxpayer Advocate has made numerous recommendations over the years to expand the IRS's use of VSD. *See, e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 152-62 (Most Serious Problem: *Virtual Service Delivery: Despite a Congressional Directive, the IRS Has Not Maximized the Appropriate Use of Videoconferencing and Similar Technologies to Enhance Taxpayer Services*).

53   The National Taxpayer Advocate has also advocated for LTAs to be placed at each international tax attaché office to better serve taxpayers abroad. *See* National Taxpayer Advocate FY 2016 Objectives Report to Congress 77-82 (Area of Focus: *International Local Taxpayer Advocates Would Provide Valuable Assistance to Taxpayers and Protect Their Rights*).

54   *See* National Taxpayer Advocate 2012 Annual Report to Congress 280.

001494

work on virtual outreach sessions.[55]  Without formalizing and making permanent the IITA team, taxpayer service for international taxpayers will dissipate further.

## CONCLUSION

International taxpayers are a growing population who face declining taxpayer service resources and increased filing and reporting requirements, along with substantial penalties for noncompliance.  The closure of the overseas tax attaché offices exacerbates this problem by eliminating a key means of providing outreach and technical assistance, identifying issues with IRS processes and procedures, and learning about current challenges and the needs of international taxpayers.  Furthermore, by terminating ETLA and R-mail, the IRS has shut itself off from taxpayers, preventing taxpayers from asking their own questions and preventing the IRS from learning how to better serve taxpayers and prevent problems.  The IRS's planned focus on web-based self-service for international taxpayers will not replace the services lost.  While in the current budget environment it may be tempting to migrate taxpayer service toward superficially lower-cost self-assistance options, significantly reducing personal service options may ultimately impair voluntary compliance and undermine taxpayers' *rights to be informed* and *to quality service.*[56]

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Reopen the four international tax attaché offices and provide funding for TAS to establish one LTA position at each office.

2. Conduct impact studies to determine the effects on taxpayer service, compliance, and revenue by opening additional tax attaché offices around the world.

3. Reestablish the ETLA (or a similar program) with timeframes for responses and create a process for using the information from ETLA inquiries in updates to IRS internal and external materials, including the irs.gov website.

4. Allocate funding for staffing additional telephone service to accommodate the need created by the expansion of international enforcement activities.

5. Create a task force to analyze and provide a report within one year on the barriers to VOIP usage and partnering with the U.S. Department of State to employ VSD technology for taxpayers at U.S. embassies and consulates.

6. Reinstate the IITA Team, with a formal charter, regular meetings, objectives, and measurable results.

---

55   *See* IRS response to TAS information request (July 22, 2015).

56   For a detailed discussion of the Taxpayer Bill of Rights, *see* http://www.taxpayeradvocate.irs.gov/About-TAS/Taxpayer-Rights.

001495

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

**MSP #8**

# APPEALS: The Appeals Judicial Approach and Culture Project Is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers

## RESPONSIBLE OFFICIALS

Kirsten B. Wielobob, Chief, Appeals
Karen Schiller, Commissioner, Small Business/Self-Employed Division
Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- The Right to Challenge the IRS's Position and Be Heard
- The Right to Appeal an IRS Decision in an Independent Forum
- The Right to Privacy
- The Right to a Fair and Just Tax System

## DEFINITION OF PROBLEM

An independent and effective Office of Appeals (Appeals) within the IRS is essential for quality tax administration and meaningful protection of taxpayer rights. Appeals' mission is to resolve tax controversies on a basis that is fair and impartial to both the government and the taxpayer and in a manner that will enhance public confidence in the integrity and efficiency of the IRS.[2] Appeals attempts to accomplish these goals and to improve voluntary compliance by providing a prompt, high-quality decision in each case, and by reasonably resolving the maximum number of tax controversies without recourse to litigation.[3]

Appeals recently implemented the Appeals Judicial Approach and Culture (AJAC) project in hopes of enhancing "internal and external customer perceptions of a fair, impartial and independent Office of Appeals."[4] AJAC's stated intent is to reinforce Appeals' mission of administrative dispute resolution by clarifying and separating the negotiation and decision-making role of Appeals from the factual investigations and case development allocated to the Examination and Collection functions.[5] For example, under AJAC, Appeals now will generally treat a Collection information statement (CIS) as verified by Collection, and whenever taxpayers in Examination-based cases raise new issues or present additional

---

1   See Taxpayer Bill of Rights, available at www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   IRM 8.1.1.1(1), Accomplishing the Appeals Mission (Feb. 10, 2012).

3   Id.

4   IRS, Internal Guidance Memorandum (IGM) AP-08-0714-0005, Implementation of the Appeals Judicial Approach and Culture (AJAC) Project, Collection – Phase 2 (July 10, 2014).

5   IRS, Reinforcing Appeals' Philosophy: Appeals Judicial Approach and Culture (AJAC) Talking Points (July 2, 2014), available at http://appeals.web.irs.gov/about/ajac.htm. Appeals states that AJAC is intended to emphasize its "quasi-judicial" nature. According to Black's Law Dictionary, "quasi-judicial" is a term not easily definable, but generally connoting "[o]f, relating to, or involving an executive or administrative official's adjudicative acts." BLACK'S LAW DICTIONARY (10th ed. 2014), available at http://westlaw.com. Appeals' use of the term "quasi-judicial" is apparently intended to distinguish factual investigations allocated to the Examination or Collection functions from dispute resolution activities on which Appeals would like to focus.

001496

evidence requiring further investigation, Appeals will send the matter back to Compliance for development and evaluation.[6]

Although AJAC's aspirations are commendable, its practical implementation is eroding the very perceptions of fairness and objectivity that it claims to bolster. One commentator stated, "[t]here seems to be something problematic in the procedure for just about everyone involved."[7] Further, non-docketed Examination-based Appeals receipts have steadily fallen and TAS has observed that AJAC cases, at least in some circumstances, may be generating less thorough review than pre-AJAC cases.[8]

The National Taxpayer Advocate has long been a proponent of an independent and effective Appeals process within the IRS.[9] Nevertheless, she is concerned that, in application, AJAC is:

- Being used to intimidate taxpayers and deny their right to an administrative appeal;
- Causing cases to bounce back and forth between Appeals and Compliance; and
- Resulting in curtailed review by Appeals Hearing Officers (Hearing Officers) of IRS Examination and Collection actions.[10]

## ANALYSIS OF PROBLEM

### AJAC Is Sometimes Being Used to Intimidate Taxpayers and Deny Their Right to an Administrative Appeal

The IRS recently affirmed its commitment to a number of fundamental taxpayer rights, including *the right to appeal an IRS decision in an independent forum.*[11] A meaningful and efficient appeals process is a core element of this taxpayer right, which is also a goal of AJAC. Nevertheless, while striving to operate more efficiently is laudable, the course the IRS is currently pursuing is imperiling taxpayers' access to Appeals.

---

6   IRM 8.22.7.1.1(2), *Collection Information Statement (CIS)* (Sept. 23, 2013); IRM 8.6.1.6.2, *General Guidelines* (Nov. 14, 2013). "Compliance" will be used hereafter as a collective term to refer to the Examination and Collection functions within the Small Business/Self-Employed Division (SB/SE) and the Wage & Investment Division (W&I). To the extent a portion of the discussion is limited to a particular IRS operating division, that division will be specifically referenced.

7   Diane Freda, *Estate Taxes: Estates Grapple With New Dispute Timelines Under IRS Appeals Procedure*, Daily Tax Rep. (BNA) No. 4, at G-3 (Jan. 7, 2015). *See* her profile at http://www.bna.com/diane-freda-h2147483829/.

8   *See* figure entitled *Comparison of Appeals' Workload by Fiscal Year, infra*; Appeals response to TAS information request (May 29, 2015), as supplemented by fiscal year (FY) 2015 data provided by Appeals (Nov. 3, 2015). *See also* anecdotal comments from tax practitioners, *infra*, regarding the diminishing extent and quality of Appeals' review under AJAC.

9   *See* National Taxpayer Advocate 2014 Annual Report to Congress 185; National Taxpayer Advocate 2010 Annual Report to Congress 210; National Taxpayer Advocate 2009 Annual Report to Congress 70.

10  This term refers to any Settlement Officer, Appeals Officer, Appeals Account Resolution Specialist, or other employee holding hearings, conferences, or who otherwise resolves open case issues in Appeals. It further encompasses individuals who conduct or review administrative hearings or who supervise hearing officers. IRS, AJAC FAQs, *available at* http://appeals.web.irs.gov/about/ajac-faq.htm#General (updated July 7, 2014).

11  Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

001497

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

An effective and available Appeals function is crucial for a variety of reasons, including Appeals' ability to:

- Accept affidavits and weigh oral testimony;
- Consider hazards of litigation; and
- Apply the *Cohan* rule as a means of negotiating a case resolution.[12]

In conjunction with AJAC, Compliance started enforcing a more stringent policy with respect to Information Document Requests (IDRs) and to close cases and bypass Appeals prior to issuing the Statutory Notice of Deficiency (SNOD) unless a taxpayer provides all requested documentation or certifies that no additional information is available.[13] For example, Letter 5262 was originally revised over TAS's objections to read:

> If you don't provide the information requested on the enclosed Form 4564 or contact me to confirm you have no additional information to provide by the response due date listed above, we will close your examination based on the information we have now. If you don't agree, you won't be able to appeal within the IRS before we issue a notice of deficiency.[14]

Nevertheless, a telephone call from a taxpayer confirming that no additional information is available leaves the IRS identically situated to where it would be if the same taxpayer failed to respond to the IDR at all.[15] Yet the outcomes are fundamentally different: in the first scenario, the taxpayer will be able to exercise his or her right to go to Appeals, while in the second scenario, the same taxpayer will be barred from exercising that right.

> **Although Appeals Judicial Approach and Culture Project's (AJAC) aspirations are commendable, its practical implementation is eroding the very perceptions of fairness and objectivity that it claims to bolster.**

When TAS objected to this policy, Compliance initially replied that mistakes would be made and the approach was subject to a learning curve, but the policy was consistent with AJAC.[16] The creation of additional obstacles and absolute prohibitions to an appeal within the IRS under the guise of AJAC has many troubling aspects. Compliance should not stand as the gatekeeper to Appeals. Appeals, not Compliance, should determine its own jurisdiction. Compliance cannot be allowed to sit as both judge and jury in deciding whether IRS information requests are reasonable and whether some lesser degree of information or alternative form of substantiation might be sufficient to allow taxpayers to establish their cases. In fact, that is the "quasi-judicial" role of Appeals — to review Compliance's determinations.

---

12 The *Cohan* rule was developed under federal case law as a means of allowing the fact finder to estimate deductible expenses where the fact of those expenses, although not their amount, can be substantiated. *See Cohan v. Comm'r*, 39 F.2d 540 (2d Cir. 1930). Note, these various settlement tools can sometimes be used by Compliance (*e.g.*, in the process of resolving coordinated issues, IRM 4.46.5.6.1, *Scope of Settlement Authority* (Mar. 1, 2006)). These resolution mechanisms, however, are not as widely available and commonly applied in Compliance as they are in the Appeals context.

13 TAS is primarily aware of this practice arising within the SB/SE Field Examination function. TAS elevated issue conference with SB/SE (July 30, 2014).

14 Letter 5262, *Examination Report Transmittal-Additional Information Due (Straight Deficiency)* (Aug. 2014); IRM 4.10.8.11, *Eligibility for Appeals Conference and Preliminary Letters (SB/SE Field and Office Examiners only)* (Sept. 12, 2014). The referenced SNOD would allow the taxpayer 90 days to appeal the IRS determination to the U.S. Tax Court.

15 In many situations, this failure to respond could be attributable to circumstances beyond taxpayers' control, such as mail failures, health issues, or extended travel. Further, the required affirmation that the requested information does not exist ignores the possibility that taxpayers may possess the information but may have objections to the scope, relevance, or legality of some of the information sought by the IDR.

16 TAS elevated issue conference with SB/SE (July 30, 2014).

001498

Compliance's approach, wrong in principle, has been made worse in practice by the compressed timelines it has imposed on taxpayers before issuing the SNOD.  In the typical Small Business/Self-Employed (SB/SE) field examination, most taxpayers would receive an initial letter that included an information request.  In the event that taxpayers did not respond, they soon were sent a second letter in the 5262 series demanding all requested information and threatening the loss of appeal rights if they did not provide that information or inform the IRS it was unavailable.  If 15 days elapsed (ten days plus five days for mail handling), or if the IRS was unsatisfied with the taxpayer's response, the SNOD would be issued and Appeals temporarily or permanently bypassed.[17]

TAS received comments from some tax practitioners who believed that they were working with Compliance to provide information and resolve a case, only to be surprised by the unexpected arrival of a SNOD, effectively ending all current administrative dialogue with the IRS.[18]  In an op-ed piece from *The New York Times*, a tax practitioner observed that if the compressed timeframes were not adhered to, "the consequences may be dire" and that "I could return home from a vacation or a stay in the hospital to find not only that I am being audited, but that my audit has already been closed and sent to the notice of deficiency unit."[19]  Core taxpayer rights — such as *the right to appeal an IRS decision in an independent forum, the right to a fair and just tax system,* and *the right to pay no more than the correct amount of tax* — mean little if the IRS implements policies impairing those rights.[20]

After the National Taxpayer Advocate brought the issue to the attention of senior leadership, the IRS agreed to discontinue the use of the Letter 5262 series on a provisional basis.  SB/SE issued a June 9, 2015 memorandum temporarily suspending use of the Letter 5262 series.[21]  TAS understands that SB/SE is contemplating reversing itself and reinstituting its previous policy with minor modifications regarding the issuance of SNODs in cases where all requested information is not provided and the taxpayer does not call to confirm the lack of such information.[22]  Thus, not only would SB/SE continue to refuse relief to those who already have been denied access to Appeals by the premature issuance of SNODs, but all taxpayers would once again become subject to this risk.  The National Taxpayer Advocate urges SB/SE to abandon its attempts to place obstacles between taxpayers and Appeals.  SB/SE should permanently discontinue use of the Letter 5262 series and the policies that led to its development.

---

17  IRM 4.10.8.11(5), *Eligibility for Appeals Conference and Preliminary Letters (SB/SE Field and Office Examiners only)* (Sept. 12, 2014).  As previously noted, taxpayers are provided with 90 days in which to file a petition with the U.S. Tax Court.  In many of these cases, the issue will then be sent back to Appeals by the Tax Court if the matter has not been previously considered by Appeals.  This additional procedural step, however, subjects taxpayers to unnecessary delays, expenses, complexities, and pitfalls for the unwary.

18  TAS conference call with Low Income Taxpayer Clinic practitioners (Apr. 22, 2015).  The information gleaned from this and other similar TAS conference calls is anecdotal and cannot be taken as systemic proof or statistical evidence.  Nevertheless, it is consistent with broader impressions formed by TAS from widespread interactions with taxpayers and their representatives.

19  David DuVal, *Beware the I.R.S.'s Speeded-Up Audit*, N.Y. Times (Apr. 29, 2015), *available at* http://www.nytimes.com/2015/04/30/opinion/beware-the-irss-speeded-up-audit.html?emc=eta1&_r=0.

20  Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

21  The impacted letters include Letter 5262, *Examination Report Transmittal - Additional Information Due (Straight Deficiency)*; Letter 5261, *Examination Report Transmittal - Additional Information Due (Claims for Refund)*; Letter 5441, *Response to Letter 5262 - Straight Deficiency, and Office Examination's Use of Letter 950, 30 Day Letter-Straight Deficiency.  See* SB/SE Memo from Scott Irick, Director, Examination/AUR Policy, *Temporary Suspension of Letters 5262, 5261, 5441, and Office Examination's Use of Letter 950* (June 9, 2015), *available at* http://lmsb.irs.gov/international/dir_compliance/foreign_resident/downloads/Letter%20Suspension%20Memo%202015-0609.pdf.

22  SB/SE response to TAS fact check document (Nov. 16, 2015).  While SB/SE does not directly address TAS's understanding, SB/SE's reply states, among other things, "[t]he AJAC 'Reassessment' [which is considering the Letter 5262 series] has developed recommendations that are being elevated for executive review and approval.  The team is recommending additional IRM clarifications, letter updates, training, external communications and oversight."  *Id.*

001499

In focus groups conducted by TAS, several tax practitioners commented that in their experience, Revenue Agents (RAs) who examine cases in Compliance now often discourage taxpayers from going to Appeals.[23] One practitioner stated, "They (RAs) always try to send me to Tax Court straight from exam; they want me to skip Appeals."[24]

Further, according to some practitioners, Compliance also has been using AJAC as a tool for "bullying" taxpayers in other circumstances.[25] TAS has received some reports that Compliance, under the vague but broad cloak of AJAC, has aggressively demanded that taxpayers sign waivers of the statute of limitations on assessment, extending it for one to two years. These demands have occurred even in cases where taxpayers have only sought a slight extension of time from the IRS to provide requested documents and where sufficient time remained under the existing statutory period of limitations for the case to be transferred to Appeals.[26] The use of procedural leverage by the IRS to intimidate taxpayers, to threaten premature case closures, and to jeopardize taxpayers' access to Appeals is inconsistent with AJAC's avowed purpose.

AJAC has been promoted as having the goal of enhancing "external customer perceptions of a fair, impartial, and independent Office of Appeals."[27] However, in some situations AJAC has been used as an instrument for limiting taxpayers' access to Appeals or coercing them into taking steps not in their best interests.

### AJAC Is Causing Cases to Bounce Back and Forth Between Appeals and Compliance

A core policy notion of AJAC is that cases should be fully worked in Compliance and not come to Appeals until the IRS and the taxpayer have reached an impasse.[28] AJAC resulted in the implementation of several directives instructing Hearing Officers to return cases to Compliance for the completion of required factual investigations.[29] If a taxpayer raises a new issue or presents additional evidence at Appeals, then the case is sent back to Compliance if, in the opinion of the Hearing Officer, it requires further investigation.[30] Even in cases where new theories or arguments relying on no additional facts are presented by the taxpayer, AJAC requires Compliance to be consulted for its recommendation.[31]

These strictures effectively narrow Appeals' jurisdiction. Cases where Appeals previously would have been actively involved and sought to negotiate settlements fair to both taxpayers and the government are now returned to Compliance. When implemented on a case-by-case basis, and when informed by the

---

23  2015 IRS Nationwide Tax Forums TAS Focus Group Report, *Appeals – How Are AJAC and CAP Changes Working?*, 6, 7 (Oct. 2015).

24  *Id.* at 7.

25  TAS conference call with practitioners associated with the American Bar Association Section of Taxation (Mar. 17, 2015).

26  *Id.* Generally, 365 days must be remaining on the statute of limitations for Appeals to accept a proposed deficiency case. IRM 8.21.3.1.1, *New Receipts and Transfers* (Aug. 28, 2014).

27  IRS, IGM AP-08-0714-0004, *Implementation of the Appeals Judicial Approach and Culture (AJAC) Project, Examination and General Matters – Phase 2* (July 2, 2014).

28  *Reinforcing Appeals' Philosophy: Appeals Judicial Approach and Culture (AJAC) Talking Points* (July 2, 2014), *available at* http://appeals.web.irs.gov/about/ajac.htm.

29  *See, e.g.,* IRS, IGM AP-08-0714-0004, *Implementation of the Appeals Judicial Approach and Culture (AJAC) Project, Examination and General Matters – Phase 2* (July 2, 2014).

30  IRS, IGM AP-08-0714-0004, *Implementation of the Appeals Judicial Approach and Culture (AJAC) Project, Examination and General Matters – Phase 2* (Projected as IRM 8.2.1.5(2)(i), (j), *Returning a Case to Examination – Appeals Hearing Officers*) (July 2, 2014).

31  IRS, IGM AP-08-0714-0004, *Implementation of the Appeals Judicial Approach and Culture (AJAC) Project, Examination and General Matters – Phase 2* (Projected as IRM 8.6.1.6.6, *Taxpayer Raises New Theory or Legal Argument*) (July 2, 2014). This consultation is to be undertaken subject to existing *ex parte* requirements. *Id.*

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1508 of 4699 PageID #: 6573

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

judgment of the Hearing Officer, such an approach is reasonable and has merit. However, when mandated by means of an inflexible systemic policy, this approach is fraught with inequities and inefficiencies.

According to some tax practitioners, AJAC is being used by Appeals as an inventory control mechanism.[32] The more cases that are bounced back to Compliance, the fewer open cases remain in Appeals' inventory. Some practitioners have observed that Appeals is often quick to embrace this opportunity and return cases to Compliance.[33] Others have related that in the past, Appeals Officers were more open to having conversations and listening to taxpayers' positions, whereas now they are in more of a hurry to move the case along — often back to Compliance.[34] The National Taxpayer Advocate is concerned that Compliance, in turn, will respond to its own expanding inventory pressures by precipitously returning cases to Appeals or bypassing Appeals altogether through the issuance of SNODs.

Appeals' workload has decreased in recent years with overall and non-docketed Examination-based case receipts steadily falling between fiscal years (FY) 2011 and 2015. By contrast, Examination-based docketed cases in Appeals have remained relatively constant, resulting in a proportional increase in such cases. This trend will likely only increase if SB/SE reinstitutes the Letter 5262 series and resumes the practice of bypassing Appeals through the precipitous issuance of SNODs. Docketed cases are expensive and stressful for taxpayers and a resource drain for the IRS. The extent to which AJAC is exacerbating this proportionally increasing trend in docketed Appeals cases will become clearer over time, but, to this point at least, AJAC does not appear to be helping. These trends are shown in the following figure.

### FIGURE 1.8.1, Comparison of Appeals' Workload by Fiscal Year[35]

|  | Nondocketed | | Docketed | | Overall Case Receipts |
|---|---|---|---|---|---|
|  | Case Receipts | Percentage | Case Receipts | Percentage |  |
| FY 2011 | 21,706 | 50% | 22,101 | 50% | 43,807 |
| FY 2012 | 19,450 | 46% | 23,004 | 54% | 42,454 |
| FY 2013 | 16,509 | 43% | 21,797 | 57% | 38,306 |
| FY 2014 | 13,563 | 37% | 23,356 | 63% | 36,919 |
| FY 2015 | 11,645 | 33% | 23,785 | 67% | 35,430 |

To further illustrate AJAC's troubling application, a tax practitioner participating in a TAS conference call provided the following example. A part of the factual record in an Appeals case included detailed bank records. The Hearing Officer indicated a willingness to sit down with the taxpayer, review the factual file together, and seek a resolution of the case based on the shared dialogue. However, the case was sent back to Compliance by the Hearing Officer's manager under the auspices of AJAC.[36] Everyone loses in this scenario including the Hearing Officer who was ready, willing, and able to resolve the case; the taxpayer who must incur the additional cost and effort of recommencing the dialogue with Compliance; and the tax system itself, which has placed needless burdens on taxpayers and strained the morale of its employees.

---

32  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).

33  *Id.*

34  2015 IRS Nationwide Tax Forums TAS Focus Group Report, *Appeals – How Are AJAC and CAP Changes Working?*, 6 (Oct. 2015).

35  Data for this figure, which focuses on Examination-based cases, was drawn from the Appeals Response to TAS information request (May 29, 2015), as supplemented by FY 2015 data provided by Appeals (Nov. 3, 2015).

36  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1509 of 4699 PageID #: 4674

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

Along with Hearing Officers whose ability to resolve cases has been limited, similar morale issues are reportedly being experienced by Compliance employees. According to some tax practitioners, certain Compliance personnel expressed the view that Compliance was not adequately consulted in the development and implementation of AJAC.[37] Some Compliance employees have articulated "feelings of anger" at AJAC's provisions and "resentment" when cases are returned from Appeals.[38] Taxpayers and their representatives are placed at an unfair and unnecessary disadvantage when forced to seek justice in such a discordant environment, particularly when the venue for resolution is perpetually in danger of changing.

### AJAC Is Resulting in Curtailed Review by Appeals Hearing Officers of IRS Examination and Collection Actions

AJAC also appears to be diminishing the substantive quality of the Appeals' reviews that are taking place. Several participants in TAS focus groups described the Appeals environment under AJAC as having shifted from conversational to adversarial.[39] Another participant in a focus group commented, "My level of confidence in Appeals has declined…"[40]

> Taxpayers who grow weary of the administrative hurdles established for case resolution or who lose access to Appeals because of premature case closures may be driven to seek justice beyond the IRS in the judiciary or might drop out of the dialogue and be denied due process altogether.

Where Examination actions are concerned, AJAC precludes taxpayers from raising issues at Appeals that are not first considered by Compliance.[41] According to practitioners, this change in practice by Appeals is significantly unfavorable for taxpayers and detracts from the fair and speedy resolution of cases.[42]

Manifestations of AJAC's attempt to limit Appeals' jurisdiction are also apparent in appeals arising out of Collection cases. For example, in cases involving offers in compromise (OIC) made outside of the collection due process context, Hearing Officers are only allowed to review the OIC in question. They are precluded from offering other collection alternatives as a means of resolving the case.[43] Thus, AJAC removes an important resolution tool from the hands of Hearing Officers, disadvantages taxpayers, and increases the burden on Collection, which, in most situations, will have the case added to its inventory.

Further, in appeals arising pursuant to the Collection Appeals Program (CAP), AJAC clarifies that Hearing Officers are to consider only the "appropriateness" of the decision under review.[44] The sense of tax practitioners interviewed by TAS is that Appeals is interpreting this review as purely procedural in nature.[45] One practitioner who is active in representing taxpayers in CAP reported being

---

37  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).

38  *Id.*

39  2015 IRS Nationwide Tax Forums TAS Focus Group Report, *Appeals – How are AJAC and CAP Changes Working?*, 6 (Oct. 2015).

40  *Id*, at 5.

41  *Aggressive IRS Audit Techniques*, panel discussion, American Bar Association Section of Taxation 2015 Joint Fall CLE Meeting, 65 (Sept. 19, 2015).

42  *Id.*

43  IRM 8.23.3.12, *Alternative Resolutions for Offers* (Oct. 15, 2014).

44  IRM 8.24.1.1.1(9), *Administrative and Legislative History* (Dec. 2, 2014). For a more in-depth discussion of issues surrounding CAP and the ways in which these issues are being exacerbated by AJAC, see National Taxpayer Advocate 2015 Annual Report to Congress, Most Serious Problem: *Collection Appeals Program (CAP): The CAP Provides Inadequate Review and Insufficient Protections for Taxpayers Facing Collection Actions, infra.*

45  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).

001502

told by a Hearing Officer that, "If all of the boxes were checked, then Appeals would sustain Collection's decision."[46]

The National Taxpayer Advocate is concerned that these restrictions on Hearing Officers' abilities to resolve controversies will result in the rubber-stamping of actions taken by Compliance, particularly in Collection cases. If Hearing Officers are limited in their ability to evaluate facts and circumstances and apply common sense and good judgment in their discussions with taxpayers, Appeals' core mission will be jeopardized. Hearing Officers should be empowered and encouraged to explore the broadest possible scope of settlement options in furtherance of their role of facilitating administrative dispute resolution. To the extent that this effort would, in the opinion of Hearing Officers, be assisted by the clarification or development of additional facts, they should have the ability to pursue such a course.[47]

To the extent that this ability is curtailed, as is currently occurring under AJAC implementation, both taxpayers and the voluntary tax system will suffer. The IRS Restructuring and Reform Act of 1998 strengthened Appeals in hopes of protecting taxpayers "caught in the IRS hall of mirrors" and providing them with an administrative appeals process that is "truly independent and structured to represent their concerns."[48] If this "hall of mirrors" is reinstituted by AJAC, taxpayers who grow weary of the administrative hurdles established for case resolution or who lose access to Appeals because of premature case closures may be driven to seek justice beyond the IRS in the judiciary or might drop out of the dialogue and be denied due process altogether. In the long run, such outcomes, which are currently being precipitated by AJAC, place extraordinary cost burdens on taxpayers, the government, and the judiciary. Moreover, the preservation of due process rights and the perception of fairness it brings are cornerstones of a successful voluntary tax compliance system, not just of the administrative appeals process.[49]

## CONCLUSION

The AJAC project is intended to increase the efficiency and effectiveness of Appeals. While these goals are laudable, current observations indicate that AJAC cases may be taking longer to resolve and, at least in some circumstances, yielding a diminished level of substantive review. AJAC's implementation is eroding the very perceptions of fairness and objectivity that the project was instituted to bolster. In practice, AJAC is being used to limit taxpayer's access to Appeals, causing cases to be bounced back and forth between Appeals and Compliance, and resulting in curtailed review by Hearing Officers. Although AJAC's underlying premise that cases should be thoroughly worked by Compliance is reasonable enough, the manner in which AJAC has been implemented is neither in the best interests of taxpayers nor tax administration.

---

46  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).

47  This authority would be consistent with the independence of Appeals, as it would be exercised in conjunction with Appeals' administrative dispute resolution activities, and would be undertaken separate and apart from the influence of other operating divisions within the IRS.

48  144 CONG. REC. S7622 (July 8, 1998) (Statement of Sen. Roth).

49  *Reinforcing Appeals' Philosophy: Appeals Judicial Approach and Culture (AJAC) Talking Points*, July 2, 2014, *available at* http://appeals.web.irs.gov/about/ajac.htm; National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 131, 134; National Taxpayer Advocate 2009 Annual Report to Congress 79.

001503

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1511 of 4699 PageID #: 4676

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Permanently discontinue the Letter 5262 series and preserve taxpayers' rights to an appeal even in cases where all requested information is not provided to Compliance.

2. Loosen AJAC restrictions to allow Hearing Officers to exercise more discretion regarding whether additional factual development or analysis within Appeals would materially assist case resolution.

3. Provide Hearing Officers with revised guidance and enhanced training emphasizing quality sub-stantive review, rather than mere satisfaction of procedural requirements by expanding timeframes and retaining Appeals' jurisdiction where appropriate, as the best means of providing taxpayers with *the right to appeal an IRS decision in an independent forum*.

4. Develop and implement an outreach plan aimed at practitioners to help them understand what is needed for a successful appeal and to provide Appeals with information about the difficulties experienced by taxpayers and practitioners under AJAC.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1512 of 4699 PageID #:  7677

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

MSP
#9

## COLLECTION APPEALS PROGRAM (CAP): The CAP Provides Inadequate Review and Insufficient Protections for Taxpayers Facing Collection Actions

### RESPONSIBLE OFFICIAL

Kirsten B. Wielobob, Chief, Appeals

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF PROBLEM

The IRS developed the Collection Appeals Program (CAP) in stages as a response to congressional concerns regarding the rights of taxpayers subject to collection activity relating to liens, levies, and installment agreements.[2] Congress also established collection due process (CDP) protections under Internal Revenue Code (IRC) § 6320 for liens and IRC § 6330 for levies.[3] Congress believed that the existence of "procedures designed to afford taxpayers due process in collections [would] increase fairness to taxpayers."[4]

Instead, this patchwork of protections has led to some overlapping Collection appeals procedures within the IRS Office of Appeals (Appeals) that are confusing and potentially problematic for taxpayers. CAP hearings do have some attractive aspects in comparison with CDP appeals that make CAP worth preserving, including expanded coverage of collection actions and an expedited timeframe. They remain severely limited, however, in the remedies and scope of review they offer taxpayers, providing no judicial oversight of the outcome and no consideration of collection alternatives.

From fiscal years (FY) 2012 through 2015, approximately 44,500 CDP appeals per year have been received by the IRS, while taxpayers have sought just 4,600 CAP hearings per year over this same period.[5] Approximately 22 percent of taxpayers emerged fully or partially victorious from CAP hearings during these years, while 68 percent of taxpayers were fully or partially victorious in CDP appeals.[6]

CAP would be fairer and more widely embraced if it offered taxpayers and their representatives an expedited resolution vehicle that was combined with a meaningful level of review and a reasonable

---

1   Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Internal Revenue Manual (IRM) 8.24.1.1.1(1), *Administrative and Legislative History* (Dec. 2, 2014). *See also* Taxpayer Bill of Rights 2 (TBOR 2), Pub. L. No. 104-168, 110 Stat. 1457 (1996).

3   The IRS Restructuring and Reform Act of 1998 (RRA 98), Pub. L. No. 105-206, § 3401, 112 Stat. 685, 746 (1998).

4   S. Rep. No. 105-174, at 67 (1998).

5   Appeals' response to TAS information request (May 18, 2015), as supplemented by FY 2015 data provided by Appeals (Nov. 3, 2015).

6   *Id.* For a more detailed breakdown of this data and a discussion of the underlying assumptions, see figure entitled "Comparison of Outcome Percentages in CAP Hearings and CDP Appeals," *infra*.

001505

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1513 of 4699 PageID #: 4678

opportunity for a negotiated settlement. CAP hearings that allowed for the consideration of collection alternatives and sought a quality outcome for both taxpayers and the government would provide a real benefit, even if that process required slightly expanded timeframes. The result would likely be more settlements, more balanced outcomes for participants, and a more attractive process for taxpayers.

Absent these improvements, the National Taxpayer Advocate is concerned that:

- Appeals adopts an unnecessarily narrow view of its role within CAP and needlessly restricts the scope of available review;

- CAP's emphasis on speed curtails the effectiveness and meaningfulness of Appeals' review;

- Procedures implemented by the Appeals Judicial Approach and Culture (AJAC) Project exacerbate CAP's shortcomings by adding to the inflexibility of an already limited mechanism;[7]

- Pursuit of a CAP hearing by a taxpayer can inadvertently cause the loss of all substantive administrative and judicial review of a collection action; and

- Taxpayers are underutilizing a potentially valuable Collection Appeals alternative.

## ANALYSIS OF PROBLEM

### CAP's Narrow Scope of Collection Actions and the Collection Vehicles Covered by It Are the Result of IRS Discretion, Not Congressional Intent

The IRS initially created CAP to provide review of lien, levy, or seizure actions taken or proposed by the Collection function. Only a few months after CAP's initiation, Congress enacted TBOR 2, which, among other things, added IRC § 6159(c) requiring the IRS to "establish procedures for an independent administrative review of terminations of installment agreements (IAs) under this section for taxpayers who request such a review."[8] Later, as part of Internal Revenue Restructuring and Reform Act of 1998 (RRA 98), Congress added appeal rights for rejected installment agreements in the same section relating to offers in compromise (OIC).[9] The treatment subsequently accorded these collection alternatives by the IRS, however, was substantially different.

Although the legislative history of RRA 98 made a passing reference to CAP, Congress defined neither the parameters of CAP nor the manner in which it should operate.[10] The IRS itself determined which Collection actions, now including rejected, modified, or terminated IAs, would be subject to CAP hearings, and then imposed an increasingly narrow scope of review available to taxpayers seeking protection of their rights within CAP.[11] Unlike actions taken or proposed regarding IAs, OICs were not placed

---

7   For an in-depth discussion of AJAC and its impact on taxpayers, see Most Serious Problem: *APPEALS: The Appeals Judicial Approach and Culture Project Is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*, *supra*.

8   TBOR 2, Pub. L. No. 104-168, 110 Stat. 1457 (1996). The text of IRC § 6159(c) has since been moved to IRC § 6159(e).

9   RRA 98, Pub. L. No. 105-206, Title III, Subtitle E, § 3462(c) (July 22, 1998). *See* IRC §§ 6159(e) and (f); 7122(e).

10  *See* S. Rep. No. 105-174, at 92 (1998); IRM 8.24.1.1.1(4), *Administrative and Legislative History* (Dec. 2, 2014).

11  Independent administrative reviews of terminated IAs are made available under IRC § 6159(e), while independent administrative reviews of rejected IAs are furnished by IRC § 7122(e)(1), and appeal rights with respect to such rejections are provided by IRC § 7122(e)(2). While Congress established these protections, the IRS determined that they would be exercised via CAP. IRM 8.24.1.1.1, *Administrative and Legislative History* (Dec. 2, 2014).

001506

within CAP by the IRS and are subject to broader, more substantive Appeals oversight and resolution procedures.[12]

The legislative history indicates that, over the years, Congress has focused on expanding taxpayer rights through the creation of CDP appeals and the mandated review of adverse determinations regarding IAs and OICs.  For the IRS to move IAs under CAP and then conduct CAP hearings in a way that potentially limits the protections afforded by CDP appeals and is less beneficial than OIC reviews is inconsistent with the spirit of TBOR 2, RRA 98, and the Taxpayer Bill of Rights recently adopted by the IRS.[13]  More broadly, the restrictions placed on the availability and scope of CAP hearings jeopardize the fundamental rights of taxpayers *to appeal an IRS decision in an independent forum*, *to challenge the IRS's position and be heard*, *to a fair and just tax system*, and *to privacy*.

National Association of Enrolled Agents testimony submitted almost 20 years ago to the National Commission on Restructuring the IRS assessed the limitations of CAP hearings in terms that are as applicable now as they were then.

> The scope of this program is so circumscribed by the procedural limitations imposed that it really does not constitute a true appellate process… We believe the lack of taxpayer and practitioner use of this "appeals" process is ample evidence that this program is not perceived as a fair and independent appellate procedure and believe the Commission ought to examine its intent and practice.[14]

### CAP's Emphasis on Speed Comes at the Unnecessary Cost of Meaningful Appeals Review

CAP hearings provide taxpayers with some distinct benefits in comparison to CDP Appeals.  CAP hearings, even more so than CDP appeals, can be utilized to challenge a range of Collection actions and can be sought:

- Before or after the IRS files a Notice of Federal Tax Lien (NFTL);

- Before or after the IRS levies or seizes property;

- Before or after the IRS terminates or modifies an IA; or

- After the IRS initially rejects a proposed IA.[15]

On the other hand, CDP appeals can only be pursued after the filing of the *first* NFTL or issuance of the *first* levy with respect to any tax liability.[16]  The rejection, modification, or termination of an IA or an OIC do not trigger the right to a CDP appeal, nor are CDP hearings available for *subsequent* liens or levies.[17]

---

12  IRM 8.23.1.3, *Conference and Settlement Practices* (Oct. 10, 2014).  Note that an exception to the more robust protections generally granted to taxpayers under the OIC regime occurs if the IRS determines that the OIC was filed solely to delay collection, in which case the OIC will be rejected and collection activity recommenced.  IRM 5.8.4.20, *Offer Submitted Solely to Delay Collection* (May 10, 2013).

13  For a more in-depth discussion regarding the potential ways in which CAP hearings can limit CDP rights, see the below section entitled *The Choice By a Taxpayer to Pursue a CAP Hearing Can Inadvertently Result In the Loss of All Substantive Administrative and Judicial Review of a Collection Action*.

14  Written testimony of Joseph F. Lane, Enrolled Agent on behalf of the National Association of Enrolled Agents, submitted to the National Commission on Restructuring the IRS (Feb. 26, 1997), *available at* http://www.house.gov/natcommirs/naea1.htm.

15  IRM 8.24.1.2(2), *Collection Appeals Program* (CAP) (Dec. 2, 2014).

16  IRC § 6320(a).

17  IRC § 6330(a).  See IRM 8.22.4, *Collection Due Process Appeals Program* (Sept. 25, 2014).  *See also* IRM 8.24.1.1.1, *Administrative and Legislative History* (Dec. 2, 2014).

001507

Case 1:25-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1515 of 4699 PageID #: 4680

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy   Appendices

An additional benefit of CAP hearings is that they are designed to provide taxpayers with an expedited response. Appeals attempts to move CAP proceedings forward quickly, ideally within five business days, with Hearing Officers generally directed to make CAP cases their first priority.[18] The average cycle time for resolution of a CAP proceeding during FYs 2012 through 2015 is 13 days.[19] By contrast, the average cycle time for a CDP appeal during the same period is approximately 196 days.[20]

These benefits under CAP as it is currently conducted come at a cost, however. Taxpayers are not allowed to challenge the underlying liability in a CAP hearing and cannot later seek judicial review of the CAP determination.[21] Further, Hearing Officers conducting a CAP proceeding undertake only a procedural review "of the action proposed or taken based on law, regulations, policy and procedures considering all the facts and circumstances."[22] As part of this inquiry, Appeals will not consider Collection alternatives (*e.g.*, IAs or OICs) to the issue under appeal or otherwise seek the "best" answer. By contrast, CDP appeals will weigh collection alternatives or challenges to the liability, and balance the proposed collection action with the taxpayer's legitimate concern regarding intrusiveness.[23]

Likely as a result of the limited review and remedies provided by the CAP process, taxpayers infrequently prevail in CAP hearings. The converse, however, is true in the case of CDP appeals. A comparison of these outcomes in contested proceedings is illustrated in the following figure.

**FIGURE 1.9.1, Comparison of Outcome Percentages in CAP Hearings and CDP Appeals**[24]

| Outcome | Review Method | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|
| Percent of Cases IRS Fully Sustained | CAP | 74% | 76% | 81% | 80% |
| | CDP | 34% | 31% | 32% | 33% |
| Percent of Cases IRS Only Partially Sustained or Fully Overturned | CAP | 26% | 24% | 19% | 20% |
| | CDP | 66% | 69% | 68% | 67% |

18  IRM 8.24.1.2.7, *Case Procedures Under CAP* (Dec. 2, 2014).

19  Appeals' response to TAS information request (May 18, 2015), as supplemented by FY 2015 data provided by Appeals (Nov. 3, 2015). Cycle time for non-docketed closed cases is measured from the point when a taxpayer's request for a hearing is filed with the IRS until a CAP proceeding is closed.

20  *Id.*

21  IRM 8.24.1.1.1(10), *Administrative and Legislative History* (Dec. 2, 2014); IRM 8.24.1.1.1(5), *Administrative and Legislative History* (Dec. 2, 2014). *See, e.g., Budish v. Comm'r*, T.C. Memo 2014-239.

22  IRM 8.24.1.1.1(9), *Administrative and Legislative History* (Dec. 2, 2014).

23  IRM 8.24.1.1.1, *Administrative and Legislative History* (Dec. 2, 2014); National Taxpayer Advocate 2014 Annual Report to Congress 185.

24  Where outcome percentages are concerned, the extent to which the IRS position is sustained by Appeals generally indicates that the taxpayer's position has been unsuccessful to the same degree. Data for this figure is drawn from the IRS response to TAS information request (May 18, 2015), as supplemented by FY 2015 data provided by Appeals (Nov. 3, 2015). The term "Percent Fully Sustained Cases" reflects closing code 14 data taken from the responses provided by Appeals. The term "Percent Partially Sustained or Fully Overturned Cases" reflects closing codes 15 and 16 data taken from the responses provided by Appeals. The comparisons are expressed as a percentage of the data furnished by Appeals under the category "Other Nondocketed Total" in Tab 1 and Tab 2 respectively, which category best captures the vast majority of contested cases. In order to reflect the different natures of CDP proceedings and CAP hearings, which have a five-day turnaround so few withdrawals take place, Appeals includes withdrawn cases under code 14 for CAPs and under code 16 for CDPs. CAP withdrawals have the same effect as CAP sustentions—that being no change to Collection's position. As a result, CAP withdrawals are included under closing code 14. See Appeals Clarification Response (June 19, 2015). For CAP closing codes, see IRM 8.24.1.3, *APS CAP Case Closing Procedures* (Dec. 2, 2014); for CDP and Equivalent Hearing closing codes, see IRM 8.22.9.8, *Closing Codes for CDP, EH, and RJ Hearings* (Nov. 13, 2013).

001508

CAP hearings and CDP appeals have distinct reasons for existing and play different roles. Each review mechanism is valuable and should be preserved. Nevertheless, CAP hearings should more effectively protect taxpayer rights and serve the needs of taxpayers subject to a Collection action, which in turn will minimize IRS rework.

CAP's primary weakness is its inflexibility, expressed in terms of a lack of substantive review and a prohibition against the consideration of alternative Collection options. CAP's rigidity and limited parameters are partially explained by Appeals' laudable desire to hasten review and provide an expedited decision. Nevertheless, an incomplete or ill-considered decision is not made better for having been reached more quickly. While speed is an important priority, Appeals should also focus on allowing a robust review and dialogue with taxpayers so that CAP proceedings can reach the best decision for all concerned at the earliest possible stage.

CAP hearings and CDP appeals may, of necessity, involve different degrees of substantive review. Nevertheless, CAP hearings should still include a meaningful level of inquiry sufficient to allow for the consideration of Collection alternatives and a quality answer based on the existing facts after remand to Collection when the circumstances dictate.

For example, assume that Collection proposed filing an NFTL against a financial advisor who is concerned that the impact on his credit report would jeopardize his employment status.[25] As a result, the taxpayer filed for a CAP hearing. Currently, the Hearing Officer would undertake a review to determine only whether Collection followed the applicable procedures. The Hearing Officer would not consider Collection alternatives, which would involve an examination of whether Collection had reasonably balanced the government's need for efficient collection of taxes with the legitimate concerns of the taxpayer. Thus, the Hearing Officer would not necessarily examine the effect of the NFTL on the taxpayer's ability to maintain or find employment in the financial industry, thereby potentially imperiling the taxpayer's job and the government's ability to collect the taxes — a lose-lose situation for both parties.[26]

The taxpayer and the government would benefit considerably if the Hearing Officer reviewed the proposed NFTL to see if the taxpayer had offered reasonable collection alternatives and Collection had properly considered these alternatives and the intrusiveness of the proposed NFTL. If not, a remand for such consideration or for pursuit of an OIC would be highly desirable for all concerned, regardless of whether Collection had the legal authority to file the NFTL in the first instance. If this additional review requires a 14-day or 21-day, rather than a five-day, target for resolution, then the time would be well spent.

### Procedures Implemented by the Appeals Judicial Approach and Culture (AJAC) Project Only Exacerbate CAP's Shortcomings

Unfortunately, under AJAC, the IRS appears to be moving precisely in the wrong direction. IRM changes implemented with respect to CAP hearings as part of AJAC clarify that "Appeals does NOT consider alternatives to the issue under appeal, but solely determines the appropriateness of the issue under

---

25  IRM 5.12.2.6(1), *NFTL Filing Criteria* (Oct. 14, 2013). In general, an NFTL will be filed if the aggregate unpaid balance of assessments is $10,000 or more.

26  IRM 5.12.2.4(6), *Determination Criteria for Do-Not-File or Deferring the NFTL Filing* (Jan. 1, 2015). The filing of an NFTL may be deferred where the Revenue Officer can substantiate with reasonable certainty, supported by documentation from the taxpayer, that filing the NFTL will hamper collection.

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1517 of 4699 PageID #:  4682

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

> To be effective, the Collection Appeals Program (CAP) hearings should examine Collection alternatives, at least to the extent they shed light on the appropriateness and intrusiveness of the collection action, and the case should be remanded to Collection for consideration of those alternatives when necessary.

appeal."[27]  Thus, Hearing Officers are directed only to sustain or not sustain Collection's position and are expressly admonished not to negotiate any Collection alternatives.[28]

This approach is bad for taxpayers and counterproductive for the IRS.  For example, under the current guidance, if Compliance follows the applicable procedural rules in proposing an NFTL filing, even if the lien is inadvisable and there are other viable collection alternatives, the Hearing Officer will be required to approve the NFTL filing.  This regime jeopardizes the taxpayer's *rights to privacy* and *to a fair and just tax system*, and will inevitably cause the IRS to do substantial downstream work to address harmful and unnecessary Collection actions.  To be effective, CAP hearings should examine Collection alternatives, at least to the extent they shed light on the appropriateness and intrusiveness of the collection action, and the case should be remanded to Collection for consideration of those alternatives when necessary.

According to responses obtained from focus groups and TAS interviews with tax practitioners, these procedural clarifications made under AJAC have added to the inflexibility of an already limited review mechanism.[29]  Some taxpayer representatives have reported that, prior to AJAC, they typically were able to obtain face-to-face conferences with Hearing Officers.[30]  Nevertheless, the renewed emphasis on narrow scope and quick disposition of cases under AJAC has led to a general inability to engage in such conferences, even though practitioners view face-to-face conferences as an essential element of the accurate and equitable disposition of taxpayers' cases.

The rush to disposition is particularly problematic in CAP cases involving IAs which, according to tax practitioners interviewed by TAS, often require approximately 30 days for proper consideration and reasonable disposition.[31]  This extra time occasionally is necessary for taxpayers to answer questions raised by Hearing Officers and to obtain and present requested documentation.  Nevertheless, such cases, along with other CAP cases, now are rigorously subjected to the five-day rule, often to the detriment of taxpayers whose arguments may require considerably longer than five days for proper presentation or thorough consideration.[32]

Further, some taxpayer representatives have reported instances in which CAP Hearing Officers are simply "rubber stamping" Collection decisions after only a nominal review.[33]  One practitioner who is active in representing taxpayers in CAP related a comment by a Hearing Officer that "[i]f all of the boxes were checked, then Appeals would sustain Collection's decision."[34]  The lack of oversight by Appeals and its unwillingness to consider legitimate arguments are more troubling to these representatives than even an unfavorable outcome reached after an unbiased and comprehensively conducted proceeding.[35]

---

27  IRM 8.24.1.1.1(9), *Administrative and Legislative History* (Dec. 2, 2014).
28  *Id.*
29  TAS conference call with practitioners associated with the American Bar Association Tax Section (Mar. 17, 2015).
30  *Id.*
31  *Id.*
32  *Id.*
33  *Id.*
34  *Id.*
35  *Id.*

### Pursuit of a CAP Hearing by a Taxpayer Can Inadvertently Cause the Loss of All Substantive Administrative and Judicial Review of a Collection Action

One of the dangers confronting taxpayers as they try to choose between their CAP and CDP options is the chance that an inopportune decision could cost them the possibility of a substantive review.  If a taxpayer proceeds with a CAP hearing and if that proceeding concludes before a CDP appeal is lodged, then the issue raised and considered at the CAP hearing may be precluded from consideration in a subsequent CDP appeal.[36]  This risk exists because the completed CAP hearing can be viewed as a "previous administrative proceeding" under IRC § 6330(c)(4).[37]

For example, assume that a taxpayer pursues a CAP hearing with respect to a proposed levy that is sustained by Appeals because Collection followed the requisite procedural steps.  Thereafter, the taxpayer may be denied access to a CDP with respect to this initial levy based on the argument that the matter is now barred from review because the taxpayer is raising no new issues.  In this event, the taxpayer would lose the additional benefits conferred in a CDP appeal such as substantive review, consideration of Collection alternatives, application of the balancing test, and judicial oversight of the outcome.

Even if the issue is not precluded from a subsequent decision in a CDP appeal because the CDP request was filed prior to, or concurrently with, the CAP hearing, the Hearing Officer conducting the CDP appeal still has the option of adopting the decision made in the CAP proceeding as part of the CDP determination.[38]  Hearing Officers are allowed to take this approach as long as the taxpayer does not present any new information or arguments in the CDP appeal regarding the issue raised in CAP.[39]  A CDP review would be appropriate if a taxpayer raised collection alternatives, but the risk remains in this uncertain environment that a Hearing Officer might mistakenly invoke issue preclusion or adopt the prior CAP decision in any event.  Thus, under a variety of circumstances, taxpayers availing themselves of the attractive aspects of CAP could unwittingly forfeit their ability to seek a CDP appeal.[40]

These potentially binding effects of a CAP hearing on a CDP appeal would be less problematic if the scope of review conducted in these proceedings and the rights they confer were synonymous, but they are not.[41]  The more searching inquiry required by a CDP appeal arguably should be construed as a "new issue" and thus should be separately pursued as part of the ensuing CDP appeal.  Nevertheless, many taxpayers, particularly low income taxpayers, may lack the legal sophistication or legal representation to frame such nuanced arguments.  As a result, such taxpayers may believe an adverse CAP decision automatically precludes any further consideration of the issue and may therefore not even raise the matter in a later occurring CDP appeal.

---

36   IRC § 6330(c)(4).  IRS Office of Chief Counsel Memorandum, *Collection Appeal Program and I.R.C. § 6330(c)(4) Issue Preclusion*, PMTA 2012-14, 4 (May 3, 2012).  For this issue preclusion to occur, the taxpayer must meaningfully have participated in the CAP appeal and the issue under consideration in the two proceedings must be identical.  *Id.*  Doubts are to be resolved in favor of the taxpayer.  IRM 8.22.5.5.1(2), *Issues Excluded under IRC 6330(c)(2)(B) and I.R.C. 6330(c)(4)(A)* (Mar. 29, 2012).  Nevertheless, this determination has few meaningful parameters, and taxpayers finding themselves in such a situation are left in a highly uncertain and vulnerable position.

37   *Id.*

38   *Id.*

39   *Id.*

40   Note that if a taxpayer requests both a CDP and a CAP regarding a proposed levy or NFTL filing, the taxpayer is required to choose one or the other.  IRM 8.24.1.1.1(8), *Collection Appeals Program Overview* (Dec. 2, 2014).  Some taxpayers, however, particularly low income taxpayers, may lack the sophistication or legal representation, to adequately understand the ramifications of their choices in the absence of a thorough explanation from the Hearing Officer, which may not be forthcoming.

41   IRM 8.24.1.1.1(5), *Collection Appeals Program Overview* (Dec. 2, 2014).

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

Moreover, Hearing Officers themselves may not be immune from confusion regarding the impact of a CAP decision. A request for CDP consideration of an issue previously included in a CAP hearing may erroneously be denied by Hearing Officers unaware that their exercise of the additional substantive review inherent in a CDP appeal generally would require a thorough reconsideration of the issue previously presented in a CAP proceeding. Alternatively, Hearing Officers, while not specifically invoking issue preclusion, may still adopt a prior CAP determination rather than providing taxpayers with the more in-depth substantive CDP analysis to which they are entitled.

In an effort to quantify the magnitude of this problem and analyze the extent to which taxpayers availing themselves of CAP hearings are being denied CDP appeals, TAS requested specific data from Appeals regarding issue preclusion and the adoption of CAP determinations in CDP cases. Appeals responded that it did not track such data.[42]

### Taxpayers Are Underutilizing a Potentially Valuable Collection Appeals Alternative

The available data illustrates that CAP is used relatively infrequently by taxpayers and their representatives. From FY 2012 through 2015, approximately 44,500 CDP appeals per year have been received by the IRS.[43] On the other hand, taxpayers have sought only 4,600 CAP hearings per year over this same period.[44] Thus, CAP usage has represented barely ten percent of CDP utilization.

This relatively low use of CAP may, at least in part, be attributable to the circumstance that outcomes are comparatively unfavorable for taxpayers. Between FY 2012 and 2015, only 22 percent of taxpayers emerged fully or partially victorious from CAP hearings, while 68 percent of taxpayers were fully or partially victorious in CDP appeals during this same period.[45]

> The relatively few negotiated settlements in the Collection Appeals Program (CAP) hearings and the poor outcomes that CAP hearings generate for taxpayers when Appeals does reach a decision may well help explain why most taxpayers and their representatives decline to pursue this course.

Further, between FY 2012 and 2015, virtually no CAP proceedings were closed as "agreed" by Appeals.[46] By contrast, well over half of the CDP appeals filed during these years yielded a compromise between the IRS and taxpayers.[47] The relatively few negotiated settlements in CAP hearings and the poor outcomes that CAP hearings generate for taxpayers when Appeals does reach a decision may well help explain why most taxpayers and their representatives decline to pursue this course.

CAP would be more widely embraced if it offered taxpayers and their representatives an expedited resolution vehicle that was combined with a meaningful level of review and the reasonable opportunity for a negotiated settlement. CAP hearings that allowed for the consideration of collection alternatives and sought a quality outcome for both taxpayers and the government would provide a real benefit, even if that process required slightly expanded timeframes. The result likely would be more settlements, more balanced outcomes for participants, and a more attractive process for taxpayers. Failure to implement such improvements creates unnecessary downstream rework for the government and

---

42  Appeals' response to TAS information request (May 18, 2015).

43  *Id.*

44  *Id.*

45  *Id.* For a more detailed breakdown of this data and a discussion of the underlying assumptions, see figure entitled *Comparison of Outcome Percentages in CAP Hearings and CDP Appeals*, *supra*.

46  *Id.*

47  *Id.*

perpetuates an antagonistic environment because taxpayers have difficulty exercising their *right to challenge the IRS's position and be heard.*

Another cause for the underutilization of CAP appears to be the lack of awareness regarding its availability. Although CAP is mentioned on irs.gov, it is not readily apparent and could be easily overlooked. Moreover, some taxpayer representatives interviewed by TAS stated that no one in the IRS had ever mentioned CAP to them or the taxpayers they represented.[48] After implementing the improvements in CAP discussed above, the IRS should increase its efforts to publicize the benefits of CAP, both to taxpayers and their representatives. This enhanced publicity could begin by increasing the profile of CAP on irs.gov as a potential mechanism for contesting Collection actions. Further, the IRS should remind Hearing Officers and all IRS employees with taxpayer contact of the importance of verbally communicating this alternative Collection Appeals process to taxpayers.

## CONCLUSION

The IRS created the restrictive regime currently applicable to CAP hearings and has the power to improve it. While preserving the concept of expedited review, the IRS should deemphasize speed as the defining principle of CAP hearings in favor of more meaningful review overall and issue resolution. As the quality and independence of CAP hearings improve, usage will expand, and both taxpayers and the IRS will benefit from increased resolution of Collection issues at an earlier stage in the administrative process.

### RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise the policies and procedures governing CAP to allow Hearing Officers the expanded authority, and where necessary, the additional time to review Collection alternatives and remand cases to Collection for consideration of those alternatives.

2. Issue guidance specifying that taxpayers' use of CAP will no longer preclude them from receiving an independent reconsideration via a CDP appeal based on either issue preclusion or pro forma adoption of the prior CAP decision.

3. After implementing the improvements in CAP discussed above, make a concerted effort to publicize the benefits of CAP and ensure that Hearing Officers and all IRS employees with taxpayer contact more effectively inform taxpayers and their representatives about the availability of CAP hearings.

---

48   TAS conference call with Low Income Tax Clinics practitioners (Apr. 22, 2015).

001513

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1521 of 4699 PageID #: 4686

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

## LEVIES ON ASSETS IN RETIREMENT ACCOUNTS: Current IRS Guidance Regarding Levies on Retirement Accounts Does Not Adequately Protect Taxpayer Rights and Conflicts with Retirement Security Public Policy

### RESPONSIBLE OFFICIALS

Karen Schiller, Commissioner, Small Business/Self-Employed Division
Debra Holland, Commissioner, Wage and Investment Division

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF THE PROBLEM

Taxpayers rely on Individual Retirement Accounts (IRAs) or defined contribution plans, such as 401(k) plans, or Thrift Savings Plans (TSPs) for federal employees, to fund living and other expenses after retirement.  With rising medical and hospice care costs, many retirees are struggling to cover their basic living expenses.  The Employee Benefits Retirement Institute (EBRI) estimates only 56.7 percent to 58.5 percent of Baby Boomers and Gen Xers are sufficiently funded for life after retirement.[2]  Social Security benefits account for only about 40 percent of retirees' total income, meaning Americans should be funding retirement plans to make up the shortfall.[3]  Understanding the importance of Americans having sufficient retirement savings, Congress for years encouraged retirement savings and formulated policies to protect the rights of individuals to pensions.[4]

Congress has given the IRS broad powers to collect taxes, including the authority to levy on a taxpayer's property and rights to property.[5]  This power to levy extends to funds held in retirement accounts.  Given the long-term importance of retirement assets to individuals' future welfare, the IRS regards retirement levies as "special cases" that require additional scrutiny and managerial approval.[6]  However, the IRS

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Jack VanDerhei, *"Short" Falls: Who's Most Likely to Come Up Short in Retirement, and When?*, Employee Benefits Retirement Institute Notes, Vol. 35, No. 6, June 2014, *available at* http://www.ebri.org/pdf/notespdf/EBRI_Notes_06_June-14_ShrtFlls-HSAs.pdf.  For purposes of this study, Baby Boomers are defined as the generation born between 1948 to 1964 and Gen Xers are the generation born between 1965 and 1974.

3   *See* Social Security Administration (SSA), *available at* http://www.ssa.gov/policy/docs/ssb/v65n3/v65n3p1.html (last visited Dec. 4, 2015); SSA, *Retirement Planner: Learn About Social Security Programs*, *available at* http://www.socialsecurity.gov/plan-ners/retire/r&m6.html (last visited Dec. 4, 2015); Association for the Advancement of Retired Persons, Affording Retirement: Social Security Alone Isn't Enough, *available at* http://www.aarp.org/work/social-security/info_06_2010/ss_isnt_enough.html (last visited Dec. 4, 2015).

4   For example, the Employee Retirement Income Security Act of 1974 (ERISA) was enacted to provide protection for participants in pension and health plans in private industry.  *See* Pub. L. No. 93–406, 88 Stat. 829 (1974).

5   *See* IRC § 6331.

6   Internal Revenue Manual (IRM) 5.11.6.2(3) (Sept. 26, 2014).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1522 of 4699 PageID #: 6687

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

guidance that explains the steps required before a retirement account can be levied contains inadequate detail and is insufficient to protect taxpayer rights.[7]

The National Taxpayer Advocate has highlighted several concerns to show current guidance is not sufficient to protect taxpayer rights including the following:

- The guidance regarding flagrant conduct (a prerequisite for the levy) lacks definition and clarity;

- There is inadequate instruction for analyzing future retirement calculations and no requirement to provide those calculations to the taxpayer;

- The IRS does not educate the taxpayer about what to do to avoid a levy, or discuss alternative collection options with the taxpayer prior to a levy on a retirement account;

- The IRS does not conduct a risk analysis similar to the pre-seizure and pre-levy considerations;

- The IRS does not track levies that are issued against particular retirement accounts and therefore is unable to conduct quality reviews to ensure taxpayers are being treated uniformly and employees are following existing guidance; and

- The IRS proposed a TSP levy pilot program within its Automated Collection System (ACS) unit, which could automate much of the decision to levy on a TSP retirement account, and would result in disparate collection treatment of TSP accounts compared to other retirement accounts.

The current Internal Revenue Manual (IRM) procedures and the proposed ACS pilot undermine both taxpayer rights and retirement security policy.

## ANALYSIS OF PROBLEM

### Background

Internal Revenue Code (IRC) § 6331 gives the IRS the right to levy on a taxpayer's property and rights to property. This power allows the IRS to levy on funds held in retirement accounts.[8] Generally, the levy on a retirement account will only reach the funds over which the taxpayer has a present withdrawal right (*i.e.,* a levy will not attach until the taxpayer has a present right to withdraw funds from the plan).[9]

The IRS has established three steps that must be taken before it can issue a notice of levy on a taxpayer's retirement account:

1. Determine what property (retirement assets and non-retirement assets) is available to collect the liability;

2. Determine whether the taxpayer's conduct has been flagrant; and

3. Determine whether the taxpayer depends on the money in the retirement account (or will in the near future) for necessary living expenses.[10]

---

7   *See* IRM 5.11.6.2(4)-(7) (Sept. 26, 2014).

8   For information on what constitutes a retirement plan, see IRC § 4974(c). The IRS may also levy on retirement income or distributions once the taxpayer retires. IRM 5.11.6.1, *Retirement Income* (Jan. 22, 2010).

9   IRM 5.11.6.2(8) (Sept. 26, 2014).

10  IRM 5.11.6.2(4)-(7) (Sept. 26, 2014).

The Small Business/Self-Employed (SB/SE) Area Director, Field Collection, must approve the notice of levy by signing the form as the Service Representative or by following IRM 5.11.1.3.5.[11]   However, any notice of levy that requires the approval of the SB/SE Collection Area Director must include a memorandum explaining the IRS employee's justification for the levy.[12]   The written information provided to the manager must include:

1. A summary of any information the taxpayer has provided that may affect the decision to levy, *e.g.*, claims that the assessment is wrong;

2. If the taxpayer has submitted such information, an analysis of that information and why the notice of levy should still be served;

3. Verification that the amount is still owed, *e.g.*, IDRS confirms the amount is still unpaid;

4. An explanation that the notice of levy is appropriate in consideration of the amount owed and any circumstances that are known about the taxpayer and the liability; and

5. Other collection alternatives considered and rejected.[13]

When a distribution occurs as the result of a levy, the taxpayer will experience tax consequences.  First, pursuant to IRC § 408(d), generally, the entire amount paid from a retirement account or any distribution, is considered gross income and is subject to taxation.  In the instance of a levy on a retirement account, the payor would be required to withhold ten percent.[14]   However, this amount of withholding is not guaranteed to be sufficient to cover the federal tax liability created by the distribution, and the taxpayer may be liable for a state income tax as well.[15]

### *The IRM Guidance Regarding Flagrant Conduct Lacks Definition and Clarity*

According to IRM guidance, if the IRS determines that a taxpayer has engaged in flagrant conduct, it may levy on a retirement account.[16]   However, the guidance also provides that if a taxpayer has *not* engaged in flagrant conduct, then the levy should not occur.[17]   Thus, the determination of flagrant behavior is a prerequisite for determining to levy on a retirement account.  IRS employees are instructed to make a determination of flagrancy on a case-by-case basis and may consider extenuating circumstances that mitigate otherwise flagrant behavior.[18]

However, there is no on-point definition of what constitutes "flagrant" behavior in the IRC, accompanying regulations, or the IRM.  The IRS has addressed "flagrant" in regulations related to excise taxes on exempt organizations (EOs). That guidance provides that "a willful and flagrant act (or failure to act) is one which is voluntarily, consciously, and knowingly committed in violation of any

> Understanding the importance of Americans having sufficient retirement savings, Congress for years encouraged retirement savings and formulated policies to protect the rights of individuals to pensions.

---

11  IRM 5.11.6.2(10) (Sept. 26, 2014).

12  IRM 5.11.1.3.5(6) (Aug. 1, 2014).

13  IRM 5.11.1.3.5(2) (Aug. 1, 2014).

14  IRC § 3405(b)(1).  The payor generally is responsible for making this withholding, but the plan administrator may be liable in the case of certain plans.  IRC § 3405(d)(1).

15  Generally, there is a ten percent additional tax on early distributions from a qualified retirement plan but this additional tax does not apply to distributions made from an account because of an IRS levy.  IRC § 72(t)(2)(A)(vii).

16  IRM 5.11.6.2(5) (Sept. 26, 2014).

17  *Id.*

18  *Id.*

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1524 of 4699 PageID #: 6489

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

provision of chapter 42 (other than IRC §§ 4940 or 4948(a)) and which appears to a reasonable man to be a gross violation of any such provision."[19]  The United States Tax Court applied this definition in determining that a trustee's actions were flagrant and therefore subject to a penalty assessment under IRC § 6684.[20]  This language could provide an analytical framework for defining "flagrancy" in the IRM as it relates to retirement accounts.  Without a clear definition of flagrant conduct, this vital element of the analysis cannot occur on a consistent and meaningful basis.  The key elements for a flagrant act should be that it is committed in a willful and voluntary manner and that a reasonable person would view it as a gross violation.[21]

Without a definition of flagrant conduct, the IRS employee must make this determination based on examples in the IRM guidance.  Several examples of flagrant conduct listed in the IRM include the following:

- Taxpayers who continue to make voluntary contributions to retirement accounts while asserting an inability to pay an amount that is owed; or

- Taxpayers who voluntarily contributed to retirement accounts during the time period the taxpayer knew unpaid taxes were accruing.[22]

By statute, federal employees, without their consent, are automatically enrolled to have a certain percentage (typically three percent) of their salary contributed to the TSP.[23]  This is done to encourage saving for retirement and to take advantage of employer matching; federal employees must take an affirmative step to stop these automatic contributions.[24]  Other employer plans adopt a similar "opt-out" approach to automatically enroll employees.[25]  Thus, an employee may have been contributing to a retirement plan via automated payroll deductions for years before incurring an IRS debt and may not be aware the IRS views such contributions to be flagrant conduct.  Indeed, if the IRS adopted an EO definition of flagrant conduct discussed above (i.e., voluntary, conscious, and knowing), it is questionable whether their contributions would constitute flagrant conduct.

The examples described above are overly broad in terms of discouraging retirement savings for *any* taxpayer with an outstanding liability.  The guidance goes against strong public policy that encourages saving

---

19  Treas. Reg. § 1.507-1(c)(2).

20  *Thorne v. Comm'r.*, 99 T.C. 67, 108-109 (1992).  In particular, the court found that the trustee engaged in "willful conduct" by knowing that certain procedures should be followed but not requiring them to be followed.  Also, the court found that the trustee did not act reasonably by relying on oral assurances of his tax advisor after he received a notice of deficiency.  Furthermore, making grants to himself and trustees' family members for their own travel to conferences were seen as a gross violation.

21  A bill has been introduced in the House and Senate that recommends a stricter standard for defining flagrant conduct.  The proposed definition includes: "(A) the filing of a fraudulent return by the taxpayer, or (B) that the taxpayer acted with the intent to evade or defeat any tax imposed by this title or the collection or payment thereof."  Taxpayer Rights Act of 2015, S. 2333, 114th Cong. § 307 (2015); Taxpayer Right Act of 2015, H.R. 4128, 114th Cong. § 307 (2015).  For more information on the bill, see Senator Ben Cardin, *Cardin and Becerra Introduce Plan to Protect Taxpayers' Rights*, *available at* http://www.cardin.senate.gov/newsroom/press/release/cardin-and-becerra-introduce-plan-to-protect-taxpayers-rights.

22  IRM 5.11.6.2(6) (Sept. 26, 2014).  TAS is working with the IRS to revise this IRM section.  However, no changes have been made at this time.

23  5 U.S.C. § 8432(b)(2)(A).  *See also* Thrift Savings Plan, *Summary of the Thrift Saving Plan* 2, *available at* https://www.tsp.gov/PDF/formspubs/tspbk08.pdf (last visited Dec. 4, 2015).

24  *See* Thrift Savings Plan, *Summary of the Thrift Saving Plan* 2, *available at* https://www.tsp.gov/PDF/formspubs/tspbk08.pdf (last visited Dec. 4, 2015).

25  Automatic enrollment in 401(k) and similar plans was one of the most highly touted changes in the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006).

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1525 of 4699 PageID #: 4690

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

for retirement.[26]  Without a definition for flagrancy and an inquiry into whether the taxpayer voluntarily committed a gross violation, the IRS employee could find flagrancy where there was an unconscious and involuntary, or unknowing violation.  This means the IRS could be reducing a taxpayer to poverty in retirement because of an involuntary or unknowing act.

Finally, these examples seem counterintuitive in light of the IRS's public guidance providing safe harbors related to automatic contribution features for retirement plans.[27]  If voluntarily contributing to a retirement account remains an element of flagrancy, taxpayers should at least be notified and given the opportunity to cease voluntary contributions prior to a levy on their retirement account.

Another example of flagrant conduct includes taxpayers who have demonstrated a "pattern of uncooperative or unresponsive behavior," which includes, "failing to meet established deadlines, failing to attend scheduled appointments, failing to respond to revenue officer attempts to contact."[28]  This guidance does not contain any definitive deadlines and is based on a subjective determination by an IRS employee.  For instance, one employee may determine that if a taxpayer is 30 days late in submitting documentation, then the taxpayer has been uncooperative, whereas another employee may consider a taxpayer uncooperative after 60 days.

Additionally, while the IRM does address extenuating circumstances that may exist to mitigate a taxpayer's behavior, it does not contain any examples of such extenuating circumstances.  Nor does the IRM require the IRS employee to identify the mitigating circumstances, which could include IRS delays and IRS failures to meet appointments or take promised actions.  As a result, this IRM is a trap for unwary taxpayers who may experience significant and irreparable harm as a result of a subjective and non-uniform finding of flagrancy by an IRS employee.

### There Is Inadequate Instruction for Analyzing Future Retirement Calculations and No Requirement to Provide Those Calculations to the Taxpayer

The last step in determining if a levy on a retirement account is appropriate is to determine if the taxpayer depends on the money in the retirement account (or will in the near future) for necessary living expenses.[29]  To conduct this analysis, employees are instructed to use the standards in IRM 5.15, *Financial Analysis*, to establish necessary living expenses and the life expectancy tables in Publication 590-A, *Individual Retirement Arrangements (IRAs)*, to estimate how much can be withdrawn annually to deplete the retirement account in the taxpayer's remaining life.[30]

---

26  Congress has focused its efforts on improving retirement savings for Americans.  Senator Orrin Hatch recalled in 2014 that, "[t]he retirement policies we have pursued have always been about helping Americans help themselves save more of their hard-earned money, not less."  *Retirement Savings 2.0: Updating Savings Policy for the Modern Economy, Hearing Before the Committee on Finance*, 113th Cong. (Sept. 16, 2014) (statement of Orrin Hatch, ranking member, Committee on Finance).

27  Rev. Proc. 2015-28.  In response to the issuance of this published guidance, Senator Ron Wyden, Finance Committee ranking member, applauded administration efforts claiming, "[t]hese improvements from the Treasury and the IRS mark an important step in helping millions of Americans save for a secure retirement.  Automatic enrollment in retirement plans is a promising method to increase retirement savings.  The changes made today will make it easier for smaller businesses to set up a retirement plan with automatic enrollment features and help more middle-class Americans prepare for retirement." Senator Ron Wyden, *Wyden Applauds Administration Efforts to Improve Retirement Saving* (Apr. 2, 2015) *available at* http://www.finance.senate.gov/newsroom/ranking/release/?id=3daed452-120a-45ab-b5fd-a9a4e21c05f4.

28  IRM 5.11.6.2(6) (Sept. 26, 2014).

29  IRM 5.11.6.2(7) (Sept. 26, 2014).  Employees are instructed not to levy on the retirement account if it is determined that the taxpayer depends on the money in the retirement account (or will in the near future).  *Id.*

30  IRM 5.11.6.2(7) (Sept. 26, 2014).  When conducting this financial analysis, employees are reminded to consider special circumstances that may be present on a case-by-case review.

001518

While the guidance refers the employee to IRM 5.15 to determine necessary living expenses, there is no discussion on determining the taxpayer's potential retirement income. Additionally, there is no requirement to document the actual calculations, making it impossible to verify that a consistent method is used in all retirement levy cases. The financial analysis handbook does not take into account cost of living increases or adjustments for increased expenses due to advanced age, such as rising health care or hospice costs. Finally, the guidance lacks a safeguard that if the IRS determines a 50-year-old taxpayer does not currently rely on the retirement account (and will not rely on it in the near future), the taxpayer has sufficient opportunity to rebuild the retirement account back up to a level that provides for a stable retirement.

> **Example:** Assume a taxpayer is 50 years old, expects to retire at age 62, and has a $40,000 tax liability with $54,000 in his TSP account. Further assume the taxpayer will begin receiving $2,000 per month from his federal pension and another $1,200 per month from Social Security at age 62, with a life expectancy of 80. The $54,000 TSP corpus (the years from the taxpayer's retirement age of 62 to 80) divided by 18 years leaves an average of $3,000 per year, or $250 per month. Thus at age 62, the taxpayer expects to have $3,450 of monthly income from all sources ($2,000 pension, $1,200 Social Security, $250 TSP). The IRS estimates the taxpayer will have necessary living expenses of $3,300 per month at retirement. Based on this financial analysis, if the IRS were to levy the entire TSP corpus, the taxpayer's monthly retirement income would be reduced to $3,200, and he could not meet his necessary living expenses of $3,300. An IRS levy should be limited to 60 percent of the TSP corpus, or $32,400, based on the crude estimate that the taxpayer would need to rely on only 40 percent of his TSP to cover necessary living expenses ($100 out of an available $250 per month). However, there are currently no safeguards to prevent the IRS from levying the *entire* TSP corpus, regardless of whether it would leave the taxpayer unable to meet necessary living expenses upon retirement.

IRM 5.11.6.2(7) does not instruct employees to provide the basis of a decision or calculations to the taxpayer. Without this information, the taxpayer cannot substantively address the IRS's determination to proceed with the levy. The IRS should consider the impact of the levy on the taxpayer's retirement security, including estimating future retirement income if the account were levied. This could be done by utilizing the Social Security Administration (SSA) and TSP websites and online calculators.[31] Alternatively, the IRS could create its own calculators for this purpose.

### *The IRS Does Not Educate the Taxpayer About What to Do to Avoid a Levy, or Discuss Alternative Collection Options With the Taxpayer Prior to a Levy on the Retirement Account*

The current IRM guidance does not require employees to educate the taxpayer as to what he or she needs to do to avoid a levy on their retirement account. Since this levy can cause irreparable harm to the taxpayer's future well-being, it is imperative that the IRS adheres to the taxpayer *right to be informed*. As stated above, an unsophisticated taxpayer who is unaware of the IRM examples regarding flagrant conduct may continue making voluntary contributions to a retirement account, risking his or her retirement assets. The IRS would not tell the taxpayer to stop or reduce contributions to avoid being deemed flagrant, even

---

31 There are tools publicly available to help taxpayers estimate their retirement earnings. The IRS could use such tools to compute an estimate of benefits. For instance, the SSA provides an online tool to estimate Social Security retirement benefits. *See* SSA, *Retirement Estimator, available at* https://www.ssa.gov/retire/estimator.html. The TSP website offers an online calculator to figure out how a TSP contribution will affect account savings over time. *See* TSP, *Paycheck Estimator, available at* https://www.tsp.gov/PlanningTools/Calculators/paycheckEstimator.html.

Case: 1:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1527 of 4699 PageID #: 4692

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

when contributions are automatically made as a part of employment. For the government to encourage retirement contributions, but also deem those contributions as flagrant conduct, without notice to the taxpayer, is a Catch-22 for the taxpayer.

Likewise, the IRS is not proactively informing taxpayers about the tax consequences of a distribution from the retirement account. Pursuant to IRC § 408(d), generally the entire amount paid from a retirement account or any distribution is considered gross income and subject to taxation. In the instance of a levy on a retirement account, the payor would generally be required to withhold ten percent for federal income taxes.[32] It is not guaranteed that the withheld amount will cover the full amount of federal tax liabilities associated with a distribution. No amount is required to be withheld for state income taxes, which could potentially subject the taxpayer to state tax penalties and enforcement activities. These tax consequences could exacerbate the taxpayer's existing financial difficulties by creating a new tax liability the taxpayer is unable to pay, creating a vicious circle of noncompliance.

> Without a definition for flagrancy and an inquiry into whether the taxpayer voluntarily committed a gross violation, the IRS employee could find flagrancy where there was an unconscious and involuntary, or unknowing violation. This means the IRS could be reducing a taxpayer to poverty in retirement because of an involuntary or unknowing act.

Educating taxpayers about tax consequences of contributions to and distributions from a retirement account is necessary for fair and just tax administration given public policy to encourage retirement savings. Moreover, communication with the taxpayer about the consequences of a levy on a retirement account (including the loss of retirement savings) might be the one piece of information that could transform a heretofore unresponsive taxpayer into a responsive and cooperative one. Thus, communication can help collect revenue *and* protect retirement savings.

Finally, the IRM makes only minimal mention of collection alternatives. The pertinent section reads: "[i]f there is property other than retirement assets that can be used to collect the liability, or if a payment agreement can be reached, consider these alternatives before issuing a levy on retirement accounts. Also consider the expense of pursuing other assets as well as the amount to be collected."[33] This excerpt only minimally references installment agreements and does not mention currently not collectible status or offers in compromise.[34] Without this information, employees may be guided to focus on the retirement account levy without considering less intrusive alternatives, thereby compromising a taxpayer's *right to privacy*.

---

32  IRC § 3405(b)(1). The payor generally is responsible for making this withholding, but the plan administrator may be liable in the case of certain plans. IRC § 3405(d)(1).

33  IRM 5.11.6.2(4) (Sept. 26, 2014).

34  When a taxpayer has no assets or income which are, by law, subject to levy, or it is determined that levy action would create a hardship, the liability may be reported as currently not collectible. A hardship exists if the levy action prevents the taxpayer from meeting necessary living expenses. IRM 1.2.14.1.14, *Policy Statement 5-71* (Nov. 19, 1980). *See also* Treas. Reg. 301.6343-1(b)(4). An offer in compromise allows the IRS and the taxpayer to settle an outstanding liability for a reduced amount. IRC § 7122.

001520

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1528 of 4699    PageID #: 3693

Most Serious Problems — Efforts to Improve Compliance and Effective Strategies — Filing Season Review    Most Serious Problems

### The IRS Does Not Conduct a Risk Analysis Similar to the Pre-Seizure and Pre-Levy Considerations

As mentioned above, levies on retirement accounts receive "special" consideration. However, the IRS must perform a general risk analysis prior to seizing a taxpayer's property.[35] A risk analysis should also be required for levies on retirement accounts. The guidance under IRM 5.11.6.2 should also make a cross-reference to IRM 5.11.1.3.1, in which IRS employees are instructed to consider the following prior to imposing a levy:

- The taxpayer's financial condition, including information discussed in IRM 5.1.12.20.1.1 related to economic hardship determinations;

- The taxpayer's responsiveness to attempts at contact and collection;

- The taxpayer's filing and paying compliance history;

- The taxpayer's effort to pay the tax; and

- Whether current taxes are being paid.[36]

This guidance includes a clear reference to economic hardship, which the guidance for retirement levies does not include. Consideration of the taxpayer's recent filing and payment compliance history could be a mitigating factor against a determination of flagrancy. Additionally, IRS employees are instructed to consider the timing of successive seizures to avoid undue hardship and collection alternatives in order to determine the feasibility of a seizure.[37] These considerations allow for greater protection of taxpayer rights and should be incorporated into guidance for retirement levies. Finally, the IRM should require that the levy take place within a reasonable amount of time (*e.g.*, 90 days) of when the risk analysis is completed to avoid a situation of changed circumstances.

### The IRS Does Not Track Levies That Are Issued Against Particular Retirement Accounts and Therefore Is Unable to Conduct Quality Reviews to Ensure Taxpayers Are Being Treated Uniformly and That the Guidance Is Being Followed By Employees

The IRS does not have a system for tracking levies that are issued against particular retirement accounts.[38] This means that IRS management and other stakeholders are not able to conduct quality reviews or track retirement levies to ensure that taxpayers are being treated in a uniform manner and that the internal guidance is being followed by employees.[39]

---

35  IRM 5.10.1.3.2, *Alternative Methods of Collection* (Aug. 4, 2014). There is no legal distinction between a levy and a seizure. Generally, if the taxpayer is holding the property, or a third party is holding the property and it cannot be turned over by writing a check, the IRS will use seizure procedures. IRM 5.11.1.2.2, *Notice of Levy vs. Seizure* (Aug. 1, 2014). A levy is often used for things such as a taxpayer's bank account, wages, or other income. *Id.*

36  IRM 5.11.1.3.1, *Pre-levy Considerations* (Aug. 1, 2014).

37  IRM 5.10.1.1 (Aug. 4, 2014).

38  IRS response to a TAS information request (May 21, 2015).

39  For information about how the inconsistent use of Designated Payment Codes reduces the ability to assess Collection actions, see Most Serious Problem: *IRS Collection Effectiveness: The IRS's Failure to Accurately Input Designated Payment Codes for All Payments Compromises Its Ability to Evaluate Which Actions Are Most Effective in Generating Payments, infra.*

001521

However, TAS conducted a review of cases from FY 2014 and FY 2015 that were most likely to contain TSP, IRA, or retirement account levies.[40] TAS reviewed 43 possible TSP levy cases and found that in 33 cases, Form 668A, *Notice of Levy*, was generated and issued to the TSP board. In 31 of those cases, the IRS employee did not document managerial approval, as required by the IRM. Additionally, flagrant conduct, a prerequisite for the levy determination, was only recorded in one case. No taxpayers were informed that making contributions could be deemed flagrant conduct. The total amount of levy funds received from these levies totaled approximately $49,000.

TAS also reviewed 128 possible IRA levy cases and found that in 72 cases, Form 668A, *Notice of Levy*, was generated and issued on an IRA account. In 52 of those cases (72 percent), the IRS employee did not document managerial approval, as required by the IRM. Flagrant conduct was documented in 18 cases and the IRS educated just one taxpayer on the effects of continuing to make IRA contributions. The total amount of levy funds received from these levies totaled approximately $2 million.

Last, TAS reviewed 176 possible retirement account levy cases and found that in 66 cases, Form 668A, *Notice of Levy*, was generated and issued on a retirement account. In 29 of those cases (44 percent), the IRS employee did not document managerial approval, as required by the IRM. The IRS documented flagrant conduct in 20 cases and the IRS informed only two taxpayers about the consequences of continued contributions. The total amount of levy funds received from these levies totaled approximately $7.6 million. It is important to make sure that each taxpayer's case receives proper analysis prior to levying on a retirement account, because proceeds from a levied retirement account cannot be returned to the retirement account, even in the event of an erroneous or wrongful levy.[41]

### *Even With Inadequate Guidance, the IRS Proposes a Pilot Project Within the Automated Collection System, Which Will Compound the Harm to Taxpayers*

Considering all of the deficiencies discussed above, the National Taxpayer Advocate is especially concerned with the IRS's pilot program aimed at allowing its ACS to issue levies on TSP accounts.[42] This pilot will treat taxpayers with TSP accounts disparately from taxpayers who have other types of retirement accounts. If a taxpayer has a defined benefit plan and has no present right to withdraw the account balance, the IRS will have no corpus to levy upon at the present time. However, recent changes in the TSP regulations allow a levy on a TSP account to reach up to the entire vested account balance now without restrictions.[43] The IRS has not articulated a reason why it believes this pilot should single out TSP

---

40   TAS review completed November 17, 2015, on potential retirement account asset levy cases with levies issued between FY 2014 and FY 2015. Note: Because some taxpayers received more than one levy, the total number of cases could be slightly higher than the total number of taxpayers in the review. This review was based on a non-random sample so statistics based on this data may not project to the overall population; however the sample demonstrates that the IRS is not always following necessary procedures.

41   The National Taxpayer Advocate recommended legislative changes to IRC § 401 (for Qualified Pension, Profit Sharing, Keogh, and Stock Bonus Plans), IRC § 408 (for IRA and SEP-IRAs), and IRC § 408A (for Roth IRAs) to authorize the reinstatement of funds to retirement accounts and other pension plans where the IRS levied upon the plans in error or in flagrant disregard of established IRS rules, procedures, or regulations and the funds were returned under IRC § 6343(d). National Taxpayer Advocate 2001 Annual Report to Congress 202-09. 5 C.F.R. § 1653.36(g) states that distributions made to satisfy an IRS levy may not be returned to a participant's TSP account.

42   ACS is a computerized system that maintains balance-due accounts and return delinquency investigations. IRM 5.19.5.2, *What Is ACS?* (Aug. 20, 2013). TSP is a retirement plan for federal employees established under 5 U.S.C. § 8437.

43   5 U.S.C. § 8473(e)(3), 5 C.F.R. § 1653.35, and IRM 5.11.6.2.1, *Thrift Savings Plan* (July 17, 2015).

accounts.[44]  As of December 31, 2014, there are approximately 4.7 million TSP participants, so the pool of taxpayers affected by this pilot could be quite large.[45]

TAS was not consulted during the process to create procedures for this pilot, but is providing comments to the draft procedures.  As currently written, the procedures provide even fewer safeguards to taxpayer rights than the current IRM guidance for levying on retirement accounts generally.[46]  For instance, the procedures treat taxpayers in ACS differently from taxpayers working with a revenue officer.[47]  Under the pilot procedures, the IRS employee's financial analysis will be restricted to these two elements:

- Document if there is any information that retirement is impending and that the taxpayer will be relying on funds in the TSP for necessary living expenses.  The employee is instructed to use available information to apply the standards in IRM 5.19.13.1.4 and Publication 590-A.  If this documentation is present, do not issue the TSP levy; and

- Also, consider any special circumstances in the taxpayer's situation, such as extraordinary expenses, or additional sources of income, including spousal income and assets, other retirement accounts, etc. that will be available to pay expenses during retirement.[48]

There is no mention of reviewing IRM 5.15, *Financial Analysis*.  Furthermore, these procedures introduce considerations not found in IRM 5.11.6.2(7), such as imputing spousal income into the financial analysis.[49]  TAS is working actively to address the problems with the pilot.

Under ACS, cases are assigned to teams, functions, or units rather than individual employees.[50]  It is a computer system that "analyzes for levy sources, undeliverable mail codes, telephone numbers, and other characteristics" in place of an employee.  The computer system also "prints letters for mailing and assigns cases to the proper team, function, or units," while a "small percentage of cases meeting specific criteria" are researched by the ACS Support function.[51]  ACS provides minimal contact with a taxpayer.  For instance, ACS uses "predictive dialer" technology, which automatically makes outbound calls to taxpayers or representatives and if contact is made, the call is transferred to a waiting agent.[52]  Last, correspondence

---

44  In response to an information request asking for the rationale of the pilot program, the IRS explained that "ACS has authority to issue levies on retirement accounts, however, it was not previously utilized.  The pilot is an opportunity to determine if this means will be cost effective and meet sound tax administration."  IRS response to TAS information request (July 9, 2015).

45  Thrift Savings Fund, *Financial Statements December 31, 2014 and 2013* 6, *available at* http://www.frtib.gov/ReadingRoom/FinStmts/TSP-FS-Dec2014.pdf.

46  IRS, *ACS Thrift Savings Plan Levy Pilot Procedures* (Dec. 9, 2015).

47  *Id.*

48  *Id.*

49  *Id.*

50  IRM 5.19.5.3, *Research on ACS* (Jan. 6, 2015).

51  *Id.*

52  IRM 5.19.5.4.1(1) (Feb. 20, 2015).  An automated message is left if an answering machine answers and if there is no answer, the system "updates the account and reschedules the case to the predictive dialer queue for another attempt."  *Id.*

001523

submitted by a taxpayer to ACS is actually processed by ACS Support, a different unit.[53]  The IRS has confirmed that the ACS pilot will work in a similar fashion.[54]

The taxpayer may struggle to navigate a system in which they receive automated phone contact, but cannot contact an assigned employee.[55]  With no employee assigned to the case, each contact or piece of correspondence would be analyzed by a different employee.  The National Taxpayer Advocate is concerned that under this system the ACS employee will not be able to make a determination of flagrancy under the proposed definition.  As mentioned above, IRM 5.11.6.2.1(5) requires that the IRS employee prepare written analysis for the manager to approve prior to levy.  This analysis requires that the employee consider the taxpayer's current situation, his or her conduct, and any mitigating circumstances, as well as the taxpayer's projected economic viability.  The National Taxpayer Advocate provided training to the employees assigned to the pilot cases.  However, even with training, the minimal contact associated with ACS will make it difficult, if not impossible, for ACS employees to make these determinations accurately.  It does not appear the ACS manager will have much information about the taxpayer's financial condition or extenuating circumstances before giving rote approval to a levy that could potentially destroy a taxpayer's retirement income security.

> **Educating taxpayers about tax consequences of contributions to and distributions from a retirement account is necessary for fair and just tax administration given public policy to encourage retirement savings.**

Furthermore, the reach of a TSP levy is far more expansive than the levy on a non-TSP retirement account.  As discussed above, the levy on a non-TSP retirement account generally only reaches the assets over which the taxpayer has a present withdrawal right.  However, recent changes in the law and regulations written by the Federal Retirement Thrift Investment Board that manages TSP accounts, allow a TSP levy to reach up to the vested account balance.[56]  Thus, the IRS can levy upon the *entire vested balance* of the TSP account, even if the participant has no current right to access the funds.[57]  As a result, a levy on a TSP account could be even more damaging to a taxpayer than a levy on a non-TSP retirement plan (*e.g.*, 401(k) plans).  This greater risk of harm should cause the IRS to provide more taxpayer rights protections rather than less.  Retirement levy determinations should require assignment to employees with the skills, training, and resources required to ensure appropriate and consistent application of retirement levies.

---

53  IRM 5.19.6.1, *ACS Support Overview/What Is ACS Support* (June 17, 2014).  ACS Support is experiencing a backlog of work and in response the IRS recently announced that ACS Support will, among other things, cease processing paper third-party levy responses in order to address taxpayer correspondence.  This deviation will occur until the end of September 2015.  Memorandum to Campus Collection Directors from DelRey Jenkins, Director, Campus Collection, *Deviation Authority to Discontinue the Processing of ACS Support (ACSS) Levy Responses* (Mar. 23, 2015).

54  Two or more employees will be designated to work the pilot inventory.  The cases will not be assigned to a specific employee.  The lead who receives the case will complete the investigation and will make a levy determination if appropriate.  If a taxpayer calls in response to the levy, the ACS employee will prepare Form 4442, *Inquiry Referral*, to the levy originator and advise the taxpayer that they will be contacted by the levy originator within 24 hours. IRS, *ACS Thrift Savings Plan Levy Pilot Procedures* (Dec 9, 2015).  Any taxpayer correspondence will be routed to the designated leads.  IRS response to TAS information request (July 6, 2015).

55  For information on how the lack of an assigned employee can affect taxpayers under correspondence examination, an automated system for examinations, *see* National Taxpayer Advocate 2014 Annual Report to Congress 134-44.  This situation is also made worse by the fact that the level of ACS customer service has decreased.  Treasury Inspector General for Tax Administration (TIGTA) determined that ACS has answered 25 percent fewer calls even though total calls into the ACS unit have decreased 16 percent since FY 2011.  TIGTA, Ref. No. 2015-30-035, *Reduced Budget and Collection Resources Have Resulted in Declines in Taxpayer Service, Case Closures, and Dollars Collected* 10 (May 2015).

56  5 U.S.C. § 8437(e)(3) and 5 CFR § 1653.35.

57  IRM 5.11.6.2.1(1) (July 17, 2015).

## CONCLUSION

Current internal guidance does not ensure that a taxpayer's unique facts and circumstances will be considered prior to levy of his or her retirement account and does not fully recognize the importance of retirement savings. It also disregards the balance between the need for enforcement to be no more intrusive than necessary. Without clear guidance, the IRS employee's determination is subjective and susceptible to personal judgment. This could lead to inconsistent treatment of similarly situated taxpayers, which could erode taxpayers' confidence in a fair tax system and decrease voluntary compliance. Moreover, a taxpayer cannot adequately challenge the decision to levy without being provided a detailed analysis of the basis for levy, a situation which impacts the taxpayer's *right to challenge the IRS's position and be heard*. Last, without clear guidance, taxpayers do not know what they need to do to comply with tax laws, which diminishes the *right to be informed*.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. In collaboration with TAS, revise the IRM on retirement account levies to define flagrant conduct, which should include elements of willful and voluntary conduct that appears to be a gross violation from a reasonable person standard, include examples of extenuating circumstances that can mitigate flagrant conduct, require a full pre-levy financial analysis, and educate taxpayers about actions available to avoid a levy on a retirement account.

2. The IRS should identify calculators that it can use, such as those provided by the SSA or TSP, to determine the impact of a levy on a retirement account on the taxpayer's future well-being. Alternatively, the IRS could create its own calculator.

3. Create a unique Designated Payment Code for retirement levy proceeds or a unique identifier within the Integrated Collection System to identify, track, and review retirement levy cases.

4. Postpone the ACS retirement levy pilot program until all of the National Taxpayer Advocate's concerns have been addressed; and if they are not able to be addressed, do not implement the pilot.

001525

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1533 of 4699 PageID #: 4698

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

**MSP #11**

# NOTICES OF FEDERAL TAX LIEN (NFTL): The IRS Files Most NFTLs Based on Arbitrary Dollar Thresholds Rather Than on a Thorough Analysis of a Taxpayer's Financial Circumstances and the Impact on Future Compliance and Overall Revenue Collection

## RESPONSIBLE OFFICIALS

Deborah Holland, Commissioner, Wage and Investment Division
Karen Shiller, Commissioner, Small Business/Self-Employed Division
Janice Hedemann, Acting Director, Office of Research, Analysis and Statistics

## TAXPAYER RIGHTS IMPACTED[1]

- ■ *The Right to Challenge the IRS's Position and Be Heard*
- ■ *The Right to Privacy*
- ■ *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

Notices of Federal Tax Lien (NFTLs) establish priority of the government's interest in a tax debtor's property with respect to certain creditors by putting the public, including third-party creditors, on notice of an existing statutory lien.[2] Several TAS studies show that NFTLs can unnecessarily harm taxpayers and reduce their ability to become or remain compliant with their federal tax filing obligations.[3] NFTLs also generate significant downstream costs for the government, often without attaching to any tangible assets.[4] The IRS files most NFTLs based on an arbitrary dollar threshold of the unpaid liability, with over 21 percent of NFTLs filed without human involvement in determining lien filings,[5] rather than a thorough analysis of the taxpayer's individual circumstances and financial situation or consideration of the NFTL's impact on future compliance and collected revenue. Even when the taxpayer attempts to initiate contact with the IRS by calling the number provided on the majority of notices, only about one in three taxpayers can get through to the IRS to make payment arrangements prior to the NFTL filing.[6]

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Internal Revenue Code (IRC) §§ 6321, 6322, and 6323(a).

3   In fiscal years (FYs) 2009-2012, TAS Research & Analysis investigated the IRS's use of NFTLs and their impact on the compliance behavior of delinquent taxpayers. *See* National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 105-30 (TAS Research Study: *Investigating the Impact of Liens on Taxpayer Liabilities and Payment Behavior*); National Taxpayer Advocate 2011 Annual Report to Congress vol. 2, 91-111 (TAS Research Study: *Estimating the Impact on Liens on Taxpayer Compliance Behavior and Income*); National Taxpayer Advocate 2010 Annual Report to Congress vol. 2, 89-100 (*Estimating the Impact of Liens on Taxpayer Compliance Behavior: An Ongoing Research Initiative*); National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 1-18 (TAS Study: *The IRS's Use of Notices of Federal Tax Lien*).

4   *See* T. Keith Fogg, *Systemic Problems with Low-Dollar Lien Filing*, 2011 TNT 194-9 (Oct. 6, 2011); National Taxpayer Advocate 2011 Annual Report to Congress 109-28 (Most Serious Problem: *Changes to IRS Lien Filing Practices Are Needed to Improve Future Compliance, Increase Revenue Collection, and Minimize Economic Harm Inflicted on Financially Struggling Taxpayers*).

5   IRS Collection Activity Report (CAR), NO-5000-25, *Lien Report, September, FY 2015*. In FY 2015, there were 515,247 liens filed, including 4,918 refiled liens, with 202,127 arriving in the Automated Collection System (ACS). Approximately 47 percent of ACS NFTLs are filed manually. Small Business/Self-Employed (SB/SE) response to TAS information request (Oct. 19, 2015); IRS CAR, NO-5000-25, *Lien Report, September, FY 2015*.

6   IRS Joint Operations Center (JOC), *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2015) (specifying that 37 percent level of service for the installment agreement line).

001526

The National Taxpayer Advocate has repeatedly expressed concerns regarding the negative impact of the IRS's NFTL filing policies on taxpayers and on future compliance.[7]  The IRS can significantly increase the effectiveness of NFTL filings without needlessly harming taxpayers by replacing the current policy with a cost-efficient algorithm for making NFTL filing determinations incorporating:

- meaningful contact with the taxpayer to obtain financial information and establishing a payment plan;

- thorough analysis of the taxpayer's financial situation, including whether the NFTL will attach to tangible property; and

- the impact of the NFTL on future compliance.

## ANALYSIS OF PROBLEM

### Background

The IRS's ability to file a NFTL, which protects the government's interest in property against subsequent purchasers, secured creditors, and junior lien holders, is a power unlike that of other creditors, since the IRS does not need to obtain a judgment to file a NFTL.[8]  The filing of a NFTL can significantly damage the creditworthiness of a taxpayer, which can negatively impact the ability to obtain financing for a home or other major purchases, find or maintain a job, secure affordable rental housing or insurance, and pay the tax debt.[9]

Congress recognized the unique nature of a NFTL and, when enacting the IRS Restructuring and Reform Act of 1998 (RRA 98), it precluded the IRS from "abusively us[ing] its liens and seizure authority."[10]  Upon assessment of a tax liability, notice to the taxpayer, demand for payment, and the taxpayer's failure to pay, a lien in favor of the United States attaches to the taxpayer's property.[11]  This statutory lien, known as a "secret lien" because the taxpayer does not usually know it has arisen, attaches to all of the taxpayer's property and rights to property, both real and personal, and to any future property acquired by the taxpayer.[12]  However, this "secret lien" does not provide the IRS with priority over other creditors that do not have actual knowledge of the secret lien; thus, the IRS must file an NFTL to establish priority of the

---

7    *See, e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 225-36 (Most Serious Problem: *Managerial Approval for Liens: The IRS's Administrative Approval Process for Notices of Federal Tax Liens Circumvents Key Taxpayer Protections in RRA 98*); National Taxpayer Advocate 2012 Annual Report to Congress 403-25 (Most Serious Problem: *Although the IRS "Fresh Start" Initiative Has Reduced the Number of Lien Notices Filed, the IRS Has Failed to Determine Whether Its Lien Policies Are Clearly Supported by Either Increased Taxpayer Compliance or Revenue*); National Taxpayer Advocate 2011 Annual Report to Congress 109-28 (Most Serious Problem: *Changes to IRS Lien Filing Practices Are Needed to Improve Future Compliance, Increase Revenue Collection, and Minimize Economic Harm Inflicted on Financially Struggling Taxpayers*).

8    IRC §§ 6321, 6322, and 6323(a).

9    *See* National Taxpayer Advocate 2014 Annual Report to Congress 225; *see also* Heather Struck, *A Bad Credit Score Affects a Lot More Than Credit*, FORBES, Jul. 20, 2011, *available at* http://www.forbes.com/sites/heatherstruck/2011/07/20/credit-score-fico-can-hurt-you/; written response from Vantage Score® (Sept. 17, 2009).

10   RRA 98, Title III, § 3421, Pub. L. No. 105-206, 112 Stat. 758 (1998).  *See also* S. REP. NO. 105-174, at 78 (1998); Unanimous Consent Request – H.R. 26767, 143 Cong. Rec. S12230-02, at S12231 (statement of Senator Roth).

11   IRC §§ 6321 and 6322.  IRC § 6201 authorizes the IRS to assess all taxes owed, and IRC § 6303 provides that within 60 days of the assessment, the IRS must provide notice and demand payment to any taxpayer liable for an unpaid tax.

12   *Id.*  Internal Revenue Manual (IRM) 5.12.1.3, *Creation and Duration* (Oct. 14, 2013).  The NFTL is effective as of the date of assessment and continues until the liability is either paid in full or is legally unenforceable.  The IRS must release the lien within 30 days after the underlying liability is satisfied or becomes legally unenforceable.  IRC § 6325(a)(1).  Because the NFTL is a statutory lien — or "secret" lien — third parties have no knowledge of the existence of the underlying debt.  IRC § 6321.

001527

Case 1:23-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1535 of 4699 PageID #: 4700

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy    Appendices

The filing of a Notice of Federal Tax Lien (NFTL) can significantly damage the creditworthiness of a taxpayer, which can negatively impact the ability to obtain financing for a home or other major purchases, find or maintain a job, secure affordable rental housing or insurance, and pay the tax debt.

government's interest in the property against subsequent purchasers, secured creditors, and junior lien holders.[13]

In 2011, in response in part to the National Taxpayer Advocate's continued concern over NFTL filing and withdrawal policies, the IRS announced a new effort to help financially struggling taxpayers get a "fresh start."[14]  The "Fresh Start Initiative" resulted in several positive changes in how the IRS files and withdraws NFTLs, including increasing the Automated Collection System (ACS) NFTL filing threshold from $10,000 to $25,000.[15]  However, the IRS continues to file NFTLs automatically based on that threshold, with little management review and without attempting meaningful contact with a taxpayer, doing a financial analysis, or considering the impact on future compliance.[16]

### Current NFTL Filing Policy Is Based on an Arbitrary Dollar Threshold of the Unpaid Liability Rather Than Focused on Meaningful Contact with the Taxpayer

As stated above, the IRS generally files NFTLs if the aggregate unpaid balance of assessment is over $10,000, or for accounts in ACS, if the assessment is over $25,000.[17] Contrary to congressional intent, only the decision to *not* file an NFTL requires managerial approval in most circumstances.[18]  Prior to the filing of an NFTL, the IRS must make "reasonable efforts" to contact the taxpayer to "advise [the taxpayer] that an NFTL may be filed if full payment is not made when requested."[19]  However, the Internal Revenue Manual (IRM) provides that "reasonable effort" includes "issuance of the statutory assessment notices and the balance due notices sent during

---

13   *See* IRC § 6323(f); Treas. Reg. § 301.6323(f)-1; IRM 5.12.1.4, *Purpose and Effect of Filing a Notice of Federal Tax Lien (NFTL)* (Oct. 14, 2013).  The IRS must file the NFTL in the correct county or jurisdiction where the taxpayer's property is located.

14   IRS, Media Relations Office, *IRS Announces New Efforts to Help Struggling Taxpayers Get a Fresh Start; Major Changes to Lien Process*, IR-2011-20 (Feb. 24, 2011).

15   National Taxpayer Advocate 2012 Annual Report to Congress 408.  The IRS implemented this change through a policy decision that reprogrammed ACS to file NFTLs only where the unpaid balance of assessment is over $25,000.  However, the IRS did not update the IRM or issue interim guidance reflecting this change.

16   National Taxpayer Advocate 2014 Annual Report to Congress 225-36 (Most Serious Problem: *Managerial Approval for Liens: The IRS's Administrative Approval Process for Notices of Federal Tax Liens Circumvents Key Taxpayer Protections in RRA 98*).

17   *See* IRM 5.12.2.6(1) (Oct. 14, 2013); IRM 5.19.4.5.3, *NFTL Filing Decisions* (Aug. 4, 2014); *see also supra* note 15 (noting that the $25,000 threshold is not listed in the IRM nor in interim guidance but is an established policy decision); SB/SE response to TAS information request (June 10, 2015) (stating that on April 15, 2011, the "ACS Systemic Lien threshold was increased to $25,000").

18   National Taxpayer Advocate 2014 Annual Report to Congress 226, 229.  As described in the 2014 Annual Report, despite the congressional direction that the IRS adopt procedures in which an employee's determination to file a NFTL would, "where appropriate," be approved by a supervisor in RRA 98 § 3421, the IRS's current policy is to only have those reviews take place when the determination is to *not* file a NFTL or if the Revenue Officer is below a full performance level of GS-9.  *See* RRA 98, Title III, § 3421, Pub. L. No. 105-206, 112 Stat. 758 (1998); Memorandum from Assistant Commissioner (Collection) (July 30, 1998) (concluding that RRA 98 § 3421 does not require supervisory review of all collection actions but allows the IRS the discretion to determine where such review would be appropriate); IRM 5.12.2.5.2(1) (Oct. 14, 2013).  Furthermore, IRM 5.12.2.5.3(2) (Nov. 9, 2015) provides that managerial approval is required for the *non*-filing or deferral of an NFTL filing when the "known aggregate assessed or to be assessed balance will be greater than $10,000," there are ten or more modules open, or the "NFTL filing is deferred or not filed for more than 120 days from initial or last [taxpayer] contact," including "situations when the Revenue Officer is waiting for either actions by or documentation from a taxpayer."  The only exceptions to managerial approval are limited to cases in which the balance is less than $2,500, there has previously been a non-filing or deferral approval in the case and circumstances remain the same, the case meets the Streamline Installment Agreement criteria under IRM 5.14.5.2, or the case meets the criteria for specifically not filing an NFTL under IRM 5.12.2.4.2(2) or 5.12.2.4.2(3).  IRM 5.12.2.5.3(1) (Nov. 9, 2015).

19   IRM 5.12.2.2(1) (Nov. 9, 2015).

001528

the collection process …."[20]  This guidance suggests the IRS is simply "checking the box" on contacting taxpayers without actually attempting meaningful contact to resolve the tax liability.

Under current procedures, the request for an NFTL filing or the appropriate non-filing documentation must be prepared within ten calendar days of the initial attempted contact or the initial actual contact with the taxpayer or his or her representative.[21]  A "contact," as defined in the IRM, is made by either a field contact, the preferred method for Revenue Officers; a telephone call; or mailing a notice or letter to the taxpayer's last known mailing address.[22]  As Figure 1.11.1 below illustrates, a majority of these attempted telephone calls by ACS using predictive dialers do not result in actual contact with the taxpayers.[23]

**FIGURE 1.11.1**[24]





Percentage of Predictive Dialer Outbound Calls in the
Automated Collection System (ACS) That Resulted in "No Contact"

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|
| Wage & Investment ACS | 50% | 46% | 66% | 55% | 60% | 71% |
| Small Business/Self-Employed ACS | 69% | 71% | 65% | 57% | 79% | 62% |

This ten-day timeframe is an incredibly short period to allow any "meaningful contact" to occur, let alone enable the taxpayer to provide the IRS with a clear picture of his or her current financial situation.  The IRS does not take into account the amount of time it takes for the taxpayer to contact the IRS and gather and send the necessary financial information or for the IRS to process and deliver that information.[25]

---

20  IRM 5.12.2.2(1) (Nov. 9, 2015).

21  IRM 5.12.2.3.2(1) (Oct. 14, 2013).  The NFTL determination is separate from the NFTL filing consideration.  The ten-day pre-filing consideration is a process of deciding whether to file, defer, or not file, an NFTL.  IRM 5.12.2.3(1) (Oct. 14, 2013).

22  IRM 5.12.2.2(2) (Nov. 9, 2015).  The IRS does not systemically track how often each "contact" method is utilized.  *See* SB/SE response to TAS information request (Nov. 6, 2015).

23  SB/SE response to TAS information request (June 10 and Oct. 19, 2015).

24  *Id.*  This does not include the limited number of "manual outbound calls" initiated by an ACS employee working an ACS case.

25  Over half of Accounts Management correspondence inventories are in "overage," meaning they have not been handled in the established timelines.  *See* IRS, Customer Account Services Accounts Management Paper Inventory Reports, *Inventory Age Report – All Programs* (week ending Sept. 30, 2015) (noting that 54 percent of Individual Master File Correspondence is in "overage").

001529

And, all this assumes the taxpayer receives correspondence about the NFTL and it is not returned to the IRS as undeliverable mail.[26]

Additionally, even if the taxpayer receives a notice or a phone message and attempts to call the IRS back at the number provided on the majority of notices, it is unlikely he or she will get through to the IRS to make payment arrangements prior to going into ACS. In fiscal year (FY) 2015, the level of service (LOS) for the Installment Agreement/Balance Due phone number was less than 40 percent.[27] Because of the poor level of service on the payment phone line, the IRS may view taxpayers as being unwilling to pay when they were actually trying to reach the IRS to set up payment plans. Consequently, given the short timeframes for taxpayer response, the IRS files NFTLs against taxpayers who are trying to reach the IRS but cannot. This situation not only harms taxpayers but also erodes trust in the IRS and can undermine future compliance.

### *The IRS Could Learn From Meaningful Contact Practices in the Financial Industry and Other Tax Administration Agencies*

The National Taxpayer Advocate has continuously discussed the importance and usefulness of meaningful contact, specifically personal contact, rather than simply mailing letters and providing taxpayers with information regarding their payment options.[28] In the private sector, creditors routinely use early intervention as a pre-collection mechanism.[29] It has become a standard in the mortgage industry for loan servicers to contact borrowers at least twice within the first 45 days of delinquency to discuss potential loss

---

26  *See* National Taxpayer Advocate 2013 Annual Report to Congress 157; National Taxpayer Advocate 2010 Annual Report to Congress 221-32 (Most Serious Problem: *The IRS Has Not Studied or Addressed the Impact of the Large Volume of Undelivered Mail on Taxpayers*).

27  IRS JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2015). The customer service representative (CSR) level of service for the Installment Agreement/Balance Due phone number in FY 2015 was approximately 37 percent. *Id.* Overall, taxpayers have to wait a significant amount of time on hold to actually speak with an assistor, and almost 18 million callers were disconnected via a "courtesy disconnect" message. *See* IRS, JOC, *Custom Report RRC 2015-1623* (including weekly data on the number of courtesy disconnects from FYs 2011 to 2015) (noting that 4,853,347 courtesy disconnects occurred in the "individual category" alone for FY 2015). The SB/SE ACS number, 800-829-3903, and the W&I ACS number, 800-829-7650, do have a significantly higher level of service, over 70 percent, but the taxpayer is not provided this number until after he or she has entered into ACS and the NFTL may have already been filed by ACS. IRS JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2015). For ACS incoming calls in FY 2015 the average handle time was 16.2 (W&I) to 16.5 (SB/SE) minutes and an average queue time of 12.8 (SB/SE) to 14.5 (W&I) minutes. SB/SE response to TAS information request (Oct. 19, 2015).

28  National Taxpayer Advocate 2011 Annual Report to Congress 336-47 (Most Serious Problem: *The IRS Does Not Emphasize the Importance of Personal Taxpayer Contact as an Effective Tax Collection Tool*); National Taxpayer Advocate 2010 Annual Report to Congress vol. 2, 40-70 (TAS Research Study: *An Analysis of the IRS Collection Strategy: Suggestions to Increase Revenue, Improve Taxpayer Service, and Further the IRS Mission*); National Taxpayer Advocate 2009 Annual Report to Congress 17-40 (Most Serious Problem: *One-Size-Fits-All Lien Filing Policies Circumvent the Spirit of the Law, Fail to Promote Future Tax Compliance and Unnecessarily Harm Taxpayers*); National Taxpayer Advocate 2008 Annual Report to Congress 114-25 (Most Serious Problem: *Navigating the IRS*); National Taxpayer Advocate 2006 Annual Report to Congress 62-82 (Most Serious Problem: *Early Intervention in IRS Collection Cases*), 83-109 (Most Serious Problem: *IRS Collection Payment Alternatives*), 110-29 (Most Serious Problem: *Levies*), 141-56 (Most Serious Problem: *Collection Issues of Low Income Taxpayers*); National Taxpayer Advocate 2004 Annual Report to Congress 226-45 (Most Serious Problem: *IRS Collection Strategy*). The National Taxpayer Advocate has also discussed in detail the impact of future compliance with meaningful contact in her prior reports. *See* National Taxpayer Advocate 2014 Annual Report to Congress 225-35 (Most Serious Problem: *Managerial Approval For Liens: The IRS's Administrative Approval Process for Notices of Federal Tax Lien Circumvents Key Taxpayer Protections in RRA 98*); National Taxpayer Advocate 2012 Annual Report to Congress 403-25 (Most Serious Problem: *Although the IRS "Fresh Start" Initiative Has Reduced the Number of Lien Notices Filed, the IRS Has Failed to Determine Whether Its Lien Policies Are Clearly Supported by Either Increased Taxpayer Compliance or Revenue*).

29  *See, e.g.*, National Service Bureau, *Pre-Collection Services (Early Intervention)*, *available at* http://www.nsbi.net/early-out-pre-collect (last visited Dec. 4, 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1538 of 4699 PageID #: 3603

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Because of the poor level of service on the payment phone line, the IRS may view taxpayers as being unwilling to pay when they were actually trying to reach the IRS to set up payment plans. Consequently, given the short timeframes for taxpayer response, the IRS files Notices of Federal Tax Liens (NFTLs) against taxpayers who are trying to reach the IRS but cannot.

mitigation options available.[30]  The Real Estate Settlement Procedures Act requires that the first contact, which must take place by the 36th day of delinquency, is a "live contact," or at least a good faith effort for live contact.[31]  Furthermore, tax administration agencies around the world, including Sweden, Australia, Norway, and New Zealand, successfully use reminders, specifically "gentle" reminders, to increase tax payment compliance and prevent enforcement measures.[32]  For example, New Zealand saw an increase of on-time payments by 12.6 percent between 2010 and 2013 by simply using short message service (SMS) to provide real-time reminders of key payments to a targeted group of taxpayers.[33]

Meaningful and personal contact, such as a "soft" letter followed by a telephone call, sends a timely message to a taxpayer.  Often a reminder is all that is necessary to resolve past-due debts prior to placing them in full collection.  It would be beneficial for the IRS, in terms of saving NFTL filing fees and promoting taxpayer rights and future compliance, to make multiple attempts to *contact* taxpayers by phone and through mailing monthly reminder notices (or SMS) instead of filing an NFTL after just one attempt.  The IRS could use technology, such as a predictive dialer system, to reach taxpayers proactively and utilize third-party databases, such as *LexisNexis® Accurint*, to find alternative numbers and addresses associated with taxpayers.[34]  However, given the current LOS and limited ability for taxpayers to reach the IRS via telephone, the IRS should expand the ten-day time frame to enable it to make meaningful contact with the taxpayer before making lien determinations.[35]

### A Thorough Analysis of the Taxpayer's Financial Situation Is Necessary to Make an Accurate NFTL Filing Determination

NFTLs are currently filed pursuant to strict business rules as opposed to a thorough review of the taxpayer's financial situation.  It was not until 2013, after consistent criticism from TAS, that the IRS added

---

30  The Consumer Financial Protection Bureau has incorporated the need for early contact with delinquent debtors in the 2013 updated mortgage servicing rules by requiring loan servicers to contact borrowers at least twice within the first 45 days of delinquency and discuss potential loss mitigation options available, if appropriate.  *See* 12 C.F.R. § 1024.39; Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10787-10807 (Feb. 14, 2013).

31  *Id.*

32  *See* OECD, Working Smarter in Tax Debt Management 44 (2014), *available at* http://www.keepeek.com/Digital-Asset-Management/oecd/taxation/working-smarter-in-tax-debt-management_9789264223257-en#page1. The use of reminders, specifically "gentle" reminders, has proven to be successful in increasing tax payment compliance and preventing enforcement measures in both Sweden and Australia.  *Id.*  Norway has seen a reduction in the need for "attachments" by 30 percent and a decrease in unsatisfied callers simply by sending gentler reminders.

33  *Id.* at Table 3.3 (2014) (stating that New Zealand saw an increase in on-time payments from 72 percent to 84.6 percent between 2010 and 2013 due to the use of SMS reminders to targeted groups of taxpayers).

34  Predictive dialer is a computer-based system that automatically dials groups of telephone numbers and then passes live calls to available CSRs.  *See, e.g.,* SpitFire Predictive Dialers, *available at* http://www.tmcnet.com/channels/predictive-dialer/ (last visited Dec. 4, 2015).  *See also* National Taxpayer Advocate 2012 Annual Report to Congress 526-36 (Legislative Recommendation: *Amend IRC § 7701 to Provide a Definition of "Last Known Address," and Require the IRS to Mail Duplicate Notices to Credible Alternative Addresses*); LexisNexis® Accurint, *available at* http://accurint.com/ (last visited Dec. 4, 2015). The IRM does instruct employees to "research" within 14 days to determine if there is a more current address available for re-issuance of the notice.  *See* IRM 5.19.6.17.4(1) (Oct. 15, 2014).

35  *See supra* note 27.

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1539 of 4699 PageID #: 4704

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

the lien determination pre-filing considerations to the IRM to assist employees in deciding whether to file an NFTL.[36]  The pre-filing considerations include:

(1) the taxpayer compliance history;

(2) taxpayer qualification for a determination exception;

(3) protection of the government's interest, including exigent circumstances, where the filing of an NFTL is necessary to protect those interests; and

(4) taxpayer's qualification for a determination that a NFTL filing will hamper collection.[37]

To ensure that the IRS is balancing the need to protect the government's interest with the taxpayer's right that the collection action be no more intrusive than necessary,[38] the IRS should complete a thorough analysis of the taxpayer's financial situation when it makes a lien determination.  At minimum, the IRS should complete a limited analysis of the taxpayer's financial situation, using a form similar to the Form 433-F, *Collection Information Statement*, to determine if the taxpayer has assets currently or will have assets in the foreseeable future.[40]  The IRS files approximately 21 percent of NFTLs automatically without human involvement in determining lien filing.[41]  Even in an automated environment, it should develop an automated basic financial analysis for NFTL filing determinations, through the use of credit scoring and automated asset verification, while elevating close call or complex cases to an employee.

### Using Technology and Databases to Improve Financial Analyses

The IRS is "one of the largest financial institutions in the world,"[42] but it is reluctant to implement financial analysis techniques and certain automation techniques used by modern financial institutions, including financial scoring, credit risk analysis, and modeling.  Several large credit scoring and credit analysis providers offer solutions to automate collection decisions.[43]  For example, *LexisNexis® RiskView™ Solutions* and *Accurint® for Collections: Decision Workflow* enables financial institutions and other creditors to access data from thousands of public sources to find court records, assets, and licenses, which can be factored into the determination of ability to repay, eligibility for a repayment plan, and recommendation of payoff amounts based on a comprehensive analysis of credit risk management data.[44]  The IRS can employ new techniques, widely used in the financial industry, to automate analysis and regular monitoring of internal and external sources.

---

36  IRM 5.12.2.3, *Notice of Federal Tax Lien Filing Determination (Pre-filing Considerations)* (Oct. 14, 2013).

37  IRM 5.12.2.3(3) (Oct. 14, 2013).  The IRM does not instruct employees to consider if the taxpayer is attempting to engage with the IRS through correspondence or phone.

38  *See* Taxpayer Bill of Rights, *The Right to Privacy*, *available at* http://www.taxpayeradvocate.irs.gov/taxpayer-rights/right-7.

39  IRC § 6320; IRM 5.12.2.3(2) (Oct. 14, 2013).

40  Form 433-F, *Collection Information Statement* (Rev. Jan. 2013), Catalog 62053J.

41  *See supra* note 5.  The IRS has provided that "lien filing determinations are not tracked," and thus it is not studying the number of lien determinations that are made, and of that number, how many resulted in a lien actually being filed and the length of time between the determination and filing.  SB/SE response to TAS information request (June 10, 2015).

42  IRS, *Careers Home*, *available at* http://www.jobs.irs.gov/student/accounting-budget-finance.html (last visited Dec. 4, 2015).

43  *See generally* Experian, *Financial Stability Risk Score*, *available at* http://www.experian.com/business-information/financial-stability-risk-score.html (last visited Dec. 4, 2015); Rosella, *Credit Risk Analysis and Modeling*, *available at* http://www.roselladb.com/credit-risk-analysis.htm (last visited Dec. 4, 2015); Rapid Insight® Analytics, *Predictive Modeling Software*, *available at* http://www.rapidinsightinc.com/products/analytics/ (last visited Dec. 4, 2015).

44  LexisNexis, *RiskView*, *available at* http://www.lexisnexis.com/risk/products/riskview-credit-risk-management.aspx (last visited Dec. 4, 2015); LexisNexis, *Accurint® for Collections: Decisioning Workflow*, *available at* http://www.lexisnexis.com/risk/products/collections/accurint-collections-decisioning.aspx (last visited Dec. 4, 2015).

001532

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1540 of 4699    PageID #: 5205

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

The IRS should develop a risk-scoring algorithm for meaningful NFTL filing determinations in an automated setting and regularly update these models to reflect actual and up-to-date data. Currently, the IRS does not utilize any risk-scoring system or business rules in determining when to consider the filing of an NFTL.[45] While there would be an initial investment in terms of programming costs, it would likely result in more efficient lien filing and would save the IRS expenses associated with the filing of liens against nonexistent assets.[46]

Any such model, however, must be built based on the fundamental principal that the IRS is not a business. That is, unlike private creditors, the IRS is not able to pick and choose with whom it wants to "do business." And unlike a business, the IRS cannot solely focus on the debtor's current tax debt; it must continue "doing business" with the taxpayer from year to year.[47] Future compliance is a predominant concern for any IRS risk scoring. Finally, it is vital that any IRS risk-scoring models are constantly updated with actual taxpayer behavior data.

At the very least, the IRS could replace the mandatory NFTL filing on currently not collectible (CNC) taxpayers and on taxpayers with no assets with a system of automated subsequent filing determinations. These automated subsequent filing determinations would be based on periodic monitoring of whether the taxpayers have acquired assets or their financial situations have improved by developing software that can incorporate analysis of information from *Accurint*® and IRS internal databases. This type of analysis would enable the IRS to continue to protect the government's interest in any future assets without unnecessarily harming taxpayers. The IRS currently allows employees to refile a NFTL, following extension of the collection statute expiration date, using their judgment rather than an arbitrary threshold amount.[48] It could also apply this approach to the original NFTL filing.

### *Updating IRS e-Guides to Incorporate Basic Financial Analysis on Taxpayers Prior to NFTL*

Another cost-effective way to operationalize the review of the taxpayer's financial condition, outside of the ACS lien filing, would be to update the IRS e-Guides with a series of questions determining if the taxpayer has or is likely to have assets to which a lien can actually attach.[49] The e-Guides would instruct IRS employees not to file a lien if they are unable to locate assets and to refrain from filing an NFTL within the ten-day period if no concerted effort is made to contact and speak directly with taxpayer.

---

45   SB/SE response to TAS information request (Nov. 6, 2015) (stating that the IRS does not currently use any "risk-scoring system or business rules in determining when to consider filing an NFTL").

46   In FY 2015, TAS had a closure rate with relief of 65 percent (603 cases) for lien release and approximately 68 percent (629 cases) for lien withdrawal. *See* TAS Business Performance Management System Report, *Closures – TAS Relief Rate by PCIC by BOD (FYs 2010-2015)*. The IRS has not done a comprehensive study on the costs associated with filing liens, for either individuals or businesses, since 1998, and that study was limited. *See* North Central DORA, South Texas DORA, *Federal Tax Lien Project, Project 13.14, Profile Report* (Dec. 1998).

47   Unlike a private creditor, the IRS cannot decide to never lend to a debtor again.

48   Upon the collection statute expiration date, the liability secured by lien becomes legally unenforceable. *See generally* IRC §§ 6325(a)(1) and 6502(a). The NFTL contains the self-releasing language that extinguishes the NFTL and underlying statutory lien. *See* Form 668(Y)(c), *Notice of Federal Tax Lien* (Rev. Feb. 2004). If the collection statute is extended or suspended on the underlying assessment, beyond the ten-year period, the NFTL must be refiled in the original jurisdiction to keep its priority back to the original filing date. *See* IRC § 6323(g).

49   E-Guides, or "electronic procedure guides," have been developed and used by the IRS for many years. They are formal guides for IRS employees that organize the different types of important processes and procedures in an easily accessible and usable way. *See* IRM 5.19.1.1(6) (Sept. 29, 2014).

001533

**Most Serious
Problems**

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

Appendices

The IRS should redefine the use of a Notice of Federal Tax Lien (NFTL) as a powerful collection tool based on meaningful and early contact with taxpayers, automation of financial analysis and asset verification, and the impact of NFTL filing on the taxpayer's financial viability and future compliance.

### Current Data Reveals That Early Interventions Drive the Collection of Revenue

TAS Research & Analysis is currently studying how the aging of a delinquency affects dollars collected on Taxpayer Delinquent Accounts (TDAs).[50] A study, set forth in Volume 2 of this report, examines the Individual Master File (IMF) Accounts Receivable Dollar Inventory (ARDI) to determine how dollars collected fluctuate as time elapses.[51]  The study determined that collection decreases as time passes, with dollar collections of over twice as much during the first year as in the second year, and over three times the collections in the third year.[52]  Furthermore, the study found that even within the first year, dollars collected decreased by about one-third after every three-month period elapsed.  Not only do raw dollars collected decrease, but the percent of the amount collected declines as time progresses with only about seven percent collected in the third year.[53]  This study clearly demonstrates the importance of early meaningful contact.  The IRS should use the data collected by TAS Research to revise its NFTL filing policies and increase its efforts to make early and frequent taxpayer contacts.

### *The IRS' Lien Pilot Program May Provide Significant Evidence of What IRS Actions Result in Revenue Collection*

In the summer of 2014, the IRS indicated its plan to revert back to the published NFTL filing threshold of $10,000 for ACS NFTL filings.[54]  After intervention by the National Taxpayer Advocate, the IRS agreed to conduct a lien filing pilot before it makes any changes in ACS filing threshold, to determine whether lowering the ACS NFTL filing threshold to $10,000 would result in enhanced protection of the government's interest and would facilitate the collection of delinquent tax liabilities.  The IRS anticipates starting the Collection Lien Pilot in February 2016.  The lien pilot program could become an excellent starting point in the development of a risk-scoring algorithm for meaningful NFTL filing determinations.

The National Taxpayer Advocate has suggested that the lien pilot program focus on the use of "meaningful contact" with taxpayers prior to the filing of the NFTL, rather than just studying the impact of different dollar thresholds, and examine the impact of NFTLs on future compliance.  Specifically, the National

---

50   *IRS Collectibility Curve*, vol. 2, *infra*.  In prior Annual Reports, the National Taxpayer Advocate has discussed how many TDAs in the IRS Automated Collection Branch and the Collection Field function are often delinquencies that have existed for many years.  The age of IRS TDA inventory is highlighted in the following statistics: (1) 55 percent of the IRS IMF TDA inventory has been in the function assigned the delinquency for at least ten months; however, the delinquency may have been in the TDA status much longer; (2) nearly 70 percent of the IMF TDAs in IRS inventory at the end of FY 2015 are Tax Year 2011 and prior liabilities; and (3) over 22 percent of the TDAs have less than four years remaining on the collection statute, meaning that the delinquency has existed for over six years.  IRS CAR, NO-5000-5 (Oct. 3, 2015).

51   *Id.*

52   *Id.*  The analysis showed that dollars collected decreased by over 50 percent from the first year to the second year and collection decreased in the third year by over 30 percent from the amount collected in the second year.

53   *Id.*  Although the balance of tax due continues to decrease slightly, the amount of assessed and accrued penalties and interest continue to rise.

54   *See* email from John Dalrymple, Deputy Commissioner for Services and Enforcement, to Nina Olson, National Taxpayer Advocate (Aug. 4, 2014).  IRM 5.19.4.5.3.2, *Filing Criteria* (Jan. 1, 2015) provides that a NFTL filing threshold is $10,000, not $25,000.

Taxpayer Advocate has recommended, and the IRS has accepted, the following four treatment groups for the lien filing pilots, plus a control group:

- Treatment Group 1 will provide for the IRS to file NFTLs on a group of taxpayers with cases in the queue with unpaid liabilities between $10,000 and $25,000.  TAS has requested that Collection ensure these taxpayers have been advised by someone in ACS that the NFTL will be filed and the pre-lien determination considerations in IRM 5.12.2.3 be used prior to the filing of a lien.

- Treatment Group 2 will receive a reminder notice that the taxes are still owed and that the taxpayers need to contact the IRS to resolve the delinquencies.

- Treatment Group 3 will receive a new notice that also provides more information about payment alternatives that may be available to the taxpayers.

- Treatment Group 4 will receive monthly reminder notices throughout the pilot period.

- The control group will follow the current process without any new treatment.

Using the treatment groups suggested by the National Taxpayer Advocate will result in measuring the impact of various types and frequency of contact with taxpayers instead of an automatic lien filing and would provide a basis for future NFTL filing criteria.

## CONCLUSION

The IRS's policy of filing NFTLs based on an arbitrary dollar threshold fails to take into account the taxpayers' ability to repay the liability and future compliance.  The IRS needs to utilize data analysis and the results of the lien pilot program to drive its decision on whether to continue using monetary thresholds to trigger NFTLs.  The IRS should redefine the use of an NFTL as a powerful collection tool based on meaningful and early contact with taxpayers, automation of financial analysis and asset verification, and the impact of NFTL filing on the taxpayer's financial viability and future compliance.  By developing modern, comprehensive, and automated financial analysis and using early intervention tools, including personal contact, the IRS will improve revenue collection and future compliance, and promote taxpayer *rights to a fair and just tax system* and *to privacy*.

001535

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1543 of 4699 PageID #: 4708

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise the IRM to require employees to make multiple attempts to initiate a meaningful personal contact with the taxpayer by phone or through mailing notices, instead of filing a NFTL after just one attempt. The IRS should adopt an early intervention policy similar to the new standard in the mortgage industry that requires two contacts, one of which is a person-to-person attempt, rather than simply mailing a letter.

2. The IRS should increase the ten-day timeframe for filing an NFTL to enable taxpayers to reach out to the IRS and provide financial information.

3. The IRS should continue to mail monthly notices to the taxpayers while the account is in the queue, ACS, or the field.

4. In collaboration with TAS, develop criteria for conducting the lien pilot as agreed upon with the National Taxpayer Advocate and refrain from decreasing the NFTL filing monetary threshold until the results of the lien pilot can be examined and discussed.

5. Amend the IRM and related e-Guides and training materials to incorporate rules for NFTL filing determinations. The rules should specify that the following items are needed prior to filing: "meaningful contact;" analysis of the taxpayer's financial situation, including a hardship determination if needed; consideration of collection alternatives; application of the balancing test, which is to balance the need for efficient collection of the tax with legitimate concerns of the taxpayer that actions be no more intrusive than necessary; and the impact on future compliance.

6. Incorporate credit scoring and automated asset verification into financial analysis for making NFTL filing determinations in ACS, with the provision to elevate close call and complex cases to a manager.

7. For accounts moving from ACS to the queue, revise the IRM to require employees to conduct a limited financial analysis based on a Form 433-F and refrain from filing an NFTL, if the employee has determined there are no assets or reasonable expectation of the taxpayer to acquire assets in the future.

8. Update the e-Guides with a series of questions determining if the taxpayer has or is likely to have assets to which an NFTL can actually attach.

MSP
#12

## THIRD PARTY CONTACTS: IRS Third Party Contact Procedures Do Not Follow the Law and May Unnecessarily Damage Taxpayers' Businesses and Reputations

### RESPONSIBLE OFFICIALS

Karen Schiller, Commissioner, Small Business/Self-Employed Division

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Privacy*
- *The Right to Confidentiality*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF PROBLEM

The IRS is generally required by Internal Revenue Code (IRC) § 7602(c) to give taxpayers reasonable advanced notice before making third party contacts (TPC) and to provide them with post-contact reports both periodically and upon request. Advance notice should allow taxpayers an opportunity to volunteer information that would, in many cases, make TPCs unnecessary, avoiding potential damage to the taxpayer's business and reputation.[2] The IRS often satisfies this requirement by including Publication 1, *Your Rights as a Taxpayer* (Pub 1), or a similarly general notice with its initial contact letter. These notices are ineffective because they do not identify the information the IRS needs, inform the taxpayer the IRS *will* make a TPC in the taxpayer's particular case, or provide the taxpayer with enough advanced notice to deliver the information before the contact.[3] TAS found that in cases where the IRS made TPCs, IRS employees did not first ask taxpayers for the specific information at issue in 22.8 percent of field exam cases and 11.1 percent of field collection cases.[4]

In addition, timely post-contact reports—*i.e.*, reports provided to taxpayers informing them of which TPCs were actually made—could help taxpayers mitigate damage caused by TPCs. However, they are also ineffective because the IRS does not provide them automatically (on a periodic basis), as required by

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See, e.g.*, S. Rep. No. 105-174 at 77 (1998).

3   The IRS may proceed with a TPC just ten days after sending the TPC notice or immediately after confirming its receipt. IRM 4.11.57.4.1.1.1, *Providing Notification Using Publication 1* (Dec. 20, 2011); IRM 25.27.1.3.1, *TPC Notification Procedures* (Jan. 16, 2014).

4   Unless otherwise indicated, the data in this discussion are drawn from a stratified random sample of 423 field collection and 485 field examination cases closed in fiscal year (FY) 2013 that TAS reviewed in 2015 (collectively, the "TPC Sample (2015)"). TAS reviewers could not determine if the IRS employee had first asked the taxpayer for this information in another 22.2 percent of the field exam cases and 14.0 percent of the field collection cases. TPC Sample (2015) (Q6). For a description of the sampling methodology and tables that show the extent to which the results can be projected to the population at a 95 percent level of confidence (*i.e.*, standard errors and confidence intervals), see the appendix. For example, although we estimate that Revenue Agents (RAs) did not ask the taxpayer for specific information before asking a third party 22.8 percent of the time, the size of our sample only allows us to be 95 percent confident that the true figure is between 10.8 and 41.7 percent for the population as a whole, as shown in the appendix.

001537

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

> The IRS is generally required by Internal Revenue Code § 7602(c) to give taxpayers reasonable advanced notice before making third party contacts... Advance notice should allow taxpayers an opportunity to volunteer information that would, in many cases, make third party contacts unnecessary, avoiding potential damage to the taxpayer's business and reputation.

IRC § 7602(c)(3), and taxpayers have no reason to request them unless they know the IRS has made a TPC. Moreover, TPC notices generally do not inform taxpayers of how to request a report.[5] Perhaps for these reasons, taxpayers did not request TPC reports in any of the 908 cases that TAS reviewed.[6] Even if a taxpayer requests one, the IRS does not have sufficient controls in place to ensure exceptions to the TPC reporting requirements are applied correctly or that the reports are complete. TAS found the IRS's TPC database, which it uses to generate these reports, was incomplete in 42.1 percent of field examination cases and in 48.5 percent of field collection cases.[7] Moreover, the IRS's case quality reviews do not effectively detect these discrepancies.

Addressing these problems would help minimize unnecessary damage to the taxpayer's reputation and business and further the taxpayer's *rights to be informed, to a fair and just tax system, to privacy, to confidentiality,* and *to challenge the IRS's position and be heard.*[8] Thus, the IRS's current TPC procedures dilute five of the ten taxpayer rights adopted by the IRS.

### ANALYSIS OF PROBLEM

#### When the IRS Contacts Third Parties, It Discloses Confidential Taxpayer Information Otherwise Protected Under IRC § 6103

In general, IRC § 6103 prevents IRS employees from disclosing confidential taxpayer information. If they unnecessarily disclose taxpayer information, the taxpayer may sue the IRS for damages.[9] However, IRS employees may disclose confidential return information to the extent necessary to conduct their official duties.[10] For example, IRS employees may need to disclose to a taxpayer's customers, employees, or colleagues that he or she is under investigation by the IRS to obtain information in connection with an examination or investigation. Some customers may decide to use other suppliers in light of the implication that the IRS suspects the taxpayer is a tax cheat or has unpaid tax liabilities. TAS's study found the IRS made TPCs in 68.1 percent of its field collection cases and 8.5 percent of its field examination cases.[11] Although in some instances damage to the taxpayer's reputation and business may be unavoidable, IRC § 7602(c) provides some procedural protection.

---

5   IRS training materials for TPC coordinators indicate that if a taxpayer requests a list from an IRS employee, the employee should forward the request to the TPC coordinator. IRS response to TAS information request (June 29, 2015).

6   TAS Sample (2015) (Q1 and Q11). Specifically, 284 of the 908 cases TAS reviewed had a non-exempt TPC and no one requested a TPC report.

7   TAS Sample (2015) (Q9). Please see the appendix for confidence intervals.

8   IRS Pub 1, *Your Rights as a Taxpayer* (Dec. 2014).

9   IRC § 7431; IRM 11.3.1.6.4, *Civil Liberty Under IRC § 7431* (May 24, 2005).

10  *See, e.g.,* IRC § 6103(k)(6); Treas. Reg. § 301.6103(k)(6)-1; IRM 4.2.5.3, *Investigative Disclosures* (July 29, 2011).

11  TPC Sample (2015) (Q1). Please see the appendix for confidence intervals.

### IRC § 7602(c) Requires the IRS to Notify Taxpayers Before Making TPCs and to Provide Them With Reports of TPCs

Enacted as part of the Internal Revenue Restructuring and Reform Act of 1998 (RRA 98), IRC § 7602(c)(1) provides that:

> An officer or employee of the Internal Revenue Service may not contact any person other than the taxpayer with respect to the determination or collection of the tax liability of such taxpayer without providing *reasonable notice in advance* to the taxpayer that contacts with persons other than the taxpayer may be made.  (Emphasis added).[12]

In addition to the advance TPC notice requirement, IRC § 7602(c)(2) requires the IRS to provide the taxpayer with a record of TPCs both "periodically" and upon request.  If taxpayers know which third parties the IRS contacted, they may be able to mitigate the resulting damage.

### The Advanced TPC Notice Requirement Is Supposed to Give Taxpayers an Opportunity to Volunteer Information

In describing the reasons for IRC § 7602(c), the Senate Committee on Finance report explains:

> [T]axpayers should be notified before the IRS contacts third parties regarding examination or collection activities with respect to the taxpayer.  Such contacts may have a chilling effect on the taxpayer's business and could damage the taxpayer's reputation in the community.  Accordingly, the Committee believes that taxpayers should have the *opportunity to resolve issues and volunteer information before the IRS contacts third parties*.[13]

The preamble to the Treasury Regulations reiterates that the TPC procedures:

> [E]nable a taxpayer to come forward with information required by the IRS before third parties are contacted.  The taxpayer's business and reputational interests therefore can be addressed without impeding the IRS' ability to make those third-party contacts that are necessary…[14]

Similarly, the current Internal Revenue Manual (IRM) acknowledges:

> [T]he intent behind this statute is to prevent the Service from disclosing to third parties that the taxpayer is the subject of a Service action without first providing reasonable notice to the

---

12  Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3417, 112 Stat. 685, 757 (1998). The language of IRC § 7602(c)(1) differs from the bill that passed in the Senate, which would have required the IRS to identify specific third parties.  H.R. 2676, § 3417, 105th Cong. 2d Sess. (May 7, 1998) (requiring the IRS to provide the taxpayer with "reasonable notice" of "such contact").  *See also*, Third Party Contacts, NPRM, 66 Fed. Reg. 77 (Jan 2, 2001) ("As originally drafted by the Senate Finance Committee, the third-party contact rule would have prohibited most IRS contacts with third parties prior to taxpayer notification of the specific contact to be made... The requirement for specific pre-contact notice was modified by the Conference Committee to require only a generalized notice of IRS intent to contact third parties…").  If this change was based on a concern that if the taxpayer knew who the IRS would contact he or she might try to influence a third party's testimony, it would still be reasonable to expect the IRS to give the taxpayer advanced notice of the specific information it would seek from third parties if not provided by the taxpayer.

13  S. REP. NO. 105-174 at 77 (1998) (emphasis added).  The Conference Report explains the IRS will provide "reasonable notice in advance to the taxpayer that the IRS may contact persons other than the taxpayer," and contemplates that it will "be provided as part of an existing IRS notice."  Conf. Rept. 105-599 at 277 (1998).  Thus, the IRS could include a specific TPC notice in an existing notice or letter, such as an information document request (IDR) or in correspondence confirming its receipt or non-receipt of the taxpayer's response to an IDR.  The IRS could revert to its practice of using IRS Letter 3164-G (DO), *(Exam-3) Third Party Contact Letter*, for this purpose.

14  T.D. 9028, 67 Fed. Reg. 77,419, 77,420 (Dec. 18, 2002) (emphasis added).  *See also* Chief Counsel Advice (CCA) 200109047 (2001) ("[T]he congressional intent behind these requirements is to provide taxpayers with the opportunity to come forward with information before third parties are contacted and the means to address any reputational concerns arising from such contacts…").

001539

taxpayer and allowing the taxpayer an opportunity to provide the information and resolve the matter.[15]

When the TPC is to verify information already provided by the taxpayer, a reasonable notice can be less specific because the taxpayer is unlikely to avoid it by providing the verification.[16]  When the TPC is to obtain information, however, reasonable advanced notice may require the IRS to identify the specific information it needs so the taxpayer can avoid the contact by either providing the information or resolving the matter.  Indeed, practitioners, including representatives of the State Bar of California Tax Section, have complained that the IRS's current TPC notice process does not give taxpayers a realistic opportunity to provide the information (or to resolve the matter) and avoid TPCs.[17]

### TPC Notices Can Be So Vague That the Taxpayer Has No Opportunity to Provide the Information

The IRM explains that "*[G]enerally*, contacts with third parties are made when the examiner is unable to obtain the information from the taxpayer or when it is necessary for the examiner to verify the information provided by the taxpayer."[18]  However, it does not actually require the employee to first request the information from the taxpayer or even disclose what information the examiner plans to seek from third parties.

The IRS uses Pub 1 and various other documents to satisfy the TPC notice requirement.[19]  They generally include language such as the following:

> Generally, the IRS will deal directly with you or your duly authorized representative. However, we sometimes talk with other persons if we need information that you have been unable to provide, or to verify information we have received.  If we do contact other persons, such as a neighbor, bank, employer, or employees, we will generally need to tell them limited information, such as your name.  The law prohibits us from disclosing any more information than is necessary to obtain or verify the information we are seeking.  Our need to contact other persons may continue as long as there is activity in your case.  If we do contact other persons, you have a right to request a list of those contacted.[20]

---

15  IRM 4.11.57.2(3) (Jan. 17, 2014) (emphasis added).  *See also* IRM 4.10.3.2.1.4, *Third Party Interviews* (Mar. 1, 2003).

16  *See, e.g.*, Treas. Reg. § 301.6103(k)(6)-1(d) (Ex. 1) ("In contacting the suppliers, the revenue agent discloses the taxpayer's name, the dates of purchase, and the type of merchandise at issue.  These disclosures are permissible under section 6103(k)(6) because, under the facts and circumstances known to the revenue agent at the time of the disclosures, the disclosures were necessary to obtain information (corroboration of invoices) not otherwise reasonably available because suppliers would be the only source available for corroboration of this information.").  An IRS CCA has approved the practice of sending general notices to verify wage information—a context in which less specific notice may, in fact, be reasonable.  CCA 200814008 (Apr. 4, 2008).

17  *See, e.g.*, Kevan P. McLaughlin, State Bar of California Tax Section, *Balancing Privacy and Efficiency Under Section 7602:  What Is "Reasonable Notice" and Changing IRS Procedures Related to Third Party Contacts* (2012); Systemic Advocacy Management System (SAMS), Submission 26446 (Feb. 5, 2013).

18  IRM 4.11.57.4(1) (Dec. 20, 2011) (emphasis added).  *See also* IRM 4.32.2.7.3.2(3) (2012) ("Examiners should attempt to obtain the information in writing from the promoter before contacting any third parties."); IRM 25.27.1.3, *Notification Requirements* (Jan. 16, 2014) ("It is the Service's practice to obtain information relating to a liability or collectability determination directly from the taxpayer whenever possible."); IRM 4.10.3.2.1.4(2) (Mar. 1, 2003) ("Information will be collected, to the greatest extent practicable, directly from the taxpayer to whom it relates… Information about taxpayers collected from third parties will be verified to the extent practicable with the taxpayer before action is taken.").

19  *See, e.g.*, IRM 25.27.1.3 (Jan. 16, 2014).  For example, Letters 3164, 3230, 3232, 3234, 3236, 3238, 3345, 3404, 4464, and Notice 1219 all contain TPC language.

20  IRS Pub 1, *Your Rights as a Taxpayer.*

This language is vague.  It does not even reveal whether the IRS plans to make a TPC in the taxpayer's particular case.  Moreover, the IRS generally delivers the TPC notice with the initial contact letter—potentially before the IRS has requested any information from the taxpayer.[21]  Finally, this language fails to disclose that the IRS is required to provide the taxpayer with periodic reports of the TPCs it makes.  Instead, the IRS ignores the law and places the burden on the taxpayer to request such reports (as discussed below).

### The IRS No Longer Provides a Second, More Specific TPC Notice

The IRS used to provide more specific TPC notices.  In testimony before the Senate Finance Committee on February 2, 2000, Commissioner Rossotti explained that:

> When we first implemented this provision [TPC notices], we attempted a "one size fits all" approach by sending a broadly written notice to virtually every taxpayer in our administrative stream… The reaction was immediate, strong, and negative.  We were told that the generic nature of the notice did not provide its recipients with any indication of why we would contact third parties to talk about their tax situations or what information we would seek.[22]

Accordingly, under IRS procedures in effect between 2000 and 2005, the IRS issued a general TPC notice followed by a more detailed one.[23]  The second notice was more likely to alert the taxpayer that the IRS was actually planning to make TPCs unless it received additional information from the taxpayer.  These notices included a specific IRS employee's contact information and sometimes even identified the specific information that the IRS needed or needed to verify and why.  For example, Letter 3164-G (DO), *(Exam-3) Third Party Contact Letter*, specifies the information the IRS needs and the date it was requested from the taxpayer.  Similarly, Letter 3164-F (DO), *(Exam-2) Third Party Contact Letter*, identifies the specific information the IRS needs to verify.[24]

---

21  IRM 4.10.2.7.4.2, *Contacting the Taxpayer by Letter* (Apr. 2, 2010) (requiring Pub 1 to be included with the initial contact letter).

22  *Hearing Before the S. Finance Comm. on Status of IRS Reform*, 106th Cong. 2nd Sess. 46 (2000) (testimony of IRS Commissioner Rossotti).

23  The IRS previously sent Notice 1219, which included language similar to Pub 1, and then followed up with one of the more specific versions of Letter 3164.  *See, e.g.*, IRM 4.10.1.6.12.2.1(5), *Notification Procedures* (May 14, 1999) ("CAUTION: Providing the taxpayer with Notice 1219 alone does not constitute adequate notification of third party contacts.  It must be attached to another letter that contains the required information found in Letter 3164: date, taxpayer's name, address and TIN, employee's name, telephone number, identification (badge) number and officer hours, tax form, type of tax and tax period(s).").  The 1999 version of IRM 4.10.1.6.12.2.1, which described this two-notice process, remains a part of the current IRM, but it conflicts with more current guidance, which states that a second more-specific TPC notice is not required.  *See, e.g.*, IRM 4.11.57.4.1.1, *Procedures for Providing Advance General Notice That Third Parties May Be Contacted* (Dec. 20, 2011); IRM 25.27.1.3.1, *TPC Notification Procedures* (Jan. 1, 2014); IRM 4.8.8.18.1(2) (July 1, 2011).  *Accord*, T.D. 9028, 67 Fed. Reg. 77,419, 77,420 (Dec. 18, 2002) (describing "general pre-contact notice followed by post-contact identification…").

24  Letter 3404C, *AUR Third Party Contact*, even identifies the third parties to be contacted.  By contrast, Letter 3164-N, *Third Party Contact to Preparers*, and Letter 3164-P, *Third Party Notification for IRC 6700/6701 Investigations*, provide more generic statements such as the one quoted above.

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1549 of 4699 PageID #:  4714

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

However, the IRS has reverted to its prior practice of providing a single generic notice. According to the current IRM, Letters 3164-G and 3164-F "are no longer applicable because notice is given via Pub 1."[25] This guidance may suggest that those who take the trouble to identify and request the specific information from the taxpayer before making a TPC to obtain it are going beyond what is required. TAS found that in 22.8 percent of field exam cases and 11.1 percent of field collection cases IRS employees did not ask taxpayers for such specific information before making TPCs to obtain it.

**FIGURE 1.12.1**[26]



### Did the Revenue Agent/Officer Ask the Taxpayer for the Information Before Requesting it From a Third Party?



| | Undetermined | No |
|---|---|---|
| Field Collection | 14.0% | 11.1% |
| Field Exam | 22.2% | 22.8% |

■ Undetermined  ■ No  ■ Yes

## The IRS Does Not Provide TPC Notice Far Enough in Advance to Allow the Taxpayer to Provide the Information

Even if the IRS were to give taxpayers meaningful advance TPC notice (*e.g.*, by using Letter 3164-G or something similar), IRS employees can make TPCs just ten business days after sending it or immediately after they deliver it by hand or otherwise confirm its receipt.[27] TAS's review found that IRS employees did not even wait this long in 5.3 percent of the field collection cases and in 2.3 percent of the field exam cases.[28] Similarly, an IRS review of 39 field examination cases closed without agreement in

---

25  IRM 4.11.57.4.1.1, *Procedures for Providing Advance General Notice That Third Parties May Be Contacted* (Dec. 20, 2011). *See also*, IRM 25.27.1.3.1, *TPC Notification Procedures* (Jan. 1, 2014) ("If the appropriate Letter 3164 **or** Publication 1 (Pub 1), *Your Rights as a Taxpayer*, version dated 09/2012 has been sent and the requisite waiting period has lapsed, the employee may seek additional information." (Emphasis added)); IRM 4.8.8.18.1(2) (July 1, 2011) (explaining, "[P]reviously, the advance general notice of potential third-party contact was usually accomplished by issuance of one of several versions of Letter 3164, *Third Party Notice*. In May 2005, Pub 1, *Your Rights as a Taxpayer*, was revised to include the advance general notice of potential third-party contact that is required by IRC § 7602. This revision is consistent with the amendment of IRC § 7602, as the Conference Committee Report (H.R. Conf. Rep. 105-599) for that section specifies, '[I]t is intended that in general this notice will be provided as part of an existing IRS notice provided to taxpayers.'"). *Accord* IRM 5.1.1.10.1, *TPC Advance Notification Procedures* (May 15, 2014) ("Letter(s) 3164 B or C (DO) are not required prior to making a third party contact as long as the revenue officer can verify through ICS that the taxpayer has received a Pub 1 (Rev. 05/2005) and/or Notice CP-504 or Notice CP-518.").

26  TPC Sample (2015) (Q6). Although we estimate that RAs and ROs did not ask the taxpayer for specific information before asking a third party 22.8 and 11.1 percent of the time (respectively), the size of our sample only allows us to be 95 percent confident that the true figure is within the range of 10.8 to 41.7 percent for RAs and 7.8 to 15.6 percent for ROs, as shown in the appendix.

27  IRM 4.11.57.4.1.1.1, *Providing Notification Using Publication 1* (Dec. 20, 2011); IRM 25.27.1.3.1, *TPC Notification Procedures* (Jan. 16, 2014).

28  TPC Sample (2015) (Q5).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1550 of 4699 PageID #: 10515

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

fiscal year (FY) 2014 found that in 13 percent, the examiner did not provide the taxpayer with appropriate advanced notice of the TPC.[29]

In addition, practitioners have complained that a TPC notice delivered immediately before the contact leaves the taxpayer with no opportunity to provide information to the IRS.[30]  Even ten days is not likely to give the taxpayer enough time to obtain information (potentially from third parties) and deliver it to the IRS, assuming the notice is specific enough that the taxpayer knows what information the IRS needs.

### The IRS Provides a Specific and Timely Notice When It Issues a Third-Party Summons

In contrast to other TPCs, when the IRS issues a third-party summons, it is generally required to give the taxpayer a copy of the summons that identifies a specific third party, the information being summoned, and a discussion of the taxpayer's right to bring an action to quash the summons.[31]  Such specific information is necessary to empower the taxpayer to provide the information or initiate proceedings to quash the summons before it is executed.

The IRS could potentially reduce internal paperwork while increasing the transparency of its third party contacts by providing the taxpayer with a copy of any written request for information from (or an interview with) a third party, instead of sending Form 12175 to the third party contact coordinator.

The IRS generally must provide the taxpayer with a copy of the summons within three days of issuing it and no later than 23 days before the third party is required to respond.[32]  A taxpayer would probably need at least as much time to gather information (potentially from a third party) and transmit it to the IRS, as contemplated by the TPC notice requirement.  Thus, unlike the TPC notice, the third-party summons notice identifies the information the IRS needs, who the IRS believes may have it, and is delivered to the taxpayer far enough in advance that the taxpayer has an opportunity to obtain and deliver the information to the IRS (making summons enforcement unnecessary) or take action to quash it.

### Increased Transparency Could Reduce the Resources Needed to Track and Report TPCs

To comply with the requirement to provide taxpayers with a record of TPCs, IRS employees record them on Form 12175 (in addition to their normal case activity record) and send it to a TPC coordinator, so that the coordinator can track and report TPCs to the taxpayer upon request.[33]  This paperwork is not required with respect to TPCs already provided to the taxpayer.[34]  For example, if the IRS gives the taxpayer a copy of a third-party summons, the taxpayer already has a record of the TPC.  For this reason, IRS employees do not need to track third-party summons, provide them to the TPC coordinator, or include them in TPC reports provided to the taxpayer.[35]  Thus, the IRS could potentially reduce internal paper-

---

29   SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Processes* 4-5 (Oct. 30, 2015).  This was a review of cases involving non-filers, return preparers, or information reports that were closed unagreed in FY 2014 with TPCs that were documented by examiners on contact sheets.  *Id.*  Unlike the cases TAS reviewed, SB/SE's cases were not selected using a random sampling methodology.  *Id.*  Examiners are not required to ask the taxpayer for the information before asking a third party, and SB/SE's review did not consider whether examiners had done so.

30   *See, e.g.,* Kevan P. McLaughlin, State Bar of California Tax Section, *Balancing Privacy and Efficiency Under Section 7602: What Is "Reasonable Notice" and Changing IRS Procedures Related to Third Party Contacts* (2012).

31   IRC § 7609(a).

32   *Id.*

33   IRM 25.27.1.4, *Recording and Reporting TPCs* (Jan. 16, 2014).

34   Treas. Reg. § 301.7602–2(e)(3).

35   Treas. Reg. § 301.7602-2(e)(4) (Example 4); IRM 4.11.57.5.1, *Documentation of Contact Not Required* (Jan. 17, 2014).

work while increasing the transparency of its TPCs by providing the taxpayer with a copy of any written request for information from (or an interview with) a third party, instead of sending Form 12175 to the TPC coordinator.

### The IRS Is Violating the Law by Failing to Provide Taxpayers With Periodic Reports

The IRS only provides post-contact reports to taxpayers upon request. It does not provide them to taxpayers "periodically," as required by IRC § 7602(c)(3).[36] The IRS's failure to provide "periodic" TPC reports violates IRC § 7602(c)(3). Although the IRS proposed regulations that would have implemented periodic reporting, the final regulations omit these provisions, explaining that the IRS and Treasury "determined that the issuance of periodic reports may result in harm to third parties and, accordingly, has determined that periodic reports should not be issued."[37] It does not indicate hat TPC reports are optional under the law

The IRS may take the position it is not violating the law because the regulation implicitly presents a re-interpretation of the statutory requirement, but the language in the preamble seems more properly described as an explanation for why the IRS has decided to violate the law. A regulatory preamble does not carry the same force as a regulation. Moreover, even a regulation that had been subject to notice and comment (and the preamble to the final regulations was not) could not overturn such a clear statutory mandate under *Chevron* step-one.[38]

In addition, the reason given by the preamble (*i.e.*, "harm to third parties") does not make sense. The regulations already protect third parties by providing that the IRS will withhold the identity of those who may be subject to reprisal.[39] It would be illogical to withhold TPC reports from taxpayers to protect third parties whose identities would not be disclosed on those reports.[40] Further, if the government were concerned about harm to the third parties, it is unclear why it would nonetheless provide *ad hoc* reports upon request that would reveal their identities. Although the IRS may now speculate that it was concerned that third parties who do not express any fear of reprisal could, in fact, be harmed if periodic reports were delivered, it did not express this concern in the preamble to the regulations (and there does not appear to be any evidence to support it) or present any other evidence for its disregard of a statutory taxpayer protection.

---

36  IRM 4.10.1.6.12.3, *Providing Taxpayers With Notice of Third Party Contacts* (May 14, 1999) states that the IRS will provide the taxpayer with a list of TPCs once per year, but it became obsolete once the IRS issued Treasury Regulations in 2002. T.D. 9028, 67 Fed. Reg. 77,419, 77,420 (Dec. 18, 2002). *See also* IRM 4.11.57.4.6, *Provide a List to the Taxpayer* (Dec. 20, 2011). A seemingly obsolete IRS training document directs employees to inform third parties their name will appear on a list of contacts that will be sent to the taxpayer "once a year" unless the third party indicates that including his or her name may result in reprisal. IRS response to TAS information request (June 29, 2015). TAS has also confirmed with TPC coordinators that they do not send periodic reports.

37  *Compare Third Party Contacts*, NPRM, 66 Fed. Reg. 77-84 (Jan 2, 2001) (proposed regulations), *with* T.D. 9028, 67 Fed. Reg. 77,419, 77,420-25 (Dec. 18, 2002) (final regulations). Contemporaneous news reports of an employee in Wakefield, Massachusetts who killed seven co-workers after learning about a pending wage levy could have colored the IRS's thinking about the periodic reporting requirement. *See* Carey Goldberg, *7 Die in Rampage at Company; Co-Worker of Victims Arrested*, N.Y. Times (Dec. 27, 2000), *available at* http://www.nytimes.com/2000/12/27/us/7-die-in-rampage-at-company-co-worker-of-victims-arrested.html. However, this particular shooting occurred before the IRS issued the proposed regulations that would have provided periodic reports. Moreover, the IRS could not have concealed a wage levy from the shooter in any event.

38  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). A court only gives deference to agency regulations under *Chevron* step-two, if it first determines the statute is ambiguous under *Chevron* step-one. *Id.*

39  Treas. Reg. § 301.7602-2(f)(3).

40  However, SB/SE found that field examiners did not document consideration of reprisal in any of the TPC cases it reviewed. SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Processes* 1 (Oct. 30, 2015). SB/SE suggested this may result, in part, because 70 percent of the TPCs in the cases it reviewed were conducted using Letter 1995, which was last revised in 1985, before IRC § 7602(c) was enacted, and does not include any language concerning reprisal. *Id.* at 6.

Further, there is a difference between requiring the IRS to provide periodic TPC reports and merely making them available upon request. Many taxpayers who would want to know who the IRS contacted will not know that any contacts were made. Providing TPC reports only upon request also burdens taxpayers to take action where otherwise they would be informed of TPCs automatically. Inasmuch as Congress enacted the periodic reporting requirement to empower taxpayers to repair their reputations, and to ensure that taxpayers know what the IRS is doing, the IRS's nullification of the periodic reporting requirement frustrates that purpose.

Finally, to the extent the IRS gives the impression it is ignoring the law, it may encourage taxpayers to ignore tax laws. It will also seem hypocritical when the IRS enforces them.

### The IRS Should Do More to Empower Taxpayers to Receive TPC Reports

Because the IRS does not send periodic TPC reports, it is even more important for it to empower taxpayers to request TPC reports so that they can mitigate damage from the TPCs. However, the IRS no longer informs taxpayers when it makes a TPC, nor does it explain how to request a list of TPCs.[41] Perhaps for these reasons, taxpayers did not request TPC reports in any of the 908 cases that TAS reviewed.[42] Thus, the IRS should do more to alert taxpayers when TPCs have been made and explain how they can request TPC reports.

### There Are No Effective Remedies for Taxpayers Harmed by the IRS's Violation of the TPC Notice and Reporting Requirements

If IRS employees violate the TPC notice requirements or erroneously omit TPCs from the list provided to the taxpayer, taxpayers have little recourse. In theory, a taxpayer may seek to quash a third-party summons on the basis that the IRS failed to follow IRC § 7602(c), but those who receive Pub 1 before the IRS issues a summons are unlikely to prevail.[43] Moreover, if a third party provides information voluntarily, the IRS would have no reason to issue a summons. In limited circumstances, a taxpayer may also seek to recover actual civil damages resulting from an IRS employee's failure to follow procedures in connection with a third party contact.[44] However, Chief Counsel Advice (CCA) suggests the IRS has never been sued on this basis because it is difficult for taxpayers to show actual damages.[45] Without judicial remedies for the violations of the important taxpayer protections afforded by IRC § 7602(c), taxpayers depend on the IRS's internal controls to ensure employees comply with the law.

---

41  For example, neither Pub 1 nor Letter 3164-N, *Third Party Contact to Preparers*, explain who a taxpayer should call or write to in making the request and whether any particular form is required.

42  TPC Sample (2015) (Q1 and Q11). Specifically, 284 of the 908 cases TAS reviewed had a non-exempt TPC and no one requested a TPC report.

43  *See, e.g., U.S. v. Jillson*, 84 A.F.T.R.2d 99–7115 (S.D.Fla.,1999) (unreported) (quashing summons issued before TPC notice); *Gangi v. U.S.*, 107 A.F.T.R.2d 2011-1542 (D.N.J. 2011) (unreported), *aff'd* 453 Fed. App'x. 255 (3rd Cir. 2011) (same). *But see, e.g., Thompson v. U.S.*, 102 A.F.T.R.2d 2008-6130 (S.D. Tex. 2008) (unreported) (refusing to quash a summons issued after TPC notice included in Pub 1); *Gangi v. U.S.*, 2 F.Supp.3d 12 (D. Mass. 2014) (same).

44  *See, e.g.*, IRC §§ 7433 (damages for unauthorized collection actions by the IRS); 7433A (damages for unauthorized collection actions by contractors). Taxpayers can also sue for damages if an IRS employee unnecessarily discloses taxpayer information protected by IRC § 6103. IRC § 7431; IRM 11.3.1.6.4, *Civil Liberty Under IRC § 7431* (May 24, 2005).

45  *See, e.g.*, CCA 201307191507492 (2013) ("There is no independent cause of action for violating third-party contact rules. As far as we are aware, the IRS has never been sued for violating the third-party contact rules, though taxpayers have occasionally attempted to assert these types of violations as a defense to summons enforcement or collection actions. In theory, a violation of section 7602(c) might support a suit by a taxpayer against the IRS under section 7433. However, section 7433 only allows a taxpayer to recover actual, direct economic damages and court costs. It is unclear what actual, direct economic damage a taxpayer would suffer as a result of a violation of section 7602(c).").

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1553 of 4699 PageID #: 4718

Most Serious
Problems

Most Serious
Recommendations

Most Litigated
Issues

### Without Sufficient Oversight, Employees Could Fail to Record TPCs on the Database or Apply the "Reprisal" Exception Excessively

#### Low-Graded IRS Employees Are Authorized to Make Reprisal Determinations Without Oversight

There are several exceptions to the TPC notice and reporting requirements, including situations where an IRS employee has "good cause to believe" that disclosure of the contact "may cause any person to harm any other person in any way" (*i.e.*, a risk of reprisal).[46]  The IRS has delegated the authority to make such determinations to low-graded (GS-4 and GS-5) employees.[47]  Employees are not required to investigate a third party's reprisal claim, but they should be required to document some valid basis for the determination (*e.g.*, that a third party expressed a fear of reprisal rather than simply "a preference not to be named).[48]  One commentator argued that because "good cause" is a low standard that is determined solely by the IRS employee making the contact, it would make them a "nullity."[49]  The commentator recommended that reprisal determinations be documented and subject to supervisory review, but this comment was rejected without explanation.  Nonetheless, it would make sense for a supervisor to ensure the employee considered reprisal and included some valid reason for any reprisal determination in the file.

#### Post-Examination Quality Reviews May Not Reliably Identify Third Party Contact Problems

After the IRS closes an examination, its technical services function may review whether the examiner documented any applicable exceptions to the reporting requirements.[50]  However, the reviewer would not necessarily look for anything more than something like: "No third party reporting is required because there is a risk of reprisal" (or some other conclusory justification).[51]  Thus, an employee is not necessarily required to document the "good cause" underlying his or her reprisal determination.  Although TAS's sample included only seven reprisal determinations (six in collection and one in exam), employees did not document the reasons for those determinations in any of the cases TAS reviewed.[52]

In theory, Field Exam National Quality Review System Attribute 617, which covers whether the taxpayer was "advised of all rights and kept informed throughout the examination process," could cover failures to provide advanced notice of third party contacts.[53]  Because the IRS does not associate a "reason code" with third party contact rule violations, however, the only way to determine if a failure for "other" reasons

---

46  Treas. Reg. § 301.7602-2(f)(3); IRM 4.11.57.4.2.3, *Reprisal* (Jan. 17, 2014); IRM 25.27.1.3, *Notification Requirements* (Jan. 16, 2014).

47  Authority to make the reprisal determination is delegated to Revenue Agents, Examination Aides, Tax Auditors, Revenue Officers, Tax Compliance Officers, Bankruptcy Specialists, GS-4 Tax Examiners, GS-5 Revenue Officer Aides, GS-5 Correspondence Examination Technicians, and GS-5 ACS Collection Representatives, among others.  *See* IRM 1.2.52.13, *Delegation Order 25-12 (Rev. 1)* (May 22, 2009).

48  Treas. Reg. § 301.7602-2(f)(3)(i) ("A statement by the person contacted that harm may occur against any person is sufficient to constitute good cause for the IRS employee to believe that reprisal may occur.  The IRS employee is not required to further question the contacted person about reprisal or otherwise make further inquiries regarding the statement"); Treas. Reg. § 301.7602-2(f)(3)(ii) (Ex. 1) (explaining a "contact is not excepted from the statute merely because the... [third party] asks that his name be left off the list of contacts.").

49  T.D. 9028, 67 Fed. Reg. 77,419, 77,420 (Dec. 18, 2002).

50  IRM 4.8.8.18.3(3) (Dec. 6, 2013) ("The reviewer will review Form 9984 to ensure that the examiner documented whether the exceptions to the notice requirements of IRC 7602(c) applied...").

51  Although not required by the current IRM, seemingly-obsolete training for TPC coordinators states that "[E]mployees *should* document the case file with the facts surrounding the decision and complete a Form 12175 as outlined above to document the reprisal determination."  IRS response to TAS information request (June 29, 2015) (emphasis added).

52  TPC Sample (2015) (Q8).

53  SB/SE, *Field Compliance Embedded Quality, Field Examination Attribute Job Aid*, Doc. 13128 (Dec. 2014); IRM Exhibit 4.8.3-1, *Quality Attributes* (Mar. 21, 2013).

is due to third party contact problems is to review the narrative provided by the reviewer.[54]  When the IRS searched the narratives for FYs 2012-2014 cases closed by Small Business/Self-Employed (SB/SE) Division Revenue Agents (RAs) and Tax Compliance Officers (TCOs) that failed Attribute 617 for "other" reasons, it found no mention of third party contact violations.  This may suggest that reviewers were not looking for such violations, perhaps because there was no reason code for them or because they were difficult to detect.[55]

One reason TPC reporting violations are difficult to detect is because employees are not always required to include the TPC's identity on Form 12175 or the TPC database.  For example, the contact's name is omitted from the form when there is a risk of reprisal.  To identify an incorrectly excluded contact, a reviewer would have to compare the TPCs in the paper case file (if any) with the number and date of those reflected in the TPC database.  TAS's review found that in 42.1 percent of the field exam cases non-exempt TPCs were missing from the TPC database.[56]  Similarly, in a limited one-time review of certain field exam cases with TPCs, SB/SE found that in 36 percent, examiners did not properly document TPCs reflected in case histories on Form 12175.[57]  Even where Form 12175 was used, only about 71 percent of the case histories included information about the contact.[58]  Thus, it appears that the IRS's regular field exam quality reviews do not effectively capture such omissions.

### Post-Collection Quality Reviews May Not Reliably Identify Third Party Contact Problems

The IRS also reviews closed collection cases to identify errors on specific quality attributes.  Field collection quality Attribute 607 addresses whether "the Third Party Contact Database was [not] updated when identifiable third party contact was made."[59]  The IRS's Integrated Collection System (ICS) functions as a Revenue Officer's (RO) case activity record.  It automatically updates the TPC database whenever a RO records an activity that involves a TPC (e.g., a levy).  The RO records such activities by selecting them from a "pick list."  Except for cases involving Trust Fund Recovery Penalties or manual levies where the RO might instead use Form 12175, it is difficult for an RO to avoid updating the TPC database if he or she selects the appropriate pick list item.[60]  Nonetheless, in nearly half (48.5 percent) of field collection cases TAS found non-exempt TPCs that were omitted from the TPC database.[61]

---

54  SB/SE RAs scored between 82.4 and 90.9 percent on attribute 617 over the last three years (FY 2012-2014) and SB/SE TCOs scored between 94.0 and 95.3 over the same period.  IRS response to TAS information request (May 18, 2015).

55  IRS response to TAS information request (May 18, 2015).  When it conducted the same review for RAs in Specialty Excise or Employment Tax, SB/SE found a few references to noncompliance with the third party contact rules.  *Id.*  These comments were associated with attribute 409 (appropriate procedural actions) or 609 (confidentiality), however.  *Id.*

56  TPC Sample (2015) (Q9).  As noted below, TAS's review also identified nonexempt TPCs that were omitted from the TPC database in 48.5 percent of the field collection cases.  *Id.*  These omissions often (in 94.5 percent in exam cases and 34.5 percent in collection cases) occurred because the RA or RO did not send Form 12175 to the TPC coordinator, or in 57.2 percent of the collection cases, because the RO did not use the proper pick list item, as discussed below.  *Id.* (Q10).

57  SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Emphasis* 5-6 (Oct. 30, 2015).

58  *Id.*

59  SB/SE, *Field Compliance Embedded Quality Field Collection (FC) Job Aid*, Doc. 12359, 27-28 (Dec. 2014) (Reason Code 5).

60  IRM 5.1.1.10.2, *TPC Reporting and Recording Procedures* (May 15, 2015) ("ICS systemically generates TPC data and updates the TPC Command Code database... Usually, the Form 12175 will not need to be completed by Collection personnel.  Exceptions, however, are manually prepared levies, Trust Fund Recovery Penalty Investigations, Jeopardy and Other Investigations, templates or documents created in Word."); ICS Users Guide at 10-31 and 29-11 to 29-15 (Jan. 2015).

61  TAS Sample (2015) (Q9).  TAS reviewers concluded that 34.5 percent of these omissions resulted because the RO did not send Form 12175 to the TPC coordinator and 57.2 percent occurred because the RO did not select the proper entry from the ICS pick list.  *Id.* (Q10).

001547

Further, ROs failed to document a reason for their reprisal determinations in each of the six cases in TAS's sample where ROs made them.[62]  Thus, Attribute 607 may not reliably identify all violations of the third party contact rules.

### The IRS Could Do More to Ensure Post-Contact Reports Are Accurate

To improve the accuracy of post-contact reports, the IRS could review the work completed by TPC coordinators.[63]  Employees who send Form 12175 to the TPC coordinator could confirm its receipt, as they do when they transmit returns.[64]  The IRS could also reconcile TPCs reflected in case histories with those found in the TPC database to ensure employees record TPCs on Form 12175 (when necessary) and the TPC coordinator enters them into the database.[65]  As noted above, such controls will be less burdensome if the IRS increases the transparency of TPCs, for example, by sending the taxpayer a copy of any written request for information from a third party within three days of the contact, as it does in connection with third-party summonses.[66]

### CONCLUSION

Improving the TPC notice and reporting procedures would be consistent with the recently-adopted Taxpayer Bill of Rights.  The taxpayer's *right to be informed*, as described in Pub 1, includes the right to "be informed of IRS decisions about their tax accounts and to receive clear explanations of the outcomes." Under current procedures, however, the IRS issues vague or non-specific TPC notices and potentially incomplete TPC reports that do not allow taxpayers to be informed about what information the IRS has decided it needs from third parties, whether it has actually contacted third parties, and how to obtain a list of the TPCs.

Pub 1 also explains that the taxpayer's *right to privacy* includes the right to "expect that any IRS inquiry… will comply with the law and be no more intrusive than necessary."  With the possible exception of certain

---

62  TAS Sample (2015) (Q7 and Q8).

63  Except for personal performance appraisals, the IRS does not regularly evaluate the quality of the work completed by TPC coordinators, nor does it regularly reconcile TPCs reflected in case histories with those found in the TPC database to ensure employees record TPCs on Form 12175 (when necessary) and the TPC coordinator enters them into the database.  IRS response to TAS fact check (Nov. 10, 2015).

64  According to a limited review of certain field exam cases by SB/SE, in 36 percent the examiner did not properly record the contact on Forms 12175.  SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Processes* 5 (Oct. 30, 2015).  Even when examiners filled out Form 12175 it only reached the TPC 92 percent of the time.  *Id.* at 6.  When an IRS employee ships one or more returns, he or she must include Form 3210, *Document Transmittal*, to provide a method for tracking their receipt.  Form 3210 can be manually prepared or computer generated by ERCS.  It must identify the taxpayer's name, tax period(s), to whom it is being sent, the originator, and the date sent.  The sender must sign and date the form and keep a portion.  Upon receipt of the return(s), the recipient must verify the contents, sign Form 3210, and return the acknowledgment portion to the sender.  *See, e.g.*, IRM 1.4.40.4.2.6, *Shipment of Returns* (May 19, 2010).

65  IRS field exam embedded quality Attribute 617 addresses third party contacts.  *See* IRM 4.11.57.1, *References – Third Party Contacts* (Jan. 17, 2014).  However, it only seems to address whether the IRS informed the taxpayer that a TPC could occur (*e.g.*, by sending Pub 1).  *See* IRM Exhibit 4.8.3-1, *Quality Attributes* (Mar. 21, 2013) ("This Attribute [617] measures if the taxpayer/representative was advised of all rights and kept informed throughout the examination process.").  By contrast, SB/SE's Field Collection quality measures are more specific, addressing whether "[T]he Third Party Contact Database was not updated when an identifiable third party contact was made."  SB/SE, *Field Compliance Embedded Quality Field Collection (FC) Job Aid*, Doc. 12359, 27-28 (Dec. 2014) (Reason Code 5).  As noted above, however, automated systems often update the TPC database for collection employees.  *See, e.g.*, IRM 5.1.1.10, *Third Party Contacts* (May 15, 2014); ICS Users Guide at 10-31 and 29-11 (Jan. 2015).  The IRS does not measure whether employees ask taxpayers for specific information before making TPCs to obtain it.

66  Under IRC § 7609(a), the IRS must provide the taxpayer a copy of a third-party summons within three days of serving it on the third party and no later than the 23rd day before the third party has to produce the records or testimony.  The IRS could use the three day period to determine if the TPC is exempt from the TPC notice and reporting requirements (*e.g.*, because of the potential for reprisal).

cases where the IRS needs to verify information already provided by the taxpayer, TPCs will be more intrusive than necessary unless the IRS gives the taxpayer a reasonable opportunity to provide information needed to avoid the TPC. No such reasonable opportunity exists if the taxpayer does not know the specific information the IRS needs or is not given enough time to respond.

**The IRS's current third party contact procedures dilute five of the ten taxpayer rights adopted by the IRS.**

Moreover, Pub 1 states that taxpayers have the *right to challenge the IRS's position and be heard*, which includes the "… right to raise objections and provide additional documentation in response to formal IRS actions or proposed actions, to expect that the IRS will consider their timely objections and documentation promptly and fairly, and to receive a response if the IRS does not agree with their position." If the IRS does not inform the taxpayer about what specific information it plans to seek from third parties (or does not provide the taxpayer enough time to respond), then the taxpayer does not have a realistic opportunity to raise objections or provide additional documentation for the IRS to consider.

In furtherance of the *rights to be informed*, *to privacy*, and *to challenge the IRS's position and be heard*, the IRS should include with the TPC notice a request for information, which would make the TPC unnecessary, except where the IRS employee documents why a TPC notice exception applies. Before making a TPC, the IRS should send the taxpayer a TPC notice that asks for the specific information it is planning to request from a third party (except in cases where such a request would be unproductive, such as where it needs to verify information already provided). It should not make the TPC if the taxpayer responds by providing (or agreeing to provide) the information within a reasonable period. It should also send taxpayers periodic reports of TPCs, as required by IRC § 7602(c)(3).

These recommendations are also consistent with the taxpayer's *right to a fair and just tax system*. Empowering only some taxpayers but not others to exercise their rights to avoid TPCs (*e.g.*, by letting them know what information they could provide to avoid it) or learn about TPCs (*e.g.*, by describing how to request TPC reports) is inconsistent with the *right to a fair and just tax system*.

In addition, Pub 1 states that the taxpayer's *right to confidentiality* includes the right to "expect that any information they provide to the IRS will not be disclosed unless authorized… [and] to expect that appropriate action will be taken against employees… who wrongfully use or disclose return information." IRS employees are only "authorized" to make TPCs, which necessarily disclose confidential taxpayer information, if they comply with the TPC notice requirements. Yet, the IRS's internal controls do not ensure it knows when employees wrongfully disclose confidential information by making TPCs that do not comply with IRC § 7602(c). Thus, the IRS's current TPC procedures dilute five of the ten taxpayer rights adopted by the IRS.

001549

Case 1:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1557 of 4699 PageID #: 4722

Most Serious
Problems

Most Litigated
Issues

Recommendations

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Include with a TPC notice a specific request for information that would make the TPC unnecessary, except where the IRS employee documents that a TPC notice exception applies or that requesting the information from the taxpayer would be pointless (*e.g.*, because the IRS needs to verify information already provided).[67]

2. Allow the taxpayer at least ten days to provide the information being requested before making the third party contact to obtain it.[68]

3. Send the taxpayer a copy of any written request for information from a third party within three days of any non-exempt contact (except in collection cases), as the IRS does in connection with third-party summonses.[69]

4. Provide taxpayers with periodic TPC reports of TPCs not already provided (if any), as required by IRC § 7602(c)(3).[70]

5. Modify TPC notices to inform taxpayers of their right to receive post-TPC reports periodically and to explain how to request these reports.

6. Require employees to document the basis (*i.e.*, "good cause") for the reprisal and other exceptions to TPC reporting, require supervisory review of such documentation, and train employees on how to apply them.[71]

7. Improve measures to ensure management knows when and how employees are not following TPC procedures.[72] For example, the IRS's reviews should regularly compare TPCs reflected in the administrative file to those reported to TPC coordinators (*e.g.*, through supervisory, quality, or operational reviews) and require TPC coordinators to acknowledge receipt of these forms. To facilitate these reviews, the IRS may need to require employees to include information on the Form 12175 that it can tie back to the TPCs referenced in the administrative file in cases where a reporting exception applies (*e.g.*, reprisal).

---

67 The IRS could return to its prior practice of using Letter 3164-G (DO), (Exam-3) Third Party Contact Letter, and Letter 3164-F (DO), *(Exam-2) Third Party Contact Letter*, for this purpose.

68 In the context of an examination, a taxpayer is notified when the Service issues a third-party summons, and the Service is required to wait 23 days before taking the summoned records. IRC § 7609(a). A collection summons is excepted from those procedures by IRC § 7609(c) to prevent the taxpayer from relocating and hiding assets. H.R. Rep. 94-658, 94th Cong., 2nd Sess. at 3206 (1976). In collection cases, however, the IRS still allows at least ten days for the production of summoned records. *See* IRM 25.5.3.4, *Time and Place of Examination Set by Summons* (July 11, 2013).

69 In collection cases, the taxpayer could still mitigate the damage resulting from the contacts by requesting a TPC list.

70 Such periodic TPC reports would be unnecessary if the IRS had already reported all TPCs to the taxpayer, as recommended.

71 The supervisory review and training would ensure employees are familiar with the TPC rules, including IRM 25.27.1.3.3(4), which requires them to describe good cause in the case history by documenting "the facts surrounding the reason for the reprisal determination" and that they do not apply the exception based solely on an unexplained request by a third party for his or her name to be left off of the list of contacts provided to the taxpayer. *See, e.g.*, Treas. Reg. § 301.7602-2(f)(3)(ii) (Ex. 1) (explaining a "contact is not excepted from the statute merely because the… [third party] asks that his name be left off the list of contacts."). An SB/SE review supports the need for training. It found that a focus group of field examiners had not received any refresher TPC training and could answer polling questions about what is or is not a TPC only 84 percent of the time; and SB/SE's case reviews found that examiners did not document consideration of the potential for reprisal in any cases SB/SE reviewed. SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Processes* 5-6 (Oct. 30, 2015).

72 Similarly, an SB/SE review recommended the addition of a new reason code to the Exam Quality Measurement System (EQMS) to track adherence to TPC procedures. SB/SE, *Third Party Contact, Program Review Report, Field Exam Special Processes* 8 (Oct. 30, 2015).

# Appendix: Third Party Contact Sampling Methodology and Data Collection Instrument

## Methodology

TAS identified a stratified random sample of 1,200 taxpayers whose cases were closed in field exam (600 cases) or field collection (600 cases) in FY 2013. The sample was larger than necessary to project the results to IRS cases nationwide because TAS expected that some case files would not be retrieved in time to complete the study. In addition, TAS oversampled the types of cases (identified by activity code and project code) deemed most likely to involve TPCs so that the sample would yield more precise estimates about how the IRS handles the relatively small percentage of cases that require TPCs.[73] Five TAS Revenue Agent Technical Advisors (RATAs) and four TAS Revenue Officer Technical Advisors (ROTAs) ordered the administrative files and a copy of the IRS's TPC database (*i.e.*, data available on IDRS) for these randomly selected cases. After TAS identified the subset of cases where taxpayers requested TPC lists, it planned to request information about the IRS's responses (*e.g.*, Letter 3173) in these cases from the IRS. However, TAS did not identify any cases where the taxpayer requested a TPC list. The ROTAs and RATAs recorded their findings on an electronic data collection instrument (DCI). TAS research tabulated the data. These results are analyzed in the body of the Most Serious Problem (MSP) above.

## Data Collection Instrument

The DCI used by TAS reviewers included the following questions:

1. Did the RA/RO make any third party contacts (TPC)?

2. Were all of the TPCs exempt from the notice and reporting requirements (*e.g.*, authorized on Form 12180, criminal investigation, risk of reprisal, collection in jeopardy, matter in litigation, and certain contacts with contractors, informants, or government officials)?

3. On what date was the first non-exempt TPC?

4. Did the IRS send the taxpayer a TPC notice (*e.g.*, Pub 1, Letters 3164, 3230, 3232, 3234, 3236, 3238, 3345, 3404, 4464, or Notice 1219)?

5. If the RA/RO sent a TPC notice, did the RO/RA wait until the (a) confirming receipt of the TPC notice or (b) at least ten calendar days after sending the TPC notice before making the first non-exempt TPC (as required by IRM 4.11.57.4.1.1.1 and IRM 25.27.1.3.1)?

6. Did the RA/RO ask the taxpayer for the information before requesting it from a third party? (For example, a formal request for specific information through personal contact or letter.)

7. Did the RA/RO determine a "reprisal" TPC reporting exception applied (as provided by IRC § 7602(c)(3), IRM 25.27.1.3.3, or IRM 4.11.57.4.2.3)?

8. If the RO/RA determined the reprisal exception applied, did the RA/RO document the reason(s) why?

---

73  Field exam cases consisted of two strata: one with certain activity codes and project codes, and the other with the remaining field exam cases. Field collection cases were divided into six strata: (1) individual closed as full paid or with an installment agreement, (2) individual closed as currently not collectible, (3) individual trust fund recovery penalty, (4) individual referred to exam and closed as full paid or with an installment agreement, (5) small business closed as full paid or with an installment agreement, and (6) small business closed as currently not collectible. Each strata was weighted to reflect the proportion of that strata in the population.

001551

9. Does the admin file (case activity record (CAR), Forms 12175, Integrated Collection System (ICS), or memo of interview (MOI)) show one or more non-exempt TPCs that are not reflected on the TPC Coordinator database?

10. Why were one or more TPCs omitted from the TPC database? [Choices included "Form 12175 not completed" or "other" with an explanation.]

11. Did the taxpayer request a TPC list? [yes/no and date recorded]

12. If the taxpayer requested one or more TPC list(s), did the IRS always mail/fax the list (*e.g.*, Letter 3173) within 10 working days (per IRMs 4.11.57.4.6 and 25.27.1.5)?

13. If the IRS sent a TPC list, were there non-exempt TPCs in the admin file that were omitted from the list and not previously disclosed to the taxpayer (*e.g.*, in response to a prior request or on a third-party summons or CDP notice)?

### Sample Results

The tables below summarize the results of TAS's sample, which are discussed in the MSP (above). The "counts" reflect the number of times a result was observed in the sample. Because TAS did not review all of the IRS's cases, the "estimate" column reflects how many times we would expect a particular result to occur in the overall population of IRS cases. The results from the sample were weighted so that the extent to which TAS over or under-sampled a particular project code did not bias the results. The upper and lower bounds of the "95% Confidence Interval" shows how close the estimate is likely to be to the true value for the entire population of IRS exam or collection cases at 95 percent level of confidence.[74] This range is generally wider for questions that were not answered very often (*i.e.*, for which the sample has relatively few data points) because the estimates become more precise when you have more data points.

### 1. Did the RA/RO make any third party contacts (TPC)?

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | No | 31.9% | 2.5% | 27.2% | 37.0% | 151 |
| | Yes | 68.1% | 2.5% | 63.0% | 72.8% | 272 |
| | Total | | | | | **423** |
| Field Exam | No | 91.5% | 1.5% | 88.1% | 94.1% | 435 |
| | Yes | 8.5% | 1.5% | 5.9% | 11.9% | 50 |
| | Total | | | | | **485** |

---

74  Unless otherwise indicated, TAS assumed reviewers only left questions blank if they could not determine how to answer them based on the information in the case file.

**2. Were all of the TPCs exempt from the notice and reporting requirements (*e.g.*, authorized on Form 12180, criminal investigation, risk of reprisal, collection in jeopardy, matter in litigation, and certain contacts with contractors, informants, or government officials)?**

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 0.3% | 0.3% | 0.1% | 1.9% | 2 |
| | No | 96.3% | 1.2% | 93.1% | 98.1% | 261 |
| | Yes | 3.4% | 1.2% | 1.7% | 6.6% | 9 |
| | **Total** | | | | | **272** |
| Field Exam | Missing | 4.0% | 3.9% | 0.6% | 23.7% | 1 |
| | No | 47.2% | 9.3% | 30.0% | 65.1% | 23 |
| | Yes | 48.8% | 9.3% | 31.4% | 66.5% | 26 |
| | **Total** | | | | | **50** |

**4. Did the IRS send the taxpayer a TPC notice (*e.g.*, Pub 1, Letters 3164, 3230, 3232, 3234, 3236, 3238, 3345, 3404, 4464, or Notice 1219)?**

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 3.6% | 1.3% | 1.8% | 7.2% | 8 |
| | No | 0.8% | 0.6% | 0.2% | 3.2% | 3 |
| | Yes | 95.5% | 1.4% | 91.8% | 97.6% | 250 |
| | **Total** | | | | | **261** |
| Field Exam | Missing | 1.1% | 1.2% | 0.2% | 8.2% | 1 |
| | Yes | 98.9% | 1.2% | 91.8% | 99.8% | 22 |
| | **Total** | | | | | **23** |

001553

5. **If the RA/RO sent a TPC notice, did the RO/RA wait until the (a) confirming receipt of the TPC notice or (b) at least ten calendar days after sending the TPC notice before making the first non-exempt TPC (as required by IRM 4.11.57.4.1.1.1 and IRM 25.27.1.3.1)?**[75]

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 72.1% | 3.0% | 65.8% | 77.7% | 180 |
| | No | 5.3% | 1.5% | 3.0% | 9.2% | 14 |
| | Yes | 22.5% | 2.8% | 17.5% | 28.6% | 56 |
| | **Total** | | | | | **250** |
| Field Exam | No | 2.3% | 1.7% | 0.5% | 9.7% | 2 |
| | Yes | 97.7% | 1.7% | 90.3% | 99.5% | 20 |
| | **Total** | | | | | **22** |

6. **Did the RA/RO ask the taxpayer for the information before requesting it from a third party? (For example, a formal request for specific information through personal contact or letter)**[76]

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 14.0% | 2.3% | 10.1% | 19.1% | 39 |
| | No | 11.1% | 2.0% | 7.8% | 15.6% | 34 |
| | Yes | 75.0% | 2.8% | 69.1% | 80.1% | 199 |
| | **Total** | | | | | **272** |
| Field Exam | Missing | 22.2% | 7.9% | 10.4% | 41.3% | 9 |
| | No | 22.8% | 7.9% | 10.8% | 41.7% | 10 |
| | Yes | 55.0% | 9.3% | 36.8% | 71.9% | 31 |
| | **Total** | | | | | **50** |

---

75  TAS reviewers left this question (Q5) blank if the RO/RA did not send the taxpayer a TPC letter, even if some other part of the IRS had done so.

76  A very broad request for information from the taxpayer that might technically have covered the information later included in the specific request to the third party was scored as "NO" (for Q6) if it would not have occurred to the taxpayer to provide such information because the IRS did not identify what it wanted with enough specificity.

**7. Did the RA/RO determine a "reprisal" TPC reporting exception applied (as provided by IRC § 7602(c)(3), IRM 25.27.1.3.3, or IRM 4.11.57.4.2.3)?**

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 25.1% | 2.8% | 20.0% | 31.0% | 71 |
| | No | 72.9% | 2.9% | 66.9% | 78.1% | 195 |
| | Yes | 2.0% | 0.8% | 0.9% | 4.5% | 6 |
| | **Total** | | | | | **272** |
| Field Exam | Missing | 8.6% | 5.4% | 2.3% | 26.9% | 3 |
| | No | 87.4% | 6.5% | 68.6% | 95.7% | 46 |
| | Yes | 4.0% | 3.9% | 0.6% | 23.7% | 1 |
| | **Total** | | | | | **50** |

**8. If the RO/RA determined the reprisal exception applied, did the RA/RO document the reason(s) why?[77]**

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | No | 100.0% | 0.0% | 100.0% | 100.0% | 6 |
| | **Total** | | | | | **6** |
| Field Exam | No | 100.0% | 0.0% | 100.0% | 100.0% | 1 |
| | **Total** | | | | | **1** |

**9. Does the admin file (case activity record (CAR), Forms 12175, Integrated Collection System (ICS), or memo of interview (MOI)) show one or more non-exempt TPCs that are not reflected on the TPC Coordinator database?**

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | No | 51.5% | 3.3% | 44.9% | 58.0% | 137 |
| | Yes | 48.5% | 3.3% | 42.0% | 55.1% | 124 |
| | **Total** | | | | | **261** |
| Field Exam | No | 57.9% | 13.4% | 31.8% | 80.2% | 12 |
| | Yes | 42.1% | 13.4% | 19.8% | 68.2% | 11 |
| | **Total** | | | | | **23** |

---

77 To improve consistency, TAS had a single reviewer examine each of the seven field collection cases. In the absence of any indication the third party actually feared reprisal, documentation that a third party "did not want to be named" was not treated as a documented reason for a reprisal determination. Similar verbiage was present in three of the collection cases TAS reviewed, but there was no express indication this was the basis for the determination. Thus, TAS avoided inferring that the RO applied the reprisal rules incorrectly. *See, e.g.,* Treas. Reg. § 301.7602-2(f)(3)(ii) (Ex.1) (explaining a "contact is not excepted from the statute merely because the... [third party] asks that his name be left off the list of contacts."). Rather, TAS assumed the RO had other undocumented reasons for making the reprisal determination.

001555

Case 3:23-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1563 of 4699 PageID #: 4728

### 10. Why were one or more TPCs omitted from the TPC database?[78]

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Form 12175 Not Used | 34.5% | 4.6% | 26.1% | 44.0% | 43 |
| | Pick List Not Used | 57.2% | 4.7% | 47.7% | 66.2% | 70 |
| | Other | 8.3% | 2.5% | 4.4% | 14.9% | 11 |
| | **Total** | | | | | **126** |
| Field Exam | Form 12175 Not Used | 94.5% | 4.3% | 76.9% | 98.9% | 9 |
| | Other | 5.5% | 4.3% | 1.1% | 23.1% | 2 |
| | **Total** | | | | | **11** |

### 11. Did the taxpayer request a TPC list?

| | | Estimate | Standard Error | 95% Confidence Interval | | Unweighted Count |
|---|---|---|---|---|---|---|
| | | | | Lower | Upper | |
| Field Collection | Missing | 0.8% | 0.6% | 0.2% | 3.2% | 3 |
| | No | 99.2% | 0.6% | 96.8% | 99.8% | 258 |
| | **Total** | | | | | **261** |
| Field Exam | No | 100.0% | 0.0% | 0.0% | 100.0% | 23 |
| | **Total** | | | | | **23** |

---

78   Because TAS reviewers frequently indicated that the "other" reason was that ROs did not select the correct pick list item, TAS compiled and reported these results separately.

001556

MSP
#13

# WHISTLEBLOWER PROGRAM: The IRS Whistleblower Program Does Not Meet Whistleblowers' Need for Information During Lengthy Processing Times and Does Not Sufficiently Protect Taxpayers' Confidential Information from Re-Disclosure by Whistleblowers

## RESPONSIBLE OFFICIALS

Jeff Wallbaum, Chief Financial Officer
John M. Dalrymple, Deputy Commissioner for Services and Enforcement
Edward Killen, Director, Privacy, Governmental Liaison and Disclosure
Douglas W. O'Donnell, Commissioner, Large Business and International
Sunita Lough, Commissioner, Tax Exempt and Government Entities Division
Karen Schiller, Commissioner, Small Business/Self-Employed Division
Richard Weber, Chief, Criminal Investigation
Kirsten B. Wielobob, Chief, Appeals
Lee D. Martin, Director, Whistleblower Office
William J. Wilkins, Chief Counsel

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Finality*
- *The Right to Privacy*
- *The Right to Confidentiality*

## DEFINITION OF PROBLEM

In 2006, in the light of empirical evidence that audits initiated on the basis of whistleblower information resulted in the recovery of hundreds of millions of dollars of unpaid tax and cost less than half, per dollar of taxes collected, of other Internal Revenue Service (IRS) enforcement programs, Congress concluded that "rewarding whistleblowers is one of the best ways to fight tax cheats."[2]  The legitimate use of whistle-blowers, however, creates risks for the subject of the whistleblower claim, especially when the claim is unsupported or not pursued.  As Congress is aware, voluntary compliance may be undermined if taxpayers perceive the IRS is not adequately guarding their tax information.[3]  It is possible to balance these two

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See* Treasury Inspector General for Tax Administration (TIGTA), Ref. No. 2006-30-092, *The Informants' Rewards Program Needs More Centralized Management Oversight* 3-4 (June 6, 2006) (describing the contents of IRS, *The Informants' Project: A Study of the Present Law Reward Program* (Sept. 1999)); *Grassley Says IRS, Treasury Need to Put Out "Welcome Mat" for Whistleblowers*, 2006 TNT 112-96 (June 12, 2006).

3   *See* Dept. of Treas., *Report to The Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions*, Vol. I, Study of General Provisions 34 (Oct. 2000) (stating that "[t]axpayers who view the IRS as a resource for a variety of other inter-ests will be less inclined to voluntarily turn over sensitive financial information out of fear of where it might ultimately land").

001557

Case v-00306-JCB   Document 124   Filed 11/07/24   Page 1565 of 4699 PageID #: 4730

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

concerns; however, the whistleblower program as currently administered by the IRS and the Internal Revenue Code (IRC) do not adequately strike that balance.

> The legitimate use of whistleblowers, however, creates risks for the subject of the whistleblower claim, especially when the claim is unsupported or not pursued. As Congress is aware, voluntary compliance may be undermined if taxpayers perceive the IRS is not adequately guarding their tax information.

The IRS has long had the authority, at its own discretion, to compensate informants who report violations of the internal revenue laws.[4] Using this discretion, now codified as subsection (a) of IRC § 7623, the IRS adopted a policy of paying informants up to 15 percent of the amount recovered, subject to a $10 million cap.[5] In 2006, Congress added subsection (b) to IRC § 7623, significantly expanding the scope of the statute by *requiring* the IRS to award certain whistleblowers an amount between 15 and 30 percent of the collected proceeds, with no maximum dollar limit.[6]

Whistleblowers took an immediate interest in IRC § 7623(b), making 50 submissions in fiscal year (FY) 2007 that appeared to meet the threshold requirements, including that the amount in dispute exceed $2 million.[7] The number of submissions under IRC § 7623(b) increased dramatically thereafter; there were 352 in FY 2014 alone.[8] The IRS paid the first IRC § 7623(b) award in 2011 and paid 11 such awards from FYs 2011 to 2014.[9] The total amount of awards under IRC § 7623 was $13.6 million in FY 2007 (when the IRS paid claims only at its discretion, under IRC § 7623(a)) and fluctuated over the years, reaching a high of $125 million in FY 2012 (when the IRS paid claims under both subsections).[10]

Despite the increased willingness of whistleblowers to come forward, the effectiveness of the whistleblower program has been undermined by conditions such as:

- The length of time it takes to resolve whistleblower cases, which averaged almost six years for awards paid in FY 2014;[11]

- Statutory provisions that impede the IRS from communicating effectively and regularly with whistleblowers; and

---

4   *See* Act of Mar. 2, 1867, ch. 169, §7, 14 Stat. 471, 473 (codified ch.11, § 3463, 35 Rev. Stat. 686 (1893-74)).

5   IRC § 7623(a); Internal Revenue Manual (IRM) 1.2.13.1.12, *Policy Statement 4-27* (Aug. 13, 2004).

6   Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 406(a)(1)(D), 120 Stat. 2921, 2958 (adding subsection (b) to IRC § 7623); IRC § 7623(b)(1). The IRS does not take into account penalties collected for failing to file Form TD F 90-22.1 (now FinCEN Form 114), *Report of Foreign Bank and Financial Accounts (FBAR)*, as required by 31 U.S.C. § 5314 in making awards under IRC § 7623. *See* Legislative Recommendation: *Whistleblower Program: Amend IRC §§ 7623 and 6103 to Provide Consistent Treatment of Recovered Foreign Account Tax Compliance Act (FATCA) and Report of Foreign Bank and Financial Accounts (FBAR) Penalties for Whistleblower Award Purposes, infra.*

7   IRS Whistleblower Office (WO), *Fiscal Year 2011 Report to the Congress on the Use of Section 7623*, Table 1; IRC § 7623(b)(5)(B). As the WO annual reports note, the number of submissions reported was subject to change. For this reason, we cite to the most recent report for which the cited data is available.

8   IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623*, Appx. Table 2.

9   *Id.* at 4.

10  IRS WO, *Fiscal Year 2011 Report to the Congress on the Use of Section 7623*, Table 4; IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623*, Appx. Table 6.

11  IRS WO response to TAS information request (Aug. 27, 2015) (noting that 101 awards were paid in FY 2014, with an average elapsed time from Form 211 receipt to award payment date of 5.8 years). The timeframes ranged from 2.4 years to 14.8 years, with a median of 5.3 years. For the 11 awards paid under IRC § 7623(b) from FYs 2011-2014, the average elapsed time from Form 211 receipt to award payment date was 4.9 years. The timeframes ranged from 3.9 years to 6.1 years, with a median of 4.9 years.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1566 of 4699 PageID #: 7831

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

■ The lack of statutory protection of whistleblowers from retaliation.[12]

Moreover, the whistleblower program does not adequately protect taxpayers from disclosure of their confidential information by whistleblowers. The causes of some of these difficulties are beyond the IRS's control, and the IRS shares some of the National Taxpayer Advocate's concerns.[13] However, the IRS has moved slowly to address issues within its purview, and has occasionally exacerbated the difficulties.[14] The whistleblower program enjoys the support of the IRS Commissioner but has yet to realize its full potential.[15]

## ANALYSIS OF PROBLEM

### Accepting Assistance From Whistleblowers Is an Efficient Enforcement Mechanism But Carries Heightened Risk for the Subject of the Claim

The IRS selects returns for audit in a variety of ways, most often using Discriminant Index Function (DIF) formulas.[16] In 1999, the IRS reported that audits of 1996-1998 returns initiated on the basis of information from an informant (now referred to as a whistleblower) "had a higher dollar yield per hour[17] and a lower no-change[18] rate" than returns selected on the basis of DIF scores.[19] Moreover, the cost/benefit ratio of whistleblower audits compared favorably with other IRS enforcement programs: "[t]he report estimated the IRS incurred slightly over four cents in cost (including personnel and administrative costs) for each dollar collected from the Informants' Rewards Program (including interest), compared to a cost of over ten cents per dollar collected for all enforcement programs."[20] From FYs 2001-2005, audits based on whistleblower information resulted in a total recovery of tax, fines, interest and penalties of more than $340 million.[21]

When the IRS accepts assistance from a whistleblower, the risk arises that the audited taxpayer's confidential information will be inappropriately disclosed to the whistleblower, a risk for which Congress and the IRS have little tolerance. IRC § 6103 generally prohibits IRS employees from disclosing a taxpayer's

---

12  The Government Accountability Office (GAO) has voiced similar concerns. See GAO, GAO-16-20, *IRS Whistleblower Program Billions Collected, but Timeliness and Communication Concerns May Discourage Whistleblowers* (Oct. 2015).

13  See IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623* 6-7.

14  See the discussion below pertaining to the IRS's refusal to enter into tax administration contracts with whistleblowers, its determination that an "administrative proceeding" begins when the IRS proposes an award, and the inadequacy of confidentiality agreements executed by whistleblowers to deter re-disclosure of taxpayer information.

15  See, e.g., William Hoffman, *Tax Analysts Interview with John Koskinen* (Oct. 17, 2014) (reiterating his support for the whistleblower program generally, expressing his willingness to explore ways to improve communication with whistleblowers, and noting the need for anti-retaliation legislation).

16  See IRM 4.22.1.5, *Benefits of NRP* (Oct. 1, 2008); IRM 4.19.11.1.5.1, *How DIF Works* (Nov. 9, 2007) (explaining, among other things, that "DIF is a mathematical technique used to score income tax returns as to examination potential").

17  Dollar yield per hour refers to the total recommended adjustments to tax liability divided by the number of examiner hours charged to examinations. (fn. in original.)

18  For the purpose of this analysis, an examination of a return results in a "no-change" when the examination is closed in the Audit Information Management System (AIMS) using Disposal Code 02 (no adjustments or changes to tax liability). (fn. in original.)

19  TIGTA, Ref. No. 2006-30-092, *The Informants' Rewards Program Needs More Centralized Management Oversight* 4 (June 6, 2006) (describing the contents of IRS, *The Informants' Project: A Study of the Present Law Reward Program* (Sept. 1999)).

20  *Id.*

21  *Id.* at 3

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1567 of 4699 PageID #:  4732

Most Serious
Problems

Recommendations

Most Litigated
Issues

"return" or "return information" and civil and criminal penalties are imposed for violating the bar.[22]  The broad definitions of "return" and "return information" forbid the IRS from telling a whistleblower, for example:

- Whether the claim led to an audit;
- Why a claim did not lead to an audit;
- Whether an audit resulted in assessment of additional tax; or
- The extent to which any additional tax was collected.[23]

The following statutory provisions allow taxpayers to recover damages for unauthorized disclosures and permit imposition of fines and prison terms, in addition to requiring termination of employment if the violator was a federal employee:

- IRC § 7431 generally allows a taxpayer whose return or return information was knowingly or negligently disclosed to bring a civil action for statutory damages of $1,000 or actual damages;[24]
- IRC § 7213 imposes a fine of up to $5,000 and imprisonment of up to five years for willful disclosure of return or return information;[25] and
- IRC § 7213A imposes a fine of up to $1,000 and imprisonment for up to one year for willful unauthorized inspection of a taxpayer's return or return information.[26]

Additionally, IRC § 6103(p) imposes requirements that pertain generally to appropriate storage and secure access of return information and requires the specified possessor to "provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information."[27]

---

22  IRC § 6103(a) prohibits the IRS from disclosing taxpayers' returns or return information absent an exception.  There are 13 exceptions found in IRC § 6103(c)-(o), none of which expressly allows disclosures to whistleblowers.  IRC § 6103(b)(1) defines "return" as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed."  IRC § 6103(b)(2)(A) defines "return information" to include "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense."

23  As the IRS advises, "[o]nce a claim is submitted, the informant may be told only the status and disposition of the claim — not the action taken in the taxpayer case.  We can say whether the claim is still open or has been closed.  If closed we can say that a claim is payable (and the amount) or that the claim is denied."  *Confidentiality and Disclosure for Whistleblowers*, *available at* www.irs.gov/uac/Confidentiality-and-Disclosure-for-Whistleblowers.

24  IRC § 7431(a)(2), (c) (imposing the same penalties for unauthorized inspection and for disclosure).  In addition, the *Taxpayer Bill of Rights Enhancement Act of 2015*, § 202, S. 1578, introduced on June 16, 2015, would increase the statutory damage amount to $5,000 for each instance of unauthorized inspection and $10,000 for each instance of unauthorized disclosure, among other things.

25  IRC § 7213(a)(1) (also providing that a federal employee who violates IRC § 7213 "shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense").  In addition, the *Taxpayer Bill of Rights Enhancement Act of 2015*, § 201, S. 1578, introduced on June 16, 2015, would increase the maximum fine for unauthorized disclosure to $20,000.

26  IRC § 7213A(a)(1)(B), (b)(1).  A federal employee "who is convicted of any violation of subsection (a) shall, in addition to any other punishment, be dismissed from office or discharged from employment."  IRC § 7213A(b)(2).  In addition, the *Taxpayer Bill of Rights Enhancement Act of 2015*, § 201, S. 1578, introduced on June 16, 2015, would increase the maximum fine for unauthorized inspection to $5,000.

27  IRC § 6103(p)(4)(D).

The National Taxpayer Advocate has long been a proponent of enforcing and extending (where appropriate) these statutory sanctions and safeguarding provisions.[28]

### Although Similar to Whistleblower Provisions of the False Claims Act, the Tax Whistleblower Statute Differs in Important Respects

In 1863, Congress enacted the False Claims Act (FCA) to address the rampant fraud on the government perpetrated during the Civil War.[29]  Under the FCA, the United States Attorney General and the Department of Justice (DOJ) are delegated the discretion to bring a civil suit for statutory penalties and damages on the basis of an informant's information, but if the government declines to proceed with the action, the informant may continue alone as a *qui tam* plaintiff in the name of the government.[30]  Prior to 1987, courts had discretion to award the informant up to ten percent of the proceeds collected if the government brought suit, and up to 25 percent of the proceeds collected, as well as the reasonable expenses for the costs of litigation, if the government declined to proceed and an individual brought the action.[31]  In 1987, amendments to the FCA strengthened the *qui tam* provisions by *requiring* payments to the informant of between 15 and 25 percent of the proceeds if the government brought suit, or 25 to 30 percent if the informant proceeded alone, and adding protections from retaliation for employee whistleblowers.[32]  The amendments also included a "tax bar," which codified prior court holdings that tax fraud is excluded from the purview of the FCA.[33]

---

28  *See* National Taxpayer Advocate 2003 Annual Report to Congress 232-54 (recommending that "[d]uring pilots and in statutory disclosures, agencies and their contractors must be subject to the safeguard provisions of IRC § 6103(p)(4), and agencies and their programs or agents must be subject to the civil and criminal sanctions of IRC §§ 7213, 7213A, and 7341"); National Taxpayer Advocate 2010 Annual Report to Congress 396 (recommending that taxpayers be allowed to recover damages for unauthorized disclosure by whistleblowers).  The President's Budget submissions for FYs 2014-2016 included legislative proposals to amend IRC § 6103 "to provide that the section 6103(p) safeguarding requirements apply to whistleblowers and their legal representatives who receive returns and return information in whistleblower administrative proceedings.  In addition, the proposal extends the penalties for unauthorized inspections and disclosures of returns and return information to whistleblowers and their legal representatives."  *See General Explanations of the Administration's Fiscal Year Revenue Proposals* (Treasury Greenbook) FYs 2014-2016 at 205, 236, and 250-51, respectively, *available at* www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx.  As discussed below, the National Taxpayer Advocate this year recommends that Congress make the safeguarding provisions and statutory sanctions applicable to whistleblowers.  *See* Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p), infra.*

29  H.R. Rep. No. 99-660, at 17 (1986).

30  31 U.S.C. § 3730(a), (b); 31 U.S.C. § 3729.  *Qui tam* is "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive."  Black's Law Dictionary (9th ed. 2009).  The private person who brings a *qui tam* action is the "relator."  According to one 2011 DOJ memo, "[t]here are no statistics reported on the length of time the average *qui tam* case remains under seal [the preliminary period during which DOJ investigates a FCA complaint and decides whether it will intervene]… In this District, most intervened or settled cases are under seal for at least two years (with, of course, periodic reports to the supervising judge concerning the progress of the case, and the justification of the need for additional time)."  *See False Claims Act Cases: Government Intervention in Qui Tam (Whistleblower) Suits* 2, *available at* http://www.justice.gov/sites/default/files/usao-edpa/legacy/2011/04/18/fcap-rocess2_0.pdf.  The length of time the suit will take appears to vary widely.  *See, e.g.*, Ben Hallman, *Whistleblowers, Beware: Most Claims End in Disappointment, Despair, available at* http://www.huffingtonpost.com/2012/06/04/whistleblower-law-false-claims-act-awards-james-holzrichter_n_1563783.html, reporting on FCA suits that took as long as 17 years to resolve, as well as one that took less than a year to resolve.

31  *See* Pub. L. 97-258, § 3730(c)(1) and (2), 96 Stat. 877, 978.

32  *See* False Claims Amendment Act of 1986, Pub. L. 99-562, Sec. 3, § 3730(d)(2), 100 Stat. 3153, 3154-3157.

33  31 U.S.C. § 3729(d).  As one commenter observed, "[s]ince the [False Claims Act] deals only with misrepresentations made in connection with the presentation of claims, misrepresentations for the purpose of defrauding the Government are in many situations not proscribed.  The Supreme Court [in *United States v. Cohn*, 270 U.S. 339 at 345] has defined a 'claim' as a demand upon the Government for the payment of money or delivery of property… However, where the citizen uses false statements to reduce his own liability to the Government, the statute is inapplicable" (fn. refs. omitted).  Note, *The False Claims Act*, 69 Harv. L. Rev. 1106 (1956).

001561

> Although there is room for improvement in the cycle time of whistleblower cases, these cases are often complex and involve built-in time constraints and waiting periods.

The "tax informant statute," now codified as IRC § 7623, was enacted in 1867.[34] Prior to 2006, payments to tax whistleblowers were not mandatory (like payments under the FCA prior to 1986); whether to pay an award and the amount of any award were within the IRS's discretion.[35] In 2006, following a Treasury Inspector General for Tax Administration (TIGTA) report identifying weaknesses in the whistleblower program, Congress added subsection (b) to IRC § 7623.[36] The 2006 amendments made whistleblower awards mandatory in certain cases, specified an award amount from 15 to 30 percent of the collected proceeds (with no cap on the amount of the award), created the IRS Whistleblower Office (WO), and provided for United States Tax Court review of whistleblower award determinations.[37] The IRS and Treasury drafted proposed regulations implementing IRC § 7623(b) in 2012, and after notice, public comment, and a public hearing, issued final regulations in August 2014.[38]

Under IRC § 7623, a tax whistleblower's statutory role has always been limited to reporting information to the IRS, which, like the Attorney General for purposes of the FCA, has the discretion to pursue the claim or not.[39] Unlike the FCA, there is no *qui tam* provision in the IRC allowing a tax whistleblower to proceed on behalf of the government, and tax whistleblowers do not have the benefit of statutory protections from retaliation.[40] Tax whistleblowers are protected by statute from having their identities disclosed in certain situations, however, and the IRS provides heightened security for whistleblower information

---

34  *See* Act of Mar. 2, 1867, ch. 169, § 7, 14 Stat. 471, 473 (codified by ch.11, § 3463, 35 Rev. Stat. 686 (1893-74)).

35  As noted above, the IRS adopted a policy of paying informants up to 15 percent of the amount recovered, subject to a $10 million cap.  IRM 1.2.13.1.12, *Policy Statement 4-27* (Aug. 13, 2004).

36  Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, § 406(a)(1)(D), 120 Stat. 2922, 2958.  *See* Joint Committee on Taxation, Technical Explanation of H.R. 6408, the "Tax Relief and Health Care Act of 2006," JCX-50-06, No. 2 (Dec. 7, 2006) (referencing TIGTA, Ref. No. 2006-30-092, *The Informants' Rewards Program Needs More Centralized Management Oversight* (June 6, 2006)).

37  Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432 § 406(b), 120 Stat. 2922, 2959 (an "off-Code" provision creating the WO); IRC § 7623(b)(4) (providing for Tax Court review of the IRS's award determination).  For administrative ease, the IRS subsequently changed its policy of awarding only up to 15 percent of the amount recovered for subsection (a) claims, and now applies the same criteria and percentages to subsection (a) claims submitted after July 1, 2010, as for subsection (b) claims.  IRM 25.2.2.7.4, *Award Computation - IRC 7623(a) claims filed on or after July 1, 2010 and IRC 7623(b) claims* (Aug. 7, 2015); WO response to TAS information request (Oct. 20, 2015).

38  Notice of Proposed Rulemaking, 77 Fed. Reg. 74798, 2013-3 I.R.B. 289 (Dec. 18, 2012); *Preamble*, T.D. 9687, 79 Fed. Reg. 47246 (Aug. 12, 2014) (noting that the IRS and Treasury held a public hearing on April 10, 2013, at which eight commenters testified).

39  The House proposed including in the 1867 statute a provision allowing *qui tam* actions by informers, but the proposal was rejected, without explanation, by the Senate.  *See* Cong. Globe, 39th Cong. 2d Sess. (1867) 1545, 1919.  Moreover, a rule similar to the one found in what is now IRC § 7401 (that "[n]o civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced") was in place prior to enactment of the 1867 tax informant statute (Act of July 13, 1866, ch. 184, § 9, 13 Stat. 111), and was left intact.  *See also Cohen v. Comm'r*, 139 T.C. 299, 302 (2012) (holding that "section 7623 [does not] confer authority [on the Tax Court] to direct the Commissioner to commence an administrative or judicial action").

40  The President's Budget submissions for FYs 2014, 2015, and 2016 included legislative proposals to provide whistleblowers with protection from retaliation.  *See* Treasury Greenbook FYs 2014-2016 at 204, 235, and 250-51, respectively, *available at* www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx.  The GAO has also recommended that Congress consider such legislation.  *See* GAO, GAO-16-20, *IRS Whistleblower Program Billions Collected, but Timeliness and Communication Concerns May Discourage Whistleblowers* 45 (Oct. 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1570 of 4699   PageID #: 7035

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Appendices

Case
Advocacy

contained in administrative files.[41]  Perhaps the biggest difference between the two whistleblower regimes is due to the protection of taxpayers' confidential information afforded by IRC § 6103, discussed above.

### It Takes the IRS Almost Five Years on Average to Make Payouts of IRC § 7623(b) Claims

The IRS paid its first whistleblower award pursuant to IRC § 7623(b) in 2011.[42]  Although there is room for improvement in the cycle time of whistleblower cases, these cases are often complex and involve built-in time constraints and waiting periods.  The process that culminates in an award under IRC § 7623(b) takes close to five years and generally begins with review of Form 211, *Application for Award for Original Information*, by the WO's Initial Claim Evaluation (ICE) Team.[43]  The claim is perfected if necessary (*e.g.*, the submitter may be asked to complete an incomplete Form 211 or provide an original signature) and then considered by a classifier in one of the IRS operating divisions.[44]  If the classifier, after reviewing Form 211 and completing a classification check sheet, advises the WO that the claim has merit, the WO refers the claim to the appropriate operating division subject matter expert, who reviews the file and advises whether the IRS should open an audit.[45]  If an audit ensues, the general progress of the claim includes: the audit itself; collection of any additional tax resulting from the audit; expiration of any period of limitations within which the audited taxpayer could request a refund; determining the amount of the award; and processing payment.[46]

---

41  *See* IRC § 6103(h)(4) (allowing disclosure of return or return information in judicial and administrative tax proceedings, except where "the Secretary determines that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation"); Treas. Reg. § 301.7623-1(e) (providing that "[u]nder the informant's privilege, the IRS will use its best efforts to protect the identity of whistleblowers"); IRM 25.2.2.5, *Examining a Whistleblower Claim* (Aug. 7, 2015) (instructing that there be "no mention or discussion of the whistleblower in the regular examination activity log, work papers, or case file" (which the IRS interprets to mean that the existence of a whistleblower, as well as his or her identity, is not to be mentioned). WO response to TAS information request (Oct. 20, 2015)); IRS Notice 2008-4, § 3.06, 2008-2 I.R.B. 253 (providing that the IRS maintains the confidentiality of the whistleblower's identity "to the fullest extent permitted by law").

42  IRS WO, *FY 2011 Report to the Congress on the Use of Section 7623* at 3.  The WO's annual reports do not identify, for awards paid, the year in which the claim was submitted.

43  WO response to TAS information request (Aug. 27, 2015) (noting that for the 11 awards paid under IRC § 7623(b) from FYs 2011-2014, the average elapsed time from Form 211 receipt to award payment date was 4.9 years).  Timeframes ranged from 3.9 years to 6.1 years, with a median of 4.9 years.

44  IRM 25.2.2.4, *Initial Form 211 Processing* (Aug. 7, 2015).  We note that the perception of the independence of the WO's determinations would be enhanced if the classifiers reported to the WO Director, similar to the structure of TAS, where revenue agents and revenue officers bring their skills and experience to TAS, and as TAS employees follow TAS's mission, with their head of office the National Taxpayer Advocate.

45  IRM 25.2.2.4.2, *Selecting a Claim* (Aug. 7, 2015).  Alternatively, the classifier may recommend that the WO reject the claim, deny the claim, refer the claim to another group for consideration, or, where the claim requires special handling or coordination among operating divisions, refer the claim(s) to the WO's Case Development and Oversight group, which analyzes and decides whether to send the claim to the field for possible audit.  A classifier who recommends not proceeding with the claim must provide documentation showing he or she considered the issue(s) reflected on the Form 211 and provide the reason he or she did not select the claim.  WO Procedural Guide, *ICE Process: Classification* 18 (rev. Mar. 27, 2015).  A subject matter expert who ultimately determines not to proceed with the case must complete Form 11369, *Confidential Evaluation Report on Claim for Award*, which his or her manager approves, and submit it to the WO Analyst, who forwards it for approval by a WO manager or senior manager.  IRM 25.2.2.4.4(8), *Operating Division SME Responsibilities* (Aug. 7, 2015).

46  *See* IRM 25.2.2, *Whistleblower Awards* (Aug. 7, 2015).  A claim may be transferred to Criminal Investigation (CI), accompanied by Form 11369 explaining the reason for the transfer, and CI may recommend the claim for prosecution, assist the Tax Division of the DOJ in prosecuting the claim, and at its conclusion, return it to the WO for consideration of an award.  IRM 9.4.1.5.1.1(7), *Information Items and Whistleblowers* (Mar. 30, 2012).  If CI determines that the referral lacks prosecution potential, it returns the case to WO, which may refer the claim to an operating division for audit consideration.  IRM 9.4.1.5.1.1(4), *Information Items and Whistleblowers* (Mar. 30, 2012).  A decision by CI to initially not take action does not prevent a criminal referral by an operating division after further development.

001563

Case 1:ev-00306-JCB   Document 124   Filed 11/07/24   Page 1571 of 4699 PageID #: 4736

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

> Even if performance goals (which do not include the time it takes to conduct the audit) are met or exceeded, and even assuming the claim is never suspended pending the outcome of an appeal, collection action, or similar case developments, it will take more than three and a half years on average for a claim to culminate in an award to the whistleblower.

Performance goals established by the IRS Deputy Commissioner of Services and Enforcement apply to some (but not all) phases of the process.[47]  For example, there are no target timeframes for completing whistleblower field audits, which take about a year and a half on average and account for the claims of more than a third of all whistleblowers.[48]  Even if performance goals (which do not include the time it takes to conduct the audit) are met or exceeded, and even assuming the claim is never suspended pending the outcome of an appeal, collection action, or similar case developments, it will take more than three and a half years on average for a claim to culminate in an award to the whistleblower.[49]  A substantial number of whistleblowers (221 out of 1,489, or about 15 percent) were awaiting the WO's review of audit results to determine whether there is sufficient information to make an award decision, which takes almost a year.[50]  The number of days this phase consumes presents an opportunity for the IRS to truncate the cycle time for whistleblower cases and reduce the time whistleblowers must wait to learn whether they will receive an award.[51]  Figure 1.13.1 shows the principal phases required in most successful IRC § 7623(b) claims.

---

47  Memo from John M. Dalrymple, Deputy Commissioner for Services and Enforcement, to Commissioners of the Large Business & International (LB&I), Small Business/Self-Employed (SB/SE), Tax Exempt and Government Entities (TE/GE) divisions, Chief of CI, and Director of the WO (Aug. 20, 2014).

48  CI response to TAS information request (Sept. 3, 2015); TE/GE response to TAS information request (Aug. 5, 2015); SB/SE response to TAS information request (July 30, 2015); LB&I response to TAS information request (July 29, 2015).  IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623*, 20,18 Appx. Tables 5, 4 (showing field audits in WB cases take on average 544 days, with 2,344 days (more than six years) the longest audit and that as of May 14, 2015, out of 1,489 whistleblowers with open claims, the claims of 500 whistleblowers (34 percent) were in field audit).  Criminal investigations of whistleblower claims take on average close to two years.  CI response to TAS information request (Sept. 3, 2015) (noting that the average number of days from the start of an investigation to its completion for investigations closed in FYs 2012, 2013, and 2014 was 572, 656, and 762, respectively).

49  The WO is in the process of updating its records to reflect new status categories and expects its future reports to more accurately capture the status of subsection (b) claims.  Current data shows that it takes 85 days on average for the WO to complete its initial review of the claim (which is faster than the 90-day target); 80 days on average for operating division subject matter expert review to determine whether to audit (which is also faster than the 90-day target); 544 days on average for operating division OD field examination; 362 days on average for the WO review of the results of field action to determine whether there is sufficient information to make an award decision; 45 days on average for the whistleblower to be notified of award decision after collected proceeds are finally determined (which is faster than the 90-day target); and 218 days for final award processing.  The sum of these periods is 1,334 days, more than 3.5 years.  IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623* 20 Appx. Table 5.

50  *Id.* at 18, 20 Appx. Tables 4 and 5 (noting that this step takes 362 days on average).  As noted, the WO is in the process of updating its records.  It is possible that some claims included in this step will be re-classified as in another status, which could affect the average number of days claims await the WO's review of audit results.  WO response to TAS information request (Oct. 20, 2015).

51  A 90-day time period for this phase would be an appropriate performance goal.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1572 of 4699 PageID #: 4737

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

**FIGURE 1.13.1**

### Principal Phases of Most Successful IRC § 7623(b) Claims



Case 1:... v-00306-JCB   Document 124   Filed 11/07/24   Page 1573 of 4699 PageID #: 4738

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

If the claim is suspended, which could occur for a variety of reasons, the average timeframe is extended, potentially for several additional years.[52]  One important reason for suspending a claim, at least in cases where the taxpayer has not waived the right to request a refund, is to allow the statutory period of limitations for requesting a refund to expire.[53]  Suspending the claim obviates the risk that the IRS would pay an award to a whistleblower out of collected proceeds it is later required to refund to the taxpayer.  Treasury regulations permit, but do not require the IRS to separate the components of a claim so that a payout on one issue can go forward while other issues are litigated.[54]

Because processing times may be lengthy, whistleblowers seek information about the status of their claims.  They approach the WO with requests for information, they submit requests to the IRS under the Freedom of Information Act (FOIA), and they inform TAS of systemic delays.[55]

### The IRS Has Never Availed Itself of IRC § 6103(n), an Exception to the Statutory Prohibition on Disclosing Confidential Taxpayer Information, That Would Allow the IRS to Update Whistleblowers on the Status of Their Claims and Protect Taxpayer Confidential Information From Re-Disclosure by the Whistleblower

There are exceptions to the nondisclosure rules of IRC § 6103, some of which may apply in the context of whistleblower claims, although none specifically addresses disclosures to whistleblowers.  For example, a whistleblower and the IRS may enter into a contract under IRC § 6103(n), sometimes referred to as a "tax administration" contract, for the whistleblower's services relating to the detection of violations of the internal revenue laws or related statutes.[56]  In that event, the IRS "may inform the whistleblower and, if applicable, the legal representative of the whistleblower, of the status of the whistleblower's claim for award under IRC § 7623, including whether the claim is being evaluated for potential investigative action, or is pending due to an ongoing examination, appeal, collection action, or litigation."[57]  If a tax administration contract is in effect, the regulations under IRC § 6103 provide that the sanctions imposed by IRC §§ 7431, 7213, and 7213A, discussed above, apply to the whistleblower.[58]  Moreover, a whistleblower who executes a contract under IRC § 6103(n) must "permit an inspection of the whistleblower's

---

52   The shortest average suspension period, arising while the claim is awaiting collection action, affected 76 whistleblowers in FY 2014 and adds about nine months on average to the timeframe.  The longest average suspension period, arising while the IRS evaluates a bulk claim involving a large number of taxpayers, affected ten whistleblowers in FY 2014 and adds almost three years to the timeframe.  IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623* at 17 Appx. Table 4.

53   Generally, taxpayers must request a refund within three years from the date their return was filed, or two years from the time the tax was paid, whichever occurs later, or, if no return was filed, within two years from the time the tax was paid.  IRC § 6511(a).  If taxpayers meet the three-year requirement, they can recover payments made during the three-year period that precedes the date of the refund request, plus the period of any extension of time for filing the return.  Taxpayers who do not meet the three-year requirement can recover only payments made during the two-year period preceding the date of the refund request.  IRC § 6511(b)(2).

54   *See* Treas. Reg. § 301.7623-4(d)(2), T.D. 9687, 79 Fed. Reg. 47246, 47275 (Aug. 12, 2014).  In any event, Form 870, *Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment*, provides that the consenting taxpayer cannot petition Tax Court, but "[y]our consent will not prevent you from filing a claim for refund (after you have paid the tax) if you later believe you are so entitled."

55   From FYs 2012-2015 (as of June 22), the IRS received 38 FOIA requests seeking access to whistleblower records, 11 of which were from whistleblowers seeking access to records about their claim.  In those cases, the whistleblower can obtain the claim and any attachments he or she provided to the IRS, and the IRS can confirm that the claim exists and is still open or closed, but cannot provide any other information about actions the IRS will take on the claim.  Privacy, Governmental Liaison and Disclosure response to TAS information request (June 29, 2015); SAMS 31265, submitted Aug. 18, 2014.

56   *See* IRC § 6103(n); Treas. Reg. § 301-6103(n)-2.

57   Treas. Reg. § 301.6103(n)-2(b)(3).

58   Treas. Reg. § 301.6103(n)-2(c) (providing "[a]ny whistleblower, or legal representative of a whistleblower, who receives return information under this section, is subject to the civil and criminal penalty provisions of sections 7431, 7213, and 7213A for the unauthorized inspection or disclosure of the return information").

001566

or the legal representative's premises by the IRS" to ensure that return information is adequately protected from unauthorized disclosure.[59]

The IRS advises its officials they may use an IRC § 6103(n) contract when disclosure to a whistleblower is "necessary to obtain a whistleblower's insights and expertise into complex technical or factual issues,"[60] and as discussed below, the regulations under IRC § 7623 contemplate the use of such contracts.[61]  At the same time, the IRS views these contracts as "not intended to be used to disseminate information to whistleblowers."[62]  On the contrary, "[a] whistleblower who thinks the IRS will grant a section 6103 contract 'without a compelling need on the part of the IRS to get information from the whistleblower has just misunderstood what (n) contracts were intended to do.'"[63]  In any event, the IRS has never entered into an IRC § 6103(n) contract with a whistleblower.[64]

### The IRS Does Provide Confidential Taxpayer Information to Whistleblowers Under Provisions That Do Not Adequately Protect Taxpayers from Re-Disclosure of Their Confidential Information by Whistleblowers

The IRS does disclose return information to whistleblowers pursuant to another exception to IRC § 6103 for what are sometimes referred to as "investigative disclosures."[65]  Under IRC § 6103(k)(6), to the extent necessary to obtain information related to the IRS's official duties or to accomplish properly any activity connected with such official duties, the IRS may disclose return information to third parties (persons other than the taxpayer).  Whether or not this exception would allow the IRS to provide status updates to a whistleblower, a whistleblower to whom a disclosure is made under IRC § 6103(k)(6), unlike a whistleblower to whom a disclosure was made pursuant to an IRC § 6103(n) contract, is not subject to statutory requirements for safeguarding the information or the statutory sanctions for re-disclosing it.[66]

The IRS discloses taxpayer information to a successful whistleblower pursuant to another exception to IRC § 6103 after it concludes an audit, collects proceeds from the taxpayer, determines that a

---

59   Treas. Reg. § 301.6103(n)-2(d)(3).  *See also* Treas. Reg. § 301.6103(n)-1 (providing analogous provisions that apply to tax administration contracts generally (not only those entered into by whistleblowers)).

60   Memorandum from John M. Dalrymple, IRS Deputy Commissioner for Services and Enforcement to Commissioners of the LB&I, SB/SE, TE/GE divisions, Chief of Criminal Investigation, and Director of the Whistleblower Office (Aug. 20, 2014); Memorandum from Steven Miller, IRS Deputy Commissioner for Services and Enforcement to Commissioners of the LB&I, SB/SE, TE/GE and W&I divisions, Chief of Criminal Investigation, and Director of the Whistleblower Office (June 20, 2012), 2012 TNT 121-15.

61   *Preamble*, T.D. 9687, 79 Fed. Reg. 47246, 47256 (Aug. 12, 2014).

62   Andrew Velarde, *Whistleblower Status Letters Seen as a Good Start but Not Enough* 2015 TNT 53-5 (Mar. 19, 2015) (describing the WO Director's view of IRS § 6103(n) contracts).

63   *Id.* (quoting the WO Director).

64   SB/SE response to TAS information request (July 31, 2015); LB&I response to TAS information request (July 29, 2015); TE/GE response to TAS information request (Aug. 5, 2015).  The GAO has recommended that the IRS "[d]evelop guidance for examiners in operating divisions to use in determining whether an Internal Revenue Code section 6103(n) contract with a whistleblower would be beneficial and outline the steps for requesting such a contract."  *See* GAO, GAO-16-20, *IRS Whistleblower Program Billions Collected, but Timeliness and Communication Concerns May Discourage Whistleblowers* 46 (Oct. 2015).

65   Andrew Velarde, *Whistleblower Status Letters Seen as a Good Start but Not Enough* 2015 TNT 53-5 (Mar. 19, 2015) (reporting that according to the WO Director, "as a practical matter, investigative disclosures under section 6103(k)(6) can be and have been used to interact with whistleblowers, and auditors are confident in using that authority, which 'works a little easier' and serves as a fair substitute" for IRC § 6103(n) contracts).  For a detailed discussion of disclosures under IRC § 6103(k)(6) to third parties other than whistleblowers, where it is *presumed* that the contact with the third party will be disclosed to the taxpayer, see Most Serious Problem: *Third Party Contacts: IRS Third Party Contact Procedures Do Not Follow the Law and May Unnecessarily Damage Taxpayers' Businesses and Reputations*, *supra*.  In contrast, as discussed above, IRS procedures require that it not disclose a whistleblower's identity to the affected taxpayer.

66   Treas. Reg. § 301.6103(k)(6)-1(c)(1) provides that these disclosures "may not be made indiscriminately or solely for the benefit of the recipient or as part of a negotiated *quid pro quo* arrangement."  The National Taxpayer Advocate does not view providing status updates pursuant to a confidentiality agreement as contravening this requirement.

whistleblower award could be paid, and notifies the whistleblower of a preliminary, or proposed, award.[67] The preliminary award the IRS communicates to the whistleblower includes "a summary report that states a preliminary computation of the amount of collected proceeds, the recommended award percentage, the recommended award amount… and a list of the factors that contributed to the recommended award percentage."[68]

Although the Internal Revenue Manual (IRM) initially treated the administrative process as beginning on the date the WO received the claim for award, Treasury regulations now provide that sending the preliminary award marks the beginning of an "administrative proceeding."[69] Pursuant to IRC § 6103(h)(4), the IRS may disclose returns and return information during a whistleblower administrative proceeding.[70] The regulations under IRC § 7623 require the whistleblower to execute a confidentiality agreement before the IRS will share any information beyond that already provided in the preliminary award.[71] Violating the confidentiality agreement, including by re-disclosing return information, is a negative factor the IRS takes into account in calculating the amount of the award.[72] Noting that "[a]s a practical matter, this factor would be ineffective after payment," the National Taxpayer Advocate recommended that taxpayers be allowed to recover damages for subsequent unauthorized disclosure by whistleblowers.[73] The WO has raised the same concern, noting "current law does not provide an effective sanction if the whistleblower discloses taxpayer information in violation of the confidentiality agreement and section 6103(h)."[74]

### More Robust Sanctions for Re-Disclosure of Taxpayer Information by Whistleblowers and Less Restrictive Interpretations of IRC §§ 7623 and 6103 Would Better Protect Taxpayers While Allowing Status Updates to Whistleblowers

The regulatory provision that a whistleblower "administrative proceeding" (which triggers an exception to the disclosure rules) begins only when the IRS proposes an award is an obvious impediment to effective communication with whistleblowers while the case is unfolding and wending its way through various phases that lead to an award. In response to a request for comment on proposed regulations under IRC § 7623, "[s]everal commenters suggested that whistleblower administrative proceedings should begin earlier. The commenters offered different suggestions for how this could be accomplished, including

---

67  IRC § 6103(h)(4), discussed below.

68  Treas. Reg. § 301.7623–3(c)(2)(ii) (for preliminary awards under IRC § 7623(b)).  *See* Treas. Reg. § 301.7623-3(b)(1) (for a similar provision for preliminary awards under IRC § 7623(a)).

69  *Compare* IRM 25.2.2.8, *Whistleblower Award Determination Administrative Proceeding - 7623(a) Claims* (June 18, 2010), *with* Treas. Reg. § 301.7623–3(b) and (c).  In practice, the IRS has never treated the administrative proceeding as beginning with receipt of the claim for award from the whistleblower.  WO response to TAS information request (Oct. 20, 2015).  Issuance of a preliminary denial letter or preliminary rejection letter in IRC § 7623(b) cases also marks the beginning of a whistleblower administrative proceeding.  *See* Treas. Reg. § 301.7623-3(c)(7) and (8).  (The WO does not conduct whistleblower administrative proceedings for claims rejected or denied under IRC § 7623(a).  *See* Treas. Reg. § 301.7623-3(b)(3).)

70  Treas. Reg. § 301.7623–3(a); Treas. Reg. § 301.6103(h)(4)-1.

71  Treas. Reg. § 301.7623-3(c)(3)(iii),(c)(4).  Requiring a whistleblower to execute a confidentiality agreement before disclosing taxpayer information pursuant to IRC § 6103(h)(4) is intended to "balance whistleblowers' desire for increased communication with protections and safeguards for taxpayers' confidential information," in view of the lack of any prohibition on re-disclosure of taxpayer information in IRC § 6103(h)(4).  *Preamble*, T.D. 9687, 79 Fed. Reg. 47246, 47258 (Aug. 12, 2014).

72  Treas. Reg. § 301.7623-4(b)(2)(vi).

73  National Taxpayer Advocate 2010 Annual Report to Congress 396-97 Legislative Recommendation: *Protect Taxpayer Privacy in Whistleblower Cases*, discussed below.

74  IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623* at 6.

001568

beginning whistleblower administrative proceedings at the time that a claim is submitted on the Form 211."[75]  However,

> [a]fter considering the comments received, Treasury and the IRS determined that beginning the administrative proceeding before the preliminary award determination letter would not meaningfully increase a whistleblower's ability to participate in and provide comments relating to the award determination.  As discussed earlier in this preamble, the IRS will use several tools, including debriefings, section 6103(n) contracts, and section 6103(k)(6) disclosures to communicate with whistleblowers following the submission of a claim.[76]

Implicit in the response is the IRS's position that once a whistleblower submits a claim, further communication with the whistleblower is appropriate only after the IRS determines to make an award (unless the IRS needs information from the whistleblower in the meantime).  In view of the lengthy timeframes involved, this approach seems inconsistent with the IRS's announced support for the whistleblower program and its commitment to finding ways of improving communication with whistleblowers.[77]

Neither IRC § 6103 nor any other statute impedes the IRS and Treasury from defining a whistleblower "administrative proceeding" as beginning with the filing of Form 211, and the IRS and Treasury could revise the regulations under IRC § 7623 to allow annual or bi-annual notifications to whistleblowers with basic information, such as whether the claim resulted in an audit, whether an audit has been concluded, whether proceeds from the audit have been collected, and an estimated time within which the WO expects to send a preliminary award.  This would allow the WO to retain significant discretion about what it will disclose and how early.  As the WO develops procedures for making periodic updates, the IRS and Treasury could update the applicable regulations to define what and when the WO will disclose.  However, these changes should not be adopted unless the appropriate regulations (whether under IRC § 6103 or IRC § 7623) are also revised to require whistleblowers who wish to receive status updates to execute confidentiality agreements that carry the statutory penalties imposed by IRC §§ 7431, 7213, and 7213A, and subject them to the safeguarding requirements of IRC § 6103(p).[78]

---

75   *Preamble*, T.D. 9687, 79 Fed. Reg. 47246, 47256 (Aug. 12, 2014).

76   *Id.* The IRS may meet with a whistleblower as part of a "debriefing," but the purpose of these meetings "is to help us understand what you know," rather than to disclose information to the whistleblower.  IRM 25.2.2-1, *Debriefing Checksheet* (Aug. 7, 2015).

77   *See, e.g.*, William Hoffman, *Tax Analysts Interview with John Koskinen* (Oct. 17, 2014) (reiterating his support for the whistleblower program generally, expressing his willingness to explore ways to improve communication with whistleblowers, and noting the need for anti-retaliation legislation).

78   Because IRC § 7623(b)(6)(A) provides that "[n]o contract with the Internal Revenue Service is necessary for any individual to receive an award under this subsection," the requirement that a whistleblower execute a confidentiality agreement would arise if the whistleblower requests status updates, not necessarily in every case.  The National Taxpayer Advocate recommends legislative adjustments that would provide an independent statutory basis for imposing the same liability on whistleblowers whether or not a confidentiality agreement is in place.  *See* Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p)*, *infra*.

001569

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

### Tax Court Rules Protect Taxpayer Information and Whistleblower Identity in Court Filings, But Legislation Is Needed to Protect Taxpayers From Re-Disclosure of Their Confidential Information by Whistleblowers and to Protect Whistleblowers From Retaliation in the Event Their Identity Becomes Known

If a challenge to the proposed award under IRC § 7623(b) is not resolved administratively, the whistle-blower may petition the Tax Court for review of the award.[79]  Disclosure of relevant return information in a judicial tax proceeding is allowed pursuant to IRC § 6103(h)(4) (the same exception that allows disclosure in "administrative proceedings") and disclosures made in open court are generally in the public domain.[80]  Unlike whistleblower cases brought pursuant to other statutes, such as the FCA, in which the alleged wrongdoer is a party to the case, in a tax whistleblower case the alleged wrongdoer (the taxpayer) is not a party and may be unaware the case even exists.  As the National Taxpayer Advocate has noted:

> A taxpayer's privacy interest generally should not be compromised without consent, which is implicit in civil litigation initiated to contest a tax deficiency or obtain a refund, but not in whistleblower litigation.  In the criminal context, considerable procedural protections leading up to a criminal charge and trial that discloses return information, coupled with the signifi-cant public interest in obedience to criminal laws, take the place of taxpayer consent.[81]

In 2010, the National Taxpayer Advocate recommended that Congress:

- Require the redaction of third-party return information in administrative and judicial proceedings relating to whistleblower claims;

- Notify a taxpayer of the intent to disclose confidential information and allow the taxpayer to request further redactions before disclosure; and

- Allow taxpayers to recover damages for subsequent unauthorized disclosure by whistleblowers.[82]

In 2012, the Tax Court adopted Rule 345, *Privacy Protections for Filings in Whistleblower Actions*, which:

- Allows a petitioner in a whistleblower case to proceed anonymously; and

- Requires a party or nonparty making the filing to refrain from including, or to redact, the name, address, and other identifying information of the taxpayer to whom the claim relates.[83]

The Tax Court, in its explanation for the proposed change relating to whistleblower cases, noted and discussed the National Taxpayer Advocate's concerns in detail.[84]

These changes in Tax Court rules, while they offer protection to both taxpayers and whistleblowers with respect to documents filed with the court, do not impede a whistleblower from re-disclosing taxpayer

---

79   IRC § 7623(b)(4), providing Tax Court jurisdiction to review any determination regarding an award under IRC § 7623(b).  The Tax Court's review is limited to the WO's determination; "section 7623 [does not] confer authority to direct the Commissioner to commence an administrative or judicial action."  *Cohen v. Comm'r*, 139 T.C. 299, 302 (2012).

80   *See Lampert v. U.S.*, 854 F.2d 335, 337 (9th Cir. 1988) (stating "once return information is disclosed in court, such informa-tion is no longer confidential, the taxpayer loses any privacy interests in that information") *cert. den'd* 490 U.S. 1034 (1989).

81   Even in a criminal trial, a taxpayer as a party could make a motion to protect private information.  *See* Fed. R. Crim. Proc. 49.1.  In a whistleblower case, unlike in a criminal or civil tax case, the taxpayer whose return information is disclosed is a third party.  National Taxpayer Advocate 2010 Annual Report to Congress 396, 398 (Legislative Recommendation: *Protect Taxpayer Privacy in Whistleblower Cases*).

82   National Taxpayer Advocate 2010 Annual Report to Congress 396 (Legislative Recommendation: *Protect Taxpayer Privacy in Whistleblower Cases*).

83   *See* Tax Ct. R. 345 (effective July 6, 2012).  The rule also cross references Rules 27 and 103(a), pertaining to privacy protec-tions and protective orders.

84   *See* United States Tax Court, Press Release (Dec. 28, 2011), *available at* www.ustaxcourt.gov/press/122811.pdf.

001570

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1578 of 4699 PageID #: 6043

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

information acquired during the whistleblower administrative proceeding or through discovery in the Tax Court proceeding, in a different venue or medium.[85]   However, the Tax Court has been proactive in responding to this risk.  In *Whistleblower One 10683-13W v. Comm'r*, the Tax Court granted whistleblowers' motions to compel discovery of information in the IRS's hands that should be included in an administrative record, and also ordered:[86]

- The IRS to mark it as "CONFIDENTIAL—Section 6103 Information Subject to Protective Order" any confidential taxpayer information it provides to the whistleblowers;

- "Any person receiving confidential information" to use it "solely for the *bona fide* purpose of conducting this litigation and not for any other purpose whatsoever," on pain of exposure to "sanctions and punishment in the nature of contempt;"

- Whistleblowers and their counsel to not disclose any confidential information directly or indirectly to any person "except for the sole purpose of trial preparation and in accordance with the provisions of the protective order;"

- Whistleblowers and their counsel, when providing confidential information to other persons for trial preparation, "to provide a copy of this order to the person receiving confidential information and inform the person that he or she must comply with the terms of the order.  Before providing confidential information, petitioners and their counsel shall obtain the person's signature on a copy of the order, followed by a business or home address of that person at which service of process can generally be made during business hours.  Petitioners and their counsel shall retain the signed copy of the order until one year after the decision in this case becomes final;" and

- Whistleblowers, their counsel, "and any other persons who receive confidential information" to "return all copies of any confidential information to respondent or certify in writing to respondent the destruction of all confidential information" upon final resolution of the case.[87]

Imposing meaningful statutory penalties on whistleblowers who engage in such unauthorized re-disclosure would also help protect taxpayers' *right to confidentiality*.[88]   In the meantime, the WO could mitigate this risk by requiring whistleblowers who seek status updates to execute confidentiality agreements that would impose safekeeping requirements on whistleblowers and grant affected taxpayers a remedy for unauthorized re-disclosure of their confidential information.[89]

As for whistleblowers, even proceeding in court anonymously does not guarantee that their identity will not come to light or be inferred, at least by some interested members of the public, including their

---

85   The WO has also voiced concern about this potential for disclosure of taxpayer information.  *See* IRS WO, *Fiscal Year 2014 Report to the Congress on the Use of Section 7623* 6-7.  At least two whistleblowers shared with the media confidential taxpayer information they acquired pursuant to informal discovery during Tax Court litigation.  *See* Jesse Drucker and Peter S. Green, *IRS Resists Whistle-Blowers Despite Wide U.S. Tax Gap* Bᴌᴏᴏᴍʙᴇʀɢ Bᴜsɪɴᴇss (June 19, 2012).  Chief Counsel response to TAS information request (Aug. 6, 2015).

86   *Whistleblower One 10683-13W v. Comm'r*, 145 T.C. No. 8 and Order in docket no. 10683-13W (Sept. 16, 2015).

87   *Id.*

88   *See* Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p)*, *infra*.

89   For litigated claims, IRS Chief Counsel attorneys could also seek to protect taxpayer information a whistleblower acquires during discovery or any other phase of the litigation.  Tax Court Rule 103, *Protective Orders*, provides in paragraph (a): "Upon motion by a party or any other affected person, and for good cause shown, the Court may make any order which justice requires to protect a party or other person from annoyance, embarrassment, oppression, or undue burden or expense, including but not limited to one or more of the following:… (7) That a trade secret or other information not be disclosed or be disclosed only in a designated way."

001571

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1579 of 4699 PageID #:  4744

Most Serious
Problems

Most Serious
Recommendations

Most Litigated
Issues

employers.  As noted above, unlike whistleblowers who proceed under the False Claims Act, tax whistle-blowers do not enjoy statutory protection from retaliation.  The National Taxpayer Advocate believes IRC provisions are needed to protect tax whistleblowers from retaliation.[90]

### CONCLUSION

With its 2006 amendments to the IRC, Congress intended to encourage tax whistleblowing as an efficient means of enforcing the tax laws.  The IRS paid only 11 awards under IRC § 7623(b) in the nine years since those amendments and has interpreted statutory provisions protecting taxpayer privacy in ways that prevent it from communicating effectively with whistleblowers who offer to assist the government in recovering unpaid taxes.  The IRS relies on exceptions to the same nondisclosure rules in ways that do not adequately protect taxpayers' confidential information from re-disclosure by whistleblowers.  Regulatory provisions crafted by the IRS and Treasury reflect these interpretations and should be adjusted to better protect taxpayers and meet the needs of whistleblowers.[91]

### RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise the regulations under IRC § 7623 to provide that a whistleblower "administrative proceeding" within the meaning of IRC § 6103(h)(4) commences with the whistleblower's submission of Form 211.

2. Revise the regulations under IRC § 6103 or IRC § 7623 to provide that the IRC §§ 7431, 7213 and 7213A penalties apply to re-disclosures of returns or return information by a whistleblower who has executed a confidentiality agreement as part of an IRC § 6103(h)(4) administrative proceeding, and that the IRC § 6103(p) safeguarding requirements also apply to such a whistleblower.

3. Revise the regulations under IRC § 7623 to require the IRS, upon the whistleblower's execution of a confidentiality agreement as part of an administrative proceeding under IRC § 6103(h)(4), to provide bi-annual status updates sufficient to allow a whistleblower to monitor the progress of the claim (*e.g.*, whether the claim resulted in an audit, whether the audit has concluded, the existence of any collected proceeds, and whether the case has been suspended) according to procedures developed by the WO.

---

90   See Legislative Recommendation: *Whistleblower Program: Enact Anti-Retaliation Legislation to Protect Tax Whistleblowers*, infra.

91   Legislative action is also necessary.  See Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p)*; Legislative Recommendation: *Whistleblower Program: Enact Anti-Retaliation Legislation to Protect Tax Whistleblowers*, infra.

001572

# AFFORDABLE CARE ACT (ACA) – BUSINESS: The IRS Faces Challenges in Implementing the Employer Provisions of the ACA While Protecting Taxpayer Rights and Minimizing Burden

## RESPONSIBLE OFFICIALS

Carolyn A. Tavenner, Director, Affordable Care Act Office
Karen Schiller, Commissioner, Small Business/Self-Employed Division

## TAXPAYER RIGHTS IMPACTED[1]

- The Right to Be Informed
- The Right to Quality Service

## PROBLEM STATEMENT

The IRS is charged with implementing complex Affordable Care Act (ACA) provisions that require updating information technology systems, issuing guidance, and collaborating with other federal agencies.[2] For tax years 2015 and beyond, certain provisions of the ACA impacting employers become effective.[3] For example, applicable large employers (ALEs) must offer minimum essential coverage (MEC) to their full-time employees.[4] Employers not in compliance with this provision may be subject to an assessable payment, referred to as the "employer shared responsibility payment" (ESRP). The IRS expects to receive 77 million new information returns once the business portions of the ACA become effective in 2015.[5]

The ACA also provides for a temporary small business health care tax credit (SBHCTC) designed to defray the costs of employers with 25 or fewer employees whose average annual wage is less than $50,000.[6] Although many businesses will not meet the strict (and complex) criteria for claiming the SBHCTC, the IRS could do more to actively promote this credit to ensure that all eligible employers can take advantage of this subsidy.

The National Taxpayer Advocate is concerned that the IRS's implementation of the ACA provisions for the 2016 filing season may burden both employers and employees if certain conditions and issues are not addressed. Through representation on the IRS ACA Executive Steering Committee and several joint

---

1   See Taxpayer Bill of Rights, available at www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
2   See Patient Protection and Affordable Care Act of 2009, Pub. L. 111-148, 124 Stat. 119 (Mar. 2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010).
3   For a discussion of concerns expressed by the National Taxpayer Advocate regarding the IRS's implementation of the components of the ACA that impact individual taxpayers, see Most Serious Problem: Affordable Care Act (ACA) - Individuals: The IRS Is Compromising Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions, infra. See also National Taxpayer Advocate FY 2016 Objectives Report to Congress 38 (Area of Focus: The IRS's Administration of the Affordable Care Act Has Gone Well Overall, But Some Glitches Have Arisen); National Taxpayer Advocate 2014 Annual Report to Congress 67 (Most Serious Problem: Implementation of the Affordable Care Act May Unnecessarily Burden Taxpayers).
4   See Internal Revenue Code (IRC) § 4980H.
5   IRS response to TAS information request (Oct. 22, 2015).
6   See IRC § 45R(d); Treas. Reg. § 1.45R-2; IRS Notice 2010-44, available at www.irs.gov/pub/irs-drop/n-10-44.pdf.

Case 1:24-cv-00306-JCB  Document 124  Filed 11/07/24  Page 1581 of 4699 PageID #: 4746

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

implementation teams, the National Taxpayer Advocate and TAS have identified the following concerns with the implementation of ACA provisions that impact employers:

- Employees in the newly-established ACA Business Exam unit need to receive specialized training on the parts of ACA implementation that impact businesses, including training on concepts such as ALE, MEC, and ESRP;

- The IRS should provide additional guidance to employers on how to calculate the number of full-time equivalents (FTEs) for purposes of meeting MEC requirements;

- The IRS lacks adequate testing of the accuracy of information-reporting data that would verify employer information before the filing season. This could lead to significant taxpayer burden that would subject employers to an unwarranted ESRP or require them to respond to unnecessary notices; and

- The IRS needs to increase active promotion of the availability of the SBHCTC to eligible employers.

Notwithstanding these concerns, we acknowledge the tremendous efforts made by the IRS to implement the health care provisions given their interdependency on decisions made by other federal agencies. Nonetheless, the IRS will be heavily scrutinized by individuals and employers for any ACA-related problems that arise in the context of return filing.

## ANALYSIS OF THE PROBLEM

### Background

#### *Applicable Large Employers*

Internal Revenue Code (IRC) § 4980H(a)(1) provides that an ALE must offer MEC to its full-time employees. In general, an employer is considered an ALE if it employs 50 or more full-time workers (or FTEs), or a combination of full-time and part-time employees that equals at least 50 FTEs.[7]

An employer calculates its FTEs based on each employee's hours of service. For purposes of the ESRP, an employee is considered full-time for a calendar month if he or she averages at least 30 hours of service per week. Under the final regulations, for purposes of determining full-time employee status, 130 hours of service in a calendar month is treated as the monthly equivalent of at least 30 hours of service per week.[8]

IRC § 4980H includes a provision stating that companies with a common owner (or that are otherwise related) generally are combined and treated as a single employer and therefore would be combined for purposes of determining whether or not they collectively employ at least 50 FTEs. If the combined total meets the threshold, then each separate company is subject to the ESRP, including those companies that individually do not employ enough employees to meet the 50 FTEs threshold.

#### *Employer Shared Responsibility Payment*

IRC § 4980H provides that ALEs will be subject to an ESRP if (1) it fails to offer its full-time employees the opportunity to enroll in MEC under an eligible employer-sponsored plan, and (2) a Premium Tax

---

7    IRC § 4980H(c)(2).

8    Treas. Reg. § 54-4890H, 79 FR 8543 (Feb. 12, 2014), *available at* www.federalregister.gov/articles/2014/02/12/2014-03082/shared-responsibility-for-employers-regarding-health-coverage.

Credit was paid to at least one full-time employee. The amount of the ESRP under IRC § 4980H(a) is $2,000 per full-time employee per year (determined on a monthly basis).[9]

IRC § 4980H(b) requires ALEs to offer affordable MEC that provides minimum value. If an ALE offers MEC but it is not considered affordable, it will be assessed an ESRP of $3,000 for each employee (determined on a monthly basis) that purchases health insurance from the exchange and is granted a tax credit and/or subsidy for health insurance.[10] While an employer may be subject to ESRP under both IRC § 4980H(a) and (b), the liability is limited to the amount under IRC § 4980H(a).[11]

The ESRP provisions generally are not effective until January 1, 2015, meaning that the ESRP will be first assessed during the 2016 filing season.[12] However, employers must take action during 2015 to avoid liability for ESRP assessed in 2016.

> The National Taxpayer Advocate is concerned that the IRS has not yet firmed up its approach to selecting and working cases involving Affordable Care Act (ACA) business issues, even as the 2016 filing season is rapidly approaching.

### Minimum Essential Coverage, Minimum Value, and Affordability

MEC, minimum value, and affordability are defined under IRC provisions other than IRC § 4980H but all relate to the determination of ESRP. MEC is defined in IRC § 5000A(f) and the regulations under that section and includes employer-provided health care coverage but not coverage providing only limited benefits, such as coverage only for vision or dental care. IRC § 36B(c)(2)(C)(ii) provides the definition of minimum value. An employer-sponsored health plan meets this standard if it is designed to pay at least 60 percent of the total cost of medical services for a standard population.

If an employee's share of the premium for employer-provided coverage would cost the employee more than 9.5 percent of that employee's annual household income (HHI), the coverage is not considered "affordable" for that employee.[13] Because employers generally will not know their employees' HHI, employers can take advantage of several affordability safe harbors set forth in the final regulations that are based on information the employer will have available.[14] If an employer meets the requirements of any of these safe harbors, the offer of coverage will be deemed affordable for purposes of the ESRP provisions regardless of whether it was actually affordable to the employee.

### IRC § 4980D Excise Tax

IRC § 4980D imposes an excise tax on employers who maintain a group health plan that fails to meet certain requirements. There is concern that certain flexible spending accounts, health reimbursement arrangements, and other arrangements that reimburse employee premiums for medical insurance purchased on the individual market are considered group health plans subject to the excise tax imposed by IRC § 4980D. By their nature, these arrangements fail to comply with the ACA market reforms that prohibit annual and lifetime dollar limits (Public Health Service Act § 2711) and require plans to provide cost-free

---

9   IRC § 4980H(c)(1). The ESRP provisions provide an inflation adjustment mechanism beginning in years after 2014. IRC § 4980H(c)(5).

10  IRS § 4980H(b)(1).

11  Treas. Reg. § 54-4890H, 79 FR 8543 (Feb. 12, 2014), *available at* www.federalregister.gov/articles/2014/02/12/2014-03082/shared-responsibility-for-employers-regarding-health-coverage.

12  IRS Notice 2013-45, *available at* www.irs.gov/irb/2013-31_IRB/ar08.html.

13  IRC § 36B(c)(2)(B) and (C).

14  Treas. Reg. § 54-4890H, 79 FR 8543 (Feb. 12, 2014), *available at* www.federalregister.gov/articles/2014/02/12/2014-03082/shared-responsibility-for-employers-regarding-health-coverage.

001575

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

preventive services (Public Health Service Act § 2713). As a result, it appears that such programs are subject to an excise tax of $100 per affected individual, per day, under IRC § 4980D as plans that fail to satisfy ACA market reforms.[15]

On February 18, 2015, the IRS issued Notice 2015-17[16] providing temporary relief from the IRC § 4980D excise tax for employer programs that reimburse employees for the cost of health insurance coverage purchased individually (including coverage obtained through an Exchange). This excise tax will not be asserted for employers that are not ALEs for 2014 and for January through June 2015. After June 30, 2015, such employers may be liable for the IRC § 4980D excise tax. Understandably, this temporary relief is not all that comforting to small businesses that must decide whether to keep providing such a benefit to their employees at the risk of being assessed an excise tax of $100 per day per employee.

### Small Business Health Care Tax Credit

Under IRC § 45R, eligible small employers can claim the SBHCTC for 2010 through 2013 and for two additional years beginning in 2014. A small employer is eligible for the credit if (a) it has fewer than 25 FTE employees, (b) the average annual wages of its employees are less than $50,000 (adjusted for inflation beginning in 2014), and (c) it pays a uniform percentage for all employees equal to at least 50 percent of the premium cost of employee-only insurance coverage.

For 2010 through 2013, the maximum credit was 35 percent of premiums paid by eligible small businesses and 25 percent of premiums paid by eligible tax-exempt organizations. For 2014 and 2015, the maximum credit rate rises to 50 percent for small businesses and 35 percent for tax-exempt organizations.[17] Businesses that have already filed and later find that they qualified in 2013 or an earlier year can still claim the credit by filing an amended return for the affected years.

### IRS Employees Need to Receive Training on the Parts of ACA Implementation That Impact Businesses, Including Training on Concepts Such as ALE, MEC, and ESRP

The IRS must ensure that employees who work ACA-related issues, especially those in taxpayer-facing roles, are properly trained on the aspects of the ACA that impact business taxpayers. The IRS has designated that ESRP cases will be worked by a specialized unit out of the Ogden Service Center but does not yet know the grade or series of the examination employees selected to work these ESRP cases.[18] The IRS expects to develop procedures and roll out training for these employees before the ESRP cases are assigned but has not committed to a certain date. The National Taxpayer Advocate is concerned that the IRS has not yet firmed up its approach to selecting and working cases involving ACA business issues, even as the 2016 filing season is rapidly approaching.

Although the IRS developed and delivered a substantial amount of training in advance of the 2015 filing season, much of that training was focused on the components of the ACA that impacted individual taxpayers.[19] In 2015, the IRS expanded training to revenue agents, tax compliance officers, and technical advisors on IRC §§ 4980H, 6055, and 6056. Once the IRS has determined which group of employees

---

15  See IRS Notice 2013-54, *available at* www.irs.gov/pub/irs-drop/n-13-54.pdf.

16  *Available at* www.irs.gov/pub/irs-drop/n-15-17.pdf.

17  See Treas. Reg. § 1.45R, 79 FR 36640 (June 30, 2014), *available at* www.federalregister.gov/articles/2014/06/30/2014-15262/tax-credit-for-employee-health-insurance-expenses-of-small-employers.

18  IRS response to TAS information request (Oct. 22, 2015).

19  See National Taxpayer Advocate 2014 Annual Report to Congress 71.

001576

will focus on examining employers' compliance with the business aspects of the ACA, this new group of employees will require comprehensive and specialized training.[20]

### The IRS Should Provide Formal Guidance to Employers on the Calculation of FTEs for Purposes of Meeting MEC Requirements

IRS outreach and education should continue to focus on increasing awareness to employers of the ACA requirements that are effective beginning in tax year (TY) 2015. For example, the IRS Information Reporting Advisory Committee (IRPAC) reported that the ACA Information Center for Tax Professionals web page on the IRS website should be improved to provide clearer guidance for TY 2014 about what constitutes MEC.[21]

Employers not in compliance with the provisions under IRC § 4980H may be subject to an assessable payment, referred to as the ESRP. On February 12, 2014, the IRS and Treasury issued final regulations on the ESRP provisions.[22] The guidance acknowledges that there are certain categories of employees whose hours of service will be particularly challenging to identify and track and advises their employers to use "a reasonable method of crediting hours of service that is consistent with section 4980H." The preamble provides some examples of what may be considered a reasonable method in certain industries but is far from comprehensive.

In addition to the final regulations, the IRS provides clarification of the guidance in the form of an ESRP Q&A page and an ALE Information Center on irs.gov.[23] While they contain helpful information, the limited Q&A page and ALE Information Center do not adequately address many questions about the calculation of FTEs for purposes of meeting the MEC requirements. Q&As are helpful, but they do not have the impact of formal guidance, which undergoes a notice and comment period. Furthermore, although informal guidance is better than no guidance, taxpayers may not rely on Q&As found on the IRS website for penalty defense purposes.

### The Inability of the IRS to Adequately Test the Accuracy of Information-Reporting Data Before the Filing Season Can Inhibit IRS Verification Efforts and May Cause Significant Taxpayer Burden

The IRS relies on information reports to verify data relevant to the ESRP liability and SBHCTC eligibility. Beginning in the 2016 filing season, the IRS will receive and process an estimated 77 million new information returns from employers.[24]

IRC § 6055 requires annual information reporting by health insurance issuers, self-insuring employers, government agencies, and other providers of health coverage. IRC § 6056 requires annual information reporting by ALEs relating to the health insurance that the employer offers (or does not offer) to

---

20   The IRS did not provide specific course modules or training schedules for business-related ACA issues. *See* IRS response to TAS information request (Oct. 27, 2015).

21   *See* IRS, *2014 IRPAC Public Report: Employee Benefits and Payroll Subgroup, available at* www.irs.gov/Tax-Professionals/IRPAC-Public-Report-Employee-Benefits-and-Payroll-Subgroup-2014.

22   Treas. Reg. § 54-4890H, 79 FR 8543 (Feb. 12, 2014), *available at* www.federalregister.gov/articles/2014/02/12/2014-03082/shared-responsibility-for-employers-regarding-health-coverage.

23   *See* IRS, *Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, available at* www.irs.gov/Affordable-Care-Act/Employers/Questions-and-Answers-on-Employer-Shared-Responsibility-Provisions-Under-the-Affordable-Care-Act (last visited Dec. 1, 2015); IRS, *ACA Information Center for Applicable Large Employers (ALEs), available at* www.irs.gov/Affordable-Care-Act/Employers/ACA-Information-Center-for-Applicable-Large-Employers-ALEs (last visited Dec. 1, 2015).

24   IRS response to TAS information request (Oct. 22, 2015).

001577

its full-time employees. Below is a list of information returns the IRS created to meet these reporting requirements:

- Form 1095-B, *Health Coverage* (used by health insurance issuers and carriers to report information about individuals who are covered by MEC and therefore aren't liable for the individual shared responsibility payment; due by February 28 (or March 31 if filing electronically));[25]

- Form 1094-B, *Transmittal of Health Coverage* (used by health insurance issuers and carriers to submit Form 1095-B);

- Form 1095-C, *Employer-Provided Health Insurance Offer and Coverage Insurance* (furnished by ALEs to any full-time employee for one or more months of the year; due by February 28 (or March 31 if filing electronically));[26] and

- Form 1094-C, *Transmittal of Employer-Provided Health Insurance Offer and Coverage Information Returns* (used by ALEs to submit Form 1095-C).

### FIGURE 1.14.1, Projected Volume of Information Returns for ACA Exchange Provisions, Tax Years 2015–2017[27]

|  | Tax Year 2015 | Tax Year 2016 | Tax Year 2017 |
|---|---|---|---|
| Forms 1095-B | 46 million | 45 million | 47 million |
| Forms 1095-C | 77 million | 77 million | 78 million |
| **Total** | **123 million** | **122 million** | **125 million** |

As noted above, the IRS expects to receive over 120 million information returns from health insurance providers and ALEs during the 2016 filing season. If this information is not furnished to the IRS timely, the IRS has little opportunity to identify problems and even less opportunity to fix them early in the filing season to prevent potential rejected returns and delays for taxpayers. As of the time of publication, the IRS has not been able to fully test the ability of its information technology systems to handle the expected volume of ACA information returns. Furthermore, the IRS has not expanded the taxpayer identification number (TIN) matching program to health insurers and self-insured employers that are required to file Form 1095-B, which may lead to mismatches and unnecessary notices.[28]

If the IRS receives incomplete or inaccurate data, taxpayers will be harmed.[29] For example, if the IRS cannot accurately verify coverage information, it will inhibit the IRS's ability to verify eligibility for the SBHCTC. Furthermore, ALEs may unnecessarily be required to substantiate coverage to employees if the data is unreliable and contains false positives. If the IRS receives inaccurate data regarding coverage, it may erroneously assess ESRPs on ALEs, which can be costly and time-consuming for both employers and the IRS to rectify.

---

25  IRS, *Instructions for Forms 1094-B and 1095-B* (2015), *available at* www.irs.gov/pub/irs-pdf/i109495b.pdf.

26  IRS, *Instructions for Forms 1094-C and 1095-C* (2015), *available at* www.irs.gov/pub/irs-pdf/i109495c.pdf.

27  IRS response to TAS information request (Oct. 22, 2015).

28  *See* Most Serious Problem: Affordable Care Act (ACA) - Individuals: *The IRS Is Compromising Taxpayers Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions*, *infra*.

29  *See* National Taxpayer Advocate 2014 Annual Report to Congress 75-6 (discussing TIN matching for Form 1095-B; the IRS will use Form 1095-B to verify compliance with IRC § 5000A); Legislative Recommendation: *Math Error Authority: Authorize the IRS to Summarily Assess Math and "Correctable" Errors Only in Appropriate Circumstances*, *infra*.

001578

### The IRS Should More Actively Promote the Availability of the SBHCTC to Eligible Employers

To educate and assist small business taxpayers, TAS developed an online estimator for the SBHCTC.[30] This tool allows small businesses to estimate their credits (if any) and find out how any changes in circumstances will impact their eligibility. Since November 2012, the SBHCTC estimator has been available on the TAS Tax Toolkit,[31] where small businesses and tax professionals can access it easily, and TAS has continually promoted it through social media, including Twitter and Facebook.

Notwithstanding the efforts of TAS, the IRS should do more to promote the availability of the SBHCTC to eligible employers. Yet it is difficult for the IRS to actively promote this credit to small businesses when it has decimated its public outreach staff, such that as of the end of October 2015, 14 states (plus the District of Columbia) did not have a single outreach and education employee dedicated to small businesses located within their borders.[32]

**The IRS expects to receive over 120 million information returns from health insurance providers and Applicable Large Employers (ALEs) during the 2016 filing season. If this information is not furnished to the IRS timely, the IRS has little opportunity to identify problems and even less opportunity to fix them early in the filing season to prevent potential rejected returns and delays for taxpayers.**

### CONCLUSION

The 2016 filing season will be challenging as the IRS implements several ACA provisions that impact employers against the backdrop of historically low levels of taxpayer service. Although the IRS developed systems and procedures to administer components of the ACA impacting individual taxpayers in the 2015 filing season, the IRS will face new challenges in the 2016 filing season when business taxpayers file their TY 2015 returns and report ESRP liabilities. The IRS will receive and process a significant amount of new information returns from insurers and exchanges to identify errors and noncompliance. While the IRS has little control over some of the anticipated risks, such as delayed or inaccurate data reporting from the exchanges, it will be held publicly responsible when the associated problems surface during the tax return filing process.

Because of the increased risk of taxpayer harm this filing season, TAS will continue to address issues as they arise and identify systemic problems. TAS will continue to assign ACA Rapid Response team members to immediately address any potential ACA systemic issues that arise during the 2016 filing season. In addition, we encourage both internal and external stakeholders to report any suspected ACA systemic issues on TAS's Systemic Advocacy Management System.[33]

---

30   To educate and assist small business taxpayers, TAS developed an online estimator for the SBHCTC, *available at* www.taxpayeradvocate.irs.gov/estimator/smallbusiness2014/.

31   The TAS Tax Toolkit is a website that contains useful tax information for individuals, businesses, tax professionals and media, including news and updates, ways TAS helps taxpayers, and important information about tax topics and rights and is available at http://www.TaxpayerAdvocate.irs.gov.

32   IRS Human Resources Reporting Center, *Report of SB/SE Job Series, Stakeholder Liaison Field Employees as of October 31, 2015* (Nov. 10, 2015). The 14 states are Alaska, Delaware, Hawaii, Iowa, Kentucky, Mississippi, Montana, Nebraska, New Hampshire, North Dakota, South Dakota, Vermont, West Virginia, and Wyoming. *See also* National Taxpayer Advocate 2014 Annual Report to Congress 31 (Most Serious Problem: *The Lack of a Cross-Functional Geographic Footprint Impedes the IRS's Ability to Improve Voluntary Compliance and Effectively Address Noncompliance*).

33   Stakeholders can report suspected systemic issues at www.irs.gov/sams.

Case 1:23-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1587 of 4699 PageID #: 4752

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Provide additional guidance to employers and tax practitioners on how to calculate the number of FTEs for purposes of meeting the MEC requirements.

2. Publish regulations explaining how the IRC § 4980D excise tax may apply to certain flexible spending accounts and health reimbursement arrangements.

3. Establish a Rapid Response team to assist front-line IRS employees with issues, problems, or questions from employers or tax practitioners.

4. Provide employees in its newly-established ACA Business Exam unit with comprehensive and specialized training on the parts of ACA implementation that impact businesses, including training on concepts such as ALE, MEC, and ESRP.

**MSP #15**

## AFFORDABLE CARE ACT (ACA) – INDIVIDUALS: The IRS Is Compromising Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions

### RESPONSIBLE OFFICIALS

Carolyn A. Tavenner, Director, Affordable Care Act Office
Karen Schiller, Commissioner, Small Business/Self-Employed Division
Sunita B. Lough, Commissioner, Tax Exempt and Government Entities Division
Debra Holland, Commissioner, Wage and Investment Division

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Finality*

### DEFINITION OF PROBLEM

Overall, the IRS has done a commendable job of implementing the first stages of the Patient Protection and Affordable Care Act of 2010 (ACA), including developing or updating information technology systems, issuing guidance, and collaborating with other federal agencies.[2]  The 2015 filing season (FS) presented difficult challenges with the introduction of the Individual Shared Responsibility Payment (ISRP)[3] and the Premium Tax Credit (PTC)[4] on tax year (TY) 2014 federal income tax returns.  At the

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
2   ACA, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010 (HCERA), Pub. L. No. 111-152, 124 Stat. 1029 (2010).
3   Internal Revenue Code (IRC) § 5000A.  Taxpayers filing tax year (TY) 2014 federal income tax returns were required to report they have "minimum essential coverage" (MEC) or were exempt from the responsibility to have the required coverage.  If the taxpayer did not have coverage and was not exempt, he or she was required to make a shared responsibility payment (SRP) when filing a return.
4   PTC is a refundable tax credit paid either in advance or at return filing to help taxpayers with low to moderate income purchase health insurance through the exchange.  IRC § 36B.  The amount of the credit paid in advance is based on projected house-hold income (HHI) and family size for the year of coverage, while the amount for which a taxpayer is actually eligible is based on actual HHI and family size for the year reflected on the tax return.  Many taxpayers were required to reconcile the credit amount they received in advance with the PTC to which they were actually entitled.  IRC § 36B(f).

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1589 of 4699 PageID #: 4754

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

same time, the IRS received and processed new information returns from insurers and exchanges.[5]   While the IRS performed well overall, several developments will likely result in significant burden imposed on both taxpayers and the IRS in future years:

- Taxpayers who received the advanced premium tax credit (APTC) in 2014 and did not file TY 2014 returns (and the Form 8962, *Premium Tax Credit (PTC)*) by Fall 2015 will face difficulties receiving APTC payments in 2016;

- The pre-refund Automated Questionable Credit (AQC) procedures for PTC mismatches impose the same burden as a post-refund PTC examination without the same due process protections, thereby subverting the statutory protections against multiple audits of the same return;[6]

- Taxpayers who receive certain large lump sum payments after receiving APTC may be caught off guard by having to repay APTC amounts, as well as penalties and interest;

- The absence of the Second Lowest Cost Silver Plan (SLCSP) amounts on some Forms 1095-A, *Health Insurance Marketplace Statement*, are delaying the processing of PTC returns and imposing unnecessary burden on taxpayers; and

- The inability of health insurers and self-insured employers to match taxpayer identification numbers (TINs) before filing leads to unnecessary mismatches and notices, increasing issuer burden and wasting IRS resources.

## ANALYSIS OF PROBLEM

### Background

ACA was enacted by Congress in 2010 to provide affordable health care coverage for all Americans.  To accomplish this goal, the ACA provides targeted tax credits for low income individuals and for small businesses, while imposing a personal responsibility on individuals to have health coverage.[7]

### *Filing Season 2015 Overall Results*

Since enactment, the IRS has been implementing complicated ACA provisions that require developing or updating information technology systems, issuing guidance, and collaborating with other federal agencies.  The IRS implementation efforts were tested during FS 2015.  The IRS achieved a relatively high level of service (LOS) on the ACA telephone hotline (800-919-0452) at about 61 percent for fiscal year (FY) 2015, which far exceeded the 38 percent overall LOS on the Accounts Management (AM) toll-free

---

5   The Health Insurance Marketplace, also called the "exchange," is a state- or federally-operated program where individuals can buy health care coverage.  Coverage is available to people who are uninsured or who buy insurance on their own.  *See* http://www.irs.gov/uac/Newsroom/The-Health-Insurance-Marketplace.  IRC § 6055 and the regulations thereunder require every person (*i.e.*, health insurance issuers, self-insuring employers, government agencies, and other providers of health coverage) that provides MEC (as defined in IRC § 5000A(f)) to an individual to report to the IRS information about the coverage of each individual covered under the policy.  IRC § 6056 requires annual information reporting by applicable large employers (ALEs) relating to the health insurance that the employer offers (or does not offer) to its full-time employees.  Notice 2013-45, 2013–31 I.R.B. 116 (July 29, 2013) and T.D. 9660, 2014-13 I.R.B. 842 provide transition relief by delaying the information reporting required under IRC §§ 6055 and 6056 until 2016 for coverage in 2015, but the IRS has encouraged entities to voluntarily provide information returns for coverage provided in 2014, which was due to be filed and furnished in early 2015.

6   The IRS is prohibited from conducting unnecessary examinations or investigations pursuant to IRC § 7605(b).

7   IRC § 4980H(a)(1) imposes a responsibility for ALEs to offer health care to employees in certain circumstances.  ACA, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by HCERA, Pub. L. No. 111-152, 124 Stat. 1029 (2010); Senate Finance Committee, *Description of Policy Options: Expanding Health Care Coverage: Proposals to Provide Affordable Coverage to All Americans* (May 14, 2009).

lines.[8]  The IRS received and processed new information returns from employers, insurers, and exchanges. Taxpayers filing TY 2014 federal income tax returns were required to report that they had "minimum essential coverage" (MEC) or were exempt from the responsibility to have the required coverage in 2014. If the taxpayer did not have coverage and was not exempt, he or she was required to make an ISRP when filing the 2014 return.[9]  The following figure provides data on the reporting of ISRPs on TY 2014 returns:

**FIGURE 1.15.1, Reporting of Individual Shared Responsibility Payments on TY 2014 Returns Through August 27, 2015[10]**

| | |
|---|---|
| Returns claiming coverage | 106 million |
| Returns with ISRP | 7.6 million |
| Average ISRP | $204 |
| Prepared returns reporting ISRP | 5.0 million |
| Forms 8965 | 12.1 million |
| Forms 8965 Claiming Household Coverage Exemption | 3.65 million |
| Forms 8965 Claiming Coverage Exemption | 8.4 million |
| Forms 8965 Submitted with Prepared Return | 6.5 million |

Additionally, eligible individual taxpayers claimed the PTC for the first time on TY 2014 returns filed during FS 2015 filing.  If the taxpayers received the credit in advance, they had to reconcile the APTC amount with the amount of the credit to which they were entitled.[11]  The following figure provides information regarding the extent to which individual taxpayers claimed the PTC on their TY 2014 returns.

**FIGURE 1.15.2, Reporting of the Premium Tax Credit on Forms 8962 for TY 2014 Returns Through August 27, 2015[12]**

| | |
|---|---|
| Forms 8962 | 3.3 million |
| Total PTC Claimed | $9.9 billion |
| Average PTC | $3,011 |
| Returns reporting APTC | 3.1 million (93% of total PTC returns) |
| Total APTC Reported | $11.3 billion |
| Forms 8962 Submitted with Prepared Returns | 2.0 million (61% of total PTC returns) |

---

8   The AM LOS of approximately 38 percent is a combined figure reflecting 30 customer service lines.  The higher LOS on the ACA line may be due, at least in part, to the fact that the number of calls to the ACA line was significantly lower than the IRS anticipated.  IRS, *FY 2015 President's Budget* 4-5, 19-23.  The ACA line received about one million net attempted calls, as compared with over 101 million on the AM lines overall during the period.  IRS, Joint Operations Center (JOC), *Product Line Detail (Enterprise Performance)* (week ending Sept. 30, 2015); IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (week ending Sept. 30, 2015).

9   IRC § 5000A.

10  Wage & Investment Research and Analysis (WIRA), *ACA Fact Sheet* (Oct. 8, 2015) (returns processed through August 27, 2015, Cycle 34).  This data is based on amounts claimed on returns that had posted as of August 27, 2015, and is preliminary and subject to change as the IRS reviews the data, processes additional TY 2014 returns and conducts compliance activities.  IRS Compliance Data Warehouse (CDW), Individual Returns Transaction File for TY 2014 (through cycle 201534).

11  IRC § 36B(f).  The amount of the credit paid in advance is based on projected income while the amount for which a taxpayer is actually eligible is based on actual income.

12  WIRA, *ACA Fact Sheet* (Oct. 8, 2015) (returns processed approximately Aug. 27, 2015).  This data is based on amounts claimed on returns that had posted as of August 27, 2015, and is preliminary and subject to change as the IRS reviews the data, processes additional TY 2014 returns, and conducts compliance activities.

001583

## Significant Issues That Arose During Filing Season 2015

As FS 2015 progressed, the IRS ran into the following three significant issues.[13]

### A SIGNIFICANT NUMBER OF TAXPAYERS OVERSTATED THE ISRP ON TY 2014 RETURNS

Approximately 412,000 taxpayers overstated their ISRP, totaling about $50.6 million through August 27, 2015 (cycle 34).[14] The *average* ISRP overstatement amount was almost $123 per return.[15] These taxpayers did not owe an ISRP for reasons that include:[16]

- The taxpayer was eligible for an ISRP exemption because the reported income is below the income tax filing threshold;[17]

- The taxpayer indicated that he or she could be claimed on another return;[18] and

- Transposition, calculation, or input error.

The IRS decided to issue soft notices to impacted taxpayers. On November 27, 2015, the IRS began issuing approximately 319,000 Letters 5600-C informing taxpayers of the potential overpayment and instructing them to file an amended return and attach Form 8965, *Health Coverage Exemptions*, if applicable. The IRS is exploring the feasibility of systemically adjusting ISRP amounts through programming. If feasible, the IRS would be able to take this action in late Spring 2016.[19] We believe that the IRS should take preventative measures to avoid ISRP overpayments in the future, such as distributing educational notices to preparers associated with overpayments and conducting a comprehensive review and testing of private-sector tax filing software to ensure that problems arising in FS 2015 do not recur.[20]

---

13  For a detailed discussion of these issues, see National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 38-47 (*The IRS's Administration of the Affordable Care Act Has Gone Well Overall, But Some Glitches Have Arisen*).

14  WIRA analysis on ISRP overstatements, through cycle 34 (August 27, 2015), on file with TAS Research. The IRS cannot calculate the exact amount of ISRP overpayments until all dependents have filed their TY 2014 tax returns (The amount of the ISRP depends on HHI pursuant to IRC § 5000A(c)).

15  This average only includes returns with an ISRP overstatement.

16  More than 268,000 taxpayers were eligible for an ISRP exemption. These taxpayers paid in over $33 million in ISRP. In addition, more than 50,000 taxpayers paid a total of nearly $12.7 million because the ISRP amount was miscalculated. The remaining nearly 93,000 taxpayers had multiple adjustments to an ISRP, overstatements of $50 or less, or returns under IRS Examination (totaling almost $4.7 million). These amounts include returns processed by the IRS through the end of August 2015. WIRA estimates from the Individual Returns Transaction File on the IRS CDW. This data is preliminary and is subject to change as the IRS reviews the data, processes additional TY 2014 returns, and conducts compliance activities.

17  IRC § 5000A(e)(2).

18  IRC § 5000A(a).

19  W&I response to TAS information request (Oct. 29, 2015); W&I response to TAS fact check (Dec. 14, 2015) (the IRS expected to mail all letters by December 31, 2015).

20  To determine the experience of taxpayers and find out if the Free File programs accurately calculate the ISRP and determine exemption eligibility, TAS created three scenarios and tested them on each of the 14 Free File sites during FS 2015. We found that four programs correctly calculated no ISRP due to an applicable exemption, but never informed the taxpayer whether he or she qualified for the exemption of income amounts that were below the filing threshold. One program did not seem to support IRS Form 8965, *Health Coverage Exemptions*. The program did not provide the appropriate prompts to take the hardship exemption and incorrectly calculated ISRP. Three programs assumed the user already knew about the available exemptions and did not provide sufficient guidance. We reported our findings to the IRS and the IRS coordinated with the Free File Alliance and all software providers associated with any of the above-mentioned problems adjusted their programs to avoid similar errors in the future. For a more detailed discussion of the FS 2015 Free File software issues, see National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 38-47 (*The IRS's Administration of the Affordable Care Act Has Gone Well Overall, But Some Glitches Have Arisen*).

**Exchanges Made Errors on Forms 1095-A, Leading to an IRS Resolution to Reduce Taxpayer Burden**

The Centers for Medicare and Medicaid Services (CMS) announced in February 2015 that about 20 percent (or 800,000) of the tax return filers who purchased health insurance from the federal exchange received Forms 1095-A, *Health Insurance Marketplace Statement*, with errors in the SLCSP information.[21] The exchange issued corrected Forms 1095-A.  The Department of Treasury publicly stated that the IRS would not pursue collection of any additional taxes or require the taxpayer to file an amended return based on the updated information in the corrected forms if the taxpayer filed a 2014 tax return with the incorrect Form 1095-A amounts.[22]  On April 10, 2015, the IRS issued Notice 2015-30, providing penalty relief for incorrect or delayed Forms 1095-A for taxpayers who timely filed their 2014 return.[23]

The IRS identified returns with errors in the SLCSP, but did not issue guidance to all employees on how to distinguish taxpayers impacted by the CMS announcement.[24]  We believe the IRS may adjust the PTC on returns filed with an incorrect Form 1095-A and pursue collection since there is no guidance to prevent this from occurring.  TAS will be monitoring its own case receipts to see if such collection activity, including refund offsets, is taking place, and will work with the IRS to issue interim guidance.

Approximately 412,000 taxpayers overstated their Individual Shared Responsibility Payment (ISRP) totaling about $50.6 million through August 27, 2015 (cycle 34). The average ISRP overstatement amount was almost $123 per return.

**Taxpayers Who Received APTC in 2014 and Did Not File TY 2014 Returns (and Form 8962) by Fall 2015 Will Face Difficulties Receiving APTC in 2016**

The Department of Health and Human Services (HHS) regulations that implement the ACA include a process for re-enrolling taxpayers in health insurance and determining their eligibility for the APTC.  To determine eligibility, the regulations require the exchange to verify income and family size with the IRS.[25]  The IRS has begun to provide a response code during the verification process that signifies that a taxpayer has not filed a tax return reconciling the amount of APTC received.[26]  The response code indicates to the Marketplace that a taxpayer may not be eligible to receive the APTC for the new coverage year.  It is our understanding that the IRS began to provide such response codes during Marketplace open enrollment for coverage year 2016, which began on

---

21  The amount of the SLCSP is a factor used to determine the amount of PTC a taxpayer is allowed. The SLCSP is based on such factors as an individual's age and the area in which he lives. IRC § 36B(b)(3)(B).

22  U.S. Department of Treasury, Press Center, *Statement from a Treasury Spokesperson on CMS Announcement Last Week About 1095-A* (Feb. 24, 2015) and *Statement from a Treasury Spokesperson on Forms 1095-A* (Mar. 20, 2015), *available at* http://www.treasury.gov/press-center/press-releases/Pages/jl9981.aspx and http://www.treasury.gov/press-center/press-releases/Pages/jl10005.aspx, respectively.  *See also* Treasury Inspector General for Tax Administration, Ref. No. 2015-43-043, *Affordable Care Act: Assessment of Internal Revenue Service Preparation for Processing Premium Tax Credit Claims 12* (May 11, 2015) (urging the IRS to develop a tool to enable taxpayers to determine the correct SLCSP premium); SERP Alert 15A0147, *Responding to Taxpayer Inquiries about Corrected Forms 1095-A, Health Insurance Marketplace Statements* (Feb. 26, 2015, rev. Apr. 6, 2015).

23  Notice 2015-30, 2015-17 I.R.B. 928 (Apr. 27, 2015).  For more information regarding the impact of the incorrect Forms 1095-A as well as the National Taxpayer Advocate's concerns, see National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 38-47 (*The IRS's Administration of the Affordable Care Act Has Gone Well Overall, But Some Glitches Have Arisen*).

24  IRM 3.12.3.75.9, *Error Code 198, Form 8962, Annual/Monthly SLCSP Amount(s), Column B (ACA)* (Jan. 1, 2015).

25  45 CFR § 155.335, Annual eligibility redetermination; HHS, *Guidance on Annual Eligibility Redeterminations and Re-enrollments for Marketplace Coverage for 2016* (Apr. 22, 2015), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/annual-redeterminations-for-coverage-42215.pdf.

26  In some cases the taxpayer may have filed a tax return but did not attach the Form 8962 which is necessary to reconcile the APTC.  IRS ACA Office response to TAS information request (Nov. 5, 2015).

001585

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1593 of 4699 PageID #: 4758

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

November 1, 2015.[27]  For all taxpayers who previously received the APTC and filed their tax returns and Form 8962 by the date of the verification, the exchanges automatically re-enrolled the taxpayers and recalculated their 2016 APTC amount during the fall of 2015.  Taxpayers who failed to file a tax return (or who filed and failed to attach Form 8962) by the date of the verification, regardless of whether they had a valid extension of time to file, will be re-enrolled in their insurance for 2016; however, they will not automatically receive the APTC.[28]  To receive the APTC, these taxpayers will have to file their 2014 tax return, including a reconciliation on Form 8962, and then go back to the Marketplace for a redetermination of their eligibility for the APTC.  This creates extra burden for taxpayers to reestablish their eligibility for the advanced credit.  Some taxpayers may erroneously believe their automatic re-enrollment in their insurance plan also includes APTC re-enrollment and not take the steps necessary to receive the APTC in 2016.

The National Taxpayer Advocate is concerned about the burden imposed on taxpayers due to the timing of the verification process between the IRS and the exchanges.  Approximately 360,000 taxpayers with APTC filed for an extension for TY 2014 returns, which allows them to file on or before October 15, 2015.[29]  It is our understanding that balance due returns take longer to process and a significant portion of these returns may have been impacted by such response codes in the verification process.[30]

Commendably, the IRS sent Letters 5591 or 5591A to APTC recipients who had not filed tax returns but received APTC.  The IRS also sent Letter 5596 to APTC recipients who had yet to file a 2014 return but had filed for an extension.  The letters urged the recipient to file as soon as possible to avoid a gap in receiving APTC in 2016.[31]  The following figure sets forth how many of each type of letter the IRS sent, as well as the dates mailed:

### FIGURE 1.15.3, Letters Sent to APTC Recipients Who Had Not Yet Filed Returns[32]

| Type of IRS Letter | Count | Dates Mailed |
| --- | --- | --- |
| Ltr 5591 | 567,976 | July 10, 2015 to July 30, 2015 |
| Ltr 5591A | 149,688 | July 31, 2015 to Aug. 21, 2015 |
| Ltr 5596 | 337,065 | Aug. 6, 2015 to Aug. 21, 2015 |

TAS did not have the opportunity to provide meaningful review of some of the letters prior to final approval by the IRS.  We believe that the letters did not adequately warn taxpayers of the need to file returns by a particular date to avoid a cumbersome process to continue receiving APTC in 2016.  We advise the IRS to work with the National Taxpayer Advocate on revisions to Letters 5591, 5591A, and 5596

---

27  IRS ACA Office response to TAS information request (Nov. 5, 2015).

28  HHS *Guidance on Annual Eligibility Redeterminations and Re-enrollments for Marketplace Coverage for 2016* (Apr. 22, 2015), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/annual-redeterminations-for-coverage-42215.pdf. IRS ACA Office response to TAS information request (Nov. 5, 2015).

29  IRS Commissioner John Koskinen Letter to Members of Congress 3 (July 17, 2015), *available at* http://www.irs.gov/pub/irs-utl/CommissionerLetterlwithcharts.pdf.

30  IRM 21.3.12.2, *Balance Due Research* (Oct. 1, 2015).  TAS encounters this issue when the taxpayer needs the return posted for purposes of getting tax transcripts for financial aid, loan applications, and proof of income.  The payments for some balance due returns are visible on the account, but no associated return has posted.  IRM 1.2.3.5.7, *Transcript Restrictions and Special Handling* (Aug. 19, 2015).

31  IRS Letters 5591, 5591A, 5596.

32  W&I response to TAS information request (Oct. 29, 2015).

> Despite the fact that the Letter 4800C begins with the language, "This is not an audit. Your return may be examined in the future," we are concerned that the Automated Questionable Credit (AQC) process and the documentation requirements imposed on the taxpayers under AQC are substantially similar to those in an examination.

for FS 2016.  The IRS should provide outreach and education early in the filing season to inform taxpayers about the consequences of filing for an extension if they received the APTC, or at least, the risk of waiting until fall to file even with a valid extension.

### The Pre-Refund Automated Questionable Credit (AQC) Procedures for PTC Mismatches Impose the Same Burden As a Post-Refund PTC Exam Without the Same Due Process Protections, Thereby Subverting the Statutory Protections Against Multiple Audits of the Same Return

The IRS is generally prohibited by Internal Revenue Code (IRC) § 7605(b) from auditing a return twice.[33]  IRC § 7605(b) first appeared as § 1309 of the Revenue Act of 1921.[34]  At that time, Congress designed the section in response to taxpayer complaints that revenue agents were subjecting them to onerous and unnecessarily frequent examinations and investigations.  The purpose of the section was to relieve taxpayers from unnecessary annoyance.[35]  Accordingly, the manner in which the IRS is conducting pre-refund "reviews" of taxpayers' PTC returns raises serious concerns about the IRS subjecting taxpayers to multiple audits and undermining this important protection.

During submission processing, the IRS ACA Verification Service (AVS) matches data reported on PTC returns with data reported from the Marketplace.  AVS checks all returns to verify if the taxpayer received APTC and reconciled the advance payment on Form 8962, *Premium Tax Credit (PTC)*.  If the data does not match or the APTC was not reconciled on Form 8962, the IRS will delay processing the return and send the taxpayer Letter 12C, requesting a corrected Form 8962, or Form 1095-A, *Health Insurance Marketplace Statement,* to support the credit and reconcile the APTC.[36]

The IRS cannot use math error authority to adjust return discrepancies attributable to third-party data mismatch.  In those cases, the IRS places a freeze on the refund, or a portion thereof, and refers the return to Compliance for further treatment.[37]

---

33   *See* IRC § 7605(b); Rev. Proc. 2005-32, § 4.03, 2005-1 C.B. 1206 (discussing procedures the IRS does not consider examinations).  IRC § 7605(b) provides "No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

34   Revenue Act of 1921, ch. 136, § 1309, 42 Stat. 310 (1921) (now codified at IRC § 7605(b)).

35   Harold Dubroff and Brant J. Hellwig, United States Tax Court: A Historical Analysis: A Historical Analysis, Government Printing Office  fn. 100 (2d. Ed. 2015); *United States. v. Powell*, 379 U.S. 48, 54-55 (1964) (quoting the statement of Senator Penrose, the manager of the bill: "I know that, from many of the cities of the country, very bitter complaints have reached me and have reached the department of unnecessary visits and inquisitions after a thorough examination is supposed to have been had. This section is purely in the interest of quieting all this trouble, and in the interest of the peace of mind of the honest taxpayer.").

36   For FY 2015 the IRS issued 684,332 total ACA-related correspondences.  From March 2, 2015, to November 28, 2015, 124,639 returns were suspended for research prior to correspondence for PTC matching issues.  Of the suspended returns, 69,019 were resolved via research and 55,620 required correspondence.  W&I response to TAS information request (Oct. 29, 2015); W&I response to TAS fact check (Dec. 14, 2015).

37   IRM 21.6.3.4.2.16.3, *At-Filing Overview* (Oct. 1, 2015); IRC § 6213(b).  Examples of third-party data mismatch include the following: (1) The taxpayer claims PTC but the taxpayer's household income (HHI) is less than 100 percent of the Federal Poverty Line (FPL) and all tax family members are U.S. citizens; (2) The taxpayer claims PTC but there is no record that anyone claimed on the return was enrolled in a Qualified Health Plan through the Marketplace; (3) Marketplace data is available for all months and the taxpayer's annual premium amount does not equal the annual premium reported by the Marketplace; (4) Marketplace data is available for all months and the taxpayer's annual premium of SLCSP does not equal the annual SLCSP reported by the Marketplace; and (5) Marketplace data is available for all months and the annual APTC reported by the taxpayer does not equal the annual APTC reported by the Marketplace.  IRM 25.25.7.8.1, *Premium Tax Credit (PTC) Error Codes (ERC) (associated with AQC)* (Jan. 9, 2015).

Depending on the type of PTC discrepancy, the IRS refers the return either to Examination to work as a traditional audit or to the AQC program for a similar "audit" process.[38]  If referred to AQC, the IRS sends a Letter 4800C, *Questionable Credit 30 Day Contact Letter*, which proposes an adjustment and requests Form 1095-A.[39]

Despite the fact that the Letter 4800C begins with the language, "This is not an audit.  Your return may be examined in the future," we are concerned that the AQC process and the documentation requirements imposed on the taxpayers under AQC are substantially similar to those in an examination.  In AQC, if a Form 1095-A is not verified, the IRS will ask for "documentation proving premium payments, copies of insurance enrollment forms, invoices, or statements from the insurance providers that include the names of those covered by the benefits."[40]  An examination of the same issue requires the same documentation on Form 14950, *Premium Tax Credit Verification,* which requests "copies of insurance enrollment forms, invoices, or statements from your insurance providers."[41]

The National Taxpayer Advocate believes that if a taxpayer submits the same information when the return is in AQC as he would in an exam, the AQC constitutes an actual examination of the taxpayer's books and records.  When the IRS doesn't classify these tax AQC adjustments as an examination, the IRS does not trigger the taxpayer's right to avoid unnecessary examinations.[42]  This position enables the IRS to later conduct an examination of a taxpayer who already has been subjected to an examination of the same return, thereby undercutting an important taxpayer protection enacted by Congress to avoid that very result.

TAS requested an opinion from the Office of Chief Counsel on whether an AQC inquiry into a PTC matching issue constitutes an audit for purposes of IRC § 7605.  We received advice in the form of an email which concluded that such AQC inquiries do not constitute an exam for purposes of IRC § 7605(b).  The Office of Chief Counsel, Procedure and Administration provided the following advice:[43]

> Revenue Procedure 2005-32 defines a number of taxpayer contacts that are not examinations for purpose of section 7605(b).  Among those contacts that do not constitute an examination are matching information on a return with information already in the Service's possession and

---

38  The AQC program is a type of work stream IRS uses to resolve refundable credit discrepancies that generally do not meet the traditional Examination or AM work stream type.  IRM 25.25.7.1, *Automated Questionable Credit (AQC) Overview* (Jan. 9, 2015).

39  If the taxpayer provides an incomplete response to the 4800C, the AQC tax examiner attempts to reach the taxpayer by phone to request additional information.  If the examiner is unable to reach the taxpayer by phone, AQC sends Letter 131C, *Information Insufficient or Incomplete for Processing Inquiry*, to request additional documentation in writing.  If the taxpayer provides information in response to the Letter 4800C indicating disagreement with the proposed adjustment, but the taxpayer provides documents deemed insufficient or if AQC does not receive a response from the taxpayer, the AQC tax examiner issues a Statutory Notice of Deficiency (SNOD) or Claim Disallowance letter.  If there is no response within the notice period, IRS defaults the SNOD and removes the credit from the taxpayer's account.  IRM 25.25.7.2, *AQC Inventory Types* (June 1, 2015); IRM 25.25.7.4(8) & (9) (June 8, 2015).

40  IRM 25.25.7.2, *AQC Inventory Types* (June 1, 2015).

41  In FY 2015, the IRS routed 20,147 accounts to AQC for PTC mismatch issues.  Of the 20,147 referred to AQC, 8,034 cases were referred to Exam (ERC 197, 198 and 199 determined to need recalculations and Exam treatment) and 6,312 were resolved.  The additional 5,801 cases remained open in AQC suspense at the end of FY 2015.  The IRS selected 18,810 TY 2014 PTC returns for examination during 2015 (through Sept. 25, 2015).  Of the selected cases, Exam closed 2,322 returns, of which 885 were no change; 1,356 were agreed, and 81 were unagreed/default.  The 885 no change cases include 462 cases selected incorrectly due to a programming error (figures reflect W&I). W&I response to TAS information request (Oct. 29, 2015); W&I response to TAS fact check (Dec. 14, 2015).

42  IRC § 7605(b).

43  Email from the Office of Chief Counsel (Nov. 13, 2015), on file with TAS.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1596 of 4699 PageID #: 4261

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

considering any records the taxpayer provides voluntarily to explain a discrepancy between a filed return and information from third parties that is used as part of a matching program. Rev. Proc. 2005-32 § 4.03(1)(b) & (c). An example of this kind of contact is "a contact with a taxpayer to… verify a discrepancy between the taxpayer's tax return and an information return, or between a tax return and information otherwise in the Service's possession." *Id.* at 4.03(1)(d)(ii)(C). Here, the Service is contacting a taxpayer to resolve a discrepancy between a taxpayer's Form 1095-A or Forms 1040 and 8962 and the 1095-A, already in the Service's possession, provided by the Health Insurance Marketplace. Such a contact falls squarely within the revenue procedure's definition of a contact that does not constitute an examination.

Even if the Service requests that the taxpayer provide additional documentation, such as proof of premium payments or copies of insurance enrollment forms, this contact should not constitute an examination. Requesting this information is a contact designed to verify a discrepancy between the taxpayer's return and information obtained as part of a matching program. It appears to fall within the example the Revenue Procedure provides of the type of contact that does not constitute an examination. Id. This interpretation of the revenue procedure is amplified by Policy Statement 4-3. That policy statement states, "contact[s] to verify a discrepancy disclosed by an information return matching program may include inspection of the taxpayer's books of account, to the extent necessary to resolve the discrepancy, without being considered an inspection within the meaning of section 7605(b) of the Code." IRM 1.2.13.1.1(5). In this case, the documents the Service is likely to request are only those necessary to resolve the discrepancy. See IRM 25.25.7.2 (listing the documents the Service will request).

We strongly disagree with the Office of Chief Counsel on its conclusion. Their response relies on its own administrative guidance and does not squarely address the point that the IRS is asking for the *exact same* information from a taxpayer in a post-refund audit as it asks from a taxpayer in a pre-refund "non-audit." The Office of Chief Counsel advice is calling a wolf a lamb because it is wearing a sheepskin on its back. Because in our view the AQC review is an examination, the IRS must follow formal audit reopening procedures if it tried to conduct a subsequent examination on the tax return in question.[44]

The IRS may compromise the taxpayer's right to an appeal and impose unnecessary delays on the taxpayer while the IRS holds the PTC portion of the taxpayer's refund.[45] If the taxpayer replies to Letter 4800C and makes changes that do not match AQC's proposed changes, AQC sends Letter 89C, *Amended Return Required to Correct Account,* to require the taxpayer to file an amended return. If this procedure were properly characterized as an examination, and the IRS proposed an adjustment, the IRS would offer the taxpayer administrative appeal rights, and the taxpayer would eventually have the right to appeal in the U.S. Tax Court upon receiving the statutory notice of deficiency.[46]

---

44  The audit reopening procedures can be found in Rev. Proc. 2005-32, 2005-23 I.R.B. 1206 (June 6, 2005); IRM, 1.2.13.1.1, *Policy Statement 4-3* (Dec. 21, 1984).

45  IRM 25.25.7.3, *AQC Initial Case Processing* (Jan. 9, 2015).

46  In the AQC process, the taxpayer may also face additional delays. If the taxpayer submits an amended return to AQC and the amended return changes the amount of the PTC other than the amount proposed by AQC, the taxpayer's return must then go through the IRS AM function to process the amended return. IRM 25.25.7.4, *Taxpayer Responses* (Aug. 25, 2015). AM reviews the claim for examination criteria and refers it to Examination if the criteria are met. IRM Exhibit 21.5.3-1, *Claim Processing with Examination Involvement* (Oct. 1, 2014). If these returns were sent to Examination from the onset, there would be no need for AQC and AM involvement, which created taxpayer burden and caused unnecessary delays. IRM 25.25.7.4, *Taxpayer Responses* (Aug. 25, 2015).

We understand that the IRS has a responsibility to protect revenue and avoid issuing improper refunds. However, we believe the IRS can achieve this goal without violating the statutory restrictions on multiple audits. It needs to coordinate the detection of PTC discrepancies with the detection of other questionable claims by the IRS's other systems (*e.g.*, the Dependent Database or Electronic Fraud Detection System). It can include all such concerns in one pre-refund or post-refund contact with the taxpayer. This approach not only protects taxpayers' rights and comports with the law, but it is also a highly efficient use of IRS resources, and minimizes taxpayer burden.

### Taxpayers Who Receive Certain Lump Sum Payments After Receiving APTC May Be Caught Off Guard by Having to Repay Large APTC Amounts As Well As Penalties and Interest

To be an eligible taxpayer for the PTC, a taxpayer's household income (HHI) for the taxable year should be between 100 to 400 percent of the federal poverty line (FPL) for their family size.[47] When the taxpayer applies for coverage, the Marketplace estimates the amount of the PTC that the taxpayer can claim for the year using information provided about family composition and projected HHI. Based upon that estimate, the taxpayer may decide to receive the amount of PTC in advance.[48] If the PTC and APTC were calculated based on projected income between 100 and 400 percent of FPL, but the taxpayer's actual HHI calculated on the tax return is more than 400 percent of the FPL, the taxpayer must repay the full amount of the excess APTC (the amount by which APTC exceeds the PTC allowed).[49]

> When the IRS doesn't classify these tax Automated Questionable Credits adjustments as an examination, the IRS does not trigger the taxpayer's right to avoid unnecessary examinations.

The IRS and HHS remind taxpayers who receive APTC to report change in circumstances, including changes in income, to the Marketplace as soon as possible to prevent instances of having to repay APTC amounts.[50] It is likely that many taxpayers were not aware of the complex consequences of receiving lump sum amounts of certain types of income. It is our understanding that some taxpayers who receive lump sum amounts from retroactive awards of Social Security disability are required to repay the full amount of APTC because the lump sum amounts push HHI above the 400 percent FPL limit.[51] TAS is currently reviewing this issue to determine the need for increased outreach communications to alert appropriate APTC recipients to possible consequences of receiving large lump sum distributions.

### The Absence of the SLCSP Amounts on Some Forms 1095-A Are Delaying the Processing of PTC Returns and Imposing Unnecessary Burden on Taxpayers

Taxpayers who receive coverage from the Marketplace receive Form 1095-A, *Health Insurance Marketplace Statement*. Part III of Form 1095-A should provide the SLCSP amount, which is used to calculate the PTC or reconcile the amount of

---

47  IRC § 36B(c)(1).

48  If the taxpayer is eligible for and decides to receive APTC, the Marketplace sends payments directly to the insurance provider on the taxpayer's behalf, reducing the taxpayer's out-of-pocket premium expense. If the taxpayer receives the APTC, the taxpayer must reconcile the payments made on his or her behalf with the actual PTC allowed on the tax return, as computed on Form 8962, *Premium Tax Credit (PTC)*. IRC § 36B(f).

49  The repayment cap in IRC § 36B(f)(2)(B) does not apply to taxpayers whose HHI exceeds 400 percent FPL.

50  *See* IRS Pub. 5152, *Report Changes to the Marketplace as They Happen: Important Reminder About Advance Payments of the Premium Tax Credit*.

51  Systemic Advocacy Management System (SAMS) entries, on file with the National Taxpayer Advocate. SAMS is a database of issues and information reported by IRS employees and the public. TAS reviews each SAMS submission and elevates them to the IRS for advocacy and resolution as appropriate.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1598 of 4699 PageID #: 63

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

APTC received on Form 8962. However, if the taxpayer purchased insurance through the Marketplace, and chose not to receive the credit in advance, the Marketplace issued the TY 2014 Form 1095-A without the SLCSP information. When the taxpayer filed the TY 2014 tax return, with the Form 8962 to claim a PTC and filled in the SLCSP based on information from the Marketplace at the time of enrollment, it causes a mismatch to occur.

The absence of the SLCSP on Form 1095-A is very confusing to taxpayers. IRS Publication 974, *Premium Tax Credit,* directs the taxpayer to SLCSP premium tools on the Federally-facilitated or state Marketplace websites to look up the SLCSP premium that applies to the taxpayer's coverage family for each month.[52] The Internal Revenue Manual (IRM) is silent on supporting documentation employees can accept from taxpayers when the SLCSP information on Form 1095-A is blank or incorrect.[53]

The lack of procedural guidance on this issue could cause delays in processing returns even when taxpayers follow guidance provided in Publication 974 or on Healthcare.gov. TAS received reports regarding IRS employees refusing to accept taxpayer SLCSP documentation that was either not directly provided by the Marketplace or that couldn't be verified by IRS resources.[54]

Taxpayers need to go directly to the Marketplace to get that information on their own, but this is something that is available early on and the Marketplace should include it on all Forms 1095-A, regardless of whether the taxpayer received the APTC. Such a seemingly minimal effort on part of the Marketplace should significantly reduce burden on both taxpayers and the IRS. The IRS should reform its rules for exchange reporting on Forms 1095-A and require the Marketplace to provide the SLCSP amounts on all such forms.

> It is our understanding that some taxpayers who receive lump sum amounts from retroactive awards of Social Security disablty are required to repay the full amount of Advanced Premium Tax Credit because the lump sum amounts push household income above the 400 percent Federal Poverty Line limit.

### The Inability of Health Insurers and Self-Insured Employers to Match TINs Before Filing Leads to Unnecessary Mismatches and Notices, Increasing Issuer Burden and Wasting IRS Resources

The IRS has not expanded the TIN matching program to health insurers and self-insured employers that are required to file Form 1095-B, *Health Coverage.*[55] The current e-Services TIN Matching Program (TMP) allows participating payers of reportable payments subject to backup withholding under IRC § 3406(b) to match the TIN and name of payees subject to potential backup withholding with IRS

---

52  IRS Pub. 974, *Premium Tax Credit*, 16 (rev. Mar. 2015).

53  IRM 3.12.3.75.9, *Error Code 198, Form 8962, Annual/Monthly SLCSP Amount(s) (ACA)* (Jan. 1, 2015), instructs the examiner to compare Form 1095-A data with taxpayer's SLCSP entries on Form 8962. If the amounts do not match or Form 1095-A is not present on the IRS system, the IRS sends correspondence to the taxpayer. If the taxpayer replies providing a Form 1095-A, the IRM instructs the examiner to compare the Form 1095-A provided by the taxpayer with taxpayer's entries on Form 8962.

54  SAMS entries, on file with TAS.

55  IRC § 6055. Currently, the law authorizes the IRS TIN Matching program only for payers of reportable payments subject to backup withholding. *See* IRC § 3406; Treas. Reg. § 31.3406(j)-1; Rev. Proc. 2003-9, 2003-8 I.R.B. 516 (Feb. 24, 2009).

Case 1:15-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1599 of 4699 PageID #: 4764

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

records prior to filing the information report.[56]  Using the TMP helps payers avoid penalties for submitting incorrect TINs on information returns.[57]

TMP would benefit the filers of Forms 1095-B which provide the names and TINs of all covered individuals and the months for which they had MEC.  The IRS will use the forms to verify an individual's compliance with the ISRP.  The reporting entities are required to begin filing the forms during FS 2016.[58]

Many Form 1095-B filers have never had to verify the accuracy of the name/TIN information and the inability to verify the information before issuing the forms could cause inaccurate TIN reporting.  If information returns with incorrect or incomplete names or TINs are submitted (because the issuers are not able to run the numbers through the IRS TIN matching program before filing), the IRS will not be able to verify that individuals have MEC.  Therefore, even covered individuals could receive notices imposing the ISRP.[59]

## CONCLUSION

During FS 2015, the IRS faced a few unanticipated challenges that resulted in increased taxpayer burden with respect to the ACA.  In general, the IRS has sufficiently addressed the issues as they arise in order to avoid similar issues in future filing seasons.  The National Taxpayer Advocate remains concerned about the burdens imposed on taxpayers who received APTC, but failed to file their TY 2014 returns by the time the IRS must verify income and family size for re-enrollment in 2016.  We are also concerned that AQC procedures for APTC mismatch and reconciliation issues are in fact an examination and therefore leave taxpayers at risk of multiple examinations of the same tax return.  Taxpayers and the IRS are unnecessarily burdened when the Marketplace leaves the SLCSP amounts blank on Forms 1095-A for taxpayers that choose not to receive the APTC.  Accordingly, TAS will work with the IRS and advocate to ensure the changes we recommend are adopted so that taxpayers are not burdened.

---

56   IRM 5.19.3.4.1.6, *e-Services Taxpayer Identification Number (TIN) Matching Program* (Apr. 23, 2014).

57   The TMP would also prevent the assessment of penalties on the businesses filing the forms.  The penalty for failure to file a correct information return is generally $100 and the penalty for failure to furnish a correct payee statement is also generally $100.  IRC §§ 6721, 6722.  The IRS will not impose the penalty if the filer shows the failure was due to reasonable cause and not willful neglect.  IRC § 6724. See Legislative Recommendation: *Affordable Care Act Information Reporting: Allow Taxpayer Identification Number Matching for Filers of Information Returns Under IRC §§ 6055 and 6056, infra.*

58   Notice 2013-45, 2013-31 I.R.B. 116 (July 29, 2013); T.D. 9660, 2014-13 I.R.B. 842 (Mar. 24, 2014).

59   IRC § 5000A.  Insurers could also receive avoidable penalty assessments arising from such mismatches.  Michael M. Lloyd and S. Michael Chittenden, *Expand TIN Matching Program to Avert Another ACA Debacle*, Tax Notes Today (Jan. 15, 2014).

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Take preventative measures to avoid ISRP overpayments in the future, such as distributing educational notices about exemptions and exclusions to preparers associated with such overpayments and conducting a comprehensive review and testing of tax filing software to ensure that the problems that arose in FS 2015 do not recur.

2. Issue guidance to field compliance employees to assist them in identifying returns with a tax liability resulting from the correction of Forms 1095-A errors in the SLCSP information and not pursuing collection, including blocking the accounts from refund offsets.

3. Work with the National Taxpayer Advocate on revising Letters 5591, 5591A, and 5596 for FS 2016 to include the exact date by which the taxpayer needs to file in order to automatically re-enroll for the APTC the following year.

4. Conduct outreach and education to inform taxpayers early in FS 2016 about the consequences of filing for an extension if the taxpayer received APTC. In particular, the information should provide the taxpayer with a specific date in 2016 by which the taxpayer needs to file the TY 2015 return in order to automatically re-enroll to receive APTC in 2017.

5. Determine a method to identify all issues relating to a return, as selected by the various filters in the filing season, and include all of the issues in one notice to the taxpayer so that the taxpayer does not have multiple audits with respect to the same return.

6. Conduct outreach and education on the consequences of receiving large lump sum distributions to APTC recipients as well as other organizations making such distributions, such as the Social Security Administration.

7. Issue guidance to both taxpayers (on the IRS website as well as in the Form 1095-A instructions) and IRS employees (in the IRM) about how taxpayers can use the look-up tool on Healthcare.gov to find their SLCSP premium amount.

8. Provide a similar IRS tool to ensure IRS employees can look-up the SLCSP amount and verify the amount provided by the taxpayer. The IRS should provide employees training on the use of the tool.

9. Reform the rules for exchange reporting on Form 1095-A and require the Marketplace to provide the SLCSP amounts on all such forms.

10. Expand the TIN matching program to include health insurers and self-insured employers that are required to file Form 1095-B, *Health Coverage*.

001593

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1601 of 4699 PageID #:  4766

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

## IDENTITY THEFT (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long

### RESPONSIBLE OFFICIALS

Debra Holland, Commissioner, Wage and Investment Division
Glenn Coles, Director, Identity Theft Victim Assistance Unit

### TAXPAYER RIGHTS IMPACTED[1]

- The Right to Quality Service
- The Right to Finality

### DEFINITION OF PROBLEM

In general, tax-related identity theft (IDT) occurs when an individual intentionally uses the personal identifying information of another person to file a falsified tax return with the intention of obtaining an unauthorized refund.[2]  Identity theft victims must substantiate their identity with the Internal Revenue Service (IRS), file various forms, and wait months or even years to receive their tax refunds and unwind the account issues.[3]

The National Taxpayer Advocate first raised concerns with the IRS's ability to resolve IDT cases in her 2004 Annual Report to Congress.[4]  Since then, the IRS has grappled to find the best approach for working IDT cases.  In fiscal year (FY) 2012, the IRS dispersed responsibility for working IDT cases by creating more than 20 specialized IDT units.[5]  In FY 2015, the IRS changed course and reorganized its IDT victim assistance functions, centralizing them under one umbrella within the Wage and Investment (W&I) division.

The National Taxpayer Advocate is pleased with this reorganization, as she has long held the belief that a centralized approach to IDT victim assistance was necessary.[6]  However, the National Taxpayer Advocate remains much more concerned with the IRS's IDT victim assistance *procedures* than she is with the *organizational structure* of the IDT victim assistance unit.  Since 2004, the National Taxpayer Advocate has made 46 recommendations to the IRS in her Annual Reports to Congress on improving its IDT victim

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   This type of tax-related identity theft is referred to as "refund-related" identity theft.  In "employment-related" identity theft, an individual files a tax return using his or her own tax identification number, but uses another individual's Social Security number (SSN) to obtain employment, and consequently, the wages are reported to the IRS under the SSN.  The IRS has procedures in place to minimize the tax administration impact to the victim in these employment-related identity theft situations.  Accordingly, we will focus on refund-related identity theft in this report.

3   National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 45-90 (*Identity Theft Case Review Report: A Statistical Analysis of Identity Theft Cases Closed in June 2014*).

4   National Taxpayer Advocate 2004 Annual Report to Congress 133-36.

5   National Taxpayer Advocate 2012 Annual Report to Congress 45-46.

6   The National Taxpayer Advocate stated in her 2013 Annual Report to Congress that "the IRS should set up a centralized identity theft unit similar to the centralized innocent spouse unit that assists taxpayers who may have been victims of domestic abuse."  *See* National Taxpayer Advocate 2013 Annual Report to Congress 75.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1602 of 4699 PageID #: ...

Most Serious
Problems

Issues

Recommendations

Most Serious
Problems

assistance, over half of which the IRS has eventually adopted.[7]  Although improvements have been made over the years, the IRS can still do much more to assist victims of IDT.

The continuing inadequacy of the IRS's IDT victim assistance is demonstrated by the growth in TAS IDT cases, which comprised 25 percent of TAS's case receipts for FY 2015.[8]  This growth was caused, in part, by certain IRS screening mechanisms; in one program, approximately one out of three returns suspended by the IRS were legitimate returns.[9]

In Volume 2 of the National Taxpayer Advocate's 2014 Annual Report to Congress, she made numerous recommendations to improve the IRS's IDT victim assistance procedures, including:

1. IDT victims with multiple issues should be assigned a sole IRS contact person (and provided with a toll-free direct extension to this contact person) who would interact with them throughout and oversee the resolution of the case, no matter how many different IRS functions need to be involved behind the scenes.

2. The IRS should track IDT cycle time in a way that reflects the taxpayer's experience more accurately — from the time the taxpayer submits the appropriate documentation to the time the IRS issues a refund (if applicable) or otherwise resolves all related issues.

3. The IRS should review its global account review procedures to ensure all related issues are actually resolved (including issuance of a refund, if applicable) prior to case closure, and conduct appropriate training for its employees.[10]

> **Identity theft victims must substantiate their identity with the IRS, file various forms, and wait months or even years to receive their tax refunds and unwind the account issues.**

The National Taxpayer Advocate believes adoption and implementation of these recommendations will improve the IRS's ability to effectively resolve IDT cases.  In addition, the IRS should expand its Identity Protection Personal Identification Number (IP PIN) pilot to allow all taxpayers the option to receive an IP PIN.  This would not only provide taxpayers a right to quality service, but also protect the federal fisc.

 In October 2015, the IRS began re-engineering its IDT victim assistance procedures, and has included TAS among the stakeholders in this re-engineering effort.  The Re-engineering Team plans to make significant improvements in IDT victim assistance; however, the IRS has not yet agreed to any of the recommendations listed above.

---

7   The IRS adopted (fully or in part) 25 of the 46 recommendations on improving IDT victim assistance made by the National Taxpayer Advocate.  Some of the adopted recommendations include:
   ◆ Standardize procedures as to what information is required from taxpayers complaining of stolen identities (National Taxpayer Advocate 2004 Annual Report to Congress 142; adopted in 2009);
   ◆ The IRS should use an electronic indicator on its master files to mark the accounts of taxpayers who have verified that they have been victims of identity theft (National Taxpayer Advocate 2005 Annual Report to Congress 191; adopted in 2008);
   ◆ The IRS should develop a form that taxpayers can file when they believe they have been victims of identity theft (National Taxpayer Advocate 2007 Annual Report to Congress 115; adopted in 2009); and
   ◆ Require the Identity Protection Specialized Unit (or in the case of a single-issue case, the specialized function) to conduct final global account reviews on all identity theft cases (National Taxpayer Advocate 2012 Annual Report to Congress 67; adopted in 2013).

8   *See* TAS Business Performance Review (BPR), FY 2015 (Oct. 1, 2015).

9   *See* IRS, W&I BPR, CY 2015 Results through September (Nov. 2, 2015) (showing a false positive rate of 34.6 percent for the Dependent Database IDT filters).

10  *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 45-90 (*Identity Theft Case Review Report: A Statistical Analysis of Identity Theft Cases Closed in June 2014*).

001595

## ANALYSIS OF PROBLEM

### Background

The IRS continues to see a significant number of IDT cases. As of the end of September 2015, the IRS had over 600,000 IDT cases with taxpayer impact (excluding duplicates) in its inventory, up nearly 150 percent from September 2014.[11]

### FIGURE 1.16.1[12]



**IRS Identity Theft Inventory on September 30, 2012-2015**

| 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|
| 646,950 | 475,861 | 242,575 | 601,799 |

Identity theft cases continue to make up a significant percentage of TAS caseload as well. TAS IDT cases increased nearly 30 percent from FY 2014 to FY 2015. In FY 2015, TAS received more than 56,000 IDT cases representing 25 percent of all TAS cases. In FY 2014, TAS received nearly 44,000 IDT cases representing 20 percent of all TAS cases.[13]

---

11  IRS, *Global Identity Theft Report* (Sept. 30, 2015); IRS, *Global Identity Theft Report* (Sept. 30, 2014).

12  IRS, *Global Identity Theft Report* (Sept. 30, 2015); IRS, *Global Identity Theft Report* (Sept. 30, 2014); IRS, *Global Identity Theft Report* (Sept. 30, 2013); IRS, *Global Identity Theft Report* (Sept. 30, 2012).

13  TAS received 56,174 IDT cases in FY 2015 and 43,690 IDT cases in FY 2014. *See* TAS BPR, FY 2015 (Oct. 1, 2015); TAS BPR, FY 2014 (Oct. 1, 2014).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1604 of 4699 PageID #: 9769

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

FIGURE 1.16.2[14]



**Identity Theft Case Receipts as a Percentage of TAS Case Receipts**

FY 2010: 17,291 (5.8%) — 298,933
FY 2011: 34,006 (11.5%) — 295,904
FY 2012: 54,748 (24.9%) — 219,666
FY 2013: 57,929 (23.6%) — 244,956
FY 2014: 43,690 (20.2%) — 216,697
FY 2015: 56,174 (24.7%) — 227,189

■ ID Theft Receipts

A significant portion of the TAS IDT cases in FY 2015 is attributable to the failure of the IRS to properly administer its Taxpayer Protection Program (TPP).[15]  The IRS uses advanced analytics to select and suspend the processing of tax returns it suspects were filed by identity thieves.  When an IRS filter stops a return, the IRS sends the taxpayer a letter asking him or her to either call the TPP phone number or visit the Out-of-Wallet website to verify his or her identity.  It turned out that approximately one out of three returns suspended by the TPP were legitimate returns,[16] resulting in a severe backlog of calls to the TPP toll-free phone line.  As shown in this figure below, the level of service (LOS) on the TPP line was particularly poor during the 2015 filing season, when the LOS dipped below ten percent for three consecutive weeks.[17]

---

14  Taxpayer Advocate Management Information System (TAMIS), *Receipts – Core Issues by BOD & Criteria – Cumulative* (run dates Oct. 1, 2015; Oct. 1, 2014; Oct. 1, 2013; Oct. 1, 2012; Oct. 1, 2011; Oct. 1, 2010).

15  Of the 56,174 IDT cases (primary issue code 425) received by TAS in FY 2015, 37,686 (67 percent) involved issues stemming from the TPP.  TAMIS (run date Oct. 1, 2015); IRS Compliance Data Warehouse (CDW), Individual Master File (Oct. 2015).

16  IRS, *IRS Return Integrity & Compliance Services (RICS), Update of the Taxpayer Protection Program (TPP)* 9 (June 24, 2015).

17  IRS, Joint Operations Center, *TPP Snapshot Reports* (Jan.–Apr. 2015). The IRS attributes the low LOS for the TPP line to a number of factors, including budget challenges that impacted all toll-free lines, problems with the Out-of-Wallet website, and multiple weather-related closures in TPP call sites.  Additional staff for TPP were trained and added in late March to improve LOS.  Email from Senior Tax Analyst, Business Performance Laboratory, Return Integrity and Compliance Services (July 6, 2015).

**FIGURE 1.16.3**[18]

### Level of Service and Average Speed of Answer, TPP Line

*Assistors conduct identity verification for returns halted in processing when the IRS determines there is a high risk of an identity thief filing the return rather than the actual taxpayer.*



*Reorganization*

In February 2014, the IRS began to consider the feasibility of adopting a centralized approach to IDT victim assistance.  As a result of this feasibility study, the IRS decided to take the following actions:

- Centralize Accounts Management (AM) IDT caseworkers, including the Identity Protection Specialized Unit (IPSU), in a single IDT Victim Assistance (IDTVA) organization;

- Centralize Small Business/Self-Employed and W&I Compliance specialized teams within IDTVA;

- Realign the Office of Privacy, Governmental Liaison, and Disclosure's Identity Protection analysts to W&I; and

- Realign Compliance headquarters analysts supporting IDT to the Customer Account Services (CAS) organization.

With this reorganization, the AM Director is now able to lead all IDT staff — including policy analysts — to ensure that IDT cases are worked consistently and tracked more easily.  In addition, the IRS consolidated the Internal Revenue Manual (IRM) effective October 1, 2015, so that all IDT procedures fall under a single IRM chapter.[19]

The new IDT Victim Assistance unit will require its employees (including IDTVA Compliance employees) to use the Correspondence Imaging System (CIS) beginning in FY 2016.  Documents and notes uploaded on CIS will allow any IRS employee with access to CIS to quickly get up to speed on a case. Using CIS will also allow the IRS the ability to balance the IDT work more effectively.  Furthermore, having all IDT cases on one system will enable the IRS to more easily track the cycle time for IDT cases, which is something the National Taxpayer Advocate has pushed the IRS to do.[20]

---

18   IRS, Joint Operations Center, *TPP Snapshot Reports* (Jan.–Apr. 2015).
19   IRM 25.23, *Identity Protection and Victim Assistance* (Oct.1, 2015).
20   *See* National Taxpayer Advocate 2013 Annual Report to Congress.

### Results of 2014 Research Study

To gain a better understanding of what is really going on in the IRS inventory of IDT cases, TAS conducted a research study in 2014 where we (in coordination with W&I) pulled a representative sample of IDT cases from IRS inventory.[21]  The results of this comprehensive review confirmed many of the observations the National Taxpayer Advocate has shared over the past decade about how the IRS can improve its IDT victim assistance.

Here are three findings from the 2014 study that merit attention:

1. *Overall, about two-thirds (67 percent) of all IDT modules in our representative sample were either (1) worked in more than one function, or (2) reassigned to another assistor within a function.*[22]  A typical IDT victim who receives assistance from the IRS will be forced to bounce around from one assistor to another.  Without a sole contact person assigned, there is a concern that an IDT case may fall through the cracks.  Forty-two percent of the IDT modules analyzed in our sample had periods of inactivity (*i.e.*, periods of time when no work was being performed on the case for more than 30 days), with an average (mean) period of inactivity was 78 days.[23]

2. *In 22 percent of IDT cases in our representative sample, the IRS closed an IDT module without taking the appropriate steps to fully resolve the victim's account.*[24]  In our study, the IRS closed many IDT cases before all account actions were taken — for example, some IDT victims had not yet received their refund, the IRS failed to issue an Identity Protection Personal Identification Number (IP PIN), or update the victim's address.[25]  This brings into question the effectiveness of the IRS's global account review process.  Either the procedures are insufficient or the IRS needs to ensure its assistors are trained better.

3. *The average cycle time for the IDT cases in our representative sample was 179 days (nearly six months).*[26]  While some functions (such as AM) tracked how long IDT cases stayed in their inventory, there was no standard calculation of cycle time across the IDT functions.  The cycle times reported by various IDT specialized units did not reflect the time that has passed since the taxpayer filed a return or the time spent interacting with other functions.  We believe this measure of 179 days more accurately indicates how long the IRS takes to resolve IDT cases, from the perspective of the IDT victim.

The Senate Appropriations Committee agreed with the National Taxpayer Advocate that the IRS should create a sole point of contact to deal with identity theft victims with multiple tax issues.[27]  The Committee

---

21   *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 45-90 (*Identity Theft Case Review Report: A Statistical Analysis of Identity Theft Cases Closed in June 2014*).

22   *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 52.

23   *Id.*

24   *Id.* at 53.

25   Of the 85 modules that we noted were prematurely closed, nine remained open as of Oct. 27, 2015.

26   *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 52-53.

27   S. Rep. 114-97, at 34 (2015), *available at* www.congress.gov/114/crpt/srpt97/CRPT-114srpt97.pdf ("Some identity theft victims have only a single issue that requires resolution, but many victims have multiple issues that must be resolved before the IRS will issue their refunds.  In addition, these victims often have to call the IRS numerous times and speak with numerous employees.... The Committee also directs IRS to report on the feasibility of assigning the cases of identity theft victims with multiple issues to a single IRS representative (and provide victims with a toll-free direct extension to this representative) who will manage the case, including coordinating the actions of different IRS functions, and work with the taxpayer until the case is fully resolved.").

001599

Case 1:21-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1607 of 4699 PageID #: 4772

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

further directed the IRS issue a report detailing procedural changes aimed to cut the cycle time of identity theft cases in half.[28]

### Re-Engineering Team

In September 2015, the IRS convened the IDT Re-engineering Team, a group of employees from across various functions empowered to make recommendations to improve the processing of IDT cases.

The IDT Re-engineering Team has formed sub-teams, including ones focused on improving the content and format of the IDT Global Report, strengthening global review procedures to ensure all actions are taken prior to closing an IDT case, and revisiting the role and scope of the IPSU.  The IDT Re-engineering Team is led by the Director of the IDTVA organization and expects to submit recommendations to the Director of Accounts Management in early 2016.

### IP PIN Expansion

In December of each year, the IRS issues IP PINs to certain victims of IDT whose identities and addresses have been verified.[29]  An IP PIN is a unique code that some taxpayers must use, along with his or her taxpayer identification number, to file electronically.[30]  IP PINs are a very effective way to prevent refund-related IDT; a would-be identity thief simply cannot e-file a tax return on a protected account without entering the IP PIN (which changes every year).

The average cycle time for the Identity Theft (IDT) cases in our representative sample was 179 days (nearly six months).

In 2014, the IRS conducted a pilot to expand the issuance of IP PINs.  Residents of the District of Columbia, Florida, and Georgia were given the opportunity to opt-in to receive an IP PIN, regardless of whether or not they were victims of IDT.[31]  Although uptake was relatively low (0.08 percent), the IRS continued the IP PIN opt-in pilot for residents of these three high-risk states in 2015.[32]  One possible reason for the low uptake is the lack of effective outreach or notice about the program.  For example, the National Taxpayer Advocate is a resident of the District of Columbia; she received no communication from the IRS that she could apply for an IP PIN for the 2015 filing season.  Whether it involves mailing notices to all eligible taxpayers, using traditional or social media, or working with third parties such as tax software companies, the IRS can and must do better than achieving an uptake rate of less than 0.1 percent for such a valuable, no-cost service.

The IRS is currently exploring the feasibility of expanding the IP PIN opt-in pilot to nationwide, but is concerned about the costs of administering the program.  The IRS estimates that it costs as much as $36 per IP PIN over a three-year period (the costs of issuing replacement IP PINs are factored into this estimate).[33]  For each taxpayer who opted to receive an IP PIN in 2014, $193 of revenue was protected.[34]

---

28  S. Rep. 114-97, at 34 (2015), *available at* www.congress.gov/114/crpt/srpt97/CRPT-114srpt97.pdf ("The Committee directs the IRS to institute, and share with the Committee within 90 days of enactment, an updated action plan and timetable predicated on a goal of reducing by half the average amount of time a taxpayer must await a disposition of a refund fraud claim.").

29  IRM 25.23.2.21, *Identity Protection Personal Identification Number (IP PIN)* (Sept. 8, 2015).

30  *Id.*

31  IRM 25.23.2.21.2, *IP PIN Opt-In Available for Designated Taxpayers Who Are Not ID Theft Victims* (Sept. 8, 2015).

32  *Id.*; W&I Research and Analysis, IP PIN Opt-in Pilot Executive Checkpoint (Sept. 2015).

33  W&I Research and Analysis, IP PIN Opt-in Pilot Executive Checkpoint (Sept. 2015).

34  $2.2 million net revenue protected / 11,400 opt-ins in 2014.  *See* W&I Research and Analysis, IP PIN Opt-in Pilot Executive Checkpoint (Sept. 2015).

In other words, the IRS stopped $5.36 in fraudulent refunds for every dollar it spent issuing IP PINs.[35] This is a conservative estimate which does not account for dollars protected in the second and third year of IP PIN use, while including the administrative cost of issuing IP PINs for three years. Based on these calculations, the IRS should secure the needed funds from Congress to expand the IP PIN opt-in program.

## CONCLUSION

The National Taxpayer Advocate is pleased that the IRS leadership has decided to adopt the recommendation to change to a centralized approach to IDT victim assistance. With a centralized approach, the IRS is better positioned to evaluate and act upon the recommendations we made in our 2014 Annual Report to Congress. We look forward to working cooperatively with the new IDTVA unit to further improve service to this vulnerable population of taxpayers. We note that many of the ideas now under consideration by this unit were recommended by the National Taxpayer Advocate as far back as a decade ago. Had the IRS adopted these recommendations at that time, millions of taxpayers would have been spared tremendous anxiety, economic harm, and burden. The IRS should learn from this past lesson and not delay another ten years before embracing the recommendations in this report.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. For identity theft victims with multiple issues, assign a sole IRS contact person (and provide with a toll-free direct extension to this contact person) to interact with identity theft victims throughout and oversee the resolution of the case. Alternatively, the IRS should conduct a pilot where selected identity theft victims with multiple issues are assigned a sole employee, and compare results (case resolution time, number of contacts, taxpayer satisfaction, quality, etc.).

2. Track identity theft cycle time in a way that reflects the taxpayer's experience more accurately — from the time the taxpayer submits the appropriate documentation to the time the IRS issues a refund (if applicable) or otherwise resolves all related issues.

3. Review and adjust its global account review procedures to ensure all related issues are actually resolved (including issuance of a refund, if applicable) prior to case closure, and conduct appropriate training for its employees.[36]

4. Expand its IP PIN pilot to allow taxpayers in every state the ability to receive an IP PIN, and convey this option to taxpayers using multiple modes of communication.

---

35  $193 revenue protected / $36 cost of IP PIN issuance = $5.36 revenue protected per IP PIN issued.

36  *See* National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 45-90 (*Identity Theft Case Review Report: A Statistical Analysis of Identity Theft Cases Closed in June 2014*).

Case ... cv-00306-JCB   Document 124   Filed 11/07/24   Page 1609 of 4699 PageID #: 4774

Most Serious
Problems

Most Serious
Recommendations

Most Litigated
Issues

Most Serious
Problems

**MSP
#17**

# AUTOMATED SUBSTITUTE FOR RETURN (ASFR) PROGRAM: Current Selection Criteria for Cases in the ASFR Program Create Rework and Impose Undue Taxpayer Burden

## RESPONSIBLE OFFICIAL

Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

When a taxpayer who has a filing requirement fails to file a tax return, the IRS is authorized under Internal Revenue Code (IRC) § 6020(b) to use third-party information to determine and assess a tax liability.[2] This is principally worked through the Automated Substitute for Return (ASFR) program, the IRS's key program for enforcing filing compliance on taxpayers who have not filed individual income tax returns but appear to owe a tax liability.[3]

If a taxpayer has not filed a return and the IRS determines that a taxpayer has a filing requirement, it will typically select certain cases to prepare a Substitute for Return (SFR) and assess the liability based on information such as Forms W-2 and 1099 filed by employers, banks, and other third parties.[4] In preparing an SFR, the ASFR program generally treats the taxpayers as single (or married filing separately where there is evidence the taxpayer is married) with no dependents, allows one exemption and only a standard deduction (even where there is third-party documentation supporting deductions on file with the IRS).[5]

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   IRC § 6020(b).

3   Internal Revenue Manual (IRM) 5.18.1.2, *What Is ASFR?* (Oct. 1, 2005). *See also* Treasury Inspector General for Tax Administration, Ref. 2014-30-023, *Expansion of the Delinquent Return Refund Hold Program Could Improve Filing Compliance and Help Reduce the Tax Gap* (Mar. 14, 2014).

4   IRM 5.18.1.2, *What Is ASFR?* (Oct. 1, 2005).

5   IRM 5.18.1.3.5, *Tax Delinquency Investigation (TDI) Supplement Information* (Oct. 1, 2005); IRM 5.18.1.7.2, *Computing Taxable Income* (Oct. 1, 2005); IRM 5.18.1.7.3, *Computing Tax Due, Penalties and Interest* (Oct. 1, 2005). ASFR programming determines the filing status, taxable income, tax, interest, and penalties "systemically," *i.e.*, without an employee review.

The ASFR program has poor collection results and a high abatement rate:

- In fiscal year (FY) 2011 through FY 2014, the IRS assessed nearly $34 billion through its ASFR authority.  The IRS collected less than one-third of this amount, nearly $11 billion.[6]

- For ASFR assessments made in FY 2011 through FY 2014, the IRS abated about $10 billion of the ASFR assessments — for a total of 29 percent of all ASFR assessments.[7]

- The ASFR program's return on investment (ROI) is small.  In FY 2014, the ASFR program had revenue of $89.5 million, but spent $39.8 million operating the ASFR program, which does not include the costs of later abating liabilities or the expense of sending out notices or making collection attempts.  This means the IRS generated net revenue of about $50 million when accounting for the cost of the program.[8]

The selection of these unproductive cases, which often result in abatement, cause rework for the IRS and potential harm to the taxpayer (*i.e.*, IRS attempts to collect the inflated liability by using its enforcement powers).  The IRS could mitigate these outcomes by considering third-party documentation that supports deductions or credits when determining which cases to select for the program.  Considering certain deductions and credits would result in a more accurate assessment, conserve IRS resources, and mitigate harm to taxpayers while protecting their rights.

## ANALYSIS OF PROBLEM

### Background

ASFR is the key IRS program for enforcing filing compliance by taxpayers who have not filed individual tax returns, but have incurred a "significant" tax liability.[9]  The program estimates the liability by computing tax, penalties, and interest based upon information reported to the IRS by third parties.[10]  When a taxpayer with reported income is delinquent in filing a return, the IRS attempts to secure the return

---

6    Individual Master File (IMF), Enforcement Revenue Information System (ERIS) on IRS Compliance Data Warehouse (CDW). The $34 billion assessed includes tax, penalties and interest.  TAS Research worked closely with the ASFR Program Office to ensure that it was properly identifying ASFR cases.  TAS and the IRS came very close in their data for ASFR cases and dollars collected through the ASFR program.  However, there was a small difference in the number of cases and dollars collected.  The numbers compiled by TAS Research showed about two percent fewer ASFR cases when compared to the ASFR Program Office's data, and showed about ten percent fewer dollars assessed compared to the ASFR Program Office's data.

7    IMF, ERIS on IRS CDW.  Some ASFR abatements occur after the taxpayer files as the secondary taxpayer on a joint return; in such cases ERIS might not capture the tax assessed to and collected from a secondary taxpayer.

8    Office of the Chief Financial Officer, Financial Management, Office of Cost Accounting Cost-Based Performance Measures ASFR, FYs 2010 – 2014, *available at* http://cfo.fin.irs.gov/FinMgmt/Cost_Accounting/docs/Cost-Study-Reports/FY2014/ ASFR-Cost_Study-FY_2014.doc (last visited May 28, 2015).  The $89.5 million represents enforcement revenue collected by the ASFR program after an SFR notice has been issued and prior to the issuance of the first collection notice.  Overall, IRS collected nearly $11 billion of assessments made in FY 2011 through FY 2014; however, the costs associated with the post-assessment collection, abatement, and other downstream tax account administration cannot be easily determined, making an accurate return on investment (ROI) calculation difficult.

9    IRM 5.18.1.2, *What Is ASFR?* (Oct. 1, 2005).  To meet ASFR processing criteria, the proposed tax liability must meet or exceed a predetermined dollar threshold established by the IRS for the ASFR program.

10   *Id*.  The IRS can use information returns (*e.g.*, Forms W-2 and 1099) filed by employers, banks, and other third parties to report various types of payments to individuals.  These payments include wages, interest, and dividends, as well as payments to self-employed taxpayers for services rendered.  The IRS collects and maintains this information through the Information Return Program (IRP).

001603

Case ...:...-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1611 of 4699 PageID #: 4776

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

In FY 2011, there were 279,374 Automated Substitute for Return (ASFR) assessed modules in which IRS received a Form 1098 showing mortgage interest expense; 85,151 of these accounts, or 30 percent, had tax abated, which IRS might have anticipated since many were qualified to itemize deductions and thereby incur a lower tax.

through correspondence. If the attempt is unsuccessful, the IRS is authorized by IRC § 6020(b) to prepare a substitute return for the taxpayer.[11]

Generally, a return delinquency meets ASFR criteria when income information obtained through Information Returns Processing (IRP) is available for the delinquent tax module, the module is no older than five years prior to the current processing year, there are no related taxpayer delinquent accounts (TDAs), and the proposed tax liability is over a certain dollar threshold.[12] When the IRS selects a return delinquency for ASFR processing, the program calculates an estimated tax liability based on available income information with an assumed filing status of "single" or "married filing separate" with one exemption.[13]

Generally, this proposed liability exceeds what the taxpayer actually would owe on a self-reported return, because the ASFR return does not take into consideration the taxpayer's actual filing status, dependency exemptions, and deductions or credits.[14] The IRS notifies the taxpayer of the proposed assessment via a "30-day letter."[15] The taxpayer may respond with an original return, an agreement to the proposed ASFR assessment, or a statement indicating disagreement with the assessment. If the taxpayer disagrees or fails to resolve the return delinquency during this 30-day period (*i.e.*, does not respond to the 30-day letter), the IRS sends a Statutory Notice of Deficiency (90-day letter) to the taxpayer by certified mail.[16] If the taxpayer does not resolve the return delinquency and petition the U.S. Tax Court for relief within 90 days, the ASFR program assesses the proposed tax, penalties and interest, and collection action proceeds on any unpaid balance due.[17]

---

11  IRC § 6020(b): "(b) Execution of return by Secretary. — (1) Authority of Secretary to execute return. — If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefor, or makes, willfully or otherwise, a false or fraudulent return, the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise. (2) Status of returns. — Any return so made and subscribed by the Secretary shall be *prima facie* good and sufficient for all legal purposes." IRM 5.18.1.2, *What Is ASFR?* (Oct. 1, 2005). Some of the third-party forms used to match taxpayer data include Forms W-2 and Forms 1099 for miscellaneous, brokerage, interest, dividend, and cancellation of debt income.

12  IRM 5.18.1.3.1, *ASFR Criteria* (Dec. 9, 2014).

13  IRS response to TAS information request (Sept. 15, 2015). "ASFR uses a single filing status unless the taxpayer account shows a previous joint filing. Taxpayers with a previous joint filing receive a married filing separate filing status, consistent with SFR procedures. Per IRC § 6013(a)." IRS clarification (Dec. 11, 2015): "CCNIP (Case Creation Nonfiler Process) creates the tax calculation used to identify the Nonfiler population, including proposed liability amount and filing status. The calculation is forwarded to ASFR."

14  Government Accountability Office, GAO-08-728, *IRS Has a Complex Process to Attempt to Collect Billions of Dollars in Unpaid Tax Debts* 15 (June 2008). "An example in which additional information leads to abatements involves ASFR assessments. The IRS uses the best information available when it prepares returns for taxpayers who have failed to file returns. When responding to the IRS-prepared return, taxpayers may provide additional information, such as on deductions to which they are entitled, which would produce a lower tax assessment compared to the ASFR-generated assessment. Accordingly, the IRS abates any assessed taxes and any applicable penalties associated with the ASFR return."

15  IRM 5.18.1.7.5, *Letter 2566 SC/CG (30-Day Letter)* (Feb. 24, 2015). The ASFR "30-day letter" provides the taxpayer with the proposed assessment amounts, and gives the taxpayer 30 days to respond. At the conclusion of the 30-day letter suspense period, if there is no/insufficient response, ASFR generates a Statutory Notice of Deficiency (90-day letter).

16  IRM 5.18.1.7.6, *Statutory Notice of Deficiency (ASFR 90-Day Letter)* (Oct. 1, 2005). The ASFR "90-day letter" (*i.e.*, the statutory notice of deficiency) notifies a taxpayer that the IRS intends to assess a tax deficiency. The notice also informs the taxpayer of the right to petition the Tax Court to dispute the proposed adjustments. The taxpayer has 90 days from the date of the notice to file a petition in the Tax Court before the tax is assessed.

17  IRM 5.18.1.7(1) (Oct. 1, 2005).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1612 of 4699 PageID #: 6877

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

### Poor Collection Results and High Abatement Rates Show That ASFR's Selection Criteria Are Inefficient and Lead to Inflated Liabilities that Are Later Abated

#### *Inflated Assessments Lead to Poor Collection Results*

In FY 2011 through FY 2014, the IRS assessed nearly $34 billion through its ASFR authority.[18]  The IRS collected nearly one-third of this amount, about $11 billion.[19]  Figure 1.17.1 provides more specifics on the ASFR program's performance during FY 2011 through FY 2014.[20]

**FIGURE 1.17.1**

**ASFR Tax Assessed - Abated, Unpaid, or Paid**



| | Abated Tax | Unpaid Tax | Paid Tax |
|---|---|---|---|
| FY 2011 | 29% ($3,647 mil) | 32% ($4,031 mil) | 39% ($4,916 mil) |
| FY 2012 | 27.6% ($1,650 mil) | 31.4% ($1,875 mil) | 41% ($2,448 mil) |
| FY 2013 | 23.4% ($663 mil) | 33.6% ($955 mil) | 43% ($1,222 mil) |
| FY 2014 | 13.6% ($371 mil) | 42% ($1,146 mil) | 44.4% ($1,211 mil) |

#### *High Abatement Rate Is an Indication of Problematic Selection Criteria*

In addition to the small percentage of dollars collected when compared to dollars assessed, the ASFR program's rate of abatement is significant.  For ASFR assessments made in FY 2011 through FY 2014, the IRS abated nearly $1 for every dollar collected.[21]  The high abatement rate can be attributed in part to the IRS not considering deductions and credits when selecting cases for ASFR.  Figure 1.17.2 shows the percentage of assessed tax later abated for FY 2011 through FY 2014.

---

18  IMF, ERIS on IRS CDW.

19  *Id*.  The $34 billion assessed includes tax, penalties and interest.

20  As noted above, some ASFR abatements occur after the taxpayer files as the secondary taxpayer on a joint return; in such cases ERIS might not capture the tax assessed to and collected from a secondary taxpayer.

21  IMF, ERIS on IRS CDW.  Of the $34 billion of tax, interest, and penalty assessed, the IRS collected $10.7 billion and abated $9.8 billion.

FIGURE 1.17.2



**Percent of ASFR Tax Abated Since Year of Assessment**

FY 2011 — 29.0%

FY 2012 — 27.6%

FY 2013 — 23.4%

FY 2014 — 13.6%

■ Tax Abated

As shown in the figure above, the amount of abatements is less in recent years, but these rates are likely to increase as time goes on, eventually reaching FY 2011 levels. As the IRS makes collection attempts (including refund offsets) on more recent ASFR assessments, taxpayers will file a return or provide documentation supporting deductions and credits, thereby resulting in a lower tax liability and abatement of the inflated ASFR liability. These abatement rates, coupled with the low collection results, indicate that the IRS should adjust its criteria for selecting cases for an ASFR assessment.

The approach of inflating a taxpayer's tax liability has several flaws. Inflating ASFR liabilities increases the number of ASFR cases that should not have been assessed in the first place. In other words, these cases only show a liability because the IRS did not consider deductions and credits. Specifically, the IRS could develop a selection algorithm that incorporates mortgage interest paid (as reported on Forms 1098), state income taxes paid (as reported on Forms W-2), and state sales tax per IRS tables. The IRS also could use historical data in the selection algorithm to include exemptions for dependents claimed on past returns and who were not claimed on another's return for the year in question. By including this information in the selection algorithm, the IRS will minimize the number of abatements, reducing both IRS rework and taxpayer burden.

### The Low Return on Investment Raises Questions About the Usefulness of the ASFR Program

When taking into account the costs of the ASFR program, along with the collection results, and abatement rate, the usefulness of the program is questionable. According to an IRS report, the ASFR program cost $39.8 million in FY 2014. The $39.8 million does not include the costs of later abating liabilities, or the expense of sending out collection notices or making collection attempts. The revenue associated with the program prior to the IRS sending a first collection notice to the taxpayer was $89.5 million, which is a net gain of about $50 million.[22] Further, the report stated that it collected $2.25 for every $1 spent on the ASFR program.[23] This is a low ROI when compared to other IRS collection programs, and even then the ROI is overstated because it does not take into consideration the significant downstream costs

---

22  Office of the Chief Financial Officer, Financial Management, Office of Cost Accounting Cost-Based Performance Measures ASFR, FY 2010 – FY 2014.

23  *Id.*

attributable to abatement.[24] For example, for every dollar invested in other IRS programs, there can be monetary returns ranging from 6-to-1 and even up to 20-to-1.[25] Improving the selection criteria for the program would increase the return on investment; otherwise, the program as currently configured raises the question of whether the $39.8 million spent might be better applied elsewhere.

### Considering Additional Information Prior to Selecting Cases for ASFR May Increase Program's Efficiency While Reducing Burden on Taxpayers

As noted above, the ASFR program could yield better results by carefully selecting which cases to pursue. This could be accomplished by considering third-party documentation (*i.e.*, documents the IRS has available to it that would support deductions and credits like the mortgage interest deduction or education deductions and credits) and prior year filing statuses.

In an effort to identify what generates abatements, and what type of information would be useful for the IRS to consider when selecting ASFR cases, TAS analyzed reason codes entered on abatements of ASFR liabilities for FY 2014. Unfortunately, the reason codes used are often vague and nondescript, and provide little information as to why the liability was abated. For example, the reason code most commonly entered was "reconsideration allowed in full." However, several of the codes did provide insight into what causes the abatement. The following are some of the most common reasons for abatement:

- Filing status (Married Filing Jointly);
- Filing status (Head of Household); and
- Itemized deductions.

In regards to the different filing statuses (*i.e.,* changing from married filing separately to married filing jointly or head of household), the IRS could look at the past three filed returns and, if the taxpayer elected married filing jointly or head of household on those past returns, it could at least consider the selected status for the purpose of determining if the case would be well suited for the ASFR program. This approach is particularly appropriate where the spouse from earlier years has not filed a return of his or her own for the ASFR year. If it would substantially reduce or eliminate the liability, the IRS could make a business decision to not prioritize this particular case for ASFR development, because there is a high probability of abatement.

Another common reason for abatement of ASFR assessments is application of itemized deductions. Unfortunately, the reason code does not specify what itemized deductions generated the abatement. However, TAS Research was able to identify ASFR assessments that were abated due to the mortgage interest deduction. In FY 2011, there were 279,374 ASFR assessed modules in which IRS received a Form 1098 showing mortgage interest expense; 85,151 of these accounts, or 30 percent, had tax abated, which IRS might have anticipated since many were qualified to itemize deductions and thereby incur a lower tax.[26] In fact, over 60 percent of all ASFR accounts with Form 1098 show mortgage interest expense amounts larger than the standard deduction, indicating these taxpayers likely qualify to itemize, yet the IRS calculates their tax at a higher rate.[27]

---

24  Also note that, overall, IRS collected nearly $11 billion of assessments made in FY 2011 through FY 2014.

25  Statement of the Commissioner of Internal Revenue John Koskinen on the FY 2016 Budget (Feb. 2, 2015).

26  IMF, ERIS on IRS CDW. There were 2,230 modules with abated tax of about $49 million attributable to TC 594 CC 84 (modules abated because the taxpayer filed as a secondary taxpayer on a joint return).

27  *Id.*

The IRS already possesses third-party documentation regarding the mortgage interest deduction, and for many other itemized deductions and credits. This documentation is just as reliable as the third-party documentation used to determine a taxpayer's income. If the IRS is confident using third-party documentation to determine income, it should also take into account third-party documentation that would support deductions or credits when making a determination as to the use of its SFR authority.

The following are examples of the type of information that should be considered when determining if a case should be selected for the ASFR program, or if an ASFR assessment would likely result in abatement:

> **EXAMPLE 1:** Taxpayer failed to file a return for tax year 2014. In the three tax years prior to 2014, the taxpayer elected married filing jointly (MFJ) status and for those years either owed zero tax or was due a refund. Further research shows that the taxpayer's spouse did not file a separate return for 2014. The IRS made an ASFR assessment on the 2014 return and used the married filing separately status. By using the married filing separately status, the taxpayer had an ASFR liability that would have been lessened or possibly eliminated if the IRS used the MFJ filing status.

> **EXAMPLE 2:** Taxpayer did not file a return for tax year 2014. For the past five years preceding 2014, the taxpayer has taken the mortgage interest deduction. By claiming this deduction, the taxpayer had a minimal tax liability. The IRS made an ASFR assessment on the 2014 return and did not include the mortgage interest deduction, even though the IRS has this information. As a result, the IRS assessed a liability that exceeded the minimal amount had the IRS considered the mortgage interest deduction.

> **EXAMPLE 3:** Taxpayer failed to file his 2014 tax return. For the past three years, taxpayer claimed the maximum amount allowed for the education deduction for those years. As a result, taxpayer typically received a refund ranging from $250 to $500. The IRS made an ASFR assessment for 2014 and did not consider the education deduction, even though it has that information available to it. As a result, taxpayer was assessed an ASFR liability that would have been eliminated if the IRS considered information available on third-party information reports.[28]

The examples above illustrate that if the IRS had considered the taxpayer's prior filing status history, or third-party documentation that support credits or deductions, it might have decided to not include the case in the ASFR program. Not only would this strike a fairer balance in the ASFR program, thereby upholding a taxpayer's *right to a fair and just tax system*, it would also prevent the IRS from using resources to conduct an ASFR assessment on an account that would likely result in abatement if the taxpayer contacted the IRS and submitted documentation substantiating deductions and credits.

Although the IRS may ultimately decide that the case should not be included in the ASFR program after considering third-party documentation, it could instead send the taxpayer a letter saying, "We have information that you may be able to claim a tax credit and we haven't received your return. Please file." This might bring in the return without doing an unproductive ASFR. This approach promotes the taxpayer's obligation to timely file a return without producing an incorrect assessment that requires abatement.

---

28   *See* IRS Form 1098-T *Tuition Statement*. "You, or the person who can claim you as a dependent, may be able to claim an education credit on Form 1040 or Form 1040A."

001608

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1616 of 4699 PageID #: 7381

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

### Narrowing the Field of ASFR Cases Will Improve Case Resolution

If the IRS reduced the number of ASFR cases by using additional third-party documentation, it could focus on the remaining ASFR cases and attempt to actually contact the taxpayer. More specifically, IRS employees could first send out a soft notice that provides information about the ASFR and how to contact the IRS. This notice could inform taxpayers of the amount the IRS believes the taxpayer owes but also acknowledges that the enclosed list of third-party documentation shows the taxpayer may be entitled to certain deductions and credits.

Currently, the IRS does not disclose in its notice that it possesses any third-party information indicating that the taxpayer might qualify for additional deductions or credits, much less share them to assist the taxpayer with preparing a return.

If the IRS does not hear back from the taxpayer in a specified period of time, an IRS employee would attempt a phone call to reach this taxpayer and discuss avenues for resolution, including collection alternatives. Going this extra step with a smaller batch of ASFR cases — chosen through refined selection criteria — would ensure that the taxpayer's failure to respond was not due to an undelivered notice.[29] This approach will improve case resolution by focusing on a smaller number of cases and adding the element of in-person contact with taxpayers. It will also reduce rework and use the IRS's most expensive touches (phone calls and actual proposed assessment letters) with a much smaller pool of potentially delinquent taxpayers.

## CONCLUSION

It is critical that the IRS designs its programs and its interactions with the public to encourage voluntary filing. The IRS designed the ASFR program to motivate taxpayers who had not filed a return, but had a requirement to do so, to contact the IRS and file such a return. However, as discussed above, the ASFR program largely fails to drive such behavior. Further, enforced collection actions are harming taxpayers and tying up IRS's own resources with unproductive cases where after applying exemptions, deductions and credits, information about which the IRS has in its possession through third-party reporting, the liability would be reduced to zero. The taxpayers would be better served if the IRS used selection criteria that considered additional third-party documentation in calculating a taxpayer's liability. This would ensure that the ASFR cases were worthy of IRS resources.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Review annually where ASFR assessments have had the most success in getting taxpayers to file an original return and adjust the ASFR selection process to focus on similar types of cases.

2. Refine ASFR abatement reason codes, making them more specific, so the IRS can use this information when determining if a case should be selected for the ASFR program.

3. When selecting cases for ASFR, consider third-party documentation that supports exemptions, deductions, and credits before making ASFR assessments.

---

29   National Taxpayer Advocate 2010 Annual Report to Congress 21.

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1617 of 4699 PageID #: 4782

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

MSP
#18

# INDIVIDUAL TAXPAYER IDENTIFICATION NUMBERS (ITINs): IRS Processes Create Barriers to Filing and Paying for Taxpayers Who Cannot Obtain Social Security Numbers

## RESPONSIBLE OFFICIAL

Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

Problems obtaining Individual Taxpayer Identification Numbers (ITINs) have long plagued taxpayers who have a tax return filing requirement and need a taxpayer identification number, but are ineligible for a Social Security number (SSN).[2] ITINs play a vital role in the U.S. tax system. Without ITINs, approximately 4.6 million taxpayers would not be able to comply with their annual tax filing and payment obligations, or receive tax benefits to which they are legally entitled.[3] When taxpayers cannot obtain ITINs timely, or at all, they may face financial hardship and limitations on where and with whom they can do business. Some taxpayers may drop out of the tax system altogether.

ITIN applications and associated return filings have dropped precipitously, down 58 percent between 2011 and 2014.[4] While the general economic climate and immigration trends help explain this decline, IRS ITIN procedures have most certainly contributed to it. In 2012, in response to a Treasury Inspector General for Tax Administration (TIGTA) report alleging significant refund fraud connected to ITINs, the IRS made sweeping changes that require applicants to submit original identification documents (subject to a few alternatives) and has maintained its policy of generally requiring applicants to apply for an ITIN with a paper tax return during the filing season.[5] The requirements have led to extreme delays for ITIN

---

1   See *Taxpayer Bill of Rights*, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   "Generally, noncitizens authorized to work in the United States by the Department of Homeland Security (DHS) can get a Social Security number." Social Security Administration, *Social Security Numbers for Noncitizens*, Publication No. 05-10096 (June 2015), *available at* http://www.socialsecurity.gov/pubs/EN-05-10096.pdf.

3   During processing years (PYs) 2012-2014 an average of 4.6 million Form 1040 returns were filed having an ITIN for either the primary or secondary (*e.g.*, spouse) filers or a dependent. IRS, Compliance Data Warehouse (CDW) (data retrieved on Dec. 15, 2015).

4   In PY 2011, the IRS received 2,317,374 ITIN applications (Form W-7), compared to 965,793 in PY 2014. IRS, *ITIN Comparative Reports* (Dec. 31, 2011; Dec. 31, 2014).

5   See IRS, IR-2012-98, IRS *Strengthens Integrity of ITIN System; Revised Application Procedures in Effect for Upcoming Filing Season* (Nov. 29, 2012), *available at* http://www.irs.gov/uac/Newsroom/IRS-Strengthens-Integrity-of-ITIN-System;-Revised-Application-Procedures-in-Effect-for-Upcoming-Filing-Season.

001610

> While concerns about refund fraud are legitimate, the IRS's solutions do not
> effectively target the fraud nor do they balance the anti-fraud regime with
> the taxpayer's need for a process no more intrusive than necessary, part of
> a taxpayer's *right to privacy*.

applicants.  During the 2015 filing season, the IRS advised taxpayers to wait up to 11 weeks,[6] and at one point had a backlog of nearly 120,000 ITIN applications with returns.[7]  While concerns about refund fraud are legitimate, the IRS's solutions do not effectively target the fraud nor do they balance the anti-fraud regime with the taxpayer's need for a process no more intrusive than necessary, part of a taxpayer's *right to privacy*.  As a result, the IRS burdens legitimate taxpayers and harms global commerce.  The advent of the Foreign Account Tax Compliance Act (FATCA) has exacerbated problems due to the greater impact of not timely receiving an ITIN.[8]  The National Taxpayer Advocate is concerned that:

- The requirement to apply for an ITIN during the filing season burdens applicants, creates delays, leads to lost returns, and hampers the IRS's ability to detect and prevent fraud.

- ITIN applicants are subject to unnecessary burden and risk losing their identification documents while the IRS creates more work for itself by not providing adequate alternatives to applicants submitting original documents.

- Combined, the requirements for most applicants to apply during the filing season and send original documents contribute to errors on the parts of the ITIN unit and ITIN applicants, resulting in growing suspension and rejection rates.

- Taxpayers abroad needing ITINs for information reporting purposes are especially burdened by the ITIN requirements and procedures.

- Future requirements for deactivating ITINs will deprive some taxpayers of ITINs they need for tax administration purposes, and the IRS policy will undermine taxpayers' *right to be informed*.

---

6   *See* IRM Procedural Update WI-03-0215-0352 (Feb. 19, 2015), *available at* http://www.irs.gov/pub/foia/ig/spder/WI-03-0215-0352%5b1%5d.pdf.

7   IRS, *ITIN Production Report* (March 28, 2015) showed 119,409 "applications [with return] awaiting input."  IRS, *ITIN Production Report* (Mar. 14, 2015) showed 3,075 "applications [without return] awaiting input."  Internal Revenue Manual (IRM) 3.21.263.8.3.1, *Preliminary W-7 Application Data Screen* (Sept. 4, 2014) instructs examiners to input as the IRS received date the stamped date or, if missing, the postmark or signature date, or the current date minus ten days.

8   *See* National Taxpayer Advocate FY 2016 Objectives Report to Congress 48-52 (Area of Focus: *The IRS's Implementation of FATCA Has in Some Cases Imposed Unnecessary Burdens and Failed to Protect the Rights of Affected Taxpayers*).  *See also* Legislative Recommendation: *Chapter 3 and Chapter 4 Credits and Refunds: Protect Taxpayer Rights by Aligning the Rules Governing Credits and Refunds for Domestic and International Withholding, infra.*

001611

Case 1:17-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1619 of 4699 PageID #:  4784

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

## ANALYSIS OF PROBLEM

### Background

Individuals ineligible for an SSN, including residents and nonresidents for tax purposes, need an ITIN to file a tax return or be claimed on another person's return.[9]  Taxpayers without SSNs rely on ITINs to:

- File required tax returns if income is above the filing threshold and pay associated taxes;

- Claim tax benefits to which they are lawfully entitled, such as the dependency exemption[10] and the Child Tax Credit;[11]

- File joint returns or be claimed as dependents on the returns of primary taxpayers;

- Avoid mandatory withholding at the rate of 30 percent on certain payments of U.S. source income made by a foreign financial institution under the requirements of FATCA [12] and U.S. source income that is fixed, determinable, annual, or periodic;[13]

- File an election or apply for a withholding certificate under the Foreign Investment in Real Property Tax Act (FIRPTA) of 1980;[14]

- Claim tax treaty benefits to obtain reduced withholding rates; and

- Provide information to third parties such as financial institutions, requiring an ITIN for information reporting and withholding.

The ITIN population has changed significantly in recent years.  In calendar year 2014, dependents comprised only 44 percent of ITIN applicants, compared to 68 percent of ITIN applicants in 2012.[15] Spouses, who made up about six percent of ITIN applicants in 2012, made up over 13 percent in 2014.[16]

---

9   Taxpayers are required by law to use a taxpayer identifying number on tax returns, statements, or other documents required to be filed, when prescribed by regulations, and the regulations specify that this number must be an SSN unless the individual is ineligible for an SSN or is required to use an employer identification number.  Internal Revenue Code (IRC) § 6109(a)(1); Treas. Reg. § 301.6109-1(a)(1)(ii)(A).  Form W-7, *Application for IRS Individual Taxpayer Identification Number*, is the application that taxpayers use to apply for an ITIN.

10   An individual may generally claim a dependency exemption amount for a child (or younger descendant or that of a sibling or step-sibling) under 19 (24 if a full-time student) sharing his or her home for over half the year and who is a U.S. citizen or national, or a resident of the U.S., Canada, or Mexico, or for a qualifying relative.  *See* IRC §§ 151(c), 152(b), (c), (d).  Note, however, that terms of tax treaties between the U.S. and foreign countries may provide for residents of those countries to claim a dependency exemption if they meet certain conditions.  *See, e.g.*, U.S.- Republic of Korea Income Tax Convention, Art. 4(7).

11   The Child Tax Credit and the refundable portion of it, known as the Additional Child Tax Credit, are generally available for children who meet the dependency exemption rules, with the additional requirement that they must also reside in the United States.  *See* IRC § 24(a), (c), and (d).

12   Pub. L. No. 111-147, Title V, Subtitle A, 124 Stat. 71, 97 (2010).  Under FATCA, participating foreign financial institutions (FFIs) who have reached agreements with the IRS to avoid being subject to systematic withholding must impose withholding on any of their own customers defined as "recalcitrant account holders."  IRC § 1471(b)(1)(D)(i).  *See* IRC § 1471(d)(6) (definition of "recalcitrant account holder").  Financial customers must provide the FFI with either a Form W-9, to certify they are U.S. persons, or a Form W-8BEN, to certify they are foreign persons, both of which require an SSN or ITIN.  Taxpayers without an SSN or an ITIN will generally be treated as recalcitrant account holders and will be subject to withholding undertaken by the FFI. IRS response to TAS information request (Nov. 1, 2013). *See also* Treas. Reg. § 1.1471-4.

13   *See* IRC § 1441.

14   Pub. L. No. 96-499, Subtitle C, 94 Stat. 2599, 2682 (1980).  FIRPTA imposes income tax on foreign persons disposing of U.S. real property interests.

15   IRS, Compliance Data Warehouse (CDW), Form W-7 Database (data drawn Dec. 15, 2015). All numbers refer to year end data. *See* National Taxpayer Advocate 2013 Annual Report to Congress 216.

16   Detailed information from ITIN applications (Form W-7) for PY 2015 are not reported here due to a programming error that caused only about half of Form W-7 records being transferred to the IRS's CDW from the ITIN Real Time System (RTS).  The IRS informed TAS that the corrected data for 2015 would not be available until early/mid 2016 and suggested that TAS exclude characteristics of 2015 Form W-7 applicants from this report.  Form W-7 data for PY 2014 and prior years have been corrected.

001612

ITIN applications submitted by nonresidents increased over eight percent between 2013 and 2014 (from 100,285 to 108,472), which might be driven in part by an increased number of taxpayers needing ITINs to comply with FATCA.  ITIN filers were only slightly more likely to claim a refund than SSN taxpayers, and the average refund for ITIN filers was slightly less than the average refund for SSN filers during the last two years.[17]  In 2015, 4.4 million ITIN filers paid over $5.5 billion in payroll and Medicare taxes and $23.6 billion in total taxes.[18]

### FIGURE 1.18.1, Type of ITIN Applicant and Country of Origin

| Year | Total | Type of Applicant | | | | Top Three Countries of Origin | | |
|------|-------|---------|--------|-----------|-------|--------|-----------|-------|
| | | Primary | Spouse | Dependent | Other | Mexico | Guatemala | India |
| 2013 | 1,175,422 | 417,747 | 129,037 | 614,849 | 13,789 | 695,268 | 78,485 | 42,742 |
| | 100% | 36% | 11% | 52% | 1% | 59% | 7% | 4% |
| 2014 | 924,507 | 383,069 | 124,487 | 403,434 | 13,517 | 466,314 | 63,043 | 54,542 |
| | 100% | 41% | 13% | 44% | 1% | 50% | 7% | 6% |

### FIGURE 1.18.2, Residency Status of ITIN Applicants and Application Exceptions[19]

| Year | Total | Residency Status | | | Top Three Application Exceptions | | |
|------|-------|----------|---------------|-------|-------------------|----------------|--------|
| | | Resident | Non-Resident | Other | Passive Income | Other Income | FIRPTA |
| 2013 | 1,175,422 | 1,044,126 | 100,285 | 31,011 | 36,348 | 10,818 | 8,171 |
| | 100% | 89% | 9% | 3% | 3% | 1% | 1% |
| 2014 | 924,507 | 781,650 | 108,472 | 34,385 | 32,243 | 13,265 | 9,728 |
| | 100% | 85% | 12% | 4% | 3% | 1% | 1% |

---

17   IRS, CDW, Form 1040 Database (data drawn Dec. 15, 2015).  All numbers refer to year end data except for 2015, which includes data through October 2015.

18   IRS, CDW, Form W-2 Database, Form 1040 Database (date drawn Dec. 16, 2015) (reflects data available from January to November 2015).  An "ITIN filer" is defined as a tax return on which an ITIN was used for either the primary or secondary (*e.g.*, spouse) filer or a dependent.  The $5.5 billion figure includes Federal Insurance Contributions Act (FICA) and Medicare taxes reported on Form W-2 by primary filers with an ITIN and primary filers with an SSN if the secondary filer or a dependent used an ITIN. This figure does not include FICA and Medicare tax paid by Form 1040 ITIN filers who used a different taxpayer identification number (*e.g.*, SSN) on Form W-2.  IRS, CDW, Form W-7 data.

19   IRS, CDW, Form W-2 Database, Form 1040 Database (date drawn Dec. 16, 2015).

Case 1:20-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1621 of 4699 PageID #: 4786

Most Serious
Problems

Most Litigated
Issues

Recommendations

**FIGURE 1.18.3, Summary Characteristics of ITIN and Non-ITIN Filers[20]**

| | 2014 | | 2015 | |
|---|---|---|---|---|
| | **ITIN** | **non-ITIN** | **ITIN** | **non-ITIN** |
| Total Tax Returns | 4,509,722 | 142,887,720 | 4,351,220 | 143,715,543 |
| Returns with a Refund | 3,582,839 | 111,415,130 | 3,429,365 | 110,734,488 |
| | 79% | 78% | 79% | 77% |
| Returns with Balance Due | 680,761 | 26,182,800 | 710,505 | 27,937,064 |
| | 15% | 18% | 16% | 19% |
| Average Refund | $2,904 | $3,321 | $2,896 | $3,363 |
| Average Balance Due | $2,011 | $5,332 | $2,089 | $5,566 |
| Total Refund Amt ($M) | $10,405 | $370,040 | $9,931 | $372,429 |
| Total Taxes Paid ($M) | $22,505 | $1,575,328 | $23,601 | $1,673,228 |
| Taxes Withheld ($M) | $12,582 | $1,042,237 | $13,200 | $1,097,267 |

The inability to obtain ITINs leads to negative consequences for taxpayers, international businesses, and the IRS, as illustrated by the following examples:

1. A foreign individual on a temporary (nonimmigrant) visa correctly obtains an SSN and pays taxes, as required, on the income earned working in the United States. His family undergoes financial hardship when he must forgo claiming the dependency exemption for his child and filing a joint return with his spouse, both residing in Mexico, because IRS procedures create barriers to them obtaining ITINs.[21]

2. A foreign investor who owns U.S. property applies for an ITIN six months in advance of an upcoming sale, leaving ample time for the IRS to process the ITIN and issue a withholding certificate. The IRS suspends her ITIN application without explaining why her supporting documents were insufficient. The investor delays the sale while she resubmits the same documents. By the time the IRS approves the ITIN application and the investor applies for and receives a withholding certificate, the sale has fallen through.

3. A resident for tax purposes, who is ineligible for an SSN, works as an independent contractor. He chooses not to file a tax return and pay taxes because he has witnessed others in his community who were unsuccessful in obtaining ITINs, even after paying certifying acceptance agents to assist them.

In 2012, TIGTA found the IRS's ITIN process was "so deficient that there is no assurance that ITINs are not being assigned to individuals submitting questionable applications."[22] While concerns about refund fraud are legitimate, the IRS's disproportionately restrictive approach to issuing ITINS does not effectively target the fraud while needlessly burdening taxpayers and preventing those with a legitimate need for an ITIN from obtaining one. Beginning in 2012, the numbers of new ITIN applications and associated returns have fallen significantly as shown in Figure 1.18.4.

---

20   IRS, CDW, Form 1040 Database (date drawn Dec. 16, 2015).

21   The documentation requirements for ITIN applications will be discussed below.

22   TIGTA, Ref. No. 2012-42-081, *Substantial Changes Are Needed to the Individual Taxpaer Identification Number Program to Detect Fraudulent Applications* 6 (July 16, 2012).

FIGURE 1.18.4, New ITIN Applications and Associated Returns in PYs 2009–2015[23]



New ITIN Applications and Associated Tax Returns

*as of Dec. 12, 2015

**The Requirement to Apply for an ITIN During the Filing Season Burdens Applicants, Creates Delays, Leads to Lost Returns, and Hampers the IRS's Ability to Detect and Prevent Fraud**

In 2003, despite the National Taxpayer Advocate's concerns about creating unnecessary administrative burden, the IRS began requiring most ITIN applications to be filed with a paper tax return during the filing season.[24]  There are exceptions for nonresident individuals claiming the benefits of a tax treaty and having income, payments, or transactions subject to third-party reporting or withholding,[25] but these applicants are a minority.[26]  ITIN applicants only have a short time to gather supporting documents and in many cases must give up original documents such as passports.[27]  Some may not be able to apply for an ITIN at all if they are out of the country during the filing season and cannot send in their documents. Furthermore, filing an ITIN application with a return means applicants cannot electronically file their annual returns in the calendar year the ITIN is issued.

While this policy was ill-considered at its inception, the consequences have grown significantly worse.  In 2003, the IRS processed ITIN applications in four to six weeks, and following the policy change, committed to two weeks.[28]  During the 2015 filing season, the IRS advised taxpayers to wait up to 11 weeks,[29]

---

23  IRS, *ITIN Comparative Reports* (weeks ending Dec. 12, 2015; Dec. 31, 2014; Dec. 31, 2013; Dec. 29, 2012; Dec. 31, 2011, Dec. 30, 2010, and Dec. 31, 2009).

24  *See* National Taxpayer Advocate 2003 Annual Report to Congress 60-86 (Most Serious Problem: *Individual Taxpayer Identification Number (ITIN) Program and Application Process*).

25  *See* Form W-7 instructions (Dec. 2014).

26  In PY 2014, about 56,700 out of 924,500 ITIN applicants (six percent) claimed an exception to filing with a tax return.  IRS, CDW, Form W-7 Database (data drawn Oct. 19, 2015).

27  The documentation requirements for ITIN applications will be discussed below.

28  *See* National Taxpayer Advocate 2003 Annual Report to Congress 79.

29  *See* IRM Procedural Update WI-03-0215-0352 (Feb. 19, 2015), *available at* http://www.irs.gov/pub/foia/ig/spder/WI-03-0215-0352%5b1%5d.pdf.

and at one point had a backlog of nearly 120,000 ITIN applications with returns.[30]  This results in ITIN taxpayers waiting up to 14 weeks to receive their refunds, contrasted with the up to three weeks taxpayers with SSNs must wait.[31]  The backlog also affected applicants who were exempt from the requirement to apply with a tax return.[32]

When questioned about the cause of the extended timeframe and backlog, the IRS cited funding decreases, which resulted in the delayed return of seasonal tax examiners by 30 days, a shorter filing season, an inability to provide overtime pay, and an overall decrease in employees.[33]  However, seasonal employees and overtime would not be necessary and the length of the season would be irrelevant if the IRS were to process ITIN applications throughout the year.[34]  The IRS maintains, "Associating the issuance of the ITIN with the filing of a tax return is the only reliable method for the IRS to verify the number is being requested and properly used for tax administration purposes."[35]  However, in the case of a Form W-7 and Form W-2 name mismatch,[36] the IRS accepts copies of pay stubs or bank accounts as proof the income belongs to the applicant.[37]  The IRS could accept these documents to determine that the taxpayer had a filing requirement and a proper tax administration purpose for an ITIN, throughout the year.  This approach would acknowledge the need for a tax filing requirement, but balance the anti-fraud regime with the taxpayer's need for a process no more intrusive than necessary.

Requiring ITIN applications to be filed with returns results in lost returns, and until a recent policy change, it also led to unprocessed returns.  More than one Low Income Taxpayer Clinic (LITC)[38] has reported instances where the IRS processed an ITIN application, but lost the associated return, which was submitted shortly before the refund statute of expiration date (RSED).[39]  Although the IRS does not keep records of lost return complaints,[40] allowing taxpayers to apply for an ITIN earlier, and later file annual returns, including the option to electronically file, would reduce the opportunity for returns to be lost.[41]

As a result of TAS's advocacy, the IRS recently agreed to change its ITIN guidance and process all valid returns filed with an ITIN application.  Prior to these changes, the Internal Revenue Manual (IRM) advised

---

30  IRS, *ITIN Production Report* (Mar. 28, 2015) showed 119,409 "applications [with return] awaiting input."  IRS, *ITIN Production Report* (Mar. 14, 2015) showed 3,075 "applications [without return] awaiting input."  IRM 3.21.263.8.3.1, *Preliminary W-7 Application Data Screen* (Sept. 4, 2014) instructs examiners to input as the IRS received date the stamped date or, if missing, the postmark or signature date, or the current date minus ten days.

31  *See* 2015 Tax Season Refund Frequently Asked Questions, *available at* http://www.irs.gov/Refunds/Tax-Season-Refund-Frequently-Asked-Questions (last updated Apr. 22, 2015).

32  The backlog led to a spike in the processing time for applications submitted without returns.  At one point during the 2015 filing season, the IRS took approximately 35 days to process these ITIN applications, compared to 23 days in 2014.  *See* IRS, *ITIN Production Report* (June 13, 2015).

33  *See* IRS response to TAS information request (Sept. 17, 2015).

34  IRS, *ITIN Production Report* (Mar. 28, 2015) showed 119,409 "applications [with return] awaiting input."  IRS, *ITIN Production Report* (March 14, 2015) showed 3,075 "applications [without return] awaiting input."  IRM 3.21.263.8.3.1, *Preliminary W-7 Application Data Screen* (Sept. 4, 2014) instructs examiners to input as the IRS received date the stamped date or, if missing, the postmark or signature date, or the current date minus ten days.

35  *See* National Taxpayer Advocate FY 2015 Objectives Report to Congress vol. 2, 87.

36  *See* Form W-7, *Application for IRS Individual Taxpayer Identification Number*, and Form W-2, *Wage and Tax Statement*.  A name mismatch occurs when the taxpayer's name on the Form W-7 is different from the taxpayer's name on Form W-2.

37  *See* IRM 3.21.263.5.10.8, *Correspondence Inventory Procedures* (Aug, 18, 2014).

38  *See* IRC § 7526.

39  TAS conference call with LITCs (Nov. 19, 2014).

40  *See* IRS response to TAS information request (Sept. 17, 2015).

41  After an ITIN is assigned, the accompanying tax return is sent for processing and follows the same path as returns with SSNs, suggesting there may be a breakdown in the process between the time the ITIN is processed and the return is sent for processing.  *Id.*

001616

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1624 of 4699    PageID #: 4389

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

Accepting Individual Taxpayer
Identification Number (ITIN)
applications throughout the year
would allow the IRS to apply
greater scrutiny to applications
where an ITIN is not needed
until the filing season.

that if the income and identity cannot be validated, the return will not be processed,[42] even if the return was a valid return under the *Beard* test.[43] This practice infringed a *taxpayer's right to pay no more than the correct amount of tax* because a properly executed return can constitute a claim for refund, and if the ITIN unit failed to send the return for processing and assign an identification number, the IRS may be unable to locate the return and thus argue no claim for refund was timely filed if the RSED has passed.[44] Furthermore, the IRS's prior practice impaired a taxpayer's *right to be informed* because the IRS did not notify taxpayers that their returns were not being processed. TAS persuaded the IRS to protect these rights by revising the IRM to process tax returns with an Internal Revenue Service Number (IRSN)[45] when they are received with an ITIN application and the IRS cannot verify that the applicant has satisfied the requirements to be assigned an ITIN.[46]

Accepting ITIN applications throughout the year would allow the IRS to apply greater scrutiny to applications where an ITIN is not needed until the filing season. The IRS could prioritize those applications where an ITIN is needed immediately, such as for FATCA purposes. The IRS could prevent more fraud by having two separate opportunities to detect fraudulent income or identity theft — one at the time of the ITIN application, and again at the time of return filing. Currently, the IRS misses out on the benefit of identifying trends throughout the year and applying rules to detect later returns that are part of fraudulent schemes.

### ITIN Applicants Are Subject to Unnecessary Burden and Risk Losing Their Identification Documents While the IRS Creates More Work for Itself By Not Providing Adequate Alternatives to Applicants Submitting Original Documents

Some of the most restrictive elements of the ITIN application procedures were implemented in 2012 in response to TIGTA's fraud concerns.[47] Applicants must either mail in original identification documents or copies certified by the issuing agency, use a Taxpayer Assistance Center (TAC) to certify their

---

42  IRM 3.21.263.5.10.8, *Correspondence Inventory Procedures* (Aug. 18, 2014). See also IRM 3.21.263.5.4.1, *Temporary W-7 Status and Final W-7 Status Screen* (Oct. 25, 2013); IRM 3.21.263.5.2.3.7, *Final Status Determination Used in Stripping Process* (Jan. 2, 2015); IRM 3.21.263.5.2.9. *Clerical Handling of Reject Status 98 Flagged 65 Day Purge, Reject Status 99 ITIN 0099 Report, Hard Reject 1 Letter 4939 Cases, and Form 4442* (Sept. 30, 2013).

43  For the tax return to be valid, it must: contain sufficient data to calculate a tax liability, purport to be a return, include an honest and reasonable attempt to satisfy the requirements of the tax law, and be signed under penalties of perjury. *See Beard v Commissioner*, 82 T.C. 766, 777 (1984), *aff'd per curiam*, 793 F.2d 139 (6th Cir. 1986).

44  IRM 3.21.263.7.3, *Refund Inquiries Involving ITIN Issues* (June 29, 2015) advises employees working refund inquiries where the ITIN application was rejected to research an internal database to locate an assigned IRSN, which is an identification number that would not be assigned if the return was not forwarded for processing.

45  An IRSN is a temporary number used in place of a taxpayer identification number such as an SSN or ITIN in order to process a return. IRM, 3.21.263.4.5, *Internal Revenue Service Number (IRSN)* (Jan. 1, 2015). An IRSN is used for processing purposes only and is not a substitute for an SSN or ITIN. IRM 3.13.5.73, *When IRSNs Are Needed* (Jan. 1, 2015).

46  *See* IRS response to TAS information request (Nov. 20, 2015). The IRS revised the following IRMs: IRM 3.21.263.4.8.3, *Hard Reject Reason Codes* (Nov. 25, 2015); IRM 3.21.263.5.4.1, *Temporary W-7 Status and Final W-7 Status Screen* (Nov. 25, 2015); IRM 3.21.263.5.10.8, *Correspondence Inventory Procedures* (Nov. 25, 2015); IRM 3.21.263.5.2.3.7, *Final Status Determination Used in Stripping Process* (Nov. 25, 2015); IRM 3.21.263.5.10.5, *Suspense Inventory Procedures* (Nov. 25, 2015). ITIN applicants whose ITIN applications are rejected and whose returns are processed with an IRSN receive a letter notifying them that an IRSN was assigned, as well as a letter explaining that a refund cannot be released for a taxpayer using an IRSN. *See* Letter 685C, *SSN Invalid* (Rev. Oct. 2007); IRM 3.13.5.72, *Assignment of Internal Revenue Service Numbers (IRSNs)* (Apr. 3, 2015). *See also* CP 54B, *Inquiry Regarding Name and SSN - Refund Delayed* (July 2013); IRM 3.13.5.127.1, *CP 54 Notices B, E, G and Q* (Jan. 1, 2015).

47  *See* TIGTA, Ref. No, 2012-42-081, *Substantial Changes Are Needed to the Individual Taxpayer Identification Number Program to Detect Fraudulent Applications* (July 16, 2012).

001617

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case Advocacy

Appendices

documents, or use a third-party certifying acceptance agent (CAA).[48]  Mailing original documents is impractical for many applicants who cannot go without their original identification documents for multiple months.  Furthermore, it results in some taxpayers not receiving their identification documents back.  Although TAS receives cases from taxpayers trying to locate lost original documents, the ITIN unit does not track the volume of undeliverable or returned mail, the number of claims for lost documents, the success rate for finding them, or the cycle time for returning them to taxpayers.[49]  Passports are especially problematic due to the need for taxpayers to have them back.  In recent years, the number of original passports submitted with ITIN applications has skyrocketed, from about 55,000 in 2012, to approximately 334,000 in 2013, and approximately 390,000 in 2014.[50]  From July 2014 to July 2015, the IRS returned 4,318 original passports to embassies, for which the IRS could not locate a better mailing address.[51]

The IRS is imposing a hardship on any ITIN applicant who is required to send original identification documents to the IRS and who does not have reasonable and accessible alternatives.  Examples of the harm taxpayers face include a taxpayer who cannot travel abroad for a medical emergency[52] or a taxpayer who risks detention because he is unable to provide his identification documents to local law enforcement.[53]  The IRM only provides for the expedited return of original documents in cases where TAS issues a request to the ITIN Unit based on the taxpayer's hardship.[54]  Requiring a taxpayer to work with TAS to provide evidence of a hardship is unnecessary and a waste of time and resources because any taxpayer who is forced to give up his or her original identification documents experiences a hardship as a matter of policy.  The IRS has objected to returning all original documents via expedited mail due to the additional cost, which it estimates to be in the millions of dollars.[55]  However, if the IRS were to provide reasonable and accessible alternatives to sending in original documents, additional costs would be minimal due to the small number of applicants required to send their original documents to the IRS.

ITIN Authenticating TACs, which provide an alternative to giving up original documents, are a poor option for many because they can only approve two types of supporting documentation — passports and national identification cards.[56]  As of September, 2015, there were 186 TACs offering ITIN authentication, with seven temporarily unavailable.[57]  Some states had no TACs offering ITIN document

---

48  See IRS, IR-2012-98, *IRS Strengthens Integrity of ITIN System; Revised Application Procedures in Effect for Upcoming Filing Season* (Nov. 29, 2012), *available at* http://www.irs.gov/uac/Newsroom/IRS-Strengthens-Integrity-of-ITIN-System;-Revised-Application-Procedures-in-Effect-for-Upcoming-Filing-Season.  However, CAAs may not certify documents for dependents, who comprise the bulk of ITIN applicants.

49  Claims for lost identification documents are processed by the IRS Office of Chief Counsel, General Legal Services.  IRS response to TAS information request (Sept. 17, 2015).

50  IRS, CDW, Form W-7 Visa Database (data drawn Oct. 20, 2015).

51  *See* IRS response to TAS information request (Sept. 17, 2015).

52  *See* National Taxpayer Advocate 2013 Annual Report to Congress 223.

53  See *id.*

54  *See* IRM 3.21.263.4.10, *Taxpayer Advocate Service (TAS) Assistance* (Oct. 19, 2015); IRM 3.21.263.5.3.4.2.4, *Returning Original Supporting Identification Documents to Applicant* (Oct. 19, 2015).

55  *See* conference call between TAS and IRS Wage and Investment, discussing *Authenticating Identification Documents at SPEC CAA VITA Sites* (Oct. 29, 2015).

56  IRS, Individual Taxpayer Identification Number (ITIN) Authenticating Taxpayer Assistance Centers, *available at* http://www.irs. gov/uac/ITIN-Authenticating-TACs-Link (last updated Dec. 7, 2015).

57  IRS, Taxpayer Assistance Center Locations Where In-Person Document Review Is Provided, *available at* http://www.irs.gov/uac/ TAC-Locations-Where-In-Person-Document-Verification-is-Provided (last updated September 28, 2015).

Under the IRS's one-size-fits-all approach for Individual Taxpayer Identification Numbers (ITINs), a taxpayer trying to open a bank account abroad must meet the same arduous requirements for original documents (without the benefit of Taxpayer Assistance Centers and certifying acceptance agents) and wait just as long for an ITIN as a taxpayer claiming refundable credits, whose income and filing requirement would be subject to greater scrutiny.

authentication services,[58] and some larger states only had them located in a single metropolitan area.[59]  Furthermore, taxpayers may face extreme waits at TACs, having to line up hours before they open to receive service.[60]  Some taxpayers may not receive ITIN service from a TAC at all, due to reduced hours and appointment times, and limitations on how many new ITIN applications will be worked.[61]   Many TACs require a valid U.S.-issued ID just to enter the building, making them completely unavailable to many applicants.[62]  Qualified Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly (TCE) sites also certify ITIN documents for free, but they have only 117 locations with CAAs, they cannot certify for dependents, and may operate only a few months each year.[63]

Using CAAs is not only cost-prohibitive for some,[64] but completely unavailable to approximately 44 percent of ITIN applicants because they cannot be used by dependents.[65]  Allowing dependents to use CAAs may actually reduce fraud because CAAs often have specialized knowledge of identification documents used in certain communities and regions, and can assist the IRS in identifying fraud.  Furthermore, it would save the IRS resources because applications would likely have fewer errors as a result of the CAA's expertise, thus reducing the number of applications that must be suspended and that require correspondence with the taxpayer.  Increasing eligibility for CAA services would also reduce the burden on TACs, allowing them to refocus scarce resources.

In 2015, the IRS initiated a pilot to test allowing three VITA CAA sites to certify documents for dependents, limited to only passports and national I.D. cards.[66]  Although the National Taxpayer Advocate is encouraged that the IRS is exploring alternative methods for dependents to have their documents certified, the pilot is structured such that its effect on applicants, and specifically on the number of applicants who submit original documents, will be minimal.

Even if the pilot is successful and leads to the IRS allowing all 128 VITA/TCE sites with CAAs to certify dependent documents, the pilot would likely only provide significant benefits to the IRS by reducing

---

58   Neither Montana nor Wyoming have any TACs offering ITIN certification.

59   For example, the only TACs offering ITIN services in Minnesota were in Minneapolis, St. Paul, or Bloomington, which are all part of the Minneapolis metropolitan area.

60   The IRS Commissioner expressed dismay upon hearing reports of taxpayers lining up hours before TACs opened in order to receive service during the 2015 filing season.  *See Hearing before the H. Ways and Means Comm., Subcomm. on Oversight on the 2015 Tax Filing Season*, 114th Cong. (2015) (Statement of John Koskinen, IRS Commissioner).

61   One submitter to TAS's Systemic Advocacy Management System (SAMS) reported that the local TAC only gives out 12-15 tokens for new ITIN applications per day, which can only be used on weekdays and would require the submitter to pull children out of school to apply for an ITIN.  SAMS Submission # 32537 (submitted March 9, 2015) (on file with TAS).

62   *See* National Taxpayer Advocate 2012 Annual Report to Congress 176. Representatives of LITCs raised concerns about the requirement of many TACs or federal buildings in which some TACs are located to produce a valid, U.S.-issued ID to enter the building.  2013 Annual LITC Grantee Conference, Recent Developments in IRS Policies and Procedures Related to ITIN Applications, panel discussion (Dec. 6, 2012).

63   *See* IRS, *List of SPEC Acceptance Agents*, *available at* http://win.web.irs.gov/spec/spec_ITIN.htm (last updated Dec. 5,  2015).

64   According to CAA websites with fee schedules posted, fees for ITINs applications prepared by CAAs can range in the hundreds of dollars for a single ITIN application.

65   IRS, CDW, Form W-7 Database for PY 2014 (data drawn Dec. 15, 2015).

66   *See* IRS, Authenticating Identification Documents for Dependents at SPEC CAA VITA Sites (Oct. 29, 2015) (on file with TAS).

the strain on TACs. While it may reduce burden for taxpayers who are already eligible to use TACs, the pilot is unlikely to decrease the number of taxpayers forced to send in original identification documents. Under the current system, dependent applicants are likely to send in original documents because either they live in a location where there is not an accessible TAC (making it unlikely there is an accessible VITA/TCE site), or they need to use documents other than a passport or national I.D. card to prove their identities. Without expanding the pilot to include all CAAs (not just VITA/TCE sites), and without allowing CAAs to approve all 13 types of documents for dependents, these applicants will still need to mail in original documents. Furthermore, because ITIN applicants in the pilot must meet the income eligibility requirements for the VITA sites, the benefits are further limited to only those taxpayers who generally make $54,000 or less, have a disability, are elderly, or have limited English.[67] Because dependent applicants are required to file ITIN applications with a tax return,[68] and generally do so during the filing season, the National Taxpayer Advocate hopes the IRS will extend the pilot through the filing season in order to obtain a full picture of how the pilot will affect dependent applicants.

In late December of 2015, Congress amended Internal Revenue Code (IRC) § 6109 to provide special rules for the issuance of ITINs.[69] The new law provides that the IRS may issue an ITIN to an applicant residing in the United States if the applicant provides the documentation required by the IRS either (a) in person to an IRS employee or to a community-based certified acceptance agent (as authorized by the IRS), or (b) by mail.[70] For applicants residing outside the United States, they must submit their applications either by mail, to an IRS employee, or to a designee of the Secretary at a U.S. diplomatic mission or consular post.[71] It allows the IRS to establish documentation requirements for ITIN applicants to prove identity, foreign status, and residency.[72] However, the IRS may only accept "original documents or certified copies meeting the requirements of the Secretary."[73] This language gives the IRS the latitude to provide a number of alternatives to accepting only original documents or copies certified by the issuing agency. When implementing the law, the IRS should use this opportunity to study the additional types of certified copies that may meet its requirements; for example, copies certified by state or other federal agencies other than the issuing agency, clerks of courts, notarized copies, and copies that are properly apostilled and authenticated by U.S. diplomatic missions abroad.[74]

Furthermore, the law provides no limitations on what documents can be certified by a CAA and whether a CAA can certify dependents' documents. Finally, the law envisions an expansion of the CAA program, which the National Taxpayer Advocate hopes the IRS will fully carry out.[75] The law lists persons eligible to be acceptance agents, which includes among others, state and local governments, federal agencies, and

---

67  *See* IRS, Free Tax Return Preparation for Qualifying Taxpayers, *available at* https://www.irs.gov/Individuals/Free-Tax-Return-Preparation-for-You-by-Volunteers (last updated Oct. 26, 2015).

68  *See* Form W-7, *Application for IRS Individual Taxpayer Identification Number Instructions* (Dec. 2014). The pilot was originally scheduled to run from September through December 2015. *See* IRS, Authenticating Identification Documents for Dependents at SPEC CAA VITA Sites (Oct. 29, 2015) (on file with TAS).

69  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(a) (2015) (to be codified at IRC § 6109(i)).

70  *See id.* (to be codified at IRC § 6109(i)(1)(A)).

71  *See id.* (to be codified at IRC § 6109(i)(1)(B)).

72  *See id.* (to be codified at IRC § 6109(i)(2)(A)).

73  *See id.* (to be codified at IRC § 6109(i)(2)(B)).

74  For detailed information, see U.S. Department of State, Authentications and Apostilles, *available at* http://travel.state.gov/content/travel/en/legal-considerations/judicial/authentication-of-documents/notarial-and-authentication-apostille.html (last visited on Dec. 18, 2015). *See also* Convention of 5 October 1961 Abolishing the Requirement of Legalization for Foreign Public Documents, *available at* https://www.hcch.net/en/instruments/conventions/full-text/?cid=41 (last visited Dec. 18, 2015).

75  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(c) (2015).

001620

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1628 of 4699 PageID #: 6693

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

other persons or categories authorized by regulations or IRS guidance.[76]  In addition, as part of a required study on the effectiveness of the application process for ITINs, the IRS must evaluate ways to expand the geographic availability of CAAs and strategies to work with other federal agencies, state and local governments, and other organizations to encourage participation in the CAA program.[77]  The IRS should use the study to explore accessible alternatives to submitting original documents under its current policy.  The IRS also should collaborate with TAS on developing criteria for this study, and include a TAS representative on the study team.

### Combined, the Requirements for Most Applicants to Apply for an ITIN During the Filing Season and Send Original Documents May Contribute to Errors on the Parts of the ITIN Unit and Applicants, Resulting in Growing Suspension and Rejection Rates

The compressed timeline for reviewing documents during the filing season encourages errors by the ITIN unit and leads to the use of seasonal employees, who may have less experience and expertise in reviewing ITIN applications.  The timeline also leads to errors by applicants who have less time to put together applications.  The rate for ITINs rejections is unacceptably high, with almost a third of applications rejected during the past two years, as shown in Figure 1.18.5.

**FIGURE 1.18.5**[78]

#### Percent of Rejected ITIN Applications in PYs 2011-2015



It is likely that the original documents requirement contributed to the spike in rejections in 2013, as a result of taxpayers sending in incomplete applications or failing to meet the IRS's standards for original documents.  During the last two processing years, the number one reason for suspended applications was documentation that did not meet IRS criteria as shown in Figure 1.18.6.

---

76   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(c) (2015).

77   *See id.* at § 203(d).

78   IRS, *ITIN Comparative Reports* (Nov. 21, 2015, Dec. 31, 2014; Dec. 29, 2012).

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1629 of 4699 PageID #: 4794

Most Serious
Problems

Most Litigated
Recommendations

Legislative
Issues

**FIGURE 1.18.6, Top Five Reasons for Suspended ITIN Applications**[79]

| Suspense Codes | 2014 | Jan. 1 - July 31, 2015 |
|---|---|---|
| S02 – Valid documentation (*i.e.*, didn't meet IRS criteria) | 97,762 | 70,259 |
| S26 – Passport | 33,543 | 26,469 |
| S03 – Identification documents must be an original or certified by the issuing agency | 31,218 | 22,317 |
| S36 – School Record | 29,442 | 20,337 |
| S30 – Medical Record (under 6) | 28,826 | 19,003 |

A frequent practitioner complaint is the IRS's suspending or rejecting applications with legitimate supporting documents. One LITC reported that over 25 percent of its ITIN applications were either suspended or rejected outright, despite being reviewed and certified by an on-site CAA and having no errors.[80] In one case the IRS asked for a passport to be resubmitted, even though a valid passport was certified by a CAA, meaning an original passport did not need to be submitted. Although the rejection rate has improved since 2013, errors by applicants and the IRS are likely as long as most ITIN applications must be filed during the filing season and include original documents.

### Taxpayers Abroad Needing ITINs for Information Reporting Purposes Are Especially Burdened by the ITIN Requirements and Procedures

As a result of the procedures, ITIN applicants abroad often must mail their documents internationally and go without them for an extended time. Taxpayers abroad do not have the benefit of TACs, which allow applicants in the United States to avoid sending in original documents. The IRS attaché offices abroad used to be able to certify ITIN applications, but all four were closed in 2015.[81] Currently, applicants abroad have limited CAA options, with CAAs in only 18 countries (Macau and Hong Kong are counted as part of China) and one U.S. territory as shown in Figure 1.18.7.[82]

---

79   IRS response to TAS information request (Sept. 17, 2015). Data for PY 2015 was only available for the first half of the year.

80   The Clinic reported this information on TAS's SAMS. *See* SAMS Issue # 33030 (submitted June 1, 2015) (on file with TAS).

81   *See* Most Serious Problem: *International Taxpayer Service: The IRS's Strategy for Service on Demand Fails to Compensate for the Closure of International Tax Attaché Offices and Does Not Sufficiently Address the Unique Needs of International Taxpayers*, *supra*.

82   The IRS has indicated that there are 18 countries (Macau and Hong Kong are counted as part of China) and one U.S. territory with a CAA. However, the irs.gov website only lists 17 countries outside the United States with CAAs because the irs.gov website is available to the general public, and only CAAs requesting to be posted on this website are listed. *See* IRS response to TAS fact check (Dec. 11, 2015). *See* IRS, *available at* https://www.irs.gov/Individuals/Acceptance-Agent-Program (last visited Nov. 23, 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1630 of 4699 PageID #: 795

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

FIGURE 1.18.7[83]

**Map of Countries with CAAs**



Furthermore, some of the largest countries with CAAs only have one or two in the entire country.[84]  The recently passed law amending IRC § 6109, referenced above, includes federal agencies in its list of persons eligible to be CAAs,[85] but the law also dictates that applicants residing abroad will not have the option of submitting their applications through a CAA at all because they are limited to submitting them by mail, to an IRS employee, or to a designee of the Secretary at a U.S. diplomatic mission or consular post.[86] Furthermore, the expanded program for training and approving CAAs under the new law is only for the purposes of applicants residing in the United States.[87]  It is incumbent upon the IRS to provide alternatives for applicants residing abroad to provide certified copies outside of using a CAA.

The recent law authorizes the IRS to accept ITIN applications at a U.S. diplomatic mission or consular post.[88]  The National Taxpayer Advocate hopes the IRS will start allowing U.S embassies and consulates abroad to certify documents in a manner similar to a CAA.  Currently, there are 275 U.S. consulates and embassies that provide a similar service for SSN applicants by conducting an in-person interview, certifying original identification documents such as birth certificates and passports, and referring the

---

83  IRS, *available at* https://www.irs.gov/Individuals/Acceptance-Agent-Program (last visited Nov. 23, 2015).  The figure only shows 17 of the 20 countries (in addition to the United States) that have CAAs because the other three countries with CAAs are those where the CAAs have not requested to be posted on the irs.gov website available to the public.

84  Brazil has only one CAA and India has only two. IRS, Acceptance Agent Program, *available at* https://www.irs.gov/Individuals/ Acceptance-Agent-Program (last visited Nov. 23, 2015).

85  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(c) (2015).  This section defines federal agencies according to the definition in IRC § 6402(h), which provides "the term 'Federal agency' means a department, agency, or instrumentality of the United States, and includes a Government corporation (as such term is defined in section 103 of title 5, United States Code).

86  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(a) (2015) (to be codified at IRC § 6109(i)(1)(B)).

87  *Id.*

88  *Id.*

applications with copies of the documents to a Federal Benefits Unit.[89]  Thus, the Department of State could certify documents for ITIN applicants in its missions abroad following established procedures.[90]

Applicants abroad also face the same timeframe as applicants applying during the filing season, which was 11 weeks in 2015, even if they are subject to an exception such as for FIRPTA or FATCA purposes and apply for an ITIN outside the filing season.[91]  Under the IRS's one-size-fits-all approach for ITINs, a taxpayer trying to open a bank account abroad must meet the same arduous requirements for original documents (without the benefit of TACs and CAAs) and wait just as long for an ITIN as a taxpayer claiming refundable credits, whose income and filing requirement would be subject to greater scrutiny. This process creates unnecessary barriers to commerce.

### Future Requirements for Deactivating ITINs Will Deprive Some Taxpayers of ITINs They Need for Tax Administration Purposes, and the IRS Policy Will Undermine Taxpayers' *Right to Be Informed*

> The IRS's deactivation plan will seriously infringe a taxpayer's *right to be informed* because the IRS will not provide advanced notification to taxpayers' last known address prior to deactivating their Individual Taxpayer Identification Numbers (ITINs).

The National Taxpayer Advocate has long advocated for the IRS to create a process for deactivating ITINs that are no longer used for tax administration purposes and is pleased the IRS and Congress have finally adopted her recommendation.[92]  However, she has concerns about how the deactivation plan will be carried out according to the requirements of the recently passed law and the IRS's implementation plans.  Under the new law, ITINs issued during 2013 and later will remain in effect unless the individual to whom the ITIN was issued fails to file a tax return or be claimed as a dependent on another's tax return during a period of three consecutive years.[93]  Before this law was passed, the IRS had announced its own deactivation plan, which would deactivate ITINs after five consecutive years of non-use.[94]  The National Taxpayer Advocate was concerned that the IRS refused to clarify whether ITINs included on a third-party information return would constitute use for tax purposes during the period, such that it would prevent deactivation.[95]  She is equally concerned that the new law does not take into account an information return filed by a third party that lists an individual's ITIN.  The deactivation requirements included in the amendment to IRC § 6109 will lead to countless problems down the road for individuals who need an ITIN in order to provide it to a third party for information reporting purposes, but who may not have a tax return filing obligation and thus would not file during a three-year period.  For example, the ITIN may be used on an interest-bearing financial account, but the taxpayer's income is below the filing threshold.

---

89   *See* email from Department of State governmental liaison to TAS (Sept. 9, 2015) (on file with TAS); email from Social Security Administration governmental liaison to TAS (Sept. 23, 2015) (on file with TAS).

90   For detailed information, see U.S. Department of State, Authentications and Apostilles, *available at* http://travel.state.gov/content/travel/en/legal-considerations/judicial/authentication-of-documents/notarial-and-authentication-apostille.html (last visited Dec. 18, 2015).  Foreign Public Documents, *available at* https://www.hcch.net/en/instruments/conventions/full-text/?cid=41 (last visited Dec. 18, 2015).

91   *See* IRM Procedural Update WI-03-0215-0352 (Feb. 19, 2015), *available at* http://www.irs.gov/pub/foia/ig/spder/WI-03-0215-0352%5b1%5d.pdf.

92   *See, e.g.*, National Taxpayer Advocate 2010 Annual Report to Congress 333; National Taxpayer Advocate 2008 Annual Report to Congress 130.

93   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 203(a) (2015) (to be codified at IRC § 6109(i)(3)).

94   *See* IRS, IR-2014-76, *Unused ITINS to Expire After Five Years; New Uniform Policy Eases Burden on Taxpayers, Protects ITIN Integrity* (June 30, 2014), *available at* https://www.irs.gov/uac/Newsroom/Unused-ITINs-to-Expire-After-Five-Years%3B-New-Uniform-Policy-Eases-Burden-on-Taxpayers,-Protects-ITIN-Integrity

95   *See* IRS response to TAS information request (Sept. 17, 2015).

001624

The IRS's deactivation plan will seriously infringe a taxpayer's *right to be informed* because the IRS will not provide advanced notification to taxpayers' last known address prior to deactivating their ITINs.[96] Although the IRS will communicate information on its website and to CAAs about the deactivation plan, it will only notify taxpayers of a deactivated ITIN and provide guidance about how to reactivate it upon submission of a return and on settlement notices.[97] This shortsighted policy will undoubtedly harm taxpayers who will not learn that they need to reapply for an ITIN until after they have already filed their returns and are awaiting refunds. Taxpayers who are traveling away from a CAA or TAC, or who do not have in their possession or cannot give up their original identification documents, may be unable to reapply for ITINs and receive their refunds. If these taxpayers were notified in advance, they could plan accordingly, or challenge the deactivation if they believed it was in error. This policy will result in more work for the IRS because it will need to process the returns under IRSNs and later merge them to the taxpayers' reactivated ITINs.

## CONCLUSION

The IRS continues to make it exceedingly difficult for taxpayers needing ITINs to comply with their tax filing and payment obligations. Until the IRS makes some significant changes in how applicants apply and how it processes ITIN applications, taxpayers may be further encouraged to stop filing returns or be prevented from receiving tax benefits to which they are lawfully entitled. Furthermore, barriers to commerce will only grow as more people will need ITINs to comply with FATCA.[98] Increased enforcement as a result of FATCA necessitates better ITIN procedures that encourage, not hamper, taxpayers' ability to comply with the tax laws.

---

96  *See* IRS response to TAS information request (Sept. 17, 2015).

97  *See id.*

98  *See* National Taxpayer Advocate FY 2016 Objectives Report to Congress 48-52 (Area of Focus: *The IRS's Implementation of FATCA Has in Some Cases Imposed Unnecessary Burdens and Failed to Protect the Rights of Affected Taxpayers*). *See also* Legislative Recommendation: *Chapter 3 and Chapter 4 Credits and Refunds: Protect Taxpayer Rights by Aligning the Rules Governing Credits and Refunds for Domestic and International Withholding, infra.*

001625

**RECOMMENDATIONS**

The National Taxpayer Advocate recommends that the IRS:

1. Allow all ITIN applicants to apply for an ITIN at any time of the year without submitting a tax return as long as they provide other evidence of a legitimate tax administration purpose for the ITIN.

2. Accept documentation such as pay stubs or bank statements as evidence of a filing requirement and thus evidence of a legitimate tax administration purpose for an ITIN.

3. Return by expedited mail all original identification documents sent to the IRS.

4. Allow TACs to certify all types of identification documents for ITIN applicants.

5. Allow CAAs to certify all types of identification documents for dependent ITIN applicants.

6. Expand the VITA CAA pilot to include CAAs who are not VITA/TCE sites and allow them to certify all types of identification documents for all ITIN applicants.

7. Partner with the Department of State to provide certification of ITIN applications at U.S. embassies and consulates abroad.

8. Collaborate with TAS on developing criteria for the ITIN study required by law, and include a TAS representative on the study team.

9. Notify all taxpayers at their last known address at least three months prior to the deactivation of their ITINs and provide guidance for how to reactivate the ITIN or challenge a deactivation the taxpayer believes is in error.

MSP
#19

# PRACTITIONER SERVICES: Reductions in the Practitioner Priority Service Phone Line Staffing and Other Services Burden Practitioners and the IRS

## RESPONSIBLE OFFICIAL

Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Retain Representation*
- *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

As the Internal Revenue Code (IRC) gets more complex, taxpayers are increasingly turning to practitioners to assist them with meeting their tax obligations and to represent them in their disputes with the IRS.  During the 2015 fiscal year (FY),  there were over one million Forms 2848, *Power of Attorney and Declaration of Representative*, filed by practitioners on behalf of taxpayers with matters before the IRS.[2]  Tax practitioners have become key IRS partners in achieving voluntary tax compliance and settling disputes.

The IRS created the Practitioner Priority Service (PPS) line to serve as the first line of contact for practitioners to resolve account related issues for their clients.[3]  This line is intended to provide practitioners with improved overall consistency and quality of service while reducing wait time.[4]

However, reductions in staffing and available services on the PPS line have resulted in increased wait times and limited services for practitioners.  Over the past five years, the IRS has gone from answering about 80 percent of PPS calls in FY 2011 to less than 50 percent in 2015.[5]  In FY 2011, the average speed of answer (ASA) was 13.3 minutes compared to 46.6 minutes for FY 2015.[6]  For a four-week period in FY 2015, the average wait time for the PPS line was in excess of one hour.[7]  In contrast, the ASA for the

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Email from the IRS Centralized Authorization File unit stating the number of Forms 2848s filed for FY 2015 (Nov. 25, 2015).

3   Internal Revenue Manual (IRM) 21.3.10.1, *Practitioner Priority Service (PPS) Overview* (Oct. 1, 2015).

4   IRM 21.3.10.1, *Practitioner Priority Service (PPS) Overview* (Oct. 1, 2015).

5   IRS, Joint Operations Center (JOC), *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2012).  Level of Service (LOS) was 78.3 percent in FY 2011.  IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).  LOS was 47.6 percent as of September 30, 2015.

6   IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2012).  ASA was 13.3 minutes in FY 2011.  IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).  ASA was 46.6 minutes, representing a 250 percent increase from FY 2011.

7   IRS, JOC, *Snapshot Reports: Product Line Detail* (weeks ending Aug. 15, 2015 through Sept. 5, 2015).

001627

Accounts Management (AM) toll-free lines during FY 2015 was 30.5 minutes.[8]  It is ironic to use the term "priority" for the practitioner line when a practitioner could call the general phone lines and have a shorter hold time.

The National Taxpayer Advocate is concerned that the IRS's lack of commitment to PPS increases the overall compliance burden on taxpayers, not limited to the increased cost of representation, and creates downstream costs for the IRS when practitioners are unable to timely resolve their clients' tax issues. Specifically, we have identified the following problems with the IRS's current approach to the PPS:

- The reduction of staffing results in an increased number of disconnected calls and a significant increase in wait time;

- The reduction in services on the PPS places an increased burden on practitioners that is passed to taxpayers; and

- The IRS does not collaborate with or collect suggestions from the practitioner community before making changes to the PPS.

### ANALYSIS OF PROBLEM

#### Background

The PPS was designed to be the first point of contact with the IRS for practitioners.[9]  Practitioners with questions have a designated professional support line they can call to receive guidance and answers regarding their clients' account related issues.  IRS customer service representatives (CSRs) trained to handle practitioners' account questions staff the toll-free line.[10]

> Over the course of the 2015 filing season, the IRS answered only about 45 percent of practitioner calls on the Practitioner Priority Service, and the hold time averaged over 45 minutes.

When a practitioner calls the toll-free number, the call is routed to one of nine PPS locations.[11] The routing is based on an evaluation of the shortest expected wait times and whether the inquiry is regarding individual tax accounts or business accounts.[12] If a practitioner's inquiry is outside the scope of the PPS's authority to answer, the assistor will provide the practitioner with the appropriate telephone contact number for his or her inquiry.

#### The Reduction of PPS Staffing Results in an Increased Number of Disconnected Calls and Significant Increase in Wait Time

Practitioners rely upon IRS assistors on the PPS line to help them effectively represent their clients.  The *right to retain representation* is negatively affected when the representative cannot reach the IRS in a reasonable amount of time and is unable to resolve issues with his or her clients' accounts.

---

8    IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (Sept. 30, 2015) (source of AM and Enterprise Total data).  The AM ASA of 30.5 minutes is a combined figure reflecting 30 customer service lines.

9    IRM 21.3.10.1, *Practitioner Priority Service (PPS) Overview* (Oct. 1, 2015).

10   The toll-free number 1-866-860-4259 is available from 7:00 a.m. to 7:00 p.m. local time (Alaska and Hawaii follow Pacific Time) and 8:00 a.m. to 8:00 p.m. for Puerto Rico, *available at* http://www.irs.gov/Tax-Professionals/Practitioner-Priority-Service.

11   The nine locations are: Brookhaven, NY; Buffalo, NY; Memphis, TN; Nashville, TN; Philadelphia, PA; Pittsburgh, PA; Cincinnati, OH; Oakland, CA; and Ogden, UT, *available at* http://www.irs.gov/Tax-Professionals/Practitioner-Priority-Service.

12   The toll-free number when last called on October 23, 2015, listed a menu of several options to direct callers to the proper assistors.

001628

The IRS has reduced the staffing on the PPS line from 98 employees solely devoted to the PPS in the FY 2011 filing season to 66 in the FY 2015 filing season, about a 30 percent decrease, as seen in Figure 1.19.1.  At the end of FY 2015, the IRS had 140 employees staffing the PPS, 57 fewer employees than in FY 2011.[13]

**FIGURE 1.19.1, Staffing Levels of Practitioner Priority Services**[14]

| Accounts Management PPS | | | |
| --- | --- | --- | --- |
| Fiscal Year | Staffing (as of 3/31) AM Direct FTEs | Staffing (as of 9/30) AM Direct FTEs | FY Total Calls Transferred Out |
| 2011 | 98 | 197 | 254,073 |
| 2012 | 92 | 193 | 205,540 |
| 2013 | 99 | 203 | 211,330 |
| 2014 | 79 | 168 | 149,791 |
| 2015 | 66 | 140 | 116,174 |

The PPS line transferred out nearly 138,000 fewer practitioners' calls to other IRS functions in FY 2015 compared to FY 2011.[15]  This transferred figure represents all PPS transfers and is not limited to transfers outside the scope of provided services.  For example, the PPS line does not handle calls from the general public and those calls would be transferred out or directed to the appropriate function for resolution.  Most significant for practitioners, a call would be transferred if the issue is a compliance issue and came into the PPS; it would need to be transferred to the proper compliance application.

With fewer staff dedicated to the PPS, the average hold times are lengthening.[16]  Over the course of the 2015 filing season, the IRS answered only about 45 percent of practitioner calls on the PPS, and the hold time averaged over 45 minutes.[17]

---

13  Response to TAS research request from Wage and Investment (W&I) (Oct. 20, 2015).  The 57 fewer employees was reached by the following computation, 197-140= 57.

14  Response to TAS research request from W&I (July 27, 2015).  Staffing data (AM Direct FTE) pulled from ETD Half Hourly Adherence Reports (AM FTE = total ready agent ½ hours in AM PPS agent groups divided by 2 divided by 2,080).  Transfer data is from the ETD Agent Transfers Report.

15  This number is derived by subtracting the FY 2015 number of calls from the FY 2011 number of calls (254,073 (FY 2011) – 116,174 (FY 2015) = 137,899).  The data shows reduced resource expenditure from 2013, the resources expended were based on the planned LOS for each year which is driven by allocated funding.

16  IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2012).  ASA was 13.3 minutes in FY 2011.  IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).  ASA was 46.6 minutes.

17  IRS, JOC, *Snapshot Reports: Product Line Detail* (Apr. 18, 2015).

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1637 of 4699 PageID #:  4802

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

**FIGURE 1.19.2**[18]

### Filing Season 2015 Weekly Service Levels for the Practitioner Priority Service Line

*This line provides tax professionals a dedicated channel to resolve taxpayer-client account issues.*



While the number of attempted practitioner calls increased in FY 2015 compared to FY 2014, the percentage of answered calls decreased by more than 30 percent over the same period, from about 70 percent CSR level of service (LOS) in FY 2014 to less than 48 percent LOS in FY 2015, as shown in Figure 1.19.3.  The average wait time (ASA) for the same period increased by 70 percent.[19]

**FIGURE 1.19.3, FYs 2014 and 2015 Call Information for the PPS Line**[20]

| Fiscal Year | Dialed Attempts | Assistor Calls Answered | Level of Service | Average Speed of Answer (Minutes) | Average Speed of Answer Change |
|---|---|---|---|---|---|
| 2014 | 1,884,497 | 1,148,997 | 70.4% | 27.4 | n/a |
| 2015 | 2,056,376 | 851,716 | 47.6% | 46.6 | 70% |

During the summer of 2015, TAS conducted focus group interviews at the IRS Nationwide Tax Forums, which provide an opportunity for enrolled agents, CPAs, and other tax professionals to earn Continuing Professional Education credits.  TAS learned that practitioners calling the PPS are experiencing such large increases in wait times that they look for other avenues for resolution of their issues.[21]  During these discussions, one practitioner stated that he called into the PPS and was placed on hold. He promptly got into his car and drove to the local taxpayer assistance center, took a number, met with an assistor, got the issue resolved, and drove back to his office before being removed from hold on the PPS line.[22]

---

18   IRS, JOC, *Snapshot Reports: Product Line Detail* (weeks ending Jan. 3, 2015, through Apr. 18, 2015).
19   IRS, JOC, *Snapshot Reports: Product Line Detail* (Sept. 30, 2015).
20   *Id.*
21   2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service* 8  (Nov. 2015).
22   *Id.*

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1638 of 4699   PageID #: 8203

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

Practitioners also reported extreme frustration with being placed on hold for over an hour, only to abruptly be disconnected.[23]  Over 415,000 calls to the PPS were disconnected before the practitioner was even able to reach an assistor.[24]  This "courtesy disconnect" occurs when the IRS switchboard is overloaded and cannot handle additional calls.  The IRS allows practitioners to remain on hold on the PPS lines longer than other phone lines.[25]

Generally, practitioners bill their clients by the hour for their services and this may include any time waiting on hold to resolve issues.[26]  As the wait times increase, taxpayers may pay considerably more for resolution of their tax issues.  More significantly, if practitioners are unable to get through on the PPS line to resolve tax account issues, there could be serious consequences for the taxpayer.  Moreover, each missed contact with practitioners to resolve account issues is a missed opportunity for the IRS to ensure that taxpayers remain compliant with their tax obligations.

> …One practitioner stated that he called into the Practitioner Priority Service and was placed on hold. He promptly got into his car and drove to the local taxpayer assistance center, took a number, met with an assistor, got the issue resolved, and drove back to his office before being removed from hold on the Practitioner Priority Service line.

### The Reduction in Services on the PPS Places an Increased Burden on Practitioners That Is Passed on to Taxpayers

PPS is available for practitioners requesting assistance with a variety of tax issues including understanding IRS notices and letters, correcting processing errors, locating and applying payments, securing installment agreements, and assisting with tax account adjustments.  Over the last several years, the IRS has reduced the number of services provided by the PPS which impacts both practitioners and taxpayers.[27]

Practitioners report they were previously able to call the PPS with tax law questions and resolve multiple client account issues with one call.[28]  Practitioners are reporting that even when they get through to an assistor they are only able to address one client's issues at a time, rather than five as specified in the Internal Revenue Manual.[29]  If a practitioner wants to address issues for additional clients, they have to hang up and call back, enduring the extensive wait time all over again.

Starting in 2014, the IRS limited the PPS scope to practitioners working on resolving their clients' active tax account issues.  The IRS no longer services

---

23   2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service.* (Nov. 2015).  IRS, JOC, Custom Report RRC 1623 (including weekly data on the number of courtesy disconnects from FY 2011 through FY 2015).

24   IRS, JOC, Custom Report RRC 1623 (including weekly data on the number of courtesy disconnects from FY 2011 through FY 2015).  This figure can be influenced by a number of factors including caller behavior.  For example, during periods of high demand, a caller might make multiple calls to the PPS simultaneously in hopes of increasing the chance of getting through for a single issue.

25   IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).  ASA was 46.6 minutes.  IRS, JOC, *Snapshot Reports: Enterprise Snapshot* (Sept. 30, 2015) (source of AM and Enterprise Total data).  The AM ASA of 30.5 minutes is a combined figure reflecting 30 customer service lines.

26   2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service* 8 (Nov. 2015).

27   IRM 21.3.10.2, *Scope of Service* (Aug. 14, 2009).  Through the PPS IRM of August 14, 2009, practitioners were not limited to the number of client accounts they could address per call to the PPS.  As of the same IRM dated October 1, 2010, and in the current IRM, practitioners are limited to addressing five client accounts per call to the PPS.

28   2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service* 7 (Nov. 2015).

29   *Id.*; IRM 21.3.10.2.1(2) (Sept. 16, 2015).  PPS toll-free CSRs resolve inquiries by taking the appropriate action and providing an accurate response.  CSRs will limit the tax practitioner to no more than five (5) clients per call.  CSRs will provide complete and accurate information and advise tax practitioners to provide their clients with the appropriate toll-free non-PPS customer service number.

calls from tax practitioners or other third parties for non-tax matters, such as transcript requests for monitoring clients' financial history. Other areas that are no longer addressed by the PPS include: general tax law questions, accounts assigned to the Automated Collection System (ACS), Automated Under Reporter (AUR) cases, Automated Correspondence Examination (ACE) situations, or when a case is assigned a Revenue Officer or Revenue Agent. [30]

### FIGURE 1.19.4, Scope of Practitioner Priority Services

| Services Provided by PPS | Services Not Provided by PPS |
|---|---|
| Understanding IRS's notices and letters | Answers to tax law questions |
| Correcting processing errors | Assistance with accounts assigned to Automated Collection System |
| Locating and applying payments | Assistance with accounts assigned to Automated Under Reporter |
| Requesting installment agreements | Accounts assigned to Correspondence Examination |
| Requesting tax account adjustments | Accounts assigned to a Revenue Officer or Revenue Agent |

Instead, these types of calls are transferred or referred to other IRS functions. When practitioners call the PPS about customer accounts that are being handled by the ACS unit, the practitioner is transferred to the respective compliance area, resulting in additional wait time and risk of being disconnected before assistance can be offered. Litigation demonstrates that taxpayers are more likely to prevail against the IRS when represented by a tax professional.[31] By reducing practitioners' ability to timely reach the IRS, they are likely impacting taxpayers' ability to satisfactorily resolve their case.

Finally, as the IRS continues to reduce taxpayer services for the general taxpayer population, it drives that work, such as answering complex tax law questions, to practitioners.[32] This shifting of more responsibility to practitioners to resolve taxpayer issues means it is more critical than ever that the PPS provide the services practitioners need to resolve them.

### The IRS Does Not Collaborate With or Solicit Suggestions From the Practitioner Community Before Reducing the Scope of the PPS

During FY 2013, an internal IRS review of the PPS revealed that the customer base of the PPS had expanded from practitioners working on actual account issues to include businesses providing third-party tax account monitoring services.[33] These services included monthly monitoring and compliance checks of current and potential clients via monthly calls to the PPS requesting verbal account information and multiple transcripts. Based upon this review, the IRS elected to restrict access to PPS so that only practi-

---

30  The ACS is a computerized inventory system that sends taxpayers notices demanding payment, issues liens and levies, and answers telephone calls in an effort to resolve balance due accounts and delinquencies. The AUR is an automated program that identifies discrepancies between the amounts that taxpayers reported on their returns and what payers reported via W-2, Form 1099, and other information returns. ACEs are automated from the initiation, aging and closing of certain Earned Income Tax Credit (EITC) and non-EITC cases. Using the ACE, Correspondence Exam can process specified cases with minimal to no tax examiner involvement until a taxpayer reply is received.

31  See Most Litigated Issues, infra. See also National Taxpayer Advocate 2014 Annual Report to Congress 426 (Most Litigated Issues).

32  R-Mail was originally deployed as a tool to send referrals to complex tax law questions that would require research by more experienced assistors. The IRS is no longer answering complex tax law questions. SERP Alert 15A0442, Post R-Mail Guidance (Oct. 5, 2015). See also Most Serious Problem: Compliance Capabilities Vision, infra/supra.

33  W&I response to TAS information request (July 27, 2015).

tioners who provide tax advice, prepare income taxes or act on behalf of taxpayers with regards to active account related issues will be assisted. These changes were included in the implementation of the 2014 Service Approach.

Now the IRS directs non-practitioners to use the Income Verification Express System or the Form 4506-T to secure account information.  While this change reduced the burden placed upon the PPS by eliminating a subset of calls, the IRS neglected to reach out to practitioners to discuss the change and solicit what other types of changes could be beneficial for practitioners.

Practitioners participating in the National Taxpayer Advocate Tax Forums focus groups overwhelmingly stated that the PPS is worse than it was five years ago and that none of them have noticed any improvements to service on the line.[34]  Despite the overall lack of service and satisfaction with the PPS, the majority of practitioners would like to continue using the line as a resource when encountering tax issues.[35]  Suggestions on how to improve the line from practitioners include: giving the caller the option to be disconnected prior to receiving a courtesy disconnect; leaving a phone number for an assistor to call back rather than having practitioners wait on hold; using more detailed prompt questions; offering a specific dedicated phone number for transcript requests; and having knowledgeable assistors who have the authority to correct issues and solve problems.

For a number of years, the National Taxpayer Advocate has recommended that the IRS develop online services for taxpayers and practitioners.[36]  Online account access was recently listed as one of the top ten initiatives needed to achieve the IRS's compliance vision.[37]  As the IRS begins to evaluate how to move towards a more interactive format of online account access allowing taxpayers, preparers, and authorized third parties to securely interact with the IRS to obtain return information, submit payments, and receive status updates, specific attention should be paid to incorporating the needs of the practitioner community while protecting taxpayers.[38]

Even with the onset of increased online account services, it will not replace the need for the PPS.[39] Practitioners need to have an avenue by which they can discuss tax account issues with a live IRS employee and seek resolution and clarification on how to solve outstanding problems.  Access to accounts online will help practitioners identify and isolate the problem, but will not always allow for solving of the account issues.  Thus, the IRS should consult with practitioners, via their membership bodies and focus groups at the Tax Forums and other annual meetings of tax professionals, about what services the PPS should provide when an online account is available.

---

34   2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service* 6 (Nov. 2015).

35   *Id.* at 8.

36   *See, e.g.,* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 67-96 (Research Study: *Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*).

37   Draft IRS Compliance Concept of Operations (CONOPS) 3, 19-22 (June 2014).

38   *See Most Serious Problem: Preparer Access To Online Accounts: Granting Uncredentialed Preparers Access to an Online Taxpayer Account System Could Create Security Risks and Harm Taxpayers, supra; Most Serious Problem: Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet, supra; Most Serious Problem: Taxpayer Access To Online Account System: As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues That Are Not Conducive to Resolution Online, supra.*

39   *Id.*

## CONCLUSION

As originally intended, PPS was a useful tool for practitioners that facilitated fast resolution of their clients' tax issues. The limitations in the scope of provided services combined with increased hold time have eroded its usefulness. Practitioners calling the PPS line spend more time on hold, have a lower chance of getting through to a live IRS CSR and use the PPS for fewer services than in previous years.[40] The IRS's lack of commitment to either restore the full suite of services originally available or offer a viable alternative for practitioners erodes several taxpayer rights, including *the right to quality service, the right to challenge the IRS's position and be heard, the right to retain representation, the right to pay no more than the correct amount of tax*, and *the right to a fair and just tax system*. Failure to promptly address practitioner access to the IRS results in increased cost of representation to taxpayers and downstream costs, as well as exposing the IRS to a possible increase in litigation over those unresolved issues.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Restore staffing levels to FY 2011 levels on the PPS to decrease wait time and eliminate disconnects for the practitioners.

2. Allow the resolution of complex tax law issues by asking questions and receiving answers from assistors.

3. Allow practitioners to resolve as many as five client account issues during one call as stated in the IRM.

4. Consult with and survey the practitioner community to find out their needs and preferences before making changes to the PPS.

5. Retain the PPS even as online account systems are developed to assist practitioners with account issues that cannot be solved through online channels, and consult with practitioners about the design of a post-online account PPS.

---

40  2015 IRS Nationwide Tax Forums TAS Focus Group Report, *IRS's Practitioner Priority Telephone Service* (Nov. 2015).

Legislative
Recommendations

Most Litigated
Issues

**MSP**
**#20**

# IRS COLLECTION EFFECTIVENESS: The IRS's Failure to Accurately Input Designated Payment Codes for All Payments Compromises Its Ability to Evaluate Which Actions Are Most Effective in Generating Payments

## RESPONSIBLE OFFICIALS

Debra Holland, Commissioner, Wage and Investment Division

Robin L. Canady, Chief Financial Officer

Karen M. Schiller, Commissioner, Small Business/Self-Employed

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Quality Service*
- *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

IRS guidance instructs revenue officers (ROs) to designate every payment they receive from a taxpayer with a specific code.[2]  ROs are directed to input a two-digit Designated Payment Code (DPC) to help identify payments, indicate application of the payment to a specific liability, and identify the event that primarily precipitated the payment (*e.g.*, liens, levies, offers in compromise, and installment agreements).[3] Congress has mandated such accounting for all federal payments.[4]

As discussed previously in the National Taxpayer Advocate's 2009 Annual Report to Congress, the IRS is not consistently or accurately applying DPCs, which reduces the IRS's ability to assess the effectiveness of its collection actions.[5]  In calendar year (CY) 2014, 87 percent of payments either had no DPC or defaulted to DPCs of "00" (undesignated payment) or "99" (miscellaneous).[6]  A 2012 Treasury Inspector General for Tax Administration (TIGTA) report raised similar concerns.  Specifically, the report showed that 77 percent of payments reviewed were processed without the required DPC, including payments received after a Notice of Federal Tax Lien (NFTL) was filed.[7]  Additionally, 34 percent of payments that did have a DPC placed on the payment had an incorrect DPC.[8]  A recent IRS study also found that

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
2   Internal Revenue Manual (IRM) 5.1.2.8.1, *Designated Payment Codes* (Sept. 26, 2014).
3   IRM 5.1.2.8.1, *Designated Payment Codes* (Sept. 26, 2014).
4   *See generally* 31 U.S.C.A. §§ 3512, 3513; 31 U.S.C.A. § 3302(e).
5   National Taxpayer Advocate 2009 Annual Report to Congress 17-40 (Most Serious Problem: *One-Size-Fits-All Lien Filing Policies Circumvent the Spirit of Law, Fail to Promote Future Tax Compliance and Unnecessarily Harm Taxpayers*).
6   IRS, Compliance Data Warehouse (CDW), Individual Masterfile (IMF) Transaction History Table, Major Transaction Codes, Transaction File Cycle 201508, Transaction Dates from Jan. 1 to Dec. 31, 2014.
7   TIGTA, Ref. No. 2012-30-026, *Designated Payment Codes Are Inaccurate and Ineffective* (Mar. 28, 2012).
8   *Id.*

001635

Case 5:my-00306-JCB  Document 124  Filed 11/07/24  Page 1643 of 4699 PageID #: 4808

certain DPCs were too vague to be helpful, that IRS DPC guidance is inconsistent, and that an absence of a systemic review of DPCs impedes the IRS's ability to obtain useful information.[9]

Adopting a consistent and accurate use of Designated Payment Codes (DPCs) would better ensure that attempts to collect an outstanding tax are useful, effective, and do not compromise a taxpayer's *right to a fair and just tax system* by taking actions that financially harm the taxpayer and have little chance of yielding the desired result.

The input of DPCs provides a way to track taxpayer behavior and future compliance but is ineffective when the IRS does not consistently or accurately apply the codes to all subsequent payments. Such failure prevents the IRS from measuring what actions, including processes such as the notice stream and the filing of an NFTL, were most successful in getting the taxpayer to pay on a balance due account. As a consequence, the IRS is blindly applying its broad collection powers and resources rather than analyzing accurate information to determine funding priorities (*i.e.*, what actions — sending a letter, making a phone call, or taking collection action — would yield the best return on investment).

The study recommended several common sense improvements, which IRS Collection officials rejected as too costly. In other words, the IRS determined it was better to continue to operate under a collection strategy conceived in a vacuum rather than adopt an approach that increases collection effectiveness and minimizes harm to the taxpayer. Adopting a consistent and accurate use of DPCs would better ensure that attempts to collect an outstanding tax are useful, effective, and do not compromise a taxpayer's *right to a fair and just tax system* by taking actions that financially harm the taxpayer and have little chance of yielding the desired result.

## ANALYSIS OF PROBLEM

### Background

The IRS receives taxpayer payments for several reasons and through various methods. For example, some payments are voluntary, such as payments submitted with a timely filed tax return. Other payments are submitted in response to IRS activities, such as receipt of an IRS notice or the filing of a lien, when the taxpayer has a balance due account. The IRS established two-digit DPCs to identify the event (*e.g.*, lien, levy, seizure) that was primarily responsible for the subsequent payment.[10] The DPCs are applied at the time the subsequent payment is processed.[11]

Congress has mandated using payment codes and tracking on a national basis to determine the revenue effectiveness of specific collection activities.[12] Congress's mandate to use such codes was largely designed to ensure that agencies having custody of public money kept accurate records of amounts received,

---

9  IRS, *Designated Payment Code Review Report* (Dec. 17, 2012). This report was conducted in response to concerns expressed by the National Taxpayer Advocate and TIGTA. *See* National Taxpayer Advocate 2010 Annual Report to Congress 250-66; National Taxpayer Advocate 2009 Annual Report to Congress 17-40; National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 1-18. *See also* TIGTA, Ref. No. 2012-30-026, *Designated Payment Codes Are Inaccurate and Ineffective* (Mar. 28, 2012).

10  These are generally balance due payments. Other payments, such as Estimated Tax Payments, Federal Tax Deposits, and payments with filed returns are designated by the nature of the payment, whether received in paper or electronic form.

11  *See* IRM 5.1.2.8.1, *Designated Payment Codes* (Sept. 26, 2014). *See also* IRM 3.11.10.5.10, *Designated Payment Code* (Jan. 1, 2015); IRM 21.3.4.7.1.3, *Designated Payment Code* (Oct. 1, 2014).

12  *See generally* 31 U.S.C.A. §§ 3512, 3513; 31 U.S.C.A. § 3302(e).

001636

transferred, and paid, and to provide the President, Congress, and the public annual updates on the financial condition of the United States government.[13]

A DPC serves a three-fold purpose. The code:

- Facilitates identification of payments designated to trust fund or non-trust fund employment taxes;
- Indicates application to a specific liability when a civil penalty includes a Trust Fund Recovery Penalty and other penalties; and
- Identifies the event that resulted in payment.

The IRS requires ROs to assign the appropriate DPC to subsequent payments on the payment voucher documents Form 809, *Receipt for Payment of Taxes*, and Form 3244, *Payment Posting Voucher*. These forms are then forwarded to an IRS submission processing center, where the payment is applied to the taxpayer's balance due account. Although IRS procedures require employees to code the sources of payments received when certain transaction codes (TCs) apply, the use of DPCs is not mandatory in all other situations.[14]

### The Lack of Specific and Consistent Guidance on How DPCs Are Applied Throughout the IRS Reduces the Reliability and Usefulness of the DPC Data

Accurate DPCs are important for drawing meaningful conclusions about the effectiveness of IRS activities and making data-driven policy decisions about service, enforcement, and resource allocation. Currently, the majority of DPCs are input manually, which make the DPCs subject to human error.[15] This manual selection process is open to interpretation and may result in unreliable data and may account, in part, for the high percentage of DPCs that are either undesignated payments or miscellaneous. For instance, in CY 2014, 87 percent of payments either had no DPC or defaulted to DPCs of "00" (undesignated payment) or "99" (miscellaneous).[16] A 2012 TIGTA report showed that 106 (77 percent) of the 138 subsequent payments reviewed were processed without the required DPC. In addition, 11 (34 percent) of the 32 subsequent payments that had a DPC were not accurate.[17] Employees may resort to DPC 00 or 99, or inputting no DPC at all, because they cannot identify a DPC specific enough to match the payment.

The DPC 06 is an example of a DPC that is not specific and may lead to inaccurate coding of a payment. The IRM 3.11.10.5.10 states that the DPC 06 is to be used to identify proceeds received from a "seizure or sale." The failure to provide a more specific definition of DPC 06 may result in the mislabeling of a payment. For instance, an employee may think that the DPC is only appropriate to use for property that is seized and sold, but not for seized cash. This may ultimately result in the employee inputting a DPC 00 or 99, or no DPC at all.

---

13  *Id.*

14  IRM 5.1.2.8, *Designated Payment Codes* (June 20, 2013); IRM 3.11.10.5.10, *Designated Payment Code* (Jan. 1, 2015); IRM 21.3.4.7.1.3, *Designated Payment Code* (Oct. 1, 2014). The use of a DPC on all posting documents/vouchers is mandatory when the following TCs are involved: "640" Advance Payment of Determined Deficiency or Underreporter Proposal; "670" Subsequent Payment; "680" Designated Payment of Interest; "690" Designated Payment of Penalty; "694" Designated Payment of Fees and Collection costs; and "700" Credit Applied. For other TCs (*e.g.*, "610" Remittance with Return; "611" Dishonored Remittance with Return; "612" Correction of TC 610 Processed in Error; "641" Dishonored Advance Payment), DPCs are not required. TCs are numeric codes for all system actions on the IRS Integrated Data Retrieval System (IDRS). IRS, Document 6209, *IRS Processing Codes and Information* (2010), 8-1 - 8-42.

15  Manually-input DPCs are determined using the source document that accompanies the payment. The source document may be the tax return, taxpayer letter, taxpayer correspondence, or a posting voucher.

16  IRS, CDW, IMF Transaction History Table, Major Transaction Codes, Transaction File Cycle 201508, Transaction Dates from Jan. 1 to Dec. 31, 2014.

17  TIGTA, Ref. No. 2012-30-026, *Designated Payment Codes Are Inaccurate and Ineffective* (Mar. 28, 2012).

Most Serious
Problems

Most Litigated
Issues

Case Advocacy-00306-JCB   Document 124   Filed 11/07/24   Page 1645 of 4699 PageID #:  4810

Legislative
Recommendations

Additionally, IRS guidance on when to use a particular DPC is insufficient, resulting in inconsistent and inaccurate determinations. For example, the definition of DPC 99 is both inconsistent and vague in the Collection (Part 5), Submission Processing (Part 3), and Accounts Management (Part 21) IRM sections. Definitions vary from:

- Miscellaneous payment (do not use if another DPC Code is applicable);[18]
- Miscellaneous payment other than above;[19]
- Miscellaneous;[20] and
- Miscellaneous payment other than 01 through 14.[21]

The IRS should develop consistent guidance throughout the IRM as to when IRS employees should use DPC 99, rather than having different instructions for employees working in different divisions in the IRS. The lack of specificity and consistency in how DPCs are applied reduces the reliability and usefulness of the DPC data.

### Transitioning From Mostly Manual to Systemic Input of DPCs Would Allow Regular Reviews and Improve Accuracy

Regular review of DPCs is important for verifying the input. However, two-thirds of all DPCs, or about 69 percent, are input manually and only 23 percent of DPCs are input systemically and are subject to review.[22] Thus, the majority of DPCs are not routinely reviewed. As discussed above, the reliability of manually-entered DPCs is questionable. Because of this unreliability, DPC information is often not taken into consideration when evaluating the effectiveness of IRS activities that supposedly led to a payment. Increasing the systemic input of DPCs may reduce errors and improve the integrity of the DPC data, simultaneously enhancing the reliability of DPC information for determining the effectiveness of specific IRS enforcement or taxpayer service activities.

Several state revenue departments use a systemic input method. These states have noticed considerable improvement in the accuracy of payment codes. The State of New York has developed a series of analytic measures that capture systemic payment data that allows for determining the best collection stream for taxpayer accounts.[23] Additionally, New York uses the codes that are input systemically to distinguish between a wage levy and a bank levy, and uses this information for determining which is more effective. The analysis of systemically input payment data showed a significantly higher case resolution rate for wage levies compared to bank levies.[24] Transitioning from a manual input of a majority of DPCs to a mainly systemic DPC process would increase the accuracy of payment data and would allow meaningful analysis of IRS activities that led to a payment.

> Accurate Designated Payment Codes (DPCs) are important for drawing meaningful conclusions about the effectiveness of IRS activities and making data-driven policy decisions about service, enforcement, and resource allocation.

---

18  IRM 5.1.2.8.1.3.1.1(1), *Examples – Using DPCs* (Aug. 15, 2008).

19  IRM Exhibit 21.1.7-5, *Designated Payment Code (DPC)* (July 17, 2014); IRM 3.11.10.5.10(8), *Designated Payment Code* (Jan. 1, 2015); IRM 3.12.10.3.23(3), *Field 01DPC – Designated Payment Code (DPC)* (Jan. 1, 2015); Exhibit 3.17.278-1, DPC Codes (Oct. 1, 2014).

20  IRM 21.3.4.7.1.3(2), *Designated Payment Code (DPC)* (Oct. 1, 2014).

21  IRM 3.8.45.9.1(3), *Designated Payment Codes (DPCs)* (Nov. 13, 2014).

22  IRS, *Designated Payment Code Review Report* (Dec. 17, 2012). No DPC was used at all for eight percent of the payments reviewed in this report.

23  IRS, *Designated Payment Code Review Report* (Mar. 11, 2013). *See also* Memorandum from Alan Gilds, IRS Senior Program Analyst for Field Operations, Review, and Enforcement, to New York Department of Revenue (May 14, 2014).

24  IRS, *Designated Payment Code Review Report* (Dec. 17, 2012).

001638

Even if the IRS is unable to immediately transition to a systemic process for the input of all DPCs, it should require regular reviews to verify that manually-input DPCs are correct. These regular reviews would also identify common errors that the IRS can address through additional guidance to employees.

> The input of a Designated Payment Code provides a way to track taxpayer behavior and future compliance but is ineffective when the IRS does not consistently or accurately apply the codes to all subsequent payments. Such failure prevents the IRS from measuring what actions… were most successful in getting the taxpayer to pay on a balance due account. As a consequence, the IRS is blindly applying its broad collection powers and resources rather than analyzing accurate information to determine funding priorities.

### Implementing IRS DPC Study Recommendations is a Good Starting Point to Improve DPC Input Accuracy and Reliability

The IRS has acknowledged some of the problems discussed above in a recent report that was conducted in response to concerns expressed by the National Taxpayer Advocate and TIGTA.[25] This study made a number of recommendations, which were presented to an IRS review implementation team and the Director of Collection Policy.[26] On March 11, 2013, the DPC review implementation team and the Director of Collection Policy finalized which recommendations would be implemented and which would not.[27] The most significant findings and recommendations include the following:

1. Consider using two DPCs to distinguish between wage levies and non-wage levies and use a systemic timing approach rather than manual input;

2. Multiple DPCs can apply to one type of payment. This requires a systemic or manual determination to use one DPC rather than another. DPCs should be reviewed to ensure that they are specific enough that they can only be applied to one payment situation; and

3. DPC analysis program owners should conduct periodic accuracy reviews of the DPC selection criteria.[28]

The IRS refused to adopt these recommendations primarily because of a lack of resources. The first recommendation listed above was rejected by the DPC implementation team and the Director of Collection Policy, because it determined that creating two separate DPCs, one for wage levies and one for non-wage

---

25   IRS, *Designated Payment Code Review Report* (Dec. 17, 2012). *See* National Taxpayer Advocate 2010 Annual Report to Congress 250-66 (Most Serious Problem: *The IRS Should Accurately Track Sources of Balance Due Payments to Determine the Revenue Effectiveness of Its Enforcement Activities and Service Initiatives*); National Taxpayer Advocate 2009 Annual Report to Congress 17-40 (Most Serious Problem: *One-Size-Fits-All Lien Filing Policies Circumvent the Spirit of Law, Fail to Promote Future Tax Compliance and Unnecessarily Harm Taxpayers*); National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 1-18 (TAS Research Study: *The IRS's Use of Notices of Federal Tax Lien*). *See also* TIGTA, Ref. No. 2012-30-026, *Designated Payment Codes Are Inaccurate and Ineffective* (Mar. 28, 2012).

26   IRS response to TAS information request (Sept. 1, 2015).

27   *Id.*

28   IRS, *Designated Payment Code Review Report* (Dec. 17, 2012).

levies, would only be feasible if a systemic approach could be used rather than inputting the codes manually.[29]  The explanation of this determination went on to say that the manual input of these two different DPCs would have to be reviewed manually, which would be time-consuming, and the IRS currently does not have enough resources to devote to such a review.  The only other alternative would be to adopt a systemic approach, which the review team and the Director of Collection Policy deemed too costly.[30]  The remaining two recommendations were also rejected because they were too costly.[31]  They would both depend on the IRS adopting a systemic approach to DPCs rather than its current manual input approach.

The decision to reject these recommendations on the basis of a lack of resources was never shared with the IRS Commissioner, Deputy Commissioner for Services and Enforcement, or the National Taxpayer Advocate.  Failing to adopt these recommendations because of resources is shortsighted and inexcusable, perpetuating the IRS's conduct of collection actions in a vacuum.  Improving the accuracy and reliability of the DPCs can lead to the most efficient use of IRS resources based on knowing what IRS activities most likely resulted in a payment from the taxpayer.  Moreover, a collection strategy based on ignorance and guesswork increases the risk of taking collection actions that are more intrusive than necessary, thereby undermining taxpayer trust in the system and undermining taxpayers' *right to privacy*.

## CONCLUSION

The IRS is not consistently or accurately applying DPCs, which reduces its ability to assess the effectiveness of collection actions and service initiatives.  Without accurately coding all the payments it receives, the IRS cannot fully meet its legal requirements to measure its business results.[32]  It also cannot meet its strategic objective of developing a data-driven approach to allocating resources and making effective service, enforcement, and resource allocation decisions.[33]  Finally, internal and external stakeholders are unable to accurately assess the effectiveness of IRS enforcement activities and service initiatives.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Revise IRM guidance and guidelines for lockbox receipts to require the entry of specific DPCs on all balance due payments.

2. Require Submission Processing employees to verify the presence of an appropriate DPC on payments by conducting regular quality reviews.

3. Provide clear and specific guidance about the circumstances under which employees can use a miscellaneous DPC.

4. Implement systemic input of most payment codes.

---

29  IRS response to TAS information request (Sept. 1, 2015).
30  *Id.*
31  *Id.*
32  *See, e.g.*, Treas. Reg. § 801.6(d)(1).
33  IRS Strategic Plan 2014-2017, *available at* http://core.publish.no.irs.gov/pubs/pdf/p3744–2014-06-00.pdf.  *See also* U.S. Department of Treasury, *Update on Reducing the Federal Tax Gap and Improving Voluntary Compliance* (July 8, 2009), Component 2: *Make a Multiyear Commitment to Research, available at* http://www.irs.gov/pub/newsroom/tax_gap_report_-final_version.pdf.

001640

**MSP #21**

## EXEMPT ORGANIZATIONS (EOs): The IRS's Delay in Updating Publicly Available Lists of EOs Harms Reinstated Organizations and Misleads Taxpayers

### RESPONSIBLE OFFICIAL

Sunita B. Lough, Commissioner, Tax Exempt and Government Entities Division

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*

### DEFINITION OF PROBLEM

The IRS maintains a list of tax exempt organizations (EOs) on two publicly accessible online databases, the Exempt Organizations Business Master File (EO BMF)[2] and the Exempt Organizations Select Check (EO Select Check).[3]  When an organization fails to file an information return or notice for three consecutive years, its exempt status is automatically revoked.[4]  Shortly after this automatic revocation, which can sometimes be erroneous, the IRS removes the EO from its online-published lists of EOs and lists it as one whose exempt status was automatically revoked.

Unless the automatic revocation was due to IRS error, an automatically revoked organization must submit a new application to have its exempt status reinstated.[5]  Even if the IRS promptly reinstates the organization or discovers its error, IRS databases will not immediately reflect the organization's restored exempt status.  The IRS updates its databases only monthly, on the second Monday of every month, except in January when the databases are not updated at all.  As a result, EOs reinstated (as well as those that receive initial exemption approval) in mid-to-late December will not appear on publicly available IRS databases until mid-February, which is well after the critical year-end fundraising season.  Reinstated EOs may lose out on donations or grants they would have received had IRS databases accurately reflected their status.  The number of automatic revocation reinstatement cases during this gap period exceeded 2,500

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   The EO BMF, *available at* http://www.irs.gov/Charities-&-Non-Profits/Exempt-Organizations-Business-Master-File-Extract-EO-BMF, contains information about EOs such as the organization's employer identification number (EIN), name and address, the Internal Revenue Code (IRC) § 501(c) subsection under which it is exempt, whether contributions to it are tax deductible, whether it is a private foundation or a public charity (and the type of public charity), the month and year it received its exemption ruling, and information from its Form 990 series return.  *See* Exempt Organizations Business Master File Extract (EO BMF), *available at* http://www.irs.gov/pub/irs-soi/eo_info.pdf.

3   EO Select Check is an online search tool, *available at* http://apps.irs.gov/app/eos/, that allows users to search for organizations eligible to receive tax deductible contributions (Publication 78 data), organizations whose tax exemption has been automatically revoked for not filing a Form 990-series return or notice for three consecutive years (Auto-Revocation List), and organizations that have filed a Form 990-N (also called an e-Postcard), an annual notice required to be filed by small EOs. Unless otherwise indicated, we use "EO Select Check" to refer to the capability to determine whether an organization is eligible to receive tax deductible contributions (Publication 78 data).  *See* Internal Revenue Manual (IRM) 25.7.6.1, *Overview* (Jan. 1, 2015).

4   *See* IRC § 6033(j)(1) (requiring the IRS to publish and maintain a list of automatically revoked organizations).

5   *See* IRC § 6033(j)(2).

001641

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

in both fiscal years (FYs) 2014 and 2015, and more than 70 percent of these cases were IRC § 501(c)(3) organizations.[6]

### ANALYSIS OF PROBLEM

#### Background

*Potential Donors and Grantors Rely on IRS Online Databases to Verify Exempt Status*

The National Taxpayer Advocate has repeatedly raised concerns about IRS delays in updating its public databases relied upon by potential donors and grantors.[7]  These databases, EO BMF and EO Select Check, are of critical importance for two reasons.  First, they allow potential individual donors to verify before making a donation that their contributions will be tax deductible.[8]  Second, they allow private foundations to verify that they are making a grant to a qualifying public charity.[9]

> As a result, Exempt Organizations (EOs) reinstated (as well as those that receive initial exemption approval) in mid-to-late December will not appear on publicly available IRS databases until mid-February, which is well after the critical year-end fundraising season.  Reinstated EOs may lose out on donations or grants they would have received had IRS databases accurately reflected their status.

IRS guidance provides that grantors and contributors may rely on an organization's listing on EO Select Check or EO BMF.[10]  In addition, grantors and contributors may, in some situations, rely on EO BMF information provided by a third party.[11]

One well-known third-party provider of EO Select Check and EO BMF data is GuideStar.[12]  GuideStar's website contains free and subscription content.  One feature available to GuideStar subscribers is Charity Check, which allows potential donors or grantors to conduct due diligence by obtaining a report that contains both EO Select Check and EO BMF data.[13]  The report will also note if an organization has been automatically revoked.[14]

In FAQs on its website regarding due diligence and its Charity Check reports, GuideStar makes clear that it does not modify any IRS data, including data from EO Select Check, EO BMF, or the automatic revocation list.[15]  In one FAQ regarding potential grantees whose organization does not appear in the EO BMF section of the Charity Check report,

---

6   TE/GE response to TAS research request (July 31, 2015).

7   *See* National Taxpayer Advocate FY 2015 Objectives Report to Congress 59; National Taxpayer Advocate 2012 Annual Report to Congress 199-200 (Most Serious Problem: *Overextended IRS Resources and IRS Errors in the Automatic Revocation and Reinstatement Process Are Burdening Tax-Exempt Organizations*).

8   A charitable contribution deduction is allowed for donations to organizations described in IRC § 170(c).  These are most commonly IRC § 501(c)(3) organizations.

9   Private foundations prefer making grants to qualifying IRC § 501(c)(3) public charities over other organizations as doing so relieves them of certain oversight requirements (called expenditure responsibility) that would otherwise arise and eliminates the risk of incurring liability for an excise tax under IRC § 4945.

10  *See* Rev. Proc. 2011-33, 2011-25 I.R.B. 887.

11  *Id.*

12  *See* www.guidestar.org.  GuideStar is an IRC § 501(c)(3) public charity that provides information and reports about nonprofit organizations registered with the IRS.

13  For a sample Charity Check report, see http://www.guidestar.org/downloadable-files/sample-guidestar-charity-check-report.pdf.

14  *See FAQs: Due Diligence and GuideStar Charity Check Overview*, FAQ #15, *available at* http://www.guidestar.org/rxg/help/faqs/guidestar-charity-check/overview.aspx.

15  *See FAQs: Due Diligence and GuideStar Charity Check Overview*, FAQs #16 and #17, *available at* http://www.guidestar.org/rxg/help/faqs/guidestar-charity-check/overview.aspx.

001642

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1650 of 4699   PageID #: 10315

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

GuideStar advises these organizations to "work directly with the IRS to ensure that their information is updated and accurately reflected in the IRS database."[16]  Understandably, GuideStar emphasizes that it "cannot and will not modify the IRS BMF database in any way" and directs these organizations to contact the IRS EO toll-free number.[17]  Thus, GuideStar (or any third-party) data is only as good as the source data from the IRS's online databases.

Other organizations highlight the importance of the EO Select Check and EO BMF databases to potential donors and grantors that are conducting due diligence and vetting organizations.  For example, the Council on Foundations, a nonprofit leadership association of grantmaking foundations and corporations, has information on its website advising grantmakers of the EO Select Check search tool and referencing the EO BMF.[18]  Another organization, Grants Managers Network, advises grantors that are conducting due diligence and vetting potential grantees that "the best practice, if you have doubts about a potential grantee's tax status, is to check it online using the IRS's free Exempt Organizations search or a third-party source."[19]

Finally, a grantmaking foundation may require potential grantees to be listed on the EO BMF.  For example, one private foundation's website explains in great detail the nature of the EO BMF and requires potential grantees to have an accurate EO BMF listing.[20]

### The IRS Recognizes the Reliance of the Public and Potential Grantors on Its Online Databases Yet It Fails to Update Them Timely

#### The IRS Recognizes Reliance on the Information Contained in Its Online Databases

The Internal Revenue Manual (IRM) discussing EO Select Check notes:

> The exempt organization (EO) community has become increasingly dependent upon their listings in the CL [EO Select Check] to prove to potential contributors that contributions to them are deductible.  The fact that an organization may hold a favorable determination letter is often not sufficient to satisfy some contributors, especially in those cases where the Service issued an organization's letter many years ago.[21]

Similarly, a Tax Exempt/Government Entities (TE/GE) IRM section discussing the EO BMF notes that "many grantors rely on the information contained in the online EO BMF to determine the eligibility of

---

16  *See FAQs: Due Diligence and GuideStar Charity Check Overview*, FAQ #17, *available at* http://www.guidestar.org/rxg/help/faqs/guidestar-charity-check/overview.aspx.

17  *Id*.  This number is 877-829-5500.

18  *See* Council on Foundations, *IRS Search Tool: Select Check*, *available at* http://www.cof.org/content/irs-search-tool-select-check.

19  *See Project Streamline: Guide to Due Diligence*, p. 6, *available at* http://gmnetwork.org/wp-content/uploads/2014/07/Due-Diligence.pdf.  This document discusses five myths about due diligence.  Myth #3 is that grantmakers need to have a copy of a grant seeker's IRS determination letter and Form 990 in every file.  The document provides that a copy of the IRS determination letter only indicates that the grantee was tax-exempt at a certain point in time and the original determination may have been rescinded or modified.  Therefore, grantors should verify a potential grantee's tax status online with the IRS or a third-party source.  Grants Managers Network is a national association of philanthropy professionals.

20  *See* Mathile Family Foundation, *FAQs – Tax Information*, *available at* http://www.mathilefamilyfoundation.org/grantmaking/faqs/tax-information/.  These FAQs discuss in great detail the grantmaking restrictions on private foundations and the severe penalties that the foundation and its managers are subject to if these rules are violated.  The FAQs also advise potential grantees to **"make sure that the IRS BMF code *currently* represents your non-profit activities/operation (Form 990) and aligns with your Form 1023 filings and subsequent communications as approved by the IRS.  When these separate designations do not agree, your organization is required to rectify discrepancies with IRS.  Please consult with your tax advisor."** (bold and italic emphasis in original).

21  IRM 25.7.6.1(3) (Jan. 1, 2015).  The same language is also used in IRM 21.3.8.12.12(3) (June 18, 2012).

001643

their applicants."[22]  Yet in the same IRM section the IRS disavows responsibility if an organization loses a grant due to not being included in the EO BMF, noting:

> The IRS cannot control how grantors and contributors use these data.  It is not Service error if an organization fails to receive a grant because it is not included in the online EO [B]MF, or because some of the information contained therein is out-of-date.  Possession of a valid determination letter is the ultimate legal proof of tax-exempt status.[23]

### *Despite Recognition of the Reliance on Its Online Databases, the IRS Fails to Timely Update Them, Causing Harm to EOs and Their Contributors*

Although the IRS recognizes that a listing on its online databases can be critical for an EO, it does not update these databases in a timely manner, causing reinstated automatically revoked organizations (as well as those organizations receiving exempt status for the first time) to potentially lose out on donations or grants.[24]  Currently, EO Select Check and EO BMF are only updated monthly, on the second Monday of every month.[25]  An organization that misses the updating cutoff will not appear on the IRS lists until the next month.  In addition, these databases are not updated at all during the month of January, meaning there is a two-month updating gap from the second Monday in December until the second Monday in February.[26]  As a result, new and reinstated EOs that receive IRS approval of exemption after the early December cutoff will not appear on publicly available IRS databases until mid-February, which is well after the critical year-end fundraising push.  The number of automatic revocation reinstatement cases during this gap period ranged from 1,353 to 2,792 in FYs 2012 to 2015, exceeding 2,500 in both FYs 2014 and 2015, as shown in Figure 1.21.1.  Significantly, more than 70 percent of these cases from the last two fiscal years are IRC § 501(c)(3) organizations.

---

22  IRM 21.3.8.12.13(3) (Nov. 16, 2012).

23  *Id.*

24  This delay may also affect newly-recognized tax EOs that receive a determination letter but are not promptly listed on the online databases.  However, the harm to reinstated automatically revoked organizations is arguably greater as these organizations were formerly tax exempt and had the ability to receive tax-deductible contributions.

25  IRM 21.3.8.3.8(1)(f) (Oct. 1, 2015) (noting "online Publication 78 data is generally updated the second Monday of each month"); IRM 21.3.8.12.13(2) (Nov. 16, 2012) (noting that EO BMF is updated or extracted monthly).  The term "extracted" is used because, as mentioned earlier, the EO BMF is an extract of information regarding EO accounts from the larger Business Master File (BMF).  *See* IRM 25.7.5.1(1) (Jan. 1, 2015).  In response to a TAS information request, the IRS stated that the internal IRS EO BMF list is generally updated within two weeks of a favorable case closing.  The IRS also stated that the program that produces the online EO BMF and EO Select Check extracts is run approximately the last full week of each month and posted online to irs.gov the second Monday of the following month.  Any accounts that are updated and posted prior to the running of the extract program will appear online.  This means that an EO account could take between 30 to 60 days to be reflected on the online EO BMF and EO Select Check databases.  TE/GE response to TAS research request (July 31, 2015).  Thus, there is a disconnect between IRS internal database updating (approximately two weeks) and external (*i.e.*, online) database updating (30-60 days).

26  *See* IRM 25.7.5.1(1) (Jan. 1, 2015) (noting that the EO Standard Extract Program is a computer program that is run on a monthly basis (except for January) to allow for extraction of both entity and limited return information from EO accounts contained on the BMF).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1652 of 4699 PageID #: 8317

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

**FIGURE 1.21.1**[27]

### Automatic Revocation Reinstatement Cases, December-February



|        | 501(c)(3) organizations | Non-501(c)(3) organizations | Total |
|--------|-------------------------|-----------------------------|-------|
| FY 2012 | 1,220 | 610 | 1,830 |
| FY 2013 | 883 | 470 | 1,353 |
| FY 2014 | 1,813 | 979 | 2,792 |
| FY 2015 | 2,053 | 484 | 2,537 |

■ 501(c)(3) organizations  ■ Non-501(c)(3) organizations

This potential month or two delay also impairs an EO's *right to quality service*, which includes taxpayers' right to receive prompt assistance in their dealings with the IRS.

### *The IRS's Suggestions for Those Impacted By the Updating Delay Miss the Mark*

The IRS website notes that an automatically revoked organization that has had its exempt status reinstated will experience a delay from the time of reinstatement until EO Select Check and EO BMF are updated.[28] The IRS website explains the reason for this delay and advises the following to reinstated organizations who are not yet listed:

> Between updates to Select Check (Pub. 78 Data) and EO BMF, donors can rely on your organization's determination letter from the IRS as proof of your exempt status. Even if your organization remains on the list of automatically revoked organizations, donors can rely on an IRS determination letter dated on or after the effective revocation date. Donors also can confirm an organization's status by calling the IRS (toll-free) at 1-877-829-5500.[29]

However, the IRS's advice that donors can rely on an IRS determination letter or call the IRS for confirmation of an organization's status belies the IRS's own recognition that donors, particularly large donors and corporate or foundation grantors, often look *solely* to the IRS online databases to determine whether or not to make a donation or grant to an organization. A determination letter from the IRS (and, by extension, a phone call to the IRS) will in many cases not satisfy a potential donor or grantor. Many donors or grantors may simply "move on" and make a donation or grant to an organization that does appear on EO Select Check and EO BMF.

Further, the IRS's failure to timely update its online databases places the onus for proving exemption on the organization and causes a burden for potential grantors or donors to have to contact an organization and ask for a determination letter or contact the IRS and deal with lengthy telephone hold times, on a general TE/GE phone line that is not dedicated specifically to EO matters, to request confirmation

---

27  TE/GE response to TAS research request (July 31, 2015).

28  *See* IRS, *Exempt Organizations Select Check: Timing of Database Updates for Organizations Whose Exempt Status Is Reinstated*, *available at* http://www.irs.gov/Charities-&-Non-Profits/Exempt-Organizations-Select-Check:-Timing-of-Database-Updates-for-Organizations-Whose-Exempt-Status-Is-Reinstated.

29  *Id.*

001645

> In fact, the IRS has stated that its future efficiency lies in providing taxpayers with "self-service" electronic options; thus, Tax Exempt and Government Entity's (TE/GE) strategy to drive grantors and donors to the phone for Exempt Organization (EO) verification is out of step with the IRS's own Concept of Operations.

of exempt status.[30]  In FY 2015, callers to the TE/GE toll-free line waited an average of 23.4 minutes to speak to an IRS representative, an increase of almost five minutes from the 18.7 minute average hold time in FY 2014.[31]  In addition, the number of IRS "courtesy disconnects" for the TE/GE phone line increased dramatically, from 4,380 in FY 2014 to 23,871 in FY 2015, a 445 percent jump.[32]  Finally, the IRS customer service representative (CSR) level of service for this phone line dropped from 68 percent in FY 2014 to 60 percent in FY 2015.[33]  As the IRS is expected to experience continued budget and hiring constraints, TE/GE telephone hold times and courtesy disconnects will likely continue to increase and the CSR level of service will likely continue to decrease.  In fact, the IRS has stated that its future efficiency lies in providing taxpayers with "self-service" electronic options; thus, TE/GE's strategy to drive grantors and donors to the phone for EO verification is out of step with the IRS's own Concept of Operations.[34]

Finally, the IRS's delay in updating its online databases undermines the public's (*i.e.*, potential donors or grantors) *right to be informed*, which includes taxpayers' right to know what they need to do to comply with the tax laws.  The IRS's delay prevents the public from finding out about certain organizations that are tax exempt and eligible to receive tax deductible contributions.

This problem is magnified for an organization that has had its exemption automatically revoked in error, as the organization should never have been removed from the IRS's online lists and now may face a significant delay getting back on them, thereby hampering its fundraising efforts.[35]  In sum, the failure to

---

30  In addition, a reinstated automatically revoked organization may be reluctant to show its new determination letter to potential donors or grantors as it draws attention to the fact that the organization was automatically revoked.

31  IRS, Joint Operations Center (JOC), *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).

32  IRS, *Custom Joint Operations Center Report* (Oct. 30, 2015).  The term "courtesy disconnect" is used when the IRS essentially hangs up on a taxpayer because its switchboard is overloaded and cannot handle additional calls.

33  *Id.*  IRS, JOC, *Snapshot Reports: Product Line Detail* (week ending Sept. 30, 2015).

34  *See Most Serious Problem: Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet*, *supra*; Most Serious Problem: *Taxpayer Access To Online Account System:  As the IRS Develops an Online Account System, It May Do Less to Address the Service Needs of Taxpayers Who Wish to Speak with an IRS Employee Due to Preference or Lack of Internet Access or Who Have Issues that Are Not Conducive to Resolution Online*, *supra*.  In describing the future vision of the IRS, IRS Commissioner John Koskinen stated, "Most things that taxpayers need to do to fulfill their obligations could be done virtually, and there would be much less need for in-person help, either by waiting in line at an IRS assistance center or calling the IRS."  *Prepared Remarks of John A. Koskinen, Commissioner, Internal Revenue Service, Before the National Press Club* (Mar. 31, 2015), *available at* https://www.irs.gov/uac/Newsroom/Commissioner-Koskinen-Speech-before-the-National-Press-Club.

35  The IRS states that "erroneous revocations are identified through taxpayer correspondence and referrals from the call-site."  TE/GE response to TAS research request (July 31, 2015).  In other words, the onus is on the erroneously automatically revoked organization to contact the IRS to correct the issue.  Once the IRS is contacted about an erroneous automatic revocation, the Employee Plans/Exempt Organizations (EP/EO) Determinations Processing Unit ("Correspondence") will conduct research to determine if the revocation was indeed erroneous.  The Correspondence Unit will then send the organization a letter affirming that it was erroneously revoked or that the revocation was correct.  If the organization was erroneously revoked, the Correspondence Unit places the name of the organization on a spreadsheet, which it sends weekly to Ogden to remove the organizations listed from the EO Select Check list of automatically revoked organizations.  The IRS indicates that these correspondence inquiries are typically completed in 30-45 days.  TE/GE response to TAS research request (July 31, 2015).  Regarding the reinstatement process for organizations that were erroneously automatically revoked, the IRS states that it generally does not request manual updates to EO Select Check data unless it identifies an organization (for example, through an inquiry) that should be listed but for some reason is not picked up by the automated updating process.  If the IRS does not do a manual update, then the organization must go through the normal monthly updating process for both EO Select Check and EO BMF after an internal record correction is made.  TE/GE response to TAS research request (Dec. 1, 2015).

list a reinstated automatically revoked organization in its online databases in a timely manner can cause an organization to lose critical donations or grants, which may be an existential issue for some organizations.

The IRS also acknowledges these delays in its TE/GE IRM.  For example, the IRS instructs its employees who are responding to a telephone call regarding an organization's omission from the EO BMF to "advise the customer that due to a systemic problem, the online 'lists' were not updated to reflect the exempt [sic] recognition."[36]  The IRS also instructs its employees to advise organizations that it can take up to two months for a record of an organization's exempt status to be reflected on the online list and to offer to send an affirmation letter to the organization.[37]  However, an affirmation letter is similar to a determination letter, and may not be sufficient to satisfy potential donors or grantors that rely solely on the IRS's online databases.

### More Frequent Updates to EO Online Databases Are a Simple Solution

> The IRS's delay in updating the online lists of Exempt Organizations (EOs) that are relied upon by both individuals and organizations harms reinstated organizations and misleads taxpayers, thereby abridging core taxpayer rights.  This problem can be significantly mitigated if the IRS updates these lists more frequently.

The solution to this problem is simple — the IRS must update its online databases of EOs more frequently.  The monthly updating (except for January) of EO Select Check is a great improvement over the quarterly updating of the old Publication 78 and the IRS is to be commended for this.  However, more frequent updating of EO Select Check and EO BMF is now needed.  The IRS updates other EO online lists more frequently than once a month (or once every two months).  For example, the IRS updates its online list of Form 990-N (e-Postcard) filers weekly.[38]  The IRS should similarly update EO Select Check and EO BMF, or provide an online addendum to these databases, on a weekly basis.  The IRS should be able to change the programming of the databases from monthly to weekly, just as it made the change from quarterly to monthly updating.[39]  However, until this change can be implemented, the IRS should manually update its online databases.

Currently, in between its regular online updating schedule, the IRS can manually update its EO Select Check listings of organizations eligible to receive tax deductible contributions and automatically revoked organizations by sending a request to the TE/GE Business Systems Planning Submission Processing Programs unit and this process can be as short as a day.[40]  In fact, the National Taxpayer

---

36   IRM 21.3.8.3.8(1)(d) (Oct. 1, 2015).

37   IRM 21.3.8.3.8(1)(f) (Oct. 1, 2015); IRM 21.3.8.12.13(5) (Nov. 16, 2012).  An affirmation letter, Letter 4168-C, *Letter Affirming 501(c) Exemption*, is a letter sent to organizations that call the IRS wishing to obtain written confirmation of their exemption.

38   *See* IRS, *Exempt Organizations Select Check: Frequently Asked Questions*, FAQ #5, *available at* http://www.irs.gov/pub/irs-tege/faqs_eo_selectcheck.pdf.

39   In a response to a TAS information request regarding whether the IRS can update EO BMF and EO Select Check more frequently than the current monthly (except for January) intervals, the IRS stated that the program used to run these two extracts only runs every four weeks, and "there is no way that the IT programmers can run the extracts more frequently."  TE/GE response to TAS research request (Dec. 1, 2015).

40   TE/GE response to TAS research request (July 31, 2015).  Organizations have come to TAS for assistance when they are at risk of losing grants because they are not listed in the IRS's online databases and TAS successfully advocates for a manual EO Select Check update.

Advocate has directed TAS employees to require the IRS to do these updates manually within 24 hours.[41] However, the IRS states that it cannot update the EO BMF manually.[42]

## CONCLUSION

The IRS's delay in updating the online lists of EOs that are relied upon by both individuals and organizations harms reinstated organizations and misleads taxpayers, thereby abridging core taxpayer rights. This problem can be significantly mitigated if the IRS updates these lists more frequently.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Update EO BMF and Select Check on a weekly basis as is the case for Form 990-N updates.

2. Until appropriate programming changes can be made, update EO Select Check manually.

3. Implement an emergency process that, even when there is weekly updating, allows for manual database updates within 24 hours of the restoration of exempt status.

---

41 In a February 2015 message to TAS employees, the National Taxpayer Advocate directed her case advocates to request manual updates within 24 hours if the IRS agrees an organization should be listed on EO Select Check as eligible to receive tax deductible contributions and to request an organization's removal from the automatic revocation list if this revocation was erroneous. TAS Wednesday Weekly, *Updates to Exempt Organizations "Select Check"* (Feb. 4, 2015).

42 TE/GE response to TAS research request (July 31, 2015). When asked why it cannot update the EO BMF manually, the IRS stated that the EO BMF is prepared by its IT personnel during a timeframe available only once a month, "except in January IT is busy with other priorities and the EO BMF is not prepared." TE/GE response to TAS research request (Dec. 1, 2015).

## INTRODUCTION: The IRS Can Do More to Improve Its Administration of the Earned Income Tax Credit and Increase Future Compliance Without Unduly Burdening Taxpayers and Undermining Taxpayer Rights

The Earned Income Tax Credit (EITC), enacted as a work incentive in the Tax Reduction Act of 1975, has become one of the government's largest means-tested anti-poverty programs.[1]  Unlike traditional anti-poverty and welfare programs, the EITC was designed to have an easy "application" process by allowing an individual to claim the benefit on his or her tax return.  This approach dramatically lowered administrative costs, since it did not require an infrastructure of case workers and local agencies.  For instance, the EITC has less than one percent in administrative costs.[2]  This is compared to administrative costs of 41.8 percent for the Women, Infants, and Children (WIC) program.[3]

To effectively administer the EITC, the IRS must understand the characteristics of EITC taxpayers.  Generally speaking, low income taxpayers share a unique set of attributes compared to the average U.S. taxpayer.  For instance, the low income taxpayer is more likely to be less educated.  Of all able-bodied adults between the ages of 25 and 55 living in the bottom third of income distribution, 23 percent had less than a high school education, compared to five percent of the comparable group living in the top two-thirds of the income distribution.[4]  Nearly two-thirds of working-age adults who experience consistent income poverty have one or more disabilities.[5]  Low income families experience lower literacy rates.[6]  Twenty-four percent of working-age adults with limited English proficiency live below the poverty line, whereas 13 percent of the comparable group of English speakers live below the poverty line.[7]

Low income households are more likely to be unbanked than middle to upper-income households.  In fact, approximately 39 percent of households with income below $30,000 per year do not have a bank account.[8]  Approximately 28 percent of households with an income below $15,000 do not have a bank account.[9]  The absence of a bank account can impact a taxpayer's ability to substantiate their income and expenses for an EITC claim.

Lack of transportation and accessible child care services limit the ability of low income taxpayers to earn income.[10]  Many low income taxpayers are often juggling competing obligations at one time, such

---

1   Pub. L. No. 94-12, § 204, 89 Stat. 26 (1975).

2   General Accounting Office (GAO), *Tax Administration Earned Income Noncompliance* 6 (May 8, 1997).

3   *WIC Program: Nutrition Service and Administrative Costs* (Mar. 6, 2015).

4   Isabel Sawhill and Quentin Karpilow, The Social Genome Project at Brookings, *Strategies for Assisting Low-Income Families* 4-5 (June 28, 2013).

5   Shawn Fremstad, Center for Economic and Policy Research, *Half in Ten: Why Taking Disability into Account Is Essential to Reducing Income Poverty and Expanding Economic Inclusion* 2 (Sept. 2009).  Consistent income poverty is measured as more than 36 months of income poverty during a 48-month period.  *Id.*

6   The Urban Child Institute, *Poverty Can Jeopardize the Development of Literacy and Early Reading Habits* (Aug. 30, 2012), *available at* http://www.urbanchildinstitute.org/articles/research-to-policy/policy/poverty-can-jeopardize-the-development-of-literacy-and-early.

7   Brookings Institute, *Investing in English Skills: The Limited English Proficient Workforce in U.S. Metropolitan Areas* (Sept. 24, 2014), *available at* http://www.brookings.edu/research/reports2/2014/09/english-skills#/M10580.

8   Federal Deposit Insurance Corporation (FDIC), *2013 FDIC National Survey of Unbanked and Underbanked Households* 17 (Oct. 2014).  For the purposes of this survey, "unbanked" means that no one in the household had a savings or checking account.  *Id.* at 4.

9   *Id.*

10   David K. Shipler, *The Working Poor, Invisible in America* 45, 52 (Alfred A. Knopf, 2004).

as multiple jobs, child care, health problems, and financial strains.  These taxpayers may not be able to dedicate their time to an audit of their EITC claim even if they have a legitimate claim.  In addition, low income taxpayers tend to be more transitory.  Between 2012 and 2013, 20.5 percent of those below 100 percent poverty changed residences, while only 11.7 percent of the general population moved during the same time.[11]  The transiency of this taxpayer population negatively affects their ability to respond to IRS correspondence in a timely manner.  The "Characteristics of Taxpayers Claiming the Earned Income Tax Credit" infographic illustrates the general characteristics of taxpayers claiming the EITC.

---

11   U.S. Census Bureau, *Current Population Survey, 2013 Annual Social and Economic Supplement* (Nov. 2013).

001650

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1658 of 4699   PageID #: 6823

Most Serious
Issues

Most Serious
Recommendations

Most Serious
Problems

Characteristics of Taxpayers Claiming the

# EARNED INCOME TAX CREDIT

**Low income taxpayers are more likely to have:**

- Limited English proficiency
- Limited computer access
- Lower education levels
- Lower literacy rates
- Higher level of disabilities

**Low income taxpayers living under 125% of poverty levels**

37%
have less than high school education

25%
are foreign born

30%
are disabled

## Comparison of the general and chronically poor populations

**Children under 18 make up**

25%
of general population

42%
of chronically poor population

**People in female-led households make up**

15%
of general population

43%
of chronically poor population

**People in married-couple families make up**

64%
of general population

26%
of chronically poor population

**73-87% of qualifying children claimed for EITC are claimed correctly**



**Low income taxpayers are more likely to face specific limitations**

 **Absence of a bank account hinders ability to verify income and expenses**

About 39% of households with income below $30,000 per year do not have a bank account.

About 28% of households with income below $15,000 per year do not have a bank account.

 **Changing residences hinders ability to respond timely to IRS correspondence**

From 2012 to 2013, over 20% of taxpayers below poverty level moved compared to less than 12% in the general population.

A 2004 TAS study found 43% of taxpayers had valid or partially valid EITC claims but couldn't successfully complete the correspondence exam process

 **The poor spend a higher percent of their income on transportation costs**

Individuals below poverty spend over four times as much of their wage income on transportation as those who are above poverty level.

**Low income families spend a considerably higher portion of their income on child care**

On average, families with employed mothers spent about 7.2% of their income on child care; however, families with income less than $1,500 per month spent 39.6% of their family income on child care.

Limited English proficiency: www.brookings.edu/research/reports2/2014/09/english-skills#/M10580.  Limited computer access: Forrester, North American Consumer Technographics Online Benchmark Survey (Part 2), 2014.  Lower education levels:  Isabel Sawhill and Quentin Karpilow, The Social Genome Project at Brookings, *Strategies for Assisting Low-Income Families* 4-5 (June 28, 2013).  Lower literacy rates: www.urbanchildinstitute.org/articles/research-to-policy/policy/poverty-can-jeopardize-the-development-of-literacy-and-early.  Higher levels of disability: http://talkpoverty.org/2014/09/19/disability-cause-consequence-poverty/.  Comparisons of the general and chronically poor populations: Edwards, A. N. (Jan. 2014), *Dynamics of Economic Well-Being: Poverty 2009-2011*, United States Census Bureau. Children claimed for EITC: IRS, Research, Analysis and Statistics, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* 5 (Aug. 2014).  Low income taxpayers living under 125% of poverty levels: (U.S. Census Bureau, 2015).  Absence of a bank account: Federal Deposit Insurance Corporation (FDIC), 2013 FDIC National Survey of Unbanked and Underbanked Households 17 (Oct. 2014); Households moving: U.S. Census general mobility 2012-2013; At least partially valid EITC claims: National Taxpayer Advocate 2004 Annual Report to Congress vol. 2.  Lack of transportation: www.urban.org/research/publication/impact-rising-gas-prices-below-poverty-commuters.  Child care: www.pewresearch.org/fact-tank/2014/04/08/rising-cost-of-child-care-may-help-explain-increase-in-stay-at-home-moms/.

001651

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1659 of 4699 PageID #: 4824

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

The EITC is a sizable credit, with approximately 26.7 million people receiving over $65 billion in EITC for tax year (TY) 2014.[12]  Taxpayers use the credit to supplement their wages to pay for basic living expenses such as food, housing, and transportation costs.  In 2013, the EITC lifted about 6.2 million people out of poverty.[13]

The EITC is associated with a high improper payment rate.[14]  The IRS currently estimates that the EITC improper payment rate is 27 percent (which accounts for an estimated $17.7 billion in improper payments).[15]  Despite much attention to this issue, the current improper payment rate has increased slightly from the improper rate measured in 2004, when it was 25 percent.[16]  However, for context, EITC overclaims account for just seven percent of gross individual income tax noncompliance, while business income underreported by individuals accounts for 51.9 percent.[17]  Improper EITC payments nonetheless continue to present a problem that cannot be ignored.

As Professor Leslie Book points out, EITC noncompliance is actually "a series of problems reflecting very different types and degrees of noncompliance."[18]  As a result, proposals and programs to address EITC noncompliance must avoid a one-size-fits-all approach and instead "properly reflect the true dimensions of noncompliance within the EITC program, including ever-changing substantive rules, a fairly complex enforcement process, and the characteristics and circumstances of the appropriate taxpaying community."[19]  Professor Book defines eight types of noncompliance, which he argues should serve as the basis for the IRS's action.[20]

Three types of noncompliance that are particularly pertinent to EITC compliance include: procedural noncompliance, unknowing noncompliance, and brokered noncompliance.[21]  Procedural noncompliance occurs when the taxpayer cannot follow the EITC rules.  In terms of an EITC claim, you may see procedural noncompliance when the IRS requests substantiating documentation from the taxpayer during an audit and the taxpayer responds with incorrect paperwork.  Unknowing noncompliance occurs when an error is attributable to the complex and changing EITC rules.  This error could occur when a taxpayer who was previously eligible for the EITC is no longer eligible because of a change in circumstances that he or she does not realize makes the taxpayer currently ineligible.  Last, brokered noncompliance occurs

---

12  IRS, *About EITC*, *available at* https://www.eitc.irs.gov/EITC-Central/abouteitc (last visited Dec. 9, 2015).

13  Center on Budget Policy and Priorities, *New Research: EITC Boosts Employment; Lifts Many More Out of Poverty Than Previously Thought*, *available at* http://www.cbpp.org/blog/new-research-eitc-boosts-employment-lifts-many-more-out-of-poverty-than-previously-thought (last visited Sept. 23, 2015).

14  An improper payment is defined as "any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements" and "any payment to an ineligible recipient." *Improper Payments Elimination And Recovery Act of 2010*, Pub. L. No. 111-204, § 2(f)(2) (2010).

15  Treasury Inspector General for Tax Administration (TIGTA), Ref. No. 2015-40-044, *Assessment of Internal Revenue Service Compliance with the Improper Payment Reporting Requirements in Fiscal Year 2014* 9 (Apr. 27, 2015).

16  *Id.*  The lowest improper payment measurement since 2004 was 23 percent, which occurred in 2012.  *Id.*

17  IRS, IR-2012-4, *IRS Releases New Tax Gap Estimates; Compliance Rates Remain Statistically Unchanged from Previous Study* (Jan. 6, 2012).  The IRS estimates $235 billion in individual income tax underreporting for tax year (TY) 2006 with $122 billion of this amount attributable to business income underreported by individuals as sole proprietors on Schedule C (Profit or Loss from Business) or as farmers on Schedule F (Profit or Loss from Farming).  Department of the Treasury, *Fiscal Year 2014 Agency Financial Report* 197 (Nov. 17, 2014).  The IRS provided a lower bound estimate of $16.2 billion in EITC overclaims for TY 2014 ($16.2 billion / $235 billion is about seven percent).

18  Leslie Book, *The Poor and Tax Compliance: One Size Does Not Fit All*, 51 Kan. L. Rev. 1145, 1147 (2003).

19  *Id.* at 1147-48.

20  *Id.* at 1166.  Mr. Book relies on the work of sociologists Robert Kidder and Craig McEwen in this analysis.

21  *Id.* at 1167-73.

001652

when the taxpayer receives inaccurate advice or assistance from a tax professional.  In our Most Serious Problems below, we discuss each of these types of noncompliance.

The Office of Management and Budget (OMB) recently requested that the Department of Treasury (Treasury) analyze the problem of EITC improper payments.  The OMB encouraged Treasury to "continue to explore new and innovative ways to address the problem and to continue to attack this challenge with every tool at our disposal."[22]  OMB requested an action plan from Treasury to meet improper payment reduction targets.  One pertinent issue OMB wanted addressed included the question: What are the one or two actions you are not already engaged in (but could realistically engage in) that would lead to a significant decrease in improper payments in the EITC program?[23]  In the material below, the National Taxpayer Advocate will recommend several actions that can be realistically adopted to improve EITC compliance and reduce improper payments.

Improvement to the EITC audit program is also an important step to meeting Congress's expectations to "engage in the first top to bottom review since 1996 of how federal policies can better support work, strengthen families, and move America forward."[24]  Based on this expectation, the National Taxpayer Advocate provides her concerns and recommendations for improving EITC compliance in the Most Serious Problems described below:

- *The IRS Does Not Do Enough Taxpayer Education in the Pre-Filing Environment to Improve EITC Compliance and Should Establish a Telephone Helpline Dedicated to Answering Pre-filing Questions From Low Income Taxpayers About Their EITC Eligibility;*

- *The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance;* and

- *The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance*

We believe that if the IRS and Congress adopt the recommendations set forth in these discussions, we will achieve improved EITC voluntary compliance.  Some of our proposals call for innovation, improved training, person-to-person contact, and staffing the program with employees that have a different set of skills.  In order to improve the future compliance and protect the taxpayer rights of low income individuals, these resources are a necessary investment.

---

22  Shaun Donovan, Director, OMB, *Letter to Honorable Jacob J. Lew, Secretary of the Treasury* (Feb. 26, 2015).

23  *Id.*

24  *Challenges Facing Low-Income Individuals and Families in Today's Economy: Hearing Before the Subcomm. on Human Resources of the H. Comm. on Ways and Means*, 114th Cong. (2015) (statement of Subcommittee Chairman Charles Boustany).

001653

**MSP #22**

## EARNED INCOME TAX CREDIT (EITC): The IRS Does Not Do Enough Taxpayer Education in the Pre-filing Environment to Improve EITC Compliance and Should Establish a Telephone Helpline Dedicated to Answering Pre-filing Questions From Low Income Taxpayers About Their EITC Eligibility

### RESPONSIBLE OFFICIALS

Debra Holland, Commissioner, Wage and Investment Division

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Retain Representation*
- *The Right to a Fair and Just Tax System*

### DEFINITION OF PROBLEM

The Earned Income Tax Credit (EITC) is a complicated tax law that depends on many factors, including a taxpayer's income, marital status, and relationship to children claimed. As discussed in the introduction to this section, the target population for the EITC shares a unique set of attributes that create inherent challenges for EITC compliance.[2] Additionally, the population claiming the EITC is constantly changing, with approximately one-third of the eligible population changing every year.[3]

The churning of the eligible population occurs because EITC eligibility requirements include the type of issues that change frequently, such as living and parenting arrangements and the gain or loss of a job. However, when one-third of the EITC population cycles in and out each year, it is very difficult for taxpayers to understand what the rules are and how the rules apply to the taxpayer's particular circumstances.

The IRS does not accommodate low income taxpayers' communication behaviors and largely ignores what channels these taxpayers need or prefer to use. As a consequence, taxpayers make avoidable errors and inaccurate EITC claims, driving up the improper payment rate.[4]

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   See Introduction: *The IRS Can Do More To Improve Its Administration of the Earned Income Tax Credit (EITC) and Increase Future Compliance Without Unduly Burdening Taxpayers and Undermining Taxpayer Rights*, *supra*.

3   IRS, *EITC Fast Facts*, *available at* http://www.eitc.irs.gov/Partner-Toolkit/basicmaterials/ff (last visited Sept. 16, 2015). For more information on the changing population of taxpayers eligible for EITC, see National Taxpayer Advocate 2013 Annual Report to Congress 109-10.

4   For a more detailed discussion of the EITC improper payment rate, see Introduction: *The IRS Can Do More To Improve Its Administration of the Earned Income Tax Credit (EITC) and Increase Future Compliance Without Unduly Burdening Taxpayers and Undermining Taxpayer Rights*, *supra*.

## ANALYSIS OF THE PROBLEM

### Background

Generally, the amount of the EITC increases with earned income, creating an incentive to work.[5]  The credit has a phase-in range (increasing the credit as the taxpayer's wages go up), a plateau range, and a phase-out range (decreasing the credit as the taxpayer's wages continue to increase, eventually making the taxpayer ineligible).  The EITC amount also increases if a worker has one, two, or three qualifying children, but is disallowed if the worker has more than $3,350 of investment income.[6]  For tax year (TY) 2014, the EITC phases out at an income ceiling of $52,427 (for a married couple filing jointly with three or more qualifying children), and this number changes annually.[7]

Figure 1.22.1 demonstrates the plateau effect of the EITC based on income, filing status, and number of children.

### FIGURE 1.22.1, Amount of EITC Based on Earnings

**Household Income and EITC**



The information listed above only covers income eligibility.  The requirements when claiming a child are even more detailed.  To have a qualifying child for EITC purposes, the child must meet three tests: age, relationship, and residence.

- Under the *age* requirement, the child being claimed must be younger than the taxpayer and must be under the age of 19 at the end of the calendar year.  The child can be under the age of 24 if he or she is a full-time student, and if the child is permanently and totally disabled, then he or she can be any age.[8]

---

5   *See* Stacy Dickert, Scott Houser & John Karl Scholz, *The Earned Income Tax Credit and Transfer Programs: A Study of Labor Market and Program Participation*, 9 Tax Policy and the Economy (James M. Porterba ed., 1995); Janet Holtzblatt, *Trade-offs Between Targeting and Simplicity: Lessons from the U.S. and British Experiences with Refundable Tax Credits* 13 (2004) (citing Dickert, Houser & Scholz among academic economists who "estimated that expansions of the EITC between 1993 and 1996 would induce more than half a million families to move from welfare to work").
6   *See generally* IRC § 32(i); Instructions for Form 1040, *U.S. Individual Tax Return* 53 (Jan. 26, 2015).
7   Internal Revenue Code (IRC) § 32(b); IRS, *Publication 596, Earned Income Credit (EIC)* 4 (Dec. 18, 2014).
8   IRC § 152(c)(3).

001655

Case 1:20-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1663 of 4699 PageID #:  4828

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

- Under the *relationship* requirement, the taxpayer generally may claim the EITC for a child who is his or her son or daughter, stepchild, foster or adopted child, or a descendant of any of them (*e.g.*, a grandchild), or a child who is a sibling, stepsibling, or half-sibling of the taxpayer, or a descendant of any of them (*e.g.*, a nephew or grandnephew).[9]

- Under the *residence* requirement, a taxpayer generally may claim the credit only with respect to a child who lives with the taxpayer for more than half the calendar year.[10]

Taxpayers without children have separate requirements.  First, they must live in the United States for more than half of the year.[11]  The taxpayer (or his or her spouse if filing jointly) must be at least 25 years old but below 65 years old.[12]  Last, the taxpayer cannot be claimed by someone else as a dependent.[13]

The struggle that low income taxpayers face in trying to navigate the complex EITC rules is not just a theoretical problem.  The recent case of *Cowan v. Commissioner* demonstrates the severity of the situation.[14]  In this case, the state of Ohio appointed Ms. Cowan to be the guardian of a child, Marquis, from 1991 until 2004.  Under state law, the guardianship automatically terminated when Marquis turned 18, which occurred in 2004.  However, Ms. Cowan continued to provide Marquis a home after he turned 18, and they continued to regard themselves as a family unit.  Ms. Cowan never adopted Marquis, the legal significance of which she did not understand.  She stipulated for trial that had she known of the importance of adoption, she would have adopted Marquis.

Later, Marquis had a daughter, and they both lived with Ms. Cowan.  In 2011, Ms. Cowan claimed Marquis's daughter as her granddaughter for the EITC.  The court disallowed this claim since she and Marquis legally are not related.  However, Ms. Cowan and Marquis *believe* and *act* as if they are family.  And it was based on that belief that Ms. Cowan filed her 2011 tax return.  Had Ms. Cowan understood the legal significance of the terminated guardianship and of adopting Marquis, she could have taken steps to ensure the outcome was in her favor.

In situations where taxpayers are operating under a complex system of rules without the necessary tools, the concept of procedural justice is impacted.  "Procedural justice" (or fairness) is a concept that considers how a taxpayer is treated by the IRS.  It looks to more than just the outcome of the interaction; it also considers if the interaction was "nonjudgmental, polite, and respectful of the individual's rights."[15]  Procedural justice is an important concept to consider when discussing EITC cases because a taxpayer's perception of procedural fairness will affect his or her perception of the agency's fairness and legitimacy, as well as his or her willingness to comply with the tax laws.[16]  The process of establishing EITC compliance can seem unjust if it is designed in a way that all but ignores the needs and limitations of the population being served.[17]

---

9   IRC § 152(c)(2).

10   IRC § 152(c)(1)(B).

11   IRC § 32(c)(1)(A)(ii)(I).

12   IRC § 32(c)(1)(A)(ii)(II).

13   IRC § 32(c)(1)(A)(ii)(III).

14   T.C. Memo. 2015-85.

15   Nina E. Olson, *Procedural Justice for All: A Taxpayer Rights Analysis of IRS Earned Income Credit Compliance Strategy*, 22 Advances in Taxation 3 (John Hasseldine ed., 2015).

16   *Id.* at 3-4.

17   For information on how the EITC audit process in particular can be improved, see Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance, infra.*

In the current customer service environment, procedural justice is undermined by the IRS's failure to provide tailored education and assistance to low income taxpayers, coupled with an examination strategy that creates significant burdens for EITC taxpayers trying to prove their eligibility.[18]  As a consequence, EITC noncompliance continues at a high level, resistant to the IRS's present actions.

### The IRS Needs to Establish a Dedicated Helpline for EITC Taxpayers During the Filing Season to Improve Filing Compliance and the Improper Payment Rate

During the filing season, the IRS provides toll-free assistance for answering basic tax law questions from any taxpayer and only rudimentary help for taxpayers with EITC questions.  The IRS also uses an outreach and education strategy directed toward both preparers and taxpayers.  For instance, on the IRS website, taxpayers are able to use a tool to see if they qualify for the EITC.[19]  The website also offers links that contain a wealth of information according to topic.  For instance, the taxpayer can find information pertaining to the income limits, credit amounts, and special rules.[20]

The IRS also makes available bilingual pamphlets and publications.  Publication 962, *Earned Income Tax Credit*, is a pamphlet that addresses the main requirements for EITC and provides the taxpayers with additional resources if they have questions.  These publications are often disseminated throughout the community at government offices and nonprofit agencies.  The IRS takes advantage of TV, radio, and social media to present public service announcements.  The best example of this outreach is EITC Awareness Day, which is a "one-day blitz in mainstream and social media to reach the broadest possible range of potentially eligible taxpayers."[21]

> … TAS research… has shown that taxpayers claiming the Earned Income Tax Credit (EITC) need additional assistance to understand EITC eligibility and avoid noncompliance. Accordingly, the National Taxpayer Advocate recommends the IRS establish a dedicated helpline for EITC questions during the filing season to meet that need.

Despite all this important high-level outreach activity, TAS research, discussed below, has shown that taxpayers claiming the EITC need additional assistance to understand EITC eligibility and avoid noncompliance.[22]  Accordingly, the National Taxpayer Advocate recommends the IRS establish a dedicated helpline for EITC questions during the filing season to meet that need.  Assistors servicing the helpline should receive training to improve interviewing and listening skills similar to those used by social workers administering a social benefit program.[23]  Taxpayers could explain their circumstances and receive specific guidance on how the law applies to those circumstances.  While these answers would be nonbinding on the IRS, the assistors on the helpline would focus on getting taxpayers to the right answer.  The helpline would help taxpayers check the accuracy of advice

---

18  *See Most Serious Problem: Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance, infra.*

19  IRS, Use the EITC Assistant, *available at* http://www.irs.gov/Credits-&-Deductions/Individuals/Earned-Income-Tax-Credit/Use-the-EITC-Assistant (last visited Sept. 18, 2015).

20  IRS, *Earned Income Tax Credit (EITC)*, *available at* http://www.irs.gov/Credits-&-Deductions/Individuals/Earned-Income-Tax-Credit (last visited Sept. 18, 2015).

21  IRS, *EITC Awareness Day*, *available at* http://www.eitc.irs.gov/Partner-Toolkit/awarenessday (last visited Sept. 18, 2015).

22  *See* National Taxpayer Advocate 2004 Annual Report to Congress vol. 2, 1-82 (*Earned Income Tax Credit (EITC) Audit Reconsideration Study*); National Taxpayer Advocate 2007 Annual Report to Congress vol. 2, 94-117 (*IRS Earned Income Credit Audits – A Challenge to Taxpayers*).

23  *See* National Taxpayer Advocate 2009 Annual Report to Congress 119-20; National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 86-7.

001657

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1665 of 4699 PageID #: 4830

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

provided them by untrained or unscrupulous return preparers.[24]  Not only would individual taxpayers benefit from this helpline, but the IRS would learn from the taxpayers themselves what the sources of confusion are with respect to the EITC.  In this way, through a dialogue with taxpayers, the IRS can update and refine its general information for *all* EITC taxpayers.[25]

### TAS Research Studies Show that Low Income Taxpayers Need Person-to-Person Contacts In Order to Understand Their Tax Obligations

The first TAS study to support this recommendation occurred in 2004, when TAS explored the effectiveness of EITC audits.[26]  In the 2004 study, TAS looked at a representative sample of taxpayers whose EITC was disallowed, in whole or part, in IRS audits and who later requested an audit reconsideration of that disallowance.  The results showed that 45 percent of the taxpayers who went to TAS for assistance received additional EITC as a result of the audit reconsideration, as compared to 40 percent who asked Examination for reconsideration.  Forty-two percent of the sample responded late or not at all to the original audit inquiry.  However, about 43 percent of this group had favorable outcomes from the audit reconsideration process, retaining about 96 percent of the total amount of EITC originally claimed on their returns.

The percentage of taxpayers who received EITC in the audit reconsideration increased in direct proportion to the number of telephone contacts TAS initiated.  Overall, only 38 percent of taxpayers who went through the audit reconsideration process but received no phone calls were awarded EITC.  This percentage increased to 67 percent for taxpayers who received three or more calls.  The 2004 study demonstrated the importance of making personal contact with low income taxpayers under audit.  If personal contact could be available earlier in the process, significant noncompliance and future audits potentially could be avoided.

In a 2007 study, TAS identified the types of barriers taxpayers face in the EITC audit process as well as the effect of representation in EITC audits.  This study discovered that on a very basic level, 26.5 percent of the surveyed taxpayers did not know from reading the EITC audit letter that they were being audited.[27]  Nearly 40 percent did not understand what the IRS was questioning in the audit.[28]  Nearly 70 percent of the taxpayers preferred to communicate with the IRS directly instead of the correspondence audit process, 46 percent preferred to communicate by telephone, and 23 percent preferred to communicate in-person.[29]  This shows that IRS written communication (both in style and format) does not line up with what low income taxpayers need to be able to engage effectively with the IRS and learn.

The IRS has studied discrete components of low income taxpayers' lives.  For instance, as part of the Qualifying Child Residency Certification Study in 2005, the IRS looked to the importance of mobility

---

24  For an analysis of the role of return preparers in EITC noncompliance and the IRS efforts to address this issue, see Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, infra*.

25  *See* Most Serious Problem: *Taxpayer Service: The IRS Has Developed a Comprehensive "Future State" Plan That Aims to Transform the Way It Interacts with Taxpayers, But Its Plan May Leave Critical Taxpayer Needs and Preferences Unmet, supra*, for a discussion of the importance of a "positive feedback loop" between IRS and taxpayers.

26  *See* National Taxpayer Advocate 2004 Annual Report to Congress vol. 2, 1-82 (*Earned Income Tax Credit (EITC) Audit Reconsideration Study*).

27  *See* National Taxpayer Advocate 2007 Annual Report to Congress vol. 2, 104.  EITC returns are selected for audit differently now than returns were selected for audit in 2007.  We do not know if this study would create the same results today.

28  *Id.*

29  *Id.* at 106-7.

001658

of low income taxpayers and taxpayers' opinions of the EITC certification process.[30]  The IRS learned that between six and 11 percent of the letters sent by the IRS as part of the study were undeliverable, and almost one-half of the taxpayers selected for a follow-up telephone survey could not be reached by mail or phone in TY 2003.[31]

A dedicated helpline would address low income taxpayers' needs by accommodating their mobility (taxpayers could call it regardless of mobility) *before* filing their tax returns.  The helpline would help avoid future noncompliance and instill a sense of procedural justice for all taxpayers — that is, the IRS listened to their concerns and explained what taxpayers needed to do to be compliant.

### The IRS Can Learn From the United Kingdom's Approach to Providing Assistance to Taxpayers Claiming Family- and Income-Based Credits

The National Taxpayer Advocate has consistently argued that low income taxpayers need customer service approaches fine-tuned for their specific needs and preferences.[32]  In the United Kingdom, Her Majesty's Revenue and Customs (HMRC) has gradually shifted its focus from that of a compliance-driven agency to one that views taxpayers as customers.  HMRC is committed to improving the "customer experience" for taxpayers claiming family and other tax credits and as a result it strives to "understand both customers' current communication behaviors, as well as how they would prefer to communicate with HMRC in the future."[33]  For instance, HMRC has determined that taxpayers claiming tax credits largely prefer contacting the agency by telephone.[34]  HMRC also studied when taxpayers are most likely to need assistance during the process of claiming a tax credit.[35]  Last, HMRC studies taxpayers' experiences, perceptions, and attitudes.[36]  This approach instills a sense of procedural justice into the process.[37]

Unlike the United States, HMRC provides a dedicated helpline for tax credit inquiries.  This helpline provides advice on tax credits, allows taxpayers to report changes in their circumstances, and provides a

---

30  IRS, *IRS Earned Income Tax Credit (EITC) Initiative, Final Report to Congress* 23, 43 (Oct. 2005).

31  IRS, *IRS Earned Income Tax Credit (EITC) Initiatives, Report on Qualifying Child Residency Certification, Filing Status, and Automated Underreporter Tests* 19 (2008).  One-third of the taxpayers selected for a follow-up telephone survey could not be reached by mail or phone in TY 2004.  *Id.*

32  *See, e.g.,* National Taxpayer Advocate 2012 Annual Report to Congress 103-15; National Taxpayer Advocate 2011 Annual Report to Congress 296-312 (Most Serious Problem: *The IRS Should Reevaluate Earned Income Tax Credit Compliance Measures and Take Steps to Improve Both Service and Compliance*); National Taxpayer Advocate 2008 Annual Report to Congress 227-42 (Most Serious Problem: *Suitability of the Examination Process*); National Taxpayer Advocate 2007 Annual Report to Congress 222-41 (Most Serious Problem: *EITC Examinations and the Impact of Taxpayer Representation*); National Taxpayer Advocate 2005 Annual Report to Congress 94-122 (Most Serious Problem: *Earned Income Tax Credit Exam Issues*); National Taxpayer Advocate 2004 Annual Report to Congress vol. 2, 8-45 (*Earned Income Tax Credit (EITC) Audit Reconsideration Study*).

33  Her Majesty's Revenue and Customs, *Channels of Communication: Usage and Preferences Among Tax Credits Customers* 1 (Aug. 2013).  *See also* Colin Payne, Julia Griggs, Mari Toomse-Smith and Hannah Silvester, NatCen Social Research, *Panel Study of Tax Credits Customers: Telephone Survey 2012: Reducing Error and Fraud, and the Transition to Universal Credit* (May 2013).

34  Her Majesty's Revenue and Customs, *Channels of Communication: Usage and Preferences Among Tax Credits Customers* 11 (Aug. 2013).

35  *Id.* at 12.

36  *See, e.g.,* Malen Davies, Rowan Foster, Pippa Lane and Lauren Small, Centre for Economic and Social Inclusion, *High Risk Renewals: Tax Credits Customers' Experiences of and Responses to the High Risk Renewals Intervention* (2013).  The High Risk Renewal (HRR) intervention is used by HMRC "to target those tax credits customers identified as having a risk of error or fraud in their claim."  *Id.* at 1.  The interventions consist of an HRR letter in addition to a "tax credits renewal pack."  *Id.* at 2.  *See also* Chris Lord, Matt Barnes and Mari Toomse, NatCen Social Research, *Exploring the Dynamics of Tax Credits Renewal Behavior: Longitudinal Analysis of the Panel Survey of Tax Credits and Child Benefit Customers* (July 2012).

37  *Supra* note 15.

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1667 of 4699 PageID #:   4832

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

The law related to Earned Income Tax Credit (EITC) eligibility is complex. At the same time, the EITC is directed toward a population of taxpayers who are least able to navigate its complexity. Additionally, the population of eligible taxpayers is in constant flux because of changing personal circumstances. With these three elements in mind, education targeted toward taxpayers claiming the EITC is an important component for improving EITC compliance.

venue for taxpayers to make complaints.[38] A majority of taxpayers in the United Kingdom preferred using this dedicated helpline for their source of information over all other services provided by HMRC and the customer satisfaction was reported as highest with the helpline.[39] While 56 percent of the taxpayers used the helpline, the next largest group relied on the HRMC website (19 percent).[40] Some other options included local tax offices (two percent), professional advisors (one percent), and community-based volunteer organizations such as the Citizens Advice Bureau (two percent).[41]

Taking a similar approach could help the IRS pinpoint where mistakes and inadvertent errors are likely to occur in EITC claims, increase efficient use of resources, and encourage taxpayers' participation in EITC compliance. It will enable the IRS to tailor its outreach and education better, based on issues and confusion identified on the helpline. It will also allow taxpayers to check whether the information they receive from their tax return preparers about their eligibility is correct. We know in the United States, low income taxpayers are more likely to use an IRS walk-in office compared to taxpayers with higher incomes.[42] In a 2014 study, TAS determined that over 75 percent of low income respondents preferred in-person meetings and meetings at a community service center compared to 28 percent who preferred telephone contact and 13 percent who preferred contact by writing.[43] This means that the current processes for low income taxpayers should be based on something other than correspondence.

A helpline would be less expensive than face-to-face assistance but still meet the needs of the low income population. By studying the best way to communicate with low income taxpayers, the IRS could determine why low income taxpayers prefer face-to-face assistance over telephone contact. If we can isolate the particular aspects of face-to-face assistance that taxpayers find helpful, it may very well be that the enhanced EITC helpline would also meet those aspects

---

38  Her Majesty's Revenue and Customs, *Tax Credits: General Enquiries*, *available at* https://www.gov.uk/government/organisations/hm-revenue-customs/contact/tax-credits-enquiries (last visited May 21, 2015).

39  Her Majesty's Revenue and Customs, *Channels of Communication: Usage and Preferences Among Tax Credits Customers* 25 (Aug. 2013).

40  *Id.* at 14.

41  *Id.* The Citizens Advice Bureau described its work as offering "information and advice through face-to-face, phone and email services, and online via Adviceguide.org.uk." Citizens Advice Bureau, *Introduction to the Citizens Advice service*, *available at* https://www.citizensadvice.org.uk/about-us/how-citizens-advice-works/who-we-are-and-what-we-do/introduction-to-the-citizens-advice-service/ (last accessed Oct. 9, 2015).

42  Eighty-two percent of low income taxpayers (with incomes under $15,000) reported being "very or somewhat likely" to use an IRS walk-in office compared to 63 percent of taxpayers with income of $75,000 or more. IRS Oversight Board, 2014 *Taxpayer Attitude Survey* 13 (Dec. 2014). The margin of error for the Oversight Board survey is 4 percent at the 95 percent confidence level.

43  National Taxpayer Advocate 2014 Annual Report to Congress vol. 2, 9. This study entailed a telephone survey of taxpayers eligible to use a Low Income Taxpayer Clinic for help with a federal tax problem. Participants had to be the person in the household responsible for handling federal income tax matters, they must have filed a federal tax return in the last three years, and their total annual household income could not exceed 250 percent of the federal poverty level. Respondents could check all applicable responses so results total more than 100 percent.

001660

(one-on-one communication, no talk time limits, personal interaction).[44]  Based on that assessment, the IRS should reevaluate how it currently serves low income taxpayers and build a system that meets the needs of taxpayers.

## CONCLUSION

The law related to EITC eligibility is complex.  At the same time, the EITC is directed toward a population of taxpayers who are least able to navigate its complexity.  Additionally, the population of eligible taxpayers is in constant flux because of changing personal circumstances.  With these three elements in mind, education targeted toward taxpayers claiming the EITC is an important component for improving EITC compliance.  In particular, if taxpayers had access to a dedicated helpline, they would be able to confirm their understanding before filing a tax return or receive help if they have a question after entering into the audit process.  This could reduce the number of mistakes and inadvertent errors.

The IRS should reevaluate how it serves the particular needs of low income taxpayers.  There is a lot of research to indicate that low income taxpayers would benefit from service methods other than correspondence examinations.  And yet, most work done with low income taxpayers is through the mail.  The IRS should take this opportunity to study how low income taxpayers prefer to work with the IRS.  Based on the results of that study, the current procedures should be revamped to optimize taxpayer participation.  In doing this, the IRS will promote a sense of procedural justice in tax administration for low income taxpayers and positively impact EITC compliance.  Doing this will also undermine unscrupulous and predatory preparers, which will further improve the improper payment rate.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Conduct a study along the lines of the UK experiment to determine how best to serve low income taxpayers.  This study should include interviews with taxpayers, nonprofit organizations, and IRS employees, to learn about taxpayer needs and communication preferences.

2. Based on the findings from the proposed study above, create a helpline dedicated to taxpayers who claim the EITC where taxpayers can call in and ask questions about their particular area of concern.  This phone line should be staffed by employees with excellent listening and communication skills who have completed training in social work and who can answer specific questions related to EITC eligibility.  The IRS should provide, in conjunction with TAS, special training on listening and communication.

---

44   The Senate Committee on Appropriations recently directed the IRS to conduct an analysis of the specific characteristics of the population of taxpayers that use the walk-in Taxpayer Assistance Centers.  In particular, the committee directed the IRS to conduct this analysis along the same lines as an analysis conducted by HMRC.  Financial Services and General Government Appropriations Bill of 2016, S.R. 000, 114th Cong. 30-31 (2015).

**MSP #23**

## EARNED INCOME TAX CREDIT (EITC): The IRS Is Not Adequately Using the EITC Examination Process As an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance

### RESPONSIBLE OFFICIALS

Debra Holland, Commissioner, Wage and Investment Division

### TAXPAYER RIGHTS IMPACTED[1]

- The Right to Be Informed
- The Right to Pay No More Than the Correct Amount of Tax
- The Right to Challenge the IRS and Be Heard
- The Right to Retain Representation
- The Right to a Fair and Just Tax System

### DEFINITION OF PROBLEM

The Earned Income Tax Credit (EITC) is a refundable credit, enacted as a work incentive in the Tax Reduction Act of 1975.[2]  It has become one of the primary forms of public assistance for low income working taxpayers.  Taxpayers eligible for the EITC often rely on the credit in order to make basic ends meet, such as to cover housing and transportation costs.  The EITC is also associated with a high improper payment rate.[3]  The IRS currently estimates that the EITC improper payment rate is 27 percent (which accounts for an estimated $17.7 billion in improper payments).[4]  Despite much attention to this issue, the current improper payment rate has increased slightly from 2004, when it was 25 percent.[5]  Thus, the IRS must balance the obligation of making sure every taxpayer eligible for the EITC receives it, with the obligation to minimize mistakes and fraud.[6]

The EITC is a complex law that involves eligibility rules based on a taxpayer's income, marital status, and parental arrangements, which can often change on a year-to-year basis.  The population claiming the

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Pub. L. No. 94-12, § 204, 89 Stat. 26 (1975).  For a detailed history of the EITC, see Dennis J. Ventry, Jr., *The Collision of Tax and Welfare Politics: The Political History of the Earned Income Tax Credit, 1969-99*, 53 Nat'l. Tax J. 983-1026 (Dec. 2000).

3   An improper payment is defined as "any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements" and "any payment to an ineligible recipient."  Improper Payments Elimination and Recovery Act of 2010, Pub. L. No. 111-204, § 2(f)(2) (2010).

4   Treasury Inspector General for Tax Administration (TIGTA), Ref. No. 2015-40-044, *Assessment of Internal Revenue Service Compliance With the Improper Payment Reporting Requirements in Fiscal Year 2014* 9 (Apr. 27, 2015).

5   *Id.*  The lowest improper payment measurement since 2004 was 25 percent, which occurred in 2012.  *Id.*

6   For information on how the IRS is addressing the role that tax return preparers play in EITC noncompliance, see Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, infra.*

EITC is constantly in flux, with approximately one-third of the eligible population changing every year.[7] At the same time, the population of taxpayers who rely on the EITC share a common set of characteristics, such as low education and high transiency, which create challenges for taxpayer compliance.[8]

Notwithstanding these challenges the IRS persists in using traditional audits as its primary compliance tool. In fact, EITC audits make up 35 percent of all IRS audits despite the fact that EITC returns account for only 19 percent of all returns filed.[9] Because audits are resource-intensive, the IRS should focus its limited resources on audit methods proven to have the greatest direct and indirect effects on compliance in order to have the biggest impact on potentially erroneous EITC claims. The IRS primarily relies on the automated correspondence examination process to work EITC audits. TAS's review of this approach reveals the following concerns:

- The correspondence audit process creates barriers for low income taxpayers due to their unique attributes;

- The EITC audit program has a no-response rate of over 40 percent, raising questions about the accuracy of some default assessments and of the audit's effectiveness as an educational tool for future compliance;[10] and

- The IRS may not be auditing the group of EITC returns that have the most noncompliance, thereby diminishing the effectiveness of IRS efforts to improve future compliance and creating a burden for taxpayers.

Improving the EITC audit program is an important step to improving the improper payment rate, reducing taxpayer burden, and meeting Congress's expectations that the IRS "engage in the first top to bottom review since 1996 of how federal policies can better support work, strengthen families, and move America forward."[11] An improved audit process will also ensure procedural justice for low income taxpayers.[12]

---

7    IRS, *EITC Fast Facts*, http://www.eitc.irs.gov/Partner-Toolkit/basicmaterials/ff (last visited Sept. 16, 2015). For more information on the changing population of taxpayers eligible for EITC, see National Taxpayer Advocate 2013 Annual Report to Congress 109-10.

8    See Introduction: *The IRS Can Do More to Improve Its Administration of the Earned Income Tax Credit (EITC) and Increase Future Compliance Without Unduly Burdening Taxpayers and Undermining Taxpayer Rights*, *supra*.

9    IRS, *2014 Data Book*, table 9a, comparing the number of EITC returns filed and the number of EITC audits in footnote 5 of the same table.

10   For FY 2014, the exact no response rate is 45.6 percent. This calculation includes 255,286 default assessments minus 99,067 default assessments that involved some taxpayer contact, bringing the total of default assessments with no taxpayer contact to 156,219. In addition, 42,490 cases involving undeliverable mail were then added, for a total of 198,709 cases with either a default assessment and no contact or undeliverable notices. That number divided by the total of 435,639 equals 45.6 percent and represents the portion of taxpayers who did not respond to the EITC audit. Audit Information Management System Closed Case Database. *See Internal Revenue Service Oversight, Hearing Before the H. Subcomm. on Fin. Serv. and Gen. Gov't Comm. on Appropriations*, 113th Cong. 34 (2014) (statement of Nina E. Olson, National Taxpayer Advocate), *available at* http://www.finance.senate.gov/imo/media/doc/Olson%20-Testimony1.pdf.

11   *Challenges Facing Low-Income Individuals and Families in Today's Economy: Hearing Before the Subcomm. on Human Res. of the H. Comm. on Ways and Means*, 114th Cong. (2015) (statement of Subcommittee Chairman Charles Boustany). Additionally, the President's FY 2016 budget includes "strategic reinvestments in the IRS," which among other things, are intended to "help increase audit and collection coverage." *Examining Federal Improper Payments and Errors in the Death Master File, Hearing before the S. Comm. on Homeland Security and Governmental Affairs*, 114th Cong. (Mar. 16, 2015) (statement of David Mader, United States Controller, Office of Management and Budget). If the IRS does receive additional funding, now is a good opportunity to evaluate its EITC audit effectiveness.

12   "Procedural justice" (or fairness) is a concept that considers how a taxpayer is treated by the IRS. It looks to more than just the outcome of the interaction, it also considers if the interaction was "nonjudgmental, polite, and respectful of the individual's rights." It is an important concept to consider when discussing EITC audits because a taxpayer's perception of procedural fairness will affect his or her perception of the agency's fairness. Nina E. Olson, *Procedural Justice for All: A Taxpayer Rights Analysis of IRS Earned Income Credit Compliance Strategy, in* 22 Advances in Taxation 1, 3-4 (John Hasseldine ed., 2015).

001663

Case 1:19-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1671 of 4699 PageID #: 4836

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Appendices

## ANALYSIS OF THE PROBLEM

### The Correspondence Audit Process Creates Barriers for Low Income Taxpayers Due to Their Unique Attributes

As noted in the Introduction, EITC taxpayers face significant challenges in interacting with the IRS, including language, financial and computer literacy, transiency, and the other characteristics of low income and poverty populations.[13]  Taxpayers claiming the EITC need to have a tailored examination process for a number of reasons, including language barriers, the inability to communicate clearly in writing, complexity of the tax law, and the volume of records required for verification.[14]  The National Taxpayer Advocate has consistently argued that low income taxpayers need approaches fine-tuned for their specific needs and preferences.[15]  The Treasury Inspector General for Tax Administration (TIGTA) also recently observed that "[IRS] compliance resources are limited, and additional alternatives to traditional compliance methods have not been developed.  Consequently, the IRS does not address the majority of potentially erroneous EITC claims."[16]  The Government Accountability Office (GAO) reported that effectiveness of audits may be limited partly because of regular backlogs in the audits, which result in delays in responding to taxpayer responses and inquiries.[17]  Moreover, practitioners have expressed concern about the suitability of the correspondence examination for taxpayers claiming the EITC:

> The system itself of requiring the least sophisticated users to endure the most impersonal process creates many of the problems for low income taxpayers.  In both the examination and collection phases of their case, low income taxpayers go from start straight through to levy without a person assigned individually to their case.[18]

### *An EITC Denial May Not Effectively Reflect a Taxpayer's Eligibility for the Credit*

When the audit process does not meet taxpayer needs, any EITC denied to the taxpayer may reflect the taxpayer's inability to navigate the audit process rather than an improper payment.[19]  When taxpayers

---

13  See Introduction: *The IRS Can Do More To Improve Its Administration of the Earned Income Tax Credit (EITC) and Increase Future Compliance Without Unduly Burdening Taxpayers and Undermining Taxpayer Rights, supra.*

14  National Taxpayer Advocate 2008 Annual Report to Congress 233.  When it comes to complying with document requests, migratory living patterns, lack of education, lack of time (*e.g.,* holding multiple jobs), lack of transportation, and limited access to technology (internet, faxes, etc.) add to the difficulty of finding and submitting documents.  National Taxpayer Advocate 2011 Annual Report to Congress 304.

15  For example, see National Taxpayer Advocate 2013 Annual Report to Congress 103-15 (Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Inappropriately Bans Many Taxpayers from Claiming EITC*); National Taxpayer Advocate 2011 Annual Report to Congress 296-312 (Most Serious Problem: *The IRS Should Reevaluate Earned Income Tax Credit Compliance Measures and Take Steps to Improve Both Service and Compliance*); National Taxpayer Advocate 2008 Annual Report to Congress 227-42 (Most Serious Problem: *Suitability of the Examination Process*); National Taxpayer Advocate 2007 Annual Report to Congress 222-41 (Most Serious Problem: *EITC Examinations and the Impact of Taxpayer Representation*); National Taxpayer Advocate 2005 Annual Report to Congress 94-122 (Most Serious Problem: *Earned Income Tax Credit Exam Issues*); National Taxpayer Advocate 2004 Annual Report to Congress vol. 2, 8-45 (*Earned Income Tax Credit (EITC) Audit Reconsideration Study*).

16  TIGTA, Ref. No. 2015-40-044, *Assessment of Internal Revenue Service Compliance With the Improper Payment Reporting Requirements in Fiscal Year 2014* 9 (Apr. 27, 2015).  Recently, a new law was enacted which will require the IRS to modify the timeframe for people claiming the EITC to receive their refunds.  The new timeframe would mean that taxpayers claiming the EITC could not receive their refunds before February 15, with the intention of reducing fraud and improper payments.  Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 § 201 (2015).

17  GAO, *Fiscal Outlook: Addressing Improper Payments and the Tax Gap Would Improve the Government's Fiscal Position* 15 (Oct. 1, 2015).  The GAO concludes that legislative action and "significant changes" in the IRS compliance processes would be necessary to reduce EITC improper payments.  *Id.*

18  *Tax Complexity, Compliance, and Administration: The Merits of Simplification in Tax Reform, Hearing Before the S. Comm. on Fin.*, 114th Cong. (Mar. 10, 2015) (statement of Keith Fogg, Professor of Law and Director of Low Income Taxpayer Clinic (LITC) Villanova Law School).

19  National Taxpayer Advocate 2011 Annual Report to Congress 301.

001664

cannot obtain the information they need to substantiate a claim during an audit, they may not pursue the case and may not receive a benefit to which they are entitled. Even if the taxpayer is not eligible for the EITC in the year of audit, if they do not learn why they are ineligible through the audit process, they may just learn that they should not claim the EITC at all, despite being eligible in later years. Or the taxpayer may repeat the mistake in the following year, triggering the two-year ban under Internal Revenue Code (IRC) § 32(k).[20] Such a system does not promote future compliance.

Some taxpayers will appeal their EITC claim denials to the U.S. Tax Court. This increases systemic costs. The taxpayer may retain a *pro bono* attorney through his or her local Low Income Taxpayer Clinic.[21] Litigation will mean increased costs for the IRS in expanding the time of IRS attorneys and Appeals staff, in addition to the court's expenses. Litigation also creates a delay for the taxpayer to receive his or her refund. A TAS review conducted in 2012 examined a random sample of cases in which the taxpayer petitioned the Tax Court for review of IRS disallowance of the EITC and the IRS conceded the EITC issue in full without trial. On average, the taxpayers had to wait 513 days for their refund.[22] Furthermore, the IRS paid $17,400 in interest on delayed refunds in 90 cases.[23]

Figure 1.23.1 shows the disposition of each EITC audit between fiscal years (FY) 2010 and 2014. The overall trends have stayed relatively consistent over the five years.

**FIGURE 1.23.1**[24]



Disposition of EITC Audits for FYs 2010-2014

---

20   A law been recently enacted which will allow the IRS to use math error authority in situations where the taxpayer has claimed the EITC during a time that he or she is barred from doing so under IRC § 32(k). Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 § 208 (2015).

21   LITCs represent low income individuals in disputes with the IRS, including audits, appeals, collection matters, and federal tax litigation. *See* IRS Publication 4134, *Low Income Taxpayer Clinic List* (Jan. 2015).

22   National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 86.

23   *Id.*

24   IRS Compliance Data Warehouse (CDW), Audit Information Management System through July 2015. This data represents information provided by the IRS. The amount of Appeals dispositions may not be accurately tracked by the IRS Audit Information Management System.

> *…An additional percentage of the audits that are closed as undeliverable, meaning the taxpayers never had an opportunity to engage in the audit process because the audit notices could not be delivered to the taxpayer… These numbers indicate that the IRS may not be having sufficient communication with taxpayers to make full use of the audit process, which includes educating taxpayers.*

For instance, each year saw over half of all assessments closed with a default assessment (meaning that the credit was denied because the taxpayer did not respond or stopped responding), making default assessments the primary type of audit closure. The number of default assessments was largest in FY 2010, with 63.7 percent of audits closed as a default assessment and smallest in FY 2014, with 58.6 percent closed as a default assessment.[25] Audits closed with a taxpayer in agreement with the outcome also stayed relatively consistent over the five years. The highest number of cases closed with taxpayer agreement occurred in FY 2010 and FY 2013, with 14.7 percent of cases closed in agreement. The lowest measurement for cases closed in agreement occurred in FY 2011, when there were 13.3 percent of the cases closed in agreement.[26] Audits closed with a no change status (meaning that following a review of documentation submitted by the taxpayer, the IRS agreed with the taxpayer's return) peaked in FY 2014 with 12.9 percent and the lowest measurement occurred in FY 2011 with 9.5 percent of the audits closed with no change.[27]

Each fiscal year there is an additional percentage of the audits that are closed as undeliverable, meaning the taxpayers never had an opportunity to engage in the audit process because the audit notices could not be delivered to the taxpayer. For the five fiscal years, an average of 11 percent of the cases were closed as un-deliverable.[28] Overall, these numbers indicate that the IRS may not be having sufficient communication with taxpayers to make full use of the audit process, which includes educating taxpayers.

Figure 1.23.2 shows the outcome of closed audits for FY 2013. While a majority (65.2 percent) are full paid, approximately one-quarter remain open with a balance due remaining. Of those listed as currently not collectible (CNC), 23.4 percent were CNC hardship.[29] CNC hardship is a status that is used when the IRS determines that collection of the liability would leave the taxpayer unable to pay their basic living expenses.[30] Taxpayers in this category will still have their refunds offset unless they can request their refund prior to offset. This means that taxpayers whom the IRS has determined are unable to pay their outstanding liabilities may still full pay the liability because of offsets. Liabilities are more likely to be

---

25  In 2010 there were 474,024 audits and 301,818 resulted in a default assessment. In 2014, there were 435,639 audits and 255,286 resulted in a default assessment. IRS CDW, Audit Information Management System Closed Case Database.

26  In 2010, there were 474,024 audits and 68,185 were closed with taxpayer agreement. In 2011, there were 483,820 audits and 64,275 were closed with the taxpayer in agreement. *Id.*

27  In 2014, there were 435,639 audits and 56,193 were closed with no change. In 2011, there were 483,820 audits and 45,780 closed with no change. IRS CDW, Audit Information Management System Closed Case Database. Appeals closed 212 non-docketed EITC cases in FY 2012. This number totaled 196 in FY 2013, 174 in 2014, and 148 in FY 2015. Appeals did not track this information during FY 2010 or FY 2011. IRS response to TAS information request (Dec. 9, 2015). The IRS noted in its fact check response dated Dec. 16, 2015 that it considers no change cases with adjustment and certain other closures as agreed cases. Accordingly the IRS computation of its agreed cases is some percentage points higher and its computation of its no change rate is correspondingly some percentage points lower. By the IRS classification of disposal codes, FY 2014 has the highest percent of cases agreed at 21.5 percent.

28  FY 2010 had an undeliverable measurement of approximately nine percent, FY 2011 had approximately 12 percent, FY 2012 had a measurement of approximately 13 percent, FY 2013 had a measurement of approximately 12 percent, and FY 2014 had a measurement of approximately ten percent.

29  Individual Master File (IMF) as of cycle 201530, AIMS data, cases closed in FY 2013.

30  Internal Revenue Manual (IRM) 5.16.1.2, *Currently Not Collectible Procedures* (Jan. 1, 2015).

001666

paid by refund offset than by other subsequent payments.  In FY 2013, the IRS received approximately $93 million in subsequent payments but approximately $333 million from refund offsets.[31]

**FIGURE 1.23.2, Status of EITC Audited Accounts, FY 2013 Audit Closures[32]**

| Category | Count | Percent |
|---|---|---|
| Full Paid | 314,720 | 65.2% |
| Balance Due Remaining | 120,941 | 25.0% |
| Installment Agreement | 18,543 | 3.8% |
| Currently Not Collectible | 28,709 | 5.9% |
| **Total** | **482,913** | **100.0%** |

### *Internal Guidance That Encourages Acceptance of Alternative Documentation to Substantiate EITC Claims Will Help Taxpayers Eligible for the Credit*

One practice that could benefit low income taxpayers is the acceptance of alternative documentation.  The IRS has guidance for analyzing documentation submitted by taxpayers in EITC cases.  In particular, IRM 4.19.14.5.4 provides IRS employees with a chart for analyzing EITC cases involving qualifying children.[33] However, the list provided is very narrow and does not reflect the types of documentation and methods of proof that may most likely be available or best-suited for taxpayers claiming the EITC.  The current internal guidance also lacks specific instruction for tax examiners to consider alternative documentation.[34] In 2013, the National Taxpayer Advocate issued internal guidance to TAS employees related to EITC issues.[35]  This guidance included a list of 50 alternative documents that could be used to substantiate an EITC claim.[36]  While not exhaustive, it created a more flexible approach to analyzing documents in EITC cases.[37]  The IRS team dedicated to improving the EITC audit process, of which TAS is a member, will address the issue of incorporating alternative documentation into internal guidance in FY 2016.

In 2005, the IRS studied the use of affidavits as part of the EITC Qualifying Child Residency Certification Study.[38]  For the study, the IRS mailed documents to taxpayers (the test group) who had claimed the EITC with qualifying children in the previous tax year (TY), but for whom the IRS could not establish qualifying child residency through available data.  The documents sent to the taxpayer explained the certification requirements, Form 8836, *Qualifying Child Residency Statement*, an affidavit form, and educational publications.[39]  To certify his or her claim, the taxpayers in the study could submit any combination of documents described in Form 8836 (medical and school records, a letter on official letterhead,

---

31  IMF as of cycle 201526.

32  IMF as of cycle 201530.  We could not determine the current status of approximately 175 cases.

33  IRM 4.19.14.5.4, *EITC Qualifying Children* (Jan. 1, 2015).  IRS employees who are directed to IRM 4.19.14.5.6 for a list of acceptable documents to prove qualifying child.  *See id.*

34  TAS, *Memorandum for Taxpayer Advocate Service Employees, Reissuance of Interim Guidance on Advocating for Taxpayers Claiming Earned Income Tax Credit (EITC) with Respect to a Qualifying Child* (Dec. 23, 2013).

35  *Id.*

36  *Id.*

37  TAS uses the Taxpayer Assistance Order (TAO) process and provides alternative documentation while advocating for taxpayers whose EITC claims were denied by the IRS.  In FY 2014, TAS issued 24 EITC TAOs, of which the IRS complied with 21.  In FY 2015, 10 EITC TAOs were issued and the IRS complied with nine.  Data obtained from the Taxpayer Advocate Management Information System (TAMIS) (Oct. 1, 2014; Oct. 1, 2015).

38  IRS, *IRS Earned Income Tax Credit (EITC) Initiative Final Report to Congress* 7 (Oct. 2005).

39  *Id.*

001667

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1675 of 4699 PageID #: 4840

Most Serious
Problems

Most Litigated
Issues

Most Litigated
Recommendations

etc.) or the affidavit.  The study found that affidavits had the highest rate of acceptance at 82 percent, compared to an overall acceptance rate of 64 percent for all document types.[40]  The study concluded that this outcome was reasonable because affidavits had dedicated lines for all of the information, explaining "as long as the affidavit was filled out completely, it would contain all the required information to be accepted."[41]

### The EITC Audit Program Has a No-Response Rate of Over 40 Percent, Raising Questions About the Accuracy of Some Default Assessments and of the Audit's Effectiveness As an Educational Tool for Future Compliance

The EITC audit process has a fairly large non-response rate of over 40 percent.[42]  Audits are not just about correcting a specific year's tax liability.  Every audit provides an opportunity for the IRS to educate the taxpayer about errors on the return, so he or she becomes and remains compliant going forward.  If the education is effective, taxpayers not only understand whether they are eligible to claim EITC in the audit year, but they can also remain compliant or avoid future noncompliance as their circumstances change.[43]  By meeting the needs of low income taxpayers during the audit process, the IRS may improve the response rate and thus increase future compliance by educating more taxpayers.

**FIGURE 1.23.3**[44]

**FY 2014 EITC Audit Dispositions by Type of IRS Examiner**



---

40   IRS, *IRS Earned Income Tax Credit (EITC) Initiative Final Report to Congress* 33 (Oct. 2005).

41   *Id.*

42   For FY 2014, the exact no response rate is 45.6 percent.  This calculation includes 255,286 default assessments minus 99,067 default assessments that involved some taxpayer contact, bringing the total of default assessments with no taxpayer contact to 156,219.  In addition, 42,490 cases involving undeliverable mail were then added, for a total of 198,709 cases with either a default assessment and no contact or undeliverable notices.  That number divided by the total of 435,639 equals 45.6 percent and represents the portion of taxpayers who did not respond to the EITC audit.  Audit Information Management System (AIMS) Closed Case Database.

43   National Taxpayer Advocate 2013 Annual Report to Congress 110.

44   AIMS Closed Case Database.  Percentages may not total to 100 percent due to rounding.  The examiner type is based on the AIMS employee code.  It should be noted that field audits and office audits account for less than 400 of the EITC audits closed in FY 2014.  We cannot determine if the selection of EITC cases for audit by different types of employees affects the disposition of the audit.

001668

The audit outcome for a taxpayer appears to improve depending on the audit method and which type of IRS examiner handles the audit. Field audits, in which a revenue agent is assigned to the taxpayer's case, have the lowest default and undeliverable numbers. Field audits had a default closing in 35.6 percent of the cases and the audit was closed as undeliverable in 4.4 percent of the cases.[45] When compared to the average undeliverable rate for all audits above, field audits that result in an undeliverable status are approximately half as frequent. Cases worked in correspondence, which do not have an assigned employee, had a default rate of 58.6 percent and an undeliverable measurement of 9.8 percent.[46] These numbers may indicate that audit outcomes are improved when an assigned employee is working the case and it is not only based on a correspondence examination.[47]

> Audits are not just about correcting a specific year's tax liability. Every audit provides an opportunity for the IRS to educate the taxpayer about errors on the return, so he or she becomes and remains compliant going forward.

The correspondence examination process is based on an exchange of documentation and not personal interaction. Under this system, even if the IRS does receive correspondence from the taxpayer, there will be missed educational opportunities. For example, if the taxpayer receives a request for substantiating documentation and does not understand the notice, he or she may send in incomplete or irrelevant documentation. Without an employee to speak with, the taxpayer will not learn what specifically is at issue and what specific documentation is needed. Thus, an otherwise legitimate claim may be denied or reduced in amount simply because the taxpayer needed an explanation of what is at issue and what is required, in terms he or she can understand.

The IRS National Research Program (NRP) recently conducted EITC audits in order to gather information about the nature of errors taxpayers made when claiming the EITC in TYs 2006 through 2008.[48] Focused taxpayer education is one component of the NRP audit that is not present in a correspondence exam.[49] NRP audits are worked by examiners "trained to make every accommodation to meet with taxpayers, to educate them about the necessary documentation for substantiating EITC eligibility, and to give them sufficient opportunity to obtain and supply the necessary information."[50] Nearly 95 percent of the NRP audits require a face-to-face meeting with an IRS examiner.[51] On the other hand, in the correspondence examination process, education of the taxpayer is not a focus.[52] As part of a study on enhanced taxpayer communication in 2013, TAS called taxpayers who had been assessed an

---

45  AIMS Closed Case Database through August 2015. It should be noted that field audits and office audits account for less than 400 of the EITC audits closed in FY 2014. We cannot determine if the selection of EITC cases for audit by different types of employees affects the disposition of the audit.

46  AIMS Closed Case Database through August 2015.

47  It should be noted that field audits and office audits account for less than 400 of the EITC audits closed in FY 2014. We cannot determine if the selection of EITC cases for audit by different types of employees affects the disposition of the audit.

48  IRS, Research, Analysis & Statistics (RAS), *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* (Aug. 2014). The NRP "seeks to increase public confidence in the fairness of our tax system by helping the IRS identify where compliance problems occur, so that the IRS can efficiently utilize its resources to address those problems." IRM 4.22.1.3(1) (Apr. 25, 2008).

49  For a general discussion of how the lack of an assigned employee in correspondence exam harms taxpayers, see National Taxpayer Advocate 2014 Annual Report to Congress 134-44.

50  IRS, RAS, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* 8 (Aug. 2014).

51  *Id.* at 5.

52  Since correspondence exam does not assign cases to one employee, the focus in correspondence exam is to have taxpayer contact go to the next available employee instead of the employee working the case. This creates a system where the IRS employee answering the taxpayer's question may not be familiar with the taxpayer's issue or documentation. National Taxpayer Advocate 2014 Annual Report to Congress 139-40.

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1677 of 4699 PageID #:   4842

Most Serious
Problems

Most Serious
Recommendations

Legislative
Issues

EITC liability in a correspondence examination and found that less than one-quarter learned that they were ineligible during the audit compared to almost one half after contacting TAS.[53]

If the IRS wants to reach the correct conclusion in *all* of its EITC audits and simultaneously promote future voluntary compliance, it should tailor its correspondence exam process to include interaction with the taxpayer and taxpayer education. Such an approach will increase EITC compliance and instill a sense of procedural justice into the audit process. One way the IRS can accomplish this is by assigning EITC correspondence exam cases to a single employee when the taxpayer responds with some information. That way, the employee can be charged with the same responsibility for educating the taxpayer as NRP auditors are.[54] This approach may reduce the number of EITC audits (which are already a disproportionately high percentage of all individual audits), however, the effectiveness of the audit in terms of ongoing compliance may even increase the indirect effectiveness of the audit.[55] Another approach involves the use of virtual face-to-face audits, whereby the taxpayer can make an appointment and meet with the auditor virtually. This technique captures the cost savings of a centralized audit group and the benefits of face-to-face communication, which enables the auditor to establish trust with the taxpayer and to identify when the taxpayer does not understand directions or is otherwise confused.

### The IRS May Not Be Auditing the Group of EITC Returns Having the Most Non-Compliance, Thereby Diminishing the Effectiveness of IRS Efforts to Improve Future Compliance and Creating a Burden for Taxpayers

TAS analysis reveals the following issues with the way in which the IRS selects EITC cases for audit:

- The IRS relies on the Dependent Database (DDb) and does not build a workload selection model based on NRP data;

- Most NRP audits did not trip DDb rules, meaning the existing DDb rules may not be capable of capturing a complete sample of cases to audit; and

- The IRS is currently focusing on cases where the DDb rules for both residency and relationship are broken, and generally focusing only on the relationship component in these audits because it is the easiest basis for denial. Because residency is the eligibility requirement associated with three-quarters of the qualifying child errors, the IRS should consider more cases where the DDb rule for residency is the only rule broken, and also educate the taxpayer about the residency requirements when both rules are broken.

### *The IRS Relies on the DDb and Does Not Build a Workload Selection Model Based on NRP Data*

Data from the NRP show how attributes of the EITC population and the complex eligibility rules impact compliance.[56] The NRP Individual Income Tax study is based on a multi-year random sample of federal individual income tax returns. As noted earlier, the NRP audit approach is better suited than the cor-

---

53   Unpublished results from *Enhanced Communication Study*, results on file with the National Taxpayer Advocate.

54   *See* National Taxpayer Advocate 2014 Annual Report to Congress 134-144 (Most Serious Problem: *Correspondence Examination: The IRS Has Overlooked the Congressional Mandate to Assign a Specific Employee to Correspondence Examination Cases, Thereby Harming Taxpayers*).

55   IRS FY 2014 Data Book Table 9a. The audit coverage rate for all individual returns is about 0.9 percent, while the coverage rate is about 1.6 percent for EITC returns. *See also supra* note 9 regarding the number of EITC audits.

56   IRS, RAS, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* (Aug. 2014). Unlike the IRS's typical EITC audits, NRP EITC audits have a response rate of about 85 percent when a qualifying child is involved. The response rate for operational EITC audits is under 60 percent. For more information on this topic, see National Taxpayer Advocate Fiscal Year 2015 Objectives Report to Congress 123-28.

001670

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1678 of 4699 PageID #: 9343

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

respondence audit to accurately determine the audit results of the low income population by generally providing for in-person (instead of correspondence) audits. NRP data should be driving how the IRS selects EITC cases for audit, since it provides information about the sources of EITC noncompliance. Currently, however, Examination receives most of its EITC cases from the DDb.[57] In this program, returns are scored by comparing the return information against various business rules established by the IRS, with the highest-scoring returns selected for audits.

### Most NRP Audits Do Not Trip DDb Rules

TAS analyzed NRP audits that broke DDb rules and found that in TY 2008, approximately 86 percent of the NRP cases with adjustments *did not* trip a DDb rule.[58] As mentioned above, the quality of the NRP data is quite high. The IRS should use this information to reevaluate its method of selecting cases for audit and improve on its ability to identify areas of noncompliance. The following figure shows the results from 2006 through 2008 NRP audits.

**FIGURE 1.23.4**[59]



**NRP Audits Disallowing Some EITC That Broke DDb Rules**

| Year | | |
|---|---|---|
| 2006 | 82.8% did not trip DDb rules | 9,190,679 Returns where some EITC was disallowed |
| 2007 | 84.1% did not trip DDb rules | 9,624,545 Returns where some EITC was disallowed |
| 2008 | 86.4% did not trip DDb rules | 10,122,467 Returns where some EITC was disallowed |

---

57  IRM 4.19.14.1(2) (Jan. 1, 2015).

58  The DDb data comes from a Business Object interface with the DDb. The NRP and closed audit information comes from the database of NRP data stored on the IRS CDW and from the AIMS also on the IRS CDW. The NRP data is a weighted sample. TAS used a weighting scheme which did not generally assign a weight to no response cases and cases selected for audit based on the DDb score. If the weights are recomputed to include these cases, about 80 percent of the returns where EITC was disallowed did not trip DDb rules. This percentage has also dropped in subsequent years, but is still about 70 percent. IRS fact check response (Dec. 16, 2015).

59  *Id.*

001671

In other words, the IRS is concentrating its Earned Income Tax Credit (EITC) audit resources on taxpayers with a noncompliance issue that is relatively minor, compared to an issue associated with 75 percent of all EITC qualifying child errors. If the point of an audit is not just to score audit adjustments and create good statistics, but rather to educate taxpayers so they understand the rules and voluntarily comply in the future, then IRS EITC audit strategy is ineffective.

### The IRS Should Consider More Cases Where the DDb Rule for Residency Is the Only Rule Broken

NRP data shows that approximately 75 percent of children claimed in error failed the residency test and only about 20 percent failed the relationship test.[60] TAS further analyzed DDb audits for TY 2012, and preliminary data show that approximately 70 percent of the returns selected for audit failed both the residency and relationship DDb audit rules. However, EITC returns with qualifying children that DDb indicates as not meeting the residency and relationship rules only comprise 23 percent of all returns that broke an EITC DDb rule.[61] TAS also found that only 11 percent of the audited returns broke the DDb rules for residency but not relationship for all children claimed, even though these returns represent about 31 percent of the returns that failed or partially failed a DDb test.[62] The data suggest that the IRS should focus some of its audit efforts on returns that have qualifying children with only residency issues, instead of primarily focusing on returns with qualifying children having both relationship and residency issues. In other words, the IRS is concentrating its EITC audit resources on taxpayers with a noncompliance issue that is relatively minor, compared to an issue associated with 75 percent of all EITC qualifying child errors. If the point of an audit is not just to score audit adjustments and create good statistics, but rather to educate taxpayers so they understand the rules and voluntarily comply in the future, then the IRS EITC audit strategy is ineffective.

### Analysis of DDb Data Shows It Is Not Detecting Most Noncompliant Taxpayers

TAS also compared NRP data to DDb data. Preliminary results suggest that based on residency and relationship, most noncompliant taxpayers were not detected by the DDb. The NRP EITC study indicates that qualifying child errors are the most expensive, and account for at least 42 percent of the overclaims.[63] The NRP study involved a random sample of returns weighted to reflect the taxpayer population.[64] On the other hand, the IRS EITC audit population includes EITC returns that tripped the DDb rules. Of all returns in the NRP EITC study (which includes data from TYs 2006 through 2008) with at least one child failing EITC eligibility for residency, only approximately 25 percent also failed a DDb residency rule (for at least one child). Likewise, of all the returns in the NRP EITC study with at least one child failing EITC eligibility for relationship, only 28 percent also failed a DDb relationship rule.

---

60   IRS, RAS, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* 22-23 (Aug. 2014).

61   The DDb data comes from a Business Object interface with the DDb. The NRP and closed audit information comes from the database of NRP data stored on the IRS CDW and from the AIMS also on the IRS CDW. In order for a taxpayer to claim a child with the EITC, that child must be a "qualifying child" as defined by IRC § 152(c). Two aspects of qualifying child include relationship and residency. To be related, the child must be the child of the taxpayer or a descendent of such a child or a brother, sister, stepbrother, stepsister of the taxpayer or a descendent of any such relative. IRC § 152(c)(2). This includes relationships by marriage and by law, such as adoptions. The residency test generally requires that the child live with the taxpayer for more than half of the tax year. IRC § 152(c)(1)(B). The DDb also selects returns for audit because the taxpayer is required to recertify EITC eligibility because of prior non-compliance with EITC eligibility rules.

62   The DDb data comes from a Business Object interface with the DDb. The NRP and closed audit information comes from the database of NRP data stored on the IRS CDW and from the AIMS also on the IRS CDW.

63   IRS, RAS, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* iv (Aug. 2014).

64   *Id.* at 5.

001672

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1680 of 4699 PageID #:  3845

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

According to this NRP analysis, most returns failing EITC residency and relationship requirements are not being detected by the DDb rules.  As noted above, the NRP study indicates that qualifying child errors are the most expensive EITC errors.  NRP data also show that nearly three-quarters of the qualifying child errors stem from failing the residency requirements, while less than 25 percent result from relationship requirements.[65]  However, the IRS does not have significant audit coverage of those who only fail EITC residency rules.  By not selecting the most appropriate cases for audit, the IRS is missing many opportunities that could truly impact compliance, overlooks educational opportunities, and continues to allow erroneous claims to be filed.

## CONCLUSION

A poorly designed EITC audit program results in lost opportunities to educate taxpayers and thus improve voluntary compliance, thereby reducing the improper payment rate.  Under the present correspondence exam program, taxpayers whose EITC is correctly disallowed in one year do not learn about EITC eligibility rules and, as a result, may not claim the EITC in a future year in which they are eligible.  Given that many low income taxpayers are not equipped to deal with the complexity of the EITC, the IRS should redesign its audit strategy to take into consideration how best to reach these taxpayers, how they respond to various types of outreach and education, how they prefer to receive service from the IRS, and how well they can comply with the EITC requirements and instructions.[66]  The approach should foster engagement, valuing education and future compliance over assessed dollars.

The IRS should also consider how it selects EITC cases for audit so that the cases with the largest impact are being reviewed.  Examination receives most of its EITC cases from the DDb.  However, TAS research indicates that this approach alone may not identify the most appropriate cases for audit, which impacts EITC noncompliance.

---

65  IRS, RAS, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* v (Aug. 2014); *supra* note 60.

66  *See* National Taxpayer Advocate 2009 Annual Report to Congress 117.

001673

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Conduct an EITC pilot with three different treatments: a regular correspondence examination, an office audit, and a correspondence examination with one auditor assigned. The pilot should measure the following: direct time on case, no response/drop-out rate, agreed to rate, audit reconsideration rate, and future compliance rate.

2. When an EITC taxpayer calls the IRS with information in response to an audit, one employee should be assigned to the taxpayer's case until it is resolved. If the taxpayer calls back, he or she could have the option to speak to the next available employee or wait for the assigned employee to call back. The IRS should hire employees with a social work background or train existing auditors to conduct the audits.

3. Use NRP data to design a formula for workload selection in addition to (or incorporated into) the DDb that will reach the audits with the most impact for taxpayer education and improvement to future compliance. This would include qualifying child errors that involve the residency test.

4. Revise the IRM with the list of additional documentation listed in the TAS IGM, as well as IRM updates about accepting alternative EITC substantiating documentation.

5. Publish and accept Form 8836, *Third Party Affidavit*, for purposes of substantiating the residency requirement for a qualifying child.

6. Collaborate with TAS to draft IRM guidance requiring correspondence examiners to adjust accounts for the childless worker credit when the taxpayer is ineligible for the EITC with children. This should be done automatically without requiring the taxpayer to request the credit.

**MSP
#24**

# EARNED INCOME TAX CREDIT (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance

## RESPONSIBLE OFFICIALS

Karen Schiller, Commissioner, Small Business/Self-Employed Division
Debra Holland, Commissioner, Wage and Investment Division

## TAXPAYER RIGHTS IMPACTED[1]

- ■ *The Right to Be Informed*
- ■ *The Right to Pay No More Than the Correct Amount of Tax*
- ■ *The Right to a Fair and Just Tax System*

## DEFINITION OF PROBLEM

The Earned Income Tax Credit (EITC) is one of the primary forms of public assistance for low income working taxpayers. To receive the benefits, the taxpayer must have earned income and file a tax return.[2] The determination of EITC eligibility is very complex and is difficult to navigate by taxpayers who are more likely to have lower literacy rates, to speak English as a second language, and to have a nontraditional family structure (where the child is not the biological child of the taxpayer claiming the credit). Fifty-five percent of returns claiming EITC were prepared by paid return preparers in tax year (TY) 2013.[3] Equally important, one IRS study showed unenrolled return preparers had the highest frequency and percentage of EITC overclaims, with 49 percent of those EITC returns containing an overclaim, and overclaims amounting to 33 percent of the total EITC claimed on those returns.[4]

Despite the involvement of so many paid preparers, the EITC suffers from a high noncompliance rate.[5] The problem of noncompliant return preparers contributing to the EITC error rate is well documented.

---

1 *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2 The design of the EITC contains a phase-in, plateau, and phase-out state. Generally as the amount of income increases, the amount of EITC increases. At a certain point the EITC amount plateaus in relation to the amount of income (the taxpayer's income can increase while he or she receives the maximum amount of EITC) and then phases out as the EITC decreases with a decrease in income. In tax year (TY) 2014, taxpayers filing a joint return with three or more kids were ineligible for the EITC with earnings of $53,269. Rev. Proc. 2014-61, 2014-47 I.R.B. 860.

3 *The National Taxpayer Advocate's 2014 Annual Report to Congress: Hearing Before the Subcomm. on Government Operations of the H. Comm. on Oversight and Reform*, 114th Cong. 28, *Figure 4: Taxpayers Claiming Refundable Credits, Claim Amounts, and Preparer Usage, Tax Years 2010-2013* (2015) (written statement of Nina E. Olson, National Taxpayer Advocate).

4 IRS, Research, Analysis & Statistics, *Compliance Estimates for the Earned Income Tax Credit Claimed on 2006-2008 Returns* 26 (Aug. 2014). These numbers represent the lower bound estimates. This measure is likely to be low because it does not account for preparers who do not sign the returns they prepare. *The National Taxpayer Advocate's 2014 Annual Report to Congress: Hearing Before the Subcomm. on Government Operations of the H. Comm. on Oversight and Reform*, 114th Cong. 28 (2015) (written statement of Nina E. Olson, National Taxpayer Advocate).

5 The current improper payment rate of 27 percent has increased slightly from the improper payment rate in 2004, which measured 25 percent. Treasury Inspector General of Tax Administration (TIGTA), Ref. No. 2015-40-044, *Assessment of Internal Revenue Service Compliance With the Improper Payment Reporting Requirements in Fiscal Year 2014* 9 (Apr. 27, 2015).

001675

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

Case 1:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1683 of 4699 PageID #: 4848

In 2014, the Government Accountability Office (GAO) conducted 19 undercover visits to randomly selected tax preparer offices. Only two of the 19 tax returns showed the correct refund amount.[6]

Since 2002, the National Taxpayer Advocate has highlighted the need to protect taxpayers from non-compliant return preparers.[7] Based on a review of the IRS's existing EITC Return Preparer Strategy, the National Taxpayer Advocate has identified several concerns:

- Preparers who do not sign the returns and preparers who are the subject of complaints to the IRS Return Preparer Office (RPO) are not incorporated into the EITC Return Preparer Strategy;

- The public does not have access to the IRS's measures for evaluating the effectiveness of the strategy; and

- The EITC Return Preparer Strategy does not sufficiently focus on the unenrolled preparer population which, combined with a comprehensive public education campaign, is critical to improving EITC noncompliance.

Moreover, the EITC Return Preparer Strategy group does not partner with TAS, despite our extensive research into the role of return preparers in facilitating compliance, and our role as overseer of Low Income Taxpayer Clinics (LITC), which have keen insights and evidence of return preparer conduct with respect to EITC.

## ANALYSIS OF PROBLEM

### Background

The EITC and Refundable Credits Policy and Coordination (ERCPC) unit is charged with "developing and coordinating delivery of the EITC Return Preparer Strategy" within the Wage and Investment (W&I) Division.[8] ERCPC lists many key IRS partners and stakeholders, including W&I Chief Counsel, Criminal Investigation Refund Crimes, W&I Campus Compliance, W&I Research & Analysis (WIRA), the RPO, and TAS.[9] However, the IRS has not involved TAS in the development or implementation of the EITC Return Preparer Strategy.

---

6   GAO, *Paid Tax Preparers: In a Limited Study, Preparers Made Significant Errors* 9 (Apr. 8, 2014). The National Consumer Law Center also conducted similar "mystery shopper" testing in 2010 and found "incompetence and fraud" in about 30 percent of the tests. *Protecting Taxpayers From Incompetent and Unethical Return Preparers, Hearing Before the S. Comm. on Fin.*, 113th Cong. 39 (2014) (statement of Chi Chi Wu, staff attorney, National Consumer Law Center).

7   National Taxpayer Advocate Fiscal Year 2015 Objectives Report to Congress 71-78; National Taxpayer Advocate 2013 Annual Report to Congress 61-74 (Most Serious Problem: *Regulation of Return Preparers: Taxpayers and Tax Administration Remains Vulnerable to Incompetent and Unscrupulous Return Preparers While the IRS Is Enjoined From Continuing Its Efforts to Effectively Regulate Unenrolled Preparers*); National Taxpayer Advocate 2009 Annual Report to Congress 41-69 (Most Serious Problem: *The IRS Lacks a Servicewide Return Preparer Strategy*); National Taxpayer Advocate 2008 Annual Report to Congress 504-12 (Most Litigated Issue: *Accuracy-Related Penalty Under Internal Revenue Code Sections 6662(b)(1) and (2)*); National Taxpayer Advocate 2006 Annual Report to Congress 197-221 (Most Serious Problem: *Oversight of Unenrolled Return Preparers*); National Taxpayer Advocate 2005 Annual Report to Congress 223-37 (Most Serious Problem: *Regulation of Electronic Return Originators*); National Taxpayer Advocate 2004 Annual Report to Congress 67-88 (Most Serious Problem: *Oversight of Unenrolled Return Preparers*); National Taxpayer Advocate 2003 Annual Report to Congress 270-301 (Legislative Recommendation: *Federal Tax Return Preparers: Oversight and Compliance*); National Taxpayer Advocate 2002 Annual Report to Congress 216-30 (Legislative Recommendation: *Regulation of Federal Tax Return Preparers); Protecting Taxpayers From Incompetent and Unethical Return Preparers, Hearing Before the S. Comm. on Fin.*, 113th Cong. 7 (2014) (statement of Nina E. Olson, National Taxpayer Advocate); *Fraud in Income Tax Return Preparation: Hearing Before the Subcomm. on Oversight of the H. Comm. on Ways and Means*, 109th Cong. (2005) (statement of Nina E. Olson, National Taxpayer Advocate).

8   Internal Revenue Manual (IRM) 1.1.13.6.4.2(3) (Oct. 7, 2013).

9   IRS response to TAS information request (June 24, 2015). Though TAS is listed on the response as a stakeholder, it has not been included in any meetings since inception of the EITC Return Preparer Strategy.

001676

Prior to fiscal year (FY) 2012, the EITC Return Preparer Strategy primarily focused on treating preparers through methods described below after the filing season. Beginning in 2011, the IRS implemented a "real time" preparer intervention program. Instead of waiting until the end of the filing season to identify and treat preparers, preparers are also scored on a daily basis and treatments are administered in real time.[10] Once prior year compliance activities conclude and the analysis is complete, the Refundable Credits Administration (RCA) office, WIRA, and Office of Compliance Analytics (OCA) meet to score and select preparers for the next fiscal year's pre-filing season treatments.[11] Once the filing season starts, filing season treatments begin and preparers whose scores meet the threshold and who have a given volume of EITC returns prepared are selected daily for the filing season treatments.[12] The scoring is based on four criteria that relate to breaking a Dependent Database (DDb) rule related to the amount of the EITC relative to the number of qualifying children or a DDb rule related to disabled qualifying children.[13]

The EITC Return Preparer Strategy Office says that it is "always striving for improvement in all areas of the program" by implementing prior year lessons and testing new ideas.[14] The EITC Return Preparer Strategy uses a "test and learn" approach that involves experimenting with different combinations of new and traditional compliance tools that are reviewed on an annual basis.[15] For instance, in its FY 2015 annual report, the Strategy described an iterative "pre-filing season treatment delivery process" that increased the contact rate from approximately 70 percent to nearly 95 percent.[16]

The EITC Return Preparer Strategy uses various tools at its disposal for preparers of questionable EITC claims, referred to as "treatments."[17] Preparers are identified in the pre-filing season and, if there are no signs of improvement, then more intensive treatment continues into the filing season.[18] Treatments include:

- *Reaching out to preparers via letter and phone contact* – letters are sent both during the pre-filing season and filing season as a warning and to educate preparers;

- *"Knock and talk" visits* – educational visits conducted by an SB/SE agent and a special agent from Criminal Investigation (CI);

- *Visits and audits for preparer due diligence* – audits of high risk preparers conducted by SB/SE employees to ascertain compliance with due diligence requirements under Internal Revenue Code (IRC) § 6695(g);[19] and

---

10  IRS response to TAS information request (June 24, 2015).

11  IRS response to TAS information request (Oct. 21, 2015). These meetings occur in mid-summer and the pre-filing season activities generally start on October 1. *Id.*

12  *Id.*

13  IRS response to TAS information request (June 24, 2015). The DDb addresses non-compliance relevant to the EITC and other tax benefits related to the dependency and residency of children. The IRS claims the DDb consistently applies the tax laws to a return claiming EITC as well as other tax issues, such as dependent exemptions, filing status, Child and Dependent Care Credit, Child Tax Credit, and education benefits, are addressed concurrently. IRM 4.19.27.2.3, *Dependent Database (DDb)* (Mar. 19, 2015). However, it is possible that a return could break a DDb rule but the taxpayer could still be eligible for the EITC. *See The Public Does Not Have Access to the IRS's Measures for Evaluating the Effectiveness of the EITC Return Preparer Strategy, infra.*

14  IRS response to TAS information request (June 24, 2015).

15  *Id.*

16  WIRA, *Fiscal Year 2015 EITC Return Preparer Analysis Summary* 2 (June 15, 2015).

17  IRS, Refundable Credits Administration Return Integrity and Compliance Services, *Overview of EITC Return Preparer Program* 3 (May 7, 2015).

18  *Id.*

19  IRS response to TAS information request (June 24, 2015).

Case 1:20-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1685 of 4699 PageID #: 4850

Most Serious
Problems

Most Serious
Recommendations

Most Serious
Issues

■ *Injunctions against paid preparers* – the Department of Justice (DOJ) may seek an injunction against a preparer, which prevents that individual from "engaging in specified misconduct or from preparing tax returns for others."[20]

For the purpose of the EITC Return Preparer Strategy, an EITC preparer is a return preparer who files 25 or more EITC returns.[21]   All preparers who meet this definition are scored.  Based on this score, the preparer may receive a compliance treatment.[22]  Allocation of resources and geographical limitations are also considered when determining treatments.[23]

### Reaching Out to Paid Tax Preparers by Letter

Figure 1.24.1 shows the types and number of letters sent to preparers for FYs 2013 through 2015.

**FIGURE 1.24.1, Pre-Filing and Filing Season Education and Compliance Letters for FYs 2013–2015**[24]

| Letter Number | Type | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|
| Pre-Filing | | | | |
| 4833 | Compliance | 10,673 | 10,892 | 7,261 |
| 4833-A | Educational | n/a | n/a | 8,473 |
| 5138 | Compliance | n/a | n/a | 1,734 |
| 5025-C | Educational | 985 | 2,856 | 479 |
| 5025-D | Educational | n/a | 1,351 | 572 |
| 5025 (no alpha) | Educational | 966 | 994 | 644 |
| 5025-Q | Educational | 953 | 522 | 2,182 |
| Filing | | | | |
| 4858 | Compliance | 1,866 | 2,272 | 3,796 |
| 5138 | Compliance | 736 | 867 | 1,015 |
| 5364/Alert | Missing Form 8867 Letter & e-File Alert | 6,667 | 6,526 | 15,935 |
| **Total Number Sent** | | **22,846** | **26,280** | **42,091** |

Pre-filing season letters are sent to preparers who prepared questionable EITC returns during the previous year.  Filing season letters are sent to preparers whose due diligence compliance does not improve while the filing season is underway.[25]  Preparers who do not receive their pre-filing season letter because it was

---

20  See Dep't of Justice, *Program to Shut Down Schemes and Scams, available at* http://www.justice.gov/tax/injunctions.htm.  The DOJ can also pursue criminal prosecution.  Since this is not an area worked by the EITC Preparer Strategy, it will not be covered in this discussion.

21  This amount is through cycle 26 of the current tax year.  An EITC return is defined as a tax return "with at least one dollar claimed and/or received in EITC based on at least one qualifying child for a tax year."  IRS response to TAS information request (June 24, 2015).

22  IRS response to TAS information request (June 24, 2015).

23  *Id.*  By limiting compliance treatments only to preparers who prepare 25 or more returns, the pool of preparers who do not sign returns will not receive a compliance treatment, an issue discussed in more detail below.

24  IRS response to TAS information requests (June 24, 2015 and Oct. 26, 2015).

25  IRS response to TAS information request (June 24, 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1686 of 4699 PageID #: 8651

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

undeliverable, will receive a follow up phone call.[26]  Undelivered letters do pose a problem for an effective treatment.  In FY 2012, the non-delivery rate for Letter 4833 was 24 percent and the rate rose to 36 percent in FY 2014.[27]  The Strategy has attempted to resolve this by recommending such things as the use of an internal database to reduce outdated addresses and sending uncertified letters.[28]

> When developing educational and compliance letters, the IRS should look to the concept of "responsive regulation," which is explained by Australian researcher Valerie Braithwaite to mean that regulators, such as the IRS, should be "responsive to the conduct of those they seek to regulate in deciding whether a more or less interventionist response is required."

Currently, the EITC Return Preparer Strategy intends to use educational letters to inform less egregious preparers of due diligence requirements and possible consequences of filing inaccurate EITC returns.[29]  Compliance letters are intended to emphasize the penalty and consequences that may result from returns with EITC errors.[30]  There are opportunities to make these letters more effective, as described in more detail below.

When developing educational and compliance letters, the IRS should look to the concept of "responsive regulation," which is explained by Australian researcher Valerie Braithwaite to mean that regulators, such as the IRS, should be "responsive to the conduct of those they seek to regulate in deciding whether a more or less interventionist response is required."[31]  Braithwaite uses a "regulatory pyramid" that includes the least intrusive actions at the bottom and most intrusive at the top.[32]  The idea is that taxpayers generally will comply at the least intrusive step but if not, more intrusive actions can be taken.  Applying this theory to the Strategy's current letters demonstrates some deficiencies.

For instance, Letter 4858, *Return Preparer Filing Season - 2015*, a compliance letter, informs preparers that a review of current year returns filed by the preparer "indicates you may have prepared inaccurate returns for your clients," but does not provide information on the exact nature of the errors being made by the preparer, thus limiting its effectiveness in getting preparers to avoid these errors in the future.[33]  There is no reason why "compliance" letters should not be educational.  In fact, to get preparers to modify their behavior, the letter should inform the preparer of the errors they are making.

The 5025 series of letters informs the preparer of the reason for noncompliance in a very general manner.  If the primary issue identified is questionable income and expenses on Schedule C, *Profit or Loss from Business*, the preparer may receive Letter 5025-C, *You May Have Prepared Inaccurate EITC Returns with Self-Employment Income*.  When the primary issue identified involves claiming children who are permanently or totally disabled, the preparer may receive Letter 5025-D, *You May Have Violated Tax Law By Preparing Inaccurate EITC Returns*.  If the primary issue is claiming qualifying children, the preparer may receive Letter 5025-Q, *You May Have Prepared Inaccurate EITC Returns Based on Questionable Qualifying*

---

26  IRS, Refundable Credits Administration Return Integrity and Compliance Services, *Overview of EITC Return Preparer Program* 3 (May 7, 2015).

27  WIRA, *Fiscal Year 2014 EITC Return Preparer Analysis Summary* 29 (June 20, 2014).  The primary reasons for being undeliverable include the letter being unclaimed and the address being outdated.  *Id.*

28  *Id.* at 30.

29  IRS response to TAS information request (Nov. 5, 2015).

30  *Id.*

31  Valerie Braithwaite, *Responsive Regulation and Taxation: Introduction*, 29 LAW & POL'Y 3, 4 (Jan. 2007).

32  *Id.*

33  IRS, Letter 4858, *Return Preparer Filing Season – 2015* (Nov. 2015).

The lack of distinction between educational and compliance letters indicates the IRS does not have a comprehensive strategy with respect to letters. In most instances the IRS has not designed the letters to make clear what behavior the preparer should change going forward. It also has not designed the letters so that successive letters make clear to the preparer that the stakes for noncompliance are being raised.

*Children.* However, the preparer will not learn what particular error he or she is making.

There also appears to be little difference between compliance and educational letters. Without a clear distinction between education and compliance, preparers may not realize they are receiving a communication meant to ramp up their regulation (and consequences). For instance, Letter 4833 was the "compliance" letter most frequently mailed during the pre-filing season in FY 2015. The language in Letter 4833 is similar in many aspects to Letter 4833-A, which was the primary "educational" letter sent during the filing season in FY 2015. The opening section of both letters informs the preparer that the IRS has reviewed returns they prepared and the review "indicates you may have prepared inaccurate returns for your clients. Intentionally disregarding EITC tax laws could result in penalties and other consequences for you as the paid preparer and for your clients." Letter 4833-A, the educational letter, contains additional information to explain to the preparer that if inaccurate returns continue to be prepared, the preparer may face a penalty or an audit and his or her clients could face repercussions.

Figures 1.24.2 and 1.24.3 compare the language in Letters 4833 and 4833-A.

001680

Most Serious Problems

**FIGURE 1.24.2**[34]

IRS Letter 4833, *EITC Return Preparer Pre-Filing Season Alert*, page 1 and Letter 4833-A, *EITC Tax Return Preparer Alert*, page 1

---

34  IRS, Letter 4833, *EITC Return Preparer Pre-Filing Season Alert* (Aug. 2014); IRS, Letter 4833-A, *EITC Tax Return Preparer Alert* (Sept. 2015).

Case 1:25-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1689 of 4699 PageID #: 4854

Most Serious
Problems

Legislative
Recommendations

Most Litigated
Issues

**FIGURE 1.24.3**[35]

**IRS Letter 4833, *EITC Return Preparer Pre-Filing Season Alert*, page 2 and Letter 4833-A, *EITC Tax Return Preparer Alert*, page 2**

We will continue to monitor the EITC returns you prepare. If the accuracy of these EITC returns does not improve, you may be subject to special follow-up procedures, including the possibility of an on-site audit.

Thank you for your cooperation.

Sincerely,

Michael C. Beebe
Deputy Director
Return Integrity & Compliance Services

Enclosures:
Publication 4687

Letter 4833 (Rev. 8-2014)
Catalog Number 58827T

Your clients:
• May be audited after we issue their refunds. If we determine your clients don't qualify for the EITC, they must repay the overpayments, plus interest.
• May be unable to claim the EITC for 2 years if the claim was due to reckless or intentional disregard of the EITC rules, or 10 years if the claim was due to fraud.

For additional information:
• Review Publication 4687, *EITC Due Diligence Brochure*, at www.irs.gov/formspubs.
• Visit our website at www.eitc.irs.gov and click on "Tax Preparer Toolkit."
• Visite www.eitc.irs.gov o ingrese las palabras claves "Letter 4833-A(SP)" para leer esta carta en español.

We will continue to monitor future EITC returns you prepare to ensure you're meeting your EITC due diligence requirements.

This letter is for your information only. You don't need to respond.

If you have questions, you can contact us via e-mail at the address listed above. For security purposes, don't include any client information if you contact us by e-mail. Include your telephone number and the hours we can reach.

Please note that we're unable to provide you with the specific returns that appear to be questionable.

Sincerely,

Steven C. Klingel
Director, Refundable Credits
Policy & Program Management

Letter 4833-A (Rev. 9-2015)
Catalog Number 67320V

35   IRS, Letter 4833, *EITC Return Preparer Pre-Filing Season Alert* (Aug. 2014); IRS, Letter 4833-A, *EITC Tax Return Preparer Alert* (Sept. 2015).

001682

In order for this correspondence stage of the EITC Return Preparer Strategy to be effective, there should be a distinct difference when the preparer receives a compliance letter after receiving an educational letter. Letter 5138, a compliance letter, comes closest to accomplishing this goal. It informs the preparer that some of their clients are being audited for their EITC claims and reminds the preparer that "failure to comply with the due diligence requirements when preparing client returns for EITC claims can adversely affect you and your clients."[36]

Letter 5364 is not categorized as either educational or compliance. This letter informs the preparer that he or she failed to attach Form 8867, *Paid Preparer's Earned Income Credit Checklist*, and may be subject to penalties and other actions.[37] Most importantly, it provides the preparer with a list of incomplete returns. Thus, the letter warns the taxpayer of *specific* consequences for failing to comply with his or her *specific* obligations under the law, and alerts the preparer to *specific* returns the IRS considers incomplete. This gives the preparer clear information with which to modify behavior; moreover, failure to modify behavior in the face of such information and warning is a good indicator that the preparer is negligent. This would set up the next stage of the compliance strategy, namely Due Diligence penalties. However, it will only be effective if the IRS follows up with those preparers who ignore the letter.

The lack of distinction between educational and compliance letters indicates the IRS does not have a comprehensive strategy with respect to letters. In most instances the IRS has not designed the letters to make clear what behavior the preparer should change going forward. It also has not designed the letters so that successive letters make clear to the preparer that the stakes for noncompliance are being raised.

As described above, the IRS will send a pre-filing season letter to a preparer based on the previous year's returns.[38] Additional letters are sent if the preparer does not improve.[39] It was not possible for TAS to determine precisely how the IRS determined which letters would be sent each year. TAS assumes a process is in place since the approach taken between FYs 2013 and 2015 has changed. A TAS review of unpublished EITC Return Preparer Strategy reports shows that the Strategy does conduct reviews that cover distinct issues related to various letters. However, TAS has not been able to locate a year-to-year review of the effectiveness of all letters, or any analysis of whether single letters or a sequence of letters are more or less effective in improving EITC compliance. Without such an analysis, it is impossible to determine the effectiveness of the IRS's EITC letter strategy.

### Due Diligence Requirements

Congress has recognized the role that paid preparers play in EITC compliance by imposing a penalty on preparers if they fail to comply with due diligence requirements.[40] IRC § 6695(g) provides that any tax return preparer who files a return or claim of refund involving the EITC and who fails to comply with due diligence requirements, will be liable for a penalty of $500 for each failure.[41] To meet the due diligence requirements, the preparer must complete Form 8867, *Paid Preparer's Earned Income Credit*

---

36  IRS, Letter 5138, *Return Preparer EITC Client Audit Notification* (Sept. 2015).

37  IRS, Letter 5364, *Warning to EITC Return Preparers - Missing Forms 8867* (Dec. 2015).

38  IRS response to TAS information request (June 24, 2015).

39  *Id.*

40  IRC § 6695(g). This duty also extends to determining the correct amount of credit allowed. *Id.* Recently, a law was enacted which would require the IRS to conduct a study of the effectiveness of the return preparer due diligence requirements on EITC claims (in addition to Child Tax Credit and American Opportunity tax credit claims). Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 § 207 (2015).

41  The United States-Korea Free Trade Agreement Implementation Act, Pub. L. No. 112–41, § 501, 125 Stat. 428, amended IRC § 6695(g) by increasing the amount of the penalty from $100 to $500 for returns filed after December 31, 2011.

*Checklist*, and include it with the return.[42]  The form is to be completed based on information provided by the taxpayer or "otherwise reasonably obtained" by the preparer.[43]  TAS first recommended requiring a signed Form 8867 be attached to each tax return back in 2003.[44]  The IRS finally adopted this recommendation for tax returns filed after December 31, 2011.[45]

To meet the knowledge requirement on Form 8867, the preparer must attest that he or she did not know or have reason to know that any information he or she relied on to determine eligibility for the EITC (and the amount of credit) is incorrect.  The preparer is instructed to not ignore implications of any information provided and to ask questions if any of the information provided seems to be "incorrect, inconsistent, or incomplete."[46]

### "Knock and Talk" Visits

A more advanced treatment for noncompliance attributable to a return preparer is the "knock and talk" visit.  This treatment consists of an educational visit by a team made up of a revenue agent and a criminal investigator.[47]  During these visits the IRS employees discuss EITC laws and due diligence requirements.[48]  As shown in figure 1.24.4, the number of Knock and Talk visits has decreased from 109 in FY 2013 to 94 in FY 2015.

### FIGURE 1.24.4, EITC Preparer Compliance Treatments, FY 2013–2015[49]

| | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|
| **Preparer Penalty Cases** | | | |
| Due Diligence Audits | 734 | 601 | 815 |
| Missing Form 8867 | 771 | 224 | 130 |
| **Number of Returns Resulting in Proposed Preparer Penalties** | | | |
| Due Diligence Audits | 35,886 | 51,034 | 62,914 |
| Missing Form 8867 | 26,655 | 5,688 | 4,191 |
| **KTV and DDV Conducted** | | | |
| Due Diligence Audits | 867 | 736 | 956 |
| Knock and Talk Visits | 109 | 96 | 94 |

### Audits of Preparer Due Diligence

As mentioned above, IRC § 6695(g) provides that any tax return preparer who files a return or claim of refund involving the EITC and who fails to comply with due diligence requirements, will be liable for a

---

42  Treas. Reg. § 1.6695-2.

43  *Id.*

44  National Taxpayer Advocate 2003 Annual Report to Congress 272.  *See also* National Taxpayer Advocate 2009 Annual Report to Congress 56.

45  Treas. Reg. §§ 1.6695-2(b)(1) and 1.6695-2(e).

46  IRS Form 8867, *Paid Preparer's Earned Income Credit Checklist* 3 (2013).

47  IRS, Refundable Credits Administration Return Integrity and Compliance Services, *Overview of EITC Return Preparer Program* 3 (May 7, 2015).

48  *Id.*

49  IRS response to TAS information requests (June 24, 2015 and Oct. 26, 2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1692 of 4699 PageID #:

Most Serious
Problems

Most Serious
Issues

Most Litigated
Issues

Legislative
Recommendations

penalty of $500 for each failure. Beginning in FY 2013, the IRS also began proposing penalties for EITC returns submitted without Form 8867, *Paid Preparer's Earned Income Credit Checklist*.[50]

The EITC Return Preparer Strategy includes audits on preparers' adherence to due diligence requirements. When the examiner determines that the preparer did not comply with the due diligence requirements, the due diligence penalty is assessed.[51] Figure 1.24.4 shows that the number of returns resulting in a proposed penalty has increased from 35,886 in FY 2013 to 62,914 in FY 2015.

The Treasury Inspector General for Tax Administration (TIGTA) conducted a review of due diligence audits in 2010. Its findings highlighted several areas for improvement, including inadequate case documentation and potentially ineffective reviews by group managers.[52] The IRS reports that case reviews are conducted annually to identify areas of improvement and training materials are revised to address problem areas.[53] One example is training material for SB/SE examiners covering EITC due diligence visits, which emphasized the need for adequate workpapers to support the conclusions in the case.[54]

When compared to Knock and Talk visits, a due diligence audit is more burdensome for both the IRS and the preparer. According to the idea of "responsive regulation," the Strategy generally should apply the less burdensome approach first. However, the Strategy has reduced the amount of Knock and Talk visits while increasing due diligence audits. An internal review of the Strategy's annual reports shows that the IRS annually tracks the "effectiveness" of each treatment. However, as discussed in more detail below, the IRS's measures of "effectiveness" may not be the best ones for tracking preparer compliance. Before the Strategy decides to forego a less intensive form of treatment, it should fully study long term preparer compliance associated with each treatment to ensure it is efficiently achieving a change in preparer behavior.

### Tracking EITC Return Preparer Improvement After Treatment

The EITC Return Preparer Strategy maintains a database of every preparer who has received a treatment (or attempted treatment) since FY 2012.[55] The progress of individual preparers does not appear to be the emphasis when measuring the change in tax return preparer behavior. In order to quantify the benefit of treatments, WIRA applies the same four criteria used in the scoring process.[56] WIRA compares the change in performance of a control group with that of the treated preparers from one filing season to the next.[57] The difference in the year-to-year change in performance between the two groups is attributed to the treatments.[58] This analysis is conducted on each treatment type to determine its effectiveness.[59]

One concern with this approach is that once in the treatment system, not all preparers continue to be tracked. While the EITC Return Preparer Strategy maintains that it monitors all preparers who receive treatment, this monitoring only applies if the preparer continues to show up as a preparer. An

---

50   IRS response to TAS information request (June 24, 2015).
51   Preparers have the right to appeal a proposed penalty assessment. IRM 20.1.6.19.1, *Pre-Assessment Appeal Rights—IRC 6694, IRC 6695, IRC 6707A, and IRC 6713* (May 16, 2012). Between TYs 2008 and 2013, Appeals abated approximately $1.7 million in penalty assessments. IRS response to TAS information request (Dec. 2, 2015).
52   TIGTA, Ref. No. 2010-40-116, *Actions Can Be Taken to Improve the Identification of Tax Return Preparers Who Submit Improper Earned Income Tax Credit Claims* 10 (Sept. 14, 2010).
53   IRS response to TAS information request (June 24, 2015).
54   IRS response to TAS information request (Oct. 21, 2015).
55   *Id.*
56   *Id.*
57   The control group is randomly assigned amongst the preparers in each treatment stream. *Id.*
58   *Id.*
59   *Id.*

unscrupulous preparer may "go underground" once they receive a high level of treatment. Such a preparer would no longer be tracked by the EITC Return Preparer Strategy. While it may be resource intensive, the EITC Return Preparer Strategy should continue to track all preparers who have received treatment while introducing new preparers each year. As discussed in more detail below, the EITC Return Preparer Strategy should not just focus its measure of success on return on investment and dollars saved, but actual long term improvement in preparer compliance.

### Given the Stagnant EITC Improper Payment Rate, Several Areas of the EITC Return Preparer Strategy Can Be Revised to Improve Its Effectiveness

As mentioned above, the percentage of EITC improper payments remains practically unchanged over the last decade.[60] The current improper payment rate of 27 percent has increased slightly from the improper rate in 2004, which measured 25 percent.[61] Based on a review of the existing EITC Return Preparer Strategy, the National Taxpayer Advocate has identified several concerns discussed in detail below.

#### *Preparers Who Do Not Sign the Returns and Preparers Who Are the Subject of Complaints to the IRS Return Preparer Office Are Not Incorporated into the EITC Return Preparer Strategy*

The EITC Return Preparer Strategy currently only reaches the pool of paid tax return preparers who prepare more than 25 EITC returns that contain errors.[62] Not all errors are committed by a known preparer. As Senate Finance Committee Chairman Wyden points out: "[i]n some egregious cases, preparers calculate a taxpayer's refund in person and skip the line that shows who did the work. Then, after the taxpayer leaves, the preparer falsifies the math to boost the refund, files the return, and pockets the difference."[63] In this situation, since the preparer did not sign the return, the preparer would not receive treatment through the EITC Return Preparer Strategy but might be discovered through a complaint by a taxpayer or other party (including IRS employees) to the IRS.

In FY 2014, the EITC Return Preparer Strategy identified 1,152 preparers misusing preparer identification.[64]



---

60  For information on how the EITC audit process is not effectively reducing the improper payment rate, see Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance*, supra.

61  TIGTA, Ref. No. 2015-40-044, *Assessment of Internal Revenue Service Compliance With the Improper Payment Reporting Requirements in Fiscal Year 2014* 9 (Apr. 27, 2015). The lowest improper payment measurement was 23 percent, which occurred in 2012. *Id*.

62  IRS response to TAS information request (June 24, 2015).

63  *Protecting Taxpayers From Incompetent and Unethical Return Preparers, Hearing Before the S. Comm. on Fin.*, 113th Cong. 2 (2014) (statement of Ron Wyden, Chairman, Committee on Finance).

64  WIRA, *Fiscal Year 2014 EITC Return Preparer Analysis Summary* 2 (June 20, 2014).

65  ██████████████████████████████████████████ The IRS has identified the information discussed is this paragraph as "official use only" and therefore we are not at liberty to disclose it.

66  ██████████████████████████████████████████ The IRS has identified the information discussed in this paragraph as "official use only" and therefore we are not at liberty to disclose it.

001686

In 2012, the RPO began sharing referrals with the ERCPC.[67]  The ERCPC independently identified and treated only 37 percent of the referred preparers, finding that most did not meet the program's selection criteria.[68]  Given limited resources, using referrals as a criterion for compliance treatment could be effective in identifying noncompliant preparers, particularly those who are operating invisibly and highly likely to be harming taxpayers.  If someone, either a taxpayer, a preparer, or an internal IRS employee, refers a preparer, that should be a selection criterion heavily weighted for at least an education, if not compliance, treatment.

The Strategy currently is not equipped to address preparers who do not sign returns.  ███████████ ████████████████████████████████████████████████████████████████████████████  However, the Strategy is aware of the impact these preparers have on EITC noncompliance.  In its 2014 annual report, the Strategy reported developing a systemic methodology to identify "ghost preparers" as part of its long term strategic plan.[70]  The report stated that the effort required would be high but the potential impact would also be high.[71]

> Given limited resources, using referrals as a criterion for compliance treatment could be effective in identifying noncompliant preparers, particularly those who are operating invisibly and highly likely to be harming taxpayers. If someone, either a taxpayer, a preparer, or an internal IRS employee, refers a preparer, that should be a selection criterion heavily weighted for at least an education, if not compliance, treatment.

A possible method for identifying ghost preparers is to track preparers after they fall off the radar and are no longer tracked.  The EITC Return Preparer Strategy could obtain a preparer inventory listing, which shows every return prepared by a preparer, for the year before the preparer falls off the radar.[72]  The EITC Return Preparer Strategy could review that list and compare it to some or all of the current year returns.  If there is a pattern of similar mistakes on the current year returns, or if a large portion of the current taxpayers now appear to prepare their own returns, the EITC Return Preparer Strategy may want to interview the taxpayers to see who prepared their returns.  If there is a trend with the new returns, it is possible that the preparer has gone underground.

The EITC Return Preparer Strategy could partner with SB/SE and its Return Preparer Program (RPP) to identify the preparers who fall off the radar.[73]  Under the RPP, the IRS can create program action cases (PAC), which are "preparer investigations where clients of questionable preparers are examined to determine whether preparer penalties and/or injunctive actions against the preparers are warranted."[74]  PACs are limited to "situations where information indicates a return preparer has engaged in a widespread practice of making material errors that demonstrates intentional misconduct or clear incompetence in preparing tax returns."[75]  This type of situation would capture the

---

67  IRS response to TAS information request (June 24, 2015).

68  *Id.*

69  ██████████████████████████████████████████████████  The IRS has identified the information discussed in this paragraph as "official use only" and therefore we are not at liberty to disclose it.

70  WIRA, *Fiscal Year 2014 EITC Return Preparer Analysis Summary* 10 (June 20, 2014).

71  *Id.*

72  Return preparer coordinators have access to listings of returns prepared by preparers using an internal IRS database.  Perhaps the EITC Return Preparer Strategy would have to partner with such coordinators to obtain this listing if they cannot obtain it on their own.  IRM 20.1.6.6, *Program Action Cases Overview* (Sept. 10, 2013).

73  For information on the RPP, see IRM 4.1.10.1, *Overview of Return Preparer Program* (Jan. 14, 2011).

74  IRM 4.1.10.3, *Program Action Cases Overview (PAC)* (Jan. 14, 2011).

75  IRM 4.1.10.3(2) (Jan. 14, 2011).

001687

actions of an unscrupulous EITC return preparer.  In fact, the EITC Due Diligence program is already a priority for the RPP.[76]

### The Public Does Not Have Access to the IRS's Measures for Evaluating the Effectiveness of the EITC Return Preparer Strategy

The ERCPC issues an annual report that evaluates the success of the EITC Return Preparer Strategy but these reports are not available for public inspection.[77]  In fact, since the population of preparers receiving treatment constantly changes, the IRS looks at the return on investment of the program to measure success.[78]  Return on investment (and therefore success of the program) is measured by the amount of EITC bad returns and dollars saved divided by the cost of treatment.[79]  The cost of each treatment is easy to ascertain.  However, as discussed below, the measurement for "bad" EITC returns and dollars saved may not be accurate.  Since FY 2012, the EITC Return Preparer Strategy estimates it has protected $2.4 billion in EITC claims.[80]  However, because there is no public report that discloses or describes the return on investment for the EITC Return Preparer Strategy, the public has no way of ascertaining the accuracy of IRS claims of success or the overall effectiveness of the IRS EITC Return Preparer Strategy.  As discussed below, the IRS's methodology likely overstates the program's revenue protection amount.

> …because there is no public report that discloses or describes the return on investment for the Earned Income Tax Credit (EITC) Return Preparer Strategy, the public has no way of ascertaining the accuracy of IRS claims of success or the overall effectiveness of the IRS EITC Return Preparer Strategy.

An erroneous EITC return is defined as a return that contains the same errors used in the scoring process.[81]  If the return breaks one of the filters in the scoring process, it is deemed a "bad" return and any credit dollars attributed to it is considered revenue protected.[82]  Thus, if a return is categorized as potentially erroneous, both the entire amount of EITC claimed as well as the entire amount of Child Tax Credit (CTC) and Additional Child Tax Credit (ACTC) claimed are identified as potentially erroneous.[83]  However, these returns do not undergo an audit by the IRS prior to this designation.  As a result, there may be instances where a return deemed erroneous is actually accurate or at least partially accurate.  For instance, there could be a return where the taxpayer claimed a child who is not a qualifying child, but the taxpayer is still eligible for the childless EITC.  Alternatively, the child could be a "qualifying relative" of the taxpayer, which could be determined by reviewing documentation in an audit.[84]  There could also be an issue with identify theft that affected a taxpayer's initial eligibility.

---

76  IRM 4.1.10.1.2, *Return Preparer Program Priorities* (Jan. 14, 2011).

77  IRS response to TAS information request (June 24, 2015).

78  Minutes for meeting via telephone between TAS employees and IRS employees responsible for implementation of the EITC Return Preparer Strategy (Nov. 20, 2015) (on file with the National Taxpayer Advocate).

79  *Id.*

80  This amount does not include the additional revenue generated from audits and due diligence visits but does include money protected for Child Tax Credit and Additional Child Tax Credit claims.  IRS response to TAS information request (June 2, 2015).  Since FY 2012, the EITC Preparer Strategy has a total program value of $1.7 billion.  IRS response to TAS information request (Oct. 20, 2015); IRS, *FY 2015 EITC Return Preparer Strategy Analysis Summary, Executive Summary* (June 2015).

81  IRS response to TAS information request (Oct. 21, 2015).

82  Minutes for meeting via telephone between TAS employees and IRS employees responsible for implementation of the EITC Return Preparer Strategy (Nov. 20, 2015) (on file with the National Taxpayer Advocate).

83  IRS response to TAS information request (Oct. 21, 2015).

84  For information on what constitutes a qualifying relative, *see* IRC § 152(d).  In many aspects, the documentation needed to prove eligibility for qualifying relative status is similar to proving a qualifying child.  IRM 4.19.14.5.6, *Personal Exemptions and Dependents* (Jan. 01, 2015).

001688

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1696 of 4699 PageID #: 2061

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

To calculate dollars protected, the EITC Return Preparer Strategy compares the change in potentially erroneous dollars of the control group to the treated group from one year to the next.[85] The change between the two groups is considered a benefit of the treatments.[86] The EITC Return Preparer Strategy measures the impact for each treatment type separately.[87] A TAS review of internal EITC Return Preparer Strategy reports indicates that each treatment type is tracked annually to show its return on investment and the bad dollars saved attributed to it.

One way in which the EITC Return Preparer Strategy could improve its analysis is to adopt a consistent approach to each year's work. For instance, since FY 2012, the EITC Return Preparer Strategy has introduced new key questions to be answered and objectives each year.[88] Such an approach does not allow for a year-to-year comparison. It also does not require the EITC Return Preparer Strategy to focus on one consistent goal. Instead, the EITC Return Preparer Strategy should adopt a core set of questions and objectives that guide the process and introduce new topics as they are identified.

As described above, not all individual preparers are tracked each year. Some may not prepare 25 returns after receiving a treatment and as a result, they will not return to the test sample.[89] We believe the EITC Return Preparer Strategy should create a core set of preparers who are tracked over time and introduce new preparers as they are identified.

Last, the current measurements for success, which include dollars protected and the return on investment, may not be the best measure to capture an increase in preparer compliance. In particular, the basis for the calculation may not be accurate as not all returns deemed "potentially erroneous" are actually erroneous, or are only partially in error. Once this calculation is improved, it will make the return on investment measurement more accurate. An improved return on investment measurement in addition to long-term tracking of a core group of preparers will show a more accurate picture of preparer compliance and the impact of IRS "touches" on that compliance.

Thus far, the IRS has shared only basic information about the EITC Return Preparer Strategy with the public. Given the importance of the EITC and the large number of preparers contributing to EITC noncompliance, transparency is extremely important. The ERCPC unit should release the annual analysis for the EITC Return Preparer Strategy to the public, including the measures used to evaluate the effectiveness of the strategy.

### The EITC Return Preparer Strategy Does Not Sufficiently Focus on the Unenrolled Preparer Populations, Which Combined With a Comprehensive Public Education Campaign, Is Critical to Improving EITC Noncompliance

The low income population is particularly vulnerable to unskilled and unethical preparers and as numerous studies have shown, these preparers operate in the areas and communities where low income persons

---

85   IRS response to TAS information request (Oct. 21, 2015).

86   *Id.* As an example, the Strategy calculated that the average preparer receiving a treatment improved $15,000 after treatment, whereas the average preparer in the control group improved by $5,000. So the impact of treatments is estimated to be $10,000 on average. The total impact of treatments is then calculated by multiplying the average savings by the number of preparers in the test group. *Id.*

87   *Id.*

88   WIRA, *Fiscal Year 2015 EITC Return Preparer Analysis Summary* 3 (June 15, 2015).

89   Derived from IRS response to TAS information request (June 24, 2015). The IRS reports that it will continue to monitor every preparer after they are initially identified. However, TAS is unable to ascertain what this monitoring entails.

reside.[90]  The ERCPC data show that compared to attorneys and Certified Public Accountants (CPA), unrolled preparers receive the vast majority of compliance treatments.  Between FYs 2012 and 2015, an average of 94 percent of all due diligence audits were performed on unenrolled preparers while four percent of the due diligence audits were conducted on enrolled agents, 1.6 percent on CPAs, and less than one percent were performed on attorneys, as shown on Figure 1.24.5.[91]  The IRS should determine if due diligence audits are the most effective way to address unenrolled preparers.  Based on current analysis, the Strategy measures its effectiveness of each treatment on return on investment and dollars saved.  As mentioned above, these measurements may be flawed.  Given the unique characteristics of the unenrolled population, the Strategy should ensure that the due diligence audit is more effective than the less costly knock and talk visit.

**FIGURE 1.24.5, Due Diligence Audits by Preparer Enrollment, FYs 2012–2015**[92]

| Fiscal Year | CPA | Attorney | Enrolled Agent | Unenrolled |
|---|---|---|---|---|
| 2012 | 1.3% | 0.0% | 2.4% | 96.3% |
| 2013 | 2.2% | 0.1% | 5.7% | 92.0% |
| 2014 | 1.3% | 0.0% | 2.7% | 96.0% |
| 2015 | 1.8% | 0.1% | 4.8% | 93.3% |
| Average | 1.7% | 0.05% | 3.9% | 94.4% |

The EITC Return Preparer Strategy does not have a way to identify if a preparer is unenrolled and instead relies on the preparer to self-identify during EITC due diligence audits.[93]  Since the EITC Return Preparer Strategy already coordinates with the RPO and RPO attends the Strategy meetings, RPO could share preparer types and geographical location with the Strategy, if the preparer is in the RPO database.[94]  If the preparer is not in the RPO database, then by definition that preparer is an unenrolled preparer or not in compliance with the requirement to obtain a  preparer tax identification number (PTIN).[95]  Currently the Strategy receives complaints about preparers from RPO but only treats 37 percent of these referrals because "most of the referral complaints are for preparers who file less than 25 EITC returns, are for issues that cannot be addressed with our current compliance tools, or are sole complaints from a single taxpayer concerning his/her preparer."[96]  If the Strategy is not going to incorporate all of these referrals into its treatment cycle, it could at least glean information about the unenrolled population from the referrals.

Since  the EITC Return Preparer Strategy cannot identify unenrolled preparers on its own, it offers information on due diligence requirements in the form of presentations and webinars and on social media to enrolled and unenrolled agents alike.[97]  Sharing educational information is a good start, however,

---

90   For a chilling inventory of studies showing the predatory practices and abuses in this area, see Brief of Amici Curiae, National Consumer Law Center and National Community Tax Coalition in Support of Defendants-Appellants, *Loving v. Internal Revenue Service*, No. 13-5061 (D.C. Cir. 2014.)

91   IRS response to TAS information request (June 24, 2015).

92   IRS response to TAS information requests (June 24, 2015 and Oct. 26, 2015).

93   IRS response to TAS information request (Oct. 21, 2015).

94   IRS response to TAS information request (June 24, 2015).

95   Unenrolled preparers may wish to "voluntarily increase their knowledge and improve their filing season competency."  They can do this by taking 18 hours of continuing education, obtaining a PTIN, and agreeing to certain terms of Circular 230, *Regulations Governing Practice before the Internal Revenue Service*.  IRS, *General Requirements*, *available at* https://www.irs.gov/Tax-Professionals/General-Requirements-for-the-Annual-Filing-Season-Program-Record-of-Completion.

96   IRS response to TAS information request (June 24, 2015).

97   *Id.*

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1698 of 4699 PageID #: 1863

Most Serious
Problems

Most Serious
Issues

Most Litigated
Recommendations

a tailored approach that directly focuses on unscrupulous unenrolled preparers in the neighborhoods where they operate and where the potential victims reside, is essential to improving EITC compliance. For instance, when the RPO office shares individual complaints received from a single taxpayer with the EITC Return Preparer Strategy, these referrals do not become part of the treatment stream. However, the referrals could be investigated to learn more about where the unenrolled preparers concentrate their work. More compliance-driven educational material could be provided in these areas specifically to target unenrolled preparers. This material would focus on the consequences of disregarding due diligence requirements and filing bad returns, up to and including prosecution. This could be done by using preparer information provided in the referrals from RPO. The EITC Return Preparer Strategy could also partner with the LITC program and consumer rights groups to gain a better understanding of how these preparers operate.

In 2015, the IRS announced an online public directory of tax return preparers, which taxpayers can search to find a preparer with specific credentials or qualifications, including attorneys, CPAs, enrolled agents, and those who have taken the voluntary annual IRS filing season training.[98] Unenrolled preparers are not included in this database, but use of this directory should be advertised in the neighborhoods where unenrolled preparers practice to empower taxpayers to make educated decisions. Since 2002, TAS has recommended that taxpayer outreach be part of the EITC compliance strategy.[99] Presumably, many improper payments could have been saved if the IRS had followed through with this recommendation in 2002 to educate taxpayers. In 2002, TAS also proposed a legislative recommendation to allow Congressional authority and funding for "an extensive public awareness campaign" targeted at taxpayers.[100] The marketing campaign would include a simple message to inform taxpayers about the preparer registration process so that taxpayers could make educated decisions.

The marketing campaign could use internal information that the Strategy has based on referrals to target the message to certain geographic areas. The campaign should also utilize partners, such as LITCs, Volunteer Income Tax Assistance (VITA) programs, and local organizations providing services to the affected taxpayer populations.[101] The partners would help to develop the outreach as well as to deliver the information to a target audience. The information should include information on the due diligence requirements, so that taxpayers know what to expect when they visit a preparer. It should also include information on how to figure out if the preparer is reputable.

A public education component to the EITC Preparer Strategy would empower taxpayers to avoid some of the problematic preparers upfront. For instance, TAS created a poster and pamphlet in 2013 to educate taxpayers who rely on preparers.[102] By helping the taxpayer be an educated consumer, the public information campaign could reduce the amount of EITC noncompliance, while also decreasing costs associated with compliance treatments and resolving erroneous refunds.

---

98  IRS, IR-2015-22, *IRS Launches Directory of Federal Tax Return Preparers; Online Tool Offers New Option to Help Taxpayers*, *available at* http://www.irs.gov/uac/Newsroom/IRS-Launches-Directory-of-Federal-Tax-Return-Preparers (last visited Sept. 30, 2015).

99  National Taxpayer Advocate 2002 Annual Report to Congress 73.

100 *Id.* at 229.

101 For example, CA$H is a collaboration of ten state coalitions, made up of more than 50 non- and for-profit partners with the goal of helping low-to moderate income people "make the most of their money." For more information, see CA$H Maine, *About CA$H*, http://www.cashmaine.org/about (last visited Sept. 15, 2015).

102 TAS, Publication 5074, *Protect Your Tax Refund* (2013); TAS, Publication 5074-A, *Protect Your Tax Refund* (Mar. 2015). For more information on this educational material, *see* National Taxpayer Advocate 2013 Annual Report to Congress 70-71.

001691

### The EITC Preparer Strategy Does Not Collaborate With TAS

The Strategy benefits from many IRS partners and stakeholders. For instance, ERCPC is the owner and primary driver of the EITC Return Preparer Strategy, but collaborates with communication functions, research, and counsel.[103] TAS is listed as a stakeholder, however, the only time TAS was invited to participate in the EITC Return Preparer Strategy was a phone call in December 2013.

The IRS does not currently include TAS in planning for its EITC Return Preparer Strategy. However, the National Taxpayer Advocate has dedicated many resources to studying problems associated with the EITC and proposing solutions.[104] The National Taxpayer Advocate has also testified before Congress numerous times to highlight issues related to the EITC.[105] EITC cases consistently rank in the top ten of all TAS case receipts.[106] Last, the National Taxpayer Advocate also administers the LITC program, which provides legal representation in numerous EITC cases.[107] The LITCs see firsthand the problems taxpayers experience with preparers, often before the issues surface with the IRS. Given TAS's extensive knowledge, research, and affiliations, TAS should be involved in the IRS's EITC Return Preparer Strategy from the start, as well as to fine tune its focus and to develop quantifiable measures of strategy effectiveness.

## CONCLUSION

The National Taxpayer Advocate commends ERCPC for its efforts to address the role that preparers play in EITC errors. However, the IRS is not effectively using the resources at its disposal, such as collaborating with TAS, other internal and external stakeholders and partners, and using referrals made about problematic preparers. Additionally, a creative and targeted outreach to unenrolled preparers and a comprehensive education campaign for taxpayers, including both localized campaigns targeted at areas where ghost or otherwise noncompliant preparers are operating, and nationwide public service advertisements, could augment the online public directory of tax return preparers. Success of the campaign would be measured not just by a reduction in bad returns and consideration of return on investment, but it would consider what types of errors are occurring by certain geographic areas. The strategy could focus efforts to study this over the longterm since sustained change in behavior for both preparers and taxpayers takes time.

---

103 IRS response to TAS information request (June 24, 2015).

104 *See, e.g.*, National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 71-104 (*Study of Tax Court Cases In Which the IRS Conceded the Taxpayer was Entitled to Earned Income Tax Credit (EITC)*); National Taxpayer Advocate 2009 Annual Report to Congress vol. 2, 75-104 (*Running Social Programs Through the Tax System*); National Taxpayer Advocate 2007 Annual Report to Congress vol. 2, 94-117 (*IRS Earned Income Credit Audits—A Challenge to Taxpayers*); National Taxpayer Advocate 2004 Annual Report to Congress vol. 2, 1-80 (*Earned Income Tax Credit (EITC) Audit Reconsideration Study*).

105 *See, e.g.*, *Protecting Taxpayers From Incompetent and Unethical Return Preparers, Hearing Before the S. Comm. on Fin.*, 113th Cong. 7 (2014) (statement of Nina E. Olson, National Taxpayer Advocate); *The National Taxpayer Advocate's 2014 Annual Report To Congress, Hearing Before the Subcomm. on Government Operations of the H. Comm. on Oversight and Reform*, 114th Cong. 28 (2015) (statement of Nina E. Olson, National Taxpayer Advocate).

106 A review of TAS case receipts since FY 2010 shows that EITC cases ranked ninth in 2010 (11,198 cases), tenth in FY 2011 (8,729 cases), seventh in FY 2012 (7,441 cases), fourth in FY 2013 (11,980 cases), third in FY 2014 (13,450 cases), and fourth in FY 2015 (10,880 cases). Data obtained from TAMIS (Oct. 1, 2010; Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

107 LITCs represent individuals with limited income or low income. *Low Income Taxpayer Clinics Program Report* (Dec. 2014). In 2014, EITC cases were 12 percent of the LITC caseload. LITC Program 2014 Year End Report.

001692

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that the IRS:

1. Release the annual analysis for the EITC Return Preparer Strategy to the public, including the measures used to evaluate the effectiveness of the strategy.

2. Include TAS as a member of the EITC Return Preparer Strategy team.

3. In collaboration with TAS and other IRS functions, and based on this annual analysis, determine where to focus resources and how to measure success with a multiyear analysis.

4. Incorporate preparer referrals, both from internal and external sources, and preparers who misuse PTINs, as a selection criterion for compliance treatment in the EITC Return Preparer Strategy.

5. Use measures for evaluating the effectiveness of the strategy on an annual basis that are not limited to measuring protected dollars or return on investment, but also include a year-to-year analysis of the preparer's behavior following treatment.

6. Tailor outreach specifically to the unenrolled preparer population that addresses due diligence requirements and is presented where these preparers operate. This outreach should incorporate TV and radio as well as social media.

7. Conduct a creative, geographic-based public education campaign in conjunction with other internal and external stakeholders including public service advertisements, videos, and tweets in order to educate taxpayers on how to select a competent preparer, what the rules of due diligence require, and the consequences of using an unskilled or unscrupulous preparer, including identity theft. Different marketing approaches should be tested and studied to track EITC compliance over the years.

001693

## APPENDIX A, Letter 5025 Series

### LETTER 5025, *You May Have Prepared Inaccurate EITC Returns With Questionable Qualifying Children and Self-Employment Income*



**Department of the Treasury**
**Internal Revenue Service**
**Wage & Investment**
NDC/EITC
1201 North Mitsubishi Motorway
Bloomington, IL  61705

Date:
10/28/2015
Contact us by e-mail at:
wi.eitcpreparerletterresponse@irs.gov
Preparer ID number:

**You May Have Prepared Inaccurate EITC Returns with**
**Questionable Qualifying Children and Self-Employment Income**

Dear [Name]:

Our review of your 2014 tax year returns claiming the earned income tax credit (EITC) indicates you may have prepared inaccurate returns for your clients. Intentionally disregarding EITC tax law could result in penalties and other consequences for you as the paid preparer and your clients. The primary issues we identified on the tax year 2014 returns you prepared are:

• Qualifying children for the EITC who don't appear to meet the relationship, residency, age, and joint return requirements.
   – A permanently and totally disabled child is considered to meet the age requirement. A child is considered permanently and totally disabled for EITC if the child can't engage in any substantial gainful activity because of a physical or mental condition, and a doctor determined the condition has lasted or can be expected to last continuously for at least one year or can be expected to lead to death.
• Questionable income and expenses on Schedule C, *Profit or Loss from Business.*

**EITC due diligence requirements for paid preparers:**
As a paid preparer, you must take extra steps to ensure your EITC returns are complete and correct.

**Paid preparers must:**
• Know the tax laws.
• Inform clients of EITC eligibility requirements to determine if each client qualifies for the EITC.
• Interview clients every year as their circumstances may change and you must use current information when determining eligibility for, and the amount of, the EITC.
• Not rely on tax return preparation software; it is only a guidance tool, not a substitute for knowledge of the tax laws.
• Meet all four due diligence requirements when preparing an EITC claim:
   1. Complete Form 8867, *Paid Preparer's Earned Income Credit Checklist,* and submit it with every EITC return you prepare.
   2. Complete an EITC worksheet, or its equivalent, showing how you computed the EITC.

**Letter 5025 (Rev. 9-2015)**
Catalog Number 59926H

001694

**LETTER 5025C,** *You May Have Prepared Inaccurate EITC Returns With Self-Employment Income*



**Department of the Treasury**
**Internal Revenue Service**
**Wage & Investment - NDC/EITC**
1201 North Mitsubishi Motorway
Bloomington, IL  61705

Date:

Contact us by e-mail at:
  wi.eitcpreparerletterresponse@irs.gov
Preparer ID number:

**You May Have Prepared Inaccurate EITC Returns with Self-Employment Income**

Dear [Name]:

Our review of your 2014 tax year returns claiming the earned income tax credit (EITC) indicates you may have prepared inaccurate returns for your clients. Intentionally disregarding EITC tax law could result in penalties and other consequences for you as the paid preparer, and your clients. The primary issues we identified on the tax year 2014 returns you prepared are questionable income and expenses on Schedule C, *Profit or Loss from Business.*

**EITC due diligence requirements for paid preparers:**

As a paid preparer, you must take extra steps to ensure your EITC returns are complete and correct.

**Paid preparers must:**
  • Know the tax laws.
  • Inform clients of EITC requirements to determine if each qualifies for the EITC.
  • Interview clients every year, as their circumstances may change and you must use current information when determining eligibility for, and the amount of, EITC.
  • Not rely on tax return preparation software; it is only a guidance tool, not a substitute for knowledge of the tax law.
  • Meet your four due diligence requirements when preparing an EITC claim:
    1. Complete Form 8867, *Paid Preparer's Earned Income Credit Checklist,* and submit it with every EITC return you prepare.
    2. Complete an EITC worksheet, or its equivalent, showing how you computed the EITC.
    3. Question the client if any information appears to be incorrect, inconsistent, or incomplete and document your questions and the client's responses. Failure to adequately question the client and document the responses is the most common reason we assess penalties.
    4. Keep all required records, including copies of any documents you relied upon to determine eligibility for, or the amount of, EITC.

**Letter 5025-C (Rev. 9-2015)**
Catalog Number 59927S

001695

Case 1:cv-00306-JCB   Document 124   Filed 11/07/24   Page 1703 of 4699 PageID #: 4868

Most Serious
Problems
Legislative
Recommendations
Most Litigated
Issues

### LETTER 5025D, *You May Have Violated Tax Law by Preparing Inaccurate EITC Returns*



**Department of the Treasury**
**Internal Revenue Service**
**NDC/EITC**
1201 North Mitsubishi Motorway
Bloomington, IL  61705

Date:
10/28/2015
To contact us toll free:
1-855-379-0440

**You May Have Violated Tax Law**
**By Preparing Inaccurate EITC Returns**

Dear [xxxxx]:

Our review of the Tax Year 2013 Earned Income Tax Credit (EITC) returns you prepared indicates you may have prepared inaccurate returns for your clients. Intentionally disregarding EITC tax law could result in penalties and other consequences for you as the paid preparer and your clients**.** The primary issues we identified on your TY 2013 returns is a high percentage of EITC returns that claim qualifying children who may not be permanently or totally disabled.

A child is considered permanently and totally disabled if both of the following apply:

• The child can't engage in any substantial gainful activity because of a physical or mental condition
• A doctor determines the condition has lasted or can be expected to last continuously for at least a year or can lead to death

**If You Prepare Inaccurate EITC Returns**

**Your client may face:**

• An audit during which we will hold his or her refund until we can determine EITC eligibility. We can also conduct an audit after we issue the refund. If we determine that your client doesn't qualify for EITC, he or she must repay any overpayment, plus interest.
• A ban for 2 or 10 years from claiming the EITC, if we determine your client's EITC claim was due to reckless or intentional disregard of the EITC rules or fraud

**You may face:**

• **A $500 penalty** for each failure to comply with EITC due diligence requirements (Section 6695(g) of the Internal Revenue Code)

**Letter 5025-D (Rev. 8-2014)**
Catalog Number 64087J

**LETTER 5025Q, *You May Have Prepared Inaccurate EITC Returns Based on Questionable Qualifying Children***



**Department of the Treasury**
**Internal Revenue Service**
**Wage & Investment - NDC/EITC**
1201 North Mitsubishi Motorway
Bloomington, IL 61705

Date:

Contact us by e-mail at:
  wi.eitcpreparerletterresponse@irs.gov
Preparer ID number:

**You May Have Prepared Inaccurate EITC Returns Based on**
**Questionable Qualifying Children**

Dear [Name]:

Our review of your 2014 tax year returns claiming the earned income tax credit (EITC) indicates you may have prepared inaccurate returns for your clients. Intentionally disregarding EITC tax law could result in penalties and other consequences for you, as the paid preparer, and your clients.

The primary issues we identified are questionable qualifying children who may not meet the residency or relationship tests, and/or questionable qualifying children who may not be permanently and totally disabled.

  − A child is a qualifying child if he or she meets the relationship, age, residency, and joint return tests.

  − A permanently and totally disabled child is considered to meet the age requirement. A child is considered permanently and totally disabled for EITC if the child can't engage in any substantial gainful activity because of a physical or mental condition, and a doctor determined the condition has lasted or can be expected to last continuously for at least one year or can be expected to lead to death.

**EITC due diligence requirements for paid preparers:**

As a paid preparer, you must take extra steps to ensure your EITC returns are complete and correct.

**Paid preparers must:**

  • Know the tax laws.

  • Inform clients of EITC requirements to determine if each qualifies for the EITC.

  • Interview clients every year, as their circumstances may change and you must use current information when determining eligibility for, and the amount of, EITC.

  • Not rely on tax return preparation software; it is only a guidance tool, not a substitute for knowledge of the tax law.

  • Meet your four due diligence requirements when preparing an EITC claim:

    1. Complete Form 8867, *Paid Preparer's Earned Income Credit Checklist,* and submit it with every EITC return you prepare.

    2. Complete an EITC worksheet, or its equivalent, showing how you computed the EITC.

**Letter 5025-Q (Rev. 9-2015)**
Catalog Number 59928D

001697

# INTRODUCTION: Legislative Recommendations

Section 7803(c)(2)(B)(ii)(VIII) of the Internal Revenue Code (IRC) requires the National Taxpayer Advocate to include in her Annual Report to Congress, among other things, legislative recommendations to resolve problems encountered by taxpayers.

The figure immediately following this Introduction summarizes congressional action on recommendations the National Taxpayer Advocate proposed in her 2001 through 2014 Annual Reports.[1]  The National Taxpayer Advocate places a high priority on working with the tax-writing committees and other interested parties to try to resolve problems encountered by taxpayers.  In addition to submitting legislative proposals in each Annual Report, the National Taxpayer Advocate meets regularly with members of Congress and their staffs and testifies at hearings on the problems faced by taxpayers to ensure that Congress has an opportunity to receive and consider a taxpayer perspective.  The following discussion highlights legislative activity during the 114th Congress relating to the National Taxpayer Advocate's proposals.

## Consolidated Appropriations Act, 2016 and Taxpayer Bill of Rights

Shortly before this report went to print, Congress enacted the Consolidated Appropriations Act, 2016.[2]  Most significantly, section 401 of this law codified the provisions of the Taxpayer Bill of Rights (TBOR), which had been adopted administratively by the IRS last year based on the National Taxpayer Advocate's recommendation.[3]  The National Taxpayer Advocate advocated for this codification in several of her prior Annual Reports to Congress,[4] and members of both the House and Senate introduced various TBOR bills earlier in the year.  Specifically, section 401 of the Consolidated Appropriations Act, 2016 amends IRC § 7803(a) to add a new paragraph that states:  "In discharging his duties, the Commissioner shall ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title" and includes the ten TBOR rights.  The National Taxpayer Advocate is pleased with this codification of TBOR and will work with the IRS to ensure that this statutory mandate is fulfilled.

Also of note, Congress appropriated $290,000,000 above the IRS's FY 2016 funding level to be used solely to achieve "measurable improvements in the customer service representative level of service rate, to improve the identification and prevention of refund fraud and identity theft, and to enhance cybersecurity to safeguard taxpayer data."[5]  Congress attached certain conditions to this funding, including that these funds will not be made available until the Commissioner submits a spending plan

---

1   An electronic version of the figure is available on the TAS website at www.TaxpayerAdvocate.irs.gov/2015-Annual-Report. The figure lists all legislative recommendations the National Taxpayer Advocate has made since 2001 and identifies each section of the Internal Revenue Code affected by the recommendations.

2   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113 (2015).

3   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 401 (2015). *See also* TBOR, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

4   *See* National Taxpayer Advocate 2014 Annual Report to Congress 275 (Legislative Recommendation: *Codify the Taxpayer Bill of Rights and Enact Legislation that Provides Specific Taxpayer Protections*); National Taxpayer Advocate 2013 Annual Report to Congress 5 (Most Serious Problem: *Taxpayer Rights: The IRS Should Adopt a Taxpayer Bill of Rights as a Framework for Effective Tax Administration*); National Taxpayer Advocate's Report to Acting Commissioner Daniel Werfel, *Toward a More Perfect Tax System: A Taxpayer Bill of Rights as a Framework for Effective Tax Administration* (Nov. 4, 2013), *available at* www.TaxpayerAdvocate.irs.gov/2013AnnualReport; National Taxpayer Advocate 2011 Annual Report to Congress 493-518 (Legislative Recommendation: *Enact the Recommendations of the National Taxpayer Advocate to Protect Taxpayer Rights*); National Taxpayer Advocate 2007 Annual Report to Congress 478-89 (Key Legislative Recommendation: *Taxpayer Bill of Rights and De Minimis "Apology" Payments*).

5   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division E, § 113 (2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 3   PageID #:  4871

Legislative
Recommendations

Most Serious
Issues

Most Litigated
Problems

to the Committees on Appropriations of the House of Representatives and the Senate.[6]  The National Taxpayer Advocate welcomes this increase in IRS funding and is hopeful that it will alleviate taxpayer burden in the allocated areas.[7]

### Other Consolidated Appropriations Act, 2016 Provisions

Besides TBOR, the Consolidated Appropriations Act, 2016 also enacted several of the National Taxpayer Advocate's previous recommendations to Congress, including:[8]

- **Dual Address Change Notices and Special Consideration for Offers in Compromise for Victims of Payroll Tax Preparer Fraud.**[9]  For the third consecutive year, Congress enacted legislation that incorporates two of the National Taxpayer Advocate's past recommendations.  Section 106 of the Consolidated Appropriations Act, 2016 requires the IRS to:

  1. Issue dual address change notices related to an employer making employment tax payments (with one notice sent to both the employer's former and new address); and

  2. Give special consideration to an offer in compromise (OIC) request from a victim of fraud or bankruptcy by a third-party payroll tax preparer.[10]  This provision codifies National Taxpayer Advocate recommendations from 2012.

- **Modification of filing dates of returns and statements relating to employee wage information and nonemployee compensation to improve compliance.**[11]  The provision requires Forms W-2 and W-3 and returns or statements that report non-employee compensation (*e.g.*, Form 1099-MISC) to be filed on or before January 31 of the year following the calendar year to which the returns relate.  The provision also provides additional time for the IRS to review refund claims based on the earned income tax credit and the refundable portion of the child tax credit in order to reduce fraud and improper payments.  The provision is effective for returns and statements relating

---

6   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division E, § 113 (2015).

7   The Consolidated Appropriations Act, 2016 legislation also increased funding for Volunteer Income Tax Assistance (VITA), allocating not less than $15,000,000 for VITA matching grants.  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division E (2015).  This is a $3,000,000 increase over last year's VITA funding, where Congress allocated not less than $12,000,000 for VITA matching grants.  *See* Consolidated And Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, Division E, 128 STAT. 2130, 2336 (2014).  In her 2014 Annual Report to Congress, the National Taxpayer Advocate recommended that the IRS increase VITA funding to maximize the overall resources (federal and matching funds) available for free tax preparation assistance.  *See* National Taxpayer Advocate 2014 Annual Report to Congress 66 (Most Serious Problem: *VITA/TCE Funding: Volunteer Tax Assistance Programs Are Too Restrictive and the Design Grant Structure Is Not Adequately Based on Specific Needs of Served Taxpayer Populations*).

8   Relevant portions of the summaries of these new provisions are drawn from House Committee on Ways and Means, Section-By-Section Summary of the Proposed "Protecting Americans From Tax Hikes Act of 2015," *available at* http://waysandmeans.house.gov/?attachment_id=39841003.

9   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division E, § 106 (2015).

10   *See* National Taxpayer Advocate 2012 Annual Report to Congress 426-44 (Most Serious Problem: *Early Intervention, Offers in Compromise, and Proactive Outreach Can Help Victims of Failed Payroll Service Providers and Increase Employment Tax Compliance*).

11   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 201 (2015).

to calendar years after the date of enactment (*e.g.*, returns filed in 2017). This provision codifies a National Taxpayer Advocate recommendation from 2013 and prior Annual Reports.[12]

- **Safe harbor for *de minimis* errors on information returns and payee statements.**[13] The provision establishes a safe harbor from penalties for the failure to file correct information returns and for failure to furnish correct payee statements by providing that if the error is $100 or less ($25 or less in the case of errors involving tax withholding), the issuer of the information return is not required to file a corrected return and no penalty is imposed. A recipient of such a return (*e.g.*, an employee who receives a Form W-2) can elect to have a corrected return issued to him and filed with the IRS. The provision is effective for returns and statements required to be filed after December 31, 2016. This provision codifies a National Taxpayer Advocate recommendation from 2013.[14]

- **Requirements for the issuance of ITINs.**[15] The provision provides that the IRS may issue individual taxpayer identification numbers (ITINs) if the applicant provides the documentation required by the IRS either (a) in person to an IRS employee or to a community-based certified acceptance agent (as authorized by the IRS) or (b) by mail. This provision codifies a National Taxpayer Advocate administrative recommendation from 2008.[16] The provision also provides that an ITIN will expire if an individual fails to file a tax return for three consecutive years. This provision codifies a National Taxpayer Advocate administrative recommendation from 2010.[17]

- **Treatment of credits for purposes of certain penalties.**[18] Among other things, the provision, which generally applies to returns filed after December 31, 2015, provides reasonable cause relief from the 20 percent penalty under IRC § 6676 for erroneous claims for refunds or credits. This provision codifies National Taxpayer Advocate recommendations from last year and 2011.[19]

---

12  *See* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, § 5, at 69, 89, 91, 96 (Research Study: *Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and Decrease Improper Payments*). Recommendation 2.2 of this study was to eliminate the March 31st deadline for e-filed information reports. All information reports, whether e-filed or filed on paper, would be due at the end of February; National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical as the IRS Develops a Real-Time Tax System*); National Taxpayer Advocate 2011 Annual Report to Congress 284-95 (Most Serious Problem: *Accelerated Third-Party Information Reporting and Pre-Populated Returns Would Reduce Taxpayer Burden and Benefit Tax Administration But Taxpayer Protections Must Be Addressed*); National Taxpayer Advocate 2009 Annual Report to Congress 338-45 (Legislative Recommendation: *Direct the Treasury Department to Develop a Plan to Reverse the 'Pay Refunds First, Verify Eligibility Later' Approach to Tax Return Processing*).

13  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 202 (2015).

14  *See* National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, § 5, at 69, 89, 91, 96 (Research Study: Fundamental Changes to Return Filing and Processing Will Assist Taxpayers in Return Preparation and *Decrease Improper Payments*). Recommendation 2.3 of this study was to minimize corrections by creating a $50 *de minimis* threshold for corrections.

15  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 203 (2015).

16  *See* National Taxpayer Advocate 2008 Annual Report to Congress 126-140 (Most Serious Problem: *IRS Handling of ITIN Applications Significantly Delays Taxpayer Returns and Refunds*). This discussion provided several administrative recommendations to the IRS to streamline the ITIN application process, including a recommendation to promote and expand the Certified Acceptance Agent program.

17  *See* National Taxpayer Advocate 2010 Annual Report to Congress 319-338 (Most Serious Problem: *Status Update: Despite Program Improvements, the IRS Policy of Processing Most ITIN Applications with Paper Returns During Peak Filing Season Continues to Strain IRS Resources and Unduly Burden Taxpayers*). Among the administrative recommendations to the IRS in this discussion was a recommendation that the IRS develop a process to verify that previously issued ITINs have been used for tax administration purposes and revoke unused ITINs on a regular basis after notifying ITIN holders.

18  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 209 (2015).

19  *See* National Taxpayer Advocate 2014 Annual Report to Congress 351 (Legislative Recommendation: *Erroneous Refund Penalty: Amend Section 6676 to Permit "Reasonable Cause" Relief*); National Taxpayer Advocate 2011 Annual Report to Congress 544 (Legislative Recommendation: *Amend the Erroneous Refund Penalty to Permit Relief in Case of Reasonable Cause for Claim to Refundable Credits*).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 4699 PageID #: 4873

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

■ **Declaratory judgments for IRC § 501(c)(4) and other exempt organizations.**[20]  The provision permits 501(c)(4) organizations and other exempt organizations to seek review in Federal court of any revocation of exempt status by the IRS.  The provision applies to pleadings filed after the date of enactment.  This provision codifies a National Taxpayer Advocate recommendation from last year.[21]

■ **Suspension of running of period for filing petition of spousal relief and collection cases.**[22]  The provision suspends the statute of limitations in cases involving spousal relief or collections when a bankruptcy petition has been filed and a taxpayer is prohibited from filing a petition for review by the Tax Court.  Under the provision, the suspension is for the period during which the taxpayer is prohibited from filing such a petition, plus 60 days. The provision applies to Tax Court petitions filed after the date of enactment.  This provision codifies National Taxpayer Advocate recommendations from 2004 and 2006.[23]

### The Surface Transportation and Veterans Health Care Choice Improvement Act of 2015

On July 31, 2015, Congress enacted the Surface Transportation and Veterans Health Care Choice Improvement Act of 2015.[24]  The Act will, beginning in 2016, change the return filing due date for partnerships and certain trusts from the 15th day of the fourth month following the close of the tax year to the 15th day of the third month following the close of the tax year.[25]  This change codifies a National Taxpayer Advocate recommendation from 2003.[26]  In addition, beginning in 2016, this legislation moves up the due date, from June 30 to April 15, for taxpayers with a financial interest in or signature authority over certain foreign financial accounts to file FinCEN Form 114, *Report of Foreign Bank and Financial Accounts (FBAR)*.[27]  The new legislation also provides for a maximum six month extension (*i.e.*, until October 15) to file this form.[28]  This change codifies a National Taxpayer Advocate recommendation from last year.[29]

---

20   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 406 (2015).

21   *See* National Taxpayer Advocate 2014 Annual Report to Congress 371 (Legislative Recommendation: *EO Judicial And Administrative Review: Allow IRC § 501(c)(4), (c)(5), or (c)(6) Organizations to Seek a Declaratory Judgment to Resolve Disputes About Exempt Status and Require the IRS to Provide Administrative Review of Automatic Revocations of Exempt Status*).  The provision goes beyond the National Taxpayer Advocate's recommendation as it is does not limit declaratory judgment rights under IRC § 7428 to organizations exempt under IRC §§ 501(c)(4), (c)(5), and (c)(6).

22   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 424 (2015).

23   *See* National Taxpayer Advocate 2006 Annual Report to Congress 536-7 (Additional Legislative Recommendation: *Suspend the Period for Filing a Tax Court Petition During Bankruptcy*); National Taxpayer Advocate 2004 Annual Report to Congress 490-1 (Additional Legislative Recommendation: *Effect of Automatic Stay Imposed in Bankruptcy Cases upon Innocent Spouse and CDP Petitions in Tax Court*).

24   *See* Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Pub. L. No. 114-41, 129 Stat. 443 (2015).

25   *See* Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Pub. L. No. 114-41, § 2006, 129 Stat. 443, 457 (2015).

26   *See* National Taxpayer Advocate 2003 Annual Report to Congress 302 (Key Legislative Recommendation: *Filing Due Date of Partnership and Certain Trusts*).

27   *See* Surface Transportation and Veterans Health Care Choice Improvement Act of 2015, Pub. L. No. 114-41, § 2006, 129 Stat. 443, 458-59 (2015).

28   *Id.* at 459

29   *See* National Taxpayer Advocate 2014 Annual Report to Congress 331 (Legislative Recommendation: *Foreign Account Reporting: Legislative Recommendations to Reduce the Burden of Filing a Report of Foreign Bank and Financial Accounts (FBAR) and Improve the Civil Penalty Structure*).  As the title indicates, this legislative recommendation contained several proposals, one of which was to change the FBAR filing due date to coincide with the due date applicable to a taxpayer's federal income tax return and Form 8938, *Statement of Specified Foreign Financial Assets* (including extensions).

001701

The following sections discuss bills introduced during the 114th Congress that reflect legislative recommendations made by the National Taxpayer Advocate in her prior Annual Reports to Congress.

## Taxpayer Rights Act of 2015

On November 30, 2015, Senator Cardin and Representative Becerra introduced companion bills entitled the Taxpayer Rights Act of 2015 (TRA 2015).[30]  The legislation would codify the TBOR and require the Commissioner of Internal Revenue to develop annual training for all Internal Revenue Service officers and employees regarding taxpayer rights, the Office of the Taxpayer Advocate's case criteria and mission, and Taxpayer Assistance Order procedures.[31]  As noted above, Congress codified the TBOR in the Consolidated Appropriations Act, 2016.[32]

TRA 2015 contains many of the National Taxpayer Advocate's prior proposals.  The legislation would establish a Community Volunteer Income Tax Assistance Matching Grant Program (VITA grant program).[33]  The VITA grant program would be administered in a manner that is substantially similar to the Community Volunteer Income Tax Assistance matching grants demonstration program established under Title I of Division D of the Consolidated Appropriations Act, 2008.  The VITA grant program would establish tax preparation sites for low income taxpayers and operate in a manner similar to the Low Income Taxpayer Clinics (LITC) program.[34]  In addition, the legislation would authorize the Secretary to promote the benefits of and encourage the use of qualified LITCs through the use of mass communications, referrals, and other means and allow IRS employees to refer taxpayers to the LITCs.[35]

The National Taxpayer Advocate has recommended that the IRS create an effective oversight and penalty regime for return preparers;[36] TRA 2015 would require the IRS to regulate any preparers not already regulated, create a penalty for unauthorized preparation of returns, and expand and increase current preparer penalties.[37]  The legislation also includes registration and disclosure requirements and new penalties for persons facilitating refund delivery products.[38]

The National Taxpayer Advocate has advocated for numerous changes to the IRS's filing and reporting of federal tax liens.[39]  Under TRA 2015, the IRS would have to weigh the benefit to the government and the harm to the taxpayer before filing a lien and would have to provide the taxpayer with an opportunity to

---

30   Taxpayer Rights Act of 2015, S. 2333, 114th Cong. (2015); Taxpayer Rights Act of 2015, H.R. 4128, 114th Cong. (2015).

31   S. 2333, § 308, 114th Cong. (2015); H.R. 4128, § 308, 114th Cong. (2015).

32   See Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 401 (2015).

33   S. 2333, § 201, 114th Cong. (2015); H.R. 4128, § 201, 114th Cong. (2015).

34   See National Taxpayer Advocate 2014 Annual Report to Congress 55-66 (Most Serious Problem: *VITA/TCE Funding: Volunteer Tax Assistance Programs Are Too Restrictive and the Design Grant Structure Is Not Adequately Based on Specific Needs of Served Taxpayer Populations*).

35   See National Taxpayer Advocate 2014 Annual Report to Congress 411-416 (Legislative Recommendation: *Contact Information On Statutory Notices Of Deficiency: Revise IRC § 6212 to Require the IRS to Place Taxpayer Advocate Service Contact Information on the Face of the Statutory Notice of Deficiency and Include Low Income Taxpayer Clinic Information with Notices Impacting that Population*); National Taxpayer Advocate 2014 Annual Report to Congress, vol. 2, 1-26 (Research Study: *Low Income Taxpayer Clinic Program: A Look at Those Eligible to Seek Help from the Clinics*); National Taxpayer Advocate 2007 Annual Report to Congress 551–553 (Legislative Recommendation: *Referral to Low Income Taxpayer Clinics*).

36   See, e.g., National Taxpayer Advocate 2009 Annual Report to Congress 41-69 (Most Serious Problem: *The IRS Lacks a Servicewide Return Preparer Strategy*), National Taxpayer Advocate 2008 Annual Report to Congress 423-26 (Legislative Recommendation: *The Time Has Come to Regulate Federal Tax Return Preparers*).

37   S. 2333, §§ 202 and 203, 114th Cong. (2015); H.R. 4128, §§ 202 and 203, 114th Cong. (2015). The bill increases the preparer penalty for gross misconduct to 100 percent of the amount of the understatement of tax.  *Id.*

38   S. 2333, §§ 202 and 203, 114th Cong. (2015); H.R. 4128, §§ 202 and 203, 114th Cong. (2015).

39   See, e.g., National Taxpayer Advocate 2009 Annual Report to Congress 357-64 (Legislative Recommendation: *Strengthen Taxpayer Protections in the Filing and Reporting of Federal Tax Liens*).

appeal the lien determination before the lien is filed.[40]  Additionally, the bill would amend the Fair Credit Reporting Act to require removal of derogatory lien-filing information from credit reports under certain circumstances.[41]

TRA 2015 also includes the National Taxpayer Advocate's 2011 recommendation to clarify that the scope and standard of review for taxpayers seeking equitable relief from joint and several liability under IRC § 6015(f) is *de novo*.[42]  In addition, the legislation would require the IRS to have at least one Appeals officer and one settlement officer assigned to each State and made available to the residents of each such State.[43]  Further, the legislation would allow the National Taxpayer Advocate to appeal to the Commissioner for final determination a decision by the IRS Deputy Commissioner to modify or rescind of a Taxpayer Assistance Order.[44]  Finally, the legislation would codify the National Taxpayer Advocate's authority to issue a Taxpayer Advocate Directive to the IRS.[45]

### Taxpayer Bill of Rights Enhancement Act of 2015

On June 16, 2015, Senators Grassley and Thune introduced the Taxpayer Bill of Rights Enhancement Act of 2015, which would amend IRC § 7803 to require the Commissioner of Internal Revenue to ensure that IRS employees are familiar with and act in accordance with taxpayer rights.[46]  As noted above, this provision was enacted in the Consolidated Appropriations Act, 2016.[47]  The proposed legislation would also:

- Hold individuals harmless on improper levy on individual retirement plans.[48]

- Provide authority to the National Taxpayer Advocate to comment on Treasury Regulations.[49]

---

40  S. 2333, § 301, 114th Cong. (2015) and H.R. 4128, § 301, 114th Cong. (2015).

41  S. 2333, § 302, 114th Cong. (2015) and H.R. 4128, § 302, 114th Cong. (2015).

42  S. 2333, § 303, 114th Cong. (2015) and H.R. 4128, § 303, 114th Cong. (2015).  *See* National Taxpayer Advocate 2011 Annual Report to Congress 531-36 (Legislative Recommendation: *Clarify that the Scope and Standard of Tax Court Determinations Under Internal Revenue Code Section 6015(f) Is De Novo*).

43  S. 2333, § 309, 114th Cong. (2015); H.R. 4128, § 309, 114th Cong. (2015).  *See* National Taxpayer Advocate 2014 Annual Report to Congress 311 (Legislative Recommendation: *Access to Appeals: Require that Appeals Have At Least One Appeals Officer and Settlement Officer Located and Permanently Available within Every State, the District of Columbia, and Puerto Rico*); National Taxpayer Advocate 2009 Annual Report to Congress 346-50 (Legislative Recommendation: *Strengthen the Independence of the IRS Office of Appeals and Require at Least One Appeals Officer and Settlement Officer in Each State*).

44  S. 2333, § 401, 114th Cong. (2015) and H.R. 4128, § 401, 114th Cong. (2015).

45  S. 2333, § 402, 114th Cong. (2015) and H.R. 4128, § 402, 114th Cong. (2015).  *See* National Taxpayer Advocate 2011 Annual Report to Congress 573-81 (Legislative Recommendation: *Codify the Authority of the National Taxpayer Advocate to File Amicus Briefs, Comment on Regulations, and Issue Taxpayer Advocate Directives*).  Taxpayer Advocate Directives mandate administrative or procedural changes to improve the operation of a functional process or to grant relief to groups of taxpayers or all taxpayers. IRM 13.1.4.2.2.5, *Delegation Order No. 250 — Authority to Issue Taxpayer Advocate Directives* (Oct. 31, 2004).

46  S. 1578, § 101, 114th Cong. (2015).

47  *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 401 (2015).

48  S. 1578, § 402, 114th Cong. (2015).  *See* National Taxpayer Advocate 2001 Annual Report to Congress 202–214 (Legislative Recommendation: *Reinstatement of Retirement Account*).

49  S. 1578, § 404, 114th Cong. (2015).  *See* National Taxpayer Advocate 2011 Annual Report to Congress 573-81 (Legislative Recommendation: *Codify the Authority of the National Taxpayer Advocate to File Amicus Briefs, Comment on Regulations, and Issue Taxpayer Advocate Directives*).

001703

■ Require the IRS to have at least one Appeals officer and one settlement officer located and permanently available in each State, the District of Columbia, and Puerto Rico.[50]

### Small Business Taxpayer Bill of Rights Act of 2015

On April 15, 2015, Senator Cornyn and Representative Thornberry introduced the Small Business Taxpayer Bill of Rights Act of 2015, which would enact a number of the National Taxpayer Advocate's previous recommendations.[51] The legislation would prohibit *ex parte* communications between Appeals officers and other IRS employees.[52] The bill also includes two recommendations relating to collection. First, it would extend the period in which a third party can bring a suit for return of levied funds or proceeds.[53] Second, it would waive the installment agreement fee for taxpayers whose adjusted gross income does not exceed 250 percent of the federal poverty level.[54]

Finally, the legislation contains two of the National Taxpayer Advocate's recommendations regarding relief from joint and several liability. The bill would suspend the running of the period for filing a Tax Court petition seeking review of an innocent spouse claim or collection due process determination for the period of time the taxpayer is prohibited because of the automatic stay imposed under section 362 of the Bankruptcy Code from filing the petition, plus 60 additional days.[55] The legislation would also clarify that the scope and standard of review for taxpayers seeking equitable relief from joint and several liability under IRC § 6015(f) is *de novo*.[56]

### Taxpayer Bill of Rights Act of 2015

On February 25, 2015, Representative Roskam introduced the Taxpayer Bill of Rights Act of 2015, which would amend IRC § 7803 to require the Commissioner of Internal Revenue to ensure that IRS employees are familiar with and act in accordance with taxpayer rights.[57] As noted above, this provision was enacted

---

50   S. 1578, § 602, 114th Cong. (2015). *See National Taxpayer Advocate 2014 Annual Report to Congress 311 (Legislative Recommendation: Access to Appeals: Require that Appeals Have At Least One Appeals Officer and Settlement Officer Located and Permanently Available within Every State, the District of Columbia, and Puerto Rico)*; National Taxpayer Advocate 2009 Annual Report to Congress 346-50 (Legislative Recommendation: *Strengthen the Independence of the IRS Office of Appeals and Require at Least One Appeals Officer and Settlement Officer in Each State*).

51   Small Business Taxpayer Bill of Rights Act of 2015, S. 949, 114th Cong. (2015); H.R. 1828, 114th Cong. (2015).

52   S. 949, § 7, 114th Cong. (2015); H.R. 1828, § 7, 114th Cong. (2015). *See National Taxpayer Advocate 2009 Annual Report to Congress 346-50 (Legislative Recommendation: Strengthen the Independence of the IRS Office of Appeals and Require at Least One Appeals Officer and Settlement Officer in Each State)* (noting the IRS Restructuring and Reform Act of 1998 prohibits *ex parte* communication between Appeals employees and other IRS employees, but recent IRS practices allowing Appeals employees to share office space with other IRS employees foster a perception of a lack of independence).

53   S. 949, § 9, 114th Cong. (2015); H.R. 1828, § 9, 114th Cong. (2015). The bill extends the time for third parties to bring suit from nine months to three years. *See National Taxpayer Advocate 2001 Annual Report to Congress 202-09 (Legislative Recommendation: Return of Levy or Sale Proceeds)*.

54   S. 949, § 10, 114th Cong. (2015); H.R. 1828, § 10, 114th Cong. (2015). *See National Taxpayer Advocate 2006 Annual Report to Congress 141-56 (Most Serious Problem: Collection Issues of Low Income Taxpayers)* (recommending the IRS implement an installment agreement (IA) user fee waiver for low income taxpayers and adopt a graduated scale for other IA user fees based on the amount of work required).

55   S. 949, § 11, 114th Cong. (2015); H.R. 1828, § 11, 114th Cong. (2015). *See National Taxpayer Advocate 2006 Annual Report to Congress 536-7 (Additional Legislative Recommendation: Suspend the Period for Filing a Tax Court Petition During Bankruptcy)*; National Taxpayer Advocate 2004 Annual Report to Congress 490-92 (Legislative Recommendation: *Effect of Automatic Stay Imposed in Bankruptcy Cases upon Innocent Spouse and CDP Petitions in Tax Court*).

56   S. 949, § 14, 114th Cong. (2015); H.R. 1828, § 14, 114th Cong. (2015). *See National Taxpayer Advocate 2006 Annual Report to Congress 536-7 (Additional Legislative Recommendation: Suspend the Period for Filing a Tax Court Petition During Bankruptcy)*; National Taxpayer Advocate 2011 Annual Report to Congress 531-36 (Legislative Recommendation: *Clarify that the Scope and Standard of Tax Court Determinations Under Internal Revenue Code Section 6015(f) is De Novo*).

57   Taxpayer Bill of Rights Act of 2015, H.R. 1058, 114th Cong. (2015).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 2   PageID #:  4877

Legislative
Recommendations

Most Litigated
Issues

Most Serious
Problems

in the Consolidated Appropriations Act, 2016. [58]  On April 15, 2015, the bill was approved by the House of Representatives, but the Senate did not act on it.

## Consolidate Education Incentives

The National Taxpayer Advocate has recommended consolidating and simplifying various Code provisions to make compliance less difficult.[59]  In March 2015, Senator Schumer and Representative Doggett introduced companion bills that include the National Taxpayer Advocate's recommendation to consolidate the education tax credits known as the Hope Scholarship and the Lifetime Learning Credits. [60]  The proposed legislation would amend the Code to replace the two credits with a new American Opportunity Tax Credit that: (1) allows an income tax credit of up to $3,000 of the qualified tuition and related expenses of a student who is carrying at least one half of a normal course load; (2) increases the income threshold for reductions in the credit amount based on modified adjusted gross income; (3) allows a lifetime dollar limitation on such credit of $15,000 for all taxable years; and (4) makes 40 percent of the credit refundable.  Additionally, the bill allows an exclusion from gross income of any amount received as a federal Pell grant.

---

58   *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Division Q, § 401 (2015).

59   *See, e.g.*, National Taxpayer Advocate 2008 Annual Report to Congress 370-72 (Legislative Recommendation: *Simplify and Streamline Education Tax Incentives*).

60   S. 699, 114th Cong. (2015); H.R. 1260, 114th Cong. (2015).

001705

# National Taxpayer Advocate Legislative Recommendations with Congressional Action

| Alternative Minimum Tax (AMT) | |
|---|---|
| **Repeal the Individual AMT** | |
| National Taxpayer Advocate 2001 Annual Report to Congress 82–100; National Taxpayer Advocate 2004 Annual Report to Congress 383–385; National Taxpayer Advocate 2008 Annual Report to Congress 356–362. | Repeal the AMT outright. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 113th Congress | S 1616 | Lee | 10/30/2013 | Referred to the Finance Committee |
| | HR 243 | Ross | 1/14/2013 | Referred to Ways & Means Committee |
| Legislative Activity 112th Congress | HR 86 | Bachmann | 1/5/2011 | Referred to Ways & Means Committee |
| | HR 99 | Dreler | 1/5/2011 | Referred to Ways & Means Committee |
| | HR 547 | Garrett | 2/8/2011 | Referred to Ways & Means Committee |
| | HR 3400 | Garrett | 11/10/2011 | Referred to Ways & Means Committee |
| | S 727 | Wyden | 4/5/2011 | Referred to the Finance Committee |
| | S 820 | Shelby | 4/14/2011 | Referred to the Finance Committee |
| | HR 3804 | Huelskamp | 1/23/2012 | Referred to Ways & Means Committee |
| Legislative Activity 111th Congress | S 3018 | Wyden | 2/23/2010 | Referred to the Finance Committee |
| | HR 240 | Garrett | 1/7/2009 | Referred to the Ways & Means Committee |
| | HR 782 | Paul | 1/28/2009 | Referred to the Ways & Means Committee |
| | S 932 | Shelby | 4/30/2009 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | S 55 | Baucus | 1/4/2007 | Referred to the Finance Committee |
| | S 14 | Kyl | 4/17/2007 | Referred to the Finance Committee |
| | S 1040 | Shelby | 3/29/2007 | Referred to the Finance Committee |
| | HR 1366 | English | 3/7/2007 | Referred to the Ways & Means Committee |
| | HR 1942 | Garrett | 4/19/2007 | Referred to the Ways & Means Committee |
| | HR 3970 | Rangel | 10/25/2007 | Referred to the Ways & Means Committee |
| | S 2293 | Lott | 11/1/2007 | Placed on the Senate Legislative Calendar under General Orders. Calendar No. 464 |
| Legislative Activity 109th Congress | HR 1186 | English | 3/9/2005 | Referred to the Ways & Means Committee |
| | S 1103 | Baucus | 5/23/2005 | Referred to the Finance Committee |
| | HR 2950 | Neal | 6/16/2005 | Referred to the Ways & Means Committee |
| | HR 3841 | Manzullo | 9/2/2005 | Referred to the Ways & Means Committee |

| Legislative Activity 108th Congress | HR 43 | Collins | 1/7/2003 | Referred to the Ways & Means Committee |
|---|---|---|---|---|
| | HR 1233 | English | 3/12/2003 | Referred to the Ways & Means Committee |
| | S 1040 | Shelby | 5/12/2003 | Referred to the Finance Committee |
| | HR 3060 | N. Smith | 9/10/2003 | Referred to the Ways & Means Committee |
| | HR 4131 | Houghton | 4/2/2004 | Referred to the Ways & Means Committee |
| | HR 4164 | Shuster | 4/2/2004 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 437 | English | 2/6/2001 | Referred to the Ways & Means Committee |
| | S 616 | Hutchison | 3/26/2002 | Referred to the Finance Committee |
| | HR 5166 | Portman | 7/18/2002 | Referred to the Ways & Means Committee |

| Index AMT for Inflation | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 82–100. | If full repeal of the individual AMT is not possible, it should be indexed for inflation. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3223 | McConnell | 9/13/2010 | Placed on the Senate Calendar |
| | HR 5077 | Hall | 4/20/2010 | Referred to the Ways & Means Committee |
| | HR  719 | Lee | 1/27/2009 | Referred to the Ways & Means Committee |
| | S 722 | Baucus | 3/26/2009 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | HR 1942 | Garrett | 4/19/2007 | Referred to the Ways & Means Committee |
| Legislative Activity 109th Congress | HR 703 | Garrett | 2/9/2005 | Referred to the Ways & Means Committee |
| | HR 4096 | Reynolds | 10/20/2005 | 12/7/2005–Passed the House; 12/13/2005–Placed on the Senate Legislative Calendar |
| Legislative Activity 108th Congress | HR 22 | Houghton | 1/7/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 5505 | Houghton | 10/1/2002 | Referred to the Ways & Means Committee |

| Eliminate Several Adjustments for Individual AMT | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 82–100. | Eliminate personal exemptions, the standard deduction, deductible state and local taxes, and miscellaneous itemized deductions as adjustment items for individual AMT purposes. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 336 | DeMint | 2/14/2011 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | S 102 | Kerry | 1/4/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | S 1861 | Harkin | 10/7/2005 | Referred to the Finance Committee |
| Legislative Activity 108th Congress | HR 1939 | Neal | 5/12/2003 | Referred to the Ways & Means Committee |

001707

| Private Debt Collection (PDC) | | | |
|---|---|---|---|
| **Repeal PDC Provisions** | | | |
| National Taxpayer Advocate 2006 Annual Report to Congress 458–462. | Repeal IRC § 6306, thereby terminating the PDC initiative. | | |
| | Bill Number | Sponsor | Date | Status |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 111th Congress | HR 796 | Lewis | 2/3/2009 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |
| | S 335 | Dorgan | 1/18/2007 | Referred to the Finance Committee |
| | HR 695 | Van Hollen | 1/24/2007 | Referred to the Ways & Means Committee |
| | HR 3056 | Rangel | 7/17/2007 | 10/10/2007-Passed the House; 10/15/2007 Referred to the Finance Committee |

| Tax Preparation and Low Income Taxpayer Clinics (LITC) | | | |
|---|---|---|---|
| **Matching Grants Program for Return Preparation** | | | |
| National Taxpayer Advocate 2002 Annual Report to Congress vii–viii. | Create a grant program for return preparation similar to the LITC grant program. The program should be designed to avoid competition with VITA and should support the IRS's goal (and need) to have returns electronically filed. | | |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division E (2015).** | | | |
| | Bill Number | Sponsor | Date | Status |
| | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| Legislative Activity 113th Congress | **Pub. L. No. 113-235, Division E, 128 STAT. 2130, 2336 (2014).** | | | |
| Legislative Activity 111th Congress | **Pub. L. No. 111-117, Div. C, Title I, 123 Stat. 3034, 3163 (2009).** | | | |
| Legislative Activity 110th Congress | **Pub. L. No. 110-161, Div. D, Title I, 121 Stat. 1975, 1976 (2007).** | | | |
| | Bill Number | Sponsor | Date | Status |
| | HR 5716 | Becerra | 4/8/2008 | Referred to the Ways & Means Committee |
| | S 1219 | Bingaman | 4/25/2007 | Referred to the Finance Committee |
| | S 1967 | Clinton | 8/2/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | HR 894 | Becerra | 2/17/2005 | Referred to the Financial Institutions and Consumer Credit Subcommittee |
| | S 832 | Bingaman | 4/18/2005 | Referred to the Finance Committee |
| | S 1321 | Santorum | 6/28/2005 | 9/15/2006–Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with S. Rep. No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders. Calendar No. 614 |
| Legislative Activity 108th Congress | S 476 | Grassley | 2/27/2003 | Referred to the Finance Committee |
| | S 685 | Bingaman | 3/21/2003 | Referred to the Finance Committee |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated into HR 1528 as an amendment and HR 1528 passed in lieu of S 882 |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| | HR 3983 | Becerra | 3/17/2004 | Referred to the Ways & Means Committee |

001708

| Legislative Activity 107th Congress | HR 586 | Lewis | 2/13/2001 | 4/18/2002–Passed the House with an amendment; referred to the Senate |
| | HR 3991 | Houghton | 3/19/2001 | Referred to the Ways & Means Committee |
| | HR 7 | Baucus | 7/16/2002 | Reported by Chairman Baucus with an amendment; referred to the Finance Committee |

| **Referrals to LITCs** | |
|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 551–553. | Amend IRC § 7526(c) to add a special rule stating that notwithstanding any other provision of law, IRS employees may refer taxpayers to LITCs receiving funding under this section.  This change will allow IRS employees to refer a taxpayer to a specific clinic for assistance. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 1573 | Durbin | 9/15/2011 | Placed on the Senate Legislative Calendar under General Orders. Calendar No. 171 |
| | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| Legislative Activity 111th Congress | HR 4994 | Lewis | 4/13/2010 | Referred to the Ways & Means Committee |
| | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |

| **Regulation of Income Tax Return Preparers** | |
|---|---|
| National Taxpayer Advocate 2002 Annual Report to Congress 216–230; National Taxpayer Advocate 2003 Annual Report to Congress 270–301; National Taxpayer Advocate 2007 Annual Report to Congress 83–95 & 140-155; National Taxpayer Advocate 2008 Annual Report to Congress 423–426; National Taxpayer Advocate 2009 Annual Report to Congress 41–69. National Taxpayer Advocate 2009 Annual Report to Congress 60-74 | Create an effective oversight and penalty regime for return preparers by taking the following steps:<br>♦ Enact a registration, examination, certification, and enforcement program for federal tax return preparers;<br>♦ Direct the Secretary of the Treasury to establish a joint task force to obtain accurate data about the composition of the return preparer community and make recommendations about the most effective means to ensure accurate and professional return preparation and oversight;<br>♦ Require the Secretary of the Treasury to study the impact cross-marketing tax preparation products and services with other consumer products and services has on the accuracy of returns and tax compliance; and<br>♦ Require the IRS to take steps within its existing administrative authority, including requiring a checkbox on all returns in which preparers would enter their category of return preparer (*i.e.,* attorney, CPA, enrolled agent, or unenrolled preparer) and developing a simple, easy-to-read pamphlet for taxpayers that explains their protections. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |

001709

| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | HR 5716 | Becerra | 4/8/2008 | Referred to the Ways & Means Committee |
| | S 1219 | Bingaman | 4/25/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | HR 894 | Becerra | 2/17/2005 | Referred to the Financial Institutions and Consumer Credit Subcommittee |
| | S 832 | Bingaman | 4/18/2005 | Referred to the Finance Committee |
| | S 1321 | Santorum | 6/28/2005 | 9/15/2006–Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336<br>9/15/2006–Placed on Senate Legislative Calendar under General Orders; Calendar No. 614 |
| Legislative Activity 108th Congress | S 685 | Bingaman | 3/21/2003 | Referred to the Finance Committee |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated into HR 1528 as an amendment and HR 1528 passed in lieu of S 882 |
| | HR 3983 | Becerra | 3/17/2004 | Referred to the Ways & Means Committee |

### Identity Theft

**Single Point of Contact**
National Taxpayer Advocates 2013 Annual Report

Designate a single point of contact for identity theft victims to work with the identity theft victim until all related issues are resolved.

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 113th Congress | S 2736 | Hatch | 7/31/2014 | Referred to Finance Committee |

### Public Awareness Campaign for Low Income Taxpayer Clinics

National Taxpayer Advocate 2014 Annual Report to Congress 411-416;
National Taxpayer Advocate 2014 Annual Report to Congress, vol. 2, 1-26;
National Taxpayer Advocate 2007 Annual Report to Congress 551 -553.

Authorize the Secretary to promote the benefits of and encourage the use of qualified LITCs through the use of mass communications, referrals, and other means.

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |

### Public Awareness Campaign on Registration Requirements

National Taxpayer Advocate 2002 Annual Report to Congress 216–230.

Authorize the IRS to conduct a public information and consumer education campaign, utilizing paid advertising, to inform the public of the requirements that paid preparers must sign the return prepared for a fee and display registration cards.

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | HR 5716 | Becerra | 4/8/2008 | Referred to the Ways & Means Committee |
| | S 1219 | Bingaman | 4/25/2007 | Referred to the Finance Committee |

001710

| Legislative Activity 109th Congress | HR 894 | Becerra | 2/17/2005 | Referred to the Financial Institutions and Consumer Credit Subcommittee |
|---|---|---|---|---|
| | S 832 | Bingaman | 4/18/2005 | Referred to the Finance Committee |
| | S 1321 | Santorum | 6/28/2005 | 9/15/2006–Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with S. Rep. No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |
| Legislative Activity 108th Congress | S 685 | Bingaman | 3/21/2003 | Referred to the Finance Committee |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated into HR 1528 as an amendment and HR 1528 passed in lieu of S 882 |
| | HR 3983 | Becerra | 3/17/2004 | Referred to the Ways & Means Committee |

| **Increase Preparer Penalties** | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2003 Annual Report to Congress 270–301. | Strengthen oversight of all preparers by enhancing due diligence and signature requirements, increasing the dollar amount of preparer penalties, and assessing and collecting those penalties, as appropriate. | | | |

| Legislative Activity 112th Congress | **Pub. L. No. 112-41 § 501, 125 Stat. 428, 459 (2011).** | | | |
|---|---|---|---|---|
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |
| | HR 4318 | Crowley/ Ramstad | 12/6/2007 | Referred to the Ways & Means Committee |
| | S 2851 | Bunning | 4/14/2008 | Referred to the Finance Committee |
| | S 1219 | Bingaman | 4/25/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | HR 894 | Becerra | 2/17/2005 | Referred to the Financial Institutions and Consumer Credit Subcommittee |
| | S 832 | Bingaman | 4/18/2005 | Referred to the Finance Committee |
| | S 1321 | Santorum | 6/28/2005 | 9/15/2006–Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title. With written report No. 109-336 9/15/2006–Placed on Senate Legislative Calendar under General Orders; Calendar No. 614 |
| Legislative Activity 108th Congress | S 685 | Bingaman | 3/21/2003 | Referred to the Finance Committee |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated into HR 1528 as an amendment and HR 1528 passed in lieu of S 882 |
| | HR 3983 | Becerra | 3/17/2004 | Referred to the Ways & Means Committee |

001711

| Refund Delivery Options | |
|---|---|
| National Taxpayer Advocate 2008 Report to Congress 427–441. | Direct the Department of the Treasury and the IRS to (1) minimize refund turnaround times; (2) implement a Revenue Protection Indicator; (3) develop a program to enable unbanked taxpayers to receive refunds on stored value cards (SVCs); and (4) conduct a public awareness campaign to disseminate accurate information about refund delivery options. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Senate Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| | HR 4994 | Lewis | 4/13/2010 | Referred to the Ways & Means Committee |

## Small Business Issues

| Health Insurance Deduction/Self-Employed Individuals | |
|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 223; National Taxpayer Advocate 2008 Annual Report to Congress 388–389. | Allow self-employed taxpayers to deduct the costs of health insurance premiums for purposes of self-employment taxes. |

| | Pub. L. No. 111-240, § 2504 STAT 2560 (2010). | | | |
|---|---|---|---|---|
| Legislative Activity 111th Congress | Bill Number | Sponsor | Date | Status |
| | S 725 | Bingaman | 3/26/2009 | Referred to the Finance Committee |
| | HR 1470 | Kind | 3/12/2009 | Referred to the Ways & Means Committee |
| Legislative Activity 110th Congress | S 2239 | Bingaman | 10/25/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | S 663 | Bingaman | 3/17/2005 | Referred to the Finance Committee |
| | S 3857 | Smith | 9/16/2006 | Referred to the Finance Committee |
| Legislative Activity 108th Congress | HR 741 | Sanchez | 2/12/2003 | Referred to the Ways & Means Committee |
| | HR 1873 | Manzullo Velazquez | 4/30/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | S 2130 | Bingaman | 4/15/2002 | Referred to the Finance Committee |

| Married Couples as Business Co-owners | |
|---|---|
| National Taxpayer Advocate 2002 Annual Report to Congress 172–184. | Amend IRC § 761(a) to allow a married couple operating a business as co-owners to elect out of subchapter K of the IRC and file one Schedule C (or Schedule F in the case of a farming business) and two Schedules SE if certain conditions apply. |

| | Pub.L. No. 110-28, Title VIII, § 8215, 121 Stat. 193, 194 (2007). | | | |
|---|---|---|---|---|
| Legislative Activity 110th Congress | Bill Number | Sponsor | Date | Status |
| Legislative Activity 109th Congress | HR 3629 | Doggett | 7/29/2005 | Referred to the Ways & Means Committee |
| | HR 3841 | Manzullo | 9/2/2005 | Referred to the Ways & Means Committee |

| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in Senate, with an amendment |
| | S 842 | Kerry | 4/9/2003 | Referred to the Finance Committee |
| | HR 1640 | Udall | 4/3/2003 | Referred to the Ways & Means Committee |
| | HR 1558 | Doggett | 4/2/2003 | Referred to the Ways & Means Committee |

| **Income Averaging for Commercial Fishermen** | | | | |
| National Taxpayer Advocate 2001 Annual Report to Congress 226. | Amend IRC § 1301(a) to provide commercial fishermen the benefit of income averaging currently available to farmers. | | | |
| Legislative Activity 108th Congress | **Pub. L. No. 108-357, § 314, 118 Stat. 1468, 1469 (2004).** | | | |

| **Election to be Treated as an S Corporation** | | | | |
| National Taxpayer Advocate 2004 Annual Report to Congress 390–393. | Amend IRC § 1362(a) to allow a small business corporation to elect to be treated as an S corporation no later than the date it timely files (including extensions) its first Form 1120S, *U.S. Income Tax Return for an S Corporation.* | | | |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 112th Congress | S 2271 | Franken | 3/29/2012 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | HR 3629 | Doggett | 7/29/2005 | Referred to the Ways & Means Committee |
| | HR 3841 | Manzullo | 9/2/2005 | Referred to the Ways & Means Committee |

| **Regulation of Payroll Tax Deposits Agents** | | | | |
| National Taxpayer Advocate 2004 Annual Report to Congress 394–399. | ◆ Amend the Code to require any person who enters into an agreement with an employer to collect, report, and pay any employment taxes to furnish a performance bond that specifically guarantees payment of federal payroll taxes collected, deducted, or withheld by such person from an employer and from wages or compensation paid to employees; ◆ Amend IRC § 3504 to require agents with an approved Form 2678, *Employer/Payer Appointment of Agent,* to allocate reported and paid employment taxes among their clients using a form prescribed by the IRS and impose a penalty for the failure to file absent reasonable cause; and ◆ Amend the U.S. Bankruptcy Code to clarify that IRC § 6672 penalties survive bankruptcy in the case of non-individual debtors. | | | |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division E, § 106 (2015).** | | | |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 113th Congress | S 900 | Mikulski | 05/08/2013 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | S 1773 | Snowe | 7/12/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | S 3583 | Snowe | 6/27/2006 | Referred to the Finance Committee |
| | S 1321 | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |

001713

| **Issue Dual Address Change Notice** | |
|---|---|
| National Taxpayer Advocate 2004 Annual Report to Congress 394–399. | Issue dual address change notices related to an employer making employment tax payments (with one notice sent to both the employer's former and new address) |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division E, § 106 (2015).** |
| Legislative Activity 113th Congress | **Pub. L. No. 113-76, Division E, Title I, § 106, 128 Stat. 5, 190 (2014) and  Pub. L. No. 113-235, Division E, Title I, § 106, 128 Stat. 2130, 2338 (2014).** |
| **Special Consideration for offer in compromise** | |
| National Taxpayer Advocate 2004 Annual Report to Congress 394–399. | Give special consideration to an offer in compromise (OIC) request from a victim of fraud or bankruptcy by a third-party payroll tax preparer. |
| Legislative Activity 113th Congress | **Pub. L. No. 113-76, Division E, Title I, § 106, 128 Stat. 5, 190 (2014) and  Pub. L. No. 113-235, Division E, Title I, § 106, 128 Stat. 2130, 2338 (2014).** |

## Simplification

| **Reduce the Number of Tax Preferences** | | | |
|---|---|---|---|
| National Taxpayer Advocate 2010 Annual Report to Congress 365–372. | Simplify the complexity of the tax code generally by reducing the number of tax preferences. | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 727 | Wyden | 4/5/2011 | Referred to the Finance Committee |

| **Simplify and Streamline Education Tax Incentives** | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2008 Annual Report to Congress 370–372; National Taxpayer Advocate 2004 Annual Report to Congress 403–422. | Enact reforms to simplify and streamline the education tax incentives by consolidating, creating uniformity among, or adding permanency to the various education tax incentives.  Specifically, (1) incentives under § 25A should be consolidated with § 222 and possibly § 221, (2) the education provisions should be made more consistent regarding the relationship of the student to the taxpayer, (3) the definitions for "Qualified Higher Education Expenses" and "Eligible Education Institution" should be simplified, (4) the income level and phase-out calculations should be more consistent under the various provisions, (5) all dollar amounts should be indexed for inflation, and (6) after initial use of sunset provisions and simplification amendments, the incentives should be made permanent. | | | |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | S 699 | Schumer | 3/10/2015 | Referred to the Finance Committee |
| | HR 1260 | Doggett | 3/4/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 113th Congress | S 835 | Schumer | 4/25/2013 | Referred to the Finance Committee |
| | HR 1738 | Doggett | 4/25/2013 | Referred to the Ways & Means Committee |
| | HR 3476 | Israel | 11/13/2013 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 727 | Wyden | 4/5/2011 | Referred to the Finance Committee |
| | S 3267 | Schumer | 6/6/2012 | Referred to the Finance Committee |
| | HR 6522 | Israel | 9/21/2012 | Referred to the Ways & Means Committee |

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 57 of 154 PageID #:  4887

Most Serious
Issues

Legislative
Recommendations

Most Litigated
Problems

| Simplify and Streamline Retirement Savings Tax Incentives | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2008 Annual Report to Congress 373–374; National Taxpayer Advocate 2004 Annual Report to Congress 423–432. | Consolidate existing retirement incentives, particularly where the differences in plan attributes are minor. For instance, Congress should consider establishing one retirement plan for individual taxpayers, one for plans offered by small businesses, and one suitable for large businesses and governmental entities (eliminating plans that are limited to governmental entities). At a minimum, Congress should establish uniform rules regarding hardship withdrawals, plan loans, and portability. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 727 | Wyden | 4/5/2011 | Referred to the Finance Committee |

**Tax Gap Provisions**

| Corporate Information Reporting | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2008 Annual Report to Congress 388. | Require businesses that pay $600 or more during the year to non-corporate and corporate service providers to file an information report with each provider and with the IRS.  Information reporting already is required on payments for services to non-corporate providers.  This applies to payments made after December 31, 2011. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 1796 | Baucus | 10/19/2009 | 10/19/2009 Placed on Senate Legislative Calendar under General Orders. Calendar No. 184 |

| Reporting on Customer's Basis in Security Transaction | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2005 Annual Report to Congress 433–441. | Require brokers to keep track of an investor's basis, transfer basis information to a successor broker if the investor transfers the stock or mutual fund holding, and report basis information to the taxpayer and the IRS (along with the proceeds generated by a sale) on Form 1099-B. | | | |
| Legislative Activity 110th Congress | **Pub. L. No. 110-343, § 403, 121 Stat. 3854, 3855 (2008).** | | | |
| | Bill Number | Sponsor | Date | Status |
| | HR 878 | Emanuel | 2/7/2007 | Referred to the Ways & Means Committee |
| | S 601 | Bayh | 2/14/2007 | Referred to the Finance Committee |
| | S 1111 | Wyden | 4/16/2007 | Referred to the Finance Committee |
| | HR 2147 | Emanuel | 5/3/2007 | Referred to the Ways & Means Committee |
| | HR 3996 PCS | Rangel | 10/30/2007 | 11/14/2007–Placed on the Senate Calendar; became Pub. L. No. 110-166 (2007) without this provision |
| Legislative Activity 109th Congress | S 2414 | Bayh | 3/14/2006 | Referred to the Finance Committee |
| | HR 5176 | Emanual | 4/25/2006 | Referred to the Ways & Means Committee |
| | HR 5367 | Emanual | 5/11/2006 | Referred to the Ways & Means Committee |

| IRS Forms Revisions | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2004 Annual Report to Congress 480; National Taxpayer Advocate 2010 Annual Report to Congress 40. | Revise Form 1040, Schedule C, to include a line item showing the amount of self-employment income that was reported on Forms 1099-MISC. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |

001715

| IRS to Promote Estimated Tax Payments Through the Electronic Federal Tax Payment System (EFTPS) | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2005 Annual Report to Congress 381–396. | Amend IRC § 6302(h) to require the IRS to promote estimated tax payments through EFTPS and establish a goal of collecting at least 75 percent of all estimated tax payment dollars through EFTPS by fiscal year 2012. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 109th Congress | S 1321RS | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |

| Study of Use of Voluntary Withholding Agreements | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2004 Annual Report to Congress 478–489; National Taxpayer Advocate 2005 Annual Report to Congress 381-396. | Amend IRC § 3402(p)(3) to specifically authorize voluntary withholdings agreements between independent contractors and service-recipients as defined in IRC § 6041A(a)(1). | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 109th Congress | S 1321RS | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336. 9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |

| Require Form 1099 Reporting for Incorporated Service Providers | |
|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 494–496. | Require service recipients to issue Forms 1099-MISC to incorporated service providers and increase the penalties for failure to comply with the information reporting requirements. |
| Legislative Activity 111th Congress | **Pub. L No. 111-148 § 9006 (2010).** <br><br> However, this Act also contains a reporting requirement for goods sold, which the National Taxpayer Advocate opposes because of the enormous burden it places on businesses.  See Legislative Recommendation: Repeal the Information Reporting Requirement for Purchases of Goods over $600, but Require Reporting on Corporate and Certain Other Payments. |

| Require Financial Institutions to Report All Accounts to the IRS by Eliminating the $10 Threshold on Interest Reporting | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 501–502. | Eliminate the $10 interest threshold beneath which financial institutions are not required to file Form 1099-INT reports with the IRS. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

001716

| Revise Form 1040, Schedule C to Break Out Gross Receipts Reported on Payee Statements Such as Form 1099 | |  | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 40. | Administrative recommendation that the IRS add a line to Schedule C so that taxpayers would separately report the amount of income reported to them on Forms 1099 and other income not reported on Forms 1099.  If enacted by statute, the IRS would be required to implement this recommendation. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

| Include a Checkbox on Business Returns Requiring Taxpayers to Verify that they Filed all Required Forms 1099 | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 40. | Administrative recommendation that the IRS require all businesses to answer two questions on their income tax returns: "Did you make any payments over $600 in the aggregate during the year to any unincorporated trade or business?" and "If yes, did you file all required Forms 1099?"  S 3795 would require the IRS to study whether placing a checkbox or similar indicator on business tax returns would affect voluntary compliance. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

| Authorize Voluntary Withholding Upon Request | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 493–494. | Authorize voluntary withholding agreements between independent contractors and service recipients. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

| Require Backup Withholding on Certain Payments When TINs Cannot Be Validated | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2005 Annual Report to Congress 238–248. | Administrative recommendation that the IRS require payors to commence backup withholding if they do not receive verification of a payee's TIN.  (S. 3795 would require voluntary withholding on certain payments.) | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

| Worker Classification | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2008 Annual Report to Congress 375–390. | Direct Treasury and the Joint Committee on Taxation to report on the operation of the revised worker classification rules and provide recommendations to increase compliance. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |

001717

| Taxpayer Bill of Rights and *De Minimis* "Apology" Payments | |
|---|---|
| **Taxpayer Bill of Rights** | |
| National Taxpayer Advocate 2014 Annual Report to Congress National Taxpayer Advocate 2013 Annual Report to Congress National Taxpayer Advocate 2011 Annual Report to Congress 493-518 National Taxpayer Advocate 2007 Annual Report to Congress 478–48. | Enact a Taxpayer Bill of Rights setting forth the fundamental rights and obligations of U.S. taxpayers. |

| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 401 (2015).** | | | |
|---|---|---|---|---|
| | Bill Number | Sponsor | Date | Status |
| | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| | S 1578 | Grassley | 6/16/2015 | Referred to the Finance Committee |
| | S 943 | Portman | 4/15/2015 | Referred to the Finance Committee |
| | S 951 | Ayotte | 4/15/2015 | Referred to the Finance Committee |
| | HR 1058 | Roskam | 2/25/2015 | Passed the House of Representatives, and was referred to the Senate Finance Committee on 4/16/2015 |
| Legislative Activity 113th Congress | HR 2768 | Roskam | 6/22/2013 | Passed the House of Representatives, and was referred to the Senate Finance Committee on 8/31/2013 |
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Ways & Means Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | HR 5716 | Becerra | 4/8/2008 | Referred to the Ways & Means Committee |

| ***De Minimis* "Apology" Payments** | |
|---|---|
| National Taxpayer Advocate 2007 Annual Report to Congress 490. | Grant the National Taxpayer Advocate the discretionary, nondelegable authority to provide *de minimis* compensation to taxpayers where the action or inaction of the IRS has caused excessive expense or undue burden to the taxpayer and the taxpayer meets the IRC § 7811 definition of significant hardship. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 112th Congress | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |
| Legislative Activity 111th Congress | S 3795 | Carper | 9/16/2010 | Referred to the Finance Committee |

| Simplify the Tax Treatment of Cancellation of Debt Income | |
|---|---|
| **Simplify the Tax Treatment of Cancellation of Debt Income** | |
| National Taxpayer Advocate 2008 Annual Report to Congress 391–396. | Enact one of several proposed alternatives to remove taxpayers with modest amounts of debt cancellation from the cancellation of debt income regime. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 111th Congress | HR 4561 | Lewis | 2/2/2010 | Referred to the Ways & Means Committee |

| Joint and Several Liability | | | | |
|---|---|---|---|---|
| **Tax Court Review of Request for Equitable Innocent Spouse Relief** | | | | |
| National Taxpayer Advocate 2001 Annual Report to Congress 128–165. | Amend IRC § 6015(e) to clarify that taxpayers have the right to petition the Tax Court to challenge determinations in cases seeking relief under IRC § 6015(f) alone. | | | |
| Legislative Activity 109th Congress | **Pub. L. No. 109-432, § 408, 120 Stat. 3061, 3062 (2006).** | | | |
| **Effect of Automatic Stay Imposed in Bankruptcy Cases upon Innocent Spouse and CDP Petitions in Tax Court).** | | | | |
| National Taxpayer Advocate 2004 Annual Report to Congress 490–92. | Allow a taxpayer seeking review of an innocent spouse claim or a collection case in U.S. Tax Court a 60-day suspension of the period for filing a petition for review, when the U.S. Bankruptcy Court has issued an automatic stay in a bankruptcy case involving the taxpayer's claim. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 113th Congress | S 725 | Cornyn | 4/15/2013 | Referred to the Finance Committee |
| | HR 3479 | Thornberry | 11/13/2013 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | HR 4375 | Johnson | 4/17/2012 | Referred to the Ways & Means Committee |
| | S 2291 | Cornyn | 4/17/2012 | Referred to the Ways & Means Committee |
| **Clarify that the Scope and Standard of Tax Court Determinations Under IRC § 6015(f) Is *De Novo*.** | | | | |
| National Taxpayer Advocate 2011 Annual Report to Congress 531–536. | Amend IRC § 6015 to specify that the scope and standard of review in tax court determinations under IRC § 6015(f) is *de novo*. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 113th Congress | S 725 | Cornyn | 4/15/2013 | Referred to the Finance Committee |
| | HR 3479 | Thornberry | 11/13/2013 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 2291 | Cornyn | 4/17/2012 | Referred to the Finance Committee |
| | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 60550 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |

001719

Case 6:24-cv-00306-JC   Document 124   Filed 11/07/24   Page 1727 of 4699 PageID #: 4892

Advocating for Taxpayer | Legislative Recommendations | Most Litigated | Case and Systemic
Problems | Recommendations | | Issues | Advocacy

| Collection Issues | | | | |
|---|---|---|---|---|
| **Improve Offer In Compromise Program Accessibility** | | | | |
| National Taxpayer Advocate 2006 Annual Report to Congress 507–519. | Repeal the partial payment requirement, or if repeal is not possible, (1) provide taxpayers with the right to appeal to the IRS Appeals function the IRS's decision to return an offer without considering it on the merits; (2) reduce the partial payment to 20 percent of current income and liquid assets that could be disposed of immediately without significant cost; and (3) create an economic hardship exception to the requirement. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |
| Legislative Activity 111th Congress | HR 4994 | Lewis | 4/13/2010 | Referred to the Ways & Means Committee |
| | HR 2342 | Lewis | 5/12/2009 | Referred to the Ways & Means Committee |
| **Strengthen Taxpayer Protections in the Filing and Reporting of Federal Tax Liens** | | | | |
| 2009 National Taxpayer Advocate Report to Congress 357–364. | Provide clear and specific guidance about the factors the IRS must consider when filing a Notice of Federal Tax Lien (NFTL) and amend the Fair Credit Reporting Act to set specific timeframes for reporting derogatory tax lien information on credit reports. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| | HR 6439 | Hastings | 11/18/2010 | Referred to the Ways & Means Committee |
| **Permit the IRS to Release Levies on Small Business Taxpayers** | | | | |
| 2011 National Taxpayer Advocate Report to Congress 537–543. | Amend IRC § 6343(a)(1)(d) to: permit the IRS, in its discretion, to release a levy against the taxpayer's property or rights to property if the IRS determines that the satisfaction of the levy is creating an economic hardship due to the financial condition of the taxpayer's business. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | HR 4368 | McDermott | 4/17/2012 | Referred to the Ways & Means Committee |

| Return of Levy or Sale Proceeds | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 202–214. | Amend IRC § 6343(b) to extend the period of time within which a third party can request a return of levied funds or the proceeds from the sale of levied property from nine months to two years from the date of levy.  This amendment would also extend the period of time available to taxpayers under IRC § 6343(d) within which to request a return of levied funds or sale proceeds. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| | S 1578 | Grassley | 6/16/2015 | Referred to the Finance Committee |
| | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 112th Congress | HR 4375 | Johnson | 4/17/2012 | Referred to the Ways & Means Committee |
| | S 2291 | Cornyn | 4/17/2012 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |
| | HR 1677 | Rangel | 3/26/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | S 1321 RS | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title. With written report No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders. Calendar No. 614 |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 3991 | Houghton | 3/19/2002 | Defeated in House |
| | HR 586 | Lewis | 2/13/2001 | 4/18/02–Passed the House with an amendment; referred to the Senate |

| Reinstatement of Retirement Accounts | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 202–214. | Amend the following IRC sections to allow contributions to individual retirement accounts and other qualified plans from the funds returned to the taxpayer or to third parties under IRC § 6343:<br>• § 401 – Qualified Pension, Profit Sharing, Keogh, and Stock Bonus Plans<br>• § 408 – Individual Retirement Account, and SEP-Individual Retirement Account<br>• § 408A – Roth Individual Retirement Account | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 1578 | Grassley | 6/16/2015 | Finance Committee |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |
| | HR 1677 | Rangel | 3/26/2007 | Referred to the Finance Committee |
| Legislative Activity 109th Congress | S 1321RS | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title with written report No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders. Calendar No. 614 |

001721

| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
|---|---|---|---|---|
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated in H.R. 1528 through an amendment and HR 1528 passed in lieu of S 882 |
| Legislative Activity 107th Congress | HR 586 | Lewis | 2/13/2001 | 4/18/2002–Passed the House with an amendment; referred to Senate |
| | HR 3991 | Houghton | 3/19/2002 | Defeated in the House |

| **Consolidation of Appeals of Collection Due Process (CDP) Determinations** | |
|---|---|
| National Taxpayer Advocate 2005 Annual Report to Congress 451–470. | Consolidate judicial review of CDP hearings in the United States Tax Court, clarify the role and scope of Tax Court oversight of Appeals' continuing jurisdiction over CDP cases, and address the Tax Court's standard of review for the underlying liability in CDP cases. |

| Legislative Activity 109th Congress | **Pub. L. No. 109-280, § 855, 120 Stat. 1019 (2006).** |
|---|---|

| **Partial Payment Installment Agreements** | |
|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 210–214. | Amend IRC § 6159 to allow the IRS to enter into installment agreements that do not provide for full payment of the tax liability over the statutory limitations period for collection of tax where it appears to be in the best interests of the taxpayer and the IRS. |

| Legislative Activity 108th Congress | **Pub. L. No. 108-357, § 833, 118 Stat. 1418, 1600 (2004).** |
|---|---|

| **Waiver of Installment Agreement Fees for Low Income Taxpayers** | |
|---|---|
| National Taxpayer Advocate 2006 Annual Report to Congress 141–56 (Most Serious Problem: Collection Issues of Low Income Taxpayers). | Implement an installment agreement (IA) user fee waiver for low income taxpayers and adopt a graduated scale for other IA user fees based on the amount of work required. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 112th Congress | HR 4375 | Johnson | 4/17/2012 | Referred to the Ways & Means Committee |
| | S 2291 | Cornyn | 4/17/2012 | Referred to the Finance Committee |

| **Strengthen the Independence of the IRS Office of Appeals** | |
|---|---|
| National Taxpayer Advocate 2009 Annual Report to Congress 346-350. | Strengthen the independence of the IRS office of Appeals and require at least one appeals officer and settlement officer in each state. In addition the Office of Appeals should be independent from the IRS, should eliminate prohibited ex parte communications with the IRS. |

| | Bill Number | Sponsor | Date | Status |
|---|---|---|---|---|
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| | S 1578 | Grassley | 6/16/2015 | Referred to the Finance Committee |
| | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways & Means Committee |

001722

| Legislative Activity 112th Congress | HR 4375 | Johnson | 4/17/2012 | Referred to the Ways & Means Committee |
| | S 2291 | Cornyn | 4/17/2012 | Referred to the Finance Committee |

### Penalties and Interest

**Erroneous Refund Penalty**

| National Taxpayer Advocate 2014 Annual Report to Congress 351. National Taxpayer Advocate 2011 Annual Report to Congress 544. | Amend section 6676 to clarify that the penalty does not apply to individual taxpayers who acted with reasonable cause and in good faith in erroneously claiming a credit or refund. Taking into account all of taxpayers' facts and circumstances in determining whether they had such reasonable cause would bring this statutory penalty into conformity with the TBOR right to a fair and just tax system. |

| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 209 (2015).** |

**Interest Rate and Failure to Pay Penalty**

| National Taxpayer Advocate 2001 Annual Report to Congress 179–182. | Repeal the failure to pay penalty provisions of IRC § 6651 while revising IRC § 6621 to allow for a higher underpayment interest rate. |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |

**Interest Abatement on Erroneous Refunds**

| National Taxpayer Advocate 2001 Annual Report to Congress 183–187. | Amend IRC § 6404(e)(2) to require the Secretary to abate the assessment of all interest on any erroneous refund under IRC § 6602 until the date the demand for repayment is made, unless the taxpayer (or a related party) has in any way caused such an erroneous refund.  Further, the Secretary should have discretion not to abate any or all such interest where the Secretary can establish that the taxpayer had notice of the erroneous refund before the date of demand and the taxpayer did not attempt to resolve the issue with the IRS within 30 days of such notice. |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 109th Congress | HR 726 | Sanchez | 2/9/2005 | Referred to the Ways & Means Committee |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |

**First Time Penalty Waiver**

| National Taxpayer Advocate 2001 Annual Report to Congress 188–192. | Authorize the IRS to provide penalty relief for first-time filers and taxpayers with excellent compliance histories who make reasonable attempts to comply with the tax rules. |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 3991 | Houghton | 3/19/2002 | Defeated in the House |

001723

| Federal Tax Deposit (FTD) Avoidance Penalty | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 222. | Reduce the maximum FTD penalty rate from ten to two percent for taxpayers who make deposits on time but not in the manner prescribed in the IRC. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 109th Congress | HR 3629 | Doggett | 7/29/2005 | Referred to the Ways & Means Committee |
| | HR 3841 | Manzullo | 9/2/2005 | Referred to the Ways & Means Committee |
| | S 1321RS | Santorum | 6/28/2005 | 9/15/2006–The Finance Committee. Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336 9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 586 | Lewis | 2/13/2001 | 4/18/2002–Passed the House with an amendment; referred to the Senate |
| | HR 3991 | Houghton | 3/19/2002 | Defeated in the House |

## Family Issues

| Uniform Definition of a Qualifying Child | |
|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 78–100. | Create a uniform definition of "qualifying child" applicable to tax provisions relating to children and family status. |
| Legislative Activity 108th Congress | **Pub. L. No. 108-311, § 201, 118 Stat. 1169-1175 (2004).** |

| Means Tested Public Assistance Benefits | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 76–127. | Amend the IRC §§ 152, 2(b) and 7703(b) to provide that means-tested public benefits are excluded from the computation of support in determining whether a taxpayer is entitled to claim the dependency exemption and from the cost of maintenance test for the purpose of head-of-household filing status or "not married" status. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 108th Congress | HR 22 | Houghton | 1/3/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 5505 | Houghton | 10/01/2002 | Referred to the Ways & Means Committee |

| Credits for the Elderly or the Permanently Disabled | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2001 Annual Report to Congress 218–219. | Amend IRC § 22 to adjust the income threshold amount for past inflation and provide for future indexing for inflation. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 107th Congress | S 2131 | Bingaman | 4/15/2002 | Referred to the Finance Committee |

| Electronic Filing Issues | | | | |
|---|---|---|---|---|
| **Scanable Returns** | | | | |
| National Taxpayer Advocate 2013 Annual Report to Congress Vol. 2, § 5, 70, 91, 96. | Require electronically prepared paper returns to include scanable 2-D code. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 113th Congress | S. 2736 | Hatch | 7/14/14 | Referred to the Finance Committee |
| **Return Filing and Processing** | | | | |
| National Taxpayer Advocate 2013 Annual Report to Congress, Volume 2, 68-96. | Eliminate the March 31st deadline for e-filed information reports.  All information reports, whether e-filed or filed on paper, would be due at the end of February. | | | |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 201 (2015).** | | | |
| **Safe harbor for *de minimis* errors returns and payee statements** | | | | |
| National Taxpayer Advocate 2013 Annual Report to Congress Vol. 2, § 5, 70, 91, 96. | Safe harbor for *de minimis* errors on information | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 202 (2015).** | | | |
| Legislative Activity 113th Congress | S 2736 | Hatch | 7/14/14 | Referred to the Finance Committee |
| **Direct Filing Portal** | | | | |
| National Taxpayer Advocate 2004 Annual Report to Congress 471–477. | Amend IRC § 6011(f) to require the IRS to post fill-in forms on its website and make electronic filing free to all individual taxpayers. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 112th Congress | S 1289 | Carper | 6/28/2011 | Referred to the Finance Committee |
| Legislative Activity 110th Congress | S 1074 | Akaka | 3/29/2007 | Referred to the Finance Committee |
| | HR 5801 | Lampson | 4/15/2008 | Referred to the Ways & Means Committee |
| Legislative Activity 109th Congress | S 1321RS | Santorum | 6/28/2005 | 9/15/2006–Referred to the Finance Committee; Reported by Senator Grassley with an amendment in the nature of a substitute and an amendment to the title; with written report No. 109-336<br>9/15/2006–Placed on the Senate Legislative Calendar under General Orders; Calendar No. 614 |
| **Free Electronic Filing For All Taxpayers** | | | | |
| National Taxpayer Advocate 2013 Annual Report to Congress Vol. 2, § 5, 70, 91, 96 | Revise IRC § 6011(f) to provide that the Secretary shall make electronic return preparation and electronic filing available without charge to all individual taxpayers. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 110th Congress | S 2736 | Hatch | 7/14/14 | Referred to the Finance Committee |

001725

| Office of the Taxpayer Advocate | | | | |
|---|---|---|---|---|
| **Confidentiality of Taxpayer Communications** | | | | |
| National Taxpayer Advocate 2002 Annual Report to Congress 198–215. | Strengthen the independence of the National Taxpayer Advocate and the Office of the Taxpayer Advocate by amending IRC §§ 7803(c)(3) and 7811.  Amend IRC § 7803(c)(4)(A)(iv) to clarify that, notwithstanding any other provision of the IRC, Local Taxpayer Advocates have the discretion to withhold from the IRS the fact that a taxpayer contacted the Taxpayer Advocate Service or any information provided by a taxpayer to TAS. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| **Access to Independent Legal Counsel** | | | | |
| National Taxpayer Advocate 2002 Annual Report to Congress 198–215. | Amend IRC § 7803(c)(3) to provide for the position of Counsel to the National Taxpayer Advocate, who shall advise the National Taxpayer Advocate on matters pertaining to taxpayer rights, tax administration, and the Office of Taxpayer Advocate, including commenting on rules, regulations, and significant procedures, and the preparation of *amicus* briefs. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 108th Congress | HR 1528 | Portman | 6/20/2003 | Referred to the Senate |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| **Taxpayer Advocate Directive** | | | | |
| National Taxpayer Advocate 2012 Annual Report to Congress 573–602; National Taxpayer Advocate 2002 Annual Report to Congress 419–422. | Amended IRC § 7811 to provide the National Taxpayer Advocate with the non-delegable authority to issue a Taxpayer Advocate Directive to the Internal Revenue Service with respect to any program, proposed program, action, or failure to act that may create a significant hardship for a taxpayer segment or taxpayers at large. | | | |
| | Bill Number | Sponsor | Date | Status |
| Legislative Activity 114th Congress | S 2333 | Cardin | 11/30/2015 | Referred to the Finance Committee |
| | HR 4128 | Becerra | 11/30/2015 | Referred to the Ways & Means Committee |
| | S 949 | Cornyn | 4/15/2015 | Referred to the Finance Committee |
| | HR 1828 | Thornberry | 4/15/2015 | Referred to the Ways & Means Committee |
| Legislative Activity 112th Congress | S 3355 | Bingaman | 6/28/2012 | Referred to the Finance Committee |
| | HR 6050 | Becerra | 6/28/2012 | Referred to the Ways & Means Committee |
| Legislative Activity 111th Congress | S 3215 | Bingaman | 4/15/2010 | Referred to the Finance Committee |
| | HR 5047 | Becerra | 4/15/2010 | Referred to the Ways & Means Committee |
| **Exempt Organizations (EO)** | | | | |
| **EO Judicial and Administrative Review** | | | | |
| National Taxpayer Advocate 2014 Annual Report to Congress 573–602 371-379. | Amend IRC § 7428 to allow taxpayers seeking exemption as IRC § 501(c)(4), (c)(5), or (c)(6) organizations to seek a declaratory judgment on the same footing as those seeking exempt status as IRC § 501(c)(3) organizations. | | | |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 406 (2015).** | | | |

001726

| Legislative Recommendations | Most Serious Problems |
| --- | --- |

## Other Issues

### Modify Internal Revenue Code Section 6707A to Ameliorate Unconscionable Impact

| | |
| --- | --- |
| National Taxpayer Advocate 2008 Annual Report to Congress 419–422. | Modify IRC § 6707A to ameliorate unconscionable impact.  Section 6707A of the IRC imposes a penalty of $100,000 per individual per year and $200,000 per entity per year for failure to make special disclosures of a "listed transaction." |

| Legislative Activity 111th Congress | Pub. L. No. 111-124, § 2041 Stat. 2560 (2010). | | | |
| --- | --- | --- | --- | --- |
| | Bill Number | Sponsor | Date | Status |
| | S 2771 | Baucus | 11/16/2009 | Referred to the Finance Committee |
| | HR 4068 | Lewis | 11/16/2009 | Referred to the Ways & Means Committee |
| | S 2917 | Baucus | 12/18/2009 | Referred to the Finance Committee |

### Eliminate Tax Strategy Patents

| | |
| --- | --- |
| National Taxpayer Advocate 2007 Annual Report to Congress 512–524. | Bar tax strategy patents, which increase compliance costs and undermine respect for congressionally-created incentives, or require the PTO to send any tax strategy patent applications to the IRS so that abuse can be mitigated. |
| Legislative Activity 112th Congress | Pub. L. No. 112-29 § 14(a), 125 Stat. 284, 327 (2011). |

### Disclosure Regarding Suicide Threats

| | |
| --- | --- |
| National Taxpayer Advocate 2001 Annual Report to Congress 227. | Amend IRC § 6103(i)(3)(B) to allow the IRS to contact and provide necessary return information to specified local law enforcement agencies and local suicide prevention authorities, in addition to federal and state law enforcement agencies in situations involving danger of death or physical injury. |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 112th Congress | HR 1528 | Portman | 6/20/2003 | 5/19/2004–Passed/agreed to in the Senate, with an amendment |
| | S 882 | Baucus | 4/10/2003 | 5/19/2004–S 882 was incorporated in HR 1528 through an amendment and HR 1528 passed in lieu of S 882 |
| | HR 1661 | Rangel | 4/8/2003 | Referred to the Ways & Means Committee |
| Legislative Activity 107th Congress | HR 586 | Lewis | 2/13/2001 | 4/18/2002–Passed the  House with an amendment; referred to the Senate |

### Attorney Fees

| | |
| --- | --- |
| National Taxpayer Advocate 2002 Annual Report to Congress 161–171. | Allow successful plaintiffs in nonphysical personal injury cases who must include legal fees in gross income to deduct the fees "above the line."  Thus, the net tax effect would not vary depending on the state in which a plaintiff resides. |
| Legislative Activity 108th Congress | Pub. L. No. 108-357, § 703, 118 Stat. 1418, 1546-48 (2004). |

### Attainment of Age Definition

| | |
| --- | --- |
| National Taxpayer Advocate 2003 Annual Report to Congress 308–311. | Amend IRC § 7701 by adding a new subsection as follows: "Attainment of Age.  An individual attains the next age on the anniversary of his date of birth." |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 108th Congress | HR 4841 | Burns | 7/15/2004 | 7/21/2004–Passed the House; 7/22/2004–Received in the Senate |

### Home-Based Service Workers (HBSW)

| | |
| --- | --- |
| National Taxpayer Advocate 2001 Annual Report to Congress 193–201. | Amend IRC § 3121(d) to clarify that HBSWs are employees rather than independent contractors. |

| | Bill Number | Sponsor | Date | Status |
| --- | --- | --- | --- | --- |
| Legislative Activity 110th Congress | HR 5719 | Rangel | 4/16/2008 | Referred to the Finance Committee |
| Legislative Activity 107th Congress | S 2129 | Bingaman | 4/15/2002 | Referred to the Finance Committee |

001727

| Restrict Access to the Death Master File | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2011 Annual Report to Congress 519–523. | Restrict access to certain personally identifiable information in the DMF. The National Taxpayer Advocate is not recommending a specific approach at this time, but outlines below several available options. | | | |
| Legislative Activity 113th Congress | **Bill Number** | **Sponsor** | **Date** | **Status** |
| Legislative Activity 113th Congress | **H.J. Res. 59, 113th Cong. § 203 (2013).** | | | |
| Legislative Activity 112th Congress | S 3432 | Nelson | 7/25/2012 | Referred to the Finance Committee |
| | HR 6205 | Nugent | 7/26/2012 | Referred toS 835the Ways & Means Committee |

| Amend the Adoption Credit to Acknowledge Jurisdiction of Native American Tribes | | | | |
|---|---|---|---|---|
| National Taxpayer Advocate 2012 Annual Report to Congress 521. | Amend IRC § 7871(a) to include the adoption credit (IRC § 23) in the list of Code sections for which a Native American tribal government is treated as a "State". | | | |
| | **Bill Number** | **Sponsor** | **Date** | **Status** |
| Legislative Activity 114th Congress | S 835 | Heitkamp | 3/23/2015 | Referred to the Finance Committee |
| | HR 1542 | Kilmer | 3/23/2015 | Referred to the Ways and Means Committee |
| Legislative Activity 113th Congress | S 835 | Johnson | 7/09/2014 | Referred to the Finance Committee |
| | HR 1738 | Kilmer | 6/12/2013 | Referred to the Ways and Means Committee |

| Filing Due Dates of Partnerships and certain Trusts | |
|---|---|
| National Taxpayer Advocate 2003 Annual Report to Congress 302. | Amend Internal Revenue Code section 6072(a) to change the regular filing deadline for partnerships described in Section 6031 and trusts described in Section 6012(a)(4) as follows:<br>♦ For partnerships and trusts making returns on the basis of a calendar year: Change the regular filing deadline from the 15th day of April following the close of the calendar year to the 15th day of March following the close of the calendar year.<br>♦ For partnerships and trusts making returns on the basis of a fiscal year: Change the regular filing deadline from the 15th day of the fourth month following the close of the fiscal year to the 15th day of the third month following the close of the fiscal year |
| Legislative Activity 114th Congress | **Pub. L. No. 114-41 § 2006, 129 Stat. 443, 457 (2015).** |

| Foreign Account Reporting | |
|---|---|
| National Taxpayer Advocate 2014 Annual Report to Congress 331. | Align the FBAR filing deadline and threshold(s) with the Form 8938 filing deadline and threshold(s). Change the FBAR filing due date to coincide with the due date applicable to a taxpayer's federal income tax return and Form 8938 (including extensions). |
| Legislative Activity 114th Congress (July 31, 2015) | **Pub. L. No. 114-41 § 2006, 129 Stat. 443, 458-459 (2015).** |

| Individual Taxpayer Identification Numbers (ITINs) | |
|---|---|
| **Requirements for the Issuance of ITINs** | |
| National Taxpayer Advocate 2008 Annual Report to Congress 126. National Taxpayer Advocate 2010 Annual Report to Congress 319. | Adminisrative recommendation that the IRS should promote the Certified Acceptance Agent program and use other federal agencies to perform acceptance agent duties as contemplated in the Treasury Regulation (e.g., the Postal Service performs a similar service in processing passport applications). |
| Legislative Activity 114th Congress (July 31, 2015) | **Pub. L. No. 114-113, Division Q § 203 (2015).** |
| **Develop a process to verify that previously issued ITINs have been used for tax administration purposes** | |
| National Taxpayer Advocate 2008 Annual Report to Congress 126. National Taxpayer Advocate 2010 Annual Report to Congress 319. | Administrative recommendation the IRS should develop a process to verify that previously issued ITINs have been used for tax administration purposes and revoke unused ITINs on a regular basis after notifying ITIN holders |
| Legislative Activity 114th Congress | **Pub. L. No. 114-113, Division Q § 203 (2015).** |

001729

## LR #1    STATUTE OF LIMITATIONS: Repeal or Fix Statute Suspension Under IRC § 7811(d)

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Quality Service*
- *The Right to Finality*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### PROBLEM

Under Internal Revenue Code (IRC) § 7811(d)(1), the statutory period of limitations on assessment or collection is suspended "beginning on the date of the taxpayer's application … [for a Taxpayer Assistance Order (TAO)] and ending on the date of the National Taxpayer Advocate's decision with respect to such application."[2]  Thus, if the IRS significantly harms a taxpayer financially and repeatedly ignores his or her concerns, and the taxpayer asks TAS for help, IRC § 7811(d) rewards the IRS and punishes the taxpayer by granting the IRS with more time to make and collect tax assessments.  In this way it undermines TAS's mission and the taxpayer's rights to *quality service, finality, privacy (which includes the right to expect that enforcement will be no more intrusive than necessary)*, and *a fair and just tax system.*

The IRS has not implemented statute suspension because its computers cannot reliably track extensions of these periods.[3]  It remains impossible to track many of these extensions, including extensions on cases that do not meet TAS's acceptance criteria.[4]

The IRS protects its interests in other ways.  If the end of a limitations period is near, the IRS routinely asks the taxpayer to agree to an extension even if TAS is involved.  It may also continue enforcement activity on TAS cases, if necessary.[5]  Even if TAS issues a TAO ordering the IRS to suspend collection, TAS will generally agree to modify the TAO if collection is in jeopardy.[6]  If it does not, the Commissioner, Deputy Commissioner, or National Taxpayer Advocate may nonetheless modify or rescind the TAO.[7]

In addition, IRC § 7811(d) only applies to taxpayers who submit written TAO applications, making it elective for those who know how to avoid it (*e.g.*, by calling TAS) and a trap for those who do

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   The periods subject to suspension and the length of any such suspension are subject to a wide variety of interpretations, as discussed below.

3   *See, e.g.,* Memorandum from Commissioner of Internal Revenue, *Taxpayer Advocate Service Statute Suspension Provisions Under IRC Section 7811(d)* (Nov. 10, 2003); Internal Revenue Manual (IRM) 13.1.14, *Suspension of the Statutes of Limitation Under IRC § 7811(d)* (Oct. 31, 2004).

4   Statute suspension does not apply if the application is rejected on the same day it is received.  *See* Treas. Reg. § 301.7811-(e)(1).

5   *See, e.g.,* IRM 5.1.9.4.1(8) (June 24, 2014); IRM 13.1.18.2.4(4) (Feb. 1, 2011); IRM 13.1.10.15, *Suspending Collection Action* (Apr. 9, 2012); *White v. Comm'r*, 899 F. Supp. 767, 773 (D. Mass. 1995).

6   *See, e.g.,* IRM 13.1.20.3.1(5) (Dec. 15, 2007) ("TAS will consider modifying the TAO if there are compelling circumstances that require immediate action by the IRS (*e.g.*, situations where collection is in jeopardy may require the immediate issuance of a Notice of Levy")).

7   IRC § 7811(c).

not.[8]  Further, about 54 percent of the taxpayers who requested TAS assistance in writing in fiscal year (FY) 2015 were unrepresented — the taxpayers most likely to get caught in the trap of inadvertently granting the IRS additional time for enforcement.[9]  If implemented, the statute suspension would also create uncertainty and disputes about deadlines that would otherwise be clear.

A recent decision by the United States Court of Appeals for the 5th Circuit in *Rothkamm* increases the need for Congress to repeal IRC § 7811(d).[10]  The 5th Circuit held that IRC § 7811(d) extended the period for filing a wrongful levy claim, a deadline applicable to a third party.  Thus, any third party or tax-payer who misses a statutory deadline (*e.g.*, the deadline to file a wrongful levy claim, to request a refund or a collection due process (CDP) hearing, or to petition the tax court) after applying to TAS may now argue that the application extended his or her deadline.  This expansion of IRC § 7811(d) and uncertainty concerning the period(s) to which it applies will exacerbate implementation problems and increase uncertainty and controversy.[11]  Congress should repeal IRC § 7811(d), or at least fix it.

## EXAMPLES

### Example 1: Statute Suspension Could Penalize Taxpayers Who Seek TAS Assistance

Taxpayer A seeks TAS assistance with a collection matter by submitting a Form 911, *Request for Taxpayer Advocate Service Assistance (and Application for Taxpayer Assistance Order)* to TAS.  Taxpayer B has the same problem but does not seek TAS assistance.  While TAS is attempting to resolve Taxpayer A's problem, prior to the issuance of a TAO, the IRS retains the discretion to issue a lien or levy to collect the liability if necessary.[12]  Because Taxpayer A's request for TAS assistance triggers IRC § 7811(d)(1), he or she is subject to IRS collection for longer than the normal ten-year period, but Taxpayer B is not.[13]  Thus, IRC § 7811(d) penalizes Taxpayer A for seeking TAS assistance.

### Example 2: Statute Suspension Will Generate Unnecessary Controversy and Inconsistency

The IRS proposes adjustments to the returns of Taxpayers C, D, and E, and mails a statutory notice of deficiency (SNOD) to each of them on the same day.  A SNOD provides a taxpayer with the right to petition the Tax Court if he or she disagrees with the adjustments described in the SNOD and specifies

---

8   *See, e.g.*, Treas. Reg. §§ 301.7811-1(b) and -1(e)(4).

9   Taxpayer Advocate Management Information System before (TAMIS) query (Oct. 26, 2015).

10  *Rothkamm v. United States*, 802 F.3d 699 (5th Cir. 2015) (hereinafter *Rothkamm*), *rev'g and remanding*, 114 A.F.T.R.2d (RIA) 5919, 2014-2 U.S. Tax Cas. (CCH) 50441 (M.D. La. 2014).

11  *See* Treas. Reg. § 301.7811-1(e); *Rothkamm* at 700 (assuming without discussion that IRC § 7811(d) suspended the period from the date TAS opened the case until the day TAS closed the case).

12  *See, e.g.*, IRM 5.1.9.4.1(8) (June 24, 2014) ("While TAS is attempting to work with the taxpayer to resolve the tax problem, action to collect the tax, such as filing of NFTL or levy, while not prohibited, will generally be suspended.  If the RO believes such action is necessary, *e.g.*, the taxpayer is dissipating assets; TAS should be contacted and advised of Collection's plans in advance."); IRM 13.1.18.2.4(4) (Feb. 1, 2011); IRM 13.1.10.15, *Suspending Collection Action* (Apr. 9, 2012) ("If the RO, Operating Division or Functional Unit refuses to suspend lien filing or levy action, discuss with the Manager whether the issuance of a TAO is appropriate.").  *See also White v. Comm'r*, 899 F. Supp. 767, 772 (D. Mass. 1995) (noting a TAO "application merely suspends the running of the period of limitations on collection.  It does not immediately suspend the collection activity itself.").

13  IRC § 6502.

the last day for filing.[14]  It must also advise the taxpayer of his or her "right to contact a local office of the taxpayer advocate and the location and phone number of the appropriate office."[15]  None of the taxpayers understand the adjustment or how to file a petition.

Taxpayers C and D both mail Form 911, *Request for Taxpayer Advocate Service Assistance (and Application for Taxpayer Assistance Order)*, to TAS on the same day, but Taxpayer E does not.  Taxpayer D has proof the IRS received his Form 911 the next day, but Taxpayer C does not.  Unbeknownst to them, Taxpayer C and Taxpayer D's forms do not actually reach a TAS office for another 15 and 20 days, respectively, due to security screening and interoffice mail delays.  Within one day of receiving the Forms 911 (17 and 22 days, respectively, after receipt by the IRS), TAS determines that Taxpayers C and D are eligible for TAS assistance and assigns a case advocate (CA) to assist them.[16]  Three days later (20 and 25 days, respectively, after receipt by the IRS), the CA determines Taxpayers C and D are experiencing a "significant hard-ship" and sends Operation Assistance Requests (OARs) to the Operating Division (OD) to obtain more information.  Twenty-six days later — 30 days after TAS's receipt of each Form 911 (46 and 51 days, re-spectively, after receipt by the IRS) — the CA receives and reviews the information and determines not to recommend issuing a TAO.  Five days later — 35 days after receipt by TAS (51 and 56 days, respectively, after receipt by the IRS), the CA contacts the taxpayers to explain his decision and closes the cases.

Twenty-nine days after the deadline for filing a petition in Tax Court, which is printed on the SNOD, Taxpayers C, D and E each contact a low income taxpayer clinic (LITC).  The LITC advises Taxpayer E not to file because his petition would be untimely, but advises Taxpayers C and D to file because they can argue the deadline for filing a petition with the Tax Court was extended by the period the TAO applica-tion was pending.[17]

Because Taxpayer C's case is appealable to the 5th Circuit, but Taxpayer D's is not, the Tax Court is more likely to accept Taxpayer C's argument that the period was extended, pursuant to *Rothkamm*, even if it holds that Taxpayer D's is not.[18]

If the court accepts Taxpayer C's or D's argument, it will have to decide how long the TAO application extended the period.  The IRS may argue it was extended from TAS's receipt until TAS's determination to accept the case (*i.e.*, by one day for each), from the IRS's receipt until TAS's determination to accept the case (*i.e.*, by 16 or 21 days, for Taxpayers C and D, respectively), from TAS's receipt until its determina-tion that Taxpayers C and D were facing a "significant hardship" and that it would send an OAR and not a TAO (*i.e.*, by three days for each), or from the IRS's receipt until this determination (*i.e.*, by 20 or 24 days for C and D, respectively); whereas Taxpayers C and D may argue it was extended by the period their

---

14  IRC § 6212; IRC § 6213(a) (providing that taxpayers have 90 days (150 days if they are outside the United States) from the date of the SNOD to petition the Tax Court); IRS Restructuring and Reform Act of 1998 (RRA 98), Pub. L. No. 105-206, § 3463(a), 112 Stat. 685, 767 (1998) (the IRS "shall include on each notice of deficiency under section 6212 … the last day on which the taxpayer may file a petition with the Tax Court.").

15  RRA 98, Pub. L. No. 105-206, § 1102(b), 112 Stat. 685, 703 (1998) (modifying IRC § 6212(a)).

16  The application is not frivolous or subject to a penalty for frivolous submissions.  *See* IRC § 6702(b)(2)(B)(ii)(III) (penalty for frivolous TAO applications).

17  *Rothkamm* held that IRC § 7811(d) tolled the period for filing a wrongful levy claim, which by operation of IRC § 6532(c)(2), extended the period for filing suit.

18  Although the Tax Court is a national court with its own precedents, where a case before it is appealable to a circuit court that disagrees with it on a legal issue, it will follow the decision of that court under the so-called *Golsen* rule.  *See Golsen v. Comm'r*, 54 T.C. 742, 756-758 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

001732

cases were open in TAS (*i.e.*, by 30 days) or from the IRS's receipt of Form 911 until TAS closed their cases (*i.e.*, by 51 or 56 days, respectively).[19]

Further, the arguments may not be the same for Taxpayers C and D because Taxpayer D retained proof of receipt of Form 911 by the IRS or because Taxpayer D's form traveled more slowly to TAS through IRS security and interoffice mail.[20]  Thus, a deadline that was previously clear, evenly applied, and easy to administer may now be unclear, unevenly applied, difficult to administer, and subject to litigation.

### Example 3: Statute Suspension Could Be a Trap for the Uninformed

Taxpayers F, G, and H each ask TAS for assistance with collection matters.  Taxpayer F seeks assistance by calling.  Taxpayer G seeks assistance by filing a Form 911, *Request for Taxpayer Advocate Service Assistance (and Application for Taxpayer Assistance Order)*, sending an email, and mailing a letter.  Taxpayer H also files Form 911, seeking assistance in resolving a liability due from him and his wife, but he only lists himself as the taxpayer on the Form 911.  The IRS does not suspend its collection activity while TAS is evaluating these cases.  IRC § 7811(d) only applies to those who submit written TAO applications.[21]  As a result, it extends the period for the IRS to collect from Taxpayers H and G, but not Taxpayer F or H's wife.[22]  In other words, the IRS has a total of ten years to collect from Taxpayer F and H's wife but more than ten years to collect from Taxpayer H and G.[23]

---

19  *Compare* IRC § 7811(d)(1) (applying suspension to the "period beginning on the date of the taxpayer's application … and ending on the date of the National Taxpayer Advocate's decision with respect to such application"), *with Rothkamm* at 700 (assuming without discussion that IRC § 7811(d) suspended the period from the day TAS opened the case until the day TAS closed the case), Treas. Reg. § 301.7811-1(e)(1) (specifying the "period beginning on the date the Ombudsman *receives* an application for a taxpayer assistance order …and ending on the date on which the Ombudsman makes a *determination* with respect to the application") (emphasis added), *and* Treas. Reg. § 301.7811-1(e)(2) (defining the date of the "decision" as "the date on which the taxpayer's request for a taxpayer assistance order is denied, or agreement is reached with the involved function of the Service, or a taxpayer assistance order is issued (except that when the taxpayer assistance order is reviewed by an official who may modify or rescind the taxpayer assistance order … the decision date is the date on which such review is completed).").

20  The filing of forms with TAS is not the same as filing them with the IRS.  *See, e.g.*, IRM 13.1.18.6.3, *Taxpayers Delivering Returns to TAS and TAS Date Stamp* (Feb. 1, 2011) ("Any tax return mailed to TAS is not considered filed with the IRS until it is received by an authorized IRS office.  As discussed below, there are designated places for filing, and those places do not include a TAS office.  Further, the postmark rule described in IRC § 7502 does not apply unless the return was properly addressed to the office with which the return was required to be filed.").

21  *See, e.g.*, Treas. Reg. §§ 301.7811-1(b) and -1(e)(4).

22  *See* Treas. Reg. § 301.7811-1(b) ("A request for a TAO shall be made on a Form 911, 'Request for Taxpayer Advocate Service Assistance (And Application for Taxpayer Assistance Order)' (or other specified form) or in a written statement that provides sufficient information for the Taxpayer Advocate Service (TAS) to determine the nature of the harm or the need for assistance."); Treas. Reg. § 301.7811–1(e)(4) ("The statute of limitations is not suspended in cases where the Ombudsman issues an order in the absence of a written application for relief by the taxpayer or the taxpayer's duly authorized representative.").  *See also* IRM 13.1.14.4.3, *Special Situations* (Oct. 31, 2004) ("In situations where only one spouse signs the form or written statement, contact the taxpayer who signed the form or written statement to determine the intent of the application…. TAS will not solicit the taxpayer's signature for the sole purpose of suspending the statute.").  Further uncertainty may result if a taxpayer submits a written application, but does not sign it.  *Id.*

23  IRC § 6502.

001733

## RECOMMENDATIONS

Repeal statute suspension under IRC § 7811(d). Alternatively, clarify that it:

(1) Only extends the period for the IRS to collect or assess a liability, and not the period for the taxpayer or a third party to act; and

(2) Only applies when:

    a. Expiration of the relevant statutory limitations period for collection or assessment is imminent (*i.e.*, expires within one year);[24]

    b. The taxpayer has declined to extend the applicable limitations period;[25] and

    c. The IRS is specifically prohibited by the terms of a TAO from pursuing collection or assessment, as the case may be, for more than seven days.

## PRESENT LAW

### A TAO Application Extends the Deadline for the IRS to Assess or Collect

In 1988, Congress enacted IRC § 7803(c), renamed the Taxpayer Ombudsman as the National Taxpayer Advocate, and established the Office of the Taxpayer Advocate (referred to as TAS).[26] The National Taxpayer Advocate is the taxpayer's voice at the IRS, and TAS is an independent organization within the IRS that helps taxpayers resolve problems and recommends administrative and legislative changes to mitigate and prevent future problems.[27] Taxpayers are only eligible for TAS assistance if they are facing an economic burden, are impacted by IRS procedures that have failed to operate as intended, or meet other specific criteria, including impairment of their rights under the Taxpayer Bill of Rights (TBOR).[28] Congress provided the National Taxpayer Advocate with the authority to issue TAOs to any office, operating division, or function of the IRS when a taxpayer is experiencing significant hardship as a result of the manner in which the internal revenue laws are being administered.[29]

IRC § 7811(b) describes what a TAO may require, as follows:

The terms of a Taxpayer Assistance Order may require the Secretary within a specified time period —

(1) To release property of the taxpayer levied upon, or;

---

24  *See, e.g.*, IRM 5.1.19.5(1) (Jan. 1, 2006) ("An imminent [collection statute expiration date] CSED is any CSED with 12 months or less remaining on the collection statute."); IRM 25.6.23.8.1, *Minimum Time Remaining on ASED* (Mar. 23, 2015) (defining an "imminent" assessment statute expiration date (ASED) in non-Tax Equity and Fiscal Responsibility Act (TEFRA) cases submitted to Centralized Case Processing or Technical Services as ranging from four to 12 months).

25  The IRS will generally not solicit an extension unless the ASED is within 180 days. IRM 25.6.22.2.1, *Assessment* (Aug. 26, 2011).

26  The Office of the Taxpayer Ombudsman was created by the IRS in 1979 to serve as the primary advocate, within the IRS, for taxpayers. This position was codified in the Taxpayer Bill of Rights (TBOR 1), included in the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100-647, Title VI, § 6230, 102 Stat. 3342, 3733 (Nov. 10, 1988). In TBOR 1, Congress added IRC § 7811, granting the Ombudsman (now the National Taxpayer Advocate) the statutory authority to issue TAOs.

27  IRC § 7803(c)(2)(A).

28  *See* IRM 13.1.7.2, *TAS Case Criteria* (Feb. 4, 2015); IRM 13.1.7.2.3 *TAS Case Criteria 8, Best Interest of the Taxpayer* (Feb. 4, 2015).

29  IRC § 7811(b); Treas. Reg. § 301.7811-1(d).

(2) To cease any action, take any action as permitted by law, or refrain from taking any action, with respect to the taxpayer under:

    (A) Chapter 64 (relating to collection);

    (B) Subchapter B of chapter 70 (relating to bankruptcy and receiverships);

    (C) Chapter 78 (relating to discovery of liability and enforcement of title); or

    (D) Any other provision of law which is specifically described by the National Taxpayer Advocate in such order.

IRC § 7811(d) describes statute suspension, as follows:

The running of any period of limitation with respect to any action described in subsection (b) [the terms of a TAO, reprinted above] shall be suspended for —

    (1) The period beginning on the date of the taxpayer's application… and ending on the date of the National Taxpayer Advocate's decision with respect to such application; and

    (2) Any period specified by the National Taxpayer Advocate in a Taxpayer Assistance Order issued pursuant to such application.

Until recently, the IRS assumed IRC § 7811(d) only extended the period for the IRS to collect or assess tax.[30] By its terms, IRC § 7811(d) suspends "[t]he running of any period of limitation with respect to any action described in subsection (b) [the terms of a TAO]." The flush language of IRC § 7811(b) provides that "[t]he terms of a Taxpayer Assistance Order may require the Secretary…" to take action and not the taxpayer. Thus, IRC § 7811(d) does not appear to extend the deadlines applicable to taxpayers or third

---

30  *See, e.g.*, IRM 13.1.18.2.4(4) (Feb. 1, 2011); IRM 13.1.10.15, *Suspending Collection Action* (Apr. 9, 2012).

parties.  Legislative history,[31] instructions to Form 911,[32] older court decisions,[33] Treasury Regulation examples,[34] and memos by IRS attorneys are all consistent with this interpretation.[35]

### A TAO Application Now Extends the Deadline for Taxpayers to File Wrongful Levy Claims in the 5th Circuit

The United States Court of Appeals for the 5th Circuit recently held in *Rothkamm* that the period of limitations for filing a wrongful levy claim was suspended by a taxpayer's application for a TAO.[36]  It focused on the portion of IRC § 7811(d) that says tolling applies to "any statute of limitations for any action described in § 7811(b)."  The court suggested that tolling applied to the wrongful levy claim because "releas[ing] property of the taxpayer levied upon," is an action described in IRC § 7811(b)(1).  Thus, the court held that an application for a TAO may extend the statutory period for a taxpayer to take action.

---

31  H. Rept. 100-1104 II at 215 (1988) (Conf. Rept.) ("Any applicable statute of limitations (*e.g.*, the *statute of limitations under sec. 6501 relating to the assessment or collection of tax*) is suspended starting on the date that the taxpayer files an application for a taxpayer assistance order with the Ombudsman and ending on the date that the Ombudsman makes a decision on the taxpayer's application (or a later date if the Ombudsman's order resulting from a taxpayer's application provides for continued suspension of the statute of limitations.  The statute of limitations is not suspended in cases where the Ombudsman issues an order in the absence of an application for relief by the taxpayer.")  (Emphasis added).

32  Form 911, *Request for Taxpayer Advocate Service Assistance (and Application for Taxpayer Assistance Order)* (2015) ("The signing of this request allows the IRS by law to suspend any applicable statutory periods of limitation relating to the assessment or collection of taxes.  However, it does not suspend any applicable periods for you to perform acts related to assessment or collection, such as petitioning the Tax Court for redetermination of a deficiency or requesting a Collection Due Process hearing.").

33  *See Demes v. United States*, 52 Fed.Cl. 365, 373 (Fed. Cl. 2002) ("This provision does not go to the tolling of the statute of limitations in court, but rather confers the IRS with discretion to effect tolling upon a taxpayer's request.  Plaintiffs therefore cannot sue in a court for a refund under this provision, nor can the court use it as a basis to toll the statute of limitations in plaintiffs' case.").  *See also Next Generation Wireless, Ltd. v. United States*, No. 06–CV–838, 2008 WL 4115516 (S.D. Oh. 2008) (considering only whether the application for a TAO extended the period of limitation for filing a wrongful levy claim under IRC § 6532(c)(2) and ignoring IRC § 7811(d)).

34  All three examples illustrating statute suspension involve the limitations on IRS collection.  Treas. Reg. § 301.7811-1(e)(3) (Examples 1-3).

35  *See, e.g.*, IRS Litigation Bulletin (LB) 360, 1990 WL 1086174, 1990 GLB LEXIS 12 (1990) ("The legislative history identifies the limitations period in section 6501 (assessment and collection of tax) as a statute subject to the suspension.  Thus, we believe that only those statutes of limitation that would continue to run to the detriment of the Service when an application for a TAO is filed, are subject to the suspension.... We do not believe that section 6511 – limitation on credit or refund – would be suspended."); Program Manager Tech. Adv. (PMTA) 2007-00429, *Suspension of the Statutes of Limitations Under Section 7811(d)* 4 (Mar. 9, 2001) (concluding a broad interpretation of IRC § 7811(d) to toll the period to take "any action" included in a TAO application would be "inconsistent with the statutory language and inconsistent with the examples provided in the regulations...").

36  *Rothkamm* did not directly hold that IRC § 7811(d) extended the period for filing suit.  Rather, it held that IRC § 7811(d) extended the period for filing an administrative claim, and that the IRS's denial of the timely-filed administrative claim extended the period for filing suit by operation of IRC § 6532(c)(2).  A future decision could clarify that IRC § 7811(d) does not extend jurisdictional deadlines for filing in court, but this case still invites litigation in this area.  *Compare Volpicelli v. United States*, 777 F.3d 1042 (9th Cir. 2015) (holding the limitations period for filing suit to challenge a wrongful levy was subject to equitable tolling because it was procedural and not jurisdictional) with *Becton Dickinson & Co. v. Wolckenhauer*, 215 F.3d 340 (3d Cir. 2000) (holding that the limitations period for filing suit to challenge a wrongful levy was jurisdictional, and thus, not subject to equitable tolling).  *Rothkamm* also held that Mrs. Rothkamm was a "taxpayer" for purposes of IRC § 7811(d) because the levy on her assets paid the tax of another.  For additional discussion of this case, see Significant Cases, *infra*.

001736

## REASONS FOR CHANGE

### The IRS Cannot Program Its Computers to Take Advantage of Extended Deadlines Under IRC § 7811(d)

IRC § 7811(d) was enacted in 1988 but not implemented.  In 2003, at the National Taxpayer Advocate's request, the IRS Commissioner formally announced the IRS would not implement IRC § 7811(d) because of two major technical difficulties.[37]  First, the IRS's Integrated Data Retrieval System (IDRS) could not reflect multiple assessment statute expiration dates (ASEDs) or collection statute expiration dates (CSED) for a husband and wife on a joint liability.  For example, if a wife applied for a TAO on a joint liability, but the husband did not, IDRS could not properly reflect an extended ASED or CSED for her without improperly reflecting an extended ASED or CSED for him.

Second, the codes the IRS uses to update IDRS (called transaction codes) could not update a single tax year to reflect multiple CSEDs for different assessments.  For example, assume a taxpayer timely reported an unpaid liability on her 2009 return filed on April 15, 2010, which the IRS could collect for ten years (*i.e.*, until April 15, 2020).  Two years later, the IRS audited the 2009 return and on April 15, 2012, assessed another liability, which it could collect for ten years (*i.e.*, until April 15, 2022).  If the taxpayer later applied for a TAO, triggering a nine-month extension of the CSED for both assessments, TAS could not properly update both CSEDs on IDRS.  If TAS tried to update IDRS to extend them, IDRS would incorrectly move the CSED for the first 2009 assessment (from the balance due return) to equal the CSED for the audit adjustment for 2009 that occurred two years later (*i.e.*, from 2020 to 2022), and then add nine months to both CSEDs.  As a result, IDRS would incorrectly show that the IRS had an additional two years (*i.e.*, 12 years and nine months) to collect the first assessment.[38]

In other words, the IRS could not accurately track the extensions of the ASED and CSED, as required by IRC § 7811(d).  Although IDRS may now be able to reflect different ASEDs and CSEDs for each spouse, it is still unable to extend the CSED correctly when multiple assessments apply to the same year, as illustrated above.[39]

### Statute Suspension Is Not Needed to Protect the Government

U.S. Appeals Court for the 5th Circuit Judge Higginbotham's dissent in *Rothkamm* quoted various authorities for the following proposition:

> All suspension provisions [including 7811(d)] are designed and intended to avoid prejudice to the IRS's ability to collect during periods of time in which collection or assessment is prohibited [or otherwise impeded][40]

---

37  *See, e.g.*, Memorandum from Commissioner of Internal Revenue, *Taxpayer Advocate Service Statute Suspension Provisions Under IRC Section 7811(d)* (Nov. 10, 2003); IRM 13.1.14, *Suspension of the Statutes of Limitation Under IRC § 7811(d)* (Oct. 31, 2004).

38  National Taxpayer Advocate FY 2003 Objectives Report to Congress, App. V, 4 (*Suspension of Statute of Limitations Periods*). See also IRM 5.19.10.4.5(3) (Feb. 1, 2014) ("Input of TC 550 will update all CSEDs on the module to the same date.  Care must be taken when inputting a TC 550 to a module with multiple CSEDs.  If correcting one CSED will cause the other CSEDs to be incorrect, then a TC 550 cannot be done.").

39  *See* IRM 5.19.10.4.5, *Resolving a Module with CSED Problems* (Feb. 1, 2014).

40  *Rothkamm* at 717 n.14. (quoting *In re Turner*, 182 B.R. 317, 329 (Bankr. N.D. Ala. 1995), *adhered to on reconsideration*, 195 B.R. 476 (Bankr. N.D. Ala. 1996) and citing *In re Gore*, 182 B.R. 293, 304 (Bankr. N.D. Ala. 1995)).

No legislative history addresses why IRC § 7811(d) was enacted.[41]  However, it seems to address concerns expressed by IRS Commissioner Egger in 1981 that granting an independent Ombudsman (the predecessor to the National Taxpayer Advocate) legal authority to stop collection activity could "seriously impair the Service's ability to collect revenue."[42]  These concerns have not materialized.

As the government has not implemented IRC § 7811(d), it has found other ways to protect its interests. The IRS routinely asks the taxpayer to agree to extend limitations periods even if TAS is assisting them. Moreover, the IRS is not required to suspend enforcement while TAS is evaluating an application for a TAO.[43]  Even if TAS issues a TAO ordering the IRS to suspend enforcement, TAS will generally agree to modify the TAO if collection is in jeopardy and if it does not, the IRS Commissioner or Deputy Commissioner may nonetheless modify or rescind the TAO.[44]  Thus, the government can protect its interests without statute suspension.

### The Automatic Statute Suspension Period Will Be Subject to Dispute

Under IRC § 7811(d)(1) statute suspension applies to the "period beginning on the date of the taxpayer's application… and ending on the date of the… decision with respect to such application."[45]  Treas. Reg. § 301.7811-1(e)(1) specifies that the period begins on the date TAS "receives an application for a taxpayer assistance order"[46] and ends on the date TAS "makes a determination with respect to the application." Thus, the National Taxpayer Advocate's position is that the suspension period ends when TAS makes its first determination.

TAS makes a number of determinations on TAO applications.[47]  It first determines whether the taxpayer qualifies for TAS assistance based on TAS's case acceptance criteria.  For 99 percent of the cases that TAS

---

41  Technical and Miscellaneous Revenue Act of 1988 (TBOR I), Pub. L. 100–647, Title VI, § 6230(a), 102 Stat. 3733 (Nov. 10, 1988) (enacting IRC § 7811(d)).

42  *Taxpayers' Bill of Rights: Hearings Before the Subcomm. on Oversight of the Internal Rev. Serv. of the S. Comm. on Fin. on S. 850*, 97th Cong. 57 (June 2, 1981) (Statement of Roscoe L. Egger, Jr., Commissioner of Internal Revenue), *reprinted at* http://www.unclefed.com/TxprBoR/1981/81Egger.html.

43  *See, e.g.*, IRM 13.1.18.2.4(4) (Feb. 1, 2011); IRM 13.1.10.15, *Suspending Collection Action* (Apr. 9, 2012) ("If the RO, Operating Division or Functional Unit refuses to suspend lien filing or levy action, discuss with the Manager whether the issuance of a TAO is appropriate.").  *See also White v. Comm'r*, 899 F. Supp. 767, 773 (D. Mass. 1995) (noting a TAO "application merely suspends the running of the period of limitations on collection.  It does not immediately suspend the collection activity itself.").

44  *See, e.g.*, IRC § 7811(c) (permitting the Deputy Commissioner or Commissioner to modify or rescind a TAO, even if issued directly by the National Taxpayer Advocate); IRM 13.1.20.3.1(5) (Dec. 15, 2007) ("TAS will consider modifying the TAO if there are compelling circumstances that require immediate action by the IRS (*e.g.*, situations where collection is in jeopardy may require the immediate issuance of a Notice of Levy).").

45  The statute says the date of the "National Taxpayer Advocate's decision."  Under IRC § 7811(f), however, the term "National Taxpayer Advocate" includes any designee of the National Taxpayer Advocate.  The National Taxpayer Advocate has delegated her TAO authority to Area Directors, Local Taxpayer Advocates, the Executive Director, Case Advocacy, and the Deputy National Taxpayer Advocate.  Treas. Reg. § 301.7811–1(a)(2); IRM 1.2.50.2, *Delegation Order 13-1 (Rev. 1)* (Mar. 17, 2009); IRM 13.1.20.2, *Determining When to Issue a Taxpayer Assistance Order* (Feb. 1, 2011).

46  Particularly in cases where there is a significant delay between the date the taxpayer mailed the application and the date TAS received it, the date the suspension period begins could be subject to dispute, as illustrated by the example above.  Disputes may also arise when TAS receives a TAO application originally delivered to the IRS and not TAS because TAS and the IRS are sometimes treated as separate entities for purposes of filing.  *See, e.g.*, IRM 13.1.18.6.3, *Taxpayers Delivering Returns to TAS and TAS Date Stamp* (Feb. 1, 2011) ("Any tax return mailed to TAS is not considered filed with the IRS until it is received by an authorized IRS office.  As discussed below, there are designated places for filing, and those places do not include a TAS office.  Further, the postmark rule described in IRC § 7502 does not apply unless the return was properly addressed to the office with which the return was required to be filed.").

47  *See, e.g.*, IRM 13.1.18.1, *Processing Taxpayer Advocate Service (TAS) Cases* (Feb. 1, 2011).

001738

accepted and closed in FY 2015, it made this determination and entered them into its case management system (called the Taxpayer Advocate Management Information System (TAMIS)) within four days.[48] Because TAS does not currently track cases that it does not accept (*i.e.*, because they do not meet TAS criteria), it is impossible to track many of these short extensions.[49]

TAS employees must also determine whether the taxpayer is facing a significant hardship before taking action (*i.e.*, issuing an OAR, a TAO, or closing the case).[50]  For 77 percent of the cases that TAS closed in FY 2015, it made the significant hardship determination within seven days.[51]  Because a taxpayer's circumstances can change, TAS may make more than one significant hardship determination during the course of its assistance.

Once TAS makes its first determination, which is usually a determination about whether to accept the case, the suspension period should end, even if TAS later determines the taxpayer is experiencing a significant hardship, determines to issue an OAR instead of a TAO, determines to issue a TAO, or determines to close the case.  The taxpayer may not always be informed of the operative date and it is likely to be subject to dispute.[52]  However, the United States Court of Appeals for the 5th Circuit held in *Rothkamm*, *without any analysis*, that the period ended on the day TAS closed its case.

To reduce burden to taxpayers and the IRS of tracking short extensions, the National Taxpayer Advocate previously recommended legislation to create an exception to statute suspension in cases where the extension would be for seven days or less.[53]  This would help reduce controversy surrounding extensions that are less likely to be important and that may not even be possible to track unless accepted under TAS case acceptance criteria.  However, confusion and litigation will likely continue until Congress repeals or clarifies IRC § 7811(d).

### Statute Suspension Could Penalize Taxpayers for Seeking Assistance

If statute suspension were applied in cases where IRS enforcement was not actually suspended, then taxpayers who come to TAS would be at a disadvantage.  They would be subject to enforcement for longer periods than taxpayers who did not come to TAS.

---

48  TAMIS Query (Nov. 23, 2015).

49  Statute suspension does not apply if the application is rejected on the same day it is received.  *See* Treas. Reg. § 301.7811-(e)(1) ("For the purpose of computing the period suspended, all calendar days except the date of receipt of the application shall be included.").

50  *See, e.g.*, IRM 13.1.18.1, *Processing Taxpayer Advocate Service (TAS) Cases* (Feb. 1, 2011).

51  TAMIS Query (Nov. 23, 2015).  It made the significant hardship determination within 23 days in 90 percent of its closed cases and within 90 days in 99 percent for FY 2015.

52  Treas. Reg. § 301.7811-1(e)(2) defines the date of the "decision" as "the date on which the taxpayer's request for a taxpayer assistance order is denied, or agreement is reached with the involved function of the Service, or a taxpayer assistance order is issued (except that when the taxpayer assistance order is reviewed by an official who may modify or rescind the taxpayer assistance order… the decision date is the date on which such review is completed)."  Some may argue that this regulatory language suggests an earlier decision or determination by TAS (*e.g.*, a determination regarding eligibility for TAS assistance or significant hardship) may not end the suspension period, as illustrated above, particularly in cases where TAS issues a TAO.

53  In response to this proposal, Rep. Lewis sponsored H.R. 586, 107th Cong § 224 (2001), which passed the House and was referred to the Senate on April 18, 2002; Rep. Houghton sponsored H.R. 3991, 107th Cong. Title II § 204 (2001), which was defeated in the House on March 19, 2002; and Rep. Portman sponsored H.R. 1528, 108th Cong. § 106 (2003), which passed the Senate on May 19, 2004.  See National Taxpayer Advocate 2002 Annual Report to Congress 159.

Perhaps for this reason, some Chief Counsel attorneys have even suggested that the IRS cannot rely on IRC § 7811(d) unless IRS enforcement activity was actually prohibited by internal procedures.[54] However, this view was limited to a specific fact pattern and is not necessarily the IRS's current official position. If statute suspension penalizes taxpayers from seeking assistance from TAS, then it encumbers the taxpayer's *right to quality service, finality, privacy* (which includes the right to expect that enforcement will be no more intrusive than necessary), and *to a fair and just tax system*.

### Statute Suspension Is a Trap for the Uninformed and Elective for Others

Statute suspension only applies to those who submit written TAO applications to TAS or who are granted TAOs that expressly provide for statute suspension.[55] Well-informed taxpayers who know that statute suspension only applies to written TAO applications could take advantage of its electivity. To avoid giving the IRS more time for enforcement, they could simply request TAS assistance by phone.[56] By contrast, similarly situated but uninformed taxpayers who file Forms 911 could be subject to IRS enforcement for longer periods.

### Statute Suspension Could Affect Thousands Each Year

TAS received 227,189 cases in FY 2015.[57] Of these, 37,484 were opened in response to correspondence from the taxpayer.[58] A sample of TAS cases received in FY 2008 found that about 49.2 percent of those received by correspondence included Form 911.[59] Assuming taxpayers submitted Forms 911 at about the same rate in FY 2015, statute suspension could apply to 18,442 taxpayers in FY 2015 alone (37,484 x 49.2 percent). Further, about 54 percent of the taxpayers who asked for TAS assistance by correspondence in FY 2015 were unrepresented — or potentially 9,959 of the 18,442 who may have been subject to statute suspension.[60] Unrepresented taxpayers are the least likely to be aware that they may have inadvertently granted the IRS additional time to assess or collect their liabilities.

### Statute Suspension Could Frustrate TAS's Mission

If TAS were to level the playing field by requiring a signed TAO application (thereby triggering statute suspension) before accepting a case, then statute suspension could discourage taxpayers who need help from seeking assistance, frustrating TAS's mission. Such a policy could also prevent TAS from offering prompt assistance to taxpayers by phone, particularly those without immediate access to the technology required to submit a written TAO application electronically (*e.g.*, a fax machine or scanner and Internet access). Legislation could clarify that written TAO applications are not required to trigger statute suspension, but then TAS would need to ensure taxpayers are aware that even a request by phone could suspend the statute, potentially discouraging taxpayers from seeking assistance.

---

54  IRS CCA 199910043, 1999 IRS CCA LEXIS 99 (Jan. 14, 1999) ("the Service may rely on IRC § 7811(d) and B.C. § 105(a) to toll the periods only where, pursuant to its own internal procedures, the Service was prohibited from collecting the taxes it seeks to have declared priority or nondischargeable and actually made no attempt to collect those taxes. Additionally, courts may well require evidence of abuse of the system by the debtor, *e.g.*, that the application was filed as a delaying tactic.").

55  *See, e.g.*, Treas. Reg. 301.7811-1(b) and -1(e)(4).

56  *Id.*

57  TAMIS query (Oct. 26, 2015).

58  *Id.*

59  TAS Technical Analysis and Guidance, *Special Study* (Dec. 2010).

60  TAMIS query (Oct. 26, 2015).

### Statute Suspension Will Generate Litigation

A TAO application may now extend the period for taxpayers and third parties to take action, at least in the 5th Circuit under *Rothkamm*.  Some taxpayers could file TAO applications because they want more time to meet statutory deadlines.  A more likely scenario, however, is that those who seek TAS assistance and later discover they missed an important deadline will argue the deadline was extended by IRC § 7811(d).[61]

### The IRS May Now Feel Obligated to Implement Statute Suspension

Some IRS attorneys concluded that the IRS was not legally required to implement statute suspension because IRC § 7811(d) only protects the IRS and does not extend periods applicable to taxpayers.[62]  Because *Rothkamm* has questioned that assumption, the IRS may now feel a greater obligation to implement it notwithstanding the technical difficulties and inequities of doing so.

### Implementation of IRC 7811(d) Would Be More Difficult If Applied to Taxpayer Deadlines

As described above, the IRS's computer systems cannot accurately reflect the ASED and CSED extensions provided by IRC § 7811(d).  These difficulties would multiply if the IRS were also required to track the extension of statutory deadlines applicable to taxpayers.  For example, there is no obvious way for employees to change the refund statute expiration date (RSED) or filing deadline for a CDP hearing that is reflected on IRS systems.[63]  Moreover, it is not even clear which taxpayer deadlines would be extended under *Rothkamm*.  Although taxpayers will argue that under the reasoning of *Rothkamm* "any" statutory deadline, including jurisdictional ones, can be extended by operation of IRC § 7811(d), the court in *Rothkamm* only held that IRC § 7811(d) extended the period for a third party to file a wrongful levy claim with the IRS.[64]

## EXPLANATION OF RECOMMENDATIONS

TAS helps taxpayers resolve problems with the IRS when they are facing an economic burden as a result of IRS action or inaction, or when the IRS is ignoring their facts and circumstances and creating devastating problems for them.  IRC § 7811(d) operates primarily, if not solely, to penalize taxpayers for seeking assistance from TAS and to reward the IRS for creating those problems by awarding it with additional time for

---

61  Although frivolous TAO applications could trigger a frivolous submissions penalty, a submission by a taxpayer facing a potentially significant hardship under IRC § 7811(a)(2) (*e.g.*, incurring significant costs (including fees for professional representation) if relief is not granted) is unlikely to be frivolous.  *See* IRC § 6702(b)(2)(B)(ii)(III) (penalty for frivolous TAO applications).

62  *Compare* LB 360, 1990 WL 1086174, 1990 GLB LEXIS 12 (1990) (concluding that because IRC § 7811(d) only protects the IRS, the IRS was not legally required to implement it), *with* PMTA 2007-00429, *Suspension of the Statutes of Limitations Under Section 7811(d)* (Mar. 9, 2001) (assuming statute suspension only applies to protect the IRS's interest but still declining to conclude its implementation was not mandatory).  Further, the 5th Circuit decision stated that the IRS has no discretion under IRC § 7811(d).  *Rothkamm* at 713 ("Congress did not provide the IRS with that discretion under § 7811(d), and the only discretion granted in the regulations is the discretion granted to the Ombudsman to lengthen the period of tolling beyond the date of the decision on the TAO application.").

63  *See, e.g.*, IRM 25.15.15, *Mirror Modules for Requests for Relief from Joint and Several Liability* (July 30, 2014) (discussing RSEDs) and IRM 21.5.6.4.8, *-D Freeze* (Mar. 3, 2014) (same); IRM 5.19.4, *Enforcement Actions* (Nov. 26, 2014) (discussing CDP filing deadline).

64  If IRC § 7811(d)(1) was inapplicable, Mrs. Rothkamm's suit would have been over seven months late, but her case was open in TAS for less than six months, according to the court.  Had the court held that IRC § 7811(d)(1) merely extended the time for filing suit, the suit would still have been late.  Rather, the court held that the suit was timely only because IRC § 7811(d)(1) extended the period for her to file an administrative claim.  The IRS's consideration and subsequent denial of her timely-filed administrative claim extended the period for filing suit by operation of IRC § 6532(c)(2).  As noted above, a future decision could clarify that IRC § 7811(d)(1) does not extend jurisdictional deadlines for filing in court.

001741

enforcement, thereby undermining taxpayer rights and TAS's mission. It throws previously clear rules and deadlines into disarray in an inconsistent, elective, and arbitrary manner. It invites litigation over which deadlines it extends and for how long. It requires the IRS to track unspecified changes to unspecified deadlines that the IRS does not and cannot track, even if it could identify all of the deadlines it should track and what changes it should make to them. For these reasons, IRC § 7811(d) must be repealed.

In the alternative, if IRC § 7811(d) cannot be repealed, then Congress could address some of the problems with IRC § 7811(d) by clarifying that it only suspends the periods for collection or assessment and only applies in cases where it is most likely to be relevant. It is most likely to be relevant only when a TAO specifically and explicitly bars enforcement for more than seven days, expiration of the relevant statutory limitations period is imminent (*i.e.*, would otherwise expire within one year), and the IRS has asked the taxpayer to extend the applicable limitations period but the taxpayer has declined. Such situations should be rare because taxpayers who are working with TAS almost always agree to extend the limitations period upon request. To reiterate, however, the National Taxpayer Advocate's primary recommendation is to repeal IRC § 7811(d).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1750 of 4699 PageID #: 4915

Legislative
Recommendations

Most Serious
Issues

Most Litigated
Issues

Appendices

Case Advocacy
Filing Season
Problems

**LR #2**

## MATH ERROR AUTHORITY: Authorize the IRS to Summarily Assess Math and "Correctable" Errors Only in Appropriate Circumstances

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Quality Service*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### PROBLEM

The IRS has the authority to correct math or clerical errors — arithmetic mistakes and the like — on a return using summary assessment (or "math error") procedures.[2]  When it makes a summary assessment, taxpayers cannot obtain judicial review before paying, unless they can determine whether and how to respond to an often-confusing IRS notice more quickly than under regular deficiency procedures.[3]  The IRS has had problems using its summary assessment authority to address discrepancies and mismatches that go beyond simple arithmetic mistakes.[4]  Yet, the Administration has proposed legislation that would allow the Treasury Department to expand the IRS's summary assessment authority to other "correctable" errors by regulation — without specific authorization from Congress — where:

1. The information provided by the taxpayer does not match the information contained in government databases;

2. The taxpayer has exceeded the lifetime limit for claiming a deduction or credit; or

3. The taxpayer has failed to include with his or her return documentation that is required by statute.[5]

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Internal Revenue Code (IRC) §§ 6213(b), (g)(2).

3   *Compare* IRC § 6211(a) *with* IRC § 6213(b)(2).

4   *See, e.g.,* National Taxpayer Advocate 2014 Annual Report to Congress 163; National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 91-2; National Taxpayer Advocate 2011 Annual Report to Congress 74; National Taxpayer Advocate 2006 Annual Report to Congress 311; National Taxpayer Advocate 2003 Annual Report to Congress 113; National Taxpayer Advocate 2002 Annual Report to Congress 25, 186; National Taxpayer Advocate 2001 Annual Report to Congress 33.  *See also Hearing on Improper Payments in the Administration of Refundable Tax Credits Before the Subcommittee on Oversight, Committee on Ways and Means,* 112th Cong. (May 25, 2011) (statement of Nina E. Olson, National Taxpayer Advocate); *Hearing on Complexity and the Tax Gap, Making Tax Compliance Easier and Collecting What's Due Before the Committee on Finance,* 112th Cong. (June 28, 2011) (statement of Nina E. Olson, National Taxpayer Advocate); *Hearing on The National Taxpayer Advocate's 2014 Annual Report to Congress, Before the House Subcomm. on Gov't Ops., Comm. on Oversight and Gov't Reform,* 114th Cong. (Apr. 15, 2015) (statement of Nina E. Olson, National Taxpayer Advocate).

5   Department of the Treasury, *General Explanations of the Administration's Fiscal Year 2016 Revenue Proposals,* February 2015, at 245-246, *available at* http://www.treasury.gov/resource-center/tax-policy/Pages/general_explanation.aspx.  For concerns about this proposal, *see, e.g., Hearing on The National Taxpayer Advocate's 2014 Annual Report to Congress, Before the House Subcomm. on Gov't Ops., Comm. on Oversight and Gov't Reform,* 114th Cong. (Apr. 15, 2015) (statement of Nina E. Olson, National Taxpayer Advocate).

001743

This proposal would allow the IRS to assume a taxpayer's return is wrong and assess a tax deficiency based on circumstances that are more complicated than they appear.

If the IRS uses summary assessment procedures to address complex issues that require additional fact finding, the assessments are more likely to be wrong, and confusing math error notices are likely to become even more difficult to understand.[6]  Confusing notices may prevent some taxpayers, particularly low income taxpayers, from responding timely.  Those who miss the deadline lose the right to challenge the adjustment in court before paying.  The IRS also wastes resources when its assessments are inaccurate because it has to review additional documentation, process abatement requests and amended returns, try to respond to calls and letters, and potentially even attempt to collect inaccurate assessments from taxpayers who are entitled to the benefits they claimed.  Thus, expanding summary assessment procedures into more complicated areas could erode the *rights to quality service, to pay no more than the correct amount of tax, to privacy, to challenge the IRS's position and be heard, to appeal an IRS decision in an independent forum*, and *to a fair and just tax system*, while wasting IRS resources.

## EXAMPLES

### Example 1: Unreliable Database Mismatches Could Trigger Math Error Authority

Not all government databases are reliable for tax purposes.  The IRS has the authority to assess tax using math error procedures when a taxpayer claims the Earned Income Tax Credit (EITC) for a child who is shown on the Federal Case Registry (FCR) as being in someone else's custody.[7]  A study that Congress required the Treasury Department to undertake with the National Taxpayer Advocate found that *about 39 percent* of the returns selected solely based on FCR data mismatches were actually correct.[8]  Because FCR data is not sufficiently reliable, the IRS has adopted the National Taxpayer Advocate's recommendation not to assess math errors based on mismatches between returns and FCR data.[9]

### Example 2: Mismatches Could Allow the IRS to Make Summary Assessments Based on the IRS's Estimate of the Mere Probability of an Error

The IRS's "Dependent Database" (DDb), combines unreliable data from the FCR with other more reliable government data (*e.g.*, the Social Security Administration's Kidlink data, which links a child's Social Security number (SSN) to its mother's SSN, and in many instances, the father's SSN).[10]  The IRS runs each return that claims a dependent or other family-status benefit through DDb filters (*e.g.*, EITC,

---

6   *See, e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 163.

7   In 2001, Congress authorized the IRS to use of summary assessment procedures to deny EITC, beginning in 2004, where data from the FCR of Child Support Orders indicates the taxpayer claiming a child is actually the non-custodial parent.  *Economic Growth and Tax Relief Reconciliation Act of 2001*, Pub. L. No. 107-16, § 303(g), 115 Stat. 38, 56-57 (2001) (codified at IRC § 6213(g)(2)(M)).  The House Conference Report requested a study of the FCR database by the Department of Treasury, in consultation with the National Taxpayer Advocate, of the accuracy and timeliness of the data in the FCR; the efficacy of using math error authority in this instance in reducing costs due to erroneous or fraudulent claims; and the implications of using math error authority in this instance, given the findings on the accuracy and timeliness of the data.  H.R. Conf. Rep. 107-84 at 147 (2001).  *See also* National Taxpayer Advocate 2002 Annual Report to Congress 189 (Legislative Recommendation: *Math Error Authority*).

8   *See* IRS, Federal Case Registry Final Report, Project 5-02-12-3-005 (CR-39) (July 2003) ("almost 39% of the FCR children were allowed per examination… With the exclusion of no reply cases… the rate of FCR children that are allowed per examination increases to 53.5%").

9   It is not clear that the IRS would have conducted the FCR study without a mandate to do so.

10   For a description of the DDb, see Internal Revenue Manual (IRM) 4.19.14, *EITC/Revenue Protection Strategy* (Jan. 1, 2015).  Exam receives a majority of its EITC work from the DDb.  IRM 4.19.14.1, *Earned Income Tax Credit (EITC) Revenue Protection Strategy (RPS)* (Jan. 1, 2015).

001744

dependent exemptions, filing status, Child and Dependent Care Credit, Child Tax Credit, and education benefits, etc.).[11]

The IRS assumes that the more inconsistencies (or "mismatches") there are between the return and the DDb (or the more "rules" it breaks) the more likely the return is to contain errors.[12]  In other words, the IRS uses the DDb to infer the probability of error, but it is not a binary (yes/no) determination.  TAS has seen instances where a return has broken all of the rules contained in the DDb and the taxpayer is still eligible for the exemption or credit claimed.  It would be unprecedented to give the IRS summary assessment authority based on some unstated *probability* that it is correct.  Yet, because the DDb is a government database that the IRS may consider to be inconsistent with a return, there is a potential it could be used in this way under the correctable error proposal.

### Example 3: The IRS Does Not Try to Reconcile Inconsistencies Before Charging a Math Error

The IRS may assess tax using math error procedures when a taxpayer claims a dependent, but does not include the dependent's correct taxpayer identification number (TIN).[13]  Because a TIN is a long string of numbers, taxpayers sometimes enter them incorrectly.  A TAS study of math errors on dependent TINs found that the IRS subsequently reversed at least part of these math errors on 55 percent of the returns with incorrect TINs.[14]  The study also found that the IRS could have resolved 56 percent of these errors using information already in its possession (*e.g.*, the TIN listed on a prior year return), rather than assessing tax using math error procedures and asking the taxpayer to explain the apparent discrepancy.[15]

Even when the taxpayer did not respond and the IRS did not reverse the math error, the TAS study found that the IRS should have reversed it in 41 percent of the cases based on information in its files, and thus, it deprived taxpayers of benefits to which they were entitled.[16]  The IRS's failure to review information in its files before assessing tax using math error procedures is inconsistent with general direction from Congress that the IRS should use information in its possession to avoid using the summary assessment process, rather than resolving uncertainty against the taxpayer.[17]  In other words, in a large percentage of

---

11  The IRS also uses the DDb filters to detect potential identity theft.  As of November 26, 2015, the DDb filters used by the IRS's Taxpayer Protection Program (TPP) had a "false positive" rate of 38.2 percent during calendar year 2015.  *See* IRS, Return Integrity & Compliance Services (RICS), *Update of the Taxpayer Protection Program (TPP)* 9 (Dec. 2, 2015).  According to the IRM, the TTP "is responsible for handling potential Identity Theft (IDT) cases that are scored by a set of IDT models in the DDb or selected through a query in the Electronic Fraud Detection System (EFDS) or selected by Integrity & Verification Operation (IVO) tax examiners during the daily screening process."  IRM 25.25.6.1, *Taxpayer Protection Program* (May 26, 2015).

12  *See generally* IRM 4.19.14, *EITC/Revenue Protection Strategy* (Jan. 1, 2015).

13  IRC § 6213(g)(2)(H).

14  National Taxpayer Advocate 2011 Annual Report to Congress vol. 2, 114, 117 (Research Study: *Math Errors Committed on Individual Tax Returns – A Review of Math Errors Issued on Claimed Dependents*).

15  *Id*. at 119-20.

16  *Id*. at 120.

17  H.R. REP. NO. 94-658, at 290 (1976) ("…care should be taken to be sure that what appears to be an error in addition or subtraction is not in reality an error in transcribing a number from a work sheet, with the final figure being correct even though an intermediate arithmetical step on the return appears to be wrong… It is expected that the Service will check such possible sources of arithmetical errors before instituting the summary assessment procedures.").  *Id* at 291 ("[T]he taxpayer has the obligation of showing that he or she is entitled to the number of exemptions claimed.  However, this summary assessment procedure is not to be used where the Service is merely resolving an uncertainty against the taxpayer.").  The 1976 committee report provided detailed direction from Congress about how it generally expected the IRS to apply the math error rules, however, the IRS was not expressly authorized to use the math error procedure to address the omission of a dependent's TIN on a return until 1996.  *See* Small Business Job Protection Act of 1996, Pub. L. No 104-188, § 1615, 110 Stat. 1853 (1996); H.R. REP. NO. 104–737, at 319-20 (1996).

math error cases the IRS imposed a burden on taxpayers, generating phone calls and letters it could not timely handle, triggering interest charges and denying tax benefits to those entitled to them, rather than investing a few minutes of research at the front end. Under the correctable error proposal, the IRS could burden taxpayers and waste more resources in this way.

### Example 4: It May Be Difficult to Determine What Documentation Is Attached

Congress authorized the IRS to use math error authority to deny the First-Time Homebuyer Credit (FTHBC) to taxpayers who did not attach a "settlement statement," as required.[18] Initially, the IRS accepted a settlement statement as sufficient only if it showed all parties' names and signatures, the property address, sales price, and date of purchase, as provided on the Form HUD-1. After learning that not all states required a settlement statement to include a complete address or both parties' signatures, the IRS reversed its position.[19]

The IRS's continued use of math error authority in this circumstance would have been very costly and burdensome.[20] To make determinations about the sufficiency of a settlement statement, an IRS employee would have to read papers attached to the return and explain any problems to the taxpayer (or summarily assess the liability without providing a good explanation). Accordingly, the National Taxpayer Advocate recommended the IRS be permitted to use math error authority only when a return does not contain a document that purports to be a settlement statement (*i.e.*, a simple yes/no determination), and required to use normal deficiency procedures to address facts-and-circumstances determinations concerning the *sufficiency* of a settlement statement.[21] Yet, under the correctable error proposal, after promulgating regulations, the IRS could summarily assess tax related to any return that did not attach sufficient documentation in similarly ambiguous circumstances.

---

18   *See* Worker, Homeownership, and Business Assistance Act of 2009, Pub. L. No. 111-92, § 11, 123 Stat. 2984, 2991-92 (2009), *amending* IRC § 36(d) and *adding* IRC § 6213(g)(2)(P).

19   The IRS's handling of FTHBC issues in the 2011 filing season delayed processing of an estimated 128,000 returns and led to a sharp increase in related TAS cases (from 669 through April 30 of fiscal year (FY) 2010 to 4,299 for the same period in FY 2011). National Taxpayer Advocate FY 2012 Objectives Report to Congress 28-36. IRS SERP Alert 100290 (May 25, 2010); IRM 21.6.3.4.2.11.6(4) (May 7, 2012) ("The settlement statement may or may not contain the buyer(s) and seller(s) signatures."). *See also* IRS SERP Alert 100066 (Feb. 12, 2010); IRS Instructions for Form 5405, *First-Time Homebuyer Credit and Repayment of the Credit* 2 (Mar. 2011) (acknowledging that not all taxpayers will have a signed HUD-1).

20   It would also have been inconsistent with concerns expressed by Congress in 1976. *See* H.R. Rep. No. 94-658, at 292 n.1 (1976) ("[D]isputes as to the adequacy of the schedule that the taxpayer submits are to be dealt with under normal administrative procedures and not by use of the extraordinary summary assessment procedure.").

21   *See, e.g.*, National Taxpayer Advocate 2011 Annual Report to Congress 524-30 (Legislative Recommendation: *Mandate That the IRS, in Conjunction with the National Taxpayer Advocate, Review Any Proposed Expanded Math Error Authority to Protect Taxpayer Rights*).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1754 of 4699 PageID #:  4919

Most Serious
Problems   Appendices   Most Litigated
Issues   Legislative
Recommendations   Case Advocacy   Research and Related
Studies

## RECOMMENDATIONS

To ensure that the IRS's use of summary assessment authority does not impair taxpayers' rights and unnecessarily burden both the taxpayer and the IRS, the National Taxpayer Advocate recommends (and reiterates prior recommendations) that Congress authorize the IRS to summarily assess a deficiency only if:[22]

1. There is a mismatch between the return and unquestionably reliable data (rather than the IRS's estimate about the mere probability of an error).

2. The IRS's math error notice clearly describes the discrepancy and how taxpayers may contest the proposed change.

3. The IRS has researched all of the information in its possession (*e.g.*, information provided on prior-year returns) that could reconcile the apparent discrepancy.

4. The IRS does not have to analyze facts and circumstances or weigh the adequacy of information submitted by the taxpayer (*e.g.*, whether *sufficient* documentation is attached) to determine if the return contains an error.

5. The abatement rate for a particular issue or type of inconsistency is below a specified threshold for those taxpayers who respond.[23]

6. For any new data or criteria, the Department of Treasury, in conjunction with the National Taxpayer Advocate, has evaluated and publicly reported to Congress on the reliability of the data or criteria for purposes of assessing tax using math error procedures.[24]  The report should analyze the burdens and benefits of the proposed use of math error authority, considering downstream costs to taxpayers (*e.g.*, time, paperwork, representation) and the IRS (*e.g.*, processing taxpayer calls and letters, requests for audit reconsideration, amended returns, appeals, and TAS intervention).

## PRESENT LAW

### Taxpayers Generally Have the Right to Judicial Review *Before* Paying an Assessment by the IRS

Before assessing a deficiency (*e.g.*, as a result of an audit), the IRS is legally required to send the taxpayer a Statutory Notice of Deficiency (SNOD), also known as a "90-day letter."[25]  This letter explains the basis for the deficiency and gives the taxpayer 90 days to file a petition with the Tax Court.[26]  A taxpayer who misses this deadline can only seek judicial review by paying the assessment and filing a claim for refund.[27]

---

22  *See, e.g.,* National Taxpayer Advocate 2014 Annual Report to Congress 284 (Legislative Recommendation: *Taxpayer Rights: Codify Taxpayer Bill of Rights and Enact Legislation that Provides Specific Taxpayer Protections*); National Taxpayer Advocate 2011 Annual Report to Congress 524-530 (Legislative Recommendation: *Mandate that the IRS, in Conjunction with the National Taxpayer Advocate, Review Any Proposed Expanded Math Error Authority to Protect Taxpayer Rights*); National Taxpayer Advocate 2002 Annual Report to Congress 189 (Legislative Recommendation: *Math Error Authority*).

23  An issue should not be subject to math error simply because the population in question is relatively unresponsive, *e.g.*, because they do not understand the IRS's notices or are transient and do not receive them.

24  As noted above, in 2001 Congress requested a study of the FCR database by the Department of Treasury, in consultation with the National Taxpayer Advocate.  H.R. Conf. Rep. 107-84, at 147 (2001).

25  Prior to the issuance of the SNOD, the IRS will generally issue a 30-day letter giving the taxpayer the opportunity to file a pro-test with Appeals.  IRS, Publication 556, *Examination of Returns, Appeal Rights, and Claims for Refund* 5 (Sept. 2013).

26  IRC § 6213.  The 90-day period becomes 150 days if the notice is addressed to a person outside of the United States.

27  If the claim is denied or if no action is taken on the claim within six months, the taxpayer may file a refund suit in a federal dis-trict court or the Court of Federal Claims within the limitations period.  IRC §§ 6511, 6532, 7422.

Low income taxpayers are less likely to be able to afford to pay the assessment before disputing it or to navigate these more complicated procedures.

### Taxpayers Do Not Automatically Receive the Right to Judicial Review Before Paying a Math Error Assessment

IRC §§ 6213(b) and (g) authorize the IRS to use its math error authority to assess and collect tax after 60 days without first providing the taxpayer access to the Tax Court. To preserve the right to petition the Tax Court, the taxpayer must request an abatement within 60 days. If the taxpayer does so, the IRS will then work the case through normal deficiency procedures (described above). Although initially limited to situations involving mathematical errors (*e.g.*, 2+2=5),[28] Congress first expanded the IRS's math error authority to address "clerical errors" (*e.g.*, inconsistent entries on the face of the return),[29] and then expanded it to address other circumstances such as where a taxpayer omits a required TIN or uses an SSN that does not match the one in the Social Security Administration's Numident database.[30]

### Congress Carefully Limited Summary Assessment Procedures

Congress was concerned about substituting summary assessment procedures for deficiency procedures.[31] It generally reserved summary assessment procedures for simple situations where "not only is the error apparent from the face of the return, but the correct amount is determinable with a high degree of probability from the information that appears on the return."[32] Noting that authorizing summary assessment procedures when the taxpayer omitted a required schedule may arguably depart from this general approach, a committee report explained that "disputes as to the *adequacy* of the schedule that the taxpayer submits are to be dealt with under normal administrative procedures and not by use of extraordinary summary assessment procedure."[33] The IRS was not to use summary assessment procedures "where it is not clear which of the inconsistent entries is the correct one" or for "resolving an uncertainty against the taxpayer."[34]

If taxpayers do not understand the supposed error, they may have difficulty deciding whether to request an abatement (assuming they understand that requesting abatement is an option). They are also less likely to request abatement within the shorter 60-day period applicable to summary assessments. Accordingly,

---

28  H.R. Rep. No. 691, at 10-11 (1926).

29  Pub. L. No. 94-455, § 1206(b), 90 Stat. 1520, 1704 (1976) (defining "mathematical or clerical error" to include (1) errors in addition, subtraction, multiplication, or division shown on any return, (2) an incorrect use of any table provided by the IRS with respect to any return if such incorrect use is apparent from the existence of other information on the return, (3) an entry on a return of an item that is inconsistent with another entry of the same or another item on the return, (4) an omission of information which is required to be supplied on the return to substantiate an entry on the return, and (5) an entry on a return of a deduction or credit in amount which exceeds certain types of statutory limits). The IRS had interpreted "math errors" broadly, but courts had limited its use to arithmetic errors; thus the 1976 legislation formally expanded it to encompass "clerical" errors, while also "restricting" its use by the IRS. H.R. Rep. No. 94-658, at 289 (1976).

30  IRC § 6213(g)(2). A "mathematical or clerical error" currently includes 14 categories of errors (in subparagraphs A-N), including (a) an omission of a correct TIN required to be included on a tax return for certain tax credits, and (b) the inclusion of a TIN indicating the individual's age disqualifies them from certain credits, as discussed above. *Id.*

31  *See* H.R. Rep. No. 94-658, at 289 (1976); S. Rep. No. 94-938(I), at 375 (1976); Joint Committee on Taxation (JCT), *General Explanation of the Tax Reform Act of 1976*, JCS 33-76, 372 (1976) (*Assessments in Case of Mathematical or Clerical Errors, Sec. 1206 of the Act and Sec. 6213 of the Code*). Although the IRS originally had the authority to assess EITC overpayments without providing taxpayers an opportunity for judicial review in a pre-payment forum (under former IRC § 6201(a)(4)), Congress specifically granted taxpayers this right in 1988. *See* Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. No. 100–647, § 1015(r), 102 Stat. 3342, 3572 (1988).

32  H.R. Rep. No. 94-658, at 292 (1976).

33  *Id.* at n.1 (emphasis added).

34  *Id.* at 291.

Congress also enacted IRC § 6213(b)(1), requiring that "[e]ach notice under this paragraph shall set forth the error alleged and an explanation thereof,"[35] and should "include questions designed to show whether the taxpayer indeed is entitled" to what they claimed on the return.[36]

## REASONS FOR CHANGE

### As the IRS Receives More Data and Fewer Resources, It May Be Tempted to Apply Summary Assessment Procedures to a Wider Range of Situations

As the IRS's resources have decreased, it has proposed that Congress expand its summary assessment authority as a seemingly cost-effective way to assess deficiencies and protect revenue.[37] This temptation will increase as the IRS receives more data that may be or appear to be inconsistent with a person's return. The IRS received about 2.1 billion information reporting documents in 2013 (including 47.5 million on paper), and projects a steady increase through 2022.[38] It will also begin receiving new types of information. Notably, the IRS will soon begin receiving information from health insurers and self-insured employers about people's health coverage;[39] credit card issuers recently started reporting the aggregate amount of reportable payments they process for businesses;[40] and brokerage firms generally must now report the cost bases (as well as gross proceeds) of stock, bond, and mutual fund sales.[41] It should make this data available to taxpayers during the filing season to help them in preparing accurate returns, and use it to inform them of seeming inconsistencies when they file or as soon afterward as possible. However, the increasing availability of tax-related data is likely to prompt the IRS to ask Congress to expand its authority to use math error procedures to assess additional tax when there appear to be inconsistencies between the data and a tax return.

### Congress Should Consider Expanding the IRS's Summary Assessment Authority Only in Limited Situations

It is appropriate to expand the IRS's summary assessment authority to cover only one of the situations described in the Administration's correctable error proposal — where there can be no doubt that the taxpayer has claimed amounts in excess of a lifetime limitation based on information shown on the return.

---

35  Pub. L. No. 94-455, § 1206(a), 90 Stat. 1520, 1703 (1976).

36  H.R. Rep. No. 94-658, at 291 (1976).

37  *See generally* National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical As the IRS Develops a Real-Time Tax System*).

38  IRS Pub. 6961, *Calendar Year (CY) Projections of Information and Withholding Documents for the United States and IRS Campuses* (July 2014), Tables 2 and 3.

39  Notice 2013-45, 2013-31 I.R.B. 116; T.D. 9660, 2014-13 I.R.B. 842 (Mar. 10, 2014). Reporting entities are not subject to penalties for failure to comply with the IRC §§ 6055 and 6056 reporting requirements for coverage in 2014 (including the provisions requiring the furnishing of statements to covered individuals in 2015 with respect to 2014). *Id.* These information returns, which are submitted with new Form 1095-B, *Health Coverage,* are not reflected in the IRS's information return projections. IRS Pub. 6961, *Calendar Year (CY) Projections of Information and Withholding Documents for the United States and IRS Campuses* (July 2014), Table 2. For a discussion of related problems, see Most Serious Problem: *Affordable Care Act - Individuals: The IRS Is Compromising Taxpayer Rights as it Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions, supra,* and Most Serious Problem: *Affordable Care Act (ACA) - Business: The IRS Faces Challenges in Implementing the Employer Provisions of the ACA While Protecting Taxpayer Rights and Minimizing Burden, supra.*

40  Pub. L. No. 110-289, Div. C, Title III, § 3091(a), 122 Stat. 2654, 2908 (2008) (codified at IRC § 6050W, applicable to returns for calendar years beginning after 2010). The IRS received about 10.3 million Forms 1099-K, *Merchant Card and Third Party Payments,* in 2013 and expects to receive about 11.6 million in CY 2022. IRS Pub. 6961, *Calendar Year (CY) Projections of Information and Withholding Documents for the United States and IRS Campuses* (July 2014), Table 2.

41  Energy Improvement and Extension Act of 2008, Pub. L. No. 110-343, Div. B, § 403(a)(1), 122 Stat. 3765, 3854 (2008) (codified at IRC § 6045(g) and phased in between 2011 and 2013).

For example, in cases where it is clear that a taxpayer has claimed an American Opportunity Tax Credit (AOTC) in excess of a statutory limit, then the summary assessment process may be appropriate.  The AOTC is a partially refundable credit for qualified post-secondary education expenditures that is available only for the first four years of a student's post-secondary education.[42]  Because the number of years claimed for each student is shown on the face of the return, allowing the IRS to use math error procedures to stop the improper payment of capped claims may be appropriate and cost effective, although probably not as cost effective as alerting the taxpayer to the problem at or before filing.[43]

### Inappropriate Expansion of Summary Assessment Authority Could Unduly Burden Taxpayers While Eroding the Right to Judicial Review

Without adequate safeguards and congressional oversight, the other proposed expansions of summary assessment authority would erode the right to judicial review *before* paying an audit assessment, which is the cornerstone of due process in the U.S. tax system.  The taxpayer bears the burden of asking for the right to petition the Tax Court within a 60-day period, rather than automatically receiving that right under normal IRS deficiency procedures.

### *It Can Be Difficult to Determine If a Particular Document Is Attached*

The correctible error proposal could potentially allow the IRS to "correct" already-accurate returns that do not appear to include required documentation.  However, it can be difficult to determine if a particular document is attached to a return, as illustrated by the FTHBC (discussed above).

### *Accurate Returns May Appear Inconsistent With Government Data*

The correctible error proposal could potentially allow the IRS to "correct" already-accurate returns that do not match the information contained in government databases.  There are a wide variety of reasons for why accurate returns may appear inconsistent with government data.  As illustrated by the FCR database, third-party data may not be sufficiently accurate.

Moreover, applying data collected for nontax purposes to tax claims is akin to relying on the addresses shown in a telephone directory to deny the home mortgage interest deduction.  Even if virtually all of the entries in a directory were accurate, they were compiled for a different purpose, do not disprove eligibility under the tax law, may not be current, and should not deprive a taxpayer of a due process right to present his or her own facts.

Of course, even data collected for tax purposes contains errors.  By one estimate, 1.5 percent of information returns have invalid payee data.[44]  If other information on these returns is inaccurate at the same rate, the IRS might burden about 31.5 million taxpayers with erroneous assessments (1.5 percent of the 2.1 billion information returns, noted above), if it could make a summary assessment based solely on

---

42  *See* IRC § 25A(i).

43  *See Improper Payments in the Administration of Refundable Tax Credits, Hearing Before the H. Subcomm. on Oversight, Comm. on Ways and Means* (May 25, 2011).  Both the Government Accountability Office (GAO) and the Treasury Inspector General for Tax Administration (TIGTA) have recommended expanding math error authority to correct returns claiming the Hope Credit (now called the American Opportunity Tax Credit) in more years than allowed by law.  *See* GAO, GAO-10-225, *IRS Met Many 2009 Goals, But Telephone Access Remained Low, and Taxpayer Service and Enforcement Could Be Improved* (Dec. 2009); TIGTA, Ref. No. 2009-30-141, *Improvements Are Needed in the Administration of Education Credits and Reporting Requirements for Educational Institutions* (Sept. 30, 2009).

44  TIGTA, Ref. No. 2011-30-019, *Targeted Compliance Efforts May Reduce the Number of Inaccurate Information Returns Submitted by Government Entities* 3-4 (Feb. 15, 2011).

inconsistencies between returns and information returns.  Even the government sent out 800,000 incorrect information reporting documents (Forms 1099-A) in the 2015 filing season.[45]

Longstanding IRS matching programs further illustrate how third-party data are often unreliable when used as the sole basis to conclude that the taxpayer's return is wrong.  The IRS's automated underreporter (AUR) process adjusts returns where there are mismatches between a tax return and data from third-party information returns, such as Forms W-2 and 1099.  For tax years (TYs) 2009-2011, 24.9 percent of these mismatches did not result in an assessment.[46]  Thirty-seven percent of the SNODs went unanswered, resulting in default assessments.[47]  About 4.6 percent of all AUR assessments (and 16.3 percent of the dollars) were abated.[48]  For taxpayers who specifically requested reconsideration of an AUR assessment in FY 2012, the IRS abated at least part of the assessment about 82.9 percent of the time (82.7 percent of the dollars).[49]  Thus, even data from information returns is a weak basis on which to conclude that a taxpayer's return is wrong.[50]

Because Congress and the judiciary have recognized that third-party information returns can be unreliable and difficult for a taxpayer to disprove, the IRS is not always entitled to rely on its general presumption of correctness in court when its determination is based on them.[51]  In the context of an exam, even the IRS recognizes the unreliability of third-party information and attempts to verify it with the taxpayer.[52]  However, the IRS could potentially replace its AUR program with summary assessment procedures under the correctable error proposal, eroding a taxpayer's right to have a court review the determination.[53]

### *"Mismatches" Should Not Trigger an Adjustment If the IRS Can Explain Them*

Not every return that contains a typo or similar error contains an understatement, as illustrated by the TAS study of math errors involving dependent TINs (described above).  As that study showed, the IRS imposed a burden on taxpayers in a large percentage of math error cases, generating phone calls and letters it could not timely handle, rather than investing a few minutes of research at the front end.  Further, for those who did not respond, the IRS improperly denied tax benefits even when it had the correct TINs in its files.

---

45  Notice 2015-30, 2015-17 I.R.B. 928; IRS, *Questions and Answers - Incorrect Forms 1095-A and the Premium Tax Credit* (July 6, 2015), *available at* https://www.irs.gov/Affordable-Care-Act/Individuals-and-Families/Questions-and-Answers-Incorrect-Forms-1095A-and-the-Premium-Tax-Credit; IRS SERP Alert 15A0147 (Apr. 6, 2015).

46  Individual Master File (June 11, 2015) (of the 16,242,759 TY 2009-2011 tax modules with mismatches that were assigned to AUR, 4,044,403 did not result in an assessment).  In some cases this may have been because the taxpayer explained the reason for the mismatch before a deficiency was assessed, but in others it may have been because the IRS decided not to pursue the discrepancy.

47  IRS response to TAS information request (May 28, 2015).  TYs 2009-2011 are the three most recent years for which the IRS has complete data.  For these same years, 12 percent of the IRS's SNODs were returned to the IRS as undeliverable.  *Id.*

48  IRS Compliance Data Warehouse (CDW), Enforcement Revenue Information System (ERIS) (Dec. 11, 2015) (AUR assessments in TYs 2009–2011).

49  IRS CDW, ERIS (Dec. 11, 2015) (reconsiderations in FY 2012).

50  According to TIGTA, more than two billion information returns were submitted to the IRS in TY 2007, of which almost 31.7 million had invalid payee data (1.5 percent).  TIGTA, Ref. No. 2011-30-019, *Targeted Compliance Efforts May Reduce the Number of Inaccurate Information Returns Submitted by Government Entities* 3-4 (Feb. 15, 2011).

51  *See, e.g., Portillo v. Comm'r*, 932 F.2d 1128 (5th Cir. 1991); IRC § 6201(d).

52  *See, e.g.,* IRM 4.10.3.2.1.4(2) (Mar. 1, 2003) ("Information about taxpayers collected from third parties will be verified to the extent practicable with the taxpayer before action is taken.").

53  For further discussion of the problems with this approach, see, *e.g.,* National Taxpayer Advocate 2012 Annual Report to Congress 180-91 (Most Serious Problem: *The Preservation of Fundamental Taxpayer Rights Is Critical As the IRS Develops a Real-Time Tax System*); Real-Time Tax System Initiative Comments of Keith T. Fogg, Director, Villanova Law School Federal Tax Clinic (Dec. 8, 2011), *available at* http://www.irs.gov/pub/irs-utl/t._keith_fogg_aba_tax_section_and_low_income_tax_clinic.pdf.

*"Mismatches" Between a Return and a Database That Reflects the Probability of an Error Should Not Trigger an Adjustment*

As described above, the DDb combines unreliable FCR data with other information, which the IRS uses to estimate the probability that a taxpayer has improperly claimed a dependent. It would be a slippery slope to authorize the IRS to assess a tax using summary assessment procedures based on its estimate of the probability that a return contains an error. Under the correctable error proposal, however, Treasury Regulations could essentially define such estimates as "mismatches" that would trigger summary assessment authority. When taxpayers do not understand math error notices or the procedure for disputing the assessment, the resulting delay may cost them the opportunity to contest it in a prepayment forum, or even the opportunity to obtain benefits to which they are entitled.

## EXPLANATION OF RECOMMENDATIONS

The National Taxpayer Advocate presents six broad recommendations that would help ensure the IRS uses math error procedures only in appropriate circumstances. First, the IRS would be permitted to use math error procedures only after reviewing and revising all of its math error notices to ensure they clearly describe what the IRS changed and why, and how to contest the change. For situations that the IRS can or will not clearly describe on a math error notice, it could use normal deficiency procedures.

Second, the IRS would be permitted to use math error procedures only when there is a mismatch between the return and unquestionably reliable data. For example, because the DDb filters combine unreliable data from various sources to create a more reliable estimate of the probability that a taxpayer's return is inaccurate, this proposal would not authorize the IRS to rely on such filters.

Third, the IRS would be permitted to use math error procedures only after it has researched all of the information in its possession that could help explain the apparent discrepancy so that it does not need to burden the taxpayer by requesting an explanation. For example, if a return contains an inaccurate dependent TIN, the IRS would review the taxpayer's prior year returns to determine if the error was a typo. If so, it could inform the taxpayer that it had corrected the typo, rather than burdening the taxpayer with an inaccurate tax assessment.

Fourth, the IRS would be permitted to use math error procedures only in situations where it does not have to analyze facts and circumstances or weigh the adequacy of information submitted by the taxpayer to determine if the return contains an error. For example, while the math error process could require the IRS to determine if the taxpayer included an attachment (*i.e.*, a yes/no determination), the proposal would not authorize its use on the basis that the documentation was insufficient (*i.e.*, a facts and circumstances inquiry).

Fifth, the IRS would be permitted to use math error procedures only if the annual abatement rate for a particular issue or type of inconsistency is below a specified threshold for those taxpayers who respond. The IRS would compute and report the abatement rate on an annual basis so that it could respond to changes in the accuracy of its assessments. It would exclude taxpayers who do not respond so as to avoid a bias toward applying math error procedures to populations that are less responsive to IRS notices (*e.g.*, because they are transient or are less likely to understand IRS correspondence).

Finally, the IRS would be permitted to use math error procedures for any new data or criteria only if, the Department of Treasury, in conjunction with the National Taxpayer Advocate, has evaluated and publicly reported to Congress on the reliability of the data or criteria for purposes of assessing tax using math

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1760 of 4699 PageID #:  4925

Legislative
Recommendations

Most Serious
Issues

Most Litigated
Problems

error procedures.  The report should analyze the burdens and benefits of the proposed use of math error authority, considering downstream costs to taxpayers (*e.g.*, time, paperwork, representation) and the IRS (*e.g.*, processing taxpayer calls and letters, requests for audit reconsideration, amended returns, appeals, and TAS intervention).

The GAO has proposed a similar study to evaluate third-party data reliability.[54]  As noted above, Congress mandated a similar study before the effective date of the IRS's math error authority to address FCR data mismatches, a study that the IRS would not have undertaken without the mandate.  These safeguards would help prevent the IRS from unnecessarily wasting resources and burdening taxpayers by making summary assessments based on conclusions that involve the exercise of judgment, information that is not sufficiently accurate, or estimates of the likelihood of an error.  They would also be consistent with the taxpayers' *rights to quality service, to pay no more than the correct amount of tax, to privacy, to challenge the IRS's position and be heard,* and *to appeal an IRS decision in an independent forum.*

---

54  GAO, GAO-11-691T, *Enhanced Pre-Refund Compliance Checks Could Yield Significant Benefits* 9 (May 25, 2011) ("To ensure IRS continues to use MEA [math error authority] only in these limited circumstances [*i.e.*, where the error is "virtually certain"] if given broader authority, Congress could, for example, require IRS to submit a report to it or an entity it designates on a proposed new use of MEA.  The report could include how such use would meet the standards or criteria outlined by Congress. The report could also describe IRS's or the National Taxpayer Advocate's assessment of any potential effect on taxpayer rights.").

001753

LR
#3

## LEVIES ON RETIREMENT ACCOUNTS: Amend IRC § 6334 to Include a Definition of Flagrancy and Require Consideration of Basic Living Expenses at Retirement Before Levying on Retirement Accounts

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### PROBLEM

Taxpayers rely on Individual Retirement Accounts (IRAs) or defined contribution plans, such as 401(k) plans, or Thrift Savings Plans (TSP) for federal employees, to fund living and other expenses after retirement.  Understanding the importance of U.S. taxpayers having sufficient retirement savings, Congress has encouraged retirement savings and formulated statutes to protect the rights of individuals to pensions.[2]  Similarly, the IRS acknowledges the long-term importance of retirement assets to individuals' future welfare by regarding retirement levies as "special cases" that require additional scrutiny and managerial approval.[3]

Nevertheless, the IRS guidance that explains the steps required before a retirement account can be levied contains inadequate detail and is insufficient to protect taxpayer rights.[4]  For instance, the determination of whether "flagrant behavior" has occurred is an important prerequisite for levying on a retirement account.[5]  According to that guidance, if the IRS determines that a taxpayer has engaged in flagrant conduct, it may consider levying on a retirement account.  The guidance also provides that if a taxpayer has not engaged in flagrant conduct, then the levy should not occur.  Thus, the determination of flagrant behavior is critical in determining whether to levy on a retirement account.

However, there is no on-point definition of what constitutes "flagrant behavior" in the Internal Revenue Code (IRC), accompanying regulations, or the Internal Revenue Manual (IRM).  As a result, the determination of flagrancy is left to subjective judgment by individual IRS employees.  Furthermore, the IRS is not required to consider the taxpayer's ability to pay basic living expenses at the time of retirement.  This could lead to inconsistent treatment of similarly situated taxpayers, which could erode taxpayers' confidence in a fair tax system and decrease voluntary compliance.  More importantly, the IRS's approach undermines Congress' goal to have people able to afford basic living expenses while in retirement.

---

1    *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2    For example, the Employee Retirement Income Security Act of 1974 (ERISA) was enacted to provide protection for participants in pension and health plans in private industry.  *See* Pub. L. No. 93–406, 88 Stat. 829 (1974).

3    IRM 5.11.6.2(3) (Sept. 26, 2014).

4    *See* IRM 5.11.6.2(4)-(7) (Sept. 26, 2014).  For a more detailed discussion, see Most Serious Problem: *Levies on Assets in Retirement Accounts: Current IRS Guidance Regarding the Levy of Retirement Accounts Does Not Adequately Protect Taxpayer Rights and Conflicts with Retirement Security Public Policy*, *supra*.

5    IRM 5.11.6.2(5) (Sept. 26, 2014).

001754

## EXAMPLE

A taxpayer is 57 years old and has worked at her current job for over ten years.  For much of that time she has had five percent of her wages automatically contributed to her retirement account, which has been matched with an equal contribution by the employer.  Prior to working at her current job, the taxpayer was self-employed.  The taxpayer fell behind on her tax liabilities while she was self-employed and now owes over $50,000.  As part of the routine collection process, a revenue officer (RO) assigned to her case has identified the retirement account as the taxpayer's only asset that can fully pay the liability.  Using the current internal guidance, the RO determined that the taxpayer's continued retirement account contributions, while she has an outstanding tax liability, constitutes flagrant conduct.  The RO also determined that, despite the taxpayer being 57 years old, she still has adequate time to save for retirement.  In making that determination, the RO did not consider the taxpayer's basic living expenses at retirement, nor did he consider the taxpayer's life expectancy or the actual amount she would realistically be able to save from age 57 to retirement.  As a result, the IRS levies the entire amount of the taxpayer's retirement account to fully satisfy her tax liability.  The taxpayer is left without retirement savings less than a decade before she will retire.

## RECOMMENDATION

To protect taxpayer rights and to further retirement security public policy, the National Taxpayer Advocate recommends that Congress:

Amend IRC § 6334 to define flagrant conduct as willful action (or failure to act) which is voluntarily, consciously, and knowingly committed in violation of any provision of chapters 1, 61, 62, 65, 68, 70, or 75, and which appears to a reasonable person to be a gross violation of any such provision; and to require the IRS to issue regulations describing a full financial analysis of the taxpayer's projected basic living expenses at retirement prior to allowing a determination to levy on a retirement account.[6]

## PRESENT LAW

IRC § 6331 authorizes the IRS to levy on a taxpayer's property and rights to property.  This power allows the IRS to levy on funds held in retirement accounts.[7]  Generally, the levy on a retirement account will only reach the assets over which the taxpayer has a present withdrawal right (*i.e.*, a levy will not attach until the taxpayer has a present right to withdraw funds from the plan).[8]  IRM guidance explains a "current levy can reach a taxpayer's vested present rights under a plan, but a levy does not accelerate payment and

---

6   A bill has been introduced in the House and Senate that recommends a stricter standard for defining flagrant conduct.  The proposed definition includes: "(A) the filing of a fraudulent return by the taxpayer, or (B) that the taxpayer acted with the intent to evade or defeat any tax imposed by this title or the collection or payment thereof."  Taxpayer Rights Act of 2015, S. 2333, 114th Cong. § 307 (2015); Taxpayer Rights Act of 2015, H.R. 4128, 114th Cong. § 307 (2015).  The proposed language also provides a statutory change by making retirement plans (including TSP accounts) exempt from levy unless "(A) the amount of tax (excluding interest and penalties) owed by the taxpayer exceeds $10,000, (B) the Secretary determines that the taxpayer has committed a flagrant act, and (C) the Secretary determines that such levy will not create an economic hardship due to the financial condition of the taxpayer (as described in [IRC] section 6343(a)(1)(D))."  Taxpayer Rights Act of 2015, S. 2333, 114th Cong. § 307 (2015); Taxpayer Rights Act of 2015, H.R. 4128, 114th Cong. §307 (2015).  For more information on the bill, see Senator Ben Cardin, *Cardin and Becerra Introduce Plan to Protect Taxpayers' Rights*, *available at* http://www.cardin.senate.gov/newsroom/press/release/cardin-and-becerra-introduce-plan-to-protect-taxpayers-rights.  The National Taxpayer Advocate believes this is another way to address the concerns involving retirement account levies.

7   For information on what constitutes a retirement plan, see IRC § 4974(c).

8   IRM 5.11.6.2(8) (Sept. 26, 2014).

is only enforceable when the taxpayer is eligible to receive benefits."[9]  If a taxpayer has a defined benefit plan and has no present right to withdraw the account balance, the IRS will have no corpus (the main part of the retirement plan) to levy upon at the present time.  Rather, the IRS can only levy the monthly distributions or the corpus of the account once a taxpayer reaches retirement age, subject to allowances for reasonable basic living expenses, which are calculated based on circumstances at that time.  However, recent changes in the TSP regulations allow a levy on a TSP account to reach up to the entire vested account balance.[10]

The IRS has established three steps that must be taken before it can issue a notice of levy on a taxpayer's retirement account:

- Determine what property (retirement assets and non-retirement assets) is available to collect the liability;

- Determine whether the taxpayer's conduct has been flagrant; and

- Determine whether the taxpayer depends on the money in the retirement account (or will in the near future) for necessary living expenses.[11]

## REASONS FOR CHANGE

It is important to make sure that the determination to levy on a retirement account is correct.[12]  Once removed, funds levied from a retirement account cannot be returned to that retirement account, even in the event of a wrongful levy.[13]  Second, when a distribution occurs as the result of levy action, the taxpayer will experience tax consequences.  Pursuant to IRC § 408(d), generally, the entire amount paid from a retirement account or any distribution, is considered gross income and is subject to taxation.  In the instance of a levy on a retirement account, the payor would be required to withhold ten percent.[14]  However, this amount of withholding is not guaranteed to be sufficient to cover the federal tax liability created by the distribution, and the taxpayer may be liable for a state income tax as well.

Even with the gravity of a retirement levy and the need for a correct decision, current internal guidance does not ensure that a taxpayer's unique facts and circumstances will be considered prior to levy of his or her retirement account.  For instance, there is no on-point definition of flagrancy, which is a prerequisite

---

9   IRM 5.11.6.2(8) (Sept. 26, 2014).  For instance, a taxpayer is fully vested in his retirement plan account balance of $10,000, but he is not yet entitled to a withdrawal.  In this instance, a levy may attach to the taxpayer's present right to the $10,000, but no money can be collected until the taxpayer has a right to withdraw those funds.  Assuming the balance has grown to $30,000 by the time the taxpayer is eligible to withdraw the funds, the IRS will only be able to collect $10,000 because this was the taxpayer's present right at the time of the levy.

10   5 U.S.C. § 8437(e)(3), 5 C.F.R. § 1653.35, and IRM 5.11.6.2.1, *Thrift Savings Plan* (July 17, 2015).

11   IRM 5.11.6.2(4)-(7) (Sept. 26, 2014).

12   *See* Most Serious Problem: *Levies on Assets in Retirement Accounts: Current IRS Guidance Regarding the Levy of Retirement Accounts Does Not Adequately Protect Taxpayer Rights and Conflicts with Retirement Security Public Policy, supra.*

13   The National Taxpayer Advocate recommended legislative changes to IRC § 401 (for Qualified Pension, Profit Sharing, Keogh, and Stock Bonus Plans), IRC § 408 (for IRAs and SEP-IRAs), and IRC § 408A (for Roth IRAs) to authorize the reinstatement of funds to retirement accounts and other pension plans where the IRS levied upon the plans in error or in flagrant disregard of established IRS rules, procedures, or regulations and the funds were returned under IRC § 6343(d).  National Taxpayer Advocate 2001 Annual Report to Congress 202-9.  5 C.F.R. § 1653.36(g) states that distributions made to satisfy an IRS levy may not be returned to a participant's TSP account.

14   IRC § 3405(b)(1).  The payor generally is responsible for making this withholding, but the plan administrator may be liable in the case of certain plans.  IRC § 3405(d)(1).

001756

to making the levy determination.  Instead, IRS employees receive their guidance in this area through various examples.  Two particularly troublesome examples include:

- Taxpayers who continue to make voluntary contributions to retirement accounts while asserting an inability to pay an amount that is owed; or

- Taxpayers who voluntarily contributed to retirement accounts during the time period the taxpayer knew unpaid taxes were accruing.[15]

The examples described above are overly broad in terms of discouraging retirement savings for *any* taxpayer with an outstanding liability.  The guidance also goes against strong public policy that encourages saving for retirement.[16]  By statute, federal employees, without their consent, are automatically enrolled to have a certain percentage (typically three percent) of their salary contributed to the TSP.[17]  This is done to encourage saving for retirement and to take advantage of employer matching; federal employees must take an affirmative step to stop these automatic contributions.[18]  Other employer plans adopt a similar "opt-out" approach to automatically enroll employees.[19]

Another example of flagrant conduct includes taxpayers who have demonstrated a "pattern of uncooperative or unresponsive behavior," which includes, "failing to meet established deadlines, failing to attend scheduled appointments, failing to respond to revenue officer attempts to contact."[20]  This guidance relies on a subjective determination by an IRS employee.  For instance, one employee may determine that if a taxpayer is 30 days late in submitting documentation, then the taxpayer has been uncooperative, whereas another employee may consider a taxpayer uncooperative after 60 days.  Without clear guidance, the IRS employee's determination is subjective and susceptible to personal judgment.

The IRS could adopt a definition of "flagrant" similar to the definition found in Treasury regulation § 1.507-1(c)(2) related to excise taxes on exempt organizations, which reads:

> a willful and flagrant act (or failure to act) is one which is voluntarily, consciously, and knowingly committed in violation of any provision of chapter 42 (other than sections 4940 or 4948(a)) and which appears to a reasonable man to be a gross violation of any such provision.

This definition contains the necessary elements of willful and voluntary conduct as well as gross violation.  This definition balances the government's interest in the efficient collection action with the government's interest in retirement security for individuals and protection of taxpayer rights.

Additionally, while the IRM does mention extenuating circumstances may exist to mitigate a taxpayer's behavior, it does not contain any examples of such extenuating circumstances.[21]  Nor does the IRM require the IRS employee to identify mitigating circumstances, which could include IRS delays, IRS failures

---

15  IRM 5.11.6.2(6) (Sept. 26, 2014).

16  Congress has focused its efforts on improving retirement savings for Americans.  Senator Orrin Hatch recalled in 2014 that, "[t]he retirement policies we have pursued have always been about helping Americans help themselves save more of their hard-earned money, not less."  *Retirement Savings 2.0: Updating Savings Policy for the Modern Economy, Hearing Before the Committee on Finance*, 113th Cong. (2014) (statement of Orrin Hatch, ranking member, Committee on Finance).

17  5 U.S.C. § 8432(b)(2)(A).  *See also* Thrift Savings Plan, *Summary of the Thrift Saving Plan* 2, *available at* https://www.tsp.gov/PDF/formspubs/tspbk08.pdf (last visited June 30, 2015).

18  *Id.*

19  Automatic enrollment in 401(k) and similar plans was one of the most highly touted changes in the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006).

20  IRM 5.11.6.2(6) (Sept. 26, 2014).

21  IRM 5.11.6.2(5) (Sept. 26, 2014).

001757

to meet appointments or take promised actions, or IRS failures to follow its own published procedures.[22] Again, this internal guidance is susceptible to subjective interpretation by an individual IRS employee.

Without an on-point definition for flagrancy and an inquiry into whether the taxpayer voluntarily committed a gross violation, the IRS employee could find flagrancy where there was an unconscious and involuntary, or unknowing violation. This means the IRS could be reducing a taxpayer to poverty in retirement because of an unconscious or unknowing act.

The last step in determining if a levy on a retirement account is appropriate is to decide if the taxpayer depends on the money in the retirement account (or will in the near future) for necessary living expenses.[23] To conduct this analysis, employees are instructed to use the standards in IRM 5.15, *Financial Analysis*, to establish necessary living expenses and the life expectancy tables in Publication 590-A, *Individual Retirement Arrangements* (IRAs), to estimate how much can be withdrawn annually to deplete the retirement account in the taxpayer's remaining life.[24]

While the guidance refers the employee to IRM 5.15 to determine necessary living expenses, there is no requirement to calculate the taxpayer's projected retirement income when he or she retires. Additionally, there is no requirement to document the actual calculations, making it impossible to verify that a consistent method is used in all retirement levy cases. The financial analysis handbook does not take into account cost of living increases or adjustments for increased expenses due to advanced age either, such as rising health care or hospice costs. Finally, the guidance lacks a safeguard that, if the IRS determines a 50-year-old taxpayer does not currently rely on the retirement account (and will not rely on it in the near future), the taxpayer has sufficient opportunity to rebuild the retirement account back up to a level that provides for a stable retirement.[25]

## EXPLANATION OF RECOMMENDATION

This legislative change will balance the need to efficiently collect taxes with the strong and longstanding public policy supporting financially secure retirements. A taxpayer cannot adequately challenge the decision to levy without being provided a detailed analysis of the basis for levy, a situation which impacts the taxpayer's *right to challenge the IRS's position and be heard*. Similarly, without clear guidance, taxpayers do not know what they need to do to comply with tax laws, so they can avoid a determination of "flagrant behavior," which diminishes the *right to be informed*.

---

22  When an IRS employee has not followed published administrative guidance (including the IRM), the National Taxpayer Advocate may construe the factors in a light most favorable to the taxpayer when deciding to issue a Taxpayer Assistance Order. IRC § 7811(a)(3).

23  IRM 5.11.6.2(7) (Sept. 26, 2014). Employees are instructed not to levy on the retirement account if it is determined that the taxpayer depends on the money in the retirement account (or will in the near future).

24  *Id.* When conducting this financial analysis, employees are reminded to consider special circumstances that may be present on a case-by-case review.

25  There are tools publicly available to help taxpayers estimate their retirement earnings. The IRS could use such tools to compute an estimate of benefits. For instance, the Social Security Administration (SSA) provides an online tool to estimate Social Security retirement benefits. *See* SSA, *Retirement Estimator, available at* https://www.ssa.gov/retire/estimator.html. The TSP website offers an online calculator to figure out how a TSP contribution will affect account savings over time. *See* TSP, *Paycheck Estimator, available at* https://www.tsp.gov/PlanningTools/Calculators/paycheckEstimator.html.

The proposed legislative change would provide a clear definition of flagrancy which would be consistent with the interpretation provided by the Tax Court and the current IRS regulations in exempt organizations' context.[26]

Finally, the proposed legislative change would require the IRS to issue formal guidance regarding a full financial analysis of the taxpayer's projected income and basic living expenses at retirement, prior to allowing a levy on a retirement account based on the taxpayer's ability to meet necessary living expenses upon retirement.

Another acceptable approach to address the deficiencies associated with retirement account levies is presented in the recently proposed Taxpayer Rights Act of 2015.  This bill proposes that retirement plans (including TSP accounts) should be exempt from levy unless "(A) the amount of tax (excluding interest and penalties) owed by the taxpayer exceeds $10,000, (B) the Secretary determines that the taxpayer has committed a flagrant act, and (C) the Secretary determines that such levy will not create an economic hardship due to the financial condition of the taxpayer (as described in [IRC] section 6343(a)(1)(D))."[27] The bill also proposes a definition for flagrant act that includes, "(A) the filing of a fraudulent return by the taxpayer, or (B) that the taxpayer acted with the intent to evade or defeat any tax imposed by this title or the collection or payment thereof."[28]

---

26  *See* Treas. Reg. § 1.507-1(c)(2); *Thorne v. Comm'r*, 99 T.C. 67, 108-109 (1992).  In particular, the court found that the trustee engaged in "willful conduct" by knowing that certain procedures should be followed but not requiring them to be followed. Also, the court found that the trustee did not act reasonably by relying on oral assurances of his tax advisor after he received a notice of deficiency.  Furthermore, making grants to himself and trustees' family members for their own travel to conferences was seen as a gross violation.

27  Taxpayer Rights Act of 2015, S. 2333, 114th Cong. § 307 (2015); Taxpayer Rights Act of 2015, H.R. 4128, 114th Cong. § 307 (2015).

28  *Id.*

001759

# CHAPTER 3 AND CHAPTER 4 CREDITS AND REFUNDS: Protect Taxpayer Rights by Aligning the Rules Governing Credits and Refunds for Domestic and International Withholding

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

## PROBLEM

Under Internal Revenue Code (IRC) §§ 1441-1443 (Chapter 3), the IRS imposes withholding on payments made to non-resident aliens and foreign corporations and allows credits and refunds of the amounts to which these taxpayers are entitled.[2]  For many years, the operation of this regime closely paralleled the approach taken by the IRS with respect to domestic withholding under IRC § 31 in that there were no restrictions limiting credits or refunds to the amount of withheld tax actually paid over to the IRS.[3]  With the advent of the additional reporting and withholding requirements established by the Foreign Account Tax Compliance Act (FATCA), which passed IRC §§ 1471-1474 (Chapter 4), the IRS has become increasingly concerned about fraudulent activity on the part of taxpayers and withholding agents.[4]  Such is the case, even though approximately 85 percent of Chapter 3 and Chapter 4 withholding agents are domestic and therefore can be reached by the IRS for tax enforcement purposes.[5]

While IRS fears may have some foundation, the nature and extent of the potential fraudulent activities have not been established by the IRS through any comprehensive, statistically valid evidence.[6]  Nevertheless, the IRS has taken the drastic step of freezing Chapter 3 and Chapter 4 refunds for up to one year or longer, while attempting to match the documentation provided by taxpayers with the documentation provided by withholding agents.  This action is not only costly for taxpayers, but for the IRS which estimates that an extension of the freezes through early 2016 will result in an interest expense of approximately $4.4 million.[7]  As of August 31, 2015, over 50,000 refund claims aggregating to well in

---

1   See Taxpayer Bill of Rights *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See* Treas. Reg. §§ 1.1462-1 and §1.1464-1.

3   For a discussion of prior IRS practice in the processing of Chapter 3 refund claims, *see* Treasury Inspector General for Tax Administration (TIGTA), Ref. No. 2010-40-121, *Improvements Are Needed to Verify Refunds to Non-resident Aliens Before the Refunds Are Sent Out of the United States*, 6 (Sept. 2010).

4   Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, 124 Stat 71 (2010); Notice 2015-10, 2015-20 I.R.B. 965.

5   Large Business and International before (LB&I) response to TAS information request (Sept. 9, 2015).  This percentage is developed from data provided by the IRS with respect to fiscal year ending (FYE) 2012 and FYE 2013, which are the only years for which it furnished this information.

6   LB&I response to TAS information request (Sept. 9, 2015).  After analyzing the issue with respect to the 2008 tax year (TY), TIGTA found no statistically significant indicia of fraud relating to IRS processing of refund claims by non-resident aliens.  A judgmental sample of TY 2007 and TY 2008 returns, however, revealed significant control weaknesses in the processing of refunds claimed on Forms 1040NR that could be exploited and therefore should be remedied.  TIGTA, Ref. No. 2010-40-121, *Improvements Are Needed to Verify Refunds to Non-resident Aliens Before the Refunds Are Sent Out of the United States* 2 (Sept. 2010).

7   IRS presentation: *Foreign Account Tax Compliance Act, Large Business & International (LB&I) Withholding & Refunds (W&R) Discussion*, slide 4 (Oct. 2015).

001760

excess of $100,000,000 have been frozen by the IRS.[8]  The vast majority of these taxpayers filing refund claims actually appear to be substantially more compliant than a comparable portion of the overall U.S. taxpayer population.[9]  However, the IRS has indefinitely retained amounts owing to this substantial group of taxpayers while it proves the compliant majority innocent in order to protect the tax system from potential exploitation by the noncompliant few.[10]  Moreover, the IRS has proposed issuing Chapter 3 and Chapter 4 regulations providing that, in general, even taxpayers who were subjected to proper withholding and who possess complete documentation of that withholding will nevertheless be fully or partially denied a refund of the withheld amounts unless the withholding agent has correctly remitted to the IRS the full amount of withholding for all taxpayers.[11]  With that step, the IRS would largely complete the transformation of its prior administrative practice of treating domestic and international credit and refund claims similarly, to a new international enforcement regime under which the burdens and risks are disproportionately shifted to largely compliant taxpayers.

### EXAMPLE

Taxpayer is a retired non-resident alien individual whose only U.S. source income during the year is dividend income from U.S. stocks.  The dividend income is subject to U.S. tax, but in an amount less than what was withheld by the withholding agent.  The withheld amount is remitted by the withholding agent to the IRS and is properly reported on the Form 1042-S issued to Taxpayer.  Although Taxpayer files an early Form 1040NR seeking a refund of the overwithholding, several months elapse with no response from the IRS.  Taxpayer, who relies on the overwithheld dividends as retirement income, contacts the IRS regarding the status of the refund and is forced to incur toll charges while waiting on hold for a lengthy period.  When the call is finally answered, the IRS customer service representative says only that the IRS will need additional time to process the return and that Taxpayer should allow up to one year from the date the Form 1040NR was due.[12]  The IRS states, "We apologize for the inconvenience," as Taxpayer wonders how to pay for short-term living expenses.[13]  Where the refund is concerned, Taxpayer's only options are to hope that the review will occur more quickly than predicted, to contact the Taxpayer Advocate Service for assistance in expediting processing of the Form 1040NR, or, eventually, to file suit in a federal district court.

---

8   IRS, Compliance Data Warehouse, IRTF Entity and IMF Trans History tables (Oct. 28, 2015); IRS presentation: *Foreign Account Tax Compliance Act, Large Business & International (LB&I) Withholding & Refunds (W&R) Discussion*, slide 9 (Oct. 2015).

9   TAS makes this assertion because our analysis found that individual taxpayers filing Form 1040NR refund claims have a lower percentage of high-scoring Discriminant Index Function (DIF) returns in comparison to filers overall.  Data drawn Nov. 10, 2015 for TY 2014 from IRS Compliance Data Warehouse, IRTF Entity table, and IMF Transaction History tables. See particularly Total Positive Income (TPI) Class 72, which encompassed most taxpayers in this group.  High-scoring DIF returns were defined as those with a DIF value that exceeded 80 percent of DIF scores in the general population for a particular TPI class.  We calculated a cutoff point for DIF scores at the 80th percentile for each TPI class for FY 2014, and calculated the percentage of Form 1040NR refund filers in each TPI class that exceeded the DIF cutoff point.  Overall, only approximately two percent of Form 1040NR refund filers exceeded their respective DIF cutoff points, compared to 20 percent for individual filers in the general population (especially TPI Class 72).  Accordingly, Form 1040NR refund filers showed a lower percentage of "high-scoring" DIF returns, and thus more compliant behavior, than the overall population.  We did, however, identify certain small groups of taxpayers within the overall group who appear to have considerable compliance issues (*see* TPI Classes 80 and 81).  LB&I notes that the above-discussed "[s]coring methodologies and the filters used are not conclusive in determining if 1040NR filers are more compliant than the overall taxpayer population." LB&I response to TAS informal fact check (Dec. 11, 2015).  This methodology, however, is the approach TAS typically employs to evaluate the relative reporting accuracy of two distinct groups.

10  *See* IRC § 6611(e)(4), under which the IRS may hold a claim without paying interest for up to 180 days from the later of the due date of the return or when the return is filed.  The IRS may issue regulations providing some exceptions that could narrow the scope and impact of these freezes.  Notice 2015-10, 2015-20 I.R.B. 965.

11  Notice 2015-10, 2015-20 I.R.B. 965.

12  IRS, SERP Alert 15A0416, *Form 1040NR Frozen Refund Extension* (Sept. 11, 2015).

13  *Id.*

Although Taxpayer's situation is unfortunate and unjustifiable, it actually could be worse. If the requisite Form 1042-S was not properly issued by the withholding agent, Taxpayer's right to receive the refund could be lost.[14] Likewise, even though amounts were correctly withheld from payments made to Taxpayer, if the withholding agent did not remit any deposits to the IRS with respect to those amounts, Taxpayer, although not at fault, would not be entitled to a refund.[15]

## RECOMMENDATION

To protect taxpayer rights, the National Taxpayer Advocate recommends that Congress amend IRC §§ 33 and 6401(b)(2) to provide that unless the IRS identifies some affirmative indicia of fraud, taxpayers will be entitled to a full credit or refund if they can demonstrate that withholding occurred at source.

## PRESENT LAW

Chapter 3 generally requires withholding agents to collect the substantive tax liability of non-resident aliens imposed under IRC §§ 871(a), 881(a), and 4948 by withholding on certain payments of U.S. source fixed or determinable annual or periodical income.[16] Likewise, Chapter 4 directs withholding agents to withhold tax on certain payments to foreign financial institutions (FFIs) that are covered nonparticipating FFIs and nonfinancial foreign entities that do not provide information regarding their substantial U.S. owners.[17] Chapter 4 also generally requires participating FFIs to withhold tax on certain payments to accounts of recalcitrant account holders and payees that are nonparticipating FFIs.[18]

Amounts withheld by withholding agents under Chapter 3 and Chapter 4 must be deposited with the IRS.[19] If, for any calendar year, the withholding agent fails to remit the proper amount of withheld taxes, it must pay the shortfall out of its own funds and is also subject to the payment of penalties and interest.[20] For each calendar year, withholding agents must file a Form 1042, *Annual Withholding Tax Return for U.S. Source Income of Foreign Persons*, with the IRS showing the aggregate amount of income they withheld under Chapter 3 and Chapter 4 and the aggregate withholdings they remitted to the government.[21] Additionally, withholding agents issue Forms 1042-S to each taxpayer from which amounts have been withheld and file the Forms 1042-S with the IRS.[22] In order to claim a credit or refund of the amounts withheld, taxpayers must attach the Form 1042-S to their annual tax return.[23]

IRC § 33 allows non-resident aliens to claim a credit or refund of taxes withheld at source under Chapter 3. In turn, Chapter 4 provides that FATCA-related credits or refunds will be made available under the rules governing Chapter 3.[24] Specifically, the beneficial owner of the income may claim a credit of

---

14  Treas. Reg. § 301.6402-3T(e); IRM 21.8.1.11.14.1, *Claims for Tax Withheld at Source* (Oct. 1, 2015).

15  IRM 21.8.1.11.14.1, *Claims for Tax Withheld at Source* (Oct. 1, 2015).

16  IRC § 1441.

17  IRC §§ 1471(a), 1473(1). IRC § 1471(d)(1)(B) excepts from the reporting and withholding requirements those accounts that are held by individuals at the same FFI and have an aggregate value of $50,000 or less.

18  IRC § 1471(b)(1)(D).

19  IRC § 6302; Treas. Regs. §§ 1.1461-1(a), 1.1474-1(b), and 1.6302-2.

20  Treas. Reg. § 1.1461-1. *See also* IRC §§ 6601, 6651(a)(2), and 6656.

21  Treas. Reg. § 1.1461-1T(b)(1).

22  Treas. Reg. § 1.1461-1T(c).

23  Treas. Reg. § 301.6402-3T(e).

24  IRC § 1474(b)(1).

the amount of tax actually withheld under Chapter 3 or Chapter 4 against the total income tax computed on the beneficial owner's return.[25]

For cases of overwithholding, the Chapter 3 and Chapter 4 regulations can be read as generally providing a credit or refund of an overpayment of tax that has actually been withheld at source.[26]  According to the IRS, however, "Under a special rule in section 6401(b)(2), the credit under section 33 is treated as a refundable credit only in the case of a beneficial owner who is a non-resident alien and who has made an election to be treated as a U.S. resident under section 6013(g) or (h)."[27]  Barring such an election, the IRS's position now is that, even if withholding at source actually takes place, the overpayment required to support a refund only occurs if the withheld amounts are remitted by the withholding agent to the IRS.[28]

Based on this analysis, the IRS has initiated the practice of matching taxpayer requests for Chapter 3 or Chapter 4 credits or refunds with the information filed by withholding agents before allowing the requested claims.[29]  To the extent that the claim for refund, which must be evidenced by a Form 1042-S, *Foreign Person's U.S. Source Income Subject to Withholding*, cannot be matched with at least some deposit from the withholding agent, no credit or refund will be allowed.[30]  Nevertheless, the IRS has not yet developed the technology necessary for automatic matching, a shortcoming warned against by the National Taxpayer Advocate in the 2013 Annual Report to Congress.[31]

As a result of this technological deficiency, the IRS originally imposed an across the board 168-day freeze on most Chapter 3 and Chapter 4 refund claims to allow for manual review.[32]  The freeze has now been extended for up to one year from the date that any unreviewed and unverified  returns were due or filed, whichever is later.[33]  This one-year freeze period could be further expanded by the IRS as it attempts to implement automated matching systems for 2014, 2015, and beyond.

By contrast, the IRS has adopted the opposite approach with respect to credits and refunds of withheld employment taxes under IRC § 31, which is worded similarly to IRC § 33.[34]  In the case of this domestic withholding, the IRS allows a credit or refund to taxpayers, even if the employer fails to make the actual deposit with the IRS.  The regulations under IRC § 31 expressly provide, "if the tax has actually been withheld at the source, credit or refund shall be made to the recipient of the income even though such tax has not been paid over to the Government by the employer."[35]

Where Chapter 3 and Chapter 4 are concerned, however, the IRS has announced its intention to propose regulations that would allow full credits or refunds only after a taxpayer files the requisite Form 1042-S

---

25  IRC §§ 1462 and1474(b)(1); Treas. Reg. §§ 1.1462-1(a) and 1.1474-3(a).

26  Treas. Reg. §§ 1.1464-1(a) and 1.1474-5(a)(1).

27  Notice 2015-10, 3, 2015-20 I.R.B. 965.

28  *Id.*

29  IRM 21.8.1.11.14.1, *Claims for Tax Withheld at Source* (Oct. 1, 2015).

30  *Id.*

31  National Taxpayer Advocate 2013 Annual Report to Congress 244.

32  IRM 21.8.1.11.14.2, *FATCA - Programming Beginning January 2015 Affecting Certain Forms 1040NR* (TC 810–3 -E Freeze) (May 1, 2015); IRS, SERP Alert 15A0188, *FATCA-Programming Beginning in January 2015 Affecting Certain Forms 1040NR (TC 810-3 -E Freeze* (Mar. 23, 2015).

33  IRS, SERP Alert 15A0416, *Form 1040NR Frozen Refund Extension* (Sept. 11, 2015); IRS, SERP Alert 15A0417, *Form 1120-F Frozen Refund Extension* (Sept. 11, 2015).

34  *See* IRC § 31.

35  Treas. Reg. §1.31-1(a).

001763

if the IRS can confirm that the withholding agent remitted the full amount of the aggregate liabilities for which the withholding agent is responsible.[36]  In the event that a withholding agent has only partially satisfied its deposit requirements with the IRS, the regulations will also provide for a *pro rata* allocation of the amount deposited among taxpayers seeking to claim credits or refunds for the withholding in question.[37]  Some exceptions may be developed for certain scenarios, such as in cases where the under deposit of tax is *de minimis*, or in cases where the withholding agent in question has a demonstrated history of compliance with its deposit requirements.[38]  None of these proposed exceptions, however, addresses circumstances where proper amounts were actually withheld from a specific taxpayer's account.

## REASONS FOR CHANGE

The IRS has transformed Chapter 3 and Chapter 4 tax administration into a system that assumes noncompliance and is dedicated disproportionately to denying unwarranted benefits to the malfeasant few at the cost of the compliant majority who deserve their credits and refunds.  Although the IRS may be reacting to control weaknesses in its non-resident alien refund process identified by TIGTA, the IRS has neither demonstrated that this category of taxpayers is comparatively noncompliant, nor that widespread fraud is actually occurring.[39]  Nevertheless, most taxpayers seeking refunds of amounts withheld under Chapter 3 or Chapter 4 will have their refunds frozen for up to one year, if not longer, while the IRS attempts to match applicable documentation and satisfy itself that fraud has not occurred.[40]  Moreover, no guarantee exists that this one-year period will not be further extended by the IRS as it attempts to implement automated matching systems for 2014, 2015, and beyond.  Thus thousands of compliant taxpayers will experience indeterminate delays in receiving their legitimately claimed refunds, while the IRS tries to marshal its internal resources and detect a relatively few bad actors.

At the same time, the IRS is considering regulations that would allow taxpayers full refunds only to the extent that their withholding agent has fully remitted to the IRS all withholding liabilities for all taxpayers.  As a result, a taxpayer could conceivably end up waiting a year or more only to find out that even though the taxpayer's withholding was properly collected and remitted to the IRS by the withholding agent, such was not the case with all other funds collected by the withholding agent, and therefore the taxpayer is only entitled to a proportional amount of the long-delayed refund.  By contrast, the IRS currently accepts creditor-risk in the case of domestic withholding, such as on employment taxes, and taxpayers need only show that the withholding actually occurred to be entitled to a credit or refund from the IRS.[41]

The IRS argues that the shift in enforcement burden now proposed with respect to international withholding is necessary as a means of preventing fraud.  Nevertheless, it has not produced any systematic and rigorous analysis documenting the nature and scope of this risk.  No comprehensive statistically valid

---

36  Notice 2015-10, III.A., 2015-20, I.R.B. 965.

37  *Id.*

38  *Id.*

39  TIGTA, Ref. No. 2010-40-121, *Improvements Are Needed to Verify Refunds to Non-resident Aliens Before the Refunds Are Sent Out of the United States*, 6 (Sept. 2010); LB&I response to TAS information request (Sept. 9, 2015).

40  IRM 21.8.1.11.14.2, *FATCA - Programming Beginning January 2015 Affecting Certain Forms 1040NR (TC 810–3 -E Freeze)* (May 1, 2015).  *See also* IRS, SERP Alert 15A0416, *Form 1040NR Frozen Refund Extension* (Sept. 11, 2015); IRS, SERP Alert 15A0417, *Form 1120-F Frozen Refund Extension* (Sept. 11, 2015).  The IRS informed taxpayers that those who requested a refund of tax withheld on a Form 1042-S by filing a Form 1040NR will have to wait up to six months from the original due date of the 1040NR return or the date the 1040NR is filed, whichever is later, to receive any refund due.  IRS, *What to Expect for Refunds in 2015*, *available at* http://www.irs.gov/Refunds/What-to-Expect-for-Refunds-This-Year (last visited on Apr. 1, 2015).

41  IRC § 31(a); Treas. Reg. § 1.31-1(a).

evidence has yet been produced to support IRS assertions that significant tax noncompliance is occurring, or may begin occurring, in the context of international withholding.  The vast majority of taxpayers filing Forms 1040NR, *U.S. Non-resident Alien Income Tax Return*, seeking refund claims actually appear to be substantially more compliant than a comparable portion of the overall U.S. taxpayer population.[42]  Although concerns regarding potential fraud should be taken seriously, open-ended retention of taxpayer funds, reallocation of creditor burdens to taxpayers, and fundamental shifts in tax policy should not be based on unsubstantiated conjecture.  Where evidence of fraud exists, the IRS should develop procedures that are narrowly tailored to address the risk of fraud, and not impose undue burden on taxpayers who are complying with the law.

The IRS has asserted that once improperly refunded amounts have left U.S. jurisdiction and gone abroad, they are virtually impossible for the IRS to recover.  While this statement may be true, the IRS does not generally face this risk in the context of potential wrongdoing by Chapter 3 and Chapter 4 withholding agents.  Indeed, according to the IRS, approximately 85 percent of these withholding agents are domestic and, therefore, can be reached by the IRS for tax enforcement purposes.[43]

Thus, withholding agents, even those active in the international context, are primarily domestic and, to the extent they engage in noncompliant behavior, can be compelled by the IRS to remit the withholding payments they have collected, even where no-nresident taxpayers are involved.[44]  The IRS has far more effective tools and comprehensive resources at its disposal for this type of enforcement than the individual taxpayers to whom the IRS would now allocate this burden.

Further, according to the Information Reporting Program Advisory Committee (IRPAC), there are many non-fraudulent reasons for a deposit shortfall and most withholding agents have a proven track record in making accurate and timely deposits.[45]  For example, the IRS might have unilaterally debited a withholding agent's Chapter 3 tax deposit account in order to settle a tax liability associated with another account of that agent.[46]  Likewise, the withholding agent might have made a coding mistake when making its deposit with the IRS.[47]  IRPAC concluded that the *pro rata* approach contemplated by the IRS confuses the legitimate problem of fraudulent refund claims with collection of shortfalls in withholding deposits.[48]

IRS concerns regarding the possibility of fraud may well be legitimate.  Nevertheless, the sweeping solutions implemented by the IRS do not properly balance the operations of the anti-fraud regime with the taxpayer's need for a process no more intrusive than necessary, part of a taxpayer's *right to privacy*.  In so doing, the IRS unnecessarily burdens taxpayers and unintentionally may well be discouraging investment in the United States and harming global commerce.

Accordingly, taxpayers should retain the right to receive their Chapter 3 or Chapter 4 credits or refunds in a timely fashion, if they can demonstrate, to the satisfaction of the IRS, that the withholding actually occurred.  These rights should parallel those existing with respect to domestic withholding.  In order to be entitled to a Chapter 3 or Chapter 4 credit or refund, a taxpayer should be required to provide only

---

42  *See* discussion regarding DIF scores of Form 1040NR refund filers, *supra*.

43  LB&I response to TAS information request (Sept. 9, 2015).  This percentage is developed from data provided by the IRS with respect to FYE 2012 and FYE 2013, which are the only years for which it furnished this information.

44  Treas. Reg. § 1.1461-1T(c).  *See also* IRC §§ 6601, 6651(a)(2), and 6656.

45  IRPAC Public Report, International Reporting and Withholding Subgroup Report 65, 69 (Oct. 28, 2015).

46  *Id.*

47  *Id.*

48  *Id.*

001765

a matching Form 1042-S from a withholding agent, or other persuasive evidence that withholding has taken place, unless the IRS has detected some affirmative indicia of fraudulent activity.  Further, the burden of pursuing noncompliant withholding agents should not be borne by taxpayers with legitimate refund claims.  Rather, as in the case of domestic withholding, the IRS should mobilize its widespread enforcement powers and seek to collect what is properly due and owing from these malfeasant withholding agents.

## EXPLANATION OF RECOMMENDATION

The IRS has treated the implementation of FATCA as an opportunity to alter the assumptions and rules governing Chapter 3 and Chapter 4 withholding.  With only minimal explanation and without any comprehensive statistically valid evidence to support its actions, the IRS has shifted from a compliance-based to an enforcement-based model of tax administration in the international withholding context.  Taxpayers subject to Chapter 3 and Chapter 4 withholding are assumed to be either intentionally or unwittingly participating in fraudulent conduct and must wait up to one year or longer while the IRS proves the taxpayer's innocence before withheld amounts are released.  Moreover, the IRS is considering shifting creditor risk with respect to withholding agents, over which taxpayers generally have no control whatsoever, away from the IRS and onto the shoulders of these same taxpayers.

**LR #5**

## FOREIGN ACCOUNT REPORTING: Eliminate Duplicative Reporting of Certain Foreign Financial Assets and Adopt a Same-Country Exception for Reporting Financial Assets Held in the Country in Which a U.S. Taxpayer Is a *Bona Fide* Resident

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### PROBLEM

As a response to IRS and congressional concerns that U.S. taxpayers were not fully disclosing the extent of financial assets held abroad, Congress passed the Foreign Account Tax Compliance Act (FATCA) in 2010.[2]  Many U.S taxpayers, particularly those living abroad, have incurred increased compliance burdens and costs as a result of FATCA reporting obligations on Form 8938, *Statement of Specified Foreign Financial Assets*, that significantly overlap with the Financial Crimes Enforcement Network (FinCEN) Form 114, *Report of Foreign Bank and Financial Accounts* (FBAR), filing requirements.[3]  These burdens include additional tax preparation fees and the unwillingness of some foreign financial institutions (FFIs) to do business with U.S. expatriates because of significant costs and regulatory risks associated with preparing and maintaining a business for ongoing FATCA compliance.[4]

Congress has given the IRS broad authority to issue regulations and guidance for the purpose of eliminating duplicative reporting requirements.[5]  The IRS has exercised the regulatory authority to eliminate duplicative reporting of assets on the Form 8938 if the asset is reported or reflected on certain other timely-filed international information returns, and provided an exception from reporting financial accounts held in U.S. territories for *bona fide* residents of such territories.[6]  However, it repeatedly declined to adopt the National Taxpayer Advocate's recommendations[7] to forego duplicative FATCA reporting

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, 124 Stat. 71 (2010) (adding Internal Revenue Code (IRC) §§ 1471-1474; 6038D).  *See also Technical Explanation of the Revenue Provisions Contained in Senate Amendment 3310, the "Hiring Incentives To Restore Employment Act," Under Consideration by the Senate*, Staff of the Joint Committee on Taxation, JCX-4-10 (Feb. 23, 2010).

3   *See* IRS Form 8938, *Statement of Specified Foreign Financial Assets* (2015) and FinCEN Form 114, *Report of Foreign Bank and Financial Accounts* (Oct. 2013).  *See also* IRS, Comparison of Form 8938 and FBAR Requirements, *available at* https://www.irs.gov/Businesses/Comparison-of-Form-8938-and-FBAR-Requirements; National Taxpayer Advocate 2013 Annual Report to Congress 235.

4   *See, e.g.,* National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 48-52; National Taxpayer Advocate 2013 Annual Report to Congress 238-48.  Under FATCA, to avoid being withheld upon a 30 percent withholding tax on certain U.S.-source payments made to them, FFIs may register with the IRS and agree to report certain information about their U.S. accounts, including accounts of certain foreign entities with substantial U.S. owners.  IRC §§ 1471-1474.

5   *See, e.g.,* IRC §§ 6038D(h)(1); 1471(d)(1)(C)(ii).

6   *See* Treas. Reg. § 1.6038D-7(a) and (c).  For examples of information returns, see, *e.g.,* Forms 3520, 3520A, 5471, 8621, 8865, or 8891.

7   *See* National Taxpayer Advocate 2014 Annual Report to Congress 343-45; National Taxpayer Advocate 2013 Annual Report to Congress 228-37; National Taxpayer Advocate 2013 Annual Report to Congress 238-48; National Taxpayer Advocate 2012 Annual Report to Congress 134-53; TAS Recommendations for Published Guidance under IRC §§ 6038D and 1471 (Apr. 15, 2015) and (Apr. 24, 2014).  *See also National Taxpayer Advocate Seeks End to Duplicative FATCA Reporting*, 2015 TNT 71-16 (Apr. 14, 2015).

001767

where assets have already been reported on an FBAR, and to allow a same-country exception for reporting financial accounts held in the country in which a U.S. taxpayer is a *bona fide* resident despite support by other stakeholders.[8]

## EXAMPLE

Madeleine and Jacque Legrand are citizens and *bona fide* residents of France.  Madeleine is also an "accidental" U.S. citizen.  She was born in New York City where her parents worked as foreign researchers at a U.S. university on a J-1 visa.  Madeleine left the United States for France with her parents at the age of three.  As an adult, she visited the United States for brief periods on several occasions prior to 2006, but has never worked in the United States.  Over 20 years of employment, Madeleine and her husband have saved about 800,000 Euros for retirement that are invested in mutual funds and certificates of deposit.  In 2014, when visiting the United States again, Madeleine learned of the requirement to report worldwide income and the information reporting requirements associated with certain foreign financial assets and accounts, and realized that her retirement savings met the reporting thresholds.[9]  When she returned to France, Madeleine attempted to comply but could not find free tax assistance.  She became anxious about the potential FBAR and FATCA penalties that could negatively affect her retirement savings.  As a result, she had to pay for tax preparation, plus an additional fee to discuss any FBAR and FATCA reporting questions with her advisor.[10]  In addition, upon learning that Madeleine is a dual U.S.-French citizen, the small local bank where the couple had held joint accounts for over a decade suggested that the Legrands either close the accounts or remove Madeleine from them, so that the bank can avoid costs and risks associated with reporting and withholding obligations under FATCA.

## RECOMMENDATIONS

To reduce the burdens of FATCA compliance, the National Taxpayer Advocate recommends that Congress:

- Amend IRC § 6038D:

  - To eliminate duplicative reporting of assets on Form 8938, *Statement of Specified Foreign Financial Assets*, if the asset is or has been reported or reflected on an FBAR; and

  - To exclude from the specified foreign financial assets required to be reported on the Form 8938 financial accounts maintained by a financial institution organized under the laws of the country of which the U.S. person is a *bona fide* resident.

- Amend IRC § 1471 to specifically exclude from the definition of financial account subject to reporting by FFIs financial accounts maintained by a financial institution organized under the laws of the country of which the U.S. person is a *bona fide* resident.

---

8    *See, e.g.*, National Taxpayer Advocate Fiscal Year 2015 Objectives Report to Congress 93-4, 99; *Reporting of Specified Foreign Financial Assets*, Preamble to Final Regulations under IRC § 6038D, Summary of Comments and Explanation of Revisions, sec. V (G), 79 FR 73817-01 (Dec. 12, 2014); Email from the Special Counsel to the Deputy Chief Counsel (Technical) to TAS Supervisory Attorney Advisor, *Recommendations for Published Guidance under Sections 6038D and 1471* (Oct. 13, 2015). *See also* Government Accountability Office (GAO), GAO-12-403, *Reporting Foreign Accounts to IRS: Extent of Duplication Not Currently Known, but Requirements Can Be Clarified*, App. 2 (Feb. 2012); TAS meetings with representatives of the Association of Americans Resident Overseas and the Federation of American Women's Clubs Overseas (Mar. 24, 2014 and Feb. 24, 2015); TAS meetings with Democrats Abroad Task Force on FATCA (Mar. 4, 2014 and Feb. 24, 2015).

9    For filing thresholds, see generally 31 U.S.C. § 5314(a); 31 C.F.R. § 1010.350; Electronic Filing Requirements for Report of Foreign Bank and Financial Accounts, FinCEN Form 114 (2014) ($10,000 threshold).  *See also* Treas. Reg. § 1.6038D–2(a).

10   TAS has been informed that this fee could be substantial, particularly for persons overseas.  TAS meeting with representatives of the American Citizens Abroad (ACA) (Sept. 4, 2014).

## PRESENT LAW

The law requires U.S. taxpayers to file a number of information returns and imposes severe civil penalties for failing to file, many of which are not based on the amount of the underpayment of tax.[11]  Among the most publicized are the penalties for failure to disclose foreign financial accounts (FBAR) and foreign financial assets (FATCA).  The Currency and Foreign Transaction Reporting Act of 1970 (commonly known as The Bank Secrecy Act) requires U.S. citizens and residents to report foreign accounts with an aggregate value of $10,000 or more at any time during the calendar year on the FBAR.[12]  FATCA requires U.S. citizens, resident aliens, and certain non-resident aliens to file a Form 8938 with their individual returns reporting foreign assets exceeding specified thresholds.[13]

A taxpayer may be subject to a civil FBAR penalty of up to $10,000 per violation for failing to file an FBAR even if the failure was not "willful."[14]  If the government establishes the failure was willful, the maximum penalty is the greater of $100,000 or 50 percent of the balance of the undisclosed account annually.[15]  The taxpayer may also face criminal penalties of up to $500,000 and ten years in prison.[16]  For taxable years beginning after March 18, 2010, pursuant to FATCA, an additional penalty of $10,000 (and up to $50,000 for continued failure after IRS notification) is imposed on U.S. taxpayers holding financial assets outside the United States who fail to report those assets on Form 8938.[17]  Underpayments of tax attributable to non-disclosed foreign financial assets are subject to an additional substantial understatement penalty of 40 percent.[18]  Additionally, the statute of limitations is extended to six years if there is an omission of gross income in excess of $5,000 and the omitted gross income is attributable to a foreign financial asset.[19]

IRC § 1471(d)(1) defines the term "United States account" and provides for the elimination of duplicative reporting requirements.[20]  The term "United States account" excludes financial accounts in FFIs if the holder of such account is otherwise subject to information reporting requirements

---

11  These penalties include but are not limited to penalties under IRC §§ 6038, 6038A, 6038B, 6038C, 6039F, 6046, 6046A. *See also* IRC §§ 6038D, 6662(b)(7); 31 U.S.C. § 5321(a)(5).

12  *See* 31 C.F.R. § 1010.306(c); Electronic Filing Requirements for Report of Foreign Bank and Financial Accounts, FinCEN Form 114 (2014).

13  Treas. Reg. § 1.6038D-2(a).  An unmarried taxpayer living in the U.S. must file a Form 8938 if the total value of the taxpayer's specified foreign financial assets is more than $50,000 on the last day of the tax year or more than $75,000 at any time during the tax year.  This threshold is doubled in the case of specified individuals who are married filing jointly.  A qualifying unmarried taxpayer living abroad must file a Form 8938 if the total value of the taxpayer's specified foreign financial assets is more than $200,000 on the last day of the tax year or more than $300,000 at any time during the tax year.  This threshold is doubled as well in the case of qualified individuals living abroad who are married filing jointly.  *Id.*

14  *See* 31 U.S.C. § 5321(a)(5)(B).  Prior to October 22, 2004, there was no penalty for a non-willful failure to file and the maximum civil penalty for willful violations was $100,000.  The American Jobs Creation Act of 2004, Pub. L. No. 108-357, Title VIII, § 821(a), 118 Stat. 1418, 1586 (Oct. 22, 2004) established a penalty for non-willful violations and increased the penalty for willful violations.

15  31 U.S.C. § 5321(a)(5)(C).  The penalty can reach 300 percent of the account balance if the willful failures continue over a six-year period.  A six-year statute of limitations applies to the civil FBAR penalty.  *See* 31 U.S.C. § 5321(b)(1).

16  31 U.S.C. § 5322; 31 C.F.R. § 1010.840(b).  To establish willfulness for either civil or criminal penalties, the IRS generally has to establish that the taxpayer had knowledge of the FBAR filing requirement.

17  IRC § 6038D.

18  *See* IRC § 6662(b)(7).

19  IRC § 6501(e).

20  IRC § 1471(d)(1)(C).

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 1777 of 4699 PageID #:  4942

Legislative
Recommendations

Problems

Most Serious
Issues

which the IRS determines would make the reporting with respect to these accounts duplicative.[21]
IRC § 1471(d)(1)(C)(ii) states:

> (C) Elimination of duplicative reporting requirements.--Such term shall not include any finan-
> cial account in a foreign financial institution if —
>
>> (ii) the holder of such account is *otherwise subject to information reporting* requirements
>> which the Secretary determines would make the reporting required by this section with
>> respect to United States accounts *duplicative* (emphasis added).

Treasury Regulation § 1.1471–5(b)(2) provides specific exceptions to the definition of financial accounts
subject to reporting by FFIs.  Currently, the regulation does not provide an exception for financial ac-
counts maintained by a financial institution organized under the laws of the country of which the U.S.
person is a *bona fide* resident.

Similarly, IRC § 6038D specifically authorizes the IRS to issue regulations or other guidance to provide
appropriate exceptions from FATCA reporting when such reporting would be duplicative of other disclo-
sures.  IRC § 6038D(h)(1) provides that:

> The Secretary shall prescribe such regulations or other guidance as may be necessary or appropri-
> ate to carry out the purposes of this section, including *regulations or other guidance which provide
> appropriate exceptions* from the application of this section in the case of —
>
>> (1) classes of assets identified by the Secretary, including any assets with respect to which
>> the Secretary determines that disclosure under this section would be duplicative of other
>> disclosures… (emphasis added).

Treasury Regulations under IRC § 6038D eliminate duplicative reporting of assets on the Form 8938
if the asset is reported or reflected on certain other timely-filed international information returns (*e.g.*,
Forms 3520, 3520A, 5471, 8621, 8865, or 8891) provided the Form 8938 indicates the filing of the form
on which the asset is reported.[22]  However, FinCEN Report 114 (FBAR) is not included on the list of
those information returns.

Similarly, Treasury Regulation § 1.6038D-7(c)(1) provides that a *bona fide* resident of a U.S. possession
who is required to file Form 8938 is *not required* to report financial accounts maintained by a financial
institution organized under the laws of the U.S. possession of which the specified individual is a *bona fide*
resident.  The regulation currently does not have a similar exception for U.S. individuals who are *bona fide*
residents of foreign countries.

---

21   IRC § 1471(d)(1)(C)(ii).

22   *See* Treas. Reg. § 1.6038D-7(a).

### REASONS FOR CHANGE

#### *Eliminate Duplicative Reporting*

For several years, the National Taxpayer Advocate and other stakeholders have expressed concerns about the overlap of FBAR and the Form 8938, which must be filed with annual federal income tax returns.[23] The FinCEN Report 114 and the Form 8938 are significantly duplicative, increasing confusion and adding to the compliance burden for taxpayers.[24]  Reporting and withholding obligations have resulted in additional costs and risks of substantial penalties for taxpayers and withholding agents, and might have prompted some FFIs to close accounts of U.S. taxpayers abroad.[25]

FATCA was passed in response to IRS and congressional concerns that U.S. taxpayers were not fully disclosing the extent of financial assets held abroad.[26]  However, the IRS's approach to FATCA apparently is based on the unsubstantiated assumption that most taxpayers are "bad actors" and that a widespread, burdensome enforcement regime is necessary.  Such has been the case even though the vast majority of taxpayers have been, and likely will continue to be, fully compliant.  In her 2013 report, the National Taxpayer Advocate observed that based on analysis of the data then available " … to this point, the IRS is imposing additional reporting burdens and increased potential penalties primarily on a category of taxpayers that, under principles of quality tax administration, should be encouraged, rather than penalized."[27] Further review of updated and expanded data from fiscal year 2010 through the present continues to demonstrate tax evaders are not feeling the weight of FATCA; instead, the burden of FATCA falls on U.S. taxpayers who likely would be compliant regardless.  U.S. taxpayers under the FATCA umbrella who must file Form 8938 are generally as compliant as the overall U.S. taxpayer population as shown on Figure 2.5.1.[28]

---

23  National Taxpayer Advocate 2013 Annual Report to Congress 238-48; National Taxpayer Advocate Fiscal Year 2013 Objectives Report to Congress 23; National Taxpayer Advocate 2012 Annual Report to Congress 134, 141; National Taxpayer Advocate 2011 Annual Report to Congress 129-272; Tax Analysts, *Texas CPAs Recommend Simplifying Foreign Financial Reporting*, 2015 TNT 167-13; GAO, GAO-12-403, *Reporting Foreign Accounts to IRS: Extent of Duplication Not Currently Known, but Requirements Can Be Clarified*, App. 2 (Feb. 2012).

24  IRS, *Comparison of Form 8938 and FBAR Requirements*, *available at* http://www.irs.gov/Businesses/Comparison-of-Form-8938-and-FBAR-Requirements.

25  Under FATCA, to avoid being withheld upon a 30 percent withholding tax on certain U.S.-source payments made to them, FFIs should register with the IRS and agree to report certain information about their U.S. accounts, including accounts of certain foreign entities with substantial U.S. owners.  IRC §§ 1471-1474.

26  *See Technical Explanation of the Revenue Provisions Contained in Senate Amendment 3310, the "Hiring Incentives To Restore Employment Act," Under Consideration by the Senate*, Staff of the Joint Committee on Taxation, JCX-4-10 (Feb. 23, 2010).

27  National Taxpayer Advocate 2013 Annual Report to Congress 241.

28  National Taxpayer Advocate Fiscal Year 2016 Objectives Report to Congress 48-52 (Area of Focus: *The IRS's Implementation of FATCA Has in Some Cases Imposed Unnecessary Burdens and Failed to Protect the Rights of Affected Taxpayers*).

001771

**FIGURE 2.5.1**[29]

### Noncompliance Rates for Form 8938 Filers vs. General Population Taxpayers



| | Form 8938 taxpayers | General population taxpayers |
|---|---|---|
| **Filing noncompliance:** *taxpayer did not file return timely* | 19 of every 1,000 noncompliant | 16 of every 1,000 noncompliant |
| **Payment noncompliance:** *taxpayer did not pay taxes timely* | 24 of every 1,000 noncompliant | 59 of every 1,000 noncompliant |

The National Taxpayer Advocate previously has observed taxpayers' willingness to meet their reporting and filing obligations is driven more by considerations of personal integrity and perceptions of systemic fairness than by economic deterrence and enforcement measures.[30]

As of December 2015, approximately 300,000 taxpayers had filed Forms 8938 for tax year (TY) 2013, while about 283,000 had filed for TY 2014.[31]  Of the taxpayers filing Forms 8938 in TY 2013, approximately 38 percent also filed FBAR forms.[32]  Roughly 24 percent of Form 8938 returns were submitted to the IRS from a foreign address based on TY 2013 data.[33]

---

29  Data drawn from IRS Compliance Data Warehouse (CDW), IRTF Entity and IMF Status History tables (Mar. 26, 2015).  This table uses status code 03 data (Tax Delinquency Investigation) to measure filing compliance and status code 22, 24, and 26 data (Tax Delinquent Account) to measure payment compliance.  The analysis covers five tax years from 2009 forward.  In addition, FATCA filers appear to have a lower level of reporting noncompliance than the general population because FATCA filers have a lower percentage of high-scoring DIF returns in comparison to filers overall.  Data drawn April 13, 2015 from CDW, IRTF Entity table, Processing Year 2013.  High-scoring DIF returns were defined as those with a DIF value that exceeded 80 percent of DIF scores in the general population for a particular TPI class.  We calculated a cutoff point for DIF scores at the 80th percentile for each TPI class for Processing Year 2013 and calculated the percentage of FATCA filers in each TPI class that exceeded the DIF cutoff point.  Only 16.5 percent of FATCA filers exceeded their respective DIF cutoff points, compared to, of course, 20 percent for individual filers in the general population.  Thus, FATCA filers showed a lower percentage of "high-scoring" DIF returns than the overall population.

30  National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 134.

31  TAS Research, CDW, IRFT Entity and IRTF F1040 tables, data drawn Nov. 16, 2015.  These numbers may change as more TY 2013 and 2014 returns are filed with the IRS.

32  TAS Research, CDW, IRFT Entity and IRMF_F90_22 tables, data drawn Nov. 16, 2015.

33  IRS LB&I Division, Planning, Analysis, Inventory, and Research (PAIR) analysis, CDW, IMF_Entity table, data drawn Dec. 18, 2015.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 4699 PageID #:  4945

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

Case Advocacy

Appendices

FIGURE 2.5.2[34]

**Taxpayers Filing Forms 8938 in Tax Year 2013**



| | |
|---|---|
| ■ Taxpayers Filing Form 8938 Who Also Filed FBAR Forms | ■ Form 8938 Returns Submitted to IRS From a Foreign Address |

As noted above, the IRS has regulatory authority under FATCA to eliminate duplicative reporting on FATCA Form 8938 and FBAR. However, it repeatedly has declined to do so, citing the Joint Committee on Taxation (JCT) Technical Explanation accompanying the HIRE Act.[35] The Technical Explanation states that "[n]othing in this provision [section 511 of the HIRE Act enacting new section 6038D] is intended as a substitute for compliance with the FBAR reporting requirements, which are unchanged by this provision."[36] At the same time, as described above, the *statutory* language (as opposed to a JCT explanation) specifically authorizes elimination of duplicative reporting requirements.[37]

While the IRS may feel constrained in its regulatory authority to change the FBAR filing requirements, it is specifically granted the freedom to adjust FATCA filing requirements. The National Taxpayer Advocate is therefore baffled by the IRS's inexplicable unwillingness to address this unnecessary duplication of reporting requirements. It appears that congressional action specifically *requiring* the IRS to eliminate duplicative reporting under FATCA and FBAR is necessary to alleviate significant burdens being experienced by affected taxpayers and to protect the taxpayers' rights *to privacy* and *to a fair and just tax system*.

### Same-Country Exception

As stated above, U.S. taxpayers residing abroad are subject to overlapping reporting requirements under FBAR and FATCA, which increase preparation expenses and the chance of error.

Additionally, organizations representing U.S. taxpayers abroad have voiced concerns about unintended consequences of new FATCA rules for FFIs that make it harder for U.S. taxpayers living abroad to open

---

34  TAS Research, CDW, IRFT Entity and IRMF_F90_22 tables, data drawn Nov. 16, 2015. IRS LB&I Division, PAIR analysis, CDW, IMF_Entity table, data drawn Dec. 18, 2015. These numbers will change as more TY 2013 returns are filed with the IRS.

35  *Technical Explanation of the Revenue Provisions Contained in Senate Amendment 3310, the "Hiring Incentives To Restore Employment Act," Under Consideration by the Senate*, Staff of the Joint Committee on Taxation, JCX-4-10 (Feb. 23, 2010). *See also Reporting of Specified Foreign Financial Assets*, Preamble to Final Regulations under IRC § 6038D, Summary of Comments and Explanation of Revisions, sec. V (G), 79 FR 73817-01 (Dec. 12, 2014); Email from the Special Counsel to the Deputy Chief Counsel (Technical) to TAS Supervisory Attorney Advisor, *Recommendations for Published Guidance under Sections 6038D and 1471* (Oct. 13, 2015); National Taxpayer Advocate 2015 Objectives Report to Congress 93-94, 99.

36  *Technical Explanation of the Revenue Provisions Contained in Senate Amendment 3310, the "Hiring Incentives To Restore Employment Act," Under Consideration by the Senate*, Staff of the Joint Committee on Taxation, JCX-4-10 (Feb. 23, 2010) at 60.

37  IRC §§ 1471(d)(1)(C)(ii) and 6038D(h)(1).

001773

and maintain legitimate bank accounts overseas.[38]  Some FFIs, such as DeutscheBank, HSBC, and ING, have reportedly closed out foreign accounts of U.S. citizens in response to FATCA to avoid significant costs and regulatory risks associated with preparing for and maintaining an ongoing FATCA compliance.[39]  Other FFIs have severely restricted the services they offer to these customers.[40]

During recent meetings with TAS, organizations of U.S. citizens abroad reiterated their concerns about the difficulty of opening bank accounts in their countries of residency.[41]  The National Taxpayer Advocate has personally received multiple reports from taxpayers, taxpayer representatives, and tax professionals residing in a range of countries including Austria, Hungary, and Sweden and from some foreign tax officials themselves.[42]  Because FATCA creates burdens for FFIs, some foreign banks are unwilling to open accounts for U.S. citizens abroad, especially for those individuals residing in small communities where the global banks do not have branches.

Similarly, substantial day-to-day compliance burdens and costs of implementing FATCA are placed on financial institutions.[43]  For example, unless an FFI agrees to provide comprehensive information regarding accounts of U.S. taxpayers, a broad range of U.S.-source payments to that FFI are subject to a 30 percent withholding tax.[44]  FATCA further charges withholding agents with the responsibility of determining whether they are obliged to undertake FATCA withholding and implementing that withholding when it is required.[45]

As a recommendation to help minimize the burden of FATCA compliance for both individual U.S. taxpayers residing abroad and FFIs, the National Taxpayer Advocate proposed that the IRS and Treasury adopt a "same-country exception."[46]  Accounts opened by U.S. citizens in a foreign country of *bona fide* residence are not "offshore" accounts designed for tax avoidance.  These *bona fide* residents have a legitimate need for local banking services in their countries of residence.  Thus, it is more logical and in keep-

---

38  IRC §§ 1471-1474.  *See, e.g.*, ACA Comments on the Proposed Treasury Regulations Concerning FATCA Dated February 8, 2012 (Apr. 4, 2012), *available at* https://www.americansabroad.org/files/6813/4192/6083/acastatementapril2012s.pdf (last visited Nov. 23, 2015); April Carvelli, *Taxes Pushing U.S. Citizens to Renounce*, Imperfect Parent (Apr. 17, 2012) (quoting Francisca N. Mordi, Vice President and Senior Tax Counsel at the American Bankers Association, who stated she received a number of calls from Americans in Europe complaining about banks closing their accounts. "They're going to drop Americans like hot potatoes," Mordi says. "The foreign banks are upset enough about the regulations that they're saying they just won't keep American customers, and it's giving (Americans living abroad) a lot of sleepless nights."), *available at* http://www.imperfectparent.com/topics/2012/04/17/taxes-pushing-u-s-citizens-to-renounce/; James Fellows, *The FATCA Chronicles: Tales From China, Canada, and Estonia*, The Atlantic (Jan. 3, 2012), *available at* http://www.theatlantic.com/international/archive/2012/01/the-fatca-chronicles-tales-from-china-canada-and-estonia/250771/; Judi Lembke, *Americans in Sweden Suffer U.S. Tax Crackdown*, The Local (Sweden's News in English) (Mar. 6, 2012), *available at* http://www.thelocal.se/39522/20120306/.

39  See National Taxpayer Advocate 2013 Annual Report to Congress 238.

40  *Id.*

41  TAS meetings with representatives of the Association of Americans Resident Overseas and the Federation of American Women's Clubs Overseas (Mar. 24, 2014 and Feb. 24, 2015); TAS meeting with Democrats Abroad Task Force on FATCA (Mar. 4, 2014 and Mar. 4, 2015).

42  National Taxpayer Advocate's meetings at the University of Vienna, Austria, Harvard Club of Hungary, Budapest, Hungary, and Swedish Tax Agency, Stockholm, Sweden.

43  Presentation of the National Taxpayer Advocate to the Securities Industry and Financial Markets Association (Oct. 7, 2014).  *See also* Lee Sheppard, *News Analysis: The Reformation of FATCA*, 2015 TNT 92-1 (May 13, 2015).

44  IRC §§ 1471(a) and 1473(1).  IRC § 1471(d)(1)(B) excepts from the reporting and withholding requirements those accounts that are held by individuals at the same FFI and have an aggregate value of $50,000 or less. Note that an FFI can provide information either as a participating FFI or pursuant to an intergovernmental agreement negotiated between the U.S. and the FFI's home country.

45  IRC §§ 1471-1474; Notice 2013-43, 2013-31 I.R.B. 113.

46  TAS Recommendations for Published Guidance under IRC §§ 6038D and 1471 (Apr. 15, 2015) and (Apr. 24, 2014).  *See also National Taxpayer Advocate Seeks End to Duplicative FATCA Reporting*, 2015 TNT 71-16 (Apr. 14, 2015).

001774

ing with the spirit of FATCA to require information reporting on financial assets and accounts opened in a country other than one's country of residence.

The IRS could have significantly alleviated reporting burdens for U.S. persons who are *bona fide* residents in foreign countries by revising regulations under IRC §§ 6038D and 1471 to eliminate the requirement to report specified foreign financial assets on the Form 8938 if such persons have reported the assets on the FBAR.  The IRS could also facilitate these taxpayers' legitimate need for local banking services in their countries of residence by excluding financial accounts maintained by a financial institution organized under the laws of the country of which the U.S. persons are *bona fide* residents from FATCA reporting.[47]  To this point, the IRS has not been willing to pursue these recommendations proposed by the National Taxpayer Advocate and supported by other stakeholders.[48]  In response to the National Taxpayer Advocate's request that this proposal be included in the U.S. Department of the Treasury Office of Tax Policy and the IRS Priority Guidance Plan, the IRS Office of Chief Counsel maintained:

> Under longstanding U.S. tax policy, U.S. citizens are taxed on their worldwide income irrespective of where they reside.  Section 6038D was enacted to provide the IRS with an effective means to ensure compliance by all U.S. taxpayers owning foreign financial assets, including those residing outside of the United States.  Thus, it was decided that the regulations under section 1471 and 6038D should not provide a broad carve out (from either the FFI reporting rules or the taxpayer self-reporting requirements, respectively) for U.S. citizens residing abroad as proposed in [TAS Recommendations for Published Guidance under Sections 6038D and 1471]. However, please note that the section 6038D regulations provide very substantial reporting relief for most U.S. citizens who are *bona fide* residents of another country.  The regulations do so by providing aggregate foreign financial asset reporting thresholds for U.S. citizens residing abroad that are very generous and substantially higher than those applicable to other U.S. taxpayers.  As a result, only those U.S. taxpayers residing abroad who have very substantial foreign financial asset holdings are required to file a Form 8938.[49]

For "accidental" Americans who have lived abroad for most of their lives, as described in the example above, the increased thresholds may not achieve the intended result as their savings may exceed even the higher thresholds.[50]  This is particularly true where the accounts subject to reporting contain retirement savings.  As a result, these taxpayers will bear the cost of tax preparation expenses for duplicate reporting under FBAR and FATCA.  Others excepted from FATCA reporting under the higher thresholds will bear

---

47  To qualify for foreign earned income exclusion and foreign housing exclusion or deduction, a U.S. citizen or resident alien (for tax purposes) must have a tax home in a foreign country, and either be a *bona fide* resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year (*bona fide* residence test), or be present in a foreign country or countries during at least 330 full days in any period of 12 consecutive months (physical presence test).  IRC § 911(d)(2).

48  Email from the Special Counsel to the Deputy Chief Counsel (Technical) to TAS Supervisory Attorney Advisor, *Recommendations for Published Guidance under Sections 6038D and 1471* (Oct. 13, 2015); TAS meetings with the Special Counsel to the Deputy Chief Counsel (Technical) (May 23, 2014 and June 17, 2015).

49  Email from the Special Counsel to the Deputy Chief Counsel (Technical) to TAS Supervisory Attorney Advisor, *Recommendations for Published Guidance under IRC Sections 6038D and 1471* (Oct. 13, 2015).

50  A qualifying unmarried taxpayer living abroad must file a Form 8938 if the total value of the taxpayer's specified foreign financial assets is more than $200,000 on the last day of the tax year or more than $300,000 at any time during the tax year. This threshold is doubled as well in the case of qualified individuals living abroad who are married filing jointly.  Treas. Reg. § 1.6038D-2(a).

the risk of IRS audits due to potential FFI errors because FFIs are still required to report their accounts to the IRS on Forms 8966, *FATCA Report*.[51]

Both groups will face the increased risk of errors as the IRS has shut itself off from a two-way dialogue with taxpayers abroad by closing all IRS tax attaché posts and eliminating the Electronic Tax Law Assistance Program, which was the only free method for taxpayers abroad to ask and receive answers to their specific tax law questions without paying toll phone or fax charges.[52]  Similarly, both groups will continue experiencing difficulties with opening or maintaining bank accounts unless the definition of financial accounts subject to reporting by FFIs under IRC § 1471(d) excludes accounts maintained by a financial institution organized under the laws of the country of which the U.S. person is a *bona fide* resident.

## EXPLANATION OF RECOMMENDATIONS

Treasury Regulations under IRC § 6038D eliminate duplicative reporting of assets on the Form 8938 if the asset is reported or reflected on certain other timely-filed international information returns (*e.g.*, Forms 3520, 3520A, 5471, 8621, 8865, or 8891) provided the Form 8938 indicates the filing of the form on which the asset is reported.[53]  The proposed legislation will achieve similar results by eliminating duplicative information reporting under FBAR.  The proposed legislative change will not jeopardize the IRS's access to foreign financial account information reported on FBARs.  The IRS has access to the FinCEN Query System, which allows IRS employees direct electronic access to FBAR data.

This legislative proposal would also exclude from FATCA coverage foreign financial assets held in the country in which a U.S. taxpayer is a *bona fide* resident.  It would mitigate concerns about the collateral consequences of FATCA raised by U.S. non-residents, reduce reporting burdens faced by FFIs, and allow the IRS to focus its enforcement efforts on identifying and addressing willful attempts at tax evasion through foreign accounts.[54]  From a technical perspective this exception is substantially similar to the regulatory exception provided to *bona fide* residents of U.S. territories.[55]

Information reporting can be very useful and can influence taxpayer behavior and future compliance, provided it is narrowly tailored to accomplish a reasonable result.  The proposed legislative recommendations enhance taxpayer *rights to privacy* and *to a fair and just tax system* without inhibiting the IRS's ability to obtain information about financial accounts maintained by FFIs outside the U.S. person's country of *bona fide* residency.

---

51  Reaching the IRS to address inadvertent errors would be especially problematic given the decline in phone service over the recent year.  In FY 2013, the average wait time on the international phone line was 10.5 minutes, compared to 19.9 minutes in FY 2015, a 90 percent increase.  Furthermore, the average level of service on the international phone line in FY 2015 was only 55 percent.  *See* Most Serious Problem: *International Taxpayer Service: The IRS's Service on Demand Strategy Fails to Compensate for the Closure of International Tax Attaché Offices and Does Not Sufficiently Address the Unique Needs of International Taxpayers*, *supra*.

52  *Id*.

53  *See* Treas. Reg. § 1.6038D-7(a).

54  A workable same-country exception would require the development of detailed guidance from the IRS, ideally arrived in consultation with FFIs and other stakeholders.  One potential starting point would be to allow an FFI to accept the self-reporting of its accountholders to the extent that this reliance is reasonable under the facts and circumstances known to the FFI.

55  *See* Treas. Reg. § 1.6038D-7(c).

001776

**LR #6**     **INDIAN TRIBAL GOVERNMENTS (ITGs): Treat ITGs As States for Social Security Tax Purposes**

### TAXPAYER RIGHTS IMPACTED[1]

- ■ *The Right to a Fair and Just Tax System*

### PROBLEM

Indian Tribal Governments (ITGs) have a unique status for federal tax purposes.[2]  In 1983, Congress enacted Internal Revenue Code (IRC) § 7871 which provides that ITGs are treated as States for certain tax purposes,[3] acknowledging that, in many respects, ITGs function like States and should therefore be treated as such.[4]  More recently, in 2000, Congress decided that ITGs should be treated identically to States with regard to Federal Unemployment Tax Act (FUTA) taxes, allowing ITGs, like State governments, to elect to pay FUTA taxes only when a former employee claims unemployment benefits.[5]  However, ITGs are not treated as States for the purpose of Social Security taxes.  Thus, unlike State employees, ITG employees who are covered by a State retirement plan are not excepted from Social Security taxes.[6]  This inconsistency creates compliance burdens for ITGs and their employees.

In addition, as the law currently stands, ITGs may not be able to recruit and retain tribal police officers by offering participation in favorable State pension plans.  Because ITGs are not treated as States for Social Security taxes under IRC § 7871 or any other IRC provision, ITGs and tribal police officers who participate in a State pension plan are still responsible for their respective employer and employee portions of Social Security tax.  This creates an inequity that can impede the ITG's ability to recruit and retain police officers, places an economic burden on the ITG attempting to address crime on tribal lands, and thereby frustrates congressional intent to deal with this issue.[7]  It also undermines ITG taxpayers' *right to a fair and just tax system*.

---

1   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   For a discussion of the various federal tax provisions applicable to ITGs, see Joint Committee on Taxation, *Overview of Federal Tax Provision and Analysis of Selected Issues Relating to Native American Tribes and Their Members*, JCX-40-12 (May 14, 2012).

3   *See* IRC § 7871(a).  These include the ability to receive tax deductible charitable contributions for income, estate, and gift tax purposes, the special treatment afforded to States for certain excise taxes, the ability to deduct taxes paid to an ITG, and the issuance of tax-exempt government bonds.  ITGs are also treated as States for other purposes that are set forth in IRC § 7871(a).

4   This section was originally enacted by the Indian Tribal Governmental Tax Status Act of 1982, Pub. L. No. 97-473, § 202(a), 96 Stat. 2605, 2608-11 (1983).  It has been amended several times since the initial enactment.

5   *See* Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 166, 114 Stat. 2763, 2763A-627 (2000).  This legislation amended FUTA provisions contained in IRC §§ 3306 and 3309 to provide that ITGs are to be treated like State and local governments for FUTA purposes.  *See* IRC §§ 3306(c), 3306(u), and 3309.  *See also* Announcement 2001-16, 2001-1 C.B. 715 (providing guidance to ITGs on FUTA obligations).

6   IRC § 3121(b)(7)(F).

7   *See* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, § 202, 124 Stat. 2261, 2262 (2010) (noting that domestic and sexual violence against American Indian and Alaska Native women has reached epidemic proportions and that Indian tribes have experienced significant increases in domestic violence, burglary, assault, and child abuse on Indian reservations).  *See also* Timothy Williams, *Higher Crime, Fewer Charges on Indian Land*, N.Y. Times, Feb. 20, 2012, *available at* http://www.nytimes.com/2012/02/21/us/on-indian-reservations-higher-crime-and-fewer-prosecutions.html?_r=0 (citing Department of Justice (DOJ) data that the country's 310 Indian reservations have violent crime rates that are more than two and a half times higher than the national average).

## EXAMPLE

An ITG is facing an increase in crime on its land. To deal with this increase, the tribe seeks to recruit additional police officers and is also concerned about the retention of its current police officers. The tribe is located within a State that, to incentivize the recruitment and retention of qualified police officers, offers a retirement plan with excellent benefits to State police officers. Under IRC § 3121(b)(7)(F), State police officers who are covered by this retirement plan are excepted from paying Social Security taxes.

To facilitate recruitment and retention of police officers, the tribe has entered into an agreement with the State that permits police officers employed by the tribe to participate in the State's retirement plan. However, because tribal police officers are technically employees of the tribe and not the State, they are not excepted from Social Security taxes. Therefore, if they wish to participate in the State retirement plan, the tribal police officers and the ITG must pay into both Social Security and the State retirement system. This inconsistent treatment between State and tribal police officers has an adverse effect on the tribe's ability to recruit and retain tribal police officers and places an economic burden on the tribe, which is attempting to address the increase in crime on tribal lands.

## RECOMMENDATION

The National Taxpayer Advocate recommends that Congress amend IRC § 7871(a) to include IRC § 3121(b)(7)(F) in the list of IRC sections for which ITGs are treated as a "State."

## PRESENT LAW

The Federal Insurance Contributions Act (FICA) provisions in the IRC provide for Social Security taxes (also referred to old age, survivors, and disability insurance, or OASDI) on both employers and employees.[8] IRC § 3101(a) imposes on the income of every individual a 6.2 percent Social Security tax on the wages (as defined in IRC § 3121(a)) received with respect to employment (as defined in IRC § 3121(b)). IRC § 3111(a) imposes on every employer, with respect to having individuals in its employ, a 6.2 percent Social Security excise tax on wages (as defined in IRC § 3121(b)).

IRC § 3121(b)(7)(F) provides an exception to the term "employment" for Social Security tax purposes and states that services performed in the employ of a State, or any political subdivision thereof, or any instrumentality, are not subject to Social Security taxes. However, this exception does not apply unless the employee is covered by a retirement plan of the State, political subdivision, or instrumentality.

IRC § 7871(a) provides that ITGs shall be treated as States for certain purposes enumerated in this section. However, this section does not provide that ITGs should be treated as States for the purpose of Social Security taxes.

## REASONS FOR CHANGE

In previous Annual Reports to Congress, the National Taxpayer Advocate has written about the unique needs of ITG taxpayers as well as made a legislative recommendation to treat ITGs as States for the

---

8    The FICA provisions are contained in Subtitle C, Chapter 21 of the IRC. FICA taxes also include Medicare taxes (also called hospital insurance, or HI) and the Additional Medicare tax, but these are not at issue here.

purpose of the adoption credit in IRC § 23.[9]  ITGs have a unique status for federal tax purposes.[10] IRC § 7871 provides that ITGs are treated as States for certain tax purposes set forth in that section.[11] These include the ability to receive tax deductible charitable contributions for income, estate, and gift tax purposes,[12] the special treatment afforded to States for certain excise taxes,[13] the ability to deduct taxes paid to an ITG,[14] and the issuance of tax-exempt government bonds.[15]  In the legislative history of IRC § 7871, a report of the Senate Committee on Finance provides the reason that Congress chose to treat ITGs as States for certain purposes.  It states:

> Many Indian tribal governments exercise sovereign powers; often this fact has been recognized by the United States by treaty.  With the power to tax, the power of eminent domain, and police powers, many Indian tribal governments have responsibilities and needs quite similar to those of State and local governments.  Increasingly, Indian Tribal governments have sought funds with which they could assist their people by stimulating their tribal economies and by providing governmental services.  The committee has concluded that, in order to facilitate these efforts of the Indian tribal governments that exercise such sovereign powers, it is appropriate to provide these governments with a status under the Internal Revenue Code similar to what is now provided for the governments of the States of the United States.[16]

Thus, in enacting IRC § 7871, Congress acknowledged that, in many respects, ITGs function like States and should therefore be treated like them for certain federal tax purposes.

More recently, in 2000, Congress decided that ITGs should be treated as States with regard to FUTA taxes.[17]  Under FUTA, employers must pay a six percent tax on total wages paid with respect to covered employment.[18]  The change in law allowed ITGs, like State governments, to elect to pay FUTA taxes only when a former employee claims unemployment benefits.[19]  Therefore, for FUTA tax purposes, ITGs are treated identically to States.

Regarding Social Security taxes under FICA, in 1990, Congress was concerned about State and local government employees who were neither covered by a State retirement system or through the federal Social

---

9    *See* National Taxpayer Advocate 2013 Annual Report to Congress 116 (Most Serious Problem: *Indian Tribal Taxpayers: Inadequate Consideration of Their Unique Needs Causes Burdens*); National Taxpayer Advocate 2012 Annual Report to Congress 521 (Legislative Recommendation: *Amend the Adoption Credit to Acknowledge Jurisdiction of Native American Tribes*).

10   For a discussion of the various federal tax provisions applicable to ITGs, see Joint Committee on Taxation, *Overview of Federal Tax Provision and Analysis of Selected Issues Relating to Native American Tribes and Their Members*, JCX-40-12 (May 14, 2012).

11   This section was originally enacted by the Indian Tribal Governmental Tax Status Act of 1982, Pub. L. No. 97-473, § 202(a), 96 Stat. 2605, 2608-11 (1983).  It has been amended a few times since the initial enactment.

12   IRC § 7871(a)(1).

13   IRC § 7871(a)(2).

14   IRC § 7871(a)(3).

15   IRC § 7871(a)(4).  ITGs are also treated as States for other purposes that are set forth in IRC § 7871(a).

16   S. Rep. No. 97-646, at 11 (1982).

17   *See* Community Renewal Tax Relief Act of 2000, Pub. L. No. 106-554, § 166, 114 Stat. 2763, 2763A-627 (2000).  This legislation amended FUTA provisions contained in IRC §§ 3306 and 3309 to provide that ITGs are to be treated like State and local governments for FUTA purposes.  See IRC §§ 3306(c), 3306(u), and 3309.  *See also* Announcement 2001-16, 2001-1 C.B. 715 (providing guidance to tribes on FUTA obligations).

18   The FUTA provisions are contained in IRC §§ 3301-3311.

19   IRC § 3309(d).

001779

Security program.[20]  It therefore enacted legislation to require Social Security coverage for State or local government employees who were not covered by a retirement system in conjunction with their employment.[21]  However, Congress provided a Social Security tax coverage exception for State employees who are actually covered (*i.e.*, not simply eligible to participate) by a State retirement plan.[22]

When enacting IRC § 7871 in 1983, Congress recognized the unique attributes of ITGs and how they have similar needs and characteristics as States and should therefore be treated as States for many tax purposes.  Similarly, in 2000, Congress decided to treat ITGs as States for FUTA tax purposes.

ITGs face high levels of crime, particularly violent crime, on tribal lands.[23]  In response, Congress enacted the Tribal Law and Order Act of 2010 to encourage the hiring of more law enforcement officers for Indian tribal lands and provide additional tools to address critical public safety needs.[24]  Specifically, one of the purposes of this legislation was "to empower tribal governments with the authority, resources, and information necessary to safely and effectively provide public safety in Indian country."[25]  This law also, among other things, expands efforts to recruit, train, and retain tribal police officers.[26]

An ITG grappling with a surge in crime will naturally seek to recruit additional tribal police officers and do its best to retain its current ones.  To facilitate recruitment and retention, an ITG will likely attempt to put forth attractive compensation packages for tribal police officers, including offering favorable retirement benefits.  Due to complex jurisdictional issues on Indian tribal lands, an ITG will often enter into agreements with State (and federal) authorities to coordinate law enforcement efforts.[27]  An ITG may also enter into an agreement with a State in which it is located to allow tribal police officers to participate in the State's retirement plan.

However, if tribal police officers choose to participate in a State retirement plan, they and the ITG must still pay Social Security taxes in addition to any contributions they make to the retirement plan.  Yet, as State employees, their State police officer counterparts are excepted under the IRC from Social Security taxes if they participate in a State retirement plan.[28]  This places an unfair economic burden on ITGs and is a disincentive for tribal police officers to work on Indian tribal lands.  As a result, ITGs may not be able to recruit and retain tribal police officers by offering participation in favorable pension plans.

---

20  *See* Staff of H. Comm. of Ways and Means, 101st Cong., Legislative History of Ways and Means Democratic Alternative, Ways and Means Comm. Print No. 101-37, at 86-87 (1990).

21  *See* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, Title XI, § 11332(b), 104 Stat. 1388, 1388-469 (1990).

22  *See* IRC § 3121(b)(7)(F).

23  *See* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, § 202, 124 Stat. 2261, 2262 (2010) (noting that domestic and sexual violence against American Indian and Alaska Native women has reached epidemic proportions and that Indian tribes have experienced significant increases in domestic violence, burglary, assault, and child abuse on Indian reservations); *see also, e.g.*, Timothy Williams, *Higher Crime, Fewer Charges on Indian Land*, N.Y. Times, Feb. 20, 2012, *available at* http://www.nytimes.com/2012/02/21/us/on-indian-reservations-higher-crime-and-fewer-prosecutions.html?_r=0 (citing DOJ data that the country's 310 Indian reservations have violent crime rates that are more than two and a half times higher than the national average).

24  *See* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, § 201, 124 Stat. 2261 (2010).  *See also* DOJ, *Tribal Law and Order Act*, *available at* http://www.justice.gov/tribal/tribal-law-and-order-act.

25  *See* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, § 202(b)(3), 124 Stat. 2261, 2263 (2010).

26  *See* DOJ, *Tribal Law and Order Act*, *available at* http://www.justice.gov/tribal/tribal-law-and-order-act.

27  *See* Tribal Law and Order Act of 2010, Pub. L. No. 111-211, § 202(a)(4)(C), 124 Stat. 2261, 2262 (2010) (noting that the complicated jurisdictional scheme in Indian country requires a high degree of commitment and cooperation among tribal, federal, and State law enforcement officials).

28  *See* IRC § 3121(b)(7)(F).

More importantly, the inconsistency in tax treatment of ITGs and tribal police officers for Social Security tax purposes as compared to their counterparts employed by States appears to run contrary to congressional intent in reducing crime, particularly violent crime, on Indian lands.

To address this inequity and the compliance burdens placed on ITGs and tribal officers (and other ITG employees), to provide uniform treatment of ITGs as States for all employment tax purposes, and to comport with congressional intent in addressing crime on ITG lands, Congress should amend IRC § 7871(a) to include IRC § 3121(b)(7)(F) in the list of IRC sections for which ITGs are treated as a State. This would mean that ITG police officers who participate in a State retirement plan, as well as the ITG, would not be responsible for Social Security taxes. In making this legislative change, Congress can align both tax and non-tax legislation impacting ITGs.

### EXPLANATION OF RECOMMENDATION

The proposal to amend IRC § 7871(a) to include IRC § 3121(b)(7)(F) in the list of IRC sections for which ITGs are treated as States would allow ITGs to better recruit and retain tribal police officers to address crime on Indian tribal lands, which has been a goal of Congress in non-tax legislation.[29] This proposal would provide parity between ITG and State law enforcement officers and would also be in line with prior congressional action treating ITGs as States for IRC § 7871 and FUTA purposes. This change would also protect the fundamental taxpayer *right to a fair and just tax system*.

---

29  Technically speaking, this proposal would amend IRC § 7871(a) to include a provision similar to IRC § 3121(b)(7)(F) in the list of IRC sections for which ITGs are treated as States. Simply treating ITGs as a State under IRC § 3121(b)(7)(F) would not achieve the desired result because the tribal police officer or other ITG employee would not be participating in an ITG retirement plan but rather a State retirement plan. However, the goal of this proposal is to extend the benefits of IRC § 3121(b)(7)(F) to ITG employees, particularly ITG tribal police officers, who participate in a State retirement plan.

<div style="margin-left:2em">

**LR #7**

## TAXPAYER RIGHTS: Toll the Time Period for Financially Disabled Taxpayers to Request Return of Levy Proceeds to Better Protect Their *Right to a Fair and Just Tax System*

### TAXPAYER RIGHTS IMPACTED[1]

- ■ *The Right to Pay No More Than the Correct Amount of Tax*
- ■ *The Right to Appeal the IRS Decision in an Independent Forum*
- ■ *The Right to Privacy*
- ■ *The Right to a Fair and Just Tax System*

### PROBLEM

Under Internal Revenue Code (IRC) § 6331, the IRS is authorized to collect outstanding tax by levying against a taxpayer's nonexempt property and rights to property. If the IRS wrongfully levies the property of a third person (*i.e.*, property in which the taxpayer has no rights and that is not otherwise subject to the federal tax lien), it is lawful for it to return such property to that person within certain time periods. The IRS also may return levied property to the taxpayer if certain conditions are met, and it must return levied property to a taxpayer, however, only if the levy was in violation of the law.[2] Under IRC § 6343(b), the IRS may only return money levied upon or money received from sale of property nine months from the date of levy.[3] A person other than a taxpayer (*i.e.* a third party) may file a civil suit against the United States for a wrongful levy under IRC § 7426, but under IRC § 6532(c), the civil suit must be brought by the third party within nine months from the date of the levy that gave rise to the action.[4] However, a taxpayer who is requesting the return of levied property generally may not bring suit if the IRS denies the taxpayer's request to return the property.[5] Therefore, if a third party or taxpayer files a request with the IRS, or if a third party files a civil suit under IRC § 7426 for return of levied proceeds without first filing a request for return of the property under IRC § 6343(b) after the nine-month period has expired, neither the IRS nor the court has authority to consider the claim.

</div>

---

1   *See* Taxpayer Bill of Rights, *available at* http://www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   *See* IRC §§ 6343(b) and (d); Treas. Reg. § 301.6343-3(d). The IRS is required to return the levied upon property if the levy was wrongful, premature, or in violation of the law. The IRS has discretion to return levied upon property if "(A) the levy was not in accordance with administrative procedures of the Secretary, (B) the taxpayer has entered into an agreement under section 6159 to satisfy the tax liability for which the levy was imposed by means of installment payments, unless such agreement provides otherwise, (C) the return of such property will facilitate the collection of the tax liability, or (D) with the consent of the taxpayer or the National Taxpayer Advocate, the return of such property would be in the best interests of the taxpayer (as determined by the National Taxpayer Advocate) and the United States."

3   IRC § 6343(b); Treas. Reg. § 301.6343-3.

4   IRC § 6532(c); Treas. Reg. § 301.6532-3. This nine-month period can be extended if the taxpayer files a claim for return of levy proceeds with the IRS within nine months of the date of the levy. It will be extended to the shorter of 12 months from the date of filing by a third party of a written request for the return of the property wrongfully levied upon, or six months from the date of mailing a notice of disallowance. A request which does not meet the requirements under Treas. Reg. § 301.6343–2(b)(3) is not considered adequate and will not extend the nine-month period.

5   A taxpayer may file suit for certain unauthorized collection actions that violated the law or a regulation under IRC § 7433, but the suit must be filed within two years of the date that the right of action accrues.

Unlike IRC § 6511(h), which suspends the running of the period for filing a claim for refund when a taxpayer can show that he or she was financially disabled,[6] neither IRC § 6343, the relevant Treasury Regulations (Treas. Reg.), or IRC § 6532(c) provides for any such suspension.[7]  The absence of a suspension of the nine-month time period when a taxpayer or an individual who is a third party, that is financially disabled fails to protect the *rights to pay no more than the correct amount of tax, to appeal an IRS decision in an independent forum, to privacy,* and *to a fair and just tax system,* and for financially disabled taxpayers or individuals who are third parties who lack the capacity to file a claim during that short time period.  Even if Congress extends the nine-month period to two years, as recommended previously by the National Taxpayer Advocate and as proposed in several bills,[8] the running of the two-year period should be suspended for the person's disability, because the same arguments apply — and especially because IRC § 6511 has the same two-year timeframe.

### EXAMPLES

#### Example One: A Levy Wrongfully Served on a Third-Party's Bank Account

Fred and Mary Jones reside in a non-community property state.  Fred Jones owes delinquent tax for taxable year (TY) 2007, when his filing status was single.  In addition, Fred and Mary Jones owe delinquent tax for returns they filed jointly for TYs 2008 and 2009.  In 2010, the IRS mistakenly levies Mary's bank for all three taxable years.  This results in money from Mary's bank account being used to pay liabilities for all taxable years, including Fred's separate TY 2007 liability.  In the beginning of 2010, Fred and Mary separated due to financial stress.  As a result of the separation and financial stress, Mary was suffering from severe clinical depression, which impaired her ability to complete day-to-day tasks and manage her financial affairs.  Mary's illness prevented her from submitting a request for return of levy proceeds until 18 months from the time the levy attached to the bank account.  The IRS rejected Mary's late-filed request for the return of the wrongly levied property because it was not submitted within the nine-month time period.  Mary is barred from filing a civil suit for return of the wrongly levied proceeds because IRC § 6532(c)(1) prohibits a suit once the nine-month period has expired if there was not a timely-filed claim.

#### Example Two: A Levy Was Filed Prematurely

John Doe suffers from Post-Traumatic Stress Disorder (PTSD) following his active combat duty.  John Doe had tax liabilities for TYs 2008 and 2009.  On January 1, 2010, the IRS filed a levy against his bank account.  However, the IRS had not issued Mr. Doe a notice of intent to levy and his right to a collection due process hearing prior to filing the levy under IRC § 6330.  During 2010, John Doe continued to suffer from severe PTSD, which crippled his ability to hold down a job, manage his financial affairs, and maintain personal relationships.  In January 2011, with the assistance of a close family member, John Doe

---

6   Congress was concerned about similar unfair outcomes and has acted with legislation to address inequities associated with taxpayers' inability to manage financial affairs, and to strike a better balance between the tax system's need for finality and taxpayer's *right to a fair and just tax system.*  Pub. L. No. 105-206 (July 1998) amended IRC § 6511, adding subsection (h), which provides that a person is financially disabled when he or she is "unable to manage his financial affairs by reason of a medically determinable physical or mental impairment of the individual which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

7   National Taxpayer Advocate 2013 Annual Report to Congress 302-10 (Legislative Recommendation: *Broaden Relief from Timeframes for Filing a Claim for Refund for Taxpayers with Physical or Mental Impairments*).

8   National Taxpayer Advocate 2001 Annual Report to Congress 202.  A bill was recently introduced in the United States Senate that included the National Taxpayer Advocate's recommendation and would extend the nine-month period in IRC § 6532(c) to two years.  Taxpayer Bill of Rights Enhancement Act of 2015, S.1578, 114th Cong. (2015).  Senator Cornyn and Representative Thornberry introduced companion bills that would extend the nine-month period in IRC § 6532(c) to three years. S. 949, 114th Cong. (2015) and H.R. 1828, 114th Cong. (2015).

001783

was able to file a request for return of levy proceeds.  Because the request was filed more than nine months from the date of levy, the IRS would be barred from considering his claim.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that Congress:

- Amend IRC § 6343(b) to suspend the period in which the IRS has to return levy proceeds during any period in which a taxpayer or a third party who is an individual is financially disabled.  A taxpayer or a third party who is an individual will not be considered to be financially disabled unless proof of the existence of a physical or mental disability is furnished in such a form and manner as the Secretary may require.

- Amend IRC § 6532(c) to suspend the period in which a third party who is an individual can file a civil suit for return of wrongfully levied proceeds during any period within that time in which that individual is financially disabled.  An individual will not be considered to be financially disabled unless proof of the existence of a physical or mental disability is furnished in such form and manner as the Secretary may require.

- Adopt the National Taxpayer Advocate's definition of financial disability:[9]

  - Replace the existing requirement that the individual impairment be medically determinable with a provision that it be determined by a qualified medical or mental health professional.  For this purpose, Congress should specify that a qualified medical or mental health professional is an individual who is licensed by the state in which he or she practices to provide direct medical or mental health treatment to another individual.

  - Replace the existing requirement that the impairment leave the individual unable to manage his financial affairs with the requirement that the impairment materially limit the management of those affairs.

The National Taxpayer Advocate reiterates her recommendation that the nine-month period for requesting return of levied property under IRC § 6343(b) should be extended to two years.[10]

## PRESENT LAW

Under IRC § 6331, the IRS is authorized to collect outstanding tax by levying against the taxpayer's nonexempt property and rights to property.  In certain situations, however, under IRC § 6343 and the regulations, levies must be released, and levied property may, or in some situations must, be returned to its owner.  The IRS is authorized to return levy proceeds to either a taxpayer when the levy was erroneous (*i.e.*, in violation of law or IRS administrative procedures) or a third party whose property has been wrongfully levied (*i.e.*, property in which the taxpayer has no rights and that is not otherwise subject to the Federal tax lien).

### Return of Wrongfully Levied Amounts to Third Parties Under IRC § 6343(b)

Under this provision, the IRS may return levied property or money when the levy incorrectly attaches to property belonging to a third party in which the taxpayer has no property rights and that is not otherwise

---

9   National Taxpayer Advocate 2013 Annual Report to Congress 302.

10   National Taxpayer Advocate 2006 Annual Report to Congress 547.

subject to the federal tax lien.[11]  This is commonly known as a "wrongful levy."  An individual can bring a civil suit against the IRS for return of the levied proceeds under IRC § 7426.  Under IRC § 6532, this suit is barred from beginning no later than nine months from the date of the levy if no timely administrative request is first made by the third party.[12]

### Return of Taxpayer's Erroneously Levied Proceeds Under IRC § 6343(d)

Under this provision, the IRS may return levied property or money in the following situations:

- A levy that is premature or not in accordance with administrative procedures;

- An installment agreement is made for a liability included on the levy, unless the agreement provides otherwise;

- Returning levy proceeds facilitates collection; and

- With the consent of the taxpayer or the National Taxpayer Advocate, returning the levy proceeds is in the best interests of the taxpayer (as determined by the National Taxpayer Advocate) and the United States.[13]

### Return of Taxpayer's Erroneously Levied Property or Money Under Treasury Regulation § 301.6343-3(d)

Under Treas. Reg. § 301.6343-3(d), the IRS must return property or money that was levied in violation of law.[14]  For example, under this regulation, the IRS must return property or money that is levied:

- Without giving the requisite 30-day notice of the right to a Collection Due Process hearing if required;[15]

- During the pendency of a proceeding for refund of divisible tax;[16]

- Before investigation of the status of levied upon property;[17] and

- During the pendency of an offer in compromise.[18]

### Time Period Under IRC § 6343(b) in Which the IRS Can Return Levied Property or Money to Taxpayer or Third Party

In all the situations above, levied upon property other than money can be returned to a taxpayer or third party at any time.[19]  However, the Treasury Regulations require a written request (described below) for return of levied money or money received from a sale of property within nine months from the date of the levy.[20]

---

11  IRC §§ 6343(b) and 6331(a).
12  National Taxpayer Advocate 2001 Annual Report to Congress 202.  Several bills were recently introduced in the United States Congress that included the National Taxpayer Advocate's recommendation and would extend the nine-month period in IRC § 6532(c) to two or three years.  *See* S.1578, 114th Cong. (2015), S. 949, 114th Cong. (2015), and H.R. 1828, 114th Cong. (2015).
13  IRC § 6343(d).
14  Treas. Reg. § 301.6343-3(d).
15  *See* IRC § 6330(a)(1).
16  IRC § 6331(i).
17  IRC § 6331(j).
18  IRC § 6331(k)(1).
19  IRC § 6343(b)(1); Treas. Reg. § 301.6343-3(e).
20  Treas. Reg. §§ 301.6343-2 and 301.6343-3.

001785

### Time Period in Which a Third Party Who Has Had Property Wrongfully Seized and/or Sold by the IRS Can File Suit Under IRC § 7426

Under IRC § 7426, a third party may file suit against the United States in the Federal District Court to enjoin the IRS from proceeding with enforcement of the levy, to return the specific property, or to grant a judgment.[21]  For a suit under IRC § 7426 to be timely, IRC § 6532 requires that it must be commenced from within nine months from the date of the levy if no request was made for the return of the levied property.[22]  However, if a written request for return of wrongfully levied property or money is submitted to the IRS within nine months from the date of the levy, the nine-month period will be extended 12 months from the date of filing the written request for the return of property wrongfully levied upon, or six months from the date of mailing the notice of disallowance, whichever is shorter.[23]  A request which does not meet the requirements under Treas. Reg. § 301.6343–2(b)(3) is not considered adequate and will not extend the nine-month period.

### The Doctrine of Equitable Tolling

The doctrine of equitable tolling prevents a statute of limitations from barring a claim if the claimant, despite diligent efforts, did not discover the injury until after the expiration of the limitations period or under the circumstances, could not reasonably be expected to file the claim within the designated time period.[24]  In *Irwin v. Dept. of Veterans Affairs*,[25] the Court held that when Congress has waived the government's sovereign immunity, thereby subjecting it to lawsuits, equitable tolling should be made applicable in the same way that it is applicable to private suits.

Applying the holding in the *Irwin* decision, the 9th Circuit recently reaffirmed its prior interpretation that equitable tolling applies to the time limitation for filing a wrongful levy suit under IRC § 6532(c).[26]  In *Volpicelli v. U.S.*, the plaintiff had filed a wrongful levy suit under IRC § 7426(a)(1) about eight years after the nine-month period for bringing a suit under IRC § 6532(c) had expired.[27]  The plaintiff alleged when he was ten years old, the IRS had levied on checks that represented gifts from his great-grandmother to be used for his college attendance.  The IRS applied the funds instead to the plaintiff's father's unrelated tax bill.  Nearly a year after the plaintiff turned 18 (the age of majority), he brought the wrongful levy suit in Nevada district court.  That court threw out the suit, holding that the nine-month period was not subject to equitable tolling.[28]  The 9th Circuit reversed the district court, contrary to other courts including the 3rd Circuit,[29] holding that the nine-month period in IRC § 6532(c) is not jurisdictional

---

21  IRC § 7426(b).  The court can grant an amount of money levied upon or judgment in an amount not to exceed what the IRS received for the sale of the property.

22  IRC § 7426(i) cross references IRC § 6532(c) for period of limitations for filing a suit.

23  IRC § 6532(c).

24  Black's Law Dictionary (10th ed. 2014).

25  498 U.S. 1075 (1991).

26  Prior to *Volpicelli v. U.S.*, 777 F.3d 1042 (9th Cir. 2015), the 9th Circuit in *Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1206–07 (9th Cir. 1995) and *Capital Tracing, Inc. v. U.S.* 63 F.3d 859, 861-62 (9th Cir. 1995) applied the then-recent Supreme Court opinion in *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89 (1990), which held that the same rebuttable presumption in suits among private litigants that statutory periods of limitations could be subject to equitable tolling applied in analogous suits involving the United States.  The 9th Circuit made two separate holdings: first, IRC § 6532(c) is not "jurisdictional", such as the 90-day period, or 150 days if the statutory notice of deficiency was sent outside the United States, for petitioning the United States Tax Court.  Second, IRC § 6532(c) was a common statutory period of limitation, and there was nothing to rebut the *Irwin* presumption in favor of tolling.

27  *Volpicelli v. U.S.*, 777 F.3d 1042 (9th Cir. 2015).

28  *Volpicelli v. U.S.,* 108 A.F.T.R.2d 2011-7409.

29  *Becton Dickinson and Co. v. Wolckenhauer*, 215 F.3d 340 (3d Cir. 2000).

and is subject to equitable tolling.[30]  The 9th Circuit remanded the case to the district court to decide, in the first instance, whether tolling was justified.

Equitable tolling has been found not applicable to other statutory time periods in tax administration.  The Supreme Court in *U.S. v. Brockamp* and the 4th Circuit in *Webb v. U.S.* declined to toll IRC § 6511.[31]  In *Brockamp*, the taxpayer, who was 93 years old and demonstrating early signs of dementia, mailed a check to the IRS for $7,000 instead of $700, along with an application for an automatic extension of time to file his 1983 tax return.  The taxpayer never sent in the 1983 return.  The taxpayer died intestate more than two years after this payment.  His daughter, administrator of the estate, discovered the $7,000 overpayment and requested in a letter to the IRS that the overpayment be refunded.  In the letter she characterized her father as "senile" and stated that he had mistakenly sent the check for $7,000 rather than $700.  The claim for refund was denied by the IRS on the basis that the statutory period of limitations under IRC § 6511 expired.[32]

In *Webb*, the taxpayer was physically and mentally abused and drugged by trusted caretakers (*i.e.*, her personal physician and an attorney hired by the physician) who coerced the taxpayer into granting them power of attorney over her finances.[33]  The caretakers ultimately stole money from the taxpayer and filed gift tax returns reporting the stolen money as a gift to the caretakers from the taxpayer.  With the assistance of a friend, the taxpayer eventually broke free of the abusive caretakers and filed a refund claim seeking a return of the paid gift taxes.  The IRS denied claims for amounts beyond three years of the filing of the gift tax return because the statutory period of limitations under IRC § 6511 had expired.

Despite these taxpayers' inability to comply with the statutory limitations period due to impairments, both the Supreme Court and the 4th Circuit held that equitable tolling did not apply because the requirements of IRC § 6511 were already set out with specificity.  It was in response to these cases that Congress enacted IRC § 6511(h).[34]

The amendment in IRC § 6511(h) suspended the running of the three- or two-year time period in IRC § 6511(a) during any period in which a taxpayer is financially disabled.  The amendment states that a person is financially disabled:

> [I]f such individual is unable to manage his financial affairs by reason of a medically determinable physical or mental impairment of the individual which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

## REASONS FOR CHANGE

The law, as currently written, prevents the IRS and the courts from returning levied property in situations where the taxpayer or a third party who is an individual, due to a physical or mental impairment, does not file a request for return of levied money or petition the court until after the nine-month period.  As mentioned above, Congress has already expressed concerns about similar outcomes in other provisions

---

30   *Volpicelli v. U.S.*, 777 F.3d 1042 (9th Cir. 2015).

31   *U.S. v. Brockamp*, 519 U.S. 347 (1997), and *Webb v. U.S.*, 66 F.3d 691 (4th Cir. 1995).

32   *U.S. v. Brockamp*, 519 U.S. 347 (1997).

33   *Webb v. U.S.*, 66 F.3d 691 (4th Cir. 1995).

34   After the *Webb* and *Brockamp* cases, both Congress and the White House realized a legislative fix was needed.  *See* Office of the White House Secretary, Press Release, Jan. 31, 1996; S. Rep. No. 105-174, at 60 (1998); H.R. Rep. No. 105-364, at 62 (1997).  Both the House and the Senate reports show the Committees believed "that in cases of severe disability, equitable tolling should be considered in the application of the statutory limitations on the filing of tax refund claims."

001787

relating to statutory periods of limitation.  Specifically, under IRC § 6511(h), the running of the three- or two-year time period for filing a claim for refund is suspended during any period in which a taxpayer is financially disabled.  By passing IRC § 6511(h), Congress ensured that taxpayers who were impaired from filing a timely claim for refund would not lose the opportunity to file such a claim altogether.

The current nine-month time period in IRC §§ 6343(b) and 6532(c) creates the same potential for harm that was experienced by the taxpayers in the *Webb* and *Brockamp* cases.  As with IRC § 6511(h), to ensure that an impaired third party who is an individual or a taxpayer is able to have his or her request for return of levy proceeds considered by either the IRS or the courts, the nine-month period should be tolled if the third party who is an individual or taxpayer can show that he or she was financially disabled during such period.  Without this change, a taxpayer or other third party who is an individual who is impaired, and therefore prevented from requesting the return of a levied amount, will lose that amount, even though the levy may have been wrongful, violated the law, or damaged the taxpayer's ability to pay the debt.  Tolling the period for filing a claim during the period in which a taxpayer or third party who is an individual is financially disabled would strike a better balance between finality for the IRS and the taxpayer's *right to a fair and just tax system*.  This would also better protect a taxpayer's *rights to privacy*, *to pay no more than the correct amount of tax*, and *to appeal an IRS decision in an independent forum*.

Although IRC § 6511(h) provided relief for financially disabled taxpayers and is a helpful guide for amending IRC §§ 6343(b) and 6532(c) its narrow definition of financial disability leaves unprotected a number of third parties who are individuals and taxpayers who lack the capacity to manage financial affairs.[35]

To ensure the provision protects all taxpayers and third parties who are individuals who lack the capacity to manage their financial affairs, Congress should adopt the definition of financial disability recommended by the National Taxpayer Advocate in her 2013 Annual Report to Congress when amending IRC §§ 6343(b) and 6532(c).[36]

This definition of financial disability would provide relief to those who can complete certain tasks but are prevented by their disability from completing others.  More specifically, in many cases a disability can materially limit particular aspects of an individual's conduct, which may cause the taxpayer or third party who is an individual to fail to file the request within the nine-month period.  For instance, for an individual suffering from clinical depression, a simple, routine task may pose little anxiety, while a more difficult and complex task (*e.g.*, filing a refund claim) may trigger severe anxiety and be avoided entirely.[37]

---

35  National Taxpayer Advocate 2013 Annual Report to Congress 302.

36  *Id.*

37  Andrew M. Busch, Jonathan W. Kanter, Sara J. Landes, and Cristal E. Weeks, *The Nature of Clinical Depression: Symptoms, Syndromes, and Behavior Analysis*, Behav. Anal. 31(1): 1-21 (2008), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/ PMC2395346/ (stating that "[d]epression is characterized as much by increased escape and avoidance repertoires as by reduced positive repertoires").  As the fields of psychiatry and mental health have advanced, we have learned that some mental illnesses, such as PTSD, may bring about neurochemical changes in the brain which may have biological, psychological, and behavioral effects on an individual's health.  *See* U.S. Department of Veterans Affairs, National Center for PTSD, *available at* http://www.ptsd.va.gov/professional/co-occurring/ptsd-physical-health.asp.  *See also* Jonathan E. Sherin, MD, PhD and Charles B. Nemeroff, MD, PhD, *Post-Traumatic Stress Disorder: The Neurobiological Impact of Psychological Trauma*, Dialogues Clin. Neurosci. 2011 Sep; 13(3): 263-78.

## EXPLANATION OF RECOMMENDATION

### Add a Provision to IRC §§ 6343 and 6532(c) Requiring Tolling for Claims of Financially Disabled Taxpayers

The nine-month period in IRC §§ 6343(b) and 6532(c) has no tolling period for financially disabled taxpayers or third parties who are individuals.[38]  Suspending the nine-month period in which a taxpayer or a third party who is an individual can request the IRS to return levy proceeds or to bring a civil action in courts would expand protections available to those taxpayers or third party individuals who are financially disabled, and make these protections consistent with the suspension of the statutory period of limitations in a refund context under IRC § 6511(h).  The concerns that led Congress to enact IRC § 6511(h) are equally applicable to the requests for return of levy proceeds.[39]

### Expand the Protections Available to Financially Disabled Individuals

As discussed in the National Taxpayer Advocate's 2013 Annual Report to Congress, taxpayers with disabilities often experience difficulty proving financial disability under IRC § 6511(h), due to its narrow definition of financial disability and medical professionals' ability to designate a taxpayer as financially disabled.[40]  In brief, the IRS interpretation and guidance for what documentation the IRS can consider in evaluating a "qualified impairment" is unduly restrictive and may lead the IRS to dismiss otherwise compelling evidence, thereby resulting in the denial of relief to taxpayers who lacked the capacity to file a refund claim.[41]  A better articulated exception with more breadth than the current definition will more readily protect individuals suffering from clinical depression, anxiety, PTSD, and other mental afflictions.[42]  Therefore, Congress should adopt the National Taxpayer Advocate's 2013 recommendation to broaden the definition of financial disability under IRC § 6511(h) when defining financial disability for the purpose of tolling the statutory time period for filing under IRC §§ 6343 and 6532.

The National Taxpayer Advocate has previously submitted legislative recommendations to broaden relief from timeframes for filing a refund claim[43] and to extend the refund statute expiration date under IRC § 6511.[44]  Even if Congress adopts the two years, the issue of tolling still exists, as it does with the three-year/two-year statutory limitations period for refund claims.[45]  The National Taxpayer Advocate reaffirms these proposals and now recommends the nine-month period in which the IRS is authorized to return levy proceeds, or the court can hear a suit for return of levy proceeds, be suspended when the taxpayer is financially disabled.

---

38   *See* 26 U.S.C. § 6343.

39   S. Rep. No. 105-174, at 60 (1998); H.R. Rep. No. 105-364, at 62 (1997).

40   National Taxpayer Advocate 2013 Annual Report to Congress 302-10.

41   National Taxpayer Advocate 2013 Annual Report to Congress 303.  In *Kurko v. Commissioner,* Docket No. 24040-13L, a Collection Due Process hearing, the taxpayer argued that an amended return claiming an overpayment was timely because the time period for filing a claim was tolled under IRC § 6511(h).  The taxpayer presented the Settlement Officer with a letter from a licensed psychologist stating that the taxpayer had a mental health disability that made her financially disabled for purposes of IRC § 6511(h)'s provision tolling the credit or refund claim period under (a).  The Settlement Officer did not accept the letter from the licensed psychologist because Rev. Proc. 99-21, 1999-1 C.B. 960, required the letter to come from a doctor of medicine or osteopathy as defined in IRC § 1395x(r)(1).  The taxpayer petitioned the United States Tax Court and in an order issued on March 20, 2015, Judge Gustafson instructed the parties to brief the issue of the validity of Rev. Proc. 99-21, 1999-1 C.B. 960.  After reading Judge Gustafson's questions in his March 20 order, the IRS decided to sign a stipulated decision providing that the overpayment was timely claimed, notwithstanding that the letter was not from a "physician" – thereby settling the case and rendering the issue moot for purposes of the *Kurko* case.

42   *See* Rev. Proc. 99-21; T. Keith Fogg & Rachel E. Zuraw, *Financial Disability for All*, 62 Cath. U. L. Rev. 965, 994-1004 (2013).

43   National Taxpayer Advocate 2013 Annual Report to Congress 302.

44   National Taxpayer Advocate 2001 Annual Report to Congress 202.

45   *Id.*  A bill was recently introduced in the United States Senate that included the National Taxpayer Advocate's recommendation and would extend the nine-month period in IRC § 6532(c) to two or three years.  *See* S.1578, 114th Cong. (2015), S. 949, 114th Cong. (2015); H.R. 1828, 114th Cong. (2015).

**LR
#8**

## THE FRIVOLOUS RETURN PENALTY: Protect Good Faith Taxpayers by Expanding the Availability of Penalty Reductions, Establishing Specific Penalty Abatement Procedures, and Providing Appeal Rights

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to a Fair and Just Tax System*

### PROBLEM

By the early 1980's, Congress became concerned with the rapid growth of deliberate defiance of the tax laws by "tax protestors."[2] As a result, Congress passed Internal Revenue Code (IRC) § 6702, which, as currently formulated, generally imposes an immediately assessable $5,000 penalty on tax returns adopting a position which the IRS has identified as frivolous or reflecting a desire to delay or impede the administration of federal tax laws.[3] This penalty, however, was primarily intended to address "protest" returns and was not aimed at taxpayers making good faith mistakes on their returns, such as innocent mathematical or clerical errors.[4]

In order to mitigate the harshness of the frivolous return penalty, Congress also allowed for a reduction of the penalty, which now can be decreased from $5,000 to $500, if the IRS determines that such reduction would promote compliance with and administration of the federal tax laws.[5] Nevertheless, when adopting procedures implementing this provision, the IRS denied potential penalty reduction to any taxpayers to the extent they have already paid the penalty, including by means of an automatic or involuntary refund offset.[6] This broad exclusion is particularly problematic because no clearly defined procedures exist allowing an abatement of the penalty for reasonable cause and good faith.[7] Further, the IRS Office of Appeals (Appeals) refuses to consider any appeals of frivolous return penalties even if those appeals are contending that the penalties were incorrectly applied in the first instance or are in some other way substantively

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   S. Rᴇᴘ. Nᴏ. 97-494(I), at 277 (1982).  Subsequently, Congress enacted the IRS Restructuring and Reform Act of 1998 (RRA 98), Pub. L. No. 105-206, Title III, Subtitle H, § 3707(a) (July 22, 1998), which prohibited the IRS from labeling taxpayers as Illegal Tax Protesters or adopting similar terminology based on fear of stigmatization.  In RRA 98 § 3707(b), Congress, however, did allow IRS personnel to designate appropriate taxpayers as "nonfilers."

3   IRC § 6702(a)(2).  The frivolous return penalty can also be imposed by the IRS in response to the filing of a specified frivolous submission.  IRC § 6702(b).  These IRC § 6702 penalties are sometimes also referred to as "postassessment penalties" because they can be assessed in the absence of deficiency procedures and because they do not provide prepayment review rights in the U.S. Tax Court.  Internal Revenue Manual (IRM) 8.11.1.1.2(1) (Nov. 12, 2013).

4   S. Rᴇᴘ. Nᴏ. 97-494(I), at 277 (1982).

5   IRC § 6702(d); Rev. Proc. 2012-43, 2012-49 I.R.B. 643.  Taxpayers can also avoid assertion of the penalty if they withdraw a frivolous return within 30 days of receiving notice by the IRS.  This right is statutory in the case of IRC § 6702(b), *Specified Frivolous Submissions*, and a matter of IRS policy in the case of IRC § 6702(a), *Frivolous Tax Returns*.  *See* IRC § 6702(b)(3); IRM 4.10.12.1(10) (Sept. 5, 2014).

6   Rev. Proc. 2012-43, § 3, 2012-49 I.R.B. 643.

7   An abatement can be obtained if the IRS has asserted the penalty in error.  IRM 25.25.10.8.4, *Post Penalty Assessment Processing* (Aug. 13, 2015).

001790

erroneous.[8]  Appeals may well be concerned with having to rehear arguments that gave rise to application of the frivolous return penalty in the first instance.  However, mechanisms already exist that could be used and expanded to properly balance taxpayers' need for post-assessment, prepayment or post-payment appeal reviews with Appeals' legitimate need to address the proliferation of baseless claims.[9]

As options for relief have been narrowed by the IRS, opportunities for inappropriate application of the frivolous return penalty have been simultaneously increased.  The number of frivolous positions specifically identified by the IRS has grown to over 50, some of which are sufficiently broad as to encompass unintentional tax reporting errors.[10]  Further, as the IRS enlarges its reliance on automated systems for application of the frivolous return penalty, the likelihood of incorrect penalty application correspondingly will expand.  Thus, an increasingly broad swath of taxpayers are exposed to application of the frivolous return penalty and are left with no meaningful administrative recourse.[11]  The approach of the IRS, to shoot first and then not even ask or answer questions later, all too often results in application of the frivolous return penalty in a way that jeopardizes a range of fundamental taxpayer rights including *the right to challenge the IRS's position and be heard*, *the right to a fair and just tax system*, and *the right to appeal an IRS decision in an independent forum*.

## EXAMPLE

Taxpayer earned $9,000 of adjusted gross income during the year and qualified for an Earned Income Tax Credit (EITC) of $3,600.  When Taxpayer completed the tax return, however, Taxpayer made a clerical error, overreporting amounts withheld and claiming a refund of $9,000, rather than the $5,000 refund that was properly payable.  The IRS issued a letter threatening Taxpayer with a frivolous return penalty if Taxpayer did not correct the return within 30 days.  This letter frightened Taxpayer who decided to seek the assistance of a tax preparer.  By the time a preparer could be located, however, and the return amended, the 30-day period had been exceeded by ten days, and the IRS moved forward with assessment of the $5,000 frivolous return penalty.  This occurred despite Taxpayer's good faith effort to correct the clerical error.

Taxpayer was somewhat heartened when the tax preparer explained the penalty could be reduced from $5,000 to $500.  This hope did not last long, however, as the IRS collected the full $5,000 penalty as an offset against the $5,000 refund to which Taxpayer was properly entitled.  As a result, the IRS was unwilling to consider the request for a penalty reduction.[12]  Taxpayer had been planning to use much of the claimed refund for essential living expenses, but after offset of the full frivolous return penalty, Taxpayer was left with nothing.

With the assistance of the tax preparer, Taxpayer filed an abatement request arguing that the error was made in good faith, which was summarily denied based on the cryptic explanation that the IRS would only look at the face of the return in determining application of the frivolous return penalty.  Not

---

8   Appeals previously undertook such reviews but has recently modified its policy in this regard.  *Compare* IRM 8.11.8.2(1) (Oct. 28, 2013) with obsolete IRM 8.11.1.7(3) (Feb. 26, 1999).

9   *See, e.g.*, IRM 8.22.5.5.3.1, *Processing Frivolous, Desire to Delay or Impede Requests* (Nov. 8, 2013).

10  These positions identified by the IRS as frivolous are set forth in Notice 2010-33, 2010-17 I.R.B. 609, as supplemented by IRM 4.10.12.1.1, *Frivolous Arguments* (Sept. 5, 2014).

11  Taxpayers theoretically can pay the penalty and file a refund claim in Federal District Court, but such a remedy generally would cost taxpayers more than the underlying penalty and would be particularly burdensome for low income and unsophisticated taxpayers.

12  *See* Rev. Proc. 2012-43, 2012-49 I.R.B. 643.

believing this answer could be correct, Taxpayer sought to have the matter reviewed by Appeals.  Taxpayer, however, was informed Appeals no longer heard any challenges to the frivolous return penalty.  Taxpayer was told about the possibility of filing a refund claim in federal court, but Taxpayer no longer had either the funds or energy to pursue the matter further.

## RECOMMENDATIONS

In order to protect good faith taxpayers and enable the frivolous return penalty to be imposed more fairly and effectively, the National Taxpayer Advocate recommends that Congress:

1. Amend IRC § 6702(b)(3) to expand the notice period allowing taxpayers to correct their returns and avoid application of the frivolous return penalty from 30 days to 60 days and establish the same mechanism for correcting returns under IRC § 6702(a).

2. Amend IRC § 6702(d) to clarify taxpayers will be eligible for reduction of the frivolous return penalty regardless of whether they have already satisfied the penalty.

3. Amend IRC § 6702 to establish the availability of a full penalty abatement for good faith and reasonable cause.

4. Amend IRC § 6702 to provide that taxpayers will be entitled to obtain either a post-assessment, prepayment or post-assessment, post-payment review of frivolous return penalties within Appeals.

## PRESENT LAW

IRC § 6702 generally imposes an immediately assessable $5,000 penalty on tax returns adopting a position that the IRS has identified as frivolous or reflecting a desire to delay or impede the administration of federal tax laws.[13]  Further requirements for application of the frivolous return penalty are that a taxpayer has filed what purports to be a tax return that does not contain information on which the substantial correctness of the self-assessment may be judged or that contains information that on its face indicates the self-assessment is substantially incorrect.[14]  The frivolous return penalty can also be imposed by the IRS in response to the filing of specified frivolous submissions, which include collection due process (CDP) appeals, requests for installment agreements, proposed offers in compromise, and taxpayer assistance orders.[15]

The IRS first identified frivolous positions subject to the IRC § 6702 penalty in Notice 2007-30.[16]  This list was augmented in 2008, and then again in 2010 when the group was expanded to cover over 50 positions and any others that were the same as or similar to those positions.[17]

This list of frivolous positions was provided at the express direction of Congress.[18]  Nevertheless, Congress also envisioned certain parameters limiting application of the frivolous return penalty.  Congress wanted a regime that discouraged "protest" returns, but not one that adopted punitive measures with respect to potentially good faith taxpayers.  As a result, Congress also required the IRS to provide taxpayers individual notice that a position they adopted constitutes a specified frivolous submission and furnish the

---

13   IRC § 6702(a)(2).
14   IRC § 6702(a)(1).
15   IRC § 6702(b).
16   Notice 2007-30, 2007-14 I.R.B. 883.
17   Notice 2008-14, 2008-4 I.R.B. 310; Notice 2010-33, 2010-17 I.R.B. 609.
18   IRC § 6702(c).

opportunity to avoid application of the penalty if the position is withdrawn within 30 days.[19]  The IRS now issues these 30-day letters in the case of potential IRC § 6702(a) penalties as well as those arising under IRC § 6702(b).[20]

As Congress originally explained,

> The committee believes that an immediately assessable penalty on the filing of protest returns will help deter the filing of such returns, and will demonstrate the determination of the congress to maintain the integrity of the income tax system …. The penalty will be imposed, therefore, only on purported returns that are patently improper and not in cases involving valid disputes with the Secretary.  This penalty will not be imposed, of course, in the case of innocent or inadvertent mathematical or clerical errors (as defined in § 6213(G)(2)(A) or (B)), including certain incorrect uses of tax tables, etc.[21]

Congress also provided the statutory authority for the IRS to reduce the IRC § 6702 penalty "… if the Secretary determines that such reduction would promote compliance with and administration of the Federal tax laws."[22]  When establishing the procedures for this reduction in Rev. Proc. 2012-43, however, the IRS imposed some significant limitations.  Among other things, the IRS determined that it would only reduce a frivolous return penalty from $5,000 to $500.[23]  Further, this reduction would only be available to the extent that the penalty had not already been satisfied by the taxpayer.[24]

A taxpayer has no appeal rights if the IRS rejects a reduction request.[25]  Further, Appeals does not currently consider any challenges with respect to application of the IRC § 6702 penalty.[26]

## REASONS FOR CHANGE

The National Taxpayer Advocate applauds both Congress and the IRS, respectively, for allowing taxpayers to avoid application of the frivolous return penalty if they withdraw and correct their frivolous position within 30 days of receiving notice from the IRS.[27]  This approach allows taxpayers to self-correct unintentional errors without experiencing the stigma and the burden of the frivolous return penalty.  It has the additional benefit of using IRC § 6702 as an opportunity to educate taxpayers and encourage their future compliance.[28]

TAS is aware of a number of circumstances, however, in which taxpayers, despite diligent and good faith efforts, have simply been unable to withdraw and correct their erroneous returns within the 30-day notice period.  This challenge is particularly acute for unsophisticated taxpayers who may require the assistance of a tax preparer to amend their tax return or even to understand the contents of the notice letter itself.[29]

---

19  IRC § 6702(b)(3).
20  IRM 4.10.12.1(10) (Sept. 5, 2014).
21  S. Rep. No. 97-494(I), at 277 (1982).
22  IRC § 6702(d).
23  Rev. Proc. 2012–43, § 4.01(2), 2012-49 I.R.B. 643.
24  Rev. Proc. 2012–43, § 3, 2012-49 IRB (Dec. 3, 2012).
25  See Rev. Proc. 2012-43, § 5.03, 2012-49 IRB (Dec. 3, 2012).
26  See IRM 8.11.8.2(1) (Oct. 28, 2013).
27  This 30-day window is statutory in the case of IRC § 6702(b) and a matter of IRS policy in the case of IRC § 6702(a).
     See IRC § 6702(b)(3); IRM 4.10.12.1(10) (Sept. 5, 2014).
28  IRM 20.1.1.2.1(8) (Nov. 25, 2011).
29  See, e.g., National Taxpayer Advocate 2014 Annual Report to Congress 163 and 172.

The notice's effectiveness should not be limited by application of a response window that is simply too short for many taxpayers, especially some unsophisticated taxpayers. As a result, the National Taxpayer Advocate recommends that Congress consider statutorily expanding the notice period allowing taxpayers to correct their returns and avoid application of the frivolous return penalty from 30 days to a reasonable but more manageable 60 days, which is in line with the amount of time available to taxpayers to correct summary assessments under IRC § 6213(b)(2), *Abatement of assessment of mathematical or clerical errors.*

Further, the previous addition by Congress of IRC § 6702(d) allowing for a reduction of the frivolous return penalty, is laudable. Nevertheless, the IRS is currently applying that reduction in a way that does not comport with Congress' intent and sometimes appears to be arbitrary and capricious.

TAS has received requests for assistance from taxpayers in a number of cases in which a group of taxpayers has been taken in by an unscrupulous tax preparer and all adopted the identical frivolous return position. Nevertheless, some of those taxpayers are eligible for the IRC § 6702(d) reduction while others are not. This distinction is often based solely on whether or not the taxpayers have already satisfied, either through direct payment or refund offset, the $5,000 penalty initially asserted by the IRS.[30]

Those taxpayers who have satisfied the $5,000 penalty are essentially double-penalized for their willingness to pay, or for their overpayment status, by losing eligibility for the reduction to $500. This practice by the IRS not only violates most taxpayers' notions of fairness, but is particularly hard on taxpayers who rely on certain refundable credits, such as the EITC. When these anticipated refunds fail to arrive, such taxpayers often find themselves in desperate circumstances without the money they had counted on for basic living expenses.

There is no persuasive reason to differentiate between taxpayers based on the payment status of the original penalty, and a very good reason to make application of the reduction more equitable. Voluntary compliance tends to correlate with taxpayers' perceptions that the IRS and the tax laws are fair and may decline if taxpayers feel that the IRS is overreaching or applying arbitrary rules.[31] Thus, Congress should consider taking steps to require that the IRS abandon the distinction that it currently draws between those who have and have not satisfied the penalty when considering eligibility for the IRC § 6702(d) penalty reduction.

Further, the IRS applies the IRC § 6702 penalty in a highly mechanical fashion, and this process is being increasingly automated. Thus, it is quite possible for taxpayers to be erroneously assessed the penalty in the first instance or for good faith taxpayers to file a return that is technically frivolous without ever intending to do so.

For example, Notice 2010-33 identifies as a frivolous position the assertion of the Fifth Amendment right against self-incrimination as the basis for withholding "all financial information from the Service."[32] When a taxpayer asserted this right with respect to the omission of certain information from the interest and dividend schedule on his tax return, the IRS assessed the IRC § 6702 penalty, and, after relief was denied in a CDP appeal, the matter came before the U.S. Tax Court in the form of cross-motions for summary judgment.[33] Judge Holmes granted the taxpayer's motion for summary judgment on the grounds that because the withheld information related to the duty to file a *Report of Foreign Bank and Financial*

---

30   Note: these refund offsets generally are automatic and involuntary.
31   National Taxpayer Advocate 2012 Annual Report to Congress vol. 2, 134.
32   Notice 2010-33, § III.(9)(f), 2010-17 I.R.B. 609.
33   *Youssefzadeh v. Comm'r*, No. 14868-14 L. (Nov. 6, 2015).

*Accounts* (FBAR), and because the willful failure to file an FBAR is a crime, the Fifth Amendment had been properly invoked, and the assessed IRC § 6702 penalty was therefore invalid.  The frivolous return penalty should not be used by the IRS as a means of doing an end run around Constitutional protections or other legitimately exercised rights.

Some taxpayers have been successful in persuading the IRS to abate the IRC § 6702 penalty where it was incorrectly applied or where it resulted from a position that the taxpayers did not know to be improper.[34] Nevertheless, TAS is also aware of other occasions in which similarly situated taxpayers have been treated differently and subjected to the penalty.  The IRS is not always consistent in its standards for acknowledging and utilizing its discretion to abate the frivolous return penalty under IRC §§ 7803 and 6404.[35]

The IRS frequently assumes that anyone caught up in the ever-expanding definition of a frivolous return must, by default, be a bad actor.  However, this category now includes many taxpayers who had no desire to delay or impede the administration of federal tax laws.  As the IRS itself recognizes in *The Penalty Handbook*, "Voluntary compliance is achieved when a taxpayer makes a good faith effort to meet the tax obligations defined by the Internal Revenue Code."[36]  Penalties should be objectively proportioned to the offense, and be used as an opportunity to educate taxpayers and encourage their future compliance.[37] Penalties should relate to the standards of behavior they encourage.[38]  IRS employees are responsible for administering the penalty statutes and regulations in an even-handed manner that is fair and impartial to both the government and the taxpayer.[39]

Such balance, however, is absent where provision of frivolous return abatements is concerned.  Additional clarity and uniformity in this area would benefit both taxpayers and the government.  Several IRC provisions expressly allow a penalty abatement for reasonable cause and good faith.[40]  Congress should consider amending IRC § 6702 to clarify the specific availability of such an abatement in appropriate cases where application of the frivolous return penalty is concerned.  Congress has already demonstrated its support for this approach in the legislative history quoted above.  This step would help eliminate confusion within the IRS and on the part of taxpayers regarding abatement discretion and would perpetuate fairness and consistency in application of the frivolous return penalty.

The problems inherent in overly broad application of the penalty are exacerbated by Appeals' current unwillingness to review IRC § 6702 determinations.[41]  Appeals has the authority to review such cases, but has made the "business decision" to terminate the provision of such oversight.[42]  This policy effectively eliminates any higher level administrative review of the actions taken by the IRS's Frivolous Return

---

34  *See* IRM 25.25.10.8.4, *Post Penalty Assessment Processing* (Aug. 13, 2015).

35  IRC § 7803 abatements are premised on the IRS Commissioner's general authority to administer the IRC.  *See also* IRC § 6404; IRM 25.6.1.10.1.1(2) (Nov. 18, 2011).  This general abatement authority can result in a refund to the extent that the refund statute of limitations under IRC § 6511 remains open with respect to any previously paid assessments that are the subject of the abatement.  IRM 25.6.1.10.1.1(6) (Nov. 18, 2011).

36  IRM 20.1.1.2.1(6) (Nov. 25, 2011).

37  IRM 20.1.1.2.1(8) (Nov. 25, 2011).

38  IRM 20.1.1.2.1(10) (Nov. 25, 2011).

39  IRM 20.1.1.2.2(c) (Nov. 25, 2011).

40  *See, e.g.*, IRC §§ 6662(c), 6651(a), and 6038D.

41  The importance of appeal rights and other issues currently relating to Appeals are further developed in the National Taxpayer Advocate 2015 Annual Report to Congress, Most Serious Problem: *Appeals: The Appeals Judicial Approach and Culture Project is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*, *supra*.

42  IRS Office of Chief Counsel Memorandum, *Appeals Rights with Respect to a Request to Abate a Section 6702 Penalty*, PMTA 2013-28 (Dec. 20, 2013).

001795

Program (FRP).[43]  It is also inconsistent with the IRS's adoption of the Taxpayer Bill of Rights, particu-
larly *the right to appeal an IRS decision in an independent forum* and *the right to challenge the IRS's position
and be heard.*

Taxpayers are granted the option of paying the assessed penalty and seeking a refund in Federal District
Court.  Realistically, however, very few taxpayers, particularly lower income taxpayers, will possess the
financial resources or the remaining energy to continue fighting a $500 penalty, or even a $5,000 penalty,
in federal court.  Further, in most cases, the legal expenses and other related costs required to contest
the penalty would exceed the amount of the penalty itself.  The deprivation of appeal rights in the case
of IRC § 6702 frivolous return penalties is a punitive and unnecessary denial of fundamental taxpayer
rights that Congress should consider taking steps to rectify by allowing for an independent Appeals review
regardless of whether the immediately assessable penalty has yet been paid by taxpayers.

Appeals may well be concerned with having to rehear arguments that gave rise to application of the
frivolous return penalty in the first instance.  Nevertheless, Appeals already has procedures directing
Appeals personnel to ignore frivolous arguments raised as part of various proceedings, such as CDP ap-
peals.[44]  Such an approach applied to all appeals of frivolous return penalties presumably would discourage
repetition of these arguments and should address case proliferation concerns.  Moreover, such potential
administrative burdens should not serve as the basis for denying taxpayers basic access to Appeals.

TAS has held ongoing discussions with the IRS operating divisions regarding many of these issues for
years.  Nevertheless, no significant administrative progress has been made toward implementing these
recommendations for protecting taxpayer rights and thereby increasing the effective and equitable applica-
tion of IRC § 6702.

## EXPLANATION OF RECOMMENDATION

Over time, the reach of the IRC § 6702 frivolous return penalty has extended beyond the bad actors for
whom it was originally designed.  Additionally, the IRS's approach to applying the penalty and the related
reduction has confused and harmed many good faith taxpayers.  The recommendations, which seek to
balance the concern for administrative efficiency with the need for taxpayer protections, would allow
taxpayers a broader window for correcting returns and submissions identified as frivolous, would achieve
greater uniformity in application of the IRC § 6702(d) reduction, would allow for a reasonable cause
abatement of the full amount of the penalty in the case of good faith taxpayers, and would ensure that
taxpayers are entitled to obtain review of frivolous return penalty abatement requests by Appeals.

---

43   The FRP currently resides within the Wage & Investment Division of the IRS.
44   IRM 8.22.5.5.3.1, *Processing Frivolous, Desire to Delay or Impede Requests* (Nov. 8, 2013).

**LR #9**

# AFFORDABLE CARE ACT INFORMATION REPORTING: Allow Taxpayer Identification Number Matching for Filers of Information Returns Under IRC §§ 6055 and 6056

## TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Pay No More Than the Correct Amount of Tax*

## PROBLEM

The IRS relies on new information returns to verify data relevant to a number of provisions in the Patient Protection and Affordable Care Act of 2010 (ACA). Although the tax code requires health insurance providers and applicable large employers (ALEs)[2] to file information returns with the IRS reflecting specific information regarding health insurance coverage,[3] the law does not permit these companies to verify taxpayer identification numbers (TINs) with the IRS prior to filing.[4] Unlike other information return filers who can perfect TINs prior to issuing any information reporting forms if the IRS advises them of any errors, health insurance providers and ALEs must rely on input from their customers and employees while still facing penalties for errors. The IRS expects to receive over 120 million information returns from health insurance providers and ALEs during the 2016 filing season.[5] If these entities were able to verify name/TIN accuracy prior to filing these information reports, they would avoid unnecessary penalties and the IRS would minimize the resources spent on avoidable penalty abatement requests.

## EXAMPLE

ABC Health is a health insurance provider that insures 800,000 individuals in the state of Maryland. As part of the insurance enrollment process, ABC Health obtains TINs from insured individuals that it uses to prepare approximately 600,000 Forms 1095-B (and the associated transmittal Form 1094-C).[6] ABC Health timely files the forms with the IRS and provides copies to the insured. Upon filing, the IRS finds that 10,000 of the TINs do not match the insureds' names, whether due to transposition errors, name changes, or otherwise. As a result, ABC Health faces $2.5 million in penalties. If ABC Health also includes the incorrect TINs on statements it furnishes to the insured, it could potentially be liable for

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Internal Revenue Code (IRC) § 4980H(a)(1) provides that an ALE must offer minimum essential coverage (MEC) to its full-time employees. In general, an employer is considered an ALE if it employs 50 or more full-time workers (or full-time equivalents (FTEs)), or a combination of full-time and part-time employees that equals at least 50 FTEs. IRC § 4980H(c)(2).

3   IRC §§ 6055 and 6056.

4   In the case of an individual taxpayer, a TIN generally is the Social Security number (SSN). *See* IRC § 6109(d). The IRS may also issue an adoption taxpayer identification number (ATIN). For an alien individual not eligible for an SSN who has a federal tax reporting requirement, the IRS assigns an individual taxpayer identification number (ITIN). *See* Treas. Reg. § 1.6109-1(a) and (d).

5   IRS response to TAS information request (Oct. 22, 2015).

6   A health insurer needs to provide a Form 1095-B to each responsible person (the individual who is the primary insured) that will include the information for all other individuals covered under that responsible person. IRC § 6055. The total number of Forms 1095-B will be less than the total number of covered individuals when taking into account self plus one and family plans.

001797

an additional $2.5 million in penalties.  If the errors were due to intentional disregard of the filing and furnishing requirements, the potential penalties would be much greater.

## RECOMMENDATION

Amend IRC §§ 6055 and 6056 to allow entities required to file information returns under these sections to verify TINs with the IRS prior to filing annual information returns.

## PRESENT LAW

IRC § 6055 requires annual information reporting by health insurance issuers, self-insuring employers, government agencies, and other providers of health coverage.  IRC § 6056 requires annual informa-tion reporting by ALEs relating to the health insurance that the employer offers (or does not offer) to its full-time employees.  Below is a list of information returns the IRS created to meet these reporting requirements:

- Form 1095-B, *Health Coverage* (used by health insurance issuers and carriers to report information about individuals who are covered by MEC);[7]

- Form 1094-B, *Transmittal of Health Coverage* (used by health insurance issuers and carriers to submit Form 1095-B);

- Form 1095-C, *Employer-Provided Health Insurance Offer and Coverage Insurance* (used by ALEs to report information about offers of health coverage and actual coverage of full-time employees);[8] and

- Form 1094-C, *Transmittal of Employer-Provided Health Insurance Offer and Coverage Information Returns* (used by ALEs to submit Form 1095-C).

Form 1095-B was developed to verify compliance with the requirement to have MEC under IRC § 5000A.  The form reports the names and TINs of all individuals covered under a health insurance plan and the months of coverage.[9]  If the IRS cannot verify that a taxpayer had MEC, the taxpayer will be assessed an Individual Shared Responsibility Payment (ISRP).[10]

---

7   The forms are due by February 28 (or March 31 if filing electronically).  IRS, *Instructions for Forms 1094-B and 1095-B* (2015), *available at* www.irs.gov/pub/irs-pdf/i109495b.pdf.

8   The forms *are due by February 28 (or March 31 if filing electronically).  IRS, Instructions for Forms 1094-C and 1095-C (2015), available at* www.irs.gov/pub/irs-pdf/i109495c.pdf.

9   If an insurer is unable to obtain a TIN for an individual after making a reasonable effort, the regulations allow it to provide the individual's date of birth instead of the TIN.

10  IRC § 5000A.  Taxpayers filing tax year 2014 federal income tax returns were required to report they have MEC or were exempt from the responsibility to have the required coverage.  If the taxpayer did not have coverage and was not exempt, he or she was required to make an ISRP when filing a return.  For a detailed discussion of the ISRP, see *Affordable Care Act - Individuals: The IRS Is Compromising Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions, supra.*

001798

Form 1095-C was developed to determine whether an ALE will be subject to an Employer Shared Responsibility Payment (ESRP) for failure to offer affordable MEC to its full-time employees.[11]  The form reports the names and TINs of all full-time employees, as well as information about their coverage under the employer-provided plan, their offer of coverage, and share of the insurance premium.  This information will also be used to verify a taxpayer's eligibility for the Premium Tax Credit (PTC) if he or she claimed one on his or her tax return.[12]

### FIGURE 2.9.1, Projected Volume of Information Returns for ACA Exchange Provisions, Tax Years 2015–2017[13]

|              | Tax Year 2015 | Tax Year 2016 | Tax Year 2017 |
|--------------|---------------|---------------|---------------|
| Forms 1095-B | 46 million    | 45 million    | 47 million    |
| Forms 1095-C | 77 million    | 77 million    | 78 million    |
| **Total**    | **123 million** | **122 million** | **125 million** |

As noted above, the IRS expects to receive over 120 million information returns from health insurance providers and ALEs during the 2016 filing season.  These information returns facilitate the administration of the ESRP, establish health insurance coverage — or lack thereof — for the ISRP, and impact eligibility for the PTC and Small Business Health Care Tax Credit (SBHCTC).[14]

The penalty for failure to file a correct information return is generally $250, and the penalty for failure to furnish a correct payee statement is also generally $250.[15]  Each penalty is capped at $3 million for each calendar year.  If the failure is due to intentional disregard of the filing or furnishing requirements, the penalty for each return or statement would be at least $500, with no maximum.  IRC § 6724 provides that the IRS will not impose the penalty if the filer shows the failure was due to reasonable cause and

---

11   IRC § 4980H provides that an ALE will be subject to an ESRP if (1) it fails to offer its full-time employees the opportunity to enroll in MEC under an eligible employer-sponsored plan, and (2) a PTC was paid to at least one full-time employee.  The amount of the ESRP under IRC § 4980H(a) is $2,000 per full-time employee per year (determined on a monthly basis).  IRC § 4980H(c)(1).  The ESRP provisions provide an inflation adjustment mechanism beginning in years after 2014.  IRC § 4980H(c)(5).  IRC § 4980H(b) requires ALEs to offer affordable MEC that provide minimum value.  If an ALE offers MEC but it is not considered affordable, the ALE will be assessed an ESRP of $3,000 for each employee (pro-rated on a monthly basis) who purchases health insurance from the exchange and is granted a tax credit and/or subsidy for health insurance.  IRS § 4980H(b)(1).  While an employer may be subject to ESRP under both IRC § 4980H(a) and (b), the liability is limited to the amount under IRC § 4980H(a).  Treas. Reg. § 54-4890H, 79 Fed. Reg. 8543 (Feb. 12, 2014), *available at* www.federalregister.gov/articles/2014/02/12/2014-03082/shared-responsibility-for-employers-regarding-health-coverage.

12   PTC is a refundable tax credit paid either in advance or at return filing to help taxpayers with low to moderate income purchase health insurance through the exchange.  IRC § 36B.  The amount of the credit paid in advance is based on projected household income (HHI) and family size for the year of coverage, while the amount a taxpayer is actually eligible for is based on actual HHI and family size for the year reflected on the tax return.  Many taxpayers were required to reconcile the credit amount they received in advance with the PTC to which they were actually entitled.  For a detailed discussion of the PTC, see Most Serious Problem: *Affordable Care Act - Individuals: The IRS Is Compromising Taxpayer Rights As It Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions, supra.*

13   IRS response to TAS information request (Oct. 22, 2015).

14   Under IRC § 45R, eligible small employers can claim the SBHCTC for 2010 through 2013 and for two additional years beginning in 2014.  A small employer is eligible for the credit if (a) it has fewer than 25 FTE employees, (b) the average annual wages of its employees are less than $50,000 (adjusted for inflation beginning in 2014), and (c) it pays a uniform percentage for all employees that is equal to at least 50 percent of the premium cost of employee-only insurance coverage.  For a detailed discussion of the SBHCTC, see *Affordable Care Act (ACA) - Business: The IRS Faces Challenges in Implementing the Employer Provisions of the Affordable Care Act While Protecting Taxpayer Rights and Minimizing Burden, supra.*

15   *See* IRC §§ 6721 and 6722.  The penalty amounts are an increase over the previous penalty amount of $100 and apply to information returns filed after December 31, 2015.  The penalty amounts are also indexed for inflation.

001799

not willful neglect.[16]  If a health insurance company or ALE reports an incorrect TIN on Form 1095-B or 1095-C due to inaccurate input from their customer or employee, the provider may obtain a penalty waiver upon proving reasonable cause.  The health insurance company or ALE must establish that the failure to include a correct TIN was due to events beyond its control and that it acted in a responsible manner by soliciting a TIN from the customer or employee in accordance with specific solicitation rules set forth in regulations.[17]

The IRS will not impose penalties under IRC §§ 6721 and 6722 for 2015 information returns on reporting entities that can show that they have made good faith efforts to comply with the information reporting requirements.  Specifically, relief is provided from penalties for incorrect or incomplete information reported on the return or statement.  No relief is provided for reporting entities that cannot show a good faith effort to comply with the information reporting requirements or that fail to timely file an information return or furnish a statement.[18]

Under IRC § 3406(i), the Commissioner has the authority to establish TIN matching programs for information returns that report payments subject to backup withholding, such as dividends or other income.  Under such a TIN matching program, a payor with reportable payments as defined in IRC § 3406(b)(1) may contact the IRS prior to filing information returns.[19]  The IRS will inform the payor (or an agent of the payor) whether or not a name/TIN combination furnished by the payee matches a name/TIN combination maintained in the database utilized for the particular matching program, which will help participating payors avoid TIN errors and reduce the number of backup withholding notices required under IRC § 3406(a)(1)(B).

The IRS online interactive or bulk TIN matching program is accessible 24 hours a day, seven days a week.[20]  The IRS response is generally limited to notification of a match or mismatch.[21]  If the IRS response indicates a TIN mismatch, the payor has the opportunity to resolve the inaccuracy with the payee, prior to filing an information return.  Otherwise, the IRS generally may not disclose a taxpayer's name, TIN, or other return information, pursuant to IRC § 6103.[22]

---

16  *See* IRC § 6724(a).

17  *See* Treas. Reg. § 301.6724-1(c)(6) and (d)(2).

18  IRS, *Questions and Answers on Information Reporting by Health Coverage Providers (Section 6055)*, Question 3, *available at* https://www.irs.gov/Affordable-Care-Act/Questions-and-Answers-on-Information-Reporting-by-Health-Coverage-Providers-Section-6055 (last visited Nov. 23, 2015).  However, consistent with the existing information reporting rules, reporting entities that fail to timely meet the requirements still may be eligible for penalty relief if the IRS determines that the standards for reasonable cause under IRC § 6724 are satisfied.

19  *See* Treas. Reg. § 31.3406(j)-1; Rev. Proc. 2003-9, 2003-8 I.R.B. 516.

20  *See* IRS Pub. 2108A, *On-line Taxpayer Identification Number (TIN) Matching Program.*

21  The TIN Matching Program provides a numerical response indicator for each match request.  The potential responses include: '0' - Name/TIN combination matches IRS records; '1' - Missing TIN or TIN not nine-digit numeric; '2' - TIN not currently issued; '3' - Name/TIN combination does NOT match IRS records; '4' - Invalid request (*i.e.*, contains alphas, special characters); '5' - Duplicate request; '6' - (Matched on SSN), when the TIN type is (3), unknown, and a matching TIN and name control is found only on the NAP DM1 database; '7' - (Matched on EIN), when the TIN type is (3), unknown, and a matching TIN and name control is found only on the EIN N/C database; '8' - (Matched on SSN and EIN), when the TIN type is (3), unknown, and a matching TIN and name control is found on both the NAP DM1 and the EIN N/C databases.  IRS Pub. 2108A, *On-line Taxpayer Identification Number (TIN) Matching Program* § 14, FAQ 9 at 9.

22  *See* IRC § 6103.  *See also* National Taxpayer Advocate 2003 Annual Report to Congress 232 (Legislative Recommendation: *Confidentiality and Disclosure of Returns and Return Information*).  Third-party payors and their authorized agents who participate in the TIN Matching Program must sign an online Terms of Agreement (TOA) clause stating they will attempt to match name/TIN combinations only for the types of reportable payments listed in Rev. Proc. 2003-9.  IRS Pub. 2108A, *On-line Taxpayer Identification Number (TIN) Matching Program* § 4.3 at 4.

001800

## REASONS FOR CHANGE

Currently, IRC § 3406 authorizes the IRS TIN matching program only for payors of reportable payments subject to backup withholding.  Currently, that is the only statutory authorization for TIN matching; the IRS is precluded under IRC § 6103 from disclosing information to filers of returns not subject to backup withholding.  The filers of other information returns that are not subject to backup withholding have no ability to verify the accuracy of the information provided to the IRS, yet are subject to the same penalties for failure to file an accurate information return as those who have access to TIN matching.  Because these filers do not have access to TIN matching, they may file information returns with incorrect name/TIN combinations and receive penalty notices, and will have to prove reasonable cause to abate penalties imposed, thereby increasing taxpayer burden and IRS rework.

In 2013, the National Taxpayer Advocate included a legislative recommendation to expand TIN matching to colleges and universities to reduce burden on all parties involved.[23]  Similarly, a legislative change that would allow filers required to file information returns under IRC §§ 6055 and 6056 to use TIN matching to verify TINs with the IRS prior to filing annual information returns would benefit the IRS, employers, health insurance providers, and taxpayers by facilitating accurate information returns.

While information matching is a critical part of the IRS's compliance strategy, it is only as effective as the accuracy of the data provided.[24]  Health insurance companies and ALEs have an information reporting requirement for which they need to verify TINs.[25]  TINs may not match an individual's name for various reasons, such as transposition errors or name changes.  The IRS's inability to accurately match a taxpayer against a Form 1095-B or 1095-C will place him or her at risk for receiving notices from the IRS that he or she is liable for an ISRP.  Still, other taxpayers may have their PTC claims questioned.  Furthermore, ALEs may unnecessarily be required to substantiate coverage to employees if the data is unreliable or in error.  If the IRS receives inaccurate data regarding coverage, it may erroneously assess ESRP on ALEs, which can be costly and time-consuming for both employers and the IRS to rectify.  This increased burden can be avoided if Congress expands TIN matching beyond the currently authorized program to allow these filers to verify name/TIN combinations and learn of inaccuracies prior to filing information returns.  This recommendation benefits the IRS, information return filers, and taxpayers by facilitating accurate information returns.

## EXPLANATION OF RECOMMENDATION

ACA was enacted by Congress in 2010 to provide affordable health care coverage for all Americans.  To accomplish this goal, the ACA provides targeted tax credits for low income individuals and small businesses while imposing a personal responsibility on individuals to have health coverage.[26]  Information returns allow the IRS to cross-check taxpayer claims against third-party reports.  In the case of ACA, health coverage and offers of coverage are contained on Forms 1095-B and 1095-C, required by IRC §§ 6055

---

23   See National Taxpayer Advocate 2013 Annual Report to Congress 319-21 (Legislative Recommendation: *Tuition Reporting: Allow TIN Matching By Colleges*).

24   See National Taxpayer Advocate 2013 Annual Report to Congress vol. 2, 83 (calling for improved accuracy of third-party reporting data); National Taxpayer Advocate 2011 Annual Report to Congress 82 (questioning the accuracy of third-party data as a source for math error adjustments).

25   Many of these filers may already have access to TIN matching for other information returns they are required to file.

26   IRC § 4980H(a)(1) imposes a responsibility for ALEs to offer health care to employees in certain circumstances.  ACA, Pub. L. No. 111-148, 124 Stat. 119 (Mar. 23, 2010), as amended by the Health Care & Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (Mar. 30, 2010); S. Fin. Comm., 111th Cong., Description of Policy Options: Expanding Health Care Coverage: Proposals to Provide Affordable Coverage to All Americans (May 14, 2009), *available at* http://finance.senate.gov/download/?id=1DD95955-E95D-4AC7-919D-DAA62490D249.

001801

and 6056, which include information that helps facilitate accurate administration of the law. The ACA contains a number of new provisions, and 2016 marks the first year applicable entities will have to file these information returns. If the information provided is inaccurate, taxpayers and employers could be assessed penalties, the IRS will have to work through avoidable penalty abatement requests, audits, and amended returns — all of which impacts taxpayers' *right to pay no more than the correct amount of tax*.

The TIN matching process reduces errors in information reported, resulting in fewer inaccurate IRS notices and penalties, saving both taxpayer and IRS resources. As a result, both the Information Reporting Program Advisory Committee (IRPAC)[27] and practitioners have called for an expansion of the TIN matching program to filers of Forms 1095-B and 1095-C.[28] The IRS has already announced penalty relief for 2015 forms filed in 2016, recognizing that entities will face difficulty with compliance amid potential issues. By extending TIN matching to Forms 1095-B and 1095-C, the recommendation reduces unnecessary burden and work for health insurance companies, ALEs, the IRS, and taxpayers.

---

27 IRPAC is a federal advisory committee whose primary purpose is to provide a public forum for the IRS and members of the information reporting community in the private sector to discuss relevant information reporting issues.

28 IRPAC, *2014 Information Reporting Program Advisory Committee (IRPAC) Public Report*, 19-22, *available at* https://www.irs.gov/pub/irs-utl/2014%20Public%20Report%20Final.pdf; Treas. Reg. §§ 1.6055-1 and 1.6055-2 (summary of comments), *available at* http://www.gpo.gov/fdsys/pkg/FR-2014-03-10/pdf/2014-05051.pdf; Michael M. Lloyd & S. Michael Chittenden, *Expand TIN Matching Program to Avert Another ACA Debacle*, Tax Notes 424-28 (Jan. 27, 2014).

**LR #10**

## EXEMPT ORGANIZATIONS (EOs): Require More Frequent Updates to Publicly Available Databases of EOs

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Quality Service*

### PROBLEM

The IRS's Tax Exempt and Government Entities (TE/GE) division maintains a list of tax exempt organizations (EOs) on two publicly accessible online databases, the Exempt Organizations Business Master File (EO BMF)[2] and Exempt Organizations Select Check (EO Select Check).[3] When an EO fails to file an information return or notice for three consecutive years, its exempt status is automatically revoked.[4] Shortly after this automatic revocation, which can sometimes be erroneous, the IRS removes the EO from its online-published lists of EOs and lists it as one whose exempt status was automatically revoked.

Unless the automatic revocation was due to IRS error, an automatically revoked organization must submit a new application to have its exempt status reinstated.[5] Even if the IRS promptly reinstates the organization or discovers its error, IRS databases will not immediately reflect the organization's restored exempt status, as the IRS updates its databases only monthly, on the second Monday of every month. However, these databases are not updated at all during the month of January, meaning there is a two-month updating gap from the second Monday in December until the second Monday in February.[6] Reinstated EOs may lose out on donations or grants they would have received had IRS databases accurately reflected their status, which may be an existential issue for some organizations. The number of automatic revocation reinstatement cases during this gap period alone exceeded 2,500 in both fiscal years (FYs) 2014 and 2015, and more than 70 percent of these cases were 501(c)(3) organizations.[7] These delays undermine taxpayers' *right to be informed* and *right to quality service.*[8]

---

1    *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2    The EO BMF (http://www.irs.gov/Charities-&-Non-Profits/Exempt-Organizations-Business-Master-File-Extract-EO-BMF) contains information about EOs such as the organization's employer identification number (EIN), name and address, the Internal Revenue Code (IRC) § 501(c) subsection under which it is exempt, whether contributions to it are tax deductible, whether it is a private foundation or a public charity (and the type of public charity), the month and year it received its exemption ruling, and information from its Form 990 series return. *See* Exempt Organizations Business Master File Extract (EO BMF), *available at* http://www.irs.gov/pub/irs-soi/eo_info.pdf.

3    EO Select Check is an online search tool, *available at* http://apps.irs.gov/app/eos/, that allows users to search for organizations eligible to receive tax deductible contributions (Publication 78 data), organizations whose tax exemption has been automatically revoked for not filing a Form 990-series return or notice for three consecutive years (Auto-Revocation List), and organizations that have filed a Form 990-N (also called an e-Postcard), an annual notice required to be filed by small EOs. Unless otherwise indicated, we use "EO Select Check" to refer to the capability to determine whether an organization is eligible to receive tax deductible contributions (Publication 78 data). *See* Internal Revenue Manual (IRM) 25.7.6.1 (Jan. 1, 2015).

4    *See* IRC § 6033(j)(1) (requiring the IRS to publish and maintain a list of automatically revoked organizations).

5    *See* IRC § 6033(j)(2).

6    *See* IRM 25.7.5.1(1) (Jan. 1, 2015) (noting that the EO Standard Extract Program is a computer program that is run on a monthly basis (except for January) to allow for extraction of both entity and limited return information from EO accounts contained on the BMF).

7    TE/GE response to TAS research request (July 31, 2015).

8    For a detailed discussion of the EO database updating delay issue, see Most Serious Problem: *Exempt Organizations (EOs): The IRS's Delay in Updating Publicly Available Lists of EOs Harms Reinstated Organizations and Misleads Taxpayers, supra.*

001803

## EXAMPLE

A small, volunteer-run Internal Revenue Code (IRC) § 501(c)(3) EO is automatically revoked because it did not file a required information return or notice for three consecutive years.[9]  As a result, the IRS places the organization on the automatic revocation list and removes it from the EO BMF and EO Select Check online databases.

Once the organization discovers that its exemption was automatically revoked, it quickly applies for reinstatement of exempt status.  The IRS promptly approves the application and sends the organization a new determination letter acknowledging the approval.  However, this approval occurs in mid-December, after the IRS has already updated its online databases and the next update will not occur until February. The organization is contacted by a potential donor who would like to make a sizeable donation before the end of the year but wishes to confirm the organization's exempt status beforehand to ensure the donation will be tax-deductible.  The potential donor is concerned because although the organization has a new determination letter, its name does not appear on the IRS's online databases.  As a result, the organization may lose a critical donation because the IRS's online databases do not accurately reflect its exempt status.

## RECOMMENDATIONS

To address IRS delays in updating its publicly available databases of EOs and their adverse impact on automatically revoked organizations that have been reinstated, the National Taxpayer Advocate recommends that Congress amend IRC § 6033 to require the IRS to:

1. Update EO BMF and Select Check on a weekly basis as is the case for Form 990-N updates; and

2. Implement an emergency process that, even when there is weekly updating, allows for manual database updates within 24 hours of the restoration of exempt status.

## PRESENT LAW

Almost ten years ago, Congress passed the Pension Protection Act of 2006, which among other things, amended IRC § 6033 to provide for the automatic revocation of EOs that did not file a required information return or notice for three consecutive years.[10]  Once an organization is automatically revoked, the IRS is required by statute to place it on a list of automatically revoked organizations.[11]  Automatically revoked organizations seeking reinstatement of exempt status are also statutorily required to submit a new application to the IRS (except for when the revocation was erroneous).[12]

In addition to being placed on the automatic revocation list, organizations that have been automatically revoked are removed from the two online databases of EOs, EO BMF and EO Select Check.  These databases are of critical importance for two reasons.  First, they allow potential individual donors to verify,

---

9   See IRC § 6033(j)(1).

10  Pub. L. No. 109-280 § 1223, 120 Stat. 780, 1090 (2006).  The law went into effect for tax periods beginning after 2006.  See IRC § 6033(j)(1) (providing that the effective date of the automatic revocation is the due date of the third annual return or notice).

11  See IRC § 6033(j)(1).  The only way an automatically revoked organization can be removed from this list is if the revocation was due to IRS error.  This list of automatically revoked organizations is available online at https://apps.irs.gov/app/eos/main-Search.do;jsessionid=dK2bhgtr3luhznjUpp62cg__?mainSearchChoice=revoked&dispatchMethod=selectSearch.

12  See IRC § 6033(j)(2).  An automatically revoked organization may obtain retroactive reinstatement of its exempt status.  See Rev. Proc. 2014-11, 2014-3 I.R.B. 411.

before making a donation, that their contributions will be tax deductible.[13]  Second, they allow private foundations to verify that they are making a grant to a qualifying public charity.[14]  IRS guidance provides that grantors and contributors may rely on an organization's listing on EO Select Check or EO BMF.[15]  In addition, grantors and contributors may, in some situations, rely on EO BMF information provided by a third party.[16]

There is no current legal requirement for the IRS to update its online EO databases at any particular interval.

## REASONS FOR CHANGE

The IRS recognizes that potential donors and grantors may rely exclusively on its online databases.[17]  However, it does not update them in a timely manner, causing reinstated automatically revoked organizations, such as the one in the example above, to potentially lose donations or grants.[18]  Currently, EO Select Check and EO BMF are only updated monthly, on the second Monday of every month.[19]  An organization that misses the updating cutoff will not appear on the IRS lists until the next month.  In addition, these databases are not updated at all during the month of January, meaning there is a two-month updating gap from the second Monday in December until the second Monday in February.[20]  As a result, new and reinstated EOs that receive IRS approval of exemption after the early December cutoff will not appear on publicly available IRS databases until mid-February, which is well after the critical year-end fundraising push.

The number of automatic revocation reinstatement cases during this gap period alone exceeded 2,500 in both FYs 2014 and 2015, and more than 70 percent of these cases were 501(c)(3) organizations.[21]  However, the IRS disavows responsibility if an EO loses a donation or grant because its databases do

---

13  A charitable contribution deduction is allowed for donations to organizations described in IRC § 170(c).  These are most commonly IRC § 501(c)(3) organizations.

14  Private foundations prefer making grants to qualifying IRC § 501(c)(3) public charities over other organizations as doing so relieves them of certain oversight requirements (called expenditure responsibility) that would otherwise arise, and eliminates the risk of incurring liability for an excise tax under IRC § 4945.

15  *See* Rev. Proc. 2011-33, 2011-25 I.R.B. 887.

16  *Id.*

17  *See* IRM 25.7.6.1(3) (Jan. 1, 2015); IRM 21.3.8.12.12(3) (June 18, 2012); IRM 21.3.8.12.13(3) (Nov. 16, 2012).

18  This delay may also affect newly-recognized tax exempt organizations that receive a determination letter but are not promptly listed on the online databases.  However, the harm to reinstated automatically revoked organizations is arguably greater as these organizations were formerly tax exempt and had the ability to receive tax-deductible contributions.

19  IRM 21.3.8.3.8(1)(f) (Oct. 1, 2015) (noting "online Publication 78 data is generally updated the second Monday of each month"); IRM 21.3.8.12.13(2) (Nov. 16, 2012) (noting that EO BMF is updated or extracted monthly).  The term "extracted" is used because the EO BMF is an extract of information regarding EO accounts from the larger BMF.  *See* IRM 25.7.5.1(1) (Jan. 1, 2015).  In response to a TAS information request, the IRS stated that the internal IRS EO BMF list is generally updated within two weeks of a favorable case closing.  The IRS also stated that the program that produces the online EO BMF and EO Select Check extracts is run approximately the last full week of each month and posted online to irs.gov the second Monday of the following month.  Any accounts that are updated and posted prior to the running of the extract program will appear online.  This means that an EO account update could take between 30 to 60 days to be reflected on the online EO BMF and EO Select Check databases.  TE/GE response to TAS research request (July 31, 2015).  Thus, there is a disconnect between IRS internal database updating (approximately two weeks) and external (*i.e.*, online) database updating (30-60 days).

20  *See* IRM 25.7.5.1(1) (Jan. 1, 2015) (noting that the EO Standard Extract Program is a computer program that is run on a monthly basis (except for January) to allow for extraction of both entity and limited return information from EO accounts contained on the BMF).

21  TE/GE response to TAS research request (July 31, 2015).

001805

not accurately reflect that the organization is exempt.[22]  It advises reinstated organizations to either show potential contributors a current IRS determination letter or ask them to contact the IRS's TE/GE toll-free line (and face lengthy hold times, courtesy disconnects, and poor levels of service) to verify the organization's exempt status.[23]  These suggestions place a burden on the reinstated organization or the potential donor or grantor.  Many donors or grantors may simply "move on" and make a donation or grant to an organization that appears on EO Select Check and EO BMF.  Other donors or grantors have operational guidelines that require the EO to be listed on the IRS databases before consideration for donations or grants.[24]

If the IRS were to update its online databases on a weekly basis, as it does for its list of Form 990-N (e-Postcard) filers,[25] it would alleviate the hardship on reinstated automatically revoked organizations and their donors or grantors.  A legislative change requiring weekly database updating would also support fundamental taxpayer rights.  Specifically, it would support donors and grantors' *right to be informed* of organizations that are tax exempt and eligible to receive tax deductible contributions.  It would also support EOs' *right to quality service*, which includes a taxpayers' right to receive prompt assistance in their dealings with the IRS.  Weekly database updating would also benefit the IRS by reducing the burden on the IRS's TE/GE phone line, as potential donors or grantors would no longer need to call the IRS to verify the exempt status of an organization not listed in the databases.

Although the IRS can update its EO Select Check database manually in between regular database updates and the National Taxpayer Advocate has directed TAS employees to require the IRS to do these manual updates within 24 hours, this *ad hoc* approach is not feasible or sustainable.[26]  In addition, the IRS states that it cannot update the EO BMF manually.[27]  Weekly database updating would limit the need for manual updates to emergency cases.

The IRS has previously moved to a more frequent updating interval, as Publication 78 data (that now appears on EO Select Check) used to be updated quarterly, but was moved to a monthly (with the exception of the gap period) updating schedule in January 2012.[28]  However, due to the harm caused to many

---

22  IRM 21.3.8.12.13(3) (Nov. 16, 2012).

23  *See* IRS, *Exempt Organizations Select Check: Timing of Database Updates for Organizations Whose Exempt Status Is Reinstated*, *available at* http://www.irs.gov/Charities-&-Non-Profits/Exempt-Organizations-Select-Check:-Timing-of-Database-Updates-for-Organizations-Whose-Exempt-Status-Is-Reinstated.  For detailed data about hold times, courtesy disconnects, and poor levels of service, see Most Serious Problem: *Exempt Organizations (EOs): The IRS's Delay in Updating Publicly Available Lists of EOs Harms Reinstated Organizations and Misleads Taxpayers*, *supra*.

24  *See, e.g.*, Mathile Family Foundation, *FAQs – Tax Information*, *available at* http://www.mathilefamilyfoundation.org/grantmaking/faqs/tax-information/.  These FAQs discuss in great detail the grant making restrictions on private foundations and that the foundation and its managers are subject to severe penalties if these rules are violated.  The FAQs also advise potential grantees to **"make sure that the IRS BMF code *currently* represents your non-profit activities/operation (Form 990) and aligns with your Form 1023 filings and subsequent communications as approved by the IRS.  When these separate designations do not agree, your organization is required to rectify discrepancies with IRS.  Please consult with your tax advisor."** (bold and italic emphasis in original).

25  *See* IRS, *Exempt Organizations Select Check: Frequently Asked Questions*, FAQ #5, *available at* http://www.irs.gov/pub/irs-tege/faqs_eo_selectcheck.pdf.

26  In a February 2015 message to TAS employees, the National Taxpayer Advocate directed her case advocates to request manual updates within 24 hours if the IRS agrees an organization should be listed on EO Select Check as eligible to receive tax deductible contributions and to request an organization's removal from the automatic revocation list if this revocation was erroneous.  TAS Wednesday Weekly, *Updates to Exempt Organizations "Select Check"* (Feb. 4, 2015).

27  TE/GE response to TAS research request (July 31, 2015).  When asked why it cannot update the EO BMF manually, the IRS stated that the EO BMF is prepared by its IT personnel during a time frame available only once a month, "except in January IT is busy with other priorities and the EO BMF is not prepared."  TE/GE response to TAS research request (Dec. 1, 2015).

28  IRM 25.7.6.3.5, *Cumulative List Indicator* (Jan. 1, 2015).

001806

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 116 of 4699 PageID #:  4979

Legislative
Recommendations

Most Serious
Issues

Most Litigated
Problems

reinstated organizations, more frequent updating is now necessary and the IRS should implement such a change, which should not entail a significant additional cost or expenditure of resources.  Because the IRS is unwilling or unable to make such a change, Congress should require it to do so.[29]

## EXPLANATION OF RECOMMENDATIONS

The proposals to amend IRC § 6033 to require the IRS to update its online EO databases more frequently would address IRS delays under the current process and their adverse impact on automatically revoked organizations that have been reinstated.  A requirement that the IRS update its databases on a weekly basis would eliminate the current potential month or two updating delay and should not involve significant additional costs or resources.  This would be in line with the IRS online weekly updating time frame for the Form 990-N (e-Postcard), which is the notice filed by small EOs.[30]

Until the IRS can make appropriate programming changes, Congress should direct the IRS, through legislative history, to update EO Select Check manually for reinstated automatically revoked organizations.  This short term fix will immediately alleviate the burden placed on these organizations.  Once the IRS moves to a weekly updating schedule, the proposal recommends that Congress require the IRS to implement an emergency process that allows for manual online database updates within 24 hours of the restoration of exempt status.  These changes would promote fair and efficient tax administration and protect two fundamental taxpayer rights, the *right to be informed* and the *right to quality service*.

---

29  In a response to a TAS information request regarding whether the IRS can update EO BMF and EO Select Check more frequently than the current monthly (except for January) intervals, the IRS stated that the program used to run these two extracts only runs every four weeks and "there is no way that the IT programmers can run the extracts more frequently."  TE/GE response to TAS research request (Dec. 1, 2015).

30  EOs that normally have annual gross receipts of not more than $50,000 may file the Form 990-N rather than the more comprehensive Form 990 or Form 990-EZ.  *See* Rev. Proc. 2011-15, 2011-3 I.R.B. 322.

**LR
#11**

## BASIS REPORTING: Reduce Taxpayer Burden and Improve Tax Compliance by Requiring Partnerships and S Corporations to Report Each Partner's or Shareholder's Adjusted Basis Annually on Schedules K-1

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Be Informed*
- *The Right to Pay No More Than the Correct Amount of Tax*

### PROBLEM

Pass-through entities determine their income, gain, and loss at the entity level, but these items are passed out and taxed at the partner or shareholder level at the owner's income tax rate. Partnerships and S corporations are two common types of pass-through entities, which are becoming the preferred way to structure businesses. Between 1980 and 2012, the number of pass-through business tax returns increased by approximately 294 percent, from nearly two million returns to about 7.6 million returns.[2] By comparison, the number of returns filed by C corporations, which are not pass-through entities, decreased by about 25 percent.[3]

Owners of pass-through entities often hold their interest for long periods of time. When the interest in the pass-through entity is sold or liquidated, the IRS requires partners or shareholders to compute their tax basis to determine the amount of gains or losses.[4] These computations are some of the most complex in the Internal Revenue Code (IRC).

Each year, partnerships and S corporations are required to furnish Schedule K-1s to each partner or member, reporting their allocable share of income, gain, or loss, and file a copy with the IRS.[5] The Schedule K-1 does not include the partner or shareholder's annual adjusted basis in the partnership or S corporation; rather, a worksheet accompanies the instructions to assist the recipient with the calculation.[6] Taxpayers often lack the specialized knowledge required to accurately calculate basis, which results in errors and can lead to an overstatement of basis or an overpayment of tax.

---

1 *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2 IRS, Statistics of Income (SOI) Tax Stats – Integrated Business Data, *Business Tax Statistics, 1980-2012*, Table 1, *available at* https://www.irs.gov/uac/SOI-Tax-Stats-Integrated-Business-Data. IRS data may double count some businesses because some private partnerships can be owned by one or more other business entities. The number of S corporation and partnership returns filed in 1980 was 1,925,043 and in 2012 the number of returns was 7,594,013.

3 *Id.*

4 IRC §§ 704, 1366.

5 IRC § 6031(b).

6 *See* IRS, *Partnership Schedule K-1 (2013)*; IRS, *Shareholder's Schedule K-1 (2013)*; IRS, *Partner's Instructions for Schedule K-1 (2013)*; IRS, *Shareholder's Instructions for Schedule K-1 (2013)*.

001808

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 6 PageID #:  4981

Legislative
Recommendations

Most Serious
Issues

Most Litigated
Problems

## EXAMPLE

Pat and Sam form an equal partnership by contributing property of equal fair market value.  Pat contributes $40,000 cash plus assets having an adjusted basis of $200,000 at the time of contribution.  In addition, Pat transfers a mortgage on one of the assets of $80,000.  Pat's beginning basis in his partnership interest is $200,000.  Pat's basis is reduced by the $80,000 mortgage he transferred, but it is increased by $40,000, his share of the mortgage once it was transferred to the partnership.

| | | |
|---|---|---:|
| Pat's adjusted basis of assets contributed: | $ | 200,000 |
| Plus cash contributed: | $ | 40,000 |
| Less mortgage liability transferred: | $ | (80,000) |
| Plus partnership debt assumed: | $ | 40,000 |
| Pat's initial basis: | $ | 200,000 |

Continuing with the above scenario, Sam contributes assets with a basis of $200,000 and a mortgage balance of $60,000.  Sam's basis in the partnership is $210,000.  Sam increases his basis by the 50 percent share of the $80,000 mortgage transferred by Pat.  In addition, Pat has a new basis of $230,000 ($200,000 plus $30,000) because he increases his basis by his 50 percent share of the $60,000 mortgage contributed by Sam.

| | | |
|---|---|---:|
| Sam's adjusted basis of assets contributed | $ | 200,000 |
| Plus cash contributed: | $ | 0 |
| Less mortgage contributed: | $ | (60,000) |
| Plus partnership debt assumed (Sam): | $ | 30,000 |
| Plus partnership debt assumed (Pat): | $ | 40,000 |
| Sam's initial basis: | $ | 210,000 |
| | | |
| Pat's initial basis: | $ | 200,000 |
| Plus partnership debt assumed (Sam): | $ | 30,000 |
| Pat's revised initial basis: | $ | 230,000 |

If the partnership was organized as an S corporation, the calculations would be slightly different.

## RECOMMENDATIONS

The National Taxpayer Advocate recommends that due to the complexity of pass-through basis computations and the inconsistent reporting of adjusted basis, Congress should require annual adjusted basis reporting on Schedule K-1s issued to each partner or shareholder.

001809

## PRESENT LAW

Determining the correct tax basis for pass-through entities is no easy task. Subchapter K,[7] which covers partnership[8] taxation, contains some of the most complicated computations in the IRC.  It is closely followed in complexity by the sections pertaining to computing the tax basis for an S corporation interest in Subchapter S.[9]

There are several sections of the IRC that determine a partner's tax basis in a partnership.  Each partner must calculate his or her basis in the partnership using two separate methods. First, the partner must determine his basis in the partnership interest, commonly referred to as "outside" basis.[10]  Outside basis is adjusted annually to reflect the income, gains, and losses from the operation of the partnership.  Second, the partner must determine his share of the partnership's basis in the partnership's assets (net of liabilities), commonly referred to as "inside" basis.[11]  A partner's inside basis is maintained in a capital account and generally differs from the partner's outside basis in that the capital account does not reflect a partner's share of partnership liabilities, or optional basis adjustments under IRC § 754.  These different types of basis can result in confusion and misreporting.

When a partner contributes property into a partnership in exchange for a partnership interest, the general rule is that a partner has a tax basis in the partnership interest equal to the adjusted tax basis of the assets

---

7   IRC §§ 701-77.

8   A partnership is the relationship existing between two or more persons who join together to carry on a trade or business. Each person contributes money, property, labor, or skill and expects to share in the profits and losses of the business.  A partnership must file an annual information return to report the income, deductions, gains, losses, etc., from its operations, but it does not pay income tax.  Instead, it "passes through" any profits or losses to its partners in accordance with the partnership agreement.  Each partner includes his or her allocable share of partnership income or loss on his or her tax return.  Partnerships organized in the United States, or derive income from operations in the United States, are required to file Form 1065, *U.S. Return of Partnership Income.*  IRC § 6031(a).

9   IRC §1361.  S corporations are corporations that elect to pass income, losses, deductions, and credits through to their shareholders for federal tax purposes.  Shareholders of S corporations report the flow-through of income and losses on their personal tax returns and are assessed tax at their individual income tax rates.  This allows S corporations to avoid double taxation on the corporate income.  S corporations are responsible for tax on certain built-in gains and passive income at the entity level.  To qualify for S corporation status, the corporation must meet the following requirements: (1) domestic corporation; (2) eligible shareholders (*e.g.*, individuals, certain trusts, and estates are eligible shareholders and partnerships, corporations or non-resident alien are ineligible shareholders); (3) no more than 100 shareholders; (4) one class of stock. Certain corporations are ineligible to elect to be an S corporation including certain financial institutions, insurance companies, and domestic international sales corporations. IRC §§ 1361-78.  Government Accountability Office (GAO), GAO-10-195, *Tax-Gap: Actions Needed to Address Noncompliance With S Corporation Tax Rules* 16 (Dec. 2009). "S corporation stakeholder representatives told us that calculating and tracking basis was one of the biggest challenges in complying with S corporation rules." Curtis J. Berger, *W(h)ither Partnership Taxation?* 47 Tax L. Rev. 105, 108 (1991) ("In order to keep tax planners from wholly abusing the partnership's privileged status, while not denying them all remaining flexibility, Congress and Treasury [fashioned] a statutory and regulatory apparatus which [is] one of the most inaccessible and burdensome features of the entire tax system."). Burgess J. W. Raby & William L. Raby, *S Corporation AAA and OAA- Alphabet Soup or Taxpayer Stew?*, 78 Tax Notes 1013 (Feb. 23, 1998) (describing Subchapter S as "remarkably complicated"). Andrea Monroe, *Integrity in Taxation: Rethinking Partnership Taxation,* 64 ALA. L. REV. 289, 316 (2012) ("Congress's desire to provide partnerships with flexible allocation provisions, coupled with the line drawing that such an approach requires, has burdened partnerships with enormous complexity.  Under the substantial economic effect safe harbor, a partnership must apply multiple layers of intricate, mathematical provisions to every allocation it makes, every year."). James Alm & Jay A. Soled, *Tax Basis Determinations, Pass-Through Entities, and Taxpayer Noncompliance.*  40 Ohio N. U. L. 693, 699 (2014) ("In the area of tax law, courts, academicians, practitioners, and students generally agree that Subchapter K (the subchapter that details partnership taxation) and the Treasury regulations promulgated thereunder are extraordinarily complex.")

10   IRC §§ 722, 705.

11   IRC §§ 723, 704.

contributed to the partnership.[12]  If a partner purchases a partnership interest, the partner will generally have a tax basis in the partnership interest equal to the purchase price of the interest.[13]

Once the partnership begins to conduct business, rules regarding partnership operation and partnership debt are applicable.  IRC § 705 explains how a partner adjusts his basis in his partnership interest based on the entity's gains or losses and/or distributions.[14]

Similarly, computing S corporation tax basis is a daunting task.  The initial basis in an S corporation is figured much like a partnership.  IRC §§ 358 or 1012 govern at the inception of the S corporation.[15]  Taxpayers who acquire their S corporation investment by purchase are generally given a tax basis in their S corporation shares equal to the purchase price.[16]  Once operations begin, the tax basis goes through annual upward and downward adjustments based upon transactions.[17]  If an S corporation incurs debt, no tax basis adjustments are made to the taxpayer's interest.[18]  If a shareholder lends funds to an S corporation or personally guarantees an S corporation's debt, then the lending shareholder's will have an additional separate basis account equal to the loan or guarantee amount.  A shareholder's basis attributable to loans or guarantees is only taken into account after the shareholder has reduced his tax basis to zero.  The shareholder cannot reduce his basis, including his basis from the indebtedness, below zero, by loss and deduction items that flow through the S corporation.[19]

Partnerships and S corporations must file information returns (Forms 1065 and 1120-S, respectively).[20]  Partnerships and S corporations generally do not directly pay taxes on the net income reported on Forms 1065 or 1120-S.  Instead, they pass profits, losses, and gains to partners and shareholders, respectively, who pay any applicable taxes.[21]  Partnerships and S corporations are required to furnish Schedule K-1s to their partners or shareholders to report their allocable share of income, loss, or gain for the year and to file a copy with the IRS.[22]

The Schedule K-1 for partnerships contains three parts: Part I (Information About the Partnership), Part II (Information About the Partner), and Part III (Partner's Share of Current Year Income, Deductions, Credits, and Other Items).  The Schedule K-1 for S corporations mirrors the one for partnerships and has three parts.  Both sets of instructions contain short sections pertaining to the calculation of

---

12  IRC § 722.

13  IRC § 742.

14  IRC § 705(a)(1).  Basis adjustments increase for (a) the taxable income of the partnership; (b) income of the partnership exempt from tax; and (c) the excess of depletion deductions over the basis of the property subject to depletion.  IRC § 705(a)(2).  Basis adjustments decrease (but not below zero) for (a) partnership distributions; (b) partnership losses; (c) partnership expenditures not deductible in computing its taxable income and not properly chargeable to the taxpayer's capital account; and (d) any partnership oil and gas property, by the amount of the partner's deduction for depletion, to the extent that such deduction does not exceed the proportionate share of the adjusted basis of such property allocated to such property.

15  IRC §§ 358, 1012.

16  IRC § 1012(a).

17  IRC § 1367.

18  IRC § 1366.

19  IRC § 1367(d)(1)(B).

20  IRC §§ 6031, 6037.

21  IRC § 701.

22  IRC §§ 6031, 6037; Treas. Reg. §§ 1.6031(a)-1, 1.6037-1.

001811

a partner's or shareholder's basis in the partnership interest or stock along with a worksheet to assist with calculations.[23]

## REASONS FOR CHANGE

### Taxpayer Burden

The explosion of growth of pass-through entities as a chosen business structure combined with the complexity of the laws and regulations governing basis computations create a situation where many taxpayers face some of the most complex sections of the IRC.

Partners and shareholders of pass-through entities may hold onto their interest for many years and fail to keep adequate records of the annual changes. Even when shareholders and partners do keep complete records, the process of computing basis changes is exceedingly complex and challenging, which is overwhelming to taxpayers. Upon sale or dissolution of their interest in a pass-through entity, taxpayers face a risk for either an overstatement of basis, with a corresponding underpayment of tax, or an understatement of basis resulting in an overpayment of tax. In some larger partnerships, there are many partners trying to independently calculate their basis with their own preparers.

### Revenue Protection

In March 2012, the IRS released a working paper that highlights the growing magnitude of the tax gap.[24] The results further support an earlier paper and prior research study findings — when transactions are subject to information reporting to the government, tax compliance is generally very high.[25] However, when transactions are not subject to information reporting to the government, the tax compliance rate drops tremendously.[26]

This change will increase tax compliance by eliminating the ability of partners and S corporation shareholders to overstate their basis and thereby not pay the correct amount of tax. Requiring the annual reporting of adjusted basis on the Schedule K-1 for pass-through entities will further help taxpayers to understand their basis and not pay an incorrect amount of tax. It will also serve to assist taxpayers keep accurate records of their basis and eliminate the need to reconstruct basis many years down the road when many complex adjustments have been made.

In an article written in 2014, Professors James Alm and Jay A. Soled estimated that noncompliance in the pass-through entity basis reporting results in an annual revenue loss of approximately $8 billion.[27] Pass-through entity basis reporting requirements would assist with the collection of this annual revenue loss, while reducing burden and minimizing complexity for taxpayers.

---

23  See IRS, *Partnership Schedule K-1 (2013)*; IRS, *Shareholder's Schedule K-1 (2013)*; IRS, *Partner's Instructions for Schedule K-1 (2013)*; IRS, *Shareholder's Instructions for Schedule K-1* (2013).

24  IRS, Office of Research, *Federal Tax Compliance Research: Tax Year 2006 Tax Gap Estimation* (Mar. 2012).

25  IRS, Office of Research, *Year 2001 Federal Tax Gap* (Feb. 2007); IRS, *IRS Releases New Tax Gap Estimates; Compliance Rates Remain Statistically Unchanged from Previous Study*, IR-2012-4 (Jan. 6, 2012). *See also* GAO, GAO-06-603, *Capital Gains Tax Gap* (2006).

26  IRS, Office of Research, *Federal Tax Compliance Research: Tax Year 2006 Tax Gap Estimation* (Mar. 2012).

27  *See* James Alm & Jay A. Soled, *Tax Basis Determinations, Pass-Through Entities, and Taxpayer Noncompliance*, 40 Ohio N. U. L. 693, 721 (2014).

## EXPLANATION FOR RECOMMENDATIONS

Requiring pass-through entity basis reporting annually on the Schedule K-1 is a win-win proposition for taxpayers and the government.  Taxpayers will no longer have to struggle with reconstructing their basis while following the complex adjustment rules, and the government will be able to collect the proper amount of tax due and better monitor compliance.

Similar to the changes for reporting adjusted stock basis enacted in 2008, pass-through entity basis reporting will reduce the recordkeeping burden on partners and S corporation shareholders seeking to report their tax basis accurately.[28]  By centralizing basis reporting with third-party preparers, the burden for accurately calculating basis lies with those who have the expertise and resources to do so.  Pass-through entities employ bookkeeping services that keep the necessary information regarding basis adjustment, and it is less burdensome for the third-party preparer to issue the annual statement.

Additionally, the Government Accountability Office (GAO) found that the full extent of partnership and S corporation income misreporting is unknown.  The IRS's last study of S corporations, using 2003-2004 data, estimated that these entities annually misreported about 15 percent (an average of $55 billion for 2003 and 2004) of their income.  Using IRS data and the study results, the GAO derived an estimate of $91 billion per year of individuals misreporting partnership and S corporation income for 2006 through 2009.[29]

In writing regulations to require annual reporting of basis, there are some technical issues.[30]  One issue involves how reporting would work in light of private party sales.  Presently, there is no requirement to notify the IRS when interests in pass-through entities are bought and sold.  If one of the 25 partners sells his partnership interest to a third party, the third party's initial basis will be what he paid.  Because this is a private transaction, the partnership may not be privy to the sales price.  If the partnership does not or cannot know the taxpayer's basis due to origination of the partnership interest either through gift or private party sale, an exception could be created to the pass-through entity basis reporting requirement. The K-1 would note that the basis calculation does not include the original purchase or gift basis of the partnership interest and only includes adjustments since that time.

A second issue involves how much additional work and change in programming to the electronic software packages the annual reporting of pass-through entity basis would require.  The technology for electronic preparation and bookkeeping software already exists.  Bookkeepers, Certified Public Accountants, and tax attorneys are already maintaining much of the information that individual partners are supposed to be keeping records of annually.  There would be a cost and time needed for updating of the software and change in record keeping methods.  The burden on preparers could possibly be mitigated by a phased in approach either by tying the reporting to assets or numbers of partners while being phased in over a period of several years.

---

28  IRC § 6045.  Prior to the passage of IRC § 6045(g), taxpayers were required to determine basis for their marketable securities.  Many, including the National Taxpayer Advocate, have argued that this resulted in an overly burdensome hardship for taxpayers.  *See* National Taxpayer Advocate 2005 Annual Report to Congress 433-39.

29  GAO, GAO-14-453, *Partnerships and S Corporations: IRS Needs to Improve Information to Address Tax Noncompliance* (May 14, 2014).

30  The National Taxpayer Advocate discussed with many individuals including persons who prepare or advise on pass-through entity returns in developing the concerns and issues regarding this legislative recommendation.

The National Taxpayer Advocate believes these technical issues, while challenging, are resolvable and that an annual basis reporting requirement ultimately benefits all parties in pass-through entities, especially partners who face challenges in computing their adjusted basis to pay no more than the correct amount of tax.

Most Serious
Issues

Legislative
Recommendations

Most Litigated
Problems

**LR #12**

## HARDSHIP WITHDRAWALS: Provide a Uniform Definition of a Hardship Withdrawal from Tax-Advantaged Retirement Arrangements

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to a Fair and Just Tax System*

### PROBLEM

The Internal Revenue Code (IRC) contains a myriad of tax-advantaged retirement arrangements to encourage taxpayers to save for retirement.[2]  While these planning vehicles help taxpayers save for retirement, they are subject to differing sets of rules regulating eligibility, contribution limits, tax treatment of contributions and distributions, withdrawals, availability of loans, and portability.  TAS has discussed in prior reports the problems that such complexity may cause to both retirement plan administrators and participants.[3]

Particularly confusing are the rules governing distributions made before age 59½.  Some tax-advantaged retirement arrangements allow participants to take an early distribution upon the event of a hardship without being subject to the ten percent additional tax imposed by IRC § 72(t).  However, these various arrangements do not uniformly apply these so-called "hardship withdrawal" provisions.

IRC § 72(t) does not contain an exception to the ten percent additional tax for taxpayers whose last resort to pay for necessary living expenses is to liquidate their qualified plan.  The lack of an exception negatively impacts low income taxpayers (those at or below the 250 percent of the federal poverty guidelines[4]) and those facing severe financial hardship resulting from an extended period of unemployment.[5]

Because the hardship withdrawal provisions do not apply uniformly to all qualified plans, taxpayers' *right to a fair and just tax system* is compromised[6] — that is, the type of qualified plan a taxpayer is participating in should not impact his or her ability to receive a hardship withdrawal.  The current rules for

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   The term "tax-advantaged" includes the ability to defer the taxation of income by making an elective deferral, the tax-deferred growth of account assets, or the tax-free withdrawals available to plan participants.  Types of tax-advantaged retirement arrangements available under the IRC include traditional Individual Retirement Accounts (IRAs), Roth IRAs, rollover IRAs, SIMPLE IRAs, 401(k) plans, profit-sharing plans, employee stock ownership plans, money purchase plans, defined benefit plans, Simplified Employee Pensions, Salary Reduction Simplified Employee Pension, SIMPLE 401(k) plans for small employers, 403(b) tax-sheltered annuity plans for 501(c)(3) organizations and public schools, and 457(b) deferred compensation plans for state and local governments.

3   See National Taxpayer Advocate 2009 Annual Report to Congress 384-90 (Legislative Recommendation: *Provide a Uniform Definition of a Hardship Withdrawal from Qualified Retirement Plans*); National Taxpayer Advocate 2008 Annual Report to Congress 373-74 (Legislative Recommendation: *Simplify and Streamline Retirement Savings Tax Incentives*); National Taxpayer Advocate 2004 Annual Report to Congress 423-32 (Legislative Recommendation: *Simplification of Provisions to Encourage Retirement Savings*).

4   The federal poverty guidelines are a measure of income level issued annually by the Department of Health and Human Services.  See U.S. Dep't of Health & Human Serv., 2015 Poverty Guidelines (Sept. 3, 2015), *available at* http://aspe.hhs.gov/2015-poverty-guidelines.

5   See Systemic Advocacy Management System Issue 32816 (submitted Apr. 15, 2015).

6   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

001815

Problems    Legislative Recommendations    Most Serious Issues

hardship withdrawals are so confusing that they present a trap for the unwary, often leading to unintended consequences that unfairly harm taxpayers who, by definition, are suffering from hardship.

## EXAMPLE

Taxpayer A, who is 45 years old, first opened a Roth Individual Retirement Account (IRA) account three years ago and has contributed $5,000 every year.  The taxpayer's Roth IRA balance is $18,000, of which $3,000 is attributable to earnings.  Taxpayer A currently works full-time for Employer B, a state agency.  Taxpayer A participates in Employer B's governmental 457(b) plan and as of October 1, 2015, had $60,000 in the plan attributable to his elective contributions and contributions made by Employer B.  Taxpayer A used to work for Employer C, a company that maintains a 401(k) plan for its employees and made pre-tax contributions to the 401(k) plan while Taxpayer A was employed with Employer C.  Taxpayer A's account balance with Employer C's 401(k) plan is $25,000 as of October 1, 2015.

During 2015, Taxpayer A is faced with a medical emergency that will require surgery and force him to miss six months of work.  Because his health insurance will cover only 70 percent of the estimated $50,000 medical expenses, Taxpayer A will have out-of-pocket costs of $15,000 for his surgery.  Taxpayer A estimates he will need an additional $20,000 to cover living expenses for his family during the next six months while he is on unpaid leave.

Taxpayer A recalls that some co-workers from Employer C were allowed to make hardship withdrawals from their retirement plans for occasions such as a home purchase.  Taxpayer A would like to know whether he can receive a distribution from his Roth IRA or his two employer-based plans to help pay medical and living expenses for the next six months.  After spending two weeks reading through plan documents and talking with friends, colleagues, and plan administrators, Taxpayer A arrives at the following conclusions:

(1) He may withdraw $15,000 from his Roth IRA (the amount contributed) without any tax consequences.  Distributions in excess of the $15,000 that will be used for medical expenses (to the extent it does not exceed the amount allowable as a deduction under IRC § 213) will not be subject to the ten percent additional tax.  Any distribution he uses for living expenses while he is unable to work will be includible in taxable income to the extent the distribution exceeds his contributions to the Roth IRA and subject to the ten percent additional tax.

(2) His governmental 457(b) plan with Employer B allows in-service distributions for "unforeseeable emergencies."  For this purpose, an unforeseeable emergency is a severe financial hardship resulting from an illness or accident.  The ten percent additional tax does not apply to distributions from a governmental 457(b) plan.

(3) His 401(k) plan with Employer C allows in-service distributions on account of hardships.  For this purpose, a hardship means an instance of "immediate and heavy financial need" and the plan provides that the regulatory safe harbor rules will be used to determine whether an employee qualifies for the distribution.  Medical expenses, but not living expenses, for the period he is unable to work fall under the safe harbor definition of immediate and heavy financial need.  Hardship distributions are included in taxable income and subjected to the ten percent additional tax for early withdrawal.

001816

## RECOMMENDATION

The National Taxpayer Advocate recommends that Congress establish uniform rules regarding the availability and tax consequences of hardship withdrawals from tax-advantaged retirement plans and arrangements. Hardship withdrawals should be permitted when a participant is faced with an unforeseeable emergency or severe financial hardship. Examples of unforeseeable emergency or severe financial hardship may include:

1. Expenses for medical care incurred by the employee, the employee's spouse, or dependents;

2. Payments necessary to prevent the eviction of the employee from his or her principal residence or foreclosure on the mortgage on that residence;

3. Loss of property due to casualty;

4. Basic living expenses of low income taxpayers (those at or below the 250 percent of the federal poverty guideline); or

5. Financial hardship resulting from an extended period of unemployment.

The National Taxpayer Advocate further recommends that the IRS exempt such hardship distributions from the ten percent additional tax imposed by IRC § 72(t).

## PRESENT LAW

Determining the tax treatment of early distributions from certain tax-advantaged retirement arrangements involves a three-pronged analysis. First, we must ascertain whether the distribution is allowed in the first place. If allowed, there must be a determination regarding the taxability of such distribution. Finally, we must determine whether the distribution is subject to the IRC § 72(t) addition to tax.

The following sections discuss the application of this analysis with respect to distributions from various qualified plans.

### 401(k) Plans

In the absence of a hardship, a 401(k) plan may generally only distribute benefits attributable to elective contributions upon an employee's death, disability, attainment of age 59½, or severance from employment.[7] Applicable Treasury regulations provide that a distribution is made due to hardship only if (1) the distribution is made due to an immediate and heavy financial need of the employee, and (2) the distribution is necessary to satisfy the immediate and heavy financial need.[8]

Applicable Treasury regulations provide that whether an employee has an immediate and heavy financial need and the amount necessary to meet such need is determined by the plan administrator based on a consideration of all relevant facts and circumstances.[9] The regulations also provide a safe harbor under which a distribution may be deemed to be on account of an immediate and heavy financial need in the following six circumstances:

1. Expenses for medical care incurred by the employee, spouse, or certain dependents;

2. Costs directly related to the purchase of a principal residence for the employee;

---

7    IRC § 401(k)(2)(B)(i).

8    Treas. Reg. § 1.401(k)-1(d)(3)(i).

9    Treas. Reg. § 1.401(k)-1(d)(3)(iii) and (iv).

3. Payment of certain tuition, related educational fees, and room and board expenses for the employee, spouse, children, or certain dependents;

4. Payments necessary to prevent the eviction of the employee from his or her principal residence or foreclosure on the mortgage of that residence;

5. Payments for burial or funeral expenses for the employee's deceased parent, spouse, children, or dependents; or

6. Expenses for the repair of damage to the employee's principal residence that would qualify for the casualty deduction under IRC § 165.[10]

The regulations also provide that a distribution is deemed necessary to satisfy an immediate and heavy financial need if:

1. The employee has obtained all other currently available distributions and nontaxable loans under the plan and all other plans maintained by the employer; and

2. The employee is prohibited from making elective deferrals to the plan and all other plans maintained by the employer for at least six months following the hardship distribution.[11]

Hardship withdrawals are generally includible in the participant's gross income in the taxable year in which paid to the participant and are taxed as ordinary income.[12]  In addition, hardship withdrawals are subject to the ten percent additional tax imposed under IRC § 72(t) if no exception applies.[13]

### 457(b) Plans[14]

In general, a governmental 457(b) plan (which covers state and local government employees) participant may not receive a distribution until he or she reaches age 70½ or separates from service, whichever is earlier.[15]  However, a governmental 457(b) plan may permit an early distribution to a participant faced with an "unforeseeable emergency."[16]

The Treasury regulations define unforeseeable emergency as:

1. A severe financial hardship resulting from an illness or accident;

2. Loss of property due to casualty; or

3. Other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the participant.[17]

---

10  Treas. Reg. § 1.401(k)-1(d)(3)(iii)(B).

11  Treas. Reg. § 1.401(k)-1(d)(3)(iv)(E).

12  IRC § 402(a).

13  Exceptions to the ten percent additional tax under § 72(t)(2)(A) include distributions: (1) made on or after the date on which the employee attains age 59½, (2) made to a beneficiary on or after the death of the employee, (3) attributable to the employee's being disabled, (4) part of a series of substantially equal periodic payments, (5) made to an employee after separation from service after attainment of age 55, (6) dividends paid with respect to stock of certain corporations, or (7) made on account of an IRS levy on the qualified plan.

14  While tax-exempt organizations may also maintain 457 plans, we will limit our discussion to governmental 457(b) plans here.

15  IRC § 457(d)(1)(A)(i).

16  IRC § 457(d)(1)(A)(iii).  If certain requirements are met, participants in 457(b) plans may be eligible to receive an in-service distribution of $5,000 or less.  IRC § 457(e)(9)(A).

17  Treas. Reg. § 1.457-6(c)(2)(i).

001818

The regulations provide several examples of events that may constitute unforeseeable emergencies, such as the imminent foreclosure of or eviction from a primary residence, the need to pay for medical expenses, or the need to pay for the funeral expenses of a spouse or dependent.[18]  However, the regulations specifically note that the purchase of a home or the payment of tuition are not generally unforeseeable emergencies for purposes of this exception.[19]

The ten percent additional tax imposed by IRC § 72(t) does not apply to 457(b) plans because a 457(b) plan is not included in the definition of a "qualified retirement plan" under IRC § 4974(c).[20]

### Roth IRAs

In general, a distribution from a Roth IRA is only includable in taxable income if it exceeds the IRA owner's basis in the IRA and is not a "qualified distribution."[21]  For this purpose, a qualified distribution includes a distribution that is:

1. Made on or after the date on which the owner attains age 59½;

2. Made to a beneficiary or the estate of the owner on or after the date of the owner's death;

3. Attributable to the individual's being disabled; or

4. Made for a first-time home purchase.[22]

Distributions from a Roth IRA that are not qualified distributions are generally includible in taxable income to the extent the distribution exceeds the contributions to the Roth IRA and are generally subject to a ten percent tax, in addition to the ordinary income taxes on the distribution.[23]  There are several statutory exceptions to the ten percent additional tax under IRC § 72(t) that include distributions that are attributable to death or disability, certain medical expenses, first-time homebuyer expenses, qualified higher education expenses, health insurance expenses of unemployed individuals, or as part of a series of substantially equal periodic payments.[24]

---

18   Treas. Reg. § 1.457-6(c)(2)(i).

19   *Id.*

20   IRC § 72(t)(1).

21   *See* IRC § 408A(d).

22   IRC § 408A(d)(2)(A) and (d)(5).

23   *See* IRC §§ 408A(d)(1) and 408A(d)(4)(B); IRC § 72(t).

24   IRC § 72(t)(2).

Figure 2.12.1 lists certain hardship withdrawal exceptions to IRC § 72(t).

**FIGURE 2.12.1, Certain Exceptions to IRC § 72(t) Ten Percent Additional Tax for Early Distributions**

| | Exception | Limitations |
|---|---|---|
| IRC § 72(t)(2)(A)(iii) | Attributable to the employee being disabled | Medically determinable physical or mental impairment to be of long-continued and indefinite duration |
| IRC § 72(t)(2)(B) | Medical expenses | Distribution may not exceed amount allowable as a deduction under IRC § 213 |
| IRC § 72(t)(2)(D) | Health insurance premiums for unemployed individuals | Distribution allowable after individual has received unemployment compensation for 12 consecutive weeks |
| IRC § 72(t)(2)(E) | Higher education expenses | Qualified higher education expenses (e.g., tuition, fees, books, supplies, equipment) of the taxpayer, taxpayer's spouse, or child/grandchild of taxpayer or spouse |
| IRC § 72(t)(2)(F) | First-time home purchases | No ownership interest in a principal residence during prior two-year period |
| IRC § 72(t)(2)(G) | Called to active duty | Qualified reservist distribution may be made at any time during the two-year period after the end of an active duty period |

001820

Figure 2.12.2 summarizes the early withdrawal provisions of certain tax-advantaged retirement vehicles.

**FIGURE 2.12.2, Summary of Early Withdrawal Provisions of Certain Tax-Advantaged Retirement Plans and Arrangements**

| | 401(k) | 457(b) Governmental Plans | Roth IRA |
|---|---|---|---|
| Who is eligible? | Employees of all non-governmental employers | Employees and independent contractors of state & local governments | Individuals (subject to income limitations if covered by employer-provided retirement plan) |
| Hardship withdrawal allowed while employed or before age 59½? | Yes, if distribution is necessary to satisfy "immediate and heavy financial need" | Yes, for "unforeseeable emergency" | Yes |
| 10% additional tax assessed? | Yes | No | Yes, to the extent the distribution exceeds contributions, except in cases of death or disability, certain medical expenses, first-time homebuyer expenses, qualified higher education expenses, health insurance expenses of unemployed individuals, or as part of a series of substantially equal periodic payments |

In summary, 401(k) plan participants are able to take an early distribution of their elective deferrals while still employed with the employer maintaining the plan "upon hardship of the employee,"[25] but such distributions may be subject to the ten percent additional tax on early distributions if made before age 59½.[26] Participants in 457(b) plans are permitted to take an early distribution of their entire benefit for "unforeseeable emergencies," and those distributions, like all 457(b) distributions, are not subject to the ten percent additional tax.[27] IRAs (including Roth IRAs) are not required to limit early distributions to the account beneficiary.[28] However, such distributions are subject to the ten percent additional tax, unless an exception applies.[29]

---

25   IRC § 401(k)(2)(B)(i)(IV).
26   IRC § 72(t).
27   IRC § 457(d)(1)(A)(iii).
28   IRC §§ 408(d) and 408A(d).
29   IRC § 72(t)(1).

001821

## REASONS FOR CHANGE

The rules covering tax-advantaged retirement plans and arrangements are among the most intricate and complex rules of the tax code and associated regulations.[30] In particular, the hardship withdrawal provisions for certain tax-advantaged retirement plans and arrangements lack uniformity and may cause confusion among plan participants. By establishing uniform rules regarding the availability and tax consequences of hardship withdrawals from tax-advantaged plans, Congress will reduce complexity and eliminate meaningless distinctions between the types of plans that may be offered by different types of employers.

As noted above, some retirement plans allow participants to receive an early distribution in cases of financial hardship, such as a medical emergency. There is no uniform definition of "hardship" among the various retirement plans that would enable a participant to easily determine when an early withdrawal is allowable. Even if a plan allows for a hardship withdrawal, participants must deal with inconsistent rules for triggering the ten percent additional tax for early withdrawal imposed by IRC § 72(t).

## EXPLANATION OF RECOMMENDATIONS

To ensure taxpayers' *right to a fair and just tax system*, the National Taxpayer Advocate recommends that Congress establish uniform rules regarding the availability of hardship withdrawals from tax-advantaged retirement plans and arrangements. These scenarios are common examples of when a taxpayer faces an unforeseen emergency that would require him or her to tap into funds earmarked for retirement savings:

1. Expenses for medical care incurred by the employee, the employee's spouse, or dependents;

2. Payments necessary to prevent the eviction of the employee from his or her principal residence or foreclosure on the mortgage on that residence;

3. Loss of property due to casualty;

4. Basic living expenses of low income taxpayers (those at or below the 250 percent of the federal poverty guidelines); or

5. Financial hardship resulting from an extended period of unemployment.

Admittedly, it will be impossible to identify all possible instances of unforeseen emergencies, and there may be disagreement as to what is "unforeseen." For example, we are not including educational expenses as an unforeseen emergency that would qualify as a hardship withdrawal. Congress, in its discretion, could authorize withdrawals for other situations. If it does, it should apply the exception uniformly to all tax-advantaged retirement vehicles and exempt the exception from the ten percent additional tax uniformly.

---

30  Part of this complexity arises because retirement plans fall under the jurisdiction of three federal agencies — the IRS, the Department of Labor, and the Pension Benefit Guaranty Corporation.

**LR #13**

## WHISTLEBLOWER PROGRAM: Enact Anti-Retaliation Legislation to Protect Tax Whistleblowers

### TAXPAYER RIGHTS IMPACTED[1]

- The Right to Challenge the IRS's Position and Be Heard
- The Right to Appeal an IRS Decision in an Independent Forum
- The Right to a Fair and Just Tax System

### PROBLEM

In recognition of the valuable role whistleblowers can play in detecting underpayments of tax and to encourage whistleblowers to come forward, Internal Revenue Code (IRC) § 7623 permits, and in some cases requires, the IRS to compensate those who report violations of the internal revenue laws.[2]  In this respect, the IRC is similar to the False Claims Act, which allows whistleblowers who report fraud on the government to share in amounts recovered from the wrongdoer.[3]  In 2006, Congress amended the whistleblower provisions of the IRC to more closely parallel the provisions of the False Claims Act.[4]  However, the IRC, unlike the False Claims Act and unlike whistleblower statutes that apply in other areas of the law, does not protect tax whistleblowers from retaliation.[5]  This lack of protection could impede employees, who may have unique skills and insights, from investigating and ascertaining whether their employers underpay taxes and from reporting those underpayments to the government.

### EXAMPLE

While she is employed by X, a whistleblower learns of a tax structure involving X and several related entities and subsidiary companies.[6]  When she raises concerns over the tax structure to X, X uses physical force and armed men to intimidate her, then fires her.  The whistleblower reports X and the related entities to the government, assists the government with its tax investigation of X and the related entities, and is subpoenaed to provide documents to the government as part of the investigation.  X and the related entities learn of the subpoena (but not the whistleblower's identity) and file multiple retaliatory actions against the whistleblower to ascertain her identity and her role in the tax investigation and to threaten and intimidate her.  Defending these actions consumes the whistleblower's time, requires her to incur significant personal expense, and adversely affects her professional reputation.  X and the related entities also make death threats against the whistleblower, which forces her to hire counterterrorism experts to advise her family on safety and to protect her on trips abroad.

---

1   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
2   IRC § 7623.
3   False Claims Act, 31 U.S.C. §§ 3729-3733, discussed below.
4   For a discussion of the legislative history of IRC § 7623 and the False Claims Act, see Most Serious Problem: *Whistleblower Program: The IRS Whistleblower Program Does Not Meet Whistleblowers' Need for Information During Lengthy Processing Times and Does Not Sufficiently Protect Taxpayers' Confidential Information from Re-Disclosure by Whistleblowers, supra.*
5   31 U.S.C. § 3730(h), discussed below, contains the anti-retaliation provisions of the False Claims Act.
6   The facts of this example are based on the court's description of events in *Whistleblower 11332-13W v. Comm'r,* T.C. Memo. 2014-92.

001823

There are no IRC provisions affording the whistleblower a remedy for the retaliation she experienced as a consequence of investigating whether X and the related companies underpaid taxes and reporting the underpayments to the government. Other potential whistleblowers faced with this lack of protection from retaliation may hesitate to ascertain whether their employers underpay tax and may decide not to report tax underpayments to the government. Those who do come forward may hesitate to contest the IRS's award determination out of fear that further proceedings will increase the chances their employers will learn their identity and retaliate against them, for which they will have no remedy under the IRC.

## RECOMMENDATIONS

To address the lack of a remedy available to tax whistleblowers subject to retaliation, the National Taxpayer Advocate recommends that Congress add a new provision to the IRC modeled on the anti-retaliation provisions of the False Claims Act.

## PRESENT LAW

The False Claims Act provides for a civil suit for statutory penalties and damages against a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," and allows a whistleblower to share in the collected proceeds from such a suit.[7] In 1986, recognizing that "few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation," Congress added an anti-retaliation provision to the False Claims Act.[8] Amendments in 2009 extended anti-retaliation protection to "[a]ny employee, contractor, or agent," and clarified that the provision:

> Protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance of a potential or actual *qui tam* action.[9]

Further amendments in 2010 supplied a three-year statute of limitations for seeking relief from retaliatory conduct.[10]

---

7   *See* 31 U.S.C. § 3729(a)(1)(A)-(G) for enumerated acts that give rise to liability. Under the False Claims Act, if the government declines to bring a civil suit for statutory penalties and damages on the basis of a whistleblower's information, the whistleblower may bring suit on behalf of the government, in what is referred to as a *qui tam* suit, and share in the collected proceeds. 31 U.S.C. § 3730. Whistleblowers in other areas of the law who are protected from retaliation are not necessarily rewarded for identifying or reporting illicit activity. *See* Joel D. Hesch, *Whistleblower Rights and Protections: Critiquing Federal Whistleblower Laws and Recommending Filling in Missing Pieces to Form a Beautiful Patchwork Quilt*, 6 Liberty U. L. Rev. 51 (2011), grouping federal whistleblower statutes into six categories: (1) reporting fraud against the government; (2) federal employees reporting violations of laws, waste, or mismanagement; (3) reporting discrimination; (4) reporting violations of environmental laws; (5) reporting conduct adverse to health; and (6) reporting violations of securities law.

8   False Claims Amendments Act of 1986, S. Rep. No. 99-345, at 34, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299.

9   Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009), extending protection not only to acts taken "in furtherance of an action under this section" but also to acts taken "in furtherance of other efforts to stop 1 or more violations of this subchapter [the False Claims Act]"; 155 Cong. Rec. E1295, 1300 (daily ed. June 3, 2009) (statement of Rep. Berman).

10  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1079A(c)(2), 124 Stat. 1376, 2077, adding paragraph (3), superseding *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409 (2005) (holding that the statute of limitations for the most closely analogous state cause of action applies).

As amended, the anti-retaliation provision of the False Claims Act states:

1. In general. – Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

2. Relief. – Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.  An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

3. Limitation on bringing civil action. – A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred.[11]

In addition to federal legislation, many states have anti-retaliation statutes to protect whistleblowers.[12] Notably, New York's False Claims Act proscribes retaliatory conduct by *prospective* employers, important protection for whistleblowers whose chief concern is obtaining and retaining future employment (rather than returning to the job from which they were fired).[13]

The False Claims Act does not apply to tax fraud.[14]  The tax whistleblower provision is in IRC § 7623, which Congress amended in 2006 by *requiring* the IRS to pay awards in some cases, creating the IRS Whistleblower Office (WO), and providing for United States Tax Court review of the WO's award determinations.[15]  The purpose of the amendments was to encourage tax whistleblowers.[16]  In 2012, the Tax Court, recognizing that whistleblowers sometimes face serious threats of retaliation, formalized its procedures for allowing whistleblowers to proceed anonymously.[17]  However, neither IRC § 7623 nor any other Code provision contains an anti-retaliation provision.

---

11  31 U.S.C. § 3730(h).

12  Ethan D. Wohl, *Confidential Informants in Private Litigation: Balancing Interests in Anonymity and Disclosure*, 12 Fordham J. Corp. & Fin. L. 551, 557 (2007), noting that "forty-seven states have enacted statutes protecting public-sector whistleblowers, and seventeen states also provide some statutory protection for private sector employees who report illegal conduct."

13  N.Y. State Fin. Law § 191 (2010).

14  31 U.S.C. § 3729(d) provides: "[t]his section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986."

15  Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432 § 406(a)(1)(D), (b), 120 Stat. 2922, 2958-2959 (adding subsection (b) to IRC § 7623 and in an "off-Code" provision creating the Whistleblower Office); IRC § 7623(b)(4) (providing for Tax Court review of the IRS's award determination).

16  *See Grassley Says IRS, Treasury Need to Put Out "Welcome Mat" for Whistleblowers*, 2006 TNT 112-96 (June 12, 2006).

17  *See Whistleblower 14106-10-W v. Comm'r*, 137 T.C. 183, 203 (2011), noting the anti-retaliation provision of the False Claims Act, the existence of state statutes protecting workers who report illegal conduct from retaliation, and the "stark" contrast with the lack of an anti-retaliation provision in IRC § 7623; U.S. Tax Court Rules of Practice and Procedure, Rule 345, *Privacy Protections for Filings in Whistleblower Actions* (effective July 6, 2012); *see also* U.S. Tax Court, *Press Release* (Dec. 28, 2011), *available at* www.ustaxcourt.gov/press/122811.pdf (discussing the adoption of a new Rule 345).

001825

## REASONS FOR CHANGE

Employees may be uniquely qualified to detect their employers' underpayments of tax, and in many instances, the only way the IRS would know about a given transaction or behavior is because someone blew the whistle. Congress, by amending IRC § 7623 in 2006, intended to encourage tax whistleblowers to come forward. However, if the employer learns of an employee's investigation or that the employee reported its tax underpayments to the government, then retaliation against the employee may ensue. The Tax Court recognized this reality and adjusted its rules accordingly.[18] Despite the IRS's and Tax Court's measures to protect whistleblowers' identities, it may not be difficult for an employer to determine who, out of a small group of informed employees, came forward to the IRS. As one district court judge observed:

> The case law, academic studies, and newspaper accounts well document the kind of treatment that is usually visited upon public and private employees who speak out as a matter of conscience on issues of public concern. For example, a six-year study on whistleblowers by Myron Peretz Glazer and Penina Migdal Glazer details the full spectrum of management retaliation against ethical resistors who speak out against company or government policy and the long-term adverse consequences such employees can face. See Myron Peretz Glazer and Penina Migdal Glazer, *The Whistleblowers: Exposing Corruption in Government and Industry* 231 (1990) (study of sixty-four whistleblowers showed significant percentage "remain out of work or underemployed, bitter about their punishment, and uncertain of ever being able to restore their lives fully").[19]

Faced with the possibility of retaliation, for which the IRC provides no remedy, tax whistleblowers may be reluctant to investigate or report tax underpayments. The lack of an anti-retaliation provision may undermine Congress's efforts to encourage tax whistleblowers. The lack of such a provision may also have a chilling effect on whistleblowers' willingness to challenge the IRS's determination of the amount of their award. A whistleblower may prefer to truncate or avoid altogether any administrative or judicial proceeding, fearing an increased likelihood his or her identity will become known and will result in retaliation for which there will be no remedy under the IRC.

## EXPLANATION OF RECOMMENDATIONS

The proposal would require a new IRC provision or the amendment of an existing provision to provide a remedy for a tax whistleblower who is subjected to retaliation for investigating or reporting underpayments of tax. The provision could be modeled on section 3730(h) of the False Claims Act, and could further be made applicable to prospective employers. Providing protection from retaliation to tax whistleblowers would place them on similar footing as whistleblowers in other areas of the law, would further Congress's objective of encouraging them to come forward, and would support their rights to pursue administrative and judicial review of the IRS's award determination.

---

18  *See Whistleblower 14106-10-W v. Comm'r*, 137 T.C. 183, 201 (2011), quoting *Mgmt. Info. Technologies, Inc. v. Alyeska Pipeline Serv., Co.*, 151 F.R.D. 478, 481 (D.D.C. 1993).

19  *Mgmt. Info. Technologies, Inc. v. Alyeska Pipeline Serv., Co.*, 151 F.R.D. 478, 481 (D.D.C. 1993).

Legislative Recommendations

| LR #14 | **WHISTLEBLOWER PROGRAM: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirement of IRC § 6103(p)** |

### TAXPAYER RIGHTS IMPACTED[1]

- *The Right to Confidentiality*

### PROBLEM

In 1976, when Congress amended Internal Revenue Code (IRC) § 6103 to generally prohibit the disclosure of tax return or return information, it also enacted what is now IRC § 7431, authorizing civil suits for damages for knowing or negligent unauthorized disclosures, and enhanced IRC § 7213, a criminal enforcement provision that penalizes willful unauthorized disclosures.[2]  The maximum amount of statutory damages ($1,000) or fines ($5,000) under these provisions has remained the same for almost four decades. In 1997, Congress added IRC § 7213A, criminalizing the willful unauthorized inspection of returns or return information; eighteen years later, the $1,000 maximum fine under this provision is the same.[3]

The Internal Revenue Service (IRS) discloses taxpayers' returns and return information to whistleblowers pursuant to exceptions to IRC § 6103.[4]  However, a whistleblower is not subject to the civil or criminal penalty provisions of IRC §§ 7431, 7213, or 7213A for unauthorized inspection or re-disclosure of that information.  Tax whistleblowers are also not subject to the safeguarding requirements of IRC § 6103(p).

### EXAMPLE

Whistleblower X, while assisting the IRS in detecting A's underpayments of tax, acquires return information about A, such as:

- The reporting positions on A's return that resulted in the underpayments;

- Other items on A's tax return, including A's earnings, the identity of A's dependents, the amount of alimony A claimed as a deduction, A's religious and political affiliations, and the recipients of A's charitable donations;

- A's tax compliance history, including the fact that A was audited several times over the past ten years and assessed additional amounts; and

- Communications between A and the IRS that would be embarrassing to A if made public.

---

1   *See* Taxpayer Bill of Rights *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2   Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976), in § 1202(a) amending IRC § 6103; in § 1202(e) enacting IRC § 7217, later redesignated as IRC § 7431, authorizing civil suits for damages; and in § 1202(d) amending IRC § 7213(a) to make willful unauthorized disclosure of return information a felony rather than a misdemeanor, increase the maximum imprisonment from one year to five years, and increase the maximum fine from $1,000 to $5,000, among other things.

3   Taxpayer Browsing Protection Act, Pub. L. No. 105-35, § 2(a), 111 Stat. 1104 (1997), authorizing imposition of a maximum fine of $1,000 and imprisonment of up to one year.

4   *See, e.g.,* IRC § 6103(k)(6) and (h)(4), discussed below.

X does not take any measures to safeguard A's return information, such as maintaining a secure place to store it, restricting access to it, or returning or destroying the information when there is no longer a need for it.

Pursuant to IRC § 7623(b), X receives a portion of the proceeds the IRS collects after auditing A and assessing additional amounts. Thereafter, X makes public the return information he learned about A while assisting the IRS. IRC § 7431 provides for civil suits for the unauthorized inspection or disclosure of return information by IRS employees, among others, but with one exception not present here, the statute does not specifically apply to whistleblowers.[5] Even if A could bring suit against X pursuant to IRC § 7431, A's recovery may not sufficiently compensate him or aid in the enforcement of confidentiality rules.

## RECOMMENDATIONS

To address the lack of an effective remedy for injury sustained by taxpayers whose return information is inspected or disclosed by a tax whistleblower without authorization, and to aid in the enforcement of the confidentiality rules, the National Taxpayer Advocate recommends that Congress:

1. Amend IRC §§ 7431, 7213, and 7213A to provide that any whistleblower (*i.e.*, a person making a claim for award under IRC § 7623) or legal representative of a tax whistleblower who receives a taxpayer's return or return information pursuant to an exception under IRC § 6103 is subject to the civil and criminal penalty provisions of IRC §§ 7431, 7213, and 7213A for the unauthorized inspection or disclosure of that information;

2. Amend IRC § 7431, which authorizes a civil suit for the negligent or knowing unauthorized inspection or disclosure of return or return information, to increase statutory damages to a more substantial amount, such as $5,000, for violations by tax whistleblowers seeking or obtaining an award pursuant to IRC § 7623(b);

3. Amend IRC §§ 7213 and 7213A, which sanction willful unauthorized disclosure or inspection of return or return information, to increase the maximum amount of fines to more substantial amounts, such as $20,000 and $1,500, respectively; and

4. Amend IRC § 6103(p) to make tax whistleblowers subject to its safeguarding requirements.

## PRESENT LAW

Prior to 1976, income tax returns were "public records," open to inspection under regulations approved by the President, or under Presidential order.[6] The Senate Finance Committee, in its report on H.R. 10612, the Tax Reform Act of 1976, proposed significant revisions to the treatment of tax returns and other information, noting:

> Although present law describes income tax returns as "public records", open to inspection under regulations approved by the President, or under Presidential order, the committee felt that returns and return information should generally be treated as confidential and not subject

---

5   The exception is when the IRS enters into a contract, sometimes referred to as a "tax administration contract" with a whistleblower pursuant to IRC § 6103(n). *See* Treas. Reg. § 301.6103(n)-2(c). The IRS has never entered into a tax administration contract with a tax whistleblower.

6   S. Rep. No. 94-938, 94th Cong., 2d Sess. (1976) at 318.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 1 of 4699 PageID #:  5001

Most Serious
Problems

Most Litigated
Issues

Legislative
Recommendations

Appendices

to disclosure except in those limited situations delineated in the newly amended section 6103 where the committee decided that disclosure was warranted.[7]

The Tax Reform Act of 1976 changed several aspects of IRC § 6103 (*e.g.*, by broadly defining "return" and "return information"), and added or amended other code sections to enhance enforcement of the nondisclosure rules.[8]  However, the Act did not extend the restrictions on disclosure to everyone who receives returns or return information; IRC § 6103 contains no provision concerning disclosures by whistleblowers specifically.  Moreover, existing exceptions to the general rule of nondisclosure that allow the IRS to disclose return information to whistleblowers were left undisturbed.  For example, IRC § 6103(k)(6) allows what are sometimes referred to as "investigative disclosures," necessary to obtain information related to the IRS's official duties or to accomplish properly any activity connected with such official duties.  IRC § 6103(h)(4) allows the IRS to disclose returns and return information during an administrative proceeding, including a whistleblower administrative proceeding.[9]  A whistleblower and the IRS may enter into a contract under IRC § 6103(n), sometimes referred to as a "tax administration" contract, for the whistleblower's services relating to the detection of violations of the internal revenue laws or related statutes, and the IRS may disclose return information in connection with the contract.

The 1976 Act added IRC § 7217, later designated IRC § 7431, "to redress any injury sustained and to aid in the enforcement of the confidentiality rules."[10]  The statute provides that a taxpayer whose return or return information was knowingly or negligently inspected or disclosed in violation of IRC § 6103 may recover actual damages or statutory damages of $1,000, as well as court costs and attorney's fees, for such unauthorized inspection or disclosure.  Congress provided for recovery of statutory damages in recognition of "the difficulty in establishing in monetary terms the damages sustained by a taxpayer as the result of the invasion of his privacy caused by an unlawful disclosure of his returns or return information."[11]

---

7   S. Rep. No. 94-938, 94th Cong., 2d Sess. (1976) at 318.

8   As amended, IRC § 6103(b)(1) defines "return" as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed."  IRC § 6103(b)(2)(A) defines "return information" to include "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense."  *See* Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 94th Cong., 2d Sess., 343 (Dec. 29, 1976), noting that "Congress decided that the prior provisions of law designed to enforce the rules against the improper use or disclosure of returns and return information were inadequate."

9   Treas. Reg. § 301.6103(h)(4)-1.  The IRS's notification to the whistleblower of a preliminary, or proposed, award through a preliminary award recommendation letter, which the whistleblower may dispute, is the beginning of an IRC § 6103(h)(4) administrative proceeding.  Treas. Reg. § 301.7623–3(b)(1); Treas. Reg. § 301.7623–3(c)(1).  Issuance of a preliminary denial letter or preliminary rejection letter in IRC § 7623(b) cases also marks the beginning of a whistleblower administrative proceeding.  *See* Treas. Reg. § 301.7623-3(c)(7) and (8).  The National Taxpayer Advocate recommends revising the regulations under IRC § 7623 to provide that a whistleblower administrative proceeding, within the meaning of IRC § 6103(h)(4) commences, with the whistleblower's submission of Form 211, *Application for Award for Original Information.  See* Most Serious Problem: *Whistleblower Program: The IRS Whistleblower Program Does Not Meet Whistleblowers' Need for Information During Lengthy Processing Times and Does Not Sufficiently Protect Taxpayers' Confidential Information from Re-Disclosure by Whistleblowers*, *supra.*

10  S. Rep. No 94-938, 94th Cong., 2d Sess. (1976) at 347; Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202(e), 90 Stat. 1520, 1687 (1976).  IRC § 7217 was redesignated as IRC § 7431 by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, § 357, 96 Stat 324, 645-6.

11  Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 94th Cong., 2d Sess., 345 (Dec. 29, 1976).

001829

The statute also provides for recovery of punitive damages if the inspection or disclosure was willful or the result of gross negligence.[12]

As noted, IRC § 7431 applies to inspections and disclosures "in violation of any provision of IRC § 6103," and thus does not generally apply to disclosures by whistleblowers, who are not generally subject to the nondisclosure rules of IRC § 6103.[13] An exception to this general rule is where a tax whistleblower discloses a taxpayer's return or return information obtained in connection with a contract authorized by IRC § 6103(n). In that situation, regulations provide that the civil remedies afforded by IRC § 7431 would be available to a taxpayer whose return or return information was re-disclosed by the whistleblower.[14] However, the IRS has never entered into an IRC § 6103(n) contract with a tax whistleblower.

The 1976 Act also adjusted IRC § 7213(a) to make the willful disclosure of returns or return information a felony rather than a misdemeanor, increase the maximum imprisonment from one year to five years, and increase the maximum fine from $1,000 to $5,000.[15] The sanction applies to, among others, federal and state employees, and would apply to a tax whistleblower with whom the IRS entered into a contract pursuant to IRC § 6103(n).[16] Where disclosure of return information to a whistleblower violates the law, *e.g.*, disclosure by a federal employee in violation of IRC § 6103, the whistleblower would be subject to the penalty for publishing the information.[17] However, the sanction does not apply to whistleblowers who acquire return information legitimately pursuant to IRC § 6103(k)(6) or (h)(4) and then re-disclose the information.

In 1997, Congress further protected taxpayers' returns and return information by enacting IRC § 7213A, a new criminal penalty providing for a fine of up to $1,000 and imprisonment of up to one year for willful unauthorized inspection of any tax return or return information.[18] Like IRC § 7213, this penalty would apply to tax whistleblowers with whom the IRS entered into a contract pursuant to IRC § 6103(n), but does not apply to tax whistleblowers who acquire return information pursuant to IRC § 6103(k)(6) or (h)(4).[19]

---

12  In 1982, Congress redesignated this statute as IRC § 7431 and amended it to provide that if a U.S. officer or employee knowingly or negligently discloses return information in violation of the disclosure restrictions, the wronged party will be permitted to bring a civil action for damages against the U.S. (rather than against the officer or employee). If a person other than a federal employee violates IRC § 7431, a suit may be brought against that person in District Court. The provisions setting the amount of liquidated damages was left unchanged. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, § 357, 96 Stat. 324, 645-6.

13  IRC § 7431(a)(2) provides: "If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer *in violation of any provision of section 6103* or in violation of section 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States" (emphasis added).

14  Treas. Reg. § 301.6103(n)-2(c).

15  Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202(d), 90 Stat. 1520, 1686-7 (1976).

16  IRC § 7213(a)(1), (2); *see also* Treas. Reg. § 301.6103(n)-2(c).

17  IRC § 7213(a)(3) provides: "Other persons: It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in a manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information."

18  Taxpayer Browsing Protection Act, Pub. L. No. 105-35, § 2(a), 111 Stat. 1104 (1997).

19  IRC § 7213A(a)(1)(B); *see also* Treas. Reg. § 301.6103(n)-2(c).

The 1976 Act also amended IRC § 6103 to impose safeguarding requirements on Federal and State agencies, among others, that receive return information pursuant to exceptions to IRC § 6103.[20]  The safeguarding requirements were intended as "a comprehensive system of administrative, technical, and physical safeguards designed to protect the confidentiality of the returns and return information and to make certain that they are not used for purposes other than the purposes for which they were disclosed."[21]  Affected recipients of return information are required, as a condition of receiving the information, to explain how they will safeguard it.[22]  Thereafter, they are required to maintain a secure area for storing the return information, restrict access to it, return or destroy it when they are finished with it, and "provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information."[23]  The safeguarding provisions of IRC § 6103(p)(4) do not apply to whistleblowers specifically.  A whistleblower who receives return information in connection with an IRC § 6103(n) contract, however, would be subject to separate safeguard provisions, including the requirement, as a condition to disclosure, that the whistleblower "permit an inspection of the whistleblower's or the legal representative's premises by the IRS."[24]

In 2006, Congress significantly expanded the reach of IRC § 7623, which authorizes the IRS to pay awards to tax whistleblowers who assist it in detecting underpayments of tax or "detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same."[25]  Under IRC § 7623(a), the IRS has discretionary authority to make awards to whistleblowers.  The 2006 amendments added subsection (b) to the statute, making whistleblower awards mandatory in certain cases, generally specifying an award amount from 15 to 30 percent of the tax recovered (with no cap on the amount of the award), creating the IRS Whistleblower Office (WO), and providing for United States Tax Court review of whistleblower award determinations.[26]  The new provision generally applies if the tax, penalties, interest, additions to tax, and additional amounts in dispute exceed $2,000,000.[27]

## REASONS FOR CHANGE

Since 2006, when Congress enhanced the provisions of IRC § 7623 by adding subsection (b), whistleblowers have responded by seeking awards pursuant to subsection (b), as well as continuing to seek discretionary awards under subsection (a).[28]  Although the IRS shares return information with whistleblowers pursuant to exceptions to the general rule of nondisclosure under IRC § 6103, it has never entered into a tax administration contract with a whistleblower pursuant to IRC § 6103(n).  Thus, in the event a whistleblower re-discloses return information legitimately acquired pursuant to an IRC § 6103 exception,

---

20  Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202(a), 90 Stat. 1520, 1683-4 (1976), adding subsection (p)(4) to IRC § 6103.

21  Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 94th Cong., 2d Sess., 341 (Dec. 29, 1976).

22  IRC § 6103(p)(4)(E).

23  IRC § 6103(p)(4)(B-D, F).

24  Treas. Reg. § 301.6103(n)-2(d)(3).

25  IRC § 7623(a).

26  Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432 § 406(b), 120 Stat. 2922, 2958-9, adding subsection (b) to IRC § 7623, including subsection (b)(4) which provides for Tax Court review of the IRS's award determination, and creating the Whistleblower Office in an "off-Code" provision.  IRC § 7623(b)(2) and (3) authorize awards of less than 15 percent in certain cases.

27  IRC § 7623(b)(5).  If the award is made with respect to an individual taxpayer, the individual's gross income must exceed $200,000 for any taxable year subject to the IRS's action.

28  See Most Serious Problem: Whistleblower Program: The IRS Whistleblower Program Does Not Meet Whistleblowers' Need for Information During Lengthy Processing Times and Does Not Sufficiently Protect Taxpayers' Confidential Information from Re-Disclosure by Whistleblowers, supra.

no provision in the IRC provides for a civil suit against the whistleblower, and the whistleblower is not subject to any criminal sanction under the Code. That whistleblowers are not subject to the safeguarding provisions of IRC § 6103(p)(4) leaves taxpayers at an even greater risk of dissemination of their confidential return information.

Even if they applied to whistleblowers who do not have an IRC § 6103(n) contract, the maximum amount of statutory damages ($1,000) and fines ($5,000) imposed by IRC §§ 7431, 7213, and 7213A are insufficient to "redress any injury" or "aid in the enforcement of the confidentiality rules." The $1,000 maximum amount of statutory damages under IRC § 7431 and the $5,000 maximum fine imposed by IRC § 7213 were both established in 1976, four decades or so ago. The same amounts in 2015 dollars, adjusted for inflation, are about $4,000 and $21,000, respectively.[29] The $1,000 maximum fine under IRC § 7213A has been in place since 1997, and is about $1,500 in 2015 dollars.[30]

## EXPLANATION OF RECOMMENDATIONS

The proposals would make the provisions of IRC §§ 7431, 7213, and 7213A applicable to whistleblowers whether or not the whistleblower has entered into an IRC § 6103(n) contract, and would make the safeguarding provisions of IRC § 6103(p)(4) applicable to such whistleblowers. These changes are intended to protect taxpayers' fundamental right to confidentiality and thereby enhance voluntary reporting and compliance with the tax laws.

The statutory minimum award to a whistleblower under IRC § 7623(b), where the amount in dispute must be at least $2 million, is generally 15 percent of the collected proceeds. Whistleblowers who seek these awards should be subject to greater liability if they re-disclose returns or return information they obtained while earning, or attempting to earn, their award, or in the award determination process. Thus, the proposal would increase the amount of statutory damages provided by IRC § 7431 to a more substantial amount, such as $5,000, for violations by whistleblowers who request awards under IRC § 7623(b).

The penalties imposed by IRC §§ 7213 and 7213A apply to willful behavior, and the existing fines, which have been unchanged for decades, are insufficient to punish or deter it. Thus, the proposal would increase the amount of these fines to more substantial amounts, such as $20,000 and $1,500, respectively.

---

29  When adjusted for inflation, $1,000 in 1976 is worth $4,166 in 2015, and $5,000 in 1976 is worth $20,829 in 2015. TAS Research (Dec. 3, 2015).

30  When adjusted for inflation, $1,000 in 1997 is worth $1,477 in 2015. TAS Research (Dec. 3, 2015).

**LR #15**

## WHISTLEBLOWER PROGRAM: Amend IRC §§ 7623 and 6103 to Provide Consistent Treatment of Recovered Foreign Account Tax Compliance Act (FATCA) and Report of Foreign Bank and Financial Accounts (FBAR) Penalties for Whistleblower Award Purposes

### TAXPAYER RIGHTS IMPACTED[1]

- ■ *The Right to Challenge the IRS's Position and Be Heard*
- ■ *The Right to Confidentiality*
- ■ *The Right to a Fair and Just Tax System*

### PROBLEM

Pursuant to two separate statutory regimes, U.S. taxpayers may be required to report their ownership of foreign bank accounts to the government.[2] If the foreign account balance exceeds $10,000 at any time during the year, the taxpayer must file an FBAR, pursuant to provisions of Title 31 of the U.S. Code.[3] If the balance exceeds $75,000 at any time during the year or exceeds $50,000 on the last day of the year, the same taxpayer, if an individual living in the U.S., must again report the foreign account, this time on IRS Form 8938, *Statement of Specified Foreign Financial Assets.*[4] Filing Form 8938 is required pursuant to provisions of FATCA, codified in the Internal Revenue Code (IRC), which is Title 26 of the U.S. Code.[5] Both the FBAR and FATCA statutory regimes impose penalties on foreign account holders for failing to report as required, and the IRS may assess and collect penalties under both statutes for the same failure to report.[6]

The IRC permits, and in some cases requires, the IRS to pay an award to whistleblowers who provide information that assists the IRS "in detecting underpayments of tax, or detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws or conniving at the same."[7] The amount of the award, paid "from the proceeds of amounts collected," or "collected proceeds," takes into account

---

1    *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

2    Bank Records and Foreign Transactions Act, better known as the Bank Secrecy Act (BSA), Pub. L. No. 91-508, 84 Stat. 1114 (1970), portions of which are codified at 31 U.S.C. §§ 5311-5332; FATCA, enacted as part of Title V of the Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, 124 Stat. 71 (2010).

3    31 U.S.C. § 5314.

4    *See* Treas. Reg. § 1.6038D-2(a) (containing other thresholds for married taxpayers filing a joint return and those living abroad).

5    FATCA, Pub. L. No. 111-147, § 511(a), 124 Stat. 71, 109 (2010), adding IRC § 6038D to the IRC. As discussed below, FATCA also requires foreign financial institutions (FFIs), in order to avoid withholding on certain U.S. source income, to report to the U.S. government accounts with balances in excess of $50,000 belonging to U.S. persons. *See* IRC § 1471.

6    31 U.S.C. § 5322; IRC § 6038D(d). The authority to assess and collect FBAR penalties has been delegated to the IRS. 31 C.F.R. § 1010.810(g). The National Taxpayer Advocate has questioned the appropriateness of twice penalizing the same failure to report, noting "penalizing someone more than once for essentially the same mistake—failing to report a foreign account—may be considered stacking, which is generally not viewed as an effective way to promote compliance, in part because it is perceived as confusing, disproportionate, and unfair." National Taxpayer Advocate 2014 Annual Report to Congress 335 (Legislative Recommendation: *FBAR Forms: Reduce the Burden of Foreign Account Reporting*).

7    IRC § 7623.

penalties the IRS collected for violations of FATCA.[8]  However, the award does not take into account penalties the IRS collected for FBAR violations.[9]  This imbalance may discourage whistleblowers from reporting foreign bank accounts to the IRS.

## EXAMPLE

A U.S. citizen with dual nationality, X, owns a foreign bank account that had a $10 million balance throughout 2015.  X reports on Schedule B of his U.S. tax return that he does not own a foreign bank account and he does not file an FBAR with respect to the account.  Pursuant to an agreement with the IRS, X's bank reports to the IRS the names of its account owners who are U.S. persons.  Because X has concealed from his bank the fact that he is a U.S. citizen, however, the bank does not report X's account to the IRS.  A tax whistleblower, Y, informs the IRS of X's foreign bank account.  The IRS verifies the existence of the account and the account balances and assesses against X a $10,000 penalty for failing to report the account as required by FATCA.  The IRS also assesses against X a penalty of $5 million for failing to file an FBAR.  The IRS collects both penalty amounts.  Because the IRS would not have known of the bank account had Y not come forward, and because Y meets the other requirements for obtaining an award under IRC § 7623, the IRS proposes to award Y a portion of the $10,000 FATCA penalty it collected from X.  The IRS will not award Y any of the $5 million FBAR penalty it collected from X.

## RECOMMENDATIONS

To address the inconsistency with which amounts collected by the IRS on the basis of whistleblower information are included in a whistleblower award, the National Taxpayer Advocate recommends that Congress amend IRC § 7623 to provide that the terms "proceeds of amounts collected" and "collected proceeds" include civil penalties recovered pursuant to 31 U.S.C. § 5321 for failing to file an FBAR. Information the IRS receives as part of its FBAR investigation should be designated as return or return information within the meaning of IRC § 6103, subject to the same limitations on disclosure, and whistleblowers should be subject to existing penalties for the unauthorized use or re-disclosure of such information.[10]

## PRESENT LAW

### FBAR Reporting Requirements

31 U.S.C. § 5314 authorizes the Secretary of the Treasury to require U.S. citizens, residents, and entities to report their foreign bank accounts.[11]  Under this authority, the Secretary of the Treasury developed Form TD F 90-22.1, *Report of Foreign Bank and Financial Accounts (FBAR)*, requiring information about all foreign accounts exceeding $10,000 at any time during the calendar year.[12]  Under

---

8    IRC § 7623.

9    *See* PMTA 2012-10 (Apr. 23, 2012).

10   *See* Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirements of IRC § 6103(p), supra.*

11   31 U.S.C. § 5314(a) provides: "the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency.  The records and reports shall contain the following information in the way and to the extent the Secretary prescribes..."

12   31 C.F.R. § 1010.350.  FBARs are now filed electronically on FinCEN Form 114, *Report of Foreign Bank and Financial Accounts (FBAR), available at* http://www.fincen.gov/forms/bsa_forms/.

001834

31 U.S.C. § 5321(a)(5)(C), a person who willfully violates the requirement to file an FBAR is subject to a penalty equal to the greater of $100,000 or 50 percent of the account balance, with no ceiling on the amount of the penalty.[13]  The Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury tasked with enforcing the FBAR provisions, delegated its authority to enforce FBAR provisions to the IRS in 2003.[14]

### FATCA Reporting Requirements

U.S. citizens, resident aliens, and certain non-resident aliens with certain assets, such as foreign bank accounts, in excess of a specified threshold must file IRS Form 8938.[15]  A person who fails to make the required disclosure on Form 8938 is subject to a penalty of $10,000, which rises as high as $60,000 if the nondisclosure continues after notification from the IRS.[16]  Form 8938, as the Government Accountability Office (GAO) has observed, duplicates much of the information required on the FBAR.[17]  The National Taxpayer Advocate has recommended coordinating the two regimes by raising the FBAR filing threshold to $50,000 and aligning the two reporting requirements so that one form could be used to report affected accounts.[18]

In addition to requiring the foreign account holder to file Form 8938, FATCA generally requires foreign financial institutions (FFIs) to report to the U.S government information about individual account holders who are U.S. persons and whose accounts exceed $50,000.[19]

### Awards to Whistleblowers

Both Title 31 and the IRC authorize the payment of awards to whistleblowers.  Under 31 U.S.C. § 5323, which the IRS does not administer, the payment of such an award, which cannot exceed $150,000, is discretionary.[20]  Funds for such awards must be appropriated (*i.e.*, paying the awards must be separately

---

13  Under 31 U.S.C. § 5321(a)(5)(A), the Secretary of the Treasury has discretion to impose a penalty of up to $10,000 for non-willful violations.  Criminal sanctions for failing to file FBARs also apply, and can result in penalties of up to $500,000.  *See* 31 U.S.C. § 5322(a), (b) (providing for a penalty of up to $250,000 and imprisonment of up to five years for willful violations and a penalty of up to $500,000 and imprisonment of up to ten years for willful violations "while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period").  As discussed in PMTA 2012-10 (Apr. 23, 2012), pursuant to 42 U.S.C. § 10601(b)(1), such amounts are currently paid into the Crime Victims Fund.  This proposal does not include making these recovered criminal fines subject to awards under IRC § 7623.

14  31 U.S.C. § 310; 31 C.F.R. § 1010.810(g).

15  IRC § 6038D; Treas. Reg. § 1.6038D-2(a)(1)-(4).  An unmarried taxpayer living in the U.S. must file a Form 8938 if the total value of the taxpayer's specified foreign financial assets is more than $50,000 on the last day of the tax year or more than $75,000 at any time during the tax year.  This threshold is doubled in the case of specified individuals who are married filing jointly.  A qualifying unmarried taxpayer living abroad must file a Form 8938 if the total value of the taxpayer's specified foreign financial assets is more than $200,000 on the last day of the tax year or more than $300,000 at any time during the tax year. This threshold is doubled as well in the case of qualified individuals living abroad who are married filing jointly.

16  IRC § 6038D(d)(1) and (d)(2).  The two penalties contemplated by IRC § 6038D(d) can potentially aggregate to $60,000.

17  GAO, GAO-12-403, *Reporting Foreign Accounts to IRS, Extent of Duplication Not Currently Known, but Requirements Can Be Clarified* 15 (Feb. 2012).

18  *See* Legislative Recommendation: *Foreign Account Reporting: Eliminate Duplicative Reporting of Certain Foreign Financial Assets and Adopt a Same-Country Exception for Reporting Financial Assets Held in the Country in which a U.S. Taxpayer is a Bona Fide Resident, supra*; National Taxpayer Advocate 2014 Annual Report to Congress 343-45.

19  *See* IRC § 1471(c),(d)(1).  Non-compliant FFIs will be subject to a thirty percent withholding penalty on certain U.S. source payments made to the institution.  *See* IRC § 1471(a).

20  31 U.S.C. § 5323(a).

001835

authorized by Congress).[21]  No funds have been so appropriated, and no awards have been paid under this provision.[22]  Under IRC § 7623(a), the IRS has discretionary authority to make awards to whistleblowers out of "proceeds of amounts collected."  If the requirements of IRC § 7623(b) are met, the IRS *is required* to pay an award out of "collected proceeds."  For awards under IRC § 7623(b), appropriated funds are apportioned by the Office of Management and Budget (OMB) based on prior year actual awards.[23]

IRC § 7623 authorizes awards for detecting "underpayment of tax" or violations of the "internal revenue laws" "in cases where such expenses are not otherwise provided for by law."  Thus, the IRS's position is that IRC § 7623 does not permit awards for recovered FBAR penalties, which are not derived from violations of the internal revenue laws and for which an award provision exists under Title 31.[24]  The Tax Court, while it has been presented with the issue, has not decided whether the IRS's position is correct.[25]  In the Tax Court case in which the issue arose, a whistleblower sought to recover an award under IRC § 7623(b) for recovered FBAR penalties.  When informed of the IRS's position that FBAR proceeds are not the subject of an award under IRC § 7623, the whistleblower viewed the communication as a de facto denial of his claim, arguing to the court that "[b]ecause the bulk of the proceeds collected from Taxpayer 1 consisted of FBAR payments for violation of title 31…there was nothing meaningful left for the Office [IRS Whistleblower Office] to investigate with respect to this claim."[26]  The court held that the communications from the IRS did not constitute a "determination regarding an award" within the meaning of IRC § 7623(b)(4) sufficient to confer jurisdiction on the court and thus did not address the issue of whether FBAR penalties are "collected proceeds."[27]

### Protection of Taxpayer Information

IRC § 6103 generally prohibits IRS employees from disclosing a taxpayer's "return" or "return information," and civil and criminal penalties are imposed for violating the bar.[28]  Form 8938, which is filed with the tax return, qualifies as "return" or "return information."[29]

---

21  *See* PMTA 2012-10 (Apr. 23, 2012) (noting "amounts paid as BSA penalties should be deposited into Treasury's General Fund).  *See* GAO, 2 *Principles of Federal Appropriations Law* 6-166 – 6-175 (3d ed. 2006) (agencies must deposit into the General Fund of the Treasury any funds received from sources outside the agency absent statutory authority to retain the funds or deposit them elsewhere).  Once these amounts go into the General Fund, only a specific appropriation can get them out.  See *id.* at 6-168 – 6-169."  *See also* OMB Circular No. A–11, *Section 20 Terms and Concepts* 3 (noting "[a]ppropriation means a provision of law… authorizing the expenditure of funds for a given purpose").

22  IRS Whistleblower Officer (WO) response to TAS information request (Aug. 26, 2015).

23  *See* OMB Circular No. A–11, *Section 20 Terms and Concepts* 3, noting "[a]pportionment is a plan, approved by OMB, to spend resources provided by one of the annual appropriations acts, a supplemental appropriations act, a continuing resolution, or a permanent law (mandatory appropriations)";  Internal Revenue Manual (IRM) 25.2.2.13, *Award Payment Procedures* (Aug. 7, 2015).

24  *See* PMTA 2012-10 (Apr. 23, 2012).

25  *Whistleblower 22231-12W v. Comm'r*, T.C. Memo. 2014-157 (2014).

26  *Id.* slip op. at 6-7.

27  *Id.*

28  IRC § 6103 (a); IRC §§ 7431, 7213, 7213A.

29  IRC § 6103(b)(1) defines "return" as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed."  IRC § 6103(b)(2)(A) defines "return information" to include "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense."

001836

The status of information the IRS gathers in an FBAR investigation under IRC § 6103 is not as straight-forward, and stems from rules pertaining to how the IRS may access Title 26 information during a Title 31 investigation.  IRC § 6103(h)(1) permits the IRS to share returns and return information with Department of Treasury employees "whose official duties require such inspection or disclosure for tax administration purposes."  IRC § 6103(b)(4) defines "tax administration" as including "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or *related statutes*" (emphasis added).  Thus, if the IRS determines that a Title 31 investigation is considered to be tax administration under the "related statute" portion of the definition of tax administration, IRS employees are authorized to access returns or return information in conducting a Title 31 investigation.[30]  It follows, according to IRS Chief Counsel guidance, that "information collected or generated in that [Title 31] investigation after the related statute call has been made is protected by section 6103."[31]  However, if in a particular case Title 31 is not a related statute (*e.g.*, because there are no possible Title 26 violations), the information would not be return information under IRC § 6103.[32]

Exceptions to the general rule of nondisclosure in IRC § 6103 permit the IRS to disclose a taxpayer's return or return information to a whistleblower in limited circumstances and for specific purposes.  For example, IRC § 6103(h)(4) permits the IRS to disclose, to the extent necessary, a taxpayer's return information to a whistleblower in a whistleblower administrative proceeding.[33]  The preliminary award the IRS communicates to the whistleblower includes "a summary report that states a preliminary computation of the amount of collected proceeds, the recommended award percentage, the recommended award amount… and a list of the factors that contributed to the recommended award percentage."[34]  The National Taxpayer Advocate has noted that existing procedures do not protect taxpayers from re-disclosure of their confidential information by whistleblowers and has recommended corrective legislation.[35]

Whether or not they qualify as "return" or "return information," FBARs and information derived or extracted from FBARs are not subject to disclosure under the Freedom of Information Act.[36]  FBARs

---

30  *See* IRM 4.26.14.2, *Access to Title 26 Returns and Return Information* (July 24, 2012) (providing guidance on "related statute" determinations).  Moreover, according to IRM 4.26.17.2(1)(d), *FBAR Procedures Starting the Case - Related Statute Memorandum* (Jan. 1, 2007), "[i]f the source of the FBAR information is a Title 26 examination… the information acquired is return information protected by IRC Section 6103.  The examiner must obtain a related statute determination, signed by a Territory Manager before using the return information in an FBAR case."  The IRM does not specify what the "source" of the FBAR information is where a whistleblower provides information that leads to a Title 26 examination.

31  IRS Chief Counsel, Procedure and Administration, Publication 4639, *Disclosure & Privacy Law Reference Guide* (Rev. 10-2012) 7-5.  An accompanying note advises "[a]lthough there are no cases addressing the related statute determination, there are cases suggesting that a money laundering charge, standing alone, is not 'tax administration.'  *See United States v. Hobbs*, 991 F.2d 569, 573 (9th Cir. 1993); *United States v. Callahan*, 981 F.2d 491, 494 n.3 (11th Cir. 1993), *cert. denied*, 508 U.S. 976 (1993)."

32  *See* IRM 4.26.17.2.3, *Cases Where No Related Statute Memorandum (RSM) Needed* (May 5, 2008) (noting "[i]f the examiner is conducting an examination under the BSA, a related statute determination is not needed to examine for FBAR compliance.  This is because no information from a tax examination or other 6103 protected source is involved.").

33  IRC § 6103(h)(4); Treas. Reg. § 301.6103(h)(4)-1.

34  Treas. Reg. § 301.7623–3(c)(2)(ii) (regarding preliminary awards under IRC § 7623(b)).  *See* Treas. Reg. § 301.7623-3(b)(1) (regarding a similar provision for preliminary awards under IRC § 7623(a)).

35  *See* Most Serious Problem: *Whistleblower Program: The IRS Whistleblower Program Does Not Meet Whistleblowers' Need for Information During Lengthy Processing Times and Does Not Sufficiently Protect Taxpayers' Confidential Information from Re-Disclosure by Whistleblowers*, *supra*; Legislative Recommendation: *Whistleblower Program: Make Unauthorized Disclosures of Return Information by Whistleblowers Subject to the Penalties of IRC §§ 7431, 7213, and 7213A, Substantially Increase the Amount of Such Penalties, and Make Whistleblowers Subject to the Safeguarding Requirements of IRC § 6103(p)*, *supra*.

36  31 U.S.C. § 5319 provides that FBARs are exempt from disclosure under the Freedom of Information Act (5 U.S.C. § 552) and "may not be disclosed under any State, local, tribal, or territorial 'freedom of information,' 'open government,' or similar law."  *See Berger v. I.R.S.*, 487 F. Supp. 2d 482, 496 (D.N.J. 2007) *aff'd*, 288 F. App'x 829 (3d Cir. 2008) (holding the IRS was not required to disclose information derived or extracted from BSA reports).

may be disclosed at the discretion of the Secretary, but guidelines issued pursuant to this authority do not specifically contemplate IRS disclosures of FBAR information to whistleblowers.[37]

## REASONS FOR CHANGE

The FATCA and FBAR statutory regimes allow the IRS to recover penalties against taxpayers who fail to report the same foreign bank account, an outcome about which the National Taxpayer Advocate has significant concerns. However, once the IRS actually collects both penalties on the basis of information provided by a whistleblower, it is anomalous to pay awards to whistleblowers with respect to recovered FATCA penalties but not recovered FBAR penalties. Moreover, information from whistleblowers may be the *only* way for the IRS to learn of foreign accounts that do not meet the FATCA third-party reporting thresholds or those that exceed the FATCA reporting thresholds but escape third-party reporting. As the whistleblower in one Tax Court case asserted, FBAR penalties may far exceed amounts recovered under Title 26.[38] Thus, whistleblowers would have more of an incentive to report undetected foreign bank accounts if FBAR penalties were included in the award amount.

Information the IRS collects as part of an FBAR investigation may not constitute "return" or "return information" under IRC § 6103, but may nevertheless be unavailable to a whistleblower pursuant to nondisclosure provisions of Title 31. To the extent a whistleblower cannot access information the IRS obtains in the course of an FBAR investigation, he or she may not be able to effectively challenge the IRS's determination about the amount of a proposed award that stems from collected FBAR penalties.[39] The proposal to include FBAR proceeds in whistleblower awards necessitates additional proposals to allow the IRS to disclose FBARs and information the IRS receives in ascertaining a taxpayer's liability for FBAR violations to whistleblowers and to simultaneously ensure the confidentiality of that information. Designating such information as return or return information within the meaning of IRC § 6103, subject to the same limitations on disclosure and making whistleblowers subject to existing penalties for violating IRC § 6103, would accomplish both objectives.

## EXPLANATION OF RECOMMENDATIONS

The proposal would:

- Amend IRC § 7623 to include collected FBAR penalties in the definition of "proceeds of amounts collected" and "collected proceeds;"

- Designate FBARs and information the IRS receives in ascertaining a taxpayer's liability for FBAR violations as return or return information within the meaning of IRC § 6103; and

- Make whistleblowers subject to existing penalties for the unauthorized use or re-disclosure of such information.

---

37  31 C.F.R. § 1010.950 provides "[t]he Secretary may within his discretion disclose information reported under this chapter for any reason consistent with the purposes of the Bank Secrecy Act." According to IRM Exhibit 4.26.14-3, *Re-Dissemination Guidelines for Bank Secrecy Act Information*, Section VI (July 24, 2012), the IRS may not disseminate BSA information without the consent of FinCEN in the absence of exceptions that would not apply to whistleblowers. *See also* IRM Exhibit 4.26.14-2, *Memorandum of Understanding Between the FinCEN and the IRS dated Sept. 24, 2010* (July 24, 2012) (including FBARs in the definition of BSA information).

38  *Whistleblower 22231-12W v. Comm'r*, T.C. Memo. 2014-157 (2014), slip op. at 6-7.

39  *See, e.g., Berger v. I.R.S.*, 487 F. Supp. 2d 482, 496 (D.N.J. 2007) *aff'd*, 288 F. App'x 829 (3d Cir. 2008) (rejecting the contention that the IRS, based on IRM provisions, had discretion to release information it obtained in a Title 31 investigation).

The proposal would lead to consistent treatment, for whistleblower award purposes, of recovered FATCA and FBAR penalties, supporting the *right to a fair and just tax system*. The proposal would strengthen the right to be heard and the right to confidentiality by:

- Clearly bringing within the ambit of IRC § 6103 information the IRS obtains as part of its FBAR investigation without the need for a "related statute" determination; and

- Allowing the IRS to share that information pursuant to exceptions of IRC § 6103, which in turn would permit whistleblowers to make an informed decision about whether to challenge a proposed whistleblower award; yet

- Adopting measures to prevent whistleblowers from re-disclosing that information.

The proposal would also provide incentive to whistleblowers to report foreign accounts that are likely to escape detection by the IRS.

001839

# INTRODUCTION: Most Litigated Issues

Internal Revenue Code (IRC) § 7803(c)(2)(B)(ii)(X) requires the National Taxpayer Advocate to identify in her Annual Report to Congress (ARC) the ten tax issues most litigated in federal courts (Most Litigated Issues).[1]  The National Taxpayer Advocate may analyze these issues to develop recommendations to mitigate the disputes resulting in litigation.

TAS identified the Most Litigated Issues (MLI) from June 1, 2014, through May 31, 2015, by using commercial legal research databases.  For purposes of this section of the Annual Report, the term "litigated" means cases in which the court issued an opinion.[2]  This year's MLI are:

- Accuracy-Related Penalty Under IRC § 6662(b)(1) and (2);[3]

- Trade or Business Expenses Under IRC § 162 and Related Sections;

- Summons Enforcement Under IRC §§ 7602, 7604, and 7609;

- Gross Income Under IRC § 61 and Related Sections;

- Appeals from Collection Due Process (CDP) Hearings Under IRC §§ 6320 and 6330;

- Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as Tax on Return Penalty Under IRC § 6651(a)(2), and Failure to Pay Estimated Tax Penalty Under IRC § 6654;

- Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403;

- Charitable Deductions Under IRC § 170;

- Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions; and

- Relief from Joint and Several Liability Under IRC § 6015.

All of these issues were identified as MLIs last year, with the exception of relief from joint and several liability for spouses.[4]  This issue has appeared in previous MLI sections, most recently in 2013.[5]  Accuracy-related penalties remained the top issue this year, although we identified 40 fewer cases than the 153 cases identified last year.[6]  This works out to a 26 percent decrease, the largest drop in any category of cases.  Summons enforcement cases experienced the second largest percentage decrease, as we identified 84 cases this year and 102 last year, an 18 percent decrease.[7]  Cases involving civil actions to enforce federal tax liens or to subject property to payment of tax and trade or business expenses also decreased from previous

---

1   Federal tax cases are tried in the United States Tax Court, United States District Courts, the United States Court of Federal Claims, United States Bankruptcy Courts, United States Courts of Appeals, and the United States Supreme Court.

2   Many cases are resolved before the court issues an opinion.  Some taxpayers reach a settlement with the IRS before trial, while the courts dismiss other taxpayers' cases for a variety of reasons, including lack of jurisdiction and lack of prosecution. Courts can issue less formal "bench opinions," which are not published or precedential.

3   IRC § 6662 also includes (b)(4), (5), (6), and (7), but because those types of accuracy-related penalties were not heavily litigated, we have only analyzed (b)(1), (2), and (3).

4   *See* National Taxpayer Advocate 2014 Annual Report to Congress 423.

5   *See* National Taxpayer Advocate 2013 Annual Report to Congress 322.

6   *See* National Taxpayer Advocate 2014 Annual Report to Congress 443.

7   *Id.* at 462.

001840

year figures by 15 percent and 14 percent, respectively.[8]  Overall, the total number of cases identified in the MLIs dropped from 731 in 2014 to 640 this year, a 12 percent decrease from last year and a 27 percent decrease from the 877 cases identified in 2013.[9]  Although there has been a decline in the number of cases over the last two years, the relative percentage of cases involving *pro se* taxpayers has remained consistent, with 62 percent this year, as compared to the same percentage last year and 63 percent in 2013.[10]

Once TAS identified the MLI, we analyzed each one in five sections: summary of findings, taxpayer rights impacted, description of present law, analysis of the litigated cases, and conclusion.  The taxpayer rights impacted section is new for the MLIs section this year and reflects the relevance of the Taxpayer Bill of Rights (TBOR), which was adopted by the IRS last year on the National Taxpayer Advocate's recommendation.[11]  Each case is listed in Appendix 3, which categorizes the cases by type of taxpayer (*i.e.*, individual or business).[12]  Appendix 3 also provides the citation for each case, indicates whether the taxpayer was represented at trial or argued the case *pro se* (*i.e.*, without representation), and lists the court's decision.[13]

We have also included a "Significant Cases" section summarizing decisions that are not among the top ten issues but are relevant to tax administration.[14]  This year, the Significant Cases discussion includes two decisions issued by the Supreme Court that impact tax adminstration issues and a circuit court of appeals decision that directly affects TAS.[15]

## AN OVERVIEW OF HOW TAX ISSUES ARE LITIGATED

Taxpayers can generally litigate a tax matter in four different types of courts:

- The United States Tax Court;
- United States District Courts;
- The United States Court of Federal Claims; and
- United States Bankruptcy Courts.

---

8   *See* National Taxpayer Advocate 2014 Annual Report to Congress 503; National Taxpayer Advocate 2014 Annual Report to Congress 453.

9   *Id.* at 425; National Taxpayer Advocate 2013 Annual Report to Congress 324.

10   *Id.*

11   *See* TBOR, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights; National Taxpayer Advocate 2013 Annual Report to Congress 5 (Most Serious Problem: *Taxpayer Rights: The IRS Should Adopt a Taxpayer Bill of Rights as a Framework for Effective Tax Administration*).

12   Individuals filing Schedules C, E, or F are deemed business taxpayers for purposes of this discussion even if items reported on such schedules were not the subject of litigation.

13   "*Pro se*" means "for oneself; on one's own behalf; without a lawyer."  BLACK'S LAW DICTIONARY (10th ed. 2014).  For purposes of this analysis, we considered the court's decision with respect to the issue analyzed only.  A "split" decision is defined as a partial allowance on the specific issue analyzed.  The citations also indicate whether decisions were on appeal at the time this report went to print.

14   Three of the cases discussed in the "Significant Cases" section of this report were decided outside the June 1, 2014, through May 31, 2015, period used to identify the ten most litigated issues, but we nonetheless have included these cases because of their impact on tax administration.

15   *King v. Burwell*, 135 S. Ct. 2480 (June 25, 2015), *aff'g* 759 F.3d 358 (4th Cir. 2014), *aff'g sub. nom. King v. Sebelius*, 997 F. Supp. 2d 415 (E.D. Va. 2014); *Obergefell v. Hodges*, 135 S. Ct. 2584 (June 26, 2015); *Rothkamm v. U.S.*, No. 14-31164, slip op. (5th Cir. 2015), — F.3d —, 116 A.F.T.R. 2d 2015-6198 (2015), *rev'g and remanding*, 114 A.F.T.R. 2d (RIA) 5997, 2014-2 U.S. Tax Cas. (CCH) P50,441 (M.D. La. 2014).

001841

With limited exceptions, taxpayers have an automatic right of appeal from the decisions of any of these courts.[16]

The Tax Court is a "prepayment" forum.  In other words, taxpayers can access the Tax Court without having to pay the disputed tax in advance.  The Tax Court has jurisdiction over a variety of issues, including deficiencies, certain declaratory judgment actions, appeals from CDP hearings, relief from joint and several liability, and determination of employment status.[17]

The United States District Courts and the United States Court of Federal Claims have concurrent jurisdiction over tax matters in which (1) the tax has been assessed and paid in full,[18] and (2) the taxpayer has filed an administrative claim for refund.[19]  The United States District Courts, along with the bankruptcy courts in very limited circumstances, provide the only fora in which a taxpayer can receive a jury trial.[20]  Bankruptcy courts can adjudicate tax matters that were not adjudicated prior to the initiation of a bankruptcy case.[21]

---

16  *See* IRC § 7482, which provides that the United States Courts of Appeals (other than the United States Court of Appeals for the Federal Circuit) have jurisdiction to review the decisions of the Tax Court.  There are exceptions to this general rule. For example, IRC § 7463 provides special procedures for small Tax Court cases (where the amount of deficiency or claimed overpayment totals $50,000 or less) for which appellate review is not available.  *See also* 28 U.S.C. § 1294 (appeals from a United States District Court are to the appropriate United States Court of Appeals); 28 U.S.C. § 1295 (appeals from the United States Court of Federal Claims are heard in the United States Court of Appeals for the Federal Circuit); 28 U.S.C. § 1254 (appeals from the United States Courts of Appeals may be reviewed by the United States Supreme Court). *See also Byers v. Comm'r*, 740 F.3d 668 (D.C. 2014), *cert. denied*, 83 U.S.L.W. 3189 (U.S. Oct. 6, 2014) (No. 14-74) (the D.C. Circuit will not transfer cases to another circuit in non-liability CDP cases unless both parties stipulate to transfer the case).

17  IRC §§ 6214; 7476-7479; 6330(d); 6015(e); 7436.

18  28 U.S.C. § 1346(a)(1).  *See Flora v. United States*, 362 U.S. 145 (1960), *reh'g denied*, 362 U.S. 972 (1960).

19  IRC § 7422(a).

20  The bankruptcy court may only conduct a jury trial if the right to a trial by jury applies, all parties expressly consent, and the district court specifically designates the bankruptcy judge to exercise such jurisdiction.  28 U.S.C. § 157(e).

21  *See* 11 U.S.C. §§ 505(a)(1) and (a)(2)(A).

## ANALYSIS OF *PRO SE* LITIGATION

As in previous years, many taxpayers appeared before the courts *pro se*. Figure 3.0.1 lists the Most Litigated Issues for the review period June 1, 2014, through May 31, 2015, and identifies the number of cases, categorized by issue, in which taxpayers appeared without representation. As the figure illustrates, the issues with the highest rates of *pro se* appearance are summons enforcement and the frivolous issues penalty.

**FIGURE 3.0.1,** *Pro Se* **Cases by Issue**

| Most Litigated Issue | Litigated Cases Reviewed | *Pro Se* Litigation | % of Cases Involving *Pro Se* Taxpayers |
|---|---|---|---|
| Accuracy-Related Penalty | 113 | 68 | 60% |
| Trade or Business Expenses | 99 | 60 | 61% |
| Summons Enforcement | 84 | 61 | 73% |
| Gross Income | 80 | 53 | 66% |
| Collection Due Process | 79 | 46 | 58% |
| Failure to File, Failure to Pay, and Estimated Tax Penalties | 63 | 41 | 65% |
| Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax | 44 | 18 | 41% |
| Charitable Deductions | 28 | 14 | 50% |
| Frivolous Issues Penalty (and analogous appellate-level sanctions) | 26 | 24 | 92% |
| Relief From Joint and Several Liability | 24 | 11 | 46% |
| **Total** | **640** | **396** | **62%** |

Figure 3.0.2 affirms our contention that taxpayers are more likely to prevail if they are represented.  The disparity in the success rate between *pro se* and represented taxpayers is much less than last year.  *Pro se* taxpayers prevailed in 19 percent of cases this year as compared to ten percent last year, a remarkable 90 percent increase in success rate.  Represented taxpayers fared slightly better than last year, achieving a 28 percent success rate as compared to 26 percent last year, an eight percent increase.

### FIGURE 3.0.2, Outcomes for *Pro Se* and Represented Taxpayers

| Most Litigated Issue | *Pro Se* Taxpayers | | | Represented Taxpayers | | |
|---|---|---|---|---|---|---|
| | Total Cases | Taxpayer Prevailed in whole or in part | Percent | Total Cases | Taxpayer Prevailed in whole or in part | Percent |
| Accuracy-Related Penalty | 68 | 14 | 21% | 45 | 12 | 27% |
| Trade or Business Expenses | 60 | 23 | 38% | 39 | 19 | 49% |
| Summons Enforcement | 61 | 1 | 2% | 23 | 2 | 9% |
| Gross Income | 53 | 7 | 13% | 27 | 10 | 37% |
| Collection Due Process | 46 | 5 | 11% | 33 | 9 | 27% |
| Failure to File, Failure to Pay, and Estimated Tax Penalties | 41 | 7 | 17% | 22 | 4 | 18% |
| Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax | 18 | 0 | 0% | 26 | 4 | 15% |
| Charitable Contributions | 14 | 5 | 36% | 14 | 5 | 36% |
| Frivolous Issues Penalty (and analogous appellate-level sanctions) | 24 | 7 | 29% | 2 | 0 | 0% |
| Relief From Joint and Several Liability | 11 | 5 | 45% | 13 | 4 | 31% |
| **Total** | **396** | **74** | **19%** | **244** | **69** | **28%** |

# SIGNIFICANT CASES

This section describes cases that generally do not involve any of the ten most litigated issues, but nonetheless highlight important issues relevant to tax administration.[1]  These decisions are summarized below.

**In *King v. Burwell*, the Supreme Court upheld Treasury regulations that provide a Premium Tax Credit to individuals who obtain health insurance through a federally-facilitated exchange.[2]**

Virginia residents who did not want to purchase health insurance or pay a penalty (under Internal Revenue Code (IRC) § 5000A) filed suit.  They challenged the validity of Treasury Regulations that grant a health insurance Premium Tax Credit, as applied to residents of states that did not set up their own exchanges.[3]  If the regulations were invalid, the plaintiffs would be ineligible for the credit.  Without the credit, the plaintiffs would not be required to purchase insurance because they would qualify for the exception applicable to low income taxpayers without access to affordable insurance.[4]

By statute, the Premium Tax Credit is only available to offset premiums available "through an Exchange established by the State."[5]  The Commonwealth of Virginia has not established a state-run health insurance exchange and is therefore served by the federally-facilitated exchange (*i.e.*, HealthCare.gov).  The plaintiffs allege that the related regulations are invalid because they authorize credits not only for people using "an Exchange established by the State," but also for people using the federally-facilitated exchange.[6]

The district court upheld the regulations and granted the government's motion to dismiss.[7]  The United States Court of Appeals for the 4th Circuit affirmed, citing *Chevron*.[8]  Under *Chevron*, courts generally defer to an agency's interpretation of ambiguous statutory language.[9]

The Supreme Court affirmed but did not defer to the IRS under *Chevron*.  It concluded that the statutory language was ambiguous, but that Congress did not intend to delegate a decision of such deep "economic

---

1  When identifying the ten most litigated issues, TAS analyzed federal decisions issued during the period beginning on June 1, 2014, and ending on May 31, 2015.  For purposes of this section, we generally used the same period, except that we included two Supreme Court decisions issued shortly thereafter and one circuit court decision that directly affects TAS.

2  *King v. Burwell*, 135 S. Ct. 2480 (June 25, 2015), *aff'g* 759 F.3d 358 (4th Cir. 2014), *aff'g sub. nom. King v. Sebelius*, 997 F. Supp. 2d 415 (E.D. Va. 2014).

3  *See generally* Treas. Reg. § 1.36B–2.

4  Low income individuals for whom the annual "cost of coverage" exceeds eight percent of their projected household income are not subject to a penalty for failing to purchase health insurance.  IRC § 5000A(e)(1)(A).  Under this rule, the cost of coverage may be reduced by the Premium Tax Credit.  IRC § 5000A(e)(1)(B)(ii).

5  IRC §§ 36B(b)(2), 36B(c)(2)(A)(i).

6  Treas. Reg. § 1.36B–2 provides that credits shall be available to anyone "enrolled in one or more qualified health plans through an Exchange," and Treas. Reg. § 1.36B-1(k) adopts, by cross-reference, a Health and Human Services (HHS) definition of "Exchange" that includes any Exchange, "regardless of whether the Exchange is established and operated by a State … or by HHS."  45 C.F.R. § 155.20.

7  *King v. Burwell*, 997 F. Supp. 2d 415 (E.D. Va.2014).

8  *King v. Burwell*, 759 F.3d 358 (4th Cir. 2014).

9  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  On the same day that the 4th Circuit issued its opinion, a panel of the Court of Appeals for the District of Columbia Circuit struck down the regulations, creating a split among the circuits.  *Halbig v. Burwell*, 758 F.3d 390 (D.C. Cir. 2014).  The Court of Appeals for the District of Columbia later agreed to rehear the case *en banc* and vacated its original decision eliminating the split.  *Halbig v. Burwell*, 114 A.F.T.R.2d (RIA) 5868 (2014).

001845

Case 6:24-cv-00306-JCB   Document 124   Filed 07/07/24   Page 1853 of 4699 PageID #:  5018

Appendices &amp; Special | Legislative | Most Serious | Filing Season | Preface &amp; Highlights
Problems                    Recommendations          **Most Litigated Issues**

and political significance" to the IRS.[10]  Additionally, it noted that the IRS had no particular expertise in crafting health insurance policy to which courts should defer.

Instead, the Court searched for a meaning compatible with the structure and purpose of the law.  It noted that the petitioner's literal interpretation could result in the failure of the legislation.  It found that Congress intended the Premium Tax Credit to apply broadly, to both state and federal exchanges to maximize insurance coverage.  The Court therefore held that Premium Tax Credits are available to individuals purchasing insurance through the federally-facilitated exchange.[11]

This case is significant because those purchasing health insurance through the federally-facilitated exchange will continue to receive tax credits.  It is also significant because the Court suggested that Treasury Regulations may not be entitled to *Chevron* deference when they interpret the ACA or other important non-tax laws in areas where the IRS does not have substantive expertise.

### In *Obergefell v. Hodges*, the Supreme Court held that states must allow same-sex couples to marry and recognize same-sex marriages performed in other states.[12]

Various district courts held that the state laws in Michigan, Tennessee, Ohio, and Kentucky, which defined marriage as between one man and one woman, violated the U.S. Constitution.  The U.S. Court of Appeals for the 6th Circuit consolidated these cases and reversed, upholding the state laws.  The Supreme Court reversed, holding that the states cannot "exclude same-sex couples from civil marriage on the same terms and conditions as opposite sex couples"[13] and that states must recognize same-sex marriages performed in other states.

Although same-sex married couples have been treated as married for federal income tax purposes since the Court held the Defense of Marriage Act (DOMA) unconstitutional,[14] this case is significant to federal income tax administration because it affects marital status, parentage, income, property rights, insurance coverage, and state taxes, all of which are reported on federal returns.  Couples in common-law marriage states may find themselves legally married on a retroactive basis.  For those in community property states, the holding may affect their taxable income for both state and federal income tax purposes, even if they file separately.[15]  Determining the parentage of children for federal tax purposes may now be less complicated.  These issues may prompt some to amend their federal or state returns.  Even those who only amend state returns to change their filing status may also amend their federal returns for consistency (*e.g.*, to adjust their deduction for state and local taxes).  While this case should generally simplify tax filing,

---

10  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015).

11  As the Court based its decision on its interpretation of the statute, it would be difficult for the IRS to issue regulations that would reinterpret the statue any other way.  *See National Cable &amp; Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005) (suggesting agencies may not adopt a statutory interpretation rejected by the courts).

12  *Obergefell v. Hodges*, 135 S. Ct. 2584 (June 26, 2015).

13  *Id.* at 2605.

14  *U.S. v. Windsor*, 133 S. Ct. 2675 (2013); Rev. Rul. 2013-17, 2013-38 I.R.B. 201.  After *Windsor*, the IRS allowed but did not require retroactive joint filing.  Rev. Rul. 2013-17, 2013-38 I.R.B. 201.  For a discussion of *Windsor* and related tax issues, see, *e.g.*, National Taxpayer Advocate 2013 Annual Report to Congress 326-27 (discussing *Windsor*), National Taxpayer Advocate 2013 Annual Report to Congress (Most Serious Problem: *Domestic Partners and Same-Sex Couples Need Federal Tax Guidance*), and National Taxpayer Advocate 2012 Annual Report to Congress 449 (Status Update: *Federal Tax Questions Continue to Trouble Domestic Partners and Same-Sex Spouses*).

15  Even if married taxpayers file separately, each is generally subject to tax on one-half of any "community income," including income earned by his or her spouse.  *See Poe v. Seaborn*, 282 U.S. 101 (1930).  Married taxpayers in community property states have "community income" under state law.

001846

there is a long list of state tax issues that will need to be resolved.[16]  In addition, the Solicitor General suggested that if the Court held the state laws unconstitutional, as it did, "the tax exemptions of some religious institutions would be in question if they opposed same-sex marriage."[17]  Representatives in Congress are reportedly working to address this issue.[18]

### In *Rothkamm v. United States*, the United States Court of Appeals for the 5th Circuit held that the period of limitations for filing a wrongful levy claim was suspended by a person's application for a Taxpayer Assistance Order (TAO).[19]

On March 6, 2012, the IRS issued a notice of levy to Mrs. Rothkamm's bank, seeking to collect her husband's tax liability from an account she claimed was her separate property.  On April 18, 2012, the bank complied with the levy, transferring the proceeds of her account to the IRS.  About two weeks later, on April 30, 2012, she sought assistance from the Taxpayer Advocate Service (TAS), filing a Form 911, *Application for a Taxpayer Assistance Order*.  About five and a half months later, on October 11, 2012, TAS closed her case.[20]  On May 15, 2013, more than nine months following the levy, Mrs. Rothkamm filed an administrative claim for wrongful levy under IRC § 6343(b).[21]  The IRS denied the claim on July 1, 2013.  Finally, on September 6, 2013, Mrs. Rothkamm filed a suit for wrongful levy under IRC § 7426(a).  The district court held her claim was time barred, but the United States Court of Appeals for the 5th Circuit reversed and remanded.

A person generally must file any administrative claim with the IRS for wrongful levy within nine months of the levy.[22]  A person may also file suit for wrongful levy in district court within the same nine-month period.[23]  However, a timely filed administrative claim tolls the nine-month period for filing a suit by up to 12 months — the shorter of 12 months from the administrative filing or six months from the date the IRS mails a notice of disallowance.[24]

---

16   Some same-sex married couples had to file as unmarried for state tax purposes, even on returns that required figures from a federal return.  To arrive at the figures needed to fill out the state returns, taxpayers sometimes had to compute "dummy" federal returns that they would not file.  *See* Intuit, *Simplifying the Tax Filing Process for Same-Sex Couples* (June 19, 2015), *available at* http://intuittaxandfinancialcenter.com/article/simplifying-the-tax-filing-process-for-same-sex-couples/.  These filing burdens, which were particularly severe for those with interests in flow-through entities doing business nationwide, should decrease as a result of this decision.

17   *Obergefell v. Hodges*, 135 S. Ct. 2584, 2626 (June 26, 2015) (J. Roberts, Dissenting).

18   *See, e.g.*, Kaustuv Basu, *Lee's Bill Would Protect Tax-Exempt Status for Religious Groups*, 147 Tax Notes 1138 (June 8, 2015); First Amendment Defense Act, S.1598, 114th Cong. (2015).

19   *Rothkamm v. U.S.*, 802 F.3d 699 (5th Cir. 2015) (hereinafter *Rothkamm II*), *rev'g and remanding*, 114 A.F.T.R. 2d (RIA) 5997, 2014-2 U.S. Tax Cas. (CCH) P50,441 (M.D. La. 2014) (hereinafter *Rothkamm I*).

20   The 5th Circuit Court's dissenting opinion noted that "Rothkamm has not argued that TAS did not inform her about the period of limitation for filing a wrongful levy action."  *Rothkamm II* at 718 n. 22.

21   Mrs. Rothkamm filed her administrative claim more than 14 months after the March 6, 2012, notice of levy and nearly 13 months after the bank paid the levy on April 18, 2012.

22   IRC § 6343(b); Treas. Reg. § 301.6343–2(a)(2).

23   IRC §§ 7426(a) and (i) (cross referencing IRC § 6532(c)).

24   IRC § 6532(c)(2); Treas. Reg. § 301.6532–3.

001847

The government first argued that Mrs. Rothkamm's suit was time barred because her nine–month period for filing a wrongful levy suit expired on January 18, 2013.[25]  Thus, her suit, filed September 6, 2013, was over seven months late.

Mrs. Rothkamm argued that her suit was timely because the nine-month period for bringing a wrongful levy suit was suspended during the pendency of both: (1) her April 18, 2012 application for a TAO (under IRC § 7811(d)); *and* (2) her timely administrative claim to the IRS filed on May 15, 2013.[26]  She reasoned that her TAO application extended the deadline for filing an administrative claim by over five months.  Because of this extension, her administrative claim was timely and it extended the period for filing suit until six months after the IRS disallowed it on July 1, 2013 (*i.e.*, until January 1, 2014).  Thus, Mrs. Rothkamm's September 6, 2013 suit was timely.

By its terms, IRC § 7811(d) suspends "[t]he running of any period of limitation with respect to any action described in subsection (b) [the terms of a TAO]."  IRC § 7811(b) provides:

> The terms of a Taxpayer Assistance Order may require the Secretary within a specified time period — (1) to release property of the taxpayer levied upon, or (2) to cease any action, take any action as permitted by law, or refrain from taking any action, with respect to the taxpayer…

The government argued and the district court agreed that (1) the tolling provided by IRC § 7811(d) only applies to "taxpayers" and that Mrs. Rothkamm was not a "taxpayer" for that purpose, and (2) even if Mrs. Rothkamm *was* a taxpayer, she was not entitled to tolling because it only applies to IRS actions, not taxpayer actions.[27]  Thus, the district court concluded it had no subject matter jurisdiction because the claim was not timely.

First, the 5th Circuit concluded that the district court erred by failing to use the definition of "taxpayer" set forth in IRC § 7701(a)(14), which includes "any person subject to any internal revenue tax."  It relied on the Supreme Court decision in *Williams*, which held that Lori Williams, "who paid a tax under protest to remove a lien on her property," was a taxpayer under IRC § 7701(a)(14), and therefore, "had standing to bring a refund action under 28 USC § 1346(a)(1), even though the tax she paid was assessed against a third party."[28]  The court rejected the government's argument that subsequent case law had altered the Supreme Court's interpretation of IRC § 7701(a)(14).[29]

---

25  *Rothkamm I*, slip op. at *2 (referencing the January 18 deadline); Govt. Motion to Dismiss, Dkt. No. 3:13-cv-00589-BAJ-RLB 2 (M.D. La., Nov. 8, 2013) (same).  If the nine-month period for filing a wrongful levy claim did not begin until the bank *paid* the levy it would have expired on January 18, 2013, but if it began when the IRS *issued* the notice of levy to the bank it would have expired on December 6, 2012.  In other cases cited by the court, and on appeal, the government argued that the period begins on the date the IRS *issues* the notice of levy.  *See, e.g.*, Brief for the Appellees, Dkt. No. 14-31164 at 15 (Feb. 2, 2015) (referencing the December 6, 2012 deadline); *United Sand & Gravel Contractors, Inc. v. U.S.*, 624 F.2d 733, 735 (5th Cir.1980) (treating the date of the notice of levy as the date of the levy); Treas. Reg. § 301.6532–3(c)(Ex. 1) (same for notice of seizure).

26  *Rothkamm I*, slip op. at *2.  Regulations make clear that wrongful levy claims must be filed with a specific office.  Treas. Reg. § 301.6343–2(b).  In other cases; however, taxpayers appear to have argued that submissions to TAS were informal claims.  *See, e.g.*, *John Purciello v. U.S.*, No. 2:11-cv-4181(DMC)(MF), 2013 WL 6448108 (D.N.J. Dec. 9, 2013).  Even if the April 30, 2012, application for a TAO was treated as an informal claim, in the absence of additional tolling, the period for filing suit would arguably have expired 12 months later, on April 30, 2013, and the May 15, 2013 filing may still have been late.

27  *Rothkamm I*, slip op. at *2.

28  *Rothkamm II* at 704 (quoting *U.S. v. Williams*, 514 U.S. 527, 529 (1995)).

29  The government cited *EC Term of Years Trust v. U.S.*, 550 U.S. 429 (2007), which held a court had no jurisdiction to hear a claim for wrongful levy by a trust under 28 U.S.C. 1346(a)(1).  The 5th Circuit explained that if the trust could bring suit under IRC § 1346(a)(1), its suit would be timely, but it would be time-barred under IRC § 7426(a)(1)'s stricter nine-month statute of limitations.  Therefore, *EC Terms of Years Trust* concerned the remedy available to the trust and had no bearing on whether the trust was a taxpayer.

The 5th Circuit found no reason to conclude that the definition of taxpayer in IRC §§ 7811 or 7803 is different from the general definition of taxpayer found in IRC § 7701(a)(14), observing that at least four of the ten examples of TAOs set forth in regulations involve wrongful levies, and speculating that some of them could have been referring to third parties.[30]  It held that the term "taxpayer" in IRC § 7811 includes not only the person against whom a tax is assessed, but also the person who actually pays the tax.  Thus, the tolling provisions under IRC § 7811 could apply to Mrs. Rothkamm.

Next, the 5th Circuit rejected the argument that tolling only applies to actions of the IRS.  IRC § 7811(d) says tolling applies to "any statute of limitations for any action described in § 7811(b)."  The court suggested that tolling applied because "release[ing] property of the taxpayer levied upon," which was at issue in Mrs. Rothkamm's case, is described in IRC § 7811(b)(1).

Because the court's holding was based on the plain language of the statute under *Chevron* step-one,[31] it gave no deference to regulations which state "[A] taxpayer's right to administrative or judicial review will not be diminished or expanded in any way as a result of the taxpayer's seeking assistance from TAS."[32]  It nonetheless reasoned that tolling would allow a taxpayer to pursue a TAO without fear that the process would prejudice her rights in the event she does not obtain TAO relief, claiming that its interpretation would not make the IRS or the taxpayer any worse off.[33]

Finally, the 5th Circuit concluded that neither the code nor the regulations make tolling subject to the IRS's discretion, dismissing contrary authorities.[34]  It also dismissed the government's statutory arguments.  The government apparently argued that Congress directly addressed the question of whether IRC § 7811(d) tolls the running of the nine-month statute of limitations in IRC § 7426(a) because neither statute references the other.  According to the court, the government failed to explain how Congress may directly address something by remaining silent on it.[35]  The government's other statutory argument was that tolling does not apply to the release of levies under IRC § 7811(b)(1) because that section does not contain the word "action."  The court determined that this argument had no merit.[36]  It noted that the government had offered no reasonable alternative construction of the plain language

---

30  *Rothkamm II* at 708 n.29 (citing Treas. Reg. §§ 301.7811-1(a)(Ex. 1), -1(e) (Exs. 1, 2 and 3)).

31  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  A court only gives deference to agency regulations under *Chevron* step-two, if it first determines the statute is ambiguous under *Chevron* step-one.  *Id.*

32  Treas. Reg. § 301.7811-1(b).  The court also reasoned that this regulation addresses TAOs and not tolling.  *Rothkamm II* at 711.

33  *Rothkamm II* at 709-10.  Whether tolling the period of limitations for taking an action makes a person better off depends on whether the person is able to take the action during the tolling period.  If they are able to take the action, tolling makes them better off because they get a longer period than otherwise provided by statute.  For example, if the ten-year period for the IRS to collect tax is extended during the pendency of a TAO application, the IRS is only better off if it could continue to collect during that period.  Assuming it could, the IRS could collect for more than ten years otherwise allowed by law.  Citing legislative history, instructions to Form 911, and case law, the dissent argues that IRC § 7811(d) tolls the limitations period only with respect to actions of the IRS on the basis that it cannot take action while an application for a TAO is pending.  *Rothkamm II* at 717-18.  The dissent also cited various cases for the proposition that "all suspension provisions [including § 7811(d)] are designed and intended to avoid prejudice to the IRS's ability to collect during periods of time in which collection or assessment is prohibited by law [or otherwise impeded]."  *Id.* at 717 n.14.

34  *Rothkamm II* at 713 (referencing *Demes v. U.S.*, 52 Fed. Cl. 365, 373 (Fed. Cl. 2002)).

35  *Id.* at 713-14.

36  *Id.*  Even if the court had accepted the government's argument that tolling under IRC § 7811(d) only covers "actions" under IRC § 7811(b) that are described using the word "action," it would have lost.  IRC § 7811(b)(2)(A) specifically refers to "actions" under "chapter 64," and IRC § 6343, which covers wrongful levies, is located in chapter 64.  In addition, IRC § 7811(b)(2)(D) refers to "actions" under "any other provision of law which is specifically described by the National Taxpayer Advocate in such order," which may address wrongful levies.

of IRC § 7811(d).[37]  Thus, it held that Mrs. Rothkamm's filing was timely because her application for a TAO tolled the period for filing a wrongful levy claim.

This case is significant because it affirms the National Taxpayer Advocate's authority to issue TAOs to assist those who are subject to levies to collect another person's liability.  However, it leaves unanswered questions about whether a "taxpayer" includes other third parties, such as whistleblowers or preparers who seek TAOs in situations where they have not been "subject to" the tax at issue in their cases.[38]

As the dissent notes, it is also significant because it creates administrative difficulties, replacing fixed periods of limitation with indefinite periods.[39]  The case is likely to prompt many taxpayers who have sought TAS assistance and subsequently missed a deadline to argue that the deadline was tolled under IRC § 7811(d) by their application to TAS.  It also raises a number of questions.  The IRS has not implemented IRC § 7811(d) because of technical difficulties in recording and tracking the suspension period.[40]  Will the IRS now feel obligated to try to implement those provisions, even in cases where they would penalize taxpayers for seeking TAS assistance?[41]  Will taxpayers now seek to toll the period for taking "any" action by simply filing a Form 911 (*e.g.*, filing in tax court, requesting a collection due process hearing, claiming a refund).[42]  If IRC § 7811(d) tolls the period for taxpayers to take action, can the National Taxpayer Advocate extend these periods even further?[43]

---

37  The government did not focus on statutory language that supports the position that only actions of the IRS are tolled: IRC § 7811(d) tolls the statute with respect to actions described in IRC § 7811(b), but the flush language of IRC § 7811(b) provides a TAO "may require the Secretary" to take or not take various actions.  In other words, all of the actions described in IRC § 7811(b) must be taken by the IRS and not the taxpayer or a third party.  Thus, IRC § 7811(d) can only toll the period of limitations with respect to actions of the IRS.

38  For additional discussion of these and other issues, see *Legislative Recommendation: Statute of Limitations: Repeal or Fix Statute Suspension Under IRC § 7811(d)*, *supra*.

39  *Rothkamm II* at 720.

40  Although TAS drafted procedures for implementing statute suspension under IRC § 7811(d), due to technical difficulties, they were not implemented (*e.g.*, tracking different suspension periods for each spouse and for assessments for the same year made on different dates).  *See, e.g.*, IRM 13.1.14 (Oct. 31, 2004); Memorandum from Commissioner of Internal Revenue, *Taxpayer Advocate Service Statute Suspension Provisions Under IRC Section 7811(d)* (Nov. 10, 2003).  At least one legal memo concludes that if the IRS has authority not to implement IRC § 7811(d), it is because the provision can only benefit the IRS by extending the period for the IRS to take enforcement actions (*e.g.*, by extending the period for collection or assessment).  *Compare* IRS Litigation Bulletin 360, 1990 WL 1086174, 1990 GLB LEXIS 12 (1990) (concluding that because IRC § 7811(d) only protects the IRS by tolling collection and assessment periods, the IRS is not legally required to implement it), *with* Memo from Acting Counsel to the National Taxpayer Advocate to Director Taxpayer Account Operations, *Suspension of the Statutes of Limitations Under Section 7811(d)* (Mar. 9, 2001) (assuming statute suspension only applies to protect the IRS's interest, but still declining to conclude its implementation is not mandatory).

41  Taxpayers would be penalized if, for example, collection statutes were tolled but collection actions were not suspended.

42  As noted above, *Rothkamm II* did not directly hold that IRC § 7811(d) extended the period for filing suit.  Rather, it held that IRC § 7811(d) extended the period for filing an administrative claim, and that the IRS's denial of the timely-filed administrative claim extended the period for filing suit by operation of IRC § 6532(c)(2).  A future decision could clarify that IRC § 7811(d) does not extend jurisdictional deadlines for filing in court, but this case still invites litigation in this area.  *Compare Volpicelli v. U.S.*, 777 F.3d 1042 (9th Cir. 2015) (holding the limitations period for filing suit to challenge a wrongful levy was subject to equitable tolling because it was procedural and not jurisdictional, as discussed below) *with Becton Dickinson & Co. v. Wolckenhauer*, 215 F.3d 340 (3d Cir. 2000) (holding that the limitations period for filing suit to challenge a wrongful levy was jurisdictional, and thus, not subject to equitable tolling).

43  IRC § 7811(d)(2) (tolling the period of limitation with respect to "any action described in subsection (b)" by "any period specified by the National Taxpayer Advocate" in a TAO).

### In *Mallo v. IRS*, the United States Court of Appeals for the 10th Circuit held that tax debt with respect to late-filed tax returns (except returns filed with IRS assistance) cannot be discharged in bankruptcy.[44]

The taxpayers did not file timely federal income tax returns for 2000 or 2001.  Only after the IRS assessed a tax liability did they file returns.[45]  More than two years later, the taxpayers filed for bankruptcy, seeking to discharge their tax debts.  The IRS argued the tax debts were not dischargeable.  In a consolidated appeal of conflicting decisions, the United States District Court for the District of Colorado agreed with the IRS, as did the United States Court of Appeals for the 10th Circuit.

A taxpayer may not discharge in bankruptcy tax liabilities "with respect to which a return … was not filed or given."[46]  Tax liabilities with respect to which a late return was filed within two years of the bankruptcy petition are also exempt from discharge.[47]  Before 2005, with certain exceptions, a debtor could discharge the portion of a tax debt that he or she self-assessed on a late return, as long as he or she waited two years after filing.  As part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Congress attempted to clarify the discharge rules by amending 11 U.S.C. § 523(a) to include a "hanging paragraph."[48]  It defines a "return" as "a return that satisfies the requirements of applicable non-bankruptcy law (including applicable filing requirements)."  It goes on to state that a late return prepared by the IRS and signed by the taxpayer under IRC § 6020(a) is treated as a return, but a return prepared by the IRS without the taxpayer's cooperation under IRC § 6020(b) is not.[49]  Whether a document is a return for tax purposes depends on whether it satisfies the *Beard* test, which requires that it (1) contain sufficient data to calculate tax liability, (2) purport to be a return, (3) be an honest and reasonable attempt to satisfy the law, and (4) be executed under penalties of perjury.[50]

The IRS argued that the tax debt was not dischargeable because it arose from an IRS assessment rather than from a taxpayer's self-assessment on a return.  In other words, a debt (or portion thereof) assessed by the IRS before filing was "with respect to which a return … was not filed or given,"[51] and thus, permanently nondischargeable, even if the taxpayer later filed a return.  The court rejected this argument, holding that the debt arose from the tax code rather than an assessment.

Instead, the court reasoned that even if a post-assessment filing is a return under *Beard*, late returns are not "returns" for purposes of discharge because they do not satisfy "applicable filing requirements."[52]  The taxpayer argued that such an interpretation would make the specific exclusion of late returns filed under IRC § 6020(b) superfluous.[53]  The taxpayer also argued that the exclusion for late returns filed less than

---

44   *In re Mallo*, 774 F.3d 1313 (10th Cir. 2014).

45   Unlike the returns deemed meaningless in *In re Hindenlang*, 164 F.3d 1029 (6th Cir. 1999), these returns did not mirror the IRS's tax assessment.

46   11 U.S.C. § 523(a)(1)(B)(i).

47   11 U.S.C. § 523(a)(1)(B)(ii).

48   BAPCPA, Pub. L. No. 109-8, § 714, 119 Stat. 23, 128 (2005) (modifying 11 U.S.C. § 523(a)).

49   11 U.S.C. § 523(a).  Under IRC § 6020(a), the IRS may prepare a late return if a taxpayer cooperates by providing "consent to disclose all information necessary for the preparation thereof" and then signs it.  When taxpayers do not provide such consent or signatures, the Secretary may prepare a late return or assessment under IRC § 6020(b) "from his own knowledge and from such information as he can obtain through testimony or otherwise."

50   *Beard v. Comm'r*, 82 T.C. 766, 777 (1984), *aff'd per curiam*, 793 F.2d 139 (6th Cir. 1986) (applying a test set forth in *Zellerbach Paper Co. v. Helvering*, 293 U.S. 172 (1934)).

51   11 U.S.C. § 523(a)(1)(B)(i).

52   11 U.S.C. § 523(a) (hanging paragraph).

53   The IRS agreed with the taxpayer on this point.  *In re Mallo*, 774 F.3d at 1325 (citing Chief Counsel Notice (CCN) CC-2010-016 (Sept. 2, 2010)).

two years before bankruptcy suggests that late returns should not always be excluded simply because they fail to meet the filing requirements.[54]

The court concluded that the exclusion for liabilities with respect to late IRC § 6020(b) returns was not superfluous because late returns could be discharged if they were filed under IRC § 6020(a).  The taxpayer argued that allowing those offered IRS assistance in filing late returns under IRC § 6020(a) to discharge the debt, but not allowing a discharge to similarly situated taxpayers who did not receive IRS assistance in filing late would be arbitrary and inconsistent with the fresh start policy underlying bankruptcy.  However, the court reasoned that any such arbitrariness would not provide a basis for it to overlook the plain language of the statute.

This case is significant because taxpayers who are even one day late in filing a return will generally not be able to discharge the liability in bankruptcy unless they can convince the IRS to assist them in filing a return under IRC § 6020(a) and it does so at least two years before the bankruptcy filing.  Although IRC § 6020(a) filings may have been more common when BAPCPA was adopted,[55] by 2010 they comprised only a "minute number of cases," according to the IRS Office of Chief Counsel.[56]  As this may make the availability of discharge arbitrary, the National Taxpayer Advocate recommended legislation to reverse this rule.[57]

### In *Hawkins v. Franchise Tax Board of CA*, the United States Court of Appeals for the 9th Circuit held that a debtor's continued spending in excess of earnings is not by itself sufficient to establish the specific willful intent to evade taxes necessary to avoid their discharge in bankruptcy.[58]

Mr. Hawkins's accountants advised him to invest in tax shelters to offset capital gains he had realized on stock he sold to fund a new venture.  That venture ultimately failed.  In 2002, the IRS disallowed the losses from the tax shelter, and in 2005, assessed a deficiency.  Mr. Hawkins and his wife filed for bankruptcy in 2006.

A debtor may not discharge a debt with respect to which he or she "willfully attempted in any manner to evade or defeat," under 11 U.S.C. § 523(a)(1)(C).  The IRS argued that the Hawkins' continued mainte-nance of a rich lifestyle — spending tens of thousands of dollars more than their income each month — even after learning about their tax debts, constituted a willful attempt to evade taxes.  The bankruptcy court agreed, finding they did very little to alter their lavish lifestyle after it became apparent they were insolvent.  It concluded that the tax debts were nondischargeable.  The district court affirmed.

The United States Court of Appeals for the 9th Circuit reversed and remanded, holding that the dis-charge exception in 11 U.S.C. § 523(a)(1)(C) did not apply without proof of specific intent.  First, the court noted that the term "willful" has different meanings in different contexts.  Based on statutory

---

54  11 U.S.C. § 523(a)(1)(B)(ii).

55  Although *Beard* was decided in 1984, when BAPCPA legislation was enacted in 2005 some authorities suggested that Form 870, *Waiver of Restrictions on Assessment and Collection of Deficiency and Acceptance of Overassessment,* and Form 4549, *Income Tax Examination Changes,* would be treated as IRC § 6020(a) returns, even if signed in response to an IRS substitute for return.  *See, e.g.,* Rev. Rul. 74-203, 1974-1 C.B. 330 (treating these forms as IRC § 6020(a) returns).  It was not until September 12, 2005, that the IRS in Rev. Rul. 2005-59, 2005-37 I.R.B. 505, revoked Rev. Rul. 74-203 and clarified that waiv-ers of assessment do not constitute returns because they do not purport to be returns and are not signed under penalties of perjury, as required under the *Beard* test.

56  CCN CC-2010-016 (Sept. 2, 2010).

57  *See* National Taxpayer Advocate 2014 Annual Report to Congress 417-22 (Legislative Recommendation: *Clarify the Bankruptcy Law Relating to Obtaining a Discharge*).

58  *Hawkins v. Franchise Tax Board of CA,* 769 F.3d 662 (9th Cir. 2014), *rev'g and remanding,* 447 B.R. 291 (N.D. CA 2011), *aff'g* 430 B.R. 225 (Bankr. N.D. CA 2010).

construction, precedent, and policy underlying the bankruptcy code, the term must be construed narrowly in the context of exceptions to discharge.

Next, the court reasoned that the language in 11 U.S.C. § 523(a)(1)(C) almost exactly matches language in IRC § 7201, a criminal statute, which penalizes anyone who "willfully attempts to evade or defeat any tax." According to the Supreme Court, the term "willfully" in IRC § 7201 requires proof of specific intent that the defendant voluntarily and intentionally violated a known legal duty.[59]

The 9th Circuit suggested that evidence of willful intent might include keeping two sets of books, making false bookkeeping entries, destroying records, and concealing assets. Simply spending beyond one's income would not qualify. The court observed that if such spending were enough, there would be few personal bankruptcies in which taxes would be dischargeable.

Finally, the court noted that other cases applying the exception from discharge under 11 U.S.C. § 523(a)(1)(C) involved intentional acts or omissions designed to evade tax, such as criminally structuring transactions to avoid currency reporting requirements, concealing assets through nominee accounts, and similar activities. In contrast, the Hawkins' spending practices after they learned of their tax debts were consistent with their historic spending practices. They invested in property that would be subject to tax liens. They did not transfer assets into nominee accounts or conceal them.[60] Further, the court observed that no other circuit has held that living beyond one's means or failing to pay taxes, by itself, constitutes willful tax evasion within the meaning of 11 U.S.C. § 523(a)(1)(C).

This case is significant because it can be construed as creating a circuit split over the conduct that will render tax debts nondischargeable in bankruptcy (*e.g.*, whether evidence of evasion and concealment is required). The case is also significant because it highlights the need for guidance concerning the meaning of willfulness in different contexts.[61]

**In *Estate of Elkins v. Commissioner*, the United States Court of Appeals for the 5th Circuit held that if a taxpayer meets its burden to establish that a valuation discount applies, the court cannot apply a different discount if the IRS does not offer evidence of a more appropriate discount.[62]**

When James A. Elkins, Jr. (decedent) died in 2006, his estate claimed a "fractional-ownership discount" on the value of jointly-owned art for purposes of computing the estate tax. The art was subject to a lease agreement governing its use and transferability. On the estate tax return, the estate reported decedent's 73 percent interest in various pieces of art, and based on an appraisal, claimed a 44.75 percent combined fractional interest discount for lack of control and marketability.[63] Although the parties agreed on the undiscounted value of the art, the IRS argued in the Tax Court that the contractual restrictions on alienation should be disregarded under IRC § 2703(a), the discounts used in calculating the fair market value of the

---

59  *Hawkins*, 769 F.3d at 668 (citing *Spies v. U.S.*, 317 U.S. 492 (1943) and other Supreme Court decisions).

60  The government claimed that a transfer of funds into a trust, which was ordered by the family court, was done with the intent to evade tax. Additionally, Hawkins' bankruptcy attorney testified that Hawkins' intent was not to pay the tax debt, but to discharge it in bankruptcy. This evidence may become more important on remand.

61  The National Taxpayer Advocate recommended legislation to clarify the meaning of willful Foreign Bank and Financial Account Reporting (FBAR) violations. *See, e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 331, 339-40.

62  *Est. of Elkins v. Comm'r*, 767 F.3d 443 (5th Cir. 2014), *rev'g* 140 T.C. 86 (2013).

63  *Id.* at 445-46.

decedent's fractional interests were overstated, and no discount was appropriate.[64]  Thus, the IRS did not produce any evidence as to an appropriate fractional interest discount.

The Tax Court found that IRC § 2703(a) was applicable to the restrictions in the agreement, and disallowed any discount in the valuation of the art.  However, as to the IRS's argument that no discounts should apply to decedent's fractional interest, the court rejected both the IRS's zero-discount position and the 44.75 percent discount applied by the estate.[65]  Instead, the Tax Court applied a ten percent discount based on a "preponderance of the evidence," seemingly weighing the analysis of the estate's experts against the IRS's rebuttal witnesses.[66]  However, the court had concluded that the testimony of one of the IRS's witnesses was not relevant, and the other merely testified that there was no established or recognized market for fractional interests in the type of art at issue.[67]

The United States Court of Appeals for the 5th Circuit agreed with the Tax Court's conclusion that a fractional-interest discount should apply.[68]  It noted that the IRS had apparently overlooked "the venerable lesson of Judge Learned Hand's opinion in *Cohan*: In essence, make as close an approximation as you can, but never use a zero."[69]  It concluded; however, that the Tax Court had misapplied the preponderance standard because the IRS had offered no evidence that any specific discount (other than zero) should apply.[70]  The Tax Court could not reject the estate's fractional-ownership discounts and apply one of its own without any supporting evidence.  Once the estate had met its burden to support a particular discount, the burden shifted to the IRS to introduce evidence to refute those facts with its own estimate.[71]  Thus, the 5th Circuit upheld the fractional interest discount applied by the estate.[72]

The 5th Circuit's analysis is significant because it discourages courts (and possibly the IRS's appeals function) from applying a split-the-baby approach to valuation discounts where the IRS presents no evidence as to an appropriate discount.  It is also significant because it could prompt the IRS to issue guidance about how to compute valuation discounts.

### In *Volpicelli v. United States*, the United States Court of Appeals for the 9th Circuit held that the limitations period for challenging a wrongful levy was subject to equitable tolling.[73]

The IRS levied Logan Volpicelli's account when he was ten years old and applied the money (a $13,000 inheritance) to his father's tax debt.  When Mr. Volpicelli was 18, he discovered the levy and promptly filed a wrongful levy suit.[74]  The government argued his suit was time barred.  Acknowledging that he

---

64  *Est. of Elkins*, 140 T.C. at 92.  *See* IRC § 2703(a) (subject to exceptions for certain bona fide business arrangements, "the value of any property shall be determined without regard to — (1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or (2) any restriction on the right to sell or use such property.").

65  *Id.* at 116.

66  *Id.* at 135.

67  *Est. of Elkins*, 767 F.3d at 448-449.

68  *Id.* at 449.

69  *Id.* at 449 n.7 (citing *Cohan v. Comm'r*, 39 F.2d 540, 543-44 (2d Cir. 1930)).

70  *Id.* at 450.

71  *Id.*  *See* IRC § 7491(a)(1) ("If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.").

72  *Est. of Elkins*, 767 F.3d at 453.

73  *Volpicelli v. U.S.*, 777 F.3d 1042 (9th Cir. 2015), *rev'g* 108 A.F.T.R.2d (RIA) 5166 (D. Nev. 2011), *reh'g denied*, No. 12-15029 (9th Cir. Apr. 8, 2015).

74  IRC § 7426(a)(1).

failed to meet the nine-month filing deadline under IRC § 6532(c), he argued that the limitations period was equitably tolled because he was a minor at the time of the levy.

The district court agreed with the government, but the United States Court of Appeals for the 9th Circuit reversed and remanded.  The court concluded it was bound by precedent, which held that IRC § 6532(c) was subject to equitable tolling.[75]  With certain exceptions that the 9th Circuit found inapplicable, there is a rebuttable presumption that filing deadlines may be equitably tolled unless Congress provides otherwise, according to the Supreme Court's decision in *Irwin*.[76]  As the court found no evidence to rebut that presumption, it held that equitable tolling applies to the deadline provided under IRC § 6532(c).

This case is significant because it is inconsistent with decisions in other circuits, presenting the potential for the Supreme Court to resolve the split.[77]  It may also be significant to the extent it suggests that tax statutes, like other statutes of limitation, are generally presumed to be subject to equitable tolling.[78]

### In *Ridgely v. Lew*, the United States District Court for the District of Columbia held that the IRS exceeded its statutory authority when it prohibited certified public accountants from charging contingent fees for the preparation of refund claims.[79]

Mr. Ridgely, a certified public accountant (CPA), filed suit under the Administrative Procedure Act (APA),[80] challenging a Treasury regulation that prohibits CPAs from charging contingent fees for preparing and filing refund claims.[81]  The parties moved for summary judgment.  Concluding that the IRS lacks statutory authority to regulate the preparation and filing of ordinary refund claims (*i.e.*, claims filed before adversarial proceedings have begun and before the taxpayer has formally engaged the CPA to represent him), the court granted Mr. Ridgely's motion and issued a permanent injunction barring the IRS from enforcing the regulation.

Congress has authorized the IRS to "regulate the practice of representatives of persons before the Department of the Treasury."[82]  In *Loving v. IRS,* the U.S. Court of Appeals for the District of Columbia Circuit held that this statute did not authorize the IRS to regulate tax return preparers because they do not "practice… before the Department" or "represent" taxpayers when preparing a return.[83]  Citing *Loving*, the U.S. District Court for the District of Columbia found that CPAs also do not "practice… before the Department" or "represent" taxpayers, prior to adversarial proceedings.  Accordingly, the statute does not authorize the IRS to regulate the mere filing of ordinary refund claims by CPAs.

---

75  *Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1206–07 (9th Cir. 1995); *Capital Tracing, Inc. v. U.S.*, 63 F.3d 859, 861–62 (9th Cir. 1995).

76  *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990).

77  *See, e.g.*, *Becton Dickinson & Co. v. Wolckenhauer*, 215 F.3d 340 (3d Cir. 2000).

78  For example, at least one commentator has speculated that future litigation could establish that the time periods under IRC § 7433 (giving taxpayers two years to file a suit for civil damages for certain unauthorized collection actions) and § 6532(a) (giving taxpayers two years from the claim disallowance to file a refund lawsuit) are also subject to equitable tolling.  *See* Marie Sapirie, *Ninth Circuit Holds Firm on Equitable Tolling*, 2015 TNT 22-9 (Feb. 2, 2015).

79  *Ridgely v. Lew*, 114 A.F.T.R.2d (RIA) 5249 (D.D.C. 2014).

80  5 U.S.C. § 551 *et seq.*

81  31 C.F.R. §§ 10.27(a)-(b) (prohibiting contingent fees except in limited circumstances).  This regulation is part of Treasury Department Circular No. 230, *Regulations Governing Practice before the Internal Revenue Service* (2014) (called Circular 230).

82  31 U.S.C § 330(a)(1).

83  *Loving v. Comm'r*, 742 F.3d 1013 (D.C. Cir. 2014), *aff'g* 917 F.Supp.2d 67 (D.D.C. 2013).  For a detailed discussion of *Loving*, see National Taxpayer Advocate 2014 Annual Report to Congress 432.  *See also* Nina E. Olson, *More Than a "Mere" Preparer: Loving and Return Preparation*, 139 Tax Notes 767 (May 13, 2013).

The court also rejected the IRS's argument that it had authority to regulate all actions of CPAs who at some point "practice" before it, regardless of whether they were acting in a "representational" capacity.  First, the statute authorizes regulation of practice, not practitioners.  Second, the statute only applies to individuals when they represent taxpayers, not to the actions of every person who may at some point become a representative.  Finally, it would lead to absurd results if the IRS could broadly regulate the actions of CPAs, no matter what they were doing, but not regulate other individuals who could assist taxpayers in filing refund claims.  The court found no support for this dichotomy in the statute's text, history or structural context.

This case is significant to the extent it suggests that none of the provisions of Circular 230 are valid as to those who merely assist in filing a return or claim for refund (even if they are CPAs or attorneys), at least before the commencement of any adversarial proceedings with the IRS or formal engagement for legal representation.  The proliferation of litigation regarding the IRS's regulation of tax return preparers is an indication that Congress should clarify the IRS's authority in this area, as the National Taxpayer Advocate has recommended.[84]

**In *Sexton v. Hawkins*, the United States District Court for the District of Nevada enjoined the IRS Office of Professional Responsibility from requesting information from a suspended practitioner or revoking his ability to e-file on behalf of clients.[85]**

Mr. Sexton, a tax lawyer, pled guilty to mail fraud and money laundering.  As a result, the IRS Office of Professional Responsibility (OPR) suspended him from practice before the IRS for an indefinite period.  During his suspension, he provided tax advice and return preparation services.  After receiving a demand for information from OPR, including a request for client records and returns, he filed a complaint seeking declaratory relief that he was not subject to OPR's jurisdiction and asked the court to enjoin OPR's request.

According to *Loving*, a person who does not actively represent taxpayers in proceedings with the IRS and only prepares returns is *not* engaged in "practice before the IRS" and is not subject to regulation by OPR under Circular 230.[86]  Mr. Sexton argued that because OPR had already suspended him from practice, he was no longer a practitioner covered by Circular 230 and his status as a mere tax return preparer left OPR with no jurisdiction over him.  The Justice Department moved to dismiss for lack of jurisdiction and failure to state a claim.  The court denied the government's motion and issued a preliminary injunction.

First, the court held that it had jurisdiction to review OPR's information request under the APA because OPR's request for information constituted a "final agency action" that would not otherwise be subject to review.[87]  According to the court, OPR's assertion of jurisdiction over Mr. Sexton had immediate consequences, such as his obligation under Circular 230 to respond to its inquiry and the possibility of additional sanctions.  If he provided the requested information to OPR, he would have to inform clients that he had turned over their confidential records and doing so would irreparably damage his reputation and business.  According to Mr. Sexton, OPR had also threatened to withdraw his ability to e-file returns on behalf of clients if he failed to respond.

---

84   The National Taxpayer Advocate has long championed the regulation of return preparers.  *See, e.g.*, National Taxpayer Advocate 2008 Annual Report to Congress 423 (Legislative Recommendation: *The Time Has Come to Regulate Federal Tax Return Preparers*); National Taxpayer Advocate 2004 Annual Report to Congress 67 (Most Serious Problem: *Oversight of Unenrolled Return Preparers*); National Taxpayer Advocate 2003 Annual Report to Congress 270 (Legislative Recommendation: *Federal Tax Return Preparers Oversight and Compliance*); National Taxpayer Advocate 2002 Annual Report to Congress 216 (Legislative Recommendation: *Regulation of Federal Tax Return Preparers*).

85   *Sexton v. Hawkins*, 114 A.F.T.R.2d (RIA) 6482 (D. Nev. 2014), *appeal docketed*, No. 14-17454 (9th Cir. Dec. 16, 2014).

86   *Loving v. Comm'r*, 742 F.3d 1013 (D.C. Cir. 2014), *aff'g* 917 F. Supp. 2d 67 (D.D.C. 2013).

87   5 U.S.C. § 702.

Second, the court found that Mr. Sexton had adequately pleaded facts to raise questions concerning (1) whether Mr. Sexton is a practitioner subject to OPR's jurisdiction, (2) whether OPR had authority to regulate a former practitioner, and (3) whether regulation of tax advice is beyond the scope of OPR's authority. The court entered a preliminary injunction barring the IRS from requesting documents from Mr. Sexton or suspending his ability to e-file. It reasoned that once Mr. Sexton produced the information it could not be "unproduced," and would cause irreparable injury to him and his business. By contrast, waiting would not be a hardship for the IRS or the public interest. The court explained that even if a permanent injunction were granted, the government could continue its investigation by issuing a subpoena.

This case is significant because it illustrates the difficulty OPR now faces in regulating previously-suspended practitioners and the need for Congress to authorize IRS regulation of tax return preparers.[88] It is also significant because it suggests an administrative request for information can be a final agency action, which is subject to judicial review under the APA.

**In *Moore v. United States*, the District Court for the Western District of Washington held that the taxpayer did not have reasonable cause for not filing Foreign Bank and Financial Account Reports (FBARs), but found IRS procedures inconsistent with the Administrative Procedure Act (APA).[89]**

Mr. Moore owned a foreign corporation that held a foreign bank account containing between $300,000 and $550,000, which he failed to report on Foreign Bank and Financial Account Reports (FBARs).[90] In 2009, he learned about the FBAR filing requirement, applied to the IRS's Offshore Voluntary Disclosure Program (OVD), and then opted out.[91] After interviewing Mr. Moore for five minutes, the Revenue Agent prepared an eight-page memo recommending that the IRS impose a non-willful penalty of $40,000 pursuant to 31 U.S.C. § 5321(a)(5) (the maximum of $10,000 for each of the four years from 2005 through 2008), but did not provide this memo to Mr. Moore.

The IRS sent Mr. Moore a brief letter proposing a penalty of $40,000 for years 2005 through 2008, and then assessed a $10,000 penalty for 2005 before his deadline to appeal had expired. When Mr. Moore appealed, his request for abatement was denied, also without explanation. Mr. Moore filed suit in the District Court for the Western District of Washington. The government counterclaimed and filed a motion for summary judgment.

Applying a *de novo* standard of review, the court held that Mr. Moore's failure to file FBARs was subject to non-willful penalties and was not due to reasonable cause. It declined to review the amount of the penalty under an "abuse of discretion" standard, as urged by the government.

Because "reasonable cause" is not defined in the Bank Secrecy Act (BSA) or in regulations interpreting the BSA, the court drew upon the IRC to define reasonable cause as the exercise of "ordinary business care and prudence" in the context of FBAR. It found Mr. Moore lacked ordinary business care and prudence because he (1) self-prepared his 2005 return without responding to the question on Schedule B about

---

88  The IRS has conceded that some suspended practitioners may obtain preparer tax identification numbers (PTINs) and prepare returns. *See* IRS, *Some Suspended or Disbarred Tax Practitioners Are Now Permitted to Obtain PTINs and Prepare Tax Returns* (May 23, 2014), *available at* http://www.irs.gov/file_source/pub/irs-utl/OPR%20statement%20052314.pdf. *See also* Rev. Proc. 2014-42, 2014-29 I.R.B. 192 (citing *Loving* and acknowledging the registered tax return preparer program is no longer in effect).

89  *Moore v. U.S.*, 115 A.F.T.R.2d (RIA) 1375 (W.D. Wash. 2015), *dismissed by* 2015 U.S. Dist. LEXIS 99804 (W.D. Wash. 2015).

90  *See* FinCEN Report 114, *Report of Foreign Bank and Financial Accounts* (which superseded TD F 90-22.1).

91  For a discussion of problems with the OVD and recommendations to improve it and the FBAR rules, see, *e.g.*, National Taxpayer Advocate 2014 Annual Report to Congress 79-93, 331-45.

whether he had foreign accounts[92] and (2) responded "no" to a similar question on an organizer he provided to his preparer for his 2007 return.  Citing *Williams*, a case that relied on similar facts to hold that an FBAR violation was *willful*, the court concluded that Mr. Moore did not have reasonable cause.[93]

The APA generally requires that an agency's denial of an appeal be accompanied by the "grounds for denial."[94]  The court concluded that the government did not sufficiently explain why it denied Mr. Moore's appeal, imposed the maximum penalty for each of the four years, and assessed the 2005 penalty before the agreed date.  The court noted that the available evidence, such as the Revenue Agent's internal memo, also failed to explain the IRS's reasons for imposing the maximum penalty.[95]  Nor did it explain why the IRS assessed the 2005 penalty before expiration of the period allowed for Mr. Moore's appeal.  The court stated that if the government did not supplement the record to explain itself on these issues, it would hold that the IRS's actions were arbitrary and capricious.  After the IRS supplemented the record, the court denied the IRS's claim for interest because of its failure to disclose its reasoning but concluded that its actions to assess the penalty were not arbitrary.[96]

Finally, the court concluded the penalty did not violate the *Excessive Fines Clause of the Eighth Amendment*.[97]  In *Bajakajian*, the Supreme Court held that a punitive forfeiture of $357,144 in currency (or 100 percent of it) for failure to report it violated the *Excessive Fines Clause* because the penalty was "grossly disproportional" to the gravity of the offense.[98]  Although the government provided no evidence as to the harm caused by the offense, the court concluded the $40,000 penalty, which was only about 10 percent of the account balance, was not disproportionate.  The court analyzed the proportionality of the FBAR penalties in aggregate, rather than separately for each year or violation.

This case is significant because it suggests that the FBAR penalty (including reasonable cause defenses) is subject to *de novo* review, though the IRS will seek greater judicial deference to its determination of the penalty amount.[99]  It also illustrates that a court may rely on the APA in reviewing FBAR penalties and may require the IRS to document and disclose to taxpayers more detailed information concerning the basis for its decisions.  Moreover, the court's analysis suggests that it is appropriate to compare the *aggregate* amount of FBAR penalties to the value of the unreported account in determining whether they violate the *Excessive Fines Clause*.  Finally, the decision confirms the difficulty taxpayers face in claiming reasonable cause for failure to report an account on an FBAR, if they have not disclosed it to a preparer and have no

---

92  Mr. Moore admitted he saw the question but did not read the instructions regarding accounts owned by a corporation.  Based on those instructions, he should have responded "yes" if he owned more than 50 percent of the stock of a corporation that owned any such accounts.

93  *Williams v. Comm'r*, 489 Fed. App'x. 655 (4th Cir. 2012) (*Williams II*); *Moore v. U.S.*, 115 A.F.T.R.2d (RIA) 1375 (W.D. Wash. 2015) (internal citations omitted) ("the only evidence materially distinguishing the defendant in *Williams II* from Mr. Moore is that defendant pleaded guilty to criminal tax evasion for failing to report the income from the foreign account he had not disclosed.").

94  5 U.S.C. § 555(e).

95  The court did not consider an Appeals memo that was in the IRS's files because the IRS successfully claimed it was privileged.

96  *Moore v. U.S.*, 2015 U.S. Dist. LEXIS 99804 (W.D. Wash. 2015).

97  After applying a balancing test, the court also concluded that the IRS's procedures did not violate the *Due Process Clause*.  This analysis confirms that the IRS's procedures must comply with mainstream due process jurisprudence.  For commentary on this issue, see Leslie Book, *Procedural Due Process and FBAR*, Procedurally Taxing (May 4, 2015), *available at* http://www.procedurallytaxing.com/procedural-due-process-and-fbar/.

98  *U.S. v. Bajakajian*, 524 U.S. 321 (1998).

99  For further commentary about the significance of this case, see, *e.g.*, Leslie Book, *District Court FBAR Penalty Opinion Raises Important Administrative and Constitutional Law Issues*, Procedurally Taxing (Apr. 6, 2015), *available at* http://www.procedurallytaxing.com/district-court-fbar-penalty-opinion-raises-important-administrative-and-constitutional-law-issues/; Andrew Velarde, *Moore Answers Novel FBAR Questions*, 2015 TNT 71-1 (Apr. 14, 2015).

good explanation for why the question about foreign accounts on Schedule B did not prompt them to read the instructions on the form.

### In *Dynamo Holdings Limited Partnership v. Commissioner*, the Tax Court, for the first time, allowed a taxpayer to use predictive coding to limit "e-discovery" to relevant documents.[100]

In consolidated Tax Court proceedings, the IRS moved to compel production of electronically stored information (ESI) on two backup tapes.[101]  The taxpayers argued that the IRS's request was excessively burdensome because to avoid producing irrelevant, confidential, and privileged material they would have to review between 3.5 and 7 million documents manually at a cost of $450,000 or more.  The taxpayers asked the court to allow them to use predictive coding to limit their response.  Predictive coding is a document review tool that uses computer algorithms that learn from a small number of human reviews to predict which documents are likely to be the most relevant.  The taxpayers' expert testified that predictive coding could limit the manual document review to 200,000-400,000 documents at a cost of $80,000–$85,000.

The IRS opposed the use of predictive coding, arguing that it is an unproven technology.  It also asserted the taxpayers could avoid the cost and expense of reviewing the documents by providing the IRS with access to all data on the tapes, while reserving the right (through a "clawback agreement") to later claim that some or all of the data that the IRS actually tries to introduce is privileged.

Although the court granted the IRS motion to compel production, it found the IRS's proposal of a clawback agreement unreasonable.  The court remarked that it is not normally in the position of deciding or imposing a particular *method* of discovery upon the parties, but would make a ruling on the matter as an issue of first impression.  Tax Court rules regarding discovery had not yet addressed the issue.[102]

The court relied upon the expert testimony and an article by Magistrate Judge Andrew Peck reviewing the technology.[103]  It reasoned that studies have indicated predictive coding is more accurate than keyword searches or even a traditional manual review, as it can reduce human error.  The court rejected the IRS's argument that predictive coding is an unproven technology, cited several federal cases that had allowed its use, and granted the taxpayers' request to use it in responding to the IRS request.[104]  It concluded that an electronic discovery expert could design an effective search.  Finally, the court noted that if the taxpayers did not address all of the IRS's concerns about incomplete discovery, the IRS could file another motion to compel.

This case is significant because it establishes that the Tax Court will allow the use of predictive coding in response to electronic discovery requests.  Predictive coding can lessen the significant burden of responding to costly discovery requests by the IRS.

---

100  *Dynamo Holdings Ltd. Partnership v. Comm'r*, 143 T.C. No. 9 (2014).

101  The IRS did not want paper copies because it wanted to review the metadata to determine when the ESI was created.

102  *See generally* Tax Court Rule 70(a).  However, the court could have relied upon Tax Court Rule 103(a), issuing an order to protect a party from undue burden or expense from a discovery request.  Guidance on e-discovery, which the IRS issued in 2012, did not incorporate predictive coding.  CCN CC-2012-017 (Sept. 13, 2012).

103  Andrew Peck, Search, *Forward: Will Manual Document Review and Keyboard Searches Be Replaced by Computer-Assisted Coding?*, L. Tech. News (Oct. 2011).

104  *See, e.g.*, *Hinterberger v. Catholic Health Sys., Inc.*, 2013 WL 2250603 (W.D.N.Y. 2013); *Moore v. Publicis Groupe*, 287 F.R.D. 182 (S.D.N.Y 2012); *In Re Actos*, 2012 WL 7861249 (W.D. La. 2012).

MLI
#1

# Accuracy-Related Penalty Under IRC § 6662(b)(1) and (2)

## SUMMARY

Internal Revenue Code (IRC) §§ 6662(b)(1) and (2) authorize the IRS to impose a penalty if a taxpayer's negligence or disregard of rules or regulations causes an underpayment of tax or if an underpayment exceeds a computational threshold called a substantial understatement, respectively. IRC § 6662(b) also authorizes the IRS to impose five other accuracy-related penalties.[1]

## TAXPAYER RIGHTS IMPACTED[2]

- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to a Fair and Just Tax System*

## PRESENT LAW

The amount of an accuracy-related penalty equals 20 percent of the portion of the underpayment attributable to the taxpayer's negligence or disregard of rules or regulations, or to a substantial understatement.[3] Underpayment is the amount by which any tax imposed by the IRC exceeds the excess of:

> The sum of (A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not shown on the return but previously assessed (or collected without assessment), over the amount of rebates made.[4]

Prior to December 18, 2015, refundable credits could not reduce below zero the amount shown as tax by the taxpayer on a return.[5] However, recently enacted law reversed the Tax Court's decision in *Rand v. Commissioner*, and amended IRC § 6664(a) to be consistent with the rule of IRC § 6211(b)(4), which would allow the IRS to calculate negative tax in computing the amount of underpayment for

---

1   IRC § 6662(b)(3) authorizes a penalty for any substantial valuation misstatement under chapter 1 [IRC §§ 1-1400U-3]; IRC § 6662(b)(4) authorizes a penalty for any substantial overstatement of pension liabilities; IRC § 6662(b)(5) authorizes a penalty for any substantial valuation understatement of estate or gift taxes; IRC § 6662(b)(6) authorizes a penalty when the IRS disallows the tax benefits claimed by the taxpayer when the transaction lacks economic substance; and IRC § 6662(b)(7) authorizes a penalty for any undisclosed foreign financial asset understatement. We have chosen not to cover them in this report, as those penalties were not litigated nearly as much as IRC §§ 6662(b)(1) and 6662(b)(2) during the period we reviewed.

2   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

3   IRC § 6662(b)(1) (negligence/disregard of rules or regulations); IRC § 6662(b)(2) (substantial understatement of income tax).

4   IRC § 6664(a).

5   *Rand v. Comm'r*, 141 T.C. 376 (2013). *See also* National Taxpayer Advocate 2014 Annual Report to Congress 449; IRS, Chief Counsel Notice CC-2014-007, *Application of the Accuracy-Related or Fraud Penalty in Tax Court Cases Involving Disallowed Refundable Credits* (July 31, 2014) (litigation guidelines for cases impacted by the *Rand* decision). The Chief Counsel Notice is deemed to be "effective until further notice," perhaps implying that this is not the last word on the issue from the IRS's perspective. Following *Rand*, there has been a legislative proposal to calculate negative tax in computing the amount of underpayment for accuracy-related penalty purposes. *See* H.R. 1, § 6306, 113th Cong. 2d Sess. (2014). *See also* Joint Committee on Taxation, *Technical Explanation of the Tax Reform Act of 2014, A Discussion Draft of the Chairman of the House Committee on Ways and Means to Reform the Internal Revenue Code: Title VI- Tax Administration and Compliance* (JCX-17-14) (Feb. 26, 2014), at 41-43.

001860

accuracy-related penalty purposes.[6]  Thus, for returns filed after December 18, 2015, or for returns filed before that date for which the period of limitations on assessment under IRC § 6501 has not expired, a taxpayer can be subject to an underpayment penalty in IRC § 6662 based on a refundable credit which reduces tax below zero.

The IRS may assess penalties under IRC §§ 6662(b)(1) and 6662(b)(2), but the total penalty rate gener-ally cannot exceed 20 percent (*i.e.*, the penalties are not "stackable").[7]  Generally, taxpayers are not subject to the accuracy-related penalty if they establish that they had reasonable cause for the underpayment and acted in good faith.[8]  In addition, a taxpayer will be subject to the negligence component of the penalty only on the portion of the underpayment attributable to negligence.  If a taxpayer wrongly reports mul-tiple sources of income, for example, some errors may be justifiable mistakes, while others might be the result of negligence; the penalty applies only to the latter.

### Negligence

The IRS may impose the IRC § 6662(b)(1) negligence penalty if it concludes that a taxpayer's negligence or disregard of the rules or regulations caused the underpayment.  Negligence is defined to include "any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."[9]  Negligence includes a failure to keep adequate books and records or to substantiate items that give rise to the underpayment.[10]  Strong indicators of negligence include instances where a taxpayer failed to report income on a tax return that a payor reported on an information return[11] as defined in IRC § 6724(d)(1),[12] or failed to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion.[13]  The IRS can also consider various other factors in determining whether the taxpayer's actions were negligent.[14]

### Substantial Understatement

Generally, an "understatement" is the difference between (1) the correct amount of tax and (2) the tax reported on the return, reduced by any rebate.[15]  Understatements are reduced by the portion attributable to (1) an item for which the taxpayer had substantial authority or (2) any item for which the taxpayer, in the return or an attached statement, adequately disclosed the relevant facts affecting the item's tax treat-ment and the taxpayer had a reasonable basis for the tax treatment.[16]  For individuals, the understatement

---

6   Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 209 (2015).

7   Treas. Reg. § 1.6662-2(c).  The penalty rises to 40 percent if any portion of the underpayment is due to a "gross valuation misstatement."  IRC § 6662(h)(1); Treas. Reg. § 1.6662-2(c).

8   IRC § 6664(c)(1).

9   IRC § 6662(c).

10   Treas. Reg. § 1.6662-3(b)(1).

11   Treas. Reg. § 1.6662-3(b)(1)(i).

12   IRC § 6724(d)(1) defines an information return by cross-referencing various other sections of the IRC that require information returns (*e.g.*, IRC § 6724(d)(1)(A)(ii) cross-references IRC § 6042(a)(1) for reporting of dividend payments).

13   Treas. Reg. § 1.6662-3(b)(1)(ii).

14   These factors include the taxpayer's history of noncompliance; the taxpayer's failure to maintain adequate books and records; actions taken by the taxpayer to ensure the tax was correct; and whether the taxpayer had an adequate explanation for under-reported income.  Internal Revenue Manual (IRM) 4.10.6.2.1, *Negligence* (May 14, 1999).  *See also* IRM 20.1.5.2(6), *Common Features of Accuracy-Related and Civil Fraud Penalties* (Jan. 24, 2012).

15   IRC §§ 6662(d)(2)(A)(i)-(ii).

16   IRC §§ 6662(d)(2)(B)(i)-(ii).  No reduction is permitted, however, for any item attributable to a tax shelter.  *See* IRC § 6662(d)(2)(C)(i).  If a return position is reasonably based on one or more of the authorities set forth in Treas. Reg. § 1.6662-4(d)(3)(iii), the return position will generally satisfy the reasonable basis standard.  This may be true even if the return position does not satisfy the substantial authority standard found in Treas. Reg. § 1.6662-4(d)(2).  *See* Treas. Reg. § 1.6662-3(b)(3).

of tax is substantial if it exceeds the greater of $5,000 or ten percent of the tax that must be shown on the return.[17]  For corporations (other than S corporations or personal holding companies), an understatement is substantial if it exceeds the lesser of ten percent of the tax required to be shown on the return (or if greater, $10,000), or $10,000,000.[18]

For example, if the correct amount of tax is $10,000 and an individual taxpayer reported $6,000, the substantial underpayment penalty under IRC § 6662(b)(2) would not apply because although the $4,000 shortfall is more than ten percent of the correct tax, it is less than the fixed $5,000 threshold.  Conversely, if the same individual reported a tax of $4,000, the substantial understatement penalty would apply because the $6,000 shortfall is more than $5,000, which is the greater of the two thresholds.

### Reasonable Cause

The accuracy-related penalty does not apply to any portion of an underpayment where the taxpayer acted with reasonable cause and in good faith.[19]  A reasonable cause determination takes into account all of the pertinent facts and circumstances.[20]  Generally, the most important factor is the extent to which the taxpayer made an effort to determine the proper tax liability.[21]

### Reasonable Basis

An understatement of tax may be reduced by any portion of the understatement attributable to an item for which the tax treatment is adequately disclosed and supported by a reasonable basis.[22]  This standard is met if the taxpayer's position reasonably relies on one or more authorities listed in Treas. Reg. § 1.6662-4(d)(3)(iii).[23]  Applicable authority could include information such as sections of the IRC; proposed, temporary, or final regulations; revenue rulings and revenue procedures; tax treaties and regulations thereunder, and Treasury Department and other official explanations of such treaties; court cases; and congressional intent as reflected in committee reports.[24]

---

17   IRC §§ 6662(d)(1)(A)(i)-(ii).
18   IRC §§ 6662(d)(1)(B)(i)-(ii).
19   IRC § 6664(c)(1).
20   Treas. Reg. § 1.6664-4(b)(1).
21   *Id.*
22   IRC § 6662(d)(2)(B)(ii)(II).
23   Treas. Reg. § 1.6662-3(b)(3).
24   Treas. Reg. § 1.6662-4(d)(3)(iii).

001862

## Penalty Assessment and the Litigation Process

In general, the IRS proposes the accuracy-related penalty as part of its examination process[25] and through its Automated Underreporter (AUR) computer system.[26]  Theoretically, before a taxpayer receives a notice of deficiency, he or she has an opportunity to engage the IRS on the merits of the penalty.[27]  Once the IRS concludes an accuracy-related penalty is warranted, it must follow deficiency procedures (*i.e.*, IRC §§ 6211-6213).[28]  Thus, the IRS must send a notice of deficiency with the proposed adjustments and inform the taxpayer that he or she has 90 days to petition the United States Tax Court to challenge the assessment.[29]  Alternatively, taxpayers may seek judicial review through refund litigation.[30]  Under certain circumstances, a taxpayer can request an administrative review of IRS collection procedures (and the underlying liability) through a Collection Due Process hearing.[31]

## Burden of Proof

In court proceedings, the IRS bears the initial burden of production regarding the accuracy-related penalty.[32]  The IRS must first present sufficient evidence to establish that the penalty is warranted.[33]  The burden of proof then shifts to the taxpayer to establish any exception to the penalty, such as reasonable cause.[34]  Because the reasonable basis standard is a higher standard to meet, it is possible that a taxpayer

---

25  IRM 4.10.6.2(1), *Recognizing Noncompliance* (May 14, 1999) ("assessment of penalties should be considered throughout the audit").  *See also* IRM 20.1.5.3(1)-(2), *Examination Penalty Assertion* (Jan. 24, 2012).

26  The AUR is an automated program that identifies discrepancies between the amounts that taxpayers reported on their returns and what payors reported via Form W-2, Form 1099, and other information returns.  IRM 4.19.3.1(3)-(8), *Overview of IMF Automated Underreporter* (Sept. 30, 2014).  IRC § 6751(b)(1) provides the general rule that IRS employees must have written supervisory approval before assessing any penalty.  However, IRC § 6751(b)(2)(B) allows an exception for situations where the IRS can calculate a penalty automatically "through electronic means."  The IRS interprets this exception as allowing it to use its AUR system to propose the substantial understatement and negligence components of the accuracy-related penalty without human review.  If a taxpayer responds to an AUR-proposed assessment, the IRS first involves its employees at that point to determine whether the penalty is appropriate.  If the taxpayer does not respond timely to the notice, the computers automatically convert the proposed penalty to an assessment without managerial review.  IRM 4.19.3.20.1.4, *Accuracy-Related Penalties* (Sept. 1, 2012).  *See also* National Taxpayer Advocate 2014 Annual Report to Congress 404-10 (Legislative Recommendation: *Managerial Approval: Amend IRC § 6751(b) to Require IRS Employees to Seek Managerial Approval Before Assessing the Accuracy-Related Penalty Attributable to Negligence Under IRC § 6662(b)(1)*); National Taxpayer Advocate 2007 Annual Report to Congress 259 ("Although automation has allowed the IRS to more efficiently identify and determine when such underreporting occurs, the IRS's over-reliance on automated systems rather than personal contact has led to insufficient levels of customer service for taxpayers subject to AUR.  It has also resulted in audit reconsideration and tax abatement rates that are significantly higher than those of all other IRS examination programs.").

27  For example, when the IRS proposes to adjust a taxpayer's liability, including additions to tax such as the accuracy-related penalty, it typically sends a notice ("30-day letter") of proposed adjustments to the taxpayer.  A taxpayer has 30 days to contest the proposed adjustments to the IRS Office of Appeals, during which time he or she may raise issues related to the deficiency, including any reasonable cause defense to a proposed penalty.  If the issue is not resolved after the 30-day letter, the IRS sends a statutory notice of deficiency ("90-day letter") to the taxpayer.  *See* IRS Pub. 5, *Your Appeal Rights and How to Prepare a Protest If You Don't Agree* (Jan. 1999); IRS Pub. 3498, *The Examination Process* (Nov. 2004).

28  IRC § 6665(a)(1).

29  IRC § 6213(a).  A taxpayer has 150 days rather than 90 days to petition the Tax Court if the notice of deficiency is addressed to a taxpayer outside the United States.

30  Taxpayers may litigate an accuracy-related penalty by paying the tax liability (including the penalty) in full, filing a timely claim for refund, and then timely instituting a refund suit in the appropriate United States District Court or the Court of Federal Claims. 28 U.S.C. § 1346(a)(1); 28 U.S.C. § 1491; IRC §§ 7422(a); 6532(a)(1); *Flora v. United States*, 362 U.S. 145 (1960) (requiring full payment of tax liabilities as a prerequisite for jurisdiction over refund litigation).

31  IRC §§ 6320 and 6330 provide for due process hearings in which a taxpayer may raise a variety of issues including the underlying liability, provided the taxpayer did not receive a statutory notice of deficiency or did not otherwise have an opportunity to dispute such liability.  IRC §§ 6320(c), 6330(c)(2)(B).

32  IRC § 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."

33  *Higbee v. Comm'r*, 116 T.C. 438, 446 (2001).

34  IRC § 7491(a).  *See also* Tax Ct. R. 142(a).

001863

may obtain relief from a penalty assessment by successfully arguing a reasonable cause defense, even if that defense does not satisfy the reasonable basis standard.[35]

## ANALYSIS OF LITIGATED CASES

We identified 113 opinions issued between June 1, 2014, and May 31, 2015 where taxpayers litigated the negligence/disregard of rules or regulations or substantial understatement components of the accuracy-related penalty.  The IRS prevailed in full in 87 cases (77 percent), taxpayers prevailed in full in 20 cases (18 percent), and six cases (five percent) resulted in split decisions.  Table 1 in Appendix 3 provides a detailed list of these cases.

Taxpayers appeared *pro se* (without representation) in 68 of the 113 cases (60 percent) and convinced the court to dismiss or reduce the penalty in 14 (21 percent) of those cases.  Represented taxpayers fared approximately the same, achieving full or partial relief from the penalty in 12 of their 45 cases (27 percent).  This difference was considerably smaller than the large disparity between represented and unrepresented taxpayers over the same period last year.[36]

In some cases, the court found taxpayers liable for the accuracy-related penalty but failed to clarify whether it was for negligence under IRC § 6662(b)(1) or a substantial understatement of tax under IRC § 6662(b)(2), or both.[37]  Regardless of the subsection at issue, the analysis of reasonable cause is generally the same.  As such, we have combined our analyses of reasonable cause for the negligence and substantial understatement cases.

### Adequacy of Records and Substantiation of Deductions to Show Reasonable Cause and as Proof of Taxpayer's Good Faith

Taxpayers are required to maintain records sufficient to establish the amount of gross income, deductions, and credits claimed on a return.[38]  The failure "to keep adequate books and records or to substantiate items properly" was the primary factor in roughly 74 percent of cases (34 out of 46) where the court found a taxpayer liable for an underpayment penalty due to negligence.[39]

In *Sawyer v. Commissioner*,[40] a married couple owned an asphalt business operated by the husband, Mr. Sawyer.  Mr. Sawyer paid his day laborers in cash, without issuing Forms W-2, *Wage and Tax Statement*, or 1099-MISC, *Miscellaneous Income*.[41]  Customers also paid Mr. Sawyer by cash or check, and he conceded that he deposited only a portion of the payments into his personal bank account.  The only records he kept included invoices from his jobs.

As part of the examination, the revenue agent conducted an analysis of bank deposits and was unable to link the invoices provided with specific bank deposits.  As a result, the revenue agent determined the business's gross receipts were underreported in tax years (TYs) 2008 and 2009.  The revenue agent also denied

---

35  Treas. Reg. § 1.6662-3(b)(3).

36  *See* National Taxpayer Advocate 2014 Annual Report to Congress 446 (penalties were reduced in 14 percent of the *pro se* cases versus 32 percent of cases involving represented taxpayers).

37  *See, e.g., Coburn v. Comm'r*, T.C. Memo. 2014-113; *Cooper v. Comm'r*, 143 T.C. 194 (2014).

38  IRC § 6001; Treas. Reg. § 1.6001-1(a).

39  *See, e.g., Burrell v. Comm'r*, T.C. Memo. 2014-217; *Kunkel v. Comm'r*, T.C. Memo. 2015-71; *Briley v. Comm'r*, T.C. Memo. 2014-114.

40  T.C. Memo. 2015-55.

41  Form 1099-MISC, *Miscellaneous Income*, is used to report non-employee compensation.

001864

deductions claimed for labor costs for TY 2008 because the taxpayer failed to establish that costs were paid or incurred in TY 2008 (or accounted for as labor completed by Mr. Sawyer or his family).

The court found the Sawyers liable for a penalty under IRC § 6662(b)(1). The Sawyers had argued a reasonable cause defense based on Mr. Sawyer's reliance on his accountant in preparing the tax return. However, the court found that Mr. Sawyer had not provided his accountant with the necessary information for reasonable reliance, as the invoices and receipts had not been provided and labor costs were merely an estimate.

In the more than 30 cases where the court attributed an underpayment to taxpayer negligence primarily due to record keeping, the court found the taxpayer acted with reasonable cause and in good faith in only one instance.[42] Inadequate record keeping was also an important factor in many determinations of whether the reasonable cause and good faith exception applied to a taxpayer's conduct. Some courts examined the issues of negligent record keeping and reasonable cause concurrently.

For example, in *Engstrom, Lipscomb & Lack, APC v. Commissioner*,[43] the taxpayer, a law firm, claimed travel expense deductions in connection with the use of two private jets. Mr. Lack was 50 percent owner of the law firm (hereinafter Engstrom). Mr. Girardi was a close friend of Mr. Lack. Together they had several joint business ventures, including G&L Aviation, a general partnership that owned aircraft and a luxury suite at the Staples Center in Los Angeles. Mr. Lack and Mr. Girardi used the aircraft extensively. Engstrom was not a partner of G&L Aviation and had no financial interest in the aircraft.

Engstrom claimed travel expense deductions for use of the aircraft and luxury suite in the amounts of $1,425,000; $1,157,797; $687,310; and $1,062,469 for years 2007 through 2010, respectively. Engstrom made payments to G&L Aviation and Mr. Lack also made payments to G&L Aviation from his personal account. There was no written agreement between Engstrom and G&L Aviation, and Engstrom did not receive invoices for payments made. However, Mr. Lack's secretary, Ms. Carter, who was employed by Engstrom, also performed recordkeeping duties for G&L Aviation. She prepared revenue schedules to show dates of payments to G&L Aviation, but these schedules did not include flight information, passenger information, or the purpose of each flight. G&L maintained flight logs, but these logs did not show the business purpose for each flight or provide detailed passenger information. Lastly, Mr. Lack maintained an executive calendar but did not include amounts for travel expenditures or detailed information regarding the business purpose for each trip.

IRC § 162 allows for the deduction of all ordinary and necessary expenses paid or incurred while carrying on a trade or business.[44] Such expenses can include the costs of travel.[45] To substantiate its claim for deductions at trial, Engstrom offered a reconstruction of the trips that included the date, destination, and passengers. This information was reconstructed from logs prepared by Ms. Carter and Mr. Lack.

---

42  *Lain v. Comm'r*, T.C. Summ. Op. 2015-5 (finding that the taxpayers substantiated only a portion of their claimed deductions, however; also finding that a burst water pipe may have prevented the taxpayers from substantiating all of the deductions).

43  T.C. Memo. 2014-221, *appeal docketed*, No. 15-70591 (9th Cir. Feb. 26, 2015).

44  For a detailed discussion of IRC § 162 and deductibility of expenses, see Most Litigated Issue: *Trade or Business Expenses Under IRC § 162 and Related Sections, infra.*

45  IRC § 162(a)(2).

001865

Two pertinent issues at trial included whether Engstrom was entitled to travel expense deductions under IRC § 162 and if Engstrom was liable for an accuracy-related penalty under IRC § 6662. To make its determination, the court divided the flights into three categories:

1. Flights on which Mr. Lack and Engstrom employees were passengers;

2. Flights on which Mr. Lack was the only Engstrom employee; and

3. Flights on which neither Mr. Lack nor any other Engstrom employee was a passenger.

The court found that Engstrom would be entitled to deductions for the first category only when the expense for each flight was properly substantiated. For the second category, the court allowed deductions only when it was readily apparent that the flight had a business purpose for Engstrom. No deductions were allowed for flights in the third category. Within this framework, the court found that many of the flights did not meet the heightened requirements for substantiation under IRC § 274(d).[46]

The court noted that the revenue schedules prepared by Ms. Carter included payment information but lacked flight information, such as a list of passengers or the business purpose for the flight. Mr. Lack's executive calendar did not include amounts of travel expenses or the business purpose for each flight. The flight logs kept by the pilots also failed to note any business purpose for the flights and did not contain passenger information. The court deemed the logs prepared by Ms. Carter and Mr. Lack noncontemporaneous and prepared in anticipation of trial. As a result, the court allowed only a portion of the claimed travel expenses to be deducted.

The court imposed a penalty for negligence under IRC § 6662(b)(1) for failure to keep adequate records. In its analysis of reasonable cause, the court found that the "[p]etitioner failed to establish reasonable cause for not keeping sufficient contemporaneous records showing important flight details and the business purpose of the travel."[47] Thus, reasonable cause was rejected based on the same evidence that established negligence.

Reasonable cause and good faith may be found if there is "an honest misunderstanding of fact or law."[48] For example, in *Dabney v. Commissioner*,[49] Mr. Dabney wanted to increase the value of his individual retirement account (IRA) by investing in real estate with funds from his IRA. He researched this investment option on the Internet and found that IRAs could hold property for investment. He spoke with a customer service representative at Charles Schwab, his investment firm, who informed him that Charles Schwab did not allow the purchase and holding of real estate. Mr. Dabney also contacted his accountant, who agreed with Mr. Dabney's assessment after reviewing his research material.

Mr. Dabney went through with his plan and had $114,000 withdrawn from his IRA. The money was wired directly to a title company in order to purchase real estate for investment purposes. He requested that the title be issued in his name along with the name of his IRA account with Charles Schwab. He later sold the property and had the proceeds of the sale sent directly to his account at Charles Schwab as a

---

46   To be deductible as a business expense under IRC § 162, travel expenses require sufficient evidence of (1) the amount of the expense; (2) the time and place of the travel; (3) the business purpose of the expense; and (4) the business relationship of the taxpayer to the person using the property. IRC § 274(d). While a contemporaneous record is not required, "a record of the elements of an expenditure or of a business use of listed property made at or near the time of the expenditure or use, supported by sufficient documentary evidence, has a high degree of credibility not present with respect to a statement prepared subsequent thereto when generally there is a lack of accurate recall." Treas. Reg. § 1.274-5T(c)(1).

47   T.C. Memo. 2014-221.

48   Treas. Reg. § 1.6664–4(b)(1).

49   T.C. Memo. 2014-108.

rollover contribution.  Charles Schwab issued a Form 1099 to the Dabneys, though Mr. Dabney did not recall receiving it.  Mr. Dabney did not report this withdrawal as income on the couple's 2009 tax return. The IRS subsequently determined a deficiency of $42,431 against the couple and imposed an accuracy-related penalty of $8,486.

The court found that, as a matter of policy, the Charles Schwab IRA did not allow real property to be held for investment and therefore the transfer of funds was not between trustees, as required for a rollover contribution.  As a result, Mr. Dabney was required to report this withdrawal as income on his tax return. However, the court declined to impose an accuracy-related penalty on the Dabneys.  In reaching this determination, the court analyzed Mr. Dabney's good faith attempt at compliance.  The court noted that Mr. Dabney was not a sophisticated taxpayer, had no background in tax or accounting, and had gone to great lengths to ensure that using funds from his IRA would be non-taxable.  Mr. Dabney's research confirmed that IRAs are permitted to hold real property, he made sure the property was held for invest-ment purposes, he obtained a scrivener's affidavit to fix an issue with the title, and made sure the funds were wired directly.  He also conferred with a Charles Schwab customer service representative and his ac-countant on multiple occasions regarding the transaction.  Although Mr. Dabney was mistaken, the court found that he had acted with reasonable cause and in good faith.[50]

### Reasonable Basis

In some situations, a taxpayer may not be certain as to how the IRS will respond to the tax treatment employed for a specific set of circumstances.  Disclosing the tax treatment used for an issue on the return, supported by a reasonable basis, can reduce the amount of an underpayment for purposes of the accuracy-related penalty.[51]  A tax position supported by a reasonable basis will also defeat a negligence claim.[52]

For example, in *Wells Fargo & Co. v. United States*,[53]  the taxpayer, a bank, claimed foreign tax cred-its from income taxes paid to the United Kingdom and expenses attributable to a Structured Trust Advantaged Repackaged Securities (STARS) transaction.  Wells Fargo entered into the STARS transaction with Barclays, a bank based in the United Kingdom (U.K.).[54]  The transaction was intended to provide tax benefits to both banks from the same income tax payments in the United Kingdom, but the IRS viewed it as a sham transaction and imposed an accuracy-related penalty on negligence grounds.

---

50  Though this case involved a deficiency on a joint return and liability for the accuracy-related penalty for both Mr. and Mrs. Dabney, the court granted a motion to dismiss Mrs. Dabney for lack of prosecution and held that it would hold her to a liability consistent with the opinion.

51  IRC § 6662(d)(2)(B)(ii).

52  Treas. Reg. § 1.6662-3(b)(1) ("A return position that has a reasonable basis… is not attributable to negligence.").

53  114 A.F.T.R.2d (RIA) 5414 (D. Minn. 2014).

54  In general, a STARS transaction is a multistep transaction that enables a U.S. participant to realize an economic benefit by claiming foreign tax credits.  The STARS transaction in *Wells Fargo* consisted of a loan and a trust component.  Wells Fargo transferred income-producing assets to a U.K.-based trust.  The assets had no relation to the U.K.  However, the trust was con-sidered a resident of the U.K., and thus, the income generated by the trust was subject to U.K taxes.  The income realized by the U.K. trust and the U.K. income taxes paid by it were treated as received and paid by Wells Fargo.  Under U.K. law, almost all of the after-U.K. tax income of the trust was treated as a distribution to Barclays.  The after-U.K. tax trust income allocated to Barclays was immediately credited to a blocked account ("Bx") in the name of Barclays that was maintained by Wells Fargo and then reinvested in the trust.  Barclays was obligated to pay consideration to Wells Fargo of a fixed amount each month that was calculated to be a percentage of the U.K. tax credits that Barclays expected to enjoy as a result of the allocation of trust income.  Barclays also deducted the Bx amounts in the calculation of its U.K. income tax liability.  The combination of U.K. tax credits and U.K. deductions (for the amounts allocated to the blocked account and contributed back to the trust and the Bx payments) created a net profit to Barclays under U.K. tax law as a result of its involvement in the STARS transaction.  Barclays effectively loaned $1.25 billion to Wells Fargo at an interest rate of 0.2 percent.  *See also* Ajay Gupta, *Interest Deductibility in Stars Cases*, Tax Notes Today, Jan. 26, 2015, 2015 TNT 16-4.

001867

The IRS argued that taxpayer participation in a sham transaction is necessarily negligent, requiring that the issue of the transaction's economic substance be determined. The court found there was insufficient support for the IRS's position. It held that the negligence penalty would be avoided if Wells Fargo's position was supported by a reasonable basis, even if the sham transaction issue is eventually lost. The court held that Wells Fargo had established a reasonable basis, supported by (1) the tax code, (2) regulations, (3) tax treaties, and (4) judicial decisions; and granted the taxpayer's motion for partial summary judgment that there was a reasonable basis for the STARS transaction reporting.

### Reliance on the Advice of a Tax Professional as Reasonable Cause

Another commonly litigated question was whether reliance on a tax professional established reasonable cause. The taxpayer's education, sophistication, and business experience are relevant in determining whether his reliance on tax advice was reasonable.[55] To prevail, a taxpayer must establish that:

1. The adviser was a competent professional who had sufficient expertise to justify reliance;

2. The taxpayer provided necessary and accurate information to the adviser; and

3. The taxpayer actually relied in good faith on the adviser's judgment.[56]

Taxpayers argued their good faith reliance on a competent tax professional in several cases this year, including *Evans v. Commissioner*.[57] In *Evans*, the married taxpayers ran a construction company, Dave Evans Construction (DEC). The taxpayers sponsored their son's successful motocross racing as a promotional activity for DEC. They deducted these expenses (including the purchase of a motorhome, a Mirage trailer, and a utility trailer) as ordinary and necessary expenses for their company pursuant to IRC § 162. The IRS argued that such expenses were not ordinary and necessary for the business and instead were personal expenses that should not have been deducted.[58]

The court ruled in favor of Mr. and Mrs. Evans. The court found that the expenses were business in nature, as the promotion of motocross led to increased exposure to clients, investors, and subcontractors. In particular, the court noted the local construction industry's significant involvement in motocross racing. Further, only one child's expenses were deducted, other corporate support was acquired for his racing, and their deductions stopped when the son became a professional racer. The court held that the expenses were reasonable in amount, as they totaled less than one percent of gross receipts for DEC. Additionally, the court found that the motorhome was not primarily used for lodging as it had a ramp and was used to store, transport, and repair motorbikes as well. The court did not allow expenses to be deducted in association with the utility trailer, as the taxpayers did not prove it was used for an advertising purpose.

The taxpayers hired Ms. Chacon, a certified public accountant (CPA), who testified that she provided necessary documents to Mr. Anderson, a separate CPA, and answered questions as he prepared the returns. The court held that taxpayers had reasonably relied in good faith on Mr. Anderson's judgment for the disallowed deductions and, therefore, were not subject to a penalty under IRC § 6662.

In *Gardner v. Commissioner*,[59] Mr. Gardner was involved in many businesses, including insurance and home construction. In 2001, he entered into agreements with David Pearl and John Pearl to breed

---

55  Treas. Reg. § 1.6664-4(c)(1). *See also* IRM 20.1.5.6.1(6), *Reasonable Cause* (Jan. 24, 2012).

56  *Neonatology Associates, P.A. v. Comm'r*, 115 T.C. 43, 99 (2000) (citations omitted), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

57  T.C. Memo. 2014-237. *See also VisionMonitor Software, LLC v. Comm'r.*, T.C. Memo. 2014-182.

58  For information on business expenses deductions, see IRC § 162 and Most Litigated Issue: *Trade or Business Expenses Under IRC § 162 and Related Sections*, *infra*.

59  T.C. Memo. 2014-148.

001868

genetically superior cattle, which would be jointly owned.  Mr. Gardner executed 24 promissory notes with entities owned by the Pearls, with the cattle as collateral.  The cattle operation amassed $991,842 in expenses over ten years for a net reported loss of $621,677.  Although the only evidence of payment was checks totaling $74,618, the taxpayer deducted all of these losses as business expenses under IRC § 162.  The court held that the Mr. Gardner was not eligible to claim these deductions because the cattle operation was an activity not engaged in for profit.[60]

Mr. Gardner argued for a reasonable cause and good faith exception based on his reliance on his CPA.  His accountant relied solely upon income and expense summaries prepared by David Pearl for the cattle operation.  While the court found the CPA to be a competent professional, it found that Mr. Gardner had, in fact, relied upon David Pearl for tax purposes and not the CPA.  As David Pearl had no expertise in accounting or taxation, the court found Mr. Gardner failed the first prong of the reasonable reliance test.  The court further found that he had failed to provide the necessary and accurate information to his CPA, a requirement under the second prong in *Neonatology Associates, P.A. v. Commissioner.*

Reliance on tax advice from the promoter of a transaction or an advisor with an inherent conflict of interest may also not be reasonable.  For example, in *Salem Financial, Inc. v. United States*, Salem Financial, a subsidiary of Branch Banking and Trust (BB&T), sought a tax refund related to a STARS transaction.[61]

In 2002, BB&T entered into the STARS transaction with Barclays Bank, which was located in the United Kingdom (U.K.).  Barclays developed the STARS transaction along with KPMG LLP, an international accounting firm.  KPMG also recommended that BB&T hire Sidley, Austin, Brown & Wood LLP (Sidley) as its tax advisor on the STARS transaction.  BB&T followed this recommendation and also requested that its accounting firm PricewaterhouseCoopers (PwC) review the transaction, but not for tax compliance purposes.

Essentially, BB&T created a trust and contributed $5.755 billion of assets to it.  Barclays gave $1.5 billion to the trust in return for an interest in the trust.  The terms of this part of the agreement meant the $1.5 billion was a loan from Barclays to BB&T.  BB&T appointed a U.K. trustee to the trust, subjecting the trust to taxation in the U.K.  BB&T used trust funds to pay the U.K. tax on the trust's income.  Barclays then received U.K. tax deductions and credits, and it made a monthly payment to BB&T, which was equal to 51 percent of the U.K. taxes paid by the trust.  BB&T then claimed a foreign tax credit.  The ability for there to be a profit from this transaction relied on both BB&T and Barclays being able to successfully obtain their respective tax credits.

On March 30, 2007, the IRS issued proposed regulations addressing schemes such as the STARS transaction.  BB&T terminated the trust six days later.  It filed returns claiming foreign tax credits and interest deductions.  Upon review, the IRS denied both claims and imposed accuracy-related penalties.  BB&T sued in the Court of Federal Claims for federal tax credits and interest deductions disallowed by the IRS as well as accuracy-related penalties imposed.[62]  The Court of Federal Claims denied the claim finding that it was not reasonable for Salem Financial to have relied on KPMG, Sidley, or PwC for tax advice, and BB&T appealed.

---

60   *See generally* IRC § 183 and the nine-factor test in Treas. Reg. § 1.183-2(b).

61   786 F.3d 932 (Fed. Cir. 2015), *aff'g in part, reversing in part and remanding*, 112 Fed. Cl. 543 (2013), *petition for cert. filed*, No. 15-380 (Sept. 29, 2015).  See footnote 53, *supra*, for a detailed discussion of the same STARS transaction involving Barclays and Wells Fargo.

62   *Salem Fin., Inc. v. United States*, 112 Fed. Cl. 543 (2013), *rev'd in part and remanded by* 786 F.3d 932 (Fed. Cir. 2015), *petition for cert. filed*, No. 15-380 (Sept. 29, 2015).

001869

On appeal, the Court of Appeals for the Federal Circuit found the STARS transaction to be a sham and disregarded all of its tax consequences. The court also upheld the imposition of accuracy-related penalties against Salem Financial. At trial, Salem Financial asserted that it reasonably relied upon the favorable tax opinion from Sidley and supportive advice from its accounting firm, PwC.

In its decision, the court notes that reliance on an advisor is not reasonable if that advisor has a conflict of interest that the taxpayer is aware of or if the transaction is "too good to be true." The court found reliance on Sidley to be unreasonable because Sidley had been selected by Salem Financial on recommendation of KPMG, the principal marketer of the STARS transaction. KPMG and Sidley were also involved with putting the transaction together; therefore, KPMG and Sidley had an interest in the transaction and their advice was deemed suspect by the court.

The court also rejected reasonable reliance upon the opinion of PwC. PwC had not been tasked with reviewing the tax compliance of the STARS transaction. As a result, PwC did not provide a tax opinion. Even so, PwC explicitly informed Salem Financial that it was not providing an opinion regarding the larger transaction and had qualified its advice by suggesting a low level of comfort that the IRS would accept the STARS transaction.

Lastly, the court rejected a reasonable reliance defense because Salem Financial should have known that the STARS transaction was "too good to be true." The court reached this conclusion based on the education and experience of the company's executives. The court upheld the accuracy-related penalty but required reassessment of the amount to allow for interest deductions on part of the transaction.

## No Affirmative Defense Offered by the Taxpayer

Many taxpayers offered no affirmative defense for the underpayment of tax, failing completely to claim the reasonable cause and good faith defense under IRC § 6664(c). Nearly two-thirds (21 cases out of 32 cases) of those failing to make an argument or present evidence of good faith were unrepresented in this reporting period.[63] The burden of proof to raise an affirmative defense is on the taxpayer and as a result, taxpayers must provide documentation to substantiate any disputed deductions or credits, explain why the records were inadequate, or show reliance on a tax professional.[64] When the taxpayer fails to present any evidence for an affirmative defense, courts may do a cursory examination of the *pro se* taxpayer's reliance on a tax professional.[65] While some *pro se* taxpayers may be unaware of the good faith exception, in many cases the taxpayer did not keep adequate records to support his or her position.[66]

An exception is *Nguyen v. Commissioner*, where evidence of reasonable reliance on the tax return preparer might have made a difference in the court's decision to impose the penalty under IRC § 6662.[67] The taxpayers, a married couple, were audited for TYs 2009 and 2010. The audit focused on the hardwood floor installation business owned and operated by Mr. Nguyen. A flood in the taxpayers' house destroyed some of Mr. Nguyen's records for 2009. Mr. Nguyen provided the surviving records to Mr. Wynn, a tax return preparer, who prepared a 2009 return for the taxpayers. Mr. Wynn reported cost of goods sold for Mr. Nguyen's business as $43,503 and supplies totaling $5,675. Mr. Wynn did not explain the difference between these two elements to the taxpayers. Ultimately, the IRS allowed only $18,095.66 for cost of

---

63   *See* Table 1 in Appendix 3, *infra*.
64   IRC § 7491(a).  *See also* Tax Ct. R. 142(a).
65   *See, e.g., Peterson v. Comm'r*, T.C. Memo. 2015-23, *appeal docketed*, No. 15-73092 (9th Cir. Oct. 8, 2015); *Smith v. Comm'r*, T.C. Memo. 2014-203.
66   *See, e.g., Duong v. Comm'r*, T.C. Memo. 2015-90; *Flores v. Comm'r*, T.C. Memo. 2015-9.
67   T.C. Memo. 2014-199.

goods sold but did allow the entire amount claimed for supplies. The Nguyens used a different return preparer in 2010, but this preparer relied on the 2009 return in preparing the 2010 return. While the taxpayers' 2010 return claimed $39,894 for supplies, the IRS allowed only $24,668.26.

At trial, the Nguyens, who had representation, provided an incomplete bank statement for 2009 and some bank statements for 2010. They provided no additional testimony to substantiate expenses. The court allowed deductions equal to the amounts calculated by the IRS. The court then considered a reasonable cause defense prior to imposing a penalty on the Nguyens. First, the court determined that the 2009 flood could not be a reason for lack of substantiation because Mr. Nguyen had explained that most of his transactions would appear in his bank account statements, which he could have obtained for the trial.

The court then considered Mr. Nguyen's background. Mr. Nguyen had come to the United States from Vietnam and had obtained a ninth grade education. He had limited English skills but had successfully operated his business since 1997. Mr. Nguyen testified that he trusted Mr. Wynn and relied on his judgment. Mr. Wynn did not appear in court, despite the fact that Mr. Nguyen had issued him a subpoena to appear. However, Mr. Nguyen also did not submit any evidence to show Mr. Wynn's credibility or experience. Without this information, the taxpayers were unable to show that they relied on Mr. Wynn in good faith.

## CONCLUSION

Over this last reporting period, the issue of accuracy-related penalties was decided by the courts in 113 cases. Litigation on the issue has continued to decline over the last two periods.[68]

Courts most often cited inadequate maintenance of records when imposing an accuracy-related penalty. When accepting a defense for reasonable cause and good faith, courts were most likely to cite reliance on a tax professional and manifestations of taxpayer efforts to comply with the tax code. About one-third of *pro se* taxpayers (21 cases out of 68 cases) and nearly one-fifth of represented taxpayers (11 cases out of 45 cases) failed to argue or present evidence of good faith.

As mentioned above, the IRS has the burden to prove the existence of an underpayment attributable to negligence/disregard of rules or regulations or an underpayment attributable to a substantial understatement.[69] However, if the taxpayer does not raise the issue of penalty assessment in the court pleadings, the taxpayer is deemed to have conceded the issue and the IRS is not required to provide evidence that the penalty is appropriate.[70] Likewise, the rules of the Tax Court require the taxpayer to include all arguments in the petition.[71]

Finally, it is important to note that Congress enacted law reversing the Tax Court's decision in *Rand v. Commissioner*, in which the Tax Court had held that refundable credits cannot reduce the amount shown as tax, by the taxpayer on a return, below zero.[72] IRC § 6664(a) was amended to be consistent with the rule of IRC § 6211(b)(4), which would allow the IRS to calculate negative tax in computing the amount

---

68   *See* National Taxpayer Advocate 2013 Annual Report to Congress 341 and National Taxpayer Advocate 2014 Annual Report to Congress 446.

69   IRC § 7491(c).

70   *Swain v. Comm'r*, 118 T.C. 358 (2002).

71   Tax Ct. R. 34(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded.").

72   Consolidated Appropriations Act, 2016, § 209 (2015). *See also Rand v. Comm'r*, 141 T.C. 376 (2013).

of underpayment for accuracy-related penalty purposes.[73]  Thus, for returns filed after December 18, 2015, or for returns filed before that date for which the period of limitations on assessment under IRC § 6501 has not expired, a taxpayer can be subject to an underpayment penalty in IRC § 6662 based on a refundable credit which reduces tax below zero.

---

73   Consolidated Appropriations Act, 2016, § 209 (2015).

MLI
#2

# Trade or Business Expenses Under IRC § 162 and Related Sections

## SUMMARY

The deductibility of trade or business expenses has long been among the ten Most Litigated Issues since the first edition of the National Taxpayer Advocate's Annual Report to Congress in 1998.[1]  We identified 99 cases involving a trade or business expense issue that were litigated between June 1, 2014, and May 31, 2015.  The courts affirmed the IRS position in 57 of these cases, or about 58 percent, while taxpayers fully prevailed in 11 cases, or about 11 percent.  The remaining 31 cases, or 31 percent, resulted in split decisions.

## TAXPAYER RIGHTS IMPACTED[2]

- *The Right to Be Informed*
- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*

## PRESENT LAW

Internal Revenue Code (IRC) § 162 allows deductions for ordinary and necessary trade or business expenses paid or incurred during the course of a taxable year.  Rules regarding the practical application of IRC § 162 have evolved largely from case law and administrative guidance.  The IRS, the Department of the Treasury, Congress, and the courts continue to provide guidance about whether a taxpayer is entitled to claim certain deductions.  The cases analyzed for this report illustrate that this process is ongoing and involves the analysis of facts and circumstances particular to each case.  When a taxpayer seeks judicial review of the IRS's determination of a tax liability relating to the deductibility of a particular expense, the courts must often address a series of questions, including those discussed below.

### What is a trade or business expense under IRC § 162?

Although "trade or business" is one of the most widely used terms in the IRC, neither the Code nor Treasury Regulations provide a definition.[3]  The definition of a "trade or business" comes from common law, where the concepts have been developed and refined by the courts.[4]  The Supreme Court has interpreted "trade or business" for purposes of IRC § 162 to mean an activity conducted with "continuity and regularity" and with the primary purpose of earning income or making profit.[5]

---

1   *See* National Taxpayer Advocate 1998-2014 Annual Reports to Congress.
2   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
3   In 1986, the term "trade or business" appeared in at least 492 subsections of the IRC and in over 664 Treasury Regulations.  *See* F. Ladson Boyle, *What Is a Trade or Business?*, 39 Tax Law. 737 (Summer 1986).
4   Carol Duane Olson, *Toward a Neutral Definition of "Trade or Business" in the Internal Revenue Code*, 54 U. Cin. L. Rev. 1199 (1986).
5   *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987).

001873

### What is an ordinary and necessary expense?

IRC § 162(a) requires a trade or business expense to be both "ordinary" and "necessary" in relation to the taxpayer's trade or business to be deductible. In *Welch v. Helvering*, the Supreme Court stated that the words "ordinary" and "necessary" have different meanings, both of which must be satisfied for the taxpayer to benefit from the deduction.[6] The Supreme Court describes an "ordinary" expense as customary or usual and of common or frequent occurrence in the taxpayer's trade or business.[7] The Court describes a "necessary" expense as one that is appropriate and helpful for development of the business.[8]

Common law also requires that in addition to being ordinary and necessary, the amount of the expense must be reasonable for the expense to be deductible. In *Commissioner v. Lincoln Electric Co.*, the Court of Appeals for the 6th Circuit held "the element of reasonableness is inherent in the phrase 'ordinary and necessary.' Clearly it was not the intention of Congress to automatically allow as deductions operating expenses incurred or paid by the taxpayer in an unlimited amount."[9]

### Is the expense a currently deductible expense or a capital expenditure?

A currently deductible expense is an ordinary and necessary expense paid or incurred during the taxable year in the course of carrying on a trade or business.[10] No current deductions are allowed for the cost of acquisition, construction, improvement, or restoration of an asset expected to last more than one year.[11] Instead, those types of expenses are generally considered capital expenditures, which may be subject to depreciation, amortization, or depletion over the useful life of the property.[12]

Whether an expenditure is deductible under IRC § 162(a) or is a capital expenditure under IRC § 263 is a question of fact. Courts have adopted a case-by-case approach to applying principles of capitalization and deductibility.[13]

### When is an expense paid or incurred during the taxable year, and what proof is there that the expense was paid?

IRC § 162(a) requires an expense to be "paid or incurred during the taxable year" to be deductible. The IRC also requires a taxpayer to maintain books and records that substantiate income, deductions, and credits, including adequate records to substantiate deductions claimed as trade or business expenses.[14] If a taxpayer cannot substantiate the exact amounts of deductions by documentary evidence (*e.g.*, invoice, paid bill, or canceled check) but can establish that he or she had some business expenditures, the courts may employ the *Cohan* rule to grant the taxpayer a reasonable amount of deductions.

---

6   290 U.S. 111, 115 (1933) (suggesting an examination of "life in all its fullness" will provide an answer to the issue of whether an expense is ordinary and necessary).

7   *Deputy v. du Pont*, 308 U.S. 488, 495 (1940) (citation omitted).

8   *See Comm'r v. Heininger*, 320 U.S. 467, 471 (1943) (citations omitted).

9   176 F.2d 815, 817 (6th Cir. 1949), *cert. denied*, 338 U.S. 949 (1950).

10  IRC § 162(a).

11  IRC § 263.  *See also INDOPCO, Inc. v. Comm'r*, 503 U.S. 79 (1992).

12  IRC § 167.

13  *See PNC Bancorp, Inc. v. Comm'r*, 212 F.3d 822 (3d Cir. 2000); *Norwest Corp. v. Comm'r*, 108 T.C. 265 (1997).

14  IRC § 6001.  *See also* Treas. Reg. §§ 1.6001-1 and 1.446-1(a)(4).

### The *Cohan* rule

The *Cohan* rule is one of "indulgence" established in 1930 by the Court of Appeals for the 2nd Circuit in *Cohan v. Commissioner*.[15]  The court held that the taxpayer's business expense deductions were not adequately substantiated, but stated that "the [Tax Court] should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making.  But to allow nothing at all appears to us inconsistent with saying that something was spent."[16]  In *Estate of Elkins v. Commissioner*, the 5th Circuit recently described "the venerable lesson of Judge Learned Hand's opinion in *Cohan*: In essence, make as close an approximation as you can, but never use a zero."[17]

The *Cohan* rule cannot be used in situations where IRC § 274(d) applies.  IRC § 274(d) provides that unless a taxpayer complies with strict substantiation rules, no deductions are allowable for:

- Travel expenses;
- Entertainment, amusement, or recreation expenses;
- Gifts; and
- Certain "listed property."[18]

A taxpayer must substantiate a claimed IRC § 274(d) expense with adequate records or sufficient evidence to establish the amount, time, place, and business purpose.[19]  A contemporaneous log is not explicitly required, but a statement not made at or near the time of the expenditure has the same degree of credibility only if the corroborative evidence has "a high degree of probative value."[20]  In addition, entertainment expenses require proof of a business relationship to the taxpayer.[21]

### Who has the burden of proof in a substantiation case?

Generally, the taxpayer bears the burden of proving that he or she is entitled to the business expense deductions and the IRS's proposed determination of tax liability is incorrect.[22]  IRC § 7491(a) provides that the burden of proof shifts to the IRS when the taxpayer:

- Introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability;
- Complies with the requirements to substantiate deductions;

---

15   39 F.2d 540 (2d Cir. 1930).  George M. Cohan was an actor, playwright, and producer who spent large sums travelling and entertaining actors, employees, and critics.  Although Cohan did not keep a record of his spending on travel and entertainment, he estimated that he incurred $55,000 in expenses over several years.  The Board of Tax Appeals, now the Tax Court, disallowed these deductions in full based on Cohan's lack of supporting documentation.  Nevertheless, on appeal, the 2nd Circuit concluded that Cohan's testimony established that legitimate deductible expenses had been incurred.  As a result, the 2nd Circuit remanded the case back to the Board of Tax Appeals with instructions to estimate the amount of deductible expenses.

16   39 F.2d 540 (2d Cir. 1930) at 544 (2d Cir. 1930), *aff'g and remanding* 11 B.T.A. 743 (1928).

17   767 F.3d 443, 449, n. 7 (5th Cir. 2014), *rev'g* 140 T.C. 86 (2013).

18   "Listed property" means any passenger automobile; any property used as a means of transportation; any property of a type generally used for purposes of entertainment, recreation, or amusement; any computer or peripheral equipment (except when used exclusively at a regular business establishment and owned or leased by the person operating such establishment); and any other property specified by regulations.  IRC §§ 280F(d)(4)(A) and (B).

19   Treas. Reg. § 1.274-5T(b).

20   Treas. Reg. § 1.274-5T(c)(1); *Reynolds v. Comm'r*, 296 F.3d 607, 615-16 (7th Cir. 2002) (noting that keeping written records is not the only method to substantiate IRC § 274 expenses but "alternative methods are disfavored").

21   Treas. Reg. § 1.274-5T(b)(3)(v).

22   *See Welch v. Helvering*, 290 U.S. 111, 115 (1933) (citations omitted) and U.S. Tax Court Rules of Practice and Procedure, Rule 142(a).

001875

- Maintains all records required under the Code; and
- Cooperates with reasonable requests by the IRS for witnesses, information, documents, meetings, and interviews.

## ANALYSIS OF LITIGATED CASES

The deductibility of trade or business expenses has been one of the ten Most Litigated Issues since the first edition of the National Taxpayer Advocate's Annual Report to Congress in 1998.[23]  This year, we reviewed 99 cases involving trade or business expenses that were litigated in federal courts from June 1, 2014, through May 31, 2015.  Table 2 in Appendix 3 contains a list of the main issues in those cases.  Figure 3.2.1 categorizes the main issues raised by taxpayers.  Cases involving more than one issue are included in more than one category.

### FIGURE 3.2.1, Trade or Business Expense Issues in Cases Reviewed[24]

| Issue | Type of Taxpayer | |
|---|---|---|
| | Individual | Business |
| Substantiation of Expenses, Including Application of the *Cohan* Rule | 14 | 60 |
| Ordinary and Necessary Trade or Business Expenses | 1 | 11 |
| Personal vs. Business Expense | 4 | 19 |
| Trade or Business Carried on for Profit | 2 | 19 |
| Economic Substance | 0 | 4 |
| Home Office | 1 | 10 |

Taxpayers represented themselves (*pro se*) in 60 of 99 cases.  Taxpayers represented by counsel (39 of 99 cases) fared slightly better than their *pro se* counterparts.  Taxpayers with representation received full or partial relief in approximately 49 percent of cases (19 of 39).  By contrast, *pro se* taxpayers received full or partial relief in 38 percent of cases (23 of 60).

### Individual Taxpayers

None of the 16 decisions involving individual taxpayers (where the term "individual" excludes a sole proprietorship) were issued as a regular opinion of the Tax Court.[25]  Eleven of the 16 individual taxpayers appeared *pro se*.  Two individual taxpayers received full relief, while nine earned split decisions.  The court fully upheld the IRS position in five of 16 cases (31 percent).

---

23   *See* National Taxpayer Advocate 1998-2014 Annual Reports to Congress.

24   Multiple issues can appear within one case; therefore, these issue-spotting breakdown figures will not match the total case count.

25   Tax Court decisions fall into three categories: regular decisions, memorandum decisions, and small tax case ("S") decisions. The regular decisions of the Tax Court include cases which have some new or novel point of law, or in which there may not be general agreement, and therefore have the most legal significance.  In contrast, memorandum decisions generally involve fact patterns within previously settled legal principles and therefore are not as legally significant.  Finally, "S" case decisions (for disputes involving $50,000 or less where the taxpayer has elected Small Case status) are not appealable and, thus, have no precedential value.  *See* IRC § 7463(b).  *See also* U.S. Tax Court Rules of Practice and Procedure, Rules 170-175.  More than half of the cases reviewed this year involving individual taxpayers (excluding sole proprietorships) were "S" cases.

Most Litigated
Issues

Legislative
Recommendations

Most Serious
Problems

The most prevalent issue was the substantiation of claimed trade or business expense deductions.  For example, in *Garza v. Commissioner*, the Tax Court denied a travel expense deduction for failure to substantiate.[26]  The taxpayer, a direct sales representative for Time Warner Cable, used his personal vehicle to make service calls and maintained a calendar planner in which he recorded his vehicle's odometer readings at the beginning and end of each month, sometimes also including intermediate readings and personal notes.  Although the taxpayer's calendar planner was contemporaneous, it lacked information detailing the amount, date, and business purpose of each use of his vehicle.  As a result, the Court denied the taxpayer a deduction for these claimed travel expenses.[27]

### Business Taxpayers

We reviewed 83 cases involving business taxpayers.  As it turned out, business taxpayers had a much lower success rate compared to individual taxpayers.  Individual taxpayers received full or partial relief in approximately 69 percent of cases (11 of 16).  Meanwhile, business taxpayers received full or partial relief in only 37 percent of cases (31 of 83).

Business taxpayers were represented by counsel in 55 percent (17 of 31) of favorably decided cases, including eight cases in which the taxpayer received full relief.  Business taxpayers were represented by counsel in 33 percent (17 of 52) of the cases the IRS won.  To the extent that *pro se* taxpayers were successful in court, these favorable outcomes stemmed mostly from their ability to provide records substantiating deductions in cases where such substantiation was in controversy.

As was the case for the individual taxpayers, substantiation of expenses was by far the most prevalent issue, and in most instances, the courts denied the business taxpayers' deductions for failure to substantiate.[28]  Courts did, however, allow some of these deductions when the taxpayer produced sufficient evidence.[29]  Courts occasionally applied the *Cohan* rule where the taxpayer presented sufficient documentation to prove an expense was incurred but had limited documentation of the precise amount.[30]  As previously mentioned, however, IRC § 274(d) makes the *Cohan* rule unavailable in certain circumstances in which the taxpayer must substantiate the deductions.

Taxpayers were also denied business expense deductions under IRC § 262(a) when the courts found the expenses were related to personal rather than business activities.[31]  In *Peterson v. Commissioner*, the taxpayer was a full-time police officer for the city of Chicago and also owned and operated a private security company.[32]  The taxpayer claimed deductions for vehicle, transportation, and travel expenses resulting

---

26   T.C. Memo. 2014-121.

27   *See also Flores v. Comm'r*, T.C. Memo. 2015-9 (denying deductions for vehicle and other Schedule A expenses for insufficient or absent documentation).

28   *See Sheridan v. Comm'r*, T.C. Memo. 2015-25 (finding that taxpayer was not entitled to annual theft loss deductions of $1 million for alleged smokeless tobacco vaporizer patent infringement); *Robinson v. Comm'r*, T.C. Memo. 2014-120, *aff'd*, No. 15-1380 (4th Cir. Sept. 3, 2015) (denying deductions for vehicle, home office, and other personal expenses).

29   *See ABC Beverage Corp. v. U.S.*, 756 F.3d 438 (6th Cir. 2014), *aff'g* 577 F. Supp. 2d 935 (W.D. Mich. 2008) (holding that a portion of the purchase price from a burdensome lease buyout was deductible); *Cooper v. Comm'r*, 143 T.C. 194 (2014) (finding that reverse engineering expenses were sufficiently related to taxpayer's business as an inventor and were deductible as a result), *appeal docketed*, No. 15-70863 (9th Cir. Mar. 20, 2015).

30   *See Mylander v. Comm'r*, T.C. Memo. 2014-191 (allowing deduction for continuing dental education based on approximated expense of class hour and annual education requirement); *Sawyer v. Comm'r*, T.C. Memo. 2015-55 (allowing deduction for labor costs approximated from taxpayer's testimony and invoices).

31   IRC § 262(a) provides that personal, living, and family expenses are generally not deductible. *See, e.g.*, *Lussy v. Comm'r*, T.C. Memo. 2015-35 (denying deductions for legal fees, travel, and other expenses personal in nature), *appeal docketed*, No. 15-11626 (11th Cir. Apr. 13, 2015).

32   T.C. Memo. 2015-23.

from his off-duty work activities.  He also deducted expenses for meals and entertainment, an additional bulletproof vest, and classes towards a master's degree in emergency management.

The Tax Court did not allow deductions for an additional bullet proof vest or expenses towards the taxpayer's master degree as these expenses were personal in nature.[33]  Similarly, the Tax Court found that the taxpayer failed to substantiate travel, meal, and entertainment expenses to the strict degree required by IRC § 274(d).  As a result, no deductions whatsoever were allowed.

Similarly, in *Engstrom, Lipscomb & Lack, APC v. Commissioner*, a law firm (Engstrom) challenged the IRS's disallowance of business-related air travel expenses.[34]  The Tax Court denied all deductions for flights where no Engstrom personnel were present because they lacked a business purpose and failed to meet the strict IRC § 274(d) substantiation requirements.  By contrast, the substantiation requirements and other prerequisites for deductibility, such as a business purpose, were held to have been satisfied with respect to many of the air travel expenses for flights on which the firm's owner or employees were passengers.[35]

Courts likewise generally sustained IRS determinations that business expense deductions were not attributable to an activity engaged in for profit within the meaning of IRC § 183.  However, in *Crile v. Commissioner*, the taxpayer successfully established that she engaged in art making as a for profit business activity.[36]  To arrive at this determination, the Tax Court proceeded to examine the taxpayer's deductions using the nine-factor test of Treas. Reg. § 1.183-2(b).[37]

The Tax Court stated that the taxpayer's business plan, credentials as an artist, time and effort spent on her art business, and the expectation of appreciation in the value of her artwork weighed in favor of her art making being for profit.  According to the Court, these factors weighed more heavily in favor of the taxpayer's art making being for profit than the fact that she earned profits in only two of the multiple years in which she claimed deductions.[38]

Another common theme was the difficulty in proving that expenses were ordinary and necessary to the taxpayer's business.[39]  The Tax Court in *Guardian Industries Corp. v. Commissioner* denied the taxpayer a deduction for a fine it paid to the Commission of the European Community (the Commission).[40]  Guardian Industries and its Luxembourg subsidiary manufactured and sold fabricated-glass products.  The Commission began an investigation of Guardian Industries and ultimately concluded that Guardian

---

33   39 F.2d 540 (2d Cir. 1930).

34   *Engstrom, Lipscomb & Lack, APC v. Comm'r*, T.C. Memo. 2014-221, *appeal docketed*, No. 15-70591 (9th Cir. Feb. 26, 2015).

35   For a more detailed discussion of this case, see Most Litigated Issue: *Accuracy-Related Penalty Under IRC § 6662(b)(1) and (2)*, *supra*.

36   T.C. Memo. 2014-202.

37   Those factors are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.

38   *Crile*, T.C. Memo. 2014-202.

39   *See* IRC § 162(a).  For examples of cases examined in which the court denied deductions for failure to prove the expense was ordinary and necessary to the taxpayer's business, *see, e.g., Fargo v. Comm'r*, T.C. Memo. 2015-96 (holding that payments made by the taxpayer's S corporation were not ordinary and necessary business expenses and therefore not deductible); *Midwest Eye Ctr., S.C. v. Comm'r*, T.C. Memo. 2015-53 (holding that taxpayer's $1 million bonus to sole executive and shareholder was not  an ordinary and necessary business expense because it was not reasonable).

40   143 T.C. 1 (2014).

Industries had engaged in a cartel with its subsidiary, violating a European treaty on price fixing.  A fine was issued against Guardian Industries as a result.

Guardian Industries attempted to deduct the fine it paid to the Commission as an "ordinary and necessary" business expense under IRC § 162.  The IRS denied Guardian Industries this deduction, explaining that the fine paid to the Commission was more appropriately categorized as a non-deductible "fine or similar penalty paid to a government for the violation of any law."[41]  The Tax Court agreed, ruling that the Commission is an "entity serving as an agency or instrumentality" of "[t]he government of a foreign country," and holding that the fine paid by Guardian Industries to the Commission therefore was not a deductible "ordinary and necessary" business expense.[42]

Taxpayers also had difficulty validating their home office deductions, losing cases where business use of a personal residence was in question.[43]  One example of this issue was *Longino v. Commissioner*, where the taxpayer, an attorney, sought to claim a number of IRC § 162 expenses, including home office deductions for the use of his apartment.[44]  The taxpayer, however, failed to substantiate that he used the apartment exclusively as his principal place of business, as his testimony provided "almost no details" about business activities conducted in the rooms in question.[45]  Consequently, the 11th Circuit affirmed the denial of the home office expense deductions on appeal.

Another issue addressed by the courts this year deals with the question of whether a transaction has economic substance, which is a prerequisite for deductibility.[46]  For example, in *Reddam v. Commissioner*, the taxpayer sought to offset his potential tax liability from the sale of a company he founded.[47]  To realize this offset, the taxpayer engaged in the trading of foreign bank stock through a series of interrelated entities.  The culmination of these trades and transactions created a sizable capital loss that the taxpayer sought to claim for tax purposes.  In 2001, however, the IRS had announced it would not recognize tax benefits from the type of transactions in which the taxpayer had engaged.[48]  The Tax Court held that the taxpayer was not entitled to claim the capital loss at issue, and the taxpayer appealed.

On appeal, the 9th Circuit utilized the "economic substance doctrine" to determine if the taxpayer's claimed capital loss should be disregarded for income tax purposes.[49]  The court concluded from the facts of the case that the taxpayer pursued his foreign bank stock transactions solely for their tax benefits and that any potential economic gain from these transactions was vastly outweighed by their designed purpose

---

41   IRC § 162(f).

42   *Guardian Indus.*, 143 T.C. 1, 20 (2014).  Treas. Reg. § 1.162-21(a) states that "[n]o deduction shall be allowed under section 162(a) for any fine or similar penalty paid to— (1) The government of the United States, a State, a territory or possession of the United States, the District of Columbia, or the Commonwealth of Puerto Rico; (2) The government of a foreign country; or (3) A political subdivision of, or corporation or other entity serving as an agency or instrumentality of, any of the above."

43   IRC § 280(A)(c)(1) allows the deduction of "a portion of the dwelling unit which is exclusively used on a regular basis… as the principal place of business for any trade or business of the taxpayer."  If the taxpayer is an employee, the home office deduction is only allowable if the exclusive use is for the convenience of the employer.

44   *Longino v. Comm'r*, 593 F. App'x 965 (11th Cir. 2014), *aff'g* T.C. Memo. 2013-80.

45   *Id.* at 969.

46   Taxpayers lost all four cases focused on the economic substance inquiry.  *See Reddam v. Comm'r*, 755 F.3d 1051 (9th Cir. 2014), *aff'g* T.C. Memo. 2012-106; *Kenna Trading, LLC v. Comm'r*, 143 T.C. No. 18 (2014) (disallowing deductions for bad debt derived from sham partnership that lacked economic substance); *Vanney Assocs., Inc. v. Comm'r*, T.C. Memo. 2014-184 (holding that the taxpayer's payment of year-end bonus to shareholder-CEO was not deductible as officer compensation); *Graffia v. Comm'r*, 580 F. App'x 474 (7th Cir. 2014), *aff'g* T.C. Memo. 2013-211 (denying deductions for flow-through losses from sham transactions that lacked economic substance).

47   755 F.3d 1051 (9th Cir. 2014), *aff'g* T.C. Memo. 2012-106.

48   IRS Notice 2001-45, 2001-2 C.B. 129.

49   *Reddam*, 755 F.3d at 1059.

001879

of creating capital losses.  As a result, the court held that these transactions lacked economic substance and therefore the capital loss was not deductible.

## CONCLUSION

The existence and amounts of allowable business expenses are highly fact-specific and are often open to interpretation.  This circumstance continues to generate substantial controversy between the IRS and taxpayers regarding the scope and extent of properly claimed business deductions.  This year, as in prior years, the IRS actively scrutinized and challenged many such deductions, while taxpayers were often willing to resort to litigation where the disallowance could not be resolved administratively within the IRS.  From June 1, 2014, through May 31, 2015, courts generally favored the IRS's denial of business expense deductions, but specific facts and circumstances yielded some victories for taxpayers.

Eleven of these full or partial victories by taxpayers involved the courts' application of the *Cohan* rule.  Use of this common law doctrine allowed taxpayers to deduct estimated expenses in cases where the expenses clearly existed but where available documentation made certainty regarding the amount of these expenses difficult or impossible.  The IRS Office of Appeals also utilizes the *Cohan* rule in assessing hazards of litigation and in seeking to reach settlements with taxpayers.[50]  The Examination process that often leads to Appeals, however, does not employ the *Cohan* rule and has adopted a more stringent document request policy to close cases and bypass Appeals in several instances.[51]

Given the relative frequency of business expense substantiation litigation, we recommend that IRS Compliance functions adopt the *Cohan* rule as a tool for evaluating and resolving tax controversies.  This step would reduce potential hazards of litigation that the IRS may face and would lead to a higher rate of mutually beneficial settlements at the earliest possible stage of administrative proceedings.  By embracing the opportunities for education, outreach, and collaboration with stakeholders that increased use of the *Cohan* rule would bring, the IRS can help taxpayers better understand business expense deductions and can effectively reduce the costly litigation to which both taxpayers and the government are currently subject.  This education, outreach, and collaboration likewise would promote taxpayers' *right to be informed* and *right to challenge the IRS's position and be heard*.

---

50   *See* National Taxpayer Advocate 2015 Annual Report to Congress (Most Serious Problem: *Appeals: The Appeals Judicial Approach and Culture Project Is Reducing The Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*), *supra*.

51   *Id.*

**MLI #3**

# Summons Enforcement Under IRC §§ 7602, 7604, and 7609

## SUMMARY

Pursuant to Internal Revenue Code (IRC) § 7602, the IRS may examine any books, records, or other data relevant to an investigation of a civil or criminal tax liability.[1]  To obtain this information, the IRS may serve a summons directly on the subject of the investigation or any third party who may possess relevant information.[2]  If a person summoned under IRC § 7602 neglects or refuses to obey the summons; to produce books, papers, records, or other data; or to give testimony as required by the summons, the IRS may seek enforcement of the summons in a United States District Court.[3]

A person who has a summons served on him or her may contest its legality if the government petitions to enforce it.[4]  Thus, summons enforcement cases are different from many other cases described in other Most Litigated Issues because often the government, rather than the taxpayer, initiates the litigation.  If the IRS serves a summons on a third party, any person entitled to notice of the summons may challenge its legality by filing a motion to quash or by intervening in any proceeding regarding the summons.[5]  Generally, the burden on the taxpayer to establish the illegality of the summons is heavy.[6]  When challenging the summons's validity, the taxpayer generally must provide "some credible evidence" supporting an allegation of bad faith or improper purpose.[7]  The taxpayer is entitled to a hearing to examine an IRS agent about his or her purpose for issuing a summons only when the taxpayer can point to specific facts or circumstances that plausibly raise an inference of bad faith.[8]  Naked allegations of improper purpose are not enough, but because direct evidence of IRS's bad faith "is rarely if ever available," circumstantial evidence can suffice to meet that burden.[9]

We identified 84 federal cases decided between June 1, 2014, and May 31, 2015 involving IRS summons enforcement issues.  The government was the initiating party in 59 cases, while the taxpayer was the initiating party in 25 cases.  Overall, taxpayers fully prevailed in two cases, while one case was split.  The IRS prevailed in the remaining 81 cases.

## TAXPAYER RIGHTS IMPACTED[10]

- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

---

1   IRC § 7602(a)(1); Treas. Reg. § 301.7602-1.
2   IRC § 7602(a).
3   IRC § 7604(b).
4   *U.S. v. Powell*, 379 U.S. 48, 58 (1964).
5   IRC § 7609(b).
6   *U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978).
7   *U.S. v. Clarke*, 134 S. Ct. 2361, 2367 (2014), *vacating* 517 F. App'x 689 (11th Cir. 2013), *rev'g* 2012-2 U.S. Tax Cas. (CCH) ¶ 50,732 (S.D. Fla. 2012).
8   *Id.* (stating that "[t]he taxpayer need only make a showing of facts that give rise to a plausible inference of improper motive").
9   *Id.* at 2367-68.
10   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

## PRESENT LAW

The IRS has broad authority under IRC § 7602 to issue a summons to examine a taxpayer's books and re-cords or demand testimony under oath.[11]   Further, the IRS may obtain information related to an investi-gation from a third party if, subject to the exceptions of IRC § 7609(c), it provides notice to the taxpayer or other person identified in the summons.[12]   In limited circumstances, the IRS can issue a summons even if the name of the taxpayer under investigation is unknown, *i.e.*, a "John Doe" summons.[13]   However, the IRS cannot issue a summons after referring the matter to the Department of Justice (DOJ).[14]

If the recipient fails to comply with a summons, the United States may commence an action under IRC § 7604 in the appropriate U.S. District Court to compel document production or testimony.[15]   If the United States files a petition to enforce the summons, the taxpayer may contest the validity of the summons in that proceeding.[16]   Also, if the summons is served upon a third party, any person entitled to notice may petition to quash the summons in an appropriate district court, and may intervene in any proceeding regarding the enforceability of the summons.[17]

Generally, a taxpayer or other person named in a third-party summons is entitled to notice.[18]   However, the IRS does not have to provide notice in certain situations.  For example, the IRS is not required to give notice if the summons is issued to aid in the collection of "an assessment made or judgment rendered against the person with respect to whose liability the summons is issued."[19]   Congress created this excep-tion because it recognized a difference between a summons issued in an attempt to compute the taxpayer's taxable income and a summons issued after the IRS has assessed tax or obtained a judgment.

For example, the IRS does not have to give notice to the taxpayer or person named in the summons if it is attempting to determine whether the taxpayer has an account in a certain bank with sufficient funds to pay an assessed tax because such notice might seriously impede the IRS's ability to collect the tax.[20]   Courts have interpreted this "aid in collection" exception to apply only if the taxpayer owns a legally identifiable interest in the account or other property for which records are summoned.[21]   Additionally,

---

11   IRC § 7602(a).  *See also LaMura v. U.S.*, 765 F.2d 974, 979 (11th Cir. 1985) (citing *U.S. v. Bisceglia*, 420 U.S. 141, 145-46 (1975)).

12   IRC § 7602(c).  Those entitled to notice of a third-party summons (other than the person summoned) must be given notice of the summons within three days of the day on which the summons is served to the third party but no later than the 23rd day before the day fixed on the summons on which the records will be reviewed.  IRC § 7609(a).

13   The court must approve a "John Doe" summons prior to issuance.  In order for the court to approve the summons, the United States commences an *ex parte* proceeding.  The United States must establish during the proceeding that its investigation relates to an ascertainable class of persons; it has a reasonable basis for the belief that these unknown taxpayers may have failed to comply with the tax laws; and it cannot obtain the information from another readily available source.  IRC § 7609(f).

14   IRC § 7602(d).  This restriction applies to "any summons, with respect to any person if a [DOJ] referral is in effect with respect to such person."  IRC § 7602(d)(1).

15   IRC § 7604.

16   *U.S. v. Powell*, 379 U.S. 48, 58 (1964).

17   IRC § 7609(b).  The petition to quash must be filed not later than the 20th day after the date on which the notice was served.  IRC § 7609(b)(2)(A).

18   IRC § 7609(a)(1); Treas. Reg. § 301.7609-1(a)(1).  *See, e.g., Cephas v. U.S.*, 112 A.F.T.R.2d (RIA) 6483 (D. Md. 2013).

19   IRC § 7609(c)(2)(D)(i).  The exception also applies to the collection of a liability of "any transferee or fiduciary of any person referred to in clause (i)."  IRC § 7609(c)(2)(D)(ii).

20   H.R. Rep. No. 94-658, at 310, *reprinted in* 1976 U.S.C.C.A.N. at 3206.  *See also* S. Rep. No. 94-938, pt. 1, at 371, *reprinted in* 1976 U.S.C.C.A.N., at 3800-01 (containing essentially the same language).

21   *Ip v. U.S.*, 205 F.3d 1168, 1172-76 (9th Cir. 2000).

001882

the IRS is not required to give notice when, in connection with a criminal investigation, an IRS criminal investigator serves a summons on any person who is not the third-party record-keeper.[22]

Whether the taxpayer contests the summons in a motion to quash or in response to the United States' petition to enforce, the legal standard is the same.[23]  In *United States v. Powell*, the Supreme Court set forth four threshold requirements (referred to as the *Powell* requirements) that must be satisfied to enforce an IRS summons:

1. The investigation must be conducted for a legitimate purpose;

2. The information sought must be relevant to that purpose;

3. The IRS must not already possess the information; and

4. All required administrative steps must have been taken.[24]

The IRS bears the initial burden of establishing that these requirements have been satisfied.[25]  The government meets its burden by providing a sworn affidavit of the agent who issued the summons declaring that each of the *Powell* requirements has been satisfied.[26]  The burden then shifts to the person contesting the summons to demonstrate that the IRS did not meet the requirements or that enforcement of the summons would be an abuse of process.[27]

The taxpayer can show that enforcement of the summons would be an abuse of process if he or she can prove that the IRS issued the summons in bad faith.[28]  In *United States v. Clarke*, the Supreme Court held that during a summons enforcement proceeding, a taxpayer has a right to conduct an examination of the responsible IRS officials about whether a summons was issued for an improper purpose only when the taxpayer "can point to specific facts or circumstances plausibly raising an inference of bad faith."[29] Blanket claims of improper purpose are not sufficient, but circumstantial evidence can be.[30]

A taxpayer may also allege that the information requested is protected by a constitutional, statutory, or common-law privilege, such as the:

- Fifth Amendment privilege against self-incrimination;

- Attorney-client privilege;[31]

---

22  IRC § 7609(c)(2)(E).  A third-party record-keeper is broadly defined and includes banks, consumer reporting agencies, persons extending credit by credit cards, brokers, attorneys, accountants, enrolled agents, and owners or developers of computer source code but only when the summons "seeks the production of the source or the program or the data to which the source relates."  IRC § 7603(b)(2).

23  *Kamp v. U.S.*, 112 A.F.T.R.2d (RIA) 6630 (E.D. Cal. 2013).

24  *U.S. v. Powell*, 379 U.S. 48, 57-58 (1964).

25  *Fortney v. U.S.*, 59 F.3d 117, 119-20 (9th Cir. 1995).

26  *U.S. v. Dynavac, Inc.*, 6 F.3d 1407, 1414 (9th Cir. 1993).

27  *Id.*

28  *U.S. v. Powell*, 379 U.S. 48, 58 (1964).

29  *U.S. v. Clarke*, 134 S. Ct. 2361, 2367 (2014), *vacating* 517 F. App'x 689 (11th Cir. 2013), *rev'g* 2012-2 U.S. Tax Cas. (CCH) ¶ 50,732 (S.D. Fla. 2012).

30  *Id.* at 2367-68.

31  The attorney-client privilege provides protection from discovery of information where: (1) legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication is related to this purpose, (4) made in confidence, (5) by the client, (6) and at the client's insistence protected, (7) from disclosure by the client or the legal advisor, (8) except where the privilege is waived.  *U.S. v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (citing 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughten rev. 1961)).

001883

- Tax practitioner privilege;[32] or

- Work product privilege.[33]

However, these privileges are limited.  For example, courts reject blanket assertions of the Fifth Amendment,[34] but note that taxpayers may have valid Fifth Amendment claims regarding specific documents or testimony.[35]  However, even if a taxpayer may assert the Fifth Amendment on behalf of him or herself, he or she cannot assert it on behalf of a business entity.[36]

Additionally, taxpayers cannot, on the basis of the Fifth Amendment privilege, withhold self-incriminatory evidence of a testimonial or communicative nature if the summoned documents fall within the "foregone conclusion" exception to the Fifth Amendment.  The exception applies if the government establishes its independent knowledge of three elements:

1. The documents' existence;

2. The documents' authenticity; and

3. The possession or control of the documents by the person to whom the summons was issued.[37]

The attorney-client privilege protects "tax advice," but not tax return preparation materials.[38]  The "tax shelter" exception limits the tax practitioner privilege and permits discovery of communications between a practitioner and client that promote participation in any tax shelter.[39]  Thus, the tax practitioner privilege does not apply to any written communication between a federally authorized tax practitioner and "any person, any director, officer, employee, agent, or representative of the person, or any other person holding a capital or profits interest in the person" which is "in connection with the promotion of the direct or indirect participation of the person in any tax shelter."[40]

In June 2014, the IRS issued temporary regulations providing that outside parties hired by the IRS may receive and examine any summoned books, papers, records, or other data and may take testimony of any

---

32  IRC § 7525 extends the protection of the common law attorney-client privilege to federally authorized tax practitioners in federal tax matters.  Criminal tax matters and communications regarding tax shelters are exceptions to the privilege.  IRC § 7525(a)(2), (b).  The interpretation of the tax practitioner privilege is based on the common law rules of attorney-client privilege.  *U.S. v. BDO Seidman, LLP*, 337 F.3d 802, 810-12 (7th Cir. 2003).

33  The work product privilege protects against the discovery of documents and other tangible materials prepared in anticipation of litigation.  FED. R. CIV. P 26(b)(3); *see also Hickman v. Taylor*, 329 U.S. 495 (1947).

34  *See, e.g., U.S. v. McClintic*, 113 A.F.T.R.2d (RIA) 330 (D. Or. 2013).

35  *See, e.g., U.S. v. Lawrence*, 113 A.F.T.R.2d (RIA) 1933 (S.D. Fla. 2014).

36  *See, e.g., U.S. v. Ali*, 113 A.F.T.R.2d (RIA) 1863 (D. Md. 2014) (citing *U.S. v. Wujkowski*, 929 F.2d 981, 983 (4th Cir. 1991)).

37  *U.S. v. Bright*, 596 F.3d 683, 692 (9th Cir. 2010).

38  *U.S. v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999).

39  IRC § 7525(b).  *See also Valero Energy Corp. v. U.S.*, 569 F.3d 626 (7th Cir. 2009).

40  *Id.*

001884

summoned person under oath.[41]  These outside parties are also permitted to fully participate in a summons interview.[42]

## ANALYSIS OF LITIGATED CASES

Summons enforcement has been a Most Litigated Issue in the National Taxpayer Advocate's Annual Report to Congress every year since 2005, when TAS identified only 44 cases but predicted the number would rise as the IRS became more aggressive in its enforcement initiatives.  The number of cases peaked at 158 for the reporting period ending on May 31, 2009, but has steadily declined, except for a one-year increase for the year ending May 31, 2012, as shown in Figure 3.3.1.  This year, the decline in the number of summons enforcement cases continues, as we identified 84 cases for the reporting period ending on May 31, 2015, a drop from the 102 cases during last year's reporting period.  A detailed list of these cases appears in Table 3 of Appendix 3.

**FIGURE 3.3.1, Summons Enforcement Cases, 2005–2015**



### IRS Summons Enforcement Cases
by reporting period of June 1-May 31 of each year

Of the 84 cases TAS reviewed this year, the IRS prevailed in full in 81, a 96 percent success rate.  Taxpayers had representation in 23 cases and appeared *pro se* (*i.e.*, on their own behalf) in the

---

41  Temp. Treas. Reg. § 301.7602-1T(b)(3).  There is notable current summons enforcement litigation involving the IRS's use of an outside law firm in an audit of Microsoft Corporation's transfer pricing arrangements.  *See* Dolores W. Gregory, *Transfer Pricing: Microsoft Pushes for Evidentiary Hearing, Cites IRS's 'Illegal' Deal With Quinn Emanuel*, Tax Notes Today (Apr. 27, 2015).  Although it is outside of the reporting period for the Most Litigated Issues section, Microsoft was successful in obtaining an evidentiary hearing in the summons enforcement case.  *See U.S. v. Microsoft Corp.*, 2015 WL 4496749 (W.D. Wash. 2015).  Commentators have come out both for and against the IRS's use of outside attorneys in cases such as Microsoft's.  *Cf.* Roger A. Pies, *IRS Prerogative to Hire Outside Counsel*, Tax Notes Today (July 7, 2015) (arguing that the IRS should be allowed to retain outside counsel in a big document case) and Stuart Gibson, *If the IRS needs Good Lawyers, it Should Look Across the Street*, Tax Notes Today (Mar. 30, 2015) (questioning why the IRS did not seek assistance from the DOJ in the Microsoft case).

42  Temp. Treas. Reg. § 301.7602-1T(b)(3).  The regulations provide that full participation includes, but is not limited to, receipt, review, and use of summoned materials, being present during summons interviews, questioning the person giving testimony, and asking the summoned person's representative to clarify an objection or assertion of a privilege.  These temporary regulations went into effect for all summons interviews held on or after June 18, 2014 and will expire on June 16, 2017.

001885

remaining 61.  Sixty-four cases involved individual taxpayers, while the remaining 20 involved business taxpayers, including sole proprietorships.[43]  Cases generally involved one of the following themes.

### Petitions to Enforce and *Powell* Requirements

The United States petitioned to enforce a summons in 59 cases and successfully met its burden under *Powell* in 58 cases.  In only one case, *United States v. Taylor*, did the IRS fail to satisfy the *Powell* requirements.[44]  In *Taylor*, the IRS was investigating the taxpayer for the collection of tax liabilities for the taxable year ending December 31, 2007.[45]  However, the revenue officer issued a summons for all documents and records from December 1, 2013 to present.[46]  The district court declined to enforce the summons and held that the IRS did not meet the relevance prong of the *Powell* requirements because the documents requested were not necessary to determine the taxpayer's tax liability for 2007.[47]

### Abuse of Process

Several taxpayers claimed that the IRS issued summonses in bad faith or for an improper purpose, and therefore enforcement would be an abuse of the court's process.[48]  However, taxpayers were unsuccessful proving either bad faith or improper purpose because they were unable to allege facts and circumstances that could plausibly imply bad faith.  For example, in *United States v. Artex Risk Solutions, Inc.*, one of the taxpayer's claims of bad faith was that the IRS did not provide reasonable deadlines to produce the necessary information.[49]  The court held that the summons was not issued in bad faith because the taxpayer failed to substantiate its claims as to the burdens it faced to comply with the summonses and did not show that IRS deadlines were unreasonable.[50]

### Petitions to Quash and Lack of Subject Matter Jurisdiction

Taxpayers petitioned to quash an IRS summons to a third party in 26 instances;[51] however, in 13 of these cases, courts dismissed the petitions for lack of jurisdiction on procedural or notice grounds.[52]  For example, a court dismissed a *pro se* taxpayer's petition to quash for lack of jurisdiction because the taxpayer filed the petition more than 60 days after the IRS had issued the summons.[53]  Another court dismissed a *pro se*

---

43   There were cases in which the IRS issued summons for investigations into both the individual taxpayer and his or her business.  For the purposes of this MLI, TAS placed these cases into the business taxpayer category.

44   *U.S. v. Taylor*, 115 A.F.T.R.2d (RIA) 1165 (C.D. Cal. 2015).

45   *Id.*

46   *Id.*

47   *Id.*  The court stated that the Government could amend its Petition and Declaration to establish a "realistic expectation" of potential relevance for the requested information.

48   *See U.S. v. Anderson*, 114 A.F.T.R.2d (RIA) 6731 (N.D. Cal. 2014), *stay denied*, 115 A.F.T.R.2d (RIA) 468 (N.D. Cal. 2015), *appeal docketed*, No. 15-15130 (9th Cir. Jan. 26, 2015); *U.S. v. Artex Risk Solutions, Inc.*, 2014 U.S. Dist. LEXIS 126932 (N.D. Ill. 2014); *Haw. Pac. Fin., Ltd. v. U.S.*, 114 A.F.T.R.2d (RIA) 5640 (D. Haw. 2014); *Highland Capital Mgmt., L.P. v. U.S.*, 51 F. Supp. 3d 544 (S.D.N.Y. 2014), *aff'd in part and vacated in part*, 2015 U.S. App. LEXIS 17112 (2d Cir. 2015); *Schwartz v. U.S.*, 115 A.F.T.R.2d (RIA) 1942 (S.D. Fla. 2015).

49   *U.S. v. Artex Risk Solutions, Inc.*, 2014 U.S. Dist. LEXIS 126932, at *14-15 (N.D. Ill. 2014).

50   *Id.* at *15.

51   In some instances, the taxpayer made the motion to quash in its answer to the government's petition to enforce.

52   In 13 of the 26 cases, the petitions to quash were denied on substantive grounds.

53   *Abusch v. U.S.*, 114 A.F.T.R.2d (RIA) 5535 (M.D. La. 2014), *adopting* 114 A.F.T.R.2d (RIA) 5533 (M.D. La. 2014), *cert. denied*, No. 14-948 (Mar. 23, 2015).  Under IRC § 7609(b)(2)(A), a taxpayer seeking to quash a third-party summons must file a petition with the appropriate district court within 20 days after the date the notice of the summons is mailed to the taxpayer.  Under IRC § 7609(b)(2)(B), the taxpayer must send a copy of the petition to quash to the party summoned and to the IRS within this 20-day timeframe.  The court in *Abusch* noted that the petition was neither timely filed nor mailed to the required parties.

001886

taxpayer's petition to quash a summons issued to the taxpayer's bank.[54]  The court held that the summons was to aid in the collection of a tax liability, and the taxpayer was therefore not entitled to notice.[55]

In *Xoriant Corp. v. United States*, two corporations petitioned to quash IRS third-party summonses they received as part of the investigation of another corporation.[56]  However, because the summons was issued directly to the two corporations, the court dismissed their petition to quash for lack of jurisdiction since "the functional effect of § 7609 is to preclude a summoned party from filing a motion to quash."[57]

### Privileges

Taxpayers attempted to invoke various privileges, including Fifth Amendment, attorney-client, or other privileges in response to an IRS summons.  For example, in *United States v. Ali*, the IRS summoned an individual taxpayer to produce certain documents and provide testimony.[58]  The taxpayer appeared in response but refused to produce any documents or answer any questions, invoking the Fifth Amendment privilege against self-incrimination.[59]  The court held that the summons was proper and ordered the taxpayer to comply.  While the taxpayer appeared a second time and answered many questions, she declined to answer over 200 questions, again invoking the Fifth Amendment privilege.[60]  She also claimed attorney-client privilege for a specific document.  The IRS petitioned the court a second time to compel the taxpayer to answer the remaining questions and produce documents.[61]  The court found that the taxpayer was not entitled to invoke the Fifth Amendment for certain documents, because these documents fell under the foregone conclusion exception to the Fifth Amendment and because the act of production was not in itself incriminating.[62]  The court also held that the taxpayer had waived her Fifth Amendment rights by disclosing them previously.[63]  However, the taxpayer was able to invoke Fifth Amendment protections for other documents and the remaining testimony, because the documents and testimony could prove that the taxpayer willfully misrepresented her income.[64]  Finally, the court held that the taxpayer successfully invoked the attorney-client privilege for a list of foreign bank accounts she had provided to her attorneys.

In another case involving attorney-client privilege, *United States v. Sanmina Corp. & Subsidiaries*, the IRS issued a summons seeking two memoranda referenced in a footnote in a report prepared by the

---

54  *Knudsen v. U.S.*, 114 A.F.T.R.2d (RIA) 5848 (E.D.N.Y. 2014).

55  *Id*.  Under IRC § 7609(c)(2)(D)(i), the IRS is not required to provide notice to the taxpayer and the taxpayer therefore has no right to quash the summons if the summons is issued to aid in the collection of the taxpayer's liability.

56  *Xoriant Corp. v. U.S.*, 114 A.F.T.R.2d (RIA) 6461 (N.D. Cal. 2014).

57  *Id*.

58  *U.S. v. Ali*, 114 A.F.T.R.2d (RIA) 6524 (D. Md. 2014).  *See also U.S. v. Ali*, 113 A.F.T.R.2d (RIA) 1863 (D. Md. 2014) (discussing the taxpayer's first summons enforcement proceeding).

59  *U.S. v. Ali*, 114 A.F.T.R.2d (RIA) 6524 (D. Md. 2014).

60  *Id*.

61  *Id*.

62  *Id*.  The court also addressed the taxpayer's request to reconsider its previous ruling that certain documents relating to the taxpayer's foreign bank accounts fell under the required records doctrine, which is another exception to the Fifth Amendment privilege.  Essentially, the required records doctrine provides that the Fifth Amendment privilege does not apply to business records that are customarily kept in accordance with government regulation.  The court noted that one of the rationales behind the required records doctrine is that the government or a regulatory agency should be able to overcome the assertion of the Fifth Amendment Privilege to inspect the records if it requires an individual to keep as a condition of voluntarily participating in that regulated activity.  Therefore, the court held that because the taxpayer chose to engage in transactions with foreign banks and entities that have specific statutory reporting requirements, she consented to present these records to the government if asked and could not invoke the Fifth Amendment privilege to avoid doing so.

63  *Id*.

64  *Id*.

taxpayer's attorneys to substantiate a significant deduction.[65]  The business taxpayer resisted, claiming the attorney-client and work product privileges protected the memoranda.[66]  The court held that the taxpayer sufficiently demonstrated that the memoranda "constituted tax advice from lawyers," therefore the attorney-client privilege attaches.  The court also held that the work product privilege applied because the memoranda were prepared in anticipation of litigation.  In addition, the court found that the taxpayer did not waive either privilege.[67]

### Civil Contempt

A taxpayer who "neglects or refuses to obey" an IRS summons may be held in civil contempt.[68]  This year, six taxpayers were held in civil contempt for failing to comply with a court order enforcing an IRS summons.[69]  Overall, contempt proceedings accounted for approximately seven percent of all summons-related cases.  Unless the taxpayers complied with the court order, they were subject to arrest,[70] fines,[71] or both.[72]

### The Impact of *United States v. Clarke*

The Supreme Court's decision in *Clarke* had an immediate impact, as taxpayers sought evidentiary hearings to challenge a summons.  First, in *United States v. Ali* (discussed above), the taxpayer argued that the Supreme Court relaxed the standard to obtain an evidentiary hearing, thus changing the law for summons enforcement.[73]  However, the district court believed that *Clarke* did not change the law; instead, *Clarke* simply resolved a circuit split.[74]

In *Schwartz v. United States*, the taxpayers alleged that the IRS issued a third-party summons in bad faith; however, the court held that the taxpayers were not entitled to an evidentiary hearing because their allegations did not "rise above conclusory allegations."[75]  Similarly, in *Masciantonio v. United States*, the taxpayer also made conclusory assertions that did not "provide a basis for an evidentiary hearing."[76]

In addition to the themes above, one case raised the issue of who may be present at a summons hearing on behalf of the taxpayer.  In *United States v. McEligot*, the IRS summoned a taxpayer's accountant in connection with an audit of the taxpayer.[77]  The accountant appeared at the hearing but refused to testify unless the taxpayer's attorney was present.[78]  The court found that IRC § 7609(b), which gives certain individuals the right to intervene in an enforcement proceeding, does not provide a right to intervene

---

65   *U.S. v. Sanmina Corp. & Subsidiaries*, 2015 U.S. Dist. LEXIS 66123 (N.D. Cal. 2015), *appeal docketed*, No. 15-16416 (9th Cir. July 15, 2015).

66   *Id.*

67   *Id.*

68   IRC § 7604(b).

69   *See U.S. v. Bowler*, 2015 U.S. Dist. LEXIS 57862 (D. Minn. 2015); *U.S. v. Erickson*, 115 A.F.T.R.2d (RIA) 684 (M.D. Fla. 2015); *U.S. v. Nichols*, 2015 U.S. Dist. LEXIS 59444 (E.D. Mich. 2015); *U.S. v. Snow*, 115 A.F.T.R.2d (RIA) 1002 (E.D. Tenn. 2015); *U.S. v. Thornton*, 115 A.F.T.R.2d (RIA) 1258 (D. Minn. 2015), *appeal docketed*, No. 15-1774 (8th Cir. Apr. 15, 2015); *U.S. v. Vanderpool*, 114 A.F.T.R.2d (RIA) 6968 (W.D. Mo. 2014).

70   *U.S. v. Bowler*, 2015 U.S. Dist. LEXIS 57862 (D. Minn. 2015).

71   *U.S. v. Erickson*, 115 A.F.T.R.2d (RIA) 684 (M.D. Fla. 2015).

72   *U.S. v. Thornton*, 115 A.F.T.R.2d (RIA) 1258 (D. Minn. 2015), *appeal docketed*, No. 15-1774 (8th Cir. Apr. 15, 2015).

73   *U.S. v. Ali*, 114 A.F.T.R.2d (RIA) 6524 (D. Md. 2014).

74   *Id.* The 11th Circuit had held that "a bare allegation of improper motive is sufficient," contrary to other circuits.

75   *Schwartz v. U.S.*, 115 A.F.T.R.2d (RIA) 1942 (S.D. Fla. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1939 (S.D. Fla. 2015).

76   *Masciantonio v. U.S.*, 114 A.F.T.R.2d (RIA) 7010 (W.D. Pa. 2014), *appeal docketed*, No. 15-1072 (3d Cir. Jan. 9, 2015).

77   *U.S. v. McEligot*, 115 A.F.T.R.2d (RIA) 1433 (N.D. Cal. 2015), *appeal docketed*, Nos. 15-16128 and 15-16134 (9th Cir. 2015).

78   *Id.*

001888

in a summons hearing.[79]  The court held that "a taxpayer does not have an absolute right to be present at a third-party summons hearing concerning the taxpayer's liabilities."[80]  The proper test is "the usual process of balancing opposing equities" between the government's interest in obtaining information in a non-adversarial manner and the taxpayer's interest in preventing improper disclosure of records.[81]  Under this test, the court found that the equities were in favor of the government because no attorney-client or work product privileges were implicated, and the accountant could raise the tax practitioner privilege if necessary.[82]

## CONCLUSION

The IRS may issue a summons to obtain information to determine whether a tax return is correct or if a return should have been filed to ascertain a taxpayer's tax liability or to collect a liability.[83]  Accordingly, the IRS may request documents and testimony from taxpayers who have failed to provide that informa-tion voluntarily.

While the number of summons enforcement cases has decreased since 2012, summons enforcement continues to be a significant source of litigation.[84]  The IRS also continues to be successful in the vast majority of summons enforcement litigation.  Taxpayers and third parties rarely succeed in contesting IRS summonses due to the significant burden of proof and strict procedural requirements.  In addition, the IRS's temporary regulations allowing the use of outside parties to assist in examinations and participate in summons interviews have generated controversy and litigation.[85]  Depending on the outcome of this litigation, there may be additional cases on this issue in future years.

---

79   *U.S. v. McEligot*, 115 A.F.T.R.2d (RIA) 1433 (N.D. Cal. 2015), *appeal docketed*, Nos. 15-16128 and 15-16134 (9th Cir. 2015).

80   *Id.*

81   *Id.*

82   *Id.*

83   IRC § 7602(a).

84   In the summons enforcement Most Litigated Issue section of the 2014 Annual Report to Congress, we noted that the IRS's Large Business and International Division (LB&I) issued guidance to examiners in November 2013 on how to handle cases where the taxpayer does not provide a complete response to an Information Document Request (IDR) by the response date. This guidance required the examiner to issue a delinquency notice and then a pre-summons letter prior to issuing a summons. LB&I created these new procedures, that focus on enhanced pre-summons communications, because it believed the new pro-cess will improve the IRS's "ability to gather information timely and reduce the need to enforce IDRs through summonses."  We remarked that "if effective, these new procedures could reduce the number of summonses issued, and as a consequence, we may see less litigation in this area in the future."  It is possible that LB&I's guidance and procedures have contributed to this year's significant decline in summons enforcement cases.

85   *See supra* note 41.  There is notable current summons enforcement litigation involving the IRS's use of an outside law firm in an audit of Microsoft Corporation's transfer pricing arrangements.  *See* Dolores W. Gregory, *Transfer Pricing: Microsoft Pushes for Evidentiary Hearing, Cites IRS's 'Illegal' Deal With Quinn Emanuel*, Tax Notes Today (Apr. 27, 2015).  Although it is outside of the reporting period for the Most Litigated Issues section, Microsoft was successful in obtaining an evidentiary hearing in the summons enforcement case.  *See U.S. v. Microsoft Corp.*, 2015 WL 4496749 (W.D. Wash. 2015).  Commentators have come out both for and against the IRS's use of outside attorneys in cases such as Microsoft's.  *Cf.* Roger A. Pies, *IRS Prerogative to Hire Outside Counsel*, Tax Notes Today (July 7, 2015) (arguing that the IRS should be allowed to retain outside counsel in a big document case) and Stuart Gibson, *If the IRS needs Good Lawyers, it Should Look Across the Street*, Tax Notes Today (Mar. 30, 2015) (questioning why the IRS did not seek assistance from the DOJ in the Microsoft case).

**MLI #4**

## Gross Income Under IRC § 61 and Related Sections

### SUMMARY

When preparing tax returns, taxpayers must complete the crucial calculation of gross income for the taxable year to determine the tax they must pay. Gross income has been among the Most Litigated Issues in each of the National Taxpayer Advocate's Annual Reports to Congress.[1] For this report, we reviewed 80 cases decided between June 1, 2014, and May 31, 2015. The majority of cases involved taxpayers failing to report items of income, including some specifically mentioned in Internal Revenue Code (IRC) § 61 such as wages,[2] interest,[3] dividends,[4] and annuities.[5]

### TAXPAYER RIGHTS IMPACTED[6]

- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to a Fair and Just Tax System*

### PRESENT LAW

IRC § 61 broadly defines gross income as "all income from whatever source derived."[7] The U.S. Supreme Court has defined gross income as any accession to wealth.[8] Over time, however, Congress has carved out numerous exceptions and exclusions from this broad definition of gross income and has based other elements of tax law on the definition.[9]

The Commissioner may identify particular items of unreported income or reconstruct a taxpayer's gross income using methods such as the bank deposits method.[10] If the Commissioner determines a tax deficiency, the IRS issues a Statutory Notice of Deficiency.[11] If the taxpayer challenges the deficiency, the Commissioner's notice is entitled to a presumption of correctness; the taxpayer generally bears the burden of proving that the determination is erroneous or inaccurate.[12]

---

1   *See, e.g.,* National Taxpayer Advocate 2014 Annual Report to Congress 472-76; National Taxpayer Advocate 2013 Annual Report to Congress 355-61.

2   IRC § 61(a)(1).  *See, e.g., Nix v. Comm'r,* 580 F. App'x 887 (11th Cir. 2014).

3   IRC § 61(a)(4).  *See, e.g., Shi v. Comm'r,* T.C. Memo. 2014-173.

4   IRC § 61(a)(7).  *See, e.g., Ebert v. Comm'r,* T.C. Memo. 2015-5.

5   IRC § 61(a)(9).  *See, e.g., Robertson v. Comm'r,* T.C. Memo. 2014-143.

6   *See* Taxpayer Bill of Rights, *available at* www.Taxpayer.Advocate.irs.gov/taxpayer-rights.

7   IRC § 61(a).

8   *Comm'r v. Glenshaw Glass,* 348 U.S. 426, 431 (1955) (interpreting § 22 of the Internal Revenue Code of 1939, the predecessor to IRC § 61).

9   *See, e.g.,* IRC § 104 (compensation for injuries or sickness); IRC § 105 (amounts received under accident and health plans); IRC § 108 (income from discharge of indebtedness); IRC § 6501(limits on assessment and collection, determination of "substantial omission" from gross income).

10  IRC § 6001.  *See, e.g., DiLeo v. Comm'r,* 96 T.C. 858, 867 (1991).

11  IRC § 6212.  *See also* Internal Revenue Manual (IRM) 4.8.9.2, *Notice of Deficiency Definition* (July 9, 2013).

12  *See* IRC § 7491(a) (burden shifts only where the taxpayer produces credible evidence contradicting the Commissioner's determination and satisfies other requirements).  *See also Welch v. Helvering,* 290 U.S. 111, 115 (1933) (citations omitted).

001890

## ANALYSIS OF LITIGATED CASES

In the 80 opinions involving gross income issued by the federal courts and reviewed for this report, gross income issues most often fall into two categories: (1) what is included in gross income under IRC § 61 and (2) what can be excluded under other statutory provisions. A detailed list of the cases appears in Table 4 of Appendix 3.

In 27 cases (34 percent), taxpayers were represented, while the rest were *pro se* (without counsel).[13] Ten of the 27 cases where taxpayers had representation (about 37 percent) prevailed in full or in part in their cases, whereas *pro se* taxpayers prevailed in full or in part in seven cases. Overall, taxpayers prevailed in full or in part in 17 of 80 cases (about 21 percent).

Drawing on the full list in Table 4 of Appendix 3, we have chosen to discuss cases involving damage awards and IRA distributions. In addition, we discuss a case of first impression involving the characterization of refundable state tax credits.

### Damage Awards

Taxation of damage awards continues to generate litigation. This year, taxpayers in at least four cases (five percent of those reviewed) challenged the Commissioner's inclusion of damage awards in their gross income, but no taxpayers prevailed in these cases.[14]

IRC § 104(a)(2) specifies that damage awards and settlement proceeds[15] are taxable as gross income unless the award was received "on account of personal physical injuries or physical sickness."[16] Congress added the "physical injuries or physical sickness" requirement in 1996;[17] until then, the word "physical" did not appear in the statute. The legislative history of the 1996 amendments to IRC § 104(a)(2) provides that "[i]f an action has its origin in a physical injury or physical sickness, then all damages (other than punitive damages) that flow therefrom are treated as payments received on account of physical injury or physical sickness… [but] emotional distress is not considered a physical injury or physical sickness."[18] Thus, damage awards for emotional distress are not considered as received on account of physical injury or physical sickness, even if the emotional distress results in "insomnia, headaches, [or] stomach disorders."[19]

To justify exclusion from income under IRC § 104, the taxpayer must show settlement proceeds are in lieu of damages for physical injury or sickness.[20] One case presented a unique issue regarding the characterization of payments made to a taxpayer for contracting to comply with the process to become an egg donor. In *Perez v. Commissioner*, the taxpayer petitioned the U.S. Tax Court to exclude from her income

---

13  One case involved three consolidated cases, where one case docket showed the taxpayers were *pro se* while the other two case dockets showed representation. *See Worth v. Comm'r*, T.C. Memo. 2014-232, *appeal docketed*, No. 15-70665 (9th Cir. Mar. 3, 2015). For the purpose of calculating the number and percentage of cases where taxpayers appeared *pro se*, we have included *Worth* in the *pro se* category.

14  *See, e.g., Duffy v. U.S.*, 120 Fed. Cl. 55 (Fed. Cl. 2015), *appeal docketed*, No. 15-5076 (Fed. Cir. Apr. 28, 2015).

15  *See* Treas. Reg. § 1.104-1(c) (damages received, for purposes of IRC § 104(a)(2), means amounts received "through prosecution of a legal suit or action, or through a settlement agreement entered into in lieu of such prosecution").

16  IRC § 104(a)(2).

17  Pub. L. No. 104-188, § 1605(a), 110 Stat. 1755, 1838 (1996).

18  H.R. Rep. No. 104-586, at 143-44 (1996) (Conf. Rep.).

19  H.R. Rep. No. 104-737, at 301 (1996) (Conf. Rep.). Note, however, that IRC § 104(a)(2) excludes from income damages, up to the cost of medical treatment for which a deduction under IRC § 213 was allowed for any prior taxable year, for mental or emotional distress causing physical injury.

20  *See, e.g., Green v. Comm'r*, 507 F.3d 857 (5th Cir. 2007), *aff'g* T.C. Memo. 2005-250.

001891

payments received as compensation for the pain and suffering associated with donating her eggs to a fertility clinic under the theory that the payments should be construed as damages.[21]

Ms. Perez entered contracts with the fertility clinic and the intended recipients of her donor eggs.  The contracts detail that the payments are compensation for Ms. Perez's time, effort, pain, and suffering and in no way are the payments for her eggs or for the sale of body parts.  Ms. Perez would be paid regardless of the outcome of the egg retrieval; that is, payment was not contingent on her producing usable eggs or on the intended recipients conceiving a viable pregnancy.  Although the fertility clinic issued a Form 1099 to Ms. Perez for the payments she received, Ms. Perez, after conferring with other donors on the internet, did not report the payments on her tax return under the theory that the payments were not taxable since they compensated her only for pain and suffering.[22]

The court looked to the question of whether Ms. Perez was compensated for services rendered or for the sale of property.[23]  The contract agreement characterized the payments as compensation for her compliance with the egg donor procedure.[24]  The Tax Court found the payments to be for services rendered and then looked to the question of whether the payments may be excluded as damages.  The court looked at Ms. Perez's challenge to the validity of the Secretary of Treasury's interpretation of "damages" in the regulations.[25]  In applying the framework set forth in *Chevron*, the court determined the regulation is a reasonable interpretation and therefore valid.[26]  The court then concluded that Ms. Perez voluntarily contracted to undergo the prospective pain and suffering and was compensated for the risk, rendering the compensation not damages.[27]

As illustrated by continuing litigation of the characterization of settlement damages, the question of when damage awards can be excluded from gross income continues to confuse taxpayers.  Although we did not identify any cases this year involving mental illness, the National Taxpayer Advocate remains concerned that taxpayers continue to disagree with the IRS's and courts' interpretation that mental illness equates to emotional distress as opposed to physical sickness or injury.  In the same way that a physical injury or sickness may have emotional side effects, many mental illnesses manifest themselves as physical symptoms.  For instance, many people who have severe depression experience the following physical symptoms: stomachaches, indigestion, constant headaches, tightness in the chest, difficulty breathing, and fatigue.[28]  Physical symptoms occur in other mental disorders, such as Post-Traumatic Stress Disorder (PTSD), which affects people who have experienced a traumatic event, such as mugging, rape, torture, being kidnapped or held captive, child abuse, car accidents, train wrecks, plane crashes, bombings, natural or human-caused disasters, or military combat.[29]  Current research shows that the experience of trauma can cause neurochemical changes in the brain that create a vulnerability to hypertension and atherosclerotic

---

21  144 T.C. 51 (2015).

22  *Id.*

23  *Id.*

24  *Id.*

25  *See* Treas. Reg. § 1.104-1(c) (damages received, for purposes of IRC § 104(a)(2), means amounts received "through prosecution of a legal suit or action, or through a settlement agreement entered into in lieu of such prosecution").

26  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (agency regulations are entitled to deference unless they (1) contradict an unambiguous statute or (2) adopt an unreasonable construction of it).

27  *Perez v. Comm'r*, 144 T.C. 51 (2015).

28  National Institute of Mental Health, *Signs and Symptoms of Depression*, *available at* http://www.nimh.nih.gov/health/topics/depression/men-and-depression/signs-and-symptoms-of-depression/persistent-physical-symptoms.shtml (last visited Oct. 6, 2015).

29  National Institute of Mental Health, *Post-Traumatic Stress Disorder*, *available at* http://www.nimh.nih.gov/health/topics/post-traumatic-stress-disorder-ptsd/index.shtml#part_145373 (last visited Oct. 6, 2015).

heart disease, abnormalities in thyroid and other hormone functions, and increased susceptibility to infections and immunologic disorders that are associated with PTSD.[30]  As discussed in the 2009 Annual Report to Congress, the interpretation that mental illness equates to emotional distress seems particularly outdated when considering the medical communities' advancements in understanding the physical cause and symptoms of mental illness.[31]

### Individual Retirement Accounts Distributions

IRC § 61(a) defines gross income as "all income from whatever source derived, including (but not limited to)… (9) Annuities; … and (11) Pensions."[32]  IRC § 408(d)(1) governs the tax treatment of distributions from individual retirement accounts (IRAs) and provides that they are generally included in gross income as amounts received as an annuity under IRC § 72.

Taxpayers in at least ten cases argued that portions of their IRA distributions, pensions, or retirement accounts were excluded from gross income, prevailing, in part, in one case.[33]  Taxpayers in at least two cases challenged the taxability of the distributions, arguing the "rollover provision" under IRC § 408(d) applied.[34]  The "rollover provision" generally excludes from gross income IRA distributions that are transferred into an eligible retirement account within 60 days of receipt.[35]  Taxpayers are limited, however, under IRC § 408(d)(3)(B) to one nontaxable rollover per year.[36]

For example, in *Bohner v. Commissioner,*  the taxpayer initiated two withdrawals from his IRA and characterized the withdrawals as a rollover to repay a loan he took from a friend and his own funds earlier that year to pay an extra amount to the Office of Personnel Management to boost his federal retirement pay.[37]  The court found the distributions includible in gross income.  The federal retirement system is not required to accept tax-free rollovers as a form of deposit, and even if it did, the court found that the taxpayer did not make the retirement plan aware of his attempt to complete a rollover and, therefore, the plan would not have been able to determine the proper tax treatment of the contribution.[38]

### Refundable State Tax Credits

The Tax Court decided a case of first impression regarding the characterization and taxability of targeted New York State tax credits.  In *Maines v. Commissioner,* the taxpayers (husband and wife) petitioned for

---

30   *See* U.S. Department of Veterans Affairs, National Center for PTSD, *available at* http://www.ptsd.va.gov/professional/co-occurring/ptsd-physical-health.asp (last visited Oct. 6, 2015).

31   National Taxpayer Advocate 2009 Annual Report to Congress 351-56 (Legislative Recommendation: *Exclude Settlement Payments for Mental Anguish, Emotional Distress, and Pain and Suffering from Gross Income*).  The National Taxpayer Advocate recommended that Congress amend IRC § 104(a)(2) to exclude from gross income payments received as settlement for mental anguish, emotional distress, and pain and suffering.  Such change was recommended because mental anguish, emotional distress, and pain and suffering can be caused by a physical condition in the body and can cause physical symptoms.  Over the past few years, doctors and researchers have made significant advances in identifying changes that occur in the brain when a person is plagued with mental illness.

32   IRC § 61(a).

33   *See Morles v. Comm'r*, T.C. Summ. Op. 2015-13 (portion of IRA distribution allocable to income was included in gross income; portion allocable to the taxpayer's investment in the contract was not included in gross income).

34   *See Bohner v. Comm'r*, 143 T.C. 224 (2014); *Dabney v. Comm'r*, T.C. Memo. 2014-108.

35   IRC § 408(d)(3)(A)(i), (ii); *Schoof v. Comm'r*, 110 T.C. 1, 7 (1998).

36   IRC § 408(d)(3)(B).

37   143 T.C. 224 (2014).

38   *Id.* at 230.

001893

redetermination of income tax deficiencies arising from receipt of refundable tax credits passed through their S Corporation and Limited Liability Company.[39]

New York state offers certain refundable state tax credits to businesses that either expand or enter into business in targeted impoverished areas and maintain the business in those areas with a required number of employees.  The business must meet all requirements to be eligible for the credits.  New York characterizes the credits as refunds of overpayments of state income tax, the same position the taxpayers maintained, with the result that the payments should not be included in gross income.[40]  In contrast, the Commissioner asserted the credits were taxable income.[41]  The court determined that the label for the credits by New York is not binding on the federal government for federal taxation purposes.

Three different credits were at issue in *Maines*.  Each has distinct qualifications, and the court determined that the credits fall into two categories.  Two credits were not tied to state taxes previously paid to New York and were, therefore, subsidies to the business and as such were fully includible in the taxpayers' gross income.[42]  The third credit was partially refundable to the taxpayers above the amount of the credit used to reduce the taxpayers' property tax liability.  As a result, the taxpayers were required to include in gross income the amount of the credit refunded above their property tax liability.[43]  The court's decision will impact a number of other New York residents who were similarly challenging the tax treatment of these credits.[44]

## CONCLUSION

Taxpayers litigate many of the same gross income issues every year due to the complex nature of what constitutes gross income.  As the definition is very broad and the courts broadly interpret accession to wealth as gross income, most cases were decided in favor of the IRS and courts continued to narrowly interpret exclusions from gross income.

While the number of cases involving the tax treatment of settlements and awards continued to decrease, from five in 2014 to four this year, it remains a perennial area of confusion for taxpayers.  The National Taxpayer Advocate has previously recommended a legislative change that would clarify the tax treatment of court awards and settlements by permitting taxpayers to exclude any payments received as a settlement or judgment for mental anguish, emotional distress, or pain and suffering.[45]

Cases involving the tax treatment of distributions from IRAs and pensions made up a larger percentage of overall cases this year, with almost 13 percent of cases compared to about 11 percent in 2014.  Taxpayers litigated this issue with only minor success this year, prevailing, in part, in only one case.

---

39   144 T.C. No. 8 (2015).

40   State tax refunds are not income unless a taxpayer claimed a deduction for them by itemizing for the previous year.  *See* IRC § 111.

41   *Maines v. Comm'r*, 144 T.C. No. 8 (2015).

42   *Id.*

43   *Id.*

44   *Id.* at n. 5 (acknowledging that there were 11 related but unconsolidated cases pending before the Tax Court that were filed by New York residents involving this issue).

45   National Taxpayer Advocate Annual 2009 Report to Congress 351-56 (Legislative Recommendation: *Exclude Settlement Payments for Mental Anguish, Emotional Distress, and Pain and Suffering from Gross Income*).

MLI
#5

# Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330

## SUMMARY

The IRS Restructuring and Reform Act of 1998 (RRA 98)[1] created Collection Due Process (CDP) hearings to provide taxpayers with an independent review by the IRS Office of Appeals of the decision to file a Notice of Federal Tax Lien (NFTL) or the IRS's proposal to undertake a levy action.  In other words, a CDP hearing gives taxpayers an opportunity for a meaningful hearing before the IRS issues its first levy or immediately after it files its first NFTL with respect to a particular tax liability.  At the hearing, the taxpayer has the statutory right to raise any relevant issues related to the unpaid tax, the lien, or the proposed levy, including the appropriateness of the collection action, collection alternatives, spousal defenses, and under certain circumstances, the underlying tax liability.[2]

Taxpayers have the right to judicial review of Appeals' determinations if they timely request the CDP hearing and timely petition the United States Tax Court.[3]  Generally, the IRS suspends levy actions during a levy hearing and any judicial review that may follow.[4]

Since 2001, CDP has been one of the federal tax issues most frequently litigated in the federal courts and analyzed in the National Taxpayer Advocate's Annual Reports to Congress.  The trend continues this year, with our review of litigated issues finding 79 opinions on CDP cases during the review period of June 1, 2014, through May 31, 2015.[5]  Taxpayers prevailed in full in 11 of these cases (nearly 14 percent) and, in part, in three others (nearly four percent).  Of the 14 opinions where taxpayers prevailed in whole or in part, five taxpayers appeared *pro se*[6] and nine were represented.

The cases discussed below demonstrate that CDP hearings serve an important role in providing taxpayers with a venue to raise legitimate issues before the IRS deprives them of property.  Many of these decisions shed light on substantive and procedural issues.

CDP hearings are particularly valuable because they provide taxpayers with an enforceable remedy with respect to several rights articulated in the Taxpayer Bill of Rights, which was adopted by the IRS in 2014 in response to National Taxpayer Advocate recommendations.[7]  In particular, by providing an opportunity for a taxpayer to challenge the underlying liability and raise alternatives to the collection action, the CDP hearing enables the taxpayer's *right to challenge the IRS position and be heard*.  If the taxpayer does

---

1   RRA 98, Pub. L. No. 105-206, § 3401, 112 Stat. 685, 746 (1998).
2   Internal Revenue Code (IRC) §§ 6320(c) (lien) and 6330(c) (levy).  IRC § 6320(c) generally requires Appeals to follow the levy hearing procedures under IRC § 6330 for the conduct of the lien hearing, the review requirements, and the balancing test.
3   IRC § 6330(d) (setting forth the time requirements for obtaining judicial review of Appeals' determination); IRC §§ 6320(a)(3)(B) and 6330(a)(3)(B) (setting forth the time requirements for requesting a CDP hearing for lien and levy matters, respectively).
4   IRC § 6330(e)(1) provides that generally, levy actions are suspended during the CDP process (along with a corresponding suspension in the running of the limitations period for collecting the tax.).  However, IRC § 6330(e)(2) allows the IRS to resume levy actions during judicial review upon a showing of "good cause," if the underlying tax liability is not at issue.
5   For a list of all cases reviewed, see Table 5 in Appendix 3, *infra*.
6   *Pro se* means "[f]or oneself; on one's own behalf; without a lawyer."  BLACK'S LAW DICTIONARY (10th ed. 2014), *available at* http://westlaw.com.
7   IRS, Taxpayer Bill of Rights, *available at* http://www.irs.gov/Taxpayer-Bill-of-Rights.  *See also* National Taxpayer Advocate 2013 Annual Report to Congress 5-19 (Most Serious Problem: *Taxpayer Rights: The IRS Should Adopt a Taxpayer Bill of Rights as a Framework for Effective Tax Administration*).

001895

not agree with the Appeals determination, he or she may file a petition in Tax Court, which furthers the taxpayer's *right to appeal an IRS decision in an independent forum.* Lastly, since the Appeals Officer must consider whether the IRS's proposed collection action balances the overall need for efficient collection of taxes with the legitimate concern that the IRS's collection actions are no more intrusive than necessary, the CDP hearing protects a taxpayer's *right to privacy* while also ensuring the taxpayer's *right to a fair and just tax system.*

## TAXPAYER RIGHTS IMPACTED[8]

- ◼ *The Right to Challenge the IRS's Position and Be Heard*
- ◼ *The Right to Appeal an IRS Decision in an Independent Forum*
- ◼ *The Right to Privacy*
- ◼ *The Right to a Fair and Just Tax System*

## PRESENT LAW

Current law provides taxpayers an opportunity for independent review of an NFTL filed by the IRS or of a proposed levy action.[9] As discussed above, the purpose of CDP rights is to give taxpayers adequate notice of IRS collection activity and a meaningful hearing before the IRS deprives them of property.[10] The hearing allows taxpayers to raise issues relating to collection of the liability, including:

- ◼ The appropriateness of collection actions;[11]
- ◼ Collection alternatives such as an installment agreement (IA), offer in compromise (OIC), posting a bond, or substitution of other assets;[12]
- ◼ Appropriate spousal defenses;[13]
- ◼ The existence or amount of the underlying tax liability, but only if the taxpayer did not receive a statutory notice of deficiency or have another opportunity to dispute the liability;[14] and
- ◼ Any other relevant issue relating to the unpaid tax, the NFTL, or proposed levy.[15]

A taxpayer cannot raise an issue considered at a prior administrative or judicial hearing if the taxpayer participated meaningfully in that hearing or proceeding.[16]

---

8    *See* Taxpayer Bill of Rights, *available at* www.Taxpayer.Advocate.irs.gov/taxpayer-rights.

9    IRC §§ 6320 and 6330. *See* RRA 98, Pub. L. No. 105-206, § 1001(a), 112 Stat. 685 (1998).

10   Prior to RRA 98, the U.S. Supreme Court had held that a post-deprivation hearing was sufficient to satisfy due process concerns in the tax collection arena. *See U.S. v. Nat'l Bank of Commerce*, 472 U.S. 713, 726-31 (1985); *Phillips v. Comm'r*, 283 U.S. 589, 595-601 (1931).

11   IRC § 6330(c)(2)(A)(ii).

12   IRC § 6330(c)(2)(A)(iii).

13   IRC § 6330(c)(2)(A)(i).

14   IRC § 6330(c)(2)(B).

15   IRC § 6330(c)(2)(A); Treas. Reg. §§ 301.6320-1(e) and 301.6330-1(e).

16   IRC § 6330(c)(4).

### Procedural Collection Due Process Requirements

The IRS must provide a CDP notice to the taxpayer after filing the first NFTL or generally before its first intended levy for the particular tax and tax period.[17]  The IRS must provide the notice not more than five business days after the day of filing the NFTL, or at least 30 days before the day of the proposed levy.[18]

If the IRS files a lien, the CDP lien notice must inform the taxpayer of the right to request a CDP hearing within a 30-day period, which begins on the day after the end of the five-business day period after the filing of the NFTL.[19]  In the case of a proposed levy, the CDP levy notice must inform the taxpayer of the right to request a hearing within the 30-day period beginning on the day after the date of the CDP notice.[20]

### Requesting a CDP Hearing

Under both lien and levy procedures, the taxpayer must return a signed and dated written request for a CDP hearing within the applicable period.[21]  The Code and regulations require taxpayers to provide their reasons for requesting a hearing.  Failure to provide the basis may result in denial of a face-to-face hearing.[22]  Taxpayers who fail to timely request a CDP hearing will be afforded an "equivalent hearing," which is similar to a CDP hearing but lacks judicial review.[23]  Taxpayers must request an equivalent hearing within the one-year period beginning the day after the five-business day period following the filing of the NFTL, or in levy cases, within the one-year period beginning the day after the date of the CDP notice.[24]

### Conduct of a CDP Hearing

The IRS generally will suspend levy action throughout a CDP hearing involving a notice of intent to levy.  However, the requirement to suspend levy action is inapplicable in certain circumstances where the IRS is not required to provide a CDP hearing prior to the levy and is only required to provide the CDP hearing within a reasonable time after the levy.[25]  These circumstances occur when the IRS determines that:

- The collection of tax is in jeopardy;

---

17  IRC § 6330(f) permits the IRS to levy without first giving a taxpayer a CDP notice in the following situations: the collection of tax is in jeopardy, a levy was served on a state to collect a state tax refund, the levy is a disqualified employment tax levy, or the levy was served on a federal contractor.  A disqualified employment tax levy is any levy to collect employment taxes for any taxable period if the person subject to the levy (or any predecessor thereof) requested a CDP hearing with respect to unpaid employment taxes arising in the most recent two-year period before the beginning of the taxable period with respect to which the levy is served.  IRC § 6330(h).

18  IRC § 6320(a)(2) or § 6330(a)(2).  The CDP notice can be provided to the taxpayer in person, left at the taxpayer's dwelling or usual place of business, or sent by certified or registered mail (return receipt requested) to the taxpayer's last known address.

19  IRC § 6320(a)(3)(B); Treas. Reg. § 301.6320-1(b)(1).

20  *Id.*

21  IRC §§ 6330(a)(3)(B) and 6320(a)(3)(B); Treas. Reg. §§ 301.6320-1(c)(2) A-C1(ii) and 301.6330-1(c)(2) A-C1(ii).

22  IRC §§ 6320(b)(1) and 6330(b)(1); Treas. Reg. §§ 301.6320-1(c)(2) A-C1, 301.6330-1(c)(2) A-C1, 301.6320-1(d)(2) A-D8 and 301.6330-1(d)(2) A-D8.  The regulations require the IRS to provide the taxpayer an opportunity to "cure" any defect in a timely filed hearing request, including providing a reason for the hearing.  Form 12153 includes space for the taxpayer to identify collection alternatives that he or she wants Appeals to consider, as well as examples of common reasons for requesting a hearing.  *See* IRS Form 12153, *Requests for Collection Due Process or Equivalent Hearing* (Mar. 2011).

23  Treas. Reg. §§ 301.6320-1(i)(2) Q&A-I6 and 301.6330-1(i)(2) Q&A-I6; *Business Integration Servs., Inc. v. Comm'r*, T.C. Memo. 2012-342 at 6-7; *Moorhous v. Comm'r*, 116 T.C. 263 (2001).  A taxpayer can request an Equivalent Hearing by checking a box on Form 12153, *Request for Collection Due Process or Equivalent Hearing*, by making a written request or by confirming that he or she wants the untimely CDP hearing request to be treated as an Equivalent Hearing when notified by Collection of an untimely CDP hearing request.  Internal Revenue Manual (IRM) 5.19.8.4.3, *Equivalent Hearing (EH) Requests and timeliness of EH Requests* (Nov.1, 2007).

24  Treas. Reg. §§ 301.6320-1(i)(2) A-I7 and 301.6330-1(i)(2) A-I7.

25  *See, e.g.*, *Dorn v. Comm'r*, 119 T.C. 356 (2002); *Zapara v. Comm'r*, 124 T.C. 223 (2005); *Bibby v. Comm'r*, T.C. Memo. 2013-281.

001897

Case 6:24-cv-00306-JCB   Document 124   Filed 04/07/24   Page 1905 of 4699 PageID #:  5070

Legislative
Recommendations

Most Litigated
Issues

Case
Advocacy

Appendices

Most Serious
Problems

- The collection resulted from a levy on a state tax refund;

- The IRS has served a disqualified employment tax levy; or

- The IRS has served a federal contractor levy.[26]

The IRS also suspends levy action throughout any judicial review of Appeals' determination, unless the IRS obtains an order from the court permitting levy on the grounds that the underlying tax liability is not at issue, and the IRS can demonstrate good cause to resume collection activity.[27]

CDP hearings are informal.  When a taxpayer requests a hearing with respect to both a lien and a proposed levy, Appeals will attempt to conduct one hearing.[28]  Courts have determined that a CDP hearing need not be face-to-face but can take place by telephone or correspondence,[29] and Appeals will conduct the hearing by telephone unless the taxpayer requests a face-to-face conference.[30]  The CDP regulations state that taxpayers who provide non-frivolous reasons for opposing the IRS collection action will generally be offered but not guaranteed face-to-face conferences.[31]  Taxpayers making frivolous arguments are not entitled to face-to-face conferences.[32]  A taxpayer will not be granted a face-to-face conference concerning a collection alternative, such as an IA or OIC, unless other taxpayers would be eligible for the alternative under similar circumstances.[33]  For example, the IRS will not grant a face-to-face conference to a taxpayer who proposes an OIC as the only issue to be addressed but failed to file all required returns and is therefore ineligible for an offer.  Appeals may, however, at its discretion, grant a face-to-face conference to explain the eligibility requirements for a collection alternative.[34]

The CDP hearing is to be held by an impartial officer from Appeals, who is barred from engaging in *ex parte* communication with IRS employees about the substance of the case and who has had "no prior

---

26  IRC § 6330(e)(1) provides the general rule for suspending collection activity.  IRC § 6330(f) provides that if collection of the tax is deemed in jeopardy, the collection resulted from a levy on a state tax refund, or the IRS served a disqualified employment tax levy or a federal contractor levy, IRC § 6330 does not apply, except to provide the opportunity for a CDP hearing within a reasonable time after the levy.  *See Clark v. Comm'r*, 125 T.C. 108, 110 (2005) (citing *Dorn v. Comm'r*, 119 T.C. 356 (2002)).

27  IRC § 6330(e)(1) and (e)(2).

28  IRC § 6320(b)(4).

29  *Katz v. Comm'r*, 115 T.C. 329, 337-38 (2000) (finding that telephone conversations between the taxpayer and the Appeals Officer constituted a hearing as provided in IRC § 6320(b)).  Treas. Reg. §§ 301.6320-1(d)(2) A-D6, A-D8 and 301.6330-1(d) (2) A-D6, A-D8.

30  *See, e.g., Appeals Letter 4141* (rev. Aug. 2012) (acknowledging the taxpayer's request for a CDP hearing and providing information on the availability of face-to-face conference).  The National Taxpayer Advocate has repeatedly raised concerns regarding the inadequacy of Appeals' communication to taxpayers on how to request a face-to-face hearing and where this information is included in the letter.  *See* National Taxpayer Advocate 2005 Annual Report to Congress 136 (Most Serious Problem: *Appeals Campus Centralization*); National Taxpayer Advocate 2009 Annual Report to Congress 70 (Most Serious Problem: *Appeals' Efficiency Initiatives Have Not Improved Customer Satisfaction or Confidence in Appeals*); National Taxpayer Advocate 2010 Annual Report to Congress 128 (Most Serious Problem: *The IRS's Failure to Provide Timely and Adequate Collection Due Process Hearings May Deprive Taxpayers of an Opportunity to Have Their Cases Fully Considered*).  For information regarding the availability of Virtual Service Delivery (VSD) teleconferencing, which provides virtual face-to-face meeting in remote locations, see National Taxpayer Advocate 2012 Annual Report to Congress 462 (Status Update: *The IRS Has Made Significant Progress in Delivering Virtual Face-to-Face Service and Should Expand Its Initiatives to Meet Taxpayer Needs and Improve Compliance*).  *See also* Director, Policy, Quality and Case Support, *Implementation of Virtual Service Delivery (VSD)*, Memorandum AP-08-0714-0007 (July 24, 2014).

31  Treas. Reg. §§ 301.6320-1(d)(2) (Q&A-D7) and 301.6330-1(d)(2) (Q&A-D7).

32  *Id.*

33  *Id.*

34  *Id.*

involvement."[35]  In addition to addressing the issues raised by the taxpayer, the Appeals Officer must verify that the IRS has met the requirements of all applicable laws and administrative procedures.[36]  An integral component of the CDP analysis is the balancing test, which requires the IRS Appeals Officer to weigh the issues raised by the taxpayer and determine whether the proposed collection action balances the need for efficient collection of taxes with the legitimate concern of the taxpayer that any collection be "no more intrusive than necessary."[37]  The balancing test is central to a CDP hearing because it instills a genuine notion of fairness into the process from the perspective of the taxpayer.[38]

Special rules apply to the IRS's handling of hearing requests that raise frivolous issues.  IRC § 6330(g) provides that the IRS may disregard any portion of a hearing request based on a position the IRS has identified as frivolous or that reflects a desire to delay or impede the administration of tax laws.[39]  Similarly, IRC § 6330(c)(4) provides that a taxpayer cannot raise an issue if it is based on a position identified as frivolous or reflects a desire to delay or impede tax administration.

IRC § 6702(b) allows the IRS to impose a penalty for a specified frivolous submission, including a frivolous CDP hearing request.[40]  A request is subject to the penalty if any part of it "(i) is based on a position which the Secretary has identified as frivolous... or (ii) reflects a desire to delay or impede the administration of Federal tax laws."[41]  In *Thornberry v. Commissioner*, the Tax Court held that if Appeals determines a request for an administrative hearing is based entirely on a frivolous position under IRC § 6702(b)(2)(A) and issues a notice stating that Appeals will disregard the request, the Tax Court does have jurisdiction to review Appeals' decision if the taxpayer timely petitions for review.[42]  The court found

---

35   IRC §§ 6320(b)(1), 6320(b)(3), 6330(b)(1) and 6330(b)(3).  *See also* Rev. Proc. 2012-18, 2012-1 C.B. 455.  *See, e.g., Industrial Investors v. Comm'r*, T.C. Memo. 2007-93; *Moore v. Comm'r*, T.C. Memo. 2006-171, *action on dec.*, 2007-2 (Feb. 27, 2007); *Cox v. Comm'r*, 514 F.3d 1119, 1124-28 (10th Cir. 2008), *action on dec.*, 2009-22 (June 1, 2009).

36   IRC § 6330(c)(1); *Hoyle v. Comm'r*, 131 T.C. 197 (2008).

37   IRC § 6330(c)(3)(C); IRM 8.22.4.2.2, *Summary of CDP Process* (Sept. 25, 2014).  *See also* H.R. REP. No. 105-599, at 263 (1998) (Conf. Rep.).  For simplicity, we use the term "proposed collection action" referring to both the actions taken and pro-posed.  IRC § 6330 requires the IRS to notify the taxpayer of the right to request a CDP hearing not less than 30 days before issuing the first levy to collect a tax.  Pursuant to IRC § 6320, the taxpayer is notified of the right to request a CDP hearing within five business days *after* the first NFTL for a tax period is filed.  Thus, Treasury Regulations under IRC § 6320 require a Hearing Office to consider "[w]hether the continued existence of the filed [NFTL] represents a balance between the need for the efficient collection of taxes and the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary."  *See* Treas. Reg. § 301.6320–1(e)(3) A-E1(vi).  Similarly, a levy action can be taken before a hearing in the fol-lowing situations: collection of the tax was in jeopardy; levy on a state to collect a federal tax liability from a state tax refund; disqualified employment tax levies; or a federal contractor levy under the Federal Payment Levy Program.  *See* IRC § 6330(f); IRM 8.22.4.2.2, *Summary of CDP Process* (Sept. 25, 2014).

38   *See* National Taxpayer Advocate 2014 Annual Report to Congress 185-96 (Most Serious Problem: *Collection Due Process: The IRS Needs Specific Procedures for Performing the Collection Due Process Balancing Test to Enhance Taxpayer Protections*).  *See also* Nina E. Olson, *Taking the Bull by Its Horns: Some Thoughts on Constitutional Due Process in Tax Collection*, 2010 Erwin N. Griswold Lecture Before the American College of Tax Counsel, 63 Tax Law. 227 (2010).

39   IRC § 6330(g).  IRC § 6330(g) is effective for submissions made and issues raised after the date on which the IRS first prescribed a list of frivolous positions.  Notice 2007-30, 2007-1 C.B. 883, which was published on or about April 2, 2007, pro-vided the first published list of frivolous positions.  Notice 2010-33, 2010-17 C.B. 609, contains the current list.

40   The frivolous submission penalty applies to the following submissions: CDP hearing requests under IRC §§ 6320 and 6330, offers in compromise under IRC § 7122, installment agreements under IRC § 6159, and applications for a Taxpayer Assistance Order under IRC § 7811.

41   IRC § 6702(b)(2)(A).  Before asserting the penalty, the IRS must notify the taxpayer that it has determined that the taxpayer filed a frivolous hearing request.  The taxpayer then has 30 days to withdraw the submission to avoid the penalty.  IRC § 6702(b)(3).

42   *See Thornberry v. Comm'r*, 136 T.C. 356, 367 (2011).  The Tax Court recently declined to overturn *Thornberry* in *Buczek v. Comm'r*, 143 T.C. No. 16 (2014), which will be discussed in the Analysis of Litigated Cases below.

Appeals' letter disregarding the hearing request was a determination conferring jurisdiction under IRC § 6330(d)(1), because it authorized the IRS to proceed with the disputed collection action.[43]

### Judicial Review of CDP Hearing

Within 30 days of Appeals' determination, the taxpayer may petition the Tax Court for judicial review.[44] The court will only consider issues, including challenges to the underlying liability, that were properly raised during the CDP hearing.[45]  An issue is not properly raised if the taxpayer fails to request Appeals' consideration of the issue or requests consideration but fails to present any evidence regarding that issue after being given a reasonable opportunity.[46]  The Tax Court, however, may remand a case back to Appeals for more fact finding when the taxpayer's factual circumstances have materially changed between the hearing and the trial.[47]  When the case is remanded, the court retains jurisdiction.[48]  The resulting hearing on remand provides the parties with an opportunity to complete the initial hearing while preserving the taxpayer's right to receive judicial review of the ultimate administrative determination.[49]

Where the validity of the underlying tax liability is properly at issue in the hearing, the court will review the amount of the tax liability on a *de novo*[50] basis.[51]  Where the Tax Court is reviewing the appropriateness of the collection action or subsidiary factual and legal findings, the court will review these determinations under an abuse of discretion standard.[52]

### Appellate Venue from Decisions of the Tax Court

Generally, the correct venue for appeals from the Tax Court is the D.C. Circuit unless one of the rules specified in IRC § 7482(b)(1) or exceptions specified in IRC §§ 7482(b)(2) or (b)(3) applies.  For instance, IRC § 7482(b)(1)(A) provides that in cases where a petitioner other than a corporation seeks redetermination of a tax liability, venue for review by the United States Court of Appeals lies with the Court of Appeals for the circuit based upon the taxpayer's legal residence.[53]  Pursuant to IRC § 7482(b)(2), the taxpayer and the IRS may stipulate the venue for an appeal in writing.

---

43  *Thornberry v. Comm'r*, 136 T.C. 356, 364 (2011).  The Office of Chief Counsel disagrees with the *Thornberry* holding and will continue to file motions to dismiss for lack of jurisdiction if the taxpayer petitions for Tax Court review of a denial, under § 6330(g), of a CDP hearing request that was determined to be based on a frivolous position.  *See* Chief Counsel Directives Manual (CCDM) 35.3.23.5.1, *Motion to Dismiss for Lack of Jurisdiction When CDP Hearing Request Denied Under Section 6330(g)* (July 25, 2012).

44  IRC § 6330(d)(1).

45  *Giamelli v. Comm'r*, 129 T.C. 107 (2007).

46  Treas. Reg. §§ 301.6320-1(f)(2) (Q&A-F3), 301.6330-1(f)(2) (Q&A-F3).

47  *Churchill v. Comm'r*, T.C. Memo. 2011-182; *see also* CCN-2013-002 (Nov. 30, 2012), which provides Counsel attorneys with instructions on when a remand based on changed circumstances might be appropriate.

48  *See, e.g., Pomeroy v. Comm'r*, T.C. Memo 2013-26 at 20.

49  *Wadleigh v. Comm'r*, 134 T.C. 280, 299 (2010).

50  *De novo* means "anew."  Black's Law Dictionary (10th ed. 2014), *available at* http://westlaw.com.

51  The legislative history of RRA 98 addresses the standard of review courts should apply in reviewing Appeals' CDP determinations.  H.R. Rep. No. 1059-99, at 266 (Conf. Rep.).

52  *See, e.g., Murphy v. Comm'r*, 469 F.3d 27 (1st Cir. 2006); *Dalton v. Comm'r*, 682 F.3d 149 (1st Cir. 2012).

53  IRC § 7482(b)(1) also provides that the proper venue lies with the court of appeals for the circuit in which is located: in the case of a corporation seeking redetermination of tax liability, the principal place of business or principal office or agency of the corporation, or if it has no principal place of business or principal office or agency in any judicial circuit, then the office to which was made the return of the tax in respect of which the liability arises; in the case of a person seeking a declaratory decision under IRC § 7476, the principal place of business or principal office or agency of the employer;  in the case of an organization seeking a declaratory decision under IRC § 7428, the principal place of business or principal office or agency of the organization; in the case of a petition under IRC §§ 6226, 6228(a), 6247, or 6252, the principal place of business of the partnership; and in the case of a petition under section IRC § 6234(c), (i) the legal residence of the petitioner if the petitioner is not a corporation, and (ii) the place or office applicable under subparagraph (B) if the petitioner is a corporation.

It has been the longstanding practice of taxpayers and the IRS to appeal CDP, innocent spouse, and inter-est abatement cases to the circuit of the petitioner's legal residence, principal place of business, or principal office or agency.  The Tax Court has also followed this approach.  Under the rule established in *Golsen v. Commissioner*,[54] the Tax Court follows the precedent of the circuit court to which the parties have the right to appeal regardless of whether the taxpayer's tax liability was at issue.

In *Byers v. Commissioner*, the D.C. Circuit held that the D.C. Circuit will not transfer cases in non-liability CDP cases unless both parties stipulate to the transfer.[55]  The D.C. Circuit did not answer the question of whether another Court of Appeals could hear an appeal of a non-liability CDP decision without stipulation.[56]  The court acknowledged that in some CDP cases involving both challenges to the tax liability and collection issues, the venue presumably would be in the appropriate regional circuit.[57]

The IRS Office of Chief Counsel recently issued a notice that provides litigation guidelines to Chief Counsel attorneys about appellate venue for collection due process, innocent spouse, interest abatement, and other non-deficiency cases in light of the decision in *Byers*.[58]  In litigating Tax Court cases, Chief Counsel attorneys are instructed to continue asserting the IRS's longstanding position that, for purposes of the *Golsen* rule, venue generally lies in the circuit of the taxpayer's legal residence, principal place of business, or principal office or agency, regardless of whether the issues in the case involve liability.  In CDP cases in which liability is at issue, Chief Counsel attorneys are instructed to argue, in the alternative, that venue lies in the regional circuit, which is consistent with *Byers*.  The notice further instructs Chief Counsel attorneys not to object to venue if a taxpayer appeals a non-liability case not enumerated in IRC § 7482(b) to the D.C. Circuit[59] or if a taxpayer appeals a non-liability case to the proper regional circuit.[60]  To address the uncertainty and confusion among taxpayers and practitioners that impact *the right to be informed*, the National Taxpayer Advocate recommended that Congress amend IRC § 7482(b)(1)(A) to provide that proper appellate venue for all CDP cases lies with the circuit court of appeals based on the taxpayer's legal residency.[61]

## ANALYSIS OF PUBLISHED OPINIONS

We identified and reviewed 79 CDP court opinions, a four percent increase from the 76 published opinions in last year's report.  As shown in Figure 3.5.1, we have identified on average about 131 opinions per year since 2001.

From 2003 to 2007, the average number of published opinions was approximately 200.  Since 2011, however, the average number of published opinions has dropped to 93.  At first glance, this decline may be

---

54  54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

55  *Byers*, 740 F.3d 668 (D.C. Cir. 2014).  For a more detailed discussion of the *Byers* case, see National Taxpayer Advocate 2014 Annual Report to Congress 477-94 (Most Litigated Issue: *Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330*).

56  740 F.3d at 677.  The court noted that it had "no occasion to decide… whether a taxpayer who is seeking review of a CDP decision on a collection method may file in a court of appeals other than the D.C. Circuit if the parties have not stipulated to venue in another circuit."

57  *Id.* at 676.

58  IRS Office of Chief Counsel, Notice CC-2015-006, *Venue for Appeals from Decisions of the Tax Court* (June 30, 2015).

59  *Byers* is controlling in the D.C. Circuit.

60  This is consistent with the IRS Office of Chief Counsel longstanding position.

61  *See* National Taxpayer Advocate 2014 Annual Report to Congress 387-91 (Legislative Recommendation: *Appellate Venue in Non-Liability CDP Cases: Amend IRC § 7482 to Provide That The Proper Venue to Seek Review of a Tax Court Decision in All Collection Due Process Cases Lies With the Federal Court of Appeals for the Circuit in Which the Taxpayer Resides*).

001901

attributed, in part, to a series of operational changes in fiscal years 2011 and 2012, collectively known as the "Fresh Start" initiative,  which led to fewer NFTL filings and more accepted OICs in the past few years, and had a positive impact on many taxpayers and revenue collection.[62]  However, it is not clear that the reduction in CDP published opinions is attributable to the reduced number of lien filings.  Of the over 21,000 CDP cases petitioned to the Tax Court between June 1, 2000, and May 31, 2015, only 282 were classified as lien cases.[63]  Furthermore, the number of CDP cases petitioned has actually increased over time.

### FIGURE 3.5.1, CDP Cases Received in Tax Court and Opinions Identified



CDP Cases Received in Tax Court and Opinions Identified
Identified June 1-May 31 of each calendar year

The increase in CDP cases received suggests that the reduced number of CDP opinions identified may not be the result of fewer taxpayers requesting a CDP hearing and then contesting the CDP determination by filing a Tax Court petition.  Instead, it could be the result of more taxpayers deciding not to pursue litigation after filing a petition, more settlements, or more non-precedential CDP orders or bench opinions that do not result in a published opinion.[64]  Moreover, the decline in litigated cases may be due to taxpayers litigating many issues of first impression in the years immediately following the enactment of IRC §§ 6320 and 6330, which now have been resolved by the courts.

---

62  For instance, in fiscal year (FY) 2014, the IRS filed about 49 percent fewer NFTLs than in FY 2011, including a corresponding 58 percent reduction in liens filed by the Automated Collection System.  In FY 2011, the IRS filed 1,042,230 liens.  *See* IRS, Collection Workload Indicators 5000-23 (Oct. 11, 2011).  In FY 2014, the IRS filed 535,580 liens.  *See* IRS, Collection Activity Report 5000-25 (Sept. 29, 2014).  Additionally, the dollars collected increased from about $17 billion in FY 2011 to about $18.5 billion in FY 2014.  *See* IRS, Collection Activity Report 5000-2 (Oct. 3, 2011), IRS, Collection Activity Report 5000-6 (Oct. 3, 2011), IRS, Collection Activity Report 5000-108 (Oct. 5, 2011); IRS, Collection Activity Report 5000-2 (Sept. 29, 2013), IRS, Collection Activity Report 5000-6 (Sept. 30, 2014), IRS, Collection Activity Report 5000-108 (Sept. 29, 2014).  We also note that the IRS has accepted 38 percent more offers in compromise than during FY 2011, and that the actual number of accepted offers has almost doubled when compared to FY 2010.  Considering FY 2014, the offer acceptance rate of 42 percent is the highest we have seen in many years.  *See* IRS, Collection Activity Report 5000-108 (Oct. 5, 2010); IRS, Collection Activity Report 5000-108 (Oct. 5, 2011); IRS, Collection Activity Report 5000-108 (Sept. 29, 2014).  During FY 2014, thousands of financially struggling taxpayers have successfully obtained lien withdrawals to help regain their financial viability.  *See* IRS, *FY 2014 C-25 Report*.

63  IRS, Chief Counsel Reports, *CDP Cases with Specific UIL Codes Received Between 06/01/2000 To 05/31/2015* (Oct. 7, 2015); IRS, Chief Counsel Reports, *CDP Cases Received Between 06/01/2000 To 05/31/2015* (Oct. 7, 2015).  CDP cases received refers to cases where the taxpayer petitioned Tax Court to contest a CDP determination.

64  For a discussion regarding the number of CDP unpublished opinions, see Carlton Smith, *Unpublished CDP Orders Dwarf Post-trial Bench Opinions in Uncounted Tax Court Rulings*, Procedurally Taxing (Jan. 29, 2015), *available at* http://www.procedurallytaxing.com/unpublished-cdp-orders-dwarf-post-trial-bench-opinions-in-uncounted-tax-court-rulings/.

Thus, the 79 published opinions identified this year do not reflect the full number of CDP cases.  Table 5 in Appendix 3 provides a detailed list of the published CDP opinions, including specific information about the issues, the types of taxpayers involved, and the outcomes of the cases.

### Litigation Success Rate

Taxpayers prevailed in full in 11 of the 79 published opinions issued during the year ending May 31, 2015 (nearly 14 percent).[65]  Taxpayers prevailed, in part, in three other cases (nearly four percent).  Of the published opinions in which the courts found for the taxpayer, in whole or in part, the taxpayers appeared *pro se* in five cases and were represented in nine others.  The IRS prevailed fully in approximately 82 percent of published opinions reviewed, a decrease from the higher recorded success of 89 percent last year.  The 18 percent success rate[66] for the taxpayer is the highest since the inception of CDP hearings and may be an indication that the IRS is not addressing collection alternatives adequately at the administrative hearing.

### FIGURE 3.5.2, Success Rates in CDP Opinions Identified[67]

| Court Decision | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Decided for IRS | 95% | 95% | 89% | 90% | 92% | 90% | 92% | 89% | 92% | 86% | 84% | 89% | 82% |
| Decided for Taxpayer | 1% | 3% | 8% | 8% | 5% | 8% | 4% | 10% | 3% | 7% | 8% | 7% | 14% |
| Split Decision | 4% | 2% | 3% | 2% | 3% | 2% | 4% | 2% | 3% | 6% | 9% | 4% | 4% |
| Neither | n/a | n/a | n/a | n/a | <1% | n/a | n/a | n/a | 1% | <1% | n/a | n/a | n/a |

### Issues Litigated

The cases discussed below are those the National Taxpayer Advocate considers significant or noteworthy.  Their outcomes can provide important information to Congress, the IRS, and taxpayers about the rules and operation of CDP hearings.  Equally important, all of the cases offer the IRS an opportunity to improve the CDP process and collection practices in both application and execution.

### *Buczek v. Commissioner*

In *Buczek v. Commissioner*, the IRS sent the taxpayer a final notice of intent to levy for unpaid taxes for tax year (TY) 2009.[68]  The taxpayer timely requested a CDP hearing with an additional seven pages attached to the request.  Each additional page contained phrases such as "Pursuant to UCC 3-501," "Refused from the cause," "Consent not given," and "Permission DENIED."  The taxpayer did not

---

65  *Budish v. Comm'r*, T.C. Memo. 2014-239; *Crosswhite v. Comm'r*, T.C. Memo. 2014-179; *Duarte v. Comm'r*, T.C. Memo. 2014-176; *Gurule v. Comm'r*, T.C. Memo. 2015-61; *Knudsen v. Comm'r*, T.C. Memo. 2015-69; *Lee v. Comm'r*, 144 T.C. 40 (2015); *Reinhart v. Comm'r*, T.C. Memo. 2014-218; *Yuska v. Comm'r*, T.C. Memo. 2015-77; *Ding v. Comm'r*, T.C. Memo. 2015-20; *Sanfilippo, Estate of v. Comm'r*, T.C. Memo. 2015-15; *Synergy Envtl., Inc. v. Comm'r*, T.C. Memo. 2014-148.

66  The success rate includes decisions for the taxpayer as well as split decisions.

67  Numbers may not total to 100 percent due to rounding.  A "split" decision refers to a case with multiple issues where both the IRS and the taxpayer prevail on one or more substantive issues.  A "neither" decision refers to a case where the court's decision was not in favor of either party.

68  *Buczek v. Comm'r*, 143 T.C. 301 (2014).

request a collection alternative, did not assert he could not pay the underlying tax, and did not raise any other issue.  The IRS sent a disregard letter stating that the taxpayer's request for a CDP hearing had been disregarded in its entirety due to the taxpayer raising frivolous arguments and that the IRS could proceed with collection.[69]  The taxpayer then appealed the IRS's determination to the Tax Court.

The main issue was whether the Tax Court had the jurisdiction to review an Appeals determination that a CDP hearing request was frivolous in its entirety and would be disregarded.  *Thornberry* held that while IRC § 6330(g) denied judicial review of the portions of CDP hearing requests identified as frivolous under IRC § 6702(b)(2)(A), it did not prohibit judicial review of the determination by the Appeals Office that the hearing request was frivolous in its entirety and that collection action could proceed.[70]  The IRS requested the court overturn *Thornberry*, arguing that it undermined IRC § 6330(g), which precludes from judicial review any portion of a CDP request deemed frivolous.

Although the court found that IRC § 6330(g) applied to this case, it distinguished it and upheld *Thornberry*.  The judge noted that the taxpayers in *Thornberry* had actually raised proper issues in their request but were still denied a hearing because the IRS deemed their issues frivolous.  In contrast, the taxpayer in the present case did not challenge the collection action, offer any collection alternatives, challenge the underlying liability, or raise any spousal defenses.[71]  The court concluded that since the taxpayer did not raise any issues that could have been considered in the CDP hearing, there were no issues that were deemed to be excluded from the portions of the request deemed frivolous.  Because this resulted in the entire request being treated as if it were never made, the court found it lacked jurisdiction to review the Appeals determination, that collection action would proceed, and thus dismissed the case for lack of jurisdiction.

This opinion has two important ramifications.  First, it upheld the *Thornberry* decision, providing an important protection for taxpayers and preventing the IRS from denying CDP hearings by simply labeling hearing requests as entirely frivolous.  Second, the court adhered to IRC § 6330(g) by finding that if the taxpayer failed to raise any legitimate issues that could be excluded from the frivolous positions, the court did not have jurisdiction to review the Appeals determination that collection would proceed.[72]

### Budish v. Commissioner

In *Budish v. Commissioner*,[73] the IRS issued a notice of intent to levy to the taxpayer, a sculptor who works in cast bronze and sells his artwork through a wholly owned S corporation.  The taxpayer timely requested and received a CDP hearing.  During the hearing, the taxpayer and Appeals Officer (AO) agreed on the payment amount for an IA that would full-pay the outstanding tax liability, but the AO insisted upon the filing of an NFTL as a condition to the IA, stating that it was in the government's best interest since the taxpayer's tax liability exceeded $200,000.  The taxpayer's counsel provided a letter from the taxpayer's supplier substantiating that should the IRS file an NFTL, the taxpayer's longstanding business relationship with the foundry would be drastically altered.  The taxpayer also argued that an NFTL would result in the buyers of sculptures not financing him by paying upfront for artwork they might never receive, because it may be encumbered by the tax lien.  Finally, the taxpayer argued that the NFTL would

---

69   *Buczek v. Comm'r*, 143 T.C. 301 (2014) at 4.

70   *Thornberry v. Comm'r*, 136 T.C. 356 (2011).

71   *Buczek v. Comm'r*, 143 T.C. 301 (2014) at 12.

72   For further analysis of *Buczek*, see Howard A. Dawson, *Tax Court Won't Bite at IRS Request to Overturn CDP Opinion*, 2014 TNT 194-14 Tax Notes Today (Oct. 7, 2014).  *See also* Stephen Olsen, *Summary Opinions for 10/03/14*, Procedurally Taxing (Oct. 13, 2014), *available at* http://www.procedurallytaxing.com/summary-opinions-for-100314/.

73   *Budish v. Comm'r*, T.C. Memo. 2014-239.

adversely affect his credit rating and, as a result, the taxpayer would be unable to pay the foundry using his credit card. Despite all these arguments, the AO insisted upon the filing of an NFTL as a condition to the IA, and the taxpayer declined to enter into the IA with those terms.

Not being able to secure a collection alternative, the AO then issued to the taxpayer a notice of determination sustaining the proposed levy action. In an attachment to the notice, the AO gave two specific reasons for insisting that a notice of lien be filed, both based on interpretations of the Internal Revenue Manual (IRM):

(1) The liability was over $200,000, so the lien must be filed to protect the government's interest;[74] and

(2) The installment agreement request did not meet streamlined, guaranteed, or in-business trust fund express criteria, so the lien was required to be filed as a condition of the installment agreement.[75]

The court determined that the AO misinterpreted and overstated the directives set forth in the IRM and erroneously concluded that the IRM required the NFTL filing. Importantly, the IRM uses the term "in general", which the court interprets to mean that there may be occasions when a lien does not have to be filed.[76] The court went on to state that IRM 5.12.2.4, relied upon by the AO, lists circumstances in which a lien *determination* must be made; it did not say these circumstances lead to a lien *filing*.[77] Furthermore, the court discussed how the IRM allows for revenue officers to defer filing a lien if it would impede the collection of tax. Thus, the court concluded that the IRM did not require the AO to file a lien.

Regarding the balancing test, the court was not persuaded by the AO's statement that the petitioner "failed to show how withholding the lien filing would be in the best interest of the government and facilitate collection," and found that this language "was, in effect, surplusage or boilerplate, included merely for the sake of completeness."[78] The AO did not explain how she came to her conclusion and did not show that she thoroughly considered the taxpayer's contention that the lien would severely impair his ability to pay off the underlying liability. The court found the AO's determination lacked any analysis of "what might have led [the AO] to conclude that levy action will balance the need for efficient collection of tax with petitioner's concern that it would be unnecessarily intrusive." The court further held that the AO failed to discuss balancing factors and thus did not properly balance the need for the efficient collection of the taxpayer's liability with the legitimate concern of the taxpayer that any collection be no more intrusive than necessary as required by IRC § 6330(c)(3)(C).[79]

By failing to perform proper balancing, the AO abused discretion in sustaining the levy. The court remanded the case to Appeals for a supplemental CDP hearing with directions to perform the balancing of factors before determining the appropriate collection action, including the impact of a proposed collection action (NFTL) on the taxpayer's ability to remain in business and generate sufficient income to not default on the proposed installment agreement; the value of the taxpayer's assets and the amount of cash flow; any

---

74  *See* IRM 5.12.2.4.1, *Integrated Collection System (ICS) Documentation When Deferring the Filing of an NFTL or Choosing Do Not File* (Oct. 14, 2013). The court assumed that the AO "felt constrained" to file an NFTL by this IRM.

75  The AO cited IRM 5.12.2.4.

76  *Budish*, T.C. Memo. 2014-239 at 18.

77  *See* IRM 5.12.2.4, *Determination Criteria for Do-Not-File or Deferring the NFTL Filing* (Oct. 30, 2009).

78  *Budish*, T.C. Memo. 2014-239 at 21. For a detailed discussion of the importance of specific procedures for performing the CDP Balancing test, see National Taxpayer Advocate 2014 Annual Report to Congress 185-96 (Most Serious Problem: *Collection Due Process: The IRS Needs Specific Procedures for Performing the Collection Due Process Balancing Test to Enhance Taxpayer Protections*).

79  *Budish*, T.C. Memo. 2014-239.

reasonable alternatives to the proposed collection action (a bond in lieu of the NFTL) under the circumstances; and the validity and the priority of the lien and whether it will attach to the taxpayer's assets.[80]

### Gurule v. Commissioner

*Gurule v. Commissioner* involved a husband (Mr. Gurule) and wife (Mrs. Gurule) who generated a 2009 tax liability as a result of Mr. Gurule taking distributions from a 401(k) retirement plan, which he intended to use for a down payment on a house after he was relocated for his job.[81]  Subsequently, Mr. Gurule lost his job and was not able to buy the new house.  Accordingly, the taxpayers moved back to their prior house, but it was foreclosed upon shortly thereafter.  In 2013, Mr. Gurule took out three separate loans (in addition to two existing loans) from his 401(k) plan to pay expenses for foreclosure, moving, a security deposit, and the first month's rent on a new residence, in addition to substantial medical expenses for Mrs. Gurule and their son and the cost of their son's funeral in 2013.  Mrs. Gurule had a severe neurological condition causing seizures, preventing her from working and requiring expenses for surgery, medication, and doctor visits.  The Gurule's son, who suffered a brain injury as a child, had numerous medical problems until he passed away in August 2013.[82]

In 2011, the IRS sent the taxpayers a notice proposing adjustments to their 2009 income tax based on the 401(k) distributions; however, it is unclear whether the taxpayers ever received a statutory notice of deficiency.  In response to a Notice of Intent to Levy issued on May 7, 2012, the taxpayers timely requested a CDP hearing, stating that collection would cause a hardship.  The taxpayers submitted an OIC to the Settlement Officer (SO), proposing to settle their liability for $950, paid over five months, based on doubt as to collectibility.  The Centralized OIC Unit preliminarily rejected the proposed OIC, finding the taxpayers could full pay based upon their net realizable equity and future income.  The SO made a separate calculation as to the taxpayers' income and reasonable collection potential (RCP).  The SO allowed the expense for the payment of the 401(k) loans shown on Mr. Gurule's pay stub, but allowed only one-half of the expense because she did not realize that Mr. Gurule was paid bi-weekly.  Furthermore, the SO did not reduce the taxpayers' net realizable equity by the amount of the third and fourth 401(k) loans, explaining that these could be considered dissipated assets, because the taxpayers chose to take out the loans knowing they owed federal taxes.[83]  The SO offered the taxpayers the choice of either increasing their OIC or accepting an installment agreement based on their net monthly income as calculated by the SO and the filing of an NFTL.  The SO also determined that the taxpayers did not meet the requirements for currently not collectible status.  After rejecting an additional OIC proposal from the taxpayers, the SO issued a notice of determination that did not address their claim of financial hardship.

The Tax Court remanded the case back to the IRS, finding the record from the CDP hearing was insufficient to allow the court to determine: (1) whether the IRS properly mailed a statutory notice of deficiency; (2) whether the SO abused her discretion by upholding the levy despite the economic hardship claim; (3) whether the SO properly calculated their RCP; and (4) whether the SO properly considered the taxpayers' special circumstances before rejecting the OIC.

Regarding the statutory notice of deficiency, the court found there was not a copy in the record and the notice of determination did not state whether the SO had verified the mailing of the notice of deficiency.

---

80  *Budish*, T.C. Memo. 2014-239.

81  T.C. Memo. 2015-61.

82  *Id.* at 3-4.

83  *Gurule*, T.C. Memo 2015-61 at 4.

001906

The court was especially concerned because the notice of determination stated that the SO had verified each of the other statutory requirements.

Concerning the economic hardship claim, the court cited *Vinatieri v. Commissioner* for the principle that an SO in a CDP hearing cannot proceed with the proposed levy action when a taxpayer establishes that it would create an economic hardship because the levy would then have to be immediately released.[84] Further the court referenced an IRM provision that only allows levies of retirement accounts when the taxpayer's conduct has been flagrant and the taxpayer does not depend on the funds for necessary living expenses.[85]  Because the notice of determination did not show that the SO considered the economic hardship claim and the administrative record showed no consideration of the IRM provision above, the court found it could not determine whether the SO abused her discretion.

Regarding the SO's calculation of the taxpayers' RCP, the court stated that the SO may have made a material error by not adjusting the taxpayers' net realizable equity of the retirement plan account after the third loan.  The court found the SO's treatment of the loans as dissipated assets was not justified, based on the administrative record, which did not establish that Mr. Gurule took out the additional 401(k) loan with intent to disregard the outstanding tax liability.  Furthermore, the court noted that the loans appeared to have been used for necessary living expenses.[86]  The court also noted that a remand may be appropriate when a taxpayer has experienced a material change in circumstances between the time of the IRC § 6630 hearing and the trial that affects the RCP calculation.  It then noted that the taxpayers' middle son passed away after the notice of determination was issued.  That event caused taxpayers to take out an additional loan from the 401(k), which affected their RCP and ability to pay the tax liability, and they were still unable to afford to bury his ashes.  Finally, the court found the administrative record suggested that the SO rejected the taxpayers' proposed OIC without giving any consideration to their special circumstances, such as Mrs. Gurule's neurological condition and the loans necessary to pay medical expenses for her and their now deceased son.

### Ligman v. Commissioner

In *Ligman v. Commissioner*, the taxpayer timely requested a CDP hearing after receiving a levy notice from the IRS for the unpaid tax liabilities for TY 2008.[87]  At the hearing, the taxpayer's representative stated that the taxpayer's only source of income was his Railroad Retirement Board benefits and offered a $25 per month partial payment IA.  The AO concluded that the petitioner's disposable monthly income was $946 and counter-offered an IA of $765 per month.[88]  After not hearing back from the taxpayer's representative, the AO closed the case and sustained the levy.  The taxpayer then appealed the determination to the Tax Court.

The taxpayer argued that the AO abused his discretion by including his retirement benefits while calculating his ability to pay, contending that these benefits were partially levy proof.  The IRS agreed that

---

84  *Gurule*, T.C. Memo 2015-61 at 8 (citing *Vinatieri v. Comm'r*, 133 T.C. 392, 400 (2009)).  This principle, which supports a taxpayer's *right to a fair and just tax system*, was incorporated into the IRM as a result of TAS's advocacy efforts.  *See* IRM 5.11.1.3.1, Pre-Levy Considerations (Aug. 1, 2014).

85  *Id.*  (citing IRM 5.11.6.2 (Dec. 2, 2011)).  For a detailed discussion of how the IRS's guidance regarding levies on retirement accounts is inadequate and infringes on taxpayer rights, see Most Serious Problem: *Levies on Assets in Retirement Accounts: Current IRS Guidance Regarding Levies on Retirement Accounts Does Not Adequately Protect Taxpayer Rights and Conflicts with Retirement Security Public Policy, supra.*

86  *Gurule*, T.C. Memo 2015-61 at 12.

87  *Ligman v. Comm'r*, T.C. Memo. 2015-79.

88  *Id.* at 9.

railroad retirement benefits were partially levy proof under IRC §§ 6334(a)(6) and 6331(h).  However, the IRS argued that it is not barred from considering the benefits (in its determination of the taxpayer's income and ability to pay) for purposes of determining availability of a collection alternative.

The court agreed with the IRS's argument, acknowledging that the IRM does not specify whether railroad retirement benefits are included in income calculation.[89]  The court stated that the railroad retirement benefits are similar to Social Security benefits, which are specifically included in the IRM's calculation of income, despite being partially levy proof.  Thus, including the taxpayer's railroad retirement benefits when calculating his ability to pay was not an abuse of discretion by the AO.[90]

### Sanfilippo v. Commissioner

This case involved the payment of estate taxes.[91]  Martha E. Sanfilippo died testate and left Garrett Rajkovich (Rajkovich) interests in various properties.  On receipt of the interests, Rajkovich's ownership in the Hacienda Shopping Center increased from 65.7 to 75.7 percent.  In addition to the interests, the decedent's will forgave Rajkovich's debt of $21,268,186 that he owed to the estate.[92]

In March 2005, the estate filed for an extension to file an estate tax return.  The IRS granted the extension, and the estate subsequently sent a completed estate tax return in October 2005.  The return valued the gross estate at over $62 million, which included Rajkovich's discharged loan and assets from one of the estate's trusts, and reported an estate tax liability of about $15 million.  Over the course of 2006 through 2010, the estate requested six additional extensions of time to pay the estate tax, due to liquidity problems of both the estate and Rajkovich.  After all but the last extension was granted, the estate, Rajkovich, and the IRS entered into a three-way security agreement.  The agreement gave the IRS a first priority security in an estate property, GMK Oakley (GMK), for as long as the liability was unpaid.[93]

On June 21, 2011, IRS sent the estate a notice of intent to levy and notice of the taxpayer's right to a CDP hearing.  The estate timely requested a CDP hearing and indicated that it would like to submit an OIC.  Rajkovich and his representative then met with SO Pobre to discuss the case.  The taxpayer informed the SO that GMK had interest from a potential buyer and the sale funds would be used to satisfy the estate tax liability.[94]  After the hearing, the estate submitted a proposal to compromise the liability for a payment of approximately $5 million, to be paid with the proceeds from the potential GMK sale.  SO Pobre decided that the RCP of the estate would go up after the potential sale, so he decided to put the case on hold.  He subsequently placed the estate in currently not collectible status, taking into account Rajkovich's obligations, independent of the estate, under the security agreement.  Unfortunately, the sale of the property was delayed and SO Pobre transferred out of the Appeals Office shortly thereafter.  Before SO Pobre transferred, the two sides agreed to meet again to come up with a "common plan" on how to move forward.  SO Pobre was then replaced by SO Owyang.

SO Owyang emailed his team manager, stating that he did not feel comfortable working on an estate case, since he was not well versed in the subject area.[95]  Even though the underlying liability was not at issue in

---

89   IRM 5.15.1 and 5.15.1.11(2)(e).  Generally all household income will be used to determine the taxpayer's ability to pay.  *See* IRM 5.15.1, *Financial Analysis Handbook*.

90   *Ligman v. Comm'r*, T.C. Memo. 2015-79 at 9.

91   *Sanfilippo v. Comm'r*, T.C. Memo. 2015-15.

92   *Id.* at 3.

93   *Id.* at 5.

94   *Id.* at 9.

95   *Sanfilippo v. Comm'r*, T.C. Memo. 2015-15 at 14.

the CDP hearing and the estate had been examined by the IRS, SO Owyang focused his analysis on the estate's transfer to Rajkovich of the Hacienda Shopping Center interest, valued at under $2 million, and the use of this interest by Rajkovich to obtain an almost $10 million loan.  SO Owyang's analysis questioning the valuation of the interest ignored the facts that Rajkovich already held a 65.7 percent majority interest in the property before the estate transferred the additional ten percent interest to him and that the IRS had previously determined the interest's value during examination.  SO Owyang closed the case and sustained the levy, citing the taxpayer's failure to provide a collection alternative to satisfy the liability. The estate appealed the case to the Tax Court.

The estate argued that SO Owyang abused his discretion when he sustained the levy.  The IRS argued that SO Owyang committed a harmless error regarding analysis of the estate assets and that the estate did not submit a proper OIC.[96]  The court disagreed with the IRS's harmless error argument because SO Owyang's miscalculation of Rajkovich's Hacienda Shopping Center interest was instrumental in his decision to sustain the levy.  The court also found the estate did in fact propose an OIC, and SO Owyang did not give any consideration to the discussions between Rajkovich and SO Pobre regarding the collection alternative or to the three-way security agreement in place.  The court held that the SO abused his discretion and remanded the case to Appeals to consider any collection alternatives proposed by the estate.[97]

### Gyorgy v. Commissioner

In *Gyorgy v. Commissioner*,[98] the taxpayer did not file tax returns for 2001 through at least 2007.  Relying on information reported on third-party information returns, the IRS prepared substitute for returns (SFRs) for the taxpayer for TYs 2001-2003.  From 2004 through 2007, the IRS sent notices of deficiency for all three tax years to the address used on the taxpayer's most recently filed return, which was his address on file.[99]  The IRS also sent a Form 2797 "R-U-There" letter to one of many possible addresses for the taxpayer that was reported on third-party information returns.  The IRS received no responses to any of its correspondence, other than the postal service returning the letters as undeliverable.  The IRS took no further steps to locate the taxpayer or reissue notices.  Between the years of 2004 and 2007, the IRS assessed the liabilities for all three tax years in which SFRs had been prepared (2001, 2002, and 2003). Then, in 2009, the IRS moved forward with collection activities by filing an NFTL and sending to the taxpayer's current residence a notice of his right to request a CDP hearing.  The taxpayer timely requested a CDP hearing, where he challenged the underlying liability and whether the IRS followed proper procedures.  The AO sustained the NFTL, finding the IRS followed legal and administrative procedures during the assessment and collection process and the taxpayer did not challenge the IRS's calculation of his liability.[100]  The taxpayer then petitioned the Tax Court.

Noting that the taxpayer did not notify the IRS of address changes and presented no evidence to contest the liabilities, the court found the IRS had mailed the statutory notices of deficiency to the taxpayer's last

---

96  An error is harmless if it does not cause prejudice or does not affect the ultimate determination in the case.  *See, e.g., Estate of Mangiardi v. Comm'r*, T.C. Memo. 2011–24, *aff'd*, 442 Fed. Appx. 526 (11th Cir. 2011).

97  *Sanfilippo v. Comm'r*, T.C. Memo. 2015-15 at 26.

98  779 F.3d 466 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013).

99  "When a notice or document is sent to a taxpayer's 'last known address,' it is legally effective even if the taxpayer never receives it."  Rev. Proc. 2010-16, I.R.B. 2010-19 (May 10, 2010).  This revenue procedure explains the IRS's procedures for determining the last known address.

100  *Gyorgy v. Comm'r*, 779 F.3d 466, 470 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013).

001909

known address and sustained the lien for TYs 2002 and 2003.[101]  The taxpayer appealed the Tax Court's decision to the Court of Appeals for the 7th Circuit.

Three interesting points of discussion were raised in this case.  The first was whether judicial review of a CDP decision was limited to the administrative record.  The 7th Circuit observed that the Tax Court looked beyond the record when it considered trial testimony.  Instead of determining definitively if judicial review should be restricted to the administrative record, the 7th Circuit declined to rule on this issue because neither party raised it, and considered the administrative record as well as evidence presented at the Tax Court trial.[102]

Second, the 7th Circuit addressed what the proper standard of review is when considering whether the IRS followed proper procedures in assessing the liability.  It is well established that a challenge to the underlying tax liability requires a *de novo* review, while the Appeal's Office's determination with regard to the collection action is reviewed under an abuse of discretion standard.[103]  This case was unique because a standard had to be chosen to review the taxpayer's challenge to the IRS's mailing procedure, which in turn was a challenge to the IRS's assessment of the underlying liability.  The 7th Circuit agreed with the Tax Court in applying an abuse of discretion standard for the mailing issue, since it was an administrative decision unrelated to the amount of the underlying liability.[104]  Additionally, the Court found that the taxpayer presented no evidence or arguments to challenge the amount of the liability, further precluding applying a *de novo* standard.

The last significant issue was whether the IRS had used reasonable diligence in finding the taxpayer's correct address.[105]  It agreed that the IRS had to take certain steps to determine the taxpayer's last known address.  In the present case though, the court found that the taxpayer made that job difficult for the IRS by not filing tax returns for many years, moving frequently, and keeping the IRS "in the dark concerning his whereabouts."[106]  It concluded that the IRS properly relied on the address listed on his most recently filed tax return and determined that the Appeals Office properly sustained the NFTL against the taxpayer.

## CONCLUSION

CDP hearings provide an invaluable opportunity for taxpayers to meaningfully address the appropriateness of IRS collection actions.  Given the important protection that CDP hearings offer, it is unsurprising that CDP remains one of the most frequently litigated issues.  The cases discussed this year were important for a variety of reasons.  They affirmed an important protection for the taxpayer, elaborated upon the Tax Court's test for abuse of discretion, and addressed procedural issues.

The *Buczek* case may have been the most important this year, in that it supported a taxpayer's *right to appeal an IRS decision in an independent forum*.  In *Buczek*, the court reaffirmed its holding in Thornberry that the court has jurisdiction to review whether the Office of Appeals properly determined that the taxpayer's CDP hearing request was entirely frivolous or for purposes of delay and correctly treated as

---

101  The court vacated the lien notice for TY 2001 because the IRS could not produce a copy of the deficiency notice or other proof that a notice was mailed.  *Gyorgy v. Comm'r*, 779 F.3d 466, 471 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013).

102  *Gyorgy v. Comm'r*, 779 F.3d 466, 473 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013).

103  *Murphy v. Comm'r*, 469 F.3d 27 (1st Cir. 2006).

104  *Gyorgy v. Comm'r*, 779 F.3d 466, 472, 480-81 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013).

105  *Id.*

106  *Id.*

if never submitted, and to review only legitimate issues properly raised in the hearing request. *Buczek* suggests that courts continue to value the protection provided to taxpayers in *Thornberry*. Although the taxpayers in *Buczek* had presented arguments to delay collection, the court understood that overturning *Thornberry* would have detrimental effects on taxpayers beyond just *Buczek*. If *Thornberry* were reversed, not only would a taxpayer's *right to appeal an IRS decision in an independent forum* be weakened, but such a decision would also compromise a taxpayer's *right to challenge an IRS decision and be heard*. This ruling protects taxpayers from the IRS erroneously labeling a request as frivolous to preclude it from judicial review, thus also upholding a taxpayer's *right to a fair and just tax system*.

*Sanfilippo* shows that there is value in assigning hearing officers to cases in which they have proper knowledge and expertise of the issues. The decision to keep the SO on the case after he complained of his difficulties resulted in needless administrative and judicial costs. To mitigate these costs in the future, the IRS should place hearing officers on cases where they have substantive expertise of issues being presented at a CDP hearing. Further, they should try to make sure that hearing officers see a case through to its completion.[107] This will reduce confusion and rework that occurs when a new hearing officer takes over a case before it is resolved and fully carry out a taxpayer's *right to challenge the IRS's position and be heard*, as well as the *right to appeal an IRS decision in an independent forum*.

The *Budish* decision provides an important development regarding the CDP balancing test. While the vast majority of cases discussing the balancing test have ruled in favor of the IRS over the years, the IRS often merely stated (without elaboration or proper analysis) in these cases it had performed the balancing test. Prior to *Budish*, there was little scrutiny or indepth review, if any, from most courts regarding Appeals' analysis of factors related to balancing the legitimate concerns of taxpayers regarding the intrusiveness of the proposed collection action with the government's interest to collect. The low number of remands may be largely due to the abuse of discretion judicial standard of review, not because Appeals conducted the balancing test properly or analyzed any balancing factors. Thus, the *Budish* decision is significant in describing balancing test factors Appeals should consider upon remand. Moving away from *pro forma* statements and boilerplate language (without proper analysis) and encouraging hearing officers to fully explain which balancing test factors they considered could go a long way in reducing future litigation. By not giving proper attention to the balancing test, the IRS is missing opportunities to improve compliance, enhance taxpayer trust and confidence, relieve undue burden on taxpayers, and support a taxpayer's *right to privacy*.[108]

*Gurule* was significant in its reaffirmation of *Vinatieri v. Commissioner*, which found an appeals officer in a CDP hearing cannot proceed with the proposed levy action when a taxpayer establishes that it would create an economic hardship, because the levy would then have to be immediately released.[109] Although TAS has advocated extensively on this issue and worked to incorporate this principle into the official explanation of a taxpayer's *right to a fair and just tax system* in the IRM, both TAS employees and tax practitioners have still seen too many cases where the IRS continues to issue levies on taxpayers it knows are experiencing economic hardship.[110]

---

107  For more information about the problems with Appeals Officers transferring cases, see Most Serious Problem: *Appeals: The Appeals Judicial Approach and Culture Project is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*, *supra*.

108  *See* National Taxpayer Advocate 2014 Annual Report to Congress 185-96 (Most Serious Problem: Collection Due Process: The IRS Needs Specific Procedures for Performing the Collection Due Process Balancing Test to Enhance Taxpayer Protections).

109  *Gurule*, T.C. Memo 2015-61 at 8 (citing *Vinatieri v. Comm'r*, 133 T.C. 392, 400 (2009)).

110  *See* National Taxpayer Advocate 2013 Annual Report to Congress 84-93 (Most Serious Problem: *Hardship Levies: Four Years After the Tax Court's Holding in Vinatieri V. Commissioner, the IRS Continues to Levy on Taxpayers It Acknowledges Are in Economic Hardship and Then Fails to Release the Levies*).

In sum, the CDP hearing is a powerful tool for the taxpayer.  Further education of taxpayers about the importance of a full and complete administrative records as well as assignment of hearing officers  who have substantive knowledge of the area of tax law and are familiar with the facts and circumstances of a particular case will only strengthen protections for taxpayers intended by Congress.  Clarifying the interpretation of IRC § 6330(g) in accord with the *Thornberry* decision would go a long way in reaffirming important due process protections afforded to taxpayers and further the taxpayer *rights to challenge the IRS position and be heard*, *to appeal an IRS decision in an independent forum*, and *to a fair and just tax system.*

001912

**MLI #6**

# Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown As Tax on Return Under IRC § 6651(a)(2), and Failure to Pay Estimated Tax Penalty Under IRC § 6654

## SUMMARY

We reviewed 63 decisions issued by federal courts from June 1, 2014, to May 31, 2015, regarding the additions to tax for:

- Failure to file a tax return by the due date under Internal Revenue Code (IRC) § 6651(a)(1);
- Failure to pay an amount shown as tax on a return under IRC § 6651(a)(2); or
- Failure to pay installments of the estimated tax under IRC § 6654.[1]

The phrase "addition to tax" is commonly referred to as a penalty, so we will refer to these additions to tax as the failure to file penalty, the failure to pay penalty, and the estimated tax penalty. Eighteen cases involved the imposition of the estimated tax penalty in conjunction with the failure to file and failure to pay penalties; 44 involved the failure to file or failure to pay penalties; one case involved only the estimated tax penalty.

The IRS imposes the failure to file and failure to pay penalties unless the taxpayer can demonstrate the failure is due to reasonable cause and not willful neglect.[2] The estimated tax penalty is imposed unless the taxpayer can meet one of the statutory exceptions.[3] Taxpayers were unable to avoid a penalty in 59 of the 63 cases.

## TAXPAYER RIGHTS IMPACTED[4]

- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to a Fair and Just Tax System*

## PRESENT LAW

Under IRC § 6651(a)(1), a taxpayer who fails to file a return on or before the due date (including extensions) will be subject to a failure to file penalty of five percent of the tax due (minus any credit the taxpayer is entitled to receive and payments made by the due date) for each month or partial month the return is late. This penalty will accrue up to a maximum of 25 percent, unless the failure is due to reasonable cause and not willful neglect.[5] To establish reasonable cause, the taxpayer must show he or she

---

1   IRC § 6651(a)(3) imposes an addition to tax for failure to pay a tax liability not shown on a return.  However, because only a small number of cases involved this penalty, we did not include it in our analysis.

2   IRC §§ 6651(a)(1), (a)(2).

3   IRC § 6654(e).

4   *See* Taxpayer Bill of Rights *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

5   IRC §§ 6651(a)(1), (b)(1).  The penalty increases to 15 percent per month up to a maximum of 75 percent if the failure to file is fraudulent.  IRC § 6651(f).

exercised ordinary business care and prudence but was still unable to file by the due date.[6]  The failure to file penalty applies to income, estate, gift, employment, self-employment, and certain excise tax returns.[7]

The failure to pay penalty, IRC § 6651(a)(2), applies to a taxpayer who fails to pay an amount shown as tax on the return.  The penalty accrues at a rate of 0.5 percent per month on the unpaid balance for as long as it remains unpaid, up to a maximum of 25 percent of the amount due.[8]  When IRS imposes both the failure to file and failure to pay penalties for the same month, it reduces the failure to file penalty by the amount of the failure to pay penalty (0.5 percent for each month).[9]

The failure to pay penalty applies to income, estate, gift, employment, self-employment, and certain excise tax returns.[10]  The taxpayer will not be held liable if he or she can establish reasonable cause, *i.e.*, the taxpayer must show he or she has exercised ordinary business care and prudence but was still unable to pay by the due date, or that payment on that date would have caused undue hardship.[11]  Courts will consider "all the facts and circumstances of the taxpayer's financial situation" to determine whether the taxpayer exercised ordinary business care and prudence.[12]  In addition, "consideration will be given to the nature of the tax which the taxpayer has failed to pay."[13]

IRC § 6654 imposes a penalty on any underpayment of estimated tax by an individual or by certain estates or trusts.[14]  The law requires four installments per taxable year, each generally 25 percent of the required annual payment.[15]  The required annual payment is generally the lesser of 90 percent of the tax shown on the return for the current taxable year or 100 percent of the tax for the previous taxable year.[16]  The IRS will determine the amount of the penalty by applying the underpayment rate, according to IRC § 6621, to the amount of the underpayment for the applicable period.[17]

To avoid the penalty, the taxpayer has the burden of proving that one of the following exceptions applies:

- The tax due (after taking into account any federal income tax withheld) is less than $1,000;[18]

- The preceding taxable year was a full 12 months, the taxpayer had no liability for the preceding taxable year, and the taxpayer was a U.S. citizen or resident throughout the preceding taxable year;[19]

---

6   Treas. Reg. § 301.6651-1(c)(1).

7   IRC § 6651(a)(1).

8   IRC § 6651(a)(2).  Note that if the taxpayer timely files the return (including extensions) but an installment agreement is in place, the penalty will continue accruing at the lower rate of 0.25 percent rather than 0.5 percent of the tax shown.  IRC § 6651(h).

9   IRC § 6651(c)(1).  When both the failure to file and failure to pay penalties are accruing simultaneously, the failure to file will max out at 22.5 percent and the failure to pay will max out at 2.5 percent, thereby abiding by the 25 percent maximum limitation.

10  IRC § 6651(a)(2).

11  Treas. Reg. § 301.6651-1(c)(1).  Even when a taxpayer shows undue hardship, the regulations require him or her to also prove reasonable cause.

12  Treas. Reg. § 301.6651-1(c)(1).  See, *e.g.*, *East Wind Indus., Inc. v. U.S.*, 196 F.3d 499, 507 (3d Cir. 1999).

13  Treas. Reg. § 301.6651-1(c)(2).

14  IRC §§ 6654(a), (l).

15  IRC §§ 6654(c)(1), (d)(1)(A).

16  IRC § 6654(d)(1)(B).

17  IRC § 6654(a).

18  IRC § 6654(e)(1).

19  IRC § 6654(e)(2).

- The IRS determines that because of casualty, disaster, or other unusual circumstances, the imposition of the penalty would be against equity and good conscience;[20] or

- The taxpayer retired after reaching age 62 or became disabled in the taxable year for which estimated payments were required, or in the taxable year preceding that year, and the underpayment was due to reasonable cause and not willful neglect.[21]

In any court proceeding, the IRS has the burden of producing sufficient evidence that it imposed the failure to file, failure to pay, or estimated tax penalties appropriately.[22]

## ANALYSIS OF LITIGATED CASES

We analyzed 63 opinions issued between June 1, 2014, and May 31, 2015, where the failure to file penalty, failure to pay penalty, or estimated tax penalty was in dispute.  All but 14 of these cases were litigated in the United States Tax Court.  A detailed list appears in Table 6 in Appendix 3.  Twenty-three cases involved individual taxpayers and 40 involved businesses (including individuals engaged in self-employment or partnerships).  Last year, individual filers outnumbered businesses nearly two to one.

Of the 41 cases in which taxpayers appeared *pro se* (without counsel), taxpayers prevailed in full in one case, and six resulted in split decisions.  Of the 22 cases in which taxpayers had representation, taxpayers prevailed in full in three cases, and one was a split decision.

### Failure to File Penalty

One recurring basis for taxpayer success in IRC § 6651 litigation is IRS failure to meet its burden of production.  For example, in *Crawford v. Commissioner*, the IRS and the taxpayer stipulated that the taxpayer's return was timely filed.[23]  Despite this agreed upon stipulated fact, at the time of the trial, the IRS argued that the taxpayer failed to file his return timely.  However, the court noted that stipulations are treated as conclusive admissions by the parties.[24]  The court went on to note that it can relieve parties of a stipulation that is contrary to the record or if justice requires.[25]  The court did not ignore the stipulated fact in this case because it determined that it may have the effect of prejudicing the *pro se* taxpayer.  Because the IRS previously stipulated that the taxpayer filed his return timely, the IRS had not met its burden of production regarding the appropriateness of the failure to file penalty.  Consequently, the court held that the taxpayer was not liable for the failure to file penalty.

In most of the cases reviewed, taxpayers could not successfully establish that the failures to file were due to reasonable cause.  Circumstances suggesting reasonable cause are typically outside the taxpayer's control.[26]  Frequent reasonable cause claims included medical illness and reliance on an agent.

---

20  IRC § 6654(e)(3)(A).

21  IRC § 6654(e)(3)(B).

22  *Higbee v. Comm'r*, 116 T.C. 438, 446 (2001) (applying IRC § 7491(c)).  An exception to this rule relieves the IRS of this burden where the taxpayer's petition fails to state a claim for relief from the penalty (and therefore is deemed to concede the penalty). *Funk v. Comm'r*, 123 T.C. 213 (2004).

23  T.C. Memo. 2014-156.

24  *Crawford v. Comm'r*, T.C. Memo. 2014-156 (citing U.S. Tax Court Rules of Practice and Procedure, Rule 91(e), and *Chapman Glen Ltd. v. Comm'r*, 140 T.C. 294, 317 (2013)).

25  U.S. Tax Court Rules of Practice and Procedure (as Amended Through July 6, 2012), Rule 91(e): "Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties.  The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires."

26  *McMahan v. Comm'r*, 114 F.3d 366, 369 (2d Cir. 1997), *aff'g* T.C. Memo.1995–547.

### Medical Illness

Depending on the facts and circumstances, a medical illness may establish reasonable cause for failure to file, if the taxpayer can show incapacitation to such a degree that he or she could not file a return on time.[27]  When considering whether the severity of the illness suffices to establish reasonable cause, the court will analyze a taxpayer's management of his or her business affairs during the illness.[28]

In *Estate of Stuller v. United States*, the IRS assessed a failure to file penalty for the late filing of the taxpayers' (Mr. and Mrs. Stuller) 2003 individual income tax return.[29]  On August 27, 2009, Mrs. Stuller (in her capacity individually as well as the executor of Mr. Stuller's estate) fully paid the assessed failure to file penalty.  Mrs. Stuller then timely filed a claim for refund for the failure to file penalty.[30]  After Mrs. Stuller did not hear from the IRS within six months from the time the claim for refund was filed, she filed a refund suit claiming that the failure to file penalty should be refunded because the failure was due to reasonable cause.[31]

Mrs. Stuller claimed that she was prevented from filing timely tax returns by her inability to locate documents needed to file the 2003 return (*i.e.*, bank statements).  She claimed that this inability was due to her being disorganized as a result of extenuating circumstances.  More specifically, in early 2003, Mr. Stuller died in a fire, and Mrs. Stuller was hospitalized with pneumonia for several weeks.  Some tax records were lost in the fire while others were deposited in storage in unmarked boxes.  Mrs. Stuller testified that she experienced stress, depression, and chronic bronchitis following the fire.  The granddaughter they cared for also had health and behavioral problems following the death of Mr. Stuller that required additional care.  Further, the death of Mr. Stuller created additional work for Mrs. Stuller as trustee.

However, the court pointed out that Mrs. Stuller's 2002 tax return was timely filed in the year of the fire.  She actively ran a restaurant business during 2003, firing one director of operations and hiring another.  The new director testified that Mrs. Stuller was attentive to the necessary issues of the business and addressed any problems in a timely manner.  Additionally, Mrs. Stuller was involved in the reconstruction of her home and competed in several horse shows, which required a significant investment of time for training.

Moreover, Mrs. Stuller had not specified which tax records she could not locate when the search for them began or the length of time she looked.  The court remarked that because bank statements were the primary record used, Mrs. Stuller could have requested duplicate bank records but did not.[32]  The court found it had no basis on which to conclude that the taxpayer could not produce the necessary records in time to file the return and therefore held the taxpayer liable for the late filing of the 2003 return.  However, the court left open an avenue for an appeal, which Mrs. Stuller subsequently filed, by suggesting

---

27  *Williams v. Comm'r*, 16 T.C. 893, 905-06 (1951) (interpreting § 291 of the 1939 Code, a predecessor to IRC § 6651), *acq.*, 1951-2 C.B. 1.  *See, e.g., Harbour v. Comm'r*, T.C. Memo. 1991-532 (finding reasonable cause for failing to timely file because the taxpayer was in a coma the month before the due date of his tax return).

28  *Judge v. Comm'r*, 88 T.C. 1175, 1189-91 (1987).

29  55 F. Supp. 3d 1091 (C.D. Ill. 2014), *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015).

30  Under IRC § 6511(a), a taxpayer generally has within three years from the time the return was filed or two years from the time the tax was paid, whichever period expires the later, to file a claim for refund.

31  IRC § 6532(a)(1).  If a taxpayer has not received a response from the IRS regarding a claim for refund within six months from the time the refund claim was filed, the taxpayer can file a suit for refund in a United States District Court or the United States Court of Federal Claims.

32  *Estate of Stuller*, 55 F.Supp.3d at 1091, *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015).

that evidence of a futile search for the records for weeks or months prior to the tax filing deadline might be sufficient for reasonable cause, in conjunction with the other circumstances.[33]

### Reliance on Agent

The U.S. Supreme Court, in *United States v. Boyle*, held that taxpayers have a non-delegable duty to file a return on time.[34]  The Court noted that "[i]t requires no special training or effort to ascertain a deadline and make sure that it is met."[35]  Therefore, a taxpayer's reliance on an agent to file a return does not excuse any failure to comply with a known filing requirement.

For example, in *Specht v. United States*, Mrs. Specht (a co-fiduciary of the Escher estate), sought to recover penalties and interest in the amount of $1,198,261.38 imposed for failing to timely file the estate tax return and pay estate taxes.[36]  Mrs. Specht, a 73-year-old high school-educated homemaker and the cousin of the deceased, was asked to be executor of the estate and formally accepted this role in February 2009. She hired Ms. Escher's former attorney, Mary Backsman, who had over 50 years of experience in estate planning, to represent the estate.  Unknown to Mrs. Specht, Ms. Backsman was fighting brain cancer.

Ms. Backsman informed Mrs. Specht that the federal estate tax return was due by September 30, 2009, though she did not file it by that date.  Additionally, Ms. Backsman failed to arrange for an agreed upon sale of stock to pay off the estate tax and lied to Mrs. Specht about it.  She failed to file a first accounting of assets for the estate, missed probate deadlines, lied to Mrs. Specht about filing an extension, failed to file state estate tax returns, and failed to file the federal estate tax return.  Ms. Backsman lied repeatedly about her handling of the situation.  After discovering that Ms. Backsman had failed to request sale of the stock, Mrs. Specht fired her and hired another attorney on November 1, 2010.  The estate filed a malpractice suit against Ms. Backsman that was settled.

Despite the above failures on the part of Ms. Backsman, the court determined that Mrs. Specht's reliance on her was unjustified.  First, Mrs. Specht could not confirm if she had timely completed her listed obligations as a fiduciary and showed no concern about that duty.  She stated in testimony that she was unsurprised Ms. Backsman had missed the filing deadline.  She took no steps to proceed with the sale of stock before the deadline and received numerous warnings that Ms. Backsman was missing filing dates. Mrs. Specht did not attend probate hearings prior to the filing deadline.  She received four notices from the probate court before the deadline, warning that Ms. Backsman was not performing her duties and that she had missed deadlines.  After the deadline for filing the federal estate tax return had passed, Mrs. Specht received two more notices and was contacted in July and September 2010 by another client of Ms. Backsman, who warned her that Ms. Backsman was incompetent.  In August 2010, she received a letter from the Ohio Department of Taxation alerting her that Ms. Backsman had not responded to their inquiries, and it could impose penalties.  Lastly, in September 2010, she contacted an attorney who told her she needed to replace Ms. Backsman.

The court noted the precedent of *United States v. Boyle*, which established a distinction between relying on an attorney for legal advice and relying on an attorney to file tax returns, a non-delegable duty which

---

33  *Estate of Stuller v. U.S.*, *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015).

34  *U.S. v. Boyle*, 469 U.S. 241 (1985).

35  *Id.* at 252.

36  *Specht v. U.S.*, 115 A.F.T.R.2d (RIA) 357 (S.D. Ohio 2015), *appeal docketed*, No. 15-3095 (6th Cir. Feb. 6, 2015).

requires no particular expertise.[37]  "'Ordinary care and prudence' requires more than mere delegation."[38]  The court also cited *Valen Mfg. Co. v. United States*, where a corporation's reliance on a bookkeeper who actively concealed a failure to file, did not establish reasonable cause.[39]  This court clearly felt constrained by precedent, noting that while Ohio had refunded the estate tax penalties after the malpractice suit, it was "truly unfortunate that the United States did not follow the State of Ohio's lead."[40]

A taxpayer may establish reasonable cause for a failure to file if he or she can prove reasonable reliance on a professional tax advisor's substantive legal advice.[41]  To reasonably rely on the advice of a tax professional, the taxpayer must present evidence of the professional's expertise and show he or she provided the professional with all necessary and accurate information.[42]

In *Cavallaro v. Commissioner*, the IRS issued a notice of deficiency to Mr. and Mrs. Cavallaro, determining a liability for the addition to tax under IRC § 6651(a)(1) in the amount of $29.6 million for the failure to file gift tax returns.[43]  The court held that the IRS showed the additions to tax were applicable but sustained the Cavallaros' defenses of "reasonable cause."

Mr. and Mrs. Cavallaro had little to no advanced education, including no formal accounting, legal, or business education.  They hired *advisers* who were competent professionals with sufficient expertise to justify reliance.  They engaged professionals from a well-known accounting firm and a well-known law firm to structure the tax-free merger of their S corporation, Knight Tool Co., with their sons' S corporation, Camelot Systems, Inc.  The merger transaction was eventually structured according to the advice given by the Cavallaros' attorney.  Under this advice, it was determined that rights to technology developed by Knight Tool Co. (*i.e.*, a computer-controlled liquid dispensing machine known as CAM/ALOT) were previously transferred to Camelot Systems, Inc. prior to the merger and therefore could not be gifted to Camelot Systems, Inc. at the time of the merger.

The court found that taxpayers had reasonably relied upon their advisors.  They had no formal legal, accounting, or business education and had hired competent professionals.  Those professionals had

---

37  *Specht v. U.S.*, 115 A.F.T.R.2d (RIA) 357 (S.D. Ohio 2015) (citing *U.S. v. Boyle*, 469 U.S. 241 (1985)).

38  *Id.*  (quoting *In re Carlson*, 126 F.3d 915, 922 (7th Cir.1997)).

39  *Id.*  (S.D. Ohio 2015) (citing *Valen Mfg. Co. v. U.S.*, 90 F.3d 1190 (6th Cir.1996)).

40  *Id.*  115 A.F.T.R.2d (RIA) 357 (S.D. Ohio 2015), *appeal docketed*, No. 15-3095 (6th Cir. Feb. 6, 2015).

41  *Estate of La Meres v. Comm'r*, 98 T.C. 294, 315-17 (1992) (citations omitted).

42  *Id.*  In her Annual Reports to Congress, the National Taxpayer Advocate has emphasized the need for minimum competency standards for paid unenrolled return preparers.  See National Taxpayer Advocate 2013 Annual Report to Congress 61-74 (Most Serious Problem: *Regulation of Return Preparers: Taxpayers and Tax Administration Remain Vulnerable to Incompetent and Unscrupulous Return Preparers While the IRS Is Enjoined From Continuing Its Efforts to Effectively Regulate Unenrolled Preparers*); National Taxpayer Advocate 2009 Annual Report to Congress 41-69 (Most Serious Problem: *The IRS Lacks a Servicewide Return Preparer Strategy*); National Taxpayer Advocate 2008 Annual Report to Congress 504-12 (Most Litigated Issue: *Accuracy-Related Penalty Under Internal Revenue Code Sections 6662(b)(1) and (2)*).  In June 2014, the IRS announced that it would be offering a new voluntary program designed to encourage education and filing season readiness for such preparers.  This program allows unenrolled return preparers to obtain a record of completion when they voluntarily complete a required amount of continuing education, including a course in basic tax return filing issues and updates, ethics, and other federal tax law courses.  Tax return preparers who elect to participate in the program and receive a record of completion from the IRS are included in a database on irs.gov to help taxpayers determine return preparer qualifications.  *See* IRS Press Release, *New IRS Filing Season Program Unveiled for Tax Return Preparers*, IR-2014-75 (June 26, 2014); Rev. Proc. 2014-42, 2014-29 I.R.B. 192.  The American Institute of Certified Public Accountants (AICPA) filed suit in the District Court for the District of Columbia, alleging that the IRS lacks the authority to implement the voluntary program.  The government subsequently filed a motion to dismiss.  On October 27, 2014, the District Court for the District of Columbia granted the IRS's motion to dismiss.  On December 16, 2014, the AICPA filed an appeal with the Court of Appeals for the District of Columbia that has not yet been decided.  *AICPA v. IRS*, 114 A.F.T.R.2d (RIA) 6451 (D.D.C. 2014), *appeal docketed*, No. 14-5309 (D.C. Cir. Dec. 16, 2014).

43  *Cavallaro v. Comm'r*, T.C. Memo. 2014-189, *appeal docketed*, No. 15-1368 (1st Cir. Mar. 24, 2015).

001918

explicitly considered the relevant issue.  Citing *Boyle*, the court noted that taxpayers are not required to challenge an attorney's tax advice to satisfy ordinary business care and prudence.[44]  The court found the Cavallaros had provided accurate and necessary information to their advisors.  They had relied sufficiently upon the advisors, and their tax positions were not attributable to themselves but to their advisors.  The court concluded that the Cavallaros had reasonable cause for not filing a gift tax return and were not liable for the failure to file penalty.

### *"Zero Return" Filers and Other Frivolous Arguments*

Under the longstanding four-part test articulated in *Beard v. Commissioner*,[45] a valid return must:

1. Contain sufficient data to calculate the tax liability;

2. Purport to be a return;

3. Represent an honest and reasonable attempt to satisfy the requirements of the tax laws; and

4. Be signed under penalties of perjury.

Each year, some taxpayers claim they have no obligation to pay taxes by filing returns reporting zero income when they have earned substantial wages that were accurately reported on a Form W-2.  A "zero" return does not constitute a tax return under the *Beard* test because it is devoid of financial data and lacks sufficient information to calculate the tax liability.[46]  Thus, when the taxpayers in *Waltner v. Commissioner* filed a return containing zeros for taxable income and total tax, the court upheld the failure to file penalty against the husband and wife.[47]

### Failure to Pay an Amount Shown Penalty

A taxpayer can file a return by the due date and still be liable for a penalty under IRC § 6651(a)(2) if the amount shown on the return is not timely paid.  In cases where individual taxpayers disputed that they were subject to the failure to pay penalty, many of their arguments for reasonable cause were similar to those used for the failure to file penalty under IRC § 6651(a)(1).  The taxpayers often unsuccessfully argued medical illness or reliance on an agent or failed to make a separate and distinct argument relevant to the failure to pay.[48]

However, a taxpayer can prevail on the failure to pay penalty when the IRS cannot meet its burden of production under IRC § 7491(c).  Specifically, the IRC § 6651(a)(2) penalty applies only when the taxpayer's filed return shows an amount due.[49]  If the taxpayer did not file a return, the IRS can only assess the penalty if it has introduced a Substitute for Return (SFR) that satisfies the requirements of IRC § 6020(b).  If the IRS cannot produce the SFR, it fails to meet its burden of production under IRC § 7491.[50]

---

44   *Cavallaro v. Comm'r*, T.C. Memo. 2014-189 (citing *U.S. v. Boyle*, 469 U.S. 241 (1985)).

45   82 T.C. 766, 777 (1984), *aff'd per curiam*, 793 F.2d 139 (6th Cir. 1986).

46   *See Cabirac v. Comm'r*, 120 T.C. 163 (2003).  *See also U.S. v. Moore*, 627 F.2d 830, 835-36 (7th Cir.1980); *Turner v. Comm'r*, T.C. Memo. 2004-251.

47   *Waltner v. Comm'r*, T.C. Memo. 2014-133.

48   *See, e.g., Central Motorplex, Inc. v. Comm'r*, T.C. Memo. 2014-207 (reliance on agent); *Akey v. Comm'r*, T.C. Memo. 2014-211 (medical illness); *U.S. v. Chelsea Brewing Co., LLC*, 114 A.F.T.R.2d (RIA) 5348 (S.D.N.Y. 2014) (financial hardship); *Villegas v. Comm'r*, T.C. Memo. 2015-33 (taxpayer offered "same excuses" for failure to pay as for failure to file); *Sodipo v. Comm'r*, T.C. Memo. 2015-3 (inability to file a tax return not reasonable cause for failure to pay), appeal docketed, No. 15-2089 (4th Cir. Sept. 16, 2015).

49   IRC §§ 6651(a)(2), (g)(2).

50   *See Wheeler v. Comm'r*, 127 T.C. 200, 210 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

001919

For example, in *El v. Commissioner*, the taxpayer failed to file a return and pay taxes for 2009.[51]  The IRS determined a deficiency and imposed penalties under IRC §§ 6651(a)(1) and (2) for failure to file and failure to pay.

To impose the failure to pay penalty in the case, the IRS was required to introduce an SFR, because the taxpayer did not file an original return for 2009.[52]  The IRS conceded that it failed to meet its burden of production, as an SFR had not been introduced into evidence.  On that basis, the court held the taxpayer not liable for the IRC § 6651(a)(2) failure to pay penalty.

### Estimated Tax Penalty

Courts routinely found taxpayers liable for the IRC § 6654 estimated tax penalty when the IRS proved the taxpayer:

- Had a tax liability;
- Had no withholding credits;
- Made no estimated tax payments for that year; and
- Offered no evidence to refute the IRS.

The IRS has the burden of production under IRC § 7491(c) to produce evidence that a taxpayer was required to make an annual payment under IRC § 6654(d)(1)(B).

For example, in *Muncy v. Commissioner*, the taxpayer, who worked at a tire store, failed to file income tax returns and pay estimated taxes for tax years 2000 through 2005.[53]  He insisted on halting his tax withholding and claimed the status of independent contractor though no aspect of his job was altered.  A third-party entity would receive his wages and disburse them to the taxpayer's trusts or nominee accounts. The entity receiving his wages did not issue him Forms W-2, 1099, or any other forms for the income distributions, at his instruction.  In 2010, he pleaded guilty to one criminal count of willfully attempting to evade income taxes for 2004.  The taxpayer was placed on probation by the court and was required to file income tax returns as a condition of his probation.[54]  In 2011, the IRS sent a notice of deficiency for tax years 2000 through 2005, which included estimated tax penalties under IRC § 6654.

In regard to the estimated tax penalty imposed, the court noted that the IRS burden of production requires evidence that there was a "required annual payment" under IRC § 6654(d)(1)(B).  The required annual payment is the lesser of: (1) 90 percent of the reported tax for that year (or the tax due, if no return is filed), or (2) 100 percent of the tax shown on the return for the immediately preceding taxable year.[55]  In situations where there was no return filed for the preceding year, the second clause is ignored.[56]  Thus, the taxpayer's required payment in this case was 90 percent of the tax due, as determined by the IRS, for each of the tax years 2001 through 2005.  For 2000, the IRS was obligated to introduce the tax return filed in 1999 so that the court could calculate the required annual payment from the lesser of the

---

51   *El v. Comm'r*, 144 T.C. No. 9 (2015).

52   *See* IRC §§ 6651(g), 6020(b); *Cabirac v. Comm'r*, 120 T.C. 163, 170 (2003).

53   *Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015).

54   *U.S. v. Muncy*, No. 4:10-cr-00018-BSM (E.D. Ark. filed Jan. 8, 2010).

55   IRC § 6654(d)(1)(B).

56   *Id.*

001920

Case 6:24-cv-00306-JCB Document 124 Filed 07/07/24 Page 1928 of 4699 PageID #: 5093

Appendices | Most Serious | Most Litigated | Legislative | Research and Related | Case and Systemic
Problems | Issues | Recommendations | Studies | Advocacy

two amounts under IRC § 6654(d)(1)(B).[57] As that return was not provided, the court was unable to conclude that there was a required annual payment for 2000. It held the taxpayer liable for the failure to pay estimated tax penalty for the years 2001 through 2005, but not for 2000.

A similar issue arose in *United States v. Nichols*, where the taxpayers filed "zero returns."[58] A zero return is filed with the IRS but erroneously lists zero as the amount of tax due. It is not considered a valid return as there was no honest intent to provide the required information.[59] The IRS provided Forms 4340, *Certificate of Assessments, Payments, Other Specified Matters*, instead of SFRs to the court. The court held these as sufficient to impose the failure to file penalties but not for the failure to pay estimated tax penalties. Because the IRS calculates the required annual payment under IRC § 6654 using the tax due as reported by the taxpayer on his return, the estimated payment for the taxpayers' zero returns was zero.[60]

### Penalty for Raising Frivolous Arguments

In four cases where the IRS had asserted either the failure to file penalty, failure to pay penalty, estimated tax penalty, or some combination thereof, the courts also imposed the IRC § 6673 penalty for making frivolous arguments.[61] In general, the courts are hesitant to impose this penalty without prior warning and in seven cases this period, the courts warned the taxpayers against making future frivolous arguments.[62]

In *Rader v. Commissioner*, the taxpayer did not report income from his plumbing business and did not file tax returns for five years.[63] The taxpayer argued that he was not legally required to file a return and that SFRs were not valid for purposes of a failure to pay penalty. He also claimed a Fifth Amendment privilege against self-incrimination. The court rejected these claims as meritless. A frivolous position is one contrary to established law and unsupported by a reasoned argument for change in the law.[64] At the conclusion of the trial, the court invoked the IRC § 6673(a)(1) penalty for frivolous arguments and held the taxpayer liable for a $10,000 penalty. Penalties for failure to file, failure to pay, and failure to pay estimated tax were also upheld.

### CONCLUSION

The IRS did not prevail in full in 11 of 63 (or 17 percent) of the failure to file, failure to pay, and the estimated tax penalty cases analyzed in this report. Considering the limited resources most taxpayers have when litigating a case against the IRS, and the immense resources possessed by the IRS, a 17 percent success rate seems unexpectedly high. This is similar to the prior year, when the IRS did not prevail in 13 percent of cases.[65] In the cases the IRS lost, the most common problem was the IRS's failure to meet its burden of production.

---

57   *See Wheeler v. Comm'r*, 127 T.C. 200, 211–12 (2006) (requiring evidence of the prior year's return to determine the required annual payment).

58   *U.S. v. Nichols*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015).

59   *See Cabirac v. Comm'r*, 120 T.C. 163 (2003).

60   *U.S. v. Nichols*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015) (citing *Linmar Prop. Mgmt. Trust v. Comm'r*, T.C. Memo. 2008-219 (2008)).

61   *See Most Litigated Issue: Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions*, *infra*.

62   *See, e.g., Kernan v. Comm'r*, T.C. Memo. 2014-228 (imposing no IRC § 6673 penalty on a taxpayer who believed he was not required to file a return unless personally invited to file), *appeal docketed*, No. 15-70574 (9th Cir. Feb. 25, 2015).

63   *Rader v. Comm'r*, 143 T.C. 376 (2014).

64   *Goff v. Comm'r*, 135 T.C. 231, 237 (2010).

65   National Taxpayer Advocate 2014 Annual Report to Congress 495.

It is critical that IRS employees look closely and thoroughly at the case facts when assessing reasonable cause claims rather than solely relying on the Reasonable Cause Assistant (RCA) software,[66] which is designed to help IRS employees make fair and consistent abatement determinations.[67]  The RCA program allows IRS employees to override the results in certain circumstances, but employees must understand the definition of reasonable cause to apply the override.[68]  Thus, a close review by an employee is essential to ensure the failure to file penalty or the failure to pay penalty is imposed appropriately.  To promote voluntary compliance and to uphold a taxpayer's *right to a fair and just tax system* and the *right to pay no more than the correct amount of tax*, the facts of taxpayers' individual cases must be carefully considered.

---

66   The Reasonable Cause Assistant can only consider failure to file or failure to pay penalties for certain individual tax returns, and the failure to deposit penalty only for certain business returns.

67   National Taxpayer Advocate 2010 Annual Report to Congress 198 (Most Serious Problem: *The IRS's Over-Reliance on Its "Reasonable Cause Assistant" Leads to Inaccurate Penalty Abatement Determinations*).  *See also* IRS, *Reasonable Cause Assistant (RCA) Usability Test Final Report Summary* 4 (May 28, 2010).  The test showed that employees using the RCA determined penalty abatement requests correctly in only 45 percent of the cases.  An even more disturbing finding was that all of the employees in the study believed they were making correct legal determinations based on reasonable cause.

68   IRM 20.1.1.3.6.10(3) (Nov. 25, 2011) ("[F]air and consistent application of penalties requires employees to make a final penalty relief determination consistent with the RCA conclusion … [U]nderstanding that the individual facts and circumstances vary for each case and that there may be unique facts and circumstances in certain cases that RCA cannot consider, an 'override (abort)' function is available in RCA.").

001922

## Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

### SUMMARY

Internal Revenue Code (IRC) § 7403 authorizes the United States to file a civil action in U.S. District Court against a taxpayer who has refused or neglected to pay any tax, to enforce a federal tax lien, or subject any of the delinquent taxpayer's property to the payment of tax.  We identified 44 opinions issued between June 1, 2014, and May 31, 2015, that involved civil actions to enforce liens under IRC § 7403.  The IRS prevailed in 40 of these cases.  The total number of cases represents an approximate 15 percent decrease from the previous year.[1]

### TAXPAYER RIGHTS IMPACTED[2]

- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to Finality*
- *The Right to Privacy*
- *The Right to a Fair and Just Tax System*

### PRESENT LAW

IRC § 7403 authorizes the United States to enforce a federal tax lien with respect to a taxpayer's delinquent tax liability or to subject any property, right, title, or interest in property of the delinquent taxpayer to the payment of a liability, by initiating a civil action against the taxpayer in the appropriate United States District Court.[3]  All parties having liens on or otherwise claiming interest in the relevant property shall be made parties to the action.[4]  The law of the state where the property is located determines the nature of a taxpayer's legal interest in the property.[5]  However, if it is determined that the taxpayer has an interest in the property, federal law controls whether the property is exempt from attachment of the lien.[6]

The court may order an officer of the court to sell the property and apply the proceeds to the delinquent tax liability.[7]  However, based on the Supreme Court case *United States v. Rodgers*, the court is not required to authorize a forced sale and may exercise limited equitable discretion.[8]  When a forced sale involves the interests of a non-delinquent third party, the court should consider four factors from *Rodgers* when determining whether the property should be sold:

1. The extent to which the government's financial interests would be prejudiced if they were relegated to a forced sale of the partial interest of the delinquent taxpayer;

---

1   National Taxpayer Advocate 2014 Annual Report to Congress 503.
2   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
3   IRC § 7403(a); Treas. Reg. § 301.7403-1(a).
4   IRC § 7403(b).
5   *U.S. v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985).
6   *U.S. v. Rodgers*, 461 U.S. 677 (1983).
7   IRC § 7403(c).
8   461 U.S. 677 (1983).

2. Whether the innocent third party with a separate interest in the property, in the normal course of events, has a legally recognized expectation that the property would not be subject to a forced sale by the delinquent taxpayer or taxpayer's creditors;

3. The likely prejudice to the third party in personal dislocation costs and inadequate compensation; and

4. The relative character and value of the non-liable and liable interests held in the property.[9]

At the sale of the property in which it holds a first lien, the United States may bid an amount equal to or less than the amount of the lien, plus selling expenses.[10] Additionally, the United States may intervene in foreclosure actions initiated by other creditors to assert any lien on the property that is the subject of such action.[11]

The United States may also remove the case to a U.S. District Court if the case was initiated in a state court.[12] However, junior federal tax liens may be effectively extinguished in a foreclosure and sale under state law, even if the United States is not a party to the proceeding.[13] The IRC specifically authorizes the court to appoint a receiver to enforce the lien and upon the government's certification that it is in the public interest, to appoint a receiver with all powers of a receiver in equity to preserve and operate the property prior to the sale.[14]

In 2015, the IRS issued an updated Internal Revenue Manual (IRM) incorporating the interim guidance detailing the procedures the IRS should use when referring cases to the Department of Justice (DOJ) when seeking to recommend a suit to foreclose on a taxpayer's principal residence.[15] When a tax lien attaches to the principal residence of a taxpayer or a residence owned by the taxpayer but occupied by the taxpayer's spouse, former spouse, or minor child, the IRS can use two methods to enforce the tax lien. The IRS can request that the DOJ:

- File suit to foreclose the federal tax lien against the principal residence under IRC § 7403; or

- Commence a proceeding to obtain a court order allowing administrative seizure of a principal residence under IRC § 6334(e)(1).[16]

---

9   461 U.S. 677 (1983) at 709-11.

10  IRC § 7403(c).

11  However, if the application of the United States to intervene is denied, the adjudication will have no effect upon the federal tax lien on the property.  IRC § 7424.  Under 28 U.S.C. § 2410, the United States may be named a party in any civil action or suit in any district court, or in any state court having jurisdiction of the subject matter.  IRC § 7424.

12  28 U.S.C. § 1444.

13  *U.S. v. Brosnan*, 363 U.S. 237 (1960).

14  IRC §§ 7403(d) and 7402(a).

15  IRM 5.17.4.8.2.5, *Lien Foreclosure on a Principal Residence* (Mar. 30, 2015).  This updated IRM is the result of action by TAS leadership.  In 2012, TAS Systemic Advocacy developed and issued to the IRS an Advocacy Proposal recommending that the IRS consider the negative impact on the taxpayer of a suit to foreclose on a principal residence prior to forwarding the case to the DOJ.  TAS, *Memorandum for Director, Collection Policy* (Aug. 20, 2012).  The National Taxpayer Advocate followed this advocacy proposal with a legislative recommendation that Congress amend IRC § 7403 to require that the IRS, before recommending that the Attorney General file a suit to foreclose, first determine whether the taxpayer's other property or rights to property, if sold, are insufficient to pay the amount due, and that the foreclosure and sale of the residence will not create an economic hardship due to the financial condition of the taxpayer.  National Taxpayer Advocate 2012 Annual Report to Congress 537-43 (Legislative Recommendation: *Amend IRC § 7403 to Provide Taxpayer Protections Before Lien Foreclosure Suits on Principal Residences*).  Following this recommendation, Systemic Advocacy consulted extensively with the IRS to develop an Internal Guidance Memorandum.  *See* IRS Interim Guidance Memorandum SBSE-0413-035 (Apr. 30, 2013).  This guidance was later reissued in IRS Interim Guidance Memorandum SBSE-0414-0032 (Apr. 18, 2014).

16  IRC § 6334(e)(1) requires that the IRS obtain court approval prior to administratively seizing a principal residence.

001924

Prior to the interim guidance, IRM provisions related to referring a case to the DOJ for administrative seizure of a principal residence under IRC § 6334(e)(1) required the IRS to consider who is living in the residence and to verify if economic hardship currently exists (or would be created by the seizure) in determining whether referral was appropriate, but not if the IRS was referring the matter to the DOJ for a foreclosure suit under IRC § 7403.[17]  The updated IRM states that the IRS would refer a case to DOJ to pursue a suit to foreclose only when there are no reasonable administrative remedies and hardship issues.  The IRM now requires the suit recommendation narrative to contain the results of the following actions:

- Attempt to personally contact the taxpayer and inform them that a suit to foreclose the tax lien on the principal residence is the next planned action;

- Attempt to identify the occupants of the principal residence;

- Discuss administrative remedies with the taxpayer such as an offer in compromise (including Effective Tax Administration offer or an offer with consideration of special circumstances);

- Advise the taxpayer about TAS, provide Form 911, *Request for Taxpayer Advocate Assistance (and Application for Taxpayer Assistance Order)*, and explain its provisions;[18] and

- Include a summary statement in the case history, along with the information on the taxpayer and the occupants of the principal residence including children.[19]

### ANALYSIS OF LITIGATED CASES

We reviewed 44 opinions issued between June 1, 2014, and May 31, 2015 that involved civil actions to enforce federal tax liens.  Table 7 in Appendix 3 contains a detailed list of those cases.  Forty-one percent of the taxpayers appeared *pro se*, and 59 percent were represented.  Taxpayers with representation received full relief in three cases and partial relief in one case.  *Pro se* taxpayers did not receive full or partial relief in any cases.

### Foreclosure of Tax Liens Against Property With Non-Liable Spouse

In *Cardaci v. United States*,[20] a husband and wife purchased a residence as joint tenants by the entirety in 1978.  The home was the only real property owned by the taxpayers (Mr. and Mrs. Cardaci) and had been their marital residence since the purchase.  The United States filed suit to foreclose the tax lien on the taxpayers' residence to satisfy, in whole or in part, the taxes assessed against Mr. Cardaci for unpaid employment taxes his business owed.  Mr. Cardaci's business had failed to remit withheld payroll taxes to the IRS for tax year 2000 and one-quarter of tax year 2001 while simultaneously paying its employees and suppliers.

The court held a bench trial to determine if it should exercise its discretion and declined to order the foreclosure sale of the residence.  Since the wife was a non-liable third party, the court applied the *Rodgers* factors to determine whether foreclosure of the tax lien on the residence was appropriate.[21]  The court

---

17   *Cf.* IRM 5.10.2.18(5) (Aug. 4, 2015), IRM 5.10.2.19(1) 5.10.2.19(1) (Aug. 4, 2014) and IRM 5.17.4.8.2.5, *Lien Foreclosure on a Principal Residence* (Mar. 30, 2015).

18   If the taxpayer indicates that the planned foreclosure of the principal residence would create a hardship, the Revenue Officer (RO) is instructed to assist the taxpayer with the preparation of Form 911 and should forward the form to the local TAS office if the RO cannot or will not provide the requested relief.

19   IRM 5.17.4.8.2.5, *Lien Foreclosure on a Principal Residence* (Mar. 30, 2015).

20   114 A.F.T.R.2d (RIA) 6744 (D.N.J. 2014), *appeal docketed*, No. 14-4237 (3d Cir. Oct. 27, 2014).

21   *Id.*  For discussion of the *Rodgers* factors, see Present Law section, *supra*.

001925

considered all factors and found that the factor concerning the value of liable and non-liable interests weighed substantially in favor of not forcing a sale of the property.

The government argued Mr. and Mrs. Cardaci's interests in the property were equal (50/50) because they both were roughly the same in age and owned a half interest. The court rejected that argument and instead found the valuation was more complicated as it had to take into account the value of Mrs. Cardaci's right to survivorship. The court reasoned that the Cardacis owned the property as tenants by the entirety, and as such, each spouse was a tenant in common with the other spouse during the joint lives of the couple. A forced sale would sever the tenancy much like a divorce decree or voluntary sale. However, in such situations, the division of the proceeds would occur after the spouses freely surrendered their survivorship interest. In this case the tenancy had not yet been severed, and Mrs. Cardaci had not surrendered the equivalent of a life estate nor her right to withhold consent of the sale. Thus, the valuation of her interest was deemed more complicated than in a divorce case because it had to account for the value of her survivorship interest. Accordingly, the court agreed that Mrs. Cardaci's right of survivorship had value and determined that the government would only be entitled to 14 percent of the sale price of the home, amounting to only a little over $14,000 for the government after expenses.[22] The court further determined that this result would be nominal compared to Mr. Cardaci's tax debt of over $80,000. It ordered the Cardacis to pay one-half of the fair market rental value of their home every month until the tax debt was satisfied. In the event that Mr. Cardaci survives Mrs. Cardaci, the court held that the government could then seek the forced sale of the residence to satisfy any remaining portion of the tax debt.[23]

In *United States v. Baker*,[24] the United States filed suit to foreclose tax liens on two parcels of land located in New Hampshire to satisfy in part the delinquent tax liabilities of the taxpayer, Scott Baker. The taxpayer married Robin Baker in 1998. In 2000, the taxpayer and his wife purchased the property the government sought to foreclose as joint tenants with the rights of survivorship. In 2008, the couple divorced. Pursuant to the divorce judgment, the taxpayer's wife was awarded the properties in question. The divorce judgment required the judgment and deed transferring the properties be recorded. However, neither the taxpayer nor the taxpayer's wife ever recorded the deeds or the judgment. In 2009, the IRS made assessments against the taxpayer and filed a Notice of Federal Tax Lien.

The government argued in the foreclosure proceeding that the tax lien for the taxpayer's liabilities attached to the properties that the wife, a non-liable third party, received pursuant to the divorce. The government claimed that its tax liens are "entitled to priority over the divorce judgment because neither the judgment nor any related deed was ever recorded."[25]

The court applied New Hampshire state law which provides that an undivided interest in real estate, apportioned by a divorce judgment, vests in the grantee spouse "by the mere force of the decree."[26] Thus, the court ruled against the government holding that the taxpayer had no rights to the properties to which the tax lien could attach. The court found that the taxpayer lost his right to own, transfer, or encumber the properties when the divorce judgment became final.

---

22   *U.S. v. Cardaci*, 114 A.F.T.R.2d (RIA) 6744 (D.N.J. 2014), *appeal docketed*, No. 14-4237 (3d Cir. Oct. 27, 2014).
23   *Id.*
24   *U.S. v. Baker*, 114 A.F.T.R.2d (RIA) 5772 (D.N.H. 2014).
25   *Id.*
26   The *Baker* court cited *Swett v. Swett*, 49 N.H. 264, 264 (1870) (quoting *Whittier v. Whittier*, 31 N.H. 452, 458-59 (1855)).

001926

512    Most Litigated Issues — Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

### Foreclosure of Tax Liens Against Property Held by a Taxpayer's Nominee or Alter Ego

At least 13 opinions identified this year involved foreclosure of federal tax liens against property titled in the name of a taxpayer's nominee or alter ego.  A nominee is one "who holds bare legal title to property for the benefit of another."[27]  Courts typically look at a number of factors to determine whether an entity is a nominee of a taxpayer, such as whether:

- The nominee paid no or inadequate consideration;

- The property was placed in the name of the nominee in anticipation of the tax debt or litigation;

- There is a close relationship between the transferor and the nominee;

- The parties to the transfer never recorded the conveyance;

- The transferor retained possession (or control); and

- The transferor continues to enjoy the benefits of property.[28]

For example, in *United States v. Jones*,[29] the court held the trust set up by the taxpayer was the nominee of the taxpayer.  The court based this conclusion on the fact that the taxpayer admitted he had "full use, enjoyment, and control over the subject property," which included residing there, renting out the property and receiving the rents, and paying all utilities and taxes associated with the property.[30]  Since Jones' transfer to the trust was invalid because the trust served as the taxpayer's nominee, the court found the title to the property was in the name of the taxpayer, and therefore, the United States was entitled to foreclose its lien on the property.

In *United States v. O'Shea*,[31] the court determined that married taxpayers who had dealings with a trust promoter convicted of tax evasion crimes held their properties in sham trusts.  The court considered the totality of circumstances, finding that the taxpayers exercised control over the parcels of land when the properties were held by the trusts.

The factors weighing in favor of a determination of control were the inadequate consideration received for the conveyance of the property and the taxpayers continuing to enjoy the benefits of ownership, including using the properties for their residence and their business and paying all the property expenses.  As the property was held by nominees or alter egos of the taxpayers, the United States was entitled to foreclose on the four parcels of land.  The court ordered the sham trusts be set aside and disregarded for tax purposes.  In a subsequent appeal of this case, the U.S. Court of Appeals for the 4th Circuit affirmed the U.S. District Court for the Southern District of West Virginia in favor of the government.[32]

### CONCLUSION

In the 2012 Annual Report to Congress, we anticipated an increase in court opinions involving lien enforcement in the coming years because the number of cases IRS referred to the DOJ spiked from 204

---

27  Bʟᴀᴄᴋ's Lᴀᴡ Dɪᴄᴛɪᴏɴᴀʀʏ (10th ed. 2014), *available at* http://westlaw.com.  *See also U.S. v. Sabby*, 113 A.F.T.R.2d (RIA) 1335 (D. Minn. 2014) (quoting *Scoville v. U.S.*, 250 F.3d 1198, 1202 (8th Cir. 2001)).

28  *See, e.g., U.S. v. Jones*, 114 A.F.T.R.2d (RIA) 6126 (D. Wyo. 2014) (quoting *Holman v. U.S.*, 505 F.3d 1060, 1065 (10th Cir. 2007)); *U.S. v. Sabby*, 113 A.F.T.R.2d (RIA) 1335 (D. Minn. 2014) (quoting *Scoville v. U.S.*, 250 F.3d 1198, 1202 (8th Cir. 2001)).

29  114 A.F.T.R.2d (RIA) 6126 (D. Wyo. 2014).

30  *Id.*

31  *U.S. v. O'Shea*, 115 A.F.T.R.2d (RIA) 887 (S.D.W. Va. 2015), *aff'd by* 116 A.F.T.R.2d (RIA) 5389 (4th Cir. 2015).

32  *U.S. v. O'Shea*, 116 A.F.T.R.2d (RIA) 5389 (4th Cir. 2015).

001927

in fiscal year (FY) 2011 to 278 in FY 2012.[33]  While there was a marked increase in lien enforcement opinions issued in reporting year 2014, from 33 in 2013 to 52 in 2014, the number of opinions issued this year fell to 44.[34]  It is unclear whether the 2014 increase in the number of litigated cases was directly related to a greater number of cases referred to DOJ in FY 2012.  The number of referrals decreased to 215 in FY 2013, and slightly fluctuated thereafter, with 211 cases referred in FY 2014 and 217 in FY 2015, as shown on Figure 3.7.1 below.[35]

**FIGURE 3.7.1, The Number of Cases Referred to the DOJ by Fiscal Year.[36]**



Liens Cases Referred to U.S. Department of Justice

221    204    278    215    211    217

FY 2010    FY 2011    FY 2012    FY 2013    FY 2014    FY 2015

The National Taxpayer Advocate anticipates the updated IRM will have a positive effect on taxpayer rights in future years, as the IRS refers fewer suits to foreclose tax liens on taxpayers undergoing a hardship or in situations where there are reasonable alternatives.  The National Taxpayer Advocate continues to recommend that Congress adopt the previous legislative recommendation to codify the approach used in the IRM.[37]

To address taxpayer burden and enhance the taxpayer *rights to privacy, to a fair and just tax system*, and *to appeal an IRS's decision in an independent forum*, the National Taxpayer Advocate has also recommended that Congress amend IRC §§ 6320 and 6330 to extend Collection Due Process rights to "affected third parties," known as nominees, alter egos, and transferees, who hold legal title to property subject to IRS collection actions.[38]  Such cases represented about 30 percent (13 of 44) of lien cases seen in this reporting period.

---

33  National Taxpayer Advocate 2012 Annual Report to Congress 639.

34  There were 48 opinions issues in 2012.  National Taxpayer Advocate 2012 Annual Report to Congress 634.

35  National Taxpayer Advocate 2014 Annual Report to Congress 508 (FY 2010 to FY 2013).  DOJ Tax Division, *Suits to Foreclose Tax Lien – Summary by Fiscal Year of Case Receipt* (Oct. 2014), and DOJ Tax Division, *Suits to Foreclose Tax Lien – Summary by Fiscal Year of Case Receipt* (Oct. 2015).

36  *Id.*

37  The National Taxpayer Advocate recommended Congress amend IRC § 7403 to require that the IRS, before recommending that the Attorney General file a suit to foreclose, first determine that the taxpayer's other property or rights to property, if sold, are insufficient to pay the amount due, and that the foreclosure and sale of the residence will not create an economic hardship due to the financial condition of the taxpayer.  National Taxpayer Advocate 2012 Annual Report to Congress 537-43 (Legislative Recommendation: *Amend IRC § 7403 to Provide Taxpayer Protections Before Lien Foreclosure Suits on Principal Residences*).

38  National Taxpayer Advocate 2012 Annual Report to Congress 544-52 (Legislative Recommendation: *Amend IRC §§ 6320 and 6330 to Provide Collection Due Process Rights to Third Parties (Known as Nominees, Alter Egos, and Transferees) Holding Legal Title to Property Subject to IRS Collection Actions*).

001928

514    Most Litigated Issues — Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

MLI
#8

# Charitable Deductions Under IRC § 170

## SUMMARY

Subject to certain limitations, taxpayers can take deductions from their adjusted gross incomes for contributions of cash or other property to or for the use of charitable organizations.[1]  To take a charitable deduction, taxpayers must contribute to a qualifying organization[2] and substantiate contributions of $250 or more.  Litigation generally arises over one or more of these four issues:

- Whether the donation is made to a charitable organization;
- Whether contributed property qualifies as a charitable contribution;
- Whether the amount taken as a charitable deduction equals the fair market value of the property contributed; and
- Whether the taxpayer has substantiated the contribution.

We reviewed 28 cases decided between June 1, 2014 and May 31, 2015, with charitable deductions as a contested issue.  The IRS prevailed in 18 cases, taxpayers in seven cases, and the remaining three cases resulted in split decisions.  Taxpayers represented themselves (appearing *pro se*) in 14 of the 28 cases (50 percent), with taxpayers prevailing in four cases, the IRS in nine cases, and the remaining one resulted in a split decision.

## TAXPAYER RIGHTS IMPACTED[3]

- *The Right to Pay No More Than the Correct Amount of Tax*
- *The Right to a Fair and Just Tax System*

## PRESENT LAW

Taxpayers must itemize to claim any charitable contribution deduction and generally are able to take a deduction for charitable contributions made within the taxable year.[4]  Transfers to charitable organizations are deductible only if they are contributions or gifts,[5] not payments for goods or services.[6]  A contribution or gift will be allowed as a deduction under Interal Revenue Code (IRC) § 170 only if it is made "to" or "for the use of" a qualifying organization.[7]

---

1   Internal Revenue Code (IRC) § 170.
2   To claim a charitable contribution deduction, a taxpayer must establish that he or she made a gift to a qualified entity organized and operated exclusively for an exempt purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual.  IRC § 170(c)(2).
3   See Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.
4   IRC §§ 63(d) and (e), 161, and 170(a).
5   The Supreme Court of the United States has defined "gift" as a transfer proceeding from a "detached and disinterested generosity."  *Comm'r v. Duberstein*, 363 U.S. 278, 285 (1960).
6   *See also* Treas. Reg. § 1.170A-1(g) (no deduction for contribution of services).
7   IRC § 170(c).

001929

For individuals, charitable contribution deductions are generally limited to 50 percent of the taxpayer's contribution base (adjusted gross income computed without regard to any net operating loss carryback to the taxable year under IRC § 172).[8]  However, subject to certain limitations, individual taxpayers can carry forward unused charitable contributions in excess of the 50 percent contribution base for up to five years.[9]  Corporate charitable deductions are generally limited to ten percent of the taxpayer's taxable income.[10]  Taxpayers cannot deduct services that they offer to charitable organizations; however, incidental expenditures incurred while serving a charitable organization and not reimbursed may constitute a deductible contribution.[11]

## Substantiation

For cash contributions, taxpayers must maintain receipts from the charitable organization, copies of cancelled checks, or other reliable records showing the name of the organization, the date, and the amount contributed.[12]  Deductions for single charitable contributions of $250 or more are disallowed in the absence of a contemporaneous written acknowledgement from the charitable organization.[13]

The donor is generally required to obtain the contemporaneous written acknowledgment no later than the date he or she files the return for the year in which the contribution is made, and it must include:

- The name of the charitable organization;

- The amount of any cash contribution;

- A description (but not the value) of any non-cash contribution;

- A statement that no goods or services were provided by the organization in return for the contribution, if that was the case;

- A description and good faith estimate of the value of goods or services, if any, that an organization provided in return for the contribution; and

- A statement that goods or services, if any, that an organization provided in return for the contribution consisted entirely of intangible religious benefits, if that was the case.[14]

For each contribution of property other than money, taxpayers generally must maintain a receipt showing the name of the recipient, the date and location of the contribution, and a description of the property.[15]  When taxpayers contribute property other than money, the amount of the allowable deduction is the fair market value of the property at the time of the contribution.[16]  This general rule is subject to certain exceptions that in some cases limit the deduction to the taxpayer's cost basis in the property.[17]

---

8   IRC §§ 170(b)(1)(A) and (G).

9   IRC § 170(d)(1).

10   IRC § 170(b)(2).

11   Treas. Reg. § 1.170A-1(g).  Meal expenditures in conjunction with offering services to qualifying organizations are not deductible unless the expenditures are away from the taxpayer's home.  *Id.*  Likewise, travel expenses associated with contributions are not deductible if there is a significant element of personal pleasure involved with the travel.  IRC § 170(j).

12   Treas. Reg. § 1.170A-13(a)(1).

13   IRC § 170(f)(8).  *See also* Treas. Reg. § 1.170A-13(f).

14   IRS Pub. 1771, *Charitable Contributions Substantiation and Disclosure Requirements* (Rev. July 2013).

15   Treas. Reg. §§ 1.170A-13(b)(1)(i) to (iii).

16   Treas. Reg. § 1.170A-1(c)(1).

17   *Id.*  Note that the deduction is reduced for certain contributions of ordinary income and capital gain property.  *See* IRC § 170(e).

For claimed contributions exceeding $5,000, the taxpayer must obtain a qualified appraisal prepared by a qualified appraiser.[18]

## ANALYSIS OF LITIGATED CASES

We reviewed 28 decisions entered between June 1, 2014 and May 31, 2015, involving charitable contribution deductions claimed by taxpayers. Table 8 in Appendix 3 contains a detailed list of those cases. Of the 28 cases, 16 involved the taxpayers' substantiation (or lack thereof) of the claimed contribution, nine cases involved a dispute over the valuation of property contributed, another ten involved the contribution of an easement, and one case involved a trust's payments to a scholarship.[19]

### Qualified Conservation Contribution

For a gift to constitute a qualified contribution under IRC § 170, the donor-taxpayer must possess a transferrable interest in the property and intend to irrevocably relinquish all rights, title, and interest to the property without any expectation of some benefit in return.[20] Taxpayers generally are not permitted to deduct gifts of property consisting of less than the taxpayers' entire interest in that property.[21] Nevertheless, taxpayers may deduct the value of a contribution of a partial interest in property that constitutes a "qualified conservation contribution,"[22] also known as a conservation easement. A contribution will constitute a qualified conservation contribution only if it is of a "qualified real property interest" made to a "qualified organization" "exclusively for conservation purposes."[23]

In *Belk v. Commissioner*, the taxpayers, a married couple who filed a joint return, purchased a large tract of land outside of Charlotte, North Carolina for the development of a residential community.[24] They formed a limited liability company (LLC) to develop the land into a golf course and 402 residential lots and then contributed the property to the LLC.[25] Several years later, the taxpayers executed a conservation easement over 184 acres that contained the golf course and transferred the easement to Smoky Mountain National Land Trust, Inc.[26] Although the easement was "for outdoor recreation" and prohibited further development, the taxpayers had granted the easement in perpetuity, subject to certain "Reserved Rights," including the right for the taxpayers to "substitute an area of land owned by [it] which is contiguous to the Conservation Area for an equal or lesser area of land comprising a portion of the Conservation Area."[27] This "Reserved Right" essentially provided the taxpayers with the ability to "swap land in and

---

18  IRC § 170(f)(11)(C). "Qualified appraisal" and "qualified appraiser" are defined in IRC §§ 170(f)(11)(E)(i) and (ii), respectively.

19  Cases addressing more than one described issue are counted for each issue. For example, cases addressing the valuation of easements are counted once as a valuation issue case and again as a conservation easement issue case. As a result, the breakdown of case issues above will not add up to the total number of cases reviewed by TAS.

20  IRC § 170(f)(3).

21  *Id.*

22  IRC § 170(b)(1)(E).

23  IRC § 170(h)(1)(A)-(C). IRC § 170(h)(4)(B)(i) provides that, in the case of a contribution that consists of a restriction with respect to the exterior of a certified historic structure, the contribution must satisfy two requirements in order to be considered "exclusively for conservation purposes": 1) the interest must include a restriction which preserves the entire exterior of the building, and 2) the interest must prohibit any change to the exterior of the building that is inconsistent with the historic character of the exterior.

24  774 F.3d 221, 223 (4th Cir. 2014), *aff'g* 140 T.C. 1 (2013).

25  *Id.*

26  *Id.*

27  *Id.* The substitution right is conditional upon the Trust's agreement that the "substitution property is of the same or better ecological stability," the "substitution shall have no adverse effect on the conservation purposes," and that "the fair market value of the substituted property is at least equal to that of the property originally subject to the Easement." *Id.*

001931

out of the Easement" and to shift the use restriction from one parcel of land to another.[28]  The taxpayers claimed a deduction of over $10.5 million for the donation of the easement in 2004, along with carryover in 2005 and 2006, but the IRS disallowed the deduction on the basis that it was not a "qualified conservation contribution."[29]  The Tax Court upheld the IRS's determination finding that the taxpayers "failed to donate an interest in real property that is subject to a use restriction granted in perpetuity."[30]

On appeal, the 4th Circuit affirmed the disallowance and ruled that the easement failed to meet the requirements of IRC § 170(h)(2) since it was not subject to a use restriction in perpetuity.[31]  The court explained that because the "taxpayer may remove land from the defined parcel and substitute other land," the restriction on "the real property" is not in perpetuity.[32]  The court found that a conservation easement is not a "qualified real property interest," as described in IRC § 170(h)(2)(C), if the terms of the easement agreement allow the grantor to change which property is subject to the easement.[33]

In *Mitchell v. Commissioner*, the taxpayers, a married couple, purchased land subject to a mortgage.[34]  Several years later, the taxpayers contributed the land, subject to the mortgage, to a family limited liability partnership.  The partnership then granted a conservation easement of almost 200 acres of unimproved land to the Montezuma Land Conservancy to be used as open space for wildlife and agricultural purposes in 2003.[35]  The deed of conservation easement in gross purported to transfer the easement to the Montezuma Land Conservancy in perpetuity; however, at the time of the donation, the taxpayers had not obtained a mortgage subordination agreement from a third party.[36]  The taxpayers claimed a deduction for the transfer on their 2003 income tax return, but it was not until 2005 that the third party agreed to subordinate his interest in the property to the easement.

In 2010, the IRS disallowed the deduction due to the fact that Montezuma Land Conservancy's interest in the property was subject to a third party's unsubordinated mortgage at the time of donation, thus, the conservation purpose was not protected in perpetuity.[37]  Although the IRC does not specifically define "protected in perpetuity," under IRC § 170(h)(5)(A), the IRS has issued regulations on this subject and has excluded deductions where there is not a mortgage subordination.[38]  The taxpayers argued that the regulations did not specify an explicit timeframe for subordinating the mortgage; however, the court rejected this and determined that the plain language of the regulation required the mortgage subordination to have occurred prior to the donation for it to be eligible for a deduction.[39]  The 10th Circuit affirmed the Tax Court's determination that the conservation easement donation failed to comply with

---

28  *Belk,* 774 F.3d at 223-24).

29  *Id.* at 224.

30  *Belk v. Comm'r,* 140 T.C. 1, 10-11 (2013).

31  *Belk,* 774 F.3d at 226.

32  *Id.*

33  *Id.* at 227.  The Tax Court made a similar determination and cited *Belk v. Comm'r* in *Balsam Mountain Invs., LLC v. Comm'r,* T.C. Memo. 2015-43 (holding that a conservation easement that allows for a future boundary adjustment is not a "qualified real property interest" and thus not eligible for a charitable contribution deduction), *appeal docketed,* No. 15-2010 (4th Cir. Sept. 3, 2015).

34  775 F.3d 1243 (10th Cir. 2015), *aff'g* 138 T.C. 324 (2012).

35  *Id.* at 1245-46.

36  *Id.* at 1246.

37  *Id.*

38  *Id. See* Treas. Reg. § 1.170A-14(g).

39  *Mitchell,* 775 F.3d at 1248, 1250-51.

Case 6:24-cv-00306-JCB    Document 124    Filed 05/07/24    Page 1940 of 4699 PageID #:  5105

Legislative Recommendations    Most Litigated Issues    Appendices    Most Litigated Issues    Case Advocacy    Legislative Recommendations    Most Serious Problems

the mortgage subordination requirements due to the fact that the third party's mortgage encumbering on the land was not subordinated until after the donation.[40]

As both cases illustrate, it is vital for a conservation easement to be protected in perpetuity for it to qualify as a "qualified conservation contribution" pursuant to the IRC and Treasury regulations.[41]  To be considered protected in perpetuity, the conservation easement must be limited to a "single, immutable parcel" for the life of the easement,[42] and the property upon which the easement is granted must not be subject to an unsubordinated mortgage.[43]

### Conservation Easement Valuation

To receive a deduction for most contributions of property in excess of $5,000, taxpayers must provide a qualified appraisal of the property that is donated.[44]  In *Scheidelman v. Commissioner*, the taxpayer lived in a townhouse in a historic district.[45]  She donated an architectural façade conservation easement to the National Architectural Trust and claimed a charitable deduction for the contribution.[46]  The taxpayer retained a real estate appraiser to value the donation,[47] which was found to be $115,000.  The IRS determined the taxpayer had failed to establish a fair market value for the easement, and the Tax Court agreed.[48]

In determining the fair market value of a conservation easement, the "before and after" valuation, which compares the values of the property with and without the easement, is generally accepted.[49]  The valuation also takes into consideration "any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use."[50]  Both the taxpayer and the IRS relied heavily on expert opinion testimony as to the pre- and post-contribution values of the property.  However, the taxpayers' experts were found to be flawed and the Tax Court concluded that the evidence presented by the experts was not entitled to any weight.[51]  Contrary to the taxpayer's experts, the IRS's expert determined that due to the historical nature of the neighborhood, there was no negative impact in valuation due to the restrictions of the easement, and, in fact, the "preservation of historic facades is a benefit, not a detriment, to the value of … property."[52]  The 2nd Circuit affirmed the Tax Court's finding that the value of the property was unchanged after the taxpayer granted the easement, and therefore, the court further held that the façade easement had no fair market value when conveyed to the National Architectural Trust.[53]

---

40  *Mitchell*, 775 F.3d at 1251, 1255.

41  IRC § 170(h)(1); Treas. Reg. § 1.170A-14(g).

42  *Belk*, 774 F.3d at 227.

43  *Mitchell*, 775 F.3d at 1255.

44  IRC § 170(f)(11)(C).

45  755 F.3d 148, 150 (2d Cir. 2014), *aff'g* T.C. Memo. 2013-18.

46  *Id.*

47  The Tax Court initially determined that the appraisal was not a "qualified appraisal" pursuant to Treas. Reg. § 1.170A-13(c)(2)(i)(A), and therefore, the taxpayer was not entitled to a deduction.  *See Scheidelman v. Comm'r*, T.C. Memo. 2010-151, *vacated by*, 682 F.3d 189 (2d Cir. 2012), *remanded*, T.C. Memo. 2013-18, *aff'd*, 775 F.3d 148 (2d Cir. 2014).

48  *Scheidelman*, 755 F.3d at 150-51.

49  *Id.* at 152.  *See also Hilborn v. Comm'r*, 85 T.C. 677, 688 (1985); Treas. Reg. § 1.170A-14(h)(3)(i).

50  Treas. Reg. § 1.170A-14(h)(3)(ii).

51  *Scheidelman*, 755 F.3d at 152.

52  *Id.* at 153.

53  *Id.* at 153-54.

When using the before and after test to determine the value of an easement placed on property that a tax-payer later claims as a charitable contribution, the property's "highest and best use" is used to determine the property's value before an easement.  Many of these "highest and best use" cases, including the U.S. Court of Appeals for the 5th Circuit's decision in *Whitehouse Hotel Limited Partnership v. Commissioner*, involve very complex and specific fact patterns.[54]  In *Whitehouse Hotel Limited Partnership*, the taxpayers appealed the Tax Court's conclusion that the "highest and best use" of a historical building was not a luxury hotel or even a non-luxury hotel, but, on the date of the easement, the correct valuation was a "shell building [] …suitable for conversion to [a] hotel."[55]  The "highest and best use" of a property is the "reasonable and probable use that supports the highest present value," and the vital question is "what a hypothetical willing buyer would consider in deciding how much to pay for the property."[56]  The 5th Circuit affirmed the Tax Court's determination that the "highest and best use" of the easement could be either a luxury hotel or a non-luxury hotel and that the valuation of the easement would not vary as a result of that determination.[57]  The "highest and best use" element for valuation is very fact-specific and due to the lack of clear regulations and bright-line interpretations in the case law, subject to frequent and prolonged litigation.[58]

## Substantiation

Sixteen cases involved the substantiation of deductions for charitable contributions.  When determining whether a claimed charitable contribution deduction is adequately substantiated, courts tend to follow a strict interpretation of IRC § 170.  Treasury Regulation § 1.170A–13(a)(1) requires the taxpayer to main-tain a canceled check or a receipt from the donee organization to substantiate a cash contribution.  In the absence of a canceled check or a receipt from the donee organization, the taxpayer must maintain other reliable written records showing the name of the donee and the date and the amount of the contribution.

In *Anyanwu v. Commissioner*, the taxpayer, who had recently divorced, claimed charitable deductions in the amount of $21,500 for 2006 and $26,600 for 2007, all of which had been disallowed by the IRS.[59]  The taxpayer provided copies of canceled checks payable to her church and an "Individual Tithes and Offerings Summary" for 2006 and 2007, showing $24,730 and $26,600 respectively.  The summaries stated that the church did not provide any goods or services in exchange for the contributions.  Although the summaries did not list the date on which they were prepared, the court found that the summaries were contemporaneous.[60]

Although the taxpayer was divorced in 2005, the summaries of contributions were addressed to both herself and her former husband, Mr. Anyanwu, and the taxpayer admitted to altering the summaries to remove her former husband's name.[61]  Despite having altered the summaries, the taxpayer provided canceled checks, which had only the taxpayer's name on them, not her ex-husband, matching the altered summaries.[62]  However, the court disallowed five contributions that the taxpayer was not able to substan-tiate with canceled checks and only allowed $1,000 for one contribution, which was the amount listed on

---

54   *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 755 F.3d 236 (5th Cir. 2014), *aff'g in part, vacating in part* 130 T.C. 304.

55   *Id.* at 241 (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 139 T.C. 304, 337 (2012)).

56   *Id.* (quoting *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 335 (5th Cir. 2010), *remanded to* 130 T.C. 304 (2012)).

57   *Id.* at 244

58   *See id.*; *Whitehouse Hotel Ltd. P'ship*, 615 F.3d at 340.

59   T.C. Memo. 2014-123.

60   *Id.*

61   *Id.*

62   *Id.*

001934

the summary, even though the taxpayer showed a canceled check for $2,800. The Tax Court determined that the taxpayer had successfully substantiated the majority of her contributions and allowed a charitable contribution deduction of $19,700 for 2006 and $26,600 for 2007.[63]

Gifts of charitable contributions of $250 or more must be substantiated by a contemporaneous written acknowledgement from the donee organization that must include:

- The amount of cash and a description (but not value) of any property other than cash contributed;

- Whether the donee organization provided any goods or services in consideration, in whole or in part; and

- A description and good faith estimate of the value of any goods or services or, if such goods or services consist solely of intangible religious benefits, a statement to that effect.[64]

For non-cash gifts of charitable contributions exceeding $500, the taxpayer must also maintain written records that include:

- The approximate date the property was acquired and the manner of its acquisition (*i.e.*, purchase, gift, inheritance, etc.);

- A description of the property in detail reasonable under the circumstances;

- The cost or other basis of the property;

- The fair market value of the property at the time it was contributed; and

- The method used in determining its fair market value.[65]

In *Kunkel v. Commissioner*, the IRS disallowed a charitable contribution deduction of $37,315 for noncash charitable contributions by the taxpayers.[66] The taxpayers claimed to have donated a variety of property to four charitable organizations: the Upper Dublin Lutheran Church, Goodwill Industries, the Military and Order of the Purple Heart Service Foundation (Purple Heart), and Vietnam Veterans of America.[67] The taxpayers claimed a contribution totaling $13,115 in noncash items to their church's 2011 annual flea market; however, they did not produce a receipt or acknowledgement from the church of their donations,[68] nor did they provide any evidence that the church actually received delivery of them. The taxpayers also allegedly contributed $24,200 in noncash donations, including over $20,000 in clothing, to the three additional charitable organizations. Similar to the church donations, the taxpayers did not provide any documentary evidence and could not remember which items went to which organization and when they had donated them.[69] The only evidence the taxpayers provided, other than their own

---

63  *Anyanwu*, T.C. Memo. 2014-123.

64  IRC §§ 170(f)(8)(A) and (B). The IRS issued a Notice of Proposed Rulemaking on September 17, 2015, that would implement the exception to the "contemporaneous written acknowledgement" requirement for substantiating charitable contribution deductions of $250 or more and would provide rules concerning the time and manner for donee organizations to file information returns that report the requirement information about contributions. *See* Prop. Treas. Reg. § 1.170A-13(f)(18)-(19), 80 Fed. Reg. 55,802 (Sept. 17, 2015).

65  IRC § 170(f)(11)(B); Treas. Reg. §§ 1.170A-13(b)(2)(ii)(C) and (D), (3)(i)(A) and (B).

66  T.C. Memo. 2015-71.

67  *Id*.

68  The taxpayers provided a receipt for their 2012 donations to the flea market; thus, the church was equipped to provide this documentation.

69  *Kunkel*, T.C. Memo. 2015-71.

testimony, was doorknob hangers left by charities stating "thank you for your contribution," but not list-ing the date, property, or name of contributor.[70]

The taxpayers, who did not provide a "contemporaneous written acknowledgement" from any of the charities, alleged this acknowledgement was not necessary because all of their contributions were under $250.[71]  The Tax Court did not find the taxpayer's assertion credible, due to the fact that the taxpayers would have had to make 97 distinct donations all with donations less than $250, despite the fact that the taxpayers testified to assigning the value of donations while completing their tax returns in 2012.[72] The Tax Court also noted that the taxpayers did not maintain written records establishing when or how they acquired items, their cost bases, their condition, and how the fair market value was calculated, nor did the taxpayers furnish a qualified appraisal, all of which is needed for contributions exceeding $500.[73] Although the Tax Court acknowledged that the taxpayers did donate some property during the tax year at issue, the lack of a written contemporaneous acknowledgment and failure to provide evidence as to value, date, location, and condition of goods donated did not satisfy the requirements of IRC § 170, and the entire deduction was disallowed.[74]

## CONCLUSION

IRC § 170 and the accompanying Treasury Regulations provide detailed requirements with which taxpay-ers must strictly comply.  The statutory and regulatory requirements to qualify for a deduction become more stringent as deductions increase in size.  Most of the charitable contribution cases reviewed this year addressed issues regarding substantiation of contributions or the complex rules governing the donation of a conservation easement.  It is vital that taxpayers include all information required by the IRC and regula-tions to substantiate any charitable contributions and their value.  The courts have consistently upheld the regulations and disallowed deductions that do not comply with the statutory and regulatory requirements.

When donating a conservation easement, taxpayers should pay particular attention to the valuation of the easement, ensuring the valuation determination can be adequately supported.  Additionally, the cases pertaining to a qualified conservation contribution illustrate the importance of paying close attention to the technicalities of the regulations.  Easement deeds should be reviewed for ambiguity, especially as to whether use restrictions have been granted in perpetuity to the donee.

---

70   *Kunkel*, T.C. Memo. 2015-71.  The taxpayers testified that they created index cards noting the items as they were delivered to Goodwill or left for pickup by Purple Heart of Vietnam Veterans.  They aggregated this information into a master list and assigned estimated values to the items at the time they prepared their tax returns.  However, the taxpayers did not provide any evidence of the index cards nor did they prepare any other contemporaneous records to support their alleged gifts.  They also did not provide any evidence regarding their cost bases in items or how they determined the fair market value.

71   *Id.*

72   *Id.*

73   *Id.*

74   *Id.*

**MLI #9**

# Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions

## SUMMARY

From June 1, 2014, through May 31, 2015, the federal courts issued decisions in at least 22 cases involving the Internal Revenue Code (IRC) § 6673 "frivolous issues" penalty and at least four additional cases involving analogous penalties at the appellate level.[1] These penalties are imposed against taxpayers for maintaining a case primarily for delay, raising frivolous arguments, unreasonably failing to pursue administrative remedies, or filing a frivolous appeal.[2] In many of the cases we reviewed, taxpayers escaped liability for the penalty but were warned they could face sanctions for similar conduct in the future.[3] Nonetheless, we included these cases in our analysis to illustrate what conduct will and will not be tolerated by the courts.

## TAXPAYER RIGHTS IMPACTED[4]

- ■ *The Right to Pay No More Than the Correct Amount of Tax*
- ■ *The Right to Challenge the IRS's Position and Be Heard*
- ■ *The Right to Appeal an IRS Decision in an Independent Forum*
- ■ *The Right to a Fair and Just Tax System*

## PRESENT LAW

The U.S. Tax Court is authorized to impose a penalty against a taxpayer if the taxpayer institutes or maintains a proceeding primarily for delay, takes a frivolous position in a proceeding, or unreasonably fails to pursue available administrative remedies.[5] The maximum penalty for taxpayers is $25,000.[6] In some cases, the IRS requests that the Tax Court impose the penalty;[7] in other cases, the Tax Court exercises its discretion, *sua sponte*,[8] to do so.

---

1   Analogous penalties at the appellate level include those under IRC § 7482 (c)(4), Fed. R. App. P. 38, or other authority.

2   The Tax Court generally imposes the penalty under IRC § 6673(a)(1). Other courts may impose the penalty under IRC § 6673(b)(1). U.S. Courts of Appeals generally impose sanctions under IRC § 7482(c)(2), 28 U.S.C. § 1927, or Rule 38 of the Federal Rules of Appellate Procedure, although some appellate-level penalties may be imposed under other authorities.

3   *See, e.g., Kaye v. Comm'r*, T.C. Memo. 2014-145.

4   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

5   IRC §§ 6673(a)(1)(A), (B), and (C). Likewise, the Tax Court may impose a penalty under IRC § 6673(a)(2) against any person admitted to practice before the Tax Court for unreasonably and vexatiously multiplying the proceedings in any case.

6   IRC § 6673(a)(1).

7   The standards for the IRS's decision to seek sanctions under IRC § 6673(a)(1) are found in the Chief Counsel Directives Manual. *See* CCDM 35.10.2 (Aug. 11, 2004). For sanctions under IRC § 6673(a)(2) of attorneys or other persons admitted to practice before the Tax Court, all requests for sanctions are reviewed by the designated agency sanctions officer (currently the Associate Chief Counsel (Procedure & Administration)). This review ensures uniformity on a national basis. *See, e.g.,* CCDM 35.10.2.2.3 (Aug. 11, 2004).

8   *"Sua sponte"* means without prompting or suggestion; on its own motion. Black's Law Dictionary (10th ed. 2014). Thus, for conduct that it finds particularly offensive, the Tax Court can choose to impose a penalty under IRC § 6673 even if the IRS has not requested the penalty. *See, e.g., Patton v. Comm'r*, T.C. Memo. 2015-75, *appeal docketed*, No. 15-2007 (6th Cir. Aug. 25, 2015).

001937

Taxpayers who institute actions under IRC § 7433[9] for certain unauthorized collection actions can be subject to a maximum penalty of $10,000 if the court determines that the taxpayer's position in the proceedings is frivolous or groundless.[10]  In addition, IRC § 7482(c)(4),[11] §§ 1912 and 1927 of Title 28 of the U.S. Code,[12] and Rule 38 of the Federal Rules of Appellate Procedure[13] (among other laws and rules of procedure) authorize federal courts to impose penalties against taxpayers or their representatives for raising frivolous arguments or using litigation tactics primarily to delay the collection process.  Because the sources of authority for imposing appellate-level sanctions are numerous and some of these sanctions may be imposed in non-tax cases, this report focuses primarily on the IRC § 6673 penalty.

## ANALYSIS OF LITIGATED CASES

We analyzed 22 opinions issued between June 1, 2014, and May 31, 2015, in which courts addressed the IRC § 6673 penalty.  Twenty-one of these opinions were issued by the Tax Court, and one was issued by a U.S. Court of Appeals in a case brought by a taxpayer who sought review of the Tax Court's imposition of the penalty.  The Court of Appeals sustained the Tax Court's position.  Four additional case decisions were issued by the Courts of Appeals on analogous appellate level penalties under IRC § 7482 (c)(4), FRAP Rule 38, or other authority.  Table 9 in Appendix 3 includes all 26 of these opinions in total.

In ten cases, the Tax Court imposed penalties under IRC § 6673, with the amounts ranging from $500 to $25,000.  In seven cases before the Tax Court, taxpayers prevailed when the IRS requested a penalty.  In each of these cases, the Tax Court warned the taxpayers not to bring similar arguments in the future.[14]  Two taxpayers were represented by an attorney; the taxpayers in the remaining 20 cases appeared *pro se* (represented themselves).  In at least one case, the Tax Court noted that the *pro se* taxpayer may not be familiar with all the rules and procedures of the court and thus opted to not impose the penalty.  But the Tax Court nonetheless made clear that "*Pro se* status, however, isn't a license to litter the dockets of the Federal courts with ridiculous allegations concerning the Code."[15]

The taxpayers presented a wide variety of arguments challenging the U.S. tax system that the courts have generally rejected on numerous occasions.  Upon encountering these arguments, the courts in nine of 22 cases cited the language set forth in *Crain v. Commissioner*:

> We perceive no need to refute these arguments with somber reasoning and copious citation of precedent; to do so might suggest that these arguments have some colorable merit.  The

---

9    IRC § 7433(a) allows a taxpayer a civil cause of action against the United States, if an IRS employee intentionally or recklessly, or by reason of negligence, disregards any IRC provision or Treasury regulation in connection with collecting the taxpayer's federal tax liability.

10   IRC § 6673(b)(1).

11   IRC § 7482(c)(4) provides that the United States Courts of Appeals and the Supreme Court have the authority to impose a penalty in any case where the Tax Court's decision is affirmed and the appeal was instituted or maintained primarily for delay or the taxpayer's position in the appeal was frivolous or groundless.

12   28 U.S.C. § 1912 provides that when the Supreme Court or a United States Court of Appeals affirms a judgment, the court has the discretion to award to the prevailing party just damages for the delay, and single or double costs.  28 U.S.C. § 1927 authorizes federal courts to sanction an attorney or any other person admitted to practice before any court of the United States or any territory thereof for unreasonably and vexatiously multiplying proceedings; such person may be required to personally pay the excess costs, expenses, and attorneys' fees reasonably incurred because of his or her conduct.

13   Federal Rule of Appellate Procedure 38 provides that if a United States Court of Appeals determines an appeal is frivolous, the court may award damages and single or double costs to the appellee.

14   *See, e.g., Bowers v. Comm'r*, T.C. Memo. 2014-130.

15   *Id.*

constitutionality of our income tax system — including the role played within that system by the Internal Revenue Service and the Tax Court — has long been established.[16]

In the Tax Court cases we reviewed, taxpayers raised the following issues that the court deemed frivolous and thus subjected the taxpayers to a penalty under IRC § 6673(a)(1) (or, in some cases, the court warned that such arguments were frivolous and could lead to a penalty in the future, if the taxpayers maintained the same positions):

- **Taxes and procedures to collect taxes are unconstitutional:** We only identified one case this year where a taxpayer made an argument that taxes or how they are collected are unconstitutional.[17]  Previous years have seen additional taxpayers advance similar arguments to no avail.[18]  The taxpayer in the one case who made constitutional arguments this year advanced many facets of the various common constitutional arguments seen in other cases over the years, including the 16th Amendment only authorizes excise taxes, and levies violate both the Fourth and Fifth Amendments.  The court found sanctions were appropriate in this case.

- **The IRS lacks proper authority:** Taxpayers in at least four cases argued that the IRS lacked the authority to take the proposed actions.[19]  In two of these cases, taxpayers asserted that the employees who issued various notices did not have the proper delegation of authority to authorize the proposed action.[20]  The IRS prevailed in two cases,[21] and although the taxpayers prevailed in the remaining two cases, the court warned the taxpayers not to pursue similar arguments in the future.[22]

- **Taxpayers are not United States persons or United States income is not taxable:** Taxpayers in three cases presented arguments that they are not United States persons subject to tax or that United States income is not taxable.[23]  In one case, a taxpayer argued that he was a resident of the independent area of Harris County, TX, which is not in the United States.[24]  The court imposed a penalty of $8,000 under Rule 38 of the Federal Rules of Appellate Procedure.

## CONCLUSION

Taxpayers in the cases analyzed this year presented the same arguments raised and repeated year after year that the courts routinely and universally reject.[25]  Taxpayers avoided the IRC § 6673 penalty in only seven cases where the IRS requested it, and in each of these cases, the courts warned the taxpayer not to bring similar arguments in the future, demonstrating the willingness of the courts to penalize taxpayers when they offer frivolous arguments or institute a case merely for delay.  Moreover, even when the Tax Court

---

16  *Crain v. Comm'r*, 737 F.2d 1417, 1417-18 (5th Cir. 1984).  See, e.g., *Rader v. Comm'r*, 143 T.C. 376 (2014).

17  *Taliaferro v. Freeman*, 595 F. App'x 961 (11th Cir. 2014), aff'g *Taliaferro v. U.S.*, 113 A.F.T.R.2d (RIA) 1840 (M.D. Ga. 2014).

18  *See, e.g.,* National Taxpayer Advocate 2014 Annual Report to Congress 510-12.

19  *See, e.g., Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015).

20  *May v. Comm'r*, T.C. Memo. 2014-194; *Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015).

21  *Banister v. Comm'r*, T.C. Memo. 2015-10, *appeal docketed*, No. 15-71103 (9th Cir. Apr. 9, 2015); *May v. Comm'r*, T.C. Memo. 2014-194.

22  *Bowers v. Comm'r*, T.C. Memo. 2014-130; *Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015).

23  *See, e.g., U.S. v. Trowbridge*, 591 F. App'x 298 (5th Cir. 2015), aff'g Docket No. 4:14-CV-00027 (S.D. Tex. May 22, 2014), *cert. denied*, 135 S.Ct. 2816 (June 8, 2015); *Bennett v. Comm'r*, T.C. Memo. 2014-256, *appeal docketed*, No. 15-71228 (9th Cir. Apr. 21, 2015); *Banister v. Comm'r*, T.C. Memo. 2015-10, *appeal docketed*, No. 15-71103 (9th Cir. Apr. 9, 2015).

24  *U.S. v. Trowbridge*, 591 F. App'x 298 (5th Cir. 2015), aff'g Docket No. 4:14-CV-00027 (S.D. Tex. May 22, 2014), *cert. denied*, 135 S.Ct. 2816 (June 8, 2015).

25  *See, e.g.,* National Taxpayer Advocate 2014 Annual Report to Congress 510-12.

Case 6:24-cv-00306-JCB   Document 124   Filed 08/07/24   Page 1947 of 4699 PageID #:  5112

acknowledges that a penalty will likely not dissuade the taxpayer from raising frivolous arguments in the future, the Tax Court nonetheless recognizes that "serious sanctions also serve to warn other taxpayers to avoid pursuing similar tactics."[26]  Further, when the IRS has not requested the penalty, the court may nonetheless raise the issue *sua sponte*, and in all cases identified, either imposed the penalty or cautioned the taxpayer that similar future behavior will result in a penalty.[27]

---

26   *Bennett v. Comm'r*, T.C. Memo. 2014-256, *appeal docketed*, No. 15-71228 (9th Cir. Apr. 21, 2015).  *See also Banister v. Comm'r*, T.C. Memo. 2015-10, *appeal docketed*, No. 15-71103 (9th Cir. Apr. 9, 2015).

27   *See, e.g., Kaye v. Comm'r*, T.C. Memo. 2014-145 (court raised the issue *sua sponte* and warned the taxpayer not to assert similar arguments in the future).

**MLI
#10**

# Relief From Joint and Several Liability Under IRC § 6015

## SUMMARY

Married couples may elect to file their federal income tax returns jointly or separately.  Spouses filing joint returns are jointly and severally liable for any deficiency or tax due.[1]  Joint and several liability permits the IRS to collect the entire amount due from either taxpayer.[2]

Internal Revenue Code (IRC) § 6015 provides three avenues for relief from joint and several liability.  IRC § 6015(b) provides "traditional" relief for deficiencies.  IRC § 6015(c) also provides relief for deficiencies for certain spouses who are divorced, separated, widowed, or not living together by allocating the liability between the spouses.  IRC § 6015(f) provides "equitable" relief from both deficiencies and underpayments but only applies if a taxpayer is not eligible for relief under IRC §§ 6015(b) or (c).

We identified 24 federal court opinions involving relief under IRC § 6015 that were issued between June 1, 2014, and May 31, 2015.  Courts granted relief to the requesting spouse in seven cases (29 percent).  The IRS prevailed in 15 cases (63 percent).  The remaining two cases resulted in split decisions.  Significant issues that arose this year include: (1) the Tax Court's jurisdiction over requests for equitable relief, and (2) intervening spouses opposing equitable relief after the IRS conceded that requesting spouses were entitled to relief at trial.

## TAXPAYER RIGHTS IMPACTED[3]

- *The Right to Pay No More Than The Correct Amount of Tax*
- *The Right to Challenge the IRS's Position and Be Heard*
- *The Right to Appeal an IRS Decision in an Independent Forum*
- *The Right to a Fair and Just Tax System*

## PRESENT LAW

### Traditional Innocent Spouse Relief Under IRC § 6015(b)

IRC § 6015(b) provides that a requesting spouse shall be partially or fully relieved from joint and several liability, pursuant to procedures established by the Secretary, if the requesting spouse can demonstrate that:

1. A joint return was filed;

2. There was an understatement of tax attributable to erroneous items of the nonrequesting spouse;[4]

---

1   IRC § 6013(d)(3).  We use the terms "deficiency"  and "understatement"  interchangeably for purposes of this discussion and the case table in Appendix 3, even though IRC §§ 6015(b)(1)(D) and 6015(f) expressly use the term "deficiency" and IRC § 6015(b)(1)(B) refers to an "understatement of tax."

2   The National Taxpayer Advocate, in the 2005 Annual Report to Congress, proposed legislation that would eliminate joint and several liability for joint filers.  *See* National Taxpayer Advocate 2005 Annual Report to Congress 407.

3   *See* Taxpayer Bill of Rights, *available at* www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

4   An erroneous item is any income, deduction, credit, or basis that is omitted from or incorrectly reported on the joint return.  *See* Treas. Reg. § 1.6015-1(h)(4).

3. The requesting spouse did not know or have reason to know of the understatement, upon signing the return;

4. It is inequitable to hold the requesting spouse liable, taking into account all the facts and circumstances; and

5. The requesting spouse elected relief within two years after the IRS began collection activities against him or her.[5]

A requesting spouse is eligible for a refund under this subsection, so long as the requesting spouse made the payment and the requirements of IRC § 6511 have been met.[6]

### Allocation of Liability Under IRC § 6015(c)

IRC § 6015(c) provides that the requesting spouse shall be relieved from liability for deficiencies allocable to the nonrequesting spouse, pursuant to procedures established by the Secretary. To obtain relief under this section, the requesting spouse must demonstrate that:

1. A joint return was filed;

2. The joint filers were unmarried, legally separated, widowed, or had not lived in the same household for the 12 months immediately preceding the election at the time relief was elected; and

3. The election was made within two years after the IRS began collection activities with respect to the requesting spouse.

This election allocates the portion of the deficiency attributable to each joint filer as calculated under the allocation provisions of IRC § 6015(d). A taxpayer is ineligible to make an election under IRC § 6015(c) if the IRS demonstrates that, at the time he or she signed the return, the requesting taxpayer had "actual knowledge" of any item giving rise to the deficiency.[7] Relief is not available for amounts attributable to fraud, fraudulent schemes, or certain transfers of disqualified assets.[8] Finally, no credit or refund is allowed as a result of relief granted under IRC § 6015(c).[9]

### Equitable Relief Under IRC § 6015(f)

IRC § 6015(f) provides that the Secretary may relieve a taxpayer from liability for both deficiencies and underpayments[10] where the taxpayer demonstrates that:

1. Relief under IRC § 6015(b) or (c) is unavailable; and

2. It would be inequitable to hold the taxpayer liable for the underpayment or deficiency, taking into account all the facts and circumstances.

---

5  Not all actions that involve collection will trigger the two-year period of limitations. Under the regulations, only the following four events constitute "collection activity" that will start the two-year period: (1) an IRC § 6330 notice; (2) an offset of an overpayment of the requesting spouse against the joint income tax liability under IRC § 6402; (3) the filing of a suit by the United States against the requesting spouse for the collection of the joint tax liability; and (4) the filing of a claim by the United States to collect the joint tax liability in a court proceeding in which the requesting spouse is a party or which involves property of the requesting spouse.  Treas. Reg. § 1.6015-5(b)(2).

6  IRC § 6015(g)(1).  *See infra* note 18 for an explanation of the general time period for filing refund claims under IRC § 6511.

7  IRC § 6015(c)(3)(C).

8  IRC §§ 6015(c)(4), (d)(3)(C).

9  IRC § 6015(g)(3).

10  An underpayment of tax occurs when the tax is properly shown on the return but is not paid.  *Washington v. Comm'r*, 120 T.C. 137, 158-59 (2003).

001942

Previously, the IRS incorporated the statutory two-year deadline found in IRC §§ 6015 (b)(1)(E) and (c)(3)(B) into the IRC § 6015 regulations and thereby imposed the two-year rule on requests for equitable relief under IRC § 6015(f).[11]  In 2009, the Tax Court, in *Lantz v. Commissioner*, held the regulation imposing the two-year rule invalid.[12]  The IRS appealed *Lantz* and similar decisions, and three courts of appeals ultimately held that the regulation was valid.[13]  In the meantime, the Tax Court continued, where permitted, to hold the regulation invalid, and the issue was appealed to other courts of appeals.[14]  The National Taxpayer Advocate consistently advocated for removal of the two-year rule that prevented taxpayers from obtaining equitable relief.[15]  In July 2011, the IRS changed its position and now considers requests for equitable relief under IRC § 6015(f) without regard to when the first collection activity was taken.[16]  The IRS proposed regulations to codify the change in the two-year rule on August 13, 2013.[17]  Taxpayers may now file requests for equitable relief within the period of limitation on collection in IRC § 6502[18] or, for any credit or refund of tax, within the period of limitation in IRC § 6511.[19]

---

11  Treas. Reg. §1.6015-5(b)(1).

12  132 T.C. 131 (2009).

13  *Mannella v. Comm'r*, 631 F.3d 115 (3d Cir. 2011) *rev'g and remanding* 132 T.C. 196 (2009); *Jones v. Comm'r*, 642 F.3d 459 (4th Cir. 2011), *rev'g and remanding* T.C. Docket No. 17359-08 (May 28, 2010); *Lantz v. Comm'r*, 607 F.3d 479 (7th Cir. 2010) *rev'g and remanding* 132 T. C. 131 (2009).

14  Adhering to the rule in *Golsen v. Comm'r*, 54 T.C. 742, 757 (1970), *aff'd* 445 F.2d 985 (10th Cir. 1971), that the Tax Court will defer to a Courts of Appeals decision which is squarely on point where appeal from the Tax Court decision lies to that Court of Appeal, the Tax Court continued to hold the regulation invalid in cases appealable to other circuits.  *See, e.g., Young v. Comm'r*, T.C. Docket No. 12718-09 (May 12, 2011); *Pullins v. Comm'r*, 136 T.C. 432 (2011); *Stephenson v. Comm'r*, T.C. Memo. 2011-16; *Hall v. Comm'r*, 135 T.C. 374, *appeal dismissed* (6th Cir. Aug. 2, 2011); *Buckner v. Comm'r*, T.C. Docket No. 12153-09, *appeal dismissed* (6th Cir. July 27, 2011); *Carlile v. Comm'r*, T.C. Docket No. 11567-09, *appeal dismissed* (9th Cir. Dec. 8, 2010); *Payne v. Comm'r*, T.C. Docket No. 10768-09, *appeal dismissed* (9th Cir. July 25, 2011); *Coulter v. Comm'r*, T.C. Docket No. 1003-09, *appeal dismissed* (2d Cir. Aug. 4, 2011).

15  National Taxpayer Advocate 2010 Annual Report to Congress 377 (Legislative Recommendation: *Allow Taxpayers to Request Equitable Relief Under Internal Revenue Code Section 6015(f) or 66(c) at Any Time Before Expiration of the Period of Limitations on Collection and to Raise Innocent Spouse Relief as a Defense in Collection Actions*); National Taxpayer Advocate 2010 Annual Report to Congress vol. 2, 1-12 (*Unlimit Innocent Spouse Equitable Relief*); National Taxpayer Advocate 2006 Annual Report to Congress 540 (Legislative Recommendation: *Eliminate the Two-Year Limitation Period for Taxpayers Seeking Equitable Relief under IRC § 6015 or 66*).

16  Notice 2011-70, 2011-2 C.B. 135 (July 25, 2011), *available at* http://www.irs.gov/pub/irs-drop/n-11-70.pdf.  The notice provides transitional rules and applies to requests submitted on or after July 25, 2011.  The notice also states that pending litigation will be managed consistently with the removal of the two-year rule.  *See also* CC-Notice 2011-017 (July 25, 2011) (providing direction for Chief Counsel attorneys handling cases docketed with the Tax Court that involve the two-year deadline).

17  78 Fed. Reg. 49,242 (Aug. 13, 2013).  Written or electronic comments were invited.  Comments and requests for a public hearing were to be received by November 12, 2013.  As of the date of this report, the IRS has not promulgated a final regulation.

18  The statutory period of limitations on collection is generally ten years after the date the tax is assessed.  IRC § 6502(a).  However, a variety of statutory provisions may extend or suspend the collection period.  For example, if a court proceeding to collect the tax is brought, such as a suit to reduce a tax liability to judgment, the period of limitations on collection is extended.  Therefore, the period of limitations on collection could exceed ten years, and a claim for innocent spouse relief would be valid at any point during that time.

19  Generally, taxpayers must request a refund within three years from the date their return was filed or two years from the time the tax was paid, whichever occurs later, or, if no return was filed, within two years from the time the tax was paid.  IRC § 6511(a).  If taxpayers meet the three-year requirement, they can recover payments made during the three-year period that precedes the date of the refund request, plus the period of any extension of time for filing the return.  However, taxpayers who do not meet the three-year requirement can recover only payments made during the two-year period preceding the date of the refund request.  IRC § 6511(b)(2).  Senator Cardin and Representative Becerra introduced companion bills that include the National Taxpayer Advocate's recommendation to codify the removal of the two-year rule that prevented taxpayers from obtaining equitable relief.  S. 2333, 114th Cong. (2015) and H.R. 4128, 114th Cong. (2015).

Revenue Procedure 2013-34 provides a nonexclusive list of factors that the IRS considers when determining whether equitable relief is appropriate.[20]  Factors include:

- Marital status;

- Economic hardship;

- Knowledge or reason to know of the understatement or underpayment, including abuse by the nonrequesting spouse;

- Legal obligation to pay the outstanding tax liability;

- Significant benefit from the understatement or underpayment;

- Compliance with income tax laws; and

- Mental or physical health.[21]

### Rights of the Nonrequesting Spouse

The individual with whom the requesting spouse filed the joint return is generally referred to as a "nonrequesting spouse" and is granted certain rights by IRC § 6015.  The nonrequesting spouse must be notified and given an opportunity to participate in any administrative proceedings concerning a claim under IRC § 6015.[22]  Further, if during the administrative process, full or partial relief is granted to the requesting spouse, the nonrequesting spouse can file a protest and receive an administrative conference in the IRS Appeals function.[23]  The nonrequesting spouse does not have the right to petition the Tax Court in response to the IRS's administrative determination regarding IRC § 6015 relief.[24]  If the requesting spouse files a Tax Court petition, the nonrequesting spouse must receive notice of the Tax Court proceeding, and the nonrequesting spouse has an unconditional right to intervene in the proceeding to dispute or support the requesting spouse's claim for relief.[25]  However, an intervening spouse has no standing to appeal the Tax Court's decision to the United States Courts of Appeals.[26]

### Judicial Review

Taxpayers seeking relief under IRC § 6015 generally file Form 8857, *Request for Innocent Spouse Relief*.[27]  After reviewing the request, the IRS ultimately issues a final notice of determination granting or denying relief in whole or in part.[28]  The taxpayer has 90 days from the date the IRS mails the notice to file a petition with the Tax Court.[29]  The Tax Relief and Health Care Act of 2006 amended IRC § 6015(e)

---

20   Rev. Proc. 2013-34, 2013-43 I.R.B. 397.  Revenue Procedure 2013-34 superseded Revenue Procedure 2003-61, 2003-2 C.B. 296.

21   *Id*. at 400-03.

22   IRC § 6015(h)(2).

23   Rev. Proc. 2003-19, 2003-5 C.B. 371.

24   *Maier v. Comm'r*, 119 T.C. 267 (2002), *aff'd*, 360 F.3d 361 (2d Cir. 2004) (holding that there are no provisions in IRC § 6015 that allow the nonrequesting spouse to petition the Tax Court from a notice of determination).

25   *Van Arsdalen v. Comm'r*, 123 T.C. 135 (2004).

26   *Baranowicz v. Comm'r*, 432 F.3d 972 (9th Cir. 2005).

27   *See* IRS Form 8857, *Request for Innocent Spouse Relief, Instructions* (Sept. 2010).

28   There are several types of preliminary determination letters that the IRS may send to the requesting or nonrequesting spouse before issuing a final determination.

29   IRC § 6015(e)(1)(A)(ii).

to expressly provide that the Tax Court has jurisdiction in "stand-alone" cases to review IRC § 6015(f) determinations, even where no deficiency has been asserted.[30]

## ANALYSIS OF LITIGATED CASES

We identified 24 opinions issued between June 1, 2014, and May 31, 2015.  The Tax Court issued the majority of the opinions (20 opinions, or 83 percent).  The IRS prevailed in full in 15 cases (63 percent), while the requesting spouse prevailed in seven cases (29 percent).  Two cases had split decisions (eight percent).  Taxpayers had representation in 13 cases (54 percent) and appeared *pro se* (*i.e.*, they represented themselves) in the remaining 11 cases (46 percent).  *Pro se* taxpayers prevailed in full in four cases (36 percent), while one *pro se* taxpayer obtained a split decision.  The nonrequesting spouse intervened in ten cases (42 percent).

### Procedural Issues

Of the 24 cases, five presented procedural issues.  Courts were faced with issues such as whether a requesting spouse may voluntarily withdraw a petition to review the IRS's denial of relief from joint liability and whether district and bankruptcy courts have jurisdiction over petitions for equitable relief filed under IRC § 6015(f).

In *Davidson v. Commissioner*, the Tax Court examined its authority to dismiss a request for relief without entering a decision in a "stand-alone" case.[31]  After the IRS denied her request for innocent spouse relief, Ms. Davidson petitioned the Tax Court for redetermination.[32]  However, after the IRS submitted its answer, Ms. Davidson requested to voluntarily withdraw her petition, to which the IRS did not object.[33]  The court first distinguished dismissals in deficiency cases, where IRC § 7459(d) controls, with other controversies.  In deficiency cases, which comprise the majority of cases before the Tax Court, a taxpayer "may not withdraw a petition to avoid a decision."[34]  Should the Tax Court dismiss a deficiency proceeding, the effect is a decision for the IRS, unless the dismissal is for lack of jurisdiction.[35]  In *Davidson*, a non-deficiency case, the Tax Court looked to the Federal Rules of Civil Procedure (FRCP) for guidance, since IRC § 7459(d) did not apply.[36]

---

30  Pub. L. No. 109-432, Div. C, § 408(a), (c), 120 Stat. 2922, 3061-62 (2006).  Prior to amendment, IRC § 6015(e) provided for Tax Court review of determinations under IRC §§ 6015(b) or (c), but it was not clear that the Tax Court had jurisdiction to review requests for relief made only under IRC § 6015(f) when no deficiency had been asserted.  The 2006 amendment followed the National Taxpayer Advocate's recommendation that IRC § 6015(e) be amended to clarify that taxpayers have the right to petition the Tax Court for review of determinations made only under IRC § 6015(f).  *See* National Taxpayer Advocate 2001 Annual Report to Congress 159-65 (Key Legislative Recommendation: *Joint and Several Liability Final Determination Rights*).  The filing of a Tax Court petition in response to the final notice of determination or after the IRC § 6015 claim is pending for six months is often referred to as a "standalone" proceeding, because jurisdiction is predicated on IRC § 6015(e) and not deficiency jurisdiction under IRC § 6213.

31  *Davidson v. Comm'r*, 144 T.C. No. 13 (2015).  A "stand-alone" case refers to a petition for redetermination that is independent of a deficiency proceeding.

32  *Id.*

33  *Id.*

34  *Id.*

35  *Id.  See also* IRC § 7459(d).  If a petition for redetermination of a deficiency has been filed by the taxpayer, a decision of the Tax Court dismissing the proceeding shall be considered as its decision that the deficiency is the amount determined by the Secretary.

36  *Id.*

Rule 41 of the FRCP allows for voluntary dismissal by the plaintiff under certain circumstances; otherwise the voluntary dismissal must be by court order.[37]  A court must use its discretion to "weigh the relevant equities and do justice between the parties."[38]  The Tax Court distinguished the present case from *Vetrano v. Commissioner*, a decision in which the Tax Court did not have authority to grant a request to withdraw a request for innocent spouse relief.[39]  In *Vetrano*, the taxpayer requested innocent spouse relief as an affirmative defense in a petition to redetermine a deficiency, which is one of three ways a taxpayer may invoke innocent spouse relief.[40]  The Tax Court held that the taxpayer was liable for the deficiency but reserved judgment on the relief issue.  The taxpayer sought to withdraw her request for relief without prejudice; however, the Tax Court could not grant the request to dismiss because "the court's final decision is conclusive with respect to an individual's later claim for § 6015 relief."[41]

In contrast, the requesting spouse in *Davidson* raised the issue of relief in a separate petition and not as a defense to a deficiency proceeding.[42]  The Tax Court held that the *res judicata* provisions in IRC § 6015 are only applicable when there is a prior proceeding.[43]  Since there is no prior proceeding when relief is requested in a "stand-alone" case, the Tax Court found that it has authority to dismiss a "stand-alone" case if there are no objections by the other party.[44]

In *United States v. Hirsch*, the District Court for the Eastern District of New York considered whether the taxpayer, Ms. Hirsch, was barred from raising innocent spouse relief as a defense in a suit to reduce assessment to judgment.[45]  Prior to the suit being commenced, in September 2000, Ms. Hirsch had filed a request for innocent spouse relief with the IRS.  The IRS contended it sent a notice of determination denying the request for innocent spouse relief to Ms. Hirsch in July 2003.[46]  Ms. Hirsch did not petition the Tax Court for review of the IRS's determination.  On March 5, 2010, the United States initiated a civil action to obtain a judgment against Ms. Hirsch, who appeared *pro se*, for her unpaid joint income tax liabilities for 1992 through 1997.[47]  Subsequently, on October 20, 2013, the government filed a motion for summary judgment arguing judgment should be entered in its favor.  Ms. Hirsch objected to the motion arguing that she should be relieved of the liabilities because she was an innocent spouse.  Ms. Hirsch contended that she never received a determination with respect to her request for innocent spouse relief,

---

37  Fᴇᴅ. R. Cɪᴠ. P. 41(a).  A plaintiff may voluntarily dismiss an action without a court order by filing (i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared.

38  *Davidson v. Comm'r*, 144 T.C. No. 13 (2015) (quoting *McCants v. Ford Motor Co.*, 781 F.2d 855, 857 (11th Cir. 1986)).

39  *Vetrano v. Comm'r*, 116 T.C. 272 (2001).

40  *Davidson v. Comm'r*, 144 T.C. No. 13 (2015).  The Tax Court has jurisdiction to review a taxpayer's request for innocent spouse relief in only three circumstances: (1) where a stand-alone petition is filed pursuant to IRC § 6015(e)(1)(A); (2) where a petition for review of a lien or levy action is filed pursuant to collection due process provisions of IRC §§ 6230 or 6330; and (3) as an affirmative defense where a petition for redetermination of a deficiency is filed pursuant to IRC § 6213(a).  *See Maier v. Comm'r*, 119 T.C. 267, 270-71 (2002), *aff'd*, 360 F.3d 361 (2d Cir. 2004); *Butler v. Comm'r*, 114 T.C. 276, 287-89 (2000); IRC §§ 6015(e)(1)(A), 6320(c), and 6330(c)(2)(A)(i).  A "stand-alone" petition must be filed no later than the close of the 90th day after the Commissioner has issued a final determination.  IRC § 6015(e)(1)(A)(i).

41  *Davidson v. Comm'r*, 144 T.C. No. 13 (2015).  *See also* IRC § 6015(g)(2) (*res judicata*).

42  *Davidson v. Comm'r*, 144 T.C. No. 13 (2015).

43  *Id.*

44  *Id.*

45  114 A.F.T.R.2d (RIA) 5896 (2014).  The factual background of this case is convoluted as it involves a divorce proceeding and a subsequent bankruptcy of Ms. Hirsch's husband.

46  *U.S. v. Hirsch*, 114 A.F.T.R.2d (RIA) 5896 (E.D.N.Y. 2014).  The taxpayer claims that she never received the notice of determination, but she did file an administrative appeal to the IRS appeals office prior to the final denial in July 2003.

47  *Id.*

001946

and the parties disputed whether the notice of determination was in fact sent to Ms. Hirsch's last known address as required by law.[48]

The court denied the motion for summary judgment concluding that the government did not establish that the Tax Court had jurisdiction over Ms. Hirsch's non-deficiency, stand-alone innocent spouse claim under IRC § 6015(f).  Currently, IRC § 6015(e)(1) gives the Tax Court jurisdiction to hear IRC § 6015(f) claims;[49] however, that provision took effect on December 20, 2006 and only applies to tax liabilities that arise or are unpaid on or after that date.[50]  Prior to the 2006 amendment, courts were unsure whether the Tax Court had jurisdiction to review "nondeficiency stand-alone petitions."[51]  In 2002, the Tax Court held it had jurisdiction in these cases.[52]  In 2004, however, the 2nd Circuit expressed doubt regarding whether the Tax Court had jurisdiction.  In subsequent decisions, the 9th Circuit, 8th Circuit, and Tax Court held that the Tax Court lacked jurisdiction to hear IRC § 6015(f) appeals absent express statutory language.[53]  Because Ms. Hirsch's tax liabilities arose before December 20, 2006, the court stated: "it appears that the Tax Court lacked jurisdiction to review [her innocent spouse] application."[54]  The court also denied the motion because a question of material fact existed as to whether IRS actually mailed the notice of determination denying Ms. Hirsch's innocent spouse application to her last known address.  This opinion is important because the decision leaves open the possibility that this district court might allow the taxpayer to raise IRC § 6015(f) as an affirmative defense in a suit to reduce an assessment to judgment, and that the Tax Court may not have exclusive jurisdiction.[55]  It has been a longstanding position of the National Taxpayer Advocate that taxpayers should be able to raise innocent spouse claims as an affirmative defense in an action to reduce joint federal tax assessments to judgment or in a lien foreclosure suit.[56]

In *Nunez v. Commissioner*, the 9th Circuit addressed whether the Tax Court maintains its jurisdiction when the IRS, in a change of its position, no longer opposes a request for innocent spouse relief.  Ms. Nunez petitioned the Tax Court after the IRS denied her request for relief; however, before trial, the IRS changed its position and would not oppose a ruling in favor of the taxpayer.[57]  Nevertheless, the Tax Court denied her motion, and the taxpayer appealed the Tax Court's denial of her motion to vacate its

---

48   The notice of determination must be sent to the taxpayer's last known address.  IRC § 6015(e)(1)(A)(i)(I).  Generally, a taxpayer's last known address is the address on the taxpayer's most recent return unless the IRS has been given clear and concise notification of a different address.  Treas. Reg. § 301.6212-2(a).

49   The parties agreed that since there was no understatement, Ms. Hirsch's claim had to be under IRC § 6015(f).

50   *U.S. v. Hirsch*, 114 A.F.T.R.2d (RIA) 5896 (E.D.N.Y. 2014).

51   *Id.*

52   *See Ewing v. Comm'r*, 118 T.C. 494 (2002), *rev'd* 439 F.3d 1009 (9th Cir. 2006).

53   *See Comm'r v. Ewing*, 439 F.3d 1009 (9th Cir. 2006); *Bartman v. Comm'r*, 446 F.3d 484 (8th Cir. 2006).  Upon reconsideration, the Tax Court overruled its holding in the *Ewing* case.  *See Billings v. Comm'r*, 127 T.C. 7 (2006).  The previous version of IRC § 6015(e) expressly granted the Tax Court jurisdiction only in IRC § 6015(b) and (c) cases.  Congress amended IRC § 6015(e) in 2006 to expressly grant authorization in IRC § 6015(f) cases.

54   *U.S. v. Hirsch*, 114 A.F.T.R.2d (RIA) 5896 (E.D.N.Y. 2014).  Although the court was correct in its analysis, prior to 2006, the Tax Court routinely reviewed stand-alone IRC § 6015(f) claims and made determinations on them.

55   The statute permits a taxpayer to petition the Tax Court "in addition to any other remedy provided by law."  Thus, U.S. district courts and the Tax Court may have concurrent jurisdiction.  IRC § 6015(e)(1)(A).  However, the United States has argued that a taxpayer cannot raise innocent spouse as an affirmative defense in a district court or bankruptcy court action on jurisdictional grounds and prevailed in a number of cases.  *See, e.g., U.S. v. Elman*, 110 A.F.T.R.2d (RIA) 6993 (2012); *U.S. v. Boynton*, 99 A.F.T.R.2d (RIA) 920 (2007); *U.S. v. Feda*, 97 A.F.T.R.2d 1985 (2006); *In re Mikels*, 524 B.R. 805, 807 (Bankr. S.D. Ind. 2015).

56   *See, e.g.*, National Taxpayer Advocate 2013 Annual Report to Congress 415-16.  *See also* National Taxpayer Advocate 2012 Annual Report to Congress 648; National Taxpayer Advocate 2010 Annual Report to Congress 504; National Taxpayer Advocate 2009 Annual Report to Congress 487; National Taxpayer Advocate 2008 Annual Report to Congress 524; National Taxpayer Advocate 2007 Annual Report to Congress 631.

57   *Nunez v. Comm'r*, 599 F. App'x 629 (9th Cir. 2015), *aff'g* T.C. Docket No. 15168-10 (Feb. 15, 2013).

decision.[58]  The taxpayer argued that because the IRS did not oppose granting her relief, the Tax Court lost jurisdiction.[59]  The 9th Circuit affirmed the Tax Court, holding that "nothing in § 6015 provides that the Tax Court loses jurisdiction once the Commissioner changes his position and supports, or stops opposing, a grant of relief in the requesting or electing spouse's favor."[60]  The Tax Court loses jurisdiction only in the case where either spouse files a refund suit in a district court, which did not happen in this instance.[61]  As a result, Ms. Nunez was not entitled to relief from joint and several liability for the tax years in dispute.[62]

In *In re Mikels*, the Bankruptcy Court for the Southern District of Indiana concluded that it lacks jurisdiction to make a determination of innocent spouse relief under IRC § 6015(f).  In response to deficiencies assessed for the 2008 and 2009 tax years, Mr. Mikels filed for innocent spouse relief for several tax years.[63]  The IRS granted relief for 2008 and 2009 but denied relief for the other tax years.[64]  The IRS later abated tax liabilities for 2008 and 2009; however, Mr. Mikels filed an objection to the IRS's determinations for tax years 2003-05, 2007, and 2010, claiming that he was entitled to relief under either IRC § 6015(c) or (f), since the liability was related to his ex-wife's daycare business.[65]  The court concluded that IRC § 6015(c) did not apply, since the only deficiencies that were assessed were subsequently abated, rendering the issue of innocent spouse relief under IRC § 6015(c) moot.  For Mr. Mikels' IRC § 6015(f) relief for the remaining tax years, the court acknowledged that section "[6015(e)(1)] does not address whether the Tax Court's jurisdiction is exclusive;" however, the court followed district court precedent concluding that the Tax Court has exclusive jurisdiction regarding stand-alone petitions for innocent spouse relief.[66]

In the 2013 Annual Report to Congress, the National Taxpayer Advocate stated that nothing in the language of IRC § 6015 gives the Tax Court exclusive jurisdiction to determine innocent spouse claims.[67]  Instead, the language of IRC § 6015(e) permits a taxpayer to petition the Tax Court for relief "in addition to any other remedy provided by law."[68]  The view taken by the bankruptcy court and district courts may leave taxpayers without a forum in which to raise innocent spouse relief as a defense to a collection suit.  The National Taxpayer Advocate has made legislative recommendations to clarify this issue.[69]

---

58  *Nunez v. Comm'r*, 599 F. App'x 629 (9th Cir. 2015), *aff'g* T.C. Docket No. 15168-10 (Feb. 15, 2013).

59  *Id.*

60  *Id.*

61  *Id.*

62  *Id.*

63  *In re Mikels*, 524 B.R. 805 (Bankr. S.D. Ind. 2015).  Mr. Mikels sought innocent spouse relief for the 2003-2005, 2007-2009, and 2010 tax years.  Mr. Mikel filed late joint returns for the years 2003-2005, 2007, and 2010 and did not file returns for the years 2008 and 2009.

64  *Id.*

65  *Id.*

66  *Id.* (citing *U.S. v. Boynton*, 99 A.F.T.R.2d (RIA) 920 (S.D. Cal. 2007)).

67  National Taxpayer Advocate 2013 Annual Report to Congress 408-19.

68  IRC § 6015(e).

69  The National Taxpayer Advocate has recommended that Congress address this issue in three Annual Reports to Congress.  National Taxpayer Advocate 2010 Annual Report to Congress 377 (Legislative Recommendation: *Allow Taxpayers to Request Equitable Relief Under Internal Revenue Code Section 6015(f) or 66(c) at Any Time Before Expiration of the Period of Limitations on Collection and to Raise Innocent Spouse Relief as a Defense in Collection Actions*); National Taxpayer Advocate 2009 Annual Report to Congress 378 (Legislative Recommendation: *Allow Taxpayers to Raise Relief Under Internal Revenue Code Sections 6015 and 66 as a Defense in Collection Actions*); National Taxpayer Advocate 2007 Annual Report to Congress 549 (Legislative Recommendation: *Allow Taxpayers to Raise Relief Under Internal Revenue Code Sections 6015 and 66 as a Defense in Collection Actions*).

## Relief on the Merits

Nineteen cases were decided on the merits. Taxpayers received full relief in five cases and partial relief in two cases. Two issues were frequently discussed in these decisions: (1) whether the requesting spouse knew or had reason to know of the underpayment, and (2) the nonrequesting spouse's right to intervene to support or oppose relief. First, the requesting spouse's knowledge that there was a deficiency or that the nonrequesting spouse would not pay the tax was a factor in 15 of the 19 decisions, including all seven of the decisions where taxpayers received full or partial relief.[70] Second, the nonrequesting spouse intervened to oppose relief in ten of the 19 cases. Of these ten cases, the IRS either originally granted relief or changed its position and determined relief was appropriate before trial in five instances.

The Tax Court reviewed both of these themes in *Molinet v. Commissioner* and *Varela v. Commissioner*. In *Molinet*, Ms. Molinet, a Cuban born taxpayer who did not have a good understanding of the United States banking system yet shared a joint bank account with her spouse who handled all of their finances, requested innocent spouse relief after her former spouse failed to pay taxes on a 401(k) distribution.[71] The IRS initially denied the request for relief but conceded the issue at trial; however, the former spouse intervened and opposed the request for relief.[72] The Tax Court reviewed Ms. Molinet's request for relief under the equitable relief provision in IRC § 6015(f) and examined her knowledge or reason to know of the underpayment as a factor in its analysis.

The Tax Court listed four factors it considered in determining whether the requesting spouse had reason to know of the underpayment:

1. The requesting spouse's level of education;

2. The requesting spouse's degree of involvement in the activity leading to the tax liability;

3. The requesting spouse's involvement in business and household financial matters; and

4. The requesting spouse's business or financial expertise.[73]

The Court found that Ms. Molinet did not have reason to know of the underpayment for three reasons. First, she had "minimal input" in financial decisions because of her difficulty understanding the United States banking system.[74] Second, she did not agree with her former spouse's decision to take taxable distributions from his 401(k) account but "reluctantly signed" the required forms because she "did not feel she had a choice in the matter."[75] Third, she "reasonably believed that she and [her former spouse] did not have any financial problems and that [her former spouse] could pay the tax due."[76] After weighing these factors in Ms. Molinet's favor, the Tax Court found that she was entitled to relief.[77]

---

70 All three methods of relief under IRC § 6015 contain a knowledge element. Knowledge may be actual or constructive, and the absence of knowledge weighs in favor of relief. *See* IRC §§ 6015(b)(1)(C), 6015(c)(3)(C); Rev. Proc. 2003-61, 2003-2 C.B. 296, §§ 4.02(1)(b) and 4.03(2)(a)(iii); *see also* Notice 2012-8, §§ 4.02(3) and 4.03(2)(c), 2012-4 C.B. 309.

71 *Molinet v. Comm'r*, T.C. Memo 2014-109. The IRS debt was assigned to Ms. Molinet's former spouse in their divorce settlement, and Ms. Molinet was convinced her former spouse could pay the debt.

72 *Id.*

73 *Id.* (citing Rev. Proc. 2013-34, § 4.03(2)(c)(iii), 2013-43 I.R.B. at 402).

74 *Id.*

75 *Id.*

76 *Id.*

77 *Id.*

In *Varela*, Ms. Varela petitioned for innocent spouse relief under all three provisions, and the government agreed at trial that she was entitled to full relief under IRC § 6015(b).[78]  In 2003, Ms. Valera began an action to divorce her husband but discontinued the action before it was completed.  Following that action, however, Ms. Varela and her former spouse separated their financial assets and responsibilities.  Ms. Varela and her former spouse separated in 2009 and eventually divorced in 2012.  The IRS agreed that Ms. Varela was entitled to relief, but her former spouse objected.  The Tax Court found that Ms. Varela did not have knowledge or reason to know of the understatements because she did not have access to her former spouse's or the corporation's bank accounts since they separated their finances.

## CONCLUSION

While the overall number of cases decreased from 2013, the last time innocent spouse relief appeared as a Most Litigated Issue, jurisdiction over innocent spouse relief continues to be an issue.  Based on their interpretation of IRC § 6015(e), courts have determined that the Tax Court has exclusive jurisdiction over stand-alone claims for innocent spouse relief, when in fact the statute permits a taxpayer to petition the Tax Court "in addition to any other remedy provided by law."[79]  Greater clarity in the statutory language would likely prevent future litigation over jurisdiction and provide taxpayers additional forums in which to pursue their claims.  For this reason, the National Taxpayer Advocate has made three legislative recommendations to address this issue and reiterates her position that taxpayers should be able to raise innocent spouse relief as a defense in collection actions.[80]

Courts' interpretation of IRC § 6015(e) prevents innocent spouses from claiming relief in deficiency cases in any forum other than Tax Court, thus limiting their opportunity to challenge and obtain relief from tax liabilities.  These restrictions impact the taxpayer's *right to challenge the IRS's position and be heard*, *to pay no more than the correct amount of tax*, *to appeal an IRS decision in an independent forum*, and *to a fair and just tax system*.

---

78   *Varela v. Comm'r*, T.C. Memo 2014-222.

79   See IRC § 6015(e)(1)(A).  This is consistent with the National Taxpayer Advocate's position that nothing in the language of IRC § 6015 confers exclusive jurisdiction the Tax Court for innocent spouse claims.  *See* National Taxpayer Advocate 2013 Annual Report to Congress 408-19.

80   The National Taxpayer Advocate has recommended that Congress address this problem in three Annual Reports to Congress.  National Taxpayer Advocate 2010 Annual Report to Congress 377 (Legislative Recommendation: *Allow Taxpayers to Request Equitable Relief Under Internal Revenue Code Section 6015(f) or 66(c) at Any Time Before Expiration of the Period of Limitations on Collection and to Raise Innocent Spouse Relief as a Defense in Collection Actions*); National Taxpayer Advocate 2009 Annual Report to Congress 378 (Legislative Recommendation: *Allow Taxpayers to Raise Relief Under Internal Revenue Code Sections 6015 and 66 as a Defense in Collection Actions*); National Taxpayer Advocate 2007 Annual Report to Congress 549 (Legislative Recommendation: *Allow Taxpayers to Raise Relief Under Internal Revenue Code Sections 6015 and 66 as a Defense in Collection Actions*).

# TAS CASE ADVOCACY

## OFFICE OF THE TAXPAYER ADVOCATE

The National Taxpayer Advocate leads TAS in all aspects of its statutory mission.  Under Internal Revenue Code (IRC) § 7803(c)(2)(A), the Office of the Taxpayer Advocate has four principal functions:

- Assist taxpayers in resolving problems with the IRS;

- Identify areas in which taxpayers are experiencing problems with the IRS;

- Propose changes in the administrative practices of the IRS to mitigate problems taxpayers are experiencing with the IRS; and

- Identify potential legislative changes that may be appropriate to mitigate such problems.

The first function described in the statute relates to TAS's case advocacy, which involves assisting taxpayers with their cases.  This section of the report discusses how TAS fulfills its mission to assist taxpayers with their specific issues and concerns involving IRS systems and procedures.

TAS's other three functions involve identifying and proposing changes to systemic problems affecting taxpayers.  TAS employees advocate systemically by:

- Identifying IRS procedures that adversely affect taxpayer rights or create taxpayer burden; and

- Recommending solutions, either administrative or legislative, to improve tax administration.[1]

TAS serves as the voice of the taxpayer within the IRS by providing the taxpayer's view on IRS policies, procedures, or programs.  While systemic advocacy is the responsibility of everyone in TAS, primary oversight of systemic advocacy efforts belongs to the Office of Systemic Advocacy.  Additionally, TAS administers the Low Income Taxpayer Clinic (LITC) grant program[2] and oversees the Taxpayer Advocacy Panel (TAP).[3]

## TAS CASE RECEIPT CRITERIA

Taxpayers typically seek TAS assistance with specific issues when:

- They have experienced a tax problem that causes financial difficulty;

- They have been unable to resolve their issues directly with the IRS; or

- An IRS action or inaction has caused or will cause them to suffer a long-term adverse impact, including a violation of taxpayer rights.

TAS accepts cases in four categories: economic burden, systemic burden, best interest of the taxpayer, and public policy.  See Figure 4.1.1, TAS Case Acceptance Criteria.

---

1   Taxpayers and practitioners can use the Systemic Advocacy Management System (SAMS) to submit systemic issues to TAS at http://www.irs.gov/sams.

2   The LITC program provides matching grants of up to $100,000 per year to qualifying organizations to operate clinics that represent low income taxpayers in disputes with the IRS and educate taxpayers for whom English is a second language about their taxpayer rights and responsibilities.  LITCs provide services to eligible taxpayers for free or for no more than a nominal fee.  See IRC § 7526.

3   TAP is a Federal Advisory Committee established by the Department of the Treasury to provide a taxpayer perspective on improving IRS service to taxpayers.  TAS provides oversight and support to the TAP program.  The Federal Advisory Committee Act (5 U.S.C. Appendix) prescribes standards for establishing advisory committees when those committees will furnish advice, ideas, and opinions to the federal government.  See also 41 C.F.R. Part 102-3.

**FIGURE 4.1.1**

# TAS Case Acceptance Criteria

*As an independent organization within the IRS, TAS helps taxpayers resolve problems with the IRS and recommends changes to prevent future problems. TAS fulfills its statutory mission by working with taxpayers to resolve problems with the IRS.[1]  TAS case acceptance criteria fall into four main categories.*

| Economic Burden | Cases involving a financial difficulty to the taxpayer; an IRS action or inaction has caused or will cause negative financial consequences or have a long-term adverse impact on the taxpayer. |
|---|---|
| Criteria 1 | The taxpayer is experiencing economic harm or is about to suffer economic harm. |
| Criteria 2 | The taxpayer is facing an immediate threat of adverse action. |
| Criteria 3 | The taxpayer will incur significant costs if relief is not granted (including fees for professional representation). |
| Criteria 4 | The taxpayer will suffer irreparable injury or long-term adverse impact if relief is not granted. |
| Systemic Burden[2] | Cases in which an IRS process, system, or procedure has failed to operate as intended, and as a result the IRS has failed to timely respond to or resolve a taxpayer issue. |
| Criteria 5 | The taxpayer has experienced a delay of more than 30 days to resolve a tax account problem. |
| Criteria 6 | The taxpayer has not received a response or resolution to the problem or inquiry by the date promised. |
| Criteria 7 | A system or procedure has either failed to operate as intended, or failed to resolve the taxpayer's problem or dispute within the IRS. |
| Best Interest of the Taxpayer | TAS acceptance of these cases will help ensure that taxpayers receive fair and equitable treatment and that their rights as taxpayers are protected.[3] |
| Criteria 8 | The manner in which the tax laws are being administered raises considerations of equity, or have impaired or will impair the taxpayer's rights. |
| Public Policy | TAS acceptance of cases under this category will be determined by the National Taxpayer Advocate and will generally be based on a unique set of circumstances warranting assistance to certain taxpayers.[4] |
| Criteria 9 | The National Taxpayer Advocate determines compelling public policy warrants assistance to an individual or group of taxpayers. |

1   IRC § 7803(c)(2)(A)(i).

2   TAS has changed its case acceptance criteria to generally stop accepting certain systemic burden issues. IRM 13.1.7.3(d), *Exceptions to TAS Criteria* (Feb. 4, 2015).

3   IRM 13.1.7.2.3, *TAS Case Criteria 8, Best Interest of the Taxpayer* (Feb. 4, 2015).

4   *See* Interim Guidance Memorandum (IGM) TAS-13-0414-001, *Interim Guidance on Accepting Cases Under TAS Case Criteria 9, Public Policy* (Apr. 2, 2014).

In many of the economic burden cases, time is critical.  If the IRS does not act quickly (*e.g.*, to remove a levy or release a lien), the taxpayer will experience additional economic harm.[4]   Best interest of the taxpayer (Criteria 8) includes breaches of the Taxpayer Bill of Rights (TBOR).[5]  With respect to public policy cases (Criteria 9), the National Taxpayer Advocate has the sole authority to determine which issues are included in this criterion and will designate them by memo.[6]

## REDEFINING TAS'S CASE ADVOCACY OPERATIONS

In the last year, as the demands for TAS's service have increased, TAS has implemented multiple strategies to focus on effectively advocating for taxpayers, as discussed below.

### TAS Organizational Shift to Expanded and Additional Local Offices in Underserved Communities

TAS has focused staffing efforts based on the importance of TAS's local presence and its connection with communities, especially as other IRS functions reduce their geographic presence and become more centralized.  The National Taxpayer Advocate established a realignment team to revisit TAS's geographic footprint and the allocation of staffing, considering population shifts and geographic centers with emerging issues.  The team reviewed whether taxpayer access to TAS resources was sufficient and analyzed whether TAS could improve advocacy by realigning its staffing to better position offices for anticipated work due to strategic decisions the IRS is making.

In addition to reviewing its existing staffing footprint, TAS analyzed population totals, primary demographics (*e.g.*, education levels and poverty rates), English as a Second Language (ESL) taxpayers, military populations, and congressional districts.  TAS weighed Metropolitan Statistical Area data within each state, as delineated by the Office of Management and Budget for collecting, tabulating, and publishing federal statistics.  TAS considered the location of existing TAS offices, availability of walk-in service, public transportation, and access to LITCs.  TAS also reviewed existing case advocate staffing, case receipts, capacity to work cases, and other factors, including how the future Taxpayer Advocate Service Integrated System (TASIS) environment will route cases.[7]

The National Taxpayer Advocate's plan is to realign staffing through attrition.  TAS identified several underserved regions across the country.  As part of a longer-term staffing initiative, TAS will expand its footprint in underserved areas, while shrinking existing staffing through attrition in certain other locations.  TAS will be able to update the model to reflect future staffing needs, as significant changes occur.  Accordingly, TAS opened a new office in San Jose, California in October 2015 and is opening offices in San Diego, California and St. Petersburg, Florida.  The National Taxpayer Advocate initiated actions to fill the Local Taxpayer Advocate (LTA) positions for the three locations.  TAS's realignment team continues to review other geographic areas for opportunities.  TAS will proactively align future hiring and attrition to better serve its taxpayer base.

---

4   IRC § 7803(c)(2)(A)(i); IRM 13.1.7.2.1, *TAS Case Criteria 1-4, Economic Burden* (Feb. 4, 2015).

5   IRC § 7803(c)(2)(A)(i); IRM 13.1.7.2.3, *TAS Case Criteria 8, Best Interest of the Taxpayer* (Feb. 4, 2015).  See TBOR, *available at* http://www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

6   IRC § 7803(c)(2)(A)(i); IRM 13.1.7.2.4, *TAS Case Criteria 9, TAS Public Policy* (Feb. 4, 2015).  See, e.g., *Interim Guidance on Accepting Cases Under TAS Case Criteria 9, Public Policy*, TAS-13-1115-007 (Nov. 2, 2015).

7   TAS uses the Taxpayer Advocate Management Information System (TAMIS) to record, control, and process cases and to analyze the issues that bring taxpayers to TAS.  TAS retrieved the data for this report on the first day of the month following the end of each fiscal year (FY).  TAS is developing an updated case management system called TASIS.  See National Taxpayer Advocate FY 2014 Objectives Report to Congress, Section VII for a full discussion of TASIS.

001953

### Centralized Case Intake (CCI)

TAS has formally changed its approach to the case intake process as a step in its strategy to focus on its primary mission to serve the most vulnerable taxpayers.  In FY 2014, TAS formed a partnership with the IRS's Wage and Investment (W&I) Business Operating Division (BOD) under the CCI Proof of Concept and expanded the process to all IRS employees staffing the National Taxpayer Advocate's toll-free line in FY 2015.  Key objectives included:

- Creating the ability for taxpayers to speak directly with TAS employees on their issues;

- Providing more in-depth interviews with vulnerable taxpayers before bringing their cases into TAS;

- Educating and guiding taxpayers in resolving their issues; and

- Increasing the intake advocate workforce to handle call demand without limiting the time needed to help each taxpayer.

Previously, IRS employees dedicated to the NTA toll-free line[8] determined whether the taxpayers met TAS criteria, and, if appropriate, opened a case directly onto the TAMIS.  Under the CCI, those IRS employees now transfer calls they believe meet TAS criteria directly to TAS intake advocates through the ASK-TAS1 toll-free line.  The intake advocates on the TAS toll-free line create cases only after validating that the taxpayers meet TAS criteria.

Of the total calls answered by ASK-TAS1, the NTA toll-free line transferred in 62 percent (54,205) of the calls.[9]  Of the transferred-in calls, nearly 83 percent (44,869) resulted in a TAS case created by the intake advocates.[10]  Through this process, intake advocates addressed the taxpayers' concerns in the remaining 17 percent (9,336) of the contacts to avoid opening a new TAS case, allowing TAS to use its resources on more complex situations requiring its specialized skills.[11]  In FY 2015, the total number of calls transferred to ASK-TAS1 almost tripled, and TAS helped almost 10,000 taxpayers without creating a case.

---

8   This number is 1-877-777-4778.

9   See IRS, *Aspect Application Activity Report*, (Oct. 1, 2014-Sept. 30, 2015).

10   Data obtained from TAMIS (Oct. 1, 2015).

11   This reflects calls resolved between Oct. 1, 2014 and Sept. 30, 2015.

**FIGURE 4.1.2**[12]

**Phone Calls Transferred to the ASK-TAS1 Line and
Resulting TAS Cases Created, FYs 2014–2015**



FY 2014: 19,065 total calls

15,117 (79%)
TAS Cases Created from
CCI Transferred Calls

3,948 (21%)
Calls Resolved
Without Creating
a New Case

FY 2015: 54,205 total calls

44,869 (83%)
TAS Cases Created from CCI Transferred Calls

9,336 (17%)
Calls Resolved
Without Creating
a New Case

### TAS Promotes the Use of Self-Help Tools to Resolve Taxpayers' Issues

To ensure TAS is helping the most vulnerable taxpayers, intake advocates handling the initial contact with the taxpayer may direct taxpayers, who are able, to navigate automated self-help IRS tools on irs.gov. Taxpayers may use the tools to resolve their issues independently and expeditiously. Some examples of the available tools are *Where's My Refund?*, *Where's My Amended Return?*, the *Online Payment Tool*, a withholding calculator, and tools to estimate benefits of the Affordable Care Act (ACA).

Additionally, TAS will identify and test self-help tools for taxpayers to resolve requests for expedited, returned, or stopped refunds and requests for copies of certain documents (*e.g.*, returns, reports, determination letters) to ease their economic burden and prevent adverse consequences. In FY 2015, TAS created a series of short videos for taxpayers, including:

- *What to Do if You Owe the IRS and Can't Pay:*
  - *Overview;*[13]
  - *Installment Agreement;*[14]
  - *Currently Not Collectible;*[15]
- *Injured Spouse;*[16] and
- *Held/Stopped Refunds.*[17]

---

12  See IRS, *Aspect Application Activity Report*, (Oct. 1, 2014 – Sept. 30, 2015).

13  *Available at* http://www.youtube.com/watch?feature=player_embedded&v=AsOEV0revVE.

14  *Available at* http://www.youtube.com/watch?feature=player_embedded&v=_xTmF8GNos4.

15  *Available at* http://www.youtube.com/watch?feature=player_embedded&v=Yxysf1p5Ivo.

16  *Available at* http://www.youtube.com/watch?feature=player_embedded&v=qhVcm9Phi1c.

17  *Available at* http://www.youtube.com/watch?feature=player_embedded&v=cyF_mwPTsjY.

### Employee Training and Education

Throughout FY 2015, TAS employees received training on the TBOR provisions to enable them to incorporate taxpayer rights into their daily casework.[18]  TAS employees will receive further education from the National Taxpayer Advocate's video presentation, *Using TBOR to Advocate for Taxpayers – Crosswalk,* at the all-employee symposium in FY 2016.

TAS is providing employees with enhanced guidance and detailed training on collection cases.  During FY 2015, local offices included TAS Technical Advisors with collection backgrounds in staff meetings to discuss technical and procedural issues to improve advocacy efforts in collection cases.  In response to TAS employees' concerns about workload distractions during training, TAS delivered "mini-symposiums" during the fall of 2015, taking employees off-line for two or three days, so they could concentrate on training.  During TAS's FY 2016 symposium, all employees will watch a video featuring the National Taxpayer Advocate and T. Keith Fogg, the Acting Director of the Legal Services Center of Harvard Law School LITC, *Advocating When Working Collection Cases.*  TAS delivered *Integrated Automation Technologies – Collection Suite Tools* to lead case advocates in FY 2015.  All case advocates will receive the training as part of a financial analysis workshop in FY 2016.  TAS will focus its resources further by releasing two videos in FY 2016: *TAS Awareness Training for Automated Collection System (ACS) Employees* and *TAS Awareness Training for Field Collection Employees*.  The videos will improve the ability of IRS employees to recognize appropriate referrals to TAS, ensuring TAS assists taxpayers most in need of help.

### Refinement of Quality Standards

TAS plans to refine its quality standards to better focus on its role of advocating for the taxpayer.  The revised standards more closely align with TAS's guiding principle of advocacy and will enable TAS to better measure and emphasize advocacy efforts, such as resolving taxpayers' issues, protecting taxpayers' rights, and keeping taxpayers informed with complete and accurate information.

In FY 2016, TAS will:

- Continue to expand the CCI and intake processes to increase the capability for intake advocates to address, resolve, and provide relief for less complex issues, allowing case advocates more time to work more complex cases;

- Propose the expansion of the CCI process to accept transferred calls from other IRS toll-free lines when the taxpayer meets TAS criteria and the IRS is unable to resolve the taxpayer's issue the same day;

- Identify additional opportunities where intake advocates can assist taxpayers in resolving their issues independently and expeditiously by directing them to self-help tools, videos, and other automated IRS tools without the need to create a TAS case; and

- Complete the TAS expansion effort in St. Petersburg, Florida and San Diego, California.

---

18   IRC § 7803(c)(2)(A)(i); IRM 13.1.7.2.3, *TAS Case Criteria 8, Best Interest of the Taxpayer* (Feb. 4, 2015).  See TBOR, *available at* http://www.TaxpayerAdvocate.irs.gov/taxpayer-rights.

## CASE RECEIPT TRENDS IN FY 2015

The Case Advocacy function in TAS has primary responsibility for direct contact with taxpayers, their representatives, and congressional staffs.  Information from these contacts and the case results are vital to TAS's statutory missions to propose changes in the IRS's administrative practices to alleviate taxpayers' problems and to identify potential legislative changes to relieve such problems.  Case Advocacy's findings and results flow into TAS's Systemic Advocacy programs and form the basis for many of the Most Serious Problems and the Legislative Recommendations in this report.

### Volume of Cases

In FY 2015, TAS received 227,189 cases, a nearly five percent increase from FY 2014.  TAS provided relief to taxpayers in approximately 78 percent of cases closed in FY 2015, consistent with FY 2014.[19]  Figure 4.1.3 compares FY 2014 and FY 2015 case receipts and relief rates by case acceptance category.

**FIGURE 4.1.3, TAS Case Receipts and Relief Rates, FYs 2014–2015[20]**

| Case Categories | Receipts FY 2014 | Receipts FY 2015 | Percent Change | Relief Rates FY 2014 | Relief Rates FY 2015 | Percent Change |
|---|---|---|---|---|---|---|
| Economic Burden | 124,732 | 135,469 | 8.6% | 75.4% | 76.2% | 1.0% |
| Systemic Burden | 91,545 | 91,425 | -0.1% | 81.4% | 81.7% | 0.4% |
| Best Interest of Taxpayers | 195 | 193 | -1.0% | 78.2% | 75.9% | -3.0% |
| Public Policy | 225 | 102 | -54.7% | 81.5% | 76.9% | -5.6% |
| **Total Cases** | **216,697** | **227,189** | **4.8%** | **77.9%** | **78.4%** | **0.7%** |

### Case Complexity

TAS monitors the complexity of its work to ensure it meets taxpayers' needs efficiently by assigning workload to match the skills of its employees, by identifying when additional resources may be needed, such as technical advisor assistance[21] or counsel advice,[22] and by balancing case inventory levels between TAS offices to ensure prompt action will occur.  TAS measures case complexity in a number of ways, including whether a case involves multiple issues or multiple tax periods and whether technical advice is needed, thus requiring more resources to resolve the matter.[23]  Whether the multiple case issues are linked

---

19  TAS determines relief rates based upon whether it can provide full or partial relief or assistance on the issue initially identified by the taxpayer.  Because TAS frequently provides relief on issues that differ from the ones initially identified, the relief rate as calculated is understated.  Data obtained from TAMIS (Oct. 1, 2015).

20  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

21  IRM 13.1.12.1.1, *Technical Advisors Roles and Responsibilities* (Nov. 13, 2009), states in part that "Technical Advisors are responsible for resolving the most technically complex or sensitive issues using effective research, communication, coordination, and negotiating skills."

22  TAS employees often need legal advice to resolve their cases.  Attorneys in the Office of Chief Counsel provide legal advice on the correct interpretation of the IRC.  *See* IRC § 7803(b)(2) and IRM 13.1.10.2, *Obtaining Legal Advice From Chief Counsel* (April 9, 2012).

23  IRM 13.4.5.4, *Case Factors Screen* (July 16, 2012).  TAS uses a complexity factor screen in its case management system.  This screen contains 24 factors, where the presence of any one of these factors indicates greater case complexity.  For example, one factor is whether the case involves analysis of the assessment, collection, or refund statute date to determine if it is about to expire.  TAS is using this data for purposes of developing TASIS and will use the factors to assign cases in TASIS.

or separate, the case advocate (CA) must resolve all issues before closing the case.[24]  CAs must identify primary and secondary core issues on cases and record them in TAMIS.[25]

Figure 4.1.4 represents the top ten sources of TAS receipts by primary core issue code (PCIC) categories from all sources without regard to TAS criteria, comparing FY 2014 and FY 2015.  The "Other TAS Receipts" category encompasses the remaining PCICs not in the top ten.

**FIGURE 4.1.4, Top 10 Issues for Cases Received in TAS, FYs 2014–2015**[26]

| Rank | Issue Description | FY 2014 | FY 2015 | FY 2015 Percent of Total | Percent Change FY 2014 to FY 2015 |
|---|---|---|---|---|---|
| 1 | Identity Theft | 43,690 | 56,174 | 24.7% | 28.6% |
| 2 | Pre-Refund Wage Verification Hold | 35,220 | 40,633 | 17.9% | 15.4% |
| 3 | Processing Amended Return | 10,245 | 11,847 | 5.2% | 15.6% |
| 4 | Earned Income Tax Credit (EITC) | 13,450 | 10,880 | 4.8% | -19.1% |
| 5 | Levy | 8,086 | 7,977 | 3.5% | -1.3% |
| 6 | Processing Original Return | 7,664 | 7,148 | 3.1% | -6.7% |
| 7 | Reconsideration of Audit and Substitute for Return under IRC § 6020(b) | 6,768 | 6,723 | 3.0% | -0.7% |
| 8 | Unpostable and Reject | 3,751 | 6,057 | 2.7% | 61.5% |
| 9 | Returned and Stopped Refund | 3,271 | 4,612 | 2.0% | 41.0% |
| 10 | Injured Spouse Claim | 7,284 | 4,604 | 2.0% | -36.8% |
|  | Other TAS Receipts | 77,268 | 70,534 | 31.0% | -8.7% |
| **Total TAS Receipts** | | **216,697** | **227,189** | | **4.8%** |

The top five primary issue codes were consistent between FY 2014 and FY 2015.  However, TAS experienced a nearly 29 percent increase in identity theft (IDT) cases in FY 2015, approaching the FY 2013 level of 57,929 cases.  TAS's ongoing high volume of IDT cases and increased receipts in FY 2015 indicate that taxpayers continue to face sizeable, complex problems.[27]  IDT cases remain the top source of TAS work.[28]

Erroneous information resulting from IDT can affect a victim's account for multiple tax periods and cause multiple issues, affecting the Accounts Management, Examination, and Collection functions.  Other complex cases include collection cases (levy releases with alternative collection solutions, return of levy proceeds, offers in compromise (OIC), or seizure prevention), examination cases with multiple periods

---

24  IRM 13.1.21.1.1, *Introduction* (Feb. 1, 2011).

25  IRM 13.1.16.13.1, *Issue Codes* (Feb. 1, 2011).  IRM 13.1.16.13.1.2, *Primary Core Issue Code* (Feb. 1, 2011), states the PCIC is a three-digit code that defines the most significant issue, policy, or process within the IRS that needs to be resolved. IRM 13.1.16.13.1.3, *Secondary Core Issue Code* (Feb. 1, 2011), states that the Secondary Core Issue Code (SCIC) identifies secondary issues and is used when a case has multiple issues.

26  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

27  *See* Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, supra.*  National Taxpayer Advocate 2013 Annual Report to Congress 75-83 (Most Serious Problem: *Identity Theft: The IRS Should Adopt a New Approach to Identity Theft Victim Assistance That Minimizes Burden and Anxiety for Such Taxpayers*) for a detailed discussion of the identity theft issues.

28  Data obtained from TAMIS (Oct. 1, 2015).

and technical issues, or income verification cases for self-employed persons with or without Earned Income Tax Credit (EITC) issues.

The percentage of cases that TAS closed with one or more SCICs increased slightly over the last year, from 58 percent in FY 2014 to 60 percent in FY 2015.  These numbers indicate that a significant portion of TAS's inventory is complex, requiring more resources and time.[29]

**FIGURE 4.1.5**[30]



### Closed Cases and Closures With Secondary Issue Codes (SCICs), FYs 2013–2015



| FY 2013 | FY 2014 | FY 2015 |
|---------|---------|---------|
| 249,372 | 222,974 | 227,512 |
| 157,818 (63.3%) | 129,281 (58.0%) | 135,851 (59.7%) |

Closures with No SCIC    Closures with SCIC

In addition to cases with multiple issues, five percent of TAS closed cases in FY 2015 required the assistance of a technical advisor to understand and resolve the complexities of the cases.[31]  Over 27 percent of TAS closed cases involved multiple tax periods.[32]  Any of these factors can increase the time TAS spends resolving a taxpayer's overall issues.

## Economic Burden Cases

Economic burden cases often occur where IRS processes are not functioning smoothly or taxpayers experience other systemic problems.  For the fourth consecutive fiscal year, more than half of TAS receipts involved taxpayers experiencing economic burden.[33]  Because these taxpayers face potential immediate adverse financial consequences, TAS requires employees to work the cases using accelerated timeframes.[34]

---

29   In FY 2013, of the 249,372 cases closed, 157,818 cases involved more than one issue.  In FY 2014, of the 222,974 cases closed, 129,281 cases involved more than one issue.  In FY 2015, of the 227,512 cases closed, 135,851 cases involved more than one issue code.  Data obtained from TAMIS (Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

30   *Id.*

31   Data obtained from TAMIS (Oct. 1, 2015).

32   *Id.*

33   *See* National Taxpayer Advocate 2014 Annual Report to Congress 533 (TAS Case Advocacy), which reflects that 60.6 percent of TAS case receipts included economic burden factors in FY 2012.

34   IRM 13.1.16.12(1), *Case Advocate Case Assignment* (March 23, 2011) (Upon acceptance into the TAS program, cases are ready for assignment to CAs within two workdays of the Taxpayer Advocate Received Date (TARD) for Criteria 1-4 cases and three workdays of the TARD for Criteria 5-9 cases).  IRM 13.1.18.3(1), *Initial Contact* (February 1, 2011)  (the CA is to contact the taxpayer or representative by telephone within three workdays of the TARD for criteria 1-4 cases and within five workdays of the TARD for criteria 5-9 cases to notify of TAS's involvement.)

FIGURE 4.1.6[35]

### TAS Economic Burden and Systemic Burden Receipts, FYs 2013–2015



| FY 2013 | FY 2014 | FY 2015 |
|---|---|---|
| 88,826 | 91,965 | 91,720 |
| 156,130 (63.7%) | 124,732 (57.6%) | 135,469 (59.6%) |

Economic burden (criteria 1–4)      Systemic burden (criteria 5–9)

Figure 4.1.7 shows the top five issues driving economic burden receipts, which represent the bulk of the increase in economic burden cases. TAS dedicates significant resources to resolving the systemic causes of these issues, as discussed in the Most Serious Problems section of this and past reports.

### FIGURE 4.1.7, Top Five Issues Causing Economic Burden (EB) Cases, FYs 2014–2015[36]

| Rank | Issue Description | FY 2014 | EB Receipts as % Total EB Receipts for Issue FY 2014 | FY 2015 | EB Receipts as % Total EB Receipts for Issue FY 2015 | EB Percent Change FY 2014 to FY 2015 |
|---|---|---|---|---|---|---|
| 1 | Identity Theft | 31,160 | 25.0% | 40,284 | 29.7% | 29.3% |
| 2 | Pre-Refund Wage Verification Hold | 20,917 | 16.8% | 25,206 | 18.6% | 20.5% |
| 3 | Earned Income Tax Credit (EITC) | 10,519 | 8.4% | 8,545 | 6.3% | -18.8% |
| 4 | Levy | 7,206 | 5.8% | 7,074 | 5.2% | -1.8% |
| 5 | Processing Amended Return | 4,713 | 3.8% | 5,331 | 3.9% | 13.1% |

### Identity Theft

IDT, which occurs when an individual intentionally uses the personal identifying information of another person to file a false tax return with the intention of obtaining an unauthorized refund, continued as the number one reason taxpayers sought TAS's assistance.[37] In FY 2015, IDT receipts comprised 25 percent

---

35   Data obtained from TAMIS (Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

36   Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015). TAS computed the top five economic burden issue codes using only the PCIC. Often TAS cases involve more than one issue and TAS tracks this data; however, these are not included within this computation to avoid counting a case more than once.

37   The IRS refers to this type of tax-related identity theft as "refund-related" identity theft. In "employment-related" IDT, an individual files a tax return using his or her own taxpayer identification number, but uses another individual's Social Security number (SSN) to obtain employment, and consequently, the wages are reported to the IRS under the SSN. IRM 25.23.1.4.1, *Identity Theft in Tax Administration* (Sept. 2, 2015). The IRS has procedures in place to minimize the tax administration impact to the victim in these employment-related identity theft situations. *See* IRM 25.23.2.20.5, *Employment-Related Identity Theft* (Sept. 8, 2015), for an example of those procedures. Accordingly, TAS will focus on refund-related IDT in this report.

of all receipts and nearly 30 percent of economic burden receipts.  The National Taxpayer Advocate first addressed the issue as a Most Serious Problem affecting taxpayers in 2004, identifying further problems and recommending solutions in subsequent reports.[38]

IDT victims often come to TAS when they are experiencing a hardship to obtain expedited resolution. Since 2010, TAS has helped over 263,000 IDT victims resolve their account problems.[39]  In FY 2015, TAS obtained relief for a significant majority of taxpayers in IDT cases with about 80 percent of taxpayers receiving relief.[40]  The FY 2015 average time to work an IDT case to its conclusion of 68 days is a 16 percent improvement from 81 days in FY 2014 and significantly less than the IRS's normal processing time of 180 days.[41]  TAS closed 54,849 IDT cases in FY 2015, including about 72 percent with economic burden.[42]

As Figures 4.1.8 and 4.1.9 demonstrate, TAS's IDT inventories have increased from FY 2014 to FY 2015, while TAS's timeframes for completing IDT cases are improving over time.

**FIGURE 4.1.8**[43]

### TAS Identity Theft Case Receipts and Percentage Changes, FYs 2010–2015



*Change compared to prior year

---

38  See Most Serious Problem: *Identity Theft (IDT): The IRS's Procedures for Assisting Victims of IDT, While Improved, Still Impose Excessive Burden and Delay Refunds for Too Long, supra*;  National Taxpayer Advocate 2013 Annual Report to Congress 75-83;  National Taxpayer Advocate 2012 Annual Report to Congress 42-67;  National Taxpayer Advocate 2011 Annual Report to Congress 48-68;  National Taxpayer Advocate 2009 Annual Report to Congress 307-11;  National Taxpayer Advocate 2008 Annual Report to Congress 79-93;  National Taxpayer Advocate 2007 Annual Report to Congress 96-115;  National Taxpayer Advocate 2005 Annual Report to Congress 180-91;  National Taxpayer Advocate 2004 Annual Report to Congress 133-36.

39  Data obtained from TAMIS (Oct. 1, 2015).

40  *Id.*

41  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

42  Data obtained from TAMIS (Oct. 1, 2015).

43  Data obtained from TAMIS (Oct. 1, 2010; Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct 1, 2014; Oct. 1, 2015).

**FIGURE 4.1.9**[44]



Identity Theft Relief Rate and Cycle Time,
FYs 2010–2015

| FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |

Cycle time (in days): 118.7, 107.2, 100.7, 87.0, 81.0, 68.3

Relief rate: 81.0%, 83.7%, 87.9%, 87.1%, 81.6%, 80.2%

■ Cycle time (in days)   — Relief rate

### Pre-Refund Wage Verification Holds

The IRS employs various filters and data mining techniques in an attempt to prevent processing fraudulent returns and issuing fraudulent refunds.  These preventive measures may also delay taxpayers' valid returns from timely processing, blocking timely receipt of refunds.  When the IRS receives more questionable returns than it has resources to evaluate properly, it places holds on the associated refunds.  In the past, the IRS's actions have raised significant taxpayer rights issues and brought increasing numbers of taxpayers to TAS.[45]

This year, as in the past, pre-refund wage verification holds under the Return Integrity and Compliance Services Program (RICS) constituted the second most frequent reason that taxpayers came to TAS for assistance.  Pre-refund wage verification hold cases remained at nearly 18 percent of TAS's total inventory in FY 2015, after almost doubling between FYs 2012 and 2014.  The volume of TAS cases reinforces the presence of significant systemic and procedural issues in the RICS program.[46]

---

44  Data obtained from TAMIS (Oct. 1, 2010; Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct 1, 2014; Oct. 1, 2015).

45  *See* National Taxpayer Advocate 2005 Annual Report to Congress 25, addressing the IRS's Questionable Refund Program (subsequently called the RICS program) that failed to provide taxpayers with adequate due process protections and failed to maintain an adequate system to vet the IRS's concerns about taxpayer refund claims.

46  *See* Most Serious Problem: *Revenue Protection: Hundreds of Thousands of Taxpayers File Legitimate Tax Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's Pre-Refund Wage Verification Program*, *supra*.  For additional discussion, see National Taxpayer Advocate FY 2015 Objectives Report to Congress 143-45 (*TAS Receipts Suggest the IRS Needs to Enhance Efforts to Detect and Prevent Refund Fraud*).

**FIGURE 4.1.10**[47]



**Pre-Refund Wage Verification Hold Receipts
and Total Case Receipts, FYs 2012–2015**

| | | | |
|---|---|---|---|
| 219,666 | 244,956 | 216,697 | 227,189 |
| 18,012 (8.2%) | 26,136 (10.7%) | 35,220 (16.3%) | 40,633 (17.9%) |
| FY 2012 | FY 2013 | FY 2014 | FY 2015 |

◼ TAS Pre-refund wage verification hold receipts   ◼ Other receipts

While the National Taxpayer Advocate makes recommendations to the IRS regarding improvements to the income verification programs,[48] TAS continues to provide advocacy to the taxpayers who come to TAS when the IRS delays their refunds under these programs. Generally, TAS achieves almost a 78 percent relief rate[49] and an 89 percent customer satisfaction rate in these cases.[50] The cycle time of these cases is about 58 days on average.[51]

### Earned Income Tax Credit Cases

The EITC is a refundable tax credit that provides an important economic benefit for low income taxpayers who have earned income.[52] TAS's FY 2015 EITC receipts were the fourth highest source of TAS's cases.[53] About 79 percent of the FY 2015 EITC cases involved taxpayers experiencing an economic burden.[54]

---

47  Data obtained from TAMIS (Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

48  *See* Most Serious Problem: *Revenue Protection: Hundreds of Thousands of Taxpayers File Legitimate Tax Returns That Are Incorrectly Flagged and Experience Substantial Delays in Receiving Their Refunds Because of an Increasing Rate of "False Positives" Within the IRS's Pre-Refund Wage Verification Program, supra.*

49  Data obtained from TAMIS (Oct. 1, 2015).

50  TAS customer satisfaction is determined using a survey administered by a contractor. TAS measures customer satisfaction by the percent of taxpayers who indicate they are very satisfied or somewhat satisfied with the service provided by TAS. The FY 2015 year-to-date results are from the third quarter FY 2015 National Summary by PCICs from the contractor's results.

51  Data obtained from TAMIS (Oct. 1, 2015).

52  The benefit is available for low income taxpayers without children but is more significant for those with children. The maximum benefit for tax year 2014 (returns filed in 2015) was $6,143 with three or more qualifying children and $496 with no qualifying children. IRS Publication 596, *Earned Income Credit* (EIC), 29-35 (Dec. 18, 2014).

53  *See* Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance,* Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Does Not Do Enough Taxpayer Education in the Pre-Filing Environment to Improve EITC Compliance and Should Establish a Telephone Helpline Dedicated to Answering Pre-filing Questions From Low Income Taxpayers About Their EITC Eligibility; and* Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, supra.* Data obtained from TAMIS (Oct. 1, 2014).

54  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).



FIGURE 4.1.11[55]

**TAS EITC Economic Burden and Total Case Receipts, FYs 2012–2015**



The EITC is complex yet its recipients are in the lower economic strata and often the least able to navigate complicated IRS processes. Low income taxpayers are found more frequently among the elderly, the disabled, Native Americans, and taxpayers with limited English proficiency.[56]  TAS taxpayers typically face difficulty substantiating the EITC's residency and relationship requirements.[57]  Taxpayers experiencing the most problems are those with non-traditional family relationships (where the child is not the biological child of the taxpayer claiming the credit) for whom documentation requirements can be overwhelming (*e.g.*, the need to obtain birth certificates for various individuals to establish the required relationship for a niece, nephew, or other extended relative).  Migratory living patterns, lack of education, lack of time (*e.g.*, holding multiple jobs), lack of transportation, and limited access to technology (*e.g.*, internet, fax) add to the difficulty of finding and submitting documents.[58]

TAS is engaging with W&I to develop more effective ways to administer EITC examinations.[59]  TAS employees serve on the cross-functional EITC Audit Improvement Team and continue to recommend improvements to the document sent to taxpayers, Form 886-H-EIC, *Documents You Need to Prove You Can Claim an Earned Income Credit on the Basis of a Qualifying Child or Children*.  In January 2015, the IRS implemented the team's suggestion to change the EITC script on the TeleTax Line to improve the service provided to EITC taxpayers.  The team also developed a video to expand taxpayers' understanding of EITC requirements.  The team currently is creating improved training for telephone assistors to promote meaningful conversations with taxpayers with EITC questions.  The goal of the improved training is to

---

55   Data obtained from TAMIS (Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

56   *See* National Taxpayer Advocate 2013 Annual Report to Congress 109; National Taxpayer Advocate 2011 Annual Report to Congress 296, 304; National Taxpayer Advocate 2009 Annual Report to Congress 110.

57   To claim a child for the EITC, the child must be a "qualifying child" and must meet three tests: age, relationship, and residency.  Pursuant to IRC § 32(c)(3)(A), the EITC generally relies on the definition of qualifying child found in IRC § 152.  The **Relationship** test requires that the child be the taxpayer's child (including an adopted child, stepchild, or eligible foster child), brother, sister, stepbrother, stepsister, or descendant of one of these relatives.  *See* IRC §§ 152(c)(2) and 152(f)(1).  The **Residency** test requires that the qualifying child must live with the taxpayer for more than half of the tax year (exceptions apply for temporary absences for special circumstances, *e.g.*, children who were born or died during the year, children of divorced or separated parents, and kidnapped children).  *See* IRC §§ 152(c)(1)(B), (e), (f)(6); and Treas. Reg. § 1.152-1(b).  The **Age** test requires the child be younger than the taxpayer and fall under one of these age categories: under age 19, under age 24 and a full-time student, or a child of any age who is permanently and totally disabled.  *See* IRC § 152(c)(3).

58   *See* National Taxpayer Advocate 2013 Annual Report to Congress, 109 (Most Serious Problem: *Earned Income Tax Credit: The IRS Inappropriately Bans Many Taxpayers From Claiming EITC*).

59   *See* Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance*, *supra*.

encourage a conversation between the IRS examiner and the taxpayer.  The training will occur before the upcoming filing season.

TAS CAs are receiving further training on how best to serve the EITC taxpayer.  These taxpayers rely on TAS for assistance to interpret the meaning of the letters received from the IRS, to assist in gathering documentation, or to deal with collection activities if the EITC taxpayer never received, or responded to, the IRS's correspondence.

The IRS primarily relies upon correspondence audits, which create problems for EITC taxpayers due to the characteristics of this population, as described above.  To counter this, the CAs must communicate with the EITC taxpayer in a more complete and understandable manner than the IRS's correspondence when the EITC taxpayer contacts TAS for assistance.  TAS is committed to training its CAs to improve communication with the EITC taxpayer.  TAS initiatives to improve its own EITC casework include actions by an EITC subject matter expert to share best practices for better communication between the CA and the EITC taxpayer and emphasis on issue development through a more personalized approach.  TAS tailors the approach to the particular needs of the EITC taxpayers, which may include assistance with the preparation of affidavits for the EITC taxpayer, the suggestion of alternative documentation when traditional documentation is not available, and direct contact with third parties.[60]

To open another avenue of communication with the EITC taxpayer, TAS participates in the IRS Digital Communications Project, which will allow non-traditional forms of communication between taxpayers and the IRS.[61]  The National Taxpayer Advocate selected EITC taxpayers to be part of the trial to determine whether EITC taxpayers can effectively communicate digitally with their CAs once they have an open case in TAS.  The non-traditional forms of communication may benefit the low income taxpayer, who may no longer have a landline telephone or access to a permanent address for mail.  Instead of the necessity of copying a birth certificate and placing the copy in the mail to the IRS, which involves cost and time, an EITC taxpayer will be able to take a photo of the document with a cell phone and send it to the CA.  Such innovations in communication are yet another method TAS is planning to use to better advocate for and educate EITC taxpayers.

As discussed in several Most Serious Problems in this report,[62] the National Taxpayer Advocate encourages the IRS to improve compliance through better taxpayer service and audit strategies, with the goal of educating the EITC taxpayer on the rules of the credit.  CAs are part of the process as well.  In EITC cases, the CA reminds the taxpayers of the rules for qualifying children, the necessity for documentation, and methods to show the IRS that they are entitled to the credit claimed.  If taxpayers have improperly

---

60   EITC cases present TAS leadership with an improvement opportunity.  In FY 2015, the average relief rate on EITC cases was over 63 percent compared to approximately 78 percent for all cases.  TAS has taken a number of steps to improve its service to these taxpayers, including EITC training for field employees led by the National Taxpayer Advocate, decentralization of all EITC casework so the cases may be worked in local offices, and EITC case reviews by TAS leadership to identify the aspects of the credit that require additional training.

61   *See* National Taxpayer Advocate 2014 Annual Report to Congress 161 (Most Serious Problem: *Virtual Service Delivery (VSD): Establish Targets and Deadlines for the Development and Implementation of VSD in Brick & Mortar Locations, in Mobile Tax Assistance Units, and Over the Internet Video Conferencing*).

62   *See* Most Serious Problem: *2015 EITC Introduction*; Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Is Not Adequately Using the EITC Examination Process as an Educational Tool and Is Not Auditing Returns With the Greatest Indirect Potential for Improving EITC Compliance*; Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS Does Not Do Enough Taxpayer Education in the Pre-Filing Environment to Improve EITC Compliance and Should Establish a Telephone Helpline Dedicated to Answering Pre-filing Questions From Low Income Taxpayers About Their EITC Eligibility; and* Most Serious Problem: *Earned Income Tax Credit (EITC): The IRS's EITC Return Preparer Strategy Does Not Adequately Address the Role of Preparers in EITC Noncompliance, supra.*

claimed the EITC, CAs ensure that these taxpayers understand the rules and can use this knowledge in the future to be compliant with tax laws.

## Affordable Care Act

In FY 2015, TAS received 3,758 cases in which the taxpayer needed assistance with an aspect of the ACA.[63]  While this was not a substantial source of cases, FY 2015 was the first year in which the IRS required taxpayers to report whether or not they had qualifying health insurance; thus, FY 2015 was the first year TAS received cases related to the ACA.  Taxpayers who received insurance through the Health Insurance Marketplace[64] received Form 1095-A, *Health Insurance Marketplace Statement,* which provided information that many taxpayers needed to complete their tax returns accurately.  Eligible taxpayers may have received the Premium Tax Credit (PTC)[65] to help offset the cost of health insurance purchased through the marketplace, and some may have received the PTC in advance, known as the Advanced Premium Tax Credit (APTC).[66]  In both situations, the taxpayers had to file Form 8962, *Premium Tax Credit,* with their tax returns to reconcile their credits.

Of the taxpayers who came to TAS with ACA problems, over 72 percent were experiencing an economic burden.[67]  In 88 percent of ACA cases, the taxpayers experienced a problem with the PTC.[68]  Most taxpayers with PTC issues contacted TAS because the IRS delayed their returns and refunds due to:

- Third-party data matching problems;
- Missing a correct Form 8962 to reconcile the APTC;
- A programming problem that improperly offset refunds against Individual Shared Responsibility Payment (ISRP) balances;
- Delays in IRS processing of PTC claims selected for audit; and
- Issues with establishing the second lowest cost silver plan for taxpayers claiming the PTC on their tax return.

Because this was the first year the IRS was dealing with ACA cases, TAS was prepared to see a number of systemic issues that would lead to an influx of ACA cases.  TAS created a Rapid Response Team — a cross-functional team of TAS employees — that worked together to immediately respond to potential ACA issues and identify where there was an issue it needed to elevate to the IRS.  The team identified a number of processing problems and worked with the IRS to resolve them.[69]  This proactive approach to a new issue allowed TAS to resolve issues quickly and prevent additional cases from coming to TAS.

---

63  Pub. L. No. 111-148, 124 Stat. 119 (March 23, 2010).  *See* Most Serious Problem: *Affordable Care Act - Individuals: The IRS Is Compromising Taxpayer Rights as it Continues to Administer the Premium Tax Credit and Individual Shared Responsibility Payment Provisions*, *supra*.

64  The Health Insurance Marketplace, also called the "Exchange," is a state or federally operated program where individuals can buy health care coverage.  Coverage is available to people who are uninsured or who buy insurance on their own.  *See* http://www.irs.gov/uac/Newsroom/The-Health-Insurance-Marketplace.  IRC § 6055 and the regulations thereunder require every person (*i.e.*, health insurance issuers, self-insuring employers, government agencies, and other providers of health coverage) that provides minimum essential coverage (as defined in IRC § 5000A(f)) to an individual to report to the IRS information about the coverage of each individual covered under the policy.

65  IRC § 36B.

66  Pub. L. No. 111-148, § 1412, 124 Stat. 119, 231 (March 23, 2010).

67  Data obtained from TAMIS (Oct. 1, 2015).

68  *Id.*

69  *See* National Taxpayer Advocate FY 2016 Objectives Report to Congress 38-47 (*The IRS's Administration of the Affordable Care Act Has Done Well Over All, But Some Glitches Have Arisen*).

Additionally, TAS trained all employees in skills needed to work ACA cases. During FY 2015, TAS employees received an intensive week-long training on the ACA, which included advocacy points on the PTC and the ISRP. TAS also trained its technical advisors in ACA collection procedures at a technical symposium in FY 2015, and the material will be available to all TAS employees in FY 2016. In addition, CAs will receive just-in-time training on the Employer Shared Responsibility Payment (ESRP)[70] in FY 2016, prior to the start of the filing season when income tax returns will first include the ESRP.[71]

### Collection Cases

TAS's total case receipts with collection issues were 21,936 in FY 2014 and 22,084 in FY 2015, a change of less than one percent.[72] The IRS's use of levies and liens declined during these periods, as shown in Figures 4.1.12 and 4.1.13.[73] Despite the reduction in liens and levies issued, the IRS's use of them accounted for about 50 percent of TAS's contact from taxpayers with collection issues in FYs 2014-2015, with about 86 percent of those cases involving economic burden in both years.[74]

**FIGURE 4.1.12, IRS Levy Volume and TAS Levy Case Receipts, FYs 2010–2015[75]**

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|
| TAS Levy Receipts | 18,015 | 15,466 | 11,419 | 8,829 | 8,086 | 7,977 |
| IRS Levy Volume | 3,606,818 | 3,748,884 | 2,961,162 | 1,855,095 | 1,995,987 | 1,464,026 |

**FIGURE 4.1.13, IRS Lien Volume and TAS Lien Case Receipts, FYs 2010–2015[76]**

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | FY 2015 |
|---|---|---|---|---|---|---|
| TAS Lien Receipts | 4,927 | 4,637 | 3,527 | 3,147 | 2,946 | 3,051 |
| IRS Lien Volume | 1,096,376 | 1,042,230 | 707,768 | 602,005 | 535,580 | 393,704 |

---

70   IRC § 4980H.

71   See Most Serious Problem: *Affordable Care Act (ACA) – Business: The IRS Faces Challenges in Implementing the Employer Provisions of the ACA While Protecting Taxpayer Rights and Minimizing Burden, supra.*

72   Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

73   See Most Serious Problem: *Notices of Federal Tax Lien (NFTL): The IRS Files Most NFTLs Based on Arbitrary Dollar Thresholds Rather Than a Thorough Analysis of a Taxpayer's Financial Circumstances and the Impact on Future Compliance and Overall Revenue Collection*; and Most Serious Problem: *Levies on Assets in Retirement Accounts: Current IRS Guidance Regarding Levies on Retirement Accounts Does Not Adequately Protect Taxpayer Rights and Conflicts with Retirement Security Public Policy, supra.* In FY 2014, TAS's case receipts for all collection PCICs were 21,936. In FY 2015, they were 22,084, an increase of less than one percent. From FY 2010 to FY 2015, levies issued by the IRS decreased by almost 60 percent and lien filings decreased by 64 percent. IRS, Collection Activity Reports, NO-5000-24, *Levy and Seizure Report* (FYs 2010 to 2015); IRS, *Collection Activity Reports*, NO-5000-25, Liens Report (FYs 2010 to 2015).

74   Data obtained from TAMIS (Sept. 30, 2014; Oct. 1, 2015). In FY 2014, TAS had 8,086 levy cases and 2,946 lien cases, equaling 11,032 cases, or 50.3 percent of the total. Of the 11,032, 7,206 levy cases and 2,254 lien cases were economic burden, totaling 9,460, or 85.8 percent. In FY 2015, TAS had 7,977 levy cases and 3,051 lien cases for a total of 11,028 cases, or 49.9 percent of the total collection cases. Of the 11,028 cases, 7,074 levy cases and 2,372 lien cases were economic burden, or 85.7 percent.

75   Data obtained from TAMIS (Oct. 1, 2010; Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014, Oct. 1, 2015). IRS, 5000-23 Collection Workload Indicators (Mar. 22, 2011; Oct. 11, 2011); IRS, 5000-25 Collection Activity Report (Oct. 1, 2012; Sept. 30, 2013; Sept. 29, 2014, Oct. 9, 2015)

76   *Id.* IRS, 5000-24 Collection Activity Report (Oct. 9, 2012; Oct. 22, 2013); IRS, 5000-25 Collection Activity Report (Oct. 6, 2014, Oct. 7, 2015).

In FY 2015, collection issues accounted for almost 11 percent of all economic burden receipts and over ten percent of TAS's total caseload.[77]  Collection issues are vitally important to affected taxpayers because while IRS collection tools (bank levies, wage levies, personal residence seizures, and the filing of Notices of Federal Tax Lien (NFTL)) significantly affect all taxpayers, they can have a particularly devastating impact on those with low incomes.

TAS provided relief in about 73 percent of these cases in FY 2015, compared to approximately 78 percent on all issues.[78]  In FY 2015, TAS issued 30 Taxpayer Assistance Orders (TAOs)[79] in collection cases where the IRS did not agree with TAS's recommendations initially.  Of these 30 TAOs, the IRS complied with 23 in an average of 14 days**,** meaning the IRS's negative responses to TAS's requests unnecessarily delayed resolution, adding to the harm to the taxpayers, when there was no material disagreement as to the resolution.[80]

TAS provided suggestions to the Office of Special Penalties (OSP) about the reasonable cause and evidence sections on its website.  TAS is working with OSP to add an electronic penalty abatement request process to the existing electronic installment agreement request process to help taxpayers receive timelier penalty abatement responses.

### TAS Operations Assistance Request Trends

To serve taxpayers more efficiently, the Commissioner delegated to the National Taxpayer Advocate certain tax administration authorities that do not conflict with or undermine TAS's unique statutory mission but allow TAS to resolve routine problems.[81]  When TAS lacks the statutory or delegated authority to resolve a taxpayer's problem, it works with the responsible IRS BOD or function to resolve the issue, a process necessary in 66 percent of all TAS cases closed in FY 2013, 67 percent in FY 2014, and 65 percent in FY 2015.[82]  After independently reviewing the facts and circumstances of a case and communicating with the taxpayer, TAS uses Form 12412, *Operations Assistance Request*, to convey a recommendation or requested action for the IRS to resolve the issue, along with documentation.  The Operations Assistance Request (OAR) also serves as an advocacy tool by:

- Giving the IRS a second chance to resolve the issue;

- Giving TAS and the BOD a chance to resolve the issue without having to elevate it; and

- Documenting systemic trends that could lead to improvements in IRS processes.

All BODs agreed to work TAS cases on a priority basis and expedite the process for taxpayers whose circumstances warrant immediate handling.  The Service Level Agreements require the BODs to direct resources to process OARs.  The OAR report alerts the BODs to the number of taxpayers who seek TAS assistance because they have not been able to resolve their problems through regular channels within the BODs' control and the types of issues.  Form 12412 includes an "expedite" box that TAS CAs can check when the BOD needs to act immediately to relieve the taxpayer's hardship.

77   Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

78   Data obtained from TAMIS (Oct. 1, 2015).

79   For a detailed discussion of TAOs, see *TAS Uses Taxpayer Assistance Orders to Advocate Effectively in Taxpayer Cases*, *infra*. TAO compliance data is as of Oct. 1, 2015.

80   Data obtained from TAMIS (Oct. 1, 2015).

81   IRM 1.2.50.3(1), *Delegation Order 13-2 (Rev. 1)* (March 3, 2008) Authority of the National Taxpayer Advocate to Perform Certain Tax Administration Functions.

82   TAS closed 165,003 OARs in 2013; 149,484 OARs in FY 2014; and 148,305 OARs in FY 2015.  Data obtained from TAMIS (Oct. 18, 2013; Oct. 6, 2014, and Oct. 5, 2015).

TAS generally sends one or more OARs on individual cases to secure action by the IRS, but TAS may use a single OAR to work the same issue for multiple taxpayers, which is called a "mass OAR." During the 2015 filing season, TAS issued a mass OAR on behalf of 158 IDT victims who had unprotected but validated TAS taxpayer accounts.[83] TAS took this action to ensure timely marking of these accounts to allow the taxpayers to receive Identity Protection PINs (IP PIN).[84] TAS worked with the IRS to update the accounts quickly, allowing the taxpayers to file returns without having to worry that an identity thief would file first using their Social Security numbers, causing processing problems for the taxpayers.

Figure 4.1.14 reflects the number of OARs issued by BOD needing expedited action.

**FIGURE 4.1.14, Expedited and Non-Expedited OARs Issued by BOD, FY 2015**[85]

| Business Operating Division | FY 2015 OARs Issued Requesting Expedite Action | FY 2015 OARs Issued without Expedite Request | FY 2015 Total OARs Issued |
|---|---|---|---|
| Appeals | 243 | 509 | 752 |
| Criminal Investigation | 32 | 54 | 86 |
| Large Business & International | 188 | 442 | 630 |
| Small Business/Self-Employed | 16,665 | 23,712 | 40,377 |
| Tax Exempt/Governmental Entity | 528 | 863 | 1,391 |
| Wage & Investment | 113,703 | 97,732 | 211,435 |
| **Total** | **131,359** | **123,312** | **254,671** |

### TAS Uses Taxpayer Assistance Orders to Advocate Effectively

The TAO is a powerful statutory tool delegated by the National Taxpayer Advocate to the LTAs to resolve taxpayer cases.[86] An LTA may issue a TAO to order the IRS to take certain actions, cease certain actions, or refrain from taking certain actions.[87] A TAO may order the IRS to expedite consideration of a taxpayer's case, reconsider its determination in a case, or review the case at a higher level.[88] When a taxpayer faces significant hardship and the facts support relief, an LTA may issue a TAO when the IRS refuses or otherwise fails to take the action TAS has requested to resolve the case.[89] Once TAS issues a TAO, the BOD must comply with the request or appeal the issue for resolution at higher levels.[90] The BOD cannot take action on the case while the TAO is on appeal.[91]

---

83  Data obtained from TAMIS (Oct. 1, 2015).

84  An IP PIN is a single-use six-digit identification number the IRS issues to IDT victims so that they can file their returns with the assurance that the identity thief cannot file first. The process of validating a taxpayer's identity and marking the account must be complete before the IRS sends the IP PIN notices prior to the commencement of the filing season.

85  Data obtained from TAMIS (Oct. 1, 2015).

86  IRC § 7811(f) states that for purposes of this section, the term "National Taxpayer Advocate" includes any designee of the National Taxpayer Advocate. *See* IRM 1.2.50.2, *Delegation Order* 13-1 (Rev. 1) (March 17, 2009).

87  IRC § 7811(b); Treas. Reg. § 301.7811-1(c)(3); IRM 13.1.20.3, *Purpose of Taxpayer Assistance Orders* (Dec. 15, 2007).

88  Treas. Reg. § 301.7811-1(c)(3): IRM 13.1.20.3 (Dec. 15, 2007).

89  IRC § 7811(a)(1); Treas. Reg. § 301.7811-1(a)(1) and (c).

90  IRM 13.1.20.5(2), *TAO Appeal Process* (Feb. 10, 2015).

91  IRC § 7811(c)(1) and Treas. Reg. § 301.7811-1(b).

In FY 2015, TAS issued 236 TAOs,[92] including 27 in cases where the IRS failed to respond to an OAR, further delaying relief to taxpayers. Of these 27 TAOs, the IRS complied with 23 in an average of 23 days, meaning the IRS did not have a significant disagreement as to the resolution and the taxpayers could have had relief sooner if the IRS had been more responsive to TAS.[93] Figure 4.1.15 reflects the results of all TAOs. Figure 4.1.16 shows the TAOs issued by fiscal year.

**FIGURE 4.1.15, Actions Taken on FY 2015 TAOs Issued**[94]

| Action | Total |
|---|---|
| IRS Complied with the TAO | 154 |
| IRS Complied after the TAO was modified | 0 |
| TAS Rescinded the TAO | 13 |
| TAO Pending in Process | 69 |
| **Total** | **236** |

**FIGURE 4.1.16, TAOs Issued to the IRS, FYs 2011–2015**[95]

| Fiscal Year | TAOs Issued |
|---|---|
| 2011 | 422 |
| 2012 | 434 |
| 2013 | 353 |
| 2014 | 362 |
| 2015 | 236 |

The LTAs have discretion to issue a TAO based on the facts and circumstances of each case. TAS leadership has review requirements geared toward prompt identification of situations in which a TAO is needed. In prior years, TAS encountered issues such as disaster area relief needs, the government shutdown, significant tax law changes such as the First-Time Homebuyer Credit, IRS procedural concerns such as the return preparer misconduct issue, or IRS processing glitches such as the First-Time Homebuyer Credit repayment that generated TAO issuances. In FY 2015, return preparer misconduct accounted for 43 TAOs.[96]

In FY 2015, TAS held discussions on the TAO process and its use during the Advocacy 360 leadership calls, which TAS initiated to emphasize all facets of advocacy beyond issuing TAOs and to strengthen awareness of situations needing a TAO. TAS leaders conducted Case Advocacy Leadership meetings in each TAS area, including a session emphasizing the TAO tool's use in resolving taxpayers' cases. These activities will continue in FY 2016.

---

92   Data obtained from TAMIS (Oct. 1, 2015).
93   *Id.*
94   *Id.*
95   Data obtained from TAMIS (Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).
96   Data obtained from TAMIS (Oct. 1, 2015).

### IRS Confusion About TAS's Role and Authority in the TAO Context

FY 2015 was a particularly contentious year with respect to TAOs. IRS employees improperly delayed or placed conditions upon TAS and the National Taxpayer Advocate's access to case-specific information, which resulted in one or more TAOs that should not have been necessary.[97] For example, in cases involving taxpayers trying to settle with the IRS in connection with the Offshore Voluntary Disclosure (OVD) Program, IRS Revenue Agents (RAs) balked at providing TAS with access to: the taxpayer's administrative file, meetings with the taxpayer that the taxpayer requested that TAS attend, the RA's recommendations to the OVD review committee, and the committee's responses. In response to a TAO, even a head of office was confused about whether it was appropriate to allow TAS employees to attend meetings with a taxpayer that TAS was assisting.

In other cases, IRS employees attempted to take actions that the TAO specifically ordered the IRS not to take[98] while the TAO was on appeal. This is a violation of IRC § 7811.[99] IRS employees have also challenged whether a TAO was appropriate in some cases, alleging that the taxpayer was not suffering or about to suffer a "significant hardship." The determination of whether there is a significant hardship for purposes of issuing a TAO, however, can only be made by the National Taxpayer Advocate and her delegates, not other IRS employees. These problems illustrate the need for the IRS to work with TAS to deliver training to its employees so they understand TAS's role and its authorities, particularly in the context of a TAO issued to the IRS.

The following examples illustrate the use of TAOs to obtain taxpayer relief. To comply with IRC § 6103, which generally requires the IRS to keep taxpayers' returns and return information confidential, the details of the fact patterns have been changed. In certain examples, TAS has obtained the written consent of the taxpayer to provide more detailed facts.

### TAOs Involving Account Resolution

As discussed above, IDT can adversely affect taxpayers. Approximately 74 percent of individual taxpayers filing returns claimed refunds, averaging about $2,700.[100] In an IDT situation, where the IRS has processed a false return before the actual taxpayer files a return, the IRS will not issue a refund to the actual taxpayer until the IRS fully resolves the SSN ownership, which can take 180 days.[101] In FY 2015, TAS issued eight TAOs involving IDT. The IRS complied with five of these TAOs within an average of 13 days.[102] TAS issued six IDT-related TAOs in cases that met economic burden case criteria and thus

---

97 Like all IRS employees, TAS employees are authorized to access any information they need to do their jobs. *See, e.g.*, IRC § 6103(h) ("Returns and return information shall, without written request, be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes.").

98 See IRC § 7811(b)(2).

99 IRC § 7811(c)(1) explicitly provides that only the National Taxpayer Advocate, the Commissioner, or Deputy Commissioner can rescind a TAO. The regulations clarify further that "a TAO is an order by the National Taxpayer Advocate to the IRS. The IRS will comply with a TAO unless it is appealed and then modified or rescinded by the National Taxpayer Advocate, the Commissioner, or the Deputy Commissioner." Treas. Reg. § 301.7811-1(b).

100 IRS, 2015 IMF Filing Season Report, Week Ending May 15, 2015. Through May 15, 2015, the IRS received 138,209 million individual tax returns, of which 101,407 million claimed a refund averaging $2,698.

101 IRM 25.23.3.2.2(f) *Tax-Related Identity Theft* (Oct 1, 2015).

102 Data obtained from TAMIS (Oct. 1, 2015).

needed expedited case handling.[103]  Specific examples of hardships encountered by these taxpayers and exacerbated by IRS delays included:

- Taxpayer was being evicted;
- Taxpayer needed to pay rent and utilities; and
- Taxpayer was behind on bills and needed to repair auto to get to work.

TAS issued 81 TAOs involving account resolution for non-IDT, non-return preparer misconduct issues, and non-exam issues.  Here are some examples:

- The taxpayer made a payment that did not post to the account.  The taxpayer provided the cancelled check with a letter from the bank, confirming that the taxpayer paid the IRS, as well as Form 8109-B, *Federal Tax Deposit Coupon*, from the bank.  The IRS would not credit the taxpayer's account.  TAS issued a TAO, stating that the taxpayer substantiated the payment under the IRM procedures and that the IRS must credit the taxpayer's account.[104] The IRS located the misapplied payment and moved it to the correct account, complying with the TAO.[105]

- The taxpayer contacted TAS regarding an injured spouse refund.[106]  The taxpayer's withholding was the sole source of the refund, and thus was entitled to a refund rather than having it applied to a liability of a former spouse.  Once the IRS completed the actions to issue the injured spouse a refund, TAS asked for permission to do an expedited manual refund.  Despite TAS's request, the IRS deposited the entire refund directly to a bank account solely belonging to the former spouse, who refused to give it to the TAS taxpayer.  After issuing a TAO, Chief Counsel to the IRS supported TAS's position that the IRS made an erroneous refund.[107]  As a result, the IRS correctly issued the refund to the TAS taxpayer.[108]

- The taxpayer filed a Form 1120-X, *Amended U.S. Corporation Income Tax Return*, to claim additional Foreign Tax Credit.  The IRS processed it for $200,000 more than what the taxpayer claimed, plus interest.  The taxpayer promptly returned the excess amount.  The IRS did not adjust the account correctly to show the correct credit or the returned refund.  In the meantime, the refund statute expiration date (RSED) passed.[109]  The taxpayer filed another Form 1120-X, based on a Competent Authority determination.[110]  The IRS refused to process the second claim, citing the expired RSED and that the taxpayer already received an excess refund.  The IRS ignored that the taxpayer returned the erroneous refund and that the Competent Authority ruling indicated

---

103 Data obtained from TAMIS (Oct. 1, 2015).

104 IRM 3.17.5.8, *Substantiation Process* (Aug. 31, 2015).

105 Release signed by the taxpayer dated July 24, 2015.

106 IRC § 6402.  When a married couple files a joint return claiming a refund, the IRS may offset the refund to satisfy certain outstanding tax and non-tax debts belonging to one of the spouses.  The non-liable spouse has a right to have a portion of the refund returned.  Form 8379, *Injured Spouse Allocation*, is the form the non-liable spouse uses to claim his or her share of the refund.

107 IRM 21.4.5.1, *Erroneous Refunds Overview* (June 25, 2013), defines an erroneous refund as the receipt of any money from the IRS to which the recipient is not entitled.  This definition includes all erroneous refunds regardless of taxpayer intent or whether the error that caused the erroneous refund was made by the IRS, the taxpayer, or a third party.

108 Release signed by the taxpayer dated August 5, 2015.

109 IRC § 6511(a) states the general rule that no credit or refund shall be allowed or made more than three years from the time the return was filed or two years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within two years from the time the tax was paid.  If the claim for credit or refund is attributable to taxes paid or accrued to any foreign country, instead of the three-year period set by IRC § 6511(a), the taxpayer has ten years from the date prescribed by law for filing the return for the year in which those taxes were actually paid or accrued.  IRC § 6511(d)(3)(A).

110 Rev. Proc. 2006-54, 2006-49 I.R.B. 1035; IRM 21.5.3.4.9, *Competent Authority Claims* (Aug. 4, 2010).

that the taxpayer's claim carried a ten-year statute of limitations.  Subsequently, the IRS moved the returned refund to the excess collection account.[111]  TAS repeatedly received the agreement of an IRS employee to correct the problems, only to have another employee stop the correction.  Then, the IRS would not take corrective action, because the employee who made the original errors was no longer employed with the IRS, citing an IRM provision that says the person who made the error should correct the error, while disregarding the caution that the unit will act when the originating employee is "not available."[112]  Once TAS issued the TAO, the IRS released the refund and fully corrected the account.[113]

- In 2012, the taxpayer contacted TAS about an IDT issue on his 2011 return.  TAS worked through the issues, securing the full refund.  Then, the IRS rejected the taxpayer's 2012 return.  TAS again secured the full refund for the taxpayer.  The taxpayer advised TAS that his 2010 refund offset to pay a debt he did not know he had, and TAS found another IDT problem.  The taxpayer provided the needed documentation, and the IRS promptly adjusted the account but refused to release the refund because the RSED had passed.  The IRS transferred the credit to the excess collection account from the taxpayer's account.[114]  TAS argued that the refund offset from the taxpayer's timely filed 2010 return and should be moved back to 2010 with an open RSED and refunded.  The IRS disagreed.  TAS sought Counsel's opinion, and Counsel agreed with TAS.  The IRS still refused to return the funds until after TAS issued a TAO.[115]

### TAS Issues TAOs Where IRS Inaction Exacerbates Return Preparer Misconduct

In the National Taxpayer Advocate's FY 2016 Objectives Report to Congress and in previous reports, she outlined the issues surrounding the IRS's current policy on assisting victims of tax return preparer misconduct.[116]  Taxpayers seek TAS assistance when they become aware of preparer misconduct, which generally only happens after the IRS:

- Reviews or audits the return;

- Disallows the incorrect deductions, withholding, or credits;

- Holds the taxpayer liable for the resulting increased tax assessment; or

- Prevents the taxpayer from obtaining the portion of the refund he or she was entitled to and did not actually receive.

---

111  IRM 3.17.220.2, *Excess Collections File* (Jan. 1, 2014).  Monies are removed from accounts after the refund statute of limitations expires, as well as payments that could not be applied as intended for a variety of reasons, and placed in this general account.

112  IRM 25.6.1.10.2.2.3, *Correction of Erroneous Abatement Cases by the Originating Function* (Nov. 18, 2011), which states in part, "the originator of an erroneous abatement requiring reversal must initiate the corrective action whether or not assigned to Statute…  **NOTE:** The originating function is responsible for corrective actions on cases where the originator is no longer working in the area where the erroneous abatement occurred.  This is regardless of whether the assessment statute has/has not expired."

113  Release signed by the taxpayer dated Sept. 10, 2015.

114  IRM 3.17.220.2, *Excess Collections File* (Jan. 1, 2014).  Monies are removed from accounts after the refund statute of limitations expires, as well as payments that could not be applied as intended for a variety of reasons, and placed in this general account.

115  Release signed by the taxpayer dated Sept. 11, 2015.

116  *See* National Taxpayer Advocate FY 2016 Objectives Report to Congress 34-7 (Area of Focus: *The IRS Agrees It Should Issue Refunds to Victims of Return Preparer Fraud, But It Has Been Slow to Develop Necessary Procedures*); National Taxpayer Advocate FY 2015 Objectives Report to Congress 4 (Preface: *The IRS is Actively Harming Victims of Return Preparer Fraud by Delaying the Release of Refunds for Years*); National Taxpayer Advocate FY 2015 Objectives Report to Congress 22-34 (*Return Preparer Fraud: A Sad Story*).  National Taxpayer Advocate 2013 Annual Report to Congress 94-102; National Taxpayer Advocate 2012 Annual Report to Congress 68-94; National Taxpayer Advocate 2011 Annual Report to Congress 420-26.

001973

In FY 2015, TAS continued to elevate the problem, issuing 43 TAOs due to return preparer miscon-duct.[117]  Since FY 2010, 161 TAOs for this issue have been elevated to the National Taxpayer Advocate, and 25 of these were elevated to the Commissioner.[118] Taxpayers in these cases are usually low income and depend on their refunds to meet basic living expenses. [119]  Some have been waiting for years to receive their proper refunds.  At this time, the IRS has not finalized the procedures, while the taxpayers continue to be harmed.

### TAOs to Examination Functions

In FY 2014, TAS issued 35 TAOs to examination units in W&I and Small Business/Self-Employed (SB/SE) BODs for issues including return preparer misconduct, the EITC, audit reconsiderations, actions to complete open audits of original returns, penalty abatements, IDT, and appeal rights.[120]

EITC TAO cases involved hardships.  An example follows:

- The taxpayer, who was elderly with health problems, had a disabled grown daughter.  The taxpayer received Social Security benefits and worked part-time to meet basic living expenses.  The taxpayer contacted TAS directly and through his Congressional representative after the IRS disallowed his dependent and the EITC, plus changed his filing status.  The IRS repeatedly challenged the docu-ments provided for proof of the daughter's disability, determining she was not a qualifying child for dependency exemption or EITC.  The daughter enrolled in school, causing the IRS to determine that she was not impaired, contrary to her doctor's statement.  The taxpayer explained that this was an online school with campuses in another state and that she did not physically attend a school with a campus.  TAS issued a TAO with additional supporting documentation about the school attendance issue to firmly establish that she was a qualifying child.  The IRS complied with the TAO to allow all items related to the taxpayer's dependent.[121]

Other examination TAO scenarios included:

- The taxpayers had a presidential memorabilia collection, which they exhibited until losing the IRC § 501(c)(3) status.  The IRS audited them on issues related to the disposition of the collec-tion.  The taxpayers approached TAS, wanting aid to conclude the exam and to address concerns regarding their rights.  Before coming to TAS, the taxpayers requested a copy of the examination file to assist in their appeal.  The examiner told the taxpayers that they had to file a Freedom of Information Act Request to get this information, contrary to current guidance from the Privacy, Governmental Liaison and Disclosure Office.  TAS issued a TAO to secure the file copy for the taxpayers, which the IRS provided.[122]

---

117  Data obtained from TAMIS (Oct. 1, 2015).

118  Data obtained from TAMIS (Oct. 1, 2011; Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

119  National Taxpayer Advocate 2013 Annual Report to Congress 94-102; National Taxpayer Advocate 2012 Annual Report to Congress 68-94.

120  Data obtained from TAMIS (Oct. 1, 2015).

121  Release signed by the taxpayer dated July 31, 2015.  In his last conversation with the CA, the taxpayer indicated that he did not claim his disabled daughter on the 2014 income tax return because he did not feel he could survive another audit experience, as it had negatively affected his health.  He would not work with the CA to file a Form 1040X, *Amended Individual Income Tax Return*, to claim his daughter to receive the refund to which he was entitled.

122  Release signed by the taxpayers dated August 10, 2015.

■ Taxpayers filed a return after an SFR assessment, and the IRS audited the return.[123]  The taxpayers needed the refund for their support, as their Social Security benefits were insufficient.  Without authority, one operating division of the IRS took incomplete action on the account.  As a result, the function with the authority to correct it refused to act.  The taxpayer was stuck between the two functions, and during this time, the refund statute expired.  Then, the IRS argued that it could not issue the refund because the refund statute had expired.[124]  TAS issued a TAO, and after the IRS operating division received an opinion from the Office of Chief Counsel upholding TAS's position, the IRS then corrected the account and released the refund.[125]

■ A couple filed protective claims to file jointly, pending the U.S. Supreme Court's decision on the Defense of Marriage Act.  Once the Court rendered its decision and the IRS published its procedures, the IRS did not process the claims.  The taxpayers sought TAS's assistance, and the IRS processed the claims for three tax periods, but not the fourth.  TAS issued a TAO to allow the fourth period due to the timely filed claim.  The IRS issued refunds with interest for all four periods.  The taxpayer received additional interest for the period of time during which the IRS delayed the resolution.[126]

■ The taxpayer needed a penalty abated.  He could not pay the $5,000 penalty to appeal it.  His sole sources of income were his Social Security benefits and a part-time job.  He filed his return, as he always had, but made a simple mistake.  The IRS deemed the return frivolous.[127]  The IRS refused to abate the penalty, saying the taxpayer had to pay it in full and go to court.  TAS issued a TAO, citing taxpayer burden and justifiable reasons about why he did not respond to the IRS's inquiry before the penalty was assessed.  The IRS abated the penalty.[128]

■ After the taxpayer fully paid the prior examination assessments for three tax years, he presented additional documents that resulted in a total abatement of the exam results.  The IRS refunded the overpaid tax amounts.  The IRS did not properly abate the associated penalties due to an omission on the exam report.  When TAS requested that the IRS follow through to abate the penalties and to release the additional refunds, the IRS stated the refund statutes had expired between the initial refund and the time of the TAS request, ignoring the fact that the claim that caused the abatement of the tax and the penalties was timely.  The IRS would not consider the correction of an error without the prior examination file, which it could not locate.  Yet the IRS had abated the total tax, so it had to abate the penalties imposed as a result of the abated tax, making the need for the administrative file moot.  TAS issued a TAO, directing abatement of the penalties and release of the refunds.  The IRS took both actions.  The taxpayer received additional interest from the government that accrued during the time that the IRS delayed this action.[129]

---

123  *See* Most Serious Problem: *Automated Substitute for Return (ASFR) Program: Current Selection Criteria for Cases in the ASFR Program Create Rework and Impose Undue Taxpayer Burden, supra*.  A substitute for return (SFR) is a return prepared for a taxpayer by the IRS when it has no record of receiving a return and has not been able to obtain one from someone who was expected to file.  IRC § 6020(b) allows the IRS to prepare a return on behalf of the taxpayer based on available information.  The taxpayer may reduce the SFR liability by filing an original return, reflecting allowable deductions and credits about which the IRS had no information at the time the SFR was prepared.

124  IRC § 6511.

125  Release signed by the taxpayers dated July 31, 2015.

126  Release signed by the taxpayers dated August 2, 2015.

127  IRC § 6702.  A request is subject to the penalty, if any part of it "(i) is based on a position which the Secretary has identified as frivolous… or (ii) reflects a desire to delay or impede the administration of the Federal tax laws."  Before asserting the penalty, the IRS must notify the taxpayer that it has determined that the taxpayer filed a frivolous tax return.  The taxpayer then has 30 days to resubmit the return without the frivolous position to avoid the penalty.

128  Release signed by the taxpayer dated August 11, 2015.

129  Release signed by the taxpayer dated August 31, 2015.

### TAOs to Tax Exempt/Government Entities (TE/GE)

TE/GE cases present vitally important advocacy opportunities for TAS, both on substantive legal determinations and processing issues.[130]  Tax-exempt organizations contribute religious, educational, scientific, social welfare, and other positive benefits to the public.  Many of these exempt organizations (EOs) are small entities, staffed by volunteers.[131]  Without the IRS's determination on the tax exemption, the entity will struggle to solicit funds from donors, who are motivated in part by the ability to deduct contributions made to an approved IRC § 501(c)(3) tax-exempt entity.  While some EOs under IRC § 501(c) may operate without the need to seek an IRS determination, it is TAS's experience with IRC § 501(c) cases that many entities are reluctant to operate without formal IRS approval.[132]

In FY 2015, TAS did not issue any TAOs to the TE/GE operating division.[133]  TAS's FY 2015 case receipts involving applications for exempt status decreased by about 74 percent from FY 2014.[134]  Nearly 31 percent of the FY 2015 cases met economic burden criteria, and 55 percent were congressional referrals.[135]  The decline in EO cases may be attributed to the introduction of the abbreviated Form 1023-EZ, *Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.* Taxpayers have received the IRC § 501(c)(3) exemption approval more quickly, causing fewer to seek TAS's assistance.  However, while this expedited process for obtaining tax exempt status has reduced TAS EO casework, it has created a significant compliance concern.[136]  Overall, TAS provided some form of relief in 83 percent of cases (1,025 organizations) seeking to resolve exempt status application issues in FY 2015.[137]  TAS resolved these cases in an average of 78 days, an improvement of over nine percent from FY 2014.[138]

### TAOs on Collection Issues

In FY 2015, levy issues were the fourth largest source of TAS economic burden receipts, as shown in Figure 4.1.7.[139]  If the IRS does not act quickly in these cases, the taxpayer may experience even greater financial harm.  TAS issued 21 TAOs on levy cases in FY 2015.  The IRS complied with 17 of the 21 TAOs

---

130  *See* Treasury Inspector General for Tax Administration (TIGTA), Ref. No. 2013-10-053, *Inappropriate Criteria Were Used to Identify Tax-Exempt Applications for Review* (May 14, 2013); National Taxpayer Advocate Special Report to Congress, *Political Activity and the Rights of Applicants for Tax-Exempt Status* (June 30, 2013).

131  *See* National Taxpayer Advocate 2009 Annual Report to Congress 287, addressing the need for targeted research and increased collaboration to meet the needs of tax EOs; National Taxpayer Advocate 2005 Annual Report to Congress 293, discussing inadequate service to EOs resulting in unnecessary penalties; National Taxpayer Advocate Special Report to Congress, *Political Activity and the Rights of Applicants for Tax-Exempt Status* (June 30, 2013).

132  Some organizations are not required to obtain formal recognition of tax-exempt status from the IRS but may obtain such recognition by submitting IRS Form 1024, *Application for Recognition of Exemption Under Section 501(a).*  National Taxpayer Advocate Special Report to Congress, *Political Activity and the Rights of Applicants for Tax-Exempt Status* 3 (June 30, 2013), available at http://www.taxpayeradvocate.irs.gov/2014ObjectivesReport/Special-Report.

133  Data obtained from TAMIS (Oct. 1, 2015).

134  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

135  Data obtained from TAMIS (Oct. 1, 2015).

136  *See* Most Serious Problem: *Form 1023-EZ: Recognition as a Tax-Exempt Organization Is Now Virtually Automatic for Most Applicants, Which Invites Noncompliance, Diverts Tax Dollars and Taxpayer Donations, and Harms Organizations Later Determined to be Taxable, supra;* Vol. 2: *Study of Taxpayers That Obtained Recognition as IRC § 501(c)(3) Organizations on the Basis of Form 1023-EZ, infra,* noting that in a representative sample of organizations whose Form 1023-EZ application was approved, 37 percent did not meet the requirements for exempt status as a section 501(c)(3) organization as a matter of law.

137  Data obtained from TAMIS (Oct. 1, 2015).

138  Data obtained from TAMIS (Oct. 1, 2014; Oct. 1, 2015).

139  Data obtained from TAMIS (Oct. 1, 2015).

for levies in FY 2015.[140]  Seventeen of the 21 levy-related TAOs requested the return of levy proceeds for taxpayers experiencing economic burden.  TAS rescinded two and is processing two more.  An example is:

- The IRS assessed a frivolous filer penalty based on a return filed under the taxpayer's SSN by an identity thief.[141]  The taxpayer learned this when the IRS levied her Social Security benefits.  The taxpayer immediately requested a return of the proceeds, but the IRS did not act on the request.  The taxpayer then requested penalty abatement and received an approval letter from the IRS.  After repeated failed attempts to get the account corrected and the levy proceeds returned, the taxpayer came to TAS.  The IRS unit that approved the penalty abatement did not have the authority to do so.  The correct unit did not agree with the decision, insisting the taxpayer had to full pay the penalty and pursue court action.  TAS argued that the taxpayer should not be burdened, when she did not file the return that gave rise to the penalty.  TAS issued a TAO.  The IRS abated the penalty and returned the levy proceeds.[142]

TAS issued 25 TAOs to Collection functions for other issues, including:

- A taxpayer, who was approximately 50 years old, contacted TAS seeking release of a wage levy as well as a proposed levy on his Thrift Savings Plan (TSP) account.  The TSP is a retirement savings and investment plan for federal employees and members of the uniformed services.[143]  A recent change in the law now allows the IRS to take the entire contents of a TSP account, regardless of whether the taxpayer has a present right to withdraw from the account.[144]  Under current internal guidance, the IRS is required to consider three issues before levying a retirement account: the availability of other assets, whether the taxpayer's conduct is flagrant, and whether the taxpayer currently relies (or will rely in the near future) on the funds in the retirement account.[145]  Prior to coming to TAS, the taxpayer submitted an installment agreement, which remained unprocessed for almost one year because the IRS claimed that it had not been received.  It was during this time that the IRS issued a levy on the taxpayer's wages and was in the process of levying his retirement account.[146]  TAS issued a TAO seeking a release of the wage levy and return of levy proceeds, requesting the IRS forebear issuing a levy on the retirement account, and challenging the sufficiency of the pre-levy analysis required for the retirement levy, particularly in regard to the determination of flagrant conduct.  In addition as part of the TAO, TAS ordered the IRS to consider an offer in compromise submitted by the taxpayer.  The IRS Deputy Commissioner rescinded the TAO.  As a result, the IRS did not release the wage levy and, in addition, levied the taxpayer's entire TSP account.  The wage levy had been so severe that the taxpayer was paying his basic living expenses by credit card.  Since the proceeds from the levy on the TSP account did not fully pay his tax liability, the taxpayer has subsequently entered into an installment agreement to satisfy the remaining balance of liability, and accordingly, the IRS has released the wage levy.  He now has approximately a

---

140  Data obtained from TAMIS (Oct. 1, 2015).

141  IRC § 6702.  A request is subject to the penalty, if any part of it "(i) is based on a position which the Secretary has identi-fied as frivolous… or (ii) reflects a desire to delay or impede the administration of the Federal tax laws."  Before asserting the penalty, the IRS must notify the taxpayer that it has determined that the taxpayer filed a frivolous tax return.  The taxpayer then has 30 days to resubmit the return without the frivolous position to avoid the penalty.

142  Release signed by the taxpayer dated August 3, 2015.

143  TSP was established by Congress in the Federal Employees' Retirement System Act of 1986 and offers the same types of sav-ings and tax benefits that many private corporations offer their employees under 401(k) plans

144  5 U.S.C. § 8437 (e)(3).

145  IRM 5.11.6.2(4)-(7), *Funds in Pension or Retirement Plans* (Sept. 26,2014).

146  The IRS is prohibited from issuing a levy while an installment agreement is pending or in effect.  IRC SS 6331(k).

decade to replenish his retirement account and may face financial instability in his retirement years. Last, the taxpayer incurred a tax liability since the distribution qualifies as gross income.[147]

- Taxpayers filed an OIC in 2012 for business taxes but withdrew it. They filed another OIC in 2014 for individual taxes owed. The LTA issued a TAO to expedite the OIC process due to the taxpayers' circumstances and to reduce the time the taxpayers had to wait for the IRS to assign the offer. The IRS complied by assigning and working the OIC.[148]

- Divorced spouses agreed to quit claim their interests in their respective houses to the other, so each alone had interest in their own properties. While the TAS taxpayer complied with the agreement, the former spouse did not. In the meantime, the former spouse who owed employment taxes passed away. The NFTL attached to the TAS taxpayer's property, because the decedent was still on the deed. Upon the death of the former spouse, his interest was extinguished. Furthermore, based on state law and the divorce decree, TAS showed that the decedent had no interest in the property. The LTA argued that, based on the ownership language in the deed, state law, and the divorce decree, the TAS taxpayer solely owned her home by virtue of the former spouse's death. The IRS could not place a lien or take any other action against her. The IRS did not agree, and TAS issued a TAO. Counsel concurred with TAS, at which point the IRS withdrew the lien and ceased action to collect the former husband's debt from the TAS taxpayer.[149]

- An identity thief filed a return claiming the First-Time Homebuyer Credit for which the IRS held the TAS taxpayer liable. The IRS filed a lien due to the IDT balance due, which was affecting the TAS taxpayer's credit. TAS identified two additional IDT years about which the taxpayer was unaware. TAS followed the IDT procedures to have all three years corrected. The IRS corrected the two most recent years but would not correct the tax year for which the taxpayer sought help. The LTA asked that the IRS look at the facts and the documents, rather than citing IRM procedures that were irrelevant due to the IDT facet. For example, the IRS insisted that it issued the statutory notice of deficiency to the address of record, which was from the identity thief's return, not the TAS taxpayer's return. TAS proved the taxpayer did not file the return. TAS issued a TAO to correct the account and release the refunds after reversing the offsets. The IRS complied. Rather than waiting for the exam decision, TAS sent an OAR for a lien withdrawal (citing the IDT), which was also successful.[150]

### TAOs to Appeals

TAS issued seven TAOs during FY 2015 to the Office of Appeals, and Appeals complied with one. TAS rescinded one at the taxpayer's request; five TAOs remain in process.

TAS has worked cooperatively with Appeals in many areas, primarily through the TAS-Appeals Advisory Board (TAAB), made up of senior leadership from both TAS and Appeals. For example, Appeals personnel briefed the TAAB on the Appeals Judicial Approach and Culture (AJAC) initiative.[151] TAS recorded an awareness video presentation about AJAC in May 2015, which it will require all CAs to view during the FY 2016 continuing education cycle. As stated previously, the National Taxpayer Advocate has

---

147 IRC § 408(d). Release signed by the taxpayer dated December 17, 2015.
148 Release signed by the taxpayer dated August 10, 2015.
149 Release signed by the taxpayer dated July 27, 2015.
150 Release signed by the taxpayer dated July 25, 2015.
151 *See* Most Serious Problem: Appeals: *The Appeals Judicial Approach and Culture Project is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*, *supra*.

concerns about the AJAC initiative.[152]  Additionally, the National Taxpayer Advocate is concerned that the Collection Appeals Program (CAP) provides inadequate review and insufficient protections for taxpayers facing collection actions.[153]

### Congressional Case Trends

Taxpayers often turn to their congressional representatives when faced with IRS issues.  The congressional representatives refer these taxpayers to TAS, which is responsible for responding to tax account inquiries sent to the IRS by members of Congress.  Figure 4.1.17 reflects the total congressional case receipts and total TAS receipts from other contacts.

### FIGURE 4.1.17[154]

**TAS Congressional Receipts and Total Case Receipts, FYs 2012–2015**



Figure 4.1.18 shows the top 10 PCICs causing taxpayers to seek the assistance of their congressional representatives.  IDT receipts increased by 69 percent between FY 2014 and FY 2015 and Pre-Refund Wage Verification Holds increased by 21 percent.  These mirror the top two issues for all receipts.  Applications for Exempt Status cases from congressional referrals declined by about 80 percent, which was similar to the decline in TAS cases overall for this issue.[155]

---

152  *See* Most Serious Problem: *Appeals: The Appeals Judicial Approach and Culture Project is Reducing the Quality and Extent of Substantive Administrative Appeals Available to Taxpayers*, *supra*.

153  *See* Most Serious Problem: *Collection Appeals Program (CAP): The CAP Provides Inadequate Review and Insufficient Protections for Taxpayers Facing Collection Actions*, *supra*.

154  Data obtained from TAMIS (Oct. 1, 2012; Oct. 1, 2013; Oct. 1, 2014; Oct. 1, 2015).

155  PCIC 460 Application for Exempt Status cases from all sources, including congressional referrals, were 3,589 in FY 2014 and 931 in FY 2015, which was a decline of about 74 percent.

**FIGURE 4.1.18, TAS Top Ten Congressional Receipts by PCIC, FYs 2014–2015**[156]

| Rank | Issue Category | FY 2014 | FY 2015 | Percent Change |
|------|----------------|---------|---------|----------------|
| 1 | Identity Theft | 1,998 | 3,378 | 69.1% |
| 2 | Pre-Refund Wage Verification Hold | 1,298 | 1,571 | 21.0% |
| 3 | Processing Original Return | 880 | 871 | -1.0% |
| 4 | Processing Amended Return | 699 | 838 | 19.9% |
| 5 | Failure to File Penalty (FTF)/ Failure to Pay (FTP) | 507 | 564 | 11.2% |
| 6 | Installment Agreements | 423 | 528 | 24.8% |
| 7 | Levies | 530 | 517 | -2.5% |
| 8 | Application for Exempt Status (F.1023/1024) | 2,645 | 512 | -80.6% |
| 9 | Transcript Requests | 427 | 502 | 17.6% |
| 10 | Other Refund Inquiries or Issues | 401 | 417 | 4.0% |
| | Other Issues | 7,641 | 7,892 | 3.3% |
| **Total Congressional Receipts** | | **17,449** | **17,590** | **0.8%** |

TAS continued to work many issues in FY 2015 after direct contact by taxpayers, their representatives' contacts, IRS employees' referrals, and congressional representatives' referrals. TAS acted to expedite the outcome of all cases but particularly those presented with economic burdens for the taxpayers.

---

156 Data obtained from TAMIS (Oct. 1, 2015).

## Top 25 Case Advocacy Issues for FY 2015 by TAMIS* Receipts

| Issue Code | Description | FY 2015 Case Receipts |
|---|---|---|
| 425 | Identity Theft | 56,174 |
| 45 | Pre-Refund Wage Verification Hold | 40,633 |
| 330 | Processing Amended Return | 11,847 |
| 63x - 640 | Open Earned Income Tax Credit (EITC) Audits, Certification, Reconsideration, Recertification | 10,880 |
| 71x | Levies (Including Federal Payment Levy Program) | 7,977 |
| 310 | Processing Original Return | 7,148 |
| 620 | Reconsideration of Audits and Substitute for Return under IRC § 6020(b) | 6,723 |
| 315 | Unpostable or Rejected Returns | 6,057 |
| 40 | Returned or Stopped Refunds | 4,612 |
| 340 | Injured Spouse Claim | 4,604 |
| 75x | Installment Agreements | 4,118 |
| 610 | Open Audit, Non-EITC | 3,591 |
| 60 | IRS Offset | 3,442 |
| 920 | Affordable Care Act (ACA) Health Insurance Premium Tax Credit for Individuals under IRC § 36B | 3,318 |
| 90 | Other Refund Inquiries or Issues | 3,314 |
| 670 | Closed Automated Underreporter | 3,300 |
| 72x | Liens | 3,051 |
| 520 | Failure to File Penalty (FTF) or Failure to Pay (FTP) | 2,578 |
| 10 | Lost or Stolen Refunds | 2,110 |
| 210 | Missing or Incorrect Payments | 1,994 |
| 320 | Math Error | 1,921 |
| 790 | Other Collection Issues | 1,907 |
| 660 | Open Automated Underreporter | 1,884 |
| 151 | Transcript Requests | 1,862 |
| 740 | Unable to Pay (Currently Not Collectible (CNC)) | 1,854 |
| **Total Top 25 Receipts** | | **196,899** |
| **Total TAS Receipts** | | **227,189** |

* Taxpayer Advocate Management Information System

# Glossary of Acronyms

| Acronym | Definition |
|---------|------------|
| AARS | Appeals Account Resolution Specialist |
| ABA | American Bar Association |
| ABLE | Achieving a Better Life Experience |
| ACA | Affordable Care Act |
| ACDS | Appeals Centralized Database System |
| ACE | Automated Correspondence Exam |
| ACS | Automated Collection System |
| ACTC | Additional Child Tax Credit |
| ADR | Alternative Dispute Resolution *or* Address Research System |
| AEITC | Advanced Earned Income Tax Credit |
| AGI | Adjusted Gross Income |
| AIC | Akaike Information Criteria |
| AICPA | American Institute of Certified Public Accountants |
| AIMS | Audit Information Management System |
| AIS | Automated Insolvency System |
| AJAC | Appeals Judicial Approach and Culture |
| ALE | Allowable Living Expenses or Applicable Large Employers |
| ALS | Automated Lien System |
| AM | Accounts Management |
| AMS | Accounts Management System |
| AMT | Alternative Minimum Tax |
| AO/SO | Appeals or Settlement Officer |
| AOIC | Automated Offer In Compromise |
| AOTC | American Opportunity Tax Credit |
| APA | Administrative Procedure Act or Advance Pricing Agreement |
| APTC | Advance Premium Tax Credit |
| AQC | Automated Questionable Credits |
| AQR | Automated Questionable Refund |
| ARC | Annual Report to Congress |
| ARDI | Accounts Receivable Dollar Inventory |
| ASA | Average Speed of Answer |
| ASED | Assessment Statute Expiration Date |
| ASFR | Automated Substitute for Return |
| ATAO | Application for Taxpayer Assistance Order |
| ATE | Average Treatment Effect |
| ATT | Average Treatment Effect on the Treated |

| Acronym | Definition |
|---------|------------|
| AUR | Automated Underreporter |
| BAPCPA | Bankruptcy Abuse Prevention and Consumer Protection Act (of 2005) |
| BMF | Business Master File |
| BOD | Business Operating Division |
| BPMS | Business Performance Management System |
| BPR | Business Performance Review |
| BRRM | Business Rules and Requirements Management |
| BSA | Bank Secrecy Act |
| CAA | Certifying Acceptance Agent |
| CAP | Collection Appeals Program or Compliance Assurance Process |
| CAR | Case Activity Record |
| CAS | Customer Account Services |
| CC | Chief Counsel (Office of) |
| CCA | Chief Counsel Advice |
| CCDM | Chief Counsel Directives Manual |
| CCH | Commerce Clearing House |
| CCI | Centralized Case Intake |
| CDP | Collection Due Process |
| CDW | Compliance Data Warehouse |
| CFO | Chief Financial Officer (Office of) |
| CI | Criminal Investigation (Division) |
| CIS | Correspondence Imaging System or Collection Information Statement |
| CMS | Centers for Medicare and Medicaid Services |
| CNC | Currently Not Collectible |
| CONOPS | Concept of Operations |
| CP | Computer Paragraph |
| CPA | Certified Public Accountant |
| CPE | Continuing Professional Education |
| CPI | Consumer Price Index |
| CPS | Collection Process Study |
| CSED | Collection Statute Expiration Date |
| CSR | Customer Service Representative |
| CTC | Child Tax Credit |
| CY | Calendar Year |
| DCI | Data Collection Instrument |
| DD | Difference-in-Differences (estimator) |

001982

| Acronym | Definition |
|---------|------------|
| DDb | Dependent Database |
| DHS | Department of Homeland Security |
| DIF | Discriminant Income Function |
| DNTA | Deputy National Taxpayer Advocate |
| DOJ | Department of Justice |
| DOMA | Defense of Marriage Act |
| DPC | Designated Payment Code |
| EA | Enrolled Agent |
| EAC | Examination Activity Class |
| EAR | Electronic Account Resolution |
| EB | Economic Burden |
| EBRI | Employee Benefits Retirement Institute |
| EFDS | Electronic Fraud Detection System |
| EFIN | Electronic Filing Identification Number |
| EFS | Enterprise Fax Storage |
| EH | Equivalent Hearing |
| EIC | Earned Income Credit |
| EIN | Employer Identification Number |
| EITC | Earned Income Tax Credit |
| EO | Exempt Organization |
| EOMF | Exempt Organization Master File |
| EP | Employee Plans |
| EQ | Embedded Quality |
| EQRS | Embedded Quality Review System |
| ERCPC | Earned Income Tax Credit and Refundable Credits Policy and Coordination |
| ERIS | Enforcement Revenue Information System |
| ERISA | Employee Retirement Income Security Act |
| ERO | Electronic Return Originator |
| ERSA | Employee Retirement Savings Account |
| ESC | Executive Steering Committee |
| ESI | Electronically Stored Information |
| ESL | English as a Second Language |
| ESRP | Employer Shared Responsibility Payment |
| ETA | Effective Tax Administration |
| ETLA | Electronic Tax Law Assistance |
| FAC | Federal Advisory Committee |
| FAQ | Frequently Asked Question |
| FATCA | Foreign Account Tax Compliance Act |

| Acronym | Definition |
|---------|------------|
| FBAR | Report of Foreign Bank and Financial Accounts |
| FC | Field Collection |
| FCA | False Claim Act |
| FCR | Federal Case Registry |
| FDC | Fraud Detection Center |
| FDIC | Federal Deposit Insurance Corporation |
| FERA | Fraud Enforcement and Recovery Act (of 2009) |
| FFI | Foreign Financial Institution |
| FIRPTA | Foreign Investment in Real Property Tax Act |
| FOIA | Freedom of Information Act |
| FPL | Federal Poverty Level or Line |
| FPLP | Federal Payment Levy Program |
| FRA | Federal Records Act |
| FRCP | Federal Rules of Civil Procedure |
| FRP | Frivolous Return Program |
| FS | Filing Season |
| FTE | Full-Time Equivalent |
| FTF | Failure To File |
| FTHBC | First-Time Homebuyer Credit |
| FTL | Federal Tax Lien |
| FTP | Failure To Pay |
| FY | Fiscal Year |
| FYE | Fiscal Year Ending |
| GAO | Government Accountability Office or General Accounting Office |
| GDP | Gross Domestic Product |
| GLD | Governmental Liaison and Disclosure |
| GE | Government Entities |
| GS | General Schedule |
| HCTC | Health Coverage Tax Credit |
| HERCA | Health Care & Education Reconciliation Act of 2010 |
| HHI | Household Income |
| HHS | Health and Human Services |
| HMRC | Her Majesty's Revenue and Customs |
| IA | Installment Agreement |
| IBC | International Business Compliance |
| ICE | Initial Claim Evaluation |
| ICS | Integrated Collection System |
| IDR | Information Document Request |

001983

| Acronym | Definition |
|---|---|
| IDRM | Information Reporting and Document Matching |
| IDRS | Integrated Data Retrieval System |
| IDT | Identity Theft |
| IDTVA | Identity Theft Victim Assistance |
| IFC | International Finance Corporation |
| IGM | Interim Guidance Memorandum |
| IIC | International Individual Compliance |
| IMD | Internal Management Document |
| IMF | Individual Master File |
| IOAA | Independent Offices Appropriation Act (of 1952) |
| IP | Internet Protocol or Identity Protection |
| IP PIN | Identity Protection Personal Identification Number |
| IPO | ITIN Program Office |
| IPSU | Identity Protection Specialized Unit |
| IRA | Individual Retirement Account |
| IRB | Internal Revenue Bulletin |
| IRC | Internal Revenue Code |
| IRDM | Information Reporting Document Matching |
| IRM | Internal Revenue Manual |
| IRMF | Information Returns Master File |
| IRP | Information Returns Processing |
| IRPAC | Information Reporting Program Advisory Committee |
| IRS | Internal Revenue Service |
| IRSN | Internal Revenue Service Number |
| IRTF | Individual Returns Transaction File |
| ISRP | Individual Shared Responsibility Payment |
| IT | Information Technology |
| ITA | Interactive Tax Assistance |
| ITAR | Identity Theft Assistance Request |
| ITG | Indian Tribal Government |
| ITIN | Individual Taxpayer Identification Number |
| IVES | Income Verification Express Service |
| IVO | Integrity & Verification Operations |
| IWV | Income Wage Verification |
| JCT | Joint Committee on Taxation |
| JOC | Joint Operations Center |
| LB&I | Large Business and International Operating Division |
| LEM | Law Enforcement Manual |

| Acronym | Definition |
|---|---|
| LEP | Limited English Proficiency |
| LIF | Low Income Filter |
| LITC | Low Income Taxpayer Clinic |
| LLC | Limited Liability Company |
| LLP | Limited Liability Partnership |
| LOS | Level of Service |
| LP | Limited Partnership |
| LR | Legislative Recommendation |
| LTA | Local Taxpayer Advocate |
| MAGI | Modified Adjusted Gross Income |
| MEA | Math Error Authority |
| MEC | Minimal Essential Coverage |
| MFJ | Married Filing Joint |
| MFT | Master File Transaction |
| MLI | Most Litigated Issue |
| MOI | Memo of Interview |
| MSP | Most Serious Problem |
| NAEA | National Association of Enrolled Agents |
| NC | No-tax-change (experimental group) |
| NEH | Non-Economic Hardship |
| NES | Needs Enhancement Support |
| NFTL | Notice of Federal Tax Lien |
| NOD | Notice of Deficiency |
| NPL | National Public Liaison |
| NPRM | Notice of Proposed Rule Making |
| NQR | National Quality Review |
| NQRS | National Quality Review System |
| NRP | National Research Program |
| NTA | National Taxpayer Advocate |
| OAR | Operations Assistance Request |
| OCA | Office of Compliance Analytics |
| OD | Operating Division |
| OECD | Organisation for Economic Co-Operation and Development |
| OIC | Offer in Compromise |
| OLS | (IRS Office of) Online Services |
| OMB | Office of Management and Budget |
| OPERA | Office of Program Evaluation, Research, & Analysis |
| OPI | Office of Penalty and Interest Administration or Over the Phone Interpreter |

001984

| Acronym | Definition |
|---------|------------|
| OPM | Office of Personnel Management |
| OPR | Office of Professional Responsibility |
| OSI | Office of Servicewide Interest |
| OSP | Office of Servicewide Penalties or Office of Special Penalties |
| OTA | Office of Tax Analysis |
| OTC | Office of Taxpayer Correspondence |
| OTP | Office of Tax Policy |
| OUO | Official Use Only |
| OVC | Office for Victims of Crime |
| OVCI | Offshore Voluntary Compliance Initiative |
| OVD | Offshore Voluntary Disclosure |
| OVDI | Offshore Voluntary Disclosure Initiative |
| OVDP | Offshore Voluntary Disclosure Program |
| PAC | Program Action Cases |
| PC | Positive-tax-change (experimental group) |
| PCIC | Primary Core Issue Code |
| PFA | Pre-Filing Agreement |
| PGLD | Privacy, Governmental Liaison and Disclosure (Office of) |
| PIA | Privacy Impact Assessment |
| PIC | Primary Issue Code |
| PLR | Private Letter Ruling |
| PMTA | Program Manager Technical Advice or Assistance |
| POA | Power Of Attorney |
| PPS | Practitioner Priority Service |
| PTC | Premium Tax Credit |
| PTIN | Preparer Tax Identification Number |
| PTSD | Post-Traumatic Stress Disorder |
| PY | Processing Year |
| QRP | Questionable Refund Program |
| RA | Revenue Agent or Reporting Agent |
| RAS | (Office of) Research, Analysis and Statistics |
| RCA | Reasonable Cause Assistant or Refundable Credits Administration |
| RCP | Reasonable Collection Potential |
| RDD | Random-Digit Dialed |
| RIA | Research Institute of America |
| RICS | Return Integrity and Correspondence Services |
| RO | Revenue Officer |
| ROI | Return on Investment |

| Acronym | Definition |
|---------|------------|
| RPO | Return Preparer Office |
| RPP | Return Preparer Program |
| RPS | Revenue Protection Program |
| RRA 98 | Internal Revenue Service Restructuring and Reform Act of 1998 |
| RRP | Return Review Program |
| RSED | Refund Statute Expiration Date |
| S/E | Self-Employed |
| SA | Systemic Advocacy |
| SAMS | Systemic Advocacy Management System |
| SB/SE | Small Business/Self-Employed Operating Division |
| SBHCTC | Small Business Health Care Tax Credit |
| SCIC | Secondary Core Issue Code |
| SEP | Special Enforcement Program |
| SERP | Servicewide Electronic Research Program |
| SFR | Substitute for Return |
| SIFMA | Securities Industry and Financial Markets Association |
| SL | Stakeholder Liaison |
| SLA | Service Level Agreement |
| SLCSP | Second Lowest Cost Silver Plan |
| SMS | Secure Messaging System |
| SNOD | Statutory Notice of Deficiency |
| SO | Settlement Officer |
| SOI | Statistics of Income |
| SP | Submission Processing |
| SPC | Submission Processing Center(s) |
| SPDER | Office of Servicewide Policy, Directives, and Electronic Research |
| SPEC | Stakeholder Partnerships, Education & Communication |
| SRP | Shared Responsibility Payment |
| SSDI | Social Security Disability Insurance |
| SSN | Social Security Number |
| STARS | Structured Trust Advantaged Repackaged Securities |
| TAB | Taxpayer Assistance Blueprint |
| TAC | Taxpayer Assistance Center |
| TAD | Taxpayer Advocate Directive |
| TAMIS | Taxpayer Advocate Management Information System |

001985

| Acronym | Definition |
|---------|-----------|
| TAMRA | Technical and Miscellaneous Revenue Act (of 1988) |
| TAO | Taxpayer Assistance Order |
| TAP | Taxpayer Advocacy Panel |
| TARD | Taxpayer Advocate Received Date |
| TAS | Taxpayer Advocate Service |
| TASIS | Taxpayer Advocate Service Integrated System |
| TBOR | Taxpayer Bill of Rights |
| TC | Transaction Code |
| TCE | Tax Counseling for the Elderly |
| TCS | Tax Computation Specialists |
| TD | Treasury Developed (form) |
| TDA | Taxpayer Delinquent Account |
| TDC | Taxpayer Digital Communications |
| TE | Tax Examiner or Tax Exempt |
| TE/GE | Tax Exempt & Government Entities Operating Division |
| TEFRA | Tax Equity and Fiscal Responsibility Act of 1982 |
| TERC | Total Enforcement Revenue Collected |
| TFRP | Trust Fund Recovery Penalty |
| TGR | Total Gross Receipts |
| TIGTA | Treasury Inspector General for Tax Administration |

| Acronym | Definition |
|---------|-----------|
| TIN | Taxpayer Identification Number |
| TIPRA | Tax Increase Prevention and Reconciliation Act (of 2005) |
| TMP | TIN Matching Program |
| TPC | Third Party Contact |
| TPI | Total Positive Income |
| TPP | Third-Party Payer or Taxpayer Protection Program |
| TPPA | Third Party Payroll Agent |
| TRCAT | Taxpayer Service Returns Processing Category |
| TSP | Thrift Savings Plan |
| TY | Tax Year |
| UK | United Kingdom |
| URP | Underreporter |
| VITA | Volunteer Income Tax Assistance |
| VOIP | Voice Over Internet Protocol |
| VSD | Virtual Service Delivery |
| W&I | Wage and Investment Operating Division |
| WIRA | Wage and Investment Research & Analysis |
| WO | Whistleblower Office |
| YTD | Year to Date |

## TABLE 1    Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But not Sole Proprietorships)** | | | |
| *Al-Soufi v. Comm'r*, T.C. Memo. 2015-68 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |
| *Ambrosius v. Comm'r*, T.C. Memo. 2014-126 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to argue reasonable cause and good faith | Yes | IRS |
| *Baker v. Comm'r*, T.C. Summ. Op. 2014-57 | 6662(b)(2) - TP acted with reasonable cause and in good faith | Yes | TP |
| *Baur v. Comm'r*, T.C. Memo. 2014-117 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to argue reasonable cause and good faith | Yes | IRS |
| *Becker v. Comm'r*, T.C. Summ. Op. 2015-2 | 6662(b)(1) - TP negligent in preparing the return; failure to establish reasonable cause or good faith | Yes | IRS |
| *Brinkley v. Comm'r*, T.C. Memo. 2014-227, appeal docketed, No. 15-60144 (5th Cir. Mar. 2, 2015) | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Burrell v. Comm'r*, T.C. Memo. 2014-217 | 6662(b)(1) - TP negligent in failing to maintain records and erroneously claiming deductions; failure to present evidence on reasonable cause and good faith reliance on return pre-parer | No | IRS |
| *Cortes v. Comm'r*, T.C. Memo. 2014-181, appeal docketed, No. 15-71129 (9th Cir. Apr. 13, 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Dabney v. Comm'r*, T.C. Memo. 2014-108 | 6662(b)(1), (2) - TPs (H&W) acted with reasonable cause and in good faith | Yes | TP |
| *Duncan v. Comm'r*, T.C. Summ. Op. 2014-56 | 6662(b)(1) - TP negligent in failing to report income and in preparing the return; failure to argue reasonable cause and good faith | Yes | IRS |
| *English v. Comm'r*, T.C. Summ. Op. 2014-66 | 6662(b)(2) - TPs (H & W) acted with reasonable cause and good faith reliance on tax professional | Yes | TP |
| *Evans v. Comm'r*, T.C. Memo. 2015-12 | 6662(b)(1) - TPs (H&W) acted with reasonable cause and in good faith reliance on tax professional | No | TP |
| *Farahani v. Comm'r*, T.C. Memo. 2014-111 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Howard v. Comm'r*, T.C. Memo. 2015-38 | 6662(b)(1), (2) - TP acted with reasonable cause and good faith regarding unreimbursed travel expenses; however, penalty for substantial understatement of income tax applies provisionally for remaining unreimbursed employee business expenses and traffic ticket | Yes | Split |
| *Hughes v. Comm'r*, T.C. Memo. 2015-89 | 6662(b)(1), (2) - IRS failed to present evidence of negligence; penalty for substantial understatement of income tax applies provisionally for previously settled issues; failure to establish reasonable cause and good faith | No | Split |
| *Iglicki v. Comm'r*, T.C. Memo. 2015-80 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Koriakos v. Comm'r*, T.C. Summ. Op. 2014-70 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to establish reason-able cause and good faith | Yes | IRS |
| *Kunkel v. Comm'r*, T.C. Memo. 2015-71 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |

001987

TABLE 1: Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Lain v. Comm'r*, T.C. Summ. Op. 2015-5 | 6662(b)(1) - TPs (H&W) acted with reasonable cause and in good faith | Yes | TP |
| *Longino v. Comm'r*, 593 F. App'x 965 (11th Cir. 2014), *aff'g* T.C. Memo. 2013-80 | 6662(b)(1) - TP negligent in failing to maintain records; failure to present evidence of reasonable cause and good faith | Yes | IRS |
| *McBride v. Comm'r*, T.C. Memo. 2015-6 | 6662(b)(2) - IRS failed to argue for accuracy based penalty | Yes | TP |
| *McCarty v. Comm'r*, T.C. Summ. Op. 2014-81 | 6662(b)(1), (2) - IRS failed to present evidence of negligence; TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *McKnight v. Comm'r*, T.C. Memo. 2015-47 | 6662(b)(2) - TPs substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Miller v. Comm'r*, T.C. Summ. Op. 2014-74 | 6662(b)(1), (2) - TP acted with reasonable cause and in good faith reliance on tax professional | No | TP |
| *Nichols, U.S. v.*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to argue reasonable cause and good faith | No | IRS |
| *Peery v. Comm'r*, T.C. Memo. 2014-151 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Peters, U.S. v.*, 113 A.F.T.R.2d (RIA) 2501 (E.D. Mo. 2014) | 6662(b)(2) - TPs (H&W) substantially understated income tax | No | IRS |
| *Resnik v. Comm'r*, T.C. Summ. Op. 2015-11 | 6662(b)(2) - TP substantially understated income tax; failure to argue reasonable cause and good faith | No | IRS |
| *Rogers v. Comm'r*, 783 F.3d 320 (D.C. Cir. 2015), *aff'g and remanding in part*, T.C. Memo. 2013-77, *petition for cert. filed*, No. 15-286 (Sept. 8, 2015) | 6662(b)(1) - TPs (H&W) negligent in failing to report income; failure to establish reasonable cause and good faith | Yes | IRS |
| *Rublowsky v. Comm'r*, T.C. Summ. Op. 2014-51 | 6662(b)(2) - TP acted with reasonable cause and in good faith | Yes | TP |
| *Salmonson v. Comm'r*, T.C. Memo. 2014-244 | 6662(b)(1) - TP negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |
| *Schmidt v. Comm'r*, T.C. Memo. 2014-159 | 6662(b)(2) - TPs (H&W) acted with reasonable cause and in good faith | No | TP |
| *Smith v. Comm'r*, T.C. Memo. 2014-203 | 6662(b)(1) - TP negligent in erroneously claiming deductions; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Sullivan v. Comm'r*, T.C. Summ. Op. 2014-89 | 6662(b)(1), (2) - TP acted with reasonable cause and in good faith | Yes | TP |
| *Thomas-Kozak v. Comm'r*, T.C. Summ. Op. 2014-104 | 6662(b)(1), (2) - TP acted with reasonable cause regarding medical expense deduction; TP was negligent in failing to maintain records for remaining deductions; penalty for substantial understatement of income tax applies provisionally, excluding the medical expense deduction | No | Split |
| *Wish v. Comm'r*, T.C. Summ. Op. 2015-25 | 6662(b)(2) - No substantial understatement of income tax; TP acted with reasonable cause and good faith | Yes | TP |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships - Schedule C, E, F)** | | | |
| *Agugo v. Comm'r*, T.C. Summ. Op. 2014-60 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith reliance on tax professional | Yes | IRS |
| *Alfaro v. Comm'r*, T.C. Summ. Op. 2014-54 | 6662(b)(2) - TPs (H&W) acted with reasonable cause and in good faith | Yes | TP |
| *Alubunkudi v. Comm'r*, T.C. Summ. Op. 2014-97 | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records; penalty for substantial understatement of income tax applies provisionally; failure to argue reasonable cause and good faith | Yes | IRS |

001988

**TABLE 1: Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)**

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Anyanwu v. Comm'r*, T.C. Memo. 2014-123 | 6662(b)(1), (2) - TP negligent in failing to maintain records and in preparing the return; penalty for substantial under-statement of income tax applies provisionally; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Ballard-Bey v. Comm'r*, T.C. Summ. Op. 2014-62 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Barnes Grp., Inc. & Subsidiaries v. Comm'r*, 593 F. App'x 7 (2d Cir. 2014), *aff'g* T.C. Memo. 2013-109 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Bogner v. Comm'r*, T.C. Summ. Op. 2014-53 | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records; TPs substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Boring v. Comm'r*, T.C. Summ. Op. 2014-105 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Briley v. Comm'r*, T.C. Memo. 2014-114, *appeal docketed*, No. 15-1461 (4th Cir. Apr. 29, 2015) | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |
| *Bronson v. Comm'r*, 591 F. App'x 625 (9th Cir. 2015), *aff'g* T.C. Memo. 2012-17 | 6662(b)(2) - TPs (H & W) substantially understated income tax; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Brown v. Comm'r*, T.C. Memo. 2014-167, *appeal docketed*, No. 15-3033 (2d Cir. Sept. 28, 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to argue reasonable cause and good faith | No | IRS |
| *Burke v. Comm'r*, T.C. Summ. Op. 2015-24 | 6662(b)(1) - TP negligent in failing to maintain records; fail-ure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Chai v. Comm'r*, T.C. Memo. 2015-42, *appeal docketed*, No. 15-1653 (2d Cir. May 19, 2015) | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Cherizol v. Comm'r*, T.C. Memo. 2014-119 | 6662(b)(2) - TP failed to address issue of accuracy based penalty; failure to argue reasonable cause and good faith | Yes | IRS |
| *Coastal Heart Med. Grp., Inc. v. Comm'r*, T.C. Memo. 2015-84 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Coburn v. Comm'r*, T.C. Memo. 2014-113 | 6662(b)(1), (2) - TP negligent in failing to maintain records; penalty for substantial understatement of income tax applies provisionally; failure to present evidence on reasonable cause and good faith reliance on tax professional | No | IRS |
| *Cooper v. Comm'r*, 143 T.C. 194 (2014), *appeal docketed*, No. 15-70863 (9th Cir. Mar. 20, 2015) | 6662(b)(1), (2) - TPs (H&W) negligent in preparing the return; penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith reliance on tax professional | No | IRS |
| *Djoshabeh v. Comm'r*, T.C. Summ. Op. 2014-58 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Duong v. Comm'r*, T.C. Memo. 2015-90 | 6662(b)(1) - TPs (business partners) negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Engstrom, Lipscomb & Lack, APC v. Comm'r*, T.C. Memo. 2014-221, *appeal docketed*, No. 15-70591 (9th Cir. Feb. 26, 2015) | 6662(b)(1) - TP negligent in failing to maintain records; fail-ure to establish reasonable cause and good faith | No | IRS |
| *Evans v. Comm'r*, T.C. Memo. 2014-237 | 6662(b)(2) - TPs (H&W) acted with reasonable cause and in good faith reliance on tax professional | No | TP |
| *Fargo v. Comm'r*, T.C. Memo. 2015-96, | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |

001989

TABLE 1: Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Flores v. Comm'r*, T.C. Memo. 2015-9 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Gardner v. Comm'r*, T.C. Memo. 2014-148 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith reliance on a tax professional | No | IRS |
| *Graham v. Comm'r*, T.C. Summ. Op. 2014-79 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Hall v. Comm'r*, T.C. Memo. 2014-171 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records and erroneously claiming deductions; failure to establish reasonable cause and good faith reliance on a tax professional | Yes | IRS |
| *Hillman v. Comm'r*, T.C. Memo. 2014-250 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Holden v. Comm'r*, T.C. Memo. 2015-83 | 6662(b)(1), (2) - TP negligent in failing to maintain records and erroneously claiming deductions; penalty for substantial understatement of income tax applies provisionally; failure to present evidence on reasonable cause and good faith | No | IRS |
| *Hunter v. Comm'r*, T.C. Memo. 2014-164 | 6662(b)(2) - TP substantially understated income tax; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Jackson v. Comm'r*, T.C. Memo. 2014-160, *appeal docketed*, No. 14-73680 (9th Cir. Dec. 2, 2014) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Jacobs v. Comm'r*, T.C. Summ. Op. 2015-3 | 6662(b)(1), (2) - TP negligent in failing to report income; TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Jones v. Comm'r*, T.C. Memo. 2014-125 | 6662(b)(1), (2) - TPs (H&W) acted with reasonable cause and in good faith | No | TP |
| *Kaminski v. Comm'r*, T.C. Summ. Op. 2015-7 | 6662(b)(2) - TP acted with reasonable cause and in good faith reliance on tax professional | Yes | TP |
| *Kinuthia v. Comm'r*, T.C. Memo. 2014-127 | 6662(b)(2) - TP substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Le Beau v. Comm'r*, T.C. Memo. 2014-198, *appeal docketed*, No. 15-70489 (9th Cir. Feb. 18, 2015) | 6662(b)(1) - TP negligent in failing to maintain records | Yes | IRS |
| *Lee v. Comm'r*, T.C. Summ. Op. 2015-33 | 6662(b)(1), (2) - TP negligent in failing to maintain records; penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith | Yes | IRS |
| *Lopez v. Comm'r*, T.C. Summ. Op. 2015-22 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Luciano-Salas v. Comm'r*, T.C. Summ. Op. 2014-76 | 6662(b)(1) - TP negligent in failing to maintain records; failure to establish reasonable cause and good faith reliance on tax professional | Yes | IRS |
| *Martarano v. Comm'r*, T.C. Summ. Op. 2014-64 | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records; TPs substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Martarano v. Comm'r*, T.C. Summ. Op. 2014-101 | 6662(b)(1) - Negligence penalty denied due to unfair surprise/prejudice | Yes | TP |
| *McClellan v. Comm'r*, T.C. Memo. 2014-257 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Metz v. Comm'r*, T.C. Memo. 2015-54 | 6662(b)(1), (2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause | No | IRS |

TABLE 1: Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Midwest Eye Ctr., S.C. v. Comm'r*, T.C. Memo. 2015-53 | 6662(b)(2) - TP substantially understated income tax; failure to present evidence on reasonable cause and good faith | No | IRS |
| *Minchem Int'l, Inc. v. Comm'r*, T.C. Memo. 2015-56 | 6662(b)(1), (2) - No substantial understatement for investment interest and deductions of personal expenses; TPs (H&W) negligent in claiming home equity loan interest deduction and failing to report income; failure to establish reasonable cause and good faith reliance on tax professional | No | Split |
| *Mylander v. Comm'r*, T.C. Memo. 2014-191 | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records; penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith | No | IRS |
| *Na v. Comm'r*, T.C. Memo. 2015-21 | 6662(b)(1), (2) - TP negligent in failing to maintain records for some unreported income; penalty for substantial understatement of income tax applies provisionally to some unreported income; failure to present evidence of reasonable cause and good faith for some unreported income | No | Split |
| *Nganga v. Comm'r*, T.C. Summ. Op. 2014-50 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to argue reasonable cause or good faith | Yes | IRS |
| *Nguyen v. Comm'r*, T.C. Memo. 2014-199 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith reliance on tax preparer | No | IRS |
| *Odujinrin v. Comm'r*, T.C. Memo. 2014-213 | 6662(b)(1) - TP negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Peterson v. Comm'r*, T.C. Memo. 2015-1, *appeal docketed*, No. 15-73092 (9th Cir. Oct. 8, 2015) | 6662(b)(1) - TP negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |
| *Peterson v. Comm'r*, T.C. Memo. 2015-23 | 6662(b)(1) - TP negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Pospisil v. Comm'r*, T.C. Summ. Op. 2014-100 | 6662(b)(1), (2) - TPs (H&W) not negligent; penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith | Yes | IRS |
| *Powell v. Comm'r*, T.C. Memo. 2014-235, *appeal docketed*, No. 15-1851 (4th Cir. July 30, 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to argue reasonable cause and good faith | Yes | IRS |
| *Price v. Comm'r*, T.C. Memo. 2014-253, *appeal docketed*, No. 15-2196 (3d Cir. May 19, 2015) | 6662(b)(2) - TPs (H&W) acted with reasonable cause and good faith | No | TP |
| *Redisch v. Comm'r*, T.C. Memo. 2015-95 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith | No | IRS |
| *Robinson v. Comm'r*, T.C. Memo. 2014-120, *aff'd*, No. 15-1380 (4th Cir. Sept. 3, 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Rogers v. Comm'r*, T.C. Memo. 2014-141 *amended on reconsideration in part*, 2014 WL 6805465 (T.C. 2014) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Ross v. Comm'r*, T.C. Summ. Op. 2014-68 | 6662(b)(1) - TP negligent in preparing the return; TP acted in good faith for reporting wages paid, but not for the remaining business deductions | Yes | Split |
| *Safakish v. Comm'r*, T.C. Memo. 2014-242, *appeal docketed*, No. 15-70826 (9th Cir. Mar. 17, 2015) | 6662(b)(2) - TP substantially understated income tax; failure to argue reasonable cause and good faith | Yes | IRS |

001991

TABLE 1: Accuracy-Related Penalty Under IRC §§ 6662(b)(1) and (2)

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Salem Fin., Inc. v. U.S.*, 786 F.3d 932 (Fed. Cir. 2015), *aff'g in part, reversing in part and remanding*, 112 Fed. Cl. 543 (2013), *petition for cert. filed*, No. 15-380 (Sept. 29, 2015) | 6662(b)(1) - TP negligent in entering a transaction that lacked economic substance; failure to establish reasonable cause and good faith | No | IRS |
| *Savello v. Comm'r*, T.C. Memo. 2015-24 | 6662(b)(1) - TP negligent in failing to maintain records; failure to present evidence on reasonable cause and good faith | No | IRS |
| *Savulionis v. Comm'r*, T.C. Summ. Op. 2015-19 | 6662(b)(1) - TPs (H&W) acted with reasonable cause and in good faith | Yes | TP |
| *Sawyer v. Comm'r*, T.C. Memo. 2015-55 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; Failure to present evidence on reasonable cause and good faith | No | IRS |
| *Schumann v. Comm'r*, T.C. Memo. 2014-138 | 6662(b)(1) - TP negligent in failing to maintain records; failure to establish reasonable cause and good faith | No | IRS |
| *Shah v. Comm'r*, T.C. Memo. 2015-31, *appeal docketed*, No. 15-1773 (6th Cir. June 30, 2015) | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records and erroneously claiming deductions; substantially understated income tax on one of two returns; failure to establish reasonable cause and good faith | Yes | IRS |
| *Sheridan v. Comm'r*, T.C. Memo. 2015-25 | 6662(b)(2) - TP substantially understated income tax; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Sievers v. Comm'r*, T.C. Memo. 2014-115 | 6662(b)(1), (2) - TP negligent in failing to maintain records; penalty for substantial understatement of income tax applies provisionally; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Simpson v. Comm'r*, T.C. Summ. Op. 2014-67 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Singhal v. Comm'r*, T.C. Summ. Op. 2014-102 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | No | IRS |
| *Suder v. Comm'r*, T.C. Memo. 2014-201 | 6662(b)(1), (2) - TPs (two shareholders) acted with reasonable cause and in good faith | No | TP |
| *Tarighi v. Comm'r*, T.C. Summ. Op. 2015-28 | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to present evidence on reasonable cause and good faith | Yes | IRS |
| *Villarreal v. Comm'r*, T.C. Summ. Op. 2014-87 | 6662(b)(1) - TPs (H&W) negligent in failing to maintain records; failure to establish reasonable cause and good faith | Yes | IRS |
| *Wakefield v. Comm'r*, T.C. Memo. 2015-4 | 6662(b)(1), (2) - TPs (H&W) negligent in failing to maintain records and distinguish personal from business expenses; penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith through reliance on promoter | No | IRS |
| *Wells Fargo & Co. v. U.S.*, 114 A.F.T.R.2d (RIA) 5414 (D. Minn. 2014) | 6662(b)(1) - TP not negligent, had reasonable basis for its reporting of the STARS transaction | No | TP |
| *Williams v. Comm'r*, T.C. Memo. 2014-158, *appeal docketed*, No. 15-71505 (9th Cir. May 19, 2015) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith | Yes | IRS |
| *Wright v. Comm'r*, T.C. Memo. 2014-175, *appeal docketed*, No. 15-1071 (6th Cir. Jan. 26, 2015 ) | 6662(b)(2) - TPs (H&W) substantially understated income tax; failure to establish reasonable cause and good faith reliance on tax professional | Yes | IRS |
| *Zierdt v. Comm'r*, T.C. Summ. Op. 2014-78 | 6662(b)(2) - Penalty for substantial understatement of income tax applies provisionally; failure to establish reasonable cause and good faith | Yes | IRS |

**TABLE 2   Trade or Business Expenses Under IRC § 162 and Related Sections**

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | |
| *Bartley v. Comm'r*, T.C. Summ. Op. 2015-23 | Failure to meet § 274 substantiation requirements; personal expenses disallowed; work boot expense allowed under § 162 | Yes | Split |
| *Flores v. Comm'r*, T.C. Memo. 2015-9 | Failure to meet § 274 substantiation requirements; failure to substantiate expenses | Yes | IRS |
| *Free-Pacheco v. U.S.*, 117 Fed. Cl. 228 (2014) | Not engaged in for profit under § 183; gambling expenses disallowed | No | IRS |
| *Garza v. Comm'r*, T.C. Memo. 2014-121 | Failure to meet § 274 substantiation requirements | No | IRS |
| *Howard v. Comm'r*, T.C. Memo. 2015-38 | Failure to substantiate expenses for travel; other expense allowed under § 162 | Yes | Split |
| *Jacobs v. Comm'r*, T.C. Summ. Op. 2015-3 | Failure to substantiate expenses | Yes | IRS |
| *Jalloh v. Comm'r*, T.C. Summ. Op. 2015-18 | Failure to meet § 274 substantiation requirements; failure to substantiate expenses; Cohan rule applied to allow uniform and protective clothing expenses; union dues expense allowed under § 162 | Yes | Split |
| *Jermihov v. Comm'r*, T.C. Summ. Op. 2014-75 | Failure to meet § 274 substantiation requirements for vehicle and travel expenses; a portion of medical expenses allowed under § 162; Cohan rule applied to allow professional dues and subscriptions | Yes | Split |
| *Lain v. Comm'r*, T.C. Summ. Op. 2015-5 | Deductions allowed for Schedule A expenses | Yes | TP |
| *McCarty v. Comm'r*, T.C. Summ. Op. 2014-81 | Business expense allowed under § 162 | Yes | TP |
| *Meinhardt v. Comm'r*, 766 F.3d 917 (8th Cir. 2014), *aff'g* T.C. Memo. 2013-85 | Failure to establish overall activity as a qualifying trade or business within § 162(a); not engaged in for profit Under § 183 | No | IRS |
| *Miller v. Comm'r*, T.C. Summ. Op. 2014-74 | Failure to substantiate expenses for utilities and office supplies; failure to meet § 274 substantiation requirements; personal expenses disallowed for clothing; home office expense allowed under § 162; Cohan rule applied to allow telephone and Internet | No | Split |
| *Monsalve v. Comm'r*, T.C. Summ. Op. 2014-91 | Failure to prove meals, entertainment, and gift expenses were ordinary and necessary; however, travel expense allowed under § 162 | Yes | Split |
| *Morataya v. Comm'r*, T.C. Summ. Op. 2015-30 | Failure to meet § 274 substantiation requirements; personal expenses disallowed; cell phone and tax return preparation fees allowed under § 162 | Yes | Split |
| *Ressen v. Comm'r*, T.C. Summ. Op. 2015-32 | Vehicle expenses allowed under § 162; however, failure to substantiate additional expenses | Yes | Split |
| *Thomas-Kozak v. Comm'r*, T.C. Summ. Op. 2014-104 | Personal expenses disallowed; failure to meet § 274 substantiation requirements; some meals and unreimbursed employee expenses allowed under § 162 | No | Split |
| **Business Taxpayers (Corporate, Partnerships, Trusts, and Sole Proprietorships - Schedules C, E, F)** | | | |
| *ABC Beverage Corp. v. U.S.*, 756 F.3d 438 (6th Cir. 2014), *aff'g* 577 F. Supp. 2d 935 (W.D. Mich. 2008) | A portion of purchase price from lease buy out allowed under § 162 | No | TP |
| *Agugo v. Comm'r*, T.C. Summ. Op. 2014-60 | Failure to establish overall activity as a qualifying trade or business within § 162(a) | Yes | IRS |

001993

TABLE 2: Trade or Business Expenses Under IRC § 162 and Related Sections

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Akey v. Comm'r*, T.C. Memo. 2014-211 | Not engaged in for profit under § 183; failure to substantiate expenses | Yes | IRS |
| *Alubunkudi v. Comm'r*, T.C. Summ. Op. 2014-97 | Failure to substantiate expenses | Yes | IRS |
| *Annuzzi v. Comm'r*, T.C. Memo. 2014-233 | Horse racing activity was engaged in for profit under § 183 | No | TP |
| *Anyanwu v. Comm'r*, T.C. Memo. 2014-123 | Failure to substantiate expenses | Yes | IRS |
| *Baker v. Comm'r*, T.C. Memo. 2014-122 | Failure to meet § 274 substantiation requirements; Cohan rule applied to allow some vehicle maintenance and license expenses | Yes | Split |
| *Ball v. Comm'r*, T.C. Summ. Op. 2014-83 | Failure to meet § 274 substantiation requirements | Yes | IRS |
| *Ballard-Bey v. Comm'r*, T.C. Summ. Op. 2014-62 | Failure to prove expense was ordinary and necessary | Yes | IRS |
| *Bedrosian v. Comm'r*, 144 T.C. No. 10 (2015) | Not engaged in for profit under § 183 | No | IRS |
| *Boring v. Comm'r*, T.C. Summ. Op. 2014-105 | Failure to meet § 274 substantiation requirements; failure to prove expense was ordinary and necessary; home office disallowed | Yes | IRS |
| *Briley v. Comm'r*, T.C. Memo. 2014-114, *appeal docketed*, No. 15-1461 (4th Cir. Apr. 29, 2015) | Failure to substantiate expenses | Yes | IRS |
| *Bronson v. Comm'r*, 591 F. App'x 625 (9th Cir. 2015), *aff'g* T.C. Memo. 2012-17 | Not engaged in for profit under § 183 | Yes | IRS |
| *Bruce v. Comm'r*, T.C. Memo. 2014-178, *aff'd, Bruce v. Comm'r*, 608 F. App'x 268 (5th Cir. 2015) | Personal expenses disallowed | No | IRS |
| *Burke v. Comm'r*, T.C. Summ. Op. 2015-24 | Failure to substantiate expenses; failure to establish overall activity as a qualifying trade or business within § 162(a); home office disallowed; ferry expenses allowed under § 162 | Yes | Split |
| *Cherizol v. Comm'r*, T.C. Memo. 2014-119 | Failure to substantiate expenses; failure to meet § 274 substantiation requirements | Yes | IRS |
| *Cooper v. Comm'r*, 143 T.C. 194 (2014), *appeal docketed*, No. 15-70863 (9th Cir. Mar. 20, 2015) | Business expense allowed under § 162 | No | TP |
| *Crawford v. Comm'r*, T.C. Memo. 2014-156 | Failure to meet § 274 substantiation requirements | Yes | IRS |
| *Crile v. Comm'r*, T.C. Memo. 2014-202 | Artwork activity was engaged in for profit under § 183 | No | TP |
| *Cullifer v. Comm'r*, T.C. Memo. 2014-208, *appeal docketed*, No. 15-13539 (11th Cir. Aug. 7, 2015) | Failure to substantiate expenses for management and professional fees; however, other management fees allowed under § 162 | No | Split |
| *Del Castillo v. Comm'r*, T.C. Summ. Op. 2015-35 | Failure to establish overall activity as a qualifying trade or business within § 162(a); failure to meet § 274 substantiation requirements | Yes | IRS |
| *Engstrom, Lipscomb & Lack, APC v. Comm'r*, T.C. Memo. 2014-221, *appeal docketed*, No. 15-70591 (9th Cir. Feb. 26, 2015) | Failure to meet § 274 substantiation requirements for some travel expenses; however, other travel expenses allowed under § 162 | No | Split |
| *Evans v. Comm'r*, T.C. Memo. 2014-237 | Expenses were ordinary and necessary; Cohan rule applied to allow some expenses; motocross racing activity expenses were not personal expenses | No | TP |
| *Fargo v. Comm'r*, T.C. Memo. 2015-96 | Failure to prove expense was ordinary and necessary | No | IRS |
| *Gardner v. Comm'r*, T.C. Memo. 2014-148 | Not engaged in for profit under § 183 | No | IRS |

TABLE 2: Trade or Business Expenses Under IRC § 162 and Related Sections

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Graffia v. Comm'r*, 580 F. App'x 474 (7th Cir. 2014), *aff'g* T.C. Memo. 2013-211 | Failure to demonstrate transaction possessed economic substance | Yes | IRS |
| *Guardian Indus. Corp. v. Comm'r*, 143 T.C. 1 (2014) | Failure to prove expense was ordinary and necessary | No | IRS |
| *Hall v. Comm'r*, T.C. Memo. 2014-171 | Failure to meet § 274 substantiation requirements; failure to substantiate expenses | Yes | IRS |
| *Helms, U.S. v.*, 579 F. App'x 615 (9th Cir. 2014), *aff'g* 106 A.F.T.R.2d (RIA) 6008 (S.D. Cal. 2010) | Failure to meet § 274 substantiation requirements | No | IRS |
| *Holden v. Comm'r*, T.C. Memo. 2015-83 | Failure to substantiate expenses | No | IRS |
| *Hume v. Comm'r*, T.C. Memo. 2014-135 | Failure to establish overall activity as a qualifying trade or business within § 162(a); failure to substantiate expenses | Yes | IRS |
| *Jackson v. Comm'r*, T.C. Memo. 2014-160, *appeal docketed*, No. 14-73680 (9th Cir. Dec. 2, 2014) | Personal expenses disallowed | No | IRS |
| *Jones v. Comm'r*, T.C. Memo. 2014-125 | Failure to substantiate expenses | No | IRS |
| *Kaminski v. Comm'r*, T.C. Summ. Op. 2015-7 | Failure to meet § 274 substantiation requirements; failure to substantiate expenses for travel; personal expenses disallowed; Cohan rule applied to allow Internet expenses | Yes | Split |
| *Kenna Trading, LLC v. Comm'r*, 143 T.C. 322 (2014) | Failure to demonstrate transaction possessed economic substance | Yes | IRS |
| *Kinuthia v. Comm'r*, T.C. Memo. 2014-127 | Failure to substantiate expenses | Yes | IRS |
| *Koriakos v. Comm'r*, T.C. Summ. Op. 2014-70 | Personal expenses disallowed; failure to meet § 274 substantiation requirements; expenses allowed under § 162 for some advertising, repairs, maintenance, and other expenses | Yes | Split |
| *Le Beau v. Comm'r*, T.C. Memo. 2014-198, *appeal docketed*, No. 15-70489 (9th Cir. Feb. 18, 2015) | Failure to substantiate some expenses; other rental expenses and real estate tax allowed under § 162 | Yes | Split |
| *Lee v. Comm'r*, T.C. Summ. Op. 2015-33 | Failure to meet § 274 substantiation requirements; personal expenses disallowed | Yes | IRS |
| *Legaspi v. Comm'r*, T.C. Summ. Op. 2015-14 | Failure to meet § 274 substantiation requirements | Yes | IRS |
| *Longino v. Comm'r*, 593 F. App'x 965 (11th Cir. 2014), *aff'g* T.C. Memo. 2013-80 | Failure to meet § 274 substantiation requirements; home office disallowed; failure to substantiate expenses | Yes | IRS |
| *Lussy v. Comm'r*, T.C. Memo. 2015-35, *appeal docketed*, No. 15-11626 (11th Cir. Apr. 13, 2015) | Failure to substantiate expenses; personal expenses disallowed; failure to meet § 274 substantiation requirements | Yes | IRS |
| *Martarano v. Comm'r*, T.C. Summ. Op. 2014-101 | Failure to prove expense was ordinary and necessary | Yes | IRS |
| *Martarano v. Comm'r*, T.C. Summ. Op. 2014-64 | Failure to meet § 274 substantiation requirements; failure to prove expense was ordinary and necessary | Yes | IRS |
| *McClellan v. Comm'r*, T.C. Memo. 2014-257 | Failure to meet § 274 substantiation requirements for entertainment, travel, and vehicle expenses; personal expenses disallowed; home office disallowed; other business expenses allowed under § 162; Cohan rule applied to allow postage and delivery costs | Yes | Split |
| *Metz v. Comm'r*, T.C. Memo. 2015-54 | Horse breeding activity was engaged in for profit under § 183 | No | TP |
| *Midwest Eye Ctr., S.C. v. Comm'r*, T.C. Memo. 2015-53 | Failure to prove expense was ordinary and necessary | No | IRS |
| *Miller v. Comm'r*, T.C. Memo. 2014-105 | Failure to substantiate expenses | Yes | IRS |

001995

| Problems | Recommendations | Issues | Appendices |
|----------|-----------------|--------|------------|

**TABLE 2: Trade or Business Expenses Under IRC § 162 and Related Sections**

| Case Citation | Issue(s) | Pro Se | Decision |
|---------------|----------|--------|----------|
| *Moyer v. Comm'r*, T.C. Memo. 2015-45 | Failure to substantiate expenses; personal expenses disallowed; failure to meet § 274 substantiation requirements for vehicle expenses; some expenses allowed under § 162 | No | Split |
| *Musa v. Comm'r*, T.C. Memo. 2015-58 | Failure to substantiate expenses for additional wage deductions and some non-employee compensation; failure to meet § 274 substantiation requirements; Cohan rule applied to allow other non-employee compensation | No | Split |
| *Mylander v. Comm'r*, T.C. Memo. 2014-191 | Cohan rule applied | No | TP |
| *Nganga v. Comm'r*, T.C. Summ. Op. 2014-50 | Failure to substantiate expenses; business license expense allowed under § 162 | Yes | Split |
| *Nichols, U.S. v.*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015) | Personal expenses disallowed | No | IRS |
| *Odujinrin v. Comm'r*, T.C. Memo. 2014-213 | Failure to meet § 274 substantiation requirements for meal, entertainment, telephone, and vehicle expenses; failure to substantiate expenses for wages, rent, and insurance; however, other business expense allowed under § 162 | Yes | Split |
| *Peppers v. Comm'r*, T.C. Summ. Op. 2014-55 | Failure to meet § 274 substantiation requirements; personal expenses disallowed | Yes | IRS |
| *Peterson v. Comm'r*, T.C. Memo. 2015-23 | Failure to meet § 274 substantiation requirements; personal expenses disallowed | Yes | IRS |
| *Peterson v. Comm'r*, T.C. Memo. 2015-1, appeal docketed, No. 15-73092 (9th Cir. Oct. 8, 2015) | Failure to meet § 274 substantiation requirements; home repair expense disallowed as a capital expenditure; airplane-related costs allowed under § 162 | Yes | Split |
| *Pospisil v. Comm'r*, T.C. Summ. Op. 2014-100 | Failure to meet § 274 substantiation requirements | Yes | IRS |
| *Powell v. Comm'r*, T.C. Memo. 2014-235, appeal docketed, No. 15-1851 (4th Cir. July 30, 2015) | Failure to establish overall activity as a qualifying trade or business within § 162(a); failure to meet § 274 substantiation requirements; failure to substantiate expenses | Yes | IRS |
| *Price v. Comm'r*, T.C. Memo. 2014-253, appeal docketed, No. 15-2196 (3d Cir. May 19, 2015) | Not engaged in for profit under § 183 | No | IRS |
| *Reddam v. Comm'r*, 755 F.3d 1051 (9th Cir. 2014), aff'g T.C. Memo. 2012-106 | Failure to demonstrate transaction possessed economic substance | No | IRS |
| *Robinson v. Comm'r*, T.C. Memo. 2014-120, aff'd, No. 15-1380 (4th Cir. Sept. 3, 2015) | Failure to establish overall activity as a qualifying trade or business within § 162(a); personal expenses disallowed; home office disallowed; failure to meet § 274 substantiation requirements | Yes | IRS |
| *Rogers v. Comm'r*, T.C. Memo. 2014-141 amended on reconsideration in part, 2014 WL 6805465 (T.C. 2014) | Failure to prove expense was ordinary and necessary; failure to meet § 274 substantiation requirements for some travel expenses, vehicle expenses, and meals; home office disallowed; however, other expenses allowed under § 162 | No | Split |
| *Ross v. Comm'r*, T.C. Summ. Op. 2014-68 | Home office disallowed; failure to prove expense was ordinary and necessary | Yes | IRS |
| *Safakish v. Comm'r*, T.C. Memo. 2014-242, appeal docketed, No. 15-70826 (9th Cir. Mar. 17, 2015) | Failure to substantiate legal and professional expenses; failure to meet § 274 substantiation requirements for travel and vehicle expenses; rent expense allowed under § 162 | Yes | Split |
| *Savello v. Comm'r*, T.C. Memo. 2015-24 | Personal expenses disallowed; model airplane retail store activity was engaged in for profit under § 183 | No | Split |
| *Savulionis v. Comm'r*, T.C. Summ. Op. 2015-19 | Home office disallowed; personal expenses disallowed | Yes | IRS |
| *Sawyer v. Comm'r*, T.C. Memo. 2015-55 | Cohan rule applied | No | TP |
| *Schumann v. Comm'r*, T.C. Memo. 2014-138 | Home office disallowed | No | IRS |

TABLE 2: Trade or Business Expenses Under IRC § 162 and Related Sections

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Securitas Holdings, Inc. v. Comm'r*, T.C. Memo. 2014-225 | Business expenses allowed under § 162 | No | TP |
| *Shah v. Comm'r*, T.C. Memo. 2015-31, *appeal docketed*, No. 15-1773 (6th Cir. June 30, 2015) | Failure to substantiate expenses; failure to meet § 274 substantiation requirements; personal expenses disallowed; not engaged in for profit under § 183 | Yes | IRS |
| *Sheridan v. Comm'r*, T.C. Memo. 2015-25 | Failure to substantiate expenses for § 165 loss deduction | Yes | IRS |
| *Sievers v. Comm'r*, T.C. Memo. 2014-115 | Home office disallowed; personal expenses disallowed for home renovation expenses and tuition; business vehicle repairs and fuel expense allowed under § 162 | Yes | Split |
| *Simpson v. Comm'r*, T.C. Summ. Op. 2014-67 | Not engaged in for profit under § 183 | No | IRS |
| *Sodipo v. Comm'r*, T.C. Memo. 2015-3, *appeal docketed*, No. 15-2089 (4th Cir. Sept. 16, 2015) | Failure to substantiate expenses | Yes | IRS |
| *Stuller, Estate of v. U.S.*, 55 F. Supp. 3d 1091 (C.D. Ill. 2014), *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015) | Not engaged in for profit under § 183 | No | IRS |
| *Tarighi v. Comm'r*, T.C. Summ. Op. 2015-28 | Failure to establish overall activity as a qualifying trade or business within § 162(a); failure to meet § 274 substantiation requirements for mileage; failure to substantiate other expenses; however, real estate tax expense allowed under § 162 | Yes | Split |
| *Vanney Assocs., Inc. v. Comm'r*, T.C. Memo. 2014-184 | Failure to demonstrate transaction possessed economic substance | No | IRS |
| *Villarreal v. Comm'r*, T.C. Summ. Op. 2014-87 | Personal expenses disallowed for credit card interest; however, other business expenses allowed under § 162 | Yes | Split |
| *Villegas v. Comm'r*, T.C. Memo. 2015-33 | Failure to substantiate expenses | Yes | IRS |
| *Wakefield v. Comm'r*, T.C. Memo. 2015-4 | Failure to meet § 274 substantiation requirements for vehicle expenses; failure to prove professional and legal expenses were ordinary and necessary; failure to substantiate seminar expenses, some marketing expenses, some office expenses, and contract labor expenses; personal expenses disallowed; Cohan rule applied to allow tax preparation fees; other business expenses allowed under § 162 | No | Split |
| *Watson v. Comm'r*, T.C. Summ. Op. 2014-108 | Failure to substantiate some rental and contract labor expenses; other business expenses allowed under § 162 | No | Split |
| *Zierdt v. Comm'r*, T.C. Summ. Op. 2014-78 | Failure to substantiate expenses for newspapers; gambling expenses disallowed; some cell phone expenses allowed under § 162 | Yes | Split |

## TABLE 3    Summons Enforcement Under IRC §§ 7602, 7604, and 7609

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | |
| *Abusch v. U.S.*, 114 A.F.T.R.2d (RIA) 5535 (M.D. La. 2014), *adopting* 114 A.F.T.R.2d (RIA) 5533 (M.D. La. 2014), *cert. denied*, No. 14-948 (Mar. 23, 2015) | TPs' petition to quash denied; Lack of subject matter jurisdiction | Yes | IRS |
| *Advanced Health Strategies, Inc. v. U.S.*, 115 A.F.T.R.2d (RIA) 411 (D. Minn. 2015), *adopting* 115 A.F.T.R.2d (RIA) 410 (D. Minn. 2014) | TPs' petition to quash third-party summons denied | Yes | IRS |
| *Ali, U.S. v.*, 114 A.F.T.R.2d (RIA) 6524 (D. Md. 2014) | Summons partially enforced and partially denied; TP denied Fifth Amendment privilege for certain documents; TP entitled to Fifth Amendment privilege for testimony and other records and to attorney-client privilege for a specific document | No | Split |
| *Anderson, U.S. v.*, 114 A.F.T.R.2d (RIA) 6731 (N.D. Cal. 2014), *stay denied*, 115 A.F.T.R.2d | Summons enforced; TP did not show summons was issued in bad faith | No | IRS |
| *Anderson, U.S. v.*, 115 A.F.T.R.2d (RIA) 468 (N.D. Cal. 2015), *enforcing* 114 A.F.T.R.2d (RIA) 6731 (N.D. Cal. 2014), *appeal docketed*, No. 15-15130 (9th Cir. Jan. 26, 2015) | TP's motion to stay enforcement denied | No | IRS |
| *Becher, U.S. v.*, 115 A.F.T.R.2d (RIA) 1113 (S.D. Fla. 2015) | Summons enforced | Yes | IRS |
| *Belcik, U.S. v.*, 115 A.F.T.R.2d (RIA) 1782 (M.D. Fla. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1779 (M.D. Fla. 2015) | Summons enforced | Yes | IRS |
| *Berthiaume, U.S. v.*, 2015 U.S. Dist. LEXIS 24715 (D. Minn. 2015), *adopting* 115 A.F.T.R.2d (RIA) 999 (D. Minn. 2015) | Summons enforced | Yes | IRS |
| *Billie, U.S. v.*, 114 A.F.T.R.2d (RIA) 5694 (S.D. Fla. 2014), *aff'd*, 2015 U.S. App. LEXIS 9046 (11th Cir. 2015) | Summons enforced | No | IRS |
| *Blackrock Fin. Partners, LLC v. U.S.*, 114 A.F.T.R.2d (RIA) 6941 (E.D. Mich. 2014) | TP's petition to quash denied; Lack of subject matter jurisdiction | No | IRS |
| *Bohn, U.S. v.*, 115 A.F.T.R.2d (RIA) 381 (E.D. Cal. 2015), *adopting* 114 A.F.T.R.2d (RIA) 6541 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Brayshaw, U.S. v.*, 114 A.F.T.R.2d (RIA) 6000 (E.D. Cal. 2014), *adopting* 114 A.F.T.R.2d (RIA) 5770 (E.D. Cal. 2014) | Summons enforced | No | IRS |
| *Brown, U.S. v.*, 114 A.F.T.R.2d (RIA) 6879 (D.N.J. 2014) | Summons enforced | Yes | IRS |
| *Chaffee, U.S. v.*, 115 A.F.T.R.2d (RIA) 1029 (E.D. Mich. 2015) | TP's motion to quash summons denied | Yes | IRS |
| *Erickson, U.S. v.*, 115 A.F.T.R.2d (RIA) 684 (M.D. Fla. 2015) | TP held in contempt | Yes | IRS |
| *Franks, U.S. v.*, 115 A.F.T.R.2d (RIA) 312 (E.D. Cal. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6502 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Furgison-Mayall, U.S. v.*, 115 A.F.T.R.2d (RIA) 1217 (E.D. Cal. 2015), *adopting* 115 A.F.T.R.2d (RIA) 997 (E.D. Cal. 2015) | Summons enforced | Yes | IRS |

### TABLE 3: Summons Enforcement Under IRC §§ 7602, 7604, and 7609

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Gamboa, U.S. v.*, 114 A.F.T.R.2d (RIA) 5357 (E.D. Cal. 2014), *adopting* 113 A.F.T.R.2d (RIA) 2194 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Gandrup v. U.S.*, 114 A.F.T.R.2d (RIA) 6576 (D. Del. 2014) | TP's motion to quash third-party summons denied | Yes | IRS |
| *Garcia v. U.S.*, 113 A.F.T.R.2d (RIA) 2462 (S.D. Tex. 2014), *adopting* 113 A.F.T.R.2d (RIA) 2459 (S.D. Tex. 2014) | TP's motion to dismiss third-party summons dismissed; Lack of subject matter jurisdiction | No | IRS |
| *Hayes, U.S. v.*, 2015 U.S. Dist. LEXIS 43333 (M.D.N.C. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1001 (M.D.N.C. 2015) | Summons enforced | No | IRS |
| *Hearn, U.S. v.*, 2014 U.S. Dist. LEXIS 103390 (M.D. Fla. 2014), *adopting* 2014 U.S. Dist. LEXIS 103388 (M.D. Fla. 2014) | Summons enforced | Yes | IRS |
| *Hunkler v. U.S.*, 115 A.F.T.R.2d (RIA) 1340 (S.D. Ohio 2015), *adopting* 113 A.F.T.R.2d (RIA) 1788 (S.D. Ohio 2014) | TP's motion to quash third-party summons denied | Yes | IRS |
| *Hunkler v. U.S.*, 114 A.F.T.R.2d (RIA) 5604 (N.D. Ohio 2014), *adopting* 114 A.F.T.R.2d (RIA) 5601 (N.D. Ohio 2014) | TP's motion to quash third-party summons denied; Lack of subject matter jurisdiction | Yes | IRS |
| *Igelshteyn, U.S. v.*, 115 A.F.T.R.2d (RIA) 911 (D.N.J. 2014) | Summons enforced | Yes | IRS |
| *Kim, U.S. v.*, 2015 U.S. Dist. LEXIS 44902 (C.D. Cal. 2015), *enforced*, No. 2:15-cv-01778 (C.D. Cal. May 4, 2015) | Summons enforced | Yes | IRS |
| *Kitson, U.S. v.*, 115 A.F.T.R.2d (RIA) 755 (N.D. Cal. 2015), *adopting* 115 A.F.T.R.2d (RIA) 753 (N.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Klingenberg, U.S. v.*, 114 A.F.T.R.2d (RIA) 6546 (E.D. Cal. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6374 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Knudsen v. U.S.*, 114 A.F.T.R.2d (RIA) 5777 (D. Del. 2014) | TP's motion to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Knudsen v. U.S.*, 114 A.F.T.R.2d (RIA) 5848 (E.D.N.Y. 2014) | TP's motion to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Le v. U.S. IRS*, 2015 U.S. Dist. LEXIS 3836 (S.D. Tex. 2015) | TP's motion to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Le v. U.S.*, 2014 U.S. Dist. Lexis 90696 (N.D. Tex. 2014), *adopting* 2014 U.S. Dist. Lexis 91305 (N.D. Tex. 2014) | TP's motion to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Leitao, U.S. v.*, 114 A.F.T.R.2d (RIA) 5017 (N.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Little, U.S. v.*, 115 A.F.T.R.2d (RIA) 989 (E.D. Cal. 2015), *adopting* 114 A.F.T.R.2d (RIA) 7049 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Martin v. U.S.*, 2015 WL 3606069 (S.D. Cal. 2015) | Summons enforced; TP's petition to quash denied | Yes | IRS |
| *McCarthy, U.S. v.*, 115 A.F.T.R.2d (RIA) 770 (S.D. Cal. 2015) | Summons enforced | Yes | IRS |
| *McEligot, U.S. v.*, 115 A.F.T.R.2d (RIA) 1433 (N.D. Cal. 2015), *appeals docketed*, No. 15-16128 (9th Cir. June 4, 2015) & No. 15-16134 (9th Cir. June 5, 2015) | Summons enforced; Motion to dismiss denied; TP does not have an absolute right to be present at a third-party summons hearing; TP's right to intervene dependent on a balancing test | No | IRS |

**TABLE 3: Summons Enforcement Under IRC §§ 7602, 7604, and 7609**

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Mockler, U.S. v.*, 2014 U.S. Dist. LEXIS 74911 (E.D. Tex. 2014), *adopting* 2014 U.S. Dist. LEXIS 75419 (E.D. Tex. 2014) | Summons enforced | Yes | IRS |
| *Nakamura, U.S. v.*, 115 A.F.T.R.2d (RIA) 760 (D. Haw. 2014) | Summons enforced | No | IRS |
| *Nelson, U.S. v.*, 115 A.F.T.R.2d (RIA) 636 (E.D. Cal. 2015), *adopting* 114 A.F.T.R.2d (RIA) 6988 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Nichols, U.S. v.*, 2015 U.S. Dist. LEXIS 59444 (E.D. Mich. 2015), *enforcing*, No. 2:14-mc-50455 (E.D. Mich. Oct. 30, 2014) | TP held in contempt | Yes | IRS |
| *Ochoa, U.S. v.*, 114 A.F.T.R.2d (RIA) 6619 (E.D. Cal. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6499 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Palma v. U.S.*, 114 A.F.T.R.2d (RIA) 5568 (S.D. Tex. 2014) | TP's petition to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Ramirez v. U.S.*, 604 F. App'x 575 (9th Cir. 2015), *aff'g* 114 A.F.T.R.2d (RIA) 6098 (C.D. Cal. 2014) | Dismissal of TP's petition to quash third-party summons for lack of subject matter jurisdiction affirmed | Yes | IRS |
| *Ramirez v. U.S.*, 114 A.F.T.R.2d (RIA) 6098 (C.D. Cal. 2014), *aff'd*, 604 F. App'x 575 (9th Cir. 2015) | TP's petition to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Ramirez v. U.S.*, 604 F. App'x 556 (9th Cir. 2015) | Denial of TP's petition to quash third-party summons affirmed | Yes | IRS |
| *Raymond, U.S. v.*, 115 A.F.T.R.2d (RIA) 696 (W.D. Wis. 2015) | Summons enforced | Yes | IRS |
| *Remsik, U.S. v.*, 2014 U.S. Dist. LEXIS 161708 (E.D. Tex. 2014), *adopting* 2014 U.S. Dist. LEXIS 162020 (E.D. Tex. 2014) | Summons enforced | Yes | IRS |
| *Rodriguez, U.S. v.*, 113 A.F.T.R.2d (RIA) 2613 (E.D. Cal. 2014), *adopting* 113 A.F.T.R.2d (RIA) 2318 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Rowe, U.S. v.*, 2015 U.S. Dist. LEXIS 70660 (N.D. Cal. 2015) | Summons enforced | Yes | IRS |
| *Sanders, U.S. v.*, 115 A.F.T.R.2d (RIA) 438 (E.D. Cal. 2015), *adopting* 114 A.F.T.R.2d (RIA) 6648 (E.D. Cal. 2014) | Summons enforced | Yes | IRS |
| *Schultz, U.S. v.*, 2014 U.S. Dist. LEXIS 174918 (D. Minn. 2014), *adopting* 2014 U.S. Dist. LEXIS 174231 (D. Minn. 2014) | Summons enforced | Yes | IRS |
| *Schwartz v. U.S.*, 115 A.F.T.R.2d (RIA) 1942 (S.D. Fla. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1939 (S.D. Fla. 2015) | TP's motion to quash denied; TP did not show summons was issued in bad faith; No attorney-client privilege; TP not entitled to an evidentiary hearing | No | IRS |
| *Snow, U.S. v.*, 114 A.F.T.R.2d (RIA) 6965 (E.D. Tenn. 2014) | Summons enforced | Yes | IRS |
| *Snow, U.S. v.*, 115 A.F.T.R.2d (RIA) 1002 (E.D. Tenn. 2015) | TP held in contempt | Yes | IRS |
| *Sopher, U.S. v.*, 114 A.F.T.R.2d (RIA) 6423 (W.D. Wis. 2015) | Summons enforced | Yes | IRS |
| *Taylor, U.S. v.*, 115 A.F.T.R.2d (RIA) 1165 (C.D. Cal. 2015) | Summons denied; Powell requirements not satisfied; Documents requested not relevant to the investigation | Yes | TP |

002000

TABLE 3: Summons Enforcement Under IRC §§ 7602, 7604, and 7609

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Terrell, U.S. v.*, 114 A.F.T.R.2d (RIA) 6898 (N.D. Ga. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6880 (N.D. Ga. 2014) | Summons enforced | Yes | IRS |
| *Thornton, U.S. v.*, 114 A.F.T.R.2d (RIA) 5598 (D. Minn. 2014), *adopting* 114 A.F.T.R.2d (RIA) 5594 (D. Minn. 2014) | Summons enforced | Yes | IRS |
| *Thornton, U.S. v.*, 115 A.F.T.R.2d (RIA) 1258 (D. Minn. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1255 (D. Minn. 2015), *appeal docketed*, No. 15-1774 (8th Cir. Apr. 15, 2015) | TP held in contempt | Yes | IRS |
| *Van Der Leest, U.S. v.*, 115 A.F.T.R.2d (RIA) 1684 (S.D. Ill. 2014), *adopting* 115 A.F.T.R.2d (RIA) 1682 (S.D. Ill. 2014) | Summons enforced | Yes | IRS |
| *Vanderpool, U.S. v.*, 114 A.F.T.R.2d (RIA) 6968 (W.D. Mo. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6966 (W.D. Mo. 2014) | TP held in contempt | Yes | IRS |
| *Williams, U.S. v.*, 114 A.F.T.R.2d (RIA) 6023 (W.D. Wis. 2014) | Summons enforced | Yes | IRS |
| *Zajac v. U.S.*, 113 A.F.T.R.2d (RIA) 2574 (M.D. Fla. 2014) | Summons enforced; TP's motion to quash denied | Yes | IRS |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships – Schedule C, E, F)** | | | |
| *Alpha Tech USA, LLC v. U.S.*, 115 A.F.T.R.2d (RIA) 384 (E.D. Tex. 2015) | TP's petition to quash dismissed; Lack of subject matter jurisdiction | No | IRS |
| *Artex Risk Solutions, Inc., U.S. v.*, 2014 U.S. Dist. LEXIS 126932 (N.D. Ill. 2014) | Summons enforced; Motion for rule to show cause granted; TP did not show summons was issued in bad faith | No | IRS |
| *Bowler, U.S. v.*, 2014 U.S. Dist. LEXIS 160132 (D. Minn. 2014), *adopting* 2014 U.S. Dist. LEXIS 160884 (D. Minn. 2014) | Summons enforced | Yes | IRS |
| *Bowler, U.S. v.*, 2015 U.S. Dist. LEXIS 57862 (D. Minn. 2015), *adopting* 2015 U.S. Dist. LEXIS 58735 (D. Minn. 2015) | TP held in contempt | Yes | IRS |
| *Chabot, U.S. v.*, 114 A.F.T.R.2d (RIA) 6235 (D.N.J. 2014), *aff'd*, No. 14-4465 (3d Cir. July 17, 2015) | Summons enforced; TP's Fifth Amendment claim denied; Required Records Doctrine applies to foreign bank account information requested under the Bank Secrecy Act | No | IRS |
| *Clarke, U.S. v.*, 115 A.F.T.R.2d (RIA) 836 (S.D. Fla. 2015), *appeal docketed*, No. 15-11663 (11th Cir. Apr. 17, 2015) | Summons enforced; TP did not show a plausible inference of improper motive | No | IRS |
| *Clarke, U.S. v.*, 134 S. Ct. 2361 (2014), *vacating* 517 F. App'x 689 (11th Cir. 2013), *vacating* 2012 U.S. Dist. LEXIS 188084 (S.D. Fla. 2012) | TP must allege specific facts that raise an inference of bad faith to examine an IRS official | No | IRS |
| *Ghafourifar, U.S. v.*, 114 A.F.T.R.2d (RIA) 6649 (N.D. Cal. 2014) | Summons enforced | No | IRS |
| *Ghislain, U.S. v.*, 115 A.F.T.R.2d (RIA) 694 (D. Vt. 2015) | Summons enforced | Yes | IRS |
| *Haw. Pac. Fin., Ltd. v. U.S.*, 114 A.F.T.R.2d (RIA) 5640 (D. Haw. 2014), *adopting* 114 A.F.T.R.2d (RIA) 5637 (D. Haw. 2014) | Summons enforced; TP's petition to quash denied; TP did not show summons was issued in bad faith | No | IRS |
| *Hernandez Tax Inc. v. U.S.*, 114 A.F.T.R.2d (RIA) 5123 (D.N.M. 2014) | Summons enforced; TP lacked standing to challenge under Right to Privacy Act | Yes | IRS |
| *Highland Capital Mgmt., L.P. v. U.S.*, 51 F. Supp. 3d 544 (S.D.N.Y. 2014), *aff'd in part and vacated in part, 2015 U.S. App. LEXIS 17112 (2d Cir. 2015)* | Summons enforced; TP's motion to quash third-party summons denied; TP did not show summons was issued for an improper purpose | No | IRS |

002001

TABLE 3: Summons Enforcement Under IRC §§ 7602, 7604, and 7609

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Masciantonio v. U.S.*, 114 A.F.T.R.2d (RIA) 7010 (W.D. Pa. 2014), *appeal docketed*, No. 15-1072 (3d Cir. Jan. 9, 2015) | Summons enforced; TP's motion to quash third-party summons denied; TP not entitled to an evidentiary hearing | Yes | IRS |
| *Petry, U.S. v.*, 114 A.F.T.R.2d (RIA) 6770 (D. Minn. 2014), *adopting* 114 A.F.T.R.2d (RIA) 6769 (D. Minn. 2014) | Summons enforced | Yes | IRS |
| *Ramirez v. U.S.*, 604 F. App'x 567 (9th Cir. 2015) | Denial of TP's petition to quash third-party summons affirmed | Yes | IRS |
| *Sanmina Corp. & Subsidiaries, U.S. v.*, 2015 U.S. Dist. LEXIS 66123 (N.D. Cal. 2015), *appeal docketed*, No. 15-16416 (9th Cir. July 15, 2015) | Summons denied; Documents protected by attorney-client and work product privileges | No | TP |
| *Titan Int'l Inc., U.S. v.*, 114 A.F.T.R.2d (RIA) 6934 (C.D. Ill. 2014), *appeal docketed*, No. 14-3789 (7th Cir. Dec. 29, 2014) | Summons enforced; TP's motion to quash denied | No | IRS |
| *Von Biberstein, U.S. v.*, 115 A.F.T.R.2d (RIA) 1175 (E.D.N.C. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1171 (E.D.N.C. 2015) | Summons enforced; no attorney-client privilege | No | IRS |
| *Von Biberstein, U.S. v.*, 115 A.F.T.R.2d (RIA) 1177 (E.D.N.C. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1173 (E.D.N.C. 2015) | TP's motion to quash third-party summons dismissed; Lack of subject matter jurisdiction | Yes | IRS |
| *Xoriant Corp. v. U.S.*, 114 A.F.T.R.2d (RIA) 6461 (N.D. Cal. 2014) | TP's motion to quash denied; Lack of subject matter jurisdiction | No | IRS |

002002

## TABLE 4    Gross Income Under IRC § 61 and Related Sections

| Case Citation | Issues | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But not Sole Proprietorships)** | | | |
| *Abrahamsen v. Comm'r*, 142 T.C. 405 (2014) | Unreported wage income | No | IRS |
| *Ambrosius v. Comm'r*, T.C. Memo. 2014-126 | Unreported military allowance income | Yes | IRS |
| *Bacon v. Comm'r*, T.C. Summ. Op. 2015-15 | Unreported cancellation of debt income | Yes | TP |
| *Blangiardo v. Comm'r*, T.C. Memo. 2014-110 | Unreported capital gain from sale of real property | Yes | IRS |
| *Bohner v. Comm'r*, 143 T.C. 224 (2014) | Unreported IRA withdrawal | No | IRS |
| *Bowers v. Comm'r*, T.C. Memo. 2014-130 | Unreported Social Security income and pension distribution | Yes | IRS |
| *Campbell v. Comm'r*, T.C. Summ. Op. 2014-109 | Unreported disability retirement income | No | IRS |
| *Carlson v. Comm'r*, 604 F. App'x 628 (9th Cir. 2015) | Unreported income | Yes | IRS |
| *Carrancho v. Comm'r*, T.C. Summ. Op. 2015-29 | Unreported Social Security income | Yes | IRS |
| *Cortes v. Comm'r*, T.C. Memo. 2014-181, *appeal docketed*, No. 15-71129 (9th Cir. Apr. 13, 2015) | Unreported income | No | IRS |
| *Dabney v. Comm'r*, T.C. Memo. 2014-108 | Unreported IRA withdrawal | Yes | IRS |
| *Duffy v. U.S.*, 120 Fed. Cl. 55 (Fed. Cl. 2015), *appeal docketed*, No. 15-5076 (Fed. Cir. Apr. 28, 2015) | Settlement proceeds under IRC § 104(a)(2) | Yes | IRS |
| *Ebert v. Comm'r*, T.C. Memo. 2015-5 | Unreported dividend income | Yes | TP |
| *El v. Comm'r*, 144 T.C. No. 9 (2015) | Unreported wage income and retirement account distribution | Yes | IRS |
| *English v. Comm'r*, T.C. Summ. Op. 2014-66 | Unreported Social Security disability income | Yes | IRS |
| *Evans v. Comm'r*, T.C. Memo. 2015-12 | Unreported foreign earned income | No | IRS |
| *Fennel v. Comm'r*, 579 F. App'x 767 (11th Cir. 2014) | Unreported income | Yes | IRS |
| *Fisher v. Comm'r*, T.C. Memo. 2014-219 | Unreported compensation for services | Yes | IRS |
| *Halo v. Comm'r*, T.C. Summ. Op. 2014-92 | Unreported Social Security income | Yes | IRS |
| *Heckman v. Comm'r*, T.C. Memo. 2014-131, *aff'd*, No. 14-3251 (8th Cir. June 10, 2015) | Unreported distribution from employee stock plan | No | IRS |
| *Hughes v. Comm'r*, T.C. Memo. 2015-89 | Unreported long-term capital gains | No | IRS |
| *Johnston v. Comm'r*, T.C. Memo. 2015-91 | Unreported cancellation of debt income | No | TP |
| *Ktsanes v. Comm'r*, T.C. Summ. Op. 2014-85 | Settlement proceeds under IRC § 104(a)(1),(2), or (3) | Yes | IRS |
| *Licha v. Comm'r*, 586 F. App'x 350 (9th Cir. 2014), *aff'g* T.C. Memo. 2011-275 | Unreported capital gains and other income | Yes | IRS |
| *Lobs v. Comm'r*, T.C. Summ. Op. 2015-17 | Unreported interest income | Yes | IRS |
| *Marran v. Comm'r*, T.C. Summ. Op. 2015-21 | Unreported lump sum payment | Yes | IRS |
| *McCarthy v. Comm'r*, T.C. Memo. 2015-50 | Unreported retirement income and Social Security income | Yes | IRS |
| *McKnight v. Comm'r*, T.C. Memo. 2015-47 | Unreported retirement plan distribution | Yes | IRS |
| *Morles v. Comm'r*, T.C. Summ. Op. 2015-13 | Unreported retirement plan and IRA distributions | Yes | Split |
| *Morris v. Comm'r*, T.C. Memo. 2015-82 | Unreported distribution from IRA | Yes | IRS |
| *Mylander v. Comm'r*, T.C. Memo. 2014-191 | Unreported cancellation of debt income | No | IRS |
| *Nix v. Comm'r*, 580 F. App'x 887 (11th Cir. 2014) | Unreported wage and dividend income | Yes | IRS |
| *Perez v. Comm'r*, 144 T.C. 51 (2015) | Damages under IRC § 104(a)(2) | No | IRS |

TABLE 4: Gross Income Under IRC § 61 and Related Sections

| Case Citation | Issues | Pro Se | Decision |
|---|---|---|---|
| *Roa v. Comm'r*, 583 F. App'x 125 (4th Cir. 2014) | Unreported wage income | Yes | IRS |
| *Robertson v. Comm'r*, T.C. Memo. 2014-143 | Unreported wage income and distribution from 401(k) | Yes | IRS |
| *Rogers v. Comm'r*, 783 F.3d 320 (D.C. Cir. 2015), *aff'g and remanding in part* T.C. Memo. 2013-77, *petition for cert. filed*, No. 15-286 (Sept. 8, 2015) | Unreported foreign earned income | Yes | IRS |
| *Sabolic v. Comm'r*, T.C. Memo. 2015-32 | Unreported tip income | Yes | TP |
| *Salmonson v. Comm'r*, T.C. Memo. 2014-244 | Unreported income | Yes | IRS |
| *Sewards v. Comm'r*, 785 F.3d 1331 (9th Cir. 2015), *aff'g* 138 T.C. 320 (2012) | Unreported pension income | No | IRS |
| *Shankar v. Comm'r*, 143 T.C. 140 (2014) | Unreported income from redemption of "thank you points" | Yes | IRS |
| *Shi v. Comm'r*, T.C. Memo. 2014-173 | Unreported interest income | Yes | IRS |
| *Smith v. Comm'r*, T.C. Summ. Op. 2014-93 | Settlement proceeds under IRC § 104(a)(2) | Yes | IRS |
| *Speer v. Comm'r*, 144 T.C. No. 14 (2015) | Unreported lump sum payout for accrued vacation and sick leave | Yes | IRS |
| *Topsnik v. Comm'r*, 143 T.C. 240 (2014), *appeal docketed*, No. 15-1251 (D.C. Cir. July 29, 2015) | Unreported capital gains income | No | IRS |
| *Waltner v. Comm'r*, T.C. Memo. 2014-133 | Unreported wage income and mutual shares sale | No | Split |
| *Wyatt v. Comm'r*, T.C. Summ. Op. 2015-31 | Unreported cancellation of debt income | Yes | IRS |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships – Schedules C, E, F)** | | | |
| *Anyanwu v. Comm'r*, T.C. Memo. 2014-123 | Unreported state income tax refund, proceeds from sale of real properties, and other income | Yes | Split |
| *Balice v. Comm'r*, T.C. Memo. 2015-46, *appeal docketed*, No. 15-2366 (3d Cir. June 5, 2015) | Unreported business income | Yes | IRS |
| *Brown v. Comm'r*, T.C. Memo. 2014-167, *appeal docketed*, No. 15-3033 (2d Cir. Sept. 28, 2015) | Unreported business income | No | IRS |
| *Bruce v. Comm'r*, T.C. Memo. 2014-178, *aff'd*, No. 14-60910 (5th Cir. June 25, 2015) | Unreported capital gain income from sale of business stock | No | IRS |
| *Burke v. Comm'r*, T.C. Summ. Op. 2015-24 | Unreported business income | Yes | IRS |
| *Chai v. Comm'r*, T.C. Memo. 2015-42, *appeal docketed*, No. 15-1653 (2d Cir. May 19, 2015) | Unreported non-employee compensation | No | IRS |
| *Coastal Heart Med. Grp., Inc. v. Comm'r*, T.C. Memo. 2015-84 | Unreported constructive dividend income | No | IRS |
| *Cosentino v. Comm'r*, T.C. Memo. 2014-186 | Unreported settlement proceeds | No | Split |
| *Duong v. Comm'r*, T.C. Memo. 2015-90 | Unreported business and tip income | Yes | Split |
| *Elbaz v. Comm'r*, T.C. Memo. 2015-49 | Unreported state income tax refund | No | IRS |
| *Gunnick, U.S. v.*, 115 A.F.T.R.2d (RIA) 1073 (D. Minn. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1062 (D. Minn. 2015) | Unreported wage, farm, and interest income, patronage dividends, and non-employee compensation | Yes | IRS |
| *Hillman v. Comm'r*, T.C. Memo. 2014-250 | Unreported business income | Yes | TP |
| *Jones v. Comm'r*, T.C. Memo. 2014-125 | Unreported business and self-employment income | No | Split |
| *Kernan v. Comm'r*, T.C. Memo. 2014-228, *appeal docketed*, No. 15-70574 (9th Cir. Feb. 25, 2015) | Unreported business income | Yes | IRS |
| *Kinuthia v. Comm'r*, T.C. Memo. 2014-127 | Unreported business income | Yes | IRS |
| *Koriakos v. Comm'r*, T.C. Summ. Op. 2014-70 | Unreported cancellation of debt income | Yes | IRS |
| *Maines v. Comm'r*, 144 T.C. No. 8 (2015) | Unreported refundable state tax credits | No | Split |

002004

TABLE 4: Gross Income Under IRC § 61 and Related Sections

| Case Citation | Issues | Pro Se | Decision |
|---|---|---|---|
| *Miller v. Comm'r*, T.C. Memo. 2014-105 | Unreported non-employee compensation | Yes | IRS |
| *Minchem Int'l, Inc. v. Comm'r*, T.C. Memo. 2015-56 | Unreported income from foreign investment transfers | No | Split |
| *Moses v Comm'r*, T.C. Memo. 2014-220 | Unreported business income | Yes | IRS |
| *Mottahedeh v. Comm'r*, T.C. Memo. 2014-258 | Unreported business income | Yes | IRS |
| *Na v. Comm'r*, T.C. Memo. 2015-21 | Unreported non-employee compensation | No | Split |
| *Powell v. Comm'r*, T.C. Memo. 2014-235, *appeal docketed*, No. 15-1851 (4th Cir. July 30, 2015) | Unreported health insurance benefits, capital gain from sale of property, and Social Security income | Yes | IRS |
| *Rader v. Comm'r*, 143 T.C. 376 (2014) | Unreported business income | Yes | IRS |
| *Rogers v. Comm'r*, T.C. Memo. 2014-141 | Unreported business income | No | Split |
| *Roudakov v. Comm'r*, T.C. Memo. 2014-193 | Unreported business income | Yes | IRS |
| *Sawyer v. Comm'r*, T.C. Memo. 2015-55 | Unreported business income | No | Split |
| *Shasta Strategic Inv. Fund LLC v. U.S.*, 114 A.F.T.R.2d (RIA) 6990 (N.D. Cal. 2014) | Unreported interest income | No | TP |
| *Sodipo v. Comm'r*, T.C. Memo. 2015-3, *appeal docketed*, No. 15-2089 (4th Cir. Sept. 16, 2015 ) | Unreported business income | Yes | IRS |
| *SWF Real Estate LLC v. Comm'r*, T.C. Memo. 2015-63 | Unreported income from the sale of state tax credits | No | IRS |
| *Villegas v. Comm'r*, T.C. Memo. 2015-33 | Unreported proceeds from sale of non-principal residence | Yes | IRS |
| *Wheeler v. Comm'r*, T.C. Memo. 2014-204 | Unreported business and rental income | Yes | IRS |
| *Worth v. Comm'r*, T.C. Memo. 2014-232, *appeal docketed*, No. 15-70665 (9th Cir. Mar. 3, 2015) | Unreported business income | Yes | IRS |
| *Young v. Comm'r*, T.C. Memo. 2015-18 | Unreported business income | Yes | IRS |

| Problems | Recommendations | Issues | | Appendices |

**TABLE 5**   **Appeals From Collection Due Process Hearings Under IRS §§ 6320 and 6330**

| Case Citation | Lien or Levy | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | | |
| *Anderson v. Comm'r*, T.C. Memo. 2014-216 | Lien/Levy | No abuse of discretion in denying face-to-face hearing since TPs (H&W) did not provide information requested | Yes | IRS |
| *Babak Roshdieh, M.D. Corp. v. Comm'r*, T.C. Summ. Op. 2014-113 | Levy | Collection action was properly sustained | No | IRS |
| *Bateman v. Comm'r*, T.C. Memo. 2015-22 | Lien | No abuse of discretion | Yes | IRS |
| *Bergdale v. Comm'r*, T.C. Memo. 2014-152 | Lien | No abuse of discretion since TP did not provide information requested | No | IRS |
| *Blank v. Comm'r*, T.C. Summ. Op. 2014-86 | Levy | No abuse of discretion since TP did not provide information requested | Yes | IRS |
| *Buczek v. Comm'r*, 143 T.C. 301 (2014) | Levy | Court lacks jurisdiction to review; motion to dismiss granted | Yes | IRS |
| *Budish v. Comm'r*, T.C. Memo. 2014-239 | Lien/Levy | Abuse of discretion by Appeals Officer; no analysis performed to meet balancing test; case remanded to Appeals | No | TP |
| *Cantrell v. Comm'r*, 576 F. App'x 439 (5th Cir. 2014), *aff'g* T.C. Memo. 2012-257, *cert. denied*, 135 S. Ct. 1881 (2015) | Levy | No abuse of discretion since TP did not provide information requested and failed to contact revenue agent; IRS acceptance of check from TP does not constitute settlement | No | IRS |
| *Caudle v. Comm'r*, T.C. Memo. 2014-196, *aff'd*, 603 F. App'x 220 (4th Cir. 2015) | Lien/Levy | No abuse of discretion since TP did not provide information requested | Yes | IRS |
| *Clifford v. Comm'r*, T.C. Memo. 2014-248 | Lien | No abuse of discretion since TP had assets in excess of offer amount; TP noncompliant with current tax obligations | Yes | IRS |
| *Coker v. Comm'r*, T.C. Summ. Op. 2014-72 | Levy | No abuse in discretion since TP did not provide information requested | Yes | IRS |
| *Cropper v. Comm'r*, T.C. Memo. 2014-139, *appeal docketed*, No. 15-9003 (10th Cir. Feb. 19, 2015) | Levy | TP precluded from challenging underlying liability; no abuse of discretion in denying face-to-face hearing | Yes | IRS |
| *Crosswhite v. Comm'r*, T.C. Memo. 2014-179 | Levy | TP precluded from challenging underlying liability; case remanded to Appeals for further consideration and to allow TP to propose new collection alternative | No | TP |
| *Cunningham v. Comm'r*, T.C. Memo. 2014-200 | Lien/Levy | No abuse of discretion in denying collection alternatives since TP did not provide information requested | Yes | IRS |
| *Day v. Comm'r*, T.C. Memo. 2014-215, *appeal docketed*, No. 14-73745 (9th Cir. Dec. 8, 2014) | Levy | No abuse of discretion since TPs (H&W) did not provide information requested; no abuse of discretion in denying face-to-face hearing | Yes | IRS |
| *Depree v. Comm'r*, T.C. Memo. 2015-40 | Levy | TP precluded from challenging underlying liability; no abuse of discretion; TP did not provide information requested for collection alternative to be considered | Yes | IRS |
| *Doonis v. Comm'r*, T.C. Memo. 2014-168 | Levy | No abuse of discretion in denying collection alternative since TP was noncompliant with filing tax returns | No | IRS |
| *Duarte v. Comm'r*, T.C. Memo. 2014-176 | Lien/Levy | Abuse of discretion could not be determined from administrative record; case remanded to Appeals for further consideration of offer and collection actions | No | TP |

002006

TABLE 5: Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330

| Case Citation | Lien or Levy | Issue(s) | Pro Se | Decision |
|---|---|---|---|---|
| *Eichler v. Comm'r*, 143 T.C. 30 (2014) | Levy | No abuse of discretion in issuing "Notice of Intent to Levy" while installment agreement was pending; case remanded to Appeals to determine economic hardship | No | Split |
| *Frierson-Harris v. Comm'r*, T.C. Memo. 2015-94, *appeal docketed*, No. 15-1294 (D.C. Cir. Aug. 24, 2015) | Lien | No abuse of discretion; TP did not provide information requested for collection alternative to be considered | Yes | IRS |
| *Garber v. Comm'r*, T.C. Memo. 2015-14 | Levy | No abuse of discretion in denying collection alternative; TPs (H&W) could not show economic hardship | Yes | IRS |
| *Gentile v. Comm'r*, 592 F. App'x 824 (11th Cir. 2014), *aff'g* T.C. Memo. 2013-175 | Levy | No abuse of discretion; TP precluded from challenging underlying liability | Yes | IRS |
| *Green v. Comm'r*, T.C. Memo. 2014-180 | Lien | No abuse of discretion; TPs (H&W) did not provide information requested | Yes | IRS |
| *Gurule v. Comm'r*, T.C. Memo. 2015-61 | Levy | Case remanded to Appeals due to underdeveloped administrative record and a material change in TPs' (H&W) ability to pay | Yes | TP |
| *Gyorgy v. Comm'r*, 779 F.3d 466 (7th Cir. 2015), *aff'g* T.C. Docket No. 19240-11 (Mar. 25, 2013) | Lien | No abuse of discretion since IRS mailed notices to last known address of TP; TP precluded from challenging underlying liability | No | IRS |
| *Harrison v. Comm'r*, T.C. Summ. Op. 2014-69 | Levy | No abuse of discretion | Yes | IRS |
| *Hauptman v. Comm'r*, T.C. Memo. 2014-214, *appeal docketed*, No. 15-1071 (8th Cir. Jan. 14, 2015) | Levy | No abuse of discretion in rejecting offer | No | IRS |
| *Hill v. Comm'r*, T.C. Memo. 2014-134 | Lien/Levy | No abuse of discretion; TP made frivolous arguments | Yes | IRS |
| *Hosie v. Comm'r*, T.C. Memo. 2014-246, *appeal docketed*, No. 15-70318 (9th Cir. Feb. 2, 2015) | Lien/Levy | No abuse of discretion in denying collection alternatives or in declining to withdraw notice of lien | No | IRS |
| *Howell v. Comm'r*, T.C. Memo. 2014-212 | Levy | No abuse of discretion since TP did not provide information requested and did not appear at hearing | Yes | IRS |
| *Johnson v. Comm'r*, T.C. Summ. Op. 2014-90 | Lien | TP precluded from challenging underlying liability; no abuse of discretion since TP did not provide information requested | Yes | IRS |
| *Kanofsky v. Comm'r*, T.C. Memo. 2015-34, *appeal docketed*, No. 15-2244 (2d Cir. July 9, 2015) | Levy | TP precluded from challenging underlying liability; no abuse of discretion; TP made frivolous arguments | Yes | IRS |
| *Karagozian v. Comm'r*, 595 F. App'x 87 (2d Cir. 2015), *aff'g* T.C. Memo. 2013-164, *petition for cert. filed*, No. 15-312 (U.S. Sept. 8, 2015) | Levy | No abuse of discretion; TP responsible for the underlying liability; decision to deny equitable recoupment affirmed | No | IRS |
| *Kaye v. Comm'r*, TC. Memo. 2014-145 | Levy | TP precluded from challenging underlying liability; no abuse of discretion in denying face-to-face hearing; TP made frivolous arguments | Yes | IRS |
| *Kirkpatrick v. Comm'r*, T.C. Memo. 2014-234 | Levy | No abuse of discretion | No | IRS |

002007

TABLE 5: Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330

| Case Citation | Lien or Levy | Issue(s) | Pro Se | Decision |
|---|---|---|---|---|
| *Knudsen v. Comm'r*, T.C. Memo. 2015-69 | Levy | IRS failed to establish notices of deficiencies were mailed to TP; motion for summary judgment denied | Yes | TP |
| *Kupersmit v. Comm'r*, T.C. Memo. 2014-247 | Lien | No abuse of discretion; TP did not provide information requested for collection alternative to be considered | Yes | IRS |
| *Lacy-Thompson v. Comm'r*, T.C. Memo. 2014-137 | Levy | No abuse of discretion; TPs (H&W) precluded from challenging underlying liability | No | IRS |
| *Lang v. Comm'r*, T.C. Memo. 2014-183 | Lien/Levy | No abuse of discretion since TP did not provide information requested; TP made frivolous arguments | Yes | IRS |
| *Lee v. Comm'r*, 144 T.C. 40 (2015) | Lien/Levy | Administrative record was underdeveloped; motion for summary judgment denied | Yes | TP |
| *Ligman v. Comm'r*, T.C. Memo. 2015-79 | Levy | No abuse of discretion in rejecting installment agreement | No | IRS |
| *Lundy v. Comm'r*, T.C. Memo. 2014-209 | Levy | No abuse of discretion; TPs (H&W) did not offer a collection alternative | Yes | IRS |
| *May v. Comm'r*, T.C. Memo. 2014-194 | Levy | No abuse of discretion; TPs (H&W) made frivolous arguments; motion for summary judgment granted | No | IRS |
| *McCullar v. Comm'r*, T.C. Memo. 2014-150 | Levy | Court lacked jurisdiction for years 2008 and 2009; TP precluded from challenging underlying tax liability; no abuse in discretion since TP did not participate in hearing | Yes | IRS |
| *Medairy v. Comm'r*, T.C. Memo. 2015-16 | Lien | No abuse of discretion in rejecting installment agreement since TP did not provide information requested or meaningfully participate in hearing | Yes | IRS |
| *Melikian v. Comm'r*, T.C. Summ. Op. 2014-114 | Lien | No abuse of discretion since TPs (H&W) did not show lien would impair ability to pay liability; Doctrine of equitable estoppel did not apply | Yes | IRS |
| *Morrison v. Comm'r*, T.C. Summ. Op. 2014-95 | Levy | No abuse of discretion; TP was precluded from challenging underlying liability; TP's argument was frivolous | Yes | IRS |
| *Moses v. Comm'r*, T.C. Memo. 2014-220 | Levy | TP responsible for underlying liability; no abuse of discretion in denying face-to-face hearing; TP made frivolous arguments and did not provide information requested | Yes | IRS |
| *Onyango v. Comm'r*, 142 T.C. 425 (2014), *appeal docketed*, No. 14-1280 (D.C. Cir. Dec. 10, 2014) | Lien/Levy | TP precluded from challenging underlying liabilities since TP refused mail | Yes | IRS |
| *Pansier v. Comm'r*, T.C. Memo. 2014-255, *aff'd*, 2015 U.S. App. LEXIS 17001 (7th Cir. 2015) | Levy | No abuse of discretion in rejecting offer | No | IRS |
| *Patton v. Comm'r*, T.C. Memo. 2015-75, *appeal docketed*, No. 15-2007 (6th Cir. Aug. 25, 2015) | Lien | No abuse of discretion; TPs (H&W) precluded from challenging underlying liabilities; TPs' (H&W) arguments were frivolous | Yes | IRS |
| *Reinhart v. Comm'r*, T.C. Memo. 2014-218 | Lien | Statute of limitations had run when lien was filed against TP | No | TP |
| *Riggs v. Comm'r*, T.C. Memo. 2015-98 | Lien/Levy | No abuse of discretion in denying "currently-not-collectible" status; TP had sufficient assets to pay | Yes | IRS |
| *Robinson v. Comm'r*, 572 F. App'x 846 (11th Cir. 2014), *aff'g* T.C. Docket No. 25740-11 (Dec. 17, 2012) | Levy | No abuse of discretion in denying face-to-face hearing; TP did not provide information requested; Tax court does not have to state standard of review | Yes | IRS |
| *Robinson v. Comm'r*, T.C. Memo. 2015-57 | Levy | No abuse of discretion since IRS may compel liquidation of assets to satisfy liability before entering into installment agreement | Yes | IRS |

002008

TABLE 5: Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330

| Case Citation | Lien or Levy | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|---|
| *Rosenthal v. Comm'r*, T.C. Memo. 2014-252 | Lien/Levy | No abuse of discretion in denying TP's request for more time; no abuse of discretion in denying collection alternatives since TP did not provide information requested | No | IRS |
| *Savoy v. Comm'r*, 589 F. App'x 187 (4th Cir. 2015), *aff'g* T.C. Memo. 2014-162 | Lien/Levy | No abuse of discretion in determining TP was "currently-not-collectible" status | Yes | IRS |
| *Scholz v. Comm'r*, T.C. Memo. 2015-2 | Levy | No abuse of discretion in denying collection alternative since TP did not provide information requested | No | IRS |
| *Smith v. Comm'r*, T.C. Memo. 2015-60 | Levy | TP precluded from challenging underlying liability | No | IRS |
| *Triola v. Comm'r*, T.C. Memo. 2014-166 | Lien/Levy | TPs (H&W) precluded from challenging underlying liability; collection action was properly sustained | No | IRS |
| *Witmyer v. Comm'r*, T.C. Memo. 2015-17 | Levy | TP precluded from challenging underlying liability; no abuse of discretion in denying installment agreement since TP did not provide information requested | Yes | IRS |
| *Wyatt v. Comm'r*, T.C. Summ. Op. 2015-31 | Levy | TP entitled to challenge underlying liabilities; TP received cancellation of indebtedness income | Yes | IRS |
| *Yari v. Comm'r*, 143 T.C. 157 (2014), *appeal docketed*, No. 14-73914 (9th Cir. Dec. 22, 2014) | Levy | Court had jurisdiction to review the amount of the penalty for failure to report listed transaction and upheld IRS's calculation of the penalty. | No | IRS |
| *Yuska v. Comm'r*, T.C. Memo. 2015-77 | Lien | Notice of determination invalid since TP had opened bankruptcy proceedings | Yes | TP |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships – Schedule C, E, F)** | | | | |
| *Ding v. Comm'r*, T.C. Memo. 2015-20 | Lien | TP entitled to challenge underlying liabilities; IRS motion for summary judgment denied | No | TP |
| *Greenoak Holdings Ltd. v. Comm'r*, 143 T.C. 170 (2014) | Levy | Court lacked jurisdiction to review | No | IRS |
| *Grace Found. v. Comm'r*, T.C. Memo. 2014-229 | Levy | Collection action was properly sustained | No | IRS |
| *Hull v. Comm'r*, T.C. Memo. 2015-86 | Levy | No abuse of discretion in denying collection alternative since TPs (H&W) were not in compliance and had history of noncompliance | No | IRS |
| *King v. Comm'r*, T.C. Memo. 2015-36, *appeal docketed*, No. 15-2439 (7th Cir. July 8, 2015) | Lien | Abuse of discretion for refusing to abate interest from the period of 4/13/2009 to 6/10/2009; no abuse of discretion for refusing to abate interest during the period that TAS worked on TP's case | Yes | Split |
| *Kipp v. Comm'r*, T.C. Memo. 2015-7 | Levy | No abuse of discretion in denying collection alternative since TPs (H&W) did not provide information requested | Yes | IRS |
| *Langley v. Comm'r*, T.C. Memo. 2015-11 | Levy | Collection action was properly sustained | Yes | IRS |
| *Portwine v. Comm'r*, T.C. Memo. 2015-29, *appeal docketed*, No. 15-9004 (10th Cir. May 27, 2015) | Lien/Levy | TP precluded from challenging underlying liability; no abuse of discretion in denying face-to-face hearing since TP did not provide information requested | Yes | IRS |
| *Sanfilippo, Estate of v. Comm'r*, T.C. Memo. 2015-15 | Levy | Settlement officer did not meaningfully consider collection alternative; case remanded to Appeals | No | TP |
| *Skallerup v. Comm'r*, T.C. Memo. 2015-48 | Lien | TP precluded from challenging underlying liability; Collection action was properly sustained | Yes | IRS |
| *Stallings Greenhouse & Nursery, LLC v. Comm'r*, T.C. Memo. 2015-62 | Lien | No abuse of discretion; TP did not provide information requested for collection alternative to be considered; TP precluded from challenging underlying liability | No | IRS |

002009

TABLE 5: Appeals From Collection Due Process Hearings Under IRC §§ 6320 and 6330

| Case Citation | Lien or Levy | Issue(s) | Pro Se | Decision |
|---|---|---|---|---|
| *Synergy Envtl., Inc. v. Comm'r*, T.C. Memo. 2014-140 | Lien | Abuse of discretion; case remanded to Appeals to consider offer | No | TP |
| *Uribe v. Comm'r*, T.C. Memo. 2014-116 | Lien/Levy | No abuse of discretion in declining to withdraw lien; remanded to Appeals to consider collection alternatives | No | Split |
| *Valteau, Harris, Koenig & Mayer v. Comm'r*, T.C. Memo. 2014-144 | Lien/Levy | Collection action was properly sustained | No | IRS |
| *Walker v. Comm'r*, T.C. Memo. 2014-187 | Lien | No abuse of discretion since TP did not provide information requested | No | IRS |

**TABLE 6**   **Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as Tax on Return Under IRC § 6651(a)(2) and Failure to Pay Estimated Tax Penalty Under IRC § 6654**

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | |
| *Bowers v. Comm'r*, T.C. Memo. 2014-130 | 6651(a)(1), (2), 6654 - failed to establish reasonable cause; failed to argue inability to pay; no 6654 exception applied | Yes | IRS |
| *Cavallaro v. Comm'r*, T.C. Memo. 2014-189, *appeal docketed*, No. 15-1368 (1st Cir. Mar. 24, 2015) | 6651(a)(1) - TPs (H&W) acted with reasonable cause in relying upon return preparer | No | TP |
| *El v. Comm'r*, 144 T.C. No. 9 (2015) | 6651(a)(1), (2) - TP failed to present evidence of reasonable cause for failure to file; IRS failed to meet its burden of production for failure to pay penalty | Yes | Split |
| *Filzer v. Comm'r*, T.C. Memo. 2014-241 | 6651(a)(2), 6654 - IRS's motions for default and dismissal granted; TP failed to meet burden of establishing any error in IRS determinations | Yes | IRS |
| *Fisher v. Comm'r*, T.C. Memo. 2014-219 | 6651(a)(1), (2), 6654 - failed to establish reasonable cause; no 6654 exception applied | Yes | IRS |
| *Hoeffner v. Comm'r*, 587 F. App'x 147 (5th Cir. 2014), *aff'g* T.C. Docket No. 25760-12 (Nov. 26, 2013) | 6651(a)(1), (2) - TPs' (H&W) claims of restricted communications with accountant, inaccessibility of records, complex tax issues, preoccupation with extensive litigation and reliance on attorney did not establish reasonable cause | No | IRS |
| *Hurd, Estate of, U.S. v.*, 115 A.F.T.R.2d (RIA) 389 (C.D. Cal. 2015) | 6651(a)(2) - failed to establish reasonable cause | No | IRS |
| *King Mountain Tobacco Co., U.S. v.*, 114 A.F.T.R.2d (RIA) 5923 (E.D. Wash. 2014), *appeal docketed*, No. 14-36055 (9th Cir. Dec. 11, 2014) | 6651(a)(2) - reliance on advice from tax professional did not establish reasonable cause | No | IRS |
| *Kupersmit v. Comm'r*, T.C. Memo. 2014-129 | 6651(a)(1), (2), 6654 - IRS unresponsiveness to TP's request for guidance did not establish reasonable cause for failure to file; no evidence of inability to pay; no 6654 exception applied | Yes | IRS |
| *Kuretski v. Comm'r*, 755 F.3d 929 (D.C. Cir. 2014), *aff'g* T.C. Memo. 2012-262, *cert. denied*, 135 S. Ct. 2309 (2015) | 6651(a)(2) - failed to present evidence of reasonable cause | No | IRS |
| *Le Beau v. Comm'r*, T.C. Memo. 2014-198, *appeal docketed*, No. 15-70489 (9th Cir. Feb. 18, 2015) | 6651(a)(1) - failed to present evidence of reasonable cause | Yes | IRS |
| *Liftin, Estate of v. U.S.*, 754 F.3d 975 (Fed. Cir. 2014), *aff'g* 111 Fed. Cl. 13 (2013) | 6651(a)(1) - TP reliance on attorney did not establish reasonable cause | No | IRS |
| *Milbourn v. Comm'r*, T.C. Memo. 2015-13 | 6651(a)(1) - TP travel and inaccessibility of records did not establish reasonable cause | No | IRS |
| *Palmer v. Comm'r*, T.C. Memo. 2015-30 | 6651(a)(1), (2), 6654 - difficulty in accessing records did not establish reasonable cause for failure to file; failure to argue inability to pay tax; no 6654 exception applied | Yes | IRS |
| *Robertson v. Comm'r*, T.C. Memo. 2014-143, *appeal docketed*, No. 15-1623 (4th Cir. June 9, 2015) | 6651(a)(1), (2), 6654 - TP failed to establish reasonable cause for failure to file; IRS did not meet its burden of production for failure to pay penalty; IRS met its burden of production for 6654 penalty | Yes | Split |
| *Salmonson v. Comm'r*, T.C. Memo. 2014-244 | 6651(a)(1) - failed to present evidence of reasonable cause | Yes | IRS |

002011

TABLE 6: Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as Tax on Return Under IRC § 6651(a)(2) and Failure to Pay Estimated Tax Penalty Under IRC § 6654

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Salzer v. Comm'r*, T.C. Memo. 2014-188 | 6651(a)(1), (2), 6654 - failed to establish reasonable cause; appropriateness of 6654 exceptions depend on recalculations; IRS conceded deductions, lowering penalties | Yes | Split |
| *Sawyer v. Comm'r*, T.C. Summ. Op. 2014-110 | 6651(a)(1), (2) - TP's legal dispute did not establish reasonable cause | Yes | IRS |
| *Specht v. U.S.*, 115 A.F.T.R.2d (RIA) 357 (S.D. Ohio 2015), *appeal docketed*, No. 15-3095 (6th Cir. Feb. 6, 2015) | 6651(a)(1) - TPs' (co-fiduciaries of estate) reliance on deception of attorney did not establish reasonable cause | No | IRS |
| *Vaughn v. U.S.*, 34 F. Supp.3d 773 (N.D. Ohio 2014), *appeal docketed*, No. 14-3858 (6th Cir. Sept. 2, 2014) | 6651(a)(1), (2) - TP reliance on financial advisors and their embezzlement did not establish reasonable cause | No | IRS |
| *Waltner v. Comm'r*, T.C. Memo. 2014-133 | 6651(a)(1) - failure to file due to willful neglect | No | IRS |
| *In re Wilson*, 115 A.F.T.R.2d (RIA) 971 (Bankr. N.D. Cal. 2015) | 6651(a)(1) - failure to file penalty discharged by bankruptcy | No | TP |
| *In re Witcher*, 114 A.F.T.R.2d (RIA) 6246 (Bankr. D.C. 2014) | 6651(a)(1), (2) - TP testimony of timely mailing is inadequate to prove IRS receipt; failure to pay tax penalty applied to period prior to bankruptcy; failure to establish reasonable cause | Yes | IRS |
| **Business Taxpayers (Corporations, Partnerships, Trust, and Sole Proprietorships – Schedules C, E, F)** | | | |
| *Akey v. Comm'r*, T.C. Memo. 2014-211 | 6651(a)(1), (2) - medical issues did not establish reasonable cause for failure to file; failed to argue inability to pay | Yes | IRS |
| *Anyanwu v. Comm'r*, T.C. Memo. 2014-123 | 6651(a)(1) - failed to establish reasonable cause | Yes | IRS |
| *Baker v. Comm'r*, T.C. Memo. 2014-122 | 6651(a)(1), (2), 6654 - TP failed to establish reasonable cause; no 6654 exceptions applied | Yes | IRS |
| *Balice v. Comm'r*, T.C. Memo. 2015-46, *appeal docketed*, No. 15-2366 (3d Cir. June 5, 2015) | 6651(a)(1), (2) - failure to file and failure to pay due to willful neglect; TP's arguments were frivolous | Yes | IRS |
| *Bennett v. Comm'r*, T.C. Memo. 2014-256, *appeal docketed*, No. 15-71228 (9th Cir. Apr. 21, 2015) | 6651(a)(2) - failed to present evidence of reasonable cause | Yes | IRS |
| *Boring v. Comm'r*, T.C. Summ. Op. 2014-105 | 6651(a)(1) - failed to argue reasonable cause | Yes | IRS |
| *Central Motorplex, Inc. v. Comm'r*, T.C. Memo. 2014-207 | 6651(a)(1), (2) - reliance on return preparer did not establish reasonable cause | No | IRS |
| *Chelsea Brewing Co., U.S. v.*, 114 A.F.T.R.2d (RIA) 5348 (S.D.N.Y. 2014), *modified by* 114 A.F.T.R.2d (RIA) 6132 (S.D.N.Y 2014) | 6651(a)(2) - undue hardship argument did not establish reasonable cause | No | IRS |
| *Cherizol v. Comm'r*, T.C. Memo. 2014-119 | 6651(a)(1) - failed to argue reasonable cause | Yes | IRS |
| *Coburn v. Comm'r*, T.C. Memo. 2014-113 | 6651(a)(1) - failed to present evidence of reasonable cause | No | IRS |
| *Crawford v. Comm'r*, T.C. Memo. 2014-156 | 6651(a)(1) - IRS failed to establish untimely filing | Yes | TP |
| *Hall v. Comm'r*, T.C. Memo. 2014-171 | 6651(a)(1) - failed to establish reasonable cause | Yes | IRS |
| *Hillman v. Comm'r*, T.C. Memo. 2014-250 | 6651(a)(1) - failed to establish reasonable cause | Yes | IRS |
| *Kernan v. Comm'r*, T.C. Memo. 2014-228, *appeal docketed*, No. 15-70574 (9th Cir. Feb. 25, 2015) | 6651(a)(1), (2), 6654 - failed to argue reasonable cause or for 6654 exception | Yes | IRS |
| *Kinuthia v. Comm'r*, T.C. Memo. 2014-127 | 6651(a)(1), (2) - failed to present evidence of reasonable cause | Yes | IRS |

TABLE 6: Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as Tax on Return Under IRC § 6651(a)(2) and Failure to Pay Estimated Tax Penalty Under IRC § 6654

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Martynuk, U.S. v.*, 115 A.F.T.R.2d (RIA) 613 (S.D.N.Y. 2015), *appeal docketed*, No. 15-946 (2d Cir. Mar. 27, 2015) | 6651(a)(1), (2), 6654 - failed to establish reasonable cause | No | IRS |
| *Miller v. Comm'r*, T.C. Memo. 2014-105 | 6651(a)(1), (2), 6654 - failed to present evidence of reasonable cause; no 6654 exceptions applied | Yes | IRS |
| *Moses v. Comm'r*, T.C. Memo. 2014-220 | 6651(a)(1), (2), 6654 - TP failed to argue reasonable cause; no 6654 exceptions applied | Yes | IRS |
| *Mottahedeh v. Comm'r*, T.C. Memo. 2014-258 | 6651(a)(1), (2), 6654 - failed to argue reasonable cause for 6654 exception | Yes | IRS |
| *Moyer v. Comm'r*, T.C. Memo. 2015-45 | 6651(a)(1), (2), 6654 - failed to argue reasonable cause for 6654 exception | Yes | IRS |
| *Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015) | 6651(a)(2), 6654 - TP failed to argue reasonable cause; IRS failed to establish filing requirement for one year; no 6654 exception applied for remaining years | Yes | Split |
| *Nichols, U.S. v.*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015) | 6654 - failure to pay estimated tax penalty does not apply to zero returns | No | TP |
| *Peterson v. Comm'r*, T.C. Memo. 2015-1, *appeal docketed*, No. 15-73092 (9th Cir. Oct. 8, 2015) | 6651(a)(1) - family illness did not establish reasonable cause | Yes | IRS |
| *Rader v. Comm'r*, 143 T.C. 376 (2014) | 6651(a)(1), (2), 6654 - failed to establish reasonable cause; no 6654 exception applied; TPs' arguments were frivolous; IRS amendment to increase penalty amounts were rejected | Yes | Split |
| *Ripley-Duggan v. Comm'r*, T.C. Summ. Op. 2014-111 | 6651(a)(1), (2), 6654 - medical issues did not establish reasonable cause; no 6654 exceptions applied | No | IRS |
| *Ross v. Comm'r*, T.C. Summ. Op. 2014-68 | 6651(a)(1) - failed to present evidence of reasonable cause | Yes | IRS |
| *Safakish v. Comm'r*, T.C. Memo. 2014-242, *appeal docketed*, No. 15-70826 (9th Cir. Mar. 17, 2015) | 6651(a)(1) - failed to argue reasonable cause | Yes | IRS |
| *Sievers v. Comm'r*, T.C. Memo. 2014-115 | 6651(a)(1), (2) - failed to argue reasonable cause | Yes | IRS |
| *Sodipo v. Comm'r*, T.C. Memo. 2015-3, *appeal docketed*, No. 15-2089 (4th Cir. Sept. 16, 2015) | 6651(a)(1), (2) - unavailability of records did not establish reasonable cause | Yes | IRS |
| *Stebbins v. Comm'r*, T.C. Summ. Op. 2015-10 | 6651(a)(1) - TP failed to establish reasonable cause; failure to timely file returns was the result of willful neglect | Yes | IRS |
| *Stuller, Estate of v. U.S.*, 55 F. Supp. 3d 1091 (C.D. Ill. 2014), *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015 ) | 6651(a)(1) - TP's (W & estate of H, S-Corp) destruction and misplacement of records due to fire, medical illness, and death of H did not establish reasonable cause | No | IRS |
| *Stuller, Estate of v. U.S.*, 115 A.F.T.R.2d 1025 (C.D. Ill. 2014), *appeal docketed*, No. 15-1545 (7th Cir. Mar. 13, 2015) | 6651(a)(1) - TP did not establish reasonable cause | No | IRS |
| *Tarighi v. Comm'r*, T.C. Summ. Op. 2015-28 | 6651(a)(1) - failed to establish reasonable cause | Yes | IRS |
| *TFT Galveston Portfolio, LTD. v. Comm'r*, 144 T.C. 96 (2015) | 6651(a)(1), (2) - failed to establish reasonable cause | No | IRS |
| *Topsnik v. Comm'r*, 143 T.C. 240 (2014), *appeal docketed*, No. 15-1251 (D.C. Cir. July 29, 2015) | 6651(a)(1), (2), 6654 - failed to present evidence of reasonable cause; amount of failure to pay penalty reduced for one tax year due to corrected calculation | No | Split |
| *Valteau, Harris, Koenig & Mayer v. Comm'r*, T.C. Memo. 2014-144 | 6651(a)(1), (2) - financial hardship claim did not establish reasonable cause | No | IRS |

TABLE 6: Failure to File Penalty Under IRC § 6651(a)(1), Failure to Pay an Amount Shown as Tax on Return Under IRC § 6651(a)(2) and Failure to Pay Estimated Tax Penalty Under IRC § 6654

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Villarreal v. Comm'r*, T.C. Summ. Op. 2014-87 | 6651(a)(1) - TPs' (H&W) belief that no tax was due did not establish reasonable cause | Yes | IRS |
| *Villegas v. Comm'r*, T.C. Memo. 2015-33 | 6651(a)(1), (2), 6654 - TPs' (H&W) belief no tax was due and reliance on tax preparer did not establish reasonable cause; no 6654 exceptions applied | Yes | IRS |
| *Wheeler v. Comm'r*, T.C. Memo. 2014-204 | 6651(a)(1), (2), 6654 - failed to argue reasonable cause; no 6654 exceptions applied; failure to pay estimated tax penalty does not apply to zero return for one tax year | Yes | Split |
| *Wyatt v. Comm'r*, T.C. Summ. Op. 2015-31 | 6651(a)(2), 6654 - financial hardship claim did not establish reasonable cause; no 6654 exceptions applied | Yes | IRS |

002014

## TABLE 7   Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | |
| *Azarian, U.S. v.*, 115 A.F.T.R.2d (RIA) 439 (N.D. Tex. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Baker, U.S. v.*, 114 A.F.T.R.2d (RIA) 5772 (D.N.H. 2014) | Federal tax liens invalid; transfer of real property complete to TP (W) via divorce decree prior to assessment against TP (H) | No | TP |
| *Carter, U.S. v.*, 606 F. App'x 464 (10th Cir. 2015), *aff'g* 113 A.F.T.R.2d (RIA) 2383 (D.N.M. 2014) | Affirmed lower court's decision to foreclose | Yes | IRS |
| *Davis, U.S. v.*, 115 A.F.T.R.2d (RIA) 1692 (E.D. Mich. 2015), *granting partial summary judgment*, 114 A.F.T.R.2d (RIA) 6019 (E.D. Mich. 2014), *appeal docketed*, No. 15-1696 (6th Cir. June 17, 2015) | Denied TP's motion for reconsideration of decision to foreclose on TPs' (H&W) jointly owned real property | No | IRS |
| *Davis, U.S. v.*, 114 A.F.T.R.2d (RIA) 6019 (E.D. Mich. 2014), *reconsideration denied by* 115 A.F.T.R.2d (RIA) 1692 (E.D. Mich. 2015), *appeal docketed*, No. 15-1696 (6th Cir. June 17, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly held real property | No | IRS |
| *Limanni, U.S. v.*, 115 A.F.T.R.2d (RIA) 1149 (D.N.H. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | Yes | IRS |
| *Long, U.S. v.*, 2014 U.S. Dist. LEXIS 184514 (N.D. Ohio 2014) | Federal tax liens valid and foreclosed against TP's real property | Yes | IRS |
| *Martin, U.S. v.*, 116 A.F.T.R.2d (RIA) 5008 (D. Haw. 2015), *appeal docketed*, No. 15-16815 (9th Cir. Sept. 14, 2015) | Federal tax liens valid and foreclosed against TP's real property | No | IRS |
| *Martinez, U.S. v.*, 115 A.F.T.R.2d (RIA) 2017 (W.D. Tex. 2015) | Federal tax liens valid and foreclosed against TP's real property | No | IRS |
| *McGrew, U.S. v.*, 114 A.F.T.R.2d (RIA) 7031 (C.D. Cal. 2014), *appeal docketed*, No. 15-55078 (9th Cir. Jan. 14, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Molina, U.S. v.*, 114 A.F.T.R.2d (RIA) 5206 (D.P.R. 2014) | Federal tax liens valid and foreclosed against TP's one half interest in real property | No | IRS |
| *Payne, U.S. v.*, 115 A.F.T.R.2d (RIA) 475 (N.D. Ohio 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Porath, U.S. v.*, 115 A.F.T.R.2d (RIA) 1575 (E.D. Cal. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1156 (E.D. Cal. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | Yes | IRS |
| *Winsper, U.S. v.*, 114 A.F.T.R.2d (RIA) 5218 (W.D. Ky. 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Worley, U.S. v.*, 592 F. App'x 100 (3d Cir. 2015), *aff'g* 113 A.F.T.R.2d (RIA) 861 (M.D. Pa. 2014) | Affirmed lower court's decision to foreclose | Yes | IRS |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships - Schedule C, E, F)** | | | |
| *Ali, U.S. v.*, 115 A.F.T.R.2d (RIA) 891 (E.D. Pa. 2015) | Federal tax liens valid and foreclosed against TP's real property | Yes | IRS |
| *Bogart, U.S. v.*, 114 A.F.T.R.2d (RIA) 5474 (M.D. Tenn. 2014), *adopting in part*, 114 A.F.T.R.2d (RIA) 5469 (M.D. Tenn. 2014), *aff'g* Docket No. 14-6225 (6th Cir. June 29, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property; property held by corporate nominee | Yes | IRS |

002015

| | | | |
|---|---|---|---|
| Problems | Recommendations | Issues | Appendices |

TABLE 7: Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Bogart, U.S. v.*, 115 A.F.T.R.2d (RIA) 1201 (M.D. Pa. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1190 (M.D. Pa. 2015), *appeal docketed*, No. 15-2363 (3d Cir. June 5, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property, trust held property as nominee | Yes | IRS |
| *Boyce, U.S. v.*, 38 F.Supp.3d 1135 (C.D. Cal 2014), *appeal docketed*, No. 14-56610 (9th Cir. Oct.6, 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly owned real property; property held by TPs' corporate nominee; fraudulent conveyance of property set aside | Yes | IRS |
| *Cardaci, U.S. v.*, 114 A.F.T.R.2d (RIA) 6744 (D.N.J. 2014), *appeal docketed*, No. 14-4237 (3d Cir. Oct. 27, 2014) | Foreclosure of tax liens denied; alternate collection ordered based on one-half of the fair rental value for real property | No | TP |
| *Church of Northwest Ark., U.S. v.*, 114 A.F.T.R.2d (RIA) 6418 (W.D. Ark. 2014) | Default judgment against TP and third parties; federal tax liens valid and foreclosed against TP's real property | No | IRS |
| *Clinkscale, U.S. v.*, 114 A.F.T.R.2d (RIA) 5544 (N.D. Ohio 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly owned real property | No | IRS |
| *Cucinello, U.S. v.*, 115 A.F.T.R.2d (RIA) 1357 (D. Alaska 2015) | Federal tax liens valid and foreclosed against TP's real property; property held by TP's nominee | No | IRS |
| *Davis, U.S. v.*, 114 A.F.T.R.2d (RIA) 6977 (S.D. Ohio 2014), *adopting* 114 A.F.T.R.2d (RIA) 6975 (S.D. Ohio 2014) | Federal tax liens valid and foreclosed against TP's real property | No | IRS |
| *DeBeck v. U.S.*, 2014 U.S. Dist. LEXIS 127085 (W.D. Tex. 2014), *aff'd in part and dismissed in part by* 2015 U.S. App. LEXIS 14365 (5th Cir. 2015) | Federal tax liens valid and foreclosed against TP's real property; all corporations and entities were TP's nominees; transfer of business to one nominee deemed illegal | No | IRS |
| *Dudley, U.S. v.*, 2014 U.S. Dist. LEXIS 180431 (E.D. Mo. 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly owned real property | Yes | IRS |
| *Edwards, U.S. v.*, 114 A.F.T.R.2d (RIA) 5622 (S.D. Ohio 2014), *modified by* 114 A.F.T.R.2d (RIA) 6214 (S.D. Ohio 2014) | Federal tax liens valid and foreclosed against TP's real property | No | IRS |
| *Edwards, U.S. v.*, 114 A.F.T.R.2d (RIA) 6214 (S.D. Ohio 2014), *modifying* 114 A.F.T.R.2d (RIA) 5622 (S.D. Ohio 2014) | Erroneous facts in prior proceeding revealed; IRS does not have first priority lien and foreclosure rendered meaningless for IRS | No | TP |
| *Eichhorn Stained Glass, Inc., U.S. v.*, 114 A.F.T.R.2d (RIA) 6281 (W.D. Ky. 2014), *appeal docketed*, No. 15-5834 (6th Cir. Aug. 5, 2015) | Federal tax liens valid for all quarters at issue except third quarter of 2000; foreclosed against TP's one-third interest in real property held as tenancy in common | No | Split |
| *Elmore, U.S. v.*, 586 F. App'x 310 (9th Cir. 2015), *aff'g* 110 A.F.T.R.2d (RIA) 5223 (W.D. Wash. 2012) | Affirmed lower court's decision to foreclose | No | IRS |
| *Fraughton, U.S. v.*, 115 A.F.T.R.2d (RIA) 1017 (D. Utah 2015), *adopting* 115 A.F.T.R.2d (RIA) 882 (D. Utah 2015), *appeal docketed*, No. 15-4103 (10th Cir. July 24, 2015) | Default judgment against TP; federal tax liens valid and foreclosed against TP's real property; property held by corporate nominee | Yes | IRS |
| *Green, U.S. v.*, 115 A.F.T.R.2d (RIA) 1262 (N.D. Okla. 2015), *appeal docketed*, No. 15-5032 (10th Cir. Apr. 20, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property; transfer to trust void | Yes | IRS |
| *Gunnink, U.S. v.*, 115 A.F.T.R.2d (RIA) 1073 (D. Minn. 2015), *adopting* 115 A.F.T.R.2d (RIA) 1062 (D. Minn. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly owned real property; property held by TPs' corporate nominee | Yes | IRS |
| *Hiatt, U.S. v.*, 114 A.F.T.R.2d (RIA) 5874 (S.D. Ind. 2014) | Federal tax liens valid and foreclosed against TP's (W) half interest in jointly owned real property; transfer to TP (H) fraudulent | No | IRS |
| *Johnson, U.S. v.*, 115 A.F.T.R.2d (RIA) 1210 (W.D. Wash. 2015) | Federal tax liens valid and foreclosed against TP's real property; property held by TP's corporate nominee | No | IRS |

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2024 of 4699 PageID #:  5189

Appendices                    Most Serious      Most Litigated                      Legislative          Case           Research
                              Issues            Issues            Recommendations   Studies              Advocacy       Problems

TABLE 7: Civil Actions to Enforce Federal Tax Liens or to Subject Property to Payment of Tax Under IRC § 7403

| Case Citation | Issue(s) | *Pro Se* | Decision |
|---|---|---|---|
| *Jones, U.S. v.*, 114 A.F.T.R.2d (RIA) 6126 (D. Wyo. 2014) | Federal tax liens valid and foreclosed against TP's real property; property held by TP's corporate nominee | Yes | IRS |
| *Martynuk, U.S. v.*, 115 A.F.T.R.2d (RIA) 613 (S.D.N.Y. 2015), *appeal docketed*, No. 15-946 (2d Cir. Mar. 27, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Novell, U.S. v.*, 114 A.F.T.R.2d (RIA) 6457 (W.D. Mo. 2014), *aff'd by* 607 F. App'x 600 (8th Cir. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) jointly owned real property; property held by TPs' corporate nominee | Yes | IRS |
| *O'Shea, U.S. v.*, 115 A.F.T.R.2d (RIA) 887 (S.D.W. Va. 2015), *aff'd by* 116 A.F.T.R.2d (RIA) 5389 (4th Cir. 2015) | Federal tax liens valid and foreclosed against TPs' (H&W, daughter) real property; trusts were nominees | Yes | IRS |
| *Perrow, U.S. v.*, 115 A.F.T.R.2d (RIA) 743 (D. Ariz. 2015), *adopting* 115 A.F.T.R.2d (RIA) 739 (D. Ariz. 2014) | Federal tax liens valid and foreclosed against TP's real property | Yes | IRS |
| *Peters, U.S. v.*, 113 A.F.T.R.2d (RIA) 2501 (E.D. Mo. 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Rozbruch, U.S. v.*, 28 F.Supp.3d 256 (S.D.N.Y. 2014), *appeal docketed*, No. 14-4330 (2d Cir. Nov. 20, 2014) | Federal tax liens valid and foreclosed against TPs' (H&W) real property | No | IRS |
| *Thompson, U.S. v.*, 115 A.F.T.R.2d (RIA) 1152 (D. Neb. 2015), *appeal docketed*, No. 15-2263 (8th Cir. June 10, 2015) | Federal tax liens valid and foreclosed against TPs' (H&W) real property; trust was nominee | Yes | IRS |
| *Wilkins, U.S. v.*, 2015 U.S. Dist. LEXIS 48478 (M.D. Fla. 2015), *appeal docketed*, No. 15-14346 (11th Cir. Sept. 29, 2015) | Federal tax liens valid and foreclosed against TP's real property; property held by TP's corporate nominee | No | IRS |

## TABLE 8   Charitable Contributions Under IRC § 170

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | |
| *Anyanwu v. Comm'r*, T.C. Memo. 2014-123 | Cash contributions mostly substantiated | Yes | TP |
| *Dannon v. Comm'r*, 571 F. App'x 514 (8th Cir. 2014), *aff'g* T.C. Docket No. 029245-12 (Nov. 19, 2013) | Cash and non-cash contributions unsubstantiated | Yes | IRS |
| *Flores v. Comm'r*, T.C. Memo. 2015-9 | Cash contribution unsubstantiated | Yes | IRS |
| *Howe v. Comm'r*, T.C. Summ. Op. 2015-26 | Non-cash contribution unsubstantiated | Yes | IRS |
| *Jalloh v. Comm'r*, T.C. Summ. Op. 2015-18 | Cash and non-cash contributions unsubstantiated | Yes | IRS |
| *Jermihov v. Comm'r*, T.C. Summ. Op. 2014-75 | Cash contributions lacked substantiation; however, some deduction allowed | Yes | TP |
| *Kalapodis v. Comm'r*, T.C. Memo. 2014-205 | TPs (H&W) who established a trust to pay educational expenses were not entitled to a charitable contribution deduction for amounts distributed from the trust to students for educational purposes | Yes | IRS |
| *Koriakos v. Comm'r*, T.C. Summ. Op. 2014-70 | Cash contributions lacked substantiation; however, some deduction allowed; non-cash contributions unsubstantiated | Yes | Split |
| *Kunkel v. Comm'r*, T.C. Memo. 2015-71 | Non-cash contributions unsubstantiated | Yes | IRS |
| *Lain v. Comm'r*, T.C. Summ. Op. 2015-5 | Cash and non-cash contributions lacked substantiation; however, some deduction allowed | Yes | TP |
| *Legaspi v. Comm'r*, T.C. Summ. Op. 2015-14 | Non-cash contribution unsubstantiated | Yes | IRS |
| *Longino v. Comm'r*, 593 F. App'x 965 (11th Cir. 2014), *aff'g* T.C. Memo. 2013-80 | Cash contribution unsubstantiated | Yes | IRS |
| *McCarty v. Comm'r*, T.C. Summ. Op. 2014-81 | Cash and non-cash contributions lacked substantiation; however, some deduction allowed | Yes | TP |
| *U.S. v. Nichols*, 115 A.F.T.R.2d (RIA) 1971 (E.D. Wash. 2015) | Cash and non-cash contributions unsubstantiated for multiple tax years; some deductions allowed in some years | No | Split |
| *Scheidelman v. Comm'r*, 755 F.3d 148 (2d Cir. 2014), *aff'g* T.C. Memo. 2013-18 | Architectural façade easement did not reduce the fair market value of home | No | IRS |
| Smith v. Comm'r, T.C. Memo. 2014-203 | Non-cash contributions unsubstantiated | Yes | IRS |
| *Thomas-Kozak v. Comm'r*, T.C. Summ. Op. 2014-104 | Non-cash contributions unsubstantiated | No | IRS |
| *Zarlengo v. Comm'r*, T.C. Memo. 2014-161 | Valuation of façade easement; easement was not protected in perpetuity until the following tax year | No | Split |
| **Business Taxpayers (Corporate, Partnerships, Trusts, and Sole Proprietorships - Schedules C, E, F)** | | | |
| *Balsam Mountain Invs., LLC v. Comm'r*, T.C. Memo. 2015-43, *appeal docketed*, No. 15-2010 (4th Cir. Sept. 3, 2015) | Conservation easement is not "qualified real property interest" | No | IRS |
| *Belk v. Comm'r*, 774 F.3d 221 (4th Cir. 2014), *aff'g* 140 T.C. 1 (2013) | Conservation easement was not "qualified real property interest" | No | IRS |
| *Costello v. Comm'r*, T.C. Memo. 2015-87 | Qualified appraisal did not meet all requirements and conservation easement was conveyed as part of a *quid pro quo* exchange | No | IRS |
| *Davis v. Comm'r*, T.C. Memo. 2015-88 | "Bargain sale" contribution substantiated; deduction amount must reflect fair market value | No | TP |

002018

TABLE 8: Charitable Contributions Under IRC § 170

| Case Citation | Issue(s) | Pro Se | Decision |
|---|---|---|---|
| *Mitchell v. Comm'r*, 775 F.3d 1243 (10th Cir. 2015), *aff'g* 138 T.C. 324 (2012) | Conservation easement was not protected in perpetuity | No | IRS |
| *Reri Holdings I, LLC v. Comm'r*, 143 T.C. 41 (2014) | Valuation of charitable contribution should be the successor member interest in LLC, not the property owned by LLC's wholly owned subsidiary | No | IRS |
| *Schmidt v. Comm'r*, T.C. Memo. 2014-159 | Valuation of conservation easement | No | TP |
| *Seventeen Seventy Sherman St., LLC v. Comm'r*, T.C. Memo. 2014-124 | Failure to identify or value consideration received in *quid pro quo* transaction prohibits charitable contribution deduction for conservation easements | No | IRS |
| *SWF Real Estate LLC v. Comm'r*, T.C. Memo. 2015-63 | Valuation of conservation easement | No | TP |
| *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 755 F.3d 236 (5th Cir. 2014), *aff'g in part, vacating in part* 139 T.C. 304 | Valuation of conservation easement | No | IRS |

002019

## TABLE 9   Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions

| Case Citation | Issue(s) | *Pro Se* | Decision | Amount |
|---|---|---|---|---|
| **Individual Taxpayers (But Not Sole Proprietorships)** | | | | |
| *Bowers v. Comm'r*, T.C. Memo. 2014-130 | TP petitioned for redetermination of deficiency and additions to tax and argued the employees who issued the notice of deficiency and substitute for return did not have the proper authority | Yes | TP | |
| *Hill v. Comm'r*, T.C. Memo. 2014-134 | TP petitioned for review of IRS decision to sustain levy action and file an NFTL and argued that he was not a withholding agent or engaged in earning income from a trade or business | Yes | TP | |
| *Lang v. Comm'r*, T.C. Memo. 2014-183 | TP petitioned for review of determination to sustain an NFTL and maintained proceedings primarily for delay | Yes | TP | |
| *May v. Comm'r*, T.C. Memo. 2014-194 | TPs (H&W) petitioned for review of IRS decision to sustain a levy and asserted the proposed assessments were invalid because they were not properly signed and the delegation of authority order did not accompany the assessments | No | IRS | $500 |
| *Patton v. Comm'r*, T.C. Memo. 2015-75, *appeal docketed*, No. 15-2007 (6th Cir. Aug. 25, 2015) | TPs (H&W) petitioned for review of IRS decision to uphold a NFTL and argued they were unable to comply with their tax obligations due to water trespass on their property by the government | Yes | IRS | $3,500 |
| *Waltner v. Comm'r*, T.C. Memo. 2014-133 | TPs (H&W) petitioned for redetermination of deficiency and penalty and asserted frivolous arguments | No | IRS | $10,000 |
| **Business Taxpayers (Corporations, Partnerships, Trusts, and Sole Proprietorships – Schedules C, E, F)** | | | | |
| *Balice v. Comm'r*, T.C. Memo. 2015-46, *appeal docketed*, No. 15-2366 (3d Cir. June 5, 2015) | TP petitioned for redetermination of deficiency and argued he is not subject to deficiency procedures and wages are not income | Yes | IRS | $25,000 |
| *Banister v. Comm'r*, T.C. Memo. 2015-10, *appeal docketed*, No. 15-71103 (9th Cir. Apr. 9, 2015) | TP petitioned for redetermination of deficiency, additions to tax and penalties, and argued that his U.S. income is not subject to taxation, he had no obligation to file an income tax return, and a statutory notice of deficiency must be signed | Yes | IRS | $25,000 |
| *Bennett v. Comm'r*, T.C. Memo. 2014-256, *appeal docketed*, No. 15-71228 (9th Cir. Apr. 21, 2015) | TP petitioned for redetermination of penalties and argued that his U.S. income is not subject to taxation and he had no obligation to file income tax returns | Yes | IRS | $25,000 |
| *Kanofsky v. Comm'r*, T.C. Memo. 2015-34, *appeal docketed*, No. 15-2244 (2d Cir. July 9, 2015) | TP petitioned for review of IRS decision to uphold notice of intent to levy and asserted international conflicts have bearing on his case, his status as a whistleblower is impacting his case, exempt organization issues are causing delay and corrupt and fraudulent community actions are blocking his business dealings | Yes | IRS | $20,000 |
| *Kanofsky v. Comm'r*, T.C. Memo. 2014-153, *aff'd*, 116 A.F.T.R.2d (RIA) 5186 (3d Cir. 2015) | TP petitioned for review of IRS decision to sustain a NFTL and asserted government corruption, fraud, and his status as a whistleblower were impacting his case | Yes | IRS | $10,000 |
| *Kanofsky v. Comm'r*, T.C. Memo. 2015-70, *appeal docketed*, No. 15-1778 (4th Cir. July 14, 2015) | TP petitioned for review of IRS decision to uphold NFTL and collect unpaid income tax and asserted he was prevented by corrupt governments and a crime wave from pursuing his business | Yes | IRS | $20,000 |
| *Kernan v. Comm'r*, T.C. Memo. 2014-228, *appeal docketed*, No. 15-70574 (9th Cir. Feb. 25, 2015) | TP petitioned for redetermination of deficiency and additions to tax and argued the Commissioner never personally notified him of a duty to file tax returns | Yes | TP | |

002020

TABLE 9: Frivolous Issues Penalty Under IRC § 6673 and Related Appellate-Level Sanctions

| Case Citation | Issue(s) | *Pro Se* | Decision | Amount |
|---|---|---|---|---|
| *Miller v. Comm'r*, T.C. Memo. 2014-105 | TP petitioned for redetermination of deficiency and instituted proceedings mainly for delay | Yes | TP | |
| *Muncy v. Comm'r*, T.C. Memo. 2014-251, *appeal docketed*, No. 15-1626 (8th Cir. Mar. 26, 2015) | TP petitioned for redetermination of deficiency and additions to tax and argued the notices of deficiency were invalid because they were not sent by an authorized delegate of the Secretary | Yes | TP | |
| *Portwine v. Comm'r*, T.C. Memo. 2015-29, *appeal docketed*, No. 15-9004 (10th Cir. May 27, 2015) | TP petitioned for review of determination to sustain lien and levy actions and instituted proceedings primarily for delay | Yes | TP | |
| *Rader v. Comm'r*, 143 T.C. 376 (2014) | TPs (H&W) petitioned for redetermination of deficiency and additions to tax and argued that the substitutes for return were invalid and asserted a Fifth Amendment claim against self-incrimination | Yes | IRS | $10,000 |
| **Section 6673 Penalty Not Requested or Imposed but Taxpayer Warned To Stop Asserting Frivolous Arguments** | | | | |
| *El v. Comm'r*, 144 T.C. No. 9 (2015) | TP petitioned for redetermination of deficiency and additions to tax and asserted frivolous arguments | Yes | | |
| *Kaye v. Comm'r*, T.C. Memo. 2014-145 | TP petitioned for review of determination to proceed with levy and asserted frivolous arguments | Yes | | |
| *Salmonson v. Comm'r*, T.C. Memo. 2014-244 | TP petitioned for redetermination of deficiency, additions to tax, and penalties and asserted frivolous arguments | Yes | | |
| *Salzer v. Comm'r*, T.C. Memo. 2014-188 | TP petitioned for redetermination of deficiency and additions to tax and asserted he could not pay taxes to a country that adopted a socialist government | Yes | | |
| **U.S. Courts of Appeals' Decisions on Appeal of Section 6673 Penalties Imposed by U.S. Tax Court** | | | | |
| *Byers v. Comm'r*, 577 F. App'x 622 (8th Cir. 2014), *aff'g* T.C. Docket No. 015841-11 (July 9, 2013) | Penalty affirmed | Yes | IRS | |
| **U.S. Courts of Appeals' Decisions on Sanctions Under Section 7482 (c)(4), FRAP Rule 38, or Other Authority** | | | | |
| *Carlson v. Comm'r*, 604 F. App'x 628 (9th Cir. 2015), *aff'g* T.C. Memo. 2012-76 | TP appealed Tax Court's redetermination of deficiency decision and filed an appeal lacking merit | Yes | IRS | $8,000 |
| *Taliaferro v. Freeman*, 595 F. App'x 961 (11th Cir. 2014), *aff'g Taliaferro v. U.S.*, 113 A.F.T.R.2d (RIA) 1840 (M.D. Ga. 2014) | TP appealed dismissal of his case and argued he is not a taxpayer, is not subject to taxation, the Sixteenth Amendment only authorizes excise taxes, levies can only be used against federal employees, he is a nonresident alien subject to tax only on income from a trade or business, levies violate his Fourth Amendment and Fifth Amendment rights | Yes | IRS | $6,252 |
| *Trowbridge, U.S. v.*, 591 F. App'x 298 (5th Cir. 2015), *aff'g* Docket No. 4:14-CV-00027 (S.D. Tex. May 22, 2014), *cert. denied*, 135 S. Ct. 2816 (2015) | TP appealed grant of summary judgment and argued he is not a U.S. citizen and that Harris County, TX is not in the U.S. | Yes | IRS | $8,000 |
| **Section 7482 (c)(4), FRAP Rule 38, or Other Authority Penalty Not Requested or Imposed but Taxpayer Warned To Stop Asserting Frivolous Arguments** | | | | |
| *Graffia v. Comm'r*, 580 F. App'x 474 (7th Cir. 2014), *aff'g* T.C. Memo. 2013-211 | TPs (H, W, son and daughter-in-law) appealed Tax Court's decision in the redetermination of deficiency and penalties and asserted frivolous challenges to the Tax Court's determinations | Yes | | |

002021

## TABLE 10   Relief from Joint and Several Liability Under IRC § 6015

| Case Citation | Issue(s) | *Pro Se* | Intervenor | Decision |
|---|---|---|---|---|
| *Blomberg v. Comm'r*, T.C. Summ. Op. 2014-82 | 6015(f) (understatement) | Yes | No | IRS |
| *Brodskiy v. Comm'r*, T.C. Summ. Op. 2015-8 | 6015(c) (understatement); IRS granted relief but intervenor objected | Yes | Yes | TP |
| *Davidson v. Comm'r*, 144 T.C. No. 13 (2015) | 6015(e) - TP's motion to voluntarily withdraw petition for innocent spouse redetermination was granted | Yes | No | TP |
| *Demeter v. Comm'r*, T.C. Memo. 2014-238 | 6015(f) (underpayment); IRS conceded issue but intervenor objected | No | Yes | TP |
| *Deihl v. Comm'r*, 115 A.F.T.R.2d (RIA) 895 (9th Cir. 2015), *aff'g* T.C. Memo. 2012-176 | 6015(c),(f) (understatement) | No | No | IRS |
| *Ehrmann v. Comm'r*, T.C. Summ. Op. 2014-96 | 6015(f) (underpayment) | Yes | No | IRS |
| *Farka v. Comm'r*, T.C. Summ. Op. 2014-73 | 6015(b),(c),(f) (understatement) | Yes | No | Split |
| *Hall v. Comm'r*, T.C. Memo. 2014-171 | 6015(b),(f) (understatement) | Yes | No | IRS |
| *Hammernik v. Comm'r*, T.C. Memo. 2014-170 | 6015(f) (underpayment) | Yes | No | IRS |
| *In re Mikels*, 524 B.R. 805 (Bankr. S.D. Ind. 2015) | Bankruptcy court did not have jurisdiction to make a determination of innocent spouse relief under 6015(f) | No | No | IRS |
| *Jackson v. Comm'r*, T.C. Summ. Op. 2014-63 | 6015(f) (underpayment) | Yes | Yes | IRS |
| *Johnson v. Comm'r*, T.C. Memo. 2014-240 | 6015(f) (underpayment) | Yes | Yes | IRS |
| *Molinet v. Comm'r*, T.C. Memo. 2014-109 | 6015(f) (underpayment); IRS conceded issue but intervenor objected | No | Yes | TP |
| *Nunez v. Comm'r*, 599 F. App'x 629 (9th Cir. 2015), *aff'g* T.C. Docket No. 15168-10 (Feb. 15, 2013) | Tax Court did not lose jurisdiction when the IRS no longer opposed relief under 6015(f) (underpayment) | No | No | IRS |
| *Palomares v. Comm'r*, T.C. Memo. 2014-243, *appeal docketed*, No. 15-70659 (9th Cir. Mar. 3, 2015) | 6015(f) (underpayment); statutory time for claiming a refund had expired | No | No | IRS |
| *Panetta v. Comm'r*, T.C. Summ. Op. 2015-16 | 6015(c),(f) (understatement) | No | No | IRS |
| *Pejoski v. Comm'r*, T.C. Summ. Op. 2014-98 | 6015(b) (understatement); IRS conceded issue but intervenor objected | Yes | Yes | TP |
| *Sanchez v. Comm'r*, T.C. Summ. Op. 2015-20 | 6015(a) (understatement); no joint return existed | No | No | IRS |
| *Sorrentino v. Comm'r*, T.C. Summ. Op. 2014-99 | 6015(a) (understatement); no joint return existed | No | Yes | IRS |
| *U.S. v. Hirsch*, 114 A.F.T.R.2d (RIA) 5896 (E.D.N.Y. 2014) | 6015(f) (underpayment) | Yes | No | TP |
| *Varela v. Comm'r*, T.C. Memo. 2014-222 | 6015(b) (understatement); IRS conceded issue but intervenor objected | No | Yes | TP |
| *Wang v. Comm'r*, T.C. Memo. 2014-206 | 6015(b),(f) (understatement) | No | Yes | IRS |
| *Work v. Comm'r*, T.C. Memo. 2014-190 | 6015(b),(c),(f) (understatement) | No | No | IRS |
| *Zelasko v. Comm'r*, T.C. Summ. Op. 2014-52 | 6015(b),(c),(f) (understatement) | No | Yes | Split |

# Taxpayer Advocate Service Directory

## HEADQUARTERS

### National Taxpayer Advocate
1111 Constitution Avenue NW
Room 3031, TA
Washington, DC  20224
Phone:  202-317-6100
Fax:     855-810-2126

### Deputy National Taxpayer Advocate
1111 Constitution Avenue NW
Room 3039, TA
Washington ,DC  20224
Phone:  202-317-6100
Fax:     855-810-2128

### Executive Director, Systemic Advocacy
1111 Constitution Avenue, NW
Room 3219, TA: SA
Washington, DC  20224
Phone:  202-317-4213
Fax:     855-813-7410

### Executive Director, Case Advocacy
1111 Constitution Avenue NW
Room 3213, TA: CA
Washington, DC  20224
Phone:  202-927-0755
Fax:     855-810-2129

### Congressional Affairs Liaison
1111 Constitution Avenue, NW
Room 1312-04, TA
Washington, DC  20224
Phone:  202-317-6082
Fax:     855-810-5886

## SYSTEMIC ADVOCACY DIRECTORS

### Director, Proactive Advocacy
1111 Constitution Avenue NW
Room 3219, TA: SA: PA
Washington, DC  20224
Phone:  202-317-4213
Fax:     855-813-7413

### Director, Technical Advocacy
1111 Constitution Avenue NW
Room 3219, TA: SA: TA
Washington, DC  20224
Phone:  202-317-4213
Fax:     855-813-7413

### Director, Advocacy Efforts
1111 Constitution Avenue NW
Room 3219, TA: SA: AE
Washington, DC  20224
Phone:  202-317-4213
Fax:     855-813-7413

### Director, Advocacy Implementation and Evaluation
1111 Constitution Avenue NW
Room 3219, TA: SA: AI/E
Washington, DC  20224
Phone:  202-317-4213
Fax:     855-813-7410

002023

## AREA OFFICES

### Andover
310 Lowell Street
Stop 244
Andover, MA  01810
Phone:  978-247-9207
Fax:      855-836-2839

### Atlanta
401 W.  Peachtree Street, NE
Room 1970, Stop 101-R
Atlanta, GA  30308
Phone:  404-338-8710
Fax:      855-822-1231

### Cincinnati
312 Elm Street, Suite 2250
Cincinnati, OH  45202
Phone:  859-669-5556
Fax:      855-824-6406

### Dallas
4050 Alpha Road
Room 924, MS 3000 NDAL
Dallas, TX  75244
Phone:  469-801-0830
Fax:      855-829-1824

### Kansas City
333 West Pershing Road
MS #P-L 3300
Kansas City, MO  64108
Phone:  816-499-4121
Fax:      855-833-6442

### New York/International
290 Broadway
14th Floor
New York, NY  10007
Phone:  212-298-2015
Fax:      855-816-9809

### Oakland
1301 Clay Street
Suite 1030-N
Oakland, CA  94612
Phone:  510-637-2070
Fax:      855-819-5021

### Richmond
400 North Eighth Street
Room 328
Richmond, VA  23219
Phone:  804-916-3510
Fax:      855-821-0237

### Seattle
915 Second Avenue
Stop W-404
Seattle, WA  98174
Phone:  206-946-3712
Fax:      855-829-5331

## CAMPUS OFFICES

### Andover
310 Lowell Street
Stop 120
Andover, MA  01810
Phone:  978-474-5549
Fax:      855-807-9700

### Atlanta
4800 Buford Highway
Stop 29-A
Chamblee, GA  30341
Phone:  770-936-4500
Fax:      855-822-3420

### Austin
3651 S. Interregional Highway
Stop 1005 AUSC
Austin, TX  78741
Phone:  512-460-8300
Fax:      855-204-5023

### Brookhaven
1040 Waverly Avenue
Stop 02
Holtsville, NY  11742
Phone:  631-654-6686
Fax:      855-818-5701

### Cincinnati
201 Rivercenter Boulevard
Stop 11-G
Covington, KY  41011
Phone:  859-669-5316
Fax:      855-828-2723

### Fresno
5045 East Butler Avenue
Stop 1394
Fresno, CA  93888
Phone:  559-442-6400
Fax:      855-820-7112

### Kansas City
333 West Pershing
Stop 1005 S-2
Kansas City, MO  64108
Phone:  816-499-6500
Fax:      855-836-2835

### Memphis
5333 Getwell Road
Stop 13
Memphis, TN  38118
Phone:  901-395-1900
Fax:      855-829-1821

### Ogden
1973 N. Rulon White Boulevard
Stop 1005
Ogden, UT  84404
Phone:  801-620-7168
Fax:      855-832-7126

### Philadelphia
2970 Market Street
Mail Stop 2-M20-300
Philadelphia, PA  19104
Phone:  267-941-2427
Fax:      855-822-1226

002024

## LOCAL OFFICES BY STATE AND LOCATION

### ALABAMA

801 Tom Martin Drive
Room 151
Birmingham, AL  35211
Phone:  205-912-5631
Fax:      855-822-2206

### ALASKA

949 East 36th Avenue
Stop A-405
Anchorage, AK  99508
Phone:  907-271-6877
Fax:      855-819-5022

### ARIZONA

4041 North Central Avenue
MS-1005 PHX
Phoenix, AZ  85012
Phone:  602-636-9500
Fax:      855-829-5330

### ARKANSAS

700 West Capitol Avenue
Stop 1005 LIT
Little Rock, AR  72201
Phone:  501-396-5978
Fax:      855-829-5325

### CALIFORNIA

*Laguna Niguel*
24000 Avila Road
Room 3361
Laguna Niguel, CA  92677
Phone:  949-389-4804
Fax:      855-819-5026

*Los Angeles*
300 N. Los Angeles Street
Room 5109, Stop 6710
Los Angeles, CA  90012
Phone:  213-576-3140
Fax:      855-820-5133

*Oakland*
1301 Clay Street
Suite 1540-S
Oakland, CA  94612
Phone:  510-907-5267
Fax:      855-820-5137

*Sacramento*
4330 Watt Avenue, SA-5043
Sacramento, CA  95821
Phone:  916-974-5007
Fax:      855-820-7110

*San Jose*
55 S. Market Street
Stop 0004
San Jose, CA  95113
Phone:  408-283-1500
Fax:      855-820-7109

### COLORADO

1999 Broadway
Stop 1005 DEN
Denver, CO  80202
Phone:  303-603-4600
Fax:      855-829-3839

### CONNECTICUT

135 High Street
Stop 219
Hartford, CT  06103
Phone:  860-756-4555
Fax:      855-836-9629

### DELAWARE

1352 Marrows Road
Suite 203
Newark, DE  19711
Phone:  302-286-1654
Fax:      855-822-1225

### DISTRICT OF COLUMBIA

77 K Street, N.E.
Suite 1500
Washington, DC  20002
Phone:  202-803-9800
Fax:      855-810-2125

### FLORIDA

*Fort Lauderdale*
7850 SW 6th Court
Room 265
Plantation, FL  33324
Phone:  954-423-7677
Fax:      855-822-2208

*Jacksonville*
400 West Bay Street
Room 535A, MS TAS
Jacksonville, FL  32202
Phone:  904-665-1000
Fax:      855-822-3414

### GEORGIA

401 W. Peachtree Street
Room 510, Stop 202-D
Atlanta, GA  30308
Phone:  404-338-8099
Fax:      855-822-1232

### HAWAII

1099 Alakea Street
Floor 22, MS H2200
Honolulu, HI  96813
Phone:  808-566-2950
Fax:      855-819-5024

### IDAHO

550 W. Fort Street
M/S 1005
Boise, ID  83724
Phone:  208-363-8900
Fax:      855-829-6039

### ILLINOIS

*Chicago*
230 S. Dearborn Street
Room 2820, Stop-1005 CHI
Chicago, IL  60604
Phone:  312-292-3800
Fax:      855-833-6443

*Springfield*
3101 Constitution Drive
Stop 1005 SPD
Springfield, IL  62704
Phone:  217-993-6714
Fax:      855-836-2832

### INDIANA

575 N. Pennsylvania Street
Stop TA771
Indianapolis, IN  46204
Phone:  317-685-7840
Fax:      855-827-2637

### IOWA

210 Walnut Street
Stop 1005 DSM
Des Moines, IA  50309
Phone:  515-564-6888
Fax:     855-833-6445

### KANSAS

555 N. Woodlawn Street, Bldg 4
Suite 112, MS 1005-WIC
Wichita, KS  67208
Phone:  316-651-2100
Fax:     855-836-2834

### KENTUCKY

600 Dr. Martin Luther King Jr. Place
Room 325
Louisville, KY  40202
Phone:  502-912-5050
Fax:     855-827-2641

### LOUISIANA

1555 Poydras Street
Suite 220, Stop 2
New Orleans, LA  70112
Phone:  504-558-3001
Fax:     855-822-3418

### MAINE

68 Sewall Street
Room 313
Augusta, ME  04330
Phone:  207-622-8528
Fax:     855-836-9623

### MARYLAND

31 Hopkins Plaza
Room 1134
Baltimore, MD  21201
Phone:  443-853-6000
Fax:     855-821-0238

### MASSACHUSETTS

JFK Building
15 New Sudbury Street
Room 725
Boston, MA  02203
Phone:  617-316-2690
Fax:     855-836-9625

### MICHIGAN

500 Woodward
Stop 07, Suite 1000
Detroit, MI  48226
Phone:  313-628-3670
Fax:     855-827-2634

### MINNESOTA

Wells Fargo Place
30 East 7th Street, Suite 817
Stop 1005 STP
St. Paul, MN  55101
Phone:  651-312-7999
Fax:     855-833-8237

### MISSISSIPPI

100 West Capitol Street
Stop 31
Jackson, MS  39269
Phone:  601-292-4800
Fax:     855-822-2211

### MISSOURI

1222 Spruce Street
Stop 1005 STL
St. Louis, MO  63103
Phone:  314-612-4610
Fax:     855-833-8234

### MONTANA

10 West 15th Street
Suite 2319
Helena, MT  59626
Phone:  406-444-8668
Fax:     855-829-6046

### NEBRASKA

1616 Capitol Avenue
Suite 182
Mail Stop 1005
Omaha, NE  68102
Phone:  402-233-7272
Fax:     855-833-8232

### NEVADA

110 City Parkway
Stop 1005 LVG
Las Vegas, NV  89106
Phone:  702-868-5179
Fax:     855-820-5132

### NEW HAMPSHIRE

Federal Office Building
80 Daniel Street
Portsmouth, NH  03801
Phone:  603-433-0571
Fax:     855-807-9698

### NEW JERSEY

955 South Springfield Avenue
3rd Floor
Springfield, NJ  07081
Phone:  973-921-4043
Fax:     855-818-5695

### NEW MEXICO

5338 Montgomery Boulevard, NE
Stop 1005 ALB
Albuquerque, NM  87109
Phone:  505-837-5505
Fax:     855-829-1825

### NEW YORK

*Albany*

11A Clinton Avenue
Suite 354
Albany, NY  12207
Phone:  518-292-3001
Fax:     855-818-4817

*Brooklyn*

2 Metro Tech Center
100 Myrtle Avenue
7th Floor
Brooklyn, NY  11201
Phone:  718-834-2200
Fax:     855-818-4818

*Buffalo*

130 South Elmwood Ave, Room 265
Buffalo, NY  14202
Phone:  716-961-5300
Fax:     855-818-4821

*Manhattan*

290 Broadway
5th Floor
Manhattan, NY  10007
Phone:  212-436-1011
Fax:     855-818-4824

### NORTH CAROLINA

4905 Koger Boulevard
Suite 102, MS1
Greensboro, NC  27407
Phone:  336-574-6119
Fax:     855-821-0243

002026

**NORTH DAKOTA**

657 Second Avenue North
Room 244, Stop 1005 FAR
Fargo, ND  58102
Phone:  701-237-8342
Fax:      855-829-6043

**OHIO**

*Cincinnati*
550 Main Street, Room 3530
Cincinnati, OH  45202
Phone:  513-263-3260
Fax:      855-824-6407

*Cleveland*
1240 E. Ninth Street
Room 423
Cleveland, OH  44199
Phone:  216-522-7134
Fax:      855-824-6409

**OKLAHOMA**

55 North Robinson Avenue
Stop 1005 OKC
Oklahoma City, OK  73102
Phone:  405-297-4055
Fax:      855-829-5327

**OREGON**

Mail Stop O-405
1220 SW 3rd Ave, Suite G004
Portland, OR  97204
Phone:  503-265-3591
Fax:      855-832-7118

**PENNSYLVANIA**

*Philadelphia*
600 Arch Street, Room 7426
Philadelphia, PA  19106
Phone:  267-941-6623
Fax:      855-821-2123

*Pittsburgh*
1000 Liberty Avenue
Room 1400
Pittsburgh, PA  15222
Phone:  412-404-9098
Fax:      855-821-2125

**RHODE ISLAND**

380 Westminster Street
4th Floor
Providence, RI  02903
Phone:  401-528-1921
Fax:      855-807-9697

**SOUTH CAROLINA**

1835 Assembly Street
Room 466, MDP-03
Columbia, SC  29201
Phone:  803-312-7901
Fax:      855-821-0241

**SOUTH DAKOTA**

115 4th Avenue Southeast
Suite 413
Aberdeen, SD  57401
Phone:  605-377-1600
Fax:      855-829-6038

**TENNESSEE**

801 Broadway, Stop 22
Nashville, TN  37203
Phone:  615-250-5000
Fax:      855-828-2719

**TEXAS**

*Austin*
300 E. 8th Street
Stop 1005-AUS
Austin, TX  78701
Phone:  512-499-5875
Fax:      855-829-1827

*Dallas*
1114 Commerce Street
MC 1005DAL
Dallas, TX  75242
Phone:  214-413-6500
Fax:      855-829-1829

*Houston*
1919 Smith Street
MC 1005HOU
Houston, TX  77002
Phone:  713-209-3660
Fax:      855-829-3841

**UTAH**

50 South 200 East
Stop 1005 SLC
Salt Lake City, UT  84111
Phone:  801-799-6958
Fax:      855-832-7121

**VERMONT**

128 Lakeside Ave, Suite 204
Burlington, VT  05401
Phone:  802-859-1052
Fax:      855-874-1978

**VIRGINIA**

400 North Eighth Street
Room 916, Box 25
Richmond, VA  23219
Phone:  804-916-3501
Fax:      855-821-2127

**WASHINGTON**

915 Second Avenue
Stop W-405
Seattle, WA 98174
Phone:  206-946-3707
Fax:      855-832-7122

**WEST VIRGINIA**

425 Juliana Street, Room 2019
Parkersburg, WV  26101
Phone:  304-420-8695
Fax:      855-828-2722

**WISCONSIN**

211 West Wisconsin Avenue
Room 507, Stop 1005 MIL
Milwaukee, WI  53203
Phone:  414-231-2390
Fax:      855-833-8230

**WYOMING**

5353 Yellowstone Road
Cheyenne, WY  82009
Phone:  307-633-0800
Fax:      855-829-6042

**INTERNATIONAL**

*Puerto Rico*
City View Plaza II
48 Carr 165 - 5th Floor
Guaynabo, PR  00968
Phone   (English):  787-522-8601
            (Spanish): 787-522-8600
Fax:      855-818-5697

*This page intentionally left blank.*

002028

002029





002030

Journal of Public Economics 143 (2016) 98–114



Contents lists available at ScienceDirect

## Journal of Public Economics

journal homepage: www.elsevier.com/locate/jpube



# The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants ☆



Nolan G. Pope

*The University of Chicago, 5107 S Blackstone Ave. 1204, Chicago, IL 60615, United States*

## ARTICLE INFO

*Article history:*
Received 15 June 2015
Received in revised form 14 May 2016
Accepted 30 August 2016
Available online 5 September 2016

*Keywords:*
Employment
Immigration
Labor market
Deferred Action for Childhood Arrivals
DACA
Unemployment
Labor force
Work authorization
Immigrant
School
Unauthorized Immigrant
Illegal Immigrant

## ABSTRACT

As the largest immigration policy in 25 years, Deferred Action for Childhood Arrivals (DACA) made deportation relief and work authorization available to 1.7 million unauthorized immigrants. This paper looks at how DACA affects DACA-eligible immigrants' labor market outcomes. I use a difference-in-differences design for unauthorized immigrants near the criteria cutoffs for DACA eligibility. I find DACA increases the likelihood of working by increasing labor force participation and decreasing the unemployment rate for DACA-eligible immigrants. I also find DACA increases the income of unauthorized immigrants in the bottom of the income distribution. I find little evidence that DACA affects the likelihood of attending school. Using these estimates, DACA moved 50,000 to 75,000 unauthorized immigrants into employment. If the effects of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) are similar to DACA, then DAPA could potentially move over 250,000 unauthorized immigrants into employment.

© 2016 Elsevier B.V. All rights reserved.

## 1. Introduction

The United States has the largest immigrant population of any nation in the world. With 40.7 million people,[1] the United States has four times as many foreign-born residents than any other country.[2] However, in the United States, 11.4 million of these individuals, or 3.6% of the entire US population, are unauthorized immigrants and have no legal status (Baker and Rytina, 2013). These unauthorized immigrants face a unique set of challenges to their economic well-being compared to citizens and authorized immigrants. Some of these challenges include the threat of deportation, lack of legal work authorization, and insufficient documentation for banking, loans, and driver's licenses. These challenges likely contribute to unauthorized immigrants' below-average levels of income, educational attainment, and above-average levels of unemployment (Fortuny et al., 2007; Rivera-Batiz, 1999; and Smith, 2006).

Due to the unique challenges unauthorized immigrants face, extensive political debate has occurred over what immigration policies should be implemented to help improve unauthorized immigrants' economic well-being without incentivizing additional illegal immigration. On June 15, 2012, President Obama used his prosecutorial discretion and announced Deferred Action for Childhood Arrivals (DACA). This announcement directed the Department of Homeland Security to accept applications for DACA from unauthorized immigrants who had arrived in the United States as children (under the age of 16) and were under the age of 31 as of June 15, 2012. Individuals whose applications are accepted receive two years of deportation relief and work authorization. Continued DACA approval is conditional on renewal every two years. With 1.7 million unauthorized immigrants potentially eligible (Passel and Lopez, 2012), DACA has provided relief from deportation and work authorization to more unauthorized immigrants than any other immigration policy since the 1986 Immigration Reform and Control Act (Baker, 2014).

Without work authorization, documentation for loans and driver's licenses, and with the possibility of deportation, unauthorized immigrants have additional labor market frictions than do authorized immigrants and citizens. DACA-eligible unauthorized immigrants could potentially reduce these labor market frictions and improve their labor market outcomes by applying for and obtaining DACA.

---

☆ I would like to thank Michael Greenstone, Kareem Haggag, Steven Levitt, Magne Mogstad, Derek Neal, and Nathan Petek for helpful comments and discussion.
    *E-mail address:* npope@uchicago.edu (N. Pope).
[1] Census Bureau.
[2] United Nations, Department of Economic and Social Affairs, Population Division

http://dx.doi.org/10.1016/j.jpubeco.2016.08.014
0047-2727/© 2016 Elsevier B.V. All rights reserved.

Particularly, I use three different measurements of employment to look at how the reduction of labor market frictions through DACA has affected unauthorized immigrants likelihood of working. I estimate whether these changes in the likelihood of working stem from changes in labor force participation or unemployment. Importantly, I estimate how these changes in working affect the income of unauthorized immigrants throughout the income distribution. Lastly, I look at whether DACA affects schooling decisions through its substitutability with working.

In this paper, I look at how DACA affects DACA-eligible immigrants' labor market outcomes through the reduction of labor market frictions. To do so, I use American Community Survey (ACS) data on over 400,000 immigrants and 5 million citizens ages 18–35 from 2005 to 2014. I estimate the effect of DACA by using a difference-in-differences empirical design. To enhance validity, I estimate the effect of DACA by performing the difference-in-differences estimation for samples of unauthorized immigrants who are just above and below DACA eligibility cutoffs. Specifically, I look at unauthorized immigrants who were just above and below the age of 16 when they entered the United States and those who were just above and below the age of 30 on June 15, 2012. In addition, I test for selection into the ACS sample of unauthorized immigrants and for differential pre-trends that may bias the results.

I find DACA has had large effects on DACA-eligible individuals' labor market outcomes, and find suggestive evidence for some schooling decisions. For DACA-eligible individuals, DACA has increased the likelihood of working by 3.7–4.8 percentage points and the number of hours worked per week by 0.9–1.7 hours. The increase in the likelihood of working and in the number of hours worked per week comes from both an increase in labor force participation and a decrease in unemployment. These estimates provide a lower bound on the intent-to-treat effect of DACA which may be as much as 1.6 times larger. In addition, the increased likelihood of working has increased the income for those in the bottom of the income distribution. Despite the increased employment, I find little evidence that DACA has influenced the likelihood of an individual being self-employed. Within two years of implementation, DACA moved 50,000–75,000 unauthorized immigrants into employment.

Since one of the requirements for obtaining DACA is to have a high school diploma or a General Educational Development (GED) certificate, I also test whether DACA had affected unauthorized immigrants' educational attainment. I find suggestive evidence that DACA pushed over 25,000 DACA-eligible individuals into obtaining their GED certificate in order to be eligible for DACA. Although working and attending school are likely substitutes, and DACA has had a positive effect on the likelihood of working, I find little evidence that DACA has affected the likelihood of attending school.

The difference-in-differences results directly answer the policy question of how DACA has affected its target population. The results also inform future immigration policies on how a reduction in labor market frictions through deferred action and work authorization might affect the larger unauthorized immigrant population. Particularly, the findings shed light on how the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy, which expands DACA and gives deferred action and work authorizations to most unauthorized immigrants who have children that are citizens, might affect the 3.7 million eligible unauthorized immigrants.[3] If the effects of DAPA are similar to the effects of DACA, then DAPA could move over 250,000 unauthorized immigrants into employment. However, due to the demographic differences between the DAPA-eligible and DACA-eligible populations, the effects of the two policies may not be similar. The results demonstrate that illegal status hurts young immigrants' ability to work, by keeping them out of the labor force and unemployed. Even in a short two-year time span, deferred action and work authorization helped young unauthorized immigrants find employment.

Due to the recency of DACA and data limitations, little work has looked at how DACA affects unauthorized immigrants. A few studies using small sets of survey data have provided suggestive evidence of an increase in job changes, employment, and decreases in school attendance (Gonzales et al., 2014; and Kosnac et al., 2014). However, these studies only have a few DACA-eligible individuals in their sample and are mostly descriptive studies that lack causal identification. In concurrent work, Amuedo-Dorantes and Antman (2016) use monthly Current Population Survey data along with a difference-in-differences strategy to look at the effect of DACA. Although they effectively use their difference-in-differences strategy, their analysis is limited by a small sample size of 11,526 non-citizens of which only a small fraction are eligible for DACA after its availability (400–450 individuals). They find DACA reduces school enrollment for these 450 DACA-eligible individuals, and provide some evidence of an increase in the likelihood of working for men. The limited sample size prevents them from looking at labor market outcomes with enough precision to detect sizable changes. This paper uses over 400,000 non-citizens and over 5 million citizens to estimate the effect of DACA on labor market and schooling outcomes. Similar to Amuedo-Dorantes and Antman (2016), I find positive effects of DACA on employment for men. I also find positive effects of DACA on employment for women. In addition, I find beneficial effects of DACA on labor force participation, unemployment, and number of hours worked per week. I also find increases in income for those in the bottom of the income distribution. However, in contrast to their results, I find no evidence of an effect of DACA on school attendance. This difference in the effect on school enrollment may be due to sampling error from their small sample size or because of strong differential pre-trends in school attendance that are observed. In addition, this paper provides a detailed analysis of the effect of DACA by income quantile, uses citizens as an additional control group, and provides tests for sample selection that may potentially bias the results.

This paper is also closely related to work done on the 1986 Immigration Reform and Control Act (IRCA). The IRCA granted amnesty and a pathway to citizenship to approximately 2.8 million unauthorized immigrants (Baker, 2014). Most studies have found the IRCA increased unauthorized immigrants' incomes (Bratsberg et al., 2002; Kossoudji and Cobb-Clark, 2002, Orrenius and Zavodny, 2012; and Rivera-Batiz, 1999), decreased crime rates (Baker, 2014), increased educational attainment (Cortes, 2013), and had little effect on long-term patterns of undocumented immigration (Orrenius and Zavodny, 2003). However, Amuedo-Dorantes and Bansak (2011) and Amuedo-Dorantes et al. (2007) have also found that unauthorized immigrants' labor force participation decreased and unemployment rates rose. In addition to the IRCA, Kaushal (2006) found that the 1997 amnesty program, the Nicaraguan Adjustment and Central American Relief Act (NACARA), increased the real wages of undocumented foreign-born men from affected countries by 3%.

Although both are major immigration policies, the IRCA and DACA differ in many ways that may cause them to affect unauthorized immigrants differently. The largest difference is that the IRCA gave amnesty and a pathway to citizenship, whereas DACA gives only two years of deportation relief and work authorization. The IRCA was also implemented when fewer legal barriers to employing unauthorized immigrants existed. Lastly, the two policies are more than 25 years apart with different labor markets. NACARA was implemented on a much smaller scale than either the IRCA or DACA and was implemented over 15 years ago.

The rest of the paper will proceed as follows. Section 2 describes the timing, benefits, and eligibility criteria of DACA. Section 3

---

[3] http://migrationpolicy.org/news/mpi-many-37-million-unauthorized-immigrants-could-get-relief-deportation-under-anticipated-new

describes the ACS data. Section 4 develops a conceptual framework for interpreting the results. Section 5 describes the difference-in-differences methodology and the samples used for the analysis. Section 6 reports the results of how DACA affects eligible unauthorized immigrants. Section 7 discusses how the results can help inform current and future immigration policy. Section 8 concludes.

## 2. Deferred Action for Childhood Arrivals

On June 15, 2012, from the Rose Garden, President Obama used his prosecutorial discretion and announced Deferred Action for Childhood Arrivals (DACA). This announcement directed the Department of Homeland Security to accept applications for DACA from qualified unauthorized immigrants. Individuals whose applications are accepted receive deferred action, which gives them two years of relief from deportation and work authorization. Continued DACA eligibility is conditional on renewal every two years.

After the announcement of DACA in June 2012, the Department of Homeland Security's Citizenship and Immigration Services (USCIS) started accepting applications for DACA on August 15, 2012. To apply for DACA, individuals have to fill out three forms, pay a processing fee of 465 dollars, and provide documentation that they meet the eligibility criteria. Although many forms and documentation are required, over 90% of processed applications are approved. The USCIS estimated applications would take 4–6 months to be processed. By the end of 2012, over 100,000 unauthorized immigrants' DACA applications had been approved. By the end of 2013 and 2014, over 500,000 and 600,000 DACA applications had been approved, respectively. Fig. 1 uses data reported by the USCIS[4] and shows the number of DACA applications approved over time. The black line represents the number of DACA applications approved in each quarter of the year. The gray bars represent the cumulative number of DACA applications approved. As Fig. 1 shows, very few DACA applications were approved until the last quarter of 2012, and the bulk of DACA applications were approved over the span of a year, from October, 2012 to September, 2013.

To qualify for DACA, unauthorized immigrants have to meet six criteria[5]: (1) applicants had no lawful status as of June 15, 2012 (i.e., an unauthorized immigrant as of June 15, 2012); (2) applicants came to the United States before the age of 16; (3) applicants must have been under the age of 31 as of June 15, 2012; (4) applicants must also have continuously resided in the United States since June 15, 2007; (5) applicants must be currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Education Development (GED) certificate, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) applicants cannot have been convicted of a felony, significant misdemeanor, or three or more other misdemeanors. In addition to these DACA qualification criteria, an individual must be 15 years or older to submit the DACA application. To prove they meet these requirements, individuals must submit documentation from a list of approved sources given by the USCIS. For example, passports or birth certificates from an individual's country of origin are required to prove an individual's age, and school or medical records are used to prove an individual came to the United States before the age of 16.



**Fig. 1.** Number of approved DACA applications by quarter. Note: The black line represents the number of DACA applications approved in a given quarter. The bars represent the cumulative number of DACA applications approved by a given quarter. The y-axis shows the number of approved applications in thousands. The x-axis shows the quarter and year.

To better understand these criteria, a breakdown of the United States' unauthorized immigrant population is helpful. As of January 2012, the Department of Homeland Security estimated 11.4 million unauthorized immigrants were living in the United States (Baker and Rytina, 2013). Of these, 80% were from Central and South America and 59% were from Mexico. Approximately 4.4 million of the 11.4 million unauthorized immigrants were under the age of 31 as of June 15, 2012. Of these 4.4 million, approximately 950,000 were immediately eligible for DACA (Passel and Lopez, 2012). In addition, approximately 770,000 were potentially eligible in the future. Of these 770,000 individuals, 450,000 met all the qualification criteria but were currently under the age of 15. The other approximately 320,000 individuals met all the qualification criteria but had no high school diploma or GED certificate. Although individuals have to pay money, they may be wary of future deportation from applying, and must obtain substantial documentation, by the end of 2014, 67% of the 950,000 individuals immediately eligible for DACA had been approved.[6] The composition of DACA-approved individuals' nationality was somewhat similar to that of the unauthorized immigrant population as a whole, with 92% from Central and South America and 78% from Mexico.

Clearly, the reason for so many individuals willing to take the time and money to apply for DACA is the perceived benefits from DACA approval. The two most obvious, and likely the largest, benefits of DACA approval are relief from deportation and work authorization. Individuals with DACA receive deferred action in which all removal actions are deferred and individuals are authorized to be present in the United States. Along with this deferred action, DACA recipients are legally allowed to work in the United States. Many smaller benefits accompany these two main benefits. DACA recipients receive a Social Security Number, which allows them to legally open a bank account and build a credit history. In all states, except Arizona and Nebraska, DACA recipients can legally obtain a driver's license.[7] However, DACA recipients are not eligible for federal welfare or federal student aid.

---

[4] http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals

[5] http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca

[6] http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals

[7] http://www.nilc.org/dacadriverslicenses2.html

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2041 of 4699 PageID #:  5206

## 3. Data

The main data used to look at the effects of DACA are individual-level data from the American Community Survey (ACS). I use ACS data from 2005 to 2014. I start with the 2005 ACS sample because it is the first year with a full one-percent sample of the United States. The 2014 ACS sample is the most recent sample available. The ACS data provide eight years of data prior to DACA and two years after. The collection of ACS data in each year is evenly distributed between each month of the year. The ACS provides many outcomes of interest including if individuals are working, in the labor force, unemployed, self-employed, their income, number of hours worked per week, whether they obtained a GED, and whether they are in school. It also provides a rich set of demographic information on individuals to be used as controls.

The ACS includes questions that allow me to focus on the unauthorized immigrant population and determine if individuals are DACA eligible. The most difficult DACA qualification criteria to identify in the ACS is whether the individual is an unauthorized immigrant. The ACS asks each individual if they are a US citizen. No additional information on legal status is available if the individual is a non-citizen. The Census Bureau and the Department of Homeland Security estimate that nearly 40% of these non-citizens are authorized immigrants (Acosta et al., 2014, Baker and Rytina, 2013). Although the variable non-citizen includes all unauthorized immigrants, it also includes many authorized immigrants. In the Empirical method section, I will discuss how this inclusion of authorized immigrants causes the analysis to underestimate the intent-to-treat effect of DACA.

These ACS data also include questions that allow me to identify individuals who meet the other DACA qualification criteria. The ACS question on quarter of birth allows me to determine the age of each individual as of June 30, 2012, and whether they are under the age of 31. Using the question on how long the individual has resided in the United States, along with their age, I determine the age at which each individual entered the United States. This question also allows me to identify if the individual has been in the United States for at least five years. Using the ACS question on education, I can determine individuals' educational obtainment. To limit the sample to only individuals who meet DACA's education requirement, I restrict my sample to only individuals who have a high school degree. Lastly, whether an individual has committed a felony or significant misdemeanor is not observed. I create the variable "eligible" for whether an individual meets all of the DACA qualifications as of June 15, in the year prior to the individual's ACS sample year (except for having committed a crime or not).

To better understand how unauthorized immigrants are included in the ACS data, the sampling process for the ACS is as follows. First, the Census Bureau uses its Master Address File, which is an inventory of all known housing units and group quarters, as the sample frame from which the Census Bureau draws its sample for the ACS. The Census Bureau estimates that from 2005 to 2014, the Master Address File covers the housing for 92.5–94.0% of the entire US population. Each month, a systematic sample of addresses is drawn from the Master Address File to represent each US county. The ACS survey is then mailed to the selected sample at the beginning of the month. Non-respondents are then contacted by telephone one month later for a computer-assisted telephone interview. One third of the nonrespondents to the mail or telephone survey are then contacted in person to complete the ACS survey one month following the telephone survey attempt. The Census Bureau reports that from 2005 to 2014, 65.5–68.7% of the addresses selected for the sample completed the survey. Of those contacted in person, 96.7–98.0% completed the survey.

In addition to the details of the ACS sampling procedure, understanding how the sampling and interview process relate to being an unauthorized immigrant is important. In regards to the ACS and unauthorized immigrants, the Census Bureau states, "The ACS interviews the resident population without regard to legal status or citizenship."[8] The fact that the ACS conducts interviews without regard to legal status can be more easily seen as the sampling and interview process is broken down. First, because the sample frame is created by using the near universe of US addresses, unauthorized immigrants are no more or less likely to be selected into the sample frame than are authorized immigrants or citizens. Second, because a systematic sample of address are drawn from the sample frame, unauthorized immigrants are no more or less likely to be selected to be sent the ACS survey. Therefore, the ACS sampling does not select a specific type of unauthorized immigrant to be included in the ACS, but is representative of the unauthorized immigrant population in the United States. The ACS sampling procedure supports the assertion that the estimates from this paper are informative about DACA-eligible unauthorized immigrants as a whole. Also, because the sampling procedure did not change between 2005 and 2014, and unauthorized immigrants were sampled in the same way before and after DACA became available, the selection of unauthorized immigrants into the sample will not affect the results. Although the ACS did not sample a specific type of unauthorized immigrant or change its sampling procedure in such a way to detrimentally affect the results, potential concerns arise regarding how the survey and item response rates of unauthorized immigrants may affect the results. I discuss these concerns in the Results section along with tests to determine their potential influence on the results.

Using the ACS data, I analyze four main types of labor market and schooling outcomes. The first outcome is the likelihood of an individual to be working. The ACS provided three survey questions that help measure this outcome. They are a binary variable for whether an individual worked in the last week and in the last year, and a continuous variable for the usual number of hours worked each week. All three of these outcome variables provide insight into whether a person is working. The second type of outcome comprises three outcome variables that help describe the underlying reason for why a person is working or not. These three outcome variables are a binary variable for whether an individual is in the labor force or not, whether unemployed or not, and whether self-employed or not. These three outcome variables help break down how DACA is affecting the likelihood of working. The third type of outcome is an individual's income. The ACS income variable measures the total amount of income an individual receives from all sources in the last 12 months. This outcome variable is used to help determine if DACA improves recipients' economic well-being and stability. The last type of outcome comprises two variables that help describe the schooling choices of individuals. The outcome variables used are whether an individual is attending school and whether the individual has obtained a GED. I use the binary outcome variable of whether an individual is attending school, because working and attending school are likely substitutes for each other and DACA may have unattended effects on an individual's likelihood of attending school. I use the binary outcome variable of having obtained a GED, because a requirement for obtaining DACA is to have a high school diploma or a GED certificate, and DACA may therefore incentivize some unauthorized immigrants to obtain their GED. The exact wording from the ACS survey for each outcome and control variable is shown in the web appendix.

Table 1 shows the summary statistics for the sample of non-citizens ages 18–35 with at least a high school degree from 2005 to 2014. The first two columns show the summary statistics for the DACA-eligible and DACA-ineligible individuals, respectively. The third column shows the difference between the two groups' means

---

[8] https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

002034

N. Pope / Journal of Public Economics 143 (2016) 98–114

**Table 1**
Summary statistics.

| Variable | Mean | | Difference | t-Statistic |
|---|---|---|---|---|
| | DACA Eligible | DACA Ineligible | | |
| Working | 65.3 | 66.5 | −1.2 | −3.3 |
| In labor force | 73.9 | 71.9 | 2.0 | 6.5 |
| Unemployed | 11.7 | 7.5 | 4.1 | 16.2 |
| Income | 15,787 | 24,358 | −8,571 | −31.8 |
| Hours worked per week | 27.1 | 28.6 | −1.5 | −9.1 |
| Self-employed | 75.1 | 73.9 | 1.2 | 3.5 |
| Attending school | 4.7 | 6.6 | −1.9 | −14.0 |
| GED | 32.0 | 21.6 | 10.4 | 28.1 |
| Years in US | 3.9 | 2.5 | 1.4 | 11.1 |
| Age entered US | 15.5 | 6.4 | 9.1 | 144.4 |
| Male | 8.4 | 22.3 | −13.8 | −287.3 |
| White | 52.6 | 51.9 | 0.7 | 3.1 |
| Black | 75.1 | 59.0 | 16.1 | 16.3 |
| Asian | 9.3 | 9.0 | 0.2 | 0.4 |
| Hispanic ethnicity | 14.5 | 30.7 | −16.2 | −27.5 |
| Home language of Spanish | 65.4 | 42.1 | 23.2 | 20.8 |
| Born in Latin America | 63.6 | 41.3 | 22.3 | 20.3 |
| Age | 72.4 | 47.4 | 24.9 | 30.9 |
| Married | 23.9 | 28.6 | −4.7 | −148.7 |
| Live in a metro area | 24.0 | 51.4 | −27.4 | −88.6 |
| High school degree | 92.4 | 92.9 | −0.4 | −1.9 |
| Some college | 49.8 | 37.2 | 12.6 | 30.3 |
| College degree | 40.2 | 25.4 | 14.7 | 43.2 |
| Observations | 10.0 | 37.3 | −27.3 | −65.4 |
| | 99,844 | 338,866 | | |

Note: The sample for the summary statistics includes non-citizens who are ages 18–35 and have at least a high school degree and corresponds to the sample in Panel C of Table 2. All binary variables are represented in percent terms.

and the fourth columns shows the *t*-statistic when testing the difference between the two means. The clearest differences between the two groups are that the DACA-eligible group tends to have entered the United States at a younger age and to be younger. In addition to the difference between the DACA-eligible and DACA-ineligible groups that can be seen in Table 1, both groups are more likely to be Hispanic, speak Spanish at home, live in a metro area, and have only a high school degree, compared to citizens of the same age (see Table A.3). In addition, both groups are about 6 percentage points less likely than citizens to be in the labor force or to be working. Although DACA-eligible individuals' incomes are much lower than citizens, DACA-ineligible individuals' incomes are similar to citizens.

## 4. Conceptual framework

In this section, I will look at the reasons why obtaining DACA may potentially affect the labor market and schooling outcomes of unauthorized immigrants and the potential consequences of these effects. First, I look at why obtaining DACA potentially affects unauthorized immigrants' labor market outcomes. Initially, DACA itself did not change the labor demand or the labor supply curves. DACA did not change employers' desire to hire a worker at a given wage. In addition, DACA did not change individuals' (citizens, authorized immigrants, and unauthorized immigrants) willingness to work at a given wage. However, DACA did reduce the frictions for DACA-eligible unauthorized immigrants to find employment, by providing work authorization, legal documentation for banking and driver's licenses, and removing potential deportation if discovered working illegally. These attenuations in frictions mainly arose from that fact that unauthorized immigrants who obtained DACA could now obtain employment from all potential employers instead of just employers who were willing to overlook individuals' legal work status. These attenuations in frictions allowed those who obtained DACA to have fewer barriers to working and to have more employment options.

As such, one would expect DACA to increase individuals' likelihood of working. This increase in the likelihood of working could arise from both discouraged workers entering the labor force and unemployed unauthorized immigrants finding employment. This increase in working should in turn increase DACA-eligible unauthorized immigrants' income. This increase in income should be particularly pronounced for those in the bottom of the income distribution due to not being able to previously find steady employment. The results of this paper will test if these reductions in labor market frictions for DACA-eligible unauthorized immigrants allow them to improved their labor market outcomes by being more likely to work, less likely to be unemployed, and by increasing their income.

Note that although DACA itself does not change the labor supply curve and instead attenuates labor-market frictions for DACA-eligible individuals, if these frictions are attenuated and those who obtain DACA increase their likelihood of working, the supply of labor will in turn increase. This increase in the supply of labor could potentially have a negative effect on overall wages. The results indicate DACA moved approximately 50,000–75,000 unauthorized immigrants into employment. This change in the supply of labor accounts for only 0.94–1.41% of the 5.33 million individuals who gained employment in 2013 and 2014 (Bureau of Labor Statistics). This finding implies that the effect of DACA on overall wages would likely be very small and would be unable to be detected in these data. However, with the much larger population that would be affected by DAPA or a large-scale amnesty program, the increase in the supply of labor may be a larger concern.

These attenuations of labor market frictions and the subsequent increase in the supply of labor have potential welfare implications. By reducing labor market frictions for unauthorized immigrants and therefore increasing their employment options, DACA clearly increases the welfare of DACA-eligible individuals. However, the increase in labor supply and the potential decrease in overall wages, may lead to a decrease in the welfare of citizens and authorized immigrants. However, the welfare increases and decreases are not likely to be symmetric. Because DACA relieves large frictions for DACA-eligible unauthorized immigrants, the resulting increase in employment is likely for individuals who are not at the margin of being willing to work, but rather are well within the margin of being willing to work. Conversely, if the increased supply of labor from DACA-eligible individuals displaces workers, these displaced workers are likely to be just at the margin of being willing to work. This would imply that the overall welfare effect is not a pure transfer to DACA-eligible individuals, but would likely enhance efficiency, although it would not be Pareto efficient.

In addition to labor market outcomes, I look at why obtaining DACA may potentially affect individuals' schooling outcomes. First, I look at the potential effect of DACA on attending school, and then the potential effect on obtaining a GED. The additional options from obtaining DACA may have a direct positive effect on the likelihood of attending schooling through legal documentation that gives immigrants access to loans to pay for tuition, the ability to obtain a driver's license so they can attend school while still living with their parents, or the ability to work while attending school to cover their tuition and living expenses. In addition, by obtaining assurance through DACA of being able to legally work in the future, DACA-eligible individuals may be more willing to invest in their human capital. However, besides these potential positive effects of DACA, work authorization has an indirect negative effect on school attendance. Working and attending school (particularly attending full time) are likely substitutes for each other. Once DACA-eligible individuals obtain DACA and can more easily find employment, they may substitute their time away from attending school and toward working. Second, because one of the requirements for obtaining DACA is to have a high school diploma or a GED certificate, DACA may directly incentivize unauthorized immigrants who do not have a high school

diploma or GED, but are otherwise eligible for DACA, to obtain a GED so they can reap the potential benefits of DACA. The results look at whether DACA affects both the likelihood of attending school and of obtaining a GED.

## 5. Empirical method

To measure the effect of DACA, I use a difference-in-differences (DID) approach. By comparing DACA-eligible individuals with DACA-ineligible individuals before and after the implementation of DACA, I can measure its effect. The simplest approach to test if DACA has an effect on DACA-eligible individuals is by comparing the outcome means of individuals eligible for DACA with those ineligible both before and after DACA became available. Figs. 2 through 5 show these simple mean comparisons between non-citizens ages 18–35 with at least a high school degree from 2005 to 2014. With DACA only being available at the end of 2012, I should only observe its effect for the years 2013 and 2014, with possibly a small effect in 2012. I discuss the results shown in these figures in detail in the Results section.

As mentioned earlier, one of the limitations with the ACS data is the inability to distinguish between unauthorized and authorized non-citizens. According to the Census Bureau (Acosta et al., 2014), the ACS estimates that there were 8.3 million non-citizens in the US between the ages of 18 and 35 in 2012. The Department of Homeland Security (Baker and Rytina, 2013) estimates that of these 8.3 million non-citizens, 38.9% were authorized immigrants and 61.1% were unauthorized immigrants. If the sample were restricted to just unauthorized immigrants, the DID estimates would be the intent-to-treat effect. However, due to this contamination of authorized immigrants

in the non-citizen sample, the DID estimates are not the intent-to-treat effect. Instead, the DID estimates will be systematically biased toward zero and will underestimate the intent-to-treat effect. With nearly 40% of the non-citizen sample being authorized immigrants, the intent-to-treat effect of DACA will be approximately 1.6 times larger than the estimates from the DID estimation. When the estimation is performed on subsamples of the data that tend to have a higher percentage of unauthorized immigrants, such as low-income and low-education subsamples (Passel and Cohn, 2009), the DID estimates are larger. However, these larger estimates may also be because unauthorized immigrants in these subsamples benefit more from obtaining DACA. Similarly, sampling error that incorrectly specifies the DACA-eligible variable would also bias the estimates toward zero. The DID estimates will provide a lower bound for the intent-to-treat effects of DACA. In addition, because only 67% of DACA-eligible individuals obtained approval, the treatment on the treated effects could potentially be as much as 1.5 times larger than the intent-to-treat effects. However, any treatment on the treated effect derived from the DID estimates could be biased by selection into who applies for DACA.

The main analysis for this paper simultaneously uses a DID approach along with some regression discontinuity design elements. I will use the DID approach on samples with individuals just above and below different DACA qualification criteria. The main model is as follows:

$$Y_{it} = \beta_0 + \beta_1 Eligible_{it} * After_{it} + \beta_2 Eligible_{it} + \beta_3 After_{it} + \beta_4 X_{it} + \beta_5 W_{it} + \theta_t + \gamma_s + \gamma_s t + \varepsilon_{it} \qquad (1)$$



**Fig. 2.** Difference in working by DACA eligibility. Note: Each figure shows the mean difference of the given variable between DACA-eligible and DACA-ineligible individuals for each year from 2005 to 2014. The sample is the same as Panel C of Table 2 and includes all non-citizens with at least a high school degree and who are between the ages of 18 and 35. DID estimates without controls that account for pre-trends are shown in the box. The shaded area between 2012 and 2013 represents when DACA became available.

104                                                   *N. Pope / Journal of Public Economics 143 (2016) 98–114*



**Fig. 3.** Difference in employment status by DACA eligibility. Note: Each figure shows the mean difference of the given variable between DACA-eligible and DACA-ineligible individuals for each year from 2005 to 2014. The sample is the same as Panel C of Table 2 and includes all non-citizens with at least a high school degree and who are between the ages of 18 and 35. DID estimates without controls that account for pre-trends are shown in the box. The shaded area between 2012 and 2013 represents when DACA became available.

where $Y_{it}$ is the outcome variable of interest (e.g., working, unemployed, in school, etc.) for individual $i$ in year $t$. The variable $Eligible_{it}$ is a binary variable equal to one if individual $i$ is eligible for DACA, and zero if ineligible. The creation of this variable was described in the Data section. The variable $After_{it}$ is a binary variable equal to one if it is after DACA became available, and equal to zero if before. Since the ACS only reports the year in which the interview is performed, I use the cutoff between 2012 and 2013 as the threshold for when DACA became available. Therefore, $After_{it}$ is equal to one if the year is 2013 or 2014 and zero if the year is from 2005 to 2012. The parameter of interest, $\beta_1$, is the coefficient on the interaction term between $Eligible_{it}$ and $After_{it}$. The vector $X_{it}$ contains demographic controls including years of education, sex, race, ethnicity, marital status, and state-level unemployment rates. The vector $W_{it}$ non-parametrically controls for the eligibility criteria by including fixed effects for individual $i$'s age and age when arrived in the United States. The vectors $\theta_t$ and $\gamma_s$ allow for time and state fixed effects, respectively. Lastly, $\gamma_s t$ allows for state-specific time trends. When estimating Eq. (1), standard errors are clustered at the state-year level.

I estimate this DID model on four different samples. The first sample includes all non-citizens ages 18–30 with at least a high school degree who entered the United States between the ages of 12 and 19. The cutoff for DACA eligibility was entering the United States before the age of 16. This sample allows a DID estimate to be obtained for individuals near the DACA age cutoff for entering the United States (four years above and below the cutoff) and therefore uses the variation in eligibility due to when an individual entered the United States. The second sample includes all non-citizens ages 27–34 with

at least a high school degree who entered the United States before the age of 16. Because the cutoff for DACA eligibility was being under the age of 31, this sample captures the variation in eligibility due to the age criterion. Third, the DID model is estimated without any regression discontinuity element. This last sample includes all non-citizens ages 18–35 with at least a high school degree and therefore uses all sources of variation in DACA eligibility. This sample is more akin to a typical DID estimation that relies heavily on the pre-trends of the two groups being similar, although the two groups may not be similar. The last sample the DID model is estimated on includes all citizens and non-citizens ages 18–35 with at least a high school degree.

The parameter of interest in all specifications is the coefficient on the interaction term between $Eligible_{it}$ and $After_{it}$. This coefficient estimates the change in the outcome variable for individuals eligible for DACA after DACA became available compared to those ineligible for DACA. The main assumption that must hold in order for the estimates to be unbiased is that the DACA-eligible and -ineligible groups have parallel trends, and the parallel trends would have continued in the absence of DACA. To support the assumption of parallel trends, I test for pre-existing trends. In addition to the test for pre-existing trends, the trends can be seen in Figs. 2 through 5. Lastly, using the two samples of individuals just above and below the DACA criteria cutoffs, near the age of 30 and near the age of 16 when entering the United States, increases the likelihood that the eligible and ineligible groups are similar and have parallel trends.

One potential concern for the interpretation of the DID estimates is that some unauthorized immigrants may not have the required

N. Pope / Journal of Public Economics 143 (2016) 98–114                                                                                   105



**Fig. 4.** Difference in income by DACA eligibility. Note: Each figure shows the mean difference of the given variable between DACA-eligible and DACA-ineligible individuals for each year from 2005 to 2014. The sample is the same as Panel C of Table 2 and includes all non-citizens with at least a high school degree and who are between the ages of 18 and 35. The first figure includes all individuals in the sample. The second figure restricts the sample to individuals with income below the 90th percentile. The third figure uses the log of income plus one as the outcome variable instead of linear income. DID estimates without controls that account for pre-trends are shown in the box. The shaded area between 2012 and 2013 represents when DACA became available.

money or may worry that obtaining DACA will increase the future likelihood of being deported, and therefore unauthorized immigrants who obtain DACA may be a specifically selected type of unauthorized immigrant. Because a large portion (67%) of DACA-eligible individuals applied and obtained DACA, this concern is somewhat limited; however, the two thirds who obtain DACA may still be substantially different from the one third who did not. This concern will not affect

the main policy implications of the results, because this concern does not affect the DID estimates. The DID estimates will still estimate the effect of how DACA affected DACA-eligible unauthorized immigrants regardless of whether they obtained DACA, and still be a lower bound on the intent-to-treat effect. However, this concern could potentially bias any treatment on the treated effects derived from these DID estimates. If a program with permanent deportation relief and



**Fig. 5.** Difference in education outcomes by DACA eligibility. Note: Each figure shows the mean difference of the given variable between DACA-eligible and DACA-ineligible individuals for each year from 2005 to 2014. The sample is the same as Panel C of Table 2 and includes all non-citizens with at least a high school degree and who are between the ages of 18 and 35. DID estimates without controls that account for pre-trends are shown in the box. The shaded area between 2012 and 2013 represents when DACA became available.

002038



**Fig. 6.** Fraction of GED tests administered in Spanish and to Hispanics. Note: The first graph shows the fraction of GED tests administered in Spanish for each year. The second graph shows the fraction of GED tests administered to Hispanics for each year.

work authorization were implemented such that immigrants were not concerned about future deportation and a higher percentage of eligible unauthorized immigrants who applied for and obtained deportation relief, then the treatment on the treated effects from such a program may be larger or smaller.

## 6. Results

### 6.1. Graphical results

In this section, I compare the outcome means of individuals eligible for DACA with those ineligible both before and after DACA became available. Each point in Figs. 2 through 5 shows the difference in the mean for individuals eligible for DACA and those ineligible. The simple DID estimates without controls that account for differential pre-trends are reported in each graph. The sample includes all non-citizens ages 18–35 with at least a high school degree (for alternative samples, see Figs. A.1–A.12). Because DACA became available at the end of 2012, its effects should be observed in the years 2013 and 2014. The effects are likely to be larger in 2014 than 2013 because a large portion of individuals would not have received approval before being surveyed in 2013.

The first graph in Fig. 2 shows the difference in means for the fraction of individuals working. This graphs shows similar pre-trends from 2005 to 2012, with the difference in means remaining relatively stable. However, once DACA became available, this difference increased by 6.3 percentage points from 2012 to 2014. The results for the fraction who worked in the past 12 months and the usual number of hours worked per week are similar and show substantial increases in employment for those eligible for DACA compared to those ineligible once DACA became available.

This effect of DACA on employment can come from either changes in labor force participation or unemployment. The results for the fraction in the labor force in Fig. 3 are similar to the results from the fraction working with staple pre-trends followed by increases in labor force participation in 2013 and 2014. The pre-trends in being unemployed are less similar, but there are still significant drops in the difference in unemployment in 2013 and 2014, respectively. The fraction of individuals self-employed shows little evidence that DACA had an impact on the likelihood of being self-employed.

The first graph in Fig. 4 shows the difference in income between DACA-eligible and -ineligible individuals. A strong differential pre-trend in income appears for the two groups prior to the availability of DACA. The difference in the mean income declines from 2005 to

2013, followed by a small uptick in 2014 that is not statistically significant. Part of this slow response for income may occur because the ACS measures income by asking individuals their income over the past 12 months. Because DACA recipients in 2013 could only have had their DACA approval for at most a year (and likely much less) and because many DACA recipients in 2013 would have been interviewed before obtaining DACA approval, this income measure may underestimate the effect of DACA on income. However, the strong differential pre-trends appear to be driven by the top 10% of the income distribution. The second graph restricts the sample to the bottom 90% of the income distribution, and the pre-trends for the two groups are much more stable. For the bottom 90% in the income distribution, there is a 1,364 dollar increase in income for DACA-eligible individuals compared to those ineligible between 2012 and 2014. Also, although an imperfect measure, the third graph shows the difference in the log of income plus one and finds large increases in log income once DACA became available.

In Fig. 5, the pre-trends for the fraction in school are different for the two groups. There is also no clear change in the mean difference when DACA becomes available. The fraction with a GED shows the mean difference in the fraction of individuals with a GED. The ACS first started asking this question in 2008, so the graph only covers the years 2008–2014. There is no clear change in the mean difference in GED obtainment once DACA became available.

To better look at the effect of DACA on GED attainment, I also use annual data from the GED Testing Service[9] on the fraction of GED tests that were taken in Spanish and by Hispanics each year (Fig. 6). Data for the GED end in 2013 because the 2002 Series GED Test expired at the end of 2013. From 2004 to 2011, the fraction of GED tests administered in Spanish ranged from 3.8% to 4.4%. However, from 2011 to 2013, the fraction of GED tests administered in Spanish increased 2.1 percentage points. The results imply that over 13,000 more individuals took the GED test in Spanish in 2013 than in 2011. In Panel B, the fraction of GED tests that were administered to Hispanics from 2004 to 2011 monotonically increases from 18.1 to 20.4%. However, contrary to what would be predicted, there is a substantial drop in 2012 to 16.7%. Then, as predicted, there is a large increase in 2013 to 24.9%. The 4.5-percentage-point increase from 2011 to 2013 is the equivalent to an additional 27,000 Hispanics taking the GED test in 2013 as compared to 2011. However, this result should be interpreted cautiously because of the dip that occurs in 2012 and the null effect in the ACS data.

⁹   http://www.gedtestingservice.com/educators/historical-testing-data

## 6.2. Difference-in-differences results

Moving from the simple approach to a more sophisticated approach, I estimate Eq. (1). I perform this estimation separately for the four different samples described in the Empirical method section. Table 2 reports the estimates from Eq. (1) for each of the four samples. Panel A of Table 2 reports the estimates from the sample that includes all non-citizens ages 18–30 with at least a high school degree who entered the United States at the ages of 12 and 19. This sample performs a DID estimation on individuals near the DACA-criteria cutoff for the age at which individuals entered the United States. The column headers indicate the outcome variables of interest that were described in the Data section. The first row reports the coefficient on the interaction term between $Eligible_{it}$ and $After_{it}$. The second row reports the coefficient on $Eligible_{it}$.

Column 1 indicates that non-citizens eligible for DACA are 4.8 percentage points more likely to be working than non-citizens ineligible for DACA after DACA became available. In other words, DACA increases the likelihood of working by 4.8 percentage points for non-citizens who meet the DACA requirements. With a base of 65% of DACA-eligible individuals working, the estimate implies DACA increases the likelihood of a DACA-eligible individual working by 7.3%. Both of these estimates are lower bounds on the intent-to-treat effect. Because approximately 40% of the non-citizen sample are authorized immigrants, the intent-to-treat effects are likely 1.6 times larger than DID estimates. Therefore the intent-to-treat effect of DACA on the likelihood of working could be as large as 7.7 percentage points, or 11.7%.

The increase in the likelihood of working can come from two different sources. The first source is individuals entering the labor force. The second is individuals moving from unemployment to employment. Columns 2 and 3 look at these two different sources separately. Column 2 shows DACA increases the likelihood of a DACA-eligible individual being in the labor force by 3.7 percentage points. Column 3 shows that for DACA-eligible individuals, DACA decreases the likelihood of being unemployed by 1.9 percentage points. From these estimates, DACA appears to move eligible individuals into the labor force and move them from unemployment to employment.

Column 4 shows that although DACA increases the likelihood of working, there is little evidence that it had an effect on DACA-eligible individuals' income for the sample as a whole. However, as was seen in Fig. 4, DACA appears to have an effect on income for individuals in the bottom of the income distribution or when less weight is placed on the upper tail of the income distribution. As such, I estimate the DID estimates using quantile regressions over the income distribution. Fig. 7 shows the results of this quantile regression for both income and the log of income plus one. Because just over 25% of individuals have zero income, estimates are not available for the lower quarter of the income distribution. As can be seen, DACA appears to have increased the income of those between the 30th and 60th percentile by 400–800 dollars or about 5–20%. DACA appears to have had little effect on those in the top of income distribution.

Columns 5 and 6 use two different measures for working. Column 5 indicates DACA-eligible individuals work 1.7 hours more per week than DACA-ineligible individuals after DACA became available. This increase can also be thought of as one additional full-time job per 23 DACA-eligible individuals. Column 6 indicates that DACA-eligible individuals are 3.9 percentage points more likely to have worked in the past 12 months. Column 7 tests whether DACA approval moves individuals from self-employment to the formal labor market. I find no statistically significant affect of DACA on self-employment.

Columns 8 and 9 look at academic attainment. Column 8 finds DACA decreases the likelihood of attending school for DACA-eligible individuals by 2.1 percentage points. This effect is statistically significant; however, the effect is likely biased due to the differential pre-trends in schooling between the DACA-eligible and -ineligible groups that can be seen in Fig. 2. Once I test for pre-trends in Table 3, the effect on schooling is indistinguishable from zero. Column 9 looks at the effect of DACA on the likelihood of having attained a GED certificate. DACA does not appear to have an effect on the number of individuals that have attained their GED.

Panels B, C, and D of Table 2 show analogous results for three additional samples. Panel B shows the results for non-citizens with at least a high school degree who are ages 27–34 and entered the United States before the age of 16. This sample includes individuals who are just above and below the age cutoff for DACA eligibility (must be under 31) but meet all other DACA eligibility requirements. The results for the individuals near the age cutoff are quite similar to the results found in Panel A. The notable difference in Panel B is that there is no statistically significant effect on schooling. Panel C includes all non-citizens with at least a high school degree who are ages 18–35. Instead of using variation in DACA eligibility that comes from being just above or below a DACA criteria cutoff along with the DID methodology as does Panels A and B, this sample only uses the DID methodology. Panel D includes all citizens and non-citizens with at least a high school degree. The results from this sample are qualitatively the same; however, the estimates tend to be smaller. These smaller estimates are likely due to the stronger differential pre-trends for this sample. Once these differential pre-trends are accounted for, the estimates for this sample are similar in magnitude to those of the first three samples (see Table A.6).

## 6.3. Potential concerns

A major concern about the empirical method used is the possibility of differential trends in the outcome variables for DACA-eligible and -ineligible individuals. Fig. 2 looks at this assumption graphically, but further analysis is performed in Table 3. Table 3 estimates Eq. (1) with the variable $Eligible_{it}$ interacted with a binary variable for each year. The interaction with the 2012 binary variable is the omitted interaction. If differential trends are a problem, the coefficients on the interaction terms leading up to 2013 and 2014 should be statistically significant and in the same direction as the coefficients on the 2013 and 2014 interaction terms. When testing for pre-trends, statistically significant effects remain for working, labor force, unemployment, hours worked per week, and worked in the past year. These point estimates vary in magnitude compared to the estimates in Table 2 but tend to be qualitatively similar. School attendance is no longer affected, likely due to the clear pre-trends for school attendance. However, there does not appear to be clear pre-trends for the other outcomes. Analogous to Table 3, Tables A.4, A.5, and A.6 show the pre-trends results for the samples in Panels B, C, and D of Table 2, respectively. Because 2012 was an election year in which immigration policy was a major topic of conversation, unauthorized immigrants may have been concerned about possible future immigration policies and therefore underinvested in work and education in 2012. If this were true, then the effects could be biased when they are compared to the omitted 2012 interaction. Tables A.18–A.21 show the pre-trends when the 2011 interaction is the omitted interaction. The effects are very similar regardless of which year is used as the omitted interaction.

Another potential concern for the identification strategy is the possibility that individuals change how they respond to the ACS after they receive DACA. Unauthorized immigrants may be more willing to answer (or truthfully answer) the citizenship question once they have obtained DACA. Also, because working without proper documentation is illegal, undocumented workers may be hesitant to respond to questions about employment. Once they receive legal status and work authorization through DACA, they may change their survey-response behavior and be more likely to respond to citizenship and employment questions. Thus, instead of DACA actually increasing recipients' likelihood of working, it may just increase

*N. Pope / Journal of Public Economics 143 (2016) 98–114*

002041

**Table 2**
The effect of DACA on labor market and education outcomes.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: entered US between ages 12 and 19* | | | | | | | | | |
| Eligible*After | 0.048*** | 0.037*** | −0.019*** | −1 | 1.715** | 0.039*** | −0.005 | −0.021** | 0.001 |
| | [0.010] | [0.011] | [0.007] | [466] | [0.420] | [0.011] | [0.005] | [0.009] | [0.004] |
| Eligible | −0.027* | −0.042*** | −0.014 | −447 | −0.378 | −0.033** | 0.001 | −0.046*** | 0.007* |
| | [0.011] | [0.012] | [0.011] | [279] | [0.374] | [0.011] | [0.006] | [0.010] | [0.004] |
| Observations | 102,765 | 102,765 | 68,831 | 102,765 | 102,765 | 102,765 | 79,454 | 102,765 | 72,117 |
| R-squared | 0.145 | 0.150 | 0.032 | 0.199 | 0.224 | 0.137 | 0.017 | 0.413 | 0.042 |
| *Panel B: ages 27 to 34 in June 2012 and entered US before age 16* | | | | | | | | | |
| Eligible*After | 0.044*** | 0.028* | −0.022*** | 1,397 | 1.184** | 0.027** | 0.017* | 0.002 | 0.009 |
| | [0.013] | [0.012] | [0.008] | [904] | [0.486] | [0.011] | [0.010] | [0.010] | [0.010] |
| Eligible | 0.008 | 0.007 | −0.003 | 214 | 0.366 | 0.014 | −0.007 | −0.015 | 0.010 |
| | [0.018] | [0.016] | [0.011] | [1,047] | [0.620] | [0.015] | [0.012] | [0.010] | [0.011] |
| Observations | 33,236 | 33,236 | 26,796 | 33,236 | 33,236 | 33,236 | 29,819 | 33,236 | 23,939 |
| R-squared | 0.059 | 0.067 | 0.027 | 0.143 | 0.110 | 0.073 | 0.018 | 0.079 | 0.078 |
| *Panel C: all non-citizens ages 18 to 35 with at least a high school degree* | | | | | | | | | |
| Eligible*After | 0.037*** | 0.033*** | −0.010* | −1,045 | 0.931*** | 0.030*** | −0.002 | −0.005 | 0.003 |
| | [0.006] | [0.005] | [0.004] | [672] | [0.317] | [0.006] | [0.003] | [0.006] | [0.002] |
| Eligible | 0.069*** | 0.065*** | −0.013*** | 5,801*** | 2.414*** | 0.060*** | 0.006* | −0.028*** | −0.004 |
| | [0.006] | [0.005] | [0.004] | [437] | [0.228] | [0.005] | [0.004] | [0.005] | [0.003] |
| Observations | 438,710 | 438,710 | 308,368 | 438,710 | 438,710 | 438,710 | 355,205 | 438,710 | 306,442 |
| R-squared | 0.130 | 0.131 | 0.032 | 0.220 | 0.187 | 0.127 | 0.022 | 0.297 | 0.052 |
| *Panel D: all citizens and non-citizens ages 18 to 35 with at least a high school degree* | | | | | | | | | |
| Eligible*After | 0.021*** | 0.017*** | −0.009*** | −529 | 0.600** | 0.025*** | 0.002 | 0.017*** | 0.007*** |
| | [0.005] | [0.004] | [0.004] | [490] | [0.256] | [0.006] | [0.003] | [0.005] | [0.002] |
| Eligible | −0.006** | −0.012*** | −0.006** | 163 | −0.344** | −0.030*** | 0.013*** | −0.023*** | −0.022*** |
| | [0.003] | [0.003] | [0.002] | [159] | [0.110] | [0.003] | [0.002] | [0.002] | [0.001] |
| Observations | 5,636,126 | 5,636,126 | 4,411,763 | 5,636,126 | 5,636,126 | 5,636,126 | 5,111,496 | 5,636,126 | 4,048,401 |
| R-squared | 0.084 | 0.069 | 0.045 | 0.248 | 0.161 | 0.059 | 0.015 | 0.322 | 0.116 |

Note: Table 2 reports the estimates from Eq. (1) for four separate samples. All four samples are restricted to individuals with at least a high school degree. Panel A uses the sample of non-citizens who entered the United States between the ages of 12 and 19. Panel B uses the sample of non-citizens between the ages of 27 and 34 who arrived in the United States before the age of 16. Panel C uses the sample of non-citizens between the ages of 18 and 35. Panel D uses the sample of citizens and non-citizens between the ages of 18 and 35. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term. The second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.



**Fig. 7.** Effect of DACA on income by income quantile. Note: Each point represents the coefficient on the interaction term between DACA eligibility and the binary variable for after DACA became available when a quantile regression is estimated using the specification from Eq. (1). No estimates are available prior to the 0.30 quantile because 25 to 30% of individuals in the sample have an income of zero. The sample is the same as Panel A of Table 2. The outcome variable for the first graph is log(*Income* + 1). The outcome variable for the second graph is income.

recipients' likelihood of reporting on the ACS survey that they worked. Using the quality flags in the ACS, I am able to test if the availability of DACA changes the likelihood of DACA-eligible individuals responding to particular questions. To do so, I use the DID estimation shown in Eq. (1) with the outcome variable, $Y_{it}$, as an indicator variable equal to one if the survey question for the outcome variable of interest was not answered and the outcome variable of interest was imputed by the ACS. The indicator variable is equal to zero otherwise. Table 4 reports the coefficients on the interaction term and on the DACA-eligible variable for the estimation performed. If the availability of DACA increases the likelihood of DACA-eligible immigrants responding to an ACS survey question, the coefficient on the interaction term should be negative and statistically significant. As Table 4 shows, for all of the outcome survey question, the coefficient on the interaction term is close to zero and none are statistically significant. This finding would indicate that DACA-eligible immigrants did not change their survey response behavior very much after DACA became available and is likely not driving the positive

effects on employment. Analogous to Table 4, Tables A.8, A.9, and A.10 show the results for the samples in Panels B, C, and D of Table 2, respectively.

One potential concern is that although all unauthorized immigrants are equally likely to be sampled, unauthorized immigrants that complete the ACS may be different from those who do not complete the ACS, and DACA affects the type of unauthorized immigrants who complete the ACS differently than those who do not complete the ACS. Although the ACS does not ask about an individual's legal status, some unauthorized immigrants might be more wary of completing a government survey. Alternatively, because completing the ACS is required by law, some unauthorized immigrants may be more inclined to fill out the ACS. If the group that is more inclined to answer the survey is also affected differently by DACA, the generalizability of the results may be affected. This concern will not affect the internal validity of the results, but may limit how much the results can be generalized to the DACA-eligible population as a whole. This is a possible concern because from 2005 to 2014, 65.5–68.7% of the

**Table 3**
Pre-trends.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| Eligible*2014 | 0.056*** | 0.041*** | −0.021* | 281 | 2.378*** | 0.041*** | 0.005 | 0.005 | 0.006 |
| | [0.018] | [0.017] | [0.011] | [902] | [0.715] | [0.019] | [0.009] | [0.013] | [0.007] |
| Eligible*2013 | 0.033** | 0.002 | −0.040*** | −318 | 0.964 | 0.020 | −0.008 | 0.012 | 0.003 |
| | [0.016] | [0.018] | [0.012] | [838] | [0.757] | [0.017] | [0.009] | [0.015] | [0.006] |
| Eligible*2011 | −0.011 | −0.008 | 0.008 | −439 | −0.655 | −0.022 | 0.000 | 0.026*** | 0.001 |
| | [0.015] | [0.015] | [0.012] | [757] | [0.626] | [0.014] | [0.008] | [0.012] | [0.006] |
| Eligible*2010 | 0.002 | −0.011 | −0.014 | −49 | 0.333 | 0.003 | 0.004 | 0.029 | 0.001 |
| | [0.015] | [0.017] | [0.015] | [711] | [0.650] | [0.014] | [0.008] | [0.018] | [0.006] |
| Eligible*2009 | 0.011 | 0.005 | −0.006 | 478 | 0.949 | 0.006 | 0.012 | 0.024* | 0.010 |
| | [0.017] | [0.016] | [0.012] | [833] | [0.675] | [0.017] | [0.009] | [0.013] | [0.006] |
| Eligible*2008 | 0.014 | −0.014 | −0.030*** | 392 | 0.588 | 0.002 | 0.000 | 0.020 | 0.006 |
| | [0.013] | [0.013] | [0.011] | [793] | [0.633] | [0.014] | [0.008] | [0.014] | [0.007] |
| Eligible*2007 | −0.002 | −0.015 | −0.010 | −101 | −0.713 | −0.015 | −0.005 | 0.040*** | – |
| | [0.014] | [0.014] | [0.012] | [730] | [0.601] | [0.014] | [0.009] | [0.014] | |
| Eligible*2006 | −0.027 | −0.054*** | −0.022** | −981 | −0.744 | −0.032* | 0.005 | 0.051*** | – |
| | [0.016] | [0.016] | [0.010] | [805] | [0.671] | [0.016] | [0.008] | [0.012] | |
| Eligible*2005 | −0.015 | −0.035** | −0.016 | 675 | −0.077 | −0.006 | 0.011 | 0.043** | – |
| | [0.018] | [0.016] | [0.013] | [730] | [0.688] | [0.018] | [0.009] | [0.019] | |
| Observations | 102,765 | 102,765 | 68,831 | 102,765 | 102,765 | 102,765 | 79,454 | 102,765 | 72,117 |
| R-squared | 0.145 | 0.151 | 0.033 | 0.200 | 0.224 | 0.138 | 0.017 | 0.414 | 0.042 |

Note: Table 3 reports the estimates from Eq. (1) with *Eligible* interacted with each year. The 2012 interaction is the omitted interaction. The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. Each row reports the estimated coefficient on the given interaction term. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

N. Pope / Journal of Public Economics 143 (2016) 98–114

**Table 4**
The effect of DACA on survey-item response rates.

| Variables | Citizen | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|---|
| Eligible*After | −0.002 | −0.002 | 0.004 | −0.007 | 0.005 | 0.007 | −0.002 | 0.004 | 0.001 | 0.002 |
| | [0.005] | [0.006] | [0.006] | [0.006] | [0.009] | [0.006] | [0.005] | [0.005] | [0.005] | [0.008] |
| Eligible | 0.014** | 0.010* | 0.007 | 0.023*** | 0.006 | 0.005 | 0.010* | 0.009 | 0.002 | 0.002 |
| | [0.005] | [0.005] | [0.007] | [0.006] | [0.007] | [0.006] | [0.006] | [0.006] | [0.004] | [0.009] |
| Observations | 102,765 | 102,765 | 102,765 | 68,831 | 102,765 | 102,765 | 102,765 | 102,765 | 102,765 | 72,117 |
| R-squared | 0.014 | 0.018 | 0.012 | 0.017 | 0.013 | 0.013 | 0.016 | 0.010 | 0.013 | 0.039 |

Note: Table 4 reports the estimates from Eq. (1) with the outcome variable, $Y_{it}$, being an indicator variable equal to one if the survey question for the outcome variable of interest was not answered and the outcome variable of interest was imputed by the ACS. The indicator variable is equal to zero otherwise. The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term and the second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

addresses that were sent the ACS survey completed it. However, for the one third of the nonrespondents that were randomly assigned to be contacted in person, 96.7–98.0% completed the survey. Because nearly all households completed the ACS survey if selected to be contacted in person, little to no selectivity of individuals into this subsample will take place based on their willingness to fill out the ACS survey. I estimate the main results using this subsample and report the results in Table A.7. The results from this subsample, in which selection on the willingness to complete the ACS is minimal to nonexistent, are very similar to the main results. This finding implies that either no selection occurs in the willingness of unauthorized immigrants to complete the ACS, or DACA does not differentially affect this type of unauthorized immigrants. Either way, this finding suggests that the results from the ACS are likely generalizable to the population of DACA-eligible unauthorized immigrants as a whole.

An additional potential concern for the identification strategy is the possibility that individuals' likelihood of completing the ACS changes after they receive DACA. If unauthorized immigrants' willingness to complete the ACS changes once they received DACA, the composition of individuals in the DACA-eligible group might change and bias the results. Similar to the previous concern, the results from Table A.7 show that when the sample is restricted to a subsample for which the survey-completion rate is over 95% and therefore there is little room for a compositional change to those included in the DACA-eligible group, the estimates for the effect of DACA are very similar. This finding implies that little change occurs in the composition of the DACA-eligible group and little to no bias to the results. In addition, I test whether the observable characteristics for the DACA-eligible group change once DACA became available in 2013. Due to strong pre-trends in observable characteristics, I use the same specification as the pre-trend tables without controls to test whether 15 different observable characteristics changed between 2012 and 2013. Table A.11 reports the coefficient on the interaction term between 2013 and being DACA eligible, with the 2012 interaction omitted. Of the 60 different coefficients estimated for the 15 observable characteristics and the 4 different samples, only 7 of the 60 coefficients are significant at the 90% confidence level. This test indicates that there is little evidence of a change in the observable characteristics of the DACA-eligible group after DACA became available. This test implies that receiving DACA did not change individuals' willingness to complete the ACS or the composition of the DACA-eligible group. Therefore, this concern would likely have little to no effect on the results.

Lastly, a potential concern is that DACA recipients are switching from informal to formal jobs and the estimates are measuring this switching and not actual labor market effects. One benefit of the ACS data is that the main question used to determine whether someone is

working includes work that was formal or informal. The wording of the question is as follows: "LAST WEEK, did this person do ANY work for pay." This wording allows both formal and informal work to be included, and therefore the effects of DACA can be seen on all types of work. The questions about whether an individual worked last year and the hours worked per week also ask about all work, whether formal or informal. In addition, the ACS also determines whether a person is self-employed. This question allows me to look at the effect of DACA on any potential movement from self-employment (more likely an informal job) to working for someone else (more likely a formal job). The results show little evidence of an effect on changes in self-employment. The ACS also asks for the occupation of individuals who have worked in the past five years. Using this variable, I estimate the main results for more formal occupations (e.g., teacher, software developer, retail clerk, etc.) and more informal occupations (e.g., cook, waitress, landscaper, child care worker, etc.). Due to the omission of individuals who may start working for the first time in five years because of obtaining work authorization through DACA, the estimates from this heterogeneity test will likely be biased. However, if the estimates for individuals with a formal occupation are similar to those with an informal occupation, individuals just switching from informal to formal jobs are unlikely to be driving the main estimates. Tables A.22–A.25 report this heterogeneity test for each of the samples. The results show little evidence of a difference between the estimates for formal and informal occupations. The results of this test imply that the main results are likely not being driven by individuals just switching from informal to formal jobs.

### 6.4. Subsample and robustness results

Tables 5–8 use the sample and specification from Panel A of Table 2 to look at how the results differ for different subsamples of income, ethnicity, gender, and education. These results look to see if particular subsamples are more or less affected by DACA, and look at how sensitive the results are to the exclusion of particular groups of individuals. Tables A.12, A.13, and A.14 show the subsample results for the samples in Panels B, C, and D of Table 2, respectively.

Table 5 shows the results for individuals below the median income, above the median income, and below the 90th percentile of the sample. Two notable differences exist between the subsamples. First, for individuals below the median and below the 90th percentile, the beneficial effects of DACA are larger. The main effects on working, labor force participation, and unemployment are about twice as large as those for the above-the-median-income subsample. Second, for individuals below the median income, DACA increased the income of DACA-eligible individuals by a statistically significant 339 dollars.

**Table 5**
The effect of DACA by income level.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: below median income* | | | | | | | | | |
| Eligible*After | 0.063*** | 0.050*** | −0.049** | 339*** | 1.891*** | 0.049*** | −0.022** | −0.036*** | 0.000 |
| | [0.015] | [0.017] | [0.020] | [111] | [0.471] | [0.017] | [0.009] | [0.013] | [0.005] |
| Eligible | −0.024* | −0.031*** | 0.001 | −275*** | −0.190 | −0.036*** | 0.006 | −0.067*** | 0.010** |
| | [0.013] | [0.014] | [0.019] | [76] | [0.403] | [0.014] | [0.009] | [0.012] | [0.004] |
| Observations | 54,417 | 54,417 | 23,315 | 54,417 | 54,417 | 54,417 | 31,892 | 54,417 | 39,413 |
| R-squared | 0.044 | 0.061 | 0.035 | 0.077 | 0.079 | 0.058 | 0.035 | 0.468 | 0.047 |
| *Panel B: above median income* | | | | | | | | | |
| Eligible*After | 0.024*** | 0.017** | −0.008 | −1,086 | 1.065** | 0.020*** | 0.004 | −0.005 | 0.002 |
| | [0.009] | [0.007] | [0.005] | [850] | [0.471] | [0.007] | [0.007] | [0.010] | [0.005] |
| Eligible | −0.055*** | −0.076*** | −0.018* | −784 | −2.006*** | −0.054*** | −0.005 | 0.006 | 0.002 |
| | [0.016] | [0.013] | [0.011] | [654] | [0.581] | [0.012] | [0.009] | [0.016] | [0.014] |
| Observations | 48,348 | 48,348 | 45,516 | 48,348 | 48,348 | 48,348 | 47,562 | 48,348 | 32,704 |
| R-squared | 0.041 | 0.060 | 0.010 | 0.160 | 0.093 | 0.074 | 0.018 | 0.233 | 0.043 |
| *Panel C: below 90th percentile income* | | | | | | | | | |
| Eligible*After | 0.050*** | 0.038*** | −0.021*** | 343 | 1.777*** | 0.041*** | −0.006 | −0.025*** | −0.001 |
| | [0.011] | [0.011] | [0.007] | [260] | [0.426] | [0.012] | [0.005] | [0.010] | [0.004] |
| Eligible | −0.024** | −0.039*** | −0.015 | 84 | −0.266 | −0.031*** | 0.001 | −0.050*** | 0.008** |
| | [0.011] | [0.012] | [0.011] | [185] | [0.371] | [0.011] | [0.006] | [0.010] | [0.004] |
| Observations | 96,111 | 96,111 | 62,453 | 96,111 | 96,111 | 96,111 | 72,898 | 96,111 | 67,419 |
| R-squared | 0.137 | 0.145 | 0.031 | 0.235 | 0.214 | 0.131 | 0.016 | 0.248 | 0.041 |

Note: Table 5 reports the estimates from Eq. (1) for individuals below the median income level (Panel A), above the median income level (Panel B), and below the 90th percentile in income (Panel C). The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term and the second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

Table 6 shows the results for the subsample of individuals who identify as Hispanic and for the subsample of Mexicans. The results are fairly similar in both magnitude and sign to the main results in Table 2. This similarity is important, because approximately 78% of DACA recipients were Mexican. They indicate a positive effect of DACA on working, labor force, hours worked per week, and worked in the last year for both Hispanics and Mexicans. The results also show a negative effect on unemployment.

Table 7 shows the results separately by gender. I find no statistically significant differences in the coefficients between men and women. The coefficients are both of similar magnitude and sign to the main results in Table 2. Table 8 shows the results separately by education level. The results in Panel A are for individuals with a high school degree or some college, and are similar to the main results

found in Table 2. The results in Panel B are for individuals with a college degree or more, and are similar in sign yet smaller in magnitude. Due to a much smaller sample size and much larger standard errors, these results are at most marginally significant.

In addition to the sensitivity analysis performed by looking at different subsamples, Table 9 looks at the robustness of the results to different choices of specification. Each row represents a different specification or sample and each cell in the row is the coefficient on the interaction term along with its standard error. Panel A of Table 9 estimates Eq. (1) with varying levels of controls. Row 1 contains no controls and only includes an indicator for DACA eligibility, an indicator for if the year is after DACA was available, and the interaction of the two. For most of the estimates, the magnitudes are approximately 50% larger than the baseline results from Table 2. However, for schooling, the magnitude is four times larger. Row

**Table 6**
The effect of DACA by ethnicity.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: Hispanic* | | | | | | | | | |
| Eligible*After | 0.044*** | 0.032*** | −0.020** | 82 | 1.939*** | 0.039*** | −0.008 | −0.023** | −0.002 |
| | [0.012] | [0.010] | [0.009] | [528] | [0.455] | [0.010] | [0.007] | [0.009] | [0.005] |
| Eligible | −0.010 | −0.015 | −0.005 | −109 | −0.113 | −0.020 | 0.002 | −0.062*** | 0.006 |
| | [0.017] | [0.016] | [0.015] | [326] | [0.550] | [0.015] | [0.008] | [0.015] | [0.007] |
| Observations | 52,285 | 52,285 | 39,065 | 52,285 | 52,285 | 52,285 | 43,294 | 52,285 | 35,296 |
| R-squared | 0.145 | 0.149 | 0.030 | 0.190 | 0.209 | 0.158 | 0.014 | 0.271 | 0.033 |
| *Panel B: Mexican* | | | | | | | | | |
| Eligible*After | 0.046*** | 0.040*** | −0.012 | 0 | 1.785*** | 0.041*** | −0.016* | −0.022* | −0.001 |
| | [0.014] | [0.012] | [0.009] | [501] | [0.588] | [0.012] | [0.009] | [0.013] | [0.007] |
| Eligible | 0.011 | 0.010 | −0.005 | −162 | 0.676 | −0.002 | 0.001 | −0.065*** | 0.007 |
| | [0.021] | [0.018] | [0.018] | [476] | [0.745] | [0.019] | [0.010] | [0.018] | [0.010] |
| Observations | 34,072 | 34,072 | 25,374 | 34,072 | 34,072 | 34,072 | 28,174 | 34,072 | 22,375 |
| R-squared | 0.187 | 0.198 | 0.033 | 0.206 | 0.250 | 0.208 | 0.014 | 0.215 | 0.033 |

Note: Table 6 reports the estimates from Eq. (1) for Hispanics (Panel A) and Mexicans (Panel B). The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term and the second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

002044

**Table 7**
The effect of DACA by gender.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: women* | | | | | | | | | |
| Eligible*After | 0.041*** | 0.037*** | −0.013 | 198 | 1.487*** | 0.038*** | −0.003 | −0.012 | 0.000 |
| | [0.013] | [0.013] | [0.012] | [504] | [0.429] | [0.012] | [0.007] | [0.015] | [0.005] |
| Eligible | −0.011 | −0.034** | −0.028 | −47 | 0.715 | −0.014 | −0.001 | −0.041*** | 0.008 |
| | [0.016] | [0.017] | [0.017] | [345] | [0.470] | [0.016] | [0.010] | [0.015] | [0.005] |
| Observations | 48,153 | 48,153 | 28,107 | 48,153 | 48,153 | 48,153 | 34,302 | 48,153 | 33,831 |
| R-squared | 0.087 | 0.090 | 0.031 | 0.182 | 0.119 | 0.085 | 0.020 | 0.405 | 0.045 |
| *Panel B: men* | | | | | | | | | |
| Eligible*After | 0.049*** | 0.034** | −0.022*** | −299 | 1.716*** | 0.035** | −0.006 | −0.028*** | 0.001 |
| | [0.014] | [0.014] | [0.008] | [737] | [0.634] | [0.015] | [0.006] | [0.010] | [0.005] |
| Eligible | −0.040*** | −0.049*** | −0.004 | −756* | −1.260*** | −0.049*** | 0.003 | −0.052*** | 0.008 |
| | [0.013] | [0.014] | [0.014] | [416] | [0.486] | [0.013] | [0.007] | [0.013] | [0.007] |
| Observations | 54,612 | 54,612 | 40,724 | 54,612 | 54,612 | 54,612 | 45,152 | 54,612 | 38,286 |
| R-squared | 0.207 | 0.222 | 0.040 | 0.194 | 0.283 | 0.205 | 0.019 | 0.421 | 0.044 |

Note: Table 7 reports the estimates from Eq. (1) for women (Panel A) and men (Panel B). The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term and the second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

2 adds demographic controls including education level, sex, race, ethnicity, marital status, state level unemployment rates, and fixed effects for individuals' age and age entered the United States. Once these controls are included, the estimates are extremely similar to the baseline estimates. Row 3 includes year and state fixed effects, and little change occurs in the estimates. Row 4 includes state time trends and are the same as the baseline estimates found in Panel A of Table 2.

Panel B shows the estimates for different sample choices. Row 1 restricts the sample to those individuals who are only two years above or below the age cutoff for entering the United States, instead of the four years used in the baseline estimation. The magnitude of these results are approximately 20% larger than the baseline results. The sample for row 2 includes those who are six years above or below the cutoff, and finds similar to slightly smaller results than the baseline results. Row 3 includes all education levels instead of only a high school degree or more. With this sample, many of the individuals (35%) will have less than a high school degree, causing them to be ineligible for DACA and therefore biasing the estimates toward zero. Rows 4 and 5 are for the subsample of individuals who are married and single. DACA appears to have a larger effect on single than married individuals; however, most of these differences are not statistically significant.

## 7. Policy implications

The results help inform two main policy questions. First, how did the implementation of DACA affect its target population and what might happen if DACA were rescinded? Second, what do the results imply for potential future immigration policies such as a temporary or permanent amnesty program or Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). Answering these two questions looks at the efficacy of current immigration policy and informs the debate on future immigration policy.

The results speak directly to how the implementation of DACA affected its target population – young unauthorized immigrants. The DID results are a lower bound of the intent-to-treat estimates so can be interpreted as a lower bound on the average effect of DACA on the DACA-eligible population. The results indicate that the implementation of DACA has increased the target population's likelihood of working by approximately 4 percentage points. This increase comes from an increase in labor force participation and a decrease in the unemployment rate of the target population. DACA has increased the income of those in the bottom of the income distribution. These effects imply that in its first two years, DACA moved 50,000–75,000 unauthorized immigrants into employment. Also, note that over two-thirds of DACA-eligible individuals had applied for DACA as

**Table 8**
The effect of DACA by education level.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: less educated (high school degree or some college)* | | | | | | | | | |
| Eligible*After | 0.050*** | 0.039*** | −0.020*** | 341 | 2.039*** | 0.045*** | −0.005 | – | – |
| | [0.011] | [0.011] | [0.007] | [386] | [0.435] | [0.012] | [0.005] | | |
| Eligible | −0.024** | −0.041*** | −0.016 | −130 | −0.270 | −0.031*** | 0.001 | – | – |
| | [0.012] | [0.012] | [0.011] | [260] | [0.378] | [0.011] | [0.006] | | |
| Observations | 89,308 | 89,308 | 58,314 | 89,308 | 89,308 | 89,308 | 67,549 | | |
| R-squared | 0.151 | 0.159 | 0.033 | 0.178 | 0.236 | 0.144 | 0.017 | | |
| *Panel B: highly educated (college degree or more)* | | | | | | | | | |
| Eligible*After | 0.032 | 0.025 | −0.010 | −3,024* | −0.643 | −0.003 | −0.003 | – | – |
| | [0.023] | [0.021] | [0.015] | [1,818] | [0.972] | [0.019] | [0.013] | | |
| Eligible | 0.013 | 0.055 | 0.063 | 1,052 | 1.702 | 0.016 | −0.018 | – | – |
| | [0.082] | [0.076] | [0.063] | [2,917] | [2.604] | [0.077] | [0.040] | | |
| Observations | 13,457 | 13,457 | 10,517 | 13,457 | 13,457 | 13,457 | 11,905 | | |
| R-squared | 0.084 | 0.079 | 0.036 | 0.148 | 0.117 | 0.072 | 0.028 | | |

Note: Table 8 reports the estimates from Eq. (1) for individuals with a high school degree or some college (Panel A) and for college graduates (Panel B). The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. The first row of each panel reports the estimated coefficient on the interaction term and the second row reports the estimated coefficient on the DACA-eligibility variable. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

002045

**Table 9**
Robustness checks.

| Variables | Working | Labor force | Unemployed | Income | Hours per week | Worked in past year | Self-employed | School | GED |
|---|---|---|---|---|---|---|---|---|---|
| *Panel A: different sets of control variables* | | | | | | | | | |
| No controls | 0.083*** | 0.072*** | −0.025*** | 781 | 3.411*** | 0.068*** | −0.002 | −0.092*** | 0.005 |
| | [0.012] | [0.013] | [0.007] | [515] | [0.535] | [0.013] | [0.005] | [0.015] | [0.004] |
| Demographic controls | 0.050*** | 0.039*** | −0.020*** | −43 | 1.774*** | 0.040*** | −0.005 | −0.021** | 0.001 |
| | [0.010] | [0.011] | [0.007] | [472] | [0.420] | [0.011] | [0.005] | [0.010] | [0.004] |
| Year and state FE | 0.049*** | 0.038*** | −0.020*** | −28 | 1.739*** | 0.040*** | −0.004 | −0.021** | 0.001 |
| | [0.010] | [0.010] | [0.007] | [469] | [0.416] | [0.011] | [0.005] | [0.009] | [0.004] |
| State time trends (baseline) | 0.048*** | 0.037*** | −0.019*** | −1 | 1.715*** | 0.039*** | −0.005 | −0.021** | 0.001 |
| | [0.010] | [0.011] | [0.007] | [466] | [0.420] | [0.011] | [0.005] | [0.009] | [0.004] |
| | | | | | | | | | |
| *Panel B: different samples* | | | | | | | | | |
| Enter US age: 14 to 17 | 0.059*** | 0.041*** | −0.031*** | 843 | 2.287*** | 0.050*** | −0.003 | −0.014 | 0.002 |
| | [0.015] | [0.015] | [0.010] | [629] | [0.596] | [0.015] | [0.007] | [0.011] | [0.005] |
| Enter US age: 10 to 21 | 0.041*** | 0.036*** | −0.011** | −111 | 1.403*** | 0.035*** | −0.005 | −0.019** | 0.004 |
| | [0.009] | [0.009] | [0.005] | [439] | [0.350] | [0.008] | [0.004] | [0.008] | [0.003] |
| All education levels | 0.039*** | 0.036*** | −0.008 | 125 | 1.415*** | 0.034*** | −0.009 | −0.016* | 0.003 |
| | [0.009] | [0.008] | [0.006] | [367] | [0.350] | [0.009] | [0.005] | [0.009] | [0.003] |
| Married | 0.034* | 0.006 | −0.036*** | 862 | 1.188 | 0.020 | −0.004 | −0.008 | 0.000 |
| | [0.020] | [0.019] | [0.012] | [1,014] | [0.765] | [0.019] | [0.012] | [0.014] | [0.008] |
| Single | 0.049*** | 0.044*** | −0.013 | −322 | 1.771*** | 0.042*** | −0.005 | −0.023** | 0.000 |
| | [0.011] | [0.011] | [0.008] | [453] | [0.440] | [0.011] | [0.005] | [0.011] | [0.003] |

Note: Table 9 reports the estimates from Eq. (1) with varying levels of controls (Panel A) and for different samples (Panel B). The estimation uses the sample from Panel A of Table 2. Each column indicates the outcome variable of interest. Each row reports the estimated coefficient on the interaction term. Standard errors are clustered at the state-year level. *** Significant at the 1% level. ** Significant at the 5% level. * Significant at the 10% level.

of 2014, which implies these applicants anticipated the benefits of DACA approval to be greater than the time costs of applying and the 465 dollar fee. Because DACA was done through prosecutorial discretion, it is more susceptible to being rescinded than a law. The results of this paper predict that the elimination of DACA would have similar effect sizes, but in the opposite direction.

Note that the estimates from the DID analysis are partial equilibrium effects. Therefore, DACA creates potential general equilibrium effects arising from the increase in the supply of workers. The results suggest DACA moved approximately 50,000–75,000 unauthorized immigrants into employment in 2013 and 2014. This increase in the supply of workers only accounts for 0.94–1.41% of the 5.33 million individuals who gained employment in 2013 and 2014 (Bureau of Labor Statistics). This finding suggests that the general equilibrium effects of DACA on wages is likely to be small. However, the general equilibrium effects may be more problematic for a future immigration policy that targets a larger population. Also, as discussed in the conceptual framework section, due to breaking large labor market frictions for unauthorized immigrants and the minimal general equilibrium effect on wages, the overall welfare effect of DACA is likely not just a pure transfer to DACA-eligible individuals, but would likely enhance efficiency, although it would not be Pareto efficient.

The results also help inform future immigration policy. Approximately 11.4 million unauthorized immigrants live in the United States (Baker and Rytina, 2013). However, only 5.4% of unauthorized immigrants have obtained deferred action and work authorization through DACA. From the results above, DACA improved the labor market outcomes for this small portion of unauthorized immigrants. However, the majority of unauthorized immigrants are excluded from DACA and do not receive these benefits. A temporary or permanent amnesty program could expand deferred action and work authorization to a larger population of unauthorized immigrants. However, because such an expansion to a larger population would include a different type of unauthorized population, whether the benefits would be similar to those found for DACA is unclear. The results from Panels A and B of Table 2 come from samples that are

close to the DACA cutoff criteria. Therefore, these estimates would be particularly policy relevant if DACA were expanded by increasing the age requirements. For individuals near these age cutoffs, the benefits are likely to be very similar.

However, if future temporary or permanent amnesty programs are expanded to include older unauthorized immigrants who likely entered the United States at older ages and may have restricted English proficiency, the effects of deferred action and work authorization may be quite different from those found for DACA. In addition, the effects could vary depending on whether the amnesty program was temporary or permanent. The intent-to-treat effects for a temporary program are likely smaller than for a permanent program, due to lower application rates from unauthorized immigrants wary of future deportation. Smaller effects for a temporary program may also come from less human capital investment without the assurance of the ability to work in the future.

The biggest potential difference between DACA and a temporary or permanent amnesty program for a larger unauthorized immigrant population are the potential general equilibrium effects. Because DACA has moved only a small number of individuals into employment, the downward pressure on wages from the increased supply of workers is likely very small. However, a larger temporary or permanent amnesty program could move many more workers into employment and could cause larger decreases in wages, particularly for low-skilled jobs. These potential general equilibrium effects make the welfare consequences unclear. Unauthorized immigrants will clearly be better off, but if the downward pressure on wages is large enough, they could offset these benefits.

Of particular importance is what these results imply for DAPA. DAPA was announced by President Obama on November 20th, 2014, and would expand eligibility for deferred action and work authorization to an additional 3.7 million unauthorized immigrants.[10] This

---

[10]  http://migrationpolicy.org/news/mpi-many-37-million-unauthorized-immigrants-could-get-relief-deportation-under-anticipated-new

new policy would expand DACA by eliminating the under-31 age requirement and would require individuals to only have been in the United States since 2010 instead of 2007. Because this paper estimates the effect of DACA on individuals near the cutoffs of these requirements, the effects of DAPA on these unauthorized immigrants should be very similar to the effects of DACA. However, DAPA would also make all parents of a US citizen who have been in the United States for at least five years eligible for deferred action and work authorization. The effects of DAPA on this population are much less clear. This population of parents would be older, already have children, and may already be well established in a job. Therefore, the labor market effects of DAPA on this population may be smaller than the effects of DACA. If the effects of DAPA were the same as DACA, DAPA would move approximately 250,000 unauthorized immigrants into employment.

## 8. Conclusion

Because the United States has the most unauthorized immigrants of any country in the world, immigration policies affect millions of people. Deferred Action for Childhood Arrivals (DACA), one of the largest immigration policies in the last 25 years, has reduced the labor market frictions for young unauthorized immigrants by giving them deportation relief and work authorization. This paper looks at how DACA has affected unauthorized immigrants eligible for DACA. I find that those eligible for DACA are more likely to work. This increase in the likelihood of working comes from both a movement into the labor force and a decrease in unemployment. Those in the bottom of the income distribution have seen increases in their income. I also find some evidence of DACA increasing unauthorized immigrants GED attainment, although this evidence is at most suggestive.

The results of this paper shed light on how the lack of legal status in the United States depresses individuals' labor market outcomes. The results speak directly to how deportation relief and work authorization affect young unauthorized immigrants. Studying the effects of DACA gives insights into how future immigration policies, such as an amnesty program or DAPA, would affect their target populations. As immigration policies are studied and refined, they will be able to better benefit the large population of unauthorized immigrants in the United States.

## Appendix A.  Supplementary data

Supplementary data to this article can be found online at http://dx.doi.org/10.1016/j.jpubeco.2016.08.014.

## References

Acosta, Y.D., Larsen, J.L., Grieco, M.E., 2014. Noncitizens under age 35: 2010–2012. American Community Survey Briefs. Report Number: ACSBR/12-06.

Amuedo-Dorantes, C., Antman, F., 2016. The impact of authorization on the schooling and labor market outcomes of undocumented immigrants: evidence from the deferred action for childhood arrivals program. Working Paper.

Amuedo-Dorantes, C., Bansak, C., 2011. The impact of amnesty on labor market outcomes: a panel study using the legalized population survey. Ind. Relat. J. of Econ. Soc. 50 (3), 71–443.

Amuedo-Dorantes, C., Bansak, C., Raphael, S., 2007. Gender differences in the labor market: impact of IRCA's amnesty provisions. Am. Econ. Rev. Pap. Proc. 97 (2), 16–412.

Baker, B.C., Rytina, N., 2013. Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012. Population Estimates Office of Immigration Statistics, Department of Homeland Security.

Baker, S., 2014. Effects of the 1986 immigration reform and control act on crime. Stanford Law and Economics Olin Working Paper No. 412.

Bratsberg, B., Ragan, F.J., Jr. Nasir, M.Z., 2002. The effect of naturalization on wage growth: a panel study of young male immigrants. J. Labor Econ. 20 (3), 97–568.

Cortes, K.E., 2013. Achieving the DREAM: the effect of IRCA on immigrant youth postsecondary educational access. Am. Econ. Rev. Pap. Proc. 103 (3), 32–428.

Fortuny, K., Capps, R., Passel, J.S., 2007. The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States, The Urban Institute, Washington, DC.

Gonzales, R.G., Terriquez, V., Ruszczyk, S.P., 2014. Becoming DACAmented assessing the short-term benefits of deferred action for childhood arrivals (DACA). Am. Behav. Sci. 58 (14), 72–1852.

Kaushal, N., 2006. Amnesty programs and the labor market outcomes of undocumented workers. J. Hum. Resour. 41 (3), 47–631.

Kosnac, H.S., Cornelius, W.A., Wong, T.K., Gell-Redman, M., Alex Hughes, D., 2014. Determinants of DACA Applications: A Multi-level, Bi-National Study of Incentives, Deterrents, and Consequences of Decisions to Seek Deferred Action for Childhood Arrivals, National Center for Border Security and Immigration.

Kossoudji, S.A., Cobb-Clark, D.A., 2002. Coming out of the shadows: learning about legal status and wages from the legalized population. J. Labor Econ. 20 (3), 598–628.

Orrenius, P.M., Zavodny, M., 2003. Do amnesty programs reduce undocumented immigration? Evidence from IRCA. Demography 40 (3), 50–437.

Orrenius, P.M., Zavodny, M., 2012. The economic consequences of amnesty for unauthorized immigrants. Cato J. 32, 85–106.

Passel, J., Cohn, D., 2009. A Portrait of Unauthorized Immigrants in the United States. Pew Hispanic Center, Washington, DC.

Passel, J., Lopez, M.H., 2012. Up to 1.7 Million Unauthorized Immigrant Youth May Benefit from New Deportation Rules. Pew Hispanic Center, Washington,DC.

Rivera-Batiz, F.L., 1999. Undocumented workers in the labor market: an analysis of the earnings of legal and illegal Mexican immigrants in the United States. J. Popul. Econ. 12 (1), 91–116.

Smith, J.P., 2006. Immigrants and the labor market. J. Labor Econ. 24 (2), 33–203.

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

[INS Order No. 2243–02]

**Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** This Notice authorizes the Immigration and Naturalization Service (''the Service'') to place in expedited removal proceedings certain aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to the determination of inadmissibility under this Notice. Aliens falling within this newly designated class who are placed in expedited removal proceedings will be detained, subject to humanitarian parole exceptions, during the course of immigration proceedings, including, but not limited to, any hearings before an immigration judge. The Service believes that implementing the expedited removal provisions, and exercising its authority to detain this class of aliens under 8 CFR part 235, will assist in deterring surges in illegal migration by sea, including potential mass migration, and preventing loss of life. A surge in illegal migration by sea threatens national security by diverting valuable United States Coast Guard and other resources from counter-terrorism and homeland security responsibilities. Placing these individuals in expedited removal proceedings and maintaining detention for the duration of all immigration proceedings, with limited exceptions, will ensure prompt immigration determinations and ensure removal from the country of those not granted relief in those cases, while at the same time protecting the rights of the individuals affected.

**EFFECTIVE DATES:** This Notice is effective on November 13, 2002.

Written comments must be submitted on or before December 13, 2002.

**ADDRESSES:** Written comments must be submitted to the Regulations and Forms Services Division, Immigration and Naturalization Service, 425 I Street NW., Room 4034, Washington, DC 20536. To ensure proper handling, please reference INS No. 2243–02 on your correspondence. You may also submit comments electronically to the Service

at *insregs@usdoj.gov* when submitting comments electronically you must include INS 2243–02 in the subject box. Comments are available for public inspection at the above address by calling (202) 514–3291 to arrange for an appointment.

**FOR FURTHER INFORMATION CONTACT:** Linda M. Loveless, Assistant Chief Inspector, Inspections Division, Immigration and Naturalization Service, 425 I Street, NW., Room 4064, Washington, DC 20536, telephone (202) 616–7489.

**SUPPLEMENTARY INFORMATION:** Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009–546 (IIRIRA), amended section 235(b) of the Immigration and Nationality Act (''Act''), 8 U.S.C. 1225(b), to authorize the Attorney General to remove without a hearing before an immigration judge aliens arriving in the United States who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7). Under these ''expedited removal'' proceedings, an alien who indicates an intention to apply for asylum or who asserts a fear of persecution or torture is referred to an asylum officer to conduct an interview as to whether such alien has a ''credible fear.'' Sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4). Those who meet that standard are referred to an immigration judge for a hearing on the merits of their claim or claims. 8 CFR 208.30(f).

The Service previously published a proposed rule and two interim rules to implement this expedited removal authority. 63 FR 19302–01 (April 20, 1998); 62 FR 10330 (March 6, 1997); and 62 FR 444–01 (Jan. 3, 1997). These rules established the current expedited removal. 8 CFR 235.3(b).

Under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), expedited removal proceedings may be applied to two categories of aliens. First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are ''arriving in the United States,'' except for Cuban citizens who arrive at United States ports-of-entry by aircraft, who are exempted from expedited removal under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). Federal regulations define an ''arriving alien.'' 8 CFR 1.1(q). Second, section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), permits the Attorney General, in his sole and unreviewable discretion, to designate certain other aliens to whom the

expedited removal provisions may be applied, even though they are not arriving in the United States. Specifically, the Attorney General may apply the expedited removal provisions to any or all aliens who have not been admitted or paroled into the United States and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by an immigration officer. The Attorney General delegated his authority to designate classes of aliens to the Commissioner of the Service:

> As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility * * *. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence.

8 CFR 235.3(b)(1)(ii).

The designation may become effective upon publication in the **Federal Register**, or, if the ''delay caused by the publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws,'' the designation may become effective upon issuance and be published as soon as practicable. 8 CFR 235.3(b)(1)(ii). Since the expedited removal authority was added to the Act in 1996, neither the Attorney General nor the Commissioner of the Service has not utilized this ''specific designation'' authority.

This Notice constitutes the first designation of an additional class of aliens who may be placed in expedited removal proceedings: aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by a Service officer. The alien has the burden affirmatively to show to the satisfaction of an immigration officer that the alien has not been present in the United States continuously for the relevant two-year period. Section 235(b)(1)(A)(iii)(II) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(II); 8

CFR 235.3(b)(1)(ii). This Notice does not apply to aliens who arrive at United States ports-of-entry.

It is important to note that certain aliens who arrive in the United States by sea are already subject to expedited removal if they fall within the definition of ''arriving alien'' in 8 CFR 1.1(q): ''an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.'' This Notice will ensure that all aliens, with one exception noted below, who arrive illegally by sea, whether interdicted or not, will be subject to expedited removal.

This designation is necessary to remove quickly from the United States aliens who arrive illegally by sea and who do not establish a credible fear. The ability to detain aliens while admissibility is determined and protection claims are adjudicated, as well as to remove quickly aliens without protection claims, will deter additional aliens from taking to the sea and traveling illegally to the United States. Illegal migration by sea is perilous and the Department of Justice has repeatedly cautioned aliens considering similar attempts to reject such a hazardous voyage.

Any alien who falls within this designation, who is placed in expedited removal proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear. If that standard is met, the alien will be referred to an immigration judge for a hearing on the merits of the protection claim or claims. Sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4). The Forms I–867A and I–867B currently used by the officers who process aliens under the expedited removal program, in accordance with the statutory requirement at section 235(b)(1)(B)(iv) of the Act, 8 U.S.C. 1225(b)(1)(B)(iv), carefully explains to all aliens in expedited removal proceedings an alien's right to a ''credible fear'' interview. The forms also require that the officer determine whether the alien has any reason to fear harm if returned to his or her country. These forms will also be used for aliens placed in expedited removal under this designation. Officers who administer the program are trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

The Service, with limited exceptions, plans to detain aliens designated by this Notice. Section 235(b)(1)(B)(iii)(IV) of the Act, 8 U.S.C. 1225(b)(1)(B)(iii)(IV) and 8 CFR 235.3(b)(iii) directs that any alien who is placed in expedited removal proceedings shall be detained pending a final determination of credible fear and if found not to have such a fear, such alien shall be detained until removed. Parole of such alien may be permitted only when the Attorney General determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective.

Section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), directs that if a credible fear has been established, the alien shall be detained for further consideration of the protection claim or claims. Immigration judge review of custody determinations under 8 CFR 3.19(a) are permitted only for bond and custody determinations pursuant to section 236 of the Act, 8 U.S.C. 1226, and 8 CFR part 236. Aliens designated under this notice would not be detained under section 236 of the Act, but rather under section 235. Aliens subject to expedited removal procedures under section 235 of the Act are not eligible for bond, and therefore may not seek a bond redetermination before an immigration judge. Parole of such aliens based on humanitarian concerns may be considered in accordance with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5) and 8 CFR 212.5.

This Notice applies to certain aliens who arrive in the U.S. by sea on or after November 13, 2002. Furthermore, expedited removal proceedings, however, will not be initiated against Cuban citizens who arrive by sea because it is longstanding U.S. policy to treat Cubans differently from other aliens. *See, e.g.,* Cuban Adjustment Act, Pub. L. 89–732 (1966) (allowing any native or citizen of Cuba who is inspected and admitted or paroled into the United States to apply for lawful permanent resident status after one year). Finally, crewmen and stowaways will not be subject to this Notice because the Act already mandates specific removal proceedings for such aliens.

This Notice does not require ''notice and comment'' under the Administrative Procedures Act because Congress explicitly authorized the Attorney General to designate categories of aliens to whom expedited removal proceedings may be applied, and that ''[s]uch designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time (emphasis added).'' Section 235(b)(1)(A)(iii)(I), 8 U.S.C.

1225(b)(1)(A)(iii)(I). Current regulations of the Service provide public notice that the designation of new categories of aliens to be subjected to expedited removal will be made via publication of a Notice in the **Federal Register:**

The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the **Federal Register**. However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter.

8 CFR 235.3(b)(ii).

In the alternative, the Service's immediate implementation of this Notice, with provisions for post-promulgation public comments, is based on the ''good cause'' exceptions found at 5 U.S.C. 553(b)(B) and (d)(3). The reason and necessity for the immediate promulgation of this rule is the need to deter foreign nationals from undertaking dangerous sea voyages to the United States and to detain those that are apprehended doing so. As explained in the **SUPPLEMENTARY INFORMATION**, a surge in illegal migration by sea, including the potential for a mass migration, would jeopardize or compromise the national security and, therefore, requires the immediate implementation of this Notice.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act (''Act'') and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) Except as provided in paragraph (5), all aliens who arrive in the United States by sea, either by boat or other means, who are not admitted or paroled, and who have not been physically present in the United States continuously for the two-year period prior to a determination of inadmissibility by a Service officer shall be placed in expedited removal proceedings. The alien has the burden affirmatively to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant two-year period. This Notice does not apply to aliens who arrive at United States ports-of-entry. This Notice does not apply to

alien crewmen or stowaways as described in the Act.

(2) Any alien who falls within this designation who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer to determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a hearing on the merits of the protection claim or claims.

(3) An alien found to have a credible fear and subsequently placed into removal proceedings before an immigration judge will be detained, with certain humanitarian exceptions, throughout those proceedings and will not be eligible to request a bond redetermination hearing before an immigration judge.

(4) This Notice applies to aliens described in paragraph (1) who arrive in the United States by sea on or after November 13, 2002.

(5) Expedited removal proceedings will not be initiated against Cuban citizens or nationals who arrive by sea.

Dated: November 12, 2002.

**James W. Ziglar,**

*Commissioner, Immigration and Naturalization Service.*

[FR Doc. 02–29038 Filed 11–12–02; 12:33 pm]

**BILLING CODE 4410–10–P**

Social Science & Medicine 199 (2018) 39–48



Contents lists available at ScienceDirect

# Social Science & Medicine

journal homepage: www.elsevier.com/locate/socscimed



# From undocumented to lawfully present: Do changes to legal status impact psychological wellbeing among latino immigrant young adults?



Caitlin Patler, Ph.D [a],[*], Whitney Laster Pirtle, Ph.D [b]

[a] University of California, Davis, USA
[b] University of California, Merced, USA

### ARTICLE INFO

*Article history:*
Received 8 October 2016
Received in revised form
3 March 2017
Accepted 6 March 2017
Available online 9 March 2017

*Keywords:*
Undocumented immigrants
Immigrants
Latinas/os
Young adults
Psychological wellbeing
Structural inequality
Immigrant legal status
DACA

### ABSTRACT

Exclusionary immigration policies, as a form of structural racism, have led to a sizeable undocumented population that is largely barred from access to resources in the United States. Existing research suggests that undocumented immigration status detrimentally impacts mobility, yet few studies have tested the impacts of legal status on psychological wellbeing. Most importantly, we know little about how *changes* to legal status impact wellbeing. Announced in 2012, the Deferred Action for Childhood Arrivals (DACA) program allows eligible undocumented youth to apply for temporary lawful status. Drawing on cross-sectional survey data from 487 Latino immigrant young adults in California collected in 2014 and 2015, we analyze the predictors of three specialized outcomes related to immigrants' psychological wellbeing—distress, negative emotions, and deportation worry before and after a transition from undocumented to lawfully present status. Results show that retrospective reports of past psychological wellness, when all respondents were undocumented, are predicted primarily by socioeconomic status. However, reports of current psychological wellness are predicted by DACA status. Our results demonstrate, for the first time, the positive emotional consequences of transitioning out of undocumented status for immigrant young adults.

© 2017 Elsevier Ltd. All rights reserved.

Gee and Ford argue that U.S. "immigration policy is a form of structural racism: exclusionary policies provide the most permanent and broad-scale type of segregation by prohibiting groups from entering the country [legally], deporting those already here, and limiting the rights of those deemed to be threats" (Gee and Ford, 2011, 122). One of the consequences of exclusionary immigration policies is the unprecedented growth of the undocumented population (Ngai, 2004). The United States is now home to 11 million undocumented immigrants, including nearly five million undocumented children and young adults under the age of 30, the vast majority (78%) of whom are from Latin America (Fortuny et al., 2007; Center for American Progress, 2014; Batalova and Zong, 2015). Increasingly, scholars are conceptualizing immigrant legal status as a critical axis of stratification (Menjívar, 2006; Dreby, 2015; Cebulko, 2014). Undocumented youth and young adults face severe barriers to higher education, good jobs, and full political

incorporation (Abrego, 2006; Gonzales, 2011; Greenman and Hall, 2013). Though much less is known about the impacts of legal status on health outcomes for young immigrants, emerging research suggests that undocumented immigration status may negatively impact psychological wellbeing as well (Potochnick and Perreira, 2010; Abrego, 2011; Dozier, 1993; Hacker et al., 2011; Gonzales et al., 2013).

Research on undocumented immigrant health remains under-developed in two important ways. First, we know little about how outcomes related to psychological wellbeing vary *within* undocumented communities. Second, we know little of what, if anything, will *change* for undocumented young peoples' psychological wellbeing if their legal status changes. The present study contributes by analyzing the ways in which Latino immigrant young adults recall their psychological wellness before and after a transition from undocumented to lawfully present status.

Our analysis emerges out of a unique political context that provides a rare opportunity to examine the impacts of transitions in legal status in a hard-to-reach population. In June 2012, President Obama announced the Deferred Action for Childhood Arrivals

* Corresponding author.
  E-mail address: patler@ucdavis.edu (C. Patler).

http://dx.doi.org/10.1016/j.socscimed.2017.03.009
0277-9536/© 2017 Elsevier Ltd. All rights reserved.

(DACA) program for undocumented youth who meet the following criteria: came to the U.S. before age 16; were younger than 31 in June 2012; have continuously resided in the U.S. from June 2007 to the present; are current students or high school/GED graduates, or honorably discharged veterans; and have no criminal record. Under this program, youth can apply for temporary (and revocable) lawful presence that includes work authorization, a social security number, and other related benefits, renewable every two years. As of the first quarter of 2015, when this study was completed, 750,000 individuals had applied for DACA, with 28% of applications coming from California and the vast majority of applicants originating from Latin America (United States Citizenship and Immigration Services, 2015). DACA provided an unprecedented and unique opportunity to analyze the experiences of program participants.

This study provides the first statistical analysis of differences in psychological wellbeing between immigrant young adults, retrospectively measured before and after a transition in legal status. We draw from original, cross-sectional telephone survey data from 487 Latino immigrant young adults in California, comparing currently undocumented young adults with formerly undocumented young adults who have transitioned into lawful presence via the DACA program. We analyze the predictors of three specialized outcomes related to immigrants' psychological wellbeing: distress (as encompassed by reports of stress, nervousness or anxiety); negative emotions (anger, fear, sadness, shame, and embarrassment); and worry about deportation of self or family. Specifically, we ask: What factors predict psychological wellbeing among Latino undocumented immigrant young adults? And, how and to what extent does psychological wellbeing change with changes to legal status? In answering these questions, we offer, for the first time, empirical evidence not just of differentiations between undocumented youth, but also of the potential emotional health advantages of moving from undocumented to lawful immigration status.

Our analyses reveal several key findings. Prior to DACA, when all respondents were undocumented, psychological wellbeing was predicted almost exclusively by socioeconomic status. However, current psychological wellbeing is most strongly predicted by DACA status. Our results suggest that the change from undocumented to lawfully present is associated with positive health outcomes. However, DACA status does not significantly reduce worry about the deportation of family members, suggesting that programs that target individuals may not go far enough in addressing the overall wellbeing and needs of immigrant families. In the current era of increasing anti-immigrant sentiment and the unprecedented intersection of immigration and criminal laws (Chavez, 2008; Coutin, 2011), our findings underscore the critical importance of formal legal recognition for immigrants.

## 1. Background

Structural racism is racism that is embedded in structures and operates to disadvantage those in marginalized racial and ethnic positions without direct action by individuals (Bonilla-Silva, 1997). Because structural racism affects institutions, ideologies, and laws, it is associated with the distribution of resources and is therefore a fundamental cause of disease (Gee and Ford, 2011; Link and Phelan, 1995). For instance, exclusionary immigration policies can hinder immigrants' access to health services and contribute to a discriminatory climate (Gee and Ford, 2011). Yet the relationship between legal status and health has gone underexplored in empirical research of immigrant health and wellbeing.

For instance, research informed by the stress process model, which links increased exposure to stressful experiences to increased health problems (Aneshensel, 1992; Turner et al., 1995; Pearlin, 1989), shows that Latino immigrants face a unique set of stressors due to their stigmatized minority status (e.g. Finch et al., 2000; Umaña-Taylor and Updegraff, 2007). The immigrant experience can be a unique stressor for Latino migrants that produces significant life events (e.g., separation from family, traumatic migration experiences) and chronic stressors (e.g., dealing with the unknowns of a new place) (Vega et al., 1987). Social stress research, however, has generally neglected the ways in which laws such as immigration policies might be stressors for disadvantaged groups.

Likewise, research on the healthy immigrant paradox (Abraído-Lanza et al., 2006; Alegría et al., 2008; Burnam et al., 1987; Grant et al., 2004; Franzini et al., 2002), often draws upon theories of acculturation to explain why Latino immigrants' health worsens over time in the U.S. Such studies argue that acculturation processes (e.g. the altering of behaviors and norms, isolation from former networks, and learning new modes of economic survival) can be stressful for migrants (Rogler et al., 1991). Acculturation is therefore associated with the adoption of unhealthy behaviors or increased exposure to discrimination, both of which can lead to poorer health (Creighton et al., 2012; Lara et al., 2005; Hovey and King, 1996; Saldana, 1995; Finch et al., 2000). Generally speaking, however, extant frameworks on Latino immigrant health would benefit from a more careful consideration of legal status as a structural constraint that can impact health and wellbeing.

Indeed, Viruell-Fuentes et al. (2012, 2007) have encouraged a reconceptualization of immigrant health and acculturation models that instead delineates how macro-social conditions (e.g., pathways to citizenship) contribute to experiences of racism, discrimination, and othering, which are then linked to proximate risk factors (e.g., health practices, medical care) that pattern health outcomes. Situating health disparities as direct and indirect consequences of structural forces is a relatively recent improvement in the immigrant health framing, but empirical examinations of these relationships remain underdeveloped. Importantly, much of the literature continues to lack a critical consideration as to how *transitions* in legal status may impact emotional health trajectories over time, especially in young adult populations.

### 1.1. Theorizing transitions in legal status among latino immigrant youth

To theorize transitions in legal status, we draw on the framework of contexts of reception from immigrant integration literature, which argues that young peoples' incorporation trajectories depend in part on the level of receptiveness of laws and policies of the host country (see, e.g., Portes and Zhou, 1993; Portes and Rumbaut, 2001). According to this theory, we would expect incorporation and lived experiences to be structured by immigration laws (and thereby, legal status) not just at arrival, but also over the long-term, and as laws and policies change or stay the same and interact with structural (e.g. socioeconomic) and institutional (e.g. schools) factors. Synthesizing the contexts of reception framework with the structural racism and health model, we hypothesize that changes to legal status will influence integration outcomes, including psychological wellbeing. This allows us to predict improved outcomes in policy contexts such as DACA that provide increased protection and access.

Our examination of the impact of legal status on the psychological wellbeing of undocumented immigrants focuses on youth, which is analytically and theoretically important for several reasons. First, undocumented young adults experience emotional consequences due to their parents' legal status (Yoshikawa, 2011; Dreby, 2015; Landale et al., 2015). Yet they may also enter adolescence facing disadvantage due to their own legal status, characterized by worries about blocked mobility, reduced motivation, anger, hopelessness, shame and self-blame, anxiety, and fear of

deportation (Gonzales et al., 2013; Abrego, 2006; Gonzales, 2011). In addition, many undocumented youth have spent most of their lives in the United States and are extensively embedded in educational institutions; their legal status can therefore become an additional source of perceived or experienced stigmatization and/ or discrimination within schools (Abrego, 2011; Patler, 2014).

Although existing studies have explored variation between immigrant groups with different legal statuses, these studies generally compare across groups, and are unable to measure the degree of change within individuals who experience a change in status. For example, Cebulko (2014) documents a hierarchy of perceived racial acceptance, with undocumented immigrants reporting (and being reported as) the least accepted, followed by those with DACA and then lawful permanent residents and U.S. citizens. We build on such research by analyzing how and to what extent individual outcomes related to psychological wellbeing change for young adults who receive DACA, as compared to their peers who remain undocumented.

## 2. Data and methods

### 2.1. Data

This paper draws from the Deferred Action for Childhood Arrivals Study (DACA Study). This cross-sectional study includes immigrant youth who applied or considered applying for DACA. This work is timely, given DACA's recent implementation, and how very little we know about its impacts. Fielded between November 2014 and February 2015, the study aimed to survey DACA recipients two-to-three years after the rollout of the program, comparing them with those who do not have DACA status. The study included modules on educational and socioeconomic trajectories, community involvement, and health and wellbeing of immigrant young adults in California. As one of the largest immigrant destinations in the nation, California is home to 2.6 million undocumented immigrants, (Pew Hispanic Center, 2013) and 28 percent of all DACA applications were filed in California (United States Citizenship and Immigration Services, 2015).

The DACA Study includes 502 telephone surveys of cell phones and landlines across California. All study procedures were approved by the University of California, Los Angeles Institutional Review Board. Respondents were drawn from a pool of individuals who attended one or more DACA workshops between 2012 and 2014. Workshops were hosted in libraries, schools, and convention centers by legal service providers, immigrants' rights organizations, and consular offices and were open to anyone who wanted information about DACA. Lawyers were on hand to review applications. 1102 participants were over 18, provided contact information, and spoke English; calls were attempted with each of these individuals. The overall response rate was 67%, with a cooperation rate of 91%. Nearly all respondents (97%) identified as Latino, with 93% from Mexico and 7% from Central or South America. After excluding non-Latinos (given the varied contexts of reception faced by different ethnic and nation-origins groups; see, e.g. Portes and Zhou, 1993), the effective sample size is 487.

The DACA program is very new, so researchers have only begun to explore its impacts. The government does not release individual-level data on DACA applicants; as a result, no current data set allows for representative sampling of individual-level characteristics of DACA applicants. Though our sampling method does not allow for the development of population estimates, we are able control for DACA status in our analysis. We therefore provide an important starting point for understanding the impacts of the program, with theoretical and empirical implications for other transitions in legal status. Beyond this methodological contribution, the DACA Study is

unique in that it does not primarily sample college and university students: only 14% of respondents had a college degree and 51% had never attended any post-secondary education (for further work drawn from samples of mostly or entirely undocumented college students, see Teranishi et al., 2015, Gonzales et al., 2014).

### 2.2. Measures

*Psychological Wellbeing* — Our outcome measures fall under the broad category of psychological distress (Mirowsky and Ross, 1989), but also consider particular health experiences that can affect disadvantaged racial/ethnic groups (Brown et al., 2013; Rogler et al., 1991; Vega and Rumbaut, 1991). We are not attempting to clinically measure psychological conditions; rather, our measures capture more specified health concerns that Latino undocumented immigrants might face. To that end, the DACA Study examined self-reported psychological wellbeing that Latino immigrant youth perceived to be directly impacted by their legal status. Questions were developed and revised in consultation with undocumented youth organizations and tested in a series of focus groups with individuals who attended the DACA workshops. Specially, to capture psychological wellbeing, respondents were asked: "because of your legal status, did you experience: 1) increased stress, nervousness or anxiety; 2) increased anger; 3) increased fearfulness; 4) increased sadness; 5) increased embarrassment or shame; 6) regular worry about getting arrested or deported; 7) regular worry about your family getting arrested or deported." Respondents could elaborate on these outcomes in an open-ended question about what has changed most since receiving DACA.

Respondents were asked to recall their experiences, as impacted by legal status, in regards to two different time periods: first, during a time in which all respondents were undocumented, and second, in the current time period, in which many respondents had transitioned from undocumented to lawfully present status. Given that we could not know in advance how long individuals had lawful status via DACA, respondents were asked whether or not they experienced those indicators either during the past year (for those who had not received DACA) or during the one-year period prior to receiving DACA (for DACA recipients). The average time a recipient had DACA at the time of the survey was about 1.5 years. Next, all respondents were asked to think about the last 30 days only, and report whether or not they had experienced those same indicators. Though Brewin et al. (1992) have concluded that current psychological mood does not impact recall of earlier events and psychological states, our reliance on recall is an important limitation of our study (discussed in greater detail below).

For the purpose of this analysis, we created four binary dependent variables for each of the two retrospective time periods: 1) in the past year/year prior to receiving DACA (hereafter "the past") and 2) in the last 30 days ("current"). *Distress* captured whether respondents experienced stress, nervousness or anxiety, as asked in the survey instrument (1 = Yes), as research confirms a strong correlation between stressful experiences and adverse mental health, especially for marginalized groups (e.g. Aneshensel, 1992; Turner et al., 1995; Pearlin, 1989). We then created a binary variable for *negative emotions* to reflect whether the respondent had experienced any of the following: anger, fear, sadness, embarrassment or shame (1 = Yes). These specific emotions have been identified in qualitative research on undocumented young adults' mental health (e.g. Gonzales et al., 2013). Respondents were asked about each emotion independently, and item responses were combined for analysis to capture orientations and expressions of emotions consistent with the construct of negative affect (Watson et al., 1988). Results from sensitivity analysis confirmed that this operationalization did not mask variation among individual

measures. Finally, because prior research on undocumented immigrants demonstrates extensive fear of deportation, which can affect overall psychological wellbeing (e.g. Brabeck and Xu, 2010), we included two variables about deportation worry: *worry about self-deportation* and *worry about the deportation of family members* (1 = Yes).

*DACA Status* — The primary independent variable is a binary measure of *DACA status*. Individuals who had been approved were coded as 1 (n = 452); those who never applied, had been denied, or had not yet received a decision were coded as 0 (n = 50). This distribution aligns with reports that 94% of initial DACA applications have been approved nationwide (United States Citizenship and Immigration Services, 2015).

*Social Demographics* — We included a series of individual and family demographic characteristics as control variables. *Gender*, measured by respondents self-identification as male or female, accounted for differential experiences and reporting of mental health problems across men and women (Rosenfield and Mouzon, 2012; McDonough and Walters, 2001). *Age* allowed us to control for the potential variation in DACA's impact as the respondent moves into adulthood. Because research on acculturation and the healthy immigrant paradox suggests that health deteriorates over time (Creighton et al., 2012; Rogler et al., 1991), we also controlled for *years in the United States*. To control for socioeconomic (or "low income") status, we include *trouble paying utility bills* in the past year (or in the year prior to receiving DACA, for DACA recipients). We also include a variable for *highest degree* (1 = high school/GED only, 2 = Vocational/Trade/Associate's Degree, and 3 = Bachelor's degree or higher). Finally, existing literature shows that having an undocumented mother can impact children's behavioral outcomes (Landale et al., 2015) as well as educational attainment (Bean et al., 2011); thus, we included binary measures for whether the *mother is undocumented* and whether the *mother had less than a high school degree*.

### 2.3. Analytic strategy

Prior to model estimation, we investigated missing data and found that no variable featured more than 5% missing observations. Using Stata 14, we preserved cases with missing data using multiple imputation by chained equations (the MICE method) and estimating twenty imputed data sets (Rubin, 1987; White et al., 2011; Graham et al., 2007). Our analyses then proceeded in three steps. We first ran logistic regression models of recollections of past psychological wellbeing, controlling for DACA status and social demographics. Second, we ran logistic regression models of reports of current psychological wellbeing with the same covariates. Finally, to assess change over time (measured retrospectively), we estimated each outcome in a logistic regression model and included an interaction between time and DACA status. Analyzing these models in long form, we used cluster-robust standard errors to account for within-person correlations. We then used Klein's —mimrgns- command for Stata to compute predicted changes in psychological wellbeing for the DACA and non-DACA subsamples, holding all other variables at their observed values.

### 3. Results

Table 1 reports univariate and bivariate analysis of all study variables. The average respondent was 24 years old and had lived in the United States for 18 years. Nearly 90% had undocumented mothers and over 60% had mothers with less than a high school degree. Forty-six percent of the sample reported having trouble paying utility bills in the past year/year before DACA. Respondents did not differ significantly by DACA status on the majority of social

demographics. However, significant differences emerged in education levels, with DACA recipients more likely to have completed vocational or bachelor's degrees. We also observed significant differences across gender: whereas 43% of the total sample was male, (58%) of those without DACA status were males.

The vast majority of respondents reported having experienced psychological distress. Importantly, however, bivariate analyses revealed no significant differences in the proportions of respondents recalling past distress, negative emotions, and deportation worry due to their legal status during the time when all were undocumented. However, reports of current adverse psychological wellbeing (in the last 30 days) varied significantly and consistently across DACA status, with significantly fewer DACA recipients reporting psychological distress. The only outcome that did not significantly differ across DACA status was current worry about the deportation of a family member.

We now turn to results from logistic regression analysis of past and current psychological wellbeing outcomes. Table 2 displays odds ratios for measures of retrospective past psychological wellbeing, controlling for relevant background characteristics. Compared to females, males had significantly lower odds of both negative emotions and worry about family deportation. In addition, having a mother who was undocumented was a significant predictor of past worry about a family members' deportation. There were no differences in past psychological wellbeing by DACA status.

Socioeconomic factors were the largest and most consistent predictor of past psychological wellbeing. Low-income respondents reported odds of distress, negative emotions, and worry that were, on average, twice as large as those with higher income, controlling for all other predictors. Those with a Bachelor's degree or higher also reported higher odds of distress, negative emotions, and worry about self-deportation compared to those with a high school degree.

Table 3 displays odds ratios for measures of psychological wellbeing in the last 30 days. As with past outcomes, males had lower odds of distress and negative emotions, and having an undocumented mother increased the odds of worry about family deportation. However, the previously observed relationship between socioeconomic status and psychological wellbeing was less consistent: Low-income status significantly increased odds only in models predicting distress and worry about family deportation. Overall, the likelihood of psychological distress was lower for those with DACA compared to those without DACA. The only outcome that DACA status did not significantly predict is worry about family deportation, demonstrating that even after obtaining lawful presence, respondents continue to worry about undocumented family members.

Our final task was to calculate the magnitude of change in psychological wellbeing by DACA status. Fig. 1a plots the predicted probabilities of distress and negative emotions. Although the lines overlap when predicting past outcomes (with probabilities hovering around 70%), the predicted probability of current outcomes decreased significantly and with far greater magnitude for DACA recipients. For example, the predicted probability of distress and negative emotions in the past 30 days for DACA recipients dropped to under 20%, whereas the probabilities were 40% or greater for those without DACA (p = 0.000).

Fig. 1b plots predicted probabilities of worry about self and family deportation, which were all above 60%. However, DACA recipients were much less likely to report worry about self-deportation in the last 30 days (15% for DACA recipients, compared to above 40% for those without DACA (p = 0.002)). Probabilities of worry about family deportation remained high for both groups, but DACA recipients reported slightly lower probabilities of worry in the last 30 days when compared to the past.

*C. Patler, W. Laster Pirtle / Social Science & Medicine 199 (2018) 39—48*                                                                                      43

**Table 1**
Descriptive and bivariate statistics for variable used in the analysis of psychological wellbeing.

| | Total | No DACA | Has DACA | Comparison of has DACA vs. no DACA |
|---|---|---|---|---|
| ***Social Demographics*** | | | | |
| Male (1 = Yes) | 42.45% | 58.33% | 40.67% | * |
| | (0.022) | (0.072) | (0.023) | |
| Age (Range: 18—34 years) | 24.151 | 24.452 | 24.118 | |
| | (0.165) | (0.566) | (0.173) | |
| Years in the U.S. (Range: 5—31 years) | 18.158 | 18.295 | 18.143 | |
| | (0.228) | (0.831) | (0.237) | |
| Trouble Paying Utility Bills (1 = Yes) | 46.10% | 46.77% | 46.03% | |
| | (0.023) | (0.074) | (0.024) | |
| High School Degree/GED or less (1 = Yes) | 64.38% | 83.33% | 62.31% | |
| | (0.028) | (0.054) | (0.023) | |
| Trade/Vocation (1 = Yes) [a] | 22.04% | 10.42% | 23.31% | * |
| | (0.019) | (0.045) | (0.020) | |
| Bachelors Degree or Greater (1 = Yes) [a] | 13.57% | 6.25% | 14.37% | + |
| | (0.016) | (0.035) | (0.017) | |
| Mother Less than High School Degree (1 = Yes) | 61.19% | 60.42% | 61.28% | |
| | (0.022) | (0.071) | (0.023) | |
| Mother Undocumented (1 = Yes) | 88.94% | 85.31% | 89.34% | |
| | (0.015) | (0.052) | (0.016) | |
| ***Psychological Wellbeing: Past Year/Year Prior to DACA*** | | | | |
| Stress (1 = Yes) | 70.68% | 70.83% | 70.66% | |
| | (0.021) | (0.066) | (0.022) | |
| Negative Emotions (1 = Yes) | 71.66% | 64.58% | 72.44% | |
| | (0.022) | (0.070) | (0.021) | |
| Worry about Self Deportation (1 = Yes) | 64.68% | 60.42% | 65.15% | |
| | (0.022) | (0.071) | (0.023) | |
| Worry about Family Deportation (1 = Yes) | 78.10% | 68.75% | 79.12% | |
| | (0.019) | (0.068) | (0.019) | |
| ***Psychological Wellbeing: Last 30 Days*** | | | | |
| Stress (1 = Yes) | 15.81% | 37.50% | 13.44% | *** |
| | (0.017) | (0.071) | (0.016) | |
| Negative Emotions (1 = Yes) | 16.84% | 41.67% | 14.12% | *** |
| | (0.017) | (0.072) | (0.017) | |
| Worry about Self Deportation (1 = Yes) | 11.91% | 41.67% | 8.66% | *** |
| | (0.015) | (0.072) | (0.013) | |
| Worry about Family Deportation (1 = Yes) | 52.62% | 58.33% | 52.00% | |
| | (0.023) | (0.072) | (0.024) | |
| N | 487 | 48 | 439 | |

Note: Standard Errors in parentheses.
+$p < 0.10$; *$p < 0.05$; **$p < 0.01$; ***$p < 0.001$ (two-tailed test).
[a] High School Degree/GED or less is omitted category for significance test.

**Table 2**
Odds ratios from logistic regression analysis of psychological wellbeing in the past year/year prior to DACA.

| | Stress/Nervousness/Anxiety | Negative Emotions | Worry about Self Deportation | Worry about Family Deportation |
|---|---|---|---|---|
| Male (1 = Yes) | 0.758 | 0.509** | 0.823 | 0.580* |
| | (0.161) | (0.111) | (0.164) | (0.135) |
| Age | 1.016 | 1.018+ | 1.010 | 0.997 |
| | (0.027) | (0.028) | (0.025) | (0.028) |
| Years in the U.S. | 1.056 | 1.067 | 1.030 | 0.976 |
| | (0.039) | (0.040) | (0.035) | (0.038) |
| Trouble Paying Utility Bills (1 = Yes) | 2.525*** | 2.535*** | 1.861** | 2.514*** |
| | (0.549) | (0.565) | (0.370) | (0.612) |
| Trade/Vocation (1 = Yes) | 1.232 | 1.007 | 1.086 | 0.981 |
| | (0.337) | (0.277) | (0.274) | (0.285) |
| Bachelors Degree or Greater (1 = Yes)[a] | 3.387** | 6.533*** | 2.262* | 1.967+ |
| | (1.407) | (3.577) | (0.771) | (0.776) |
| Mother Less than High School Degree (1 = Yes)[a] | 0.932 | 0.986 | 1.309 | 1.261 |
| | (0.203) | (0.220) | (0.262) | (0.293) |
| Mother Undocumented (1 = Yes) | 0.843 | 1.156 | 1.278 | 2.262* |
| | (0.323) | (0.428) | (0.416) | (0.780) |
| Has DACA | 0.883 | 1.238 | 1.121 | 1.500 |
| | (0.312) | (0.428) | (0.364) | (0.529) |
| F-stat | 4.08*** | 5.27*** | 2.46** | 3.40*** |
| N | 487 | 487 | 487 | 487 |

Notes: Standard errors in parentheses.
+$p < 0.10$; *$p < 0.05$; **$p < 0.01$; ***$p < 0.001$ (two-tailed test).
[a] High School Degree/GED or less is omitted category.

**Table 3**
Odds ratios from logistic regression analysis of psychological wellbeing in the past 30 days.

| | Stress/Nervousness/Anxiety | Negative Emotions | Worry about Self Deportation | Worry about Family Deportation |
|---|---|---|---|---|
| Male (1 = Yes) | 0.560* | 0.347*** | 0.737 | 0.708+ |
| | (0.155) | (0.101) | (0.232) | (0.137) |
| Age | 0.978 | 0.977+ | 0.986 | 0.984 |
| | (0.031) | (0.030) | (0.035) | (0.023) |
| Years in the U.S. | 1.024 | 1.078 | 1.059 | 0.976 |
| | (0.045) | (0.046) | (0.053) | (0.032) |
| Trouble Paying Utility Bills (1 = Yes) | 1.708* | 1.316 | 1.762+ | 1.480* |
| | (0.449) | (0.339) | (0.536) | (0.283) |
| Trade/Vocation (1 = Yes) | 0.393* | 0.860 | 0.750 | 1.244 |
| | (0.164) | (0.292) | (0.308) | (0.308) |
| Bachelors Degree or Greater (1 = Yes)[a] | 1.217 | 1.221 | 0.793 | 1.540 |
| | (0.467) | (0.461) | (0.399) | (0.464) |
| Mother Less than High School Degree (1 = Yes)[a] | 0.922 | 0.959 | 1.503 | 0.972 |
| | (0.247) | (0.254) | (0.486) | (0.190) |
| Mother Undocumented (1 = Yes) | 1.931 | 1.417 | 0.824 | 4.163*** |
| | (0.995) | (0.619) | (0.396) | (1.459) |
| Has DACA | 0.236*** | 0.176*** | 0.129*** | 0.628 |
| | (0.083) | (0.063) | (0.047) | (0.205) |
| F-stat | 3.29*** | 3.85*** | 4.41*** | 3.00** |
| N | 487 | 487 | 487 | 487 |

Notes: Standard errors in parentheses.
+p < 0.10; *p < 0.05; **p < 0.01; ***p < 0.001 (two-tailed test).
[a] High School Degree/GED or less is omitted category.

## 4. Discussion

Preexisting research finds that immigration status detrimentally impacts mobility among undocumented immigrants, yet few studies have tested the impacts of immigration status on psychological wellbeing. Most importantly, we know very little about how *changes* to legal status impact psychological wellbeing. This investigation set out with two goals: 1) to examine internal variation within the predictors of Latino immigrant youth's psychological wellbeing and then 2) to assess the impacts of transitions in legal status on these outcomes.

Regarding the first aim, we find that socioeconomic status and gender are predictors of past psychological wellbeing, measured retrospectively at a time when all respondents were undocumented. Low-income respondents, captured here as those who had trouble paying utility bills, were much more likely to report increased distress, negative emotions, and worry, compared to those who were not low-income. This finding is consistent with relationships delineated by the stress process model, that suggests individuals from disadvantaged social status groups (i.e., low socioeconomic status) have greater exposure to stress (i.e., worrying about how bills will get paid), are limited in their resources to deal with the stress, and therefore may have increased health problems (e.g. Aneshensel, 1992; Mirowsky and Ross, 1989; Turner et al., 1995; Adler et al., 1994; Pearlin et al., 1981). Although stress process theory would predict such a result, previous research had not explicitly taken up the case of immigration status.

Health research has shown that components of socioeconomic status have different effects on health (Shavers, 2007), which may also be the case here. Interestingly, respondents with a college degree were more likely to report past distress, negative emotions, and worry about self-deportation, compared to those with a high school degree or less. This finding may seem paradoxical at first, as we may think of college graduates as a privileged population with access to resources and social networks that are often unavailable in less educated communities. However, college-educated undocumented individuals have a great deal to lose from their unauthorized status: they graduate with degrees that should prepare them to enter the white-collar labor market, yet face legal barriers to accessing commensurate employment opportunities (Gonzales,

2011). Our seemingly paradoxical finding may therefore be the result of the disjoint between increased educational achievement and continued barriers to mobility for these highly educated individuals (see also Teranishi et al., 2015).

We also observed that gender influenced past psychological wellbeing: Males were less likely than females to report negative emotions and worry about deportation. This finding aligns with sociology of health research documenting different experiences of mental health outcomes for men and women. For instance, females are more likely than males to experience anxiety and/or depression (Rosenfield and Mouzon, 2012). Furthermore, our findings are consistent with migration research demonstrating that female children of immigrants are more likely to experience mental health problems (Portes and Rumbaut, 2001). In light of these findings, future research would do well to underscore the variety of background factors shaping the undocumented experience, highlighting the multilayered realities of individuals' identities and marginalities.

Interestingly, neither age nor length of time in the U.S. was significantly related to psychological wellbeing in our analyses. These results do not lend support for the healthy immigrant paradox, which suggests that immigrants' health often deteriorates over time (Abraído-Lanza et al., 2006; Alegría et al., 2008; Burnam et al., 1987; Grant et al., 2004; Franzini et al., 2002). Instead, our findings show that immigrants report better health after a transition to lawful presence. These results are in line with the argument that structural forces like immigration laws exert a significant impact on health outcomes, perhaps more so than the acculturation measures traditionally used in research on the healthy immigrant paradox (Viruell-Fuentes, 2007). Indeed, we found a strong, positive, and significant effect of legal status on psychological wellbeing. Receiving DACA reduced the odds of distress, negative emotions, and worry about self-deportation by 76–87%, compared to respondents without DACA.

What might explain this change? Survey participants responded to an open-ended question at the end of the survey: *"What do you think has most changed for you since receiving DACA?"* Overall, DACA recipients seem optimistic about changes, citing financial stability, access to education and resources like drivers' licenses, and reduced fear/greater freedom. For example, respondents shared the

1a)



1b)



**Fig. 1.** Predicted Probability of Psychological Wellbeing, by DACA Status. Note: Predicted probabilities computed after regressing psychological wellbeing outcomes on an interaction between time and DACA status; all other control variables are held at their observed values.

following sentiments:

"I have a better job, I am more stable, and not afraid to drive around. I have an ID now and I am more capable to do what I want. I feel better emotionally, physically, and psychologically."

"Peace. [I can] breathe better. Hope. And knowing I exist. I feel like I belong and other people know I exist."

Such sentiments indicate that DACA has had a legitimizing effect (Abrego, 2008) on recipients, in which access to lawful presence and new opportunities has improved their sense of security in their future. These results are consistent with other studies showing that immigrants associate undocumented status with belonging to a disadvantaged social status that is "othered" (Viruell-Fuentes, 2007,

1525) and that the process of legalization has a transformative impact on their sense of self (Menjívar and Lakhani, 2016; Cebulko, 2014; Gee et al., 2016). Our results demonstrate some of the first empirical evidence that legal status transformations can impact their psychological wellbeing as well.

Despite the positive nature of our findings, we remain cautious about whether DACA can offer permanent transformative effects on wellbeing. First, DACA provides individual relief from deportation but does not apply to family members. Indeed, DACA recipients in our study were no less likely than non-recipients to report ongoing worry that a family member will be deported. This finding is consistent with research documenting pervasive fear of law enforcement and family separation among the children of undocumented immigrants (Dreby, 2015). Second, emerging qualitative

research indicates that some DACA recipients face increased responsibility within their families, especially when other family members remain undocumented, which can lead to conflicts and frustration with the program (Sousa-Rodriguez et al., 2015). Perhaps most importantly, because DACA is a temporary program and does not offer permanent legal status, it is possible that the emotional health benefits of the program could decrease over time if access to permanent status and citizenship remains elusive or if DACA is discontinued.

We note one additional finding that may seem perplexing at first glance. We showed that DACA status significantly reduces the likelihood of distress, negative emotions and deportation worry, yet we also observed a reduction (albeit much less drastic) in these concerns among respondents who remain undocumented. This could be an effect of applying for DACA vs. receiving DACA, yet the sample of those who had applied for DACA and were still awaiting a response was too small to test this hypothesis. Future research with larger sample sizes could help tease out this effect. However, another hypothesis is that the overall improvements to psychological wellbeing may be partially explained by the timing of the DACA study in relation to the political context. The survey went into the field in November 2014, which coincidentally aligned with the Obama administration's announcement of two major policy changes related to undocumented immigrants: 1) an expansion of the DACA program, and 2) the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), a program that would extend temporary lawful presence to eligible parents of U.S. Citizens and Lawful Permanent Residents. Though expanded DACA and DAPA did not go into effect, the lawsuit challenging these programs was not filed until after the survey's completion in February 2015. It is therefore possible that survey respondents were positively impacted by the initial announcement of these programs. Likewise, it is entirely possible that improvements to psychological wellbeing will not hold in the current political context in which anti-immigrant sentiment continues to grow and the DACA program may face elimination.

## 5. Conclusion

This study sought to understand the influence of a transition from unlawful to lawful status on the psychological wellbeing of Latino immigrant young adults. To do so, we build upon and contribute to several bodies of literature, which have developed in relative isolation of one another. Specifically, our aim was to underscore the critical importance of linking research in the sociology of health and illness (in particular studies of social stress and Latino health disparities) and the sociology of international migration (in particular studies of immigrant legal status). Our results suggest that literature both on immigrant integration and Latino immigrant health should do much more to account for immigrants' evolving and complex legal statuses and how these may influence mobility over time and as policies (and legal statuses) change or stay the same. Our research provides empirical support for frameworks laid out by Gee and Ford (2011) and Viruell-Fuentes (2007) that encourage critical consideration of macro-level factors, such as structural racism, in shaping the health of racial and ethnic minorities. Inasmuch as good health is linked to positive and complete social integration, our results are timely and instructive. Our research also adds nuance to a growing body of work on the experiences of undocumented youth that has largely grouped undocumented individuals as a way of comparing them to those with legal status (e.g. Greenman and Hall, 2013). We build on this groundbreaking work by showing that there are also important differences between undocumented young people; specifically,

that their psychological wellbeing is influenced by gender and socioeconomic status.

This study also has some important limitations; we therefore provide suggestions for future research that could expand upon and confirm our findings. First, we relied on a non-representative area survey, which limits the generalizations we can make to other parts of the country and other immigrant groups. Additional research beyond California would provide an important comparison (e.g. Cebulko, 2014; Jefferies, 2014), given the size of California's immigrant population and its political context of reception. Indeed, California has one of the most inclusive policy climates for undocumented immigrants in the country (Rodríguez et al., 2015): The Golden State has passed laws expanding access to healthcare and higher education for undocumented immigrants which may provide a more positive context for DACA's implementation than other states—if the program remains in place. In addition, future research that can expand beyond Latino racial groups (e.g. Cebulko, 2014; Patler, 2014) and take place in languages other than English would also be a valuable contribution. In the absence of representative samples, scholars should endeavor to investigate, as we have done, the experiences of immigrant youth who do not belong to highly selective categories such as activists or university students.

Second, our measures rely on retrospective responses, which increases the potential for recall bias. For instance, DACA recipients might have been more likely than those who did not obtain DACA to recall past psychological states as poor. However, major concerns regarding the impact of recall bias on our results may be tempered when considering that all respondents in our sample recalled their prior psychological wellbeing more poorly than current wellbeing (as shown in Table 1 and Fig. 1). In other words, DACA recipients and non-recipients did not differentially report their past wellbeing. Nonetheless, future longitudinal studies of DACA recipients would be particularly relevant in assessing changes over time and establishing causal effects.

An additional limitation pertains to the wording of the DACA survey's questionnaire, which asked respondents to report their psychological experiences as impacted by their legal status. Respondents who attended workshops on the DACA application process and the benefits of DACA could be motivated to provide answers that support the idea that DACA is beneficial, which would overestimate its effects. Alternatively, some participants might not recognize that their wellbeing is harmed by lack of legal status, which would then underestimate the effect of DACA. An alternative study design that does not anchor the dependent variable with legal status but includes DACA status as an independent variable would help confirm the novel findings we present here. Using standard measures of psychological wellbeing, such as the Center for Epidemiologic Studies Depression (CES-D) scale for depressive symptoms, would also be fruitful in allowing for comparisons to other populations. Finally, while our research examines a unidirectional change (from undocumented to lawfully present), future research could explore the psychological health impacts of other types of changes; for example, transitioning from some kind of legally recognized status to undocumented status.

In the absence of any large-scale legalization program since the mid-1980s, an entire generation of children has grown up without legal status. We know that a lack of legal status impacts multiple aspects of immigrants' lives, including health and wellbeing, and we also know that communities do not benefit when individuals are unhealthy. We have shown that changes to immigrant legal status can directly improve psychological wellbeing. Inasmuch as individual wellbeing is linked to overall community health, then our findings are of critical importance as the country continues to debate policy solutions for undocumented communities.

C. Patler, W. Laster Pirtle / Social Science & Medicine 199 (2018) 39–48                47

## Acknowledgements

Generous support was provided to Caitlin Patler from the American Sociological Association's Sydney S. Spivack Program in Applied Social Research and Social Policy Community Action Research Award, Ford Foundation, National Science Foundation (grant number DGE-0707424), Sociological Initiatives Foundation, University of California Center for New Racial Studies, University of California Institute for Mexico and the United States, UCLA Institute of American Cultures and the Chicano Studies Research Center, and UCLA Institute for Research on Labor and Employment. Our thanks go to Susan Bibler Coutin, Edelina Burciaga, Erin Hamilton, Bill Vega, and Zulema Valdez for their valuable comments on earlier drafts of this paper. We also thank the *Social Science & Medicine* editors and anonymous reviewers for their helpful feedback. We thank Tanya Golash-Boza and Zulema Valdez for hosting the Creative Connections Retreat, from which this collaboration was fostered. Caitlin Patler thanks current and former members of Dream Team Los Angeles for their contributions to this study.

## References

Abraído-Lanza, Ana F., Armbrister, Adria N., Flórez, Karen R., Aguirre, Alejandra N., 2006. Toward a theory-driven model of acculturation in public health research. Am. J. Public Health 96 (8), 1342–1346.

Abrego, Leisy, 2008. Legitimacy, social identity, and the mobilization of law: the effects of assembly bill 540 on undocumented students in California. Law Soc. Inq. 33 (3), 709–734.

Abrego, Leisy J., 2006. I can't go to college because I Don't have papers: incorporation patterns of Latino undocumented youth. Lat. Stud. 4 (3), 212–231.

Abrego, Leisy J., 2011. Legal consciousness of undocumented latinos: fear and stigma as barriers to claims-making for first- and 1.5-generation immigrants. Law Soc. Rev. 45 (2), 337–369.

Adler, Nancy E., Boyce, Thomas, Chesney, Margaret A., Cohen, Sheldon, Folkman, Susan, Kahn, Robert L., Leonard Syme, S., 1994. Socioeconomic status and health: the challenge of the gradient. Am. Psychol. 49 (1), 15–24.

Alegría, Margarita, Canino, Glorisa, Shrout, Patrick E., Woo, Meghan, Duan, Naihua, Vila, Doryliz, Torres, Maria, Chen, Chih-nan, Meng, Xiao-Li, 2008. Prevalence of mental illness in immigrant and non-immigrant US Latino groups. Am. J. Psychiatry 165 (3), 359–369.

Aneshensel, Carol S., 1992. Social stress: theory and research. Annu. Rev. Sociol. 18, 15–38.

Batalova, Jeanne, Zong, Jie, 2015. Frequently Requested Statistics on Immigrants and Immigration in the United States. D.C.: Migration Policy Institute, Washington.

Bean, Frank D., Leach, Mark A., Brown, Susan K., Bachmeier, James D., Hipp, John R., 2011. The educational legacy of unauthorized migration: comparisons across US-immigrant groups in how parents' status affects their offspring. Int. Migr. Rev. 45 (2), 348–385.

Bonilla-Silva, Eduardo, 1997. Rethinking racism: toward a structural interpretation. Am. Sociol. Rev. 62 (3), 465–480.

Brabeck, Kalina, Xu, Qingwen, 2010. The impact of detention and deportation on Latino immigrant children and families: a quantitative exploration. Hispanic J. Behav. Sci. 32 (3), 341–361.

Brewin, Chris R., Andrews, Bernice, Gotlib, Ian H., 1992. Psychopathology and early experience: a reappraisal of retrospective reports. Psychol. Bull. 113 (1), 82–98.

Brown, Tony N., Donato, Katharine M., Therese Laske, Mary, Duncan, Ebony M., 2013. Race, nativity, ethnicity, and cultural influences in the sociology of mental health. In: Aneshensel, Carol S., Phelan, Jo C., Bierman, Alex (Eds.), Handbook of the Sociology of Mental Health. Springer Netherlands, Rotterdam.

Burnam, M. Audrey, Hough, Richard L., Karno, Marvin, Escobar, Javier I., Telles, Cynthia A., 1987. Acculturation and lifetime prevalence of psychiatric disorders among mexican americans in Los Angeles. J. Health Soc. Behav. 28 (1), 89–102.

Cebulko, Kara, 2014. Documented, undocumented, and liminally legal: legal status during the transition to adulthood for 1.5-generation Brazilian immigrants. Sociol. Q. 55 (1), 143–167.

Center for American Progress, 2014. The Facts on Immigration Today (Washington, D.C).

Chavez, Leo R., 2008. The Latino Threat: Constructing Immigrants, Citizens, and the Nation. Stanford University Press, Stanford.

Coutin, Susan Bibler, 2011. The rights of noncitizens in the United States. Annu. Rev. Law Soc. Sci. 7, 289–308.

Creighton, Mathew J., Goldman, Noreen, Pebley, Anne R., Chung, Chang Y., 2012. Durational and generational differences in mexican immigrant obesity: is acculturation the explanation? Soc. Sci. Med. 75 (2), 300–310.

Dozier, Sandra Bygrave, 1993. Emotional concerns of undocumented and out-of-status foreign students. Community Rev. 13 (2), 33–38.

Dreby, Joanna, 2015. Everyday Illegal: when Policies Undermine Immigrant Families. University of California Press, Oakland.

Finch, Brian Karl, Kolody, Bohdan, Vega, William A., 2000. Perceived discrimination and depression among mexican-origin adults in California. J. Health Soc. Behav. 41 (3), 295–313.

Fortuny, Karina, Capps, Randolph, Passel, Jeffrey S., 2007. The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States. The Urban Institute, Washington, D.C.

Franzini, Luisa, Ribble, John, Keddie, Arlene, 2002. Understanding the hispanic paradox. Ethn. Dis. 1 (3), 496–518.

Gee, Gilbert C., Ford, Chandra L., 2011. Structural racism and health inequities. Du Bois Rev. Soc. Sci. Res. race 8 (1), 115–132.

Gee, Gilbert C., Morey, Brittany N., Walsemann, Katrina M., Ro, Annie, Takeuchi, David T., 2016. Citizenship as privilege and social identity: implications for psychological distress. Am. Behav. Sci. 60 (5), 680–704.

Gonzales, Roberto G., 2011. Learning to Be illegal: undocumented youth and shifting legal contexts in the transition to adulthood. Am. Sociol. Rev. 76 (4), 602–619.

Gonzales, Roberto G., Suárez-Orozco, Carola, Dedios-Sanguineti, Maria Cecilia, 2013. No place to belong: contextualizing concepts of mental health among undocumented immigrant youth in the United States. Am. Behav. Sci. 57 (9), 1–26.

Gonzales, Roberto G., Terriquez, Veronica, Ruszczyk, Stephen P., 2014. Becoming DACAmented: assessing the short-term benefits of deferred action for childhood arrivals (DACA). Am. Behav. Sci. 58 (14), 1852–1872.

Graham, John W., Olchowski, Allison E., Gilreath, Tamika D., 2007. How many imputations are really Needed? Some practical clarifications of multiple imputation theory. Prev. Sci. 8 (3), 206–213.

Grant, Bridget F., Stinson, Frederick S., Hasin, Deborah S., Dawson, Deborah A., Patricia Chou, S., Anderson, Karyn, 2004. Immigrant and lifetime prevalence of DSM-IV psychiatric disorders among mexicans Americans and non-hispanic whites in the United States: results from the national epidemiological survey on alcohol and related conditions. Arch. Gen. Psychiatry 61 (12), 1226–1233.

Greenman, Emily, Hall, Matthew, 2013. Legal status and educational transitions for mexican and central american immigrant youth. Soc. forces 91 (4), 1475–1498.

Hacker, Karen, Chu, Jocelyn, Leung, Carolyn, Marra, Robert, Pirie, Alex, Brahimi, Mohamed, English, Margaret, Beckmann, Joshua, Acevedo-Garcia, Dolores, Marlin, Robert P., 2011. The impact of immigration and customs enforcement on immigrant health: perceptions of immigrants in everett, Massachusetts, USA. Soc. Sci. Med. 74 (4), 586–594.

Hovey, Joseph D., King, Cheryl A., 1996. Acculturative stress, depression, and suicidal ideation among immigrant and second-generation Latino adolescents. J. Am. Acad. Child Adolesc. Psychiatry 35 (9), 1183–1192.

Jefferies, Julian, 2014. The production of "illegal" subjects in Massachusetts and high school enrollment for undocumented immigrant youth. Lat. Stud. 12 (1), 65–87. http://dx.doi.org/10.1057/lst.2014.5.

Landale, Nancy S., Halliday Hardie, Jessica, Oropesa, R.S., Hillemeier, Marianne M., 2015. Behavioral functioning among mexican-origin children: does parental legal status matter? J. Health Soc. Behav. 56 (1), 2–18.

Lara, Marielena, Gamboa, Cristina, Iya Kahramanian, M., Morales, Leo S., Hayes Bautista, David E., 2005. Acculturation and Latino health in the United States: a review of the literature and its sociopolitical context. Annu. Rev. Public Health 26, 367–397.

Link, Bruce G., Phelan, Jo, 1995. Social conditions as fundamental causes of disease. J. Health Soc. Behav. 35, 80–94.

McDonough, Peggy, Walters, Vivienne, 2001. Gender and health: reassessing patterns and explanations. Soc. Sci. Med. 52 (4), 547–559.

Menjívar, Cecilia, 2006. Liminal legality: salvadoran and guatemalan immigrants' lives in the United States. Am. J. Sociol. 111 (4), 999–1037.

Menjívar, Cecilia, Lakhani, Sarah M., 2016. Transformative effects of immigration law: migrants' personal and social metamorphoses through regularization. Am. J. Sociol. 121 (6), 1818–1855.

Mirowsky, John, Ross, Catherine, 1989. Social Causes of Psychological Distress. Aldine Transactions, Piscataway.

Ngai, Mae M., 2004. Impossible Subjects: Illegal Aliens and the Making of Modern America. Princeton University Press, Princeton, N.J.

Patler, Caitlin, 2014. Racialized "illegality": the convergence of race and legal status among black, Latino, and asian american undocumented young adults. In: Carty, Victoria, Luévano, Rafael, Woldemikael, Tekle (Eds.), Scholars and Southern Californian Immigrants in Dialogue: New Conversations in Public Sociology. Lexington Books, pp. 93–113.

Pearlin, Leonard I., 1989. The sociological study of stress. J. Health Soc. Behav. 30 (3), 241–256.

Pearlin, Leonard I., Menaghan, Elizabeth G., Lieberman, Morton A., Mullan, Joseph T., 1981. The stress process. J. Health Soc. Behav. 22 (4), 337–356.

Pew Hispanic Center, 2013. A Nation of Immigrants: A Portrait of the 40 Million, Including 11 Million Unauthorized. Washington, D.C.

Portes, Alejandro, Rumbaut, Rubén G., 2001. Legacies: the Story of the Immigrant Second Generation. University of California Press, Berkeley and Los Angeles.

Portes, Alejandro, Zhou, Min, 1993. The new second generation: segmented assimilation and its variants. Ann. Am. Acad. Political Sci. 530 (November), 74–96.

Potochnick, Stephanie R., Perreira, Krista M., 2010. Depression and anxiety among first-generation immigrant Latino youth: key correlates and implications for future research. J. Nerv. Ment. Dis. 198 (7), 470.

Rodríguez, Michael A., Young, Maria-Elena, Wallace, Steven P., 2015. Creating Conditions to Support Healthy People: State Policies that Affect the Health of Undocumented Immigrants and Their Families. University of California Global

Health Institute, Los Angeles, CA.

Rogler, Lloyd H., Cortes, Dharma E., Malgady, Robert G., 1991. Acculturation and mental health status among hispanics: convergence and new directions for research. Am. Psychol. 46 (6), 585—597.

Rosenfield, Sarah, Mouzon, Dawne, 2012. Gender and mental health. In: Aneshensel, Carol S., Phelan, Jo C., Bierman, Alex (Eds.), Handbook of the Sociology of Mental Health, pp. 277—296.

Rubin, Donald B., 1987. Multiple Imputation for Nonresponse in Surveys. John Wiley, New York.

Saldana, Delia H., 1995. Acculturative Stress. In: Saldana, Delia H. (Ed.), Hispanic Health Psychology: Critical Issues in Theory. Sage, Beverly Hills, pp. 43—56.

Shavers, Vickie L., 2007. Measurement of socioeconomic status in health disparities research. J. Natl. Med. Assoc. 99 (9), 1013—1023.

Sousa-Rodriguez, Isabel, Aranda, Elizabeth, Vaquera, Elizabeth, October 2, 2015. The paradoxes of DACA: challenges for young undocumented immigrant identities and belonging. In: Conference on Undocumented Immigration and the Experience of Illegality. Russell Sage Foundation, New York, NY.

Teranishi, Robert T., Suárez-Orozco, Carola, Suárez-Orozco, Marcelo, 2015. In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform. The Institute for Immigration, Globalization, and Education: University of California, Los Angeles.

Turner, R. Jay, Wheaton, Blair, Lloyd, Donald A., 1995. The epidemiology of social stress. Am. Sociol. Rev. 60 (1), 104—125.

Umaña-Taylor, Adriana J., Updegraff, Kimberly A., 2007. Latino adolescents' mental health: exploring the interrelations among discrimination, ethnic identity, cultural orientation, self-esteem, and depressive symptoms. J. Adolesc. 30 (4), 549—567.

United States Citizenship and Immigration Services, 2015. Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics, and Case Status, 2012-2015 (March 31). Washington, D.C.

Vega, William A., Kolody, Bohdan, Valle, Juan Ramon, 1987. Migration and mental health: an empirical test of depression risk factors among immigrant mexican women. Int. Migr. Rev. 21 (3), 512—530.

Vega, William A., Rumbaut, Ruben G., 1991. Ethnic minorities and mental health. Annu. Rev. Sociol. 17, 351—383.

Viruell-Fuentes, Edna A., 2007. Beyond acculturation: immigration, discrimination, and health research among mexicans in the United States. Soc. Sci. Med. 65 (7), 1524—1535.

Viruell-Fuentes, Edna A., Miranda, Patricia Y., Abdulrahim, Sawsan, 2012. More than culture: structural racism, intersectionality theory, and immigrant health. Soc. Sci. Med. 75 (12), 2099—2106.

Watson, David, Clark, Lee A., Tellegen, Auke, 1988. Development and validation of brief measures of positive and negative affect: the PANAS scales. J. Personality Soc. Psychol. 54 (6), 1063—1070.

White, Ian R., Royston, Patrick, Wood, Angela M., 2011. Multiple imputation using chained equations: issues and guidance for practice. Statistics Med. 30, 377—399. http://dx.doi.org/10.1002/sim.4067.

Yoshikawa, Hirokazu, 2011. Immigrants Raising Citizens: Undocumented Parents and Their Young Children. Russell Sage Foundation, New York.

002060

Downloaded from by guest on August 16, 2024. Copyright 2008

# Short-, Medium-, and Long-Term Consequences of Poor Infant Health

## An Analysis Using Siblings and Twins

**Philip Oreopoulos**
**Mark Stabile**
**Randy Walld**
**Leslie L. Roos**

ABSTRACT

*We use administrative data on a sample of births between 1978 and 1985 to investigate the short-, medium-, and long-term consequences of poor infant health. Our findings offer several advances to the existing literature on the effects of early infant health on subsequent health, education, and labor force attachment. First, we use a large sample of both siblings and twins, second, we use a variety of measures of infant health, and finally, we track children through their schooling years and into the labor force. Our findings suggest that poor infant health predicts both mortality within one year, and mortality up to age 17. We also find that infant health is a strong predictor of educational and labor force outcomes. In particular, infant health is found to predict both high school completion and welfare takeup and length.*

*Philip Oreopoulos is an associate professor of economics at the University of Toronto. Mark Stabile is an associate professor of business economics and public policy at the University of Toronto. Randy Walld is an information technologist at the University of Manitoba. Leslie Roos is a professor of community health science at the University of Manitoba. The authors gratefully acknowledge those individuals who helped make this research possible. These include the Manitoba Ministry of Education, Citizenship and Youth—John Van Wallenghem, Richard Perrault, Carol Crera, Jean Britton, Ken Clark, and Shirley McLellan; from the Ministry of Family Services and Housing—Harvey Stevens, Grant Doak, Gudrun Fritz, and Jan Forster; and from the Ministry of Health—Louis Barre. Janet Currie and Sandra Black provided very helpful comments. Stabile and Roos thank the Canadian Institutes for Health Research for financial support. Oreopoulos thanks the Social Sciences and Humanities Research Council of Canada (MH:2004/2005–27). Additional support was provided by the Canadian Institute for Advanced Research and the RBC Financial Group (MH:2003/2004-32). The authors also thank Florian Hoffman for excellent research assistance. The data used in this article are housed at the Manitoba Centre for Health Policy. Information on access can be obtained by contacting Leslie Roos, Manitoba Centre for Health Policy, 4th Floor, 727 McDermot Avenue, Winnipeg, MB R3E 3P5 Canada; e-mail:Leslie_Roos@cpe.umanitoba.ca Beginning from August 2008 through July 2011, All codes to replicate the tables in this paper will be kept on file during this time*
ISSN 022-166X E-ISSN 1548-8004 © 2008 by the Board of Regents of the University of Wisconsin System

002061

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2069 of 4699 PageID #:  5234

Downloaded from by guest on August 16, 2024. Copyright 2008

## I. Introduction

Infants born in poor health, as measured by low and very low birth weights and low Apgar scores, have lower chances of survival, and also may experience further health and social difficulties later in life (Conley 2003). Low-birth-weight babies are also increasingly expensive to treat in hospital. Almond et al. (2005) calculate that among babies weighing 2000 grams, an additional 450 grams is associated with a $10,000 savings in hospital charges for inpatient services. As such, understanding the causes and consequences of poor infant health has been a primary concern of both the medical and health policy literature for some time.

Medical advice to expecting mothers on how to prevent low birth weight, including refraining from smoking and seeking prenatal care, is centered around the notion that preventing low birth weight will improve both the life chances of the child and chances of future success. Researchers also have noted the potential to reduce hospital costs significantly through inexpensive prenatal interventions aimed at reducing low birth weight in particular (Almond et al. 2005). Program evaluations on both Medicaid expansions in the United States (Currie and Gruber 1996) and the introduction of national health insurance in Canada (Hanratty 1996) have examined improved prenatal treatment and its potential effects on infant health, providing further evidence of the policy importance of, and potential benefits associated with, improving infant health.

As noted in Almond et al. (2005), interventions aimed particularly at reducing low birth weight are premised on the notion that low birth weight in particular is the cause of poor health and related outcomes in the future, and not simply a marker and correlate of such problems. While interventions and public policy aimed at improving overall infant health, including reducing the incidence of low birth weight, are likely to have both short- and long-term benefits, a clearer understanding of the causes and consequences of poor infant health only can help to improve the efficacy of both healthcare and public policy. An analysis of the long-term impact of infant health also may uncover important relationships not realized from focusing on earlier outcomes. Infants born lower than average birth weight but not considered at risk of early death, for example, may in fact benefit from prenatal care. Or, the majority of low-birth-weight infants that survive past one year may face few subsequent risks.

A considerable body of research attempts to quantify the effects of early infant health on both early childhood survival and on future health, education, and social outcomes. Conley, Strully, and Bennett (2003), for example, examined the effects of birth weight for both fraternal and identical twins on both neonatal and post-neonatal mortality. They conclude that birth weight differences between twins affects infant mortality and that this effect is stronger for fraternal than identical twins. Almond et al. (2005) examine the relationship between low birth weight, low Apgar scores, and mortality in the first year of life. Using a large sample of twin births from the National Center for Health Statistics, they show that, while both birth weight and Apgar scores are strongly related to infant mortality across families, the relationship between birth weight and infant mortality significantly decreases when differences between twins are examined. In contrast, the relationship between Apgar scores and infant mortality remains strong both across families and within twin pairs. Both papers note that, while twin samples can be extremely helpful in eliminating

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2070 of 4699 PageID #:  5235

Downloaded from by guest on August 16, 2024. Copyright 2008

unobserved heterogeneity across families, the resulting sample is somewhat unique in that twins tend to be of lower weight than the average in the singleton infant population.

A second stream of social science literature has used twin studies to examine the longer-term effects of birth weight on health and education. Behrman and Rosenzweig (2004) use twin data from the Minnesota Twins Registry to examine the effects of low birth weight on the educational attainment and adult health of women. They find that increasing birth weight increases schooling attainment by about one-third of a year and that this effect is stronger within twins than across children of different families. Conley, Strully, and Bennett (2003) examine the effects of low birth weight on high school graduation and placement in special education using the Panel Study of Income Dynamics. They find that the effects of low birth weight on timely high school graduation are more pronounced among siblings than across families. The study does not look at other measures of infant health (Apgar and gestation) nor does it explore the potential nonlinear effects of low birth weight on infant health. Black et al. (2007) use a sample of Norwegian twins to examine the long-run consequences of low birth weight. Their evidence confirms that low birth weight is not a good predictor of infant death within twin pairs. However, they do find long-term effects of low birth weight on cognitive outcomes, educational outcomes, and on earnings.

Our paper expands on the results of previous work in the following ways: First, it uses an administrative sample of both siblings and twins to examine the effects of infant health on mortality within one year. Comparing sibling findings and twin findings allows us to overcome concerns that twins are a select sample of the population and that inference from this sample is not, therefore, generalizable to the broader population. Second, tracking both siblings and twins through school and into their early experiences in the work force provides longer-term evidence for both groups, including educational outcomes, healthcare costs, and social assistance receipt. Third, a variety of infant health measures, including birth weight, Apgar scores, and gestational length, are used to contrast the effects of these measures on outcomes and to reconcile and expand the findings of other research using multiple measures of infant health. Gestational length is an important determinant of low birth weight, one which twin only studies are unable to examine. Finally, using a sample of children with uniform access to health insurance further corrects for any potential unobserved heterogeneity *within* families across siblings that might not be captured in sibling-fixed-effects models and offers an interesting comparison with a U.S. sample lacking universal coverage.

Our findings offer several advances to the existing literature on the effects of early infant health on subsequent health, education, and labor force attachment. First, we confirm earlier results by Almond et al., which show that the effect of infant health as measured by birth weight less than 2,500 grams largely disappears when looking at within twin variation. The five-minute Apgar score and measures of very low birth weight (less than 1,500 grams) are stronger predictors of infant mortality within one year than birth weight for twin samples. However, we find that within sibling pairs Apgar, low birth weight, and gestational age predict infant mortality within one year, even though we continue to account for unobserved heterogeneity across families. Second, infant health is found to predict both high school completion and social assistance (welfare) takeup and length. We find evidence of longer-term consequences of infant health both across families, within siblings, and within twin

Downloaded from by guest on August 16, 2024. Copyright 2008

pairs, although different measures of infant health predict outcomes differently. The results suggest strong effects of infant health on death between ages one and 17, grade completion, and months on social assistance after age 18, even for ranges not considered overtly concerning (for example, birth weights between 2,500 and 3,500 grams and Apgar scores of seven or eight). The results are similar comparing families living in more or less disadvantaged neighborhoods. Interestingly, we find weaker evidence of the longer-term effects of infant health on either cognitive ability as measured by language arts test scores or longer-term physician visits and costs. Overall, we conclude that there are indeed long-term consequences of poor infant health, and that a better understanding of these consequences can be determined by examining a variety of infant health measures and by examining the variation both within families and within twin pairs. The implication of these findings is that reductions in poor infant health will lead to lower mortality, greater human capital accumulation, and lower welfare usage.

## II.  Data

The data are from the Population Health Research Data Repository at the Manitoba Centre for Health Policy (MCHP). Our main data match hospital records at birth to other administrative records on education, physician visits, and social-assistance takeup. We also match socioeconomic characteristics at the postal code level using the 2001 Canadian Census. The sample includes more than 96 percent of all children born in Manitoba in 1978–82 and 1984–85 and more than 99 percent of this group remaining in the province up to June of their 18th year.[1] Health, educational, and social assistance outcomes are tracked up to 2004.[2] Further details on the construction of the data set are available in the data appendix (see the *JHR* website, www.ssc.wisc.edu/JHR/).

Table 1 presents descriptive statistics of the infant health measures recorded on the hospital records and used in our study: birth weight (in grams), gestation (in weeks), and five-minute Apgar score (on a ten-point scale). Means, standard deviations, and percentiles for these measures are shown for the full sample of births between 1979 and 1985. These statistics are also shown for the subset sample of births with at least two siblings identified within this cohort range and the subset sample of twins. The sibling sample excludes twins.

The frequency distributions of these variables compare similarly with those generated from nationally representative samples of Canada or the United States. The mean birth weight among the full sample is about 3,500 grams. Twins weigh about 950 grams less and are born about three weeks earlier. About 7 percent of the full sample is born low birth weight, defined as weighing less than 2,500 grams. In the analysis below, we explore not only the effects of being born less than 2,500 grams and less than 1,500 grams, but also the effects of being born below average birth weight, between 2,500 to 3,000 grams and between 3,001 to 3,500 grams. Gestation

---

1.  The cohort born in 1983 was not included because grade 12 provincial tests were not given in the school year 2000/2001 (when the 1983 birth cohort would be expected to be in grade 12).
2.  In Canada, welfare is more commonly referred to as social assistance. For consistency, we maintain this terminology.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2072 of 4699 PageID #:  5237

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 1**
*Descriptive Statistics of Infant Health Measures*

**5 Minute APGAR Score (0–10)**

| Sample | Mean | s.d. | Within Family s.d. | 1st | 5th | 10th | 25th | 50th | 75th | N |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Percentile | | | |
| All births 1979–85 | 9.094 | 0.928 | NA | 6 | 8 | 8 | 9 | 9 | 10 | 108,800 |
| Siblings only | 9.131 | 0.919 | 0.646 | 6 | 8 | 8 | 9 | 9 | 10 | 54,123 |
| Twins only | 8.594 | 1.397 | 0.625 | 1 | 6 | 7 | 9 | 9 | 9 | 1,742 |

**Birth Weight (in Grams)**

| Sample | Mean | s.d. | Within Family s.d. | 1st | 5th | 10th | 25th | 50th | 75th | N |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Percentile | | | |
| All births 1979–85 | 3,424.5 | 570.3 | NA | 1,680 | 2,500 | 2,760 | 3,100 | 3,450 | 3,780 | 109,125 |
| Siblings only | 3,458.3 | 556.6 | 314.1 | 1,780 | 2,580 | 2,820 | 3,140 | 3,480 | 3,800 | 54,986 |
| Twins only | 2,517.4 | 610.6 | 201.9 | 790 | 1,360 | 1,725 | 21,81.5 | 2,580 | 2,930 | 1,752 |

**Gestation (in Weeks)**

| Sample | Mean | s.d. | Within Family s.d. | 1st | 5th | 10th | 25th | 50th | 75th | N |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Percentile | | | |
| All births 1979–85 | 39.4 | 2.0 | NA | 32 | 36 | 37 | 39 | 40 | 40 | 90,135 |
| Siblings only | 39.4 | 1.9 | 1.1 | 33 | 37 | 38 | 39 | 40 | 40 | 45,583 |
| Twins only | 36.5 | 3.3 | 0.0 | 25 | 30 | 32 | 35 | 37 | 39 | 1,492 |

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2073 of 4699 PageID #:  5238

Downloaded from by guest on August 16, 2024. Copyright 2008

before birth typically takes about 40 weeks. Preterm births are often defined as births before 37 weeks gestation; there are 7 percent preterm births in our full sample. Late births occur after 41 weeks.

The Apgar score summarizes five vital sign conditions at birth. Heath care providers assess an infant's heart rate, respiration, muscle tone, reflex, and color; they assign values of zero, one, or two for each category, with the best possible total score equaling ten. A score less than seven often triggers additional action to stabilize conditions. A score of seven to ten is considered normal. As shown below, lower five-minute Apgar scores even within this normal range affect subsequent educational outcomes and social assistance takeup.

The typical variation in these infant health measures between a pair of siblings or a pair of twins is about 55 to 70 percent of the typical variation between any randomly chosen infant pair. Column 2 of Table 1 lists standard deviation for each variable, across all individuals. Column 3 shows standard deviations in these infant health measures within families, among siblings and twins. These amounts are the standard deviations of the residuals generated after regressing the health measures on a set of family fixed effects. The standard deviation for Apgar scores is about 0.92 over the full sample and 0.65 within families. The standard deviation for gestation is about two weeks and one week between siblings. The within family standard deviation of birth weight is still 314 grams between siblings, and 202 grams between twins. In perspective, Almond, Chay, and Lee (2005) report that the average difference in birth weight between a newborn with a mother who smokes and one with a mother who does not is 285 grams.[3] The average difference in gestation is 0.3 weeks, while the average difference in five-minute Apgar score is 0.07. Our main analysis uses within family variation in infant health to explore short- and long-run differences in socioeconomic outcomes. Column 3 indicates considerable variation within families to work with in exploring later outcome differences.

We observe differences in infant health across both siblings and twins for several reasons. Between siblings, birth weight can differ due to both gestational length and differences in intrauterine growth retardation (IUGR). Between twins, differences in birth weight are mainly attributable to differences in IUGR. Twin studies have emphasized that much of the literature has focused on differences in IUGR, despite the fact that gestational length accounts for a significant percent of the low-birth-weight infants. One possible reason for this, as noted by Almond et al. (2005) and reported in Goldenberg and Rouse (1998), is that there is little medical evidence on how to effectively increase gestational length, whereas there are widely accepted policy interventions aimed at IUGR (reducing smoking and ensuring appropriate nutrition during pregnancy, are the most common of these). Apgar scores differ between both siblings and twins. The test was initially designed to measure whether infants required immediate medical care and has been shown to be highly correlated with infant mortality (Almond et al. 2005).[4] After testing whether the infant health measures

---

3. These figures are for the sample of Pennsylvania singletons born between 1989 and 1991. The means, standard deviation, and percentiles reported in Table 1 are similar to those reported by Almond, Chay, and Lee for their Pennsylvania sample.

4. The definition and purpose of the Apgar were obtained from the NIH web site at http://www.nlm.nih.gov/medlineplus/ency/article/003402.htm

**Table 2**

*Descriptive Statistics of Outcome Measures (Sibling Sample) 1979–85 Manitoba Births*

|  | Mean | Standard Deviation | Age of Individual | N |
|---|---|---|---|---|
| Infant mortality | 0.011 | 0.105 | To 365 days | 54,310 |
| Death between ages 1 and 17 | 0.006 | 0.080 | 17 | 53,700 |
| Moved from Manitoba | 0.208 | 0.406 | 17 | 53,750 |
| Total physician visits | 14.358 | 12.610 | Age 12–17 | 40,203 |
| Language score (standardized scaled logit) | −0.016 | 1.013 | Grade 12 | 40,203 |
| Reached grade 12 by age 17 | 0.694 | 0.461 | 17 | 40,203 |
| Ever on social assistance[a] | 0.080 | 0.271 | Age 18 to Mar-04 | 22,870 |
| Months on social assistance[a] | 1.372 | 5.985 | Age 18 to Mar-04 | 22,870 |

a. Includes only the cohorts born between 1978 and 1982 to maximize a consistent exposure window for social assistance.

presented here are good predictors of death in the first year, we then consider, conditional on survival, whether they are also predictors of poor health later in life and potentially measures of cognitive ability and human capital as well.

Table 2 lists the health and socioeconomic outcomes explored in our paper. The infant mortality variable comes from matching births and deaths from the Manitoba Vital Statistics over the first year of life. The variable takes on the value of one if a birth is matched to a death in the first year, and zero otherwise. A death between ages one and 17 is similarly recorded.

The other outcome variables came from administrative data on physician costs, education, and social assistance. These data are available only for Manitoba residents. The analysis of the effects of infant health on these longer-term outcomes, therefore, is conditional on survival and conditional on remaining a resident in the province. We focus on estimating the long-term effects of infant health for those born in Manitoba and living in the province at least until they reach 17.5 years old. Table 2 indicates that 24 percent of our original sample of births in Manitoba between 1979 and 1985 either died or left the province before this age. We shall document that health at birth does indeed affect mortality before age 17, even after one year, but it does not affect mobility. For all outcome measures except mortality and mobility, we condition on the sample of those remaining in Manitoba at least until age 17.

The Manitoba Repository data record hospital discharge abstracts and physician claims extending back to 1970. Physician claims include diagnostic information and are primarily reimbursed on a fee-for-service system. We summarize adolescent health by summing the number of ambulatory physician visits recorded between ages 12 and 17.[5] An ambulatory physician visit is any contact with a physician that is

5. We chose to only use ambulatory visits after age 11, as many children have many routine visits before age 12 for immunizations, which are not due to poor health.

Downloaded from by guest on August 16, 2024. Copyright 2008

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2075 of 4699 PageID #: 5240

Downloaded from by guest on August 16, 2024. Copyright 2008

billable by the physician to Manitoba Health and occurs while the patient is not a hospital in-patient. This includes physician services received in hospital emergency rooms and outpatient departments, contacts with physicians in salaried positions, consultative and nonconsultative care, and physician visits to residents of personal care homes. Excluded from ambulatory physician visits are all claims for optometrist, oral surgery, dental, periodontal, and chiropractor contacts; inpatient visits (that is, contact with a physician while admitted to a hospital); and laboratory tests, radiology, and similar services. More than 90 percent of this population contacts a physician over a two-year period and the average visit rate is more than four visits per year.

We link education enrollment records with the provincial registry to determine whether a student has attained grade 12 by age 17. Not attaining grade 12 by this age could indicate that a student entered school late for age, has been held back in a grade at least once, or has dropped out. This measure is available for all seven birth cohorts used. Students may not have reached grade 12 because they have been held back. On the other hand, many students held back are more likely to drop out. Our measure proxies as an overall indicator for being at risk of ending up with a low level of education attainment.[6]

We also have information from provincial language arts standards tests taken in grade 12. These tests contribute 30 percent to the students' final course grade. Individuals pass the language arts test by scoring 50 percent or more on a comprehensive exam. The test focuses on reading comprehension, exploring and expanding on ideas from texts, the management of ideas and information, and writing and editing skills. For each birth cohort, we record the test score in five percentage point categories (13 in total, with a residual 14th for students scoring between 0 and 35 percent) in the year that most students write the test. Within each birth cohort, approximately 35 percent of test scores are missing. For these students we impute test scores based on the reason for missing information (ranking them below the lowest scoring category among those who wrote the test) and estimate models both including and excluding imputed values. Details on the imputation methods are available in the data appendix (see the *JHR* website, www.ssc.wisc.edu/jhr/)

Finally, the sample of Manitoba residents is matched to monthly social assistance records up to March 2004. Our youngest birth cohort only can be followed for about a year after the age of 18. The oldest cohorts are followed from age 18 to age 25. Eight percent of our sample received some social assistance before April 2004. In order to avoid censoring issues we define our social assistance exposure window two ways. First, using the cohorts born between 1978 and 1982 we use the maximum exposure to social assistance eligibility possible in our data such that all siblings are observed for the same length of time. This produces an exposure window of 3.25 years. Second, we use the total possible exposure for all birth cohorts. We report only the former but the results are not sensitive to selecting the sample this way. In case infant health also may affect the length of time on social assistance, we focus on the number of months individuals in our sample used these services. The average number of months on social assistance over our selected sample is 1.4.

---

6. Approximately 3 percent of the children start school (kindergarten) a year late. Analysis by month of birth shows these children to be disproportionately those born in November and December.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2076 of 4699 PageID #:  5241

## III. Empirical Methods

We estimate models of the effects of early infant health on mortality, health expenditures, educational performance, and social assistance receipt as follows:

$$(1) \quad y_{ijt} = \alpha + \beta \text{inf} health_{ij} + X_{ij} + \delta_j + \tau_t + \varepsilon_{ijt}$$

Where $y_{ijt}$ represents the outcomes for individual $i$ in family $j$, at time $t$. $X$ measures family or individual specific controls such as marital status, sex of the child, and mother's age at birth. We also include a set of dummies for the birth order of the child within each family size to completely control for any effects of both birth order and family size.[7] The $\tau_t$ are year of birth fixed effects to account for any differences by year of birth of the child. The $\delta_j$ are family fixed effects, which, as we outline in greater detail below, are included in some specifications.

Our primary parameter of interest is $\beta$, which is the coefficient associated with our estimate of the effect of early infant health. As discussed above, we use three different measures: birth weight, five-minute Apgar score, and gestational length in weeks. Our main analysis classifies these infant health measures into categories and uses dummy variables to estimate possible nonlinear effects of infant health. This approach helps uncover more detailed relationships between infant health and our outcome measures. For example, education attainment may differ by birth weight only for the small fraction born weighing less than 2,500 grams and surviving. In this case, a linear regression model would not adequately capture this relationship. For Apgar score, we estimate effects at birth by comparing scores of six or less, seven to eight, or nine, to a score of ten. For birth weight, we group infants by whether they weigh 1,000 grams or less, 1,001 to 1,500 grams, 1,501 to 2,500 grams, 2,501 grams to 3,000 grams, 3,001 to 3,500 grams, and 3,501 grams or more. For gestation, we compare normal gestation length, between 40 and 41 weeks, to infants born with less than 37 weeks gestation, with 37, 38, or 39 weeks of gestation, and with 42 weeks or more.[8]

For each measure of infant health, we estimate five models: OLS using our entire sample, OLS using the sample of children with siblings, OLS using the sample of twins in the data, the sibling sample including family fixed effects ($\delta_j$) and finally the twin sample including family fixed effects.

One of the advantages of our study is that we are able to examine how the relationship between infant health and our outcome measures change when we use twin and sibling fixed effects with the same data. We are able to compare OLS coefficients to the within-twin and within-sibling estimates, and within the sibling estimates we are able to compare the coefficients when we allow the source of birth weight variation to vary due to

---

7. Several studies point out that family size correlates with education and other socioeconomic outcomes. Black, Deveraux, and Salvanes (2005), also find important differences in outcomes depending on birth order. We control for these differences with family-size and birth-order fixed effects, in case these variables also relate to infant health. Family size and birth order are based on the final family size and birth order in the family (using all siblings in the data up to 2004). Excluding such controls does not change our baseline results in significant ways.

8. To check how sensitive our results are to functional form, and to allow comparison with studies that use different specifications, we reestimate our models using linear specifications. The results are qualitatively similar and are available in Oreopoulos et al. (2006).

Downloaded from by guest on August 16, 2024. Copyright 2008

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2077 of 4699 PageID #: 5242

Downloaded from by guest on August 16, 2024. Copyright 2008

both IUGR and gestational length, to those using IUGR alone (for example, controlling for gestation). Comparing twin and sibling estimates in this way exploits the benefits of both identification strategies. Using the siblings we are able to use a more representative sample of children, but we risk that our estimates are biased due to both the potential change in parental investment following the birth of the first child (noted in Rosenzweig and Wolpin 1995) as well as the potential change in socioeconomic status between births (more on this below). Using the twins, we are able to eliminate these potential biases, but we estimate coefficients for a limited and unrepresentative sample. It also is possible that the patterns of postnatal investment as a function of infant health are different for siblings than for twins and this could also lead to differences in the coefficient estimate.[9] Finding common patterns across these estimation strategies allows for more confidence in the inference. Differences across these methods also may be informative as to the nature of the infant health-future outcome relationship.

Our estimates of Equation 1 serve two purposes. First, we are able to replicate the results found in Almond et al. (2005), contrasting OLS and twin models with family fixed effects, using a smaller sample of Canadian children. The differences using between-family and within-family variation found in that research are shown to hold for this sample of Canadian children as well. Second, we are able to expand on the Almond et al. analysis of the effects of infant health on one-year mortality by estimating fixed effects models using variation in infant health across siblings instead of across twins.

In addition, we estimate alternate versions of Equation 1 using the other outcome measures described above, including: whether the child was held back a grade, the child's language arts test scores measured in grade 12, whether the child dropped out of high school before graduation, and whether the child was on social assistance. Thus, we are able to apply the same OLS, twin, and sibling analyses to a variety of longer-term measures of child health and social outcomes.

## IV. Results

Table 3a shows the effects of our measures of infant health on infant mortality (death before age one). The subsequent tables presenting results with different outcome variables have a similar structure. Column 1 displays the coefficients on the infant health categories for the full sample of singletons and siblings, without family fixed effects. These results are from the linear probability model for whether an infant died in the first year regressed on the infant health dummy variables, plus controls for mother's marital status, gender of child, and a complete set of dummy variables for all family size and birth order combinations. The second column shows the same regression, but for the subset sample of births with at least one other sibling identified within the birth cohorts 1979–85 (but excluding twins). In the third

---

9. As noted in the empirical specification section below, we include a full set of birth-order fixed effects to partially control for this, although differences in the interaction between birth order and infant health could still lead to differences in the results. To explore this possibility we perform a further specification check of interacting birth order and poor infant health on reaching grade 12 by age 17 to explore whether parents respond differently to an early child with poor infant health compared to a later child. We find no significant interaction terms between infant health and birth order.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 3a**

Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth)With and Without Family Fixed Effects

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| | APGAR Score (Omitted Category APGAR=10) | | | | |
| APGAR≤6 | 0.2588 *** | 0.3092 *** | 0.3197 *** | 0.3123 *** | 0.0957 *** |
| | (0.0021) | (0.0034) | (0.0047) | (0.0171) | (0.0237) |
| APGAR=7–8 | 0.0613 *** | 0.0189 *** | 0.0198 *** | 0.0186 * | −0.0045 |
| | (0.0010) | (0.0015) | (0.0022) | (0.0111) | (0.0155) |
| APGAR=9 | 0.0017 *** | 0.0025 *** | 0.0020 | 0.0024 | −0.0014 |
| | (0.0006) | (0.0009) | (0.0014) | (0.0097) | (0.0147) |
| F-test: No information about health effects | 5,036.06 *** | 2,887.21 *** | 1,588.14 *** | 137.49 *** | 8.93 *** |
| Sample size | {108,893} | {54,091} | {54,091} | {1,740} | {1,740} |
| R-squared | 0.12 | 0.13 | 0.50 | 0.34 | 0.84 |
| | Birth Weight (Omitted Category BW = 3,500+grams) | | | | |
| BW<1,000 | 0.8120 *** | 0.8572 *** | 0.8723 *** | 0.7249 *** | 0.2532 *** |
| | (0.0046) | (0.0071) | (0.0099) | (0.0292) | (0.0701) |
| BW 1,000–1,500 | 0.2657 *** | 0.3622 *** | 0.3912 *** | 0.2099 *** | 0.0848 ** |
| | (0.0039) | (0.0066) | (0.0093) | (0.0220) | (0.0384) |
| BW 1,500–2,500 | 0.0320 *** | 0.0479 *** | 0.0630 *** | 0.0051 | 0.0048 |
| | (0.0013) | (0.0022) | (0.0034) | (0.0174) | (0.0246) |
| BW 2,500–3,000 | 0.0058 *** | 0.0065 *** | 0.0130 *** | 0.0063 | −0.0043 |
| | (0.0008) | (0.0012) | (0.0021) | (0.0174) | (0.0231) |

002071

Downloaded from by guest on August 16, 2024. Copyright 2008

| | | | | | |
|---|---|---|---|---|---|
| BW 3,000–3,500 | 0.0015 *** | 0.0018 *** | 0.0042 *** | −0.0006 | −0.0017 |
| | (0.0006) | (0.0009) | (0.0014) | (0.0182) | (0.0218) |
| F-test: no information about health effects | 7,099.73 *** | 3,586.36 *** | 1,899.91 *** | 213.85 *** | 3.25 *** |
| Sample size | {109,125} | {54,310} | {54,310} | {1,752} | {1,752} |
| R-squared | 0.25 | 0.25 | 0.57 | 0.48 | 0.84 |
| **Gestation (Omitted Category 40–41 Weeks)** | | | | | |
| Gestation≤36 weeks | 0.0837 *** | 0.1060 *** | 0.1187 *** | 0.0804 *** | NA |
| | (0.0014) | (0.0023) | (0.0039) | (0.0104) | |
| Gestation 37 weeks | 0.0056 *** | 0.0084 *** | 0.0142 *** | 0.0060 | NA |
| | (0.0016) | (0.0025) | (0.0041) | (0.0141) | |
| Gestation 38 weeks | 0.0035 *** | 0.0052 *** | 0.0073 *** | 0.0044 | NA |
| | (0.0010) | (0.0015) | (0.0026) | (0.0123) | |
| Gestation 39 weeks | 0.0010 | 0.0005 | −0.0003 | 0.0089 | NA |
| | (0.0008) | (0.0013) | (0.0021) | (0.0132) | |
| Gestation≥42 weeks | 0.0005 | −0.0003 | 0.0005 | 0.0001 | NA |
| | (0.0013) | (0.0019) | (0.0031) | (0.0237) | |
| F-test: no information about health effects | 722.48 *** | 435.15 *** | 198.70 *** | 7.55 *** | |
| Sample size | {90,135} | {45,583} | {45,583} | {1,492} | NA |
| R-squared | 0.05 | 0.05 | 0.51 | 0.19 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002072

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2080 of 4699 PageID #:  5245

Downloaded from by guest on August 16, 2024. Copyright 2008

column, the coefficients presented correspond to the regression model that now includes family fixed effects. The fourth and fifth columns show the results among twins, without and with family fixed effects respectively.

The first panel shows the results defining infant health by five-minute Apgar score. Infants born assessed with an Apgar score below seven are about 26 percentage points more likely to die within one year than those with Apgar scores of ten, and 31 percentage points more likely to die among the sibling sample. This relationship holds when we use only differences between siblings in Column 3. The coefficient remains virtually unchanged. However, after adding family fixed effects in the twin sample, the coefficient falls by about two-thirds. The relatively higher association between Apgar and early death is far less severe for those with scores of seven or eight. While such assignments are not normally considered indicators of critical need, non-twin siblings in this category are about 1.9 percentage points more likely to die within a year than other siblings with scores of ten. For twins, however, this relationship drops by a third, and is measured less precisely because of the smaller sample size. The results also suggest only a minute difference in infant mortality between infants with Apgar scores of nine versus ten.

The second panel presents the same set of results, but using birth weight instead of Apgar categories. Interestingly, the same contrast in results between the sibling and the twins samples arises when we compare the effects of very low levels of birth weight on infant mortality with and without fixed effects. The estimated effects of low birth weight slightly increase after adding the family fixed effects for the sibling sample. Even for infants born between 2,500 and 3,500 grams—below average weight but not typically considered low birth weight—there is about a one percentage point higher risk of death within one year. The estimated effect associated with weighing less than 1,500 grams falls by about two-thirds when comparing twins from the same family compared to using cross-variation of the nontwin sibling sample. Similar results were found by Almond, Chay, and Lee (2005), who focus on twins exclusively.

Variation in infant health between twins cannot be due to changes in socioeconomic circumstances of the parents between births. Changes in such circumstances over the one- to seven-year period in our sibling sample do not seem large enough to explain the different estimates, especially since the coefficients do not fall at all after adding the fixed effects (the twins results suggest a downward omitted variable bias). Another explanation is that twin birth-weight variation cannot result from differences in gestation, but it certainly can with the sibling sample. The last panel indicates siblings born premature are significantly more likely to die in one year than another sibling not born premature. A sibling born 37 weeks since conception faces a 1.4 percentage point higher chance of infant mortality than another sibling born between 40 and 41 weeks since conception. We also find slightly higher chances of infant mortality from 39 weeks gestation. Thus, one possibility to explain the different estimated effects from low birth weight and low Apgar score between nontwin siblings and twins is gestation, an important source of variation correlated with these measures of infant health but left out from the between twins analysis.[10]

---

10. Approximately 14 percent of the births in our sample are from C-sections. C-sections can alter the gestational length in ways that may affect our estimates. We reestimated the gestational models excluding C-sections and the results are very similar.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2081 of 4699 PageID #:  5246

Downloaded from by guest on August 16, 2024. Copyright 2008

In order to compare the sibling and twin fixed-effects more closely we also estimate models of the effects of birth weight on infant death conditional on gestation. Interestingly, there is little change in the coefficients on birth weight (they are, on average, 90 percent of the size of the coefficients excluding controls for gestation) while most of the coefficients on gestation become insignificant. This suggests that most of the relationship between birth weight and infant health is indeed due to IGUR and not differences in gestational length, supporting the inference from estimates of twin samples. These results are reported in Table 3b.

There are sufficient numbers of infant deaths in our sample to explore the relationship between infant health and death by cause if we group our sample into four classifications: congenital anomalies (24 percent), symptoms, sign and ill-defined conditions (11 percent) (including SIDS, although 76 percent of these deaths are coded as "sudden death, cause unknown"), conditions originating in the perinatal period (41 percent), and all other diagnoses (20 percent, including injuries which make up 3 percent of the 20 percent). Although the twin samples get too small to infer much, the sibling-fixed-effects results suggest that at lowest birth weights and Apgar scores, the largest effect is from conditions originating in the perinatal period. These include respiratory distress syndrome, disorders relating to low birth weight and short gestation, and hematological disorders of fetus and newborn. Because many of the examples given for these disorders are exactly our infant health measures, the strength of this relation should not be surprising. At low, but not very low birth weights, and mid-level Apgar scores, congenital anomalies are also reasonably large predictors (and conditions originating in the perinatal period remain large). These results are presented in Appendix Tables A1 through A4.[11]

To explore the extent of possible adjustments in fertility decisions in response to having a sick child we reestimate our model splitting the sibling sample into (a) the sample for which the first child has poor health and (b) a subsequent child has poor health.[12] These results are reported in Appendix Table A5. Using both birth weight and Apgar scores as the measure of infant health we note that the effects of poor infant health on death within one year are fairly consistent between the samples where the first child experienced poor infant health and where a subsequent child experienced poor infant health. While the coefficients on infant health for the sample with a subsequent child having poor health are larger in some cases, the coefficients in both samples continue to be large and significant.

Extending the analysis on child death out to the first 17 years of life, we continue to find an effect of both low Apgar scores and low birth weight on survival when we examine children across families and between siblings within families (Table 4). Indeed, the coefficients on birth weight between 1,000 and 2,500 grams actually increase once we include family fixed effects, and the coefficients on the lowest Apgar scores remain relatively stable. Using the twin sample, however, we find no evidence of a negative

---

11. A main contribution of this paper is to explore robustly whether the consequences of infant health continue over the longer term. Extrapolating from cause of death to the cause of longer-run relationships, while extremely important, is an area for further exploration.

12. This subsample includes only those siblings who fit the following criteria: one group has first-born <3,000g (or Apgar <eight) with no later sibling <3,000g, and the second group is first-born >3,000g and some later sibling <3,000g.

002074

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2082 of 4699 PageID #: 5247

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 3b**
*Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| | | Birth Weight (Omitted Category BW = 3,500+ grams) | | | |
| BW<1,000 | 0.8069 *** | 0.8494 *** | 0.8683 *** | 0.7296 *** | 0.2532 *** |
| | (0.0048) | (0.0074) | (0.0103) | (0.0301) | (0.0701) |
| BW 1,000–1,500 | 0.2609 *** | 0.3546 *** | 0.3872 *** | 0.2145 *** | 0.0848 ** |
| | (0.0041) | (0.0069) | (0.0097) | (0.0230) | (0.0384) |
| BW 1,500–2,500 | 0.0292 *** | 0.0435 *** | 0.0604 *** | 0.0091 | 0.0048 |
| | (0.0015) | (0.0024) | (0.0037) | (0.0181) | (0.0246) |
| BW 2,500–3,000 | 0.0051 *** | 0.0053 *** | 0.0120 *** | 0.0093 | −0.0043 |
| | (0.0008) | (0.0013) | (0.0021) | (0.0177) | (0.0231) |
| BW 3,000–3,500 | 0.0013 ** | 0.0014 *** | 0.0038 *** | 0.0006 | −0.0017 |
| | (0.0006) | (0.0009) | (0.0014) | (0.0182) | (0.0218) |
| *F*-test: No infant health effects | 6,192.65 *** | 3,043.72 *** | 1,640.12 *** | 200.80 *** | 3.25 *** |

002075

Downloaded from by guest on August 16, 2024. Copyright 2008

| | {109,125} | {54,310} | {54,310} | {1,752} | {1,752} |
|---|---|---|---|---|---|
| Sample size | | | | | |
| R-squared | 0.25 | 0.25 | 0.56 | 0.48 | 0.84 |
| | | Gestation (Omitted Category 40–41 Weeks) | | | |
| Gestation ≤36 weeks | 0.0061 *** | 0.0095 *** | 0.0053 | −0.0091 | NA |
| | (0.0015) | (0.0024) | (0.0035) | (0.017) | |
| Gestation 37 weeks | 0.0001 | 0.0016 | 0.0041 | −0.0095 | NA |
| | (0.0014) | (0.0022) | (0.0032) | (0.0133) | |
| Gestation 38 weeks | 0.0015 | 0.0026 * | 0.0024 | −0.0113 | NA |
| | (0.0009) | (0.0014) | (0.0020) | (0.0123) | |
| Gestation 39 weeks | 0.0000 | 0.0000 | −0.0015 | −0.0013 | NA |
| | (0.0007) | (0.0011) | (0.0016) | (0.0128) | |
| Gestation ≥42 weeks | 0.0009 | 0.0006 | 0.0005 | −0.0093 | NA |
| | (0.0011) | (0.0017) | (0.0024) | (0.0296) | |
| Gestation missing | −0.0004 | −0.0009 | −0.0018 | −0.0124 | |
| | (0.0016) | (0.0025) | (0.0035) | (0.0199) | |
| *F*-test: | 3.31 *** | 3.14 *** | 1.14 | 0.24 | |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asteriks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002076

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2084 of 4699 PageID #:  5249

Downloaded from by guest on August 16, 2024. Copyright 2008

relationship between infant health and death up to age 17. In fact, the coefficient on Apgar scores between seven and eight is the wrong sign and marginally significant. Given the drop in predictive power within twins for our one-year mortality rate estimates, it is perhaps not surprising that we do not find results with twins for mortality 17 years out. On the whole, however, we take these results as evidence that infant health continues to be a strong predictor of mortality both across and within families even up to age 17.

Table 5 indicates little correlation between infant health and Manitoba emigration. The OLS results with the full sample indicate a small correlation between poorer infant health and moving away from the province before age 17 (particularly for Apgar ≤ six, although the confidence interval here is quite wide) suggesting some potential sample selection bias here. However, the point estimates gravitate toward zero after including the family fixed effects regardless of which measure of infant health is used. Our results suggest that once we control for family fixed effects, our estimates on the impact of infant health on later outcomes among Manitoba residents do not appear to be biased from some fraction of our sample leaving the province.[13]

Another important source of selection bias is mortality. Our results beyond infant mortality are conditional on being alive past age one (and for those later results that extend beyond age 17, the results are similarly conditional on being alive past age 17). If we assume that those in the worst health died and that these children would also have had poor outcomes later in life then our estimates can be seem as underestimates of the true effects of poor infant health on longer term outcomes.

Conditional on survival until age 17, we find little evidence of significant effects of infant health on physician utilization between ages 12 and 17. Table 6 displays the estimates of the effects of Apgar score, birth weight, and gestation on total physician visits between these ages, with and without including family fixed effects. The dependent variable here is number of physician visits between the ages of 12 and 17. We find little consistent evidence here to support a relationship between infant health and physician visits 12 to 17 years later. Although we do find some evidence of a greater number of visits within twin families for those children with birth weights between 1,000 and 1,500 grams, the majority of the coefficient estimates are insignificant and some are the wrong sign.

Table 7 shows the results of the language arts standards test for the sample of Manitoban residents at age 17. Recall that for the approximately 30 percent of residents who did not write the test, the score is imputed by ranking these individuals lower than those writing the test and categorizing them by enrollment and attainment categories (for example, withdrawn from school or held back). A score is given to each associated test score and education attainment category using a standardized logit transformation weighted by the population size in each group.

Columns 1 and 2 indicate a clear positive correlation between infant health and the language arts test measure. For example, a low-birth-weight child averages a score about 0.23 standard deviations below a child born weighing above 3,500 grams. Apgar scores less than eight and gestation lengths less than 38 weeks are also associated with significantly lower grade 12 test scores. The relationship weakens notably after adding the

---

13. Being born 1,500-2,500g or having an Apgar score of seven to eight in the sibling-fixed-effects model is associated with a 0.2 percent (and insignificant) increase in the probability of moving out of the province off a base of 20[0] percent.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 4**

*Estimated Effects of Infant Health of Birth on Mortality between Ages 1 to 17 With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| APGAR Score (Omitted Category APGAR=10) | | | | | |
| APGAR≤6 | 0.0111 *** | 0.0147 *** | 0.0131 *** | 0.0100 | −0.0159 |
| | (0.0020) | (0.0033) | (0.0045) | (0.0076) | (0.0136) |
| APGAR=7–8 | 0.0026 *** | 0.0038 *** | 0.0034 * | −0.0071 * | −0.0150 * |
| | (0.0008) | (0.0013) | (0.0018) | (0.0043) | (0.0087) |
| APGAR=9 | 0.0001 | −0.0002 | 0.0004 | −0.0040 | −0.0092 |
| | (0.0005) | (0.0008) | (0.0011) | (0.0038) | (0.0082) |
| $F$-test: No infant health effects | 14.1 *** | 10.4 *** | 3.88 *** | 2.31 * | 1.13 |
| Sample size | {107,772} | {53,527} | {53,527} | {1,693} | {1,693} |
| R-squared | 0.01 | 0.01 | 0.48 | 0.07 | 0.55 |
| Birth Weight (Omitted Category BW = 3,500+ grams) | | | | | |
| BW<1,000 | 0.0444 *** | −0.0058 | −0.0384 * | 0.0004 | 0.0170 |
| | (0.0094) | (0.0169) | (0.0226) | (0.0216) | (0.0488) |
| BW 1,000–1,500 | 0.0124 *** | 0.0193 *** | 0.0291 *** | 0.0161 | 0.0169 |
| | (0.0040) | (0.0073) | (0.0101) | (0.0100) | (0.0211) |
| BW 1,500–2,500 | 0.0025 ** | 0.0043 ** | 0.0068 ** | 0.0002 | 0.0013 |
| | (0.0011) | (0.0020) | (0.0030) | (0.0075) | (0.0132) |
| BW 2,500–3,000 | 0.0003 | 0.0006 | 0.0019 | 0.0010 | 0.0028 |
| | (0.0007) | (0.0011) | (0.0018) | (0.0075) | (0.0124) |

*(continued)*

002078

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 4** (continued)

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| BW 3,000–3,500 | 0.0006 | 0.0009 | 0.0034 *** | 0.0043 | −0.0013 |
| | (0.0005) | (0.0008) | (0.0012) | (0.0078) | (0.0117) |
| F-test: No infant health effects | 7.36 *** | 2.44 ** | 4.24 ** | 1.15 | 0.26 |
| Sample size | {108,073} | {53,700} | {53,700} | {1,700} | {1,700} |
| R-squared | 0.01 | 0.01 | 0.48 | 0.06 | 0.55 |
| Gestation (Omitted Category 40–41 Weeks) | | | | | |
| Gestation ≤36 weeks | 0.0028 ** | 0.0024 | 0.0039 | 0.0023 | NA |
| | (0.0011) | (0.0019) | (0.0030) | (0.0049) | |
| Gestation 37 weeks | 0.0010 | 0.0009 | 0.0012 | −0.0027 | NA |
| | (0.0012) | (0.00192) | (0.0030) | (0.0060) | |
| Gestation 38 weeks | 0.0004 | 0.0014 | 0.0027 | −0.0029 | NA |
| | (0.0008) | (0.0012) | (0.0019) | (0.0056) | |
| Gestation 39 weeks | 0.0003 | 0.0014 | 0.0008 | 0.0020 | NA |
| | (0.0006) | (0.0012) | (0.0015) | (0.0059) | |
| Gestation ≥42 weeks | 0.0008 | −0.0004 | −0.0002 | −0.0068 | NA |
| | (0.0010) | (0.0010) | (0.0023) | (0.0137) | |
| F-test: No infant health effects | 1.38 | 0.71 | 0.63 | 0.47 | |
| Sample size | {89,276} | {45,078} | {45,078} | {1,447} | |
| R-squared | 0.01 | 0.01 | 0.54 | 0.08 | |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002079

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 5**
Estimated Effects of Infant Health at Birth on Mobility out of Manitoba Before Age 18 With and Without Family Fixed Effects

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| | | APGAR Score (Omitted Category APGAR=10) | | | |
| APGAR≤6 | 0.0241 ** | 0.0169 | −0.0195 * | 0.0465 | 0.0169 |
| | (0.0115) | (0.0165) | (0.0110) | (0.0548) | (0.0178) |
| APGAR=7–8 | 0.0120 *** | 0.0072 | 0.0023 | 0.0470 | 0.0111 |
| | (0.0046) | (0.0062) | (0.0043) | (0.0308) | (0.0113) |
| APGAR=9 | 0.0042 | 0.0067 * | −0.0002 | 0.0174 | 0.0148 |
| | (0.0030) | (0.0038) | (0.0028) | (0.0270) | (0.0107) |
| F-test: No infant health effects | 3.38 ** | 1.29 | 1.24 | 0.94 | 0.70 |
| Sample size | {107,772} | {53,527} | {53,527} | {1,693} | {1,693} |
| R-squared | 0.07 | 0.05 | 0.88 | 0.06 | 0.99 |
| | | Birth Weight (Omitted Category BW = 3,500+ grams) | | | |
| BW<1,000 | −0.0016 | −0.0161 | −0.0031 | 0.2391 | −0.0348 |
| | (0.0545) | (0.0836) | (0.0552) | (0.1548) | (0.0634) |
| BW 1,000–1,500 | −0.0175 | −0.00908 | 0.0041 | 0.0564 | −0.0253 |
| | (0.0230) | (0.0361) | (0.0245) | (0.0716) | (0.0274) |
| BW 1,500–2,500 | 0.0126 * | 0.0271 *** | 0.0027 | 0.1148 ** | −0.0249 |
| | (0.0066) | (0.0098) | (0.0073) | (0.0536) | (0.0171) |
| BW 2,500–3,000 | 0.0099 ** | 0.0079 | −0.0045 | 0.0988 * | −0.0314 * |
| | (0.0039) | (0.0053) | (0.0043) | (0.0537) | (0.0161) |

(continued)

002080

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2088 of 4699 PageID #:  5253

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 5** (continued)

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample With Family F. E. |
|---|---|---|---|---|---|
| BW 3,000–3,500 | 0.0058 ** | 0.0061 | 0.0027 | 0.1307 ** | −0.0188 |
| | (0.0029) | (0.0038) | (0.0029) | (0.0560) | (0.0152) |
| F-test: No infant health effects | 2.11 * | 1.97 * | 0.80 | 1.58 | 0.96 |
| Sample size | {108,073} | {53,700} | {53,700} | {1,700} | {1,700} |
| R-squared | 0.07 | 0.05 | 0.88 | 0.06 | 0.99 |
| Gestation (Omitted Category 40–41 Weeks) | | | | | |
| Gestation≤36 weeks | 0.0076 | 0.0157 * | 0.0102 | 0.0511 | NA |
| | (0.0063) | (0.0092) | (0.0069) | (0.0318) | |
| Gestation 37 weeks | 0.0122 * | 0.0172 * | −0.0059 | 0.0092 | NA |
| | (0.0070) | (0.0095) | (0.0070) | (0.0392) | |
| Gestation 38 weeks | −0.0090 ** | −0.0022 | 0.0055 | 0.0644 * | NA |
| | (0.0045) | (0.0059) | (0.0045) | (0.0367) | |
| Gestation 39 weeks | −0.0008 | −0.0010 | −0.0003 | 0.0589 | NA |
| | (0.0037) | (0.0048) | (0.0036) | (0.0386) | |
| Gestation≥42 weeks | 0.0044 | 0.0042 | −0.0033 | −0.1367 | NA |
| | (0.0056) | (0.0073) | (0.0052) | (0.0894) | |
| F-test: No infant health effects | 2.12 * | 1.36 | 1.12 | 1.93 * | |
| Sample size | {89,276} | {45,078} | {45,078} | {1,447} | |
| R-squared | 0.06 | 0.04 | 0.90 | 0.06 | |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002081

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 6**
*Estimated Effects of Infant Health at Birth on Total Physician Visits Between Ages 12 and 17 With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| *APGAR Score (Omitted Category APGAR=10)* | | | | | |
| APGAR≤6 | 1.9767 *** | 1.5734 ** | 1.5356 ** | 1.9612 | 0.7656 |
| | (0.4213) | (0.6186) | (0.6768) | (1.7188) | (2.2051) |
| APGAR=7–8 | 0.5790 *** | 0.2692 | −0.5566 ** | −1.0923 | −1.2239 |
| | (0.1629) | (0.2243) | (0.2561) | (0.9297) | (1.3159) |
| APGAR=9 | 0.3954 *** | 0.3173 ** | −0.1826 | 0.0717 | −0.4005 |
| | (0.1043) | (0.1376) | (0.1628) | (0.8024) | (1.2520) |
| *F*-test: No infant health effects | 11.76 *** | 3.47 ** | 3.81 *** | 1.58 | 0.74 |
| Sample size | {79,143} | {40,078} | {40,078} | {1,348} | {1,348} |
| R-squared | 0.04 | 0.05 | 0.68 | 0.09 | 0.78 |
| *Birth Weight (Omitted Category BW = 3,500+ grams)* | | | | | |
| BW<1,000 | −0.9530 | −0.8204 | 2.2148 | 2.6851 | 4.9343 |
| | (1.9892) | (3.1370) | (3.3498) | (4.8230) | (10.6648) |
| BW 1,000–1,500 | 1.0137 | −0.5904 | −1.6869 | 9.3137 *** | 7.3252 ** |
| | (0.8185) | (1.3344) | (1.4809) | (2.1409) | (2.9635) |
| BW 1,500–2,500 | 0.4262 * | −0.1540 | 0.5461 | 3.3341 ** | 0.1926 |
| | (0.2359) | (0.3662) | (0.4425) | (1.5216) | (1.8861) |
| BW 2,500–3,000 | 0.2481 * | 0.3470 * | 0.2464 | 3.5727 ** | 0.1849 |
| | (0.1402) | (0.1941) | (0.2537) | (1.5280) | (1.7688) |

*(continued)*

002082

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 6** (*continued*)

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample With Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| BW 3,000–3,500 | 0.2125 ** | 0.3026 ** | 0.3215 * | 2.9624 * | 1.9898 |
| | (0.1027) | (0.1375) | (0.1704) | (1.6084) | (1.6555) |
| *F*-test: No infant health effects | 1.78 | 1.47 | 1.25 | 4.03 *** | 2.77 ** |
| Sample size | {79,363} | {40,203} | {40,203} | {1,354} | {1,354} |
| R-squared | 0.04 | 0.05 | 0.68 | 0.10 | 0.78 |
| | | | Gestation (Omitted Category 40–41 Weeks) | | |
| Gestation ≤36 weeks | 0.2814 | −0.2208 | −0.5687 | 0.8215 | NA |
| | (0.2271) | (0.3395) | (0.4291) | (0.9276) | |
| Gestation 37 weeks | 0.3913 | 0.1131 | −0.1167 | 3.1315 *** | NA |
| | (0.2491) | (0.3487) | (0.4345) | (1.1326) | |
| Gestation 38 weeks | 0.4832 *** | 0.2030 | 0.0325 | −0.1308 | NA |
| | (0.1582) | (0.2119) | (0.2693) | (1.0700) | |
| Gestation 39 weeks | 0.0867 | −0.1401 | −0.1719 | −0.0701 | NA |
| | (0.1305) | (0.1731) | (0.2151) | (1.1335) | |
| Gestation ≥42 weeks | 0.0874 | −0.0581 | −0.0985 | −1.3445 | NA |
| | (0.1973) | (0.2636) | (0.3201) | (2.3796) | |
| *F*-test: No infant health effects | 2.29 ** | 0.53 | 0.48 | 2.59 ** | NA |
| Sample size | {66,504} | {33,921} | {33,921} | {1,166} | NA |
| R-squared | 0.04 | 0.05 | 0.72 | 0.10 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002083

Downloaded from by guest on August 16, 2024. Copyright 2008

Oreopoulos, Stabile, Walld, and Roos   111

**Table 7**
*Estimated Effects of Infant Health at Birth on Language Arts Score With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| APGAR Score (Omitted Category APGAR=10) | | | | | |
| APGAR≤6 | −0.1541 *** | −0.1730 *** | −0.0913 * | 0.1254 | 0.0756 |
| | (0.0297) | (0.0450) | (0.0481) | (0.1457) | (0.1568) |
| APGAR=7–8 | −0.0503 *** | −0.0436 *** | −0.0245 | 0.0326 | −0.1021 |
| | (0.0116) | (0.0164) | (0.0183) | (0.0786) | (0.0936) |
| APGAR=9 | 0.0069 | 0.0184 * | −0.0012 | 0.0444 | −0.0952 |
| | (0.0074) | (0.0101) | (0.0116) | (0.0676) | (0.0890) |
| F-test: No infant health effects | 18.52 *** | 10.97 *** | 1.82 | 0.30 | 0.99 |
| Sample size | {79,194} | {40,514} | {40,514} | {1,364} | {1,364} |
| R-squared | 0.17 | 0.20 | 0.75 | 0.20 | 0.87 |
| Birth Weight (Omitted Category BW = 3,500+grams) | | | | | |
| BW<1,000 | −0.3142 ** | −0.2576 | −0.0491 | −0.5415 | 0.01819 |
| | (0.1411) | (0.23089) | (0.23167) | (0.40812) | (0.7616) |
| BW 1,000–1,500 | −0.26 *** | −0.2302 ** | −0.0812 | −0.4608 ** | −0.185 |
| | (0.05806) | (0.09822) | (0.10557) | (0.18116) | (0.21163) |
| BW 1,500–2,500 | −0.1519 *** | −0.2188 *** | −0.0492 | −0.1826 | −0.0987 |
| | (0.01673) | (0.02695) | (0.03155) | (0.12875) | (0.13469) |
| BW 2,500–3,000 | −0.1172 *** | −0.1303 *** | −0.0477 ** | −0.2063 | −0.2139 * |
| | (0.0099) | (0.0143) | (0.0181) | (0.1293) | (0.1263) |

(continued)

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2092 of 4699 PageID #: 5257

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 7** (*continued*)

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| BW 3,000–3,500 | −0.0339 *** | −0.0459 *** | −0.0154 | −0.0969 | −0.0672 |
| | (0.0073) | (0.0101) | (0.0121) | (0.1361) | (0.1182) |
| *F*-test: No infant health effects | 42.74 *** | 27.73 *** | 1.57 | 1.95 * | 1.54 |
| Sample size | {79,363} | {40,203} | {40,203} | {1,354} | {1,354} |
| R-squared | 0.17 | 0.20 | 0.74 | 0.21 | 0.86 |
| Gestation (Omitted Category 40–41 Weeks) | | | | | |
| Gestation≤36 weeks | −0.0797 *** | −0.1232 *** | 0.0255 | 0.0061 | NA |
| | (0.0161) | (0.0251) | (0.0303) | (0.0800) | |
| Gestation 37 weeks | −0.0678 *** | −0.0999 *** | −0.0076 | 0.1317 | NA |
| | (0.0177) | (0.0258) | (0.0307) | (0.0976) | |
| Gestation 38 weeks | −0.0114 | −0.0166 | 0.0263 | −0.0708 | NA |
| | (0.0112) | (0.0157) | (0.0190) | (0.0922) | |
| Gestation 39 weeks | 0.0083 | 0.0003 | 0.0037 | 0.0543 | NA |
| | (0.0093) | (0.0128) | (0.0152) | (0.0977) | |
| Gestation≥42 weeks | −0.0204 | −0.0231 | −0.0089 | −0.1789 | NA |
| | (0.0140) | (0.0195) | (0.0226) | (0.2051) | |
| *F*-test: No infant health effects | 8.44 *** | 7.70 *** | 0.60 | 1.28 | |
| Sample size | {66,504} | {33,921} | {33,921} | {1,166} | NA |
| R-squared | 0.17 | 0.20 | 0.79 | 0.21 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance.

002085

Downloaded from by guest on August 16, 2024. Copyright 2008

family fixed effects. The point estimates for birth weight and Apgar score are all still negative, but many are no longer significant. Siblings given an Apgar of six or less receive a test score about one-tenth of a standard deviation lower than a sibling with a ten. We also find indications of small, but in some cases significant, lasting effects on test scores from being born low birth weight, even among youths born weighing between 2,500 and 3,500 grams (only slightly below the average). The negative coefficients associated with gestation of less than 37 weeks without fixed effects become close to zero, once sibling fixed effects are added. All the point estimates for the gestation results are very small and insignificant.

Because of the large number of imputed test scores in the language arts test, we also rerun all our specifications dropping the 35 percent of students with imputed scores to check whether these students are driving our results. We continue to find little effect of infant health on this particular test score.

While our results for language arts test scores are mixed, our results examining high school attainment suggest long-lasting effects of infant health. Table 8 shows the estimates for the effects of infant health on reaching grade 12 by age 17. An individual may fail to reach this grade because she either dropped out or repeated at least one earlier grade. The sibling-fixed-effects analysis in Column 3 indicates a substantial impact on grade 12 attainment from infant health. Moving from the results with no family fixed effects to those that include them show only a small fall in the coefficients.

A newborn assessed with an Apgar score of six or less, for example, has a 7.4 percentage point lower probability of reaching grade 12 by age 17 compared to a youth born with an Apgar of ten (Column 2). When family fixed effects are added (Column 3), the estimated effect drops to a 4.1 percentage point difference in the probability of reaching grade 12 by this age. Siblings with Apgar scores still considered normal but below average (seven or eight) are two percentage points more likely to drop out or repeat a grade.

A similar story holds when looking at birth weight. Students born with low birth weights between 1,500 and 2,500 grams, and who survive until age 17 are about eight percentage points less likely to be enrolled in grade 12 than those born weighing 3,500 grams or more. The chances of infants attaining grade 12 by age 17 are severely affected by being born weighing less than 1,500 grams. The gestation results are also strong and significant. Premature siblings born in 36 weeks or less are 4.0 percentage points less likely by age 17 than those born in 40–41 weeks. Negative effects on this measure of educational attainment among those born in 38 or 39 weeks are also detected. A sibling born after 38 weeks gestation is 2.5 percentage points less likely to be in grade 12 at age 17 than another sibling born less than 40 weeks gestation.[14,15,16]

---

14. We have estimated the main results separately by sex. The effects in most cases do not differ significantly by sex. Interestingly, however, the effects of infant health on reaching grade 12 by age 17 appear to be somewhat stronger for females than males.

15. We note that for this outcome, if we omit C-section births the effects of having a gestational period of 38 weeks for the sibling-fixed-effects model is no longer significant.

16. We again test the extent of possible adjustments in fertility decisions in response to having a sick child by reestimating our model splitting the sibling sample into a) the sample for which the first child has poor health and b) a subsequent child has poor health. These results are reported in Appendix Table A6. Our results remain large and significant across both samples, with slightly larger coefficients in some cases for the second subsample.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 8**
*Estimated Effects of Infant Health at Birth on Reaching Grade 12 by Age 17 With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| | | APGAR Score (Omitted Category APGAR=10) | | | |
| APGAR ≤6 | −0.0697 *** | −0.0739 *** | −0.0410 * | 0.0710 | 0.0317 |
| | (0.0137) | (0.0206) | (0.0239) | (0.0701) | (0.0706) |
| APGAR=7–8 | −0.0240 *** | −0.0302 *** | −0.203 ** | 0.0179 | −0.0210 |
| | (0.0053) | (0.0075) | (0.0091) | (0.0378) | (0.0421) |
| APGAR=9 | 0.0058 * | 0.0111 ** | 0.0051 | 0.0428 | −0.0156 |
| | (0.0034) | (0.0046) | (0.0058) | (0.0325) | (0.0401) |
| F-test: No infant health effects | 21.3 *** | 16.3 *** | 4.12 *** | 0.81 | 0.32 |
| Sample size | {79,194} | {40,514} | {40,514} | {1,364} | {1,364} |
| R-squared | 0.15 | 0.18 | 0.70 | 0.18 | 0.88 |
| | | Birth Weight (Omitted Category BW = 3,500+ grams) | | | |
| BW<1000 | −0.1842 *** | −0.1308 | 0.0546 | −0.3346 * | −0.0837 |
| | (0.0649) | (0.1060) | (0.1153) | (0.1968) | (0.3434) |
| BW 1000–1500 | −0.1353 *** | −0.1271 *** | −0.1410 *** | −0.2708 *** | −0.2315 ** |
| | (0.0267) | (0.0451) | (0.0525) | (0.0874) | (0.0954) |
| BW 1500–2500 | −0.0793 *** | −0.1168 *** | −0.0815 *** | −0.1284 ** | −0.0685 |
| | (0.0077) | (0.0124) | (0.0157) | (0.0621) | (0.0607) |
| BW 2500–3000 | −0.0398 *** | −0.0496 *** | −0.0430 *** | −0.1094 * | −0.0921 |
| | (0.0046) | (0.0066) | (0.0090) | (0.0624) | (0.0570) |

002087

Downloaded from by guest on August 16, 2024. Copyright 2008

| | | | | |
|---|---|---|---|---|
| BW 3000–3500 | −0.0125 *** | −0.0189 *** | −0.0243 ** | −0.0639 | −0.0488 |
| | (0.0034) | (0.0046) | (0.0060) | (0.0656) | (0.0533) |
| F-test: No infant health effects | 37.47 *** | 27.74 *** | 8.98 *** | 2.91 ** | 1.72 |
| Sample size | {79,363} | {40,203} | {40,203} | {1,354} | {1,354} |
| R-squared | 0.16 | 0.18 | 0.69 | 0.19 | 0.88 |
| Gestation (Omitted Category 40–41 Weeks) | | | | | |
| Gestation $\leq$36 weeks | −0.0602 *** | −0.0843 *** | −0.0403 *** | −0.0498 | NA |
| | (0.0074) | (0.0115) | (0.0150) | (0.0387) | |
| Gestation 37 weeks | −0.0246 *** | −0.0426 *** | −0.0345 ** | 0.0473 | NA |
| | (0.0081) | (0.0118) | (0.0152) | (0.0472) | |
| Gestation 38 weeks | −0.0064 | −0.0139 * | −0.0252 *** | 0.0419 | NA |
| | (0.0051) | (0.0072) | (0.0094) | (0.0446) | |
| Gestation 39 weeks | 0.0076 * | 0.0062 | −0.0014 | 0.0580 | NA |
| | (0.0042) | (0.0059) | (0.0075) | (0.0473) | |
| Gestation $\geq$42 weeks | −0.0067 | −0.0099 | −0.0116 | −0.1740 * | NA |
| | (0.0064) | (0.0089) | (0.0112) | (0.0992) | |
| F-test: No infant health effects | 17.14 *** | 14.37 *** | 3.19 *** | 3.23 *** | NA |
| Sample size | {66,504} | {33,921} | {33,921} | {1,166} | NA |
| R-squared | 0.16 | 0.19 | 0.75 | 0.19 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002088

Downloaded from by guest on August 16, 2024. Copyright 2008

Finally, we estimate models including both birth weight and gestational length. As with infant death, the coefficients on birth weight remain significant while the coefficients on gestation are generally no longer significant. Results are shown in Appendix Table A7.

Table 9 shows the estimated effects of infant health on the probability of receiving any social assistance between the age of 18 and 21.25 years of age. Our sample includes only individuals born between 1979 and 1982 (we exclude the younger cohorts in this analysis as noted above). Given the relatively short window of social assistance eligibility, only 8 percent of our sample received social assistance over this period. The least-squares results without family fixed effects indicate a substantial relationship between poor infant health and receiving social assistance. Apgar scores strongly predict takeup. A young adult given an Apgar of six or less at birth has a 6.6 percentage point higher probability of receiving welfare than a contemporary given an Apgar of ten. Individuals with Apgar scores between seven and nine also have a higher likelihood of receiving social assistance. These effects are closer to zero once the family fixed effects are added in Column 3. The point estimates are somewhat noisy, but they suggest that the causal effects of Apgar score on welfare use, independent of family circumstances that correlate with this score, are lower than predicted by the strong effects estimated using the cross-family variation. Interestingly, the estimates from the smaller sample of twins do suggest a big effect. From Column 5, a twin who is given an Apgar of nine stands an 8.1 percentage point higher probability of receiving social assistance than does her other twin with an Apgar of ten.

The effects of birth weight on social assistance takeup are also strong in the OLS, weaker in the sibling fixed effects, but very strong in the twin fixed effects. The least-squares results in Column 2 indicate a strong escalating relationship between being born low birth weight and receiving social assistance. The point estimates fall substantially in Column 3 from including the family fixed effects. While, once again, the estimates for this outcome variable are imprecise, the standard errors are small enough to rule out that the estimates are equal to those without the fixed effects, while not ruling out the effects are zero. The twins results, like the case with Apgar scores, are strongly positive and suggestive of a long-lasting effect from infant health.

The gestation results without fixed effects indicate a significant relationship among youths born after less than 38 weeks gestation. These coefficients, however, all drop close to zero (and are imprecisely measured) after adding family fixed effects.

In an attempt to increase the variance of social assistance use in our sample, we also look at months on social assistance between age 18 and 21.25. Table 10 presents these results. The mean number of months on social assistance in our sample of siblings is 1.4. The results are also somewhat noisy, but generally suggest a continued link between our infant health measures and social assistance use. Birth weight appears to affect not only takeup but also duration of social assistance. The coefficients for the effects of low birth weight on months on social assistance using family fixed effects are about one-half to three-quarters the size of those without the fixed effects. The estimates for the average association between being born 1,500 to 3,000 grams and social assistance use are significant, and we can reject the hypothesis that all the estimated effects are zero or less. The coefficients from the twins

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 9**

*Estimated Effects of Infant Health at Birth on Social Assistance Take-up With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| | | | APGAR Score (Omitted Category APGAR=10) | | |
| APGAR≤6 | 0.0505 *** | 0.0660 *** | 0.0302 | 0.0105 | 0.0309 |
| | (0.0108) | (0.0174) | (0.0211) | (0.0518) | (0.0670) |
| APGAR=7–8 | 0.0198 *** | 0.0217 *** | 0.0146 * | 0.0087 | 0.0765 * |
| | (0.0042) | (0.0064) | (0.0081) | (0.0258) | (0.0390) |
| APGAR=9 | 0.0121 *** | 0.0092 ** | −0.0049 | 0.0171 | 0.0813 ** |
| | (0.0025) | (0.0037) | (0.0049) | (0.0212) | (0.0555) |
| *F*-test: No infant health effects | 16.17 *** | 8.42 *** | 3.01 ** | 0.23 | 2.03 |
| Sample size | {54,254} | {22,802} | {22,802} | {874} | {874} |
| R-squared | 0.08 | 0.09 | 0.65 | 0.11 | 0.74 |
| | | | Birth Weight (Omitted Category BW = 3500+grams) | | |
| BW<1000 | −0.0381 | −0.0251 | −0.2155 ** | −0.0635 | 0.1412 |
| | (0.0541) | (0.0804) | (0.0955) | (0.2428) | (0.2802) |
| BW 1000–1500 | 0.0408 * | 0.0253 | 0.0439 | 0.0707 | 0.2430 ** |
| | (0.0211) | (0.0369) | (0.0448) | (0.0595) | (0.0943) |
| BW 1500–2500 | 0.0377 *** | 0.0436 *** | 0.0186 | 0.0565 | 0.1062 * |
| | (0.0060) | (0.0103) | (0.0138) | (0.0417) | (0.0568) |
| BW 2500–3000 | 0.0219 *** | 0.0248 *** | 0.0062 | 0.0403 | 0.1058 ** |
| | (0.0035) | (0.0054) | (0.0078) | (0.0419) | (0.0533) |

*(continued)*

002090

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 9** (continued)

| | Full Sample | Sibling Sample No Family F. E. | Sibling Sample Family F. E. | Twins Sample No Family F. E. | Twins Sample Family F. E. |
|---|---|---|---|---|---|
| BW 3000–3500 | 0.0096 *** | 0.0127 *** | 0.0078 | 0.0807 * | 0.1178 ** |
| | (0.0026) | (0.0038) | (0.0053) | (0.0441) | (0.0491) |
| *F*-test: No infant health effects | 14.43 *** | 7.47 *** | 1.85 | 1.02 | 1.88 * |
| Sample size | {54,412} | {22,870} | {22,870} | {880} | {880} |
| R-squared | 0.08 | 0.09 | 0.65 | 0.12 | 0.74 |
| | | | Gestation (Omitted Category 40–41 Weeks) | | |
| Gestation≤36 weeks | 0.0309 *** | 0.0373 *** | −0.0042 | 0.0160 | NA |
| | (0.0063) | (0.0106) | (0.0160) | (0.0260) | |
| Gestation 37 weeks | 0.0214 *** | 0.0317 *** | −0.0132 | −0.0124 | NA |
| | (0.0069) | (0.0108) | (0.0163) | (0.0348) | |
| Gestation 38 weeks | 0.0113 *** | 0.0155 *** | −0.0033 | −0.0050 | NA |
| | (0.0043) | (0.0065) | (0.0101) | (0.0322) | |
| Gestation 39 weeks | −0.0035 | −0.0048 | −0.0085 | −0.0471 | NA |
| | (0.0036) | (0.0053) | (0.0080) | (0.0307) | |
| Gestation≥42 weeks | 0.0047 | 0.0040 | −0.0137 | −0.0187 | NA |
| | (0.0052) | (0.0079) | (0.0116) | (0.0573) | |
| *F*-test: No infant health effects | 8.13 *** | 5.47 *** | 0.51 | 1.09 | NA |
| Sample size | {41,593} | {17,175} | {17,175} | {694} | NA |
| R-squared | 0.08 | 0.09 | 0.76 | 0.15 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002091

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 10**
*Estimated Effects of Infant Health at Birth on Months on Social Assistance With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Twins Sample No Family F.E. | Twins Sample Family F.E. |
|---|---|---|---|---|---|
| | | | APGAR Score (Omitted Category APGAR=10) | | |
| APGAR≤6 | 1.3555 *** | 1.7468 *** | 0.8219 * | 1.5889 | 1.6621 |
| | (0.2406) | (0.3866) | (0.4889) | (1.1879) | (1.6354) |
| APGAR=7–8 | 0.5543 *** | 0.6349 *** | 0.5418 *** | 0.6216 | 1.3031 |
| | (0.0930) | (0.1419) | (0.1863) | (0.5914) | (0.9516) |
| APGAR=9 | 0.1954 *** | 0.0986 | −0.1994 * | 0.3314 | 0.8966 |
| | (0.0561) | (0.0824) | (0.1128) | (0.4865) | (0.8659) |
| F-test: No infant health effects | 20.85 *** | 12.78 *** | 7.22 *** | 0.78 | 0.68 |
| Sample size | {54,254} | {22,802} | {22,802} | {874} | {874} |
| R-squared | 0.06 | 0.06 | 0.61 | 0.17 | 0.73 |
| | | | Birth Weight (Omitted Category BW = 3500+ grams) | | |
| BW <1000 | −0.4577 | −1.7721 | −1.0878 | −1.1759 | −1.2839 |
| | (1.2061) | (1.7860) | (2.2111) | (5.5353) | (6.7116) |
| BW 1000–1500 | 1.6866 *** | 0.5559 | 1.3630 | 1.4057 | 1.7435 |
| | (0.4698) | (0.8195) | (1.0360) | (1.3570) | (2.2587) |
| BW 1500–2500 | 1.0086 *** | 1.2861 *** | 0.9042 *** | 0.8977 | 2.0004 |
| | (0.1331) | (0.2285) | (0.3190) | (0.9504) | (1.3600) |
| BW 2500–3000 | 0.5272 *** | 0.6356 *** | 0.3548 * | 0.6650 | 3.0202 ** |
| | (0.0787) | (0.1198) | (0.1817) | (0.9545) | (1.2773) |

*(continued)*

002092

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table 10** (continued)

|  | Full Sample | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Twins Sample No Family F.E. | Twins Sample Family F.E. |
|---|---|---|---|---|---|
| BW 3000–3500 | 0.2113 *** | 0.3160 *** | 0.2653 ** | 1.8979 * | 3.4056 *** |
|  | (0.0579) | (0.0853) | (0.1230) | (1.0059) | (1.1771) |
| *F*-test: No infant health effects | 20.02 *** | 11.38 *** | 2.36 ** | 1.37 | 2.25 ** |
| Sample size | {54,412} | {22,870} | {22,870} | {880} | {880} |
| R-squared | 0.06 | 0.06 | 0.61 | 0.17 | 0.73 |
| | | Gestation (Omitted Category 40–41 Weeks) | | | |
| Gestation≤36 weeks | 0.7880 *** | 0.9217 *** | 0.2576 | 0.8108 | NA |
|  | (0.1410) | (0.2360) | (0.3712) | (0.5329) | |
| Gestation 37 weeks | 0.6180 *** | 0.7582 *** | 0.3541 | −0.3809 | NA |
|  | (0.1435) | (0.2395) | (0.3784) | (0.7141) | |
| Gestation 38 weeks | 0.2100 ** | 0.3178 ** | 0.0279 | 0.1203 | NA |
|  | (0.0966) | (0.1444) | (0.2342) | (0.6602) | |
| Gestation 39 weeks | −0.1390 * | −0.2428 ** | −0.1531 | −0.3572 | NA |
|  | (0.0802) | (0.1178) | (0.1869) | (0.6304) | |
| Gestation ≥42 weeks | 0.1287 | 0.1467 | −0.1461 | 0.6918 | NA |
|  | (0.1153) | (0.1764) | (0.2699) | (1.1741) | |
| *F*-test: No infant health effects | 11.44 *** | 7.55 *** | 0.55 | 1.30 | NA |
| Sample size | {41,593} | {17,175} | {17,175} | {694} | NA |
| R-squared | 0.06 | 0.07 | 0.73 | 0.28 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002093

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2101 of 4699 PageID #:  5266

Downloaded from by guest on August 16, 2024. Copyright 2008

sample with family fixed effects included, all suggest a long-lasting and large effect of poor Apgar score or birth weight on months on social assistance. The Apgar score results are not significant, but the implied effects of birth weight are large, as they are when looking at only social assistance takeup (in the previous table).

We reexamined our main sibling results for a subsample of siblings less than two years and three years apart. (Tables showing these results are available in Oreopoulos et al. 2006.) A threat to validity in the siblings analysis comes from changes to family or environmental contexts in between births that could account for differences in socioeconomic outcomes. By looking at a subset of siblings closer in age, fewer changes in family circumstances that may affect these outcomes are likely to occur. However, length between births is potentially endogenous (families that experience a bad first birth may wait longer to have a second child) and in this case, it might be that the effects of infant healthcare muted. The coefficients on the estimated effects of Apgar scores, birth weight, and gestation on infant mortality largely remain intact after looking only at siblings less than two years apart. The estimates with family fixed effects remain quite similar to the estimates without them, indicate a strong relationship, and suggest a significant causal relationship between these measures of health at birth and one-year mortality. It is worth pointing out again that this contrasts with the twins results, where the estimated effects fall by as much as two-thirds when accounting for family factors common between twins. We perform a similar analysis for grade attainment outcomes between the sample with all siblings and the one with siblings less than two years apart. The subsample is one-fourth the size of the full sample. Yet, for birth weight, the results are remarkably stable. Low-birth-weight siblings are approximately 10 percentage points less likely to attain grade 12 by age 17. Even those born between 2,500 and 3,500 grams are 2-5 percentage points less likely to attain grade 12 compared to those born weighing more than 3,500 grams. The estimated effects from being born premature or with a low Apgar are measured less precisely with the subsample of siblings close apart, but the results generally point to the same conclusions about impact of these measures on grade attainment, with and without including family fixed effects. Finally, we also repeat the analysis for social assistance takeup outcomes. The full sample results suggest significant effects of low birth weight on months receiving social assistance after age 19, as does the sample of siblings less than three years apart. The standard errors around the point estimates for the smaller sample of siblings less than two years apart prevent definitive conclusions. The Apgar results include a nonintuitive results that those born with an Apgar score of nine instead of ten are slightly less likely to end up on social assistance, while those born with an Apgar score of seven or eight are more likely. None of the gestation results are significant.

We end our analysis by considering whether our estimated effects of infant health on subsequent outcomes differ by family background using census enumeration area-level income data from the 2001 Canadian Census to stratify our sample by income quintile. The results among the bottom fifth group of families still reveal quite similar point estimates compared to those from the full sample (tables of these results are available in Oreopoulos et al. 2006). For example, among children with parents from the lowest residential income quintile, an Apgar score of seven or eight for one sibling is associated with a 2.3 percentage point higher likelihood of death within one year than another sibling given a five-minute Apgar score of ten. Using the bottom

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2102 of 4699 PageID #: 5267

Downloaded from by guest on August 16, 2024. Copyright 2008

two-income quintiles increases the sample, while still focusing on families from poor socioeconomic backgrounds. In general, we find no substantial differences in the estimated effects of infant health on mortality comparing these more disadvantaged groups with the entire population of births. This evidence is consistent with previous research (Currie and Hyson 1999) using an older cohort of births.

We perform similar analyses by residential income quintile to examine the held back and months on social assistance outcome. In general, we conclude that there is no strong evidence that the effects of infant health on high school attainment and social assistance takeup are any worse among families from lower income backgrounds. Our results by quintile suggest that the short-, medium-, and longer-term effects of infant health are not confined to a single quintile, but rather are uniform across the population.

## V. Conclusions

We use a cohort of births from a single Canadian province to examine the short-, medium-, and long-term effects of poor infant health. Our results both confirm and extend recent work on the effects of infant health on survival and future measures of health, human capital, and labor force attachment.

Using three measures of infant health: birth weight, Apgar scores, and gestational length, we find that poor infant health predicts both mortality within one year, and mortality up to age 17. These results hold both across families and between siblings within families. Consistent with results in Almond et al. (2005), differences in infant health within families but between twin pairs lead to much smaller differences in both one-year and 17-year mortality rates. This drop in the estimated effects occurs for twins but not for siblings.

We also find that infant health is a strong predictor of educational and labor force outcomes. In particular, infant health is found to predict both high school completion and social assistance (welfare) takeup and length. We find evidence of longer-term consequences of infant health both across families, within siblings, and within twin pairs, although different measures of infant health predict outcomes differently. Birth weight and Apgar scores appear to be stronger predictors than gestation length in these areas when family fixed effects are included, and in models with both birth weight and gestation included as regressors, the coefficients on birth weight are stronger predictors of the outcomes of study. Interestingly, we find less evidence of the longer-term effects of infant health on either cognitive ability as measured by language arts test scores or longer-term physician visits.

In Conley's review of this literature (Conley et al. 2003), he notes that low-birth-weight babies are associated with a number of biological conditions that could affect later outcomes. Neurological handicaps, respiratory infections, and gastrointestinal problems, and higher rates of hypertension some of these. These problems all could manifest themselves in difficulty learning, leading to slower completion rates, and eventually higher takeup rates such as those found in our study for both low birth weight and low Apgar score babies. It is somewhat surprising, however, that we do not also find results in doctors' visits and language test scores, where we would also expect these conditions to manifest themselves.

002095

Downloaded from by guest on August 16, 2024. Copyright 2008

Our evidence, along with a growing body of literature in this area, confirms the importance of early childhood health as a predictor of future outcomes. Examining differences across families, between siblings, and between twin pairs can help inform both the medical literature and public policy with regards to understanding mechanisms of child development and effective ways to improve childhood health and hence future outcomes.

## References

Almond, D., K. Chay, and David Lee. 2005. "The Costs of Low Birth Weight." *Quarterly Journal of Economics* 120(3):1031–83.

Behrman, J., and Mark Rosenzweig. 2001. "The Returns to Increasing Body Weight." Penn Institute for Economic Research Working Paper No.01-052.

———. 2004. "The Returns to Birth Weight." *Review of Economics and Statistics* 86(2):586–601.

Black, S., P. Devereux, and Kjell Salvanes. 2007. "From the Cradle to the Labor Market: The Effect of Birth Weight on Adult Outcomes." *Quarterly Journal of Economics* 122(1): 409–39.

———. 2005. "The More the Merrier? The Effect of Family Size and Birth Order on Children's Education." *Quarterly Journal of Economics* 120(2):669–700.

Conley, D., K. Strullly, and Neil Bennett. 2003. "A Pound of Flesh or Just Proxy? Using Twin Differences to Estimate the Effect of Birth Weight on Life Chances." NBER Working Paper No.9901.

———. 2003. *The Starting Gate: Birth Weight and Life Chances*. Berkeley: University of California Press.

Currie, Janet, and Jonathan Gruber. 1996. "Health Insurance Eligibility, Utilization of Medical Care, and Child Health," *Quarterly Journal of Economics* 111(2):431–66.

Currie, Janet, and Enrico Moretti. 2005. "Biology as Destiny? Short and Long-Run Determinants of Intergenerational Transmission of Birth Weight." NBER Working Paper No.11567.

Currie, Janet, and Rosemary Hyson. 1999. "Is the Impact of Health Shocks Cushioned by Socioeconomic Status? The Case of Birth Weight." *American Economic Review* 89(2):245–50.

Goldenberg, R., and Dwight Rouse. 1998. "Prevention of Premature Birth." *New England Journal of Medicine* 339(5):313–20.

Hanratty, M. 1996. "Canadian National Health Insurance and Infant Health." *American Economic Review* 86(1):276–84.

Kramer, M. 1987. "Intrauterine Growth and Gestational Duration Determinants." *Pediatrics* 80(4):502–11.

Mosteller, F., and J.W. Tukey. 1977. *Data Analysis and Regression: A Second Course in Statistics*. Reading: Addison-Wesley.

Mustard, C., S. Derksen, J. M. Berthelot, and M. Wolfson. 1999. "Assessing Ecologic Proxies for Household Income: A Comparison of Household and Neighbourhood Level Income Measures in the Study of Population Health Status." *Health and Place* 5(2):157–71.

National Institutes of Health. 1999. "NIH Guide: Low Birth Weight in Minority Populations," PA-99-045.

Oreopoulos, P., M. Stabile, L. L. Roos, and R. Walld. 2006. "Short, Medium, and Long Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins." NBER Working Paper No.11998.

Roos, L. L., R. Walld, J. Uhanova, and R. Bond. 2005. "Physician Visits, Hospitalizations and Socioeconomic Status: Ambulatory Care Sensitive Conditions in a Canadian Setting." *Health Services Research* 40(4):1167–85.

Roos L. L., and J. P. Nicol. 1999. "A Research Registry: Uses, Development, and Accuracy." *Journal of Clinical Epidemiology* 52(1):39–47.

Rosenzweig, M., and K. Wolpin. 1995. "Sisters, Siblings, and Mothers: The Effects of Teen-Age Childbearing on Birth Outcomes in a Dynamic Family Context." *Econometrica* 63(2):303–26.

Watson, D. E., A. Katz, R. J. Reid, B. Bogdanovic, N. Roos, and P. Heppner. 2004. "Family Physician Workloads and Access to Care in Winnipeg: 1991 to 2001." *Canadian Medical Association Journal* 171(4):339–42.

Willms, J. D. 1986. "Social Class Segregation and its Relationship to Pupils' Examination Results in Scotland." *American Sociological Review* 51(2):224–41.

Downloaded from by guest on August 16, 2024. Copyright 2008

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A1**
Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) Cause: Conditions Originating in the Perinatal Period (ICD-9 760-779) With and Without Family Fixed Effects

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| N cases | 447 | 243 | 243 | 35 | 35 |
| APGAR Score (Omitted Category APGAR=10) | | | | | |
| APGAR≤6 | 0.1613 *** | 0.1907 *** | 0.1922 *** | 0.2464 *** | 0.0364 ** |
| | (0.0014) | (0.0021) | (0.0029) | (0.0144) | (0.0167) |
| APGAR=7–8 | 0.0076 *** | 0.0077 *** | 0.0069 *** | 0.0169 * | –0.0035 |
| | (0.0006) | (0.0010) | (0.0014) | (0.0093) | (0.0110) |
| APGAR=9 | 0.0007 * | 0.0006 | –0.0004 | 0.0005 | –0.0001 |
| | (0.0004) | (0.0006) | (0.0009) | (0.0082) | (0.0104) |
| $F$-test: No infant health effects | 4582.74 *** | 2769.32 *** | 1484.64 *** | 121.61 *** | 2.81 ** |
| Sample size | {108,893} | {54,091} | {54,091} | {1,740} | {1,740} |
| R-squared | 0.11 | 0.14 | 0.51 | 0.31 | 0.89 |
| Birth Weight (Omitted Category BW = 3500+ grams) | | | | | |
| BW <1000 | 0.7070 *** | 0.7500 *** | 0.7551 *** | 0.6016 *** | –0.0199 |
| | (0.0027) | (0.0039) | (0.0055) | (0.0238) | (0.0497) |
| BW 1000–1500 | 0.1884 *** | 0.2298 *** | 0.2372 *** | 0.1661 *** | 0.0421 |
| | (0.0023) | (0.0037) | (0.0051) | (0.0179) | (0.0272) |
| BW 1500–2500 | 0.0116 *** | 0.0188 *** | 0.0227 *** | –0.0011 | 0.0027 |
| | (0.0007) | (0.0012) | (0.0019) | (0.0141) | (0.0174) |

*(continued)*

002098

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2106 of 4699 PageID #:  5271

Downloaded from by guest on August 16, 2024. Copyright 2008

**Table A1** (*continued*)

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| BW 2500–3000 | 0.0013 *** | 0.0013 ** | 0.0033 *** | −0.0012 | 0.0017 |
| | (0.0005) | (0.0007) | (0.0011) | (0.0142) | (0.0164) |
| BW 3000–3500 | 0.0003 | 0.0000 | 0.0006 | −0.0027 | −0.0010 |
| | (0.0003) | (0.0005) | (0.0008) | (0.0148) | (0.0164) |
| $F$-test: No infant health effects | 15248.10 ** | 8113.15 *** | 4207.34 *** | 224.48 *** | 1.20 |
| Sample size | {109,125} | {54,310} | {54,310} | {1,752} | {1,752} |
| R-squared | 0.41 | 0.43 | 0.67 | 0.50 | 0.88 |
| | *Gestation (Omitted Category 40–41 Weeks)* | | | | |
| Gestation ≤36 weeks | 0.0574 *** | 0.0721 *** | 0.0753 *** | 0.0451 *** | NA |
| | (0.0009) | (0.0014) | (0.0024) | (0.0107) | |
| Gestation 37 weeks | 0.0013 | 0.0014 | −0.0018 | 0.0078 | NA |
| | (0.0010) | (0.0015) | (0.0025) | (0.0133) | |
| Gestation 38 weeks | 0.0010 | 0.0019 ** | 0.0016 | 0.0023 | NA |
| | (0.0007) | (0.0009) | (0.0016) | (0.0125) | |
| Gestation 39 weeks | 0.0004 | 0.0004 | 0.0000 | 0.0090 | NA |
| | (0.0005) | (0.0008) | (0.0013) | (0.0131) | |
| Gestation ≥42 weeks | 0.0005 | 0.0001 | 0.0002 | 0.0104 | NA |
| | (0.0008) | (0.0012) | (0.0019) | (0.0304) | |
| $F$-test: No infant health effects | 866.88 *** | 550.53*** | 217.51 *** | 6.81 *** | NA |
| Sample size | {90,135} | {45,583} | {45,583} | {1,492} | NA |
| R-squared | 0.05 | 0.06 | 0.50 | 0.23 | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asteriks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A2**
Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) Cause: Congenital Anomalies (ICD-9 740–759) With and Without Family Fixed Effects

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| N cases | 297 | 170 | 170 | 4 | 4 |
| | | APGAR Score (Omitted Category APGAR=10) | | | |
| APGAR≤6 | 0.0634 *** | 0.0751 *** | 0.0791 *** | N too low | N too low |
| | (0.0013) | (0.0019) | (0.0027) | (4 cases) | (4 cases) |
| APGAR=7–8 | 0.0063 *** | 0.0076 *** | 0.0091 *** | | |
| | (0.0006) | (0.0009) | (0.0013) | | |
| APGAR=9 | 0.0010 *** | 0.0014 *** | 0.0019 ** | | |
| | (0.0004) | (0.0005) | (0.0008) | | |
| F-test: No infant health effects | 934.48 *** | 528.99 *** | 303.68 *** | | |
| Sample size | {108,893} | {54,091} | {54,091} | {1,740} | {1,740} |
| R-squared | 0.03 | 0.03 | 0.45 | | |
| | | Birth Weight (Omitted Category BW = 3500+ grams) | | | |
| BW <1000 | 0.0451 *** | 0.0489 *** | 0.0518 *** | N too low | N too low |
| | (0.0028) | (0.0043) | (0.0059) | (4 cases) | (4 cases) |
| BW 1000–1500 | 0.0476 *** | 0.0878 *** | 0.1062 *** | | |
| | (0.0024) | (0.0040) | (0.0056) | | |
| BW 1500–2500 | 0.0136 *** | 0.0156 *** | 0.0252 *** | | |
| | (0.0008) | (0.0013) | (0.0021) | | |

(continued)

002100

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A2** (continued)

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| BW 2500–3000 | 0.0033 *** (0.0005) | 0.0048 *** (0.0007) | 0.0097 *** (0.0012) | | |
| BW 3000–3500 | 0.0004 (0.0004) | 0.0006 (0.0005) | 0.0029 *** (0.0008) | | |
| F-test: No infant health effects | 188.91 *** | 150.19 *** | 109.44 *** | | |
| Sample size | {109,125} | {54,310} | {54,310} | {1,752} | {1752} |
| R-squared | 0.01 | 0.02 | 0.44 | | |
| *Gestation (Omitted Category 40–41 Weeks)* | | | | | |
| Gestation ≤36 weeks | 0.0150 *** (0.0008) | 0.0188 *** (0.0012) | 0.0254 *** (0.0021) | N too low (4 cases) | NA |
| Gestation 37 weeks | 0.0025 *** (0.0009) | 0.0038 *** (0.0013) | 0.0070 *** (0.0022) | | NA |
| Gestation 38 weeks | 0.0015 *** (0.0006) | 0.0019 ** (0.0008) | 0.0025 * (0.0014) | | NA |
| Gestation 39 weeks | 0.0005 (0.0005) | −0.0001 (0.0007) | 0.0003 (0.0011) | | NA |
| Gestation ≥42 weeks | 0.0008 (0.0007) | 0.0010 (0.0010) | 0.0022 (0.0016) | | NA |
| F-test: No infant health effects | 80.90 *** | 49.00 *** | 32.04 *** | | |
| Sample size | {90,135} | {45,583} | {45,583} | {1,492} | NA |
| R-squared | 0.01 | 0.02 | 0.50 | | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002101

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A3**

*Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) Cause: Symptoms, Signs and Ill-Defined Conditions (includes SIDS) (ICD-9 780–799) With and Without Family Fixed Effects*

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| N cases | 138 | 92 | 92 | 4 | 4 |
| APGAR Score (Omitted Category APGAR=10) | | | | | |
| APGAR≤6 | 0.0050 *** | 0.0053 *** | 0.0051 ** | N too low (4 cases) | N too low (4 cases) |
| | (0.0008) | (0.0014) | (0.0020) | | |
| APGAR=7–8 | 0.0011 *** | 0.0022 *** | 0.0024 ** | | |
| | (0.0004) | (0.0006) | (0.0010) | | |
| APGAR=9 | 0.0001 * | 0.0005 | 0.0002 | | |
| | (0.0002) | (0.0004) | (0.0006) | | |
| F-test: No infant health effects | 14.01 *** | 7.92 *** | 4.25 *** | | |
| Sample size | {108,893} | {54,091} | {54,091} | {1,740} | {1,740} |
| R-squared | 0.00 | 0.00 | 0.41 | | |
| Birth Weight (Omitted Category BW = 3500+ grams) | | | | | |
| BW <1000 | 0.0073 *** | 0.0039 | 0.0039 | N too low (4 cases) | N too low (4 cases) |
| | (0.0019) | (0.0032) | (0.0045) | | |
| BW 1000–1500 | 0.0052 *** | 0.0090 *** | 0.0072 * | | |
| | (0.0016) | (0.0030) | (0.0042) | | |
| BW 1500–2500 | 0.0015 *** | 0.0030 *** | 0.0021 | | |
| | (0.0005) | (0.0010) | (0.0016) | | |

*(continued)*

002102

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A3** (continued)

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| BW 2500–3000 | 0.0003 | 0.0003 | −0.0006 | | |
| | (0.0003) | (0.0006) | (0.0009) | | |
| BW 3000–3500 | 0.0004 | 0.0008 ** | −0.0001 | | |
| | (0.0002) | (0.0004) | (0.0006) | | |
| $F$-test: No infant health effects | 6.08 *** | 4.17 *** | 1.29 | | |
| Sample size | {109,125} | {54,310} | {54,310} | | {1,752} |
| R-squared | 0.00 | 0.00 | 0.41 | | |
| | | Gestation (Omitted Category 40–41 Weeks) | | | |
| Gestation ≤36 weeks | 0.0025 *** | 0.0035 *** | 0.0033 ** | N too low | NA |
| | (0.0005) | (0.0009) | (0.0015) | (4 cases) | |
| Gestation 37 weeks | 0.0014 ** | 0.0015 | 0.0041 *** | | NA |
| | (0.0006) | (0.0010) | (0.0016) | | |
| Gestation 38 weeks | 0.0008 ** | 0.0014 ** | 0.0016 | | NA |
| | (0.0004) | (0.0006) | (0.0010) | | |
| Gestation 39 weeks | 0.0001 | 0.0003 | −0.0007 | | NA |
| | (0.0003) | (0.0005) | (0.0008) | | |
| Gestation ≥42 weeks | 0.0001 | 0.0001 | −0.0021 * | | NA |
| | (0.0005) | (0.0008) | (0.0012) | | |
| $F$-test: No infant health effects | 6.55 *** | 3.98 *** | 3.71 *** | | |
| Sample size | {90,135} | {45,583} | {45,583} | {1,492} | NA |
| R-squared | 0.00 | 0.00 | 0.52 | | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A4**
Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) Cause: All Other Diagnoses With and Without Family Family Effects

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| N cases | 693 | 407 | 407 | 10 | 10 |
| APGAR Score (Omitted Category APGAR=10) | | | | | |
| APGAR≤6 | 0.0209 *** | 0.0267 *** | 0.0281 *** | N too low | N too low |
| | (0.0019) | (0.0030) | (0.0024) | (10 cases) | (10 cases) |
| APGAR=7–8 | 0.0035 *** | 0.0056 *** | 0.0055 *** | | |
| | (0.0009) | (0.0013) | (0.0019) | | |
| APGAR=9 | 0.0000 | –0.0004 | 0.0009 | | |
| | (0.0006) | (0.0008) | (0.0012) | | |
| F-test: No infant health effects | 48.47 *** | 34.74 *** | 18.19 *** | | |
| Sample size | {108,893} | {54,091} | {54,091} | {1,740} | {1,740} |
| R-squared | 0.01 | 0.01 | 0.46 | | |
| Birth Weight (Omitted Category BW = 3500+ grams) | | | | | |
| BW <1000 | 0.0157 *** | 0.0077 | 0.0066 | N too low | N too low |
| | (0.0043) | (0.0067) | (0.0091) | (10 cases) | (10 cases) |
| BW 1000–1500 | 0.0173 *** | 0.0191 *** | 0.0244*** | | |
| | (0.0037) | (0.0062) | (0.0085) | | |
| BW 1500–2500 | 0.0069 *** | 0.0124 *** | 0.0128 *** | | |
| | (0.0012) | (0.0021) | (0.0031) | | |

*(continued)*

002104

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A4** *(continued)*

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Twins Sample No Family F.E. | Twins Sample With Family F.E. |
|---|---|---|---|---|---|
| BW 2500–3000 | 0.0010 | 0.0005 | 0.0016 | | |
| | (0.0007) | (0.0012) | (0.0019) | | |
| BW 3000–3500 | 0.0006 | 0.0003 | 0.0028 ** | | |
| | (0.0005) | (0.0008) | (0.0013) | | |
| *F*-test: No infant health effects | 13.16 *** | 9.23 *** | 5.08 *** | | |
| Sample size | {109,125} | {54,310} | {54,310} | {1,752} | {1,752} |
| R-squared | 0.01 | 0.01 | 0.46 | | |
| *Gestation (Omitted Category 40–41 Weeks)* | | | | | |
| Gestation ≤36 weeks | 0.0055 *** | 0.0053 *** | 0.0081 *** | N too low | NA |
| | (0.0011) | (0.0019) | (0.0030) | (10 cases) | |
| Gestation 37 weeks | 0.0005 | 0.0012 | 0.0041 | | NA |
| | (0.0013) | (0.0020) | (0.0032) | | |
| Gestation 38 weeks | 0.0006 | 0.0014 | 0.0028 | | NA |
| | (0.0008) | (0.0013) | (0.0020) | | |
| Gestation 39 weeks | 0.0003 | −0.0007 | 0.0002 | | NA |
| | (0.0007) | (0.0010) | (0.0016) | | |
| Gestation ≥42 weeks | 0.0003 | −0.0004 | −0.0002 | | NA |
| | (0.0010) | (0.0016) | (0.0024) | | |
| *F*-test: No infant health effects | 4.86 *** | 2.16 * | 1.80 | | |
| Sample size | {90,135} | {45,583} | {45,583} | {1,492} | NA |
| R-squared | 0.01 | 0.01 | 0.52 | | NA |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asteriks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002105

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A5**

*Estimated Effects of Infant Health at Birth on Infant Mortality (Death within One Year of Birth) With and Without Family Fixed Effects*

| | First-born <3000g, Later sibs >3000g | | First-born >3000g, one later sib <3000g | |
|---|---|---|---|---|
| | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. |
| APGAR Score (Omitted Category APGAR=10) | | | | |
| APGAR≤6 | 0.4979 *** | 0.4929 *** | 0.4047 *** | 0.4199 *** |
| | (0.0104) | (0.0144) | (0.0111) | (0.0150) |
| APGAR=7–8 | 0.0329 *** | 0.0366 *** | 0.0455 *** | 0.0524 *** |
| | (0.0056) | (0.0083) | (0.0065) | (0.0092) |
| APGAR=9 | 0.0068 * | 0.0029 | 0.0032 | 0.0025 |
| | (0.0038) | (0.0059) | (0.0043) | (0.0062) |
| F-test: No infant health effects | 795.80 *** | 417.97 *** | 472.66 *** | 288.10 *** |
| Sample size | {6,265} | {6,265} | {5,433} | {5,433} |
| R-squared | 0.30 | 0.61 | 0.22 | 0.54 |
| Birth Weight (Omitted Category BW = 3500+ grams) | | | | |
| BW <1000 | 0.9345 *** | 0.9323 *** | 0.8021 *** | 0.8263 *** |
| | (0.0172) | (0.0235) | (0.0200) | (0.0263) |
| BW 1000–1500 | 0.5444 *** | 0.5674 *** | 0.3679 *** | 0.4226 *** |
| | (0.0170) | (0.0235) | (0.0197) | (0.0260) |
| BW 1500–2500 | 0.0648 *** | 0.0738 *** | 0.0826 *** | 0.0942 *** |
| | (0.0080) | (0.0117) | (0.0082) | (0.0104) |
| BW 2500–3000 | 0.0107 * | 0.0149 | 0.0161 *** | 0.0304 *** |
| | (0.0064) | (0.0096) | (0.0061) | (0.0076) |
| BW 3000–3500 | −0.0005 | 0.0139 ** | −0.0013 | 0.0089 |
| | (0.0042) | (0.0059) | (0.0053) | (0.0071) |

*(continued)*

002106

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A5** *(continued)*

| | First-born <3000g, Later sibs >3000g | | First-born >3000g, one later sib <3000g | |
|---|---|---|---|---|
| | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. | Sibling Sample No Family F.E. | Sibling Sample With Family F.E. |
| *F*-test: No infant health effects | 852.77 *** | | 408.29 *** | 255.52 *** |
| Sample size | {6,280} | {6,280} | {5,451} | {5,451} |
| R-squared | 0.42 | 0.68 | 0.29 | 0.58 |
| | Gestation (Omitted Category 40–41 Weeks) | | | |
| Gestation ≤36 weeks | 0.1344 *** | 0.1532 *** | 0.1340 *** | 0.1592 *** |
| | (0.0074) | (0.0118) | (0.0076) | (0.0116) |
| Gestation 37 weeks | 0.0074 | 0.0154 | 0.0037 | −0.0017 |
| | (0.0082) | (0.0136) | (0.0095) | (0.0147) |
| Gestation 38 weeks | 0.0034 | 0.0011 | −0.0010 | 0.0039 |
| | (0.0056) | (0.0097) | (0.0071) | (0.0110) |
| Gestation 39 weeks | 0.0029 | −0.0037 | 0.0076 | 0.0086 |
| | (0.0049) | (0.0082) | (0.0066) | (0.0097) |
| Gestation ≥42 weeks | 0.0069 | 0.0149 | −0.0017 | −0.0104 |
| | (0.0088) | (0.0145) | (0.0116) | (0.0164) |
| *F*-test: No infant health effects | 71.99 *** | 41.04 *** | 71.58 *** | 43.56 *** |
| Sample size | {5,300} | {5,300} | {4,566} | {4,566} |
| R-squared | 0.10 | 0.52 | 0.09 | 0.53 |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively. Sample includes only those siblings where at least one child had a birth weight of less than 3000g.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A6**
Estimated Effects of Infant Health at Birth on Reaching Grade 12 by Age 17 With and Without Family Fixed Effects

| | First-born <3000g, Later sibs >3000g | | First-born >3000g, one later sib <3000g | |
| --- | --- | --- | --- | --- |
| | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Sibling Sample No Family F.E. | Sibling Sample Family F.E. |
| APGAR Score (Omitted Category APGAR=10) | | | | |
| APGAR≤6 | −0.1817 *** | −0.1726 *** | −0.0013 | 0.0381 |
| | (0.0535) | (0.0619) | (0.0550) | (0.0622) |
| APGAR=7–8 | −0.0484 ** | −0.0416 * | −0.0035 | −0.0002 |
| | (0.0207) | (0.0253) | (0.0248) | (0.0288) |
| APGAR=9 | −0.0101 | 0.0191 | 0.0453 *** | 0.0503 *** |
| | (0.0138) | (0.0174) | (0.0160) | (0.0189) |
| F-test: No infant health effects | 5.29 *** | 3.07 ** | 3.46 ** | 3.09 ** |
| Sample size | {4,668} | {4,668} | {3,942} | {3,942} |
| R-squared | 0.21 | 0.73 | 0.18 | 0.70 |
| Birth Weight (Omitted Category BW = 3500+ grams) | | | | |
| BW <1000 | 0.3327 | 0.6136 ** | −0.3588 ** | −0.1453 |
| | (0.2388) | (0.2623) | (0.1585) | (0.1720) |
| BW 1000–1500 | −0.0559 | −0.0202 | −0.1054 | −0.2668 ** |
| | (0.0971) | (0.1097) | (0.0934) | (0.1054) |
| BW 1500–2500 | −0.0751 ** | −0.0945 ** | −0.1329 *** | −0.0880 ** |
| | (0.0341) | (0.0405) | (0.0347) | (0.0366) |
| BW 2500–3000 | −0.0282 | −0.0573 * | −0.0154 | −0.0487 * |
| | (0.0268) | (0.0328) | (0.0250) | (0.0257) |

(continued)

002108

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A6** *(continued)*

| | First-born <3000g, Later sibs >3000g | | First-born >3000g, one later sib <3000g | |
|---|---|---|---|---|
| | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Sibling Sample No Family F.E. | Sibling Sample Family F.E. |
| BW 3000–3500 | −0.0233 | −0.0424 ** | 0.0107 | 0.0040 |
| | (0.0176) | (0.0199) | (0.0216) | (0.0242) |
| *F*-test: No infant health effects | 1.7 | 2.81 ** | 5.09 *** | 2.94 *** |
| Sample size | {4,427} | {4,427} | {3,708} | {3,708} |
| R-squared | 0.19 | 0.71 | 0.18 | 0.68 |
| Gestation (Omitted Category 40–41 Weeks) | | | | |
| Gestation ≤36 weeks | −0.0492 * | −0.0032 | −0.0408 | −0.0417 |
| | (0.0272) | (0.0330) | (0.0270) | (0.0338) |
| Gestation 37 weeks | −0.0174 | −0.0023 | −0.0395 | −0.0712 * |
| | (0.0285) | (0.0366) | (0.0334) | (0.0423) |
| Gestation 38 weeks | 0.0055 | −0.0026 | 0.0038 | −0.0133 |
| | (0.0194) | (0.0256) | (0.0235) | (0.0299) |
| Gestation 39 weeks | 0.0394 ** | 0.0216 | 0.0287 | −0.0009 |
| | (0.0173) | (0.0217) | (0.0222) | (0.0268) |
| Gestation ≥42 weeks | 0.0552 * | 0.0276 | −0.0447 | −0.0383 |
| | (0.0311) | (0.0390) | (0.0385) | (0.0436) |
| *F*-test: No infant health effects | 2.86 ** | 0.35 | 1.72 | 0.91 |
| Sample size | {3,770} | {3,770} | {3,101} | {3,101} |
| R-squared | 0.21 | 0.76 | 0.19 | 0.74 |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asteriks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A7**

Estimated Effects of Infant Health at Birth on Reaching Grade 12 by Age 17 With and Without Family Fixed Effects

Unlike in other models, these coefficients were generated by a model including both birthweight and gestation

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Twins Sample No Family F.E. | Twins Sample Family F.E. |
|---|---|---|---|---|---|
| | | Birth Weight (Omitted Category BW = 3500+ grams) | | | |
| BW <1000 | −0.1707 *** | −0.1039 | 0.0603 | −0.3029 | −0.0837 |
| | (0.0653) | (0.1066) | (0.1161) | (0.1979) | (0.3434) |
| BW 1000–1500 | −0.1224 *** | −0.0984 ** | −0.1362 ** | −0.2446 *** | −0.2315 ** |
| | (0.0277) | (0.0465) | (0.0542) | (0.0906) | (0.0954) |
| BW 1500–2500 | −0.0722 *** | −0.1012 *** | −0.0768 *** | −0.1166 | −0.0685 * |
| | (0.0088) | (0.0137) | (0.0171) | (0.0645) | (0.0607) |
| BW 2500–3000 | −0.0392 *** | −0.0459 *** | −0.0395 *** | −0.1156 * | −0.0921 |
| | (0.0048) | (0.0068) | (0.0093) | (0.0630) | (0.0570) |
| BW 3000–3500 | −0.0131 *** | −0.0186 *** | −0.0227 *** | −0.0682 | −0.0488 |
| | (0.0034) | (0.0047) | (0.0061) | (0.0656) | (0.0533) |
| F-test: No infant health effects | 24.17 *** | 17.02 *** | 6.73 *** | 1.93 * | 1.72 |
| Sample size | {79,363} | {40,203} | {40,203} | {1,354} | {1,354} |
| R-squared | 0.16 | 0.18 | 0.69 | 0.20 | 0.88 |
| | | Gestation (Omitted Category 40–41 Weeks) | | | |
| Gestation≤36 weeks | −0.0139 | −0.0320 ** | −0.0074 | −0.0107 | NA |
| | (0.0087) | (0.0132) | (0.0156) | (0.0441) | |

(continued)

Downloaded from by guest on August 16, 2024. Copyright 2008

**Appendix Table A7** *(continued)*

Unlike in other models, these coefficients were generated by a model including both birthweight and gestation

| | Full Sample | Sibling Sample No Family F.E. | Sibling Sample Family F.E. | Twins Sample No Family F.E. | Twins Sample Family F.E. |
|---|---|---|---|---|---|
| Gestation 37 weeks | −0.0061 | −0.0218 * | −0.0225 | 0.0648 | NA |
| | (0.0083) | (0.0121) | (0.0142) | (0.0490) | |
| Gestation 38 weeks | 0.0032 | −0.0030 | −0.0146 * | 0.0593 | NA |
| | (0.0053) | (0.0073) | (0.0088) | (0.0457) | |
| Gestation 39 weeks | −0.0118 *** | 0.0110 * | 0.0007 | 0.0650 | NA |
| | (0.0043) | (0.0059) | (0.0070) | (0.0481) | |
| Gestation ≥42 weeks | −0.0088 | −0.0121 | −0.0027 | −0.1764 * | NA |
| | (0.0065) | (0.0090) | (0.0105) | (0.1002) | NA |
| Gestation Missing | 0.0077 | 0.0141 | −0.0074 | 0.0354 | |
| | (0.0095) | (0.0135) | (0.0153) | (0.0760) | |
| *F*-test (6 df): | 2.74 ** | 2.98 *** | 0.86 | 1.89 * | |

All regression models include additional fixed effects for mother's marital status, gender of child, and family sibling size dummies for the birth order of the child within each family size. One, two, and three asterisks indicate statistical significance at the 10, 5, and 1 percent levels respectively.

002111

*American Economic Review: Papers & Proceedings 2015, 105(5): 576–580*
http://dx.doi.org/10.1257/aer.p20151109

## MIGRATION, INCOME, AND ECONOMIC POLICY

# The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes[†]

*By* Pia M. Orrenius and Madeline Zavodny*

The United States occasionally offers temporary protected status (TPS) to migrants whose countries are experiencing civil unrest, violence, a natural disaster, or an epidemic. Migrants who have TPS typically cannot be deported, and they are permitted to work legally in the United States. As of early 2014, more than 340,000 migrants had TPS (Messick and Bergeron 2014). The United States currently extends TPS to migrants from 11 countries: El Salvador, Guinea, Haiti, Honduras, Liberia, Nicaragua, Sierra Leone, Somalia, Sudan, South Sudan, and Syria.

TPS is designed to provide a safe haven to migrants who would otherwise have to return home to potentially dangerous situations. Unlike refugees, migrants with TPS do not receive legal permanent resident status. They are supposed to return home when the TPS designation for their country expires. The Secretary of Homeland Security designates countries for TPS, usually for a period of 6 to 18 months, and can extend the designation if conditions in the home country do not improve. Migrants must be present in the United States by a specified date—typically soon after the triggering event in their home country—in order to be eligible for TPS.

Most TPS beneficiaries are unauthorized immigrants who were subject to removal and could not work legally prior to receiving TPS.

A few are in the United States on temporary visas. TPS therefore may improve most recipients' labor market outcomes by giving them permission to work. In particular, TPS recipients may gain access to higher-paying jobs that are typically not open to unauthorized immigrants or most temporary visa holders.

Little previous research has examined the effect of granting temporary legal status on migrants' labor market outcomes—a particularly relevant issue in light of President Obama's recent executive actions intended to grant deferred deportation and work permits to several million unauthorized immigrants. Studies on legalization programs in the United States that awarded legal permanent residence—a "green card" instead of the temporary reprieve of TPS—typically find that recipients' earnings increase by 6 to 13 percent (e.g., Rivera-Batiz 1999; Kossoudji and Cobb-Clark 2002). Earnings gains are bigger among well-educated immigrants than among less-educated immigrants, and are often bigger among women than among men. Much of the gains appear to be due to recipients being able to move into higher-paying occupations (Lozano and Sørensen 2011). Evidence on the employment effects of legalization is more mixed. Some studies indicate negative employment effects: men appear to become more selective about the jobs they were willing to hold, while women appear more likely to exit the labor force (e.g., Amuedo-Dorantes, Bansak, and Raphael 2007). Some research finds positive employment effects among women (Pan 2012).

This study examines how migrants from El Salvador who are likely to have received TPS fare in the labor market relative to those who arrived too late to qualify for TPS. Salvadorans are by far the largest group of TPS holders in the

*Orrenius: Federal Reserve Bank of Dallas, 2200 N. Pearl St., Dallas, TX 75201 (e-mail: pia.orrenius@dal.frb.org); Zavodny: Agnes Scott College, 141 E. College Ave., Decatur, GA 30030 (e-mail: mzavodny@agnesscott.edu). The views expressed here are solely those of the authors and do not reflect those of the Federal Reserve Bank of Dallas or the Federal Reserve System.
[†] Go to http://dx.doi.org/10.1257/aer.p20151109 to visit the article page for additional materials and author disclosure statement(s).

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2120 of 4699 PageID #:  5285

United States. This study compares Salvadorans to migrants from Mexico, who have never been eligible for TPS. Difference-in-differences results suggest that TPS increases employment among less-educated women while decreasing it among men. TPS appears to increase men's earnings, in part because they are able to move into higher-paying occupations.

## I. Background

Since the late 1970s, hundreds of thousands of Central Americans have fled conflicts and natural disasters in their home countries and entered the United States illegally. Eligible migrants from El Salvador received temporary relief from deportation several times, including receiving TPS designation in March 2001 after two earthquakes rocked El Salvador. That status has been extended ten times since then, most recently in early 2015. As a result, Salvadoran migrants who were in the United States in early 2001 and received TPS have been allowed to live and work in the United States continuously ever since. About 290,000 Salvadorans were initially granted TPS, and some 204,000 currently have TPS.

Having legal status, even on a temporary basis, may affect migrants' labor market outcomes through several channels. Employers may be unwilling to hire unauthorized immigrants, so having legal status may boost migrants' employment by making it easier to find a job. Having a work permit may also increase migrants' earnings, in part by opening up more and better-paying jobs to them.

Having TPS also may change beneficiaries' incentives to work. With the threat of deportation removed, migrants who feel safer may reduce their precautionary savings and consume more leisure. Target earners who extend their planned stay after receiving TPS may reduce their labor supply since they now have a longer time frame to earn their targeted amount. On the other hand, relatives back home may have greater financial needs after the events that triggered TPS. Migrants may increase their labor supply in order to send more money home after a natural disaster. Unauthorized immigrants are ineligible for virtually all public assistance programs, and receiving TPS does not change this. It therefore is unlikely that TPS causes changes in eligibility for public assistance that would in turn reduce work incentives. TPS beneficiaries are potentially eligible for unemployment insurance benefits, however.

## II. Data and Methodology

This study uses data from the 2005 and 2006 American Community Survey (ACS) to examine labor market outcomes among likely TPS beneficiaries from El Salvador. The ACS offers a large, nationally representative sample of US residents. The survey includes questions about labor market outcomes, place of birth, and year of entry into the United States.

Salvadorans who were in the United States in early 2001 were eligible for TPS, while those who entered later were not. Salvadorans who report entering the country in 1999–2000 are therefore likely to have received TPS and are the treatment group in this study. Salvadorans who report entering the United States in 2002–2003—too late to receive TPS—serve as the control group. (Migrants who report entering in 2001 are excluded since it is unclear whether they entered in time to receive TPS.) The narrow time windows are used to make the two entry groups as comparable as possible in terms of years of US residence. Nonetheless, the treatment group has resided in the United States for a few more years.

We therefore compare pre- and post-TPS Salvadoran migrants with Mexican migrants who report entering during the same periods. This allows us to control for shared differences in labor market outcomes between arrival groups of Salvadorans and Mexicans using a difference-in-differences (D-in-D) methodology.[1] The D-in-D method requires assuming that, absent TPS, the difference in outcomes between earlier and more recent Salvadoran migrants would be the same as the corresponding difference among Mexican migrants.

As a check on the validity of this assumption, we estimate a similar specification for Guatemalan and Mexican immigrants. Guatemala is similar to El Salvador in a number

---

[1] The conventional difference-in-differences method would involve looking at Salvadoran migrants before and after they received TPS, relative to Mexican migrants. Because of concerns about selection in return migration, we instead use data only from 2005–2006 and compare pre-TPS migrants with post-TPS migrants. We treat the 2005–2006 data as a cross section.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2121 of 4699 PageID #:  5286

of respects, including a weak economy and widespread violence, but Guatemalan migrants have never received TPS. Like Mexicans and Salvadorans, most Guatemalan migrants are unauthorized immigrants. These three countries were consistently the three top source countries of unauthorized immigrants living in the United States during 2000 to 2012.

We examine several labor market outcomes: employment, unemployment (not conditional on labor force participation), labor force participation, usual weekly hours and annual weeks worked (also not conditional on labor force participation), the natural log of real weekly earnings, and the natural log of average real weekly earnings of US natives in the same occupation. The last variable can be viewed as a measure of occupational prestige. All regressions are estimated using OLS by sex for two groups, those who did not attend college (the less-educated) and those who did (the more-educated), since some previous research indicates that having legal status is more beneficial to more-educated migrants.

The regressions control for several individual-level characteristics reported in the ACS. These include age (as a quartic), marital status, and education (not a high school graduate, or not a college graduate). The regressions also control for state of residence to capture differences in business cycle conditions across states. We report robust standard errors.

### III. Results

Column 1 of Table 1 reports D-in-D regression results for less-educated male migrants from El Salvador and Mexico. The results indicate that less-educated Salvadoran men who are likely to have received TPS were about 6 percentage points less likely to be employed than those who entered too recently to have received TPS, relative to the corresponding difference among Mexican migrants with the same entry periods. The lower employment arises from greater unemployment, not from lower labor force participation, suggesting men with TPS are more selective about the jobs they take. There is no significant difference in weekly hours or annual weeks worked; in results not shown here, there is also no significant difference in hours or weeks worked conditional on employment.

Less-educated Salvadoran men who are likely to have received TPS earn about 13 percent more, conditional on being employed. Real weekly earnings among US natives in the same occupation are almost 10 percent higher. Taken together, these two results suggest that more than three-quarters of the increase in earnings is due to TPS beneficiaries working in higher-paying occupations. As a whole, the results suggest that less-educated Salvadoran men who receive TPS are able to move into better jobs and become more selective about the jobs they hold, increasing their earnings but also their job search and unemployment incidence.

Less-educated Salvadoran women who receive TPS appear to enter the labor force and work, in contrast. The D-in-D results in column 2 indicate that the relative employment rate among less-educated Salvadoran women who are likely to have received TPS increases by more than 17 percentage points. Their labor force participation rate increases by about 15 percentage points. Their usual weekly hours worked increase by almost 5.6 hours, and their annual weeks worked increase by about 7.5 weeks. This increase in women's labor supply is likely linked to the decrease in men's employment. In results not shown here, the increase in labor force participation is driven by married women, although employment, weekly hours, and weeks worked increase for both married and single less-educated women. Less-educated women's earnings do not appear to be affected by receiving TPS.

The effects of TPS are different among more-educated migrants. Employment and unemployment do not change significantly, relative to the comparison group, among more-educated Salvadoran men who are likely to have received TPS. However, they are more likely to be in the labor force and to work in higher-paying occupations; they also work more weeks per year. More-educated Salvadoran women who are likely to have received TPS are not more likely to work or to be in the labor force, but they have considerably higher average earnings and work in higher-paying occupations.

In other results, Guatemalan migrants who entered the United States in 1999–2000 did not have significantly different labor market outcomes than those who entered in 2002–2003, relative to the corresponding difference among Mexican migrants (see Orrenius and Zavodny

TABLE 1—DIFFERENCE-IN-DIFFERENCES REGRESSION RESULTS FOR LIKELY TPS BENEFICIARIES
FROM EL SALVADOR RELATIVE TO IMMIGRANTS FROM MEXICO

|  | Less-educated | | More-educated | |
|---|---|---|---|---|
|  | Men | Women | Men | Women |
| Employed | −0.060* | 0.173*** | 0.101 | −0.046 |
|  | (0.032) | (0.057) | (0.077) | (0.117) |
| Unemployed | 0.060*** | −0.024 | 0.029 | 0.055 |
|  | (0.020) | (0.028) | (0.024) | (0.059) |
| In labor force | −0.0002 | 0.149*** | 0.131* | 0.009 |
|  | (0.0263) | (0.057) | (0.073) | (0.105) |
| Usual weekly hours | 0.346 | 5.564** | 4.182 | 5.300 |
|  | (1.283) | (2.330) | (3.836) | (4.401) |
| Annual weeks worked | 0.905 | 7.485*** | 7.656* | −1.716 |
|  | (1.706) | (2.770) | (4.198) | (5.252) |
| Real weekly earnings | 0.131*** | 0.033 | 0.191 | 0.477** |
|  | (0.045) | (0.076) | (0.152) | (0.230) |
| Real weekly earnings in occupation | 0.099** | 0.065 | 0.237* | 0.298** |
|  | (0.043) | (0.057) | (0.121) | (0.125) |

*Notes:* Shown is the coefficient on an interaction term between a dummy variable for Salvadorans and a dummy variable for migrating to the United States in 1999–2000. Results are from OLS regressions. The sample includes Salvadoran and Mexican immigrants who migrated in 1999–2000 or 2002–2003. The regressions also control for age (as a quartic), marital status, not having completed high school (or college), state of residence, being from El Salvador, and migrating in 1999–2000. Robust standard errors in parentheses.

    ***Significant at the 1 percent level.

    **Significant at the 5 percent level.

    *Significant at the 10 percent level.

*Source:* Authors' calculations.

2014). This suggests that differences across the two entry periods in the composition of Mexican migrants or in the labor market conditions they faced in the United States do not underlie our results.

Preexisting trends also do not appear to drive our main results. To investigate this possibility, we conducted a falsification exercise (or "pseudo experiment") on a hypothetical break in the data in 1996. A comparison of Salvadoran and Mexican migrants who arrived in 1994–1995 with migrants who arrived in 1997–1998 indicates few statistically significant differences before and after the hypothetical break.

### IV. Conclusion

Having legal status, even on a temporary basis, appears to allow more-educated immigrants of both sexes and less-educated male immigrants to move into better jobs. The prospect of moving into better jobs after getting a work permit appears to make less-educated men more selective about the jobs they will take, increasing the time they spend searching for jobs and hence boosting their unemployment. Concomitant with the increase in less-educated men's unemployment, less-educated women are more likely to enter the labor force and work. Taken as a whole, the results indicate that having even a temporary work permit improves migrants' labor market opportunities.

The labor market effects of TPS are particularly salient given current US immigration policy. The 2001 TPS for Salvadoran migrants is a potential indicator of how a legalization program, particularly one that does not create a pathway to US citizenship, would affect beneficiaries. TPS is similar in a number of respects to the recently announced Deferred Action for Parent Accountability (DAPA), the 2012 Deferred Action for Childhood Arrivals (DACA) program, and the types of legalization programs bandied about by several members of

Congress in 2013 and 2014. DAPA and DACA do not grant legal permanent residence and a pathway to US citizenship but rather temporary, renewable permission to live and work legally in the United States. The results here suggest that migrants benefit from a program that grants legal status even on a temporary basis. Understanding the broader effects of such a program on other groups of immigrants and on US natives is an area for future research, as is studying whether such programs induce additional inflows of unauthorized immigrants.

## REFERENCES

**Amuedo-Dorantes, Catalina, Cynthia Bansak, and Steven Raphael.** 2007. "Gender Differences in the Labor Market: Impact of IRCA's Amnesty Provisions." *American Economic Review* 97 (2): 412–16.

**Kossoudji, Sherrie A., and Deborah A. Cobb-Clark.** 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population." *Journal of Labor Economics* 20 (3): 598–628.

**Lozano, Fernando A., and Todd A. Sørensen.** 2011. "The Labor Market Value to Legal Status." Institute for the Study of Labor Discussion Paper 5492.

**Messick, Madeline, and Claire Bergeron.** 2014. *Temporary Protected Status in the United States: A Grant of Humanitarian Relief that is Less Than Permanent*. Washington, DC: Migration Policy Institute.

**Orrenius, Pia M., and Madeline Zavodny.** 2014. "The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes." Institute for the Study of Labor Discussion Paper 8744.

**Pan, Ying.** 2012. "The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986." *Journal of Labor Research* 33 (2): 119–42.

**Rivera-Batiz, Francisco L.** 1999. "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States." *Journal of Population Economics* 12 (1): 91–116.

Copyright of American Economic Review is the property of American Economic Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103 and 212**

[CIS No. 2519–2011; DHS Docket No. USCIS–2012–0003]

**RIN 1615–AB99**

## Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

**SUMMARY:** On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a proposed rule to amend its regulations to allow certain immediate relatives of U.S. citizens who are physically present in the United States to request provisional unlawful presence waivers prior to departing from the United States for consular processing of their immigrant visa applications. This final rule implements the provisional unlawful presence waiver process. It also finalizes clarifying amendments to other provisions within our regulations. The Department of Homeland Security (DHS) anticipates that these changes will significantly reduce the length of time U.S. citizens are separated from their immediate relatives who engage in consular processing abroad. DHS also believes that this new process will reduce the degree of interchange between the U.S. Department of State (DOS) and USCIS and create greater efficiencies for both the U.S. Government and most provisional unlawful presence waiver applicants.

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* Confer any legal status, protect against the accrual of additional periods of unlawful presence, authorize an alien to enter the United States without securing a visa or other appropriate entry document, convey any interim benefits (*e.g.,* employment authorization, parole, or advance parole), or protect an alien from being placed in removal proceedings or removed from the United States in accordance with current DHS policies governing initiation of removal proceedings and the use of prosecutorial discretion.

**DATES:** This final rule is effective March 4, 2013.

**FOR FURTHER INFORMATION CONTACT:** Roselyn Brown-Frei, Office of Policy and Strategy, Residence and Naturalization Division, U.S. Citizenship and Immigration Services,

Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2099, Telephone (202) 272–1470 (this is not a toll free number).

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the Major Provisions of the Regulatory Action
  C. Costs and Benefits
II. Legal Authority
III. Background
  A. Notice of Intent
  B. Proposed Rule
  C. Final Rule
IV. Public Comments on Proposed Rule
  A. Summary of Public Comments
  B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process
  C. Eligibility for the Provisional Unlawful Presence Waiver
  D. Filing Requirements and Fees
  E. Adjudication
  F. Denials, Motions To Reopen or Reconsider, and Appeals
  G. Effect of Pending or Approved Provisional Unlawful Presence Waivers
  H. Automatic Revocation
  I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver
  J. Miscellaneous Comments
  K. Comments on Executive Orders 12866/ 13563 Analysis
V. Regulatory Amendments
VI. Statutory and Regulatory Requirements
  A. Unfunded Mandates Reform Act of 1995
  B. Small Business Regulatory Enforcement Fairness Act of 1996
  C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  D. Executive Order 13132
  E. Executive Order 12988 Civil Justice Reform
  F. Paperwork Reduction Act
  G. Regulatory Flexibility Act

**SUPPLEMENTARY INFORMATION:**

## I. Executive Summary

### A. Purpose of the Regulatory Action

#### 1. Need for the Regulatory Action

Certain spouses, children, and parents of U.S. citizens (immediate relatives) who are in the United States are not eligible to apply for lawful permanent resident (LPR) status while in the United States. Instead, these immediate relatives must travel abroad to obtain an immigrant visa from the Department of State (DOS) to return to the United States to request admission as an LPR, and, in many cases, also must request from the Department of Homeland Security (DHS) a waiver of inadmissibility as a result of their unlawful presence in the United States. Currently, these immediate relatives

cannot apply for the waiver until after their immigrant visa interviews abroad. As a result, these immediate relatives must remain outside of the United States, separated from their U.S. citizen spouses, parents, or children, while USCIS adjudicates their waiver applications. In some cases, waiver application processing can take well over one year, prolonging the separation of these immediate relatives from their U.S. citizen spouses, parents, and children. In addition, the action required for these immediate relatives to obtain LPR status in the United States— departure from the United States to apply for an immigrant visa at a DOS consulate abroad—is the very action that triggers the unlawful presence inadmissibility grounds under section 212(a)(9)(B)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(a)(9)(B)(i). As a result of the often lengthy processing times and uncertainty about whether they qualify for a waiver of the unlawful presence inadmissibility grounds, many immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad to seek an immigrant visa.

#### 2. Provisional Unlawful Presence Waiver Process

Through this final rule, DHS is changing its current process for the filing and adjudication of certain waivers of inadmissibility for eligible immediate relatives of U.S. citizens, who are physically present in the United States but will proceed abroad to obtain their immigrant visas. The new waiver process will allow eligible immediate relatives to apply for a provisional unlawful presence waiver while they are still in the United States and before they leave to attend their immigrant visa interview abroad. DHS anticipates that this new provisional unlawful presence waiver process will significantly reduce the time that U.S. citizens are separated from their immediate relatives. USCIS's approval of an applicant's provisional unlawful presence waiver prior to departure also will allow the DOS consular officer to issue the immigrant visa without further delay, if there are no other grounds of inadmissibility and if the immediate relative is otherwise eligible to be issued an immigrant visa.

#### 3. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security

(Secretary) with the administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

*B. Summary of the Major Provisions of the Regulatory Action*

On April 2, 2012, U.S. Citizenship and Immigration Services (USCIS) published a Notice of Proposed Rulemaking (NPRM), which outlined the provisional unlawful presence waiver process. *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 77 FR 19902 (April 2, 2012). After careful consideration of the public comments, DHS adopts most of the proposed regulatory amendments without change, except for the provisions noted below:

1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3) in this final rule to clarify that fee waivers are not available for the biometric or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h)

and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA sections 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses), and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) immigration judges (IJs) and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the intended streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS therefore added a new paragraph to clarify that the *Application for Provisional Unlawful Presence Waiver,* Form I–601A, will be filed only with USCIS, even if an alien is in removal proceedings before EOIR. *See* section 212.7(e)(1).

4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States. DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the new provisional

unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that the Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may

reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based, prior to the date of publication of this final rule. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

### 8. Section 212.7(e)(4)(v)

DHS initially proposed excluding all aliens who were in removal proceedings from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; or (3) removal proceedings had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS has not used the initial proposed categories of aliens above. Rather, DHS has decided to allow aliens in removal proceedings to participate in this new provisional unlawful presence waiver process if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Aliens whose removal proceedings are terminated or dismissed are covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver. Aliens who have had their NTAs cancelled by ICE are also covered in the general population of aliens who are eligible to apply for a provisional unlawful presence waiver, since their removal proceedings were never initiated through filing of an NTA with EOIR.

Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted the provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS has made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.[1]

### 9. Section 212.7(e)(4)(ix)

For operational reasons, DHS initially proposed rejecting applications filed by aliens who previously filed a Form I–601A with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the National Visa Center (NVC) immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern that limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed or the alien was a victim of individuals or entities not authorized to practice immigration law. DHS agrees that a one-time filing limitation is too restrictive and is removing the single filing limitation. If an individual's provisional unlawful presence waiver request is

denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a traditional waiver by filing Form I–601, Application for Waiver of Grounds of Inadmissibility, with the USCIS Lockbox, after he or she attends the immigrant visa interview abroad and after DOS conclusively determines that the individual is inadmissible on a ground(s) that is waivable. DHS, therefore, has removed this provision from the final rule.

### 10. Section 212.7(e)(5)(ii)

DHS corrected a typographical error in the prefatory language to this section, removing the term "application" the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

### 11. Section 212.7(e)(5)(ii)(A)

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR at 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR at 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct application filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A).

### 12. Section 212.7(e)(5)(ii)(G)

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially

---

[1] DHS recognizes that this is a departure from the long-standing principle in immigration law and policy that aliens must establish eligibility not only at the time of filing but also up until the time USCIS adjudicates the case. *See, e.g., Matter of Isidro-Zamorano,* 25 I&N Dec. 829, 830–31 (BIA 2012) (explaining the "well established" principle that application for an immigration benefit is "continuing" and that eligibility is determined at the time of adjudication, not at the time of application). However, DHS believes that a departure from this general principle is permissible and warranted in this limited context, especially since the provisional unlawful presence waiver process is purely discretionary. Furthermore, the provisional unlawful presence waiver is not valid while the alien remains in the United States. It only takes effect after the alien departs from the United States, appears for his or her immigrant visa interview, and is determined by DOS to be otherwise eligible for an immigrant visa, in light of the approved I–601A provisional unlawful presence waiver.

acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(ii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from

qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another Form I–601A under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State, and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application before final adjudication and file another Form I–601A, in accordance with the form instructions and with the required filing and biometric services fees. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

### C. Costs and Benefits

This final rule is expected to result in a reduction of the time that U.S. citizens are separated from their immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government should achieve increased efficiencies in processing immigrant visas for individuals subject to the unlawful presence inadmissibility bars under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). We expect costs to the Federal government of the provisional unlawful presence waiver process to be offset by the additional fee revenue collected for form processing.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to

approximately $538.1 million at a seven percent discount rate. Compared to the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which DHS estimates will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file new provisional unlawful presence waiver applications based on the same approved immediate relative petition if their original Form I–601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Individuals that file a new Form I–601A will still face the biometric and Form I–601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver. To the extent that this rule induces new demand for immediate relative immigrant visas, additional immigration benefit forms, such as the Petition for Alien Relative, Form I–130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which DHS estimates will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

Estimates for the costs of the rule were developed assuming that current demand for requesting waivers of grounds of inadmissibility based only on unlawful presence is constrained because of concerns that families may endure lengthy separations under the current system. Due to uncertainties as to the degree of the current constraint of demand, DHS used a range of constraint levels with corresponding increases in demand to estimate the costs. The costs for each increase in demand are summarized below.

ESTIMATED INCREASE IN COSTS WITH AN INCREASE IN DEMAND OF:

|  | 25% | 50% | 75% | 90% |
|---|---|---|---|---|
| **Cost of Biometrics Collection and Processing** | | | | |
| 10 year Costs Undiscounted ............................................... | $46,803,460 | $59,088,534 | $71,373,907 | $78,746,295 |
| Total 10 year Costs Discounted at 7% ............................... | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| Total 10 year Costs Discounted at 3% ............................... | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |
| **Cost of Biometrics Collection and Processing and Form I–601A for Re-filers** | | | | |
| 10 year Costs Undiscounted ............................................... | $79,942,420 | $100,924,521 | $121,908,872 | $134,499,783 |
| Total 10 year Costs Discounted at 7% ............................... | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| Total 10 year Costs Discounted at 3% ............................... | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |
| **Costs of Applications for the Additional (Induced) Demand for Immigrant Visas** | | | | |
| 10 year Costs Undiscounted ............................................... | $143,931,692 | $287,854,640 | $431,775,838 | $518,143,249 |
| Total 10 year Costs Discounted at 7% ............................... | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| Total 10 year Costs Discounted at 3% ............................... | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |
| **Total Costs to New Applicants** | | | | |
| 10 year Costs Undiscounted ............................................... | $270,677,572 | $447,867,695 | $625,058,617 | $731,389,326 |
| Total 10 year Costs Discounted at 7% ............................... | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| Total 10 year Costs Discounted at 3% ............................... | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

## II. Legal Authority

The Homeland Security Act of 2002, Public Law 107–296 (Homeland Security Act of 2002), section 102, 116 Stat. 2135, 6 U.S.C. 112, and section 103 of the INA, 8 U.S.C. 1103, charge the Secretary with administration and enforcement of the immigration and naturalization laws. The Secretary is implementing this provisional unlawful presence waiver process under the broad authority to administer DHS and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority. The Secretary's discretionary authority to waive the ground of inadmissibility for unlawful presence can be found in INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The regulation governing certain inadmissibility waivers is 8 CFR 212.7. The fee schedule for provisional unlawful presence waiver applications is found at 8 CFR 103.7(b)(1)(i)(AA).

## III. Background

### A. Notice of Intent

On January 9, 2012, DHS published a notice in the **Federal Register**— Provisional Waivers of Inadmissibility for Certain Immediate Relatives of U.S. Citizens, 77 FR 19902 (Jan. 9, 2012)— announcing its intent to change the current process for certain applications for waivers of inadmissibility filed in connection with an immediate relative immigrant visa application. The notice explained the proposed process that DHS was considering and that DHS would further develop a proposal, which it would ultimately finalize through the rulemaking process.

On January 10, 2012, USCIS conducted a stakeholder engagement to discuss the Notice of Intent. More than 900 people participated via telephone and in person. USCIS provided an overview of how the proposed process changes may affect filing and adjudication. USCIS also addressed questions from stakeholders. Topics covered included eligibility, procedures, and consequences of an approval or denial of a provisional unlawful presence waiver.

### B. Proposed Rule

On April 2, 2012, DHS published a proposed rule in the **Federal Register**, proposing to amend the regulations to revise the process for applying for waivers of inadmissibility. *See* 77 FR 19902. DHS received over 4,000 public comments to the proposed rule. Comments were submitted by individuals, immigrant advocacy groups, attorneys, accredited representatives, religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. DHS counted each petition or mass mailing as one comment, but acknowledged the number of signatures associated with each comment.

Opinions on the proposed rule varied. A large number of comments (3,442) were favorable and supported the implementation of the new provisional unlawful presence waiver process. A few hundred commenters (430) opposed the proposed rule, in many instances because of a misperception that the provisional unlawful presence waiver process would grant legal status to aliens not lawfully present in the United States and allow them to remain in the United States permanently. DHS also received 310 comments, some of which did not address any aspect of the proposed rule or reflect a commenter's support or opposition to the proposed rule. These 310 commenters also did not make any specific suggestions that related to the proposed rule. Finally, DHS received a comment in the form of a petition signed by 118,593 individuals who opposed the proposed rule; the signed petition, however, reflected the same misperception[2] about the provisional unlawful presence waiver process as seen in some of the comments from others who opposed the rule.

In preparing this final rule, DHS considered these public comments and other relevant materials contained in the docket. All comments may be reviewed at the Federal Docket Management System (FDMS) at *http://*

---

[2] The petition incorrectly summarized the substance and nature of the proposed rule. The petition also erroneously concluded that the provisional unlawful presence waiver process granted aliens not lawfully present in the United States a temporary legal status in the United States and put them on the "fast track" to permanent legal status—neither of which can occur under this final rule.

*www.regulations.gov,* docket number USCIS–2012–0003.

*C. Final Rule*

This final rule adopts most of the regulatory amendments set forth in the proposed rule without change. The rationale for the proposed rule and the reasoning provided in its preamble remain valid with respect to these regulatory amendments. DHS also has made several clarifying changes to the regulatory text, based on suggestions from commenters and on policy decisions made after publication of the proposed rule. The changes to the regulatory text are summarized in Section V below. This final rule also adopts, without change, the regulatory amendment clarifying 8 CFR 212.7(a)(1) and (3). This final rule does not address comments seeking changes in U.S. laws, regulations, or agency policies that are unrelated to the provisional unlawful presence waiver process or the clarifying amendments to 8 CFR 212.7(a). This final rule also does not change the procedures or policies of other DHS components or federal agencies, or resolve issues outside the scope of this rulemaking. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process in the future.

**IV. Public Comments on the Proposed Rule [3]**

*A. Summary of Public Comments*

The 60-day public comment period for the proposed rule ended on June 1, 2012. Commenters included individuals, immigrant advocacy groups, attorneys, and accredited representatives, as well as religious organizations and leaders, individuals in academia, Members of Congress, and members of the media. Some comments also were submitted through mass mailing campaigns or petitions, expressing support for, or opposition to, the provisional unlawful presence waiver process. The majority of comments came from supporters of the proposed rule who agreed that it would promote family unity and reduce the length of time immediate relatives (spouses, children, and parents of a U.S. citizen over the age of 21 years) would

be separated from the U.S. citizen petitioner. Many also agreed that it would relieve the financial burdens that the current process places on American families, encourage individuals to obtain a lawful status, and benefit the United States generally. Numerous commenters shared their personal stories about the hardships they experienced after being separated from their loved ones, and applauded DHS for taking a step to reduce such scenarios in the future.

Several commenters strongly disagreed with the proposed provisional unlawful presence waiver process, arguing that the Executive Branch did not have the legal authority to make the proposed changes without approval from Congress. Other commenters argued that the proposed rule was unconstitutional. Many commenters who opposed the change believed that the current immigration laws are not properly enforced and that DHS favors illegal aliens over legal immigrants. Some commenters also believed that DHS was rewarding illegal behavior by publishing this rule. These commenters stated that this rule would only encourage illegal immigration and fraud, would be harmful to the American economy, and that the Federal Government's money would be better invested in assisting U.S. citizens and legal immigrants, rather than illegal aliens and their U.S. citizen families. A few commenters opposed the proposed rule because they believed that it is unfair to exclude individuals outside the United States from eligibility for the proposed provisional unlawful presence waiver process or because the requirements articulated in the rule (for example, the lack of protection from removal) were too stringent or not helpful.

DHS has reviewed all of the public comments received in response to the proposed rule and addresses them in this final rule. DHS's responses are grouped by subject area, with a focus on the most common issues and suggestions raised by the commenters. DHS received few or no comments on the following topics: (1) The rejection criteria, (2) withdrawals, and (3) the validity of an approved provisional unlawful presence waiver.

*B. Legal Authority To Implement the Provisional Unlawful Presence Waiver Process*

Several commenters questioned DHS's legal authority to implement the provisional unlawful presence waiver process. Commenters argued that the proposed rule was unconstitutional and that it was the role of Congress, not the

Executive Branch, to create immigration laws and policy. DHS disagrees with the view that this rule exceeds the Secretary's legal authority.

Congress has plenary authority over immigration and naturalization and, through its legislative power, may enact legislation establishing immigration law and policy. *See, e.g., Arizona* v. *United States,* 132 S. Ct. 2492, 2498 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations.'') (citations omitted); *see also Fiallo* v. *Bell,* 430 U.S. 787, 792 (1977). The Executive Branch, which includes DHS, is charged with implementing the laws passed by Congress. Through section 102 of the Homeland Security Act of 2002, 106 Stat. 2135, 6 U.S.C. 112, and INA section 103, 8 U.S.C. 1103, Congress has specifically charged the Secretary with the administration and enforcement of the immigration and naturalization laws. The Secretary is authorized to promulgate rules and "perform such other acts as he deems necessary for carrying out his authority" based upon considerations rationally related to the immigration laws. INA section 103(a)(3), 8 U.S.C. 1103(a)(3). The Secretary has broad discretion to determine the most effective way to administer the laws. *See, e.g., Narenji* v. *Civiletti,* 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary of Homeland Security)], so long as his action is reasonably related to the duties imposed upon him"); *see also Arizona,* 132 S. Ct. at 2499 (noting "broad discretion exercised by immigration officials" under the immigration laws).

The provisional unlawful presence waiver process is not a substantive change to the immigration laws but a procedural change in the way that a specific type of waiver application can be filed with USCIS. Generally, individuals who are required by law to obtain a waiver of inadmissibility must apply for the waiver through the procedures prescribed by the Secretary, as permitted under the Homeland Security Act and the INA. Current waiver filing procedures for an individual processing an immigrant visa application abroad at a consular post require the individual to apply for a waiver of grounds of inadmissibility

---

[3] USCIS received some comments prior to the official comment period, including two letters signed by over 200 immigrant advocate organizations. Most of the concerns or suggestions made by the pre-publication commenters were captured through other public comments submitted during the official period.

while outside the United States and after his or her immigrant visa interview. Under this final rule, DHS is permitting a category of aliens—certain immediate relatives of U.S. citizens who will be pursuing an immigrant visa application at a consular post abroad—to file an application for a provisional unlawful presence waiver of inadmissibility due to unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), while still in the United States. By creating these new filing procedures, DHS anticipates that the immigrant visa waiver process will become more efficient for the U.S. Government and for U.S. citizens and their immediate relatives. It will reduce the length of time American families are separated while the immigrant visa applicant is going through the immigrant visa process. The applicant may remain in the United States with his or her family until the time the applicant must depart from the United States to attend his or her immigrant visa interview.

### C. Eligibility for the Provisional Unlawful Presence Waiver

1. Preference Categories

A large number of commenters focused on who is eligible to participate in the provisional unlawful presence waiver process. Some commenters believed the proposed rule was too restrictive and excluded many individuals who also could benefit from the new process. Others asked why DHS was not expanding eligibility to all families and their close immediate or distant relatives such as in-laws, grandparents, aunts and uncles. The commenters also asked why DHS did not include all family-sponsored or employment-based immigrants, especially if aliens in a particular immigrant visa category had current visa availability. The commenters argued that there was no discernible difference between immediate relatives and preference aliens who have current visa availability. The commenters also indicated that the hardships of lengthy family separation are just as compelling for LPR families as they are for U.S. citizen families. The commenters also asked that, if DHS will not expand the provisional unlawful presence waiver process to all LPR families, DHS should at least consider expanding the provisional unlawful presence waiver process to LPRs who have U.S. citizen children.

Several Congressional commenters argued that there was no compelling, legal, operational or other rationale that would justify DHS's decision to limit

the provisional unlawful presence waiver process to immediate relatives. The Congressional commenters stated that it was unambiguous that Congress intended the unlawful presence waiver under section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), to be available to immediate relatives and certain preference aliens, including unmarried adult children of U.S. citizens and LPR spouses and children. The Congressional commenters thought that DHS's distinction could not be justified based on DHS's reading of congressional intent. Instead, the Congressional commenters argued that DHS would be ignoring clear congressional intent and cause the provisional unlawful presence waiver process to be underutilized by entire categories of persons for whom the waiver is now available. Finally, many commenters believed that expanding the provisional unlawful presence waiver process to preference categories would offer more measurable benefits to USCIS and DOS and would facilitate legal immigration by encouraging a more sizeable population to seek to adjust their status.

Suggestions for additional eligibility criteria or categories of eligible aliens varied but most commenters asked DHS to consider expanding eligibility to: (1) All preference categories generally; (2) unmarried sons and daughters of U.S. citizens who are over the age of 21 years; (3) married sons and daughters or siblings of U.S. citizens; (4) spouses and minor children of LPRs; (5) parents of minor U.S. citizen children; (6) children who were brought to the United States when young, such as those aliens who would qualify under the proposed Development, Relief and Education for Alien Minors (DREAM) Act [4]; (7) preference aliens who have lived in the United States for more than 10 years; (8) family members of personnel in the U.S. Armed Forces, including the National Guard, reserves, and veterans; and (9) any preference category with current visa availability.

The focus of the provisional unlawful presence waiver process is to reduce the impact of the current waiver process on U.S. citizens by reducing the time U.S. citizens are separated from their immediate relatives. DHS chose to limit eligibility to immediate relatives of U.S. citizens not only because the immigrant

[4] The DREAM Act, a bill that aims to permit children of undocumented immigrants, who were brought to the United States at a young age, to obtain a legal status if they meet certain criteria. Versions of the DREAM Act have been introduced and reintroduced on several occasions, including most recently in May 2011, but none has passed Congress to date. *See, e.g.,* Development, Relief and Education for Alien Minors Act of 2011, S. 952, 112th Cong.

visas for this category are always available, but also because it is consistent with Congress' policy choice to prioritize family reunification of immediate relatives of U.S. citizens over other categories of aliens. For example, family-sponsored and employment-based categories have annual numerical limits, whereas there are no numerical limits on the availability of immigrant visas to immediate relatives. *Compare* INA section 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), *with* INA section 203(a), (b), 8 U.S.C. 1153(a), (b). Focusing on U.S. citizens as part of this discretionary process also is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens and between classes of aliens in immigration laws and policies. *See, e.g., Fiallo,* 430 U.S. at 792; *Mathews* v. *Diaz,* 426 U.S. 67, 81 (1976).

DHS also believes that focusing the provisional unlawful presence waiver process on immediate relatives of U.S. citizens is consistent with recognized government interests in encouraging eligible long-time LPRs to naturalize so that their spouses, parents, and children under the age of 21 years can become immediate relatives and also benefit from this new process. *See, e.g., City of Chicago* v. *Shalala,* 189 F.3d 598, 608 (7th Cir. 1999).

Family-sponsored and employment-based preference categories have annual numerical limits. Therefore, preference categories carry an inherent risk that they may become oversubscribed; if an individual's immigrant visa is based upon a preference category, his or her immigrant visa may become unavailable at any given time upon oversubscription of the preference category. Retrogression of visa availability can have a direct, adverse impact on agency backlogs and processing.

DHS appreciates the comments from the public on these issues and has given them serious consideration. DHS will consider future expansion of the program after DHS and DOS have assessed the effectiveness of the provisional unlawful presence waiver process and the operational impact it may have on existing agency processes and resources *See Beach Commc'ns* v. *FCC,* 508 U.S. 307, 316 (1993) (observing that policymakers ''must be allowed leeway to approach a perceived problem incrementally''). For these reasons, DHS has not adopted the commenters' suggestions. At this time, the provisional unlawful presence waiver process will remain available only to individuals who are immediate relatives of U.S. citizens (*i.e.,* spouses, children, and parents (if the U.S. citizen

**Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations **543**

is at least 21 years of age)), as defined in INA section 201(b), 8 U.S.C. 1151(b).

## 2. Aliens Outside the United States

Numerous commenters asked DHS to extend eligibility to individuals who are currently outside the United States. Commenters argued that immediate relatives who had already departed from the United States to consular process or who voluntarily left the United States to avoid the consequences of removal should not be punished for their actions. Some commenters also felt that it was unfair to speed up the process for individuals residing illegally in the United States, while not doing anything for those individuals who departed the United States voluntarily to comply with the rules. Many commenters shared their personal stories about the difficulties of long-term separation from their spouses and the impact it had on them and their children. Most commenters wanted their family members abroad to have the opportunity to participate in a faster, more effective process or for DHS to at least provide some other form of relief to overcome the effects of the 3-year and 10-year bars for these individuals.

DHS recognizes that there are many difficulties faced by U.S. citizens when their immediate relatives must obtain waivers while outside the United States. DHS, however, believes that creating a provisional unlawful presence waiver process abroad would be duplicative of DOS's current immigrant visa processes and USCIS's current Form I–601, Application for Waiver of Grounds of Inadmissibility waiver process, which would not be an efficient use of agency resources.

To alleviate some of the delays in overseas waiver processing, USCIS recently centralized Form I–601 filings such that individuals located outside the United States now file the Form I–601 in the United States where USCIS has sufficient resources at its service centers to accommodate filing surges.[5] Applicants who need waivers are no longer required to schedule a ''waiver filing'' appointment with the U.S. Embassy or consulate, which in some cases required applicants to wait up to two months just for these waiver filing appointments. Centralization of Form I–601 filings from abroad should significantly reduce the time individuals must spend abroad, waiting to receive immigrant visas so they can

return to the United States. Centralizing Form I–601 filings in this manner also will significantly reduce the current backlog that exists at USCIS international offices. In addition, as of June 4, 2012, when USCIS began to implement centralized filing of Forms I–601 for individuals outside of the United States, USCIS had approximately 10,200 cases pending. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization, as well as those that individuals continue to file at the USCIS Field Office in Ciudad Juarez, Mexico through December 4, 2012.[6] USCIS anticipates that it will complete processing of all cases pending in USCIS offices abroad within approximately six months of the effective date of this rule.

For these reasons, DHS did not adopt the commenters' suggestions, and individuals who are already outside of the United States must pursue a waiver of inadmissibility through the current Form I–601 process. The provisional unlawful presence waiver process will remain available only to those individuals who are currently in the United States and will be departing for consular processing abroad.

## 3. Aliens Who Cannot Establish Extreme Hardship to a U.S. Citizen Spouse or Parent

Several commenters objected to the exclusion from the provisional unlawful presence waiver process of immediate relatives of U.S. citizens who could establish extreme hardship only to an LPR spouse or parent. Commenters argued that this restriction limited the number of individuals who could benefit from the provisional unlawful presence waiver process and that there was no rational basis for the limitation. Some also believed that applicants will submit ''weak'' extreme hardship claims relating to a qualifying U.S. citizen relative when the real hardship would be to an LPR spouse or parent. Commenters also asked that DHS allow individuals to make a showing of extreme hardship to their U.S. citizen children.

DHS has carefully considered these comments and the recommended changes. However, DHS will not adopt the suggested changes at this time. As stated in the proposed rule, a primary

purpose for creating the provisional unlawful presence waiver process is to reduce the amount of time U.S. citizens are separated from their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the provisional unlawful presence waiver process. *See* 77 FR at 19908. Finally, DHS cannot include children as qualifying relatives for purposes of the extreme hardship determination because the statute only permits a showing of extreme hardship to a spouse or parent as a basis for granting the waiver. *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). Only Congress has the power to amend the immigration laws to add other individuals who can be qualifying relatives for purposes of the extreme hardship determination.

DHS is open to considering expanding the provisional unlawful presence waiver process to include lawful permanent residents as qualifying relatives after DHS has a better understanding of the impact of the provisional unlawful presence waiver process on agency resources and operations.

## 4. Aliens in Removal Proceedings

Numerous commenters asked DHS to expand eligibility for the provisional unlawful presence waiver to include aliens in removal proceedings. Some commenters suggested that DHS include anyone who is in removal proceedings, without further qualifications. Others suggested that DHS include aliens in removal proceedings if they: (1) Were granted prosecutorial discretion; (2) were the primary caretakers for U.S. citizens; (3) were previously granted voluntary departure; or (4) had their cases administratively closed. Commenters also believed that the provisional unlawful presence waiver process undermines DHS's ongoing prosecutorial discretion initiative. A few commenters also said DHS should eliminate the requirement that aliens with administratively closed cases pursue voluntary departure because it was too complicated and could result in separation from a U.S. citizen spouse, parent, or child if the alien fails to comply with the terms and conditions of voluntary departure. Several commenters criticized the use of voluntary departure, arguing that the time frames for voluntary departure in many instances would be too short (60 or 120 days) to cover the time needed

---

[5] As of June 4, 2012, most individuals abroad, who have applied for certain visas and have been found inadmissible by a DOS consular officer, must mail Forms I–601 directly to a USCIS Lockbox facility. For more information, please visit the USCIS Web site at *www.uscis.gov*.

[6] USCIS provided a transition period during which individuals who are processing their immigrant visa applications through the U.S. consulate in Ciudad Juarez, Mexico, could file their I–601 applications either with the Lockbox facility or at the USCIS Ciudad Juarez Field Office. This transition period ended on December 4, 2012.

for the adjudication of the Form I–601A and the time the applicant needs to prepare for departure after approval of the provisional unlawful presence waiver request. Other commenters suggested that DHS include any alien who has been issued a Notice to Appear (NTA). They reasoned that, if the purpose of the provisional unlawful presence waiver is to avoid hardship to U.S. citizens, it should make no difference whether or not an NTA has been issued. One commenter also requested that DHS allow individuals who have a fear of returning to their home countries to participate in the provisional unlawful presence waiver process.

Several immigrant advocacy groups asked DHS to allow individuals to file the provisional unlawful presence waiver application *before* termination of removal proceedings or a grant of voluntary departure. The commenters argued that allowing individuals to apply for the provisional unlawful presence waiver while still in proceedings would ensure that USCIS, and not U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP), is the first agency to determine if an applicant qualifies for the waiver. If the applicant's provisional unlawful presence waiver is approved, then the applicant could seek termination or dismissal of his or her case. The advocacy groups stated that many individuals subject to removal, whether detained or non-detained, were unrepresented and could be confused by the various barriers to filing the provisional unlawful presence waiver application. They also argued that allowing an individual to file the provisional unlawful presence waiver application while proceedings are pending would ensure that unrepresented aliens are not left with having to choose between seeking avenues of relief in removal proceedings and pursuing an immigrant visa abroad.

Finally, one commenter asked DHS to clarify the three options noted in the proposed rule at 8 CFR 212.7(e)(3)(v) through 212.7(e)(3)(vii) (*i.e.,* termination/dismissal, cancellation of NTA, administrative closure with voluntary departure) for aliens in removal proceedings. The commenter noted that two of the provisions, 8 CFR 212.7(e)(3)(v) (termination/dismissal) and 212.7(e)(3)(vii) (administrative closure with voluntary departure) in the proposed rule, conflicted because aliens who chose to pursue voluntary departure would need to have their cases recalendared before an IJ. Recalendaring of the alien's case would

result in the alien being barred under 8 CFR 212.7(e)(3)(v), because the removal proceedings would still be pending and not "terminated or dismissed." The commenter also recommended that the final rule make clear that USCIS can only accept a provisional unlawful presence waiver once DHS, through ICE's Office of Chief Counsel, affirmatively consents to it in the removal proceedings.

After careful consideration of all comments on this issue, DHS has decided to limit eligibility for the provisional unlawful presence waiver process to individuals whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. Under its prosecutorial discretion (PD) policies, ICE has been reviewing cases pending before EOIR and all incoming cases to ensure that they are aligned with the agency's civil enforcement priorities and that ICE is effectively using its finite resources. For cases that ICE determines are not enforcement priorities, it exercises its discretion where appropriate, typically by moving for administrative closure. *See* Memorandum by ICE Director John T. Morton in his June 17, 2011 memorandum and the subsequent November 17, 2011 directive from Peter S. Vincent, Principal Legal Advisor to all attorneys at the ICE Office of Chief Counsel. DHS, however, is not limiting eligibility solely to cases administratively closed under the ICE case-by-case review initiative, but also is allowing any alien whose case is administratively closed and has not been recalendared at the time of filing the Form I–601A to participate in the provisional unlawful presence waiver process. In addition, individuals in removal proceedings whose cases are deferred pursuant to the Deferred Action for Childhood Arrivals (DACA) [7] process may also request that ICE seek administrative closure once USCIS defers action in their cases.

If the Form I–601A is approved for an alien whose proceedings have been administratively closed, the alien should seek termination or dismissal of the proceedings, without prejudice, by EOIR. The request for termination or dismissal should be granted *before* the alien departs for his or her immigrant visa interview abroad. Applicants who leave the United States before their

removal proceedings are terminated or dismissed may experience delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility, such as INA section 212(a)(6)(B), 8 U.S.C. 1182(a)(6)(B) (failure to attend a removal proceeding without reasonable cause), or INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (aliens who have been ordered removed or who depart from the United States while an order of removal is outstanding). *See Matter of Sanchez-Herbert,* 26 I&N Dec. 43 (BIA 2012) (holding that an IJ is required to issue an in absentia removal order (rather than terminating proceedings) even though the alien previously had departed from the United States, if the alien had proper notice of the hearing and DHS establishes the alien's removability). ICE intends to work with individuals to facilitate the timely termination or dismissal of an individual's removal proceedings once he or she obtains a provisional unlawful presence waiver.

Focusing on this subset of aliens in removal proceedings is consistent with the Department's established enforcement priorities. Individuals who received administrative closure are likely individuals whom ICE or EOIR has determined, on a case-by-case basis or as a matter of policy, to be non-enforcement priorities. This includes individuals whose cases are deferred through the DACA process. Given that these individuals have been determined to not be enforcement priorities because of their compelling equities (*e.g.,* their long-term presence in the United States or their connection to U.S. citizen relatives), DHS determined that they should be able to participate in the provisional unlawful presence waiver process. DHS may consider expanding eligibility for the provisional unlawful presence waiver process to other subsets of aliens in removal proceedings in the future and after implementation of this final rule.

Aliens whose cases are deferred, whether authorized by ICE or by USCIS through approval of a Form I–821D, Consideration of Deferred Action for Childhood Arrivals, must meet all requirements under 8 CFR 212.7(e) to receive a provisional unlawful presence waiver. Deferred action does not override or modify the eligibility requirements specified in this final rule. Thus, aliens whose cases have been deferred but have final orders of removal or other grounds of inadmissibility beyond unlawful presence will remain ineligible for a provisional unlawful presence waiver.

---

[7] On June 15, 2012, the Secretary of Homeland Security issued a memorandum to USCIS, CBP, and ICE, regarding the exercise of prosecutorial discretion with respect to certain individuals who came to the United States as children. See the USCIS Web site—*www.uscis.gov*—for more information about the DACA process.

## 5. Aliens With Final Orders of Removal and Previously Removed

Numerous commenters requested that DHS allow aliens with final orders of removal to participate in the provisional unlawful presence waiver process. The commenters offered a variety of suggestions, many of which came out of their own personal circumstances. For example, some commenters suggested that DHS include aliens with final removal orders who: (1) Are currently detained pending removal; (2) had their removal orders temporarily suspended; (3) are still in the United States and had final orders of removal issued within the last five to 10 years or, alternatively, issued more than 10 years ago; (4) were determined by DHS to warrant a favorable exercise of prosecutorial discretion; (5) were previously granted voluntary departure; (6) were granted voluntary departure but overstayed by 10 years; (7) are subject to in absentia final orders of removal due to ineffective assistance of counsel; (8) have been removed for a noncriminal ground of inadmissibility; (9) have obtained advanced consent to reapply for admission to the United States; or (10) were previously removed, regardless of whether the alien is abroad or still inside the United States. A few commenters indicated that those with final orders of removal should be included if they are married to U.S. citizens and have children. Most commenters stated that U.S. citizen family members of aliens with final orders of removal face the same hardships as those with relatives subject to inadmissibility based on unlawful presence in the United States.

DHS considered these suggestions and has concluded that it will not expand the provisional unlawful presence waiver process to include aliens with final removal orders. Generally, aliens who have outstanding final orders of removal may be inadmissible on a variety of grounds other than unlawful presence, such as criminal offenses (INA section 212(a)(2), 8 U.S.C. 1182(a)(2)) and fraud and misrepresentation (INA section 212(a)(6)(C), 8 U.S.C. 1182(a)(6)(C)). In addition, any alien who is subject to a final order of removal, decides to leave the United States, and subsequently seeks admission, is inadmissible as an alien with a prior removal under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A). Similarly, any alien who has been ordered removed or who has been unlawfully present in the United States for an aggregate period of a year or more and subsequently attempts to enter or reenter the United States without being admitted is inadmissible under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C), and may have his or her final order of removal reinstated under INA section 241(a)(5), 8 U.S.C. 1231(a)(5). The provisional unlawful presence waiver is only available to an alien who, upon departure from the United States, would be inadmissible only due to accrual of unlawful presence under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). Thus, a large percentage of aliens in removal proceedings will not be eligible for a provisional unlawful presence waiver. As a result, DHS has concluded that, because the success of this new provisional unlawful presence waiver process relies on its efficient, streamlined approach and close coordination with the NVC, the provisional unlawful presence waiver process will not be expanded to include aliens with final removal orders.

## 6. Aliens With Scheduled Immigrant Visa Interviews

Several commenters asked DHS to include aliens in the provisional unlawful presence waiver process regardless of whether they had an immigrant visa interview scheduled in the past. Several commenters objected to this ground of ineligibility, arguing that it was irrational and served no purpose or was arbitrary, capricious and cruel. Several commenters stated that many individuals already had cancelled their immigrant visa interviews after publication of the Notice of Intent on January 9, 2012 (77 FR 19902). An immigrant advocacy group asked DHS to include applicants with previously scheduled interviews. The group acknowledged that allowing such applicants to reschedule immigrant visa interviews would create an additional administrative burden on DOS, but believed that it would ensure equity among those immediate relatives seeking to legalize their status while minimizing the length of time they are separated from their families. The advocacy group also believed that failure to include this group would only create confusion and ultimately ineligibility for the very individuals who the rule is supposed to help.

Several commenters suggested that DOS return the immigrant visa application packet to the NVC once an alien files a provisional unlawful presence waiver. Another commenter suggested that the petitioner should be allowed to fly to the consulate abroad, retrieve the immigrant visa application packet, and return it to the NVC so DHS could adjudicate the waiver and the NVC could match the immigrant visa application packet to the approved provisional unlawful presence waiver. One commenter suggested that aliens should be allowed to resubmit the immigrant visa application package to the NVC so that they could file the provisional unlawful presence waiver application. Some commenters also asked DHS to give individuals still in the United States the option to either postpone their immigrant visa interviews so they could file the provisional unlawful presence waiver or proceed with consular processing.

Several commenters were concerned that the time periods for filing and adjudication of a provisional unlawful presence waiver application, filing of the immigrant visa application, and DOS scheduling of the immigrant visa interview were too short. The commenters believed that it created timing issues for immigration law practitioners in terms of advising their clients on filing the Form I–601A and paying the immigrant visa fee. The commenters stated that once the immigrant visa fee was paid, DOS would schedule the immigrant visa interview potentially before USCIS adjudicated the Form I–601A and, as a result, the applicant would be ineligible for the provisional unlawful presence waiver. Finally, one commenter requested that DHS implement a grace period of at least one year after publication of the final rule during which applicants who had scheduled immigrant visa interviews could participate in the provisional unlawful presence waiver process.

DHS disagrees that limiting eligibility to aliens who have not had their immigrant visa interviews scheduled has no rational basis. DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the date of publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and their immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013. DHS now adds language to the final rule to

clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

DHS has clarified the regulatory text at 8 CFR 212.7(e)(4) and (5)(ii) so that aliens clearly understand that if the Department of State scheduled the alien for his or her initial immigrant visa interview prior to the date of publication of this final rule, the Form

I–601A will be rejected and returned to the applicant with the associated filing and biometric fees or denied. The Form I–601A will be rejected even if the applicant's interview is rescheduled *after* the date of publication of this final rule. USCIS will verify with DOS whether the applicant's immigrant visa interview was scheduled before the date of publication of this final rule.

### 7. Aliens With Other Grounds of Inadmissibility

Several commenters asked DHS to consider expanding the provisional unlawful presence waiver process to include additional grounds of inadmissibility and the waivers associated with such grounds. These commenters specifically referenced waivers such as the waiver for certain criminal grounds of inadmissibility under INA section 212(h), 8 U.S.C. 1182(h), for fraud and misrepresentation under INA section 212(i), 8 U.S.C. 1182(i), and for alien smuggling under INA section 212(d)(11), 8 U.S.C. 1182(d)(11). Some commenters suggested that DHS include any waiver that has the same extreme hardship standard into the provisional unlawful presence waiver process. Other commenters believed that it would be more efficient to resolve all grounds of inadmissibility at the same time. They suggested that DHS include all grounds of inadmissibility that can be waived and currently appear on the Form I–601. The commenters believed this change would alleviate the need for aliens to file multiple waiver requests at the time of their immigrant visa interviews.

Several commenters stated that an individual should not be precluded from filing a provisional unlawful presence waiver application if the individual: (1) Was previously arrested, especially if there was no conviction or the conviction was for a crime involving moral turpitude (CIMT) that meets the petty offense exception under INA section 212(a)(2)(A)(ii), 8 U.S.C. 1182(a)(2)(A)(ii); (2) violated his or her status; (3) worked without authorization; or (4) made a false claim to U.S. citizenship under INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(ii). A few commenters also requested that USCIS make an affirmative finding that a specific ground of inadmissibility does not apply to an applicant. The commenters requested that such a finding be either persuasive or binding on DOS consular officers.

Finally, some commenters were confused about the effect of the provision that allows USCIS to deny a provisional unlawful presence waiver

application if USCIS has a ''reason to believe'' that the alien will be inadmissible on grounds other than unlawful presence. The commenters argued that DHS should not deny a provisional unlawful presence waiver simply because DHS has reason to believe that the applicant was convicted of a crime, especially since some crimes are not automatic bars to admission to the United States in a lawful immigration status and, upon further review, would not be considered convictions or criminal offenses for immigration purposes.

DHS has considered these comments but will not adopt the suggested changes. The goal of the provisional unlawful presence waiver process is to facilitate immigrant visa issuance for immediate relatives of U.S. citizens who are otherwise admissible [8] to the United States except for the 3-year and 10-year unlawful presence bars, which are triggered upon departure from the United States. DOS, not USCIS, determines if an immigrant visa applicant is eligible for an immigrant visa and whether there are any grounds of inadmissibility that may bar issuance of the immigrant visa. If USCIS were to consider other grounds of inadmissibility beyond unlawful presence, it would create backlogs in the adjudication of the provisional unlawful presence waivers and, in turn, adversely impact DOS's immigrant visa process. In particular, to assess an application for a waiver of inadmissibility based on fraud, misrepresentation, or criminal history, an individual generally must undergo vetting through an in-person interview at a USCIS Field Office. Since DOS already conducts an in-depth in-person interview as part of the immigrant visa process, DHS believes that such a full review by USCIS would be duplicative of DOS's efforts.

DHS, however, intends to uphold its responsibility to protect the integrity and security of the immigration process by conducting full background and security checks to assess whether an individual may be a threat to national security or public safety. To maintain a streamlined process, USCIS will, however, only conduct a limited review of the waiver application to determine if: (1) The individual has self-reported a ground of inadmissibility that would render him or her ineligible for the provisional unlawful presence waiver;

---

[8] An alien will not be inadmissible for being present in the United States without admission or parole under INA section 212(a)(6)(A)(i), 8 U.S.C. 1182(a)(6)(A)(i), or for lacking proper immigrant entry documents under INA section 212(a)(7)(A), 8 U.S.C. 1182(a)(7)(A), once he or she leaves the United States to attend a consular interview.

(2) the results of the background checks reveal conduct or actions that potentially would make an individual ineligible for an immigrant visa; or (3) the individual has engaged in activities that could impact the discretionary determination regarding whether he or she warrants a favorable exercise of discretion. If USCIS determines that there is reason to believe that the alien *may* be inadmissible to the United States at the time of his or her immigrant visa interview based on another ground of inadmissibility other than unlawful presence, USCIS will deny the request for the provisional unlawful presence waiver. USCIS's determination on the provisional unlawful presence waiver is not a *conclusive* finding of inadmissibility. It also is not an assessment of whether a particular crime or pattern of conduct would ultimately bar an individual from obtaining a legal status under the immigration laws.

Aliens who may have other grounds of inadmissibility are not precluded from obtaining a waiver of such grounds (if permitted by law) and ultimately an immigrant visa. The individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa.

### 8. Aliens in Temporary Protected Status

Several commenters asked DHS to clarify how the provisional unlawful presence waiver process affects aliens in Temporary Protected Status (TPS) and to ensure that such aliens are included in the provisional unlawful presence waiver process. DHS does not believe these additions to the eligibility criteria are necessary.

Any alien who meets the requirements of the provisional unlawful presence waiver process and who is consular processing abroad can obtain a provisional unlawful presence waiver regardless of the alien's current status in the United States.[9] An alien

currently registered for TPS under INA section 244, 8 U.S.C. 1254a, is considered to be maintaining lawful nonimmigrant status[10] for purposes of adjustment of status or change of status. *See* INA section 244(f)(4), 8 U.S.C. 1254a(f)(4). A grant of TPS, however, does not cure an unlawful entry prior to the alien's grant of TPS or any unlawful presence the alien may have accrued prior to being granted TPS. *See Serrano* v. *U.S. Att'y Gen.,* 655 F.3d 1260 (11th Cir. 2011). If the TPS beneficiary needs a waiver of inadmissibility for unlawful presence, that alien is in the same position as any other alien who needs a waiver of inadmissibility under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), at the time of the immigrant visa processing abroad. As a result, TPS applicants who are immediate relatives of U.S. citizens can participate in the provisional unlawful presence waiver process if they are pursuing consular processing of an immigrant visa abroad.

### 9. Additional Eligibility Criteria

A few commenters suggested that DHS consider limiting or adding eligibility criteria to better prioritize aliens who may be eligible for the provisional unlawful presence waiver process. Two commenters suggested that DHS require an individual to have a minimum amount of time in the United States unlawfully (*e.g.,* two, three, or five years) before he or she could file a provisional unlawful presence waiver. Another commenter suggested that DHS limit eligibility to aliens who were married to a U.S. citizen prior to the effective date of this final rule. One commenter suggested limiting the eligibility criteria solely to aliens physically present in the United States, who are immediate relatives with an approved Form I–130, and who are at least 17 years of age. Several commenters suggested that DHS give priority to aliens who are minors and aliens who show good moral character, have no criminal record, and demonstrate that they have been productive and responsible as evidenced by paying taxes, mortgages, and self-sufficiency. Finally, several commenters requested that DHS base approval of the provisional unlawful presence waiver on factors such as: (1) Having good moral character; (2) having no criminal record; (3) not having abused government benefits; (4) putting

children through school; (5) paying taxes; (6) being married to a U.S. citizen or having U.S. citizen children; or (7) owning a home.

DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS/NVC immigrant visa process. DHS, however, did not adopt these limitations or restrictions. The commenters' suggestions are already part of the overall analysis of whether an individual warrants the grant of the provisional unlawful presence waiver as a matter of discretion. The factors that play into the discretionary analysis are not limited to one particular set of factors, *see, e.g., Matter of Cervantes-Gonzalez,* 22 I. & N. Dec. 560, 566 (BIA 1999); as part of the application for provisional unlawful presence waiver, an applicant should set forth any favorable discretionary factor he or she considers relevant to the adjudication. By setting restrictions on the number of years of unlawful presence or the date when an individual married the U.S. citizen, DHS would exclude a subset of immediate relatives of U.S. citizens who are or would be otherwise eligible. DHS, therefore, has not adopted these suggestions and retains the eligibility criteria listed in 8 CFR 212.7(e)(3).

### D. Filing Requirements and Fees

#### 1. Concurrent Filing

Many commenters asked DHS to allow concurrent filing of the Form I–130 or Form I–360, Form I–601A, and, if needed, the Form I–212, Application for Permission to Reapply for Admission Into the United States After Deportation or Removal. Several commenters noted that USCIS does adjudicate some Form I–212s in the United States pursuant to the regulations at 8 CFR 212.2(j) and in certain cases may grant the Form I–212 conditionally in anticipation of the individual's departure. Other commenters argued that applicants should be allowed to file the provisional unlawful presence waiver at any stage of immigrant petition or visa process. Several commenters said that DHS could avoid duplicating efforts by processing multiple applications at the same time. The commenters believed it was inefficient for DHS not to allow concurrent filing and an injustice to waiver applicants to maintain separate processes for the Form I–601A and Form I–212, especially when the separate processes have the effect of increasing the time applicants must

---

[9] USCIS also received two comments asking whether alien crewman could apply for a provisional unlawful presence waiver. As stated above, any alien in the United States who qualifies as an immediate relative and has an approved Form I–130 or Form I–360 may apply for the provisional unlawful presence waiver, irrespective of his or her current immigration status, if otherwise eligible.

[10] INA section 244(f)(4), 8 U.S.C. 1254a(f)(4), provides that, during the period that an alien is granted temporary protected status, the alien is considered as being in or maintaining lawful status as a nonimmigrant for purposes of adjustment or change of status.

spend outside the United States and away from their families. The commenters asked DHS to at least examine the feasibility of concurrently processing these applications before the alien has to leave for his or her immigrant visa interview. Finally, one commenter suggested that USCIS should allow applicants to submit the Form I–601A and Form I–212 prior to the filing of the Form I–130.

DHS has considered these comments but believes that concurrent filing, or allowing filing of the Form I–601A before the immediate relative petition, would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. Currently, Form I–130 denials are appealable to the DOJ, EOIR Board of Immigration Appeals (BIA), and if the alien challenges the denial, USCIS would either have to hold the provisional unlawful presence waivers until the Form I–130 was decided on appeal or deny the Form I–601A but reopen it if the appeal is decided favorably for the alien. Both scenarios are inefficient and could cause USCIS to incur additional costs for storing the provisional unlawful presence waiver applications and transferring any A-files or receipt files between offices until the administrative appeal process is complete. DHS developed this provisional unlawful presence waiver process in close coordination with DOS to ensure that both agencies could efficiently complete the waiver and immigrant visa process concurrently within a short timeframe. Allowing the filing of the Form I–601A after the Form I–130 or Form I–360 is approved is more efficient for USCIS and often is more efficient for the applicant as well. Therefore, DHS will not accept concurrently filed Forms I–130 and I–601A, or allow for the filing of the Form I–601A before approval of the immediate relative petition.

Moreover, DHS will not permit concurrent filing of Forms I–601A and I–212. While an individual can obtain advance, conditional consent to reapply for inadmissibility under INA section 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (prior removal or departure under order of removal), while still in the United States, DHS will not incorporate the Form I–212 in the provisional unlawful presence waiver presence process at this time for the following reasons.

First, most applicants seeking a provisional unlawful presence waiver will not have A-files. However, every I–212 applicant with a prior removal order has an A-file because he or she was in removal proceedings. If

concurrent filing of Forms I–601A and I–212 is permitted, USCIS in each case would have to request and review the applicant's A-file—a process that can cause significant delay. This extra procedural step in turn could create significant delays in USCIS processing of provisional unlawful presence waiver applications.

Second, individuals currently may file an administrative appeal with the Administrative Appeals Office (AAO) of a decision denying their Form I–212. Consequently, if concurrent filing of Forms I–601A and I–212 is permitted, and the Form I–212 is denied and an appeal taken, USCIS would have to hold the applicant's Form I–601A until the I–212 appeal is decided and, if the applicant seeks review in federal court, until the litigation is resolved. The streamlined Form I–601A process is designed to avoid these extra procedural steps, which would create backlogs in USCIS adjudication of the provisional unlawful presence waiver.

Form I–212 also is used to seek consent to reapply to overcome inadmissibility for unlawful reentry after a prior immigration violation under INA section 212(a)(9)(C), 8 U.S.C. 1182(a)(9)(C).[11] Aliens who are subject to this ground of inadmissibility cannot seek consent to reapply until they have been outside of the United States continuously for 10 years. Therefore, allowing the Form I–212 to be filed concurrently with the Form I–601A might mistakenly imply that those inadmissible under INA section 212(a)(9)(C) can file in the United States and at an earlier time.

## 2. Filing Fees

One commenter stated that applying the current Form I–601 filing fee to the Form I–601A was fiscally irresponsible. The commenter argued that DHS does not know how many provisional unlawful presence waivers it will receive or adjudicate and, therefore, cannot accurately determine the case workload or what resources it will need to cover the actual costs for adjudicating the Form I–601A. The commenter suggested that DHS increase the filing fee to $650 plus $85 for the biometric fee to avoid a fiscal shortfall. Several commenters stated that DHS should require provisional unlawful presence waiver applicants to pay a fine or fee ($5,000 to $20,000) to remain in the United States and obtain LPR status

through an immigrant visa if eligible for the provisional unlawful presence waiver; some of these commenters believed that this fine or fee would help reduce the national debt.

Many opponents of the provisional unlawful presence waiver process indicated that the costs of implementation are too expensive and that the U.S. Government should not spend money on illegal aliens. The commenters believed that DHS was using tax money to support the new process. Additionally, two commenters recommended that DHS establish a premium processing fee to expedite processing of the provisional unlawful presence waiver. The commenters also suggested that DHS give special consideration to federal employees and those currently serving in active duty, reserve personnel, and veterans of the U.S. Armed Forces. Some commenters believed that individuals who did not commit any felonies should not have to pay a fee. Several commenters stated that the filing fee was either too high or too low. Some commenters stated that DHS should permit fee waivers because the fees were too high; others said that DHS should double the fee to offset the costs for implementing the new process because the Form I–601A fee was too low. Some commenters also indicated that fee waivers would be appropriate for aliens seeking the provisional unlawful presence waiver because most of them have low incomes, and that this is especially true for aliens who work in the agricultural and similar service sectors and cannot afford to cover the filing costs required by USCIS. Another commenter argued that the elimination of a fee waiver violated the Due Process Clause of the U.S. Constitution's Fifth Amendment because it was not legislated by Congress as was done in the context of INA section 245(i), 8 U.S.C. 1255(i). Finally, two commenters said that the provisional unlawful presence waiver process was too expensive and as a result would be at risk for underuse.

With regard to the immigrant visa fee that must be paid to DOS, several commenters mentioned that the DOS immigrant visa (IV) fee is only valid for one year. They were concerned that the period for adjudication of the provisional unlawful presence waiver might last longer than USCIS expects. The commenters asked DHS to state in the regulation that pending provisional unlawful presence waiver applications maintain the validity of the IV fees, so that applicants would not forfeit the IV fees and have to repay them in the future. Some commenters also indicated that the requirement to pay the

---

[11] The regulations governing the processing of advance, conditional consent to reapply in the United States at 8 CFR 212.2(j) do not apply to aliens who are subject to this ground of inadmissibility. *See Matter of Torres-Garcia*, 23 I&N Dec. 866 (BIA 2006).

immigrant visa fee before filing the provisional unlawful presence waiver was confusing. DHS's responses to these views are divided into the four categories below.

(i) Authority To Charge Immigration Fees

Congress has given the Secretary broad authority to administer and enforce the immigration and naturalization laws of the United States. As part of this broad authority, the Secretary has discretion to set filing fees for immigration benefits at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other immigrant applicants. INA section 286(m), 8 U.S.C. 1356(m). The Secretary also has authority to set fees needed to recover administrative costs. The fee revenue collected under INA section 286(m), 8 U.S.C. 1356(m), remains available to DHS to provide immigration and naturalization benefits and ensures the collection, safeguarding, and accounting of fees by DHS. INA section 286(n), 8 U.S.C. 1356(n).

The Secretary has discretion to waive filing fees or exempt certain types of benefit requests from the fee requirements. The Secretary also has broad discretion to waive any fee when an individual's circumstances warrant such a waiver. Aliens who request a fee waiver are not entitled to the waiver as a matter of law,[12] nor do they have a cognizable due process interest in a discretionary fee waiver. The denial of a fee waiver request is a matter of discretion. The agency also has not provided for administrative appeals of such discretionary decisions.

None of the money used for USCIS adjudication of the provisional unlawful presence waiver comes from appropriated funds. As a fee-based agency, USCIS is primarily funded by applicants seeking immigration benefits. Applicants are required to pay their own fees. USCIS uses these fees to process applicants benefit requests and to cover its administrative costs. USCIS,

however, will not, as a matter of discretion, grant fee waivers for the provisional unlawful presence waiver or associated biometric fee.

(ii) Premium Processing of the Provisional Unlawful Presence Waiver

The Secretary has established a premium processing fee for certain employment-based immigration benefit requests under INA section 286(u), 8 U.S.C. 1356(u). USCIS provides premium processing for certain benefit types if an authorized applicant or petitioner pays a surcharge of $1,225 for the service. The surcharge is paid in addition to the filing fees for the immigration benefit requested. USCIS's Premium Processing Service (PPS) generally provides faster processing times and adjudication. USCIS guarantees 15-calendar-day processing to those who choose to use the PPS. In general, if USCIS cannot make a final decision on the applicant's benefit request within this period, USCIS will refund the PPS fee. *See* 8 CFR 103.7(e)(2). Even if the PPS fee is refunded, USCIS will endeavor to continue expedited processing of the underlying benefit request.

DHS, however, cannot extend premium processing to family-based applications or to waivers of inadmissibility that accompany such applications because INA section 286(u), 8 U.S.C. 1356(u), only allows premium processing for employment-based petitions and applications. Therefore, DHS is not adopting this suggestion. DHS, however, reminds applicants that they can request expedited adjudication of a provisional unlawful presence waiver in accordance with current USCIS expedite guidance.[13]

(iii) Fee Level for the Provisional Unlawful Presence Waiver

DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS decided to set the fee for the provisional unlawful presence waiver process to be the same as the current Form I–601 waiver application fee because the population that will be eligible for the provisional unlawful presence waiver is a subset of those individuals who would otherwise have to file under the current Form I–601 process. Also, the adjudication of the Form I–601A will be comparable to the adjudication of a Form I–601 requesting

waiver of inadmissibility pursuant to INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. DHS will consider the impact of the provisional unlawful presence waiver process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends.

(iv) DOS Immigrant Visa Fee

DOS is the agency in charge of NVC procedures. The NVC procedures are outlined in the information materials that applicants receive from the NVC. As long as the applicant follows NVC procedures, and has informed the NVC of the filing of the provisional unlawful presence waiver, as outlined in the NVC procedures, the fact that a Form I–601A is pending will not result in the invalidation of the NVC processes. A pending I–601A also will not affect the validity of DOS immigrant visa fee and applicants will not be required to resubmit the DOS immigrant visa fee solely due to the Form I–601A processing, provided the applicant complies with all DOS processing requirements.

3. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters questioned why DHS would limit the number of provisional unlawful presence waiver applications that could be filed by an individual applicant. Some commenters stated that many applicants will be unrepresented, and, as a result of their lack of knowledge or understanding of the immigration process, could be denied solely for technical reasons, such as failure to present the proper documents. Commenters also stated that some pro se aliens may obtain inadequate, erroneous, or unscrupulous legal assistance, which could result in their cases being denied. The commenters argued that precluding these individuals from filing another Form I–601A would be unduly harsh and that DHS's duty of fairness to applicants should trump the agency's interest in administrative efficiency and finality. Several commenters also disagreed with the limitation on filing,

---

[12] One commenter referred to INA section 245(i) as an example in which Congress authorized fee waivers and asserted that USCIS cannot exclude fee waivers in the provisional unlawful presence waiver process. Congress has legislated when certain categories of aliens are exempt from paying certain immigration fees. The authority, however, to waive the provisional unlawful presence waiver application fee lies with the Secretary through her authorities under INA sections 103 and 286(m), 8 U.S.C. 1103 and 1356(m), among others. The fact that Congress has provided for fee waivers in different situations does not preclude the Secretary from exercising her discretionary authority not to provide for fee waivers in the context of this rule.

[13] For guidance on USCIS expedite procedures, please visit *www.uscis.gov.*

especially when an applicant withdraws his or her initial filing.

One commenter requested that USCIS return the fee if the waiver application is withdrawn. Some commenters also found it a cumbersome and costly approach to require individuals whose waivers are denied or withdrawn to file another waiver through the regular process after the consular interview. A few commenters requested that USCIS assign another officer to adjudicate a new Form I–601A, if the prior provisional unlawful presence waiver request was denied or withdrawn. Finally, some commenters believed that it was unjust to exclude applicants from the provisional unlawful presence waiver process if they had pending adjustment of status applications.

DHS appreciates the valid concerns of these commenters and recognizes that if it implemented the regulatory text as published in the NPRM, aliens with compelling circumstances could be precluded from obtaining a provisional unlawful presence waiver. For these reasons, DHS is removing the single-filing limitation. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing or whose Form I–601A is denied can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. If the ground(s) of inadmissibility identified by the DOS consular officer can be waived, the individual can file a Form I–601 along with any supporting documentation or evidence needed to demonstrate eligibility for the waiver and ultimately the immigrant visa. Since USCIS has now centralized adjudication of Forms I–601 filed by aliens abroad, USCIS anticipates that the processing time in the traditional Form I–601 waiver process will be reduced.

Applicants and their attorneys or accredited representatives also are reminded that they may address or correct mistakes by supplementing a pending Form I–601A waiver request

with additional evidence or correcting the request before USCIS makes a final decision in the case. USCIS will take into consideration any evidence received when making the decision.

### 4. Biometrics

Several commenters were concerned about the biometrics requirement and the potential harm to applicants, especially if they were denied a provisional unlawful presence waiver. One commenter believed that the biometrics requirement should be eliminated because it would make applicants hesitant to apply for the provisional unlawful presence waiver because of a perceived inherent danger for undocumented persons to work so closely with the U.S. Government. One commenter stated that, when DHS collects biometrics from applicants, it demands a great amount of personal information that could put applicants at risk. The commenter believed that the information collected from biometrics could be incriminating and used to initiate investigations. The commenter also noted that the proposed rule failed to offer applicants any protection from being placed in removal proceedings. One commenter claimed that the collection of biometrics was another way for DHS to "find fault" with the applicant and bar waiver approval. Finally, several commenters believed that DHS should allow all individuals to provide biometrics at a U.S. Embassy or consulate and, therefore, should include aliens outside the United States.

After consideration of these comments, DHS is not modifying the biometrics requirement. Requiring collection of biometrics helps USCIS determine if an alien is potentially subject to another ground of inadmissibility or if there are negative factors or conduct that may affect whether the individual warrants a favorable exercise of discretion. DHS only collects the biographic information needed to run such checks and to adjudicate any requested immigration benefit. Requiring biometrics also is consistent with the agency's enforcement priorities and necessary to ensure that an individual granted a Form I–601A is not a national security risk or public safety threat. USCIS will continue to follow its existing Notice to Appear (NTA) policies to determine whether the agency will initiate removal proceedings against a particular individual or refer them to ICE. Finally, DHS will not permit capture of biometrics abroad because the Form I–601A process is a domestic process that applies only to aliens who are present in the United States at the time of filing,

and DOS already collects an applicant's biometrics at the U.S. Embassy or consulate abroad as part of the immigrant visa application process.

### 5. The Minimum Age (17 Years) Requirement

Several commenters objected to the requirement that applicants must be 17 years of age or older to file a provisional unlawful presence waiver. The commenters argued that the requirement is confusing and suggested eliminating it altogether. One commenter suggested changing the minimum age from 17 to 18 years old. The commenters asked DHS to provide clear instructions to the public that individuals do not begin to accrue unlawful presence until they are 18 years old and stated that it would be best if applicants judged on their own whether and when they should file the provisional unlawful presence waiver application.

It is important for DHS to maintain the flexibility to reject applications filed by applicants under the age of 17 so these applicants are not precluded from filing another waiver application in the future. This approach would allow an applicant to save the cost for filing an unnecessary waiver application until the waiver is actually needed. This approach of allowing individuals who are 17 years or older request a provisional unlawful presence waiver also enables more efficient processing of the immigrant visa application for immediate relative children who are under the age of 18 years and therefore have not yet accrued unlawful presence, but who very possibly will turn 18 years old before the DOS consular interview, accrue unlawful presence subsequent to such time, and potentially trigger the bars under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), upon a departure. If these children must wait until they have turned 18 years old and thereafter accrued at least 180 days of unlawful presence to file a Form I–601A, it may be the case that by that time DOS will have already scheduled a consular interview, thereby precluding the alien from eligibility for this process and leading to the hardship to U.S. citizen parents that this rulemaking intends to avoid.

### 6. Effect of the Child Status Protection Act (CSPA)

Several commenters asked DHS to clarify that the Child Status Protection Act (CSPA) provisions, which protects certain children from aging-out of eligibility for certain immigration benefits, be applied to the agency's definition of "immediate relative" for purposes of access to the provisional

unlawful presence waiver process. DHS clarifies in the Form I–601A instructions that an applicant will remain eligible for a provisional unlawful presence waiver so long as he or she remains an "immediate relative" as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify as an "immediate relative" for purposes of access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA. *See* INA section 201(f), 8 U.S.C. 1151(f).

*E. Adjudication*

1. Extreme Hardship—Standards and Training

Numerous commenters questioned DHS's policy on extreme hardship. Many urged DHS to issue more detailed guidance on extreme hardship, arguing that the term is unclear and potentially subjects applicants to arbitrary decision-making by USCIS officers. Other commenters indicated that clear guidance would allow individuals to better assess their chances for an approval. One commenter even provided DHS with a list of suggestions for consideration when creating new policy guidance on extreme hardship determinations. A number of commenters requested that DHS ensure, through training, that the extreme hardship standard is applied evenly and consistently, and that extreme hardship assessments include consideration of the financial and emotional effects of separation. Many commenters thought that the current extreme hardship standard applied by USCIS is too rigid and should be relaxed. Several commenters also asked DHS to conduct extensive training for domestic USCIS officers, specifically on country conditions, which are critical to making an extreme hardship determination. The commenters stated that USCIS personnel who adjudicate waivers abroad already are highly trained, have intimate familiarity with specific country conditions, and are knowledgeable about conditions in the applicant's home country. The commenters were concerned that, without extensive training, USCIS officers in the United States may adopt a more restrictive approach. The commenters wanted USCIS to ensure that country-specific knowledge is not lost once waiver processing is moved stateside. Several commenters also mentioned that USCIS should use the adjudicator's manual and standard operating procedures created by the Refugee, Asylum, and International Operations Directorate (RAIO) because

they explain the entire process, standard of review, and other requirements. The commenters stated that this manual is an invaluable resource and that USCIS should create a similar one for the provisional unlawful presence waiver process and make it publicly available.

Extreme hardship is a statutory requirement that an applicant must meet to qualify for an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). The INA does not define the term, and federal courts have not specifically defined extreme hardship through case law. The BIA has stated that extreme hardship is not a definable term of fixed and inflexible meaning, but that the elements to establish extreme hardship are dependent upon the facts and circumstances of each case. *See Matter of Cervantes-Gonzalez,* 22 I&N Dec. 560, 565 (BIA 1999). When USCIS assesses whether an applicant has established extreme hardship, USCIS looks at the totality of the applicant's circumstances and any supporting evidence to determine whether the qualifying relative will experience extreme hardship.

In this final rule, USCIS is not modifying how it makes extreme hardship determinations or how it defines extreme hardship. Consistent with how USCIS currently makes extreme hardship determinations, USCIS will consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application. USCIS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent. USCIS will thoroughly train officers to adjudicate provisional unlawful presence waivers, create standard operating procedures specific to the Form I–601A process, and monitor implementation and conduct further training if necessary.

2. Presumption of Extreme Hardship

Several commenters asked DHS to apply a presumption of extreme hardship if the applicant has to file a new Form I–601 waiver application because the DOS consular officer determined that the applicant was inadmissible on other grounds that can be waived. The commenters argued that the extreme hardship would already be established as part of the provisional unlawful presence waiver application and USCIS should not have to re-adjudicate that aspect of the waiver.

Many commenters believed that USCIS should automatically find extreme hardship exists in certain circumstances. The commenters argued that extreme hardship should be found based solely on: (1) Separation of the U.S. citizen from his or her immediate relative; (2) dangerous conditions in the applicant's home country; (3) the fact that the U.S. citizen and undocumented alien have a U.S. citizen child; (4) the fact that the applicant would be separated from his or her children for three or 10 years; (5) being a student in the United States; or (6) the fact that the applicant was brought into the United States at a young age and that he or she could qualify under the DREAM Act if enacted. Some commenters also suggested that DHS publish clear criteria for extreme hardship and include factors such as the length of time an alien has been married, the existence of children, the payment of taxes, strong ties to the United States and life-long assets, lack of eligibility for adjustment of status, and the loss of a business. The commenters believed that setting out clear criteria would help applicants better understand how to meet the extreme hardship standard.

Several Congressional commenters stated that DHS has already established a precedent in its regulations that includes a presumption of extreme hardship for certain Salvadorans and Guatemalans under the Nicaraguan Adjustment and Central American Relief Act (NACARA), Public Law 105–100, as amended, citing 8 CFR 1240.64(d)(1). These Congressional commenters believed that DHS could include similar regulations and even create a rebuttable presumption that an extreme hardship requirement has been satisfied when applicants would be required to remain for prolonged periods of time in dangerous locations. The Congressional commenters further argued that DHS could determine if a location was dangerous by whether DOS awards danger pay to its employees serving in such locations, citing 5 U.S.C. 5928 (awarding danger pay when there is a "civil insurrection, civil war, terrorism, or wartime conditions"). Many commenters also stated that the rule should, at a minimum, consider the dangerousness of a location as a highly-relevant factor during the adjudication. One commenter also suggested that extreme hardship should be found if the U.S. citizen has to relocate to a country where Peace Corps does not send its personnel because it is too dangerous.

DHS is not modifying how it makes extreme hardship determinations or defining extreme hardship for purposes of the provisional unlawful presence

waiver process. DHS also is not creating presumptions of extreme hardship. As indicated previously, extreme hardship is not a definable term and elements to establish extreme hardship are dependent upon the facts and circumstances of each case. Consistent with existing practice, USCIS will continue to consider all factors and supporting evidence that an applicant submits with his or her provisional unlawful presence waiver application in assessing if the applicant has established the requisite extreme hardship. DHS also has included in the Form I–601A instructions examples of factors to help provisional unlawful presence waiver applicants understand what types of documents can be provided to establish the required extreme hardship to a U.S. citizen spouse or parent.

In terms of re-adjudicating prior extreme hardship and discretionary determinations, DHS will not alter its position on this point. Every extreme hardship determination and discretionary determination is based on a careful consideration of the evidence of record at the time the determination is made. If the DOS consular officer determines that a new ground of inadmissibility applies in the applicant's case, USCIS may consider that as a new, material factor when assessing whether the applicant continues to warrant a favorable exercise of discretion. As such, USCIS reserves the authority to reopen and reconsider, on its own motion, an approval or a denial of a provisional unlawful presence waiver application at any time, including when new factors come to light after the provisional unlawful presence waiver applicant's immigrant visa interview.

3. Eliminating the Extreme Hardship Requirement

Several commenters suggested that DHS completely eliminate the extreme hardship requirement for purposes of the provisional unlawful presence waiver, rather than try to define it. Others argued that immediate relatives should not have to prove extreme hardship at all, especially if married to a U.S. citizen.

Congress enacted the provisions of the INA that describe the statutory requirements for obtaining a waiver of inadmissibility under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). *See* INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). DHS, as part of the Executive Branch, does not have the authority to dispense with any statutory requirement. As a result, DHS cannot eliminate extreme hardship as a

requirement or approve a provisional unlawful presence waiver for an individual who has not established that he or she meets all the statutory requirements set by Congress. Only Congress can change the minimum statutory requirements individuals must meet to qualify for a waiver of inadmissibility. USCIS, therefore, cannot adopt these suggestions.

4. Timelines for Adjudication; Interviews

Several commenters urged DHS to establish clear timeframes for adjudication of the provisional unlawful presence waiver and for immigrant visa issuance. The commenters stated that without a clear pronouncement, the uncertainties about the duration of the adjudication process would discourage applicants from taking advantage of the provisional unlawful presence waiver process. Some commenters believed that it would be beneficial if provisional unlawful presence waiver applicants could be interviewed to establish extreme hardship and the bona fides of the marriage and recommended that USCIS interview applicants electronically or through a remote interview process. The commenters also suggested combining the interview for Form I–130 with the interview for Form I–601A. One commenter believed that allowing applicants to be interviewed for the provisional unlawful presence waiver would result in what the commenter called "more humane adjudications."

DHS declines to adopt these suggestions. In terms of processing times, DHS generally publishes the estimated processing times for particular immigration benefits and for the local offices where an applicant's case would be adjudicated. *See https://egov.uscis.gov/cris/ processTimesDisplayInit.do* (USCIS case processing times). For the provisional unlawful presence waiver application, USCIS and DOS are coordinating closely to make sure that the timing of the approval of a provisional unlawful presence waiver application is close to the time of the scheduled immigrant visa interview abroad. DOS estimates that it will schedule the applicant for an immigrant visa interview within two to three months after approval of the provisional unlawful presence waiver and the applicant's submission of the required immigrant visa processing documents to DOS. This timeframe allows the immediate relative the opportunity to remain united with his or her U.S. citizen spouse or parent until shortly before his or her immigrant visa interview and will allow DOS to

adjudicate an immigrant visa shortly after the applicant appears for his or her interview. DHS also believes that this streamlined process will significantly shorten the length of time immediate relatives must remain outside the United States before they can rejoin their U.S. citizen relatives.

In most instances, the provisional unlawful presence waiver application will be adjudicated at the USCIS National Benefits Center (NBC). USCIS will adjudicate the applications based on the applicant's responses in the Form I–601A, any supporting documentation, and any results from background and security checks. The NBC does not conduct on-site interviews. In cases where an interview would be required, USCIS would have to transfer the applicant's information and A-File/ Receipt File to the local district office and schedule the applicant for an interview, which could take several months. Thus, a requirement to interview all provisional unlawful presence waiver applicants would undermine the goal of this new streamlined process. Through the streamlined provisional unlawful presence waiver process, DHS hopes to reduce the time it takes for an applicant to receive a decision from USCIS and complete the immigrant visa process abroad. DHS, however, has reserved its authority to request that a provisional unlawful presence waiver applicant appear for an interview.

5. Requests for Evidence and Notices of Intent To Deny

Several commenters believed that DHS should generously use Requests for Evidence (RFEs) and Notices of Intent to Deny (NOIDs) to clarify any weaknesses or deficiencies in an alien's provisional unlawful presence waiver application before USCIS renders a decision. Otherwise, some eligible applicants might be unnecessarily excluded from the process. Several commenters asked DHS to expand the use of RFEs to any aspect of the provisional unlawful presence waiver application and not just limit it to the extreme hardship determination. The commenters believed that this change would allow applicants to submit all evidence necessary to establish eligibility for the waiver and give USCIS more information about an applicant's admissibility rather than automatically issuing a denial. With respect to NOIDs, several commenters argued that USCIS should issue a NOID instead of a denial, especially if other grounds of inadmissibility were detected. The commenters also stated that USCIS should issue a NOID to at least let the

applicant know which grounds of inadmissibility USCIS believes may come up at the immigrant visa interview.

As stated in the proposed rule, DHS is committed to issuing RFEs to address applications it receives that are missing critical information related to extreme hardship or if applications are missing critical information related to whether the alien merits a favorable exercise of discretion. USCIS officers also retain the discretion to issue an RFE on any issue or subject matter, if the adjudicator believes that additional evidence will aid in the adjudication. DHS anticipates that most RFEs will focus on the substantive determination on extreme hardship and any factors that may establish that the applicant warrants a favorable exercise of discretion.

USCIS will not issue NOIDs in this provisional unlawful presence waiver process, notwithstanding the provisions of 8 CFR 103.2(b)(16). A NOID provides an applicant or petitioner with an opportunity to review and rebut derogatory information of which he or she is unaware. In the provisional unlawful presence waiver process, USCIS will not be conducting a full admissibility assessment and, as a result, will not be issuing a NOID describing all possible grounds of inadmissibility. USCIS, instead, will be deciding an individual's eligibility based on his or her responses to the Form I–601A questions and the results from the applicant's background and security checks. Most applicants would be aware of their prior criminal or immigration history and the potential that these offenses might make them ineligible for the requested benefit. If an individual's provisional unlawful presence waiver application is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends to file a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. At that time, the applicant can make his or her case about whether a particular criminal offense or immigration violation renders the applicant ineligible for the immigrant visa. If needed, the applicant will have an opportunity to file all

required waivers and appeal any denial of the Form I–601 application to the AAO.

*F. Denials, Motions To Reopen or Reconsider, and Appeals*

1. Denials and Motions To Reopen/Reconsider

Several commenters stated that USCIS should not deny a provisional unlawful presence waiver solely because there are other grounds of inadmissibility. The commenters suggested that USCIS approve the provisional unlawful presence waiver and then inform the applicant of any other potential grounds of inadmissibility or ineligibility discovered during adjudication of the provisional unlawful presence waiver application. Some commenters recommended that DHS allow an applicant to file a motion to reopen or reconsider if the provisional unlawful presence waiver application is denied, giving the applicant a chance to rebut DHS's findings. Several commenters and immigrant advocacy groups urged DHS to loosen restrictions on filing of motions to reopen or reconsider. The commenters argued that these are due process protections that are "integral parts of our legal system." The commenters urged DHS to allow such motions especially in cases of changed circumstances, erroneous denials, deficient applications filed by pro se applicants, and deficient or improper filings by "notarios" and individuals not authorized to practice immigration law in the United States. The commenters recommended that DHS do significant public outreach to familiarize potential applicants with the new provisional unlawful presence waiver process and ensure that immigrants are aware of notario practices. The commenters also asked DHS to place warnings in the instructions to the provisional unlawful presence waiver application and post them on the USCIS Web page to help applicants to avoid scams. The commenters suggested that DHS provide applicants with links to all 50 State Bar Associations so that applicants may contact the state bars to ensure that the person assisting them is a licensed attorney or accredited representative who is authorized to practice immigration law.

With regard to DHS's concern with substantial delays in immigrant visa processing if motions to reopen or multiple filings were permitted, the commenters stated that DHS would still expend additional resources on cases where an applicant is denied a provisional unlawful presence waiver

and must go abroad to apply again with USCIS for a waiver of inadmissibility. The commenters also noted that USCIS and DOS would have to coordinate processes anyway if the waiver application is denied or when the agency elects to reopen and deny the waiver on its own motion. Finally, several commenters said that DHS should give the applicant a chance to file a new provisional unlawful presence waiver application if the first request is denied. The commenters noted that most applicants have been in the United States for extended periods of time and have not traveled abroad because of the uncertainty in the process, the hardships, and potential dangers in their home countries. According to these commenters, if USCIS denied waiver applications for this group and did not permit a second filing in the United States, most of these applicants would simply choose to remain in the United States unlawfully and without status.

DHS understands the concerns of the commenters but nonetheless believes that allowing motions to reopen or reconsider would undercut the efficiencies USCIS and DOS will gain through the streamlined provisional unlawful presence waiver process. DHS also has determined that allowing motions to reopen or reconsider could significantly interfere with the operational agreements between USCIS and DOS and could substantially delay waiver and immigrant visa processing. To alleviate some of the commenters' concerns, however, USCIS has eliminated the filing limitation initially proposed in the NPRM. Consequently, if an individual's provisional unlawful presence waiver request is ultimately denied, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS that he or she intends to file a new I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible.

As indicated in the proposed rule, DHS is retaining its authority and discretion to reopen or reconsider a decision on its own motion. For the provisional unlawful presence waiver process, USCIS may reopen the decision and deny or approve the provisional

unlawful presence waiver at any time if USCIS finds that the decision was issued in error or approval is no longer warranted. USCIS will follow the requirements of 8 CFR 103.5(a)(5) before reopening a case and denying a waiver application.

DHS agrees with the need for public outreach and materials specific to the provisional unlawful presence waiver process to help potential applicants avoid being the victims of scams by individuals who are not authorized to practice immigration law. USCIS has already begun an initiative, the Unauthorized Practice of Immigration Law (UPIL) initiative, to inform the public about individuals who are not authorized to practice immigration laws and has held several stakeholders outreach engagements on the topic. For more details about this initiative, please visit the USCIS Web site at *www.uscis.gov/avoidscams.*

**2. Denials and Initiation of Removal Proceedings**

Several commenters questioned the usefulness of the proposed rule, especially because it did not contain any confidentiality provisions or make clear what would happen to an individual if a provisional unlawful presence waiver is denied. Many thought that undocumented individuals will be hesitant or deterred from filing the provisional unlawful presence waiver as it would expose their status in the United States and cause their families even more stress. Numerous commenters asked DHS to implement a confidentiality provision so that the denial of the provisional unlawful presence waiver request does not automatically trigger removal proceedings or notice to ICE that the individual's case was denied; others requested that DHS include a "nonremovability" clause in the regulatory text. Some commenters also urged USCIS to work closely with CBP to ensure that CBP will not initiate removal proceedings against an alien who is departing from the United States to attend the immigrant visa interview.

DHS is committed to focusing its finite enforcement resources on its enforcement priorities, including individuals who pose a threat to public safety or national security. As indicated in the proposed rule, DHS will follow current agency policy for issuance of Notices to Appear (NTAs). *See www.uscis.gov/NTA.* However, consistent with its civil enforcement priorities, DHS does not envision initiating removal proceedings against aliens or referring aliens to ICE whose provisional unlawful presence waiver

applications have been approved. Similarly, consistent with its civil enforcement priorities, DHS also does not envision initiating removal proceedings against aliens whose Form I–601As are denied or withdrawn prior to final adjudication. Pursuant to its existing policy governing issuance of NTAs and referrals to ICE,[14] an individual whose request for a provisional unlawful presence waiver is denied or who withdraws the Form I–601A prior to final adjudication will typically be referred to ICE only if he or she is considered a DHS enforcement priority—that is, if the individual has a criminal history, has committed fraud, or otherwise poses a threat to national security or public safety. Given USCIS's existing NTA policy, which appropriately focuses USCIS's referrals to ICE on individuals who are considered DHS enforcement priorities, DHS will not create a "nonremovability" clause or confidentiality provision to preclude automatic initiation of removal proceedings. DHS will follow the NTA issuance policy in effect at the time of the adjudication to determine if it will initiate removal proceedings against an applicant whose Form I–601A provisional unlawful presence waiver application is denied. Furthermore, if DHS discovers acts, omissions, or post-approval activity that would meet the criteria for NTA issuance or determines that the provisional unlawful presence waiver was granted in error, DHS may issue an NTA, consistent with DHS's NTA issuance policy, as well as reopen the provisional unlawful presence waiver approval and deny the waiver request.

**3. Appeals**

Several commenters argued that DHS should permit appeals of denials while the applicant is in the United States. The commenters claimed that denial of a provisional unlawful presence waiver was equivalent to a final waiver denial and should be subject to appeal rights similar to those allowed for the current Form I–601 denials that are filed with the AAO. One commenter argued that not allowing aliens to appeal essentially meant that DHS would adjudicate all waivers favorably. The commenter also stated that denying appeals would not meet the due process requirements. A

few commenters urged DHS to allow appeals at least in cases in which there were questions of law, errors, or changed circumstances. Finally, several commenters stated that DHS, by relegating certain questions of inadmissibility to either DOS or federal court, was abdicating its authority to interpret the law for grounds of inadmissibility where no waiver is available.

DHS disagrees with these positions. There is no cognizable due process interest in access to or eligibility for a discretionary, provisional unlawful presence waiver of inadmissibility. *See, e.g., Champion* v. *Holder,* 626 F.3d 952, 957 (7th Cir. 2010) ("To articulate a due process claim, [the individual] must demonstrate that she has a protected liberty or property interest under the Fifth Amendment. Aliens have a Fifth Amendment right to due process in some immigration proceedings, but not in those that are discretionary.") (citations omitted). The provisional unlawful presence waiver process is purely discretionary and no alien has a right to obtain a waiver from the Secretary of Homeland Security.[15]

Even assuming that such an interest exists, none of the commenters cite any case or statute that supports the claim that the Due Process Clause of the Fifth Amendment *requires* an Executive agency to provide for administrative appeal of an agency decision. Section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704, does permit an agency to provide an administrative appeal and if the agency chooses to do so, the agency can also, by regulation, make the filing of an administrative appeal a necessary prerequisite to judicial review. *See Darby* v. *Cisneros,* 509 U.S. 137 (1993). But nothing in section 10(c) or the *Darby* decision *mandates* that an agency must provide for an administrative appeal.[16] In upholding

---

[14] *See* USCIS Memorandum, Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in cases Involving Inadmissible and Removable Aliens (Nov. 7, 2011), available at: *http://www.uscis.gov/USCIS/Laws/Memoranda/Static_Files_Memoranda/NTA%20PM%20(Approved%20as%20final%2011-7-11).pdf.*

[15] Even with respect to ordinary Form I–601 waivers, Congress specifically gave the Secretary discretion to decide who should or should not be granted an unlawful presence waiver under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v). This discretion is not diminished by the fact that one element of that determination rests on a legal requirement—satisfying the extreme hardship standard. Even if an applicant establishes extreme hardship, the Secretary is not required to favorably exercise her discretion in the adjudication of the waiver. *See Matter of Mendez-Moralez,* 21 I&N Dec. 296, 301 (BIA 1996) ("Extreme hardship is a requirement for eligibility, but once established it is but one favorable discretionary factor to be considered.").

[16] To the contrary, the Court's conclusion in *Darby* that pursuing an administrative appeal is a prerequisite to judicial review only if required by statute or the agency chooses to provide for such an administrative appeal and also chooses to make it mandatory strongly suggests that an agency is not

the BIAs' practice of ''affirmance without opinion'' of immigration judge decisions, for example, several courts of appeals have recognized that Due Process does not require an agency to provide for administrative appeal of its decisions. *See, e.g., Zhang* v. *U.S. Dep't of Justice,* 362 F.3d 155, 157 (2d Cir. 2004); *Loulou* v. *Ashcroft,* 354 F.3d 706, 709 (8th Cir. 2003); *Falcon Carriche* v. *Ashcroft,* 350 F.3d 845, 850 (9th. Cir. 2003); *Mendoza* v. *U.S. Att'y Gen.,* 327 F.3d 1283, 1289 (11th Cir. 2003); *Albathani* v. *INS,* 318 F.3d 365, 376 (1st Cir. 2003); *Guentchev* v. *INS,* 77 F.3d 1036, 1037–38 (7th Cir. 1996).

Finally, if USCIS denies an alien's Form I–601A, the alien has two alternate avenues for obtaining a waiver of inadmissibility: (1) Filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver or (2) filing a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. The Form I–601 is appealable to the AAO.

Appeals should be reserved for actions that are based on a comprehensive assessment of the applicant's admissibility. Jurisdiction over the final admissibility determination in the context of the Form I–601 lies with the AAO and with DOS in the context of the immigrant visa eligibility determination. It would be an inefficient use of resources for DHS to allow an administrative appeal of a decision that does not take into consideration the full inadmissibility determination or any other factors that may be discovered during the course of the immigrant visa interview abroad. DHS, therefore, is retaining its policy of not affording an administrative appeal of the denial of a provisional unlawful presence waiver application.

### G. Effect of Pending or Approved Provisional Unlawful Presence Waivers

Many commenters asked USCIS to consider allowing aliens with pending provisional unlawful presence waiver applications to travel and work while waiting for a decision from USCIS to travel abroad for their immigrant visa interview. Several commenters also suggested that individuals with pending provisional unlawful presence waiver applications be given Social Security numbers and driver's licenses. Some

required to allow for administrative appeal at all, in the absence of a statutory mandate.

commenters requested that aliens not accrue unlawful presence during the pendency of Form I–601A or while waiting for their immigrant visa interview. The commenters believed that a pending provisional unlawful presence waiver application should ''stop the clock'' on any immigration violation. Another commenter stated that the final rule should clearly specify that the pendency of a Form I–601A protects an individual from further accrual of unlawful presence and places the individual in a period of stay authorized by the Secretary described in INA section 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii). Finally, several commenters stated that approval of the provisional unlawful presence waiver should guarantee immigrant visa issuance and the right to return to the United States.

A waiver of inadmissibility is an ancillary benefit to a primary application that would give an alien legal immigrant status; the waiver, by itself, does not convey a legal status. In the provisional unlawful presence waiver process, the primary application is the immigrant visa over which DOS, not USCIS, has jurisdiction. The waiver only addresses grounds of inadmissibility (in this instance, unlawful presence) that may preclude DOS from issuing the immigrant visa at the time of the applicant's interview abroad. If DOS approves the immigrant visa, the alien can be admitted to the United States as a LPR, assuming CBP determines that he or she is otherwise admissible and entitled to the immigrant visa classification. *See* INA sections 204(e), 211(a), and 221(h); 8 U.S.C. 1154(e), 1181(a), and 1201(h). Interim benefits provided on the basis of something pending with DHS or DOJ are granted only in connection with a pending application for an immigration status within the United States. DHS does not have authority to issue Social Security numbers; the Social Security Administration has sole jurisdiction over the issuance of Social Security numbers. Finally, DHS has no authority to issue driver's licenses; the issuance of these types of documents are governed by the laws and regulations of the individual U.S. states, which prescribe the conditions for obtaining and issuance of identification cards and drivers' licenses.

As stated in the proposed rule, the approval of a provisional unlawful presence waiver does not create a lawful immigration status, extend any authorized period of stay, protect aliens from removal or law enforcement action, or grant any other immigration benefits, including temporary work

authorization and advance parole. DHS is not altering its position on interim benefits as initially stated in the proposed rule. Finally, the grant of a provisional unlawful presence waiver does not guarantee that an individual with an approved immigrant visa will be admitted to the United States by CBP.

Operationally, USCIS and DOS have coordinated closely on this streamlined process and the close timeframe between processing of the Form I–601A approval and the immigrant visa application will encourage individuals to speed up the consular process and to depart from the United States as quickly as possible. Any issuance of interim benefits or specific authorized periods of stay will hinder this goal and the integrity of the program. DHS added language to the final rule to make clear that applicants are not eligible for interim benefits and that a pending or approved application for provisional unlawful presence waiver does not authorize any interim benefits. *See* section 212.7(e)(2).

DHS reminds the public that the filing or approval of a provisional unlawful presence waiver application will *not:* (1) Confer any legal status; (2) protect against the accrual of additional unlawful presence; (3) authorize an alien to enter the United States without securing a visa or other appropriate entry document; (4) convey any interim benefits (*e.g.,* employment authorization, advance parole, or eligibility to be paroled based solely on a pending or approved Form I–601A); or (5) protect an alien from being placed in removal proceedings or removed from the United States, in accordance with current DHS policies governing initiation of removal proceedings and use of prosecutorial discretion.

### H. Automatic Revocation

Several commenters questioned the regulatory text in proposed 8 CFR 212.7(a)(4)(iv), which provides for automatic termination of the validity of an approved waiver under INA section 216(f), 8 U.S.C. 1186a(f), when the conditional resident status of an alien admitted under INA section 216, 8 U.S.C. 1186a, is terminated. The commenters argued that this provision was contrary to the INA and should be removed from the final rule. The commenters noted that under INA section 216(f), 8 U.S.C. 1186a(f), waivers under INA section 212(h), 8 U.S.C. 1182(h) (for certain criminal grounds of inadmissibility), and INA section 212(i) 8 U.S.C. 1182(h) (for fraud or misrepresentation), are the only types of waivers that are automatically terminated upon termination of

conditional resident status. As a result, they assert, DHS lacks the authority to implement this regulatory change when Congress has already clearly spoken on the matter.

A few commenters also argued that DHS should eliminate automatic revocation or adjudicate revocations separate and apart from the provisional unlawful presence waiver process. The commenters believed that it would be more efficient for DHS to reserve the right to review an approved provisional unlawful presence waiver rather than automatically revoke it, especially when DOS determines that the applicant is subject to another ground of inadmissibility or there are other negative discretionary factors that were not considered at the time of the Form I–601A adjudication. The commenters also opined that DHS would not need to re-adjudicate any portion of the waiver that has the same or lesser standard needed for waiving the newly discovered ground of inadmissibility (e.g., if the new ground of inadmissibility required a showing of extreme hardship, DHS could simply adopt the provisional unlawful presence waiver determination on extreme hardship, when adjudicating the waiver request for the new ground of inadmissibility).

DHS agrees that the statute at INA section 216(f), 8 U.S.C. 1186a(f), only addresses automatic revocation of approved waivers under INA sections 212(h) or (i). As a result, it has clarified that the amendment to 8 CFR 212.7(a)(4), regarding treatment of certain waivers upon the termination of conditional resident status under INA section 216(f), 8 U.S.C. 1186a(f), and automatic revocation of approved waivers of inadmissibility, only applies to approved waivers based on INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i), and is revising 8 CFR 212.7(a)(4) accordingly.

As to revocations, DHS has not adopted the commenters' suggestions. DHS believes that revocation of an approved case requires an assessment of the facts and circumstances as they existed at the time the case was approved as well as any newly discovered information that may have affected the officer's decision or discretion at the time of adjudication. When USCIS reviews a case for possible revocation, USCIS looks at the facts and law at the time the case was approved to determine if the applicant was in fact eligible for the benefit requested. USCIS also reviews any newly discovered information to see if it is relevant and could have potentially affected the officer's discretionary assessment in the case. Since the provisional unlawful presence waiver is a discretionary process, DHS will retain its authority on revocations and its position on automatic revocations. Consistent with 8 CFR 103.2(b)(16), if USCIS discovers derogatory information that was unknown to the applicant, USCIS will provide notice of such information and give the applicant an opportunity to respond prior to any decision to deny the application. DHS, however, will not allow aliens to appeal a decision to revoke a provisional unlawful presence waiver.

*I. Comments on Form I–601A, Application for Provisional Unlawful Presence Waiver, and the Form Instructions*

DHS invited the public to comment on the proposed rule and the Form I–601A and the instructions to accompany the form. DHS has considered the comments to the Form I–601A and the form instructions. While DHS has not adopted all suggestions made by comments, below is a list of changes to the form and instructions that DHS incorporated as a result of these comments.

1. Comments on Form

a. Part 1, Information About Applicant—Immigration or Criminal History Records

Several commenters suggested that USCIS allow individuals in removal proceedings to apply for provisional unlawful presence waivers if their removal proceedings had been administratively closed pursuant to ICE's Prosecutorial Discretion (PD) initiative. Several commenters also stated that this section of the form was confusing and/or inaccurate. Specifically, the commenters believed this section was inaccurate because it indicates that an applicant will be ineligible for a provisional unlawful presence waiver if the applicant answers "Yes" to certain questions relating to other possible grounds of inadmissibility. The commenters also believed the questions were too broad to lead to a firm finding of inadmissibility and should be amended to say that the applicant "may" not be eligible and that USCIS "may" deny the application if the applicant answers "Yes" to those questions. These commenters also identified specific inaccuracies and provided suggested edits to revise this section.

DHS has amended the final rule to indicate that an individual in removal proceedings may apply for a provisional unlawful presence waiver if the individual's removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. DHS is not limiting eligibility solely to individuals whose cases were closed pursuant to the ICE Prosecutorial Discretion (PD) initiative. Any alien whose removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A, can apply for a provisional unlawful presence waiver. If USCIS approves the provisional unlawful presence waiver for an individual whose removal proceedings are administratively closed, the individual should seek termination or dismissal of his or her removal proceedings before departing the United States to appear at the immigrant visa interview to avoid possible delays in his or her immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. DHS has updated the form and its instructions accordingly.

DHS has incorporated many of the commenters' suggested edits while rewriting this part of the form to clarify ambiguities and to correct inaccuracies. DHS also has revised the form and instructions to clarify that USCIS "may" find an applicant ineligible for a provisional unlawful presence waiver if USCIS determines that there is *reason to believe* the Department of State may find the applicant ineligible for a ground of inadmissibility other than unlawful presence. Regardless of whether DHS approves or denies the provisional unlawful presence waiver, an immigrant visa applicant should present evidence of eligibility and any documents needed to establish admissibility to the consular officer at the time of his or her immigrant visa interview. The approval of a provisional unlawful presence waiver does not guarantee that the consular officer will find the applicant eligible for an immigrant visa. Also, the denial of a provisional unlawful presence waiver does not preclude the applicant from filing a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A.

Alternatively, the applicant can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after his or her immigrant visa interview at the U.S. Embassy or consulate abroad. The

purpose of these eligibility questions is not for USCIS to pre-adjudicate immigrant visa eligibility, but to limit the provisional unlawful presence waiver process to individuals whose only potential ground of inadmissibility is based on prior unlawful presence in the United States. All other potential grounds of inadmissibility and/or ineligibility need to be addressed with the consular officer during the immigrant visa interview.

Finally, one commenter suggested that the form be enhanced by incorporating a detailed questionnaire, similar to that of Form I–601, aimed at uncovering other potential grounds of inadmissibility.

DHS did not include a detailed questionnaire covering every potential ground of inadmissibility because the Form I–601A may only be used to waive unlawful presence. The purpose of the section entitled ''Immigration or Criminal History Records'' is to give applicants an opportunity to explain any possible immigration or criminal history records which USCIS may uncover during routine system and background checks. DHS will not make any changes to the form based on this comment.

b. Part 2, Information About Immediate Relative Petitions and Consular Processing

Many commenters suggested that DHS allow individuals to cancel or reschedule their immigrant visa interviews in order to seek a provisional unlawful presence waiver.

In response to these suggestions, DHS considered a number of criteria and restrictions to make the process operationally manageable without creating delays in processing of other petitions or applications filed with USCIS or in the DOS immigrant visa process. By including aliens who were scheduled for an interview prior to the publication of this final rule, the projected volume of cases could significantly increase and would create backlogs not only in the provisional unlawful presence waiver process, but also in adjudication of other USCIS benefits. The increased volume would also adversely impact DOS and its immigrant visa process.

For these reasons, DHS will not expand the provisional unlawful presence waiver to include individuals whose immigrant visa interviews were scheduled before the date of publication of this final rule January 3, 2013, even if the consulate or individual cancelled or rescheduled the immigrant visa interview *after* the date of publication of this final rule. DHS adds language to the

final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

USCIS will reject or deny any Form I–601A filed by an alien who was scheduled for an interview prior to the date of publication of this final rule, even if the alien's interview is rescheduled *after* the date of publication

of this final rule. DHS has updated the form and its instructions accordingly.

c. Part 3, Information About Qualifying Relative

Many commenters asked DHS to allow eligible applicants to show extreme hardship to a LPR spouse or parent, if applicable, since the statute authorizes a waiver of unlawful presence based on a showing of extreme hardship to a spouse or parent who is either a U.S. citizen or LPR.

DHS has considered these comments but is not adopting the suggested change. As stated in the proposed rule, a primary purpose for creating the provisional unlawful presence waiver process is to reduce the separation of U.S. citizens and their immediate relatives. Focusing on hardship to U.S. citizens is consistent with permissible distinctions that may be drawn between U.S. citizens and aliens. It also is consistent with the Secretary's authority to administer the immigration laws and determine the most efficient means for effectuating the waiver process. *See* 77 FR at 19908.

d. Interviews

One commenter suggested that when USCIS requires an interview for a provisional unlawful presence waiver, USCIS should allow the applicant to choose to either appear at a local USCIS field office for an in-person interview or have a video-conferenced interview with an adjudicator at a USCIS service center using appropriate technology (*e.g.,* Skype).

DHS reviewed these comments but did not adopt the suggestions. DHS does not anticipate that many provisional unlawful presence waiver applicants will require an in-person interview. Also, USCIS does not conduct interviews at the NBC, namely because of its remote location and the type of benefit requests adjudicated by that center, which are generally paper-based decisions. USCIS also will not conduct video interviews in lieu of in-person interviews when such interviews are required. Therefore, DHS will not make the suggested change to the form.

2. Comments on Instructions

a. Eligibility Criteria—Pending Adjustment Applications

Several commenters were confused about what it means to have a pending application for adjustment of status and did not understand why this would affect eligibility for a provisional unlawful presence waiver.

DHS will not remove the restriction for individuals who have an application for adjustment of status pending with

USCIS. Individuals who are eligible to obtain LPR status while inside the United States through the adjustment of status process and intend to pursue LPR status through that process do not need the provisional unlawful presence waiver. The provisional unlawful presence waiver is only valid for the purpose of seeking an immigrant visa outside the United States. To avoid confusion, DHS has updated the form instructions to clarify that this restriction only applies to individuals with a pending Form I–485, Application to Register Permanent Residence or Adjust Status.

b. Limitations on Filing of Provisional Unlawful Presence Waivers

Many commenters suggested that DHS remove the restriction to the number of times an individual may seek a provisional unlawful presence waiver or modify it to allow re-filing of the provisional unlawful presence waiver application.

DHS considered these comments and has changed the final rule to reflect that if an individual's provisional unlawful presence waiver request is denied or withdrawn prior to final adjudication, the individual may file a new Form I–601A, in accordance with the form instructions, with the required fees and any additional documentation that he or she believes might establish his or her eligibility for the waiver. The applicant's case must still be pending with DOS and the applicant must notify DOS of his or her intent to file a new Form I–601A.

Alternatively, the individual can file a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS has updated the form and instructions accordingly.

c. Qualifying Relatives

One commenter suggested adding "child" as a qualifying relative for establishing extreme hardship. DHS cannot adopt this suggestion because Congress limited the qualifying relationship for purposes of establishing extreme hardship to spouses or parents. DHS cannot change this statutory requirement.

d. Child Status Protection Act

One commenter asked DHS to clarify in the Form I–601A instructions how the provisional unlawful presence waiver relates to children who benefit from the CSPA. DHS has added language to the Form I–601A

instructions to make clear applicants will remain eligible for a provisional unlawful presence waiver as long as the applicants remain "immediate relatives" as defined in the INA, as amended by the CSPA. Thus, an aged-out child may still qualify as an "immediate relative" for purposes of access to the provisional unlawful presence waiver process as long as the child is classified as an immediate relative under the INA.

e. Statement From Applicant

One commenter suggested adding a sentence in Part 5 of the instructions to explain that applicants may supplement their statements on extreme hardship and factors warranting a favorable exercise of discretion with an attached letter. DHS added the information as requested to the Form I–601A instructions.

f. Penalties

One commenter suggested adding a reminder in the instructions that applicants read the section entitled "Penalties" before the applicant signs the application. DHS added the reminder on the form and in the form instructions, as requested.

g. Required Documents—Check List

One commenter suggested adding a checklist to assist applicants with information on the types of documents and statements that should be submitted with the provisional unlawful presence waiver application. DHS added a separate section with a checklist as requested.

h. Unauthorized Practice of Immigration Law

One commenter suggested adding a warning regarding the unauthorized practice of immigration law.

DHS agrees with this suggestion. In 2011, USCIS started an initiative—the Unauthorized Practice of Immigration Law (UPIL) initiative—to educate the public about potential fraud and scams in the immigration context. USCIS has posted information about the UPIL initiative on its Web site. DHS encourages applicants to review the information at *www.uscis.gov/ avoidscams*. DHS also has added a link to this Web site on the form instructions.

*J. Miscellaneous Comments*

1. Statutory Changes

A large number of supporters of the rule indicated that the proposed rule did not go far enough. The commenters asked DHS to allow individuals who were eligible for the provisional

unlawful presence waiver but ineligible for adjustment of status to remain in the United States and adjust their status to a LPR. Several commenters asked DHS to reinstate INA section 245(i), 8 U.S.C. 1255(i). Others asked if DHS could reduce the number of years an alien must remain outside the United States because of unlawful presence under INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). A few commenters also asked if DHS could include a waiver of INA section 212(a)(6)(C)(ii), 8 U.S.C. 1182(a)(6)(C)(i) (false claim to U.S. citizenship). Some commenters asked DHS to grant waivers even if the applicants did not meet all statutory requirements. One commenter said that DHS should eliminate the discretionary portion of the waiver in its entirety. Others wanted DHS to simply grant legal status to individuals married to U.S. citizens, irrespective of whether they had an approved petition or needed a provisional unlawful presence waiver. They argued that if an individual is the spouse of a U.S. citizen then such an individual should simply be able to become a LPR of the United States.

Congress has prescribed the statutory requirements for obtaining LPR status through adjustment of status in the United States. Congress also established the current grounds of inadmissibility and the conditions for any waivers associated with such grounds. DHS does not have the authority to change or dispense with those statutory requirements. DHS cannot reinstate INA section 245(i), 8 U.S.C. 1225(i), or take any action that would grant permanent resident status to individuals who do not meet the statutory requirements for that status. Only Congress can amend the statutory requirements that individuals must meet to qualify for adjustment of status. DHS, therefore, cannot adopt these recommendations. However, DHS supports comprehensive immigration reform, and DHS will implement any legislation that may be enacted by Congress, including any authorized extension of INA section 245(i), 8 U.S.C. 1225(i).

2. Fraud Detection and Prevention; National Security

Some commenters argued that the Federal Government's focus should be on enforcement and deterring illegal entry and marriage fraud. Others opined that the provisional unlawful presence waiver process was a "back door" through which illegal immigrants who pose a threat to national security could be granted a waiver and LPR status.

A core mission of DHS is to protect national security, public safety, and the

integrity of the immigration process. DHS has a number of preventative measures in place, as provided by law and through agency policy, to address matters relating to national security and fraud. DHS incorporates these measures through regulations and standard operating procedures that bolster the adjudications process. USCIS's Fraud Detection and National Security (FDNS) Directorate focuses on its fraud and national security mission. FDNS investigates fraud and national security issues relating to the immigration benefit process and makes appropriate referrals to ICE, DOJ, and other law enforcement agencies. USCIS has established standard operating procedures in field offices for referrals to FDNS on potential fraud cases that may require additional review. USCIS's Office of Policy and Strategy is responsible for developing future benefit fraud assessments. For fraud prevention, FDNS has initiated fraud training for Immigration Services Officers (ISOs) to detect any patterns or increase in fraudulent practices in a particular application type or area of the United States. Additionally, USCIS already has processes in place, including requiring additional interviews and home site visits, conducted by specially trained immigration officers throughout the United States, to assess whether a marriage was entered into to evade immigration laws. These processes provide strong tools for combating potential fraud.

Congress provided several measures aimed at preventing marriage fraud, focusing especially on the potential for fraud in marriages of less than two years' duration. For instance, Congress mandated that aliens married less than two years generally are subject to conditional resident status for two years after admission as an immigrant. *See* INA section 216, 8 U.S.C. 1186a; 8 CFR part 216; 8 CFR 235.11. Once USCIS approves an immediate relative petition for an alien married to a U.S. citizen, and DOS determines that the alien is admissible and eligible for an immigrant visa, the alien can seek admission to the United States as an LPR. If, however, the alien married the U.S. citizen less than two years before the date of admission, the alien is admitted conditionally for a two-year period.

In general, the U.S. citizen petitioner and the conditional permanent resident must jointly seek to remove the conditions within the 90-day period immediately preceding the second anniversary of the date the alien obtained conditional permanent residence status. If the U.S. citizen petitioner and the conditional permanent resident fail to do so, the alien's conditional permanent resident status is terminated automatically, and any waiver granted in connection with the status under INA sections 212(h) or (i), 8 U.S.C. 1182(h) or (i), is automatically terminated. Furthermore, if USCIS determines that the marriage was entered into to evade the immigration laws, USCIS cannot approve future petitions for that alien. *See* INA section 204(c), 8 U.S.C. 1154(c). USCIS also reserves the authority, as it does generally for other benefit requests, to interview the alien and the U.S. citizen spouse in connection with the provisional unlawful presence waiver application in the exercise of discretion.

Another preventive measure is the provisional unlawful presence waiver requirement that the applicant appear for biometrics capture at a USCIS Application Support Center (ASC). The biometrics requirement allows USCIS to run thorough background and security checks on individuals seeking an immigration benefit to determine if an alien is not only potentially subject to other grounds of inadmissibility or not eligible for a favorable exercise of discretion, but also whether the alien poses a national security or public safety risk.

### 3. Backlog Reduction

One commenter suggested that DHS first clear all application backlogs abroad and at the AAO before implementing any new process. Commenters also indicated that DHS should give special consideration to individuals who have a pending waiver application that was filed abroad.

USCIS has already undertaken several efforts to reduce the backlogs in adjudication, both abroad and at the AAO. As of June 4, 2012, USCIS has implemented centralization of certain Form I–601 filings in the United States. USCIS has dedicated additional resources on a temporary basis to expeditiously process the cases filed prior to centralization. USCIS anticipates that the residual cases filed prior to centralization and during the transition period that recently ended on December 4, 2012, will be completed within about six months of the effective date of this final rule. By moving most of the adjudication case load to the United States for these cases, USCIS expects to reduce the filing and processing times for overseas filers of Form I–601.

The AAO has also undertaken various backlog reduction efforts in the context of administrative appeals. Since July 2011, the waiver adjudication branch of

the AAO has reduced processing time from 27 to 19 months, and reduced the number of cases in the backlog by more than 1,400. USCIS anticipates this rate of reduction to continue and plans on reducing processing time for waivers to 6 months by June 2013. These various efforts demonstrate the Department's continued commitment to timely adjudication of waivers and customer service with the resources available.

### 4. Other Immigrant Visa Requirements

A few commenters suggested that individuals who are eligible for the provisional unlawful presence waiver should have the option to complete the medical examination required for immigrant visa issuance in either the United States or abroad. DHS did not adopt this suggestion.

DOS has jurisdiction for health-related inadmissibility determinations in the overseas immigrant visa application context; DOS, therefore, requires immigrant visa applicants to have the required medical examination performed by a DOS-designated panel physician abroad. *See* 22 CFR 42.66. DOS and the Centers for Disease Control and Prevention within the Department of Health and Human Services set the criteria and parameters for these medical exams depending on country conditions. While USCIS has designated civil surgeons for certifications in other contexts, these civil surgeons are not recognized by DOS and therefore cannot complete the required medical examination for purposes of the visa issuance abroad. Operationally, allowing provisional unlawful presence waiver applicants to complete the medical examination in the United States could cause delays and backlogs at DOS. DHS, therefore, will not adopt this suggestion.

### 5. Departure Requirement and Third-Country Processing

Several commenters asked why approved provisional unlawful presence waiver applicants are required to return to their home country to complete the immigrant visa requirement. The commenters suggested that these applicants should not have to travel to a dangerous place like Ciudad Juarez, Mexico, but instead complete their process in a safe third country like Canada. Many commenters said that requiring individuals to depart would have a significant impact on U.S. citizen family members, especially if the individual is the primary financial provider for the family. The commenters also said that departure would cause U.S. citizen family members to become dependent on the U.S. Government if

the immediate relative had to remain outside of the United States for a prolonged period of time. Several other commenters suggested that DHS eliminate the departure requirement altogether or at least allow provisional unlawful presence waiver applicants to be interviewed in the United States or pick up their immigrant visa at their country's embassy in the United States. Finally, several Congressional commenters urged DHS to coordinate with DOS so that provisional unlawful presence waiver applicants do not have to return home. The commenters stated that the departure requirement should be eliminated entirely or, alternatively, that DOS should identify additional consulates for processing of the provisional unlawful presence waiver and immigrant visa issuance. The commenters also suggested that DOS's NVC could assign immigrant visa petitions and provisional unlawful presence waiver applications to designated consular posts in safe and convenient locations, citing the authority as part 9 of the Foreign Affairs Manual (FAM) section 42.61, Note 2.1. Finally, the commenters said that DHS should consider using its parole authority broadly to eliminate the need for immediate family members to travel abroad to obtain an immigrant visa to which they are entitled under current law.

DOS has jurisdiction over consular processing and setting the location for immigrant visa application filing and interviews. *See* 22 CFR 42.61. DHS, therefore, will not alter this requirement and, as stated above, cannot change the statutory requirements for adjustment of status in the United States. In response to the request for DHS to broadly use its parole authority for provisional unlawful presence waiver applicants, DHS will continue to exercise its authority to parole applicants for admission into the United States on a case-by-case basis, reviewing the unique circumstances and facts that relate to each individual's case to determine whether the individual's circumstances warrant a discretionary grant of parole based on urgent humanitarian factors or as a significant public benefit. INA section 212(d)(5), 8 U.S.C. 1182(d)(5). With this rule, DHS is not changing its current policy on the use of its parole authority.

6. Comprehensive Immigration Reform

Many commenters, including numerous individuals who signed group petitions, said that the focus should be on comprehensive immigration reform (CIR) rather than a "patchwork" of small initiatives that do not fix the current broken immigration system as a whole. While the commenters generally supported some type of CIR, their views on what should be included in a CIR bill varied significantly.

Some commenters stated that CIR is needed to legalize the current immigrant population in the United States and to create guest worker programs that will benefit the U.S. economy. The commenters argued that legalization will result in significant economic benefits to the United States and help solve many of our current immigration problems. These commenters supported the idea of reuniting U.S. citizen families and stated that the Administration should focus on legal immigration and naturalization to ensure that immigrants are fully aware of the rights and opportunities available to them.

Many commenters opposed the provisional unlawful presence waiver process because they believed it would encourage illegal immigration and that it was a form of "backdoor amnesty." Some commenters believed that Congress should enact stronger penalties against those who enter illegally and enforce the current laws against those who deliberately violated U.S. immigration law. The commenters also believed that the focus should be on border security and legal immigration, not on aliens who made the choice to come to the United States illegally. One commenter noted that the current immigration policy was not working and that the United States needs a "comprehensive top down rewrite" of all the immigration laws. A few commenters were opposed to the provisional unlawful presence waiver process because they believed it was politically motivated and not designed to fix the current immigration system.

Fixing the current immigration system is a top priority for DHS, and the Administration is committed to comprehensive immigration reform. Congress has the power to amend the immigration laws to create a workable system that unites families, improves the U.S. economy, and preserves national security and public safety. USCIS will do everything possible to prepare for successful implementation of any comprehensive immigration reform legislation and ensure that the integrity of the U.S. immigration system is maintained.

7. Transformation

Several commenters urged DHS to convert the provisional unlawful presence waiver process and immigrant visa process to an electronic process. The commenters believed that if applicants and attorneys could file online, they would save money, time, paper, and the mailing costs that currently accompany paper filings. The commenters stated that E-filing is consistent with USCIS's current Transformation Initiative.

DHS agrees with the commenters that it should move toward electronic filing of immigration benefits. In fact, USCIS already is transforming its immigration benefit process and recently launched its new electronic filing and adjudication system known as USCIS Electronic Immigration System (USCIS ELIS). USCIS ELIS allows individuals to establish a USCIS ELIS online account and, currently, to apply online for an extension or change of their nonimmigrant status for certain visa types. USCIS ELIS also enables USCIS officers to review and adjudicate online filings from multiple agency locations across the country. USCIS believes that the Transformation Initiative is an important step forward for the agency and is working to expand system features and functionality in additional releases this calendar year and beyond. In future releases of USCIS ELIS, USCIS will add form types and functions, including waivers of inadmissibility, gradually expanding the system to cover filing and adjudication of all USCIS immigration benefits. USCIS will notify the public when such expansions and additions of form types occur.

*K. Comments on the EO 12866/13563 Analysis*

DHS received several comments on the volume projection included in the analysis, especially as it relates to the DHS projection of additional demand. Many commenters believed that application volume is understated. One commenter stated that the Federal Government stands to earn over one billion dollars from the change. Another commenter suggested that DHS examine rates of use of health care and public education as points for comparison in determining demand for the provisional unlawful presence waiver. This commenter suggested that using undocumented immigrant access to health care and public education as models will reveal that the provisional unlawful presence waiver is at risk for underuse. Many commenters noted that the costs of obtaining an immigrant visa limit those who can afford to apply for the provisional unlawful presence waiver and that increasing the cost with required biometric submission is another barrier to participation. A commenter was concerned the cost of this rule would add to the national debt. Another commenter argued that current

immigration laws and the provisional unlawful presence waiver rule disproportionately impact children of immigrant families who have a greater likelihood to be either low-income or living under the poverty line and are not as likely to have resources needed to make use of the waiver option.

As stated repeatedly throughout the analysis, DHS was unable to precisely project application volumes for the provisional unlawful presence waiver due to unavailability of data on those who are unlawfully present. Historical estimates show only aliens who have taken the steps to obtain an immigrant visa. DHS did conduct a reasonable methodological approach based on those who have made use of inadmissibility waivers under the current process.

DHS does not believe that using public health and education records would better refine our estimates. As the commenter noted, these services are underutilized by undocumented immigrants. Furthermore, neither these models nor the others that were examined differentiate undocumented immigrants with U.S. citizen immediate relatives from those undocumented immigrants with other immigrant/citizen family compositions. Since only immediate relatives of U.S. citizens may apply for provisional unlawful presence waivers, DHS does not believe that using the suggested models will offer a more reliable means of estimating the additional demand.

While DHS acknowledges that the costs of obtaining an immigrant visa may be a constraint on demand, and agree these costs will have more impact on low-income immigrant families, the only additional cost of the provisional unlawful presence waiver process beyond the existing waiver process is the costs incurred for submitting biometrics. Relative to the other costs, biometric costs represent approximately eight percent of the total cost of obtaining an immediate relative immigrant visa. The costs of obtaining an immigrant visa are not costs of this rule. Finally, this final rule will not add to the national debt. As explained in the proposed rule at 77 FR 19919, this final rule is not expected to impose additional costs on the federal government since the fee revenues collected should offset the form processing cost.

## V. Regulatory Amendments

DHS adopted most of the proposed regulatory amendments without change, except for the following provisions noted below:

### 1. Section 103.7(c)(3)(i)

In the proposed rule, DHS noted in the supplementary text that applicants for a provisional unlawful presence waiver cannot seek a fee waiver for the Form I–601A filing fees or the required biometric fees. *See* 77 FR at 19910. DHS incorrectly referenced proposed regulatory text at 8 CFR 103.7(b)(1)(i)(C) and inadvertently omitted the correct citation to the regulatory provision being amended and the amendatory text. DHS has corrected this error and has included an amendment to 8 CFR 103.7(c)(3)(i) in this final rule to clarify that fee waivers are not available for the biometric fee or filing fees for the Form I–601A. *See* section 103.7(c)(3)(i).

### 2. Section 212.7(a)(4)(iv)

DHS proposed an amendment to 8 CFR 212.7(a)(4) to provide that termination of an alien's conditional LPR status also would result in automatic revocation of an approved waiver of inadmissibility. *See* 77 FR at 19912 and 19921. Several commenters noted that INA section 216(f), 8 U.S.C. 1186a(f), only allows for automatic revocation of waivers of inadmissibility approved under INA sections 212(h) and (i), 8 U.S.C. 1182(h) and (i). DHS agrees and has revised the amendment to 8 CFR 212.7(a)(4) to clarify that automatic revocation of approved waivers upon termination of conditional resident status only applies to approved waivers based on INA section 212(h), 8 U.S.C. 1182(h) (waivers for certain criminal offenses) and INA section 212(i), 8 U.S.C. 1182(i) (waivers for fraud or willful misrepresentation of a material fact). *See* section 212.7(a)(4)(iv).

### 3. Section 212.7(e)(1)

During discussions about the proposed provisional unlawful presence waiver process and how it would affect aliens in removal proceedings, a question arose regarding the authority of DOJ IJs and whether IJs would adjudicate Forms I–601A for aliens in removal proceedings. DHS determined that it would be more efficient and appropriate to have Form I–601A waivers centralized and adjudicated by one agency, USCIS, especially given the streamlined nature of the process and the need for close coordination with DOS once a waiver is decided. DHS, therefore, added a new paragraph to clarify that the Application for Provisional Unlawful Presence Waiver, Form I–601A, will be filed only with USCIS even if an alien is in removal proceedings before EOIR. *See* section 212.7(e)(1).[17]

### 4. Section 212.7(e)(2)

DHS restructured this provision and added language to make clear that approval of the provisional unlawful presence waiver is discretionary and does not constitute a grant of any lawful immigration status or create a period of stay authorized by the Secretary for purposes of INA section 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). *See* section 212.7(e)(2)(i). DHS also clarified that a pending or approved provisional unlawful presence waiver does not authorize any interim benefits such as employment authorization or advance parole. *See* section 212.7(e)(2)(ii).

### 5. Section 212.7(e)(3)

Many commenters asked DHS to expand eligibility for the provisional unlawful presence waiver process to other categories of aliens seeking to immigrate to the United States.

DHS considered the commenters' suggestions but is limiting the provisional unlawful presence waiver to immediate relatives of U.S. citizens. After assessing the effectiveness of the provisional unlawful presence waiver process and its operational impact, DHS, in consultation with DOS and other affected agencies, will consider expanding the provisional unlawful presence waiver process to other categories.

### 6. Former Section 212.7(e)(4)(ii)(H)

DHS initially proposed to reject a provisional unlawful presence waiver application if an alien has not indicated on the application that the qualifying relative is a U.S. citizen spouse or parent. *See* 77 FR at 19922. DHS has determined that this criterion is more appropriate for an adjudicative decision and that this assessment should not be made through a review during the intake process. Thus, DHS has deleted this rejection criterion in the final rule.

### 7. Section 212.7(e)(4)(iv)

DHS proposed excluding aliens from the provisional unlawful presence waiver process who were already scheduled for their immigrant visa

---

[17] Under 8 CFR 1240.1(a)(1)(ii), immigration judges (IJs) have authority to adjudicate certain waiver applications made by aliens in removal proceedings. However, IJs will not be adjudicating provisional unlawful presence waiver applications under this rule because all aliens who are in removal proceedings—including those whose cases were administratively closed and have been recalendared or who are subject to an administratively final order of removal are ineligible for the provisional unlawful presence waiver by operation of this final rule. *See* 8 CFR 212.7(e)(4).

interviews with DOS. *See* 77 FR at 19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD) to determine the date on which the Department of State initially acted to schedule the petition for his or her immigrant visa interview (*i.e.*, the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien who USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule the alien's immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner.

*8. Section 212.7(e)(4)(v)*

DHS initially proposed excluding all aliens who were in removal proceedings

from the provisional unlawful presence waiver process, except those whose: (1) Removal proceedings had been terminated or dismissed; (2) Notices to Appear (NTAs) had been cancelled; and (3) cases had been administratively closed but subsequently were reopened to grant voluntary departure. *See* 77 FR at 19922. In this final rule, DHS allows aliens in removal proceedings to participate in this new provisional unlawful presence waiver process but only if their removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A. *See* section 212.7(e)(4)(v). Through this final rule, the Form I–601A and its accompanying instructions, and additional information published on the USCIS Web site, DHS also will notify such applicants that, if granted a provisional unlawful presence waiver, applicants should seek termination or dismissal of their removal proceedings. The request for termination or dismissal should be granted *before* they depart for their immigrant visa interviews to avoid possible delays in their immigrant visa processing or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility. *See* section 212.7(e)(2). Finally, DHS made conforming changes to the filing requirements in section 212.7(e)(5)(i) to include aliens who are in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A.

*9. Section 212.7(e)(4)(ix)*

For operational reasons, DHS initially proposed rejecting applications filed by aliens who had previously filed a Form I–601A provisional unlawful presence waiver application with USCIS. DHS designed the provisional unlawful presence waiver process to streamline waiver and immigrant visa processing by closely tying adjudication of the Form I–601A to the NVC's immigrant visa processing schedule. DHS considered the potential impact of multiple filings on this schedule, the possible delays to the immigrant visa process, and the potential for agency backlogs.

Many commenters, however, expressed concern with limiting the program to one-time filings could potentially exclude individuals who otherwise would qualify for the provisional unlawful presence waiver.

Upon consideration of these comments, DHS agrees that an alien could have compelling reasons for filing another provisional unlawful presence application, especially in cases where an alien's circumstances have changed

or the alien was a victim of individuals or entities not authorized to practice immigration law. For these reasons, DHS agrees that a one-time filing limitation is too restrictive and is removing the single-filing limitation in this final rule. If an individual's provisional unlawful presence waiver request is denied or withdrawn, the individual may file a new Form I–601A, in accordance with the form instructions and with the required fees. The applicant's case must still be pending with DOS, and the applicant must notify DOS that he or she intends to file a new Form I–601A. In the case of a withdrawn Form I–601A, USCIS will not refund the filing fees because USCIS has already undertaken steps to adjudicate the case.

Alternatively, an individual who withdraws his or her Form I–601A filing prior to final adjudication, or whose Form I–601A is denied, can apply for a Form I–601, Application for Waiver of Grounds of Inadmissibility with the USCIS Lockbox, after he or she attends the immigrant visa interview and after DOS conclusively determines that the individual is inadmissible. DHS, therefore, has removed this provision from the final rule.

*10. Section 212.7(e)(5)(ii)*

DHS corrected a typographical error in the prefatory language to this section, removing the term ''application'' the second time it appears in the paragraph. *See* section 212.7(e)(5)(ii).

*11. Section 212.7(e)(5)(ii)(A)*

DHS proposed a list of rejection criteria for Forms I–601A filed at the Lockbox, including the criterion to reject for failure to pay the required or correct fee for the waiver application. *See* 77 FR 19922. DHS inadvertently referenced the biometric fee as a basis for rejection in the supplementary information. *See* 77 FR 19911. DHS has modified the regulatory text to make clear that a Form I–601A will only be rejected for failure to pay the required or correct filing fee and not the biometric fee. *See* section 212.7(e)(5)(ii)(A). Individuals who have failed to pay the required or correct biometric fee will be notified of that failure. 8 CFR 103.17(b). USCIS will not process or adjudicate applications filed by individuals who do not pay the required or correct biometric fee.

*12. Section 212.7(e)(5)(ii)(G)*

DHS proposed rejecting provisional unlawful presence waiver applications filed by aliens who were already scheduled for their immigrant visa interviews with DOS. *See* 77 FR at

19921. DHS has retained this requirement. DHS now adds language to the final rule to clarify when an alien is ineligible for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview.

USCIS will first look at whether the scheduled immigrant visa interview is based on the approved immediate relative petition (I–130 or I–360) that accompanies the Form I–601A. If it is, USCIS will then look at the Department of State's Consular Consolidated Database (CCD to determine the date on which the Department of State initially acted to schedule the applicant for his or her immigrant visa interview (*i.e.,* the date of scheduling itself and not the date and time the applicant must appear for the interview).

If the date that the Department of State initially acted to schedule the immigrant visa interview is *prior to* the date of publication of this final rule, January 3, 2013, then the alien is ineligible to apply for a provisional unlawful presence waiver. If the date that Department of State initially acted to schedule the immigrant visa interview is on or *after* the publication date of this final rule, the alien is eligible to apply for a provisional unlawful presence waiver. The actual date and time that the alien is scheduled to appear for the interview is not relevant for the eligibility determination. This rule applies even if the alien failed to appear for his or her immigrant visa interview, cancelled the interview, or requested that the interview be rescheduled. Therefore, USCIS may reject or deny any Form I–601A filed by an alien if USCIS determines that the Department of State, prior to the date of publication of this final rule, initially acted to schedule an initial immigrant visa interview for the approved immediate relative petition upon which the Form I–601A is based. *See* section 212.7(e)(4)(iv).

An alien who is ineligible to apply for a provisional unlawful presence waiver because of a previously scheduled immigrant visa interview may still qualify for a provisional unlawful presence waiver if he or she has a new DOS immigrant visa case because (1) DOS terminated the immigrant visa registration associated with the previously scheduled interview, and they have a new immediate relative petition; or (2) the alien has a new immediate relative petition filed on his or her behalf by a different petitioner. *See* section 212.7(e)(5)(ii)(G).

### 13. Section 212.7(e)(9)

DHS initially proposed that aliens who were denied a provisional unlawful presence waiver could not file a new Form I–601A. Instead, such aliens would have to leave the United States for their immigrant visa interviews and file a Form I–601, Application for Waiver of Grounds of Inadmissibility, after the Department of State determined they were inadmissible. Some commenters were concerned that limiting aliens to a single filing of an I–601A would potentially bar aliens from qualifying for a provisional unlawful presence waiver, especially when they may have experienced changed circumstances that would result in extreme hardship to the U.S. citizen spouse or parent. In light of these concerns, DHS has amended this final rule to allow aliens who are denied a provisional unlawful presence waiver to file another Form I–601A, based on the original approved immigrant visa petition. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) provided the alien meets all of the requirements. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

### 14. Section 212.7(e)(10)

DHS has amended this provision to allow an applicant to withdraw a previously-filed provisional unlawful presence waiver application prior to final adjudication and file another Form I–601A. *See* section 212.7(e)(10).

### 15. Section 212.7(e)(14)(iv)

DHS clarified the language in section 212.7(e)(14)(v) to specify that a provisional unlawful presence waiver is automatically revoked if the alien, at any time before or after the approval of the provisional unlawful presence waiver, or before the immigrant visa is issued, reenters or attempts to reenter the United States without being admitted or paroled. *See* section 212.7(e)(14)(iv).

## VI. Statutory and Regulatory Requirements

### A. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of the Act requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector.

Although this rule does exceed the $100 million expenditure threshold (adjusted for inflation), this rulemaking does not contain such a mandate. The provisional unlawful presence waiver process is a voluntary program for aliens that are immediate relatives of U.S. citizens intending to become legal permanent residents. The requirements of Title II of the Act, therefore, do not apply and DHS has not prepared a statement under the Act.

### B. Small Business Regulatory Enforcement Fairness Act of 1996

DHS considers this rule a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. DHS was not able to estimate with precision the increase in demand due to this rule; therefore, we estimated costs using range scenario analysis. The final rule expanded eligibility for the provisional unlawful presence waiver process to aliens in removal proceedings whose cases have been or will be administratively closed, provided that the case has not been recalendared at the time of Form I–601A filing and that the alien is otherwise eligible. Due directly to this expansion, there is a possibility that the rule will have an impact on the economy of $100 million or more in the first year of implementation. If demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, then the total impact on the economy would be approximately $107.8 million (undiscounted), $157.8 million (undiscounted), or $187.7 million (undiscounted), respectively, in the first year. By year 2, the total impact to the economy if demand for the provisional unlawful presence waiver increases by 50 percent, 75 percent, or 90 percent, is $33.2 million (undiscounted), $45.7 million (undiscounted), or $53.1 million (undiscounted), respectively. The impact of the rule is directly associated with the increased demand in legalizing immigration status by applying for legal permanent resident status via consular processing and participating in the provisional unlawful presence waiver process. The impact includes filing fees, time, and travel costs of complying with this final rule. The costs of this final rule will fall exclusively on alien immediate relatives of U.S. citizens that reside in the United States and must request a waiver for unlawful presence. This rule will not result in a major

increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

*C. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is a "significant regulatory action" that is economically significant under section 3(f)(1) of Executive Order 12866. Accordingly, the Office of Management and Budget has reviewed this regulation. This effort is consistent with Executive Order 13563's call for agencies to "consider how best to promote retrospective analysis of rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to modify, streamline, expand, or repeal them in accordance with what has been learned."

1. Summary

The final rule will allow certain immediate relatives of U.S. citizens who are physically present in the United States to apply for a provisional unlawful presence waiver of the 3-year or 10-year bar for accrual of unlawful presence prior to departing for consular processing of their immigrant visa. This new provisional unlawful presence waiver process will be available to an alien whose only ground of inadmissibility is, or would be, the 3-year or 10-year unlawful presence bar. DHS anticipates that the changes made in this final rule will result in a reduction in the time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. In addition, the Federal Government will achieve increased efficiencies in processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar.

Since publication of the proposed provisional unlawful presence waiver

rule, DOS published an updated fee schedule for consular services which did the following with respect to this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa application fees.[18] DHS has incorporated these changes and updated data into our final analysis.

DHS estimates the discounted total ten-year cost of this rule will range from approximately $196 million to approximately $538.1 million at a seven percent discount rate. Compared with the current waiver process, this rule requires that provisional unlawful presence waiver applicants submit biometric information. Included in the total cost estimate is the cost of collecting biometrics, which we estimate will range from approximately $32.9 million to approximately $56.6 million discounted at seven percent over ten years. Also included in the total cost estimate are the costs faced by those who choose to file a new provisional unlawful presence waiver application based on the same approved immediate relative petition if their original Form I–601A is denied or withdrawn, which DHS decided to allow in response to public comments to the proposed rule. Aliens that file a new Form I–601A will still face the biometric and Form I–601A filing fees and opportunity costs, which we estimate will range from approximately $56.2 million to approximately $96.7 million discounted at seven percent over ten years. In addition, as this rule significantly streamlines the current process, DHS expects that additional applicants will apply for the provisional unlawful presence waiver compared to the current waiver process. To the extent that this rule induces new demand for immediate relative visas, additional immigration benefit forms, such as the Petitions for Alien Relative, Form I–130, will be filed compared to the pre-rule baseline. These additional forms will involve fees being paid by applicants to the Federal Government for form processing and additional opportunity costs of time being incurred by applicants to provide the information required by the forms. The cost estimate for this rule also includes the impact of this induced demand, which we estimate will range from approximately $106.9 million to approximately $384.8 million discounted at seven percent over ten years.

A key uncertainty that impacts any cost estimate of this rule is the uncertainty involving the actual number of people that will avail themselves of this streamlined provisional unlawful presence waiver process. DHS is not aware of any data that will allow us to estimate with precision the increase in demand due to this rule. In this final rule DHS has made the careful determination to expand eligible participation to aliens in removal proceedings whose cases are administratively closed and have not been recalendared at the time of filing the Form I–601A, and who are otherwise eligible for the provisional unlawful presence waiver. DHS has accounted for any potential additions to the volume estimate as a result of these changes in the final analysis. Statistics compiled by the Department of Justice (DOJ) Executive Office of Immigration Review (EOIR) indicate there have been a total of 70,276 cases that were administratively closed at the immigration courts or the Board of Immigration Appeals (BIA) where the sole charge is INA 212(a)(6)(A)(i).[19] DHS has no way of knowing precisely how many of the 70,276 cases are immediate relatives of U.S. citizens and are otherwise eligible for the provisional unlawful presence waiver, so we have applied similar range analysis to estimate the additional population surge resulting from the influx of cases previously administratively closed. In addition to this static influx that could occur with previously administratively closed cases, permitting aliens in removal proceedings whose cases are administratively closed when this rule becomes effective or administratively closed but not recalendared at the time of filing the Form I–601A could add approximately 700 to 2,500, annually, to our volume estimate. Lastly, allowing applicants the ability to re-file a Form I–601A if the initial application was denied or withdrawn will result in an increase to our volume estimates. A review of USCIS Form I–601 processing statistics indicated a denial rate of 34%. A review of USCIS completion statistics for the current I–601 waiver process did not indicate a statistical trend for withdrawals. DHS has assumed in this final analysis that the same denial rate of 34% will apply for the provisional waiver for unlawful presence application, and in an effort to present the maximum projected impact, has

---

[18] *See* 77 FR 18907.

[19] Source: Department of Justice, EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

calculated cost impacts based on the assumption that every applicant with a denied or withdrawn Form I–601A will file a new Form I–601A. For cost estimating purposes, DHS has analyzed the cost of an increase in demand of 25%, 50%, 75% and 90% compared to the existing waiver process.

Table 1 provides an estimate of the annualized cost of this rule, in 2012 dollars, at three percent and seven percent discount rates, over the range of demand increases of 25%, 50%, 75%, and 90% compared to the existing

waiver process and also qualitative benefits. The annualized cost of this rule will range from approximately $27.9 million annualized to $76.6 million (7 percent discount rate) and approximately $27.4 million to $74.6 million (3 percent discount rate).

### TABLE 1—ANNUALIZED COSTS AND BENEFITS
[2013–2022, dollar amounts expressed in millions]

| | 3% Discount rate | | | | 7% Discount rate | | | |
|---|---|---|---|---|---|---|---|---|
| | Range analysis for demand increases by: | | | | Range analysis for demand increases by: | | | |
| | 25% | 50% | 75% | 90% | 25% | 50% | 75% | 90% |
| COSTS:<br>  Annualized monetized costs .... | $27.4 | $45.5 | $63.7 | $74.6 | $27.9 | $46.6 | $65.4 | $76.6 |
| Annualized quantified, but unmonetized costs. | None | | | | None | | | |
| Qualitative (unquantified) costs | None | | | | None | | | |
| BENEFITS:<br>Annualized monetized benefits | None | | | | None | | | |
| Annualized quantified, but unmonetized benefits. | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | | This rule will reduce the amount of time that U.S. citizens are separated from their alien immediate relatives, thus reducing the financial and emotional hardship for these families. | | | |
| Qualitative (unquantified) benefits. | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | | Federal Government will achieve increased efficiencies by streamlining the processing immediate relative visas for individuals subject to the unlawful presence inadmissibility bar. | | | |

### 2. Problems Addressed by the Rule

Currently, aliens undergoing consular processing of their immediate relative visas cannot apply for an unlawful presence waiver until the consular officer determines that they are inadmissible during their immigrant visa interviews. The current unlawful presence waiver process requires these immediate relatives to remain abroad until USCIS adjudicates the waiver. DOS can only issue the immigrant visa upon notification from USCIS that the waiver has been approved. As previously mentioned, the processing time under the current waiver process can take over one year. Because of these lengthy processing times, U.S. citizens may be separated from their immediate relative family members for prolonged periods resulting in financial, emotional, and humanitarian hardships. Promoting family unification is an important objective of the immigration laws. *See Holder* v. *Martinez Gutierrez,* 132 S. Ct. 2011, 2019 (2012).

The final rule will permit certain immediate relatives to apply for a provisional unlawful presence waiver prior to departing from the United States. USCIS will adjudicate the provisional unlawful presence waiver and, if approved, provide notification to DOS so that it is available to the consular officer at the immigrant visa interview. If the consular officer

determines there are no other impediments to admissibility and that the alien is otherwise eligible for issuance of the immigrant visa, the visa can be immediately issued. DHS anticipates that this process change will significantly reduce the amount of time U.S. citizens are separated from their immediate alien relatives. In addition, the changes will streamline the immigrant visa waiver process, thereby increasing efficiencies for both USCIS and DOS in the issuance of immediate relative immigrant visas.

### 3. The Population Affected by the Rule

As explained above, only certain immediate relatives undergoing consular processing for an immigrant visa who would be inadmissible based on accrual of unlawful presence at the time of the immigrant visa interview will be eligible to apply under the proposed waiver process. Immediate relatives of U.S. citizens who are seeking adjustment of status in the United States are not affected. Immediate relatives who are eligible for adjustment of status in the United States generally include those who were admitted to the United States on nonimmigrant visas (student, tourist, etc.) or who were paroled, including those who are present in the United States after the expiration of their authorized periods of stay. In addition,

immediate relatives that self-petition, using USCIS Form I–360, as battered spouses and/or children of U.S. citizens or LPRs are able to seek adjustment of status in the United States. While all immediate relative aliens can choose to pursue consular processing if they wish, due to the financial strain and family separation inherently involved in consular processing, we have chosen to exclude aliens that are eligible to adjust status in the United States from this economic analysis.

In most instances, aliens present in the United States without having been admitted or paroled are not eligible to adjust their status and must leave the United States for immigrant visa processing at a U.S. Embassy or consulate abroad. Because these aliens are present in the United States without having been admitted or paroled, many already have accrued more than 180 days of unlawful presence and, if so, would become inadmissible under the unlawful presence bars upon their departure from the United States to attend their immigrant visa interviews. While there may be limited exceptions, the affected population would consist almost exclusively of alien immediate relatives present in the United States without having been admitted or paroled. In addition, the final rule expands eligibility to aliens in removal proceedings whose cases are

002147

administratively closed and have not been recalendared at the time of filing the Form I–601A and to aliens who are in receipt of a charging document, Notice to Appear, that has not yet been filed with the immigration courts. In both of these instances the aliens must still meet all other eligibility requirements in order to apply for the provisional unlawful presence waiver. Finally, the final rule removes the one-time filing restriction and allows aliens to file a new provisional unlawful presence waiver application on the same approved immediate relative petition if the initial Form I–601A is denied or withdrawn prior to final adjudication.

DHS does not maintain data on the number of immediate relatives present in the United States who would qualify under the unlawful presence waiver process. The DHS Office of Immigration Statistics (DHS OIS) estimates that the population of unauthorized immigrants (those present without admission or parole) residing in the United States is approximately 11.6 million as of January 2010.[20] While all persons affected by the rule are within the estimated population of 11.6 million, it is estimated that only a portion are immediate relatives of U.S. citizens who meet the criteria required for the new process.

Other estimates are equally inconclusive on the number of immediate relatives of U.S. citizens who are subject to the unlawful presence bars. For example, the Pew Hispanic Trust estimates that there are 9.0 million persons[21] living in mixed status families in the United States that include at least one unauthorized adult alien and at least one U.S.-born child. This, and associated information from the Pew Hispanic Trust, does not provide a reliable means for the calculation of how many of the individuals in these families are U.S.

citizens rather than alien immediate relatives, or the proportion of persons with unlawful presence who are the relatives of LPRs rather than U.S. citizens.[22] Nor do these data indicate how many persons within these families are under the age of 18[23] or have alternative methods of normalizing their immigration status without having to leave the United States and, consequently, are unlikely to be affected by the provisional unlawful presence waiver process.

Data from different sources cannot be reliably combined because of differences in their total estimates for different categories, the estimation and collection methodologies used, or other reasons of incompatibility. Absent information on the number of aliens who are in the United States without having been inspected and admitted or paroled and who are immediate relatives of U.S. citizens, DHS cannot reliably estimate the affected population of the rule.

### 4. Demand

DHS expects that the final rule will increase demand for both immigrant visa petitions for alien relatives and applications for waivers of inadmissibility. Existing demand is constrained by the current process that requires individuals to leave the United States and be separated for unpredictable and sometimes lengthy amounts of time from their immediate relatives in the United States in order to obtain an immigrant visa to become an LPR. Immediate relatives eligible for LPR status if issued a waiver of inadmissibility may be reluctant to avail themselves of the current process because of the length of time that they may be required to wait outside the United States before they can be admitted as LPRs.

The provisional unlawful presence waiver process will allow an immediate relative who meets the eligibility criteria to apply for a provisional unlawful presence waiver and receive a decision on that application before departing from the United States for a consular interview. This streamlined process may reduce the reluctance of aliens who may wish to obtain an immigrant visa to become an LPR but are deterred by the lengthy separation from family members

imposed by the current process and uncertainty related to the ultimate success of obtaining an approved inadmissibility waiver.

The costs associated with normalizing a qualifying immediate relative's status also may be a constraint to demand. These current costs include:[24]

1. Petition for Alien Relative, Form I–130, to establish a qualifying relationship to a U.S. citizen; cost to the petitioner of fee paid = $420.00.

2. Application for Waiver of Grounds of Inadmissibility, Form I–601, to obtain a waiver of inadmissibility for unlawful presence; cost to applicant of fee paid = $585.00.

3. Time and expense of preparing the evidence to support the ''extreme hardship'' requirements for a waiver of inadmissibility. The evidentiary requirements could include sworn statements from family members, friends and acquaintances, medical records, psychiatric/psychological records, school records, evidence of illness of family members, financial information and tax returns, letters from teachers, support letters from churches and community organizations, evidence of health and emotional problems that may result from the separation, and other such documentation; costs of evidentiary requirements are variable and based on the specific facts of individual cases.

4. Travel from the United States to the immediate relative's home country or country where the visa is being processed, and any additional travel expenses required to support two households while awaiting an immigrant visa; cost of travel to consular interview are variable and dependent upon the specific circumstances of individual cases.

5. Immigrant visa processing fees paid to: (a) The Department of State ($230), processed on the basis of a USCIS-approved I–130 petition; and b) USCIS ($165). Total cost to the applicant of fees paid = $395.00.

6. An Affidavit of Support Under Section 213A of the Act, Form I–864; cost to petitioner of fee paid = $88.00.

7. Other forms, affidavits, etc. as required for individual applications; cost are variable.

The costs listed above are not new to this rule; they are the current costs faced by aliens who are inadmissible for

---

[20] Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*, available at *http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011.pdf*. **Note:** The OIS estimate of the unauthorized population residing in the United States in January 2010 was revised from a previous OIS estimate of 10.8 million. The revised 2010 estimate of 11.6 million is derived from the 2010 American Community Survey which uses population estimates based on the 2010 Census, whereas the previously released 2010 estimate was derived from the 2000 Census. The OIS estimate of the unauthorized population residing in the United States in January 2011 was 11.5 million, a decrease of 0.87% when compared to the 2010 estimate of 11.6 million.

[21] Pew Hispanic Trust, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood* 6 (Dec. 2011), available at *http://www.pewhispanic.org/files/2011/12/Unauthorized-Characteristics.pdf*.

[22] The provisional unlawful presence waiver process will only be available to alien immediate relatives of U.S. citizens, not to alien relatives of lawful permanent residents.

[23] In the Pew Hispanic Trust report, *Unauthorized Immigrants: Length of Residency, Patterns of Parenthood*, ''families'' are defined as adults age 18 and older who live with their minor children (*i.e.*, younger than 18) and unmarried, dependent children younger than 25.

[24] Fees quoted are as of June 2012. Source for DOS fees: *http://travel.state.gov/visa/temp/types/types_1263.html#perm*. Source for USCIS fees: *http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD&vgnextchannel=b1ae408b1c4b3210VgnVCM100000b92ca60aRCRD*.

unlawful presence and must undergo consular processing for immediate relative immigrant visas.

Under the provisional unlawful presence waiver process, aliens must submit biometrics after filing the provisional unlawful presence waiver application, along with the corresponding fee (currently $85.00). Submission of biometrics to DHS is separate from the DOS immigrant visa security surcharge that recovers costs to DOS associated with providing enhanced border security. Since publication of the proposed provisional unlawful presence waiver rule, DOS published an updated fee schedule for consular services which did the following as respects this rule: (1) Reduced the immediate relative visa fee from $330 to $230; (2) increased the immigrant visa security surcharge fee from $74 to $75; and (3) discontinued charging a separate fee for the immigrant visa surcharge and instead embedded the fee in the immigrant visa

application fees.[25] The requirement to submit biometrics to DHS in order to apply for a provisional unlawful presence waiver, with the associated fee, time, and travel costs, would be a small portion of the total costs of the immigrant visa application process.

As there are no annual limitations on the number of immediate relative visas that can be issued, the increase in the annual demand for waivers would be determined by the size of the affected population and the increased propensity to apply. As previously mentioned, a potential increase in demand might be limited, as is current demand, by the costs previously noted.

With the absence of an estimate of the affected population, we have calculated an estimate for the increase in demand based on historical records and assumptions on the range of demand. Forecasts of demand based on historical volumes of immediate relatives who are seeking waivers for unlawful presence are limited, at best, due to the lack of data. Historical estimates show only

those aliens who have taken the steps to obtain an immigrant visa to become LPRs. The data are silent, however, on that population of aliens who have not initiated action to become LPRs due to current uncertainties and risks. Therefore, we recognize that the estimates provided may understate what may actually occur when this rule becomes effective.

The current level of demand, shown in Table 2, is a result of the existing constraints described previously: the possibility of lengthy separation of immediate relatives and their U.S. citizen relatives; uncertainty of the ultimate success of obtaining an approved inadmissibility waiver; and the financial constraints (costs). Because of the variability in timing between when immigrant visa petitions and waiver applications are submitted and adjudicated and the time when an immigrant visa is issued, comparisons between the totals within a single year are not meaningful.

TABLE 2—HISTORICAL IMMIGRATION DATA—FISCAL YEARS 2001 THROUGH 2010

| Fiscal year | Petitions for immediate alien relative, form I–130[26] | Immediate relative visas issued | Ineligibility finding[27] | Ineligibility overcome[28] |
|---|---|---|---|---|
| 2001 | [29]592,027 | 172,087 | 5,384 | 6,157 |
| 2002 | 321,577 | 178,142 | 2,555 | 3,534 |
| 2003 | 357,081 | 154,760 | 3,301 | 1,764 |
| 2004 | 330,514 | 151,724 | 4,836 | 2,031 |
| 2005 | 290,777 | 180,432 | 7,140 | 2,148 |
| 2006 | 309,268 | 224,187 | 13,710 | 3,264 |
| 2007 | 344,950 | 219,323 | 15,312 | 7,091 |
| 2008 | 412,297 | 238,848 | 31,069 | 16,922 |
| 2009 | 455,864 | 227,517 | 24,886 | 12,584 |
| 2010 | 471,791 | 215,947 | 22,093 | 18,826 |
| 10 year average | 388,615 | 196,297 | 13,029 | 7,432 |
| Ineligibility Findings overcome (10 year average) | n/a | n/a | n/a | 57.0% |

**Note:** Sums may not total due to rounding.
Sources: Petitions for Alien Relative, Form I–130, query of USCIS Performance Analysis System by USCIS' Office of Performance and Quality, Data Analysis and Reporting Branch. Immediate relative visas issued are from individual annual Report(s) of the Visa Office, Department of State Visa Statistics, accessible at http://travel.state.gov/visa/statistics/statistics 1476.html. Ineligibility data are also from the individual annual report(s) of the Visa Office, Department of State Visa Statistics and appears in Table XX of each annual report.

[25] See 77 FR 18907. DHS has revised the cost estimates in this final rule to reflect the updated DOS fee schedule.

[26] Numbers in this column differ from the proposed rule (77 FR 19915) as the proposed rule inadvertently used data for preference aliens. We've corrected the table to account for immediate relative petitions filed using Form I–130. We note the ten year average here of 388,615 differs by less than two percent from the ten year average of 395,919 used in the proposed rule. We recognize that immediate relative petitions also can be filed by certain aliens using the Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360. Immediate relative petitions filed for the Amerasian classification are filed for aliens that are already outside the United States so we do not believe these aliens would benefit from the provisional unlawful presence waiver requirements. Additionally, self-petitioning

battered spouses and children covered under the Violence Against Women Act (VAWA) are able to seek adjustment of status in the United States regardless of whether they have been inspected and admitted or paroled into the United States, see INA section 245(a). Moreover, self-petitioning battered spouses and children typically are exempt from accruing unlawful presence for purposes of INA section 212(a)(9)(B)(i). See INA section 212(a)(9)(B)(iii)(IV). While beneficiaries of immediate relative petitions for a widow(er) of a U.S. citizen may avail themselves of the provisional unlawful presence waiver, in the period 2001–2010, the ten-year average for these petitions was 594. For purposes of clarity in the assumptions and future calculations of impact, we have decided not to include this population in the immediate relative petition volumes given the relatively negligible

filing volumes. Note: The current filing fee for Form I–360 is $405 for a widow(er) of a U.S. citizen.

[27] Both the Ineligibility Finding and Ineligibility Overcome columns refer only to ineligibility in which the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This figure is not limited to immigrant petitioners who are immediate relatives of U.S. citizens; it also includes relatives of LPRs. Ineligibility findings were low between 2001 and 2005/2006 because many individuals were not seeking immigrant visas through the consular process overseas; instead, they adjusted to lawful permanent resident status stateside under INA section 245(i).

[28] Id. Ineligibility Findings/Ineligibility Overcome includes alien relatives who are not affected by the rule. Comparisons between the totals of Ineligibility Findings/Ineligibility Overcome within a single
Continued

**568**    **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

As is evident, each of the data sets in Table 2 demonstrates a wide variability. The estimate of future demand under the new process would be determined by the number of ineligibility findings. The data for Ineligibility Findings and Ineligibility Overcome in Table 2 refer only to ineligibility where the grounds of inadmissibility were the 3-year or the 10-year unlawful presence bar. This data, however, also includes alien relatives of LPRs (or preference aliens) who are not affected by this rule. DHS has provided the data in Table 2 to provide historical context noting that the last three years of ineligibility findings are well above the 10-year historical average. For this reason, DHS used the estimate for the future filings for waivers of inadmissibility made by the USCIS Office of Performance and Quality (OPQ), Data Analysis and Reporting Branch, as the basis for the

estimated future filings. The current OPQ estimate for future waivers of inadmissibility is approximately 24,000 per year. Currently, 80 percent (or 19,200) of all waivers of inadmissibility are filed on the basis of inadmissibility due to the unlawful presence bars.[30] This estimate is further confirmed when examining the most recent 5-year period between FY 2006–FY 2010 where the average unlawful presence ineligibility finding is approximately 21,400. In light of the recent upward trend of immediate relative visas issued and ineligibility findings presented in Table 2, OPQ's estimate of 19,200 applications for waivers of unlawful presence represents as reasonable of an approximation as possible for future demand based on available data of the current waiver process.

DHS anticipates that the changes to create a new provisional unlawful presence waiver process will encourage

immediate relatives who are unlawfully present to initiate actions to obtain an immigrant visa to become LPRs when they otherwise would be reluctant to under the current process. As confidence in the new process increases, we would expect demand to trend upward. DHS estimates were formulated based on general assumptions of the level of constraints on demand removed by the rule. DHS does not know of any available data that would enable a more precise calculation of the increases in filing propensities or an increase in the number of inadmissibility findings or the percentage of inadmissibility findings where the inadmissibility bar is overcome.

Table 3 indicates the estimate of demand under the current process. This is the baseline demand expected in the absence of the rule.

TABLE 3—BASELINE ESTIMATES OF GROWTH IN PETITIONS FOR ALIEN RELATIVES AND INELIGIBILITY FINDINGS BASED ON UNLAWFUL PRESENCE UNDER THE CURRENT PROCESS

| Fiscal year | Petitions for alien immediate relative, Form I–130[31] | Ineligibility finding[32] |
|---|---|---|
| Year 1 | 402,217 | 19,709 |
| Year 2 | 416,294 | 20,398 |
| Year 3 | 430,864 | 21,112 |
| Year 4 | 445,945 | 21,851 |
| Year 5 | 461,553 | 22,616 |
| Year 6 | 477,707 | 23,408 |
| Year 7 | 494,427 | 24,227 |
| Year 8 | 511,732 | 25,075 |
| Year 9 | 529,642 | 25,952 |
| Year 10 | 548,180 | 26,861 |
| 10 Year Totals | 4,718,560 | 231,209 |

**Note:** Sums may not total due to rounding.

Based on the data available on requests for waivers under the current process, Table 3 forecasts the number of findings of inadmissibility due to accrual of unlawful presence. The results presented in Table 3 are meant to show forecasts for future demand for waivers due to unlawful presence bars under the current process. DHS assumes that in every case where a consular officer determines inadmissibility based

on unlawful presence, the alien would apply for a waiver. Thus, Table 3 represents the baseline totals we expect in the absence of the provisional unlawful presence waiver process.

In these calculations, the petitions for an alien relative made by U.S. citizens are expected to increase annually by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years based on

reports by the DHS OIS.[33] This is an imperfect calculation, as the undocumented population has declined since its peak in 2007,[34] but because of the data association problems noted previously, DHS used the 10-year (long term) compound average growth rate.

The ineligibility findings in Table 3 are calculated using the estimate of 19,200 average annual waivers filed on the basis of unlawful presence, which

year are not meaningful because of the variability in timing between when an ineligibility finding is made and when (and if) it is overcome.

[29] The number of Petitions for Alien Relative, Form I–130, filed in 2001 is high because many filed petitions in anticipation of the INA section 245(i) sunset date, which occurred on April 30, 2001.

[30] The 80 percent estimate was calculated by USCIS based on data from all Forms I–601 completed by USCIS abroad from August 2010 to October 2011 and comparing those that listed only unlawful presence as an inadmissibility ground.

[31] The first year estimate for the baseline demand of I–130 petitions is the 10 year average of 388,615 multiplied by the 3.5 percent compound annual growth rate for the undocumented population for the previous 10 years reported in the DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011.* Subsequent years are increased at the same 3.5 percent growth rate. As a comparison, the U.S. population as a whole rose at a compound annual growth rate of 0.930 percent over the same period.

[32] Ineligibility Findings are calculated at the USCIS estimate of 0.049 per alien immediate relative petition.

[33] DHS Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011.* The 3.5 percent (rounded) compound annual growth rate is calculated from the estimated populations of unauthorized immigrants living in the United States in 2000 (8.5 million) and in 2010 (11.6 million).

[34] *Id.*

equates to 0.049 ineligibility findings for every alien relative petition based on the 10-year average. Again, these calculations are imperfect since ineligibility findings are based on immigrant visas granted for the alien relative population (both immediate relative and family preference).

DHS does not have data available that would permit an estimation of the

escalation of change in this variable. Thus, this estimate of future petitions for alien relatives and ineligibility findings is based on a range of assumptions concerning the current constraint on demand. As a result, Table 4 provides a scenario analysis utilizing estimates of various amounts of constraint on demand. For example, an

assumption that demand is currently constrained by 25 percent would mean that there would be a 25 percent increase from the baseline in the number of Form I–601A applications for each year under the new provisional unlawful presence waiver process. The findings of this range analysis are presented in Table 4.

TABLE 4—ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A ASSOCIATED WITH THE INCREASED DEMAND OF THE RULE

| Year | Expected demand for Form I–601A with current constrained demand of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 1 | 24,636 | 29,563 | 34,490 | 37,446 |
| Year 2 | 25,498 | 30,598 | 35,697 | 38,757 |
| Year 3 | 26,390 | 31,669 | 36,947 | 40,113 |
| Year 4 | 27,314 | 32,777 | 38,240 | 41,517 |
| Year 5 | 28,270 | 33,924 | 39,578 | 42,971 |
| Year 6 | 29,260 | 35,111 | 40,963 | 44,475 |
| Year 7 | 30,284 | 36,340 | 42,397 | 46,031 |
| Year 8 | 31,344 | 37,612 | 43,881 | 47,642 |
| Year 9 | 32,441 | 38,929 | 45,417 | 49,310 |
| Year 10 | 33,576 | 40,291 | 47,006 | 51,036 |
| 10-Year Totals | 289,012 | 346,814 | 404,617 | 439,298 |

**Note:** Numbers may not total due to rounding.

In response to comments on the proposed rule, DHS has made the careful determination to expand participation in the provisional unlawful presence waiver process to immediate relative aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared at the time of filing the Form I–601A. Aliens who are in removal proceedings whose cases have been or will be administratively closed are likely comprised primarily of aliens who would need to seek immigration relief via DOS consular processing. Thus, we believe that such individuals are also already accounted for in the volume estimates provided above which were based on historical filings of Form I–601 to waive the unlawful presence ground. However, to not understate the volume, we examined historical case resolution statistics of immigration proceedings provided by EOIR. Historical statistics are silent on the volume of cases that have been administratively closed and later recalendared.

Based on statistics compiled by EOIR, 66,365 cases at the immigration court level and 3,911 cases at the BIA (for a total of 70,276 cases) were administratively closed since 1992 where the sole charge is INA

212(a)(6)(A)(i).[35] DHS has no way of knowing precisely how many of the 70,276 previously administratively closed cases would be immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver. In an effort to be balanced in our estimate, it would be incorrect to assume that every removal proceeding case that was administratively closed in the past will also meet the requirements under the provisional unlawful presence waiver process. Therefore, we will provide a range analysis to estimate the proportion that would be eligible to participate over a similar range of assumptions as used in calculating induced demand. In this instance, however, we will assume that removal proceeding cases that are eligible to participate would range from 25–90 percent, where 25 percent means that 25 percent of the administratively closed cases also meet the remaining provisional unlawful presence waiver requirements. Since cases that were administratively closed in the past represent a static statistic, we only reflect this potential influx in one year of our volume projections. Thus, the addition made to the volume estimate in

Year 1 to account for estimates of additional Form I–601A filings from aliens whose removal proceedings have been be administratively closed are: 17,569 (25 percent of 70,276 cases); 35,138 (50 percent); 52,707 (75 percent); and 63,249 (90 percent).

Similarly, DHS estimated increases to the yearly volume projection in order to account for those aliens with cases that will be administratively closed and therefore eligible to apply for the provisional unlawful presence waiver, provided they meet the additional requirements. DHS examined EOIR historical case resolution statistics over the five-year period FY 2007–FY 2011 to determine an appropriate average number of cases that are administratively closed from which to base this yearly estimate on. Those findings are presented in Table 5.

TABLE 5—NUMBER OF ADMINISTRATIVELY CLOSED CASES—FISCAL YEARS 2007 THROUGH 2011 [36]

| Fiscal year | Number |
| --- | --- |
| 2007 | 7,966 |
| 2008 | 8,409 |
| 2009 | 7,885 |

---

[35] Source: EOIR, Office of Planning, Analysis, and Technology; statistics include cases completed from January 1, 1992–December 5, 2012. Data compiled on December 5, 2012.

[36] Source: Executive Office for Immigration Review Office of Planning, Analysis, and Technology FY 2011 Statistical Year Book February 2012, available at: http://www.justice.gov/eoir/statspub/fy11syb.pdf.

**570**   **Federal Register** / Vol. 78, No. 2 / Thursday, January 3, 2013 / Rules and Regulations

TABLE 5—NUMBER OF ADMINISTRA-
TIVELY CLOSED CASES—FISCAL
YEARS 2007 THROUGH 2011 [36]—
Continued

| Fiscal year | Number |
|---|---|
| 2010 ............................................ | 8,939 |
| 2011 ............................................ | 6,337 |
| 5-yr Average ............................... | 7,907 |

In examining the data over the five-year span (presented in Table 5), there is no obvious upward or downward trend, so for the purpose of simplifying, DHS assumes no growth in this statistic. Over the 20-year period of analysis of EOIR's statistics of administratively closed cases, DHS determined that 35% of all administratively closed cases were those where the sole charge is unlawful presence.[37] Assuming this proportion will continue to hold, we estimate that EOIR would administratively close 2,768 cases per year where the sole charge is unlawful presence.[38] Again, DHS has no way of knowing precisely how many of the 2,768 estimated unlawful presence administratively closed cases will be aliens who are immediate relatives of U.S. citizens and otherwise eligible for the provisional unlawful presence waiver process. Applying the same range analysis based on participation rates, DHS has made the following yearly additions to the volume estimate of additional Form I–601A filings to account for those aliens whose removal proceedings have been or will be administratively closed: 692 (25 percent of 5-year average 2,768); 1,384 (50 percent); 2,076 (75 percent); and 2,492 (90 percent). The final estimate for future filings of the provisional unlawful presence waiver considers both induced demand relative to the current process and the participation rate of aliens in removal proceedings whose cases have been or will be administratively closed. This final estimate is presented in Table 6.

TABLE 6—FINAL ESTIMATES OF INADMISSIBILITY FINDINGS REQUIRING AN UNLAWFUL PRESENCE WAIVER, FORM I–601A

[Table 4 plus an adjustment for aliens in removal proceedings whose cases have been or will be administratively closed and have not been recalendared]

| Year | Expected demand for Form I–601A with current constrained demand or participation rate of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 ............................................................................ | 42,897 | 66,085 | 89,274 | 103,188 |
| Year 2 ............................................................................ | 26,191 | 31,982 | 37,774 | 41,249 |
| Year 3 ............................................................................ | 27,083 | 33,053 | 39,023 | 42,606 |
| Year 4 ............................................................................ | 28,007 | 34,161 | 40,316 | 44,010 |
| Year 5 ............................................................................ | 28,963 | 35,309 | 41,655 | 45,463 |
| Year 6 ............................................................................ | 29,952 | 36,496 | 43,040 | 46,967 |
| Year 7 ............................................................................ | 30,976 | 37,725 | 44,474 | 48,524 |
| Year 8 ............................................................................ | 32,036 | 38,997 | 45,957 | 50,135 |
| Year 9 ............................................................................ | 33,133 | 40,313 | 47,493 | 51,802 |
| Year 10 .......................................................................... | 34,269 | 41,676 | 49,083 | 53,528 |
| 10-Year Totals ............................................................... | 313,501 | 395,793 | 478,084 | 527,467 |

**Note:** Numbers may not total due to rounding.

Table 7 is the expected marginal increase in inadmissibility waiver initial applications due to the final rule implementing the provisional unlawful presence waiver process. These estimates are obtained by subtracting the baseline estimates in Table 3 (without the rule) from the estimates when the rule becomes effective in Table 6.

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
| --- | --- | --- | --- | --- |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 ............................................................................ | 23,189 | 46,377 | 69,565 | 83,479 |
| Year 2 ............................................................................ | 5,792 | 11,584 | 17,375 | 20,851 |
| Year 3 ............................................................................ | 5,971 | 11,941 | 17,911 | 21,494 |
| Year 4 ............................................................................ | 6,155 | 12,310 | 18,465 | 22,159 |
| Year 5 ............................................................................ | 6,347 | 12,693 | 19,039 | 22,847 |
| Year 6 ............................................................................ | 6,544 | 13,088 | 19,632 | 23,559 |

[37] Statistic calculated by DHS based on EOIR statistics on administratively closed cases from January 1, 1992–December 5, 2012. According to the EOIR report, there were a total of 189,566 aliens whose cases have been administratively closed at immigration court. Of those, a total of 66,365 cases were administratively closed at the immigration court where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 66,365/189,566 = 0.3501 or 35% (rounded)] Similarly, there were a total of 11,279 aliens whose cases have been administratively closed at the BIA. Of those, a total of 3,911 cases were administratively closed at the BIA where the sole charge is INA 212(a)(06)(A)(i). [Calculation: 3,911/11,279 = 0.3468 or 35% (rounded)].

[38] Calculation: 35% of the 5-year average of administratively closed cases (7,907) = 2,768 (rounded).

[39] The increased ineligibility findings in Table 6 are the difference in ineligibility findings from the different assumptions of the level of constrained demand or participation rate (as respects those in removal proceedings whose cases have been administratively closed) in Table 5 and the baseline ineligibility findings shown in Table 2.

TABLE 7—FINAL ESTIMATES OF THE ADDITIONAL INELIGIBILITY FINDINGS REQUIRING AN INADMISSIBILITY WAIVER UNDER THE RULE (INDUCED DEMAND) [39]—Continued

[Table 6 minus Table 3]

| Year | Additional ineligibility findings requiring an inadmissibility waiver with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 7 ................................................................. | 6,749 | 13,498 | 20,247 | 24,297 |
| Year 8 ................................................................. | 6,961 | 13,922 | 20,883 | 25,060 |
| Year 9 ................................................................. | 7,181 | 14,361 | 21,541 | 25,850 |
| Year 10 ................................................................ | 7,408 | 14,815 | 22,222 | 26,667 |
| 10 Year Totals ................................................... | 82,292 | 164,583 | 246,875 | 296,258 |

**Note:** Numbers may not total due to rounding.

Lastly, in response to public comments on the proposed rule, DHS has made the decision to not reject provisional unlawful presence waiver applications from aliens who previously submitted a Form I–601A application that either was denied or withdrawn. This means that an alien can file a new provisional unlawful presence waiver application on the basis of the original approved immediate relative petition. DHS has examined USCIS I–601 processing data over the 5-year period, FY 2007–2011. The average denial rate over that 5-year period is 34%.[40]

Internal USCIS review of I–601 historical application data indicated that withdrawals of Form I–601s were not a significant occurrence. At this time, DHS is unable to project a trend associated with the frequency of cases that are denied or withdrawn and later the alien chooses to re-file a waiver application. In an effort to present the maximum volume projection of I–601A re-filers, we have made the following assumptions: (1) The five-year denial rate of 34% calculated for Form I–601s will hold for Form I–601As; and (2) for every I–601A that is denied, we assume

that the alien will file an additional I–601A. We believe that showing the maximum volume projections under those assumptions will sufficiently account for those cases that are withdrawn. The volume projection of I–601A re-filers is shown in Table 8, and is based on a 34% denial rate for all initial filings presented in Table 6. We have chosen to present the re-filing volume projections separately because re-filers would be able to base the re-filed application on the initial immediate relative petition.

TABLE 8—FINAL ESTIMATES OF DENIED OR WITHDRAWN PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATIONS WHERE AN ALIEN WOULD RE-FILE A NEW FORM I–601A

[Assumes that 34% of all initial applications in Table 6 will be denied or withdrawn]

| Year | Estimate of denied or withdrawn applications requiring a re-filed Form I–601A assuming the same demand and participation rates of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 ................................................................. | 14,585 | 22,469 | 30,354 | 35,084 |
| Year 2 ................................................................. | 8,905 | 10,874 | 12,844 | 14,025 |
| Year 3 ................................................................. | 9,209 | 11,239 | 13,268 | 14,487 |
| Year 4 ................................................................. | 9,523 | 11,615 | 13,708 | 14,964 |
| Year 5 ................................................................. | 9,848 | 12,006 | 14,163 | 15,458 |
| Year 6 ................................................................. | 10,184 | 12,409 | 14,634 | 15,969 |
| Year 7 ................................................................. | 10,532 | 12,827 | 15,122 | 16,499 |
| Year 8 ................................................................. | 10,893 | 13,259 | 15,626 | 17,046 |
| Year 9 ................................................................. | 11,266 | 13,707 | 16,148 | 17,613 |
| Year 10 ................................................................ | 11,652 | 14,170 | 16,689 | 18,200 |
| 10-Year Totals .................................................... | 106,593 | 134,571 | 162,551 | 179,341 |

**Note:** Numbers may not total due to rounding.

### 5. Costs

The final rule will require provisional unlawful presence waiver applicants to submit biometrics to USCIS. This is the only new cost applicants will incur under the provisional unlawful presence waiver process in comparison to the current waiver process. The other

costs of the rule emanate from the increase in the demand created by the provisional unlawful presence waiver process. These other costs include the fees and preparation costs for forms prepared by individuals who we believe take the initiative to normalize their immigration status where they

otherwise would not due to existing constraints previously described under the current I–601 waiver process.

For the biometric collection, the immediate relative alien will incur the following costs associated with submitting biometrics with an application for the provisional unlawful

---

[40] Source: USCIS Office of Performance and Quality, Data Analysis and Reporting Branch.

Query of CIS Consolidated Operational Repository

for I–601 receipts, approval and denials for FY 2007—2011; report created December 8, 2011.

presence waiver: the required USCIS fee and the opportunity and mileage costs of traveling to a USCIS ASC to have the biometric recorded.

The current USCIS fee for collecting and processing biometrics is $85.00. In addition, DHS estimates the opportunity costs for travel to an ASC in order to have the biometric recorded based on the cost of travel (time and mileage) plus the average wait time to have the biometric collected. While travel times and distances will vary, DHS estimates that the average round-trip distance to an ASC will be 50 miles, and that the average time for that trip will be 2.5 hours. DHS estimates that an alien will wait an average of one hour for service and to have biometrics collected.

DHS recognizes that the individuals impacted by the rule are unlawfully present and are generally not eligible to work; however, consistent with other DHS rulemakings, we use wage rates as a mechanism to estimate the opportunity or time valuation costs associated with the required biometric collection. The Federal minimum wage is currently $7.25 per hour.[41] In order to anticipate the full opportunity cost of providing biometrics, DHS multiplied the minimum hourly wage rate by 1.44 to account for the full cost of employee benefits such as paid leave, insurance, and retirement, which equals $10.44 per hour.[42] In addition, the cost of travel includes a mileage charge based on the estimated 50 mile round trip at the General Services Administration rate of $0.555 per mile, which equals $27.75 for each applicant.[43]

Using an opportunity cost of time of $10.44 per hour and the 3.5 hour estimated time for travel and service and the mileage charge of $27.75, DHS estimates the cost per provisional unlawful presence waiver applicant to be $64.29 for travel to and service at the ASC.[44] When the $85.00 biometric fee is added, the total estimated additional cost per provisional unlawful presence waiver over the current waiver process is $149.29. All other fees charged by USCIS and DOS to apply for immediate relative visas remain the same under the current and provisional unlawful presence waiver processes.[45]

The incremental costs of the biometric requirement of the rule are computed as the $149.29 cost per provisional unlawful presence waiver multiplied by the total number of applicants for provisional unlawful presence waivers applying after the final rule is effective. This population is represented in Table 6. The incremental costs of the additional biometric requirement are shown in Table 9.

TABLE 9—COSTS OF BIOMETRIC REQUIREMENT TO IMMEDIATE RELATIVES FILING A PROVISIONAL UNLAWFUL PRESENCE WAIVER APPLICATION

[Table 6 multiplied by $149.29]

| Year | Additional inadmissibility waiver application fees with current constrained demand or participation rate of | | | |
|---|---|---|---|---|
| | 25 percent | 50 percent | 75 percent | 90 percent |
| Year 1 | $6,404,093 | $9,865,830 | $13,327,715 | $15,404,937 |
| Year 2 | 3,910,054 | 4,774,593 | 5,639,280 | 6,158,063 |
| Year 3 | 4,043,221 | 4,934,482 | 5,825,744 | 6,360,650 |
| Year 4 | 4,181,165 | 5,099,896 | 6,018,776 | 6,570,253 |
| Year 5 | 4,323,886 | 5,271,281 | 6,218,675 | 6,787,171 |
| Year 6 | 4,471,534 | 5,448,488 | 6,425,442 | 7,011,703 |
| Year 7 | 4,624,407 | 5,631,965 | 6,639,523 | 7,244,148 |
| Year 8 | 4,782,654 | 5,821,862 | 6,860,921 | 7,484,654 |
| Year 9 | 4,946,426 | 6,018,328 | 7,090,230 | 7,733,521 |
| Year 10 | 5,116,019 | 6,221,810 | 7,327,601 | 7,991,195 |
| 10-Year Totals Undiscounted | 46,803,460 | 59,088,534 | 71,373,907 | 78,746,295 |
| 10-Year Totals Discounted at 7.0 percent | 32,907,683 | 42,030,423 | 51,153,460 | 56,628,050 |
| 10-Year Totals Discounted at 3.0 percent | 39,926,220 | 50,653,297 | 61,380,675 | 67,818,069 |

**Note:** Numbers may not total due to rounding.

In addition to the costs of the biometric requirement, DHS expects that the rule will induce an increase in demand for immediate relative visas, which will generate new fees paid to the USCIS and DOS. As the only new requirement imposed by this rule on provisional unlawful presence waiver applicants compared with the current waiver process is biometrics, fees collected for filing forms that are already required (such as the Form I– 130) are not costs of this rule. The new fee revenue, however, is that generated by the additional demand shown in Table 7, and from transfers made by applicants to USCIS and DOS to cover the cost of processing the forms. In addition to the fees, there are nominal preparation costs associated with completing the forms. We estimate the amount of these fees and their associated preparation costs to give a more complete estimate of the impact of this rule. We consider the fee values to be a reasonable proxy for the underlying costs of this rule. The additional fees and preparation costs are shown in Table 10.

In determining the preparation cost for the forms, different labor rates were used depending on the citizenship status of the petitioner. If the form is completed by the alien immediate relative (Form I–601A), the loaded minimum wage of $10.44 per hour was used. If the form is completed by a U.S.

---

[41] U.S. Dep't of Labor, Wage and Hour Division. The minimum wage in effect as of July 24, 2009, available at: *http://www.dol.gov/dol/topic/wages/minimumwage.htm*.

[42] U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release, Table 1. Employer costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group, Dec. 2011, available at *http://www.bls.gov/news.release/archives/ecec_03142012.htm*.

[43] *See* 77 FR 22786.

[44] ($10.44 per hour × 3.5 hours) + ($0.555 per mile × 50 miles) = $64.29.

[45] The Application for a Provisional Waiver of Inadmissibility, Form I–601A, will carry the same USCIS fee as Form I–601.

citizen, we used the mean hourly wage for ''all occupations'' as reported by the Bureau of Labor Statistics and then adjusted that wage upward to account for the costs of employee benefits, such as annual leave, for a fully loaded hourly wage rate of $31.31.[46] The times to complete the forms are based on the estimated burden time reported for the individual forms.

These costs and appropriate fees paid to USCIS and DOS are calculated by the formula:

1. Cost of Form I–130: Preparation cost = ($31.31 × 1.5 hours) = $46.97; USCIS fee to cover processing cost = $420.00. Total cost = $466.97

2. Cost of Form I–601A: Preparation cost = ($10.44 × 1.5 hours) = $15.66; USCIS fee to cover processing costs = $585.00. Total cost = $600.66

3. Cost of Form I–864: Preparation cost = ($31.31 × 6.0 hours) = $187.86; DOS fee to cover processing costs = $88.00. Total cost = $275.86

4. Cost of Immigrant Visa: Preparation cost of Form DS–230 = ($10.44 × 1.0 hour) = $10.44; Processing Fees: DOS fee to cover processing costs = $230; USCIS fee to cover processing costs = $165. Total cost = $405.44.

Based on the above, the total costs per application: ($466.97 + 600.66 + 275.86 + 405.44) = $1,748.93.

TABLE 10—COSTS FOR PREPARING AND FILING USCIS AND DOS FORMS

[Table 7 multiplied by $1,748.93]

| Year | Additional preparation costs and filing fees with current constrained demand or participation rate of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
|---|---|---|---|---|
| Year 1 ............ | $40,555,938 | $81,110,127 | $121,664,315 | $145,998,927 |
| Year 2 ............ | 10,129,803 | 20,259,605 | 30,387,659 | 36,466,939 |
| Year 3 ............ | 10,442,861 | 20,883,913 | 31,325,085 | 37,591,501 |
| Year 4 ............ | 10,764,664 | 21,529,328 | 32,293,992 | 38,754,540 |
| Year 5 ............ | 11,100,459 | 22,199,168 | 33,297,878 | 39,957,804 |
| Year 6 ............ | 11,444,998 | 22,889,996 | 34,334,994 | 41,203,042 |
| Year 7 ............ | 11,803,529 | 23,607,057 | 35,410,586 | 42,493,752 |
| Year 8 ............ | 12,174,302 | 24,348,603 | 36,522,905 | 43,828,186 |
| Year 9 ............ | 12,559,066 | 25,116,384 | 37,673,701 | 45,209,841 |
| Year 10 .......... | 12,956,073 | 25,910,398 | 38,864,722 | 46,638,716 |
| 10 Year Totals Undiscounted ................................................ | 143,931,692 | 287,854,640 | 431,775,838 | 518,143,249 |
| 10 Year Totals Discounted at 7.0 percent ........................... | 106,881,772 | 213,757,395 | 320,631,489 | 384,766,730 |
| 10 Year Totals Discounted at 3.0 percent ........................... | 125,678,197 | 251,348,945 | 377,018,045 | 452,432,274 |

**Note:** Sums may not total due to rounding.

The totals in Table 10 are calculated by multiplying the induced demand shown in Table 7 by the $1,748.93 shown above. DHS acknowledges there are additional costs to the existing process, such as travel from the United States to the immediate relative's home country where the immigrant visa is being processed and the additional expense of supporting two households while awaiting an immigrant visa. Such costs are highly variable and depend on the circumstances of the specific petitioner. We did not estimate the impacts of these variable costs. To the

extent that this rule allows immediate relatives to reduce the time spent in their home country, we expect a proportionate reduction in these costs. These cost savings represent a benefit of this rule.

In addition, the final rule has removed the limitation that allowed aliens to file only one Form I–601A on the basis of an approved immediate relative petition. In response to public comment, DHS will allow an alien to file a new Form I–601A based on the same approved immediate relative petition if the initial Form I–601A is

denied or withdrawn. If an alien chooses to file a new provisional unlawful presence waiver application, the alien would face the biometric costs (including biometric fees and travel to the ASC to submit biometrics) and the fee and preparation costs associated with Form I–601A. As previously established, the biometric costs are $149.29 and the Form I–601A costs are $600.66 per applicant. The total costs associated with the estimated population volume are presented in Table 11.

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
|---|---|---|---|---|
| Year 1 ............................................................................... | $10,938,021 | $16,850,627 | $22,763,982 | $26,311,246 |
| Year 2 ............................................................................... | 6,678,305 | 8,154,956 | 9,632,358 | 10,518,049 |
| Year 3 ............................................................................... | 6,906,290 | 8,428,688 | 9,950,337 | 10,864,526 |

---

[46] The $31.31 rate is calculated by multiplying the $21.74 average hourly wage for all occupations May

2011 (available at *http://www.bls.gov/oes/2011/ may/oes_nat.htm*) by the 1.44 fully loaded multiplier.

TABLE 11—COSTS ASSOCIATED WITH APPLICANTS THAT RE-FILE FORM I–601A AFTER THE INITIAL FORM I–601A IS DENIED OR WITHDRAWN—Continued

[Table 8 multiplied by $749.95]

| Year | Additional costs for applications that are denied and re-filed over the range analysis of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 4 | 7,141,774 | 8,710,669 | 10,280,315 | 11,222,252 |
| Year 5 | 7,385,508 | 9,003,900 | 10,621,542 | 11,592,727 |
| Year 6 | 7,637,491 | 9,306,130 | 10,974,768 | 11,975,952 |
| Year 7 | 7,898,473 | 9,619,609 | 11,340,744 | 12,373,425 |
| Year 8 | 8,169,205 | 9,943,587 | 11,718,719 | 12,783,648 |
| Year 9 | 8,448,937 | 10,279,565 | 12,110,193 | 13,208,869 |
| Year 10 | 8,738,417 | 10,626,792 | 12,515,916 | 13,649,090 |
| 10-Year Totals Undiscounted | 79,942,420 | 100,924,521 | 121,908,872 | 134,499,783 |
| 10-Year Totals Discounted at 7.0 percent | 56,207,656 | 71,788,866 | 87,371,675 | 96,721,450 |
| 10-Year Totals Discounted at 3.0 percent | 68,195,707 | 86,516,943 | 104,840,098 | 115,834,193 |

**Note:** Sums may not total due to rounding.

The total cost to applicants is shown in Table 12 as the sum of Table 9, Table 10, and Table 11.

TABLE 12—TOTAL COSTS TO APPLICANTS OF THE FINAL RULE

[Sum of Tables 9–11]

| Year | Estimated total cost at current constrained demand or participation rate of | | | |
| | 25 percent | 50 percent | 75 percent | 90 percent |
| --- | --- | --- | --- | --- |
| Year 1 | $57,898,052 | $107,826,583 | $157,756,013 | $187,715,110 |
| Year 2 | 20,718,162 | 33,189,154 | 45,659,297 | 53,143,051 |
| Year 3 | 21,392,372 | 34,247,144 | 47,101,166 | 54,816,677 |
| Year 4 | 22,087,603 | 35,339,893 | 48,593,083 | 56,547,045 |
| Year 5 | 22,809,853 | 36,474,349 | 50,138,095 | 58,337,702 |
| Year 6 | 23,554,023 | 37,644,613 | 51,735,204 | 60,190,697 |
| Year 7 | 24,326,409 | 38,858,631 | 53,390,853 | 62,111,325 |
| Year 8 | 25,126,162 | 40,114,053 | 55,102,544 | 64,096,488 |
| Year 9 | 25,954,429 | 41,414,276 | 56,874,124 | 66,152,230 |
| Year 10 | 26,810,510 | 42,758,999 | 58,708,239 | 68,279,001 |
| 10 Year Totals Undiscounted | 270,677,572 | 447,867,695 | 625,058,617 | 731,389,326 |
| 10 Year Totals Discounted at 7.0 percent | 195,997,110 | 327,576,683 | 459,156,625 | 538,116,229 |
| 10 Year Totals Discounted at 3.0 percent | 233,800,123 | 388,519,186 | 543,238,818 | 636,084,535 |

**Note:** Sums may not total due to rounding.

Costs to the Federal Government include the possible costs of additional adjudication personnel associated with increased volume and the associated equipment (computers, telephones) and occupancy costs (if additional space is required). However, we expect these costs to be offset by the additional fee revenue collected for form processing. As previously explained, DHS has adopted the current cost for adjudicating an Application for Waiver of Ground of Inadmissibility, Form I–601($585), as the initial filing fee that will be required for the Form I–601A. DHS will consider the impact of the provisional unlawful presence waiver

process workflow and resource requirements as a normal part of its biennial fee review. The biennial fee review determines if fees for immigration benefits are sufficient in light of resource needs and filing trends. Consequently, we do not believe that this rule will impose additional costs on the Federal Government.

6. Benefits

The benefits of the rule are the result of streamlining the immigrant visa waiver process. The primary benefits of the provisional unlawful presence waiver process changes are qualitative and result from reduced separation time

for U.S. citizens and their immediate relatives. In addition to the obvious humanitarian and emotional benefits derived from family reunification, we also anticipate significant financial benefits accruing to the U.S. citizen due to the shortened period he or she would have to financially support the alien relative abroad. DHS is currently unable to estimate the average duration of time an immediate relative must spend abroad while awaiting waiver adjudication under the current process, and so cannot predict how the time spent apart would be reduced under the provisional unlawful presence waiver process. As a result of streamlining the

002156

unlawful presence waiver process, there also could be workflow efficiencies realized by both USCIS and DOS. The new process will enable USCIS to process and adjudicate the provisional unlawful presence waivers domestically. As a result, USCIS may be able to move a large part of its workload to Service Centers or field offices with resources that are less expensive than overseas staffing resources and that are flexible enough to accommodate filing surges. In addition, the new provisional unlawful presence waiver process will allow DOS to review these cases once, as opposed to the current unlawful presence process where these cases are reviewed twice, at a minimum. DHS anticipates that the new process will make the immigrant visa process more efficient.

### D. Executive Order 13132

This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### E. Executive Order 12988 Civil Justice Reform

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

### F. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. *See* Public Law 104–13, 109 Stat. 163 (May 22, 1995). This final rule requires that an applicant requesting a provisional unlawful presence waiver complete an *Application for Provisional Waiver of Unlawful Presence,* Form I–601A. This form is considered new information collection and is covered under the PRA. USCIS is currently seeking

approval of this newly created instrument from OMB.

DHS submitted Form I–601A to OMB for review. OMB temporarily assigned an OMB Control Number, 1615–0123, to the form and also filed comments in accordance with 5 CFR 1320.11(c). DHS has considered the comments received in response to the publication of the proposed rule and the comments submitted by OMB concerning the creation of the Form I–601A. DHS' response to the comments appears in this final rule and in an appendix to the supporting statement that accompanies this rule. USCIS has submitted the supporting statement to OMB as part of its request for approval of this new information collection instrument.

On April 2, 2012, DHS published a proposed rule, *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* in the **Federal Register** at 77 FR 19902. In the PRA section of that rule, DHS inadvertently indicated that USCIS would be seeking to revise a currently approved information collection instrument. DHS, however, should have indicated that it would be requesting the approval of a new information collection instrument, *Application for Provisional Unlawful Presence Waiver,* Form I–601A. This final rule corrects that error.

Despite the inadvertent error in the notice inserted in the PRA portion of the proposed rule, DHS clearly communicated to the public, in other parts of the proposed rule, that it was considering the creation of a new information collection instrument, Form I–601A, to be able to collect information required from certain immediate relatives of U.S. citizens seeking a provisional unlawful presence waiver of the unlawful presence inadmissibility ground. USCIS received comments from the public on the proposed Form I–601A. Those comments have been addressed under part IV (Public Comments on Proposed Rule).

Lastly, DHS has updated the supporting statement to reflect a change in the estimate for the number of respondents that USCIS projected would submit this type of request from 38,277 respondents to 62,348 respondents. This change of the initially projected estimate is due to the final rule's expansion of the eligibility criterion initially proposed, which results in an increase of the estimated population of aliens that DHS expects could file Form I–601A. With the increase in the total number of respondents, DHS has increased the total annual burden hours to 166,469 hours. In addition, DHS has revised the

originally proposed form I–601A and its instructions to include the changes as discussed in Part IV (Public Comments on the Proposed Rule) and the appendix of the supporting statement. The revised materials can be viewed at *www.regulations.gov.*

### G. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

DHS has reviewed this regulation in accordance with the Regulatory Flexibility Act and certifies that this rule will not have a significant economic impact on a substantial number of small entities. The factual basis for this determination is that this rule directly regulates individuals who are the immediate relatives of U.S. citizens seeking to apply for an unlawful presence waiver of inadmissibility in order to be eligible to obtain an immigrant visa outside the United States. The impact is on these persons as individuals, so that they are not, for purposes of the Regulatory Flexibility Act, within the definition of small entities established by 5 U.S.C. 601(6). DHS received no public comments challenging this certification.

## VII. Amendments

### List of Subjects

#### 8 CFR Part 103

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information; Privacy, Reporting and recordkeeping requirements, Surety bonds.

#### 8 CFR Part 212

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

Accordingly, USCIS amends chapter I of title 8 of the Code of Federal Regulations as follows.

## PART 103—POWERS AND DUTIES; AVAILABILITY OF RECORDS

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1365b; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 1 *et seq.*); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p.166; 8 CFR part 2.

■ 2. Section 103.7 is amended by revising paragraphs (b)(1)(i)(AA) and (c)(3)(i) to read as follows:

### § 103.7   Fees.

\*   \*   \*   \*   \*

(b) \*  \*  \*
(1) \*  \*  \*
(i) \*  \*  \*

(AA) *Application for Waiver of Ground of Inadmissibility (Form I–601) and Application for Provisional Unlawful Presence Waiver (I–601A).* For filing an application for waiver of grounds of inadmissibility or an application for a provisional unlawful presence waiver: $585.

\*   \*   \*   \*   \*

(c) \*  \*  \*
(3) \*  \*  \*

(i) Biometric Fee, except for the biometric fee required for provisional unlawful presence waivers filed under 8 CFR 212.7(e).

\*   \*   \*   \*   \*

## PART 212—DOCUMENTARY REQUIREMENTS; NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 3. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 U.S.C. 1185 note (section 7209 of Pub. L. 108–458); 8 CFR part 2. Section 212.1(q) also issued under section 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 4. Section 212.7 is amended by:
■ a. Revising paragraphs (a)(1), (a)(3), and (a)(4); and
■ b. Adding paragraph (e).
The revisions and addition read as follows:

### § 212.7   Waivers of certain grounds of inadmissibility.

(a)(1) *Application.* Except as provided by 8 CFR 212.7(e), an applicant for an immigrant visa, adjustment of status, or a K or V nonimmigrant visa who is inadmissible under any provision of section 212(a) of the Act for which a waiver is available under section 212 of the Act may apply for the related waiver by filing the form designated by USCIS, with the fee prescribed in 8 CFR

103.7(b)(1), and in accordance with the form instructions. Certain immigrants may apply for a provisional unlawful presence waiver of inadmissibility as specified in 8 CFR 212.7(e).

\*   \*   \*   \*   \*

(3) *Decision.* If the waiver application is denied, USCIS will provide a written decision and notify the applicant and his or her attorney or accredited representative and will advise the applicant of appeal procedures, if any, in accordance with 8 CFR 103.3. The denial of a provisional unlawful presence waiver is governed by 8 CFR 212.7(e).

(4) *Validity.* (i) A provisional unlawful presence waiver granted according to paragraph (e) of this section is valid subject to the terms and conditions as specified in paragraph (e) of this section. In any other case, approval of an immigrant waiver of inadmissibility under this section applies only to the grounds of inadmissibility, and the related crimes, events, or incidents that are specified in the application for waiver.

(ii) Except for K–1 and K–2 nonimmigrants and aliens lawfully admitted for permanent residence on a conditional basis, an immigrant waiver of inadmissibility is valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status.

(iii) For a K–1 or K–2 nonimmigrant, approval of the waiver is conditioned on the K–1 nonimmigrant marrying the petitioner; if the K–1 nonimmigrant marries the K nonimmigrant petitioner, the waiver becomes valid indefinitely, subject to paragraph (a)(4)(iv) of this section, even if the applicant later abandons or otherwise loses lawful permanent resident status. If the K–1 does not marry the K nonimmigrant petitioner, the K–1 and K–2 nonimmigrants remain inadmissible for purposes of any application for a benefit on any basis other than the proposed marriage between the K–1 and the K nonimmigrant petitioner.

(iv) For an alien lawfully admitted for permanent residence on a conditional basis under section 216 of the Act, removal of the conditions on the alien's status renders the waiver valid indefinitely, even if the applicant later abandons or otherwise loses lawful permanent resident status. Termination of the alien's status as an alien lawfully admitted for permanent residence on a conditional basis also terminates the validity of a waiver of inadmissibility based on sections 212(h) or 212(i) of the Act that was granted to the alien. Separate notification of the termination

of the waiver is not required when an alien is notified of the termination of residence under section 216 of the Act, and no appeal will lie from the decision to terminate the waiver on this basis. If the alien challenges the termination in removal proceedings, and the removal proceedings end in the restoration of the alien's status, the waiver will become effective again.

(v) Nothing in this subsection precludes USCIS from reopening and reconsidering a decision if the decision is determined to have been made in error.

\*   \*   \*   \*   \*

(e) *Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives.* The provisions of this paragraph (e) are applicable to certain aliens who are pursuing consular immigrant visa processing as an immediate relative of a U.S. citizen.

(1) *Jurisdiction.* All applications for a provisional unlawful presence waiver, including an application for a provisional unlawful presence waiver made by an alien in removal proceedings before the Executive Office for Immigration Review, must be filed with USCIS, with the fees prescribed in 8 CFR 103.7(b), and in accordance with the form instructions.

(2) *Provisional Unlawful Presence Waiver; In General.* (i) USCIS may adjudicate applications for a provisional unlawful presence waiver of inadmissibility based on section 212(a)(9)(B)(v) of the Act filed by eligible aliens described in paragraph (e)(3) of this section. USCIS will only approve such provisional unlawful presence waiver applications in accordance with the conditions outlined in paragraph (e) of this section. Consistent with section 212(a)(9)(B)(v) of the Act, the decision whether to approve a provisional unlawful presence waiver application is discretionary and does not constitute a grant of a lawful immigration status or a period of stay authorized by the Secretary.

(ii) A pending or an approved provisional unlawful presence waiver does not authorize any interim immigration benefits such as employment authorization or advance parole. Any application for a travel document or request for employment authorization that is submitted in connection with a provisional unlawful presence waiver application will be rejected.

(3) *Eligible aliens.* Except as provided in paragraph (e)(4) of this section, an alien may be eligible to apply for and receive a provisional unlawful presence

waiver for the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act if he or she meets the requirements in this paragraph. An alien may be eligible to apply for or receive a waiver if he or she:

(i) Is present in the United States at the time of filing the application for a provisional unlawful presence waiver, and for biometrics collection at a USCIS ASC;

(ii) Upon departure, would be inadmissible only under section 212(a)(9)(B)(i) of the Act at the time of the immigrant visa interview;

(iii) Qualifies as an immediate relative under section 201(b)(2)(A)(i) of the Act;

(iv) Is the beneficiary of an approved immediate relative petition;

(v) Has a case pending with the Department of State based on the approved immediate relative petition and has paid the immigrant visa processing fee as evidenced by a State Department Visa Processing Fee Receipt;

(vi) Will depart from the United States to obtain the immediate relative immigrant visa; and

(vii) Meets the requirements for a waiver provided in section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent.

(4) *Ineligible Aliens.* Notwithstanding paragraph (e)(3) of this section, an alien is ineligible for a provisional unlawful presence waiver under paragraph (e) of this section if:

(i) USCIS has reason to believe that the alien may be subject to grounds of inadmissibility other than unlawful presence under section 212(a)(9)(B)(i)(I) or (II) of the Act at the time of the immigrant visa interview with the Department of State;

(ii) The alien is under the age of 17;

(iii) The alien does not have a case pending with the Department of State, based on the approved immediate relative petition, and has not paid the immigrant visa processing fee;

(iv) The Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013 for the approved immediate relative petition on which the provisional unlawful presence waiver is based, even if the interview has since been cancelled or rescheduled *after* January 3, 2013;

(v) The alien is in removal proceedings, unless the removal proceedings are administratively closed and have not been recalendared at the time of filing the Form I–601A;

(vi) The alien is subject to a final order of removal issued under section 217, 235, 238, or 240 of the Act or a

final order of exclusion or deportation under former 236 or 242 of the Act (pre-April 1, 1997), or any other provision of law (including an in absentia removal order under section 240(b)(5) of the Act);

(vii) The alien is subject to reinstatement of a prior removal order under section 241(a)(5) of the Act; or

(viii) The alien has a pending application with USCIS for lawful permanent resident status.

(5) *Filing.* (i) An application for a provisional unlawful presence waiver of the unlawful presence inadmissibility bars under section 212(a)(9)(B)(i)(I) or (II) of the Act, including an application by an alien in removal proceedings that are administratively closed and have not been recalendared at the time of filing the Form I–601A, must be filed in accordance with 8 CFR part 103 and on the form designated by USCIS. The prescribed fee under 8 CFR 103.7(b)(1) and supporting documentation must be submitted in accordance with the form instructions.

(ii) An application for a provisional unlawful presence waiver will be rejected and the fee and package returned to the alien if the alien:

(A) Fails to pay the required filing fee for the provisional unlawful presence waiver application or to pay the correct filing fee;

(B) Fails to sign the provisional unlawful presence waiver application;

(C) Fails to provide his or her family name, domestic home address, and date of birth;

(D) Is under the age of 17;

(E) Does not include evidence of an approved petition that classifies the alien as an immediate relative of a U.S. citizen;

(F) Fails to include a copy of the fee receipt evidencing that the alien has paid the immigrant visa processing fee to the Department of State; or

(G) Has indicated on the provisional unlawful presence waiver application that the Department of State initially acted to schedule the immigrant visa interview prior to January 3, 2013, even if the interview was cancelled or rescheduled *after* January 3, 2013.

(6) *Biometrics.* (i) All aliens who apply for a provisional unlawful presence waiver under this section will be required to provide biometrics in accordance with 8 CFR 103.16 and 103.17, as specified on the form instructions.

(ii) *Failure to appear for biometrics capture.* If an alien fails to appear for biometrics capture, the provisional unlawful presence waiver application will be considered abandoned and denied pursuant to 8 CFR 103.2(b)(13).

The alien may not appeal or file a motion to reopen or reconsider an abandonment denial under 8 CFR 103.5.

(7) *Burden of proof.* The alien has the burden to establish eligibility for the provisional unlawful presence waiver as described in this paragraph of this section, and under section 212(a)(9)(B)(v) of the Act, including that the alien merits a favorable exercise of the Secretary's discretion.

(8) *Adjudication.* USCIS will adjudicate the provisional unlawful presence waiver application in accordance with this paragraph of this section and section 212(a)(9)(B)(v) of the Act, except the alien must show extreme hardship to his or her U.S. citizen spouse or parent. USCIS also may require the alien and the U.S. citizen petitioner to appear for an interview pursuant to 8 CFR 103.2(b)(9). If USCIS finds that the alien does not meet the eligibility requirements for the provisional unlawful presence waiver as described in paragraph (e) of this section, or if USCIS otherwise determines in its discretion that a waiver is not warranted, USCIS will deny the waiver application. Notwithstanding 8 CFR 103.2(b)(16), USCIS may deny an application for a provisional unlawful presence waiver without prior issuance of a request for evidence or notice of intent to deny.

(9) *Notice of Decision.* USCIS will notify the alien and the alien's attorney of record or accredited representative of the decision in accordance with 8 CFR 103.2(b)(19). USCIS also may notify the Department of State. Denial of an application for a provisional unlawful presence waiver is without prejudice to the alien filing another provisional unlawful presence waiver application under paragraph (e) of this section, provided the alien meets all of the requirements in this part, and the alien's case must be pending with the Department of State. An alien also may elect to file a Form I–601, Waiver of Grounds of Inadmissibility, pursuant to paragraph (a)(1) of this section after departing the United States, appearing for his or her immigrant visa interview at the U.S. Embassy or consulate abroad, and after the Department of State determines the alien's admissibility and eligibility for an immigrant visa. Accordingly, denial of a request for a provisional unlawful presence waiver is not a final agency action for purposes of section 10(c) of the Administrative Procedure Act, 5 U.S.C. 704.

(10) *Withdrawal of waiver requests.* An alien may withdraw his or her request for a provisional unlawful presence waiver at any time before USCIS makes a final decision. Once the

case is withdrawn, USCIS will close the case and notify the alien and his or her attorney or accredited representative. The alien may file a new Form I–601A, in accordance with the form instructions and required fees. The alien's case must be pending with the Department of State and the alien must notify the Department of State that he or she intends to file a new Form I–601A.

(11) *Appeals and Motions To Reopen.* There is no administrative appeal from a denial of a request for a provisional unlawful presence waiver under this section. The alien may not file, pursuant to 8 CFR 103.5, a motion to reopen or reconsider a denial of a provisional unlawful presence waiver application under this section.

(12) *Approval and Conditions.* A provisional unlawful presence waiver granted under this section:

(i) Does not take effect unless, and until, the alien who applied for and obtained the provisional unlawful presence waiver:

(A) Departs from the United States;

(B) Appears for an immigrant visa interview at a U.S. Embassy or consulate; and

(C) Is determined to be otherwise eligible for an immigrant visa by a Department of State consular officer in light of the approved provisional unlawful presence waiver.

(ii) Waives the alien's inadmissibility under section 212(a)(9)(B) of the Act only for purposes of the application for an immigrant visa and admission to the United States as an immediate relative of a U.S. citizen pursuant to the approved immediate relative petition (Form I–130 or I–360) upon which the provisional unlawful presence waiver application was based.

(iii) Does not waive any ground of inadmissibility other than the grounds of inadmissibility under section 212(a)(9)(B)(i)(I) or (II) of the Act.

(13) *Validity.* Until the provisional unlawful presence waiver takes full effect as provided in paragraph (e)(12) of this section, USCIS may reopen and reconsider its decision at any time. Once a provisional unlawful presence waiver takes full effect as defined in paragraph (e)(12) of this section, the period of unlawful presence for which the provisional unlawful presence waiver is granted is waived indefinitely, in accordance with and subject to paragraph (a)(4) of this section.

(14) *Automatic Revocation.* The approval of a provisional unlawful presence waiver is revoked automatically if:

(i) The consular officer determines at the time of the immigrant visa interview that the alien is ineligible to receive a visa under section 212(a) of the Act other than under section 212(a)(9)(B)(i)(I) or (II) of the Act;

(ii) The immigrant visa petition approval associated with the provisional unlawful presence waiver is at any time revoked, withdrawn, or rendered invalid but not otherwise reinstated for humanitarian reasons or converted to a widow or widower petition;

(iii) The immigrant visa registration is terminated in accordance with section 203(g) of the Act, and has not been reinstated in accordance with section 203(g) of the Act; or

(iv) The alien, at any time before or after approval of the provisional unlawful presence waiver or before an immigrant visa is issued, reenters or attempts to reenter the United States without being inspected and admitted or paroled.

**Janet Napolitano,**
*Secretary.*

[FR Doc. 2012–31268 Filed 1–2–13; 4:18 pm]

**BILLING CODE 9111–97–P**



Vox needs your help to cover the 2024 election and ensure that our readers have access to timely and reliable information.

**Support Vox**



POLITICS · THE BIG IDEA

# Here's how DACA changed the lives of young immigrants, according to research

They got jobs, continued their education, and boosted the US economy.

by **Roberto G. Gonzales**
Feb 16, 2018, 8:50 AM EST

 

Hundreds of immigration advocates marched near Trump Tower last week in support of the Deferred Action for Childho Arrivals program. Spencer Platt/Getty Images

Congress this week failed to come up with a solution to protect undocumented people who have been shielded from deportation under the Deferred Action for Childhood Arrivals program. The program is now set to end on March 5, six months after US

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2169 of 4699 PageID #:  5334



The failure to protect these people would be a tragedy, because the program has changed many, many lives for the better, as my research and that of others has shown. It took them out of limbo and let them contribute to their families, communities, and the US economy.

When the Obama administration launched DACA in 2012, it amounted to a natural experiment: What would happen if you gave a portion of the overall population of undocumented immigrants fresh access to employment and other opportunities?

Immigrants who applied for protection under the program — enrollment is not automatic — were at least temporarily shielded from deportation. They also got temporary Social Security numbers and two-year work permits. To qualify, they had to have arrived in the US before 2007 (at 15 years old, or younger), been 30 or younger in 2012, and either have a high-school degree or be enrolled in high school or similar educational program.

When the program began, I started a national research project to study the effects on its beneficiaries. Those effects were profound: Under DACA, beneficiaries saw increased educational attainment, higher social mobility, and better mental health.

My research into undocumented immigrants predates DACA. From 2002 to 2015, I followed 150 undocumented young adults in Los Angeles, examining how they transitioned to adulthood in a context of limited rights. In ***Lives in Limbo: Undocumented and Coming of Age in America,*** I compared a group of people who attended college with a group that had left school at or before high school graduation.

## Before DACA, undocumented immigrants could not translate academic achievement into professional success

Pre-DACA, even those young adults who had attained advanced degrees found their work and life outcomes limited — and unusually similar to those of less-educated peers. Lacking Social Security numbers, driver's licenses, and other credentials,

002162



---

ADVERTISEMENT

---

FEATURED VIDEOS FROM VOX

Why everything you buy is worse now





From clothes to tech, why is everything so poorly made?

---

In 2011, I sat across an auto assembly plant lunchroom table from Jonathan, who had not graduated from high school, and Ricardo, who had two postsecondary degrees. If Ricardo had been a citizen, he would have had his choice of attractive job possibilities, but both, now in their late twenties, faced the same limited work options.

Many people I interviewed described chronic headaches, toothaches, ulcers, difficulty sleeping problems, eating disorders, and thoughts of suicide. They had grown up in communities around Los Angeles and (as a result of the 1982 Supreme Court decision

002163



But at a critical stage in their lives, their immigration status blocked important rites of passage — they couldn't get getting driver's licenses, after-school jobs, or financial aid for college. (Many colleges would allow them to enroll, but they were disqualified from federal financial aid.)

Life in the shadows enacts a heavy toll. In my book, using a term from sociology, I argued that illegality was a "master status": a binding constraint that overwhelmed all other traits and achievements. It acted as a lead weight that eventually dragged them down.

The undocumented young adults in my study were the embodiment of Langston Hughes's "dream deferred."

## DACA opened doors, and eased stress

But with DACA, things changed for many of these same people. In 2013, my research team surveyed nearly 2,700 DACA-eligible young adults. Moreover, beginning in 2015, we carried out two waves of in-depth, in-person interviews with 481 DACA beneficiaries in six states: Arizona, California, Georgia, Illinois, New York, and South Carolina.

Just 16 months into the program, 59 percent of respondents reported having found a new job. Over one-fifth of the people we surveyed had obtained a paid internship.

Undocumented immigrants aren't forbidden from having credit cards or bank accounts, but having a Social Security number makes getting these financial tools a lot easier. Almost one-half of our survey respondents opened up their first bank account after receiving DACA, and a third acquired their first credit card. Close to 60 percent of our respondents had obtained a driver's license.

Twenty-one percent of those we surveyed reported that their access to health care had improved, sometimes because they had access to health plans provided by schools or

002164

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2172 of 4699 PageID #:  5337



DACA's benefits appear to be greatest for people with degrees from four-year colleges. They were more than 1.5 times as likely to obtain new jobs and increase their earnings than DACA beneficiaries who never went to college. It seems they were finally able to make full use of their credentials and networks.

Our findings are now a couple of years old, but they have been corroborated. Six months ago, the political scientist Tom K. Wong, of UC San Diego, released **results from a similar survey of DACA beneficiaries** that found that 69 percent of respondents reported moving to a job with better pay. More than half moved to a job that they thought better fit their education and training, or offered better working conditions.

ADVERTISEMENT

Much of the political and media coverage of this group has focused on the academically gifted, but, in terms of distance traveled, DACA's biggest success stories involve moderate achievers. Most undocumented immigrant youth end their schooling before entering college. (In fact, more than 40 percent **fail to complete high school**.)

002165

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 2173 of 4699 PageID #: 5338



beneficiaries who completed certificate or licensing programs — in fields like nursing, dentistry, construction, and cosmetology — experienced significant growth in salary. Sixty-eight percent who did so told us their hourly salaries increased from the $5-to-$8 range to more than $14 an hour.

## Employers benefit, too, when they can hire qualified beneficiaries of DACA

Less tangible, but equally important, is DACA's positive role in improving the mental health and general well-being of its beneficiaries. More than two-thirds of recipients told us they were less afraid of law enforcement and of being deported. (Fifty-nine percent of our respondents say they would **report** a crime now in a situation when they wouldn't before.)

Being able to get a driver's license or to obtain lawful employment is about more than transportation and work: It's about not having to always look over your shoulder. Nearly 70 percent indicated that they feel less stress in general.

Eighteen-year-old Carolina, who is from Illinois, told us, "My freshman and sophomore year, I did really bad [in school], mostly because I was just not motivated because … all of this is going to be worthless in the end." With DACA, her mindset changed: "OK, I actually have a chance," she said.

Failing to replace DACA would also have negative consequences for the schools, hospitals, tech firms, courts, and community organizations for which this population is now able to work. There are now thousands of "DACAmented" teachers in US schools.

While not a perfect policy — only a pathway to citizenship would offer that — DACA has provided a significant boost to a large number of young people. The research is clear that DACA beneficiaries have made truly impressive economic and educational gains.

002166



and to no purpose. It would be a stain on the soul of our nation.

*Roberto G. Gonzales is professor of education at Harvard University and author of* **Lives in Limbo: Undocumented and Coming of Age in America**.

---

**The Big Idea** is Vox's home for smart discussion of the most important issues and ideas in politics, science, and culture — typically by outside contributors. If you have an idea for a piece, pitch us at **thebigidea@vox.com**

YOU'VE READ 1 ARTICLE IN THE LAST MONTH

Here at Vox, we believe in helping everyone understand our complicated world, so that we can all help to shape it. Our mission is to create clear, accessible journalism to empower understanding and action.

If you share our vision, please consider supporting our work by becoming a *Vox Member*. Your support ensures Vox a stable, independent source of funding to underpin our journalism. If you are not ready to become a Member, even small contributions are meaningful in supporting a sustainable model for journalism.

Thank you for being part of our community.



**Swati Sharma**
Vox Editor-in-Chief

MEMBERSHIP

| Monthly | Annual | One-time |

◯ **$5/month**          ◯ $10/month

◯ $25/month          ◯ $50/month

◯ Other

002167



How DACA helped over 1/4 of young immigrants find ...

We accept credit card, Apple Pay, and Google Pay.

You can also contribute via



---

**MORE IN THIS STREAM**                                     SEE ALL

  ### Trump improbably promises Congress will fix DACA if the Supreme Court strikes it down
By NICOLE NAREA

  ### The Supreme Court isn't giving Trump leverage on a shutdown DACA deal
By DARA LIND

  ### A federal appeals court just ruled against Trump on DACA
By DARA LIND

## More in **The Big Idea**

THE BIG IDEA  |  OCT 9, 2020

### Is it anti-Catholic to ask a Supreme Court nominee how her religion affects her decisions?

President Trump's nominee has written about how religious views and judicial views intersect — and sometimes collide.

By MARK TUSHNET



THE BIG IDEA  |  MAY 9, 2019

### Women are filing more harassment claims in the #MeToo era. They're also facing more retaliation.

The Equal Employment Opportunity Commission reported that sexual harassment complaints rose 13.6 percent last year.

By ALEX PRESS



POLITICS  |  APR 22, 2019

002168



by storing carbon in natural ecosystems.

By GREG ASNER



---

**THE HIGHLIGHT**  |  APR 3, 2019

### Why do we let our kids play tackle football?

It will be considered unthinkable 50 years from now.

By CHRIS NOWINSKI



---

**THE BIG IDEA**  |  JAN 7, 2019

### Is America's future capitalist or socialist?

Steve Pearlstein, author of *Can American Capitalism Be Saved?* and Bhaskar Sunkara, editor of the socialist journal Jacobin, debate.

By EZRA KLEIN



---

**THE BIG IDEA**  |  NOV 21, 2018

### Online shopping is terrible for the environment. It doesn't have to be.

Give your business to companies that promote slower delivery and consolidated shipments.

By MIGUEL JALLER



---

## The Latest

TWO HOURS AGO

### The Trump shooting points to shocking Secret Service security lapses

---

3:00 PM EDT

### Why is the DNC accelerating Joe Biden's nomination?

---

12:14 PM EDT

### Republican National Convention 2024: The biggest news and updates

---

10:45 AM EDT

### 5 causes — and accelerants — of political violence

---

8:00 AM EDT

002169



7:00 AM EDT

Democrats shouldn't use Trump's shooting as an excuse to stick with Biden

SPONSORED CONTENT











The Most Realistic Game of 2024

Join players around the…

Plarium

Target Shoppers Say This Drugstore Wrinkle…

Super C Serum

Neurologists Approve: These Barefoot Shoes…

Barefoot Vitality

If Your Dog Eats Dry Food, Do This Every Day

(Most Dog Owners Do…

ultimatedogfo…

Cesar Millan Shares Some Of The Wor…

Why Don't More Dog…

Dog Food Ex…

Book Publishers for New Authors

bestsearches.…

Recommended content |

ADVERTISEMENT





**About us**  |  **Our staff**  |  **Ethics & Guidelines**  |  **How we make money**  |  **Contact us**
**How to pitch Vox**  |  **Newsletters**

Privacy Notice  |  Terms of Use  |  Cookie Policy  |  Do Not Sell or Share My Personal Data  |  Licensing  |  Accessibility
Platform Status  |  Careers

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

SEPTEMBER 17, 2021

# The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants

By Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas

The United States is often described as a nation of immigrants. With the exception of Native Americans, the vast majority of Americans are immigrants or the descendants of immigrants or enslaved people. This diversity has been celebrated for its contributions to American culture through cuisine, language, and the arts, among many other influences.

Immigrants also make an important contribution to the U.S. economy. Most directly, immigration increases potential economic output by increasing the size of the labor force. Immigrants also contribute to increasing productivity. Economists Gaetano Basso and Giovanni Peri find that immigrants are more mobile than natives in response to local economic conditions, perhaps because they have fewer long-standing familial and community ties, helping labor markets to function more efficiently. Economists Jennifer Hunt and Marjolaine Gauthier-Loiselle have also shown that immigrants boost innovation, a key factor in generating improvements in living standards. Specifically, they find that a 1 percentage point increase in the population share of immigrant college graduates increases patents per capita by 9 percent to 18 percent.

While most immigrants residing in the United States are legally authorized to live and work here, the Department of Homeland Security (DHS) estimates the population of unauthorized immigrants to be roughly 11.4 million as of 2018. This estimate and those used by researchers include beneficiaries of Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS), even though both groups have legal authorization to live and

002172

Case 6:24-cv-00306-JCB  Document 124  Filed 11/07/24  Page 2180 of 4699  PageID #: 5345

work in the United States on a temporary basis.[1] This diverse population also includes other individuals who either entered without passing through immigration (unauthorized entry), or legally came to the United States on a temporary basis and then overstayed their visa.[2] Most of these individuals may not legally work or receive safety-net benefits—or only can under substantial restrictions.

This blog discusses the economics of legalizing unauthorized immigrants. Some critics claim that legalizing unauthorized immigrants, as proposed by the Build Back Better framework, could be costly because they would become eligible for additional social insurance benefits such as Medicaid. However, granting permanent legal status would also likely raise tax revenues, increase productivity, and have additional benefits for the children of these immigrants, generating substantial economic value for the country.

**Permanent legal status is likely to increase the effective labor supply of unauthorized immigrants.**

About 73 percent of unauthorized-immigrant adults ages 18 to 65 were employed in any given year from 2014 to 2019, roughly equal to the employment rates of non-citizen legal residents and U.S. citizens.[3] Permanent legal status would likely allow these workers to be more productive, generating gains that could be realized through a variety of channels.

Critically, permanent legal status would allow these currently unauthorized immigrants to pursue and accept jobs for which their skills are well-suited, rather than being restricted to particular sectors of the economy, such as agriculture, construction, and leisure and hospitality, where employers often do not insist on legal status and where wages are lower on average. For example, around one-half of workers in the U.S. dairy industry—which in 2018 paid between $11 and $13 an hour for general labor—are immigrants, most of whom are thought to be unauthorized.[4] Without legal status, unauthorized immigrants have limited opportunities for job mobility, a key channel by which other workers find better, more productive employment matches over their careers.

Comparisons between the earnings of authorized and unauthorized immigrants suggest that limited job opportunities cause talent to be

002173

8/19/24, 2:24 PM    The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants | CEA | The White House

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2181 of 4699 PageID #: 5346

misallocated, reducing productivity. Unauthorized-immigrant workers have been estimated to earn about 40 percent less per hour than native-born workers and about 35 percent less per hour than legal immigrants. A large part of these gaps can be explained by differences in average skills as measured by educational attainment; however, after adjusting for these and other demographic differences, this research continues to find a significant "wage penalty" for unauthorized workers ranging from 4 percent to 24 percent of their hourly wage. Further, we estimate that there is no wage penalty for unauthorized-immigrant workers relative to similar legal immigrants within the same occupation and industry, which suggests the penalty arises from being confined to low-paying jobs.[5]

In addition to employment opportunities, evidence from prior legalizations in the United States and in other countries suggests that legalization also encourages immigrants to improve their language skills, induces them to complete additional education and training, and improves their health outcomes, all of which make them more productive members of society. For example, evidence from Germany finds that faster access to citizenship led immigrant women to improve their language skills in addition to increasing their labor force attachment. In a study of U.S. teenagers born to the same immigrant families—but whose legal status varies due to the countries in which they were born—the unauthorized-immigrant teenagers were about 2.6 percentage points less likely to be enrolled in school. In addition, evidence from the Immigration Reform and Control Act of 1986 (IRCA) and DACA shows these reforms increased schooling for previously-unauthorized immigrants. Finally, a recent economic study also suggests that DACA-recipients experienced improved physical and mental health, which contributes to increased productivity.

In a market economy, employees' productivity influences their pay. As a result, productivity improvements—through better job matches, investments in skills, and increases in physical and mental health—should be reflected in increased wages among the legalized immigrants. Indeed, the research evidence supports this hypothesis. For example, research finds that the wages of DACA-eligible Dreamers rose 4 to 5 percent by 2016 relative to those not eligible.[6] Another study concludes that the DACA-related gains in earnings for unauthorized workers were largest among the lowest paid workers. These results signify that even though these unauthorized

immigrants may currently be working in the United States, providing them with legal permanent status would increase their effective labor supply, that is, the work their greater productivity enables them to do. Importantly, this increase in productivity is foundational for improving U.S. economic growth.

Given that providing legal status to unauthorized immigrants would increase their effective labor supply, critics of legalization argue there could be adverse labor market consequences for native and other immigrant workers. While there is not a large economics literature on the labor market effects of legalization on other workers, in a well-cited National Academies report on the economic and fiscal impact of immigration, a distinguished group of experts concludes that in the longer run, the effect of immigration on wages overall is very small.[7]

### Figure 1: Age Distribution of Citizens and Unauthorized Immigrants

Source: U.S. Current Population Survey (ASEC 2014-2019), CEA Analysis.

**Permanent legal status would likely have implications for costs and revenues for the Federal government.**

While granting permanent legal status to unauthorized immigrants would likely boost economic growth, some are concerned about the price tag, given that an increased number of legal immigrants could enroll in, and raise costs of, social benefit programs. However, some of this increased cost would likely be offset by higher tax contributions.[8]

Consider first the potential increase in costs to the Federal government associated with receipt of social benefits. Legal status may make undocumented immigrants more comfortable using Federal benefits for which they are already eligible, such as emergency health services under Medicaid and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In addition, newly-legalized immigrants could take up social benefits for which they were previously ineligible due to their unauthorized status. Based on benefit use among demographically-similar, non-citizen legal immigrants, this increase in take-up could be significant. For example, many of these immigrants could become fully eligible for Medicaid.[9] Finally, granting legal status could also increase benefit take-up among citizen or authorized-immigrant relatives of undocumented immigrants; several studies find that the threat of an undocumented relative being deported discouraged benefit take-up by citizen members of the same household, even though those citizens are eligible for benefits and cannot be deported.

However, much of the direct fiscal cost of these public benefits is likely to be repaid due to increased tax contributions from the immigrants, and, in the long run, by positive fiscal contributions from their children. Anyone working in the United States is supposed to be paying taxes; however, Federal income tax compliance rates for unauthorized immigrants are unknown. Several government agencies and nongovernmental organizations estimate rates between 50 and 75 percent. By comparison, tax compliance rates on ordinary wage income are close to 100 percent for the U.S. population as a whole, according to the U.S. Treasury Department.

Shifts from the informal to the formal sector that are expected to result from legal status would likely increase tax compliance rates. Indeed, after the passage of IRCA, researchers found that income tax compliance rates of previously-unauthorized immigrants in California became comparable to other residents. Combined with the wage gains, gross tax revenues would increase. Moreover, undocumented immigrants are disproportionately of prime-working age (see Figure 1) and relatively younger than prime-age U.S. citizens. Therefore, they are likely to have many working years during which they will be paying these higher payroll and income taxes if they are legalized.

Finally, many children of unauthorized immigrants grow up in households below the Federal poverty level because their parents cannot secure higher-paying work due to their immigration status. Growing up poor can be harmful for child development, and providing public health insurance and nutrition assistance has been shown to improve the health of immigrant children. In general, the direct fiscal cost of public assistance for low-income children is thought to be substantially or fully offset in the long run. The costs are offset by increases in tax revenues and reductions in spending on government programs when these children grow up to become higher-earning adults than they would have had they not received assistance.[10]

**Conclusion**

Immigrants have made innumerable contributions to American business and society. However, current law confines millions of them to a life in the shadows, without the rights to be fully economically engaged or have access to foundational social protections. Such treatment inflicts  harms on unauthorized immigrants themselves and their families—many of which include U.S. citizens and non-citizen legal residents—as well as to the broader economy.

Though some argue that increased take-up of social programs would generate a substantial fiscal cost to the government, the productivity of the newly-legalized would likely increase, which would benefit all in the United States by expanding economic output. Further, the ensuing increase in wages and compliance with tax requirements would increase their contributions to public sector finances, and their children would benefit as well. Allowing currently unauthorized workers to engage fully in the labor force would not only benefit the immigrants and their families, but society as a whole.

─────────────

[1] DHS estimates of the unauthorized immigrant population are calculated as the residual from subtracting the legally-resident, foreign-born population from the total foreign-born population. Dreamers (individuals born between 1981 and 2012 brought to the United States as children) who applied to and were accepted into the DACA program can legally work and reside in the United States, but only for two years, at which point they must apply to renew their status; the Supreme Court ruled in June 2020 that the Trump

Administration could not end the program, but the U.S. District Court in Southern Texas ruled in July 2021 that the program is not lawful. While those currently in the DACA program are still protected and can reapply, new applicants are not accepted, and the case is making its way through the Federal courts. TPS is granted only until resolution of the conditions in a recipient's country of origin that make it difficult or unsafe to return.

[2] Unauthorized immigrants do not include people who have been granted asylum or refugee status or nonimmigrant residents, such as students and temporary workers, who have been granted permission to study or work in the United States for a limited period of time and for a specific purpose.

[3] CEA analysis of Current Population Survey microdata from 2014 to 2019.

[4] The average hourly wage in the United States in 2020 was about $27 an hour.

[5] Based on CEA analysis of Current Population Survey microdata from 2014 to 2019.

[6] Evidence from the wage impacts of naturalization in the United States and other countries; smaller extensions of work authorization to particular groups of unauthorized immigrants, such as those aided by the Chinese Student Protection Act of 1992; and reforms that have restricted employment options for unauthorized workers, also suggest that granting legal status would improve labor market outcomes of unauthorized workers.

[7] See also David Card's Richard T. Ely Lecture to the American Economic Association in which he argues that immigrants have had at most small impacts on wage inequality among natives.

[8] We note that the fiscal impacts of providing legal permanent status to existing unauthorized immigrants likely differ from prior analyses of the fiscal impacts of immigration generally, as unauthorized immigrants are already in the country, and many currently work, pay taxes, and receive some forms of government benefits. This existing relationship with the government makes it necessary to estimate how their rates of tax compliance and take-up of benefits would change if they gained legal status. Such

002178

calculations are not straightforward and require important assumptions, some with scarce relevant data and evidence that could inform them.

[9] Unauthorized immigrants who entered the United States after August 22, 1996—the date Federal welfare reforms were signed into law—would generally be eligible only after a waiting period of five years of legal residence for several benefits, including non-emergency health services under Medicaid and the Supplemental Nutrition Assistance Program (SNAP).

[10] At present the Congressional Budget Office (CBO) does not account for any long-run fiscal return to public benefit programs, suggesting that current approaches to "scoring" the fiscal impacts of legal status are likely to overstate their true fiscal cost.

002179

NBER WORKING PAPER SERIES

DISTRIBUTING THE GREEN (CARDS):
PERMANENT RESIDENCY AND PERSONAL INCOME TAXES AFTER
THE IMMIGRATION REFORM AND CONTROL ACT OF 1986

Elizabeth U. Cascio
Ethan G. Lewis

Working Paper 24872
http://www.nber.org/papers/w24872

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
July 2018, Revised December 2018

We thank conference and seminar participants at the 2016 SOLE Annual Meeting, IIES, Montana State University, UCLA, UIUC, the University of Copenhagen, the University of Nottingham, Uppsala University, and Williams College, as well as two anonymous reviewers and the editor, for their comments on our earlier working paper that circulated under the title, "How Much Does Amnesty Strengthen the Safety Net? Evidence from the Immigration Reform and Control Act of 1986." We also thank William Paja and Chris Brown for outstanding research assistance and gratefully acknowledge funding from Dartmouth College. All errors are our own. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2018 by Elizabeth U. Cascio and Ethan G. Lewis. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Distributing the Green (Cards): Permanent Residency and Personal Income Taxes after the
Immigration Reform and Control Act of 1986
Elizabeth U. Cascio and Ethan G. Lewis
NBER Working Paper No. 24872
July 2018, Revised December 2018
JEL No. H24,H53,H71,J61

## ABSTRACT

We explore how permanent residency affects personal income tax participation and net personal income tax payments using variation from the Immigration Reform and Control Act of 1986 (IRCA), which authorized the largest U.S. amnesty to date. We exploit the timing and geographic unevenness of IRCA's legalization programs alongside newly digitized data on personal income taxes in California, home to the majority of applicants. Green Cards induced the previously unauthorized to file state income tax returns at rates comparable to other California residents. While the new returns generated little additional revenue through the end of the 1990s, they did raise the incomes of families with children through new claims of the federal Earned Income Tax Credit.

Elizabeth U. Cascio
Department of Economics
Dartmouth College
6106 Rockefeller Hall
Hanover, NH 03755
and NBER
elizabeth.u.cascio@dartmouth.edu

Ethan G. Lewis
Department of Economics
Dartmouth College
6106 Rockefeller Hall
Hanover, NH 03755
and NBER
ethan.g.lewis@dartmouth.edu

## 1.      Introduction

An estimated 11.1 million unauthorized immigrants, many from Mexico or Central America, live in the U.S. today (Pew Research Center, 2016). As ranks of the unauthorized have swelled, policymakers have implemented only temporary fixes, such as Deferred Action for Childhood Arrivals (DACA). In recent years, many legal immigrants from Central America and the Caribbean have also been eligible only for Temporary Protected Status (TPS).[1] Some argue that offering such immigrants a more permanent place would set a dangerous precedent and condone, if not encourage, illegal border-crossing. Others say that doing so is not only morally just but could also have broader social benefits by incentivizing immigrants to "come out of the shadows" – to work in the formal sector and more generally, join mainstream American society.

Existing research typically finds that extending legalization opportunities to unauthorized immigrants improves their earnings prospects.[2] However, we know less about the downstream societal impacts of legalization. Kuka, Shenhav, and Shih (2018) argue that, by increasing the return to education, DACA has raised educational attainment and lowered teenage fertility among affected immigrants. Other recent studies show that large-scale legalization both in the U.S. (Baker, 2015) and Europe (Bell, Fasani, and Machin, 2013; Mastrobuoni and Pinotti, 2015; Pinotti, 2017) has reduced crime, possibly because legal status increases its opportunity cost.[3]

---

[1] DACA provides work authorization and deferral from deportation for childhood arrivals prior to 2007. TPS provides work (and travel) authorization and deportation deferrals in response to temporary home country conditions, such as civil wars and natural disasters. The Trump administration recently terminated the TPS designation for Haitians and Hondurans, suspended new applications for temporary status under DACA, and is currently accepting applications for DACA renewals only under federal court order.

[2] Some studies exploit variation from the one of IRCA's two legalization programs that targeted the long-time resident unauthorized (Kassoudji and Cobb-Clark, 2002, Amuedo-Dorantes, Bansak, and Raphael, 2007; Lozano and Sorensen, 2011; Pan, 2012; Steigleder and Sparber, 2017). Others consider the 1997 Nicaraguan Adjustment and Central American Relief Act (Kaushal, 2006) and DACA (Pope, 2016; Amuedo-Dorantes and Antman, 2017).

[3] On the other hand, broader immigration reform, which typically involves stepped-up immigration enforcement in addition to legalization, can raise crime rates among subsequent arrivals (Freedman, Owens, and Bohn, 2018).

002182

We build on this nascent literature by estimating the impacts of receiving a Green Card, or lawful permanent resident (LPR) status, on personal income tax participation and net personal income tax payments. Green Card holders have an incentive to file income tax returns to protect their status. But there may also be personal financial gain in filing, since LPRs qualify for the federal Earned Income Tax Credit (EITC). A refundable tax credit that began as a payroll tax offset for lower-earning families, the EITC is now a central federal anti-poverty program, providing cash transfers to 27 million families of up to 40% of annual earnings. Given current tax law, conferring LPR status on unauthorized parents is necessary for millions of citizen children to access these transfers, and any benefits from childhood exposure to them.[4] State income tax participation among the previously unauthorized may also help to fund local public goods, such as education, that immigrants routinely use.[5],[6]

We use variation from the Immigration Reform and Control Act of 1986 (IRCA) to estimate the effects of Green Card distribution on state personal income tax participation, net state personal income tax payments, and transfers under the federal EITC. The last major comprehensive immigration reform, IRCA provided a path to a Green Card for over three million immigrants, mostly low-wage Mexicans, living unlawfully in the U.S. at the time. About 88% of applicants were successful, driving an unprecedented short-lived spike in the flow of new LPRs starting in the late 1980s, shown in Figure 1. Applicants were also unevenly distributed

---

[4] Over 2009 to 2013, an estimated 4 million U.S. citizens lived with at least one unauthorized parent (Capps, Fix, and Zong, 2016). The additional family income from the EITC lifts large numbers of children out of poverty every year (Short, 2014). Previous research has also found that it improves health at birth (Hoynes, Miller, and Simon, 2015) and the test scores (Dahl and Lochner, 2012), college enrollment rates (Manoli and Turner, 2018), and educational attainment and earnings (Bastian and Michelmore, 2017) of older children.

[5] Most of the "fiscal burden" of immigration is state and local, due largely to enrollment of immigrants in public schools (National Academy of Sciences, 2016). In some states with large immigrant populations, like California, education is also partially funded through state income tax revenues. See Brunner and Sonstelie (2006) for an overview of California's school finance system.

[6] Our investigation is complementary to that in Monras, Vázquez-Grenno, and Elias (2018), who estimate the payroll tax impacts of a recent legalization episode in Spain.

across the country as well as across California, which was the intended home of the majority. Combined with the state's income tax statistics, which provide unparalleled insights into income tax participation for this period, this spatial variation makes California the ideal setting for this study.

Our baseline empirical strategy takes advantage of this variation and the timing of Green Card distribution under IRCA's legalization programs. Intuitively, we ask whether California metro areas where higher shares of the working-age population applied for temporary legal status – and were eventually eligible for Green Cards – experienced larger changes in aggregate personal income tax outcomes starting in the late 1980s as those Green Cards were issued (the "short term"), then entered a new equilibrium through the end of the 1990s (the "medium term").[7] We apply this strategy to newly-digitized, richly detailed, county-level California state income tax statistics spanning the 1980s and 1990s, as well as county-level panel data on EITC transfers. To validate our EITC findings, we also exploit variation in applicant share across and within other states.

Our estimates imply that distributing Green Cards to an estimated 1.33 million unauthorized in California led to a sustained increase of around 700,000 state income tax returns annually, accounting for a million adults. While there is suggestion of upward income mobility and increasing tax contributions over the medium term, in the short term Green Cards generated little in the way of additional state personal income tax revenue given the relatively large number of dependents claimed by new LPRs and California's generous tax treatment of children in low-

---

[7] Though we could extend the analysis out further into the future to obtain "long term" estimates, potential residential mobility of IRCA applicants from their place of application becomes an ever-increasing concern, given the spread of Mexicans from California that began in the 1990s (Card and Lewis, 2007). Reassuringly, the relationship between applications per capita and Green Cards issued to IRCA applicants per capita at the state level is very close to what would have been expected in the absence of internal migration (Appendix A), but no data exist on the location decisions of applicants after they became permanent residents.

income families. At the federal level, annual EITC transfers to state residents rose, initially by about $500 million and by $1 billion in the years after the 1994 EITC expansion.

Additional evidence supports a causal interpretation. Filing increases in areas with higher applicant shares were well-timed with Green Card distribution to IRCA applicants and were initially concentrated at the bottom of the income distribution, consistent with their economic profile. Effects of the EITC expansions over our analysis period on the non-applicant populations of areas with higher applicant shares also cannot explain our EITC estimates.[8] In addition, application of the baseline research design within several other states suggests that the California findings are not idiosyncratic; variation across states also shows the rise in the number of EITC claims – not just transfer amounts – fueled by new Green Cards. Further, we consider an alternative research design that exploits the fact that California's Hispanic population generated more applicants per capita than did New York's.  This specification accounts for the possibility that IRCA's other, enforcement provisions may have affected the broader Hispanic population, as well removes other potential biases from heterogeneity in outcomes trends across areas with different Hispanic population shares. The estimates yield similar inferences for the EITC.

Our findings thus arguably represent the reduced-form impacts of the largest legalization episode in the history of the U.S., and possibly the world. If the non-applicant local population was unaffected, however, they also uncover the person-level impacts of obtaining a Green Card. Under this interpretation, our estimates imply that new LPRs were represented on state income tax returns at about the same rate (75 to 80%) as other California residents were prior to IRCA. The implied EITC effects of obtaining a Green Card also align well with predictions of EITC receipt based on applicants' earnings and fertility and these tax-filing rates. By the end of the

---

[8] The EITC was expanded three times over our analysis period: first by the Tax Reform Act of 1986 and later by the Omnibus Budget Reconciliation Acts of 1990 and 1993.

1990s, IRCA's Green Card distribution was generating around $700 in EITC transfers per new LPR, amounting to about $1,400 per new (state) income tax return.

Our findings speak to current conversations over immigration reform. Large-scale distribution of Green Cards would arguably have similar effects today: the EITC remains a central transfer program, and though demographically similar as in the past, the unauthorized are now less concentrated in states with income taxes (Hoefer, Rytina, and Baker, 2013). That said, our estimates are context-specific, dependent on the population at hand and the tax institutions in place in the 1980s and 1990s. Individual tax identifier numbers (ITINs) enable federal income tax compliance (though still not EITC access) in this population today. IRCA's size and accompanying enforcement efforts may have also affected economic opportunity – and tax liability – for this cohort of legalized immigrants. We thus urge some caution in generalization.

## 2.    The Immigration Reform and Control Act

### 2.1.    IRCA's Legalization Programs

Public Law 99-603 – familiarly known as IRCA – was largely unanticipated when signed into law by President Reagan on November 6, 1986, having passed due only to a fragile coalition rapidly assembled at the end of the year after 15 years of failed attempts at immigration reform (Baker, 1990). Then, like now, opposition to amnesty was fierce among a significant share of politicians, and the increased enforcement measures that opponents demanded in exchange for support were anathema to existing supporters.

IRCA had two legalization programs. The general legalization program allowed immigrants who could document continuous residence in the U.S. since before January 1, 1982 to apply for temporary legal status, which consisted of work and travel authorization, between May 1987 and May 1988. The Special Agricultural Worker (SAW) program accepted

applications for temporary status between May 1987 and November 1988 from those who could demonstrate 90 days of work on certain USDA-defined seasonal crops in the year ending May 1, 1986, with no additional residency requirement. 40% of all applications came through the SAW program.

Both programs charted a path to permanent residency. Applicants under the general legalization program were able to apply for LPR status 18 months after approval of temporary status, contingent on learning English and passing a civics test by the time of application. SAW applicants, by contrast, were granted LPR status almost automatically one or two years after gaining temporary admission.[9] 88% of all 3.04 million applicants – nearly all of the 90% who achieved temporary status – eventually became LPRs, and transition rates to permanent residency were similar across programs, at 90.5% for applicants under the general program and 85.5% for SAWs (Rytina, 2002). LPRs through either program could go on to apply for U.S. citizenship, but residency for income tax purposes – and qualification for the EITC – was established by a Green Card alone.[10]

Table 1 Panel A gives characteristics of the 1.62 million resident Californians who applied for legal status, based on anonymized data on the universe of applications from the Legalization Applications Processing System (LAPS). (See Appendix A for a complete description of the data.) Nearly all applicants were working age – between the ages of 15 and 64 – and only a third were women (column 1). The applicant pool was also overwhelmingly Hispanic, with 83% from Mexico alone. Similar to national averages, 41% of California

---

[9] The first 350,000 applicants who could demonstrate having worked on farms with qualifying crops for each of the three years ending May 1, 1986 were on the faster track (one year) to receive permanent residency.

[10] A law change put in effect in 1995 added a full (calendar) year residency requirement to qualify for the EITC. This should not affect our analysis since almost all Green Cards for IRCA legalization applicants were issued by 1993.

applicants were SAWs. General legalization program and SAW applicants differed: SAWs were more likely to be working age, male, and Mexican (columns 2 and 3). Survey data from the Legalized Population Survey (LPS) and the 1989 National Agricultural Workers Survey (NAWS), summarized in Panel B, also show that working-age SAWs had lower hourly wages, less completed education, and fewer children than general legalization program applicants. However, the two groups were more similar to each other than they were to the rest of California's population – low wage, high employment, and of the age to have children, suggesting high EITC eligibility and limited liability under the state's income tax, at least at the time of application.

*2.2.    IRCA's Timing and Regional Variation*

IRCA presents an intuitive strategy for identifying the effects of permanent residency in geographic panel data: if such effects exist, areas with more applicants in the working-age population should have begun to experience relatively large changes in outcomes when the typical applicant received a Green Card.[11]

Figure 2 considers timing, tracing the status of applications over time from the general legalization and SAW programs combined based on the application-level data from the LAPS and statistics on LPR transitions and naturalizations from Rytina (2002).[12] As expected, all applications for temporary status were submitted by late 1988. Half were accepted by the end of 1988, but acceptances continued through 1992. These trends were similar in California and the nation, supporting our application of the nationwide timing of LPR transitions to the California analysis. These transitions occurred mainly between the 1989 and 1992 fiscal years, spanning

---

[11] LPR share could be viewed as endogenous to tax outcomes and is also difficult to measure precisely.
[12] Appendix Figure A1 shows cumulative application status trends separately for general legalization program and SAW applicants.

October 1, 1988 to September 30, 1992. Since an immigrant is a U.S. resident for tax purposes if an LPR for any of a calendar year, Figure 2 thus suggests that the effects of LPR status on income tax filing should have first appeared in 1988 and continued to rise through 1992. But there could have been filing lags for bureaucratic reasons (e.g., delays in obtaining a social security number), making when growth in new filing ends – and our "medium term" analysis begins – an empirical question.

California was the intended home of 53% of working-age applicants nationally, and applicants made up a large share – 8.2% – of California's working-age population when IRCA was passed in 1986. Texas was a distant second, with 415,000 working-age applicants (14.6% of the national total), accounting for 3.8% of the state's working-age population. The population percentages are examples of our measure of policy intensity going forward: the ratio of working-age applicants (based on LAPS data) to total working-age population as of 1986 (based on Census Bureau estimates) times 100, which we also refer to as the "applicant share," or $A_c$.[13]

Our empirical approach works because the state most affected and the subject of our analysis – California – had an uneven spatial distribution of applicants. Table 2 Panel A summarizes the variation in applicant share across California metropolitan statistical areas (MSAs, or metro areas), which will be our primary cross-sectional unit of analysis.[14] There was significant variation in $A_c$ in the state: the standard deviation was 4.3 percentage points (column 1). In addition, metro areas with above versus below (unweighted) median $A_c$ for the state on average had a 7.4 percentage point higher applicant share (column 4).[15] As shown in Figure 3,

---

[13] Arizona, New Mexico, and Nevada rounded out the top five states in terms of applicant shares. See Appendix Table A1 and Appendix Figure A2.

[14] Statistics are weighted by 1986 population for consistency with the empirical analysis to follow.

[15] While they do not move in lockstep, areas with higher values of $A_c$ on average have both higher general legalization program applicant shares and higher SAW applicant shares: the general legalization program applicant share was 5.3 percentage points higher and the SAW share was 2.1 percentage points higher in above-median versus

the highest applicant share MSAs were in southern California (Los Angeles) and the Central

Valley, but MSAs with above-median applicant shares were distributed throughout the state.

### 2.3.    *Green Cards or Enforcement?*

As noted, the compromise that made IRCA possible countered the "immigration-loosening" legalization programs with new "immigration-tightening" enforcement measures – specifically, increased funding for border security and new sanctions for employers who knowingly hired unauthorized workers. This raises the concern that our estimates may not isolate the effect of Green Cards *per se*.

To be clear, these enforcement measures were not directly related to personal income tax outcomes but might have had indirect effects by affecting earnings. Even in the aggregate, however, these effects could be opposite-signed. On one hand, Bansak and Raphael (2001) find that IRCA's employer sanctions increased wage discrimination against Hispanic workers relative to non-Hispanic workers in four heavily-affected southwestern states (California, Texas, Arizona, and New Mexico).[16] Given the high Hispanic share among amnesty applicants (Table 1), such discrimination would have lowered earnings among applicants relative to a counterfactual without employer sanctions, potentially increasing the likelihood that they had earnings in the EITC eligibility range. On the other hand, if effective, heightened border security might have increased wage growth of applicants by reducing the flow of competing Mexican and Central American migrants, thus potentially lowering their EITC eligibility.[17]

---

below-median $A_c$ California MSAs. We choose not to investigate these programs separately because of limited and not fully credible identifying variation from each.

[16] Other theoretical and empirical work also suggests that increased interior enforcement likely lowers wages (Cobb-Clark, Shiells, and Lowell, 1995; Chassambouli and Peri, 2015).

[17] Time-series analysis suggests that IRCA had little impact on flows from Mexico (Passel and Woodrow, 1990; Orrenius and Zavodny, 2003), and there is little evidence to suggest border security affects the rate of border crossing (Gathmann, 2008). However, border security may raise apprehensions (Hanson and Spilimbergo, 1999). Various official investigations at the time (summarized in U.S. GAO, 1990) also found little evidence that IRCA had much impact on unauthorized arrivals.

Our baseline research design accounts for aggregate impacts of IRCA's enforcement provisions, as we ask whether trends in outcomes varied systematically with MSA applicant share. That is, our baseline approach will yield biased estimates only if any direct effects of enforcement on tax outcomes were proportional to applicant share.  In a robustness check, we also consider an alternative research design using an area with a high density of Hispanics but a low density of applicants – New York – as a comparison group for California.  By allowing for time-varying direct effects of baseline MSA Hispanic share, this alternative approach should remove biases from enforcement effects that are proportional to *Hispanic* population share, regardless of the applicant share in the local population.

Policymakers at the time actually surmised that discrimination in response to the employer sanctions could be proportional to Hispanic share, rather than just applicant share. Their fear was that, to avoid sanctions, employers would begin to discriminate against legal workers with an ethnic background similar to the applicants.[18] The Bansak and Raphael (2001) result could be consistent with this possibility, since they make no distinction across higher- and lower-applicant areas within the four states of interest. A government survey conducted in the late 1980s also suggests that employers across the U.S. discriminated against Hispanic workers after IRCA.  In fact, the difference in self-reported rates of hiring discrimination as a result of IRCA between employers in California and in New York (City) were small and not statistically significant (U.S. GAO, 1990).[19] While not dispositive, such descriptive statistics suggest that enforcement effects would have been proportional to Hispanic share, at least to some degree.

---

[18] The concern was great enough that IRCA actually established a new Office of Special Counsel in the Department of Justice to adjudicate claims of employer discrimination.

[19] Approximately 6.2 percent of employers in California said that they "began a practice to not hire persons because of foreign appearance or accent" due to IRCA, whereas about 14.7 percent of California employers "began to hire only U.S. citizens and not hire persons with temporary work eligibility documents."  By comparison, 6 percent and 13 percent of employers in New York City responded affirmatively to these respective questions (U.S. GAO, 1990).

### 3.    Data and Key Variables

*3.1.    Income Tax Outcomes*

Our analysis relies on a trove of detailed annual state personal income tax statistics

published in the California Franchise Tax Board (CAFTB) *Annual Reports*.[20] These reports give,

separately by county and for narrow bins of adjusted gross income (AGI), the number of state

income tax returns filed (total and joint returns), the number of dependents claimed, aggregate

AGI, and tax assessed. We initially focus on outcomes for low-AGI ("low-income") filers, where

short-term effects of Green Cards via IRCA were likely concentrated (Table 1). We consider the

number of low-income state returns, as well as total AGI, number of dependents, estimated

number of adults represented, and state income tax assessed on those returns. We also use data

on EITC transfers to counties, reported in the BEA's Local Area Personal Income Accounts.

These latter data are available for states outside of California as well, which we consider in

robustness checks. All monetary values are converted to real 2014 dollars using the CPI-U.

We apply a fixed definition across years of a low-income state return based on quintiles

of California's 1979 AGI distribution.[21] More specifically, we define the bottom quintile – AGI

below $13,150 (2014 dollars) – as low-income. By a rough approximation – assuming applicants

occupied the same ranks in the AGI and hourly wage distributions (see Appendix Figure A3) –

the bottom quintile would have been relevant for 96% of California SAWs and 51% of

California's general legalization program applicants at the time of application, or nearly 71% of

all California applicants.[22]

---

[20] All data sources introduced in this section are described in detail in Appendix A.

[21] Using the 1979 distribution allows us to present results for the narrowest possible income ranges given rising inequality over the 1980s. Note that we must trim the 1979 AGI distribution at both the bottom ($1) and top ($130,433 in 2014 dollars, the 93rd percentile of the 1979 distribution) to apply a fixed definition of a low-income return across years; the quintiles pertain to this trimmed distribution. See Appendix A.

[22] We benchmark the quintile thresholds of the overall 1979 California AGI distribution to the California wage distribution (based on the 1987 and 1988 CPS-MORGs) and determine the percentiles of the California general

While we focus on the bottom quintile in our event-study estimates, we show results for higher quintiles for our preferred long-difference specification. We anticipate finding declining short-term estimates across quintiles; in fact, the AGI minimum for the third quintile ($28,450) exceeds expectations for 90% of applicants at the time of application, suggesting that short-term estimates for the third quintile and above provide useful falsification checks. Over the medium term, however, this need no longer need be true, as the IRCA cohort ages and earns more. Even so, EITC eligibility would have arguably remained high through the end of the sample period.[23]

We aggregate the CAFTB state tax outcomes and BEA EITC transfers to the MSA level, due to limitations on geographic detail in several key controls introduced below, and normalize the aggregate MSA figures by annual estimates of MSA working age population (15- to 64-year-olds), based on county-level data published by the Census Bureau. Our analysis then focuses on an annual, MSA-level panel for California for the 21 years spanning 1979 through 1999.[24]

Table 2 Panel B summarizes pre-IRCA (1986) levels of key outcome measures; the CAFTB count measures are multiplied by 100 to be on a comparable scale with $A_c$. For every 100 working-age people, between 10 and 11 California state returns were filed in 1986 and about 12 adults and 4 dependents were represented in the bottom quintile of the state's 1979 AGI distribution. The average working age person also received about $23.50 in EITC transfers.

---

[23] legalization program and California SAW wage distributions at the time of application (based on data from the LPS and 1989 NAWS) that correspond to the resulting wage values. This procedure implies that the second quintile will capture the remaining 4% of SAW applicants and 31% of general legalization program applicants (19% of all applicants), the third quintile 10% of general legalization program applicants (5.6% of all applicants), the fourth quintile 5% of general legalization program applicants (2.8% of all applicants), and the fifth quintile the remaining 3% of general legalization program applicants (1.7% of all applicants).

[23] During the period of Green Card distribution under IRCA (1988 to 1992), EITC eligibility was limited to families with children and phased out completely at around $37,000 in annual family earnings. In 1994, following the 1993 Omnibus Budget Reconciliation Act, the maximum earnings to qualify for the EITC rose, particularly for families with two or more children, and an EITC for childless adults was introduced. See Appendix Figure A4.

[24] Using metro areas instead of counties also may help limit attenuation due to internal migration of the applicants. The choice of a 1999 end date is arbitrary, but also motivated by this concern.

While there are some significant differences in 1986 average tax characteristics across MSAs with above- and below-median applicant shares (column 4), our estimation strategy exploits the entire continuum of $A_c$ and, to account for the "tech boom," allows for different unrestricted outcome trends in the Bay Area and the rest of the state.[25] Column 5 shows that conditional on a Bay Area fixed effect to match this specification, the predictive power of $A_c$ for 1986 tax outcomes is a bit weakened statistically. Even so, our preferred estimates allow for time-varying effects of tax characteristics where the coefficient on $A_c$ is significant, marked with a "†".

Unfortunately, we cannot study impacts on the same personal income tax outcomes at the federal level due to the lack of sufficiently detailed statistics on federal income tax returns for counties or MSAs. We instead provide evidence of increased federal filing among the low-income using state-level variation in $A_c$ (Appendix Figure A2) and published state-level data on the number of EITC claims from IRS Statistics of Income (SOI) from 1983 forward. The *SOI Bulletins* also give total EITC amounts claimed (including refunds and reductions in positive tax liability), providing a point of comparison to estimates based on the BEA reports of EITC transfers. Again, we normalize these figures by annual estimates of working-age population and focus on annual panel data through 1999. Since it is an outlier in terms of applicant share, we exclude California from the state-level analysis.

## 3.2.    *Data on Potential Confounders*

Because our empirical strategy relies on variation across areas over time, our estimates are at risk of contamination by other local area shocks to EITC transfers or to the state income tax participation and net state income tax payments of lower-income populations. We attempt to mitigate this risk by including control variables in our models.

---

[25] As shown in Figure 3, the MSAs of the Bay Area – Oakland, San Francisco, San Jose, Santa Cruz, Santa Rosa, and Vallejo – on average had lower values of $A_c$.

One worry is that metro areas with higher $A_c$ experienced relative increases in tax-filing rates among low earners or in EITC transfers because those areas gained relatively more low earners over time. Our models therefore allow for time-varying effects of pre-IRCA area characteristics that correlate with trends in local wage structures over the period of interest. Aside from the Bay Area dummy, 1980 educational composition of the population is a useful predictor of changes in the local wage structure: metro areas with higher education levels experienced relatively large gains in the returns to education over the 1980s (Beaudry, Doms, and Lewis, 2010). We gather data on the educational attainment of adults from published tabulations from the 1980 Census (Minnesota Population Center, 2011). California MSAs with higher applicant shares did indeed have higher high school dropout rates, though not different college equivalent rates (Table 2 Panel C); we allow for time-varying effects of both.

Most of our remaining controls are motivated by the need to account for other determinants of the EITC over the period of interest. First, holding the EITC schedule constant, EITC transfers to an area will depend not only on the local wage distribution, but also on the presence of children in tax-filing units with low earnings, the employment rate among low earners, and how informed the local population is about the EITC. We cannot observe these factors directly, but we can use employment to working-age population ratios (from County Business Patterns) as a proxy for local economic activity and the ratio of kids to the total working-age population as a measure of the presence of children.[26] By allowing for time-varying effects of 1986 per-capita EITC transfers, we may also account for different metro area trends in EITC knowledge.[27]

---

[26] For the state-level analysis, we use the state unemployment rate as a control.

[27] Chetty, Friedman, and Saez (2013) use the degree of "sharp bunching" around the first kink in the EITC schedule as a proxy for how informed a local population is about the EITC. For tax year 1996 (the first for which our data

Second, the EITC schedule expanded three times over the sample period – in 1987, 1991, and 1994 (Appendix Figure A4) – contributing to mechanical increases in EITC transfers holding constant program knowledge and the demographic and economic composition of the MSA population. The fact that new LPRs would have benefited from these expansions is not itself a source of bias, but rather the concern is that metro areas with relatively high applicant shares may have had a greater share of *non-applicants* with earnings in EITC expansion ranges. We gather information on the local share of likely non-applicants who stood to gain from the EITC schedule changes, given their earnings and presence of children, from the 1980 Census Public Use Microdata Samples (PUMS; Ruggles et al., 2015).[28] We also consolidate information on entire earned income distributions of likely non-applicants by family type in 1980 into an "expected EITC" for non-applicants, which applies later EITC schedules (inflation adjusted using the CPI-U) to each area's non-applicant population as of the 1980 Census.

There is little preliminary evidence that non-applicant responses to changes in the EITC schedule confound our inferences about EITC transfers. As shown in Table 2 Panel D, few predictors of future EITC transfers to the non-applicant population vary significantly with $A_c$. In addition, Figure 4 Panel A shows that both levels and trends in the expected non-applicant EITC are virtually identical across California MSAs with above versus below median applicant shares, with gains in expected EITC transfers arising as anticipated when the EITC expanded in 1987, 1991, and especially in 1994.[29] Yet, California MSAs experienced relatively large gains in actual EITC transfers well before this, and particularly between 1990 and 1991, when many IRCA

---

overlap), per-capita state EITC transfers are positively correlated with their state-level sharp bunching measure, suggesting that per-capita EITC transfers may also reflect knowledge about the program.

[28] Likely non-applicants include citizens and non-citizens not from Mexico or Central America.

[29] A similar result holds if we apply the EITC schedule to an MSA's likely non-applicant population in 1990. We prefer to construct expected EITC based on 1980 characteristics because they were predetermined as of IRCA.

applicants got Green Cards (Figures 1 and 2). To keep our specifications parsimonious, we allow for time-varying effects only of the two non-applicant shares that coincide roughly with newly eligible groups – corresponding to the highest income ranges shown in Table 2, panel D, by family type.

## 4.      Permanent Residency and Tax Outcomes

Our first empirical model is an event-study one in the spirit of Figure 4 Panel A, preserving year-to-year variation in the relationship of $A_c$ with outcomes and so not imposing the timing of LPR transitions. However, it uses all of the variation in $A_c$ across metro areas, more readily enabling a person-level interpretation of the estimates (see Appendix B). It also allows us to test whether differences in outcomes with $A_c$ change in a statistically meaningful way over time and to regression adjust these differences for other metro area-by-time varying factors. We then summarize the content of these event-study estimates and probe the robustness of our findings with a more restrictive long-differences model that takes the timing of Green Card distribution explicitly into account.

### 4.1.   Event-study estimates

Our event-study specification models outcome $y_{ct}$ in MSA $c$ in year $t$ as

(1) $$y_{ct} = \sum_{\tau \neq 87} \theta_\tau D_t^\tau \times A_c + \sum_{\tau \neq 87} \beta_\tau D_t^\tau \times X_c + X'_{ct}\kappa + \gamma_c + \alpha_t + \varepsilon_{ct} \,,$$

where $D_t^\tau$ is a year dummy, set to one if $t$ is equal to $\tau$, zero otherwise (or $D_t^\tau = 1[t = \tau]$). We interact the year dummies with applicant share, $A_c$, as well as with $X_c$ – the other pre-IRCA MSA characteristics described in Section 3.2 and marked with a "†" in Table 2, as well as a Bay Area dummy. We also control for the ratios of employment and children to the working-age population, $X_{ct}$. The MSA fixed effects, $\gamma_c$, then absorb all sources of potential bias, observed and unobserved, that are fixed within a metro area over time. The year fixed effects, $\alpha_t$, account for

shocks to outcomes shared by all California MSAs at a given point in time. $\varepsilon_{ct}$ represents unobserved determinants of outcomes.

The $\theta_\tau$'s are the parameters of interest, capturing the precise timing of differential changes in outcomes for areas with relatively high values of $A_c$ relative to the base year 1987 – the year before the LPR transitions for IRCA amnesty applicants began. If $A_c$ were a dummy for being above the median applicant share for the state, like in Figure 4 Panel A, and if there were no controls beyond the MSA and year fixed effects, $\theta_\tau$ would give a difference-in-differences in mean outcomes between above- and below-median MSAs shown in Figure 4 Panel A, in year $\tau$ versus 1987. Instead of splitting $A_c$ in two groups, model 1 uses the entire continuum of $A_c$, so $\theta_\tau$ becomes a difference in slope coefficient estimates on $A_c$ in $\tau$ versus 1987, and controls for other metro-area characteristics.

Figure 4 Panel B shows estimates of model 1 for EITC transfers per capita and for the expected non-applicant EITC. The capped vertical lines around the estimates represent their 95% confidence intervals; inference accounts for clustering on metro area, and regression estimates are weighted by 1986 MSA population.[30] For actual EITC transfers, estimates of the interaction coefficients $\theta_\tau$ are first statistically significant in 1991 and grow in magnitude in the years to follow. Also consistent with the trends shown in Figure 4 Panel A, event-study coefficient estimates for the expected EITC for non-applicants are relatively small and never significant.

Figure 5 turns to estimates of model 1 for the California state income tax measures, starting with low-income state filing rates in Panel A. MSAs with higher applicant shares experienced relatively large increases in bottom-quintile state returns filed per working age

---

[30] Given the potentially small number of clusters (23), our inference throughout the paper assumes degrees of freedom equal to the number of clusters less two (e.g., 21 degrees of freedom in the California analysis). Simulations by Cameron, Gelbach, and Miller (2008) imply that this approach generates tests of about correct size.

person starting in 1988. Estimates of the interaction coefficients $\theta_\tau$ are statistically significant by 1990 and continue to grow in magnitude through 1993; stabilization in 1992 or shortly thereafter is expected if Green Cards are the causal mechanism at work, given the timing of their distribution, repeated from Figure 2 with dashed green line (right axis) in the figure. Declines are possible across the late 1990s if the new LPRs moved up the income distribution with age.[31] Effects on real AGI per working age person (Panel B) follow a similar pattern.

As seen in Panel C, however, effects on state income taxes assessed on low-income filers do not, despite the increase in real AGI, suggesting limited state income tax liability among most new LPRs. State income taxes assessed are a function not only of AGI, but also of any deductions that lower taxable income, tax rates, and credits that reduce tax liability. Application of California's non-refundable child tax credit to the new filers can alone explain the null (to negative) findings for taxes assessed on low-income filers. Consistent with the IRCA amnesty applicants having children or being of prime age to do so (Table 1), many of the marginal low-income filers had dependents: the number of dependents claimed among low-income filers in relatively high $A_c$ MSAs changes roughly one-for-one with returns filed after 1987 (Panel A). Adding back our estimate of this credit to taxes assessed, in Panel C, generates a positive impact on "counterfactual" taxes, assuming this credit did not exist.

The key identifying assumption in model 1 is that unobserved determinants of outcomes were not trending differently across metro areas with higher applicant shares, particularly after 1987. Put differently, in the absence of IRCA's legalization provisions, we assume that areas with higher applicant shares would not have experienced different trends in outcomes after Green Cards were issued. Our choice of controls was intended to help satisfy this assumption,

---

[31] That EITC transfers per capita continue to rise (Figure 4) is a function of changes in the EITC schedule benefiting new LPRs, as discussed in more detail below.

but we cannot test it directly. If it were violated, though, metro areas with higher values of $A_c$ may have already been experiencing changes in outcomes in the pre-IRCA period. We test for pre-trends formally below but note now that the event-study estimates for $\tau < 1987$ are consistently statistically insignificant and small relative to those for $\tau > 1987$.

### 4.2. Long-difference estimates

The graphical evidence in Figures 4 and 5, based on estimation of model 1, suggests that the distribution of Green Cards through IRCA brought the previously unauthorized "out of the shadows" and onto income tax rolls in California. It also led to an increase in EITC transfers to California residents – and potentially to the residents of other states with amnesty applicants. But the focus there was only on low-income returns; the event-study model itself also does not provide a simple take-away message about magnitudes or a ready way of assessing robustness.

To address these limitations, we turn to a long-differences specification. We restrict attention to data from key years: 1981 (pre-IRCA), 1987 (pre-transition to permanent residency), 1993 (end of filing response to permanent residency), and 1999 (end of analysis period) and take 6-year long differences over 1981 to 1987, 1987 to 1993 (short term), and 1993 to 1999 (continuing to medium term). Stacking these differences, we then estimate the model:

(2) $$\Delta y_{ct} = \alpha_t + \theta_t A_c + \beta_t X_c + \Delta X'_{ct} \kappa + \Delta \varepsilon_{ct} \ ,$$

where $\Delta$ represents a 6-year difference ($\Delta y_{ct} = y_{ct} - y_{ct-6}$) and all other variables are as already defined. Thus, as in model 1, we force the effects of the time-varying covariates to be the same over time but allow effects of fixed MSA characteristics (and the intercept) to vary.

The $\theta_t$ ($t$ = 1987, 1993, and 1999) are now the parameters of interest. If IRCA's legalization were driving our findings, estimates of $\theta_{93}$ should be sizable and statistically significant for the outcomes considered in Figures 4 and 5, whereas estimates of $\theta_{87}$ should not be. Interpretation of

estimates of $\theta_{99}$ depends on the outcome at hand, even among the low-income; as discussed, effects could be seen as the legalized population ages, or as the tax policy that applies to new LPRs (e.g., the EITC schedule or California's child tax credit) changes. We designate estimates of $\theta_{93}$ as short-term impacts and the sum of estimates of $\theta_{93}$ and $\theta_{99}$ as medium-term impacts, allowing effects to accumulate over time. The sources of identification in short- and medium-term impacts in model 2 are relatively transparent: these coefficients will allow us to identify the effects of Green Cards distributed under IRCA only if the unobservable shocks to outcomes captured in $\Delta\varepsilon_{ct}$ – including anything from the intensity of IRCA's enforcement and the EITC expansions to changes in local wage structures – are not correlated with $A_c$.

Table 3 shows the long-difference estimates for the outcomes presented in Figures 4 and 5, again weighting by 1986 population and clustering standard errors on metro area. Column 1 gives estimates for state filing in the bottom quintile. These estimates follow the basic pattern posited above. There was no differential growth in state filing in higher $A_c$ areas before IRCA and a significant decline in bottom-quintile filing between 1993 and 1999, consistent with Figure 5 Panel A. But during the short-term, each additional percentage point increase in applicant share yielded on average 4 more bottom-quintile returns per every 1000 working age people. For the average California MSA, which had an applicant share of 7.1% and a 1986 working age population of 770,000, the estimates suggest that IRCA's legalization programs generated an additional 23,070 low-income tax returns by 1993.

There is another way to contemplate magnitudes. In particular, if the estimates not only identify the effect of legalization but non-applicants were also completely unaffected, the effect of moving from 0% to 100% on $A_c$ is equivalent to the person-level impact of applying for amnesty (see Appendix B). Under these assumptions, our estimates imply that being an amnesty

applicant increased the short-term probability of filing a bottom-quintile state income tax return by 0.422. Scaling up this estimate to reflect the 88% rate of Green Card receipt among applicants by 1993, we arrive at the implied short-term effect of LPR status on the likelihood of filing a return and having AGI in the lowest quintile – a 48 percentage point (0.422/0.88 x 100) increase.

Of course, the implied effect of a Green Card on the likelihood of filing a return *at all* needs to add up effects across quintiles of the AGI distribution, just like the *total* number additional returns filed due to the amnesty needs to account for higher-income returns. The solid lines in Figure 6 Panel A connect the short-term long-difference estimates for the state filing rate for all quintiles through the fourth, where our ability to reliably detect effects dies out along with their likelihood of occurring.[32] The short-term impact, shown in the first row of Table 4, is then the implied total effect of having a Green Card at the person level, aggregating across the first four quintiles and normalizing by the 88% Green Card issuance rate.[33] Becoming an LPR increased an applicant's short-term chances of filing a state income tax return by 61.8 percentage points. This corresponds to an increase in the total number of returns filed in California between 1987 and 1993 of around 820,000 annually.[34] By 1999, these figures decline to 53.2 percentage points and about 708,000 annual returns.

Such figures might seem too low to be consistent with a high degree of tax compliance among IRCA Green Card holders. But in cases where these new LPRs filed *joint* returns (i.e., if they were married to one another), only one new tax return would have been filed for every two

---

[32] Appendix Figure 1 plots the pre-trends (long-difference estimates for 1981 to 1987) by quintile for all of the same outcomes as in Figure 6.  The capped vertical lines in both figures represent 95% confidence intervals.

[33] Adding in the fifth quintile generates enough noise to swamp the point estimate, particularly for continuous outcomes such as real AGI and taxes assessed, where outlying values can be influential on the estimates. For the count outcomes, estimates are not statistically different with the fifth quintile included.

[34] We use the total number of working-age Californian applicants (1,511,772=1,622,074 x 0.932; see Table 1) in this calculation and all subsequent calculations like it. We also continue to apply the 88% transition rate to LPR status. Thus, we estimate that 1,330,360 (=0.88*1,511,772) working age California applicants obtained Green Cards.

applicants. Figure 6 Panel B gives long-difference estimates by quintile for the number of *adults* represented on returns (2 x number of joint returns + number of single returns), a concise way of summarizing this information; see also column 2 of Tables 3 and 4. These estimates follow the same pattern for filing overall but yield a higher short-term impact, of 83.7%, corresponding to 1.11 million adults. For the medium term, these figures fall slightly to 75.5% and one million, respectively. The implied filing rate is very similar to the non-applicant filing rate of 76.4%, estimated using the number of adults represented on California state income tax returns as a fraction of the 1986 working-age population, net of applicants.

The quintile-specific estimates also provide insight into income mobility among the applicants. The short-term filing estimates shown in Panels A and B of Figure 6 are roughly proportional to the share of applicants that we anticipated each quintile would represent: effects are largest for the bottom quintile and fade out by the third. But there is suggestion of upward mobility over the medium term, as shown in the dashed line: over 1993 to 1999, declines in representation in the bottom quintile are statistically significant and increases in the third are almost so. There is also evidence of increases in real AGI and state income tax contributions in the third quintile later in the 1990s (Panels D and E), and of relative declines in the number of dependents claimed (Panel C), which would be expected as the IRCA cohort ages.[35] However, any conclusions about income mobility must necessarily be relatively speculative given the increasing possibility of geographic mobility among applicants over time.

The last two columns of Tables 3 and 4 present long-difference estimates and implied short- and medium-impacts for actual EITC transfers and expected non-applicant EITC transfers. Even with potential income mobility in this population, it is not surprising to see a positive

---

[35] We do not show tax revenues gross of the California child tax credit above the third quintile (panel F) because for much of the 1990s the credit was unavailable to higher income taxpayers.

medium-term impact that is significantly larger than the short-term estimate: the expansion of the EITC in 1994 would have yielded large benefits for new LPRs with two or more children already filing a tax return and claiming the EITC. The estimates imply that IRCA's legalization provisions generated nearly $494 million in EITC transfers for California residents by 1993. By 1999, this figure rose to $988 million. Reassuringly, we find no impact on the expected non-applicant EITC and no significant pre-IRCA trend in EITC transfers to higher $A_c$ areas.

Returning to the question of interpretation, the implied person-level EITC effects of having a Green Card can be fruitfully compared to mechanical EITC eligibility impacts – what we anticipate EITC transfers to applicants to have been based on their characteristics (Table 1 and associated data) if there had been no behavioral labor supply response to the EITC and an effect on federal tax filing equal to what we see at the state level.[36] Assuming complete take-up of the EITC among new tax filers, mechanical EITC impacts are very similar to what we find over the medium term – $697 versus $743 (Table 4, column 7).[37] Combining the actual estimate with its counterpart for overall state filing rate – and assuming that increases in state filing match those for federal filing – generates around $1,400 ($743/0.532) in EITC transfers on the marginal

---

[36] To project "mechanical" EITC eligibility, we map family income-by-fertility bins in the LPS and NAWS onto formulaic 1993 and 1999 EITC amounts using Mexican and Central American immigrants in California in the 1980 Census PUMS. We use family income from baseline and fertility as of 1992 in the LPS (sample of general legalization program applicants). In the NAWS (sample of SAW applicants), we use family income at baseline but project fertility forward using a model estimated on the two years of LPS data. Mechanical EITC amounts would be larger if fertility is higher than we predict but smaller if LPRs experienced family earnings growth after 1992.

[37] If we allow for the more realistic scenario of incomplete take-up – specifically, an 80% take-up rate, consistent with existing IRS tabulations (https://www.eitc.irs.gov/eitc-central/participation-rate/eitc-participation-rate-by-states, accessed July 3, 2018) – our estimates are larger than would be expected on the basis of mechanical effects alone, leaving some scope for a behavioral response (e.g., $568 by 1999). Such behavioral labor supply responses have been found to be empirically important (e.g., Eissa and Liebman, 1996; Eissa and Hoynes, 2004). Unfortunately, we cannot estimate behavioral labor supply responses to qualifying for the EITC using our research design, because it at best identifies the reduced-form impacts of obtaining a Green Card; the Current Population survey is also too small and identifies too few metro areas to estimate even reduced-form labor supply responses. However, estimates of the impact of the EITC on the income distribution suggest that mechanical contributions outweigh behavioral ones (Chetty, Friedman, and Saez, 2013).

002204

return. In the short-term, the mechanical amounts ($598) are larger than the estimates ($371), suggesting that take-up of the EITC among new filers may have been incomplete initially.

## 5.    Robustness

Our approach yields fairly compelling evidence that IRCA Green Card holders filed California state tax returns at high rates and received sizable federal EITC transfers. But questions remain: Are these findings somehow idiosyncratic to California? Applicant share is also not randomly assigned, so despite our judicious choice of controls and the robustness checks shown thus far, could our estimates be capturing something beyond the impacts of IRCA's legalization? We address these concerns in this section, largely by estimation of EITC impacts using other geographies.

### 5.1.    *Application of the Long-Difference Model to Other Geographies*

In the spirit of the last column of Table 2, the first two columns of Table 5 give within-state slopes on $A_c$ for key baseline MSA characteristics for California (column 1, but now without Bay Area fixed effects) and for Florida and Texas (column 2, controlling for state fixed effects), which offer enough within-state variation in applicant share to support identification (Appendix Table A1). Column 3 does a similar exercise for state-level characteristics, using the state-level variation in $A_c$ (Appendix Table A2) but excluding California. There may be slightly more balance on education composition in Florida and Texas than in California, but the estimates are imprecise. At the state level, $A_c$ is positively correlated with college equivalent share, but negatively correlated with dropout share – the opposite of what is true across California MSAs.

The first two columns of Table 6 give EITC transfer and expected non-applicant EITC transfer estimates for California MSAs using a specification that is estimable for these other

geographies.[38] The short- and medium-term estimates are larger than what we find at baseline, suggesting the importance for magnitudes of the additional controls available in California. Even so, the consistent pattern of effects supports consideration of the pared-down specification for Florida and Texas. As shown in columns 3 and 4, estimates for Florida and Texas MSAs (including state-by-year fixed effects) are similar to the California estimates. At the state level, the short-term impacts are also very similar to what we found for California: LPR status on average yields about a $520 annual EITC transfer (column 5), compared to a $480 transfer in California (column 1). Medium-term impacts are not as large, but they are imprecise. The expected non-applicant EITC findings (column 6) also suggest that the medium-term estimates at the state level may be biased downward by non-applicant populations in states with higher applicant shares benefiting less from the 1994 EITC expansion.

Despite this caveat, the remaining columns of Table 6 show estimates for two outcomes that can only be observed at the state level: total EITC amounts (which incorporate reductions in tax liability; column 7) and federal returns claiming the EITC (x 100; column 8), both normalized by working age population. The identifying variation in the long-difference model yields increases in EITC transfers on the extensive margin, just as we would expect if Green Cards were the causal mechanism. Taken literally, the estimates imply that becoming an LPR increases the likelihood of claiming the EITC by 38 percentage points in the short term and by 24 percentage points over the medium run. These figures understate the number of adult LPRs on a return claiming the EITC, however, due to instances of joint filing.

*5.2.   Alternative Research Design*

---

[38] From the vector $X_c$, we thus exclude the Bay Area fixed effect and the 1986 levels of state income tax outcomes.

If IRCA's stepped-up immigration enforcement measures fell differentially on high Hispanic density areas, as described in Section 2.3, our estimates so far may capture the joint effects of legalization and enforcement.[39] High Hispanic density areas may also have experienced different trends in the outcomes of interest for other reasons, completely unrelated to IRCA. For example, heterogeneous outcome trends could arise due to differences in the industrial structures of areas with high Hispanic population shares, combined with differences in the effects of the business cycle across industries.

As a final check on our findings, we therefore consider an alternative research design that parameterizes the effects of IRCA's legalization via a difference across states in application rates from the Hispanic population.  New York is a good candidate state to use as a comparison group: like California, New York had a high Hispanic share in 1980 (11% versus 19%), but New York's Hispanics were weighted toward groups that were already citizens or authorized. The ratio of applicants to Hispanics should therefore have been much higher in California than in New York. If application (and ultimately Green Cards) affected outcomes, the same Hispanic share should have then translated into a larger change in outcomes in California than in New York.

This idea is captured by the model:

(3) $$\Delta y_{cst} = \alpha_{st} + \theta_{st} H_c + \beta_{st} X_c + \Delta \varepsilon_{cst} \, ,$$

where $H_c$ is now the 1980 Hispanic population share in MSA $c$ in state $s$, estimated from Census tabulations (Minnesota Population Center, 2011). Except for the use of $H_c$ in place of $A_c$, model 3 is very similar to model 2, where parameters had implicit $s$ subscripts in being estimated for California only. But the parameters of interest in model 3 are *differences* in the coefficients

---

[39] Such enforcement efforts may have also differentially affected areas with high foreign-born share. We have therefore also done the exercise described below using foreign-born share in place of Hispanic share, with very similar results. As explained earlier, though, it is not *a priori* clear what impact IRCA's combination of border enforcement and employer sanctions might have had on *local* tax outcomes, if any.

on $\theta_{st}$ across California and New York (i.e., $\theta_{CA,t} - \theta_{NY,t}$). Thus, adding New York allows us to difference out time-varying direct effects of Hispanic share – something that would have been difficult to do in the California-only analysis given its high correlation with applicant share.

The first column and panel of Table 7 shows this correlation, regression adjusting for the more limited set of controls available for MSAs in all states that was used in Table 6. In California, every percentage point increase in Hispanic share was associated with a 0.597 percentage point increase in applicant share. The corresponding estimate in New York (column 2) is much smaller, and the 0.423 percentage point difference in coefficients on Hispanic share is highly statistically significant (column 3).

The remainder of Table 7 presents the estimates of $\theta_{CA,t}$ and $\theta_{NY,t}$ for EITC transfers, the only outcome for which we can implement this approach, along with $\theta_{CA,t} - \theta_{NY,t}$ (without and then with time-varying MSA controls), for each of the three periods considered in our long-difference analysis. The California-specific estimates (column 1) suggest an effect: the coefficient on $H_c$ is much more positive and statistically significant after IRCA. And the New York-specific estimates (column 2) provide little reason to think that the California estimates are biased, at least through the short-term. However, the New York coefficient on Hispanic share is negative though not strongly significant for the 1993 to 1999 difference. Areas with higher Hispanic shares thus appear to have had *lower* growth in EITC transfers after 1993, suggesting some downward bias in our medium-term estimates.

Regardless, differences in the California and New York coefficients for the short- and medium-term, shown in column 3, are positive and statistically significant. Implied effects are larger than our initial long-difference estimates for California only, but they also have large

standard errors.[40] Adding time-varying controls, in column 4, produces implied effects that are somewhat smaller. Consistent with the effects being driven by new LPRs, we find no relationship with expected EITC transfers to the non-applicant population (column 5). Overall, results from this alternative approach suggest that factors affecting the outcomes of interest that are correlated with Hispanic population share – including aspects of IRCA's enforcement – are not dramatically biasing the inferences from our baseline approach.

## 6.    Conclusion

In this paper, we have explored how personal state income tax participation,  net state income payments, and EITC transfers evolved after three million low-wage unauthorized immigrants, mainly from Mexico and Central America, were given the opportunity to apply for Green Cards starting in the late 1980s. Exploiting the timing and geographic intensity of IRCA's legalization programs and unique tax statistics from California, among other data sources, we find that becoming an LPR dramatically increased the chances these immigrants both filed income tax returns and, potentially via new filing, received the EITC.

The new state returns generated little in the way of new tax payments through the end of the 1990s. However, tentative evidence of rising incomes among the new LPRs is consistent with existing research findings (Kassoudji and Cobb-Clark, 2002; Amuedo-Dorantes, Bansak, and Raphael, 2007) and suggests that an alternative approach following people rather than areas over time (to account for residential mobility of applicants) would reveal long-term positive impacts of legalization on state income tax revenues. Unfortunately, such person-level data are not currently available, nor are published statistics granular enough to examine how this historical

---

[40] To obtain these impacts, we estimated model 3 on the combined California-New York data using instrumental variables, where the instruments were (year-specific) interactions between 1980 Hispanic share and a dummy for California (conditional on year-specific direct effect of Hispanic share). We then scaled the IV estimates by multiplying by 100 and dividing by the estimated LPR transition rate, 0.88, as in earlier tables.

episode affected payroll tax contributions. If Green Cards induced shifts in employment to the covered sector, the payroll tax effects would have been sizable.[41]

By the late 1990s, however, the maximum EITC would have more than just offset payroll tax contributions; it would have elevated the incomes of immigrant families, and potentially dramatically so. On the one hand, there would have been deadweight loss involved in this redistribution. On the other, mounting evidence suggests that the social benefits from childhood exposure to the EITC – manifested in improved health at birth (Hoynes, Miller, and Simon, 2015), higher test scores (Dahl and Lochner, 2012), and higher levels of educational attainment (Bastian and Michelmore, 2017; Manoli and Turner, 2018) – would have been more than enough to compensate. And indeed, recent work suggests that childhood exposure to other social programs, such as food stamps (East, 2014) and public health insurance (Bronchetti, 2014), is particularly beneficial for immigrants.[42] Overall, our findings are thus consistent with other studies (e.g., Baker, 2015) that point to social benefits from a permanent solution to the challenge of a large unauthorized population.

---

[41] There was likely a positive impact on sales tax revenues proportional to applicant share as well. For example, the combined state and local California rate of sales tax was 7.25% (starting in 1991); Florida and Texas had sales tax rates of 6% and 6.25%. So a significant share of legalized immigrants' income and wage gains were likely returned to treasuries in these states. On top of this, IRCA's legalization appears to have induced Mexican arrivals to decrease their remittances (Amuedo-Dorantes and Mazzolari, 2010) and so may have increased their consumption holding constant income, as has been found in European amnesties (Dustmann, Fasani, and Speciale, 2017).

[42] See Bitler and Hoynes (2013) for a discussion of the evidence on immigrants and social programs broadly. Revoking legal status is not necessary to deter take-up of social programs by immigrants; research suggests that aggressive interior enforcement is enough (Alsan and Yang, 2018; Watson, 2014).

002210

**References**

Alsan, Marcella and Crystal Yang. 2018. "Fear and the Safety Net: Evidence from Secure Communities." NBER Working Paper 24731.

Amuedo-Dorantas, Catalina and Francisca Antman. 2017. "Schooling and labor market effects of temporary authorization: evidence from DACA." *Journal of Population Economics* 30(1): 339-373.

Amuedo-Dorantes, Catalina, Cynthia Bansak, and Steven Raphael. 2007. "Gender Differences in the Labor Market: Impact of IRCA' Amnesty Provisions." *American Economic Review, Papers & Proceedings* 97(2): 412-416.

Amuedo-Dorantes, Catalina and Francesca Mazzolari. 2010. "Remittances to Latin America from Migrants in the United States: Assessing the Impact of Amnesty Programs." *Journal of Development Economics* 91(2): 323-335.

Baker, Scott R. 2015. "Effects of Immigrant Legalization on Crime." *American Economic Review, Papers & Proceedings* 105(5): 210-213.

Baker, Susan Gonzalez. 1990. *The Cautious Welcome: The Legalization Programs of the Immigration Reform and Control Act.* Washington DC: The Urban Institute.

Bansak, Cynthia and Stephen Raphael. 2001. "Immigration Reform and the Earnings of Latino Workers: Do Employer Sanctions Cause Discrimination?" *Industrial and Labor Relations Review* 54(2): 275-295.

Bastian, Jacob and Katherine Michelmore. 2017. "The Long-Term Impact of the Earned Income Tax Credit on Children's Education and Employment Outcomes." *Journal of Labor Economics*, forthcoming.

Beaudry, Paul, Mark Doms, and Ethan Lewis. 2010. "Should the PC be Considered a Technological Revolution?  Evidence from US Metropolitan Areas." *Journal of Political Economy* 118(5): 988-1036.

Bell, Brian, Francesco Fasani, and Stephen Machin. 2013. "Crime and Immigration: Evidence from Large Immigrant Waves." *Review of Economics and Statistics* 95(4): 1278-1290.

Bitler, Marianne and Hilary Hoynes. 2013. "Immigrants, Welfare Reform, and the US Safety Net." In Card, David and Steven Raphael, Eds. *Immigration, Poverty, and Socioeconomic Inequality*.  New York:  Russell Sage Foundation.

Bronchetti, Erin. 2014. "Public Insurance Expansions and the Health of Immigrant and Native Children." *Journal of Public Economics* 120: 206-219.

002211

Brunner, Eric J. and Jon Sonstelie. "California's School Finance Reform: An Experiment in Fiscal Federalism." In William A. Fischel, Ed., *The Tiebout Model at Fifty: Essays in Public Economics in Honor of Wallace Oates*. Cambridge, MA: Lincoln Institute of Land Policy.

Cameron, A. Colin, Jonah B. Gelbach, and Douglas L. Miller. "Bootstrapped-Based Improvements for Inference with Clustered Errors." *The Review of Economics and Statistics* 90(3): 414-427.

Card, David and Ethan Lewis. 2007. "The Diffusion of Mexican Immigrants During the 1990s: Explanations and Impacts." In George J. Borjas, Ed., *Mexican Immigration to the United States*. Chicago: University of Chicago Press, p. 193-227.

Chassamboulli, Andri and Giovanni Peri. 2015. "The Labor Market Effects of Reducing The Number of Illegal Immigrants." *Review of Economic Dynamics* 18(4): 792-821.

Chetty, Raj, John Friedman, and Emmanuel Saez. 2013. "Using Differences in Knowledge Across Neighborhoods to Uncover the Impacts of the EITC on Earnings." *American Economic Review* 103(7): 2683-2721.

Cobb-Clark, Deborah A., Clinton R. Shiells, and B. Lindsay Lowell. 1995. "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages." *Journal of Labor Economics*, 13(3): 472-498.

Dahl, Gordon B. and Lance Lochner. 2012. "The Impact of Family Income on Child Achievement: Evidence from the Earned Income Tax Credit." *American Economic Review* 102(5): 1927-1959.

Dustmann, Christian, Francesco Fasani and Biagio Speciale. 2017. "Legal Status and Consumption Behaviour of Immigrant Households." *Journal of the European Economic Association* 15(3): 654-691.

East, Chloe. 2018. "The Effect of Food Stamps on Children's Health: Evidence from Immigrants' Changing Eligibility." Mimeo, University of Colorado-Denver.

Gathmann, Christina. 2008. "Effects of enforcement on illegal markets: Evidence from migrant smuggling along the southwestern border." *Journal of Public Economics* 92(10-11): 1926-1941.

Hanson, Gordon H., and Antonio Spilimbergo. 1999. "Illegal Immigration, Border Enforcement, and Relative Wages: Evidence from Apprehensions at the U.S.-Mexico Border." *American Economic Review*, 89(5): 1337-1357.

Eissa, Nada and Hilary Hoynes. 2004. "Taxes and the Labor Market Participation of Married Couples: The Earned Income Tax Credit" *Journal of Public Economics* 88 (9-10): 1931-1958.

002212

Eissa, Nada and Jeffrey Liebman. 1996. "Labor Supply Response to the Earned Income Tax Credit." *Quarterly Journal of Economics* 111(2): 605-637.

Freedman, Matthew, Emily Owens, and Sarah Bohn. 2018. "Immigration, Employment Opportunities, and Criminal Behavior." *American Economic Journal: Economic Policy* 10(2): 117-151.

Hoefer, Michael, Nancy Rytina, and Brian Baker. 2013. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011." Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security.

Hoynes, Hilary, Douglas L. Miller, and David Simon. 2015. "Income, the Earned Income Tax Credit, and Infant Health." *American Economic Journal: Economic Policy* 7(1): 172-211.

Kaushal, Neeraj. 2006. "Amnesty Programs and the Labor Market Outcomes of Undocumented Workers." *Journal of Human Resources* 14(3): 631-647.

Kossoudji, Sherrie A., and Cobb-Clark, Deborah A. 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population." *Journal of Labor Economics*, 20(3): 598-628.

Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2018. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA." NBER Working Paper 24315.

Lozano, Fernando and Todd A. Sorensen. 2011. "The Labor Market Value to Legal Status." IZA Discussion Paper 5492.

Dayanand Manoli and Nicholas Turner. 2018. "Cash-on-Hand and College Enrollment: Evidence from Population Data and the Earned Income Tax Credit." *American Economic Journal: Economic Policy* 10(2): 242-271.

Mastrobuoni, Giovanni and Paolo Pinotti. 2015. "Legal Status and the Criminal Activity of Immigrants." *American Economic Journal: Applied Economics* 7(2): 175-206.

Minnesota Population Center. 2011. National Historical Geographic Information System: Version 2.0. Minneapolis, MN: University of Minnesota.

Monras, Joan, Javier Vázquez-Grenno, and Ferran Elias. 2018. "Understanding the Effects of Legalizing Undocumented Immigrants." Manuscript, March 2018.

National Academies of Sciences, Engineering, and Medicine; Division of Behavioral and Social Sciences and Education; Committee on National Statistics; Panel on the Economic and Fiscal Consequences of Immigration. 2016. *The Economic and Fiscal Consequences of Immigration*. Francine D. Blau and Christopher Mackie, Editors.

002213

Orrenius, Pia, and Madeline Zavodny. 2003. "Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA." *Demography*, 40(3): 437-450.

Pan, Ying. 2012. "The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986." *Journal of Labor Research* 33: 119-142.

Pinotti, Paolo. 2017. "Clicking on Heaven's Door: The Effect of Immigrant Legalization on Crime." *American Economic Review* 107(1): 138-168.

Pope, Nolan. 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants." *Journal of Public Economics* 143: 98-114.

Ruggles, Steven, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek. 2015. *Integrated Public Use Microdata Series: Version 6.0*. Minneapolis: University of Minnesota.

Rytina, Nancy. 2002. "IRCA Legalization Effects: Lawful Permanent Residence and Naturalization through 2001." Mimeo, Office of Policy and Planning Statistics Division, U.S. Immigration and Naturalization Service.

Short, Kathleen. 2014. "The Supplemental Poverty Measure: 2014." Current Population Reports P60-254. Washington, D.C.: U.S. Census Bureau.

Steigleder, Quinn and Chad Sparber. 2017. "The effect of legal status on immigrant wages and occupational skills." *Applied Economics Letters* 24(2): 80-84.

United States Department of Homeland Security. 2017. *Yearbook of Immigration Statistics: 2016*. Washington, D.C.: U.S. Department of Homeland Security, Office of Immigration Statistics.

United States General Accounting Office (GAO). 1990. *Immigration Reform:  Employer Sanctions and the Question of Discrimination*.  (GAO/GGD-90-62). Washington, D.C.: United States General Accounting Office.

Watson, Tara. 2013. "Inside the Refrigerator: Immigration Enforcement and Chilling in Immigrant Medicaid Participation." *American Economic Journal: Economic Policy* 6(3): 313-338.

Woodrow, Karen A. and Jeffrey S. Passel. 1990. "Post-IRCA Undocumented Immigration to the United States: An Assessment Based on the June 1988 CPS." In F.D. Bean, B. Edmonston, and J.S. Passel Eds. *Undocumented Migration to the United States: IRCA and the Experience of the 1980s*. Washington, DC: Urban Institute Press.

002214

002215



Figure 1. U.S. Admissions: Green Cards Issued by Year
1970-2016

*Notes:* Data sources: United States Department of Homeland Security (2017), Rytina (2002), and authors' calculations.

34

002216



Figure 2. Cumulative Legal Status of IRCA Legalization Applicants Over Time

*Notes:* Numbers of initial applicants and temporary admissions were calculated by the authors at the year and month level from the LAPS data, excluding the 2% of applicants whose application date was not provided. Numbers of permanent residents and naturalized citizens by fiscal year (ending October of calendar year) are from Rytina (2002). To calculate cumulative transitions to permanent residency and citizenship, we divide the published fiscal year figures by the total number of applicants as reported in the LAPS data.

35

002217



Figure 3. IRCA Legalization Applications, Age 15-64, by California MSA

% of 1986 Population Aged 15-64

Range:
(12,16]
(8,12]
(4,8]
(2,4]
(1,2]
(.5,1]
[.001,.5]
Non-metro/No Data

*Notes*: Map plots the percent of a metropolitan area's 1986 working age population that applied for legal status under IRCA.  The number of working-age applicants for legal status was calculated by the authors from the LAPS data, and the 1986 working age population was estimated by the Census Bureau. Working age is defined as ages 15-64 for consistency across the two data sets.

Figure 4.  EITC Transfers/Working Age by Applicant Share



*Notes*:  Panel B shows coefficients (95% confidence intervals) on interactions between applicant share ($A_t$) and year dummies.  All specifications include MSA fixed effects, year fixed effects, employment-to-(working age) population, the ratio of children to (working age) population, and time-varying effects of a Bay Area dummy and the pre-existing MSA characteristics marked with a "+" in Table 2. Interactions with the indicator for 1987 are omitted to identify the model. Specifications are weighted by 1986 working age population, and standard errors are clustered on metro area. Vertical dotted lines at the end of fiscal 1987.

002218

002219



Figure 5. Personal Tax Outcomes Bottom Quintile of 1979 CA AGI

*Notes:* Figures show coefficients (95% confidence intervals) on interactions between applicant share ($\lambda_c$) and year dummies. All specifications include MSA fixed effects, year fixed effects, employment-to-(working age) population, the ratio of children to (working age) population, and time-varying effects of a Bay Area dummy and the pre-existing MSA characteristics marked with a "†" in Table 2. Interactions with the indicator for 1987 are omitted to identify the model. Specifications are weighted by 1986 working age population, and standard errors are clustered on metro area. Vertical dotted lines at the end of fiscal 1987.

38

002220



Figure 6. Impact on CA Income Tax Outcomes, by Quintile of 1979 CA AGI and Year

*Notes:* Solid lines show long-difference estimates (95% confidence intervals) separately by quintile of the 1979 CA AGI distribution of the outcome shown on applicant share ($A_c$). All specifications include year fixed effects, long differences in employment-to-(working age) population and the ratio of children to (working age) population, and time-varying effects of interactions between the year indicators and each of a Bay Area dummy and the pre-existing MSA characteristics marked with a "†" in Table 2. Specifications are weighted by 1986 working age population, and standard errors are clustered on metro area. Appendix Figure 1 plots pre-trends that are jointly estimated with these coefficients.

39



Appendix Figure 1. Impact on 1981-87 CA Income Tax Outcomes

*Notes:* Figures show pre-trends (1981-87 effects) (with 95% confidence intervals) for model jointly estimated with coefficients shown in Figure 6. Solid lines show long-difference estimates separately by quintile of the 1979 CA AGI distribution of the outcome shown on applicant share ($A_c$). All specifications include year fixed effects, long differences in employment-to-(working age) population and the ratio of children to (working age) population, and time-varying effects of interactions between the year indicators and each of a Bay Area dummy and the pre-existing MSA characteristics marked with a "+" in Table 2. Specifications are weighted by 1986 working age population, and standard errors are clustered on metro area.

002221

40

Table 1.  Demographic and Economic Characteristics of IRCA Applicants for Legal Status in California

| Applicant type: | General Legalization & SAW Programs (1) | General Legalization Program (2) | SAW Program (3) |
|---|---|---|---|
| | A. Universe Data (LAPS), at Time of Application | | |
| Age (%): | | | |
|   Working Age (15-64) | 93.2 | 88.8 | 99.6 |
|   Parent Age (20-44) | 74.4 | 71.6 | 78.4 |
| Female (%): | 33.8 | 45.0 | 17.9 |
| Mexican (%) | 83.3 | 77.8 | 91.3 |
| Hispanic (%) | 93.8 | 93.3 | 94.6 |
| Number of Applications | 1,622,074 | 956,302 | 665,772 |
| | B. Survey Data (LPS & NAWS) | | |
| Female (%) | | 43.3 | 17.9 |
| Mexican (%) | | 77.4 | 99.0 |
| Hourly wage ($2014), median * | | 11.4 | 9.5 |
|   Percentile, from CPS** | | 18.0 | 11.1 |
| Employed (%) * | | 79.5 | |
| Hours per Week\|Employed * | | 41.2 | |
| Paid Hourly (v. Piece Rate) (%) * | | | 81.3 |
| Hours per Week\|Paid Hourly * | | | 47.5 |
| High school dropout (%) | | 74.5 | 93.8 |
| Years of Schooling | | 7.8 | 4.9 |
| Married (%)*** | | 68.1 | 64.8 |
| Any Children (%)*** | | 82.0 | 45.9 |
| Two or More Children (%)*** | | 66.9 | 32.6 |
| Number of Observations | | 3,146 | 390 |

*Notes:* SAW=Seasonal Agricultural Worker. LAPS=Legalization Applications Processing System. LPS=Legalized Population Survey. NAWS=National Agricultural Workers Survey (FY89). Calculations from the LAPS are based on the universe of applicants who intended to reside in California at the time of application. Calculations from the LPS are based on the 3,146 survey respondents who were age 15-64 and intended to reside in California at the time of application for amnesty; note that the LPS only surveyed general legalization program applicants who were still in the U.S. and at least age 18 in 1989. Calculations from the NAWS are based on the 390 respondents aged 15-64 who were residing in California and had a pending application for legalization (assumed under the SAW program) at the time of the FY89 survey. * Measured at time of application for legal status in the LPS and at the time of the survey (FY89) in the NAWS. ** Percentile of the California wage distribution in the 1987-88 Merged Outgoing Rotation Group (MORG) files. *** In 1992 for general legalization program applicants and 1989 for SAW program applicants.

Table 2.  Pre-IRCA Area Characteristics and their Relationship with Applicant Share, California MSAs

| | Means (sd) All CA MSAs | Means (sd) by $A_c$: Above Median | Below Median | Difference (3)-(2) (se) | Linear Slope on $A_c$ (se)[*] |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) |
| **A. Treatment Variable: Applications/Working Age Population** | | | | | |
| All Applications (General Legalization + SAW), $A_c$ | 8.16 | 11.16 | 3.72 | 7.44 | |
| | (4.29) | (2.34) | (1.90) | (1.32) | |
| **B.  1986 Levels of Key Outcomes:  Full Population** | | | | | |
| EITC Transfers  per working age person (2014$)[†] | 23.5 | 25.4 | 20.7 | 4.7 | 0.7 |
| | (5.9) | (6.3) | (4.3) | (2.7) | (0.3) |
| California Tax Returns in the Bottom Quintile of the 1979 CA AGI Distribution/Total Working Age Pop: | | | | | |
| Number of Returns x 100 | 10.5 | 10.6 | 10.2 | 0.4 | 0.1 |
| | (1.3) | (1.2) | (1.4) | (0.5) | (0.1) |
| Number of Adults on Returns x 100 | 12.0 | 12.3 | 11.6 | 0.7 | 0.1 |
| = (2 x No. of Joint + No. of Single) x 100 | (1.8) | (1.7) | (1.9) | (0.6) | (0.1) |
| Number of Dependents x 100[†] | 4.2 | 5.2 | 2.7 | 2.5 | 0.3 |
| | (2.0) | (1.8) | (1.0) | (0.5) | (0.1) |
| Real Adjusted Gross Income (2014$)[†] | 631.9 | 650.2 | 604.7 | 45.5 | 6.0 |
| | (58.5) | (54.7) | (55.8) | (17.6) | (3.1) |
| Tax Payments (2014$) | 0.2 | 0.2 | 0.2 | 0.0 | 0.0 |
| | (0.1) | (0.1) | (0.1) | (0.0) | (0.0) |
| **C. % _all_  of Persons Ages Over Age 25 (1980 Census):** | | | | | |
| College Equivalents[†] | 40.9 | 38.2 | 44.8 | -6.6 | -0.3 |
| | (7.4) | (6.0) | (7.7) | (2.9) | (0.2) |
| No HS Degree[†] | 26.4 | 28.8 | 22.9 | 5.9 | 0.8 |
| | (5.7) | (5.4) | (4.3) | (2.0) | (0.2) |
| **D.  1980 Characteristics of Non-Applicants** | | | | | |
| 1986 Expected EITC Transfers to Non-Applicants (2014$) | 15.3 | 15.2 | 15.4 | -0.2 | -0.2 |
| /Total Working Age Population | (3.3) | (3.3) | (3.5) | (1.5) | (0.2) |
| Number of Families as a  % of Total Working Age Pop | | | | | |
| w/ Kids and No Earned Income | 1.71 | 1.77 | 1.60 | 0.17 | 0.03 |
| | (0.45) | (0.47) | (0.43) | (0.23) | (0.03) |
| w/ Kids and Earning $1-$4,999 | 1.52 | 1.50 | 1.55 | -0.05 | -0.03 |
| | (0.34) | (0.34) | (0.37) | (0.15) | (0.02) |
| w/ Kids and Earning $5,000-$9,999 | 1.97 | 2.01 | 1.91 | 0.10 | -0.02 |
| | (0.44) | (0.44) | (0.46) | (0.21) | (0.02) |
| w/ Kids and Earning $10,000-$14,999[†] | 24.22 | 24.71 | 23.51 | 1.20 | -0.22 |
| | (4.44) | (4.49) | (4.53) | (2.10) | (0.24) |
| w/o Kids and No Earned Income | 13.56 | 13.20 | 14.09 | -0.89 | -0.06 |
| | (2.25) | (2.00) | (2.58) | (1.09) | (0.09) |
| w/o Kids and Earning $1-$4,999[†] | 7.78 | 7.22 | 8.61 | -1.38 | -0.15 |
| | (1.68) | (1.35) | (1.84) | (0.47) | (0.09) |
| # of Metro Areas | 23 | 11 | 12 | 23 | 23 |
| Control for Bay Area Dummy? | No | No | No | No | Yes |

_Notes:_  Authors' calculations from the Legalization Application Processing System and Census estimated population (Panel A); the BEA's Local Area Personal Current Transfer Receipts (+1986 Census population estimates) and CAFTB statistics (Panel B); the 1980 Census tabulations (Panel C, from NHGIS), and 1980 Census PUMS (Ruggles et al., 2015; Panel D).  Means and regressions are weighted by Census estimates of 1986 area working-age population. Dollar figures in the 1980 Census are nominal (1979$).  The median California MSA has an applicant share of 6.98. Standard errors in columns 4 and 5 are heteroskedasticity-robust.  [†]Time-varying effects of these variables are included in subsequent models. [*]Slope on working age applications/working age population ($A_c$) in a linear regression of each characteristic on $A_c$ and a dummy for Bay Area = Oakland, San Franciscio, San Jose, Santa Cruz, Santa Rosa and Vallejo.

002223

Table 3.  Baseline Long-Difference Estimates for Low-Income Tax Outcomes:  California MSAs

| | Dependent variable is long difference in: | | | | | | | |
| | Count per total working age person (x 100) | | | Amount per working age person ($2014) | | | Amount per working age person ($2014) | |
| | In First Quintile of 1979 CA AGI Distribution | | | | | | EITC Transfers | |
| | #CA Tax Returns | #Adults on CA Tax Returns[+] | #of Dependents | CA Adjusted Gross Income | CA Income Tax Assessed | CA Tax Gross of Child Credit | Actual | Expected, Non-Applicants[++] |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| A. Pre-IRCA (1981 to 1987) | | | | | | | | |
| Applicant Share ($A_s$) | -0.018 | -0.027 | 0.062 | 4.3 | 0.009 | 0.021 | 0.360 | 0.400 |
| | (0.064) | (0.084) | (0.091) | (4.0) | (0.011) | (0.085) | (0.554) | (0.264) |
| B. Short Term (1987 to 1993) | | | | | | | | |
| Applicant Share ($A_s$) | 0.422 | 0.545 | 0.52 | 22.5 | -0.018 | 0.526 | 3.266 | 0.146 |
| | (0.075) | (0.095) | (0.079) | (2.2) | (0.010) | (0.078) | (0.733) | (0.186) |
| C. Medium Term (1993 to 1999) | | | | | | | | |
| Applicant Share ($A_s$) | -0.120 | -0.140 | -0.210 | -9.4 | -0.028 | -0.016 | 3.271 | 0.011 |
| | (0.043) | (0.059) | (0.063) | (3.3) | (0.015) | (0.139) | (1.884) | (0.500) |
| N (metro area x year) | 69 | 69 | 69 | 69 | 68 | 69 | 69 | 69 |
| P-values on F-tests | | | | | | | | |
| 1981-87 = 1987-93 | 0.000 | 0.000 | 0.000 | 0.000 | 0.027 | 0.000 | 0.000 | 0.253 |
| 1987-93 = 1993-99 | 0.000 | 0.000 | 0.000 | 0.000 | 0.638 | 0.000 | 0.997 | 0.696 |

*Notes*: All regressions are estimated on stacked long-difference data (for 1981-87, 1987-93, and 1993-99), and coefficients shown are those on interactions between MSA applicant share and year dummies. All regressions include year fixed effects, long differences in the ratios of total employment and number of children to the working age population, and time-varying effects of being in the Bay Area and the pre-IRCA MSA characteristics marked with a "+" in Table 2. Standard errors are clustered on metro area, and regressions are weighted by 1986 working-age population. +Number of joint returns +2 x number of single returns. ++Non-applicants defined as citizens and non-citizens not from Mexico or Central America. Expected EITC created by applying year-specific EITC program rules to non-applicants in the 1980 Census PUMS (Ruggles et al., 2015).

43

002224

Table 4.  Implied Effect of Permanent Residency on Tax Outcomes

| | CA Tax Outcomes, Combining AGI Quintiles 1-4 | | | | | | | |
| | Number per working age person | | | Amounts per working age person, 2014$ | | | EITC Transfers | |
| | #of Tax Returns | #of Adults[+] | #of Dependents | AGI | Income Tax | Tax Gross of Child Credit | Actual | Expected, Non-Applicants[++] |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Short-Term (-1993) | 0.618 | 0.837 | 0.931 | $3,328.01 | -$152.83 | $58.11 | $371.15 | $16.58 |
| | (0.120) | (0.169) | (0.190) | (2323.24) | (36.02) | (20.97) | (83.32) | (21.11) |
| Medium-Term (-1999) | 0.532 | 0.755 | 0.438 | $4,618.10 | -$129.01 | $218.88 | $742.85 | $17.87 |
| | (0.192) | (0.297) | (0.299) | (4207.64) | (44.67) | (44.96) | (288.32) | (76.50) |

*Notes*: In columns 1-6, the short-term effect is the sum of 1987 to 1993 coefficients from quintiles 1-4, shown in the corresponding panel of Figure 6, divided by 0.88 (reflecting the LPR transition rate). Medium-term effect is the sum of the 1987 to 1993 and 1993 to 1999 coefficients from Figure 6, also divided by 0.88. Short-term effects in columns 7 and 8 are the 1987 to 1993 coefficient in columns 7 and 8, respectively, of Table 4, and medium-term effects are the sum of the 1987 to 1993 and 1993 to 1999 coefficients, again divided by 0.88. All dollar outcomes are all also multiplied by 100. +Number of joint returns + 2 x number of single returns. . ++Non-applicants defined as citizens and non-citizens not from Mexico or Central America. Expected EITC created by applying year-specific EITC program rules to non-applicants in the 1980 Census PUMS (Ruggles et al., 2015).

44

002225

Table 5.  Linear Relationship Betwee Pre-Existing Area Characteristics and and Policy Intensity, by Geography

| | Slope on A. | | |
|---|---|---|---|
| geographic variation: | CA MSAs (1) | FL+TX MSAs (2) | State-Level, no CA (3) |
| *A.  1986 Levels of Key Outcomes:  Full Population* | | | |
| EITC Transfers  per working age person (2014$)[†] | 0.9 | 1.6 | 1.7 |
| | (0.2) | (1.0) | (0.8) |
| *B. % <u>all</u> of Persons Ages Over Age 25 (1980 Census):* | | | |
| College Equivalents[†] | -0.8 | -0.2 | 1.7 |
| | (0.3) | (0.6) | (0.5) |
| No HS Degree[†] | 0.9 | 1.0 | -0.5 |
| | (0.1) | (0.6) | (0.9) |
| *C.  1980 Characteristics of Non-Applicants* | | | |
| 1986 Expected EITC Transfers to Non-Applicants (2014$) | 0.0 | 0.4 | 0.0 |
| /Total Working Age Population | (0.2) | (0.7) | (0.6) |
| Number of Families as a  % of Total Working Age Pop | | | |
| w/ Kids and No Earned Income | 0.04 | 0.04 | -0.10 |
| | (0.02) | (0.04) | (0.06) |
| w/ Kids and Earning $1-$4,999 | 0.00 | 0.03 | -0.02 |
| | (0.02) | (0.06) | (0.05) |
| w/ Kids and Earning $5,000-$9,999 | 0.02 | 0.05 | 0.06 |
| | (0.03) | (0.10) | (0.09) |
| w/ Kids and Earning $10,000-$14,999[†] | 0.18 | -0.33 | -0.11 |
| | (0.26) | (0.49) | (0.71) |
| w/o Kids and No Earned Income | -0.05 | -0.21 | -0.32 |
| | (0.09) | (0.31) | (0.53) |
| w/o Kids and Earning $1-$4,999[†] | -0.12 | -0.54 | -0.18 |
| | (0.04) | (0.16) | (0.09) |
| State Fixed Effects? | No | Yes | No |
| Bay Area Fixed Effect? | No | No | No |
| #of Areas | 23 | 43 | 49 |

*Notes*.  Table shows slope from a regression of the specified characteristic  on applicant share at the level of geography given: California metro areas (column 1), Florida and Texas metro areas (column 2), and U.S states except California (column 3). Heteroskedasticity-robust standard errors in parenetheses.  Time-varying effects of characteristics  marked with a dagger are included in Table 6.

Table 6.  Long-Difference Estimates of Impact on EITC/Working Age Poplution: Other Geographies and Controls

| | MSAs in California | | MSAs in Florida and Texas | | | U.S. States, Excluding California | | |
| | Amount | Expected, Non-Applicants[++] | Amount | Expected, Non-Applicants[++] | Transfers | Expected, Non-Applicants[++] | Total Amount | Returns Claiming x 100 |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| A. Pre-IRCA (1981 to 1987) | | | | | | | | |
| Applicant Share (A$_s$) | 0.496 | -0.157 | 1.036 | 0.009 | 1.457 | -0.142 | 0.688 | 0.072 |
| | (0.276) | (0.075) | (0.345) | (0.190) | (1.049) | (0.166) | (0.953) | (0.074) |
| B. Short Term (1987 to 1993) | | | | | | | | |
| Applicant Share (A$_s$) | 4.248 | -0.067 | 3.439 | 0.710 | 4.572 | -0.325 | 6.629 | 0.331 |
| | (0.376) | (0.109) | (1.423) | (0.468) | (1.151) | (0.357) | (1.356) | (0.060) |
| C. Medium Term (1993 to 1999) | | | | | | | | |
| Applicant Share (A$_s$) | 4.009 | -0.420 | 6.678 | 0.249 | -0.802 | -1.147 | 0.509 | -0.124 |
| | (0.844) | (0.293) | (4.305) | (0.928) | (2.760) | (0.514) | (3.149) | (0.121) |
| N (metro area x year) | 69 | 69 | 129 | 129 | 147 | 147 | 147 | 147 |
| P-values on F-tests | | | | | | | | |
| 1981-87 = 1987-93 | 0.000 | 0.439 | 0.059 | 0.086 | 0.049 | 0.430 | 0.000 | 0.000 |
| 1987-93 = 1993-99 | 0.706 | 0.102 | 0.282 | 0.481 | 0.067 | 0.041 | 0.068 | 0.006 |
| D. Implied Effects of Permanent Residency | | | | | | | | |
| Short term (-1993) | $482.73 | -$7.61 | $390.84 | $80.70 | $519.49 | -$36.90 | $753.32 | 0.38 |
| | (42.73) | (12.39) | (161.67) | (53.15) | (130.76) | (40.61) | (154.05) | (0.07) |
| Medium term (-1999) | $938.28 | -$55.29 | $1,149.66 | $109.02 | $428.34 | -$167.29 | $811.17 | 0.24 |
| | (130.41) | (44.35) | (645.72) | (149.81) | (353.22) | (90.24) | (405.96) | (0.12) |

*Notes*: All regressions are estimated on stacked long-difference data (for 1981-87, 1987-93, and 1993-99), and coefficients shown are those on interactions between MSA applicant share and year dummies. All regressions include year fixed effects, long differences in the ratios of number of children, and total employment to the working age population (in columns 4-6 this is replaced with the unemployment rate), and time-varying effects of pre-IRCA MSA characteristics marked with a "†" in Table 5. Columns 3-4 also unrestricted state x year effects. Standard errors are clustered on metro area (columns 1-4) or state (columns 5-8), and regressions are weighted by 1986 working-age population. . ++Non-applicants defined as citizens and non-citizens not from Mexico or Central America. Expected EITC created by applying year-specific EITC program rules to non-applicants in the 1980 Census PUMS (Ruggles et al.. 2015).

46

002227

Table 7.  Alternative Approach:  Using New York Metro Areas to Account for Direct Effects of Hispanic Shar

| | Fully Interacted Fixed Controls Only* | | | With Time-Varying Controls | |
| | | | | | Expected EITC, Non-Applicants[+] |
| | CA | NY | Difference | Actual EITC | |
| | (1) | (2) | (3) | (4) | (5) |
| **A. Dep. Var.:  Applicant Share ($A_c$)** | | | | | |
| Hispanic Share ($H_c$) | 0.597 | 0.174 | 0.423 | ** | ** |
| | (0.051) | (0.007) | (0.052) | | |
| **B. Dep. Var.:  Δ EITC Transfers/Working Age** | | | | | |
| **1. Pre-IRCA (1981 to 1987)** | | | | | |
| Hispanic Share ($H_c$) | 0.173 | -0.070 | 0.244 | -0.168 | 0.045 |
| | (0.054) | (0.133) | (0.117) | (0.403) | (0.081) |
| **2. Short-term (1987 to 1993)** | | | | | |
| Hispanic Share ($H_c$) | 2.521 | -0.100 | 2.621 | 3.116 | -0.034 |
| | (0.272) | (0.338) | (0.392) | (0.908) | (0.242) |
| **3. Medium-term (1987 to 1993)** | | | | | |
| Hispanic Share ($H_c$) | 2.768 | -1.573 | 4.342 | 4.516 | 0.088 |
| | (0.468) | (0.815) | (0.806) | (0.963) | (0.484) |
| N (metro area x year) | 69 | 33 | 102 | 102 | 102 |
| P-values on F-tests | | | | | |
| 1981-87 = 1987-93 | 0.000 | 0.913 | 0.000 | 0.006 | 0.738 |
| 1987-93 = 1993-99 | 0.411 | 0.033 | 0.004 | 0.050 | 0.755 |
| **C. Implied Effects of Permanent Residency** | | | | | |
| Short term (-1993) | - | - | $703.53 | $448.76 | -$12.96 |
| | | | (107.11) | (199.84) | (47.27) |
| Medium term (-1999) | - | - | $1,868.85 | $1,526.69 | $9.27 |
| | | | (330.70) | (329.85) | (129.00) |

*Notes:* *Fixed controls are those marked with a "†" in Table 5.  ** With the inclusion of time-varying controls (employment/population and children/working age population), we stack all of the differences  and estimate the model jointly, and so the relationship between Hispanic share and applicant share in California relative to New York becomes year-varying.  Coefficient estimates between year-specific applicant share and year-specific Hispanic share in California are in the 0.4-0.5 range.  To obtain implied effects of permanent residency, we estimated model 3 on the combined California-New York data using instrumental variables, where the instruments were (year-specific)  interactions between 1980 Hispanic share and a dummy for California (conditional on direct, time-varying effect of Hispanic share).  We then scaled the IV estimates by multiplying by 100 and dividing by the estimated LPR transition rate, 0.88, as in earlier tables. +Non-applicants defined as citizens and non-citizens not from Mexico or Central America.  Expected EITC created by applying year-specific EITC program rules to non-applicants in the 1980 Census PUMS (Ruggles et al., 2015).

On-line Appendices for

**Distributing the Green (Cards):**
**Permanent Residency and Personal Income Taxes after**
**the Immigration Reform and Control Act of 1986**

*by*

Elizabeth U. Cascio
Ethan G. Lewis

November 2018

(Not for journal publication)

002229

## Appendix A: Data Sources
### (For On-line Publication Only)

**1.      Legalization Applications Processing System (LAPS)**

Our main measure of policy intensity and Figures 2 and 3 and Table 1 use, in whole or in part, statistics compiled from the Legalization Applications Processing System (LAPS), available from the National Archives. These public-use microdata consist of selected fields from anonymized records from all forms I-687 (application for temporary legal status under IRCA's general legalization program) and forms I-700 (application for temporary legal status under IRCA's SAW program) received by the Immigration and Naturalization Service, consisting of 3,040,948 records in total. These fields describe some outcomes of the application process, including the month and year of application for temporary status and of decision on temporary status, through the end of fiscal year 1992; Figure A1 shows trends in application status for general legalization program and SAW applicants separately based on this information and statistics from Rytina (2002).



Figure A1. Cumulative Legal Status of IRCA Legalization Applicants Over Time, by Application Type

LAPS data identify the state and county of "intended residence" (current U.S. address) of the applicant at the time of application, imputed from the zip code of intended residence. County is suppressed for applicants in counties with under 100,000 population (as of the 1990 census) or with fewer than 25 applications.

Table A1. States with Highest Population Shares of Working-Age Applicants

| State | Applicants/ Pop Aged 15-64 | % of All US Applicants | % of States' Applicants: | | | Metro Areas | |
|---|---|---|---|---|---|---|---|
| | | | General Legalization Program | In Identified County | In Identified Metro Area | Number ID'd in State | Applicants/Pop Std. Dev. |
| California | 8.21 | 53.1 | 56.2 | 98.1 | 95.8 | 23 | 4.29 |
| Texas | 3.78 | 14.6 | 66.6 | 82.2 | 82.2 | 24 | 2.43 |
| Arizona | 3.62 | 2.75 | 31.8 | 92.0 | 85.2 | 3 | 4.48 |
| Nevada | 2.82 | 0.67 | 52.1 | 83.7 | 83.7 | 2 | 0.07 |
| New Mexico | 2.67 | 0.89 | 54.0 | 54.1 | 54.1 | 2 | 3.46 |
| Illinois | 1.99 | 5.25 | 73.9 | 98.3 | 98.1 | 11 | 1.33 |
| Florida | 1.94 | 5.07 | 30.4 | 88.7 | 88.3 | 19 | 1.94 |
| Idaho | 1.57 | 0.34 | 18.6 | 1.7 | 1.7 | 1 | 0.00 |
| Oregon | 1.51 | 0.92 | 13.3 | 64.0 | 64.0 | 4 | 1.06 |
| New York | 1.39 | 5.90 | 67.0 | 99.1 | 98.9 | 11 | 1.21 |
| Washington | 1.20 | 1.26 | 22.7 | 57.9 | 57.9 | 9 | 2.48 |

*Notes:* Authors' calculations from the LAPS data and Census population estimates for 1986.

Table A1 shows some statistics on our measure of policy intensity – the ratio of working age applicants to 1986 working age population, times 100 ("applicant share") – for the 11 top applicant-generating states; Figure A2 shows applicant share for all states graphically. Each of the 11 top states had an applicant share of over 1 percent, and together they represented nearly 91% of all applications. California, location of the majority (53.1%) of applicants and the focal state of our analysis, had the highest applicant density, with applicants representing 8.21% of its working-age population. Texas was a distant second, home to 14.6% of working-age applicants representing 3.78% of the state's working-age population. In both states, as in the country as a whole, a majority of applications came through the general legalization program. Applicants in Florida, the second state to Texas in our supplemental within-state analysis, were more skewed towards farmworker applications (SAWs), with only 30% of all applications coming through the general legalization program.

Our main cross-sectional unit of analysis is a metropolitan area (metro area, or MSA), which is a collection of counties. We relied on the 1990 definition of metropolitan areas with one exception.[1] Geographic suppression in the LAPS means that we lose a handful of smaller metropolitan areas,[2] but columns 4 and 5 of Table A1 show that the vast majority of applications that are in identified counties are also in identified metropolitan areas. In California, 95.8% of applications are in a metropolitan area we can identify in the LAPS, out of the 98.1% of applications in identified counties in the state. Thus, suppressed counties not only contain a small share of applications, but are also rural and so would not be in our analysis anyway.

The final two columns of Table A1 show the variation in applications per capita within each state. California, Texas, and Florida are particularly well-suited for within-state analysis, in that they each contain a large number of identifiable metropolitan areas: 23 in California, 24 in

---

[1] See https://www2.census.gov/programs-surveys/metro-micro/geographies/reference-files/1990/historical-delineation-files/90mfips.txt (accessed November 15, 2018). In California we added San Luis Obispo, which attained status as a metropolitan area shortly after the 1990 Census.

[2] These include Yuba City (California); San Angelo, Sherman-Denison, and Victoria (Texas), and Fort Walton Beach (Florida).

Texas, and 19 in Florida. These states also have considerable variation in applicant density across their metropolitan areas. We focus on California because of the quality of the state's income tax statistics and a desire to offer as complete an analysis as possible of how large-scale distribution of Green Cards impacts the income tax system.



Figure A2. IRCA Legalization Applications, Age 15-64, by State
% of 1986 Population Aged 15-64

Regarding geography in the LAPS, it is important to note that the relevant county for later phases of the application process is simply not available. This is the main reason that we focus on applicants, rather than legal permanent residents (LPRs), in constructing our policy intensity measure; the other is that using LPRs would more likely lead to an endogenous "treatment." Under this framing, our econometric model is the reduced-form for a two-stage model, whose unobserved first stage coefficient on applicant share (in predicting LPR share) is less than one since not all applicants become LPRs. To obtain an instrumental variables-like estimate in the paper, we thus divide our reduced-form estimate by 0.88, the fraction of applicants becoming LPRs by 1993. But migration within the U.S., migration out of the U.S., or mortality may make this the wrong scaling factor.

Public-use statistics fortunately allow us to measure state at admission to permanent residency, and thus can provide insight into the appropriateness of dividing by 0.88 to scale our estimates.[3] Exhibit A plots LPR admissions per capita (i.e., per 1986 working age population, times 100) against applicant share by state, with a 45° line shown for reference. The points are below the 45° line, as expected since not all applicants become LPRs, but not far below. Indeed, the weighted regression line (weighted by 1986 working age population, and excluding California

---

[3] In particular, the annual *Statistical Yearbook of the Immigration and Naturalization Service* tabulates the total number of admissions to permanent residency each year by state (U.S. Department of Justice, Immigration and Naturalization Service, 1990, 1991, 1992, 1993b, 1994, 1995, 1995, 1996, 1997). These tables include those who gained legal status and those who came to the U.S. legally through other channels. Another INS data source, *Immigrants Admitted to the United States* (ibid, 1993a, 1993c, 1993d, 2007, 2010a, 2010b) is microdata on all of the individual cases of new admission to permanent residency each fiscal year excluding those who legalized under IRCA. Thus, by tabulating the latter sources to counts of admissions at the area level and subtracting them from the total counts in the former sources, we can obtain counts of legalized immigrants admitted to permanent residency by state. Unlike in the main analysis, though, it is not possible to limit this to the working age population, since the tabulated data are not stratified by age. However, recall that the vast majority of applicants were working age.

and the District of Columbia, as in our state-level analysis) gives a slope of 0.889, which is very close to just being the aggregate rate (88.3 percent) at which applicants became LPRs (through 1996, the final year we tracked it using the sources listed in the prior footnote).[4] This suggests very little net reshuffling of the legalized immigrant populations across states through the mid-1990s and that dividing our estimates by 0.88, as we do in the paper, should provide a good approximation of the person-level of impact of obtaining a Green Card.



Exhibit A. Admissions to Permanent Residency vs. Legalization Applications/Working Age Population, by State

## 2.    Legalized Population Survey and the National Agricultural Workers Survey

Two other sources are used to construct the descriptive statistics on the legalized population in Table 1 and to calculate "mechanical" EITC transfers for applicants: the Legalized Population Survey (LPS) and the 1989 wave of the National Agricultural Workers Survey (NAWS).[5] The LPS was a small random sample (N=6,193), initially taken in 1989, of those aged 18 or older who applied for legal status under the general legalization program and were still in the U.S., which essentially excludes anyone whose application for temporary legal status was denied by that date. The LPS includes some information directly from respondents' applications (some the

---

[4] Although admissions to permanent residency among the IRCA-legalized population continue to trickle in after 1996, the numbers were trivial as a share of the total. In fact, the vast majority of legalization applicants who would ever receive permanent residency had done so by fiscal year 1992 (see, e.g., Figure 2). Specifically, though, Exhibit A excludes the 2,548 applicants were admitted to permanent residency in fiscal year 1997, and the fewer than 1,000 applicants were admitted each year after that (United States Department of Homeland Security, 2003).

[5] The LPS is available on the web at http://mmp.opr.princeton.edu/LPS/LPSpage.htm. The NAWS are available at https://www.doleta.gov/agworker/naws.cfm.

same information that is reported in LAPS), retrospective questions about wages and employment at the time of application, and questions about education and family composition. There was also a follow-up survey in 1992 that asked many of the same questions about applicants' current labor force status, income, and family. The target population for this follow-up was limited to those applicants who had been admitted as LPRs, dropping the sample size down to 4,012. The survey documentation also says refusals to be surveyed were rare (2% of attempted interviews in the 1992 wave), and the main reason people were not interviewed was because they could not be located (14% of attempted interviews in the 1992 wave). People who had left the state from which they applied could thus be underrepresented in these data.

The LPS does not cover those who applied for legalization under the SAW program. For a sample of SAW applicants, we turned to the (fiscal year) 1989 NAWS. The NAWS is a random sample of workers employed by farms. The NAWS does not ask about IRCA directly, so to proxy for those attempting to legalize under IRCA, we identified the 970 NAWS respondents who still had a pending application for legalization (and who were working age). Note that this excludes the SAW applicants whose legal status had been decided on or before fiscal year 1989 (which, according to the LAPS, was about 21% of applicants; another 18% were ruled on by the end of fiscal 1989) or who had left the U.S. farm sector by that time.

Figure A3 shows the hourly wage distributions of respondents applying from California (in the case of the LPS) or residing in California (in the case of the NAWS). The hourly wage distribution of California residents from the Merged Outgoing Rotation Group files of the 1987 and 1998 Current Population Survey (available at NBER) are shown for comparison.



Figure A3. Hourly Wage Distributions of CA Applicants, by Program vs. California Hourly Wage Distribution, 1987-88

### 3.   California State Income Tax Data

We draw our state income tax outcomes from *Annual Reports* of the California Franchise Tax Board.[6] We digitized Table 7 of the reports for tax years 1979 to 1999 for this project. This table consistently gives, by county, the number of returns (all, joint), the number of dependents, adjusted gross income (AGI; in thousands), and tax assessed (in thousands) within many mutually-exclusive and exhaustive narrow ranges of AGI. Our main outcomes from these data derive from quintiles of California's "trimmed" 1979 AGI distribution; we designate the bottom quintile as "low-income," and so apply a consistent definition of a low-income return over time.

More specifically, we estimate percentile thresholds assuming a uniform distribution of returns within each narrow income bin (e.g., $1000 ranges at the bottom of the 1979 distribution).[7] We then calculate aggregate outcomes (e.g., the total number of state returns) by 1979 percentile for later years by first inflating the percentile thresholds and later income ranges to real 2014 dollars, then by assuming a uniform distribution of returns within these ranges. Because the AGI bins have the same nominal values for many years and having distinct minimum and maximum values on each relevant bin is a requirement of this approach, we trim the 1979 AGI distribution at a minimum of $1 and a maximum of $40,000 (nominal dollars) to implement it. The

---

[6] Scans of these reports are available at https://www.ftb.ca.gov/Archive/aboutFTB/annrpt/archive_index.shtml. The reports give statistics with a one-year lag, so we rely on the 1980 through 2000 *Annual Reports*.

[7] This seems a reasonable enough assumption. For example, the mean and median AGI per return are very similar to each other for all bins in all county-years, consistent with expectations under a uniform distribution.

maximum amounts to $130,433 in 2014 dollars, representing the 93rd percentile of the 1979 AGI distribution.

One of the outcomes – "counterfactual" state income tax assessed – requires us to know the formula for California's child tax credit. This formula is provided for all years in Table 2 of the 2000 *Annual Report*.

## 4.      Other Data Sources

*Bureau of Economic Analysis EITC data:* Our main measure of EITC transfers is taken directly from Table CA35 ("Personal Current Transfer Receipts") of the Local Area Personal Income Accounts, published by the Bureau of Economic Analysis.[8]

*California Department of Finance Population Estimates:* Annual data on the age composition of the population for California metropolitan areas were aggregated from July population estimates detailed by age x race x county in State of California (1998, 2009).[9] Unless otherwise noted, we use California's population estimates to construct the MSA-by-time varying controls (the ratio of employment to (working age) population and the ratio of children to (working age) adults).

*Census Bureau Population Estimates:* Throughout the paper, the denominator of applicant share is MSA population aged 15 to 64 in 1986, computed using the Census Bureau's county age-sex-race files (U.S. Dept. of Commerce, Bureau of the Census, 1992; available as ICPSR study 6031). We also use these population estimates to construct employment-to-(working age) population ratios and the ratio of children to (working-age) adults for all MSAs and for states in Table 6.

*Census Public-Use Microdata:* We use the 1980 Census 5% PUMS (Ruggles, et al., 2015) to construct shares of "likely non-applicant" families with and without children with family earnings in various ranges (Table 2) and to construct the expected EITC for non-applicants. We use all adults in these calculations, and non-applicants consist of citizens and non-citizens not from Mexico or Central America. We also use a sample of "likely applicants" from the 1980 Census 5% PUMS (i.e., non-citizens from Mexico and Central America) to refine our family earnings estimates for the calculation of "mechanical" EITC transfers, in Section 4 of the paper.

*Census Tabulations:* We calculate the 1980 MSA-level Hispanic population shares using STF-1 (100%) counts of Spanish origin and total population at the county level, published by the National Historical Geographic Information System (NHGIS) (Minnesota Population Center, 2011). For the education composition variables (share high school dropout and share college equivalent; Table 2), we use the STF-3 long-form sample counts of persons ages 25 and over by years of school completed at the county level, also published by NHGIS.[10]  The number of college equivalents is calculated as the sum of people with (at least) four years of college education, plus one half of the number of people with 1-3 years of college education.

---

[8] Go to  https://www.bea.gov/iTable/iTable.cfm?reqid=70&step=1&isuri=1&acrdn=7#reqid=70&step=1&isuri=1.

[9] These annual intercensal population estimates, and some information on how they were estimated, can be found at http://www.dof.ca.gov/Forecasting/Demographics/Estimates/.

[10] The NHGIS identifiers for these tables are ds104 and NT8 (Spanish origin) and ds107 and NT48A (education).

*County Business Patterns:* The numerator of the MSA employment-to-(working age) population ratio is derived from County Business Patterns data spanning 1979 to 1999 and available on ICPSR or (in the case of 1997 and 2000) the Census Bureau's website.[11] Our employment measure is County Business Patterns total employment.

*Earned Income Tax Credit Schedules:* EITC schedules are from the Tax Policy Center (http://www.taxpolicycenter.org/taxfacts/displayafact.cfm?DocID=36&Topic2id=40&Topic3id=42). The evolution of key EITC parameters over our sample period is shown in Figure A4.

*IRS Statistics of Income:* We draw two state-level EITC measures – the number of EITC claims and the total EITC amounts (including refunds and reductions in positive tax liability) – from published data from IRS Statistics of Income. We digitized this information from Table 2 of the *SOI Bulletin*, which provides it for 1983 forward with a two-year lag in fall issues through 1995 (for 1993) and in the spring 1996 and 1997 issues (for 1994 and 1995) (U.S. Department of the Treasury, various).[12] For tax years 1996 and later, the tables are available for direct download (in Excel format from 1997 forward) at https://www.irs.gov/statistics/soi-tax-stats-historic-table-2.



Figure A4.  Changes in EITC Parameters Over Time

---

[11] There are various ICPSR study numbers: 8442 (1979), 8142 (1980), 8348 (1981), 8360 (1982), 8433 (1983), 8665 (1984), 8883 (1985), 9198 (1986), 9381 (1987), 9711 (1988), 9740 (1989), 6030 (1990), 6382 (1991), 6488 (1992), 2343 (1993), 2280 (1994), 2406 (1995), 2701 (1996), 3087 (1998), and 3439 (1999). The data for 1997 and 2000 were downloaded from https://www.census.gov/programs-surveys/cbp/data/tables.All.html.
[12] Scans of *SOI Bulletins* are available at https://www.irs.gov/statistics/soi-tax-stats-soi-bulletins.

## Appendix B: Supporting the Person-Level Interpretation of our Estimates
### (For On-Line Publication Only)

One interpretation given to the slope estimate on $A_c$ in the long-difference model is that of a person-level causal impact of becoming a permanent resident. This interpretation relies on several assumptions: (1) Our regressions aggregate a person-level regression model; (2) There is no effect of Green Cards distributed in an area on non-applicants that is proportional to applicant share; and (3) Increases in $A_c$ translate into increases in the LPR share at a rate equal to the national average. We addressed (3) in Appendix A.  In this Appendix, we demonstrate (1) and consider the theoretical and empirical evidence in support of (2).

## 1.       Derivation of the Estimating Equation from an Individual-Level Model

A randomized controlled trial (RCT) would be the ideal way to estimate the effects of obtaining a Green Card. In an RCT, Green Cards would be randomly assigned among unauthorized individuals who apply for them. The model of interest would be given by:

(B1)     $y_{ict} = \alpha_t + \theta_t G_i + \varepsilon_{ict},$

where $y_{ict}$ represents an outcome of interest (e.g., EITC transfers) for working age person $i$ in MSA $c$ in year $t$, $G_i$ is an indicator for whether $i$ is randomly assigned a Green Card in $t^*$, and $\varepsilon_{ict}$ captures unobservables. With the study sample limited to unauthorized immigrants and Green Cards randomly assigned, it should be the case that $\theta_t = 0$ for all years $t < t^*$. That is, on average, there should be no difference in outcomes between the treatments and controls before Green Cards are distributed. After legalization, or for $t \geq t^*$, $\theta_t$ then captures the causal impacts of having a Green Card.

The identification strategy afforded by variation from IRCA is difference-in-differences, which can be represented by the model:

(B2)     $\Delta y_{ic} = \tilde{\alpha} + \bar{\theta} G_i + \Delta \varepsilon_{ic},$

The coefficient of interest is now $\bar{\theta}$, which captures differential trends in outcomes between those who received Green Cards versus those who did not. Unlike model B1, identification in model B2 does not rely on an assumption of identical expected outcomes. Instead, estimates will be unbiased if the trend in outcomes for the comparison group, represented by $\tilde{\alpha}$, is an accurate representation of what would have happened for the legalized population absent the status change.[13]

In our context, a lack of existing microdata that identify both whether an immigrant has a Green Card and the outcomes of interest precludes estimation of model B2. Taking averages of model B2 at the area-by-year level (across *all* working age people) then differencing over time yields a model closer to our long-difference specification:

---

[13] This approach has been taken in past studies of the wage and employment impacts of IRCA's legalization, but for general legalization program applicants only and using native-born Hispanics in the NLSY79 as the comparison group (Kossoudji and Cobb-Clark, 2002; Amuedo-Dorantes, Bansak, and Raphael, 2007).

(B3)    $\Delta y_c = \tilde{\alpha} + \tilde{\theta} G_c + \Delta \varepsilon_c,$

where $\Delta y_c$ represents the change in average outcomes over time in MSA $c$, and $G_c$ represents the fraction of the area's working age population receiving Green Cards. If model B2 is correctly specified, the difference-in-differences coefficient in model B3, estimated using aggregate data, is thus equivalent to the effect of having a Green Card at the person level from model B2 using data from the same population (in this case, all MSA residents, so the comparison group consists of all non-applicants in the MSAs under study). This is intuitive: if a Green Card increased the likelihood that an immigrant received EITC income, for instance, areas with higher Green Card shares should have experienced larger increases from before to after Green Card distribution in EITC transfers per capita.

But clearly, model B3 could also have been derived from a person-level model with an effect of $G_c$ on both applicants and non-applicants, such as

(B4)    $\Delta y_{ic} = \tilde{\alpha} + \tilde{\theta}_1 G_i + \tilde{\theta}_2 G_c + \Delta \varepsilon_{ic}.$

In this case, $\tilde{\theta} = \tilde{\theta}_1 + \tilde{\theta}_2$; that is, the impact of Green Card distribution as estimated on aggregate data (model B3) captures both the direct effect for Green Card holders and an indirect, aggregate effect on each member of the MSA population.

## 2.    Potential Indirect Impacts of IRCA

Could IRCA's Green Card distribution have had broader impacts beyond the person-level ones we hope to identify? We are mainly interested in impacts on non-applicants that could be proportional to applicant share, our measure of policy intensity. Given our focus on the income tax, these could operate through impacts of IRCA on the labor market. In theory, large-scale distribution of Green Cards could have had aggregate impacts on the labor market by changing workers' bargaining position, time horizon, or remittances, but the available evidence suggests that these impacts would be orders of magnitude smaller than the direct effect for applicants.

First, theoretical work on amnesty suggests that unauthorized immigrants affect the labor market because they have a higher search cost (or worse outside option) than authorized immigrants (or natives) in a wage bargaining model (Chassambouli and Peri, 2015). Giving a large share of the population Green Cards thus can push up immigrants' – and so similarly skilled natives' – wages, though at the expense of employment due to higher labor costs and lower profits. The available calibrations however suggest the impacts on natives are miniscule.[14]

---

[14] Chassambouli and Peri (2015)'s calibrations suggest that increasing the rate at which undocumented Mexican workers are legalized would likely increase both native-born earnings and employment. This is not an ideal model of IRCA, however, which was a one-time amnesty. Indeed, their findings appear to partly – perhaps mainly – derive from the greatly increased flows of immigrants that result from the higher legalization rate. Although not explicitly about unauthorized immigration, comparisons in Chassambouli and Palivos (2014) appear closer in spirit to IRCA: they compare labor market impacts of an immigration-induced skill mix shock when immigrants have, alternatively, higher or the same search costs as natives. Such a shift in theory raises the expected costs of hiring workers of their skill level, and so induces lower job entry and leads to lower employment. Despite the fact that immigrants make up

Second, by increasing immigrants' time horizon, legal status may over time induce immigrants to acquire U.S.-specific skills (like English), potentially making them more substitutable for natives. However, the elasticity of substitution between immigrants and natives is already so large (e.g., Card, 2009; Ottaviano and Peri, 2012) that this change would also likely have a small effect on natives' wages.

Third, immigrants legalized under IRCA reduced their remittances (Amuedo-Dorantes and Mazzolari, 2010), which could theoretically lead to positive effects on earnings through higher U.S. consumer spending. However, estimates in Olney (2015) suggest the resulting wage increase would be less than one percent.

Consistent with this, the only study that has examined the broader labor market impacts of amnesty found that its impact on aggregate wages was negligible (Cobb-Clark, Shiells, and Lowell, 1995).[15]

---

over 10 percent of the labor market in their simulations, the effects derived from changes in search costs are generally below 0.1% (comparing columns of their table 2).

[15] The authors examined a very crude outcome, production worker wages (not broken out by nativity), which shows a negligibly larger increase after IRCA in areas with more general legalization program applicants compared to areas with fewer.

002240

## Appendix References

Amuedo-Dorantes, Catalina, Cynthia Bansak, and Steven Raphael. 2007. "Gender Differences in the Labor Market: Impact of IRCA' Amnesty Provisions." *American Economic Review, Papers & Proceedings* 97(2): 412-416.

Amuedo-Dorantes, Catalina and Francesca Mazzolari. 2010. "Remittances to Latin America from Migrants in the United States: Assessing the Impact of Amnesty Programs." *Journal of Development Economics* 91(2): 323-335.

Card, David. 2009. "Immigration and Inequality." *American Economic Review* 99(2): 1-21.

Chassamboulli, Andri and Giovanni Peri. 2015. "The Labor Market Effects of Reducing The Number of Illegal Immigrants." *Review of Economic Dynamics* 18(4): 792-821.

Chassamboulli, Andri and Theodore Palivos. 2014.  "A Search Equilibrium Apporach to the Effects of Immigration on Labor Market Outcomes." *International Economic Review* 55(1): 111-129.

Cobb-Clark, Deborah A., Clinton R. Shiells, and B. Lindsay Lowell. 1995. "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages." *Journal of Labor Economics*, 13(3): 472-498.

Kossoudji, Sherrie A., and Cobb-Clark, Deborah A. 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population." *Journal of Labor Economics*, 20(3): 598-628.

Minnesota Population Center. 2011. National Historical Geographic Information System: Version 2.0. Minneapolis, MN: University of Minnesota.

Olney, Will. 2015. "Remittances and the Wage Impact of Immigration." *Journal of Human Resources* 50(3): 694-727.

Ottaviano, Gianmarco I.P., and Giovanni Peri. 2012. "Rethinking the Effect of Immigration on Wages." *Journal of the European Economic Association* 10(1): pp. 152-97.

Ruggles, Steven, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek. 2015. Integrated Public Use Microdata Series: Version 6.0 [Machine-readable database]. Minneapolis: University of Minnesota.

Rytina, Nancy. 2002. "IRCA Legalization Effects: Lawful Permanent Residence and Naturalization through 2001." Mimeo, Office of Policy and Planning Statistics Division, U.S. Immigration and Naturalization Service.

State of California, Department of Finance. 1998. "Race/Ethnic Population with Age and Sex Detail, 1970-1989." Sacramento, CA.

----. 2009. "Race/Ethnic Population with Age and Sex Detail, 1990-1999." Sacramento, CA.

State of California, Franchise Tax Board. 1980-2000. *Annual Report*. Sacramento, CA.

United States Department of Commerce. Bureau of the Census (2009). "Revised Estimates of the Population of Counties by Age, Sex, and Race [United States]: 1980-1989." ICPSR06031-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2009-01-20.

United States Department of Homeland Security (2003). "Yearbook of Immigration Statistics, 2002." Washington, DC: U.S. Government Printing Office.

United States Department of Justice. Immigration and Naturalization Service (1990). "Statistical Yearbook of the Immigration and Naturalization Service, 1989." Washington, DC: U.S. Government Printing Office.

----. 1991. "Statistical Yearbook of the Immigration and Naturalization Service, 1990." Washington, DC: U.S. Government Printing Office.

----. 1992. "Statistical Yearbook of the Immigration and Naturalization Service, 1991." Washington, DC: U.S. Government Printing Office.

----. 1993a. "Immigrants Admitted to the United States, 1989." ICPSR06161-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor].

----. 1993b. "Statistical Yearbook of the Immigration and Naturalization Service, 1992." Washington, DC: U.S. Government Printing Office.

----. 1993c. "Immigrants Admitted to the United States, 1990." ICPSR06164-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor].

----. 1993d. "Immigrants Admitted to the United States, 1991." ICPSR06165-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor].

----. 1994. "Statistical Yearbook of the Immigration and Naturalization Service, 1993." Washington, DC: U.S. Government Printing Office.

----. 1995. "Statistical Yearbook of the Immigration and Naturalization Service, 1994." Washington, DC: U.S. Government Printing Office.

----. 1996. "Statistical Yearbook of the Immigration and Naturalization Service, 1995." Washington, DC: U.S. Government Printing Office.

----. 1997. "Statistical Yearbook of the Immigration and Naturalization Service, 1996." Washington, DC: U.S. Government Printing Office.

002242

----. 2007. "Immigrants Admitted to the United States, 1993-1995." ICPSR version. Washington, DC: U.S. Dept. of Justice, Immigration and Naturalization Service [producer], 1997. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2007-01-17.

----. 2010a. "Immigrants Admitted to the United States, 1992." ICPSR06449-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2010-08-26.

---- 2010b. "Immigrants Admitted to the United States, 1996." ICPSR02534-v2. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 2010-09-17.

United States Department of the Treasury, Internal Revenue Service.  1985-1995. *Statistics of Income: SOI Bulletin*.  Fall issue.

----.  1996-1997. *Statistics of Income: SOI Bulletin*.  Spring issue.

002243



© iStockphoto.com

## The U Visa
### An Effective Resource for Law Enforcement

By STACEY IVIE, M.Ed., and NATALIE NANASI, J.D.

Law enforcement personnel strive for strong connections with all citizens. In pursuit of this goal, striking an appropriate balance—one that punishes wrongdoers while protecting victims—can present a challenge. One way that officers not only can foster better relationships with immigrant communities but also increase offender accountability, promote public safety, and help ensure that crimes translate into convictions is to promote awareness of the U visa, which provides important immigration benefits to cooperating crime victims.

The authors believe that the fear of deportation has created a class of silent victims and undermined officers' attempts at community-oriented policing among immigrant populations. They opine that the U visa helps improve relations with these communities, increase the reporting of criminal activity, enable provision of services to victims, and enhance the prosecution of violent perpetrators. Also, the authors feel that officers may have misconceptions about the U visa and not recognize its effectiveness as a tool. They hope that this article will help clarify the intent, purpose, and benefits of the U visa to the law enforcement community.

### DESCRIPTION OF THE U VISA

Congress created the U visa—available to immigrant

victims of a wide range of serious crimes—as part of the Victims of Trafficking and Violence Protection Act of 2000, recognizing that many of these individuals, with temporary or no legal status, fear that assisting law enforcement could lead to deportation.[1] By providing noncitizen victims a means of stabilizing their legal status, the U visa encourages them to report the crimes. It helps to curtail criminal activity, protect the innocent, and encourage victims to "fully participate in proceedings that will aid in bringing perpetrators to justice."[2] The U visa also can promote contact with law enforcement officers within isolated communities, which provides valuable assistance to individuals at heightened risk of victimization.

The U visa provides an avenue to legal status for immigrant crime victims who 1) have suffered substantial physical or mental abuse as a result of victimization; 2) possess information regarding the activity; and 3) offer a source of help in the investigation or prosecution.[3] The incident in question must have violated U.S. law or occurred within the nation's borders (including Indian country and military installations) or one of its territories or possessions.

The qualifying criminal activities covered by the U visa include a long list of serious offenses or the attempt, conspiracy, or solicitation to commit any of them. Unlike other protections available to battered immigrants (such as those provided under the Violence Against Women Act), eligibility for a U visa does not depend on a marriage between the victim and abuser or the legal status of the perpetrator.[4]

To obtain a U visa, victims must demonstrate to the U.S. Citizenship and Immigration Services (USCIS) their willingness to cooperate in a qualifying investigation or prosecution by law enforcement entities, such as federal, state, or local police agencies; prosecutors; judges; or any other appropriate authority. This definition includes organizations with criminal investigative jurisdiction in their respective areas of expertise (e.g., Child Protective Services, the Equal Employment Opportunity Commission, and the Department of Labor).[5]

## BENEFITS FOR VICTIMS

Approved U-visa petitioners receive temporary legal status and work authorization, which allows these victims to support themselves and rebuild their lives in safety while assisting law enforcement.[6] After 3 years, they may gain eligibility for lawful permanent resident status (i.e., a Green Card). Such benefits make the U visa an effective tool for bringing victims, particularly those of domestic



Detective Ivie serves with the Alexandria, Virginia, Police Department.



Ms. Nanasi is an attorney with the Tahirih Justice Center in Falls Church, Virginia.

002245

violence who may depend on the perpetrator for legal status or economic support, out of the shadows. Research shows that "immigrant battered women want…the violence to stop, but culture, lack of support and immigration status limit their ability to deal with the violence and make them particularly vulnerable to failure in their attempts to escape a battering relationship."[7] Often, these victims find it difficult to break free as social "isolation, exacerbated by lack of social contacts, geographic isolation, and limited mastery of English or cultural alienation… interferes with detection and accountability, makes it easier for the batterer to ignore social sanctions, promotes increased marital dependence, and increases intrafamilial exclusivity and intensity."[8] The prospect of a U visa may eliminate the person's fear of calling the police for help, and, once connected to legal and social service systems (e.g., victim-witness advocates, battered-women's shelters, health- and child-care programs), some of the pressures that discourage victims of domestic violence to leave a relationship may be alleviated, allowing them to ultimately break the cycle of abuse.

Moreover, financial concerns pose significant barriers that prevent victims of crimes,

such as domestic violence, from leaving and attaining economic self-sufficiency. Because battered immigrant women are not eligible for many work opportunities and public benefits, they and their children must choose between remaining in a violent situation or facing starvation and poverty. The U visa, therefore, can afford noncitizen



> **With immigrant victims no longer afraid to cooperate… the subsequent increase in reporting will ensure the identification and apprehension of more violent criminals.**



victims of domestic violence the same opportunities as survivors with U.S. citizenship and allow them to obtain the resources crucial in helping them escape from abusive situations.[9]

### ADVANTAGES FOR LAW ENFORCEMENT

#### Cooperative Victims

With immigrant victims no longer afraid to cooperate

with the police, the subsequent increase in reporting will ensure the identification and apprehension of more violent criminals. Additionally, victim participation in the investigation or prosecution of cases increases the likelihood of convictions. The resulting accountability of offenders can lead to defendant rehabilitation, which, in turn, ultimately may increase the number of productive members of society, reduce crime rates, and promote public safety for all members of a community.

Use of the U visa also may cause a decline in recidivism, or the repetition of certain crimes, thus decreasing the frustration of officers and the loss of financial assistance and other services needed by victims. These issues prove particularly prominent in domestic violence cases. Statistics show that "on average, women…leave and return to an abusive relationship five times before permanently leaving…."[10] Those five incidents may have involved law enforcement responding to the scene and spending numerous hours on a case, thereby decreasing officers' availability to other crime victims. Perhaps, the prosecutor spent time and financial resources to create an evidence-based prosecution with a limited chance of conviction. In such instances, the U

002246

visa can increase the likelihood of victim cooperation, thereby eliminating these wasted hours.

Moreover, recidivism rates logically will decrease when public service resources are provided to undocumented victims of certain pattern crimes. The ability to earn an income and receive financial assistance may drastically change the outlook of victims who had no prospect for life modification prior to the availability of the U visa, allowing them to leave a violent relationship.

Last, use of the U visa also can eliminate the current conflict faced by officers who respond to domestic violence scenes. Like many other states, the commonwealth of Virginia mandates public assistance for victims of domestic abuse. The Virginia Code requires that the officer "provide the allegedly abused person, both orally and in writing, information regarding the legal and community resources available...."[11] However, this directive conflicts with the prohibition against immigrant victims receiving public benefits, creating a confusing situation for first responders. Putting noncitizen victims of

---

### Offenses Covered by the U Visa

To obtain a U visa, the immigrant must be the victim of one or more qualifying crimes; the attempt, conspiracy, or solicitation to commit any of the acts; or any similar activity in violation of federal, state, or local criminal law.

| | |
|---|---|
| Rape | Torture |
| Trafficking | Incest |
| Domestic violence | Sexual assault |
| Abusive sexual contact | Prostitution |
| Sexual exploitation | Female genital mutilation |
| Being held hostage | Peonage |
| Involuntary servitude | Slave trade |
| Kidnapping | Abduction |
| Unlawful criminal restraint | False imprisonment |
| Blackmail | Extortion |
| Manslaughter | Murder |
| Felonious assault | Witness tampering |
| Obstruction of justice | Perjury |

*8 U.S.C. 1101(a)(15)(U)(iii)*

---

domestic violence on the path to legal status can resolve this inconsistency.

**Community-Oriented Policing**

Community-oriented policing "promotes and supports organizational strategies to address the causes and reduce the fear of crime and social disorder through problem-solving tactics and police-community partnerships."[12] In short, this law enforcement model is based on the principle that only the partnership of police and citizens can successfully address the problem of crime in communities. The U.S. Department of Justice promotes community-oriented policing as a highly effective problem-solving model.

Fear of deportation breaks down the ties that bind the police and the community, and, without a joint venture involving both participants and the trust that must exist between the two parties, community-oriented policing will not work. Use

002247

of the U visa can address this fear, giving victims more confidence about calling the police and increasing trust between community members and those sworn to protect and serve.

**FREQUENTLY ASKED QUESTIONS**

Although the U visa can provide substantial benefits to both victims and officers, the authors recognize that valid questions and concerns exist that may limit its acceptance and effectiveness in the law enforcement community. The answers to some frequently asked questions can help address these issues.

- *What role do law enforcement agencies have in the application process?* Agencies only complete the 3-page Form I-918 Supplement B, U Nonimmigrant Status Certification (i.e., the "law enforcement certification form"), which simply requires the department's information; the details of the crime; and the victim's personal data, knowledge of the incident, and helpfulness to the investigation or prosecution. Signing the form does not indicate sponsorship of the immigrant. Although the form bears significant weight because it demonstrates that the individual has met several of the eligibility criteria, the USCIS

decides whether to grant the U visa only after evaluating the totality of the circumstances. However, a U visa will not be issued without a signed law enforcement certification.

- *Who can sign the law enforcement certification form?* Heads of certifying agencies or any supervisory employee they appoint (i.e., a designated certifier) can sign the form. A designated certifier should know the



> **Fear of deportation breaks down the ties that bind the police and the community…**



certification requirements thoroughly and be readily identifiable and accessible to immigrant crime victims; this simplifies the process for applicants, serves as a quality control measure, and prevents abuse of the U visa.

- *What if the victim stops cooperating?* Certifying departments may notify USCIS if victims do not

meet their ongoing responsibility to cooperate with law enforcement officers. However, agencies should recognize when a victim may have suffered abuse-related trauma (e.g., post-traumatic stress disorder or other debilitating emotional or physical condition) or legitimately fear retaliation from perpetrators; in such situations, agencies should be mindful of withdrawing or refusing certification. Departments also should remember that issuance of a U visa does not require any case outcomes or milestones; a victim must only be helpful.[13] Last, USCIS assumes "an ongoing need for the applicant's assistance"; if authorities no longer need help, the victims have fulfilled their obligation to law enforcement.[14]

- *Is there a quid pro quo?* No. The U visa is not given in exchange for filing a police report or for testimony at trial.

- *Are some eligible victims criminals due to their illegal presence in the United States?* The Immigration and Nationality Act (INA) determines an individual's legal status. In enacting the Victims of Trafficking and Violence Prevention Act and creating the U visa,

002248

Congress modified the INA. The federal government weighed all of the interests involved and ultimately created a legal status for cooperating crime victims, regardless of their means of entry into the country, based on the determination that "the purpose of the U nonimmigrant classification is to strengthen the ability of law enforcement agencies to investigate and prosecute such crimes as domestic violence, sexual assault, and trafficking in persons, while offering protection to alien crime victims in keeping with the humanitarian interests of the United States."[15]

- *Will U visas increase the filing of false police reports?* To combat false reporting, law enforcement officials should conduct a thorough investigation of any alleged crime to determine its authenticity. Concerning a false allegation, not only should officers not sign the U-visa certification form but they should initiate a criminal charge for the filing of a false police report. However, no evidence indicates that an agency's use of the U visa will lead to the filing of false claims. The U visa covers crimes that are serious, predominantly violent, difficult to

> **For Additional Information**
>
> *http://www.uscis.gov*
> *http://www.tahirih.org*
> *http://www.legalmomentum.org/our-work/immigrant-women-program/*

fabricate, and that carry dire legal consequences for the perpetrator. Additionally, immigrants hesitant to contact authorities regarding a real crime because of their fear of deportation probably would not do so to report a false one. Moreover, U-visa regulations protect against its abuse in this way. First, they specifically exclude "a person…culpable for the qualifying criminal activity" from U-visa eligibility.[16] Further, if applicants cannot demonstrate a true crime's occurrence, their suffering from the incident, or their cooperation with law enforcement, they cannot obtain a U visa.

- *Do law enforcement agencies have to sign U-visa certification forms?* The federal government does not mandate that law enforcement agencies implement a U-visa certification process. It only serves as a resource designed to augment the effectiveness of a criminal investigation or prosecution.

However, departments that decline participation may prevent the identification and punishment of violent perpetrators. Moreover, refusing to certify a qualifying victim not only undermines the purpose of the federal law but decreases an agency's ability to combat crime, apprehend perpetrators, foster relationships within immigrant communities, and provide crucial assistance to victims of violent crime.

**CONCLUSION**

The fear of deportation can cause immigrant communities to cut themselves off from police and not offer information about criminal activity, even when victimized. Consequently, predators remain on the street, emboldened because they know they can strike with a degree of impunity. As a result, societies face increased crime, including serious offenses, and the perpetrators victimize and endanger everyone, not just illegal immigrants.[17]

002249

**ACTUARIAL NOTE**
Number 151
April 2013

**SOCIAL SECURITY ADMINISTRATION**
**Office of the Chief Actuary**
**Baltimore, Maryland**

## EFFECTS OF UNAUTHORIZED IMMIGRATION ON THE ACTUARIAL STATUS OF THE SOCIAL SECURITY TRUST FUNDS

*by Stephen Goss, Alice Wade, J. Patrick Skirvin, Michael Morris, K. Mark Bye, and Danielle Huston*

### INTRODUCTION

This actuarial note provides information related to projections of the effects of unauthorized immigrants on the U.S. labor force, and more specifically on the actuarial status of the Social Security (OASI and DI) Trust Funds. We have been modeling this important, yet elusive, population for many years. We reported on these effects in a letter to Illinois Senator Dick Durbin in 2007 (copy available on request). The nature and characteristics of this population have changed over the last decade and so we have modified our methods to better account for work activity and potential benefit receipt by unauthorized immigrants. All estimates and analysis reflect the intermediate assumptions and methods developed for the 2012 Trustees Reports.

The balance of this note provides:

- A brief review of the nature of unauthorized immigration, how it has changed, and how our modeling has evolved;

- A detailed discussion of the effects of unauthorized immigration on Social Security's actuarial status;

- Answers to some important questions regarding undocumented immigrants; and

- A list of the major laws affecting both unauthorized immigrants and Social Security.

### A BRIEF REVIEW OF UNAUTHORIZED IMMIGRATION

Legal immigration into the United States has been a major source of population growth and diversity. For over a century, legal immigration has been regulated and the numbers of legal immigrants have been limited by a succession of laws. Unauthorized immigration into the U.S. results from entering the country without legal authorization and from overstaying temporary visas. Both forms of immigration have contributed substantially to the population, directly and indirectly. The indirect contribution refers to the fact that children born in the U.S. to these immigrants are U.S. citizens. For the purpose of this discussion, we use the following terms:

- *Legal immigrants* – U.S. residents born outside the U.S. who have been granted legal permanent resident (LPR) status or have become naturalized citizens.

- *Other immigrants* – U.S. residents born outside the U.S. who have not attained LPR status or citizenship (this group includes those with temporary legal visas).

- *Unauthorized immigrants* – *Other immigrants* residing in the U.S. without current papers documenting their legal status (i.e., either they entered the U.S. without legal documentation or they overstayed temporary visas).

- *Unauthorized workers* – *Other immigrants* working in the U.S. without current visas granting them authorization to work.

In the beginning of 1989, there were an estimated 5 million unauthorized immigrants in the U.S. The Immigration Reform and Control Act of 1986 (IRCA) allowed unauthorized immigrants who could prove they had been residing here for 5 years to apply for LPR status. From 1989 through 1991, about half of these unauthorized immigrants were granted LPR status under IRCA. Since the mid 1990's, however, the estimated number of persons entering the U.S. without authorization has averaged over 1 million per year, and the estimated number of unauthorized immigrants now totals more than 10 million. Individuals leave unauthorized status both by leaving the U.S. (emigration) and by applying for, and being granted, LPR status. In fact, about half of the individuals granted LPR status each year are estimated to come from the other immigrant population. Most of these individuals are residing as temporary legal immigrants with visas or have overstayed visas, rather than coming from the population that has never had temporary legal status.

In 2008, the Office of the Chief Actuary (OCACT) completely restructured the projection method for the other immigrant population. This restructuring had two objectives. The first was to model separately the annual flows of individuals: (1) entering the country in other immigrant status; (2) converting from other immigrant status

to LPR status; and (3) leaving the U.S. from the other immigrant population. The second objective was to reflect administrative changes made by the Social Security Administration (SSA) since 2001, which made it more difficult for unauthorized immigrants to obtain Social Security numbers (SSN) through illegitimate means. Since 2001, SSA greatly increased scrutiny of applications for an SSN after birth, which reduced the incidence of illegitimate receipt of an SSN. For other immigrants entering the U.S. in 2001 and earlier, we assume that about one-third attained apparently legitimate SSNs through illegitimate means. For unauthorized immigrants entering the country after 2001, we believe that the granting of SSNs based on illegitimate documentation has been greatly reduced.

Laws enacted in 1996 and 2004 make Social Security benefits unavailable to unauthorized immigrants residing in the U.S. and to any noncitizen without a work-authorized SSN at some point in time. We project that these laws will significantly reduce benefit receipt among persons who remain in the unauthorized immigrant population in the future.

## How the Participation of Unauthorized Workers Affects Social Security's Financial Position

For the annual Trustees Reports, the President's Budget, and other documents, OCACT projects the numbers of unauthorized immigrants residing in the United States, their earnings, and the implications of these earnings on Social Security financing. Our projections assume that unauthorized residents work at about the same rate as the rest of the population by age and sex, but earnings are less likely to be reported as taxable and even less likely to be credited for future benefit entitlement. Thus, our projections suggest that the presence of unauthorized workers in the United States has, on average, a positive effect on the financial status of the Social Security program. For the year 2010,[1] we estimate that the excess of tax revenue paid to the Trust Funds over benefits paid from these funds based on earnings of unauthorized workers is about $12 billion.

While we cannot determine the precise effect on Social Security financing of earnings of unauthorized immigrants, program data fully capture this effect. The current overall financial status of the Social Security Trust Funds is well known, and it provides an excellent base upon which to make projections for the future. The difficulty lies in determining what portion of total taxes paid to and benefits received from the Social Security Trust Funds derive from the earnings of these immigrants. We can only estimate these amounts using the best available information.

Beyond the taxes paid and benefits received by unauthorized workers, the larger effect on the long-term actuarial status of the OASDI Trust Funds derives from the children born in the U.S. to these immigrants. These children are natural born citizens and add to the growth in the overall U.S. population. This contribution to future generations of workers is the largest part of the effect on the actuarial status both for legal and other immigrants.

### Earnings of Unauthorized Immigrants in the United States

The Census Bureau estimates that the number of people living in the U.S. who were foreign born and not U.S. citizens was 21.7 million in January 2009. Of these, 12.6 million individuals were not legal permanent residents of the U.S. We refer to this group as other immigrants (other than legal permanent resident immigrants). Of this number, about 10.8 million resided in the U.S. in an unauthorized status. The remaining other immigrants resided in the U.S. in a temporary authorized status (for example students and workers with temporary visas).

In order to make projections of the financial status of the Social Security program, OCACT projects the number of other immigrants who are working under various classifications. OCACT assumes that other immigrants are as likely to work as legal permanent residents of the same age and sex. The estimated number of other immigrants working is 8.3 million in 2010. OCACT estimates 0.6 million of the 8.3 million other immigrant workers in 2010 had temporary work authorized at some point in the past and have overstayed the term of their visas. In addition, OCACT estimates that 0.7 million unauthorized workers in 2010 obtained fraudulent birth certificates at some point in the past and these birth certificates allowed the workers to get an SSN. Combining these two groups with the 1.3 million current visa holders with temporary authorization, we estimate 2.7 million other immigrants have SSNs in their name and thus can work, pay taxes, and have earnings credited to their record for potential benefits in the future.

OCACT estimates 1.8 million other immigrants worked and used an SSN that did not match their name in 2010. Their earnings may be credited to someone else's record (when the SSN and name submitted to the employer match Social Security records) or may be credited to the Earnings Suspense File (when submitted with non-matching SSN and name).  Finally, OCACT estimates 3.9 million other immigrants worked in the underground economy in 2010.

---

[1] January 1, 2010, is the starting year for the Social Security population projections. These estimates for 2010 rely on the most recent estimates from the Census Bureau and Department of Homeland Security at the time of preparation for the 2012 Trustees Report (November 2011).

Eliminating the current visa holders with temporary authorization (1.3 million other immigrants with legal work authorization), and those in the underground economy (3.9 million unauthorized workers), we estimate that there are about 3.1 million unauthorized immigrants working and paying Social Security taxes in 2010. With the average amount of OASDI taxable earnings for these immigrants assumed to be about 80 percent of the average level for all workers, we estimate $13 billion in payroll taxes from unauthorized immigrant workers and their employers in 2010.

## Benefits Based on Earnings by Unauthorized Immigrants

Estimating the portion of all 2010 OASDI benefit payments that will be based on prior unauthorized earnings is even more problematic than estimating current unauthorized earnings. In general, we believe that the evidence indicates a relatively small portion of those who potentially could draw benefits do so.

The principal category of unauthorized immigrants who can currently draw a Social Security benefit includes those who have overstayed visas, or obtained an SSN through illegitimate means. For January 1, 2010, we estimate that there were 720 thousand other immigrants aged 62 and over. Assuming: (1) about 25 percent of these immigrants meet the insured requirements and have a functional SSN matching their name; and (2) they have a monthly benefit level about half the average, we estimate about 180 thousand beneficiaries received roughly $1 billion in benefits in 2010.

Three additional categories of workers account for a relatively small amount of the total OASDI benefit payments. First, individuals who began receiving benefits before 1997 and never obtained authorization to work, could potentially be receiving benefits. However, they met the difficult challenge of documenting their past earnings and establishing the earnings as taxable. Second, individuals who never obtained authorization to work, received an SSN before 2004, and now live abroad could potentially receive a benefit. However, they would have similar challenges in documenting past earnings. Third, individuals who currently have authorization to work but did not have authorization while residing here in the past would find it difficult to document the earlier earnings. In each of these cases, the requirement to document ownership of reported taxable earnings in the past is a high hurdle, and meeting this requirement seems to be more the exception than the rule.

Overall, therefore, we estimate that about $1 billion of OASDI benefit payments for 2010 derive from earnings in years where the worker was unauthorized.

## Conclusion

While unauthorized immigrants worked and contributed as much as $13 billion in payroll taxes to the OASDI program in 2010, only about $1 billion in benefit payments during 2010 are attributable to unauthorized work. Thus, we estimate that earnings by unauthorized immigrants result in a net positive effect on Social Security financial status generally, and that this effect contributed roughly $12 billion to the cash flow of the program for 2010. We estimate that future years will experience a continuation of this positive impact on the trust funds.

While we expect the size of the unauthorized population to grow further in the future, several changes would limit the reporting of their earnings as taxable. Among these are issuance of SSNs at birth in recent years and greater scrutiny of birth certificates for individuals who only apply for SSNs at working ages. In addition, recent legislation requires that other immigrants receiving an SSN after 2003 cannot receive benefits unless the worker had legal work authorization at some point before retiring. Another recent change is the creation of a national-wide earnings verification system, which allows employers to check the legal status of their employees. While these changes will alter the future impact of earnings by unauthorized immigrants on the trust funds, we still expect significant effects that will benefit the financial status of the programs.

## ANSWERS TO SPECIFIC QUESTIONS ON UNAUTHORIZED IMMIGRATION

## Unauthorized workers in the U.S. and the Social Security system

- **Question:** To what extent has the economic downturn (that began in 2007) changed immigration trends in the U.S.?
  **Response:** The economic downturn did not affect the number of persons attaining legal immigrant status, as there are always more applicants than can be allowed under the legal limits. However, the downturn did affect the numbers of other immigrants entering and leaving the country. For the intermediate projection of the 2008 Trustees Report (these projections did not include the downturn), we assumed 1.5 million other immigrants

would enter the country in 2009. We now estimate that about 700 thousand other immigrants entered the country in 2009. In addition, due to the recession, we estimate that the number of other immigrants leaving the country was elevated in 2009, leaving only 40,000 net other immigrants for the year. We expect the effects of the recession on the number of other immigrants entering and leaving the country to be temporary. For 2015, we expect the number entering the country to return to 1.5 million and the net other immigration to be about 500,000.

- **Question:** What is the total number of unauthorized workers now participating in the U.S. economy? How has this number changed in the past and how will it change in the future?
  **Response:** We estimate that the number of unauthorized workers grew from 4.8 million in 2000 to 8.0 million in 2007, the peak of the last business cycle. The economy then fell into recession and the estimated number of unauthorized workers declined to 7.0 million in 2010. We project that the economy will recover and that the number of unauthorized workers will rise to 9.6 million in 2020.

- **Question:** What is the number of workers who are entering the country illegally? What is the number of workers who have overstayed their visas? How have these numbers changed?
  **Response:** The number of persons residing in the country without current legal authorization grew during the period 1990 to 2006 and the Department of Homeland Security (DHS) estimated the stock of unauthorized immigrants to be 11.8 million as of January 1, 2007. However, DHS estimated that this number declined to 10.8 million as of January 1, 2009. After the recovery from the recession, we assume the annual number of other immigrants (unauthorized and temporary visas) entering the U.S. will be 1.5 million per year. However, we assume that about one-third of those entering the country (largely those who have temporary visas or overstay temporary visas) will gain LPR status within a few years, and that the majority of the remaining 1 million other immigrants will eventually leave the country. We estimate the number of other immigrants who have entered the country legally with a temporary visa, have overstayed their visa (work or student), and are working using their legitimately acquired SSN to be 0.6 million in 2010, slightly above the 2000 level of 0.5 million.

- **Question:** How many of the unauthorized workers have an SSN issued in their name and how many are reporting earnings under invalid numbers?
  **Response:** Before 1980, many unauthorized workers obtained SSNs in their name using fraudulent identification, particularly birth certificates. After 2001, however, SSA became far more vigilant on identification, and the number of persons obtaining SSNs with fraudulent identification should now be relatively small. We estimate 0.7 million unauthorized workers in 2010 were working using fraudulent identification (most with SSNs obtained before 2001), and we project this number to decrease to less than 0.2 million in 2040. Increasingly in the future, earnings reported to SSA for unauthorized workers will be reported with an illegitimate SSN. In this case, the reported earnings show up with a mismatch between name and SSN and thus would be assigned to the Earnings Suspense File. Due to this mismatch, the worker (and employer) would be paying payroll taxes, but the earnings would not be credited toward later receipt of benefits. Our estimate for the current stock of these immigrants is 1.8 million in 2010, rising to 3.4 million by 2040.

- **Question:** How many unauthorized workers are employed in the underground economy? How has this number changed in the past and how will it change in the future?
  **Response:** The estimated number of unauthorized workers who are employed in the underground economy grew from 2.2 million in 2000 to 3.9 million in 2010. We project the number of these workers to grow to 9.0 million in 2040.

### Wage reporting and wage levels

- **Question:** Of the unauthorized workers paying OASDI taxes, what is the average level of earnings upon which the taxes are levied and how does that level compare with the broader U.S. labor force?
  **Response:** We assume the average level of taxable earnings for these unauthorized workers equals about 80 percent of the average level for all workers. For 2010, we estimate this average level for these unauthorized workers to be about $34,000.

- **Question:** What is the dollar amount of payroll taxes paid by unauthorized workers and their employers for the latest tax year?
  **Response:** We estimate $13 billion in OASDI payroll taxes from unauthorized immigrant workers and their employers in 2010. This number reflects earnings for those with no recorded SSN, those who have obtained an SSN with fraudulent identification, and those with legitimate SSNs who have overstayed temporary visas.

- **Question:** Does information in the Social Security Earnings Suspense File (ESF) provide insights into

4

002253

unauthorized workers' labor force participation and earnings? What dollar amount or percentage of earnings in the ESF is the result of unauthorized work? How many items posted to the ESF are from unauthorized work? Since both legal and illegal workers may hold several jobs in any tax reporting year, how does that affect the estimate of unauthorized wage items and earnings reported by unauthorized workers?

**Response:** Viewing the history of the ESF, we attempt to separate the total dollar amount of taxable wages for each year between unauthorized workers and the rest of the population. However, because we cannot identify which individual "wage items" are for unauthorized immigrants and which are for legal residents, we have no way to determine specifically either the number of wage items reported per worker or the average total annual earnings per worker represented on the ESF. Historically, both the unauthorized population and the percent of total reported earnings that goes to the ESF have been rising and we estimate a continuation of these trends. We estimate earnings in the ESF for unauthorized immigrants will increase from less than 1 percent of total taxable payroll in 2000 to about 2 percent in 2040.

### Benefits based on earnings by unauthorized workers

- **Question:** How many unauthorized workers receive benefits from Social Security? How many fall under the category of overstayed visa or an SSN obtained through illegitimate means? What is their benefit level, their insured status, and the total amount of benefits they receive compared to authorized workers? What are the trends over time? How will these trends change in the future?

  **Response:** Individuals who enter the country as unauthorized immigrants and remain in that status for life are relatively unlikely to receive benefits from the OASDI program. Those who work in the underground economy have no basis for expecting to be entitled for benefits. Those who have worked and paid payroll taxes without a matched SSN will have had their earnings placed in the suspense file and will have only a relatively remote possibility of obtaining credit for these earnings for the purpose of becoming entitled to a benefit. The relatively small and declining number of unauthorized immigrants who have an SSN with earnings credited in their name, may receive benefits in the

future. However, to receive benefits they must meet the following three conditions: (1) work long enough to acquire insured status under the program; (2) receive legal work authorization at some time; and (3) receive legal resident status for the time of their benefit entitlement or, if not, are willing to leave the U.S. to receive a benefit.

- **Question:** What categories of persons, who are or were unauthorized workers, may be eligible for benefits if they can document past earnings? To what degree are they successful in documenting such earnings?

  **Response:** We estimate about 30 percent of the other immigrants who were living in the U.S. and were age 62 in 2000, would be eligible to receive retired-worker benefits. We project that the percent eligible to receive a retired-worker benefit will decline to around 10 percent at the end of the 75-year projection period. In addition, SSA authorized about 0.5 million checks to persons living abroad in December 2010. However, most of these individuals are U.S. citizens living abroad or persons receiving benefits under totalization agreements with other countries (based on authorized work).

### MAJOR LAWS AFFECTING UNAUTHORIZED IMMIGRATION AND SOCIAL SECURITY

- *Immigration Reform and Control Act (IRCA) of 1986* allowed about ½ of the undocumented population in 1987 to become legal permanent residents over the period 1989-1991.

- Effective December 1, 1996, the *Illegal Immigration Reform and Immigrant Responsibility Act of 1996* prohibits SSA from paying monthly Title II benefits to noncitizens who are in the United States for any month during which they are not lawfully authorized to be in the country. After 2000, SSA became more vigilant in issuing SSNs. Since September 2002, SSA verifies noncitizens' immigration status with the Department of Homeland Security (DHS) before assigning an original SSN or issuing a replacement SSN card.

- The *Social Security Protection Act of 2004* restricts SSA from authorizing Title II benefits to noncitizen workers who received an original Social Security number (SSN) after January 1, 2004 unless they were issued an SSN for work purposes or were admitted into the United States as a nonimmigrant visitor for business or as an alien crewman.



NATIONAL IMMIGRATION LAW CENTER



Search

DONATE NOW     TAKE ACTION

National Immigration Law Center > Issues > Economic Support > Overview of Immigrant Eligibility for Federal Programs

# Overview of Immigrant Eligibility for Federal Programs

**Updated May 2024**



*By* **Tanya Broder and Gabrielle Lessard**

The major federal public benefits programs have long excluded some non–U.S. citizens from eligibility for assistance. Programs such as the Supplemental Nutrition Assistance Program (SNAP, formerly known as the Food Stamp Program), nonemergency Medicaid, Supplemental Security Income (SSI), and Temporary Assistance for Needy Families (TANF) and its precursor, Aid to Families with Dependent Children (AFDC), were largely unavailable to undocumented immigrants and people in the United States on temporary visas.

However, the 1996 federal welfare and immigration laws introduced an unprecedented era of restrictionism. [1] Prior to the enactment of these laws, lawful permanent residents of the U.S. generally were eligible for assistance in a manner similar to U.S. citizens. Once the laws were implemented, most lawfully residing immigrants were barred from receiving assistance under the major federal benefits programs for five years or longer.

Even where eligibility for immigrants was preserved by the 1996 laws or restored by subsequent legislation, many immigrant families hesitate to enroll in critical health care, job-training, nutrition, and cash assistance

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.  Accept  **Read More**

002255

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2263 of 4699    PageID #:  5428

1996 laws, causing severe hardship for many low-income immigrant families who lacked the support available to other low-income families.[2]

Efforts to address the chilling effects and confusion have continued since that time. The Trump administration's exclusionary policies compounded the problem, making it even more difficult to ensure that eligible immigrants and their family members would secure services.

This article focuses on eligibility and other rules governing immigrants' access to federal public benefits programs. Many states have attempted to fill some of the gaps in noncitizen coverage resulting from the 1996 laws, either by electing federal options to cover more eligible noncitizens or by spending state funds to cover at least some of the immigrants who are ineligible for federally funded services.

In determining an immigrant's eligibility for benefits, it is necessary to understand the federal rules as well as the rules of the state in which an immigrant resides. Updates on federal and state rules are available on NILC's website.[3]

## Immigrant Eligibility Restrictions

### Categories of Immigrants: "Qualified" and "Not Qualified"

The 1996 welfare law created two categories of immigrants for benefits eligibility purposes: "qualified" and "not qualified." Contrary to what these names suggest, the law excluded many people in *both* groups from eligibility for many benefits, with a few exceptions. The "qualified" immigrant category includes:

- lawful permanent residents, or LPRs (people with green cards)
- refugees, people granted asylum or withholding of deportation/removal, and conditional entrants
- people granted parole by the U.S. Department of Homeland Security (DHS) for a period of at least one year
- Cuban and Haitian entrants[4]
- certain abused immigrants, their children, and/or their parents [5]
- certain survivors of trafficking [6]
- individuals residing in the U.S. pursuant to a Compact of Free Association (COFA) [7]

All other immigrants, including undocumented immigrants, as well as many people who are lawfully present in the U.S., are considered "not qualified."[8]

In the years since the initial definition became law, there have been a few expansions of access to benefits. In 2000, Congress established a new category of noncitizens — survivors of trafficking — who are eligible for federal public benefits to the same extent as refugees, regardless of whether they have a qualified immigrant status [9] In 2003, Congress clarified that "derivative beneficiaries" listed on trafficking survivors' visa

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002256

Immigrant visas similarly became eligible for benefits to the same extent as refugees.[11] In 2021, Congress extended the same benefits eligibility to certain Afghans paroled into the U.S.[12] In 2022, Congress made certain Ukrainians who were paroled into the U.S. eligible for benefits to the same extent as refugees.[13] In 2020, Congress declared that, for Medicaid purposes only, citizens of Micronesia, Marshall Islands, and Palau who reside in the U.S. pursuant to a Compact of Free Association (COFA migrants) would be considered "qualified" immigrants.[14]  In 2024, Congress declared that COFA migrants are "qualified" immigrants for all federal public benefits programs and removed restrictions on their eligibility for federal means-tested public benefits.[15]

## Federal Public Benefits Generally Denied to "Not Qualified" Immigrants

With some important exceptions detailed below, the law prohibits not-qualified immigrants from enrolling in most "federal public benefit programs."[16] Federal public benefits include a variety of safety-net services paid for by federal funds.[17] But the welfare law's definition does not specify which programs are covered by the term, leaving that clarification to each federal benefit–granting agency. In 1998, the U.S. Department of Health and Human Services (HHS) published a notice clarifying which of its programs fall under the definition.[18] The list of 31 HHS programs includes Medicaid, the Children's Health Insurance Program (CHIP), TANF, Foster Care, Adoption Assistance, the Child Care and Development Fund, and the Low-Income Home Energy Assistance Program. Any new programs must be designated as federal public benefits in order to trigger the associated eligibility restrictions and, until they are designated as such, should remain open to broader groups of immigrants.

The HHS notice clarifies that not every benefit or service provided within these programs is a federal public benefit. For example, in some cases not all of a program's benefits or services are provided to an individual or household; they may extend, instead, to a community of people — as in a community clinic or the weatherization of an entire apartment building.[19]

The welfare law also attempted to force states to pass additional laws, after August 22, 1996, if they choose to provide state public benefits to certain immigrants.[20] Such micromanagement of state affairs by the federal government is potentially unconstitutional under the Tenth Amendment.[21]

## Exceptions to the Restrictions

The law includes important exceptions for certain types of services. Regardless of their immigration status, not-qualified immigrants are eligible for emergency Medicaid [22] if they are otherwise eligible for their state's Medicaid program.[23] The law does not restrict access to public health programs that provide immunizations and/or treatment of communicable disease symptoms (whether or not those symptoms are caused by such a disease). School breakfast and lunch programs remain open to all children regardless of immigration status, and every state has opted to provide access to the Special Supplemental Nutrition Program for Women,

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002257

Short-term noncash emergency disaster assistance remains available without regard to immigration status. Also exempt from the restrictions are other in-kind services necessary to protect life or safety, as long as no individual or household income qualification is required. In 2001, the U.S. attorney general published a final order specifying the types of benefits that meet these criteria. The attorney general's list includes child and adult protective services; programs addressing weather emergencies and homelessness; shelters, soup kitchens, and meals-on-wheels; medical, public health, and mental health services necessary to protect life or safety; disability or substance abuse services necessary to protect life or safety; and programs to protect the life or safety of workers, children and youths, or community residents.[25]

## Verification Rules

When a federal agency designates a program as a federal public benefit foreclosed to not-qualified immigrants, the law requires the state or local agency to verify the immigration and citizenship status of all program applicants. However, many federal agencies have not specified which of their programs provide federal public benefits. Until they do, state and local agencies that administer the programs are not obligated to verify the immigration status of people who apply for them.

And under an important exception contained in the 1996 immigration law, nonprofit charitable organizations are not required to "determine, verify, or otherwise require proof of eligibility of any applicant for such benefits." This exception relates specifically to the immigrant benefits restrictions in the 1996 welfare and immigration laws.[26]

## Eligibility for Major Federal Benefit Programs

Congress restricted eligibility even for many qualified immigrants by distinguishing between those who entered the U.S. before or "on or after" the date the law was enacted, August 22, 1996. The law barred most immigrants who entered the U.S. on or after that date from "federal means-tested public benefits" during the five years after they secure qualified immigrant status[27] This waiting period is often referred to as the five-year bar. Federal agencies clarified that the "federal means-tested public benefits" are Medicaid (except for emergency services), CHIP, TANF, SNAP, and SSI.[28]

## TANF, Medicaid, and CHIP

States can receive federal funding for TANF, Medicaid, and CHIP to serve qualified immigrants who have completed the federal five-year bar.[29] Refugees, people granted asylum or withholding of deportation/removal, Cuban/Haitian entrants, certain Amerasian immigrants,[30] Iraqi and Afghan Special Immigrants, and survivors of trafficking are exempt from the five-year bar, as are qualified immigrants who are veterans or active-duty military and their spouses and children. In addition, children who receive federal

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002258

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2266 of 4699 PageID #: 5431

Over half of the states have used state funds to provide TANF, Medicaid, and/or CHIP to immigrants who are subject to the five-year bar on federally funded services, or to a broader group of immigrants.[31] A growing number of states and counties provide health coverage to children, young adults, or pregnant persons regardless of their immigration status. Several states offer or will offer health coverage to older adults regardless of their immigration status. And five states (California, Colorado, Minnesota, Oregon, Washington) and the District of Columbia offer or will offer public or private health coverage with state subsidies to all otherwise eligible immigrants regardless of their immigration status.

Where federal matching funds are available, forty-four states have chosen to cover immigrant children and/or pregnant people, or to provide prenatal care regardless of immigration status.[32] In 2009, when Congress first reauthorized the CHIP program, states were granted an option to provide federally funded Medicaid and CHIP to "lawfully residing" children and/or pregnant persons regardless of their date of entry into the U.S.[33] As of May 2024, thirty-eight states[34] plus the District of Columbia have opted to take advantage of this federal funding for immigrant health care coverage, which became available on April 1, 2009.

Twenty-two states use or will use federal funds to provide prenatal care regardless of immigration status, under an option enabling states to provide prenatal services through CHIP. Under this option, the pregnant person's fetus is technically the recipient of CHIP-funded services. This approach potentially limits the scope of services available to the pregnant person to those directly related to the fetus's health.[35] However, several states have used another CHIP option or state funds to provide 12 months of post-partum care, regardless of status.

The District of Columbia, New Jersey, New York, and Vermont use state or local funds to provide prenatal care regardless of the pregnant person's immigration status.

While the federal health care reform law, known as the Affordable Care Act (ACA),[36] did not alter immigrant eligibility for Medicaid or CHIP, it provided new pathways for lawfully present immigrants to obtain health insurance. Coverage purchased in the ACA's health insurance marketplaces is available to most lawfully present noncitizens.[37] A "special rule" allows immigrants with incomes under 100 percent of the federal poverty level to obtain subsidized marketplace coverage if their immigration status makes them ineligible for Medicaid.[38]

**SNAP**

Although the 1996 law severely restricted immigrant eligibility for the Supplemental Nutrition Assistance Program (SNAP, formerly known as the Food Stamp Program), subsequent legislation restored access for many immigrants. Qualified immigrant children, refugees, people granted asylum or withholding of deportation/removal, Cuban/Haitian entrants, certain Amerasian immigrants, Iraqi and Afghan Special Immigrants, survivors of trafficking, COFA migrants, qualified immigrant veterans, active duty military and

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002259

who were born before August 22, 1931, may be eligible if they were lawfully residing in the U.S. on August 22, 1996. Other qualified immigrant adults, however, must wait until they have been in qualified status for five years before they can secure critical nutrition assistance.

Six states — California, Illinois, Maine, Massachusetts, Minnesota, and Washington — provide state-funded nutrition assistance to some of the immigrants who are ineligible for the federal SNAP program. [40]

## SSI

Congress imposed its harshest restrictions on immigrant seniors and immigrants with disabilities who seek assistance under the SSI program.[41] Although advocacy efforts in the two years following the welfare law's passage achieved a partial restoration of these benefits, significant gaps in eligibility remain. For example, SSI continues to exclude not-qualified immigrants who were not receiving the benefits, on August 22, 1996, as well as most qualified immigrants who entered the country after the welfare law passed and seniors without disabilities who were in the U.S. before that date.[42]

"Humanitarian" immigrants (including refugees, people granted asylum or withholding of deportation/removal, Amerasian immigrants, Cuban and Haitian entrants, Iraqi and Afghan Special Immigrants, and survivors of trafficking) can receive SSI, but only during the first seven years after having obtained the relevant status. The main rationale for the seven-year time limit was that it was intended to provide a sufficient opportunity for humanitarian immigrant seniors and those with disabilities to naturalize and retain their eligibility for SSI as U.S. citizens. However, a combination of factors, including immigration backlogs, processing delays, former statutory caps on the number of asylees who can adjust their immigration status, language barriers, and other obstacles, made it impossible for many of these individuals to naturalize within seven years. Although Congress enacted an extension of eligibility for refugees who faced a loss of benefits due to the seven-year time limit in 2008, that extension expired in 2011.[43] Subsequent attempts to reauthorize the extension were unsuccessful, and the exclusion from SSI of thousands of seniors and people with disabilities continues. In March 2024, Congress removed the restrictions on access to SSI for COFA migrants.

Six states — California, Hawaii, Illinois, Maine, New Hampshire, and Washington — provide cash assistance to certain immigrant seniors and people with disabilities who are ineligible for SSI; some others provide much smaller general assistance grants to these immigrants.

## The Impact of Sponsorship on Eligibility

Under the 1996 welfare and immigration laws, family members and some employers eligible to file a petition to help a person immigrate must become financial sponsors of the immigrant by signing a contract with the government called an "affidavit of support". Under the enforceable affidavit (Form I-864), the sponsor

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002260

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2268 of 4699 PageID #:  5433

Immigrants whose sponsors sign an enforceable affidavit of support are subject to additional eligibility restrictions. When an agency is determining a lawful permanent resident's financial eligibility for TANF, SNAP, SSI, nonemergency Medicaid, or CHIP,[44] the law in some cases requires the agency to "deem" the income of the immigrant's sponsor or the sponsor's spouse to be available to the immigrant. The sponsor's income and resources are added to the immigrant's, which often disqualifies the immigrant as over-income for the program. The 1996 laws imposed deeming rules in certain programs until the immigrant becomes a citizen or secures credit for 40 quarters (approximately 10 years) of work history in the U.S.

Domestic violence survivors and immigrants who would go hungry or homeless without assistance ("indigent" immigrants) are exempt from sponsor deeming for at least 12 months.[45] Some programs apply additional exemptions from the sponsor-deeming rules.[46] The U.S. Department of Agriculture (USDA) has issued helpful guidance on the indigence exemption and other deeming and liability issues.[47]

## Beyond Eligibility: Overview of Barriers That Impede Access to Benefits for Immigrants

### Confusion about Eligibility

Confusion about eligibility rules is widespread in both immigrant communities and benefit agencies. The confusion stems from the complex interaction of the immigration and welfare laws, differences in eligibility criteria for various state and federal programs, and a lack of adequate training on the rules as clarified by federal agencies. Consequently, many eligible immigrants have assumed that they should not seek services, and eligibility workers have turned away eligible immigrants mistakenly.

### Fear of Being Considered a Public Charge

The immigration laws allow officials to deny a noncitizen's application for lawful permanent residence or entry into the U.S. if the authorities determine that the person is "likely to become a public charge."[48] In deciding whether an immigrant is likely to become a public charge, immigration or consular officials review the "totality of the circumstances," including the person's health, age, income and resources, education and skills, family circumstances, and the affidavit of support. Under the current DHS regulations and longstanding policy, officials may consider the receipt of only two types of public benefits in a public charge assessment:

- Public cash assistance for income maintenance, and
- Long-term institutionalization at government expense.[49]

During the period immediately after the 1996 welfare and immigration laws passed, the misapplication of the public charge ground of inadmissibility contributed significantly to the chilling effect on immigrants' access to

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002261

Confusion and *fear about these rules, however, became widespread.*[50] *Immigrants' rights advocates, health* care providers, and state and local governments organized to persuade federal agencies to clarify the limits of the rules. In 1999, the Immigration and Naturalization Service (INS, whose functions were later assumed by the Department of Homeland Security, or DHS) issued helpful guidance and a proposed regulation on the public charge doctrine.[51] The guidance clarified that receipt of health care and other noncash benefits will not jeopardize the immigration status of recipients or their family members by putting them at risk of being considered a public charge.[52]

The Trump administration attempted to alter this policy dramatically by issuing rules that made it much more difficult for low- and middle-income families to immigrate, and that profoundly exacerbated the chilling effect on access to services. Multiple courts found that the rules were likely unlawful. The Biden administration dismissed the appeals of these decisions, allowed an order vacating the DHS rule to take effect, and formally withdrew the prior administration's DHS public charge rule.

On September 9, 2022, US Citizenship and Immigration Services (USCIS) published a final rule addressing the public charge inadmissibility ground.[53] The new rule became effective on December 23, 2022. The Department of State (DOS) is applying a similar policy to applications that are processed abroad.[54] DOS has indicated that it plans to issue proposed public charge rules, which are likely to conform with the new USCIS rule.[55] The final USCIS public charge rule is largely consistent with the 1999 Field Guidance and includes some helpful clarifications.[56] USCIS revised its forms to reflect the new rules and may make further revisions, or issue more guidance, in response to feedback from advocates and practitioners.

Despite the restoration of longstanding public charge policy, widespread confusion and concern about the public charge rules remains, deterring many eligible immigrants and their US citizen family members from seeking critical services.[57]

## Requirement of Affidavits of Support

The 1996 laws enacted rules that make it more difficult to immigrate to the U.S. to reunite with family members. As noted above, since December 19, 1997 relatives (and some employers) who sponsor an immigrant have been required to meet strict income requirements and to sign a long-term contract, or affidavit of support (USCIS Form I-864), promising to maintain the immigrant at 125 percent of the federal poverty level and to repay certain means-tested public benefits the immigrant may receive.[58]

The specific federal benefits for which sponsors may be liable have been defined to be TANF, SSI, SNAP, nonemergency Medicaid, and CHIP. Affidavit of support regulations issued in 2006 make clear that states are not obligated to seek reimbursement from sponsors. The regulations prohibit states from collecting reimbursement for any services used before the state issues a public notification that the services are considered means-tested public benefits for which sponsors will be liable.[59]

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002262

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2270 of 4699 PageID #:  5435

making their sponsors liable financially has deterred eligible immigrants from applying for critical services.

## Language Access

Many immigrants face significant linguistic and cultural barriers to obtaining benefits. As of 2022, approximately 22 percent of the U.S. population (5 years of age and older) spoke a language other than English at home.[60] Although 97 percent of long-term immigrants to the U.S. eventually learn to speak English well,[61] many are in the process of learning the language, and around 8 percent of people living in the U.S. speak English less than very well.[62] These limited–English proficient (LEP) residents cannot effectively apply for benefits or meaningfully communicate with a health care provider without language assistance.

Title VI of the Civil Rights Act of 1964 and its implementing regulations prohibit recipients of federal funding from discriminating on the basis of national origin, which has been interpreted to prohibit discrimination based on language. Benefit agencies, health care providers, and other entities that receive federal financial assistance are required to take "reasonable steps" to assure that people who are LEP have "meaningful access" to federally funded programs, but compliance with this law varies widely, and language access remains a challenge.[63]

Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability by an entity that provides or administers health-related services, health insurance coverage, or assistance in obtaining health services or coverage where any portion of the entity's health-related activities directly or indirectly receives funding from the U.S. Department of Health and Human Services (HHS).  Health programs administered by HHS, as well as health insurance marketplaces like HealthCare.gov and other entities established under Title I of the ACA are also subject to Section 1557's requirements.[64]

Entities covered by Section 1557 are required to take reasonable steps to provide, free of charge, meaningful access to persons with limited English proficiency (LEP) who are eligible to be served or likely to be affected by the covered entity's health programs.[65] They also are required to implement written policies and procedures for providing language assistance services[66] and to provide notices of the availability of language assistance in the 15 most common languages in the state or states where the entity operates health-related programs. [67]

## Verification

Rules that require benefit agencies to verify applicants' immigration or citizenship status have been misinterpreted by some agencies, leading them to demand immigration documents or Social Security numbers (SSNs) in situations when applicants are not required to submit such information.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002263

providers to use in verifying immigration status.[68] The guidance, which remains in effect, directs benefit agencies already using the Systematic Alien Verification for Entitlements (SAVE) process to continue to do so. [69] Previously, the use of SAVE in the SNAP program was an option that could be exercised by each state, but the 2014 Farm Bill mandated that SAVE be used in SNAP nationwide.[70]

However, important protections for immigrants who are subject to verification remain in place. Applicants for major benefits are guaranteed a "reasonable opportunity" to provide requested immigration documents, including, in some cases, receipts confirming that the person has applied for replacement of lost documents. In the federal programs that are required by law to use SAVE, applicants who declare that they have a satisfactory status and who provide documents within the reasonable opportunity period should remain eligible for assistance while verification of their status is pending. And information submitted to the SAVE system may not be used for civil immigration enforcement purposes.

The 1997 DOJ guidance recommends that agencies make decisions about financial and other eligibility factors before asking an applicant for information about their immigration status.

## Questions on Application Forms

Federal agencies have worked to reduce the chilling effect of immigration status–related questions on benefit applications. In 2000, HHS and USDA issued a "Tri-Agency Guidance" document, recommending that states delete from benefit applications questions that are unnecessary and that may chill participation by immigrant families.[71] The guidance confirms that only the immigration status of the applicant for benefits is relevant. It encourages states to allow family or household members who are not seeking benefits to be designated as nonapplicants early in the application process. Similarly, under Medicaid, TANF, and SNAP, only the applicant must provide a Social Security number. In 2011, the USDA issued a memo instructing states to apply these principles in their online application procedures[72] These principles are also codified in Medicaid and CHIP regulations, and in the Affordable Care Act .[73]

SSNs are not required for people seeking only emergency Medicaid.[74]

## Reporting to the Department of Homeland Security

Another common source of fear in immigrant communities stems from a 1996 provision that requires benefits-administering agencies to report to DHS people who the agencies *know* are not lawfully present in the U.S. This requirement is, in fact, quite narrow in scope.[75] It applies only to three programs: SSI, certain federal housing programs, and TANF.[76]

In 2000, federal agencies outlined the limited circumstances under which the reporting requirement is triggered [77] Only people who are actually seeking benefits (not relatives or household members applying on

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002264

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2272 of 4699 PageID #: 5437

housing, or TANF. The conclusion that the person is unlawfully present also must be supported by a determination by the immigration authorities, "such as a Final Order of Deportation."[78] Findings that do not meet these criteria (e.g., a DHS response to a SAVE computer inquiry indicating an immigrant's status, an oral or written admission by an applicant, or suspicions of agency workers) are insufficient to trigger the reporting requirement. Agencies are not required to submit reports to DHS unless they have knowledge that meets the above requirements. Finally, the guidance stresses that agencies are not required to make immigration status determinations that are not necessary to confirm eligibility for benefits.

There is no federal reporting requirement in health programs. To address the concerns of eligible citizens and immigrants in mixed–immigration status households, the DHS issued a memo in 2013 confirming that information submitted by applicants or family members seeking Medicaid, CHIP, or health care coverage under the Affordable Care Act would not be used for civil immigration enforcement purposes.[79]

## Looking Ahead

The 1996 welfare law produced sharp decreases in public benefits participation by immigrants. Proponents of welfare "reform" saw that fact as evidence of the law's success, noting that a reduction of welfare use, particularly among immigrants, was precisely what the legislation intended. The wisdom of these restrictions increasingly has been called into question, including the unfairness of excluding immigrants from programs that are supported by their taxes.

During the COVID-19 pandemic, many states and localities recognized that they could not protect the health and safety of their residents unless everyone in the community had access to health care, safe working conditions, and economic support. Numerous jurisdictions offered short-term disaster assistance, stimulus payments, or other relief to individuals who were excluded from federal economic impact payments and unemployment insurance programs. Some offered tax credits or basic income to a subset of residents regardless of their immigration status. These efforts, while helpful, were not sufficient to meet the need or to address the longstanding racial disparities in access to care, support, and opportunities. Understanding that our lives, health, and economic security are interconnected, several states are expanding access to health care for immigrants and are exploring new strategies for ensuring that all community members can thrive.

*This article, "Overview of Immigrant Eligibility for Federal Programs," is periodically updated as new developments warrant. The edition published immediately prior to this May 2024 edition was dated July 2021.*

## NOTES

[1] Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (hereinafter "welfare law"), Pub.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002265

Act of 1996 (hereinafter "IIRIRA"), enacted as Division C of the Defense Department Appropriations Act, 1997, Pub. L. No. 104–208, 110 Stat. 3008 (Sept. 30, 1996).

[2] Michael Fix and Jeffrey Passel, *The Scope and Impact of Welfare Reform's Immigrant Provisions* (Discussion Paper No. 02-03) (The Urban Institute, Jan. 2002), www.urban.org/research/publication/scope-and-impact-welfare-reforms-immigrant-provisions.

[3] *Guide to Immigrant Eligibility for Federal Programs* update page, www.nilc.org/updatepage/.

[4] The Cuban and Haitian entrant benefit eligibility category includes Cuban and Haitian nationals with a range of current and past immigration statuses listed at 45 C.F.R. § 401.2. See also U.S. Department of Health and Human Services, Office of Refugee Resettlement Fact Sheet on Cuban and Haitian entrants at https://www.acf.hhs.gov/sites/default/files/documents/orr/orr_fact_sheet_cuban_haitian_entrant.pdf.

[5] To be considered a "qualified" immigrant under the battered spouse or child category, the immigrant must have an approved visa petition filed by a spouse or parent, a self-petition under the Violence Against Women Act (VAWA) that has been approved or sets forth a prima facie case for relief, or an approved application for cancellation of removal under VAWA. The spouse or child must have been battered or subjected to extreme cruelty in the U.S. by a family member with whom the immigrant resided, or the immigrant's parent or child must have been subjected to such treatment. The immigrant must also demonstrate a "substantial connection" between the domestic violence and the need for the benefit being sought. And the battered immigrant, parent, or child must not be living with the abuser. While many people who have U visas have survived domestic violence, they are not considered qualified battered immigrants under this definition.

[6] Survivors of trafficking and their derivative beneficiaries who obtain a T visa or whose application for a T visa sets forth a prima facie case are considered "qualified" immigrants. This group was added to the definition of "qualified" by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. 110–457, § 211 (Dec. 23, 2008).

[7] Individuals lawfully residing in the U.S. pursuant to a Compact of Free Association between the United States and Micronesia, the Marshall Islands or Palau were added to the definition of "qualified" immigrants by the Consolidated Appropriations Act of 2024 § 209(f)(3) (March 9, 2024)(amending 8 USC § 1641(b)(8)).

[8] Throughout the remainder of this article, qualified will be understood to have this particular meaning, as will not-qualified; they will not be enclosed in quotation marks.

Before 1996, some of these immigrants were served by benefit programs under an eligibility category called "permanently residing in the U.S. under color of law" (PRUCOL). PRUCOL is not an immigration status, but a benefit eligibility category that has been interpreted differently depending on the benefit program and the

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. Accept **Read More**

002266

including California, Massachusetts, and New York, continue to provide services to immigrants meeting this definition, using state or local funds.

[9] The Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, § 107 (Oct. 28, 2000). Federal agencies are required to provide benefits and services to individuals who have been subjected to a "severe form of trafficking in persons" to the same extent as refugees, without regard to their immigration status. To receive these benefits, the survivor must be either under 18 years of age or certified by the U.S. Department of Health and Human Services (HHS) as willing to assist in the investigation and prosecution of severe forms of trafficking in persons. In the certification, HHS confirms that the person either (a) has made a bona fide application for a T visa that has not been denied, or (b) is a person whose continued presence in the U.S. is being ensured by the attorney general in order to prosecute traffickers in persons.

[10] Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108–193, § 4(a)(2) (Dec. 19, 2003).

[11] Iraqis and Afghans granted Special Immigrant visas (SIV) under the Refugee Crisis in Iraq Act of 2007 § 1244(g) (subtitle C of title XII of division A of Public Law 110-181; 122 Stat. 398) or the Afghan Allies Protection Act of 2009 § 602(b)(8) (title VI of division F of Public Law 111- 8; 123 Stat. 809) are eligible for benefits to the same extent as refugees. Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, § 8120 (Dec. 19, 2009).

[12] Extending Government Funding and Delivering Emergency Assistance Act, Pub. L. 117-43 (Sept. 30, 2021) as amended by the Continuing Appropriations and Ukraine Supplemental Appropriations Act, Pub. L. 117-180 § 149 (Sept. 30, 2022), and by the Consolidated Appropriations Act, 2023, Pub. L. 117-328 § 1501 (Dec. 29, 2022). Afghans granted humanitarian parole between July 31, 2021, and September 30, 2023 — and their spouses and children, and parents or guardians of unaccompanied children granted parole after September 30, 2022 — also are eligible for federal benefits to the same extent as refugees. Eligibility for this group continues until the end of their parole term.

[13] Additional Ukraine Supplemental Appropriations Act, 2022, H.R. 7691 (May 21, 2022); Emergency Supplemental Appropriations for fiscal year ending September 30, 2024, H.R. 815, Pub. L. 118-50 (April 24, 2024). Ukrainians paroled into the U.S. between February 24, 2022, and September 30, 2024 – and their spouses and children, and parents, guardians or primary caregivers of unaccompanied children paroled into the U.S. after September 30, 2023 – are eligible for federal benefits to the same extent as refugees. (There is an exception for an initial resettlement program). Eligibility for this group continues until their parole is terminated.

[14] Consolidated Appropriations Act, 2021, Pub. L. 116-260, § 208(c) (Dec. 27, 2020).

[15] Consolidated Appropriations Act of 2024 § 209(f) (March 9, 2024).

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. Accept **Read More**

002267

[17] "Federal public benefit" is described in the 1996 federal welfare law as (a) any grant, contract, loan, professional license, or commercial license provided by an agency of the U.S. or by appropriated funds of the U.S., and (b) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment, benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the U.S. or appropriated funds of the U.S.

[18] HHS, Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), "Interpretation of 'Federal Public Benefit,'" 63 Fed. Reg. 41658–61 (Aug. 4, 1998). The HHS notice clarifies that not every benefit or service provided within these programs is a federal public benefit.

[19] HHS, Division of Energy Assistance, Office of Community Services, Memorandum from Janet M. Fox, Director, to Low Income Home Energy Assistance Program (LIHEAP) Grantees and Other Interested Parties, re. Revision-Guidance on the Interpretation of "Federal Public Benefits" Under the Welfare Reform Law (June 15, 1999).

[20] Welfare law § 411 (8 U.S.C. § 1621).

[21] See, e.g., *Matter of Application of Cesar Adrian Vargas for Admission to the Bar of the State of New York* (2015 NY Slip Op 04657; decided on June 3, 2015, Appellate Division, Second Department Per Curiam) (holding that the requirement under 8 U.S.C. § 1621(d) that states must pass legislation in order to opt out of the federal prohibition on issuing professional licenses — in this case, admission to the New York State bar — to undocumented immigrants infringes on New York State's 10th amendment rights).

[22] Emergency Medicaid covers the treatment of an emergency medical condition, which is defined as "a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in: (A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions: or (C) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1396b(v).

[23] Welfare law § 401(b)(1)(A) (8 U.S.C. § 1611(b)(1)(A)).

[24] Welfare law § 742 (8 U.S.C. § 1615).

[25] U.S. Dept. of Justice (DOJ), "Final Specification of Community Programs Necessary for Protection of Life or Safety under Welfare Reform Legislation," A.G. Order No. 2353– 2001, 66 Fed. Reg. 3613–16 (Jan. 16, 2001).

[26] IIRIRA § 508 (8 U.S.C. § 1642(d)).

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.   Accept   **Read More**

002268

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2276 of 4699    PageID #:  5441

[28] HHS, Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), "Interpretation of 'Federal Means-Tested Public Benefit,'" 62 Fed. Reg. 45256 (Aug. 26, 1997); U.S. Dept. of Agriculture (USDA), "Federal Means Tested Public Benefits," 63 Fed. Reg. 36653 (July 7, 1998). The CHIP program, created after the passage of the 1996 welfare law, was later designated as a federal means-tested public benefit program. See Health Care Financing Administration, "The Administration's Response to Questions about the State Child Health Insurance Program," Question 19(a) (Sept. 11, 1997).

[29] States were also given an option to provide or deny federal TANF and Medicaid to most qualified immigrants who were in the U.S. before Aug. 22, 1996, and to those who enter the U.S. on or after that date, once they have completed the federal five-year bar. Welfare law § 402 (8 U.S.C. § 1612). Only one state, Wyoming, denies Medicaid to immigrants who were in the country when the welfare law passed. Colorado's proposed termination of Medicaid to these immigrants was reversed by the state legislature in 2005 and never took effect. In addition to Wyoming, six states (Mississippi, Montana, North Dakota, South Carolina, South Dakota, and Texas) require lawful permanent residents who complete the five-year bar to have credit for 40 quarters of work history in the U.S. in order to qualify for Medicaid. Montana, South Carolina and Texas, however, provide health coverage to lawfully residing children, while South Carolina and Wyoming cover lawfully residing pregnant persons regardless of their date of entry into the U.S. Five states (Indiana, Mississippi, Ohio, South Carolina, and Texas) fail to provide TANF to all qualified immigrants who complete the federal five-year waiting period. For more detail, see NILC's "Table: Overview of Immigrant eligibility for Federal Programs," endnotes 5-7, at www.nilc.org/table_ovrw_fedprogs/.

[30] For purposes of the exemptions described in this article, the term *Amerasians* applies only to individuals granted lawful permanent residence under a special statute enacted in 1988 for Vietnamese Amerasians. See § 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in § 101(c) of Public Law 100-202 and amended by the 9th proviso under Migration and Refugee Assistance in Title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Public Law 100-461, as amended).

[31] See *Guide to Immigrant Eligibility for Federal Programs*, 4th ed. (National Immigration Law Center, 2002), and updated tables at www.nilc.org/updatepage/.

[32] See Medical Assistance Programs for Immigrants in Various States (National Immigration Law Center) at https://www.nilc.org/issues/health-care/medical-assistance-various-states/.

[33] Section 214 of the Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) (H.R.2), Public Law 111-3 (Feb. 4, 2009).

[34] Michigan's coverage of lawfully residing children and pregnant people will become available once administrative changes have been made, with a target date of August 2024.

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. Accept **Read More**

002269

8/27/24, 6:06 PM
Overview of Immigrant Eligibility for Federal Programs - National Immigration Law Center
Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2277 of 4699 PageID #:  5442

*Medical Assistance Programs for Immigrants in Various States* (National Immigration Law Center, October 2022), www.nilc.org/medical-assistance-various-states/. However, some states have used the CHIP program's Health Services Initiative funding to offer 12 months of post-partum care regardless of the person's immigration status. See, e.g. CMS letter to California Department of Health Care Services (Sept. 14, 2021), www.dhcs.ca.gov/formsandpubs/laws/Documents/CHIP-SPA-21-0032-Approval.pdf.

[36] Pub. Law No. 111-148, as amended by the Health Care and Education Act of 2010, Pub. Law No. 111-152. For more information about immigrant eligibility for coverage under the Affordable Care Act, see *Immigrants and the Affordable Care Act (ACA)* (NILC, Jan. 2014), www.nilc.org/immigrantshcr/.

[37] HHS initially excluded persons granted Deferred Action for Childhood Arrivals (DACA) from its lawful presence definition. 45 C.F.R. § 152.2 (8). In April 2023, HHS proposed to include DACA recipients in its lawful presence definition for purposes of the ACA and the option to cover children and pregnant people in Medicaid and CHIP; the proposed rule also clarified eligibility for certain other lawfully present individuals. 88 Fed. Reg. 25313 (April 26, 2023). In May 2024, HHS finalized its rule to include DACA recipients in its lawful presence definition for ACA purposes, and to clarify eligibility for certain other groups. 89 Fed. Reg. 39392 (May 8, 2024), adding 45 C.F.R. § 155.20. These groups will become eligible to apply for coverage and subsidies beginning November 1, 2024. For more information on the ACA, see NILC's fact sheets at www.nilc.org/acafacts/. The agency stated that the rulemaking process for the Medicaid and CHIP portion of the proposal is ongoing. 89 Fed. Reg. 39392, 39399 (May 8, 2024).

[38] 45 CFR § 155.305(f)(2).

[39] The disability-related programs (for the purpose of "immigrants receiving disability-related assistance"), include SSI, Social Security disability, state disability or retirement pension, railroad retirement disability, veteran's disability, disability-based Medicaid, and disability-related General Assistance, if the disability determination uses criteria as stringent as those used for SSI.

[40] See NILC's updated tables on state-funded services at www.nilc.org/updatepage/.

[41] Welfare law § 402(a) (8 U.S.C. § 1612(a)).

[42] Most new entrants cannot receive SSI until they become citizens or secure credit for 40 quarters of work history (including work performed by a spouse during marriage, persons "holding out to the community" as spouses, and by parents before the immigrant was 18 years old).

[43] The SSI Extension for Elderly and Disabled Refugees Act, Pub. Law. 110-328 (Sept. 30, 2008).

[44] Welfare law § 421 (8 U.S.C. § 1631).

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002270

[46] Children, for example, are exempt from deeming in the Supplemental Nutrition Assistance Program. In states that choose to provide Medicaid and CHIP to lawfully residing children and pregnant persons, regardless of their date of entry, deeming and other sponsor-related barriers do not apply to these groups.

[47] 7 C.F.R. § 274.3(c). See also *Supplemental Nutrition Assistance Program: Guidance on Non-Citizen Eligibility* (USDA, June 2011), https://www.fns.usda.gov/snap/eligibility/non-citizen-eligibility See also *Deeming of Sponsor's Income and Resources to a Non-Citizen* (HHS, TANF-ACF-PI-2003–03, Apr. 17, 2003), https://www.acf.hhs.gov/ofa/policy-guidance/tanf-acf-pi-2003-03-deeming-sponsors-income-and-resources-non-citizen. Federal agencies (HHS and USDA) posted additional guidance pursuant to the Trump administration's May 23, 2019, memorandum on enforcing the responsibilities of sponsors. President Biden rescinded this memorandum on February 2, 2021, directing agencies to review all actions taken in accordance with the Trump memorandum.

[48] INA § 212(a)(4).

[49] 8 CFR § 212.21.

[50] Claudia Schlosberg and Dinah Wiley, *The Impact of INS Public Charge Determinations on Immigrant Access to Health Care* (National Health Law Program and NILC, May 22, 1998), https://www.oregonadvocates.org/geo/search/download.67362.

[51] DOJ, "Field Guidance on Deportability and Inadmissibility on Public Charge Grounds," 64 Fed. Reg. 28689–93 (May 26, 1999); see also DOJ, "Inadmissibility and Deportability on Public Charge Grounds," 64 Fed. Reg. 28676–88 (May 26, 1999); U.S. Dept. of State, INA 212(A)(4) Public Charge: Policy Guidance, 9 FAM 40.41.

[52] The use of all health care programs, except for long-term institutionalization (e.g., Medicaid payment for nursing home care), was declared to be irrelevant to public charge determinations. Programs providing cash assistance for income maintenance purposes are the only other programs that are relevant in the public charge determination. The determination is based on the "totality of a person's circumstances," and therefore even the past use of cash assistance can be weighed against other favorable factors, such as a person's current income or skills or the contract signed by a sponsor promising to support the intending immigrant.

[53] 87 Fed. Reg. 55472 (Sept. 9, 2022).

[54] 9 FAM 302.8 (U) PUBLIC CHARGE – INA 212(A)(4) (state.gov), at https://fam.state.gov/FAM/09FAM/09FAM030208.html.

[55] 88 Fed. Reg. 60574 (Sept. 5, 2023)(restoring 22 C.F.R. § 40.41, effective October 5, 2023).

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish. Accept **Read More**

[57] See, e.g., Research Documents Harm of Public Charge Policy During the COVID-19 Pandemic (*Protecting Immigrant Families*, Aug. 2021), https://pifcoalition.org/wp-content/uploads/2022/05/Documenting-the-Harm-2021.pdf; Immigrant Families Poll Finds Persistent Chilling Effect (*Protecting Immigrant Families*, Dec. 2021), https://pifcoalition.org/resource/immigrant-families-poll-finds-persistent-chilling-effect. See also "One in Four Adults in Mixed-Status Families Did Not Participate in Safety Net Programs in 2022 Because of Green Card Concerns (Urban Institute, Aug. 17, 2023), at https://www.urban.org/research/publication/one-four-adults-mixed-status-families-did-not-participate-safety-net-programs; Health and Health Care Experiences of Immigrants: The 2023 KFF/LA Times Survey of Immigrants (Sept. 17, 2023) at https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants/.

[58] Welfare law § 423, amended by IIRIRA § 551 (8 U.S.C. § 1183a).

[59] U.S. Dept. of Homeland Security, "Affidavits of Support on Behalf of Immigrants," 71 Fed. Reg. 35732, 35742–43 (June 21, 2006). On May 23, 2019, the Trump administration issued a memorandum on enforcing the responsibilities of sponsors. President Biden rescinded the memorandum through an executive order issued on February 2, 2021, directing agencies to review all actions taken in accordance with the Trump memorandum.

[60] Selected Social Characteristics in the United States (American Community Survey table, 2022).

[61] James P. Smith and Barry Edmonston, eds., *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (Washington, DC: National Academy Press, 1997), www.nap.edu/catalog.php?record_id=5779#toc, p. 377.

[62] American Community Survey, *supra* note 59.

[63] See the federal interagency language access website, www.lep.gov, for a variety of materials, including guidance from the U.S. Dept. of Justice and federal benefit agencies.

[64] 42 U.S.C. § 18116; 45 CFR § 92.2.

[65] 44 CFR § 92.201.

[66] 45 CFR § 92.8(d).

[67] 45 CFR § 92.11.

[68] DOJ, "Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.  Accept  **Read More**

002272

Public Benefits," 63 Fed. Reg. 41662–86 (Aug. 4, 1998). Final regulations have not been issued. Once the regulations become final, states will have two years to implement a conforming system for the federal programs they administer.

[69] SAVE is used to help state benefits agencies verify eligibility for several major benefits programs. See 42 U.S.C.§ 1320b-7. DHS verifies an applicant's immigration status by tapping numerous databases and/or through a manual search of its records. This information is used only to verify eligibility for benefits and may not be used for civil immigration enforcement purposes. See the Immigration Reform and Control Act of 1986, 99 Pub. L. 603, § 121 (Nov. 6, 1986); DOJ, "Verification of Eligibility for Public Benefits," 63 Fed. Reg. 41662, 41672, and 41684 (Aug. 4, 1998). See also *The Systematic Alien Verification for Entitlements (SAVE) Program: A Fact Sheet* (American Immigration Council, Dec. 15, 2011), https://www.americanimmigrationcouncil.org/research/systematic-alien-verification-entitlements-save-program-fact-sheet.

[70] 113 Pub. L. 79, § 4015 (Feb. 7, 2014).

[71] Letter and accompanying materials from HHS and USDA to State Health and Welfare Officials: "Policy Guidance Regarding Inquiries into Citizenship, Immigration Status and Social Security Numbers in State Applications for Medicaid, State Children's Health Insurance Program (SCHIP), Temporary Assistance for Needy Families (TANF), and Food Stamp Benefits" (Sept. 21, 2000).

[72] *Conforming to the Tri-Agency Guidance through Online Applications* (USDA, Feb. 2011), www.fns.usda.gov/sites/default/files/Tri-Agency_Guidance_Memo-021811.pdf.

[73] 42 C.F.R. § 435.907(e) (Medicaid); 42 C.F.R. § 457.320 (CHIP); 42 U.S.C. §18081(g)(ACA).

[74] The Medicaid rules also require that agencies assist eligible applicants in obtaining an SSN, may not delay or deny benefits pending issuance of the SSN, and provide exceptions for individuals who are ineligible for an SSN or who have well-established religious objections to obtaining one. 42 C.F.R. § 435.910(e), (f), and (h).

[75] Welfare law § 404, amended by BBA §§ 5564 and 5581(a) (42 U.S.C. §§ 608(g), 611a, 1383(e), 1437y).

[76] *Id.* See also H.R. Rep. 104–725, 104th Cong. 2d Sess. 382 (July 30, 1996). The Food Stamp Program (now called the Supplemental Nutrition Assistance Program, or SNAP) had a reporting requirement that preexisted the 1996 law.

[77]Social Security Administration, HHS, U.S. Dept. of Labor, U.S. Dept. of Housing and Urban Development, and DOJ – Immigration and Naturalization Service, "Responsibility of Certain Entities to Notify the Immigration and Naturalization Service of Any Alien Who the Entity 'Knows' Is Not Lawfully Present in the United States," 65

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.    Accept    **Read More**

002273

*Non-Citizen Eligibility* (USDA, June 2011), https://www.fns.usda.gov/snap/eligibility/non-citizen-eligibility, pp. 48-52. See also 7 C.F.R. § 273.4(b)(1).

[78] *Id.*

[79] *Clarification of Existing Practices Related to Certain Health Care Information* (DHS, Oct. 25, 2013), www.ice.gov/doclib/ero-outreach/pdf/ice-aca-memo.pdf.

## SIGN UP → → →
### FOR EMAIL UPDATES

**First Name** *

**Last Name** *

**Zip Code** *

**E-Mail Address** *

**SEARCH**

This website uses cookies to improve your experience. We'll assume you're ok with this, but you can opt-out if you wish.  Accept  **Read More**

002274

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Part 274a**

[CIS No. 2767–24; DHS Docket No. USCIS–2024–0002]

**RIN 1615–AC78**

**Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Temporary final rule with request for comments.

**SUMMARY:** This rule temporarily amends existing Department of Homeland Security (DHS) regulations to provide that the automatic extension period applicable to expiring Employment Authorization Documents (Forms I–766 or EADs) for certain renewal applicants who have filed Form I–765, Application for Employment Authorization (EAD application), will be increased from up to 180 days to up to 540 days from the expiration date stated on their EADs. DHS is taking these steps to help prevent renewal applicants from experiencing a lapse in their employment authorization and documentation.

**DATES:**

*Effective dates:* This temporary final rule (TFR) is effective April 8, 2024, through September 20, 2027, except for the amendments to 8 CFR 274a.13(d)(5), which are effective from April 8, 2024 through October 15, 2025.

*Submission of public comments:* Comments must be received on or before June 7, 2024.

**ADDRESSES:** You may submit comments on the entirety of this temporary final rule package, identified by DHS Docket No. USCIS–2024–0002, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments. The electronic Federal Docket Management System will accept comments before midnight Eastern time on June 7, 2024.

Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to USCIS in implementing these changes will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that support such recommended change. Comments submitted in a manner other

than as provided above, including emails or letters sent to DHS or U.S. Citizenship and Immigration Services (USCIS) officials, will not be considered comments on the TFR and may not receive a response from DHS. Please note that DHS and USCIS cannot accept any comments that are hand-delivered or couriered. In addition, USCIS cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. USCIS is also not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 (not a toll-free call) for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:** Charles Nimick, Chief, Business and Foreign Workers Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone 240–721–3000 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

### Public Participation

DHS invites you to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this temporary final rule. DHS also invites comments that relate to the economic, environmental, or federalism effects that might result from this temporary final rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to DHS will reference a specific provision of the temporary final rule, explain the reason for any recommended change, and include data, information, or authority that supports the recommended change. Comments submitted in a manner other than explicitly provided in this section, including emails or letters sent to USCIS or DHS officials, will not be considered comments on the TFR and may not receive a response.

In addition to seeking comments on all aspects of this TFR, DHS also invites the public to comment on the following:

• Whether DHS regulations should be revised to permanently lengthen the period of the automatic extension period to up to 540 days for employment authorization and/or EAD validity for eligible renewal applicants;

• Whether a different permanent extension period should be

implemented, for some or all applicants covered by the automatic extension provision on either a temporary or permanent basis; and

• Whether other solutions should be considered to mitigate the risk of expiring employment authorization and/or EAD validity for some or all applicants covered by the automatic extension provision.

DHS also specifically seeks comments on the regulatory alternatives described in section III.C. and V.B. of this preamble.

### Instructions

All submissions should include the agency name and DHS Docket No. USCIS–2024–0002 for this rulemaking. Providing comments is entirely voluntary. DHS will post all submissions, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov* and will include any personal information you provide. Because the information you submit will be publicly available, you should consider limiting the amount of personal information in your submission. DHS may withhold information provided in comments from public viewing if it determines that such information is offensive or may affect the privacy of an individual. For additional information, please read the Privacy and Security notice available through the link in the footer of *https://www.regulations.gov.*

*Docket:* For access to the docket and to read comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2024–0002. You may also sign up for email alerts on the online docket to be notified when comments are posted or a subsequent rulemaking is published.

### I. Executive Summary

#### A. Purpose and Summary of the Regulatory Action

DHS has determined that the up to 180-day automatic extension under 8 CFR 274a.13(d) is currently not enough time for the growing number of renewal EAD applicants. Without this TFR, approximately 800,000 renewal EAD applicants will be in danger of having their applications remain pending beyond the 180-day automatic extension period, resulting in applicants losing employment authorization and/or EAD validity in the approximately 2-year period beginning May 2024 because of USCIS processing delays and through no fault of their own. Such widescale lapses in employment authorization and EAD validity would result in substantial and unnecessary harm to noncitizens

who timely filed for extensions of employment authorization, their families, their employers, and the public at large. To avert these gaps in employment authorization and/or EAD validity for certain renewal EAD applicants, and the resulting harmful effects gaps can cause, DHS is temporarily amending existing DHS regulations to increase the automatic extension period applicable to expiring employment authorization and/or EADs (Form I–766) for certain renewal applicants who have filed EAD applications from up to 180 days to up to 540 days from the expiration date stated on their EADs. The increase will be available to any eligible renewal EAD applicant with an application filed on or after October 27, 2023, and pending on or after April 8, 2024 and any eligible applicant who files a renewal EAD application during the 540-day period beginning on or after April 8, 2024 and ending September 30, 2025. DHS has decided to focus on near-term uncertainty and critical needs of applicants, their families, and their employers by ensuring that, through this TFR, none of them will imminently or in the near-term experience the harmful effects caused by gaps in employment authorization and/or EAD validity due to processing delays. At the same time, this rule provides DHS with an additional window during which it can consider long-term solutions by soliciting public comments, evaluating the effects of ongoing and future policy and operational changes described throughout this rule, and continuing to identify new strategies and efficiencies.

*B. Summary of Legal Authority*

The authority for the Secretary of Homeland Security (Secretary) to issue this TFR is found in section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which recognizes the Secretary's authority to extend employment authorization to noncitizens in the United States, and section 101(b)(1)(F) of the Homeland Security Act (HSA), 6 U.S.C. 111(b)(1)(F), which establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland." Under section 103(a) of the INA, 8 U.S.C. 1103(a), the Secretary is authorized to administer the immigration and nationality laws and establish such regulations as the Secretary deems necessary for carrying out such authority.

*C. Summary of the TFR Provisions*

This rule amends 8 CFR 274a.13(d) as follows:

• New 8 CFR 274a.13(d)(6): DHS is adding a new paragraph 8 CFR 274a.13(d)(6). With this new paragraph, DHS is temporarily increasing the regular automatic extension period for employment authorization and/or EAD validity of up to 180 days under 8 CFR 274a.13(d)(1) to a period of up to 540 days for renewal applicants eligible to receive an automatic extension.

• Amending existing 8 CFR 274a.13(d)(5): To avoid confusion between the automatic extension period granted under new 8 CFR 274a.13(d)(6) and existing 8 CFR 274a.13(d)(5), DHS is revising the heading of existing 8 CFR 274a.13(d)(5). 8 CFR 274a.13(d)(5) only applies to EAD renewal applications properly filed on or before October 26, 2023. The new heading will clearly reflect the date. DHS is neither extending nor otherwise amending 8 CFR 274a.13(d)(5).

*D. Summary of Costs and Benefits*

This rule results in stabilization of earnings worth $29.1 billion to employment-authorized immigrants, cost savings of $5.2 billion to U.S. employers from avoided labor turnover, and is expected to yield $3.1 billion in employment tax transfer payments over a 5-year period of analysis using a 2 percent discounting rate (see Table 13 for more information). While the EAD end dates are known to USCIS and can be used to accurately project lapses, there is uncertainty around the monetized, economic impacts due to the timing of EAD renewal filing behavior and the resulting duration of lapses experienced by workers of varying wages in the absence of this rule. The Regulatory Impact Analysis discusses the low end and high end estimates that bound the expected impacts of this regulatory action.

**II. Background**

USCIS' ability to process both initial and renewal EAD applications within USCIS' targeted processing times has been adversely impacted by a variety of unforeseeable and dynamic events and circumstances, described in the following sections. As a result, DHS has found it necessary to take actions to reduce the likelihood that certain applicants for renewal EADs experience unnecessary lapses in their employment authorization and/or proof of employment authorization because of USCIS processing delays and through no fault of their own. Such widescale lapses in employment authorization and

EAD validity would result in substantial and unnecessary harm to noncitizens who timely filed for extensions of employment authorization, their families, their employers, and the public at large.

In 2021, a surge in EAD applications, coupled with operational challenges exacerbated by the COVID–19 pandemic, resulted in a significant increase in EAD application processing times. The EAD application processing times increased to such a level that the 180-day automatic extension of employment authorization for certain pending renewal EAD applications[1] was insufficient to prevent many renewal applicants from experiencing a lapse in employment authorization and/or documentation while their renewal applications remained pending with USCIS.

In May 2022, DHS published a temporary final rule ("2022 TFR") that, for certain renewal applications filed during a limited period that ended on October 26, 2023, increased the automatic extension period from up to 180 days to up to 540 days.[2] This measure helped minimize gaps in employment authorization and/or EAD validity for certain renewal EAD applicants, while giving USCIS a window of time to address its backlogs through operational and sub-regulatory measures. Those operational and sub-regulatory measures helped USCIS to work toward its goal of returning to regular processing times.

Although USCIS' efforts since the issuance of the 2022 TFR prevented a substantial number of renewal applicants from experiencing a lapse in their employment authorization and/or documentation, the processing times for renewal EAD applications are currently at such a level that the current 180-day automatic extension period for certain renewal EAD applications remains insufficient to prevent a large number of lapses in the coming months.

Accordingly, DHS is again taking steps to help prevent certain renewal EAD applicants from experiencing a lapse in their employment authorization, valid documentation of their employment authorization, or both, while their renewal applications remain pending. USCIS also continues to implement other solutions to return processing times to target levels, as detailed in section III.B of the preamble.

Without this 2024 TFR, approximately 800,000 renewal applicants will be in danger of losing their employment authorization and/or

---

[1] *See* 8 CFR 274a.13(d).

[2] *See* 87 FR 26614 (May 4, 2022) (2022 TFR).

**24630** **Federal Register** / Vol. 89, No. 68 / Monday, April 8, 2024 / Rules and Regulations

documentation in the period beginning May 2024 and ending March 2026.[3] If faced with a disruption of their employment authorization and/or documentation, these renewal applicants may lose their jobs through no fault of their own, and employers may be faced with finding replacement workers, an undue burden that is exacerbated during a time when the U.S. economy is experiencing more job openings than available workers.[4]

Therefore, DHS has determined that it is imperative to increase the automatic extension period of employment authorization and/or EAD validity for eligible renewal EAD applicants for a temporary period. This temporary increase to the automatic extension period will be effective April 8, 2024 and will apply to renewal EAD applications that are properly filed on or after October 27, 2023,[5] and on or before September 30, 2025.

This new temporary increase to the automatic extension period will, in most cases, help avoid the gaps in employment authorization and/or documentation that could otherwise affect eligible renewal EAD applicants, their families, and their U.S. employers in those cases where USCIS is unable to process their renewal applications within the 180-day automatic extension period provided under the current regulation.

### A. Legal Authority

The Secretary of Homeland Security's (Secretary) authority for the regulatory amendments made in this TFR are found in various sections of the Immigration and Nationality Act (INA or the Act), 8 U.S.C. 1101 *et seq.,* and the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135 (codified in part at 6 U.S.C. 101 *et seq.*). General authority for issuing this TFR is found in section 103(a) of the INA, 8 U.S.C. 1103(a), which authorizes the Secretary to administer and enforce the immigration and nationality laws and establish such regulations as the Secretary deems necessary for carrying out such authority, as well as section 102 of the HSA, 6 U.S.C. 112, which vests all of the functions of DHS in the Secretary and authorizes the Secretary to issue regulations.[6] Further authority for this TFR is found in:

• Section 208(d)(2) of the INA, 8 U.S.C. 1158(d)(2), which authorizes the Secretary to grant employment authorization to applicants for asylum if 180 days have passed since filing an application for asylum;

• Section 214 of the INA, 8 U.S.C. 1184, including section 214(a)(1) of the INA, 8 U.S.C. 1184(a)(1), which authorizes the Secretary to prescribe, by regulation, the time and conditions of the admission of nonimmigrants;

• Section 244(a)(1)(B) of the INA, 8 U.S.C. 1254a(a)(1)(B), which states that the Secretary shall authorize employment and provide evidence of employment authorization for noncitizens who have been granted Temporary Protected Status;

• Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), which recognizes the Secretary's authority to extend employment authorization to noncitizens in the United States; and

• Section 101(b)(1)(F) of the Homeland Security Act, 6 U.S.C. 111(b)(1)(F), which establishes as a primary mission of DHS the duty to "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."

### B. Legal Framework for Employment Authorization

#### 1. Types of Employment Authorization: 8 CFR 274a.12(a), (b), and (c)

Whether a noncitizen is authorized to work in the United States depends on the noncitizen's immigration status or other conditions that may permit employment authorization (for example, having a pending application for asylum or a grant of deferred action). DHS regulations outline three classes of noncitizens who may be eligible for employment in the United States, as follows:[7]

• Noncitizens in the first class, described at 8 CFR 274a.12(a), are authorized to work "incident to status" for any employer, as well as to engage in self-employment, as a condition of their immigration status or circumstances. This means that for certain eligible noncitizens, employment authorization is granted with the underlying immigration status (called "incident to status" employment authorization). Although authorized to work as a condition of their status or circumstances, certain classes of noncitizens must apply to USCIS in order to receive a Form I–766 EAD as evidence of that employment authorization.[8]

• Noncitizens in the second class, described at 8 CFR 274a.12(b), also are authorized to work "incident to status" as a condition of their immigration status or circumstances, but generally the authorization is valid only with a specific employer.[9] These noncitizens are issued an Arrival-Departure Record (Form I–94) indicating their employment-authorized status in the United States and do not file separate requests for evidence of employment authorization.

• Noncitizens in the third class, described at 8 CFR 274a.12(c), are required to apply for employment authorization and may work only if USCIS, in its discretion, approves their application. They are authorized to work for any employer or engage in self-employment upon approval of their EAD application, subject to certain restrictions, so long as their EAD remains valid.[10]

#### 2. The Application Process for Obtaining Employment Authorization and EADs: 8 CFR 274a.13(a)

For certain eligibility categories listed in 8 CFR 274a.12(a) (the first class) and all eligibility categories listed in 8 CFR 274a.12(c) (the third class), as well as additional categories specified in form instructions, an EAD application must be properly filed with USCIS (with fee

---

[3] *See* section V.B.2. Table 7, TFR Future Population Projections by Month, Rounded to Thousands.

[4] Bureau of Labor Statistics data show that, as of December 2023, there were 0.7 unemployed persons per job opening. *See* U.S. Department of Labor, U.S. Bureau of Labor Statistics, "Number of unemployed persons per job opening, seasonally adjusted," *https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited Feb. 6, 2024).

[5] The 2022 TFR increased the automatic extension period from up to 180 days to up to 540 days for certain renewal EAD applications filed on or after May 4, 2022, and on or before October 26, 2023. Beginning on October 27, 2023, the automatic extension period reverted to the original 180-day period for those eligible applicants who timely file Form I–765 renewal applications. For individuals who received an increased automatic extension under the 2022 TFR, the automatic extension generally will end when they receive a final decision on their renewal application or the end of the up to 540-day period, whichever comes earlier.

[6] Although several provisions of the INA discussed in this TFR refer exclusively to the "Attorney General," such provisions are now to be read as referring to the Secretary of Homeland Security by operation of the HSA. *See* 6 U.S.C. 1103(a)(1) and (g), 1551 note; *Nielsen* v. *Preap*, 139 S. Ct. 954, 959 n.2 (2019).

[7] There are several employment-eligible categories that are not included in DHS regulations, but instead are described in the form instructions to Form I–765, Application for Employment Authorization (EAD application). Employment-authorized L nonimmigrant spouses are an example. *See* INA sec. 214(c)(2)(E), 8 U.S.C. 1184(c)(2)(E).

[8] *See* 8 CFR 274a.12(a).

[9] *See* 8 CFR 274a.12(b).

[10] *See* 8 CFR 274a.12(c); *Matter of Tong*, 16 I&N Dec. 593, 595 (BIA 1978) (holding that the term "'employment' is a common one, generally used with relation to the most common pursuits," and includes "the act of being employed for one's self").

or fee waiver, as applicable) to receive employment authorization and/or an EAD.[11] EADs issued under 8 CFR 274a.12(a) or (c) generally allow these noncitizens to work for any U.S. employer or engage in self-employment, subject to certain restrictions, as applicable. If an EAD application is granted under CFR 274a.12(a), the resultant EAD provides the noncitizen with proof of employment authorization incident to status or circumstance. Certain noncitizens may file EAD applications concurrently with related benefit requests if permitted by the form instructions or as announced by USCIS.[12] In such instances, the underlying benefit requests, if granted, would form the basis for an EAD or eligibility to apply for employment authorization. For eligibility categories listed in 8 CFR 274a.12(a) and (c), USCIS has the discretion to establish a specific validity period for the EAD.[13]

3. Automatic Extensions of EADs for Renewal Applicants: 8 CFR 274a.13(d)

a. Renewing Employment Authorization and/or EADs

Employment authorization and EADs generally are not valid indefinitely but instead expire after a specified period of time.[14] Generally, noncitizens within the eligibility categories listed in 8 CFR 274a.12(c) must obtain a renewal of employment authorization and their EADs before the expiration date stated on their current EADs, or they will lose their eligibility to work in the United States (unless, since obtaining their current EADs, the noncitizens have obtained an immigration status or belong to a class of individuals with employment authorization incident to that status or class, or obtain employment authorization based on another category).[15] The same holds true for some classes of noncitizens

authorized to work incident to status whose EAD expiration dates coincide with the termination or expiration of their underlying immigration status. Other noncitizens authorized to work incident to status, such as asylees, refugees, and Temporary Protected Status (TPS) beneficiaries may have immigration status that confers employment authorization that continues past the expiration date stated on their EADs. Nevertheless, such noncitizens may wish to renew their EAD to have acceptable evidence of their continuous employment authorization for various purposes, such as presenting evidence of employment authorization and identity to their employers for completion of the Employment Eligibility Verification (Form I–9) process. Failure to renew their EADs prior to the expiration date may result in job loss if such noncitizens do not have or cannot present alternate acceptable evidence of employment authorization to show their employers, as employers who continue to employ noncitizens without employment authorization may be subject to criminal penalties and/or civil monetary penalties.[16]

Those seeking to renew previously granted employment authorization or EADs must file renewal EAD applications with USCIS in accordance with the form instructions.[17]

b. Minimizing the Risk of Gaps in Employment Authorization and/or EAD Validity Through Automatic Extensions

If an eligible noncitizen is not able to obtain renewal of their employment authorization and/or EAD before it expires, the noncitizen and the employer could experience adverse consequences. For the noncitizen, the lack of renewal could cause job loss, gaps in employment authorization and/or documentation, and loss of income. For the noncitizen's employer, the disruption may cause instability with business continuity or other financial harm. Beyond the financial and economic impact that gaps in employment authorization or proof thereof create for the noncitizen and the employer, if the noncitizen engages in unauthorized employment, such activity may render a noncitizen removable,[18] render a noncitizen ineligible for future benefits such as adjustment of status,[19] and/or subject the employer to civil and/or criminal penalties.[20]

Before 2016, DHS regulations stated that USCIS would "adjudicate an application [for an EAD] within 90 days" from the date USCIS received the application.[21] If USCIS did not adjudicate the application within that timeframe, the applicant was eligible for an interim document evidencing employment authorization with a validity period not to exceed 240 days. On November 18, 2016, as part of DHS's efforts to implement the flexibilities provided to noncitizens and employers by the American Competitiveness in the Twenty-first Century Act of 2000 (AC21), as amended, and the American Competitiveness and Workforce Improvement Act of 1998, DHS published a final regulation[22] removing the provision and replacing it with the current 8 CFR 274a.13(d).

To prevent gaps in employment authorization and/or documentation and related consequences for certain renewal applicants,[23] and in light of processing times and possible filing

---

[11] *See* 8 CFR 103.2(a) and 8 CFR 274a.13(a). An applicant who is employment authorized incident to status (*e.g.*, asylees, refugees, TPS beneficiaries) may file an EAD application to request an EAD. Applicants who are filing within an eligibility category listed in 8 CFR 274a.12(c) must, by contrast, use the EAD application form to request both employment authorization and an EAD.

[12] *See* 8 CFR 274a.13(a). For example, the spouse of an H–1B worker may file an EAD application at the same time as their Form I–539, Application to Extend/Change Nonimmigrant Status. *See* USCIS, DHS, "Employment Authorization for Certain H–4, E Dependent Spouses," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/employment-authorization-for-certain-h-4-dependent-spouses* (last visited Dec. 4, 2023).

[13] *See* 8 CFR 274.12(a) and (c).

[14] *See* 8 CFR 274a.13(b). *But see* 8 CFR 274a.14 [setting forth the bases for termination or revocation of employment authorization].

[15] *See* 8 CFR 274a.14(a)(1)(i).

[16] The employee must present the employer with acceptable documents evidencing identity and employment authorization. The lists of acceptable documents can be found on the second page of the Form I–9. *See* USCIS, DHS, Form I–9, "Employment Eligibility Verification," *https://www.uscis.gov/sites/default/files/document/forms/i-9.pdf* (last visited Feb. 7, 2024). An employer that does not properly complete Form I–9, which includes reverifying continued employment authorization, or continues to employ an individual with knowledge that the individual is not authorized to work, may be subject to civil money penalties. *See* USCIS, DHS, "M–274 Handbook for Employers," "11.8 Penalties for Prohibited Practices," *https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/110-unlawful-discrimination-and-penalties-for-prohibited-practices/118-penalties-for-prohibited-practices* (last visited Feb. 7, 2024). In addition, an employer who engages in a "pattern or practice" of employing unauthorized individuals may face criminal penalties under 8 U.S.C. 1324a(f). U.S. Immigration and Customs Enforcement has primary enforcement responsibilities for enforcement of the civil monetary penalties under Section 274A of the INA, 8 U.S.C. 1324a and Section 274C of the INA, 8 U.S.C. 1324c.

[17] *See* USCIS, DHS, Form I–765, "Instructions for Application for Employment Authorization," *https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf* (last visited Feb. 7, 2024). In reviewing the EAD application, USCIS ensures that the fee was paid, a fee waiver was granted, or a fee exemption applies.

[18] *See, e.g.,* INA sec. 237(a)(1)(C), 8 U.S.C. 1227(a)(1)(C); 8 CFR 214.1(e).

[19] *See* INA sec. 245(c), (k); 8 U.S.C. 1255(c), (k).

[20] *See* INA sec. 274A, 8 U.S.C. 1324a.

[21] *See* 8 CFR 274a.13(d) (2016).

[22] *See* 81 FR 82398 (Nov. 18, 2016) ("AC21 Final Rule"). The final rule was issued after a proposed rule was published in the **Federal Register**. *See* 80 FR 81899 (Dec. 31, 2015) ("AC21 NPRM").

[23] *See* 80 FR 81899, 81927 (Dec. 31, 2015) ("DHS proposes to amend its regulations to help prevent gaps in employment authorization for certain employment-authorized individuals who are seeking to renew expiring EADs. . . . These provisions would significantly mitigate the risk of gaps in employment authorization and required documentation for eligible individuals, thereby benefitting them and their employers.").

surges,[24] DHS changed its regulations at 8 CFR 274a.13(d) such that under the current provision, and except as otherwise provided by law, certain categories of renewal applicants receive an automatic extension of their EADs (and, if applicable, related employment authorization) for up to 180 days from the expiration date on the EAD.[25] To receive the automatic extension, an eligible renewal applicant must meet the following conditions:

• The renewal applicant timely files an application to renew the employment authorization and/or EAD before the EAD expires;[26]

• The renewal EAD application is based on the same employment authorization category on the front of the expiring EAD or is for an individual approved for TPS whose EAD was issued pursuant to 8 CFR 274a.12(c)(19);[27] and

• The renewal applicant's eligibility to apply for employment authorization continues notwithstanding the expiration of the EAD and is based on an employment authorization category that does not require the adjudication of an underlying application or petition before the adjudication of the renewal application, as may be announced on the USCIS website.[28]

The following classes of noncitizens filing to renew an EAD may be eligible to receive an automatic extension of their employment authorization and/or EAD for up to 180 days:[29]

• Noncitizens admitted as refugees (A03);[30]

• Noncitizens granted asylum (A05);[31]

• Noncitizens admitted as parents or dependent children of noncitizens granted permanent residence under section 101(a)(27)(I) of the INA, 8 U.S.C. 1101(a)(27)(I) (A07);[32]

• Noncitizens admitted to the United States as citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau pursuant to agreements between the United States and the former trust territories (A08);[33]

• Noncitizens granted withholding of deportation or removal (A10);[34]

• Noncitizens granted TPS, regardless of the employment authorization category on their current EADs (A12);[35]

• Noncitizen spouses of E–1/2/3 nonimmigrants (Treaty Trader/Investor/Australian Specialty Worker) (A17);[36]

• Noncitizen spouses of L–1 nonimmigrants (Intracompany Transferees) (A18);[37]

• Noncitizens who have properly filed applications for TPS and who have been deemed *prima facie* eligible for TPS under 8 CFR 244.10(a) and have received an EAD as a "temporary treatment benefit" under 8 CFR 244.10(e) and 274a.12(c)(19) (C19);[38]

• Noncitizens who have properly filed applications for asylum and withholding of deportation or removal (C08);[39]

• Noncitizens who have filed applications for adjustment of status to lawful permanent resident under section 245 of the INA, 8 U.S.C. 1255 (C09);[40]

• Noncitizens who have filed applications for suspension of deportation under section 244 of the INA (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the INA, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (C10);[41]

• Noncitizens who have filed applications for creation of record of lawful admission for permanent residence (C16);[42]

• Noncitizens who have properly filed legalization applications pursuant to section 210 of the INA, 8 U.S.C. 1160 (C20);[43]

• Noncitizens who have properly filed legalization applications pursuant to section 245A of the INA, 8 U.S.C. 1255a (C22);[44]

• Noncitizens who have filed applications for adjustment of status pursuant to section 1104 of the Legal Immigration Family Equity Act (C24);[45]

• Certain noncitizen spouses (H–4) of H–1B nonimmigrants with an unexpired Form I–94 showing H–4 nonimmigrant status (C26);[46] and

• Noncitizens who are the principal beneficiaries or derivative children of approved Violence Against Women Act (VAWA) self-petitioners,[47] under the employment authorization category "(c)(31)" in the form instructions to the EAD application (C31).[48]

The extension automatically terminates the earlier of up to 180 days after the expiration date of the EAD, or upon issuance of notification of a decision denying the renewal request.[49] An EAD that is expired on its face is considered unexpired when combined with a Form I–797C receipt notice indicating a timely filing of the application to renew the EAD.[50] Therefore, when the expiration date on the front of the EAD is reached, a noncitizen who is continuing in their employment with the same employer may present to their employer the Form I–797C receipt notice for the EAD application to show that their EAD has been automatically extended as evidence of continued employment authorization, and the employer must

---

[24] *See* 80 FR 81899, 81927 (Dec. 31, 2015) ("DHS believes that this time period [of up to 180 days] is reasonable and provides more than ample time for USCIS to complete the adjudication process based on USCIS' current 3-month average processing time for Applications for Employment Authorization."); *id.* at 81927 n.77 ("Depending on any significant surges in filings, however, there may be periods in which USCIS takes longer than 2 weeks to issue Notices of Action (Forms I–797C).").

[25] 8 CFR 274a.13(d); *see also* 81 FR 82398, 82455–82463 (Nov. 18, 2016) (AC21 Final Rule).

[26] 8 CFR 274a.13(d)(1)(i). TPS beneficiaries must file during the designated period in the applicable **Federal Register** notice.

[27] *See* 8 CFR 274a.13(d)(1)(ii) (exempting individuals approved for TPS with EADs issued pursuant to 8 CFR 274a.12(c)(19) from the requirement that the employment authorization category on the face of the expiring EAD be the same as on the EAD renewal application).

[28] *See* 8 CFR 274a.13(d)(1)(iii).

[29] *See* USCIS, DHS, "Automatic Employment Authorization (EAD) Extension," *https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-employees/automatic-employment-authorization-document-ead-extension* (last visited Feb. 7, 2023).

[30] *See* 8 CFR 274a.12a(3).

[31] *See* 8 CFR 274a.12a(5).

[32] *See* 8 CFR 274a.12a(7).

[33] *See* 8 CFR 274a.12a(8).

[34] *See* 8 CFR 274a.12a(10).

[35] *See* 8 CFR 274a.12a(12) or (c)(19).

[36] *See* INA sec. 214(e)(2), 8 U.S.C. 1184(e)(2).

[37] *See* INA. sec. 214(c)(2)(E), 8 U.S.C. 1184(c)(2)(E).

[38] *See* 8 CFR 274a.12(c)(19).

[39] *See* 8 CFR 274a.12(c)(8).

[40] *See* 8 CFR 274a.12(c)(9). In certain adjustment of status cases, if the applicant seeks an EAD and advance parole (by filing Form I–131, Application for Travel Document), USCIS may issue an employment authorization card combined with an Advance Parole Card (Form I–512). This is also referred to as a "combo card." If the EAD card is combined with the advance parole authorization (the EAD card has an annotation "SERVES AS I–512 ADVANCE PAROLE"), any automatic extension does not apply to the advance parole part of the combo card.

[41] *See* 8 CFR 274a.12(c)(10).

[42] *See* 8 CFR 274a.12(c)(16).

[43] *See* 8 CFR 274a.12(c)(20).

[44] *See* 8 CFR 274a.12(c)(22).

[45] *See* 8 CFR 274a.12(c)(24).

[46] *See* 8 CFR 274a.12(c)(26).

[47] Family based immigration generally requires U.S. citizens and lawful permanent residents to file a petition on behalf of their noncitizen family members. Some petitioners may misuse this process to further abuse their noncitizen family members by threatening to withhold or withdraw sponsorship in order to control, coerce, and intimidate them. With the passage of VAWA and its subsequent reauthorizations, Congress provided noncitizens who have been abused by their U.S. citizen or lawful permanent resident relative the ability to petition for themselves (self-petition) without the abuser's knowledge, consent, or participation in the process. The VAWA provisions allow victims to seek both safety and independence from their abusers.

[48] INA sec. 204(a)(1)(D)(i)(II), (IV), (a)(1)(K), 8 U.S.C. 1154(a)(1)(D)(i)(II), (IV), (a)(1)(K).

[49] *See* 8 CFR 274a.13(d)(3).

[50] *See* 8 CFR 274a.13(d)(4).

update the previously completed Form I–9 to reflect the extended EAD expiration date based on the automatic extension while the renewal is pending. For new employment, the automatic extension date is recorded on the Form I–9 by the employee and the employer in the first instance. In either case, the reverification of employment authorization or the EAD occurs when the automatic extension period terminates.[51]

USCIS generally recommends the filing of a renewal EAD application up to 180 days before the current EAD expires.[52] If the renewal application is granted, the employment authorization and/or EAD generally will be valid as of the date of approval of the application. If the application is denied, the automatically extended employment authorization and/or EAD generally is terminated on the day of the denial.[53] If the renewal application was timely and properly filed, but remains pending beyond the 180-day automatic extension period, the applicant must stop working upon the expiration of the automatically extended validity period and the employer must remove the employee from the payroll if the applicant/ employee cannot provide other acceptable evidence of current employment authorization.[54] As a result, both the employee and the employer may experience the negative consequences of gaps in employment authorization and/or EAD validity. Since its promulgation in 2016, the automatic extension provision at 8 CFR 274a.13(d) has helped to minimize the risk of these negative consequences for applicants who are otherwise eligible for the automatic extension and their employers.

*C. 2022 Temporary Final Rule*

1. Overview

In 2022, processing times for EAD applications had increased due to operational challenges that were

exacerbated by the emergency measures USCIS employed to maintain its operations through the height of the COVID–19 pandemic in 2020, combined with a sudden increase in EAD application filings. The up to 180-day automatic extension period for renewal EAD applicants' employment authorization and/or EADs was no longer sufficient to prevent lapses in employment authorization for these applicants.

To mitigate the impact of these operational challenges, on May 4, 2022, DHS published a TFR titled ''Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants'' (2022 TFR) in the **Federal Register**.[55] The rule temporarily amended DHS regulations at 8 CFR 274a.13(d) by adding a new paragraph 8 CFR 274a.13(d)(5), which lengthened the automatic extension period provided in that section from up to 180 days to up to 540 days for those two categories described in the TFR, upon timely filing of an EAD renewal application.[56] That increase was available to eligible renewal applicants whose EAD applications were pending as of May 4, 2022, including those applicants whose employment authorization had already lapsed following the initial 180-day extension period, and to eligible applicants who filed a renewal EAD application during the 540-day period beginning on or after May 4, 2022, and ending October 26, 2023.[57] On October 27, 2023, the automatic extension renewal period reverted to 180 days (the automatic extension period under 8 CFR 274a.13(d)(1)) for eligible renewal EAD applications filed on or after October 27, 2023.[58]

2. Public Comments

In promulgating the 2022 TFR, DHS invited the public to participate in the rulemaking by submitting comments and written data. In response to the request for comments, the Department received a total of 190 public comment submissions. Of the 190 submissions, 117 are unique submissions, 61 are copies of form letters associated with mass mail campaigns, 6 are duplicate submissions, and 6 are not germane to the 2022 TFR.[59]

Of the comments listed above, one submission expressed opposition, 94

submissions expressed support, and 83 expressed a mixed opinion (*e.g.,* general support with a request for further changes). Many expressed their appreciation for the rule and commented on the positive impacts the rule had not only on applicants, their families, and their support systems, but also on employers and the economy. Many who supported the rule overall also expressed that DHS should have applied the rule more broadly by expanding certain aspects of the rule (*e.g.,* to cover all classes of noncitizens) or requested revisions to the rule (*e.g.,* that the effective period of the rule be longer, or that it be issued as a final rule that would make the increased extension permanent, not temporary). A comment submitted by an advocacy group noted that USCIS should make permanent the 540-day automatic extension because it was unlikely that USCIS would fully eliminate USCIS' backlog owing to circumstances beyond USCIS' control, including a lack of funding and adequate staffing. The group added that USCIS could publish a final rule to make the 540-day automatic extension period permanent as an appropriate exercise of USCIS' rulemaking authority under the Administrative Procedure Act (APA) because USCIS requested comments in connection with the 2022 TFR.[60] Another advocacy group noted that making permanent the automatic extension period of 540 days would be more efficient and promote predictability. Some commenters suggested that DHS consider alternative regulatory or sub-regulatory actions. Some addressed other concerns, including clarity, outreach, and coordination with other departments.

While DHS reviewed and considered the comments submitted in response to the 2022 TFR, DHS did not make changes to the 2022 TFR in response to the comments because DHS considered the rulemaking to be sufficient at that time to address the issues facing the affected population of renewal EAD applicants and their U.S. employers. DHS also considered some comments, such as commenters' suggestions to eliminate employment authorization for certain groups entirely, to be beyond the scope of the 2022 TFR, which was intended to be a temporary solution to the potential disruption facing certain renewal applicants and their U.S. employers resulting from USCIS

---

[51] *See* USCIS, DHS, ''Completing Supplement B, Reverification and Rehires (formerly Section 3),'' *https://www.uscis.gov/i-9-central/complete-correct-form-i-9/completing-supplement-b-reverification-and-rehires-formerly-section-3* (last visited Nov. 3, 2023); *see also* USCIS, DHS, ''M–274 Handbook for Employers,'' ''5.2 Temporary Increase of Automatic Extension of EADs from 180 Days to 540 Days'' (last visited Dec. 7, 2023).

[52] *See* USCIS, DHS, ''I–765, Application for Employment Authorization,'' *https://www.uscis.gov/i-765* (last visited Jan. 19, 2024); USCIS, DHS, ''Employment Authorization Document,'' *https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document* (last visited Dec. 7, 2023); *see also* 81 FR at 82456 (''AC21 Final Rule'').

[53] *See* 8 CFR 274a.13(d)(3).

[54] *See* 8 CFR 274a.2(b)(vii) (reverification provision).

[55] 87 FR 26614 (May 4, 2022).

[56] *See* 8 CFR 274a.13(d); *see also* 87 FR 26614, 26651 (May 4, 2022).

[57] *See id.*

[58] *See* 87 FR 26614, 26631 (May 4, 2022).

[59] The agency has not previously responded to the public comments received from the 2022 TFR.

[60] The group cited *Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 140 S.Ct. 2367, 2384–85 (2020) (holding that an interim final rule's ''request for comments readily satisfied the APA notice requirements.'').

processing delays. DHS also took various sub-regulatory actions, as described in section III.B of this preamble, to further address USCIS processing delays and minimize the risk of potential gaps in employment authorization and/or documentation.

Lastly, DHS considered the comment in opposition to the rule that asserted that DHS only provided a cursory justification for the TFR and questioned DHS's authority to issue the TFR, its consideration of the impact on U.S. workers, and its justification for claiming good cause to issue the rule without the notice and comment procedure required under the APA. DHS disagrees with these various assertions, as the preamble to the 2022 TFR included a detailed explanation of the legal authority and justification for the rulemaking, as well as the basis for foregoing notice and comment based on the good cause exception.[61] Nevertheless, DHS included additional details in this rule to further clarify the legal authority for this TFR and has provided additional explanation regarding the consideration of U.S. workers and potential impacts, if any, of this TFR on U.S. workers. Specifically, as explained in this preamble, this TFR is limited to certain renewal EAD applicants—*i.e.*, those who have already been authorized for employment—and automatically extending their employment authorization and/or EAD, so that they may continue to perform the services they are already doing will have minimal adverse impact, if any, on other U.S. workers.[62] Moreover, in providing benefits for renewal applicants and their U.S. employers, this rule indirectly benefits U.S. workers by protecting the financial stability and continuity of operations for affected U.S. employers. DHS also provides a detailed explanation, including citation to cases cited by the commenter, regarding the APA's good cause exception and its application to this TFR.

All comments submitted in response to the 2022 TFR have been reviewed and considered by DHS in the development of this 2024 TFR.

### 3. Impact of the 2022 TFR

The 2022 TFR proved to be very successful at minimizing disruption to renewal EAD applicants and their U.S. employers that would have otherwise resulted from USCIS processing delays. Not only did the 2022 TFR immediately restore employment authorization for approximately 70,000 renewal EAD applicants who were already beyond the up to 180-day automatic extension period when the 2022 TFR published, but the 2022 TFR also helped nearly 280,000 renewal EAD applicants avoid a gap in employment authorization or employment authorization documentation based on applications filed on or after May 4, 2022, and on or before October 26, 2023.

### III. Purpose of This Temporary Final Rule

DHS has determined that the up to 180-day automatic extension under 8 CFR 274a.13(d) is currently not enough time for the growing number of renewal EAD applicants. Without this TFR, hundreds of thousands of renewal EAD applications will remain pending beyond the 180-day automatic extension period, resulting in applicants losing employment authorization and/or EAD validity. The grave situation that many renewal applicants (and their families) and their employers will imminently or soon face without this action is not the result of the applicants' actions but is instead the result of several converging factors affecting USCIS operations. These factors, as described in detail later in this section, have resulted in a significant increase in USCIS processing times for several categories of renewal EAD applications.

Based on these factors, DHS has determined that the 180-day automatic extension provision is currently insufficient to protect applicants, their families, and their employers as was originally intended. If USCIS does not take immediate action, approximately 800,000 EAD renewal applicants will be in danger of experiencing a gap in employment authorization and/or EAD validity in the approximately 2-year period beginning May 2024.[63] Such widescale lapses in employment authorization and EAD validity would result in substantial and unnecessary harm to noncitizens who timely filed for extensions of employment authorization, their families, their employers, and the public at large. Approximately 80 percent of those renewal applications will be pending asylum applicant (C08) EADs. The remaining 20 percent will primarily be adjustment applicant (C09) and cancellation of removal (C10) EADs.[64] Therefore, to avert gaps in employment authorization and/or EAD validity for certain renewal EAD applicants and the harmful effects caused by such lapses, DHS is temporarily amending existing DHS regulations to increase the automatic extension period from up to 540 days from the expiration date stated on their EADs.

DHS is applying this rule to all renewal EAD application categories eligible for automatic extension pursuant to 8 CFR 274a.13(d), not just to C08, C09, and C10 EAD renewal categories, even though some of these categories currently experience processing times that do not raise a risk of the applicant experiencing a lapse in employment authorization or documentation. While nearly all renewal applications eligible for automatic extension fall within the C08, C09, and C10 categories, DHS has made this decision because it has determined that it would not be operationally practical for USCIS to implement a different approach. Making distinctions among categories would cause confusion among employers and employees; and backlogs and processing times may yet increase for these other categories.

---

[61] Among other things, the commenter asserted that section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B) was "merely definitional" and did not confer authority on DHS to grant or extend employment authorization to certain classes of noncitizens covered by the rule. DHS disagrees with the commenter's assertion. DHS further discusses the relevant authorities earlier in section II of this preamble. *See also, e.g., Washington Alliance of Technology Workers* v. *DHS,* 50 F.4th 164, 191–192 (D.C. Cir. 2022) ("What matters is that section 1324a(h)(3) expressly acknowledges that employment authorization need not be specifically conferred by statute; it can also be granted by regulation.").

[62] *See* section V.B.3.d., Module D. Other Impacts. As explained, this rule extends current employment authorization for individuals who are at risk of losing such authorization solely because of USCIS processing delays; it does not grant new work authorization to additional persons. *See id.* According to the most recent data (applicable to October 2023), the U.S. labor force stands at 167,728,000. The maximum population of about 824,000 represents 0.50 percent of the national labor force, approximately 554,000 of which would potentially not lapse as a result of the action being taken. *See id.* Additionally, according to the Bureau of Labor Statistics data, and as of December 2023, there were 0.7 unemployed persons per job opening. *See* U.S. Department of Labor, U.S. Bureau of Labor Statistics, "Number of unemployed persons per job opening, seasonally adjusted,"

*https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited Feb. 6, 2024). Thus, data indicates that there are currently more jobs than available employees. As such, DHS believes, based on the nature of this rulemaking as well as current economic conditions, that the hypothetical possibility of some U.S. workers replacing workers who would temporarily lose employment authorization in the absence of this rulemaking is not a compelling reason to allow widespread losses of employment authorization due to USCIS processing delays.

[63] *See* section V.B.2. Table 6 of the Regulatory Impact Analysis.

[64] *See* section V.B.2. Table 6 of the Regulatory Impact Analysis for how the renewal categories will be affected under this TFR.

*A. Sudden Increase in EAD Applications and Associated Operational Challenges*

1. Comparing Fiscal Year (FY) 2023 Receipts to FY 2022 Receipts

The most recent and significant contributing factor to the severe backlog and increased processing times for renewal EAD applications is the substantial increase in the number of initial EAD applications based on pending asylum applications (C08) that began in March 2023. This surge and sustained increase in receipts during FY 2023[65] substantially increased processing times for renewal EAD applications because USCIS was required to prioritize adjudication of certain initial EAD applications over other applications such as renewal EAD applications.[66]

As shown in Tables 1A. through C. below, in FY 2023, USCIS received approximately 3.49 million EAD applications, which was 50 percent higher than the volume received in FY 2022 (approximately 2.33 million). USCIS received approximately 2.37 million initial EAD applications in FY 2023, which was 77 percent higher than the volume of initial EAD applications received in FY 2022 (approximately 1.34 million). USCIS received approximately 1.12 million renewal EAD applications in FY 2023, which was 13 percent higher than the volume received in FY 2022 (approximately 990,000).

### Table 1A—Initial and Renewal EAD Applications

| Fiscal year | EAD applications | Difference |
|---|---|---|
| 2022 ... | 2,330,000 | |
| 2023 ... | 3,490,000 | 50 percent higher than 2022. |

### Table 1B—Initial EAD Applications

| Fiscal year | EAD applications | Difference |
|---|---|---|
| 2022 ... | 1,340,000 | |
| 2023 ... | 2,370,000 | 77 percent higher than 2022. |

### Table 1C—Renewal EAD Applications

| Fiscal year | EAD applications | Difference |
|---|---|---|
| 2022 ... | 990,000 | |
| 2023 ... | 1,120,000 | 13 percent higher than 2022. |

While overall EAD application filings increased in FY 2023, USCIS received a substantial increase in filings in the second half of the fiscal year. USCIS received a spike of nearly 100,000 EAD application filings in March 2023, resulting in a monthly total well over 300,000. However, USCIS received approximately 61,000 fewer EAD applications the following month in April 2023, underscoring the dynamic and variable nature of EAD filings at that time.

As shown in Figure 1 below, the primary drivers in the growth of EAD applications in FY 2023 (both initials and renewals) were EAD applications based on pending asylum applications (C08), TPS (A12/C19), and parole (C11).

**Figure 1. I–765 Receipts by Major Eligibility Category**



The higher volume receipts, particularly initial C08 EAD applications, led to increased processing times for renewal EAD applications because, as explained in section III.A.2.a., USCIS had to prioritize adjudicative resources on C08 initial EAD applications to comply with court-ordered deadlines for processing these case types and to address other priorities.[67] Consequently, the efforts USCIS undertook to improve its

---

[65] For the beginning of FY 2023 until March 2023, USCIS averaged 160,000 initial EAD application receipts per month. In March 2023, initial EAD application receipts spiked to over 250,000. For the remainder of FY 2023, USCIS averaged 220,000 initial EAD application receipts per month. The EAD category with the largest growth of initial receipts in the second half of FY 2023 was C08 (pending asylum applications).

[66] See section III.A.2.a of this preamble for more information on this requirement to prioritize initial EAD applications in the C08 category (pending asylum applications).

[67] *See* section III.A.2.a of this preamble for more information on the court-imposed requirement to prioritize initial EAD applications in the C08 category. For more information on EAD application processing times resulting from increased filings, *see* section III.C of this preamble.

processing times for renewal EAD applications—including increasing its staffing levels—were insufficient to keep up with the substantial and unanticipated increase in EAD application filings.

To address the unexpectedly high volume of incoming receipts, USCIS increased officer hours expended on initial C08 EAD applications from 116,000 in FY 2022 to 361,000 in FY 2023, an increase of approximately 245,000 hours. The increase in officer hours was comprised of straight time [68] (95,000 hours in FY 2022 to 268,000 hours in FY 2023, an increase of 173,000 hours or 282 percent) and overtime (21,000 hours in FY 2022 to 93,000 hours in FY 2023, an increase of 72,000 hours or 443 percent). To achieve this increase in hours, USCIS reassigned officers from other workloads and hired new staff.

For staff transfers from other product lines to initial C08 EAD applications, USCIS first utilized staff that previously worked on C08 renewals because they were already trained on C08 EAD processing. When this was insufficient to meet the court-ordered 30-day processing requirement for C08 EAD initial applications, USCIS reassigned personnel from other product lines and trained them to work on C08 EAD processing.

This court-ordered prioritization of initial C08 EAD applications over other applications has negatively affected renewal EAD processing times because USCIS was unable to dedicate sufficient officer hours to keep pace with renewal EAD applications. To help address this issue, USCIS increased officer hours from 92,000 in FY 2022 to 113,000 in FY 2023 for renewal C08 EAD applications. Despite this increase of 21,000 officer hours, USCIS has been unable to keep up with its volume of renewal C08 EAD applications. As of February 2024, the 80th percentile processing time [69] for renewal C08 EAD applications was 16 months. USCIS is also behind in its target for adjudications of other automatic extension categories, including C09

(pending adjustment of status application, 7.5 months), C10 (suspension of deportation, 16.3 months), A12 (TPS, 11.2 months), A5 (asylee, 4.8 months), and A10 (granted withholding of deportation or removal, 6.6 months).

As is explained in this preamble, EAD application processing times and the number of pending EAD applications have not sufficiently improved, and despite USCIS' multiple operational and sub-regulatory efforts to reduce the backlog, ongoing and dynamic circumstances, which are outside of USCIS' control, have prevented USCIS from keeping up with the adjudicatory workload.

USCIS has continued to closely monitor the automatic-extension eligible renewal EAD caseloads and processing times. Despite USCIS' best efforts, such improvements have not yet provided the desired impact. Table 2 shows that the number of pending EAD applications has not materially improved since the end of FY 2023. The total number of pending EAD applications at the end of February of 2024 is approximately 1.40 million applications, which continues to pose a challenge for USCIS and also impacts processing times for renewal EAD applications eligible for automatic extensions because of the limited amount of USCIS resources that can be allocated to those case types. The total number of pending auto-extension EAD renewal applications at the end of February 2024 was approximately 439,000. While some progress has been made in addressing the backlog, the progress has not yet achieved sufficient gains to reduce EAD renewal processing times and avoid imminent and near-term lapses in employment authorization for EAD renewal applicants.

TABLE 2—PENDING EAD
APPLICATIONS BY MONTH

| Month | All EAD applications | Auto-extension renewals |
|---|---|---|
| Sep 2023 ............ | 1,490,000 | 534,000 |
| Oct 2023 ............ | 1,510,000 | 504,000 |
| Nov 2023 ............ | 1,500,000 | 474,000 |
| Dec 2023 ............ | 1,470,000 | 448,000 |
| Jan 2024 ............ | 1,440,000 | 457,000 |
| Feb 2024 ............ | 1,400,000 | 439,000 |

Source: DHS, USCIS, OPQ, CLAIMS3, ELIS, retrieved March 15, 2024.

### 2. Effect of Operational Challenges on EAD Application Adjudications

a. Operational Challenges Associated With Initial EAD Application Filings by Pending Asylum Applicants (C08)

The operational challenges associated with the recent surge in EAD applications has primarily [70] been driven by initial EAD applications by individuals with pending asylum applications (C08).[71] In FY 2022, USCIS received 266,036 initial C08 EAD applications. In FY 2023, receipts dramatically increased to 802,284. The increase in initial C08 EAD applications placed a substantial strain on USCIS' adjudicative resources due to the high volume of cases and, as discussed in this section, the stringent 30-day timeline in which USCIS must, by regulation and court order, adjudicate these applications.

In addition to increased EAD filings, EAD processing overall also has been affected by litigation regarding two rules, published in 2020, that amended the regulations governing EAD applications associated with asylum applications.

The regulation at 8 CFR 208.7(a)(1), which was originally promulgated in 1994,[72] requires USCIS to adjudicate initial C08 EAD applications within 30 days of filing.[73] However, on June 22, 2020, DHS published a final rule titled "Removal of 30-day Processing Provision for Asylum Applicant-Related Form I–765 Employment Authorization Applications", which amended 8 CFR 208.7(a)(1) to remove the 30-day

---

[68] Straight time is the regular wage an employee receives for working a regular schedule and does not include overtime pay.

[69] The processing times displayed on the USCIS website is the amount of time it took USCIS to complete 80 percent of adjudicated cases over the last 6 months. "Processing time is defined as the number of days (or months) that have elapsed between the date USCIS received an application, petition, or request and the date USCIS completed the application, petition, or request (that is, approved or denied it) in a given six-month period." *See* USCIS, DHS, "Case Processing Times," *https://egov.uscis.gov/processing-times/more-info* (last visited January 19, 2024).

[70] Other factors related to EAD processing have affected USCIS' workload and personnel, such as processing EADs for noncitizens who were paroled after scheduling an appointment through CBP One or through the Cuban, Haitian, Nicaraguan, and Venezuelan parole processes. However, these processes have not significantly compounded the pressures on EAD renewal processing, and they do not alter USCIS' determination that the primary factor leading to longer processing times for renewal EAD applications is the sudden and sustained increase in initial applications for EADs in the C08 category, which must be adjudicated within 30 days. *See* section III.A.2 of this preamble for a detailed discussion of the operational effects of the C08 initial applications.

[71] Currently, pending asylum applicants may not be granted employment authorization until 180 days after the filing of the application for asylum. INA sec. 208(d)(2), 8 U.S.C. 1158(d)(2). Pending asylum applicants requesting employment authorization under the C08 category may file their EAD applications once the asylum application has been pending for 150 days. 8 CFR 208.7(a)(1).

[72] *See* 59 FR 62284 (Dec. 5, 1994).

[73] On July 26, 2018, in *Rosario* v. *USCIS*, the U.S. District Court for the Western District of Washington granted summary judgment against the government and issued an order requiring USCIS to comply with the 30-day regulatory timeline at 8 CFR 208.7. *See* 365 F. Supp. 3d 1156 (W.D. Wash. 2018).

processing requirement.[74] Several days later, DHS published another final rule titled "Asylum Application, Interview, and Employment Authorization for Applicants," which made further changes to DHS's regulations governing eligibility for employment authorization based on a pending asylum application, including extending the waiting period before asylum applicants could apply for an EAD from 180 days to 365 days (not including delays caused or requested by an applicant) and imposing other restrictions and requirements.[75]

Litigation followed the publication of these two rules ("2020 Asylum EAD Rules"), including *CASA*[76] in the U.S. District Court for the District of Maryland, and *Asylumworks*[77] in the U.S. District Court for the District of Columbia. On September 11, 2020, the court in *CASA* imposed a preliminary injunction requiring that USCIS not apply the 2020 Asylum EAD Rules to members of CASA and Asylum Seeker Advocacy Project organizations. On February 7, 2022, the U.S. District Court for the District of Columbia issued an order in *Asylumworks* vacating the 2020 Asylum EAD Rules in their entirety.[78] On September 22, 2022, DHS published a final rule titled "Asylum Application, and Employment Authorization for Applicants; Implementation of Vacatur"[79] that removed the changes made by the 2020 Asylum EAD Rules, restoring the regulatory text that predated the 2020 Asylum EAD Rules and thus implementing the court order in *Asylumworks*.

As a result of the *Asylumworks* court order, since February 7, 2022, USCIS has been required to process initial EAD applications for all asylum applicants within 30 days of filing. While the court order required a return to a regulatory requirement that existed until 2020, the burden created by the court's order was

significant and continues to affect overall EAD processing today.

Following the *Asylumworks* vacatur, at the end of February 2022, there were 93,639 pending cases to which the 30-day processing requirement applied. To address the backlog of cases and comply with the court's order, USCIS worked to increase resources for the entire initial C08 EAD application workload, including adding staff (pulling from other workloads as well as new hires) and offering overtime.[80]

In particular, USCIS has added staff dedicated to the adjudication of C08 initial EAD applications by reassigning and training experienced officers from other portfolios and assigning new hires to this portfolio. In addition, USCIS offered overtime to all officers working C08 initial EAD applications.[81] As a result of these efforts, USCIS maintained higher levels of completions than have occurred since 2017, resulting in the significant reduction of total C08 initial EAD applications pending over 30 days. USCIS expended 68,000 hours on C08 initial EAD applications in FY 2021, 116,000 hours in FY 2022, and 361,000 hours in FY 2023. USCIS expended 245,000 more officer hours in FY 2023 than FY 2022 adjudicating C08 initial EAD applications. Some of these hours could have gone to other workloads, including renewal EAD applications.

### b. Impact of the Significant Increase in Referrals to USCIS for Credible Fear Assessments

As DHS noted in 2023, economic and political instability around the world has been fueling high levels of global migration, including in the Western Hemisphere.[82] For example, in

December 2022, U.S. Border Patrol (USBP)[83] encountered approximately 222,000 noncitizens between ports of entry, then second only to May 2022 (approximately 224,000 encounters). Daily encounters averaged 7,152 in that month (as compared to the daily average of 1,265 in the immediate pre-pandemic period, 2014–2019).[84] The Department estimated, based on April 2023 projections and planning models, that the number of daily encounters could rise to approximately 11,000 per day.[85] The Department announced sweeping new measures to address the anticipated further increase in migration, including a new rule that introduced a rebuttable presumption of asylum ineligibility for certain noncitizens[86] and a surge in resources to expeditiously process and remove individuals who arrive at the southwest border without a lawful basis to remain.[87]

These new measures have helped DHS to better manage migratory flows, but require USCIS resources to implement in the face of historically high levels of encounters at the southwest land border between the ports of entry. Although such encounters dropped between April 2023 (183,921) and May 2023 (171,382), and dropped again in June 2023 (99,538), encounters began to increase in July 2023 (132,642) and then remained higher than May 2023 levels through December 2023 (249,735), before falling again in January 2024 (176,205).[88] With this increase in encounters at the southwest border, there has also been an increase in referrals to USCIS for credible fear screenings[89] of individuals

---

[74] *See* 85 FR 37502 (June 22, 2020). DHS issued this final rule after having issued a proposed rule, seeking public comments. *See* 84 FR 47148 (Sept. 9, 2019).

[75] *See* 85 FR 38532 (June 26, 2020). This final rule was promulgated after publishing a notice of proposed rulemaking. *See* 84 FR 62374 (Nov. 14, 2019).

[76] *See CASA de Maryland, Inc.* v. *Wolf,* 486 F. Supp. 3d 928 (D. Md. 2020).

[77] *See Asylumworks* v. *Mayorkas,* 590 F. Supp. 3d 11 (D.D.C. Feb. 7, 2022).

[78] *Asylumworks* v. *Mayorkas,* 590 F. Supp. 3d 11 (D.D.C. Feb. 7, 2022) ("*Asylumworks* vacatur"). The vacatur decision in *Asylumworks* effectively mooted the *CASA* case. The *CASA* court eventually acknowledged the case had become moot on May 18, 2023, when it granted the government's motion to dismiss. *See CASA de Maryland, Inc.* v. *Mayorkas,* No. 8:20–CV–2118–PX, 2023 WL 3547497 (D. Md. May 18, 2023).

[79] *See* 87 FR 57795 (Sept. 22, 2022).

[80] Receipts of initial C08 EAD applications for the first half of FY 2022 averaged 16,900 per month, and for the second half of FY 2022, 27,500 receipts per month. Average monthly receipts of initial C08 EAD applications for the first half of FY 2023 was 55,000, and it increased to 78,700 in the second half of FY 2023.

[81] From October 2020 to February 2022, USCIS officers collectively averaged 250 overtime hours per month processing C08 initial EAD applications. From March 2022 until February 2023, USCIS officers collectively averaged 3,800 overtime hours per month on C08 initial EAD applications. From March 2023 until October 2023, USCIS officers collectively averaged 9,900 overtime hours per month on C08 initial EAD applications.

[82] *See* 88 FR 31314, 31314–31315 (May 16, 2023). Analysis by the DHS Office of Immigration Statistics (OIS) found that even while the Centers for Disease Control and Prevention's (CDC) Title 42 public health Order had been in place, encounters with noncitizens attempting to cross the United States' southwest border without authorization has been high. *See* 88 FR at 31315. The "Title 42 public health Order" issued by CDC under 42 U.S.C. 265, was in effect from March 20, 2020 until May 11, 2023 and suspended the introduction into the United States of certain persons who, due to the existence of COVID–19 in countries or places from

which persons were traveling, created a serious danger of the introduction of such disease into the United States. *See* 85 FR 17060 (Mar. 26, 2020). The processes usually applicable under the INA, Title 8 of the U.S.C., generally did not apply to cover noncitizens while the Order was in effect.

[83] USBP is the component of U.S. Customs and Border Protection (CBP) within DHS responsible for U.S. border security between ports of entry. USBP's mission is to detect and prevent the illegal entry of individuals into the United States. *See* CBP, DHS, "Along the U.S. Borders," *https://www.cbp.gov/border-security/along-us-borders* (last visited Mar. 7, 2024).

[84] *See* 88 FR 31314, 31315 (May 16, 2023).

[85] *See* 88 FR 31314, 31316 (May 16, 2023).

[86] *See* 88 FR 31314, 31314 (May 16, 2023).

[87] *See* DHS, Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration* (last visited Mar. 11, 2024).

[88] *See* Southwest Land Border Encounters at *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited Mar. 7, 2024).

[89] Under the INA, certain noncitizens arriving in the United States who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8
Continued

who express an intention to apply for asylum or who express a fear of persecution, torture, or returning to their home country. In FY 2023, USCIS received a historic high of 149,700 credible fear referrals.[90]

The Directorate at USCIS that processes these claims, the Refugee, Asylum and International Operations Directorate ("RAIO"), had insufficient staff to accommodate such increased volume. To address the impact of these high numbers of credible fear referrals from the southwest border on existing asylum and credible fear procedures, USCIS has been detailing USCIS personnel, including officers who adjudicate EAD applications, to the USCIS RAIO directorate for up to 120 days to conduct credible fear screenings.[91] However, because only an immigration officer who is also an "asylum officer," as defined at section

U.S.C. 1182(a)(6)(C) (misrepresentation) or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7) [for failure to meet documentation requirements for admission), may be removed from the United States without a further hearing or review (expedited removal) unless the noncitizen indicates either an intention to apply for asylum under section 208 of the INA, 8 U.S.C. 1158, or expresses a fear of persecution or torture. *See* INA sec. 235(b)(1)(A)(i), (iii), 8 U.S.C. 1225(b)(1)(A)(i), (iii); 8 CFR 235.3(b)(4). If such a noncitizen indicates an intention to apply for asylum or expresses a fear of persecution, torture, or of returning to their home country, the immigration officer refers the noncitizen for an interview with a USCIS asylum officer, who will determine if the noncitizen has a credible fear of persecution in his or her country of nationality or last habitual residence. *See* INA sec. 235(b)(1)(A), 8 U.S.C. 1225(b)(1)(A). If the USCIS asylum officer determines the noncitizen has a credible fear of persecution or torture, the noncitizen may apply for asylum and remain in the United States until a final determination is made on the asylum application by an immigration judge or, in some cases, by an asylum officer. *See* generally INA sec. 235(b), 240, 8 U.S.C. 1225(b), 1229a; *see also* 8 CFR 208.2, 208.30 and 1208.30. The HSA grants to DHS the authority to adjudicate affirmative asylum applications—*i.e.,* applications for asylum filed with DHS for individuals not in removal proceedings—and authority to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. *See* 6 U.S.C. 271(b)(3); INA sec. 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B).

[90] *See* USCIS, DHS, Asylum Division Monthly Statistics Report, Fiscal year 2023, October 2022 to September 2023, *https://www.uscis.gov/sites/ default/files/document/data/ asylumfiscalyear2023todatestats_230930.xlsx* (last visited Nov. 27, 2023).

[91] *See* DHS, "Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration," *https://www.dhs.gov/news/ 2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration* (last updated May 11, 2023) ("DHS and the Department of Justice (DOJ) are also surging asylum officers and immigration judges, respectively, to complete immigration proceedings at the border more quickly."). Approximately 157 immigration officer FTEs participated in a credible fear detail in FY 2023, and approximately 212 FTEs participated from May 2023 to January 2024.

235(b)(1)(E) of the Act, 8 U.S.C. 1225(b)(1)(E), may conduct credible fear screenings, USCIS had to ensure that any non-asylum officers received the necessary asylum officer training before they could start on the detail.[92] Thus, many USCIS detainees were required to take a full-time asylum officer training course lasting several weeks. Having had to divert adjudicatory resources by having adjudicators detailed to the credible fear process created a significant operational strain in the renewal EAD adjudication resulting in an increase of processing times.[93] Due to the ongoing need for additional asylum officers and credible fear interviews, USCIS continues to solicit for detainees across all USCIS components.

Positive credible fear determinations also create a downstream increase in applications for employment authorization, as these individuals may apply for asylum before the Executive Office for Immigration Review, which renders them eligible to apply for employment authorization after the asylum application has been pending for 150 days.

### c. Impact of Affirmative and Defensive Asylum Filing Surges and Backlogs and the Effect on C08 Renewals

As noted above, the recent surge in EAD applications has primarily been driven by initial EAD applications filed by individuals with pending asylum applications (C08). USCIS received historic levels of affirmative asylum applications in FY 2022 and FY 2023. In FY 2022, USCIS received more than 240,600 affirmative asylum applications.[94] In FY 2023, USCIS received more than 454,300 affirmative asylum applications.[95] Despite efforts to

[92] *See* INA sec. 235(b)(1)(B)(i) and (b)(1)(e), 8 U.S.C. 1225(b)(1)(B)(i) and (b)(1)(e); 8 CFR 208.1(b). As required by law, asylum officers receive special training, including training on international human rights law, non-adversarial interview techniques, and country conditions information.

[93] On October 20, 2023, the Administration requested $755 million in supplemental funding from Congress for USCIS to hire additional officers to adjudicate an increase in asylum filings and address the backlog in processing employment authorization applications and immigration benefit requests. *See* Letter regarding critical national security funding needs for FY 2024, *https:// www.whitehouse.gov/wp-content/uploads/2023/10/ Letter-regarding-critical-national-security-funding-needs-for-FY-2024.pdf.* Congress has not fulfilled that request as of March 11, 2024.

[94] *See* USCIS, DHS, Asylum Division Monthly Statistics Report. Fiscal Year 2022. October 2021 to September 2022, *https://www.uscis.gov/sites/ default/files/document/data/ AsylumFiscalYear2022ToDateStats.xlsx* (last visited Nov. 27, 2023).

[95] *See* USCIS, DHS, Asylum Division Monthly Statistics Report. Fiscal year 2023. October 2022 to September 2023, *https://www.uscis.gov/sites/ default/files/document/data/*

adjudicate these pending applications, backlogs for both affirmative (filed with USCIS) and defensive (filed with the Executive Office for Immigration Review (EOIR)) asylum applications have grown. Specifically, as of September 30, 2023, over 1.062 million affirmative asylum applications were pending with USCIS and 937,000 total asylum applications were pending before EOIR, respectively. Owing to these backlogs, USCIS has seen an increase in C08 renewal EAD applications. Because initial C08 EADs issued prior to September 2023 were valid for a period of 2 years, the backlog in asylum applications at USCIS and EOIR is projected to result in over 770,000 C08 renewal EAD application filings during the effective period of this TFR.[96]

### 3. Additional Designations for Temporary Protected Status

Over the course of FY 2022 and FY 2023, the Secretary of Homeland Security, following consideration of relevant country conditions and other appropriate country factors and in consultation with interagency partners, designated, redesignated, and extended the designation of several foreign countries for TPS under section 244 of the INA, 8 U.S.C. 1254a. There are currently 16 foreign countries with active TPS designations.[97] TPS provides temporary protection from removal and employment authorization to eligible nationals of designated countries present in the United States. The Secretary may designate a country for TPS if the conditions in a country prevent the country's nationals from returning safely due to ongoing armed conflict or extraordinary and temporary conditions or render the country temporarily unable to handle adequately the return of its nationals due to an environmental disaster that has resulted in a substantial but temporary disruption in living conditions.[98] USCIS is the designated entity within DHS to administer the TPS program.

Once a country is designated, eligible nationals of that country may apply for TPS by filing Form I-821, Application for Temporary Protected Status (TPS application). Applicants may also request an EAD by filing an EAD application with their TPS application, while their TPS application is pending

*asylumfiscalyear2023todatestats_230930.xlsx,* (last visited Nov. 27, 2023).

[96] *See* TFR Modeling Methodology.

[97] For a list of designated countries, see *https:// www.uscis.gov/humanitarian/temporary-protected-status* (last visited Nov. 7, 2023).

[98] *See* INA secs. 244(b)(1)(A)–(C); 8 U.S.C. 1254a(b)(1)(A)–(C).

or after their TPS application is approved.[99] TPS-based EADs fall under the A12 (TPS previously granted) and C19 (initial TPS application pending) categories. Individuals granted TPS may re-register for TPS and apply to renew their EADs as part of any announced re-registration period if the country continues to be designated for TPS.[100]

Over the course of FY 2022 and FY 2023, the Secretary newly designated five countries for TPS: Afghanistan,[101] Cameroon,[102] Ethiopia,[103] Sudan,[104] and Ukraine [105] because of humanitarian concerns and instability in these countries. These initial designations allowed nationals of these countries who were already in the United States to remain in the United States and apply for EADs. During this same period, the Secretary extended and redesignated for TPS Burma,[106] Haiti,[107] Syria,[108] Somalia,[109] South Sudan,[110] and Yemen,[111] which allowed existing TPS beneficiaries to re-register for TPS and apply for renewal of their EADs, and allowed additional nationals present in the United States from these countries to apply for TPS to remain in the United States and apply for EADs. The Secretary also extended the TPS designation for El Salvador,[112] Honduras,[113] Nicaragua,[114] Nepal,[115] and Venezuela,[116] thereby allowing existing TPS beneficiaries to re-register for TPS and apply for renewal of their EADs.

These additional designations, extensions, and redesignations resulted in a significant increase in initial and renewal EAD filings. In FY 2021, USCIS received 148,898 EAD applications filed by TPS applicants. Of these, 24,172 were renewal EAD applications. In FY 2022, USCIS received 100,484 EAD applications filed by TPS applicants. Of these, 33,352 were renewal EAD applications. In FY 2023, USCIS received 329,325 EAD applications filed by TPS applicants, which represent an over 300 percent increase in TPS EAD applications from FY 2022 to FY 2023. Of these, 230,363 were renewal EAD applications as a result of the withdrawal of the TPS terminations and extensions of TPS in that fiscal year. As of January 2024, the Secretary has redesignated and extended TPS for Cameroon [117] and Syria.[118]

The increased number of TPS-based EAD filings (particularly in renewal EAD applications in the A12 category) from FY 2022 to FY 2023 further stretched limited USCIS resources and contributed to the longer processing times for renewal EAD applications overall. Specifically, this increase helps explain why the 80th percentile processing time for automatic extension-eligible renewal applicants was 14.5 months by February 2024,[119] and increased the number of persons who are projected to experience a lapse in their employment authorization and/or EAD validity starting May 2024, as further detailed below.

**4. Increased Workforce Resources Unlikely To Keep Pace**

Despite USCIS' best efforts to sufficiently anticipate and allocate staff to process EAD applications, USCIS has been unable to keep pace due to unexpected increases in receipts. The agency increased its adjudicative resources in concert with the increased receipts, devoting approximately 54 percent more adjudicative hours to EADs in FY 2023 than in FY 2022, resulting in 46 percent more EAD completions than in FY 2022.[120] USCIS projects that EAD application filings will continue to increase into FY 2024. The rapid increase in anticipated EAD application filings in FY 2024,[121] combined with the mandated 30-day processing time for initial C08 EAD applications, means that USCIS expects a shortfall in adjudications compared to receipts. This shortfall will prevent USCIS from adjudicating renewal EAD applications in time to avoid approximately 800,000 applicants from experiencing a temporary lapse in employment authorization and/or employment authorization documentation during the 2-year period beginning May 2024 absent the implementation of this temporary final rule.

From FY 2021 to FY 2023, adjudicative staff time [122] in the Service Center Operations (SCOPS) and Field Operations Directorate (FOD) spent on EAD adjudications increased rapidly. In FY 2021, USCIS Immigration Services Officers (ISOs) in these directorates expended 6,571,544 hours on all form types. This equates to roughly 5,249 full-time equivalents (FTEs).[123]

During FY 2021, USCIS spent 420,248 hours on EAD applications alone, which represents approximately 336 FTEs, or 6 percent of the total adjudicative time spent on all filings. In FY 2022, USCIS ISOs expended 6,732,963 hours (5,378 FTEs) in adjudications in SCOPS and FOD, with 512,413 hours (which equates to approximately 409 FTEs), or 8 percent of total adjudication time for all filings, used on EAD applications alone. In FY 2023, the proportion of time spent on EAD application adjudications continued to increase, with 788,861 hours (which equates to approximately 630 FTEs), or 12 percent of the total adjudicative time of 6,376,682 (5,093 FTEs).[124]

Thus, from FY 2021 to FY 2023, the proportion of USCIS' total adjudicative time that was spent on EAD adjudications doubled from 6 percent of total adjudicative time to 12 percent, and USCIS was not able to sufficiently increase staff for EAD adjudications,

⁹⁹ *See* INA sec. 244(a)(4), 8 U.S.C. 1254a(a)(4); 8 CFR 244.5, 274a.12(c)(19).

¹⁰⁰ *See* INA sec. 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); 8 CFR 244.12, 274a.12(a)(12).

¹⁰¹ 87 FR 30976 (May 20, 2022).

¹⁰² 87 FR 34706 (June 7, 2022).

¹⁰³ 87 FR 76074 (Dec. 12, 2022).

¹⁰⁴ 87 FR 23202 (Apr. 19, 2022).

¹⁰⁵ 87 FR 23211 (Apr. 19, 2022).

¹⁰⁶ 87 FR 58515 (Sept. 27, 2022).

¹⁰⁷ 88 FR 5022 (Jan. 26, 2023).

¹⁰⁸ 87 FR 46982 (Aug. 1, 2022).

¹⁰⁹ 88 FR 15434 (Mar. 13, 2023).

¹¹⁰ 88 FR 60971 (Sept. 6, 2023).

¹¹¹ 88 FR 94 (Jan. 3, 2023).

¹¹² 88 FR 40282 (June 21, 2023).

¹¹³ 88 FR 40304 (June 21, 2023).

¹¹⁴ 88 FR 40294 (June 21, 2023).

¹¹⁵ 88 FR 40317 (June 21, 2023).

¹¹⁶ 87 FR 55024 (Sept. 8, 2022).

¹¹⁷ 88 FR 69945 (Oct. 10, 2023).

¹¹⁸ 89 FR 5562 (Jan 29, 2024).

¹¹⁹ For more information on how USCIS calculates its processing times, see USCIS' web page at *https://egov.uscis.gov/processing-times/more-info* (last visited Nov. 14, 2023).

¹²⁰ The 54 percent increase in officer hours did not result in a 54 percent increase in completions because there are different hours per completion rates for different EAD categories. There was a significant increase in C08 initial adjudications in FY 2023. In FY 2023, the average C08 initial EAD application took 0.44 hours, whereas EADs overall took 0.23 hours. Therefore, the difference in complexity of different types of EAD adjudications is the primary reason for the deviation in the increase of total hours and total completions.

¹²¹ The Volume Projection Committee (VPC) forecasts USCIS workload volume using subject matter expertise from various directorates and program offices, including the Service Centers, National Benefits Center, RAIO, and regional, district, and field offices. Input from these offices helps refine the volume projections. VPC forecasts that there will be 4.6 million EAD application filings for FY 2024, compared to the approximately 3.49 million EAD applications filed in FY 2023.

¹²² Adjudicative staff time means actual time, in hours, that USCIS spends adjudicating a benefit request. This includes straight time and overtime.

¹²³ An FTE is an approximation of the number of hours of labor that make up the equivalent of one full-time employee. It allows for a more meaningful comparison of resources than the raw number of staff allocated to a particular adjudication, as it accounts for factors such as part-time work, leave, and other factors. When calculating FTEs, USCIS used a 60-percent utilization rate to account for non-adjudicative time, such as the time officers spend attending trainings and roundtable discussions, performing administrative tasks, and leave.

¹²⁴ The number of adjudicative hours in FOD and SCOPS went down in FY 2023, as the FTE equivalent of approximately 157 Immigration Services Officers were detailed to credible fear screenings.

despite its robust hiring efforts.[125] This doubling of adjudicative time expended on a single form type over 2 years is highly unusual [126] and cannot be sustained without increasing resources and staffing rapidly.

As discussed earlier in this section, USCIS projects continued growth in EAD filings in FY 2024, requiring a combination of reallocating additional staff to adjudicate EAD applications, providing additional overtime opportunities, and hiring new staff.[127]

Based on these developments, USCIS predicts that without this TFR, approximately 800,000 noncitizens will experience a lapse in employment authorization or proof of employment authorization for the 2-year period beginning May 2024.[128]

### B. Other Measures Taken To Reduce EAD Application Processing Times

USCIS has also taken other significant operational steps to streamline EAD adjudications and reduce EAD processing times. Backlogs in general are a significant concern for the applicants who are applying for benefits with USCIS.[129] As the backlogs increase, applicants and petitioners experience longer wait times to receive a decision on their benefit requests. This is especially concerning where the backlog involves employment

authorization and/or employment eligibility verification documentation, which is critical to applicants' and their families' livelihoods as well as U.S. employers' continuity of operations. USCIS understands the impact that delays in receiving decisions on pending EAD applications have on applicants and is striving to address the backlogs through a number of measures, including but not limited to this TFR. Specifically, USCIS has taken the following steps to address EAD application workloads and processing times, which includes initiatives that were implemented prior to the 2022 TFR and are still in effect, such as lifting the hiring freeze, publishing the Fee Rule, and reducing processing time for adjustment of status applicants with visas that are immediately available.

### 1. Increased EAD Validity Periods for Certain Applicants

As discussed in section II. B., Legal Framework for Employment Authorization, while certain classes of noncitizens are authorized to engage in employment authorization incident to status or circumstance, other classes of noncitizens are authorized to engage in employment only if they apply for and are granted such authorization by USCIS.[130] Under governing regulations, USCIS has the discretion to assign the validity period for EADs.[131]

Since 2021, USCIS has made multiple policy changes to increase the maximum validity period for EADs in a number of categories.[132] In February 2022, USCIS increased the validity period for initial and renewal EADs for asylees and refugees, noncitizens with withholding of deportation or removal, and VAWA self-petitioners from maximum 1 year to maximum 2 years.[133]

USCIS also changed the policy by which, in some cases, initial and/or renewal EADs were issued for noncitizens with deferred action (non-DACA) and parolees for a validity period that was less than the period of deferred action or parole. The update increased the maximum period of EAD validity to run concurrently with the underlying deferred action or parole, thus reducing the need for repeat renewal EAD filings by these noncitizens.[134]

On September 27, 2023, USCIS updated its policy to increase the validity period to a maximum of 5 years for initial and renewal EADs for certain noncitizens who must apply for employment authorization, including applicants for asylum or withholding of removal, adjustment of status under section 245 of the INA, 8 U.S.C. 1255, and suspension of deportation or cancellation of removal.[135] USCIS expects this EAD policy to cause EAD filings in the applicable categories to significantly decrease starting in late FY 2025 and remain low until the third quarter of FY 2028, as there should be relatively few EADs with an expiration date between September 25, 2025, and September 26, 2028. Although USCIS predicts that the main effects of this policy change will not occur until after October 2025, USCIS projects that the increased validity periods will lead to a greater than 95 percent reduction in renewal EAD filing volumes from FY 2026 to late FY 2028 for categories covered by this policy.

The guidance that was published as part of the updated policy also explains that the categories of noncitizens who are automatically authorized employment incident to status or circumstances and provided more information on who can present a Form I–94, Arrival/Departure Record, to an employer as an acceptable document showing employment authorization under List C of Form I–9, Employment Eligibility Verification.[136] This guidance

---

[125] See other parts of this preamble explaining operational challenges encountered through litigation and other events, such as the need for increased staffing at the southwest border.

[126] For example, over the same time period, adjudicative time spent on other large USCIS workloads held relatively steady. As a percentage of adjudication time for all filings, time spent on Form N–400, Application for Naturalization was 22 percent in FY 2021, 22 percent in FY 2022, and 20 percent in FY 2023. Time on Form I–129, Petition for Nonimmigrant Worker seeking H–1B classification was 8 percent of all total filings in FY 2021, 8 percent in FY 2022, and 9 percent in FY 2023.

[127] The resources required to reduce the processing backlogs for renewal EAD applications is discussed at section III.C.3.a.

[128] See section V.B.2. Table 7, TFR Future Population Projections by Month, Rounded to Thousands.

[129] For example, the Citizenship and Immigration Services Ombudsman 2023 Annual Report to Congress stated that the backlogs at USCIS have resulted in an ''ongoing exponential increase . . . in requests for case assistance.'' The Report further states ''USCIS began the year fully cognizant of its challenges in decreasing processing times and getting its backlogs under control and took significant steps to accomplish those goals. But 2022 brought with it significant new tasks for the agency that would create their own processing and operational challenges—challenges that the agency continues to grapple with in 2023 and which will impact future workloads.'' See CIS Ombudsman, DHS, ''Citizenship and Immigration Services Ombudsman Annual Report 2023 '' (June 30, 2023) at v, viii, https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf.

[130] See 8 CFR 274a.12(a)–(c).

[131] See 8 CFR 274a.12(a) (''USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States.''); 8 CFR 274a.12(c) (''USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.'').

[132] See, e.g., USCIS, DHS, Policy Alert (PA–2021–10), ''Employment Authorization for Certain Adjustment Applicants'' (June 9, 2021), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20210609-EmploymentAuthorization.pdf (updating the validity period for initial and renewal EADs issued to applicants for adjustment of status under INA 245 from 1 year to 2 years).

[133] See USCIS, DHS, Policy Alert (PA–2022–07), ''Updating General Guidelines on Maximum Validity Periods for Employment Authorization Documents based on Certain Categories'' (Feb. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220207-EmploymentAuthorizationValidity.pdf.

[134] See USCIS, DHS, Policy Alert (PA–2022–07), ''Updating General Guidelines on Maximum Validity Periods for Employment Authorization Documents based on Certain Categories'' (Feb. 7, 2022), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220207-EmploymentAuthorizationValidity.pdf.

[135] See USCIS, DHS, Policy Alert (PA–2023–27), ''Employment Authorization Document Validity Period for Certain Categories'' (Sept. 27, 2023), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20230927-EmploymentAuthorizationValidity.pdf.

[136] See USCIS, DHS, Policy Alert (PA–2023–27), ''Employment Authorization Document Validity Period for Certain Categories'' (Sept. 27, 2023), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20230927-EmploymentAuthorizationValidity.pdf.

also clarified that certain Afghan and Ukrainian parolees are employment authorized incident to parole.[137]

With the ongoing efforts to improves processing, which USCIS anticipates will lead to eventual reductions in filing volumes, USCIS will be better able to keep up with the EAD application workflow, avoid lapses in employment authorization and documentation, focus on reducing the overall backlog at USCIS, and enable officers to focus on other workloads.

2. Lifted the Hiring Freeze and Increased the Number of Full Time Equivalent Employees

USCIS is a fee-based agency that relies on predictable fee revenue and its carryover from the previous year. Due in part to the significant drop in revenue from the impact of the COVID–19 pandemic on benefit request filings and USCIS' inability to update its fee structure since the 2016 Fee Rule, as explained below, USCIS employed every available means to preserve sufficient funds to meet payroll and carryover obligations. These measures included drastic cuts as well as an agency-wide hiring freeze beginning on May 1, 2020.[138]

USCIS lifted the agency-wide hiring freeze in March 2021. With the hiring freeze lifted, USCIS was able to begin hiring personnel in an effort to return to pre-pandemic staffing levels. Initial hiring was largely internal in order to fill promotional vacancies. Following that initial hiring, USCIS posted public job announcements to hire from outside USCIS. This effort's impact is not realized immediately, as it is lengthy, time-consuming, and ongoing. The hiring process entails posting the job announcement, reviewing resumes, providing qualified candidates' information to the hiring office, conducting assessments and interviews, making and approving selections, and completing background checks prior to a new employee entering on duty. New hires then go through orientation, several weeks of basic training, duty-specific training, and mentoring.[139] The entire process from entering on duty to

a new hire reaching full proficiency may take several months.

Hiring new personnel continued to be a USCIS priority in 2023 in order to help reduce backlogs and meet operational requirements. When DHS issued the 2022 TFR on May 4, 2022, USCIS had approximately 18,500 employees. USCIS ended 2022 with 19,983 staff, and staffing levels grew to 20,631 by June 30, 2023.

As discussed previously, from FY 2021 to FY 2023, USCIS increased the number of FTEs adjudicating EAD applications from 336 FTEs to 630 FTEs, an 87.5-percent increase.[140] However, a large portion of the FTE increase for EADs was dedicated to initial C08 EAD applications due to the 30-day processing requirement. As a result, USCIS was unable to divert resources to other categories, such as renewal EAD applications in the auto-extension categories. From FY 2021 to FY 2023, USCIS increased the number of FTEs adjudicating initial C08 EAD applications by approximately 480 percent.[141]

In short, from FY 2021 to FY 2023, USCIS increased the number of FTEs dedicated to adjudicating EAD applications by 87.5 percent. However, this significant increase in personnel performing EAD adjudications has not been sufficient to address the surge in applications. USCIS expects a continued FTE shortfall in the short term that will prevent USCIS from adjudicating renewal EAD applications in time to prevent a temporary lapse in employment authorization for approximately 800,000 applicants during the 2-year period beginning May 2024.

3. Issuance of Final Fee Rule

USCIS is primarily funded by fees charged to applicants and petitioners for the adjudication of immigration and naturalization benefits requests and is authorized, by law, to recover the full cost [142] of all adjudications and naturalization services.[143] USCIS

calculates and proposes fees to recover the full cost of operations associated with adjudicating immigration benefit requests as authorized by section 286(m) of the INA, 8 U.S.C. 1356(m). USCIS last adjusted its fee schedule in December 2016, including the fees for EAD applications, although the mandated biennial fee reviews indicate an urgent need to update USCIS filing fees.[144] However, DHS until recently has been unable to update the fee structure, as explained below, and the current 2016 fee structure, including the Form I–765 fee of $410 per adjudication, has been insufficient to recover the full cost of USCIS operations, thus leading to the fiscal troubles previously described.[145]

In the spring of 2020, in the wake of the COVID–19 pandemic, USCIS revenue dropped by 40 percent in April and an additional 25 percent in May from the forecasted collections. That created a possibility that USCIS might violate statutory anti-deficiency requirements and led to dramatic cuts in spending through the last half of FY 2020, a hiring freeze, and planned furloughs if revenue did not increase.[146]

Towards the end of June and July 2020, revenue began to return to normal levels and, in conjunction with major budget cuts, allowed USCIS to avoid the furloughs. In FY 2021, USCIS instituted 32 percent cuts to non-payroll expenses, continued the hiring freeze through April 2021, and did not fund enhancements. While USCIS' carryover funding has stabilized, USCIS is still enduring the effects of those 32 percent budget cuts.[147]

DHS issued a final rule on August 3, 2020, to adjust the USCIS fee schedule by a weighted average of 20 percent, reflecting the results of the FY 2019/2020 USCIS fee review.[148] DHS

---

[137] *See* USCIS, DHS, Policy Alert (PA–2023–27), ''Employment Authorization Document Validity Period for Certain Categories'' (Sept. 27, 2023), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20230927-EmploymentAuthorizationValidity.pdf*.

[138] Although the agency-wide hiring freeze started on May 1, 2020, USCIS' FOD initiated a hiring freeze in December 2019 and USCIS' SCOPS Directorate did the same starting in February 2020.

[139] *See* USCIS, DHS, ''Training,'' *https://www.uscis.gov/about-us/careers/training* (last updated Jan. 2, 2020).

[140] An FTE is an approximation of the number of hours of labor that make up the equivalent of one full-time employee. *See* fn. 123 in section III.A.4 of this preamble.

[141] As previously discussed, USCIS ISOs spent 68,000 hours on C08 initial EAD applications in FY 2021, 116,000 hours in FY 2022, and 361,000 hours in FY 2023.

[142] Full costs of providing all adjudication and naturalization services, includes support costs such as physical overhead, information technology management and oversight, human resources, national security vetting and investigations, accounting and budgeting, and legal services. *See* 88 FR 402, 417 (Jan. 4, 2023) (''2023 Fee Rule NPRM'').

[143] *See* INA sec. 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication

and naturalization services at a level to ''ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants''). This contrasts with congressional appropriated agencies, whose budgets are not directly impacted by fluctuations in fee revenue.

[144] *See* 81 FR 73292 (Oct. 24, 2016) (''2016/2017 Fee Rule''). Under the Chief Financial Officers Act of 1990 (''CFO Act''), codified at 31 U.S.C. 901–03, and under the Office of Management and Budget (OMB) Circular A–25, USCIS must conduct biennial reviews of the non-statutory fees deposited into USCIS' fee account. The primary objective of a fee review is to determine whether immigration and naturalization benefit fees will generate sufficient revenue to fund the anticipated operating costs associated with administering the nation's legal immigration system and to propose the necessary adjustments.

[145] *See* 88 FR 402, 405 (Jan. 4, 2023).

[146] *See* 88 FR 402, 426 (Jan. 4, 2023).

[147] *See* 88 FR 402, 426 (Jan. 4, 2023).

[148] *See* 85 FR 46788 (Aug. 3, 2020) (''2020 Fee Rule''). The final rule was issued after DHS has

Continued

estimated an average annual USCIS deficit of $1,035.9 million.[149] The rule was scheduled to become effective on October 2, 2020.[150] However, USCIS was not able to implement the fees set out in the 2020 fee rule because it was enjoined by two Federal district courts.[151]

On January 31, 2024, DHS published a new Fee Rule to cover the increased cost of adjudicating benefit requests.[152]

As explained in section III.B.2 of this preamble, before finalizing the Fee Rule, a USCIS endured a lengthy hiring freeze that left thousands of positions unfilled for an extended period. Even though the hiring freeze ended on March 31, 2021, USCIS was constrained for a prolonged period by the fee levels in the 2016 Fee Rule. USCIS is working diligently to backfill vacant positions and hire for new ones. However, the Federal recruitment, hiring, and vetting processes take many months followed by onboarding, basic training, and several weeks of form-specific training and mentoring. Incoming receipts have exceeded the agency's gains through hiring, and those hiring gains have been limited by insufficient revenue.[153]

**4. Prioritized Adjudication of Employment-Based I–485 Adjustment Applications**

Another area in which USCIS is actively prioritizing its workload is employment-based adjustment of status applications, which has downstream effects on EAD application adjudications, particularly those based on a pending adjustment of status application (C09). Since employment-based adjustment of status applicants are eligible for employment authorization based on the pendency of the adjustment of status application, the number of such applications filed with USCIS and the duration of their

pendency directly impact the number of initial and renewal EAD applications filed. At the start of FY 2021, there were approximately 126,000 employment-based adjustment of status applications pending with USCIS. Approximately 313,000 employment-based adjustment of status applications were received during FY 2021. USCIS typically processes approximately 120,000 employment-based adjustment of status applications each year,[154] which generally corresponds with the number of available employment-based immigrant visas minus the number of such visas issued by Department of State annually. However, in FY 2021, FY 2022, and FY 2023, additional employment-based visas became available because of unusually low visa usage in the family-sponsored preference categories due in part to consular closures during the COVID–19 pandemic.[155] In response, USCIS prioritized processing of employment-based adjustment of status applications to maximize usage of available visas. By the end of FY 2021, USCIS had processed and approved approximately 175,000 employment-based adjustment of status applications, an increase of approximately 50 percent above the typical baseline.[156] USCIS continued this prioritization in FY 2022, approving more than 220,000 employment-based adjustment of status applications, and in FY 2023, where preliminary estimates show that USCIS approved more than 145,000 such applications. However, at the start of FY 2024 approximately 180,000 employment-based adjustment of status applications remained unadjudicated, including approximately 122,000 impacted by priority date retrogressions that may leave them pending for many years and thereby eligible for C09 EADs during this extended period.[157]

To the extent possible, USCIS is committed to prioritizing adjudicating employment-based adjustment of status applications to utilize the available visa numbers each fiscal year.[158] In turn, many applicants are relieved from filing renewal EAD applications, because approval of the adjustment of status application grants the noncitizen lawful permanent resident status such that they are employment authorized incident to status, and leads to issuance of a Permanent Resident Card, an acceptable Form I–9 document.[159] Therefore, the more adjustment of status applications USCIS is able to process and approve, the fewer C09 renewal EAD applications USCIS will receive, thereby reducing the number of EAD renewal filings overall. In the interim, urgent action is needed to address the growing number of renewal EAD applicants who may soon experience a gap in their employment authorization and/or EAD because of USCIS' predicted but unprecedented renewal EAD processing times.

**5. Issued Guidance Stating That Spouses of E and L Nonimmigrants Are Employment Authorized Incident to Status**

In March 2022, USCIS issued policy guidance stating that spouses of E[160]

---

published a proposed rule. *See* 84 FR 62280 (Nov. 14, 2019).

[149] *See* 85 FR 46788, 46794 (Aug. 3, 2020).

[150] *See* 85 FR 46788 (Aug. 3, 2020).

[151] *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020) (''*ILRC*''); *Nw. Immigrant Rights Project* v. *USCIS,* 496 F. Supp. 3d 31 (D.D.C. 2020) (''*NWIRP*'').

[152] *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, proposed rule, 88 FR 402, 492 (Jan. 4, 2023); and U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, final rule, 89 FR 6194 (Jan. 31, 2024).

[153] From FY 2021 through FY 2022, USCIS received a range of approximately 2.3 to 2.6 million EAD applications (seeking both initial EADs and renewal of initial EADs) each fiscal year. In FY 2023, this figure increased to approximately 3.5 million. This increase in EAD applications contributed to the formation of backlogs, as discussed further in section III.C.1 of this preamble.

[154] *See* Office of Immigration Statistics, DHS, ''2021 Yearbook of Immigration Statistics,'' Table 7, ''Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2012 2021,'' *https://www.dhs.gov/sites/default/files/2023-03/2022_1114_plcy_yearbook_immigration_statistics_fy2021_v2_1.pdf* (last visited Nov. 14, 2023).

[155] Family-sponsored visas that remain unused at the end of the fiscal year are made available in the subsequent fiscal year to employment-based categories. *See* INA sec. 201(d); 8 U.S.C. 1151(d); *see also* USCIS, DHS, Archive, ''Fiscal Year 2022 Employment-Based Adjustment of Status FAQs'' (last reviewed/updated Aug. 26, 2022), *https://www.uscis.gov/archive/fiscal-year-2022-employment-based-adjustment-of-status-faqs.*

[156] *See* USCIS, DHS, News Release, ''USCIS Announces FY 2021 Accomplishments'' (Dec. 16, 2021), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-fy-2021-accomplishments* (last viewed Nov. 27, 2023).

[157] For more information on visa retrogression, *see https://www.uscis.gov/green-card/green-card-*

*processes-and-procedures/visa-availability-priority-dates/visa-retrogression* (last accessed Dec. 7, 2023). In the interest of reducing the burden on both the agency and the public, USCIS has implemented multiple increases of the maximum validity period for initial and renewal EADs issued to applicants for adjustment of status under sec. 245 of the INA, 8 U.S.C. 1255, as described in section III.B.1 of this preamble. USCIS' return to its processing goal of 3 months for EAD renewal applications is critically important for applicants facing visa retrogression, as they may require multiple renewals.

[158] While the INA provides that unused employment-based visas allocated to a given fiscal year are made available in the subsequent fiscal year to family-sponsored preference categories, those visas are effectively lost due to other provisions that have the effect, after accounting for the number of immigrant visas used by immediate relatives of U.S. Citizens (among others), of setting the number of family-sponsored preference visas in a fiscal year at 226,000. *See* INA sec. 201(c) and (d); 8 U.S.C. 1151(c) and (d). To avoid the loss of unused employment-based immigrant visas, USCIS prioritizes employment-based adjustment of status applications over most other applications, including EAD renewal applications.

[159] *See* 8 CFR 274a.12(a)(1).

[160] *See* INA sec. 101(a)(15)(E), 8 U.S.C. 1101(a)(15)(E) (providing that a noncitizen entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which the noncitizen is a national, (or, in the case of a noncitizen who acquired the relevant nationality through a financial investment and who has not previously been granted status under this subparagraph, the foreign state of which the noncitizen is a national and in which the noncitizen has been domiciled for a continuous period of not less than 3 years at any point before applying for a nonimmigrant visa under this

and L[161] nonimmigrants were authorized to work incident to status and did not need to obtain an EAD in order to seek employment.[162] This new policy resulted in reduced initial and renewal EAD applications by these noncitizen spouses. During the 12 months preceding this policy update, between March 1, 2021, and February 28, 2022, USCIS received an average of 700 A17 (spouse of E nonimmigrant) and 1,500 A18 (spouse of L nonimmigrant) EAD applications per month. Between March 1, 2022, and September 30, 2023, after the policy began to take effect, USCIS received an average of 220 A17 and 350 A18 EAD applications per month. In FY 2023, USCIS received an average of 160 A17 and 90 A18 EAD applications per month. Therefore, this policy resulted in a reduction of about 2,000 initial and renewal EAD applications per month.

### 6. Permitted Certain Asylum Applicants To Electronically File EAD Applications

In January 2023, USCIS announced that certain asylum applicants were now eligible to electronically file applications for EADs in the C08 category.[163] This allowed applicants to submit their applications, check the status of their case, and receive notices from USCIS online, thus reducing the operational costs associated with paper applications such as scanning, manual data entry, and shredding. These cost savings have allowed resources to be used elsewhere, including funding new positions and overtime. Offering the option to file EAD applications online has made the process more efficient, secure, and convenient for EAD applicants and increased operational efficiencies for USCIS.

### 7. Alternative Backlog Reduction Method Considered But Not Implemented: Changing the Adjudication of EAD Renewal Applications To Prioritize Adjudication by the Expiration Date of an Applicant's 180-Day Automatic Extension

In addition to the backlog reduction efforts described in section III.B of this preamble, USCIS explored the possibility of changing the order of renewal EAD adjudications from a general First in First Out (FIFO) processing order[164] to a processing order that would prioritize adjudication based on the expiration date of the applicant's 180-day automatic extension period. After careful consideration, USCIS has determined that this option was not operationally feasible. The primary reasons are the manual effort required to identify and assign cases to officers based on when an individual's previous employment authorization expires, the volume of impacted cases, and the inability to surge additional resources to implement such a change.

Regarding the manual effort required to identify when the EAD associated with a renewal case expires, there is currently no system-based way to assign work based on expiring employment authorization. This means that, although cases can be tracked online using existing systems, the act of delivering those cases based on expiration dates to an officer requires that they be manually assigned. Additionally, as the categories of renewal applications are filed and adjudicated in a mix of paper and electronic formats, records staff must physically locate each individual paper file. EAD applications that are paper files are generally organized and assigned by receipt date on file room shelves, so any attempt to manually identify when the EAD associated with a renewal case expires would require physically tabbing through all files received on the same given day and for the same filing category. Multiplying that effort by the hundreds of thousands of pending renewal EAD applications would cause significant inefficiencies for both adjudications and records staff, diverting resources further away from other tasks, in turn creating new backlogs. As of November 2023, approximately 467,000 thousand EAD applications pending with SCOPS (44 percent) remained in paper files.

Even with respect to electronically filed renewal EAD applications, it is currently not possible to assign cases electronically by expiration date. USCIS would have to do so manually, using spreadsheets to look up and identify all pending EAD renewal applications and then document and sort each case by date of EAD expiration. USCIS would then need to identify each application in the system and then manually route each EAD application to be assigned for pre-processing and adjudication.[165] The task of manually assigning work for both pre-processing and adjudication would take additional time and interfere with USCIS' overall productivity until the system can be modified to accommodate a new process for prioritizing and assigning work. As discussed below, it would take at least one year to modify the system to re-prioritize this workload.

In addition, the information technology resources required to modify the system in this manner and the time it takes to develop, test, and implement an automated assignment process make it infeasible to reprioritize the workload in the system in time to prevent the renewal EAD expirations beginning in May 2024. To implement this process in USCIS' Electronic Immigration System online system, it would take the USCIS Office of Information Technology approximately 6 to 9 months of development time and an additional 3 months for beta testing and deployment. In addition, changes would need to be made to the process by which cases are selected for adjudication in the case management system used by USCIS to process immigration benefit requests.

Finally, prioritizing renewal EAD applications based on the expiration of the 180-day automatic extension periods versus a general FIFO processing order would lead to the inequitable result that applicants who filed their renewal EAD applications right before the expiration of their EADs could be prioritized over applicants who filed their renewal EAD applications according to USCIS' recommended filing period in advance of their EAD expiration date. Such prioritization could incentivize more applicants to file their renewal EAD applications close to the expiration of their EADs, as their applications would effectively be expedited over other applications filed up to 6 months in advance of expiration. Should that occur, USCIS and the public would

---

subparagraph), and the spouse and children of any such noncitizen if accompanying or following to join such alien.).

[161] *See* INA sec. 101(a)(15)(L); 8 U.S.C. 1101(a)(15)(L) (providing that a noncitizen who, within 3 years preceding the date of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the noncitizen spouse and minor children of any such noncitizen if accompanying him or following to join him").

[162] *See* USCIS, DHS, Policy Alert (PA–2022–11), "Documentation of Employment Authorization for Certain E and L Nonimmigrant Dependent Spouses" (Mar. 18, 2022) *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220318-EmploymentAuthorization.pdf.*

[163] *See* USCIS, DHS, "Asylum Applicants Can Now File Form I–765 Online," *https://www.uscis.gov/newsroom/alerts/asylum-applicants-can-now-file-form-i-765-online* (last accessed Dec. 7, 2023).

[164] Under a FIFO processing order, applications are generally reviewed in the order in which they are received.

[165] Before most applications and petitions are assigned to an officer for adjudication, they are pre-processed, meaning the information contained with the case is ingested, vetted, and verified, and then the case is routed to the appropriate workflow for adjudication.

become more reliant on automatic extensions to help minimize the problem of gaps in employment authorization and/or valid documentation instead of the preferred solution of maintaining the current processing order, continuing to pursue additional processing efficiencies, and temporarily extending the automatic extension period to up to 540 days in this TFR.

### C. The Need To Increase the Automatic Extension Period From 180 Days to 540 Days

#### 1. EAD Application Processing Backlogs

USCIS relies on a combination of internal processes and plans to work to reduce backlogs.[166] Although USCIS has been diligently implementing the backlog mitigation efforts discussed in section III.B of this preamble in order to reduce renewal EAD application processing times, USCIS is unable to achieve its target 3-month processing goal or significantly reduce the EAD renewal processing times to below 180 days due to the volume of pending EAD applications, new EAD filings that USCIS continues to receive, and time needed to increase staffing levels to meet existing demands.

As of February 2024, USCIS had approximately 439,000 pending renewal EAD requests in the categories eligible for automatic extension,[167] and received an average of approximately 52,800 additional automatic extension-eligible renewal EAD applications per month in FY 2023.[168] These additional renewal

applications are adding to the current backlog, given that USCIS currently completes approximately 49,100 automatic extension-eligible renewal EAD applications per month.[169]

In FY 2023, the 80th percentile processing time for all renewal EAD applications was 14.2 months. For those automatic extension-eligible renewal applicants, as of February 2024, the 80th percentile processing time was 14.5 months.[170] Given these processing times and USCIS' EAD adjudication rates, DHS projects that, between May 2024 to March 2026, approximately 800,000 renewal applicants eligible for an automatic extension will exceed the 180-day automatic extension period unless this Temporary Final Rule is issued.

#### 2. Impact of Long Processing Times for Renewal EAD Applications

For the reasons discussed in section III.A of this preamble, the dramatic increase in EAD applications and associated operational challenges were caused by a number of external developments that constrained USCIS' ability to dedicate sufficient resources to processing renewal EAD applications. As a result, the 180 days of additional employment authorization and/or EAD validity under 8 CFR 274a.13(d) are insufficient. After the additional 180 days are exhausted, many applicants will still be waiting for their renewal EAD applications to be approved. These applicants will experience a lapse in their employment authorization and/or EAD validity while their renewal applications remain pending.

Without immediate intervention, DHS estimates that the situation will dramatically worsen over time, as each month thousands of additional renewal EAD applicants will be at risk of losing their employment authorization and/or EAD validity despite the 180-day automatic extension period currently provided by regulation.

USCIS projects that approximately 800,000 individuals could lose employment authorization between May 2024 and March 2026 in the absence of

this TFR.[171] In May 2024, 3,000 renewal applicants, the majority [172] of whom are in the C08 pending asylum applicant category, are projected to experience a gap in their employment authorization and/or EAD validity. The number of applicants who could lose employment authorization and/or EAD validity each month will rapidly increase to 12,000 during July, and peaking at more than 60,000 during November 2025, unless immediate action is taken to remedy the situation.

The situation for asylum applicants is especially dire because of the significant time that asylum applicants must wait to become employment-authorized in the first place. By statute, asylum applicants cannot be approved for initial EADs until their asylum applications have been pending for 180 days.[173] This initial wait time exacerbates the often-precarious economic situations asylum seekers may be in as a result of fleeing persecution in their home countries. Many lacked substantial resources to support themselves before they fled or spent much of what they had to escape their country and travel to the United States. Those with resources may have been forced to leave what they had behind because they lacked the time to sell property or otherwise gather what they owned. When whole families are threatened, the primary earner may be the first to travel to the United States to establish a new home before bringing the rest of the family. The cost to travel to the United States is high, as is the relative cost of living. In these circumstances, if the asylum seeker is unable to work for extended periods of time, it can not only negatively impact that individual, but the whole family as well. For those who have already found jobs to support their needs, the potential for their initial EADs to expire prior to the approval and issuance of a renewed EAD may force them back into instability caused by a gap in their authorization to work.

Continuation of employment authorization and/or EADs is also a requirement for their employers who must comply with Form I–9 reverification requirements in order to continue to employ these employees.[174] In addition, some employers, notwithstanding possible violation of section 274B of the INA, 8 U.S.C. 1324b

---

[166] The primary way staffing for backlog reduction has taken place is through hiring based on fee-funded receipts, improved efficiencies to current processes, and some appropriations from Congress.

[167] The vast majority of applicants filing renewal EAD applications and who are eligible for the automatic extension of EADs under 8 CFR 274a.13(d) fall into three filing categories: (1) noncitizens who have properly filed applications for asylum and withholding of deportation or removal (C08); (2) noncitizens who have filed applications for adjustment of status to lawful permanent resident under section 245 of the INA, 8 U.S.C. 1255 (C09); and (3) noncitizens who have filed applications for suspension of deportation under section 244 of the INA (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the INA, 8 U.S.C. 1229b, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (C10). In FY 2023, these three filing categories made up nearly 61 percent of the renewal EAD receipts filed in categories eligible for the automatic extension of employment authorization. Broken down further among these three categories: the C08 category comprised approximately 41 percent of the renewal EAD receipts filed in categories eligible for the automatic extension, while the C09 category comprised approximately 10 percent and the C10 comprised approximately 10 percent.

[168] In FY 2023, USCIS received a total of approximately 633,000 renewal EAD applications

in the categories eligible for automatic extension, which averages to approximately 52,800 filings per month.

[169] Based on current processing times, many of the 534,000 currently pending renewal EADs will remain pending through the end of FY 2024. These applications generally do not add to the number of renewal applicants who will lose employment authorization in May 2024 because most of the pending renewal applications were filed under the 2022 TFR and still benefit from the 540-day automatic extension period.

[170] For more information on how USCIS calculates its processing times, see USCIS' web page at *https://egov.uscis.gov/processing-times/more-info* (last visited Nov. 14, 2023).

[171] See section V.B.2., Table 7, TFR Future Population Projections by Month, Rounded to Thousands.

[172] See section V.B.2., Table 6A. EADs that could lapse in the absence of the TFR, by Class and Percent Variation.

[173] See INA sec. 208(d)(2), 8 U.S.C. 1158(d)(2).

[174] See 8 CFR 274a.2(b)(1)(vii).

(governing unfair immigration-related employment practices), may be hesitant to hire asylum seekers in the first place if it appears maintaining their employment will be difficult due to potential lapses in employment authorization.

Continuous employment authorization and documentation during the pendency of an asylum application is vital for asylum seekers in the United States to access housing, food, and other necessities. In addition, asylum seekers may need income from employment to access medical care, mental health services, and other resources, as well as to access legal counsel in order to pursue their claims before USCIS or EOIR. Access to mental health services is particularly crucial for asylum seekers due to the prevalence of trauma-induced mental health concerns, including depression and post-traumatic stress disorder. The physical harm experienced by many asylum seekers frequently necessitates continuous medical care for extended periods of time. Finally, the purpose for which asylum seekers came to the United States is to seek long-term protection by receiving asylum.

In addition, having unexpired employment authorization and EADs is necessary for certain noncitizens such as asylum applicants and TPS beneficiaries when they apply for benefits that require proof of identity or immigration status. The only acceptable document available to some noncitizens such as asylum applicants and TPS beneficiaries to establish identity for other purposes, such as obtaining a REAL ID-compliant driver's license or identification card, may be an unexpired EAD.[175] REAL ID-compliant driver's licenses as well as identification cards are used for other official purposes including access to Federal facilities and boarding federally regulated commercial aircraft.[176] Without an unexpired EAD, certain classes of noncitizens would not be able to apply for REAL ID-compliant driver's licenses and IDs.

DHS is aware of the importance of employment authorization and evidence of employment authorization for applicants' and their families' livelihoods, as well as their U.S. employers' continuity of operations and financial health. DHS also is cognizant of the potential detrimental impact that gaps in employment authorization may have on an applicant's eligibility for future immigration benefits should the

applicant, *e.g.,* inadvertently engage in unauthorized employment during the gap,[177] and on their U.S. employers who must examine unexpired documents that evidence their employees' employment eligibility and attest that their employees are authorized to work in the United States.[178] DHS also acknowledges that the substantial increase in backlogs and prolonged processing times for renewal EAD applications are not the fault of applicants, but nonetheless will have significant adverse consequences for applicants, their families, and their employers in the absence of this TFR.

3. The Current Automatic Extension Period of 180 Days Must Be Temporarily Increased to 540 Days

DHS has determined that the automatic extension period of up to 180 days at 8 CFR 274a.13(d) is currently insufficient to meet the original purpose for which it was implemented: to prevent the occurrence of gaps in employment authorization and documentation for eligible applicants.[179] Although USCIS has significantly increased staffing as well as case completions, these gains have been outstripped by the increased volume of receipts and other operational issues. As a result, USCIS is unable to significantly increase its rate of completion in the immediate term and, therefore, is currently unable to meaningfully reduce the volume of pending cases while also keeping pace with the inflow of renewal EAD filings. While USCIS will continue to explore and implement ways to improve adjudicative efficiencies in the short and long term, USCIS expects that its substantial renewal EAD backlogs will continue in the immediate future. This temporary circumstance has created an urgent situation for noncitizens and U.S. employers as gaps in employment authorization and documentation have a highly detrimental impact on noncitizen workers and their U.S. employers.

a. Reduce Backlogs

As stated above, USCIS received an average of approximately 52,800 automatic extension-eligible EAD applications per month in FY 2023, and completes approximately 49,100 such requests per month, leading to the growing backlog.[180] The 80th percentile processing time for the automatic extension categories combined as of February 2024 was 14.5 months. Based on current incoming volumes and completions, USCIS projects that this backlog will hold steady, if not slightly increase, in the next 6 months. USCIS began to hire following the end of the hiring freeze associated with the fiscal impacts of COVID–19 and the potential furlough, both of which contributed to higher-than-average attrition. The hiring and training processes are lengthy, but USCIS is continuing to grow and see the increases in completions associated with improved staffing. Additionally, the agency continues to refine and expand the use of systems to improve processing efficiency.

Based on the growth of receipts for renewal EAD applications in the past year[181] and USCIS' projection of similar growth, DHS believes that a temporary increase of 360 days (beyond the 180-day period) for a total of 540 days (approximately 18 months) is an appropriate increase of the automatic extension period to mitigate the risk that a majority of eligible applicants will experience a lapse in employment authorization or EAD validity, consistent with the purpose of the generally applicable automatic extension provision provided under the current regulation.

The temporary extension period implemented in this TFR better reflects current and potential processing times for renewal EADs and should provide USCIS with more time to further increase adjudicative staff, implement additional processing efficiencies, and reduce renewal EAD processing times to a level that aligns with the current up to 180-day automatic extension provision. USCIS is committed to mitigating the impact of renewal EAD application processing delays on applicants as it continues to work to return to its goal of processing renewal EAD applications within 3 months.[182]

---

[175] 6 CFR 37.11(c).

[176] REAL ID Act of 2005, Public Law 109–13, div. B, Title II, Sec. 201(3) (May 11, 2005).

[177] With certain exceptions, if a noncitizen continues to engage in or accepts unauthorized employment, the individual may be barred from adjusting status to that of a lawful permanent resident under INA 245. *See* INA secs. 245(c)(2) and (8), 8 U.S.C. 1255(c)(2) and (8).

[178] *See, e.g.,* INA sec. 274A(b)(1), 8 U.S.C. 1324a(b)(1), 8 CFR 274a.2(a)(3).

[179] *See* Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers final rule, 81 FR 82398, 82405 (Jan. 17, 2017) ("To prevent gaps in employment for such individuals and their employers, the final rule provides for the automatic [180-day] extension of EADs (and, where necessary, employment authorization) upon the timely filing of a renewal application.").

[180] *See* section V.B.2, Table 6A., EADs that could lapse in the absence of the TFR, by Class and Percent Variation.

[181] *See* section III.A, Table 1C. of this preamble for more details.

[182] *See* USCIS, DHS, "Reducing Processing Backlogs," *https://egov.uscis.gov/processing-times/ reducing-processing-backlogs* (last visited Jan. 19, 2024).

To determine how long DHS should provide this temporary increased automatic extension period, DHS assessed the pending and incoming volume of renewal EAD filings against current USCIS resources. As of February 2024, USCIS had approximately 439,000 pending renewal EAD requests in automatic extension-eligible categories, and this is projected to increase for the near future. To achieve USCIS' processing goal of 3 months for EAD renewal applications,[183] USCIS must keep pace with the incoming volume (in other words, complete approximately 57,500 renewal EAD requests in automatic extension-eligible categories per month projected in the 18 month period beginning in May 2024) in addition to reducing the pending volume of renewal requests from 439,000 to 172,500.[184] USCIS anticipates that the decrease in filings for applicants who received an EAD with 5-year validity will provide an opportunity to address existing backlogs and improve processing times. USCIS currently completes approximately 49,100 automatic-extension eligible renewal EAD adjudications per month, averaging 0.23 hours per completion. To reduce the expiration counts to near zero by the end of the TFR period, USCIS would need to increase completions by approximately 4,900 per month, which is about a 10% increase. This means that USCIS would need to devote approximately 162,000 officer hours a year at 15 minutes per case, or achieve an equivalent increase in completions through policy changes, processing enhancements, or other means, in order to keep pace with the incoming flow of new renewal requests and minimize the number of renewal applicants who may lose their employment authorization and/or documentation prior to the approval of their EAD applications. As described in section III.C.3.b of this preamble, USCIS will continue pursuing other means to increase completions and reduce expirations while this TFR is in effect.

Therefore, DHS has concluded that it will authorize a temporary 360-day increase to the automatic 180-day extension period, for a total of 540 days, to individuals who file a renewal EAD application during the 540-day period following publication of this rule. DHS

will also grant the additional 360-day increase to the automatic extension period to those with pending renewal applications that were filed after the expiration of TFR 2022, that is, on or after October 27, 2023. Applicants who file an EAD renewal application after this filing timeframe and who are eligible for an automatic extension of their employment authorization and/or EADs will receive the 180-day automatic extension currently provided at 8 CFR 274a.13(d)(1).

This TFR applies to two groups of applicants. First, the rule applies to those renewal applicants eligible for the automatic extension who have filed their renewal EAD applications on or after October 27, 2023,[185] which remain pending as of the date this rule goes into effect, [INSERT DATE OF PUBLICATION IN THE **FEDERAL REGISTER**], and whose EAD has not expired or whose current up to 180-day auto-extension has not yet lapsed, since this group is at imminent or near-term risk of experiencing a gap in employment authorization and/or documentation.[186] Second, the rule applies to new renewal applicants who file their EAD applications during the 18-month period following the rule's effective date to avoid a future gap in employment authorization and/or documentation.[187] However, in recognition of Congress' clear intent in the INA to prohibit and provide penalties for unauthorized employment, including the accountability of employers that employ noncitizens who are not authorized to work in the United States,[188] this TFR does not address periods of unauthorized employment. In other words, this rule does not cure any unauthorized employment that may have accrued prior to issuance of the rule.

In addition, DHS has determined that the temporary amendment made by this rule should remain in the Code of

Federal Regulations (CFR) for an amount of time sufficient to cover the approximately 18-month period during which the up to 540-day automatic extension will be authorized, plus an additional 720 days, so that the regulatory provision remains in the CFR for the entire time that applicants may be relying on this temporary increase to the regular automatic extension period.[189] As such, this TFR will take effect on April 8, 2024, and will be removed from the CFR on September 20, 2027, that is, approximately 3 years and 6 months (or 1,260 days) after the rule takes effect, although no new beneficiaries will receive a 540-day automatic extension after September 30, 2025. Further, as is consistent with current guidance, applicants should file a renewal EAD application no earlier than 180 days prior to the expiration date of their EAD.

b. Improve Future Processing Times and Reduce Filing Volume

DHS also considered other factors that may further help to reduce the renewal EAD application processing times, including the potential for additional officers based on a potential increase in filing fee revenue while this TFR is in effect, as well as processing efficiencies through streamlining certain steps in the processing of renewal EAD applications and the policy changes described above. Based on the available data on the pending and incoming volume of renewal EAD filings, and taking into consideration future variables, such as increased adjudicative staff and filing fees, USCIS expects to improve its processing times over the coming years.

Additionally, the automatic extensions provided in this TFR will extend through the period in which USCIS expects to see a decrease in filings due to the policy change to provide 5-year validity to certain categories of EADs. This window of decreased receipts should provide USCIS the opportunity to significantly decrease backlogs. Based on the conditions in place at the beginning of FY 2024, USCIS projects that the implementation of the 5-year-maximum EAD policy will result in a significant drop in EAD renewal applicants as of September 27, 2025. The largest volume of EAD categories are C08s, C09s, and

---

[183] See USCIS, DHS, "Reducing Processing Backlogs," https://egov.uscis.gov/processing-times/reducing-processing-backlogs (last visited Jan. 19, 2024).

[184] USCIS estimates that 172,500 pending requests translates roughly to a 3-month processing time, depending on monthly EAD renewal application receipts and the number of officer hours devoted to processing renewal receipts.

[185] Individuals who have filed their renewal EAD application on or before October 26, 2023.

[186] An individual who filed a renewal EAD application on or after October 27, 2023, but whose application was denied prior to the publication date of this rule, no longer has a pending application and therefore will not receive the additional automatic extension.

[187] Providing a set amount of additional automatic extension time for a set period is the least administratively burdensome approach, allowing the agency to focus its limited resources on addressing the lengthy processing times themselves. Additionally, DHS anticipates that this approach is the least burdensome for the public, including employees and employers, since the temporary solution is clear, can be relied upon, can be planned for, and otherwise operates in the same way as the existing automatic extension described in 8 CFR 274a.13(d)(1) and the 2022 TFR.

[188] See generally INA sec. 274A, 8 U.S.C. 1324a.

[189] 720 days is the amount of time needed to cover the up to 540-day automatic extension for all EAD renewal applicants eligible for the automatic extension, including those who timely filed an EAD renewal application on or before September 30, 2025 but whose EAD expires within 180 days after September 30, 2025. Such applicants could be eligible for the up to 540-day automatic extension, beginning on the day their EAD expires.

**Federal Register** / Vol. 89, No. 68 / Monday, April 8, 2024 / Rules and Regulations **24647**

C10s, which have generally been issued 5-year EADs starting on September 27, 2023.[190] This means that EADs in these categories issued on or after September 27, 2023, will not be facially expiring until on or after September 26, 2028. Thus, DHS projects, as of the beginning of FY 2024 that there will be very few EAD renewal applicants in these categories after September 27, 2025 (just before the beginning of FY 2026), until early FY 2028. DHS expects that, by the close of the filing timeframe outlined in this temporary final rule, the usual 180-day automatic extension period will be sufficient.

In addition, the 540-day filing period will ensure that eligible EAD renewal applicants who timely file a renewal application will have a near term solution and will not experience a lapse in employment authorization and/or documentation starting in May 2024, while USCIS continues to pursue a long-term solution by soliciting public input and fully assessing the effects of policy and operational changes described in this preamble.

### 4. EAD Renewal Applicants at Risk of Experiencing a Gap in Employment Authorization or EAD Validity Under This TFR

The data projection in the Regulatory Impact Analysis ("RIA") indicates that even with the 540-day automatic extension provided in this TFR, approximately 260,000 EAD renewal applicants are potentially at risk of experiencing a gap in employment authorization or proof of employment authorization.[191] That is, at the baseline and assuming that no operational or other policy changes are implemented, of the projected 689,000 (lower bound estimate) to 824,000 (upper bound estimates) [192] of renewal applicants who receive a temporary up to 540-day automatic extension period, about 260,000 renewal EAD applicants could still lapse between November 2025 and April 2027.[193] However, this projection is based on data from the beginning of

FY 2024 and the conditions in place at that specific time. Because of several variables, these data projections cannot fully take into account the complete effect of operational and policy changes described above, combined with any future changes and operational shifts (such as hiring additional officers or additional technological changes and operational shifts that improve processing efficiency) that USCIS plans to undertake to reduce EAD processing times.[194] This TFR will provide USCIS with more time to evaluate the effects of the operational changes already implemented [195] and consider and implement additional operational, policy, and technological changes that may further improve the overall efficiency of USCIS adjudications. Based on current projections, this TFR also will ensure that, during the 540 days following publication of this TFR, none of the affected applicants are expected to experience a gap in employment authorization and/or EAD validity because of USCIS processing delays. This TFR will therefore address the associated harmful effects that gaps in employment authorization and/or documentation will have for applicants, their families, their employers, and the economy during that time.

As part of the development of this rule, DHS considered whether the temporary automatic extension period in the new 8 CFR 274a.13(d)(6) should be increased to at least up to 730 days (rather than up to 540 days). Based on the baseline data projections, DHS believes that increasing the automatic extension period to at least up to 730 days could ensure that a large part of the approximately 260,000 renewal EAD

applicants who are currently predicted to experience a gap in employment authorization and/or documentation under the 540-day automatic extension period would not experience any gaps.

However, although DHS understands that granting an automatic extension of 540-days might not fully resolve the problem, DHS has determined to focus on near-term needs of applicants, their families, and employers by ensuring that, through this TFR, none of them will imminently or in the near-term experience the harmful effects that gaps in employment authorization and/or documentation could create. At the same time, the rule provides DHS with an additional window during which it can consider long-term solutions by soliciting public comments, evaluating the effects of ongoing policy and operational changes described in this preamble, and continuing to identify new strategies and efficiencies in the future.

Creating a near-term solution with a 540-day extension period is furthermore appropriate because longer extension periods would create additional complexities for employers. For example, TPS designations and associated EAD benefits cannot be granted for longer than 18 months (which is approximately 540 days).[196] If USCIS were to extend the automatic EAD extension period beyond 540 days, it would have to create a separate provision for TPS-based EAD applicants. Having up to 730 days of an automatic extension period for one group of EAD renewal applicants and 540 days for others increases the risk of confusion as employers would be required to understand and adhere to additional different extension periods depending on eligibility category on the EAD the worker possessed and when the EAD renewal application was filed. For example, an employer may have multiple employees who are employment authorized under the C08 category but, depending on when their EAD renewal application was filed, those employees may have different amounts of time for which their employment authorization and EAD are automatically extended. Even though they all have employment authorization under C08, those employees who filed an EAD renewal application before October 27, 2023, would have an automatic extension up to 540 days, whereas those who filed on or after October 27, 2023, would have an automatic extension up to 730 days. These variables increase the risk that an

---

[190] In general, USCIS issued EADs for 2 years in these categories prior to September 27, 2023.

[191] *See* V.B.2. Table 6 detailing how variation in the inputs used to the model a baseline affect the range of results of the rule's estimated impacts in the RIA.

[192] *See* V.B.2. Table 6 and Table 7.

[193] DHS predicts that, based on the high level of C08 filings who received a 2-year validity EAD prior to the policy change implementing a 5-year policy, USCIS will experience a spike in renewal EAD processing times starting around August 2024 and lasting through October 2025 because of a large amount of C08 renewal filings. As a result of this spike in processing times, USCIS projects that approximately 260,000 renewal EAD applicants could lapse between November 2025 and April 2027 if there is no change to current conditions.

[194] Although these data projections cannot fully take into account the complete effect of possible operational and policy changes, USCIS does include a sensitivity analysis that considers a change in officer output by +/− 10 percent and +/− 15 percent. All other variables remain constant. See Tables 6A and 6B.

[195] For example, as explained in section III.B.1. of this preamble, USCIS expects that the new 5-year EAD practice implemented in September 2023 will cause certain EAD renewal filings in the applicable categories to significantly decrease starting in October 2025 and to remain low until the third quarter of FY 2028. There should be very few EADs in the categories covered by the 5-year EAD policy with a validity expiration date between September 25, 2025, and September 26, 2028. Although the main effects of the 5-year EAD policy change will not occur until October 2025, USCIS projects that the increased validity periods will lead to a 60 percent reduction in volumes, on average, and possibly greater for categories who historically file only one EAD renewal to maintain employment authorization during the pendency of their primary immigration benefit. After October 2025, USCIS, as well as applicants filing for renewal of their EADs, will benefit from the long-term effects of this policy change as the reduced filing volumes should allow USCIS to reduce EAD renewal processing times.

[196] *See* INA secs. 244(a)(2), (b)(2), (d), 8 U.S.C. 1254a(a)(2), (b)(2), (d); 8 CFR 244.12.

employer may make a mistake when verifying employment authorization or determining when reverification needs to occur. Because employers may face civil money penalties if they do not properly maintain employment eligibility verification paperwork or employ a noncitizen without employment authorization,[197] the risk of a mistake stemming from different automatic extension periods is not insignificant.

In addition, DHS currently assesses that it is premature to grant an automatic extension for up to 730 days (or approximately 2 years), in part because the longer the period of time before an employer has to reverify a noncitizen employee whose employment authorization is automatically extended, the greater the risk they could unknowingly employ someone whose employment authorization has ended.[198]

Additionally, both employers and applicants are already familiar either with the normal 180-day extension or the 540-day extension under the 2022 TFR. The 540-day extension provided under the 2022 TFR continues to be effective for some applicants until October 15, 2025, and having other validity periods in this 2024 TFR may be confusing to applicants, employers, and the public at large. For these reasons, and because employers would assess the applicability of the auto-extension based in part on a non-secure document (such as the Form I–797C, Notice of Action), at this time DHS prefers shorter validity periods for temporary, non-secure documents.

Also, operationally, while managing 540- and 730-day extensions might be feasible and could mitigate harms projected after October 2025, the additional complexity, for both USCIS and employers, of administering different automatic extension durations could delay issuing or implementing this TFR to address imminent lapses in employment authorization and EAD validity.

DHS also believes that the automatic extension period of 540 days is appropriate in scope because of the uncertainties in data projections. As described above, USCIS' current projections are based on factors as they exist as of the beginning of FY 2024 and the conditions in place at that specific time. USCIS' projections become less certain further into the future because

those existing factors will be impacted as changes and operational shifts arise. For example, over the course of the coming months, processing times may improve based on the policy and operational changes described throughout this preamble and by gaining additional adjudicative efficiencies and technological changes. As a result, the projection that approximately 260,000 renewal EAD applicants might experience a lapse in employment starting in October 2025 may exceed the actual number. On the other hand, there are also unpredictable variables that are out of USCIS's control, such as the events that resulted in the need for this very rulemaking. Thus, because of these uncertainties, DHS believes it to be appropriate to address the imminent and near-term needs of applicants and their U.S. employers by implementing an up to 540-day automatic extension period for eligible EAD renewal applications properly filed during the 540 days after this TFR is published, and to create a longer-term solution after soliciting additional input and having had the opportunity to fully assess the effects of USCIS policy and operational changes described in this preamble.

Finally, DHS notes that providing a 730-day *filing period* (*i.e.,* the period of time, following publication of this rule, during which the timely filing of an EAD renewal application results in an up to 540-day automatic extension), would not assist those 260,327 EAD renewal applicants who could still experience a lapse in their EAD validity. This is because the cause of the remaining 260,000 at-risk renewal EAD applicants under this TFR is primarily the number of 2-year initial asylum application EADs (C08) issued in mid-to late-FY 2023, when USCIS substantially increased its production to comply with the 30-day processing time requirement imposed by the *Rosario* court order.[199] Based on current data predictions, and if staffing levels and adjudicative efficiencies remain unchanged, renewal of these initial C08 EADs will be pending longer than the 540-day automatic extension period. Thus, extending the filing period to 730 days would not assist these applicants and would not have an impact because they will already have timely-filed and pending EAD renewal applications. If their applications are approved, they generally will be granted a 5-year EAD and/or employment authorization.

For these reasons, DHS believes an up to 540-day automatic extension period

and a 540-day automatic extension filing period are appropriate as they are narrowly tailored to serve the imminent short-term need of eligible EAD renewal applicants and their U.S. employers. These periods also allow DHS to consider longer-term solutions following receipt of additional input and assess the effect of ongoing and future policy and operational changes. If DHS determines that future regulatory action would be warranted, DHS may issue another rule. DHS welcomes public comment that would inform any potential future regulatory actions on this subject, including whether to permanently extend the automatic extension period to 540 days, or whether a different permanent extension period should be implemented, for some or all applicants covered by the automatic extension provision on either a temporary or permanent basis.

*D. Severability*

In issuing this TFR, it is DHS's intention that the rule's various provisions be considered severable from one another to the greatest extent possible. For instance, if a court of competent jurisdiction were to hold that the automatic extension may not be applied to a particular category of renewal EAD applicants or in a particular circumstance, DHS would intend for the court to leave the remainder of the rule in place with respect to all other covered persons and circumstances. DHS's overarching goal is to avoid widescale lapses in employment authorization and EAD validity that would result in substantial and unnecessary harm to noncitizens who timely filed for extensions of employment authorization, their families, their employers, and the public at large.

**IV. Temporary Regulatory Change: 8 CFR 274a.13(d)(5) and 8 CFR 274a.13(d)(6)**

*A. Adding New 8 CFR 274a.13(d)(6)*

With this TFR, DHS is amending 8 CFR 274a.13(d) to add a new paragraph (6) that will be in effect temporarily until September 20, 2027. Under the new paragraph, DHS is increasing the automatic extension period for employment authorization and/or EAD validity of up to 180 days (described in 8 CFR 274a.13(d)(1)) to a period of up to 540 days for renewal applicants eligible to receive an automatic extension who properly file a renewal EAD application on or after October 27, 2023, and on or before September 30, 2025 and whose application is pending

---

[197] *See* INA sec. 274A(e)(5), 8 U.S.C. 1324a(e)(5).

[198] EAD renewal applications are filed by the noncitizen, so employers do not know when or if the application is approved. Employers usually must rely on the employee to provide the information.

[199] *See Rosario* v. *USCIS,* 365 F.Supp.3d 1156 (W.D. Wash. 2018).

during the 18-month [200] period beginning April 8, 2024, and ending September 30, 2025. Automatic extensions of employment authorization and/or EAD validity will revert to the up to 180-day period for those eligible applicants who timely file renewal EAD applications after September 30, 2025. The increased automatic extension period will apply to eligible renewal applicants who timely file their EAD applications on or before the last day of the 18-month period.

Similar to the 180-day automatic extension period provided by 8 CFR 274a.13(d)(1), the increased automatic extension period of up to 540 days established by this TFR generally will automatically terminate the earlier of up to 540 days after the expiration date of the EAD, or upon issuance of notification of a denial on the renewal EAD request even if this date is after September 30, 2025.

Moreover, 8 CFR 274a.13(d)(6) will remain in the CFR for an additional 720 days after this 540-day period, until September 20, 2027, to ensure that renewal applicants who are already within their up to 540-day automatic extension period as of September 30, 2025, will not get cut off from any remaining employment authorization and/or EAD validity that is over 180 days (the normal automatic extension period under 8 CFR 274a.13(d)(1) but instead will be able to take full advantage of the 540-day period.

Similar to 8 CFR 274a.13(d)(4), this TFR provides that an EAD that appears on its face to be expired ("facially expired") is considered unexpired under this rule for up to 540 days from the expiration date on the front of the EAD when combined with a Notice of Action (Form I–797C) indicating timely filing of the renewal EAD application and the same employment eligibility category as stated on the facially expired EAD (or in the case of an EAD and I–797C notice that each contains either an A12 or C19 TPS category code, the category codes need not match).[201] While the current provision at 8 CFR 274a.13(d)(4), and, likewise, the provision in this TFR, do not require

that the qualifying Notices of Action specify the automatic extension period, in practice, USCIS issues a Form I–797C Notice of Action to all renewal applicants with general information regarding who is eligible for an automatic extension and currently includes an explanation of the up to 180-day automatic extension period. On and after April 8, 2024, USCIS plans to issue Form I–797C Notices of Action with an explanation of the up to 540-day automatic extension period. USCIS does not plan to issue updated Form I–797C notices to eligible applicants who filed their renewal EAD application before April 8, 2024. However, even Form I–797C notices for an EAD application filed after October 26, 2023, that refer to a 180-day automatic extension still meet the regulatory requirements. Therefore, individuals in the categories covered by this rule who are issued Form I–797C notices with a Received Date of October 27, 2023, through the day preceding April 8, 2024 that refer to a 180-day automatic extension, along with their qualifying EADs, still receive the extension of up to 540 days from the date on the face of the EAD under this rule. USCIS will update the web page on the USCIS website that is referenced in the current Form I–797C receipt notice to reflect the change in the automatic extension period. The public should refer to this web page when determining whether a Form I–797C Notice of Action, if presented with the facially expired EAD, is acceptable to show that the EAD validity is extended. Employers completing Form I–9 may attach a copy of the web page with the employee's Form I–9 to document the extension of employment authorization and/or EAD validity. USCIS will also update I–9 Central on the USCIS website to provide employees and employers with specific guidance on Form I–9 completion, including any required notations indicating the above-described extension of employment authorization and/or EAD validity, in such cases. The automatic extension established by this rule applies to EADs as such; therefore, if another agency accepts unexpired EADs for any purpose (such as establishing identity or, in some situations, immigration status), then the agency should generally accept the EADs that are automatically extended under this rule. This applies to benefit granting agencies that are registered to use the SAVE [202] program to verify

immigration status, because SAVE can verify a benefit applicant's immigration status using an automatically extended EAD.

This rule does not modify the current reverification requirements an employer must follow for Form I–9 at 8 CFR 274a.2(b)(1)(vii) that apply to automatic extensions, except that this rule temporarily extends the automatic extension period in 8 CFR 274a.13(d) from up to 180 days to up to 540 days. Therefore, to complete Form I–9 for new employment, the employee and employer should use the extended expiration date to complete Sections 1 and 2 of the Form I–9 and reverify once the automatic extension period expires.[203] For current employment, the employer should update the previously completed Form I–9 to reflect the extended expiration date based on the automatic EAD extension while the renewal is pending and reverify once the automatic extension expires.[204]

Under this TFR, just as under existing 8 CFR 274a.13(d)(3), DHS will retain the ability to otherwise terminate any employment authorization or EAD, or extension period for such employment authorization or document, by written notice to the applicant, by notice to a class of noncitizens published in the **Federal Register**, or as provided by statute or regulation, including 8 CFR 274a.14.[205]

### B. Amending 8 CFR 274a.13(d)(5)

To avoid confusion between the automatic extension period granted under 8 CFR 274a.13(d)(5) and period granted under newly added 8 CFR 274a.13(d)(6), DHS is amending existing 8 CFR 274a.13(d)(5) by revising the heading in the paragraph to reflect that the paragraph applies to renewal applications properly filed on or before October 26, 2023.[206]

With this TFR, DHS is not extending or otherwise amending the provisions in

---

[200] For ease of reference, DHS sometimes refers to the approximate period of 18 months. However, the precise number of days is 540.

[201] As it is currently the case with the up-to 180-day automatic extension, if an adjustment of status applicant's (C09) EAD card is combined with the advance parole authorization, *i.e.,* the applicant is issued a combo card (in this case, the EAD card itself has an annotation "SERVES AS I–512 ADVANCE PAROLE"), Similarly, the 540-day automatic extension provided by the 2022 TFR, as well as the up-to 540-day automatic extension provided by this rule, do not apply to the advance parole part of the applicant's combo card.

[202] SAVE is a program administered by USCIS and is used by Federal, state and local benefit granting agencies to verify the immigration status of their benefit applicants in order for the agency to determine eligibility for the benefits they

administer. *See https://www.uscis.gov/save* (last visited Jan.19, 2024).

[203] *See* 8 CFR 274a.2(b)(1)(vii); *see also* USCIS, DHS, "Automatic Extensions Based on a Timely Filed Application to Renew Employment Authorization and/or Employment Authorization Document" *https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/50-automatic-extensions-of-employment-authorization-andor-employment-authorization-documents-eads-in/51-automatic-extensions-based-on-a-timely-filed-application-to-renew-employment-authorization* (last visited Oct. 27, 2023).

[204] *Id.*

[205] Therefore, for example, in situations where the underlying status that provides employment authorization would expire prior to 540 days, USCIS may include specific information on the applicant's Form I–797C receipt notice as to how long the automatic extension of the individual's EAD will last.

[206] *See* 8 CFR 274a.13(d)(5) heading.

8 CFR 274a.13(d)(5). As explained in the 2022 TFR, the filing period for the temporary increase of the automatic extension under 8 CFR 274a.13(d)(5) ended on October 26, 2023, after which the automatic extension period reverted to up to 180 days.[207] The increased automatic extension period under 8 CFR 274a.13(d)(5) was available to eligible renewal applicants who had a timely filed renewal EAD application pending during the 18-month period beginning May 4, 2022, and ending at the end of October 26, 2023, and it remains valid until the individual's up to 540-day automatic extension period expires.[208] However, once an individual's up to 540-day automatic extension period under 8 CFR 274a.13(d)(5) expires, the individual will not receive any additional employment authorization and/or EAD validity under this new TFR, because DHS is not extending the effect of 8 CFR 274a.13(d)(5).

Additionally, the 2022 TFR provided that 8 CFR 274a.13(d)(5) would remain in the CFR for an additional 720 days after October 26, 2023, although the up to 540-day automatic extension period has reverted to up to 180 days for individuals who filed a renewal application after October 26, 2023.[209] Therefore, 8 CFR 274a.13(d)(5) will remain in the CFR until October 15, 2025. The 2022 TFR explained that retaining the paragraph until October 15, 2025, will ensure that applicants who are within their up to 540-day automatic extension period on or after October 26, 2023, will not lose any remaining employment authorization and/or EAD validity that is over 180 days (the normal automatic extension period under 8 CFR 274a.13(d)(1)), but will be able to take full advantage of the up to 540-day period.[210]

Having both paragraphs 8 CFR 274a.13(d)(5) and 8 CFR 274a.13(d)(6) may result in the confusion of employers, applicants, and the public in general. Thus, to avoid confusion, DHS is amending 8 CFR 274a.13(d)(5) by revising its heading to clearly state that 8 CFR 274a.13(d)(5) only applies to renewal applications properly filed on or before October 26, 2023.

## V. Regulatory Requirements

### A. Administrative Procedure Act

This rule is informed and supported by comments on the 2022 TFR, which as noted above suggested making the TFR permanent. In addition, DHS is issuing this rule without a separate proposed rule describing the present emergency, or a delayed effective date. DHS therefore invokes the "good cause" and other exceptions in the APA. 5 U.S.C. 553(b)(B) and (d)(3); *see also* 5 U.S.C. 553(b)(1) (exception for delayed effective dates for substantive rules that grant or recognize an exemption or relieve a restriction).[211]

### 1. Requirements for Establishing Good Cause

An agency may forgo notice-and-comment rulemaking and a delayed effective date when the agency "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B); *see also* 5 U.S.C. 553(d)(3). The "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations, or where delay could result in serious harm." [212] Although the good cause exception is "narrowly construed and only reluctantly countenanced," [213] "it is an important safety valve to be used where delay caused by notice and comment would do real harm." [214] An agency may find that advance notice and comment or a delayed effective date is "impracticable" when undertaking such procedures would impede due and timely execution of important agency functions.[215] For example, a finding of

impracticability may be appropriate when an investigation shows that a new rule must be put in place immediately to avert a serious safety risk to the public.[216] Courts have held that a determination of impracticability "is inevitably fact-or context-dependent," [217] and have acknowledged that the need to avert an imminent "fiscal calamity could conceivably justify bypassing the notice-and-comment requirement," if, for instance, the agency's finding is supported by an adequate record and reflects consideration of alternatives to bypassing notice-and-comment procedures.[218] In determining whether to invoke the exception under 5 U.S.C. 553(d)(3) some courts call for the agency "to balance the necessity for immediate implementation against the principles of fundamental fairness which requires that all affected persons be afforded a

---

[207] *See* 87 FR 26614, 26631 (May 4, 2022).

[208] For example, if the applicant properly and timely filed the EAD renewal application on October 26, 2023, the applicant's employment authorization and/or EAD validity lasts up to 540 days from the date of expiration printed on the applicant's employment authorization and/or EAD, or upon issuance of notification of a denial on the renewal EAD request.

[209] *See* 87 FR 26614, 26631.

[210] *See id.*

[211] Separate from the APA's 30-day delayed-effective-date requirements, 5 U.S.C. 553(d), the Congressional Review Act imposes a 60-day delayed-effective-date requirement for rules identified at 5 U.S.C. 804(2), *see* 5 U.S.C. 801(a)(3). Under both the APA and the Congressional Review Act, however, the agency is exempt from the delayed effective date requirements of both acts if the agency provides good cause, as it does in this rulemaking. *See* 5 U.S.C. 553(d)(3) and 808(2).

[212] *Jifry* v. *FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004).

[213] *State of New Jersey* v. *EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *see also Am. Fed. Gov't Emps.* v. *Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("As the legislative history of the APA makes clear, moreover, the exceptions at issue here are not 'escape clauses' that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations. . .").

[214] *U.S.* v. *Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010).

[215] *See Util. Solid Waste Activities Group* v. *EPA*, 236 F.3d 749, 754–55 (D.C. Cir. 2001) ("With respect to the 'impracticable' ground, the Attorney General's Manual explains "that a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded

by the notice otherwise required in [§ 553]. . .") (quoting United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30–31 (1947)).

[216] *See Util. Solid Waste Activities Grp.* v. *EPA*, 236 F.3d 749, 754–55 (D.C. Cir. 2001) (citing the Attorney General's Manual on the APA (1947).).

[217] *Mid-Tex Elec. Co-op, Inc.* v. *FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987); *Petry* v. *Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984) ("But it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances. . ."). Courts have explained that notice-and-comment rulemaking may be impracticable where, for instance, air travel security agencies would be unable to address threats posing "a possible imminent hazard to aircraft, persons, and property within the United States," *Jifry*, 370 F.3d at 1179; if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* 236 F.3d at 755 (ultimately finding that not to be the case and rejecting the agency's argument); or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of the Southern Mountains, Inc.* v. *Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).

[218] *See Sorenson Comms., Inc.* v. *FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014); *Mack Trucks, Inc.* v. *EPA*, 682 F.3d 87, 93–94 (D.C. Cir. 2012) (acknowledging that good cause may be found when "an entire industry and its customers were imperiled," in contrast to a situation where the agency seeks to rescue certain third parties from the consequences of their own business choices); *Mid-Tex Elec. Co-op, Inc.*, 822 F.2d at 1132 (upholding a good cause finding where the agency sought to avert "irremedial [sic] financial consequences and regulatory confusion"); *Am. Fed'n of Govt. Emp., AFL–CIO* v. *Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (concluding that the agency's good cause finding was a reasonable response to avoid economic harm to certain poultry processors and likely shortages and increases in consumer prices); *N. Am. Coal Corp.* v. *Director, Off. Of Workers' Comp. Prog., DOL*, 854 F.2d 386, 389 (10th Cir. 1988) (concluding that "the loss or delay of medical benefits to many eligible coal miners was a real harm and the extension of the filing deadline operated as a safety valve to prevent this harm."); *Nat'l Venture Capital Ass'n* v. *Duke*, 291 F. Supp. 3d 5, 18 (D.D.C. 2017) (reasoning that fiscal injury to an agency may be less likely to support a good cause finding than fiscal injury to third parties).

reasonable time to prepare for the effective date of its ruling." [219]

DHS believes that engaging in the APA's notice and comment requirement under 5 U.S.C. 553(b) in this situation would impede due execution of USCIS' mission and result in real and serious harm to the public. As outlined in this preamble, unless DHS takes this action immediately, USCIS' lengthy processing times for renewal EAD applications will result in hundreds of thousands of renewal EAD applicants experiencing gaps in employment authorization and/ or EAD validity, leading to adverse impacts on the applicants, their families, their employers, and their communities. The grave situation that these third parties face is not the result of their own actions and is beyond their control. Rather, the present situation is the result of several circumstances that affected USCIS operations, resulting in significant increases to USCIS processing times for several categories of renewal EAD applications since the publication of the 2022 TFR.

DHS believes, as supported by the comments received on the 2022 TFR,[220] that this regulation will allow USCIS to immediately avert the dire impact the circumstances create for affected renewal EAD applicants, their families, and their employers. Accordingly, DHS believes that bypassing the ordinary notice and comment procedure and the delayed effected date requirement is justified in the totality of the circumstances and is consistent with USCIS' statutory mission to take regulatory action to administer employment authorization benefits effectively,[221] and is necessary to achieve the purpose of 8 CFR 274a.13(d).

### 2. The EAD Processing Backlog Has Grown Despite USCIS' Best Efforts

In the middle of FY 2023, EAD application filings began to increase substantially. USCIS ultimately received a record-breaking total of approximately 3.49 million initial and renewal EAD applications in FY 2023, which is up from approximately 2.33 million EAD filings in FY 2022 (October 2021 through September 2022), a 50-percent increase of approximately 1.2 million EAD initial and renewal filings. Of these, approximately 1.12 million renewal EAD applications were filed in FY 2023, which was 13 percent higher than the volume received in FY 2022 (approximately 990,000 applications). Thus, the historic 1 million application increase in initial and renewal filings, compounded by the lack of fee increase, the adjudicative demands of USCIS' responses to global humanitarian crises, and other increases in immigration benefit filings, has created an unsurmountable operational strain. This strain significantly impacts USCIS' ability to keep pace with the growing numbers of applications.

As explained in detail elsewhere in this preamble, the effects of USCIS' previous and current financial strains have unfortunately continued through FY 2022 and FY 2023. In particular, the preliminary injunction of the 2020 Fee Rule has resulted in USCIS operating with insufficient reserves to increase staffing commensurate with increased filing rates. If USCIS operates under these conditions, it significantly hampers USCIS' agility when reacting to spikes in filings.[222] Thus, although USCIS increased its workforce in FY 2023, substantially increased the number of officer hours spent adjudicating EAD applications,[223] and took numerous steps to improve adjudicatory efficiency,[224] it has been unable to sufficiently reduce renewal EAD processing times. The problem has been compounded by a litigation outcome that requires USCIS to reimplement the 30-day processing timeline for initial C08 EADs.[225] The operational burden on USCIS resulting from complying with court orders and reimplementing the 30-day processing timeline was further strained by the recent surge in initial C08 EAD applications: In FY 2023 (October 2022 through September 2023) there were approximately 800,000 initial C08 EAD applications, which is an increase of approximately 200 percent over the approximately 266,000 initial C08 EAD applications filed in FY 2022. Because adjudicative capacity to date has been unable to keep up with the increased rate of filings, in order to comply with the *Rosario* court order and the required 30-day processing timeline, USCIS had to prioritize initial C08 EAD applications over other applications, including renewal EAD applications, which has negatively affected renewal EAD processing times overall.[226]

As explained earlier in the preamble, EAD application processing times and the number of pending EAD applications have not sufficiently improved, despite multiple operational and sub-regulatory efforts that USCIS has been implementing. Despite USCIS' best efforts at backlog reduction, ongoing and dynamic circumstances, which are outside of USCIS' control, have prevented USCIS from keeping up with the adjudicatory workload.

During FY 2024, USCIS has continued to closely monitor the automatic extension-eligible renewal EAD caseloads and processing times.[227] These improvements have not yet provided the desired reduction in pending EAD applications. For example, Table 2 shows that the volume of pending EAD applications has not materially improved in FY 2024.[228] The total number of pending EAD applications at the end of February of 2024 is approximately 1.40 million applications, which continues to pose a challenge for USCIS and also impacts processing times for renewal EAD applications eligible for automatic extensions because of the limited amount of USCIS resources that can be allocated to those case types. The total number of pending auto-extension EAD renewal applications at the end of February 2024 was approximately 439,000. While some progress has been made in addressing the backlog, the progress has not yet achieved sufficient gains to reduce EAD renewal processing times and avoid imminent and near-term lapses in employment authorization for EAD renewal applicants.

---

[219] *N. Arapahoe Tribe* v. *Hodel,* 808 F.2d 741, 752 (10th Cir. 1987) (finding that the agency's reliance on the good cause exception under 5 U.S.C. 553(b) and (d)(3) to be proper given the immediate urgency that warranted the imposition of the regulations as an interim action). Note that the requirements of § 553(d)(3) do not apply in the case of an action covered by section 553(d)(1), *i.e.,* a rule which grants or recognizes an exemption or relieves a restriction. This is one such rule.

[220] *See* section II.C.2 of this preamble.

[221] *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, sec. 101(b)(1)(F), codified as 6 U.S.C. 111(b)(1)(F). USCIS, as a component of DHS, should exercise its function in a manner that ensures that the overall economic security of the United States is not diminished by efforts, activities and programs aimed at securing the homeland.

[222] *See* "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements," 88 FR 402, 529 (Jan. 4, 2023) (stating that processing times increase, and the case processing backlog grows when USCIS does not have sufficient resources to meet its goals).

[223] *See* section III.A.2. of this preamble (as compared to FY 2021).

[224] *See* section III.B. of this preamble.

[225] *See Asylumworks* v. *Mayorkas,* 590 F. Supp. 3d 11 (D.D.C. 2022).

[226] *See* section III.A.2.a, Operational Challenges Associated with Initial EAD Application Filings by Pending Asylum Applicants (C08).

[227] *See* Sections III.A.2 and B.

[228] *See* Section III.A.1. Table 2. Pending EAD Applications by Month.

**3. Advance Notice and Comment Are Impracticable Due to Imminent Risk of Severe Harm to Third Parties**

Processing times [229] for renewal EADs that are eligible for the up-to 180-day automatic extension were 14.5 months as of February 2024.[230] It is not operationally feasible, particularly because of demands on USCIS to comply with court orders and the 30-day timeline for adjudication of initial C08 EAD applications, for USCIS to redirect any portion of its resources currently dedicated to adjudicating initial EAD applications to handle the adjudication of renewal EAD applications. Consequently, the lengthy processing times, which exceed the up to 180-day automatic extension available under the current rule, will lead to significant gaps in employment authorization and/or employment authorization documentation for those who complied with all requirements to timely file a renewal EAD application so as not to experience such gaps.

Because this result would substantially harm applicants, their families and their employers, DHS believes there is urgent need to act via this rule to mitigate the risk of a significant lapse in employment authorization for a majority of eligible applicants. DHS anticipates that, without this action, as soon as May 2024, the 180-day extension of employment authorization and/or EADs of approximately 3,000 renewal applicants will expire.[231] After May 2024, the number of renewal applicants expected to experience gaps in employment authorization and/or EAD validity each month will rapidly increase to up to 12,000 (upper bound estimate) per month by July 2024, to up to 45,000 (upper bound estimate) by April 2025 and up to 64,000 (upper bound estimate) per month by November 2025.[232] Thus, in the absence of this action, DHS anticipates that over the time period of May 2024 to March 2026,[233] between 689,000 (lower bound estimate) to 824,000 (upper bound estimate) renewal EAD applicants would be at risk of losing their employment authorization and/or valid

documentation [234] and, consequently, experiencing job loss, while waiting for USCIS to process their renewal EAD applications.[235]

Of the approximately 3,000 renewal applicants projected to face this situation in May 2024, the majority [236] are asylum applicants (C08 category), a particularly vulnerable population. Continuous employment authorization during the pendency of an asylum application is vital for asylum seekers in the United States, given their particularly vulnerable position. Therefore, this group of renewal applicants needs urgent action via this rulemaking so these applicants can continue to have employment authorization and/or EAD validity and continue to make a living to sustain themselves and their families.

Considering the total population potentially impacted by this rule, DHS estimates that, with the implementation of this rule, approximately $60.1 billion (for the upper bound population estimate using a 2-percent discount rate) in labor income for affected renewal applicants would be preserved from FY 2024 through FY 2028.[237] This also translates to potential preserved employment taxes of approximately $6.3 billion (for the upper bound population estimate using a 2-percent discount rate) [238] that benefit government entities and that would be forgone if these individuals were to lose their employment due to the potential lapses in employment authorization simply on account of processing delays.

Any delay in action to provide an advance opportunity for notice and comment, therefore, would risk severe harm and unnecessary burdens on

applicants, their families, employers, and communities. DHS believes, based on the success of the 2022 TFR, that the immediate implementation of this rulemaking will serve the short-term needs of applicants, their families and employers as it will significantly reduce the potential for additional gaps in employment authorization and/or EAD validity, job loss, and financial uncertainty for renewal EAD applicants and their families.[239] At the same time, the rule provides DHS with an additional window during which it can consider long-term solutions by soliciting public comments and evaluating the effects of the ongoing policy changes described throughout this preamble and future policy and operational changes that will enable USCIS to reach its target processing time of 3 months.

As it relates to employers, DHS notes that as of the beginning of the calendar year 2024, employers continue to face a variety of challenges, including more job openings than available workers.[240] To ensure continuity of operations, businesses and entities may have made decisions (for example, entering into contracts, applying for grants, signing leases, or commencing development of product lines) in reliance on the expectation that their affected employees would receive timely renewals of employment authorization and documentation. Thus, this rule prevents adverse impacts on businesses and individuals resulting from the uncertainty associated with widescale lapses in employment authorization.[241]

DHS's analysis suggests that, if this rule is not implemented immediately, approximately 63,000 to 82,000 employers may be negatively affected.[242] DHS further estimates that these businesses and organizations employing affected EAD holders would incur approximately $17.4 billion in labor turnover costs (for the upper bound population estimate using a 2-percent discount rate) for the separation and replacement of these employees.[243]

[229] Processing times are based on the 80th percentile of those approved or denied.

[230] See section III.A.3., Additional Designations for Temporary Protected Status.

[231] See section V.B.2. Table 7. TFR Future Population Projections by Month, Rounded to Thousands.

[232] See section V.B.2. Table 7. TFR Future Population Projections by Month, Rounded to Thousands.

[233] See section V.B.2. Table 7. TFR Future Population Projections by Month, Rounded to Thousands.

[234] See section V.B.2. Table 6A. EADs that could lapse in the absence of the TFR, by Class and Percent Variation. As explained in the preamble, certain applicants within the affected population, including those who are employment authorized incident to status or non-working adults and children, may not necessarily lose their employment authorization after the 180-day automatic extension period is exhausted, but their EADs become invalid so that they can no longer use them for other purposes, such as an identification document or as proof for receiving State or local public benefits to the extent eligible, in addition to not having proof of employment authorization for Form I–9 purposes.

[235] See DHS's analysis outlined in the preamble at section V.B., Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review), regarding the affected population.

[236] See section V.B.2. Table 6A. EADs that could lapse in the absence of the TFR, by Class and Percent Variation.

[237] Labor earnings includes wages and salaries as well as benefits (e.g., paid leave, supplemental pay, insurance).

[238] See section V.B.3.c. Table 13, Monetized Expected Value Impacts for the TFR ($ millions, 2022).

[239] See section V.B.2. Table 7, TFR Future Population Projections by Month, Rounded to Thousands, Column "With TFR," showing that the effect of this TFR.

[240] Bureau of Labor Statistics data show that, as of December 2023, there were 0.7 unemployed persons per job opening. U.S. Department of Labor, U.S. Bureau of Labor Statistics, "Number of unemployed persons per job opening, seasonally adjusted," https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm (last visited Feb. 6, 2024).

[241] See section V.B. Introduction, Table 5. OMB A–4 Accounting Statement ($ millions, 2022).

[242] See section V.B.1. Table 3. Summary of Impacts (2022 dollars, FY 2024–FY 2028).

[243] See section V.B.3.c. Table 13. Monetized Expected Value Impacts for the TFR ($ millions,

Thus, this rule would avoid significant costs to employers that employers would otherwise experience through no fault of their own.[244]

With this TFR, DHS seeks to reduce the likelihood that additional businesses and entities may be adversely impacted by terminating employees whose employment authorization or documentation expires due to USCIS processing delays. However, the longer this rule is delayed, the greater these potential costs to employers will be. The resulting costs and disruptions in business continuity that employers will experience are the same harm that 8 CFR 274a.13(d) and this rulemaking seek to prevent. As outlined elsewhere in this preamble, in its 2016 rule proposing the up to 180-day automatic extension of employment authorization, DHS explained that the purpose of the provision is to mitigate the risk of gaps in employment authorization and required documentation and the resulting consequences to eligible renewal applicants and their employers.[245] As a DHS component agency, one of USCIS' primary functions is to administer immigration benefits, including adjudicating requests for and issuing employment authorization and/or EADs.[246] As explained previously, the INA recognizes the Secretary's

authority to extend employment authorization to noncitizens in the United States[247] and authorizes the Secretary to take necessary regulatory action to carry out this authority effectively.[248]

In short, an advance opportunity for notice and comment and a 60-day delayed effective date would result in thousands of renewal EAD applicants and their employers experiencing gaps in employment authorization and/or EAD validity. Such a course of action is therefore impracticable as it would impede USCIS functions in effectively administering DHS's employment authorization authority and document issuance functions and would have a significant negative impact on applicants and employers. Under the current circumstances, DHS believes that an immediate, temporary increase in the duration of the automatic extension period is necessary to achieve this purpose.

### 4. The TFR Is of Limited Duration and Scope

Although courts have noted that the time-limited nature of an agency's action cannot, by itself, justify forgoing notice and comment rulemaking, it is a significant factor in the agency's claim for good cause when addressing an emergency.[249] DHS believes that issuing this measure as a temporary rule, which will be for only a period of 540 days, is a reasonable approach to avoid the harms discussed in this rule and thus supports the claim of good cause. Specifically, the regulatory reach of the amendments to 8 CFR 274a.13(d) is limited to individuals with renewal EAD applications properly filed on or after October 27, 2023, and on or before September 30, 2025.[250] The amendments to DHS regulations made by this TFR will only remain in place for a total of 1,260 days (i.e., 3.5 years). The temporal limitations and narrowly scoped population are suitably tailored to avert imminent and near-term harm to a specific class of applicants and their employers, given the special circumstances.[251]

The remedy is further limited to applicants who are currently in the United States and authorized to work. These applicants are merely seeking renewal of their employment authorization and/or EADs, not initial determination of their eligibility. These individuals, if employed, are already workers in the U.S. labor market as a result of the initial employment authorization, and they have relied on the current regulations under 8 CFR 274a.13(d) to avoid experiencing a gap in employment if they timely and properly file the renewal applications. Yet, having complied with the law, they nonetheless face a gap in employment authorization and/or documentation because of processing delays that directly resulted from the emergent circumstances that befell USCIS. This TFR is limited to renewal EAD applicants—i.e., those who have already been authorized for employment—and the additional automatic extension will have minimal adverse impact, if any, on other U.S. workers.[252] Moreover, in providing significant benefits for renewal applicants and their U.S. employers, this rule indirectly benefits

---

2022). Turnover costs are calculated as a percent of annual salary. Amount shown as total present value, using a 2-percent discount rate.

[244] See section III.C.3. The Current Automatic Extension Period of 180 Days Must be Temporarily Increased to 540 Days.

[245] See 80 FR 81899, 81927 (Dec. 31, 2015). Further, in the AC21 NPRM, DHS explained that it believed the 180-day auto extension to be a reasonable and effective amount of time to mitigate that risk. See 80 FR 81899, 81927 (Dec. 31, 2015). ("DHS believes that this time period [of up to 180 days] is reasonable and provides more than ample time for USCIS to complete the adjudication process based on USCIS' current 3-month average processing time for Applications for Employment Authorization.") After receiving and considering public comments, DHS published the final rule. DHS later also welcomed comments on the 2022 TFR, as discussed above. Thus, the concept of the up to 180-day automatic extension has been ventilated for public comment multiple times. This TFR is merely a temporary 18-month deviation from the 180-day timeframe, warranted in this situation for the reasons explained.

[246] As of March 1, 2003, the former INS ceased to exist as an agency within the U.S. Department of Justice, and its functions respecting applications for immigration benefits (such as the adjudication of requests for employment authorization and/or EADs) were transferred to U.S. Citizenship and Immigration Services in the U.S. Department of Homeland Security. See HSA of 2002, Public Law 107–296, sections 451 and 471(a) (Nov. 25, 2002); 68 FR 10922 (Mar. 6, 2003). Additionally, under the HSA sec. 101(b)(1)(F), 6 U.S.C. 111(b)(1)(F), USCIS, as a DHS component, should exercise this function in a manner that ensures that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland.

[247] See INA sec. 274A(h)(3)(B), 8 U.S.C. 1324a(h)(3)(B).

[248] See INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3).

[249] See Mid-Tex, 822 F.2d at 1132 (stating that public notice and comment gain in importance the more expansive the regulatory reach of an agency's rule and that courts, therefore, have consistently recognized that a rule's temporally limited scope is among the key considerations in evaluating an agency's "good cause" claim).

[250] See 8 CFR 274a.13(d)(6).

[251] Courts have been more inclined to finding good cause for issuance of rules without notice and comment if the effect is limited in scope and duration. See, e.g., Nat'l Fed'n Emps v. Divine, 671

F.2d 607 (D.C. Cir. 1982) (finding that OPM's emergency action was within the scope of the "good cause" exception as the agency's action of postponing the open benefits season was required by events and circumstances beyond its control and necessary because not delaying would have been not only impracticable but also potentially harmful); Council of Southern Mountains, Inc., 653 F.2d at 582 (upholding Mine Safety and Health Administration order delaying implementation of a rule without notice and comment "for a relatively short time"); San Diego Navy Broadway Complex Coalition v. U.S. Coast Guard, 2011 WL 1212888, at *6 (S.D. Cal. 2011) (finding good cause for issuance of a TFR because agency limited its effect to several months and also explicitly indicated its intent to initiate notice-and-comment rulemaking).

[252] See section V.B.3.d., Module D. Other Impacts. As explained, this rule extends current employment authorization for individuals who are at risk of losing such authorization solely because of USCIS processing delays; it does not grant new work authorization to additional persons. See id. According to the most recent data (applicable to October 2023), the U.S. labor force stands at 167,728,000. The maximum population of about 824,000 represents 0.50 percent of the national labor force, approximately 554,000 of which would potentially not lapse as a result of the action being taken. See id. Additionally, according to the Bureau of Labor Statistics data, and as of December 2023, there were 0.7 unemployed persons per job opening. See U.S. Department of Labor, U.S. Bureau of Labor Statistics, "Number of unemployed persons per job opening, seasonally adjusted," https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm (last visited Feb. 6, 2024). Thus, data indicates that there are currently more jobs than available employees. As such, DHS believes, based on the nature of this rulemaking as well as current economic conditions, that the hypothetical possibility of some U.S. workers replacing workers who would temporarily lose employment authorization in the absence of this rulemaking is not a compelling reason to allow widespread losses of employment authorization due to USCIS processing delay.

U.S. workers by protecting the financial stability and continuity of operations for affected U.S. employers.

This temporary measure is consistent with the intent of the current 8 CFR 274a.13(d). In this rule, DHS neither makes additional categories eligible for the automatic extension nor alters existing procedures for such extension; DHS is simply temporarily increasing the up to 180-day timeframe for those already eligible for an automatic extension. As shown by the 2022 TFR, such an increase in the automatic extension of employment authorization and/or EAD validity is effective, yet narrowly scoped, measure for navigating filing spikes and their effects on application processing times.

DHS also significantly limits this rulemaking to address the potential lapses that are imminent, further demonstrating that DHS has good cause to issue this rulemaking without the notification procedures required under the APA. The data projections show that even with the 540-day automatic extension provided in this TFR, approximately 260,327 EAD renewal applicants (or approximately 33 percent of the applicants who are the subjects of this rule) are potentially at risk of experiencing a gap in employment authorization and/or EAD validity once their 540-day automatic extension period expires.[253] The data further indicates that extending the automatic extension period to up to 730 days would be required to prevent many of these lapses in employment authorization and/or EAD validity, which could begin in November 2025, based on projected processing times.[254] At this time, DHS has limited the automatic extension to the minimum period necessary to avert the immediate emergency while USCIS (1) works to improve processing times and (2) seeks comment on this TFR and potential additional measures to take at a future time.

DHS appreciates that this TFR does not resolve all potential uncertainty with respect to renewal EAD applications, but notes that it has sought comment on potential solutions and that USCIS' ongoing streamlining efforts, sub-regulatory measures, and technology innovations may produce significant results within this filing period. The filing period and concomitant up to 540-day automatic extension established by this TFR is

therefore appropriately tailored to avert imminent harm to renewal EAD applicants, their families and employers and provide USCIS with the time needed to assess the effect of any recently implemented adjudicative efficiency measures [255] and implement further improvements.

### 5. USCIS Has Not Delayed in Issuing This TFR

Finally, in some cases regarding the good cause standard, courts have concluded that an agency's claim of emergency was undermined because the agency delayed in implementing its decision.[256] In such contexts, courts have considered, for instance, whether the agency "acted diligently" to address the problem and "overcome the hurdles created by other parties," [257] whether the circumstances requiring agency action "were beyond the agency's control," [258] and whether the agency addressed the emergency with an action of limited scope and duration.[259]

As an initial matter, DHS notes that the harm the agency seeks to avoid is vast and would directly befall many blameless third parties.[260] DHS further urges that the agency has not delayed at all. As noted above, USCIS has been taking active measures to reduce the backlog since the publication of the 2022 TFR,[261] including staffing

increases, overtime allowance, policy changes that reduce overall adjudicatory volumes and eliminate unnecessary hurdles for applicants, and technological innovations that have created operational efficiencies. Unfortunately, these measures have not yet been sufficient to return to the goal of normal average processing times of 3 months for renewal EAD applications because of the volume of EAD applications that USCIS received in FY 2023—a circumstance that is beyond USCIS' control. USCIS has looked for other options to further create efficiencies but has yet been unable to create efficiencies that match the increase in receipts. Accordingly, having tried many alternatives and in the face of a dynamic set of challenges,[262] DHS has determined that this temporary regulatory action is the only practicable solution to reduce the likelihood that approximately 824,000 renewal applicants, their families, and their employers will imminently face the dire circumstances and associated costs resulting from a lapse in employment authorizations and/or EAD validity periods. USCIS developed the technical analysis underlying this regulation on an expedited basis, and dedicated scarce agency resources to the swift issuance of this rule while addressing other pressing policy matters, such as the Fee Rule.

In sum, DHS has concluded that the good cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this TFR. Delaying implementation of this rule until the conclusion of notice-and-comment procedures of section 553(b) and the delayed effective date provided by 5 U.S.C. 553(d) would be impracticable due to the need to prevent significant harm to renewal EAD applicants, their families, employers, and communities.

### B. Executive Order 12866 (Regulatory Planning and Review) and Executive Order 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 (Regulatory Planning and Review), as amended by Executive Order 14094 (Modernizing Regulatory Review), and 13563 (Improving Regulation and Regulatory Review) direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic,

---

[253] *See* section V.B.2. Table 6B. EADs that could lapse under the TFR, by Class and Percent Variation.

[254] *See* section V.B.3.d. Table 14, Approximate EAD lapses under different extensions.

[255] *See* section III.B. Other Measures Taken to Reduce EAD Application Processing Times.

[256] Many of the leading cases involve circumstances where the agency cited a need to meet an imminent statutory or administrative deadline. *See Envtl. Def. Fund, Inc.* v. *EPA,* 716 F.2d 915 (D.C. Cir. 1983) (rejecting a claim of good cause to suspend certain reporting requirements before they entered into effect, because the agency had almost a year earlier deferred such requirements and announced that it intended to rescind them); *Council of Southern Mountains, Inc.,* 653 F.2d at 580–82 (stating that "only in exceptional circumstances" may "the imminence of [a legal or administrative] deadline" for taking a particular action "permit[ ] avoidance of APA procedures," because otherwise the agency could delay in acting and then claim an emergency); *NRDC* v. *Abraham,* 355 F.3d 179, 205 (2d Cir. 2004) (rejecting the agency's claim of an emergency need to review and reconsider certain standards prior to an impending and self-imposed administrative deadline); *Nat'l Venture Capital Ass'n,* 291 F. Supp. 3d at 16–17 (collecting cases).

[257] *See, e.g., Council of Southern Mountains, Inc.,* 653 F.2d at 581.

[258] *See, e.g., Council of Southern Mountains, Inc.,* 653 F.2d at 581; *Nat'l Fed'n of Fed. Empl.* v. *Devine,* 671 F.2d 607, 611 (D.C. Cir. 1982).

[259] *See, e.g., Council of Southern Mountains, Inc.,* 653 F.2d at 581; *Devine,* 671 F.2d at 612.

[260] *See, e.g., Nat'l Venture Capital Ass'n,* 291 F. Supp. 3d at 16–17.

[261] *Cf., e.g., Tri-County. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("But this is not a case of unjustified agency delay. The Commission did act earlier. . . . [and t]he agency needed to act again . . . because "persistent power outages and other logistical challenges ha[d] made the continued operation of restored networks more expensive than some expected.").

[262] *See* also section III.A.1, Comparing Fiscal Year (FY) 2023 Receipts to FY 2022 Receipts, describing the significant increase in the numbers of filings in the second half of FY 2023.

environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has designated this rule a ''significant regulatory action'' as defined under section 3(f)(1) of E.O. 12866, as amended by Executive Order 14094. Accordingly, OMB has reviewed this rule.

1. Introduction

This TFR temporarily amends existing DHS regulations to provide that the automatic extension period applicable to expiring employment authorization and/or Employment Authorization Documents (Forms I–766 or ''EADs'') for certain renewal applicants who have timely filed their EAD renewal applications, will be increased from up to 180 days to up to 540 days for qualified applicants who filed or file an EAD renewal application between October 27, 2023 and September 30, 2025.

As is detailed earlier in the preamble, processing times for renewal EAD applications remain at such a level that the current 180-day automatic extension period for certain renewal EAD applicants' employment authorization and/or EADs is currently insufficient. Despite USCIS working on reducing the backlog of renewal EAD applications, recent events have made it difficult to keep up with the adjudicatory workload.[263] While USCIS is implementing solutions to return processing times to target levels, USCIS is taking additional steps to mitigate the risk that renewal EAD applicants will experience a lapse in employment authorization and/or documentation and related consequences while their renewal EAD applications remain pending.[264]

In the absence of this rule, we estimate that between approximately 689,000 and 824,000 renewal EAD applicants will experience a lapse in employment authorization and/or employment authorization documentation between May 2024 and March 2026. As of the current data analysis (November 1, 2023) even with the extension up to 540 days about 260,000 renewal EAD applicants may still experience a lapse,[265] beginning in November 2025, under baseline conditions, *i.e.*, assuming status quo conditions.[266] The purpose of this TFR is to reduce the likelihood that large numbers of eligible applicants who qualify for automatic extensions of their expiring EADs will experience gaps in employment authorization and/or EAD validity.[267] This TFR will therefore provide for greater earnings stability for individuals and continuity of business operations for their employers.

DHS has determined that the population impacted by this TFR consists of the pool of future applicants who, without this rule, would likely experience a lapse in employment during the 23-month period as described above. Because USCIS cannot forecast the future population with precision, we present a baseline population that could range from 689,000 to 824,000. After applying an adjustment for current unemployment conditions in the economy (described in detail in the ensuing analysis section), we arrive at an adjusted population that could range from 663,000 to 793,000.

DHS has prepared two types of quantified estimates of the impacts that could be generated by this TFR applicable to the adjusted population. This rule will prevent the majority of EAD holders from incurring a loss of earnings (''stabilized earnings'') because of USCIS processing delays for renewal EAD applications, as under this rule there will be no disruption to their earnings due to a lapsed EAD. This rule will also generate labor turnover cost-savings to businesses that employ the EAD holders, as under this rule there would not be a disruption to the majority of EAD holders' employment authorization and/or document validity. Additionally, to the extent this rule prevents affected EAD holders' jobs from going unfilled, there will be less impacts to tax transfers from businesses and employees to the Federal Government.[268]

Due to substantial variation in the inputs utilized to estimate the impacts, there is a very wide range in which they could fluctuate. These impacts are summarized in Table 3, where the monetized figures represent the forecast expected value (which is the mean of trial-based simulations) discounted at 2 percent.

TABLE 3—SUMMARY OF IMPACTS
[2022 Dollars, FY 2024–FY 2028]

**EAD Holder Earnings Preserved (''Stabilized Earnings''):**
- *Entities directly affected:* Individual EAD holders.
- *Population:* maximum 663,000 to 793,000 individuals with renewal EADs.
- *Monetized present value estimate (2 percent):* $29.1 billion.
- *Type:* Stabilized labor income to affected renewal EAD applications; this labor income is a proxy for either prevented transfers from EAD holders to others in the workforce or cost savings to employers for preserved productivity, depending on if employers would have been able to easily find replacement labor for affected EAD holders without this rule.
- *Summary:* Individuals would benefit from being able to maintain their employment authorization and, by extension, their employment, without disruption; DHS estimated these savings based on data from recently lapsed EADs and labor earnings, both of which vary within a range.

---

[263] Events such as increased designations of countries for temporary protected status, increased number of Afghan and Ukrainian national parolees, increased asylum filings due to the end of the Title 42 public health Order, and a court decision to require USCIS to process all initial EAD applications from asylum applicants with 30 days. Please see ''Additional Designations for Temporary Protected Status,'' ''Increased EAD Validity Periods for Certain Applicants,'' ''Impact of the Significant Increase in Referrals to USCIS for Credible Fear Assessments,'' and ''Effect of Operational Challenges on EAD Application Adjudications'' in the preamble for more information.

[264] Such measures include increasing the validity periods for certain types of applicants, permitting asylum applicants to electronically file EAD applications, lifting the USCIS hiring freeze and increasing the number of employees, prioritizing workload management, and addressing fiscal issues in the Fee Rule. Please see ''Other Measures Taken to Reduce EAD Application Processing Times'' in the preamble for more information.

[265] Extensions beyond 540 days would likely reduce the number of EADs that would still lapse, however this TFR opts for a 540-day extension, as discussed in the preamble and later in ''Module D. Other Impacts.''

[266] The estimate of 260,000 renewal EAD applicants that may still experience a lapse is based on assumptions that renewal applicants will maintain the same filing behavior, operational efficiency and productivity will not change, and staffing levels and adjudication hours for EAD renewals will remain unchanged.

[267] As stated earlier in the preamble, DHS is applying this rule to all renewal EAD application categories eligible for automatic extension pursuant to 8 CFR 274a.13(d), even though some of these categories currently experience processing times that do not raise a risk of the applicant experiencing a lapse in employment authorization or documentation. Ninety-five percent of applications fall within the C08, C09, and C10 categories. DHS has made this decision because it has determined that it would not be operationally practical for USCIS to implement a different approach; making distinctions among categories would cause confusion among employers and employees; and backlogs and processing times may yet increase for these other categories.

[268] This rule will also prevent a reduction in State and local tax revenue but that is not quantified in this analysis. Please see Table 5 for more information.

TABLE 3—SUMMARY OF IMPACTS—Continued

[2022 Dollars, FY 2024–FY 2028]

- *Potential preserved employment taxes:* $3.1 billion (Present Value, 2-percent discount rate); actual amount will depend on how easily businesses would have been able to find replacement labor for affected EAD holders without this rule.

**Employer Labor Turnover Cost Savings:**

- *Entities directly affected:* businesses that employ the EAD holders.
- *Population:* Possibly 63,000 to 82,000 employers.
- *Monetized present value estimate (2 percent):* $5.2 billion.
- *Type:* Cost-savings.
- *Summary:* There would be cost savings to employers in terms of continuity of business operations due to the worker not being separated; DHS estimated these savings based on information applicable to turnover costs relevant to employee annual earnings, both of which vary within a range.

**Other Impacts Considered:**

- Individuals impacted would likely benefit from cost-savings accruing to not having to incur the direct costs and some related costs associated with searching for and obtaining a new job once their renewal EAD that lapsed is eventually approved.
- To the extent that individuals' earnings will be maintained, burdens to their support network would be prevented.
- DHS does not expect adverse disruptions to the labor market from this TFR, as the rule is intended to avoid disruptions to employment.
- DHS did not include estimates for stabilized earnings for any duration of continued unemployment that EAD holders might have experienced beyond their EAD lapse duration without this rule. Inclusion of such additional time would increase the estimates of saved earnings from the rule.
- Avoid opportunity costs to businesses for having to choose the next best alternative to employment of the affected renewal EAD applicant. We do not know if the replacement hire in a next best alternative scenario would have been a comparable substitute (*i.e.,* a productivity or profit charge to employers).
- Prevent adverse impacts on businesses and individuals resulting from the uncertainty associated with widescale lapses in employment authorization.

Some of the impacts of this rule will depend on whether businesses would have been able to find replacement labor for the positions the affected renewal EAD applicants would have lost if they had experienced a gap in employment authorization and/or employment authorization documentation without this rule. If businesses would have been able to find replacement labor from the pool of the unemployed, the only monetized cost savings of the rule to society is for preventing costs resulting from labor turnover. If businesses would not have been able to find replacement labor, the monetized cost savings of the rule would also include prevented lost productivity due to a lack of available labor. However, the impacts of this rule to the affected renewal EAD applicants do not depend on whether their employer can find replacement labor. This rule will prevent affected renewal EAD applicants from incurring a loss of earnings.

DHS estimates that stabilized earnings to renewal EAD applicants ranges from $2.0 billion to $12.7 billion with a primary estimate of $6.2 billion (annualized, 2 percent), depending on the wages and other compensation the renewal EAD applicants earn, the number of renewal EAD applicants affected, and the duration of the gap in employment authorization and/or employment authorization documentation that would occur without this rule.[269] DHS uses estimates of the stabilized earnings as a measure of either: (1) prevented transfers of this compensation from the affected population to others in the labor market; or (2) a proxy for businesses' cost

savings from prevented lost productivity, depending on whether businesses would have been able to find replacement labor for affected renewal EAD applicants without this rule.

DHS does not know what the next best labor alternative would have been for businesses without this rule. Accordingly, DHS does not know the portion of the overall effects of this rule that are transfers or costs savings. To begin, DHS describes the two extreme scenarios, which provide the bounds for the range of effects.

*Scenario 1:* If, in the absence of this rule, all businesses would have been able to immediately find reasonable labor substitutes for the positions the renewal EAD applicants would have lost, businesses would have lost little or no productivity. Accordingly, this rule prevents $6.2 billion (primary estimate annualized, 2 percent) from being transferred from affected renewal EAD applicants to workers currently in the labor force (whom are not presently employed full time) or induced back into the labor force and this rule would result in $0 cost savings to businesses for prevented productivity losses.

*Scenario 2:* Conversely, if all businesses would have been unable to within the period of analysis find reasonable labor substitutes for the position the EAD holder filled, then businesses would have lost productivity. Accordingly, $6.2 billion is the estimated monetized cost savings from this rule for prevented productivity losses and this rule will result in preventing $0 from being transferred from affected renewal EAD applicants to replacement labor. Because under this scenario businesses would not have been able to find replacement labor, the rule may also result in additional cost savings to employers for prevented profit losses;

and further, may also prevent a reduction in tax transfer payments from businesses and employees to the government. DHS has not estimated all potential tax effects but notes that stabilized earnings of $6.2 billion would have resulted in employment tax losses to the Federal Government (*i.e.,* Medicare and Social Security) of $0.7 billion (annualized, 2 percent).

In both scenarios, whether without this rule employers would have been able to find replacement labor or not, DHS assumes that businesses would have incurred labor turnover costs for having to search for a replacement for affected renewal EAD applicants. Accordingly, DHS estimates the rule will also result in additional labor turnover cost savings to businesses ranging from $0.09 billion to $3.7 billion, with a primary estimate of $1.1 billion (annualized, 2 percent) depending on the wages and other compensation the renewal EAD applicants earn, the number of renewal EAD applicants affected, and the replacement cost to employers.

Table 4 below summarizes these two scenarios and the primary estimate of this rule at a 2-percent discount rate. Because DHS does not know the overall proportion of businesses that would have been able to easily find replacement labor in the absence of this rule, for DHS's primary estimate we assume that replacement labor would have been immediately found for half of all renewal EAD applicants and not found for the other half (*i.e.,* an average of the two extreme scenarios described above). However, as noted previously, December 2023 unemployment and job openings data indicate there are more jobs available than people looking for

---

[269] Lapse-duration accounted for approximately 47.5 percent of this range, wages accounted for 47.0 percent, and the lapse rate 4.9 percent. For more information, please see section V.B.3.b.i. "Earnings impact to EAD holders."

jobs.[270] Accordingly, we believe the impacts of this rule will most likely skew towards Scenario 2, with the rule resulting in mostly cost savings for employers who would have been unable to fill the jobs of affected renewal EAD applicants without this rule.

### TABLE 4—PRIMARY ESTIMATE—MONETIZED ANNUALIZED IMPACTS AT 2%

[Millions]

| Category | Description | Scenario 1: immediate replacement labor found for all affected EAD | Scenario 2: no replacement labor found for affected EAD over the period of analysis | Primary estimate: replacement labor found for half of affected EAD holders |
|---|---|---|---|---|
| **Transfers** | | | | |
| Stabilized Earnings ........... | Prevented compensation transfers from renewal EAD applicants to other workers. | $6,176.5 | $0 | $3,088.3 |
| Employment Taxes ........... | Prevented reduction in employment taxes paid to the Federal Government. | 0 | 651.7 | 325.9 |
| **Cost Savings** | | | | |
| Labor Turnover ................. | Prevented labor turnover costs to businesses ........... | 1,098.3 | 1,098.3 | 1,098.3 |
| Productivity ...................... | Prevented lost productivity to businesses (stabilized earnings used as a proxy). | 0 | 6,176.5 | 3,088.3 |
| Total Cost Savings .... | ......................................................................... | 1,098.3 | 7,274.8 | 4,186.6 |

There are two important caveats to the monetized estimates. First, as the pending caseload evolves over the course of time that this TFR applies to, the pending count and therefore the total number of renewal EAD applications and individuals associated with them will change.[271] A resultant effect of the caseload changes is that as USCIS works through this backlog, the number of affected renewal EAD applicants and the durations for which renewal EAD applicants may experience a lapse in employment without this rule will likely vary from the durations modeled. As a result, DHS acknowledges the uncertainty in the above monetized impacts.

Second, DHS recognizes that non-work time performed in the absence of employment authorization has a positive value, which is not accounted for in the above monetized estimates.[272] For example, if someone performs childcare, housework, home improvement, or other productive or non-work activities that do not require employment authorization, that time still has value. In assessing the burden of regulations to unemployed populations, DHS routinely assumes the time of unemployed individuals has some value.[273] The monetized estimates of the compensation this rule preserves are measured relative to a baseline in which individuals lose employment authorization and the associated income as a result of the problem this rule seeks to address. The monetary value of the compensation this rule preserves are savings to the individual, but DHS has considered whether net societal savings may be lower than the sum of the preserved compensation to the individuals and whether a more accurate estimate of the net impact to society from losing employment authorization in the absence of this rule might take into account the value of individuals' non-work time, even though this population has lost their authorization to sell their time as labor. Due to the variety of values placed on non-work time, and the additional fact that this non-work time is involuntary, it is difficult to estimate the appropriate adjustment that DHS should make to preserved compensation in order to account for the social value of non-work time. Accordingly, DHS recognizes that the net societal savings of this rule may be somewhat lower than those reported below, but they are a reasonable estimate of the impacts to avoiding the costs of lapsed employment authorization.

Pursuant to OMB Circular A–4, DHS has prepared an A–4 Accounting Statement for this rule.[274]

---

[270] Bureau of Labor Statistics data show that, as of December 2023, there were 0.7 unemployed persons per job opening. *See* U.S. Department of Labor, U.S. Bureau of Labor Statistics, ''Number of unemployed persons per job opening, seasonally adjusted,'' *https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited Feb. 6, 2024).

[271] Caseload changes can be the result of workforce hiring and/or officer re-assignments to other non-EAD renewal application workloads, as well as policy changes such as increasing certain EAD validity periods and improving processing efficiency through increased use of technological advancements.

[272] Boardman et al., *Cost-Benefit Analysis Concepts and Practice* (2018), p. 152.

[273] For regulatory analysis purposes, DHS generally assumes the value of time for unemployed individuals is at least the value of the Federal minimum wage.

[274] OMB Circular A–4 (November 9, 2023) is available at *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf* (last viewed on March 12, 2024).

TABLE 5—OMB A–4 ACCOUNTING STATEMENT

[$ Millions, 2022]

[Period of analysis: FY 2024–FY 2028]

| Category | Primary estimate | | Minimum estimate | Maximum estimate | Source citation (RIA, preamble, etc.) |
|---|---|---|---|---|---|
| **Benefits:** | | | | | |
| Monetized Benefits ........................................... | 2% | N/A | N/A | N/A | RIA. |
| Annualized quantified, but un-monetized, benefits ............ | N/A | | N/A | N/A | RIA. |
| Unquantified Benefits ........................................ | • Avoiding a lapse in employment authorization and/or EAD validity for renewal EAD applicants may also prevent any monetary or other support that would have been necessary for the support network of affected EAD holders to transfer to affected EAD holders during such a period of unemployment. • The rule would prevent affected individuals from incurring direct and indirect costs associated with looking for work. | | | | RIA. |
| **Costs:** | | | | | |
| Annualized monetized costs ................................... | 2% | −$4,186.6 | −$87.9 | −$16,449.3 | RIA. |
| Annualized quantified, but un-monetized, costs ............... | N/A | | N/A | N/A | RIA. |
| Qualitative (unquantified) costs ............................. | • It will better ensure other cost savings of holding an EAD or job will not be disrupted or subject to significant uncertainty because of USCIS processing delays, such as valid identity documents, or health insurance obtained through an employer. • Additionally, this rule will prevent adverse impacts on businesses that would result from required terminations for affected renewal EAD applicants, or the uncertainty associated with widescale lapses in employment authorization. • In cases where, in the absence of this rule, companies cannot find reasonable substitutes for the labor the affected renewal EAD applicants have provided, affected businesses would also save profits from the productivity that would have been lost. In all cases, companies would avoid opportunity costs from having to choose the next best alternative to employment of the affected renewal EAD applicant. | | | | RIA. |
| **Transfers:** | | | | | |
| Annualized monetized transfers: "on budget" ................. | 2% | 0 | 0 | 0 | RIA. |
| From whom to whom? | N/A | | | | N/A. |
| Annualized monetized transfers: stabilized earnings ......... | 2% | 3,088.3 | 0 | 12,749.4 | RIA. |
| From whom to whom? | This rule will prevent compensation from transferring from affected renewal EAD applicants to other workers. | | | | RIA. |
| Annualized monetized transfers: taxes ....................... | 2% | 325.9 | 0 | 1,345.3 | RIA. |
| From whom to whom? | This rule will prevent a reduction in employment taxes from companies and employees to the Federal Government (quantified). It would also prevent a reduction in income taxes from employees to Federal, State, and local governments (unquantified). | | | | RIA. |

| Category | Effects | Source citation (RIA, preamble, etc.) |
|---|---|---|
| Effects on State, local, and/or tribal governments ........... | This rule will prevent a reduction in State and local tax revenue (unquantified). It will also prevent potential reliance on State or local government-funded support services that may have been necessary with a gap in employment authorization (unquantified). | RIA. |
| Effects on small businesses ................................... | This rule does not directly regulate small entities but has indirect cost-saving to small entities that may employ affected renewal EAD applicants. Such businesses will avoid the costs for labor turnover and loss of productivity and profits had they not been able to immediately fill the labor performed by the affected renewal EAD applicant. | RIA, RFA. |
| Effects on wages .............................................. | Preserve access to wages and other compensation for renewal EAD applicants. | RIA. |
| Effects on growth ............................................. | None. | RIA. |

## 2. Background and Population

As is detailed in the preamble and elsewhere in this rule, processing times for renewal EAD applications continue to increase to such a level that the current 180-day automatic extension period for certain renewal EAD applicants' employment authorization and/or EADs is currently insufficient. DHS has carefully analyzed the current backlog of cases and has been able to make projections regarding the

population. At the likely time the TFR would become effective, DHS has identified approximately 1 million EADs that would be slated to expire during FY 2024 through FY 2027. We culled this "broad" population for cases accruing to very early filers and certain classes that might be adjudicated to arrive at a "baseline" population of about 793,000 that would likely face a lapse. Our analysis considers projected

filing volumes, filing time behavior, case processing times, and officer completion metrics. However, there is likely to be some variation in the officer completion metrics that source this figure, and we have allowed this input to vary 10- and 15-percent from the baseline to account for uncertainty such as in USCIS workforce hiring of adjudication officers and officer re-assignments to other non-EAD renewal

application workloads.[275] The results are captured in Table 6, which shows by EAD category. As is shown, the population could range from about 689,000 to 824,000, and at the baseline, about 260,000 could still lapse (beginning in November 2025 after exceeding the up to 540-day automatic extension) under the action being taken.[276]

TABLE 6A—EADs THAT COULD LAPSE IN THE ABSENCE OF THE TFR, BY CLASS AND PERCENT VARIATION

| Variation | A03 | A05 | A10 | C08 | C09 | C10 | Total |
|---|---|---|---|---|---|---|---|
| +15% | 315 | 16,706 | 6,152 | 494,631 | 149,619 | 22,001 | 689,423 |
| +10% | 426 | 17,525 | 7,591 | 529,156 | 152,125 | 24,568 | 731,391 |
| Baseline | 628 | 18,701 | 10,622 | 581,372 | 155,699 | 26,030 | 793,053 |
| −10% | 912 | 19,584 | 12,082 | 602,442 | 158,365 | 26,171 | 819,556 |
| −15% | 1,033 | 20,050 | 12,510 | 604,356 | 159,575 | 26,181 | 823,706 |

Table 6B—EADs That Could Lapse Under the TFR, by Class and Percent Variation

| Variation | A03 | A05 | A10 | C08 | C09 | C10 | Total |
|---|---|---|---|---|---|---|---|
| +15% | 0 | 2,040 | 0 | 90 | 65,061 | 33 | 67,223 |
| +10% | 0 | 4,111 | +10 | 52,030 | 77,651 | 33 | 133,825 |
| Baseline | 0 | 7,703 | 0 | 155,730 | 96,861 | 33 | 260,327 |
| −10% | 0 | 10,960 | 0 | 262,245 | 110,540 | 74 | 383,818 |
| −15% | 86 | 12,100 | 989 | 314,911 | 117,581 | 74 | 445,741 |

Source: USCIS analysis of renewal EAD filing data, provided by Office of Performance and Quality (OPQ), USCIS, DHS, Claims 3 database; data provided October 18, 2023.

**Note:** Numbers may not total due to rounding.

In developing the populations examined for this analysis, it is useful to consider three categories. First, there are applicants whose automatically extended EADs under the relevant categories benefited from the FY 2022 TFR (*i.e.,* they filed on or before October 26, 2023). Second, there are applicants who filed after October 26, 2023 and whose EADs are still valid, including being within the 180-day auto-extension period, but whose auto-extension period will expire in the timespan leading up to this TFR taking effect (the "current" period captures the date of the analysis, which is November 2023, through April 2024). Third are the applicants whose EADs would lapse after this TFR becomes effective if it were not for the TFR. These population components will be considered "past," "current," and "future," respectively.

In this specific case, we think it is most appropriate to attribute the impacts to the "future" population

when the TFR is in effect. The "past" pool of applicants benefited from the previous TFR and would not be affected by this rule. The "current" pools of applicants, whose EADs may lapse before this rule takes effect, also would not gain any benefit from this rule. However, this population is expected to be relatively very small in size (if not zero) compared to the size of the pool of "future" applicants.

In the absence of this rule, we estimate that between 689,000 and 824,000 renewal EAD applicants will likely experience a lapse in employment authorization and/or employment authorization documentation. This "future" population would begin to lapse in May 2024 if not for this TFR, as applicants would have reverted back to an auto-extension period of up to 180 days beginning in October 2023. These lapses would occur through March 2026, a point in time when it is estimated that USCIS would have

caught up on adjudicating these renewal filings. This TFR will reduce the likelihood that renewal EAD applicants will experience gaps in employment authorization and/or EAD validity with an auto-extension period of approximately 18 months. Because this rule auto-extends employment authorization for an additional 18 months and does not on its own reduce incoming volumes, it is estimated that even under this rule some renewal EAD applicants may still experience lapses. However, they would not begin to experience lapses until 18 months after the effective date of this TFR (approximately November 2025), under the baseline scenario and would occur through March 2027 under this TFR. Table 7 provides a granular tabulation of the populations without the TFR and with the TFR and figure 2 provides a monthly expirations of baseline values from Table 7.

---

[275] All other variables remain constant.

[276] Certain categories have been excluded from this analysis. The A17 (E spouses), A18 (L spouses) and C26 (H spouses) potential auto-extensions are limited to the duration of their unexpired I–94 or the auto extension period, whichever is shorter. However, I–94 data is controlled by CBP Arrival and Departure Information System (ADIS) and is currently not available in a batch/systematic manner for USCIS to use to calculate this auto-extension end date and estimate these populations. Moreover, a large cohort of E, L, and H spouses concurrently file renewal EAD applications with an

underlying Form I–129 and Form I–539, and therefore the auto-extension end date is limited by the current I–94 validity date. But, in these circumstances, the E, L, and H spouses do not have an unexpired I–94 that extends beyond the current expiration date of the existing EAD. While a minority of renewal EAD applications filed for these spouses are not filed concurrently with the Form I–539, and their associated EADs face expiration, USCIS projects that H spouses (the largest population in the cohort) would mostly be processed on time to avoid any lapses in EAD validity. Furthermore, with the new "incident to

status" employment authorization for E and L spouses, the relatively low number of A17 and A18 renewals noticeably decreased during the first six months of FY 2024. The A12 and C19 categories (TPS categories) often have a separate auto-extension related to each country-specific **Federal Register** Notice (FRN). Additionally, each TPS designation, redesignation, or extension only remains in place for up to 18 months at a time. A07, A08, C16, C20, C22, C24, and C31 all have relatively low renewal filing rates. As such, these categories are excluded from this analysis.

TABLE 7—TFR FUTURE POPULATION PROJECTIONS BY MONTH, ROUNDED TO THOUSANDS

| | No TFR | | | With TFR | | |
|---|---|---|---|---|---|---|
| | Low bound: EADs facing lapse each month (baseline +15%) | Baseline: EADs facing lapse each month | Upper bound: EADs facing lapse each month (baseline −15%) | Low bound: EADs facing lapse each month (baseline +15%) | Baseline: EADs facing lapse each month | Upper bound: EADs facing lapse each month (baseline −15%) |
| May–24 | 3,000 | 3,000 | 3,000 | 0 | 0 | 0 |
| Jun–24 | 5,000 | 6,000 | 6,000 | 0 | 0 | 0 |
| Jul–24 | 10,000 | 11,000 | 12,000 | 0 | 0 | 0 |
| Aug–24 | 16,000 | 18,000 | 18,000 | 0 | 0 | 0 |
| Sept–24 | 22,000 | 25,000 | 26,000 | 0 | 0 | 0 |
| Oct–24 | 16,000 | 23,000 | 27,000 | 0 | 0 | 0 |
| Nov–24 | 19,000 | 27,000 | 31,000 | 0 | 0 | 0 |
| Dec–24 | 17,000 | 25,000 | 29,000 | 0 | 0 | 0 |
| Jan–25 | 21,000 | 28,000 | 32,000 | 0 | 0 | 0 |
| Feb–25 | 27,000 | 38,000 | 42,000 | 0 | 0 | 0 |
| Mar–25 | 27,000 | 35,000 | 36,000 | 0 | 0 | 0 |
| Apr–25 | 32,000 | 43,000 | 45,000 | 0 | 0 | 0 |
| May–25 | 26,000 | 35,000 | 36,000 | 0 | 0 | 0 |
| Jun–25 | 23,000 | 30,000 | 32,000 | 0 | 0 | 0 |
| Jul–25 | 36,000 | 42,000 | 43,000 | 0 | 0 | 0 |
| Aug–25 | 33,000 | 38,000 | 39,000 | 0 | 0 | 0 |
| Sept–25 | 49,000 | 51,000 | 52,000 | 0 | 0 | 1,000 |
| Oct–25 | 50,000 | 52,000 | 52,000 | 0 | 0 | 2,000 |
| Nov–25 | 61,000 | 64,000 | 64,000 | 0 | 1,000 | 2,000 |
| Dec–25 | 52,000 | 53,000 | 53,000 | 0 | 1,000 | 4,000 |
| Jan–26 | 53,000 | 54,000 | 54,000 | 0 | 3,000 | 7,000 |
| Feb–26 | 50,000 | 50,000 | 50,000 | 1,000 | 5,000 | 7,000 |
| Mar–26 | 41,000 | 42,000 | 42,000 | 1,000 | 5,000 | 12,000 |
| Apr–26 | 0 | 0 | 0 | 2,000 | 5,000 | 12,000 |
| May–26 | 0 | 0 | 0 | 1,000 | 3,000 | 13,000 |
| Jun–26 | 0 | 0 | 0 | 3,000 | 5,000 | 13,000 |
| Jul–26 | 0 | 0 | 0 | 4,000 | 8,000 | 25,000 |
| Aug–26 | 0 | 0 | 0 | 3,000 | 10,000 | 22,000 |
| Sept–26 | 0 | 0 | 0 | 4,000 | 19,000 | 36,000 |
| Oct–26 | 0 | 0 | 0 | 5,000 | 19,000 | 44,000 |
| Nov–26 | 0 | 0 | 0 | 9,000 | 36,000 | 54,000 |
| Dec–26 | 0 | 0 | 0 | 8,000 | 30,000 | 51,000 |
| Jan–27 | 0 | 0 | 0 | 8,000 | 38,000 | 51,000 |
| Feb–27 | 0 | 0 | 0 | 10,000 | 36,000 | 49,000 |
| Mar–27 | 0 | 0 | 0 | 8,000 | 36,000 | 41,000 |
| Apr–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| May–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jun–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jul–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aug–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sept–27 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 689,000 | 793,000 | 824,000 | 67,000 | 260,000 | 446,000 |

Source: USCIS analysis of renewal EAD filing data, provided by Office of Performance and Quality (OPQ), USCIS, DHS, Claims 3 database; data provided October 18, 2023.

**Figure 2. Monthly Expirations of Baseline Values from Table 7**



An assumption that is implicit in the populations developed above is that every individual with a lapsed EAD would be unauthorized to work. In reality, some of the individuals may be authorized to work—or become authorized to work—incident to status and merely relying upon the EAD to evidence that employment authorization. Others may be relying upon the EAD as a government-issued identity document and not using it to obtain employment. In either instance, USCIS does not know, and is unable to reasonably estimate, how many individuals or what percentages of the populations may be separately employment authorized or otherwise not relying on the EAD to document their employment authorization. It is possible, therefore, that the lower bound estimate of population is overstated.

USCIS stresses that the population over time can vary via changes in volumes, processing times, and other factors that are very difficult to predict. As such, DHS acknowledges the uncertainties in these estimates, but they represent the potential population for the impact estimates using the best available information at the time of this analysis. To the extent that the population can vary, the impacts estimated in the following analysis would vary as well.

3. Impact Analysis

This section is organized into modules as follows: Module A develops earnings levels for the renewal EAD

filers, which is a key component of the impacts we estimate. Module B focuses on the impact simulations for the impacted population's labor earnings impacts and is divided into two sections: (1) labor earnings, and (2) labor turnover cost. Module C collates the monetized impacts and discounts them over the course of the five fiscal years in which the impacts could accrue. Module D concludes with consideration of other possible effects.

a. Module A. Earnings of Renewal EAD Applicants

USCIS expects two broad types of impacts from this TFR that are estimated and quantified. First, there will be impacts to eligible individual EAD holders in terms of their ability to maintain labor earnings. Second, impacts will accrue to businesses that employ the EAD holders in maintaining continuity of employment and thus avoiding labor turnover costs. A core component of both impacts is the earnings of the renewal EAD filers, which figure prominently into the monetized estimates. Since there is likely to be variation in earnings applicable to the population, in this module we cover the methodology to develop a range for earnings bounded by a lower and upper level.

Because many of the individuals renewing EADs would be relatively new entrants to the labor force, we would not expect most of them to earn very high-tier wages. The Federal minimum wage

is currently $7.25 per hour,[277] but many States have implemented higher minimum wage rates.[278] However, the Federal Government does not track a nationwide population-weighted minimum wage estimate. Individuals in the population of interest could be located anywhere within the United States and may be subject to a range of minimum wage rates depending on the State or city in which they live.

Consistent with other rules, DHS uses the 10th percentile hourly wage from the Bureau of Labor Statistics (BLS) National Occupational Employment and Wage Estimates for all occupations as a reasonable proxy for the effective minimum wage for individuals who are likely to earn an entry-level wage. BLS estimates account for changes in wages across the United States labor market, which is updated annually and will thus reflect any changes to State minimum wage rates. The 10th percentile hourly wage estimate for all occupations is currently $13.14, not accounting for worker benefits.[279]

It is likely however, that some individuals impacted earn wages above the minimum. Because the EADs

---

[277] See DOL, "Minimum Wage," *https://www.dol.gov/general/topic/wages/minimumwage* (last accessed Nov. 7, 2023).

[278] See DOL, "State Minimum Wage Laws," *https://www.dol.gov/agencies/whd/minimum-wage/state* (last accessed Nov. 7, 2023).

[279] See BLS, "May 2022 National Occupational Employment and Wage Estimates," "United States," *https://www.bls.gov/oes/2022/may/oes_nat.htm#00-0000* (last visited Nov. 7, 2023). The 10th, 25th, 75th and 90th percentile wages are available in the downloadable XLS file link.

impacted do not include or require, at the initial or renewal stage, any data regarding wages, DHS has no information from the associated forms concerning earnings, occupations, industries, positions, or businesses that may employ such workers. DHS can add some robustness to the estimates by incorporating actual data concerning the employment of the EAD holders to draw inference on their earnings.

DHS obtained E-Verify case data for FY 2021 and FY 2022 for the EAD categories potentially impacted, which yielded 12.26 million records.[280] These data neither distinguish between an E-Verify case for an initial EAD, a renewal EAD, or an E-Verify case result, but they do provide information that we can draw from regarding employment. The

E-Verify data do not provide information on job type or occupation, but it does provide information about the primary business activity of the EAD holder's employer as categorized by the North American Classification System (NAICS).

Analysis of the E-Verify case data shows that they disproportionately accrued to a small subset of activity. Of 103 represented economic activities, only three exhibited shares of cases higher than 10 percent—Professional, Scientific, & Technical Services (24.5 percent), Other Information Services (19.1 percent), and Administrative and Support Services (11.9 percent). Moreover, the upper quartile (75th percentile) is reached with just eleven activities. The average individual share

across these eleven activities was 6.8 percent, while for the entire remainder the individual average was 0.3 percent. Given this concentration, we will center the analysis on the activities comprising the upper quartile.

In Table 8 we present the activities, followed by the level of activity applicable to the respective the North American Industry Classification System (NAICS) code from the BLS. We rescaled the shares of the activities according to the total number of records for the upper quartile (9.01 million) and obtained the July 2022 average hourly wage for the activities of all employees within the relevant NAICS codes from BLS.[281] We then calculated a weighting factor input, which is the product of the wage and the rescaled share.

TABLE 8—DERIVATION OF UPPER BOUND FOR HOURLY WAGE[282]

| Economic activity | NAICS code | Level | Share (%) | Cumulative | Wage[283] | Weight factor |
|---|---|---|---|---|---|---|
| Professional, Scientific, & Technical Services | 541000 | subsector | 33.3 | 33.3 | 48.34 | 16.10 |
| Other Information Services | 519100 | industry | 26.0 | 59.4 | 45.27 | 11.79 |
| Administrative & Support Services | 561000 | subsector | 16.2 | 75.6 | 25.78 | 4.18 |
| Internet Service providers, Web Search Portals, & Data Processing. | 518200 | industry | 7.4 | 83.0 | 51.33 | 3.80 |
| Educational Services | 611000 | subsector | 3.1 | 86.1 | 33.31 | 1.03 |
| Food Services & Drinking Places | 722000 | subsector | 2.8 | 88.8 | 18.54 | 0.51 |
| Nursing & residential Care Facilities | 623000 | subsector | 2.5 | 91.4 | 23.31 | 0.59 |
| Publishing Industries (non-internet) | 511000 | subsector | 2.3 | 93.7 | 50.10 | 1.17 |
| Specialty Trade Contractors | 238000 | subsector | 2.3 | 96.0 | 33.83 | 0.78 |
| Hospitals | 622000 | subsector | 2.1 | 98.1 | 38.00 | 0.80 |
| Management of Companies/Enterprises | 550000 | sector | 1.9 | 100.0 | 44.48 | 0.84 |
| Sum (rounded) | | | | | | 41.60 |

Summing along the final column yields an hourly wage of $41.60, which will apply as the upper earnings bound for this analysis, noting that it is 39.6 percent higher than our national average wage weighted across all occupations, of $29.76.[284]

DHS accounts for worker benefits when estimating the opportunity cost of time by calculating a benefits-to-wage multiplier using the most recent BLS report detailing average total employee compensation for all civilian U.S. workers.[285] DHS estimates the benefits-to-wage multiplier to be 1.45, which

incorporates employee wages and salaries and the full cost of benefits, such as paid leave, insurance, and retirement.[286] Therefore, using the benefits-to-wage multiplier, DHS calculates the total rate of compensation for individuals at the high end of the range as $60.32. DHS calculates the total

[280] USCIS, DHS, Immigration Records and Identity Services Directorate (IRIS), Verification Division; (Oct. 12, 2023).

[281] BLS, "Industries at a Glance," "Industries by Supersector and NAICS Code," *https://www.bls.gov/iag/tgs/iag_index_naics.htm* (last visited Nov. 7, 2023).

[282] There are some technical details applicable to Table 8. The title of the activity shown is in a few cases abbreviated for space consideration. Otherwise, they reflect exactly what was recorded in the E-Verify data. For the activities shown comprising the upper quartile, from the first level analysis one activity, Non-store Retailers, was dropped, and "replaced" by Management of Companies/Enterprises. The reason this was conducted is that in the recent (2022) revision to the NAICS codes, Non-store Retailers was eliminated. Many such revisions to activities have been made, and the BLS will often describe what revised activity(ies) in the update ensconce the former classification. In this case, the removed activity consists of three current industry groups, Electronic Shopping and Mail-Order Houses (NAICS 4541), Vending Machine Operators (NAICS

4542), and Direct Selling Establishments (NAICS 4543). However, the BLS does not provide wage data applicable to these industry groups (*see https://www.bls.gov/iag/tgs/iag454.htm*). In addition, internet Service providers, Web Search Portals, & Data Processing appears to apply to a dated 2002 NAICS application, and was changed in a 2007 revision to "Data Processing, Hosting, and Related Services" subsector (*see https://www.bls.gov/iag/tgs/iag518.htm*).

[283] July 2022 average hourly wages from the following: *https://www.bls.gov/iag/tgs/iag54.htm; https://www.bls.gov/iag/tgs/iag519.htm; https://www.bls.gov/iag/tgs/iag561.htm; https://www.bls.gov/iag/tgs/iag518.htm; https://www.bls.gov/iag/tgs/iag61.htm; https://www.bls.gov/iag/tgs/iag722.htm; https://www.bls.gov/iag/tgs/iag623.htm; https://www.bls.gov/iag/tgs/iag511.htm; https://www.bls.gov/iag/tgs/iag238.htm; https://www.bls.gov/iag/tgs/iag622.htm; https://www.bls.gov/iag/tgs/iag55.htm.* For Educational Services, the average earnings are reported annually for five specific occupations, and the hourly wage was derived by dividing the annual salary by 2,080

annual work hours (*see https://www.bls.gov/iag/tgs/iag61.htm*) (Obtained 10–15–2023).

[284] The national average wage is found in the "May 2022 National Occupational Employment and Wage Estimates" in the BLS Occupational Employment and Wage Statistics (OEWS) portal, *https://www.bls.gov/oes/2022/may/oes_nat.htm* (last updated Apr. 25, 2023). Relevant calculation: (41.60 ÷ 29.80) − 1) × 100.

[285] *See* BLS, Economic News Release, "Employer Costs for Employee Compensation—June 2023," Table 1. Employer costs for employer compensation by ownership, p. 4, *https://www.bls.gov/news.release/archives/ecec_09122023.pdf* (last visited Nov. 7, 2023).

[286] The benefits-to-wage multiplier is calculated as follows: (Total Employee Compensation per hour) ÷ (Wages and Salaries per hour) = $43.26 ÷ $29.86 = 1.45 (rounded). *See* BLS, Economic News Release, "Employer Costs for Employee Compensation—June 2023," Table 1. Employer costs for employer compensation by ownership, p. 4, *https://www.bls.gov/news.release/archives/ecec_09122023.pdf* (last visited Nov. 7, 2023).

rate of compensation for individuals at the lower end of the range as $19.05 per hour, where the 10th percentile hourly wage estimate is $13.14 per hour and the average benefits are $5.91 per hour.[287]

b. Module B. Impacts That Could Accrue to Labor Earnings

i. Earnings Impact to EAD Holders

There are three core inputs ("components" or "variables") requisite to estimate the impacts that could accrue to labor compensation; the lapse-duration, earnings, and the impacted population. DHS first extracted adjudication records on 77,000 auto-extended EADs for the relevant categories, which had lapsed and where the renewal EAD applications were subsequently approved from January 1, 2022, to May 15, 2022.[288] This date range is the benchmark needed for this module of the analysis because it captures the most recent data in the past in which the auto-extension was 180 days and USCIS was experiencing processing delays that resulted in lapses in employment authorization. This timeframe serves as the general structure for the distribution or shape of lapse durations; later, we make further adjustments to account for the larger population of renewal applications in need of processing than during this time period.

Next, USCIS used the Excel random number generator tool to randomly sample 3,000 records in order to work with a much smaller and tractable data set. For each record, we calculated the lapse-duration in calendar days. The data were next grouped into the number of cases that elapsed per day-duration and the concomitant share of cases applicable to each duration was tabulated.

Having a tractable sample, it is important to evaluate the structure of the data. We utilized the Oracle Crystal Ball® Modelling and Simulation Software ("OCB") to analyze the data. The data analysis batch fit tool in OCB indicates that the Gamma density function provides the best fit.[289] The

Gamma distribution is a member of the exponential distributions and is applicable in situations where the data displays considerable variance, is restricted to positive values, and is skewed to the right (positively skewed). It is frequently utilized in analyses to predict durations and wait times until future events occur. The durations display a wide range (1—1,049) and cluster around a median of 58, which is lower than the mean of 77.9, further informing the positive skew.[290] The extreme skew of the data can be evidenced from Table 9, which displays the percentiles applicable to the average lapse durations.

TABLE 9—PERCENTILES FOR THE NUMBER OF CALENDAR DAYS BETWEEN WHEN AUTO-EXTENDED EADs EXPIRED AND RENEWAL FORMS I–765 WERE SUBSEQUENTLY APPROVED FROM JANUARY 1, 2022, TO MAY 15, 2022

["Lapse Duration" in calendar days]

| Percentile | Lapse duration |
|---|---|
| 10 | 10 |
| 20 | 21 |
| 30 | 30 |
| 40 | 42 |
| 50 | 58 |
| 60 | 89 |
| 70 | 121 |
| 80 | 147 |
| 90 | 176 |
| 100 | 1,049 |

Source: USCIS analysis of renewal EAD filing data, provided by Office of Performance and Quality (OPQ), USCIS, DHS, Claims 3 database; data provided October 18, 2023.

As can be seen, the extreme jump in the lapse value from 176 to 1,049 in the 90th to 100th percentile is evident that there is long tail on the right side of the distribution capturing a small number of low probability outlier (numerically high value) durations.

All three core inputs require some adjustments to make them as salient as possible. Foremost, the lapse-durations are in calendar days, hence we make an adjustment to account for a full-time 8-hour workday and 5-day workweek. However, not all U.S. workers are employed full-time, so we also make an adjustment to number of hours worked per week. BLS currently reports that average weekly hours across all private nonfarm industries is 34.4.[291] This

figure is 86.0 percent of a 40-hour workweek.

As it relates to the core variable, population, the assessments of possible impacts rely on the assumption that everyone who was approved for an EAD under the relevant categories entered the labor force. DHS believes this assumption is justifiable because applicants, with few exceptions, would generally not have expended the direct filing (for the pertinent EAD categories in which there is a filing fee) and time-related opportunity costs associated with applying for an EAD if they did not expect to recoup an economic benefit. Realistically, however, individuals might not be employed for any number of other reasons not specifically relevant to this action. The national unemployment rate as of October 2023 is 3.9 percent.[292] There is constant and considerable job turnover in the labor market even when the unemployment rate is low. Individuals could be unemployed due to this normal turnover or from any number of case-specific factors and conditions. As such, we believe it is reasonable to scale the population to account for current unemployment, which is conducted by integrating the employment rate, as unity minus 0.039, to arrive at 0.961.

DHS scales the baseline population by the unemployment rate and the lapse rate—the percentage of the affected renewal population that might still experience a lapse in EAD with this rule—to achieve the population likely to avoid a lapsed EAD with this rule. The sensitivity analysis discussed in Tables 6 and 7 reveals that the percentage of EADs that would lapse under the proposed bridge varies. As such, the rate that would not lapse also varies. For the baseline population and lapse rate we rely on the triangle distribution. This distribution is ideal for these inputs because it sets a minimum and maximum value around a center point ("likeliest" value). In our calibration, the center point is the baseline value. For the population, the approximate minimum is 689,000, maximum is 824,000, and the center point is 793,000. For the lapse rate, the minimum is 9.8 percent, maximum is 54.1 percent, and the center point is 32.8 percent.[293] See Table 6.

---

[287] The calculation of the benefits-weighted 10th percentile hourly wage estimate: $13.14 per hour × 1.45 benefits-to-wage multiplier = $19.053 = $19.05 (rounded) per hour.

[288] Data provided by the USCIS, OPQ, Performance and Evaluation reporting (PAER) Division. USCIS Global Claims, and Global systems (10–17–23).

[289] OCB ranks density fit according to internal routines that evaluate the appropriateness of several tests according to features of the data. In this case, the Gamma density function fits the data best based on all continuous distributions subject to a scoring method applicable to the test statistic of the

Anderson-Darling (A–D) test, which in this case is 20.661.

[290] The produced tuning parameters are, location = 0.96, scale = 78.0, shape = 1.04671.

[291] BLS, Economic News Release, "The Employment Situation—September 2023," https://

www.bls.gov/news.release/archives/empsit_10062023.htm (Oct. 6, 2023).

[292] BLS, Economic News Release, "The Employment Situation—October 2023," https://www.bls.gov/charts/employment-situation/civilian-unemployment-rate.htm (Nov. 7, 2023).

[293] Low bound: 67,223 lapses with the rule/689,423 without; Primary: 260,327 lapses with the rule/793,053 without; Upper bound: 445,741 lapses with the rule/823,706 without.

DHS is interested in estimating the mean and a range for the impacts that is likely to be realized and employs a simulation approach. For the earnings we rely on the uniform distribution. This is a discrete distribution, which essentially means that any value in the range has the same probability as being selected as any other value. This structure is chosen because we have no evidence or data to suggest that the earnings would tend to cluster at either the low or high end of the range.

Next, DHS adjusts the lapse durations for the expected future under the TFR. DHS explained that the Gamma density function provides the best fit to the lapse- durations. DHS will operate under the assumption that the underlying data structure does not change over the future (the period of the TFR). Specifically, the durations will be positively skewed and clustered around a median less than the mean, with a long thin tail capturing very low-probability values substantially greater than the mean. The benefit of the Gamma distribution is that the location parameter is generally close to the minimum value, which will be consistent (in time), and the scale parameter represents the mean. The key shift factor that will change in the future is that the average duration will increase drastically. This increase will result from the increased processing times for EAD renewal filings that are concomitant to the growth in filings and the resulting backlog of cases, as is described in the preamble. We therefore have the capability to change the mean, and providing we do not alter the shape parameter, the general underlying data structure is retained–albeit with a new mean. In practice, changing the mean can have some effect on the other two parameters, but the distortion is very miniscule. DHS ran dozens of experiments with a range of means that could be gleaned as appropriate as being informed by the data and in every case the Gamma fit was solidly retained, visual examination yielded no discernable differences in structure, and the parameters varied by a miniscule amount. Stated in more slightly formal terms, the distribution for lapse-durations that DHS is working with is generally scalable about its mean, which is a crucial necessary condition for estimation.

To determine the mean to impute we analyzed data provided by the USCIS Office of Performance and Quality, applicable to estimated lapse-durations by the size of the population that could be impacted. We began by forecasting monthly filing volumes over the period of analysis based on historical filing patterns and expected EAD expirations by month. We also estimated average monthly officer completions based on FY 2023 totals.

Because USCIS generally adjudicates applications in the order of the date received, for each month in the analysis we calculated the pending inventory by adding forecasted receipts and subtracting average officer completions. Using this information, we are able to estimate the number of pending applications that would expire each month and the estimated amount of time until the expired EADs would be adjudicated (*i.e.,* the lapse duration). Next, DHS utilized estimates of the number of possible lapses and the estimate of the average lapse duration over the period in which most of the EADs would lapse. We then divided the number of EADs lapsing by duration into the total number that could lapse over the entire period to obtain individual weighting factors. Multiplying each weight factor by the lapse duration and summing over all data points yielded a weighted average lapse duration of 271 days.

Above, we have described the adjustments made to the population to account for unemployment and employment lapses that may still happen, to wages to account for benefits, and to the lapse duration to account for the work week and hours worked. In practice, it is not necessary to make the adjustments to the core inputs directly or even sequentially. The reason is that the inputs (core and incumbent adjustment factors) interact in the estimation procedure multiplicatively, hence they can be abridged into a single equation and nested compactly as a "one-step" routine in the software program.

The inputs and settings for the estimates are encapsulated in Table 10. In practice there are two modules (populations) that will comprise the earnings impacts. The Department believes the impacts will be beneficial to EAD holders as "preserved" or "stabilized" earnings. For EADs that this rule will prevent from lapsing, the duration input is the gamma density tuned to the parameters produced by the software and truncated at the upper end by a value of 360 (days), since the gamma curve is infinite in its upper tail. However, individuals with EADs that may still lapse would also incur a benefit of being able to work exactly 360 days longer than they otherwise would—there is no variation or distribution, as the extra days is the point value of 360 days. There are any number of ways to derive an expression capturing the two population modules that may still incur stabilized earnings, *i.e.,* (a) those that would be prevented from lapsing, and (b) those that would still lapse. In the technical appendix accompanying this rulemaking, we develop the system from its long form into a compact nested equation, which is the product of two terms, as is shown in Table 10. The combined employment "intensity" scalar is developed to abridge all non-varying inputs common to both modules as a single input for purpose of brevity.

TABLE 10—MODEL FOR ESTIMATION OF EARNINGS IMPACT

| Input | Structure | Settings |
|---|---|---|
| Baseline Population (P) ............................ | Triangle distribution .................................... | Min: 689,000.<br>Max: 824,000.<br>Likeliest: 793,000. |
| Lapse rate (L) ........................................... | Triangle distribution .................................... | Min: 9.8%.<br>Max: 54.1%.<br>Likeliest: 32.8%. |
| Hourly wage (W) ....................................... | Uniform distribution .................................... | Min: $13.14.<br>Max: $41.60. |

TABLE 10—MODEL FOR ESTIMATION OF EARNINGS IMPACT—Continued

| Input | Structure | Settings |
|---|---|---|
| Lapse Durations: ......................................<br>$D_S$: EADs saved from lapse ....................<br>$D_L$: EADs that lapse ................................ | $D_S$: Gamma density; ..................................<br>$D_L$: Point value ........................................... | $D_S$: Gamma density.<br>Location: 0.96.<br>Scale: 271.0.<br>Shape: 1.047.<br>Max: 360.<br>$D_L$: 360. |
| Combined scalar ...................................... | Point value ................................................ | Benefits multiplier (B): 1.45.<br>Workweek time (T): 5 ÷ 7 days = 0.714.<br>Average hours (H): 34.4 ÷ 40 hours = 0.86.<br>Full time day hours (F): 8.0.<br>Employment rate (E): 1 − 0.039 = 0.961.<br>Scalar (S) = B × T × H × F × E = 6.85. |
| Nested equation ...................................... | $\{(W \times S \times P) \times (D_S - (L \times (D_S - D_L)))\}$ | |

| Results summary ...................................... | Forecast values (millions, undiscounted) [294] | |
|---|---|---|
| Range level | Preserved earnings impact | Taxes = (impact × 0.153) ÷ 1.45 |
| low | $10,230.1 | $1,079.5 |
| average | 30,984.8 | 3,269.4 |
| high | 63,958.4 | 6,748.7 |

- Impact type: stabilized earnings to individuals.
- Contribution to forecast variance:
  Lapse duration = 47.5%.
  Hourly wage = 47.0%.
  Lapse rate: 4.9%.
  Population: 0.6%.

Source: USCIS analysis, 3–5–24.

OCB repeatedly calculates results using a different set of random values from the range of values and probability distributions described in Table 10 above to build a model of possible results. We ran 100,000 randomized seed trials, which is more than sufficient to generate a 95 percent level of precision in the results.

[294] The low and high values reflect a 95 percent certainty bound, which captures the distribution specific values between the 2.5th and 97.5th percentiles.

**Figure 3. Stabilized Earnings Estimate**



Based on the simulation, and as shown in Figure 3, the expected value (which is the mean of probabilistic-based forecast values) for stabilized earnings is $31.0 billion.[295] We also generated a 95 percent certainty range, which reports $10.2 billion to $64.0 billion. A sensitivity analysis that scores the inputs in terms of how much variation in each contributes to fluctuation in the forecasted values reveals that the lapse-durations (that vary) and wage contributed about the same, 47.5 and 47.0 percent of the total variation, in order, while the lapse rate contributed a small 4.9 percent of the variation (see Table 10 for more information). DHS believes that the earnings impact, which can be thought of as "stabilized" or "preserved" earnings to renewal EAD applicants, will be beneficial to the EAD holders, as the rule would prevent a lapse in their employment authorization and an incumbent interruption of their labor compensation.

If, without this rule, businesses would not have been able to find replacement labor for the position the affected renewal EAD applicant filled, then the unperformed labor would have resulted in a reduction in taxes from employers and employees to governments. Accordingly, the stabilized earnings derived from this rule, and estimated above, will prevent such a reduction in taxes. It is challenging to quantify Federal and State income tax impacts of employment in the labor market scenario because individual and household tax situations vary widely as do the various State income tax rates.[296] But DHS is able to estimate the potential contributory effects on employment taxes, namely Medicare and Social Security, which have a combined tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[297] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated level of tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent.

DHS estimates the tax impacts on the unburdened earnings basis. This is done by multiplying the stabilized earnings by the employment tax rate of 15.3 percent, and dividing the resulting product by the benefits burden multiple of 1.45.[298] If, without this rule, all employers would have been unable to find replacement labor for the position the renewal EAD applicant filled, this rule will prevent a reduction in employment taxes from employers and employees to the Federal Government of $3.3 billion, but could range from $1.1 billion to $6.7 billion, in undiscounted terms. The actual value of tax impacts will depend on the number of affected EAD holders that businesses would have been able to easily find reasonable labor substitutes for in the absence of this rule.

There are several caveats to our estimates that could cause the true impacts to vary higher or lower. In one way, the estimates are likely to be understated. DHS accounted for the duration of the EAD lapse, but this is not necessarily the total spell of unemployment individuals could face. The BLS reports that the median spell of unemployment across all economic sectors is 9.2 weeks, which would be 64.4 days (unadjusted). We did not include this because we do not know if

---

[295] The certainty level is based on the entire range of forecast values, so the 95 percent certainty range is the range between which 95 percent of forecasted values are expected to fall, regardless of proximity to the mean. Roughly speaking, the 95 percent certainty bound would generally capture the distribution-specific forecast values lying between the 2.5th and 97.5th percentiles.

[296] Robert Frank, "61% of Americans paid no federal income taxes in 2020, Tax Policy Center says," CNBC (Aug. 18, 2021), *https://www.cnbc.com/2021/08/18/61percent-of-americans-paid-no-federal-income-taxes-in-2020-tax-policy-center-says.html* (last updated Aug. 20, 2021), and for varying State income tax rates, *see* Tonya Moreno, "Your Guide to State Income Tax Rates," The Balance, *https://www.thebalance.com/state-income-tax-rates-3193320* (last updated Jan. 3, 2022).

[297] The various employment taxes are discussed in more detail, *see* Internal Revenue Service, "Understanding Employment Taxes," *https://www.irs.gov/businesses/small-businesses-self-employed/understanding-employment-taxes* (last updated Mar. 14, 2022). *See* Internal Revenue Service "Publication 15," "(Circular E), Employer's Tax Guide" (Dec. 19, 2023), *https://www.irs.gov/pub/irs-pdf/p15.pdf* for specific information on employment tax rates. Relevant calculation: (6.2 percent Social Security+1.45 percent Medicare)×2 employee and employer losses=15.3 percent total estimated public tax impact.

[298] We divide by the 1.45 benefits multiplier to account for the fact that employment taxes are calculated based upon wages paid, not including fringe benefits.

some portion of individuals may be able to return to their previous employers (for example, if the EAD lapse was shorter than the median spell of unemployment and if the employer has difficulty finding a replacement worker) or, for those who cannot, if they would start the search process until they became reauthorized to work. If they did not—*i.e.,* they started looking for new work during the lapse, double counting would be invoked for some portion of the duration. It may be useful to think of the total unemployment spell as being the sum of two parts, the EAD lapse and the [job] "search time." We have no data to support a determination on when the search process starts, and hence if the two parts intersect, and therefore we do not include it. However, to the extent that it may be reasonable to assume that many individuals would not start looking for work until after they became re-authorized to work, incorporating the "search time" duration in addition to their lapse duration would substantially increase the scope of the stabilized earnings impacts.

Second, in addition to the search time spell of unemployment outside of the lapse alone, there are costs to looking for work. There are direct costs involved in activities such as resume updating, possibly learning new skills, travel to interviews, and so on. There are also time-related opportunity costs applicable to the job search. DHS does not have salient data or method to allocate the portion of individuals that would need to conduct a job search and the portion of the search time that could be conducted during the EAD lapse, and thus they are not included.

ii. Labor Turnover Cost Impacts

This TFR is expected to generate a labor turnover cost savings to employers of affected EAD holders. DHS bases the assessment of these impacts on the assumption that every EAD applicable to the adjusted population that would have lapsed without this rule would have generated an involuntary separation from an employer, and that the separation is due to no other factors.

Employment separations can generate substantial labor turnover costs to employers that can be divided into several components. First are the direct or "hard" costs that involve separation and replacement costs. The separation costs include exit interviews, severance pay, and costs of temporarily covering the employee's duties and functions with other employees, which may require overtime or temporary staffing. The replacement costs typically include expenses of advertising positions,

search and agency fees, screening applicants, interviews, background verification, employment testing, hiring bonuses, and possible travel and relocation costs. Once hired, employers face additional training, orientation, and assessment costs.

Second, direct costs involve loss of productivity and possibly profitability due to operational and production disruptions, which can include errors from other employees that may temporally fill the position. Some analysts have identified a third cost segment, which is a type of indirect cost, which encompasses loss of institutional knowledge, networking, and impacts to work-culture, morale, and interpersonal relationships. This last type of cost is almost impossible to measure quantitatively.[299]

There are numerous studies and reports concerning labor turnover costs available from Human Resource entities that are cited across correspondent literature. Some focus on specific occupations, industries, salary levels, and often measure turnover cost in slightly different ways. Labor turnover cost is generally reported as a share of annual earnings or an actual cost per employee. Usually these reports measure the more direct, or "hard" costs associated with turnover and not intangible effects such as worker morale or lost productivity. Many reports cite a 2012 report published by the Center for American Progress (CAP) that surveyed more than 30 studies that considered both direct (*e.g.,* separation and replacement) and indirect (*e.g.,* loss of institutional knowledge) costs. DHS captures preserved productivity savings—proxied by stabilized impacts to applicants—had employers not been able to immediately fund replacement labor for renewal EAD applicants without this rule. DHS requests public comments on how, or if, that measure of productivity may overlap with the types of productivity covered in the CAP report captured here, such as from the substitutability of replacement labor.[300]

The CAP and other reports that we reviewed confirm three central aspects of turnover cost: (1) that they vary substantially across industries and jobs; (2) that they tend to grow (in absolute and percentage terms) according to skill level and earnings; and (3) that they are

higher for salaried workers compared to hourly wage earners.[301] The report notes that specialized technical jobs and highly paid jobs in line with senior or executive levels, which involve high levels of education, credentials, and stringent hiring criteria, can generate disproportionately high replacement costs that can reach more than 100 percent of the salary—compared to jobs with low educational and technical requirements.[302] However, the CAP survey found that costs tend to range within a bound of 10 percent to around 40 percent of the salary. For example, CAP found despite wide variation and range, for workers earning on average $75,000 per year or less (2012$), turnover costs ranged typically from 10 to 30 percent of the salary, clustering at about 21 percent. More recent reports indicate that the typical cost is about one-third of the salary.[303]

DHS could nest the information provided above into an estimation procedure, but it would be beneficial to examine granular data to hone the estimates for two reasons. First, it would be valuable to quantify the correlation between annual earnings and labor turnover costs and incorporate it in the ensuing forecast procedure. Second, it is desirable to obtain a distribution for the data—an average and median could be gathered from the referenced reporting, but there would be a gap in terms of other metrics needed to calibrate a certain distribution.

DHS examined a 2020 report by the Washington Center for Equitable Growth, which updated the earlier CAP study results to provide information on about thirty-five studies on turnover costs.[304] We selected data points that

[299] For additional descriptions of the components of labor turnover costs, *see* Ghase Charba, "Employee retention: The Real Cost of Losing an Employee," PeopleKeep, (updated February 2, 2023), *https://www.peoplekeep.com/blog/employee-retention-the-real-cost-of-losing-an-employee.*

[300] DHS did not receive public comment on this specific request in the previous EAD Auto Extension TFR.

[301] *See* Heather Boushey and Sarah Jane Glynn, "There Are Significant Business Costs to Replacing Employees," Center for American Progress, (Nov. 16, 2012), *https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/.*

[302] *See* Shane Mcfeely and Ben Wigert, "This Fixable Problem Costs U.S. Businesses $1 Trillion," Workplace, (Mar. 13, 2019), *https://www.gallup.com/workplace/247391/fixable-problem-costs-businesses-trillion.aspx. See also* Kate Heinz, "The True Costs of Employee Turnover," Built In, *https://builtin.com/recruiting/cost-of-turnover* (last updated June 23, 2023).

[303] *See* "The Real Cost of Employee Turnover in 2021," Terra Staffing Group (Nov. 4, 2020), *https://www.terrastaffinggroup.com/resources/blog/cost-of-employee-turnover. See* also Louie Andre, "112 Employee Turnover Statistics: 2021 Causes, Cost & Prevention Data," Finances Online, *https://financesonline.com/employee-turnover-statistics/#cost* (last accessed Nov. 7, 2023).

[304] *See* Kate Bahn and Carmen Sanchez Cumming, "Improving U.S. Labor Standards and the Quality of Jobs to Reduce the Costs of Employee Turnover to U.S. Companies," Washington Center for Equitable Growth, (December 2020), *https://*
Continued

captured both the annual earnings salary (which the study benchmarked to 2019 levels) and turnover costs. We then culled the data applicable to salary levels more than the maximum in our earnings bound. We note before making any adjustments, multiplying the maximum wage ($41.60) by 2,080 average annual hours yields a maximum annual earnings figure of $86,528. Twenty-seven resulting data points were employed for the analysis. While this may be relatively few observations, OCB nevertheless was able to fit a lognormal density function to the data, and we are confident in relying on the results.[305] Foremost, the mean of 22.4 percent and the median of 16.6 percent of annual

salary are amenable to the metrics reported in the studies referenced above and fall within a substantial range, from 2.1 percent to 68.7 percent. Second, on qualitative grounds the lognormal distribution is well-suited as a setup, as it is often utilized in situations where there is wide variation and there is a discrete lower end minimum, further restricted to positive values. First, negative values can be ruled out in context—there cannot be zero cost to an employee separation—and thus a lower tail cutoff to bound to the cost percentage is appropriate. Second, we can reasonably conjecture that the costs would tend to cluster near the lower tail of the distribution (as outlined in the

CAP report), which is amenable to the positive skew of the distribution, reinforced by the data resultant mean being larger than the median.[306]

Additionally, the scatterplots presented in Figures 4A and 4B with the fitted least squares line clearly reveal that turnover cost is an increasing function of the annual earnings, with a moderately strong correlation coefficient of 0.421.[307] Figure 4A plots the cost as a percentage of salary, as this is how it is inputted into the estimation, while Figure 4B plots the cost in actual dollars, for context (the data points utilized are provided in the accompanying technical appendix).



Figure 4A. Relation Between Annual Salary and Turnover Cost (%)

equitablegrowth.org/wp-content/uploads/2020/12/122120-turnover-costs-ib.pdf. The data are found in the methodological appendix, located in the Docket for this rulemaking.

[305] DHS used the same general data source for the turnover costs for the 2022 EAD TFR. In that earlier rule a slightly different distribution was applied than the lognormal herein. The software periodically updates the mathematics and scoring algorithms applicable to density fits and the result was a slight change in the appropriate fit. However, both distributions take on a very similar shape and

any resulting differences in results would be very minor.

[306] OCB indicates that the multiple continuous distributions are appropriate for the data but ranks the Lognormal distribution highest in terms of goodness of fit with an A–D test statistic of $t = 0.1282$ and an associated $p$-value of 0.971. The three produced parameters are as follows: location $= -0.03$, mean $= 0.23$, and standard deviation $= 0.19$. The fitted parameters affect the shape and position of the distribution.

[307] The slope coefficient for the regression of costs against salary is 5.2E–06. By multiplying this figure by 5,000 to obtain 0.026, it can be interpreted that a $5,000 increase in salary is associated with a 2.6 percentage point increase in labor turnover costs, on average, within the range of our data. The exact probability of committing a type I error ($p$-value) for the slope coefficient is 0.028, such that we can reject the hypothesis that salary and turnover costs are not systemically related (or such that the correlation in the particular data is due to randomness) with more than 95 percent confidence.

Figure 4B. Relation Between Annual Salary and Turnover Cost ($)

To obtain the annual salary we multiply the (non-burdened) wage bounds ($13.14 and $41.60) by 2,080 annual full-time hours but make the adjustment to account for average hours by scaling by 0.86, as was introduced above for stabilized earnings. In addition, we scale the baseline population to account for unemployment and lapses that may still occur even with this rule; this rule would delay though not prevent separations for employees that may still experience a lapse. DHS also recognizes that a certain number of individuals may have been terminated or chosen to leave irrespective of this rule and, accordingly, this rule won't prevent such turnover. DHS does not have data on the number of renewal EAD applicants that would have been terminated from or left their jobs had they not lost employment authorization.[308] DHS requests public comment on data that could be used to make such an adjustment.[309]

We calibrated the lognormal distribution for the parameters produced and calibrated the estimation program according to the below input values. The lognormal distribution is infinite in the upper tail and we truncated the cost percentage to 68.7 percent, the highest value in the underlying data. The core inputs are the baseline population, turnover cost percentage, and the wage (unburdened). In practice, it is not necessary to adjust them directly or even sequentially. The reason is that all the inputs (core and adjustment factors) interact in the estimation procedure multiplicatively, hence they can be abridged into a single equation and nested compactly as a "one-step" routine in the software program as the product of two terms. The inputs and settings are collated in Table 11, with the nested equation shown as well. The correlation between cost and earnings is tuned to 0.421. Imputing the correlation essentially means that if a randomly chosen earnings value is high, there is a higher probability that a high turnover cost percentage will be selected as well and vice versa for lower cost percentages. The table below summarizes the entire system—the inputs, their settings, and the resulting outputs.

TABLE 11—MODEL FOR ESTIMATION OF TURNOVER COST IMPACT

| Input | Structure | Settings |
|-------|-----------|----------|
| Baseline Population (P) ............................. | Triangle distribution ................................ | Min: 689,000. Max: 824,000. Likeliest: 793,000. |
| Lapse rate (L) ............................................ | Triangle distribution ................................ | Min: 9.8%. Max: 54.1%. Likeliest: 32.8%. |
| Hourly wage (W) ........................................ | Uniform distribution ................................. | Min: $13.14. Max: $41.60. |
| Turnover cost % (C) ................................... | Lognormal density ................................... | Location: −0.03. Mean: 0.23. S-dev.: 0.19. Max: 0.687. |

---

[308] Further, DHS does not have data on the number of EAD renewal applicants that have been terminated because their employer used an online calculator provided by USCIS to assist in the determination of an EAD expiration date.

Presumably an employer would determine an EAD expiration well in advance of the date for business continuation purposes. Regardless, an employer would spend time utilizing this optional online calculator with or without this rule and is not considered an additional burden for this rule.

[309] DHS did not receive public comment on this specific request in the previous EAD Auto Extension TFR.

**24670**   **Federal Register** / Vol. 89, No. 68 / Monday, April 8, 2024 / Rules and Regulations

TABLE 11—MODEL FOR ESTIMATION OF TURNOVER COST IMPACT—Continued

| Input | Structure | Settings |
|---|---|---|
| Employment scalar (S) | Point value | Average hour adjustment (H): 0.86.<br>Full time annual hours (A): 2,080.<br>Employment rate (E): 0.961.<br>Scalar = H × A × E = 1,719. |
| Correlation | W, C | 0.421. |
| Nested equation | {(W × C × P × S) × (1 − L) | |

| Results summary | Forecast values (millions, undiscounted) | | |
|---|---|---|---|
| | low | average | high |
| | $441.0 | $5,509.9 | $18,560.7 |
| | • Impact type: Cost-savings to employers<br>• Contribution to forecast variance:<br> (a) Turnover cost (%) = 65.1%<br> (b) Hourly wage = 34.9%<br> (c) Population and lapse rate = negligible<br>Number of businesses impacted: 62,900–82,400 | | |

Source: USCIS analysis, 3–5–2024.

We ran 100,000 randomized seed trials, which is more than sufficient to generate 95 percent level of precision in the results. The results are displayed in Figure 5.

**Figure 5. Estimated Labor Turnover Impacts**



Based on the simulation, the expected value is $5.5 billion, and the 95 percent precision bound results in a range of forecasts from $0.4 billion to $18.6 billion. The sensitivity analysis reveals that variation in the turnover cost percentage of the salary contributed about 65.1 percent of the wide certainty range while about 34.9 percent was driven by the variance in earnings. The other inputs contributed negligibly.

In addition to the projected cost-savings to businesses reported above, DHS can make some estimates of the number of businesses that could benefit from the cost-savings. From the E-Verify data utilized to develop an upper wage bound, we randomly sampled 451 EAD employers, which is more than the requisite 384 needed for a 95 percent level of confidence and collected the number of E-Verify cases per EAD

employer.[310] The analysis reveals that there were on average ten cases per EAD employer for FY 2022. If this figure is

[310] DHS determined the sample size using a standard statistical formula based on the total EAD employer population of 149,132 in FY 2022 with a 95 percent confidence level and a 5 percent confidence interval. This means that there is a 95 percent chance that parameters descriptive of the population (e.g., the EAD employer population size) are no more than 5 percent different from the statistic obtained by the sample.

extrapolated to the baseline population, it would indicate that between 62,900 and 82,400 EAD employers could be impacted.

c. Module C. Monetized Impacts for the TFR

In Table 12 we collate the undiscounted monetized impacts derived from the above sections.

### TABLE 12—SUMMARY OF MONETIZED IMPACTS

[FY 2024 through FY 2028, undiscounted, in $ millions, 2022$]

|  | Stabilized earnings | Labor turnover cost | Total impacts | Employment taxes |
|---|---|---|---|---|
| Low end | $10,230.1 | $441.0 | $10,671.1 | $1,079.5 |
| Average | 30,984.8 | 5,509.9 | 36,494.7 | 3,269.4 |
| High end | 63,958.4 | 18,560.7 | 82,519.1 | 6,748.7 |

Because the TFR will apply to more than one full fiscal year, we also apply a discounting framework to the impacts. Since there is a one-to-one mapping from the population to the impacts, we can derive the yearly allocations directly from the population figures. According to our analysis, based on the broad population, the shares of impacts allocated to the FYs 2024, 2025, 2026, 2027, and 2028, in order, are 6.0, 18.7, 36.2, 31.8, and 7.4 percent.[311]

Table 13 provides the allocated impacts according to the allocation derived above, to account for the average, and low and high ends of the certainty bound in order. The table is organized into two sections to account for undiscounted terms and those at a 2-percent discount rate. We parsed out the stabilized earnings and labor turnover impacts separately, as they will embody different types of impacts.

### TABLE 13—MONETIZED EXPECTED VALUE IMPACTS FOR THE TFR

[$ millions, 2022]

|  |  |  |  |  |
|---|---|---|---|---|
| **A. Undiscounted** | | | | |
| **1. Low end bound** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes[312] |
| 2024 | $618.3 | $26.7 | $645.0 | $65.2 |
| 2025 | 1,909.3 | 82.3 | 1,991.6 | 201.5 |
| 2026 | 3,699.5 | 159.5 | 3,858.9 | 390.4 |
| 2027 | 3,249.3 | 140.1 | 3,389.4 | 342.9 |
| 2028 | 753.8 | 32.5 | 786.3 | 79.5 |
| 5-year Total | 10,230.1 | 441.0 | 10,671.1 | 1,079.5 |
| **2. Average** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
| 2024 | 1,872.7 | 333.0 | 2,205.7 | 197.6 |
| 2025 | 5,782.8 | 1,028.3 | 6,811.1 | 610.2 |
| 2026 | 11,204.9 | 1,992.5 | 13,197.4 | 1,182.3 |
| 2027 | 9,841.4 | 1,750.1 | 11,591.5 | 1,038.4 |
| 2028 | 2,283.0 | 406.0 | 2,689.0 | 240.9 |
| 5-year Total | 30,984.8 | 5,509.9 | 36,494.7 | 3,269.4 |
| **3. High end bound** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
| 2024 | 3,865.6 | 1,121.8 | 4,987.4 | 407.9 |
| 2025 | 11,936.8 | 3,464.0 | 15,400.8 | 1,259.5 |
| 2026 | 23,129.0 | 6,712.0 | 29,841.0 | 2,440.5 |
| 2027 | 20,314.5 | 5,895.3 | 26,209.8 | 2,143.5 |

[311] These shares are derived by dividing into a total population of EADs that could expire (before making any adjustments) across the four- year span FY 2024 through FY 2027 of 1,112,425 the share that could expire in each of those years, in order, 90,612 (8.1 percent), 248,299 (22.3 percent), 455,822 (41.0 percent), and 317,692 (28.6 percent). Because the average lapse duration of 271 days is 74.2 percent of a 365-day year, the stabilized earnings and employment taxes may be spread over more than one fiscal year. To account for the cost savings accruing to the next fiscal year (the remaining 25.8 percent), we then extrapolate this percentage to the population for lapses that would begin in the second half of a fiscal year t. The resulting impacts are spread over FY 2024 through FY 2028 in the following shares: 6.0 percent (8.1 percent × 74.2 percent), 18.7 percent (8.1 percent × 25.8 percent + 22.3 percent × 74.2 percent), 36.2 percent (22.3 percent × 25.8 percent + 41.0 percent × 74.2 percent), 31.8 percent (41.0 percent × 25.8 percent + 28.6 percent × 74.2 percent), and 7.4 percent (28.6 percent × 25.8 percent). Source: DHS, USCIS, OPQ (March 5, 2024).

TABLE 13—MONETIZED EXPECTED VALUE IMPACTS FOR THE TFR—Continued

[$ millions, 2022]

| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
|---|---|---|---|---|
| 2028 | 4,712.5 | 1,367.6 | 6,080.1 | 497.3 |
| 5-year Total | 63,958.4 | 18,560.7 | 82,519.1 | 6,748.7 |
| **B. 2% discount** | | | | |
| **4. Low end bound** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
| 2024 | 606.2 | 26.1 | 632.3 | 64.0 |
| 2025 | 1,835.1 | 79.1 | 1,914.2 | 193.6 |
| 2026 | 3,486.1 | 150.3 | 3,636.4 | 367.8 |
| 2027 | 3,001.8 | 129.4 | 3,131.2 | 316.7 |
| 2028 | 682.7 | 29.4 | 712.1 | 72.0 |
| 5-year Total | 9,612.0 | 414.4 | 10,026.3 | 1,014.2 |
| Annualized | 2,039.3 | 87.9 | 2,127.2 | 215.2 |
| **5. Average** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
| 2024 | 1,836.0 | 326.5 | 2,162.5 | 193.7 |
| 2025 | 5,558.2 | 988.4 | 6,546.6 | 586.5 |
| 2026 | 10,558.6 | 1,877.6 | 12,436.2 | 1,114.1 |
| 2027 | 9,092.0 | 1,616.8 | 10,708.7 | 959.4 |
| 2028 | 2,067.8 | 367.7 | 2,435.5 | 218.2 |
| 5-year Total | 29,112.6 | 5,177.0 | 34,289.5 | 3,071.9 |
| Annualized | 6,176.5 | 1,098.3 | 7,274.8 | 651.7 |
| **6. High end bound** | | | | |
| FY | Stabilized earnings | Labor turnover | Total impacts | Estimated taxes |
| 2024 | 3,789.8 | 1,099.8 | 4,889.6 | 399.9 |
| 2025 | 11,473.3 | 3,329.5 | 14,802.8 | 1,210.6 |
| 2026 | 21,795.0 | 6,324.9 | 28,119.8 | 2,299.7 |
| 2027 | 18,767.5 | 5,446.3 | 24,213.8 | 1,980.3 |
| 2028 | 4,268.3 | 1,238.7 | 5,506.9 | 450.4 |
| 5-year Total | 60,093.8 | 17,439.2 | 77,533.0 | 6,340.9 |
| Annualized | 12,749.4 | 3,699.9 | 16,449.3 | 1,345.3 |

For the discounted figures, the annualized amounts are the average annual equivalence basis.

d. Module D. Other Impacts

As explained previously, DHS does not know what the next best alternative would have been for businesses without this rule. Accordingly, DHS does not know the proportion of the stabilized labor earnings estimates developed above that would represent cost savings to businesses for prevented lost productivity or are prevented transfer payments from affected EAD holders to replacement labor.[313] These effects are very difficult to quantify and could be influenced by multiple factors, but we will address the possibilities at a conceptual level.

In the cases where, in the absence of this rule, businesses would have been able to easily find reasonable labor substitutes for the renewal EAD applicants, then the impact of this rule is preventing a distributional impact where the earnings of affected EAD holders would be transferred to others, who might fill in for (and presumably replace) the renewal EAD applicants during their earnings lapse. The portion of the total estimate of stabilized income that would represent this prevented transfer payment will depend on the ability of businesses to have found replacement labor in the absence of this rule.

[312] If, without this rule, businesses could not find replacement labor for any of the affected EAD holders, the tax impacts shown represent the loss in employment taxes this rule would prevent. The actual amount will depend on how easily businesses would have been able to find replacement labor in the absence of this rule.

[313] Transfer payments are monetary payments from one group to another that do not affect total resources available to society. See OMB Regulatory Impact Analysis: A Primer pages 7 and 8 for further discussion of transfer payments and distributional effects. https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf.

**Federal Register** / Vol. 89, No. 68 / Monday, April 8, 2024 / Rules and Regulations **24673**

In the cases where, in the absence of this rule, businesses would not have been able to easily find reasonable labor substitutes for the renewal EAD applicants, then the impact of this rule is preventing an associated loss of productivity for employers. Therefore, the portion of the total estimate of stabilized income that would represent cost savings to employers for prevented productivity losses in the absence of this rule will depend on the ability of businesses to have found replacement labor in the absence of this rule. In this case, the rule may also result in additional cost savings to employers for prevented profit losses and having to choose the next best alternative to the EAD holder.

DHS does not know what this next-best alternative may be for those companies. However, if the replacement candidate would have been substitutable for the affected renewal EAD applicant to a high degree, the labor performed by the new candidate would not have resulted in changes to profits or productivity. Accordingly, if the replacement labor is highly substitutable, we wouldn't expect this rule to result in cost savings for productivity loss as a result of employing the next available alternative for labor. If, however, the replacement labor is a poor substitute and would have decreased productivity, then this rule will preserve that lost productivity.

The above discussion involves two important points: If employers replaced individuals who faced a lapse in their employment authorization and/or EAD validity after the automatic extension with others in the labor force, then once employment eligibility and the EAD was eventually reauthorized the EAD holder would need to conduct a new search for a new job. They would thus incur direct costs associated with seeking new employment. As discussed above, DHS was not able to monetize these potential additional costs.

DHS does not believe this rule will adversely affect the U.S. labor market. This rule extends current employment authorization for individuals who are at risk of losing it solely because of USCIS processing delays; it does not grant new work authorization to additional persons. DHS expects that this rule will help to partially alleviate the adverse effects that a lapse in employment authorization would have on affected current employment-authorized individuals and their employers. In FY 2022, 89 percent of EAD renewals for affected categories were approved[314] and all renewals, by definition, had a previously approved initial EAD application. According to the most recent data (applicable to October 2023), the U.S. labor force stands at 167,728,000.[315] The maximum population of about 824,000 represents 0.50 percent of the national labor force, approximately 554,000 of which would potentially not lapse as a result of the action being taken.

Without this rule, EAD holders who remain eligible for employment authorization would encounter delays in renewal EADs and either be unauthorized to work for periods of time or lack documentation reflecting their employment authorization. This rule is not making additional categories eligible for employment authorization; it simply temporarily increases the 180-day timeframe for those already eligible for an automatic extension. It will mitigate the risk that these EAD holders will experience gaps in employment authorization and/or EAD validity as a result of USCIS processing delays. Accordingly, stabilized earnings for these EAD holders may also relieve the support network of the applicants for any monetary or other support that would have been necessary during such a period of unemployment. This network could include public and private entities, and it may comprise family and personal friends, legal services providers and advisors, religious and charity organizations, State and local public institutions, educational providers, and nongovernmental organizations. DHS believes these impacts would accrue as cost-savings to the noncitizen EAD holders and their families.

Finally, DHS provides Table 14 to elucidate the share and number of EADs that could lapse at the baseline population value (793,000).

TABLE 14—APPROXIMATE EAD LAPSES UNDER DIFFERENT EXTENSIONS

| Extension days (above current 180 days) | Total automatic extension days (including current 180 days) | Approximate share that could lapse (percent) | Approximate number that could lapse |
|---|---|---|---|
| 0 | 180 | 100 | 793,000 |
| 30 | 210 | 90 | 713,000 |
| 60 | 240 | 80 | 634,000 |
| 90 | 270 | 75 | 595,000 |
| 120 | 300 | 65 | 515,000 |
| 180 | 360 | 55 | 436,000 |
| 210 | 390 | 45 | 376,000 |
| 360 | 540 | 33 | 260,000 |
| 540 | 720 | 8 | 63,000 |

Source: USCIS analysis, 11–3–23

[314] We note that the applicable renewal EAD approval rate from FY 2022 for A03, A05, A07, A08, A10, A12, A17, A18, C08, C09, C10, C16, C19, C20, C22, C24, C26, and C31 filings was 89 percent. The calculation was made from EAD filing data. *See* Form I–765, Application for Employment Authorization, All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type (FY 2003 through 2022), *https://www.uscis.gov/sites/default/files/document/data/I-765_Application_for_Employment_FY03-22_AnnualReport.pdf* (last updated Nov. 2022). Due to the increase in backlogs, the renewal EAD approval rate was calculated as the number of approvals divided by the sum of approvals and denials, rather than the receipts basis. Calculation: 511,660 ÷ (551,660 + 63,545) = 0.89. We note that this percent may be understated because some C09 denials are denied because the applicant's Form I–485 was approved, and they are now a lawful permanent resident; setting aside C09 adjudications entirely, the renewal EAD approval rate would be 94%.

Calculation: 430,879 ÷ (430,879 + 26,252) = 0.94. Further, the table in the above link notes that "[s]ome applications approved or denied may have been received in previous reporting periods." It is possible that an approval or denial reported in this table for FY 2022 could have been from a renewal EAD application submitted in FY 2021.

[315] BLS, "Employment Situation Summary Table A, Household Data, seasonally adjusted," "Civilian labor force," *https://www.bls.gov/news.release/empsit.a.htm* (last visited Nov. 7, 2023).

Even with the TFR an estimated 260,000 (baseline) EADs could still lapse, though adding 360 days to the current 180-day extension would help ensure that these lapses would not occur until November 2025. Extensions below 540 days would stand to generate larger numbers of potential lapses. Therefore, DHS did not consider lower extensions as alternatives.[316]

DHS has not quantified the net benefits from an alternative of granting extensions greater than 540 days to all or some EAD categories. Qualitatively, although Table 14 shows the approximate number of EADs that could lapse is further reduced using a 720-day bridge (540 temporary extension + the existing 180 days) and thus attending benefits would be greater, policy and operational constraints exist. As discussed earlier in this preamble, a longer automatic extension period would result in a larger number of employers using 720 or 730 days as their Form I–9 reverification date, even though only one-third of affected applicants could need longer than 540 days. Additionally, TPS designations, and thus associated-EAD benefits cannot be granted for longer than 18 months (approximately 540 days). In addition, the Department believes that a longer period could cause confusion and potential mistakes in employer verification. While a hypothetical carve out might allow for all non-TPS EAD extensions of greater duration, DHS has limited information on the potential burdens such a carve out could create by deviating from the 540-day extension that applicants and their U.S. employers are familiar with from the 2022 TFR. Operationally, while managing 540- and 730-day extensions might be feasible and could mitigate harms projected after October 2025, the additional complexity to both USCIS and employers of administering two different automatic extension durations could delay issuing or implementing this TFR to address imminent lapses in employment authorization and EAD validity. Accordingly, USCIS is proposing an automatic extension totaling 540 days, consistent with the FY 2022 TFR and TPS EAD limitations and will evaluate the public comments and consider further action as appropriate, while at the same time working to reduce the number of EAD renewal applicants that

may still have their EADs lapse as a result of processing backlogs.

4. Future Regulatory Action

This rule temporarily amends existing DHS regulations to provide that the automatic extension period applicable to expiring EADs for certain renewal applicants who have filed Form I–765, Application for Employment Authorization, will be increased from up to 180 days to up to 540 days from the expiration date stated on their EADs. DHS is soliciting public comment on this TFR as well as potential alternatives, such as a permanent increase in the automatic extension period from up to 180 days to up to 540 days or a longer extension period for certain populations, such as non-TPS EAD renewal applicants.

Qualitatively, a permanent provision for increasing the automatic extension period to up to 540 days would provide long-term predictability for applicants and relieve DHS from the pressure of having to promptly respond to unexpected changes in circumstances that may result in spikes in USCIS processing times and lapses in employment authorization and/or documentation for renewal EAD applicants. As previously discussed, recent unexpected increases in EAD applications, such as initial EAD applications by individuals with pending asylum applications (C08) and EAD applications for adjustment of status (C09), have contributed to a growing backlog. Should there again be unexpected increases in EAD applications for reasons unknown at this time, USCIS would have greater flexibility to temporarily reallocate adjudicative resources to other product lines because it would have a longer period to process renewal EAD applications before applicants would be adversely affected by a delay in the processing of their renewal EAD application. A permanent rule would also mitigate the number of potential lapses in employment authorization and/or documentation for renewal EAD applicants that may otherwise occur after the current TFR expires if processing times were to spike again in the future.

A future temporary or permanent rule might also include an extension period of greater than 540 days for non-TPS EAD renewal applicants, but although such a longer period would reduce the number of EADs that could still lapse with a 540-day extension period, among other potential effects, such bifurcated automatic extension periods may result in some confusion among employers, who have become familiar with either a

180-day period or a 540-day period. DHS welcomes public comments on any potential benefits and burdens from a permanent increase of the automatic extension period, longer extension period for non-TPS applicants, or other measures that would create more certainty for this population of renewal EAD applicants and their employers.

*C. Regulatory Flexibility Act*

The Regulatory Flexibility Act (RFA) (5 U.S.C. 601 *et seq.*), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). The RFA's regulatory flexibility analysis requirements apply only to those rules for which an agency is required to publish a general notice of proposed rulemaking pursuant to 5 U.S.C. 553 or any other law. *See* 5 U.S.C. 604(a). As discussed previously, DHS did not issue a notice of proposed rulemaking for this action. Therefore, a regulatory flexibility analysis is not required for this rule.

*D. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)*

The Congressional Review Act (CRA) was included as part of SBREFA by section 251 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* OIRA has determined that this TFR meets the criteria in 5 U.S.C. 804(2). DHS has complied with the CRA's reporting requirements and has sent this rule to Congress and to the Comptroller General as required by 5 U.S.C. 801(a)(1). As stated in section V.A of this preamble, DHS has found that there is good cause to make this rule effective immediately upon publication.[317]

*E. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, which includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal

---

[316] DHS emphasizes that these figures are only approximations. The reason is that the percentages for lapses (column 2) are the OCB ventiles (percentiles at 5 percent increments) for the extensions below 360 days. But they do not align exactly with the day extensions (column 1). Because of the way the data are produced, we chose the percentile closest to the true extension value.

[317] *See* 5 U.S.C. 808(2).

governments, in the aggregate, or by the private sector.[318] The inflation adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI–U).[319] This rule is exempt from the written statement requirement, because DHS did not publish a notice of proposed rulemaking for this rule.

This TFR does not contain a Federal mandate as the term is defined under UMRA.[320] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

*F. Executive Order 13132 (Federalism)*

This rule does not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, 64 FR 43255 (Aug. 4, 1999), this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

*H. National Environmental Policy Act*

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act

(NEPA), 42 U.S.C. 4321 *et seq.*, applies to them and if so, what degree of analysis and documentation is required. DHS Directive 023–01 Rev. 01 and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual)[321] establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA.[322] The CEQ regulations allow Federal agencies to establish, in their NEPA implementing procedures, categories of actions ("categorical exclusions") that experience has shown do not, individually or cumulatively, have a significant effect on the human environment and, therefore, do not require preparation of an environmental assessment or environmental impact statement.[323] The Instruction Manual, Appendix A lists the DHS categorical exclusions.[324]

Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[325]

This rule amends DHS's existing regulations under 8 CFR 274a.13(d) to temporarily increase the period of time that the employment authorization of certain eligible renewal EAD applicants are automatically extended while their renewal applications remain pending with USCIS. More specifically, this rule provides that the automatic extension period applicable to expiring EADs for certain applicants who have filed renewal EAD applications will be increased from up to 180 days to up to 540 days.

DHS finds no significant impact on the environment, or any change in environmental effect that will result from the rule amendments being promulgated in this temporary final rule. Accordingly, DHS finds that the promulgation of this temporary final rule's amendments clearly fits within categorical exclusion A3 established in

the Department's NEPA implementing procedures as an administrative change with no change in environmental effect.

This TFR is limited to increasing the automatic extension period applicable to expiring EADs for certain renewal applicants who have filed a renewal EAD application and is not part of a larger DHS rulemaking action. In accordance with DHS's NEPA implementing procedures, DHS has reviewed the rule and finds no extraordinary circumstances associated with this TFR exists that may give rise to significant environmental effects requiring further analysis and documentation. Therefore, this action is categorically excluded and no further NEPA analysis or documentation is required.

*I. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[326] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[327] DHS has systematically reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this regulation will not negatively affect family well-being and will not have any impact on the autonomy or integrity of the family as an institution. DHS believes that this TFR will create positive effects on the family by mitigating uncertainty about continued employment authorization for renewal applicants.

*J. Paperwork Reduction Act*

This rule does not propose new, or revisions to existing, "collection[s] of

---

[318] *See* 2 U.S.C. 1532(a).

[319] *See* BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202312.pdf* (last visited Jan. 17, 2024). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023—Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

[320] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

[321] The Instruction Manual contains the Department's procedures for implementing NEPA and was issued November 6, 2014. Available at *https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex.*

[322] 40 CFR parts 1500 through 1508.

[323] 40 CFR 1507.3(e)(2)(ii) and 1501.4.

[324] *See* Appendix A, Table 1.

[325] *See* Instruction Manual section V.B(2)(a) through (c).

[326] *See* 5 U.S.C. 601 note.

[327] Pub. L. 105–277, 112 Stat. 2681 (1998).

information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320. As this is a TFR that only will increase the duration of an automatic extension of employment authorization and EAD, USCIS does not anticipate a need to update the EAD application or to collect additional information beyond that already collected on the EAD application.

## List of Subjects in 8 CFR Part 274a

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 274a as follows:

## PART 274a CONTROL OF EMPLOYMENT OF ALIENS

■ 1. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599; Title VII of Pub. L. 110–229, 122 Stat. 754; Pub. L. 115–218, 132 Stat. 1547; 8 CFR part 2.

■ 2. Effective April 8, 2024, through October 15, 2025, amend § 274a.13 by revising the heading of paragraph (d)(5) to read as follows:

## § 274a.13   Application for employment authorization.

\*   \*   \*   \*   \*

(d) \* \* \*

(5) *Temporary increase in the automatic extension period for renewal applications properly filed on or before October 26, 2023.* \* \* \*

■ 3. Effective April 8, 2024, through September 20, 2027, amend § 274a.13 by adding paragraph (d)(6) to read as follows:

The revisions and additions read as follows:

## § 274a.13   Application for employment authorization.

\*   \*   \*   \*   \*

(d) \* \* \*

(6) *Temporary increase in the automatic extension period for renewal applications properly filed on or after October 27, 2023.* The authorized extension period stated in paragraph (d)(1) of this section, 8 CFR 274a.2(b)(1)(vii), and referred to in paragraph (d)(3) and (4) of this section is increased to up to 540 days for all eligible classes of aliens as described in paragraph (d)(1) of this section who properly filed their renewal application on or after October 27, 2023, and on or

before September 30, 2025. Such automatic extension period will automatically terminate the earlier of up to 540 days after the expiration date of the Employment Authorization Document (Form I–766, or successor form) or upon issuance of notification of a denial on the renewal request, even if such date is after September 30, 2025. An Employment Authorization Document that has expired on its face is considered unexpired when combined with a Notice of Action (Form I–797C), which demonstrates that the requirements of paragraph (d)(1) of this section and this paragraph (d)(6) have been met, notwithstanding any notations on such notice indicating an automatic extension of up to 180 days. Nothing in this paragraph (d)(6) will affect DHS's ability to otherwise terminate any employment authorization or Employment Authorization Document, or extension period for such employment authorization or document, by written notice to the applicant, by notice to a class of aliens published in the **Federal Register**, or as provided by statute or regulation, including 8 CFR 274a.14.

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–07345 Filed 4–4–24; 8:45 am]

**BILLING CODE 9111–97–P**

*The National Academies of*
SCIENCES
ENGINEERING
MEDICINE

# THE NATIONAL ACADEMIES PRESS

This PDF is available at http://nap.edu/23550

SHARE   



## The Economic and Fiscal Consequences of Immigration (2017)

### DETAILS

642 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-44445-3 | DOI 10.17226/23550

GET THIS BOOK

FIND RELATED TITLES

### CONTRIBUTORS

Francine D. Blau and Christopher Mackie, Editors; Panel on the Economic and
Fiscal Consequences of Immigration; Committee on National Statistics; Division
of Behavioral and Social Sciences and Education; National Academies of
Sciences, Engineering, and Medicine

### SUGGESTED CITATION

National Academies of Sciences, Engineering, and Medicine 2017. *The Economic
and Fiscal Consequences of Immigration*. Washington, DC: The National Academies
Press. https://doi.org/10.17226/23550.



**Visit the National Academies Press at NAP.edu and login or register to get:**

– Access to free PDF downloads of thousands of scientific reports

– 10% off the price of print titles

– Email or social media notifications of new titles related to your interests

– Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press.
(Request Permission) Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.

Copyright © National Academy of Sciences. All rights reserved.

002324

The Economic and Fiscal Consequences of Immigration

# The Economic and Fiscal Consequences of Immigration

Panel on the Economic and Fiscal Consequences of Immigration

Francine D. Blau and Christopher Mackie, *Editors*

Committee on National Statistics

Division of Behavioral and Social Sciences and Education

A Report of
*The National Academies of*
SCIENCES · ENGINEERING · MEDICINE

THE NATIONAL ACADEMIES PRESS
*Washington, DC*
**www.nap.edu**

002325

Copyright National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS  500 Fifth Street, NW  Washington, DC 20001**

This activity was supported by Grant No. 13-103091-000-CFP from the John D. and Catherine T. MacArthur Foundation, with additional support from the National Academy of Engineering Independent Fund, the National Academy of Medicine Independent Fund, and the National Academy of Sciences Independent Fund. Support for the work of the Committee on National Statistics is provided by a consortium of federal agencies through a grant from the National Science Foundation (award number SES-1024012). Any opinions, findings, conclusions, or recommendations expressed in this publication do not necessarily reflect the views of the organization or agency that provided support for the project.

International Standard Book Number-13:   978-0-309-44445-3
International Standard Book Number-10:   0-309-44445-4
Library of Congress Control Number:   2017937437
Digital Object Identifier:   https://doi.org/10.17226/23550

Additional copies of this publication are available for sale from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

Copyright 2017 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Suggested citation:  National Academies of Sciences, Engineering, and Medicine. (2017). *The Economic and Fiscal Consequences of Immigration*. Washington, DC: The National Academies Press. doi: https://doi.org/10.17226/23550.

002326

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*The National Academies of*
SCIENCES · ENGINEERING · MEDICINE

The **National Academy of Sciences** was established in 1863 by an Act of Congress, signed by President Lincoln, as a private, nongovernmental institution to advise the nation on issues related to science and technology. Members are elected by their peers for outstanding contributions to research. Dr. Marcia McNutt is president.

The **National Academy of Engineering** was established in 1964 under the charter of the National Academy of Sciences to bring the practices of engineering to advising the nation. Members are elected by their peers for extraordinary contributions to engineering. Dr. C. D. Mote, Jr., is president.

The **National Academy of Medicine** (formerly the Institute of Medicine) was established in 1970 under the charter of the National Academy of Sciences to advise the nation on medical and health issues. Members are elected by their peers for distinguished contributions to medicine and health. Dr. Victor J. Dzau is president.

The three Academies work together as the **National Academies of Sciences, Engineering, and Medicine** to provide independent, objective analysis and advice to the nation and conduct other activities to solve complex problems and inform public policy decisions. The National Academies also encourage education and research, recognize outstanding contributions to knowledge, and increase public understanding in matters of science, engineering, and medicine.

Learn more about the National Academies of Sciences, Engineering, and Medicine at **www.national-academies.org**.

002327

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## *The National Academies of*
## SCIENCES · ENGINEERING · MEDICINE

**Reports** document the evidence-based consensus of an authoring committee of experts. Reports typically include findings, conclusions, and recommendations based on information gathered by the committee and committee deliberations. Reports are peer reviewed and are approved by the National Academies of Sciences, Engineering, and Medicine.

**Proceedings** chronicle the presentations and discussions at a workshop, symposium, or other convening event. The statements and opinions contained in proceedings are those of the participants and have not been endorsed by other participants, the planning committee, or the National Academies of Sciences, Engineering, and Medicine.

For information about other products and activities of the National Academies, please visit nationalacademies.org/whatwedo.

002328

Copyright National Academy of Sciences. All rights reserved.

## PANEL ON THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

**FRANCINE D. BLAU** (*Chair*), Department of Economics, Cornell University

**MICHAEL BEN-GAD,** Department of Economics, School of Arts and Social Sciences, City, University of London

**GEORGE J. BORJAS,** Malcolm Wiener Center for Social Policy, John F. Kennedy School of Government, Harvard University

**CHRISTIAN DUSTMANN,** Department of Economics, University College London

**BARRY EDMONSTON,** Department of Sociology, University of Victoria, BC

**ISAAC EHRLICH,** Department of Economics, State University of New York at Buffalo

**CHARLES HIRSCHMAN,** Department of Sociology, University of Washington, Seattle

**JENNIFER HUNT,** Department of Economics, Rutgers University

**DOWELL MYERS,** Sol Price School of Public Policy, University of Southern California

**PIA M. ORRENIUS,** Research Department, Federal Reserve Bank of Dallas, TX

**JEFFREY S. PASSEL,** Pew Research Center, Washington, DC

**KIM RUEBEN,** Urban-Brookings Tax Policy Center at the Urban Institute, Washington, DC

**MARTA TIENDA,** Woodrow Wilson School, Princeton University

**YU XIE,** Princeton Institute of International and Regional Studies, Princeton University


**GRETCHEN DONEHOWER,** University of California, Berkeley (consultant to the panel)

**RYAN EDWARDS,** Queens College, City University of New York (consultant to the panel)

**SARAH GAULT,** Urban Institute (consultant to the panel)

**JULIA GELATT,** Urban Institute (consultant to the panel)


**CHRISTOPHER MACKIE,** *Study Director*

**CONSTANCE F. CITRO,** *CNSTAT Director*

**ESHA SINHA,** *Associate Program Officer*

**ANTHONY S. MANN,** *Program Coordinator*

*v*

002329

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## COMMITTEE ON NATIONAL STATISTICS

**LAWRENCE D. BROWN** (*Chair*), Department of Statistics,
The Wharton School, University of Pennsylvania
**FRANCINE BLAU,** Department of Economics, Cornell University
**MARY ELLEN BOCK,** Department of Statistics (emerita), Purdue
University
**MICHAEL CHERNEW,** Department of Health Care Policy, Harvard
Medical School
**JANET CURRIE,** Department of Economics, Princeton University
**DONALD DILLMAN,** Social and Economic Sciences Research Center,
Washington State University
**CONSTANTINE GATSONIS,** Department of Biostatistics and Center for
Statistical Sciences, Brown University
**JAMES S. HOUSE,** Survey Research Center, Institute for Social Research,
University of Michigan
**THOMAS MESENBOURG,** U.S. Census Bureau (retired)
**SUSAN MURPHY,** Department of Statistics and Institute for Social
Research, University of Michigan
**SARAH NUSSER,** Office of the Vice President for Research, Iowa State
University
**COLM O'MUIRCHEARTAIGH,** Harris School of Public Policy Studies,
University of Chicago
**RUTH PETERSON,** Criminal Justice Research Center, Ohio State
University
**ROBERTO RIGOBON,** Sloan School of Management, Massachusetts
Institute of Technology
**EDWARD SHORTLIFFE,** Department of Biomedical Informatics,
Columbia University and Arizona State University

**CONSTANCE F. CITRO,** *Director*
**BRIAN HARRIS-KOJETIN,** *Deputy Director*

*vi*

002330

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# Acknowledgments

This report is the product of contributions from many colleagues, whom we thank for their time, generosity, and expert guidance. The project was sponsored by the John D. and Catherine T. MacArthur Foundation. We thank Tara Magner and Valerie Chang, who represented the MacArthur Foundation, for their roles in initiating the study and for their insights during the development and early stages of the project. Supplemental support was provided by the National Academy of Engineering Independent Fund, the National Academy of Medicine Independent Fund, and the National Academy of Sciences Independent Fund.

The panel thanks the following individuals who attended open meetings and generously gave of their time to present material to inform the panel's deliberations. Ronald Lee (University of California, Berkeley) reviewed methods for producing intergenerational population and fiscal impact projections. Gordon Hanson (University of California, San Diego) discussed the role of immigrants in innovation. Ian Preston (University College London) gave a presentation about immigration and public finances in the United Kingdom. Alan Auerbach (University of California, Berkeley) shared his deep expertise on tax and fiscal policy and on intergenerational estimates of fiscal impacts. Matthew Hall (Cornell University) described his research on interstate migration and the assimilation of U.S. immigrants. Brian Cadena (University of Colorado Boulder) described how immigrants affected the spatial allocation of labor across localized markets during the Great Recession. Audrey Singer (Brookings Institution) discussed the comparative skill and educational profiles of immigrants and the native-born in the United States, as well as policy and public responses to immigration. David Card (Uni-

*vii*

002331

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

versity of California, Berkeley) engaged the panel on a wide range of labor market topics, including wage impacts and employment effects across skill and other groups, and on variation in the capacity of industries to absorb immigrants. Ethan Lewis (Dartmouth College) presented on immigrant and native substitutability in the labor market and on the impact of immigration on production technology and economic growth. Ted Mouw (University of North Carolina) discussed evidence from the U.S. Census Bureau's Longitudinal Employer-Household Dynamics on worker displacement in high-immigration industries. Rob Fairlie (University of California, Santa Cruz) described findings from his research on the impact of immigrants on entrepreneurship and job creation. Magnus Lofstrom (Public Policy Institute of California) likewise discussed entrepreneurship and job creation and the role of state policies affecting these processes. Sarah Bohn (Public Policy Institute of California) discussed the role of immigrants in informal labor markets in California. Annette Bernhardt (University of California, Berkeley) presented on how unauthorized status plays out in the workplace—its correlation with higher rates of unemployment and labor law violations, and how current immigration policy shapes the bargaining between employers and undocumented workers. Laura Hill (Public Policy Institute of California), with input from Hans Johnson (Public Policy Institute of California), provided an overview of state and local policy issues affected by immigration in California, and of methods using administrative IRS data and indirect survey methods for measuring the extent of unregulated/unauthorized work. Nancy Folbre (University of Massachusetts Amherst) provided information to the panel about immigration and nonmarket and care work. Giovanni Peri (University of California, Davis) presented on labor market issues ranging from the role of immigrants in stimulating local labor markets to the impact of foreign science, technology, engineering, and mathematics workers on native wages and employment in U.S. cities. Dan Lichter (Cornell University) discussed Hispanic boomtowns and how immigration affects population change and racial diversity in rural America. Klaus Zimmermann (University of Bonn) presented evidence to the panel on the economic and fiscal impacts of circular migration. Lynn Karoly and Francisco Perez-Arce (RAND Corporation) presented a framework for benefit-cost analyses of state-specific immigration policies (e.g., in-state tuition, e-verify, driver's licensing, etc.). These presentations stimulated extensive discussion of the issues covered in this report.

The panel also wishes to thank Joan Monras (Columbia University), Joan Llull (Center for Monetary and Financial Studies), and Patricia Cortés (Boston University) for their help with the Chapter 5 analysis of the effect on native wages of an inflow of immigrants into the labor market.

The panel could not have conducted its work efficiently without the capable staff of the National Academies of Sciences, Engineering, and Medicine. Connie Citro, director of the Committee on National Statistics, and

002332

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*ACKNOWLEDGMENTS*                                                                    *ix*

Robert Hauser, executive director of the Division of Behavioral and Social Sciences and Education, provided institutional leadership and substantive contributions during meetings—Connie also contributed to the writing of the report as well. Kirsten Sampson-Snyder, Division of Behavioral and Social Sciences and Education, expertly coordinated the review process. Robert Katt provided meticulous, insightful, and thorough final editing that improved the readability of the report for a wide audience. Esha Sinha provided highly capable data analyses for the panel and helped coordinate panel meetings. We also thank program associate Anthony Mann for his well-organized and efficient logistical support of the panel's meetings.

On behalf of the panel, I would like to express our deep gratitude to our study director, Christopher Mackie. He did a superb job in keeping us on track and coordinating all our myriad activities from our review of the existing literature to our original data analyses. He helped organize our meetings and develop the structure of the panel's final report, contributed to our literature review and the drafting and reworking of the report's chapters, and shepherded the report through the final review process. We all benefited enormously from his superlative organizational skills, insightful input into the report, and resourcefulness, as well as his patience and good humor. Speaking personally, it has been a great pleasure to collaborate with Chris on this important endeavor.

We thank the consultants to the panel who were absolutely critical to the extensive data analyses underlying major parts of this report. Collaborating with members of the panel, Gretchen Donehower (University of California, Berkeley) and Ryan Edwards (Queens College and University of California, Berkeley) produced the national-level fiscal impact estimates. Sarah Gault (Urban Institute) provided data analysis for the state and local fiscal impacts estimates. Julia Gelatt (Urban Institute) provided a range of data analyses of educational and occupational profiles of the population.

Finally, and most importantly, a note of appreciation is in order for my fellow panel members. Despite their many professional commitments, every panel member donated countless hours and shared extensive expertise to make this report possible. As a result, the report reflects the collective expertise and commitment of all panel members: Michael Ben-Gad, City, University of London; George J. Borjas, Harvard University; Christian Dustmann, University College London; Barry Edmonston, University of Victoria; Isaac Ehrlich, State University of New York at Buffalo; Charles Hirschman, University of Washington, Seattle; Jennifer Hunt, Rutgers University; Dowell Myers, Sol Price School of Public Policy at the University of Southern California; Pia Orrenius, the Federal Reserve Bank of Dallas; Jeffrey S. Passel, Pew Research Center; Kim Rueben, Urban Institute; Marta Tienda, Princeton University; and Yu Xie, Princeton University. This group—deliberately chosen for their varied perspectives, diverse back-

002333

Copyright National Academy of Sciences. All rights reserved.

grounds, and deep subject-matter knowledge—displayed rigor and creativity, and also patience when dealing with one another to produce this report.

This report has been reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise. The purpose of this independent review is to provide candid and critical comments that assist the institution in making its reports as sound as possible, and to ensure that the reports meet institutional standards for objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process.

The panel thanks the following individuals for their helpful reviews of this report: Alan J. Auerbach, Department of Economics, University of California, Berkeley; Claire D. Brindis, Bixby Center for Global Reproductive Health and Adolescent and Young Adult Health-National Resource Center, University of California, San Francisco; Steven Camarota, Center for Immigration Studies, Washington, DC; David Card, Department of Economics, University of California, Berkeley; Gordon Hanson, Center for Emerging and Pacific Economies, School of International Relations and Pacific Studies, University of California, San Diego; Laura Hill, Public Policy Institute of California; Ronil Hira, Department of Political Science, Howard University; Ronald Lee, Department of Demography, University of California, Berkeley; Ethan G Lewis, Economics Department, Dartmouth College; Douglas S. Massey, Department of Sociology, Princeton University; Alejandro Portes, Department of Sociology, Princeton University; Audrey Singer, Metropolitan Policy Program, Brookings Institution; and Madeline Zavodny, Department of Economics, Agnes Scott College.

Although the reviewers listed above provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations, nor did they see the final draft of the report before its release. The review of the report was overseen by Julie DaVanzo, Center for the Study of Family Economic Development, RAND Corporation, Santa Monica, CA, and Christopher A. Sims, Department of Economics, Princeton University. Appointed by the Report Review Committee of the National Academies, they were responsible for making certain that the independent examination of this report was carried out in accordance with institutional procedures and that all review comments were carefully considered. We are indebted to them for scrupulously executing their charge. Responsibility for the final content of the report rests entirely with the authoring panel and the institution.

Francine D. Blau, *Chair*
Panel on the Economic and Fiscal Consequences of Immigration

002334

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# Contents

**Summary**       1

### PART I: BACKGROUND AND CONTEXT

**1   Introduction**       17
     1.1   Context and Motivation, 17
     1.2   Economic Impacts, 24
     1.3   Fiscal Impacts, 26
     1.4   Charge to the Panel, 30

**2   Immigration to the United States: Current Trends in Historical Perspective**       33
     2.1   Introduction, 33
     2.2   Immigration Trends and Origins from 1820 to 2015, 35
     2.3   Immigration Driven by Labor Demand, 45
     2.4   The Net International Migration Rate and Its Contribution to Population Growth, 46
     2.5   Past and Future Trends in the Stock of First and Second Generation Immigrant Populations, 51
     2.6   Immigration and Changes in Race and Ethnic Composition, 56
     2.7   Population Aging, the Baby Boom, and the Transition to an Immigrant Workforce, 62

*xi*

002335

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2343 of 4699 PageID #:  5508

The Economic and Fiscal Consequences of Immigration

2.8   From Traditional Gateways to New Destinations:
      The Changing Geography of Immigrant Settlement, 71
2.9   Conclusions, 79
2.10  Technical Annex on Counting Immigrants, 81

**3   Socioeconomic Outcomes of Immigrants**                                      **85**
3.1   Introduction, 85
3.2   Education and Occupation Profiles, 86
3.3   Employment, Wage, and English-Language Assimilation
      Profiles, 98
3.4   Poverty and Welfare Utilization, 119
3.5   Conclusions, 132
3.6   Technical Annex of Tabulations and Regression Results, 136
3.7   Technical Annex on Occupational Categories, 154

**PART II: ECONOMIC IMPACTS**

**4   Employment and Wage Impacts of Immigration: Theory**                        **165**
4.1   Introduction, 165
4.2   A Simple Model with a Single Type of Labor, 166
4.3   Employment Effects of Immigration with Elastic
      Labor Supply, 175
4.4   Multiple Types of Labor, 178
4.5   Multiple Technologies and Multiple Goods, 187
4.6   Responses by Natives, 193
4.7   The Link Between Immigration and Frictional
      Unemployment, 193
4.8   Conclusions, 195

**5   Employment and Wage Impacts of Immigration:**
    **Empirical Evidence**                                                        **197**
5.1   Introduction, 197
5.2   Some Basic Conceptual and Empirical Issues, 202
5.3   Spatial (cross-area) Studies, 210
5.4   Aggregate Skill Cell and Structural Studies, 224
5.5   A Cross-Study Comparison of Immigrants'
      Impact on Wages, 239
5.6   High-Skilled Labor Markets and Innovation, 248
5.7   Key Messages and Conclusions, 264
5.8   Annex: Summary Comparison of Selected Wage and
      Employment Impact Studies for the United States, 269
5.9   Technical Notes for the Cross-Study Comparison of the
      Magnitudes of Immigrants' Impact on Wages, 274

002336

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

CONTENTS                                                          *xiii*

6   **Wider Production, Consumption, and Economic Growth
    Impacts**                                                     **279**
    6.1   Introduction, 279
    6.2   Impact on Overall Economic Activity (GDP), 282
    6.3   Sectoral and Geographic Impacts, 286
    6.4   Impact on Prices of Consumer Goods and
          Cost of Living, 289
    6.5   The Role of Immigration in Long-Run Economic
          Growth, 297
    6.6   Beyond GDP—Nonmarket Goods and Services and the
          Informal Economy, 312
    6.7   Conclusions, 316
    6.8   Technical Annex on Models of Endogenous Growth
          in a Closed Economy, 317


                        **PART III: FISCAL IMPACTS**

7   **Estimating the Fiscal Impacts of Immigration—
    Conceptual Issues**                                           **323**
    7.1   Introduction, 323
    7.2   Sources of Fiscal Costs and Benefits, 328
    7.3   Static and Dynamic Accounting Approaches, 331
    7.4   Sources of Uncertainty: Assumptions and Scenario Choices in
          Fiscal Estimates, 337
    7.5   Distributive Fiscal Effects—Federal, State, and Local, 352
    7.6   Summary and Key Points, 354

8   **Past and Future Fiscal Impacts of Immigrants on the Nation**   **359**
    8.1   Introduction, 359
    8.2   Historical Fiscal Impacts of Immigration, 1994-2013, 360
    8.3   Forecasts of Lifetime Net Fiscal Impacts, 407
    8.4   Annex: Technical Documentation for the Fiscal
          Estimates, 463

9   **State and Local Fiscal Effects of Immigration**             **495**
    9.1   Introduction, 495
    9.2   Measurement Methods, 497
    9.3   Geographic and Demographic Distribution of
          Immigrants, 504
    9.4   Fiscal Variation Among States, 2011-2013, 516
    9.5   Aggregate Fiscal Effects by State, 522

002337

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*xiv*                                                        CONTENTS

9.6   Net Effects of Immigration on State and Local Budgets, 525
9.7   Alternative Treatments of Education Costs, 536
9.8   Marginal Versus Average Fixed Costs, 537
9.9   Conclusions, 541
9.10  Technical Annex: Supplemental Tables, 544

**10  Research Directions and Data Recommendations                567**
10.1  Counting and Characterizing Immigrants and Their
        Descendants, 568
10.2  Information on Legal Status, 571
10.3  Measurement of Immigration and Emigration Patterns, 574
10.4  Exploiting Multiple Data Sources, 575

**References                                                       581**

**Appendix**
    Biographical Sketches                                         607

002338

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# Tables, Figures, and Boxes

**TABLES**

2-1    Persons Obtaining Lawful Permanent Resident Status by Region and Selected Country of Last Residence, Fiscal 1820-2013 (percentage of total), 38

2-2    Components of Population Growth: United States, by Decade, 1790-2000, and by Year, 2000-2013, 48

2-3    Racial and Ethnic Diversity by Immigrant Generation, United States, 1900, 1970, 2000, 2010, and 2014, 57

2-4    Population Aging in Projections That Include or Exclude Immigration, 66

2-5    Decadal Change in U.S. Working-age Population, Ages 25-64, by Immigrant Generation, from 1960-1970 to 2020-2030, Based on Population Estimates and Projections,  68

2-6    New Immigrant Arrivals by State of Current Residence: 1980, 1990, 2000, 2008, 2010, and 2014, 74

3-1    Share of Male Workers, Ages 25-64, Who Were Born Abroad, by Major Occupational Category, by Decennial Census Year 1970-2000, and in 2012, 96

3-2    Share of Female Workers, Ages 25-64, Who Were Born Abroad, by Major Occupational Category, by Decennial Census Year 1970-2000, and in 2012, 97

*xv*

002339

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

3-3     Segregation Index of U.S.-born and Foreign-born Workers, Ages 25-64, Across 41 Occupations, by Decennial Census Year 1970-2000, and in 2012, 98

3-4     Mean Share of Weeks Worked by Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, 99

3-5     Mean Share of Weeks Worked by Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, 100

3-6     Mean Share of Weeks Worked by Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-54, 101

3-7     Mean Share of Weeks Worked by Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-54, 101

3-8     Difference in Share of Weeks Worked for Immigrant Cohorts, Relative to Native-born Cohort, by Census Period, Men, Ages 25-64, 102

3-9     Difference in Share of Weeks Worked for Immigrant Cohorts, Relative to Native-born Cohort, by Census Period, Women, Ages 25-64, 103

3-10    Average Hourly Wages and Earnings of Employed Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, in 2012 Dollars, 106

3-11    Average Hourly Wages and Earnings of Employed Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, in 2012 Dollars, 108

3-12    Weekly Wage Assimilation of Male Immigrants, by Cohort (percentage difference between native-born and foreign-born wages), 110

3-13    Weekly Wage Assimilation of Female Immigrants, by Cohort (percentage difference between native-born and foreign-born wages), 111

3-14    Percentage of Immigrants and Their Children in Poverty and Near Poverty, by Source Country and World Region of Birth, 2011, 120

3-15    Welfare Use of Households with Children, by State, Current Population Survey 2011-2013 (in percentage), 126

3-16    Educational Attainment of Male Immigrants, Ages 25 and Older, by Decennial Census Year 1970-2000, and in 2012, 136

3-17    Educational Attainment of Female Immigrants, Ages 25 and Older, by Decennial Census Year 1970-2000, and in 2012, 136

002340

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2348 of 4699 PageID #:  5513

The Economic and Fiscal Consequences of Immigration

3-18    Share of Foreign-born Male Workers (percentage), Ages 25-64, by
        Occupational Category, by Decennial Census Year 1970-2000, and
        in 2012, 137

3-19    Share of Foreign-born Female Workers (percentage), Ages 25-64,
        by Occupational Category, by Decennial Census Year 1970-2000,
        and in 2012, 140

3-20    Difference in Share of Weeks Worked for Immigrant Cohorts, by
        Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64,
        Controlling for Age (cubic) Only, 142

3-21    Difference in Share of Weeks Worked for Immigrant Cohorts, by
        Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64,
        Controlling for Age (cubic) and Years of Education, 143

3-22    Difference in Share of Weeks Worked for Immigrant Cohorts, by
        Decennial Census Year 1970-2000, and in 2012, Women, Ages
        25-64, Controlling for Age (cubic) Only, 144

3-23    Difference in Share of Weeks Worked for Immigrant Cohorts, by
        Decennial Census Year 1970-2000, and in 2012, Women, Ages
        25-64, Controlling for Age (cubic) and Years of Education, 145

3-24    Age-adjusted Relative Weekly Earnings of Immigrant Cohorts, by
        Decennial Census Year 1970-2000, Men, Ages 25-64, Controlling
        for Age (cubic) Only, 146

3-25    Age- and Education-adjusted Relative Weekly Earnings of
        Immigrant Cohorts, by Decennial Census Year 1970-2000, and in
        2012, Men, Ages 25-64, Controlling for Age (cubic) and Years of
        Education, 147

3-26    Age-adjusted Relative Weekly Earnings of Immigrant Cohorts, by
        Decennial Census Year 1970-2000, and in 2012, Women, Ages
        25-64, Controlling for Age (cubic) Only, 148

3-27    Age- and Education-adjusted Relative Weekly Earnings of
        Immigrant Cohorts, by Decennial Census Year 1970-2000, and in
        2012, Women, Ages 25-64, Controlling for Age (cubic) and Years
        of Education, 149

3-28    Age-adjusted Probabilities of Speaking English Very Well,
        Immigrant Cohorts, by Decennial Census Year 1980-2000, and in
        2012, Men, Ages 25-64, Controlling for Age (cubic) Only, 150

3-29    Age-adjusted Probabilities of Speaking English Very Well,
        Immigrant Cohorts, by Decennial Census Year 1980-2000, and in
        2012, Women, Ages 25-64, Controlling for Age (cubic) Only, 151

3-30    Age-adjusted Probabilities of Speaking English Well, Immigrant
        Cohorts, by Decennial Census Year 1980-2000, and in 2012, Men,
        Ages 25-64, Controlling for Age (cubic) Only, 152

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

3-31   Age-adjusted Probabilities of Speaking English Well, Immigrant Cohorts, by Decennial Census Year 1980-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) Only, 153

5-1   Simulated Percentage for Wage Impacts of 1990-2010 Immigrant Supply Shock, 236
5-2   Effect on Native Wages of an Inflow of Immigrants That Increases Labor Supply by 1 Percent, 242
5-3   Recent Studies Using Cross-Area, Occupation, or Industry Approaches, 270

6-1   Educational Attainment as of 2012 of the Foreign-born Population (in thousands), Ages 25 and Older, by Year of Entry, 308
6-2   Educational Attainment as of 2012 of the U.S. Foreign-born and Native-born Populations (in thousands), Ages 25 and Older, by World Region of Birth, 308
6-3   Mean Years of Schooling of U.S.-born Versus All and Recent Foreign-born Immigrant Populations by World Region of Birth, 310

7-1   Domains and Types of Impacts of Immigration That Affect Fiscal Balances, 329
7-2   Multiple Impacts of Granting Eligibility to Undocumented Immigrants for In-State Tuition, 343

8-1   Net per Capita Fiscal Impacts, in 1994 and 2013, of First Generation Immigrants and Their Dependents, Second Generation Native-born Independent Individuals and Their Dependents, and Third-plus Generation Native-born Independent Individuals and Their Dependents, by Level of Government, 389
8-2   Net per Capita Fiscal Impacts of First, Second, and Third-plus Generation Groups (each with dependents) in 2013, by Scenario and Level of Government, 394
8-3   Regression Analysis of Net Fiscal Impacts (in dollars per person) of First and Second Generation Groups Relative to Third-plus Generation Group, 1994-2013, by Level of Government, 399
8-4   Average Annual Growth in Per Capita Flows, 2012-2087 (under three scenarios, in percentage), 412
8-5   Educational Distribution by Generation, Ages 25 and Older, for Recent (past 5 years) and All Immigrants, 415
8-6   Age Distribution by Generation, 1994-1996 and 2011-2013, 419

002342

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

8-7    Average per Person Benefits Received, by Age Group and
       Generational Group, 1995 and 2010 (in thousands of 2012
       dollars), 424
8-8    Predicted Educational Distribution of U.S.-born Children of a
       Foreign-born Parent, Percentages of Parental Offspring Expected
       to Be in an Educational Category (rows add to 100), 425
8-9    Predicted Educational Distribution of U.S.-born Children of a U.S.-
       born Parent, Percentages of Parental Offspring Expected to Be in
       an Educational Category (rows add to 100), 425
8-10   Observed and Projected Educational Distribution for Immigrants,
       Ages 20-30, Who Arrived in the United States in the Past 5 Years
       and Their Descendants, 427
8-11   Demographic Indicators Used in Fiscal Impact Calculations, 429
8-12   75-year Net Present Value Flows for Consolidated Federal, State,
       and Local Governments for Two Future Budget Scenarios, by
       Education and Age of Arrival, Varying the Treatment of Public
       Goods and Characteristics of an Average Immigrant (fiscal impacts
       are in thousands of 2012 dollars), 430
8-13   75-year Net Present Value Flows Comparing an Immigrant
       Arriving at Age 25 with a Native-born Person Followed from
       Age 25, for Consolidated Government Finances under Two
       Future Budget Scenarios, by Educational Attainment, Varying the
       Treatment of Public Goods (in thousands of 2012 dollars), 440
8-14   75-year Present Value Flows for Consolidated Federal, State,
       and Local Governments for Three Future Budget Scenarios,
       by Grouped Ages of Immigrant Arrival in the United States,
       with Public Goods Excluded from Incremental Benefit Costs
       to Immigrants and Descendants (flows in thousands of 2012
       dollars), 445
8-15   75-year Present Value Flows for Federal Government Only, for
       Three Future Budget Scenarios, by Grouped Ages of Immigrant
       Arrival in the United States, with Public Goods Excluded from
       Incremental Benefit Costs to Immigrants and Descendants (flows in
       thousands of 2012 dollars), 448
8-16   75-year Present Value Flows for State and Local Governments
       only, for Three Future Budget Scenarios, by Grouped Ages
       of Immigrant Arrival in the United States, with Public Goods
       Excluded from Incremental Benefit Costs to Immigrants and
       Descendants (flows in thousands of 2012 dollars), 451

002343

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

8-17   75-year Present Value Flows for Consolidated Federal, State, and Local Governments for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods (defense, federal subsidies, and rest-of-world payments) Included in Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars), 454

8-18   75-year Present Value Flows for Federal Governments Only, for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods (defense, federal subsidies, and rest-of-world payments) Included in Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars), 457

9-1    Percentage Foreign-born Population by State, 2011-2013 and 2000, in Order from Highest to Lowest Percentage Foreign-born in 2011-2013, 506

9-2    Percentage Independent Persons by Immigrant Generation, by State, 2011-2013, in Order from Highest to Lowest Percentage (first generation independent persons), 508

9-3    Average Age and Percentage, Ages 65 and Older, Independent Persons by Immigrant Generation by State, 2011-2013, 512

9-4    State and Local Revenues per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013, 518

9-5    State and Local Expenditures per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013, 520

9-6    Net Difference between State and Local Revenues and Expenditures per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013, 523

9-7    Net Difference between State and Local Revenues and Expenditures per Household Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013, 529

9-8    Regression Analysis of Net Fiscal Impact at the State and Local Level per Independent Person Unit, by Immigrant Generation, 2011-2013, 532

9-9    Net Difference between State and Local Revenues and Expenditures per Independent Person Unit with Alternative Assignment of Education Expenditures (rounded to nearest $50), by Immigrant Generation, 2011-2013, 538

9-10   Net Difference between State and Local Revenues and Expenditures per Independent Person Unit with a Marginal Allocation of Fixed Revenues and Expenditures (rounded to nearest $50), by Immigrant Generation by State, 2011-2013, 542

002344

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

9-11   Census of Governments (COG) State and Local Revenue Flow
       Types and Allocation Methods, 545
9-12   Census of Governments (COG) State and Local Expenditure Flow
       Types and Allocation Methods, 547
9-13   Annualized Weighted Sample Cases of Independent Persons by
       Immigrant Generation by State, Current Population Survey Annual
       Social and Economic Supplement for 2011-2013, 549
9-14   Sum of Unweighted Sample Cases of Independent Persons by
       Immigrant Generation by State, Current Population Survey Annual
       Social and Economic Supplement for 2011-2013 Total, 551
9-15   Average Number of Children (dependents) per Independent Person
       Unit, by Immigrant Generation by State, 2011-2013, 553
9-16   Average Adjusted Gross Income (AGI) per Independent Person
       Unit (rounded to nearest $50), by Immigrant Generation by State,
       2011-2013, 555
9-17   Percentage with Less Than a High School Degree (<HS) and
       More Than a Bachelor's Degree (>BA), Independent Persons by
       Immigrant Generation by State, 2011-2013, 557
9-18   Net Difference between State and Local Revenues and
       Expenditures per Independent Person Unit (rounded to nearest
       $50), Including Coefficient of Variation Below, by Immigrant
       Generation by State, 2011-2013, 560
9-19   Average Household Size per Household Unit, by Immigrant
       Generation by State, 2011-2013, 563
9-20   Annualized Weighted Sample Cases of Households by Immigrant
       Generation by State, Current Population Survey Annual Social and
       Economic Supplement for 2011-2013, 565

## FIGURES

2-1   Legal immigration to the United States, 1820-2012, 36
2-2   Percentage of first and second generations in the U.S. population,
      1850-2030, 53
2-3   Change in age composition of U.S. population from 1960-2030
      (projected), 63
2-4   Rising senior ratio in the U.S. population, with and without
      projected immigration, 65
2-5   Net change in working-age population each decade, by immigrant
      generation (in millions), 1960-1970 to 2020-2030, 68

3-1   Educational attainment of recent immigrants (those who entered
      in the 5 years prior), by Decennial Census year 1970-2000, and in
      2012 (in percentages), 88

002345

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*xxii*                                            *TABLES, FIGURES, AND BOXES*

3-2    Mean years of educational attainment of U.S.-born and recent immigrants (those who entered in the 5 years prior), by Decennial Census year, 1970-2000, and in 2012, 89

3-3    Mean years of educational attainment of recent immigrants, (those who entered in the 5 years prior), by Decennial Census year, 1970-2000, and in 2012, by country/region of birth, 90

3-4    Age and educational attainment of foreign-born residents, 1970 and 2012, 91

3-5    Age and educational attainment of U.S.-born residents, 1970 and 2012, 92

3-6    Aging profile for high English-language proficiency of male immigrants (wage earners), by arrival cohort, 115

3-7    Aging profile for high English-language proficiency of female immigrants (wage earners), by arrival cohort, 116

3-8    Aging profile for moderate English-language proficiency of male immigrants (wage earners), by arrival cohort, 117

3-9    Aging profile for moderate English-language proficiency of female immigrants (wage earners), by arrival cohort, 118

3-10   Poverty rates for all U.S. residents, natives, and immigrants, 1970-2010, 122

3-11   Safety net participation as fraction of households (Y axis) with incomes less than 200 percent of the federal poverty level, 131

3-12   Trends in poverty rate of children, 1994-2009, 132

3-13   Trends in program participation of children, 1994-2009, 133

4-1    Labor market (with inelastic labor supply) response to an influx of immigrant workers, 167

4-2    Capital market (with inelastic labor supply) response to an influx of immigrant workers, 169

4-3    Labor market (with elastic labor supply) response to an influx of immigrant workers, 176

4-4    Capital market (with elastic labor supply) response to an influx of immigrant workers, 177

4-5    Low-skilled labor market response to an influx of low-skilled immigrant workers, 179

4-6    High-skilled labor market response to an influx of low-skilled immigrant workers, 179

4-7    Capital market response to an influx of low-skilled immigrant workers, 180

4-8    High-skilled labor market response to an influx of high-skilled immigrant workers, 184

4-9    Low-skilled labor market response to an influx of high-skilled immigrant workers, 185

002346

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*TABLES, FIGURES, AND BOXES* *xxiii*

4-10   Capital market response to an influx of high-skilled immigrant workers, 185
4-11   The allocations of capital and labor in a two-good economy, before and after immigration, 188
4-12   High-skilled labor market response to an influx of high-skilled immigrant workers (with long-run technological change), 192

5-1   Predicted and actual position of recent immigrants (less than 2 years in the United States) in the wage distribution, 209
5-2   Scatter between male wages and male immigration across skill groups, 227
5-3   Self-employment rates by nativity, 2000-2012, 262

7-1   Age-specific taxes and benefits, by immigrant generation, United States, 2012, 325

8-1   The U.S. population by age and immigrant status in 1995, 367
8-2   The U.S. population by age and immigrant status in 2011, 368
8-3   Average number of own children in household, by immigrant generation, 2013, 370
8-4   Average years of education across age by immigrant generation in 1994, 371
8-5   Average years of education across age by immigrant generation in 2013, 372
8-6   Employment-to-population ratio across age by immigrant generation in 1994, 373
8-7   Employment-to-population ratio across age by immigrant generation in 2013, 374
8-8   Wage and salary income in 2012 dollars by immigrant generation in 1995, 375
8-9   Wage and salary income in 2012 dollars by immigrant generation in 2012, 376
8-10  Fiscal flows, first generation immigrants to the United States, 2012, 378
8-11  Total taxes paid per capita in 1995 at all levels of government, by age and immigrant generation, 379
8-12  Total taxes paid per capita in 2012 at all levels of government, by age and immigrant generation, 380
8-13  Total per capita benefits received in 1995 at all levels of government, by age and by immigrant generation, 381
8-14  Total per capita benefits received in 2012 at all levels of government, by age and by immigrant generation, 382

002347

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

8-15   Federal old-age benefits received per capita in 2012, by age and
       immigrant generation, 383
8-16   Federal means-tested antipoverty benefits received per capita in
       2012, by age and immigrant generation, 384
8-17   Net fiscal impact in 1995, per capita, including all levels of
       government, by age and immigrant generation, 385
8-18   Net fiscal impact in 2012, per capita, including all levels of
       government, by age and immigrant generation, 386
8-19   Ratio of receipts to outlays for first generation and native-born
       groups as defined for Table 8-1, 392
8-20   Age profiles of wage and salary income by educational attainment
       and nativity, 2012, 420
8-21   Age profiles of net fiscal impact by educational attainment and
       nativity, 2012, 421
8-22   Average taxes paid by immigrants, ages 25-64, by education
       group, relative to educational attainment of less than high
       school, 423
8-23   Net fiscal impacts of immigration, by budget scenario, treatment of
       public goods, and average characteristics of new immigrants, 437
8-24   Predicted educational attainment for native-born children, 490
8-25   Predicted educational attainment for foreign-born children, 490

### BOXES

1-1    Statement of Task, 31

2-1    Sources of Data on Measuring First and Second Generation
       Stocks, 52

6-1    Remittances, 290

8-1    Alternative Scenarios for Attributing Public Expenditures to
       Immigrants and Natives, 364
8-2    Definitions of Dependent and Independent Persons, 377

9-1    Definitions of Independent and Dependent Persons, 500

002348

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# Summary

More than 40 million people living in the United States were born in other countries, and almost an equal number have at least one foreign-born parent. Together, the first generation (foreign-born) and second generation (children of the foreign-born) comprise almost one in four Americans. It comes as little surprise, then, that many U.S. residents view immigration as a major policy issue facing the nation. Not only does immigration affect the environment in which everyone lives, learns, and works, but it also interacts with nearly every policy area of concern, from jobs and the economy, education, and health care, to federal, state, and local government budgets.

Although this report focuses on the United States, the rise in the share of foreign-born populations is an international phenomenon among developed countries.[1] And, given disparities in economic opportunities and labor force demographics that persist across regions of the world, immigration is an issue that will likely endure. Recent refugee crises further highlight the complexity of immigration and add to the urgency of understanding the resultant economic and societal impacts.

One set of headline questions concerns the economy, specifically jobs and wages: To what extent do the skills brought to market by immigrants complement those of native-born workers, thereby improving their prospects; and to what extent do immigrants displace native workers in the

---

[1] The United States is about in the middle of the range for OECD countries in terms of the percentage of its population that is foreign born.

*1*

002349

Copyright National Academy of Sciences. All rights reserved.

2                    *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

labor market or lower their wages?[2] How does immigration contribute to vibrancy in construction, agriculture, high tech, and other sectors? What is the role of immigration in driving productivity gains and long-term economic growth?

Other questions arise about taxes and public spending: What are the fiscal impacts of immigration on state, local, and federal governments—do immigrants cost more than they contribute in taxes? How do impacts change when traced over the life cycle of immigrants and their children? How does their impact on public finances compare with that of the native-born population? To what extent is the sustainability of programs such as Social Security and Medicare affected by immigration and immigration policy?

The Panel on the Economic and Fiscal Consequences of Immigration was convened by the National Academies of Sciences, Engineering, and Medicine through its Committee on National Statistics to distill findings on these complex questions in a way that advances the conversation and improves understanding of these important topics.[3] Support for the study was provided by the John D. and Catherine T. MacArthur Foundation and the National Academies' presidents.

## IMMIGRANTS AND THEIR CHARACTERISTICS

Key developments have occurred over the two decades since the last major report on this topic from the National Research Council (1997), *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration*:

- The number of immigrants living in the United States increased by more than 70 percent—from 24.5 million (about 9% of the population) in 1995 to 42.3 million (about 13% of the population) in 2014; the native-born population increased by about 20 percent during the same period.
- Annual flows of lawful permanent residents have increased. During the 1980s, just under 600,000 immigrants were admitted legally (received green cards) each year; after the 1990 Immigration Act took effect, legal admissions increased to just under 800,000 per

---

[2]This report uses the term "immigrant" synonymously with the term "foreign-born." This follows common practice of referring to the foreign-born population counted in a census or estimated by a survey as "immigrants," even though technically this population often includes foreign students, temporary workers on H-1B and other visas, and migrants who entered the country surreptitiously or overstayed legal visas.

[3]The full text of the panel's charge is reproduced in Chapter 1.

002350

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

year; since 2001, legal admissions have averaged just over 1 million per year.

- Estimates of the number of unauthorized immigrants in the United States roughly doubled from about 5.7 million in 1995 to about 11.1 million in 2014. Gross inflows, which had reached more than 800,000 annually by the first 5 years of the 21st century, decreased dramatically after 2007; partly as a result, the unauthorized immigrant population shrank by about 1 million over the next 2 years. Since 2009, the unauthorized immigrant population has remained essentially constant, with 300,000-400,000 new unauthorized immigrants arriving each year and about the same number leaving.

- The foreign-born population has changed from being relatively old to being relatively young. In 1970, the peak concentration of immigrants was in their 60s; in 2012, the peak was in their 40s.

- Educational attainment has increased steadily over recent decades for both recent immigrants and natives, although the former still have about 0.8 years less of schooling on average than do the latter. Such averages, however, obscure that the foreign-born are overrepresented both among those with less than a high school education and among those with more than a 4-year college education, particularly among computer, science, and engineering workers with advanced degrees. The foreign- and native-born populations have roughly the same share of college graduates.

- As time spent in the United States lengthens, immigrants' wages increase relative to those of natives and the initial wage gap narrows. However, this process of economic integration appears to have slowed somewhat in recent decades; the rate of relative wage growth and English-language acquisition among the foreign-born is now slightly slower than it was for earlier immigrant waves. The children of immigrants continue to pick up English-language skills very quickly.

- Geographic settlement patterns have changed since the 1990s, with immigrants increasingly moving to states and communities that historically had few immigrants. Nonetheless, the majority of the foreign-born population continues to reside in large metropolitan centers in traditional gateway states.

Macroeconomic conditions have also changed:

- *The New Americans* was released during a prolonged period of economic expansion; annual real gross domestic product (GDP) growth was between 2.7 and 4.8 percent in 1992-2000. Since then, the nation has experienced a dot-com bust recession, followed by a

002351

Copyright National Academy of Sciences. All rights reserved.

4        *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

largely jobless recovery, a housing boom, the Great Recession, and another long, slow recovery.

- The nation's total public debt, which, in addition to federal government debt, includes state and local debt, was about 63 percent of GDP in 1997. After declining to about 54 percent in 2001, it increased to 100 percent by the end of 2012. In 2016, total public debt remains over 100 percent of GDP. The increases of the past decade have occurred largely as a result of, and in response to, the Great Recession.
- Civilian labor force growth has slowed, from around 1.2 percent annually in the 1990s, to 0.7 percent in the 2000s, to a projected 0.5 percent this decade, reflecting current demographics such as aging Baby Boomers and more young people going to college.
- The portion of the labor force that is foreign born has risen from about 11 percent to just over 16 percent in the past 20 years. Immigrants and their children will account for the vast majority of current and future net workforce growth—which, at less than 1 percent annually, is slow by historical standards.

## LABOR MARKET AND OTHER ECONOMIC IMPACTS

Economic theory provides insights into the mechanisms whereby immigration may impact wages and employment in a receiving country. By increasing the supply of labor, an episode of immigration is predicted to reduce the wages of workers already in the labor market who are most similar to the new arrivals; the incomes of others may increase, either because immigrants' skills complement their own or because the returns on capital increase as a result of changes to the labor force. The mix of skills possessed by arriving immigrants—whether manual laborers, professionals, entrepreneurs, or refugees—will influence the magnitude and even the direction of wage and employment impacts.

Given the potential for multiple, differentiated, and sometimes simultaneous effects, economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers. Firms open and close, people retire, workers switch jobs, and a stream of young native-born job seekers comes of age. Changes occur in technology, global supply chains, international trade, and foreign investment. The inflow of the foreign-born

002352

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

at a given time is, under normal circumstances, a relatively minor factor in the $18 trillion U.S. economy.

The measurement task is further complicated because the impact of immigration on labor markets varies across time and place, reflecting the size of the inflow, the skill sets of natives and incoming immigrants, the local industry mix, the spatial and temporal mobility of capital and other inputs, and the overall health of the economy. Some of the processes that are set in motion take place immediately upon arrival of the foreign-born, while others unfold over many years. Aside from supplying labor, immigration (like population growth generally) adds to consumer demand and derived demand for labor in the production of goods and services, which, in turn, may affect workers' wages and incomes.

Beyond these real-world complexities, several additional measurement problems must be resolved. Primary among these is that characteristics of local economies affect where people decide to live. Evidence suggests that immigrants locate in areas with relatively high labor demand and wages for the skills they possess and that immigrants are more willing than natives to relocate in response to changes in labor market conditions. If immigrants predominantly settle in areas that experience the highest wage growth, the observed wage growth (or dampened wage decline) may be erroneously attributed to the increase in immigration. Additionally, correct identification of the wage and employment effects of immigration must account for the possible migration response of natives to the arrival of immigrants. Researchers have made great strides in addressing these issues in recent decades; even so, the degree of success in dealing with them is still debated.

Empirical research in recent decades has produced findings that by and large remain consistent with those in *The New Americans*. When measured over a period of more than 10 years, the impact of immigration on the *wages* of natives overall is very small. However, estimates for subgroups span a comparatively wider range, indicating a revised and somewhat more detailed understanding of the wage impact of immigration since the 1990s. To the extent that negative wage effects are found, *prior immigrants*—who are often the closest substitutes for new immigrants—are most likely to experience them, followed by native-born high school dropouts, who share job qualifications similar to the large share of low-skilled workers among immigrants to the United States. Empirical findings about inflows of skilled immigrants, discussed shortly, suggest the possibility of positive wage effects for some subgroups of workers, as well as at the aggregate level.

The literature on *employment* impacts finds little evidence that immigration significantly affects the overall employment levels of native-born workers. However, recent research finds that immigration reduces the number of hours worked by native teens (but not their employment rate). Moreover, as with wage impacts, there is some evidence that recent immigrants

002353

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

6          *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

reduce the employment rate of prior immigrants—again suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.

Until recently, the impact of high-skilled immigrants on native wages and employment received less attention than that of their low-skilled counterparts. Interest in studying high-skilled groups has gained momentum as the H1-B and other visa programs have contributed to a rapid rise in the inflow of professional foreign-born workers (about 250,000 people per year during the last decade). Several studies have found a positive impact of skilled immigration on the wages and employment of both college-educated and noncollege-educated natives. Such findings are consistent with the view that skilled immigrants are often complementary to native-born workers, especially those who are skilled; that spillovers of wage-enhancing knowledge and skills occur as a result of interactions among workers; and that skilled immigrants innovate sufficiently to raise overall productivity. However, other studies examining the earnings or productivity prevailing in narrowly defined fields find that high-skilled immigration can have adverse effects on the wages or productivity of natives working in those fields.

With so much focus in the literature on the labor market (and much of this on the short run), other economic consequences—such as the role of immigrants in contributing to aggregate demand, in affecting prices faced by consumers, or as catalysts of long-run economic growth—are sometimes overlooked by researchers and in policy debates. By construction, labor market analyses often net out a host of complex effects, many of which are positive, in order to identify direct wage and employment impacts.

The contributions of immigrants to the labor force reduce the prices of some goods and services, which benefits consumers in a range of sectors including child care, food preparation, house cleaning and repair, and construction. Moreover, new arrivals and their descendants are a source of demand in key sectors such as housing, which benefits residential real estate markets. To the extent that immigrants flow disproportionately to where wages are rising and local labor demand is strongest, they help equalize wage growth geographically, making labor markets more efficient and reducing slack.

Importantly, immigration is integral to the nation's economic growth. Immigration supplies workers who have helped the United States to avoid the problems facing stagnant economies created by unfavorable demographics—in particular, an aging (and, in the case of Japan, a shrinking) workforce. Moreover, the infusion by high-skilled immigration of human capital has boosted the nation's capacity for innovation, entrepreneurship, and technological change. The literature on immigrants and innovation suggests that immigrants raise patenting per capita, which ultimately contributes to productivity growth. The prospects for long-run economic

002354

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants.

## FISCAL IMPACTS

Beyond wage and employment considerations, policy makers and the general public are interested in the impact that an expanding population, and immigration in particular, has on public finances and the sustainability of government programs. All population subgroups contribute to government finances by paying taxes and add to expenditures by consuming public services—but the levels differ. On average, individuals in the first generation are more costly to governments, mainly at the state and local levels, than are the native-born generations; however, immigrants' children—the second generation—are among the strongest economic and fiscal contributors in the population. Estimates of the long-run fiscal impact of immigrants and their descendants would likely be more positive if their role in sustaining labor force growth and contributing to innovation and entrepreneurial activity were taken into account.

Two basic accounting approaches, each with advantages and disadvantages, can be used to estimate the fiscal impact of immigration. Static models may be used to analyze a specific time frame, often a tax year. If data are available, cross-sectional static models can be repeated over multiple years to calculate fiscal impacts for a historical period. By contrast, dynamic projection models can be used to compute the net present value of tax contributions and government expenditures attributable to immigrants and, in some analyses, their descendants projected over their life cycles. Such analyses involve modeling the impact of an additional immigrant on future public budgets.

Regardless of the modeling approach, assumptions play a central role in analyses of the fiscal impacts of immigration. An important example is how the children of immigrants are treated in the analysis. In forward-looking projections, the logic for including second generation effects is straightforward: Even when the children of immigrants are native-born citizens, the costs and benefits they generate to public finances would not have accrued in the receiving country had their parents not immigrated in the first place. In cross-sectional analyses, life-cycle effects are captured only to the extent that data are detailed enough to reveal earnings levels of the children of immigrants once they become adults. Even then, the current fiscal contribution of today's adults provides only an imperfect estimate of the future contribution of today's children.

Analysts must also make assumptions about immigrants' use of public services. For services such as education and health care, where the total cost of provision is roughly proportional to the number of recipients, expendi-

002355

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tures should be assigned on a per capita, average cost basis. In other cases, the marginal cost of provision may differ greatly from the average cost. For pure public goods (such as national defense, government administration, or interest on the national debt),[4] the marginal cost of an additional immigrant is, at least in the short run, zero or close to it; thus, for answering some questions, it may be reasonable to allocate the costs of pure public goods only to the native-born or to the pre-existing population consisting of natives and earlier immigrants. For analyses estimating the fiscal impact of other kinds of immigration scenarios—for example, for large numbers of arrivals taking place over a multiyear period—the zero marginal cost assumption becomes less tenable. Because public goods such as national defense represent a large part of the federal budget, decisions about how to allocate these expenditures have a very large impact on fiscal estimates. For forward-looking intergenerational accounting models, additional assumptions must be made about government budgets, the tax burden across generations, and the interest rate, all of which can affect results dramatically.

While cross-sectional estimates of fiscal impacts are limited in a number of ways, 20 years of Current Population Survey (CPS) data on the first and second generations analyzed by the panel reveal numerous insights about the fiscal impacts of immigrants at the national level:

- Immigrant and native-born populations have historically been and remain very different in terms of their age structure. For the 1994-2013 analysis period, the first generation was heavily concentrated in working ages. Meanwhile, during the early years of this period, the second generation had higher shares of elderly and young people relative to the first and third-plus generations;[5] however, by 2012, the second generation had become more heavily concentrated at younger ages, including younger adults.
- Cross-sectional data from 1994-2013 reveal that, *at any given age*, the net fiscal contribution of adults in the first generation (and not including costs or benefits generated by their dependents) was on average consistently less favorable than that of the second and third-plus generations. Relative to the native-born, the foreign-born contributed less in taxes during working ages because they earned less. However, this pattern reverses at around age 60, beyond which the third-plus generation has consistently been more

---

[4] A pure public good has the characteristic that its consumption by one individual does not reduce the amount available to be consumed by others, and it is not possible to exclude any individuals from consuming the good.

[5] Throughout the report, "third-plus generation" is used as shorthand to refer to any American who is in the third or higher generation after immigration (generally, those with two U.S.-born parents).

002356

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

expensive to government on a per capita basis than either the first or second generation; this is attributable to the third-plus generation's greater use of Social Security benefits.

- The same cross-sectional analysis for 1994-2013 reveals that second generation adults had on average a more favorable net fiscal impact for all government levels combined than either first or third-plus generation adults. Reflecting their slightly higher educational achievement, as well as their higher wages and salaries (at a given age), the second generation contributed more in taxes on a per capita basis during working ages than did either of the other generational groups.

- Examining the per capita fiscal impact in an alternative way that reflects the age structure of each generational group as it actually existed in each year during the 1994-2013 analysis period produces a different perspective on the data. For this analysis, the panel included net fiscal costs of dependent children as part of the calculations for their parent's generation. Under the conservative assumption that the per capita fiscal cost of public goods such as national defense should be assigned on an average cost basis, the first generation group (including dependent children) again had a more negative fiscal impact than either of the other generation groups. This outcome is primarily driven by two factors: First, the lower average education level of the first generation translated into lower incomes and, in turn, lower tax payments; second, higher per capita costs (notably those for public education) were generated at the state and local levels because the first generation had, on average, more dependent children than other adults in the population (due in part to the age structure of first generation adults). A partially offsetting positive fiscal impact was created by the fact that, during the analysis period, first generation adults were disproportionately of working ages and paying taxes.

- Under the same assumptions as above, and using the same data, the fiscal impact of the second generation group (including their dependent children) was only modestly less negative than for the first generation over the period as a whole and considerably more negative than that of the third-plus generation. This result may appear at odds with the *age-specific* data indicating that the second generation typically outperforms all other generations along a number of dimensions, including years of education, per capita wage and salary income, and per capita taxes paid. This apparent incongruity is due mainly to changing age profiles. At the beginning of the 1994-2013 period, the second generation was concentrated in the (fiscally expensive) retirement ages. By 2013, comparatively

002357

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

more second generation individuals were in younger age groups, while more third-plus generation individuals were in older age groups. As a result of this demographic shift, the second generation group's fiscal impact became only slightly more negative than that of later generations. The larger negative effect for the second generation group during the analysis period was due entirely to their age distribution.

- Figures for the 1994-2013 analysis period translate into large fiscal shortfalls overall for *all three* groups (although the federal and total fiscal picture became more favorable for the first and second generation groups over the period, while it generally became less favorable for the third-plus generation group). These shortfalls are consistent with deficit figures in the National Income and Product Accounts for the federal-, state-, and local-level budgets combined. For 2013, the total fiscal shortfall (i.e., the excess of government expenditures over taxes) was $279 billion for the first generation group, $109 billion for the second generation group, and $856 billion for the third-plus generation group.[6] Under this scenario, the first generation group accounted for 17.6 percent of the population and 22.4 percent of the total deficit, while the second generation accounted for a slightly higher share of the total deficit (8.7%) than their share in the population (7.4%). While the fiscal shortfall for the average member of the first generation group was larger than it was for an average member in either native-born group, the shortfall for the latter groups would have been larger without the presence of the first generation group because federal expenditures on public goods such as national defense (assigned to members of all three groups on an average cost basis here) would have to be divided among a smaller population.

- Because government expenditures on public goods are large, accounting for almost one-third of total federal spending, the average versus marginal cost assumption is an important driver of fiscal impact estimates. When a marginal cost allocation of public goods is assumed instead of the average cost allocation used in the fiscal impact numbers reported above, the total net fiscal impact of the first generation group accounts for less than 4 percent of the total deficit, while still accounting for 17.6 percent of the sample population.

---

[6]Again, in this analysis, dependent children are included in the generational group of the parent to which they are assigned.

002358

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Models that project the fiscal impact of immigrants and their descendants—that is, models that add up the future tax payments and benefit receipts each year from the time of entry into the United States—provide an alternative to the static historical analyses described above. Although the assumptions involved—about the government budget, choice of interest rate, or who pays for public goods—strongly influence the results, additional important insights about the impact of immigration on fiscal balances can be derived as follows:

- Viewed over a long time horizon (75 years in our estimates), the fiscal impacts of immigrants are generally positive at the federal level and negative at the state and local levels. State and local governments bear the burden of providing education benefits to young immigrants and to the children of immigrants, but their methods of taxation recoup relatively little of the later contributions from the resulting educated taxpayers. Federal benefits, in contrast, are largely provided to the elderly, so the relative youthfulness of arriving immigrants means that they tend to be beneficial to federal finances in the short term. In addition, federal taxes are more strongly progressive, drawing more contributions from the most highly educated. The panel's historical analysis indicates that inequality between levels of government in the fiscal gains or losses associated with immigration appears to have widened since 1994. The fact that states bear much of the fiscal burden of immigration may incentivize state-level policies to exclude immigrants and raises questions of equity between the federal government and states.
- Today's immigrants have more education than earlier immigrants and, as a result, are more positive contributors to government finances. If today's immigrants had the same lower educational distribution as immigrants two decades ago, their fiscal impact, expressed as taxes paid minus expenditures on benefits received, would be much less positive or much more negative (depending on the scenario). Whether this education trend will continue remains uncertain, but the historical record suggests that the total net fiscal impact of immigrants across all levels of government has become more positive over time.
- An immigrant and a native-born person with similar characteristics will likely have about the same fiscal impact. Persons with higher levels of education contribute more positively to government finances regardless of their generational status. Furthermore, within age and education categories, immigrants generally have a more salutary effect on budgets because they are disqualified from some benefit programs and because their children tend to have

002359

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

higher levels of education, earnings, and tax paying than the children of similar third-plus generation adults.

In addition to the net fiscal effects of immigration for the nation as a whole, the effects on revenues and expenditures for state and local governments are also of concern to policy makers and the public. The panel's analysis of subnational data indicates that the net burden of immigration to fiscal balance sheets varies tremendously across state governments. Consistent with findings in the national-level analyses (and for the same reasons), first generation adults plus their dependents tend to be more costly to state and local governments on a per capita basis than adults (plus their dependents) in the second or third-plus generations, and, in general, second generation adults contribute the most to the bottom line of state balance sheets.

For the 2011-2013 period, the net cost to state and local budgets of first generation adults (including those generated by their dependent children) is, on average, about $1,600 each. In contrast, second and third-plus generation adults (again, with the costs of their dependents rolled in) create a net positive of about $1,700 and $1,300 each, respectively, to state and local budgets. These estimates imply that the total annual fiscal impact of first generation adults and their dependents, averaged across 2011-2013, is a cost of $57.4 billion, while second and third-plus generation adults create a benefit of $30.5 billion and $223.8 billion, respectively. By the second generation, descendants of immigrants are a net positive for the states as a whole, in large part because they have fewer children on average than do first generation adults and contribute more in tax revenues than they cost in terms of program expenditures.

In jurisdictions with higher spending on schools (kindergarten through 12th grade), the relative cost of first generation immigrants with more dependents is typically higher compared with low-spending jurisdictions. However, this investment could drive higher wages in the future.

## DATA RECOMMENDATIONS

The theoretical and empirical advances of recent decades have allowed researchers to address questions about the economic and fiscal impacts of immigration with greater confidence; nonetheless, some questions remain difficult to answer fully. Therefore, this report concludes by identifying data needs for pushing the knowledge frontier forward so that a report published 20 years from now will present an even more comprehensive portrayal of how immigration affects the economy and those engaged in economic activities. A key requirement is building into the nation's statistical infrastructure the capacity to monitor the net contributions of the native-born children of immigrants who help to shape the nation's economic and demographic

002360

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

future over the course of their entire lives. The ability to identify second generation respondents is extremely desirable for empirical analyses of both the labor market and fiscal impacts of the children of immigrants, who may on average attain different education and skill levels (often higher), achieve different occupational outcomes, and generate at least slightly different fiscal impacts compared with the general population. Perhaps the most important of the data recommendations for advancing research on immigration identified in this report—and also recommended in our sister panel's report (National Academies of Sciences, Engineering, and Medicine, 2015) *The Integration of Immigrants into American Society*—is for the U.S. Census Bureau to add a question on the birthplace of parents to the American Community Survey (ACS). This addition would permit more accurate monitoring of local populations and labor forces than is possible with the current source of such information, the CPS, which while highly valuable has a considerably smaller sample size than the ACS.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002362

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# PART I

# BACKGROUND AND CONTEXT

002363

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002364

Copyright National Academy of Sciences. All rights reserved.

# 1

# Introduction

## 1.1  CONTEXT AND MOTIVATION

Immigration is not a new phenomenon. The United States has been a nation of immigrants[1] throughout its history. Nonetheless, the issue of immigration has often risen to the fore, and today many Americans view immigration as one of the top policy issues facing the nation.[2] Perhaps this should come as no surprise given that the percentage of foreign-born in the U.S. population has been steadily growing, increasing from 4.7 percent in 1970 (the lowest ever measured for the United States) to 11.1 percent in 2000, and further rising to 13.3 percent in 2014 (approaching the historical highs attained 100 years ago). An even higher percentage of households have at least one family member who is foreign born. According to the

---

[1] In general in this report, the term "immigrant" is used synonymously with the term "foreign-born." In doing this, the panel follows common statistical practice for referring to the foreign-born population counted in a census or estimated by a survey as "immigrants," even though the category includes foreign students, temporary workers on H-1B and other visas, and migrants who entered the country surreptitiously or overstayed legal visas. Further, in portions of the report, such as in the fiscal analyses in Chapters 8 and 9, we distinguish between immigrant generations: the first generation (who are foreign-born), the second generation (those born in the United States to at least one foreign-born parent), and the third-and-higher generations (those born in the United States to native-born parents). For brevity, the report uses "third-plus generation" to refer to the latter group. In Chapter 2, Section 2.10 (Counting Immigrants) addresses these and other definitional issues.

[2] In the 2015 edition of the Pew Research Center's annual policy priorities survey, 52 percent of Americans rated immigration a "top priority for the president and Congress." (Pew Research Center, 2015b).

002365

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Census Bureau, more than 20 percent of married couples in the United States include a spouse born in another country. And nearly one-quarter of the U.S. population is either foreign born themselves or has at least one foreign-born parent (Pew Research Center, 2015a, p. 120). Moreover, the largest increases in the percentage of foreign-born in recent years have taken place in states—many of them in the South—unaccustomed to immigration.[3] Hence, immigration is undeniably a key factor shaping many communities and households. In workplaces, classrooms, and neighborhoods across many parts of the country, daily interaction among the native-born, earlier immigrants, and new arrivals is the norm, and these interactions raise awareness of immigration across the population more broadly.

Immigration is also constantly in our purview because it is an ongoing process. And, given divergences in demographic trends and economic opportunities that persist across regions of the world, it is one that is likely to continue. The stream of arrivals—at times a relative trickle and at times rapid—not only affects the environment in which we live, learn, and work, but also interacts with nearly every policy area of concern, from jobs and the economy, education, and health care to the federal budget deficit. Thus, immigration factors into a nearly endless list of social and economic questions whose answers will shape the nation's future.

This study assesses the impact of dynamic immigration processes on economic and fiscal outcomes for the United States, a major destination of world population movements. Related topics, such as the occupational, educational, and other assimilation issues faced by immigrants themselves, necessarily enter the discussion along the way.[4] The report is organized into three major sections: Part I (Chapters 1-3) provides background and context by placing immigration to the United States in historical perspective and statistically describing the economic assimilation of immigrants in recent history. Part II (Chapters 4-6) assesses economic impacts of immigration, focusing on wages, employment, and labor markets generally, as well as on broader economic activity and long-run growth. Part III (Chapters 7-10) estimates fiscal impacts over recent past periods for federal and state governments and presents illustrative future immigration scenarios for the federal level.

---

[3]The states where the proportion of foreign-born has risen by one-third or more since 2000 are Alabama, Arkansas, Indiana, Iowa, Kentucky, Louisiana, Maryland, Mississippi, Nebraska, North Dakota, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, and Wyoming. This calculation is based on Decennial Census and American Community Survey data presented in Grieco et al. (2012).

[4]The integration of immigrants into American society—specifically, their outcomes in terms of educational attainment, occupational distribution, income, residential integration, language ability, and poverty—is the focus of a companion report, *The Integration of Immigrants into American Society* (National Academies of Sciences, Engineering, and Medicine, 2015).

Copyright National Academy of Sciences. All rights reserved.

INTRODUCTION                                                                 19

The last major report from the National Academies of Sciences, Engineering, and Medicine to take on these topics comprehensively was *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration*, released in 1997 (National Research Council, 1997). One conclusion of that report was that immigration flows were unlikely to have a very large effect on the earnings of the native-born or on per capita gross domestic product (GDP). However, the report recognized that immigration can have sizable effects on segments of the workforce and on specific geographic areas with high concentrations of immigrants. Similarly, fiscal impacts overall were found to be modest but highly variable at the margin, mainly due to the great variety in age, education, and experience brought by new arrivals. One reason for revisiting these topics is to reconsider how findings about economic and fiscal impacts may have changed in the past 20 years, given the very different political, economic, and demographic context of the present relative to the 1990s. A key underlying question is: "How is what is known now about the consequences of immigration different from what was thought before, either because of expanded and improving research or because of changed circumstances?"

The following short "then and now" list summarizes how the context has shifted and why a reassessment is warranted.

1.  Between the mid-1990s and 2014, the total number of immigrants living in the United States increased by more than 70 percent, from 24.5 million in 1995 to 42.3 million in 2014 (based on published data from the 1995 Current Population Survey and the 2014 American Community Survey). Over the same period, the number of unauthorized immigrants estimated to be in the United States roughly doubled from about 5.7 million in 1995 to about 11.1 million (Passel and Cohn, 2016).

2.  Regarding inflows, legal immigration has increased somewhat. During the 1980s, just under 600,000 (577,000 annual average over 1980-1989) immigrants were admitted legally each year (received green cards); after the Immigration Act of 1990 took effect, legal admissions increased to just under 800,000 per year.[5] Then, from

---

[5]Approximately 785,000 green cards, granting lawful permanent residency, were issued per year over the 1992-2000 period. The vast majority of these went to foreign-born individuals qualifying as family of a U.S. citizen or lawful permanent resident, admitted through employer sponsorship, granted protection as refugees or asylum seekers, or originating from countries with low immigration rates to the United States (also known as diversity immigrants or green-card lottery immigrants). A small percentage of individuals and their dependents during this period also benefited from the Immigration Reform and Control Act of 1986, which legalized certain seasonal agricultural workers as well as unauthorized individuals who entered the United States before January 1, 1982, and met a set of standard naturalization conditions.

002367

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

2001 on, legal admissions averaged more than 1 million per year (1,043,000 for 2001-2014).[6] Another major change, beginning in the 1990s, has been the increased entrance of immigrants via temporary foreign worker visas—including through the H-1B program, which allows U.S. companies to temporarily employ foreign workers in high-skilled, specialty occupations. Since the category was created in 1990, the number of H-1B visas made available each year has been limited to an annual statutory cap of 65,000; however, higher caps (115,000 or 195,000) were put in place from 1999-2003 and, since 2006, 20,000 additional visas have been available for foreign professionals who graduate with a master's degree or doctorate from a U.S. university.

3.  Growth of the unauthorized immigrant population averaged about 500,000 per year between 1990 and 2007 as a result of large inflows of new unauthorized immigrants offset by smaller outflows of those already here. In the early 1990s, inflows were averaging 400,000-500,000 per year. By the first 5 years of the 21st century, average annual inflows of new unauthorized immigrants reached more than 800,000 every year. After 2007, the pattern changed dramatically; the unauthorized immigrant population decreased by about 1 million over the next 2 years as outflows increased substantially and inflows of new unauthorized immigrants dropped from the high levels of the early 2000s. Since 2009, the unauthorized immigrant population has remained essentially constant as inflows and outflows have reached a rough balance. During this period, 300,000-400,000 new unauthorized immigrants have arrived each year and about the same number have left the United States.

4.  With respect to overall economic conditions, *The New Americans* (National Research Council, 1997) was released in the midst of a period of prolonged real GDP growth, with annual rates ranging from 2.7 to 4.0 percent between 1992 and 1996 and from 4.1 to 4.8 percent between 1997 and 2000. Since 2000, the United States has experienced a major 2-year slowdown and a rebound, followed by the Great Recession (which reached its nadir with a –2.8 percent GDP decline in 2009) and a long slow recovery.

---

[6]There is no strong trend after 2001. There was a drop in 2003 due to increased security checks and start-up delays for the U.S. Department of Homeland Security, but these delays were offset by increases in 2005-2006.

002368

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

5. The nation's federal public debt, expressed as a percentage of GDP, was in the 4446 percent range in 1997 and by 2001 had declined to 31 percent of GDP. The debt has been increasing since 2001 and has remained at more than 70 percent of GDP since the end of 2012. Indeed, total public debt, adding in state and local debt held by the public, is now greater than 100 percent of GDP. The increases of the past decade have occurred largely as a result of and in response to the Great Recession.[7]

6. Growth in the size of the civilian labor force has slowed from around 1.2 percent annually in the 1990s to 0.7 percent in the 2000s and to a projected 0.5 percent annual growth for this decade. This trend reflects current demographics (mainly an aging Baby Boom cohort reaching retirement age), more young people going to college, and a decline in labor force participation rates of working-age adults (including a leveling off of the decades-long trend of rising labor force participation by women). Workforce size and participation carries implications for fiscal balances and the sustainability of government retirement and health care programs because benefits are largely funded by taxes paid by current workers. Likewise, the number of workforce exits (mainly retirements)—which has increased from 18.8 million in the 1990s to 23.4 million in the 2000s and to a projected 27.3 million in the 2010s—has a major impact on the fiscal health of these programs.

7. The portion of the labor force that is foreign born has grown from about 11 percent to just over 16 percent in the past 20 years. The vast majority of current and future net workforce growth—which, at less than 1 percent annually, is very slow by historical standards—will be accounted for by immigrants and their U.S.-born descendants (Myers et al., 2013).

8. Population aging figures more prominently on today's political agendas than it did 20 years ago, driven by a number of factors including rising health care costs (since the mid-1990s, the nation's total expenditures on health care, as a share of GDP, have increased from roughly 13% to 18%) and concerns about the long-term viability of Social Security insurance as Baby Boomers retire. What an aging population portends for future workforce trends is highly uncertain. Much depends on incentives for seniors to remain in the labor force; on educational investments in youth, including the children of immigrants; and on the skill composition of future immigrants.

---

[7]Federal Reserve Bank of St. Louis. *Total Public Debt as Percent of Gross Domestic Product*. Available: https://research.stlouisfed.org/fred2/series/GFDEGDQ188S [November 2016].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

9.  Geographic patterns of immigrant settlement have changed in the past two decades, with immigrant families increasingly settling in "nontraditional" receiving states and communities. None of the traditional gateway states (California, Florida, New Jersey, and New York), where immigrants make up roughly 20 percent or more of the population, were among the top seven states with the highest growth rates over 1990-2010. Over that 20-year period, Arkansas, Georgia, Kentucky, Nevada, North Carolina, South Carolina, and Tennessee, each experienced growth rates over 300 percent—albeit from low initial immigrant populations at the beginning—in their immigrant populations.

Intertwined with many of the trends identified above was the Great Recession, extending officially from December 2007 to mid-2009, which had devastating consequences for middle- and low-income households, particularly those whose members were among the 8 million workers who lost their jobs and whose wealth was based on inflated housing prices (Economic Policy Institute, 2012). Although the recession officially ended in June 2009, the labor market response has been sluggish, unlike trade and industrial growth, which has direct implications for economic opportunity. As in the "jobless recovery" after the 2001 recession (Bernstein, 2003), employment growth has been slow and highly uneven by skill level, industry sector, and occupation (Carnevalle et al., 2015). Even with unemployment falling from its recession peak of 10.0 percent (October 2009) to its current rate of around 5 percent during the slow recovery, the addition of 6.8 million nonfarm payroll jobs in the 42 months since February 2010 when payrolls bottomed out is below the number lost during the market contraction.[8] However, the job growth picture is mixed: Median earnings for full-time, full-year workers have at least returned to and possibly now exceed pre-recession levels; growth in low-wage jobs also has restored recession losses; and the gap between the earnings of young and experienced workers has widened. Some of these trends have potentially exacerbated wage gaps by skill level.

In addition, rising immigration is far from being just a U.S. trend. The rise in the share of foreign-born populations is an international phenom-

---

[8]These figures come from Pew Research Center analysis of Bureau of Labor Statistics data. Available: http://www.pewresearch.org/fact-tank/2013/09/25/at-42-months-and-counting-current-job-recovery-is-slowest-since-truman-was-president [November 2016].

002370

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

enon among the developed countries,[9] although the experiences of each nation are sufficiently disparate that claims about the consequences of immigration are unlikely to hold across all places at all times.

The drivers behind migration patterns to the top destination countries are also diverse. Geographic proximity is a factor in most but not all cases. For example, there are close to 12 million Mexican-born individuals living in the United States, but there are also 3 million U.S. residents born in India and 1.9 million born in the Philippines. And 4.7 million UK-born individuals are living in Australia. Differences in the restrictiveness embedded in a nation's policy objectives affect the size and composition of immigrant inflows. The primary entry-purpose designations are "economic," "family reunification," "asylum and humanitarian," and "student." Family reunification is the largest avenue through which individuals qualify for admission and for lawful permanent residence in the United States, and those entering under this designation represent more than 60 percent of all legal entries. The United States is somewhat unusual in this respect, as most other countries use entry categories other than family reunification at higher rates.[10]

Economic incentives motivate much of the world's population movements. The Australian government (as well as others, such as the UK government) has formalized this objective—albeit from the receiving country's perspective—instituting a point-based system in 1989 designed to grant visas based on the personal attributes of applicants indicating their ability to contribute to society, defined primarily by their occupational category. An extreme example is the United Arab Emirates. As a result of massive guest worker programs, more than 80 percent of its population consists of foreign-born individuals,[11] the vast majority of whom are excluded from

---

[9]The Migration Policy Institute has a comprehensive and easily understood set of interactive maps, charts, and other visuals on international migration statistics, showing trends over time and across countries. Available: http://www.migrationpolicy.org/programs/datahub/international-migration-statistics [November 2016]. See also the *International Migration Outlook 2015* (OECD, 2015).

[10]The events surrounding the resettlement of people fleeing turmoil in Syria since the onset of the civil war there in 2011 has put pressure on the United States to increase the number of refugees it accepts above the current annual cap of 70,000. A plan by the Obama administration would increase the number of refugees (people who can prove they are escaping war or persecution) to 100,000 by 2017—still a small fraction of foreign-born admitted to the United States and a very small number compared with the millions of Syrians living in Jordan, Lebanon, and Turkey, and now Germany and other parts of Europe. (Through the first half of 2015, Germany had received nearly 100,000 Syrian refugees.) Debate about these different immigration policy paths by the candidates has played a prominent role in the run-up to the 2016 presidential election.

[11]Temporary workers such as these generally are not considered immigrants as defined in Chapter 2.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

citizenship and access to government programs. China is a major sending country, mainly due to its enormous overall population but also because of its many students studying abroad (mainly in the United States).

Beyond these broad developments in the national and global environment, there have been changes over the past two decades in the characteristics of immigrants (and the native-born) in the United States and in the environments to which they arrive. Trends—in age, education, occupation, country of origin, and opportunities and constraints—that directly shape immigrant integration are documented in much greater detail in Chapters 2 and 3, as are historical developments in the policy environment. Together, these first three chapters set the context for the subsequent chapters, which analyze how these variables interact to affect wage, employment, and other economic and fiscal outcomes.

## 1.2  ECONOMIC IMPACTS

The consequences of immigration for individuals already established in a receiving country, particularly those involving wage and employment prospects, are a long-standing concern to a range of stakeholders. The headline questions are: Do immigrants take jobs away from natives; do they lower the wages of natives? Do immigrants complement native-born workers or are they more often substitutes? What occupational niches do immigrants fill for the benefit of the rest of the economy? What is the role of immigrants in driving productivity change and long-term economic growth? And what is their role in contributing to vibrancy in construction, agriculture, high tech, and other economic sectors?

A deep though not fully unified literature addresses these concerns. The panel's review and assessment of this literature, which deals with labor markets specified in a number of different ways (e.g., by skill group, by occupation, by geographic area), reached a number of conclusions. As explored in detail in Chapter 5, wage and employment outcomes resulting from immigration are closely tied to the extent to which new arrivals complement or substitute for workers already established in the labor market. For cases in which immigrants and natives specialize in different occupational activities—perhaps the former as construction workers or scientists and the latter as supervisors or financial analysts—wage gains and job creation become likely outcomes. When new arrivals compete with those already in the labor force—for example, if unskilled immigrants and native-born teenagers (or earlier immigrants) are applying for the same fast food restaurant jobs—wages and job opportunities for the latter may be negatively impacted, at least in the short run.

The definitiveness of the panel's conclusions is tempered by the fact that measurement of the impacts created by flows of foreign-born individuals

002372

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

into labor markets is difficult. The effects of immigration have to be isolated from innumerable, simultaneously occurring influences that shape local and national economies. Beyond this measurement challenge, the relation between immigration labor inflows and market outcomes is not a constant; it varies across places and immigration episodes, reflecting the skill set of incoming immigrants and natives in destination locales, a given market's mix of industries, the spatial and temporal mobility of capital and other inputs, and the overall state of the economy. Although a labor market emphasis has created a rich economics literature on immigration, there are still a number of unresolved empirical questions, which this report explores.

Much of the wage and employment research reviewed in Chapters 4 and 5 involves essentially static marginal analyses answering the question, "if *x* new arrivals are added to the labor supply, what are the likely short-run market impacts?" Many fiscal analyses—for instance, the impact on state, local, or federal budgets this year or the projected life-cycle fiscal impacts for the nation—are similarly oriented toward assessing marginal effects. However, it is also important to consider the dynamics underlying an expanding economic pie, dynamics that operate over long time periods. Thus, to the labor market discussion we attempt to overlay a critical issue that is sometimes overlooked: the relationship between immigration and economic growth. Once it becomes clear that immigration contributes to long-term economic expansion in a way that accommodates a larger population, assessments of short-term adjustments and societal costs can be placed in a more complete context.

Long-run growth requires infusions of labor, various forms of capital—both physical and human—and technology. Given native fertility rates and age profiles in the United States and in many other industrialized nations, immigrants are the most likely candidates for generating net labor force growth. Likewise, they contribute to capital formation and innovation, which also shapes the way and the pace at which growth unfolds. Easterlin (1980) wrote about the impact of immigrants and family formation on cycles of growth in the American economy before the restrictive immigration regulation in the 1920s. Cutler et al. (1990) and many others have discussed the implications of population aging on secular stagnation in Japan and Europe while finding the United States less affected because of higher immigration rates. Population aging is a major policy issue in part because of slowing labor force growth and a declining ratio of workers to dependents but also because, relative to other adult age groups, older people purchase fewer houses and durable goods, which drive a significant component of economic demand. The demographic profile of immigrants factors into these trends in obvious ways: One-half of the foreign-born are between the ages of 18 and 44 (about 80% are between the ages of 18 and 64), compared with about one-third of the native-born (about 60% are between 18 and 64).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

An essential piece of the long-run economic analysis investigated in Chapters 5 and 6 involves immigrants and their contributions to human capital development, scientific advancement, and innovation. For this reason, researchers are increasingly interested in documenting trends of the foreign-born among students studying and professionals working in science, technology, engineering, and mathematics (STEM) fields; their roles in business creation, patenting and other activities related to innovation, productivity, and growth are also being examined. To the extent that immigrants can add disproportionately to cutting-edge science activities occurring in universities and research labs, the U.S. economy is likely to benefit. The National Science Foundation's 2010 National Survey of College Graduates suggests that this is indeed the case. For example, 60 percent of foreign graduate students were enrolled in STEM fields, and although the foreign-born represent only 14 percent of all employed college graduates, they account for 50 percent of those with doctoral degrees working in mathematics and computer science occupations.[12] Immigrants are also overrepresented in Silicon Valley high-tech firms; roughly one-fourth of high tech startups during the period 1995-2005 included at least one immigrant among the firm's founders. Beyond science and technology, immigrants have historically played a key role in small-scale retailing, which can help to revitalize urban (and sometimes rural) areas, expanding nascent business sectors by lowering the cost of goods and services; examples include nail salons, ethnic restaurants, child and elder care, and lawn care and gardening. Recent studies (e.g., Fairlie, 2012) indicate that immigrants display entrepreneurial rates above those of the native-born population.[13]

### 1.3  FISCAL IMPACTS

Part III of this report (Chapters 7-10) assesses the impact that immigration has on fiscal trends at the federal and state levels of government. Along with wages and employment consequences, the fiscal impact is the other major factor determining the extent to which immigrants are or will

---

[12]National Science Foundation's National Center for Science and Engineering Statistics, *Science and Engineering Indicators 2012*. Available: http://www.nsf.gov/statistics/seind12/pdf/c02.pdf [November 2016]. Interestingly, as pointed out by Teich (2014), whereas the H-1B visa program is often viewed as the mechanism whereby science and engineering and, in turn, innovation can be strengthened—and scientists and engineers engaged in research and development are indeed brought in or allowed to extend stays under the program—the majority of H-1B visa recipients are in computer programming and other information technology fields. Many immigrants working under H-1B visas do so for firms that outsource information technology services overseas.

[13]However, due to a smaller average size of new businesses started by the foreign-born, their relative contribution to job creation is less clear (Fairlie, 2012).

002374

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

be net economic contributors to the nation. The headline questions here include the following: What are the fiscal impacts of immigrants for state and federal governments; do they cost more or less than they contribute in taxes? How do the fiscal impacts change when traced over the life cycle of immigrants and their children? How does their impact on public finances compare with others in the population?

In formulating immigration policy, information about public finances—specifically the added tax burden or benefit to those already in the country created by new immigrants—is of central interest.[14] In addition, immigration affects the growth rate of government outlays. By adding workers and beneficiaries to the economy at different rates relative to the native-born, immigration affects the long-term financial health of programs such as Social Security and medical care programs. Answering such questions about long-term implications requires calculating how fiscal impacts change when traced over the life cycle of immigrants, their children, and future generations.

Recent studies suggest an increasing recognition of the need to understand the fiscal challenges of immigrant integration in an environment characterized by a mismatch between the federal government's revenues and spending. The 2010 report *Choosing the Nation's Fiscal Future* assessed the options and possibilities for a sustainable federal budget (National Research Council and National Academy of Public Administration, 2010). That study considered a range of policy changes that could help put the budget on a sustainable path, including reforms to reduce the rate of growth in spending for Medicare and Medicaid, options to reduce the growth rate of Social Security benefits or to raise payroll taxes, and changes in many other government spending programs and tax policies. Among the policy recommendations the study considered was the option of expanding the numbers of immigrants, especially skilled workers, with the expectation that this could boost the working portion of the U.S. population, thus helping to pay for benefits to the elderly. However, the report concluded that because immigrants obviously grow old, too, any budget fix from increased immigration would be a temporary one; even if immigration doubled or tripled from current rates, only a small long-term contribution to aggregate income and to federal revenues could be expected (National Research Council and National Academy of Public Administration, 2010, p. 31). By

---

[14]That the Congressional Budget Office produces estimates of these impacts indicates the high degree of political interest. For example, in a recent analysis of the 2013 Senate immigration reform bill by the Executive Office of the President (2013), the Congressional Budget Office estimated that the bill's enactment could reduce the federal budget deficit by nearly $850 billion over the next 20 years, in large part due to increased work by otherwise unauthorized immigrants who would become authorized under the bill, along with greater ability to tax their earned income.

002375

Copyright National Academy of Sciences. All rights reserved.

28          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

contrast, Myers (2012) used Census Bureau projections to conclude that, if immigration slows the process at a critical time, it does not have to stop population aging completely in order to be beneficial. He demonstrated that the critical fiscal problem now facing the United States is linked to the sharp increase (by roughly two-thirds) in old-age dependency on federal benefit programs that would occur between 2010 and 2030. Immigration can reduce the program deficit impact in that critical period, even though "immigrants grow old, too" in later decades.[15] The fiscal projections in Chapters 8 and 9 of this report illustrate how highly dependent public expenditures and tax revenues are on the population age structure.

As with estimates of employment and wage impacts, estimating the fiscal impacts of immigration is a complex calculation that depends to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. The first-order *net fiscal impact* of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. The foreign-born are a diverse population, and the way in which they affect government finances is sensitive to their demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs.

The potential to alter a nation's or state's fiscal path is greatest when the sociodemographic characteristics of arrivals differ distinctly from those of the overall population—and particularly when these characteristics are linked to employment probability and wage levels. In the United States, immigrants have historically exhibited lower skills and education and, in turn, lower income relative to the native-born. However, as described in Chapter 3, after 1965 substantial numbers of the foreign-born are now in high-skilled occupations as well. Age at arrival is another important determinant of fiscal impact: The very young and the very old typically create net costs to government programs. Immigrants arriving while of working age—who pay taxes almost immediately and for whom per capita social expenditures are the lowest—are, on average, net positive contributors. This value gradually declines with higher age at entry, as the projected number of years remaining in the workforce becomes smaller. For immigrants with lower levels of education, the net present value of expected contributions is much smaller initially and turns negative at a much earlier

---

[15]Population projections by the Pew Research Center (2015a) indicate that post-2015 cumulative immigration is likely, by 2050, to reduce the ratio of seniors to the overall population by one-fourth relative to what it would be without immigration. Myers (2012) contended that the logical error stems from focusing only on the endpoint commonly used in Social Security population projections—85 years out—when the greatest problem is the sharp age increase from 2020 to 2030.

002376

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

age. Those arriving after age 21 also typically do not add to the largest state and local cost of immigration—the cost of public education in the receiving country—although their children will. These age and life-cycle variations in fiscal impacts are only realized over the course of many years.

When considering alternative scenarios, it can be important to differentiate immigrants by country of origin and legal status, as individuals grouped by these characteristics experience different outcomes in the labor market and different take-up rates for government services. As just one example of how heterogeneity may affect fiscal impacts, Camarota (2012) found that for the top immigrant-sending countries in 2010, the share of immigrant households participating in means-tested programs (e.g., food assistance and Medicaid) was highest for households headed by immigrants from Mexico (57%), followed by Guatemala (55%) and the Dominican Republic (54%). The lowest rates were for households headed by immigrants from Canada (13%), Germany (10%), and the United Kingdom (6%). Thus, the net fiscal impact of immigration for a particular state or the nation as a whole is driven by a rich set of contextual factors.

A comprehensive accounting of fiscal impacts is further complicated by secondary effects on the native-born population. For example, because new additions to the workforce may alter the wages or employment probabilities of those already employed, the impact on taxes paid directly by immigrants is only part of the picture. Moreover, revenues generated from the native-born who have benefited from economic growth and job creation attributable to immigrant innovators or entrepreneurs would also have to be included in a comprehensive evaluation, as would indirect impacts on property, sales, and other taxes and on per capita costs of the provision of public goods.

Accounting exercises such as those presented in Chapters 8 and 9 create combined tax and benefit profiles by age and education to decompose the timing and source of fiscal effects—and they typically deal only with the direct, not the secondary, effects. Forward-looking projections build scenarios to demonstrate alternative assumptions about how public expenditures—e.g., for public education and various programs (Aid to Families with Dependent Children; Medicaid; Special Supplemental Nutrition Program for Women, Infants, and Children; Supplemental Nutrition Assistance Program; Supplemental Security Income; etc.)—and revenues change by generation and affect a baseline fiscal estimate.

Part III explores a number of methodological approaches to address different accounting objectives. For some policy questions, multigenerational costs and benefits attributable to an additional immigrant or to the inflow of a certain number of immigrants may be most relevant. For others, the budget implications for a given year associated with the current immigrant population or for recent changes in the foreign-born population residing

002377

Copyright National Academy of Sciences. All rights reserved.

in a particular state or in the entire nation may be of interest—this is often the focus of state legislators, for example. Sometimes the question is about absolute net fiscal impacts; sometimes it is about the fiscal impact of an immigrant *relative* to that of an additional native-born person. Although these approaches require very different kinds of aggregations and calculations, the program (expenditure) and tax (revenue) fiscal components are largely the same.

## 1.4  CHARGE TO THE PANEL

The changing patterns of immigration and the evolving consequences for American society, institutions, and the economy continue to fuel public policy debate that plays out at the national, state, and local levels. The National Research Council has published a number of studies over the past 20 years that have been influential in these debates.[16] The foremost of these studies, *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (National Research Council, 1997), was prepared in response to a request from the congressionally chartered Commission on Immigration Reform, which required a scientific foundation for policy making on immigration. *The New Americans*—parts of which are updated with more recent information by this report—focused on the effects of immigration on the future size and composition of the U.S. population, the influence of immigration on the U.S. economy, and, in particular, the fiscal impact of immigration on federal, state, and local governments.

Questions concerning immigrant integration were explored in a 2006 study focusing on the impact of the growing role of Hispanics in the United States. *Multiple Origins, Uncertain Destinies: Hispanics and the American Future* (National Research Council, 2006b) made important contributions to understanding the process of immigrant integration and its effects on families, education, the labor force, and health.

Since *The New Americans*, a growing body of research and improved sources of data—most notably, the American Community Survey, the New Immigrant Survey, and a longer series of Current Population Surveys—have made it possible to fruitfully update that report's findings. Remaining, significant data gaps notwithstanding (described in Chapter 10), it is now more possible than ever to assess the consequences of immigration for the

---

[16]Among these reports are *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration* (National Research Council, 1997); *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (National Research Council, 1998); *America Becoming: Racial Trends and Their Consequences* (National Research Council, 2001); *Hispanics and the Future of America* (National Research Council, 2006a); and *Multiple Origins, Uncertain Destinies: Hispanics and the American Future* (National Research Council, 2006b).

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 1-1**
**Statement of Task**

The National Academies' National Research Council will appoint a committee of leading economic, demographic, and fiscal experts to study the economic and fiscal impact of immigration. The expert panel will (1) summarize existing knowledge about the economic and fiscal impacts of immigration; (2) project immigration and related economic and fiscal trends to the year 2050, or present an analysis of projection scenarios representing best research on the topic; (3) discuss implications of the panel's findings for economic and fiscal policy, particularly with regard to expenditure and tax programs; and (4) identify gaps in our existing knowledge and in the data infrastructure.

The goal of the project is to lay the basis for informed and fact-based discussion of the issues surrounding current immigration into the United States among a wide range of audiences from policy makers to researchers, teachers, and the general public. In carrying out its charge, the panel will address a list of specific questions about the impacts of immigration on:

- overall living standards and the macro economy;
- wages and income of U.S. natives and immigrants;
- the labor market broadly (e.g., to what extent does immigrant labor complement and substitute for native employment);
- budgets and fiscal health at the federal, state, and local levels; and
- intergovernmental fiscal dynamics (e.g., the distribution of the budget impact across federal, state, and local entities).

At the conclusion of the study, the National Academies Press will publish a consensus report of the panel that will be available on the Web and in paperback. In addition, dissemination activities will be planned to ensure that the report has an appropriate impact.

---

American economy in a shifting demographic, social, and political landscape. Given this backdrop, the Panel on the Economic and Fiscal Consequences of Immigration was formed by the National Research Council and tasked with assessing the fiscal and economic impacts of immigration. The Statement of Task guiding the panel's work is reproduced in Box 1-1.

The findings and conclusions in this report are intended to help inform basic policy conversations such as the following: How many immigrants to admit? What should be the composition of those admitted? What is the economic impact of enforcement dealing with immigration that takes place within and outside authorized channels? Which individuals and government levels benefit, in the short run and in the long run, from new immigration? Priorities and policy decisions depend in part on the kinds of information

002379

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

about economic and fiscal impacts contained in this report; they may also depend in part on other objectives—for example, the value (economic and noneconomic) to people of unifying families or of providing safe refuge for those fleeing oppression. How each of these objectives is weighted is a political matter, which is not addressed here. Nonetheless, an informed discussion of policy options does depend on accurate information; the panel hopes that this report provides such information for the economic and fiscal domains. The audience for the report begins with policy makers and lawmakers at the federal, state, and local levels but extends to the general public, nongovernmental organizations, the business community, educational institutions, and the research community.

002380

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# 2

# Immigration to the United States: Current Trends in Historical Perspective

## 2.1 INTRODUCTION

More than 40 million persons living in the United States were born in other countries, and almost an equal number—the second generation—have at least one parent who was born abroad. Together, the first generation (foreign-born) and second generation (U.S.-born children of the first generation) comprise almost one in four Americans (Pew Research Center, 2015a, p. 120). Political leaders and social commentators sometimes cite these large numbers as evidence that the United States is facing an unprecedented crisis that threatens the economy and the cultural fabric of U.S. society. However, current levels of immigration, though at record highs in absolute numbers, are not out of line with those experienced for most of American history when considered relative to the total U.S. population. The United States has witnessed successive waves of mass immigration that were initially seen as crises but are now celebrated as major contributions to a "nation of immigrants" (Kennedy, 2008; Martin, 2010). In the coming years, immigration will be the primary source of labor force growth in an increasingly aging population.

Placing current and future immigrant trends and patterns into historical perspective is the objective of this chapter. In addition to setting the stage for the subsequent chapters of this report, a look backward also provides context for understanding the contentious debates over immigration. Each generation of Americans, from the founding of the republic to the present day, has wrestled with questions of who should be allowed to enter the country and to become a citizen. Americans, especially natives and long-

*33*

002381

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2389 of 4699 PageID #:  5554

settled immigrants, have always been suspicious of the qualities of newcomers: their character, their skills, their loyalty, and their potential to assimilate to American values and institutions (Zolberg, 2006). At many times during U.S. history, laws and policies were enacted to restrict the entry and freedoms of different groups of newcomers. But the door was never completely closed, and peoples from almost every part of the world have continued to seek refuge and opportunity on American soil that they could not find in their home countries (Daniels, 1991; King, 2000; Reimers, 1992).

The growth of the U.S. population from less than 4 million in 1790 to about 320 million in 2015 is due in no small measure to immigration. Most Americans today are the descendants of immigrants who arrived after the founding of the nation in the late 18th century (Edmonston and Passel, 1994, p. 61; Gibson, 1992). Their immigrant ancestors may not have been welcomed because their language, religion, culture, or appearance was not considered sufficiently "American." Yet, with the passage of generations, the children, grandchildren, and great-grandchildren of the successive waves of immigrants have become part of the American tapestry. This multigenerational process, which involves integration of different peoples, religions, and cultures, has diversified and broadened what it means to be "an American" (Gleason, 1980).

Immigrants and their descendants have also been accepted, even if not fully embraced, because of their determination and enterprise. Many immigrants are willing to undertake less desirable jobs than, and to settle in locations that are shunned by, native-born workers. The children of immigrants are often distinguished by their ambition and creativity (Hirschman, 2013), helping to invigorate American society and sustain this nation's world leadership in science and culture. In his 1958 book, *A Nation of Immigrants*, then-Senator John F. Kennedy claimed that the distinctive American culture of optimism and enterprise arises from our immigrant heritage.

In this brief survey, the panel addresses four major contemporary issues that have historical roots:

1. Are current levels of immigration higher than those experienced in the past?
2. How is immigration changing the racial and ethnic makeup of the U.S. population?
3. What will be the impact of immigrant workers on the U.S. economy as the Baby Boom generation departs the workforce?
4. How have the geographic settlement patterns of new immigrants changed in recent decades?

To understand the significance of these issues, the chapter begins with an overview of historical trends and patterns of immigration to the United

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2390 of 4699 PageID #:  5555

The Economic and Fiscal Consequences of Immigration

States. Three themes are emphasized (1) the volume of immigrant inflows and their changing origins; (2) the context of reception, often hostile but later accommodating; and (3) the successful integration of immigrants and their children.

## 2.2 IMMIGRATION TRENDS AND ORIGINS FROM 1820 TO 2015

The United States began collecting data on the numbers and origins of arrivals by ship in 1820. This statistical series, published in the annual *Yearbook of Immigration of Statistics* by the U.S. Department of Homeland Security (DHS), is widely considered to be the standard account of immigration to the United States, even though the series provides an incomplete record of immigration for much of American history. For example, overland entries from Canada and Mexico were not counted until the early 20th century. In recent decades, the DHS figures are not the number of new arrivals but of persons receiving lawful permanent resident (LPR) status, commonly called receiving a "green card." More than 1 million persons receive LPR status each year, but the majority of these have already been in the United States, some for many years. In addition, many other new arrivals enter the United States on temporary visas to work, study, or accompany a family member who comes to work or study. In fact, LPRs and temporary students or workers are not entirely separate populations, since over half of new LPR visas each year are "status adjustments" received by persons who were already in the United States on another visa (or even without a visa). Despite these limitations, the DHS series is the most widely used source of data for measuring long-term flows of (legal) immigrants to the United States. Figure 2-1 shows the absolute number (in thousands) of arrivals/LPRs based on the DHS data series with labels for the major immigration eras identified by Philip Martin (2013) in his Population Reference Bureau publication. We note that the spike in the numbers of new immigrants from 1989 to 1991 does not represent a surge of new arrivals but rather the change in legal status for the 3 million previously undocumented immigrants who received LPR status following the passage of the Immigration Reform and Control Act of 1986 (IRCA). Table 2-1 shows more detailed data on the specific countries of origin from the published DHS Immigration and Naturalization Service data series for each of the four periods identified in Figure 2-1 (the dates of Martin's periodization are slightly revised here to be consistent with the availability of DHS data by country of origin).

Based on the DHS data series, at least 74 million immigrants have arrived in the United States since 1820. There are only fragmentary counts of those who returned to their countries of origin or who died without leaving any descendants, but there is little doubt that almost all Americans are

002383

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 2-1** Legal immigration to the United States, 1820–2012.
NOTE: IRCA adjustments refer to the amnesty provisions of the Immigration Reform and Control Act of 1986, under which 2.7 million undocumented foreign-born U.S. residents obtained lawful permanent resident status.
SOURCE: This figure replicates Martin (2013, Fig. 2, p. 5) directly from the data series maintained by the U.S. Department of Homeland Security, 2014. These data can be downloaded from https://www.dhs.gov/publication/yearbook-immigration-statistics-2013-lawful-permanent-residents [November 2016].

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2392 of 4699 PageID #:  5557

The Economic and Fiscal Consequences of Immigration

the products of immigration, past or present. Without a common ancestry (real or imagined) to claim, American identity has been forged by common experiences rather than descent. These common experiences of Americans are created and reinforced by public schools, military service, civic organizations, Hollywood images, political campaigns, and social movements.

The four periods represented in Figure 2-1 are (1) frontier expansion before 1880, (2) industrialization and the age of the Great Atlantic Migration from 1880 to 1929, (3) the immigration pause from 1930 to 1965, and (4) the post-1965 wave of migration from Latin America and Asia. Even though millions of migrants arrived in each period, the eras of industrialization and the post-1965 wave stand out as exceptional, with 23 and 35 million documented immigrants, respectively.

The absolute numbers of arrivals or immigrants represented in Figure 2-1 (and on which the percentages in Table 2-1 are based) are not adjusted for the size of the American population at the time. For example, the 1 million or more annual arrivals in the early 20th century—in a country of less than 100 million people—represented a larger change to the population base than the arrival of 1 million annual immigrants in the early 21st century when the U.S. population numbered more than 300 million. The next section of this chapter presents estimates of the net international migration rate relative to the national population. The first conclusion from Figure 2-1 is that the annual numbers of immigrants in the current period—the "post-1965 wave"—are not exceptionally different from the numbers during much of American history. The one period that is distinctively different is the 1930 to 1965 immigration pause (Massey, 1995). This era, often remembered with nostalgia by many older Americans as representative of the American past, is actually the most different with respect to the annual numbers (and percentage of the receiving population) of arriving immigrants.

Beyond the number of immigrants, it is helpful to survey the major trends and patterns that shape and describe immigrant flows. These include the factors that motivate long-distance migration; condition the reception of immigrants by the receiving population; and shape government policies that have encouraged, discouraged, and restricted immigration at various times (Hirschman et al., 1999; Massey et al., 1998; Portes and Rumbaut, 2014). Economic factors loom large among the many causes of international migration. As a frontier New World country in the mid-19th century, a rapidly growing industrial economy in the early 20th century, and a dynamic postindustrial economy in recent decades, the United States has always attracted immigrants (Easterlin, 1980). Long-distance migrants rarely come from the ranks of the successful; more often they have been peasants pushed off their lands by the commercialization of agriculture, workers who lost their traditional livelihood because of the

002385

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

38

**TABLE 2-1** Persons Obtaining Lawful Permanent Resident Status by Region and Selected Country of Last Residence, Fiscal 1820-2013 (percentage of total)

| Region and Country of Last Residence | Frontier Expansion 1820-1879 | Industrialization 1880-1929 | Pause 1930-1969 | Post-1965 Era 1970-2013 | All Periods 1820-2013 |
|---|---|---|---|---|---|
| Total (%) | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Europe | 90.0 | 82.9 | 47.5 | 13.1 | 47.7 |
| Northwestern Europe | 52.2 | 13.8 | 14.3 | 3.0 | 13.8 |
| Britain | 19.5 | 6.7 | 8.4 | 1.9 | 6.3 |
| Ireland | 28.7 | 5.0 | 1.8 | 0.3 | 5.6 |
| Scandinavia | 3.6 | 6.1 | 2.1 | 0.3 | 2.7 |
| Germany and Switzerland | 31.8 | 7.1 | 14.8 | 1.3 | 8.3 |
| Eastern Europe | 1.2 | 33.4 | 4.8 | 5.0 | 13.1 |
| Austria-Hungary | 0.7 | 16.6 | 2.3 | 0.3 | 5.5 |
| Poland | 0.2 | 1.5 | 1.3 | 1.2 | 1.2 |
| Russia | 0.4 | 13.7 | 0.1 | 2.0 | 5.2 |
| Southern Europe | 1.3 | 22.5 | 11.2 | 2.3 | 9.2 |
| Italy | 0.7 | 19.0 | 7.2 | 0.9 | 7.0 |
| Greece | 0.0 | 1.9 | 1.9 | 0.5 | 1.0 |
| Spain and Portugal | 0.5 | 1.6 | 2.0 | 0.9 | 1.2 |
| Asia | 2.3 | 3.4 | 7.5 | 34.0 | 18.0 |
| China, Hong Kong, Taiwan | 2.3 | 0.4 | 2.0 | 6.6 | 3.7 |
| Japan | 0.0 | 1.2 | 1.2 | 0.8 | 0.9 |
| Philippines | 0.0 | 0.0 | 1.3 | 6.2 | 3.0 |
| Korea | 0.0 | 0.0 | 0.4 | 3.0 | 1.4 |
| Vietnam | 0.0 | 0.0 | 0.0 | 2.9 | 1.4 |
| India | 0.0 | 0.0 | 0.3 | 4.6 | 2.2 |
| Other Asia | 0.0 | 1.7 | 2.3 | 9.9 | 5.4 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | | | | | |
|---|---|---|---|---|---|
| Americas | 6.8 | 13.2 | 43.4 | 45.6 | 30.5 |
| Canada and Newfoundland | 5.8 | 7.9 | 15.3 | 2.4 | 5.8 |
| Mexico | 0.3 | 3.2 | 11.1 | 19.2 | 11.1 |
| Caribbean | 0.7 | 1.5 | 8.4 | 11.7 | 6.9 |
| Cuba | 0.1 | 0.2 | 4.3 | 2.7 | 1.8 |
| Dominican Republic | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Haiti | 0.0 | 0.0 | 0.5 | 1.9 | 0.9 |
| Jamaica | 0.0 | 0.0 | 1.0 | 2.2 | 1.1 |
| Other Caribbean | 0.5 | 1.3 | 1.3 | 1.5 | 1.3 |
| Central America | 0.0 | 0.2 | 2.3 | 5.3 | 2.8 |
| South America and other America | 0.1 | 0.4 | 6.4 | 7.0 | 4.1 |
| | | | | | |
| Africa | 0.0 | 0.1 | 0.6 | 4.9 | 2.4 |
| Oceania | 0.1 | 0.2 | 0.7 | 0.7 | 0.4 |
| Not specified | 2.1 | 0.2 | 0.2 | 1.7 | 1.1 |
| | | | | | |
| Total persons (in thousands) | 9,604 | 22,540 | 7,269 | 34,694 | 74,107 |

NOTE: Official recording of immigration to the United States began in 1820 after the passage of the Act of March 2, 1819. For the period 1820-1867, the data represent alien passenger arrivals at seaports. For the periods 1868-1891 and 1895-1897, the data are for all immigrant alien arrivals. For 1892-1894 and 1898-2013, the data represent immigrant aliens admitted for permanent residence. From 1892 to 1903, aliens entering by cabin class were not counted as immigrants. Land arrivals were not completely enumerated until 1908. Prior to 1906, the data are for country of origin; from 1906 to 2013, the data are for country of last residence. Because of changes in national boundaries, data for a particular country may not necessarily refer to the same geographic area over time. Only the largest countries from the source table are listed here, although the regional and subregional areas are inclusive for all new arrivals/immigrants from that area. The boundaries of most of Eastern Europe changed radically from the late 19th century through the early decades of the 20th century. Moreover, many new arrivals may have reported their national identities rather than the country or political unit from which they came. For complete details, see the 21 detailed footnotes to the source table.
SOURCE: This table is a summary of Table 2 of the *Yearbook of Immigration Statistics: 2013* (U.S. Department of Homeland Security, 2014, pp. 6-7).

002387

Copyright National Academy of Sciences. All rights reserved.

40        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

collapse of industries, and minorities who were fleeing religious or political persecution (Hatton and Williamson, 2008; Massey et al., 1998). Nor are migrants selected from the bottom of the socioeconomic spectrum in sending societies; instead, most migrants come from the middle ranks of the sending society. The poorest of the poor rarely become long-distance migrants because they lack the resources to cover the costs of transportation and initial settlement (Massey, 1999; Portes and Rumbaut, 2014, Ch. 3).

**Settling the Frontier: Immigration from Western Europe Prior to 1880**

Before 1880, 90 percent of immigrants were from Europe, mostly from the United Kingdom, Ireland, and Germany (Table 2-1). Another 6 percent originated in Canada. There were smaller numbers from Scandinavia, the periphery of Europe, and China. Compared to the present, it might seem that the United States was a homogenous society for the first century after independence. This interpretation would, however, be a serious misreading of the deep racial and ethnic divides in 18th and 19th century America.

The first census in 1790 showed that 20 percent of the early American population was of African origin—90 percent of whom were slaves (Archdeacon, 1983, p. 25; Gibson and Jung, 2005, Table A.1). For the three centuries after European arrival in the New World, many more Africans crossed the Atlantic in chains than did free or indentured Europeans (Hatton and Williamson, 2008, p. 8). In addition, it should not be overlooked that Native American populations were demographically and politically ascendant in all of North America except the eastern seaboard (Snipp, 1989), even if they were not enumerated in early censuses. The conflicts and political struggles over slavery and white settlements on Native American lands were the major political issues in early American history.

In the 18th century, Americans often expressed intolerance of European groups that spoke other languages and followed different religious faiths than the majority. Benjamin Franklin complained that the "Palatine Boors" were becoming so numerous in Pennsylvania that they might be tempted to Germanize the resident population instead of the residents Anglifying them (Archdeacon, 1983, p. 20; Jones, 1992, pp. 39-40). The major immigration wave in the 1840s and 1850s, primarily of Irish Catholics fleeing the potato famine, sparked a nativist reaction, popularly known as the "Know-Nothing" movement (Higham, 1988, Ch. 2). In 1854, 6 governors and 75 members of Congress were elected from the Know-Nothing party on a platform of ending immigration (Archdeacon, 1983, pp. 81-82). Although nativism receded in the 1860s as the Civil War dominated domestic politics, the animosity against immigrants, and Catholics in particular, was a harbinger of what was to come.

002388

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2396 of 4699 PageID #:  5561

The Economic and Fiscal Consequences of Immigration

### The American Industrial Revolution and Immigration
### from Southern and Eastern Europe, 1880 to 1924

The second historical period of immigration includes the last two decades of the 19th century and the first quarter of the 20th (Table 2-1 approximates this period with data from 1880 to 1929). Although most of the immigrants during this era crossed the Atlantic, there was also an important trans-Pacific flow of migrants from China and Japan to California. The first large-scale Chinese migration began in the 1860s and 1870s, and the 200,000 Chinese workers in California in 1880 made up nearly a quarter of the state's labor force (Bonacich, 1984). Fearing wage competition with Chinese workers, white workers in California, supported by unions and politicians, unleashed a vitriolic anti-Chinese campaign that led to the first ban on immigration of a national origin group—the so-called "Chinese Exclusion Act of 1882" (Chan, 1991). When Japanese began arriving in large numbers in the late 1890s and early 1900s, they were also met with racial hostility that soon led to a ban on immigration of Japanese workers with the "Gentlemen's Agreement" of 1907 (Daniels, 1962).

In the five decades from 1880 to 1929, more than 22 million immigrants arrived in the United States—a country that only numbered 50 million in 1880. Even more controversial than the numbers were the sources of the "new immigrants," as they were called. The earlier streams of Irish, British, and German immigrants gradually gave way to peoples from Southern and Eastern Europe, including more than 4 million Italians, 3 million people from the Russian Empire, another 4 million from the Austrian-Hungarian Empire, and millions more from other parts of Eastern Europe, Greece, Spain, Portugal, and Scandinavia. During this period, there were also sizable immigrant streams from the Americas, notably Canada, Mexico, and the Caribbean, as well as from Japan. Relative to the prior period (1820 to 1879), the age of the American industrial revolution (1880 to 1929) saw the fraction of immigrants from Northwestern European origins reduced from 52 to 14 percent, while the numbers from Eastern and Southern Europe soared from 2 to 55 percent.

Industrialization provided a propitious labor market for throngs of unskilled workers willing to accept jobs that were shunned by native-born Americans (Atack et al., 2000, p. 322; Carpenter, 1927, p. 271; Hirschman and Mogford, 2009). However, the differences in language, culture, and religion between new immigrants and the native-born population, combined with popular anxieties over the industrialization of the American economy, contributed to the formidable political backlash against Southern and Eastern European immigrants during the late 19th and early 20th centuries.

Anti-Catholic attitudes were a core feature of 19th century American culture, which sometimes seethed into mob violence (Archdeacon, 1983,

002389

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

p. 81; Daniels, 1991, pp. 267-268). The rising tide of 19th century nativism morphed into a pseudo-scientific theory of Anglo-Saxon racial superiority based on Social Darwinism (Higham, 1988). Premised on assertions that immigrants from Southern and Eastern Europe could not be assimilated into American society, academic treatises and popular writings alleged that these new immigrants would undermine American political and cultural values and lower the intelligence of the population. An unusual political coalition, including the Ku Klux Klan, Midwestern Progressives, and many prominent intellectuals joined the anti-immigrant hysteria (Higham, 1988, Ch. 1; Jones, 1992, pp. 228-230). In 1910, the Dillingham Commission, appointed by Congress, issued a 42-volume report, which avowed the racial inferiority of the new immigrants from Eastern and Southern Europe (Bernard, 1980, p. 492; Handlin, 1957, Ch. 5).

The Immigration Restriction League, founded by young Harvard-educated elites in 1894, advocated a literacy test to slow the tide of immigration from Southern and Eastern Europe, which allegedly were sending an "alarming number of illiterates, paupers, criminals, and madmen who endangered American character and citizenship" (Higham, 1988, p. 103). When the literacy test failed to stem the immigration tide, the restrictionists pushed for numerical caps on new arrivals that aimed to reduce if not eliminate immigration from undesirable origins. Congress passed a law in 1921 that restricted immigration to 3 percent of each nationality already in the U.S. population, based on the 1910 census. Seeking to tighten the screws, the Immigration Act of 1924 ("Johnson-Reed Act") lowered the quotas by restricting immigration to 2 percent of each nationality counted in the 1890 census—a date before the surge in immigration from Southern and Eastern Europe. Following vitriolic congressional debates about redistricting, the act was amended in 1929 to set quotas based on the "national origins" of the white U.S. population (Bernard, 1980, pp. 492-493; Jasso and Rosenzweig, 1990; Tienda, 2002).

The anti-immigrant prejudices also triggered scapegoating of immigrants as the alleged causes of a myriad of social problems, including crime, radical politics, labor unions, and disease. The "Red Scare" (directed at socialists and communists) during 1919 and 1920 led to the mass arrests and deportations of immigrants (Higham, 1988, pp. 222-233). In early 1920, Attorney General A. Mitchell Palmer directed federal agents to round up more than 6,000 "aliens" without warrants. Although most were eventually released, many "were detained for unjustifiably long times and some suffered incredible hardships" (Cohen, 1964, p. 73). Similar scapegoating episodes occurred in the 1930s when, in the depth of the Great Depression, President Hoover authorized repatriation of Mexicans without due process in order to reduce welfare rolls and open up deportees' jobs for American workers (Balderrama and Rodriguez, 1995). As Nazi Germany unleashed

002390

Copyright National Academy of Sciences. All rights reserved.

an increasingly violent repression of its Jewish population during the 1930s, only a small number of Jewish refugees from Germany were allowed to enter the United States. Even as awareness of an approaching Holocaust of European Jewry spread, American immigration quotas, reinforced with anti-Semitism in the State Department, restricted any emergency response to accept more refugees (Breitman and Kraut, 1987; Zolberg, 2006).

### The Immigration Pause from 1924 to 1965

During the long hiatus in immigration, only 7 million LPRs were admitted (Table 2-1 approximates this period with data from 1930 to 1969). The Great Depression and World War II were key factors leading to the very low levels of immigration for the 1930s and 1940s. Moreover, the restrictive laws of the 1920s had dramatically lowered immigration with very small national origin quotas for Southern and Eastern European countries and quotas of zero immigrants from Asia and Africa. Consequently, almost half of the 7 million immigrants admitted during this period originated from Western Hemisphere counties, which were exempt from the national origin quotas. The largest influx was from Canada, but there were also substantial numbers from Mexico, the Caribbean, and South America. Strong social and economic ties between Mexicans granted U.S. citizenship by decree and Mexican citizens living south of the Rio Grande provided a foundation for sustained migrant flows even after the creation of the Border Patrol in 1924. In addition to those granted permanent residence, the United States authorized the entry of temporary workers from Mexico—popularly known as the Bracero program in 1942. More than 5 million Mexicans came to the United States as braceros between 1942 and 1964 (Massey et al., 2002); virtually all of the braceros returned to Mexico. There was also continued immigration from the few European countries that were given generous immigration quotas (Tienda, 2002).

The era from the 1920s to the 1960s was an important period for the integration and assimilation of Southern and Eastern European immigrants, and especially their children—the second generation—into the mainstream of American life (Alba and Nee, 2003). Against the backdrop of an often-hostile reception encountered by the new immigrants stands the remarkable social and economic progress of millions of immigrants from different cultural origins during the early and middle decades of the 20th century. Because new immigrants were considered a breed apart in the 1910s and 1920s, ethnic intermarriage rates were low and residential segregation levels were high (Lieberson, 1963; Pagnini and Morgan, 1990). Despite its many flaws, the Americanization movement did boost naturalization rates of immigrants and broaden educational opportunities for children of immigrants (King, 2000). By the 1950s, the children of early 20th century

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

immigrants had reached socioeconomic parity with other white Americans, residential integration was the norm in growing suburban areas, and ethnic intermarriage was unremarkable (Alba and Nee, 2003; Duncan and Duncan, 1968; Lieberson, 1980). During this period, World War II and the ensuing postwar economic boom (when all boats were rising) also played a role as an engine of integration over time. These trends continued and expanded during the second half of the 20th century to incorporate previously stigmatized immigrant and religious groups, including Catholics and Jews, into the social and economic mainstream. For much of the 20th century, the American commitment to diversity was limited to reserving one seat on the Supreme Court for a Catholic and another for a Jew—the implicit assumption was that without some sort of informal quota, minority religions would not be represented. In 2015, by comparison, all of the justices on the Supreme Court were Catholic or Jewish. This shift suggests that other factors, such as political ideology, are now more important than religion or ancestry.

### The Post-1965 Immigration Wave from Latin America and Asia

The 35 million legal immigrants from 1970 to 2013 represent a new chapter in American immigration history, with more than 40 percent coming from Latin America and 34 percent from Asia (Table 2-1). The count of immigrants granted LPR status over this period includes 6 million from Mexico, 4 million from the Caribbean, 1.8 million from Central America, and 2.4 million from South America. Of the 12 million Asian immigrants granted LPR status since 1970, 2 million hail from China (including Taiwan and Hong Kong), another 3 million are from the Philippines, and more than 1 million each came from Korea, Vietnam, and India. Since 1970, more than 1.7 million immigrants from Africa were granted LPR status.

Although the popular response to the post-1965 immigration wave may lack the blatant expressions of vitriol that were common in early 20th century America, there are parallels between the anti-immigrant political movements then and now. Undocumented immigrants evoke considerable antipathy from political leaders and the media, including allegations that immigrants increase crime rates; spread communicable diseases; create congestion in schools, parks, and other public facilities; and deplete scarce natural resources (Bouvier, 1992; Chavez, 2008; Federation for American Immigration Reform, 2009; Massey and Pren, 2012). Prominent intellectuals and academics sometimes legitimately claim that the newcomers from Asia and Latin America cannot be assimilated (Brimelow, 1995). Singling out Latin Americans (and Mexicans in particular), Harvard political scientist Samuel P. Huntington (2004, p. 256) warned that the continued influx would eventually "change America into a country of two languages, two cultures, and two peoples." As in the past when anti-immigrant sentiment

Copyright National Academy of Sciences. All rights reserved.

mounted, Congress passed a series of punitive laws in the 1990s and 2000s, which permitted the deportation of aliens, including permanent residents, with little regard for due process. The arbitrary detention and deportation of many Muslim immigrants in the wake of 9/11 is similar to the forced repatriation of Mexicans during the 1930s and 1950s.

Beyond concerns about the impact of immigrants on the labor market and the fiscal system, some Americans believe that the large numbers of immigrants from "third world" countries are a threat to national identity and culture (National Academies of Sciences, Engineering, and Medicine, 2015, p. 50). Much of the outrage in the mass media is focused on undocumented immigrants and the problem of "broken borders," but the antipathy against illegal immigration often spills over to all immigrants, particularly during periods of economic recession (Chavez, 2008; Portes, 2007; Sanchez, 1999). In 1994, for example, California voters approved Proposition 187, which was intended to limit access to health care and public schooling for the children of undocumented immigrants. Another response to the perceived immigrant threat was the militarization of the Mexican border (Dunn, 1996) and the spending billions of dollars for border enforcement along the nearly 2,000-mile peaceful border (Massey et al., 2016).

## 2.3 IMMIGRATION DRIVEN BY LABOR DEMAND

One of the major issues in immigration debates, past and present, has been whether migration is primarily a response to conditions in the countries of origin or to economic demand in the United States. Economic and demographic theory predict that both pushes and pulls are important, but there are other noneconomic factors influencing long-distance migration, including the social support from family and friends who have previously migrated (Massey et al., 1993), as well as immigrant admissions policies that emphasize family reunification. It is not so much a question of "either-or," but whether the magnitude of long-distance migration flows is responsive to labor demand and therefore "self-regulating" (at least in part), or whether immigration can only be controlled by restrictive policies (Hollifield et al., 2014).

The consensus of economic historians is that international migration before the 1920s was highly responsive to the economic demand for labor (Easterlin, 1968; Hatton and Williamson, 2008; Thomas, 1973). The restrictive immigration policies of the United States from the 1920s onward (and elsewhere in the world) reduced international migration to very low levels and ended the historic link between economic demand and the Atlantic migration system.

Following the immigration reforms in the 1960s, immigration levels increased from 1970 to the late 1990s and have oscillated since then at

002393

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

relatively high levels compared with the decades immediately prior to 1970. However, there have been substantial swings in the national origins and composition of immigrant arrivals during the contemporary period of mass immigration. For example, the large influx of unauthorized migrants, especially from Mexico, appears to have slowed in the early 2000s and then declined after the Great Recession (Passel et al., 2013). The major wave of Korean immigration peaked in the 1980s, while immigration from China and India increased in the 1990s and 2000s (U.S. Department of Homeland Security, 2014, Table 2.1).

Changes in immigration and refugee policies have shaped much of the fluctuations in the most recent period, including expansion of temporary immigration of high-skilled workers under the H-1B visa program and increasing numbers of international students, both undergraduate and graduate, enrolling in American universities (see Section 5.6 in this report). These policies and programs reflect, at least in part, the high demand for highly skilled labor in STEM fields (science, technology, engineering, and mathematics) by American firms in the high tech sector and in research laboratories in universities and the private sector.

There is also a high demand for temporary labor by the American agricultural sector, which has led to the creation of the H-2A visa program. The significant flows of undocumented workers to low-wage jobs in domestic child care, agriculture, and construction signify a partial response to the demand for workers by employers and for services by households in the United States (Massey et al., 2002; Muller, 1993; Portes and Rumbaut, 2014). The dramatic reduction in the levels of unauthorized migration following the collapse of the construction industry during the Great Recession in 2007-2009 suggests a powerful feedback from economic conditions (Martin, 2013; Massey, 2012). As will be shown in a following section, immigrants and their children have comprised a growing share of the working-age population. With the impending retirements among the large population of Baby Boomers, immigrants will play an even larger role in serving the labor needs of economic growth.

## 2.4  THE NET INTERNATIONAL MIGRATION RATE AND ITS CONTRIBUTION TO POPULATION GROWTH

The iconic portrait of immigration shown in Figure 2-1 represents only the inflow of LPRs to the United States. It does not include those coming on temporary visas to work or study nor those entering without authorization. Moreover, the DHS series does not include emigrants—the numbers of persons who depart from the United States each year. There has always been a substantial return migration of immigrants to their country of origin (Bandiera et al., 2013; Van Hook et al., 2006). More-

002394

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2402 of 4699 PageID #:  5567

over, the absolute number of immigrants does not incorporate information on the size of the national population. The magnitude of immigration relative to the total resident population (sometimes labeled "the density of immigration") is a better reflection of the visibility of presence of newcomers and of their potential impact on the host society. Standard demographic measures are typically expressed in rates relative to the population per unit of time. Thus, the panel's preferred index of immigration is the "net international migration rate" (or the net immigration rate) defined as net international migrants (immigrants minus emigrants) for a time interval divided by the (average) total resident population for the same time interval.

However, the lack of direct and complete measurement of all persons who enter and leave the United States has meant that most research relies on the one-sided and partial DHS series of LPRs as the index of temporal flow of immigration to the United States. Demographers and economic historians have, however, made heroic efforts to estimate the net international migration rate based on incomplete data and indirect methods of estimation (Barde et al., 2006; Carter et al., 2006, Ch. 1, pp. 541-550).

Table 2-2 shows the best available estimate of the trend in the net international migration rate and the share of national population growth attributable to net immigration for each decade from 1790 to 2000 and annually from 2000 to 2013. The historical series from 1790 to 2000 was assembled by Michael Haines (2006) and published in the millennial edition of the *Historical Statistics of the United States* (Carter et al., 2006). Table 2-2 also includes U.S. Census Bureau estimates of the net international migration rate for each year from 2000 to 2013 (except 2009). Although the techniques of estimation used in the historical series and the Census Bureau estimates are somewhat different, they rely on a similar logic. Net international migration is measured as the residual for a specific time interval (decade or year) after subtracting natural increase (births minus deaths) from total population growth for the same time interval. This method is indirect, but components (population growth and natural increase) are better measured than are the actual numbers of immigrants and emigrants.

Despite the record numbers of immigrants admitted in recent decades (as shown in Figure 2-1), the net immigration rate in Table 2-2 shows that contemporary immigration is fairly modest when considered relative to the size of the total population. The highest rates of net immigration relative to the total population occurred neither in the early 20th century nor in the early 21st century but rather in the 1840s and 1850s. The net international migration rate was about 8 or 9 per 1,000 population during this time, falling to about 6 or 7 per 1,000 population from 1880 to 1920, and then falling further in the decades of the Great Depression, 1940s, and 1950s.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-2** Components of Population Growth: United States, by Decade, 1790-2000, and by Year, 2000-2013

| Time Period | Mid-Period Population (thousands) | Rate of Total Increase (per 1,000) | Crude Birth Rate (per 1,000) | Crude Death Rate (per 1,000) | Rate of Natural Increase (per 1,000) | Net International Migration | |
| | | | | | | Rate per 1,000 | Percentage of Population Growth |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 1790-1800 | 4,520 | 30.1 | — | — | 26.5 | 3.6 | 11.9 |
| 1800-1810 | 6,132 | 31.0 | — | — | 26.9 | 4.2 | 13.5 |
| 1810-1820 | 8,276 | 28.6 | — | — | 24.7 | 3.9 | 13.7 |
| 1820-1830 | 11,031 | 28.9 | — | — | 26.8 | 2.1 | 7.1 |
| 1830-1840 | 14,685 | 28.3 | — | — | 23.5 | 4.8 | 16.9 |
| 1840-1850 | 19,686 | 30.7 | — | — | 22.4 | 8.3 | 27.0 |
| 1850-1860 | 26,721 | 30.4 | — | — | 20.6 | 9.8 | 32.3 |
| 1860-1870 | 35,156 | 23.6 | — | — | 17.4 | 6.3 | 26.5 |
| 1870-1880 | 44,414 | 23.1 | 41.2 | 23.7 | 17.5 | 5.6 | 24.2 |
| 1880-1890 | 55,853 | 22.7 | 37.0 | 21.3 | 15.7 | 7.0 | 30.9 |
| 1890-1900 | 68,876 | 19.0 | 32.2 | 19.4 | 12.8 | 6.2 | 32.6 |
| 1900-1910 | 83,822 | 19.4 | 29.8 | 17.3 | 12.6 | 6.9 | 35.3 |
| 1910-1920 | 100,546 | 14.2 | 26.9 | 15.3 | 11.6 | 2.6 | 18.1 |
| 1920-1930 | 115,829 | 14.5 | 23.2 | 11.6 | 11.5 | 3.0 | 20.5 |
| 1930-1940 | 127,250 | 7.3 | 19.5 | 11.1 | 8.4 | -1.0 | -14.0 |
| 1940-1950 | 139,928 | 13.9 | 23.1 | 10.5 | 12.6 | 1.3 | 9.6 |
| 1950-1960 | 165,931 | 17.1 | 24.8 | 9.5 | 15.3 | 1.8 | 10.4 |
| 1960-1970 | 194,303 | 12.7 | 20.1 | 9.4 | 10.6 | 2.0 | 16.1 |
| 1970-1980 | 215,973 | 10.3 | 15.4 | 8.9 | 6.5 | 3.8 | 37.0 |
| 1980-1990 | 238,466 | 9.9 | 15.8 | 8.7 | 7.2 | 2.8 | 27.9 |

Copyright National Academy of Sciences. All rights reserved.

| Year | Population | | | | | | |
|------|------------|------|------|------|------|------|------|
| 1990-2000 | 266,557 | 11.1 | 14.9 | 8.5 | 6.4 | 4.8 | 42.9 |
| 2000 | 282,172 | 10.3 | 14.3 | 8.6 | 5.8 | 4.3 | 41.3 |
| 2001 | 285,082 | 9.5 | 14.1 | 8.5 | 5.5 | 3.8 | 39.6 |
| 2002 | 287,804 | 8.8 | 14.1 | 8.4 | 5.7 | 2.9 | 32.6 |
| 2003 | 290,326 | 9.4 | 14.2 | 8.4 | 5.7 | 3.4 | 36.3 |
| 2004 | 293,046 | 9.2 | 14.1 | 8.3 | 5.8 | 3.2 | 35.0 |
| 2005 | 295,753 | 9.6 | 14.1 | 8.2 | 6.0 | 3.4 | 35.4 |
| 2006 | 298,593 | 10.0 | 14.4 | 8.1 | 6.3 | 2.9 | 29.0 |
| 2007 | 301,580 | 9.3 | 14.2 | 8.1 | 6.1 | 2.9 | 30.9 |
| 2008 | 304,375 | 8.6 | 14.0 | 8.2 | 5.8 | 2.8 | 32.5 |
| 2009 | Not available | | | | | | |
| 2010 | 309,347 | 7.7 | 12.8 | 8.1 | 4.7 | 3.0 | 38.5 |
| 2011 | 311,722 | 7.7 | 12.6 | 8.0 | 4.6 | 3.1 | 40.0 |
| 2012 | 314,112 | 7.6 | 12.6 | 8.2 | 4.4 | 3.2 | 41.9 |
| 2013 | 316,498 | 7.5 | 12.5 | 8.2 | 4.3 | 3.1 | 42.2 |

NOTES: Net International Migration Rate from 1790 to 2000 is based on Rate of Population Growth minus the Rate of Natural Increase. Net International Migration Rate from 2000 to 2013 includes the international migration of both native- or foreign-born populations. Specifically, it includes (a) the net international migration of the foreign-born, (b) the net migration between the United States and Puerto Rico, (c) the net migration of native-born U.S. citizens from and to the United States, and (d) the net movement of the Armed Forces population between the United States and overseas. Net international migration for Puerto Rico includes the migration of native- and foreign-born populations between the United States and Puerto Rico.
SOURCES: Haines (2006); U.S. Census Bureau (2015).

Copyright National Academy of Sciences. All rights reserved.

The net international migration rate rose from its very low levels during the middle decades of the 20th century to 2 per 1,000 in the 1960s—as the post-1965 immigration wave began. The net international migration rate then jumped to 3.8 per 1,000 in the 1970s, receded to 2.8 in the 1980s, and then increased to 4.8 per 1,000 in the 1990s. In the early 2000s, the rate fluctuated and then dropped to about 2.8 to 2.9 at the onset of the Great Recession in 2008. The rate appears to have stabilized around 3.1 to 3.2 from 2011 to 2013.

The current net international migration rate of one-third of one percent (3.3 per 1,000) per year is only half the level experienced in the prior period of mass migration, from 1880 to 1910. However, one aspect of contemporary immigration is higher than in prior periods of mass migration. During the post-1965 wave of immigration, net international migration has been a larger fraction of national population growth than it was during most earlier periods. The last column in Table 2-2 shows the ratio of net international migration to the total rate of population growth (either intercensal or annual)—which can also be expressed as the share of population growth due to net immigration. Since the 1970s, net immigration has been around 35 percent, and sometimes over 40 percent of total population growth. The ratio did drop below 30 percent during the 1980s and for a few years around the 2008 Great Recession, but immigration has been a major reason for the relatively high rate of population growth in the United States (compared to most other industrialized countries).

The explanation for the apparent anomaly of a historically moderate net international migration rate and a record-high contribution of immigration to national population growth is that other components of population growth have fallen to historically low levels. Over U.S. history, the rate of natural increase in the population (births minus deaths) has been steadily declining because the costs and benefits of large families changed for both native-born and foreign-born couples as the nation became more urbanized and industrialized. In addition, in an aging society deaths per thousand of population are also rising, which further depresses natural increase. In the past few years, the rate per 1,000 for natural increase has fallen below 5.0. As natural increase declined closer to the net international migration rate of around 3.0 per 1,000, the immigration contribution to total population growth has increased to roughly 40 percent, even though the numbers of immigrants per year was not increasing.

The post-1965 immigration wave coincided with the end of the Baby Boom, the transition to below-replacement fertility, and an aging population. Fertility in the United States has hovered around the replacement level of 2.1 births per woman for the past three decades, but fell after the 2007-2009 recession to 1.86 in 2013. With the total fertility rate of white non-Hispanic women, the largest ethnic group, consistently below

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2406 of 4699 PageID #:  5571

The Economic and Fiscal Consequences of Immigration

1.9, higher fertility among other groups, particularly Hispanics (roughly 2.8 prior to the recession, when it fell to 2.2), has helped to maintain the replacement level.[1] Overall, fertility of immigrant women is slightly higher than that of the native-born; however, the differential is small and typically narrows over time (Monte and Ellis, 2014; U.S. Census Bureau, 2014, p. 17). Even though the overall fertility rate has remained near replacement, the convergence of nativity differentials in childbearing behavior, combined with rising numbers of deaths from an aging population, portends slower future population growth even with high immigration levels.

## 2.5 PAST AND FUTURE TRENDS IN THE STOCK OF FIRST AND SECOND GENERATION IMMIGRANT POPULATIONS

Immigration effects are often viewed as due to not only the numbers of foreign-born alone (the first generation) but also their children born in the United States (the second generation). This section reviews the trends over time in the numbers of first and second generation individuals (see Box 2-1 on sources of data for these trends). The *stock* of the foreign-born in the total population at any moment in time represents the cumulative impact of prior waves of immigration, net of the deaths and the return migration of earlier immigrants. Changes in the size and composition of the stock of foreign-born across successive Decennial Censuses provide a portrait of the presence of immigrants and their children in American society.

Through the passage of generations, descendants of the foreign-born become part of the national population without any sense of being foreign or "other," but at what point does this happen? In this chapter, as in the broader research literature, the children of immigrants—the second generation—are considered part of the immigrant community (Carpenter, 1927; Hutchinson et al., 1956; Portes and Rumbaut, 2014). For the fiscal analysis accounting in Chapters 8 and 9, the education and other costs of dependent individuals in the second generation are included on the immigrant side of the ledger. However, the decision of where to draw the line on which generations are included in the immigrant community is somewhat arbitrary.

The children of immigrants, if born in the United States as most are, are native born by definition and, under the Fourteenth Amendment, are U.S. citizens at birth. Most individuals in the second generation adopt English as their primary language, and many of them marry outside their ethnic community (Lichter et al., 2011; Qian and Lichter, 2011). Yet, many if not most of the second generation are reared and socialized within the immigrant/ ethnic sociocultural environment of their parents. Their family, religious, and community ties keep them attached to the immigrant experience. This

---

[1]Fertility data are from Martin et al. (2015).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

---

**BOX 2-1**
**Sources of Data on Measuring First and**
**Second Generation Stocks**

Foreign birth was first included in the Decennial Census in 1850, and a question on birthplace of parents was first added in the 1890 census. Parental birthplace of parents was dropped from the 1980 and subsequent censuses. The Current Population Survey (CPS), a major Census Bureau survey, added a question on parental birthplace in 1994, but the CPS data are not exactly comparable to the Decennial Census data or to the American Community Survey (the replacement for detailed census data after 2000). The latest Census Bureau population projections do include estimates of the future foreign-born population. Because of the inconsistencies in the census series and the lack of counts of the second generation, the data in this section use the adjusted population estimates and projections prepared by the Pew Research Center (2015a). These adjusted population series differ slightly from official census data because of methods of adjustment, estimation, and projection, but the differences are generally less than one percentage point.[a]

———————

[a]All things being equal, one would ideally use "official" Census Bureau estimates and projections. However, the Pew estimates include first, second, and third generation[b] components, while the Census Bureau only includes first and second-and-higher generational data. Since the panel considers the second generation as part of the larger "immigrant population community," this tips our decision in favor of using the Pew Research Center data.

[b]As noted at the beginning of Chapter 1, this report uses "third-plus generation" as shorthand for all U.S. residents whose parents are native-born U.S. citizens (sometimes called "third and higher generation").

---

reality was a reason for the addition of the parental birthplace question to the Decennial Census a few decades after the question on foreign birth was adopted. In keeping with this line of reasoning, the panel considers both the first and second generations as part of the immigrant population.

Figure 2-2 shows the relative size—as a percentage of the total population—of first and second generation immigrant groups from the late 19th century to the early 21st century; these figures are based on historical Decennial Census data and Pew Research Center population estimates and projections. From 1860 to 1920, the foreign-born share of the U.S. population fluctuated between 13 and 15 percent. The second generation was larger, hovering around 20 percent of the total population. The size of the second generation population was a product of the high fertility rate of immigrants at that time, approximately twice what it is today (Morgan et al., 1994). Comprising upward of one-third of the population—one-half the population outside the South and a majority among city dwellers—in

002400

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2408 of 4699 PageID #:  5573

The Economic and Fiscal Consequences of Immigration



**FIGURE 2-2** Percentage of first and second generations in the U.S. population, 1850-2030.
SOURCE: Pew Research Center (2015a).

the early decades of the 20th century, immigrants and their children were a highly visible presence in schools, workplaces, and American politics (Hirschman, 2005).

With the passage of immigration restrictions in the 1920s, followed by the Great Depression in the 1930s and World War II in the 1940s, the flow of immigrants dropped to record lows (Figure 2-1). The decline in the stock of the foreign-born population lagged the drop in flows but followed the same temporal trend, reaching a low of less than 5 percent in 1970. During the long immigration pause in the mid-20th century, the decline of the stock of second generation followed suit with a lag, reaching a low of 12 percent in 1970 and 10 percent in 1980. In the early 20th century, the center of gravity in immigrant communities was in the working-age first generation and their youthful progeny. By midcentury, the foreign-born population was diminished by the lack of new arrivals and a rising death toll among this aging population. The second generation was somewhat younger, but its ranks also began to shrink during the middle decades of the century as that population aged and the fertility of the foreign-born population fell.

The 1965 Immigration Act is typically used to date the beginning of a new era of mass immigration. But implementation of the new immigration quotas was delayed for several years, and it might be better to consider

002401

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

1970, which recorded the nadir in the size of the foreign-born population, as the start of the new age of mass migration. The absolute size of the foreign-born population rose from less than 10 million in 1970 to 45 million in 2015, while the fraction of foreign-born in the total population rose steadily to reach 14 percent in 2015—slightly below the levels experienced a century earlier. The significance of the second generation is obscured in Figure 2-2 because the rising numbers of children of the post-1965 immigrants are counterbalanced by deaths among much older members of the second generation, who were the children of early 20th century immigrants. Since 2000, however, the "new" second generation has expanded rapidly from 24 million in 2000 to 38 million in 2015 (that is, from 10% to 12% of the population). At present, in 2016, one in four Americans is an immigrant or the child of an immigrant.

Before discussing the projections of the future stock of foreign-born in Figure 2-2, it is useful to review the dynamics of recent immigration since the Great Recession. In the early 2000s, immigration continued at more or less the same pace as in the immediately prior decades. Data from the American Community Survey (ACS) showed a continued rise in the foreign-born population, as did the estimates of the undocumented immigrant population, which reached a peak of 12.2 million in 2007 (Passel et al., 2013). However, there were signs that Mexican immigration was beginning to decline in the early years of the decade (Passel et al., 2013). For the last three decades of the 20th century, Mexican immigration, much of it unauthorized, had been the largest component of the post-1965 immigration wave. The slowdown in Mexican immigration has several sources. The deep-rooted cause is slower growth of the Mexican population in the young working ages due to sharp fertility declines in the 1980s and 1990s. Mexico's total fertility rate plunged from 6.8 births per woman in 1970 to 2.2 by 2006 (Johnson and Stoskopf, 2010). When children of the high-fertility era came of age between 1980 and 2000, a very large wave of young people sought job opportunities across the border in Texas and California, later dispersing across the United States. After 2007, owing in part to Mexico's fertility decline, relatively fewer young people pursued jobs in the United States; with an improved Mexican economy, many more were absorbed into the workforce at home.

Despite the huge increase in personnel and other costs of border enforcement, the size of the foreign-born Mexican-origin population in the United States increased from 2.2 million in 1980 to 11.7 million in 2010 (Greico et al., 2012). A little more than half the foreign-born Mexican-origin population currently in the United States may be unauthorized (Passel et al., 2013). Massey and Pren (2012) have argued that the hardening of the U.S.-Mexican border had a modest impact on the likelihood of young Mexicans crossing the border, but it raised the costs of doing so and there-

002402

Copyright National Academy of Sciences. All rights reserved.

fore discouraged return migration once migrants had entered the United States. Traditionally, much of migration from Mexico to the United States had been circular, often traveling for seasonal employment and with only a minority settling permanently in the United States. With the higher costs of border crossing, however, many young Mexican workers opted to settle permanently in the United States rather than risk detection by undertaking multiple crossings. Thus the border hardening yielded the unexpected result of increasing the immigrant population of Mexican origin, and their subsequent children, who permanently resided inside the United States.

The impact of the 2007-2009 Great Recession on Mexican migration was qualitatively different from that of prior downturns. The effects of the high unemployment rate, including the especially sharp decline in construction jobs, which had often been filled by Mexican immigrants, caused the net migration rate from Mexico to fall to zero, or perhaps even to turn negative, as the numbers of returning migrants equaled or surpassed those of new arrivals (Passel et al., 2013). A recent report by the Pew Research Center claims that since 2009, more Mexicans left the United States than entered—reversing the direction of the largest single-country flow since 1970 (Gonzalez-Barrera, 2015). Contributing to this overall decline in Mexican immigration has been a drop in the absolute number of undocumented immigrants in the United States in part due to an increase in their removals and deportations (Massey and Pren, 2012).

Since 2000, even as immigration from Latin America, and Mexico in particular, was decreasing, an increasing share of immigration has come from Asia. In absolute numbers, recent arrivals over the prior 5 years from Asia rose from 323,000 in 1970 to 2.5 million in 2013 (Pew Research Center, 2015a, pp. 36-37). Since 2008, various measures have shown more Asian immigrants arriving in the United States than Hispanics). Recent data, however, show that increases in immigration from Central America have reduced the gap between Asian and Hispanic immigration (ibid).

To summarize, there seem to be two distinct periods of immigrant flows into the United States during the early 21st century. The first was from 2000 to 2007, when the foreign-born population continued the high pace of arrivals recorded in the 1990s. The second period began after 2008, when the recession caused a sharp slowing of immigration from Mexico and Latin America. The economic conditions that dampened the flows of unauthorized immigration have had much less impact on legal immigration based on family reunification, much of which is coming from Asia.

The Pew Research Center projections in Figure 2-2, which incorporate the recent slowdown in unauthorized migration, show only modest increases in the size of the foreign-born population from 45 million in 2015 to 48 million in 2020 and to 57 million in 2030. The share of the foreign-born as a fraction of the total population is predicted to rise slowly to 14

002403

Copyright National Academy of Sciences. All rights reserved.

percent in 2020 and to 15 percent in 2030. These projections are roughly comparable to those published by the Census Bureau, but there are minor differences in methods and assumptions (Pew Research Center, 2015a, Ch. 2; U.S. Census Bureau, 2014). The second generation is predicted to rise to 13 percent in 2020 and 14 percent in 2030. Whereas the projected share of the foreign-born in the total population is comparable to the actual share a century earlier, the share of the second generation is projected to be roughly half as large as a century ago, due to the much lower fertility of immigrants today.

## 2.6 IMMIGRATION AND CHANGES IN RACE AND ETHNIC COMPOSITION

Immigration has been the major demographic driver of changes in the racial and ethnic composition of the U.S. population since the settlement of North America several centuries ago (Klein, 2004). However, for much of the country's history, the diversity of its population was not measured because of the limited scope of questions in the Decennial Census. For example, Native American populations were only enumerated after they were settled on reservations or in government-administered areas. Religion has never been included in Decennial Censuses. While the list (and definition) of racial and ethnic groups has varied considerably over the past two centuries, ethnic differentiation within the white population was not measured in Decennial Censuses from 1850 through 1970, a period when much of the concern about immigration was driven by diverse countries of origin among white European immigrants.

Table 2-3 shows the racial and ethnic origins of the resident American population in 1900, 1970, 2000, 2010, and 2014. In 1900, the United States was in the middle of the peak years of immigration from Southern and Eastern Europe, while 1970 was just before the massive contemporary wave of immigration from Latin America and Asia. The racial and ethnic classification in Table 2-3 is a blend of pre-2000 and post-2000 categories, with the following major groups: White (non-Hispanic), American Indian/Alaskan Native (non-Hispanic), African American (non-Hispanic), Latino/Hispanic/Spanish, Asians and Pacific Islanders (non-Hispanic) and "mixed race" (non-Hispanic). Data on persons with multiple race identities (two or more races) were first available in the 2000 Decennial Census and starting in 2003 in the CPS.

Almost half of Hispanics report themselves to be white, and about one-third write in a Hispanic national origin category in response to the race question. In Table 2-3, all Hispanics, regardless of their response to the race question, are classified as "Latino/Hispanic/Spanish." The 1900 and 1970 data are based on public use microdata derived from the Decennial

002404

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 2-3  Racial and Ethnic Diversity by Immigrant Generation, United States, 1900, 1970, 2000, 2010, and 2014

| Race and Ethnic Identity | Percentage Distribution | | | | |
| | 1900 | 1970 | 2000 | 2010 | 2014 |
| --- | --- | --- | --- | --- | --- |
| **White (non-Hispanic)** | 87.3 | 83.3 | 69.6 | 64.0 | 62.3 |
| 3rd-plus generation | 53.8 | 69.0 | 62.4 | 57.4 | 56.1 |
| 1st and 2nd generation | 33.5 | 14.3 | 7.2 | 6.7 | 6.3 |
| **American Indian/Alaskan Native (non-Hispanic)** | 0.3 | 0.3 | 1.0 | 0.7 | 0.8 |
| **African American (non-Hispanic)** | 11.7 | 10.9 | 12.9 | 12.0 | 12.1 |
| 3rd-plus generation | 11.7 | 10.7 | 11.4 | 10.4 | 10.1 |
| 1st and 2nd generation | 0.1 | 0.3 | 1.5 | 1.6 | 1.9 |
| **Latino/Hispanic/Spanish** | 0.5 | 4.6 | 11.5 | 16.4 | 17.3 |
| 3rd-plus generation | 0.2 | 2.1 | 3.1 | 4.5 | 5.1 |
| 1st and 2nd generation | 0.3 | 2.5 | 8.5 | 11.9 | 12.2 |
| **Asian American & Pacific Islander (non-Hispanic)** | 0.1 | 1.2 | 4.9 | 5.1 | 5.6 |
| 3rd-plus generation | 0.0 | 0.2 | 0.5 | 0.4 | 0.5 |
| 1st and 2nd generation | 0.1 | 1.0 | 4.5 | 4.7 | 5.1 |

continued

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

58

TABLE 2-3  Continued

| Race and Ethnic Identity | Percentage Distribution | | | | |
|---|---|---|---|---|---|
| | 1900 | 1970 | 2000 | 2010 | 2014 |
| Mixed Race (non-Hispanic) | NA | NA | NA | 1.8 | 1.9 |
| 3rd-plus generation | NA | NA | NA | 1.4 | 1.5 |
| 1st and 2nd generation | NA | NA | NA | 0.3 | 0.4 |
| TOTAL | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

| Race and Ethnic Identity | Population Count (thousands) | | | | |
|---|---|---|---|---|---|
| | 1900 | 1970 | 2000 | 2010 | 2014 |
| White (non-Hispanic) | 65,637 | 169,435 | 191,228 | 194,814 | 195,399 |
| 3rd-plus generation | 40,433 | 140,334 | 171,359 | 174,537 | 175,717 |
| 1st and 2nd generation | 25,204 | 29,101 | 19,869 | 20,277 | 19,682 |
| American Indian/Alaskan Native (non-Hispanic) | 196 | 691 | 2,801 | 2,234 | 2,448 |
| African American (non-Hispanic) | 8,810 | 22,257 | 35,424 | 36,589 | 37,783 |
| 3rd-plus generation | 8,761 | 21,731 | 31,311 | 31,621 | 31,738 |
| 1st and 2nd generation | 49 | 526 | 4,113 | 4,968 | 6,045 |
| Latino/Hispanic/Spanish | 401 | 9,289 | 31,660 | 49,797 | 54,253 |
| 3rd-plus generation | 146 | 4,292 | 8,384 | 13,687 | 16,115 |
| 1st and 2nd generation | 255 | 4,997 | 23,276 | 36,109 | 38,139 |

002406

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | | | | | |
|---|---|---|---|---|---|
| Asian American & Pacific Islander (non-Hispanic) | 142 | 2,465 | 13,597 | 15,486 | 17,510 |
| 3rd-plus generation | 31 | 495 | 1,339 | 1,285 | 1,496 |
| 1st and 2nd generation | 111 | 1,970 | 12,258 | 14,200 | 16,014 |
| Mixed Race (non-Hispanic) | | | | 5,362 | 6,002 |
| 3rd-plus generation | | | | 4,302 | 4,654 |
| 1st and 2nd generation | | | | 1,060 | 1,349 |
| TOTAL POPULATION | 75,186 | 203,302 | 274,709 | 304,282 | 313,395 |

NOTE: For this table, the categories of White, American Indian, Asian American, and Pacific Islander exclude those who identified as Hispanic, to avoid double-counting. All those who identified as Hispanic are included in the category for Latino/Hispanic/Spanish. In this table as throughout the report, "3rd-plus generation" refers to all U.S. residents with two native-born parents.

SOURCES: 1900 and 1970 Decennial Census Public Use Microdata Sample file, available: http://www.ipums.org/usa/ [November 2016]. 2000 CPS from Merged 1998 to 2002 CPS Public Use Microdata Sample file, available: https://cps.ipums.org/cps/ [November 2016]. 2010 and 2014 CPS Public Use Microdata Sample file, available: https://cps.ipums.org/cps/ [November 2016].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Censuses for those years, while data for 2000, 2010, and 2014 are based on the CPS. Within each ethnic-origin category (except American Indian), the third-plus generation[2] population is distinguished from the combined first and second generation (immigrant stock) population.

One indicator of the long-resident U.S. population of European origin is the category in Table 2-3 for third-plus generation non-Hispanic white. This group's share of the total U. S. population has hardly changed from 1900 to 2014. Just over half of the American population (54%) was in this category at the turn of the 20th century, and the share was only slightly higher (56%) in 2014.

In 1900, about 12 percent of the U.S. population was of African (or part African) origin. Because most African Americans lived in the South prior to the Great Migration (from 1915 to 1960), they had only a small presence in the rest of the nation—generally only a few percentage points. Other minority groups, including Native Americans, Hispanics, and Asians combined, comprised only 1 percent of the total population in 1900.

The major source of ethnic diversity in 1900 was within the white (European-origin) population. About one in three Americans in 1900 consisted of whites who were foreign born or had at least one foreign-born parent. This fraction rose to almost half of the population outside the South and to a substantial majority of the population in the largest cities. As discussed earlier, many old stock Americans considered immigrants of Eastern and Southern European origin to be socially and racially inferior. During this period, the Daughters of the American Revolution and similar groups were organized to stress their ancestral origins and to distance themselves from the new immigrants. College fraternities and sororities, social clubs, and many professions established racial, religious, and ethnic barriers to exclude the new immigrants and their descendants (Baltzell, 1964; Lieberson, 1980).

During the middle decades of the 20th century, the second generation (and much of the first generation) population assimilated into American life. Through generational succession, immigrant communities became ethnic communities (often of mixed ancestry) that celebrated their roots through memory, cuisine, annual festivals, and embellished Hollywood stories. Through intergenerational economic mobility and broadly shared economic prosperity, most of the children and grandchildren of Italian, Irish, and Eastern European immigrants joined the American middle class. Rather than the pressurized assimilation endured by their parents during the Americanization movement of the early 20th century, economic integration and social mobility of children and grandchildren of Eastern and

---

[2]As noted in Chapter 1, throughout this report "third-plus generation" is used as shorthand for all U.S. residents whose parents are native-born Americans.

002408

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2416 of 4699 PageID #:  5581

The Economic and Fiscal Consequences of Immigration

Southern Europeans were facilitated by postwar economic growth, the GI Bill for World War II veterans, the expansion of public higher education, and suburban development (Alba and Nee, 2003; Duncan and Duncan, 1968; Katznelson, 2005; Lieberson, 1980).

With the gradual acceptance of the descendants of Southern and Eastern Europeans as part of the majority white population, the U.S. ethnoracial landscape in the post–World War II era was focused on the black-white divide. By the 1970 Decennial Census, fully 94 percent of the population self-identified as either white (83%) or African American (11%). For African Americans, who had long been denied equal opportunity on the basis of skin color, the Civil Rights Movement of the 1950s and 1960s was the struggle to redress more than two centuries of segregation and government-sanctioned discrimination. The Great Migration of African Americans to cities in the Northeast and Midwest and to some places on the West Coast made the black-white divide a national issue. Although geographically concentrated in a few major cities and states (California, New York, and Texas), by 1970 the growing Latino presence was felt as activists demanded ethnic identification and social recognition (Mora, 2014).

The 1965 amendments to the Immigration and Nationality Act replaced the infamous, restrictive immigration quotas by national origin of the Immigration Act of 1924 with a preference system based on principles favoring family reunification and certain highly skilled professions. Although Congress may have assumed that there would only be modest increases in the numbers of immigrants and their composition following the 1965 changes in immigration law, the long-term impact was to open the door to a new wave of mass immigration. Not only did annual immigration flows increase but the annual flows of legal immigrants from Asia surpassed that of legal immigrants from Latin America within a dozen years (Tienda, 2015). A less documented trend is a shift in the age composition of LPRs toward older ages, which is a predictable outcome of expanding the definition of immediate family members to include parents (Carr and Tienda, 2013). Accompanying these shifts in legal immigration was the advent of large-scale settlement of undocumented immigrants, mainly from Latin America. By the early 2000s, the numbers of new arrivals of unauthorized immigrants exceeded arrivals of legal immigrant in some years (Passel and Suro, 2005, p. 5).[3]

This wave of immigration from Latin America and Asia gained momentum during the last quarter of the 20th century and into the 21st cen-

---

[3]For additional detail on changes in the unauthorized population, see Figure 1-17, which charts the number of undocumented immigrants in the United States from 1990 to 2013, and surrounding discussion in the report of our sister panel (National Academies of Sciences, Engineering, and Medicine, 2015).

002409

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tury, further diversifying the U.S. population. The number of Hispanics expanded fivefold from less than 10 million in 1970 to more than 50 million in 2014—representing about 17 percent of the total population. Asians and Pacific Islanders have had an even higher rate of growth—from 1.5 million in 1970 to 17.5 million in 2014—and currently represent over 5 percent of U.S. residents. Assuming the current mix of immigrants continues, Pew Research Center (2015a, p. 119) population projections suggest that Asians could comprise 14 percent of the U.S. population by 2065 and Hispanics 24 percent.

Immigration is driving the increase in population diversity. As shown in Table 2-3, about two-thirds of all Hispanics and 9 in 10 Asian and Pacific Islanders are either foreign born or children of immigrants. Since 1970 there has been an important but much smaller increase in the African American population of immigrants and the children of immigrants.

U.S. population diversity now commands the attention of politicians, bureaucrats, and the general public as electronic and print media report new demographic milestones, such as the rise of majority-minority states and localities. Table 2-3 shows that the percentage of the non-Hispanic white population, which was 87 percent of the total population in 1900 and still 83 percent in 1970, declined to just 62 percent by 2014. The Census Bureau projects that by 2060 non-Hispanic whites will represent 43 percent of the U.S. population (Colby and Ortman, 2015, p. 9; also see Pew Research Center, 2015a).

These projections rest on several arbitrary assumptions about the nature of race and ethnic identities, mainly that racial groups can be defined in categories that are mutually exclusive and not overlapping, and foremost for projections, that the membership in these categories remains distinct over several decades. Given the overlap that already occurs between those who identify as Hispanic and also identify with one of the "race" categories, as well as the trend toward more intermarriage across these ethnoracial boundaries, projections by race and Hispanic origin must rely on today's categories, which are increasingly hypothetical for the future. Perhaps they are best thought of as projections of the future population based on the predominant "origins" of that population as represented in today's categories. Predictions about the future ethnic composition of the United States certainly should not be treated as projections of the identities that will be expressed by future residents of America.

## 2.7  POPULATION AGING, THE BABY BOOM, AND THE TRANSITION TO AN IMMIGRANT WORKFORCE

The age structure of a population, the relative shares of old and young, has an important influence on economic welfare, social mobility, and the

002410

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2418 of 4699 PageID #:  5583

The Economic and Fiscal Consequences of Immigration

resources available to support the elderly and children. At a given time, the age structure of a population is a reflection of the numbers of births in prior years and their survival, as well as the volume and age composition of immigrants. The most important of these factors is fertility. Societies with high fertility rates invariably have youthful populations with high fractions of children, adolescents, and young adults. Low-fertility societies have larger fractions of older persons, including the elderly.

The Baby Boom, those Americans born from the late 1940s to the mid-1960s, actually reversed the aging of the American population for several decades. The very large birth cohorts during this period rippled through the age structure of the American population over the past half-century. This trend is shown in Figure 2-3 with the fraction of the national population in three broad age categories of 0-24, 25-64, and 65 and above, from 1960 to the present and then projected to 2030 based on the Pew Research Center's population estimates and projections (Pew Research Center, 2015a).

The most distinctive feature of the population in 1960, at the peak of the Baby Boom, was the relative abundance of children and youth and the relative scarcity of the elderly. With less than 1 in 10 Americans above age 65, the costs of Social Security (and Medicare, which was implemented



**FIGURE 2-3** Change in age composition of U.S. population from 1960-2030 (projected).
SOURCE: Pew Research Center (2015a).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

in 1965) were easily covered with modest levels of taxation. The costs of youthful dependents, for schooling in particular, were substantial, but the benefits were broadly distributed to most households with children. The costs of child care were primarily borne by families and by women in particular.

The population share of children and youth fell sharply by 10 percentage points from 1970 to 1990 and has continued to decline, but more gradually, in recent years. The share of the elderly has increased very slowly over the same period, rising from 9 percent in 1960 to 12 percent in 2005. However, the rate of change in population aging has accelerated in recent years, and the share of elderly is predicted to reach 16 percent in 2020 and 20 percent in 2030. The population share in the prime working ages, 25-64, rose for several decades after 1970 and was about 54 percent of the total population from 2005 to 2015. As the large Baby Boom cohorts—those born from 1946 to 1964—become senior citizens in the years following 2010, the population share in the prime working ages will decline, dropping below 50 percent by the late 2020s.

Changes in the age structure and the growth of the elderly population exert a fundamental constraint on public finances. In a "pay as you go" system, public funds for the elderly are a function of the generosity of the program, taxes paid by the working population, and the relative numbers of workers and beneficiaries. In essence, the support of dependent-aged populations rests on the number of working-age Americans. Figure 2-4 displays the ratio of seniors ages 65 and older to working ages 25 to 64, in a variation of demographers' traditional old-age dependency ratio, but with working age beginning at 25. Of course, people ages 18 to 24 also can be workers, but in modern postindustrial nations more often they are of "training age," enrolled in higher education or engaged as interns and apprentices, and so they are not yet productive enough to contribute to supporting the seniors. Similarly, people over age 65 also can be workers themselves, but retirement follows for most soon after this age, and old-age support programs have eligibility at 65 (Medicare) and 67 (Social Security's full retirement age).

What is most striking about Figure 2-4 is that the senior ratio (sometimes called the old-age dependency ratio) remained relatively constant, with between 19 and 24 seniors per 100 working-age population, from 1960 to 2010, after which it is projected to rise sharply (based on the Pew 2015 projection data). The oldest Baby Boomers crossed the age 65 threshold in 2011, and by 2015, the ratio has already climbed to 27.1. In the next 25 years, by 2040, the ratio is projected to reach 44.0. This increase of 16.9 in the senior ratio reflects the growing weight of the entitlement programs carried by a relatively smaller working-age population.

The current level of youthful immigration to the United States is not sufficient to completely reverse population aging or to rejuvenate low-

002412

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2420 of 4699 PageID #:  5585

The Economic and Fiscal Consequences of Immigration



**FIGURE 2-4** Rising senior ratio in the U.S. population, with and without projected immigration.
SOURCE: Myers (2012) and unpublished estimates by Pew Research Center (2015a).

fertility populations (Schmertmann, 1992; United Nations Population Division, 2001). As noted earlier, 1 million new immigrants per year is less than one-third of 1 percent of 300 million people that comprise the American population. But the small effect of immigration on population aging is not inconsequential (Lutz and Scherbov, 2006). To demonstrate the impact of immigration on population aging, one can compare old age ratios in projections that include or exclude immigration using the method developed by Myers (2012). If one hypothetically removes immigration after 2015, including the future descendants of those immigrants, it is possible to compare the future changes in the senior ratio over several decades. These data have already been applied in Figure 2-4, but the calculation of how large a difference immigration makes requires more detail.

As demonstrated in Table 2-4, population projections can be compared for the key ages with and without immigration. Without any immigration after 2015, the older population grows to a ratio of 55.9 seniors per 100 working-age adults in 2065, compared with 47.5 if immigration is included. Even in the first 25 years, by 2040, the ratio without immigration is projected to reach 48.8, an increase of 21.7, ve¡rsus an increase of 16.9 if immigration continues as projected. In effect, already by 2040, the absence of immigration in the population projection would lead to growth of the senior ratio that is about one-quarter (28.1%) greater than if immigration

002413

Copyright National Academy of Sciences. All rights reserved.

TABLE 2-4 Population Aging in Projections That Include or Exclude Immigration

| | Population (thousands) | | | Senior Ratio (65+/25-64 × 100) | | | Growth in Ratio | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2040 | 2065 | 2015 | 2040 | 2065 | 2015-2040 | 2040-2065 | 2015-2065 |
| Including Projected Immigration | | | | | | | | | |
| 25-64 | 173,195 | 187,554 | 213,252 | | | | | | |
| 65 and older | 46,853 | 82,512 | 101,333 | 27.05 | 43.99 | 47.52 | 16.94 | 3.52 | 20.47 |
| Assuming No Immigration 2015 to 2065 | | | | | | | | | |
| 25-64 | 173,195 | 164,620 | 158,345 | | | | | | |
| 65 and older | 46,853 | 80,278 | 88,469 | 27.05 | 48.77 | 55.87 | 21.71 | 7.11 | 28.82 |
| Percentage Change in the Senior Ratio in the Absence of Immigration | | | | | | | 28.17 | 101.61 | 40.81 |

SOURCE: Pew Research Center (2015a).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

proceeds as projected and, after 50 years (by 2065), it would increase this indicator of aging by 40.8 percent. Clearly, immigration cannot fully stop population aging, but it can partially slow its effects. As can be seen in the table, immigrants (and descendants) add to the working-age population much more than to the elderly population. Not all grow old at once, and even after immigrants age, their children continue to pay a dividend toward old age support.

Belonging to the working-age population does not directly translate into employment—this depends on labor force behavior. In general, foreign-born men are slightly more likely to be employed than their native-born peers, especially after the first few years of adjustment following immigration (Duncan and Trejo, 2012; National Academies of Sciences, Engineering, and Medicine, 2015, Ch. 6). The gap is widest among men with a high school or less than high school education. Over a quarter of low-educated men in the third-plus generation are not employed, whereas the employment-to-population ratio of foreign-born men is very high across the education spectrum. The difference in employment ratios between foreign-born and native-born men is due mainly to differences in labor force participation and not to unemployment. Native-born men have some options—advanced education, early retirement, disability—that are not as readily available to foreign-born men, especially those who are unauthorized immigrants.

Among women, larger nativity differentials in labor force participation are common. Immigrant women are somewhat less likely (about 5 to 10 percentage points) to be employed than their third-plus generation peers in the same racial and ethnic group (the pattern is reversed for those with less than a high school education). The main differences in employment here are due to the high percentage of immigrant women staying home with young children; their labor force participation rate now resembles that of native-born females during the 1970s (which was much higher than it had been, say, in the 1950s, but still far from its peak around the year 2000). Second generation women are, however, just as likely to be working as their third-plus generation peers (National Academies of Sciences, Engineering, and Medicine, 2015, Ch. 6).

As the Baby Boom cohorts age and exit from the labor force in the coming decades, immigrants and their children will play an even larger role in the American economy. To provide an historical perspective on future trends, Table 2-5 and Figure 2-5 report the net population change (in thousands) in the working-age population, ages 25-64, by immigration generation for each decade from 1960 to 2010, with projections added for 2020 and 2030 (Pew Research Center, 2015a). The net change in the working-age population is the balance between the numbers turning age 25 (new entrants) relative to those turning age 65 (those exiting) during the decade. Among the first generation, net change is the inflow of new

002415

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 2-5** Decadal Change in U.S. Working-age Population, Ages 25-64, by Immigrant Generation, from 1960-1970 to 2020-2030, Based on Population Estimates and Projections

| Time Period | Net Change in Resident Working-age Population (thousands) | | | |
| | Total | Immigrant Generation | | |
| | | First | Second | Third-plus |
|---|---|---|---|---|
| 1960 to 1970 | 6,317 | −526 | −1,949 | 8,793 |
| 1970 to 1980 | 17,195 | 2,597 | −3,092 | 17,690 |
| 1980 to 1990 | 22,373 | 5,346 | −2,564 | 19,591 |
| 1990 to 2000 | 19,637 | 8,703 | −920 | 11,854 |
| 2000 to 2010 | 19,243 | 9,576 | 1,462 | 8,205 |
| 2010 to 2020 | 8,992 | 4,548 | 3,954 | 490 |
| 2020 to 2030 | 2,009 | 2,093 | 6,939 | −7,022 |

SOURCE: Pew Research Center (2015a).



**FIGURE 2-5** Net change in working-age population each decade, by immigrant generation (in millions) from 1960-1970 to 2020-2030.
SOURCE: Table 2-5 data, Pew Research Center (2015a).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

immigrants minus the number of retiring or departing migrants. Among the second and third-plus generations, net change is driven by the size of cohorts that were born 25 years earlier relative to those born 65 years ago (those entering and leaving the working-age population). A large wave of new immigrants and their childbearing will trigger a subsequent large wave of births of second generation children, who will become workers approximately two decades later.

From 1960 to 1970, the working-age population grew by a little more than 6 million—a slow expansion driven by the relatively small birth cohorts that occurred in the late 1930s and early 1940s. The figure of 6 million additional working-age people reflects the balance of a net increase of almost 9 million in the third-plus generation population and a net decrease of almost 2.5 million in first and second generation populations. These figures reflect the mortality experience and aging out of the workforce (attaining age 65) of immigrants and children from early in the 20th century, before the long immigration pause. In short, the foreign-born population in 1960 was composed mainly of the elderly survivors of the early 20th century immigration. The figure of 6 million persons added to the working-age population during the 1960s is dwarfed by the population changes that follow over the next few decades.

Between 1970 and 2010, the working-age population expanded by about 20 million net workers each decade. From 1970 to 1990, the growth was entirely due to Baby Boom cohorts in the third-plus generation reaching working age. Immigration added to the ranks of potential workers, but much of the increase was canceled out by aging of the second generation (i.e., children of early 20th century immigration). Subsequently, in the last decade of the 20th century, the share of the increase in working-age population due to net immigration rose, not only because the inflow of immigrants increased but also because the additions to the third-plus generation of working age slowed to only 12 million.

The 2000 to 2010 decade was a transitional period in terms of the share of growth in the working-age population contributed by immigrants. Overall growth held steady, with an increase of 17 million persons ages 25 to 64, but the increase from the third-plus generations slowed to 8 million, while the first and second generation working-age population increased by 9.5 and 1.5 million, respectively. These trends have accelerated since 2010 and are projected to continue through the 2020s. Growth of the third-plus generation is all but vanishing, with almost all of the 9 million net additions to the working-age population coming from the ranks of the first and second generations. The high relative growth of the second generation reflects the increases in immigration after 1970; the children of those immigrants are now coming of age, and new immigrants continue to make net additions to the working-age population.

002417

Copyright National Academy of Sciences. All rights reserved.

The decade after 2010 marks a major turning point. The leading edge of the Baby Boom generation is aging into the retirement range (turning 65 and older), and their numbers are approximately equal to entry of younger third-plus generation persons in the working ages. Overall, the net growth of potential workers (ages 25-64) among third-plus generation cohorts will shrink to less than half a million from 2010 to 2020. At the same time, the Pew Research Center projections suggest that the net increase in the number of working-age foreign-born will also slow, falling by half between the decades 2000-2010 and 2010-2020. However, the second generation—the children of the post-1965 wave of immigrants—are projected to add almost 4 million net entrants to the working-age population, a much greater number than in earlier decades.

After 2020, the aging of the Baby Boom generation from 2020 to 2030 will begin to drain the potential workforce drawn from the ranks of the third-plus generation; a net departure from the working-age population of over 7 million is expected. From 2020 to 2030, modest growth of the population ages 25 to 64—projected as a net gain of only 2 million persons—will result because of the growth of the first and second generation population segments. Based on the projections by the Pew Research Center (2015a), the net gain of potential first generation workers will slow to 2 million in the 2020s. This number is less than half that of the 2010-2020 decade and lower than any decade since 1970, reflecting the fact that earlier immigration cohorts are reaching retirement ages.

The projected changes in size of the working-age population from 2010 to 2030 are almost entirely due to the aging of persons already born and living in the United States. Assumptions about future mortality and emigration rates create a bit of uncertainty in the projections but not much. If the American economy grows and requires more workers both to replace those who retire and to create new firms and industries, the primary source of labor will be first and second generation immigrants. This basic fact will hold at all levels, from low-skilled service jobs to professionals with postgraduate degrees. It bears repeating that the reason the third-plus generation cannot be a source of workforce growth is that so many of the older members from this population segment will be aging past 65. Many young people who are third-plus generation Americans will be joining the working-age population, but they will simply be outnumbered by the flood of departing Baby Boomers. These Baby Boom departures are expected to create employment opportunities that will benefit all ethnoracial groups. For instance, Richard Alba (2009) has argued that, similar to the World War II period, this coming period could create ideal conditions for reducing competitive frictions between groups and reducing inequality among minority groups and immigrants.

002418

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

In addition to its impacts on employment and future economic growth, the volume and age composition of the immigrant population also has implications for public expenditures on education, old-age security, and health care. The working ages are also the primary ages of family formation. Foreign-born women will bear an increasing share of future births in the United States. However, as discussed above, all groups in the United States appear to be converging to replacement-level fertility (two children per woman) or below by the second generation. Currently, first and second generation immigrants comprise about one of four children in schools. Their schooling generates expenditures, but it is also an investment in their future productivity and the well-being of the rapidly growing elderly population of Baby Boomers (Myers, 2007).

The post-1965 immigrants also are beginning to retire and to become eligible for Social Security and Medicare. There is also some evidence that late-age immigration has been increasing somewhat (Batalova, 2012; Carr and Tienda, 2013; Terrazas, 2009). Carr and Tienda (2013) used administrative data to examine changes in the age composition of immigrant inflows since 1980; they found that approximately two-thirds of all LPRs admitted between 1981 and 2009 were in their prime working ages. Concurrently, immigration of persons above age 65 increased, rising from about 11 percent of new LPRs admitted between 1981 and 1985 to nearly 17 percent of new admissions between 2006 and 2009. This increase is consistent with claims by Jasso and Rosenzweig (1989), who attribute this rise in older-age immigration primarily to sponsorship of parents by naturalized immigrants and to a lesser extent to the visa backlog for numerically capped relatives of naturalized immigrants. Other studies have found that numerically capped relatives from the top four sending nations contributed to late-age immigration because their family members aged while waiting in long queues for their visa priority number to be called (Tienda, 2015; Wasem, 2012).

## 2.8 FROM TRADITIONAL GATEWAYS TO NEW DESTINATIONS: THE CHANGING GEOGRAPHY OF IMMIGRANT SETTLEMENT

The geographical distribution of immigrants across the United States has been a function of initial patterns of settlement and subsequent patterns of internal migration. The initial pattern of settlement is sometimes affected by proximity, favoring seaports of first arrival and places near border crossings. The concentration of 19th century Irish immigrants in Boston and New York and of Cubans in south Florida in the 1960s and 1970s is illustrative of the importance of proximity. Locations of economic opportunity and of established co-ethnic communities are also important determinants of settlement patterns. In the early 20th century, high labor

002419

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2427 of 4699 PageID #:  5592

demand drew immigrants to work in steel mills in Pittsburgh and Buffalo and to coal fields in Pennsylvania, as do present-day meat packing plants in small towns in North Carolina and the Midwest. Even more important than arrival proximity is the presence of families and friends who can provide temporary housing, assistance in finding jobs, and the warmth of welcome based on ties of kinship and mutual obligation. These same factors affect the secondary, internal migration of immigrants after arrival. In the 1960s and 1970s, the federal government sought to settle Cuban and Vietnamese refugees in isolated small towns throughout the country in a misguided effort to spur assimilation (Portes and Bach, 1985). Most of these families eventually moved to cities that had concentrations of their ethnicity, where they found family and relatives who could provide economic opportunity and also understand their cultural and spiritual needs.

The descendants of immigrants have less connection to the churches, institutions, and neighborhoods favored by their immigrant forebears, and they tend to move to suburban locations with more amenities and to other states and localities that offer attractive economic opportunities. Many cities and locations within cities retain an ethnic character across generations, but it usually takes a continuous flow of immigrants to maintain the social and economic vitality of an ethnic community. The deconcentration and dispersal of immigrant communities, as with the general process of assimilation, is a multigenerational process that occurs unless discrimination or other institutional factors obstruct economic and social mobility.

The initial settlement patterns of the post-1965 immigration wave follow the logic of earlier immigration flows, except that the origins of the immigrants shifted from Europe to Latin America and Asia. Most new arrivals during the 1970s and early 1980s settled in five gateway states:[4] New York along the eastern seaboard; California and Texas along the southern border; Illinois in the heartland; and Florida in the southeast (Hirschman and Massey, 2008; Tienda, 2002). Immigrants registered a visible presence in another five states—Maryland, Massachusetts, New Jersey, Virginia, and Washington—which, together with the traditional destination states, housed over 80 percent of the foreign-born population until 1990 (Massey and Capoferro, 2008). With the exception of Texas and California, where proximity to the Mexican border facilitated recruitment of temporary workers into agricultural jobs throughout the 20th century, most of the initial post-1965 immigrants were concentrated in large urban centers (Singer, 2004).

---

[4]This discussion follows Massey and Capoferro's (2008) classification of states. New Jersey could certainly be considered among the major immigration destination states since in recent decades it at least matches Illinois in terms of the share of new settlers, number of foreign-born, and share of foreign-born.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2428 of 4699 PageID #:  5593

The Economic and Fiscal Consequences of Immigration

Beginning in the late 1980s and with greater momentum in the 1990s and 2000s, the foreign-born population witnessed a significant geographic dispersal. Labor demand was the primary factor driving the geographic scattering of the foreign-born population, particularly in industries that demanded unskilled and/or seasonal labor (Goodwin-White, 2012; Kandel and Parrado, 2005). Buoyed by low unionization rates suppressed by state right-to-work laws (U.S. Bureau of Labor Statistics, 2015a, Table 5), Southern states with histories of limited prior immigration and recent robust growth in labor demand were major beneficiaries of the dispersal toward nontraditional destinations. In addition, housing costs, school quality, public safety, and other amenities also attracted newcomers away from the traditional gateways and toward other destinations (Lichter and Johnson, 2009; Singer, 2004, 2009; Tienda and Fuentes, 2014). Among factors that pushed both settled immigrants and new arrivals away from the traditional gateways, Massey and Capoferra (2008) identified high unemployment rates, which coincided with growth in the availability of newly legalized workers, along with rising anti-immigrant sentiment and tighter border controls authorized by IRCA and selectively implemented at ports of entry along the U.S.-Mexico border.

Despite widespread agreement in the research literature that the effects of immigration are strongest in areas where immigrants are spatially concentrated, relatively few empirical studies have examined the initial settlement patterns and subsequent internal migration of immigrants. Available empirical studies suggest that internal migration rates are higher for immigrants than for the native-born. However, internal migration rates vary according to skill levels, regional origins, and legal status (Massey, 1987). Based on pubic use microdata from the U.S. Census Bureau, Bartel (1989) found large regional-origin differences in remigration following initial settlement, with Asians more likely than either Europeans or Latin Americans to engage in subsequent internal migration. Furthermore, internal migration tends to accentuate the spatial concentration of the foreign-born population, albeit differentially according to immigrants' regional origins (Bartel, 1989; Edmonston, 2002). Both the propensity to migrate and spatial concentration patterns depend both on immigrants' and their families' characteristics and on their expectations regarding conditions in potential areas of settlement.

To illustrate the changing patterns of settlement of the post-1965 wave of immigrants, Table 2-6 shows the population of immigrants who arrived in the United States during six periods—1975-1980, 1985-1990, 1995-2000, 2002-2008, 2008-2010, and 2010-2104—by current state of residence in 1980, 1990, 2000, 2008, 2010, and 2014, respectively. The first three columns, for the pre-2000 periods, are taken from Massey and Capoferro's (2008) classic analysis, based on "residence 5 years earlier" data from the 1980, 1990, and 2000 Decennial Censuses. The next three (post-2000)

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

74

**TABLE 2-6** New Immigrant Arrivals by State of Current Residence: 1980, 1990, 2000, 2008, 2010, and 2014

| | Percentage Distribution of Immigrants Arriving in the U.S. (Census or CPS year shown in parentheses) | | | | | |
|---|---|---|---|---|---|---|
| Group and State of Residence | 1975-1980 (1980) | 1985-1990 (1990) | 1995-2000 (2000) | Pre-Recession 2002-2008 (2008) | Recession 2008-2010 (2010) | Post-Recession 2010-2014 (2014) |
| **Big Five** | | | | | | |
| **Subtotal** | **63.8** | **67.3** | **54.7** | **47.8** | **50.7** | **44.0** |
| California | 31.1 | 35.4 | 21.1 | 17.0 | 19.9 | 12.3 |
| New York | 12.9 | 13.5 | 9.9 | 7.5 | 7.9 | 8.4 |
| Texas | 8.5 | 6.8 | 10.2 | 10.2 | 8.9 | 9.3 |
| Florida | 5.8 | 7.2 | 8.2 | 9.2 | 9.5 | 9.8 |
| Illinois | 5.5 | 4.5 | 5.3 | 4.0 | 4.5 | 4.2 |
| **Second Tier** | | | | | | |
| **Subtotal** | **12.1** | **13.2** | **14.1** | **14.9** | **12.6** | **15.9** |
| New Jersey | 3.7 | 4.3 | 4.7 | 4.6 | 3.7 | 4.8 |
| Virginia | 1.9 | 2.3 | 2.5 | 3.0 | 2.2 | 3.1 |
| Maryland | 1.8 | 2.2 | 1.9 | 2.5 | 2.6 | 2.8 |
| Massachusetts | 2.6 | 2.8 | 2.6 | 2.8 | 2.2 | 2.8 |
| Washington | 2.1 | 1.6 | 2.4 | 2.0 | 1.9 | 2.4 |
| **Third Tier** | | | | | | |
| **Subtotal** | **18.5** | **15.6** | **25.5** | **24.7** | **22.6** | **23.9** |
| Georgia | 0.7 | 1.2 | 3.0 | 3.1 | 3.0 | 2.3 |
| Pennsylvania | 1.8 | 1.9 | 1.7 | 1.4 | 1.9 | 2.9 |
| Michigan | 1.9 | 1.3 | 2.0 | 1.7 | 1.2 | 2.9 |
| Arizona | 1.1 | 1.5 | 2.0 | 2.6 | 1.9 | 1.1 |
| North Carolina | 0.8 | 0.8 | 2.5 | 1.7 | 0.6 | 1.7 |

002422

Copyright National Academy of Sciences. All rights reserved.

| | | | | | | |
|---|---|---|---|---|---|---|
| Ohio | 1.4 | 1.0 | 1.5 | 1.3 | 1.3 | 1.7 |
| Connecticut | 1.0 | 1.2 | 1.2 | 1.3 | 1.6 | 1.3 |
| Minnesota | 0.5 | 0.6 | 1.2 | 1.4 | 1.8 | 1.4 |
| Colorado | 1.3 | 0.8 | 1.8 | 1.4 | 0.9 | 1.2 |
| Tennessee | 0.4 | 0.3 | 0.9 | 1.7 | 2.1 | 1.2 |
| Nevada | 0.5 | 0.5 | 1.1 | 1.0 | 0.9 | 1.1 |
| Oregon | 1.0 | 0.9 | 1.2 | 1.2 | 0.7 | 0.9 |
| Utah | 0.4 | 0.4 | 0.9 | 0.8 | 0.7 | 1.4 |
| Indiana | 0.6 | 0.3 | 1.0 | 0.7 | 1.0 | 0.2 |
| Hawaii | 1.4 | 0.9 | 0.6 | 0.5 | 0.8 | 0.4 |
| Wisconsin | 0.8 | 0.6 | 0.8 | 1.1 | 0.3 | 0.4 |
| Kansas | 0.6 | 0.5 | 0.6 | 0.5 | 0.2 | 0.8 |
| Missouri | 0.7 | 0.4 | 0.8 | 0.6 | 0.4 | 0.4 |
| Louisiana | 1.1 | 0.4 | 0.4 | 0.5 | 0.8 | 0.5 |
| Rhode Island | 0.5 | 0.5 | 0.3 | 0.3 | 0.4 | 0.3 |
| Other States | 5.6 | 3.9 | 5.7 | 12.6 | 14.0 | 16.1 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Average Annual Number of Immigrants Arriving (thousands) | 274 | 766 | 1,146 | 1,196 | 1,267 | 1,287 |
| Theil's Diversity Index | 70 | 66 | 77 | 80 | 78 | 82 |

NOTE: CPS = Current Population Survey.
SOURCE: Data from Flood et al. (2015) and Massey and Capoferro (2008, Table 1).

002423

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2431 of 4699 PageID #:  5596

periods are selected to show the settlement patterns during the pre-recession period of 2002-2008, the years of the Great Recession (2008-2010), and the post-recession period (2010-2014). The data for these periods are based on a survey question about the year of arrival in the United States, which is included in both Decennial Censuses and the Annual Social and Economic Supplement (March round) of the CPS. The dates of arrival include the first few months of the year of interview (April for a Decennial Census and March for the CPS). The absolute number of immigrants in each data source is adjusted to annual averages (total arrivals/years since arrival).

The classic pattern of post-1965 immigrant concentration on the West Coast, East Coast, and a few other locations is evident in the column for 1980, which reflects the character of immigration in the late 1970s. During this period, 31 percent of recent immigrants were in California and 44 percent were in just two states: California and New York. There were also significant numbers of new immigrants in a few other states: Florida, Illinois, and Texas. More than 60 percent of all recent immigrants resided in these top five destination states. A closer look reveals that most of these immigrants resided in the major cities in these states: Chicago, Houston, Los Angeles, Miami, New York City, San Francisco, and a handful of other metropolitan areas. A second tier of states, including Maryland, Massachusetts, New Jersey,[5] Virginia, and Washington, collectively housed 12 to 13 percent of immigrants, or about 2 to 3 percent each. Another 20 states, identified as "third tier" in Table 2-6, each had about 1 percent (more or less) of all recent immigrants each, for a total of 18 percent. Although the post-1965 wave of immigration was in full swing in the late 1970s—on average, more than a quarter million immigrants arrived annually during this period—the very concentrated patterns of settlement meant that the majority of the American population, especially in medium-size cities and small towns in the Midwest and South, had little contact with new immigrants.

The pace of immigration accelerated in the late 1980s with more than 760,000 arrivals annually, almost tripling the average from 10 years earlier. The patterns of immigrant settlement were even more concentrated in 1990 than in 1980, as confirmed by the decrease in Theil's Diversity Index from 70 to 66.[6] There was an increasing concentration of recent immigrant settle-

---

[5]As noted above, New Jersey could reasonably be categorized in the first group, which would become the "big six."

[6]Geographical diversity of immigrants is measured with Theil's (1972) entropy index,

$$E = \frac{-\sum_{i=1}^{n} p_i * \ln(p_i)}{\ln(n)} \times 100$$

where $p_i$ is the proportion of immigrant arrivals in state $i$ and there is a total of $n$ states. The index varies from 0 (all immigrants in one state) to 100 (an equal number of immigrants in each state).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

ment in California, New York, and Florida, and some second tier states witnessed increased settlement of recent arrivals. Although many national political leaders thought the concentration of immigrants was a sign of slow assimilation, immigration researchers explained that the gravitation of immigrants to locations with dense social and business networks was not only the historical pattern but also the path most likely to lead to upward mobility (Portes and Rumbaut, 1990).

The 1990s were a period of rapid economic growth and also increased immigration; the average annual number of arrivals in the late 1990s rose to more than 1 million per year. It was also the beginning of a dispersed immigrant settlement pattern that generated many new immigrant destinations (Massey, 2008; Singer, 2004, 2009; Tienda and Fuentes, 2014; Waters and Jimenez, 2005). Although the vast majority of the foreign-born population continued to reside in large metropolitan centers (with more than half of the foreign-born population concentrated in just 10 metropolitan areas), immigrants' spatial redistribution was particularly vigorous in states where few had previously settled, including small towns, suburban communities, and cities in Georgia, North Carolina, and several Midwestern states (Hirschman and Massey, 2008; Lichter and Johnson, 2009; Singer, 2009). As shown in Table 2-6, the Diversity Index rose from 66 to 77, indicating a very strong trend away from concentrated settlement.

Although gateway cities and states continued to receive the largest numbers of new immigrants, there were very large relative shifts of new immigrants away from California and New York. The diversion of immigrants away from California in the 1990s and continuing to recent years has been stunning. California's share of the immigrant inflow plunged from 35.4 percent of the nation's new arrivals in the latter half of the 1980s to 17.0 percent in the early 2000s (Table 2-6). The inflow corresponding to this 18 percentage point decline was distributed across many new places, each with a relatively small share of the total shift. The largest gains in foreign-born population share were 1.8 percentage points in Georgia and North Carolina. The shift has been explained by loss of job opportunities in California in the 1990s due to that state's unusually deep and prolonged recession, combined with high housing prices as an added deterrent (Myers, 2007, Ch. 5). Once migration networks discovered the plentiful jobs and low costs across the South, much of the immigrant inflow was diverted away from California, save for selected high-skilled Asian immigrants and family reunification sponsored by California's established base of more than 8 million foreign-born residents. The demographic renewal of depopulated nonmetropolitan areas brought by new immigrants has visibly altered the ethnic composition of rural America in a short period of time and has also infused new economic life into dwindling communities (Lichter and Johnson, 2009; Tienda and Fuentes, 2014). The geography of immigration

002425

Copyright National Academy of Sciences. All rights reserved.

defies simple generalizations due to the enormous diversity of places and people involved.

The post-2000 patterns are even more complex, largely because of the Great Recession of 2008 to 2009, which interrupted the dispersal to new destinations. In Table 2-6, the panel examines three periods—2002 to 2008, 2008 to 2010, and 2010 to 2014—that provide pre-recession, recession, and post-recession comparisons. The first period, from 2002 to 2008, shows a continuation of immigrant flows to new destinations and away from California, New York, and Illinois. Relative growth of immigrant settlement accelerated in the Virginia and Maryland suburbs of Washington, DC, but increased most significantly in the residual grouping of "other states," which doubled their immigrant shares from 6.1 percent in the late 1990s to 12.6 percent in the pre-recession period. The panel's interpretation is that the attractions of economic opportunity in new destinations, plus the emergence of new immigrant communities, are eroding the pull of the traditional gateway states and cities.

The Great Recession did not stop overall immigration. The CPS data in Table 2-6 show that more than 1 million new international migrants arrived annually in the years before, during, and after the recession. Since these data count only new arrivals and not departures, they are not necessarily in conflict with the evidence that net undocumented migration into the United States slowed or even reversed during these years. The reported inflows might have been counterbalanced by outflows. Moreover, new arrivals after the recession have been mainly authorized immigrants, most of whom are on family reunification immigrant visas or were admitted on temporary work or student visas.

During the Great Recession period (2008-2010), the pull to new destinations waned and there was a slight reversion back to traditional gateways. The diversity index that had risen from 66 to 80 from the late 1980s to the early 2000s (indicating more geographic dispersion) fell slightly to 78 during the recession years. California increased its share of immigrants, as did a couple of other traditional gateway states. Many of the second- and third-tier states that had been gaining immigrants in the 1990s and early 2000s saw a decline in their share of new immigrant arrivals. One explanation, which the panel considers likely, is that many of the growth sectors that were pulling migrants to nontraditional locations, such as construction and manufacturing, had few jobs during the recession for anyone, including immigrants. In the traditional gateways, the ethnic economy, immigrant institutions, and family networks were better situated to buffer the adverse effects of the recession. The new destinations were also in states with the highest concentration of undocumented persons among their immigrant populations (Passel and Cohn, 2014). Thus, the slowdown in unauthorized immigration probably also slowed settlement in many new destinations.

002426

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2434 of 4699 PageID #:  5599

The Economic and Fiscal Consequences of Immigration

The most recent period, based on 2014 CPS data, shows a return to the dispersal of new migrants away from traditional gateway areas (especially California) and gains for the second tier states and other states. In short, the Great Recession interrupted, but did not reverse, the post-1990s trend toward increasing geographic dispersal of the foreign-born population. Economic recovery rekindled the trend away from traditional gateway locations to new destinations.

The classification of states into "traditional gateways" and "new destinations" obscures more complex patterns that are evident for individual states over the entire 35-year period. Perhaps the most dramatic change is the declining primacy of California as the leading destination for new immigrants. Although California is still the leading destination, receiving 12 percent of new immigrants from 2010 to 2014, this figure is about one-third its foreign-born share in the 1970s and 1980s. Florida, by contrast, increased its share of new immigrants from 6 to almost 11 percent as other groups beyond Cubans (Latin American and Caribbean) have settled there. The increasing dispersal of immigrants around the county has made many more Americans aware that immigration is a national phenomenon.

## 2.9 CONCLUSIONS

This brief survey of historical, current, and future immigration trends supports five specific conclusions drawn by the panel:

1. In terms of the proportion of new immigrants to the national population, contemporary immigration to the United States is at moderate levels historically. Although contemporary net immigration rates are not high by historical standards, international migration is a larger component of U.S. population growth now than in the past because the share of growth due to fertility of the native-born has fallen appreciably.

2. Immigration has broadened the ethnic diversity of the American population and will continue to do so, but the increasing integration of American society may make ethnic distinctions ever less meaningful.[7] There has been a steady blurring of origin group categories over the last 100 years or more of our history, and with rising rates of intermarriage there is little reason to assume this trend will change in the future. A great source of American resilience as an immigrant-absorbing country is that assimilation has been a two-way street, with the mainstream society gaining exposure to

---

[7]The sister report to this one (National Academies of Sciences, Engineering, and Medicine, 2015) fully explores topics pertaining to the integration of immigrants into American society.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

cultures and customs of many nations, as well as benefiting from immigrants' high aspirations, strong families, and strong work ethic (National Academies of Sciences, Engineering, and Medicine, 2015).

3.  From 1970 to 2010, the American labor force has accommodated the growth of 80 million persons in the prime working ages (25-64), even while the ratio of female employment to the total population grew by 50 percent from 1970 to 2000. The rapid intergenerational growth of successive cohorts of the third-plus generation—that is, larger cohorts of persons ages 25-34 entering the working years and replacing cohorts who were leaving the prime working age years—ceased after 2010 and will turn negative from 2020 to 2030. Future labor force growth will therefore depend completely on immigrants and their U.S.-born descendants.

4.  Immigration helps to slow the aging of American society. The senior ratio—the number of people age 65 and older divided by the number ages 25 to 64—has begun to rise sharply, which places added weight on the smaller working-age group to support Social Security, Medicare, and other old-age programs. After decades of stability hovering between 20 and 24 seniors per 100 working-age adults, the ratio is projected to climb to 44 by 2040 (and to 48 by 2065). It would climb to 49 by 2040 (and to 56 by 2065) if no new immigrants (and their descendants) are included in projections of the population after 2015. Given continued levels of immigration in population projections, the increase in the senior ratio in the next 25 years is 28 percent less than if no immigration were projected in the population; for projections out to the next 50 years, the increase in the ratio is 40 percent less if current levels of immigration continue.

5.  The shift of immigrant settlement away from traditional gateway areas to new destinations, which began in the 1990s, was interrupted during the Great Recession of 2008-2009 but has resumed in the period since. This dispersal of immigration settlement, combined with the virtual cessation in the net inflow of undocumented immigrants, has changed the character and direction of the post-1965 wave of immigration.

The subsequent chapters of this report address economic issues of contemporary immigration with a focus on the labor market and fiscal system. Many of the controversies over these questions turn on issues of the availability of data and the precise measurement of key theoretical concepts. There is also debate over the interpretation of relatively small differences as well as the assessment of short-term versus long-term impacts, some of

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

which still lay in the future. The study of past demographic trends does not resolve these empirical issues or contemporary policy debates, but it does offer a valuable perspective on American society's resilience in absorbing immigrants.

For example, the initial political and social response to major waves of immigration has historically almost invariably been negative. Many Americans in the early 21st century, just like their predecessors in the mid-19th and early 20th centuries, fear that the numbers and characteristics of new immigrants will have adverse economic, demographic, and cultural impacts on the welfare of the native-born population. Although there may well be short-term costs of immigration, both for immigrants and the host society, study of the last two centuries suggests the long-term impact has been almost entirely positive. Not only did markets adjust but U.S. society and culture have created institutions that allowed the descendants of immigrants to move up the socioeconomic ladder and that broadened the definition of identity as an American far beyond the imagination of the late 18th century founding population.

## 2.10  TECHNICAL ANNEX ON COUNTING IMMIGRANTS

To understand the impacts of immigration on U.S. society and its economy, it is necessary to know how many immigrants have arrived on U.S. shores, when they arrived, and from where. Largely because of data limitations, authoritative answers to these seemingly basic questions are surprisingly difficult to obtain. In theory, immigration is measured as stocks—namely, counts of the resident foreign-born in censuses and surveys—and flows, which are the numbers of arrivals (minus departures) in a given period. Even with complete and accurate measurement, however, the stocks of the foreign-born are not simply the sum of the net flows of prior immigrants. Rather, in any given year, the foreign-born stock represents the survivors among prior migrants, those who neither emigrated nor died. International migration adds not only to the foreign-born stock but also to the numbers of native-born Americans through the fertility of the immigrants after they arrive. The U.S.-born children of immigrants—commonly referred to as the "second generation"—are native born, both literally and in law. Yet because of their proximate migration background, many organizations and service agencies consider the second generation (especially when they are children living in their parents' households) as part of the immigrant community. An ambiguity is that children may have one foreign-born and one native-born parent. By general convention, if either parent is foreign-born, the children are considered second generation.

Stock measures of the foreign-born population are affected by changes in both census enumeration methods and items in the questionnaire that

002429

Copyright National Academy of Sciences. All rights reserved.

identify immigrants. Every Decennial Census from 1850 to 2000 included a question on birthplace (and a question on country of birth for the foreign-born). Comparable data on the foreign-born are available from the ACS, which replaced the long-form census schedule after 2000, and from the CPS, which is used to track labor market trends. Decennial Census, CPS, and ACS data on the foreign-born population include permanent residents, persons on temporary work and student visas, and undocumented residents who either entered without inspection or have overstayed visas.[8] The native-born population includes persons born in the 50 states and the U.S. territories (e.g., Puerto Rico, American Samoa, etc.) and those born aboard with U.S. citizen parent(s). Therefore, the official census definition of foreign-born—all residents who are not U.S. citizens at birth—differs somewhat from the common understanding that the foreign-born are persons born outside the 50 states.[9]

The major limitation of Decennial Census, ACS, and CPS data for the study of immigration is that the current visa status (and visa status at time of arrival) of foreign-born respondents is not recorded. Current citizenship and year of arrival are measured in most data sources, although with some significant variations in the wording of the question and in measurement precision in the arrival dates. In census-type surveys, therefore, it is impossible to distinguish between LPRs ("green card" holders), persons on temporary nonimmigrant visas for work or study, and persons who lack an official visa. Nonetheless, it is common statistical practice to refer to the foreign-born population counted in a census or estimated by a survey as "immigrants," even though the category includes foreign students, temporary workers on H-1B and other visas, and migrants who entered the country surreptitiously or overstayed legal visas. There is considerable mobility across these statuses, and current visa status does not always predict who stays permanently.

Changes in the stock of immigrants over time (e.g., between rounds of a census or survey) are very imperfect measures of immigration flows. Net changes in the immigrant stock are a result not only of in-migration but also of out-migration and deaths of immigrants that have occurred between rounds of the census or survey. Although measurement can be improved by

---

[8]Although the Decennial Census and federal surveys attempt to be universal, nonresponse is a serious problem. Undocumented persons are likely to be underenumerated in all surveys and censuses.

[9]This number of people born abroad of American parents has increased significantly since World War II. Prior to the 1980 Decennial Census, this group was identifiable in census data through the questions on country of birth of parents. Since 1980, the Decennial Census (and the ACS and CPS) inquire about citizenship as well as country of birth. This permits data users to identify the foreign-born population as well as to distinguish U.S. citizens by birth who are "born abroad of American parent(s)."

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2438 of 4699 PageID #:  5603

The Economic and Fiscal Consequences of Immigration

considering shorter intervals and recent arrivals (based on year of arrival data), the growth (or decline) of the size and change in the composition of the foreign-born population are only indirect measures of the flows of immigration.

Flows of immigrants are also difficult to measure because of changes in the criteria used to record new admissions and because return flows are poorly measured. In 1820, the federal government began counting immigrants based on arrivals by ships at major seaports. However, persons crossing land borders were not counted until the early years of the 20th century. The historical fact that a considerable number of immigrants entered the United States by crossing land borders after arriving by ship at Canadian ports renders counts of immigrants for these periods incomplete.

A second major problem with flow estimates is the lack of comprehensive data on departures, or emigration. Because of poor data quality, the U.S. Immigration and Naturalization Service ceased publishing emigration counts in 1958. Historians have estimated that perhaps up to one-third of the persons who arrived between 1880 and 1924 returned to Europe (Wyman, 1993, p. 10). Even higher figures were reported in a recent study based on detailed administrative records from Ellis Island (Bandiera et al., 2013). That study found that out-migration rates may have been as high as 60 to 70 percent during the early 20th century, although they varied sharply by group, being quite low for those who faced persecution at home but comparatively high for groups dominated by labor migrants. Recent research suggests that current emigration levels are not insignificant and also vary sharply by group (Ahmed and Robinson, 1994; U.S. Census Bureau, 2014; Van Hook et al., 2006).

Another problem with official flow data is the change in definition from "arrivals" to "lawful permanent residents" (LPRs) in the 1930s. When the United States first implemented restrictions on entry by health status and other criteria (literacy was added in 1917), alien arrivals were "inspected" by authorities before being allowed to enter the United States. Steamship companies also screened potential immigrants at embarkation because they were liable for the return transportation of persons denied entry to the United States. After the passage of the 1924 legislation, prospective immigrants were required to obtain an immigrant visa from an American consular office in their origin country (Zolberg, 2006, Ch. 8). The shift in measurement to those with immigrant visas probably had little impact during the 1930s and 1940s. Not only were immigrant flows fairly modest but the numbers of nonimmigrant foreigners who were in the United States for tourism, study, or temporary work also was much smaller than the inflow of permanent immigrants. This is no longer the case. Currently, a majority of the "new" immigrants getting green cards in most years have already been in the United States (often for many years) on temporary visas.

002431

Copyright National Academy of Sciences. All rights reserved.

Based on DHS administrative records, there were 61 million nonimmigrant border crossings in 2013 (Foreman and Monger, 2014).[10] Of these, more than 48 million were tourists; however, there were also about 3 million arrivals (and associated family members) on temporary work visas, 1.7 million students (and family members) on F1 and M1 visas, a half-million exchange visitors on J1 and J2 visas, and more than 6 million temporary visitors for business on B1 and WB visas. Very few of these nonimmigrant entrants become residents of the United States, as the vast majority are only in the country for short periods.

There is no official count of persons who are in the United States without a visa—the undocumented population—but the expert consensus is that the undocumented population peaked at approximately 12 million in 2007, then fell to about 11 million in the wake of the Great Recession (Baker and Rytina, 2013; Passel et al., 2013).

Both side-door (nonimmigrant visa entrants) and back-door (undocumented entrants) arrivals have complicated the assumption that the number of persons receiving LPR status reliably tracks new arrivals to the United States. Simply put, there are many more persons entering (and leaving) on temporary visas (or without a current visa) than the number of new LPRs. Most but not all persons on temporary work and student visas are counted as part of the foreign-born population in censuses and surveys, which inflates immigrant stock measures. However, people on temporary visas who are included in the count of the foreign-born population very likely represent less than 5 percent of the foreign-born population (National Academies of Sciences, Engineering, and Medicine, 2015, p. 119). Temporary visa holders can achieve LPR status via sponsorship by an employer or family member. In recent years, large pluralities of new LPRs are persons who adjust their temporary visa status to LPR after many years of residence with or without a visa (Kandel, 2014; U.S. Department of Homeland Security, 2013). Notwithstanding these difficulties in measuring immigration flows and statuses, about 70 percent of the foreign-born population in census and survey data are LPRs or naturalized U.S. citizens; the remainder consists largely of undocumented immigrants (Pew Research Center, 2015a, Ch. 5).

---

[10]Technically, this is the number of I-94 admissions. The estimated number of nonimmigrant border crossings is even larger (173 million): The official estimate includes persons with border crossing cards and other frequent travelers for whom electronic I-94 forms are not automatically generated. The conversion from paper to electronic I-94 forms has increased the reported number of nonimmigrant admissions (Foreman and Monger, 2014).

Copyright National Academy of Sciences. All rights reserved.

# 3

# Socioeconomic Outcomes of Immigrants

## 3.1 INTRODUCTION

The skill mix of the immigrant population—and, particularly, how their education and experience levels compare to those of the native-born—is a key determinant of the impact their arrival will have on the wages and employment in receiving labor markets. These characteristics also affect immigrant assimilation and immigrants' fiscal impact. If an inflow of immigrants is composed mainly of low-skilled workers, it is reasonable to expect that the pre-existing low-skilled population (both native-born and earlier immigrant arrivals) will be most affected by the increased supply of workers. Likewise, if an immigrant inflow is composed of high-skilled workers in very specialized fields, pre-existing workers in those narrow fields are most likely to be affected.[1] Furthermore, the skill mix of the immigrant population is likely to influence the speed with which immigrants assimilate in their new country. Skilled immigrants may acquire new skills more quickly, including English language fluency, and may have more ready access to job information that would allow them to catch up with natives relatively quickly.

Labor market skills are also directly linked to fiscal impacts. As with the native-born, low-skilled immigrants contribute less on average than their higher skilled counterparts to the public coffers in the form of income taxes and other kinds of taxes. Based on their lower incomes, on average,

---

[1]In-depth theoretical and empirical support for these assertions comprise the content of Chapters 4 and 5.

002433

Copyright National Academy of Sciences. All rights reserved.

they have greater eligibility for some programs. However, their immigrant status, even if legal, may make them ineligible for other programs.

Immigration confers economic benefits on the native-born population as a whole but, among the native-born, there are likely to be winners and losers. While pre-existing workers most similar to immigrants may experience lower wages or a lower employment rate, pre-existing workers who are complementary to immigrants are likely to benefit, as are native-born owners of capital. Beneficial effects of skilled immigration are likely to be reinforced in the presence of capital-skill complementarity, where native-owned capital becomes more productive when combined with high-skilled labor; the panel delves into these consequences of immigration in Chapters 4 and 5. These benefits may be further augmented if there are "productivity spillovers" between high-skilled immigrants and the native-born workforce.

This chapter summarizes trends in the skill mix of the immigrant population and addresses how these trends compare with those of natives. Educational attainment is examined, as are differences in the occupations of immigrants and the native-born. The chapter also examines the extent of economic assimilation: the rate at which the economic outcomes of immigrants catch up with those of native-born Americans, focusing on employment, wage, and English-language acquisition outcomes. It also reviews some of the differences between immigrants and the native-born in terms of poverty rates and participation in social assistance programs. The descriptive statistics presented here serve to link the discussion of context and history in Chapter 2 and the analyses of wage, employment, and fiscal impacts in later chapters.

## 3.2  EDUCATION AND OCCUPATION PROFILES

### Education Profiles

Trends in the skills of immigrants relative to those of the native-born help answer questions such as whether today's immigrants face greater or lesser barriers to full economic assimilation than in the past and whether they are likely to displace or complement native-born workers in certain segments of the labor market if they arrive in sufficiently large numbers. In this section, the panel examines changes in the distribution of educational attainment of immigrants over successive cohorts, relative to the corresponding native-born cohorts.

The education of a cohort of immigrants at a given point in time can be divided into two components: (1) the initial level of education they attained prior to their arrival in the United States, and (2) additional education attained after immigrating. Higher amounts of both are expected to lead to

002434

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

more favorable earnings outcomes and fiscal impacts. Using data from the 1970-2000 Decennial Census and the 2012 3-year American Community Survey (ACS),[2] which covers the years 2010-2012, the panel documents how immigrants' initial education upon arrival has changed over the past few decades. We define "recent immigrants" as persons who were born outside the United States (excluding those born to U.S.-citizen parents) who arrived within the 5 years prior to each census or to the 2012 ACS. The analysis is restricted to individuals ages 25 and older. Figure 3-1 shows that **the education levels of immigrant cohorts upon arrival have been rising steadily over time**. For example, about half of recent immigrants in 1970 had less than a high school education, but by 2012 this figure had halved to 26 percent. Whereas in 1970 only 20 percent of recent immigrants had completed postsecondary education (8% with college education and 12% with advanced education), by 2012 this proportion had increased to 38 percent (22% with college education and 16% with advanced education). Average years of school completed are superimposed on the same chart to reveal the steady upward trend, from 10.2 in 1970 to 12.6 in 2012.[3]

Section 3.6 of this chapter is a Technical Annex of the panel's detailed tabulations and regression analyses based on Decennial Census and survey data in the Integrated Public Use Microdata Series (IPUMS). Tables 3-16 and 3-17 in Section 3.6 break out the educational attainment levels at arrival for men and for women, respectively. These tabulations show that **increases since 1970 in immigrant education levels at arrival have been large for both men and women.**

The rise in immigrants' initial education over successive immigrant cohorts should be interpreted within a broader U.S. context, in which improvement in educational attainment has been a general phenomenon

---

[2]The ACS data were accessed through IPUMS (Ruggles et al., 2015), with all estimates weighted to be nationally representative. In tables and text throughout Chapter 3, 2012 is used as shorthand for 2010-2012.

[3]The continuous measure of educational attainment is calculated by first assigning each person the number of years of completed education above kindergarten as reported in the detailed educational attainment variable *educ* in the ACS data provided by IPUMS. For categories of years of education, such as "Grades 1, 2, 3, or 4," the midpoint is used (in this case, 2.5 years). For educational attainment reported by category, such as "associate's degree," or "bachelor's degree," we followed Jaeger (1997) in assigning years of educational attainment. However, for those reporting a doctoral degree, we assigned additional years of educational attainment (beyond that used by Jaeger) on the basis of data on the average time to completion of doctoral degrees in the United States from the National Science Foundation (see http://www. nsf.gov/statistics/infbrief/nsf06312/). In results not presented here, we used a different coding scheme for calculating continuous years of educational attainment, relying on the IPUMS *educ* variable, which presents broader educational attainment categories that are consistent across years. The average years of education resulting from this alternate coding scheme were very similar to those resulting from our original coding scheme, which is used in this report.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-1** Educational attainment of recent immigrants (those who entered in the 5 years prior), by Decennial Census year 1970-2000, and in 2012 (in percentages).
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

over birth cohorts in the native-born population (Fischer and Hout 2006). This comparison is important because, as noted in the introduction, the impact of immigration on wages and employment of the native-born is directly related to relative education (and experience) levels. Figure 3-2 compares trends in education (measured in mean years of schooling) for recent immigrants and for native-born persons. Given that about one-half of recent immigrants in each year fall in the 25-34 age range, compared to roughly one-quarter of native-born persons, Figure 3-2 presents the data separately for three age ranges: (1) everyone ages 25 and older, (2) those ages 25-34, and (3) those ages 35 and older.

The native-born have consistently higher educational attainment. However, for adults ages 25-35 (middle panel) there has been convergence in education between the two groups, particularly since the 1980s. In 1970, recent immigrants ages 25-34 had 0.5 years less schooling than their native counterparts, with mean levels of 12.1 for the native-born and 11.6 for a recently arrived immigrant. By 1980, the gap had expanded to 1.2 years, with mean education levels of 13.1 and 11.9 respectively. By 2012, the gap had narrowed to 0.3 years, with a mean of 13.7 years of education for the native-born and 13.4 for the recently arrived foreign-born. On the other hand, for the total ages 25 and older population (left-hand panel in

002436

Copyright National Academy of Sciences. All rights reserved.



The Economic and Fiscal Consequences of Immigration



**FIGURE 3-2** Mean years of educational attainment of U.S.-born and recent immigrants (those who entered in the 5 years prior), by Decennial Census year 1970-2000, and in 2012.
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Figure 3-2), the educational gap between immigrants and natives ended up slightly larger in 2012 than in 1970 (0.8 versus 0.6 years of education) because, even as the native-born/foreign-born education gap narrowed for those ages 25-34, the gap remained steady for adults ages 35 and older, changing from 1.4 years of schooling in 1970 to a gap of 1.5 years in 2012.

To assess trends for different groups based on national or regional origins, Figure 3-3 presents mean years of schooling among recent immigrants ages 25 or older across the largest immigrant groups identifiable in the data. The trends differ sharply by country or region of origin: **The largest increases in educational attainment have occurred among immigrants from Mexico, China, and the group combining immigrants from Europe, Oceania, and Canada.** Average Mexican immigrant education improved by 3.8 years, from a very low level of 5.7 years in 1970, to 9.5 years in 2012. Chinese immigrants started from a relatively high education level of 10.5 years and moved up to 13.9 years—an average increase of 3.4 years of schooling. For the miscellaneous group that includes immigrants from Europe, Oceania, and Canada, education levels increased over the analysis period from an average of 10.2 years of schooling to 14.8 years, for an average increase of 4.6 years. Immigrants from Latin American countries other than Mexico experienced an average increase of 1.8 years in edu-

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-3** Mean years of educational attainment of recent immigrants (those who entered in the 5 years prior), by Decennial Census year 1970-2000, and in 2012, by country/region of birth.
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

cation levels from 9.5 to 11.3 years. Three origin groups—immigrants from India, Philippines, and Asia other than China—experienced a muted U-shaped profile, with very small net gains during the period. Immigrants from Africa are the only group with an opposite trend to that of all immigrants, as the average years of education of recent admission cohorts declined from 13.7 years in 1970 to 13.0 in 2012—but this group had a very high starting level.

### Age-Education Pyramids

This subsection describes the age-education structure of the foreign-born and native-born populations in the United States. For the native-born population, the age structure is driven primarily by past fertility behavior and secondarily, in older ages, by mortality patterns. For the immigrant population, however, the age structure is determined less by fertility and mortality than by historical arrival rates and by the age composition of new immigrant inflows.

We use population pyramids to visualize the joint age-education structure of the foreign-born population relative to the native-born population from 1970 to 2002. Figure 3-4 presents an age-education pyramid for

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

foreign-born residents in 1970 and 2012. Figure 3-5 displays comparable information for native-born residents. These pyramids, like typical age-sex pyramids, graphically display the age distribution of a population. However, they differ from typical age-sex pyramids in two important respects. First, the pyramids do not reflect the actual sizes of the two populations, as they only show within-population proportions (i.e., each pyramid sums to 100 percent for its specified population); population sizes are provided in notes accompanying the figures. Second, each horizontal bar representing the relative size of an age group is divided into education groups—from low (light colored) to high (dark colored). Five education groups are distinguished for the population age 15 and greater: (1) less than high school (or less than 12 years of education, depending on the source data), (2) high school (12 years of education), (3) some college (13-15 years of education), (4) college completion (or 16 years of education), and (5) beyond college (more than 16 years of education).



**FIGURE 3-4** Age and educational attainment of foreign-born residents, 1970 and 2012.
NOTE: The 9.6 million foreign-born U.S. residents in 1970 constituted 4.7% of the total population. The 40.4 million foreign-born U.S. residents in 2012 constituted 13% of the total population.
SOURCE: Analyses of 1970 Decennial Census data and 2012-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002439

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2447 of 4699 PageID #:  5612



**FIGURE 3-5** Age and educational attainment of U.S.-born residents, 1970 and 2012.
NOTE: The 193.6 million native-born U.S. residents in 1970 constituted 95.3% of the total population. The 271.2 million native-born residents in the United States in 2012 constituted 87% of the total population.
SOURCE: Analyses of 1970 Decennial Census data and 2012-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Although the size of the native-born population increased during the observation period, the relative size of the total foreign-born population expanded much more. In 1970, the ratio of the native-born to the foreign-born population was about 20, meaning that there were 20 native-born U.S. residents for each foreign-born resident. This ratio steadily declined to 15 in 1980, 12 in 1990, 8 in 2000, and 7 in 2012.

Aside from children younger than age 15, the foreign-born population evolved from being a relatively old population in 1970 to a relatively young population in 2012. This is because most immigrants arrive in their early adult years (ages 20-35). A comparison of the two pyramids reveals that the number (and share) of immigrants ages 30-39 has swollen to offset the declining numbers of the native-born population in that age range, a decline due to the late 20th century fertility bust.

It is also noteworthy that in both 1970 and 2012 the educational attainment of the foreign-born population was more concentrated at the extremes than that of the native-born population, particularly for young

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

adults. In 1970, for example, 41 percent of the foreign-born population ages 30-34 had not completed high school, compared to 30 percent of the native-born. In the same age group, 11 percent of the foreign-born population had attained more than a 4-year college education in 1970, compared with 6 percent for the native-born population. By 2012, the percentage of the population ages 30-34 that completed less than high school was down to 29 percent for the foreign-born and to 8 percent for the native-born. At the high end of the education distribution, 13 percent of the foreign-born population had attained more than a 4-year college education, versus 11 percent of the native-born population. In 1970, for the 30-34 age group, 7 percent for the foreign-born population had 4-year college education (and no more) while 8 percent for the native-born population had 4-year college education (and no more). By 2012, the numbers at this achievement level had grown to just over 17 percent for the foreign-born population and almost 23 percent for the native-born population.

For the broader working age population—those ages 25-64—the relative differences in educational achievement between immigrants and natives are not dissimilar from those for the younger (ages 30-34) group. In 1970, 52 and 41 percent of the foreign-born and native-born populations, respectively, had not completed high school; by 2012, these rates had dropped to 28 and 8 percent, respectively. In this broader age group, 7 percent of the foreign-born population and 5 percent of the native-born population had attained more than a 4-year college education in 1970; these rates had climbed to just over 11 percent and just under 11 percent, respectively, by 2012. The percentage of the population in this age group with a 4-year college education (and no more) was slightly lower across the board relative to the 30-34-year-old cohorts: just over 7 percent for the foreign-born population and just over 8 percent for the native-born population in 1970; by 2012, the numbers at this achievement level had grown to just over 17 percent of the foreign-born population and just under 23 percent of the native-born population.

Three conclusions stem from comparing the education-age pyramids for natives and immigrants:

1. Educational attainment of recent immigrants has improved appreciably over the past few decades.
2. For recent immigrants ages 25-34, educational attainment has risen in comparison to that of native-born Americans. Among all age groups, however, the educational attainment gap has remained relatively constant over the period.
3. Compared to the native-born, recent immigrants continue to be overrepresented among the high and low categories of educational attainment.

002441

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2449 of 4699 PageID #:  5614

### Occupation Profiles

As in most social surveys and statistical reports, U.S. Decennial Censuses and the ACS collect data on workers' occupations by coding them into classification systems that delineate major differences in tasks performed and in the skills, education, or training needed across jobs.[4] Detailed coding systems have evolved over time in response to changes in the occupational structure of the labor market. Tracking data on occupational changes over time requires a consistent coding system which, fortunately, has been created by Xie and Killewald (2012) and Xie et al. (2016). This system, based on classification of 41 occupational categories, was created to meet two conflicting objectives by (1) reducing the number of occupational categories and (2) grouping detailed occupations only when socioeconomic status and work content are sufficiently similar across these occupations.

The Technical Annex in Section 3.7 lists the occupational titles under each category for the 2000 Decennial Census. Table 3-18 in Section 3.6 presents the percentage shares of foreign-born male workers, from 1970 to 2012, within each occupational category. Table 3-19 does the same for female workers. In the last column of these tables, the share of workers with a bachelor's degree or higher in 2012 is given as a measure of the socioeconomic status of the occupational category (Hauser and Warren, 1997).

Comparing the proportion of foreign-born workers within each occupation to the overall proportion of foreign-born workers across all occupations (top row in both Tables 3-18 and 3-19) reveals whether foreign-born workers are overrepresented or underrepresented in a given occupational category. One clear pattern that emerges for both men and women is that immigrants are concentrated in two types of occupations: (1) those requiring low levels of education, such as "cleaning service and food service workers," "textile machine operators," and "personal service workers and barbers," and (2) professional occupations requiring high levels of education such as "physical scientists," "life scientists," "physicians, dentists, and related," and "architects," and "mathematicians." Some occupations, such as "social and recreation workers," "preschool and elementary teachers," "protective service workers," "secretaries," and "bookkeepers," have always had a low percentage of foreign-born workers. Changes in the share of foreign-born workers over time are most evident (in Tables 3-18 and 3-19) for "farmers and farm laborers," "laborers, except farm," and "computer specialists," for which the share of foreign-born workers changed from underrepresentation to overrepresentation (relative to the foreign-born share of workers across all occupations). A change in the opposite

---

[4]See  http://www.bls.gov/soc/revising_the_standard_occupational_classification_2018.pdf [November 2016].

002442

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2450 of 4699 PageID #:  5615

The Economic and Fiscal Consequences of Immigration

direction, from overrepresented to underrepresented, occurred for foreign-born workers occupied as "writers, artists, and media workers" and as "health technicians."

Table 3-1 shows the results for male workers when the 41 occupational categories are collapsed into 8 major occupational categories (using the Tier 2 classification in the Section 3.7 annex on occupational classification). Table 3-2 shows the same for female workers. This level of classification reveals other dimensions of the patterns described above.

First, while foreign-born workers are overrepresented in high-level professional groups that require the most education (such as scientists, engineers, and architects), they are underrepresented among other professionals, managers, and sales personnel. This pattern probably reflects the differing importance of verbal communication skills in technical occupations versus those requiring interaction with customers and subordinates, as well as occupational licensing requirements in some professions. Also noteworthy is that growth over the 1970-2012 period in the share of foreign-born workers in the first four occupational categories listed in Tables 3-1 and 3-2 has been slower than the growth in the share of foreign-born workers in the general labor force (across all occupations), resulting in a relative decline of foreign-born workers in these higher-status occupations. For the next four lower-status occupational categories, increases are generally observed in the share of foreign-born workers that outpace the share of foreign-born workers across all occupations. As in the detailed occupational tabulations in Tables 3-18 and 3-19, the increase in foreign-born workers' presence is most pronounced among "farmers and farm laborers," growing from 2.7 percent of all male workers in that occupational category in 1970 to 26.9 percent in 2012 and from 3.8 percent of all female workers in the category to 32.6 percent.

The disproportionate share of foreign-born workers in both the highest- and lowest-skilled occupations may contribute to occupational segregation between foreign-born workers and native-born workers. To address this question, the panel computed the segregation index (Duncan and Duncan, 1955) between the two groups of workers across the 41 occupational categories, restricting the comparison to persons ages 25 to 64 years who were employed and working at least 50 weeks a year in a nonmilitary occupation. The segregation index can be interpreted as the minimum proportion for each type of worker whose occupation would have to be reassigned in order to achieve equal representation among foreign-born workers across all occupations. In the results presented in Table 3-3, the first row indicates trends in the segregation index for all workers, male and female. The next two rows break down the trends by gender. For all workers, the segregation index increased from 0.14 to 0.23 over the past five decades. The increasing trend is more pronounced for female workers (from 0.13 to 0.26) than

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-1 Share of Male Workers, Ages 25-64, Who Were Born Abroad, by Major Occupational Category, by Decennial Census Year 1970-2000, and in 2012

| Occupation | Share of Workers in Occupation Who Are Foreign Born (%) | | | | | Share of All Workers with a Bachelor's or Higher Degree in 2012 (%) | Total Workers in Occupation in 2012 (U.S.-born and foreign-born) |
|---|---|---|---|---|---|---|---|
| | 1970 | 1980 | 1990 | 2000 | 2012 | | |
| Across All Occupations | 4.9 | 6.2 | 8.6 | 11.8 | 18.7 | 34.6 | 53,072,944 |
| Occupation | | | | | | | |
| High-level professionals | 7.6 | 9.2 | 10.9 | 14.4 | 19.3 | 90.5 | 3,684,121 |
| Professionals | 4.7 | 5.8 | 7.8 | 11.0 | 15.0 | 65.5 | 8,508,515 |
| Managers | 4.3 | 5.5 | 7.2 | 9.5 | 13.2 | 55.7 | 6,765,903 |
| Sales workers | 3.9 | 5.0 | 7.3 | 9.9 | 14.5 | 35.4 | 9,680,387 |
| Service workers | 7.4 | 9.5 | 13.2 | 16.5 | 25.2 | 15.7 | 6,025,253 |
| Farmers and farm laborers | 2.7 | 3.9 | 7.5 | 14.5 | 26.9 | 13.4 | 834,952 |
| Skilled workers | 4.7 | 5.8 | 7.7 | 10.8 | 19.3 | 7.5 | 8,114,032 |
| Unskilled worker | 5.0 | 6.7 | 9.4 | 13.6 | 24.4 | 6.2 | 9,459,781 |

NOTE: "Workers" is defined as those who are employed and working at least 50 weeks a year in a nonmilitary occupation. The major occupational categories are those in the Tier 2 classification in Section 3.7. Skilled workers include mechanical workers, carpenters, electricians, construction workers, and craftsmen. Unskilled workers include textile machine operators, metal working, transportation operators, operators (other than textile, metalworking, and transportation), and laborers (except farm workers).
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 3-2 Share of Female Workers, Ages 25-64, Who Were Born Abroad, by Major Occupational Category, by Decennial Census Year 1970-2000, and in 2012

| Occupation | Share of Workers in Occupation Who Are Foreign Born (%) | | | | | Share of All Workers with a Bachelor's or Higher Degree in 2012 (%) | Total Workers in Occupation in 2012 (U.S.-born and foreign-born) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1970 | 1980 | 1990 | 2000 | 2012 | | |
| Across All Occupations | 5.4 | 6.7 | 8.0 | 10.2 | 15.8 | 36.5 | 46,229,202 |
| Occupation | | | | | | | |
| High-level professionals | 12.1 | 11.3 | 10.8 | 15.1 | 19.4 | 93.0 | 1,957,552 |
| Professionals | 4.9 | 6.1 | 7.0 | 8.9 | 11.8 | 64.1 | 12,243,469 |
| Managers | 4.8 | 5.0 | 5.7 | 7.4 | 10.5 | 55.4 | 4,665,702 |
| Sale workers | 4.3 | 5.0 | 6.2 | 7.6 | 11.6 | 22.3 | 15,715,603 |
| Service workers | 6.1 | 8.8 | 11.9 | 15.8 | 26.9 | 9.8 | 8,559,180 |
| Farmers and farm laborers | 3.8 | 4.6 | 8.4 | 17.2 | 32.6 | 16.4 | 160,377 |
| Skilled workers | 5.5 | 8.7 | 11.3 | 15.0 | 22.7 | 13.1 | 678,948 |
| Unskilled workers | 7.9 | 11.3 | 13.5 | 17.9 | 29.0 | 6.9 | 2,248,371 |

NOTE: "Workers" is defined as those who are employed and working at least 50 weeks a year in a nonmilitary occupation. The major occupational categories are those in the Tier 2 classification in Section 3.7. Skilled workers include mechanical workers, carpenters, electricians, construction workers, and craftsmen. Unskilled workers include textile machine operators, metal working and transportation operators, operators, except textile, metalworking, and transportation, laborers, except farm workers.

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002445

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-3** Segregation Index of U.S.-born and Foreign-born Workers, Ages 25-64, Across 41 Occupations, by Decennial Census Year 1970-2000, and in 2012

|                | 1970 | 1980 | 1990 | 2000 | 2012 |
|----------------|------|------|------|------|------|
| All Workers    | 0.14 | 0.16 | 0.16 | 0.18 | 0.23 |
| Male Workers   | 0.14 | 0.15 | 0.14 | 0.16 | 0.21 |
| Female Workers | 0.13 | 0.17 | 0.18 | 0.20 | 0.26 |

NOTE: "Workers" is defined as those who are employed and working at least 50 weeks a year in a nonmilitary occupation.
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

for male workers (from 0.14 to 0.21). Across all three rows, the pattern is clearly in the direction of a rise in occupational segregation between foreign-born and native-born workers, perhaps reflecting the impact of growth in immigration from Mexico (see Chapter 2) and increased participation of Mexico-born immigrants in a relatively small number of service occupations.

## 3.3 EMPLOYMENT, WAGE, AND ENGLISH-LANGUAGE ASSIMILATION PROFILES

### Employment

Employment and other economic outcomes are key indicators of the pace and extent to which immigrants integrate into the United States. One of the most important labor market outcomes is the likelihood of working. One way to gain an understanding of employment trends is to examine the fraction of time worked or share of weeks worked over the year for different groups over time. Trends in mean fraction of time worked—calculated as the average number of weeks worked (including zeroes) divided by 52—for male immigrants relative to those of native-born men for ages 25-64 are given in Table 3-4. Table 3-5 presents parallel data for women.[5]

---

[5]Share of weeks worked in the year previous to the survey is an indicator of employment over the year; the variable combines the information of having worked in a particular week and being attached to the labor force over the year. Juhn and Murphy (1997) used share of weeks worked in the year previous to the survey, from the March Current Population Survey, to study trends in labor supply of married couples. Borjas (2003) investigated the impact of immigration on labor market outcomes of native-born, one of which was fraction of time worked.

Our initial calculations used the variable EMPSTAT (Employment Status) from PUMS files, which may not capture employment status of immigrants accurately for year 2000. The 2000

002446

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-4**  Mean Share of Weeks Worked by Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64

| Nativity | 1970 | 1980 | 1990 | 2000 | 2012 |
|---|---|---|---|---|---|
| Native-born | 88.8 | 83.5 | 82.7 | 82.5 | 75.9 |
| Foreign-born | 86.1 | 80.3 | 78.9 | 78.6 | 81.1 |
| Africa | 78.3 | 70.7 | 79.0 | 79.6 | 80.2 |
| Europe and Other | 87.5 | 82.7 | 81.0 | 81.6 | 80.5 |
| Other Latin America | 85.2 | 80.2 | 78.8 | 77.7 | 80.4 |
| Mexico | 82.7 | 78.7 | 76.3 | 76.2 | 82.4 |
| Other Asia | 82.0 | 71.8 | 76.0 | 78.3 | 78.0 |
| China | 82.4 | 80.3 | 78.2 | 79.4 | 79.4 |
| India | 81.5 | 86.8 | 86.2 | 85.4 | 87.9 |
| Philippines | 84.0 | 83.8 | 84.2 | 81.3 | 79.9 |
| Vietnam | 74.9 | 61.4 | 73.8 | 79.1 | 77.5 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

These data indicate that, historically, foreign-born men have lagged slightly behind native-born; however, by 2012, foreign-born men in the United States were more likely to be employed than native-born men. The share of weeks worked for both native-born and foreign-born men has generally declined over the 1970-2010 period, although immigrants from Africa, India and Vietnam are notable exceptions. By the share-of-weeks-worked metric, native-born men appear to have been disproportionately hit by the Great Recession, as is evident from the gap in native- and foreign-born men's share of weeks worked, with the latter 5.2 percentage points higher in 2012. However, the Great Recession also had an impact on immigrants in a way that is not captured by employment rates. A portion of immigrant unemployment was "exported" as foreign workers left the country; indeed, by some estimates, the unauthorized population alone declined by more than a million after 2007 (Passel and Cohn, 2014).

As shown in Table 3-5, both foreign-born and native-born women have dramatically increased their average number of weeks worked per year over the past 40 years. As with men, foreign-born women have had

---

Decennial Census may have had problems correctly classifying the employment status of people who had a job or business in the census reference week but who did not work during that week for various reasons. There is an underestimate of employment and overestimate of people not in labor force in that Census relative to the Current Population Survey's February to May 2000 sample.

For further description of the accuracy of data on employment status from the method matching the 2000 Census and the Current Population Survey, see Palumbo and Siegel (2004).

002447

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2455 of 4699 PageID #:  5620

**TABLE 3-5** Mean Share of Weeks Worked by Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64

| Nativity | 1970 | 1980 | 1990 | 2000 | 2012 |
|---|---|---|---|---|---|
| Native-born | 42.5 | 51.4 | 62.9 | 67.6 | 66.9 |
| Foreign-born | 40.9 | 47.8 | 54.1 | 55.0 | 58.7 |
| Africa | 38.5 | 45.1 | 57.2 | 60.2 | 64.4 |
| Europe and Other | 40.9 | 47.8 | 56.1 | 59.3 | 63.7 |
| Other Latin America | 49.7 | 54.5 | 59.1 | 59.6 | 64.2 |
| Mexico | 29.1 | 36.2 | 41.8 | 42.9 | 49.0 |
| Other Asia | 33.4 | 41.8 | 47.9 | 53.3 | 55.6 |
| China | 44.9 | 54.5 | 58.4 | 60.6 | 64.0 |
| India | 36.9 | 45.5 | 54.0 | 53.7 | 55.3 |
| Philippines | 51.1 | 64.9 | 73.3 | 73.0 | 74.0 |
| Vietnam | 21.1 | 41.8 | 52.7 | 62.4 | 66.1 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

lower employment prospects than U.S.-born women since 1980; in the case of women, the nativity gap in employment has generally grown over the period. These trends partly reflect the gender roles (labor force participation rates) in the immigrant countries of origin and their impact on the behavior of immigrant women in the United States. Foreign-born women have increasingly arrived from Asian and Latin American nations which, for cultural and other reasons, have lower female labor force participation rates than does the United States. Blau et al. (2011) examined women's labor supply assimilation profiles and found that foreign-born women from countries with high female labor force participation consistently work more than do immigrant women from countries with low female labor force participation, although both groups assimilate over time toward the employment patterns of native-born women.[6] Admission policies also play an important role in shaping employment rates of immigrant women. Many women are tied movers, arriving as spouses with visas that explicitly prohibit or severely limit their capacity to work in the United States. Nonetheless, data reported in Table 3-5 reveal that immigrant women, irrespective of the country or world region they are from, have made steady gains by the share-of-weeks-worked metric.

---

[6]Blau et al. (2013) investigated second generation women's labor supply, fertility, and education and found evidence of intergenerational transmission of gender roles, suggesting an impact of immigrant parental behavior on second generation behavior. Empirical analysis by Fernandez and Fogli (2009) arrived at similar conclusions.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Tables 3-6 and 3-7 report the same statistics as Tables 3-4 and 3-5, respectively, but for the age group 25-54 instead of 25-64. As expected, the younger age group displays higher shares of weeks worked. For men, the effect is larger for natives than immigrants in recent years because fewer immigrants are ages 55-64 and the focus on the younger groups thus narrows the immigrant employment advantage. For women, on the other hand,

**TABLE 3-6**  Mean Share of Weeks Worked by Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-54

| Nativity | 1970 | 1980 | 1990 | 2000 | 2012 |
|---|---|---|---|---|---|
| Native-born | 91.2 | 87.0 | 86.1 | 85.8 | 79.8 |
| Foreign-born | 88.4 | 81.8 | 80.1 | 80.0 | 83.5 |
| Africa | 78.0 | 70.2 | 79.2 | 80.1 | 81.1 |
| Europe and Other | 90.6 | 85.5 | 83.6 | 84.8 | 84.7 |
| Other Latin America | 85.9 | 81.0 | 79.4 | 79.0 | 82.4 |
| Mexico | 85.4 | 80.1 | 77.4 | 77.3 | 84.5 |
| Other Asia | 82.3 | 72.4 | 77.1 | 79.6 | 80.3 |
| China | 84.7 | 82.0 | 79.8 | 81.3 | 83.2 |
| India | 81.7 | 87.2 | 87.4 | 86.5 | 89.9 |
| Philippines | 85.8 | 86.3 | 85.8 | 83.0 | 83.0 |
| Vietnam | 71.2 | 62.6 | 75.3 | 80.8 | 80.8 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

**TABLE 3-7**  Mean Share of Weeks Worked by Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-54

| Nativity | 1970 | 1980 | 1990 | 2000 | 2012 |
|---|---|---|---|---|---|
| Native-born | 43.3 | 54.9 | 67.0 | 71.2 | 70.5 |
| Foreign-born | 42.4 | 49.7 | 56.4 | 56.8 | 60.3 |
| Africa | 38.1 | 46.1 | 58.2 | 61.7 | 65.9 |
| Europe and Other | 42.2 | 50.3 | 60.4 | 63.7 | 67.4 |
| Other Latin America | 51.7 | 55.8 | 60.5 | 61.3 | 66.0 |
| Mexico | 31.0 | 37.7 | 43.4 | 44.1 | 50.1 |
| Other Asia | 34.0 | 43.0 | 49.6 | 55.2 | 57.6 |
| China | 45.1 | 56.5 | 61.2 | 63.3 | 67.3 |
| India | 36.7 | 46.4 | 56.4 | 55.3 | 56.8 |
| Philippines | 52.7 | 68.7 | 75.9 | 75.0 | 76.2 |
| Vietnam | 21.1 | 43.2 | 55.0 | 65.3 | 70.8 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002449

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the gap in employment rates between immigrant and native-born women is wider in the younger age group than in the older one. This reflects differing patterns of employment for immigrant and native-born women of the same birth cohort.

As discussed in Section 3.2, the skill composition of new immigrants has evolved over time. Furthermore, the economy faced by new immigrants has exhibited long-term changes (for example, male labor force participation has fallen) and cyclical expansions and contractions. Thus, one would expect variation in cross-cohort shares of weeks worked at various points in time after their arrival to the United States. Tables 3-8 and 3-9 show the difference in the share of weeks worked for immigrant cohorts spaced 10 years apart, relative to the comparable cohort of native-born individuals. The approach used to analyze the share of weeks worked here is similar to that used by Borjas (2014b) to analyze wages. The regression model used to produce the estimates specifies the dependent variable as the fraction of time worked or share of weeks worked. Two models are estimated, one that controls only for age (introduced as a third order polynomial) and a second that controls for age and years of education. Both model specifications include arrival cohort dummies with the native-born group as the

**TABLE 3-8** Difference in Share of Weeks Worked for Immigrant Cohorts, Relative to Native-born Cohort, by Census Period, Men, Ages 25-64

| Arrival Cohort | Controlling for Age (cubic) Only Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | –0.107 | –0.010 | 0.005 | 0.013 | 0.022 |
| 1975-1979 | –0.183 | –0.019 | –0.019 | 0.046 | |
| 1985-1989 | –0.185 | –0.033 | 0.042 | | |
| 1995-1999 | –0.160 | 0.057 | | | |

| Arrival Cohort | Controlling for Age (cubic) and Years of Education Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | –0.101 | 0.013 | 0.030 | 0.037 | 0.050 |
| 1975-1979 | –0.164 | 0.023 | 0.020 | 0.083 | |
| 1985-1989 | –0.156 | 0.013 | 0.087 | | |
| 1995-1999 | –0.135 | 0.098 | | | |

SOURCE: Regression coefficients reported in Tables 3-20 and 3-21 (see Section 3.6).

002450

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-9** Difference in Share of Weeks Worked for Immigrant Cohorts, Relative to Native-born Cohort, by Census Period, Women, Ages 25-64

| Arrival Cohort | Controlling for Age (cubic) Only Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | −0.014 | −0.001 | −0.023 | −0.030 | −0.005 |
| 1975-1979 | −0.163 | −0.074 | −0.063 | −0.016 | |
| 1985-1989 | −0.255 | −0.131 | −0.032 | | |
| 1995-1999 | −0.295 | −0.097 | | | |

| Arrival Cohort | Controlling for Age (cubic) and Years of Education Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | 0.014 | 0.039 | 0.017 | −0.001 | 0.026 |
| 1975-1979 | −0.118 | −0.006 | −0.015 | 0.027 | |
| 1985-1989 | −0.199 | −0.070 | 0.021 | | |
| 1995-1999 | −0.256 | −0.041 | | | |

SOURCE: Regression coefficients reported in Tables 3-22 and 3-23 (see Section 3.6).

reference group. The estimated regression coefficients for cohort dummies are reported in Tables 3-8 and 3-9. These model specifications, which are estimated from five consecutive annual cross-section datasets, establish trends in the share of weeks worked for different immigrant cohorts relative to the native-born.

Looking first at the results for men in Table 3-8, one can see that shortly after arrival to the United States, and as one would expect, immigrant men—especially recent cohorts—worked fewer weeks relative to native-born men. Immigrant men who arrived before 1970 appeared to fare better in this relative comparison than cohorts that arrived from the mid-1970s onwards. Controlling for age and years of education, an immigrant male who arrived between 1965 and 1969 worked 5 weeks less than a comparatively aged native-born male, while an immigrant who arrived between 1995 and 1999 experienced a disadvantage that had grown to 7 weeks. The trends in share of weeks worked as duration of stay lengthens can also be observed for different arrival cohorts. All of the arrival cohorts experienced at least modest gains in their employment prospects with longer U.S. residence; the 1975-1979 and 1995-1999 arrival cohorts experienced especially substantial employment boosts relative to native-born men over time, even

Copyright National Academy of Sciences. All rights reserved.

just 10 years after immigrating. The panel concludes that, **for these cohorts of immigrant men, after an initial period of adjustment in which their share of weeks worked is lower than natives, they became slightly more likely to be employed than their native-born age-peers.**

This analysis of Decennial Census data is broadly consistent with what has been shown in the literature. Duncan and Trejo (2012) showed that the initial employment gap is widest among men with a high school education or less and that the difference in employment rates between immigrant and native-born men is due mainly to differences in labor force participation and not due to differences in unemployment.[7]

Immigrant women, who display a lower share of weeks worked than do immigrant men, also typically have a lower share of weeks worked than do native-born women of the same age. However, again, the Decennial Census data are consistent with the literature in showing that their probability of being employed relative to native-born women rises with length of U.S. residence (see Blau et al., 2011) despite some cyclical changes. The 1965-1969 arrival cohort appears to be an exception to the pattern of convergence, whereas the 1995-1999 cohort, which starts the furthest below its native-born age-peers, exhibits the largest observed 10-year increase in the relative share of weeks worked. This indicates that, **as immigrant women are exposed to U.S. labor market conditions and social norms, they grow increasingly likely to participate in the labor force and find employment.** Also, many immigrant women experience a change in their visa status in the first 10 years, which improves their chances of finding employment.[8]

### Wage Assimilation Profiles

Alongside employment prospects, tracing the wage trajectories of immigrants is crucial to understanding their economic well-being and their contribution to the receiving country's economy. Wage trajectories indicate the initial earnings and then the subsequent wage growth of workers as experience increases. While immigrants contribute to the economy by permitting greater specialization among workers, an immigrant's contribution will be greater if he or she finds a job in which his or her skills are fully utilized, and rising wages may be a sign of improving job match quality. Rising wages for skilled immigrants may also be a sign that they are reach-

---

[7]For definition of labor force participation, employment, and unemployment, see http://www.bls.gov/bls/cps_fact_sheets/lfp_mock.htm [November 2016].

[8]The gender distribution of persons receiving lawful permanent resident status in fiscal year 2013 is skewed toward women under the categories of Family-Sponsored and Immediate Relatives of U.S. Citizens (54.2%), while immigrants admitted under Employment based preference are more likely to be men (51%). See Annual Flow Report 2014 by Department of Homeland Security and Table 9 in U.S. Department of Homeland Security (2014).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

ing positions in which they have positive spillovers on other workers. In this section, the panel addresses this facet of the changing economic status of immigrants. The key questions are: How closely do the earnings of immigrant and native-born workers track as worker experience increases, and how has the relationship changed over time?

The earnings gap varies between men and women workers and also across immigrants' source countries. The first picture of relative wages of immigrants and natives is painted by Tables 3-10 and 3-11. These two tables use Decennial Census and ACS data to show hourly wages and annual earnings for men and women by nativity (native-born and foreign-born), with further detail by immigrant source country, but not differentiated by immigrants' length of time in the United States. The hourly wages of foreign-born men in 1970 were 3.7 percent higher than those of native-born male workers, and their annual earnings were very slightly higher. In subsequent decades, the gap reversed and widened such that, by 2012, the average hourly wage of foreign-born male workers was 10-11 percent lower than that for their native-born counterparts. For women, relative wages evolved from rough parity in 1970 to a 7 percent gap in favor of native-born women by 2012.

These averages conceal large differences among world regions and specific source countries. For foreign-born men, workers from Europe, Oceania, and Canada; India; Other Asia; and, since 1990, China perform better in terms of wages and earnings than native-born men. This is also generally true of immigrants from Africa. In contrast, immigrant workers from Latin America (including Mexico) and Vietnam earn considerably less than native-born workers, while immigrant workers from the Philippines earn about the same as, or in some years a bit less than, native-born men.

The broad outlines are similar for women, although wage and income gaps are much smaller. In general, women from Asia fare well in wage comparisons, as do women from Africa and from Europe, Oceania, and Canada, while women from Latin America, particularly Mexico, and from Vietnam tend to have lower wages than the native-born. One notable observation is that, among women, immigrants from the Philippines earn more than native-born women.

One gender difference of note involves the changing standard (that is, the native-born wages) to which immigrants' wages are being compared over time. For men, the wages of natives have been quite flat over the past few decades, and consequently the growing wage gap by nativity implies an absolute decline in the real wages and earnings of male immigrants who arrived in later decades. In contrast, the real wages of native-born women have been rising such that the widening wage gap by nativity among women is consistent with flat or rising wages of female immigrants.

A considerable literature has gone beyond the simple gap between aver-

002453

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2461 of 4699 PageID #: 5626

**TABLE 3-10** Average Hourly Wages and Earnings of Employed Foreign-born and Native-born Men, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, in 2012 Dollars

| Nativity | 1970 | | 1980 | |
|---|---|---|---|---|
| | Hourly | Annual | Hourly | Annual |
| Native-born | $30.25 | $62,398 | $32.50 | $61,522 |
| Foreign-born | 31.38 | 62,443 | 31.52 | 57,115 |
| Africa | 32.90 | 61,403 | 39.55 | 69,027 |
| Europe, Oceania, Canada, and Other | 34.32 | 69,201 | 34.77 | 66,648 |
| Other Latin America | 24.86 | 47,916 | 27.79 | 48,049 |
| Mexico | 20.37 | 38,631 | 22.31 | 35,735 |
| Other Asia | 34.41 | 68,115 | 37.73 | 63,138 |
| China | 27.16 | 55,729 | 29.95 | 57,122 |
| India | 36.82 | 68,616 | 38.95 | 78,138 |
| Philippines | 25.86 | 53,699 | 34.06 | 57,296 |
| Vietnam | 23.95 | 50,825 | 21.52 | 36,569 |

NOTE: Hourly wages are computed by dividing annual earnings from wages and self-employment income by weeks worked and average hours per week. The sample is men ages 25-64 who worked at some point in the preceding calendar year and were not enrolled in school.

age native-born and immigrant wages to examine the evolution of the gap by immigrant time spent in the United States. The literature finds that the wage gap between native-born and foreign-born workers narrows over time as the latter accumulate job experience in the U.S. labor market and invest in their skills. Chiswick (1978) pioneered this work, comparing the earnings of immigrants and native-born male workers of different ages at a point in time using data from the 1970 Decennial Census. He estimated that, at the time of arrival, immigrants earn about 17 percent less than natives and that it takes 10-15 years to close the wage gap, depending on the source country of the immigrant. Chiswick also found that immigrants often experience

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | 1990 | | 2000 | | 2012 | |
|---|---|---|---|---|---|---|
| | Hourly | Annual | Hourly | Annual | Hourly | Annual |
| | $30.99 | $60,647 | $32.80 | $65,557 | $32.00 | $65,674 |
| | 29.84 | 54,736 | 30.02 | 54,308 | 28.62 | 55,824 |
| | 34.36 | 69,100 | 33.66 | 67,018 | 35.80 | 63,101 |
| | 36.52 | 71,930 | 40.71 | 82,044 | 43.40 | 89,725 |
| | 25.81 | 45,716 | 26.20 | 45,577 | 23.42 | 43,929 |
| | 19.10 | 30,295 | 20.52 | 32,600 | 17.34 | 31,186 |
| | 34.88 | 65,476 | 36.42 | 67,684 | 33.70 | 68,155 |
| | 33.02 | 63,207 | 40.52 | 71,262 | 38.07 | 76,179 |
| | 49.46 | 86,094 | 46.47 | 93,211 | 47.63 | 99,772 |
| | 31.79 | 55,119 | 33.13 | 55,357 | 29.87 | 56,199 |
| | 24.51 | 44,433 | 28.26 | 49,102 | 27.17 | 53,630 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

faster wage growth relative to the native-born, in part because they are starting from a position that allows for catching up (that is, if their initial jobs do not reflect their earnings potential). Since Chiswick's 1978 study, the economic assimilation literature has extended the analysis to take into account changes in the attributes of successive immigrant arrival cohorts, as well as the role of immigrant age at arrival (Borjas, 1985; Borjas and Tienda, 1985; Carliner, 1980; DeFreitas, 1980; Long, 1980). These studies, based on cross-sectional data, all concluded that immigrant workers experience rapid wage growth compared to native-born workers of the same generation.

002455

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-11** Average Hourly Wages and Earnings of Employed Foreign-born and Native-born Women, by Decennial Census Year 1970-2000, and in 2012, Ages 25-64, in 2012 Dollars

| Nativity | 1970 | | 1980 | |
|---|---|---|---|---|
| | Hourly | Annual | Hourly | Annual |
| Native-born | $19.32 | $27,793 | $20.10 | $27,100 |
| Foreign-born | 19.04 | 27,320 | 20.31 | 26,501 |
| Africa | 19.04 | 27,439 | 22.55 | 29,448 |
| Europe, Oceania, Canada and Other | 19.94 | 28,482 | 20.70 | 27,056 |
| Other Latin America | 16.95 | 25,502 | 18.88 | 25,320 |
| Mexico | 14.80 | 18,207 | 15.73 | 17,814 |
| Other Asia | 19.20 | 26,626 | 20.90 | 26,331 |
| China | 19.35 | 29,146 | 19.48 | 27,559 |
| India | 28.91 | 31,371 | 25.55 | 35,882 |
| Philippines | 20.57 | 31,521 | 27.42 | 36,993 |
| Vietnam | 19.18 | 23,709 | 17.29 | 22,686 |

NOTE: Hourly wages are computed by dividing annual earnings from wages and self-employment income by weeks worked and average hours per week. The sample is women ages 25-64 years who worked at some point in the preceding calendar year and were not enrolled in school.

Borjas (1985) argued that there is an inherent weakness in estimating the dynamic process of wage assimilation using a single time-point snapshot, due to the changing skill sets of successive immigrant arrival cohorts. The Chiswick approach assumes that outcomes for immigrants who in 1970 had been in the United States for 10 years represent the likely outcomes of 1970 new arrivals 10 years later, in 1980 (or conversely, that the outcomes of new arrivals in 1970 represent the outcomes established immigrants likely had in 1960). By using census data from both 1970 and 1980, Borjas was able to look at the actual outcomes in 1980 of immigrants

002456

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | 1990 | | 2000 | | 2012 | |
|---|---|---|---|---|---|---|
| | Hourly | Annual | Hourly | Annual | Hourly | Annual |
| | $20.68 | $31,531 | $23.80 | $37,869 | $23.85 | $40,996 |
| | 20.99 | 30,691 | 22.99 | 34,214 | 22.11 | 36,333 |
| | 27.83 | 37,005 | 25.59 | 40,344 | 22.75 | 39,024 |
| | 22..98 | 33,195 | 26.55 | 41,987 | 29.45 | 48,341 |
| | 18.63 | 27,212 | 20.76 | 29,602 | 18.14 | 25,690 |
| | 13.79 | 17,027 | 16.23 | 19,702 | 12.87 | 17,865 |
| | 22.21 | 32,606 | 24.15 | 36,608 | 22.99 | 37,185 |
| | 21.60 | 35,624 | 27.75 | 44,377 | 27.86 | 49,634 |
| | 28.11 | 43,624 | 31.31 | 53,477 | 33.97 | 60,320 |
| | 26.61 | 42,105 | 29.17 | 46,317 | 27.48 | 49,914 |
| | 19.51 | 30,483 | $20.0 | 30,189 | 17.51 | 29,575 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

who had arrived in 1970, thus separating arrival cohort[9] skill effects from human capital accumulation effects on earnings growth. Borjas found that within-cohort earnings growth is slower than predicted from single-census (snapshot) regression analysis. Borjas (1995a) updated these findings by including 1990 census data, concluding that the 1980 and 1990 arrival

_____

[9]In this context, "arrival cohort" refers to a group of immigrants who arrived in the United States at the same time or during the same time period.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2465 of 4699 PageID #:  5630

**TABLE 3-12** Weekly Wage Assimilation of Male Immigrants, by Cohort (percentage difference between native-born and foreign-born wages)

| | Controlling for Age (cubic) Only Years Since Migration | | | | |
|---|---|---|---|---|---|
| Arrival Cohort | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | –0.235 | –0.120 | –0.020 | –0.014 | 0.176 |
| 1975-1979 | –0.314 | –0.185 | –0.176 | –0.136 | |
| 1985-1989 | –0.331 | –0.269 | –0.252 | | |
| 1995-1999 | –0.273 | –0.269 | | | |

| | Controlling for Age (cubic) and Years of Education Years Since Migration | | | | |
|---|---|---|---|---|---|
| Arrival Cohort | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | –0.172 | –0.030 | 0.099 | 0.133 | 0.111 |
| 1975-1979 | –0.211 | 0.011 | 0.039 | 0.069 | |
| 1985-1989 | –0.176 | –0.056 | –0.026 | | |
| 1995-1999 | –0.149 | –0.074 | | | |

NOTE: Regression coefficients reported in Section 3.6, Tables 3-24 and 3-25.

cohorts of immigrants are unlikely (and less likely than earlier cohorts) to catch up and match the wages of their native-born peers in their lifetimes.

Following Borjas (2016a), the panel investigated the rate of economic assimilation by calculating age-adjusted wage differentials between each immigrant cohort and its native-born cohort, using a regression estimated separately for each year—1970, 1980, 1990, 2000, and 2010-2012—from the Decennial Census and ACS IPUMS data. The dependent variable is the log of weekly earnings, and the regressors initially include age (introduced as a third-order polynomial, or cubic term) and arrival-cohort fixed effects, and then education as a third regressor.[10] Tables 3-12 and 3-13 show how the wages of immigrants relative to native-born workers of the same age evolve with time in the United States, computed separately for different immigrant arrival cohorts.[11] Male immigrants who arrived between 1965 and 1969 began with an initial wage disadvantage of 23.5 percent, but the gap narrowed to 12 percent 10 years after arrival. By 40 years after arrival, this immigrant arrival cohort earned 17.6 percent more per week than com-

---

[10]Age is introduced as a third-order polynomial to control for nonlinear effects of age on earnings.

[11]See Tables 3-24 through 3-27 in the Technical Annex (Section 3.6) for full regression results.

002458

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 3-13  Weekly Wage Assimilation of Female Immigrants, by Cohort (percentage difference between native-born and foreign-born wages)

| Arrival Cohort | Controlling for Age (cubic) Only Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | −0.021 | 0.068 | 0.083 | 0.023 | 0.133 |
| 1975-1979 | −0.082 | −0.002 | −0.053 | −0.031 | |
| 1985-1989 | −0.184 | −0.138 | −0.168 | | |
| 1995-1999 | −0.216 | −0.239 | | | |

| Arrival Cohort | Controlling for Age (cubic) and Years of Education Years Since Migration | | | | |
|---|---|---|---|---|---|
| | 0 | 10 | 20 | 30 | 40 |
| 1965-1969 | 0.111 | 0.173 | 0.202 | 0.133 | 0.073 |
| 1975-1979 | 0.038 | 0.201 | 0.135 | 0.142 | |
| 1985-1989 | −0.009 | 0.060 | 0.027 | | |
| 1995-1999 | −0.075 | −0.056 | | | |

NOTE: Regression coefficients reported in Section 3.6, Tables 3-26 and 3-27.

parable native-born males. Later-arriving cohorts began with a larger wage disadvantage: 31.4 percent lower than native-born males for those admitted between 1975 and 1979, 33.1 percent lower for those admitted between 1985 and 1989, and 27.3 percent lower for those admitted between 1995 and 1999. Moreover, the wage disadvantage does not disappear for these arrival cohorts, and the rate at which it narrows has slowed. For example, the 1965 cohort made up 21.5 percentage points of the gap in their first 20 years, whereas the 1975 cohort made up only 13.8 percentage points and the 1985 cohort only 7.9 percentage points.

When the panel additionally controlled for education, which allows for comparison of the degree to which immigrants catch up with their native-born peers with similar skills, the sizes of the immigrant-to-native-born wage gaps are much reduced. Moreover, it is only the two most recent arrival cohorts that have not yet closed the gap with their native-born peers with the same education. Of these two cohorts, 1985-1989 arrivals have nearly closed the gap after 20 years in the United States, earning only 2.6 percent less than natives with the same education.

002459

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Since immigrants are disproportionately low-skilled, it is also likely that growing wage inequality in the economy generally, which is associated with a widening wage gap between high- and low-skilled workers, has adversely affected immigrant entry wages and impeded their capacity to catch up to natives. Putting this somewhat differently, even if immigrant skills had remained constant, their wages relative to natives would have fallen. Borjas (1995a) examined relative wages during the 1980s (a time when low-skilled immigrant workers fared particularly poorly) and found that, although the change in wage structure accounted for some (16-17%) of the decline in the relative wages of immigrants, most of it remained and was attributable to declining educational attainment relative to natives.[12] A larger role for wage structure was obtained by Butcher and DiNardo (1998). They analyzed the role of the changing wage structure in the native-immigrant wage gap by estimating wage distributions of male and female immigrants who were recent arrivals in 1970, simulating what would have happened had they faced the wage structure obtaining in 1990. The counterfactual analysis allowed the researchers to tease out how much of the gap in native-immigrant wage distribution could be attributed to changing immigrant skills versus change in the wage structure. Depending on where a worker was along the wage distribution, the wage structure was found to have dramatic effects. For male workers at the higher end of the distribution, the wage structure changes explained 68 percent of the increase in wage gap.

The following key conclusions can be drawn from the above analyses. As their time spent in the United States lengthened, male immigrants who arrived between 1965 and 1969 experienced rapid relative growth in their wages, which allowed them to close the gap with natives. This indication of economic integration has slowed somewhat in more recent decades; the aging profile for relative wages has flattened across arrival cohorts, indicating a slowing rate of wage convergence for immigrants admitted after 1979. These overall conclusions hold after controlling for immigrants' educational attainment, although the relative wage picture for immigrants is considerably more favorable when education is controlled for.

Compared to male immigrants of the same cohort, female immigrants start off with a less dramatic wage disadvantage, particularly if earlier cohorts are considered, but they experience slower growth in their wages relative to their native-born than do male immigrants (compare Tables 3-12

---

[12]As discussed in Chapter 6, Card (2009) and Blau and Kahn (2015) examined the wage inequality-immigration relationship from the opposite direction by investigating the impact of immigration on wage inequality. Immigrants are concentrated in the tails of the skill-and-wage distribution and thus potentially increase inequality among the full population (immigrants and native-born combined) due to compositional effects. Both studies found, however, that immigration can account for only a very small share of the rise in overall U.S. wage inequality between 1980 and 2000 (Card, 2009) or between 1980 and 2010 (Blau and Kahn, 2015).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and 3-13). The 1995-1999 arrival cohort did not experience any relative wage growth during its first 10 years in the United States. Much of the wage disadvantage of female immigrants disappears, however, when years of education are accounted for (lower half of Table 3-13), indicating that education differences explain much of the wage difference for immigrant women compared with native-born women. Even the large wage disadvantage for the 1995-1999 cohort is mostly accounted for by that group's lesser educational attainment compared with native-born females. Recent trends in part reflect increasing rates of inflow of Mexican immigrants with low education during the 1990s (Borjas, 2014b).

Although the use of repeated cross-sections is a great improvement over use of a single cross-section, the fact that some immigrants return home means that estimated assimilation may inadvertently reflect a change in the composition of a cohort, rather than a trend toward wage parity for individuals within the cohort. The ideal dataset would be a longitudinal one following immigrants (and the corresponding native-born cohort) over time, yet retaining the large sample size of Decennial Census and ACS data. For this reason, Lubotsky's (2007) work on immigrant wage assimilation is of seminal importance because it is based on longitudinal data that link the 1994 Current Population Survey (CPS) with administrative Social Security records in order to trace individuals' earnings history back to 1951. That longitudinal analysis revealed smaller entry-level wage gaps and slower wage growth among immigrants (compared with native-born peers) relative to the estimates derived from cross-section data. Consistent with results derived by Trejo (2003) and Blau and Kahn (2007), Lubotsky also found a slower assimilation process for Latin American immigrants compared with immigrants with other regional origins. He attributed part of the faster wage growth found in cross-section data to the uncaptured effect of return migration of low-earning immigrants. Immigrants who stay in the United States earn more than those who decide to leave; therefore, estimates of the rate of wage convergence derived from a census or sample of immigrants who remain in the United States are biased upward.[13]

Dustmann and Görlach (2014), using estimates of out-migration rates from various cross-country empirical studies, confirmed that out-migration is not random. Emigration rates (from the receiving country) differ by source country, age at arrival in the receiving country, continuing source country ties, legal status, and economic conditions in the source country that vary over time and across place. All these factors make generaliza-

---

[13]The opposite situation will take place when high-wage earning immigrants leave, the path of wage convergence calculated from cross-section data will be biased downward. State et al., (2014) found evidence of out-migration of high-skilled workers from the United States in years following the "dot-com" crash of 2000-2002.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tions about behavior and motivation of immigrants difficult. Immigrants from developed countries are more likely to emigrate (from their receiving country) compared with immigrants from less-developed countries. Moreover, immigrants coming from poor nations are more likely to stay even if they fare poorly in the host country's labor market. There is some evidence that immigrants closer to retirement age are more likely to leave their host country, particularly if they have immediate relatives in the source country. However, hailing from economically prosperous regions of a source country improves the likelihood of staying in the host country because remittance income has superior investment opportunities. Also, refugees are less likely to leave than economic immigrants (Dustmann and Görlach, 2014).

### English-Language Proficiency and Assimilation

We suggested above that if immigrants acquire country-specific skills more rapidly than native-born workers with similar attributes, wage convergence will take place. Language skills may be particularly important. Funkhouser and Trejo (1995) found that the changing composition of immigrants accounted in part for the reduction in entry wages described above. Trejo (2003) noted that the falling average skills among U.S. immigrants relative to their native-born peers reflects the rising share from Latin America who tend not to be fluent in English upon arrival (one of the skills rewarded in the U.S. labor market). Bleakley and Chin (2004) showed a positive impact of English-language skills on earnings for individuals who immigrated to the United States as children. Analyses by Dustmann and Fabbri (2003) on immigrants to the United Kingdom and by Berman and colleagues (2000) on Soviet immigrants to Israel found that proficiency in the host country's language was positively associated with wages. Lewis (2012) used data from the 2000 Decennial Census and the 2007-2009 ACS to estimate the impact of English-language skills on relative wages of immigrants when new immigrants enter the labor market. Immigrants with advanced English-language skills suffered less negative wage impact than did immigrants with poor English-language skills. Comparing the wage gap between black immigrants and native-born blacks, Hamilton (2014) found that black immigrants from English-speaking countries eventually achieved wage parity with native-born blacks, but their counterparts from non-English-speaking countries did not.

Following Borjas (2014b), Figures 3-6 and 3-7 show the assimilation profile for English-language proficiency of male and female wage-earning immigrants by arrival cohort. The age-adjusted probability of "speaking English very well" is calculated from a linear probability model estimated separately for datasets from the Decennial Census Public Use Microdata Series for 1970-2000 and the ACS Public Use Microdata Series for 2010-

002462

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-6** Aging profile for high English-language proficiency of male immigrants (wage earners), by arrival cohort.
NOTE: Regression coefficients reported in Table 3-28 (see Section 3.6).

2012, restricting the sample to immigrants originating in countries outside the British sphere of influence.[14] The dependent variable is a dummy that is set to unity if the immigrant speaks only English or speaks English very well and is set to zero otherwise. The regressors include the worker's age (introduced as a cubic polynomial). This regression analysis gives the following results:[15]

---

[14]The intent here was to limit the sample to immigrants who had the chance to learn English over time, after arriving in the United States. The countries in the British sphere of influence are where English is widely spoken, which implies that immigrants from those source countries would be fluent in English at the time of entry into the United States. These countries are Antigua-Barbuda, Australia, Bahamas, Barbados, Belize-British Honduras, Bermuda, Canada, Dominican Republic, Grenada, Guyana/British Guiana, Ireland, Jamaica, Liberia, New Zealand, Northern Ireland, South Africa, St. Kitts-Nevis, St. Vincent, Trinidad and Tobago, and the United Kingdom.
[15]For detailed results, see Tables 3-20 through 3-23 in the Technical Annex, Section 3.6.

002463

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

- Male immigrants who arrived between 1975 and 1979 experienced a 12 percentage point increase in their fraction with English proficiency by 1990 and a 19 percentage point increase by 2012.
- The age-language proficiency profile for this arrival cohort is steeper than that of the 1985-1989 and 1995-1999 arrival cohorts.
- In the case of female immigrants, all arrival cohorts have a steeper age-language proficiency profile than male immigrants, although the general result holds that immigrants who arrived during the late 1980s and 1990s are slower in accumulating language skills than those who arrived in the late 1970s.

Figures 3-8 and 3-9 repeat the age-adjusted probability calculations but for a lower threshold of language proficiency: the probability of speaking English well (or better). These trends generally corroborate the finding discussed above that earlier cohorts of immigrants experienced more rapid language assimilation than recent cohorts. The relative slowdown of language assimilation may again be partly explained by high rates of immigra-



**FIGURE 3-7** Aging profile for high English-language proficiency of female immigrants (wage earners), by arrival cohort.
NOTE: Regression coefficients reported in Table 3-29 (see Section 3.6).

002464

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-8** Aging profile for moderate English-language proficiency of male immigrants (wage earners), by arrival cohort.
NOTE: Regression coefficients reported in Table 3-30 (see Section 3.6).

tion from Mexico during the 1990s. Lazear (2007) found that Mexicans start below immigrants from other countries in terms of English-language fluency and never catch up; in general, non-Hispanics were more fluent than Hispanics at all times after arrival in the United States. One possible explanation, articulated by Borjas (2014b, p. 35), is "immigrants who enter the country and find a large welcoming ethnic enclave have much less incentive to engage in these types of investments since they will find a large market for their pre-existing skills."

Immigration policy also plays a role in patterns of wage convergence. Specifically, immigrants who enter the United States on work visas have different assimilation profiles than those on nonwork visas. Borjas and Friedberg (2009) examined the uptick in relative entry wages of immigrants who arrived between 1995 and 2000 and conjectured that expansion of the H1-B visa program was partly responsible. Chen (2011) found that work-visa holders with science and engineering degrees earned abroad experienced a higher rate of wage growth than nonwork-visa holders with

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-9** Aging profile for moderate English-language proficiency of female immigrants (wage earners), by arrival cohort.
NOTE: Regression coefficients reported in Table 3-31 (see Section 3.6).

these degrees, but they did not reach economic parity with work-visa holders who had science and engineering degrees earned from U.S. institutions. The wage disadvantage was greater for nonwork-visa holders because they tended to concentrate in fields other than science and engineering, where there is less standardized, technical knowledge that is invariant and transferable across national boundaries. Chen also found that immigrant workers who possessed work visas upon first entry to the United States did not suffer from an earnings penalty, providing support for the notion that assimilation in these fields can be achieved without host-country-specific human capital. Chen attributed this finding to the universalism of science and engineering training and degrees (Chen, 2011). Orrenius and Zavodny (2014) investigated earnings of immigrants under Temporary Protected Status, a status typically granted if dangerous conditions are present in the immigrants' home country due to war or a natural disaster. Using ACS data from 2005-2006, the authors compared labor market outcomes of men

002466

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and women immigrants from El Salvador, Mexico, and Guatemala. Their results suggested that being given legal status, even on a temporary basis, leads to better employment prospects for women and higher earnings for men relative to other immigrants with similar skills who were not granted Temporary Protected Status.

Evidence also exists indicating that place of education and source country characteristics influence labor market outcomes of U.S. immigrants. Zeng and Xie (2004) used data from the 1990 Decennial Census and the 1993 National Survey of College Graduates to compare earnings among native-born whites, native-born Asian-Americans, Asian immigrants educated in the United States, and Asian immigrants who completed education in their home country. Earnings differences between native-born groups and U.S.-educated Asian immigrants were small to negligible; however, Asian immigrants educated abroad earned 16 percent less than their counterparts who received U.S. degrees. Blau et al. (2011) investigated the impact of source country characteristics on the participation of married immigrant women in the U.S. labor force. They found that women immigrants from countries with high female labor force participation rates not only worked a greater number of annual hours than female immigrants from countries with low female labor force participation rates, they closed the gap with native-born women in 6 to 10 years. Borjas (2016a) revisited cohort effects and found that, in addition to average educational attainment at time of entry, gross domestic product (GDP) of source country affected economic assimilation of an immigrant cohort in its first 10 years. One explanation advanced by Borjas for the positive correlation between GDP of source country and economic assimilation is that skills of immigrants from high-income industrialized economies are more easily transferable to U.S. labor markets.

### 3.4 POVERTY AND WELFARE UTILIZATION

Comparative information about income status and welfare program use by different populations is essential to understanding the balance of fiscal benefits and the burdens that immigrants and their families bring to U.S. society.[16] Examining trends related to native and immigrant poverty rates and program use over time also provides a perspective on assimilation different from but related to the trends associated with wages and employment. Because welfare programs comprise significant shares of federal, state, and local budgets, usage patterns by immigrants that differ from usage patterns of the native-born would imply that immigrants impose different fiscal burdens on these welfare programs.

---

[16] The terms "safety net" and "welfare" are used interchangeably in this section.

002467

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

By design, low-income households are more likely to access public benefits programs than are high-income households. As shown in Table 3-14 and Figure 3-10, immigrants experience higher poverty rates compared to the native-born; although, as the table indicates, this is not the case for

**TABLE 3-14** Percentage of Immigrants and Their Children in Poverty and Near Poverty, by Source Country and World Region of Birth, 2011

| | In Poverty | | In or Near Poverty | |
| --- | --- | --- | --- | --- |
| | Immigrants | Immigrants and Their U.S.-born Children | Immigrants | Immigrants and Their U.S.-born Children |
| **Country of Birth** | | | | |
| Mexico | 30.1 | 34.8 | 62.9 | 67.8 |
| Honduras | 32.7 | 34.0 | 66.4 | 66.3 |
| Guatemala | 28.5 | 31.4 | 63.2 | 66.9 |
| Dominican Republic | 21.2 | 25.7 | 49.0 | 54.8 |
| Haiti | 23.7 | 25.2 | 49.5 | 49.5 |
| Cuba | 22.9 | 24.3 | 48.7 | 49.4 |
| Ecuador | 19.2 | 22.6 | 43.0 | 46.7 |
| El Salvador | 20.3 | 22.0 | 53.2 | 56.7 |
| Laos | 13.8 | 18.0 | 32.7 | 44.0 |
| Vietnam | 17.4 | 17.6 | 37.6 | 38.3 |
| Colombia | 14.9 | 16.0 | 31.0 | 33.6 |
| Jamaica | 12.2 | 16.0 | 33.5 | 37.1 |
| Iran | 16.2 | 15.2 | 32.7 | 32.8 |
| USSR/Russia | 12.5 | 12.9 | 12.8 | 30.7 |
| China | 14.0 | 13.6 | 33.4 | 30.8 |
| Peru | 10.1 | 13.6 | 32.4 | 36.4 |
| Pakistan | 11.0 | 11.9 | 30.6 | 32.9 |
| Korea | 9.7 | 11.1 | 23.8 | 24.8 |
| Japan | 12.1 | 10.1 | 26.2 | 25.0 |
| Canada | 9.1 | 8.0 | 19.4 | 18.1 |
| Poland | 7.2 | 7.5 | 32.1 | 30.5 |
| United Kingdom | 5.6 | 7.2 | 16.9 | 21.4 |
| Germany | 6.7 | 6.8 | 23.7 | 22.4 |
| India | 6.7 | 6.2 | 15.4 | 15.5 |
| Philippines | 6.3 | 5.5 | 19.4 | 20.1 |
| **Region of Birth** | | | | |
| Middle East | 27.6 | 28.2 | 45.1 | 47.9 |

002468

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2476 of 4699 PageID #:  5641

The Economic and Fiscal Consequences of Immigration

**TABLE 3-14** Continued

| | In Poverty | | In or Near Poverty | |
|---|---|---|---|---|
| | Immigrants | Immigrants and Their U.S.-born Children | Immigrants | Immigrants and Their U.S.-born Children |
| Central America (excludes Mexico) | 25.2 | 26.8 | 56.8 | 59.1 |
| Sub-Saharan Africa | 22.9 | 24.6 | 42.9 | 46.2 |
| Caribbean | 19.4 | 22.0 | 43.4 | 46.2 |
| South America | 14.5 | 16.0 | 34.6 | 37.1 |
| East Asia | 12.4 | 12.8 | 30.0 | 30.6 |
| Europe | 9.5 | 10.1 | 27.6 | 27.8 |
| South Asia | 8.9 | 8.9 | 20.2 | 21.1 |
| **All Immigrants** | 19.9 | 23.0 | 43.6 | 47.6 |
| **All Natives** | 13.5 | | 31.1 | |
| **Children of Immigrants (<18)** | 32.1 | | 59.2 | |
| **Children of Natives (<18)** | 19.2 | | 39.3 | |

NOTE: The poverty and near-poverty percentages shown for "all natives" exclude U.S.-born children under age 18 of foreign-born fathers. "Immigrants and Their U.S.-born Children" includes U.S.-born children under age 18 of foreign-born fathers. "Near poverty" is defined as less than 200 percent of the federal poverty threshold.
SOURCE: Data from Camarota (2011, Table 10), based on the March 2011 Current Population Survey public use file.

immigrants from a subset of source countries (those toward the bottom of the list). In 2011, 19.9 percent of immigrants and 32.1 percent of children of immigrants[17] (under 18) lived in poverty, compared to 13.5 percent of native-born persons and 19.2 percent of children of native-born. Suro et al. (2011) found that, for the period 2000 to 2009, immigrants living in suburbs experienced higher rates of poverty relative to the native-born living in suburbs; but their contribution to the growth of poor populations living in these areas ("the suburbanization of poverty") was lower relative to that of the native-born.

---

[17]Immigrants are defined here as the foreign-born as identified by the nativity variable in the CPS; the category thus includes naturalized citizens, lawful permanent residents, nonimmigrant visa holders, refugees, asylees, and unauthorized immigrants.

002469

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-10** Poverty rates for all U.S. residents, natives, and immigrants, 1970-2010.
SOURCE: Reproduced from Card and Raphael (2013, Fig. 1.1, p. 5).

The primary reasons that immigrants experience higher levels of poverty than the native-born are that (as shown earlier in Tables 3-4, 3-5, 3-10, and 3-11) they are relatively less likely to be employed and they earn lower wages on average. And, as the analysis on fraction of time worked and wage assimilation in Section 3.3 shows, it takes some time for newly arrived immigrants to move up the job ladder and for the poor among them to lift themselves and their children out of poverty.

Another reason for the higher immigrant poverty rates stems from the shift in source countries away from Europe toward poorer countries in Asia and Latin America. Table 3-14, which shows the percentage of immigrants and their children in poverty and near poverty, reveals the wide variation in poverty experienced by immigrants from different countries. Poverty rates are higher for groups that form a larger proportion of the total immigrant population relative to those that comprise a smaller proportion (Table 2-1).

002470

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

For example, 34.8 percent of Mexican immigrants and their U.S.-born children live in poverty, which is more than five times the corresponding statistic for immigrants and their U.S.-born children from countries such as India and the Philippines.

Additionally, there has been a change in the sectoral structure of the economy which affects the economic opportunities of low-skilled workers, including a large share of newly arriving immigrants. The United States has shifted from an industrial-based economy to a service-based economy that predominantly generates jobs with limited opportunities for economic mobility (Chen, 2011). The modern structure of the U.S. economy, with many jobs in the service sectors and high-skilled occupations but a shrinking number in between—in combination with less than full transferability of education and experience acquired abroad—has made it difficult for low-skilled immigrants to work their way out of poverty.

Comparatively high levels of poverty among immigrant groups relative to the native-born translates into greater participation in safety net programs. Although safety net programs are aimed at low-income families, children, and the elderly, not all immigrants have access due to restrictions imposed by law. Unauthorized immigrants and individuals on nonimmigrant visas are not eligible for the Supplemental Nutrition Assistance Program (SNAP), nonemergency Medicaid, Supplemental Security Income (SSI), and Temporary Assistance for Needy Families (TANF). The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) introduced additional restrictions. The former made lawful permanent residents (LPRs) and certain other lawfully residing immigrants ineligible for federal means-tested public benefit programs (such as Medicaid) for the first 5 years after receiving the relevant status. The latter also included a provision intended to prevent states from extending in-state tuition benefits to unauthorized immigrants.[18] LPRs who were previously eligible for assistance (before the enactment of these laws) became ineligible to receive assistance under the major federal benefits programs for a period of 5 years or longer. U.S.-born children of immigrants remained eligible for all programs, as they are citizens. Refugees and asylees also remained eligible for all programs.[19] Subsequent amendments to the 1996 legislation restored benefits to legal immigrants for certain programs; for example, in 2002 SNAP eligibility was extended to qualified immigrant children without a waiting period.

---

[18]There is a difference between being eligible for a welfare program and accepting benefits (taking up welfare). Participation rate is a combination of being eligible and taking up welfare.

[19]Capps et al. (2009) used CPS data to track welfare usage by refugee and asylees families between 1994 and 2004. There were sharp declines in TANF use, Medicaid and State Children's Health Insurance Program coverage, and SNAP and SSI participation rates during that period.

002471

Copyright National Academy of Sciences. All rights reserved.

One feature of PRWORA and IIRIRA is that states were allowed the option of providing fully state-funded safety net programs to legal immigrants not covered by federal programs. For example, several states or counties provide health coverage to children and/or pregnant women without a waiting period, regardless of their immigration status (Broder and Blazer, 2011). A report by the Pew Charitable Trusts (2014b) documented that 40 states and the District of Columbia either "supplement federal benefits programs with programs funded only by the states, or take the Unborn Child or CHIPRA [Children's Health Insurance Program Reauthorization Act of 2009] options that expand the federal programs with state and federal matching funds . . . [while] only 10 states have neither provided their own programs for immigrants nor taken up one of the federal-state options to expand eligibility."

While not carrying implications of the same magnitude as factors such as education and health, use of welfare programs certainly factors into the fiscal impact of immigration. Table 3-15, updating Camarota (2011), reports welfare usage by state for immigrant households with children and households led by native-born persons with children. Overall, these data show that the immigrant households use several programs, most notably food assistance and Medicaid, at higher rates than do households led by the native-born. The states with the highest usage rates for immigrant-headed households are Louisiana (77.8%), South Dakota (73.8%), New Mexico (72.5%) and Kansas (70.6%), while for native-headed households the highest-usage states are Arkansas (59.4%), Mississippi (55.2%), New Mexico (53.3%) and Louisiana (53.0%). The gap between immigrant and native-born welfare use is largest in Colorado, Minnesota, South Dakota, and Wisconsin. In these four states, immigrant households with children have a usage rate for any welfare that is an average 33 percentage points higher than the usage rate for native-born counterparts.

This higher use of welfare programs by immigrants is attributable to their lower average incomes and larger families. Bitler and Hoynes (2013) used 1995-2010 CPS data on TANF, food stamps (SNAP), Medicaid, State Children's Health Insurance Program (SCHIP), SSI, school lunch, Low-Income Home Energy Assistance Program, and housing benefits to compare household-level participation in welfare programs between immigrant and native households with incomes less than 200 percent of the federal poverty level.[20] The authors found that, among these lower-income households with children, those led by immigrants participated in some safety net programs at lower rates than did native-led households. This was evident for the 1995-2010 period for cash welfare, food stamps, and SSI. The authors

---

[20]For the Bitler and Hoynes (2013) study, immigrant or native-born status was determined by the nativity of the household head.

002472

Copyright National Academy of Sciences. All rights reserved.

went on to report that "children who are themselves immigrants are less likely to participate in Medicaid/SCHIP across the entire time period as well, and native children of immigrant parents about as likely as children of native parents to participate" (Bitler and Hoynes, 2013, p. 16). The main exception, they noted, was in the school lunch program, where low-income immigrant households with children consistently participated at higher rates than did native-born households. Figure 3-11 summarizes results from Bitler and Hoynes (2013). Graph (a), showing any safety net participation, is higher for low-income immigrant households than for corresponding native-born households primarily because of immigrant families' higher participation in the school lunch program.[21]

Borjas (2011) also examined poverty and program participation among immigrant children[22] using 1994-2009 CPS data on cash assistance, SNAP benefits, and Medicaid received by households. The children in that study were divided into four groups: (a) U.S.-born children who have one immigrant parent (mixed parentage), (b) U.S.-born children who have two immigrant parents, (c) foreign-born children who have two immigrant parents, and (d) U.S.-born children with U.S.-born parents. The analysis revealed that, even though poverty rates[23] decreased for children (whether U.S.-born or foreign-born) with two immigrant parents between 1996 and 2000, they have increased since 2007. As shown in Figure 3-12, they have also gone up for children of the native-born but not as quickly. Also, among the four groups of children, the poverty rate was highest for foreign-born children with two immigrant parents. Children of mixed parentage had a group poverty rate not significantly different from children of two native-born parents. A similar conclusion can be drawn from the Borjas (2011) analysis of program participation rates (see Figure 3-13). U.S.-born children with two immigrant parents have the highest program participation rates among the four groups. This is not a surprising outcome, as their parents are likely to have the lowest income and, since they are U.S. born, the children are eligible for various safety net programs.

---

[21]Chapter 8 examines means-tested benefits by first, second, and third-plus generation immigrants (see Figure 8-15). The analysis there, based on 2011-2013 March CPS data, reveals that, between ages 20 and 60, the third-plus generation receives more means-tested antipoverty program benefits than either the first or second generations. Among the underlying factors are that recent arrivals do not qualify for many of these programs initially, and the second generation has a slightly more favorable socioeconomic status than does the third-plus generation. For a description of underreporting of means-tested transfer programs in the CPS and the Survey of Income and Program Participation, see Wheaton (2007).

[22]Borjas (2011) defined immigrant children as those who are foreign born and migrate to the United States with their foreign-born parents and those who are U.S. born to one or two immigrant (foreign-born) parents.

[23]The poverty rate is defined as the fraction of children in a particular group that is being raised in households where family income is below the poverty threshold.

002473

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2481 of 4699 PageID #:  5646

The Economic and Fiscal Consequences of Immigration

**TABLE 3-15** Welfare Use of Households with Children, by State, Current Population Survey 2011-2013 (in percentage)

| State | Any Welfare | | Cash Assistance | |
|---|---|---|---|---|
| | Immigrant | Native | Immigrant | Native |
| Alabama | 52.4 | 49.5 | 1.1 | 8.4 |
| Alaska | 49.2 | 38.5 | 5.4 | 4.6 |
| Arizona | 55.1 | 42.6 | 3.0 | 5.5 |
| Arkansas | 69.1 | 59.4 | 5.0 | 7.3 |
| California | 61.5 | 40.7 | 9.5 | 9.4 |
| Colorado | 62.0 | 31.4 | 3.5 | 4.6 |
| Connecticut | 45.8 | 32.4 | 3.8 | 4.1 |
| Delaware | 58.2 | 41.0 | 3.2 | 7.2 |
| District of Columbia | 63.4 | 50.5 | 3.6 | 21.1 |
| Florida | 57.3 | 42.8 | 3.4 | 4.7 |
| Georgia | 51.2 | 45.0 | 2.0 | 4.5 |
| Hawaii | 55.3 | 45.9 | 8.1 | 6.9 |
| Idaho | 64.4 | 41.0 | 1.6 | 3.7 |
| Illinois | 59.1 | 41.6 | 2.0 | 4.3 |
| Indiana | 57.6 | 44.4 | 1.0 | 5.4 |
| Iowa | 50.5 | 40.3 | 3.2 | 4.9 |
| Kansas | 70.6 | 40.8 | 2.9 | 5.5 |
| Kentucky | 60.1 | 49.6 | 2.7 | 9.1 |
| Louisiana | 77.8 | 53.0 | 5.1 | 6.9 |
| Maine | 50.8 | 45.7 | 5.6 | 9.3 |
| Maryland | 42.3 | 31.7 | 1.1 | 4.0 |
| Massachusetts | 48.6 | 34.7 | 8.1 | 9.1 |
| Michigan | 48.3 | 43.6 | 6.1 | 7.4 |
| Minnesota | 66.9 | 29.1 | 11.4 | 4.4 |
| Mississippi | 45.9 | 55.2 | 4.5 | 7.9 |
| Missouri | 54.7 | 40.1 | 1.1 | 7.3 |
| Montana | 29.4 | 45.5 | 0.0 | 6.4 |
| Nebraska | 66.0 | 33.0 | 5.0 | 4.2 |
| Nevada | 49.5 | 36.6 | 4.4 | 4.1 |
| New Hampshire | 30.3 | 26.5 | 2.8 | 3.6 |
| New Jersey | 46.4 | 28.9 | 4.1 | 5.4 |
| New Mexico | 72.5 | 53.3 | 8.8 | 6.6 |
| New York | 64.2 | 42.2 | 7.8 | 7.4 |
| North Carolina | 58.6 | 44.3 | 2.3 | 5.8 |

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2482 of 4699 PageID #:  5647

The Economic and Fiscal Consequences of Immigration

| Food Assistance | | Housing | | Medicaid | |
| --- | --- | --- | --- | --- | --- |
| Immigrant | Native | Immigrant | Native | Immigrant | Native |
| 42.8 | 38.2 | 5.1 | 4.3 | 39.5 | 41.6 |
| 31.8 | 24.1 | 5.2 | 4.7 | 41.7 | 30.0 |
| 48.9 | 30.4 | 0.9 | 2.9 | 39.4 | 34.5 |
| 57.5 | 45.4 | 5.3 | 4.9 | 59.9 | 51.3 |
| 48.0 | 28.2 | 4.2 | 4.9 | 49.2 | 32.0 |
| 49.3 | 20.8 | 9.1 | 3.8 | 46.4 | 25.1 |
| 28.3 | 20.6 | 3.4 | 6.6 | 39.6 | 27.6 |
| 37.9 | 28.7 | 5.6 | 8.1 | 45.0 | 34.8 |
| 46.7 | 40.0 | 8.6 | 24.0 | 53.7 | 46.0 |
| 43.5 | 30.4 | 1.8 | 3.3 | 43.5 | 33.6 |
| 40.3 | 34.4 | 0.5 | 4.7 | 37.2 | 34.0 |
| 38.5 | 29.2 | 13.8 | 8.7 | 41.4 | 39.3 |
| 56.7 | 33.1 | 2.1 | 4.2 | 42.7 | 32.1 |
| 43.0 | 29.7 | 0.8 | 5.1 | 49.7 | 35.2 |
| 46.6 | 33.1 | 4.0 | 8.9 | 37.8 | 37.4 |
| 37.8 | 28.9 | 0.8 | 1.8 | 37.9 | 34.0 |
| 61.7 | 31.9 | 6.6 | 6.6 | 51.3 | 30.7 |
| 51.1 | 39.4 | 7.1 | 5.1 | 50.1 | 40.8 |
| 55.8 | 39.5 | 3.0 | 6.5 | 59.5 | 46.5 |
| 37.5 | 33.3 | 28.0 | 5.3 | 47.0 | 40.9 |
| 32.7 | 20.1 | 1.9 | 4.3 | 31.2 | 25.2 |
| 32.4 | 22.5 | 13.0 | 7.5 | 44.5 | 31.2 |
| 34.9 | 33.1 | 2.3 | 4.4 | 43.4 | 36.6 |
| 54.3 | 19.3 | 12.2 | 3.5 | 54.2 | 23.5 |
| 38.1 | 46.1 | 0.0 | 7.9 | 26.4 | 43.5 |
| 37.6 | 29.5 | 6.5 | 5.2 | 47.8 | 30.9 |
| 23.6 | 32.9 | 7.5 | 7.6 | 19.5 | 35.9 |
| 58.0 | 24.9 | 13.6 | 4.3 | 38.9 | 23.5 |
| 42.1 | 28.5 | 2.9 | 5.6 | 25.3 | 22.8 |
| 18.7 | 13.6 | 2.0 | 2.3 | 21.5 | 23.3 |
| 30.3 | 18.1 | 4.3 | 5.1 | 37.5 | 24.1 |
| 57.4 | 35.9 | 9.3 | 5.6 | 62.3 | 44.6 |
| 44.0 | 27.9 | 8.5 | 9.2 | 55.3 | 34.5 |
| 50.0 | 35.0 | 4.0 | 5.0 | 49.4 | 37.1 |

*continued*

002475

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-15** Continued

| State | Any Welfare | | Cash Assistance | |
|---|---|---|---|---|
| | Immigrant | Native | Immigrant | Native |
| North Dakota | 30.7 | 34.9 | 0.0 | 3.9 |
| Ohio | 66.5 | 44.2 | 4.6 | 7.8 |
| Oklahoma | 57.4 | 52.3 | 2.2 | 6.7 |
| Oregon | 51.9 | 44.3 | 4.9 | 6.7 |
| Pennsylvania | 46.2 | 42.2 | 3.8 | 6.5 |
| Rhode Island | 64.1 | 38.7 | 4.6 | 8.6 |
| South Carolina | 56.1 | 46.5 | 1.2 | 6.0 |
| South Dakota | 73.8 | 41.8 | 7.4 | 5.9 |
| Tennessee | 58.1 | 46.8 | 4.9 | 7.8 |
| Texas | 63.7 | 44.2 | 2.8 | 5.3 |
| Utah | 57.0 | 32.1 | 2.2 | 3.5 |
| Vermont | 57.5 | 52.5 | 8.9 | 7.7 |
| Virginia | 34.3 | 28.5 | 2.2 | 4.7 |
| Washington | 63.5 | 41.7 | 7.1 | 4.3 |
| West Virginia | 27.1 | 49.9 | 20.3 | 8.5 |
| Wisconsin | 67.9 | 36.9 | 5.7 | 4.8 |
| Wyoming | 56.9 | 35.8 | 0.0 | 4.3 |
| | | | | |
| TOTAL | 58.2 | 41.8 | 5.5 | 6.3 |

NOTES: Current Population Survey data for 2011, 2012, and 2013, restricted to households with at least one child under the age of 18. Immigrant households are based on the head of household's immigrant status (where the head of household is considered immigrant if they are not a citizen or are a naturalized citizen). "Any welfare" encompasses cash assistance (SSI and

002476

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | Food Assistance | | Housing | | Medicaid | |
|---|---|---|---|---|---|---|
| | Immigrant | Native | Immigrant | Native | Immigrant | Native |
| | 21.5 | 23.9 | 2.3 | 6.6 | 21.5 | 25.2 |
| | 55.9 | 34.9 | 3.3 | 5.5 | 55.8 | 35.1 |
| | 43.8 | 39.3 | 0.0 | 4.8 | 48.8 | 41.4 |
| | 44.4 | 33.6 | 3.1 | 3.9 | 39.6 | 36.2 |
| | 33.2 | 28.3 | 2.0 | 5.4 | 34.6 | 36.2 |
| | 51.3 | 27.7 | 10.8 | 9.6 | 50.2 | 33.4 |
| | 44.0 | 37.9 | 2.0 | 5.0 | 35.7 | 35.2 |
| | 56.6 | 33.0 | 15.8 | 8.4 | 61.1 | 33.9 |
| | 43.2 | 35.5 | 7.8 | 4.1 | 45.1 | 39.4 |
| | 55.2 | 34.6 | 1.8 | 5.8 | 45.6 | 33.9 |
| | 47.7 | 24.6 | 5.4 | 3.4 | 33.9 | 20.1 |
| | 33.1 | 31.0 | 21.2 | 4.6 | 47.7 | 47.9 |
| | 24.1 | 21.1 | 1.4 | 5.3 | 27.0 | 21.8 |
| | 52.8 | 30.4 | 8.7 | 3.8 | 55.2 | 33.2 |
| | 10.3 | 37.6 | 6.4 | 4.3 | 27.1 | 40.5 |
| | 59.2 | 25.8 | 1.7 | 3.2 | 50.4 | 32.4 |
| | 46.3 | 24.4 | 4.0 | 5.1 | 48.5 | 29.0 |
| | | | | | | |
| | 45.3 | 30.6 | 4.2 | 5.3 | 45.7 | 33.8 |

TANF), food assistance (WIC, free or reduced-price school lunch, and food stamps), housing assistance (public housing and rent subsidies), and Medicaid.
SSI = Supplemenal Security Income; TANF = Temporary Assistance for Needy Families; WIC = Special Supplemental Nutrition Program for Women, Infants, and Children.
SOURCE: Panel's calculations from Current Population Survey 2011-2013 data.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

130



Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-11** Safety net participation as fraction of households (Y axis) with incomes less than 200 percent of the federal poverty level.

NOTE: Calculations are from the 1995–2010 Annual Social and Economic Supplement data of the Current Population Survey. Sample included children under 18 with household income below 200% of poverty level. Program participation was measured at the household level. Any safety net program participation means someone in the household (1) participated in public assistance, food stamps (SNAP), Medicaid, free or reduced-price school lunch, Supplemental Security Income, or public housing or (2) received a rental subsidy from the government or energy assistance. Figures are weighted. Shaded areas refer to annual periods of labor market contraction. See source text for explanation of the weighting applied to the data shown in the graphs and further details of the analytical methodology.

SOURCE: Bitler and Hoynes (2013, Figs. 11.3–11.8, pp. 333–338).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-12** Trends in poverty rate of children, 1994-2009.
SOURCE: Borjas (2011, Fig. 2, p. 251). The author's calculations are based on data from the 1994-2009 March Current Population Survey administrations. The poverty rate is the percentage of households with incomes below the poverty threshold.

## 3.5 CONCLUSIONS

This chapter examined how trends in the skills of immigrants—particularly their education and experience—compare to those of the native-born population. The relative skill compositions of the two populations are an important determinant of the economic consequences of immigration, along with the magnitude of immigrant inflows and the share of immigrants likely to increase the productivity of other workers. The chapter also described how employment rates and wages of immigrants have compared with those of the native-born population.

Although the native-born population increased during the period of analysis, the total foreign-born population size expanded much more, resulting in an increase in the share of the foreign-born in the total population. And, aside from children younger than age 15, the foreign-born population changed from being a relatively old population in 1970 to being a relatively young population, with a peak concentration of persons ages 25-34 in 2012.

Education levels of immigrant arrival cohorts have been steadily rising over time, a trend observed for both men and women. That said, as explored

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 3-13**  Trends in program participation of children, 1994-2009.
SOURCE: Borjas (2011, Fig. 3, p. 253). Author's calculations are based on data
from 1994-2009 March CPS administrations. The program participation rate gives
the fraction of children living in households that received cash assistance, Supple-
mental Nutrition Assistance Program (SNAP) benefits, or Medicaid (in the top
panel), or cash assistance and SNAP benefits (in the bottom panel).

in Chapter 5, the impact of immigration on the wages and employment of
the native-born population is most directly related to *relative* education
levels. While there is a consistent gap in educational attainment between
the native-born and the foreign-born, with the former enjoying the advan-
tage, there is a trend toward convergence between the two groups in the
average education levels for adults ages 25-34—a category in which about
half of recent immigrants in each year fall. In 1970, the mean education
for persons ages 25-34 was 12.1 (years of education) for the native-born
and 11.6 for a recently arrived immigrant; by 1980, the gap had expanded
from 0.5 years to 1.8 years, with mean years of education of 13.1 and
11.9, respectively. By 2012, the gap narrowed substantially to 0.3 years,

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

with a mean of 13.7 years of education for the native-born and 13.4 for the recently arrived foreign-born. Across all age groups combined, however, no such convergence in educational attainment is observed.

Over this period, the educational attainment of the foreign-born population has consistently been more varied than that of the native-born population. This contrast is particularly pronounced for young adults. In 1970, 41 percent of the foreign-born ages 30-34 had not completed high school, compared to 30 percent of the native-born. In the same age group, also in 1970, the foreign-born population had 11 percent with more than college education, compared to the native-born at 6 percent. In 2012, again restricting to individuals ages 30-34, 29 percent of the foreign-born had less than high school education, compared to 8 percent of the native-born. At the high end, 13 percent of the foreign-born, versus 11 percent of the native-born, had more than college education.

Occupational sorting has also changed in recent decades. While foreign-born workers are overrepresented in high-level professional groups that require the most education (such as scientists, engineers, and architects), they are underrepresented among other professionals, managers, and sales personnel. It is interesting to note that growth in the share of foreign-born workers in these occupations has been slower than growth in the share of foreign-born workers in the general labor force, resulting in a relative decline of foreign-born workers in these relatively high-status occupations.

Employment outcomes provide one indication of the pace and extent to which immigrants integrate into the United States. Shortly after arrival in the United States, immigrant men—especially recent cohorts—experience a disadvantage relative to native-born men in terms of the probability of being employed. However, for cohorts of immigrants arriving since the 1970s, after this initial period of adjustment in which their probability of employment is lower, they became slightly more likely to be employed than their native-born peers. The higher employment rate among immigrant men is mainly represented in the population with education of a high school degree or less, and the difference in employment ratios between immigrant and native-born men is due mainly to differences in labor force participation and not to unemployment. Immigrant women display lower employment rates than immigrant men and, typically, lower rates than native-born women. However, their probability of being employed relative to native-born women also rises appreciably after 10 years of U.S. residence, as immigrant women are exposed to U.S. labor market conditions and social norms and as some experience changes in their visa status, which improves their chances of finding employment.

On the wage front, as their time spent in the U.S. workforce extends, immigrants tend to catch up with their native-born peers. Male immigrants who arrived between 1965 and 1969 experienced rapid growth in their

002482

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

relative wages, which allowed them to close the gap with native-born peers. This indication of economic integration has shown signs of slowing in more recent decades. The relative wage profile has flattened somewhat across recent arrival cohorts, indicating a slowing rate of wage convergence. This overall conclusion holds after controlling for immigrants' educational attainment, although the relative wage picture for immigrants is considerably more favorable when education is controlled for. Compared to male immigrants, female immigrants start off with a less dramatic wage disadvantage, but they experience slower growth in their wages relevant to native-born peers than do male immigrants.

Regarding poverty and program participation, a key change since *The New Americans* report (National Research Council, 1997) was welfare reform that restricted program access to some immigrants. One implication of that legislation for immigrants has been a lowering of participation rates in means-tested programs, which impacts their capacity to navigate through challenging economic times. The Great Recession of 2007-2009 and subsequent slow recovery, combined with the changing sectoral composition of the economy, has created difficult economic conditions for immigrants and the native-born alike, especially those at the low-skilled end of the labor spectrum.

002483

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## 3.6  TECHNICAL ANNEX OF TABULATIONS
## AND REGRESSION RESULTS

**TABLE 3-16**  Educational Attainment of Male Immigrants, Ages 25 and Older, by Decennial Census Year 1970-2000, and in 2012

|  | Immigrants in 1970 (%) | Immigrants in 1980 (%) | Immigrants in 1990 (%) | Immigrants in 2000 (%) | Immigrants in 2012 (%) |
|---|---|---|---|---|---|
| Less than High School | 47 | 37 | 37 | 36 | 27 |
| High School Diploma / GED | 15 | 16 | 17 | 17 | 20 |
| Some College | 11 | 18 | 17 | 14 | 14 |
| Bachelor's Degree | 9 | 12 | 15 | 17 | 21 |
| Graduate Education | 19 | 18 | 15 | 16 | 18 |
| N (all attainment levels) | 426,700 | 787,420 | 1,258,276 | 2,022,420 | 1,853,249 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

**TABLE 3-17**  Educational Attainment of Female Immigrants, Ages 25 and Older, by Decennial Census Year 1970-2000, and in 2012

|  | Immigrants in 1970 (%) | Immigrants in 1980 (%) | Immigrants in 1990 (%) | Immigrants in 2000 (%) | Immigrants in 2012 (%) |
|---|---|---|---|---|---|
| Less than High School | 54 | 44 | 40 | 35 | 25 |
| High School Diploma / GED | 23 | 22 | 20 | 19 | 20 |
| Some College | 10 | 16 | 17 | 16 | 16 |
| Bachelor's Degree | 7 | 10 | 15 | 18 | 24 |
| Graduate Education | 6 | 9 | 8 | 12 | 15 |
| N (all attainment levels) | 506,333 | 812,320 | 1,267,141 | 1,972,390 | 2,057,872 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002484

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-18** Share of Foreign-born Male Workers (percentage), Ages 25-64, by Occupational Category, by Decennial Census Year 1970-2000, and in 2012

| Occupation | Share of Male Workers in Occupation Who are Foreign Born | | | | | Share of All Male Workers with a Bachelor's or Higher Degree in 2012 |
| | 1970 | 1980 | 1990 | 2000 | 2012 | |
|---|---|---|---|---|---|---|
| Across All Occupations | 4.8 | 6.2 | 8.6 | 11.8 | 18.7 | 34.6 |
| Occupation | | | | | | |
| Lawyers and judges | 2.5 | 2.2 | 2.8 | 3.6 | 5.2 | 99.1 |
| Physicians, dentists, and related | 11.5 | 14.2 | 14.5 | 18.3 | 22.6 | 98.4 |
| Mathematicians | 6.7 | 8.6 | 9.4 | 16.5 | 21.4 | 96.5 |
| Postsecondary teachers | 11.0 | 11.4 | 15.9 | 17.8 | 26.2 | 95.6 |
| Preschool and elementary teachers | 3.0 | 2.9 | 4.0 | 5.5 | 6.4 | 95.5 |
| Physical scientists | 10.0 | 10.5 | 12.1 | 21.8 | 28.7 | 95.0 |
| Life scientists | 9.5 | 7.2 | 10.4 | 19.5 | 28.9 | 93.5 |
| Architects | 7.5 | 9.4 | 11.2 | 11.5 | 18.3 | 89.1 |
| Social and recreation workers | 4.0 | 4.3 | 5.6 | 8.2 | 10.4 | 88.5 |
| Librarians, archivists, and curators | 6.5 | 8.2 | 7.5 | 8.0 | 8.4 | 86.6 |
| Accountants and financial analysts | 4.1 | 5.9 | 7.8 | 9.4 | 12.7 | 81.0 |
| Engineers | 6.8 | 9.4 | 11.7 | 15.2 | 19.5 | 79.8 |
| Secondary, vocational, and adult ed. Teachers | 2.8 | 3.5 | 5.3 | 5.8 | 8.2 | 75.7 |
| Religious workers | 5.3 | 4.9 | 5.8 | 8.1 | 11.9 | 75.2 |
| Administrators and public officers | 2.2 | 3.0 | 4.1 | 6.3 | 7.8 | 72.9 |
| Nurses, dieticians, therapists | 4.5 | 6.1 | 8.0 | 12.3 | 18.7 | 68.0 |

continued

002485

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

138

**TABLE 3-18** Continued

| | Share of Male Workers in Occupation Who are Foreign Born | | | | | | | Share of All Male Workers with a Bachelor's or Higher Degree in 2012 |
|---|---|---|---|---|---|---|---|---|
| | 1970 | 1980 | 1990 | 2000 | 2012 | | | |
| Social scientists | 6.6 | 7.3 | 7.2 | 10.4 | 13.9 | | | 67.2 |
| Computer specialists | 4.4 | 6.6 | 10.0 | 17.2 | 23.5 | | | 66.5 |
| Writers, artists, and media workers | 7.0 | 7.2 | 8.0 | 9.8 | 12.4 | | | 60.9 |
| Managers and proprietors | 4.6 | 5.8 | 7.6 | 9.7 | 13.7 | | | 54.3 |
| Sales workers, retail | 5.2 | 5.3 | 8.8 | 11.4 | 17.1 | | | 50.2 |
| Secretaries | 5.5 | 7.1 | 8.3 | 9.8 | 14.5 | | | 37.8 |
| All other technicians | 4.7 | 5.5 | 7.8 | 8.0 | 10.8 | | | 35.1 |
| Bookkeepers | 6.0 | 9.1 | 12.3 | 14.0 | 16.6 | | | 33.5 |
| Health service workers | 4.1 | 8.5 | 11.9 | 16.7 | 24.0 | | | 32.6 |
| Sales workers | 3.4 | 4.5 | 6.6 | 7.7 | 10.9 | | | 32.3 |
| Clerical workers | 3.7 | 5.1 | 7.6 | 10.4 | 14.9 | | | 26.9 |
| Protective service workers | 1.7 | 2.6 | 3.3 | 4.9 | 7.1 | | | 25.7 |
| Health technicians | 8.6 | 11.8 | 12.5 | 12.4 | 16.3 | | | 19.0 |
| Personal service workers and barbers | 10.5 | 12.7 | 15.7 | 19.0 | 28.9 | | | 17.6 |
| Farmers and farm laborers, incl. forestry and fishing | 2.7 | 3.9 | 7.5 | 14.5 | 26.9 | | | 13.4 |
| Cleaning service and food service workers | 10.5 | 14.2 | 20.2 | 25.2 | 35.5 | | | 9.1 |
| Craftsmen | 5.1 | 6.7 | 9.2 | 13.0 | 20.4 | | | 8.9 |
| Electricians | 3.6 | 3.8 | 5.3 | 7.0 | 12.0 | | | 7.9 |
| Construction workers | 4.6 | 5.6 | 8.4 | 12.0 | 25.5 | | | 7.2 |

002486

Copyright National Academy of Sciences. All rights reserved.

| | | | | | |
|---|---|---|---|---|---|
| Operators, except textile, metalworking, and transportation | 5.6 | 7.1 | 9.3 | 12.4 | 19.6 | 7.2 |
| Mechanical workers | 4.0 | 5.1 | 6.6 | 9.0 | 14.5 | 7.1 |
| Textile machine operators | 13.3 | 18.1 | 23.6 | 32.0 | 49.0 | 6.8 |
| Carpenters | 7.3 | 7.5 | 8.6 | 12.6 | 28.1 | 6.3 |
| Metalworking and transportation operators | 3.3 | 4.6 | 7.0 | 10.6 | 20.1 | 5.9 |
| Laborers, except farm | 5.0 | 7.8 | 11.8 | 18.6 | 32.8 | 5.7 |

NOTE: "Workers" is defined as those who are employed and work at least 50 weeks a year in a nonmilitary occupation. Occupational categories are the Tier 1 categories in Section 3.7, Technical Annex on Occupational Categories.
SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002487

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

140

TABLE 3-19 Share of Foreign-born Female Workers (percentage), Ages 25-64, by Occupational Category, by Decennial Census Year 1970-2000, and in 2012

| | Share of Female Workers in Occupation Who Are Foreign Born | | | | | Share of All Female Workers with a Bachelor's or Higher Degree in 2012 |
| --- | --- | --- | --- | --- | --- | --- |
| | 1970 | 1980 | 1990 | 2000 | 2012 | |
| Across all occupations | 5.4 | 6.7 | 8.0 | 10.2 | 15.8 | 36.5 |
| Occupations | | | | | | |
| Lawyers and judges | 5.0 | 3.3 | 4.2 | 5.5 | 8.2 | 97.5 |
| Physical scientists | 18.0 | 16.2 | 16.6 | 27.9 | 30.8 | 97.2 |
| Life scientists | 9.4 | 13.4 | 12.7 | 24.1 | 32.2 | 96.8 |
| Architects | 21.1 | 14.0 | 15.6 | 18.0 | 21.4 | 94.9 |
| Postsecondary teachers | 8.8 | 8.2 | 10.8 | 11.8 | 18.9 | 94.3 |
| Physicians, dentists, and related | 29.4 | 28.4 | 20.3 | 22.5 | 23.1 | 92.6 |
| Social and recreation workers | 4.1 | 3.8 | 4.6 | 6.5 | 8.6 | 88.1 |
| Mathematicians | 6.6 | 7.4 | 11.8 | 15.4 | 23.3 | 87.7 |
| Preschool and elementary teachers | 2.1 | 3.1 | 4.1 | 5.4 | 7.2 | 87.6 |
| Librarians, archivists, and curators | 6.1 | 5.7 | 6.2 | 6.6 | 6.7 | 86.9 |
| Engineers | 6.5 | 9.1 | 10.6 | 18.1 | 25.3 | 85.4 |
| Secondary, vocational, and adult ed teachers | 3.6 | 4.0 | 4.7 | 5.7 | 8.5 | 81.2 |
| Administrators and public officers | 2.7 | 3.2 | 4.1 | 5.4 | 7.8 | 72.0 |
| Social scientists | 5.3 | 6.8 | 6.2 | 9.2 | 10.9 | 70.6 |
| Writers, artists, and media workers | 7.0 | 6.4 | 6.4 | 8.2 | 11.1 | 68.2 |
| Religious workers | 5.2 | 4.7 | 5.4 | 6.2 | 8.3 | 66.1 |
| Computer specialists | 4.7 | 7.0 | 9.9 | 14.5 | 21.8 | 64.7 |
| Nurses, dieticians, therapists | 5.5 | 7.3 | 8.0 | 10.1 | 13.2 | 60.5 |
| Accountants and financial analysts | 4.8 | 6.8 | 7.7 | 10.3 | 14.7 | 59.9 |

002488

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2496 of 4699 PageID #:  5661

| | | | | | |
|---|---|---|---|---|---|
| Managers and proprietors | 5.0 | 5.3 | 5.9 | 7.7 | 11.0 | 52.3 |
| Sales workers, retail | 5.3 | 6.3 | 8.8 | 10.8 | 16.8 | 41.4 |
| All other technicians | 4.7 | 6.6 | 7.4 | 8.6 | 12.5 | 38.6 |
| Health service workers | 5.1 | 6.7 | 9.4 | 12.7 | 19.1 | 27.2 |
| Protective service workers | 3.5 | 3.9 | 3.7 | 5.3 | 7.1 | 27.2 |
| Sales workers | 4.6 | 6.0 | 6.8 | 8.4 | 12.0 | 22.8 |
| Clerical workers | 4.1 | 5.2 | 6.1 | 7.3 | 10.9 | 20.1 |
| Secretaries | 4.1 | 4.2 | 4.8 | 5.5 | 7.5 | 18.6 |
| Construction workers | 5.2 | 5.7 | 7.2 | 9.3 | 16.0 | 18.1 |
| Mechanical workers | 3.7 | 4.7 | 5.9 | 7.9 | 13.3 | 17.7 |
| Farmers and farm laborers, including forestry and fishing | 3.8 | 4.6 | 8.4 | 17.2 | 32.6 | 16.4 |
| Bookkeepers | 4.3 | 4.6 | 5.9 | 7.0 | 9.7 | 15.3 |
| Electricians | 3.1 | 5.9 | 7.9 | 10.5 | 11.7 | 13.8 |
| Personal service workers and barbers | 6.5 | 9.9 | 13.8 | 14.6 | 26.5 | 12.0 |
| Craftsmen | 5.9 | 9.7 | 13.1 | 17.7 | 27.0 | 11.0 |
| Carpenters | 6.9 | 7.2 | 8.7 | 11.5 | 20.3 | 10.8 |
| Health technicians | 8.8 | 7.8 | 6.9 | 8.0 | 10.8 | 7.9 |
| Laborers, except farm | 5.0 | 8.9 | 9.7 | 16.1 | 28.7 | 7.5 |
| Cleaning service and food service workers | 6.3 | 10.0 | 13.6 | 20.4 | 35.6 | 7.4 |
| Operators, except textile, metalworking, and transportation | 6.7 | 10.3 | 13.4 | 17.7 | 30.7 | 7.1 |
| Metalworking and transportation operators | 5.6 | 5.9 | 5.7 | 6.3 | 11.7 | 6.2 |
| Textile machine operators | 11.0 | 16.3 | 20.4 | 30.5 | 50.5 | 6.1 |

NOTE: "Workers" is defined as those who are employed and work at least 50 weeks a year in a nonmilitary occupation. Occupational categories are the Tier 1 categories in Section 3.7, Technical Annex on Occupational Categories.

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

142

TABLE 3-20 Difference in Share of Weeks Worked for Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) Only

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -0.158 | 0.001 |
| 2005-2009 | | | | | | | | | 0.011 | 0.001 |
| 2000-2004 | | | | | | | | | 0.056 | 0.001 |
| 1995-1999 | | | | | | | -0.160 | 0.001 | 0.057 | 0.001 |
| 1990-1994 | | | | | | | -0.047 | 0.001 | 0.044 | 0.000 |
| 1985-1989 | | | | | -0.185 | 0.001 | -0.033 | 0.001 | 0.042 | 0.000 |
| 1980-1984 | | | | | -0.048 | 0.001 | -0.032 | 0.000 | 0.042 | 0.000 |
| 1975-1979 | | | -0.183 | 0.001 | -0.019 | 0.001 | -0.019 | 0.000 | 0.046 | 0.000 |
| 1970-1974 | | | -0.025 | 0.001 | -0.016 | 0.000 | -0.011 | 0.000 | 0.034 | 0.001 |
| 1965-1969 | -0.107 | 0.001 | -0.010 | 0.000 | 0.005 | 0.000 | 0.012 | 0.001 | 0.022 | 0.001 |
| 1960-1964 | 0.000 | 0.001 | 0.005 | 0.000 | 0.021 | 0.000 | 0.018 | 0.002 | 0.033 | 0.001 |
| 1950-1959 | 0.014 | 0.000 | 0.019 | 0.000 | 0.034 | 0.001 | 0.024 | 0.002 | 0.038 | 0.002 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 3-21 Difference in Share of Weeks Worked for Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) and Years of Education

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -0.158 | 0.001 |
| 2005-2009 | | | | | | | | | 0.040 | 0.008 |
| 2000-2004 | | | | | | | | | 0.098 | 0.012 |
| 1995-1999 | | | | | | | -0.135 | 0.003 | 0.098 | 0.012 |
| 1990-1994 | | | | | | | -0.011 | 0.006 | 0.086 | 0.012 |
| 1985-1989 | | | | | -0.156 | 0.003 | 0.013 | 0.008 | 0.087 | 0.013 |
| 1980-1984 | | | | | -0.008 | 0.005 | 0.012 | 0.008 | 0.085 | 0.013 |
| 1975-1979 | | | -0.164 | 0.001 | 0.023 | 0.006 | 0.019 | 0.007 | 0.083 | 0.011 |
| 1970-1974 | | | 0.004 | 0.002 | 0.026 | 0.006 | 0.027 | 0.008 | 0.077 | 0.014 |
| 1965-1969 | -0.101 | 0.000 | 0.013 | 0.002 | 0.030 | 0.004 | 0.037 | 0.006 | 0.050 | 0.010 |
| 1960-1964 | 0.008 | 0.000 | 0.017 | 0.001 | 0.035 | 0.002 | 0.030 | 0.004 | 0.039 | 0.003 |
| 1950-1959 | 0.023 | 0.000 | 0.026 | 0.001 | 0.043 | 0.003 | 0.030 | 0.004 | 0.032 | 0.002 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-22** Difference in Share of Weeks Worked for Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) Only

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -0.369 | 0.002 |
| 2005-2009 | | | | | | | | | -0.208 | 0.002 |
| 2000-2004 | | | | | | | | | -0.131 | 0.001 |
| 1995-1999 | | | | | | | -0.295 | 0.002 | -0.097 | 0.001 |
| 1990-1994 | | | | | | | -0.173 | 0.001 | -0.063 | 0.000 |
| 1985-1989 | | | | | -0.255 | 0.001 | -0.131 | 0.001 | -0.031 | 0.000 |
| 1980-1984 | | | | | -0.111 | 0.001 | -0.086 | 0.000 | -0.010 | 0.001 |
| 1975-1979 | | | -0.163 | 0.001 | -0.074 | 0.000 | -0.063 | 0.001 | -0.016 | 0.002 |
| 1970-1974 | | | -0.033 | 0.001 | -0.053 | 0.000 | -0.049 | 0.001 | -0.022 | 0.002 |
| 1965-1969 | -0.014 | 0.000 | -0.001 | 0.000 | -0.023 | 0.000 | -0.030 | 0.001 | -0.005 | 0.002 |
| 1960-1964 | 0.004 | 0.000 | -0.009 | 0.000 | -0.014 | 0.000 | -0.025 | 0.002 | -0.002 | 0.002 |
| 1950-1959 | -0.011 | 0.000 | -0.011 | 0.000 | -0.016 | 0.001 | -0.016 | 0.002 | 0.015 | 0.002 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-23 Difference in Share of Weeks Worked for Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) and Years of Education

| | Census | | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | | -0.353 | 0.001 |
| 2005-2009 | | | | | | | | | | -0.170 | 0.003 |
| 2000-2004 | | | | | | | | | | -0.075 | 0.006 |
| 1995-1999 | | | | | | | -0.256 | 0.002 | | -0.041 | 0.007 |
| 1990-1994 | | | | | | | -0.117 | 0.004 | | -0.005 | 0.008 |
| 1985-1989 | | | | | -0.200 | 0.005 | -0.070 | 0.005 | | 0.021 | 0.008 |
| 1980-1984 | | | | | -0.042 | 0.007 | -0.030 | 0.006 | | 0.038 | 0.008 |
| 1975-1979 | | | -0.118 | 0.002 | -0.006 | 0.007 | -0.015 | 0.005 | | 0.027 | 0.008 |
| 1970-1974 | | | 0.017 | 0.003 | 0.007 | 0.005 | -0.005 | 0.006 | | 0.023 | 0.009 |
| 1965-1969 | 0.014 | 0.000 | 0.039 | 0.003 | 0.017 | 0.005 | -0.001 | 0.005 | | 0.025 | 0.008 |
| 1960-1964 | 0.027 | 0.000 | 0.017 | 0.002 | 0.011 | 0.004 | -0.006 | 0.005 | | 0.009 | 0.005 |
| 1950-1959 | 0.009 | 0.001 | 0.007 | 0.002 | 0.003 | 0.004 | -0.004 | 0.005 | | 0.014 | 0.005 |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-24 Age-adjusted Relative Weekly Earnings of Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) Only

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -.1971 | .0041 |
| 2005-2009 | | | | | | | | | -.3106 | .0044 |
| 2000-2004 | | | | | | | | | -.3388 | .0027 |
| 1995-1999 | | | | | | | -0.273 | 0.004 | -.2692 | .0010 |
| 1990-1994 | | | | | | | -0.269 | 0.003 | -.2662 | .0035 |
| 1985-1989 | | | | | -0.331 | 0.001 | -0.269 | 0.002 | -.2521 | .0056 |
| 1980-1984 | | | | | -0.285 | 0.001 | -0.236 | 0.002 | -.2094 | .0060 |
| 1975-1979 | | | -0.314 | 0.001 | -0.185 | 0.001 | -0.176 | 0.005 | -.1357 | .0047 |
| 1970-1974 | | | -0.223 | 0.001 | -0.124 | 0.002 | -0.128 | 0.006 | -.0054 | .0045 |
| 1965-1969 | -0.235 | 0.001 | -0.122 | 0.001 | -0.02 | 0.003 | -0.014 | 0.005 | .1760 | .0103 |
| 1960-1964 | -0.058 | 0.001 | -0.041 | 0.001 | 0.046 | 0.004 | 0.074 | 0.004 | 1.1337 | .0181 |
| 1950-1959 | 0.037 | 0.001 | 0.032 | 0.001 | 0.1 | 0.003 | 0.147 | 0.01 | | |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 3-25** Age- and Education-adjusted Relative Weekly Earnings of Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) and Years of Education

| Variables | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -.064 | .017 |
| 2005-2009 | | | | | | | | | -.136 | .028 |
| 2000-2004 | | | | | | | | | -.130 | .029 |
| 1995-1999 | | | | | | | -.149 | .021 | -.074 | .023 |
| 1990-1994 | | | | | | | -.099 | .025 | -.075 | .018 |
| 1985-1989 | | | | | -.176 | .015 | -.056 | .025 | -.026 | .019 |
| 1980-1984 | | | | | -.098 | .017 | -.039 | .020 | -.003 | .014 |
| 1975-1979 | | | -.211 | .0041 | .011 | .016 | .039 | .019 | .069 | .012 |
| 1970-1974 | | | -.087 | .0047 | .075 | .014 | .088 | .017 | .120 | .004 |
| 1965-1969 | -0.172 | .0025 | -0.030 | .002 | .099 | .006 | .133 | .008 | .111 | .017 |
| 1960-1964 | 0.003 | .0023 | 0.015 | .0004 | .133 | .002 | .133 | .004 | .987 | .025 |
| 1950-1959 | 0.01 | .0017 | 0.077 | .0018 | .186 | .001 | .096 | .018 | | |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002495

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*148*

TABLE 3-26 Age-adjusted Relative Weekly Earnings of Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) Only

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | -.2782 | .0033 |
| 2005-2009 | | | | | | | | | -.3143 | .0031 |
| 2000-2004 | | | | | | | | | -.2989 | .0021 |
| 1995-1999 | | | | | | | -0.216 | 0.002 | -.2395 | .0010 |
| 1990-1994 | | | | | | | -0.165 | 0.002 | -.2027 | .0027 |
| 1985-1989 | | | | | -0.184 | 0.001 | -0.138 | 0.001 | -.1684 | .0048 |
| 1980-1984 | | | | | -0.093 | 0.000 | -0.100 | 0.002 | -.0975 | .0054 |
| 1975-1979 | | | -0.082 | 0.000 | -0.002 | 0.000 | -0.053 | 0.004 | -.0312 | .0040 |
| 1970-1974 | | | 0.026 | 0.001 | 0.042 | 0.001 | -0.026 | 0.005 | .0615 | .0041 |
| 1965-1969 | -0.021 | 0.001 | 0.068 | 0.001 | 0.083 | 0.002 | 0.023 | 0.004 | .1329 | .0104 |
| 1960-1964 | 0.037 | 0.001 | 0.036 | 0.000 | 0.061 | 0.002 | 0.043 | 0.003 | .1706 | .0189 |
| 1950-1959 | 0.051 | 0.000 | 0.025 | 0.001 | 0.013 | 0.002 | 0.173 | 0.008 | | |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002496

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-27 Age- and Education-adjusted Relative Weekly Earnings of Immigrant Cohorts, by Decennial Census Year 1970-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) and Years of Education

| | Census | | | | | | | | ACS | |
| | 1970 | | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010-2012 | | | | | | | | | −.230 | .009 |
| 2005-2009 | | | | | | | | | −.154 | .019 |
| 2000-2004 | | | | | | | | | −.114 | .020 |
| 1995-1999 | | | | | | | −.075 | .019 | −.056 | .018 |
| 1990-1994 | | | | | | | .002 | .021 | −.010 | .016 |
| 1985-1989 | | | | | −.009 | .020 | .060 | .023 | .027 | .014 |
| 1980-1984 | | | | | .120 | .024 | .0091 | .021 | .078 | .010 |
| 1975-1979 | | | .038 | .008 | .201 | .023 | .135 | .019 | .142 | .010 |
| 1970-1974 | | | .162 | .009 | .224 | .020 | .131 | .014 | .160 | .004 |
| 1965-1969 | .111 | .007 | .173 | .008 | .202 | .012 | .133 | .008 | .073 | .010 |
| 1960-1964 | .142 | .006 | .102 | .005 | .143 | .008 | .111 | .002 | −.017 | .019 |
| 1950-1959 | .144 | .005 | .080 | .004 | .101 | .008 | .123 | .013 | | |

SOURCE: Analyses of 1970-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*150*

**TABLE 3-28** Age-adjusted Probabilities of Speaking English Very Well, Immigrant Cohorts, by Decennial Census Year 1980-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) Only

| Variables | Census 1980 Coeff | 1980 Robust SE | 1990 Coeff | 1990 Robust SE | 2000 Coeff | 2000 Robust SE | ACS 2012 Coeff | 2012 Robust SE |
|---|---|---|---|---|---|---|---|---|
| 2010-2012 Arrivals | | | | | | | .3676 | .0202 |
| 2005-2009 Arrivals | | | | | | | .3098 | .0211 |
| 2000-2004 Arrivals | | | | | | | .3144 | .0163 |
| 1995-1999 Arrivals | | | | | 0.332 | 0.015 | .3588 | .0098 |
| 1990-1994 Arrivals | | | | | 0.346 | 0.013 | .3756 | .0048 |
| 1985-1989 Arrivals | | | 0.327 | 0.005 | 0.355 | 0.007 | .4008 | .0062 |
| 1980-1984 Arrivals | | | 0.369 | 0.005 | 0.408 | 0.005 | .4489 | .0110 |
| 1975-1979 Arrivals | 0.309 | 0.005 | 0.428 | 0.003 | 0.462 | 0.008 | .4947 | .0164 |
| 1970-1974 Arrivals | 0.364 | 0.004 | 0.480 | 0.003 | 0.517 | 0.013 | .5999 | .0279 |
| 1965-1969 Arrivals | 0.432 | 0.004 | 0.561 | 0.005 | 0.598 | 0.017 | .7173 | .0439 |
| 1960-1964 Arrivals | 0.532 | 0.008 | 0.654 | 0.007 | 0.706 | 0.025 | .8257 | .0625 |
| 1950-1959 Arrivals | 0.672 | 0.017 | 0.754 | 0.013 | 0.821 | 0.037 | | |

SOURCE: Analyses of 1980-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-29 Age-adjusted Probabilities of Speaking English Very Well, Immigrant Cohorts, by Decennial Census Year 1980-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) Only

| | Census | | | | | | ACS | |
| | 1980 | | 1990 | | 2000 | | 2012 | |
| Variables | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|
| 2010-2012 Arrivals | | | | | | | .3300 | .0154 |
| 2005-2009 Arrivals | | | | | | | .2907 | .0143 |
| 2000-2004 Arrivals | | | | | | | .3080 | .0101 |
| 1995-1999 Arrivals | | | | | 0.302 | 0.013 | .3540 | .0060 |
| 1990-1994 Arrivals | | | | | 0.333 | 0.011 | .3733 | .0038 |
| 1985-1989 Arrivals | | | 0.322 | 0.008 | 0.365 | 0.005 | .4179 | .0061 |
| 1980-1984 Arrivals | | | 0.360 | 0.007 | 0.422 | 0.005 | .4895 | .0108 |
| 1975-1979 Arrivals | 0.281 | 0.009 | 0.429 | 0.004 | 0.484 | 0.008 | .5339 | .0151 |
| 1970-1974 Arrivals | 0.341 | 0.007 | 0.508 | 0.004 | 0.572 | 0.013 | .6084 | .0219 |
| 1965-1969 Arrivals | 0.424 | 0.006 | 0.596 | 0.006 | 0.660 | 0.016 | .7335 | .0315 |
| 1960-1964 Arrivals | 0.543 | 0.009 | 0.714 | 0.010 | 0.767 | 0.021 | .7948 | .0435 |
| 1950-1959 Arrivals | 0.716 | 0.019 | 0.829 | 0.020 | 0.902 | 0.028 | | |

SOURCE: Analyses of 1980-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002499

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

152

TABLE 3-30 Age-adjusted Probabilities of Speaking English Well, Immigrant Cohorts, by Decennial Census Year 1980-2000, and in 2012, Men, Ages 25-64, Controlling for Age (cubic) Only

| Variables | Census 1980 Coeff | Robust SE | 1990 Coeff | Robust SE | 2000 Coeff | Robust SE | ACS 2012 Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|
| 2010-2012 Arrivals | | | | | | | 0.604 | 0.018 |
| 2005-2009 Arrivals | | | | | | | 0.533 | 0.019 |
| 2000-2004 Arrivals | | | | | | | 0.572 | 0.015 |
| 1995-1999 Arrivals | | | | | 0.557 | 0.01 | 0.643 | 0.009 |
| 1990-1994 Arrivals | | | | | 0.632 | 0.009 | 0.69 | 0.003 |
| 1985-1989 Arrivals | | | 0.562 | 0.006 | 0.662 | 0.005 | 0.717 | 0.005 |
| 1980-1984 Arrivals | | | 0.663 | 0.005 | 0.725 | 0.003 | 0.777 | 0.009 |
| 1975-1979 Arrivals | 0.578 | 0.009 | 0.736 | 0.003 | 0.789 | 0.005 | 0.805 | 0.011 |
| 1970-1974 Arrivals | 0.666 | 0.008 | 0.779 | 0.002 | 0.827 | 0.008 | 0.847 | 0.018 |
| 1965-1969 Arrivals | 0.747 | 0.003 | 0.866 | 0.006 | 0.889 | 0.012 | 0.857 | 0.028 |
| 1960-1964 Arrivals | 0.854 | 0.006 | 0.944 | 0.008 | 0.937 | 0.016 | 0.816 | 0.041 |
| 1950-1959 Arrivals | 0.993 | 0.013 | 0.986 | 0.01 | 0.954 | 0.023 | | |

SOURCE: Analyses of 1980-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

002500

Copyright National Academy of Sciences. All rights reserved.

TABLE 3-31 Age-adjusted Probabilities of Speaking English Well, Immigrant Cohorts, by Decennial Census Year 1980-2000, and in 2012, Women, Ages 25-64, Controlling for Age (cubic) Only

| Variables | Census | | | | | | ACS | |
| | 1980 | | 1990 | | 2000 | | 2012 | |
| | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE | Coeff | Robust SE |
|---|---|---|---|---|---|---|---|---|
| 2010-2012 Arrivals | | | | | | | 0.573 | 0.02 |
| 2005-2009 Arrivals | | | | | | | 0.529 | 0.019 |
| 2000-2004 Arrivals | | | | | | | 0.572 | 0.013 |
| 1995-1999 Arrivals | | | | | 0.525 | 0.015 | 0.633 | 0.006 |
| 1990-1994 Arrivals | | | | | 0.607 | 0.012 | 0.664 | 0.004 |
| 1985-1989 Arrivals | | | 0.549 | 0.01 | 0.647 | 0.006 | 0.714 | 0.008 |
| 1980-1984 Arrivals | | | 0.633 | 0.008 | 0.717 | 0.004 | 0.773 | 0.012 |
| 1975-1979 Arrivals | 0.533 | 0.011 | 0.725 | 0.004 | 0.788 | 0.007 | 0.809 | 0.016 |
| 1970-1974 Arrivals | 0.613 | 0.009 | 0.794 | 0.002 | 0.859 | 0.011 | 0.851 | 0.02 |
| 1965-1969 Arrivals | 0.707 | 0.006 | 0.879 | 0.004 | 0.919 | 0.014 | 0.874 | 0.027 |
| 1960-1964 Arrivals | 0.845 | 0.007 | 0.972 | 0.008 | 0.962 | 0.017 | 0.796 | 0.035 |
| 1950-1959 Arrivals | 1 | 0.014 | 1 | 0.01 | 0.984 | 0.021 | | |

SOURCE: Analyses of 1980-2000 Decennial Census data and 2010-2012 American Community Survey data, accessed through the Integrated Public Use Microdata Series.

Copyright National Academy of Sciences. All rights reserved.

## 3.7  TECHNICAL ANNEX ON OCCUPATIONAL CATEGORIES

The occupational analysis in Chapter 3 tracks changes in concentration of native-born and foreign-born individuals in different occupational categories. Because the occupational structure of a labor market changes over time, an occupational coding system that takes into account such changes is required. Xie and Killewald (2012) and Xie et al. (2016) created such a coding system, which is useful for tracking occupational changes over time. This system, based on classification of 41 occupational categories—and reproduced below—was created to meet two conflicting objectives to the extent possible: (1) reduce the number of occupational categories, and (2) group detailed occupations only when socioeconomic status and work content are sufficiently similar across these occupations. With the second purpose in mind, the second-tier occupational categories are 8 major occupational categories that are generated by collapsing the 41 occupational categories. This two-tier occupational coding system is the basis for Tables 3-18 and 3-19.

*First-Tier Occupational Categories*

**Lawyers and judges:** Lawyers; Judges, magistrates, and other judicial workers

**Physicians, dentists, and related practitioners:** Chiropractors; Dentists; Optometrists; Physicians and surgeons; Podiatrists; Audiologists; Veterinarians; Health diagnosing and treating practitioners, all other

**Mathematicians:** Actuaries; Mathematicians; Statisticians; Miscellaneous mathematical science occupations; Professors and postsecondary instructors, mathematical (imputed in 2000 and 2007)

**Postsecondary teachers:** Postsecondary teachers

**Preschool and elementary teachers:** Preschool and kindergarten teachers; Elementary and middle school teachers

**Physical scientists:** Astronomers and physicists; Atmospheric and space scientists; Chemists and materials scientists; Environmental scientists and geoscientists; Physical scientists, all other; Professors and postsecondary instructors, physical sciences (imputed in 2000 and 2007)

**Life scientists:** Agriculture and food scientists; Biological scientists; Conservation scientists and foresters; Medical scientists; Professors and postsecondary instructors, life sciences (imputed in 2000 and 2007)

**Architects:** Architects, except naval

002502

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Social and recreation workers:** Counselors; Social workers; Miscellaneous community and social service specialists; Recreation and fitness workers; Residential advisors

**Librarians, archivists, and curators:** Archivists, curators, and museum technicians; Librarians

**Accountants and financial analysts:** Financial managers; Cost estimators; Accountants and auditors; Budget analysts; Credit analysts; Financial analysts; Personal financial advisors; Insurance underwriters; Financial examiners; Loan counselors and officers; Tax examiners, collectors, and revenue agents; Tax preparers; Financial specialists, all other

**Engineers:** Aerospace engineers; Agricultural engineers; Biomedical engineers; Chemical engineers; Civil engineers; Computer hardware engineers; Electrical and electronics engineers; Environmental engineers; Industry engineers, including health and safety; Materials engineers; Mechanical engineers; Mining and geological engineers, including mining safety engineers; Nuclear engineers; Petroleum engineers; Engineers, all other; Sales engineers; Professors and postsecondary instructors, engineering (imputed in 2000 and 2007)

**Secondary, vocational, and adult education teachers:** Secondary school teachers; Special education teachers; Other teachers and instructors; Other education, training, and library workers

**Religious workers:** Clergy; Directors, religious activities and education; Religious workers, all other

**Administrators and public officers:** Legislators; Administrative services managers; Education administrators; Natural sciences managers; Postmasters and mail superintendents; Social and community service managers; Compliance officers, except agriculture, construction, health and safety, and transportation

**Nurses, dietitians, therapists:** Dietitians and nutritionists; Pharmacists; Physician assistants; Registered nurses; Occupational therapists; Physical therapists; Radiation therapists; Recreational therapists; Respiratory therapists; Speech-language therapists; Therapists, all other; Massage therapists

**Social scientists:** Economists; Market and survey researchers; Psychologists; Sociologists; Urban and regional planners; Miscellaneous social scientists and related workers

**Computer specialists:** Computer scientists and systems analysts; Computer programmers; Computer software engineers; Computer support specialists; Database administrators; Network and computer systems administrators; Network systems and data communications analysts; Operations research analysts; Computer

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

control programmers and operators; Professors and postsecondary
instructors, computer science (imputed in 2000 and 2007)

**Writers, artists and media workers:** Artists and related workers;
Designers; Actors; Producers and directors; Athletes, coaches,
umpires, and related workers; Dancers and choreographers;
Musicians, singers, and related workers; Entertainers and performers,
sports and related workers, all other; Announcers; News analysts,
reporters and correspondents; Public relations specialists; Editors;
Technical writers; Writers and authors; Photographers

**Managers and proprietors:** Chief executives; General and operations
managers; Advertising and promotions managers; Marketing and
sales managers; Public relations managers; Computer and information
systems managers; Human resources managers; Industrial production
managers; Purchasing managers; Transportation, storage, and
distribution managers; Farm, ranch, and other agricultural
managers; Construction managers; Engineering managers; Food
service managers; Funeral directors; Gaming managers; Lodging
managers; Medical and health services managers; Property, real
estate, and community association managers; Managers, all other;
Purchasing agents and buyers, farm products; Wholesale and retail
buyers, except farm products; Purchasing agents, except wholesale,
retail and farm products; Human resources, training, and labor
relations specialists; Management analysts; Other business operations
specialists

**Sales workers, retail:** First-line supervisors/managers of retail sales
workers; Cashiers; Counter and rental clerks; Parts salespersons;
Retail salespersons; Door-to-door sales workers, news and street
vendors, and related workers

**Secretaries:** Secretaries and administrative assistants

**All other technicians:** Appraisers and assessors of real estate; Surveyors,
cartographers, and photogrammetrists; Marine engineers and
naval architects; Drafters; Engineering technicians, except drafters;
Surveying and mapping technicians; Agricultural and food
science technicians; Biological technicians; Chemical technicians;
Geological and petroleum technicians; Nuclear technicians; Other
life, physical, and social science technicians; Paralegals and legal
assistants; Miscellaneous legal support workers; Library technicians;
Miscellaneous media and communication workers; Broadcast and
sound engineering technicians and radio operators; Television,
video, and motion picture camera operators and editors; Media
and communication equipment workers, all other; Animal trainers;
Aircraft pilots and flight engineers; Air traffic controllers and airfield
operations specialists; Locomotive engineers and operators; Railroad

002504

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

brake, signal, and switch operators; Railroad conductors and yardmasters; Subway, streetcar, and other rail transportation workers; Ship and boat captains and operators; Ship engineers; Bridge and lock tenders; Transportation inspectors

**Bookkeepers:** Bookkeeping, accounting, and auditing clerks

**Health service workers:** Licensed practical and licensed vocational nurses; Nursing, psychiatric, and home health aides; Occupational therapist assistants and aides; Physical therapist assistants and aides; Dental assistants; Medical assistant and other health care support occupations

**Sales workers:** Agents and business managers of artists, performers, and athletes; First-line supervisors/managers of nonretail sales workers; Advertising sales agents; Insurance sales agents; Securities, commodities, and financial service sales agents; Travel agents; Sales representatives, services, all other; Sales representatives, wholesale and manufacturing; Models, demonstrators, and product promoters; Real estate brokers and sales agents; Telemarketers; Sales and related workers, all other; Reservation and transportation ticket agents and travel clerks

**Clerical workers:** Claims adjusters, appraisers, examiners, and investigators; Logisticians; Meeting and convention planners; Teacher assistants; First-line supervisors/managers of gaming workers; Gaming service workers; First-line supervisors/managers of office and administrative support workers; Switchboard operators, including answering service; Telephone operators; Communications equipment operators, all other; Bill and account collectors; Billing and posting clerks and machine operators; Gaming cage workers; Payroll and timekeeping clerks; Procurement clerks; Tellers; Brokerage clerks; Correspondence clerks; Court, municipal, and license clerks; Credit authorizers, checkers, and clerks; Customer service representatives; Eligibility interviewers, government programs; File clerks; Hotel, motel, and resort desk clerks; Interviewers, except eligibility and loan; Library assistants, clerical; Loan interviewers and clerks; New accounts clerks; Order clerks; Human resources assistants, except payroll and timekeeping; Receptionists and information clerks; Information and record clerks, all other; Cargo and freight agents; Couriers and messengers; Dispatchers; Meter readers, utilities; Postal service clerks; Postal service mail carriers; Postal service mail sorters, processors, and processing machine operators; Production, planning, and expediting clerks; Shipping, receiving, and traffic clerks; Stock clerks and order fillers; Weighers, measurers, checkers, and samplers, recordkeeping; Computer operators; Data entry keyers; Word processors and typists; Desktop publishers; Insurance claims and

002505

Copyright National Academy of Sciences. All rights reserved.

policy processing clerks; Mail clerks and mail machine operators, except postal service; Office clerks, general; Office machine operators, except computer; Proofreaders and copy markers; Statistical assistants; Office and administrative support workers, all other

**Protective service workers:** First-line supervisors/managers of correctional officers; First-line supervisors/managers of police and detectives; First-line supervisors/managers of fire fighting and prevention workers; Supervisors, protective service workers, all other; Firefighters; Fire inspectors; Bailiffs, correctional officers, and jailers; Detectives and criminal investigators; Parking enforcement workers; Police and sheriff's patrol officers; Transit and railroad police; Animal control workers; Private detectives and investigators; Security guards and gaming surveillance officers; Crossing guards; Lifeguards and other protective service workers

**Health technicians:** Clinical laboratory technologists and technicians; Dental hygienists; Diagnostic related technologists and technicians; Emergency medical technicians and paramedics; Health diagnosing and treating practitioner support technicians; Medical records and health information technicians; Opticians, dispensing; Miscellaneous health technologists and technicians; Other health care practitioners and technical occupations; Medical, dental, and ophthalmic laboratory technicians

**Personal service workers and barbers:** First-line supervisors/managers of personal service workers; Ushers, lobby attendants, and ticket takers; Miscellaneous entertainment attendants and related workers; Funeral service workers; Barbers; Hairdressers, hairstylists, and cosmetologists; Miscellaneous personal appearance workers; Baggage porters, bellhops, and concierges; Tour and travel guides; Transportation attendants; Child care workers; Personal and home care aides; Personal care and service workers, all other; Parking lot attendants

**Farmers and farm laborers, including forestry and fishing:** Farmers and ranchers; Fish and game wardens; First-line supervisors/managers of farming, fishing, and forestry workers; Agricultural inspectors; Animal breeders; Graders and sorters, agricultural products; Miscellaneous agricultural workers; Fishers and related fishing workers; Hunters and trappers; Forest and conservation workers; Logging workers

**Cleaning service and food service workers:** Chefs and head cooks; First-line supervisors/managers of food preparation and serving workers; Cooks; Food preparation workers; Bartenders; Combined food preparation and serving workers, including fast food; Counter attendants, cafeteria, food concession, and coffee shop; Waiters

002506

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and waitresses; Food servers, nonrestaurant; Dining room and cafeteria attendants and bartender helpers; Dishwashers; Hosts and hostesses, restaurant, lounge, and coffee shop; Food preparation and serving related workers, all other; First-line supervisors/managers of housekeeping and janitorial workers; First-line supervisors/managers of landscaping, lawn service, and groundskeeping workers; Janitors and building cleaners; Maids and housekeeping cleaners; Pest control workers

**Craftsmen:** Boilermakers; Millwrights; First-line supervisors/managers of production and operating workers; Aircraft structure, surfaces, rigging, and systems assemblers; Electrical, electronics, and electromechanical assemblers; Structural metal fabricators and fitters; Bakers; Food batchmakers; Model makers and patternmakers, metal and plastic; Molders and molding machine setters, operators, and tenders, metal and plastic; Tool and die makers; Welding, soldering, and brazing workers; Lay-out workers, metal and plastic; Tool grinders, filers, and sharpeners; Metalworkers and plastic workers, all other; Bookbinders and bindery workers; Fabric and apparel patternmakers; Upholsterers; Furniture finishers; Jewelers and precious stone and metal workers; Photographic process workers and processing machine operators; Semiconductor processors; Etchers and engravers; Molders, shapers, and casters, except metal and plastic; Tire builders

**Electricians:** Electricians; Electrical power-line installers and repairers; Precision instrument and equipment repairers

**Construction workers:** First-line supervisors/managers of construction trades and extraction workers; Brickmasons, blockmasons, and stonemasons; Carpet, floor, and tile installers and finishers; Cement masons, concrete finishers, and terrazzo workers; Paving, surfacing, and tamping equipment operators; Pile-driver operators; Drywall installers, ceiling tile installers, and tapers; Glaziers; Insulation workers; Painters, construction and maintenance; Paperhangers; Pipelayers, plumbers, pipefitters, and steamfitters; Plasterers and stucco masons; Reinforcing iron and rebar workers; Roofers; Sheet metal workers; Structural iron and steel workers; Construction and building inspectors; Fence erectors; Hazardous materials removal workers; Septic tank services and sewer pipe cleaners; Miscellaneous construction and related workers; Manufactured building and mobile home installers

**Operators, except textile, metalworking and transportation:** Motion picture projectionists; Operating engineers and other construction equipment operators; Derrick, rotary drill, and service unit operators, oil, gas, and mining; Earth drillers, except oil and gas;

002507

Copyright National Academy of Sciences. All rights reserved.

*160*        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

Explosives workers, ordinance handling experts, and blasters; Mining machine operators; Roof bolters, mining; Other extraction workers; Miscellaneous assemblers and fabricators; Butchers and other meat, poultry, and fish processing workers; Food and tobacco roasting, baking, and drying machine operators and tenders; Food cooking machine operators and tenders; Job printers; Prepress technicians and workers; Printing machine operators; Extruding and forming machine setters, operators, and tenders, synthetic and glass fibers; Sawing machine setters, operators, and tenders, wood; Power plant operators, distributors, and dispatchers; Stationary engineers and boiler operators; Water and liquid waste treatment plant and system operators; Miscellaneous plant and system operators; Chemical processing machine setters, operators, and tenders; Crushing, grinding, polishing, mixing, and blending workers; Cutting workers; Furnace, kiln, oven, drier, and kettle operators and tenders; Inspectors, testers, sorters, samplers, and weighers; Packaging and filling machine operators and tenders; Painting workers; Cementing and gluing machine operators and tenders; Cooling and freezing equipment operators and tenders; Paper goods machine setters, operators, and tenders; Production workers, all others; Conveyor operators and tenders; Crane and tower operators; Dredge, excavating, and loading machine operators; Hoist and winch operators

**Mechanical workers:** Elevator installers and repairers; First-line supervisors/managers of mechanics, installers, and repairers; Computer, automated teller, and office machine repairers; Radio and telecommunications equipment installers and repairers; Avionics technicians; Electric motor, power tool, and related repairers; Electrical and electronics installers and repairers, transportation equipment; Electrical and electronics repairers, industrial and utility; Electronic equipment installers and repairers, motor vehicles; Electronic home entertainment equipment installers and repairers; Security and fire alarm systems installers; Aircraft mechanics and service technicians; Automotive body and related repairers; Automotive glass installers and repairers; Automotive service technicians and mechanics; Bus and truck mechanics and diesel engine specialists; Heavy vehicle and mobile equipment service technicians and mechanics; Small engine mechanics; Miscellaneous vehicle and mobile equipment mechanics, installers, and repairers; Control and valve installers and repairers; Heating, air conditioning, and refrigeration mechanics and installers; Home appliance repairers; Industrial and refractory machinery mechanics; Maintenance and repair workers, general; Maintenance workers, machinery;

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Telecommunications line installers and repairers; Coin, vending, and amusement machine services and repairers; Locksmiths and safe repairers; Riggers; Signal and track switch repairers; Engine and other machine assemblers

**Textile machine operators:** Laundry and dry-cleaning workers; Pressers, textile, garment, and related materials; Sewing machine operators; Shoe and leather workers and repairers; Shoe machine operators and tenders; Tailors, dressmakers, and sewers; Textile bleaching and dyeing machine operators and tenders; Textile cutting machine setters, operators, and tenders; Textile knitting and weaving machine setters, operators, and tenders; Textile winding, twisting, and drawing out machine setters, operators, and tenders; Textile, apparel, and furnishings workers, all other

**Carpenters:** Carpenters; Cabinetmakers and bench carpenters; Model makers and patternmakers, wood; Woodworking machine setters, operators, and tenders, except sawing; Woodworkers, all other

**Metalworking and transportation operators:** Highway maintenance workers; Rail-track laying and maintenance equipment operators; Commercial drivers; Extruding and drawing machine setters, operators, and tenders, metal and plastic; Forging machine setters, operators, and tenders, metal and plastic; Rolling machine setters, operators, and tenders, metal and plastic; Cutting, punching, and press machine setters, operators, and tenders, metal and plastic; Drilling and boring machine tool setters, operators, and tenders, metal and plastic; Grinding, lapping, polishing, and buffing machine tool setters, operators, and tenders, metal and plastic; Lathe and turning machine tool setters, operators, and tenders, metal and plastic; Milling and planing machine setters, operators, and tenders, metal and plastic; Machinists; Metal furnace and kiln operators and tenders; Multiple machine tool setters, operators, and tenders, metal and plastic; Heat treating equipment setters, operators, and tenders, metal and plastic; Plating and coating machine setters, operators, and tenders, metal and plastic; Extruding, forming, pressing, and compacting machine setters, operators, and tenders; Cleaning, washing, and metal pickling equipment operators and tenders; Supervisors, transportation and material moving workers; Ambulance drivers and attendants, except emergency medical technicians; Bus drivers; Driver/sales workers and truck drivers; Taxi drivers and chauffeurs; Motor vehicle operators, all other; Sailors and marine oilers; Other transportation workers; Industrial truck and tractor operators; Shuttle car operators; Tank car, truck, and ship loaders; Material moving workers, all other

002509

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Laborers, except farm:** Grounds maintenance workers; Nonfarm animal caretakers; Construction laborers; Helpers, construction trades; Roustabouts, oil and grease; Helpers-extraction workers; Helpers-installation, maintenance, and repair workers; Other installation, maintenance, and repair workers; Helpers-production workers; Service station attendants; Cleaners of vehicle and equipment; Laborers and freight, stock, and material movers, hand; Machine feeders and offbearers; Packers and packagers, hand; Pumping station operators; Refuse and recyclable material collectors

*Second-Tier Categories*

These eight categories are combinations of the first-tier categories defined above. The second-tier categories are used in Tables 3-1 and 3-2.

**High-level professionals:** Life scientists; Physical scientists; Social scientists; Mathematicians; Engineers; Architects; Physicians, dentists, and related; Postsecondary teachers; Lawyers and judges

**Professionals:** Nurses, dietitians, therapists; Preschool and elementary teachers; Secondary, vocational, and adult education teachers; Health technicians; All other technicians; Computer specialists; Writers, artists, and media workers; Librarians, archivists, and curators; Social and recreation workers; Religious workers; Accountants and financial analysts

**Managers and Administrators:** Administrators and public officers; Managers and proprietors

**Sale workers and clerks:** Sales workers, retail; Sales workers; Clerical workers; Bookkeepers; Secretaries

**Skilled workers:** Mechanical workers; Carpenters; Electricians; Construction workers; Craftsmen

**Unskilled workers:** Textile machine operators; Metal working and transportation operators; Operators, except textile, metalworking, and transportation; Laborers, except farm

**Farmers and farm laborers:** Farmers and farm laborers, including forestry and fishing

**Service workers:** Cleaning service workers and food service workers; Health service workers; Personal service workers and barbers; Protective service workers

002510

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# PART II

# ECONOMIC IMPACTS

002511

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002512

Copyright National Academy of Sciences. All rights reserved.

<div align="center">4</div>

# Employment and Wage Impacts of Immigration: Theory

## 4.1  INTRODUCTION

This chapter demonstrates how economic theory can be used to analyze the economic impact of immigration. The discussion starts with the simplest case and progresses to more complex specifications in order to illustrate the various channels through which immigration affects labor markets and how the economy's adjustments mitigate those effects over time. Because adjustments take time, particularly when immigration is unexpected, the initial and longer run impacts of immigration differ. The impact of immigration will also depend on the size of the inflow, the skill composition of immigrants compared to that of the native-born population, and characteristics of the destination country economy such as the ease with which firms can adopt or develop new technologies and the speed at which capital can accumulate or move between industries, as well as the economic links between that country's regions and its degree of integration with the world economy.

Theory predicts that immigration initially confers net economic benefits on the destination country economy while creating winners and losers among the native-born via changes in the wage structure and the return to capital. Resulting changes in factor prices increase the production of goods and services that use the type of labor that immigrants provide most intensively. With time, the capital stock adjusts and eventually technology may respond as well, pushing up the demand for labor and hence wages toward their original levels. It bears noting that, if firms anticipate immigration and there is no lag in the response of capital and technology, the length of time elapsing between an immigration inflow and the "long-run" adjust-

<div align="center">*165*</div>

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2521 of 4699 PageID #:  5686

ment of the labor market could be very short. Either way, if the economy simply returns to a larger version of its pre-immigration state, with the same capital-labor ratio, there are no winners and losers among the native-born, but equally, no net benefit to them from immigration.

This chapter provides a simple, largely graphical description of the often mathematically complex theoretical models that economists use to analyze the impact of immigration (or other labor supply shocks). The analysis relies heavily on the shifting of supply and demand curves, since these are most familiar to a general audience. It should be emphasized that these graphics only partly reflect the dynamic and general equilibrium characteristics of the models described here.

Most of the analysis is qualitative, designed to identify the mechanisms through which an influx of new immigrants is likely to affect wages and returns to capital as well as the overall level of income enjoyed by the native-born population that absorbs them. The concept of an *immigration surplus* as developed by Borjas (1995b) is introduced to quantify how, abstracting from fiscal effects, the arrival of immigrants affects the welfare of the native-born population on net. The panel quantifies these effects by inserting aggregate measures from national accounts or parameter estimates from empirical research. The emphasis here is on providing plausible orders of magnitude for the changes we model and should not be confused with the statistical estimation that is at the heart of Chapter 5.

## 4.2  A SIMPLE MODEL WITH A SINGLE TYPE OF LABOR

To understand the impact of immigration as seen through the prism of economic theory, it is easiest to begin by analyzing the simplest possible model, one constrained by highly unrealistic assumptions, and then consider the implications of more complicated models that arise as at least some of these assumptions are removed. We begin by assuming that the economy is inhabited by a large number of identical individuals and firms and that all economic activity is devoted to the production of a single consumption good. Firms produce this good by combining two highly aggregated inputs: work effort or labor, for which the individuals in this economy receive a wage ($w$) paid by the firm, and the physical capital (the tools, equipment, machinery, and buildings) each firm owns. We assume that all individuals devote a fixed amount of time to work activities (the quantity of labor supply is perfectly inelastic—it does not respond to wage changes) and that the stock of physical capital is initially fixed. For the moment, we also assume that ownership of firms is equally distributed across the population, whose wage income is supplemented by dividends paid by these firms. For simplicity of expression, we use the term "native" to refer to the native-born population.

002514

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Initial Labor Market Effects of Immigration

The diagram in Figure 4-1 describes the labor market in this simple model of the economy. For firms, the demand for labor is a decreasing function of wages represented initially by $L_1^D$, and the labor supplied by the native workers is fixed at $N$. The initial equilibrium (denoted by the number 1) is the point where labor supply $L_1^S$ and labor demand $L_1^D$ cross, and this point determines the wage $w_1$. In this economy, total income is equivalent to the amount produced of the single good and is represented by the area underneath the demand curve: the triangle A and the two rectangles B and C, or A + B + C. The area of the two rectangles B + C represents the income the people in this economy receive from firms as labor earnings ($N \times w_1$). The triangle A represents the accounting profits received by firms from the sale of goods after the cost of labor has been paid; these profits are assumed to be remitted to the population as dividends.

Now consider what happens when there is a sudden unanticipated increase in the population due to an influx of new immigrants. These new immigrants increase the total labor supply from $N$ to $N + M$, and the labor supply curve shifts from $L_1^S$ to $L_2^S$. Crucially, we assume these new immigrants arrive without capital and that they do not receive a share of the



**FIGURE 4-1** Labor market (with inelastic labor supply) response to an influx of immigrant workers.

Copyright National Academy of Sciences. All rights reserved.

existing capital, which remains wholly owned by the native-born population. At the new equilibrium (marked with the number 2), wages are $w_2$ ($w_2 < w_1$), so the immediate effect of the influx of new immigrants is to drive down the wage. Now firms pay wage income to workers ($N \times w_2$), corresponding to rectangle C, to the native population, and $w_2 \times M$, corresponding to rectangle D, to immigrants; the value of the total amount of goods produced increases to A + B + C + D + E. The profits earned by the firms increase from the area represented by triangle A to A + B + E. Rectangle B represents the amount firms once paid as wages to natives but which now is paid to them as dividends instead. Triangle E represents the part of the overall increase in income (D + E) not captured by the immigrants themselves; this is commonly called the "immigration surplus." The immigration surplus represents the benefit that accrues to the native population from an inflow of new immigrants.

Although immigrants are consumers as well as workers, the demand curve for labor does not shift outward in this simple model until capital adjusts. The reason for this is that the demand curve is determined by the economy's productive capacity, and the addition to aggregate consumption created by the immigration-driven population growth is represented as a movement along the demand curve. Although the extra labor causes the aggregate amount of output to rise, *per-capita output*—output divided by the new, higher number of people in the economy—initially declines. **To summarize, in this simple theoretical model of the labor market, the influx of immigrants initially drives down wages but native incomes still rise in the aggregate due to the immigration surplus.**

### Initial Capital Market Effects of Immigration

There are two input factors in this model economy, capital and labor, and it is important to also consider how immigration affects the market for capital. The diagram in Figure 4-2, which describes the capital market in this economy, is sufficient to illustrate most of the changes that occur following an influx of additional workers. The cost of capital for firms can be either the interest rate at which they borrow or, if funded from retained earnings, the rate of return available on an alternative investment. In this simple framework, the two are identical. Meanwhile, the economy-wide cost of capital for households is the rate of return on their asset holdings. The demand curve for capital slopes downward since firms choose to acquire less new capital and hold less existing capital at higher rates of return (or cost of capital for the firm).[1] The amount of capital available is initially fixed at $K_1$ and the initial equilibrium (denoted by the number 1) determines the initial rate of return $r_1$.

---

[1]We use the term *rate of return* rather than *cost of capital* because our focus is on the two sources of income for households, namely wages and the return on assets.

002516

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-2** Capital market (with inelastic labor supply) response to an influx of immigrant workers.

The area underneath the demand curve once again equals the amount of the single good produced as well as total income. The area of the rectangle A in Figure 4-2 is the amount $r_1 \times K_1$ paid by firms as dividends and corresponds exactly to the area of the triangle A in Figure 4-1. Likewise, the areas of the triangle C and the right trapezoid B in Figure 4-2 correspond to the areas of the rectangles B and C respectively in Figure 4-1. This once more is the amount the firm initially pays in wages.

An influx of new immigrants (an increase in labor relative to capital) makes each unit of the pre-existing capital stock more productive. The rightward shift in the demand curve for capital from $K_1^D$ to $K_2^D$ in Figure 4-2 captures this rise in the rate of return to capital. If one assumes that the production technology has an attribute economists call constant returns to scale—which specifies that output quantity increases by the same proportion as the quantity of all inputs—the horizontal distance between $K_1^D$ and $K_2^D$, measured in percentage terms, is equal to $M/N$ (the ratio of immigrant to native labor).[2] The right trapezoid B is the amount of income once paid

---

[2]Constant returns to scale means that if all the inputs increase by $x$ percent, the output they produce increases by the same $x$ percent.

002517

Copyright National Academy of Sciences. All rights reserved.

as wages but now paid as dividends, and the wages paid to the natives are reduced to the triangle C. The area in trapezoid D represents the wages paid to immigrants, and triangle E once again represents the immigrant surplus. Modeling the impact of immigration in terms of its impact on the market for capital is admittedly less intuitive than modeling it in terms of its impact on the labor market. However, the rise in the rate of return to capital from $r_1$ to $r_2$ in Figure 4-2 underlines an important insight: the immigration surplus arises because the labor supplied by new immigrants makes native-owned capital more productive. Restating, **immigration raises the return to capital, making capital more productive and increasing income to owners of capital.**

### How Big Is the Immigration Surplus?

How can one quantify the size of the immigration surplus? A simple approximation for the area $E$ in Figure 4-1 yields $\frac{1}{2}(w_2 - w_1)M$ or, restated as a fraction of total output $Y$, $E$ equals $\frac{1}{2}\left(\frac{M}{N}\right)^2 \frac{w_2 N}{Y} \text{E}_{LL}$, where $\text{E}_{LL}$ is the elasticity of the own-factor price for labor (that is, the percentage change in wages divided by the percentage change in labor between point 1 and point 2), $\frac{w_1 N}{Y}$ represents the share of income initially paid to natives, and $\frac{M}{N}$ is the size of the immigration surge relative to the native workforce.[3] In the United States, 65 percent of total national income is paid as employee compensation; it is therefore reasonable to assume that the elasticity of the own factor price for labor is $-0.35$ and the elasticity of the rate of return with respect to labor is $0.65$.[4] The area represented by triangle E grows quadratically with the increase in the proportion of new immigrants so, unless the increase in the workforce generated by an influx of new immigrants is very large, the overall increase in income will be relatively small. A 1 percent increase in the workforce caused by an influx of immigrants

---

[3]From Borjas (2014), we define the factor price elasticity $\text{E}_{LL} = \left(\frac{w_2 - w_1}{w_1}\right) / \left(\frac{M}{N}\right)$ which is the inverse of the elasticity of labor demand. Therefore $\frac{w_2 - w_1}{Y} = \text{E}_{LL} \frac{M}{N} \frac{w_1}{Y}$ and $\frac{1}{2}\frac{(w_2 - w_1)M}{Y} = \frac{1}{2}\left(\frac{M}{N}\right)^2 \frac{w_1 N}{Y} \text{E}_{LL}$.

[4]For a simple Cobb-Douglas production function, these elasticity values follow directly from the share of national income paid as employee compensation (equal to 0.65) and the approximation $\text{E}_{LL} = \frac{w_1 N}{Y} - 1$. In this case the immigration surplus is $-\frac{1}{2}\left(\frac{M}{N}\right)^2 (1 + \text{E}_{LL})\text{E}_{LL}$.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

lowers wages by 0.35 percent, raises the rate of return to capital by just under eight basis points (or 0.08%) and generates an immigration surplus of $199 million for the native population in an economy with an annual gross domestic product (GDP) of $17.5 trillion.[5] An increase in the workforce twice as large, equivalent to 2 percent of the U.S. workforce, generates a decline in wages of 0.75 percent and an immigration surplus four times larger, equivalent to $796 million.[6] Rather than focus on an incremental inflow of workers, the model can also generate estimates of the wage impact and immigration surplus of the entire immigrant population. Immigrant labor accounts for 16.5 percent of the total number of hours worked[7] in the United States, which, using this methodology, implies that the current stock of immigrants lowered wages by 5.2 percent and generated an immigration surplus of $54.2 billion, representing a 0.31 percent overall increase in income that accrues to the native population. However, it bears noting that it is problematic to apply the same static methodology used for small temporary inflows to measuring the impact of the entire population of immigrants, which has grown over the course of decades. Over such a long period of time, capital has had plenty of time to adjust, and so these estimates can at best be described as upper limits that exaggerate the real impact of immigration on native wages and overall incomes.[8]

**In summary, natives' incomes rise in aggregate as a result of immigration; the size of the increase depends on the number of immigrants relative to natives, natives' share of income, and the size of the wage effect of immigration.**

---

[5] The cross-factor elasticity that measures the increase in gross returns in response to the increase in the labor force is defined as $E_{KL} = \left(\frac{r_2 - r_1}{r_1 + \delta}\right) / \left(\frac{M}{N}\right)$. For a simple Cobb-Douglas production function, $E_{KL} = \frac{w_1 N}{Y}$. If one assumes a capital output ratio of 3 and a rate of depreciation of 0.05, the initial net real rate of return to capital is 6.67 percent.

[6] An immigration influx 10 times larger than the 1 percent example—one that increases the labor force by 10 percent—will have an impact on both wages and the return to capital that is also about 10 times larger. Wages drop by 3.5 percent and the rate of return to capital rises by about 75 basis points. However, because of the squared term in the formula for the immigration surplus, the surplus increases 100-fold, to $19.9 billion. Hence the ratio between the benefit that accrues to natives as a group (total income = wages + dividends) from immigration, compared to the amount of redistribution between different sources of income (wages versus dividends), rises rapidly with the immigration influx.

[7] U.S. Census Bureau, Current Population Survey (CPS), unweighted average across years 2013, 2014, and 2015.

[8] Ben-Gad (2004) demonstrated that dynamic calculations of the surplus are considerably lower than those obtained using Borjas' (1995b) static approach.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2527 of 4699 PageID #:  5692

The Economic and Fiscal Consequences of Immigration

### Who Gets the Immigration Surplus?

Consider the factors that affect the decrease in the wage bill paid to natives, represented by the area of rectangle B in Figure 4-1. A decline in wages of 0.35 percent in this simple model economy, assuming a GDP of $17.5 trillion, implies that as much as $39.6 billion that was once paid as wages is now paid as returns to capital (for the 1% immigration-induced workforce increase scenario). Of course this is immaterial if our initial (unrealistic) assumption holds that all the natives are identical and own equal shares of the nation's capital stock. Indeed, even if people have radically different levels of income, as long as everyone shares the same proportion of income derived from wage earnings and capital income, the shift between the two generated by immigration has no impact on the distribution of income. But what if the proportions are not equal? If, to take an extreme example, the population is divided between those who derive all their income from work and others who derive all their income from capital, the shift in resources described in this example is potentially substantial. Even for the case of a 1 percent increase in the number of workers, the shift from wages to income from capital outweighs the immigration surplus by a factor of nearly 200.

In practice, most people derive at least some of their lifetime income from capital, if not directly through capital gains, dividends, rents, or interest payments, then indirectly through the ownership of their own residence and through pension savings. Still, the composition of income varies significantly across the income distribution, with those at the very top receiving larger shares of their income from capital than those at the bottom.[9] This means that not only does a disproportionate share of the immigration surplus accrue to people who enjoy higher incomes but the shift in overall income composition in response to immigration can at least initially exacerbate income inequality and could leave some people absolutely worse off.

**In summary, the immigration surplus stems from the increase in the return to capital that results from the increased supply of labor and the subsequent fall in wages. Natives who own more capital will receive more income from the immigration surplus than natives who own less capital, who can consequently be adversely affected.**

---

[9]The Gini coefficient for earnings is 0.489 but 0.898 for interest, 0.789 for dividends and 0.753 for rents, royalties, estates or trusts (U.S. Census Bureau, 2014). Zero on the Gini scale indicates perfect equality in distribution (of earnings, or income, or whatever is being measured), and a score of 1.0 indicates total inequality. Salaries, wages, and pension income account for 91.17 percent of income for people in the top 10 to 5 percent of the income distribution, 83.35 percent for people in the top 5 to 1 percent, 72.34 percent for people in the top 1 to 0.5 percent, 60.46 percent for the top 0.5 to 0.1 percent, 46.65 percent for the top 0.1 to 0.01 percent, and 33.47 percent for the top 0.01 percent (Alvaredo et al., 2013).

002520

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### The Effects of Capital Adjustment:
### What If Immigrants Bring Capital with Them?

All the changes in wages and the distribution of income analyzed above are predicated on the assumption that the aggregate stock of capital remains fixed even as the income each unit generates increases. More likely one should expect that, as the influx of immigration raises the rate of return to capital from $r_1$ to $r_2$ in Figure 4-2, an incentive is created for more of it to be produced or to flow from abroad. The accumulation of additional capital has a number of effects: wages are restored to their original level, the return to capital falls, and the immigration surplus dissipates. As noted below, this is typically referred to as the long-run impact of immigration because capital responds with a lag when immigration is unanticipated.

One can also illustrate the impact of capital's response to immigration with the following thought experiment: What would happen if each immigrant not only supplied additional labor, but arrived in the country with an amount of capital that matched the capital holdings of the natives? Once again the supply curve for labor shifts from $L_1^S$ to $L_2^S$, but now this is accompanied by a shift in the demand curve from $L_1^D$ to $L_2^D$ as the additional capital the immigrants bring raises the marginal product of labor. If one further assumes a constant returns to scale production technology, the economy reaches equilibrium points marked by the number 3 in both Figures 4-1 and 4-2, where neither the wage nor the rate of return to capital changes, there is no immigration surplus or change in the composition of income, and the initial ratios between capital and output and labor and output are restored. The economy is larger, of course, but all the benefits of immigration, whether in terms of wage earnings, represented by the areas D, E, and F, or the income generated by the capital imported by the new immigrants, represented by areas G and H, accrue to the new immigrants. This implies that programs designed to facilitate the immigration of people who agree to invest in the domestic economy will indeed ameliorate or even reverse the impact of immigration on wages and the distribution of income; but, perhaps counterintuitively, such programs will also reduce or eliminate the immigration surplus that otherwise would accrue to natives.

**Assuming constant returns to scale, if immigrants bring enough capital with them such that the capital-labor ratio does not change, then the economy simply grows larger. There is no negative wage impact nor is there an immigration surplus.**[10]

---

[10]If production is characterized by increasing returns to scale, where a particular fractional increase in all inputs yields more than the same fractional increase in output, an influx of immigrants together with capital may generate a rise in wages and a positive immigration surplus.

002521

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### How Else Can Capital Adjust?

Of course immigrants need not arrive with capital for immigration to prompt an adjustment to the stock of capital. Instead, the upward pressure on the rate of return to capital generated by the arrival of new workers provides an incentive for capital to either flow from abroad or to accumulate domestically. Here it is important to emphasize the unique attributes of the U.S. economy compared with smaller counterparts. Often it is appropriate to analyze the behavior of an economy using a small open-economy model. This is particularly appropriate if a large fraction of the economy's output is devoted to exports, if it is very open to inflows of capital from abroad, and if it represents such a small share of world output that changes in economic conditions originating in that country are unlikely to have meaningful effects on the global economy. In the context of a small open economy, an influx of immigrant workers is likely to be accompanied by an inflow of capital from abroad. Those who own the newly invested capital also own a claim to the income it generates, represented by the area of G + H in Figure 4-2. Once again, if capital flows into the economy along with the additional new immigrants, there is no change to native welfare or to the distribution of income between capital and labor.

Yet, even if capital flows freely into a small open economy and all the additional capital is readily purchased and easily transportable, there can still be substantial delays between the arrival of new immigrants and the time when new capital is ultimately installed. If the unexpected influx of new immigrants is relatively small, the resulting increase in the rate of return to capital will not be very large and will probably be very short-lived because the additional capital can be easily procured and installed at a low cost. Alternatively, if the influx of new immigrants is relatively large, the inflow of capital required to lower the rate of return to its long-run value will necessarily be large as well. Any effort to expedite the process of procuring and installing large amounts of additional capital, particularly as the immigrant influx was unforeseen, carries additional costs.[11] Meanwhile, during the period of adjustment, immigration exerts downward pressure on wages.

Of course the United States economy is not small and, as a consequence, transactions with the rest of the world account for a smaller share of its economic activity than for any other industrialized country. This means that much of the new capital added to the economy following an influx of new immigrants is likely to be produced locally. Higher rates of

---

[11]Small open economy models typically include convex capital adjustment costs to ensure that investment is not more volatile than what one typically observes in the data. See, for example, Hansen et al. (2015). Klein and Ventura (2009) analyzed the impact of enlarging the European Union and creating a common labor market in North America in a model where capital flows freely across borders.

002522

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2530 of 4699 PageID #: 5695

The Economic and Fiscal Consequences of Immigration

return induce higher savings rates and some shifting of production from consumer goods to capital. Yet, because people generally dislike sharp fluctuations in the amount they consume, this capital adjustment process may occur gradually, even in the absence of capital adjustment costs. Of course, if immigration is anticipated, then capital may adjust much faster. In fact, if the immigration episode is fully anticipated, capital can be increased in advance, reducing or eliminating the adjustment period.

Ben-Gad (2004) used a general equilibrium optimal growth model—the standard macroeconomic model where savings and investment are endogenously determined—to investigate the behavior of wages, returns to capital, and the size of the immigration surplus following an unanticipated change in immigration policy. To understand the overall effect of immigration flows, the change considered is a radical one—the permanent suspension of all future immigration to the United States. The result is a gradual increase in wages until they are 0.8 percent above their previous trend, and the rate of return to capital falls by 6 basis points, the equivalent of a decrease in interest rates from 4.06 to 4.00 percent.[12] Pursuing such a policy would mean relinquishing the immigration surplus. Yet, since capital gradually adjusts following the suspension of immigration, the loss measured in terms of the size of the U.S. economy in 2014 would amount to only about $4 billion.

**Summarizing, even if immigrants arrive without capital, domestic savings and investment will rise as a result of the higher return to capital. Once the capital-labor ratio is restored, the adverse wage effect of immigration and the immigration surplus disappear.**

### 4.3  EMPLOYMENT EFFECTS OF IMMIGRATION WITH ELASTIC LABOR SUPPLY

In exploring these simple models of the economy so far, we have assumed that the amount of labor each worker supplies is fixed rather than a function of wages or other income. Suppose instead that for each percentage increase in wages, workers, whether native or immigrant, increase the amount of labor $l$ they supply to the market by $v$ percent. The initial labor supply curve in Figure 4-3, $L_1^S$, is no longer vertical but slopes upwards and the total amount of labor supplied in equilibrium is $N \times l_1$. The arrival of M additional immigrants shifts the labor supply curve by the horizontal distance M to $L_2^S$, which exerts downward pressure on wages. Lower wages mean the equilibrium amount of labor supplied by each worker drops from

---

[12]Unlike the static analysis, here the change in immigration represents a change in long-run flows. The flow of immigrant workers dilutes the capital stock, hence any change in the flows has permanent (albeit small) effects on wages and the rate of return to capital.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-3** Labor market (with elastic labor supply) response to an influx of immigrant workers.

$l_1$ to $l_2$ while the aggregate amount of labor increases to $(M + N)l_2$. Qualitatively, the results from the previous section do not change: the unanticipated arrival of immigrants increases the amount of labor in the economy and initially lowers wages. The difference is quantitative: the higher the value of the own-wage supply elasticity, $v$, the more the per capita amount of labor rather than the wage adjusts with the arrival of the immigrants.

If the factor price elasticity of labor demand is $E_{LL} < 0$, the change in wages from $w_1$ to $w_2$ in Figure 4-3 following an immigration influx of size $M$ is $\dfrac{E_{LL}}{1 - v E_{LL}} \dfrac{M}{N} w_1$ or $\dfrac{E_{LL}}{1 - v E_{LL}} \dfrac{M}{N}$ when measured in percentage terms. The increase in the rate of return on capital is also mitigated by the adjustment of labor supply in response to lower wages; the demand curve for capital in Figure 4-4 initially shifts only part of the way outward and only shifts further as the supply of capital adjusts. The smaller the decline in wages the immigrants create, the smaller the immigration surplus they generate.

The area of triangle E in Figure 4-3 corresponds to the immigration sur-

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2532 of 4699 PageID #:  5697

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-4** Capital market (with elastic labor supply) response to an influx of immigrant workers.

plus. When measured as a fraction of output, it is $-\frac{1}{2}\left(\frac{M}{N}\right)^2 \frac{w_1 N}{Y} \frac{E_{LL}}{1-\nu E_{LL}}$

and it also declines as the value of $\nu$ increases. How large a value of $\nu$ could one reasonably assume? Few econometric studies estimate a single elasticity of labor supply for the entire population. At minimum, labor econometricians divide the population by gender and marital status and estimate elasticities for each subpopulation. The highest value for $\nu$ found by Blau and Kahn (2007) is 0.4 (for married women). If one treats $\nu = 0.4$ as an upper bound, and assuming once again that compensation of employees accounts for 65 percent of national income, the immigration influx that raises labor supply by 1 percent now yields an immigration surplus of only \$175 million, an influx of 2 percent yields \$698 million, and the entire stock of current immigrants, who contribute 16.5 percent of total hours worked, yields \$47.5 billion.[13]

---

[13]By contrast, in Ben-Gad's (2004) dynamic model with endogenous capital, if the elasticity of labor supply is 0.75, the loss to natives of abolishing future immigration flows is only \$3 billion.

002525

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2533 of 4699 PageID #:  5698

**In summary, if some natives exit the labor force in response to immigration, then there is an employment effect of immigration in addition to a wage effect. The wage effect is smaller, however, than in the case where native labor supply is fixed.**

### 4.4  MULTIPLE TYPES OF LABOR

#### Complementarities Between Worker Types

The simple models presented thus far have assumed there is a single labor market in the economy where all workers supply the same amount of labor and where this labor is qualitatively identical. In reality, workers differ in their levels of skill, experience, and education and in their occupations. Thus, in a modern economy there is not one uniform labor market but many.

To keep the analysis simple, we now assume that there are only two types of workers. One type supplies high-skilled labor and the other supplies low-skilled labor. The distinction between the two types of workers is sometimes made on the basis of what type of jobs they perform, but more often it is imputed on the basis of how many years of schooling or educational qualifications they have accumulated. In the model explored here, firms employ both types of workers along with capital to produce final goods. For simplicity, we once again assume that each worker supplies a fixed amount of his or her type of labor in the market.

Immigrant worker type will be crucial in determining how their arrival will affect wages and the returns to capital. In Figures 4-5, 4-6, and 4-7, the panel considers the case in which all immigrants fall into the low-skilled category—this is of course a gross simplification. In Figure 4-5, the arrival of $M_u$ low-skilled immigrant workers, augmenting the population of low-skilled native workers $N_u$, means that, just as in Figure 4-1, the supply curve in the market for low-skilled labor $L_{u,1}^S$ shifts to $L_{u,2}^S$. Wages for low-skilled workers decline from their initial value of $w_{u,1}$ to $w_{u,2}$. In the economy with undifferentiated labor, the influx of immigrant workers in Figure 4-1 raised the productivity of the second factor of production, capital, as shown in Figure 4-2. Likewise, here, the influx of low-skilled workers complements the other two factors of production, capital and high-skilled labor, and raises their productivity. This change in the market for high-skilled labor is captured in Figure 4-6 by the shift in the demand curve $L_{s,1}^D$ to $L_{s,2}^D$ and the rise in wages for high-skilled workers from $w_{s,1}$ to $w_{s,2}$. As before, the increase in the supply of one factor of production, in this case low-skilled labor, increases the value of the remaining factors, both high-skilled labor in Figure 4-6 and capital in Figure 4-7, where the influx of new immigrants once more causes the outward shift in the demand curve from $K_1^D$ to $K_2^D$ and raises the rate of return from $r_1$ to $r_2$.

002526

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-5** Low-skilled labor market response to an influx of low-skilled immigrant workers.



**FIGURE 4-6** High-skilled labor market response to an influx of low-skilled immigrant workers.

002527

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2535 of 4699 PageID #:  5700



**FIGURE 4-7** Capital market response to an influx of low-skilled immigrant workers.

How large are the initial changes in the two wages and the returns to capital likely to be? Start with the low-skilled natives who now face direct competition from immigrants in their labor market. Generally, the smaller the share of workers in a given category, the greater in absolute value the corresponding value of the factor price elasticity will be.[14] Take the example in which the labor force is equally divided between high-skilled and low-skilled workers. In this case, a 1 percent increase in the overall number of workers will not depress overall wages as much as the wages of low-skilled workers would fall when the influx is only half as large but completely confined to the ranks of the low-skilled. When comparing the effects of an influx of equal absolute size, this contrast becomes yet more pronounced.

Moreover, the way the model distinguishes between different types of workers crucially affects how the wage rate will respond to influxes of new immigrants. The more the labor force is disaggregated, the larger the own-wage response will be to an increase in immigration if all the immigrants are

---

[14] For Cobb-Douglas production functions, this is precisely true. The factor price elasticity of workers in category $i$ is equal to $E_{LL} = \frac{w_i N_i l_i}{Y} - 1$.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2536 of 4699 PageID #:  5701

confined to one particular category of labor. Even if the analysis is restricted to just two types of labor, the more broadly the category of high-skilled workers is defined, the more narrow the category of low-skilled workers will be and, in all likelihood, the larger (in absolute value) the corresponding elasticity of the own-factor price for low-skilled labor $E_{UU}$. What this means is that the slope of the low-skilled labor demand curve $L_{u,1}^{D}$ in Figure 4-5 is likely to be steeper than the slope of the aggregate labor demand curve $L_1^{D}$ in Figure 4-1.

The effect of low-skilled immigration on the other two factors of production largely depends on the value of elasticities $E_{SU}$ and $E_{KU}$, which represent the percentage change in high-skilled wages and returns to capital, respectively, divided by the percentage change in the number of low-skilled workers. Most evidence suggests that these elasticities are positive but not very large. In other words, there is a relatively low degree of complementarity and comparatively high degree of substitutability between low-skilled labor and both high-skilled labor and capital. This means that the shifts in the demand curves $L_{s,1}^{D}$ to $L_{s,2}^{D}$ and $K_1^{D}$ to $K_2^{D}$ are not likely to be very large, and consequently the initial increase in wages from $w_{s,1}$ to $w_{s,2}$, and the increase in returns to capital $r_1$ to $r_2$ are unlikely to be very large either.

**The bottom line here is that immigration is predicted to raise native wages in the case where immigrant and native workers are complements, meaning their productivity rises from working together. Native workers who are substitutes for immigrants, however, will experience negative wage effects.**

### The Immigration Surplus with Immigrant–Native Complementarity

In the model above, the two elasticities $E_{SU}$ and $E_{KU}$ determine the size of the short-term immigration surplus, which now comprises two elements: the surplus that accrues to native high-skilled workers, represented by the triangle $E_S$ in Figure 4-6, and the surplus that accrues to whichever natives own capital, represented by the triangle $E_K$ in Figure 4-7.[15] The size of each triangle is determined by the magnitude of the shift in the demand curve which is, in turn, determined by the elasticities $E_{SU}$ and $E_{KU}$. The sum of the two surpluses represented by $E_S$ and $E_K$ is equal to the area of the triangle marked $E_S + E_K$ in Figure 4-5. Indeed, as long as the influx of immigrants is confined to one skill category, it is sufficient to know the elasticity of

---

[15] If one assumes the constant returns aggregate production function $F(x)$ applies, there is a close relationship between all the factor price elasticities: $\sum_i E_{ij} = 0$ and $\sum_i \alpha_i E_{ij} = 0$, where $E_{ij} = \alpha_i c_{ij}$. The elasticity of complementarity between factors $i$ and $j$ is $c_{ij} = \dfrac{F(x)F_{ij}}{F_i F_j}$.

002529

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

demand for that type of labor to determine the size of the immigration surplus, which can then be calculated as it was in the case of undifferentiated labor, using the formula $-\frac{1}{2}\left(\frac{M_u}{N_u}\right)^2 \frac{w_{1,u}N_u}{Y} E_{UU}$ .

Suppose again that the population is equally divided between high- and low-skilled workers and that the former receive a wage twice as high as the latter. The share of income paid for low-skilled work is now one-third of 0.65 (the overall share of earnings in total national income), or approximately 0.22, against 0.43 (the remaining portion) for high-skilled work. Finally, assume the value of $E_{UU} = -0.6$. Together these values imply that an influx of low-skilled immigrants that increases the overall labor force by 1 percent but raises the size of the low-skilled workforce by 2 percent lowers low-skilled wages by 1.2 percent. The influx generates an immigration surplus of just under $462 million for the $17.5 trillion U.S. economy, which is substantially larger than the immigration surplus in the model above that assumed only one type of labor. If one now assumes that $E_{KU} > 0$, the value of $E_{SU}$ can be at most no higher than 0.31, which means wages for high-skilled workers increase by no more than 0.62 percent in response to the influx of low-skilled immigrants. Borjas (2014a) cited $E_{SU} = 0.05$ as a more empirically plausible number, which implies a rise in wages of 0.1 percent. Furthermore, if $E_{UU} = -0.6$ and $E_{SU} = 0.05$, the income shares imply $E_{KU} = 0.32$, so the losses experienced by low-skilled workers represent for the most part gains to owners of capital rather than to high-skilled wage earners.

**Summarizing, the immigration surplus is larger when immigrant workers are complementary to natives. Income from the surplus accrues to both owners of capital and high-skilled workers when immigrants are low-skilled.**

### Capital Accumulation in a Model with Immigrant-Native Complementarities

As in the one-labor-category model (Section 4.2), the rise in the rate of return to capital in the two-category model induces capital inflows or capital accumulation. This process raises the wages of both types of workers. Wages of high-skilled workers rise still further as the stock of capital grows, and the wages of low-skilled workers partially recover as well. Yet with more than one type of labor, neither the process of capital accumulation nor even the free flow of capital from abroad is sufficient to guarantee that wages return to their previous levels for *both* groups following an unexpected immigration episode, even in the long run, unless it also affects native occupational choice and investment in education. And even then this adjustment is a very long-run phenomenon. What this means is that

002530

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the shift in low-skilled wages from $w_{u,2}$ to $w_{u,3}$ only partially mitigates the initial decline from $w_{u,1}$.[16]

**Restating this, once the capital-labor ratio is restored, average wages are also restored, as in the model with just one type of labor. However, in a framework with two types of labor and regardless of any complementarities, *relative* wages may not return to pre-immigration levels. If immigrants are low-skilled, the deterioration of the relative wages of low-skilled workers may persist in the long run.**

### The Role of Capital-Skill Complementarity in the Immigration Surplus

There is one more aspect to the dynamic impact of capital accumulation in this context. Empirical work on U.S. manufacturing, dating back to work by Zvi Griliches (1969) and confirmed by subsequent research, suggests there is evidence of what economists call "capital-skill complementarity."[17] Indeed, consistent with this evidence, in representing the demand curves in Figures 4-5 and 4-6, we assumed that the factor price elasticity of the demand curve for high-skilled workers is higher in absolute value than that corresponding demand curve for low-skilled workers—that is, that the demand curve for high-skilled workers is more steeply sloped than the demand curve for low-skilled workers. The result is that additional increments of capital raise the productivity and hence the wage of high-skilled workers more than they raise the wage of low-skilled workers. Though wages for both may rise, the additional capital also partly substitutes for low-skilled labor to a degree it does not substitute for high-skilled labor.

Capital-skill complementarity has another implication: The immigration surplus generated by an increase in the number of high-skilled workers is potentially much larger than for a similar-sized influx of low-skilled workers. To see this, consider what happens in the market for high-skilled labor when the population of high-skilled native workers $N_s$ is augmented by $M_s$ high-skilled immigrant workers. The labor supply curve shifts from $L_{s,1}^S$ to $L_{s,2}^S$ in Figure 4-8 and wages decrease from $w_{s,1}$ to $w_{s,2}$. The immediate impacts of

---

[16]This is the pattern found by Ben-Gad (2008), who simulated the dynamic behavior of wages and returns to capital following a temporary surge in either low-skilled or high-skilled immigration in a model with a nested constant elasticity of substition (nested CES) production function that incorporates capital-skill complementarities. In Table 5-1 in Chapter 5, the panel considers a different configuration of the nested CES production function in which the elasticities of substitution between different types of labor vary but the elasticities of substitution between capital and the different types of labor are identical.

[17]Studies by Fallon and Layard (1975) and Krusell and colleagues (2000) for the United States and by Duffy et al. (2004) using international data all confirm this finding. Goldin and Katz (1998) suggested that capital-skill complementarity emerged during the early 20th century with the transition from artisanal to mass production.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2539 of 4699 PageID #:  5704



**FIGURE 4-8** High-skilled labor market response to an influx of high-skilled immigrant workers.

an influx of each category of immigrant labor skill on the demand for the second category in Figures 4-6 and 4-9 are qualitatively identical, as is the impact on the demand for capital in Figures 4-7 and 4-10.

What is different is that because of capital-skill complementarities, the outward shift in the demand curve from $K_1^D$ to $K_2^D$ in Figure 4-10 is assumed to be substantially larger than the shift in Figure 4-7. This means the rise in the rate of return is larger and the value of the capital-related component of the short-term immigration surplus $E_K$ is larger as well. Indeed, if one assumes that the share of national income captured by high-skilled immigrants is larger than the share captured by low-skilled immigrants and that the elasticity $E_{US}$ is greater than $E_{SU}$, then the demand curve in Figure 4-9 shifts outward more than in Figure 4-6. Hence, a percentage increase in the number of high-skilled workers raises the wages of low-skilled workers by more than the same percentage increase in low-skilled workers raises the wages of the high skilled.

Assume once again that the initial population is divided equally between high- and low-skilled workers, and that high-skilled workers receive a wage twice that of the low skilled. Assume further that the demand for high-skilled workers is more elastic than for low skilled, such that $E_{SS} = -0.9$.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2540 of 4699 PageID #:  5705

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-9** Low-skilled labor market response to an influx of high-skilled immigrant workers.



**FIGURE 4-10** Capital market response to an influx of high-skilled immigrant workers.

002533

Copyright National Academy of Sciences. All rights reserved.

The immigration surplus generated by high-skilled immigrants, here equal to $-\frac{1}{2}\left(\frac{M_s}{N_s}\right)^2 \frac{w_{1,s}N_s}{Y}\mathrm{E}_{ss}$, of a 1 percent increase in the number of workers, all now high-skilled immigrants, is equal to just over $1.35 billion in a $17.5 trillion economy.

Furthermore, because the rise in the rate of return is higher when high-skilled rather than low-skilled immigrants are added to the economy, the inflow or accumulation of capital will be larger as well. This means that the further increase in low-skilled wages from $w_{u,2}$ to $w_{u,3}$ will be somewhat higher and that, in particular, a more significant portion of the loss in high-skilled wages will be corrected in the long term as the demand curve in Figure 4-8 shifts from $L_{s,1}^D$ to $L_{s,2}^D$. This means that even after the long-run accumulation of capital is accounted for, here the immigration surplus does not completely disappear. Simulations by Ben-Gad (2008) found that even if university-educated workers are only 2.7 times more productive than workers without degrees, university-educated immigrants generate a surplus for natives 10 times larger than the surplus generated by other immigrants.

Immigration generates a surplus that accrues to both immigrants and natives, but the latter capture a larger share of the surplus when immigrants are skilled. **Capital is likely more complementary to high-skilled than low-skilled labor, which has implications for the immigration surplus.**

### Immigration Surplus in the Long Run

It might seem odd that the influx of the same number of immigrants who are exclusively either high-skilled or low-skilled can each generate a surplus larger than the influx generated by immigrants in the model with undifferentiated labor. The reason for this result is that by altering the skill distribution in the economy, immigrant labor creates shifts in wages that represent opportunities for native-born workers. In other words, the arrival of new workers from abroad disrupts the relative supply of different factors of production, and it is this disruption that generates the immigration surplus. The more disruptive the influx—here not only the number of workers but the mix of different skill types is altered—the greater the magnitude of the surplus.

This last point is emphasized by Borjas (2014a), who examined the immigration surplus for varying proportions of high- and low-skilled immigration.[18] In his model, the high-skilled group consists of workers with more than a high school education. Applying this criterion to data from the 2000 Decennial Census, 61.4 percent of natives can be categorized as

---

[18]See Chapter 6.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2542 of 4699 PageID #:  5707

The Economic and Fiscal Consequences of Immigration

high skilled, but only 48.9 percent of immigrants classify as such. Given that immigrants comprise approximately 15 percent of the U.S. workforce, the theoretically derived calculation of the short-run immigration surplus (where capital remains fixed) yields an estimate of between 0.24 percent and 0.5 percent of GDP, but the long-run surplus (after the stock of capital has adjusted) reduces to between 0.02 and 0.03 percent of GDP. Immigrants fail to generate a substantial surplus because they are too similar to the population absorbing them. By contrast, if all the immigrants were low skilled, the short-run surplus would be between 0.45 and 0.9 percent and the long-run surplus between 0.42 and 0.77 percent. If all the immigrants were high skilled, the corresponding numbers are 0.75 and 1.35 percent in the short run, and 0.16 and 0.31 percent in the long run. In the short run, natives benefit most from the arrival of high-skilled immigrants because of capital-skill complementarities, but in the long run, low-skilled immigrants generate the larger surplus because they are more dissimilar to natives. In all cases, **once capital adjusts, capital-skill complementarity is less important to the immigration surplus. The extent to which the immigrant skill set differs from that of natives has, in theory, comparatively more effect on the magnitude of the immigration surplus in the long run.**

## 4.5  MULTIPLE TECHNOLOGIES AND MULTIPLE GOODS

### Immigration and Output Mix

So far, this discussion has assumed that people in this model economy produce and consume some aggregate good (or, similarly, that there are many goods but they are produced using the same production technology). It is instructive to consider the impact of immigration under a set of alternative assumptions about the nature of markets, including in the context of a model designed to analyze the impact of international trade.

Assume once again that the economy being modeled produces the goods it consumes by combining two factors, capital and labor, but instead of one type of good it now produces two distinct goods, designated A and B in the Lerner diagram in Figure 4-11.[19] The technology represented has the familiar characteristic of constant returns to scale, but allows for different combinations of capital and labor in the production of different goods. More specifically, to produce each unit of good A requires relatively large amounts of capital and less labor, while the production of good B employs relatively more workers and uses less capital. Assume further that all goods are freely traded internationally. This assumption simplifies the analysis because it implies that the prices of each good are set in global markets.

---

[19]The diagram was developed by Lerner (1952).

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2543 of 4699 PageID #: 5708

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-11**  The allocations of capital and labor in a two-good economy, before and after immigration.

The rays from the origin labeled A and B each represent the combination of capital and labor that is required to produce one of the final goods. The shaded area between the two rays is referred to as the cone of diversification. This means that, if the economy's total initial endowment of productive inputs—its stock of capital $K$ and available labor $N$—falls within this area, one expects this economy to produce both goods. The alternatives are that the economy exclusively produces good A if the initial endowment is to the left of the shaded area or exclusively produces good B if the initial endowment is to the right of the shaded area.

In the case assumed in Figure 4-11, initially—before the arrival of new immigrants—the production of good A employs most of the labor $N_{A,1}$ and capital $K_{A,1}$, leaving only a comparatively small amounts $N_{B,1}$ and $K_{B,1}$ employed in the production of good B. All this changes when the initial work force $N$ is supplemented by the arrival of $M$ new immigrants, causing the initial endowment to shift horizontally to the right. Still, as long as the shift is not large enough to carry the new endowment point outside the cone of diversification, the economy continues to produce both types of goods.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Since both goods are traded on world markets, and at fixed world prices, the amount of each good consumed does not change. What does change is the pattern of this economy's trade with the rest of the world.

Suppose that before the arrival of the immigrants, the economy exported A and imported B. After the arrival of the immigrants, the volume of trade would decline and, if the effect is sufficiently large, one expects a switch toward importing A and exporting B. Alternatively, if initially this economy imported A and exported B, the volume of this trade would increase. To provide a concrete example, suppose the garment industry in this economy is relatively labor intensive. Its domestic garment industry produces less than the total amount of garments consumed and the remainder is imported. The arrival of more labor will reduce the volume of these imports and increase the amount produced domestically.

Of course none of these rather extreme assumptions is particularly representative of the condition of the U.S. economy as it absorbs new workers from abroad. Neither the prices of different goods nor the wages or returns to capital are fixed in global markets, and this simple example abstracts from the way trade can shift production within sectors between different firms. Yet even if the assumptions are mostly unrealistic, the analysis is useful because it captures in a relatively extreme fashion an additional dimension through which immigration alters the U.S. economy: reallocating output between the production of different goods. Adjustment through changes in the mix of goods produced, along with the subsequent changes in both the volume and pattern of international trade, implies less adjustment through factor prices and so will dampen, to some degree, the downward pressure immigration might otherwise exert on wages in the short run.

Of course final goods are not the only things traded—factor inputs including capital are imported and exported. Indeed the very process of international migration represents a flow of the factor input labor between countries and can serve as a substitute for trade in final goods. Workers can produce a good in a foreign country and export it to the United States, driving down both the price of the good paid by U.S. consumers and the wages of their American counterparts. Alternatively they can migrate to the United States and expand domestic production. Qualitatively the effect would be similar. Hence, there is some degree of substitution between international migration and international trade.

**Summarizing, firms that use relatively labor-intensive technology benefit more from immigration and respond by increasing production and, hence, their demand for labor. The subsequent change in the economy's output mix is larger the closer the trade ties are between the receiving economy and the rest of the world, and this change further reduces any adverse impact of immigration on wages.**

002537

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Immigration and Technology

Thus far, the models discussed in this chapter have assumed that the technology for any given firm or industry is fixed and exogenously determined. In reality, technology progresses. Recognition that firms may have a choice of technologies, that the evolution of technology is likely to be influenced by changes in the composition of labor, and that immigrants themselves may hasten the process of technological change leads to an appreciation of additional links between immigration and wages.

Consider the possibility that a good may be produced with either of two technologies. Instead of assuming two different goods as above, Figure 4-11 now models an economy such that A and B represent different technologies.[20] Method A is more capital intensive than method B, but if one assumes that wages and the rate of return to capital are determined on world markets, the analysis illustrated by Figure 4-11 does not change. An influx of new immigrants now causes the amount produced using technology B to increase and the amount produced using technology A to decline.

The aggregate amount of capital remains constant as long as its rate of return is determined on global markets, but the amount used by type A firms declines from $K_{A,1}$ to $K_{A,2}$, and the amount used by type B firms increases from $K_{B,1}$ to $K_{B,2}$. The shift in the allocation of capital reinforces the shifts in the allocation of labor, so that even though the total amount of labor in the economy grows, the amount employed by type A firms always declines from $N_{A,1}$ to $N_{A,2}$. Since this case assumes that the labor supplied by natives and by immigrants is identical, one can assume furthermore that all $M$ new immigrants join type B firms. Even so, the number of native workers employed at type B firms increases as well, from $N_{B,1}$ to $N_{B,2}$. Hence, if one assumes the economy is completely open and all the relevant prices, including wages and rates of return are determined on global markets, the economy can still absorb large numbers of immigrant workers by reallocating both capital and labor between the different types of technologies available.

As with the introduction of multiple goods, the introduction of different modes of production for the same good provides an additional channel through which immigration may alter the economy and absorb some of the impact that might otherwise force down wages. In the case analyzed by Lewis (2013), this result extends beyond the two-factor example with only one type of labor to models with multiple types of labor. Namely, an influx of immigrants who supply a particular type of labor once again causes a portion of output to shift toward those firms that employ that labor most intensively. Adding more types of technology increases the range of possible responses of industry to an influx of new immigrants.

---

[20]See Trefler's (1998) analysis of the Heckscher-Ohlin model of international trade.

002538

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2546 of 4699 PageID #:  5711

The Economic and Fiscal Consequences of Immigration

Of course, it is unlikely that the transition between different modes of production is instantaneous. Beaudry and Green (2005) modeled an economy that is gradually transitioning between older and newer, more advanced technologies that rely more heavily on both capital and high-skilled workers. They found that the pace at which the older technology is replaced is determined by the pace at which both physical and human capital accumulate. (Chapter 6 examines the role of human capital in more detail.) An influx of new immigrants alters not only the supply of overall labor relative to capital but also the relative supply of different types of labor, potentially changing the pace of the transition. Another implication of the Beaudry and Green model is that an increase in the number of high-skilled workers may not only lower the wages these workers can command in the market but, in contrast to the analysis in Section 4.4, may also lower the wage of low-skilled workers as well, since capital shifts away from the traditional sector.

It is useful to go a step further, and ask how these different technologies arise. The shifting availability of workers with different levels or types of skill alters the incentives for the development of different types of technology. Hence, an influx of high-skilled workers would spur the development of new technologies that complement the type of labor they supply. Acemoglu (1998, 2002b) raised the possibility that while the arrival of a particular type of worker may lower wages in the short term, the new technologies that develop in response raise these workers' productivity and ameliorate the decline in wages over time.

Indeed under certain conditions, particularly if there is a high degree of substitutability between the different workers in the economy, the long-run labor demand curve will slope upward.[21] Consider once more an influx of high-skilled immigrants $M_S$ in Figure 4-12 that shifts the supply of labor from $L^S_{s,1}$ to $L^S_{s,2}$. In the initial phase, the wage drops from $w_{s,1}$ to $w_{s,2}$ along the short-run labor demand curve $L^D_{s,1}$. Over time, as new technologies are developed to take advantage of the now more plentiful supply of high-skilled labor, the demand curve shifts out to $L^D_{s,2}$ and wages increase from $w_{s,2}$ to $w_{s,3}$. The long-run demand curve for high-skilled labor is upward sloping.

It is further possible that immigration could speed technological progress for any given skill group if skilled immigrants are themselves innovative or provide entrepreneurial skills complementary to native innovators. This would reinforce the endogenous technological change just described. The theoretical link between immigrants and innovation is considered further in the context of immigration and economic growth in Chapter 6.

Once again, even for relatively small countries most of the assumptions made in the models discussed in this chapter are unrealistic. Even in small

---

[21]Acemoglu (2002a) used this mechanism to explain why the relative wage of college-educated workers increased even as the supply of these workers grew.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 4-12** High-skilled labor market response to an influx of high-skilled immigrant workers (with long-run technological change).

countries, wages and prices are not solely determined on international markets, and to a degree neither is the return to capital. Furthermore, not all goods are tradeable across different countries or even different regions. For a country as large as the United States, with its enormous and relatively autarkic internal market, these assumptions are even less realistic. However, it is important to emphasize that the assumptions for these models have been made to simplify the analysis and to isolate effects that are still likely to exist to some degree, even if none of the assumptions are strictly true in a real economy. What this means is that many of the wage effects described in earlier sections are likely to be diluted by the response of firms (for example, altering the mix of goods and services they produce, shifting between modes of production, or developing new technologies) as the labor supplied by new immigrants is made available in the market.

**Summarizing, firms can also respond to immigration by implementing technologies that are complementary to the type of labor immigrants' supply; this is another adjustment mechanism that mitigates adverse wage effects.**

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2548 of 4699 PageID #:  5713

The Economic and Fiscal Consequences of Immigration

### 4.6  RESPONSES BY NATIVES

Finally, we briefly note that there are other margins of adjustment to immigration that are not related to technology or even firms but also serve to reduce the wage impact of immigration. Of particular importance is that responses by natives may mitigate the wage effects of immigration. Individuals who compete with immigrants may choose to better exploit their comparative advantage in language or to upgrade their human capital. For example, if immigrants are not native speakers of English, immigration changes the comparative advantage of the native-born toward tasks that are more language and communication intensive and encourages them to shift into occupations utilizing these skills. This response mitigates negative wage impacts of immigration (Peri and Sparber, 2009). Furthermore, incentives to increase education are influenced by the wage structure, which is in turn affected by the entry of immigrant workers (Chiswick, 1989; Chiswick et al., 1992). If immigration causes increased wage inequality, younger natives may increase their education in response, mitigating negative wage impacts on the unskilled in the long run. Evidence of these effects is examined in the next chapter.

### 4.7  THE LINK BETWEEN IMMIGRATION
### AND FRICTIONAL UNEMPLOYMENT

How does immigration affect the rates of employment or unemployment of native workers? For the case of an elastic labor supply, the influx of immigrant workers in Figure 4-3 initially lowers the wage from $w_1$ to $w_2$, and the amount of work supplied by an average native declines from $l_1$ to $l_2$. Yet this decline in the amount of work performed by natives does not correspond to an increase in the rate of unemployment as economists usually define this term. By the conventional definition, people are considered unemployed if they are willing to work at the prevailing wage but cannot find a firm willing to hire them.

In modern economies there are nearly always some people who are unemployed and, at the same time, some number of firms with vacancies they wish to fill. Over time, as the unemployed fill existing vacancies, others lose or quit their jobs and new people enter the labor market. Similarly, even as some firms die or shrink in size, causing workers to become unemployed, other firms expand or are established, creating new vacancies. Diamond (1982) and Mortensen and Pissarides (1994) constructed models in which this type of frictional unemployment emerges from the behavior of the unemployed searching for new jobs and firms searching for new employees. In these models, an unemployed individual must decide in each period whether to accept a job offer rather than remaining unemployed for

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

another period, in which case he or she remains available to accept some better job that might be offered in the future.

To date, there are only a few published papers that simulate and analyze the impact of immigration within this search and matching framework. Ortega (2000) analyzed immigration between two countries in a stylized model with only one type of labor. Liu (2010) analyzed the impact of unauthorized low-skilled immigration between 1970 and 2005 on unemployment in the United States. Chassamboulli and Palivos (2014) generalized these two papers and analyzed the impact of immigration between 2000 and 2009 on the U.S. labor market. Finally, Chassamboulli and Peri (2015) analyzed the impact of curtailing illegal immigration from Mexico. What these studies share is the seemingly paradoxical result that although larger immigration flows may generate higher rates of unemployment in some sectors, overall, the rate of unemployment for native workers declines.

In the baseline version of the Chassamboulli and Palivos (2014) model, immigration increased the size of the overall labor force by 6.1 percent over the course of a decade. A slightly larger share of the immigrants had college degrees compared to natives, 28.8 percent versus 27.4 percent. The influx caused a decline of 0.31 percent in the wages of high-skilled native workers and a rise of 0.24 percent in the wages of low-skilled native workers. These results mimic the patterns of change in wages implied by the analysis in Figures 4-8 and 4-9. At the same time, the long-run rate of unemployment simulated by the model dropped as a result of immigration from 6.10 percent to 5.46 percent for low-skilled natives and from 2.40 percent to 2.02 percent for high-skilled natives. Why do both unemployment rates decline?

The explanation is that in all of these search and matching models, searching for new workers is costly for firms. The entry of new workers through migration increases the likelihood of filling a vacant position quickly and thus reduces the net cost of posting new offers. The fact that immigrants in each skill category earn less than natives reinforces this effect. Though immigrants compete with natives for these additional jobs, the overall number of new positions employers choose to create is larger than the number of additional entrants to the labor market. The effect is to lower the unemployment rate and to strengthen the bargaining position of workers. Hence, aggregating across the two skill types, wages for all natives increase by 0.07 percent.

According to the simulations performed by Chassamboulli and Palivos (2014), the new immigrants who arrived between 2000 and 2009 had a particularly large and positive impact on the wages paid to the pre-existing stock of immigrants, whether high or low skilled. This result contradicts much of the empirical literature on wage effects, which generally finds that new immigrants are close substitutes for previous waves of immigrants.

002542

Copyright National Academy of Sciences. All rights reserved.

In the simulations performed by Chassamboulli and Peri (2015), a drop of 50 percent in the stock of unauthorized immigrants from Mexico, accomplished by either stricter border enforcement or more deportations, will raise the wages of low-skilled workers by 0.56 percent and lower wages for high-skilled workers by 0.35 percent. At the same time, the removal of these unauthorized immigrants lowers the rate of employment for high-skilled workers from a baseline rate of 87.00 percent to 86.94 percent. The now smaller number of unauthorized immigrants, all assumed to be low skilled, impedes firms' overall incentive to search for these types of workers, causing the employment rate for low-skilled workers to drop from 73.0 percent to 72.4 percent.

What one learns from the papers investigating the effect of immigration on unemployment using search and matching models is that whatever the short-term impact of immigration on unemployment found in empirical studies, it would be wrong to automatically assume that an increase in the flow of new immigrants must necessarily push up the rate of unemployment in the long run. **In short, immigration can lower native unemployment by reducing search costs for employers.**

## 4.8 CONCLUSIONS

The theoretical models point to many ways in which economic responses by individuals and firms are expected to mitigate the initial impact of immigration on the labor markets of receiving countries. Once immigration changes the relative prices of labor and capital, factor inputs are reallocated across sectors and firms may adjust their technology and output mix to make more intensive use of workers. The existing labor force may also respond by investing in certain skills and upgrading their human capital (as discussed further in Chapter 6). However, theoretical models are at best partial representations of the real-world objects they seek to analyze. For models to be tractable, assumptions are made to ignore certain phenomena or to fix the values of some key economic variables. For example, aggregating across different types of workers and across different types of immigrants and natives necessarily means a loss of detail. Still, a few important insights into the impact of immigration on the receiving economy emerge.

First, the arrival of an unanticipated inflow of immigrants initially affects the economy by changing the wage structure—reducing the wages of those natives most similar to immigrants but possibly raising the wages of other natives—and by increasing the return to capital. Second, the responses of capital and technology mean many, though not all, of these initial changes may be transitory in nature. In the long run, changes in the economy's output mix and the adoption of technology that favors

002543

Copyright National Academy of Sciences. All rights reserved.

196     THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

immigrant labor provide potentially important adjustment mechanisms to mitigate adverse wage effects of immigration. Decisions of natives to move into occupations where they have a comparative advantage or to invest in their human capital may also reduce adverse wage effects.

Third, the arrival of immigrants raises the overall income of the native population that absorbs them: the immigration surplus. This surplus is directly related to the degree to which immigration changes wages and returns to capital. In the simplest models, the more wages decline, the larger the surplus. Moreover, the size of the surplus is likely to be small—far smaller than the effect immigration has on the distribution of income. Immigration enlarges the economy while leaving the native population slightly better off on average, but the greatest beneficiaries of immigration are the immigrants themselves as they avail themselves of opportunities not available to them in their home countries.

002544

Copyright National Academy of Sciences. All rights reserved.

# 5

# Employment and Wage Impacts of Immigration: Empirical Evidence

## 5.1 INTRODUCTION

The primary impact of immigrant inflows to a country is an expansion in the size of its economy, including the labor force. Per capita effects are less predictable: An injection of additional workers into the labor market could negatively impact some people in the pre-existing workforce, native- and foreign-born, while positively impacting others. The wages and employment prospects of many will be unaffected. The direction, magnitude, and distribution of wage and employment effects are determined by the size and speed of the inflow, the comparative skills of foreign-born versus native-born workers and of new arrivals versus earlier immigrant cohorts, and the way other factors of production such as capital adjust to changes in labor supply. Growth in consumer demand (immigrants also buy goods and services), the industry mix and health of the economy, and the nation's labor laws and enforcement policies also come into play.

The primary determinant of how immigration affects wages and employment is the extent to which newly arriving workers substitute for or complement existing workers. As laid out theoretically in Chapter 4, wages may fall in the short run for workers viewed by employers as easily substitutable by immigrants, while wages may rise for individuals whose skills are complemented by new workers. For example, suppose foreign-born construction workers enter the labor market, causing a decrease in construction workers' wages. Firms will respond by hiring more construction workers. Since additional first-line supervisors may be needed to oversee and coordinate the activities of the expanded workforce, the demand

002545

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and hence the wages of these complementary workers could receive a boost. On the other hand, where immigrants compete for the same jobs, whether as construction workers or academic mathematicians (Borjas and Doran, 2012), employment opportunities or wages of natives are likely to suffer.[1] Further, where the availability of low-skilled immigrants at lower wages allows businesses to expand, total employment will rise. Wage and employment effects are predicted to be most pronounced in skill groups and sectors where new immigrants are most concentrated.

Given the potential for multiple, differentiated, and sometimes simultaneous effects, economic theory alone is not capable of producing decisive answers about the net impacts of immigration on labor markets over specific periods or episodes. The role and limitations of theory were assessed by Dustmann et al. (2005, p. F324):

> Economic theory is well suited to help understand the possible consequences of immigration for receiving economies, and the theoretical aspects of the possible effects of immigration for the receiving economies' labour markets are well understood. That is not to say that predictions of theory are clear-cut, however. It is compatible with economic models that changes in the size or composition of the labour force resulting from immigration could harm the labour market prospects of some native workers; however, it is likewise compatible with theory that immigration even when changing the skill composition of the workforce has no effects on wages and employment of native workers, at least in the long run. Economic models predict that labour market effects of immigration depend most importantly on the structure of the receiving economy, as well as the skill mix of the immigrants, relative to the resident population.

Empirical investigation is therefore needed to estimate the magnitude of responses to immigration by employers, by native-born and earlier-immigrant workers and households, by investors, by the public sector, and in housing and consumer-goods markets (Longhi et al., 2008, p. 1). Dynamic conceptual approaches are needed to assess some of the impacts of immigration, particularly those that require long periods of time to unfold.

In the context of the U.S. experience, immigrants have historically been most heavily represented in low-skilled occupations. This has prompted an extensive body of empirical work investigating whether immigration has had a negative effect on the wages and employment of low-skilled

---

[1]Detailed discussion of when immigrant labor complements and when it substitutes for native employment can be found in Foged and Peri (2014) who analyzed relative employment effects using longitudinal employer-employee data for Denmark covering the period 1991-2008. Mouw et al. (2012) and Rho (2014) also examined this question using evidence from the Census Bureau's Longitudinal Employer Household Data on worker displacement in high-immigration industries.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2554 of 4699 PageID #:  5719

natives and earlier immigrants. However, a substantial and growing share of immigrants is highly skilled. In part because of this change—and also because of the possibility of positive spillovers from the highly skilled to other workers and to the economy more generally—this group is receiving increased attention. The panel's summary of the literature in this chapter reviews both these strands of research: After reviewing the pivotal influence of substitutability among different labor inputs in Section 5.2, the focus of Sections 5.3 and 5.4 is predominantly on empirical analyses of low-skilled markets. Section 5.5 reports on a cross-study comparison of the magnitude of immigrants' impacts on wages. Section 5.6 examines some of the research findings about the highly skilled, including the impact of immigration on innovation.

Given the complexity of mechanisms through which immigration shapes the economy, it is not surprising that the empirical literature has produced a range of wage and employment impact estimates. The basic challenge to overcome in empirical work is that, while wages before and after immigration can be observed, the counterfactual—*what the wage change would have been if immigration had not occurred*—cannot. A range of techniques has been used in the construction of this counterfactual, and all require assumptions to facilitate causal inference (i.e., identifying assumptions). The different approaches can be judged in part by the plausibility of these assumptions.

The panel has organized this review of empirical studies primarily in terms of methodological approach, using three labels common in this literature. We first describe and present results from *spatial* studies, which compare worker outcomes across geographic areas. Next, we review results from analyses that use aggregate (nationwide) data, including *skill cell* studies, which compare worker outcomes across groups defined to have similar education and experience, and *structural* studies, which implement the skill cell approach with a closer connection between theory and empirical estimation. Much of the discussion in these sections is concentrated on studies of the overall labor market and the low-skilled labor market. Later in the chapter, we turn our attention to evidence about high-skilled labor markets, including the effect of skilled immigration on innovation and entrepreneurship.

Spatial studies define subnational labor markets—frequently, these are metropolitan areas—and then compare changes in wage or employment levels for those with high and those with low levels of immigrant penetration, controlling for a range of additional factors that make some destination locations more attractive than others. As immigrants are likely to settle in those metropolitan areas that have experienced positive economic shocks, econometric methods are used to identify spatial variation in immigrant penetration that can be considered "exogenous"—that is, not determined

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2555 of 4699 PageID #:  5720

within the system being studied—with respect to the outcome that is modeled, which is typically the wages or employment of native-born workers. To illustrate, suppose an analyst is interested in identifying the impact of immigration on wages of the native-born in local labor markets. If immigrants settle predominantly in areas that experience the highest wage growth, then this will induce spurious correlation contaminating estimates of the causal effect of immigration; wage growth (or dampened wage decline) will be erroneously attributed to the increase in labor supply. An econometric solution to this problem presents itself if immigrants choose areas not just on the basis of economic conditions but also on the basis of non-economic factors, such as proximity to others with similar backgrounds. These non-economic factors can help the analyst create variation in immigrant penetration that is independent of wage growth and that is not correlated with unobserved factors that determine wage growth. A subset of these studies has obtained identification by taking advantage of "natural experiments" created by unusual immigration events, such as the Mariel boatlift injection of more than 100,000 Cuban workers into the Miami labor market in 1980 (Borjas, 2016b; Card, 1990; Peri and Yasenov, 2015).

Another potential problem with the spatial approach, noted by Borjas (2014a), is that natives may react to an influx of immigrants by leaving affected areas, thus dissipating the labor market impacts of migration across the national economy. However, whether such responses by natives are indeed an empirical problem is controversial in the literature on immigrant inflows and native outflows (the panel considers this issue below in the review of research, e.g., Borjas, 2006; Card, 2001; Card and DiNardo, 2000; Kritz and Gurak, 2001). A more intractable problem with the spatial approach, also noted by Borjas (2014a), is that trade in goods between locales or movement of capital can also work to disperse the impacts of immigration nationally. In fact, an important insight of economic theory is that **flows across localities, whether in labor, capital, or goods, will tend to diffuse the impact of immigration across the national economy**, potentially making spatial comparisons less informative. To the extent that existing spatial studies have not been able to address all possible mechanisms through which local labor markets adjust, it is possible that they underestimate any impact of immigration on labor market outcomes at the national level. At the same time, economic theory also implies that domestic impacts of immigrant inflows are reduced to the extent that the United States trades with the rest of the world and that capital flows into and out of the United States (see Chapter 4).[2]

---

[2]The extent to which trade serves to reduce the effect of immigration on an individual *country* has received attention theoretically, and these insights may apply to cross-city analyses. The classic factor price equalization model (Samuelson, 1948) holds that, if a country produces

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

As noted previously, the second broad category of research reviewed in this chapter focuses on aggregate (national level) data and entails dividing labor markets by skill, typically defined by years of education and experience. Borjas (2003) pioneered both the skill cell and structural approaches that comprise this line of work. In the skill cell approach, estimation relies on variation, not between geographical areas as is done in spatial analyses but between skill groups. The idea is to relate differences in immigrant inflows across the range of skill cells to differences in wage outcomes of native-born workers—just as the spatial approach relates differences in immigrant inflows across places to differences in wage growth. The drawback of this approach is that it does not estimate the entire impact of immigration. While it captures the effect on native-born workers of immigrants who have similar skills, it does not capture the effect on the native-born of immigrants who have dissimilar skills. It is unknown whether omission of these cross-group effects leads to an overestimation or underestimation of the wage impact of immigrants.

The structural approach involves assuming a particular production function describing the relationship between output and inputs (the factors of production), estimating the parameters that characterize the production technology (most notably the elasticities of substitution between factors of production), and then simulating the impact of changes in labor supply on relative wages of, say, native-born workers based on the estimated parameters and the assumed functional form of the production function.[3] While, as noted earlier, all empirical approaches require identifying assumptions, structural models require particularly strong assumptions, and some of those assumptions build in specific numerical answers for the wage impact. Apart from the functional form assumptions for the production technology, as detailed in Section 5.3, results may be sensitive to assumptions about the feasibility and extent to which different inputs, such as more- and less-skilled workers or immigrants and native-born, may be substituted for one another. These assumptions are, however, necessary to reduce the dimensionality of these models in a way that makes them tractable.

Another issue for a structural approach is that predictions based on these models ignore general equilibrium effects, such as how different kinds

---

multiple goods that are each traded internationally, changes in relative supplies of labor of varying skills within that country need not have any effect on the relative wages by skill level within that country, provided the country is small relative to the rest of the world. On the other and, shifts in labor supplies by skill, say due to immigration, may affect relative wages if there is a significant nontraded sector or if a country specializes in one traded good (Dustmann et al., 2005; Kuhn and Wooton, 1991; Samuelson, 1948). See Blau and Kahn (2015) and Borjas (2014a) for a more extended discussion.

[3]See Borjas (2014a, p. 106 ff.) for a thorough description of the constant elasticity of substitution (CES) structural modeling framework that is used in this literature.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of workers interact with each other and how investment, consumption, and other responses in the economy play out. Finally, this approach, like the skill cell approach, assumes that the analyst is able to assign immigrants and native-born workers to cells within which their education and potential labor market experience are equivalent (see Dustmann and Preston, 2012).

Not all studies fall neatly into the taxonomy described above. Both spatial analyses and aggregate skill cell and production function studies may divide workers into skill groups, and a spatial study by Peri et al. (2015a) uses city-specific production functions to estimate total factor productivity growth of U.S. cities attributable to the addition of foreign-born science, technology, engineering, and mathematics (STEM) workers. Borjas (2014a, p. 127) prescribes a strategy for future research that would combine the findings from spatial approaches—where average wage effects are estimated directly from the data—with the restrictions implied by factor demand theory to estimate cross-group effects. Though there may be some overlap and gray areas across approaches, the panel follows this categorical organization in the detailed discussion below of empirical results and then considers the lessons derived from the literature in the concluding discussion (Section 5.7).

## 5.2  SOME BASIC CONCEPTUAL AND EMPIRICAL ISSUES

The foregoing discussion of economists' approaches to analyzing the impact of immigration, as well as the Chapter 4 description of relevant theory, highlights the importance of some basic concepts in determining the effect immigrants may have on native-born workers. In particular, it is clear from a theoretical perspective that the expected impact of immigration is larger in the short run than in the long run, at least if the immigration is unanticipated. In addition, whether immigrants are substitutable for natives (and how closely) or complementary with them is important for determining the direction (negative or positive) as well as the magnitude of the immigrant effects. While the theoretical concepts are reasonably clear, empirically testing them is less so. Below, the panel considers some of the empirical issues that have arisen.

### The Short Run Versus the Long Run

The standard distinction between the short run and the long run in microeconomic theory is that in the short run the capital stock is fixed and cannot adjust to changes in the demand for capital. Meanwhile, in the long run, capital is completely variable and adjusts fully to changes in demand for it. With immigration, the return to capital initially rises then falls over the adjustment period, eventually returning to its original level.

002550

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2558 of 4699 PageID #:  5723

The Economic and Fiscal Consequences of Immigration

Macroeconomic theory further distinguishes between a short run in which technology and education (human capital) of workers are fixed and a long run in which they adapt to changing economic circumstances. This latter conception of the long run is the focus of the panel's discussion of immigration in an endogenous growth context in Chapter 6.

These distinctions are murkier in the real world, since these concepts do not map one-to-one with time periods of specific, consistent length. One guide to the speed at which capital adjusts is a study by Gilchrist and Williams (2004) showing that in (West) Germany and Japan, both of which suffered a large loss of capital during World War II and large population inflows immediately afterwards, the return to capital fell to world levels by the 1960s. This suggests that, for U.S. immigration purposes, capital is likely to adjust fully in considerably less than 20 years and in some cases may even be built up in anticipation of immigration. In studies of the United States, Lewis (2011a) found immigration-induced changes in the adoption of manufacturing automation equipment in a 5-year span from 1988 to 1993, while Beaudry et al. (2010) found immigration-induced changes in the adoption of computers between 1990 and 2000. These studies show that there is at least some adjustment of U.S. capital and possibly technology over 5-10 years, though it is unknown whether the adjustment observed was complete. Moreover, it might be argued that the notion of complete adjustment in the face of ongoing immigration is not clearly defined, in that there is no theory and little empirical evidence on the effect of anticipated immigration on firm behavior.

Among the various approaches reviewed in this chapter, the structural approach deals most explicitly with the distinction between the short and long run. Though the structural models are static and do not model changes over time, they yield separate short- and long-run estimates of the impact of immigration based on explicit assumptions regarding the elasticity of the supply of capital. However, technology is held fixed, and the response of worker human capital is not dealt with explicitly. Results from the spatial approach and the simple skill cell approach are more difficult to characterize along a time dimension. Presumably, estimating the effects of a large, sudden, unanticipated increase in immigration—as occurred with the Mariel boatlift—in the year or two following the inflows captures the short-run effect of immigration. More generally, the estimated effect depends on the spacing of data (e.g., decennial or yearly), the exact specification of the regressions, and the timing of immigrant inflows between the observation points; certain specifications could reflect a mixture of short- and long-run effects (Baker et al., 1999). While the panel acknowledges these ambiguities, we follow an extensive literature in continuing to use the terms "short run" and "long run," and we grapple with the distinction as it arises in our discussion of differences in magnitudes across studies in Section 5.5.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2559 of 4699 PageID #:  5724

### Substitution Between Inputs and Issues in Defining Skill Groups

Economic theory points to the importance of substitutability and, conversely, complementarity between different kinds of workers in determining the impact of immigration on the wages and employment of natives.[4] Where immigrants and natives are substitutes, adverse wage and employment effects may result; the more closely immigrants' skills and abilities match those of natives, the more adverse these effects are expected to be. This raises the issue of how empirical researchers measure skill and identify groups that are potentially in competition, as well as how they model the extent of substitutability between them. Thus, we consider these issues before delving into the empirical findings on the impact of immigrant inflows on natives and prior immigrants.

Substitutability between two groups—say native workers (N) and immigrant workers (I)—is measured by the *elasticity of substitution*. The elasticity of substitution between natives and immigrants gives the percentage change in the ratio of immigrant workers to native workers (I/N) employed in response to a given percentage change in the wages of natives relative to immigrants ($w_N/w_I$). So, for example, an elasticity of 2 would indicate that an increase of 1 percent in the wage of natives relative to immigrants would result in an increase of 2 percent in the ratio of immigrants to native workers employed. A very high value of this elasticity implies that as the relative wage of natives rises (so natives become more expensive compared to immigrants), employers would make a more sizable switch to hiring immigrant workers—suggesting that it would be easier to make the switch. A low value of the elasticity would suggest that a similar rise in the relative wage of natives would not lead to a very large increase in the relative number of immigrants employed, suggesting that employers find it difficult to replace natives with the immigrants. If the elasticity were equal to zero, a rise in the relative wage of natives would not change the number of immigrants employed at all, suggesting that employers find it impossible to replace natives with immigrants because the two groups are not substitutable.

Substitutes may be divided into *perfect substitutes* and *imperfect substitutes*. Two groups of workers that are perfect substitutes are so nearly identical for purposes of production that an employer will be indifferent between hiring a worker from one group or the productivity equivalent number of workers from the other. One somewhat confusing aspect of this terminology is that one might be tempted to assume that perfect substitutes

---

[4]For simplicity and also due to policy concerns, the panel frequently refers to immigrant versus native-born workers. In reality, immigrant inflows may affect the wages not only of natives but of earlier immigrants as well. Some studies have looked explicitly at the impacts of new flows of immigrants on earlier immigrants, as well as on the native-born.

002552

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

are equally productive—but that need not be the case. As long as the two groups' relative wages reflect any productivity difference between them, employers will be indifferent between hiring one or the other. The elasticity of substitution between perfect substitutes is infinite. In such a case, if the relative wage of one group were to rise, the employer would shift entirely to the other group. Imperfect substitutes are, as the name implies, substitutable in the eyes of employers but not perfectly so. The magnitude of the elasticity indicates how closely substitutable the two groups are.

In implementing this concept of substitutability, an issue that arises is how to define skill groups. As we have noted, the large representation of less-educated individuals among immigrant inflows into the United States has focused attention of researchers on the wage and employment consequences of this inflow for less-skilled natives. But how is skill to be measured? This question arises across all the approaches this report surveys and has been answered in various ways. No approach is free from some level of disagreement about this issue. In general, studies employing the spatial methodology have used education level as the metric of skill (e.g., Card, 2005), although in a few cases occupations have been used to distinguish skill groups (Card, 2001; Orrenius and Zavodny, 2007). Aggregate skill cell and production function studies generally define skill by taking into account both experience (using age as a proxy) and education to form experience-education cells (e.g., Borjas, 2003). Finally, a recent alternative for defining skill in a way that groups immigrants and natives who are competing in the labor market assumes that two individuals with the same percentile ranking in the wage distribution are viewed as close substitutes in the eyes of employers; Dustmann et al. (2013) applied this approach for the United Kingdom.

One issue that has arisen in spatial studies, as well as in aggregate production function analyses, is how to delineate educational categories. Often, four educational categories are created: (1) did not complete high school, (2) completed high school only, (3) some college, and (4) completed college. Sometimes (e.g., Borjas, 2003, 2014a) the "completed college" group is further divided into college graduates and postgraduates, yielding five categories. Some research has focused on a subset of categories—for example, examining how the inflow of low-skilled immigrants affects the wages of low-skilled natives. Recently, however, questions have been raised as to whether each educational category should be viewed as a separate factor (that is, as imperfect substitutes). Based both on his review of recent aggregate time series studies and his own analysis of spatial data, Card (2009) argued that evidence supports the conclusion that high school dropouts are essentially perfect substitutes for high school graduates. In a production function context, Ottaviano and Peri (2012) also combined the two groups, providing evidence from their data that the elasticity of

002553

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

substitution is quite high, even infinite in some estimates. The treatment of these two educational categories can have significant implications. As Card (2009) pointed out, immigrants have a much higher share of high school dropouts than natives, but a fairly similar share of "high school equivalent" workers (dropouts and graduates combined, accounting for differences in productivity). Thus, the change in the skill distribution caused by an inflow of immigrants, and the resulting impact of immigration on relative wages, is smaller if the high school dropout and high school graduate categories are aggregated.[5] However, aggregating the two groups is not without controversy. Borjas et al. (2012), in particular, take issue with the justification for doing so, namely the evidence on the elasticity of substitution.

The second issue of importance is whether immigrants and natives *within* skill groups are perfect substitutes. This issue is potentially quite important in that, for cases in which natives and immigrants are imperfect substitutes, any negative wage effects resulting from immigrant inflows will be more concentrated on previous immigrants, who are usually the closest substitutes for new immigrants, lessening the adverse impact on natives.[6]

Various research findings lend support to the notion that immigrants are imperfect substitutes for natives with similar *measured* characteristics.[7] Chiswick (1978) found a lower return to experience and education among new immigrants than among natives—with this experience and education presumably primarily acquired abroad. In line with Chiswick's findings, Blau and Kahn (2015) found, for a sample of newly legalized immigrants, that education acquired abroad had a lower return than education acquired in the United States, while Akee and Yuksel (2008) found that the gap between the return to foreign versus U.S. experience is larger than that for foreign versus U.S. education. "Downgrading"[8] of immigrant skills is also suggested by Akresh's (2006) finding that, in comparing the jobs immigrants held prior to and after migrating, they typically experienced downward occupational mobility. Also relevant is Kossoudji and Cobb-Clark's (2000) evidence of occupational upgrading of immigrants upon legalization, which suggests downgrading of unauthorized immigrants skills relative to native-born workers. Blau and Kahn (2007a) reported higher unemployment rates of Mexican immigrants (the largest single group of immigrants) relative to native-born workers with similar age and education—again suggest-

---

[5]Card (2009) advocated the formation of just two skill groups: high school equivalent and college equivalent labor. This two-group structure has frequently been used in recent aggregate time series studies.

[6]See Card (2009) for a discussion; he pointed out that the difference between a large but finite elasticity of substitution and perfect substitution can be quantitatively quite important.

[7]Most of this paragraph is drawn from Blau and Kahn (2015).

[8]This is the term used by Dustmann et al. (2013).

002554

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

ing imperfect substitution between the two groups. Finally, evidence from Smith (2012) that an inflow of immigrants with a high school degree or less reduced the employment (measured in hours worked) of native teens suggests that newly arrived adult immigrants may be closer substitutes to native teens than to their adult counterparts.[9]

Other work highlights the role of English-language fluency, a factor largely unaccounted for in aggregate analyses, in producing imperfect substitutability between immigrants and native-born with similar observed characteristics. Using census data on immigrant-native wage gaps for immigrants who were fluent compared with immigrants with no English, Lewis (2011b) analyzed how native-immigrant differences in language skills contribute to occupational specialization. He found that native-born workers are more represented in occupations where communication is important, which suggests that within education level, immigrants and natives may be imperfect substitutes. As the length of time spent by immigrants in the United States increases, their English improves and immigrants and native-born with comparable education become closer substitutes. In a similar vein, Somerville and Sumption (2009) found that immigrant concentration in particular industries induces natives to shift into higher paying industries where language and other native skills come into play. Likewise, Peri and Sparber (2011) investigated the role of communication skills in producing immigrant/native-born differences in occupations requiring graduate degrees. They found that the foreign-born specialize in fields demanding quantitative and analytical skills and the native-born specialize in fields where interactive and communication skills are highly valued.

Additional evidence suggesting imperfect substitution between immigrants and the native-born was provided by Ottaviano and Peri (2012). Using a structural production function approach, they estimated substitution elasticities, whose values indicate that immigrants and natives were imperfect substitutes within the typical categories used, especially among the less skilled. The production function approach they employed enabled them to take this imperfect substitutability into account in estimating wage effects. Borjas et al. (2012) challenged these findings and presented evidence that the results are sensitive to assumptions made in the estimation process.[10] Moreover, while Dustmann and Preston (2012) agreed that the usual approach groups together dissimilar immigrants and natives, they

---

[9]Orrenius and Zavodny (2008) found a similar result: Minimum wage increases resulted in higher employment rates among adult immigrants while rates fell for native-born teens. The evidence therefore suggests employers switched to older foreign-born workers in lieu of native-born teens once labor costs rose.

[10]Borjas et al. (2012) found, for example, that the inclusion of fixed effects eliminates the finding that comparably skilled immigrants and natives are imperfect substitutes.

002555

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

also took issue with Ottaviano and Peri's (2012) method of addressing the problem.[11]

Spatial studies potentially have methods for handling imperfect substitutability between immigrants and natives as well. As an example, Altonji and Card (1991) estimated the link between the fraction of immigrants in the population and the wages and employment of less-skilled natives. Their specification allows any impact that immigrants with higher observable skills may have on the low-skilled native group (due to the immigrants' imperfect substitution with higher-skilled natives) to be captured as well. It is also possible to build in adjustments to realign the way new arrivals are sorted into skill cells in these models. Orrenius and Zavodny (2007) examined the impact of immigrant penetration separately by occupational category, to allow immigrant substitutability to differ by skill. They argued that substitutability of immigrants for natives should be greater for less-skilled occupations and found results consistent with this hypothesis. In contrast, in their production function study referenced above, Ottaviano and Peri (2012) hypothesized, and found evidence, that among the highly educated, foreign-born workers are more highly substitutable for native-born workers. While these results differ, both studies found evidence of imperfect substitutability between immigrants and natives that appears to differ by skill level.

Other evidence supportive of imperfect substitutability between immigrants and natives comes from studies examining the impact of immigrant inflows on natives and prior immigrants separately. The idea here is that, if immigrants and natives are imperfect substitutes, the impact of immigrant inflows on prior immigrants should be larger than on the native-born, since immigrants are likely to be closer substitutes for each other than for natives. Many studies focus only on the native-born component of the pre-existing workforce, but when both groups are examined, larger negative wage and employment effects for previous immigrants than for the native-born are generally found (e.g., Card, 2001; Ottaviano and Peri, 2012).

Support for the view that immigrants downgrade upon arrival comes from the study noted above by Dustmann et al. (2013) for the United Kingdom. Although immigrants to the United Kingdom have typically had

---

[11]Specifically, Dustmann and Preston (2012) argued that a key assumption in the Ottaviano and Peri (2012) approach is that immigrants and natives can be allocated to age-education cells within which their potential experience and education are comparable. This may, however, not be the case, as immigrants may—at least initially—downgrade, which means they compete with natives in segments of the labor market other than where one would expect them based on their observed education and potential experience. This will cause a bias in the estimates of the elasticity of substitution between immigrants and natives. Due to downgrading, immigrants and natives may appear to be imperfect substitutes even though, if correctly classified, they are not.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

more education on average than native-born workers, they have fallen disproportionately at the lower end of the wage distribution. This finding, the authors claimed, has serious consequences for approaches that rely on pre-assigning immigrants to skill cells based on their observed age and education, within which they are assumed to be equivalent in production to natives.

Data from the Current Population Survey (CPS) indicate that downgrading is also an issue in the United States, although to a lesser extent. Figure 5-1 (from Dustmann and Preston, 2012) shows the predicted position, based on age and years of schooling, and the actual position of recent immigrants relative to the native-born wage distribution. The short-dashed line in the graph (labeled "actual") indicates that recent immigrant workers are more concentrated in the lower quintiles and less concentrated in the



**FIGURE 5-1** Predicted and actual position of recent immigrants (less than 2 years in the United States) in the wage distribution.
NOTE: The vertical axis represents densities—the continuous equivalent of probabilities. One can interpret the vertical axis as giving the probability of immigrant workers being in one specific percentile of the native wage distribution. The curve labeled "actual," then, is not the probability of being in a given wage percentile relative to natives but rather the probability of being in a given percentile of the native wage distribution.
SOURCES: Dustmann and Preston (2012, Fig. 1b, p. 222). Original graphic based on Current Population Survey data, 1997 to 2007.

002557

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

higher quintiles of the native wage distribution than would be predicted by their age and education profiles (the horizontal line is the reference indicating the nonimmigrant wage distribution; the long-dashed line is where one would predict immigrants to be located along the distribution of native wages if they received the same return on labor for their observed education and experience as natives did). Elsewhere in their paper, Dustmann and Preston (2012) showed that downgrading is strongest just after arrival (the period reflected in the graph); they found that over time, immigrants to the United Kingdom catch up to the occupations and wage levels predicted by their education.

Based on observations like these, Dustmann et al. (2013) argued against estimators that require the preallocation of immigrants to skill groups, arguing that this may not lead to meaningful estimates because immigrants may compete with native-born workers at other parts of the skill distribution than those to which one would assign them based on observed characteristics. Using a spatial approach, they proposed an estimator that does not rely on preallocation of immigrants to skill groups but instead regresses skill-group-specific native wages (in their approach, defined as percentiles of the wage distribution) on the overall inflow of immigrants. The resulting estimates have a straightforward interpretation and are not affected by downgrading.

While there is indeed suggestive evidence that immigrants and natives may be imperfect substitutes within skill groups defined by measured characteristics, there remains controversy regarding whether this is an important issue for empirical analyses and how it should be dealt with. The panel considers this issue further, along with the appropriateness of aggregating high school dropouts and high school graduates, in the context of the studies reviewed below.

## 5.3  SPATIAL (CROSS-AREA) STUDIES

In the pioneering work by Grossman (1982) on the "substitutability of immigrants and natives in production"—a paper that influenced much of the subsequent research—labor market boundaries were defined as metropolitan areas. Intuitively, since immigrants choose some destinations with greater frequency than others, comparing wage and employment trends across metropolitan areas should yield evidence about the impact of their arrival. As described above, the methodology involves testing whether native wage growth and employment rates in the high-immigration areas are lower than those in the low-immigration areas.[12] The earliest studies relied solely on cross-sectional variation, while later work, beginning notably with Altonji

---

[12]Card (2005) describes the spatial approach in detail.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2566 of 4699 PageID #:  5731

and Card (1991) and including most of the studies summarized here, recognized and attempted to deal directly with the endogeneity problem inherent in this approach: The magnitude of immigrant flows into an area is likely to be correlated with its economic vitality and wage growth.

Studies relying on geographic labor market variation are listed and compared in Section 5.8, Table 5-3. In considering the results of these studies, a useful starting point is the assessment of evidence presented 20 years ago in *The New Americans* (National Research Council, 1997). For the literature surveyed in that report, with the exception of Altonji and Card (1991), the estimated coefficient indicating the sensitivity of native-born wages to an increase in immigrants in a given local labor market was closely clustered around zero. *The New Americans* reported:

> The evidence also indicates that the numerically weak relationship between native wages and immigration is observed across all types of native workers, white and black, skilled and unskilled, male and female. The one group that appears to suffer significant negative effects from new immigrants is earlier waves of immigrants, according to many studies. (National Research Council, 1997, p. 223)

As documented below, however, continued study of this issue over the past two decades has led to greater variation and detail in estimates of the wage impacts of immigration obtained from the local labor market approach.

Comparing the experiences of high-immigration and low-immigration geographic areas has a great deal of intuitive appeal. The concept is easy to understand. Blau and Kahn (2015, p. 813) outlined the advantages of the approach:

> . . . the empirical work directly ties the key explanatory variable, immigration, to the outcomes of interest. No assumptions about how labor and other inputs combine in production processes need be made. In particular, one need not assume or try to estimate the degree to which immigrants and natives of equal observed skills substitute for each other, although such a relationship will influence the parameter estimates. In addition, using the area approach will provide more potential observations than using national aggregates, producing more efficient estimates.

The analytic challenges to spatial studies have to do with the endogenous factor flows and trade flows that potentially bias the estimates of cross-area wage differentials.[13] Borjas (2014a), Blau and Kahn (2015), and

---

[13]This is also an issue for aggregate skill cell and production function models, discussed in Section 5.4, albeit possibly a lesser one. As explained by Llull (2015), immigrants to the United States do not display random experience levels (ages) and education.

Copyright National Academy of Sciences. All rights reserved.

others, as noted below, identified these challenges: (1) Immigrant flows are not randomly distributed across metropolitan area labor markets. As noted above, new arrivals are likely to select areas at least near those that are thriving economically[14]—that is, those experiencing wage and employment growth (e.g., California or Florida in the mid-to-late 1990s). This area-selection bias creates spurious, positive correlations between immigration to an area and that area's employment conditions and relative wages. (2) Local labor markets are not closed, which means that natives (or earlier immigrants) are free to relocate their labor (and capital), which may at least partially equilibrate prices and quantities across markets defined by geographic areas. As possible evidence of this problem, Borjas et al. (1997) showed that, for the 1980-1990 period, the correlation between inflows of low-skilled immigrants and the wages of low-skilled natives was more negative, the larger the geographical area demarcated (regions versus states or states versus metropolitan areas). Similarly, Borjas (2003) included analyses by geographical areas (i.e., states) that reveal smaller negative effects on a skill group's earnings from an immigrant inflow than did the national level estimates. (3) Trade in goods between areas will tend to equalize factor prices, including wages, across areas, in a process known as factor price equalization. Finally, models for which the key independent variable (immigration) is measured for small geographic areas with small samples are susceptible to measurement errors, greatly attenuating the measured impact of immigration (Aydemir and Borjas, 2007).

### Endogeneity of Change in Immigrant Share and Labor Market Performance

The above complications associated with estimating cross-area wage and employment effects make it difficult to establish causal links. Regarding the endogeneity challenge, the question is: To what extent do immigrant inflows affect wages and employment and to what extent do wage and employment conditions influence immigrant inflows? Either could explain an observed correlation, and both probably occur to some degree in any given case. Indeed, Cadena and Kovak (2016) showed that low-skilled immigrants have settled in those cities that offer the highest wages, leading to a positive correlation between wage growth and immigrants' location decisions. If new arrivals migrate to strong economies that are already experiencing high or rising wages, measured negative effects of immigration

---

[14]Mainly due to housing, immigrants are often priced out of the most economically thriving neighborhoods within a metropolitan area (Saiz, 2008). For this reason, analyses at, for example, the census tract level may produce quite different results from those at the Metropolitan Statistical Area (MSA) or state level.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

will be understated unless this counterbalancing influence is accounted for. Conversely, immigration may decline in response to relatively slow wage growth in areas that are economically depressed. Monras (2015) found that, during the Great Recession, "fewer people migrated into the locations that suffered more from the crisis." This relative shrinking of the labor supply in the most hard-hit metropolitan areas would have alleviated some of the negative wage effects associated with the crisis by spreading the local recession shocks across regions or nationally.

As noted above, this endogeneity problem may be overcome by isolating the variation in immigrant inflows across areas that is neither determined by outcome variables (such as area wages) nor affected by the same unobserved factors that influence wages. The common approach to doing this is to find a variable (or a set of variables) that (1) is correlated with the inflow of immigrants to an area, but (2) is not correlated with factors that determine the growth of wages, other than through the inflow of immigrants. Such variables are called "instrumental variables" (IVs) or just "instruments." While (1) is an empirical question, and can be tested, (2) is untestable and has to rely on the plausibility of the assumptions under which it is valid. The quality of the study depends therefore on the degree to which the assumptions underlying (2)—called exclusion restrictions—are plausible.

It can be difficult to find instruments that are highly correlated with the inflow of foreign-born workers into a local labor market yet uncorrelated with the other factors that determine wages or job growth in that area. The most common IV strategy, introduced by Altonji and Card (1991) and further developed by Card (2001), relies on the observation that immigrants tend to locate where there are already settlements of their co-nationals (see Bartel, 1989). Reasons suggested for this tendency include the possibility of drawing on preexisting networks, informational advantages, and access to cultural goods that are difficult to obtain without access to co-nationals. While past concentrations of individuals from one's own country are likely to be correlated with future inflows to a particular area, they are at the same time unlikely to be correlated with future area-specific shocks that affect wages and employment. Based on this line of reasoning, the approach then allocates the overall inflow of immigrants from a particular country to spatial areas based on historical settlement patterns. For example, suppose the United States consisted of a Southern part and a Northern part only; assume further that, in 1980, 10 percent of all immigrants from Mexico lived in the North, while 90 percent lived in the South. Now suppose that 100,000 Mexicans arrived between 1999 and 2000. Based on the historical settlement pattern in 1980, this approach would assign 10,000 to the North and 90,000 to the South. Doing the same assignment process for all immigrant groups and summing up for each region results in an estimate

002561

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of the area-specific inflow of immigrants between 1999 and 2000 that is solely based on historical settlement patterns and is unlikely to be correlated with contemporaneous (i.e., 1999-2000) area-specific shocks to wages and employment.

One possible problem with this approach is that economic characteristics that initially made an area attractive to immigrants may persist over time. For example, if traits of the economy driving both economic growth and migration in gateway locations such as California or New York have systematically differed from other regions over many years, the downward impact of immigration on wages may still be masked. However, as Blau and Kahn (2015) noted, the finding by Blanchard and Katz (1992) that the wage effects of local employment shocks die out within 10 years provides some support for the interval, employed in most of these studies in the construction of the instrument, of 10 or more years between the previous immigrant concentrations used to derive the allocation and the current inflows.[15]

Due to concerns about whether local labor market conditions during the analysis period are, or are not, directly related to conditions for the period from which the instrument is constructed, researchers have begun exploring alternative instruments. For example, an IV constructed to deal with endogeneity of location choices may be based on a characteristic such as the distance between origin and destination countries. In a skill cell study based on cross-national comparisons, Llull (2013, p. 2) used variation in "push factors . . . interacted with distance to the destination country in order to construct an instrument based on variation over time and across destination countries." So, for example, violence in Guatemala would be expected to increase migration to Mexico or the United States at a greater rate than to Europe. Llull further broke out variation by skill level, based on the assumption that destination choices will be more constrained for low-skilled workers because, compared with high-skilled workers, they have fewer resources to travel long distances.

### Native Response to Immigration, Trade, and Technology Adjustments

Mobility of labor, capital, and goods between areas gives rise to a second analytic challenge for spatial studies. Cities and states are not closed economies, meaning that labor and capital flow from one to another, and these flows have the capacity to equalize prices.[16] If immigrants were to

---

[15]Borjas et al. (1997) attempted to address this issue by controlling for pre-existing population trends. See also Dustmann et al. (2005) for the United Kingdom.

[16]Price equalization pressure would also happen in the presence of trade even if labor and capital were immobile—see below and the theory discussion in Chapter 4. This is important because sometimes papers find that labor is not that mobile and mistakenly conclude that therefore prices are not equalizing.

002562

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

arrive in disproportionate numbers in a city (or neighborhood, or whatever spatial unit defines the labor market), it is possible that some workers previously there may respond by moving elsewhere, which would diffuse the downward pressure on wages across cities:

> . . . natives may respond to the wage impact of immigration on a local labor market by moving their labor or capital to other cities. These factor flows would re-equilibrate the market. As a result, a comparison of the economic opportunities facing native workers in different cities would show little or no difference because, in the end, immigration affected *every* city, not just the ones that actually received immigrants. (Borjas, 2003, p. 1338.)

In such a scenario, a comparison of wages across cities would reveal little, if any, wage effect.

While predicted by theory, evidence of the equilibrating hand of factor input mobility—specifically, native migratory response to increased job competition—is mixed. On one side, Card (2001), Card and DiNardo (2000), Kritz and Gurak (2001), and Peri (2007) found, for the U.S. context, either no relationship between the entry of immigrants and the exit (or failure to enter) of the native-born or that both immigrants and the native-born moved to the same cities and probably for the same reason: economic opportunity. Economically healthy cities, for example, likely attract inflows of both international and domestic migrants. These results suggest that outflows of natives may not significantly contaminate estimates of immigrant effects based on regional variation.

The evidence on the other side, for factor input mobility, includes Borjas (2006), who used Decennial Census data for the period 1960-2000 to show that internal migration decisions by natives are sensitive to immigrant-induced increases in labor supply. Specifically, high-immigration areas were associated with lower native in-migration rates and higher native out-migration rates. Native migration responses, in turn, "attenuate the measured impact of immigration on wages in a local labor market by 40 to 60 percent, depending on whether the labor market is defined at the state or metropolitan area level" (Borjas, 2006, p. 221). Some heterogeneity in responses has also been detected. For example, Kritz and Gurak (2001) found minimal overall connection between in-migration of foreign-born and out-migration of native-born, but they also found that the results varied by state and by group. They found a positive relationship between immigration and native out-migration for California and Florida and also found that, in states that have experienced the highest immigration, foreign-born men were more likely to out-migrate than were native-born men. That is, prior immigrants were more mobile than natives. Partridge and Rickman (2008) found out-migration responses to immigration to be more significant

002563

Copyright National Academy of Sciences. All rights reserved.

in rural counties. In addition, they found that previous interstate movers (immigrant or native-born) were more likely to move from states with high recent immigration than either immigrants living in their state of first settlement or natives living in their state of birth.

A similar masking of cross-area impacts could occur due to intercity and interstate trade. Card (2005, p. 10) noted that, in the presence of trade across cities, "relative wages may be uncorrelated with relative labor supplies, even though at the national level relative wages are negatively related to relative supplies." If low-skilled international immigrants move to Los Angeles, for example, the production of goods intensive in low-skilled labor will increase there. However, the prices of these goods in Los Angeles may not change compared to other cities because free trade within the United States ensures prices are equalized across cities and regions, and so are wages (which is the factor price equalization theorem). This means that so long as technology does not change, relative wages of low-skilled workers in Los Angeles compared to other cities will not change either. This logic holds as long as the inflow of immigrants is not so large that Los Angeles ceases to produce goods intensive in higher-skilled labor and comes to specialize in low-skilled intensive goods;[17] in this case, relative wages of low-skilled workers in Los Angeles could indeed fall compared to other cities. These results are also contingent on there not being a significant nontraded sector and on Los Angeles producing just a small share of low-skilled intensive goods produced nationally.

In sum, any type of labor market response to immigration—whether along the margin of labor flows, capital flows, or flows of goods—can serve to diffuse the impact of immigration from the localities directly affected to the national economy. This kind of diffusion implies that even though one may not observe adjustments along a particular margin, there may be other unexamined and unexplored margins along which such adjustments can take place. Any such adjustments imply that spatial correlations between wages and immigration may underestimate the national wage impact of immigration.

The adjustments described thus far in this section explain why spatial studies may underestimate any national wage impact of immigration. However, the same reasoning implies that there are other adjustments—international trade in goods and services and capital flows across countries—mitigating the wage effect of immigration at the national level. Imports and exports of goods and services together represented 30.0 percent of U.S. gross domestic product (GDP) in 2014, indicating that the United States is well integrated in world trade. Along with large capital flows between

---

[17]See Section 4.5 for discussion illustrating these relations in a simple model with two types of labor and two types of production technologies.

002564

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2572 of 4699 PageID #:  5737

The Economic and Fiscal Consequences of Immigration

the United States and foreign countries, this trade may prevent or limit any wage response to immigration, though this is difficult to study empirically.

The ability of firms to change their technology is another factor possibly dampening negative wage impacts of immigration. The basic idea is that firms adjust technology to absorb workers who become more abundant through immigration (see Section 4.5). Similar to the situation with trade, this adjustment can lead to a situation where an immigration-induced labor supply shock is absorbed without changes in wages.[18] Hanson and Slaughter (2002) were among the first to compare the trade- and technology-induced adjustments to labor supply shocks on the industry level, while Dustmann and Glitz (2015) extended this literature by investigating adjustments at the firm level and considering the role of firm births and deaths in the adjustment process. Both papers found that technology-induced changes in factor intensity are more important for the absorption of immigration than trade-induced changes in the mix of outputs (see also Lewis, 2013). Lewis (2011a) focused on the technology explanation and examined how investment in automation machinery by U.S. manufacturing plants over recent decades has substituted for different kinds of labor. He concluded that "these investments substituted for the least-skilled workers and complemented middle-skilled workers at equipment and fabricated metal plants." He found that metropolitan areas that experienced faster growth in the relative supply of less-skilled labor as a result of immigration "adopted significantly less machinery per unit output, despite having similar adoption plans initially [implying that] fixed rental rates for automation machinery reduce the effect that immigration has on less-skilled relative wages" (Lewis, 2011a, p. 1029).

### Illustrative Results from Spatial Studies

Table 5-3 in Section 5.8 summarizes the results from spatial studies of the labor market effects of immigration, most of which employed IV methods to address the endogeneity of immigrants' locational choices. While these studies are not uniform—they use different data, look at different time periods, and examine varying magnitudes of immigrant inflows—their results suggest that the impact of immigration on the group most likely to be affected, low-skilled workers, ranges from negligible to at least modestly negative. A more precise comparative assessment of the literature is provided in Section 5.5 below. As noted above, some groups such as prior

---

[18]In terms of a standard model of production, this interpretation refers to a change in relative inputs due to a technology-induced rotation of the isoquant around a fixed isocost line, while the trade explanation above refers to a situation where relative inputs (i.e. shares of low-skilled to high-skilled labor) change due to the isocost line rotating around a fixed isoquant.

002565

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

immigrants—for example, the Hispanic immigrants and Hispanic native-born studied by Cortés (2008)—appear to experience somewhat larger negative wage impacts. One contributing factor to the differential wage impact experienced by Hispanics, identified by Warren and Warren (2013) and Massey and Gentsch (2014), is that these groups are often competing in labor markets characterized by a rising share of unauthorized workers who are under increasing enforcement pressure. This may reduce their bargaining power and create downward pressure on wages in those labor markets. Employment impacts, measured in various ways discussed below, are also modest but perhaps vary more broadly across metropolitan areas.

Spatial studies commonly designate the skill group of natives, and sometimes immigrants, according to education level, although some use occupation as the skill dimension. Given the composition of immigrants relocating to the United States historically, the focus has generally been on their impact on low-skilled or other disadvantaged groups. The important study by Altonji and Card (1991) is an example. The IV approach used in most subsequent studies had its beginnings in this study and was later further refined in Card (2001). In Altonji and Card (1991), the 1970 share of immigrants in the population was used to construct the IV for immigrant inflows over the 1970-1980 period. As discussed above with regard to the possible imperfect substitutability of immigrants and the native-born with similar measured characteristics, focusing on the total immigrant share implicitly allows cross-effects to be examined. However, it does not allow an analysis of which immigrants are having the largest impact and instead measures the average effect.[19]

Overall, Altonji and Card (1991) found that immigration had a negative effect on wages, with a 1 percentage point increase in the immigrant share of the population reducing wages of low-skilled, native-born workers by 1.2 percent. They also found that a 1 percentage point increase in a city's foreign-born share predicted a reduction in the earnings of black males with a high school degree or less by 1.9 percent, black females with high school or less by 1.4 percent, and smaller—and statistically insignificant—reductions in earnings for whites with a high school education or less. The only other spatial study that found negative wage effects of similar magnitude is Borjas (2014a); the panel discusses below why these results might differ from those of other studies. Regarding employment (as opposed to wage) effects, Altonji and Card (1991) found that immigration

---

[19]For example, two cities may have the same share of immigrants but in one city immigrants may be predominantly high skilled and in another predominantly low skilled. As explored in Section 4.5, the estimated effect of the immigrant share variable may be smaller than if the effect of immigrant shares of low-skilled and high-skilled immigrants on their native counterparts were separately examined.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

over the 1970-1980 period in low-wage industries led to modest displacement of low-skilled natives from those industries; but they found no statistically significant reduction in low-skilled natives' weeks worked or the employment-to-population ratio.

LaLonde and Topel (1991) examined the impact of recent immigration on different arrival cohorts of prior immigrants. Their results are notable for identifying a negative relationship between new inflows and the earnings of recent prior immigrants—an effect that appeared to diminish with the amount of time prior immigrants had spent in the United States. In addition, they characterized the estimated effect of immigrants on the wages of nonimmigrants as "quantitatively unimportant" (Lalonde and Topel, 1991, p. 190). While they did not instrument for immigrant inflows, potentially underestimating the negative effect of immigrants, their findings are consistent with evidence discussed above of imperfect substitution between immigrants and native-born workers.

Since immigrants were disproportionately (relative to native-born workers) in the low-skilled category in the time periods examined, researchers expected larger impacts of immigration on the wages of low-skilled native-born blacks than whites because among low-skilled workers, native-born blacks are less skilled and otherwise disadvantaged compared to native-born whites. As noted above, Altonji and Card (1991) found adverse wage effects that were larger for blacks than whites. LaLonde and Topel (1991) also reported a negative effect for young (and hence inexperienced) native-born blacks, finding that a doubling in the number of new immigrants would decrease wages by a very modest 0.6 percent for young native-born black workers. Other studies for this period (e.g., Bean et al., 1988; Borjas, 1998) did not detect an effect for native-born black workers. Original analysis of Decennial Census data in *The New Americans* suggested that one reason for this minimal measured impact was that—as of the mid-1990s—immigrants and the black population still largely resided in different geographic locations and therefore were not typically in direct competition for jobs (National Research Council, 1997, p. 223). Until recently, large proportions of the nation's immigrants were concentrated in relatively few geographic areas, making the distinction between high- and low-immigration areas somewhat intuitive. However, relative to 20 or even 10 years ago, immigrants are now much more spatially diffused, so one should not assume that these historical relationships continue to hold.

Returning to the question of the impact of immigration on the wages of less-skilled natives, subsequent studies by Card (2001, 2005, 2009) concluded that—in line with previous findings other than Altonji and Card (1991)—the impact of immigration on the wages of less-skilled natives was modest for the various time periods considered in these studies. The Card studies all use instrumental variables to address endogeneity of immigrant

002567

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2575 of 4699 PageID #:  5740

inflows, and in Card (2001, 2009) the issue of native out-migration was addressed and found not to play a role. Card (2005, 2009) raised the possibility that high school dropouts and high school graduates are perfect substitutes as an explanation for these small wage effects. As noted above, if this is the case, then the skill distribution of immigrants is quite similar to that of natives and hence large negative wage effects on low-skilled natives are not expected.

While most studies in the spatial literature use education to define skill, it is noteworthy that Card (2001) and Orrenius and Zavodny (2007) focused instead on occupation. The former separated the labor market into different metropolitan areas and, within metropolitan areas, into different occupation groups. Immigrants' inflows into cells defined by occupation and metropolitan area were predicted for each immigrant source country based on (1) the share of earlier immigrant cohorts from the source country living in the metropolitan area and (2) the *national* share of immigrants from the source country in each occupation. Card then summed over source countries to obtain the instrumental variable for immigrant inflows into these occupation-metropolitan area cells.[20] The basic finding of this study was that immigration during 1985-1990 reduced real wage levels by at most 3 percent in low-skilled occupations in gateway U.S. metropolitan areas characterized by the highest immigration levels. Results varied by group: a 10 percent labor supply increase due to immigration (implying a much larger percentage increase in the number of immigrants) was associated with a wage decline of 0.99 percent for male natives and 0.63 percent for female natives, a decline of 2.5 percent for earlier female immigrants, and a change indistinguishable from zero for earlier male immigrants. It is notable that the largest negative effects were for an immigrant group. On the employment side, Card (2001, p. 58) found "relatively modest" effects of recent immigrant inflows on workers in the bottom of the skill distribution in "all but a few high-immigrant cities." A 10 percent labor supply increase was found to have reduced the employment rate by 2.02 percentage points for male natives, by 0.81 points for female natives, by 0.96 points for earlier male immigrants, and by 1.46 points for earlier female immigrants.

Orrenius and Zavodny (2007) used a panel model with instrumental

---

[20]That is, what Card termed the "supply-push component" of immigrant inflows for group $g$ into occupation group $j$ and city $c$ ($SP_{jc}$) is:

$$SP_{jc} = \sum_g \tau_{gj} \lambda_{gc} M_g,$$

where $M_g$ represents the number of immigrants from source country $g$ entering the United States between 1985 and 1990; $\lambda_{gc}$ is the fraction of immigrants from an earlier cohort of immigrants from country $g$ who live in city $c$ in 1985, and $\tau_{gj}$ is the national fraction of all 1985-1990 immigrants from $g$ who fall into occupation group $j$.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2576 of 4699 PageID #:  5741

variables to estimate wage impacts of immigration on natives, also by occupation group. The authors found a small negative effect on the wages of low-skilled natives and no wage effect in more-skilled labor markets. A variable quantifying "immigrants who are admitted to the United States in a given year as the spouse of a U.S. citizen by occupation group, area, and year" works as the instrument because it is correlated with the rate of immigration into a given Metropolitan Statistical Area (MSA) and occupation but is uncorrelated with unobserved factors that drive wage growth (Orrenius and Zavodny, 2007, p. 11).

Smith (2012) examined spatial variation in employment for a narrowly defined group of workers under the hypothesis that new immigrant workers often compete in very specific labor markets. Also employing an IV model based on the geographic preferences of previous immigrants, he found that low-skilled immigration since the late 1980s had negatively impacted *youth employment* more than less-educated, native-born adult employment. He estimated that a 10 percent increase in the number of immigrants with a high school degree or less reduced the "average total number of hours worked in a year by around 3 percent for native teens and by less than 1 percent for less-educated adults." This finding adds a new detail to the previous research that generally found modest negative or no relationship across states or cities between intensity of immigration and *adult* labor market outcomes across metropolitan areas or states (e.g., Card, 1990, 2001; Lewis, 2003). Smith (2012, p. 55) suggested that two factors were at work, "There is greater overlap between the jobs that youth and less-educated adult immigrants traditionally do, and youth labor supply is more responsive to immigration-induced changes in their wage." His empirical analysis also suggests that, despite modest increases in schooling rates of natives in response to immigration, there is little evidence of higher earnings 10 years later in life. Smith concluded that it is possible "an immigration-induced reduction in youth employment, on net, hinders youths' human capital accumulation."

Other recent studies also suggest larger negative effects of immigrant inflows on earlier immigrants than on natives, consistent with LaLonde and Topel's (1991) earlier findings and the notion of imperfect substitution between the two groups. Cortés (2008) examined the impact of immigrant inflows over the 1980-2000 period in immigrant-intensive predominantly service industries, following Card's approach of instrumenting immigrant inflows using previous settlement patterns. Similar to Card, she found that low-skilled immigration does not have an effect on low-skilled native wages overall. She did, however, find a modest negative impact on the wages of low-skilled previous immigrants and low-skilled native-born Hispanics, especially those with poor English. Complementary findings by Lewis (2013) indicate that among immigrants, the wages of those with poor English skills are more

002569

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

sensitive to immigrant inflows than the wages of those with good English skills. This evidence suggests that language skills may be a significant factor influencing substitutability between immigrants and natives with the same observed characteristics.

### Natural Experiments

Sometimes "natural experiments" arise that provide unique opportunities to deal with the endogeneity problems inherent in spatial analysis. Such experiments also provide an opportunity to study the short-run effect of abrupt, unexpected immigration episodes, which should yield the most negative impacts on natives. An example is the pioneering work by Card (1990), who took advantage of one such case—the 1980 Mariel boatlift, which brought thousands of predominantly low-skilled Cuban immigrants (referred to as "Marielitos") to Miami, expanding that area's labor force by about 7 percent in just a few months. This circumstance allowed for a well-controlled analysis: Card was able to estimate the impact of this immigration episode by comparing wage and employment changes after the influx in Miami with wage and employment changes in otherwise similar metropolitan areas that did not experience this influx. The endogeneity problem confronting spatial analyses was avoided altogether because the arrival of the Marielitos to Miami had nothing to do with selection of a high wage destination. Card's study was one of the first to use the identification strategy that became known as the "difference in difference" approach: comparing differences in wages or employment between Miami and other metropolitan areas, and over time. However, it still entails an important assumption—that, in the absence of the Mariel boatlift, wages and employment in Miami would have developed in similar fashion as in the comparison metropolitan areas (the "common trend assumption").

Using this approach, Card (1990) found that, while the unemployment rate among black workers rose in the 2 years after the Marielito influx into the labor market, the rise was not significantly different from that experienced in four comparison cities (Atlanta, Houston, Los Angeles, and Tampa-St. Petersburg, chosen because of similar racial profiles and employment trends). One explanation Card provides is the flexibility of the Miami labor market in absorbing low-skilled workers by expansion of industries that produce goods that use low-skilled workers more intensively. In this study, the comparison cities substitute for the missing counterfactual: namely, what would have happened if the immigration had never taken place.

First, Borjas (2016b) and Peri and Yasenov (2015) have recently reappraised the Mariel boatlift immigration episode, carefully matching the skills of the arrivals with those of the pre-existing workforce. The skill-matching technique led them to focus on the impact on non-Hispanic (Borjas)

002570

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2578 of 4699 PageID #:  5743

The Economic and Fiscal Consequences of Immigration

and non-Cuban (Peri and Yasenov) high school dropouts because high school dropouts represented about 60 percent of those arriving on Florida's shores as a result of Castro opening the port of Mariel. The available data do not permit natives and immigrants to be distinguished, but Miami had few non-Hispanic immigrants at that time. Both papers were motivated in part by the development of a new technique (Abadie et al., 2010) to select comparison cities more systematically than did Card. Despite this methodological similarity, the authors reach very different conclusions. Peri and Yasenov concurred with Card, finding no detectable negative effects on wages of non-Cuban workers. Borjas found that a drop, in the range of a 10 to 30 percent decrease, in the relative wage of the least educated Miamians occurred between 1979 and 1985, representing a shock that took the better part of a decade to absorb. The divergent results in the two studies are due in large part to the composition of the samples and data sources examined to analyze wage trends in post-Mariel Miami and the comparison cities.

The misalignment of the study results described above suggests that differences in the implementation of a methodology can result in quite different estimates of the impact of immigration. Consideration of these studies also underlines that what occurred to the wage structure in Miami was a very unusual event—one that can be characterized as a true short-run shock occurring in a compressed time period, as opposed to more-anticipated immigrant flows that typically occur over longer time periods. The decade-long absorption of the supply shock in the Miami labor market was a unique episode and may not be fully informative about the dynamics of how labor markets in general adjust to immigration.

Monras (2015) exploited a different natural experiment. The Mexican peso crisis caused that country's GDP to contract by 5 percent in 1995, leading to a surge in Mexican immigration to the United States for reasons unrelated to changes in the U.S. economy. This event allowed Monras to estimate a short-run effect by comparing wage data for 1994 and 1995 using the CPS. Unlike in the Mariel boatlift case, this natural experiment did not direct immigrants to a particular location in the United States, so Monras used the usual IV for immigrant location based on the 1980 settlement pattern of Mexicans. He found that a 1 percent increase in labor supply due to the immigration of Mexicans with an education of high school or less reduced the wages of pre-existing non-Hispanic workers with an education of high school or less by 0.7 percent. The pre-existing workers in this sample include non-Hispanic immigrants. The observed effect is less negative than that observed by Altonji and Card (1991) but more negative than those observed by Card (1990) and Cortés (2008). Monras found that internal migration caused most of the effect to dissipate within 10 years.

Using a natural experiment approach in the study of immigration is quite attractive, although, as one can see in our discussion of the impact

002571

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of the Mariel boatlift, the results are still not free from disagreement. It would certainly be of considerable interest to have a number of such studies for the United States. But, by its nature, this type of exogenous inflow of immigrants is a rare occurrence. While the panel's review in this chapter is focused on empirical evidence for the U.S. experience, in this case, given the paucity of data for the United States, it is worth noting evidence from other countries where natural-experiment situations have arisen.

Blau and Kahn (2015) surveyed not only Card's (1990) analysis of the Mariel boatlift but also studies of four other natural-experiment events: (1) the repatriation of French-Algerians following the end of colonial rule in Algeria in 1962 (Hunt, 1992); (2) the repatriation of Portuguese residents from former Portuguese colonies in Africa in 1974 (Carrington and de Lima, 1996); (3) the migration of Jews from the former Soviet Union to Israel after the loosening of emigration restrictions in 1990 following the fall of Communism (Cohen-Goldner and Paserman, 2011; Friedberg, 2001); and (4) the repatriation of ethnic Germans from Eastern Europe and the former Soviet Union following German reunification (Glitz, 2012). In each case, the immigrant inflows were relatively sudden and quite sizable. Blau and Kahn concluded, from the evidence of these studies, that "while the studies are not unanimous, there is at most weak evidence . . . that these episodes had important effects on the level or distribution of native wages, despite the size of the immigration shocks" (Blau and Kahn, 2015, p. 828).

## 5.4  AGGREGATE SKILL CELL AND STRUCTURAL STUDIES

The spatial studies described in Section 5.3 rely on variation in the immigrant density across metropolitan areas or states to infer differential wage and employment impacts. Skill cell studies, such as the pioneering study by Borjas (2003), exploit variation in the density of immigrants across groups of workers categorized by their work experience (typically using age as a proxy) and education, the principal (observable) determinants of skill. Sorting into these skill cells allows for a comparison of outcomes (typically wages) of workers presumed to compete in approximately the same labor market. Labor supply changes, in the form of new immigration, permeate various skill groups unevenly; for example, recent immigrants have been represented disproportionately at very low and very high education levels. The methodological approach is to compare the changes in natives' outcomes in skill cells that experienced larger increases in immigrant density with the changes in natives' outcomes in skill cells that had smaller increases; the comparison allows the impact of immigration to be inferred. Specifically, the approach measures the wage effect on natives of inflows of immigrants of similar skill, averaged across all skill levels.

Skill cell studies have typically (but not always) been conducted at the

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

national level, which alleviates the problem in spatial models of diffusion of any national impact across geographic areas.[21] However, the problem remains that incoming immigrants with particular skills may be responding to changes in demand for workers of different skill types, thus leading to spurious correlations between wage growth by skill type and the change in immigrant density by skill type. Another problem with this approach is that the experience and education of immigrants—as reported in survey data—may not be as highly valued by employers as are their equivalents in native-born workers, meaning that immigrants may be allocated by the model to skill cells different from the ones in which they are actually competing with native workers. As noted above in this chapter, Dustmann and Preston (2012) discussed the role of skill downgrading in the sorting of immigrants into occupations. Relatedly, because surveys suitable for the study of immigration do not contain information on actual experience, necessitating the use of age as a proxy, the classification into skill cells is considerably less accurate for women than for men. For this reason, the reported studies using this approach have all limited themselves to analyzing the impact of immigration on males.

A quite distinct set of studies employs the methodological approach referred to as the structural approach. Structural studies of immigration typically divide workers into skill cells at the national level, but the hallmark of the approach is the imposition of theory-based relationships (structure) on the data. An attractive feature of the structural approach is that estimates can be used to simulate economic outcomes associated with different immigration scenarios. For example, a structural model can project the impact of visa policy proposals, such as to increase high-skilled immigration or to create programs allowing unauthorized immigrants credentials to work. However, the technical difficulties associated with this approach require the use of simplifying assumptions that influence the estimated outcomes. This section reviews in turn the published studies corresponding to the two methodologies.

### Aggregate Skill Cell Analyses

Borjas (2003), the first paper using this approach, created skill categories based on four education groups—did not complete high school, completed just high school, attended some college, and completed college—and eight

---

[21]National-level estimates do not eliminate this measurement problem to the extent that markets for human and financial capital are global rather than national, as they are increasingly becoming.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2581 of 4699 PageID #:  5746

experience levels: 1-5 years, 6-10 years, and so on, up to 36-40 years.[22] Borjas (2014a) further divided "completed college" into "college graduate" and "post-graduate" based on evidence that workers with advanced degrees are often not competing closely for jobs with those who have just a college degree. The skill cell approach assumes that workers within each cell, whether foreign- or native-born, are perfect substitutes while workers across cells are imperfect substitutes. The wage impact of immigration on male natives is typically estimated by regressing cell-specific outcomes on the immigrant share in the respective education-experience group (skill cell).

Purely correlational (i.e., ordinary least squares, or OLS, regression) estimates based on Decennial Census data in Borjas (2003) and Borjas (2014a)[23] revealed a negative correlation, for male workers, between wage growth and the share of immigrants by skill group. This relationship is illustrated in Figure 5-2.

The scatter diagram data suggest that, at the national level, male wages should fall by 3 to 4 percent if immigration increases the number of male workers in a skill group by 10 percent due to immigration (approximately the effect of immigration on labor supply cumulatively from 1980 to 2000) (Borjas, 2003). Most of this effect is driven by observations at the low end of the education spectrum. As summarized later in this chapter, the national skill cell studies find larger negative wage effects on native-born workers from immigration inflows than do other approaches (i.e., spatial and structural studies).

Two papers by different authors expand on the skill cell work of Borjas. Llull (2015) addressed the endogeneity of immigrant density by skill cell and observed that the characteristics of arriving immigrants are not random but determined in part by both the labor demand and wages for a given skill cell in the United States. He developed a new instrument based on a cross-country analysis of the determinants of migration. The number of immigrants of each skill type expected in the United States is predicted based on events abroad: events that are very unlikely to be correlated with the return to education and experience in the United States. His results are striking: using this instrumental variable almost triples the negative effect found by Borjas (2003), yielding the most negative wage effect of any published study (equal to Altonji and Card's [1991] impact on wages of low-education black men). The panel speculates below as to why this might be.

Card and Peri (2016) focused instead on robustness tests, showing that the wage effects predicted in Borjas's (2014a, Ch. 4) skill cell model

---

[22]Experience, sometimes termed "potential experience," was calculated based on the estimated number of years that had elapsed since the individual finished school.

[23]Borjas (2003) used data from the Public Use Microdata Series, 1960-2000, whereas Borjas (2014a) used the Public Use Microdata Series for 1960-2010.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 5-2** Scatter between male wages and male immigration across skill groups. NOTE: Each point in the scatter diagram represents the decadal change in the log weekly wage and the immigrant share (that is, the percentage of immigrants in the workforce) for a native group of working men defined by years of education and work experience. The slope of the regression line is –0.450, with a standard error of 0.172.
SOURCE: Borjas (2003, Fig. II, p. 1345).

are sensitive to the form of the regression used. They found that changes to the way the statistical relationship is estimated and a change in the way immigration is captured each leads to less-negative estimates of the impact of immigration on wages and renders estimates at different levels of geographic aggregation more similar. The issues raised by the sensitivity of the Borjas results to the Card and Peri robustness tests, particularly as they relate to the measure of immigrant inflow, are potentially relevant for a number of immigration studies using a similar approach.[24]

It should be noted that estimates produced using the spatial and non-structural skill cell approaches are not conceptually comparable. Whereas

---

[24]See, for example, Borjas (2003, 2006, 2009), Bonin (2005), Bratsberg et al. (2013), and Steinhardt (2011). Card and Peri (2016) argued that their immigration measure (immigrant induced labor supply changes) is preferred because it is not biased by endogenous native flows; Borjas (2003, Ch. 4, fn. 8) argued that his measure (the fraction of immigrants in the skill group, including labor-market-specific fixed effects) is preferable because of nonlinearities between wages and measures of the immigrant supply shock.

002575

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the skill cell approach identifies the average *direct* effect of increasing the number of workers in the various skill groups on wages of (male) workers in these skill groups, spatial studies often estimate different parameters (depending on the specification), many of which also capture *indirect* effects induced by complementarities between immigrants and native workers at other parts of the skill distribution. These indirect effects may come about because an increase in workers in one skill group may decrease wages of workers in that group but increase wages of complementary workers *across* skill groups (e.g., the case where immigrants compete and harm the wages of construction or kitchen workers but enhance the opportunities and wages of first-line supervisors or wait staff). Further, there must be sufficiently low substitution between age-education cells to allow for estimation of the standard skill cell model. And, as with any methodology, data must be sufficient to allow the analyst to correctly allocate immigrants into skill cells defined by high degrees of substitutability within a cell.

A strong assumption in the skill cell approach—discussed in Section 5.2—is that immigrants and natives with the same measured education and the same age (or potential experience) are very close substitutes. Immigrants' education and labor market experience are often not comparable to that of natives, and immigrants therefore earn less than observationally similar natives, particularly when they first arrive in the host country. This downgrading can be dramatic, as Dustmann et al. (2013) illustrated for the case of the United Kingdom. As a result, immigrants compete most closely with natives in other skill cells than those to which they would be assigned, based on education and experience observables. As an example consider an Iranian surgeon who practiced for 15 years in Iran but upon arrival in the United States speaks little English and is not comfortable with the U.S. operating theatres or technology. This individual's labor market experience in Iran may hold little value in the United States. As a result, the immigrant may initially work in a lower position, perhaps as a nurse, and then possibly move to a physician's position as the individual gains English proficiency and acquires experience and the requisite medical licenses. Thus, although arriving with high measured skills, this immigrant competes with individuals in another skill cell than the one to which the immigrant would be assigned, based on observables.

It is possible to build in adjustments to realign the way new arrivals are sorted into skill cells in these models. For example, by using occupation as the indicator of skill, Orrenius and Zavodny (2007) bypass the estimation problem created by skills downgrading in more restrictive models.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Structural Estimates

Much of the research described above, including the cross-area (spatial) analyses and simple skill cell correlations, impose little structure on the econometric models from which wage and employment impacts are estimated. In contrast, *structural models* build on theoretical relationships to simulate labor market responses to immigration. In these models, identification (i.e., establishing the differences between a situation with immigration and one without) is achieved by using the model structure, which imposes a relationship between labor supply and wages, the magnitude of which depends on the estimated parameters that characterize the production function (i.e., the relationship between output and inputs of the factors of production). Typically, simple variants are used such as the constant elasticity of substitution (CES) production function,[25] to derive these relationships—specifically, the elasticities of substitution between different skill groups—and describe them with a small number of parameters. These estimated parameters may then be used to simulate the impact of changes in labor supply due to immigration on the relative wages of native-born workers.

The implementation of structural models raises a number of issues. For one, there is the need to select a production function; this imposes functional form assumptions that may be restrictive. As noted above, beginning with Borjas (2003), the literature has used a nested CES framework. Decisions must also be made about which cross-group substitution elasticities to estimate, which can have a strong effect on the findings from structural models. The number of such cross-group effects that may be estimated is limited because, as that number grows, the empirical exercise quickly becomes intractable. For example, Borjas (2003) separated the labor force into 32 skill groups defined by education and work experience. In order to estimate all cross-group elasticities, 1,024 (or 32 × 32) effects would have to be estimated. Borjas (2003) instead estimated the extent of substitution across education groups and across experience groups, then calculated the skill-group elasticities from this smaller set of starting estimates. Later researchers—for example, Ottaviano and Peri (2012), discussed below—have modified some of these assumptions.

Structural model simulations may be performed for either short-run or long-run scenarios. As discussed above, short-run analyses measure the wage impact of immigration before there has been sufficient time to adjust capital inputs; that is, in the short run capital is fixed. The long run is a time frame that by definition is sufficiently long to allow firms to adjust the

---

[25]As its name suggests, under this production technology assumption, there is a constant percentage change in factor (e.g., capital and labor) proportions at all output levels. A formal presentation of the CES version of the structural model can be found in Borjas (2014a, pp. 106-112).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

amount and type of physical capital (e.g., by purchasing new machines or building new plants) used in response to factor shocks.[26] If, for example, there is an immigration-induced decline in the wages of relatively low-skilled production workers, this may lead to an increase in investment in industries using more of this type of labor, potentially cushioning the decrease in their wages (see Section 4.5). The simulations conducted under these two alternative assumptions may be regarded as bounding the wage effects associated with an immigration shock (at least the wage effects estimated using this approach). Borjas (2003), along with a number of other studies, performed simulations of specific labor supply shocks. These studies assume that the entire immigration that occurred over a certain period (such as 1990 through 2010) happened all at once, and then the simulation projects the impact of this supply shock in the short run and in the long run. Borjas (2003), in particular, emphasized the short run and assumed the stock of physical capital is fixed. One rationale for adopting this assumption is the lack of evidence with respect to how long it takes capital to adjust in different situations. Ottaviano and Peri (2012), on the other hand, emphasize the long run.

An important point is that in the empirical literature, temporal distinctions between the short and long run do not necessarily map precisely with the theoretical concepts. In the real economy, there is variation in how long it takes capital to adjust (the defining characteristic of the long run). Indeed, if capital adjusts quickly, the long run could be quite short in calendar time; if it adjusts slowly it might be quite protracted in calendar time. In terms of the structural models, what is really meant by "the short run" is that capital is perfectly inelastic in supply while "in the long run" capital is perfectly elastic in supply.[27]

Another important point is that while structural models can estimate changes in *relative wages* across groups in the short or long run, the assumptions necessary to estimate the model require that the *average* wage cannot be affected by immigration in the long run. The production function specification dictates that a 10 percent immigration-induced increase in supply have a 0.0 percent impact on average wages in the long run and must lower the average wage by 3.0 percent in the short run (Borjas, 2014a, p. 109).[28] This technical assumption cascades to all other estimates of the

---

[26]Chapter 4 provides examples of simple models that use this common distinction between short-run and long-run effects and illustrate the adjustment differences relevant to the two time frames.

[27]The panel also notes these are static models whereas a full modeling of the long-run/short-run distinction would specify a dynamic model.

[28]See Section 4.2 (or Borjas, 2014a) for a formal explanation of the underlying production function theory behind these numbers. Again, the intuition is that, in the short run and with other inputs to production fixed, additional workers will compete for a limited number of

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

wage impact of immigration using this framework. As a result, since the average wage cannot change in the long run, adjustments to immigration occur only in relative wages: The groups that received disproportionately large numbers of immigrants may experience a long-term relative decline in their wage, while the wage of the groups that received very few immigrants may see a relative increase in the long run. It is important to keep these mathematical restrictions in mind when interpreting any wage impact estimated from the structural approach.

As with any theoretical approach, the simplifying assumptions entailed in the aggregate production function approach come at a cost (Blau and Kahn, 2015, p. 812):

> . . . Specifically, one must decide how to disaggregate labor into skill groups and also what types of substitution/complementarity relationships to allow. As examples of the latter, recall Lewis's (2011b) model allowing skilled and unskilled labor to have asymmetric relationships with capital or Ottaviano and Peri's (2012) models allowing differing substitution relationships between different pairs of education groups. Moreover, researchers must also decide whether to allow immigrants and natives within a skill group to be imperfect substitutes, and if so, whether the immigrant/native substitution parameter should be the same for all skill groups (Lewis, 2011a).

The relative wage and employment impacts predicted by these models hinge crucially on estimates of the elasticities of substitution between native-born and foreign-born workers overall, and the separate elasticities between education and experience groups or between skill groups. The less interchangeable different kinds of workers are, the less they compete and the less downward pressure inflow of one group can exert on wages of another.

An important early paper using the aggregate production function approach in this area was Borjas et al. (1997). These authors compared the actual supplies of workers in particular skill groups to what they would have been in in the absence of immigration and then used results from previous studies on the elasticity of substitution among skill groups to compute the impact of the immigrant supply shock on the relative wages of skill groups. The study, which focused on the 1980-1995 period, examined two

---

jobs, which exerts downward pressure on wages. In the long run, once firms have had time to adjust capital stocks, the demand for labor increases along with the size of the economy and wages will be pushed back upward toward initial levels. The elasticities of substitution between immigrant workers and different types of established workers in the labor market dictate which workers' pay will change by more than –3 percent and which workers' pay will change by less than –3 percent.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2587 of 4699 PageID #:  5752

relative wage comparisons: (1) the wages of high school dropouts relative to those with at least a high school degree and (2) college graduates relative to high school graduates (where all workers were aggregated into "high school equivalents" and "college equivalents"). The authors found that immigration accounted for a 3-6 percent decline in the wages of high school dropouts relative to high school graduates between 1980 and 1995—in the range of 27-55 percent of the total decline for that group over the period. In contrast, they found that immigration did not explain much of the increase in the college wage premium (i.e., the college versus high school equivalent comparison). These findings reflect the fact that, for these larger educational group aggregates, immigration did not substantially affect relative supplies of workers in each skill category.

Although the results from Borjas et al. (1997) are intriguing, there were limitations to the study. The underlying production relationships (parameters) were obtained from outside sources and the relative wage effects of immigrant supply shifts were mechanically predicted from these elasticities of substitution. Furthermore, each specification (the wage group comparisons in (1) and (2) above) distinguished (compared) just two types of labor.

These and other issues were addressed by Borjas (2003), who focused on the impact of immigration on relative wages in the United States over the 1980-2000 period using a nested CES production function approach. Borjas assumed—similar to Card and Lemieux (2001)—that workers within the same education category but who differ in their labor market experience are not perfect substitutes in production. As in the analysis by Borjas et al. (1997) of the shorter post-1980 period, Borjas (2003) found substantial negative wage effects of immigration with capital held fixed, particularly on the low skilled. He estimated that the immigrant inflow from 1980 to 2000, equal to an increase in the labor supply of working men of about 11 percent, lowered the wages of male native high school dropouts by 8.9 percent and those of male college graduates by 4.8 percent.

As noted earlier, Borjas disaggregated skill groups by work experience (proxied by age) as well as education levels, forming 32 education-experience cells. His addition of the experience dimension built on the insight from human capital theory that workers enhance their skills not only through investments in formal schooling (i.e., education) but also by accruing skills through labor market experience. He thus assumes that not only are workers with different education levels imperfect substitutes but workers with the same education but different experience levels are imperfect substitutes. In the real world, immigrant inflows vary across education-experience cells, and the extent of that variation changes over time. This variation helps allow the impact of immigration on the labor market to be identified. Borjas assumed that, within education-experience cells, immigrants and natives are perfect substitutes. In contrast to the study by Borjas

002580

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

et al. (1997), which used outside information to obtain the parameters of the production function, Borjas (2003) directly estimated parameters of the production function and then simulated the wage impacts based on the estimated elasticities.

Even the highly disaggregated approach proposed by Borjas (2003) involves some simplifying assumptions. Recent work suggests that results using the structural approach are sensitive to these assumptions. We illustrate this point with findings from Ottaviano and Peri (2012), a study of the relative wage effects of immigration over the 1990-2006 period based on Census Bureau data (from the Decennial Census and the American Community Survey [ACS]), which used the same broad framework as Borjas (2003) but changed some of the assumptions. A key distinction is that Ottaviano and Peri make different assumptions than Borjas about the supply of capital. Whereas Borjas (2003) assumed that capital supply is inelastic (does not have time to react to growing labor supply), Ottaviano and Peri assumed that it is perfectly elastic.

In addition, Ottaviano and Peri made two important changes in how substitution across groups is specified.[29] First, in contrast to Borjas (2003), Ottaviano and Peri allowed immigrants and natives to be imperfect substitutes. We have already discussed how, given language differences and other factors, it might be reasonable to assume that immigrants and natives are imperfect substitutes. Further, they split the sample in order to allow the substitutability between immigrants and natives for the less educated (high school dropouts and high school graduates) to differ from that for the more highly educated (those with some college and college graduates). The intuition underlying this assumption is that language and other barriers are less prevalent among highly educated foreign-born workers than among less educated foreign-born workers, allowing highly educated foreign-born workers to be closer substitutes for their native-born counterparts.[30] Their estimated elasticities are consistent with imperfect substitutability that differs in magnitude by education category: They obtain a native-immigrant elasticity of substitution of 11.1 for the less educated and 33 for the more highly educated (indicating that workers in the latter category are more interchangeable). Allowing for imperfect substitution between immigrants and natives is potentially important because the less closely immigrants

---

[29]Manacorda et al. (2012), writing in parallel with Ottaviano and Peri (2012) on the United Kingdom, also developed the same approach based on the idea of immigrants and natives being imperfect substitutes within age-education cells.

[30]The results from Peri and Sparber (2009) offer some support for the imperfect substitutability idea; they found that low-skilled foreign-born workers are employed disproportionately—highly so in some cases—in occupations such as construction, kitchen work, etc., that demand more physical effort and less communication skill.

Copyright National Academy of Sciences. All rights reserved.

substitute for natives, the smaller the effect immigrants will have on the wages of natives with the same observable skills.

Second, while Borjas (2003) imposed the same elasticity value for all adjacent education groups, Ottaviano and Peri (2012) specified the elasticity of substitution between education groups as being different (independent of native/immigrant status). They posited that, in the current economy, high school dropouts can fill many of the same kinds of jobs as workers with just a high school diploma; in other words, they hypothesized that high school graduates and dropouts often compete in the same labor market. This would be consistent with Card (2009), who found high school graduates and high school dropouts to be virtually perfect substitutes. (Recall that the economists' designation of perfect substitutes means that, for instance, high school dropouts and high school graduates can be traded at a constant rate, but that rate does not have to be one-to-one.) At other skill levels—for example between those in the labor force with some college and those with a graduate degree—the degree of substitution may be lower. Consistent with this reasoning and with Card (2009), Ottaviano and Peri found that the elasticity of substitution between high school dropouts and high school graduates is at least 10 and is infinite in some estimates, while the elasticity of substitution at higher skill levels is much lower. Since most immigrants to the United States are low skilled, the wage impact of an increase in immigrant supply will be lower if high school dropouts and high school graduates are combined, since the immigrant supply shock will constitute a smaller percentage of the same skill-group labor force in the larger aggregate.

In contrast to Borjas et al. (1997) and Borjas (2003), Ottaviano and Peri (2012) found that immigration had only a very small effect on native wages within skill groups. Using the more detailed set of parameters reflecting imperfect substitutability between natives and immigrants within an education-experience cell, they found that the effect of immigration over the 1990-2006 period was to reduce the wages of native-born high school dropouts in the range of 0.6-1.7 percent. Averaged across all skill categories, the study found that U.S.-born workers experienced a slight increase in wages as a result of immigration.

The Ottaviano and Peri (2012) specification is not without controversy. Borjas et al. (2012) presented evidence that the estimates of their two key substitution elasticities—that between immigrants and natives and that between high school dropouts and high school graduates—are sensitive to the type of data used and to what regressors are included in the underlying production function models.[31] As Blau and Kahn (2015, p. 821) noted,

---

[31]Dustmann and Preston (2012) presented evidence that downgrading of immigrants may lead to finite estimates of the elasticity of substitution between immigrants and natives even if the true elasticity of substitution in infinite.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

"The varying results in the estimates of the substitution elasticities illustrate a potential drawback of this type of approach to estimating the impact of immigration."

The contrasting findings between the Borjas (2003) and Ottaviano and Peri (2012) studies suggest that results from structural models are influenced by crucial assumptions, some of which involve unobserved and untestable issues. However, these two studies also differ along a number of dimensions, ranging from the time period studied to whether the results are obtained under the assumption of capital being inelastic or perfectly elastic, that make them difficult to compare. To abstract from the impact of extraneous factors and to focus on the importance of substantive decisions, the panel extends an analysis presented in Borjas (2014b). Table 5-1 summarizes wage simulations associated with alternative specifications ("scenarios") for a consistent time period, 1990-2010, treating all immigration between 1990 and 2010 as if it constituted a single supply shock.[32,33] The table includes the following scenarios for both the short run and the long run ("GB" refers to Borjas, 2003; "OP" refers to Ottaviano and Peri, 2012; variables are defined and discussed below):

- **Scenario 1**: Immigrants and natives in a skill group are perfect substitutes ($\sigma_{MN} = \infty$), and high school dropouts and high school graduates are different groups—similar to GB.
- **Scenario 2**: Immigrants and natives in a skill group are imperfect substitutes ($\sigma_{MN} = 20.0$, as in OP), and high school dropouts and high school graduates are different groups (as in GB).
- **Scenario 3**: Immigrants and natives in a skill group are perfect substitutes ($\sigma_{MN} = \infty$, as in GB), and high school dropouts and high school graduates are perfect substitutes ($\sigma_{HS} = \infty$, as in OP).
- **Scenario 4**: Immigrants and natives in a skill group are imperfect substitutes ($\sigma_{MN} = 20.0$), and high school dropouts and high school graduates are perfect substitutes ($\sigma_{HS} = \infty$)—similar to OP.

In Table 5-1, the term $\sigma_{MN}$ is the elasticity of substitution between immigrants and natives with the same measured skills. This term equals infinity if the two groups are perfect substitutes (the assumption in Borjas [2003]) or equals 20 for the "preferred" estimate in Ottaviano and Peri (2012). The term $\sigma_{HS}$ is the elasticity of substitution between high school

---

[32]For an analysis spanning 20 years, one might reasonably argue that—to the extent immigration is less a "shock" than a somewhat predictable flow—investment patterns reflect some level of anticipation of the expansion of the workforce and population generally.

[33]In contrast to the macro literature, in all these scenarios the elasticity of substitution between labor and each of the different types of capital is assumed to be identical, precluding the capital skill complementarities discussed in Chapter 4.

Copyright National Academy of Sciences. All rights reserved.

**TABLE 5-1** Simulated Percentage for Wage Impacts of 1990–2010 Immigrant Supply Shock

| | High School Dropouts | High School Graduates | Some College | College Graduates | Post-College | All Education Groups |
|---|---|---|---|---|---|---|
| Percentage Supply Shift | 25.9 | 8.4 | 6.1 | 10.9 | 15.0 | 10.6 |
| **A. Short Run** | | | | | | |
| Scenario 1*: $\sigma_{MN} = \infty$ | | | | | | |
| All workers | –6.3 | –2.8 | –2.3 | –3.3 | –4.1 | –3.2 |
| Scenario 2: $\sigma_{MN} = 20.0$ | | | | | | |
| Native-born | –4.9 | –2.3 | –2.0 | –2.7 | –3.3 | –2.6 |
| Foreign-born | –8.5 | –6.6 | –5.9 | –8.1 | –8.5 | –7.6 |
| All workers | –6.3 | –2.8 | –2.3 | –3.3 | –4.1 | –3.2 |
| Scenario 3*: $\sigma_{MN} = \infty$ and $\sigma_{HS} = \infty$ | | | | | | |
| All workers | –3.4 | –3.4 | –2.3 | –3.3 | –4.1 | –3.2 |
| Scenario 4: $\sigma_{MN} = 20.0$ and $\sigma_{HS} = \infty$ | | | | | | |
| Native-born | –2.1 | –3.0 | –2.0 | –2.7 | –3.3 | –2.7 |
| Foreign-born | –5.6 | –7.3 | –5.9 | –8.1 | –8.5 | –7.2 |
| All workers | –3.4 | –3.4 | –2.3 | –3.3 | –4.1 | –3.2 |

Copyright National Academy of Sciences. All rights reserved.

**B. Long Run**

| | | | | | | |
|---|---|---|---|---|---|---|
| Scenario 1:[a] $\sigma_{MN} = \infty$ | | | | | | |
| All workers | -3.1 | 0.4 | 0.9 | -0.1 | -0.9 | 0.0 |
| Scenario 2: $\sigma_{MN} = 20.0$ | | | | | | |
| Native-born | -1.7 | 0.9 | 1.2 | 0.5 | -0.1 | 0.6 |
| Foreign-born | -5.3 | -3.4 | -2.7 | -4.9 | -5.3 | -4.4 |
| All workers | -3.1 | 0.4 | 0.9 | -0.1 | -0.9 | 0.0 |
| Scenario 3:[a] $\sigma_{MN} = \infty$ and $\sigma_{HS} = \infty$ | | | | | | |
| All workers | -0.2 | -0.2 | 0.9 | -0.1 | -0.9 | 0.0 |
| Scenario 4: $\sigma_{MN} = 20.0$ and $\sigma_{HS} = \infty$ | | | | | | |
| Native-born | 1.1 | 0.2 | 1.2 | 0.5 | -0.1 | 0.5 |
| Foreign-born | -2.4 | -4.1 | -2.7 | -4.9 | -5.3 | -4.0 |
| All workers | -0.2 | -0.2 | 0.9 | -0.1 | -0.9 | 0.0 |

[a]Because, in this scenario, native-born and foreign-born workers are perfect substitutes, it is unnecessary to differentiate between the two; hence, only one row for "all workers" is shown.
SOURCE: Borjas (2014a, Tables 5.2, 5.4, 5.6). The simulations use the nested constant elasticity of substitution (CES) framework, set $\sigma_E = 5.0$, and assume that the aggregate production function is Cobb-Douglas, implying $\sigma_{KL} = 1.0$.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

dropouts and high school graduates. It is equal to infinity if the two groups are perfect substitutes.

The above scenarios summarize how the key differences in the structural studies literature can be linked back to the studies' modeling assumptions. Allowing capital to adjust (i.e., moving from a short-run to a long-run scenario) reduces the estimated negative effects across the board—that is, for all workers as well as for relative wage effects within each education group. As the elasticity of substitution between native-born and foreign-born is changed from the two groups being perfect substitutes ($\sigma_{MN}$ = ∞) to imperfect substitutes ($\sigma_{MN}$ = 20.0), the impact on the wages of "all workers" (natives and immigrants) for any given skill group is unchanged, but *within* each skill group, imperfect substitutability is associated with a larger negative wage impact on earlier foreign-born workers (prior immigrants) and a smaller negative wage impact on native-born workers. This makes sense for the following reason: In cases where foreign-born and native-born are close substitutes, one would expect an immigration shock to have a more equal impact on the two groups; imperfect substitutability between the two groups insulates natives from negative effects to some degree. Comparing otherwise similar scenarios in which high school dropouts and high school graduates are imperfect substitutes (Scenarios 1 and 2) versus scenarios in which they are perfect substitutes (Scenarios 3 and 4), one can see that the impact of allowing high school dropouts and high school graduates to be perfect substitutes has the effect of reducing the negative wage impact for high school dropouts. This makes sense, as any negative impact from the inflow of unskilled workers is now diluted across a larger portion of the labor supply (high school dropouts plus high school graduates). A portion of the negative wage impact is averaged into the value for high school graduates, which becomes slightly more negative. The simulations also show that allowing for imperfect substitution between immigrants and natives does not greatly attenuate the wage impact of immigration on high school dropouts. There is still a 2 to 5 percent wage loss, depending on whether one looks at the long run or short run. The scenario that does lead to a much lower negative or even positive impact of immigration on the lowest skilled workers is the one that also incorporates the possibility that high school dropouts and high school graduates are perfect substitutes.

When comparing simulated effects across education groups within a scenario, it is useful to remember that all structural simulated effects reflect a combination of the estimated parameters relating relative wages and relative labor supply across skill groups and the simulated amount of immigration-induced labor supply by skill group. Unlike in spatial and skill cell studies, the impacts cannot be separated into the amount due to the responsiveness of the skill group to changes in labor supply and the magnitude of the group's simulated labor supply change. However, the pattern

002586

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

across columns in Table 5-1 does mirror qualitatively the magnitudes of the labor supply changes by education over 1990-2010, the values used in the simulation. Negative effects for natives tend to be larger for high school dropouts, the group with the largest immigration inflow, followed by those with post-college education, a group that also experienced relatively large inflows. Native high school graduates and those with some college tend to experience smaller negative effects and, indeed, under most scenarios, slightly positive effects in the long run, consistent with relatively small immigrant inflows over the period. The impacts on college-educated natives are very similar to the mean effects across education.

Key takeaway points from this simulation are that the assumptions about capital—fixed short run versus adjusted long run—and substitutability among skill groups have large effects on estimates of wage impacts. Wage effects (overall and within skill groups) are more negative in the short run than in the long run, when they are sometimes even positive. And, for both the short-run and long-run scenarios, the largest negative effects on native less-skilled workers are for the scenarios in which immigrants and natives are perfect substitutes and high school dropouts and graduates are imperfect substitutes (Scenario 1). The smallest negative effects on native less-skilled workers are for the scenarios in which immigrants and natives are imperfect substitutes and high school dropouts and graduates are perfect substitutes (Scenario 4). Indeed, under this scenario, all native groups except the postcollege-education group benefit from immigration in the long run.[34]

## 5.5  A CROSS-STUDY COMPARISON OF IMMIGRANTS' IMPACT ON WAGES

As is apparent from the literature review above, the results of a given study of the impact of immigration on wages or employment are typically directly comparable to only a handful of others. Sometimes two studies are not directly comparable because the underlying methodology is fundamentally different. For example, skill cell studies estimate the effect of immigrants on the most similar natives, omitting the effect of immigrants on less similar natives that is captured in most spatial studies, while structural studies build in the assumption that average wages are unchanged by immigration in the long run and hence are essentially studies of relative wages. But often, even within a methodology, studies are not immediately

---

[34]Recall, also, the all-important point that the absolute wage impact numbers are dictated by production function assumptions; only the relative wage impacts across skill groups are driven by the data. And, here too, the magnitude of the relative wage impacts is tied to the relative size of the immigrant inflows by the assumptions of the model.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

comparable because of differences in the way the number of immigrants is captured. For example, the study may focus on immigrants as a share of the labor force or the share of the labor force that is of a particular skill (instrumented by the predicted immigrant inflows of that skill type). For this reason, in Table 5-2, the panel presents in terms of a common metric the results of several prominent spatial and skill cell papers discussed in this chapter, along with the largest and smallest structural impacts for all natives and for native high school dropouts, based on the results in Table 5-1. For each study, the table shows calculations of the wage effect on the indicated group of natives of an increase in immigrants that raises labor supply of the state, occupation, skill cell, or education group by 1 percent. Wage effects in bold are the coefficients reported in the source study; other coefficients were calculated by the panel as outlined in the Technical Notes in Section 5.9.

For most spatial and skill cell studies, the calculations to convert their results into the common metric are straightforward (see Technical Notes in Section 5.9), though they do involve using a particular value of the share of immigrants in the labor force. To make the studies as comparable as possible, the same value of the share of immigrants in the labor force should be used in all the calculations, even though a given study's average share will depend on the exact years of data used. To calculate the underlined values in Table 5-2, the panel set the immigrant share of the labor force at its 2000 value of 12.6 percent for those studies requiring harmonization. However, the harmonization approach for spatial and skill cell papers does not lend itself as readily to the structural studies, which involve several parameters rather than a single parameter. Nevertheless, it is useful to make a more crude adjustment to see whether the structural results are broadly in line with those of other studies, setting aside the issue of relative versus absolute wage changes. For the structural studies, the simulations reported in Table 5-1 above may be thought of as the result of a simple increase in the share of immigrants in the labor force from 1990 to 2010, rather than the result of more complex changes in different types of labor over the period. The wage effects reported in the simulations may then be divided by this increase in immigrant share to get the effect of a percentage point increase in immigrant share, a figure that may then be converted to the effect of a 1 percent increase in the labor supply, as was done for the spatial and skill cell studies. A similar exercise may be performed for Borjas (2016b) and Peri and Yasenov (2015). (See the last two subsections of Section 5.9 for Technical Notes on the panel's calculations for Borjas (2015), Peri and Yasenov (2015), and the structural studies.)

Table 5-2 confirms that there is a wide range of estimated elasticities and makes clearer than do unharmonized results which estimated elasticities are most negative and what patterns exist in the size of elasticities. Consider first the results for all natives and native dropouts (i.e., excluding

002588

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

results for minorities). There is considerable variation in the findings, with results ranging from a set clustered around zero (including small positive values) to a set in the −0.8 to −1.0 range *within* each of the three approaches (with the exception of three studies noted below). Results close to zero are obtained in the spatial studies of Card (2001) for native men and women and of Cortés (2008) for native dropouts, in Card and Peri's (2016) skill cell regressions for all native men, and also in the long-run structural models for all natives (whose results are close to zero by assumption). Results in the −0.8 to −1.0 range are those of the Altonji and Card (1991) spatial study and the structural short-run calculation for dropouts (Scenario 1, in which capital is fixed and immigrants and natives are perfectly substitutable). Two much more negative estimates (again excluding the elasticities for minorities) are Borjas's (2016b) upper bound for native non-Hispanic men (−1.4) and Llull's (2015) skill cell analysis for all native men (−1.7). On the other hand, the considerably more positive estimate of 0.3 is from Peri and Yasenov's (2015) study of the same Mariel Boatlift immigration episode studied by Borjas (2015).

Some notable patterns emerge. Confirming expectations based on economic theory about which groups are most negatively affected by immigration, native dropouts tend to be more negatively affected than better-educated natives (as indicated by comparing results for dropouts with the overall results for all workers or all men or women). The results in the table also suggest that this negative effect may be compounded for native minorities. Altonji and Card (1991) found more negative results for low-education blacks than low-education whites: The coefficient for black males reported in the table is the most negative effect they reported. Cortés examined a number of groups and found the largest negative effects for Hispanic dropouts with poor English, as well as larger negative effects for Hispanic dropouts than for all dropouts. This could be because native dropout minorities are the closest native substitutes for immigrants. As the results in panel C, Structural Studies, of Table 5-2 show, the closer substitutes immigrants and natives are assumed to be (the higher $\sigma_{MN}$), the more negative the effect of immigration on natives. While not reported in Table 5-2, structural estimates that distinguish between the effects on (prior) immigrants and on natives found larger negative effects on immigrants (Table 5-1), and the relatively large negative effects found by Monras (2015) are for dropouts, *including* non-Hispanic immigrants.[35]

Although theory predicts larger negative effects on native wages of immigrant inflows in the short run than in the long run, this pattern

---

[35]The Borjas (2016b) study's large negative effects are for male non-Hispanic dropouts, including non-Hispanic immigrants (although the latter are likely few in number and perhaps no more similar to immigrants than they are to natives).

Copyright National Academy of Sciences. All rights reserved.

**TABLE 5-2** Effect on Native Wages of an Inflow of Immigrants That Increases Labor Supply by 1 Percent

| Study | Wage Effect (%) | Which Natives |
|---|---|---|
| **A. Spatial Studies** | | |
| Altonji and Card (1991) | <u>–1.7</u> | Dropouts, black men |
| | <u>–1.0</u> | Dropouts |
| Borjas (2016b) | –1.4 | Dropouts, non-Hispanic men |
| | –0.5 | Dropouts, non-Hispanic men |
| Monras (2015) | **–0.7** | High school graduates or less, non-Hispanic, including immigrants |
| Cortés (2008) | **–0.6** | Dropouts, Hispanic with poor English |
| | **–0.3** | Dropouts, Hispanic |
| | **–0.1** | Dropouts |
| Card (2001) | **–0.1** | Men |
| | **0.1** | Women |
| Peri and Yasenov (2015) | 0.3 | Dropouts, non-Cuban |
| **B. Skill Cell Studies** | | |
| Llull (2015) | <u>–1.7</u> | Men |
| Borjas (2003) | <u>–0.6</u> | Men |
| Card and Peri (2016) | <u>–0.2</u> | Men |
| Card and Peri (2016) | **–0.1** | Men |
| **C. Structural Studies** | | |
| | –0.8 | Dropouts |
| | –0.4 | All |
| | –0.4 | Dropouts |
| | –0.3 | Dropouts |
| | –0.2 | All |
| | 0.1 | All |
| | 0.1 | Dropouts |

NOTES: Panel C, "Structural studies," refers to the results in Table 5-1: the maximum and minimum values for the effect on all natives (except the long-run minimum value for Scenarios 1 and 3, which is zero by assumption) and on native dropouts are reported. "Dropouts" refers to high school dropouts; HS to high school or less. "10-year differences" refers to analysis relating the 10-year change in wage to the 10-year change in immigration; "fixed effects (10-yearly data)" indicates that levels rather than changes were used. All nonstructural coefficients are from instrumental variables estimates except Borjas (2003) and Card and Peri (2016), where they are the ordinary least squares (OLS) coefficients from the nonstructural estimation, and Borjas (2016b).

Altonji and Card's (1991) black native dropouts had less than 13 years of education, while the dropouts of all races had less than 12 years. The Cortés (2008) sample is of dropouts in immigrant–intensive nontraded sectors. Monras's (2015) natives included earlier non–Hispanic

002590

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| Which Immigrants | Short Run? | Note |
|---|---|---|
| | | |
| All | — | 10-year difference |
| All | — | 10-year difference |
| Dropouts | Yes | Upper bound, Mariel boatlift |
| Dropouts | Yes | Lower bound, Mariel boatlift |
| HS or less, Mexican | Yes | 1-year difference |
| | | |
| Dropouts | — | Fixed effects (10-yearly data) |
| Dropouts | — | Fixed effects (10-yearly data) |
| Dropouts | — | Fixed effects (10-yearly data) |
| All | — | *5-year difference, wage level* |
| All | — | *5-year difference, wage level* |
| Dropouts | Yes | Mariel boatlift |
| | | |
| All | — | IV, fixed effects (10-yearly data) |
| All | — | OLS, fixed effects (10-yearly data) |
| All | — | OLS, 10-year differences |
| All | — | OLS, 10-year differences |
| | | |
| All | Yes | Scenario 1: $\sigma_{MN} = \infty$ |
| All | Yes | Scenarios 1 and 3: $\sigma_{MN} = \infty$ |
| All | — | Scenario 1: $\sigma_{MN} = \infty$ |
| All | Yes | Scenario 4: $\sigma_{MN} = 20$ |
| All | Yes | Scenarios 2 and 4: $\sigma_{MN} = 20$ |
| All | — | Scenarios 2 and 4: $\sigma_{MN} = 20$ |
| All | — | Scenario 4: $\sigma_{MN} = 20$ |

immigrants. Natives and immigrants cannot be distinguished in Borjas's (2016b) data. The elasticity of substitution between immigrants and natives is $\sigma_{MN}$; when it is infinite, the two groups are perfect substitutes.

Bolded figures are coefficients reported directly from the cited study; underlined figures are the result of the panel's calculation using the paper's coefficient and an immigrant density of $p = 0.126$, the national value for the 2000 labor force. See Section 5.9 for technical notes on these calculations and those for the structural cases and a number of other papers that do not involve $p = 0.126$ and are implicitly evaluated at a different $p$ (though a very similar one in the case of the structural papers).

For column 5, the "short-run" designation indicates effects found over a less than 5-year span, or structural calculations with capital held fixed. The length of time required for capital, technology, and other factors to respond to unexpected or expected immigration inflows, and hence the distinction between short and long run, cannot be rigorously determined.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

does not come through unambiguously in the table. The pattern is pronounced for the structural studies (see also Table 5-1), where the short run is imposed in accordance with theory by fixing the capital stock at its initial value. But the pattern is less clear in nonstructural studies. Monras's (2015) study of the 1-year effect of unanticipated inflows is clearly capturing the short run and does find a relatively large negative effect (–0.7), while Borjas's (2016b) negative elasticities based on the first 7 post-arrival years after an unanticipated immigrant inflow (–0.6 to –1.4) are also likely to be capturing a short-run effect. However, Peri and Yasenov (2015) estimated the most positive elasticity of any study (0.3), based on the first 3 years after the Mariel Boatlift examined by Borjas (2016b). This elasticity is statistically insignificant, and the authors characterize their paper as finding no negative effect rather than finding a positive effect, but their result would rule out, statistically, effects as negative as the lower bound finding of –0.6 in Borjas (2015).

Studies examining the relation between 10-year changes in immigration and 10-year changes in wages ("10-year differences")—Altonji and Card (1991) and Card and Peri (2016)—capture exactly 10 years of adjustment and hence probably also capture considerable capital adjustment. The same is true for studies using data spaced 10 years apart but not differenced ("fixed effects"), such as Llull (2015), Borjas (2003), and Cortés (2008), which capture adjustment over at least 10 years.[36] Card's 2001 paper examining the effect of flows over 5 years is more difficult to categorize in terms of capital adjustment. The contrasting results of studies examining the same frequency of effects suggest the importance of other factors in determining the elasticity estimated, including the methodological approach.

There appear to be some differences in elasticities by approach not accounted for by the share of studies in each looking at the long versus short term, at dropout natives versus all natives, and minority natives versus all natives. On balance, the skill cell studies find the most negative wage impacts and the structural studies the least negative, with the spatial studies in the middle; differences between approaches are of about the same order of magnitude as the variation among studies using the same approach. Below, the panel revisits some of the methodological differences discussed in Section 5.3 to see if this ranking is expected, with particular attention to the medium- to long-run time frame probably captured by most nonstructural studies.

Spatial studies can be biased either to find a positive effect (if instrumental variables do not correct adequately for immigrant location choice) or to find zero effect (if trade in goods and flows of capital and labor

---

[36]Baker et al. (1999) showed that only specifications in differences clearly capture effects of a particular frequency.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

distribute the effect nationally), but they will also incorporate changes in technology, technique, or sector that genuinely mitigate negative wage impacts, and they will include cross-effects of immigrants on less similar natives. The skill cell studies avoid the biases of the spatial studies, which makes them more likely to find negative effects, as they do, but they do not include cross-effects, whose overall direction (negative or positive) is unknown. Thus, it is not certain that the larger effects from skill cell studies compared to spatial studies are to be expected. All skill cell studies to date have examined the impact of immigration on men only, unlike studies using other approaches. However, other studies do not paint a clear picture of whether women or men are more vulnerable to immigration impacts, leaving it unclear as to whether the gender focus of skill cell studies explains why their estimated wage effects on natives are more negative.

The structural studies preclude any effect on overall wages in the long run, due to the choice of a production function that is assumed to remain constant over time. This rules out any overall shift up in wages due to increasing returns to scale or any immigration-induced skill-neutral technological progress, but it also precludes any overall shift down in wages due to decreasing returns to scale. Moreover, it rules out any downward pressure on dropout wages if the induced technological progress complements high-skilled workers and substitutes for low-skilled workers (though given large inflows of low-skilled immigrants, this would probably not be expected). It is therefore not easy to trace the ranking of the impact by approach back to the methodological characteristics of each.

It is useful to discuss possible reasons for the variations in estimated elasticities within each of the approaches (i.e., spatial, skill cell, and structural studies). The reasons for the variation within the structural approach are transparent: Short-run effects are larger, and effects with natives and immigrants assumed to be perfect substitutes are larger than those where they are not.[37] Further, as discussed above with respect to Table 5-1, assumptions about substitutability across education groups, particularly whether or not high school graduates and high school dropouts are perfect substitutes, also influence the results, with the assumption of perfect substitutability resulting in smaller estimated negative effects. Thus, as suggested by our discussion of the simulation results in Table 5-1, the value of the wage elasticities from the structural estimates in the bottom panel of Table 5-2 depends on the particular scenario being considered. One general conclusion is that the value of the wage elasticity is not as greatly affected when one only allows for imperfect substitution between natives and immigrants with the same level of education. The value of the wage

---

[37]Note that rounding the elasticities to one decimal place has led to the effects of scenarios that differed slightly in Table 5-1 being reported as the same magnitude here.

002593

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

elasticity for high school dropouts, however, becomes much less negative or even positive when one adds the assumption that high school dropouts and high school graduates are perfect substitutes.

The differences among studies within the spatial approach seem fairly consistent with differences in the immigrants and natives studied and whether the impact estimated is short or long run. The results of the Altonji and Card (1991) study do, however, appear more negative than expected on this basis. They may be affected by the use of an earlier and less sophisticated historical settlement-pattern instrument than was used in later studies. Additionally, some spatial studies (and some skill cell studies) investigate time periods that are long enough to capture long-run adjustments in capital and technology and in natives' human capital accumulation and to reflect increasing aggregate demand as a result of immigration. Spatial and reduced-form skill cell studies potentially capture some adjustments that the structural analyses rule out and, if the instrumental variable is ineffective, some that are unintended, such as equalization of wages spatially as a result of trade or of capital and labor mobility.

The variation within the skill cell studies may reflect both economic and econometric issues. Llull (2015) may have found a very large negative effect because the novel instrument used picks out the impact of immigrants fleeing turmoil, an immigrant category that may possibly have a more negative impact on native wages (see discussion below). The variation among the other three OLS studies appears to reflect econometric issues. Card and Peri (2016) indicated that the original Borjas (2003) skill cell elasticity of –0.6 is sensitive to changes in the form of regression used.[38] The OLS results should be the same whether the fixed effects or 10-year differences method is employed. Card and Peri showed that the results are considerably less negative for differences (–0.2), suggesting a problem of omitted variables or possibly that the regressions are capturing different frequency (short versus long run) effects.[39] Furthermore, when Card and Peri (2016) changed the immigrant variable from the (change in the) immigrant share of the labor force to the change in the number of immigrants divided by the initial labor force, the elasticity becomes close to zero (–0.1). They argued that the latter immigrant variable is superior, as it is unaffected by changes in the native labor force that might be driven by the same factors as immigration.[40] It is unclear to what degree the Llull instrumental variables elasticity is robust to these changes.

---

[38] Card and Peri (2016) tested the robustness of a slightly different Borjas (2003) specification from that in Table 5-2, so their results should be compared to a harmonized elasticity from Borjas (2003) of –0.5.

[39] See Baker et al. (1999).

[40] Borjas (2014a) argued that the share specification is superior because the relation between the wage and immigration-induced percentage increase in labor supply is highly nonlinear.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2602 of 4699 PageID #:  5767

The Economic and Fiscal Consequences of Immigration

Llull's (2015) skill cell study has the most negative elasticity of any study (–1.7), which raises a possibility not considered thus far: that the impact of immigrants may vary according to the reason for their migration to the United States. His addition of instrumental variables estimation triples the size of the OLS effect found by Borjas (2003), and his choice of instruments may help inform why instrumental variables raise the magnitude so much. All other instrumental variables studies in the table use an instrument based on historical settlement patterns, which means that the estimated effect is that of immigrants who chose their U.S. location to be close to their co-ethnic predecessors (this is called the Local Average Treatment Effect) and who may therefore be disproportionately composed of immigrants who have been encouraged to come to the United States by family ties. Llull used forced migration as an instrument for the share of immigrants in a skill cell. Economic or political turmoil or natural disasters in the origin country provide random variation in immigration that is not related to better employment opportunities in the destination. His estimates therefore reflect the impacts of immigrants fleeing acute problems and for whom family ties may be less important. This raises the possibility that such immigrants have a more negative effect on natives than do immigrants encouraged by family ties, particularly if their arrival is less likely to be anticipated. An alternative interpretation is that the traditional spatial studies' instrument based on where earlier settlers settled is simply invalid because those earlier settlers settled in high-wage cities.

An important point is that, while Table 5-2 suggests which native wages are more susceptible to a given immigration inflow, what the table does not show is that native groups differ in the magnitude of immigrant inflows they face. For example, since native dropouts experience a larger immigrant-driven labor supply increase than do natives overall (see Chapter 4), their greater susceptibility to immigration is compounded by higher inflows.

**The results of these comparative exercises remain consistent with *The New Americans* (National Research Council, 1997) in suggesting that, particularly when measured over a period of 10 years or more, the impact of immigration on the overall native wage may be small and close to zero. However, estimates for subgroups span a wider range and suggest some revisions in understanding of the wage impact of immigration since the 1990s.** At that time, the authoring panel's conclusion that "immigration has had a relatively small adverse impact on the wage and employment opportunities of competing native groups" seemed to summarize well what the academic studies indicated. However, the intensive research on this topic over the past two decades, summarized in Table 5-2, displays a much wider variation in the estimates of the wage impact on natives who are most likely to compete with immigrants, with some studies suggesting sizable negative wage effects on native high school dropouts. In addition, the

002595

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

recent literature is in agreement with *The New Americans* in finding larger negative effects for disadvantaged groups and for prior immigrants than for natives overall, when those effects are examined separately. (Results for prior immigrants are not shown in Table 5-2 but were reviewed earlier in Section 5.3.) Thus, the evidence suggests that groups comparable to the immigrants in terms of their skill may experience a wage reduction as a result of immigration-induced increases in labor supply, although there are still a number of studies that suggest small to zero effects.

## 5.6  HIGH-SKILLED LABOR MARKETS AND INNOVATION

Much of the research on the impact of immigrants focuses on the inflow of immigrants with low education and skills. Immigration patterns for the United States drive some of this emphasis because new arrivals are disproportionately represented in lower educational attainment segments of the population. As of 2011, ACS data show that nearly one-third of foreign-born individuals in the United States do not have a high school diploma and about 23 percent have a high school diploma and nothing beyond (Orrenius and Zavodny, 2014).[41] It is therefore often presumed that the majority of immigrants will enter low-skilled labor markets, and this is where fear has been expressed that natives' job opportunities will be lost. However, as discussed in Chapters 3 and 6, another sizable concentration of immigrants is in high-skilled educational categories, and in recent decades immigrants have become overrepresented in certain occupations—for example, computer software developers, medical scientists, registered nurses, teachers, accountants, computer systems analysts, and physicians—requiring high education and skill levels.[42] ACS data also show that, as of 2011, 27 percent of the foreign-born have a college degree or higher, compared with just over 28 percent for natives, and 29 percent of workers in the U.S. economy with doctoral degrees are foreign-born. Reflecting these trends, researchers considering the overall impact of immigration on wages and employment have become increasingly interested in what is happening at the high end of the skills spectrum. Consideration of the impact on natives of high-skilled immigration raises some similar questions to those considered earlier for less-skilled immigrants. But in addition, new questions arise in the context of high-skilled immigration: High-skilled immigrants may innovate, or help natives innovate, and more generally may have positive spillovers on native productivity.

---

[41]See Chapter 3 for a more detailed breakdown of education attainment of immigrants.

[42]See Orrenius and Zavodny (2014). The fact that a large share of immigrants is highly skilled is not new. Immigrants have always had a bimodal distribution by education. That the high end is *overrepresented* relative to natives is, however, a new development.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Technological progress is a key driver of productivity growth and ultimately of economic growth (Griliches, 1992). If immigrants innovate and advance technology, they therefore increase the growth rate of native income in addition to raising its level. Jones (2002) estimated that 50 percent of U.S. total factor productivity (TFP)[43] growth in recent decades is attributable to scientists and engineers. One way high-skilled immigrants could increase technological innovation is through a greater concentration than natives in science and engineering occupations. Immigrants are likely to be overrepresented in such occupations, since scientific and engineering knowledge transfers easily across countries; it does not rely on institutional or cultural knowledge, is not associated with occupations with strict licensing requirements like the practice of medicine, and does not require the sophisticated language skills of a field such as law (see Chiswick and Taengnoi, 2007; Peri and Sparber, 2008). High-skilled immigrants could also increase innovation if a combination of immigration policies and immigrant self-selection leads them to be more educated or of higher inventive ability. Even immigrants who do not innovate themselves may increase innovation by providing complementary skills to inventors, such as entrepreneurship. On the other hand, because natives are likely to respond to the arrival of immigrant innovators, any immigrant contribution to innovation is unlikely to be simply additive. Potential native innovators could be deterred by the additional competition or could be attracted by the possibility of collaboration.

These considerations make studies of immigrant innovation and entrepreneurship, and of skilled immigration more generally, of great interest and importance. In this section, after providing background on the visa pathways available to skilled immigrants, the panel examines the effect of high-skilled immigration on native wages and employment. We then review the effect of immigration on innovation followed by the effect of immigration on entrepreneurship. While research in this area is quite recent, there is very little to suggest that wages are driven down or that native workers are displaced in high-skilled occupations; the evidence is stronger, though still inconclusive, that the direction of any impacts is at least modestly positive. The innovation literature as a whole indicates that immigrants are more innovative than natives and increase innovation per capita, thus likely boosting economic growth per capita. Immigrants appear to innovate more than natives not because of greater inherent ability but due to their concentration in science and engineering fields.[44]

---

[43]TFP is defined as that portion of output not accounted for by the amount of capital stock and (quality-adjusted) labor force used in its production.
[44]Borjas (2014a) and Kerr (2013b) also reviewed this literature.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Visa Pathways for High-Skilled Immigrants

Foreign-born workers with a bachelor's degree or equivalent initially move to the United States either on a temporary visa or as a permanent resident. A worker who enters as a permanent resident may do so as a relative of a U.S. permanent resident or citizen, sponsored by an employer as an EB-1, EB-2, or EB-3 worker considered particularly qualified, or on an EB-5 investor's visa. Permanent residents are free to change employer. Temporary work visas are issued to the foreign worker's U.S. employer to hire him or her specifically: The worker is not free to choose an employer on arriving in the United States, faces barriers to changing employer after arrival, and may not become self-employed (or start a company) nor become unemployed. Those who enter on temporary visas may succeed in obtaining permanent resident status by marrying a U.S. citizen or through their employer's sponsorship. Some foreign-born workers initially enter the United States as students or trainees on F-1 visas and take advantage of the Optional Practical Training period permitting up to a year and a half of work, and/or they obtain another status after graduation.[45] Individuals who enter as dependents of temporary visa holders and may be unable to work initially gain permanent residence if their family member does.

Because those entering as permanent residents typically stay longer in the United States than do those entering on temporary visas, the initial visa composition of new entrants is different from that of the stock of workers at a given point in time. The National Survey of College Graduates shows that, in 2013, 38 percent of foreign-born, college-educated workers had entered with lawful permanent residence, 16 percent on a temporary work visa, 25 percent on a student or trainee visa, 11 percent as the dependent of a temporary visa holder, and 9 percent on other temporary visas.

The two most common entry work visas are the intracompany transferee visas (L-1A and L-1B), whose numbers are uncapped and are for 1-3 years, renewable for a maximum stay of 5-7 years, and the specialty worker (H-1B) visas, whose number is capped (in the for-profit sector) and which are issued for 3 years, renewable once. Both are "dual intent" visas, meaning the employer may sponsor the worker for permanent residence. Intracompany transferees have been transferred to the United States by an employer for whom they have worked abroad for at least a year. Some skilled workers also enter as a J-1 exchange visitor, although the number of J-1 holders who are skilled is not known.[46] As discussed below, while

---

[45]For a detailed description of visa types, see https://www.uscis.gov/working-united-states/working-us [November 2016].

[46]See Wasem (2016) for information on less common temporary work visas for skilled workers.

Copyright National Academy of Sciences. All rights reserved.

H-1B visa holders have been subject to much scrutiny, despite imperfect data, there has been much less analysis of L-1 visa holders.

### Impact of High-Skilled Immigration on Wages and Employment

As noted previously, the impact of high-skilled immigration on native wages and employment has been the focus of less attention than the impact of low-skilled immigration. However, in part due to the substantial and rising share of high-skilled immigrants, as well as the possibility of positive spillovers from this group, increasing attention has focused on them. Much of this research employs the spatial approach. As elsewhere in the spatial literature, it is difficult to identify the causal effect of skilled immigration—again, reverse causality or unobserved common factors may confound results. For example, wage increases for natives may lead to increased growth of immigration by STEM workers—so again, the potential for results to be contaminated by locational choices persists.[47] Analyses must address the possibility that cities with rapid productivity growth will experience wage growth and (for nonobservable reasons) will also attract foreign STEM workers.

A study by Peri et al. (2015a) devised an instrument to address the endogeneity problem, apportioning the changing national-level number of H-1B visas to cities based on the 1980 distribution of foreign-born STEM workers, thus combining the identification methods of Card (2001) and Kerr and Lincoln (2010).[48] Their study period, 1980 to 2010, is especially dynamic because college-educated STEM workers grew from 2.4 percent of total employment to 3.2 percent over the period, and foreign-born workers were responsible for more than 80 percent of this growth. The authors found that a rise in foreign-born STEM workers by 1 percentage point of a city's total employment (close to the total increase over the period) increases the real wages of college-educated natives by 7 to 8 percent and those of noncollege-educated natives by 3 to 4 percent (Peri et al., 2015a, p. 3). The effect on the native employment rate was not statistically significant. These results are consistent with a positive effect of inflows of foreign-born STEM workers on the wages of both college-educated and, to a lesser extent, noncollege-educated natives. However, the very large estimates of

---

[47]Controlling for factors such as native response may be especially important in this context, given that high-skilled labor markets are likely to be national and even international in spatial scope.

[48]To ensure that this is an effective instrumental variable, the authors tested to confirm that "the initial (1980) distribution of other types of foreign-born workers (e.g., less educated and manual workers), the initial industry-structure of the metropolitan area, and the subsequent inflow of non-STEM immigrants do not predict growth in foreign STEM workers" (Peri et al., 2015a, p. 3).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

this wage increase raise the possibility that there may be additional factors driving the determination of wages in high-skilled labor markets that are not captured by this approach.

Other studies of the impact of high-skilled immigration on wages and employment analyze the impact on specific groups of native workers. Because about half of workers receiving H-1B visas in recent years have been hired to work in computer occupations, these jobs are the most likely to be negatively impacted by an inflow of skilled immigrants. To examine this, Peri et al. (2015b) took advantage of the fact that H1B-B visas were allocated via lottery in 2007 and 2008. Some cities appeared to satisfy less of their firms' demand for H-1B workers than did others, although the city demand for H-1B visas has to be proxied by firms' preliminary expressions of interest, which are much more numerous than actual applications. The authors found that the more a city's demand for H-1B workers outstripped the visas its firms won in the lottery, the lower the city's employment and wage growth for native-born workers in computer occupations. They inferred that H-1B workers do not displace but rather complement natives in computer-related occupations.[49]

These positive estimated effects on native wages (Peri et al., 2015a, 2015b) and employment (Peri et al., 2015b) are consistent with high-skilled immigrants' being complementary with natives, especially high-skilled natives; with human capital spillovers stemming perhaps from interactions among workers; or with skilled immigrants innovating sufficiently to raise the productivity of all workers. For example, highly educated hires may stimulate the productivity of natives—at least in the computer-related occupations studied—incentivizing firms to expand hiring. This type of mechanism is also explored in important research by Moretti (2010), who found that each job in the tradable high tech sector (making products that need not be consumed locally) generates between 0.5 to 2 additional jobs in the local economy. Immigrant innovation is considered in detail later in this section (Section 5.6).

However, not all studies find beneficial wage and employment effects of skilled immigrants. Borjas (2009) examined the correlation between immigrant share and the earnings of doctorate-holders by doctoral cohort and discipline. He estimated wage elasticities of –0.24 to –0.31, where these elasticities indicate the percentage change in earnings associated with a 1 percent change in labor supply due to immigration. The larger estimate (absolute value) was obtained when the elasticity was calculated using only the sample of foreign-born doctoral recipients that intended to stay in the United States. In addition, Borjas and Doran (2012) examined

---

[49]In contrast, a study by Doran et al. (2015) found that firms' employment of H-1B workers did tend to crowd out firms' employment of other workers.

002600

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the impact of the arrival of 336 Soviet émigré mathematicians after the collapse of the Soviet Union. They found that American mathematicians in subfields with active émigrés were published and cited less after 1992 and were more likely to move to lower-quality institutions and out of active publishing.

### Do Natives Change Field or Occupation in Response to Skilled Immigration?

One reason many high-skilled natives may not be harmed by high-skilled immigration, especially over longer time periods, is that they may shift into other fields in which they have a comparative advantage due, for example, to qualifications or language skills or in which they are complementary to immigrants. Such shifts would increase the economy's productivity via greater specialization and would constitute one of the benefits of immigration. Peri and Sparber (2011) provided evidence that inflows of highly educated immigrants cause natives to switch to more communication-intensive occupations. Cortés and Pan (2014) found that U.S. states with the highest flows of foreign-born nurses experienced decreased numbers of natives entering the profession and sitting for licensing exams; the researchers detected an offsetting increase of similar size in the numbers of natives entering teaching professions in these states. They used an instrument based on historical immigrant flows for foreign nurses. Borjas (2007) employed a fixed effects panel of universities over time to study the effect of foreign-born graduate students on native-born graduate student enrollment. He did not find evidence of a crowd-out effect for the typical native, but there was a strong negative correlation between increases in the number of foreign-born students enrolled at a particular university and the number of white native-born men in that university's graduate program.

The possibility of natives changing occupation or field of study has been of particular interest in the context of immigrants' effect on innovation. Consequently, a number of papers ask whether skilled immigration causes natives to leave or fail to enter STEM fields. Orrenius and Zavodny (2015) examined whether native-born bachelor's students pick a science or engineering major. The covariates of interest measure the concentration of immigrants in college as well as the concentration of immigrants when the natives were of high school age, and the instruments are variants of the historical settlement pattern instrument. They found that the presence of immigrants deterred some native-born women from choosing a science or engineering major; this effect was not found for native-born men. Some evidence of native response to immigrants entering STEM fields was also found by Bound et al. (2015). Using a structural model, the authors estimated that native employment in computer science would have been

002601

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

7.0-13.6 percent higher in 2004 absent increased immigration after 1994; they also found wages for computer scientists would have been 2.8-3.8 percent higher. However, they found that *total employment* in computer science would have been 3.8-9.0 percent *lower*. This is consistent with the possibility that immigration increased software innovation, although this is of course hard to measure.

Another reason that an increase in the numbers of high-skilled immigrants in the labor market may not lead to lower overall employment or wages of highly educated natives is positive productivity effects, or spillover effects whereby technological progress is spurred through the creation and diffusion of knowledge and innovation. This topic is discussed below.

### Theoretical Considerations Relevant to Innovation

As explained in Borjas (2014a) and discussed above, it is high-skilled immigrants' potential positive externalities, rather than the simple fact that they are more productive individually than low-skilled immigrants, that distinguish their impact on natives from that of other immigrants. Innovation is the channel through which immigrants could potentially have the largest positive externality. Innovation, whether by natives or immigrants, eventually enters the public domain and increases the productivity of workers not linked through the market to the original innovator. Immigrant innovators may also have a positive externality on native innovators, which could magnify the externality due to their own innovation.

However, the arrival of a certain number of innovative immigrants is not likely to boost the number of innovators in the country by the same number. Some innovative immigrants will not enter innovative work, while innovative natives will respond to the immigration. Some natives may leave innovative work to exploit the increase in their comparative advantage in language-intensive work (Peri and Sparber, 2009). Conversely, if immigrant innovators render native innovators more productive, the number of native innovators could rise. Studies of the effect of immigration on innovation must take these responses into consideration when judging whether immigration is likely to have boosted economic growth rather than simply having caused a one-time increase in efficiency.

### Methodological Considerations for the Impact
### of Immigration on Innovation

Many of the methodological concerns relevant for the impact of immigrants on innovation are the same as those relevant for the impact on wages and employment, especially the endogenous pattern of immigrant density across the units of observation. One dimension along which studying inno-

002602

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2610 of 4699 PageID #:  5775

vation is trickier is measurement: most studies proxy for innovation with patents, while some compute TFP[50] and assess the effect of immigration on productivity. Patent counts measure inventions, a type of knowledge with the potential to increase TFP, but not all inventions are patented and not all innovation comes in the form of inventions. Innovative business practices are not inventions, for example, while innovative software became patentable in 1995 amid debate about whether a software innovation constitutes an invention (see Hall and MacGarvie, 2009). Furthermore, patents vary greatly in terms of quality, though future citations to patents provide a guide to quality. On the other hand, the measurement of TFP is fraught with difficulties such as the specification of the correct production function and further measurement issues such as the rate at which capital depreciates (Aiyar and Dalgaard, 2005).

Conversely, along a second important dimension, studying the impact on innovation is more straightforward than studying the impact on wages. While the presumption of factor price equalization (or at the least, factor price insensitivity) through interregional trade means that the effect of local concentrations of immigrants on wages is likely to be national in part, and not purely local, there is no equivalent of this constraint for patents; whereas the benefits of innovation diffuse across the country, the location of the original inventor does not. Nor would a response of capital flows equalize patenting across regions. The adjustment mechanism that does remain is geographic mobility of native innovators reacting to any immigration-induced changes in innovator wages. If immigrant innovators have negative effects on native innovator productivity and wages in their region, native innovators will avoid immigrant locations. This native relocation will lead a spatial identification approach to underestimate the benefit of immigration. Nevertheless, the forces for national diffusion of innovation responses are weaker than for the diffusion of wage responses. The implication is that using spatial variation in immigration to identify the effect on patenting is subject principally to the endogeneity problem of immigrants possibly choosing their location based on the outcome variable. Studies focusing directly on productivity, however, are subject to problems similar to wage studies: a bias toward finding no effect remains even if immigrant location is successfully instrumented, due to the forces equalizing labor market conditions across regions.

### Are Immigrants More Innovative Than Natives?

Immigrants are most likely to increase innovation if they are themselves more innovative than natives, making an individual-level comparison of

---

[50]TFP is defined above, in the introduction to Section 5.6.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2611 of 4699 PageID #:  5776

immigrants and natives the logical first step. At least as measured by patents, immigrants do innovate considerably more than natives. Using the 2003 National Survey of College Graduates (NSCG), Hunt (2011) showed that among individuals with a bachelor's degree or higher, immigrants are twice as likely to patent as natives, while Kerr (2007) documented the rapid rise from 1975 to 2004 of U.S. patents authored by U.S. residents with Indian and Chinese first and last names: from 2 percent to 9 percent of all patents for Chinese names and from 2 percent to 6 percent of all patents for Indian names. Kerr could not distinguish first and second generation immigrants, but this growth is nevertheless fundamentally fueled by immigration.

More specifically, the Hunt (2011) study showed that 0.9 percent of natives, compared to 2.0 percent of immigrants, had been granted a patent in the previous 5 years. One measure of the quality of these patents is whether they have been licensed or commercialized; 0.6 percent of natives compared to 1.3 percent of immigrants had licensed or commercialized a patent granted in the previous 5 years. All these differences were statistically significant. She also found that, conditional on having at least one patent, immigrants and natives had similar numbers of patents.

Hunt's dataset is one of the few with visa information, and she found that the particularly innovative immigrants were those who entered on a temporary worker visa or a temporary student visa (especially as a graduate student or postdoctoral fellow). It seems that foreign-born workers or students chosen by a firm or university were more innovative than those who entered on a green card, most of whom were joining family in the United States and who patented at levels similar to natives. Hunt also investigated the source of the immigrant advantage and found that the immigrants' edge was due to their being much more likely to have studied science or engineering as a highest degree and to a lesser extent to their having higher education than natives. Her comparison among immigrants and natives with similar fields of study and level of education did not yield any statistically significant differences in patenting.

### Do Immigrants Increase Innovation?

The superior innovative performance of immigrants, as measured by instruments such as rates of patenting, does not, however, necessarily imply that immigration increases innovation, since natives are likely to change their behavior in the face of immigration and could reduce their own innovation. One of several studies that tackled the more difficult issue of overall innovation is that of Hunt and Gauthier-Loiselle (2010), who used census and U.S. Patent and Trademark Office (USPTO) data to form a panel of states from 1950 to 2000. The key explanatory variable, the intercensal

002604

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

change in the share of a state's population that is skilled immigrants, is endogenous: High-skilled workers are more likely to migrate to states that are experiencing positive shocks to innovation, either narrowly or as part of more general skill-biased technological change, unobservable to the econometrician. Like many authors of wage impact studies, Hunt and Gauthier-Loiselle used an instrument based on historical immigrant settlement patterns: in this case, the 1940 settlement pattern.[51]

The results showed that influxes of high-skilled immigrants—those with either at least a bachelor's or master's degree or those working in science and engineering occupations—statistically significantly increased patenting per capita. A 1 percentage point increase in the immigrant college graduates' population share increased patents per capita by 9-18 percent, with the larger effects resulting from the instrumental variables analysis. This means that the net result of the immigrants' own innovation, any native movements in or out of innovative jobs, and any effect of immigrants on the productivity of native innovators was positive. The magnitudes are such that the increase in skilled immigration in the 1990s can account for one-third of the large patenting increase in that decade. In turn, this additional patenting may have increased GDP per capita by 1.4-2.4 percent by the end of the decade.

Immigrants may also increase native patenting, but because U.S. patents do not note the birthplace of the inventor, Hunt and Gauthier-Loiselle (2010) could not directly examine this question. However, calculations of the immigrant contribution based on the individual-level 2003 NSCG suggest that the state panel must reflect considerable positive effects on native patenting. But the standard errors for the calculations are large, and the individual-level immigrant contribution may not always have been at its 2003 level.

Most other papers study the effect of more specific groups of immigrants than Hunt and Gauthier-Loiselle (2010). Kerr and Lincoln (2010), for example, used USPTO patent data and CPS data to form a panel of cities for 1995-2008, but they examined the effect on patenting of increased numbers of workers entering the United States on H-1B visas. Hunt (2011) suggested that these workers are indeed very likely to patent. The difficulty is that the distribution of H-1B holders by states is unknown and must be proxied for by using the number of preliminary applications, Labor Condition Applications, or simply noncitizen immigrants, which introduces measurement error into the regression. Identification of the effect comes from variation in the initial share of the population that is on H-1Bs, interacted

---

[51]A potential issue with this approach is that if controls do not account for state-specific patenting shocks that are very persistent and influence national inflows of particular immigrant groups, the instrument could be correlated with the error term. Though this does not seem likely, it cannot be ruled out, for example, that California has had serially correlated positive patenting shocks that caused low-skilled Chinese to settle there before 1940 but that have motivated high-skilled Chinese to move to the United States in more recent years.

002605

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

with the change in the H-1B national cap—under the assumption that a state's increase is greatest where the initial share is greatest.

Kerr and Lincoln (2010) found that an increase in the national H-1B cap statistically significantly increased patenting in cities with many H-1B holders compared to cities with fewer H-1B holders. A 10 percent increase in the cap was associated with a 0.3-0.7 percent increase in patenting for each standard-deviation change in a city's share of H-1Bs. The magnitude of these results is not easily comparable with those of Hunt and Gauthier-Loiselle (2010). Kerr and Lincoln found that immigrants had little or no effect on the patenting of those with Anglo-Saxon names, who were disproportionately natives. This contrast with the Hunt and Gauthier-Loiselle findings could be attributable either to imperfections in one or both studies relevant to measuring this externality or to the focus by Kerr and Lincoln on short-term effects, whereas Hunt and Gauthier-Loiselle focused on long-term effects.

In contrast to the studies described so far, Doran et al. (2015) found no contribution to patenting from H-1B visa holders. Specifically, they found that relative to firms that lost the 2006 and 2007 H-1B lotteries, winning firms had no increase in the number of patents in the 9 years following their acquiring the H-1B workers. The use of a lottery makes the identification in this study methodology particularly clean.

The differing results across these studies may reflect immigrant heterogeneity generally and among H-1B workers in particular. A large share of the H-1B inflows consists of young computer programmers working for information technology software services firms; often both firm and worker are Indian.[52] Such workers tend to stay only a short time in the United States[53] and reflect U.S. participation in Mode 4 of the General Agreement on Trade in Services;[54] these workers are not expected

---

[52]For example, in FY 2006, about one-half (51%) of first-time H-1Bs were awarded to computer programmers; 69 percent of first-time H-1B visas were awarded to workers ages 25-34; and 54 percent of first-time H-1B visas were awarded to Indians. See U.S. Citizenship and Immigration Services data at https://www.uscis.gov/tools/reports-studies/immigration-forms-data [May 2017].

[53]Clemens (2010, p. 14) reported that for a large Indian software services firm making great use of the H-1B program, typical U.S. assignments last 6-15 months (though it is common for H-1B winners to return to India, then later take another H-1B assignment in the United States).

[54]This trade agreement took effect in January 1995 and is binding on all members of the World Trade Organization, which was established on the same date. Mode 4 concerns the supply of a service by a service supplier of one member, through the presence of natural persons of a member. The United States committed to permitting temporary work permission for intracompany transferees from abroad (an unlimited number of L-1 visas) and for 65,000 specialty occupation workers (H-1B visas). See https://www.uscis.gov/tools/reports-studies/immigration-forms-data [May 2017].

002606

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

to innovate.[55] Such workers are a large share of the flows that drive the results reported by Doran et al. (2015), but they are a much smaller share of the stocks of immigrants who entered on temporary work visas and were found to be so innovative by Hunt (2011). A cross-section such as that used by Hunt (2011) implicitly weights immigrants according to the duration of their stay in the United States.

Two other papers examine fascinating cases of high-skilled immigration and its effect on innovation. Using a clever identification based on the different specializations of American and Soviet mathematicians, Borjas and Doran (2012) showed that American mathematicians' research was reduced by the arrival of Russian mathematicians after the Cold War but that total U.S.-based mathematical research remained approximately constant. In contrast, Moser et al. (2014) showed that German Jews who fled to the United States in the 1930s greatly boosted patenting in chemical fields. They found that the German Jews increased native patenting by attracting to their subfields natives who would otherwise not have patented, while reducing the patenting of natives already in the field. As with Doran and colleagues, their instrument exploits differences in specialization—in this case between German Jews and American chemists. Both of these studies examined the impact of exceptionally skilled immigrants, and one would not necessarily expect to find similar impacts of immigration from, for example, recent immigrants in the H-1B program.

A quite different approach is to measure the effect of immigration on productivity directly. The advantage of this approach is that productivity is the economists' ultimate interest, while the disadvantage is that productivity is difficult to measure and innovations improving productivity diffuse across the country. The measure of productivity most closely linked to innovation is TFP. Measuring TFP involves modeling output by selecting a production function for the economy—a difficult exercise—and measuring the values of inputs, which involves judgments on matters such as the rate of depreciation of capital. TFP is measured as the residual in the modeling exercise and is sensitive to modeling and measurement choices, so this type of evidence cannot provide conclusive proof of an immigration impact on productivity.

Peri (2012) measured state-level TFP for a panel of states and linked this directly to immigration, using as an instrument historic settlement patterns (similar to Hunt and Gauthier-Loiselle, 2010) or distance to the Mexican border. Peri et al. (2015a) calculated the effect of immigrant science

---

[55]Computer science graduates in general do not patent more than do workers outside science and engineering (Hunt et al., 2013), but innovation in computer science may often be more akin to improved business organization than invention and hence poorly captured by patent counts.

002607

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and engineering workers (unusually broadly defined) on TFP by combining effects on wages and employment, described above, with the assumption that the capital to labor ratio is constant in the long run. Both papers (Peri, 2012; Peri et al., 2015a) found that immigration increases TFP.

### Do Immigrants Foster Growth Through Entrepreneurship?

For inventions to speed growth, they must be brought to market. Inventiveness and business acumen are therefore complementary inputs to technology-spurred productivity growth. These inputs may be embodied in a single person or may be combined though collaboration among two or more people. New inventions are often best developed and marketed in new firms, making entrepreneurship a particularly important type of business acumen in this context.[56] Baumol (1993, p. 260) argued that, just as capital investment and human capital may be treated as endogenous to economic growth, "[t]o some degree, the same story can be told about the exercise of entrepreneurship, investment in innovation, and the magnitude of activity directed to the transfer of technology. These too, clearly, are influenced by past productivity growth achievements and they also, in their turn, influence future growth." A link can be made between the literature on entrepreneurship and endogenous growth theory (Lucas, 1988) by recognizing that an expanded capacity for entrepreneurial ability is a form of human capital. Schultz (1980, p. 437) stated that ". . . the abilities of entrepreneurs to deal with the disequilibria that are pervasive in a dynamic economy are a part of the stock of human capital. . . . An innovation by a business enterprise (Schumpeter's innovator) is an endogenous event."[57]

Researchers interested in economic growth as well as in entrepreneurship and business formation frequently examine the rate at which immigrants open new firms. Fairlie and Lofstrom (2015) used ACS data from 2006 to 2010 to calculate that the 2.4 million immigrant business owners (defined simply as the self-employed, with or without employees) made up a slightly higher share of all business owners (18.2%) than their share of the total U.S. workforce (16.3%). This translates into slightly higher business ownership among immigrants than among natives: 11.0 percent of immigrants and 9.6 percent of natives owned a business in this dataset.

---

[56]Wennekers and Thurik (1999, p. 46) described entrepreneurship as the "manifest ability and willingness of individuals, on their own, in teams, within and outside existing organizations, to: perceive and create new economic opportunities (new products, new production methods, new organizational schemes and new product market combinations); and to introduce their ideas in the market, in the face of uncertainty and other obstacles, by making decisions on location, form and the use of resources and institutions."

[57]See also Acs et al. (2012).

002608

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

However, there are variations in entrepreneurship by immigrants' country of origin, as well as by industry. Indian immigrants are the most entrepreneurial of any group including natives, and immigrant businesses represent more than a quarter of businesses in the transportation, accommodation, and recreation and entertainment sectors.[58]

Monthly business startup data constructed from matching respondents across months in the 2007-2011 CPS were used by Fairlie and Lofstrom (2015) to estimate that immigrants represented 24.9 percent of new business owners, a figure much higher than the 15.6 percent of the nonbusiness-owning population immigrants represent. This finding seems at odds with the fairly similar overall self-employment rates found for immigrants and natives. One possibility is that the more recent immigration cohorts were more entrepreneurial than either natives or earlier immigrants, which should eventually lead to a larger difference in the stock of self-employed. Figure 5-3, which shows that the immigrant self-employment rate has risen relative to the native rate since 2000, is consistent with this possibility. Alternatively, higher business startup rates could imply a higher failure rate for immigrant entrepreneurs. Consistent with immigrant businesses being younger, they are also smaller: Using data from the 2007 Survey of Business Owners, Fairlie and Lofstrom (2015) found that immigrant-owned firms had $434,000 in average annual sales and receipts compared with $609,000 for nonimmigrant firms.

Business owners' level of education may also be used as a measure of the likely contribution of businesses to the economy. Fairlie and Lofstrom (2015) reported that, while immigrants are highly overrepresented among owners with less than a high school degree, at almost 45 percent, they also represent 15.7 percent of owners with a college degree. However, the latter share may overstate the value of immigrants' contribution if immigrants turn to self-employment because their foreign education and experience are less valuable, or less valued, than American education and experience (Borjas, 1986; Fairlie and Meyer, 1996; Portes and Zhou, 1996), rather than because of an innovative business idea. For example, Akresh (2006) found that 50 percent of immigrants experienced occupational downgrading[59] on arrival in the United States. While showing that immigrants contribute significantly to self-employment, data representative of the population thus do

---

[58]For theoretical and empirical analysis of the clustering of immigrant and ethnic groups in particular types of self-employment, see Kerr and Mandorff (2015). Kloosterman and Rath (2001) focused on small business formation in nontradable sectors such as lower-end retailing and restaurants.

[59]As characterized by the author, this term refers to transitions by immigrants into jobs for which they are overeducated or overqualified and which may entail a loss of occupational status or prestige relative to the job they held in their country of origin.

002609

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 5-3**  Self-employment rates by nativity, 2000-2012.
SOURCE: Magnus Lofstrom, Immigrant Entrepreneurship (presentation to the panel) based on Current Population Survey data, July 29, 2014.

not show clearly the contribution of immigrant entrepreneurs to successful (in terms of size or growth) or innovative firms.

To pinpoint immigrant contributions to innovative entrepreneurship, better data are required. Currently, it can be difficult to distinguish between the self-employed who have a small number of employees and those that do not, or between businesses that are innovating and those that are not. The smaller average size of immigrant businesses may obscure a pattern in which immigrants disproportionately start small, noninnovative businesses that are less likely to grow as well as successful, eventually large, innovative businesses. There are hints that immigrants disproportionately start very successful businesses, suggested by high-profile examples of public U.S. companies with foreign-born founders, such as Google, eBay, Yahoo!, and Sun Microsystems. In a sample of 1,300 "high-impact" technology firms and 2,000 founders across the United States, Hart and Acs (2011) found that around 16 percent of firms have at least one immigrant founder. Wadhwa et al. (2007) found that immigrants started 25 percent of new high tech companies with more than $1 million in sales in 2006, while Anderson and Platzer (2006) found that immigrants represented 25 percent of founders of recent public venture-backed companies. Qualitative studies such as Saxenian (1999) also emphasize the large immigrant contribution to technology startups.

002610

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Using the 2003 NSCG, Hunt (2011) was also able to narrow the focus to fast-growing startups. Like many surveys, the NSCG includes questions on firm size and self-employment, which permit a distinction between the self-employed with more than 10 employees and the self-employed with fewer than 10 (including none). Hunt (2011) took advantage of unusual additional startup information in the NSCG to examine the probability of founding a firm that grew to more than 10 employees in 5 years. She found that, conditional on characteristics, immigrants are 30 percent more likely to found such firms than are similar natives. In an unconditional comparison between all immigrants and all natives, the result is the same in sign and magnitude, but statistically insignificant: The rarity of the outcome (0.6% of native respondents founded a firm that met the condition) makes standard errors large in all regressions and also precludes investigation of the startup's industry or the founder's patenting activity.

A literature overlapping with the immigrant business formation and entrepreneurship literature examines links between immigrants and their home countries. For example, Saxenian (2002) described a phenomenon she called "brain circulation." As high tech entrepreneurs first migrate to the United States for some combination of education, business experience, and innovation experience, they found technology companies or affiliates at home while maintaining or increasing U.S. ties. Kerr (2008) quantified the positive links between immigrant patenting in the United States and labor productivity and manufacturing (especially high technology) output in immigrants' home developing countries, while Foley and Kerr (2013) showed that an increase in a multinational company's patenting by workers of a particular ethnicity was followed by greater investment by the company in the home country corresponding to the ethnicity. Studies of whether immigrants boost trade between the source and destination country also have implications for growth and entrepreneurship (Gaston and Nelson, 2013).

Immigrants may increase international trade in two ways. First, they may have a taste for goods available only in the home country, which stimulates demand for imports directly and also indirectly as natives acquire a taste for the same foreign goods. Second and more relevant for this section, immigrants know the markets in their home country and maintain business ties there founded on trust and social capital. These ties and knowledge can reduce the problems of incomplete contract enforcement and asymmetric information that constitute barriers to trade. The empirical literature in this area is less sophisticated in dealing with potential endogeneity than other literatures related to immigration. The most rigorous paper examining the United States, Bandyopadhyay et al. (2008), confirmed the results of the wider literature by finding that U.S. states that received an increased number of immigrants from a particular source country increased their exports

002611

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

to that country. Andrews et al. (2015) confirmed these results for Germany using firm-level data. However, the possibility that a common third factor is increasing both trade and immigration, or that the causality runs both ways, cannot be ruled out in all cases.

The literature on immigrants and entrepreneurship is informative about the number of businesses formed by immigrants and the importance of ties between immigrant innovators and entrepreneurs and their home country, but it is only suggestive about whether immigrants causally stimulate trade or whether immigrants have a causal impact on U.S. growth through fast-growing or innovative startup companies. More research and more data with which to perform it are required to not only confirm the reported associations but also shed light on causation.

## 5.7 KEY MESSAGES AND CONCLUSIONS

Economies respond to immigration through several mechanisms: adjustment of factor prices, shifts in output mix, and changes in the use of production technology. The extensive literature on the economic impacts of immigration primarily focuses on the marginal product of labor and the resultant wage and employment outcomes in receiving countries' labor markets. The review in this chapter reflects this research emphasis. However, shifts in sectoral composition and adaptation of new technology are also discussed, both to fully understand immigration wage and employment dynamics and because they are interesting in their own right. The impact of immigration on capital accumulation and economic output, considered in Chapter 4, is relevant here in differentiating between short- and long-run changes in wages. The panel also considered the relationship between the immigration of high-skilled workers and innovation and how this relationship may generate changes in long-run economic growth; however, this topic is addressed more comprehensively in Chapter 6.

The empirical evidence reviewed in this chapter reveals one sobering reality: Wage and employment impacts created by flows of foreign-born workers into labor markets are complex and difficult to measure. The effects of immigration have to be isolated from many other influences occurring simultaneously that shape local and national economies and the relative wages of different groups of workers. Among the largest of these influences are changes in production technology, communications technology, and the global economy, which together promote international trade in goods and services (and hence offshoring), global supply chains, and foreign investment. Additionally, firm births and deaths occur, people retire, workers switch jobs, and a stream of young native-born job seekers come of age—all factors that affect the labor market. The inflow of the foreign-born at a given point in time is, under normal circumstances, a relatively

002612

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2620 of 4699 PageID #:  5785

minor factor in the $18 trillion U.S. economy.[60] That said, quantitatively significant labor supply shocks do occur, especially in localized markets, such as that which accompanied the 1980 Mariel boatlift in Miami (Borjas, 2016b; Card, 1990; Peri and Yasenov, 2015). Even then, the wage impacts may be difficult to detect.

The measurement task is further complicated because **the impact of immigration on labor markets varies across time and place, reflecting the size of the inflow, the skill sets of natives and incoming immigrants, the local industry mix, the spatial and temporal mobility of capital and other inputs, and the overall health of the economy.** Some of the processes that are set in motion take place immediately upon arrival of the foreign-born, while others unfold over many years. Aside from supplying labor, immigration (like population growth generally) adds to consumer demand and hence the derived demand for labor in the production of goods and services. This counterbalancing impact potentially plays a role in explaining why much of the empirical research finds small wage impacts associated with immigration. As noted above, the changes in wages and employment attributable to immigration can be difficult to identify because other factors tend to swamp the relatively small role that immigration typically plays in the overall labor market. In short, the uniqueness of immigrant inflows to time and place implies that it is difficult to use the lessons from one episode to predict the impact under different circumstances in the future.

Beyond these real world complexities, several additional measurement problems must be resolved. Primary among these (at least for some kinds of studies) is the endogeneity of immigrants' locational choices—most notably, the interaction between the vibrancy of local economies and people's location choices. Evidence suggests (Borjas, 2001; Somerville and Sumption, 2009) that immigrants locate in areas with relatively high labor demand and wages for the skills they possess and that immigrants are more willing than natives to relocate in response to changes in labor market conditions (Cadena and Kovak, 2016). If immigrants predominantly settle in areas that experience the highest wage growth, a spurious correlation arises: Wage growth (or dampened wage decline) will be erroneously attributed to the increase in labor supply. Additionally, correct identification of the wage and employment effects of immigration must account for the possible migration response of natives to the arrival of immigrants. Researchers have made great strides addressing these identification issues in recent decades; even

---

[60]While the incremental *flow* of new immigrants appears to generate modest economic impacts, the *stock* of foreign-born individuals that has accumulated over time may be significant to *long-run economic growth* (see Chapter 6). Also notable is the fact that immigrants account for almost half the labor force growth in the United States since the mid-1990s (see Chapter 2).

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2621 of 4699 PageID #:  5786

so, the degree of success in dealing with them is still debated and methods are still being perfected.

Several analytic approaches have been developed to estimate wage and employment impacts associated with immigration, each with strengths and weaknesses. Spatial studies compare wage and employment trends in high versus low immigration areas, often defined by metropolitan areas, in order to identify the impact of immigration on wages and employment. A different set of studies examines the impact of immigration by exploiting variation in the density of the foreign-born across skill groups, typically defined by experience (age) and education groupings, instead of across geographic areas. Spatial studies must contend with the challenge of the endogeneity of destination locations, as described above. Meanwhile, skill cell studies, by focusing on the effect of immigrants on similar natives, may miss wage and employment effects induced by complementarities between immigrants and native-born workers at other parts of the skill distribution.

An influential variant of the skill cell literature is the third general approach reviewed in depth in this chapter. This structural approach imposes a modeling structure that relies heavily on assumptions about the relationship between output and the inputs to production (including different kinds of labor). The underlying structure assumes that average wages are unchanged by immigration in the long run—a period of time long enough such that all inputs to production, including capital, may be adjusted by firms. This assumption limits such analyses to estimating *relative* wage impacts across different groups, such as across high school dropouts, those with a high school degree, those with some college, and those with a college degree. The technical assumptions are therefore not innocuous; the most significant ones concern the degree to which capital is adjusted by firms in response to new worker inflows, the degree to which immigrants and natives within the same skill group are substitutable, and the degree to which high school graduates and high school dropouts are substitutable.

While many studies conclude that, economy wide, the impact of immigration on average wages and employment is small, a high degree of consensus exists that specific groups are more vulnerable than others to inflows of new immigrants. Theory predicts that the workers already in the receiving labor market who are the closest substitutes for immigrants are most likely to experience immigration-induced wage declines. Prior immigrants are typically the closest substitutes for new immigrants, followed by native high school dropouts, who are more affected due to the large share of low-skilled workers among immigrants to the United States. For this reason and due to concern about the economic well-being of native high school dropouts, much of the empirical literature concentrates on low-skilled labor markets.

002614

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Empirical research in recent decades suggests that findings remain by and large consistent with those in *The New Americans* (National Research Council, 1997) in that, when measured over a period of more than 10 years, the impact of immigration on the wages of natives overall is very small. However, estimates for subgroups span a comparatively wider range indicating some revisions in understanding of the wage impact of immigration since the 1990s. As noted above, for example, some studies have found sizable negative short-run wage impacts for high school dropouts, the native-born workers who in many cases are the group most likely to be in direct competition for jobs with immigrants. Even for this group, however, there are studies finding small to zero effects, likely indicating that outcomes are highly dependent on prevailing conditions in the specific labor market into which immigrants flow or the methods and assumptions researchers use to examine the impact of immigration. The literature continues to find less favorable effects for certain disadvantaged workers and for prior immigrants than for natives overall.

For the larger group of studies of natives overall or of low-skilled natives, the panel compared the magnitude of estimated wage impacts after harmonizing (to the extent possible) the effects associated with an immigrant influx equivalent to a 1 percent increase in labor supply. Some notable patterns emerge. Consistent with theory, **native dropouts tend to be more negatively affected by immigration than better-educated natives. Some research also suggests that, among those with low skill levels, the negative effect on native's wages may be larger for disadvantaged minorities** (Altonji and Card, 1991; Borjas et al., 2012) and Hispanic high school dropouts with poor English skills (Cortés, 2008). Since native dropouts experience a larger immigrant-driven labor supply increase than do natives overall, their greater susceptibility to a given immigrant inflow is compounded by higher inflows. Another regularity consistent with theory is that **there are larger negative effects on native wages from immigrant inflows in the short run** (i.e., in studies of the immediate impacts of abrupt immigrant inflows or in which inflows are observed over shorter periods of time, or in the case of the structural studies, when capital is assumed fixed). **Estimated negative effects tend to be smaller (or even positive) over longer periods of time (10 years or more) or in the case of structural studies, when capital is assumed to be perfectly flexible.**[61]

The results from our comparison of magnitudes also suggest that some of the differences in the estimated effects of immigration on natives are due to methodology, since they cannot be fully accounted for by whether the studies are looking at the long versus short term, at high school dropout

---

[61]In the case of structural studies, when capital is assumed to be perfectly flexible, wage effects on natives are zero, although this result is built in by theoretical assumptions.

Copyright National Academy of Sciences. All rights reserved.

natives versus all natives, or minority natives versus all natives. **The skill cell studies appear to find the most negative wage impacts and the structural the least negative, with the spatial studies in the middle.** As noted earlier, the approaches are not fully comparable. The numerical value of some of the elasticities from the structural approach is often built in by the technical assumptions. The skill cell studies avoid the endogeneity biases of the spatial studies, which makes the former more likely to find negative effects. However, they do not include cross-effects, for example the impact of an inflow of immigrants in one skill group on the wages of natives in another skill group, whose overall sign is unknown. If positive, cross-effects would not reverse the sign of the reported net effects but would lessen their magnitude.

Most studies find little effect of immigration on the employment of natives. However, recent research (Smith, 2012) does find that native teen employment, measured in hours worked, but not the employment rate, is reduced by immigration. Moreover, as with wage impacts, there is evidence that the employment rate of prior immigrants is reduced by new immigration—again suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.

The impact of high-skilled immigration on native wages and employment has been the focus of less attention than the impact of low-skilled immigration. **The results of spatial studies are mixed, but some find a positive impact of high-skilled immigration on the wages and employment of both college-educated and less educated natives.** If confirmed, such findings would be consistent with high-skilled immigrants being complementary with natives, especially high-skilled natives; with human capital spillovers stemming perhaps from interactions among workers; or with high-skilled immigrants innovating sufficiently to raise the productivity of all workers. **However, other studies that examine the earnings or productivity of narrowly defined groups of high-skilled workers (such as doctorates in narrow fields or professional mathematicians) found that high-skilled immigration had adverse effect on the wages or productivity of these high-skilled natives.**

Finally, **immigrants influence the rate of innovation in the economy, which potentially affects long-run economic growth.** While research in this area is very recent, literature on the topic as a whole indicates that **immigrants are more innovative than natives; more specifically, high-skilled immigrants raise patenting per capita, which is likely to boost productivity and per capita economic growth**. Immigrants appear to innovate more than natives not because of greater inherent ability but due to their concentration in science and engineering fields. With so much focus on the labor market, this critical issue—the relationship between immigration and long-run economic growth—is sometimes overlooked by researchers and in the public debate. We turn to this and other topics in Chapter 6.

002616

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## 5.8  ANNEX: SUMMARY COMPARISON OF SELECTED WAGE AND EMPLOYMENT IMPACT STUDIES FOR THE UNITED STATES

As an aid for readers, Table 5-3 provides a summary comparison of the spatial (cross-area) studies and structural studies discussed in Sections 5.2 through 5.7. For each study, the author, the population sample analyzed, the methodology, and the key findings are listed.

002617

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 5-3  Recent Studies Using Cross-Area, Occupation, or Industry Approaches

| Study | Sample, Analysis Unit | Methods | Findings |
|---|---|---|---|
| Altonji and Card (1991) | U.S. men and women, 1970–1980, MSA | Spatial correlation, first differences, IV | 1 percentage (pctg.) point increase in immigrant share lowers native wages by 0.3% to −1.2%; employment and participation effects negligible. |
| LaLonde and Topel (1991) | U.S. men, 1970–1980, MSA | Spatial correlation, first differences | Negative wage effects for new immigrants, effects die out for earlier immigrant cohorts, no effects for natives. |
| Card (2001) | U.S. men, 1990 cross-section; natives and earlier immigrants by MSA × broad skill/occupation/gender group | Spatial correlation, IV, analysis across cities and skill levels simultaneously to remove bias from omitted variables | Immigrants lower wages of less skilled natives—wages 0.99 pctg. points (male natives), 2.5 pctg. points (female earlier immigrants), 0 (other groups). 10% labor supply increase reduces employment rate 2.02 pctg. points (male natives), 0.81 pctg. points (female natives), 0.96 pctg. points (male earlier immigrants), 1.46 pctg. points (female earlier immigrants). |
| Cortés (2008) | U.S. men and women, 1980–2000, MSA | Spatial correlation, IV, country | Low-skilled immigrants don't affect native wages overall. Previous immigrant and Hispanic wages lowered (1-1.5%). |
| Peri et al. (2014) | U.S. city × period (periods: 1990-2000, 2000-2005, 2005-2010) | Estimated H-1B–driven rise in STEM workforce, based on 1990 foreign STEM workforce by city and sending country and national-level distribution of H-1B visas by sending country | 1 pctg. point increase in foreign share in STEM workers raises native STEM wages 7-8%. |

002618

Copyright National Academy of Sciences. All rights reserved.

| Study | Data | Approach | Findings |
|---|---|---|---|
| Borjas (2003) | Education level × experience level × U.S. census survey, 1960-2000 | Number of foreign-born workers in each education-experience-year group | ~10% migration-induced labor growth in 1980-2000 cut wages for native non-high school completers 8.9%. |
| Camarota (1998) | Cross-section (1991) for U.S. | Wages of all workers | Wages: −0.5% overall; wages for workers in low-skilled occupations −0.8%. |
| Card (2001) | Cross-section (1990), IV for U.S. | Relative wages and employment of low-skilled natives | No effect on relative wages, small negative impact on relative employment. |
| Card (1990) | Miami men and women, 1980-1985 | Spatial correlation; measured impact of increase in low-skilled labor supply shock associated with Mariel boatlift | No effect on wages or unemployment of unskilled workers. |
| Dustmann et al. (2005) | UK men and women, 1983-2000 (pooled cross-sections) | Spatial correlation, IV methods; first-differences with IV (1983-2000); participation rate, (un)employment rate, and hourly wages of the working population by education | Immigration has statistically insignificant effect on wage of each skill group. |
| Dustmann et al. (2013) | UK men and women, 1997-2005 | Spatial correlation by wage percentile, IV method | Immigration lowers wages at 5th and 10th percentiles, raises average and above median wages. |
| Clemens (2013) | 58 employment offices × 66 months, North Carolina, Feb. 2005-May 2011 | Great Recession–caused unemployment jump, 2008-2009 | Even after total unemployed in studied counties rose from 283,000 to 490,000, and with 6,500 job openings, only 7 native workers took and held farm jobs for the 2011 season—the rest were filled by migrants. |

continued

002619
Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

272

TABLE 5-3  Continued

| Study | Sample, Analysis Unit | Methods | Findings |
|---|---|---|---|
| Smith (2012) | U.S. youth and adults | Spatial correlation, IV | 10% increase in immigrants with high school degree or less reduced average number of hours worked by 3-3.5% for native teens; less than 1% for less educated adults. |
| Kerr and Lincoln (2010) | U.S. cities × year, 1995-2007 | Estimated number of H-1B holders in a city, by ethnicity, based on national-level H-1B ethnic breakdown and number of H-1B applications in 2001-2002 | Among top quintile of cities in H-1B dependence, 10% increase in national H-1B population associated in same year with 6-12% increase in patent filing by people with Indian or Chinese names and 0-2% rise overall. |
| Peri (2012) | U.S. states × U.S. Decennial Census, 1960-2006 | Distance to Mexican border; estimates of migrant stocks based on 1960 stocks by state and sending country; national-level growth rates by sending country | Immigration increases productivity (output per units of labor and capital input). |
| Borjas and Doran (2012) | U.S. and Soviet mathematicians who published in 1970-1989 | Arrival of ~336 Soviet émigré mathematicians in U.S. just after collapse of Soviet Union | American mathematicians in subfields with active émigrés were published and cited less after 1992 and more likely to leave profession, indicating zero-sum displacement by new immigrants. |
| Moser et al. (2014) | 166 chemistry subfields × year, U.S., 1920-1970 | Starting in 1933, arrival of 26 Jewish émigré chemists from Nazi Germany & Austria, distinguishing their pre-departure subfields from ones with active German/ Austrian researchers who did not leave | American inventors in subfields with émigrés recorded an extra 170 patents/year in 1933-1970 in total, 70% over pre-1933 level. |

002620

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## Structural (Aggregate Production Function) Approach

| Study | Data | Approach | Findings |
| --- | --- | --- | --- |
| Grossman (1982) | 1970 Decennial Census data (native, second generation, and foreign-born workers) | Uses cross-section data to estimate a trans-log production function to compute elasticities of substitution between immigrants and natives | Second generation and foreign-born workers are substitutes for 3rd generation and higher native-born. |
| Borjas et al. (1997) | U.S. 1980-1995, men and women | Applies estimated substitution elasticity of low-skilled for high-skilled workers to immigrant share | Wage elasticity is –0.322; immigrants lowered wages of high school dropouts relative to high school grads by 4.8%. |
| Borjas (2003) | U.S. men, 1980-2000 | Nested production function, IV methods | Immigrants lower wages of dropouts by 8.9% and college graduates by 4.9%. |
| Borjas (2014a) | Education level × experience level × U.S. census survey, 1960-2010 | Nested production function, IV methods; number of foreign-born workers in each education-experience-year group | 10.6% migration-induced labor growth in 1990-2010 cut wages for native non-high school completers 6.2% (no capital adjustment) or 3.1% (after full capital adjustment). |
| Orrenius and Zavodny (2007) | Panel model with IV (1994-2000) (for U.S.) | Wages of natives by occupation groups | Wages of low-skilled natives negatively impacted by immigration (-0.26%); no effect for more-skilled labor. |
| Ottaviano and Peri (2012) | Education level × experience level × native/immigrant × U.S. census survey, 1990-2006 | Nested production function, IV methods; total person-weeks of work in each education-experience-nativity-year group | Small effects on wages of dropouts. Disaggregated, a 10% migration-induced labor growth 1990-2006 *raised* wages for native non-high school completers 1.7%, cut them for foreign-born 8.1% (both after full capital adjustment). |
| Borjas (1987) | 1980 Decennial Census data (white, black, Hispanic, and Asian natives and immigrants) | Generalized Leontief | Immigrants have small effects on native-born but sizable impact on earnings of immigrants themselves. |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### 5.9  TECHNICAL NOTES FOR THE CROSS-STUDY COMPARISON OF THE MAGNITUDES OF IMMIGRANTS' IMPACT ON WAGES

This appendix explains the calculations behind the magnitudes of immigrants' impact on wages reported in Table 5-2. Some papers report the impact of increasing the share of immigrants in the population or labor force by one percentage point, some of increasing the ratio of immigrants to natives by one percentage point, some of increasing immigrants by an amount that would increase the labor force (including natives) by 1 percent, and some the impact of particular episodes of immigration. The goal is to report what each paper implies about the percent change in wages in response to immigration that increases the labor force by 1 percent, $\frac{\partial \log w_j}{\partial \log L_j}$, where $w$ is the wage and $L$ the labor force, and $j$ indexes the unit of observation, which may be the labor force of a state, an occupation, or a skill cell or education group.

All papers use the log wage, $\log w_j$, as the dependent variable. In several papers, the independent variable is $\log k_j$, where $k_j \equiv \frac{L_j}{L} = \frac{M_j + N_j}{M + N}$, the share of employment or the labor force or population that is of education or occupation type $j$, a share which may be rewritten as a reminder that L is composed of immigrants N and natives M. The dependent variable is instrumented with predicted immigration, making the coefficient on $k_j$, $\theta$, the effect of a change in the share that is due to immigration: $\frac{\partial \log w_j}{\partial \log L_j} = \theta$. For such cases, $\theta$ is reported bolded in the table.

In other papers, the dependent variable is $p_j \equiv \frac{M_j}{M_j + N_j}$, the share of immigrants in the labor force, occupation, education group, or skill cell $j$. In this case, $\frac{\partial \log w_j}{\partial \log L_j} = \theta(1 - p_j)$, where $\theta$ is the coefficient on $m_j$.

- Proof: $\dfrac{\partial \log w_j}{\partial \log L_j} = \dfrac{\partial \log w_j}{\partial \log p_j} \dfrac{\partial \log p_j}{\partial \log L_j} = \theta p_j \dfrac{L_j}{p_j} \dfrac{\partial p_j}{\partial L_j}$

  $= \theta p_j \dfrac{L_j}{p_j} \dfrac{\partial p_j}{\partial M_j} = \theta L_j \left( \dfrac{1}{L_j} - \dfrac{M_j}{L_j^2} \right) = \theta \left( 1 - p_j \right)$

002622

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2630 of 4699 PageID #:  5795

The Economic and Fiscal Consequences of Immigration

In yet other papers, the dependent variable is $m_j \equiv \dfrac{M_j}{N_j}$, the ratio of immigrants to natives in the labor force or education group j. In this case, $\dfrac{\partial \log w_j}{\partial \log L_j} = \theta \dfrac{1}{(1 - p_j)}$, where $\theta$ is the coefficient on $m_j$.

- Proof: $\dfrac{\partial \log w_j}{\partial \log L_j} = \dfrac{\partial \log w_j}{\partial \log m_j} \dfrac{\partial \log m_j}{\partial \log L_j} = \theta m_j \dfrac{L_j}{m_j} \dfrac{\partial m_j}{\partial L_j}$

  $= \theta m_j \dfrac{L_j}{m_j} \dfrac{\partial m_j}{\partial M_j} = \theta \dfrac{L_j}{N_j} = \theta \dfrac{M_j + N_j}{N_j} = \theta \dfrac{1}{(1 - p_j)}$

To make comparable the magnitudes in papers whose dependent variable is $p_j$ or $m_j$, one must choose a value of $p_j$. The ideal for any given paper would be the average $p_j$ in the paper's sample. However, the panel evaluated at a common $p_j$ value to ensure that the magnitudes of effects across papers do not differ simply because the average immigrant density differs across papers. For papers seeking to estimate the impact of all immigrants, we set p = 0.126, which is the immigrant share of the labor force in 2000. So 1 – p = 0.874; magnitudes calculated in this way are underlined in Table 5-1. Below, we explain how we treated results from each paper that can be rendered comparable in this way, and how we treated results from papers assessing particular episodes, including the structural results. While the implicit value of $p_j$ for the structural papers is close to 0.126, the results from other particular episodes may implicitly or explicitly be evaluated at a different $p_j$.

**Altonji and Card (1991)**

- Independent variable is $p$.
- $\theta$ = –1.2 for all native-born high school dropouts. The most negative coefficient is $\theta$ = –1.9 for black native-born male high school dropouts (Altonji and Card, 1991, Table 7.7; Table 7.8, row 6, final column).
- If the number of immigrants rises sufficiently to raise labor supply by 1 percent, native-born high school dropout wages fall $(0.874)(-1.2) = -1.0\%$; native-born black male high school dropout wages fall $(0.874)(-1.9) = -1.7\%$.

002623

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Borjas ( 2003) Nonstructural Estimation**

- Independent variable is $p$.
- $\theta = -0.637$ for native men (own-wage coefficient; Table III, row 3 column 2, in Borjas, 2003). The impact on women was not studied.
- An increase in the number of immigrants sufficient to increase the labor force by 1 percent reduces wages by $(0.874)(-0.637) = -0.56\%$.

**Borjas ( 2015), Peri and Yasenov (2015)**

- Borjas (2016b) reports on p. 27 that wages of (non–Hispanic) dropouts fell 10-30 percent as a result of the Mariel boatlift.
- His Table 2, p. 49, indicates that the boatlift increased the share of Marielitos among high school dropouts from 0 percent (by definition) to 17.5 percent (column 3). The denominator (column 1) appears to be all high school dropout workers including Hispanic non-Marielitos.
- Columns 1 and 2 of Table 2 (and the text on p. 27) indicate that the boatlift increased the labor supply of high school dropouts by 21 percent, assuming column 1 is indeed all dropout workers.
- Since a 21 percent increase in high school dropout labor supply due to immigration reduced wages 10 to 30 percent, a one percent increase reduces wages by –0.48 percent to –1.43 percent.
- Peri and Yasenov (2015) report in their Table 4 that wages rose 4.5 percent immediately after the Mariel boatlift.
- They report on page 7 that the Marielitos increased the number of high school dropouts by 15-18 percent.
- This means that a 1 percent increase in labor supply increased wages by 0.25-0.30 percent.

**Card (2001)**

- Independent variable is $\log k_i$ ($\log f_i$ in Card's notation).
- $\theta = -0.099$ for native men, $+0.063$ for native women (Card, 2001, Table 10, lower panel).
- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native wages fall by $\theta$ (this is the local average treatment effect [LATE] interpretation of instrumenting the log share of a group in the labor force with immigration to the group).

002624

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB  Document 124  Filed 11/07/24  Page 2632 of 4699 PageID #: 5797

The Economic and Fiscal Consequences of Immigration

**Card and Peri (2016)**

- Independent variable is $p$ (own-wage coefficient) $\Delta p$ or $\dfrac{\Delta M}{M_{t-1} + N_{t-1}}$.

- $\theta = -0.237$ (for $\Delta p$; Table 2, 2nd row last column); $\theta = -0.124$ (for $\dfrac{\Delta M}{M_{t-1} + N_{t-1}}$; Table 2, 3rd row last column).

- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native wages fall $(0.874)(-0.237) = -0.21\%$ (for $\Delta p$; for $\dfrac{\Delta M}{M_{t-1} + N_{t-1}}$, the magnitude may be read directly from the coefficient $\theta$, so $-0.12\%$).

**Cortés (2008)**

- Independent variable is $\log k_j$.
- $\theta = -0.05$ and is insignificant for all native dropouts (Cortés, 2008, Table 8). There are a variety of $\theta$ for other native groups (Table 10).
- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native high school dropout wages fall by $\theta$ (this is the LATE interpretation of instrumenting the log share of a group in the labor force with immigration to the group).

**Llull (2015)**

- Independent variable is (own-wage coefficient).
- $\theta = -2.0$ (own-wage coefficient; Llull, 2015, Table 7 bottom row).
- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native wages fall $(0.874)(-2.0) = -1.75\%$

**Monras (2015)**

- Independent variable is $m_j$.
- The calculations below ignore the fact that the regressions in Monras (2015) also control for $\log L_j$ (theory suggests controlling for $\log N_j$, a variable with a coefficient of 0.05).
- Controls for GDP and the size of the labor force mean that implicitly capital is held fixed. However, because the study looks at the short-run effect of an unexpected inflow, these controls may matter little.
- $\theta = -0.75$ (Table 4 column 7, author's preferred coefficient).
- $\bar{p} = 0.055$

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native wages fall by $(-0.75)/(1 - .055) = -0.79\%$. Alternatively, one can rely on theory and an approximation based on small $p$ to read the effect directly from the coefficient, to obtain $-0.75$ percent (for this to be correct, $\log N_j$ must be controlled for in the regression).

**Structural Wage Effects in Table 5-2**

- The wage-effect values shown in the second column of the "Structural Studies" section of Table 5-2 simulate the effect of immigration from 1990 to 2010, when the share of immigrants in the labor force rose from 9.3 percent to 16.4 percent—a 7.1 percentage point rise.
- We focus on the most negative and the least negative (or most positive) scenarios in Table 5-1, ignoring the result that the long-run effect on all workers (Scenarios 1 and 3) is zero, since this is an assumption embedded in the model.
  - For all natives in the short run, wage impacts in Table 5-1 range from −3.2 percent (Scenario 1) to −2.6 percent (Scenario 2).
  - For all natives in the long run, wage impacts in Table 5-1 are 0.5 percent (Scenario 4) or 0.6 percent (Scenario 2).
  - For native dropouts in the short run, wage impacts in Table 5-1 range from −6.3 percent (Scenario 1) to −2.1 percent (Scenario 4).
  - For native dropouts in the long run, wage impacts in Table 5-1 range is from −3.1 percent (Scenario 1) to 1.1 percent (Scenario 4).
- So a 1 percentage point increase in the immigrant share would imply reductions in wages of these amounts divided by 7.1 (the observed percentage point rise in the immigrant share between 1990 and 2010), or:
  - −0.37 to −0.45 percent for all natives in the short run
  - +0.07 to +0.08 percent for all natives in the long run
  - −0.89 to −0.30 percent for native dropouts in the short run
  - −0.44 to +0.15 percent for native dropouts in the long run
- If the number of immigrants rises sufficiently to increase labor supply by 1 percent, native wages would fall by 0.874 times the values in the previous bullet. In Table 5-2, values for the wage effect are rounded to one decimal place, which results in several scenarios being reported as having the same effect.

002626

Copyright National Academy of Sciences. All rights reserved.

# 6

# Wider Production, Consumption, and Economic Growth Impacts

## 6.1 INTRODUCTION

As consumers, workers, innovators, and entrepreneurs, immigrants help shape nearly every aspect of the economy and of society more broadly. Labor market consequences are perhaps the most visible and most debated economic concern, due to their direct impact on employment and wages. But product, housing, and capital markets are affected by immigration as well, as are some nonmarket activities and—as a result of human capital formation and innovation induced by high-skilled immigration in particular— the trajectory of long-run economic growth. This chapter discusses these economic impacts of immigration that take place beyond the labor market while recognizing that many outcomes associated with them are influenced by their interaction with changes in labor supply and demand over time.[1]

The chapter begins (Section 6.1) with a description of aggregate-level impacts: year-to-year changes in gross domestic product (GDP) or in GDP per capita, driven by expansion of the labor force and physical capital, as well as production-technology adjustments, responding to immigrant flows. Borjas (2013), in considering the impact of immigration on overall economic activity, estimated that the presence of immigrant workers—the *stock* of authorized and unauthorized foreign-born workers—in the labor market makes the U.S. economy an estimated 11 percent larger each year

---

[1]Nathan (2014), surveying what is only a fairly recent literature, organized these "wider economic impacts of immigration" (beyond labor markets) into a dynamic framework encompassing the production and consumption sides of the economy; the focus of his literature review is on the role of high-skilled immigrants.

002627

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

(which amounts to around $2 trillion in GDP in 2016). As a percentage of the overall economy, annual GDP growth directly attributable to the labor of recent immigrant *inflows* is much smaller, and it mostly accrues to immigrants themselves.

However, when factors beyond those directly attributable to labor force expansion are considered—for example, the contribution of immigrants to capital formation, entrepreneurship, and innovation, which also shape the way and the pace at which growth unfolds—expansion of the aggregate economy attributable to new arrivals becomes much larger. Recent immigrants have higher patenting rates than natives due to their concentration in science and engineering and to their disproportionate representation among highly educated workers. One would expect this increased innovation to exert a positive externality on the productivity of natives, very likely raising per capita GDP growth. Peri (2012) performed a state-level analysis of the impact of immigration on total factor productivity. Using historic settlement patterns (similar to Hunt and Gauthier-Loiselle, 2010) and distance to the Mexican border as instruments to control for endogeneity of immigrants' locational choices, he found immigration increased total factor productivity by promoting efficient task specialization. Similarly, Peri et al. (2015a) found that cities experiencing a greater immigration of science and engineering workers (broadly defined as the share of a city's total employment comprised of foreign science, technology, engineering, and mathematics [STEM] workers) increased the productivity of college labor.

Evidence also exists (see Borjas, 2001; Cadena and Kovac, 2016; Somerville and Sumption, 2009) that immigrants locate in high labor demand/high wage areas for the skills they possess and are more willing than natives to relocate in response to changes in labor market conditions. This tendency may reduce friction and slack in labor markets by reallocating labor in a way that helps equalize compensation across geographic areas (see discussions in Chapter 5 of problems for spatial approaches to measuring wage effects of immigration).

Sections 6.2 and 6.3 discuss the consequences of immigration in specific sectors of the economy where the foreign-born population share is high and consider the influence of immigration on consumer prices and cost of living. Increases in the share of low-skilled immigrants in the labor force appear to have reduced, over time, the prices of immigrant-intensive services such as child care, eating out, house cleaning and repair, landscaping and gardening, taxi rides, and construction. Most of these services are "nontradable," which means they must be produced and consumed in the same geographic area. The decrease in prices is found to be driven by lower wages paid by those hiring in labor markets populated by low-skilled workers of Hispanic origin, particularly those with relatively low English proficiency and/or who are not legally authorized to work (Baghdadi and Jansen, 2010; Cortés,

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

2008). Through lower prices, low-skilled immigration creates positive net benefits to users of these services. Furthermore, the availability of low-cost, flexible housekeeping and child care services provided by the foreign-born appears to have allowed women in high-salary jobs to increase their work hours (Cortés and Tessada, 2011).

Housing is a specific sector in which immigrants play an important role. On the supply side, immigrants are disproportionately represented in construction industries (see Chapter 3). Their addition to the labor force may reduce the cost of construction and maintenance services. However, new arrivals also provide a major source of housing demand and, by raising both prices and rents, generate a potential windfall for native owners of housing. Studies of U.S. metropolitan areas have detected this demand-driven impact on the price of housing services. Saiz (2007) estimated that an inflow of legal immigrants equal to 1 percent of the total population would be expected to lead to an increase of about 1 percent for both rents and housing values. Ottaviano and Peri (2012) arrived at similar results.

Section 6.4 shifts the focus from primarily short-term economic impacts created by new immigrant flows to impacts on long-term growth. The emphasis is on technological innovation and human capital formation—viewed here as interacting, or endogenous, components of the evolving economy rather than as factors determined outside the process, or exogenously—as engines of growth that takes place over decades, not years.[2] The potential effects of immigration are assessed using growth models in which future productivity and income growth are determined by investments in human capital and technological innovation.

The difference between the measured economic outcomes generated by endogenous growth models, as opposed to models in which growth is exogenous to the economy, may be significant. The recent endogenous-growth literature suggests that estimates of productivity and wage impacts of immigration can be either larger or smaller than those derived when static conditions are assumed, depending largely on the extent to which new immigrants contribute to human capital formation and innovation. In particular, this literature finds that the positive effects associated with high-skilled immigration and the negative effects associated with low-skilled immigration are amplified when viewed in a long-run endogenous growth context. These results are compatible with evidence about the educational achievement of descendants of immigrants (Chapters 2, 3, and 8). The endogenous growth models also predict that complementarities between immigrants and natives in knowledge production lead to increases in the

---

[2]In econometric models, exogenous variables are not systematically affected by changes in the other variables of the model, whereas endogenous variables are at least in part determined by other variables or latent factors that affect them both.

002629

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

rate of per capita income growth, not just increases in the level of national income (economic activity).

Some endogenous growth models are also consistent with empirical evidence suggesting that the proportion of high-skilled workers immigrating to the United States (as well as to other major receiving countries), relative to total immigration flows, has been increasing in recent decades to the point where, in some sectors, their skill levels already match or surpass those of natives (Ehrlich and Kim, 2015). In terms of their contribution to innovation and average human capital formation, the impacts of immigration that play out in the long run also operate over transitory phases and can appear within one generation. Consider, for example, the educational attainment of the children of relatively high-skilled immigrants, which on average outpaces that of their parents and of the native-born population. Estimated medium-run effects on average wages in the population (such as after 10 years) observed in the literature (see Chapter 5) are by and large consistent with many of the predictions from endogenous growth models.

Economic activities that take place beyond the market, such as in-home production, or in markets that operate on the fringes of taxing authorities, are discussed at the end of the chapter, in Section 6.5. If immigrants devote more time to nonmarket work such as caregiving and housework than do natives—and data from time-use surveys suggest that this may indeed be the case (Ribar, 2012)—or are more likely to be employed in sectors where informal work arrangements are common, reliance on conventional sources of wage and employment data and on GDP measures will result in incomplete assessments of the impact of immigration on the economy.

## 6.2  IMPACT ON OVERALL ECONOMIC ACTIVITY (GDP)

The size of a market economy is a function of the total number of workers, the stock of physical capital, and the average factor output, or productivity. Immigration directly adds to the size of the economy by increasing the population and workforce; it also affects the composition of the population in a number of ways, including age, gender, and education. The presence of immigrant workers (authorized and unauthorized) in the labor market has made the U.S. economy much larger—perhaps 11 percent larger, an increase equivalent to $1.6 trillion of GDP in 2012 (Borjas, 2013). Extrapolating, in 2016 this contribution to GDP is about $2 trillion. This makes sense intuitively, as the *stock* of foreign-born workers in the labor market, which has accumulated over many decades, is large. According to Bureau of Labor Statistics (BLS) data on labor force characteristics, there were 25.7 million foreign-born persons ages 16 and older

002630

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

participating in the labor force in 2014, representing 16.5 percent of the total U.S. workforce.[3]

Quite distinctly from these contributions by the stock of immigrants, it is also of interest to know how much the annual *flow* of new immigrants contributes to economic growth. Under normal circumstances, the annual flow of foreign-born workers into most countries is small relative to the overall population. It is therefore unsurprising that studies focusing on short-run wage and employment impacts (such as those reviewed in Chapter 5) would imply increases in GDP attributable to recent immigration that are quite small when measured as a share of the total economy. In addition, the benefit accruing to U.S. natives (the immigration surplus discussed at length in Chapter 4) is typically estimated to be a small piece of this already small overall impact. Borjas (1995b) found that the foreign-born added about 0.1 percent to the portion of GDP accruing to the native-born. Borjas et al. (1997) and Johnson (1997) found somewhat higher and lower impacts respectively, but the differences do not change the conclusion that the contribution is practically undetectable in aggregate (GDP) data. Based on this and related literature, *The New Americans* (National Research Council, 1997, p. 153) concluded (in the context of the 1980s and 1990s): **"Overall, barring sizable immigration-induced economies or diseconomies of scale, the most plausible magnitudes of the impact of immigration on the economy are modest for those [natives] who benefit from immigration, for those who lose from immigration, and for total GDP. The domestic gain . . . may be modest relative to the size of the U.S. economy, but it remains a significant positive gain in absolute terms."**

While aggregate annual impacts are small, immigration can nevertheless make a significant contribution to economic *growth*, especially since immigrants are disproportionately of working age and significantly boost employment growth. Consider how different the U.S. growth path would be had all immigration been cut off 10, 20, or 30 years ago: Clearly GDP would be much smaller, and perhaps per capita GDP would be as well—in no small part because the United States would have an older population with a considerably lower percentage of individuals active in the workforce (Myers et al., 2013).[4] Over the long run, foreign-born inflows have a

---

[3]See http://blogs.bls.gov/blog/tag/foreign-born [November 2016]. The concentration of immigrants varies greatly by geographic location and economic sector. In some cases, immigrants may even supply all of a business's labor and create all of its demand. A restaurant in an enclave that hires only foreign-born workers and where all its customers are from the same community may have little to no effect on native wages and employment, while obviously contributing to a larger national economy.

[4]A recent working paper by Maestas et al. (2016) examines the effect of an aging population on per capita output at the state level in the United States. They found that per capita GDP growth during the period 1980-2010 was 9.2 percent lower than it would have been had the

Copyright National Academy of Sciences. All rights reserved.

compounding effect that potentially influences economic and fiscal trends in profound ways. As a result, the Congressional Budget Office and other organizations are interested both in estimating how immigration flows impact GDP and in the fiscal picture for various scenarios of the volume and composition of immigration (e.g., legal status, skill mix).[5]

Conclusions such as the one cited above from *The New Americans*— reflecting estimates derived from a static framework that typically only accounts for the direct labor share of income and the immigrant and native-born shares of the labor force—are being reconsidered in light of evidence that immigrants may increase the productivity of some natives. When factors beyond those directly attributable to labor force expansion are considered—specifically, those effects created indirectly through higher savings, investment, and capital flows—expansion of the aggregate economy attributable to new arrivals becomes larger. Ben-Gad (2008) analyzed the impact on the United States of absorbing an additional 60,000 immigrants per year over the course of a decade. If all these additional immigrants have college degrees, per capita GDP would rise by 0.15 percent at the end of the first decade. Ultimately, as the capital stock continues to adjust, per capita GDP would increase by a further 0.105 percent in the decades that follow. If none of the additional immigrants have college degrees, the additional inflow ultimately lowers per capita GDP by 0.09 percent, though natives still benefit from an immigration surplus.[6]

Yet all these studies, whether static (Borjas, 1995b; Borjas et al., 1997; Johnson, 1997) or dynamic (Ben-Gad, 2008), fall within the neoclassical economics tradition. Different types of labor combine with physical capital to produce output using a predetermined technology. This framework does not exclude analysis of long-run growth as the technology evolves over time; however, there is no sustained immigration-induced technological change. For example, what happens if immigrants themselves change the technology? As detailed in Section 5.6, patenting activity by foreign-born

---

population not aged, with two-thirds of this reduction attributable to slower growth in the labor productivity of workers and about one-third attributable to slower labor force growth. Given current population projections, their results imply that "annual GDP growth will slow by 1.2 percentage points this decade and 0.6 percentage points next decade due to population aging" (Maestas et al., 2016). This aging effect would be even more pronounced without the influence of the immigrant population, which is relatively younger than the native-born population.

[5]See https://www.cbo.gov/sites/default/files/114th-congress-2015-2016/reports/49868-Immigration4.pdf [November 2016].

[6]Studying the Canadian case, Dungan et al. (2013) used a macroeconometric forecasting model to simulate "the impact on the Canadian economy of a hypothetical increase in immigration." They found generally positive impacts on real GDP and GDP per capita, aggregate demand, investment, productivity, government expenditures, taxes, and especially net government balances, with essentially no impact on unemployment.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

college graduates is estimated to have increased U.S. GDP by 1.4-2.4 percent over the decade of the 1990s (Hunt and Gauthier-Loiselle, 2010). Although the overall macroeconomic impact of immigration that takes place in a given year is modest compared to other factors, the compounding role of foreign-born innovators and other kinds of workers becomes significant to long-run economic growth.

Finally, beyond the impact of immigration on total or per capita GDP, there may be effects on the distribution of income. The flow of immigration typically alters the skill and occupational composition of a country's workforce. If immigrants disproportionately increase the size of the lowest earnings quintiles, their addition to the population will raise overall inequality by any measure (such as a Gini index). The same logic holds for measures of poverty rates. Moreover, if immigrants are concentrated in the lowest *and* in the highest education groups, as is the case in the United States, this change in the composition of the population increases measured wage inequality, although such an accounting does not take into account any (positive or negative) effects of immigration on native-born workers. Analyses of the U.S. economy (e.g., Blau and Kahn, 2015 and Card, 2009) have found this direct compositional effect to be very small. That said, Card (2009) did find the effects of recent immigrant inflows on overall wage inequality in the population (including natives and immigrants) to be somewhat larger than the impact on the relative wages of U.S. natives, "reflecting the concentration of immigrants in the tails of the skill distribution and higher residual inequality among immigrants than natives" (Card, 2009, p. 1). Overall, however, Card found that immigration still accounted for only a small share (5%) of the increase in wage inequality in the United States from 1980 to 2000.

Wage inequality could also be affected when immigration impacts the wages of natives (as described in detail in Chapters 4 and 5). If, for example, immigration increases the relative supply of low-pay, low-skilled workers and there is only a partial offsetting increase in demand for goods and services they produce, the pay of low-wage workers will fall relative to that of high-wage workers—leading to an increase in measured inequality. If low-skilled immigrants competing with natives are, at the same time, complements to business owners and high-skilled workers at the high end of the income distribution, the wages of the latter two groups may rise. Such wage changes would exacerbate inequality, which is already growing due to the increasing demand for high-skilled labor that has taken place since the 1970s. In addition, international trade during this period may have put downward pressure on demand for and wages of workers in medium- and low-skilled sectors.

002633

Copyright National Academy of Sciences. All rights reserved.

## 6.3 SECTORAL AND GEOGRAPHIC IMPACTS

Although immigration flows over any given year or quarter have a minimal impact on overall levels of economic activity as measured by GDP or GDP growth, certain sectors or regions may be disproportionately affected. As documented in detail in Chapter 3, foreign-born workers are more likely than native-born workers to be employed in low-wage service sector occupations and less likely to be employed in management, professional, and sales occupations. They are also more likely to be employed in goods-producing sectors such as construction, agriculture, and manufacturing. This occupational and industrial sorting primarily reflects the disproportionate presence of foreign-born workers at the low-education end of the skill spectrum; it also represents different skill sets (e.g., English-language proficiency) that are at least partly independent of years of schooling.

Although the foreign-born have historically been concentrated in construction, farm, and service-sector jobs, they are playing an increasing role in high-skilled occupations, many of them in STEM fields.[7] Research into this trend has found evidence of clear links between high-skilled immigration, entrepreneurship, and innovation in high tech sectors (Kerr, 2013b; Kerr and Kerr, 2011). This line of research, summarized in Chapter 5, supplements work on more traditional ethnic entrepreneurship focusing on small business formation in nontradable sectors such as lower-end retailing and restaurants (Kloosterman and Rath, 2001). As covered elsewhere in this report (Chapter 3 and Section 6.5 below), the higher-education sector in the United States is generating graduates who help meet the demand for high-skilled workers. In 2013, the number of foreign students attending U.S. universities was around 820,000 (F-1 visas); the number of students from China alone was about 200,000 (up from 16,000 in 2003). A large percentage of these foreign-born students, particularly at the graduate level, are enrolled in STEM fields.

Just as the occupational sorting of immigrants has resulted in the concentration of foreign-born workers in certain sectors, both low- and high-skilled, migration flows have also been spatially clumped. Many entry-level service sector jobs are located in urban areas with prior immigration, which draws low-skilled immigrants. Highly educated foreign scientists and

---

[7]Lofstrom and Hayes (2011) analyzed earnings differences between H-1B visa holders and U.S.-born workers in STEM occupations and found little evidence that the visa holders were paid less than natives of similar age and education. Hunt (2015) examined immigrant and native skills and wages in U.S. computer and engineering labor markets and found that immigrants earned higher wages on average due to higher average levels of education. The wage advantage was larger for computer workers than for engineering workers, possibly due to greater returns on English proficiency for the latter. Occupation-based samples of the American Community Survey reveal larger wage differentials between the two groups than do education-based samples.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

engineers also tend to locate in cities where clustering of human capital and more efficient migrant-native task specialization are facilitated (Peri et al., 2015a). Hall et al. (2011, p. 1) reported that in 44 of the nation's 100 largest metropolitan areas—including large coastal cities such as San Francisco and Washington, DC—college-educated immigrants outnumber immigrants without high school diplomas by at least 25 percent. The low-skilled destinations, which have the reverse distribution, tend to be in the Great Plains and in the border states of the West and Southwest.

Beyond cities, there are examples of immigrants reversing the fortunes of declining regions or helping to fuel growth in small towns. Immigrants typically flow to these towns in response to employment opportunities, such as meat packing or poultry processing. Carr et al. (2012) documented the rise of Hispanic boomtowns and examined rural populations where decline had been slowed and even reversed from an infusion of new immigrants.[8] Hong and McLaren (2015) explored this potential "shot in the arm for local economies," focusing mainly on the labor market impact of consumer demand for local services. They found that the bump in consumption can "attenuate downward pressure from immigrants on non-immigrants' wages, and also benefit non-immigrants by increasing the variety of local services available."[9] Using Decennial Census data from 1980 to 2000, the authors found evidence that, due to these effects, immigrants did in some cases raise native workers' real wages. They also found an employment effect: specifically, that each immigrant created 1.2 local jobs for local workers, most of them going to native-born workers. Sixty-two percent of these jobs are in nontraded services; that is, where the good or service must be produced and consumed in the same local area.

Explaining why net migration patterns are most likely to affect markets for nontradable goods, Mazzolari and Neumark (2012) noted that, for some kinds of goods and services, trade is impractical due to high cost of transportation, short shelf life (e.g., restaurant meals), fixed location of output (e.g., landscaping), or even for legal or security reasons (e.g.,

---

[8]Carr et al. (2012) cite a number of factors that incentivized new arrivals to reside in specific locations where allowed by enforcement and where jobs could be found which, in the process, contributed to the creation of immigrant "boomtowns." Among these factors were the Immigration Reform and Control Act of 1986; anti-immigrant legislation (e.g., California's Proposition 187); militarization of the border; transformation of the meat packing industry; and concentration of oil, timber, furniture, carpeting, textiles, and other nondurable manufacturing. See an issue brief from the Immigration and the States project of the Pew Charitable Trusts for data showing the impact of immigrants slowing population decline in some counties (http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2014/12/changing-patterns-in-us-immigration-and-population [November 2016]).

[9]Mazzolari and Neumark (2012) found evidence that immigration in California is associated with fewer stand-alone retail stores but a greater variety of ethnic restaurants.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

288          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

national defense). These constraints create niches for low-skilled workers in occupations serving these markets.

There is evidence that immigrants are more responsive than natives to regional differences in labor demand, a factor that makes labor markets more efficient because workers flow to where wages are rising (Borjas, 2001; Somerville and Sumption, 2009). Controlling for endogeneity of destination decisions, Cadena and Kovac (2016) culled evidence from the Great Recession to conclude that "Mexican-born immigrants' location choices in the U.S. respond strongly to changes in local labor demand, and that this geographic elasticity helps equalize spatial differences in labor market outcomes for low-skilled native workers, who are much less responsive" (Cadena and Kovac, 2016, p. 257).

Borjas (2001) examined the role of immigrants in improving labor market efficiency and found that immigration "greases the wheels of the labor market by injecting into the economy a group of persons who are very responsive to regional differences in economic opportunities" (Borjas, 2001, p. 4). The paper explored empirically and theoretically how labor market efficiencies gained from immigrants clustering in higher-wage regions raises GDP, relative to what would have been observed if immigrants had simply replicated the geographic sorting of the native population. Analyzing Decennial Census data for the period 1950-1990, Borjas found evidence that geographic sorting of immigrants reflected interstate wage differences. New immigrants were found to be more likely to locate in states that offer the highest wages for the category of skills that they possess. In other words, new immigrants "make up a disproportionately large fraction of the 'marginal' workers who chase better economic opportunities and help equalize opportunities across areas" (Borjas, 2001, p. 2). If the foreign-born respond to increasing wage differentials by moving toward relatively higher paying regions, they may help fill labor demand in expanding industries (such as health care[10]) driven by an aging population or other factors. Borjas also found evidence of greater wage convergence across geographic regions during high-immigration periods. However, at the low-skilled end of the labor spectrum, Orrenius and Zavodny (2008) found evidence that, during the 1994-2005 period, some immigrants "may have been discouraged from settling in states that set wage floors substantially above the federal minimum." This indicates that, in some cases, immigrants locational choices are more closely linked with job opportunities (employment growth) than with wages. Cadena (2014) corroborated this hypothesis. He found that, over the 1994-2007 period, recently arrived low-skilled immigrants selectively located in states that had not increased their minimum wage levels, suggest-

---

[10]OECD and World Health Organization (2010) estimated the large numbers of nurses being recruited by developed economies to help meet health care demands.

002636

Copyright National Academy of Sciences. All rights reserved.

ing a sensitivity among workers to the potential for subsequent "disemployment effects" that could be induced. One conclusion reached by the author is that these locational choice patterns may diffuse any negative wage impacts affecting established workers in immediately affected local labor markets throughout the country.

One barrier to this kind of efficient allocation of new workers, foreign-born or otherwise, relates to cost of living (i.e., real wages). Hsieh and Moretti (2015) found that homeowners in high-wage cities have an incentive to restrict housing supply through regulatory means. Studying the contributions of individual U.S. cities to national GDP growth, they showed that worker productivity was increasingly variable across cities, reflecting "an increasingly inefficient spatial allocation of labor across U.S. cities" (Hsieh and Moretti, 2015, p. 1). Part of this variability was tied to housing prices (and policies). They found that the main effect of fast productivity growth in cities like New York, San Francisco, and San Jose—cities with booming high-tech and finance industries—was an increase in local housing prices and local wages, not in employment. In the presence of strong labor demand, tight housing supply effectively limited employment growth in these cities. In contrast, "the housing supply was relatively elastic in Southern cities. Therefore, total factor productivity growth in these cities had a modest effect on housing prices and wages and a large effect on local employment" (p. 34). This constraint means that not all workers, including immigrants, have the option of locating in the most productive cities.[11] It may also partly explain the shift since the 1990s in immigrant location patterns from traditional gateways such as California, Florida, Illinois, New Jersey, and New York to states in the Southeast, Rocky Mountain West, and Pacific Northwest (Pew Charitable Trusts, 2014a).

## 6.4  IMPACT ON PRICES OF CONSUMER GOODS AND COST OF LIVING

### Consumer Prices

In previous chapters, the size and direction of wage impacts driven by immigration was shown to be highly context-dependent, varying by size and duration of inflow, the skill mix of workers, and sector. For similar reasons, immigration has an ambiguous theoretical effect on the relative prices of different goods and services. The same economic change—an increase in the supply of workers—that can lower wages and production costs can also lower prices, particularly in labor-intensive sectors (Baghdadi and Jansen,

---

[11]It may also reflect the possibility that high-skilled labor markets are more "national" in scope while low-skilled labor markets are more local.

002637

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

290          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

---

**BOX 6-1**
**Remittances**

After arriving in their destination country, immigrants add to total consumer demand for goods and services and ultimately to the demand for labor used in their production. However, not all of the wages earned by immigrants are spent or saved in their new country; some earnings are sent back to relatives in countries from which they emigrated. There is a large literature documenting the beneficial impacts of such transfers in the origin country where the money is spent, saved, or invested (see Amuedo-Dorantes and Pozo, 2006; Rapoport and Docquier, 2006; Rodriguez and Tiongson, 2001; and Taylor, 1999). But from the perspective of the remittance-sending country, the outflow of income when immigrant workers send remittances "back home" reduces immigrant savings rates and consumption within the United States and deepens the deficit in the current account. The more they send home, the less they can contribute to domestic demand and savings. Little empirical work has been done to analyze the impact of immigration on consumer demand; even less has examined the role of remittances in this scenario.

Olney (2015) is one of the few studies to examine how remittance outflows affect the wages and income of native workers. Using a detailed microdata set that includes information on remittances and wages of immigrant and native-born workers in Germany, the study specified a model to test (1) the extent to which remittances dampen immigration-driven increases in the domestic consumer base and any positive impact on native wages that would be associated with them; and (2) the prediction that remittances will negatively impact wages of native workers in nontraded service industries (since these industries depend more heavily on local consumption) more than wages of native workers overall. The model employs an instrumental variables approach (see Section 5.3) to address endogeneity created if income shocks in particular areas lead simultaneously to higher native wages and to wealthier immigrants remitting more money than in other areas. In Germany, remittances equal roughly 1.3 percent of all income earned, meaning that a 1 percent increase in remittances decreases German national income by 0.013 percent. The model predicts that, as a result of dampened consumption in Germany, a 1 percent increase in the outflow of remittances will lead to a 0.027-0.056 percent decrease in wages (Olney, 2015, p. 23). This is a very small decrease—a loss of 7 to 8 euros on a 30,000-euro annual wage—and does not account for the large benefits derived from remittances in the less-developed countries to which they are sent.

---

2010; Cortés, 2008). However, immigrants are consumers as well as producers. And, although their average purchasing levels and patterns will not exactly mirror those of the rest of the population due to a range of factors, including the sending of remittances (see Box 6-1), immigrants contribute to the demand for goods and services, creating a potentially offsetting channel

002638

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Also important is that the outflow of remittances may have a number of indirect effects of varying magnitude. There is likely to be a small fiscal impact. To the extent that some portion of remitted money would have been spent in the United States, it reduces nonincome-based tax revenues such as sales taxes. There may be offsetting effects as well. The prospect of sending money home could also affect future migration rates by altering the financial calculus associated with the decision to migrate or by directly reducing chain migration. Improving the productive use of immigrant savings and remittances in fund-receiving countries could generate export demand for U.S. products.

Defining remittances as all transfers from the immigration-receiving country to the immigrants' country of origin, the literature distinguishes several motives for remittances, each of which is likely to be affected by the duration of migration. One reason for transferring money is to support family members back home; these are intrafamily transfers across national borders. As it is more likely that immigrants leave their families behind when they plan a return to the home country, this type of remittance flow is likely to be larger for temporary migrations. Funkhouser (1995) presented a simple model for such remittances. A second reason for remitting funds is to create savings held in the origin country for future consumption or investment purposes. Dustmann and Mestres (2010) found that temporary migrants were more likely to hold assets in their home countries. Third, maintaining the option to return to their home country may require immigrants to undertake investments and make contributions to the home community. If seen as an insurance mechanism, this also may be a remittance motive for migrants who currently do not plan to return. Batista and Umblijs (2014) analyzed the relationship between risk aversion and remittances among immigrants in Ireland. They found that more risk-averse individuals and those with higher wages were more likely to remit.

While this discussion emphasizes that remittances may reduce some of the benefits immigration confers on the destination country economy by reducing what immigrants spend and save domestically, such a focus ignores the important benefits that remittances confer upon the origin country. Moreover, native individuals and businesses also increasingly spend and invest abroad. Regardless of its source, such international capital flows are recognized by economists as having a substantial and important role in moving funds from rich to poor countries, which is needed to speed up global growth and reduce cross-country inequality and possibly also international migration.

through which market dynamics may be affected.[12] For example, foreign-born workers in the construction industry may lower the cost of producing new owner-occupied or rentable housing if they reduce wages—Current

----

[12]Bodvarsson et al. (2008) and Hercowitz and Yashiv (2002) showed that immigrants affect the demand for goods and services immediately upon arrival.

002639

Copyright National Academy of Sciences. All rights reserved.

Population Survey data indicate they constitute about 25 percent of all workers in construction industries. However, because they also demand units in which to live,[13] the impact on final prices is ambiguous.

Though the evidence is somewhat limited, the intensive infusion of lower-cost foreign-born labor into certain occupational sectors would be expected to reduce prices, benefiting consumers who purchase these goods and services (see Section 4.4). Among the foreign-born, unauthorized workers may do disproportionately more to reduce prices because they earn less than otherwise comparable authorized workers, foreign- or native-born. Benefits in the form of reduced costs of living created by lower prices to consumers should, as noted above, be largely restricted to nontraded services. Child care, eating out, house cleaning and repair, landscaping and gardening, taxi rides, and construction are a few examples of goods or services that must be produced and consumed in the same geographic location and for which prices are most likely to be affected by local availability of different pools of labor. While international trade allows production processes to be transported to where low-cost labor is located, immigration allows the low-cost labor to be brought to where production takes place. If one takes metropolitan areas as the unit of observation, the local concentration of low-skilled immigrants working in *traded* industries would be expected to have little to no impact on prices, at least at the local level (Cortés, 2008, p. 383).[14]

Using microdata from the BLS Consumer Price Indexes, Cortés (2008) estimated variation in prices across cities and over time in relation to the proportion of low-skilled immigrants in the working population. She found that, overall, a "10 percent increase in the share of low-skilled immigrants in the labor force of a city reduces prices of immigrant-intensive services, such as gardening, housekeeping, babysitting, and dry cleaning, by approximately 2 percent" (Cortés, 2008, p. 382).[15] Over the period 1980-2000, this translated into a decrease in the prices of immigrant-intensive services by a city average of 9 to 11 percent. She found the decrease in prices to be

---

[13]Myers and Pitkin (2013) found that immigrants constituted 39 percent of the growth in homeowners over the period 2000-2010.

[14]There have been a few studies examining the impact on aggregate prices. For example, in their conclusions, Blanchflower et al. (2007) concluded ". . . at present it appears that A8 [visa] immigration has tended to increase supply by more than it has increased demand in the UK (in the short run), and thereby acted to reduce inflationary pressure." Bentolila et al. (2007), using Spanish data, found high levels of immigration into Spain had a negative impact on inflation (0.9 percentage points per year), which helped to bring down the overall unemployment rate by almost 7 percentage points over the period 1999-2006.

[15]This finding provides some supports for the idea that low-skilled, foreign-born workers largely compete with one another. In the year 2000, 60 percent of high school dropouts were native born, yet they made up only a quarter of dropouts working in the gardening and housekeeping sectors (Cortés, 2008, p. 389).

002640

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

driven by decreased wage bills for employers, mainly those who had hired immigrants who competed directly in the labor market populated by individuals of Hispanic origin with relatively low English proficiency.

Next, Cortés used BLS Consumer Expenditure Survey data to identify which groups have the highest propensity to consume goods and services produced by sectors making intensive use of immigrant labor. The overall effect on consumption baskets was found to be largest for high-income households, who are more likely than low-income households to consume products such as child care, landscaping, and restaurant meals that are immigrant-intensive in production. Immigrants working in child care and other household services influence labor market dynamics (and patterns of consumption) in a particularly important way. The lower cost of these services made possible by the increased supply of labor for their provision has allowed native and of course some immigrant families with comparatively high levels of education and income to outsource them. As a result, individuals in these households are able to redirect labor toward higher-earning market occupations. This link is investigated in Cortés and Tessada (2011) who, using Decennial Census data to track immigrant cohorts of the 1980s and 1990s, examined how low-skilled immigration affects the labor supply of highly educated women in the United States. They found a striking correspondence between the availability of low-cost, flexible housekeeping and child care services provided by the foreign-born and increases in the number of hours worked by women in high-salary jobs.[16]

Of course, lower-income households also benefit from reduced prices of clothing, housing, food, etc.; however, they (especially recent immigrant cohorts) have also been empirically shown to bear the brunt of any negative wage impacts associated with new immigration that occurs. As a result, the overall (net) effect on economic well-being is negative for some and positive for others, unless immigration-induced technological progress is sufficient to raise all wages. As put by Cortés (2008, p. 414):

> The low-skilled immigration wave of the period 1980-2000 increased the purchasing power of high-skilled workers living in the 30 largest cities by an average of 0.32 percent and decreased the purchasing power of the typical native high school dropouts by a maximum of 1 percent and of Hispanic low skilled natives by 4.2 percent.

These findings support the conclusion that, through lower prices, low-skilled immigration created positive net benefits to the U.S. economy during

---

[16]For natives switching time from nonmarket work to market jobs, the reduction in their own home production does not count against GDP, whereas their new work, and that of workers they hire to do the same home tasks, is included in GDP. So, if measured by GDP only, the overall increase in the value of economic activity may be overstated.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the last two decades of the 20th century, while also generating a redistribution of wealth from low- to high-skilled native-born workers.

### Immigration and the Housing Sector

Immigration significantly impacts local housing markets by contributing to the demand for apartments and single-family homes. If there is a resultant increase in home prices, then this raises the wealth of current homeowners. According to the Census Bureau, housing wealth (home equity) accounted for about 25 percent of total wealth in U.S. households in 2011.[17] On the other hand, higher prices reduce housing affordability for potential home buyers. Housing expenses, including utilities and furnishings, account for 33.6 percent of average household consumer spending, with direct shelter expenses of 19.7 percent, compared to 17.6 percent of spending allocated to transportation and 12.9 percent for food. Spending on shelter is moderately higher in absolute terms for homeowners than renters, and spending by homeowners on utilities, supplies, and furnishings is considerably higher than it is for renters (U.S. Bureau of Labor Statistics, 2015b).

Demand for housing is a direct function of the rate of household formation, which depends on a host of demographic factors including immigration but also depends on the health of the economy. Household formation is defined as the net change in the number of households in a given period, also equivalent to the net change in occupied housing units (owned and rented combined). One inhibitor of the economic recovery following the Great Recession is that household formation has proceeded at less than one-half of its normal rate since 2007, eliminating the growth in spending that accompanies it (Paciorek, 2013).[18] A decline in household formation is consistent with a delay in family formation, but it can also signal increased doubling up of individuals in shared housing who otherwise would have lived in separate units. The failure to increase occupancy of more housing units has its greatest impact on the construction industry, which tends to be sensitive to the business cycle.

Immigrants have accounted for roughly one-third of household formations during the last two decades. In the decade of 2000-2010, even though the pace of new immigrant arrivals was somewhat reduced, immigrants

---

[17]See http://www.census.gov/people/wealth/files/Wealth%20Highlights%202011%20Revised%207-3-14.pdf [November 2016].

[18]"This persistent weakness in the housing market has also contributed to the slow pace of the overall economic recovery. For example, the direct contribution of residential investment to annual GDP growth frequently reached 1 to 1.5 percentage points in recoveries prior to the mid-1980s. During the 3 years subsequent to the end of the recession in the second quarter of 2009, the contribution of residential investment to GDP averaged close to zero" (Paciorek, 2013, p. 2).

002642

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

still accounted for 32.6 percent of the nation's household formations, partly because native-born household formation was contracting (Myers and Pitkin, 2013). The children of immigrants—the second generation—also add to household formation and the demand for housing. A study by the Harvard Joint Center for Housing Studies used tabulations of 1994 and 2014 Current Population Survey data to estimate that second-generation immigrants accounted for the largest share of growth in households among the under-30 cohort during the last 20 years (Masnick, 2015).

The long-term effects of immigrants in the housing market have been documented in a series of studies. The ever-rising share of household growth (owners and renters combined) accounted for by immigrants in recent decades in turn contributed to the demand for homes. Masnick (2015) calculated that the immigrant share of all owner-occupied units increased from 6.8 percent in 1994 to 11.2 percent in 2014. The immigrant share of homeowner *growth* rose from 10.5 percent in the 1980s to 20.9 percent in the 1990s, then to 39.2 percent in the 2000s, and is projected to be 35.7 percent in the 2010s (Myers and Liu, 2005; Myers and Pitkin, 2013). The immigrant share of rental unit growth was 26.4 percent in the 1980s, 60.4 percent in the 1990s, and 31.7 percent in the 2000s; it is projected to be 26.4 percent in the 2010s. The unusually high immigrant share of rental unit growth in the 1990s is attributed to an upswing in immigration in that decade, combined with a downswing in the population growth of native-born young adults, due to the arrival in adult years of the undersized cohort known as Generation X (those born from the mid-1960s to the early 1980s). Similarly, the high share of homeowner growth in the 2000s attributed to immigrants stemmed from advancement of that relatively small native-born cohort into prime home-buying ages, combined with the advancement of immigrants from rental to home-owning status. In the current decade, native-born homeowners are continuing to lag, with immigrants again supplying a large share of the growth that upholds house values.

Immigrants from Asian countries are observed to have higher home-ownership rates than immigrants of Hispanic origin, and both rates have been lower than rates for other demographic groups, even after controlling for income (Alba and Logan, 1992; Coulson, 1999).[19] However, one of the strongest findings in the immigrant housing literature is that immigrants advance rapidly into homeownership the longer they reside in the United States, with especially steep gains among Hispanics, who start from lower levels (Myers and Lee, 1998). The research indicates that the gains for the

---

[19]Estimates based on the Current Population Survey Annual Social and Economic Supplement (IPUMS) indicate that homeownership rates (the number of owner-occupied housing units divided by the total number of occupied housing units) for Asian and Hispanic groups in 2010 were about 59 and 48 respectively, compared to around 68 for the nation as a whole.

Copyright National Academy of Sciences. All rights reserved.

housing market from new immigrant arrivals continue to increase for three decades after their arrival.

The discussion above suggests that immigration, like any increase in the population, has the potential to drive up an area's house prices because, at least in the short run, the supply of housing is relatively inelastic. This is beneficial for homeowners and those who derive income from renting out accommodations. For natives who do not already own homes, whether they plan to continue renting or aspire to eventually purchase a home, this represents an increase in the cost of living. Ottaviano and Peri (2005) and Saiz (2003, 2007) found that the price of housing in metropolitan areas was systematically positively correlated with immigration. Saiz (2003) found strong evidence that the Mariel Boatlift influx of immigrants had a pronounced impact on the Miami housing market for several years following the event. Using a difference-in-difference approach common to spatial wage studies (covered in Chapter 5), he found that the unexpected shock to housing demand caused short-run rental prices in Miami to increase by 8-11 percent more than those for comparable housing markets.

Studies of a more general set of U.S. metropolitan areas have also found this demand-driven impact on the price of housing services. Saiz (2007) estimated that an inflow of legal immigrants equal to 1 percent of the total population would be expected to lead to an increase of about 1 percent for both rents and housing values.[20] Ottaviano and Peri (2012) found the increase in housing prices from a similar event to be between 1.1 percent and 1.6 percent. Because immigrants tend to locate in cities with faster wage (and possible housing price) growth, analyzing local labor market impacts of immigration on native outcomes without controlling for city characteristics will bias estimates. Vigdor (2013) examined the contribution of immigrants in the creation of housing wealth in places like New York City, particularly in downtown neighborhoods, while also showing how prices have stabilized in Rust Belt cities. The study, conducted using county-level data spanning 1970 to 2010, found "the most pronounced impact of immigration on housing values was in thriving Sun Belt cities that remain affordable and in declining Rust Belt cities where immigration acts as a barrier against even greater declines in home values" (Vigdor, 2013).

It should be noted that data limitations make housing price studies difficult in part because most of the data used must be aggregated to at least the metropolitan-area level. If immigrants cluster in specific neighborhoods within metropolitan areas, then analyses using Decennial Census

---

[20]For the United States, Saiz (2007) and Saiz and Wachter (2011) found that immigration raises rents and housing values in destination cities, with population and rents rising in proportion. Within cities, the most immigrant-dense neighborhoods saw relatively slower price increases, an effect the authors attributed to native exits and increased urban-level segregation.

002644

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

data will dilute effects of immigration on housing prices because the data are aggregated for the entire metropolitan area. Thus, data that can be further disaggregated to the area of individual neighborhoods or smaller levels are needed to accurately assess the impact of immigration on housing. Saiz and Wachter (2011) used track-level data from the Decennial Census to show that, even in the presence of an overall positive relationship between housing values and in-migration at the metropolitan area level, a negative relationship often emerges at the neighborhood level. This observation is indicative that immigration may be inducing sorting across neighborhoods as opposed to across metropolitan areas (this sorting still has distributional consequences). Findings by Cascio and Lewis (2011) based on school district level data sources suggest that the negative relationship between in-migration to neighborhoods and housing values may be partly accounted for by parents' housing choices based on preferences regarding the ethnic composition of public schools.

## 6.5  THE ROLE OF IMMIGRATION IN LONG-RUN ECONOMIC GROWTH

As discussed in detail in Chapter 5, much of the research on the economic impact of immigration, such as that focusing on labor market effects, takes a somewhat short-run perspective. While these analyses typically distinguish time durations too short for firms to adjust capital from durations sufficient to allow such adjustments ("the long run"), the focus of the latter is still typically not on periods of history long enough to follow determinants of economic growth. So a further distinction must be made between analyses examining "long-run" changes in wages and employment (as "the long run" was defined for the purposes of Chapter 5) and analyses of the sources of *growth* in an economy. The latter are concerned with the impact of immigration on trends in GDP growth that unfold over decades, not years.

Solow (1956) famously devised a model in which growth in an economy's total output derives from accumulation of the factors of production.[21] As a nation's capital and labor inputs expand—and, crucially, technological progress occurs—economic growth is generated. Factor accumulation alone cannot sustain growth in per capita income; technological progress is needed to overcome diminishing marginal returns to variable factors of production. The contributions of expanding labor and capital are directly accounted for in the production function, while the effects of technological change enter as a residual. The growth in total output is thus

---

[21]Presentation of Solow's "neoclassical" growth model can be found in any good macroeconomic text such as Mankiw (2008). Bodvarsson and Van den Berg (2009) presented a graphical representation of the Solow model in the context of the economics of immigration.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2653 of 4699 PageID #:  5818

accounted for by the growth in the supply of inputs, subject to the depreciation rate of capital, and by growth in total factor productivity due to growth in technology—all determined exogenously.

As explored in detail in Chapters 4 and 5, this aggregate production function framework linking inputs to outputs is a foundational feature of much of the empirical literature measuring the effect of immigration on wages and employment;[22] it provides a method of combining workers of different skills in order to evaluate competitive effects as well as cross-skill complementary effects of immigrants on wages (Ottaviano and Peri, 2012). The structural model studies using the factor proportions approach reviewed in Chapter 5 largely follow Solow by assuming a constant elasticity of substitution baseline production function.

A shortcoming of early growth models was that, once an economy had accumulated a level of physical capital sufficient to meet needs dictated by the current production technology, any further economic growth was predicated on improving that technology, which was exogenously determined. More recent models have introduced investments in knowledge—for example, human capital and innovative activity—to provide a mechanism with which to account for economic growth within the processes modeled, in effect connecting growth to internal forces within the economy and thereby making it endogenous (with respect to that model). In essence, endogenous growth models start where the Solow-type growth model ends. With human capital or other knowledge recognized as critical and *controllable* factors, people's ideas and innovations become a component of technology that is subject to deliberate investment decisions; this treatment, in turn, allows the model to project self-sustaining and persistent long-term growth in both per capita and aggregate output.

Models such as those developed by Romer (1990) and Lucas (1988) shift the analytic emphasis from factor accumulation to increases in productivity by allowing the growth rate of technological progress to be determined within the system rather than exogenously. Barro (1991) and Mankiw et al. (1992) also refined empirical growth modeling by adding the concept of human capital—which includes the knowledge, skills, and experience possessed by individuals—as a factor of production. Since human capital is largely unobserved, Barro used level of academic achievement (education) as a proxy and found the variable to be statistically significant and positively related to economic growth over time. Similarly, Baumol (1993, pp. 259-260) concluded that ". . . so far as capital investment, education, and the like are concerned, one can best proceed by treating them

---

[22]For example, a nested, constant elasticity of substitution production function was used in Borjas and Katz (2007); Borjas et al. (1997); Card (2009); D'Amuri et al. (2010); Ottaviano and Peri (2012); and other studies.

002646

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

as *endogenous* variables in a sequential process—in other words, these variables affect productivity growth, but productivity growth, in turn, itself influences the value of these variables, after some lag. These endogenous influences are, then, critical components of a feedback process."

One motivation behind endogenous growth modeling is to reveal how human capital—specifically the generation of new ideas through research and development (R&D) that create new products and production processes—advances the technological frontier and translates into productivity gains (Lucas, 1988; Romer, 1990). Competition is also created among firms when entrepreneurs create businesses around new ideas (Aghion et al., 2009; Schumpeter, 1950). This reassessment of economic growth processes is potentially very important for characterizing the economic contributions of the foreign-born because immigrants bring with them, and acquire, levels of human capital that are different from those of the general population.

"Endogenizing" human capital into the growth model can allow for consideration, as discussed in Section 5.5, of how innovation and entrepreneurship injected into an economy by immigrants may alter total factor productivity and, in turn, long-term growth in economic output. Peri et al. (2014) found, for example, that STEM workers (foreign- and native-born) may have accounted for 30-50 percent of all U.S. productivity growth between 1990 and 2010. Within endogenous growth frameworks, immigration provides labor and human capital factor growth—the working-age population in countries like Germany and Japan would actually be shrinking (or, in the case of the latter, shrinking more) without it—as well as other forms of capital such as financial, social, and cultural capital. Skilled migrants especially may influence drivers of productivity such as entrepreneurship (discussed in Section 6.4), investment, and innovation (Section 5.5 provides support for this).

### The Main Ideas Underlying the Endogenous Growth Concept

The essence of endogenous growth theory is that the persistent and largely uninterrupted growth in per capita income in the United States and other developed economies over the past 170 years or so can be explained as the outcome of continuous investments in human capital and knowledge formation, or in direct innovative activity at the firm and industry levels, which serve as engines of advancement in total factor productivity and per capita income.[23] While the literature varies in terms of the way that the

---

[23]Though such growth is ordinarily accompanied by investment in and accumulation of physical capital as well, models that rely solely on the physical capital channel either cannot bring about sustained growth over long time periods or generate empirically implausible predictions.

002647

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

mechanics and motivating forces of this process are identified, all endogenous growth models share two basic characteristics. One is that the process can be self-sustaining because of continuing *investments* that individuals, families, and firms make in the formation of human capital and associated physical capital. The other is that the process is invariably aided by knowledge spillover effects[24] and related economies in the process of knowledge formation or technological innovations that bring about not just a self-sustaining *level* of productivity and (per capita) income, but a continuous *rate* of growth. Transitions from lower stages of economic development into regimes of continuous productivity growth occur endogenously within the economy through optimal allocation of productive resources into learning, education, basic science, and R&D, rather than exclusively through discrete technological breakthroughs that occur randomly and unpredictably in a way that is largely exogenous to the economy.

Innovation and knowledge formation occur not just through investments by the native population; they can be affected by immigration as well. While most of the theoretical literature on endogenous growth has so far been formulated in a closed-economy set-up, there is a fledgling strand, described below, that is exploring the relevance of immigration to knowledge formation in an open-economy setting. Skilled immigrants contribute to knowledge formation through their own acquired knowledge as well as via "diversity effects" in knowledge formation, as modeled in Ehrlich and Kim (2015).[25] As noted by Hanson (2012), the flow of innovation is constrained by the supply of talented scientists, engineers, and other technical personnel; immigration helps relax this constraint, both in theory and in practice:

> Each year, U.S. universities conduct a global talent search for the brightest minds to admit to their graduate programs. Increasingly, foreign students occupy the top spots in the search. Data from the National Science Foundation's Survey of Earned Doctorates show that between 1960 and the late 2000s, the share of PhDs awarded to foreign students rose from one fifth to three fourths in mathematics, computer science, and engineering; from

---

[24]Knowledge spillover effects are those that create impacts beyond the entity in which they occurred—for example, when knowledge or ideas accumulated by a specialized or geographically concentrated group of agents stimulate knowledge formation in others through interaction among agents within an organization or through transmission of knowledge across various communication and networking channels outside an organization.

[25]At a highly aggregated (national) level, Alesina et al. (2016, p. 101) found that greater diversity of the skilled workforce (defined by people's birthplaces) "relates positively to economic development (as measured by income and TFP [total factor productivity] per capita and patent intensity) even after controlling for ethno-linguistic and genetic fractionalization, geography, trade, education, institutions and origin-effects capturing income/productivity levels in the immigrants' home countries."

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

one fifth to three fifths in physical sciences; and from one fifth to one half in life sciences (Hanson, 2012, p. 26).

This process contributes to U.S. economic growth due to the fact that many foreign students stay after completing their schooling; for example, Finn et al. (2005) found that almost two-thirds of foreign-born students in science and engineering fields remained in the United States a decade after they earned their doctoral degree.

### Approaches to Modeling the Mechanics of Endogenous Growth

The two main approaches used to identify the engines of economic growth in this literature are the human-capital-based models and the R&D-based technology-production models. Models using either approach replace the assumption that the technology is exogenous with one in which the economy can grow endogenously through deliberate investments in infrastructure and basic science by individuals, private firms, and the government.

The human-capital-based approach focuses on investments in human knowledge, cognitive skills, and higher education, along with other determinants of human capital (fertility, health, population size). Individuals and families invest in their own or their offspring's learning capacity and knowledge formation.[26] Such knowledge production can lead to self-sustaining, long-term growth in total factor productivity and per capita income on the assumption that "knowledge is the only factor of production that is not subject to diminishing returns" (see Clark, 1923, p. 120).

The technology production approach focuses on technological innovations that are driven by profit-maximizing firms investing in R&D and competing over innovations that yield higher-quality products and production processes or greater variety and superior quality of new goods, innovations that lead to self-generating expansion in real output per capita and individual welfare.[27] This technology production is generally assumed to

---

[26]This may be motivated by economic, altruistic, and related intergenerational objectives. The literature following this approach includes the path-setting contributions by Lucas (1988), Becker et al. (1990), and other studies included in Ehrlich (1990), which were based on dynastic-type models of investment in general human capital and fertility. Further expansions by Ehrlich and Kim (2007), Ehrlich and Lui (1991), and Galor and Moav (2004) used overlapping-generations frameworks to identify the role of additional factors that motivate individuals and parents to invest in the education, skill, and health of their children as well as complementary factors of production that enhance human capital formation and economic growth.

[27]The literature following this approach, which includes Romer (1986, 1990) and Stokey (1988), emphasizes profits and rewards to innovators, as well as the market structure within which innovations are produced, as motivating forces influencing investment in innovation and growth.

Copyright National Academy of Sciences. All rights reserved.

be subject to economies of scale in R&D production. Even this literature, however, recognizes human capital formation as a critical factor that contributes to innovation.

The bulk of the endogenous growth model literature consists of closed-economy models, which means they do not account for trade and immigration. (The Technical Annex to this chapter, Section 6.8, illustrates the mechanics through which endogenous growth can occur in closed-economy models.) They do, however, emphasize the specific role higher education plays in the development process, essentially because tertiary education is more likely to contribute innovative ideas that enhance scientific and entrepreneurial innovations. Moreover, higher-skilled workers and inventors can generate knowledge spillover effects that enhance knowledge formation and the productivity of lower-skilled workers with whom they interact in production and job training. There is indeed a general recognition in both the literature on innovation and the endogenous growth literature that the processes of knowledge formation, innovation, and economic growth are enhanced not just by individuals' own educational investments but also by the spillover effects conferred by the interaction within and across different skill groups, and thus also by the average skill level and educational attainments in the population.

Beyond the closed-economy models, there is a nascent literature on endogenous growth that adopts an explicit or implicit open-economy setting that allows for the role of immigration in enhancing either R&D/new goods production or human capital formation. The product-innovation-based models of an open-economy focus on the potential contribution of immigrants to the scale of the labor force employed in the R&D sector of the economy through various channels. For example, Lundborg and Segerstrom (2000, 2002) developed two versions of an open-economy model with two trading countries (either "North-North" with two rich countries, or "North-South" with a rich and a poor country) in which self-sustaining growth occurs through continuous product innovation. Firms in both countries compete to become leaders in introducing improved quality products, which are then adopted by consumers in both countries through trade. Growth is measured in terms of real consumption or utility from quality product innovations. Since all products are available to consumers in both countries, both countries share the same growth rate.

The R&D production function in this "quality ladder" model is subject to scale economies, so the equilibrium rate of growth in consumer utility is determined by the size of the labor force engaged in R&D production. Immigration matters in these models simply because it increases population and labor force size. When immigration occurs, the productivity gains enjoyed by the receiving country are offset by productivity losses in the sending country. Where the countries have similar production technolo-

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

gies but different population endowments and wages, (as in Lundborg and Segerstrom, 2000), there are efficiency gains from workers migrating from the more populated to the less populated country. In Lundborg and Segerstrom (2002), where the North has superior R&D production technology and wages are initially higher, immigration is again treated as an exogenous variable that is determined through the imposition of quotas. In both cases, immigration leads to more efficient production and world output rises. However, immigration reduces the welfare of the receiving country's workers in the case where natives' wages fall.

Another example of an innovation-based model is from Drinkwater et al. (2007), who adopted a model with R&D production serving as the engine of growth. The economy in this model consists of three sectors producing ordinary manufacturing goods and R&D output consisting of blueprints for new varieties of goods. Unlike the Lundborg and Segerstrom (2000, 2002) models, this model recognizes two types of workers—skilled and unskilled—as well as physical capital, and employment in R&D is assumed to be relatively skill-intensive. Self-sustaining growth in income occurs as a result of external economies generated by the "density" of new product varieties: the ratio of new products relative to the economy's population, rather than population size itself. The authors call this density of new product varieties "knowledge capital."

The focus of the Drinkwater et al. study (2007) is on how immigration, treated as exogenous, affects the receiving country's long-term growth and the net benefit to natives in that country: the "immigration surplus." Calibrated simulation runs of the model indicate that if immigration involves exclusively high-skilled migrants, the growth rate of real income rises due to an increase in skill-intensive R&D activity. In contrast, the net real income benefits to natives were negative if immigration was exclusively low skilled. These results derived from simulations in which skilled labor and physical capital were assumed to be substitutes in production, but the same qualitative results were obtained in simulations where the two factors were modeled as complementary. The welfare implications remain the same when measured in utility terms, rather than real income terms, in the two illustrated cases in which immigrants were exclusively high skilled or low skilled.

The human-capital-based models focus on the channels through which human capital formation and migration contribute to growth. Zak et al. (2002) developed an overlapping-generations model in which growth is enabled through human capital formation. Children's human capital grows if parents choose to lower fertility, which varies as a function of household income. The economy may be in one of three possible development states: a "poverty trap," a "middle-income trap," or a balanced-growth equilibrium

002651

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

path.[28] The prospect of growth depends on the economy's initial distributions of human capital among natives and immigrants, its initial levels of physical capital, and its "political capacity." All inputs must be sufficiently above a threshold level to enable reaching the balanced growth path. Simulation runs using this model indicate that migration can enhance the level of the growth equilibrium path in the receiving economy only within specific bounds. If the migration inflow is sufficiently high or the human capital of immigrants relative to natives is sufficiently low, the development trajectory of an initially growing economy can reverse, starting a slide toward the poverty trap. But high-income receiving countries are more likely to benefit from a skill distribution of migrants that is skewed toward high levels of human capital. More generally, the model implies that, while skilled immigration can favorably affect the rate of convergence to a balanced growth path or the likelihood the latter occurs, it does not affect the economy's growth rate if the economy is already in a growth equilibrium.

Ehrlich and Kim (2015) added a new dimension to the human-capital-based endogenous growth model that allows for international labor mobility by treating the flow of immigrants and their skill composition, as well as human capital formation, income distribution, and economic growth, as endogenous variables. To this end, they pursue an open-economy model recognizing two interacting countries—destination and source—as well as two types of workers: skilled and unskilled. For analytical convenience, these workers are assumed to be employed exclusively in two sectors producing high tech and low tech consumer goods, respectively. The goods production functions exhibit constant returns to scale in effective labor hours, but they are also subject to external effects that are decreasing in the quantity of workers but increasing in the average worker's human capital due to workplace interactions among workers. The model recognizes both fertility and investment in human capital to be endogenous variables that are determined by parents within each skill type. To derive globally balanced growth equilibrium paths in both countries, the skilled and unskilled natives and immigrants are linked through spillover effects in knowledge production across skill group within each country, as well as across the same skill groups across the receiving and sending countries. The model offers theoretical propositions and supporting empirical evidence showing that a skill-biased technological shock (SBTS), can, for example, lead to a higher skill composition in the migration to receiving countries and that such induced migration can contribute to a higher balanced growth path of per capita income while also moderating the increase in the level of income inequality within receiving countries, both of which occur as a result of the SBTS. In an extended model, the authors allow human capital formation

---

[28]As in Becker et al. (1990).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

to also benefit from "diversity effects" due to complementarities between immigrants and natives in knowledge production.

### Empirical Evidence of the Role of Human Capital in Migration and Growth

The treatment of immigration flows and the skill distribution of natives and immigrants as exogenous variables is common to the above-described endogenous growth literature. The work by Ehrlich and Kim (2015) differs in that it treats both the growth prospect and the distributions of skill types and human capital attainments in receiving and sending countries and among immigrants as endogenous outcomes of underlying exogenous parameters, including those affecting the production and transmission of knowledge and the costs of parental investments in the quantity and human capital attainments of children. The model can therefore offer testable implications about the impact of changes in the volume and skill distribution of migration flows and population shares, as well as the impact of these changes on the global economy's balanced growth path.

A plausible scenario in Ehrlich and Kim (2015) that leads to testable implications is one in which a skill-biased technological advance occurs either in just the receiving country or in both the receiving and sending countries simultaneously. A real-world example is the information technology revolution that started in the 1970s, became widely spread around the world in the following decades, and is still continuing. Analytical considerations and calibrated numerical simulation in Ehrlich and Kim (2015) imply that such technological advances generate a higher rate of human capital formation and full-income growth, as well as a generally *rising* level and share of skilled migrants relative to both the migrant and native populations in the receiving countries.

The latter implications have been tested against data from two international panels reporting the skill composition of migrant populations, indicated by college educational attainments: (1) a World Bank panel assembled by Schiff and Sjoblom (2008), including data on the 6 major receiving countries of immigration from 190 sending countries over the period 1975-2000; and (2) a 2013 panel assembled by the Institute for Employment Research, Nuremberg, Germany, (Institut für Arbeitsmarkt- und Berufsforschung, IAB), which contains data on the same receiving countries over the period 1980-2010. Both panels use aggregate census data on immigration assembled by each of the receiving countries. The metric for high skill employed in these panels is having "at least some tertiary education" (13-plus years of schooling).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Regression analysis conducted by Ehrlich and Kim (2015) based on the World Bank data for five of the six major receiving countries[29]—Australia, Canada, France, the United Kingdom, and the United States—indicates that the high-skilled component of net migrant flows from the 190 sending countries has indeed been continually rising over the entire sample period.[30] Detailed raw data from both the World Bank and IAB panels confirm this pattern for each of the receiving countries. Moreover, while the native-born populations in the five receiving countries have experienced a rising trend in the same skill composition measures over the same period, the rise in the skill level of migrant populations has exceeded that in the native-born populations for most of them.

These findings from the World Bank and IAB panels are corroborated by more recent and detailed data from the U.S. Census Bureau. As Table 6-1 indicates, the percentage of the foreign-born population in the United States with bachelor and higher degrees has been generally rising by year of entry of immigrants even before 1970. For those entering the United States over that table's most recent period (2000-2012), the percentage of immigrants with a college degree or higher (32.9%) exceeds that of the native population in 2012 (31.3%, as shown in Table 6-2). As Table 6-2 also shows, in 2012 the percentages of Asian and European immigrants with bachelor and higher degrees were substantially higher than the percentage of the native-born population, while the percentages of Latin American (all) and Mexican immigrants with bachelor and higher degrees were substantially lower. A similar trend is found using Decennial Census data assembled by Smith (2014b) for the *average* years of schooling over an even longer period: 1940-2010 (see Table 6-3). By this measure, while the average years of schooling of all foreign-born entrants is still below that of natives in 2010, the gap has been narrowing over time, with Asian and European migrants' average years of schooling again exceeding that of the native-born population.

### The Immigration Surplus in Endogenous Growth Models

The endogenous growth paradigm, which focuses on the long-term dynamic implications of immigration, also offers new insights concerning the measurement of the net economic costs and benefits to natives associated with immigration—what the literature has often termed the "immi-

---

[29]The sixth country, Germany, was excluded due to absence of relevant time series data for a reunified Germany prior to 1990.

[30]This pattern was derived from fixed effects models regressing *changes* in migrant population stocks on GDP (in cubic transformation) in destination countries, GDP in source countries, and other standard correlates.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

gration surplus." The standard approach for measuring the immigration surplus is based on a static framework in which the capital stock is a given constant, production of output is subject to constant returns to scale, and the economy is competitive. The surplus is then assessed as the difference between the increased output, which by definition is equal to the income of all natives in the economy (workers and owners of capital) resulting from migration, and the reduced labor wages of native workers brought about by the increased labor supply due to migration (see the simple models described in Chapter 4). Variations in this standard approach include allowances for different labor skills and possible discrete shifts in the economy's capital stock that may accompany the migration increase. The immigration surplus thus measured is positive, but small—typically less than 1 percent of GDP (see Borjas, 1995b, and Chapter 4).

The difference between the measures of the conventional immigration surplus generated in static models or in dynamic models with exogenously determined growth and those based on the endogenous growth paradigms is that the latter account for the way immigration interacts with the economy's human capital formation and self-sustaining growth. While it may seem that, by comparison, the measures derived in an endogenous growth context would always result in larger positive magnitudes than the static measures, the literature surveyed below indicates that this is not necessarily the case. Indeed, two of the studies—Drinkwater et al. (2003) and Ehrlich and Kim (2015)—computed the immigration surplus using numerical simulations and found that the estimates can be either larger or smaller than those derived under static conditions, depending on assumptions regarding the mix of high- versus low-skilled immigrants.

The Drinkwater et al. (2003) study provides estimates of the immigration surplus using both a baseline model, where no complementarities between skilled labor and physical capital are assumed, and an alternative model where such complementarities are allowed (the results for the alternative model are shown in parentheses below). If migration is restricted to include exclusively high-skilled migrants, it can result in a dynamic immigration surplus as high as a 3.6 percent (4.3%) increase in the steady-state consumption equivalent for a representative household in the destination country, compared to as low as a 0.33 percent (0.55%) increase in the static case. In contrast, if immigration is restricted exclusively to unskilled migrants, the dynamic immigration surplus becomes negative—as low as –3.5 percent (–4.0%) of the consumption equivalent of the representative household, as opposed to a positive level of 0.18 percent (0.04%) in the static case. Each skill group in the destination country gains less than the representative household when immigration is exclusively by the same skill group, but the change affects more heavily the unskilled group in both the dynamic and static cases. The immigrant surplus magnitudes of

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 6-1** Educational Attainment as of 2012 of the Foreign-born Population (in thousands), Ages 25 and Older, by Year of Entry

| Population (total or by degree attainment) | Total | | Year of Entry 2000 or later | |
|---|---|---|---|---|
| | Number | % | Number | % |
| Total Population | 34,162 | **100.0** | 10,609 | **100.0** |
| High School and Above | 24,477 | **71.7** | 7,607 | **71.1** |
| Bachelor's and Above | 9,943 | **29.1** | 3,491 | **32.9** |
| Master's and Above | 3,826 | **11.2** | 1,450 | **13.7** |
| Doctorate | 686 | **2.0** | 270 | **2.5** |

NOTE: In 2012, the percentages of the native population that had attained high school and above, bachelor's and above, master's and above, and doctorate were 90.9%, 31.3%, 11.1%, and 1.5%, respectively.
SOURCE: U.S. Census Bureau, Current Population Survey, Annual Social and Economic. Supplement, 2012, Table 2.5. Available: https://www.census.gov/data/tables/2012/demo/foreign-born/cps-2012.html [May 2017].

**TABLE 6-2** Educational Attainment as of 2012 of the U.S. Foreign-born and Native-born Populations (in thousands), Ages 25 and Older, by World Region of Birth

| Population (total or by degree attainment) | Total Foreign-Born | | Natives | |
|---|---|---|---|---|
| | Number | % | Number | % |
| Total | 34,162 | **100.0** | 170,418 | **100.0** |
| High School and Above | 24,477 | **71.7** | 154,826 | **90.9** |
| Bachelor's and Above | 9,943 | **29.1** | 53,348 | **31.3** |
| Master's and Above | 3,826 | **11.2** | 18,904 | **11.1** |
| Doctorate | 686 | **2.0** | 2,492 | **1.5** |

SOURCE: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2012, Table 2.5. Available: https://www.census.gov/data/tables/2012/demo/foreign-born/cps-2012.html [May 2017].

002656

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| 1990-1999 | | 1980-1989 | | 1970-1979 | | Before 1970 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Number | % | Number | % | Number | % | Number | % |
| 9,546 | 100.0 | 7,027 | 100.0 | 3,867 | 100.0 | 3,112 | 100.0 |
| 6,747 | 70.7 | 4,921 | 70.0 | 826.0 | 73.1 | 2,376 | 76.3 |
| 2,665 | 27.9 | 1,943 | 27.7 | 1,078 | 27.9 | 766 | 24.6 |
| 1,008 | 10.6 | 665 | 9.5 | 390 | 10.1 | 314 | 10.1 |
| 158 | 1.7 | 129 | 1.8 | 68 | 1.8 | 61 | 2.0 |

World Region of Birth

| Asia | | Europe | | Latin America | | | | Other | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | All | | Mexico | | | |
| Number | % | Number | % | Number | % | Number | % | Number | % |
| 9,823 | 100.0 | 4,075 | 100.0 | 17,971 | 100.0 | 9,881 | 100.0 | 2,292 | 100.0 |
| 8,595 | 87.5 | 3,675 | 90.2 | 10,118 | 56.3 | 4,215 | 42.7 | 2,089 | 91.1 |
| 4,939 | 50.3 | 1,688 | 41.4 | 2,314 | 12.9 | 593 | 6.0 | 1,002 | 43.7 |
| 2,027 | 20.6 | 715 | 17.5 | 684 | 3.8 | 144 | 1.5 | 401 | 17.5 |
| 387 | 3.9 | 152 | 3.7 | 77 | 0.4 | 13 | 0.1 | 71 | 3.1 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

310

TABLE 6-3 Mean Years of Schooling of U.S.-born Versus All and Recent Foreign-born Immigrant Populations by World Region of Birth

| Population by Birth Origin and Years in U.S. (for foreign-born) | 2010 | 2002 | 1996 | 1990 | 1980 | 1970 | 1960 | 1950 | 1940 |
|---|---|---|---|---|---|---|---|---|---|
| All U.S.-born | 13.59 | 13.31 | 12.99 | 12.61 | 11.78 | 10.84 | 10.01 | 9.43 | 8.77 |
| All foreign-born | 12.27 | 12.00 | 11.51 | 11.31 | 10.59 | 8.97 | 7.74 | 7.46 | 6.68 |
| 1-5 years in U.S. | 12.53 | 12.32 | 11.73 | 11.65 | 11.25 | 10.36 | 9.95 | NA | 8.90 |
| Foreign-born, Asian | 14.22 | 13.96 | 13.28 | 12.94 | 13.17 | 11.32 | 8.37 | 7.24 | 7.76 |
| 1-5 years in U.S., Asian | 14.07 | 14.73 | 13.13 | 12.90 | 12.50 | 13.46 | 12.08 | NA | 10.44 |
| Foreign-born, European | 13.89 | 13.58 | 12.89 | 11.94 | 10.29 | 8.99 | 7.83 | 7.39 | 6.74 |
| 1-5 years in U.S., European | 14.05 | 14.61 | 14.65 | 13.63 | 12.11 | 10.35 | 10.32 | NA | 8.95 |
| Foreign-born, Hispanic | 10.39 | 9.81 | 9.27 | 9.23 | 8.91 | 7.91 | 5.99 | 5.79 | 4.71 |
| 1-5 years in U.S., Hispanic | 10.33 | 9.84 | 8.41 | 9.14 | 8.26 | 8.40 | 7.23 | NA | 7.25 |
| Foreign-born, Mexican | 9.51 | 8.66 | 7.93 | 7.71 | 6.74 | 5.59 | 4.39 | 4.53 | 3.97 |
| 1-5 years in U.S., Mexican | 9.56 | 8.53 | 7.52 | 7.83 | 6.33 | 5.93 | 4.58 | NA | 6.06 |

SOURCE: Smith (2014b, Table 4.3); based on Decennial Census data, 1940-1990, and March Current Population Survey for 1996-2000.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the opposite effects become even larger when the Drinkwater et al. (2003) simulations allow for a complementary relation between skilled labor and physical capital (the corresponding percentage changes are shown by the parenthetical figures above).

In the Ehrlich and Kim (2015) benchmark model, the immigration surplus generated by the endogenous increase in immigration is also found to be higher for the average household of natives in the destination country, but it reflects opposite net gains to skilled and unskilled native households (thus generating distributional effects similar to those derived in Drinkwater et al., 2007). Skilled households gain less than the average household and unskilled households gain more. Specifically, in the Ehrlich and Kim model, the percentage change in the full income per capita (FIPC) experienced by natives in the destination country following a SBTS is measured using two scenarios: (a) when the skill composition of immigrants at the destination country is free to adjust following the SBTS, and (b) when the skill composition is confined by an immigration policy restricting it to remain fixed at its initial equilibrium steady state. The percentage difference in the natives' FIPC in scenario (a) versus (b) accounts for the net benefits from the *unrestricted migration* scenario relative to the *restricted migration* scenario, which in this model is the immigration surplus. Ehrlich and Kim estimated this immigration surplus to be 1.48 percent of the natives' FIPC at the end of a 15-generations period, which is equivalent to a modest 0.003 percentage point gain in the average annual growth rate of FIPC over that period. This long period is selected for illustration as it approximates the period over which the economy approaches a new steady state. Note, however, that the rise in the FIPC under these conditions, as well as under the conditions of the simulations reported below, already appears after the first generation following the SBTS and continues over the entire transition phase leading to a new steady state.[31]

Ehrlich and Kim (2015) also simulated the immigration surplus under two alternative scenarios: (a) when the skill composition of immigrants is freely determined in an initial equilibrium steady state at the destination country, and (b) when the destination country *disallows altogether* the migration of either skilled or unskilled migrants. Here, if skilled migration is disallowed, the difference in FIPC between the unrestricted and restricted

---

[31]Tables 3 and 4 in Ehrlich and Kim (2015) illustrate the magnitudes of the immigration surplus over 5 and 10 generations, as well as the 15-generation period. It is interesting that the *percentage* changes in the natives' initial FIPC in the generations immediately following the SBTS are estimated to be slightly higher than those after 15 years. But the immigration surplus thus measured is "partial": it captures the net benefits from *additional* unrestricted immigration following an SBTS, starting from positive values, rather than *zero* values of skilled and unskilled migration following the SBTS. The latter are captured by the estimates based on the alternative scenarios in the following paragraphs.

002659

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

immigration scenarios is significantly more pronounced in the benchmark case, where it amounts to a cumulative gain in the natives' initial FIPC of 79.8 percent after 15 generations, equivalent to a 0.376 percentage point gain in the average annual growth rate of FIPC in the unrestricted immigration scenario relative to the restricted immigration scenario over this period. However, the opposite outcome occurs when the destination country disallows any unskilled migration. In this case, natives experience a *gain* of 33.0 percent in FIPC in the restricted immigration scenario relative to the unrestricted scenario (i.e., an immigration surplus of –33.0%) after a period of 15 generations, or a change in the average annual growth rate of FIPC of –0.058 percentage points per annum over this period.

Larger estimates of the immigration surplus are computed in Ehrlich and Kim's (2015) extended model, which allows for positive complementarities or "diversity effects" in knowledge production across natives and immigrants of the same skill group. For example, the immigration surplus in the case where *all* migration is disallowed in the destination country amounts to a persistent gain of 0.593 percent in the annual growth rate of FIPC after a 15-generations period.

Bear in mind that all the immigration surplus estimates reviewed in this section are theoretical and subject to limiting assumptions. They do indicate, however, that the long-term dynamic immigration surplus could far exceed its estimates based on static models, both on the up side and the down side. This realization opens up opportunities for immigration policies that could enhance the benefits of migration to both destination and source countries.

## 6.6 BEYOND GDP—NONMARKET GOODS AND SERVICES AND THE INFORMAL ECONOMY

Immigrants, like their native-born counterparts, also contribute to the economy in ways that are not, or at least not fully, captured by market-based economic statistics such as GDP and employment rates.[32] Much labor used in the provision of health, child, and elder care for family members or friends, for example, goes undetected in official statistics, as a substantial

---

[32]Becker (1991) observed that extensive, economically valuable work—from care activities to home maintenance—goes on inside the family but is largely unrecognized in conventional measures of economic output. The National Research Council (2005) report *Beyond the Market* explores in great detail methods for accounting for nonmarket economic activities in the areas of household production, investment in education, investment in health, selected government and nonprofit sector activities, and environmental assets and services.

002660

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

amount of that valued activity is nonmarket in nature.[33] Immigrant women play a particularly important role in housework and child care, whether done for their own families, working in informal arrangements (which may be market or nonmarket based) for others, or in formal employment. Female participation rates of immigrants in market work are on average lower than for native-born females, indicating that they may be engaged in more nonmarket production. Also, immigrants more often live "doubled up" or in extended family situations, raising the possibility of greater non-market production or a shifting of who is doing it (e.g., grandma watches the kids while mom works) relative to nonimmigrant households where child care and other services are more likely to be purchased in the market.

Because home-produced services do not involve market transactions, some of the economic benefits of family-based immigration policies may be underestimated or overlooked by conventional economic statistics. However, the American Time Use Survey has allowed researchers to begin examining immigrant-native differences in nonmarket work. Ribar (2012) provided a broad overview of immigrant time use, using data from this survey. His study confirmed that immigrant women in his dataset devoted more time to household production (caregiving and housework) than native-born women. He also found that they spent more time sleeping. Immigrant men spent more time in market work and less time performing housework, community activities, and leisure than did native-born men.[34] Vargas (2016) found that results vary considerably by country of origin, but over time, immigrant time use becomes more like that of natives.

Alesina and Giuliano (2007) examined time use patterns as well and found that, relative to population averages, strong family ties[35] are associated with a higher number of hours spent in home production and lower labor force participation of women, as well as less reliance on the government for social insurance. Abrams (2013) discussed easy to overlook (and difficult to measure) benefits of family-based immigration policy and assessed the role of immigrants who may not participate in wage-paying labor but who nonetheless contribute in economically valuable ways by providing "unpaid care work in the homes of relatives who are participat-

---

[33]A common illustrative example is an individual who marries his/her housekeeper. If the housekeeper's wife/husband continues to clean the house, GDP decreases, even though the amount of economic activity remains the same.

[34]Some of the redistribution of time for immigrants relative to natives may be attributable to the need of the former to engage in assimilation-related activities that are costly and take time; Hamermesh and Trejo (2013) explored this issue.

[35]Strength of family ties is scored based on responses by individuals across 81 countries from the World Value Survey regarding "the role of the family and the love and respect that children are expected to have for their parents."

Copyright National Academy of Sciences. All rights reserved.

ing in market labor, sometimes even making such market participation possible" (Abrams, 2013, p. 21).

Nonmarket activities in the sphere of home production are different from labor that takes place outside the household where immigrants are paid but their compensation is not reported through official channels. Low-skilled immigrants work in a range of sectors where their labor is more likely to be "off the books" and hence untaxed. Occupations for which this may be true (but not always) include house cleaning and babysitting services, home repair, landscaping, and many others.[36]

As noted by Bohn and Owens (2012), informal sector employment—defined in their analysis as paid work that would have been taxable if it had been reported to the tax authorities—is thought to be large and growing. Bohn and Lofstrom (2013) found self-employed, "likely unauthorized" men to be especially concentrated in a handful of industries and occupations—about 46 percent of this group worked in construction while another 17 percent worked in landscaping.[37] Much unreported work, but not all, takes place in "markets" and shows up in GDP. Studies of employment arrangements estimate that over half of the unauthorized immigrants in the United States pay income and payroll taxes through employers withholding from their paychecks or by the immigrants filing tax returns (Congressional Budget Office, 2007).

Some work that takes place informally does so without employment protections, health insurance, Social Security, and other worker benefits. Unregulated work is often connected to immigration through the growth of ethnic economies and because some immigrants lack documentation to work legally in the United States. Across states and over time, there is a relationship between the sizes of informal economies and changing rules and processes for immigrants to attain legal status; enforcement is also a factor. Bernhardt et al. (2009)[38] presented evidence from qualitative fieldwork and the 2008 Unregulated Work Survey about how unauthorized status can play out in the workplace and its correlation with higher rates of

[36]Haskins (2010) reviewed the literature examining reasons why tax evasion is prevalent, using analysis of Internal Revenue Service data plus qualitative interviews with Filipina nannies in the Washington, D.C., area.

[37]Bohn and Owens (2012) found that states with high concentrations of low-skilled male immigrants have higher levels of informal employment in the landscaping industry. Measuring informal work is difficult and requires case studies and specialized surveys (e.g., the National Day Labor Survey). Bohn and Owens used a residual method to estimate informal work in landscaping and other occupations. For construction, the residual was based on a total employment estimate based on "unofficial data"—for example, based on building permits and other information, minus a count of documented workers captured in  an "official" source such as the BLS's Quarterly Census of Employment and Wages for residential construction.

[38]See http://www.nelp.org/content/uploads/2015/03/BrokenLawsReport2009.pdf [November 2016].

002662

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

unemployment and labor law violations, including paying below-minimum wages.[39] In addition to the potential for worker abuse, injury, and exploitation, another secondary economic effect of informal, unreported work is that employers may prefer immigrants to competing native workers when only the immigrants can be employed under arrangements in which payroll taxes are ignored and labor regulations are not observed.

Even in the context of formal labor markets, there is some evidence that immigrants are more likely to hold jobs characterized by poor working conditions or high risk than are natives. Based on individual-level data from the 2003-2005 American Community Survey and from the BLS, Orrenius and Zavodny (2009) found that foreign-born workers were employed in more dangerous jobs than were U.S.-born workers, "partly due to differences in average characteristics, such as immigrants' lower English-language ability and educational attainment" (Orrenius and Zavodny, 2009, p. 535).

Informal work arrangements also carry fiscal implications when wages are not taxed or if the amount of wages taxed is smaller than it should be. A study of Los Angeles County by Flaming et al. (2005) indicated the substantial role of informal workers in the local economy: 679,000 in 2004, or roughly 15 percent of the county's labor force. The report estimated that the informal economy in Los Angeles County generated an $8.1 billion payroll in 2004, which translated into a $1 billion reduction in Social Security taxes that would have been paid by employers and workers if it were formal work.[40] Flaming et al. (2005) estimated that Medicare taxes paid by employers and workers were reduced by $236 million for that year; California State Disability Insurance payments paid by workers were reduced by $96 million; unemployment insurance payments paid by employers were reduced by $220 million; and Workers Compensation Insurance payments paid by employers were reduced by $513 million. These estimates illustrate that, since wage transactions in the informal sector are not always taxed, the fiscal impact is negative (relative to equivalent taxed work). Although not all informal work is performed by unauthorized immigrants, and a minority of unauthorized immigrants are engaged in off-the-books employment, legalization of unauthorized immigrants would likely result in a reduction of untaxed labor in the informal market.

The overall impact of the informal economy on jobs, production, tax-paying status, and fiscal consequences is not a thoroughly studied topic.

---

[39]Surveying unauthorized workers and hard-to-sample groups (where there is no sampling frame) often requires innovative methods such as respondent-driven sampling, which also means the data are not necessarily representative.

[40]A considerable amount of money—estimated to be in billions of dollars—is also paid into the Social Security system that is associated with faulty Social Security numbers or Individual Taxpayer Identification Numbers. A rapid growth in the Social Security Earning Suspense File affects Social Security Trust Fund balances and, in turn, program costs and fiscal projections.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

However it does appear that state-level immigration laws can play a role in pushing people off the books. Bohn and Lofstrom (2013) addressed the employment effects of state legislation on employment outcomes of low-skilled, unauthorized workers. Analyzing the impact of the 2007 Legal Arizona Workers Act—which allows the state to suspend or revoke the business licenses of employers found to have knowingly hired unauthorized workers—they found a lower probability of wage and salary employment and a higher rate of self-employment among this group. The size of the gray/underground economy may have been put on a different course after the September 11, 2001, terrorist attacks with changed laws and enforcement protocols; it is now also more difficult to get Social Security numbers, which, for example, are needed to work in many jobs.

There are many are other nonmarket impacts created by immigration, sometimes negative but often positive. These issues are not dealt with in any detail in this report, but they are covered elsewhere: The impact of immigration on population health, crime (Castañeda et al., 2015; National Academies of Sciences, Engineering, and Medicine, 2015), and subjective well-being of individuals (Polgreen and Simpson, 2011) are just a few examples. Also, *The New Americans* (National Research Council, 1997, pp. 98-99) discussed how immigration contributes to population growth and congestion in destination countries, which places demands on the environment and infrastructure. However, that report also notes that immigration is primarily distributive, since an immigrant is leaving one place (relieving congestion) and moving to another (adding to congestion).

## 6.7 CONCLUSIONS

**The economic impact of immigration extends well beyond the wage and employment interactions reviewed in Chapter 5.** With so much focus in the literature on the labor market (and much of this, on the short run), other critical issues—such as the role of immigrants in contributing to aggregate demand, in affecting prices faced by consumers, or as catalysts of long-run economic growth—are sometimes overlooked by researchers and in the policy debates. In fact, by construction, many of the labor market analyses reviewed in Chapter 5 net out the kinds of economic effects that have been discussed in this chapter, many of which are positive, in order to identify direct, short-run wage and employment impacts.

**The contributions of immigrants to the labor force reduce the prices of some goods and services, which benefits consumers in a range of sectors including child care, food preparation, house cleaning and repair, and construction.** Moreover, new arrivals and their descendants also provide a major source of demand in sectors such as housing, benefiting residential real estate markets. To the extent that immigrants flow disproportionately

002664

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

to where wages are rising and local labor demand is strongest, **they help equalize wage growth geographically, making labor markets more efficient and lowering slack.**

**Immigration also contributes to the nation's economic growth.** Most obviously, immigration supplies workers, which increases GDP and has helped the United States avoid the fate of stagnant economies created by purely demographic forces—in particular, an aging (and, in the case of Japan, a shrinking) workforce. Perhaps even more important than the contribution to labor supply **is the infusion by high-skilled immigration of human capital that has boosted the nation's capacity for innovation and technological change. The contribution of immigrants to human and physical capital formation, entrepreneurship, and innovation are essential to long-run sustained economic growth.** Innovation carried out by immigrants also has the potential to increase the productivity of natives, very likely raising economic growth per capita. In short, **the prospects for long-run economic growth in the United States would be considerably dimmed without the contributions of high-skilled immigrants.**

In Part III of this report (Chapters 7 through 10), the panel turns to another key component of immigration that must be considered alongside labor market and other economic impacts in order for policy assessment to be comprehensive: the fiscal impact created by the new arrivals.

## 6.8 TECHNICAL ANNEX ON MODELS OF ENDOGENOUS GROWTH IN A CLOSED ECONOMY

The basic mechanism through which endogenous growth occurs can be illustrated using human-capital-based models. The perception of human capital or human knowledge as the economy's engine of growth stems from a wide agreement in economics that knowledge is the major force affecting productivity growth and the only reproducible economic asset that is not subject to diminishing returns (paraphrasing Clark, 1923). This thesis can be supported by examining the critical role played by the accumulated stock of past knowledge in transmitting and facilitating the acquisition of new knowledge, which offsets any diminishing returns from investment in the latter. In Lucas (1988), this process operates implicitly because the investor (or productive enterprise) is infinitely lived. In the Becker et al. (1990) dynastic model and in the Ehrlich and Lui (1991) overlapping generations model, knowledge formation occurs through the transfer of knowledge from finitely lived young parents to offspring via the following human capital production function:

$$(1)\ H_{t+1} = A\ (H^e + H_t)\ (b_t)^\alpha$$

002665

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

where $H_t$ and $H_{t+1}$ measure the human capital acquired by the parent generation (t) and the offspring (t + 1), $H^e$ denotes an endowed productive capacity measured in units of human capital; $A$ denotes the technology of knowledge transmission from the parent generation to that of the offspring; and $h_t$ is the share of total productive capacity, $(H^e + H_t)$, or "full income" that young parents devote to promote the acquisition of human capital by their kids. (For simplicity, total productive capacity can be assumed to equal full income if human capital is taken to be the only asset underlying the production of goods and has a neutral effect on the productivity of labor and capital, and thus on the capital/labor ratio.) While the investment share of full income $h_t$ can be subject to diminishing returns (if $\alpha < 1$) with no loss of generality, the stock of new human capital, $H_{t+1}$, is assumed to be linearly related to old human capital, $H_t$, consistent with Clark's assumption that human capital as a productive asset is not subject to diminishing returns. The contribution, $h_t$, of the parent generation to the acquisition of future knowledge, $H_{t+1}$, is thus seen as the sine qua non for innovation and technological advance.

The assumed production function illustrates the role of intergenerational spillover effects in achieving the growth of innovative human capital. Absent any link between the generations, human capital would be essentially stagnant. But, by this formulation, whether innovative production capacity can actually grow over time crucially depends on the size of investment in new knowledge capital chosen by generation $t$. This can be illustrated as follows: if $\alpha = 1$ and the value of $h_t$ is assumed to be a constant fraction of total production capacity $h^*$ that can generate a continuous growth in future production capacity, then by equation (1), the growth evolution equation would be:

$$(2)\quad (H^e + H_{t+1})/(H^e + H_t) \equiv (1 + g_t) = Ah^* + [H^e/(H^e + H_t)]$$

which implies that if $t$ approaches an infinite value, the last term in equation (2) will disappear and the growth rate of full income will be given by the term $Ah^*$. This term indicates that a steady state of continuous growth in total productive capacity, i.e., $g > 0$ in equation (2), can be attained only if investment in human capital, $h^*$ reaches a threshold level $h^* > 1/A$. By contrast, a value of $h^* \leq 1/A$ can be shown to yield a stagnant equilibrium.[41]

The equilibrium steady state of long-term growth, $g^* > 0$, is thus essentially a function of the optimal investment parents choose to make in the human capital of their children, $h^*$. The conditions that determine this

---

[41]The solution of the difference equation (1) is given by:
$H^e + H_t = (Ah^*)^t[H(0) + H^e] + [(Ah^*)^t - 1]H^e/(Ah^* - 1)$. Thus, growth can occur if and only if $Ah^* > 1$. If $Ah^* < 0$, e.g., $H^e + H_t = H^e/(1 - Ah^*)$.

002666

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

level are a function not just of the technology of knowledge production and transfer but also of the altruistic preferences of parents and the relative costs motivating them to choose between quantity and quality of children and their own consumption, as well as the financing constraints limiting their ability to invest.

002667

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2675 of 4699 PageID #:  5840

The Economic and Fiscal Consequences of Immigration

002668

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# PART III

# FISCAL IMPACTS

002669

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002670

Copyright National Academy of Sciences. All rights reserved.

7

# Estimating the Fiscal Impacts of Immigration—Conceptual Issues

## 7.1 INTRODUCTION

In formulating immigration policy, information about the impact of immigration on public finances is crucial. Along with the impact on wages and employment (see Chapters 4 and 5), the per capita impact on taxes and program expenditures is the other factor determining the extent to which immigrants are or will be net economic contributors to the nation. *The New Americans* (National Research Council, 1997, p. 225) identifies two other reasons why estimates of current and long-run fiscal impacts are important to policy: First (as discussed in Section 7.5 below), immigration may create taxpayer inequities across states and local areas; specifically, regions that receive disproportionate shares of immigrants may incur higher short-run fiscal burdens if the new arrivals initially contribute less in revenues than they receive in public services. Second, projections of the consumption of public services and payment of taxes over time are essential in order to predict "the full consequences of admitting additional immigrants into the United States." This chapter discusses the conceptual issues that arise when estimating the fiscal impacts of immigration, recognizing that it is a complex calculation dependent to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. In so doing, the discussion here provides a foundation for the empirical analyses conducted by the panel and reported on in Chapters 8 and 9.

Understanding of the fiscal consequences of immigration has often been clouded because much of the research is conducted by policy-focused

*323*

002671

Copyright National Academy of Sciences. All rights reserved.

groups that tailor the assumptions to support one position over another. As described by Vargas-Silva (2013, p. 1), "Most of these organizations have a set agenda in favour or against increased immigration. Unsurprisingly, those organizations with a favourable view of immigration tend to find that immigrants make a positive contribution to public finances, while those campaigning for reduced immigration tend to find the contrary." The partisan nature of the policy debate notwithstanding, careful estimates based on defensible methodologies are possible. *The New Americans*, a pioneering effort in this respect, included a detailed discussion of methodological considerations that is still highly relevant (National Research Council, 1997). That volume, along with more recent studies, such as Auerbach and Oreopoulos (1999), Dustmann and Frattini (2014), Preston (2013), Rowthorn (2008), Storesletten (2003), and Vargas-Silva (2013), significantly advanced the conceptual framework for thinking about fiscal impacts, making the task much easier now than it was at the time that *The New Americans* was written.[1]

The first-order *net fiscal impact* of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. However, a comprehensive accounting of fiscal impacts is more complicated. Beyond the taxes they pay and the programs they use themselves, the flow of foreign-born also affects the fiscal equation for many natives as well, at least indirectly through labor and capital markets. Because new additions to the workforce may increase or decrease the wages or employment probabilities of the resident population, the impact on income tax revenues from immigrant contributions may be only part of the picture. Revenues generated from natives who have benefited from economic growth and job creation attributable to immigrant innovators or entrepreneurs would also have to be included in a comprehensive evaluation, as would indirect impacts on property, sales, and other taxes and on per capita costs of the provision of public goods.

Additionally, the full fiscal impact attributable to a given immigrant or immigration episode is only realized over many years. As shown in Figure 7-1, albeit with cross-sectional data, the distribution of individuals along the life cycle displays systematically different tax contribution and program expenditure combinations. For example, the child of an immigrant—as with the child of a native-born person—is likely to absorb resources early in life (most notably due to the costs of public education) and therefore is likely

---

[1] Referencing this literature affords the opportunity to shorten the methodological discussion here; however, when reporting the panel's own fiscal estimates, in Chapters 8 and 9, we document in detail the expenditure and revenue categories used in the estimation, along with the underlying methods, assumptions, and modeling choices.

002672

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 7-1** Age-specific taxes and benefits, by immigrant generation, United States, 2012.
NOTE: All public spending is included in benefits except pure public goods (defense, interest on the debt, subsidies). Data are per capita age schedules based on Current Population Survey data, smoothed and adjusted to National Product and Income Accounts annual totals.
SOURCE: Panel analysis of Current Population Survey data.

to exert a net negative impact on public finances initially. However, later in the life cycle, working and tax-paying adults typically become net contributors to public finances. A full accounting of the fiscal effects of immigration therefore requires information about "the additional or lower taxes paid by native-born households as a consequence of the difference between tax revenues paid and government benefits received by immigrant households over both the short and the long term" (Smith, 2014a, p. 2). Reliable estimates of taxpayer impacts over time are important elements of a thorough economic analysis of the costs and benefits of immigration (Smith, 2014a).

The impact of immigrants on government finances is sensitive to their characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs. It is often important to distinguish country of origin and legal status of immigrants, as

002673

Copyright National Academy of Sciences. All rights reserved.

326          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

groups differentiated by these characteristics experience different outcomes in the labor market and different take-up rates for government services. Inclusion of detailed individual-level characteristics (age, education, etc.) may adequately address these observed fiscal costs and benefit differences across origin countries.[2] Even so, due to this heterogeneity, it is impossible to reach generalizable conclusions about the fiscal impact of immigration because each country's or state's case is driven by a rich set of contextual factors. Impacts vary over time as laws and economic conditions change (e.g., pre- and post-financial crisis) and by place of destination (e.g., by country, region, and state—each of which has its own policies and population skill and age compositions). It is also important to note that, during periods when fiscal balances for immigrants become increasingly negative, such as during major recessions, they likewise become increasingly negative for natives.

The potential of immigration to alter a country's or state's fiscal path is greatest when the sociodemographic characteristics of arrivals differ distinctly from those of the overall population—and particularly when these characteristics are linked to employment probability and earnings. In the United States, first generation immigrants have historically exhibited lower skills and education and, in turn, income relative to the native-born. Analyses of New Jersey and California for *The New Americans* (National Research Council, 1997, pp. 292-293) concluded that the estimated negative fiscal impacts during the periods 1989-1990 and 1994-1995, respectively, were driven by three factors: (1) immigrant-headed households had more children than native households on average, and so consumed more educational services on a per capita basis; (2) immigrant-headed households were poorer than native households on average, thus making them eligible to receive more state and locally funded income transfers; and (3) due to their lower average incomes, immigrant-headed households paid lower state and local taxes. Recently, though, the share of foreign-born workers in high-skilled occupations has been increasing, partly as a result of the H-1B visa programs initiated in the 1990s. But even after education and other characteristics are accounted for, immigrants' labor market outcomes are often less positive than their native-born counterparts. One explanation is that the skills gap may be exacerbated by underemployment due to downgrading of education and other qualifications, at least for a period after arrival. An interesting question is whether immigration may have some fiscal impact, even if it does not alter the composition of the resident population—that is, if immigrants had the same characteristics as

---

[2]In a reassessment of state-level analyses from *The New Americans*, Garvey et al. (2002) found that divergent fiscal impacts, originally attributed to country-of-origin effects, could be explained by different socioeconomic characteristics.

002674

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the native-born population. The answer depends in part on the extent to which immigrants assimilate into or out of the welfare state and into or out of the labor market.

Age at arrival is an important determining fiscal factor as well, because of its relation to the three factors identified above. Immigrants arriving while of working age—who pay taxes almost immediately and for whom per capital social expenditures are the lowest—are, on average, net positive contributors. In *The New Americans*' fiscal estimates for the 1990s, a 21-year-old with a high school diploma was found to have a net present value of $126,000. This value gradually declines with age at arrival; as the projected number of years remaining in the workforce becomes smaller; the figure turned negative for those arriving after their mid-thirties. For immigrants with lower levels of education, the estimated net present value was much smaller initially and turned negative at an earlier age (National Research Council, 1997, pp. 328-330). Immigrants arriving after age 21 also do not themselves add to costs of public education in the receiving country (although, if they have them, their children would). In cases where immigrants are educated in the origin country, the receiving country benefits from the investment without paying for it, creating a distortion in the expenditure estimates.

Relationships between immigrant characteristics and fiscal impact were quantified by Dustmann and Frattini (2014) for the UK case, where immigration patterns have been quite different from the patterns in California and New Jersey during the 1990s and from the U.S. experience in general. Recent history in the United Kingdom has seen the arrival of large numbers of foreign-born individuals near the beginning of their productive working years, *after* completion of their full-time education. When formal education is financed by the countries of origin, a considerable savings—or, perhaps more accurately put, a return on investment made by others—is realized by the receiving countries. Dustmann and Frattini (2014) used an annuity-based quantification strategy that takes into account these "savings" to the destination country, showing how they increase along with the duration of stay in the receiving economy. In the UK case (and unlike the U.S. case), immigrants are on average also more educated than the native-born, although levels of education (absolute and relative) displayed by immigrants have changed over time and differ greatly by country of origin.[3]

Accounting exercises such as those presented in Chapters 8 and 9 create combined tax and benefit profiles by age and education to decompose the timing and source of fiscal effects. Forward projections build scenarios to

---

[3]Dustmann and Frattini (2014) do not differentiate between fiscal contributions of high- and low-skilled immigrants. Thus they do not estimate whether low-skilled immigrants to the United Kingdom have made positive or negative fiscal contributions.

Copyright National Academy of Sciences. All rights reserved.

*328        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

demonstrate alternative assumptions about how changes in outlays—e.g., the use of public education and various programs (Supplemental Security Income; Medicaid; the Special Supplemental Nutrition Program for Women, Infants, and Children; Aid to Families with Dependent Children; etc.)—and revenues change by generation and affect fiscal estimates. As discussed in Section 7.4, methodological approaches have been developed to suit different accounting objectives. For some policy questions, multigenerational costs and benefits attributable to an additional immigrant or to the inflow of a certain number of immigrants may be most relevant; for other questions, the budget implications for a given year associated with the stock, or recent changes in the stock, of the foreign-born residing in a state or nation is most relevant. For example, the latter is often what state legislators are most interested in. Sometimes the question is about absolute fiscal impacts; sometimes it is about the impact of an immigrant *relative* to that for an additional native-born person. Although these approaches require very different kinds of aggregations and calculations, the program (expenditure) and tax (revenue) fiscal components are largely the same.

## 7.2  SOURCES OF FISCAL COSTS AND BENEFITS

The first task in estimating fiscal impact of immigration, whether at the federal, state, or local level, is to identify the categories of costs and benefits that are affected. Immigrants contribute to fiscal balances through taxes and other payments they make into the system; they create additional fiscal costs when they receive transfer payments (e.g., Social Security benefits) or use publicly funded services (e.g., education or health care). The net fiscal impact that immigrants impart depends on the characteristics that they bring—their mix of skills and education, age distribution and family composition, health status, fertility patterns—and whether their relocation is temporary, permanent, or circular. It also depends on whether they seek employment on the legal labor market and on other conditions prevailing at destination locations, as well as their success in assimilating economically and socially.

In the context of benefit-cost analyses of state-specific immigration policies, Karoly and Perez-Arce (2016) identified channels through which immigration affects fiscal balances (see Table 7-1).

Benefits and costs may accrue to individuals and employers (predominantly through employment and wage impacts—see Chapters 4 and 5) or to the public sector. Among public expenditures associated with an expanding population, be it immigrant- or native-driven, schooling is often the most

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 7-1** Domains and Types of Impacts of Immigration That Affect Fiscal Balances

| Domain | Impacts to Address |
|---|---|
| State Economic Output | Gross state product in aggregate and for specific industries |
| Labor Market | Employment and wages of subgroups of workers defined by education, race/ethnicity, nativity, or other characteristics |
| P-12 Education | Use of educational services and education outcomes from preschool to grade 12 |
| Higher Education | Use of public and private higher education institutions, including 2-year colleges and 4-year colleges and universities |
| Law Enforcement | Allocation of resources across specific types of state and local law enforcement activities |
| Criminal Justice System | Allocation of resources across specific types of criminal justice system costs (e.g., courts, jails, prisons) |
| Social Welfare System | Specific cash and in-kind transfer programs (may be affected by availability to unauthorized immigrants) |
| Population Health and Health Care | Health outcomes (e.g., immunization rates, communicable diseases, low birthweight babies) and health care utilization (public and private costs overall) |
| State and Local Tax Revenues | Specific sources of state and local tax revenues and tax expenditures (e.g., tax credits) |
| Other | Costs to implement adopted policies and defend them in the courts |

SOURCE: Karoly and Perez-Arce (2016).

significant one for state and local budgets.[4] In multigenerational analyses where the specified time horizon is sufficiently long to capture future income returns, the cost of education in the current year is best categorized as an investment. In a single-year static analysis, public education for the school age population will appear as an accounting cost; likewise, for the older working-age taxpaying population, the cost of education incurred in previous periods will not be captured as part of the net calculation.

Beyond public education, a large number of other goods, services, and programs generate public costs at various levels of government:[5] Medicare and Medicaid, Social Security and other protections, housing, prisons and courts, police services, and others—are financed through tax payments by

---

[4]According to the U.S. Census Bureau's *State Government Finances Summary: 2013*. See https://www2.census.gov/govs/state/g13-asfin.pdf [November 2016] expenditure for education comprised 35.6 percent of all general expenditure by state governments.

[5]These components are itemized in detail for the panel's federal and state fiscal estimate calculations in Chapters 8 and 9.

002677

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

immigrants and the native-born. Economic conditions and the demographic profile of the immigrants determine the participation rate of immigrants in various safety net programs. A general finding for the United States has been that immigrants and their children have been less likely to use some programs (e.g., Social Security, Medicare,[6] cash transfers—though this difference may diminish with length of stay), while others (e.g., bilingual education) are used more intensively. As discussed in Section 7.4, the impact that immigrants have on the cost of providing public goods and services depends on the way their use is attributed.

Ideally, models estimating fiscal impacts of immigration should distinguish between citizens and noncitizens and then, for the latter, authorized and unauthorized individuals. All subgroups make contributions to government finances (pay various kinds of taxes) and consume public services, but the levels differ. Legal status is often central to determining what services immigrants qualify for and tend to use and what taxes they are required to pay. Per capita expenditures on various programs vary by documentation status and are therefore directly affected by policy.[7] Undocumented individuals may make retirement-related payments (e.g., Social Security, Medicare); some will never benefit while others may receive partial benefits or later become citizens and enjoy full benefits.

Safety net programs are aimed at low-income families, children, and the elderly, but immigrants do not have access identical to the native-born, due to restrictions imposed by law. Unauthorized immigrants and individuals on nonimmigrant visas are not eligible for the Supplemental Nutrition Assistance Program, nonemergency Medicaid, Supplemental Security Income, or Temporary Assistance for Needy Families. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 introduced additional restrictions. The former made lawful permanent residents and certain other lawfully residing immigrants ineligible for federal means-tested public benefit programs (such as Medicaid) for the first 5 years after receiving the relevant status. The latter statute included a provision intended to prevent

---

[6]For example, using Medical Expenditure Panel Survey to determine medical expenses, Zallman et al. (2015) calculated that, from 2000 to 2011, unauthorized immigrants contributed $2.2 to $3.8 billion more than they withdrew annually from the Medicare Trust Fund—creating a total surplus of $35.1 billion. This surplus, just for those 11 years, was estimated to have accounted for 1 additional year in the current projection in which the Medicare program remains solvent through 2030.

[7]A report by the Congressional Budget Office in 2015 titled *How Changes in Immigration Policy Might Affect the Federal Budget* is available at http://www.cbo.gov/sites/default/files/cbofiles/attachments/49868-Immigration.pdf [November 2016]. The report lays out how policy change scenarios affecting the status of the currently unauthorized population would affect the federal budget.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

states from extending in-state tuition benefits to unauthorized immigrants.[8] Prior to the enactment of these laws, authorized immigrants had access to public assistance and education benefits that were by and large equal to the access of citizens. U.S.-born children of immigrants remain eligible for all programs because they are citizens.

Borjas (2011) examined poverty and program participation among immigrant children[9] using 1994-2009 Current Population Survey (CPS) data on cash assistance, Supplemental Nutrition Assistance Program benefits, and Medicaid received by households. The study divided children into four groups: (a) those who have one immigrant parent (mixed parentage); (b) U.S.-born children who have two immigrant parents; (c) foreign-born children who have two immigrant parents; and (d) U.S.-born children with U.S.-born parents. The analysis revealed that, even though poverty rates[10] decreased for children with two immigrant parents between 1996 and 2000, they have risen since 2007. Among the four groups of children, the poverty rate is highest for foreign-born children with two immigrant parents. Children of mixed parentage exhibit poverty rates that are not significantly different from those of children of native-born parents. Similar conclusions can be drawn from the figures on program participation rates. U.S.-born children with two immigrant parents have the highest program participation rates among the four groups, which is not a surprising outcome as their parents are likely to have lower income and, since they are native-born, they are eligible for various safety net programs.

It is more difficult to estimate expenditure levels for unauthorized immigrants, which adds an element of uncertainty to forward projections. Even the microdata sources from national surveys do not contain enough detail or population coverage to make these distinctions accurately for all programs, and assumptions must be embedded in the estimates about numbers of unauthorized citizens and about their impact on program usage.

### 7.3 STATIC AND DYNAMIC ACCOUNTING APPROACHES

New immigrants affect governments' fiscal balances almost immediately upon arrival—by paying sales, income, and other kinds of taxes and

---

[8]According to the National Conference on State Legislatures, 18 states have passed legislation since 2001 extending in-state tuition rates to undocumented students who meet a set of requirements. One state, Wisconsin, revoked its law in 2011. See http://www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx  [November 2016].

[9]Borjas (2011) defined immigrant children as those who are foreign born and migrate to the United States with their foreign-born parents and those who are U.S. born to one or two immigrant (foreign-born) parents.

[10]The poverty rate is defined as the fraction of children in a particular group that is being raised in households where family income is below the official poverty threshold.

Copyright National Academy of Sciences. All rights reserved.

332        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

by using schools and other services. Impacts compound subsequently, over extended time horizons. State legislators or local school districts may be most concerned about the extent to which immigrants affect current and near-term budgets. Others—policy makers concerned with the long-term solvency of a government program or with multiyear budget projections or a researcher studying long-run economic growth—may be more interested in life-cycle impacts that take place over many decades. The appropriate analytic framework, each requiring specific kinds of data and entailing specific sets of assumptions, is dictated by the temporal concept most relevant to the question at hand. Additionally, while many analyses have attempted to estimate the fiscal impact of all foreign-born individuals or immigrant-headed households currently in the population, it is often more relevant for policy debates to estimate the net impact of new immigrants, since the rate and composition of new arrivals is presumably what policy will affect. It is conceptually muddled to bundle the impact of immigrants who arrived in different historical periods, who may be very different in terms of the way that they have been integrated into society and the economy.

The two basic accounting approaches to estimating fiscal impacts, one static and the other dynamic, capture distinct but connected aspects of immigration processes. The static accounting approach is conducted for a specific time frame, often a tax year, in which contributions by immigrants to public finances—in the form of taxes generated directly by them or indirectly by others (in practice, most analyses are limited to the former)—are compared with expenditures on benefits and services supplied to that population. Such an approach might be used, for example, to answer questions such as, "in California, how much did the foreign-born and their dependents add to tax revenues, and how much did they cost in terms of government expenditures last year?" And, "how much did the grown children of immigrants (and their dependents) add in tax revenue and cost in terms of expenditures last year?" Dynamic accounting approaches, in contrast, compound costs and benefits over extended time periods. This is done by computing the net present value of tax contributions and government expenditures attributable to immigrants—and in some analyses, their descendants—projected over their life cycles. Dynamic analyses involve modeling the impact of an additional immigrant on future public budgets and are useful for addressing questions such as, "over the next 50 years, what will be the impact on fiscal balances if $x$ immigrants with a given set of characteristics $y$ enter the country?" In both static and dynamic estimates, difference between immigrants and natives tend to be much larger on the tax revenue side than on the benefits cost side, though the second generation catches up quickly and eventually pays as much or more than the native–born population in general (National Research Council, 1997, p. 314). The earnings and tax profiles for the third generation are more or less the same as for the native population over all.

002680

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

A static analysis may cover a single year or be repeated for cohorts across a number of years. To a large extent, results are driven by the composition of immigrants in terms of age, education, and other factors, relative to that of the native-born.[11] As described by Preston (2013) and Dustmann and Frattini (2014), immigration can affect static estimates of the public budget constraint in a range of ways because, on average, they pay taxes and consume public services differently from the population as a whole, alter the taxes paid or services consumed by the native-born, and may affect the cost of providing services to natives. A single-year static model may provide a reasonably accurate basis for future projections in a steady state with stable immigrant rates and characteristics. However, historically, this steady-state assumption has not been met because generations of immigrants differ greatly in place of origin, age, skills, education, and other relevant characteristics. Thus, if a static calculation examines the impact of all foreign-born, it will combine people with highly varying characteristics, giving an "inaccurate picture of the impact of any particular generation of immigrants" (National Research Council, 1997, p. 297).

Dustmann and Frattini (2014) used a repeated cross-sectional approach to estimate the net fiscal contribution over the period 2001-2011 for immigrants who arrived in the United Kingdom after 2000. This kind of analysis answers the question "What has been the net fiscal contribution of immigrants who arrived in a country after a given point in time?" (Dustmann and Frattini, 2014, p. 598). Because the analysis is retrospective, data on actual tax payments and public expenditures can be used to estimate the fiscal impact of a cohort of individuals from the start of residency onward to the present in a way that minimizes dependency on underlying assumptions. The analysis does not require projecting income levels, educational costs, or government budgets in future years for which data do not yet exist.

Kaczmarczyk (2013) summarized these advantages of the static approach:

- Conceptual simplicity—it is relatively straightforward to explain the results of the static approach, as they are observed flows of revenues and costs associated with immigrant-driven expansion of the population.
- Use of historical data—no detailed population projection data are needed.

---

[11]See *The New Americans* (National Research Council, 1997, pp. 257-263) for a formal description of the steps involved for a static annual fiscal impact analysis. See Dustmann and Frattini (2014) for a detailed description of the repeated cross-sectional approach, and see Chapter 8 for details of the analyses used for this report.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

- Eased reliance on assumptions—there is no need to impose strict assumptions about future trends of immigrant and native populations (e.g., size and education, age composition) and about government (e.g., fiscal balance or change in immigration policies).

Among the disadvantages, he lists the following:

- Results lack a forward-looking perspective, which is often critical for informing policy.
- Static analysis has less capacity to assess the long-term consequences of recent migration—for instance, to project how immigrants will use services or pay taxes over their lifetimes, consequences that are particularly important when the immigrants' demographic profiles differ significantly from those of the native population.
- It is difficult to incorporate fiscal impacts of a proposed change in immigration policy unless the annual snapshots are repeated indefinitely, in which case the information will still be retrospective.

In contrast to static fiscal impact estimates, dynamic analyses are designed to project future contributions to public finances and costs of public benefits programs. Such models attempt to account for: (1) future population growth, including the components driven by natural increase and by net migration; (2) projected changes in employment and wage profiles; and (3) government spending and tax rates. Immigrants can affect public finances by changing the age, skills, or other elements of the composition of the population. Assumptions are required about the rate at which immigrant earnings converge with native counterparts for various age/education cells after arrival (see Chapter 3 for evidence on this) and about future fiscal balances (see discussion below in this section).

Using a dynamic intergenerational approach based on mid-1990s data for the United States, *The New Americans* estimated that the net present value of the lifetime fiscal impact (combined federal, state, local) was −$13,000 for an immigrant with less than a high school education, +$51,000 for an immigrant with a high school education; and +$198,000 for an immigrant with more than a high school education (National Research Council, 1997, p. 350). Lee and Miller (2000), updating *The New Americans* and using a similar methodology, showed that the initial fiscal impact of most immigrants (and their households) is negative as a result of low earnings upon arrival and the costs associated with schooling of their children. After about 16 years, the impact of a "representative" immigrant turns and remains positive. The dynamic approach is designed to capture these full life-cycle impacts; by contrast, results from the static approach

002682

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

will reflect the fiscal impact at a moment in time of the entire distribution of foreign-born of different ages and arrival dates.[12]

An attractive feature of dynamic fiscal projections is that their structure allows the effects of proposed or current policies to be simulated. Different scenarios can be run, for example, to project the impact of a rule change allowing the wages of unauthorized workers to be reinstated on their record of earnings upon obtaining a valid Social Security Number, or the generational consequences of cutting Social Security benefits versus raising payroll taxes. Fiscal impacts of visa policy changes that may affect the age and skill mix in the stock of foreign-born and the population as a whole can also be projected.[13] The mix of visas—working, student, family reunion, seeking asylum—under which immigrants enter will affect both the employment and taxes generated from immigrants and the benefits used. Immigrants entering the country on work visas can reasonably be expected to have more favorable labor market outcomes than those arriving for family or humanitarian reasons. Those entering with work and student visas also have limited access to benefits such as social housing and unemployment compensation and are more likely to generate tax revenues in current and future periods. Ideally, data would allow the flow of the foreign-born population to be decomposed by entry category, since any projected changes in the distribution by these categories would be expected to have a direct impact on fiscal outcomes.

Dynamic analyses vary in terms of how and if various mechanisms through which immigration can impact the economy and the subsequent fiscal picture are incorporated. *The New Americans* (National Research Council, 1997) and Lee and Miller (2000) developed "partial equilibrium" analyses in the sense that they only estimate direct fiscal effects attributable to immigrants themselves. They do not take into account indirect (general equilibrium) impacts of immigration on wages, or on labor force participation and occupational choices of the pre-existing population—mainly because these factors are very difficult to estimate credibly. Over time, the reshaping of the labor force, the expansion of capital stock, and any impact

---

[12]Figure 7-1 illustrates the fiscal profile by age for a static, cross-sectional analysis of the United States based on 2012 data.

[13]Sometimes, past policies can also be examined to inform possible impacts. Hansen et al. (2015) forecasted the impact of immigration on public finances for Denmark by taking advantage of the natural experiment that occurred there around the year 2000 as a result of shifting from a heavily family reunification–based policy to a skills and employment–based policy. Over the period immediately after the policy shift, from 2000 to 2008, the unemployment gap between native-born in Denmark and immigrants narrowed and public finances improved. More generous social safety net benefits in Denmark were also shown to lead to more negative fiscal impact than in the United Kingdom for low-skilled immigrants (Dustmann and Frattini, 2014).

002683

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

on productivity and economic growth brought on by immigration will affect public finances through conduits such as corporate taxes and taxes paid by natives. Therefore, assumptions about central growth rates must also be made (see Section 6.5) for general equilibrium analyses. Immigration also produces other indirect effects, such as on housing ownership and rental markets which, in principle, could be integrated into dynamic fiscal models. Also, behavioral responses—such as when an influx of cheap child care or housekeeping service workers changes the labor supply decisions by native workers—can also be studied.[14]

Likewise, static analyses—particularly for a single year—are, by their very structure, partial equilibrium analyses; future periods must be considered in order to incorporate most secondary or indirect effects. Hansen et al. (2015) included general equilibrium effects in their dynamic projection using population register data on both first- and second-generation immigrants. Their model "estimates long term economic activities and sustainability of economic policy" on the basis of submodules projecting the population (incorporating fertility rates, mortality rates, and inward and outward migration); future age-, gender-, and origin-specific education levels of that population; and future proportions of the population within and outside the labor force (Hansen et al., 2015, p. 8).

Storesletten (2003) analyzed the United States using a general equilibrium approach, in the sense that labor supply and payments to the factors of production were treated as endogenous in his model, which was specified to incorporate differential impact of immigrants by age, employment status (working or not), and skill level. In such analyses, variation in the fiscal impact of immigration is dictated less by the size of the immigrant population than by its composition. Chojnicki et al. (2011) used a general equilibrium model to analyze the impact of immigration on social expenditure and the public budget in the United States for the period 1945-2000. They found that immigration had a large positive impact on public finances, relative to a no-immigration scenario, during that period—mainly due to immigrants' younger age structure and higher fertility rates relative to the total population. These demographic effects reduced transfer payments by lowering the old-age dependency ratios (see Chapter 2).

To summarize the preceding discussion, among the advantages of dynamic fiscal estimation models are the following (Kaczmarczyk, 2013):

- A forward-looking perspective providing a projection of the fiscal impacts of immigration in a life-cycle framework that captures net positive expenditures for younger and older individuals on educa-

---

[14]This topic is discussed in Chapter 6.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tion and health care and net positive revenues during working years when tax payments are highest; and

- capacity to assess the impact of immigration on structural changes resulting from population aging (e.g. pension system and its sustainability).

Among the disadvantages of the dynamic accounting approach (or, really, any analytic attempt to estimate future consequences) are the following:

- Outcomes depend strongly on the set of assumptions made about future trends in income and population growth (which depends on projections of fertility rates, life expectancies, and return migration rates), worker productivity, labor market participation rates for immigrants and natives, and government-established tax rates and program spending levels; and
- within the generational accounting framework, huge degrees of uncertainty are introduced due to unknown future deficit and debt profiles. In addition, as noted in *The New Americans* (National Research Council, 1997, p. 256), "dynamic fiscal accounting requires specification of a social rate of discount, so that future tax revenues and spending needs can be compared in terms of current dollars."

The literature has identified a range of policy-relevant questions for which fiscal impact studies are required: For example, what is the marginal impact of an incremental increase in immigration (i.e., the impact of one additional immigrant); the per capita impact of an increased rate of immigration; the future impact of an immigrant cohort with a given demographic profile; the impact of an additional 100,000 immigrants over current levels; or the consequences of changing numbers or types of visas/entries (e.g., skill based instead of family centric)? Or, alternatively, what has been the net fiscal contribution of the foreign-born who arrived in a country after a given point in time; and how have the net impacts varied by level of government? Defining the question or scenario of interest is clearly the prerequisite to selecting an appropriate modeling framework.

## 7.4 SOURCES OF UNCERTAINTY: ASSUMPTIONS AND SCENARIO CHOICES IN FISCAL ESTIMATES

Estimating fiscal impacts is data intensive and methodologically complex. Even if accurate microdata were available on the characteristics, taxes paid, and program usage for all immigrants and natives, decisions must still be reached about how to treat various kinds of costs and benefits and—in the case of dynamic projections—the uncertainty of future economic and

002685

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

policy trends. When data are lacking, or when projections into the future are required, assumptions must be made about program participation rates and policy changes. Dynamic projections rely more heavily on assumptions than do static models but, as identified below, modeling choices are required in any fiscal analysis.

### Unit of Analysis: Individuals Versus Households

A preliminary step in all fiscal analyses is to select the unit of analysis. A decision must be made whether tax payments and expenditures based on program use will be estimated for households as a unit or for each individual. Ideally, this decision would be dictated conceptually by the budget item that is being apportioned. For instance, health and education expenditures accrue for individuals while some taxes and benefits, including most cash-transfer programs, are based on household characteristics. Data realities sometimes prevent the unit of analysis choice from matching the ideal.

For dynamic analyses, the household unit of analysis is problematic because families' living arrangements change over time through marriage, divorce, the departure of grown children, the arrival of additional family members from abroad, return migrations to the country of origin, and deaths. Dynamic fiscal accounting based on households becomes exceedingly difficult "as (often arbitrary) forecasts of family dissolution and formation become necessary" (National Research Council, 1997, p. 255). Further complicating the situation is the increasing prevalence of nonimmigrants in immigrant-headed households, and vice versa. Because households are not stable over time and because the costs and benefits originating in mixed households often need to be divided between native-born and foreign-born members—as opposed to having to ascribe them exclusively to one group or the other—the individual unit of analysis is more flexible and empirically feasible for dynamic analyses. Perhaps for these reasons, this was the approach taken in the dynamic projections in *The New Americans* (National Research Council, 1997).

For cross-sectional analyses, the choice of unit of analysis is somewhat more difficult. Although the individual is used for the baseline scenario in its dynamic analyses, *The New Americans* (National Research Council, 1997, pp. 255-256) states, "Since the household is the primary unit through which public services are consumed and taxes paid, it is the most appropriate unit as a general rule and is recommended for static analysis." While this logic is sound, a case can also be made for again selecting the individual as the primary unit. Aside from the value of being consistent with the method used for the dynamic analysis, there is, even at a point in time, the issue of how to define an immigrant household: by head of household, by requiring both parents in a two-parent household to be foreign born,

002686

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

etc. Assigning the public cost of children to parents as individuals allows the costs to be attributed to multiple immigrant generations when called for by the situation (e.g., cases in which households consist of one first generation adult and one native-born adult). Moreover, the static analysis in this report extends beyond that used in *The New Americans* by repeating the cross-sectional estimates over 20 years, a period more than long enough to see household composition change.

### Accounting for the Second Generation

The treatment of native-born individuals with foreign-born parents is an issue in both static and dynamic approaches.[15] In forward-looking projections, the logic for including second generation effects is straightforward: Even if children of immigrants are native-born citizens, they generate costs and benefits to the receiving country directly as a result of their parent(s) having entered the population. Children of immigrants, whether born in the origin or destination country, consume public education services while they are of school age, and they may be expected to contribute to the net fiscal balance in a positive way by paying taxes later in their lives. In a cross-sectional analysis, this life-cycle effect will be driven by current demographic composition. It will be captured only to the extent that data are detailed enough to reveal the grown children of immigrants who have graduated into tax-paying adults at a point in time. Most of the flagship population data sources in the United States, including the Decennial Census (after 1970) and the American Community Survey (ACS), which replaced the Decennial Census long form, do not identify second generation respondents.[16] Fortunately, information on parental birthplace has been available since 1994 from the CPS, and these data are used in the state and local level analysis in Chapter 9 and at various points in the national analysis in Chapter 8.[17]

---

[15]Beyond the conceptual question, as discussed below, capturing the relevant population is complicated by lack of data in most Census Bureau datasets on parental place of birth. This makes identification of second generation individuals difficult once they have left the immigrant-headed household.

[16]See Massey (2010) on analytic limitations created by the absence of data on parents' birthplaces in the Decennial Census and the ACS. As just one example among many, the ability to identify second generation respondents is necessary for estimating tax revenues contributed by the children of immigrants after leaving the education system (and leaving immigrant-headed households) and entering the labor market. If not accounted for, this biases estimates of the net fiscal contributions of immigrants in a negative direction.

[17]As noted by Massey (2010), relative to the ACS, the sample size of the CPS is quite small, which means that the Census Bureau data sources only yield stable estimates for large immigrant groups and highly aggregated geographic areas (e.g., large-population states and at the national level).

002687

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Dynamic cohort analyses attempt to capture second and later generation effects but must make assumptions about return immigration rates and economic assimilation that affect future employment and earnings profiles.[18] For intergenerational projections, assumptions must be made not only about the future flow of immigrants into the country but also about the education and skills that they will bring or will acquire upon arrival. Predicted tax payments and benefit expenditures will differ dramatically for a high-education versus a low-education scenario. For immigrants that arrive after age 25, it is generally assumed that they will maintain the education level observed on arrival, so no further predictions about their education have to be made. For immigrants arriving at younger ages, their future final educational attainment is typically predicted as a function of parental education. And, when estimating the marginal cost of immigrants to education budgets, the children of immigrants are typically included, independent of birthplace. In the research used as an input to the fiscal projections in *The New Americans*, Lee and Miller (1997) found that including projected lifetime impacts of children of immigrants into the analysis provided a strongly positive fiscal contribution regardless of their parents' educational attainment. That said, the initial estimates of fiscal contribution for immigrants themselves (prior to factoring in second generation effects) were highly dependent on educational attainment. Immigrants with education beyond high school were projected to add positively to net present value while those with lower levels of education caused a net fiscal loss. Similarly, Storesletten (2003) found the net cost to society of immigrants to be highly variable, with the difference between amount paid in taxes and amount of public goods and services used over the life cycle ranging from a $36,000 cost to a $96,000 benefit, depending on the individual's education level.

As noted above, choices must also be made about how to handle the increasingly common cases of children of mixed (one native-born, one foreign-born) couples. The literature includes analyses in which the children are put in one group or the other and analyses in which they are split between the two groups. *The New Americans* assigned native-born children of native/foreign-born couples by the birth status of household head (National Research Council, 1997). Dustmann and Frattini (2014) considered children of mixed couples as half natives and half immigrants and allocated the costs accordingly. As will be seen in Chapters 8 and 9, how the children of immigrant-headed households are treated can have a large impact on fiscal estimates; details about how second generation individuals are handled in the national and state and local level estimates are provided in those chapters.

---

[18]The role of educational attainment assumptions for the second generation is discussed by Blau et al. (2013).

002688

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Stay and Return Rates of Immigrants

Population projections underlying dynamic fiscal projections must incorporate estimates of survivorship, fertility rates, and net in-migration. Since not all foreign-born individuals who come to the United States stay long term, return migration must also be taken into account. Immigrant return rates and length-of-stay patterns affect the population demographics and, in turn, a receiving country's fiscal picture. A student may return home after completing a degree. A person entering on a work visa may do the same after completing a job. Historically, circular migration has occurred as well, especially for people who worked seasonally in the United States, many of whom were unauthorized.[19] When foreign-born individuals move to a country to work but then return home, they are less likely to ultimately tap into expensive late-life benefits such as Social Security and publicly funded medical care. Yet they may enroll in pension systems and begin contributing income and payroll taxes immediately. If immigrants are temporary and do not claim pensions or other post-retirement benefits from the destination country, their net fiscal contribution is likely to be very positive. In contrast, immigrants who stay will typically create system costs later in life.

Circular and return migration patterns, and assumptions about them, are especially important for forward-looking, dynamic fiscal estimates. Most obviously, for the foreign-born who return or circulate out, the second generation impacts are not in play, unless they have U.S.-born children who stay or eventually return. Therefore, assuming that all foreign-born individuals who appear in the data will stay until death can lead to large errors in fiscal (and economic) impact studies. The population projections underlying the dynamic model in Chapter 8 assume that children of immigrants ages 0-19, whose parents emigrate, leave with them, even if they are U.S. born. Largely following the Census Bureau methodology, immigrants are assumed to have a much higher risk of emigration during the first 10 years after arrival in the United States. Fiscal projections will be affected especially if the characteristics—for example, age, skill, earnings—of out-migrants are systematically different from averages for all foreign-born individuals such that selection effects come into play.

Conceptually, then, the ideal fiscal analysis would factor in return rates and separately track the characteristics of permanent and temporary immigrants. Data constraints typically make this impossible, so assumptions are made based on partial information. The baseline scenario in the dynamic models developed for *The New Americans* was that 30 percent of

---

[19]Massey et al. (2015) argued that return and circular migration among undocumented immigrants (primarily from Mexico) has dropped sharply in response to the massive increases in border enforcement of the past two to three decades.

002689

Copyright National Academy of Sciences. All rights reserved.

immigrants later emigrate, taking with them all their young children; 16 percent of those born in the second generation were assumed to emigrate with their parents. Such assumptions about return migration affect only the projected numbers of immigrants in the country; secondary effects in the labor market and in earnings profiles reflecting different characteristics and self-selection patterns among stayers and leavers (which, historically, is the norm) are not captured.

Storesletten's (2003) intergenerational model incorporates estimates of out-migration rates and post-migration take-up rates of social benefits to demonstrate how fiscal contributions are affected in different scenarios. One notable finding for the United States was that return migration of high-skilled immigrants under age 50—quite common during the first few years after arrival—decreases their time-discounted fiscal contributions. Kırdar (2012), studying the German pension and unemployment insurance systems, found that building immigrant return decisions into his model as an endogenous choice increased the net expected gain to the destination country's finances. (Storesletten did not address selection effects differentiating career paths of temporary versus permanent immigrants.) This is explained by the observation that those most likely to be beneficiaries later on—low income immigrants—are also the ones most likely to return first due to inferior labor market outcomes. A summary report by OECD (2013) on the fiscal impact of immigration also found important differences for most developed countries in the tax contribution and benefit use patterns of native-born populations, permanent immigrants, and temporary immigrants.

### Indirect/Secondary Fiscal Impacts

Most intergenerational fiscal projections are limited by a partial equilibrium perspective. That is, they focus on first-order tax revenue and program spending effects—those discussed above—while assuming that no market or behavioral changes take place in response to new immigrants. Labor market displacement or enhancement, capital adjustments, housing price pressures, etc., are not factored in. The same is true for the static approaches described above where, for example, any labor market displacement of natives—and in turn the impact on the tax contributions they make and public services they use—have been largely ignored.

Second-order market effects do clearly occur, and several studies noted above attempt to account for some of them. As discussed in Chapter 6, immigration-induced expansion of the population can increase housing prices and rents; low-skilled migrants willing to work in house-cleaning or child or elder care services enable native workers, particularly high-skilled

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

women, to supply more labor to the market, which affects tax contributions. In a comprehensive analysis, these ripple effects in the economy would be accounted for; however, due to the complexity of operationalizing a general equilibrium approach into the accounting framework, they typically are omitted. The fiscal impacts literature has generally concluded that these kinds of impacts are minor relative to overall economic activity. However, even if *overall* (nationwide) labor market effects of immigration are likely to be small, whether the direction is positive or negative, the impact may be large in specific geographic areas or types of markets.

Karoly and Perez-Arce (2016) provided a policy-relevant example of main and secondary impacts, using college tuition as the case study. Table 7-2 itemizes the direct and secondary economic and fiscal effects that she found associated with a policy granting in-state tuition benefits to undocumented immigrants. Such a policy may incentivize foreign-born individuals to come to the United States (or to a particular state) to take advantage of the benefit—a direct cost, but it may also create more high-skilled workers who, at least in time, would raise wages and in turn tax revenues, improving the fiscal picture.

**TABLE 7-2** Multiple Impacts of Granting Eligibility to Undocumented Immigrants for In-State Tuition

| Potential Main Impact | Potential Secondary Impacts |
|---|---|
| Increased Number of Unauthorized Immigrants | Decreased wages of unskilled workers |
| | Increased economic output/decreased price of some services |
| | Increased tax revenue and increased government expenditures |
| Increased Educational Attainment of Unauthorized Immigrants | Effects through changes in individual human capital: |
| | • Increased earnings for unauthorized immigrants |
| | If demand for subsidies exceeds supply: |
| | • Decreased subsidized enrollments by other groups (legal immigrants, nonimmigrants) |
| | If net increase in subsidized enrollments: |
| | • Increased government expenditures for higher education subsidies |
| | If net increase in college-educated versus noncollege-educated population and labor supply: |
| | • Increased wages of low-skilled workers |
| | • Increased economic output |
| | • Increased tax revenue and decreased government expenditures |

SOURCE: Karoly and Perez-Arce (2016).

002691

Copyright National Academy of Sciences. All rights reserved.

344      THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

### Allocating Costs of Government-Provided Goods and Services

Both static and dynamic fiscal analyses must make assumptions about how to allocate government spending among newly arrived immigrants (authorized and not), established foreign-born residents, and the native-born. To do this, it is necessary to consider how broadly and intensively immigrants use public services and transfer benefits. Take-up rates by the foreign-born for various programs, described in Chapter 3, become important parameters in fiscal estimates. The models in Chapters 8 and 9 necessarily include such parameters for assigning costs. A default assumption might be that immigrants' use-rate is equal to that for the population, so that they account for the same per capita consumption of public services as do natives. If possible (that is, if data exist), it is preferable to consider to use patterns of the many government-provided goods and services on a case-by-case basis, as the nature of their consumption is highly variable. Differences in the characteristics of immigrants and native-born individuals also come into play. Obvious examples for which use patterns vary for different groups are English as a second language (ESL) classes taught in schools or translation services offered in hospitals. Since these services are used disproportionately by immigrants, it may make sense to attribute a higher average cost to recent arrivals than to established foreign-born or native-born individuals.

For some services, such as education and health care, data may reveal that the total cost of provision is roughly proportional to the number of recipients. This argues for assigning costs on a pro rata, or per capita average cost, basis in the accounting exercise (Dustmann and Frattini, 2013). In other cases, the marginal cost of provision may differ significantly from the average cost. Publicly provided goods that depend only partly on the size and composition of the population, such as public infrastructure, public administration, and police forces are examples. In the case of "congestible public goods," the marginal costs of additional population (immigrant or native) may be higher or lower than average cost but is greater than zero. Such might be the case if a district's schools were operating at or above capacity and an influx of immigrants created the need to build new schools and hire additional teachers. Proper accounting of congestible goods requires information—or lacking appropriate data, assumptions—about how the provision and consumption of goods and services change with the share of immigrants in the population.[20] Most studies attribute the costs of these kinds of goods equally across the whole population—that is, propor-

---

[20]For computational feasibility, analyses frequently assume that the quality and level of services are fixed. Thus, with a flow of immigrants added to the population, total costs must increase to maintain that quality level for most goods and services. Income transfers, for example, are more like private goods, and per-person spending must be maintained if service levels for all are to be held constant (National Research Council, 1997, p. 256).

002692

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tional to the number of recipients (Rowthorn, 2008). Whether or not there is resource strain and congestion—with resulting impacts on the sustainability of public services or population welfare programs—relates closely to the way the marginal analysis is framed. Congestion may be irrelevant when considering the current fiscal year impact for school or infrastructure budgets created by an additional immigrant. In contrast, congestion is a central concern when considering long-term costs associated with a growing population. Similarly, the marginal cost calculus will be quite different when considering the marginal addition of one immigrant at a point in time versus the addition of many thousand immigrants over a period of time.

"Pure" public goods—goods defined by the trait that their value and availability is not diminished by additional users—also enter fiscal estimates. Such goods, at least within a range, are unaffected by population size. National defense, which accounts for about 18 percent of the U.S. federal budget, is a classic example. The marginal increase in these costs due to immigration is, at least in the short run, zero or close to it. Other candidates to be treated as pure public goods include government administration and interest on the national debt. Dustmann and Frattini (2014, p. 7) contrast pure versus congestible public goods:

> 'Pure' public goods and services are not rivals in consumption and the marginal cost of providing them to immigrants is likely to be zero. For example, the expenditure for defence or for running executive and legislative organs is largely independent of population size. 'Congestible' public goods and services are—at least to some extent—rival in consumption, so the marginal cost of providing them is unknown, although probably smaller than the average cost and positive. For example, the cost of fire protection services, waste management and water supply may indeed increase with the size of the resident population. . . .The ideal—if data were limitless—would be to measure the marginal cost of providing each public good and assign it to every new immigrant.

In the case of pure public goods, immigration has the beneficial effect of allowing fixed program costs to be spread over a greater number of taxpayers—thereby lowering per capita costs for the population in general (Loeffelholz et al., 2004). In fiscal accounting exercises, this savings would therefore enter as a reduction in the per capita tax burden imposed on current native residents (and established, taxpaying immigrants). One could challenge this treatment for very long run analyses by arguing that, over time, public goods such as defense spending have been correlated with gross domestic product (GDP) and population size.

The fiscal analyses in Chapter 8 present alternative scenarios, allocating the costs of pure public goods to natives only in one subset and to everyone

002693

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

in another (that is, spreading the costs equally across the entire population, including the arriving foreign-born). To understand this assumption, it is useful to consider types of expenditure that are the opposite of pure public goods—for example, an ESL program. To a first approximation, there would be no costly ESL programs if not for the arrival of new immigrants. This suggests that one should ascribe the program's cost to them alone. Putting aside economies of scale in providing such programs, an additional immigrant increases the total cost of providing ESL education. By the same logic, the arrival of an additional immigrant does not change in any meaningful way the cost of defending the country; in fact, as pointed out above, it lowers the per capita cost of a given amount of defense (as the numbers of aircraft carriers, etc., remain the same) as long as the immigrants contribute something, even if it is below average, to the overall size of the tax base. For analyses estimating the fiscal impact of other kinds of immigration scenarios—for example, for large numbers of arrivals taking place over a multiyear period—the zero marginal cost assumption becomes less tenable.

Since public good items such as national defense represent a large part of the federal budget, the difference between allocating expenditures on them pro rata or at a zero marginal cost will have a very large impact on fiscal estimates. In fact, such assumptions are likely to swamp the impact of most of the other assumptions and data issues that arise in fiscal impact analyses.

In the Dustmann and Frattini (2014) analysis of UK fiscal balances for the period 2001-2011, the total net contribution of all immigrants ranged from –£76 billion (2011 prices) under the average cost scenario (public goods costs are assigned to immigrants pro rata) to +£27 billion under the marginal cost (public goods costs are assigned to natives only) scenario. These are large numbers in absolute terms but, relative to the size of the overall economy, still fairly modest: –0.7 percent and +0.3 percent of UK GDP respectively. The fiscal analysis in *The New Americans* showed similarly contrasting estimates made under marginal versus average cost assumptions, albeit for a forward-looking projection:

> If all the expenditures we categorize as provision of public goods (military expenditures are the leading case) were instead treated as private or congestible goods, so that a per capita cost is allocated to immigrants and their descendants, then the average NPV [net present value] would drop from +$80,000 to –$5,000, just slightly negative, or by $85,000, thus identifying public goods as contributing powerfully to the result. A similar calculation shows that treating congestible goods (roads, police, etc.) as public goods with zero marginal costs would add $80,000 to the baseline NPV, for a total of +$160,000 (National Research Council, 1997, p. 346).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

A static analysis by Passel and Fix (1994), in which the marginal cost of providing a range of public services to immigrants was assumed to be zero, estimated the net fiscal impact of immigration in the United States to be +$25 billion for 1992. Replicating this analysis—but changing the allocation assumption to one in which the marginal cost of providing public services to immigrants is set equal to the average cost—Borjas (1994) re-estimated the net annual fiscal impact associated with immigration in the United States to be about –$16 billion.

Some public expenditures pose additional, interesting analytic issues. One is law enforcement. While data limitations are significant and the research on the topic undeveloped, a review of recent literature on crime and immigration (commissioned by the sister panel to this one) reached a number of conclusions—among them the following from Kubrin (2014):

- Immigrants are generally less crime prone than their native-born counterparts.
- However, this individual-level negative association between immigrants (relative to the native-born) and crime rate appears to wane across immigrant generations: The U.S.-born children of immigrants exhibit higher offending rates than their parents.
- Areas, and especially neighborhoods, with greater concentrations of immigrants have lower rates of crime and violence, all else being equal.
- Theories to explain this negative association between crime rate and immigration have not been sufficiently empirically evaluated.

These findings suggest that a practical starting point for treating crime and law enforcement is to assign costs on a pro rata, or per capita average cost basis. However, with more granular data, it could be reasonably argued that a smaller-than-average per capita cost should be assigned to new immigrants.

Border enforcement is a special subcategory of law enforcement, and the literature is quite unresolved about how to treat its cost. The Secure Fence Act of 2006 authorized hundreds of additional miles of fencing along the U.S.-Mexico border. The annual budget of the Border Patrol increased from $363 million in 1993 to $3.5 billion in 2013. Since the creation of the Department of Homeland Security in 2003, the annual budget of Customs and Border Protections, which includes the Border Patrol, doubled from $5.9 billion to $11.9 billion in 2013. Spending on Immigration and Customs Enforcement, the interior-enforcement counterpart to Customs and Border Protections within the Department of Homeland Security, grew from $3.3 billion since its inception in 2003 to $5.9 billion in 2013. The budget for Enforcement and Removal Operations has increased from

002695

Copyright National Academy of Sciences. All rights reserved.

348        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

$1.2 billion in 2005 to $2.9 billion in 2012.[21] These are large budget increases for individual programs, but they represent only a very small fraction of government expenditures, and so they can only have a limited effect on estimates of per capita fiscal impacts.

There are at least two defensible options for allocating the cost of these programs. Probably the least controversial default option is to divide the cost among all, foreign-born and native-born. The foreign-born who have been in the country for a long time have pretty much the same things to gain and lose as the native-born. Conceptually, it might make sense to treat recent immigrants, especially those still trying to unify families, etc. differently, but to try to slice it that fine in the actual projections would be very difficult.

Alternatively, an analysis could start with the premise that unless one thinks that the bulk of the money is spent processing new immigrants or handling their visas (unlikely), this is not a cost of immigration but rather the cost of keeping immigrants out. Ascribing that cost to immigrants creates the perverse effect that the more effective the program is (or the more money devoted to it), the more expensive it is per immigrant who arrives in the United States during the period of analysis. Consider the following example: suppose that (at immense expense) U.S. border security and immigration control programs manage to seal the U.S.-Mexico border so effectively that during an entire year, only one illegal immigrant manages to successfully cross it. Using the approach in question, the billions spent on these programs would be ascribed to that one person. The more immigrants who manage to cross the border, the lower are the per capita cost of the programs. In light of these perverse consequences, it appears more reasonable to treat these programs as additional pure public goods and to not ascribe their cost to (arriving) immigrants only but to spread the cost across all residents, either including or excluding the arriving immigrants.

In a general equilibrium analysis, the question of how to distribute these costs is more complicated, as the efficacy of border enforcement affects labor and other markets throughout the economy. Massey et al. (2015), using data from the Mexican Migration Project, estimated the determinants of departure and return according to legal status. They found that, since 1986, Mexico-U.S. circular migration "has declined markedly for undocumented migrants but increased dramatically for documented migrants . . . [and] return migration by undocumented migrants dropped in response to the massive increase in border enforcement." Return migration of documented migrants was unaffected (Massey et al., 2015, p. 1015).

---

[21]Ewing, W.A. (2014). *The Growth of the U.S. Deportation Machine and Its Misplaced Priorities*. Available: http://immigrationimpact.com/2014/03/10/the-growth-of-the-u-s-deportation-machine-and-its-misplaced-priorities [November 2016].

002696

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Given the economic benefits of circular and temporary migration for work purposes,[22] it is certainly possible that additional costs have been created to the economy by the increased border enforcement, beyond the narrow costs of the programs themselves in the federal budget.

Finally, if indirect impacts are also considered (see "Indirect/Secondary Fiscal Impacts" above in Section 7.4), accurate estimation of fiscal impacts would require including the contribution of immigrants to the delivery of public services, not just their consumption of these services. In a number of government service sectors (e.g., health care), recent immigrants have lowered costs because of their availability and willingness to work at a lower wage than native-born workers. This type of effect would only be detected in partial equilibrium analyses, such as most of those reviewed in Chapter 5, if, for instance, their presence in the labor market lowered native wages or reduced their employment.

### Fiscal Imbalance—Dealing with Debt

For forward-looking projects such as the *generational accounting* model used in Chapter 8 (and in *The New Americans)*, assumptions must be made about the government's intertemporal budget constraint and about the tax burden across generations. To calculate the path of revenues and expenditures (and accumulating deficits), it is necessary to overcome the reality that one does not know what future fiscal balances will look like and what the level of deficit financing will be. Budgetary adjustments imposed to conform to an assumption about the debt/GDP ratio must be divided between tax increases and benefit reductions. Assumptions about how (and to what extent) net tax payments made by current and future generations cover the present value of future government expenditures and help to pay the debt can have a large impact on the estimates of fiscal impacts. In *The New Americans*, this assumption was handled as follows: A government "cannot let its debt grow without limit relative to the economy, as measured by gross domestic product (GDP), without losing credibility in its ability to repay and may eventually face default. To reflect this, it is necessary to assume that the ratio of debt to GDP stabilizes at some point" (National Research Council, 1997, p. 299). The baseline scenario for that study used 2016 as the time when fiscal policy would hold the debt/GDP ratio constant. Among the alternatives cited in *The New Americans* (National Research Council, 1997, p. 300) to the assumption that government must be in balance or that debt cannot exceed a given percentage of GDP (e.g.,

---

[22]See Zimmermann (2014), which examines how circular migrants fill labor shortages in host countries while also encouraging the transfer of skills ("brain circulation") from one geographic area to another.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2705 of 4699 PageID #:  5870

current policy remains in place until the debt/GDP ratio hits 1.0), were the following:

- Current tax and expenditure policies will continue, causing the debt to explode over time (Auerbach, 1994; Congressional Budget Office, 1996).
- Debt/GDP ratio is stabilized immediately at its current value.
- Current policy remains in place for 10 years, after which the ratio is stabilized.

All three options can in principle be modeled (although the first would be complicated in a general equilibrium analysis in which one was trying to quantify what would happen to the economy as a result of an exploding national debt). Assuming a constant debt/GDP ratio means adjustment gets harder and harder for program costs like Medicare. Different scenarios will lead to different adjustments in taxes and benefit payments over time.

Assumptions about budget imbalances invoked in several of the Chapter 8 scenarios rely on the Congressional Budget Office's (CBO's) fiscal forecast from its long-term budget outlook. In the past, the CBO assumed that the upper limit for debt could reach stratospheric levels of 1,000 percent of GDP (debt/GDP ratio of 10), but since 2010 the CBO has adopted a maximum ratio of 250 percent. This constraint seems likely because at that level either the cost of debt service plus whatever else the government spends exceeds the maximum amount that can be raised in taxes (this is where tax revenue reaches the top of the Laffer curve in their models) and because there is no precedent in modern history for sustaining this level of debt (the relevant precedent is the United Kingdom after the Napoleonic Wars, when the debt/GDP ratio reached about 230%). Of course 250 percent is still very high,[23] and it is hard to imagine that fiscal policy will not have to change long before that ratio is reached, but any number that is chosen will be equally arbitrary.

Fiscal balance also plays a role in static analyses. For the average individual in the population, the net fiscal contribution must be negative if the country is running a deficit for the year of analysis. Therefore, as Dustmann and Frattini (2014, p. 598) pointed out, "The absolute net contributions of different populations may not be a meaningful measure of their fiscal contribution because these figures depend on the magnitude of the deficit. What is more insightful is their relative contribution in comparison to other population groups, especially as this comparison somewhat 'eliminates' the common deficit effect as far as it affects different groups in the same way."

---

[23]The current debt-to-GDP ratio (including external debt) for the United States is about 105 percent; the all-time high for the country, reached in 1946, was about 122 percent.

002698

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Appropriate Discount Rate (for dynamic analysis only)

The government borrowing rate determines, in expected value, the present value of future net dollar flows in the budget. A discount rate may be higher than the borrowing rate if it reflects additional risk characteristics of future income or income taxes (Auerbach et al., 1991). The practical importance of the choice of discount rate is that it determines the relative importance of fiscal flows at different points in time. Lower discount rates will place more-similar weight on an immigrant's near-term expenditures and taxes (e.g., during school and early working years) and longer term ones (e.g., during retirement), compared with a higher rate. By extension, the lower rate will place a relatively higher weight on descendants in the calculation of net present value. In contrast, higher rates discount future flows more heavily than lower rates, giving greater weight to near-term fiscal flows and less to those far into the future, such as taxes paid or program expenditures for descendants. The alternative interest rate scenarios in *The New Americans* illustrate that changing the discount rate has a large effect on the net present value estimates of an immigrant's fiscal impact. The "baseline scenario" for that report—which, among its required assumptions (listed on pp. 325-326), used a real interest rate of 3 percent—yielded a lifetime total fiscal impact (federal and state/local combined) for an "average" immigrant of +$80,000 (net present value). However, the net present value climbs to +$219,000 if the interest rate is changed to 2 percent, and drops to +$39,000 if a 4 percent rate is used. When interest rates of 6 and 8 percent are used to reflect "the uncertainty of future tax revenues," the net present value of the average fiscal impact of an additional immigrant falls to +$15,000 and +$8,000 respectively.[24]

One discount rate that has been used in fiscal impact analyses is the real rate of interest at which the U.S. Treasury can borrow. This rate is hard to predict, and even retrospectively it depends on the maturity of the bonds being sold. The CBO uses 1.7 percent as the real interest rate of Treasury borrowing for 2014 to 2039 and 2.2 percent thereafter for real returns but 2.5 percent for debt held by the Social Security and Medicare Trust Funds.[25] By contrast, to reflect a particular risk profile for investment in

---

[24]We do not perform this sensitivity analysis for our lifetime net fiscal impacts calculations in Chapter 8, but the order of magnitude in variation with changes in the interest rate assumption would be similar to that described here.

[25]As noted by the CBO (Congressional Budget Office, 2014a, pp. 110-111):

> The estimates and assumptions underlying the economic benchmark suggest that the inflation adjusted rate of return on 10-year Treasury notes will be one-half to two-thirds of a percentage point lower in the coming decades than it was during the 1990–2007 period. Therefore, CBO projects that the interest rate on 10-year Treasury notes (adjusted for the rate of increase in the CPI-U) will rise in the next

002699

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the context of the economic impacts of climate change, William Nordhaus's DICE-2013R model uses 4.25-5.00 percent, depending on whether the model is running a near-term or long-term scenario (Nordhaus and Sztorc, 2013, p. 38). The panel views a discount rate in the 2-3 percent range as a reasonable compromise.

## 7.5  DISTRIBUTIVE FISCAL EFFECTS— FEDERAL, STATE, AND LOCAL

Tax inequities arise across states and regions because (1) public goods and services are provided by governments at the federal, state, and local levels; (2) different kinds of taxes are collected at these levels; and (3) immigrants are not uniformly distributed across jurisdictions. Equitable immigration policy making must take these inequities into account. Among the wide range of services financed by states and local governments—ranging from public welfare and health, to capital outlays on highways and to police and fire protection—the largest expenditure category is investment in the population's education. Because immigrants are not distributed uniformly across the country (and because people frequently find jobs in locations other than where they were educated), inequalities in fiscal impacts attributable to their arrival can occur across areas. About 74 percent of all foreign-born lived in 10 states as of 2010, and in these states they are concentrated in major metropolitan areas.

Whereas state and local governments tend to support programs for the young, the federal government's fiscal responsibility falls disproportionately on programs for the elderly—specifically pensions and health care—which

---

few years from its current, extraordinarily low level to average 2.5 percent over the 2014–2039 period and over the longer term—compared with its average of 3.1 percent between 1990 and 2007. The average interest rate on all federal debt held by the public tends to be a little lower than the rate on 10-year Treasury notes. The reason is that interest rates are generally lower on shorter-term debt than on longer-term debt, and the average maturity of federal debt is expected to remain at less than 10 years. Thus, CBO projects that the average real interest rate on all federal debt held by the public (adjusted for the rate of increase in the CPI-U) will be 1.7 percent over the 2014–2039 period and 2.2 percent over the longer term. (The average interest rate on all federal debt is projected to rise more slowly than the 10-year rate because only a portion of federal debt matures each year.) CBO generally uses the average interest rate on all federal debt as a discount rate when it calculates the present value of future streams of total federal revenues and outlays in its long-term projections, as it does in estimating the fiscal gap described in Chapter 1. The Social Security and Medicare trust funds hold special-issue bonds that generally earn interest rates that are higher than the average real interest rate on federal debt. Therefore, in projecting the balances in the trust funds and calculating the present value of future streams of revenues and outlays for those funds, CBO uses an interest rate equal to 2.5 percent in the long run.

002700

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

occur later in life. When immigrants are on average younger than the population as a whole—as has traditionally been true (though this is changing somewhat in recent decades)—states tend to incur the more immediate costs of new immigrants.[26] Furthermore, only a portion of the fiscal benefit of immigrants—the taxes they pay—accrue to state and local governments, with a substantial share going to the federal government. This means that, even if the arrival of immigrants creates a neutral net fiscal impact in the long run, some subnational areas will incur net costs, while others and the federal government may incur net benefits. Additionally, some states may be net exporters to other states of college-educated graduates transitioning into the workforce. Ideally, life-cycle fiscal impact models would quantify the benefits over the long term that accrue to states that have made strong investments in public education, taking into account subsequent interstate migration of those who have been educated.

The state analyses of New Jersey and California reported on in *The New Americans,* which were based on Garvey and Espenshade (1998) and Clune (1998), respectively, confirmed the intuition that an inflow of foreign-born individuals affects state finances disproportionately. For New Jersey, in the fiscal year 1989-1990, the net fiscal cost to state and local budgets associated with immigrant-headed households was estimated to be $232 (adjusted to 1996 USD) per native household. In the case of California, the state and local fiscal burden imposed on native residents by immigrant-headed households was estimated to be $1,178 per native household for fiscal year 1994-1995 (again adjusted to 1996 USD). For both studies, all publicly provided goods other than national defense were assigned equally (pro rata) across the full population, foreign-born and native-born. In contrast, the addition of immigrants in these states was estimated to have generated net fiscal contributions to the federal budget (National Research Council, 1997, pp. 292-293).

Lee and Miller (2000), updating results from the analysis in *The New Americans*, confirmed that the fiscal impact of immigration at the federal level is largely positive and typically negative at the state and local levels. However, fiscal outcomes are sensitive to both the amount of immigration and the kinds of immigration that occur, as well as the prevailing tax rates and rules on benefits. Local results vary widely depending on whether or not a locality receives large numbers of immigrants. Areas that do not attract immigrants may still benefit from the federal tax advantages that are created without having to shoulder the marginal local costs generated

---

[26]In a review of the literature for the United States, Kandel (2011) concluded that the relatively young age distribution of the foreign-born accentuates the degree to which state and local governments incur greater fiscal costs from the foreign-born than the federal government.

Copyright National Academy of Sciences. All rights reserved.

by incoming populations. Additionally, spending patterns (e.g., on schools or other benefits) and taxes (e.g., property taxes) may in turn influence the level and composition of immigration attracted to an area.

While education expenditures and income tax revenues create much of the redistribution from state to federal jurisdictions, there are other factors. One example is the cost of public safety, law enforcement, and corrections; the federal government reimburses state and local entities a fraction of costs to incarcerate criminal aliens, the remaining costs are borne by local governments. Though a growing population will typically add to the total cost of policing and enforcement, evidence cited above suggests that the marginal cost added by an immigrant may be less than the average cost for the population, as the new arrivals generally exhibit lower crime rates than do natives. Another cost of immigration is created by the use of welfare programs (see Chapter 3 for a detailed profile). Programs, such as Social Security and Medicare, Medicaid, and Temporary Assistance for Needy Families, create expenditures affecting the fiscal picture at the federal level. However, because the foreign-born are disproportionately of working age and contributing through payroll taxes, increases in immigration have improved Social Security's finances (Social Security Administration, 2015). Immigrant households' use of food assistance programs and Medicaid is much higher than that of native-headed households—not as a result of not working (in 2009, 95% of immigrant households with children had at least one person working) but because of lower levels of education and income. Use of cash and housing programs for the two groups is similar. The extent of the impact differential for welfare programs between foreign- and native-born varies by state, by localities within state, and by specific program (see Table 3-15, Chapter 3, on welfare use for immigrant and native households with children). Likewise, the burden of immigration on law enforcement is not evenly distributed across states because a handful of states incarcerate the majority of noncitizens who commit crimes. Additionally, Branche (2011) explored the costs that cities incur under various programs of immigration enforcement and found that federal contributions did not suffice to compensate for the loss at the state level.

## 7.6 SUMMARY AND KEY POINTS

Estimating the fiscal impacts of immigration is complex. How the exercise is framed and what assumptions are built into the model depend to a significant degree on the questions of interest. For some policy questions, forward-looking costs and benefits projected to accrue as a result of an additional immigrant (and his or her descendants), or the in-flow of some number of immigrants, may be most relevant. For other questions, the budget implications for a given year associated with the stock, or recent

002702

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

changes in the stock, of foreign-born people residing in a state or nation may be the primary interest—this is often the case for legislators. Sometimes the question is about absolute net fiscal impacts; sometimes it is about the impact of immigrants *relative* to the native-born.

All population subgroups make contributions to government finances by paying various kinds of taxes and add to expenditures by consuming public services—but the levels differ. Therefore, **models of the fiscal impacts of immigration must distinguish between citizens and noncitizens and, for the latter, authorized and unauthorized individuals.** Legal status is often central to determining what services immigrants qualify for and tend to use and what taxes they are required pay.

There are two basic accounting approaches to estimating fiscal impacts, one static and the other dynamic. Static models are conducted for a specific time frame, often a tax year. The contribution to public finances of immigrants (and, in many analyses, dependent household members) as well as government expenditures on benefits and services supplied to that population are computed and are often compared with those of the native-born. If data are available, cross-sectional static models can be repeated over multiple years to gain a sense of fiscal impacts for a historical period. Dynamic accounting approaches, in contrast, compute the net present value of tax contributions and government expenditures attributable to immigrants, and in some analyses the resulting generations, projected over the immigrants' (and their descendants', if included in the analysis) life cycles. Such analyses involve modeling the impact of an additional immigrant on future public budgets.

Among the advantages of the **static approach** (and, implicitly, the disadvantages of the dynamic projections) are the following:

- **Conceptual simplicity due to comparatively less reliance on assumptions**—assumptions are not needed about future population trends (which depend on further assumptions about fertility rates, life expectancies, and return migration rates), income growth, economic performance, tax rates and program use, deficit and debt profiles, and immigration policy changes—which introduce a high degree of uncertainty into estimates that require such assumptions.
- The backward-looking perspective of a static analysis enables the **use of data on observed flows of revenues and expenditures associated with immigrant-driven expansion of the population.**
- If repeated cross-sectionally, a static approach can provide **rigorous estimates of the net fiscal contribution of immigrants up to the present time (or, as far as is covered in the data) who arrived in a country after a given point in time.**

002703

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Among the advantages of **dynamic projection models** (and, implicitly, disadvantages of the static approach) are the following**:**

- They provide a **forward-looking perspective for estimating the fiscal impacts of immigration in a life-cycle framework,** creating the capacity to incorporate results into policy scenarios using alternative assumptions about the number of immigrants entering the country, their characteristics, and their legal status.
- They provide **a capacity to adjust for structural differences between migrants and natives**—for example, to assess the impact of immigration on population aging, which in turn may affect economic outcomes and the sustainability of government programs.

A preliminary step in all fiscal analyses is to select the unit of analysis. For dynamic analyses, the household unit of analysis is problematic because household structure changes over time through marriage, divorce, widowhood, the departure of grown children, the arrival of additional family members from abroad, death, etc. (National Research Council, 1997, p. 305). Additionally, native-born individuals reside in immigrant-headed households and vice versa. Therefore, **the individual unit of analysis is appropriate for dynamic analysis** since households are not stable over time and because it allows the costs and benefits originating in mixed households to be divided between native-born and foreign-born members, as opposed to having to ascribe them exclusively to one group or the other.

For cross-sectional analyses, the choice is somewhat different, although a case can still be made for again selecting the individual as the primary unit. Aside from being consistent with the method used for the dynamic analysis, even at a point in time, there is an issue of how to define an immigrant household—by head, by requiring both adults to be foreign born, etc.—that is largely avoided by focusing on individuals. This task becomes even more problematic for a repeated cross-sectional analysis that spans 10 or 20 years.

Assumptions must also be made about how to treat fiscal impacts generated by the children of immigrants. In forward-looking projections, the logic for including second generation effects is straightforward: Even if children of immigrants are native-born citizens, the costs and benefits that they generate would not have been realized without the initial addition to the population of the immigrant parent(s). Given that educational attainment drives projected earnings and tax payments, assumptions must be made about it as well. Final education level attained is typically predicted as a function of parental education. In cross-sectional analyses, this life-cycle effect will be driven by current demographic composition. Costs associated with educating the children of immigrants that accrue during the analysis

002704

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

period are included in the fiscal estimate; however, a good case can be made for treating these expenditures as an investment, due to the strongly positive association between level of education and eventual contributions to tax revenues. This return on investment is only captured (and imperfectly, except in a steady state) in cross-sectional data to the extent that the data are detailed enough to reveal the earnings of grown children of immigrants. Even then, except in a steady state, the net fiscal contribution of today's grown children of immigrants is a blunt estimate of the future impact of today's young children.

Assumptions must also be made about the legal access to and use by immigrants of public services and how this additional use affects the cost of their provision. Ideally, data would be available to allow estimates of how a marginal immigrant changes public costs (and quality of service). In the absence of such data, assumptions must be made. **For services such as education and health care, where the total cost of provision is roughly proportional to the number of recipients, expenditures should be assigned on a pro rata basis, or per capita average cost basis, in the accounting exercise.** A practical starting place for treating crime and law enforcement is to assign costs on a pro rata, or per capita average cost basis as well. In other cases, the marginal cost of provision may differ significantly from the average cost. For some "congestible public goods," the marginal costs of additional population (immigrant or native) may be higher than average cost. For pure public goods[27] (defense, government administration, interest on the national debt), the marginal cost due to immigration is, at least in the short run, zero or close to it. **Thus, for answering some questions, it may be reasonable to allocate the costs of pure public goods to the native-born or to the resident population prior to the arriving immigrants** (a resident population consisting of natives and earlier immigrants). **Since public goods such as national defense represent a large part of the federal budget, the choice of how to allocate these expenditures will have a large impact on fiscal estimates.** It is instructive to run alternative scenarios to gain a sense of the magnitude imparted by this choice.

For the forward-looking generational accounting model, assumptions must be made about the government's intertemporal budget constraint and about the tax burden across generations. **Projections of future fiscal policy and deficits depend on many unknown and uncertain aspects of the future context, about which choices must be made.** For example, one set of estimates in Chapter 8 relies on the CBO's fiscal forecast from its long-term budget outlook. Since 2010, the CBO has adopted a maximum deficit level

---

[27]A pure public good has the characteristics that (1) its consumption by one individual does not reduce the amount available to be consumed by others, and (2) it is not possible to exclude any individuals from consuming the good.

002705

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of 250 percent of GDP and no more. This choice is driven by the notion that, at this level, the cost of debt service plus whatever else the government spends exceeds the maximum amount that can be raised in taxes and by the fact that there is no precedent in modern history for sustaining this level of debt.

The government borrowing rate determines, in expected value, the present value of future net dollar flows in the budget. For the panel's analyses, the relevant discount rate is the real rate of interest at which the U.S. Treasury can borrow. This is hard to predict and, even retrospectively, it depends on the maturity of the bonds being sold. The CBO uses 1.7 percent for the discount rate from 2014 to 2039 and 2.2 percent thereafter for real returns, but 2.5 percent for debt held by the Social Security and Medicare Trust Funds. The choice of discount rate has a large impact on estimated net present value of future fiscal impacts of an additional immigrant. **Because this and other assumptions have such a substantial impact on absolute estimates, comparative figures—for example, comparisons of the estimates for different education groups or for immigrants relative to the native-born—are more interesting and reliable than the absolute figures.**

Finally, tax inequities across states and regions arise because (1) different types of government goods and services are provided by federal, state, and local levels, (2) different kinds of taxes are collected at these jurisdictions, and (3) immigrants are not uniformly distributed across jurisdictions. **Previous research (e.g., Lee and Miller, 2000) has firmly established that the fiscal impact of immigration at the federal level is largely positive and typically negative at the state and local levels.** However, fiscal outcomes are sensitive to both the amount of and the kinds of immigration that occur, as well as the prevailing tax rates and benefits rules.

Copyright National Academy of Sciences. All rights reserved.

# 8

# Past and Future Fiscal Impacts of Immigrants on the Nation

## 8.1 INTRODUCTION

Chapter 7 described accounting approaches for assessing the fiscal impact of immigration and outlined the conceptual challenges involved in its measurement given that the counterfactual scenario (no immigration) is unobservable. In this chapter, the panel applies these concepts to estimate the fiscal impacts of immigration at the national level. In so doing, the underlying variation across geographic regions that is important for a full understanding of the impacts of immigration is ignored at this point. These national estimates incorporate the U.S. federal government budget in its entirety and a single aggregation of budgets in the 50 states and their localities. Chapter 9 explores variation in state and local fiscal impacts across states in detail.

The panel chose to set geographic variation aside (for the time being) in order to focus on how fiscal impacts of immigrants have changed over time. As described in Chapter 9 and elsewhere in this report, over time there has been considerable change both in states' fiscal policies and practices and in geographic patterns of immigrant receiving and internal migration. These are important features that mediate impacts on particular geographic regions. But the aggregated national analysis may be more directly useful for national immigration policy, and it provides a feasible method of assessing trends in fiscal impacts over time.

In the sections that follow, the panel first documents the path of net annual fiscal impacts and the relevant characteristics among immigrants and natives during a recent historical period for which good coverage in

*359*

002707

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

annual cross-sectional data exists. Covering 20 years of immigrants' experiences, from 1994 to 2013, these data allow annual fiscal effects to be decomposed into amounts attributable to different immigrant generations. However, it is important to note that these cross-sectional estimates of fiscal impacts are heavily influenced by the age distribution of the underlying groups at the time of data collection. Thus, although such cross-sectional "snapshots in time" are instructive, they do neglect the evolution of fiscal costs and benefits over time that occurs as these groups age—an evolution that we know to be important (see Chapter 7). After children are born, their average fiscal impacts remain negative for many years because they absorb benefits in the form of public education and other support while paying little or no taxes. But children eventually become adults, many of whom work and, for sustained periods, pay more in taxes than they receive in expenditures on benefits. In old age, the fiscal-impact pendulum typically swings back the other way. To some extent, today's older immigrants may be taken as proxies for today's young immigrants observed in future periods. But simply assuming an older age group in a cross section is identical to a younger age group observed at a later time is likely to offer a misleading portrait of the cumulative fiscal impacts of any particular cohort of immigrants over that cohort's life span.

The above limitation of the cross-sectional analysis establishes the rationale for estimating life-cycle fiscal impacts. The second task undertaken in this chapter is to formalize conjectures about future life-cycle fiscal impacts in a systematic way. The panel presents a longitudinal forecast of the future national fiscal impacts of immigrants arriving today, using updated methodologies developed for the 1997 *New Americans* report (National Research Council, 1997) and updated data and assumptions about future growth rates, interest rates, and demography. Because the children of immigrants play an important role in the fiscal impact of immigration, we pay special attention to fertility rates and intergenerational patterns of educational attainment, and we factor in return-migration behavior. The forecast aims to answer the following question: In today's dollars, what is the predicted long-term net benefit to domestic governments of an additional immigrant and that immigrant's descendants?

## 8.2  HISTORICAL FISCAL IMPACTS OF IMMIGRATION, 1994-2013

This section provides cross-sectional estimates of the fiscal impact of immigration for the nation at specific points in recent history. These estimates are possible because data essential for this kind of analysis have now been available for an extended period. The addition of questions about parents' places of birth to the annual demographic supplement to the Current Population Survey (CPS) enabled *The New Americans* to explore the

002708

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

current and future fiscal impacts of first and second generation immigrants, which tended to differ significantly (National Research Council, 1997). At that time, only samples for 1994 and 1995 were available with sufficient data fields to identify generational status, so pooling these years to allow for sufficient sample size generated a dataset for a single cross-sectional analysis. With almost two decades of additional data now available, the current panel was able to create a sequence of multiple cross-sectional samples. Thus, we can examine the impacts of immigration, taking into account both the first and second generation, during this historical time interval.

## Notes on Measurement

As in the national fiscal projections for the 1997 report, the analyses in this chapter focus on individual immigrants rather than immigrant households (although, when the costs of children are allocated to adults in the same households, as is done much of the time here, a quasi-household structure is created). While many studies of the fiscal impacts of immigration adopt immigrant-headed households as the unit of account, measuring benefits and taxes at the individual level facilitates longitudinal calculations of the type presented in Section 8.3, where the future fiscal impacts of immigration are explored. Households may change their composition over time through marriage and divorce, deaths, births, adoptions, move-ins and move-outs, additions or subtractions of members beyond the nuclear family, and so forth. Also, immigrant-headed households often contain nonimmigrant members. Following individuals is simpler because decision rules for allocating fiscal flows in the face of some of these family-dynamic complications can be avoided.

Within the data analysis approaches used in this chapter, fiscal positives (taxes) and fiscal negatives (expenditures on program benefits) are first allocated to the individuals most closely linked to them. In some cases this individual allocation creates some additional interpretive tasks, relative to household analyses, in order to identify the fiscal impact of a particular population group defined by nativity and generation. The costs of educating the U.S.-born children of immigrants are particularly important in this regard. In a household-based analysis, public education unambiguously creates a cost attributable to the immigrant-headed household. For an individual-based analysis, the cost of public education is detected due to the presence of a child in the household and is initially assigned to that child. In some of the analyses below, we present data in such a way that the age- and individual-specific timing of fiscal impacts (both positives in the form of taxes and negatives in the form of program costs) can be shown—even for children. In other analyses, the fiscal impacts of individuals and their dependents are combined and the impacts of the latter are attributed their parents' genera-

002709

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tional groups. Details about which allocation procedure is used are provided for each of the accounting exercises reported on below.

Age profiles—indicating average flows of taxes or benefits by education, by immigrant generation, and in some cases by time since the immigrant's arrival—are central to the accounting and forecast methods used here. To generate these profiles, the panel used data from the Annual Social and Economic (March) Supplement of the CPS, which provides annual estimates of program utilization as well information on the characteristics (such as education and nativity) of respondents. These age profiles are used in both the historical static and lifetime forecast analyses presented in this chapter.[1] Single-year age profiles were constructed by averaging three adjacent years' worth of data for smoothness. These age profiles are then rescaled for each middle year so that—when applied to population estimates by age, education, immigrant generation, and time-since-arrival in that middle year—they capture the total flows for a given program in that year in an estimate that is consistent with administrative sources.[2] Details

---

[1]The main alternative to the CPS that could have been used is the Survey of Income and Program Participation (SIPP), conducted by the Census Bureau. The CPS and SIPP each have advantages and disadvantages. While ultimately choosing not to use it for other reasons, *The New Americans* (National Research Council, 1997) panel concluded that the greatest strength of SIPP is that it contains more accurate monthly data on program participation and expenditures and richer information on wealth and income sources than does the March CPS. The current panel, like the panel that authored the 1997 report, chose to use the CPS due its substantially larger sample size. Because the analyses in this report required cells defined by age, immigrant generation, and education, as well as some separate analyses at the state level, sample size was critical. The March CPS also has an oversample of Hispanics (and a number of other groups, including Asians), which increases representation of immigrant and second generation households. In addition, because the March CPS is conducted every year, it is possible to combine across years to further increase the sample size. Moreover, the state-level analysis in Chapter 9 would not have been possible using the SIPP, and the panel felt it was important to use a consistent data source across analyses. Timeliness was also an issue. The lags in release of new SIPP data are much longer than those for the March CPS, which is available in the fall of each survey year. Current immigration research based on SIPP is using the data from the 2008 panel. The immigrant population had a different composition by 2011-2013 relative to 2008—specifically, the more recent period has lower percentages of unauthorized immigrants, fewer Mexican immigrants, and more Asian immigrants. Also, program use and employment change over time. Regarding potential bias, both data sources are known to underreport income and program use. And although internal panel calculations indicated that SIPP shows higher program use than does the CPS, the differences were about the same for immigrants and natives, so the bias was not related to immigrant status but rather just an overall feature of the CPS. Thus, adjustment to administrative totals for income and program use addresses much of the known underreporting problem.

[2]The analyses in this chapter make the de facto assumption that immigrants are represented in the CPS roughly proportionally to their representation in the population. For each benefits program, CPS data are adjusted for under- or over-reporting by scaling each record by a single multiplicative factor for that particular program so that the accumulated aggregate over all records match program totals from National Income and Product Accounts. However, there is

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

about the estimation methods for specific programs are listed in the Technical Annex to this chapter.

To assess the robustness of the panel's historical estimates, we conducted a sensitivity analysis by varying assumptions about program utilization and about how public expenditures are attributed. We broadly followed the methodology of Dustmann and Frattini (2014), who specified two overarching cost scenarios in which immigrants incur either the average cost or the marginal cost of public goods, plus a number of subscenarios within each of these two. Their baseline specification has immigrants incurring the average cost of public goods. For our analysis, we used the eight scenarios listed in Box 8-1, the first of which is the average-cost baseline, consistent with Dustmann and Frattini (2014).

Dustmann and Frattini (2014) explained the rationale for examining these particular scenarios. In theory, as explained in Chapter 7, pure public goods can be enjoyed by an unlimited number of citizens, implying that the cost of providing them to an additional immigrant should be zero (the marginal cost scenario). But in practice one expects most services provided by governments to be susceptible to congestion. As described in detail in Chapter 7, assigning to immigrants the average cost of public goods—like defense spending, or total defense outlays—calculated across all U.S. residents is a conservative assumption in that it generates estimates that may overstate the net cost of an additional immigrant. Thus, to examine robustness of findings based on the average-cost approach, the panel included scenarios (5 through 8) that assign a marginal cost of zero for public goods, under the assumption that an additional immigrant does not increase the total cost to the nation of services such as national defense.

Scenario 1 includes interest payments as a component of public goods spending, along with defense, foreign aid, and state and local spending

---

likely a differential undercount of the unauthorized component of the immigrant population. Based on a residual method that compares survey estimates of the resident population with administrative data on legal immigration, a number of researchers (e.g., Baker and Rytina, 2013; Passel and Cohn, 2014; Warren and Warren, 2013) have estimated the characteristics of the unauthorized population, including its fiscal impacts. These estimates suggest that unauthorized immigrants as a group may have a more positive fiscal impact than authorized immigrants, but only because of their age structure. The average undocumented immigrant is of younger working age than the average documented immigrant (there are very few undocumented immigrants of retirement age); thus, the net fiscal impact of the former is more positive at the federal level and overall. Also, as detailed in Chapter 3, undocumented individuals, young unauthorized immigrants who qualify for the Deferred Action for Childhood Arrivals Program, temporary visa holders, and recent legal permanent residents are ineligible to receive benefits from some programs; and unauthorized immigrants do not qualify for the earned income tax credit. Nonetheless, since, at any given age, unauthorized immigrants tend to earn less than their authorized counterparts, controlling for age, they are less of a benefit to public finances than authorized immigrants.

002711

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 8-1**
**Alternative Scenarios for Attributing Public Expenditures to Immigrants and Natives**

Scenario 1:   Immigrants and natives incur the average cost of public goods
Scenario 2:   Same as scenario 1, but interest costs are excluded
Scenario 3:   Same as scenario 1, but immigrants' consumption and sales and excise taxes are reduced by 20 percent
Scenario 4:   Same as scenario 1, but capital income taxation is not contributed by immigrants before 10 years in the country
Scenario 5:   Immigrants incur the marginal cost of public goods (zero), and natives incur the total cost
Scenario 6:   Same as scenario 5, but interest costs are excluded
Scenario 7:   Same as scenario 5, but immigrants' consumption and sales and excise taxes are reduced by 20 percent
Scenario 8:   Same as scenario 5, but capital income taxation is not contributed by immigrants before 10 years in the country

---

categories such as subsidies and interest payments. In scenarios 2 and 6, we remove interest payments from the public goods calculation because they represent the cost of servicing debt attributable to past spending and deficits from which new immigrants did not benefit.[3] Scenarios 3 and 7 follow *The New Americans* (National Research Council, 1997) in estimating the consumption of immigrants by assuming a constant real amount of income is remitted to the country of origin and thus not spent in the United States. Based on a conservative reading of a study using data on Germany, Dustmann and Frattini (2014) assumed that immigrants send remittances back to their home countries at levels that affect consumption such that U.S. sales and excise taxes paid by them are reduced by 20 percent relative to the average for the general population. This adjustment factor is used in scenarios 3 and 7 to provide another robustness assessment that is consistent with their methodology. In scenarios 4 and 8, the panel explores

---

[3]Interest payments, the vast majority of which go to servicing the debt, are not raised right away by an immigrant entering the country—they represent the current cost of servicing past deficits to which new immigrants did not contribute. Over time, an additional immigrant may affect the level of debt and thus debt payments, depending on his or her net fiscal impact. But, particularly for the intergenerational projection exercise (in the second part of this chapter), this calculation would be very complicated as each lifetime profile of marginal fiscal net contribution or cost uniquely affects the debt and debt service costs. Treating the marginal contribution of immigrants to debt service as either zero or average cost as we do provides a range of possible results, although given the impact of discounting on future flows, the true impact would be much closer to the zero cost than the average cost scenario.

002712

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the effects from assigning zero capital income taxation to immigrants who have been in the United States for less than 10 years. In the other scenarios, the implicit assumption is that ownership of company shares is distributed similarly across native- and foreign-born populations. But scenarios 4 and 8 assume that recent immigrants do not own shares of U.S. companies and therefore do not make capital tax payments. Although new arrivals do have lower ownership than the general population, this simplifying assumption is clearly an overstatement of the difference in stock equity between natives and immigrants. Nonetheless, it is useful for understanding the potential impact of assumptions about capital ownership by immigrants.

In the sections that follow, the panel first describes the policy environment, and then explores the age structure and number of children of U.S. immigrants, and trends in education, working, and earnings among immigrants. We then examine the effects of variations in patterns of program utilization, receiving government benefits, and paying taxes, by age. Because the assumption about how the costs of public goods are assigned varies across scenarios, our initial analysis of age-related patterns (which follows immediately below) omits them—this allows the discussion to focus first on fiscal impacts linked to age structure. In the subsequent sections, we reintroduce public goods in order to present complete fiscal impact estimates for immigrants and natives for scenario 1 and, to test for robustness, across the other seven scenarios.

### A Changing Policy Environment

*The New Americans* (National Research Council, 1997) was released immediately after passage of welfare reform via the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). PRWORA was one of the largest changes in fiscal policy in recent decades. The 1997 report attempted to estimate the effects of PRWORA on the fiscal impacts of immigrants, bearing in mind that the law denied certain means-tested benefits to noncitizens. Its authors assumed immigrants received no such transfers until after 5 years of residence.[4] The changes in net fiscal impact of immigration associated with PRWORA, although modest, were found to make immigrants less costly to states and localities and more beneficial to federal finances (National Research Council, 1997). Subsequent analyses by Bitler and Hoynes (2013), Borjas (2002),  and others indicated that, in the aftermath of PRWORA, participation rates at the national level of immigrants declined for a number of programs relative to those of natives

---

[4]The affected programs were Supplemental Security Income, Aid to Families with Dependent Children (AFDC), food stamps (SNAP), nonemergency Medicaid, energy assistance, rent subsidies, and public housing.

Copyright National Academy of Sciences. All rights reserved.

(see discussion in Chapter 3). Borjas (2002) found that much of the national decline was attributable to immigrants living in California, who experienced "a precipitous drop in their welfare participation rate (relative to natives)."

In the years since welfare reform, there have been other significant changes to U.S. fiscal policy that likely factor into the fiscal impacts of immigrants. In particular, other income support programs have grown to fill the gaps left by welfare reform. The Earned Income Tax Credit has been expanded several times over the past three decades, rising more than five-fold from an $11 billion program in 1994 to a $58 billion program in 2013. Similarly the child tax credit, introduced in the late 1990s, has grown into a $22 billion program that aims to support working families. Participation in the Supplemental Nutrition Assistance Program (SNAP), also known as food stamps, declined initially after welfare reform before rising strongly due to policy reforms prior to the Great Recession, during which SNAP participation rates rose even more (Ganong and Liebman, 2013). In 2013, SNAP assistance totaled $75 billion, up from $23 billion in 1994.

Other changes in the federal safety net during this period included the addition of a prescription drug benefit to Medicare starting in 2006, the expansions of Medicaid, and introduction of health insurance subsidies in 2014 via the Affordable Care Act (ACA), which also aimed to rein in future Medicare spending. Undocumented immigrants are explicitly omitted from coverage and subsidies under the ACA, but authorized immigrants are fully eligible. Because the panel's period of historical data ends in 2013, we do not include the ACA in our historical analysis. In the longitudinal forecast of the future fiscal impacts of immigrants (Section 8.3), we model the effects of the ACA following the assumptions of the Congressional Budget Office (CBO).

There were also changes in tax policy during the historical period. Income tax rates were cut across the board in 2001 but partially reinstated for high-income households in 2013. Tax rates on capital gains and dividends were cut in 2003 and were also partially reinstated for high-income households in 2013. By 2011, these tax cuts had reduced average federal tax rates on all income groups, but by more in the lowest four quintiles (Congressional Budget Office, 2014b).

By 2013, most of the federal policy responses to the Great Recession, which significantly lowered taxes and raised spending starting in 2008, had run their course. In particular, payroll tax rates, which were lowered in 2011 and 2012, returned to their precrisis levels. However, usage of means-tested benefits remains elevated compared to prerecession levels (Congressional Budget Office, 2015).

In addition to these changes at the federal level, state and local fiscal policies have also been in flux during the historical period. Chapter 9 provides details about differences across states in the effect of immigration on subnational fiscal situations.

002714

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2722 of 4699 PageID #:  5887

The Economic and Fiscal Consequences of Immigration

### The Age Structure of Immigrant and Native Populations

Immigrants and their children differ from natives in a variety of ways, but perhaps most notably in terms of age structure. Figure 8-1 shows the age structure in 1995 of first generation immigrants (the foreign-born) and their native-born children (the second generation), both plotted against the left vertical axis, and the rest of the native-born population (referred to here as the third-plus generation) plotted against the right axis. Figure 8-2 shows the age distributions of these three groups in 2012.

To repeat the definition of immigrant generations given in Chapter 1, "first generation" refers to foreign-born persons, excluding those born abroad and granted citizenship at birth because their parents are U.S. citizens. The second generation consists of U.S.-born persons who have one or more first generation parents. The third-plus generation includes U.S.-born persons of two U.S.-born parents and those born abroad but granted citizenship at birth because their parents are U.S. citizens. Note that persons born in U.S. outlying areas such as Puerto Rico are considered U.S. born



FIGURE 8-1  The U.S. population by age and immigrant status in 1995.
NOTE: "Third-plus generation" includes third and higher generations since ancestors arrived in the United States.
SOURCE: Data are from the 1994-1996 March Current Population Surveys.

002715

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2723 of 4699 PageID #: 5888

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-2** The U.S. population by age and immigrant status in 2011.
NOTE: "Third-plus generation" includes third and higher generations since ancestors arrived in the United States.
SOURCE: Data are from the 2011-2013 March Current Population Surveys.

in this analysis because they are citizens at birth and thus, barring legal changes in citizenship, their movement to or from the 50 states would not be affected by immigration policy.

As both figures reveal, the first generation is heavily concentrated at working ages and does not contain many very young or very old people—the latter reflects the unusually small numbers of immigration arrivals during the mid-20th century. The second generation, which in 1995 still included children of early 20th century immigrants, is nearly the mirror image of the first generation, with comparatively few members of working age and higher shares of children and the elderly. By 2012, the second generation had become more concentrated at young ages, including younger adults, reflecting the substantial growth in their parents' population—first generation immigrants of working ages—and the mortality of the second generation children of earlier immigrant waves. By contrast, the age structure of the third-plus generation has remained more stable. However, the aging of the Baby Boom generation has produced a more rectangu-

002716

Copyright National Academy of Sciences. All rights reserved.

lar (rather than pyramidal) age distribution than was typical in the past, roughly equalizing the shares of young, working-age, and older third-plus generation Americans.

Age structure is crucially important for contextualizing fiscal impacts of a group with a particular nativity status *at a point in time*—or cross sectionally. While lifetime fiscal impacts may turn out to be more similar across groups, the short-term impact of a group that is concentrated at working ages when tax contributions are high will be more positive than that of a group that is, at that time, either relatively young or elderly or both, because the latter age ranges typically receive more transfers than they contribute in taxes. Given the patterns evident in Figures 8-1 and 8-2, if tax payments are attributed to the first generation, many of whom are of working age, and the use of public expenditures on education are attributed to their second-generation children, one would expect the current net fiscal impact of the first generation to be positive and the impact of the second generation to be negative. The net fiscal impact of the third-plus generation could be positive or negative, but is likely to have become less positive with the aging of the Baby Boom cohorts. After 20 more years, the age distribution of those currently in the first generation will look a lot more like the current third-plus generation.

However, when the costs of dependent children are attributed to their parents—which, for many questions, will be the most relevant allocation—estimates of the current-year fiscal impact generated by first generation immigrants change dramatically. There are large counterbalancing fiscal impacts in an "immigrant household" grouping scheme. When a population is disproportionately of working ages, and therefore paying taxes and creating a positive fiscal impact, they are also likely to be disproportionately parents of children creating a fiscal negative, primarily in the form of public education costs. As shown below, this demographic characterization accurately describes first generation immigrants for the 1994-2013 period. In 2013, first generation immigrant households had a weighted average of 0.95 children in their households (see Figure 8-3)—much higher than the weighted averages of 0.29 and 0.48 for second generation and third-generation households. As indicated in Figure 8-3, some of this difference is accounted for by the fact that immigrants have had higher fertility over the past 17 or so years (suggested by the higher position at early parenting ages of the red line representing the first generation) and are also more likely to live in multi-generational households as elders.[5] But these children-in-households profiles do not account for the full difference in the weighted averages across the

[5]This is mostly "explained" by Hispanic ethnicity and family reunification policies that brought many older first generation immigrants to join their first generation children. Second generation persons have the lowest fertility, and in Figure 8-3 the whole curve for that generation is shifted a few years to the right compared with either the first or third-plus generation.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2725 of 4699 PageID #:  5890

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-3**  Average number of own children in household, by immigrant generation in 2013.
NOTE: Figures based on the Integrated Public Use Microdata Series (IPUMS)-imputed child variable, which includes biological and adopted children and step-children of any age or marital status. Second generation includes persons with one or two foreign-born parents. "Third-plus generation" includes children with parents who are second or higher generation since ancestors arrived in the United States.
SOURCE: Data are from the March 2013 Current Population Survey.

three generational categories; in fact most of the difference can be attributed to the much higher percentage of immigrants in the parenting age range relative to other populations. The average number of children for the first generation is expected to decrease as the group grows older due to slower replacement (with new immigrants arriving) than in the past.

### Trends in Education, Employment, and Earnings by Immigrant Status

In addition to age and number of dependents, an individual's education level and employment status are also important determinants of fiscal impact. Earnings and thus tax contributions tend to rise strongly with age and experience. They also rise with the level of education, and they track employment patterns in a predictable fashion. Benefits may vary inversely with education and employment to the extent that the safety net compensates need, but old-age entitlements also tend to rise with lifetime earnings and longevity, which are correlated positively with education.

002718

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2726 of 4699 PageID #:  5891

*PAST AND FUTURE FISCAL IMPACTS OF IMMIGRANTS ON THE NATION*   371



**FIGURE 8-4** Average years of education across age by immigrant generation in 1994.
SOURCE: Data are from the March 1994 Current Population Survey.

Figure 8-4 shows average education levels across age by immigrant generation in 1994 as measured in the CPS.[6] Average education declines for all groups beyond age 40 because earlier birth cohorts were less well educated. On average, first generation immigrants in 1994 had 1.5 fewer years of education than either the second or third-plus generations. Second generation education in 1994 was similar to but higher than that of the third-plus generation by 0.35 years; the children of immigrants tended to have higher education levels than other natives at every age.

Age-specific education levels have been changing over time for all U.S. residents as younger cohorts with more education have replaced older cohorts with less. Figure 8-5 depicts the same age patterns of educational attainment as Figure 8-4 but for immigrant generations in 2013. Each line is higher than it was in 1994 by roughly 1 year. The gap between the first

---

[6]We transformed educational attainment categories in the CPS into years of attainment using the crosswalk method suggested by Jaeger (1997).

002719

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2727 of 4699 PageID #:  5892



**FIGURE 8-5** Average years of education across age by immigrant generation in 2013.
SOURCE: Data are from the March 2013 Current Population Survey.

and third-plus generations has narrowed slightly during this interval from 1.5 to 1.25 years, while the second generation maintained the same 0.35 year advantage over the third-plus generation.

Patterns in employment across age also vary by immigrant status and have shifted somewhat over time. Figure 8-6 shows that in 1994, employment for all groups followed the expected inverted-U shape with increasing age and that immigrants worked less, at a given age, than natives (i.e., the first generation worked less than the second and third) except at some typical retirement ages.[7] On average, immigrants ages 20 and older were about 5 percentage points less likely to be employed than the second or third-plus generations. But by 2013, as depicted in Figure 8-7, that gap had

---

[7]As detailed in Chapter 3, the lower employment ratio of immigrants has historically been driven by lower participation of foreign-born women in the labor market. After an adjustment period, immigrant men often have employment ratios equivalent to natives and for some groups (e.g., low-skilled categories) they are considerably higher.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2728 of 4699 PageID #:  5893

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-6** Employment-to-population ratio across age by immigrant generation in 1994.
SOURCE: Data are from the March 1994 Current Population Survey.

narrowed to 2 percentage points—mostly as a result of increasing employment of immigrant women (see Chapter 3), with lingering differences by immigrant status only under age 40. Employment rates by age among the second generation have remained broadly similar to those of the rest of the native-born population.

Although employment patterns of immigrants and natives have converged somewhat over time, if one adds the impact of wages the trends in relative earnings are more similar to trends in relative education, which display less convergence. Figure 8-8 shows large differences by immigrant generation in wage and salary income in 1995, measured in 2012 dollars and including those with zero earnings. On average, immigrants ages 20 and older in 1995 earned about $5,500, or 23 percent, less than natives of comparable age. In contrast, the second generation earned roughly $3,000, or 12 percent, more than the third-plus generation. Estimates vary, but an additional year of schooling may raise earnings by 10 percent (Card, 2001). Relative to that baseline, the immigrant earnings penalty is larger than

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-7** Employment-to-population ratio across age by immigrant generation in 2013.
SOURCE: Data are from the March 2013 Current Population Survey.

might be expected, given their education disparities, but the remaining difference could be explained by reduced employment rates or hours worked. The earnings advantage of the second generation relative to the third-plus generation appears larger than would be explained by educational differences alone.

Figure 8-9, which shows earnings by age and immigrant status in 2012, visually suggests the second generation had pulled further away from the third, which is true. Note that these estimates are the average wage and salary income over people who are working and who are not. If one takes the average wage and salary income for the peak earning ages of 35-55 years old, earnings grew by about 12-13 percent for first and second generation persons but only by 9 percent for third-plus generation persons. So compared to third-plus generation wage and salary earnings, the second generation is pulling ahead and the first generation is catching up.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2730 of 4699 PageID #:  5895

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-8** Wage and salary income in 2012 dollars by immigrant generation in 1995.
SOURCE: Data are from the March 1994-1996 Current Population Surveys.

### Trends in Fiscal Flows by Age and Immigrant Generation

Now that we have considered many of the relevant characteristics of each generational group, we put this all together to examine fiscal flows. In this section we continue to take the individual as the unit of analysis, attributing tax receipts and benefit cost flows—which, when combined, yield net fiscal impacts—to each individual across the full age spectrum. This approach is useful for showing how fiscal flows vary by age and, controlling for age, across generational groups. However, such an approach disregards that children and other dependents are linked to independent adults, often from a different generational group. For this reason, in the section after this one, our analysis shifts focus by redefining generational groups to include dependents; so, for example, the first generation immigrant (the foreign-born) group includes foreign-born individuals ages 18 and older, *plus their dependent first and second generation children* (see Box 8-2). For now, in

002723

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-9** Wage and salary income in 2012 dollars by immigrant generation in 2012.
SOURCE: Data are from the March 2011-2013 Current Population Surveys.

this section, we continue to look at the fiscal flows associated with individuals without taking their dependents into account.

The cost of educating the young dominates fiscal flows early in the life cycle; contributions in the form of taxes paid dominate the middle years, and the cost of health care dominates the later years. This pattern is illustrated for first generation immigrants in Figure 8-10. Given that taxes and fiscal transfers in the United States are largely based on earnings, one would expect the persistent earnings disadvantage of immigrants and the persistent advantage of the second generation to be mirrored in patterns of tax payments and program utilization. This is certainly true in the case of taxes paid to all levels of government, which is shown in Figure 8-11 for the year 1995 and in Figure 8-12 for the year 2012. In both years, tax contributions strongly track the age profiles of wage and salary income shown in Figures 8-8 and 8-9 up to retirement ages. Because retirees continue to pay taxes on wealth and on some forms of income, their tax contributions remain positive even after their earnings cease. Immigrants ages 20 and

002724

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

---

**BOX 8-2**
**Definitions of Dependent and Independent Persons**

**Dependent:** For the purpose of the panel's estimates, we consider dependents to be anyone: (1) under age 18, (2) ages 18 through 21 and in high school full time, or (3) ages 18 through 23 and in school full time or part time with income below half of the poverty level for one person. We also consider single individuals who are ages 18 through 23 and not in school but with income below half of the poverty level (for one person) who live with at least one independent person (typically a parent) as a dependent person; 1.2 percent of the population are in this category and they are treated as dependents but are not assigned education costs.

**Independent person:** Any person (most of whom are adults ages 18 and older) who is not a dependent child. We consider individuals ages 18 through 23 who are in school and working more than part time to be independent regardless of income level.

There are a few exceptions to the aforementioned criteria. If a person is married, he or she is considered independent irrespective of age. If a person is single with children and there are no family members other than children in the household, and the person is earning above half the poverty level, the person is considered independent. If there is a household with no members satisfying the above criteria for being independent, we consider any household member with income above the average amount in the household and age 18 and older (or age 16 and older if all in the household are under 18) to be the independent person(s) in the household.

---

older contributed about 23 percent less than the third-plus generation[8] in both years, while the second generation contributed 12 percent more than the third-plus in 2012 versus 10 percent in 1995.

Comparison of the data shown in Figures 8-8, 8-9, 8-11, and 8-12 also reveals relatively moderate increases over time in tax contributions relative to the growth in earnings. Between 1995 and 2012, per capita taxes paid rose 10 percent for immigrants, 13 percent for the second generation, and 11 percent for the third-plus generation. This is about half as fast as the growth in earnings during this period; if all taxes were levied on earnings, it would imply reductions in average tax rates of about 10 percent as well. One can see by comparing the graphs in Figures 8-11 and 8-12 that all of

---

[8]Again, throughout this report, "third-plus generation" refers to all persons in the third and higher generations after immigration. In short, anyone resident in the United States who is not first or second generation is in the "third-plus generation" as defined for this chapter.

002725

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-10** Fiscal flows, first generation immigrants to the United States, 2012.
NOTE: All public spending is included, *except* pure public goods (defense, interest on the debt, subsidies). The "Health" category includes Medicaid and Children's Health (CHIP) programs. Data are Current Population Survey (CPS)-based per-capita age schedules, smoothed and adjusted to National Income and Product Accounts (NIPA) annual totals.
SOURCE: Data are from the March 2011-2013 Current Population Surveys.

the increase in inflation-adjusted tax contributions came from increases at older ages.

In contrast to the tax picture, per capita government benefits have risen in real terms across all age and nativity groups at an average rate that was slightly faster than the growth in earnings. This is largely attributable to the influence of current economic conditions compared to those in the 1990s: employment and wages have grown slowly in the wake of the Great Recession, while federal spending was increased to respond to the crisis. While the levels may have changed, Figures 8-13 and 8-14 (which attribute program costs of education at the age points of the children being edu-

002726

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-11** Total taxes paid per capita in 1995 at all levels of government, by age and immigrant generation.
SOURCE: Data are from the 1994-1996 March Current Population Surveys, normalized to program totals.

cated[9]) show that little change has occurred in the shape of the age profiles of benefits over time, nor has there been much change in the distribution of benefits across groups defined by immigrant status. But each age profile has risen, with growth most apparent (by comparing the lines in Figures 8-13 and 8-14) at the youngest and oldest ages.

Growth in per capita benefits from 1995 to 2012 was most rapid for those under age 20, where outlays increased 31 percent for immigrants, 38 percent for the second generation, and 33 percent for the third. But the second-most rapid rate of growth in benefits was actually among individuals of working ages, 20 to 64, which is not easy to see in the figures.

---

[9]For other programs where the benefit depends on household size or that require the presence of children to qualify, the benefit is allocated equally to all members of the family unit receiving the benefit. These programs include AFDC, other welfare programs, and the Earned Income Tax Credit (EITC).

002727

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 2735 of 4699 PageID #:  5900



**FIGURE 8-12** Total taxes paid per capita in 2012 at all levels of government, by age and immigrant generation.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to program totals.

Benefits absorbed in the working-age range rose 33 percent for immigrants, 34 percent among the second generation, and 32 percent for the third-plus generation. Increases in benefit *amounts* at these ages were considerably less than the increases in benefit *amounts* for other age groups because benefits started from a smaller base. Benefit levels in retirement were already the highest of any age group, and they increased the most in dollar terms during this period. But the *percentage* growth in benefits for the retirement age group was only 16 percent for immigrants, 12 percent for the second generation, and 18 percent for the third-plus generation.

Another noteworthy aspect of these trends is that per capita benefits absorbed by the third-plus generation exceed those for the first and second

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-13**  Total per capita benefits received in 1995 at all levels of government, by age and by immigrant generation.
SOURCE: Data are from the 1994-1996 March Current Population Surveys, normalized to program totals.

generations at all ages past the typical years of college attendance.[10] To the extent that receipt of some government benefits is contingent on years spent in the country, some of this is to be expected. But it is striking that the U.S.-born second generation absorbs fewer benefits than other natives at all such ages in both 1994 and 2012. The underlying patterns of program use contributing to differential benefit receipt by native-born children of immigrants and other natives at adult ages are primarily twofold. Up until about age 50, the third-plus generation uses means-tested programs such as Medicaid, unemployment benefits, food stamps, and the Earned Income

---

[10]This finding is consistent with those in the peer-reviewed research literature. Sevak and Schmidt (2014), for example, link Health and Retirement Study survey data to restricted Social Security administrative data to show that immigrants have lower levels of benefits than do natives. The amount included here as state and local retirement benefits includes defined benefit plans but not defined contribution plans. The latter are typically not categorized as a public benefit and should be distinguished from payments out of tax revenues.

002729

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-14**  Total per capita benefits received in 2012 at all levels of government, by age and by immigrant generation.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to program totals.

Tax Credit (EITC) more intensively than does the second generation. After age 50, the third-plus generation absorbs more old-age benefits, such as Social Security pensions and disability payments, federal retirement payments, and state and local retirement benefits.

These patterns of program use are also revealed in Figure 8-15, which shows receipt of benefits associated with federal old-age support programs (Social Security, Medicare, Medicaid payments to nursing homes, federal worker retirement, and other programs), and in Figure 8-16, which shows federal means-tested programs for the poor (the rest of Medicaid, Supplemental Security Income, unemployment insurance, food stamps, the EITC, and other support); data are shown for 2012 in both figures. Old-age benefits are nonzero prior to retirement because of the inclusion of disability insurance, but they rise rapidly for all groups after age 62. Immigrants receive less Social Security than natives because they have typically paid less into the system or have immigrated after working ages. Prior to age 62, the excess spending generated by the third-plus generation relative to the second generation is

002730

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-15**  Federal old-age benefits received per capita in 2012, by age and immigrant generation.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to program totals.

due to federal disability insurance, whereas after age 62 it is attributable to federal retirement benefits (i.e., Social Security), which rise steeply with age.

For working-age individuals, the means-tested federal antipoverty benefits tracked in Figure 8-16 show the third-plus generation as receiving the highest per capita benefits. At young ages, per capita benefit receipt is highest for the second generation (the children of immigrants). A similar conclusion can be drawn from the data on program participation rates. As detailed in Chapter 3, U.S.-born children with two immigrant parents have higher program participation rates than those with one or two native-born parents because they are likely to live in households with lower than average incomes and, since they are U.S. born, they are eligible for various safety net programs. At the oldest ages, the first generation absorbs the most means-tested antipoverty benefits on a per capita basis.[11]

-----

[11]Of course, the aggregate expenditure amounts are greatest for natives because they are by far the largest group.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-16** Federal means-tested antipoverty benefits received per capita in 2012, by age and immigrant generation.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to program totals.

Medicaid and Supplemental Security Income, which are included here and are typically characterized as means-tested, effectively serve as substitutes for Medicare and Social Security for older immigrants, many of whom do not qualify for those old-age entitlements because of abbreviated domestic work histories. Differences by nativity in usage of means-tested programs at working ages are partially mechanical in nature; recent arrivals do not qualify for many of these programs initially. But program eligibility cannot explain the differences between the second and third-plus generations during working ages, so these differences are likely instead driven primarily by more favorable socioeconomic status among the second generation.

    *Net fiscal impacts* by age and immigrant status are depicted for 1995 and 2012 in Figures 8-17 and 8-18, respectively. These graphs reveal that the second generation has had a more positive net fiscal impact at almost every age than either the first or third-plus generation. Individuals of the

002732

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-17**  Net fiscal impact in 1995, per capita, including all levels of government, by age and immigrant generation.
SOURCE: Data are from the 1994-1996 March Current Population Surveys, normalized to program totals.

second generation contribute considerably more in taxes during working ages than either of the other generational groups, although they also absorb slightly more benefits at younger ages. By contrast, at least prior to around age 60, the net fiscal impact of the first generation has been consistently less positive than the other two generational groups.

Although the third-plus generation contributes more in taxes during working ages than does the first generation, and thus its net fiscal impact during working ages is more positive than immigrants, this pattern switches in retirement. In old age, the third-plus generation has consistently been more expensive to government on a per capita basis than either the first or second generation, despite the higher per capita utilization of means-tested benefits in old age by the first generation.

Net fiscal impacts at the state and local level by age and immigrant status (not shown, but based on the data sources cited for the figures)

002733

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2741 of 4699 PageID #:  5906

The Economic and Fiscal Consequences of Immigration



FIGURE 8-18  Net fiscal impact in 2012, per capita, including all levels of government, by age and immigrant generation.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to program totals.

broadly conform to these patterns, with larger deficits at younger ages for the first and second generations, followed by larger surpluses at working and older ages. Federal net fiscal impacts (not shown in the figures) are also similar in pattern to those illustrated but, because transfers to the young are primarily channeled through states and localities, the negative net impacts for individuals positioned in the pre-working ages of the life cycle are smaller (in absolute terms).

### Annual Fiscal Impacts by Immigrant Status

In this section, the panel considers the fiscal impact of different population subgroups defined by immigrant status. The total net fiscal impact of a subpopulation depends on its age structure, depicted earlier in this chapter, and on the age profile of net fiscal impacts, as presented in the preceding

002734

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

discussion. Because U.S. subpopulations identified by nativity are so different in size, their aggregate fiscal impacts also vary widely in magnitude, which complicates comparisons. Thus, it is useful to recast the net fiscal impacts of immigrant groups either on an average (per capita) basis, as was done above, or as the ratio of government receipts contributed (taxes paid) to expenditures on benefits received, as was done by Dustmann and Frattini (2014). When this "fiscal ratio" is greater than unity, the group pays more in taxes than it receives in benefits, whereas a fiscal ratio less than unity indicates that the group pays less in taxes than it receives in benefits. However, this approach does not control for a group's age structure, which we have seen is quite important—this is a topic to which we return later in the chapter when we examine the fiscal impact of the foreign born and native born controlling for their characteristics.

We begin by examining the annual fiscal impacts of all age cohorts of three broadly defined generational groups as identifiable in our pooled March CPS data samples for the 1994-2013 analysis period. Our definitions of first, second, and third-plus generation are unchanged from earlier in the chapter. However, for the analysis here—and in contrast to the analyses up to this point in the chapter—we have created groupings that are partially mixed. The first group consists of first generation immigrants (the foreign-born) ages 18 and older, *plus their dependent first and second generation children* (see Box 8-2). The second group consists of independent individuals (those ages 18 and older) in the second generation *plus their dependents (who typically are third generation by nativity status)*. The third group consists of independent individuals in the third and higher generations, plus their dependents.[12] The rationale, in this exercise, of grouping dependents with their parents is so that the full fiscal impact created by an immigrant or a native born person (which includes their family members, or other dependents) can be estimated for a given year; without the presence of the independent persons to which they are linked, dependents could not factor into the fiscal picture. Later in this chapter, we analyze the impact of these same three generational groups on fiscal impact, adjusting for age, education, and other characteristics; this analytical framework allows for assessment of the net fiscal impacts, at the federal and state levels of government, of these first and second-generation groups separately, in comparison to the third-plus generation group, specified as the reference group.

Associating dependent children with an independent individual responsible for them entails assigning the children to the generational group

---

[12]For all three groups, dependent children—identified at the individual level in the CPS data—are included in their parents' generational group. Therefore, some second generation individuals (i.e., dependent children) appear in the first generation group; the same logic applies to the membership of the groups labeled "second generation" and "third-plus generation."

002735

Copyright National Academy of Sciences. All rights reserved.

defined by the nativity status of that individual (typically their parent(s)); this is done for the dependent children of independent individuals in each of the generational groups. Dependent children are assigned to the parental generation if one or more independent parents are present in the household.[13] If there are no parents in the household, then the generational group of the oldest co-resident independent relative is assigned. Defining generational groups in this way attributes the costs to governments associated with dependent children—most notably, in terms of magnitude, public expenditures on education—to the generation of a parent or relative responsible for raising the child.[14] Of course, dependent children of any population subgroup, foreign-born or native-born, generate a net fiscal cost (they are not yet working and they need to be educated). As expected, and as shown quantitatively below, the fiscal costs associated with dependent children to some extent counterbalance the positive fiscal impact for the first generation (see Figures 8-17 and 8-18) created by the fact that, during the analysis period at hand, this generation was disproportionately of working age and hence paying taxes (refer to Figures 8-1, 8-2, 8-11, and 8-12).

Table 8-1 reports subpopulation size, per capita fiscal impacts, and fiscal ratios for these groups of independent-persons-plus-dependents at different levels of government in 1994 and 2013. The cost of public goods is assigned on an *average cost* basis as specified in scenario 1 (defined in Box 8-1, above); results for the alternative scenarios are discussed later in the chapter. Recall, that these may be considered relatively conservative estimates because the addition to government costs associated with public goods (like national defense) created by one addition (or a small number of additions) to the population may be close to zero. The calculations reveal that the population group consisting of immigrants (first generation) and their dependent children has a lower fiscal ratio than either of the groups composed of native-born independent individuals and their dependent children. The overall fiscal ratio of the second generation (independents plus their dependents) is more similar to that of the first generation group in 1994 but more similar to that of the third-plus generation group in 2013; we provide an explanation of this observation below. A major source of the overall differential between the first generation group and the two native-born groups originates from the considerably lower fiscal ratio at the state

---

[13]It is possible for a dependent to be associated with independent persons in different generational groups (e.g., a child of a first generation mother and third-plus generation father). In order to sort the group of children with this ambiguous generational identification, a randomly selected half are assigned to the mother's generation and the other half to the father's. This is done instead of splitting the flows of each child to avoid ending up with a group-weighted per capita flow that does not match the total population per capita flow.

[14]In those few cases where there was no independent co-resident parent, the associated independent person was usually a grandparent.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 8-1 Net Per Capita Fiscal Impacts, in 1994 and 2013, of First Generation Immigrants and Their Dependents, Second Generation Native-born Independent Individuals and Their Dependents, and Third-plus Generation Native-born Independent Individuals and Their Dependents, by Level of Government

| 1994 | 1st Generation and Their Dependents (population: 29.9 million) | | | 2nd Generation and Their Dependents (population: 20.8 million) | | | 3rd Generation and Their Dependents (population: 212.2 million) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Outlays | Receipts | Receipts/ Outlays | Outlays | Receipts | Receipts/ Outlays | Outlays | Receipts | Receipts/ Outlays |
| Federal | 8,408 | 5,769 | 0.686 | 13,853 | 8,022 | 0.579 | 8,996 | 7,734 | 0.860 |
| State and Local | 5,104 | 3,215 | 0.630 | 4,601 | 4,659 | 1.013 | 4,621 | 3,901 | 0.844 |
| Total | 13,511 | 8,985 | 0.665 | 18,454 | 12,681 | 0.687 | 13,617 | 11,635 | 0.854 |

| 2013 | 1st Generation and Their Dependents (population: 55.5 million) | | | 2nd Generation and Their Dependents (population: 23.3 million) | | | 3rd Generation and Their Dependents (population: 237.3 million) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Outlays | Receipts | Receipts/ Outlays | Outlays | Receipts | Receipts/ Outlays | Outlays | Receipts | Receipts/ Outlays |
| Federal | 9,767 | 7,117 | 0.729 | 13,093 | 9,495 | 0.725 | 12,050 | 9,473 | 0.786 |
| State and Local | 6,141 | 3,769 | 0.614 | 6,101 | 5,039 | 0.826 | 5,844 | 4,813 | 0.823 |
| Total | 15,908 | 10,887 | 0.684 | 19,194 | 14,534 | 0.757 | 17,894 | 14,286 | 0.798 |

NOTE: "Dependent" and "independent" are defined as in Box 8-2. Outlays include all government spending, including interest payments and public goods, which are allocated equally to all groups on a per capita basis. Population counts are the sum of independents and dependents in each group. Data are from March Current Population Surveys. Estimates are for scenario 1 (see Box 8-1) which assigns the average costs of public goods to new immigrants, as opposed to the marginal cost, and includes interest payments.

002737

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and local level of government for the former group whose adult members, during the analysis period, were more likely to be of parenting age and who also experienced higher fertility rates.[15] These differentials in state- and local-level fiscal impacts largely reflect differences in the groups' total cost of educating dependents.[16] In the longer term, these dependent children will grow up to be contributing adults and thus these educational expenditures may reasonably be considered an investment in their future productivity.

The first generation group displays a lower fiscal ratio than does the third-plus generation group at the federal level. This fiscal effect, and a portion of the fiscal difference at the state and local level as well, reflects the lower average education levels—and, related to these, the lower wages and employment—of the first generation independent persons compared to the second and third-plus generation independents in the other two groups (see the cross-sectional results presented in the previous section). Interestingly, the fiscal ratios in Table 8-1 at the federal level actually rose for the first and second generation groups between 1994 and 2013, whereas they fell for the third-plus generation group. To some extent, this may reflect new programs and expansion of others (such as EITC) that some native-born individuals are eligible for and some immigrants are not, as well as declining fertility rates among immigrants. But the trend is mainly driven by the aging of the native-born population. In 2013, the third-plus generation (as defined by nativity status) population included a higher proportion of elderly persons than it did in 1994. The second generation population, in contrast, had a relatively much higher concentration of individuals in the fiscally expensive retirement age groups in 1994 than in 2013 (refer back to Figures 8-1 and 8-2). As described in Chapter 2, at the beginning of the 1994-2013 analysis period, a large portion of the second generation consisted of the children of earlier heavy waves of immigrants who arrived around the beginning of the 20th century and were thus an older group. The elderly are, of course, associated with increased federal outlays. By 2013, more of the children of newer waves had reached adulthood and were thus more heavily represented among second-generation independent persons, reducing the average age of this group.

Readers will note that the figures in Table 8-1 translate into quite large fiscal shortfalls *overall*—the fiscal ratio (Receipts/Outlays columns) falls well below 1.0 for *all three* groups. For 2013, the *55.5 million* first generation independent persons and their dependents, 23.3 million second

_____

[15]We stress again that these are averages; the foreign-born are an extremely heterogeneous group along many of the dimensions being considered here, and consequently they are also heterogeneous in their per capita fiscal ratios.

[16]The per-child cost of education in our estimates is the same for all groups. The differences referenced here are due to differences in the average number of dependent children per independent individual in the three groups.

002738

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

generation independent persons and their dependents, and 237.3 million third-plus generation independent persons and their dependents yield a total fiscal shortfall of $1,243 billion. The total fiscal burden is $279 billion for the first generation group (average outlays of $15,908 minus average receipts of $10,887, multiplied by 55.5 million individuals), $109 billion for the second generation group (average outlays of $19,194 minus average receipts of $14,534, multiplied by 23.3 million individuals), and $856 billion for the third-plus generation group (average outlays of $17,894 minus average receipts of $14,286, multiplied by 237.3 million individuals). Under this scenario, the first generation group accounts for 17.6 percent of the population but 22.4 percent of the total deficit. In contrast, the second generation group accounts for just a slightly higher share of the total deficit (8.7%) than its share in the population (7.4%). The third-plus generation group, with 75 percent of the population, accounts for just 68.9 percent of the deficit. Note that, while the fiscal shortfall for the average person in the first-generation group (i.e., the per capita shortfall) was larger than was the per capita shortfall in either native-born group, the shortfall for the latter two groups would have been larger without the presence of the first generation group. This is because federal expenditures on public goods such as national defense (assigned to immigrants on an average cost basis in scenario 1) would have to be divided among a smaller population of second and third-plus generation individuals.

Cross-checking against alternative sources indicates that, although the overall deficit numbers in Table 8-1 are large, the totals (for all three groups) are consistent with actual deficit figures in the National Income and Product Accounts for the federal and state-and-local level budgets combined: The difference in 2013 between total taxes and contributions for government social programs ($4,332 billion) and total expenditures including all public goods ($5,584 billion) was $1,252 billion. The consolidated deficit for that year was actually smaller by about $400 billion because, on the revenue side, government asset income (which immigrants are assumed to not pay) and current transfer receipts (mainly fines and fees) are not included in the panel's estimates.

To elaborate on trends in net fiscal impacts since *The New Americans* (National Research Council, 1997), Figure 8-19 plots the total fiscal ratio of receipts to outlays for the three generation groups, as defined for Table 8-1, across all years since 1994. Crucially, there is no correction made here (or in Table 8-1) for different age distributions across groups and over time. The net impact of each group grows more positive during the boom of the late 1990s before falling and rising during and after the mild recession of 2001, then falling and rising again during and after the financial crisis of 2008

002739

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-19** Ratio of receipts to outlays for first generation and native-born groups as defined for Table 8-1.
SOURCE: Data are from the 1994-2013 March Current Population Surveys normalized to program totals. Estimation is for scenario 1, which assigns the average costs of public goods including interest payments to both immigrants and the native-born.

which precipitated the Great Recession.[17] In addition to this cyclical variation, a noteworthy pattern here is the reduction in the gap between the first and second generation groups, represented by the two dashed lines, and the third-plus generation group, shown by the solid line. As the Table 8-1 data show, the second generation group in particular becomes quite similar by 2014 to the third-plus generation group.

While all part of the same story, the data representations in Figure 8-19 and in Table 8-1 reveal determinants of the fiscal impact of generational groups that are quite distinct from those previously captured in Figures 8-5 through 8-12. The earlier figures show the second generation (including independents and dependents of that generation together) exceeding even the third-plus generation along a number of dimensions, including years of education, per capita wage and salary income, and per capita taxes paid.

_____
[17]The recession of the early 2000s began in March 2001 and ended in November 2001; the Great Recession began in December 2007 and ended in June 2009. These dates are determined by the National Bureau of Economic Research's Business Cycle Dating Committee at http://www.nber.org/cycles/cyclesmain.html [November 2016].

002740

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

However, the data in the earlier figures provide estimates of these variables for individuals in each generation group *by age,* regardless of calendar year. In contrast, Figure 8-19 and Table 8-1 present data in a way that prominently reflects group demographic composition and changes therein over the 1994-2013 analysis period. In Table 8-1 and Figure 8-19, the comparatively low fiscal ratios for the second generation group, relative to the third-plus generation group, in the beginning of the period reflect the former group's comparatively high concentration in the (fiscally expensive) retirement ages of the distribution at that time. The closing gap in fiscal ratios between the generations shown in Figure 8-19 reflects the more recent profile, which is now younger for the second generation, as well as the relative aging of the third-plus generation into retirement. In other words, the second generation has been gaining something of a demographic advantage from a fiscal perspective as the composition of its adult population has become younger while the third-plus generation has been growing older. The aging of the third-plus generation has also reduced the gap in fiscal ratios between the first and third-plus generation groups. The elderly are associated with increased federal outlays regardless of nativity status. The higher number of dependent children among the first generation, and the associated fiscal costs particularly at the state and local levels, offset this reduction of the fiscal ratio gap between the first generation group and the native–born groups somewhat. This interpretation of the relative fiscal impacts of the first, second, and third-plus generation groups (as defined for Table 8-1) becomes clearer below, where fiscal impacts of these groups are compared while controlling for age and other characteristics. The more favorable fiscal situation of the second generation group compared to the first is germane to a consideration of the impact of immigration since many people think of this group as part of the immigrant stock.

We now turn to the set of alternative scenarios defined in Box 8-1 above (following the approach of Dustmann and Frattini, 2014). Table 8-2 repeats the estimates for 2013 under scenario 1 (from the lower panel of Table 8-1) and then presents the estimates for 2013 under the seven alternative scenarios. For each scenario, the changes from scenario 1 are applied to all members of a defined generational group. For example, in the subset of scenarios developed to assess changes in magnitude when assuming a marginal-cost allocation of public goods (scenarios 5 through 8), instead of the average cost allocation in scenarios 1 through 4, the marginal-cost allocation is applied to all members of the first generation group, including the second-generation dependent children of first generation independents. In these scenarios, the total net fiscal impact of the first generation group becomes much more favorable, as it must mathematically. In each of scenarios 5 through 8, the total fiscal ratio for the first generation group now exceeds that for the second and third-plus generation groups. The main

002741

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 8-2** Net per Capita Fiscal Impacts of First, Second, and Third-plus Generation Groups (each with dependents) in 2013, by Scenario and Level of Government

| | | 2013 | 1st Generation and Their Dependents (population: 55.5 million) | | |
|---|---|---|---|---|---|
| | | | Outlays | Receipts | Receipts/ Outlays |
| Scenario 1 | Immigrants pay average cost of public goods | Federal | 9,767 | 7,117 | 0.729 |
| | | State and Local | 6,141 | 3,769 | 0.614 |
| | | Total | 15,908 | 10,887 | 0.684 |
| Scenario 2 | Scenario 1, but interest costs are excluded | Federal | 8,466 | 7,117 | 0.841 |
| | | State and Local | 5,517 | 3,769 | 0.683 |
| | | Total | 13,983 | 10,887 | 0.779 |
| Scenario 3 | Scenario 1 but immigrants' sales taxes are 80% | Federal | 9,767 | 7,051 | 0.722 |
| | | State and Local | 6,141 | 3,475 | 0.566 |
| | | Total | 15,908 | 10,525 | 0.662 |
| Scenario 4 | Scenario 1, but new immigrants' corporate taxes are zero | Federal | 9,767 | 6,937 | 0.710 |
| | | State and Local | 6,141 | 3,769 | 0.614 |
| | | Total | 15,908 | 10,706 | 0.673 |
| Scenario 5 | Immigrants pay marginal cost of public goods | Federal | 6,154 | 7,117 | 1.157 |
| | | State and Local | 5,515 | 3,769 | 0.683 |
| | | Total | 11,669 | 10,887 | 0.933 |
| Scenario 6 | Scenario 5, but interest costs are excluded | Federal | 6,154 | 7,117 | 1.157 |
| | | State and Local | 5,515 | 3,769 | 0.683 |
| | | Total | 11,669 | 10,887 | 0.933 |
| Scenario 7 | Scenario 5, but immigrants' sales taxes are 80% | Federal | 6,154 | 7,051 | 1.146 |
| | | State and Local | 5,515 | 3,475 | 0.630 |
| | | Total | 11,669 | 10,525 | 0.902 |
| Scenario 8 | Scenario 5, but new immigrants' corporate taxes are zero | Federal | 6,154 | 6,937 | 1.127 |
| | | State and Local | 5,515 | 3,769 | 0.683 |
| | | Total | 11,669 | 10,706 | 0.917 |

NOTE: See note to Table 8-1. The eight estimation scenarios are described in Box 8-1 and accompanying text.

002742

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| 2nd Generation and Their Dependents (population: 23.3 million) | | | 3rd-plus Generation and Their Dependents (population: 237.3 million) | | |
|---|---|---|---|---|---|
| Outlays | Receipts | Receipts/ Outlays | Outlays | Receipts | Receipts/ Outlays |
| 13,093 | 9,495 | 0.725 | 12,050 | 9,473 | 0.786 |
| 6,101 | 5,039 | 0.826 | 5,844 | 4,813 | 0.823 |
| 19,194 | 14,534 | 0.757 | 17,894 | 14,286 | 0.798 |
| 11,792 | 9,495 | 0.805 | 10,749 | 9,473 | 0.881 |
| 5,477 | 5,039 | 0.920 | 5,220 | 4,813 | 0.922 |
| 17,269 | 14,534 | 0.842 | 15,970 | 14,286 | 0.895 |
| 13,093 | 9,507 | 0.726 | 12,050 | 9,486 | 0.787 |
| 6,101 | 5,092 | 0.835 | 5,844 | 4,868 | 0.833 |
| 19,194 | 14,600 | 0.761 | 17,894 | 14,353 | 0.802 |
| 13,093 | 9,536 | 0.728 | 12,050 | 9,513 | 0.790 |
| 6,101 | 5,039 | 0.826 | 5,844 | 4,813 | 0.823 |
| 19,194 | 14,576 | 0.759 | 17,894 | 14,326 | 0.801 |
| 13,734 | 9,495 | 0.691 | 12,691 | 9,473 | 0.746 |
| 6,216 | 5,039 | 0.811 | 5,959 | 4,813 | 0.808 |
| 19,949 | 14,534 | 0.729 | 18,650 | 14,286 | 0.766 |
| 12,208 | 9,495 | 0.778 | 11,165 | 9,473 | 0.848 |
| 5,478 | 5,039 | 0.920 | 5,221 | 4,813 | 0.922 |
| 17,686 | 14,534 | 0.822 | 16,386 | 14,286 | 0.872 |
| 13,734 | 9,507 | 0.692 | 12,691 | 9,486 | 0.747 |
| 6,216 | 5,092 | 0.819 | 5,959 | 4,868 | 0.817 |
| 19,949 | 14,600 | 0.732 | 18,650 | 14,353 | 0.770 |
| 13,734 | 9,536 | 0.694 | 12,691 | 9,513 | 0.750 |
| 6,216 | 5,039 | 0.811 | 5,959 | 4,813 | 0.808 |
| 19,949 | 14,576 | 0.731 | 18,650 | 14,326 | 0.768 |

002743

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

source of the shift occurs at the federal level, where the cost of public goods such as national defense accrues. However, even the fiscal ratio for the state and local levels rises somewhat for the first generation group, since there are some public costs that accrue to governments at the subnational level.

Looking in greater detail at the results in Table 8-2, one can see that, as alluded to above, the biggest difference across the scenarios is in the way that government spending on public goods like national defense and interest payments is allocated. Government expenditures on public goods are large at the federal level in the United States, with defense outlays totaling $617.1 billion and federal interest payments adding $417.4 billion in 2013. Subsidies and grants accounted for another $125 billion. All together, these categories of federal spending accounted for almost one-third of total federal spending as reflected in the National Income and Product Accounts that year. Therefore, allocating none of the costs associated with these public goods to individuals in the first generation group, as is done under the marginal-cost scenarios, changes the fiscal ratio estimates significantly. Fiscal ratios for the first generation group rise and become considerably closer to one relative to scenarios 1 through 4, in which the average cost of public goods is allocated to the full population, including immigrants and their dependents. Most but not all of the increase in the fiscal ratio for the first generation group is linked to the change in the public goods assumption that results in vastly reduced federal spending on this group—from an estimate of $9,767 per individual in scenario 1 down to $6,154 in scenario 5—a reduction that raises the ratio of receipts to outlays from 0.729 to 1.157. State and local spending on the first generation group also falls modestly for the marginal-cost scenarios, due to a reduction in some interest payments and subsidies treated as public goods, but not by as much as the federal spending declines. In scenario 5, the total fiscal burden for the first generation group drops to $43.4 billion while it rises to $126.2 billion for the second generation group and to $1,035.6 billion for the third-plus generation group. In this scenario, the first generation group accounts for less than 4 percent of the total deficit (while still of course accounting for 17.6 percent of the sample population). As noted, government expenditures on public goods account for almost one-third of total federal spending. Therefore, the average-cost versus marginal-cost assumption—along with other assumptions having to do with how expenditures are allocated—are quantitatively extremely important in driving estimates of the fiscal impact different generational groups.

Thus, while for scenarios 1 through 4 the first generation group displays slightly lower but quite comparable fiscal ratios at the federal level, compared with the third-plus generation group,[18] the ordering reverses

---

[18]Here as elsewhere in the report, "third-plus generation" is a short-hand way of referring to everyone who is neither an immigrant nor a U.S-born child of at least one immigrant parent.

002744

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and a wide gulf between the first and third-plus generation groups appears for scenarios 5 through 8. If it is assumed that spending on defense and other pure public goods does not increase with a marginal immigrant and instead these costs are assigned to the native-born only (both second and third-plus generation groups), the first generation group appears in a much more favorable light relative to the scenarios in which its members share in the cost of pure public goods equally. Comparisons between scenarios 1-4 and 5-8 also reveal a small compounding effect associated with the native-born groups (the second and third-plus generation groups). A consequence of the zero marginal-cost allocation assumption is that these two groups appear more costly because they bear an increased burden in public goods costs—costs that in these scenarios are spread across a population that is decreased by the number of foreign-born and their dependent children.

Results also vary somewhat across the other scenarios in Table 8-2, but these differences pale in comparison with the choice between assuming marginal cost versus average cost for public goods. Excluding interest payments—that is, when only the fiscal flows generated by current, but not by past, program usage as reflected in deficits, debt, and interest payments are counted—as is done for scenarios 2 and 6, outlays for all generational groups are naturally reduced and the ratios of receipts to outlays rise.[19] The differences between immigrants and the native-born groups remain qualitatively unchanged, but the first generation comes closer to "breaking even"—and actually does so at the federal fiscal level in scenario 6—compared with scenarios 1 and 5.

Scenarios 3, 4, 7, and 8 adjust the first generation's contributions of tax receipts downward either in terms of their sales and excise taxes (3 and 7) or corporate income taxes (4 and 8). The motivation for these scenarios is the recognition that some immigrants, especially new arrivals, send remittances to their country of origin rather than spending all of their discretionary income in the receiving country and that they may not yet own taxable U.S. capital assets. The scenarios that test these factors (described in Box 8-1 above) reduce tax receipts somewhat but do not drastically alter the picture. These reductions in tax receipts do little to change the relative value of the immigrant and native-born generational groups (as defined for Tables 8-1 and 8-2) in terms of their net fiscal impacts.

---

[19]This calculation is meant mainly to serve as a sensitivity test and not to be realistic. However, debt was incurred by generations now dead as well, and an additional living person (native-born or immigrant) should not be counted as having contributed to that portion of the debt.

002745

Copyright National Academy of Sciences. All rights reserved.

### Comparing Immigrants to Natives, Controlling for Characteristics

While informative, the per capita net fiscal impacts and fiscal ratios reported thus far are associated with broad groups of individuals of widely varying age and other characteristics. As the age profiles examined earlier have suggested, the pattern, during this report's period of analysis, of net fiscal impacts of the first generation group is shaped in large part by their disproportionate presence in the working-age and family-rearing portion of the life cycle. In the aggregate, they have made large positive contributions in the form of tax revenues (although still paying less per capita in taxes than their second and third generation counterparts—refer to Figure 8-11), while also drawing on public expenditures at higher than average rates, mainly due to the presence of more children in their households relative to native-born groups. As today's immigrants age, as their children continue to move out of parental households, and as they themselves eventually move into retirement, their fiscal profiles will change substantially.

To more fully grasp the fiscal impact of immigrants and to better understand the reasons for the observed differences, it is useful to adjust for characteristics that tend to vary substantially with nativity. Chief among the key factors are age and education, as well as the calendar year—more specifically, the point in the business cycle, which clearly shifts the fiscal contributions of all population groups, as revealed by Figure 8-19 above. In Table 8-3, the panel explores how net fiscal impacts correlate with immigrant-native differences in characteristics in our pooled March CPS samples spanning 1994 to 2013. As in the analysis that produced the Table 8-1 results, the first group consists of first generation (foreign-born) immigrants, plus their *dependent* children. The second group consists of independent individuals in the second generation and their dependents. In both these groups, as in the analysis for Table 8-1, the potentially productive parents (from a tax contribution perspective) are paired with their children who generate net public costs, predominantly in the form of education. Those in the third-plus generation group include all U.S.-born persons ages 18 and older who do not have a foreign-born parent, plus their dependent children. Unlike the presentation of results in Tables 8-1 and 8-2, in Table 8-3 the estimated fiscal impacts for the third-plus generation group are used as the reference group (or benchmark) for a regression analysis of how the first and second generation groups differ from this benchmark. The unit of analysis in the regression analysis is the *independent* individual; therefore, unlike in the previous analysis, the total number of observations is less than the population (which also includes dependents). Here, the flow of program outlays and tax receipts for dependents are rolled up into the flows of the independent person to which they are linked in the data. This was an explicit decision for this type of analysis because the goal is to

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 8-3** Regression Analysis of Net Fiscal Impacts (in dollars per person) of First and Second Generation Groups Relative to Third-plus Generation Group, 1994-2013, by Level of Government

| | Federal | State and Local | Total |
|---|---|---|---|
| *Model 1 –* Controls: none; *N* = 2,537,262 | | | |
| 1st generation group | –1309 *** | –1940 *** | –3249 *** |
| 2nd generation group | –4380 *** | 535 *** | –3845 *** |
| 3rd+ gen ref. group | — | — | — |
| R² | 0.002 | 0.003 | 0.002 |
| *Model 2 –* Controls: **age group, year, sex;** *N* = 2,537,262 | | | |
| 1st generation group | –2181 *** | –1748 *** | –3929 *** |
| 2nd generation group | 1927 *** | 738 *** | 2665 *** |
| 3rd+ gen ref. group | — | — | — |
| R² | 0.223 | 0.040 | 0.152 |
| *Model 3 –* Controls: age group, year, sex, **education;** *N* = 2,537,262 | | | |
| 1st generation group | –803 *** | –1303 *** | –2107 *** |
| 2nd generation group | 1109 *** | 554 *** | 1663 *** |
| 3rd+ gen ref. group | — | — | — |
| R² | 0.296 | 0.062 | 0.220 |
| *Model 4 –* Controls: age group, year, sex, education, **race/ethnicity;** *N* = 2,537,262 | | | |
| 1st generation group | 34 | –649 *** | –615 *** |
| 2nd generation group | 1233 *** | 825 *** | 2058 *** |
| 3rd+ gen ref. group | — | — | — |
| R² | 0.303 | 0.067 | 0.229 |
| *Model 5 –* Controls: age group, year, sex, education, race/ethnicity, **number of dependents;** *N* = 2,537,262 | | | |
| 1st generation group | 277 *** | –382 *** | –104 |
| 2nd generation group | 981 *** | 547 *** | 1529 *** |
| 3rd+ gen ref. group | — | — | — |
| R² | 0.344 | 0.285 | 0.338 |

NOTES: The first, second, and third-plus generation groups (as defined at the beginning of the chapter) consist only of independent individuals. Dependents are not included (hence *N* is smaller than in the earlier analysis), but their fiscal flows are rolled into those of the independent person(s) to whom they are linked.  Each column presents coefficients and significance levels from a separate ordinary least squares regression of net fiscal impact at the given level of government (dependent variable) on indicators for generational group assignment (x variables) and indicators for the other characteristics listed as controls.

*continued*

002747

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 8-3**  Continued

The control variables added for each successive model are highlighted in boldface.

Coefficients indicate the marginal per capita effects, in 2012 dollars, that are associated with that generational group relative to the third-plus generation group. A positive coefficient indicates an improvement, or savings to the government level, in net fiscal impact; a negative coefficient indicates a budgetary reduction for that government level. Thus, a coefficient on "First generation group" equal to 100 implies that, compared to an average member of the third-plus generation group, an average member of the first generation group has a net fiscal impact that is $100 more positive for that level of government.

Age groups are measured in 5-year intervals.

Asterisks denote statistical significance at the 1 percent (***), 5 percent (**), or 10 percent (*) levels. Estimation applies to scenario 1, which assigns the average costs of public goods, including interest payments, to each member of the first generation group (as well as to each member of the second and third-plus generation groups).

A note on the $R^2$ values: In an alternative specification in which (1) the fiscal costs and benefits linked to first generation and second generation individuals were grouped independently of age, and (2) dependents were not assigned to a parent's generational group, the $R^2$ values were quite a bit larger. This change in the strength of correlation occurs because, when the fiscal impacts of dependent children are not included in the generational group of the parent or responsible adult to which the children are assigned, the age variable explains a lot more of the total variation in fiscal impacts compared to the specification used for this table, in which age as a driving factor of fiscal impact is diluted by grouping dependents with the independent individual to which they are assigned.

estimate the impact on the regressions of the independent person's characteristics—most notably age, education, and number of dependents.

Table 8-3 shows the results of a number of regression analyses designed to understand how differences in characteristics between independent individuals in the first and second generation groups (as defined above) and the third-plus generation reference group contribute to group differences in per capita fiscal impact. In each model, the net fiscal impact in 2012 dollars is regressed on generational group status (i.e., first generation or second generation group, with the third-plus generation group constituting the reference category). Model 1 includes no additional explanatory variables and hence shows unadjusted difference in net fiscal impacts for the first and second generation groups relative to the third-plus generation group. Each subsequent model incorporates an additional control variable or group of control variables. A comparison of the coefficients of each subsequent model with the preceding one illuminates the role of the control variable(s) that have been added in explaining the differences between the first and second generation groups and the third-plus generation group. For this very large pooled sample, the regression coefficients are nearly always statistically significant (the level of statistical significance is shown by the asterisks after a coefficient, as explained in the table note).

002748

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Model 1 represents the differences in net fiscal impacts of the first and second generation groups relative to the third-plus generation group when differences in characteristics of the two groups are not taken into account. Hence, it corresponds to what would be obtained if one simply examined the averages for each generational group. Using Model 1, the first generation group's net fiscal impact is $1,309 less per independent person[20] at the federal level and $1,940 less at the state and local level, for a total of $3,249 less in net fiscal impact per person overall. The corresponding figures for the second generation group are $4,380 less per person at the federal level and $535 more per person at the state and local level, totaling $3,845 less overall.

The extremely large deficit for the second generation group at the federal level in Model 1 might seem surprising in light of Figures 8-17 and 8-18, which indicate that second generation *individuals* generally have a more positive fiscal picture than third-plus generation *individuals* at most adult ages (and have a similar picture in the remaining ages). Although the comparison in those two figures do not take the fiscal impact of dependents into account, it seems unlikely that their inclusion would shift the picture so drastically. The major factor accounting for the large shift is the differences in the age distribution between second and third-plus generation individuals, as illustrated in Figures 8-1 (for 1994) and 8-2 (for 2012). One can think of the regression sample (spanning 1994-2013) as representing a mixture of the two age distributions for each immigrant generation. When the panel examined the data for this period, we found that, among adults, the second generation was concentrated among both younger individuals, prior to their peak earning years, and (especially) older individuals. The latter are most expensive for the federal government due to their lower taxes paid and higher benefits received, but not very expensive for the states (because they still pay property taxes). This makes the fiscal impact of second generation independent persons at the federal level quite negative relative to the third-plus generation group. Results for Model 2, discussed below, confirm this reasoning.

Model 2 adds basic controls for age, calendar year, and sex. The results control for differences in age profiles for the first generation and second generation groups relative to the third-plus generation group, as well as any differences in sex composition or in the year of the CPS source survey. Under Model 2, a negative coefficient on the generation group indicator means that, adjusted for age, sex of group members, and survey year, the net fiscal impact is more negative for a member of that group than for a

---

[20]The *N*s in Table 8-3 are the numbers of independent individuals present in each generational group; the flows of dependents are rolled into those of the independent individuals in the household to which they are linked.

002749

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

member of the third-plus generation (reference) group. Of course a positive coefficient indicates the opposite. Comparing the results for Model 2 with those for Model 1 shows that, controlling for age and the other two variables, the fiscal impact of the first generation group remains quite negative relative to the third-plus generation group.

The impact of differences in the age distribution of the first and third-plus generation groups is seen by comparing the coefficients for the first generation group in Model 2 to those obtained in Model 1. The fiscal impact of the first generation group becomes *more negative* (by $872 per person) at the federal level, while it becomes *less negative* (by $192 per person) at the state and local level. These results indicate that the age distribution of the first generation group has a (fairly substantial) positive effect on that group's fiscal contribution relative to the reference group at the federal level (because the first generation group's contribution becomes more negative when one controls for age) but a (smaller) negative effect on the first generation group's fiscal contribution at the state and local level. These findings reflect the concentration of first generation immigrants in the working ages, which increases their federal tax contributions, but it also means they have more dependent children, on average, which increases state and local expenditures on education. Taking both the federal and state and local contributions together, controlling for age (as well as sex and year) results in the total fiscal impact of the first generation group becoming *more negative* (by $680 per person), meaning that the immigrant age distribution has a positive effect on that group's fiscal contribution overall. This analysis highlights that the first generation group's concentration in the working ages has a favorable effect on their fiscal impact at the federal level and overall but a (relatively small) negative effect on their fiscal impact at the state level.

In contrast to the findings for the first generation group, the Model 2 results for the second generation show positive net fiscal impacts for this group at both the federal and state and local levels, totaling $2,665 per person. These results indicate that the large negative effect for this group at the federal level in Model 1 were entirely due to the group's age distribution (concentration at both younger and, especially, older ages), since controlling for age (as well as sex and year) transforms this to a sizable positive effect ($1,927 per person).

Models 3, 4, and 5 sequentially add controls for education, race/ethnicity, and number of dependents, respectively. Again, for brevity, we report regression coefficients only for first and second generation groups; these coefficients can be interpreted as 2012 dollars of net fiscal impact associated with being a member of the first or second generation group, compared to being a member of the third-plus generation group. In Model 3, where educational differences are taken into account, the negative net fiscal

002750

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

impacts of the first generation become considerably attenuated. Relative to Model 2, the negative impact on federal finances falls by more than half, from –$2,181 to –$803 per person, while the effect on state and local finances falls by about a quarter, from –$1,748 to –$1,303. In Model 4, which controls for differences in racial/ethnic identity, the net fiscal impact of the first generation moves even closer to that of the third-plus generation: essentially on par at the federal level (+$34) and becoming much less negative (just –$615 per person, down from –$2,107) in total. One rationale behind this specification is that, in the United States, race and ethnicity may proxy for differences in treatment and opportunity. Along with age and education, race and ethnicity can affect earnings opportunities and may also be related to labor force participation.

The trend of converging fiscal impacts across immigrant generation groups continues in Model 5. Controlling for number of dependents—where a higher average number of dependents, relative to the third-plus generation, creates more-negative fiscal impacts for immigrants in a raw analysis—lowers the total net fiscal impact for the first generation to a statistically insignificant negative difference (–$104 per person) from the third-plus generation. In short, this comparison of first generation and third-plus generation individuals of similar age and race/ethnicity, with similar education levels and in households with similar numbers of dependents, yields estimated net fiscal impacts that are quite similar.

For the second generation, the net fiscal impacts in Models 3 through 5 continue to be more positive than the third-plus generation reference group across the board, as they were for Model 2. Taking Models 2 through 5 together, the second generation's positive impact on federal finances is somewhat large, varying between $981 per person in Model 5 and $1,927 per person in Model 2. Impacts on state and local finances are also positive but smaller, ranging from $547 per person in Model 5 to $825 per person in Model 4.

It is perhaps not surprising that controlling for education and race/ethnicity eliminates a significant portion of the immigrant penalty (that is, the negative net fiscal impact relative to the third-plus generation) for the first generation. At working ages, net fiscal impact is likely to rise with human capital and skills relevant for U.S. labor markets. These results also reflect that members of the second generation (like all nativity groups) are costly primarily during their youth (when this analysis links them as dependents with a foreign-born parent). Once they are independent adults, this analysis shows their net fiscal impact to be quite positive, even when they are linked with their own dependents.

When a similar regression analysis is applied to the seven alternative scenarios, one finds that assigning public goods only to the native-born (i.e., the second and third-plus generations) strongly increases the   estimated

Copyright National Academy of Sciences. All rights reserved.

net fiscal impact of being an immigrant (member of the first generation). Because that scenario assigns the cost of public goods to the second and third-plus generations alike, coefficients on the second generation indicator do not change.

### Historical Fiscal Impacts: Summary

While cross-sectional estimates of fiscal impacts are limited in a number of ways, 20 years of CPS data on first and second generation immigrants provide numerous insights about the fiscal impacts of immigrants.

**Immigrant and native-born populations have historically been and remain very different in terms of their age structure.** For the 1994-2013 analysis period, first generation individuals were heavily concentrated in working ages, reflecting growth in immigration leading up to this period and the typical young age profile of immigrants. During the early years of this period, the second generation had comparatively higher shares of elderly, especially, and also young individuals relative to the first and third-plus generations[21] because members of that generation tended to be the children of earlier large waves of immigrants. By 2012, the second generation was mainly concentrated at young ages, including younger adults, reflecting substantial recent growth in the immigrant cohort of working-age adults with children, coupled with mortality of the second generation children of earlier waves of immigrants.

Considering the fiscal contributions of individuals (without including dependent children), cross-sectional data from 1994-2013 reveal that**, at any given age, adult members of the second generation typically have had a more positive net fiscal impact for all government levels combined than either first or third-plus generation adults.** Reflecting their slightly higher educational achievement, as well as their higher wages and salaries (at a given age), the second generation contributes more in taxes on a per capita basis during working ages than either the first or second generations.

The same cross-sectional data reveal that **the net fiscal impact of individuals in the first generation—at least prior to around age 60—has been consistently less positive than the fiscal impact of the second and third-plus generations.** Relative to the other two generation groups, the foreign-born contribute less in taxes during working ages, and thus their net positive impact during working ages is lower. However, **this pattern switches in retirement, when the third-plus generation has consistently been more expensive to government on a per capita basis than either the first or second**

---

[21]As noted earlier, throughout this report, "third-plus generation" refers to individuals of the third generation *and higher*—that is, all U.S. residents who are neither immigrants nor children of at least one foreign-born parent.

002752

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**generation.** This change reflects the greater use of Social Security benefits by the third-plus generation.

A different perspective on these same data results from examining the annual per capita fiscal impact for the 1994-2013 analysis period in a way that reflects the age structure of each generational group as it actually existed in each year. For this analysis, the panel defined generational groups such that each group includes the dependent children of independent individuals. For these generational groups, the net fiscal costs of dependent children are included as part of the calculations of outlays, receipts, and net fiscal impacts for the group. For purposes of per capita comparisons, the population of each group is counted as the number of independent individuals of that generation plus the number of their dependent children. **Assigning the per capita fiscal cost of public goods such as national defense on an average cost basis, the first generation group (independent individuals plus their dependents), has a lower fiscal ratio (taxes paid divided by expenditures on benefits received) than the second and third-plus generation groups.** This outcome, portrayed in Table 8-1 and Figure 8-19, is driven by two factors: (1) The lower average education level of the first generation group translates into lower incomes and, in turn, lower tax payments. (2) Higher per capita costs (notably those for public education of dependent children) are generated by the first generation group at the state and local levels because this group has, on average, more dependent children per adult member. A partially offsetting positive fiscal impact is that, during the analysis period, first generation adults were disproportionately of working ages and paying taxes. The regression results, which adjust for characteristics—most notably age and education—corroborate this interpretation (refer to Table 8-3). Controlling for age, the results indicate that, during the analysis period, the concentration of independent individuals of the first generation group in the working ages created a favorable effect on the group's fiscal impact at the federal level and overall but a (relatively small) negative effect on its fiscal impact at the state and local level. The regression results further indicate that **the more negative fiscal impact of the first generation group (relative to the two native-born groups) overall is accounted for by (1) lower average educational levels for first-generation adults and (2) their larger average number of dependents.**

Looking again at every year over the 1994-2013 period of historical analysis, and again assigning the per capita fiscal cost of public goods such as national defense on an *average cost* basis to all generational groups, **the fiscal ratio for the second generation group (including dependent children) is only modestly more positive than the fiscal ratio for the first generation group over the period as a whole, and it is well below that of the third-plus generation group.** The fiscal ratio (shown in Table 8-1 and Figure 8-19) is similar to that of the first generation group in 1994, but becomes more like

002753

Copyright National Academy of Sciences. All rights reserved.

that of the third-plus generation group by 2013 (although it remains lower). This result may at first blush be somewhat surprising, given the data represented in Figures 8-8 through 8-12, which show that the second generation (as individuals without dependent children) exceeded the third-plus generation along a number of dimensions, including years of education, per capita wage and salary income, and per capita taxes paid. Remember, however, that data underlying those earlier figures were arranged to estimate these variables for individuals in each group *at a given age*. The comparatively low fiscal ratios for the second generation group relative to the third-plus generation group reflects, in the beginning of the 1994-2013 period, the former group's comparatively high concentration in the (fiscally expensive) retirement portion of the age distribution. The closing gap in fiscal ratios between the generational groups (shown in Figure 8-19) reflects the more recent age profile, characterized by a younger second generation of independent individuals and an aging of the third-plus generation's independent individuals to a higher concentration in retirement. The regression analysis in Table 8-3 indicates that **the larger negative effect for the second generation group (compared to the third-plus generation group) during the analysis period was due entirely to the two groups' age distributions.**

Because the federal government has typically run budget deficits during the analysis period, the three generational groups mostly have negative net fiscal impacts between 1994 and 2013. However, **both federal and total fiscal ratios increased for both the first and second generation groups between 1994 and 2013, while they generally decreased for the third-plus generation group.** The net fiscal impact of each generational group grew more positive during the boom of the late 1990s before falling and rising during the 2000s and again during and after the financial crisis of 2008.

**Data for the analysis period (shown in Table 8-1) translate into large fiscal shortfalls overall: The total fiscal ratio falls well below 1 for *all three* generational groups.** Cross-checking against alternative sources indicates that, although these numbers are large, they are consistent with deficit figures in the National Income and Product Accounts for the federal and state-and-local budgets combined. For 2013, the data in Table 8-1 show the 55.5 million people in the first generation group (independent individuals and their dependents), 23.3 million people in the second generation group (independent individuals and their dependents), and 237.3 million people in the third-plus generation group (independent individuals and their dependents) as producing a total (federal plus state-and-local) fiscal shortfall of $1,243 billion. The total fiscal burden was $279 billion for the first generation group (average outlays of $15,908 minus average receipts of $10,887, multiplied by 55.5 million individuals), $109 billion for the second generation group (average outlays of $19,194 minus average receipts of $14,534, multiplied by 23.3 million individuals), and $856 billion for the third-plus

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

generation group (average outlays of $17,894 minus average receipts of $14,286, multiplied by 237.3 million individuals). Under the assumptions of this analysis, **the first generation group accounted for 17.6 percent of the population and 22.4 percent of the total deficit. In contrast, the second generation group accounted for a slightly higher share of the total deficit (8.7%) than its share in the population (7.4%). While the fiscal shortfall for the average person in the first generation was larger than it was for the average person in either the second or third-plus generation groups, the shortfall for the latter two groups would have been larger without the addition of the first generation group because federal expenditures on public goods such as national defense (assigned to all members of that group on an average cost basis under scenario 1) would have to be divided among a smaller population.** Some argue that this is an important benefit of immigration.

Government expenditures on public goods are large, accounting for almost one third of total federal spending. Therefore, the average versus marginal cost assumption is quantitatively extremely important in driving fiscal impact estimates. **When a marginal cost allocation of public goods is assumed, instead of the average cost allocation, the total net fiscal impact of the first generation group becomes much lower than that of the two native-born groups.** In this case, the first generation group accounts for less than 4 percent of the total deficit (while still of course accounting for 17.6 percent of the sample population).

**Fiscal impacts vary strongly by level of government.** States and localities bear the burden of funding educational benefits enjoyed by immigrant and native children. The federal government transfers relatively little to individuals at young and working ages but collects much tax revenue from working-age immigrant and native-born workers. Inequality between levels of government in the fiscal gains or losses associated with immigration appears to have widened since 1994.

## 8.3  FORECASTS OF LIFETIME NET FISCAL IMPACTS

### Introduction

Section 8.2 addressed the question of the fiscal impacts of immigration using current and historical data to describe what has happened in recent decades. One insight from that analysis was that recent fiscal impacts reflect the youthful age structure of immigrants currently and thus may not be indicative of their future fiscal impacts. In this section, the future fiscal impacts of immigrants are explored using a different type of analysis. Among the focal questions are the following: If an immigrant arrives in the United States and pays taxes and receives benefits over his or her lifetime, will that additional immigrant contribute positively to public finances on

002755

Copyright National Academy of Sciences. All rights reserved.

net, by paying more in taxes than that individual receives in benefits? Or will this additional immigrant represent a net fiscal cost by absorbing more in benefits than is paid in taxes? What about the children of that immigrant who may create public costs today but who may work and pay taxes in future years? In short, what is the magnitude of the total new net contribution or burden associated with the immigrant's arrival, including the net contribution or burden of the immigrant's descendants?

This research question is best examined with a dynamic, forward-looking calculation, as was done in the pioneering work on future fiscal impacts in *The New Americans* (National Research Council, 1997) almost two decades ago. The calculation assumes the condition and subsequent life experience of an "average" new immigrant, based on the characteristics of recent arrivals to the United States, and follows the immigrant into the future, adding up tax payments and benefit receipts each year from the time of entry, weighted by the probability of the immigrant's survival and probability of remaining in the country. The model also forecasts the immigrant's fertility, and the taxes paid and benefits absorbed by children of the immigrant. The fiscal impacts of descendants are also weighted by probabilities of their survival and of remaining in the United States.

Including the impact of an immigrant's descendants over a significant part of the life cycle is an important feature of the forward-looking calculation presented here, and one that distinguishes it from other types of fiscal impact models. Descendants of immigrants often only enter the debate as children, because this is often where they appear in cross-sectional data providing a point-in-time snapshot; currently the average immigrant household is a net fiscal burden in part because young children of immigrants, like the children of natives, receive public education. Following the descendants of immigrants further into the future, when they become workers and start paying taxes, provides a more complete measure of fiscal impact because it includes not just the cost of their education but also the delayed fiscal benefits of that education: larger tax payments made possible by the investment in human capital that education represents.

As discussed in Chapter 7, forward-looking analyses require assumptions about future developments which are inherently uncertain. The panel has addressed these uncertainties by examining the robustness of results across an array of reasonable alternative scenarios. The CBO and the Social Security Trustees[22] routinely conduct analyses of long-term fiscal

---

[22]Technically, there are three boards of trustees overseeing the Social Security and Medicare programs: the Board of Old Age and Survivors Insurance Trust Fund and the Disability Trust Fund, the Board of the Hospital Insurance Trust Fund (Medicare Part A), and the Board of the Supplemental Medical Insurance Trust Fund (Medicare Part B). Currently the same six trustees serve on all three boards. For further information, see www.ssa.gov/history/reports/trustees/historypt.html [November 2016].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

developments that many observers view as meaningful, given that they supply "official" projections, even though they are subject to high levels of uncertainty. Those analyses similarly evaluate robustness by comparing results across a range of scenarios. We adopt a broadly similar research design and array of assumptions about central rates of growth and change in future periods.

## Methodology

Broadly speaking, the budget concepts and methodologies adopted here were developed in *The New Americans* (National Research Council, 1997). Age profiles are estimated for a comprehensive list of government tax and spending programs at federal and at state and local levels. The approach is partial equilibrium in nature, which means that an additional new immigrant is assumed to pay taxes and receive benefits in the same way that an average immigrant with similar characteristics does along whichever temporal baseline is being projected. Any economic or policy responses to the presence of the new immigrant are not taken into consideration. In addition, we do not model macroeconomic responses to debt or tax rates beyond those that are implicit in CBO forecasts, which we describe in detail below. For small changes, these assumptions are likely to be reasonable, but one should not extrapolate these results to forecast the effects of large numbers of new immigrants.

As discussed in the preceding section presenting the historical analysis, a key question is how to account for government spending on public goods. There are several such categories, but by far the largest is federal defense spending which today amounts to around $2,000 per person annually. Pure public goods, by definition, do not trigger additional costs with additional users—at least as long as the number of additional users is small—so the marginal impact should be zero; and it almost certainly would be if one were to take literally the scenario of only one additional immigrant. But it may be incorrect to assume that a large increase in the population, whether obtained through immigration or some other channel, would exert no pressure on the defense budget and similar programs. In order to examine the robustness of our results, we include alternative assignments for federal defense spending and other categories of public goods in a subset of scenarios. As in *The New Americans* (National Research Council, 1997), we also model several categories of spending as *congestible goods*—that is, goods subject to congestion with more users, and thus a cost that rises with population increase. Public administration expenses, police and fire-fighting services, and incarceration are all treated as congestible costs. In the forward-looking calculation, we omit interest payments, the vast majority of which are federal interest payments on the

002757

Copyright National Academy of Sciences. All rights reserved.

*410*        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

debt. Interest payments are conceptually distinct from spending on public goods; they represent the current costs of servicing past deficits that have accumulated into the current debt.[23] New immigrants are responsible only for the net fiscal impacts incurred once they have arrived in the country, which are fully accounted for by their annual tax contributions less their absorption of benefits (which, in some scenarios, includes public goods such as defense).

The panel's methodology measures the future net fiscal impact of an immigrant and descendants over a 75-year time horizon, with dollar amounts discounted to present values using standard techniques. Because of the length of human life spans, fiscal planning is best informed by projections that cover a long time horizon. For example, the Social Security Trustees annually project program balances over a 75-year horizon, which is long enough for most current workers to age out of the system. Since 2003, the Social Security Trustees have also presented supplemental forecasts of actuarial balance over an infinite future, and *The New Americans* (National Research Council, 1997) projected net fiscal impacts of immigrants over an infinite horizon. For this report, the panel adopted the 75-year horizon of the Trustees, which also appears in supplemental long-term forecasts prepared by the CBO (Congressional Budget Office, 2014a), which it calls its extended baseline or "projections for the very long term."

One of the challenges of projecting taxes and spending either in aggregate or associated with an (incremental) immigrant and descendants over such a long time horizon is that the forecasts may or may not imply fiscal sustainability. Assumed fiscal sustainability may specify a national debt that does not grow without limit, interest rates that do not explode in reaction to ballooning debt levels, and gross domestic product (GDP) that continues to grow with population and productivity rather than shrink in response to a debt crisis. The authors of *The New Americans* (National Research Council, 1997) opted to forecast a future in which the ratio of debt to GDP was stabilized at 80 percent through a balanced mix of tax increases and benefit reductions. In their forecast, the ratio first hits that target level in 2016 (National Research Council, 1997, p. 324).[24] For this report, the panel opted instead to generate three forecast scenarios; these are based on:

---

[23]In other words, it does not make sense to treat interest payments on past debt as a benefit received by a new immigrant. Also, it goes directly counter to the argument that, as far as interest payments are concerned, immigrants are a positive to government budgets as they help spread the cost of debt payments across more individuals.

[24]Economists believe the ratio of publicly held debt to GDP is a good measure of fiscal sustainability. To date, the 80 percent threshold has only been crossed by the U.S. government during World War II.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2766 of 4699 PageID #:  5931

The Economic and Fiscal Consequences of Immigration

- **CBO's Long-term Budget Outlook** that assumes no changes in current legislation—that is, all current laws persist and no new laws are passed to change taxes or spending in the future. Current entitlement programs continue to pay benefits exactly as they do now, and provisions of newer legislation such as the Affordable Care Act grow as currently legislated. Tax breaks enacted after the Great Recession expire as legislated and, as wages rise, more taxpayers end up in higher tax brackets. This scenario does not prevent the federal debt from growing to what many economists believe are levels that would severely impact economic growth and the continuing ability to borrow money. To implement the CBO's long-term budget projections for this exercise, age profiles of the various taxes and benefit programs are adjusted to match aggregate program amounts as projected by the CBO.
- **CBO's Long-term Budget Outlook with Deficit Reduction** that takes the previous scenario as its starting point but, beginning in 2015, narrows the gap between federal spending and revenue using a 50/50 split between tax increases and spending cuts. Adjustments narrow annual deficits to half of their projected levels after 20 years, which is about the time the debt-to-GDP ratio is projected to exceed 90 percent in the CBO current legislation scenario. This represents approximately $3 trillion in projected deficit reduction from 2015 to 2035: raising taxes 3 percent higher than their projected level by 2035 and lowering noninterest spending by 3 percent compared to its projected 2035 level.
- **No Budget Adjustments,** our "business-as-usual" forecast in which spending and taxes simply increase by the rate of productivity growth, which is set at 1 percent, and stay fixed relative to one another across all age profiles.[25] An annual rate of 1 percent was chosen in order to parallel the basic assumptions in other long-run studies (such as those used in budget projections by CBO and in *The New Americans*). In this scenario, in contrast to the CBO projections, no currently legislated or expected fiscal changes, such as an increase in Social Security retirement ages or a sunsetting of tax cuts, are included. The only change over time is that the current

---

[25]State and local governments are typically subject to balanced-budget amendments, and we generally adhere to the methodologies described in the 1997 report to forecast these budgets. In the two CBO-based scenarios that we present here, we assume both per capita spending and revenue grow at the same rate as per capita GDP in CBO's long-term budget outlook. This holds the state-funded portion of Medicaid to a lower growth rate than is assumed for the program as a whole, and it is assumed that the federal government assumes any excess costs. In the third scenario of "business-as-usual" or "no budget adjustments," we let spending and revenue grow at the central rate of 1 percent.

002759

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

observed age schedule of tax payments and benefit receipts for each group shifts up at the same rate every year.

Table 8-4 shows the resulting average annual inflation-adjusted growth rates over the projection interval in several categories of per capita flows across these three scenarios. Except for the category of other discretionary spending, growth in per capita expenditures is higher in the two CBO scenarios than in the third scenario. Federal revenue grows at a 2.2 percent rate on average in CBO's deficit reduction scenario, 0.2 percentage points faster than federal spending.

Under the no budget adjustments scenario (third bullet above), annual growth in per capita expenditure flows is set at 1 percent per year for each age group; any deviation from that in Table 8-4, column 3, is driven by change in the population age structure. For example, even though growth in spending on each age group's Medicare benefits is set at 1 percent, the overall growth rate is higher (1.7%) because the population is shifting disproportionately into ages that receive the benefit. The CBO projections build in this effect as well, but also reflect that medical costs have been rising at a faster rate than economic growth, a trend that is assumed to continue (in the CBO scenarios). In the CBO-based scenarios, the Student Health Insurance Plan and the Affordable Insurance Exchanges experience

**TABLE 8-4**  Average Annual Growth in per Capita Flows, 2012-2087 (under three scenarios, in percentage)

|  | CBO Long-Term Budget Outlook | CBO with Deficit Reduction | No Budget Adjustments |
|---|---|---|---|
| Federal Spending (excluding public goods) | 2.1 | 2.0 | 1.5 |
| OASDI | 2.1 | 2.0 | 1.7 |
| Medicare | 2.9 | 2.8 | 1.9 |
| Medicaid, SHIP, Exchanges | 3.0 | 2.9 | 1.4 |
| Other Discretionary | 0.7 | 0.6 | 1.0 |
| Federal Revenue | 2.1 | 2.2 | 1.0 |
| Income Tax | 2.4 | 2.5 | 1.0 |
| FICA | 1.6 | 1.7 | 1.0 |
| Corporate Taxes | 1.8 | 1.9 | 1.0 |
| Other Taxes | 2.5 | 2.6 | 1.2 |

NOTES:  CBO = Congressional Budget Office, OASDI = Old-Age, Survivors, and Disability Insurance Program, SHIP = Student Health Insurance Plan, and FICA = Federal Insurance Contributions Act.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

additional growth pressure from legislative changes that will continue to go into effect as a result of the Affordable Care Act. On the revenue side, the CBO projections show faster growth than the panel's No Budget Adjustments scenario mainly due to tax bracket creep: the fact that, in the absence of legislative changes to the tax code, assumed economic growth will place an increasing proportion of the population in higher tax brackets.

The goal of this exercise is to assess the net present value (NPV) to governments of an additional immigrant and that immigrant's descendants; to do so, a real rate of interest (or discount rate) must be specified in order to value future dollars in terms of current dollars. The Social Security Trustees have assumed rates of 2.4, 2.9, and 3.4 percent for their three alternatives in two consecutive actuarial reports (Board of Trustees, Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds, 2014, 2015). CBO assumed a 2.5 percent interest rate in its 2014 long-range forecasts and 2.3 percent in its 2015 forecasts (Congressional Budget Office, 2014, 2015).[26] The panel chose a relatively conservative real discount rate of 3 percent. A higher value will reduce the impact of future cash flows on the bottom line. Because many fiscal impacts of immigration, such as the education of the children of immigrants, are more negative in the short run than they are in the long run, a rate that is too high would tend to understate the net fiscal benefit or overstate the net fiscal cost of an immigrant.

### The Future in Context

As discussed earlier in this chapter, both immigrants and government budgets have changed since the mid-1990s, when a similar exercise was undertaken for *The New Americans* (National Research Council, 1997). Each of these changes, discussed below, has implications for the estimation of the fiscal impacts of immigrants.

#### Who Is the New Immigrant?

Each immigrant arrives with a particular set of characteristics that contribute to shaping that person's experience once he or she arrives in the United States. The panel focuses on the characteristics that are most important in determining the amount of taxes an immigrant pays and the cost of benefits they receive: their education, age at arrival in the country, and time since arrival. Education is correlated with current and future earnings,

---

[26]On the other hand, reflecting a particular risk profile for investment in the context of the economic impacts of climate change, William Nordhaus's DICE-2013R model uses discount rates in the 4.25-5 percent range, depending on whether they are being applied to a near-term or long-term scenario (Nordhaus and Sztorc, 2013, p. 38).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

and thus tax payments. Earnings also determine eligibility for means-tested benefits and for government benefits that are pegged to past earnings, like Social Security or unemployment benefits. Age determines where a person is in his or her career and where that individual falls on the inverse-U-shaped earnings curve. Time since arrival is important in three ways: Time in the country is one eligibility rule for several important government benefit programs; it correlates with extent of assimilation, which among other things allows immigrants to at least partially close earnings gaps with their native-born counterparts; and, in combination with a fixed current date, it delineates different arrival cohorts with different characteristics that are correlated with tax and benefit flows.

In order to accurately portray how the fiscal impacts of today's immigrants might have changed since the research for *The New Americans* (National Research Council, 1997) was done in the 1990s, it is necessary to identify the characteristics of recent arrivals and of the overall population of immigrants in the country. Starting with education, today's immigrants have more people in the highest educational groups and fewer in the lowest. This trend is revealed in Table 8-5, which shows educational distributions based on five categories of attainment: less than a high school diploma, high school diploma, some college but no degree, bachelor's degree, and additional years of schooling or degrees beyond a bachelor's (which includes attainment of advanced degrees). For comparative purposes, distributions for the second and third-plus generations[27] are also shown for the current period and for the mid-1990s. Because these generations differ significantly in their age structure, the table shows age-standardized measures of these educational distributions. These figures are obtained by applying age-specific education rates for different groups to a single profile of the population by age—in this case, that of first generation immigrants.

As shown previously, immigrants have had systematically different levels of education depending on their arrival cohort. To explore this, the panel varied the first generation group examined in the top and bottom panels of Table 8-5. The top panel focuses on immigrants who have arrived within the past 5 years, while the bottom panel includes the entire stock of immigrants. Both the top and bottom panels define the second and third-plus generations the same way but, because each panel standardizes to the age structure of its first generation, the educational achievement rates change slightly for both of the native-born generations. Averages for each nativity group within the five tiers of the educational

---

[27]The generations used for Table 8-5 include all individuals by their nativity status only, whether they are independent or dependent individuals; dependent children of a different nativity status are not included in their parents' generation.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

415

TABLE 8-5 Educational Distribution by Generation, Ages 25 and Older, for Recent (past 5 years) and All Immigrants

| | First Generation | | | Second Generation | | | Third-plus Generation | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1994-1996 | 2011-2013 | Change | 1994-1996 | 2011-2013 | Change | 1994-1996 | 2011-2013 | Change |
| **First generation includes recent immigrants only:** | | | | | | | | | |
| <HS | 0.36 | 0.21 | -0.14 | 0.11 | 0.08 | -0.03 | 0.12 | 0.07 | -0.05 |
| HS | 0.21 | 0.23 | 0.02 | 0.28 | 0.24 | -0.04 | 0.35 | 0.29 | -0.06 |
| SomCol | 0.13 | 0.14 | 0.01 | 0.30 | 0.29 | 0.01 | 0.28 | 0.30 | 0.02 |
| BA | 0.19 | 0.25 | 0.06 | 0.21 | 0.25 | 0.05 | 0.18 | 0.23 | 0.05 |
| >BA | 0.11 | 0.16 | 0.05 | 0.10 | 0.14 | 0.04 | 0.07 | 0.10 | 0.04 |
| Total | 1.00 | 1.00 | | 1.00 | 1.00 | | 1.00 | 1.00 | |
| Average (numbering education groups 1-5): | 2.50 | 2.93 | 0.43 | 2.92 | 3.14 | 0.22 | 2.71 | 3.00 | 0.29 |
| | | | | | | | | | |
| **First generation includes all immigrants:** | | | | | | | | | |
| <HS | 0.38 | 0.26 | -0.12 | 0.13 | 0.08 | -0.05 | 0.16 | 0.08 | -0.07 |
| HS | 0.22 | 0.24 | 0.02 | 0.30 | 0.25 | -0.05 | 0.35 | 0.31 | -0.05 |
| SomCol | 0.11 | 0.14 | 0.02 | 0.27 | 0.28 | 0.00 | 0.26 | 0.29 | 0.03 |
| BA | 0.18 | 0.23 | 0.04 | 0.18 | 0.23 | 0.05 | 0.16 | 0.21 | 0.05 |
| >BA | 0.10 | 0.14 | 0.03 | 0.11 | 0.16 | 0.05 | 0.07 | 0.11 | 0.04 |
| Total | 1.00 | 1.00 | | 1.00 | 1.00 | | 1.00 | 1.00 | |
| Average (numbering education groups 1-5): | 2.41 | 2.74 | 0.33 | 2.83 | 3.13 | 0.30 | 2.64 | 2.95 | 0.31 |

NOTE: The distributions for the second and third-plus generation groups are standardized on the age distribution of the first generation group. Figures in the bottom rows of each panel show the weighted average of the fraction of individuals at each education level multiplied by the number assigned to the level, from 1 to 5.
SOURCE: All data used in the analysis are from the 1994-1996 and 2011-2013 March Current Population Survey.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2771 of 4699 PageID #:  5936

distribution are shown along the bottom of each panel. These statistics show that, in both the earlier and current periods, the second generation achieves the highest educational attainment, the third-plus generation is next highest, and the first generation has the lowest educational attainment of the three.

While all nativity groups have improved their educational distributions, the first generation has caught up over time. Recent first generation immigrants, depicted in the first two data columns of the top panel, show the most improvement. Their share in the lowest educational group has shrunk the most (the less than high school, <HS, group decreased by 14 percentage points) and their share in the highest educational group has grown the most (the group with additional years beyond a bachelor's degree, >BA, increased by 5 percentage points). Among all first generation immigrants, shown in the first two data columns of the lower panel, the trends are similar but, as one might expect, the educational distribution is shifted toward less attainment because earlier immigrants have less education than recent immigrants. In both panels, the first generation has experienced the largest decrease in the lowest education group and the largest overall increase in average education level.

Increasing education levels over time motivated the panel to adopt a methodological change in its approach to longitudinal forecasting compared to previous work. In *The New Americans*, the analysis used only three education categories: less than high school, high school diploma, and more than a high school diploma. No distinction was drawn between the top three categories in Table 8-5 because there were fewer immigrants in those categories. This may have been a reasonable strategy given the distribution of education among immigrants at the time, but as Table 8-5 reveals, it has become increasingly insufficient for analysis.

Changing educational attainment patterns means that, relative to the 1990s, a greater percentage of recent immigrants are found in higher earning and higher taxpaying groups. Likewise, a smaller percentage are now found in the lower socioeconomic groups that—once citizenship or sufficient time in the country has been established—may qualify for means-tested benefit programs such as the EITC, Medicaid, and Supplemental Security Income (SSI). Table 8-5 also shows that, over this time period, the educational attainment of the second generation did not improve as much as it did for the first generation. But the second generation remains the most educated of these three groups.

Recent immigrants are slightly older on average than were those who arrived during the 1990s, following the global trend of population aging affecting both the United States and almost every sending country in the

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2772 of 4699 PageID #:  5937

world.[28] Age is important because, as shown earlier in this chapter, young and old age groups are net recipients of government benefit programs, paid for by those in the working ages who are net taxpayers. Figure 8-18 shows this pattern, in which the first crossover occurs around age 25, when young adults begin working and paying enough taxes to break even; the second crossover occurs around age 65, when most U.S. residents become eligible for Social Security and Medicare. Using these cross-over points as age boundaries, Table 8-6 shows the age distributions for immigrants and natives now and in the mid-1990s. First generation immigrants today are even more heavily concentrated at working ages, as defined by the 25-65 age group, than they were at the time of *The New Americans* (National Research Council, 1997). This is true regardless of whether one looks at recent immigrants, shown in the leftmost columns, or all first generation immigrants as shown in the middle columns. Although current workers get older and eventually become expensive retirees, one would still expect these developments to be good for government finances in the short term. By contrast, the age structure for natives has not changed much during this period. The Baby Boom generation, located solidly within the working-age group in the early period, has begun to move into retirement and will continue to do so. The bottom line most relevant here is that these shifts in age structure imply that an average new immigrant today is more likely to be of working age than 20 years ago. Thus, our forecast of that average new immigrant's lifetime net fiscal impact begins at a more advantageous age for government budgets now compared with when the estimates for *The New Americans* (National Research Council, 1997) were created.

The sections that follow assess the fiscal impacts that are associated with an "average immigrant"—a weighted average of flows based on the distribution of age and education either of recent arrivals or of all current first-generation immigrants, depending on the scenario.

### *What Does a New Immigrant Currently Pay in Taxes and Receive in Benefits?*

In Section 8.2, age profiles of taxes and benefits, based on estimates of program utilization from the March CPS, were presented; essentially the same age profiles are used for the analysis here. However, age profiles across nativity groups are further disaggregated by time in the United States and across the five educational categories described above.[29] A key challenge

---

[28]The older age and higher education of recent immigrants also reflect the decline of Mexican immigration. This is not thought to be a fluke of the recession but reflects long-term changes in Mexico, especially the decline in fertility that once produced surplus workers needing to find work outside their native country.

[29]To summarize briefly, these age profiles are schedules of tax and benefit flows per person by age, which are estimated from 3-year pooled CPS samples, smoothed using standard

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of this forward-looking exercise involves dealing with incomplete educational histories for the young. For a large share of individuals ages 0-24 years, their schooling has not yet been completed. In these cases, we assign to these individuals' records the educational group of a parent, which we impute if no parents are co-resident in the household.

We begin by examining age profiles of wage and salary earnings, which are shown in Figure 8-20. For each generation group, there is a clear gradient in earnings according to education, and it is broadly similar within each group. One visible difference is that immigrants of the first generation earn less of a premium for a high school degree compared to the other two groups. The first generation earns less at each level of education except the highest and, even within that group, immigrants at older working ages still suffer an earnings penalty compared to other workers. Relative to the third-plus generation and higher, whose average earnings rise with age until roughly age 60, immigrants with more than a bachelor's degree exhibit a more steeply rising earnings profile and an inflection point near age 45.

Net fiscal impacts by age across education and nativity are shown in Figure 8-21. Children and young adults under age 25 with incomplete education are coded as having the education level of a parent (or average if there are two). Net fiscal impacts begin negative at young ages for all groups before dropping sharply at the age of public elementary schooling. Trajectories by education crisscross one another after high school, when the net impact of individuals who drop out of or stop at high school rises more than those who continue in school. Fiscal impacts then tend to rise strongly and become positive during working years, increasing until the mid-50s for the second and third-plus generation but plateauing earlier among the first generation. Another aspect here that mirrors patterns in earnings is the compression of the educational gradient within the first generation.

Gradients across educational groups within the third-plus generation

techniques, and augmented with other data sources where necessary. We estimate age profiles across five groups identified by nativity and time in the United States: foreign-born arriving within the last 0-4 years, foreign-born arriving within the last 5-9 years, foreign-born arriving more than 10 years ago, native-born of foreign-born parents, and native-born of native-born parents. We also measure these age profiles separately across the five education groups as described in the previous section. For each program, we adjust CPS data for under- or over-reporting by scaling each record by a single multiplicative factor for that particular program so that the accumulated aggregate over all records matches program totals from the National Income and Product Accounts (NIPA). In our calculations, 2012 is the first year of the forecast; for *The New Americans* (National Research Council, 1997) work, it was an average of 1994 and 1995. When the CPS has individual-level indicators of a particular flow, those are used. Where only a household-level flow is available, we make assumptions about the allocation of the household amount to individuals within the household that mirror the methodologies in *The New Americans*. A full discussion of the panel's methodologies is in the Annex (Section 8.4) at the end of this chapter.

Copyright National Academy of Sciences. All rights reserved.

TABLE 8-6 Age Distribution by Generation, 1994-1996 and 2011-2013

| Age Group | Recent First Generation | | | All First Generation | | | All Native Born | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1994-1996 | 2011-2013 | Change | 1994-1996 | 2011-2013 | Change | 1994-1996 | 2011-2013 | Change |
| 0-24 | 0.47 | 0.37 | -0.10 | 0.22 | 0.14 | -0.08 | 0.38 | 0.36 | -0.01 |
| 25-64 | 0.50 | 0.59 | 0.09 | 0.66 | 0.73 | 0.07 | 0.50 | 0.50 | 0.00 |
| 65+ | 0.03 | 0.04 | 0.01 | 0.12 | 0.13 | 0.01 | 0.12 | 0.14 | 0.01 |
| Total | 1.00 | 1.00 | | 1.00 | 1.00 | | 1.00 | 1.00 | |

NOTE: "Recent First Generation" means individual arrived in the United States within 0-4 years of the analysis period
SOURCE: All data used in the analysis are from the 1994-1996 and 2011-2013 March Current Population Survey.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2774 of 4699 PageID #:  5939

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-20** Age profiles of wage and salary income by educational attainment and nativity, 2012.
SOURCE: Data from the 2011-2013 March Current Population Surveys.

002768

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2776 of 4699 PageID #: 5941

The Economic and Fiscal Consequences of Immigration

### A. First generation



### B. Second generation

### C. Third-plus generation



**FIGURE 8-21** Age profiles of net fiscal impact by educational attainment and nativity, 2012.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to administrative control totals.

002769

Copyright National Academy of Sciences. All rights reserved.

422    THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

are arguably most interesting here. The largest differences between groups in terms of absolute dollars is found at working ages, when those with the most education are contributing much more on net than those with the least. Third-plus generation persons without a high school degree never contribute more than they receive, a striking result that is not true for either the first or second generation. Children of the third-plus generation also exhibit a wider educational gradient in their net fiscal impacts than either of the other two groups. The explanation for both of these patterns must be greater usage of fiscal transfer programs by third generation working-age parents, given their education levels compared to immigrants. For the first generation, part of this is purely mechanical; eligibility for some fiscal transfers depends on time spent in the country. But the second generation should have close to the same access as the third-plus generation; but Figure 8-21 shows signs of less program utilization by the second generation.

Figure 8-22 shows how strongly tax contributions rise with educational attainment for immigrants. Each set of 5 vertical bars in the figure shows taxes paid by an educational group relative to those paid by the least educated in each period and at each level of government. So, in 2012 for example, as represented in the far-right bar chart, those with a bachelor's degree paid on average almost three times as much in total taxes as did those with less than a high school education. Taxes paid by immigrants in the highest education group are considerably higher than those paid by the other education groups, and they appear to be rising faster. This trend is more pronounced at the federal level than at the state and local levels, presumably because the federal income tax is relatively more progressive than most taxes collected at the state level. The trends shown in Figure 8-22 are roughly the same for second and third-plus generation taxpayers.

For benefits, the relative flows are more similar across education groups than they are for taxes where, on average, the high education groups pay much more than the low education groups.[30] Regulations requiring documentation of legal status or minimum time in the United States to qualify for some benefit programs have had the expected effect of decreasing immigrants' participation in those programs. Focusing on those age groups that are net receivers of benefits, Table 8-7 shows that, while benefits have grown in real terms for all nativity groups since the time (circa 1995) of the data used in *The New Americans* (National Research Council, 1997), benefits have grown more slowly for the first generation than for the other two generational groups. Given these underlying trends in taxes and benefits by nativity since *The New Americans*, one should expect new immigrants to

---

[30]For all groups regardless of immigration status, the government has shifted its benefit portfolio away from the poorest of the poor and toward the working poor (Moffitt, 2015).

002770

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*423*



FIGURE 8-22  Average taxes paid by immigrants, ages 25-64, by education group, relative to educational attainment of less than high school.
SOURCE: Data are from the 2011-2013 March Current Population Surveys, normalized to administrative control totals.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2779 of 4699 PageID #:  5944

*424*

TABLE 8-7  Average per Person Benefits Received, by Age Group and Generational Group, 1995 and 2010 (in thousands of 2012 dollars)

| | State/Local Benefits | | | Federal Benefits | | |
|---|---|---|---|---|---|---|
| | 1995 | 2010 | % Change | 1995 | 2010 | % Change |
| Ages 0-24 | | | | | | |
| 1st Generation | 7.6 | 9.1 | 19 | 1.7 | 2.6 | 49 |
| 2nd Generation | 7.3 | 9.5 | 30 | 2.6 | 4.4 | 73 |
| 3rd+ Generation | 7.1 | 8.8 | 23 | 2.5 | 4.3 | 68 |
| Age 65+ | | | | | | |
| 1st Generation | 3.0 | 3.3 | 10 | 20.9 | 22.5 | 22 |
| 2nd Generation | 3.6 | 4.2 | 16 | 24.3 | 33.5 | 38 |
| 3rd+ Generation | 4.7 | 6.5 | 38 | 25.2 | 32.4 | 28 |

NOTE: Includes all government spending other than defense, interest payments, and subsidies.
SOURCE: Panel generated using Current Population Survey data pools from 2011-2013.

now cost government less, relative to the other generational groups, than they did in the 1990s.

### What Will an Additional Immigrant and Descendants Pay in Taxes and Receive in Benefits in the Future?

In order to forecast taxes and benefits for an average immigrant and descendants, it is necessary to first forecast the ultimate educational attainment for young immigrants and the future educational attainment of the offspring of immigrants. The panel predicted the education of offspring as a function of parental education using regression analysis based on CPS samples 15 years apart. The earlier sample gives the education of parents born in particular regions who have children ages 10-16 living in their households. The later sample gives the education of people ages 25-31 whose parents were born in that region. Adult child education is regressed on parental education by birth region, with separate equations for native-born children versus foreign-born children. This generates equations that are used to predict a child's ultimate educational attainment; a random error term is included in the equations to obtain realistic educational distributions for each generation. Separate regressions are used to estimate the transmission of educational attainment from foreign-born parents to foreign-born children (not shown) and, for comparative purposes, from U.S.-born parents to their U.S.-born children.

Results from this estimation are presented below as transition matrices. Table 8-8 shows the transition for U.S.-born children of an immigrant parent; Table 8-9 shows the transition for U.S.-born children of a U.S.-born parent. Each cell of the matrix shows the chance that the child attains the

002772

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2780 of 4699 PageID #:  5945

The Economic and Fiscal Consequences of Immigration

**TABLE 8-8**  Predicted Educational Distribution of U.S.-born Children of a Foreign-born Parent, Percentages of Parental Offspring Expected to Be in an Educational Category (rows add to 100)

|  | Child's Education | | | | |
| --- | --- | --- | --- | --- | --- |
| Parent's Education | Less Than High School | High School Graduate | Some College | Bachelor's Degree | More Than Bachelor's Degree |
| 1. Less than high school | 17.1 | 44.1 | 32.4 | 6.2 | 0.3 |
| 2. High school graduate | 4.3 | 27.2 | 46.2 | 20.3 | 2.0 |
| 3. Some college | 0.7 | 11.9 | 40.2 | 38.0 | 9.2 |
| 4. Bachelor's degree | 0.1 | 2.2 | 21.7 | 46.5 | 29.5 |
| 5. More than bachelor's degree | 0.0 | 0.6 | 8.8 | 37.7 | 52.9 |

NOTE: Educational distributions are the panel's predictions using the methodology described in the text introducing the table.

**TABLE 8-9**  Predicted Educational Distribution of U.S.-born Children of a U.S.-born Parent, Percentages of Parental Offspring Expected to Be in an Educational Category (rows add to 100)

|  | Child's Education | | | | |
| --- | --- | --- | --- | --- | --- |
| Parent's Education | Less Than High School | High School Graduate | Some College | Bachelor's Degree | More Than Bachelor's Degree |
| 1. Less than high school | 29.4 | 50.9 | 18.4 | 1.3 | 0.0 |
| 2. High school graduate | 7.6 | 42.2 | 42.2 | 7.8 | 0.2 |
| 3. Some college | 1.0 | 16.9 | 50.1 | 28.8 | 3.2 |
| 4. Bachelor's degree | 0.0 | 2.3 | 26.0 | 51.8 | 19.9 |
| 5. More than bachelor's degree | 0.0 | 0.3 | 7.0 | 40.3 | 52.4 |

NOTE: Educational distributions are the panel's predictions using the methodology described in the text introducing the table.

educational level indicated in the column head, given the parent's educational attainment shown in the row stub. A strong pattern of upward educational mobility is apparent for the children of immigrants. Numbering the five education categories from 1 to 5, with 1 being the lowest and 5 the highest, the offspring of those with less than a high school education (category 1) would have an average education group of 2.3. Meanwhile, a category 2 parent could expect offspring that average 2.9, a parent of category 3 could expect offspring at 3.4, a category 4 parent could expect 4.0, and a category 5 parent's offspring average 4.4 (offspring of parents in the highest educational category have nowhere to go but down, of course). These averages are consistent with the phenomenon of reversion

002773

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

to the mean in correlated measures: Those lowest in the distribution on one measure are more likely to have a large increase on the other measure, while those at the highest end of the distribution are more likely to have a decrease. Still, there is an overall trend toward increasing educational attainment with immigrant generation. To see this, imagine starting with just five parents, each in one of the parental education categories, so that their average group category is 3. If they all had the same fertility pattern, they would have offspring with an average group category of 3.4.

Comparing Tables 8-8 and 8-9 shows that children of U.S.-born parents also have upward educational mobility, but not as much as the children of immigrants. For example, the children of immigrants with less than a high school education have a 17.1 percent chance of achieving only this level (i.e., making no upward transition), while children of third-plus generation parents in category 1 have a 29.4 percent chance of only attaining that same level. Repeating the calculation in which five parents, one from each educational category, have children, the children's average group category would be only 3.2, in contrast with the 3.4 for the children of immigrants. Note that this calculation abstracts from the education distribution of the parents and only indicates relative upward educational mobility. The fact that immigrants' children appear to have more upward mobility is perhaps consistent with the narrative of immigrants coming to the United States for the specific purpose of giving their children better opportunities than they had in their home countries. If true, first generation parents may be relatively more focused on educational attainment for their children than native-born parents. This result carries through to the patterns of tax payments by generation: If second generation children go on to achieve higher levels of education, one would also expect that they will be higher earners and thus pay relatively more in taxes than other groups.

Table 8-10 provides a different perspective on how educational transmission plays out in the forecast for a sample of new immigrants ages 20-30 who have been in the United States less than 5 years. Each column shows an educational distribution. The leftmost column is the immigrants' actual education as observed in the CPS. Immigrants who are observed at ages under 25 are at first assigned their parent's observed education, as shown in the leftmost column. Their projected ultimate educational attainment after age 25 (second column in Table 8-10) can be higher or lower than this initial assignment. Although some immigrant children of highly educated immigrants may end up with less education, the overwhelming trend here is toward upward mobility (e.g., compare the second column with the first), with the share projected to be in the lowest attainment category falling to half that of their immigrant parents. The third and fourth columns show the predicted ultimate educational distribution of the children and grandchildren of the immigrants whose observed distribution is in the first column. The

002774

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 8-10** Observed and Projected Educational Distribution for Immigrants, Ages 20-30, Who Arrived in the United States in the Past 5 Years and Their Descendants

| | | Projected Educational Distributions | | |
|---|---|---|---|---|
| | Observed in CPS | Immigrant | Children | Grandchildren |
| 1. Less than high school | 0.42 | 0.21 | 0.04 | 0.04 |
| 2. High school graduate | 0.16 | 0.18 | 0.17 | 0.13 |
| 3. Some college | 0.12 | 0.22 | 0.30 | 0.32 |
| 4. Bachelor's degree | 0.18 | 0.27 | 0.32 | 0.31 |
| 5. More than bachelor's | 0.11 | 0.12 | 0.17 | 0.20 |
| **TOTAL** | 1.00 | 1.00 | 1.00 | 1.00 |
| Average category score | 2.40 | 2.90 | 3.40 | 3.50 |

NOTE: The "average category score" is the weighted average of the education categories numbered 1 through 5, using the proportional distribution as weights.
SOURCE: Data represent both analysis of Current Population Survey data and panel's projections.

third column, compared with the first two, reveals an upward shift between first and second generations that is similar on average (shown in the bottom row) to the half-category jump experienced by the first generation after arrival. Differences between the second and third-plus generation exist but are not as large, which is what one might expect to see in repeated application of transition matrices. The important implication of these patterns for the fiscal analysis that follows is that even an immigrant arriving with little education, whom one would expect to pay relatively less in taxes and cost relatively more in benefits, will likely have offspring with more education. That education will cost the government and taxpayers in the near term, but that investment ultimately pays off in the form of elevated tax contributions by the second and higher generations in the future. However, computations using a positive discount rate reduce the present value of those future payoffs.

*How Long Do the New Immigrants Stay, and How Many U.S.-born Children Do They Add to the Population?*

The final piece of the longitudinal calculation concerns the demography of the new immigrant and that immigrant's descendants—specifically, the mortality, fertility, and migration schedules that apply to each individual. We account for the immigrant's likelihood of survival each year into the future, of remaining in the United States (not emigrating back to the home country or to another country), and of having descendants through fertility. Similar forecasts apply to the immigrant's descendants whose fiscal impacts

Copyright National Academy of Sciences. All rights reserved.

428    THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

are also appropriately weighted by their probabilities of remaining alive and within the United States. In particular, we assume that any immigrant who leaves the country will take along any children younger than age 20. The mortality, fertility, and emigration probabilities are the same as those used to generate the demographic projections in Chapter 2.

Table 8-11 shows several indicators of vital rates across current first, second, and third-plus generations (labeled "Current"), plus the same indicators as observed in the mid-1990s and used in the 1997 report *The New Americans* (labeled "Circa 1990s"). Following global trends, the total fertility rate has fallen, as shown in the top left panel of Table 8-11, and fertility has also shifted toward older ages in all generational groups, as shown in the bottom left panel.[31] The largest changes were experienced by the first generation and to some extent by the second generation. The middle panels of Table 8-11 show that the immigrant and all-native-born generational groups have also experienced longevity increases since the 1990s. Survivorship is not very different across generations, with a slight advantage for immigrants. The right-hand panels show cumulative emigration probabilities. These have risen since the 1990s time frame used by *The New Americans* (National Research Council, 1997), but the increases are small. Comparison of the cumulative probabilities of emigration over the two time horizons listed in the table, within 10 years of arrival and within 50 years, reveals that the risk of emigration decreases the longer the immigrant stays in the country. According to current statistics, 24 percent of an immigrant cohort will leave the United States within the first 10 years after arrival, whereas only an additional 7 percent leave between year 10 and year 50, for a cumulative total of 31 percent. These are the figures used in the projections of fiscal impacts for this report.

### The Fiscal Impacts of a New Immigrant—Detailed Results

Estimates of the present value of the net fiscal impact associated with a new immigrant vary widely, depending on a number of assumptions. Table 8-12 captures this variation. The age of the immigrant upon arrival varies across the columns within each panel of data; the education level of the immigrant varies down the rows of each panel. The panels in Parts 1 and 2 of Table 8-12 vary assumptions about the addition of descendants and the future fiscal regime. The panels from top to bottom vary the

---

[31]The fertility indicator in Table 8-11, the Total Fertility Rate, measures "children per woman" implied by age-specific rates of birth in a period. In our fiscal impacts calculation, the panel counted half of the projected offspring of an immigrant as the second generation. Children with two immigrant parents will be fully counted by this technique, while a child of one immigrant parent and one native-born parent will be half-allocated to the immigrant and half to the native-born parent.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*429*

**TABLE 8-11** Demographic Indicators Used in Fiscal Impact Calculations

| Fertility Indicators by Generation | 1st | 2nd | 3rd+ |
|---|---|---|---|
| Total Fertility Rate | | | |
| Circa 1990s | 2.7 | 2.3 | 2.0 |
| Current | 2.3 | 2.0 | 1.9 |
| Change | −0.4 | −0.4 | −0.1 |
| Average Age of Age-Specific Fertility Schedule | | | |
| Circa 1990s | 26.6 | 26.6 | 26.6 |
| Current | 30.2 | 29.1 | 29.1 |
| Change | 3.6 | 2.5 | 2.5 |

| Mortality Indicators by Generation | 1st | 2nd+ |
|---|---|---|
| Probability of Survival, Birth to Age 40 | | |
| Circa 1990s | 0.96 | 0.96 |
| Current | 0.97 | 0.97 |
| Change | 0.01 | 0.01 |
| Probability of Survival, Ages 40 to 80 | | |
| Circa 1990s | 0.59 | 0.51 |
| Current | 0.60 | 0.58 |
| Change | 0.02 | 0.07 |

| Cumulative Probability of Emigration | |
|---|---|
| Within 10 Years of Arrival | |
| Circa 1990s | 0.23 |
| Current | 0.24 |
| Change | 0.01 |
| Within 50 Years of Arrival | |
| Circa 1990s | 0.29 |
| Current | 0.31 |
| Change | 0.02 |

NOTE: The two generational groups used for the mortality indicators are first-generation immigrants ("1st") and all native-born (2nd+).
SOURCE: Values in the rows labeled "Current" are the indicator values used in the calculations done for this report based on the 2011-2013 March Current Population Survey; values in the "Circa 1990s" rows are those used in *The New Americans* (National Research Council, 1997).

002777

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*430*

TABLE 8-12  75-year Net Present Value Flows for Consolidated Federal, State, and Local Governments for Two Future Budget Scenarios, by Education and Age of Arrival, Varying the Treatment of Public Goods and Characteristics of an Average Immigrant (fiscal impacts are in thousands of 2012 dollars)

PART 1
CBO Long-term Budget Outlook

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **AVERAGES BASED ON RECENT IMMIGRANTS** | | | | | | | | | | | | |
| No Public Goods Included in Benefits | | | | | | | | | | | | |
| <HS | 35 | -225 | -257 | -117 | 23 | -198 | -257 | -109 | 11 | -26 | 0 | -8 |
| HS | 239 | -42 | -164 | 49 | 140 | -50 | -164 | 11 | 98 | 8 | 0 | 39 |
| SomCol | 401 | 157 | -155 | 261 | 236 | 99 | -155 | 155 | 165 | 58 | 0 | 106 |
| BA | 495 | 504 | -160 | 481 | 301 | 366 | -160 | 330 | 194 | 138 | 0 | 150 |
| >BA | 446 | 994 | -100 | 812 | 287 | 805 | -100 | 635 | 159 | 190 | 0 | 177 |
| Avg. | 291 | 269 | -201 | 259 | 177 | 196 | -201 | 173 | 114 | 73 | 0 | 85 |
| Benefits Include Defense, Subsidies, and Rest-of-World Payments | | | | | | | | | | | | |
| <HS | -77 | -294 | -279 | -200 | -32 | -246 | -279 | -158 | -45 | -47 | 0 | -43 |
| HS | 127 | -112 | -187 | -33 | 85 | -99 | -187 | -39 | 42 | -14 | 0 | 6 |
| SomCol | 288 | 82 | -178 | 170 | 180 | 49 | -178 | 104 | 107 | 33 | 0 | 67 |
| BA | 385 | 426 | -186 | 395 | 245 | 316 | -186 | 279 | 140 | 110 | 0 | 116 |
| >BA | 339 | 915 | -123 | 726 | 231 | 754 | -123 | 583 | 108 | 161 | 0 | 142 |
| Avg. | 180 | 195 | -224 | 173 | 121 | 147 | -224 | 123 | 59 | 48 | 0 | 50 |

002778

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## AVERAGES BASED ON ALL IMMIGRANTS

### No Public Goods Included in Benefits

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| <HS | 49 | −239 | −253 | −196 | 32 | −221 | −253 | −186 | 17 | −18 | −10 | 0 |
| HS | 271 | −82 | −155 | −47 | 157 | −88 | −155 | −65 | 114 | 6 | 19 | 0 |
| SomCol | 425 | 63 | −144 | 99 | 249 | 28 | −144 | 45 | 176 | 35 | 54 | 0 |
| BA | 540 | 290 | −157 | 280 | 324 | 218 | −157 | 195 | 216 | 72 | 85 | 0 |
| >BA | 515 | 648 | −99 | 547 | 321 | 556 | −99 | 452 | 194 | 91 | 95 | 0 |
| Avg. | 301 | 53 | −183 | 58 | 181 | 27 | −183 | 22 | 121 | 26 | 37 | 0 |

### Benefits Include Defense, Subsidies, and Rest-of-World Payments

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| <HS | −65 | −299 | −274 | −259 | −23 | −266 | −274 | −230 | −42 | −33 | −29 | 0 |
| HS | 156 | −143 | −177 | −109 | 102 | −133 | −177 | −109 | 55 | −9 | 0 | 0 |
| SomCol | 310 | 2 | −166 | 34 | 194 | −18 | −166 | 0 | 117 | 20 | 33 | 0 |
| BA | 427 | 230 | −180 | 216 | 268 | 172 | −180 | 150 | 159 | 57 | 66 | 0 |
| >BA | 404 | 588 | −122 | 485 | 265 | 510 | −122 | 407 | 139 | 78 | 77 | 0 |
| Avg. | 188 | −8 | −205 | −5 | 125 | −19 | −205 | −22 | 63 | 12 | 18 | 0 |

continued

002779

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*432*

**TABLE 8-12  Continued**

PART 2
No Budget Adjustments

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **AVERAGES BASED ON RECENT IMMIGRANTS** | | | | | | | | | | | | |
| *No Public Goods Included in Benefits* | | | | | | | | | | | | |
| <HS | -118 | -231 | -254 | -185 | -18 | -176 | -254 | -115 | -100 | -55 | 0 | -70 |
| HS | 13 | -105 | -170 | -67 | 61 | -70 | -170 | -29 | -48 | -36 | 0 | -39 |
| SomCol | 117 | 35 | -163 | 67 | 127 | 47 | -163 | 78 | -11 | -12 | 0 | -11 |
| BA | 172 | 283 | -177 | 235 | 160 | 251 | -177 | 210 | 12 | 32 | 0 | 25 |
| >BA | 140 | 627 | -120 | 469 | 143 | 565 | -120 | 427 | -2 | 63 | 0 | 42 |
| Avg. | 45 | 116 | -206 | 77 | 82 | 118 | -206 | 92 | -37 | -2 | 0 | -15 |
| *Benefits Include Defense, Subsidies, and Rest-of-World Payments* | | | | | | | | | | | | |
| <HS | -266 | -322 | -282 | -295 | -90 | -239 | -282 | -179 | -176 | -84 | 0 | -116 |
| HS | -136 | -198 | -197 | -176 | -12 | -132 | -197 | -94 | -123 | -65 | 0 | -83 |
| SomCol | -33 | -63 | -192 | -53 | 55 | -17 | -192 | 12 | -88 | -46 | 0 | -64 |
| BA | 26 | 181 | -206 | 122 | 87 | 186 | -206 | 144 | -61 | -5 | 0 | -22 |
| >BA | -2 | 523 | -149 | 355 | 69 | 499 | -149 | 359 | -70 | 24 | 0 | -4 |
| Avg. | -103 | 19 | -234 | -36 | 9 | 54 | -234 | 26 | -112 | -35 | 0 | -62 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

433

## AVERAGES BASED ON ALL IMMIGRANTS

### No Public Goods Included in Benefits

|        |      |      |      |      |     |      |       |      |      |     |     |   |
|--------|------|------|------|------|-----|------|-------|------|------|-----|-----|---|
| <HS    | -107 | -237 | -250 | -219 | -6  | -199 | -250  | -177 | -101 | -38 | -42 | 0 |
| HS     | 36   | -129 | -160 | -112 | 80  | -105 | -160  | -88  | -44  | -24 | -23 | 0 |
| SomCol | 135  | -21  | -151 | -10  | 142 | -15  | -151  | -4   | -7   | -7  | -6  | 0 |
| BA     | 204  | 147  | -174 | 123  | 184 | 130  | -174  | 107  | 20   | 17  | 16  | 0 |
| >BA    | 187  | 405  | -119 | 318  | 176 | 374  | -119  | 293  | 11   | 30  | 24  | 0 |
| Avg.   | 54   | -28  | -189 | -36  | 93  | -16  | -189  | -23  | -38  | -11 | -14 | 0 |

### Benefits Include Defense, Subsidies, and Rest-of-World Payments

|        |      |      |      |      |     |      |       |      |      |     |     |   |
|--------|------|------|------|------|-----|------|-------|------|------|-----|-----|---|
| <HS    | -258 | -316 | -276 | -301 | -78 | -259 | -276  | -233 | -180 | -58 | -68 | 0 |
| HS     | -116 | -208 | -187 | -193 | 8   | -164 | -187  | -145 | -124 | -44 | -48 | 0 |
| SomCol | -17  | -101 | -179 | -96  | 70  | -74  | -1798 | -62  | -87  | -27 | -34 | 0 |
| BA     | 55   | 68   | -202 | 39   | 112 | 71   | -202  | 49   | -57  | -3  | -10 | 0 |
| >BA    | 40   | 326  | -147 | 236  | 103 | 314  | -147  | 235  | -63  | 12  | 1   | 0 |
| Avg.   | -96  | -107 | -216 | -119 | 20  | -79  | -216  | -80  | -117 | -31 | -39 | 0 |

NOTE: The "total" figures equal the fiscal impact of the individual, starting at age 25, plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference between scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: Values are panel generated, using the same 2011-2013 Current Population Survey data pools used for the earlier projections.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

breadth of spending programs assumed to be affected by an additional immigrant, either with or without spending on public goods, and the pool of immigrants on which the analysis computes characteristics of an average immigrant. The first set of data panels in Parts 1 and 2 use the pool of recent immigrants who have arrived within the past 5 years; the second set use the pool of all first generation immigrants.

Each cell in the table is the amount, in thousands of inflation-adjusted 2012 dollars, of the net fiscal impact associated with an immigrant's arrival today under the assumptions of that data-panel's scenario. For example, the highlighted statistic of "259" in the first set of data panels of the table means that, under the CBO Long-term Budget Outlook scenario, the total fiscal impact of a new immigrant who most resembles recent immigrants in terms of average age and education creates a positive fiscal balance flow to all levels of government with an NPV of $259,000. The cells four and eight columns to the right of this cell shows that, under these same assumptions, the projection attributes $173,000 of this total impact to the immigrant as an individual and $85,000 to that immigrant's descendants.[32]

These are large numbers, and a comparison with the corresponding statistics that appear directly to the right of this first data panel, under the no-budget-adjustments scenario, reveals that a large part of these average fiscal impact amounts is accounted for by the assumptions made by CBO in their future fiscal scenarios. Table 8-4, presented above, indicated significant differences in the growth of benefits programs across fiscal scenarios. Application of the CBO assumptions increases estimates of an immigrant's net present value of fiscal impacts to levels that may at first glance seem unreasonably high. Because the present value of labor earnings for an average immigrant under these assumptions is in the neighborhood of a million dollars,[33] tax rates would have to be very high or benefit rates very low to produce a present value of net fiscal impact associated with that immigrant that is roughly 17.3 percent of lifetime earnings.[34] However, it is important to remember the timing of life-cycle fiscal flows. Working-age people pay more in taxes than they consume in benefits and, in old age, they consume more in benefits than they pay in taxes. The large expenditures

---

[32]We have rounded the statistics in Table 8-12 to the nearest thousand dollars to enhance readability, so the total for immigrant as an individual plus that immigrant's descendants may not exactly match the total impact statistic.

[33]The present value of a stream of annual earnings that starts at $35,000 and grows at a real rate of 1 percent over 35 years of working from age 30 to 65 is equal to $907,195 when the real discount rate is 3 percent.

[34]During the historical period of CPS data used by the panel in Section 8.2, covering 1994 to 2013, taxes as a share of GDP hovered around 27 percent, or 18 percent at the federal level and 9 percent at the state and local level. Spending was 30 percent, split between 20 percent at the federal level (of which 4% was defense) and 10 percent at the state level.

Copyright National Academy of Sciences. All rights reserved.

on retirement benefits are, on average, more heavily discounted relative to tax dollars contributed during the working years. With a discount rate of 3 percent and a 35-year difference between the age at which individuals become a net fiscal positive (taxes paid are greater than benefits received) and the age at which they again become net fiscal negatives (vice versa), the net benefits are discounted to about a third of what they would be using the discount applied to the net fiscal positive years. Additionally, assuming productivity growth of 1 percent, the effective discount rate becomes 2 percent and the adjustment is less extreme.

By comparison, under the No Budget Adjustments scenario, smaller net fiscal impact estimates are produced, reflecting an assumed growth in the size of government that is more in line with historical precedent. For immigrants and descendants combined, the highlighted statistic in the first set of data panels in this scenario is $77,000. It is noteworthy that under this scenario, the immigrant's own contribution to this number is a surplus of $92,000, shown four columns further to the right, while the fiscal impact of that average immigrant's descendants, is a deficit of −$15,000. These projections contrast with those presented in *The New Americans*, in which the descendants of immigrants had net positive impacts in part because of the assumption about imposed fiscal sustainability. Under the CBO Long-term Budget Outlook scenarios in Table 8-12—in which some categories of spending are projected to grow less rapidly and some taxes grow more rapidly (for a likely net effect of reduced levels of debt compared to the No Budget Adjustments scenario)—the descendants of immigrants almost universally have positive fiscal impacts on the bottom line.

Table 8-12 also reveals that, if the arrival of a new immigrant raises spending on public goods by its per capita level, the immigrant's net fiscal impact becomes less positive and may become negative. This is shown in the second panel in Parts 1 and 2, where it is assumed that an immigrant's arrival raises spending on public goods such as defense (and therefore the calculation includes the average cost of public goods as part of the immigrant's fiscal costs). The highlighted average fiscal impact on the left-hand side of this panel is $173,000, down from $259,000 in Part 1 in which an additional immigrant does not raise spending on public goods. In Part 2, the average fiscal impact has fallen from $77,000 to −$36,000. The third and fourth data panels in Table 8-12 recalculate these statistics using all first generation immigrants as the basis for computing the effect of a new immigrant. This assumption pushes all the fiscal impacts more negative because the more heterogeneous group of all living first generation immigrants has less education and is older than the group of recent arrivals. The average fiscal impact (the four highlighted data cells) across these four scenarios range from $58,000 to −$119,000. The stock of all first generation immigrants reflects the characteristics of both recent and further-past arrivals, and (as

002783

Copyright National Academy of Sciences. All rights reserved.

436        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

discussed in Chapter 3) these characteristics have been changing over time. It is perhaps surprising that some of the numbers in these panels remain positive after weighting the calculations to include the characteristics of those earlier arrivals.

Within each of the data panels, Table 8-12 also contains detailed information about how net fiscal impacts vary by an immigrant's age at arrival and level of education. As one might expect, the net fiscal impact is less positive (or more negative) when the immigrant arrives during youth or at retirement ages and becomes more positive with higher educational attainment.[35] Note that there are no descendants for those arriving at age 65+ because fertility rates are zero after age 50 in the demographic projections. Those arriving at older ages may have brought children with them, but those children would be immigrants themselves and are counted as new arrivals in their own right.

### Broader Patterns across Major Scenarios

Given the considerable stability in gradients by age and education, it is possible to focus on net fiscal impacts at the average age and education level in order to sharpen conclusions about robustness across scenarios.[36] These category averages appear as shaded and boxed areas in Table 8-12, and Figure 8-23. Figure 8-23 also shows results for the second CBO scenario, in which there is planned deficit reduction over time achieved by explicitly raising taxes and cutting benefits.

The black bars in Figure 8-23 show net fiscal impacts when spending on public goods is assumed to not increase in response to an immigrant's arrival. As discussed earlier, this scenario is arguably most reasonable when considering the marginal impact of one additional immigrant's arrival and is less reasonable when considering the arrival of many new immigrants. The gray bars show results for when spending on public goods is assumed to rise with an additional immigrant, calculated by assigning the per capita amount spent on residents to immigrants as well. Bar pairs are shown for each of the three budget scenarios: black for the scenario without assign-

---

[35]The one exception to this relationship is when the BA category is compared with the >BA category for immigrants arriving at ages 0-24. For these immigrants, initial education is that of their parents. Because of reversion to the mean, having parents in the highest education category means that there is a substantial chance that the children will, on average, end up with less education than their parents.

[36]For both age and education, the averages are weighted averages of the 75-year present values for each of 81 age groups (ages 0-80+) by five education categories, with the weights derived from either the age-by-education distribution of recent immigrants in 2011-2013 or the age of all immigrants alive, as indicated by the data panel headings in Table 8-12 and the New Arrival versus All Immigrants bars in Figure 8-23.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-23** Net fiscal impacts of immigration, by budget scenario, treatment of public goods, and average characteristics of new immigrants.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2793 of 4699 PageID #:  5958

ing public goods ("congestible only") and gray for the scenario with cost of public goods assigned to immigrants. The pairs are grouped by the two measures of an average immigrant's characteristics: first by whether just recent arrivals are pooled or all first-generation immigrants currently alive are included, then by the three budget outlook scenarios.

Figure 8-23 indicates that estimates of an immigrant's net fiscal impact vary fairly widely across scenarios—from +$279,000 to –$119,000. The average of the 12 estimates in Figure 8-23 is $77,000, and the standard deviation is $125,000.[37] Shifting the pool from which one calculates characteristics of an average immigrant has a relatively large impact on the final estimate. Assuming that a new immigrant resembles recent immigrants yields a more positive net fiscal impact than does assuming the new immigrant is drawn from the entire stock of first generation immigrants currently in the country.

The choice of budget or fiscal adjustment scenario is also important. Under the CBO-based scenarios, the net fiscal impacts are higher (more positive) than under the scenario with no budget adjustment because spending grows less rapidly than taxes in the former than in the latter. Note that all three of these scenarios assume unsustainable increases in deficits and debt over time, although the No Budget Adjustments scenario reaches unrealistic levels of debt much faster than the CBO scenarios. The CBO "extended baseline" model—which is the basis for the first (Long-term Budget Outlook) scenario in Figure 8-23, and in which interactions between fiscal flows and projected economic growth are estimated—shows the federal-debt-to-GDP ratio reaching 100 percent by 2036 and 219 percent by the end of the 75-year projection window. The ratios are much larger for the No Budget Adjustments scenario, and a little bit smaller for the CBO scenario with deficit reduction.

### The Fiscal Impact of Immigrants Relative to Natives

Thus far in Section 8.3, we have focused on whether an additional immigrant will benefit or be a drain on public finances. The results of the panel's projections show that the age and education characteristics of entering immigrants have a major influence on the answer to this question. This leads naturally to another question: if new immigrants have the same age and education as native-born persons, will their fiscal impacts be the same? This question is of interest for assessing whether it is immigrant status that is relevant for understanding fiscal impacts or whether it is just a matter of adding an additional person to the economy. In other words, is it simply

---

[37]The standard error of the mean is the sample standard deviation divided by the square root of N, here equal to $36,000.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

age and education that distinguishes immigrants from natives as far as fiscal impacts are concerned, or are there other differences? Certainly there are statutory differences, in that many benefit programs prohibit paying benefits to immigrants at all or before some waiting period, but there is no similar prohibition on collecting taxes from immigrants. This would suggest that an immigrant would be less costly than a native with exactly the same age and education characteristics at a particular point in time. However, there may be other differences beyond just age and education. Similar immigrant and native levels of educational attainment might be associated with different earnings and thus taxes paid; for example, otherwise comparable groups might have different levels of language proficiency that would impact earnings, or there may be other unobservable differences. Adding a future-looking perspective, there are additional demographic differences between immigrants and natives that will be reflected in the fiscal calculation: they have somewhat different levels of fertility and mortality, and immigrants may emigrate out of the population, which is far less likely for natives. Thus, it becomes an empirical question whether there are consistent differences in the net fiscal impact of immigrants and natives of the same age and education.

The panel explored this question. Results are summarized in Table 8-13, which shows the projected total net fiscal impacts for an immigrant entering the country at age 25, versus a native-born person observed from the time he or she reaches age 25. Note that this calculation is not affected by the past of these hypothetical 25-year-olds: The fact that the U.S. government did not have to pay for the immigrant's education is not included; nor is the fact that the native-born 25-year-old had native-born taxpaying parents who finance his or her education. These past issues are set aside to follow only the immigrant's and the native's impact on government budgets from their 25th year on. The calculation is broken out to show the fiscal impact component attributed to the 25-year-old as an individual and the component attributed to that individual's descendants. As in Table 8-12, net fiscal impacts for the immigrant and the native-born individual are shown for each educational attainment category under two budget scenarios (CBO Long-term Budget Outlook and the No Budget Adjustments scenario). Here, pure public goods are omitted for everyone, natives and immigrants (top panel) or assigned equally to everyone (bottom panel). Differences in the fiscal impacts of the immigrant and the native-born are shown in shaded bars, positive numbers indicating cases in which that the immigrant is better for fiscal balances and negative numbers indicating cases in which the native is better.

To understand the patterns, first look at the columns labeled "Individual," which show the fiscal impact for the immigrant or native as an individual (excluding fiscal impact of descendants) for the scenario in which

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

440

**TABLE 8-13** 75-year Net Present Value Flows Comparing an Immigrant Arriving at Age 25 with a Native-born Person Followed from Age 25, for Consolidated Government Finances under Two Future Budget Scenarios, by Educational Attainment, Varying the Treatment of Public Goods (in thousands of 2012 dollars)

| | | CBO Long-term Budget Outlook | | | No Budget Adjustments | | |
|---|---|---|---|---|---|---|---|
| | | Total | Individual | Descendants | Total | Individual | Descendants |
| No Public Goods Included in Benefits | | | | | | | |
| <HS | Immigrant | −186 | −109 | −77 | −246 | −87 | −159 |
| | Native | −388 | −251 | −137 | −427 | −234 | −193 |
| | Imm−Nat | 202 | 142 | 60 | 181 | 147 | 34 |
| HS | Immigrant | 72 | 49 | 23 | −79 | 21 | −100 |
| | Native | 14 | 61 | −47 | −139 | −7 | −132 |
| | Imm−Nat | 58 | −12 | 70 | 60 | 28 | 32 |
| SomCol | Immigrant | 347 | 205 | 142 | 109 | 136 | −27 |
| | Native | 262 | 208 | 54 | 26 | 97 | −71 |
| | Imm−Nat | 85 | −3 | 88 | 83 | 39 | 44 |
| BA | Immigrant | 821 | 514 | 307 | 433 | 361 | 72 |
| | Native | 895 | 684 | 211 | 473 | 446 | 27 |
| | Imm−Nat | −74 | −170 | 96 | −40 | −85 | 45 |
| >BA | Immigrant | 1,362 | 972 | 390 | 795 | 670 | 125 |
| | Native | 1,344 | 1,020 | 324 | 766 | 674 | 92 |
| | Imm−Nat | 18 | −48 | 66 | 29 | −4 | 33 |

002788

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

441

*continued*

Benefits Include Defense, Subsidies, and Rest-of-World Payments

| | | | | | | |
|---|---|---|---|---|---|---|
| <HS | Immigrant | −302 | −164 | −138 | −398 | −158 | −240 |
| | Native | −503 | −313 | −190 | −580 | −315 | −265 |
| | Imm−Nat | 201 | 149 | 52 | 182 | 157 | 25 |
| HS | Immigrant | −44 | −6 | −38 | −231 | −50 | −181 |
| | Native | −191 | −1 | −100 | −292 | −88 | −204 |
| | Imm−Nat | 57 | −5 | 62 | 61 | 38 | 23 |
| SomCol | Immigrant | 231 | 150 | 81 | −43 | 65 | −108 |
| | Native | 147 | 146 | 1 | −127 | 16 | −143 |
| | Imm−Nat | 84 | 4 | 80 | 84 | 49 | 35 |
| BA | Immigrant | 705 | 459 | 246 | 281 | 290 | −9 |
| | Native | 780 | 622 | 158 | 320 | 365 | −45 |
| | Imm−Nat | −75 | −163 | 88 | −39 | −75 | 36 |
| >BA | Immigrant | 1,246 | 917 | 329 | 643 | 599 | 44 |
| | Native | 1,229 | 958 | 271 | 613 | 593 | 20 |
| | Imm−Nat | 17 | −41 | 58 | 30 | 6 | 24 |

002789

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

442

**TABLE 8-13** Continued

Benefits Include Defense, Subsidies, Rest-of-World Payments, and Interest Payments

| | | CBO Long-term Budget Outlook | | | No Budget Adjustments | | |
|---|---|---|---|---|---|---|---|
| | | Total | Individual | Descendants | Total | Individual | Descendants |
| <HS | Immigrant | −716 | −316 | −400 | −522 | −216 | −306 |
| | Native | −915 | −490 | −425 | −705 | −381 | −324 |
| | Imm−Nat | 199 | 174 | 25 | 183 | 165 | 18 |
| HS | Immigrant | −458 | −158 | −300 | −355 | −108 | −247 |
| | Native | −513 | −178 | −335 | −417 | −154 | −263 |
| | Imm−Nat | 55 | 20 | 35 | 62 | 46 | 16 |
| SomCol | Immigrant | −183 | −2 | −181 | −167 | 7 | −174 |
| | Native | −265 | −31 | −234 | −252 | −50 | −202 |
| | Imm−Nat | 82 | 29 | 53 | 85 | 57 | 28 |
| BA | Immigrant | 291 | 307 | −16 | 157 | 232 | −75 |
| | Native | 368 | 445 | −77 | 195 | 299 | −104 |
| | Imm−Nat | −77 | −138 | 61 | −38 | −67 | 29 |
| >BA | Immigrant | 832 | 765 | 67 | 519 | 541 | −22 |
| | Native | 817 | 781 | 36 | 488 | 527 | −39 |
| | Imm−Nat | 15 | −16 | 31 | 31 | 14 | 17 |

NOTE: The "total" figures equal the fiscal impact of the individual, starting at age 25, plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference between scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: Values are panel generated using 2011-2013 Current Population Survey data pools for the projections.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2798 of 4699 PageID #:  5963

The Economic and Fiscal Consequences of Immigration

pure public goods are left out (top panel). Notice that these values are more similar for immigrant and native within the same educational category than they are for either individual across educational categories. The fiscal impact is negative only for individuals in the lowest educational attainment category (less than high school, <HS). This is true for both natives and immigrants, with values of –$251,000 for the fiscal impact of a native-born person and –$109,000 for an immigrant. The low-skilled immigrant is less costly than the low-skilled native mainly because the former will not qualify for as many welfare programs. For all educational attainment groups from completing high school (HS) and higher, net impacts are positive and greater for the native-born person—but the differences between immigrant and native-born are relatively small. For example, strictly from the perspective of fiscal balance, an immigrant with a bachelor's degree (BA) (positive fiscal impact of $514,000) is preferable over a native with only some college (positive impact of $208,000).

In contrast, as shown in the next column, descendants of the immigrant always contribute more to fiscal balances than do the descendants of the native-born person, no matter what the individual's educational attainment is, which budget scenario is assumed, or how public goods are treated. This is mostly due to the greater average educational attainment of an immigrant's descendants, compared to the average educational attainment of descendants of the native born. To a lesser extent, there is also a small advantage for second generation persons in estimated earnings, and thus tax payments, within education category, compared to third-plus generation persons.

Combining the fiscal impact of the individual with that of the individual's descendants (the "Total" columns in Table 8-13), one can see that the hypothetical immigrant in this projection is almost always more positive (or less negative), from a fiscal balance perspective, than the hypothetical native-born person. The exception is the BA educational attainment category. Nonetheless, the lesson to draw from these projections is that the variability in fiscal impact is much greater across education categories than between immigrants and natives with the same educational attainment. Under the conditions of this projection, the major driver of fiscal impacts is educational attainment, not immigrant status.

Note that the above discussion does not touch on the results for the lower half of Table 8-13, in which most types of public goods are included as benefits paid for by both the immigrant and the native-born individual and to their descendants. This is because the patterns discussed are similar for the scenario with public goods costs included, just with more negative fiscal impacts. Because the same average value of the additional public goods is assigned to immigrants, natives, and descendants alike, the only differences for that scenario, compared to the scenario with no public

002791

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

goods, will be driven by demographic differences, such as different fertility, mortality, and emigration, and those differences are slight.

### Looking within Net Impacts

It is helpful to disaggregate the results of the panel's projection into taxes paid versus benefits received and also into impact by level of government. Tables 8-14, 8-15, and 8-16 do this for the accounting scenario in which an additional immigrant does not trigger additional spending on public goods, and therefore the cost of public goods is not added into the benefits received. Tables 8-17 and 8-18 present total and federal-only fiscal impacts when the alternative scenario is used, in which a new immigrant is assumed to increase spending on public goods by the per capita cost of those goods. Throughout Tables 8-14 through 8-18, the analysis calculates the characteristics of an average immigrant by drawing from the CPS pool of recent immigrants (CPS survey data for 2011 through 2013).

In all five tables, as in Tables 8-12 and 8-13 above, many of these fiscal impact estimates may seem large, but recall that they are the sums of discounted (NPV) flows over 75 years. For comparison, consider the lifetime earnings of a native-born worker without a college degree who earns $35,000 a year. Over a 40-year working life from ages 25 to 65, assuming an average tax rate of 25 percent in income, property, sales, corporate and other taxes, plus another 7.65 percent for employees' contributions for FICA taxes, this worker will accumulate tax payments of $457,000 in undiscounted dollars. Assuming an annual rate of real growth of 1 percent and a discount rate of 3 percent, the present value of this flow of taxes becomes $318,000. This is roughly consistent with the total taxes paid in the No Budget Adjustments scenario in Table 8-14 for a new immigrant who arrives ages 0-24. The 75-year present value of taxes paid by that person is $283,000 if his parent had less than a high school education, $350,000 if the parent had a high school diploma, and $417,000 if the parent had some college. (These figures are from the column under the No Budget Adjustments scenario for just the immigrant's own flows, without the flows from dependents. Adding the future flow of taxes in the descendants column increases the NPV of taxes to the estimates shown in the Total Impact column.)

These tables also illustrate the differential impacts of education on taxes paid versus benefits received. For instance, in the No Budget Adjustments section of Table 8-14, an immigrant who arrives during working ages (i.e., ages 25-64) with a BA will pay much more in taxes than an immigrant of similar age with less than a high school education ($704,000 versus $258,000). The educational gradient in the receipt of benefits, which is inverted with higher education groups receiving less in benefits, is much less

002792

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*445*

TABLE 8-14 75-year Present Value Flows for Consolidated Federal, State, and Local Governments for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods Excluded from Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars)

| | CBO Long-term Budget Outlook | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Impact | | | | Immigrant | | | | Descendants | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | 35 | −225 | −257 | −117 | 23 | −198 | −257 | −109 | 11 | −26 | 0 | −8 |
| HS | 239 | −42 | −164 | 49 | 140 | −50 | −164 | 11 | 98 | 8 | 0 | 39 |
| SomCol | 401 | 157 | −155 | 261 | 236 | 99 | −155 | 155 | 165 | 58 | 0 | 106 |
| BA | 495 | 504 | −160 | 481 | 301 | 366 | −160 | 330 | 194 | 138 | 0 | 150 |
| >BA | 446 | 994 | −100 | 812 | 287 | 805 | −100 | 635 | 159 | 190 | 0 | 177 |
| Avg. | 291 | 269 | −201 | 259 | 177 | 196 | −201 | 173 | 114 | 73 | 0 | 85 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 778 | 340 | 38 | 503 | 382 | 216 | 38 | 272 | 396 | 125 | 0 | 230 |
| HS | 942 | 475 | 33 | 620 | 482 | 318 | 33 | 365 | 461 | 157 | 0 | 255 |
| SomCol | 1,096 | 659 | 40 | 844 | 576 | 438 | 40 | 491 | 521 | 220 | 0 | 354 |
| BA | 1,159 | 978 | 53 | 1,005 | 638 | 682 | 53 | 649 | 521 | 296 | 0 | 355 |
| >BA | 1,088 | 1,445 | 78 | 1,314 | 618 | 1,101 | 78 | 939 | 469 | 344 | 0 | 375 |
| Avg. | 989 | 771 | 43 | 822 | 521 | 543 | 43 | 515 | 468 | 228 | 0 | 307 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 743 | 565 | 295 | 619 | 358 | 414 | 295 | 381 | 385 | 151 | 0 | 238 |
| HS | 704 | 517 | 197 | 570 | 342 | 368 | 197 | 354 | 362 | 149 | 0 | 216 |
| SomCol | 696 | 501 | 194 | 583 | 340 | 340 | 194 | 336 | 356 | 162 | 0 | 247 |
| BA | 665 | 474 | 213 | 524 | 337 | 316 | 213 | 319 | 327 | 158 | 0 | 205 |
| >BA | 641 | 450 | 179 | 503 | 331 | 296 | 179 | 304 | 310 | 154 | 0 | 198 |
| Avg. | 698 | 502 | 244 | 563 | 344 | 347 | 244 | 342 | 354 | 154 | 0 | 221 |

*continued*

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

446

**TABLE 8-14** Continued

CBO Long-term Budget Outlook with Deficit Reduction

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | 56 | -212 | -254 | -101 | 34 | -189 | -254 | -99 | 22 | -23 | 0 | -2 |
| HS | 263 | -28 | -162 | 67 | 153 | -40 | -162 | 22 | 110 | 13 | 0 | 45 |
| SomCol | 427 | 174 | -151 | 283 | 250 | 110 | -151 | 168 | 178 | 64 | 0 | 115 |
| BA | 522 | 525 | -157 | 503 | 316 | 381 | -157 | 345 | 206 | 145 | 0 | 159 |
| >BA | 472 | 1,023 | -97 | 840 | 302 | 826 | -97 | 654 | 170 | 197 | 0 | 186 |
| Avg. | 316 | 288 | -199 | 279 | 190 | 209 | -199 | 186 | 126 | 79 | 0 | 93 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 791 | 345 | 38 | 510 | 388 | 218 | 38 | 276 | 404 | 127 | 0 | 235 |
| HS | 959 | 481 | 33 | 630 | 490 | 321 | 33 | 370 | 470 | 160 | 0 | 260 |
| SomCol | 1,116 | 668 | 40 | 858 | 585 | 443 | 40 | 498 | 531 | 225 | 0 | 361 |
| BA | 1,181 | 992 | 53 | 1,021 | 650 | 690 | 53 | 659 | 531 | 302 | 0 | 362 |
| >BA | 1,108 | 1,467 | 79 | 1,336 | 629 | 1,117 | 79 | 954 | 478 | 351 | 0 | 383 |
| Avg. | 1,007 | 782 | 43 | 835 | 530 | 550 | 43 | 522 | 477 | 232 | 0 | 313 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 735 | 556 | 292 | 611 | 353 | 407 | 292 | 375 | 382 | 149 | 0 | 236 |
| HS | 697 | 509 | 195 | 563 | 337 | 361 | 195 | 348 | 360 | 147 | 0 | 215 |
| SomCol | 689 | 494 | 192 | 576 | 336 | 333 | 192 | 330 | 353 | 161 | 0 | 246 |
| BA | 658 | 467 | 211 | 517 | 333 | 310 | 211 | 314 | 325 | 157 | 0 | 204 |
| >BA | 636 | 444 | 176 | 496 | 327 | 290 | 176 | 299 | 309 | 154 | 0 | 197 |
| Avg. | 691 | 494 | 242 | 556 | 339 | 341 | 242 | 336 | 352 | 153 | 0 | 220 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**No Budget Adjustments**

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | -118 | -231 | -254 | -185 | -18 | -176 | -254 | -115 | -100 | -55 | 0 | -70 |
| HS | 13 | -105 | -170 | -67 | 61 | -70 | -170 | -29 | -48 | -36 | 0 | -39 |
| SomCol | 117 | 35 | -163 | 67 | 127 | 47 | -163 | 78 | -11 | -12 | 0 | -11 |
| BA | 172 | 283 | -177 | 235 | 160 | 251 | -177 | 210 | 12 | 32 | 0 | 25 |
| >BA | 140 | 627 | -120 | 469 | 143 | 565 | -120 | 427 | -2 | 63 | 0 | 42 |
| Avg. | 45 | 116 | -206 | 77 | 82 | 118 | -206 | 92 | -37 | -2 | 0 | -15 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 514 | 258 | 37 | 349 | 283 | 181 | 37 | 213 | 231 | 76 | 0 | 136 |
| HS | 616 | 352 | 30 | 432 | 350 | 258 | 30 | 282 | 265 | 94 | 0 | 149 |
| SomCol | 716 | 479 | 35 | 576 | 417 | 348 | 35 | 372 | 299 | 130 | 0 | 205 |
| BA | 746 | 704 | 47 | 697 | 451 | 532 | 47 | 493 | 295 | 172 | 0 | 204 |
| >BA | 693 | 1,025 | 64 | 909 | 428 | 827 | 64 | 695 | 264 | 198 | 0 | 214 |
| Avg. | 643 | 558 | 39 | 569 | 375 | 424 | 39 | 391 | 268 | 134 | 0 | 178 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 631 | 489 | 291 | 534 | 300 | 358 | 291 | 328 | 331 | 131 | 0 | 206 |
| HS | 603 | 458 | 200 | 499 | 290 | 328 | 200 | 311 | 313 | 130 | 0 | 188 |
| SomCol | 599 | 444 | 198 | 509 | 290 | 301 | 198 | 293 | 309 | 142 | 0 | 216 |
| BA | 574 | 421 | 224 | 462 | 291 | 281 | 224 | 283 | 283 | 140 | 0 | 179 |
| >BA | 552 | 397 | 185 | 440 | 286 | 262 | 185 | 268 | 267 | 135 | 0 | 172 |
| Avg. | 598 | 442 | 246 | 491 | 292 | 307 | 246 | 299 | 306 | 135 | 0 | 192 |

NOTE: The "total" figures equal the fiscal impact of the individual immigrant plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference among scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: The values are panel generated using Current Population Survey data pools from 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 8-15  75-year Present Value Flows for Federal Government Only, for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods Excluded from Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars)

| | CBO Long-term Budget Outlook | | | | | | | | | | | |
| | Total Impact | | | | Immigrant | | | | Descendants | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | 165 | -192 | -229 | -43 | 13 | -215 | -229 | -119 | 152 | 23 | 0 | 76 |
| HS | 335 | -53 | -152 | 76 | 108 | -109 | -152 | -36 | 227 | 56 | 0 | 112 |
| SomCol | 474 | 109 | -149 | 271 | 189 | 2 | -149 | 85 | 285 | 107 | 0 | 187 |
| BA | 570 | 399 | -160 | 434 | 264 | 220 | -160 | 222 | 306 | 178 | 0 | 212 |
| >BA | 544 | 793 | -104 | 703 | 271 | 567 | -104 | 467 | 272 | 226 | 0 | 236 |
| Avg. | 388 | 205 | -186 | 256 | 149 | 87 | -186 | 99 | 239 | 118 | 0 | 157 |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 540 | 209 | 15 | 334 | 252 | 121 | 15 | 168 | 288 | 87 | 0 | 166 |
| HS | 670 | 310 | 15 | 423 | 329 | 197 | 15 | 236 | 342 | 114 | 0 | 187 |
| SomCol | 791 | 449 | 18 | 596 | 402 | 286 | 18 | 332 | 390 | 163 | 0 | 264 |
| BA | 849 | 700 | 23 | 724 | 456 | 476 | 23 | 456 | 393 | 224 | 0 | 269 |
| >BA | 800 | 1,073 | 45 | 974 | 446 | 810 | 45 | 688 | 354 | 263 | 0 | 285 |
| Avg. | 710 | 541 | 19 | 582 | 362 | 372 | 19 | 354 | 348 | 170 | 0 | 228 |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 376 | 400 | 244 | 377 | 239 | 336 | 244 | 287 | 137 | 64 | 0 | 90 |
| HS | 336 | 363 | 167 | 348 | 221 | 306 | 167 | 272 | 115 | 57 | 0 | 75 |
| SomCol | 317 | 340 | 167 | 324 | 213 | 284 | 167 | 247 | 105 | 56 | 0 | 77 |
| BA | 279 | 301 | 182 | 291 | 192 | 256 | 182 | 234 | 87 | 45 | 0 | 57 |
| >BA | 256 | 280 | 149 | 271 | 175 | 243 | 149 | 221 | 81 | 37 | 0 | 50 |
| Avg. | 322 | 337 | 204 | 326 | 213 | 285 | 204 | 255 | 109 | 52 | 0 | 71 |

Copyright National Academy of Sciences. All rights reserved.

CBO Long-term Budget Outlook with Deficit Reduction

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | 186 | -179 | -226 | -27 | 24 | -206 | -226 | -110 | 162 | 27 | 0 | 82 |
| HS | 359 | -38 | -150 | 93 | 121 | -99 | -150 | -26 | 238 | 60 | 0 | 119 |
| SomCol | 501 | 126 | -146 | 293 | 203 | 14 | -146 | 97 | 298 | 112 | 0 | 195 |
| BA | 598 | 420 | -157 | 457 | 279 | 235 | -157 | 236 | 319 | 185 | 0 | 220 |
| >BA | 570 | 822 | -101 | 731 | 286 | 589 | -101 | 487 | 284 | 233 | 0 | 244 |
| Avg. | 413 | 224 | -186 | 277 | 162 | 100 | -183 | 112 | 251 | 123 | 0 | 165 |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 553 | 213 | 15 | 342 | 258 | 123 | 15 | 172 | 296 | 90 | 0 | 170 |
| HS | 687 | 317 | 15 | 433 | 337 | 200 | 15 | 241 | 350 | 116 | 0 | 192 |
| SomCol | 811 | 459 | 18 | 610 | 411 | 292 | 18 | 339 | 400 | 167 | 0 | 270 |
| BA | 871 | 714 | 23 | 741 | 467 | 485 | 23 | 465 | 403 | 230 | 0 | 276 |
| >BA | 820 | 1,096 | 46 | 995 | 457 | 826 | 46 | 702 | 363 | 270 | 0 | 293 |
| Avg. | 728 | 553 | 19 | 596 | 370 | 379 | 19 | 361 | 358 | 174 | 0 | 234 |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 367 | 392 | 241 | 370 | 234 | 329 | 241 | 282 | 133 | 63 | 0 | 88 |
| HS | 328 | 355 | 165 | 340 | 216 | 299 | 165 | 266 | 112 | 56 | 0 | 74 |
| SomCol | 310 | 332 | 165 | 317 | 208 | 278 | 165 | 242 | 102 | 55 | 0 | 75 |
| BA | 273 | 294 | 180 | 284 | 188 | 250 | 180 | 229 | 85 | 44 | 0 | 55 |
| >BA | 251 | 274 | 147 | 265 | 171 | 237 | 147 | 216 | 80 | 37 | 0 | 49 |
| Avg. | 315 | 329 | 202 | 319 | 208 | 278 | 202 | 250 | 107 | 51 | 0 | 69 |

continued

Copyright National Academy of Sciences. All rights reserved.

**TABLE 8-15** Continued

| | No Budget Adjustments | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Impact | | | | Immigrant | | | | Descendants | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | −2 | −205 | −228 | −120 | −23 | −193 | −228 | −123 | 21 | −11 | 0 | 3 |
| HS | 101 | −117 | −158 | −44 | 38 | −124 | −158 | −70 | 64 | 7 | 0 | 26 |
| SomCol | 188 | −9 | −158 | 78 | 92 | −41 | −158 | 17 | 96 | 32 | 0 | 61 |
| BA | 247 | 188 | −176 | 194 | 136 | 116 | −176 | 113 | 110 | 71 | 0 | 81 |
| >BA | 235 | 447 | −123 | 374 | 139 | 348 | −123 | 278 | 96 | 98 | 0 | 96 |
| Avg. | 135 | 57 | −191 | 76 | 64 | 17 | −191 | 26 | 71 | 39 | 0 | 60 |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 317 | 142 | 15 | 207 | 169 | 95 | 15 | 121 | 148 | 47 | 0 | 86 |
| HS | 391 | 208 | 13 | 264 | 217 | 148 | 13 | 167 | 174 | 60 | 0 | 97 |
| SomCol | 463 | 296 | 15 | 365 | 265 | 211 | 15 | 230 | 198 | 85 | 0 | 135 |
| BA | 490 | 460 | 19 | 456 | 293 | 345 | 19 | 319 | 197 | 116 | 0 | 137 |
| >BA | 457 | 699 | 34 | 615 | 281 | 564 | 34 | 470 | 176 | 135 | 0 | 146 |
| Avg. | 413 | 357 | 17 | 364 | 236 | 269 | 17 | 247 | 177 | 88 | 0 | 117 |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 320 | 347 | 243 | 327 | 192 | 289 | 243 | 244 | 127 | 58 | 0 | 83 |
| HS | 289 | 325 | 171 | 308 | 179 | 272 | 171 | 237 | 110 | 53 | 0 | 71 |
| SomCol | 275 | 305 | 173 | 287 | 173 | 252 | 173 | 213 | 102 | 53 | 0 | 74 |
| BA | 243 | 273 | 195 | 261 | 157 | 228 | 195 | 206 | 86 | 44 | 0 | 56 |
| >BA | 222 | 252 | 157 | 241 | 142 | 215 | 157 | 192 | 81 | 37 | 0 | 49 |
| Avg. | 278 | 300 | 208 | 288 | 173 | 251 | 208 | 221 | 105 | 49 | 0 | 68 |

NOTE: The "total" figures equal the fiscal impact of the individual immigrant plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference among scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: The values are panel generated using Current Population Survey data pools from 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

451

TABLE 8-16 75-year Present Value Flows for State and Local Governments only, for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods Excluded from Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars)

| | CBO Long-term Budget Outlook | | | | | | | | | | | |
| | Total Impact | | | | Immigrant | | | | Descendants | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| State/Local Net | | | | | | | | | | | | |
| <HS | -130 | -33 | -28 | -74 | 10 | 16 | -28 | 10 | -141 | -49 | 0 | -84 |
| HS | -96 | 11 | -12 | -26 | 32 | 58 | -12 | 47 | -128 | -48 | 0 | -74 |
| SomCol | -73 | 48 | -5 | -10 | 47 | 96 | -5 | 70 | -120 | -48 | 0 | -80 |
| BA | -75 | 105 | 0 | 47 | 37 | 146 | 0 | 108 | -113 | -41 | 0 | -61 |
| >BA | -98 | 202 | 4 | 109 | 16 | 238 | 4 | 168 | -114 | -36 | 0 | -59 |
| Avg. | -97 | 65 | -16 | 2 | 28 | 109 | -16 | 74 | -125 | -44 | 0 | -72 |
| State/Local Taxes | | | | | | | | | | | | |
| <HS | 237 | 132 | 23 | 168 | 130 | 94 | 23 | 104 | 107 | 37 | 0 | 64 |
| HS | 272 | 165 | 18 | 196 | 153 | 121 | 18 | 129 | 119 | 43 | 0 | 68 |
| SomCol | 305 | 209 | 22 | 249 | 174 | 152 | 22 | 159 | 131 | 58 | 0 | 90 |
| BA | 310 | 278 | 30 | 280 | 182 | 206 | 30 | 193 | 127 | 72 | 0 | 87 |
| >BA | 287 | 372 | 33 | 341 | 172 | 291 | 33 | 251 | 115 | 81 | 0 | 90 |
| Avg. | 279 | 229 | 24 | 239 | 159 | 171 | 24 | 161 | 120 | 58 | 0 | 78 |
| State/Local Benefits | | | | | | | | | | | | |
| <HS | 367 | 164 | 51 | 242 | 119 | 78 | 51 | 94 | 248 | 86 | 0 | 148 |
| HS | 368 | 154 | 30 | 233 | 121 | 63 | 30 | 81 | 247 | 91 | 0 | 141 |
| SomCol | 379 | 161 | 27 | 259 | 128 | 56 | 27 | 88 | 251 | 106 | 0 | 170 |
| BA | 385 | 176 | 31 | 233 | 145 | 60 | 31 | 85 | 240 | 113 | 0 | 148 |
| >BA | 385 | 170 | 29 | 232 | 156 | 53 | 29 | 83 | 229 | 117 | 0 | 148 |
| Avg. | 376 | 165 | 40 | 237 | 131 | 62 | 40 | 87 | 245 | 102 | 0 | 150 |

continued

Copyright National Academy of Sciences. All rights reserved.

**TABLE 8-16** Continued

CBO Long-term Budget Outlook with Deficit Reduction

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **State/Local Net** | | | | | | | | | | | | |
| <HS | -130 | -33 | -28 | -74 | 10 | 16 | -28 | 10 | -141 | -49 | 0 | -84 |
| HS | -96 | 11 | -12 | -26 | 32 | 58 | -12 | 47 | -128 | -48 | 0 | -74 |
| SomCol | -73 | 48 | -5 | -10 | 47 | 96 | -5 | 70 | -120 | -48 | 0 | -80 |
| BA | -75 | 105 | 0 | 47 | 37 | 146 | 0 | 108 | -113 | -41 | 0 | -61 |
| >BA | -98 | 202 | 4 | 109 | 16 | 238 | 4 | 168 | -114 | -36 | 0 | -59 |
| Avg. | -97 | 65 | -16 | 2 | 28 | 108 | -16 | 74 | -125 | -44 | 0 | -72 |
| **State/Local Taxes** | | | | | | | | | | | | |
| <HS | 237 | 132 | 23 | 168 | 130 | 94 | 23 | 104 | 107 | 37 | 0 | 64 |
| HS | 272 | 165 | 18 | 196 | 153 | 121 | 18 | 129 | 119 | 43 | 0 | 68 |
| SomCol | 305 | 209 | 22 | 249 | 174 | 152 | 22 | 159 | 131 | 58 | 0 | 90 |
| BA | 310 | 278 | 30 | 280 | 182 | 206 | 30 | 193 | 127 | 72 | 0 | 87 |
| >BA | 287 | 372 | 33 | 341 | 172 | 291 | 33 | 251 | 115 | 81 | 0 | 90 |
| Avg. | 279 | 229 | 24 | 239 | 159 | 171 | 24 | 161 | 120 | 58 | 0 | 78 |
| **State/Local Benefits** | | | | | | | | | | | | |
| <HS | 367 | 164 | 51 | 242 | 119 | 78 | 51 | 94 | 248 | 86 | 0 | 148 |
| HS | 368 | 154 | 30 | 223 | 121 | 63 | 30 | 81 | 247 | 91 | 0 | 141 |
| SomCol | 379 | 161 | 27 | 259 | 128 | 56 | 27 | 88 | 251 | 106 | 0 | 170 |
| BA | 385 | 173 | 31 | 233 | 145 | 60 | 31 | 85 | 240 | 113 | 0 | 148 |
| >BA | 385 | 170 | 29 | 232 | 156 | 53 | 29 | 83 | 229 | 117 | 0 | 148 |
| Avg. | 376 | 165 | 40 | 237 | 131 | 62 | 40 | 87 | 245 | 102 | 0 | 150 |

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2808 of 4699 PageID #:  5973

The Economic and Fiscal Consequences of Immigration

**No Budget Adjustments**

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **State/Local Net** | | | | | | | | | | | | |
| <HS | -116 | -27 | -27 | -65 | 5 | 17 | -27 | 8 | -121 | -44 | 0 | -73 |
| HS | -89 | 12 | -12 | -23 | 23 | 55 | -12 | 42 | -112 | -43 | 0 | -65 |
| SomCol | -71 | 44 | -5 | -11 | 35 | 88 | -5 | 61 | -106 | -44 | 0 | -72 |
| BA | -75 | 96 | -1 | 41 | 24 | 135 | -1 | 97 | -99 | -39 | 0 | -56 |
| >BA | -94 | 181 | 3 | 96 | 4 | 216 | 3 | 149 | -98 | -36 | 0 | -53 |
| Avg. | -90 | 59 | -15 | 2 | 19 | 100 | -15 | 66 | -109 | -41 | 0 | -64 |
| | | | | | | | | | | | | |
| **State/Local Taxes** | | | | | | | | | | | | |
| <HS | 196 | 115 | 22 | 142 | 113 | 86 | 22 | 93 | 83 | 29 | 0 | 50 |
| HS | 225 | 144 | 17 | 168 | 133 | 110 | 17 | 115 | 92 | 34 | 0 | 52 |
| SomCol | 253 | 183 | 20 | 211 | 152 | 138 | 20 | 141 | 101 | 45 | 0 | 70 |
| BA | 256 | 244 | 28 | 241 | 158 | 188 | 28 | 174 | 98 | 56 | 0 | 67 |
| >BA | 235 | 326 | 30 | 294 | 148 | 263 | 30 | 225 | 88 | 63 | 0 | 69 |
| Avg. | 230 | 201 | 23 | 205 | 138 | 156 | 23 | 144 | 92 | 45 | 0 | 61 |
| | | | | | | | | | | | | |
| **State/Local Benefits** | | | | | | | | | | | | |
| <HS | 312 | 142 | 49 | 207 | 108 | 69 | 49 | 84 | 204 | 73 | 0 | 123 |
| HS | 314 | 133 | 29 | 191 | 110 | 56 | 29 | 73 | 203 | 77 | 0 | 118 |
| SomCol | 324 | 139 | 26 | 222 | 117 | 50 | 26 | 80 | 207 | 89 | 0 | 142 |
| BA | 330 | 148 | 29 | 200 | 134 | 53 | 29 | 77 | 196 | 95 | 0 | 123 |
| >BA | 330 | 146 | 27 | 198 | 144 | 47 | 27 | 76 | 186 | 98 | 0 | 123 |
| Avg. | 321 | 142 | 38 | 203 | 120 | 55 | 38 | 78 | 201 | 86 | 0 | 125 |

NOTE: The "total" figures equal the fiscal impact of the individual immigrant plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference among scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: The values are panel generated using Current Population Survey data pools from 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

TABLE 8-17  75-year Present Value Flows for Consolidated Federal, State, and Local Governments for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods (defense, federal subsidies, and rest-of-world payments) Included in Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars)

### CBO Long-term Budget Outlook

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | -77 | -254 | -279 | -201 | -32 | -247 | -279 | -158 | -45 | -47 | 0 | -43 |
| HS | 127 | -112 | -187 | -33 | 84 | -99 | -187 | -39 | 42 | -14 | 0 | 6 |
| SomCol | 288 | 82 | -178 | 171 | 180 | 50 | -178 | 104 | 108 | 33 | 0 | 67 |
| BA | 384 | 426 | -183 | 395 | 245 | 316 | -183 | 279 | 139 | 110 | 0 | 116 |
| >BA | 339 | 915 | -123 | 725 | 231 | 754 | -123 | 583 | 108 | 161 | 0 | 142 |
| Avg. | 180 | 195 | -224 | 173 | 121 | 147 | -224 | 123 | 59 | 48 | 0 | 50 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 778 | 340 | 38 | 503 | 382 | 216 | 38 | 272 | 396 | 125 | 0 | 230 |
| HS | 942 | 475 | 33 | 620 | 482 | 318 | 33 | 365 | 461 | 157 | 0 | 255 |
| SomCol | 1,096 | 659 | 40 | 844 | 576 | 438 | 40 | 491 | 521 | 220 | 0 | 354 |
| BA | 1,159 | 978 | 53 | 1,005 | 638 | 682 | 53 | 649 | 521 | 296 | 0 | 355 |
| >BA | 1,088 | 1,445 | 78 | 1,314 | 618 | 1,101 | 78 | 939 | 469 | 344 | 0 | 375 |
| Avg. | 989 | 771 | 43 | 822 | 521 | 543 | 43 | 515 | 468 | 228 | 0 | 307 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 855 | 634 | 317 | 703 | 414 | 462 | 317 | 430 | 441 | 172 | 0 | 273 |
| HS | 816 | 587 | 220 | 653 | 397 | 416 | 220 | 404 | 418 | 170 | 0 | 249 |
| SomCol | 809 | 576 | 218 | 674 | 396 | 389 | 218 | 387 | 413 | 188 | 0 | 287 |
| BA | 775 | 551 | 236 | 610 | 394 | 365 | 236 | 370 | 381 | 186 | 0 | 240 |
| >BA | 749 | 529 | 201 | 589 | 388 | 346 | 201 | 356 | 361 | 183 | 0 | 233 |
| Avg. | 809 | 576 | 267 | 649 | 400 | 396 | 267 | 392 | 409 | 179 | 0 | 256 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

CBO Long-term Budget Outlook with Deficit Reduction

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | −54 | −280 | −276 | −186 | −21 | −236 | −276 | −148 | −33 | −43 | 0 | −36 |
| HS | 153 | −97 | −185 | −15 | 98 | −88 | −185 | −28 | 55 | −9 | 0 | 13 |
| SomCol | 317 | 101 | −175 | 193 | 195 | 62 | −175 | 117 | 121 | 39 | 0 | 76 |
| BA | 415 | 449 | −180 | 419 | 261 | 331 | −180 | 294 | 153 | 118 | 0 | 125 |
| >BA | 367 | 946 | −120 | 755 | 246 | 776 | −120 | 603 | 121 | 169 | 0 | 152 |
| Avg. | 207 | 215 | −221 | 195 | 135 | 161 | −221 | 136 | 72 | 54 | 0 | 59 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 791 | 345 | 38 | 510 | 388 | 218 | 38 | 276 | 404 | 127 | 0 | 235 |
| HS | 959 | 481 | 33 | 630 | 490 | 321 | 33 | 370 | 470 | 160 | 0 | 260 |
| SomCol | 1,116 | 668 | 40 | 858 | 585 | 443 | 40 | 498 | 531 | 225 | 0 | 361 |
| BA | 1,181 | 992 | 53 | 1,021 | 650 | 690 | 53 | 659 | 531 | 302 | 0 | 362 |
| >BA | 1,108 | 1,467 | 79 | 1,336 | 629 | 1,117 | 79 | 954 | 478 | 351 | 0 | 383 |
| Avg. | 1,007 | 782 | 43 | 835 | 530 | 550 | 43 | 522 | 477 | 232 | 0 | 313 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 844 | 624 | 315 | 693 | 408 | 454 | 315 | 423 | 436 | 170 | 0 | 270 |
| HS | 806 | 578 | 217 | 644 | 392 | 409 | 217 | 397 | 414 | 169 | 0 | 247 |
| SomCol | 800 | 567 | 215 | 665 | 390 | 381 | 215 | 381 | 409 | 186 | 0 | 284 |
| BA | 766 | 544 | 234 | 602 | 389 | 359 | 234 | 364 | 378 | 184 | 0 | 238 |
| >BA | 741 | 522 | 199 | 581 | 383 | 340 | 199 | 351 | 358 | 181 | 0 | 231 |
| Avg. | 800 | 567 | 264 | 640 | 394 | 389 | 264 | 386 | 405 | 178 | 0 | 254 |

continued

002803

Copyright National Academy of Sciences. All rights reserved.

**TABLE 8-17** Continued

| | No Budget Adjustments | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Impact | | | | | | | | | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Total Net** | | | | | | | | | | | | |
| <HS | -267 | -322 | -282 | -296 | -90 | -239 | -282 | -179 | -176 | -84 | 0 | -116 |
| HS | -135 | -197 | -197 | -176 | -12 | -132 | -197 | -93 | -123 | -65 | 0 | -83 |
| SomCol | -33 | -63 | -192 | -53 | 55 | -17 | -192 | 12 | -88 | -46 | 0 | -64 |
| BA | 26 | 181 | -205 | 122 | 87 | 186 | -205 | 144 | -61 | -5 | 0 | -22 |
| >BA | -2 | 523 | -149 | 355 | 69 | 499 | -149 | 360 | -70 | 24 | 0 | -4 |
| Avg. | -103 | 19 | -234 | -36 | 9 | 54 | -234 | 26 | -112 | -35 | 0 | -62 |
| **Taxes** | | | | | | | | | | | | |
| <HS | 514 | 258 | 37 | 349 | 283 | 181 | 37 | 213 | 231 | 76 | 0 | 136 |
| HS | 616 | 352 | 30 | 432 | 350 | 258 | 30 | 282 | 265 | 94 | 0 | 149 |
| SomCol | 716 | 479 | 35 | 576 | 417 | 348 | 35 | 372 | 299 | 130 | 0 | 205 |
| BA | 746 | 704 | 47 | 697 | 451 | 532 | 47 | 493 | 295 | 172 | 0 | 204 |
| >BA | 693 | 1025 | 64 | 909 | 428 | 827 | 64 | 695 | 264 | 198 | 0 | 214 |
| Avg. | 643 | 558 | 39 | 569 | 375 | 424 | 39 | 391 | 268 | 134 | 0 | 178 |
| **Benefits** | | | | | | | | | | | | |
| <HS | 780 | 580 | 319 | 644 | 373 | 420 | 319 | 392 | 407 | 160 | 0 | 252 |
| HS | 751 | 550 | 227 | 608 | 362 | 390 | 227 | 376 | 389 | 159 | 0 | 232 |
| SomCol | 749 | 542 | 227 | 629 | 362 | 365 | 227 | 360 | 387 | 177 | 0 | 269 |
| BA | 720 | 523 | 253 | 575 | 364 | 346 | 253 | 349 | 356 | 177 | 0 | 226 |
| >BA | 695 | 502 | 231 | 554 | 360 | 328 | 213 | 336 | 335 | 174 | 0 | 219 |
| Avg. | 746 | 539 | 273 | 604 | 365 | 370 | 273 | 365 | 381 | 169 | 0 | 240 |

NOTE: The "total" figures equal the fiscal impact of the individual immigrant plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference among scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.
SOURCE: The values are panel generated using Current Population Survey data pools from 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

TABLE 8-18 75-year Present Value Flows for Federal Government Only, for Three Future Budget Scenarios, by Grouped Ages of Immigrant Arrival in the United States, with Public Goods (defense, federal subsidies, and rest-of-world payments) Included in Incremental Benefit Costs to Immigrants and Descendants (flows in thousands of 2012 dollars)

| | CBO Long-term Budget Outlook | | | | | | | | | | | |
| | Total Impact | | | | Immigrant | | | | Descendants | | | |
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | 53 | −261 | −251 | −127 | −43 | −263 | −251 | −168 | 95 | 2 | 0 | 42 |
| HS | 23 | −123 | −175 | −7 | 52 | −157 | −175 | −86 | 170 | 34 | 0 | 79 |
| SomCol | 361 | 34 | −173 | 180 | 134 | −47 | −173 | 34 | 228 | 81 | 0 | 147 |
| BA | 460 | 321 | −183 | 348 | 208 | 170 | −186 | 171 | 252 | 151 | 0 | 177 |
| >BA | 436 | 714 | −127 | 616 | 215 | 517 | −127 | 415 | 222 | 197 | 0 | 201 |
| Avg. | 277 | 131 | −209 | 171 | 93 | 39 | −209 | 48 | 184 | 93 | 0 | 122 |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 540 | 209 | 15 | 334 | 252 | 121 | 15 | 168 | 288 | 87 | 0 | 166 |
| HS | 670 | 310 | 15 | 423 | 329 | 197 | 15 | 236 | 342 | 114 | 0 | 187 |
| SomCol | 791 | 449 | 18 | 596 | 402 | 286 | 18 | 332 | 390 | 163 | 0 | 264 |
| BA | 849 | 700 | 23 | 724 | 456 | 476 | 23 | 456 | 393 | 224 | 0 | 269 |
| >BA | 800 | 1,073 | 45 | 974 | 446 | 810 | 45 | 688 | 354 | 263 | 0 | 285 |
| Avg. | 710 | 541 | 19 | 582 | 362 | 372 | 19 | 354 | 348 | 170 | 0 | 228 |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 487 | 470 | 266 | 461 | 294 | 384 | 266 | 337 | 193 | 85 | 0 | 124 |
| HS | 447 | 433 | 189 | 430 | 276 | 354 | 189 | 322 | 171 | 79 | 0 | 108 |
| SomCol | 430 | 415 | 191 | 415 | 268 | 333 | 191 | 299 | 162 | 82 | 0 | 117 |
| BA | 389 | 378 | 206 | 376 | 248 | 306 | 206 | 285 | 141 | 73 | 0 | 91 |
| >BA | 363 | 359 | 172 | 357 | 231 | 293 | 172 | 273 | 132 | 66 | 0 | 84 |
| Avg. | 433 | 411 | 227 | 412 | 269 | 334 | 227 | 306 | 165 | 77 | 0 | 106 |

*continued*

Copyright National Academy of Sciences. All rights reserved.

TABLE 8-18 Continued

CBO Long-term Budget Outlook with Deficit Reduction

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | 77 | -247 | -248 | -109 | -31 | -253 | -248 | -158 | 107 | 6 | 0 | 49 |
| HS | 249 | -107 | -172 | 12 | 66 | -146 | -172 | -75 | 184 | 39 | 0 | 87 |
| SomCol | 390 | 53 | -170 | 203 | 148 | -34 | -170 | 47 | 241 | 87 | 0 | 156 |
| BA | 490 | 344 | -180 | 372 | 224 | 185 | -180 | 186 | 266 | 158 | 0 | 186 |
| >BA | 465 | 744 | -124 | 646 | 231 | 539 | -124 | 435 | 234 | 205 | 0 | 210 |
| Avg. | 304 | 151 | -206 | 193 | 107 | 52 | -206 | 62 | 197 | 99 | 0 | 131 |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 553 | 213 | 15 | 342 | 258 | 123 | 15 | 172 | 296 | 90 | 0 | 170 |
| HS | 687 | 317 | 15 | 433 | 337 | 200 | 15 | 241 | 350 | 116 | 0 | 192 |
| SomCol | 811 | 459 | 18 | 610 | 411 | 292 | 18 | 339 | 400 | 167 | 0 | 270 |
| BA | 871 | 714 | 23 | 741 | 467 | 485 | 23 | 465 | 403 | 230 | 0 | 276 |
| >BA | 820 | 1,096 | 46 | 995 | 457 | 826 | 46 | 7020 | 363 | 270 | 0 | 293 |
| Avg. | 728 | 553 | 19 | 596 | 370 | 379 | 19 | 361 | 358 | 174 | 0 | 234 |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 4,477 | 460 | 263 | 452 | 289 | 376 | 263 | 330 | 188 | 84 | 0 | 122 |
| HS | 438 | 424 | 187 | 421 | 271 | 346 | 187 | 316 | 167 | 78 | 0 | 106 |
| SomCol | 421 | 406 | 188 | 407 | 263 | 326 | 188 | 293 | 158 | 80 | 0 | 114 |
| BA | 381 | 371 | 203 | 368 | 243 | 299 | 203 | 279 | 138 | 71 | 0 | 89 |
| >BA | 356 | 352 | 170 | 350 | 227 | 287 | 170 | 237 | 129 | 65 | 0 | 83 |
| Avg. | 424 | 402 | 225 | 403 | 263 | 327 | 225 | 300 | 161 | 75 | 0 | 104 |

002806

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2814 of 4699 PageID #:  5979

**No Budget Adjustments**

| | Total Impact | | | | Immigrant | | | | Descendants | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. | 0-24 | 25-64 | 65+ | Avg. |
| **Federal Net** | | | | | | | | | | | | |
| <HS | -151 | -295 | -255 | -231 | -96 | -256 | -255 | -187 | -55 | -40 | 0 | -43 |
| HS | -47 | -209 | -185 | -153 | -35 | -187 | -185 | -135 | -12 | -22 | 0 | -18 |
| SomCol | 38 | -107 | -187 | -42 | 20 | -105 | -187 | -49 | 18 | -2 | 0 | 7 |
| BA | 101 | 85 | -205 | 81 | 63 | 51 | -205 | 47 | 38 | 34 | 0 | 34 |
| >BA | 92 | 342 | -151 | 259 | 65 | 283 | -151 | 210 | 27 | 60 | 0 | 49 |
| Avg. | -12 | -41 | -219 | -37 | -9 | -47 | -219 | -40 | -3 | 6 | 0 | 2 |
| | | | | | | | | | | | | |
| **Federal Taxes** | | | | | | | | | | | | |
| <HS | 317 | 142 | 15 | 207 | 169 | 95 | 15 | 121 | 148 | 47 | 0 | 86 |
| HS | 391 | 208 | 13 | 264 | 217 | 148 | 13 | 167 | 174 | 60 | 0 | 97 |
| SomCol | 463 | 296 | 15 | 365 | 265 | 211 | 15 | 230 | 198 | 85 | 0 | 135 |
| BA | 490 | 460 | 19 | 456 | 293 | 345 | 19 | 319 | 197 | 116 | 0 | 137 |
| >BA | 457 | 699 | 34 | 615 | 281 | 564 | 34 | 470 | 176 | 135 | 0 | 145 |
| Avg. | 413 | 357 | 17 | 364 | 236 | 269 | 17 | 247 | 177 | 88 | 0 | 117 |
| | | | | | | | | | | | | |
| **Federal Benefits** | | | | | | | | | | | | |
| <HS | 468 | 438 | 270 | 437 | 265 | 351 | 270 | 308 | 203 | 87 | 0 | 129 |
| HS | 438 | 417 | 199 | 417 | 252 | 335 | 199 | 302 | 186 | 82 | 0 | 115 |
| SomCol | 425 | 403 | 202 | 407 | 2,445 | 316 | 202 | 280 | 180 | 88 | 0 | 128 |
| BA | 390 | 375 | 224 | 375 | 230 | 293 | 224 | 272 | 160 | 82 | 0 | 103 |
| >BA | 365 | 356 | 185 | 356 | 216 | 281 | 185 | 260 | 149 | 75 | 0 | 96 |
| Avg. | 425 | 398 | 236 | 401 | 246 | 315 | 236 | 287 | 180 | 83 | 0 | 115 |

NOTE: The "total" figures equal the fiscal impact of the individual immigrant plus the fiscal impacts of that individual's descendants. See accompanying text for a discussion of the difference among scenarios without and with public goods included. The discount rate used for the net present value calculations is 3 percent.

SOURCE: The values are panel generated using Current Population Survey data pools from 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

460        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

steep than the gradient for taxes paid. An immigrant arriving at working age with a college degree will receive less in benefits than the high school dropout ($281,000 compared to $358,000), but this difference is far less than it was for taxes paid ($532,000 versus $181,000). Overall, since taxes are sharply increased with education, and benefits are reduced (albeit not as dramatically), one can see why the higher levels of education among recent immigrants produce a more positive net fiscal impact than previous immigrants produced.

The consolidated amounts in Tables 8-12, 8-13, and 8-14 are the sum of the corresponding federal amounts in Table 8-15 and the state/local amounts in Table 8-16. The two CBO-based scenarios are the same at the state and local levels because there is no deficit reduction plan for state and local budgets. By statute, those budgets are required to balance. These results show that almost all of the positive fiscal impacts of immigration come from the federal level. State and local impacts are mostly negative for the average new immigrant as an individual and for that individual's descendants. Comparing the difference in fiscal impacts of the individual with those of the immigrant's descendants gives some indication of what drives these patterns. The descendants' amounts are mostly negative because state and local governments must pay the upfront costs of education for young immigrants who are still dependents and for the young native-born children of new immigrants. Even though working-age immigrants pay state and local taxes, these receipts are not large enough to compensate for the cost of educating their children. In addition, the 75-year time window for our future-looking projections cuts the analysis off when some of the children and grandchildren of the hypothetical immigrant are in their highest earning, highest tax-paying ages. Although those amounts would be heavily discounted in the calculations because they are relatively far in the future, there would likely be some additional benefit from these flows into state and local budgets if the projection was extended further and captured them.

Table 8-16 also does not show as wide a spread in the present value of tax revenues by education group at the state and local level as at the federal level. State and local governments rely much more heavily on revenue sources other than income taxes than does the federal government. Sales and property taxes are less correlated with education than are income taxes. A key upshot of this is that higher levels of education among recent immigrants, which seems to be such a boon to federal budgets, cannot help as much to maintain fiscal balance at the state and local level. Another is that educating the children of immigrants, while demonstrably helpful at the federal level because of the progressivity of federal taxes, is much less of a gain for the states, where the sales and property tax contributions of more educated residents do not seem to exceed those of less educated residents as much as taxes do at the federal level.

002808

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Future Impacts: Summary

**Although estimates vary across scenarios, fiscal impacts of immigrants are generally positive at the federal level and negative at the state and local levels.** State and local governments bear the burden of providing education benefits, upon arrival and continuing, to young immigrants and to the children of immigrants, but their methods of taxation tend to recoup relatively fewer contributions later from the most highly educated taxpayers. Federal benefits, in contrast, are largely focused on the elderly, so the relative youthfulness of arriving immigrants means that they tend to have positive fiscal impacts on federal finances in the short term. In addition, federal taxes are more strongly progressive, drawing more contributions from the most highly educated. The investment in public education requires public funds and pays public dividends, but a key issue is that the public dividends tend to be absorbed by the federal government, while the public funds are provided by the states. The fact that states bear much of the fiscal burden of immigration may incentivize state-level policies to exclude immigrants. Equity issues between the federal government and across states should be given consideration in future iterations of immigration policy.

**Forward-looking projections of the net fiscal impact of an additional immigrant and descendants generate a relatively wide range of possible results.** Future developments are uncertain, and, across a range of reasonable scenarios, the fiscal impact from an additional immigrant can be positive or negative depending on which assumptions are used in the calculation. Three assumptions are particularly important in determining the results: the future of government budgets, the treatment of public goods (i.e., how costs on budget items such as national defense change are assumed to change with an additional immigrant), and the immigrant's characteristics.

**The future path of fiscal policy is important for assessing the fiscal impacts of immigrants.** Under "business as usual," in which federal deficits continue and debt increases rapidly relative to GDP, immigrants are not valuable to governments (i.e., they do not have a positive fiscal impact) because nobody is valuable to governments. The net fiscal impact for any U.S. resident, immigrant or native-born, is negative. When fiscal sustainability is assumed to result in future spending cuts and tax increases, immigrants are more valuable than native-born Americans (that is, their net fiscal impact is greater in a positive direction).

**The treatment of spending on public goods is important for assessing the fiscal impact of immigrants.** Federal defense spending is a very large part of the budget. But the addition of a single citizen through immigration or birth cannot plausibly increase defense spending, which is easily shared by all citizens, while it clearly must increase spending on transfer programs

Copyright National Academy of Sciences. All rights reserved.

462     *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

such as Social Security. Therefore, it is reasonable to omit the per capita cost of pure public goods, such as national defense, from the incremental cost to government of a single additional citizen. However, for larger increases in population through sustained immigration, this reasoning no longer holds and the net fiscal impact of immigrants may dip negative if spending on public goods is assumed to increase with the resulting population increase.

**The characteristics of a new immigrant are important for assessing the fiscal impact.** During the past 20 years, there has been considerable change in many characteristics of immigrants, chief among them—for purposes of understanding fiscal impacts—being age structure and educational attainment. If a future immigrant looks like recent new immigrants, rather than like an average immigrant of the entire first generation alive today, that immigrant will have a more positive net fiscal impact because of increased levels of education and concentration at working ages, the characteristics most lucrative to governments from the perspective of tax collections.

**Today's immigrants have more education, making them more positive contributors to government finances than immigrants in the past.** If today's immigrants had the same lower educational distribution as immigrants two decades ago, their positive fiscal impact would have been 30-70 percent lower. Whether these trends will continue or not remains uncertain, but the historical record suggests that the total net fiscal impact of immigrants across all levels of government may have become more positive over time.

**An immigrant and a native-born person with similar characteristics will likely have about the same fiscal impact.** Persons with higher levels of education contribute more positively to government finances regardless of their immigrant status. Furthermore, within age and education categories, immigrants generally have a more salutary effect on budgets than a native-born person because they are disqualified from some benefit programs and because their children, on average, tend to achieve higher levels of education, earnings, and tax paying. Of course, government policy has much more control over levels of immigration than over rates of native population growth, and thus the policy implications of this point are minimal.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## 8.4 ANNEX:
## TECHNICAL DOCUMENTATION FOR THE FISCAL ESTIMATES

Chapter 8 contains estimates of costs and benefits of U.S. residents by generation, as well as discounted flows, of taxes paid and benefits received, that are expected to arise from one new immigrant arriving in the United States in the future, including flows attributable to that immigrant's descendants. This annex explains the calculation steps involved in the creation of this dataset of flows and in all of the NPV calculations that appear in Chapter 8. After an overview of the calculation steps, the second section documents in detail how the age profiles of taxes and benefits were generated. The third section explains the methodology for estimating educational transmission from one generation to the next and projecting educational attainment of future immigrants and descendants. The fourth subsection covers the projection of future taxes and benefits, and the final subsection documents how key demographic characteristics (survivorship, emigration, and number of descendants) were projected for future immigrants and their descendants.

### Overview of Calculation Steps

The same input data that were used in the historical static calculations in Section 8.2 were used in the forward projections in Section 8.3, but the future-looking projected flows are only used in the 75-year horizon calculations. The steps in the forward-looking calculation are described briefly in this section in a numbered list. The subsequent sections of the annex give complete details for each step.

### 1. *Estimate Age Profiles of Tax and Benefit Flows by Immigrant Status and Education*

The profiles are smoothed, per capita age schedules of tax and benefit flows, estimated from rolling 3-year CPS samples and augmented with other data sources where necessary. They are adjusted by an overall factor (i.e., one multiplicative factor is applied to all age groups) so that the aggregates match totals from the NIPA for the central year of the 3-year period. For example, the age profiles for 2012 come from pooled CPS samples for 2011-2013 and are adjusted to 2012 NIPA total. The "jumping-off" year for the future-looking 75-year flow projections is 2012.

Age profiles are estimated for five immigrant groups and five educational attainment groups. The immigrant groups are foreign born arriving within the last 0-4 years, foreign-born arriving within the last 5-9 years, foreign-born arriving more than 10 years ago, native-born children of foreign-born

002811

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

parents, and native-born children of native-born parents. The five education groups are less than high school completion (<HS), completed high school (HS), some college (SomCol), graduated from college with a degree (BA), and education beyond the first college degree (>BA). When the CPS has individual-level indicators of a particular flow, those are used. Where a household-level flow is available, assumptions are made about the allocation of the household amount to individuals within the household.

Some flows are not attributable to individuals but instead can be assigned to everyone in the population on a per capita basis. These include public goods, such as defense and subsidies, interest payments on debt, general costs of public administration, and other costs shared across society such as the costs of police, fire, and building and maintaining public infrastructure. For some analyses, it is appropriate to exclude some of these costs, for others it is more reasonable to include them. The tables in the chapter specify whether and which public goods were included in per capita costs.

For the historical static calculations in Section 8.2, the same rolling 3-year pooled CPS samples are used, but at the individual level rather than collapsed into per capita age profiles. However, the microdata is still adjusted to agree with NIPA totals for the central year at the aggregate level. The data sources and assumptions for each flow are listed in the next subsection of this annex, followed by details on the aggregate NIPA amounts to which the age profiles were adjusted.

## 2. Estimate Future Educational Attainment of Young Immigrants and of All Immigrant Descendants

Because an individual's tax payments and benefit receipts differ so much by the individual's educational attainment, to predict future flows for an immigrant one must first predict the educational level that individual and his descendants will attain. An immigrant who arrives after age 25 is likely to maintain the education level observed on arrival, so we assume no change in educational attainment after age 25. If the immigrant arrives before age 25, we instead predict a future education level by estimating regression functions that predict offspring education based on parental education.

The regression functions were estimated using Decennial Census samples 15 years apart. The earlier sample was used to observe the education of parents born in particular regions who had children ages 10-16 living in their households. The later sample provided observations of the education of persons ages 25-31 whose parents were born in that region. These distributions were compared to derive regression functions to predict a child's educational attainment based on parents' education and birth region. Separate functions were derived for native-born children and for foreign-born

002812

Copyright National Academy of Sciences. All rights reserved.

children. In predicting ultimate education levels, random error terms were added to maintain realistic educational distributions at each generation. More details on this process are included below.

### 3. Project Future Taxes and Benefits

The NPV calculations start with the jumping-off year of 2012 and continue forward 75 years to 2087. To estimate federal flows, three different scenarios are used, as follows:

1. The CBO's Long-Term Budget Outlook's extended baseline scenario, which projects what would happen in the future under all currently legislated tax and spending provisions but no new ones (Congressional Budget Office, 2014a).
2. A CBO version of the extended baseline scenario but with a long-term plan to reduce federal deficits.
3. A simple No Budget Adjustments scenario in which no budget-mitigation mechanisms are assumed but the age profiles themselves simply shift up every year by an assumed rate of productivity growth (1% was used).

State and local budgets were handled differently because they cannot run large deficits like the federal government can. For the CBO-based scenarios, we assumed that all state and local flows grow at the same rate as national GDP in CBO's baseline budget projection (which does not include economic feedbacks from debt to economic performance, although CBO does have alternative projections that do incorporate equilibrium effects). For the No Budget Adjustments scenario, state and local flows were handled in the same way as federal flows, with age profiles of taxes paid and benefits received shifting upward by an assumed 1 percent per year. More details on these projections and what they do to future deficits appear in the detailed discussion below.

### 4. Project Survivorship, Emigration, and Number of Descendants

To project fiscal impacts of an immigrant arrival into the future, one needs to know how likely the immigrant is to survive in each future year and to not emigrate from the United States (either back to the immigrant's country of origin or to another country). To project the fiscal impacts of the immigrant's descendants, one needs to know how many children will be born and what their survivorship and risk of emigration will be. For the projections in Chapter 8, all of these demographic factors are the same as those used for the demographic projections elsewhere in the report.

002813

Copyright National Academy of Sciences. All rights reserved.

However, there is one additional assumption needed to cover the case of young children whose immigrant parents choose to emigrate. We assume here that children of immigrants ages 0 to 19 years whose parents emigrate will also emigrate, even if they are native born. See the section below on projection of demographic characteristics for further details.

### 5. Final Calculation: Sum Up Discounted Projected Future Flows Based on Entry Characteristics and Apply a Discount Rate

The final "thought experiment" of estimating the fiscal impact of the arrival of one additional immigrant combines the results from steps 3 and 4. Defining survivorship broadly to include the risk of emigration along with the risk of death, this process then involves weighting the projected per capita flows by the survivorship probability of a hypothetical immigrant and that immigrant's hypothetical descendants at each year from 2012 to 2087, given the immigrant's level of education and age at entry.

To talk through one example, imagine an immigrant arriving at age 32 in 2012 with less than high school education. The age profiles specify that this immigrant will have a particular level of taxes paid and benefits received in 2012, and the difference between them is that person's net fiscal impact in 2012. For 2013, the calculation uses the projected taxes paid and benefits received of a now 33-year-old with less than high school education, weighted by the probability of having survived to age 33 and not emigrated, discounted by 3 percent. The process continues for a 34-year-old in 2014, this time discounted by 3 percent each year for 2 years. The net fiscal impact for the 35-year-old immigrant in 2015 is discounted for each of 3 years, and so on. The discounted annual net fiscal impacts for all 75 years are then added together to give the NPV of the immigrant's arrival attributable just to that individual (excluding flows from the immigrant's descendants).

The discounted NPV for each of the immigrant's descendants is calculated similarly. Based on fertility rates, the immigrant has an expected number of births in 2013, weighted by the probability of a newborn surviving (and not leaving with an emigrating parent). This number of children is multiplied by the taxes paid less benefits received that are expected to accrue to a newborn child in 2013, and so for each year as the expected children age and progress through their years of public schooling. Eventually in one or another future year, each surviving child of the immigrant is old enough to have a positive expected number of births, and the discounted NPV calculation process will continue forward for the immigrant's grandchildren as well. All expected (based on fertility, survivorship and emigration rates, etc.) offspring over the 75-year period are included in deriving the summed-up fiscal impact for the immigrant's descendants.

002814

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2822 of 4699 PageID #:  5987

For comparative purposes, a similar analysis can be done for native-born persons of native-born parents. Even though natives only ever "arrive" at birth (age 0), the calculation for a native-born individual that is included in Chapter 8 is for the discounted flows starting from age 25. But that calculation is used just for comparison with an immigrant arriving at age 25 (to equalize the comparison, given that the immigrant does not receive public schooling benefits in the United States).

The immigrant calculations described here give the 75-year present values for a particular age and education at arrival. However, for purposes of the issues discussed in Chapter 8, we are usually interested in the discounted present value for a set of average characteristics for a particular group. In the chapter, averages for recent immigrants and all immigrants are shown.

### Age Profiles of Taxes and Benefits

#### CPS Data and Definition of Immigrant Generations

Most of the profiles used in *The New Americans* (National Research Council, 1997) were based on CPS data, pooling March samples for 1994 and 1995. Federal tax and benefit flows were adjusted to national aggregates as measured in NIPA for 1994. State and local benefits were adjusted to agree with 1994 fiscal year totals, while state and local taxes were adjusted to follow a balanced budget rule.

The age profiles used in this report also use mostly CPS data, pooling samples over 3 years to get the appropriate age shape for the central year, then adjusting to national aggregates for the central year. The profiles shown here are for 2012: The age profiles are calculated from CPS samples for 2011, 2012, and 2013 and are adjusted to be consistent with national aggregates for calendar year 2012.

For each age profile, the source in the CPS for that profile is noted below, as is the source for the national aggregate that the age profile is adjusted proportionally to match. Separate profiles were generated for each of five immigration groups with each of five education levels. Immigrants are divided by generation and, for the first generation, by the time since their arrival in the United States:

- Foreign-born (first generation)[38]
  –arrived 0-4 years ago

---

[38]This group does *not* include those born abroad of American-citizen parents, as those persons would be considered citizens at birth and thus not affected by immigration policy. Such persons are considered to be third-plus generation for this report.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

          –arrived 5-9 years ago
          –arrived 10 or more years ago
  • Native-born with two foreign-born parents (second generation)
  • Native-born with two native-born parents (third generation)[39]

     In its computations, *The New Americans* (National Research Council, 1997) split native-born person with one foreign-born parent and one native-born parent 50/50 between the second and third-plus generations. This is appropriate for the forward-looking present value calculation because it credits an immigrant and nonimmigrant who have a child together as each having half of that child. Thus, higher or lower expected fertility for immigrant groups as compared to native groups will be accounted for in the calculation of net fiscal impacts of descendants. However, for the historical static calculations in Section 8.2, these children can be considered as either second or third generation, depending on the calculation scenario.
     The age profiles were further separated into the five education groups, with immigrant descendants and immigrants themselves moving from one education category to another based on estimated generational transitions. The five education groups, abbreviated as <HS, HS, SomColl, BA, and >BA, are defined above in the "Overview of Calculation Steps."

*Institutionalized Persons (mainly nursing home residents)*

     Because the CPS does not include persons in institutions, each age profile must be adjusted to reflect the total U.S. resident population instead of just the household-resident population. This issue is most acute at oldest ages, when there are high rates of nursing home residence. For some age profiles, the adjustment for the "missing" residents in the CPS is made by assuming the value for the net fiscal flows for these persons is zero, or is the same as those not in nursing homes. For other age profiles, a different assumption is made based on external data sources. Data on the percentage of persons in institutions, by age and immigration status, are from the Integrated Public Use Microdata Series (IPUMS) for 1980, 1990, and 2000 and the American Community Survey (ACS) for the period 2006-2012, interpolated for years with no sample.
     The IPUMS and ACS data for most years do not allow separation of nursing home residence by other types of institutionalization. All persons ages 65 and older in institutions are assumed to be in nursing homes. Also, IPUMS and ACS only allow separating institutionalization percentages by first generation versus second or higher generations. For this report, the

---

[39]Throughout this report, the term "third-plus generation" is used as shorthand to refer to all U.S. residents who are technically third generation or more from an immigrant ancestor.

002816

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

proportion institutionalized for second and higher generations is applied to both the second and third-plus generation estimates.

While rates of institutionalization are generally lower for immigrants compared to natives, and much lower for recent immigrants, they are very relevant for estimating the correct flows of some transfer programs that benefit the oldest age groups, such as Medicare and Medicaid, and for estimating the difference between average benefits for immigrants and the native-born.

### Allocations to Individuals When CPS Data Are Household Level

When CPS source data are used at individual level, the data are used "as is," unless otherwise noted. When the source data are at the household level, the allocation of the household amount to individuals within the household is specified for each variable.

### Top Codes

CPS income variables have top codes to prevent identification of individuals. For most years and most survey items, a group average for those to whom the top code applies is given in the CPS data. Where CPS data do not have a top-coded value (mostly for years prior to 2011), twice the value of the highest non-topcoded value is substituted for records in that category.

### Levels of Government

Flows are divided into federal government flows and state/local government flows. For programs where federal and state/local resources are combined, the program is treated as federal if the federal government provides a large proportion of the resources for the program, treated as state/local if state/local governments provide most of the funding, and divided into separate flows with the same age shape but different aggregate controls where there are substantial funding components from both levels of government.

### Variable List

The following list defines the variables used in the datasets derived from the CPS data to generate the age profiles for taxes paid and benefits received. This information is provided for readers interested in working with the panel's datasets or with data extracts similar to those used by the panel for the forward-looking projections in Chapter 8.

002817

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*Group characteristics:*

| | |
|---|---|
| year | Year of age profile (central year of 3-year pooled CPS samples) |
| age | Age groups, single year to 80+ |
| immig | Immigration groups (see following section for groups) |
| edu | Education groups (see following section for groups) |
| totpop | Total resident population represented by year/age/immig/edu group |

*Federal taxes:*

| | |
|---|---|
| inctx_f | Income tax, federal |
| corptx_f | Corporate tax, federal |
| extx_f | Excise tax, federal |
| fica_f | FICA contributions (employer and employee combined), federal |
| smicon_f | Contributions for Supplementary Medical Insurance (Medicare Part B), federal |
| unmpcon_f | Unemployment insurance contributions, federal |
| othtx_f | Other taxes, federal |

*State/local taxes:*

| | |
|---|---|
| inctx_s | Income tax, state/local |
| prptxown_s | Property tax attributed to owners of property, state/local |
| prptxrent_s | Property tax estimated as "passed down" to renters, state/local |
| salestax_s | Sales tax, state/local |
| othtx_s | Other taxes, state/local |

*Federal benefits:*

| | |
|---|---|
| oasdi_f | Social Security payments (Old-Age and Disability Insurance), federal |
| hi_f | Medicare Part A benefits (hospital insurance), federal |
| smi_f | Medicare Part B benefits (also called supplementary medical insurance), federal |
| mcaidnhom_f | Medicaid payments to nursing homes, federal portion |
| mcaidnoninst_f | Medicaid payments to other than nursing homes, federal portion |
| incunemp_f | Unemployment benefit payments, federal |
| retrr_f | Railroad retirement, federal |

002818

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | |
|---|---|
| incssi_f | Supplemental security income (to low-income old, blind, disabled), federal |
| eitcred_f | EITC payments, federal |
| fdstmp_f | Food stamp benefits (now called SNAP), federal |
| schlunch_f | School lunch benefits, federal |
| incwelfr_f | Welfare program benefits (AFDC, TANF, GA, welfare reform benefits), federal |
| jail_f | Incarceration costs, federal |
| vetben_f | Veterans' benefits (military retirement, disability, readjustment), federal |
| refugee_f | Refugee settlement programs, federal |
| scholar_f | Scholarships and student loan subsidies, federal |
| rentsub_f | Rent subsidies, federal |
| pubhous_f | Public housing benefits, federal |
| heatsup_f | Energy payment subsidies for low-income people, federal |
| ret_f | Retirement benefits, federal |
| cong_f | Congestible goods (transportation, public admin, etc.), federal |

*State/local benefits:*

| | |
|---|---|
| mcaidnhom_s | Medicaid payments to nursing homes, state portion |
| mcaidnoninst_s | Medicaid payments to other than nursing homes, state portion |
| schip_s | SCHIP benefits, state |
| incssi_s | Supplemental security income (to low-income old, blind, disabled), state |
| jail_s | Incarceration costs, state/local |
| wic_s | WIC benefits, state |
| lowedu_s | Primary and secondary education, state/local |
| college_s | Public college and university support, state/local |
| ret_s | Retirement benefits, state/local |
| incwkcom_s | Workers' compensation benefits, state/local |
| bilingual_s | Bilingual education costs, state/local |
| cong_s | Congestible goods (police, public admin, etc.), state/local |

*For comparative purposes:*

| | |
|---|---|
| wgsal | Wages and salary income |
| gia_x | Grants-in-aid from federal to state/local governments (on a per capita basis) |

002819

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

472     THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

*"Pure" public goods (all distributed on a per capita basis to the entire population, so no further documentation for these flows appears in this annex):*

| | |
|---|---|
| int_fx | Interest payments on the federal debt |
| def_fx | Defense spending, federal |
| sub_fx | Subsidies, federal |
| rowgr_fx | Grants to rest-of-world, federal |
| int_sx | Interest payments by state and local governments |
| sub_sx | Subsidies, state/local |

*Summary groups of age profiles:*

| | |
|---|---|
| purepub | All variables in "pure" public goods group above |
| fedtax | All variables in federal tax group above |
| sltax | All variables in state/local tax group above |
| fedold | Federal benefits based on old age (oasdi_f, hi_f, smi_f, retrr_f, ret_f) |
| fedpoor | Federal benefits based on low income (mcaidnhom_f, mcaidnoninst_f, incunemp__f, incssi_f, eitcred_f, fdstmp_f, schlunch_f, incwelfr_f, rentsub_f, pubhous_f, heatsup_f) |
| fededu | Federal education benefits (scholar_f) |
| fedother | Other federal benefits (jail_f, vetben_f, refugree_f, cong_f) |
| fedben | Total federal benefits (fedold, fedpoor, fededu, fedother) |
| slold | State/local benefits based on old age (ret_s) |
| slpoor | State/local benefits based on low income (mcaidnhom_s, mcaidnoninst_s, incssi_s, schip_s, wic_s) |
| sledu | State/local education benefits (lowedu_s, college_s, bilingual_s) |
| slother | Other state/local benefits (jail_s, incwkcom_s, cong_s) |
| slben | Total state/local benefits (slold, slpoor, sledu, slother) |
| fednet | Net federal impact (taxes-benefits) |
| slnet | Net state/local impact (taxes-benefits) |
| tottax | Total taxes (fed and s/l combined) |
| totben | Total benefits (fed and s/l combined) |
| totnet | Net total impact (fed and s/l combined) |

*Codes for immigration groups (immig variable):*

| | |
|---|---|
| 0 | All groups combined |
| 10 | Foreign-born (FB, all arrival groups combined) |
| 11 | FB, arrived 0-4 years ago |

002820

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | |
|---|---|
| 12 | FB, arrived 5-9 years ago |
| 13 | FB, arrived 10+ years ago |
| 20 | Native-born (NB) of 2 FB parents (2nd generation) |
| 25 | NB with 1 FB parent, 1 NB parent (2.5 generation) |
| 30 | NB with 2 NB parents plus FB but citizen at birth (3rd generation) |

*Codes for education groups (edu variable):*

| | |
|---|---|
| 0 | Total population (all education groups combined) |
| 1 | Less than HS |
| 2 | HS graduate or GED |
| 3 | Some college |
| 4 | Bachelor's degree |
| 5 | Any post bachelors |

*Details on Each Flow*

The following documentation describes source data, aggregates to which totals are normalized, and assumptions underlying tax revenue and various benefit and public cost flow calculations used in the fiscal impact estimates. This section does not include description of flows assigned on a per capita basis.

**Federal Income Taxes (variable name: inctx_f)**

| | |
|---|---|
| Source data: | CPS individual-level variable *fedtax*, which is imputed by the Census Bureau's tax model. For married couples filing jointly, the tax model assigns the whole amount to one of the spouses; but this has been recoded to give half of the amount to one spouse, half to the other. |
| Aggregate: | NIPA (National Income and Product Accounts) Table 3.2, Federal Government Current Receipts and Expenditures, personal current taxes. |
| NH assump: | Non-household (i.e., institutionalized) persons assumed to pay no income tax. |
| Topcoding: | fedtax = 99997 for years before 2011, used 2 x highest non-topcoded value for the year. |

**Federal Corporate Taxes (variable name: corptx_f)**

| | |
|---|---|
| Source data: | 80% of CPS individual-level variables for dividend and interest income (*incdivid+incint*) plus 20% of CPS individual-level variable for wages (*incwage*). |

002821

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

474        *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

Aggregate:   NIPA Table 3.2. Federal Government Current Receipts and Expenditures, taxes on corporate income. (There is a much smaller amount in the state/local expenditures table titled "taxes on corporate income," but that is considered to be similar enough to a sales tax that it is included with state sales taxes.)

NH assump:   Non-household persons are assumed to have 20% of assets of persons in households. Data underlying this assumption originate from U.S. National Transfer Accounts publications by Lee et al. (2011).

Topcoding:   incdivid = 99997 and incint = 99997 for years prior to 1999, used 2 x highest non-topcoded value for the year (*incwage* has imputed values for topcodes).

## Federal Excise Taxes (variable name: extx_f)

Source data:   Excise taxes are predicted based on a regression equation estimated from data from the Consumer Expenditure Survey where household adjusted gross income (AGI) and household structure predict the amount the household spends on consumption of alcohol, tobacco, and gasoline. (These three items make up the bulk of excise taxes in most years.) This regression equation is then applied to the household sum of values in the individual-level CPS variable adjginc. Household amount is allocated to individuals in the household based on individual shares of household AGI, but dividing total spousal couple AGI evenly between both spouses. AGI amount reduced by $1,250 as in *The New Americans* (National Research Council, 1997) ($1,250 real 1994 dollars are adjusted to real value for each subsequent year) for first generation, as this amount is assumed to be remitted to the country of origin.

Aggregate:   NIPA Table 3.2. Federal Government Current Receipts and Expenditures, Excise taxes.

NH assump:   Non-household persons are assumed to have $0 for these taxes.

Topcoding:   adjginc = 99997 for years prior to 1999, used 2 x highest non-topcoded value for the year.

## FICA Taxes (variable name: fica_f)

Source data:   CPS individual-level variable fica, which is imputed by Census Bureau's tax model; same change made for married couples filing jointly as for federal income taxes (assigned 50/50 to spouses).

002822

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

| | |
|---|---|
| Aggregate: | NIPA Table 3.6. Contributions for Government Social Insurance, Employer and Employee contributions for Old-Age, Survivors, and Disability Insurance; and Hospital Insurance. |
| NH assump: | Non-household persons are assumed to pay no FICA tax. |
| Topcoding: | No topcoding. |

### Federal SMI Contributions (variable name: smicon_f)

| | |
|---|---|
| Source data: | Allocated based on enrollment in Medicare (CPS variable himcare = 2). |
| Aggregate: | NIPA Table 3.6. Contributions for Government Social Insurance, Supplementary Medical Insurance. |
| NH assump: | Non-household persons are assumed to have $0 for these taxes. |
| Topcoding: | Not applicable. |

### Federal Unemployment Contributions (variable name: unmpcon_f)

| | |
|---|---|
| Source data: | Allocated based on any contributions to FICA taxes in Medicare (CPS variable fica > 0) to reflect flat amount contributed by employers for each employee. |
| Aggregate: | NIPA Table 3.6. Contributions for Government Social Insurance, Unemployment Insurance. |
| NH assump: | Non-household persons are assumed to have $0 in federal unemployment contributions. |
| Topcoding: | Not applicable. |

### Other Federal Taxes (variable name: othtx_f)

| | |
|---|---|
| Source data: | Following *The New Americans* (National Research Council, 1997), federal "other" has same age shape as federal income tax. |
| Aggregate: | Remaining revenue items from federal taxes and social contribution tables. |
| NH assump: | Non-household persons are assumed to have $0 for these taxes. |
| Topcoding: | Not applicable. |

### State Income Taxes (variable name: inctx_s)

| | |
|---|---|
| Source data: | CPS individual-level variable state tax, which is imputed by Census Bureau's tax model. For married couples filing jointly, amount is divided 50/50 between spouses. |
| Aggregate: | NIPA Table 3.3, State and Local Government Current Receipts and Expenditures, personal current taxes. |

002823

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

476      *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

NH assump:  Non-household persons are assumed to have $0 for these taxes.

Topcoding:  statetax = 99997 for years prior to 2011; used 2 x highest non-topcoded value for the year.

### Property Tax (owners/renters) (variable names: prptxown_s, prptxrent_s)

Source data:  For owners, CPS household-level variable proptax, for those households occupied by the owners (ownershp = 10). For renters, it is based on percentage who rent. For both, amount is allocated to adults (i.e., nondependents) in the household but weighted by family size. (For example, if a household has two families in it, an adult couple and a couple with two children, one-third of the amount would be allocated to the couple, two-thirds to the nuclear family, but then each family's amount would be divided evenly among the two adults in that family.)

Aggregate:  State/local property taxes (NIPA Table 3.3, line 8), divided into that paid on owned housing versus rental housing based on shares of consumption of owned housing versus rental (Table 2.4.5. Personal Consumption Expenditures by Type of Product). Of the portion attributed to rental housing, 70% allocated to renters, 30% to property owners.

NH assump:  For renters, non-household population is assumed to pay $0. For owners, non-household population is assumed to pay 20% of the amount paid by the household population, based on data from the National Nursing Home Survey showing about 20% of non-household residents pay for the nursing home using their own insurance or own income/assets. The rest are either using means-tested government programs that require the resident to spend down assets or they are using help from relatives or charities, implying that they have no assets.

Topcoding:  Not applicable.

### Sales Taxes (variable name: salestax_s)

Source data:  Similar to excise taxes. Excise taxes are predicted based on a regression equation estimated from data from the Consumer Expenditure Survey where household AGI and household structure predict total taxable consumption. This regression equation is then applied to the household sum of values in the individual-level CPS variable adjginc. Household amount is allocated to individuals in the household based on individual

002824

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

shares of household AGI, but dividing total spousal couple AGI evenly between both spouses. AGI amount is reduced by $1,250 (real 1994 dollars are adjusted to real value for each subsequent year) for the first generation, as this amount is assumed to be remitted to the immigrant's country of origin.

Aggregate: NIPA Table 3.3. State and Local Government Current Receipts and Expenditures, sales taxes.

NH assump: Non-household persons are assumed to pay $0 sales tax.

Topcoding: adjginc = 99997 topcode through 2010 (original value was $99999); adjginc = 9999997 topcode beginning in 2011 (original value was $9999999); before 2011, used 2 x highest non-topcoded value for the year.

### Other State/Local Taxes (variable name: othtx_s)

Source data: Following *The New Americans* (National Research Council, 1997), state/local "other" has same age shape as state/local income tax.

Aggregate: Remaining revenue items from state/local taxes and social contribution tables.

NH assump: Non-household persons are assumed to have $0 for these taxes.

Topcoding: Not applicable.

### Federal OASDI (variable name: oasdi_f)

Source data: CPS individual-level variable incss (includes payments to retirees, survivors, and the disabled).

Aggregate: NIPA Table 3.12 Government Social Benefits.

NH assump: Same as for non-nursing home (i.e., household) population.

Topcoding: Not applicable.

### Hospital Insurance (Medicare Part A) (variable name: hi_f)

Source data: CPS individual-level variable on Medicare enrollment (himcare = 2), but weighted by total per capita personal health care expenditures by age from the 2011 National Health Accounts.

Aggregate: Total Medicare costs come from Government Social Benefits (NIPA Table 3.12), multiplied by the percentage going to Part A from Medicare Trustees Report.

NH assump: These are mostly hospital costs associated with nursing home residents when they have serious complications, and such costs are very expensive. Non-household persons are assumed

002825

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

478        *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

to be consuming at twice the level of household residents. Data underlying this assumption originate from U.S. National Transfer Accounts publications by Lee et al. (2011).

Topcoding:  Not applicable.

**Supplemental Medical Insurance (Medicare Parts B & D)**
**(variable name: smi_f)**

| | |
|---|---|
| Source data: | (Same as for *hi_f*) CPS individual-level variable on Medicare enrollment (himcare = 2), but weighted by total per capita personal health care expenditures by age from the 2011 National Health Accounts. |
| Aggregate: | Total Medicare costs come from Government Social Benefits (NIPA Table 3.12), multiplied by the percentage going to Parts B & D from Medicare Trustees Report. |
| NH assump: | Same as for the household population. |
| Topcoding: | Not applicable. |

**Medicaid Payments to Nursing Homes**
**(variable names: mcaidnhom_f, mcaidnhom_s)**

| | |
|---|---|
| Source data: | Federal and state/local levels are coded separately. Because this flow is for persons not in the household population, CPS does not have indicators for this. Instead, we assign these costs based on the percentage of population in nursing homes, ages 65 and older, as measured in IPUMS/ACS for that year. These sources do not have generational detail, so the profile only differentiates between the first generation and native-born generations; (the second and third-plus generations are assigned the weight for native-born [second and higher] generations. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, Medicaid), multiplied by the proportion that Medicaid paid to nursing homes as measured in National Health Expenditures data. Also separated into federal and state/local portions from the National Health Expenditure data. |
| NH assump: | Not applicable. |
| Topcoding: | Not applicable. |

002826

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Medicaid Payments to Other Than Nursing Homes
(variable names: mcaidnoninst_f, mcaidnoninst_s)**

| | |
|---|---|
| Source data: | Federal and state/local levels are coded separately. Assigned based on Medicaid enrollment (CPS variable himcaid = 2) but weighted by total per capita personal health care expenditures by age from the 2011 National Health Accounts. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, Medicaid), multiplied by proportion Medicaid paid to non-nursing homes from National Health Expenditures data and also separated into federal and state/local portions from National Health Expenditure data. |
| NH assump: | These are mostly hospital costs associated with nursing home residents when they have serious complications, and such costs are very expensive. Non-household persons are assumed to be consuming at twice the level of household residents. Data underlying this assumption originate from U.S. National Transfer Accounts publications by Lee et al. (2011). |
| Topcoding: | Not applicable. |

**Unemployment Insurance Income (variable name: incunemp_f)**

| | |
|---|---|
| Source data: | CPS individual-level variable *incunemp*. This variable does contain some payments from private sources, but as long as those are not huge or radically different by age or immigrant generation, it is corrected for in the aggregate adjustment. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, unemployment insurance). |
| NH assump: | Non-household persons are assumed to have $0 for this benefit. |
| Topcoding: | incunemp = 99997 for years 1995, 1996, 1998, 2000-2007, 2009-2013; replace with 2 x top value for the non-topcoded observations. |

**Railroad Retirement (variable name: retrr_f)**

| | |
|---|---|
| Source data: | CPS individual-level variable *increti1* (amount of income from first source) and srcreti1 = 5 (receives U.S. Railroad retirement pension); similarly *increti2* and srcreti2 = 5 for the second source of income. If there is an amount attributed to someone with a spouse in the household, that amount is divided evenly between the two spouses. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, U.S. railroad retirement). |
| NH assump: | Same as household population. |

002827

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

480          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

Topcoding:   increti1 and increti2 = 99997 for years up to and including
             1998 and from 2011 forward. Substituted 2 x highest non-
             topcoded value.

### Supplemental Security Income (variable names: incssi_f, incssi_s)

Source data:  Federal and state/local levels are coded separately. CPS indi-
              vidual-level variable *incssi*.
Aggregate:    Government Social Benefits (NIPA Table 3.12), SSI federal
              and state/local amounts are listed separately.
NH assump:    Same as household population.
Topcoding:    Not applicable.

### EITC (variable name: eitcred_f)

Source data:  CPS individual-level variable *eitcred* is imputed by Census
              Bureau's tax model. Allocation is made by summing all *eitcred*
              in a family unit and dividing evenly among people in the family.
Aggregate:    Government Social Benefits (NIPA Table 3.12, line 25,
              Refundable Tax Credits).
NH assump:    Non-household persons are assumed to have $0 for this benefit.
Topcoding:    Not applicable.

### Food Stamps/SNAP (variable name: fdstmp_f)

Source data:  CPS household-level variable *stampval* (value of food stamps
              received), divided equally among all household members.
Aggregate:    Government Social Benefits (NIPA Table 3.12, federal SNAP
              benefits).
NH assump:    Non-household persons are assumed to have $0 for this benefit.
Topcoding:    Not applicable.

### Federal School Lunch Program (variable name: schlunch_f)

Source data:  CPS household-level variable *lunchsub*, which indicates
              households where some or all of the children received free
              or reduced price school lunches, and CPS household-level
              variable *frelunch*, which indicates how many children in the
              household received free or reduced price lunches. An equal
              value is assigned to all children households with lunchsub =
              1 and is allocated to all children ages 5-18, starting with the
              youngest, until reaching the total number in the household
              given in *frelunch*. (There is no individual-level indicator of
              which children received the free lunches.)

002828

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Aggregate:   Federal budget historical tables (Table 11.3—Outlays for Payments for Individuals by Category and Major Program, child nutrition and special milk programs).

NH assump:   Non-household persons are assumed to have $0 for this benefit.

Topcoding:   Not applicable.

## Welfare (variable name: incwelfr_f)

Source data:   This includes AFDC, Temporary Assistance for Needy Families, welfare reform benefits, and general assistance. CPS individual-level variable *incwelfr*. Allocation is made by summing all *incwelfr* in a family unit and dividing evenly among people in the family.

Aggregate:   Government Social Benefits (NIPA Table 3.12, family assistance and general assistance).

NH assump:   Non-household persons are assumed to have $0 for this benefit.

Topcoding:   Not applicable.

## Incarceration Costs (variable names: jail_f, jail_s)

Source data:   Percentage institutionalized under age 65 from IPUMS/ACS. We were only able to distinguish difference between the first and native-born (second and higher) generations. Federal and state/local levels are coded separately.

Aggregate:   NIPA Table 3.16. Government Current Expenditures by Function, prison costs, separated out by federal versus state/local levels.

NH assump:   Not applicable.

Topcoding:   Not applicable.

## Military Retirement and Other Veteran's Benefits (variable name: vetben_f)

Source data:   CPS individual-level variables incvet, plus increti1 (amount of income from first source) if srcreti1 = 3 (receives military pension), and similarly increti2 and srcreti2 for the second source of income. Amounts to veteran with spouse in the household is divided equally between spouses.

Aggregate:   Government Social Benefits (NIPA Table 3.12, line 17 Veterans' benefits).

NH assump:   Same as for non-nursing home population.

Topcoding:   Not applicable.

002829

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Refugee Support (variable name: refugee_f)**

| | |
|---|---|
| Source data: | Assigned equally to all 1st generation immigrants. |
| Aggregate: | Federal Budget Historical Table 11.3—Outlays for Payments for Individuals by Category and Major Program: 1940–2020, "refugee assistance." |
| NH assump: | $0. |
| Topcoding: | Not applicable. |

**Student Aid (cash scholarships) (variable name: scholar_f)**

| | |
|---|---|
| Source data: | CPS individual-level variable *incedu* if CPS variable *srcedu* indicates that source of the funding is from government, for ages 18-24. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, for education). |
| NH assump: | $0. |
| Topcoding: | For years 1997 and 2011-2013, topcoded 99997. Substituted 2 x highest non-topcoded value. |

**Rent Subsidies (variable name: rentsub_f)**

| | |
|---|---|
| Source data: | CPS household-level variable *rentsub* indicates if the household received a rent subsidy. This is attributed equally to individuals in the household (so individuals in smaller households with subsidy have greater attribution). |
| Aggregate: | Historical Federal budget tables, Table 11.3—Outlays for Payments for Individuals by Category and Major Program: 1940–2019 gives amount spent on housing, Table 12.3—Total Outlays for Grants to State and Local Governments by Function, Agency, and Program: 1940–2015, gives part used for rent subsidies on private property as opposed to government-owned public housing). |
| NH assump: | $0. |
| Topcoding: | Not applicable. |

**Public Housing (variable name: pubhous_f)**

| | |
|---|---|
| Source data: | CPS household-level variable indicating if household is part of a government housing project, allocated equally to all individuals in public housing households. |
| Aggregate: | Historical Federal budget tables, Table 11.3—Outlays for Payments for Individuals by Category and Major Program: 1940–2019 gives amount spent on housing, Table 12.3— |

002830

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Total Outlays for Grants to State and Local Governments by Function, Agency, and Program: 1940–2015, gives part used for public housing as opposed to rent subsidies).

NH assump: $0.

Topcoding: Not applicable.

### Energy Assistance (varname: heatsup_f)

Source data: CPS household-level variables indicating if household received energy assistance (*heatsub*) and if so how much it was worth (*heatval*). Value divided equally among all household members.

Aggregate: Government Social Benefits (NIPA Table 3.12, energy assistance).

NH assump: $0.

Topcoding: Not applicable.

### Government Retirement Benefits (federal and s/l separately) (variable name: ret_f/ret_s)

Source data: For federal, CPS individual-level variable *increti1* (amount of income from first source) and *srcreti1* = 2 (receives federal government pension), and similarly *increti2* and *srcreti2* for the second source of income. For state/local, CPS individual-level variable *increti1* (amount of income from first source) and *srcreti1* = 4 (receives state/local government pension), and similarly *increti2* and *srcreti2* for the second source of income. For both age profiles, if the amount was to a person with a spouse in the household, the amount is allocated to both spouses equally.

Aggregate: For Federal, Historical Federal budget tables, Table 11.3— Outlays for Payments for Individuals by Category and Major Program: 1940–2019. State/local: NIPA Table 7.23. Transactions of State and Local Government Defined Benefit Pension Plans.

NH assump: For both, same as for household population.

Topcoding: increti1 and increti2 = 99997 for < = 1998 and > = 2011. Substituted 2 x highest value.

### Congestible Goods–Federal and State/Local (variable name: cong_f / cong_s)

Source data: None. Same by all ages by assumption.

Aggregate: Residual, after all accounted for flows and "pure" public goods are subtracted from total expenditures (NIPA table 3.2 for Federal, 3.3 for State/Local).

002831

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

NH assump:   Same as for household population.
Topcoding:   Not applicable.

### State Child Health Insurance Program (SCHIP) (variable name: schip)

Source data:   CPS individual-level variable indicating if person ages 0-18 was enrolled in health insurance through SCHIP. No cost information so age shape is just based on enrollment. CPS enrollment rates are known to be less than estimates from other sources, but as long as there is no correlation between enrollment discrepancy and age or immigration status then the aggregate adjustment will take care of the error.

Aggregate:   National Health Accounts, total spent by SCHIP program (includes pure federal amount and amount spent by states, both of their own funds and from grants-in-aid from federal to state governments).

NH assump:   $0.
Topcoding:   Not applicable.

### WIC (variable name: schip)

Source data:   CPS individual-level variable *gotwic* indicates if a woman was receiving WIC benefits. Allocated equally to all of those women and any of their children in the household ages 0-4.

Aggregate:   NIPA Table 3.12, Government Social Benefits, line for State/local "other" which is WIC, but also includes some small amounts for foster care and adoption assistance that were not able to be separated out.

NH assump:   $0.
Topcoding:   Not applicable.

### Primary and Secondary Education (variable name: lowedu_s)

Source data:   • This age profile is complex and combines 4 pieces of data: (1) percentage enrolled, (2) state-by-state relative per pupil spending, (3) percentage of schoolchildren with limited English proficiency (LEP), and (4) relative costs of educating a student with LEP vs. not.
  • Enrollment is assumed to be 100% for ages 5-14. For high school, enrollment based on CPS variable *schlcoll* with half weight given to those half-time enrolled. (This variable doesn't distinguish between public and private schools.) Note that the universe for this variable was ages 16-24 prior to 2013 but changes to 16-54 in 2013. For high school enrollment, how-

002832

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

ever, the extended ages make little difference because of the very low high school enrollment above age 19.

• Average per pupil spending by state comes from the Census Bureau's Census of Governments (Finance—Survey of School System Finances). Each state's spending level is turned into a weight relative to the national average.

• The data for % LEP for first generation immigrants come from IPUMS/ACS samples. For first generation, the proportion of schoolchildren who either do not speak English at home (variable *language* not equal to 1) or are reported to not speak English or not speak English well (variable *speakeng* is 1 or 6) is defined here as LEP for the first generation. The % LEP for third-plus generation is assumed to be zero; % LEP for second generation is assumed to be halfway between the empirical estimate for first generation and the assumed 0% for third-plus generation.

• Following footnote 13 from *The New Americans* (National Research Council, 1997), Chapter 7, the relative costs of education for students who are LEP is 1.44, compared to 1 for non-LEP.

• So, the overall estimate for each age/immigrant group is percentage enrolled, weighted by relative state spending and relative costs based on how many students are LEP. This is then adjusted to the aggregate control as for all age profiles.

Aggregate:      Table 3.16. Government Current Expenditures by Function, expenditures on primary and secondary education.

NH assump:     0.

Topcoding:      Not applicable.

**Public College and Other Postsecondary (variable name: college_s)**

Source data:   Based on enrollment in college, with half weight given to those half-time enrolled. The enrollment data uses the CPS variable "schlcoll."   As noted above, the universe changes from ages 16-24 before 2013 to 16-54 in 2013. For the projected age profiles, the 2013 proportions enrolled are used for ages 25-54, while the pooled sample of 2011, 2012, and 2013 is used to calculate proportion enrolled for ages 16-24. For the historical age profiles, the comparison between 1994 and 2013 suffers from this change in data collection, but the impact is minor because of the low levels of higher education enrollment for age 25+ and because of the adjustment of per capita age profiles to national-level aggregate flows. Thus, there is a slight

002833

Copyright National Academy of Sciences. All rights reserved.

*486*      *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

|  |  |
|---|---|
|  | discrepancy in the age of the public higher education benefit receipt over the period, but no difference in the total expenditure or average expenditure across the total population. |
| Aggregate: | Table 3.16. Government Current Expenditures by Function, expenditures on higher education (federal and state/local combined). |
| NH assump: | 0. |
| Topcoding: | Not applicable. |

**Workers' Compensation (variable name: incwkcom_s)**

|  |  |
|---|---|
| Source data: | CPS individual-level variable *incwkcom*. |
| Aggregate: | Government Social Benefits (NIPA Table 3.12, federal and s/l worker's compensation combined, but this is mostly state/local). |
| NH assump: | 0. |
| Topcoding: | 99997 for 1995, 1996, 1998-2001, 2003, 2004, 2006, 2007, 2009-2013, replaced with 2 x maximum value. |

**Bilingual Education (variable name: bilingual_s)**

|  |  |
|---|---|
| Source data: | Age shape comes from the % limited English proficiency (LEP) for first generation and for second generation with two foreign-born parents (see details on *lowedu_s* for source data for LEP status). Note that this is supposed to represent the costs of a particular educational program designed to teach in two languages. It is included as a cost beyond just the general cost of educating students with LEP, which is already included in the *lowedu_s* age profile. |
| Aggregate: | 2.5% of total amount spent on elementary and secondary education (this is the same assumption used in NA). |
| NH assump: | 0. |
| Topcoding: | Not applicable. |

### Details on Administrative Totals

Each measured flow is adjusted by a single multiplicative factor so that the population-weighted aggregate is consistent with totals reported in the annual tables of the National Income and Product Accounts, as compiled by the Bureau of Economic Analysis (see http://www.bea.gov/national [November 2016]). Note the handling of federal grants-in-aid to state and local governments: they are counted as government expenditures and not as state and local revenue, to avoid double counting this flow. An example for 2013 is shown, but all years are calculated in a similar fashion:

002834

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

NIPA Table Extracts for 2013 (Billions)

| | Table 3.1 Consolidated | Table 3.2 Federal | Table 3.3 State/Local | |
|---|---|---|---|---|
| **Receipts** | **4,788.6** | **3,113.0** | **2,125.6** | |
| Tax receipts | 3,283.6 | 1,811.8 | 1,471.8 | [1] |
| Contributions for government social insurance | 1,109.9 | 1,092.3 | 17.7 | [1] |
| Income receipts on assets | 244.4 | 164.7 | 79.7 | |
| Transfer receipts [2] | 180.4 | 59.5 | 570.8 | |
| Portion that is federal grants-in-aid (GIA) to s/l | --- | --- | 450.0 | |
| Surplus of gov't enterprises | (29.6) | (15.3) | (14.3) | |
| | | | | |
| **Expenditures** | **5,662.9** | **3,762.1** | **2,350.8** | |
| Consumption expenditures | 2,547.6 | 963.0 | 1,584.5 | |
| Portion spent on defense | 617.1 | 617.1 | --- | [2] |
| Consumption expenditures LESS Defense | 1,930.5 | 345.9 | 1,584.5 | [1] |
| Government social benefits to persons | 2,372.2 | 1,806.8 | 565.4 | [1] |
| Government social benefits to rest of world | 18.9 | 18.9 | --- | |
| Other transfer payments [2] | 46.4 | 496.3 | --- | |
| Portion that is federal grants-in-aid (GIA) to s/l | --- | 450.0 | --- | [1] |
| Interest payments | 617.7 | 417.4 | 200.3 | [2] |
| Subsidies | 60.2 | 59.7 | 0.5 | [2] |

Amounts Included in Fiscal Impacts Analysis

GIA are attributed in the analysis as federal expenditures and subtracted from s/l to avoid double counting.

| | Total | Federal | State/Local | |
|---|---|---|---|---|
| **Total Taxes** | **4,393.6** | **2,904.1** | **1,489.5** | |
| Tax receipts | 3,283.6 | 1,811.8 | 1,471.8 | |
| Contributions for government social insurance | 1,109.9 | 1,092.3 | 17.7 | |
| | | | | |
| **Total Benefits** | **4,302.6** | **2,602.7** | **1,699.9** | |
| Consumption expenditures LESS Defense | 1,930.4 | 345.9 | 1,584.5 | |
| Government social benefits to persons [3] | 2,372.2 | 1,806.8 | 565.4 | [3] |
| Federal grants-in-aid (GIA) to s/l | - | 450.0 | (450.0) | |
| | | | | |
| **Taxes less benefits** | **91.0** | **301.4** | **(210.4)** | |
| | | | | |
| **Public Goods** | **1,360.2** | **1,159.4** | **200.8** | |
| Defense | 617.1 | 617.1 | --- | [2] |
| Interest | 617.7 | 417.4 | 200.3 | [2] |
| Subsidies | 60.2 | 59.7 | 0.5 | [2] |
| Transfers and social benefits to ROW | 65.2 | 65.2 | --- | [2] |

[1] Included in all fiscal impacts analyses as congestible goods assigned to individuals.
[2] Non-congestible goods included in some analysis scenarios, assigned on a marginal or per capita basis.
[3] Includes $450.0B in federal grants-in-aid to state/local government.  Thus, the consolidated amount
equals federal amount + state/local amount - federal grants-in-aid.

002835

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2843 of 4699 PageID #:  6008

## Estimates of Education Transmission and Projection of Educational Attainment

In the future-looking analysis, we want to estimate the fiscal impact of persons in the future and that impact differs by education—persons of different education earn, pay taxes, qualify for and accrue benefits at different levels. For those people who begin the 75-year projection period very young or are born in the projection period, we need to estimate which education group they will be in when they grow up. This section describes the process used to project education for those who are ages 0-24 in 2012 or are born during the projection.

### Estimating Education Prediction Functions

Using CPS samples from early years, we identified a cohort of parents who are age 25 or older (and thus have completed their educations), based on the co-residence of young children in their households. We then identified that cohort of children in a later year when the children are age 25 or older (and thus also likely to have completed their educations). Both parents and children are disaggregated, based on parental birth region, and separate CPS samples are taken as distinct data points. This gives a sufficient sample to estimate the average expected educational attainment of children based on the average educational attainment of parents. This was done separately by parental birth region, and a separate set of predictions was made for U.S.-born children versus non-U.S.-born children.

Specifically, the data come from CPS samples from 1994 to 2014. We observe the children's educational attainment each year from 2009 to 2014 and compare that to the parental educational attainment in each year from 1994 to 1999, generating a set of six paired parent-child averages for each region. We could not observe parental cohorts earlier than 1994 because there were no data collected on birthplace in earlier samples. We could not observe children's cohorts later than 2014 because that was the most recent CPS sample available at the time the analysis was done. The comparisons were done separately by regional groups of parental birth and also by whether the child was U.S. born or foreign born.

For the U.S.-born offspring, a cohort of parents for each region in each year X (where X varies from 1994 to 1999) is identified by the following characteristics: they have at least one co-resident U.S.-born own-child, ages 10-16, in the household (own-child as imputed by IPUMS-CPS) and the parent was born in that region. The cohort of children of these parents is identified in year X + 15 (where X + 15 varies from 2009 to 2014) by the following characteristics: they are ages 25-31, were born in the United States, and indicate that they have at least one parent born in the designated region.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

For the foreign-born child case, the comparison is similar, except that the own-child of the parents must be born in the parental region and the children identified in the children's cohort must be born in the parental region.

The 10-16 year-old age group in year X was chosen to be as large an age group as possible to increase the sample size, but it had to also satisfy two additional criteria: (1) young enough that the children in year X were likely to still be living in the parental home, and (2) old enough that the children in year X + 15 have mostly all completed their education or at least achieved the highest educational category.

Educational outcomes were based on the CPS variable for years of schooling, but were grouped into more categories than the educational groups used for the fiscal flows analysis. This difference allowed for better identification of the parent-child educational relationships, but the education predictions of the offspring were recoded into the five educational attainment categories for use in the 75-year discounted flows calculations.

The parental birth regions were as follows: United States (or born abroad to citizen parents), Mexico, Central America (excluding Mexico), South America, Canada, Europe, Africa, East Asia, Southeast Asia, Other Asia (Eurasia, Central Asia, Oceania). The average education of the parent and child for each region for six consecutive CPS samples was calculated, and a regression was run to predict children's average educational attainment based on the parental average educational attainment. Canada and Africa were not included in the regressions because the sample sizes in the average were too small (in most years, fewer than 50 observations in the child cohort group).

The charts below (Figures 8-24 and 8-25) show the resulting estimates and linear regression equations that were used to predict educational attainment based on parental education. Two separate regression equations were used for two sets of regions: one included Mexico, South America, and Central America; the other included all of the other regions. Although the predictions for U.S.-born children of U.S.-born parents are not needed in estimating the 75-year discounted net fiscal impact of immigrants, the prediction equation for U.S.-born children of a U.S.-born parent was estimated as well for comparative purposes. The results are shown below. The parent-child paired averages are plotted as points; the predicted regression line representing educational assimilation is shown as well.

### Projected Future Taxes and Benefits

Each tax and benefit flow must be projected forward 75 years from the starting year of 2012. This was done in several different ways to create different scenarios of future fiscal flows.

002837

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration



**FIGURE 8-24** Predicted educational attainment for native-born children.



**FIGURE 8-25** Predicted educational attainment for foreign-born children.

002838

Copyright National Academy of Sciences. All rights reserved.

The simplest approach to understand is that for the no budget adjustments scenario. This scenario takes the per capita tax and benefit age profiles of 2012 and increases them each year by the assumed rate of productivity growth, 1 percent in our projections. This approach implies that the federal and state/local governments change nothing about its tax rates and spending and that no other aspects of the economy change. All per capita amounts at all ages, education, and immigration groups simply grow at 1 percent per year. This scenario leads to quickly increasing levels of debt, which the federal government may be able to sustain for quite some time but not indefinitely. State and local budgets function in a very different statutory environment compared to the federal government and typically have balanced-budget requirements that would constrain their ability to tax and spend in this fashion, but no provision is made for that requirement in this scenario.

More complex is the scenario that uses CBO's long-term budget projections and matches the growth of various fiscal flows to be consistent with that scenario. At the time the projection work was done, the most recent report was CBO's *2014 Long-Term Budget Outlook*, published in July 2014 (Congressional Budget Office, 2014a, https://www.cbo.gov/publication/45471 [November 2016]), with supplemental data tables available at https://www.cbo.gov/about/products/budget-economic-data#1 [November 2016]).

The method used by the panel for matching to the projections in the CBO report is simple for flows that are the same for all age groups. They are simply increased year over year by the same per capita growth rate reported in the supplemental tables. This is the case for general government congestible spending such as public administration, police, fire, etc. It is also the case when we apply public goods such as defense or interest on public debt on an average cost basis. When these items are applied on a marginal cost basis—that is, when they are assigned as zero cost attributed to immigrants—the nonimmigrant amounts are estimated to be a per capita amount that generates an aggregate level of these flows if the per capita amount is paid by each nonimmigrant (with the numbers of nonimmigrants provided by the Pew Research Center projections). Of course, the per capita value in the marginal cost case is only relevant for the one piece of data reported in Chapter 8 where 25-year-old natives are compared to 25-year-old immigrants.

Matching the CBO report for flows that do vary by age is more complex. In this case, in order to match overall per capita growth rates projected by CBO, we must project the amount of growth or decline that is inherent in population age structure by using the population projections from the Pew Research Center to find a baseline population-driven change and then calculate the additional change above or below that necessary to match CBO projections. To illustrate the calculation, imagine that a hypo-

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

thetical benefit flow is projected by CBO to rise from 100 to 110 per person in a year. If that flow is assigned to all age groups equally, then the adjustment to match the CBO projection is simply to increase the estimated age profile by 10 percent at each age. Imagine, however, that this flow mostly benefits the elderly. If the population of interest is aging, then from one year to the next, without altering the age profile at all, the population per capita flow may grow from 100 in year 1 to 102 in year 2, simply because the population is aging. To make the overall per capita flow equal to 110, we must first calculate the population-driven change of 100 to 102, and then multiply the overall age profile by 110/102 = 1.0784 to grow the rest of the necessary amount. In this illustrative case, the overall per capita age profile must increase by only 7.8 percent to have the average flow increase by 10 percent.

The CBO projections cover only federal flows, so the panel's projections must make assumptions about what will happen with state and local government taxing and spending in order to project those flows into the future. For this case, we assumed both per capita spending and revenue grow at the same rate as per capita GDP in CBO's long-term budget outlook (Congressional Budget Office, 2014a). This holds the state-funded portion of Medicaid to a lower growth rate than is assumed for the program as a whole. This assumption implies that the federal government will assume any excess costs.

The CBO baseline projection is intended to be the best guess as to government budgets if current policy is completely unchanged. It does not include any economic feedbacks from this no-policy-change scenario but simply looks at current government tax and spending policy and combines that with the Census Bureau's population projections and assumptions about the future of economic variables such as interest rates. In this scenario, then, there is no attempt to deal with any future fiscal imbalances that may arise, and thus the overall deficit and national debt rise sharply.

Thus, the panel employed a third scenario in which, relative to the CBO baseline case, taxes are increased and benefits decreased (on a 50/50 basis) to achieve $3 trillion in deficit reduction by 2035, relative to the baseline scenario. By trying different levels of tax increases and benefit reductions on an ad hoc basis, we found that the path that achieved this $3 trillion in reduction was about 3 percent higher, by 2035, in taxes paid and about 3 percent lower in benefits received, compared to 2013 in the CBO baseline case. State and local budgets in this scenario are handled similarly to the way they are treated in the CBO baseline scenario.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### Projected Demography:
### Survivorship, Emigration, and Number of Descendants

The rates of fertility, mortality, and emigration used in projecting future survivorship, numbers of surviving offspring, and probability of remaining in the United States (as opposed to emigrating), are from the Pew Research Center projections discussed above in Chapter 2. Where the Pew Research Center rates vary by race/ethnic group, these have been combined by current race/ethnic composition to produce an overall population average.

Five generations of descendants are counted in the demographic projections, to cover all potential births for the 75-year forward-looking observation period.

002841

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002842

Copyright National Academy of Sciences. All rights reserved.

# 9

# State and Local Fiscal Effects of Immigration

## 9.1  INTRODUCTION

Of concern to policy makers and the public are not only the net fiscal effects of immigration for the nation as a whole, currently and over time, but also the effects on revenues and expenditures for state and local governments. Immigrants are not distributed equally among the states or localities, and state and local governments differ in their fiscal policies generally and in their policies toward immigrants specifically. Consequently, any examination of the fiscal effects of immigration at the state and local levels and the extent to which immigrants are a net fiscal burden or benefit must consider the individual circumstances of each jurisdiction.

The 1997 National Research Council report, *The New Americans*, estimated the net state and local government fiscal effects of immigration for only two states: California and New Jersey (National Research Council, 1997). Around that time, based on 2000 Decennial Census long-form sample data, California alone accounted for nearly one-third of the total number of 31 million foreign-born, while California and New Jersey, together with Florida, Illinois, New York, and Texas, accounted for about 70 percent of the foreign-born population. By 2011-2013, American Community Survey (ACS) data indicate that a larger number of immigrants had become more widely dispersed so that California accounted for about one-quarter of the total number of 41 million foreign-born and the same six states accounted for about 65 percent of the foreign-born population. Other states with significant numbers of foreign-born in 2011-2013 included Arizona, Georgia, Maryland, Massachusetts, and Virginia. Relative to the total

*495*

002843

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

population, the foreign-born increased from 11 percent of the U.S. total in 2000 to 13 percent in 2011-2013. By state, as of 2000, the foreign-born accounted for 14 percent or more of the population in only seven states, while by 2011-2013 the foreign-born accounted for 14 percent or more of the population in 12 states; see further discussion in Section 9.3 below.

This chapter examines the state and local government fiscal effects of immigration for each of the 50 states and the District of Columbia for the 3-year period 2011-2013. We focus on the individual as the unit of analysis—more specifically, the independent individual. The panel's analysis here attributes the fiscal costs of (and taxes received from) dependents to their parents. This independent-person concept best acknowledges that the fiscal costs or benefits of children are due to the decisions of their parents independent of the children's own immigrant status. In addition, as in portions of Chapter 8, we distinguish among three immigrant generations (first, second, and third-plus, where "third-plus generation" is used as shorthand for all U.S. residents with two native-born parents).

Before proceeding to describe our measurement methods and results, it is worth referencing the extensive discussion of how, theoretically, immigrants' net costs to state and local governments are treated in *The New Americans* (National Research Council, 1997, pp. 254-270). That discussion, well worth reviewing, also details the range of simplifying assumptions that are necessary to derive empirical estimates of net costs. For example, for tractability, one must generally assume that immigrants use government services, such as public libraries or highway maintenance, at the same rate as natives (except when there is an explicit eligibility criterion excluding immigrants). Under this assumption, the costs of each service are allocated equally to immigrants and to natives on a per capita basis. In our evaluation, we present results making similar assumptions but then also examine what the relative costs of immigrants would be using different assumptions about whether the overall level of spending on a particular service is likely to change. For example, if the number and staffing of libraries is assumed to be unchanged, we would ask, "What is the relative cost of immigrants, assuming they produce zero marginal costs to state and local governments for library services?" The rationale behind the marginal and average cost choice for allocating the cost of public goods—particularly pure public goods such as national defense—is discussed in detail in Chapters 7 and 8.

A key difference between the fiscal impact study in this chapter and the state-level analyses in *The New Americans* (National Research Council, 1997) is the unit of analysis. In *The New Americans*, analysis was done at the household level using the nativity of the household head to determine immigrant status. This panel's preferred estimates present results based on independent individuals, including the cost of dependent children in the net benefit or burden of their parent(s). This makes our results more com-

002844

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

parable to those presented in Chapter 8 and better captures revenues and expenditures of all immigrants, independent of who is listed as householder. We do also present results on a household basis (see Table 9-7).

## 9.2  MEASUREMENT METHODS

We constructed our estimates from the Current Population Survey (CPS) Annual Social and Economic Supplement (ASEC). This nationally representative survey of people in households and group quarters, excepting institutions (e.g., jails, nursing homes), enabled us to identify generation status, including *first generation immigrants* (individuals who were born abroad who are noncitizens or naturalized citizens), *second generation individuals* (individuals who were born in the United States with at least one foreign-born parent), and *third-plus generation individuals* (individuals who were born in the United States with two native-born parents).[1] For each generation, we examined household living arrangements, income from various sources, and estimated taxes paid. It is important to account separately for second generation immigrants; this was not done in the state estimates in *The New Americans* (National Research Council, 1997), but it is done in the analysis in this chapter. At any point in time, many second generation immigrants are of working age and, when treated as independent individuals as in this report, contribute revenues that exceed costs. However, they may have represented a cost burden for their state and locality as children—costs that would not have been borne if their parent(s) had not entered the United States. Indeed, many second generation immigrants are themselves school-age children, whom we assign to their first generation parent(s) and who will likely represent a net burden for state and local governments for their education.

In order to achieve sufficient sample size for our analysis, we pooled 3 years of the CPS ASEC data covering 2011-2013.[2] Our sample represents, on a weighted basis and averaging over the 3 years, about 223 million independent people (essentially adults, as described below), of whom 16 percent are first generation and 8 percent are second generation. The remaining 76 percent are third-plus generation individuals, many of whose families have been in the United States for decades or centuries. The sample also repre-

---

[1]The second generation also includes those born abroad to an American parent with their other parent foreign-born, and the third-plus generation also includes those who were born abroad to two American parents.

[2]Were the ACS to include a question on place of birth of parents, it would be possible to carry out an analysis of state-level fiscal effects of immigration, by immigrant generation, with a much larger sample and correspondingly greater reliability than is possible with the CPS ASEC, even pooling over 3 years (see Chapter 10).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

sents about 85 million dependent children in each year.[3] In our study, as discussed more fully below, revenues and expenditures for dependent children are assigned to their parent(s) for estimation purposes, independent of the child's own immigrant status.

We used the 3-year average of the 2011-2013 Census of Governments (COG) Annual Survey of State and Local Government Finances[4] as our source for estimates of state and local revenues and expenditures of various kinds. Because different states provide different services at the state versus local level, we found it most useful to combine state and local revenues and expenditures to provide a complete picture of nonfederal government services. We did not have sufficient sample sizes or information on individuals to provide estimates for most substate areas—indeed, our estimates for many states are highly variable due to small sample sizes. These limited sample sizes also mean we do not estimate differences across places of origin.

We used simulation methods to piece together the data from the CPS ASEC and the 2011-2013 COG to estimate—for each independent person and his or her dependent children in the sample, weighted to be representative of their numbers in their state's population—the revenues each provides to his or her state and locality of residence and the expenditures incurred by that state and locality on his or her behalf (including expenditures on behalf of any dependent children). Additional description of this method, as well as of differences in this approach from that used in *The New Americans* (National Research Council, 1997), is provided in the relevant sections below.

We then compared the resulting estimates of net state and local government fiscal benefit (or burden) for independent persons, characterized by immigrant status (first, second, or third-plus generation). We present comparisons among the states on an average-per-independent person unit basis by generation and on an aggregate basis. It can be the case, at one extreme, that a state has not only a high net fiscal burden (expenditures exceed revenues) per first and/or second generation immigrant but also a large number of first and/or second generation immigrants. At the other extreme, a state may have not only a low net fiscal burden (or a net fiscal benefit) per first and/or second generation immigrant but also a small number of immigrants. And there can be any combination in between. We further assessed how differences among and within the states in estimates of

---

[3]Of these dependent children, considered in their own right, 4 percent are first generation, 21 percent are second generation, and 75 percent are third-plus generation. There are as many second generation dependents as independent adults; their costs in part explain why first generation independent persons are more costly.

[4]Available: https://www.census.gov//govs/local/historical_data.html [November 2016] .

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

net fiscal burden result from differences in characteristics of first and second generation immigrants, such as their age distribution, education level, and number of dependents as compared to native born individuals.

We also assess how differences among states in net fiscal burden result from differences in taxation and spending policies of individual states and their localities. We finally present some analyses to indicate the sensitivity of our main results to alternative assumptions about some components of revenues and expenditures. The key driver of differences has to do with education costs—the largest single part of state and local expenditures.

As defined in Chapter 7, the approach used in this chapter is a static analysis, producing estimates for a point in time. We did not attempt, for example, to play out, over time, the consequences for a state of its investment in education of first and second generation immigrant children on the skill mix of its labor force at a future date. Such an analysis would be difficult to conduct, not least because of the mobility of the population among the states so that children educated in one state may, to a greater or lesser extent, work as adults in another state.

### Constructing Independent Person Units for Analysis

Most people live in households, as opposed to institutions and other similar living situations. Although a significant number of household residents live alone, many others live with relatives or with nonrelatives as in a group house. Many tax and expenditure programs are carried out on a family or household basis (e.g., state income and local property taxes and benefits from many low-income assistance programs, such as school meals). So the household would seem to be a natural unit of analysis, and *The New Americans* (National Research Council, 1997) carried out its analysis of net fiscal state and local government burdens for California and New Jersey on a per-household basis. Households, however, change in their composition within and across years and also may contain a mix of immigrant generations and a mix of related and unrelated members. For this conceptual reason, we conducted our analysis in terms of persons, which is also the unit for our analysis of fiscal effects over time at the national level in Chapter 8. Specifically, we constructed "independent person" units, consisting of one independent adult plus an assignment of any dependent children in whole or in part, as described below. Box 9-1 repeats the definitions of independent persons and dependent children given in Box 8-2 and also defines "independent person unit."

Having classified each individual in the sample as independent or dependent, we then constructed independent person units for analysis. The assignment of dependent children in a household to independent

002847

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

---

**BOX 9-1**
**Definitions of Independent and Dependent Persons**

**Dependent:** For the purpose of the panel's estimates, we consider dependents to be anyone: (1) under age 18, (2) ages 18 through 21 and in high school full time, or (3) ages 18 through 23 and in school full time or part time with income below half of the poverty level for one person. We also consider single individuals who are 18 through 23 and not in school but with income below half of the poverty level (for one person) who live with at least one independent person (typically a parent) as a dependent person; 1.2 percent of the population are in this category and they are treated as dependents but are not assigned education costs.

**Independent person:** Any person (most of whom are adults ages 18 and older) who is not a dependent child. We consider individuals ages 18 through 23 who are in school and working more than part time to be independent regardless of income level.

There are a few exceptions to the aforementioned criteria. If a person is married, he or she is considered independent irrespective of age. If a person is single with children and there are no family members other than children in the household, and the person is earning above half the poverty level, the person is considered independent. If there is a household with no members satisfying the above criteria for being independent, we consider any household member with income above the average amount in the household and ages 18 and older (or age 16 and older if all in the household are under 18) to be the independent person(s) in the household.

**Independent person unit:** Comprises the independent person plus assigned dependent children (which typically is half of any child assigned to two parents).

---

individual(s) includes all of their revenue and expenditure flows.[5] Dependent children and their flows are split between parents if they reside in a two-parent household; they are assigned fully to the resident parent if in a single-parent household. They are assigned to the grandparent(s) if their parents are dependents; they are assigned to the householder when parents are not present and the householder is a foster parent or grandparent. Dependents in households with family members other than parents or grandparents are assigned to the highest earning independent relative.

---

[5]In the case when the dependent weights differ from that of the independent person they are assigned to, the dependents and their flow amounts are multiplied by their dependent weight and then divided by the weight of the independent person(s) they are assigned to.

002848

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Dependents in households without any family members are assigned to the highest earning independent household member. As with dependent children in two-parent households, nonchild dependents (related and unrelated) are split between married couples in cases where they are assigned to one of the spouses. Ninety-four percent of dependent children in our dataset are assigned to parents, with an additional 5 percent assigned to other family members (remaining dependents are assigned to nonfamily members).

### Defining Immigrant Generations for Independent Person Units

The classification of independent person units by immigrant generation was performed on the basis of the independent person's status as follows: as in the other analyses in this report, independent individuals born abroad who are not citizens or who are naturalized citizens are classified as first generation immigrants. Independent individuals who are native born (including those born in Puerto Rico) and one or both of whose parents are foreign born are classified as second generation, as are those born abroad to an American parent with their other parent foreign-born. As defined above, the third-plus generation includes independent individuals who are native born to two native-born parents, as well as those who are born abroad to two American parents.

It bears repeating that independent person units are classified by the generation of the independent person; children are assigned to one or two independent persons on the basis of relationship and not generation. Thus, first generation independent person units with children may include children born abroad, those who in their own right would be classified as second generation, or both. Similarly, second generation independent person units with children may include children who are second or third generation when considered in their own right.

### Estimating State and Local Revenues per Independent Person Unit

After constructing independent person units, the next step was to assign the revenues each such unit provided to its state and locality, using 2011-2013 COG data on taxes and other forms of revenue. Revenues (and expenditures) were assigned to each individual, with flows for dependents then being wrapped up to the independent persons who support them. So, for example, any benefits received by a child living with two parents would be assigned to the child and then half of the value would be pulled into each parent's independent person unit amounts. For many types of revenue, the amount assigned to each independent person unit depended on the unit's demographic and economic information. For example, state income taxes paid depended on income and taxes reported in the CPS data. Because CPS

002849

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

data, on average, underreport income, amounts allocated for income and sales taxes were scaled up to equal COG state aggregates. The following types of revenues were assigned to independent person units (their percentage of all state and local revenues is shown in parentheses, but these average numbers mask the wide variations among states):

- property taxes (14%);
- general sales taxes (10%);
- selective sales taxes and public utilities (5%);
- individual income taxes (9%);
- business taxes (3%);
- higher education charges (tuition, etc.) (3%);
- school lunch sales (less than 1%);
- other education charges (less than 1%);
- insurance trust revenue (15%);
- other revenue (22%); and
- intergovernmental revenue (18%).

Table 9-11, in the Technical Annex to this chapter, provides detailed information on each revenue type and how the revenues for each type were allocated to independent person units.

### Estimating State and Local Expenditures per Independent Person Unit

After the assignment of revenues, the next step was to assign state and local expenditures to independent person units using 2011-2013 COG data. Similar to revenues, these amounts often vary with individual characteristics; most notably, education expenses depend on the number and age of dependents. CPS noninstitutional Medicaid and public welfare expenditure amounts were scaled up to equal COG state aggregates. The following types of expenditures were assigned (their percentage of all state and local expenditures is shown in parentheses, and again these average values mask wide variations among states):

- higher education expenditures (7%);
- elementary and secondary education expenditures (16%);
- other education expenditures and libraries (4%);
- Medicaid and public welfare (16%);[6]
- insurance trust expenditures (11%);

---

[6]While it is included in the 16 percent of COG expenditures from Medicaid and public welfare, we do not assign the 2 percent of the total 2011-2013 COG expenditures that went to institutional Medicaid spending.

002850

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2858 of 4699 PageID #:  6023

The Economic and Fiscal Consequences of Immigration

- other expenditures and capital outlays (45%); and
- intergovernmental expenditures (less than 1%).

Table 9-12 in the Technical Annex provides additional information on each expenditure type and how the expenditures for each type were allocated to independent person units.

### Differences from the Approach Used in *The New Americans*

We followed a similar but not identical approach to that used in *The New Americans* (National Research Council, 1997, Ch. 6) to estimate the cross-sectional, point-in-time net fiscal effects of immigrants on state and local government budgets. Below we indicate key differences and the reasons for them:

- *Coverage.* The 1997 report constructed net fiscal effects estimates for just two states—California and New Jersey—using March 1995 CPS data for California and the 1990 Public Use Microdata Sample for New Jersey. By using 3 years of pooled CPS ASEC data in our analysis,[7] we were able to construct estimates for all 50 states and the District of Columbia, although small sample sizes for many states impair the quality of the estimates.
- *Unit of analysis.* The 1997 report used households as the unit of analysis on the grounds that most government programs and services are planned on a household basis. As argued above, this panel views households as too heterogeneous in composition. We therefore used an independent person unit of analysis, consisting essentially of an adult and any dependent children (or shares of children if married). This difference in analysis unit means that dollar amounts of net effects per unit are not comparable between the 1997 study and this report (even if one accounted for inflation and other differences). The reason is that there are about twice as many independent person units as there are households. Section 9.6 includes information at the household level and highlights how differences in household size can affect relative costs or benefits.
- *Immigrant characteristics.* The 1997 report distinguished between households headed by foreign-born individuals (further catego-

---

[7]The CPS ASEC for any one year in 2011-2013 has about twice the sample size of the 1995 March CPS, and the pooling of the CPS ASEC over 3 years increases the CPS ASEC sample size of unique respondents twice again. We keep respondents appearing in 2 consecutive years in our sample for both years so that each of the 3 data years is fully representative of the non-institutionalized population in that year and we capture these respondents' different revenue and expenditure flows in each of the 2 years.

002851

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

504          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

rized by region of origin—Europe/Canada, Asia, Latin American, and other) and households headed by native-born individuals. Other household members might include a mix of foreign- and native-born people. This study, in contrast, looked at three groups of independent persons: first, second, and third-plus generation. (Dependent children were assigned to one or two parents or another independent person in their household regardless of their own immigrant generation.) This grouping permitted us to ascertain the contribution of second generation independent persons, which in many states provide a return on the investment made in their education as children through taxes paid when they become working-age adults. We did not look at region of origin for first generation independent persons, in part due to small sample sizes for many states.

- *Revenues and expenditures.* The 1997 report broke out state from local revenues and expenditures, which we did not do because of differences among states in how functions such as education are allocated between the state and local governments. The 1997 report also looked at revenues and expenditures at the federal level for households living in California. In contrast, our analysis did not attempt to estimate federal fiscal effects for independent person units by state if those effects involved the individual directly rather than flowing through state or local governments. For example, federal funds for primary and secondary (K-12) education are included because the money is directed to the states and then distributed. In contrast, federal Social Security payments are excluded because the funds are directly sent to individuals. Similarly, state income taxes are included but not federal income taxes.

### 9.3  GEOGRAPHIC AND DEMOGRAPHIC DISTRIBUTION OF IMMIGRANTS

As background for our discussion of state and local fiscal effects, we provide information for two periods, 2011-2013 and 2000, not only on the geographic distribution of immigrants by state in the two time periods but also on variations among states in the demographic composition of their immigrant populations. For comparability when examining changes over time, we look at distributions of the foreign-born (noncitizens or naturalized citizens born abroad), which corresponds to the sum of "independent

002852

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

persons" in the first generation plus any of their children born abroad.[8] Comparisons across and within states among different groups are for the three generations of independent persons as defined above.

### Geographic Distribution of the Foreign-born, 2000 Compared to 2011-2013

Table 9-1 shows the percentage of foreign-born in each state's population for the period 2011-2013 compared with 2000, using data from the 2011-2013 ACS and the 2000 Decennial Census long-form sample. The states are ranked from highest to lowest percentage of foreign-born in 2011-2013. Also shown is the percentage point change between 2000 and 2011-2013. Percentages are expressed in whole numbers without decimals to remind the reader that the data are estimates from samples of the resident population.

For the United States as a whole, the foreign-born population as a percentage of the total increased by 2 percentage points over the period—from 11 percent in 2000 to 13 percent in 2011-2013. Percentage point increases by state ranged narrowly from no change in several states to 4 points in Maryland. Accordingly, it is not surprising that the patterns of geographic dispersion of the foreign-born were broadly similar in the two periods. Thus, the seven states with the highest percentages of foreign-born in 2011-2013—California, Florida, Hawaii, Nevada, New Jersey, New York, and Texas—were the states with the highest percentages of foreign-born in 2000, although overall the concentration of foreign-born individuals in these states has declined.

Table 9-1 also shows the numbers of foreign-born in 2011-2013 and the increase from 2000 (in thousands) by state. Numeric gains are important to keep in mind when considering how immigration may affect states' fiscal pictures and their policies toward immigrants. **Every state has experienced positive net numeric growth in its immigrant population since 2000.** California, Florida, and Texas gained between 1 million and 1.4 million immigrants over the period, and New York State gained over 500 thousand. Six states gained between 300 and 500 thousand, five states gained between 200 and 300 thousand, and seven states gained between 100 and 200 thousand immigrants. Of the 22 states that experienced increases in numbers of immigrants of 100 thousand or more, 12 had populations with

---

[8]Our analysis in this chapter is subject to the same caveats about the difficulties of identifying immigrants with existing data that are outlined in the Technical Annex to Chapter 2 above. In addition, as discussed further below, our state-level analysis is compromised by small sample sizes for many states in the CPS ASEC, even after pooling data over 3 years.

002853

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-1** Percentage Foreign-born Population by State, 2011-2013 and 2000, Ordered from Highest to Lowest Percentage Foreign-born in 2011-2013

| State | Percentage Foreign-born | | Percentage Point Change Since 2000 | Number Foreign-born (in thousands) | |
|---|---|---|---|---|---|
| | 2011-2013 | 2000 | | 2011-2013 | Change Since 2000 |
| California | 27 | 26 | +1 | 10,262 | 1,397 |
| New York | 22 | 20 | +2 | 4,376 | 508 |
| New Jersey | 21 | 18 | +3 | 1,902 | 425 |
| Florida | 19 | 17 | +2 | 3,760 | 1,089 |
| Nevada | 19 | 16 | +3 | 528 | 211 |
| Hawaii | 18 | 18 | 0 | 249 | 37 |
| Texas | 16 | 14 | +2 | 4,273 | 1,373 |
| Massachusetts | 15 | 12 | +3 | 1,010 | 237 |
| Connecticut | 14 | 11 | +3 | 491 | 121 |
| District of Columbia | 14 | 13 | +1 | 90 | 16 |
| Illinois | 14 | 12 | +2 | 1,801 | 272 |
| Maryland | 14 | 10 | +4 | 835 | 317 |
| Arizona | 13 | 13 | 0 | 880 | 224 |
| Rhode Island | 13 | 11 | +2 | 138 | 19 |
| Washington | 13 | 10 | +3 | 922 | 308 |
| Virginia | 11 | 8 | +3 | 937 | 367 |
| Georgia | 10 | 7 | +3 | 955 | 378 |
| Colorado | 10 | 9 | +1 | 502 | 132 |
| New Mexico | 10 | 8 | +2 | 204 | 55 |
| Oregon | 10 | 8 | +1 | 384 | 94 |
| Delaware | 9 | 6 | +3 | 78 | 33 |
| North Carolina | 8 | 5 | +3 | 738 | 308 |
| Utah | 8 | 7 | +1 | 240 | 82 |
| Alaska | 7 | 6 | +1 | 52 | 15 |
| Kansas | 7 | 5 | +2 | 195 | 60 |
| Minnesota | 7 | 5 | +2 | 400 | 140 |
| Idaho | 6 | 5 | +1 | 94 | 30 |
| Michigan | 6 | 5 | +1 | 610 | 87 |
| Nebraska | 6 | 4 | +2 | 120 | 45 |
| New Hampshire | 6 | 4 | +2 | 74 | 20 |
| Oklahoma | 6 | 4 | +2 | 214 | 83 |
| Pennsylvania | 6 | 4 | +2 | 778 | 270 |
| Arkansas | 5 | 3 | +2 | 135 | 61 |
| Indiana | 5 | 3 | +2 | 310 | 123 |
| Iowa | 5 | 3 | +2 | 142 | 50 |
| South Carolina | 5 | 3 | +2 | 227 | 111 |
| Tennessee | 5 | 3 | +2 | 302 | 143 |
| Wisconsin | 5 | 4 | +1 | 273 | 79 |

002854

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-1** Continued

| State | Percentage Foreign-born | | Percentage Point Change Since 2000 | Number Foreign-born (in thousands) | |
| | 2011-2013 | 2000 | | 2011-2013 | Change Since 2000 |
|---|---|---|---|---|---|
| Louisiana | 4 | 3 | +1 | 177 | 61 |
| Missouri | 4 | 3 | +1 | 239 | 87 |
| Ohio | 4 | 3 | +1 | 465 | 126 |
| Vermont | 4 | 4 | 0 | 26 | 3 |
| Alabama | 3 | 2 | +1 | 165 | 77 |
| Kentucky | 3 | 2 | +1 | 143 | 62 |
| Maine | 3 | 3 | 0 | 46 | 9 |
| North Dakota[a] | 3 | 2 | +1 | 19 | 6 |
| South Dakota | 3 | 2 | +1 | 24 | 10 |
| Wyoming | 3 | 2 | +1 | 20 | 9 |
| Mississippi | 2 | 1 | +1 | 66 | 26 |
| Montana[a] | 2 | 2 | 0 | 20 | 3 |
| West Virginia | 2 | 1 | +1 | 28 | 8 |
| United States | 13 | 11 | +2 | 40,918 | 9,910 |

[a]Estimate is from the American Community Survey 5-year estimates because 3-year estimates are not available due to small sample size.
SOURCE: Foreign-born in 2000 from 2000 Decennial Census long-form sample, Summary File 4, Table QT-P14, Population Group—Total population, Nativity, Citizenship, see http://www.census.gov [November 2016]. Foreign-born in 2011-2013 from American Community Survey 3-year estimates, Table S0501: Selected Characteristics of the Native and Foreign-Born Populations, see http://www.census.gov [November 2016].

13 percent (the U.S. average) or more foreign-born in 2011-2013, and 10 had populations with smaller percentages of foreign-born.

### Geographic Distribution of Independent
### Persons by Generation, 2011-2013

Turning to our analysis for 2011-2013, we first consider the composition by state of independent person populations from the CPS ASEC, classified by immigrant generation (first, second, or third-plus). Table 9-2 provides estimates of the three immigrant generations as percentages of each state's population of independent persons, ordered from highest to lowest percentage for the first generation. We use this ordering for subsequent tables as well, to help readers focus on the states with the largest percentages of first generation independent persons, which are also the states

002855

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2863 of 4699 PageID #:  6028

The Economic and Fiscal Consequences of Immigration

**TABLE 9-2** Percentage Independent Persons by Immigrant Generation, by State, 2011-2013, in Order from Highest to Lowest Percentage (first generation independent persons)

| State | Immigrant Generation (% of total independent persons in state) | | |
|---|---|---|---|
| | First | Second | Third+ |
| California | 35 | 15 | 50 |
| New Jersey | 28 | 12 | 60 |
| New York | 27 | 12 | 60 |
| Nevada | 25 | 11 | 64 |
| Florida | 23 | 9 | 68 |
| Texas | 21 | 10 | 69 |
| Hawaii | 21 | 15 | 64 |
| | | | |
| Maryland | 19 | 7 | 74 |
| Arizona | 18 | 11 | 70 |
| District of Columbia | 17 | 8 | 74 |
| Massachusetts | 17 | 12 | 71 |
| Illinois | 17 | 8 | 75 |
| Washington | 17 | 10 | 74 |
| Connecticut | 16 | 11 | 72 |
| Rhode Island | 16 | 14 | 70 |
| | | | |
| Virginia | 14 | 5 | 82 |
| Delaware | 12 | 4 | 83 |
| Georgia | 12 | 3 | 85 |
| New Mexico | 12 | 7 | 81 |
| Oregon | 11 | 8 | 81 |
| Colorado | 11 | 7 | 82 |
| Alaska | 11 | 7 | 82 |
| Nebraska | 11 | 4 | 85 |
| Idaho | 10 | 5 | 85 |
| North Carolina | 10 | 4 | 87 |
| | | | |
| Utah | 9 | 6 | 85 |
| Michigan | 9 | 6 | 85 |
| Minnesota | 9 | 5 | 86 |
| Kansas | 8 | 4 | 88 |
| Pennsylvania | 7 | 6 | 87 |
| Iowa | 6 | 3 | 90 |
| New Hampshire | 6 | 8 | 86 |
| Wisconsin | 6 | 5 | 90 |
| | | | |
| Tennessee | 5 | 2 | 92 |
| Arkansas | 5 | 2 | 93 |
| Kentucky | 5 | 2 | 93 |
| South Carolina | 5 | 2 | 93 |
| Oklahoma | 5 | 3 | 92 |
| Vermont | 5 | 8 | 87 |

002856

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-2**  Continued

| State | Immigrant Generation (% of total independent persons in state) | | |
|---|---|---|---|
| | First | Second | Third+ |
| Indiana | 5 | 4 | 92 |
| Ohio | 5 | 4 | 91 |
| Louisiana | 4 | 2 | 94 |
| Missouri | 4 | 3 | 93 |
| South Dakota | 4 | 4 | 92 |
| Alabama | 4 | 2 | 94 |
| Maine | 3 | 7 | 89 |
| North Dakota | 3 | 5 | 92 |
| Wyoming | 3 | 4 | 93 |
| Montana | 3 | 6 | 92 |
| Mississippi | 3 | 1 | 96 |
| West Virginia | 1 | 2 | 96 |
| United States | 16 | 8 | 76 |

NOTE: See text for definitions of independent person and immigrant generation. Rows may not sum to 100% for a state due to rounding error (values of 0.5 to 0.9 percent are rounded up).
SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

with the largest sample sizes for the first generation. (Tables 9-13 and 9-14 in the Technical Annex provide, respectively, annualized weighted sample counts and total 3-year unweighted counts of first, second, and third-plus generation independent persons by state in the pooled CPS ASEC data for 2011-2013.)[9] For the United States as a whole, first generation independent persons are 16 percent of all independent persons, second generation independent persons are 8 percent of all independent persons, and third-plus generation independent persons are 76 percent of all independent persons.[10]

By state, West Virginia has the lowest proportion of first generation

---

[9]As noted in Tables 9-13 and 9-14 in the annex, the full 2011-2013 sample does not account for overlap among sample cases due to the rotation group design of the survey.

[10]The estimated percentages of first generation independent persons in 2011-2013 in Table 9-2 are generally higher than the corresponding estimated percentages of foreign-born in Table 9-1 (e.g., 16% versus 13% for the United States). The reason is that the denominator in Table 9-2 is all independent persons (essentially all adults) and not the total population, combined with the fact that, proportionally, the first generation includes more independent persons compared with dependent children (considered in their own right) than does the remaining population. Nonetheless, the ordering of states is not that different between Tables 9-1 and 9-2.

002857

Copyright National Academy of Sciences. All rights reserved.

independent persons in the state's total independent population (1%) and California has the highest proportion (35%). Ten states have first generation independent populations that make up less than 5 percent of the state's total independent population.[11] First generation independent individuals in these 10 states (and the other 26 states below the national average of 16%) are less represented in the first generation independent population nationwide than are all of their independent individuals in the national independent population. Seven states have first generation independent populations that comprise at least 20 percent of their total independent population.[12] First generation individuals in these seven states (and the other seven states and District of Columbia above the national average) are more represented in the first generation independent population nationwide than are all of their independent populations in the national independent population. Consequently, caution should be taken in comparing *national* averages of state and local revenue and expenditure flows for the first, second, and third-plus generations, due to the differing composition of individuals in each state among the three generations.

### Demographic Distributions of Independent Persons, 2011-2013

The three immigrant generations of independent persons that we define differ among themselves within and among states on characteristics that affect the net fiscal benefit or burden they entail for their state (and its localities). Among these characteristics are age, number of dependent children associated with the independent person unit, unit income, and education, for which we provide a broad overview below.

*Age*

The age of an independent person has an effect on the person's net fiscal benefit or burden for the state and locality. Working-age people with employment, for example, typically pay significantly more in taxes than they receive from expenditures and therefore provide a net fiscal benefit to their state and locality, other things equal. However, if their independent person unit includes dependent children, these benefits are lessened and often reversed because of costs for the children's education and other services. We observed these patterns in the national level analyses in Chapter 8 as well. The net fiscal benefit or burden of retirees will depend on a state's

---

[11]These 10 states are Alabama, Louisiana, Maine, Mississippi, Missouri, Montana, North Dakota, South Dakota, West Virginia, and Wyoming.
[12]These seven states are California, Florida, Hawaii, Nevada, New Jersey, New York, and Texas.

002858

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

tax structure and social services for the elderly; for low-income retirees on Medicaid, the net fiscal impact is likely to be negative.[13]

Table 9-3 shows the average age of independent persons by state and generation and the percentage who are 65 and older in our data for 2011-2013. Nationwide, first generation independent persons are 45.8 years on average; second generation independent persons are older, at 46.5 years on average; and third-plus generation independent persons are older still, at 48.5 years on average. Nationwide, the elderly population (age 65+) comprises 14 percent of first generation independent persons, 23 percent of second generation independent persons, and 19 percent of third-plus generation independent persons.

The general patterns evident for the nation hold for states, but there are some significant exceptions. For example, among the seven states with the highest percentages of first generation independent persons, the average age of this generation varies from 44 years in Texas to 51 years in Hawaii. Florida has higher-than-average percentages of people ages 65 and older in all three generations (20%, 27%, and 24%, respectively), while Hawaii has even higher percentages of people ages 65 and older in its first and second generation independent person populations (24% and 32%, respectively) but a lower-than-average percentage in its third-plus generation independent person population (17%).

*Number of Dependent Children*

The number of children in an independent person unit has an important effect on its net state and local benefit or burden, primarily stemming from the expenditure side of the ledger, for at least two reasons. First, education expenditures, which are allocated to school-age children, are a large item in state and local budgets (23% on average). Second, the more children in an independent unit, the larger the amount the unit is assigned for expenditures that are allocated to all persons (these expenditures total 49% on average—4% on other education and libraries and 45% on all other—see Table 9-12 in the Technical Annex to this chapter). Similarly, revenues that are allocated to all persons also total about half of revenues—see Table 9-11 in the Technical Annex to this chapter.[14]

---

[13]As indicated in Table 9-12, Medicaid costs for the institutionalized, who are not represented in the CPS ASEC, are not included in the allocation of expenditures to independent person units.

[14]A few of the expenditures and revenues we include in the group of those allocated to all persons are allocated selectively based on age. Liquor store expenditures, which are part of other expenditures, are allocated to all persons ages 21 and older. Motor fuels and tobacco product sales taxes, which are part of selective sales taxes, and motor vehicle license and motor vehicle operators license revenues, which are part of other revenues, are allocated to

Copyright National Academy of Sciences. All rights reserved.

**TABLE 9-3** Average Age and Percentage, Ages 65 and Older, Independent Persons by Immigrant Generation by State, 2011-2013

| | Immigrant Generation | | | | | | | | |
| | First | | Second | | Third+ | | All | |
| State | Avg. Age | % 65+ | Avg. Age | % 65+ | Avg. Age | % 65+ | Avg. Age | % 65+ |
|---|---|---|---|---|---|---|---|---|
| California | 47 | 14 | 41 | 14 | 48 | 19 | 47 | 16 |
| New Jersey | 45 | 14 | 52 | 35 | 49 | 19 | 48 | 19 |
| New York | 48 | 19 | 49 | 28 | 48 | 17 | 48 | 19 |
| Nevada | 47 | 15 | 44 | 24 | 48 | 18 | 47 | 18 |
| Florida | 49 | 20 | 49 | 27 | 51 | 24 | 50 | 23 |
| Texas | 44 | 9 | 41 | 12 | 47 | 17 | 46 | 15 |
| Hawaii | 51 | 24 | 51 | 32 | 48 | 17 | 49 | 21 |
| Maryland | 45 | 13 | 45 | 20 | 48 | 18 | 48 | 17 |
| Arizona | 46 | 13 | 46 | 22 | 49 | 19 | 48 | 19 |
| District of Columbia | 42 | 10 | 39 | 11 | 45 | 17 | 44 | 16 |
| Massachusetts | 47 | 16 | 53 | 38 | 48 | 18 | 49 | 20 |
| Illinois | 45 | 13 | 45 | 22 | 49 | 19 | 48 | 18 |
| Washington | 45 | 14 | 47 | 22 | 48 | 18 | 48 | 18 |
| Connecticut | 47 | 15 | 55 | 38 | 49 | 17 | 49 | 19 |
| Rhode Island | 47 | 14 | 54 | 40 | 48 | 18 | 49 | 20 |
| Virginia | 44 | 11 | 44 | 13 | 49 | 19 | 48 | 18 |
| Delaware | 42 | 10 | 53 | 38 | 50 | 21 | 49 | 21 |
| Georgia | 42 | 9 | 39 | 9 | 47 | 16 | 46 | 15 |
| New Mexico | 44 | 8 | 45 | 18 | 50 | 23 | 49 | 21 |
| Oregon | 44 | 9 | 48 | 24 | 49 | 20 | 49 | 19 |
| Colorado | 44 | 12 | 47 | 21 | 47 | 17 | 47 | 16 |
| Alaska | 47 | 15 | 41 | 11 | 46 | 12 | 45 | 13 |
| Nebraska | 40 | 6 | 49 | 32 | 48 | 19 | 47 | 18 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*513*

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Idaho | 43 | 11 | 43 | 17 | 49 | 21 | 48 | 20 |
| North Carolina | 42 | 6 | 44 | 20 | 49 | 21 | 48 | 19 |
| Utah | 42 | 7 | 43 | 15 | 45 | 16 | 44 | 15 |
| Michigan | 46 | 17 | 55 | 39 | 49 | 19 | 49 | 20 |
| Minnesota | 42 | 11 | 52 | 34 | 48 | 18 | 48 | 18 |
| Kansas | 43 | 10 | 47 | 26 | 48 | 21 | 48 | 20 |
| Pennsylvania | 44 | 13 | 58 | 45 | 49 | 20 | 49 | 21 |
| Iowa | 41 | 6 | 51 | 36 | 48 | 18 | 48 | 18 |
| New Hampshire | 46 | 13 | 57 | 42 | 48 | 17 | 49 | 18 |
| Wisconsin | 44 | 10 | 57 | 41 | 49 | 19 | 49 | 20 |
| Tennessee | 40 | 8 | 46 | 18 | 49 | 20 | 48 | 19 |
| Arkansas | 39 | 8 | 42 | 14 | 49 | 22 | 48 | 21 |
| Kentucky | 41 | 9 | 44 | 18 | 48 | 19 | 48 | 18 |
| South Carolina | 43 | 10 | 49 | 20 | 49 | 20 | 49 | 20 |
| Oklahoma | 42 | 7 | 40 | 15 | 48 | 20 | 48 | 19 |
| Vermont | 50 | 22 | 56 | 35 | 49 | 18 | 49 | 20 |
| Indiana | 43 | 10 | 47 | 24 | 49 | 20 | 49 | 20 |
| Ohio | 44 | 16 | 54 | 32 | 49 | 20 | 49 | 20 |
| Louisiana | 45 | 13 | 44 | 14 | 48 | 19 | 48 | 19 |
| Missouri | 44 | 12 | 52 | 32 | 48 | 19 | 48 | 20 |
| South Dakota | 41 | 8 | 59 | 49 | 48 | 18 | 48 | 19 |
| Alabama | 42 | 9 | 48 | 19 | 49 | 19 | 48 | 19 |
| Maine | 47 | 16 | 59 | 44 | 49 | 19 | 50 | 21 |
| North Dakota | 41 | 7 | 62 | 58 | 46 | 15 | 47 | 17 |
| Wyoming | 43 | 11 | 54 | 35 | 47 | 16 | 47 | 17 |
| Montana | 45 | 15 | 61 | 52 | 49 | 22 | 49 | 23 |
| Mississippi | 43 | 9 | 44 | 14 | 49 | 20 | 49 | 20 |
| West Virginia | 48 | 17 | 52 | 31 | 50 | 19 | 50 | 19 |

*continued*

002861

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*514*

TABLE 9-3 Continued

| State | Immigrant Generation | | | | | | | |
| | First | | Second | | Third+ | | All | |
| | Avg. Age | % 65+ | Avg. Age | % 65+ | Avg. Age | % 65+ | Avg. Age | % 65+ |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Top 15 States by % in First Generation | 47 | 15 | 45 | 21 | 48 | 19 | 48 | 18 |
| United States | 46 | 14 | 47 | 23 | 48 | 19 | 48 | 19 |

NOTES: See text for definitions of independent person and immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).
SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002862

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

In our data for 2011-2013, nationwide, first generation independent persons have an average of 0.52 children per unit, second generation persons have an average of 0.33 children per unit, and third-plus generation persons have an average of 0.36 children per unit (see Table 9-15 in the Technical Annex to this chapter). For most states, independent individuals in the second generation have fewer children than those in the first and third-plus generations, although the second and third-plus generations are quite similar (independent persons of the second generation in California have more children on average than do those in the third-plus generation). Among the seven states with the largest percentages of first generation independent persons, the average number of children per first generation independent person unit ranges from 0.39 in Florida to 0.64 in Texas, while the range per second generation independent person unit is from 0.24 in New Jersey to 0.47 in Texas. The range per third-plus generation independent person unit is from 0.31 in Florida to 0.38 in Texas. For the next seven states and District of Columbia that have between 15 and 20 percent of their independent persons in the first generation, the variation is even greater, with the District of Columbia having the lowest average number of children in each generation. States with smaller shares of immigrants also show wide variation in their average number of children per independent person, with Vermont averaging 0.29 children while Utah averages 0.53 children.

*Income and Education*

Income levels affect taxes paid and benefits received for independent persons and their children (see Table 9-16 in the Technical Annex to this chapter). Nationwide, average adjusted gross income (AGI) is lowest among first generation independent person units at about $29,450 per unit, considerably higher among second generation independent person units at $34,900 per unit, and higher still among third-plus generation units at $35,900 per unit. Among the seven states with the highest percentages of first generation independent person units, average AGI for the first generation varies from $26,100 per unit in Texas to $35,700 per unit in New Jersey. Average AGI for the second generation in these seven states varies from $28,250 per unit in Nevada to $37,900 per unit in New Jersey. For third-plus generation independent person units, New Jersey again has the highest average income of $47,250, in contrast to the lowest average income for third-plus generation independent person units of $33,800 in

---

all persons ages 18 and older. Alcoholic beverage sales taxes, which are part of selective sales taxes, and liquor store revenues, which are part of other revenues, are allocated to all persons ages 21 and up.

002863

Copyright National Academy of Sciences. All rights reserved.

Florida. Among states with over one-quarter of their independent persons in the first or second generation (or at least 15 percent of independent individuals in the first generation), Arizona has the lowest average income for first generation independent person units ($25,100).

Income levels relate to education levels, and education levels differ significantly across generations. A larger percentage of first generation independent persons have not received a high school degree (28%) than is the case for the second and third-plus generations (10% and 9%, respectively). However, the percentage of first generation immigrants with advanced degrees beyond a bachelor's degree is comparable to that of the other two generations (all between 10% and 12%; Table 9-17 in the Technical Annex to this chapter presents the state-by-state figures). The percentage with at least a bachelor's degree is likewise comparable between the first and third-plus generations (28% and 29%, respectively). However, these statewide averages in part mask differences in higher education both across and within states. For example, in California, 8 percent of first generation independent persons have more than a bachelor's degree, compared with 10 percent for second generation and 12 percent for third-plus generation independent persons. The District of Columbia has the highest share of individuals with more than a bachelor's degree (29%), but 45 percent of second generation independent persons have more than a bachelor's degree compared to 27 and 28 percent, respectively, of first and third-plus generation individuals. Part of the difference comes about because many of the states with small immigrant populations also have lower numbers of residents with more than a bachelor's degree.

## 9.4  FISCAL VARIATION AMONG STATES, 2011-2013

We next look at state and local government revenues and expenditures by state and immigrant generation. States must generally balance their budgets year by year, but they vary greatly in the types and amounts of taxes they levy and the level of services they provide. Given the large differences in population size among states, it is important when examining state and local government fiscal data to convert the information to an appropriate population base. While we have calculated revenues, expenditures, and net fiscal effects for all states, the discussion below focuses on the 14 states and the District of Columbia with at least one-quarter of independent persons in the first or second generation (these states and the District of Columbia also have the 15 highest percentages of first generation individuals). Calculations are available, and presented in the tables, for all states, but caution must be exercised when examining differences for other states, especially those near the bottom of the tables, due to limited sample sizes. We also round all dollar amounts to the nearest $50 to emphasize that the basis for

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

our estimates is a relatively small sample. In the remainder of the chapter, we present estimates of revenues, expenditures, and net fiscal effects on a per-independent person unit basis (where dependent children and their revenues and expenditures are assigned to their parents).

### State and Local Government Revenues

While most state governments rely on general sales and income taxes and local governments rely primarily on property taxes, the composition of state and local revenues varies substantially. Nine states (including Florida, Nevada, Texas, and Washington) do not levy a broad-based personal income tax, and five states do not levy a general sales tax.

Table 9-4 provides population-based revenue estimates by state for all independent person units and those in each generation with per-unit amounts derived using the allocation process described in Table 9-11 in the Technical Annex to this chapter. For the United States as a whole, 2011-2013 annualized state and local government revenue averaged $14,700 per independent person unit. This amount masks considerable variation by state, particularly at the higher end. Thus, 17 states averaged between $11,650 and $12,950 per independent person unit; 13 states averaged between $13,000 and $14,500; 16 states averaged between $14,550 and $17,800; and five states exceeded $17,800 per independent person unit. The five jurisdictions with the highest average state and local government estimated revenue per independent person unit were Alaska ($36,400), the District of Columbia ($27,600), Wyoming ($24,150), New York ($22,400), and North Dakota ($20,300), while the five states with the lowest state and local government estimated revenue per independent person unit were Idaho ($11,650), Florida ($11,800), New Hampshire ($11,850), Georgia ($11,900), and Arizona ($11,900). If we limit our analysis to the 15 jurisdictions with the largest shares of first and second generation immigrants, the average revenue per independent person unit is $15,750 and varies from $11,800 in Florida to $27,600 in the District of Columbia.

By generation nationwide, state and local government revenue averaged about the same amount per first generation and third-plus generation independent person unit: $14,350 and $14,700, respectively. Revenue was higher for the second generation, averaging $15,500 per second generation independent person unit. However, these national similarities among generations mask large differences across states among generations. For the 15 jurisdictions with the largest shares of first and second generation immigrants, the average revenue for an independent person unit in the third-plus generation exceeds that of a unit in the first generation by $1,450 ($16,100 versus $14,650) and is only slightly lower than that of a unit in the second generation ($16,200).

002865

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-4** State and Local Revenues per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation | | | | Difference: First less Third+ |
| | First | Second | Third+ | All | |
|---|---|---|---|---|---|
| California | $15,600 | $18,450 | $19,150 | $17,800 | –$3,550 |
| New Jersey | 14,350 | 15,050 | 16,700 | 15,850 | –2,350 |
| New York | 20,200 | 22,200 | 23,450 | 22,400 | –3,250 |
| Nevada | 11,500 | 12,350 | 13,100 | 12,650 | –1,600 |
| Florida | 11,050 | 11,550 | 12,050 | 11,800 | –1,000 |
| Texas | 11,950 | 12,950 | 12,850 | 12,650 | –900 |
| Hawaii | 14,200 | 14,850 | 16,400 | 15,700 | –2,200 |
| | | | | | |
| Maryland | 13,900 | 13,850 | 14,350 | 14,250 | –500 |
| Arizona | 11,000 | 12,000 | 12,150 | 11,900 | –1,150 |
| District of Columbia | 24,700 | 28,400 | 28,200 | 27,600 | –3,500 |
| Massachusetts | 14,900 | 15,300 | 16,600 | 16,150 | –1,700 |
| Illinois | 12,450 | 13,850 | 14,750 | 14,300 | –2,250 |
| Washington | 14,650 | 14,900 | 15,250 | 15,100 | –600 |
| Connecticut | 14,800 | 15,900 | 17,050 | 16,550 | –2,250 |
| Rhode Island | 14,300 | 13,950 | 15,900 | 15,350 | –1,600 |
| | | | | | |
| Virginia | 12,500 | 13,500 | 12,800 | 12,800 | –300 |
| Delaware | 16,050 | 15,300 | 16,150 | 16,100 | –100 |
| Georgia | 10,850 | 12,200 | 12,050 | 11,900 | –1,200 |
| New Mexico | 17,450 | 15,400 | 14,850 | 15,200 | 2,600 |
| Oregon | 16,050 | 15,500 | 15,150 | 15,250 | 950 |
| Colorado | 12,950 | 14,200 | 14,250 | 14,100 | –1,250 |
| Alaska | 37,250 | 38,700 | 36,100 | 36,400 | 1,150 |
| Nebraska | 15,700 | 15,550 | 16,400 | 16,300 | –700 |
| Idaho | 10,400 | 11,600 | 11,800 | 11,650 | –1,400 |
| North Carolina | 12,800 | 13,500 | 13,250 | 13,200 | –450 |
| | | | | | |
| Utah | 13,650 | 13,650 | 13,900 | 13,850 | –250 |
| Michigan | 12,300 | 12,450 | 13,250 | 13,100 | –950 |
| Minnesota | 14,550 | 14,400 | 16,150 | 15,900 | –1,600 |
| Kansas | 13,750 | 13,200 | 13,800 | 13,750 | 0 |
| Pennsylvania | 14,050 | 12,050 | 13,550 | 13,500 | 500 |
| Iowa | 15,750 | 15,000 | 15,150 | 15,200 | 600 |
| New Hampshire | 11,500 | 11,600 | 11,900 | 11,850 | –400 |
| Wisconsin | 13,850 | 13,450 | 14,550 | 14,450 | –700 |
| | | | | | |
| Tennessee | 12,000 | 11,750 | 12,250 | 12,250 | –250 |
| Arkansas | 11,950 | 12,800 | 12,200 | 12,200 | –300 |
| Kentucky | 12,200 | 13,750 | 12,050 | 12,100 | 150 |
| South Carolina | 13,150 | 14,550 | 12,900 | 12,950 | 300 |
| Oklahoma | 12,100 | 14,300 | 12,800 | 12,850 | –700 |
| Vermont | 15,650 | 14,950 | 15,650 | 15,550 | 0 |
| Indiana | 12,400 | 12,350 | 12,250 | 12,250 | 150 |

002866

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-4** Continued

| State | Immigrant Generation | | | | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | All | |
| Ohio | 13,450 | 14,450 | 14,850 | 14,750 | –1,350 |
| Louisiana | 12,950 | 14,450 | 14,650 | 14,550 | –1,650 |
| Missouri | 12,150 | 12,800 | 12,500 | 12,500 | –350 |
| South Dakota | 12,900 | 10,550 | 13,500 | 13,350 | –600 |
| Alabama | 12,650 | 12,200 | 12,500 | 12,500 | 150 |
| Maine | 12,750 | 12,050 | 12,700 | 12,650 | 50 |
| North Dakota | 20,700 | 17,050 | 20,450 | 20,300 | 250 |
| Wyoming | 24,100 | 21,950 | 24,250 | 24,150 | –150 |
| Montana | 15,000 | 10,700 | 13,450 | 13,350 | 1,550 |
| Mississippi | 14,450 | 15,050 | 14,350 | 14,400 | 100 |
| West Virginia | 16,100 | 13,350 | 12,950 | 13,000 | 3,100 |
| Top 15 States by % in First Generation | 14,650 | 16,200 | 16,100 | 15,750 | –1,450 |
| United States | 14,350 | 15,500 | 14,700 | 14,700 | –350 |

NOTES: See text for construction of revenues by state and generation. Because the difference between first and third-plus generation revenue amounts is taken from the unrounded estimates and then rounded to the nearest $50, the value may differ from the first generation column less the third-plus due to rounding in some cases. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be taken when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

### State and Local Government Expenditures

Spending varies across states, with some states raising and spending more money than others. Note that, due to balanced budget rules, the states that raised more revenues almost always spent more funds. Table 9-5 provides population-based expenditure estimates by state for all independent person units and by generation with per-unit amounts derived using the allocation process documented in Table 9-12 in the Technical Annex to this chapter. For the United States as a whole, 2011-2013 annualized state and local government expenditures averaged $13,850 per independent person unit, or about $900 less than was raised in revenue. Sixteen states had average expenditures between $10,450 and $11,950 per independent unit; 17 states were between $12,000 and $14,000; 13 states were between

002867

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

$14,050 and $16,700; and five states exceeded $16,700 of expenditures per independent unit. The five states with the highest average state and local government expenditures per independent unit were Alaska ($29,950), California ($16,750); the District of Columbia ($28,500), New York ($20,700); and Wyoming ($20,750); the lowest were Arizona ($10,900); Arkansas ($10,900), Florida ($10,850), Idaho ($10,450, and Indiana ($11,250). If the analysis is limited to the 15 states with the largest state share in the first generation, the average spending per independent person unit is $14,950 (which is higher than the national average) and ranges from $10,850 in Florida to $28,500 in the District of Columbia: the same two lowest and highest jurisdictions among these 15 for average revenue per independent person unit.

**TABLE 9-5** State and Local Expenditures per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation | | | All | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | | |
| California | $17,650 | $16,900 | $16,050 | $16,750 | $1,600 |
| New Jersey | 16,200 | 12,750 | 16,000 | 15,650 | 200 |
| New York | 21,700 | 17,800 | 20,850 | 20,700 | 800 |
| Nevada | 12,800 | 11,350 | 11,150 | 11,550 | 1,650 |
| Florida | 11,450 | 10,350 | 10,700 | 10,850 | 700 |
| Texas | 14,000 | 13,350 | 11,450 | 12,200 | 2,500 |
| Hawaii | 14,900 | 13,600 | 14,700 | 14,600 | 200 |
| | | | | | |
| Maryland | 13,950 | 11,800 | 13,800 | 13,700 | 150 |
| Arizona | 12,350 | 11,750 | 10,400 | 10,900 | 1,950 |
| District of Columbia | 27,500 | 21,300 | 29,500 | 28,500 | –2,000 |
| Massachusetts | 17,150 | 13,000 | 16,150 | 15,950 | 1,050 |
| Illinois | 15,150 | 13,250 | 13,750 | 13,950 | 1,400 |
| Washington | 17,750 | 14,300 | 14,500 | 15,000 | 3,250 |
| Connecticut | 15,400 | 12,300 | 15,750 | 15,300 | –350 |
| Rhode Island | 15,800 | 11,800 | 14,300 | 14,200 | 1,500 |
| | | | | | |
| Virginia | 13,050 | 12,200 | 11,950 | 12,150 | 1,100 |
| Delaware | 16,550 | 13,250 | 15,450 | 15,450 | 1,150 |
| Georgia | 12,100 | 11,550 | 11,200 | 11,300 | 850 |
| New Mexico | 19,950 | 15,150 | 13,850 | 14,650 | 6,150 |
| Oregon | 17,950 | 13,250 | 13,450 | 13,950 | 4,500 |
| Colorado | 15,950 | 13,150 | 13,300 | 13,600 | 2,600 |
| Alaska | 33,300 | 32,950 | 29,250 | 29,950 | 4,050 |
| Nebraska | 17,900 | 14,100 | 14,500 | 14,850 | 3,400 |
| Idaho | 11,450 | 11,000 | 10,300 | 10,450 | 1,150 |
| North Carolina | 13,450 | 11,750 | 11,750 | 11,900 | 1,700 |

002868

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-5** Continued

| State | Immigrant Generation | | | | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | All | |
| Utah | 15,550 | 14,100 | 13,400 | 13,650 | 2,200 |
| Michigan | 12,600 | 9,900 | 12,450 | 12,300 | 150 |
| Minnesota | 19,650 | 11,100 | 13,950 | 14,300 | 5,650 |
| Kansas | 16,200 | 12,050 | 12,600 | 12,900 | 3,600 |
| Pennsylvania | 15,300 | 10,300 | 13,300 | 13,250 | 2,000 |
| Iowa | 16,800 | 12,450 | 13,600 | 13,750 | 3,200 |
| New Hampshire | 12,050 | 9,850 | 11,350 | 11,300 | 700 |
| Wisconsin | 17,550 | 11,900 | 13,000 | 13,200 | 4,550 |
| | | | | | |
| Tennessee | 12,700 | 10,500 | 11,500 | 11,550 | 1,150 |
| Arkansas | 13,150 | 11,150 | 10,750 | 10,900 | 2,350 |
| Kentucky | 13,150 | 11,300 | 11,950 | 12,000 | 1,200 |
| South Carolina | 13,000 | 12,100 | 12,300 | 12,350 | 700 |
| Oklahoma | 11,900 | 12,350 | 11,350 | 11,400 | 600 |
| Vermont | 15,400 | 11,550 | 14,600 | 14,400 | 800 |
| Indiana | 12,250 | 10,600 | 11,200 | 11,250 | 1,050 |
| Ohio | 13,000 | 10,750 | 13,350 | 13,200 | –300 |
| | | | | | |
| Louisiana | 13,400 | 15,550 | 14,850 | 14,800 | –1,500 |
| Missouri | 12,350 | 10,550 | 11,300 | 11,350 | 1,050 |
| South Dakota | 13,450 | 9,050 | 11,650 | 11,600 | 1,800 |
| Alabama | 13,700 | 9,650 | 11,900 | 11,950 | 1,800 |
| Maine | 13,100 | 9,600 | 11,950 | 11,800 | 1,150 |
| North Dakota | 17,500 | 11,500 | 15,050 | 14,950 | 2,450 |
| Wyoming | 22,800 | 18,400 | 20,800 | 20,750 | 2,000 |
| Montana | 13,100 | 9,500 | 12,550 | 12,350 | 600 |
| Mississippi | 13,150 | 12,400 | 13,000 | 13,000 | 150 |
| West Virginia | 15,550 | 9,500 | 11,450 | 11,450 | 4,100 |
| | | | | | |
| Top 15 States by % in First Generation | 16,350 | 14,600 | 14,450 | 14,950 | 1,950 |
| | | | | | |
| United States | 15,950 | 13,800 | 13,400 | 13,850 | 2,550 |

NOTE: See text for construction of expenditures by state and generation. Because the difference between first and third-plus generation expenditure amounts is taken from the unrounded estimates and then rounded to the nearest $50, the value may differ from the first generation column less the third-plus due to rounding in some cases. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be exercised when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.

SOURCE: Panel estimates implemented Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002869

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

By generation, for the United States as a whole, annualized state and local government expenditures for the 2011-2013 period were considerably higher for first generation independent person units ($15,950) than for second generation ($13,800) or third-plus generation ($13,400) independent person units. This was due to greater program participation (including public education). For the 15 states with the largest share of their independent population in the first generation, average expenditures for each immigrant generation were higher than the national averages by generation, but the gap *between* the generations was smaller (with average expenditures of $16,350 for the first generation versus $14,600 for the second and $14,450 for the third-plus generation).

## 9.5  AGGREGATE FISCAL EFFECTS BY STATE

Total state and local government revenues averaged $3.3 trillion per year in 2011-2013, while total state and local government expenditures averaged $3.17 trillion, nearly balancing out. In theory, when one looks across the amount of revenues contributed by each generation and the expenditures received by each generation, and if balanced budget rules held, the net total across generations in each state should be zero. In fact, because certain state and local funds run surpluses and deficits, no state actually has state and local revenues precisely equal to state and local expenditures. California, the state with the largest population and the largest number and percentage of first generation independent person immigrants, had the largest positive net difference in dollars between total average annual state and local revenue and expenditure flows in 2011-2013 ($22.9 billion) out of all 50 states and the District of Columbia. With spending exceeding revenues by $2.4 billion, Pennsylvania had the largest negative net difference in dollars. The District of Columbia had the largest negative net difference as a percentage of state and local revenues (−6%), while North Dakota had the largest positive net difference (+23%).

We exclude the institutional portion of Medicaid spending ($72 billion) from our estimates due to missing this population in our data, which widens the gap between aggregate U.S. revenues and expenditures in 2011-2013. After we take out institutional Medicaid spending, all but two states have positive budget balances (compared with seven negative-balance states when all expenditure flows are included).

Nationwide, the fact that the state and local government revenues we allocated exceeded expenditures by $197 billion, after excluding institutional Medicaid spending, means that an average net difference of $900 was assigned per independent person unit. By state, average net differences resulting from fiscal imbalances that were assigned at the unit level varied from -$850 in the District of Columbia to $6,450 in Alaska (see the "All"

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

column of Table 9-6). With net differences in revenues and expenditures ranging from positive to negative across states, when comparing net differences per independent person unit for different immigrant generations, it can be difficult to disentangle how much variation is from across-generation cost differences versus net cost differences among states.

Our analysis is for a specific time period for which state fiscal balances may not be typical. For example, the difference between state and local total revenues and total expenditures was positive in 2011 ($281 billion, or $353 billion after excluding Medicaid institutional spending). In 2012, this

**TABLE 9-6** Net Difference between State and Local Revenues and Expenditures per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation | | | All | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | | |
| California | –$2,050 | $1,550 | $3,100 | $1,050 | –$5,150 |
| New Jersey | –1,850 | 2,300 | 700 | 200 | –2,550 |
| New York | –1,500 | 4,400 | 2,600 | 1,700 | –4,050 |
| Nevada | –1,300 | 1,000 | 1,950 | 1,050 | –3,250 |
| Florida | –350 | 1,200 | 1,350 | 950 | –1,700 |
| Texas | –2,050 | –400 | 1,400 | 450 | –3,450 |
| Hawaii | –700 | 1,250 | 1,700 | 1,150 | –2,400 |
| | | | | | |
| Maryland | –100 | 2,050 | 550 | 550 | –650 |
| Arizona | –1,350 | 250 | 1,750 | 1,000 | –3,100 |
| District of Columbia | –2,800 | 7,100 | –1,300 | –850 | –1,500 |
| Massachusetts | –2,250 | 2,300 | 500 | 250 | –2,750 |
| Illinois | –2,700 | 550 | 1,000 | 350 | –3,650 |
| Washington | –3,050 | 600 | 750 | 100 | –3,850 |
| Connecticut | –600 | 3,550 | 1,300 | 1,250 | –1,900 |
| Rhode Island | –1,500 | 2,100 | 1,600 | 1,150 | –3,100 |
| | | | | | |
| Virginia | –600 | 1,300 | 800 | 650 | –1,400 |
| Delaware | –500 | 2,050 | 750 | 650 | –1,250 |
| Georgia | –1,250 | 650 | 800 | 550 | –2,050 |
| New Mexico | –2,550 | 250 | 1,000 | 550 | –3,550 |
| Oregon | –1,900 | 2,250 | 1,650 | 1,300 | –3,550 |
| Colorado | –2,950 | 1,050 | 900 | 500 | –3,850 |
| Alaska | 3,950 | 5,800 | 6,850 | 6,450 | –2,900 |
| Nebraska | –2,200 | 1,500 | 1,900 | 1,450 | –4,100 |
| Idaho | –1,050 | 600 | 1,500 | 1,200 | –2,550 |
| North Carolina | –650 | 1,700 | 1,500 | 1,300 | –2,150 |
| | | | | | |
| Utah | –1,950 | –450 | 500 | 250 | –2,450 |
| Michigan | –250 | 2,550 | 800 | 800 | –1,050 |

*continued*

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-6** Continued

| State | Immigrant Generation | | | | Difference: First less |
| | First | Second | Third+ | All | Third+ |
|---|---|---|---|---|---|
| Minnesota | −5,100 | 3,250 | 2,200 | 1,600 | −7,250 |
| Kansas | −2,450 | 1,150 | 1,150 | 850 | −3,600 |
| Pennsylvania | −1,250 | 1,750 | 250 | 250 | −1,500 |
| Iowa | −1,000 | 2,550 | 1,550 | 1,450 | −2,600 |
| New Hampshire | −550 | 1,750 | 550 | 600 | −1,100 |
| Wisconsin | −3,650 | 1,550 | 1,550 | 1,250 | −5,250 |
| | | | | | |
| Tennessee | −700 | 1,250 | 750 | 700 | −1,450 |
| Arkansas | −1,200 | 1,650 | 1,450 | 1,300 | −2,650 |
| Kentucky | −950 | 2,400 | 100 | 100 | −1,050 |
| South Carolina | 150 | 2,400 | 550 | 600 | −450 |
| Oklahoma | 200 | 1,950 | 1,500 | 1,450 | −1,300 |
| Vermont | 250 | 3,400 | 1,000 | 1,150 | −750 |
| Indiana | 150 | 1,750 | 1,050 | 1,050 | −900 |
| Ohio | 450 | 3,650 | 1,500 | 1,550 | −1,050 |
| | | | | | |
| Louisiana | −400 | −1,100 | −250 | −250 | −200 |
| Missouri | −150 | 2,250 | 1,200 | 1,200 | −1,400 |
| South Dakota | −550 | 1,500 | 1,850 | 1,750 | −2,400 |
| Alabama | −1,100 | 2,500 | 550 | 550 | −1,650 |
| Maine | −350 | 2,450 | 750 | 850 | −1,100 |
| North Dakota | 3,250 | 5,500 | 5,400 | 5,350 | −2,200 |
| Wyoming | 1,300 | 3,550 | 3,450 | 3,400 | −2,150 |
| Montana | 1,850 | 1,250 | 950 | 950 | 950 |
| Mississippi | 1,300 | 2,600 | 1,350 | 1,400 | −50 |
| West Virginia | 550 | 3,850 | 1,500 | 1,550 | −950 |
| | | | | | |
| Top 15 States by % in First Generation | −1,700 | 1,650 | 1,650 | 800 | −3,400 |
| | | | | | |
| United States | −1,600 | 1,700 | 1,300 | 900 | −2,900 |

NOTES: See text for construction of revenues and expenditures by state and generation. Because the difference between first and third-plus generation net difference (revenue less expenditure) amounts is taken from the unrounded estimates and then rounded to the nearest $50, the value may differ from the first generation column less the third-plus due to rounding in some cases. Similarly, because differences between revenues and expenditures are calculated on unrounded numbers and then the difference is rounded, these values may differ from calculated differences between Tables 9-4 and 9-5. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be taken when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

switched to a negative difference, largely due to a very significant decline in insurance trust revenue (government employee retirement revenue fell from $554.3 billion to $169.9 billion) between the 2 years, reflecting changes due to delayed payments during the recession. In 2013, the net fiscal state balance became positive again. To smooth out these cycles, we averaged revenues and expenditures for 2011-2013. If 2011 rather than 2011-2013 state and local revenue and expenditure amounts were assigned to our sample, the average net difference per independent person unit would become even more positive, going from $900 to approximately $1,600 per independent person unit. If, instead, we had used 2012 amounts, the individual unit average net difference would turn negative (–$200). If we had eliminated all insurance trust contributions and payments along with excluding the institutional portion of Medicaid spending, averaged over the 2011-2013 period, 11 states would be estimated to have higher expenditures than revenues, while, on average per independent person unit, there would be $200 more in revenues raised than spent in the country as a whole.

## 9.6  NET EFFECTS OF IMMIGRATION ON STATE AND LOCAL BUDGETS

### Estimated Differences in Net Fiscal Effects per Independent Person Unit by Generation

Table 9-6 shows the estimated net differences between state and local revenues and expenditures, by generation per independent person unit. Our estimates are derived using the replicate weights in the 2011-2013 CPS ASEC, whereby calculations of net differences are run many times in order to estimate an appropriate standard error and coefficient of variation, or CV (the standard error as a percentage of the estimate). We used replicate weights and show CVs in this part of the analysis (see Table 9-18 in the Technical Annex to this chapter) because we have reached the primary question of interest: How much do first and second generation units cost their states and localities? Also, the net differences are the result of balancing revenue and expenditure assignments, thereby magnifying the errors in each.[15]

As seen in Table 9-6, for the United States as a whole, **first generation independent person units (which include first and second generation children assigned to independent first generation persons) cost the states on net about $1,600 each. In contrast, second generation independent**

---

[15]Not only does the CPS ASEC have sampling error, which is large for many states even pooled over 3 years, but also both the CPS ASEC and the COG have other sources of error, such as response error, imputation error, and the like.

002873

Copyright National Academy of Sciences. All rights reserved.

person units (which include second and third generation children assigned to independent second generation persons) contribute on net to state and local budgets about $1,700 each, and third-plus generation independent person units (which include their children) contribute on net to state and local budgets about $1,300 each.[16] These estimates of the fiscal impact imply that the total annual aggregate impact of the first generation and their dependents, averaged across 2011-2013, is a cost of $57.4 billion, while the second and third-plus generation individuals (and their children) create benefits of $30.5 billion and $223.8 billion, respectively. Note that the surplus revenues raised amount to $197 billion, which equals the surplus across all 50 states.[17] **This overall pattern is largely driven by the larger education costs for first generation independent person units, which include more children on average than units of the other two generations. By the second generation, immigrants are a net win for the states as a whole, given that they have fewer children on average than first generation units and are contributing in revenues more than they cost in expenditures.[18]** State by state, however, there are wide variations in net gains or losses, although the panel is unable to make claims as precisely as we would like for many of our state and local estimates because of the large sampling errors.

The demographic differences between the first, second, and third-plus generation independent person units serve as the drivers of the differences

---

[16]The finding here, that the first generation generates higher net fiscal costs at the state and local level, is consistent with that from the parallel analysis in Chapter 8 (Table 8-1). The numbers for the second and third-plus generations here and for the second and third-plus generation in Chapter 8 do not map exactly, due to slight methodological differences. The Chapter 8 analysis is for 2013, while the analysis here averages over the 2011-2013 period. More importantly, the two analyses treat grant-in-aid spending from the federal government (which pays for programs like Medicaid and some welfare programs) differently. Chapter 9 includes these revenue transfers to states in state revenues (with the exception of the institutional portion of Medicaid spending), while Chapter 8 does not. Also, in Chapter 8, the funding raised by the federal government to pay for the grants-in-aid is treated as either federal taxes or federal deficit spending, which leads to both lower spending and lower revenue estimates at the state and local level. Finally, in the Chapter 8 analysis, there is no balanced budget assumption—the aggregates are as reported in the National Income and Product Accounts. If grants-in-aid are taken off both sides of the state/local ledger, the net fiscal balance becomes more negative.

[17]The $197 billion aggregate surplus here is calculated by totaling the unrounded estimates of net fiscal effects by state multiplied by the average number of independent persons in each year (see Table 9-13 in the Technical Annex to this chapter); this will differ somewhat from the total if the rounded estimates in Table 9-6 are used instead.

[18]These results are driven by the fact that the costs of dependents are assigned to their parents. If, instead, taxes paid and services received were assessed at the individual level, with dependent children considered in their own right, the relative costs would shift across groups. Because half of all second generation individuals are dependents, allocating all costs and benefits to each person (rather than wrapping up dependent children to independents) would cause the average net fiscal cost for first generation individuals to decline and reverse sign in many states, while the costs for second generation individuals would increase.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2882 of 4699 PageID #:  6047

in revenue and expenditure flows across them. First generation independent person units generate higher costs due to the presence of more dependent children, on average, in those units. Much of this comes from the assignment of K-12 education spending, which accounts for 16 percent of all state and local spending. If we remove all K-12 education expenditures from our estimates, rather than assigning school spending to the students themselves (which in most cases means wrapping it up to the independent parents/individuals who support them), the spending difference between the first and third-plus generations decreases from $2,900 to $1,950, a 32 percent decrease.

Beyond education spending, the 45 percent of spending flows that are classified as "other" (hospitals, health, veterans' services, etc.—see Table 9-12 in the Technical Annex to this chapter) is allocated to all people, both dependent and independent, evenly. Thus, first generation independent individuals on average have higher total expenditure amounts from these flows allocated to all because they have more flows wrapped up from more dependent children. However, if a portion of these spending costs were treated as fixed expenditure flows, irrespective of population numbers (analogous to the treatment of national defense in some scenarios in Chapter 8), the addition of first generation independent person units to the population base would reduce these average costs for the second and third-plus generation units; the dollar amounts would be spread across a larger population (which is what we did in our baseline estimates), but the marginal cost to the state would not change. Additionally, although it is not evident in cross-sectional estimates, the majority of the dependent children of first generation immigrants who are second generation and whose costs are assigned to their parents will go on to become net contributors once they reach working ages.

**Although per unit spending on the second generation independent person units is slightly more than it is on the third-plus generation units, the per unit net *difference* between revenues and expenditures is the most *positive* for second generation independent person units.** With a positive net difference of $1,700, second generation independent person units contribute $400 more on average than third-plus generation units. This corroborates findings reported in Chapter 8. However, this is largely due to the distribution of second generation independent person units across states, rather than the relative contribution of second versus third-plus generation units within a state. The third-plus generation independent person units contribute less in taxes and other revenue flows on average than the second generation, despite having the highest average income of all three generations. Looking at specific tax flows, the second generation units contribute the most in both state income tax and general sales tax on average, followed by the third-plus generation units and then the first

002875

Copyright National Academy of Sciences. All rights reserved.

528     *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

generation independent person units, reflecting the lower average AGI of first generation independent persons in the sample. However, this is driven by differences in tax structures in place across different states, rather than differences in the characteristics of the independent person units.

Note that the average U.S. spending and revenues raised per independent person unit hide differences across states. Thus, because many of the states with small numbers of first generation independent person units also have lower spending and taxes, the spending per third-plus generation independent person unit is lower for these states than for the states where immigrants often settle. Focusing on the 14 states and the District of Columbia with the highest share of first generation independent person units, one can see differences across generations as well. Moreover, as noted above, these differences can vary from year to year depending on whether a state is running a surplus or deficit. While first generation independent person units have more spent on them than revenues contributed in these 15 jurisdictions, this amount varies from a net cost of $100 in Maryland to a net cost of $3,050 in Washington State. For the second generation independent person units, while on average across states more revenues are raised than money spent on them, the differences vary from a net cost of about $400 per second generation independent person unit in Texas to a net contribution of $7,100 per such unit to the District of Columbia's budget. Similarly, whether an average third-plus generation independent person unit costs or contributes to a state (and local) budget varies from a net cost of $1,300 in the District of Columbia to a net contribution of $3,100 in California. These differences are largely driven both by different demographic and economic characteristics of individuals and by fiscal choices made by state and local governments.

### Estimated Differences in Net Fiscal Effects at the Household Level

If, instead of independent person units, one were to use self-identified households, very similar patterns result across generations (as defined by the generation of the designated head of household), albeit the estimates are often about double the estimates for independent person units. That is, one finds that first generation households in general have higher state and local net costs or smaller contributions than do the second or third-plus generation households (see Table 9-7). Again, this pattern varies across states, with second generation households often, but not always, contributing more to a state and local surplus than either first or third-plus generation households. The estimated amounts are higher because, typically, average household size includes more than one independent person. Differences in household size and composition will affect the relative size of net contribution or burden. Table 9-19 in the Technical Annex to this chapter presents

002876

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-7** Net Difference between State and Local Revenues and Expenditures per Household Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation (household units) | | | |
|---|---|---|---|---|
| | First | Second | Third+ | All |
| California | –$4,400 | $2,500 | $5,750 | $2,150 |
| New Jersey | –4,400 | 4,200 | 1,500 | 400 |
| New York | –2,750 | 7,600 | 4,600 | 3,100 |
| Nevada | –2,500 | 1,700 | 3,400 | 1,950 |
| Florida | –800 | 1,950 | 2,400 | 1,700 |
| Texas | –4,550 | –300 | 2,500 | 900 |
| Hawaii | –2,300 | 3,150 | 3,600 | 2,400 |
| | | | | |
| Maryland | –450 | 4,600 | 1,000 | 1,000 |
| Arizona | –2,800 | –150 | 3,250 | 1,800 |
| District of Columbia | –5,650 | 11,100 | –1,950 | –1,400 |
| Massachusetts | –4,200 | 4,400 | 750 | 450 |
| Illinois | –5,350 | 750 | 1,650 | 600 |
| Washington | –6,600 | 800 | 1,450 | 200 |
| Connecticut | –1,050 | 5,200 | 2,550 | 2,300 |
| Rhode Island | –3,050 | 3,950 | 2,850 | 2,100 |
| | | | | |
| Virginia | –1,650 | 3,900 | 1,400 | 1,200 |
| Delaware | –700 | 2,600 | 1,350 | 1,200 |
| Georgia | –2,450 | 300 | 1,450 | 1,000 |
| New Mexico | –5,050 | –700 | 1,950 | 1,000 |
| Oregon | –3,900 | 4,500 | 3,000 | 2,400 |
| Colorado | –6,200 | 2,050 | 1,650 | 900 |
| Alaska | 7,350 | 10,300 | 12,300 | 11,700 |
| Nebraska | –4,450 | 2,750 | 3,300 | 2,600 |
| Idaho | –2,000 | 700 | 2,800 | 2,250 |
| North Carolina | –1,650 | 2,000 | 2,700 | 2,300 |
| | | | | |
| Utah | –4,800 | –1,150 | 1,050 | 450 |
| Michigan | –650 | 4,650 | 1,450 | 1,450 |
| Minnesota | –10,000 | 4,550 | 3,900 | 2,900 |
| Kansas | –5,050 | 2,200 | 2,000 | 1,550 |
| Pennsylvania | –2,150 | 2,950 | 450 | 450 |
| Iowa | –2,250 | 2,100 | 2,850 | 2,550 |
| New Hampshire | –1,000 | 2,050 | 1,150 | 1,100 |
| Wisconsin | –8,300 | 2,450 | 2,800 | 2,250 |
| | | | | |
| Tennessee | –300 | 1,650 | 1,300 | 1,250 |
| Arkansas | –2,150 | 5,000 | 2,550 | 2,400 |
| Kentucky | –1,700 | 3,500 | 150 | 150 |
| South Carolina | –100 | 1,000 | 1,100 | 1,050 |
| Oklahoma | 500 | 3,150 | 2,650 | 2,550 |

*continued*

002877

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-7** Continued

| State | Immigrant Generation (household units) | | | |
|---|---|---|---|---|
| | First | Second | Third+ | All |
| Vermont | –850 | 5,000 | 1,950 | 2,100 |
| Indiana | 200 | 4,700 | 1,800 | 1,850 |
| Ohio | 850 | 6,600 | 2,600 | 2,750 |
| Louisiana | –850 | 1,250 | –500 | –450 |
| Missouri | 50 | 3,150 | 2,100 | 2,050 |
| South Dakota | –2,300 | 3,400 | 3,200 | 3,050 |
| Alabama | –1,300 | 5,450 | 1,000 | 1,000 |
| Maine | –500 | 3,400 | 1,400 | 1,500 |
| North Dakota | 4,900 | 8,500 | 9,350 | 9,200 |
| Wyoming | 3,700 | 6,450 | 6,000 | 5,950 |
| Montana | 1,950 | 2,100 | 1,650 | 1,650 |
| Mississippi | 2,350 | 8,000 | 2,400 | 2,500 |
| West Virginia | 2,700 | 7,600 | 2,600 | 2,700 |
| Top 15 States by % in First Generation | –3,600 | 2,850 | 3,050 | 1,550 |
| United States | –3,300 | 3,000 | 2,400 | 1,600 |

NOTE: See text for construction of revenues and expenditures by state and generation and for definitions of household immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be taken when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

information on average household size by generation (of head of household) by state. Table 9-20 in the Technical Annex to this chapter provides annualized weighted sample counts of first, second, and third-plus generation households by state in the pooled CPS ASEC 2011-2013 data.[19]

An advantage of using households as the unit of analysis is that assumptions do not have to be made about allocation of income, dependents, or receipt of social services among independent persons in the household—they can be assigned to the whole household. However, a single generation status must be assigned to the entire household, even for cases in which different independent persons within the household are of different genera-

---

[19]As noted in Table 9-20, the full 2011-2013 household sample does not account for overlap among sample cases due to the rotation group design of the survey.

002878

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2886 of 4699 PageID #:  6051

The Economic and Fiscal Consequences of Immigration

tions. Thus, for the estimates presented here, the panel assigned generation status at the household level using the generational status self-reported by the householder. For mixed cases, if the nonimmigrant is more likely to be the householder (say, because of more facility with English), then our estimates will be muddied. While not the standard procedure, which would use either all individuals, all households, or all families, presenting results according to independent person units (and assigning dependent children to their parents to form a unit) provides a cleaner comparison, as it avoids inconsistencies caused by differences in household size or composition.

### Decomposing Cross-Generation Differences

To highlight the relationship between the demographic and economic differences across generations of independent person units and the variations in state and local revenues and expenditures across these generations, the panel examined how differences in characteristics like age structure and education levels of the first, second, and third-plus generations impact the average net contribution (or burden) of independent person units of each generation. Table 9-8 shows results from multiple regression analyses that follow closely those conducted in Chapter 8 and reported in Table 8-3, in which net fiscal impact at the state and local level is regressed on generation as defined by independent person units.[20] The third-plus generation of independent person units is used as the reference category so that coefficients can be reported on indicators for the first and second generations. We present six models, with each subsequent model adding more control variables to account for cross-generational differences. For brevity, we only report the regression coefficients for immigrant generation, which represent, in dollars, the net fiscal impacts associated with being a first or second generation independent person unit, compared to third-plus generation independent person units.

In almost all cases, the regression coefficients for immigration generation are statistically significant, with first generation independent person units having a net fiscal cost relative to the third-plus generation, while the opposite is true for second generation independent person units. Note that, because time since arrival is not accounted for, the net fiscal burden

---

[20]Some of the methodological differences between Chapter 8 and Chapter 9 in how net fiscal impact estimates at the state and local level are generated are detailed in footnote 16. In addition, the sample for the estimates and regression analyses here in Chapter 9 differs from the sample used in Chapter 8. The Chapter 8 regression analysis uses observations of independent individuals from a pooled CPS 1994-2013 sample that has adjusted population weights to represent the total residential population (including institutionalized residents). Chapter 9 uses observations of independent individuals from a pooled CPS 2011-2013 sample that is representative of the noninstitutionalized population.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

TABLE 9-8 Regression Analysis of Net Fiscal Impact at the State and Local Level per Independent Person Unit, by Immigrant Generation, 2011-2013

| | OLS regression | With state fixed effects |
|---|---|---|
| **Model 1 – Controls: none; N = 416,284** | | |
| 1st generation (+ dependents) | –2,913 *** | –3,183 *** |
| 2nd generation (+ dependents) | 384 *** | 150 * |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.009 | 0.012 |
| **Model 2 – Controls: age group, year, sex; N = 416,284** | | |
| 1st generation (+ dependents) | –2,429 *** | –2,682 *** |
| 2nd generation (+ dependents) | 762 *** | 547 *** |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.056 | 0.059 |
| **Model 3 – Controls: age group, year, sex, education; N = 416,284** | | |
| 1st generation (+ dependents) | –1,478 *** | –1,591 *** |
| 2nd generation (+ dependents) | 422 *** | 327 *** |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.128 | 0.132 |
| **Model 4 – Controls: age group, year, sex, education, race/ethnicity; N = 416,284** | | |
| 1st generation (+ dependents) | –1,166 *** | –1,190 *** |
| 2nd generation (+ dependents) | 565 *** | 537 *** |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.135 | 0.140 |

of a first generation independent person unit is not the same as that for a *new* first-generation immigrant (as just 14% of our first generation sample arrived in the U.S. after 2006). On average, recently arrived first generation independent person units (since 2006) have small net fiscal burdens relative to first generation units that have been in the United States longer because the new first generation immigrants heading the unit tend to be younger, have more education, and have fewer dependent children.

Following the same order as in Chapter 8, we add control variables that typically explain (statistically account for) demographic and economic differences; an additional model directly controls for income so that the importance of that factor can be discussed. Note that the order in which the control variables are added matters, so decreases in the difference from the comparison group (third-plus generation independent person units) with each additional variable can be seen as the additional marginal effect of including that variable. For example, the effects we find on age in part

002880

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-8** Continued

| | | |
|---|---|---|
| **Model 5** – Controls: age group, year, sex, education, race/ethnicity, number of dependents; N = 416,284 | | |
| 1st generation (+ dependents) | –706 *** | –660 *** |
| 2nd generation (+ dependents) | 258 *** | 291 *** |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.407 | 0.412 |
| **Model 6** – Controls: age group, year, sex, education, race/ethnicity, number of dependents, income; N = 416,284 | | |
| 1st generation (+ dependents) | –421 *** | –243 *** |
| 2nd generation (+ dependents) | 19 | 177 *** |
| 3rd+ gen (+ dependents) ref. group | — | — |
| $R^2$ | 0.553 | 0.559 |

NOTES: Each column presents coefficients and significance levels from a separate ordinary least squares (OLS) regression of net fiscal impact at the state and local level (dependent variable) on indicators for immigrant status (*x* variables) and indicators for the other characteristics listed. Coefficients are the marginal effects in terms of dollars per independent person unit that are associated with the given immigrant status, relative to third-plus generation independent person units. A positive number is an improvement or savings in net fiscal impact; a negative number is a reduction or deficit. Thus a coefficient on a "1st generation" independent person unit equal to +1,000 implies that, compared to a third-plus generation unit, a first generation unit has a more positive net fiscal impact by $1,000 at the state and local level. Age groups are measured in 5-year intervals. Asterisks denote statistical significance at the 1 percent (***), 5 percent (**), or 10 percent (*) level.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

are related to the likelihood of having different numbers of dependents at different points in an independent person's life cycle.

Model 1, which does not include any control variables, reports the difference in net fiscal impacts of the first and second generation independent person units relative to the third-plus generation units. Controlling for no other factors, a first generation independent person unit on average costs state and local governments $2,913 more than an additional third-plus generation independent person unit, while an additional second generation independent person unit *contributes* $384 more than an additional third-plus generation unit. If the regression analysis controls for average state spending and taxes by introducing state fixed effects, as is shown in the right-hand column of Table 9-8, first and second generation independent person units are on average about $200 more costly, compared to a third-plus generation independent person unit, than with no state fixed effects (middle column of Table 9-8, labeled "OLS Regression"). Table 9-8

002881

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

includes regression model runs with and without state fixed effects, but the discussion below will focus on the coefficients for the model runs without the state fixed effects.

Model 2 adds a set of basic controls for age of the independent person, calendar year, and gender. As discussed in Section 9.3, the first generation independent individuals are on average the youngest of the three generations. With more independent persons concentrated in child-raising ages, the first generation units have, on average, more dependent children and consequently have higher state and local expenditures on education. Because we are limiting our estimates to a 3-year period that is at a similar point in the economic cycle, the year controls make little difference and the coefficients on calendar year are not significant in this model (although they do have small but statistically significant effects in later models).[21] Similarly, the gender makeup of each generation does not affect the relative fiscal impact. While male independent person units appear to contribute more than females in this model, the difference in income between the two genders is driving this and there is no significant difference between men and women in our later model that controls for income.[22] Thus, after controlling for age group (as well as year and gender), the fiscal impact of the first generation units (–$2,429) becomes less negative relative to the third-plus generation independent person units by about $500. The second generation units have the highest share of elderly independent persons in them (age 65 and older), relative to the units of the other two generations, leading to additional public costs. When this is controlled for under Model 2, the second generation's fiscal impact (+$762) becomes more positive, relative to the third-plus generation by about $400.

Because the independent persons in the first generation units have less education on average than those in second and third-plus generation units, controlling for education (Model 3) shrinks the negative net fiscal impact for first generation independent person units to –$1,478 (a decrease of about 40 percent from the Model 2 net fiscal impact). Conversely, controlling for education lowers the positive net fiscal impact for second generation units due to the higher educational attainment of second generation independent persons compared to third-plus generation independent persons.

Model 4 incorporates controls for race and ethnicity in addition to the controls already included in Model 3. As noted in the discussion of the Chapter 8 regression analyses, race and ethnicity may proxy for differences

---

[21]The coefficients on calendar years 2012 and 2013 (relative to the comparison group for calendar year 2011) in Model 2 are –34 and –72, respectively, and are not statistically significant.

[22]The coefficient on male (relative to the female comparison group) in Model 2 is 1,689 and is statistically significant at the 1 percent level. However, when we introduce a control for income in our final model the coefficient on male is –36 and no longer statistically significant.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

in treatment and opportunity, affecting earnings opportunities and possibly labor force participation. Under Model 4, the first-to-third-plus generation gap in net fiscal impact closes further (to just –$1,166) and the independent person units in the second generation show a small increase (going from +$422 to +$565) in their net fiscal impact relative to units in the third-plus generation.

Controlling for the number of dependent children (Model 5) has a dramatic effect on the relative costs of an average unit in the first and second generations, relative to an average third-plus generation unit. Because first generation independent person units have more dependent children on average compared with third-plus generation units (0.52 versus 0.36), they incur higher public education costs when education expenditures are assigned fully to school-aged children rather than a portion being considered a public good. Controlling for the number of dependents decreases the negative net fiscal impact of a unit in the first generation relative to third-plus generation units by close to $500 (going from –$1,166 to –$706). In contrast, due to having fewer dependent children as compared to third-plus generation independent individuals, the fiscal benefit of second generation units relative to third-plus generation independent person units declines by about half (to +$258), compared to the fiscal benefit before controlling for dependents (Model 4). The coefficient on number of dependents indicates that, for each additional dependent child, an independent person unit's net fiscal impact is decreased by almost $9,750.[23]

Finally, Model 6 in Table 9-8 shows how the net impact changes when AGI is controlled for in the regression. With average incomes for first generation independent person units being the lowest of the three generations (see Table 9-16 in the Technical Annex to this chapter), they contribute less to state and local tax revenues and are more likely to receive government benefits. Adding income to the control variables already included in Model 5 further diminishes the difference in net fiscal impact between independent person units in the first and third-plus generations to just –$421, and the difference between independent person units in the second and third-plus generations is not statistically significant. The Model 6 coefficient on AGI indicates that for each additional $100 of income, a unit's net fiscal impact is made more positive by about $11.[24] Thus, after adding controls for age group, year, sex, education, race and ethnicity, number of dependents, and income, the average negative net fiscal impact of the first generation units relative to independent person units in the third-plus generation is

---

[23]The coefficient on the number of dependents in Model 5 is –9,739 and is significant at the 1 percent level.

[24]The coefficient on AGI in Model 6 is 0.107 and is statistically significant at the 1 percent level.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

significantly diminished. **Demographic and economic characteristics of first generation independent person units account for close to –$2,500 of the original –$2,931 gap relative to third-plus generation units.** These characteristics also account for all of the positive contribution of second generation independent person units relative to the third-plus generation units.

When the regression analysis sample is limited to independent person units living in the 14 states and the District of Columbia in which at least one-quarter of all independent persons belong to the first or second generation, the results for the first generation are similar to those in the sample that includes all states. Demographic and economic characteristics of first generation independent person units in these jurisdictions account for close to $3,100 of their original $3,383 net fiscal cost relative to a unit in the third-plus generation. For second generation units in these jurisdictions, the initial difference in fiscal impact compared with third-plus generation independent person units is statistically insignificant, but after controlling for demographic and economic characteristics, a second generation unit would contribute $150 more than an average third-plus generation unit.

## 9.7  ALTERNATIVE TREATMENTS OF EDUCATION COSTS

As noted in Section 9.6, much of the differential expenditure burden for first generation independent person units comes from the cost of educating the dependent children in the unit. However, these children will grow up to be higher contributing second generation adults. In our baseline estimates, the panel assigned the cost of education to families that include children attending school. This means K-12 costs are assigned based on the presence of school-age children and public higher education payments are assigned to independent persons who are either attending, or have a dependent attending, an institution of higher education. This allocation ignores the future public benefit of education to those with and without children and the benefit to society of a better educated population. On average, K-12 spending per student is almost $9,000 in the United States as a whole but varies from $5,400 per pupil in Utah and $5,550 in Arizona to $26,950 in the District of Columbia.

To examine the possible public benefit spillovers, the panel re-ran the baseline estimates with various alternative assumptions about who receives the benefit (or would be responsible for the cost) of K-12 and public higher education. We first assigned half of the cost of K-12 education accruing to state and local governments to everyone within the state (including all independent and dependent persons) on a per capita basis. The remaining half was assigned to students as in the baseline scenario. This approach recognizes a level of public value to others of school spending. Table 9-9 shows how these differences in assigning education expenses affect estimates of

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

the relative costs for the United States as a whole and for specific states. Allocating half of K-12 expenses per capita in this manner, the net fiscal burden of first generation independent units declines by about $250 per independent unit (a change in net fiscal impact from –$1,600 to –$1,350). The costs borne by second generation independent person units increase by about $150 per unit, reflecting the lower number of dependents for second generation independent units overall; costs remain about the same for the third-plus generation units under this alternative scenario.

If we instead allocate half of the K-12 expenditures to just the independent persons, rather than to all persons, and the remaining half to students, the net fiscal impact of first generation units becomes –$1,250 and the second and third-plus generations have small increases in the costs they bear. This reduces the difference in net costs between first and third-plus generation independent person units from $2,900 to $2,500. Row 4 of Table 9-9 shows the results of assigning half of state and local spending on both K-12 and higher education to just the independent persons. Including higher education spending in this assignment approach has little effect on relative revenues and expenditures as reflected in the U.S. averages for independent person units in the first and third-plus generations.

The lower three panels of Table 9-9 illustrate, for specific states, how independent person units in the generations fare when education expenses are allocated differently. Most of the changes are small, but when we allocated half of the K-12 education benefits in California to independent persons, the net cost of first generation units declined by $300, with a similar decline in the net benefit from units in the second and third-plus generations. Interestingly, second generation Californian independent person units have increased fiscal contributions to the state under the scenario in which half of K-12 and higher education costs are attributed to all independent persons. This reflects higher-than-average usage of higher education by second generation Californians. Similarly, how educational expenses are allocated in New Jersey affects the relative costs and benefits between units in the first and second generations, with the relative benefits for third-plus generation units staying fairly constant.

## 9.8 MARGINAL VERSUS AVERAGE FIXED COSTS

*The New Americans* (National Research Council, 1997) included a theoretical discussion of the relative cost of a new immigrant family in terms of its marginal cost to governments. However, most of that report's estimates of household level state and local finances were based on allocating revenues and expenditures across existing immigrant and nonimmigrant households on an average cost basis; the same was true for that report's treatment of federal spending (with the exception of national defense).

002885

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-9** Net Difference between State and Local Revenues and Expenditures per Independent Person Unit with Alternative Assignment of Education Expenditures (rounded to nearest $50), by Immigrant Generation, 2011-2013

| State | Immigrant Generation | | |
|---|---|---|---|
| | First | Second | Third+ |
| **All 51 States** | | | |
| Education expenditures to students | –$1,600 | $1,700 | $1,300 |
| Half of K-12 expenditures to students, half to all as public good | –1,350 | 1,550 | 1,300 |
| Half of K-12 expenditures to students, half to all independents as public good | –1,250 | 1,450 | 1,250 |
| Half of K-12 and higher education expenditures to students, half to all independents as public good | –1,250 | 1,650 | 1,250 |
| **Top 15 States by % in First Generation** | | | |
| Education expenditures to students | –$1,700 | $1,650 | $1,650 |
| Half of K-12 expenditures to students, half to all as public good | –1,500 | 1,450 | 1,600 |
| Half of K-12 expenditures to students, half to all independents as public good | –1,400 | 1,400 | 1,550 |
| Half of K-12 and higher education expenditures to students, half to all independents as public good | –1,400 | 1,600 | 1,550 |
| **California** | | | |
| Education expenditures to students | –$2,050 | $1,550 | $3,100 |
| Half of K-12 expenditures to students, half to all as public good | –1,850 | 1,450 | 2,950 |
| Half of K-12 expenditures to students, half to all independents as public good | 1,750 | 1,400 | 2,900 |
| Half of K-12 and higher education expenditures to students, half to all independents as public good | 1,850 | 1,700 | 2,900 |
| **Florida** | | | |
| Education expenditures to students | –$350 | $1,200 | $1,350 |
| Half of K-12 expenditures to students, half to all as public good | –300 | 1,150 | 1,300 |
| Half of K-12 expenditures to students, half to all independents as public good | –250 | 1,100 | 1,300 |
| Half of K-12 and higher education expenditures to students, half to all independents as public good | –200 | 1,250 | 1,250 |
| **New Jersey** | | | |
| Education expenditures to students | –$1,850 | $2,300 | $700 |
| Half of K-12 expenditures to students, half to all as public good | –1,550 | 1,800 | 700 |
| Half of K-12 expenditures to students, half to all independents as public good | –1,450 | 1,600 | 700 |

002886

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2894 of 4699 PageID #:  6059

The Economic and Fiscal Consequences of Immigration

**TABLE 9-9** Continued

| State | Immigrant Generation | | |
|---|---|---|---|
| | First | Second | Third+ |
| Half of K-12 and higher education expenditures to students, half to all independents as public good | –1,550 | 1,750 | 700 |

NOTE: See text for construction of revenues and expenditures by state and generation.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

The evidence on the public versus private nature of government-provided services is mixed. Whereas total public spending no doubt increases with the size of the population, some categories of spending are likely to be unaffected, at least for a small increase in immigrant population and in the short run.

For the analyses in this chapter, about half of all spending (and revenues) is allocated based on personal or family attributes. But for many spending categories such as public safety, hospitals, and libraries, the costs have been allocated across all persons (both independent and dependent). Similarly, some revenue sources—such as transfers from the federal government for roads and those from natural resource extraction, which would be the same even if there were more new immigrants—are allocated on a per capita basis. While the panel did not specify which particular expenditures are public goods, it is important to highlight that some of these fixed costs are not higher due to the presence of immigrants.[25] The amounts of these fixed costs assigned to second and third-plus generation persons are lower than they otherwise would be due to the presence of more first generation arrivals as these costs become spread across a larger population. Not surprisingly, the implicit savings to nonimmigrants created by spreading fixed costs across a larger population varies with the population share in the first generation. For some communities, especially those facing declining populations, the influx of new immigrants can help lower their fixed costs. Indeed, for some costs, notably capital expenditures, bond repayments, and public pension obligations, the benefits of the government spending may have been received by earlier generations so having a larger population to pay off these debts benefits the existing population.

While not definitive, Table 9-10 highlights the difference in fiscal gaps that results from changing from an approach in which the fixed revenues

---

[25]Fixed costs are the part of expenses that do not change with the addition of another individual.

002887

Copyright National Academy of Sciences. All rights reserved.

*540*        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

and fixed costs for public goods are allocated to all individuals to a marginal allocation in which they are allocated only to second and third-plus generation independent persons and their dependents. When these fixed revenues and expenditures are assigned only to second and third-plus generation independents and their dependents on a per-person basis, instead of being assigned evenly to persons from all generations—thus assuming a marginal amount of zero to first generation independents and their dependents—the negative gap in net fiscal impact between first and third-plus generation independent person units decreases (in absolute terms) from –$2,900 to –$450 (Table 9-10). Thus, part of the higher fiscal costs for first generation independent units found in most of the analyses in this chapter are from these fixed costs. Under the assumption that first generation independent person units do not bear these costs, net positive fiscal impacts decrease or turn negative for second and third-plus generation independent person units—and these cost increases are highest in the states with more immigrants. For the 15 jurisdictions with the largest percentage of their populations in the first generation, the fiscal cost gap between first and third-plus generation independent person units closes from –$3,400 to –$150. In terms of overall fiscal impact, in California, for example, if these fixed costs (and revenues) were only allocated to second and third-plus generation independent persons and their dependents, the state's first generation independent person units change from generating a large net negative burden for the state to making a net positive contribution (going from generating a net cost of $2,050 to a net fiscal benefit of $1,050—about $400 less than that of third-plus generation independent units under a marginal allocation). As the share of the population that is composed of first generation independent person units declines, the impact of shifting from an average to a marginal allocation of these fixed revenues and expenditures diminishes.

Note that, if one were to only shift the fixed costs (and revenues) currently being borne by *new* immigrants who have arrived since 2006 (rather than all first generation individuals) to the remaining population (including other first generation individuals previously resident), the fixed costs for the rest of the population (both independent and dependent) would increase by about $50 per independent person unit; and, in most states, recent immigrants would provide a net fiscal benefit. Again, the size of the shift in costs depends on the number and makeup of recent immigrant families. For example, the increase in net fiscal costs for nonrecent first generation independent person units in California would be about $100. This alternative approach recognizes that, in many states, first generation independent persons are long-term residents of this country.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

### 9.9 CONCLUSIONS

While previous chapters have highlighted the role immigrants play in affecting federal budgets and in their impact across state and local governments combined, it is important to recognize that **the burdens and contributions to fiscal balance sheets vary tremendously across states.**[26] Under the strictest set of assumptions, in which all costs of public education fall on the parents of those being educated and in which the cost of public goods are shared across the population equally, first generation independent person units are estimated to be the most costly relative to second and third-plus generation units. **For the 2011-2013 period, first generation independent person units incurred a net cost on average of $1,600 per unit per year, compared to a net benefit of $1,700 for second generation independent person units and $1,300 for third-plus generation units.**

Most states follow the national pattern in which units in the second generation contribute the most per unit due to slightly higher incomes and fewer average dependents, but this is not the case in California. Additionally, among the 15 states with the most first and second generation independent individuals, California has the largest difference, $5,150, between the fiscal shortfall of independent person units in the first generation (–$2,050) and the fiscal benefit of units in the third-plus generation ($3,100), while Maryland has the smallest difference at $650. In Maryland, independent person units in the second generation generate an even higher level of per-unit fiscal benefit ($2,050) than do units in the third-plus generation ($550), while in California, the positive fiscal impact of units in the second generation, at $1,550, falls short of that for units in the third-plus generation. Both states have progressive income taxes, and some of these differences appear to be related to Maryland having a larger percentage of first and second generation independent persons with more than a bachelor's degree. In many of the states with the fewest first generation independent person units, the difference in relative contribution between units in the first and third-plus generations is negligible, while units in the second generation contribute more to a state's bottom line.

**The relative contribution or burden of any independent person unit is driven largely by that unit's demographic and economic characteristics—most notably the number of dependents in the unit and the unit's income levels.** Because first generation units tend to have less income and more dependents than units in the second or third-plus generation, they are more costly to state and local governments. However, the children of

---

[26]Fiscal impacts also vary widely at substate levels. Ideally, our analysis would estimate impacts at city and county levels, as insights about local jurisdictional responsibilities and benefits are of great interest to those governments. However, for the kinds of analyses done here, it is not possible to analyze at the local level with the available data, due to sample size limitations.

002889

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-10** Net Difference between State and Local Revenues and Expenditures per Independent Person Unit with a Marginal Allocation of Fixed Revenues and Expenditures[a] (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation | | | All | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | | |
| California | $1,050 | –$150 | $1,450 | $1,050 | –$350 |
| New Jersey | 750 | 1,350 | –300 | 200 | 1,000 |
| New York | 1,750 | 3,250 | 1,350 | 1,700 | 400 |
| Nevada | 1,100 | 200 | 1,200 | 1,050 | –100 |
| Florida | 850 | 850 | 950 | 950 | –100 |
| Texas | –1,150 | –650 | 1,150 | 450 | –2,250 |
| Hawaii | 2,150 | 550 | 950 | 1,150 | 1,200 |
| Maryland | 2,100 | 1,550 | 50 | 550 | 2,050 |
| Arizona | –450 | 0 | 1,550 | 1,000 | –1,950 |
| District of Columbia | 2,200 | 6,150 | –2,350 | –850 | 4,550 |
| Massachusetts | –100 | 1,850 | 50 | 250 | –150 |
| Illinois | 300 | –50 | 350 | 350 | –50 |
| Washington | –250 | 100 | 200 | 100 | –450 |
| Connecticut | 2,800 | 2,950 | 600 | 1,250 | 2,200 |
| Rhode Island | –950 | 2,000 | 1,500 | 1,150 | –2,450 |
| Virginia | 1,200 | 1,000 | 500 | 650 | 700 |
| Delaware | 600 | 1,900 | 600 | 650 | 0 |
| Georgia | –100 | 500 | 650 | 550 | –750 |
| New Mexico | –3,600 | 400 | 1,150 | 550 | –4,700 |
| Oregon | –1,200 | 2,150 | 1,600 | 1,300 | –2,800 |
| Colorado | –550 | 800 | 600 | 500 | –1,200 |
| Alaska | –5,500 | 7,000 | 7,950 | 6,450 | –13,450 |
| Nebraska | –950 | 1,350 | 1,750 | 1,450 | –2,700 |
| Idaho | –800 | 600 | 1,500 | 1,200 | –2,300 |
| North Carolina | 50 | 1,650 | 1,450 | 1,300 | –1,350 |
| Utah | –700 | –600 | 400 | 250 | –1,100 |
| Michigan | 200 | 2,500 | 750 | 800 | –550 |
| Minnesota | –3,500 | 3,150 | 2,050 | 1,600 | –5,550 |
| Kansas | –900 | 1,050 | 1,050 | 850 | –1,900 |
| Pennsylvania | 250 | 1,650 | 150 | 250 | 150 |
| Iowa | –300 | 2,500 | 1,500 | 1,450 | –1,850 |
| New Hampshire | 850 | 1,650 | 450 | 600 | 400 |
| Wisconsin | –2,000 | 1,450 | 1,450 | 1,250 | –3,450 |
| Tennessee | –550 | 1,250 | 750 | 700 | –1,300 |
| Arkansas | –1,200 | 1,650 | 1,450 | 1,300 | –2,650 |

*continued*

002890

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-10** Continued

| State | Immigrant Generation | | | All | Difference: First less Third+ |
|---|---|---|---|---|---|
| | First | Second | Third+ | | |
| Kentucky | –250 | 2,400 | 50 | 100 | –300 |
| South Carolina | 450 | 2,400 | 550 | 600 | –100 |
| Oklahoma | –300 | 2,000 | 1,500 | 1,450 | –1,800 |
| Vermont | 800 | 3,350 | 1,000 | 1,150 | –150 |
| Indiana | 1,150 | 1,700 | 1,000 | 1,050 | 150 |
| Ohio | 1,400 | 3,600 | 1,450 | 1,550 | –50 |
| Louisiana | 850 | –1,150 | –300 | –250 | 1,150 |
| Missouri | 600 | 2,200 | 1,200 | 1,200 | –550 |
| South Dakota | 850 | 1,450 | 1,800 | 1,750 | –950 |
| Alabama | –850 | 2,500 | 550 | 550 | –1,400 |
| Maine | 700 | 2,400 | 700 | 850 | 0 |
| North Dakota | 850 | 5,600 | 5,500 | 5,350 | –4,650 |
| Wyoming | –800 | 3,650 | 3,500 | 3,400 | –4,300 |
| Montana | 2,400 | 1,200 | 900 | 950 | 1,500 |
| Mississippi | 750 | 2,650 | 1,400 | 1,400 | –650 |
| West Virginia | –500 | 3,850 | 1,500 | 1,550 | –2,000 |
| Top 15 States by % in First Generation | 700 | 700 | 900 | 800 | –150 |
| United States | 500 | 1,000 | 950 | 900 | –450 |

NOTES: Fixed revenue flows include other revenues and intergovernmental revenues (see Table 9-11 in the Technical Annex to this chapter for more information). Fixed expenditure flows include expenditures on other education and libraries, public welfare vendor payments to private vendors and administration expenditures, and other expenditures and capital outlays (see Table 9-12 in the Technical Annex to this chapter for more information). See text for more detail on the construction of revenues and expenditures by state and generation. Because the difference between first and third-plus generation net difference (revenue less expenditure) amounts is taken from the unrounded estimates and then rounded to the nearest $50, the value may differ from the first generation column less the third-plus due to rounding in some cases. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be taken when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.

   [a]The marginal cost allocation of fixed expenditures in these estimates reassigns fixed revenues and expenditures to second and third-plus generation independents and their dependent children, rather than assigning them to all individuals (both independent and dependent) in all generations as in the average cost allocation in the baseline estimates (see Table 9-6).

SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

*544*    *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

immigrants who are being educated grow up to become second generation adults, the group that, in general (but not always), contributes the most, when assessed in terms of independent person units, to a given state's fiscal health. In addition, the age distribution of independent persons also affects the relative contribution they make as a unit (with their dependents) to a state's budget. The share of the population that is elderly increases costs and decreases tax revenues to states. While not as costly as dependent children, the smaller share of first generation independent persons who are ages 65 and older offsets some of the costs for states, most notably in the form of Medicaid payments.

**While the characteristics of individuals within an independent person unit affect the relative contribution or burden made by that unit, decisions made by the state and local governments about the level and structure of taxes and services provided also affect the relative burden or contribution of the unit.** In places with higher spending on K-12 schools, for example, the relative cost of units in the first generation is higher than for units in the second or third-plus generation because the first generation units include more dependents.

**The differences in contributions or burdens across generations and states also depend on whether fixed costs are allocated to all persons equally.** The cost of an additional independent person unit in the first generation (or for that matter, an additional unit in any generation) is dampened to the extent that many of the costs that accrue to state and local governments are not sensitive to a small increase in the population. **Using a marginal cost allocation, under which an additional immigrant is presumed not to add to the costs of administering the subset of state and local government services categorized as public goods, leads to more similar estimates of per-unit fiscal impacts across the three generations.** The reason is that expenditures for the second and third-plus generation units increase, while those for first generation units decrease. In this respect, the cross-generation fiscal patterns are quite similar to those presented in Chapter 8 for the national level.

## 9.10  TECHNICAL ANNEX: SUPPLEMENTAL TABLES

This annex includes tables referenced in the text of this chapter but that are not included at the point of reference.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-11**  Census of Governments (COG) State and Local Revenue Flow Types and Allocation Methods

| Revenue Flow Type (% of 2011-2013 COG revenue) | Allocation to Independent Person Units (name of CPS ASEC variable[a] in italics) |
| --- | --- |
| Property Taxes (14%) | CPS ASEC *proptax* if owner household, divided across all independents in the household. Property tax assigned to renters (CPS *ownershp* indicator for paying with cash rent) using the state average of property tax as a percentage of household income for owners from the CPS; property tax set to zero for renters if household income is less than or equal to zero. Difference between the sum of CPS property tax for owners plus property tax assigned to renters and the COG total amount assigned to all independent adults. |
| General Sales Taxes (10%) | State sales tax amounts from IRS tables assigned based on CPS *adjginc* (split between spouses for married filing jointly and less remittances of 5% for first generation) and scaled up to match COG total.[b] |
| Selective Sales Taxes and Public Utilities (5%) | Assigned to all ages 18 and older:<br>▪ Motor fuels sales taxes<br>▪ Tobacco product sales taxes<br>Assigned to all ages 21 and older:<br>▪ Alcoholic beverage sales taxes<br>Assigned to all:<br>▪ Public utilities and other selective sales taxes |
| Individual Income Taxes (9%) | CPS *stataxac* scaled to match COG amount (split between spouses for married filing jointly). |
| Business Taxes (3%) | Assigned within states based on AGI distribution:<br>▪ Corporate income tax (split between spouses for married filing jointly); Documentary and stock transfer taxes; Corporations in general license; Alcoholic beverages license; Amusements license; Occupation and business license, NEC |
| Higher Education Charges (3%) | Assigned to all in college (weighted for full time versus half time). |
| School Lunch Sales (<1%) | Taken out of K–12 expenditures (see Table 9-12). |
| Other Education Charges (<1%) | Remaining revenue from education charges assigned to all. |

*continued*

002893

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-11**  Continued

| Revenue Flow Type (% of 2011-2013 COG revenue) | Allocation to Independent Person Units (name of CPS ASEC variable[a] in italics) |
|---|---|
| Insurance Trust Revenues (15%) | Assigned to all people with wage income:<br>• Unemployment compensation contributions<br>• Workers' compensation contributions and other insurance trust revenue<br>Assigned to all state and local government employees:<br>• State and local employee retirement contributions |
| Other Revenues (22%) | Assigned to all:<br>• Taxes: Death and gift taxes; Severance taxes; Taxes NEC<br>• License taxes: Hunting and Fishing license; Public utilities license; Other license taxes<br>• Current charges (excluding education): Hospital; Highways; Air transportation; Parking facilities; Sea and inland port facilities; Natural resources; Parks and recreation; Housing and community development; Sewerage; Solid waste management; Other charges<br>• Miscellaneous general revenue<br>• Utility revenue<br>Assigned to all ages 18 and older:<br>• Motor vehicle license and motor vehicle operator's license<br>Assigned to all ages 21 and older:<br>• Liquor store revenues |
| Intergovernmental Revenues (18%) | COG intergovernmental revenues (from federal government) less COG intergovernmental expenditures (to federal government) assigned to all. |

[a]Variable names reflect CPS data variable names used in the Integrated Public Use Microdata Series.

[b]State sales tax amounts (prior to scaling to COG totals) come from the IRS Optional State and Certain Local Sales Tax Tables. We do not explicitly account for additional local sales taxes but expect them to be captured in scaling to COG totals. The one exception to this is Alaska, which has a statewide local sales tax but no state sales tax; in this case we use the IRS Optional Local Sales Tax Tables for Certain Local Jurisdictions.

002894

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-12**  Census of Governments (COG) State and Local Expenditure Flow Types and Allocation Methods

| Expenditure Flow Type (% of 2011-2013 COG expenditures) | Allocation to Independent Person Units (name of CPS ASEC variable[a] in italics) |
|---|---|
| Higher Education Expenditures (7%) | Amount (less capital outlays) assigned to all in college (weighted for full time versus half time). |
|  | *Alternative—examine if half of the COG expenditure amount assigned to college students as above and the remaining half assigned evenly to all independent individuals in states.* |
| Elementary and Secondary Education Expenditures (16%) | Amount (less capital outlays and school lunch sales) assigned to all in K-12 (weighted for full time versus half time for high schoolers). |
|  | *Alternative—examine if half of the COG expenditure amount assigned to K-12 students as above and the remaining half assigned evenly to all persons or all independent individuals in states.* |
| Other Education Expenditures and Libraries (4%) | Amount (plus capital outlays from higher education and elementary and secondary education) assigned to all. |
| Medicaid/Public Welfare (16%) | Medicaid: CPS *pmvcaid* (for CPS recipients) scaled to match COG vendor payments amount (less the remainder of total Medicaid institutional spending[b] after subtracting out COG spending on institutions for public welfare). |
|  | Other public welfare: CPS *incwelfr* (for CPS recipients) scaled to match COG public welfare spending on SSI, TANF, and other cash assistance. |
|  | Assigned to all:<br>▪ Vendor payments to private vendors for services other than medical<br>▪ Public welfare administration expenditures |
| Insurance Trust Expenditure (11%) | Assigned to all people with wage income:<br>▪ Unemployment compensation<br>▪ Workers' compensation and other insurance trust<br>Assigned to all state and local government employees:<br>▪ State and local employee retirement |

*continued*

002895

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*548*        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

**TABLE 9-12** Continued

| Expenditure Flow Type (% of 2011-2013 COG expenditures) | Allocation to Independent Person Units (name of CPS ASEC variable[a] in italics) |
|---|---|
| Other Expenditures and Capital Outlays (45%) | Assigned to all:<br>• Hospitals; Health; Social insurance administration; Veterans' services; Highways; Air transportation; Parking facilities; Sea and inland; Police protection; Fire protection; Correction; Protective inspection and regulation; Natural resources; Parks and recreation; Housing and community development; Sewerage; Solid waste management; Financial administration; Judicial and legal; General public buildings; Other governmental administration; Interest on general debt; Miscellaneous commercial activities; Other and unallocable<br>• Utility expenditure<br><br>Assigned to all ages 21 and older:<br>• Liquor store expenditure |
| Intergovernmental Expenditure (<1%) | COG intergovernmental expenditure amount (to federal government) taken out of COG intergovernmental revenue amount (from federal government). |

[a]Variable names reflect CPS data variable names used in the Integrated Public Use Microdata Series.

[b]Total Medicaid institutional spending (2% of total 2011-2013 COG expenditures) is taken from the Centers for Medicare & Medicaid Services 2015 report *Medicaid Expenditures for Long-Term Services and Supports in FY 2013*, appendix Table D. See http://www.medicaid.gov/medicaid-chip-program-information/by-topics/long-term-services-and-supports/downloads/ltss-expenditures-fy2013.pdf [November 2016].

002896

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-13** Annualized Weighted Sample Cases of Independent Persons by Immigrant Generation by State, Current Population Survey Annual Social and Economic Supplement for 2011-2013

| State | Immigrant Generation | | | |
| | First | Second | Third+ | Total |
|---|---|---|---|---|
| California | 9,250,306 | 4,136,035 | 13,307,832 | 26,694,173 |
| New Jersey | 1,751,320 | 772,147 | 3,771,057 | 6,294,524 |
| New York | 3,861,185 | 1,723,287 | 8,503,595 | 14,088,067 |
| Nevada | 477,237 | 218,729 | 1,247,935 | 1,943,901 |
| Florida | 3,258,513 | 1,312,743 | 9,763,553 | 14,334,809 |
| Texas | 3,818,671 | 1,756,376 | 12,193,672 | 17,768,719 |
| Hawaii | 205,752 | 150,674 | 621,632 | 978,057 |
| Maryland | 814,468 | 307,380 | 3,159,673 | 4,281,520 |
| Arizona | 865,223 | 531,020 | 3,285,407 | 4,681,650 |
| District of Columbia | 85,316 | 40,448 | 362,412 | 488,176 |
| Massachusetts | 828,697 | 577,464 | 3,447,603 | 4,853,764 |
| Illinois | 1,540,692 | 718,036 | 6,908,763 | 9,167,490 |
| Washington | 822,229 | 482,882 | 3,655,282 | 4,960,393 |
| Connecticut | 415,692 | 293,845 | 1,861,099 | 2,570,636 |
| Rhode Island | 126,085 | 108,649 | 545,477 | 780,212 |
| Virginia | 782,112 | 275,958 | 4,710,072 | 5,768,143 |
| Delaware | 80,814 | 29,431 | 544,748 | 654,993 |
| Georgia | 815,187 | 235,106 | 5,750,442 | 6,800,735 |
| New Mexico | 168,429 | 107,035 | 1,184,370 | 1,459,834 |
| Oregon | 315,531 | 231,330 | 2,288,182 | 2,835,044 |
| Colorado | 398,306 | 264,829 | 2,975,143 | 3,638,278 |
| Alaska | 52,703 | 35,281 | 405,367 | 493,351 |
| Nebraska | 139,263 | 51,548 | 1,124,233 | 1,315,044 |
| Idaho | 107,882 | 57,765 | 928,129 | 1,093,776 |
| North Carolina | 652,743 | 260,141 | 5,944,608 | 6,857,492 |
| Utah | 173,479 | 109,824 | 1,552,991 | 1,836,295 |
| Michigan | 628,807 | 438,991 | 6,003,030 | 7,070,828 |
| Minnesota | 328,484 | 210,376 | 3,320,867 | 3,859,727 |
| Kansas | 160,448 | 83,215 | 1,769,231 | 2,012,894 |
| Pennsylvania | 654,971 | 542,680 | 8,283,510 | 9,481,161 |
| Iowa | 141,651 | 74,120 | 1,979,890 | 2,195,661 |
| New Hampshire | 62,234 | 77,990 | 842,922 | 983,146 |
| Wisconsin | 231,605 | 196,104 | 3,723,672 | 4,151,382 |
| Tennessee | 254,822 | 113,462 | 4,316,184 | 4,684,468 |
| Arkansas | 111,359 | 45,188 | 1,965,865 | 2,122,411 |
| Kentucky | 162,813 | 63,359 | 2,932,800 | 3,158,972 |
| South Carolina | 170,719 | 73,929 | 3,112,174 | 3,356,822 |
| Oklahoma | 134,805 | 85,287 | 2,466,798 | 2,686,889 |
| Vermont | 22,308 | 38,284 | 418,140 | 478,731 |

*continued*

002897

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-13** Continued

| State | Immigrant Generation | | | Total |
|---|---|---|---|---|
| | First | Second | Third+ | |
| Indiana | 207,956 | 166,713 | 4,143,988 | 4,518,657 |
| Ohio | 376,581 | 355,286 | 7,577,243 | 8,309,110 |
| Louisiana | 136,282 | 68,343 | 2,955,957 | 3,160,582 |
| Missouri | 173,581 | 121,130 | 4,056,352 | 4,351,063 |
| South Dakota | 22,998 | 25,087 | 540,674 | 588,759 |
| Alabama | 133,617 | 71,586 | 3,249,440 | 3,454,644 |
| Maine | 34,121 | 75,909 | 907,094 | 1,017,124 |
| North Dakota | 16,025 | 25,584 | 460,026 | 501,636 |
| Wyoming | 13,059 | 15,212 | 385,954 | 414,226 |
| Montana | 19,432 | 41,598 | 678,111 | 739,141 |
| Mississippi | 52,251 | 28,357 | 1,956,632 | 2,037,241 |
| West Virginia | 19,248 | 30,344 | 1,327,807 | 1,377,398 |
| Top 15 States by % in First Generation | 28,121,384 | 13,129,714 | 72,634,993 | 113,886,092 |
| United States | 36,078,012 | 17,856,095 | 169,417,639 | 223,351,747 |

NOTES: See text for definitions of independent person and immigrant generation. These sample counts are the average number of weighted cases classified as independent persons per year in the Current Population Survey Annual Social and Economic Supplement (ASEC) for 2011-2013. Note that these counts are not representative of the annualized total U.S. population in these years because they do not include dependent children. The ASEC includes cases in February, March, and April of each year. Because of the rotation group design, by which addresses are in the sample for 4 months, out for 8 months, and in again for 4 months, the total 3-year sample double-counts individuals who are in the sample in pairs of years (2011-2012 or 2012-2013). States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).
SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002898

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-14** Sum of Unweighted Sample Cases of Independent Persons by Immigrant Generation by State, Current Population Survey Annual Social and Economic Supplement for 2011-2013 Total

| State | Immigrant Generation | | | Total |
|-------|-------|--------|--------|-------|
|       | First | Second | Third+ |       |
| California | 15,823 | 6,653 | 18,173 | 40,649 |
| New Jersey | 2,706 | 983 | 4,899 | 8,588 |
| New York | 5,526 | 2,132 | 10,459 | 18,117 |
| Nevada | 1,901 | 739 | 3,914 | 6,554 |
| Florida | 4,889 | 1,580 | 10,966 | 17,435 |
| Texas | 6,087 | 2,731 | 15,425 | 24,243 |
| Hawaii | 1,725 | 1,216 | 4,838 | 7,779 |
| Maryland | 2,190 | 719 | 7,415 | 10,324 |
| Arizona | 1,232 | 663 | 3,485 | 5,380 |
| District of Columbia | 1,209 | 509 | 4,656 | 6,374 |
| Massachusetts | 1,185 | 697 | 4,338 | 6,220 |
| Illinois | 2,561 | 1,048 | 9,102 | 12,711 |
| Washington | 1,366 | 696 | 5,054 | 7,116 |
| Connecticut | 1,641 | 983 | 6,540 | 9,164 |
| Rhode Island | 1,222 | 894 | 4,589 | 6,705 |
| Virginia | 1,411 | 460 | 7,100 | 8,971 |
| Delaware | 905 | 277 | 5,311 | 6,493 |
| Georgia | 1,267 | 325 | 7,294 | 8,886 |
| New Mexico | 518 | 304 | 3,218 | 4,040 |
| Oregon | 766 | 474 | 4,460 | 5,700 |
| Colorado | 1,209 | 706 | 7,257 | 9,172 |
| Alaska | 587 | 355 | 3,964 | 4,906 |
| Nebraska | 828 | 251 | 5,125 | 6,204 |
| Idaho | 560 | 261 | 3,537 | 4,358 |
| North Carolina | 928 | 311 | 6,909 | 8,148 |
| Utah | 595 | 294 | 4,062 | 4,951 |
| Michigan | 900 | 550 | 7,827 | 9,277 |
| Minnesota | 1,019 | 498 | 7,927 | 9,444 |
| Kansas | 581 | 256 | 4,935 | 5,772 |
| Pennsylvania | 960 | 657 | 10,543 | 12,160 |
| Iowa | 618 | 256 | 6,535 | 7,409 |
| New Hampshire | 560 | 616 | 6,799 | 7,975 |
| Wisconsin | 533 | 355 | 6,759 | 7,647 |
| Tennessee | 330 | 138 | 4,982 | 5,450 |
| Arkansas | 304 | 96 | 3,876 | 4,276 |
| Kentucky | 328 | 115 | 5,280 | 5,723 |
| South Carolina | 311 | 120 | 4,929 | 5,360 |
| Oklahoma | 302 | 162 | 4,603 | 5,067 |
| Vermont | 289 | 436 | 4,816 | 5,541 |

*continued*

002899

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-14** Continued

| State | Immigrant Generation | | | Total |
|---|---|---|---|---|
| | First | Second | Third+ | |
| Indiana | 341 | 226 | 5,391 | 5,958 |
| Ohio | 530 | 434 | 9,492 | 10,456 |
| Louisiana | 192 | 87 | 3,737 | 4,016 |
| Missouri | 284 | 187 | 5,852 | 6,323 |
| South Dakota | 263 | 232 | 5,511 | 6,006 |
| Alabama | 209 | 91 | 4,274 | 4,574 |
| Maine | 243 | 472 | 6,042 | 6,757 |
| North Dakota | 185 | 227 | 4,480 | 4,892 |
| Wyoming | 210 | 193 | 4,879 | 5,282 |
| Montana | 103 | 200 | 3,399 | 3,702 |
| Mississippi | 112 | 51 | 3,734 | 3,897 |
| West Virginia | 70 | 85 | 3,977 | 4,132 |
| Top 15 States by % in First Generation | 51,263 | 22,243 | 113,853 | 187,359 |
| United States | 70,614 | 33,001 | 312,669 | 416,284 |

NOTES: See text for definitions of independent person and immigrant generation. These sample counts are the total number of cases classified as independent persons in each Current Population Survey Annual Social and Economic Supplement (ASEC) for 2011-2013. The annual observations for each state and immigrant generation are approximately one-third of the counts listed above. The ASEC includes cases in February, March, and April of each year. Because of the rotation group design, by which addresses are in the sample for 4 months, out for 8 months, and in again for 4 months, the three-year sample counts shown above double count individuals who are in the sample in pairs of years (2011-2012 or 2012-2013). States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).

SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002900

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-15** Average Number of Children (dependents) per Independent Person Unit, by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation (average number of children per independent person unit) | | | |
|---|---|---|---|---|
| | First | Second | Third+ | All |
| California | 0.52 | 0.39 | 0.34 | 0.41 |
| New Jersey | 0.48 | 0.24 | 0.37 | 0.38 |
| New York | 0.44 | 0.26 | 0.36 | 0.37 |
| Nevada | 0.56 | 0.34 | 0.34 | 0.39 |
| Florida | 0.39 | 0.28 | 0.31 | 0.32 |
| Texas | 0.64 | 0.47 | 0.38 | 0.44 |
| Hawaii | 0.44 | 0.28 | 0.36 | 0.37 |
| | | | | |
| Maryland | 0.47 | 0.23 | 0.35 | 0.36 |
| Arizona | 0.59 | 0.46 | 0.34 | 0.40 |
| District of Columbia | 0.28 | 0.14 | 0.28 | 0.27 |
| Massachusetts | 0.44 | 0.22 | 0.35 | 0.35 |
| Illinois | 0.54 | 0.35 | 0.36 | 0.39 |
| Washington | 0.56 | 0.29 | 0.34 | 0.37 |
| Connecticut | 0.46 | 0.24 | 0.37 | 0.37 |
| Rhode Island | 0.47 | 0.22 | 0.32 | 0.33 |
| | | | | |
| Virginia | 0.51 | 0.40 | 0.35 | 0.38 |
| Delaware | 0.49 | 0.28 | 0.36 | 0.37 |
| Georgia | 0.57 | 0.45 | 0.40 | 0.42 |
| New Mexico | 0.72 | 0.44 | 0.35 | 0.40 |
| Oregon | 0.64 | 0.29 | 0.32 | 0.35 |
| Colorado | 0.63 | 0.34 | 0.36 | 0.39 |
| Alaska | 0.56 | 0.53 | 0.40 | 0.43 |
| Nebraska | 0.64 | 0.33 | 0.36 | 0.39 |
| Idaho | 0.64 | 0.41 | 0.41 | 0.44 |
| North Carolina | 0.61 | 0.39 | 0.36 | 0.39 |
| | | | | |
| Utah | 0.77 | 0.44 | 0.51 | 0.53 |
| Michigan | 0.49 | 0.22 | 0.38 | 0.38 |
| Minnesota | 0.64 | 0.25 | 0.35 | 0.37 |
| Kansas | 0.65 | 0.35 | 0.37 | 0.39 |
| Pennsylvania | 0.50 | 0.19 | 0.33 | 0.33 |
| Iowa | 0.56 | 0.27 | 0.36 | 0.37 |
| New Hampshire | 0.40 | 0.23 | 0.33 | 0.33 |
| Wisconsin | 0.70 | 0.27 | 0.35 | 0.36 |
| | | | | |
| Tennessee | 0.57 | 0.29 | 0.35 | 0.36 |
| Arkansas | 0.64 | 0.4 | 0.35 | 0.37 |
| Kentucky | 0.47 | 0.29 | 0.36 | 0.37 |
| South Carolina | 0.55 | 0.37 | 0.37 | 0.38 |
| Oklahoma | 0.60 | 0.46 | 0.37 | 0.39 |

*continued*

002901

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-15** Continued

| State | Immigrant Generation (average number of children per independent person unit) | | | |
|---|---|---|---|---|
| | First | Second | Third+ | All |
| Vermont | 0.36 | 0.19 | 0.30 | 0.29 |
| Indiana | 0.56 | 0.43 | 0.40 | 0.41 |
| Ohio | 0.43 | 0.27 | 0.37 | 0.37 |
| Louisiana | 0.40 | 0.32 | 0.42 | 0.41 |
| Missouri | 0.46 | 0.34 | 0.36 | 0.36 |
| South Dakota | 0.53 | 0.25 | 0.38 | 0.38 |
| Alabama | 0.74 | 0.23 | 0.37 | 0.38 |
| Maine | 0.40 | 0.18 | 0.30 | 0.30 |
| North Dakota | 0.44 | 0.16 | 0.35 | 0.34 |
| Wyoming | 0.46 | 0.23 | 0.36 | 0.36 |
| Montana | 0.29 | 0.18 | 0.35 | 0.34 |
| Mississippi | 0.52 | 0.28 | 0.43 | 0.43 |
| West Virginia | 0.56 | 0.24 | 0.32 | 0.32 |
| Top 15 States by % in First Generation | 0.51 | 0.34 | 0.35 | 0.39 |
| United States | 0.52 | 0.33 | 0.36 | 0.38 |

NOTE: See text for definitions of independent person unit, dependent person or child, and immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).
SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-16**  Average Adjusted Gross Income (AGI) per Independent Person Unit (rounded to nearest $50), by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation ($ AGI per independent person unit) | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| California | $28,800 | $35,950 | $42,450 | $36,700 |
| New Jersey | 35,700 | 37,900 | 47,250 | 42,900 |
| New York | 28,650 | 37,550 | 39,200 | 36,100 |
| Nevada | 26,650 | 28,250 | 34,700 | 32,000 |
| Florida | 26,350 | 32,050 | 33,800 | 31,950 |
| Texas | 26,100 | 29,850 | 37,550 | 34,300 |
| Hawaii | 28,750 | 29,000 | 36,400 | 33,650 |
| | | | | |
| Maryland | 38,700 | 45,450 | 44,700 | 43,600 |
| Arizona | 25,100 | 28,500 | 36,100 | 33,200 |
| District of Columbia | 41,950 | 74,150 | 55,750 | 54,850 |
| Massachusetts | 35,850 | 41,200 | 43,500 | 41,950 |
| Illinois | 27,650 | 35,200 | 39,850 | 37,450 |
| Washington | 33,300 | 34,800 | 40,900 | 39,050 |
| Connecticut | 40,350 | 43,050 | 47,600 | 45,900 |
| Rhode Island | 29,500 | 29,100 | 39,650 | 36,550 |
| | | | | |
| Virginia | 42,200 | 52,750 | 42,200 | 42,700 |
| Delaware | 33,200 | 32,800 | 33,250 | 33,200 |
| Georgia | 28,200 | 37,450 | 34,000 | 33,450 |
| New Mexico | 31,300 | 33,050 | 34,750 | 34,200 |
| Oregon | 28,650 | 32,850 | 32,800 | 32,350 |
| Colorado | 29,550 | 39,150 | 41,800 | 40,250 |
| Alaska | 33,800 | 43,050 | 39,450 | 39,100 |
| Nebraska | 24,800 | 31,100 | 37,250 | 35,700 |
| Idaho | 23,100 | 28,700 | 31,350 | 30,400 |
| North Carolina | 29,850 | 35,800 | 30,900 | 31,000 |
| | | | | |
| Utah | 27,100 | 31,450 | 34,900 | 33,950 |
| Michigan | 30,700 | 31,900 | 32,650 | 32,400 |
| Minnesota | 28,200 | 34,050 | 39,650 | 38,400 |
| Kansas | 24,750 | 27,550 | 34,850 | 33,750 |
| Pennsylvania | 33,650 | 29,200 | 33,950 | 33,700 |
| Iowa | 26,400 | 25,050 | 33,850 | 33,050 |
| New Hampshire | 41,850 | 35,100 | 41,100 | 40,650 |
| Wisconsin | 24,200 | 29,900 | 34,900 | 34,100 |
| | | | | |
| Tennessee | 28,650 | 27,500 | 28,500 | 28,500 |
| Arkansas | 23,500 | 31,550 | 25,950 | 25,950 |
| Kentucky | 22,550 | 35,650 | 27,500 | 27,450 |
| South Carolina | 30,350 | 37,500 | 27,550 | 27,900 |

*continued*

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-16** Continued

| State | Immigrant Generation ($ AGI per independent person unit) | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| Oklahoma | 32,300 | 37,000 | 32,300 | 32,450 |
| Vermont | 31,550 | 34,000 | 34,750 | 34,500 |
| Indiana | 35,400 | 32,300 | 30,900 | 31,150 |
| Ohio | 28,150 | 38,450 | 30,850 | 31,050 |
| Louisiana | 20,850 | 25,950 | 29,200 | 28,800 |
| Missouri | 29,550 | 33,750 | 34,000 | 33,800 |
| South Dakota | 24,150 | 23,150 | 32,800 | 32,050 |
| Alabama | 28,250 | 39,650 | 30,050 | 30,150 |
| Maine | 32,750 | 28,400 | 32,050 | 31,800 |
| North Dakota | 37,000 | 22,650 | 39,800 | 38,850 |
| Wyoming | 27,100 | 30,300 | 35,800 | 35,300 |
| Montana | 23,450 | 21,650 | 28,900 | 28,350 |
| Mississippi | 30,000 | 30,550 | 26,850 | 27,000 |
| West Virginia | 36,150 | 39,450 | 28,200 | 28,600 |
| Top 15 States by % in First Generation | 29,150 | 35,150 | 39,850 | 36,700 |
| United States | 29,450 | 34,900 | 35,900 | 34,800 |

NOTES: See text for definitions of independent person unit and immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).
SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002904

Copyright National Academy of Sciences. All rights reserved.

**TABLE 9-17** Percentage with Less Than a High School Degree (<HS) and More Than a Bachelor's Degree (>BA), Independent Persons by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation (independent persons) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | First | | Second | | Third+ | | All | |
| | <HS | >BA | <HS | >BA | <HS | >BA | <HS | >BA |
| California | 34 | 8 | 10 | 10 | 7 | 12 | 17 | 11 |
| New Jersey | 18 | 13 | 9 | 15 | 7 | 12 | 10 | 13 |
| New York | 22 | 11 | 9 | 16 | 9 | 14 | 13 | 13 |
| Nevada | 26 | 6 | 13 | 6 | 7 | 8 | 12 | 8 |
| Florida | 19 | 8 | 6 | 13 | 8 | 10 | 10 | 10 |
| Texas | 43 | 7 | 18 | 8 | 10 | 9 | 18 | 8 |
| Hawaii | 17 | 8 | 8 | 9 | 4 | 10 | 8 | 10 |
| Maryland | 19 | 21 | 4 | 23 | 8 | 15 | 10 | 16 |
| Arizona | 36 | 9 | 12 | 9 | 8 | 11 | 14 | 11 |
| District of Columbia | 23 | 27 | 3 | 45 | 8 | 28 | 10 | 29 |
| Massachusetts | 19 | 17 | 6 | 22 | 7 | 17 | 9 | 17 |
| Illinois | 26 | 12 | 8 | 13 | 7 | 11 | 10 | 11 |
| Washington | 25 | 12 | 7 | 12 | 5 | 11 | 9 | 11 |
| Connecticut | 17 | 19 | 9 | 16 | 7 | 16 | 9 | 17 |
| Rhode Island | 33 | 9 | 13 | 11 | 9 | 13 | 14 | 12 |
| Virginia | 16 | 17 | 4 | 19 | 9 | 13 | 10 | 14 |
| Delaware | 27 | 14 | 5 | 11 | 8 | 9 | 10 | 10 |
| Georgia | 23 | 12 | 6 | 14 | 10 | 9 | 12 | 10 |
| New Mexico | 40 | 12 | 14 | 17 | 11 | 14 | 15 | 14 |
| Oregon | 25 | 12 | 4 | 16 | 7 | 10 | 9 | 11 |
| Colorado | 37 | 10 | 9 | 14 | 5 | 14 | 9 | 13 |
| Alaska | 18 | 8 | 11 | 7 | 7 | 9 | 8 | 8 |

continued

002905

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*558*

**TABLE 9-17** Continued

| State | Immigrant Generation (independent persons) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | First | | Second | | Third+ | | All | |
| | <HS | >BA | <HS | >BA | <HS | >BA | <HS | >BA |
| Nebraska | 45 | 9 | 10 | 6 | 5 | 9 | 9 | 9 |
| Idaho | 45 | 6 | 12 | 9 | 6 | 8 | 10 | 8 |
| North Carolina | 32 | 12 | 13 | 16 | 11 | 9 | 13 | 9 |
| Utah | 30 | 9 | 8 | 10 | 6 | 9 | 8 | 9 |
| Michigan | 19 | 19 | 7 | 16 | 8 | 9 | 9 | 10 |
| Minnesota | 26 | 13 | 8 | 10 | 5 | 9 | 7 | 10 |
| Kansas | 31 | 15 | 14 | 17 | 6 | 11 | 9 | 11 |
| Pennsylvania | 14 | 17 | 10 | 12 | 10 | 9 | 10 | 9 |
| Iowa | 37 | 13 | 13 | 12 | 8 | 7 | 10 | 7 |
| New Hampshire | 10 | 19 | 8 | 14 | 6 | 12 | 7 | 12 |
| Wisconsin | 31 | 12 | 13 | 12 | 6 | 9 | 8 | 9 |
| Tennessee | 31 | 8 | 7 | 6 | 12 | 8 | 13 | 8 |
| Arkansas | 37 | 10 | 9 | 5 | 13 | 6 | 14 | 6 |
| Kentucky | 24 | 17 | 4 | 13 | 13 | 7 | 13 | 8 |
| South Carolina | 24 | 16 | 8 | 17 | 13 | 9 | 13 | 9 |
| Oklahoma | 31 | 14 | 17 | 13 | 9 | 8 | 10 | 9 |
| Vermont | 12 | 15 | 8 | 16 | 8 | 13 | 8 | 13 |
| Indiana | 32 | 14 | 10 | 6 | 9 | 8 | 10 | 8 |
| Ohio | 22 | 15 | 8 | 12 | 10 | 7 | 11 | 8 |
| Louisiana | 26 | 7 | 6 | 10 | 14 | 7 | 14 | 7 |
| Missouri | 18 | 21 | 14 | 19 | 11 | 9 | 11 | 10 |
| South Dakota | 33 | 10 | 17 | 4 | 7 | 7 | 9 | 7 |
| Alabama | 42 | 14 | 9 | 14 | 13 | 9 | 14 | 9 |

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

559

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Maine | 14 | 19 | 14 | 10 | 8 | 9 | 8 | 10 |
| North Dakota | 16 | 18 | 19 | 5 | 6 | 7 | 7 | 7 |
| Wyoming | 26 | 12 | 14 | 5 | 7 | 7 | 8 | 7 |
| Montana | 11 | 14 | 8 | 10 | 6 | 9 | 6 | 9 |
| Mississippi | 21 | 9 | NA | 8 | 16 | 7 | 16 | 7 |
| West Virginia | 8 | 39 | 3 | 12 | 13 | 7 | 13 | 8 |
| Top 15 States by % in First Generation | 29 | 10 | 10 | 12 | 8 | 12 | 13 | 11 |
| United States | 28 | 11 | 10 | 12 | 9 | 10 | 12 | 10 |

NOTES: See text for definitions of independent person and immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). NA: Not available (Mississippi has no sample persons in this category).

SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002907

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-18** Net Difference between State and Local Revenues and Expenditures per Independent Person Unit (rounded to nearest $50), Including Coefficient of Variation Below, by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| California | –$2,050 | $1,550 | $3,100 | $1,050 |
| | (9%) | (15%) | (6%) | (13%) |
| New Jersey | –1,850 | 2,300 | 700 | 200 |
| | (23%) | (15%) | (45%) | (130%) |
| New York | –1,500 | 4,400 | 2,600 | 1,700 |
| | (24%) | (12%) | (12%) | (15%) |
| Nevada | –1,300 | 1,000 | 1,950 | 1,050 |
| | (24%) | (38%) | (9%) | (16%) |
| Florida | –350 | 1,200 | 1,350 | 950 |
| | (46%) | (20%) | (9%) | (10%) |
| Texas | –2,050 | –400 | 1,400 | 450 |
| | (9%) | (68%) | (9%) | (23%) |
| Hawaii | –700 | 1,250 | 1,700 | 1,150 |
| | (77%) | (26%) | (13%) | (19%) |
| Maryland | –100 | 2,050 | 550 | 550 |
| | (407%) | (24%) | (37%) | (33%) |
| Arizona | –1,350 | 250 | 1,750 | 1,000 |
| | (32%) | (172%) | (15%) | (20%) |
| District of Columbia | –2,800 | 7,100 | –1,300 | –850 |
| | (35%) | (14%) | (48%) | (60%) |
| Massachusetts | –2,250 | 2,300 | 500 | 250 |
| | (23%) | (24%) | (61%) | (116%) |
| Illinois | –2,700 | 550 | 1,000 | 350 |
| | (13%) | (72%) | (17%) | (50%) |
| Washington | –3,050 | 600 | 750 | 100 |
| | (22%) | (76%) | (35%) | (196%) |
| Connecticut | –600 | 3,550 | 1,300 | 1,250 |
| | (66%) | (10%) | (20%) | (16%) |
| Rhode Island | –1,500 | 2,100 | 1,600 | 1,150 |
| | (33%) | (18%) | (16%) | (20%) |
| Virginia | –600 | 1,300 | 800 | 650 |
| | (73%) | (48%) | (23%) | (25%) |
| Delaware | –500 | 2,050 | 750 | 650 |
| | (130%) | (33%) | (36%) | (39%) |
| Georgia | –1,250 | 650 | 800 | 550 |
| | (29%) | (103%) | (18%) | (24%) |

002908

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-18** Continued

| State | Immigrant Generation | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| New Mexico | −2,550 | 250 | 1,000 | 550 |
| | (30%) | (338%) | (27%) | (46%) |
| Oregon | −1,900 | 2,250 | 1,650 | 1,300 |
| | (36%) | (29%) | (15%) | (17%) |
| Colorado | −2,950 | 1,050 | 900 | 500 |
| | (14%) | (31%) | (20%) | (37%) |
| Alaska | 3,950 | 5,800 | 6,850 | 6,450 |
| | (31%) | (21%) | (5%) | (6%) |
| Nebraska | −2,200 | 1,500 | 1,900 | 1,450 |
| | (29%) | (45%) | (13%) | (14%) |
| Idaho | −1,050 | 600 | 1,500 | 1,200 |
| | (50%) | (89%) | (21%) | (25%) |
| North Carolina | −650 | 1,700 | 1,500 | 1,300 |
| | (74%) | (43%) | (12%) | (14%) |
| Utah | −1,950 | −450 | 500 | 250 |
| | (31%) | (146%) | (36%) | (82%) |
| Michigan | −250 | 2,550 | 800 | 800 |
| | (189%) | (18%) | (18%) | (18%) |
| Minnesota | −5,100 | 3,250 | 2,200 | 1,600 |
| | (18%) | (20%) | (11%) | (14%) |
| Kansas | −2,450 | 1,150 | 1,150 | 850 |
| | (37%) | (57%) | (16%) | (23%) |
| Pennsylvania | −1,250 | 1,750 | 250 | 250 |
| | (41%) | (23%) | (56%) | (57%) |
| Iowa | −1,000 | 2,550 | 1,550 | 1,450 |
| | (58%) | (24%) | (14%) | (15%) |
| New Hampshire | −550 | 1,750 | 550 | 600 |
| | (104%) | (19%) | (26%) | (23%) |
| Wisconsin | −3,650 | 1,550 | 1,550 | 1,250 |
| | (23%) | (43%) | (11%) | (16%) |
| Tennessee | −700 | 1,250 | 750 | 700 |
| | (71%) | (60%) | (27%) | (27%) |
| Arkansas | −1,200 | 1,650 | 1,450 | 1,300 |
| | (89%) | (72%) | (17%) | (18%) |
| Kentucky | −950 | 2,400 | 100 | 100 |
| | (77%) | (38%) | (156%) | (170%) |
| South Carolina | 150 | 2,400 | 550 | 600 |
| | (441%) | (42%) | (31%) | (28%) |
| Oklahoma | 200 | 1,950 | 1,500 | 1,450 |
| | (345%) | (44%) | (12%) | (12%) |

*continued*

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-18** Continued

| State | Immigrant Generation | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| Vermont | 250 | 3,400 | 1,000 | 1,150 |
| | (414%) | (16%) | (23%) | (19%) |
| Indiana | 150 | 1,750 | 1,050 | 1,050 |
| | (574%) | (36%) | (14%) | (14%) |
| Ohio | 450 | 3,650 | 1,500 | 1,550 |
| | (153%) | (18%) | (12%) | (11%) |
| Louisiana | –400 | –1,100 | –250 | –250 |
| | (211%) | (99%) | (97%) | (88%) |
| Missouri | –150 | 2,250 | 1,200 | 1,200 |
| | (478%) | (37%) | (22%) | (23%) |
| South Dakota | –550 | 1,500 | 1,850 | 1,750 |
| | (169%) | (42%) | (13%) | (13%) |
| Alabama | –1,100 | 2,500 | 550 | 550 |
| | (86%) | (39%) | (33%) | (35%) |
| Maine | –350 | 2,450 | 750 | 850 |
| | (360%) | (17%) | (26%) | (22%) |
| North Dakota | 3,250 | 5,500 | 5,400 | 5,350 |
| | (33%) | (12%) | (4%) | (4%) |
| Wyoming | 1,300 | 3,550 | 3,450 | 3,400 |
| | (61%) | (21%) | (6%) | (5%) |
| Montana | 1,850 | 1,250 | 950 | 950 |
| | (54%) | (69%) | (32%) | (32%) |
| Mississippi | 1,300 | 2,600 | 1,350 | 1,400 |
| | (110%) | (52%) | (19%) | (19%) |
| West Virginia | 550 | 3,850 | 1,500 | 1,550 |
| | (250%) | (24%) | (18%) | (17%) |
| United States | –1,600 | 1,700 | 1,300 | 900 |
| | (5%) | (6%) | (3%) | (4%) |

NOTES: See text for construction of revenues and expenditures by state and generation. Coefficient of variation (CV) = standard error divided by the estimate; generally estimates with a CV of less than or equal to 10 percent of the estimate are considered statistically reliable in the profession. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2). Caution should be taken when examining the state-level estimates, especially those near the bottom of the table, because of small first (and second) generation populations for many states.
SOURCE: Panel estimates implemented on the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002910

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-19** Average Household Size per Household Unit, by Immigrant Generation by State, 2011-2013

| State | Immigrant Generation (household units) | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| | 3.35 | 2.85 | 2.41 | 2.77 |
| California | | | | |
| New Jersey | 3.13 | 2.17 | 2.48 | 2.60 |
| New York | 2.77 | 2.22 | 2.34 | 2.43 |
| Nevada | 3.19 | 2.51 | 2.36 | 2.55 |
| Florida | 2.70 | 2.25 | 2.25 | 2.34 |
| Texas | 3.42 | 2.87 | 2.46 | 2.68 |
| Hawaii | 3.31 | 2.55 | 2.73 | 2.81 |
| | | | | |
| Maryland | 3.20 | 2.37 | 2.50 | 2.60 |
| Arizona | 3.00 | 2.68 | 2.34 | 2.49 |
| District of Columbia | 2.31 | 1.84 | 1.99 | 2.02 |
| Massachusetts | 2.83 | 2.24 | 2.52 | 2.53 |
| Illinois | 3.20 | 2.41 | 2.34 | 2.47 |
| Washington | 3.23 | 2.39 | 2.41 | 2.53 |
| Connecticut | 2.93 | 2.14 | 2.49 | 2.51 |
| Rhode Island | 2.81 | 2.07 | 2.40 | 2.41 |
| | | | | |
| Virginia | 3.33 | 2.33 | 2.43 | 2.52 |
| Delaware | 3.37 | 2.16 | 2.47 | 2.55 |
| Georgia | 3.11 | 2.90 | 2.42 | 2.50 |
| New Mexico | 3.20 | 2.42 | 2.37 | 2.47 |
| Oregon | 3.26 | 2.25 | 2.34 | 2.43 |
| Colorado | 3.20 | 2.44 | 2.39 | 2.47 |
| Alaska | 3.07 | 2.90 | 2.43 | 2.52 |
| Nebraska | 3.29 | 2.31 | 2.37 | 2.45 |
| Idaho | 3.44 | 2.52 | 2.62 | 2.69 |
| North Carolina | 3.23 | 2.61 | 2.33 | 2.40 |
| | | | | |
| Utah | 3.75 | 2.92 | 2.97 | 3.03 |
| Michigan | 2.97 | 2.20 | 2.45 | 2.48 |
| Minnesota | 3.27 | 2.05 | 2.38 | 2.42 |
| Kansas | 3.05 | 2.35 | 2.36 | 2.41 |
| Pennsylvania | 2.76 | 2.01 | 2.38 | 2.38 |
| Iowa | 3.12 | 2.15 | 2.36 | 2.39 |
| New Hampshire | 2.86 | 2.17 | 2.49 | 2.48 |
| Wisconsin | 3.30 | 2.03 | 2.35 | 2.38 |
| | | | | |
| Tennessee | 3.00 | 2.11 | 2.36 | 2.39 |
| Arkansas | 3.39 | 2.73 | 2.36 | 2.42 |
| Kentucky | 2.54 | 2.19 | 2.36 | 2.37 |
| South Carolina | 3.18 | 2.41 | 2.33 | 2.37 |
| Oklahoma | 2.96 | 2.57 | 2.43 | 2.46 |
| Vermont | 2.55 | 2.11 | 2.36 | 2.34 |

*continued*

002911

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

564      *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

**TABLE 9-19** Continued

| State | Immigrant Generation (household units) | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| Indiana | 3.01 | 2.47 | 2.46 | 2.48 |
| Ohio | 2.70 | 2.16 | 2.39 | 2.39 |
| Louisiana | 2.71 | 2.14 | 2.43 | 2.44 |
| Missouri | 2.86 | 2.32 | 2.37 | 2.38 |
| South Dakota | 2.98 | 2.10 | 2.39 | 2.40 |
| Alabama | 3.26 | 2.00 | 2.40 | 2.42 |
| Maine | 2.52 | 2.02 | 2.33 | 2.31 |
| North Dakota | 2.54 | 1.77 | 2.33 | 2.30 |
| Wyoming | 2.74 | 2.19 | 2.41 | 2.41 |
| Montana | 2.64 | 1.84 | 2.32 | 2.30 |
| Mississippi | 2.89 | 2.27 | 2.47 | 2.48 |
| West Virginia | 2.85 | 2.15 | 2.32 | 2.32 |
| Top 15 States by % in First Generation | 3.12 | 2.53 | 2.39 | 2.57 |
| United States | 3.11 | 2.46 | 2.40 | 2.50 |

NOTE: See text for definitions of household immigrant generation. States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).

SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

002912

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-20** Annualized Weighted Sample Cases of Households by Immigrant Generation by State, Current Population Survey Annual Social and Economic Supplement for 2011-2013

| State | Immigrant Generation (household units) | | | |
| | First | Second | Third+ | All |
|---|---|---|---|---|
| California | 4,165,605 | 1,909,347 | 7,290,777 | 13,365,729 |
| New Jersey | 800,286 | 417,914 | 2,014,610 | 3,232,810 |
| New York | 1,931,804 | 938,610 | 4,799,345 | 7,669,759 |
| Nevada | 221,452 | 114,295 | 708,295 | 1,044,042 |
| Florida | 1,633,088 | 714,054 | 5,590,941 | 7,938,082 |
| Texas | 1,790,863 | 897,525 | 6,734,224 | 9,422,612 |
| Hawaii | 87,836 | 75,432 | 298,703 | 461,970 |
| Maryland | 355,518 | 167,081 | 1,692,462 | 2,215,061 |
| Arizona | 434,177 | 288,928 | 1,840,934 | 2,564,039 |
| District of Columbia | 45,174 | 25,062 | 230,009 | 300,244 |
| Massachusetts | 402,195 | 326,099 | 1,849,285 | 2,577,578 |
| Illinois | 725,138 | 398,153 | 3,941,849 | 5,065,140 |
| Washington | 396,778 | 262,069 | 2,011,809 | 2,670,655 |
| Connecticut | 209,041 | 166,248 | 1,006,186 | 1,381,475 |
| Rhode Island | 64,911 | 61,840 | 302,730 | 429,481 |
| Virginia | 344,930 | 146,510 | 2,616,571 | 3,108,012 |
| Delaware | 33,915 | 17,280 | 298,211 | 349,406 |
| Georgia | 382,297 | 116,885 | 3,286,581 | 3,785,763 |
| New Mexico | 85,943 | 65,467 | 650,302 | 801,713 |
| Oregon | 157,829 | 133,985 | 1,249,616 | 1,541,430 |
| Colorado | 197,560 | 148,757 | 1,659,617 | 2,005,935 |
| Alaska | 25,451 | 18,874 | 227,630 | 271,955 |
| Nebraska | 65,732 | 30,673 | 639,860 | 736,265 |
| Idaho | 51,831 | 30,059 | 507,833 | 589,722 |
| North Carolina | 292,724 | 142,004 | 3,429,987 | 3,864,714 |
| Utah | 75,762 | 56,737 | 790,040 | 922,539 |
| Michigan | 309,768 | 242,271 | 3,310,617 | 3,862,656 |
| Minnesota | 162,845 | 133,355 | 1,868,256 | 2,164,456 |
| Kansas | 79,486 | 45,724 | 1,027,262 | 1,152,473 |
| Pennsylvania | 332,324 | 332,286 | 4,593,236 | 5,257,846 |
| Iowa | 67,251 | 47,449 | 1,124,796 | 1,239,496 |
| New Hampshire | 29,221 | 46,888 | 444,335 | 520,444 |
| Wisconsin | 108,938 | 126,223 | 2,098,162 | 2,333,323 |
| Tennessee | 128,032 | 61,266 | 2,444,634 | 2,633,932 |
| Arkansas | 51,843 | 20,457 | 1,097,159 | 1,169,458 |
| Kentucky | 91,897 | 39,889 | 1,660,988 | 1,792,775 |
| South Carolina | 74,065 | 35,736 | 1,746,109 | 1,855,910 |
| Oklahoma | 68,796 | 51,493 | 1,393,898 | 1,514,187 |
| Vermont | 10,733 | 22,360 | 230,817 | 263,910 |

*continued*

002913

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**TABLE 9-20** Continued

| State | Immigrant Generation (household units) | | | |
|---|---|---|---|---|
| | First | Second | Third+ | All |
| Indiana | 103,939 | 99,918 | 2,341,293 | 2,545,150 |
| Ohio | 180,261 | 226,818 | 4,293,483 | 4,700,562 |
| Louisiana | 67,474 | 36,549 | 1,649,038 | 1,753,061 |
| Missouri | 86,649 | 77,525 | 2,327,948 | 2,492,123 |
| South Dakota | 11,226 | 16,247 | 309,966 | 337,439 |
| Alabama | 67,486 | 40,388 | 1,780,690 | 1,888,564 |
| Maine | 20,112 | 45,719 | 499,588 | 565,419 |
| North Dakota | 7,936 | 16,919 | 266,819 | 291,675 |
| Wyoming | 6,955 | 9,593 | 219,098 | 235,646 |
| Montana | 7,903 | 26,384 | 394,971 | 429,258 |
| Mississippi | 23,561 | 16,190 | 1,097,737 | 1,137,487 |
| West Virginia | 10,119 | 21,168 | 751,852 | 783,140 |
| Top 15 States by % in First Generation | 13,263,865 | 6,762,657 | 40,312,156 | 60,338,678 |
| United States | 17,086,659 | 9,508,706 | 94,641,157 | 121,236,522 |

NOTES: See text for definitions of household immigrant generation. These sample counts are the average number of weighted cases classified as households per year in the Current Population Survey Annual Social and Economic Supplement (ASEC) for 2011-2013. The ASEC includes cases in February, March, and April of each year. Because of the rotation group design, by which addresses are in the sample for 4 months, out for 8 months, and in again for 4 months, the total 3-year sample double-counts households that are in the sample in pairs of years (2011-2012 or 2012-2013). States are listed from highest to lowest percentage of first generation independent persons in the state's population of independent persons (see Table 9-2).

SOURCE: Panel tabulations of the Current Population Survey Annual Social and Economic Supplement for 2011-2013.

Copyright National Academy of Sciences. All rights reserved.

10

# Research Directions and Data Recommendations

A detailed review of the research literature upon which this report is built reveals that much is known about the economic and fiscal impacts of immigration. A rich portrayal of the roles that immigrants have played in recent U.S. economic history can be drawn, and short-run labor market and public finance outcomes can even be forecast reasonably well (Kerr and Kerr, 2013). But even with the theoretical and empirical advances of recent decades, some questions remain difficult to answer comprehensively and accurately. In some cases, research is constrained by a still emerging conceptual clarity; more often, however, it is hindered by data limitations. Data on immigrants and their descendants—on nativity, education, age and date of arrival, time spent in the United States, and legal status at present and upon entry—are central to analyses of the economic and fiscal impacts of immigration.

In this chapter, the panel recommends next steps for improving the data infrastructure necessary to support continued advances on the research topics detailed in this report. The data needed to study fiscal and economic impacts of immigrants are similar to the data needed to study their integration into society. Therefore, many of the recommendations presented here previously appeared in the report by our sister panel, *The Integration of Immigrants into American Society* (National Academies of Sciences, Engineering, and Medicine, 2015, hereafter "the *Integration* report"). In addition to presenting formal recommendations, we identify several opportunities to enhance available data but do not formally recommend them. While these data would be valuable to researchers, they do not rise to the

*567*

002915

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

same level of importance or their collection may be less feasible than the data enhancements we recommend.

## 10.1  COUNTING AND CHARACTERIZING IMMIGRANTS AND THEIR DESCENDANTS

To understand the effects of immigration on society and the economy, it is necessary to know how many immigrants have arrived in the country, when they arrived, and from where. As discussed in Chapter 2, answers to these seemingly basic questions can be surprisingly difficult to obtain and will continue to be so without further improvement of data sources. Every Decennial Census from 1850 to 2000 included a question on birthplace (foreign-born respondents were also asked about country of birth), which allowed the size of the foreign-born population to be measured. Data on the foreign-born are also collected by the American Community Survey (ACS), a large household survey that replaced the long-form Decennial Census after 2000, and, since 1994, the Current Population Survey (CPS), which is designed for the primary purpose of monitoring labor market trends. These data sources provide information about basic demographic and socioeconomic characteristics—age, sex, marital status, employment status, occupation, income, earnings, and educational attainment—of the foreign-born. The foreign-born population includes permanent residents, persons on temporary work and student visas, and undocumented residents who entered the country either without inspection or have overstayed visas; however, neither the CPS nor the ACS identify the legal status of respondents. The Census Bureau also produces population projections that estimate the future size of the foreign-born population based on a set of demographic assumptions.[1]

Although it is important to build into the nation's statistical infrastructure the capacity to monitor progress of the foreign-born population, it is equally critical to do so for their U.S.-born children who, as native-born citizens, reveal a great deal about how new Americans are integrating into society and helping to shape the nation's economic and demographic landscape. The ability to identify second generation respondents is extremely desirable for empirical analyses of both labor market and fiscal impacts of immigration. As with the foreign-born themselves, their children may on average attain different education and skill levels (often higher—see

---

[1]Because of the inconsistences in the Decennial Census series and the lack of counts of the second generation population, the Pew Research Center also produces projections, including separate projections for the second and third-plus generations, which are used for some of the fiscal impact estimates in Chapter 8 of this report. The Pew population series differs slightly from official census data because of methods of adjustment, estimation, and projection, but the differences are generally less than 1 percentage point, well within the margin of error.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Chapter 8), achieve different occupational outcomes, and generate at least slightly different fiscal impacts compared with the general population. In turn, their presence may affect employment rates and composition (either positively or negatively), as well as per capita earnings, taxes paid, and social program utilization—all integral to fiscal and labor market outcomes.

Thus, for analyzing the earnings and occupational integration of immigrants and their descendants, and for a range of other research purposes, a question on parental birthplace is needed for a large representative sample of the population. Such a question was first added to the 1890 Decennial Census[2] but was dropped for the 1980 and subsequent Decennial Censuses. In 1994, the CPS helped to ameliorate the situation by adding two questions about parental birthplace: "In what country was your father born?" and "In what country was your mother born?" The CPS is, however, not exactly comparable to the Decennial Census or to the ACS; it only covers the civilian, noninstitutionalized population, and it includes data on a different set of potential covariates. Massey (2010) provides a definitive discussion of immigration measurement issues and explains why a question about parents' birthplace is crucially needed on the ACS. In so doing, he also notes the primary constraint inherent in the relatively small sample size of the CPS (compared to the ACS or the long-form Decennial Census): the CPS sample size is often inadequate to address questions about immigrants by nationality groups, and the problem is intensified for smaller geographic areas.[3] As Massey (2010, p. 128) notes, the CPS allows one to "study second-generation Mexican immigrants in California, but is of little use if one seeks information about second-generation Koreans in Oregon—the sample will just be too small." For cases in which the CPS is inadequate for studying subgroups, the ACS would often provide the sample size needed to do so. For this reason, and others cited above, a modification to the ACS is warranted:

---

[2]From 1890 through 1930, parental birthplace questions were asked of all census respondents. With the advent of sampling in the 1940 census, these questions were asked only to a subset of the population: for every 20th person (5%) in the 1940 census, for every 5th person (20%) in the 1950 census, for 25 percent of *households* in the 1960 census, and for 15 percent of *households* in the 1970 census.

[3]The relevant part of the CPS (the March supplement) has a sample size of around 75,000 households, which yields, on average, information on more than 11,000 foreign-born households and 26,000 foreign-born individuals. The March supplement also significantly oversamples Hispanics and, to a lesser degree, Asians. A list of all the surveys that collect data on immigration can be found at the University of California, Berkeley, Population Center. Available: http://www.popcenter.berkeley.edu/resources/migration_data_sets/data_by_region.php [November 2015].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Recommendation 1:** The U.S. Census Bureau should add a question on the birthplace of parents to the American Community Survey.[4]

With such an enhancement to the ACS, fiscal analyses such as those reported on in Chapter 9 of this report would be more robust because more characteristics of the foreign-born and the second generation could be compared against the rest of the population at the state or substate level.

During this panel's work estimating the fiscal impact of immigration, it also became clear that, in addition to asking about parental birthplace, it would be useful to have data on parents' educational attainment. The absence of this information even in the CPS, which includes information on parental birthplace, means that both *The New Americans* (National Research Council, 1997) and the analyses in this report (Chapter 8)—along with many other studies—must rely on average intercohort education levels (a comparison of the mean values for different cohorts), a simplifying assumption that affects a large research literature, not just that on immigration. If microdata existed to compare individuals and their parents, estimates of intergenerational transmission of educational attainment and the determinants thereof would be much more precise.

**Recommendation 2:** As a first step toward addressing the issue of intergenerational transmission of educational attainment, the Current Population Survey should ask respondents about parents' educational attainment as a follow-up to the existing questions about parental birthplace.

As discussed below, some research questions about immigrants and their descendants are best addressed by tracking populations over a number of years. Longitudinal studies of the second generation are needed to provide information about their economic and social contributions, about their labor market and fiscal impact, and about how they integrate along various dimensions over time—essential aspects of the country's overall immigration experience. Past academically sponsored efforts, such as the New Immigrant Survey (Jasso et al., 2006), have attempted to do this, but that particular survey was limited to legal immigrants arriving in certain years. A survey similar to the National Education Longitudinal Studies, but focused on a large second generation sample followed from early adolescence into adulthood, would enhance immigration research.[5]

---

[4]This recommendation is replicated from the *Integration* report (p. 429, Recommendation 10-1).

[5]Detailed, individual-level data of this kind, often required for capturing and analyzing processes as they unfold, require safe access that protects privacy and confidentiality.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

In addition, the *Integration* report recommends that a number of currently operating national longitudinal surveys "should oversample the foreign-born, especially the smaller Asian and non-Mexican Hispanic groups that, when combined, make up a significant share of the immigrant population." Existing models of how to oversample key populations can be found in a range of surveys, such as the National Health Interview Survey, the Panel Study of Income Dynamics, and the National Health and Nutrition Examination Survey (National Academies of Sciences, Engineering, and Medicine, 2015, p. 432).

## 10.2  INFORMATION ON LEGAL STATUS

A second major limitation of Decennial Census, ACS, and CPS data for studying immigration is that neither current visa status nor visa status at time of arrival are recorded, making it impossible to distinguish between lawful permanent residents ("green card" holders), persons on temporary nonimmigrant visas for work or study, persons with other types of visas, and persons who lack an official visa. As a result, it is common statistical practice to refer to the foreign-born population in a census or survey as "immigrants" even though such a categorization will typically include foreign students, various workers on temporary employment visas, those on temporary residence visas, and migrants who are not authorized to be in the country.[6] For this reason, better data are needed on visa status, initially and currently, as well as on time and age at arrival (which is already collected).

There is considerable mobility across visa categories as well, and current visa status does not always predict who stays permanently. Legal status has been shown in a number of surveys to be a dynamic variable that changes over time, as immigrants' circumstances change. As highlighted in the *Integration* report (National Academies of Sciences, Engineering, and Medicine, 2015, p. 430), "The attainment of legal status and eventual citizenship are likely to be crucial steps in the process of economic and social integration, yet researchers presently lack the means to model them."

---

Such protections are a feature of the U.S. Census Bureau's Federal Statistical Research Data Centers, which enable researchers—albeit with some level of burden relative to public access sources—to access and analyze microdata and small-area data (for details, see http://www.census.gov/fsrdc).

[6]There are many types of temporary visas that permit people to reside (and sometimes work) legally in the United States—usually for 1 year or less, although some temporary visas can be renewed for several years. Temporary resident visas are issued for visitors; fiancés and spouses of U.S. citizens; entertainers, athletes, and religious workers; Canadian and Mexican professionals; business trainees; and others that are allowed to reside in the United States for short periods of time. See Chapter 3 of the *Integration* report for details on the various visa and other statuses for temporary and long-term entry to the United States.

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2927 of 4699 PageID #:  6092

572     THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

Because there is no official count of persons who are in the United States without a valid visa—the unauthorized population[7]—an additional question should be considered for the CPS:

> **Recommendation 3:** The U.S. Census Bureau and the Bureau of Labor Statistics should test and, if feasible, add a question on the monthly Current Population Survey that allows respondents to select among various well-defined legal statuses at entry or at present, leaving those in undocumented status to be identified by process of elimination.[8]

Following this guidance provides a good starting point but undocumented persons are likely to be under-enumerated in surveys and censuses. The purpose of the recommended pretest is to determine whether the inclusion of such questions might have a deleterious effect on survey participation. For these reasons, in addition to the "process of elimination method" suggested in the above recommendation, creative use of administrative and other kinds of data is desirable to identify immigrant populations of interest, such as the authorized and nonauthorized.[9]

It is also possible to tap into legalization programs to learn more about the subset of immigrants applying for citizenship. As an example of how this opportunity has been exploited in the past, the *Integration* report cites the 1986 Immigration Reform and Control Act (IRCA), which mandated a survey of immigrants who legalized. The survey, which collected data on "how they entered the United States, where they fit into the labor market, demographic characteristics, family composition, use of social services, migration behavior and origins . . . illuminated the behavior of a population for which there previously was little systematic information" (*Integration* report, p. 430). The potential of this kind of instrument points to a clear strategy for additional systematic data collection:

---

[7]The expert consensus is that the unauthorized population peaked at approximately 12 million in 2007, then fell to about 11 million in the wake of the Great Recession (Baker and Rytina, 2013; Passel et al., 2013).

[8]This recommendation is adapted from the *Integration* report (p. 430, Recommendation 10-2).

[9]Van Hook et al. (2014) presented evidence about coverage of the Mexican-born population in the 2000 U.S. Decennial Census and in the ACS using death and birth registrations and a net migration method. "For the late 1990s and first half of the 2000–2010 decade, results indicate that coverage error was somewhat higher than currently assumed but had substantially declined by the latter half of the 2000–2010 decade . . . [and] that U.S. census and ACS data miss substantial numbers of children of Mexican immigrants, as well as people who are most likely to be unauthorized: namely, working-aged Mexican immigrants (ages 15–64), especially males" (Van Hook et al., 2014, p. 699).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**Recommendation 4:** Congress should include a provision in the next immigration bill to survey the undocumented population. Data should be collected in two ways: USCIS [U.S. Citizenship and Immigration Services] should collect data on applicants who were previously out-of-status or entered without inspection, and government statistical agencies should conduct surveys similar to those conducted after the Immigration Reform and Control Act.[10]

Legalization programs certainly create targeted opportunities to learn more about individuals who were previously living without legal status in a way that provides a window on the broader group; however, it is important for data users to recognize that those who legalize are a selected group that is not fully representative of their counterparts who have not legalized.

Currently, data on legal immigrants entering the United States and those applying for benefits such as naturalization collected by the Department of Homeland Security (including USCIS), the State Department, and the Office of Refugee Resettlement are generally limited to data items needed for processing cases. The collection of additional information would make it possible to maximize the research value of these administrative data and to allow specific questions of interest to be addressed.

**Recommendation 5:** Data on naturalizations (for which the Department of Homeland Security has a record of every case) should be linked with the data on admissions. Similarly, data on attaining lawful permanent resident status should be linked to the individual's temporary visa history. This would make it possible to monitor how individuals progress through the immigration system.

Additional data, such as on occupation and education, could be collected from all applicants for lawful permanent resident status. Information on family members admitted at the same time could be linked and information on sponsors added. These additional data items could be collected from a sample of the people processed every year. A 10 percent sample of the admissions/naturalizations each year, for example, would generate a dataset with about 100,000 awards of lawful permanent residence and 75,000 naturalizations every year. Of course, as pointed out in the *Integration* report (National Academies of Sciences, Engineering, and Medicine, 2015, p. 431), such an expansion in administrative data collection only creates value if the information can be made available to researchers and the public in secure data centers.

---

[10]This recommendation is adapted from the *Integration* report (p. 431, Recommendation 10-4).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Understanding of the unauthorized and other immigrant populations could be further enhanced by exploiting longitudinal data sources. This panel supports the idea behind the recommendation advanced in the *Integration* report (National Academies of Sciences, Engineering, and Medicine, 2015, p. 430) to add questions about legal status to a select set of longitudinal surveys that contain significant numbers of foreign-born respondents. The New Immigrant Survey, the Survey of Income and Program Participation, and the Los Angeles Family and Neighborhood Study are examples of surveys that include direct questions on legal status. This modification could be considered for the Panel Study of Income Dynamics, the National Health Interview Survey, the National Education Longitudinal Survey, and the National Health and Nutrition Examination Survey. However, careful pretesting would be needed to assess the potential impact on response rates overall, and of undocumented immigrants in particular, of asking respondents about legal status. The integrity of these very important surveys should not be risked unless it can be convincingly established that eliciting truthful answers about legal status from respondents will not create undue risks to the entire enterprise.

## 10.3  MEASUREMENT OF IMMIGRATION AND EMIGRATION PATTERNS

Longitudinal data are also essential for uncovering the correlates of a range of social and economic outcomes of immigration (National Research Council, 1996). Likewise, the ability to follow individuals and cohorts over time is crucial to understanding factors behind geographic movements—for example, those affecting emigration, circular migration, and interstate migration—and analyzing selection effects associated with these behaviors (in this case, the factors or characteristics that are causally linked with immigration and emigration). Given that the earnings, tax payments, or program use of those who stay are systematically different from those who leave, measures of return and circular migration are especially important for estimating long-term economic impacts.[11]

For the same reasons, longitudinal data that are valuable for tracking changing legal status of individuals, return or circular migration, or changes in patterns of program use are also essential for projecting fiscal impacts with precision. In their discussion of return migration, Kerr and Kerr (2011) pointed out that analyses of fiscal impacts often assume that immi-

---

[11]The U.S. Immigration and Naturalization Service ceased publishing emigration data in 1958 because the data available were thought to be incomplete, but alternative estimates based on recent research suggest that current emigration levels are not insignificant (Van Hook et al., 2006).

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

grants remain permanently in the host country after arrival; public service use and taxes paid are then estimated on the basis of cross-sectional patterns. The authors conclude that, in order to "provide a better estimate of the mean effect and also characterize the heterogeneity in immigrant types," calculations of both labor market and fiscal impacts need to consider rates of return migration and identify selective outflow (Kerr and Kerr, 2011, p. 69). This advice is followed in the forward-looking fiscal projections presented in Chapter 8, which incorporate population projections by the Pew Research Center that include adjustments to account for out-migration.[12]

Better data on remittances would also enhance immigration research. Remittances dampen the contribution of immigrants to aggregate demand in the host country while stimulating aggregate demand in the origin country into which the funds flow; by extension, some fiscal benefits in the host country attributable to immigrants may likewise be weakened (Kerr and Kerr, 2011). If questions on respondents' own and parental nativity were added to an existing survey, such as the Survey of Consumer Finances and the Consumer Expenditure Survey, the resultant data could prove useful for refining understanding of spending and remittance behavior among immigrants. The fiscal accounting exercises in Chapters 8 and 9 build in adjustments to account for the impact of remittances on consumption and sales taxes paid; however, these adjustments were based on data for Germany because adequate U.S. data were unavailable.

## 10.4  EXPLOITING MULTIPLE DATA SOURCES

For a wide range of information needs underpinning immigration research, strategic linking of administrative datasets—on visa status for example—and other sources beyond traditional household surveys can greatly enhance the capacity to track variables of interest, particularly at the individual level, over time. USCIS and other federal agencies compile administrative data containing detailed information about immigrants, including flows of new arrivals by visa status and data on newly naturalized U.S. citizens. However, the published data are aggregated in a way that offers only very basic cross-tabulations. It is impossible to use these data for fine-grained analyses, which typically require micro-level data on individuals and the ability to link to additional information sources, such as aggregate data on localities.

---

[12]The cumulative return rates used in the analysis are segmented by age and by duration in the United States. The return rate is about .24 for immigrants in their first 10 years in the country and about .31 during the first 50 years after arrival. These estimates are within a percentage point or two of the return rates used in the forward looking fiscal analysis presented in *The New Americans* (National Research Council, 1997).

002923

Copyright National Academy of Sciences. All rights reserved.

Sometimes key pieces of information cannot be gleaned from household surveys. An example, used in the estimation of state and local fiscal impacts, is the cost of bilingual education and of educating students for whom English is a second language (not necessarily in a bilingual education program). The costs of such programs cannot be estimated from a household survey because they are incurred by schools, not parents. The source of data used in this report for modeling the added costs for language-assistance instruction is a now fairly outdated study by the Urban Institute (Clark, 1994). Updated information would be useful for sharpening estimates of education costs associated with immigration.

Beyond the survey data realm, another action that would be useful for generating fiscal projections would be for the Congressional Budget Office to make its budget projection engine public and give users the ability to experiment with different scenarios to see how changes affect estimated fiscal flows, tax rates, the size of the national debt, etc. For federal fiscal estimates, such as those produced in Chapter 8 of this report, this capability would have provided the opportunity to generate additional scenarios and to flesh out more exhaustively how reasonable each one appears. Achieving this is a complex proposition, but the capability would benefit research projects estimating future fiscal impacts of various policies—immigration related or otherwise.

Exploiting multiple data modes also has the potential to advance research on employment dynamics. To quantify the mobility of workers, or the extent to which displacement of pre-existing workers occurs, longitudinal data that "measure layoffs, unemployment spells, changes of residence and occupational and industrial mobility" are critical (Longhi et al., 2008, p. 25). Record linkages between surveys and detailed administrative records are now available to study firm and worker interactions and status changes. For the United States, the pioneering Longitudinal Employer-Household Dynamics Program[13] has proven highly useful for analyzing how labor markets adapt to changing circumstances and, in so doing, has expanded opportunities for more sophisticated studies of employment effects associated with immigration inflows.[14] In general, research in the United States has more frequently examined wage impacts than employment effects; European scholars have given more attention to analyzing employment impacts.[15] Foged and Peri (2015) analyzed labor market outcomes of low-

---

[13]For details, go to http://lehd.ces.census.gov/research.

[14]Mouw et al. (2012) and Rho (2013) examined worker displacement in high immigration industries using evidence from the Longitudinal Employer-Household Dynamics Program.

[15]As reviewed in Chapter 5, there has been some work in the United States on employment impacts. Smith (2012) analyzed the impact of immigration on hours worked of low-skilled native-born workers and found that the largest negative effect was on teenagers.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

skilled natives in response to an inflow of low-skilled immigrants using longitudinal employer-employee data from Denmark.

Another area in which multiple data sources could advance research on the impact of immigration on wages and employment is in measuring capital formation. As discussed in Chapter 5, the demand for labor and the capacity of the economy to absorb new workers, including immigrants, is strongly influenced by the speed at which firms invest and adjust their capital stock and production technologies. Assumptions are often made or implied about this process which, in certain kinds of models, strongly influence wage and employment impact estimates. At this point, there is little empirical basis for these assumptions because the temporal characteristics of how capital formation occurs in response to changing factors of production is an under-researched topic (Longhi et al., 2008, p. 25). Better microdata on investment and capital stock at industry and regional levels are needed and might be supplemented by a variety of non-survey-data sources such as firm administration records or commercial databases.

Long-term multisource data projects are also important for studying economic and social mobility—a topic that has recently gained heightened visibility among researchers, policy makers, and the general public. Concerns about growing income and wealth inequality and about the health of the "American dream" have spurred research into intergenerational issues, which often have even more acute implications for immigrants and their descendants. The *Integration* report points out that "matched individual-level records from Decennial Censuses (and the ACS) with income data from Internal Revenue Service and the Social Security Administration would allow for longitudinal studies of the socioeconomic progress of immigrants in American society and allow for the measurement of both intracohort change and intercohort change (for cohorts based on time of arrival in the United States) for successive waves of immigrants." Additionally, "matched Census and USCIS records would allow for in-depth studies of pathways to legalization and also the impact of legal status on socioeconomic outcomes of individuals and their children"[16] (National Academies of Sciences, Engineering, and Medicine, 2015, p. 431). This opportunity should be pursued:

---

[16]Similar data are collected in the French Permanent Demographic Sample (EDP), which is a pioneering longitudinal database maintained by the French National Institute of Statistics and Economic Studies, a central government agency located in Paris. The EDP is a panel survey based on immigrant arrival and census data that comprises a 1 percent sample of all immigrants that have entered France since 1967. The panel database includes information on immigrants at the time of arrival, linked to the General Population Census of 1968 and later censuses. It provides a rich database on the social and economic adjustment of immigrants over recent decades. A study by Richard (2013) provides an example of the usefulness of EDP data for studying labor outcomes.

Copyright National Academy of Sciences. All rights reserved.

578          THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

**Recommendation 6:** The U.S. Census Bureau and U.S. Citizenship and Immigration Services should create a system that links administrative data to Census Bureau–administered surveys, including the Decennial Census, the American Community Survey, and the Survey of Income and Program Participation, following protocols that have recently been used to link Internal Revenue Service data to Census Bureau data and/or following protocols developed for the American Opportunity Study (National Research Council, 2013).[17]

The American Opportunity Study (AOS) is a new project, still under way, that takes as its goal to digitize and link data across Decennial Censuses, the ACS, and other administrative sources (such as Internal Revenue Service datasets) for the purpose of studying social mobility and related topics such as the following (Grusky et al., 2015):[18]

- Parent-child social mobility across a variety of dimensions (income, education, occupation) and with repeated measurements
- Social mobility within small geographic units
- Three-generation analyses (and beyond)
- Subgroup analyses (e.g., immigrants from specific countries or regions)
- Study of complex families (distinguishing social, biological, and financial parents)
- Intergenerational inheritance of program participation

A key topic motivating the AOS project is to improve the measurement of intergenerational changes in the immigrant population, ultimately improving the evidence base for policy.

Due to its high profile and its centrality among policy issues, research will continue on immigration regardless of whether the changes recommended in this chapter are implemented, and much of the focus of this research will be on the fiscal and economic consequences topics covered in this volume. However, initiatives such as the AOS and others that create a coordinated data infrastructure will, if successful, greatly enhance these

---

[17]This recommendation is replicated from the *Integration* report (National Academies of Sciences, Engineering, and Medicine, 2015 p. 431, Recommendation 10-5).

[18]The linkages across Census Bureau and administrative data will be designed to promote social, behavioral, and economic research in a way that creates savings on survey costs, improves data accuracy, and increases the ability to understand the long-term consequences of economic and social change. A longitudinal panel of the population, with identifiers for immigrants and later generations, could be constructed, and research using it could be conducted in restricted data environments such as the Census Bureau's Research Data Centers (National Academies of Sciences, Engineering, and Medicine, 2015).

002926

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

*RESEARCH DIRECTIONS AND DATA RECOMMENDATIONS*                    *579*

research efforts. In this chapter, the panel has briefly identified next steps for pushing the knowledge frontier forward so that a report published 20 years from now will be able to present an even more comprehensive assessment of how immigration contributes to the economy and affects those engaged in its activities.

002927

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002928

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# References

Abadie, A., Diamond, A., and Hainmueller, J. (2010). Synthetic control methods for comparative case studies: Estimating the effect of California's tobacco control program. *Journal of the American Statistical Association*, *105*(490), 493-505.

Abrams, K. (2013). What makes the family special? *The University of Chicago Law Review*, *80*(1), 7-28.

Acemoglu, D. (1998). Why do new technologies complement skills? Directed technical change and wage inequality. *Quarterly Journal of Economics*, *113*(4), 1055-1089.

Acemoglu, D. (2002a). Technology and the labor market. *Journal of Economic Literature*, *40*(1), 7-72.

Acemoglu, D. (2002b). Directed technical change. *Review of Economic Studies*, *69*(4), 781-809.

Acs, Z.J., Audretsch, D.B., Braunerhjelm, P., and Carlsson, B. (2012). Growth and entrepreneurship. *Small Business Economics*, *39*(2), 289-300.

Aghion, P., Blundell, R., Griffith, R., Howitt, P., and Prantl, S. (2009). The effects of entry on incumbent innovation and productivity. *Review of Economics and Statistics, 91*(1), 20-32.

Ahmed, B., and Robinson, G.J. (1994). *Estimates of Emigration of the Foreign-Born Population: 1980-1990.* Population Division Working Paper No. 9. Washington, DC: U.S. Bureau of the Census. Available: https://www.census.gov/population/www/documentation/twps0009/twps0009.html [March 2016].

Aiyar, S., and Dalgaard, C.-J. (2005). Total factor productivity revisited: A dual approach to development accounting. *IMF Staff Papers, 52*(1), 82-102. Available: https://www.imf.org/External/Pubs/FT/staffp/2005/01/pdf/aiyar.pdf [March 2016].

Akee, R., and Yuksel, M. (2008, December). *A Note on Measures of Human Capital for Immigrants: Examining the American Community Survey and New Immigrant Survey.* IZA Discussion Paper No. 3897. Bonn: Germany. Available: http://ftp.iza.org/dp3897.pdf [May 2016].

Akresh, I.R. (2006). Occupational mobility among legal immigrants to the United States. *International Migration Review, 40*(4), 854-884.

002929

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Alba, R.D. (2009). *Blurring the Color Line: The New Chance for a More Integrated America*. Cambridge, MA: Harvard University Press.

Alba, R.D., and Logan, J.R. (1992). Assimilation and stratification in the homeownership patterns of racial and ethnic groups. *International Migration Review, 26*(13), 14-41.

Alba, R.D., and Nee, V. (2003). *Remaking the American Mainstream: Assimilation and Contemporary Immigration*. Cambridge, MA: Harvard University Press.

Alesina, A., and Giuliano, P. (2007, April). *The Power of the Family*. IMF and IZA Discussion Paper No. 2750. Bonn: Germany. Available: http://ftp.iza.org/dp2750.pdf [April 2016].

Alesina, A., Harnoss, J., and Rapoport, H. (2016). Birthplace diversity and economic prosperity. *Journal of Economic Growth, 21*(2), 101-138.

Altonji, J.G., and Card, D.E. (1991). The effects of immigration on the labor market outcome of less-skilled natives. In J.M. Abowd and R.B. Freeman (Eds.), *Immigration, Trade, and the Labor Market* (pp. 201-234). Chicago, IL: University of Chicago Press. Available: http://www.nber.org/chapters/c11773.pdf [December 2016].

Alvaredo, F., Atkinson, A.B., Piketty, T., and Saez, E. (2013). The top 1 percent in international and historical perspective. *Journal of Economic Perspective, 27*(3), 3-20. Available: https://eml.berkeley.edu/~saez/alvaredo-atkinson-piketty-saezJEP13top1percent.pdf [March 2016].

Amuedo-Dorantes, C., and Pozo, S. (2006). Migration, remittances, and male and female employment patterns. *American Economic Review Papers and Proceedings, 96*(2), 222-226.

Anderson, S., and Platzer, M. (2006). *American Made: The Impact of Immigrant Entrepreneurs and Professionals on U.S. Competitiveness*. Arlington, VA: National Venture Capital Association. Available: http://www.contentfirst.com/AmericanMade_study.pdf [February 2016].

Andrews, M., Schank, T., and Upward, R. (2015, October). *Do Foreign Workers Reduce Trade Barriers? Microeconomic Evidence*. IZA Discussion Paper No. 9437. Bonn, Germany. Available: http://ftp.iza.org/dp9437.pdf [March 2016].

Archdeacon, T.J. (1983). *Becoming American: An Ethnic History*. New York: The Free Press.

Atack, J., Bateman, F., and Parker, W.N. (2000). The farm, the farmer, and the market. In S.L. Engerman and R.E. Gallman (Eds.), *The Cambridge Economic History of the United States* (vol. 2, 245-284). Cambridge, MA: Cambridge University Press.

Auerbach, A.J. (1994). The U.S. fiscal problem: Where we are, how we got here, and where we're going? *NBER Macroeconomics Manual, 9*, 141-186. Available: http://www.nber.org/chapters/c11009.pdf [April 2016].

Auerbach, A.J., and Oreopoulos, P. (1999). Analyzing the fiscal impact of U.S. immigration. *American Economic Review Papers and Proceedings, 89*(2), 176-180.

Auerbach, A.J., Gokhale, J., and Kotlikoff, L.J. (1991). Generational accounts: A meaningful alternative to deficit accounting. In D. Bradford (Ed.), *Tax Policy and the Economy* (pp. 55-110). Cambridge, MA: MIT Press.

Aydemir, A., and Borjas, G.J. (2007). Cross-country variation in the impact of international migration: Canada, Mexico, and the United States. *Journal of the European Economic Association, 5*(4), 663-708.

Baghdadi, L., and Jansen, M. (2010). The effects of temporary immigration on prices of non-traded goods and services. *Journal of Economic Integration, 25*(4), 754-782.

Baker, B., and Rytina, N. (2013). *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012*. Population Estimates. Washington, DC: U.S. Department of Homeland Security, Office of Immigration Statistics. Available: https://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf [December 2015].

Baker, M., Benjamin, D., and Stanger, S. (1999). The highs and lows of the minimum wage effect: A time-series cross-section study of the Canadian law. *Journal of Labor Economics, 17*(2), 318-350.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Balderrama, F., and Rodriguez, R. (1995). *Decade of Betrayal: Mexican Repatriation in the 1930s*. Albuquerque: University of New Mexico Press.

Baltzell, E.D. (1964). *The Protestant Establishment: Aristocracy and Caste in America*. New York: Vintage Books.

Bandiera, O., Rasul, I., and Viarengo, M. (2013). The making of modern America: Migratory flows in the age of mass migration. *Journal of Development Economics, 102*(C), 23-47. Available: https://ideas.repec.org/a/eee/deveco/v102y2013icp23-47.html [January 2016].

Bandyopadhyay, S., Coughlin, C.C., and Wall, H.J. (2008). Ethnic networks and U.S. exports. *Review of International Economics, 16*(1), 199-213.

Barde, R., Carter, S.B., and Sutch, R. (2006). International migration. In S.B. Carter, S.S. Gartner, M.R. Haines, A.L. Olmstead, R. Sutch, and G. Wright (Eds.), *Historical Statistics of the United States: Earliest Times to the Present, Millennial Edition* (vol. 1, pp. 523-540). New York: Cambridge University Press.

Barro, R.J. (1991). Economic growth in a cross section of countries. *Quarterly Journal of Economics, 106*(2), 407-443.

Bartel, A.P. (1989). Where do the new U.S. immigrants live? *Journal of Labor Economics, 7*(4), 371-391.

Batalova, J. (2012). *Senior Immigrants in the United States*. Washington, DC: Migration Policy Institute. Available: http://www.migrationpolicy.org/article/senior-immigrants-united-states [March 2016].

Batista, C., and Umblijs, J. (2014). Migration, risk attitudes, and entrepreneurship: Evidence from a representative immigrant survey. *IZA Journal of Migration, 3*(17), 1-25.

Baumol, W.J. (1993). *Entrepreneurship, Management, and the Structure of Payoffs*. Cambridge, MA: MIT Press.

Bean, F.B., Lowell, L., and Taylor, L.J. (1988). Undocumented Mexican immigrants and the earnings of other workers in the United States. *Demography, 25*(1), 35-52.

Beaudry, P., and Green, A. (2005). Changes in U.S. wages, 1976-2000: Ongoing skill bias or major technological change? *Journal of Labor Economics, 23*(3), 609-648.

Beaudry, P., Doms, M., and Lewis, E. (2010, October). Should the PC be considered a technological revolution? Evidence from U.S. metropolitan areas. *Journal of Political Economy, 118*(5), 988-1036.

Becker, G.S. (1991). *A Treatise on the Family*. Cambridge, MA: Harvard University Press.

Becker, G.S., Murphy, K.M., and Tamura, R. (1990). Human capital, fertility, and economic growth. *Journal of Political Economy, 98*(5), S12-S57.

Ben-Gad, M. (2004). The economic effects of immigration: A dynamic analysis. *Journal of Economic Dynamics and Control*, 28(9), 1825-1845

Ben-Gad, M. (2008). Capital-skill complementarity and the immigration surplus. *Review of Economic Dynamics, Elsevier for the Society for Economic Dynamics*, 11(2), 335-365.

Bentolila, S., Dolado, J.J., and Jimeno, J.F. (2007). *Does Immigration Affect the Phillips Curve? Some Evidence for Spain*. CEMFI, Madrid, Spain, mimeo.

Berman, E., Lang, K., and Siniver, E. (2000). *Language-Skill Complementarity: Returns to Immigrant Language Acquisition*. NBER Working Paper No. w7737. Cambridge, MA: National Bureau of Economic Research.

Bernard, W.S. (1980). Immigration: History of U.S. policy. In S. Thernstrom (Ed.), *Harvard Encyclopedia of American Ethnic Groups* (pp. 486-495). Cambridge, MA: Harvard University Press.

Bernhardt, A., Milkman, R., Theodore, N., Heckathorn, D., Auer, M., DeFilippis, J., González, A.L., Narro, V., Perelshteyn, J., Polson, D., and Spiller, M. (2009). *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities*. New York: National Employment Law Project.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Bernstein, J. (2003). *The Jobless Recovery*. EPI Issue Brief No. 186. Washington, DC: Economic Policy Institute. Available: http://www.epi.org/publication/issuebriefs_ib186/ [March 2016].

Bitler, M., and Hoynes, H. (2013). Immigrants, welfare reform, and the U.S. safety net. In D. Card and S. Raphael (Eds.), *Immigration, Poverty, and Socioeconomic Inequality*. New York: Russell Sage Foundation.

Blanchard, O., and Katz, L. (1992). Regional evolutions. *Brookings Papers on Economic Activity, 1*, 1-77.

Blanchflower, D.G., Saleheen, J., and Shadforth, C. (2007). The impact of the recent migration from Eastern Europe on the UK economy. *Bank of England Quarterly Bulletin*, 47(1), 131-136.

Blau, F.D., and Kahn, L.M. (2007a). Gender and assimilation among Mexican Americans. In G.J. Borjas (Ed.), *Mexican Immigration to the United States* (pp. 57-106). Chicago, IL: University of Chicago Press.

Blau, F.D., and Kahn, L.M. (2007b). The gender pay gap. *The Economists' Voice*, 4(4), 1-6, Article 5.

Blau, F.D., and Kahn, L.M. (2015). Immigration and the distribution of incomes. In B.R. Chiswick and P.W. Miller (Eds.), *Handbook on the Economics of International Migration* (pp. 793-843). Amsterdam: Elsevier.

Blau, F.D., Kahn, L.M., and Papps, K.L. (2011). Gender, source country characteristics, and labor market assimilation among immigrants. *The Review of Economics and Statistics*, 93(1), 43-58. Available: http://opus.bath.ac.uk/26076/1/REST_a_00064.pdf [January 2016].

Blau, F.D., Kahn, L.M., Liu, A.Y., and Papps, K.L. (2013). The transmission of women's fertility, human capital, and work orientation across immigrant generations. *Journal of Population Economics*, 26(2), 405-435.

Bleakley, H., and Chin, A. (2004). Language skills and earnings: Evidence from childhood immigrants. *The Review of Economics and Statistics*, 86(2), 481-496.

Board of Trustees, Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds. (2014). *The 2014 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds*. Washington, DC: Government Publishing Office. Available: https://www.ssa.gov/oact/tr/2014/tr2014.pdf [June 2016].

Board of Trustees, Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds. (2015). *The 2015 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds*. Washington, DC: Government Publishing Office. Available: https://www.ssa.gov/oact/tr/2015/tr2015.pdf [June 2016].

Bodvarsson, O.B., and Van den Berg, H. (2009). *The Economics of Immigration: Theory and Policy*. Heidelberg, Germany: Springer-Verlag.

Bodvarsson, O.B, Van den Berg, H., and Lewer, J. (2008). Measuring immigration's effects on labor demand: A reexamination of the Mariel boatlift. *Labour Economics*, 15, 560-574.

Bohn, S., and Lofstrom, M. (2013). Employment effects of state legislation. In D. Card and S. Raphael (Eds.), *Immigration, Poverty, and Socioeconomic Inequality* (pp. 282-314). New York: Russell Sage.

Bohn, S., and Owens, E.G. (2012). Immigration and informal labor. *Industrial Relations*, 51(4), 845-883.

Bonacich, E. (1984). Some basic facts: Patterns of Asian immigration and exclusion. In L. Cheng and E. Bonacich (Eds.), *Labor Immigration under Capitalism* (Ch. 2, pp. 60-78). Berkeley: University of California Press.

Bonin, H. (2005). *Wage and Employment Effect of Immigration to Germany: Evidence from a Skill-Group Approach*. IZA Discussion Paper No. 1875. Bonn, Germany.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Borjas, G.J. (1985). Assimilation, changes in cohort quality, and the earnings of immigrants. *Journal of Labor Economics*, 3(4), 463-489. Available: http://ftp.iza.org/dp1875.pdf [December 2016].

Borjas, G.J. (1986). The self-employment experience of immigrants. *The Journal of Human Resources*, 21(4), 485-506.

Borjas, G.J. (1987). Self-selection and the earnings of immigrants. *American Economic Review*, 77(September), 531-553.

Borjas, G.J. (1990). *Friends or Strangers: The Impact of Immigrants on the U.S. Economy*. New York, NY: Basic Books.

Borjas, G.J. (1994). The Economics of Immigration. *Journal of Economic Literature*, 32(December), 1667-1717.

Borjas, G.J. (1995a). Assimilation and changes in cohort quality revisited: What happened to immigrant earnings in the 1980s? *Journal of Labor Economics*, 13(2), 201-245.

Borjas, G.J. (1995b). The economic benefits from immigration. *Journal of Economic Perspectives*, 9(2), 3-22.

Borjas, G.J. (2001). Does immigration grease the wheels of the labor market? *Brookings Papers on Economic Activity*, 32(1), 69-134.

Borjas, G.J. (2002). Welfare reform and immigrant participation in welfare programs. *International Migration Review*, 35(4), 1093-1123.

Borjas, G.J. (2003). The labor demand curve is downward sloping: Reexamining the impact of immigration on the labor market. *Quarterly Journal of Economics*, 118(4), 1335-1374.

Borjas, G.J. (2006). *Immigration in High-Skill Labor Markets: The Impact of Foreign Students on the Earnings of Doctorates*. NBER Working Paper No. 12085. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w12085.pdf?new_window=1 [October 2015].

Borjas, G.J. (2007). Do foreign students crowd out native students from graduate programs? In R.G. Ehrenberg and P.E. Stephan (Eds.), *Science and the University* (pp. 134-149). Madison: University of Wisconsin Press.

Borjas, G.J. (2009). *The Analytics of the Wage Effect of Immigration*. NBER Working Paper No. 14796. Cambridge, MA: National Bureau of Economic Research.

Borjas, G.J. (2011). *Poverty and Program Participation among Immigrant Children* (Scholarly Articles No. 8052147). Cambridge, MA: Harvard Kennedy School of Government.

Borjas, G.J. (2013). *Immigration and the American Worker: A Review of the Academic Literature*. Washington, DC: Center for Immigration Studies. Available: http://cis.org/immigration-and-the-american-worker-review-academic-literature [November 2015].

Borjas, G.J. (2014a). *Immigration Economics*. Cambridge, MA. Harvard University Press.

Borjas, G.J. (2014b). *The Slowdown in the Economic Assimilation of Immigrants: Aging and Cohort Effects Revisited Again*. NBER Working Paper No. 19116. Cambridge, MA: National Bureau of Economic Research. Available: http://www.uib.no/sites/w3.uib.no/files/attachments/slowdown_of_assimilation_january_2014.pdf [January 2016].

Borjas, G.J. (2016a). The slowdown in the economic assimilation of immigrants: Aging and cohort effects revisited again. *Journal of Human Capital*, 9(4), 483-517.

Borjas, G.J. (2016b). *The Wage Impact of the Marielitos: Additional Evidence*. NBER Working Paper No. 21850. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w21850 [April 2016].

Borjas, G.J., and Doran, K.B. (2012, October). *Intellectual Mobility: Native Responses to Supply Shocks in the Space of Ideas*. Working Paper, University of Notre Dame, IN. Available: www.iae.csic.es/investigatorsMaterial/a12291013490184620.pdf [April 2016].

Borjas, G.J., and Friedberg, R.M. (2009). *Recent Trends in the Earnings of New Immigrants to the United States*. NBER Working Paper No. 15406. Cambridge, MA: National Bureau of Economic Research.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Borjas, G.J., and Katz, L.F. (2007). The evolution of the Mexican-born workforce in the U.S. labor market. In G.J. Borjas (Ed.), *Mexican Immigration to the United States* (pp. 13-55). Chicago, IL: University of Chicago Press.

Borjas, G.J., and Tienda, M. (Eds.). (1985). *Hispanics in the U.S. Economy*. New York: Academic Press.

Borjas, G.J., Freeman, R.B., and Katz, L. (1997). How much do immigration and trade affect labor market outcomes? *Brookings Papers on Economic Activity*, 1997(1), 1-90.

Borjas, G.J., Grogger, J., and Hanson, G.H. (2012). On estimating elasticities of substitution. *Journal of the European Economic Association*, 10(1), 198-210.

Bound, J., Braga, B., Golden, J.M., and Khanna, G. (2015). Recruitment of foreigners in the market for computer scientists in the U.S. *Journal of Labor Economics*, 33(S1), S187-S223.

Bouvier, L.F. (1992). *Peaceful Invasions*. Lanham, MD: University Press of America.

Branche, A. (2011). *The Cost of Failure: The Burden of Immigration Enforcement in America's Cities*. Drum Major Institute for Public Policy: New York. Available: http://uncover thetruth.org/wp-content/uploads/2011/04/DMI-Cost-of-Failure.pdf [May 2016].

Bratsberg, B., Raaum, O., Roed, M., and Schone, P. (2013). Immigration wage effects by origin. *Scandinavian Journal of Economics*, 116(2), 356-393.

Breitman, R., and Kraut, A.M. (1987). *American Refugee Policy and European Jewry, 1933-1945*. Bloomington: Indiana University Press.

Brimelow, P. (1995). *Alien Nation: Common Sense About America's Immigration Disaster*. New York: Random House.

Broder, T., and Blazer, J. (2011). *Overview of Immigrant Eligibility for Federal Programs*. Washington, DC: National Immigration Law Center.

Butcher, K.F., and DiNardo, J.E. (1998). *The Immigrant and Native-Born Wage Distributions: Evidence from the United States Censuses*. NBER Working Paper No. 6630. Cambridge, MA: National Bureau of Economic Research.

Cadena, B.C. (2014). Newly arriving immigrants as labor market arbitrageurs: Evidence from the minimum wage. *Journal of Urban Economics*, 80, 1-12.

Cadena, B.C., and Kovak, B.K. (2016, January). Immigrants equilibrate local labor markets: Evidence from the Great Recession. *American Economic Journal: Applied Economics, American Economic Association*, 8(1), 257-290.

Camarota, S.A. (1998). *The Wages of Immigration: The Effect on the Low-Skilled Labor Market*. Washington, DC: Center for Immigration Studies.

Camarota, S.A. (2011). *Immigrants in the United States: A Profile of America's Foreign-Born Population*. Washington, DC: Center for Immigration Studies. Available: http://cis.org/node/3876 [January 2016].

Camarota, S.A. (2012). *Immigrants in the United States, 2010: A Profile of America's Foreign Born Population*. Washington, DC: Center for Immigration Studies. Available: http://cis.org/2012-profile-of-americas-foreign-born-population [April 2016].

Capps, R., Fix, M.E., and Henderson, E. (2009). Trends in immigrants' use of public assistance after welfare reform. In M.E. Fix (Ed.), *Immigrants and Welfare: The Impact of Welfare Reform on America's Newcomers* (pp. 123-152). New York: Russell Sage Foundation.

Card, D. (1990). The impact of the Mariel boatlift on the Miami labor market. *Industrial and Labor Relations Review*, 43(2), 245-257. Available: http://davidcard.berkeley.edu/papers/mariel-impact.pdf [January 2016].

Card, D. (2001). Immigrant inflows, native outflows, and the local labor market impacts of higher immigration. *Journal of Labor Economics*, 19(1), 2-64. Available: http://davidcard.berkeley.edu/papers/immig-inflows.pdf [July 2015].

Card, D. (2005). Is the new immigration really so bad? *The Economic Journal*, 115(507), F300-F323.

002934

Copyright National Academy of Sciences. All rights reserved.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2942 of 4699 PageID #:  6107

Card, D. (2009). Immigration and inequality. *American Economic Review: Papers and Proceedings*, 99(2), 1-21.

Card, D., and DiNardo, J. (2000). Do immigrant inflows lead to native outflows? *American Economic Review*, 90(2), 360-367.

Card, D., and Lemieux, T. (2001). Can falling supply explain the rising return to college for young men? *Quarterly Journal of Economics*, 116(2), 705-746.

Card, D., and Peri, G. (2016, April). *Immigration Economics: A Review*. Working paper. Berkeley, CA. Available: http://davidcard.berkeley.edu/papers/card-peri-jel-april-6-2016.pdf [April 2016].

Card, D., and Raphael, S. (Eds.). (2013). *Immigration, Poverty, and Socioeconomic Inequality*. New York: Russell Sage Foundation.

Carliner, G. (1980). Wages, earnings, and hours of first, second and third generation American males. *Economic Inquiry*, 18(1), 87-102.

Carnevalle, A.P., Jayasundera, T., and Gulish, A. (2015). *Good Jobs are Back: College Graduates are First in Line*. Washington, DC: Georgetown University, Center on Education and the Workforce. Available: https://cew.georgetown.edu/cew-reports/goodjobsareback/ [January 2016].

Carpenter, N. (1927). *Immigrants and Their Children*. Census Monograph. Washington, DC: Government Printing Office.

Carr, P.J., Lichter, D.T., and Kefalas, M.J. (2012). Can immigration save small-town America? Hispanic boomtowns and the uneasy path to renewal. *The Annals of the American Academy of Political and Social Science*, 64(1), 38-57.

Carr, S., and Tienda, M. (2013). Family sponsorship and late-age migration in aging America: Revised and expanded estimates of chained migration. *Population Research and Policy Review*, 32(6), 825-849.

Carrington, W.J., and de Lima, P.J.F. (1996). The impact of 1970s repatriates from Africa on the Portuguese labor market. *ILR Review*, 49(2), 330-347.

Carter, S.B., Sigmund, S., Sigmund Gartner, S., Haines, M.R., Olmstead, A.L., Sutch, R., and Wright, G. (2006). *Historical Statistics of the United States: Earliest Times to the Present*. Millennial Edition. New York: Cambridge University Press.

Cascio, E.U., and Lewis, E.G. (2011). Cracks in the melting pot: Immigration, school choice, and segregation. *American Economic Journal: Applied Economics* 17(4), 24-36.

Castañeda, H., Holmes, S., Madrigal, D., Young, M.-E., Beyerle, N., and Quesada, J. (2015). Immigration as a social determinant of health. *Annual Review of Public Health*, 36(1), 375-392.

Chan, S. (Ed.) (1991). *Entry Denied: Exclusion and the Chinese Community in America, 1882-1943*. Philadelphia, PA: Temple University Press.

Chassamboulli, A., and Palivos, T. (2014). A search-equilibrium approach to the effects of immigration on labor market outcomes. *International Economic Review*, 55(1), 111-129.

Chassambouli, A., and Peri, G. (2015, October). The labor market effects of reducing the number of illegal immigrants. *Review of Economic Dynamics, Elsevier for the Society for Economic Dynamics*, 18(4), 792-821.

Chavez, L.R. (2008). *The Latino Threat: Constructing Immigrants, Citizens, and the Nation*. Stanford, CA: Stanford University Press.

Chen, L.Y. (2011). *Three Essays on the Economic Integration of Foreign-educated Immigrants: A Test of Classical Assimilation* (doctoral dissertation). Dissertation submitted to the University of Michigan, Ann Arbor.

Chiswick, B.R. (1978). The effect of Americanization on the earnings of foreign-born men. *Journal of Political Economy*, 86(5), 897-922.

002935

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Chiswick, B.R., and Taengnoi, S. (2007, August). *Occupational Choice of High Skilled Immigrants in the United States*. IZA Discussion Paper No. 2969. Bonn, Germany. Available: http://ftp.iza.org/dp2969.pdf [April 2016].

Chiswick, B.R., Chiswick, C.U., and Karras, G.T. (1992). The impact of immigrants on the macro-economy. *Carnegie-Rochester Conference Series on Public Policy*, 37, 279-316.

Chiswick, C.U. (1989). The impact of immigration on the human capital of natives. *Journal of Labor Economics*, 7(4), 464-486.

Chojnicki, X., Docquier, F., and Ragot, L. (2011). Should the U.S. have locked heaven's door? Reassessing the benefits of postwar immigration. *Journal of Population Economics*, 24(1), 317-359.

Clark, J.M. (1923). *Studies in the Economics of Overhead Costs*. Chicago, IL: University of Chicago Press.

Clark, R.L. (1994). *The Costs of Providing Public Assistance and Education to Immigrants*. Washington, DC: Program for Research on Immigration Policy, Urban Institute.

Clemens, M.A. (2010, June). *The Roots of Global Wage Gaps: Evidence from Randomized Processing of U.S. Visas*. Working Paper No. 212. Center for Global Development, Washington, DC. Available: file:///C:/Users/amann/Downloads/wp212.pdf [April 2016].

Clemens, M.A. (2013, May). *International Harvest: A Case Study of How Foreign Workers Help American Farms Grow Crops—and the Economy*. Report by the Partnership for a New American Economy and the Center for Global Development. Washington, DC. Available: http://www.cgdev.org/sites/default/files/international-harvest.pdf [April 2016].

Clune, M.S. (1998). The fiscal impacts of immigrants: A California case study. In J.P. Smith and B. Edmonston (Eds.), *The Immigration Debate* (pp. 120-182). Washington, DC: National Academy Press.

Cohen, S. (1964). A study of nativism: The American red scare of 1919. *Political Science Quarterly*, 79(1), 52-75.

Cohen-Goldner, S., and Paserman, M.D. (2011). The dynamic impact of immigration on natives' labor market outcomes: Evidence from Israel. *European Economic Review*, 55(8), 1027-1045.

Colby, S., and Ortman, J. (2015, March). *Projections of the Size and Composition of the U.S. Population: 2014 to 2060*. Population Estimates and Projections: Current Population Reports P25-1143. Washington, DC: U.S. Census Bureau.

Congressional Budget Office. (1996). *The Economic and Budget Outlook: Fiscal Years 1997-2006*. Available from U.S. Government Printing Office, Washington, DC.

Congressional Budget Office. (2007). *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*. Report of CBO. Washington, DC. Available: https://www.cbo.gov/publication/41645 [November 2015].

Congressional Budget Office. (2014a). *The 2014 Long-Term Budget Outlook*. Washington, DC.

Congressional Budget Office. (2014b). *The Distribution of Household Income and Federal Taxes, 2011*. Washington, DC.

Congressional Budget Office. (2015, January). *The Economic and Budget Outlook, 2015 to 2025*. Washington, DC.

Cortés, P. (2008). The effect of low-skilled immigration on U.S. prices: Evidence from CPI data. *Journal of Political Economy*, 116(3), 381-422.

Cortés, P., and Pan, J. (2013). Outsourcing household production: Foreign domestic helpers and native labor supply in Hong Kong. *Journal of Labor Economics*, 31(2), 327-371.

Cortés, P., and Pan, J. (2014). Foreign nurse importation and the supply of native nurses. *Journal of Health Economics*, 37, 164-180.

Cortés, P., and Tessada, J. (2011). Low-skilled immigration and the labor supply of highly skilled women. *American Economic Journal: Applied Economics*, 3(3), 88-123.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Coulson, N.E. (1999). Why are Hispanic- and Asian-American homeownership rates so low? Immigration and other factors. *Journal of Urban Economics*, 45(2), 209-227.

Cutler, D.M., Poterba, J.M., Sheiner, L.M., and Summers, L.H. (1990). An ageing society: Opportunity or challenge? *Brookings Papers on Economic Activity*, 1(1990), 1-73. Washington, DC: The Brookings Institution. Available: http://www.brookings.edu/~/media/Projects/BPEA/1990-1/1990a_bpea_cutler_poterba_sheiner_summers_akerlof.pdf [April 2016].

D'Amuri, F., Gianmarco, G.I.P., and Peri, G. (2010). The labor market impact of immigration in Western Germany in the 1990s. *European Economic Review, Elsevier*, 54(4), 550-570.

Daniels, R. (1962). *The Politics of Prejudice: The Anti-Japanese Movement in California and the Struggle for Japanese Exclusion*. Berkeley: University of California Press.

Daniels, R. (1991). *Coming to America: A History of Immigration and Ethnicity in American Life*. New York: Harper Perennial.

DeFreitas, G. (1980). *The Earnings of Immigrants in the American Labor Market* (doctoral dissertation). Columbia University, New York.

Diamond, P.A. (1982). Wage determination and efficiency in search equilibrium. *Review of Economic Studies*, 49(2), 217-227.

Doran, K., Gelber, A., and Isen, A. (2015). *The Effects of High-Skilled Immigration Policy on Firms: Evidence from H-1B Visa Lotteries*. IRLE Working Paper No. 117-15. Available: http://irle.berkeley.edu/workingpapers/117-15.pdf [August 2015].

Drinkwater, S., Levine, P., Lotti, E., and Pearlman, J. (2003). *The Economic Impact of Migration: A Survey*. School of Economics Discussion Papers No. 0103. School of Economics, University of Surrey, UK.

Drinkwater, S., Levine, P., Lotti, E., and Pearlman, J. (2007). The immigration surplus revisited in a general equilibrium model with endogenous growth. *Journal of Regional Science*, 47(3), 569-601.

Duffy, J., Papageorgiou, C., and Perez-Sebastian, F. (2004). Capital-skill complementarity? Evidence from a panel of countries. *Review of Economics and Statistics*, 86(1), 327-344.

Duncan, B., and Duncan, O.D. (1968). Minorities and the process of stratification. *American Sociological Review*, 33(3), 356-364.

Duncan, B., and Trejo, S. (2012). The employment of low-skilled immigrant men in the United States. *American Economic Review: Papers and Proceedings*, 102(3), 549-554.

Duncan, O.D., and Duncan, B. (1955). A methodological analysis of segregation indexes. *American Sociological Review*, 20(2), 210-217.

Dungan, P., Fang, T., and Gunderson, M. (2013). Macroeconomic impacts of Canadian immigration: Results from a macro model. *British Journal of Industrial Relations, London School of Economics*, 51(1), 174-195. Available: http://onlinelibrary.wiley.com/doi/10.1111/j.1467-8543.2012.00905.x/epdf [November 2016].

Dunn, T.J. (1996). *The Militarization of the U.S.-Mexico Border, 1978-1992: Low-Intensity Conflict Doctrine Comes Home*. Austin: CMAS Books, University of Texas at Austin.

Dustmann, C., and Fabbri, F. (2003). Language proficiency and labour market performance of immigrants in the UK. *Economic Journal, Royal Economic Society*, 113(489), 695-717.

Dustmann, C., and Frattini, T. (2013). *Immigration: The European Experience*. Centre for Research and Analysis of Migration, Discussion Paper Series No 22/11. In D. Card and S. Raphael (Eds.), *Immigration, Poverty, and Socioeconomic Inequality*. Russell Sage Foundation. Available: http://www.ucl.ac.uk/~uctpb21/doc/CDP_22_11.pdf [May 2016].

Dustmann, C., and Frattini, T. (2014). The fiscal effects of immigration to the UK. *The Economic Journal*, 124(580), F593-F643.

Dustmann, C., and Glitz, A. (2015, July). How do industries and firms respond to changes in local labor supply? *Journal of Labor Economics*, 33(3), 711-750.

Copyright National Academy of Sciences. All rights reserved.

Dustmann, C., and Görlach, J. (2014). *Selective Outmigration and the Estimation of Immigrants' Earnings Profiles*. CESifo Working Paper Series No. 4617. Munich, Germany: CESifo Group.

Dustmann, C., and Mestres, J. (2010). Remittances and temporary migration. *Journal of Development Economics*, 92(1), 62-70.

Dustmann, C., and Preston, I. (2012). Estimating the effect of immigration on wages. *Journal of the European Economic Association*, 10(1), 216-223. Available: http://www.ucl.ac.uk/~uctpb21/Cpapers/Estimating%20the%20Effect%20of%20Immigration%20on%20Wages_FINAL.pdf [January 2016].

Dustmann, C., Fabbri, F., and Preston, I. (2005). *The Impact of Immigration on the UK Labour Market*. CReAM Discussion Paper Series 05 No. 01. Centre for Research and Analysis of Migration (CReAM), Department of Economics, University College London, UK.

Dustmann, C., Frattini, T., and Preston, I. (2013). The effect of immigration along the distribution of wages. *Review of Economic Studies*, 80(1), 145-173. Available: http://www.oxfordjournals.org/our_journals/restud/prpaper.pdf [September 2015].

Easterlin, R. (1968). *Population, Labor Force, and Long Swings in Economic Growth*. New York: National Bureau of Economic Research.

Easterlin, R. (1980). Immigration: Economic and social characteristics. In S. Thernstrom (Ed.), *Harvard Encyclopedia of American Ethnic Groups* (pp. 476-486). Cambridge, MA: Harvard University Press.

Economic Policy Institute. (2012). *The State of Working America 12th Edition*. Washington, DC. Available: http://www.stateofworkingamerica.org/chart/swa-wages-table-4-15-hourly-wages-men-education and http://www.stateofworkingamerica.org/chart/swa-wages-table-4-16-hourly-wages-women [September 2015].

Edmonston, B. (2002). *Interprovincial Migration of Canadian Immigrants*. Working Paper Series No. 02-10. Vancouver Centre of Excellence, Research on Immigration and Integration in the Metropolis. Burnaby, BC: Simon Fraser University.

Edmonston, B., and Passel, J. (Eds.). (1994). *Immigration and Ethnicity: The Integration of America's Newest Arrivals*. Washington, DC: Urban Institute Press.

Ehrlich, I. (Ed.). (1990). The problem of economic development. A conference of the Institute for the Study of Free Enterprise Systems. *The Journal of Political Economy*, 98(5), part 2.

Ehrlich, I., and Kim, J. (2007). The evolution of income and fertility inequalities over the course of economic development: A human capital perspective. *Journal of Human Capital*, 1(1), 137-174.

Ehrlich, I., and Kim, J. (2015). Immigration, human capital formation, and endogenous economic growth. *Journal of Human Capital*, 9(4).

Ehrlich, I., and Lui, F.T. (1991). Intergenerational trade, longevity, and economic growth. *The Journal of Political Economy*, 99(5), 1029-1059.

Executive Office of the President. (2013, July). *The Economic Benefits of Fixing Our Broken Immigration System*. The White House, Washington, DC. Available: https://www.whitehouse.gov/sites/default/files/docs/report.pdf [August 2016].

Fairlie, R.W. (2012). *Immigrant Entrepreneurs and Small Business Owners, and Their Access to Financial Capital*. Small Business Administration, Office of Advocacy: Washington, DC. Available: http://www.sba.gov/sites/default/files/rs396tot.pdf [March 2016].

Fairlie, R.W., and Lofstrom, M. (2015). Immigration and entrepreneurship. In B. Chiswick and P. Millers (Eds.), *Handbook of the Economics of International Migration* (vol. 1B). Oxford, UK: Elsevier.

Fairlie, R.W., and Meyer, B. (1996). Ethnic and racial self-employment differences and possible explanations. *Journal of Human Resources*, 31(4), 757-793.

Fallon, P.R., and Layard, P.R.G. (1975). Capital-skill complementarity, income distribution, and output accounting. *Journal of Political Economy*, 83(2), 279-301.

002938

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Federation for American Immigration Reform. (2009). *U.S. Taxpayers Should Not Have to Pay for Illegal Immigrants' Healthcare*. Washington, DC. Available: http://www.fairus.org/opinion/u-s-taxpayers-should-not-have-to-pay-for-illegal-immigrants-healthcare [September 2015].

Fernandez, R., and Fogli, A. (2009). Culture: An empirical investigation of beliefs, work, and fertility. *American Economic Journal: Macroeconomics*, 1(1), 146-177.

Finn, M.G., Flaming, D., Haydamack, B., and Joassart, P. (2005). *Hopeful Workers, Marginal Jobs: LA's Off-the-Books Labor Force*. Economic Roundtable. Los Angeles, CA. Available: http://www.economicrt.org/summaries/hopeful_workers_marginal_jobs_synopsis.html [August 2015].

Fischer, C.S., and Hout, M. (2006). *Century of Difference: How America Changed in the Last One Hundred Years*. New York: Russell Sage Foundation.

Flaming, D., Haydamack, B., and Joassart, P. (2005). *Hopeful Workers, Marginal Jobs: LA's Off the Books Labor Force*. Economic Roundtable.

Flood, S., King, M., Ruggles, S., and Warren, S. (2015). *Integrated Public Use Microdata Series*. Current Population Survey: Version 4.0 (Machine-Readable Database).

Foged, M., and G Peri (2015). *Immigrants' Effect on Native Workers: New Analysis on Longitudinal Data*. IZA Discussion Paper No. 8961. Bonn, Germany.

Foley, F., and Kerr, W.R. (2013). Ethnic innovation and U.S. multinational firm activity. *Management Science*, 59(7), 1529-1544.

Foreman, K., and Monger, R. (2014). *Nonimmigrant Admissions to the United States, 2013*. Annual Flow Report. Washington, DC: Office of Immigration Statistics, Department of Homeland Security.

Friedberg, R.M. (2001). The impact of mass migration on the Israeli labor market. *The Quarterly Journal of Economics*, 116(4), 1373-1408.

Funkhouser, E. (1995). Remittances from international migration: A comparison of El Salvador and Nicaragua. *Review of Economics and Statistics*, 77(1), 137-146.

Funkhouser, E., and Trejo, S.J. (1995). The labor market skills of recent male immigrants: Evidence from the Current Population Survey. *Industrial and Labor Relations Review*, 48(4), 792-811.

Galor, O., and Moav, O. (2004). From physical to human capital accumulation: Inequality and the process of development. *Review of Economic Studies*, 71(4), 1001-1026.

Ganong, P., and Liebman, J. (2013, August). *The Decline, Rebound, and Further Rise in SNAP Enrollment: Disentangling Business Cycle Fluctuations and Policy Changes*. NBER Working Paper No. 19363. Cambridge, MA: National Bureau of Economic Research.

Garvey, D.L., and Espenshade, T.J. (1998). Fiscal impacts of immigrant and native households: A New Jersey case study. In J.P. Smith and B. Edmonston (Eds.), *The Immigration Debate* (pp. 66-119). Washington, DC: National Academy Press.

Garvey, D.L., Espenshade, T.J., and Scully, J.M. (2002). Are immigrants a drain on the public fisc? State and local impacts in New Jersey. *Social Science Quarterly*, 83(2), 537-553.

Gaston, N., and Nelson, D.R. (2013). Bridging trade theory and labour econometrics: The effects of international migration. *Journal of Economic Surveys*, 27(1), 98-139.

Gibson, C. (1992). The contribution of immigration to the growth and ethnic diversity of the American population. *Proceedings of the American Philosophical Society*, 136, 157-175.

Gibson, C., and Jung, K. (2005). *Historical Census Statistics on Population Totals by Race, 1790 to 1990, and by Hispanic Origin, 1970 to 1990, for Large Cities and Other Urban Places in the United States*. Washington, DC: Population Division, U.S. Census Bureau. Available: http://purl.access.gpo.gov/GPO/LPS75196 [August 2016].

Gilchrist, S., and Williams, J.C. (2004). *Transition Dynamics in Vintage Capital Models: Explaining the Postwar Catch-up of Germany and Japan*. NBER Working Paper No. 10732. Cambridge, MA. Available: http://www.nber.org/papers/w10732 [March 2016].

Copyright National Academy of Sciences. All rights reserved.

592   *THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION*

Gleason, P. (1980). American identity and Americanization. In W. Petersen, M. Novak, and P. Gleason (Eds.), *Concepts of Ethnicity* (pp. 80-96). Cambridge, MA: Belknap Press.

Glitz, A. (2012). The labor market impact of immigration: A quasi-experiment exploiting immigrant location rules in Germany. *Journal of Labor Economics*, 30(1), 175-213.

Goldin, C., and Katz, L.F. (1998). The origins of technology-skill complementarity. *Quarterly Journal of Economics*, 113(3), 693-732.

Gonzalez-Barrera., A. (2015). *More Mexicans Leaving than Coming to the U.S.* Washington, DC: Pew Research Center. Available: http://www.pewhispanic.org/files/2015/11/2015-11-19_mexican-immigration_FINAL.pdf [March 2016].

Goodwin-White, J. (2012). Emerging U.S. immigrant geographies: Racial wages and migration selectivity. *Social Science Quarterly*, 93(3), 779-798.

Grieco, E.M., Trevelyan, E., Larsen, L., Acosta, Y.D., Gambino, C., Cruz, P., Gryn, T., and Walters, N. (2012). *The Size, Place of Birth, and Geographic Distribution of the Foreign-Born Population in the United States: 1960 to 2010.* U.S. Census Bureau, Population Division Working Paper No. 96. Washington, DC.

Griliches, Z. (1969). Capital-skill complementarity. *The Review of Economics and Statistics*, 51(4), 465-468.

Griliches, Z. (1992). The search for R&D spillovers. *Scandinavian Journal of Economics*, 94(0), S29-S47.

Grossman, J.B. (1982). The substitutability of natives and immigrants in production. *Review of Economic and Statistics*, 64(3), 596-603.

Grusky, D.B., Smeeding, T.M., and Snipp, C.M. (2015). A new infrastructure for monitoring social mobility in the United States. *The ANNALS of the American Academy of Political and Social Science*, 657(1), 63-82.

Haines, M. (2006). Table A15-21, Components of population growth by decade. In S.B. Carter, S. Sigmund, S. Sigmund Gartner, M.R. Haines, A.L. Olmstead, R. Sutch, and G. Wright (Eds.), *Historical Statistics of the United States: Earliest Times to the Present* (pp. 1-35). Millennial Edition. New York: Cambridge University Press.

Hall, B.H., and MacGarvie, M. (2009). *The Private Value of Software Patents.* Berkeley, CA. Available: http://eml.berkeley.edu/~bhhall/papers/HallMacGarvie_Dec09.pdf [January 2015].

Hall, M., Singer, A., De Jong, G.F., and Graefe, D.R. (2011, June). *The Geography of Immigrant Skills: Educational Profiles of Metropolitan Areas.* State of Metropolitan America Series. Washington, DC: Brookings Institution.

Hamermesh, D., and Trejo, S. (2013, April). How do immigrants spend their time? The process of assimilation. *Journal of Population Economics*, 26(2), 507-530.

Hamilton, T. (2014). Selection, language heritage, and the earnings trajectories of black immigrants in the United States. *Demography*, 51(3), 975-1002.

Handlin, O. (1957). *Race and Nationality in American Life.* Garden City, NY: Doubleday Anchor Books. Available: http://eml.berkeley.edu/~bhhall/papers/HallMacGarvie_Dec09.pdf [January 2015].

Hansen, M.F., Schultz-Nielsen, M.L., and Tranæs, T. (2015, February). *The Impact of Immigrants on Public Finances: A Forecast Analysis for Denmark.* IZA Discussion Paper No. 8844. Bonn, Germany.

Hanson, G.H. (2012). *Immigration, Productivity, and Competitiveness in American Industry.* Paper presented at the Competing for Talent. Washington, DC: The United States and High-Skilled Immigration.

Hanson, G.H., and Slaughter, M.J. (2002). Labor-market adjustment in open economies: Evidence from U.S. states. *Journal of International Economics*, 57(1), 3-29.

Hart, D.M., and Acs, Z.J. (2011). High-technology immigrant entrepreneurship in the U.S. *Economic Development Quarterly*, 25(2), 116-129.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Haskins, C.B. (2010, February). *Household Employer Payroll Tax Evasion: An Exploration Based on IRS Data and on Interviews with Employers and Domestic Workers*. Unpublished Ph.D. dissertation, University of Massachusetts, Amherst. Available: http://scholarworks.umass.edu/open_access_dissertations/163 [September 2015].

Hatton, T.J., and Williamson, J.G. (2008). *Global Migration and the World Economy: Two Centuries of Policy and Performance*. Cambridge, MA: The MIT Press.

Hauser, R.M., and Warren, J.R. (1997). Socioeconomic indexes for occupations: A review, update, and critique. *Sociological Methodology*, 27(1), 177-298.

Hercowitz, Z., and Yashiv, E. (2002). *A Macroeconomic Experiment in Mass Immigration*. IZA, Discussion Paper No. 475. Bonn, Germany. Available: http://www.iza.org [December 2015].

Higham, J. (1988). *Strangers in the Land: Patterns of American Nativism, 1860-1925*. Second ed., orig. published 1955. New Brunswick, NJ: Rutgers University Press.

Hirschman, C. (2005). Immigration and the American century. *Demography*, 42(4), 595-620.

Hirschman, C. (2013). The Contributions of immigrants to American culture. *Daedalus*, 142(3), 26-47.

Hirschman, C., and Massey, D.S. (2008). Places and peoples: The new American mosaic. In D.S. Massey (Ed.), *New Faces in New Places: The Changing Geography of American Immigration* (pp. 1-21). New York: Russell Sage Foundation.

Hirschman, C., and Mogford, E. (2009). Immigration and the American industrial revolution from 1880 to 1920. *Social Science Research*, 38(4), 897-920.

Hirschman, C., DeWind, J., and Kasinitz, P. (Eds.). (1999). *The Handbook of International Migration: The American Experience*. New York: Russell Sage Foundation.

Hollifield, J., Martin, P., and Orrenius, P.M. (2014). *Controlling Immigration: A Global Perspective* (3rd Ed.). Stanford, CA: Stanford University Press.

Hong, G., and McLaren, J. (2015, April). *Are Immigrants a Shot in the Arm for the Local Economy?* NBER Working Paper No. 21123. JEL No. F22, F66. Cambridge, MA. Available: http://www.nber.org/papers/w21123 [January 2016].

Hsieh, C.-T., and Moretti, E. (2015). *Why Do Cities Matter? Local Growth and Aggregate Growth*. University of Chicago Working Paper. Chicago, IL. Available: http://faculty.chicagobooth.edu/chang-tai.hsieh/research/growth.pdf [March 2015].

Hunt, J. (1992). The impact of the 1962 repatriates from Algeria on the French labor market. *Industrial and Labor Relations Review*, 45(3), 556-572.

Hunt, J. (2011). Which immigrants are most innovative and entrepreneurial? Distinctions by entry visa. *Journal of Labor Economics*, 29(3), 417-457.

Hunt, J. (2013). *Are Immigrants the Most Skilled U.S. Computer and Engineering Workers?* Working paper. Rutgers, NJ. Available: http://www.rci.rutgers.edu/~jah357/Hunt/Immigration_files/highskill_all.pdf [September 2015].

Hunt, J. (2015). Are immigrants the most skilled U.S. computer and engineering workers? *Journal of Labor Economics*, 33(S1), S39-S77.

Hunt, J., and Gauthier-Loiselle, M. (2010). How much does immigration boost innovation? *American Economic Journal: Macroeconomics*, 2(2), 31-56.

Hunt, J., Garant, J.P., Herman, H., and Munroe, D.J. (2013). Why are women underrepresented amongst patentees? *Research Policy*, 42, 831-843.

Huntington, S.L. (2004). *Who Are We? The Challenges to America's National Identity*. New York: Simon and Schuster.

Hutchinson, E.P., Burgess, R.W., and Herring, P. (1956). *Immigrants and Their Children, 1850 to 1950*. 1950 Census Monograph. Washington, DC: U.S. Government Printing Office.

Jaeger, D.A. (1997). Reconciling the old and new Census Bureau education questions: Recommendations for researchers. *Journal of Business and Economic Statistics*, 15(3), 300-309.

002941

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Jasso, G., and Rosenzweig, M.R. (1989). Sponsors, sponsorship rates, and the immigration multiplier. *The International Migration Review*, 23(4), 856-888.

Jasso, G., and Rosenzweig, M.R. (1990). *The New Chosen People: Immigrants in the United States*. New York: Russell Sage Foundation.

Jasso, G., Massey, D.S., Rosenzweig, M.R., and Smith, J.P. (2006). *The New Immigrant Survey 2003, Round 1*. Public Release Data. Princeton, NJ. Available: http://nis.princeton.edu/data.html [April 2016].

Johnson, G.E. (1997, February). *Estimation of the Impact of Immigration on the Distribution of Income among Minorities and Others*. University of Michigan, mimeo.

Johnson, J.A., and Stoskopf, C.H. (Eds.). (2010). *Comparative Health Systems: Global Perspectives*. Sudbury, MA: Jones and Bartlett Publishers.

Jones, C. (2002). Sources of U.S. economic growth in a world of ideas. *American Economic Review*, 92(1), 220-239.

Jones, M.A. (1992*). American Immigration*. 2nd ed. Originally published 1960. Chicago, IL: University of Chicago Press.

Juhn, C., and Murphy, K.M. (1997, January). Wage Inequality and Family Labor Supply. *Journal of Labor Economics*, 15(1), 72-97.

Kaczmarczyk, P. (2013). *Are Immigrants a Burden for the State Budget?* Review paper. RSCAS EUI Working Papers 2013/79. Florence, Italy: European University Institute.

Kandel, W.A. (2011, October). *Fiscal Impacts of the Foreign-Born Population*. Washington, DC: Congressional Research Service.

Kandel, W.A. (2014). *Permanent Legal Immigration to the United States: Policy Overview*. Congressional Research Service 7-5700. Washington, DC. Available: https://fas.org/sgp/crs/homesec/R42866.pdf [July 2015].

Kandel, W.A., and Parrado, E.A. (2005). Restructuring of the U.S. meat processing industry and new Hispanic migrant destinations. *Population and Development Review*, 31(3), 447-471.

Karoly, L.A., and Perez-Arce, F. (2016). *A Cost-Benefit Framework for Analyzing the Economic and Fiscal Impacts of State-Level Immigration Policies*. RAND Corporation. Santa Monica, CA. Available: http://www.rand.org/pubs/research_reports/RR1397.html [September 2016].

Katznelson, I. (2005). *When Affirmative Action was White: An Untold Story of Racial Inequality in Twentieth-Century America*. New York: W.W. Norton.

Kennedy, J.F. (2008). *A Nation of Immigrants*. Reprint ed., originally published 1958. New York: Harper Perennial.

Kerr, S.P., and Kerr, W.R. (2011). Economic impacts of immigration: A survey. Finnish Economic Papers. *Finnish Economic Association*, 24(1), 1-32.

Kerr, S.P., and Kerr, W.R. (2013). Immigration and employer transitions for STEM workers. *American Economic Review: Papers and Proceedings*, 103(3), 193-197. Available: http://www.people.hbs.edu/wkerr/Kerr_Kerr%20AER13_STEM.pdf [March 2016].

Kerr, W.R. (2007). *The Ethnic Composition of US Inventors*. HBS Working Paper No. 08-006.

Kerr, W.R. (2008). Ethnic scientific communities and international technology diffusion. *Review of Economics and Statistics*, 90(3), 518-537.

Kerr, W.R. (2013a). *High-Skilled Immigration, Domestic Innovation, and Global Exchanges*. The National Bureau of Economic Research No. 4. Cambridge, MA. Available: http://www.nber.org/reporter/2013number4/kerr.html [April 2016].

Kerr, W.R. (2013b). *U.S. High-Skilled Immigration, Innovation, and Entrepreneurship: Empirical Approaches and Evidence*. Harvard Business School Working Paper, NBER, and Bank of Finland. Available: http://www.people.hbs.edu/wkerr/Kerr_HighSkillImmEmpirics-8-26-13.pdf [May 2016].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Kerr, W.R., and Lincoln, W.F. (2010). The supply side of innovation: H-1B visa reforms and U.S. ethnic invention. *Journal of Labor Economics*, 28(3), 473-508.

Kerr, W.R., and Mandorff, M. (2015). *Social Networks, Ethnicity, and Entrepreneurship*. NBER Working Paper No. 21597. Harvard Business School Working Paper No. 16-042. Cambridge, MA. Available: https://dash.harvard.edu/bitstream/handle/1/23490132/16-042.pdf?sequence=1 [April 2016].

King, D. (2000). *Making Americans: Immigration, Race and the Origins of the Diverse Democracy*. Cambridge, MA: Harvard University Press.

Kırdar, M.G. (2012). Estimating the impact of immigrants on the host country social system when return migration is an endogenous choice. *International Economic Review*, 53(2), 453-486.

Klein, H.S. (2004). *A Population History of the United States*. New York: Cambridge University Press.

Klein, P., and Ventura, G. (2009). Productivity differences and the dynamic effects of labor movements. *Journal of Monetary Economics*, 56(8), 1059-1073.

Kloosterman, R., and Rath, J. (2001, April). Immigrant entrepreneurs in advanced economies. Mixed embeddedness further explored. *Journal of Ethnic and Migration Studies, Special issue on Immigrant Entrepreneurship*, 27(2), 189-202.

Kossoudji, S.A., and Cobb-Clark, D.A. (2000). Finding good opportunities within unauthorized markets: U.S. occupational mobility for male Latino workers. *International Migration Review*, 30(4), 901-924.

Kritz, M.M., and Gurak, D.T. (2001). The impact of immigration on the internal migration of natives and immigrants. *Demography*, 38(1), 133-145.

Krogstad, J.M., and Passel, J.S. (2015). *5 Facts about Illegal Immigration in the U.S.* Washington, DC: Pew Research Center. Available: http://www.pewresearch.org/fact-tank/2015/11/19/5-facts-about-illegal-immigration-in-the-u-s/ [July 2015].

Krusell, P., Ohanian, L.E., Ríos-Rull, J.-V., and Violante, G.L. (2000). Capital-skill complementarity and inequality: A macroeconomic analysis. *Econometrica*, 68(5), 1029-1053.

Kubrin, C. (2014). *Crime and Immigration: Reviewing the Evidence and Charting Some Promising New Directions in Research*. Paper prepared for the Panel on Integrating Immigrants into American Society, National Academies of Science, Engineering, and Medicine. Washington, DC.

Kuhn, P., and Wooton, I. (1991). Immigration, international trade, and the wages of native workers. In J.M. Abowd and R.B. Freeman (Eds.), *Immigration, Trade, and the Labor Market* (pp. 235-259). Chicago, IL: University of Chicago Press.

LaLonde, R.J., and Topel, R.H. (1991). Labor market adjustments to increased immigration. In J.M. Abowd and R.B. Freeman (Eds.), *Immigration, Trade, and the Labor Market* (pp. 167-199). Chicago, IL: University of Chicago Press. Available: http://www.nber.org/chapters/c11772.pdf [May 2016].

Lazear, E.P. (2007). Mexican assimilation in the United States. In G.J. Borjas (Ed.), *Mexican Immigration to the United States* (pp. 107-122). Chicago, IL: University of Chicago Press.

Lee, R., and Miller, T. (1997). *The Future Fiscal Impacts of Current Immigrants*. Working paper of the project on Intergenerational Transfers. Department of Demography, University of California, Berkeley.

Lee, R., and Miller, T. (2000). Immigration, Social Security, and broader fiscal impacts. *American Economic Review: Papers and, Proceedings*, 90(2), 350-354.

Lee, R., Donehower, G., and Miller, T. (2011). The changing shape of the economic lifecycle in the United States, 1960 to 2003. In R.D. Lee and A. Mason (Eds.), *Population Aging and the Generational Economy: A Global Perspective* (Ch. 15, 313-326). Edward Elgar, UK.

Lerner, A.P. (1952, February). Factor prices and international trade. *Economica*, 19, 1-15.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Lewis, E. (2003, December). *Local, Open Economies Within the U.S.: How Do Industries Respond to Immigration?* Federal Reserve Bank of Philadelphia Working Paper No. 04-01.

Lewis, E. (2011a). Immigration, skill mix, and capital skill complementarity. *The Quarterly Journal of Economics*, 126(2), 1029-1069.

Lewis, E. (201lb, November). *Immigrant-Native Substitutability: The Role of Language Ability*. National Bureau of Economic Research Working Paper No. 17609. Available: https://www.dartmouth.edu/~ethang/ImmNat.pdf [June 2016].

Lewis, E. (2012). *Immigrant-Native Substitutability and the Role of Language*. NBER Working Paper No. 17609. Available: http://www.iga.ucdavis.edu/Research/EJS/conferences/spring-2012-conference/ethan-lewis-paper [December 2015].

Lewis, E. (2013). Immigrant-native substitutability and the role of language. In D. Card and S. Raphael (Eds.), *Immigration, Poverty, and Socio-Economic Inequality* (pp. 60-98). New York: Russell Sage.

Lichter, D.T., and Johnson, K.M. (2009). Immigrant gateways and Hispanic migration to new destinations. *International Migration Review*, 43(3), 496-518.

Lichter, D.T., Carmalt, J.H., and Qian, Z. (2011). Immigration and intermarriage among Hispanics: Crossing racial and generational boundaries. *Sociological Forum*, 26(2), 241-264.

Lieberson, S. (1963). Ethnic patterns in American cities. *The Milbank Memorial Fund Quarterly*, 41(3), 323-326.

Lieberson, S. (1980). *A Piece of the Pie: Blacks and White Immigrants Since 1880*. Berkeley: University of California Press.

Liu, X. (2010). On the macroeconomic and welfare effects of illegal immigration. *Journal of Economic Dynamics and Control*, 34(12), 2547-2567.

Llull, J. (2013). *Understanding International Migration: Evidence from a New Dataset of Bilateral Stocks (1960-2000)*. Barcelona GSE Working Paper No. 715. Available: http://www.barcelonagse.eu/sites/default/files/working_paper_pdfs/715.pdf [May 2016].

Llull, J. (2015). *The Effect of Immigration on Wages: Exploiting Exogenous Variation at the National Level*. Barcelona, Spain, GSE Working Paper No. 783.

Loeffelholz, H., Bauer, T., Haisken-DeNew, J., and Schmidt, M. (2004). *Fiskalische Kosten der Zuwanderer*. RWI Report for the Sachverständigenrat für Zuwanderung und Integration. Available: http://www.bamf.de/SharedDocs/Anlagen/DE/Downloads/Infothek/Zuwanderungsrat/exp-loeffelholz-zuwanderungsrat.pdf?__blob=publicationFile [June 2016].

Lofstrom, M., and Hayes, J. (2011). *H-1Bs: How Do They Stack Up to U.S. Born Workers?* IZA Discussion Paper No. 6259. Bonn, Germany. Available: http://ftp.iza.org/dp6259.pdf [November 2015].

Long, J.E. (1980). The effect of Americanization on earnings: Some evidence for women. *Journal of Political Economy*, 88(3), 620-629.

Longhi, S., Nijkamp, P., and Poot, J. (2008). Meta-analysis of empirical evidence on the labor market impacts of immigration. *Region et Development*, 27(1), 161-190.

Lubotsky, D.H. (2007). Chutes or ladders? A longitudinal analysis of immigrant earnings. *Journal of Political Economy*, 115(5), 820-867. Available: https://www.princeton.edu/rpds/papers/Chutes_or_Ladders.pdf [March 2015].

Lucas, R.E. (1988). On the mechanics of economic development. *Journal of Monetary Economics*, 22(1), 3-42.

Lundborg, P., and Segerstrom, P.S. (2000). International migration and growth in developed countries: A theoretical analysis. *Economica, London School of Economics and Political Science*, 67(268), 579-604.

Lundborg, P., and Segerstrom, P.S. (2002). The growth and welfare effects of international mass migration. *Journal of International Economics*, 56(1), 177-204.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Lutz, W., and Scherbov, S. (2006). Future demographic change in Europe: The contribution of migration. In D.G. Papademetriou (Ed.), *Europe and its Immigrants in the 21st Century: A New Deal or a Continuing Dialogue of the Deaf?* (pp. 207-222). Washington, DC: Migration Policy Institute.

Maestas, N., Mullen, K.J., and Powell, D. (2016, July). *The Effect of Population Aging on Economic Growth, The Labor Force, and Productivity.* NBER Working Paper No. 22452. Cambridge, MA.

Manacorda, M., Manning, A., and Wadsworth, J. (2012). The impact of immigration on the structure of wages: Theory and evidence from Britain. *Journal of the European Economic Association,* 10(1), 120-151.

Mankiw, N.G. (2008). *Principles of Macroeconomics.* Toronto, Canada: Thomson Nelson.

Mankiw, N.G., Romer, D., and Weil, D.N. (1992). A contribution to the empirics of economic growth. *The Quarterly Journal of Economics,* 107(2), 407-437.

Martin, J.A., Hamilton, B.E., Osterman, M.J.K., Curtin, S.C., and Matthews, T.J. (2015). Births: Final data for 2013. *National Vital Statistics Reports,* 64(1), Table 8.

Martin, P. (2013). The global challenge of managing migration. *Population Bulletin,* 68(2). Available: http://www.prb.org/pdf13/global-migration.pdf [February 2016].

Martin, S.F. (2010). *A Nation of Immigrants.* New York: Cambridge University Press.

Masnick, G. (2015, January). *11+ Million Undocumented Immigrants in the U.S. Could be Important for the Housing Recovery.* The Harvard Joint Center for Housing Studies. Available: http://housingperspectives.blogspot.com/2015/01/11-million-undocumented-immigrants-in.html [February 2015].

Massey, D.S. (1987). The ethnosurvey in theory and practice. *International Migration Review,* 21(4), 1498-1522.

Massey, D.S. (1995). The new immigration and the meaning of ethnicity in the United States. *Population and Development Review,* 21(3), 631-652.

Massey, D.S. (1999). International migration at the dawn of the twenty-first century. The Role of the state. *Population and Development Review,* 25(2), 303-323.

Massey, D.S. (2008). *New Faces in New Places: The Changing Geography of American Immigration.* New York: Russell Sage Foundation.

Massey, D.S. (2010). Immigration statistics for the 21st century. *The ANNALS of the American Academy of Political and Social Science,* 631, 124-140.

Massey, D.S. (2012). *Immigration and the Great Recession.* Stanford, CA: Stanford Center on Poverty and Inequality.

Massey, D.S., and Capoferro, C. (2008). The geographic diversification of American immigration. In D.S. Massey (Ed.), *New Faces in New Places: The Changing Geography of American Immigration* (pp. 25-50). New York: Russell Sage Foundation.

Massey, D.S., and Gentsch, K. (2014). Undocumented migration to the United States and the wages of Mexican immigrants. *International Migration Review,* 48(2), 482-499.

Massey, D.S., and Pren, K. (2012). Unintended consequences of US immigration policy: Explaining the post-1965 surge from Latin America. *Population and Development Review,* 38(1), 1-29.

Massey, D.S., Durand, J., and Malone, N.J. (2002). *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration.* New York: Russell Sage Foundation.

Massey, D.S., Durand, J., and Pren, K.A. (2015). Border enforcement and return migration by documented and undocumented Mexicans. *Journal of Ethnic and Migration Studies,* 41(7), 1015-1040.

Massey, D.S., Durand, J., and Pren, K.A. (2016). Why border enforcement backfired. *American Journal of Sociology,* 121(5), 1157-1600.

002945

Copyright National Academy of Sciences. All rights reserved.

Massey, D.S., Arango, J., Graeme, H., Kouaouci, A., Pellegrino, A. and Taylor, J.E. (1993). Theories of international migration: A review and appraisal. *Population and Development Review*, 19(3), 431-466.

Massey, D.S., Arango, J., Hugo, G., Kouaouci, A., Pellegrino, A., and Taylor, J.E. (1998). *Worlds in Motion: International Migration at the End of the Millennium*. Oxford: UK. Oxford University Press.

Mazzolari, F., and Neumark, D. (2012). Immigration and product diversity. *Journal of Population Economics*, 25(3), 1107-1137.

Moffitt, R.A. (2015, June). The deserving poor, the family, and the U.S. welfare system. *Demography*, 52(3), 729-749.

Monras, J. (2015). *Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisis*. Sciences Po. Available: http://www.columbia.edu/~jm3364/Joan_Monras_Mexican_Immigration_revision_v5.pdf [April 2016].

Monte, L.M., and Ellis, R.R. (2014, July). *Fertility of Women in the United States: 2012*. Population Characteristics, P20-575. Washington, DC: U.S. Census Bureau. Available: http://www.census.gov/content/dam/Census/library/publications/2014/demo/p20-575.pdf [February 2016].

Mora, G.C. (2014). *Making Hispanics: How Activists, Bureaucrats, and Media Constructed a New American*. Chicago, IL: University of Chicago Press.

Moretti, E. (2010). Local multipliers. *American Economic Review: Papers and Proceedings*, 100(2), 1-7.

Morgan, S.P., Watkins, S.C., and Ewbank, D. (1994). Generating Americans: Ethnic differences in fertility. In S.C. Watkins (Ed.), *After Ellis Island: Newcomers and Natives in the 1910 Census* (pp. 83-124). New York: Russell Sage Foundation.

Mortensen, D.T., and Pissarides, C.A. (1994). Job creation and job destruction in the theory of unemployment. *Review of Economic Studies*, 61(3), 397-415.

Moser, P., Voena, A., and Waldinger, F. (2014, March). *German-Jewish Émigrés and U.S. Invention*. NBER Working Paper Series No. 19962. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w19962.pdf [April 2016].

Mouw, T., Brand, J., and Jarvis, B. (2012). *Immigration and Worker Displacement from High Immigration Industries: Evidence using Longitudinal Data from the LEHD*. PAA Paper Submission. Available: http://paa2012.princeton.edu/papers/122680 [December 2015].

Muller, T. (1993). *Immigrants and the American City*. New York: New York University Press.

Myers, D. (2007). *Immigrants and Boomers: Forging a New Social Contract for the Future of America*. New York: Russell Sage Foundation.

Myers, D. (2012). The contribution of immigration to reducing aging in America. *Public Policy and Aging Report*, 22(2), 1-7.

Myers, D., and Lee, S.W. (1998). Immigrant trajectories into homeownership: A temporal analysis of residential assimilation. *International Migration Review*, 32(3), 593-625.

Myers, D., and Liu, C.Y. (2005). The emerging dominance of immigrants in the United States housing market, 1970 to 2000. *Urban Policy and Research*, 23(3), 347-365.

Myers, D., and Pitkin, J. (2013, April). *Immigrant Contributions to Housing Demand in the United States: A Comparison of Recent Decades and Projections to 2020 for the States and Nation*. Special report, Research Institute for Housing America, Mortgage Bankers Association. Washington, DC.

Myers, D., Levy, S., and Pitkin, J. (2013). *The Contributions of Immigrants and Their Children to the American Workforce and Jobs of the Future*. Washington, DC: Center for American Progress. Available: https://www.americanprogress.org/issues/immigration/report/2013/06/19/66891/the-contributions-of-immigrants-and-their-children-to-the-american-workforce-and-jobs-of-the-future/ [April 2016].

002946

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Nathan, M. (2014). The wider economic impacts of high-skilled migrants: A survey of the literature for receiving countries. *IZA Journal of Migration*, 3(1), 4.

National Academies of Sciences, Engineering, and Medicine. (2015). *The Integration of Immigrants into American Society*. Panel on the Integration of Immigrants into American Society, M.C. Waters and M.G. Pineau (Eds.). Committee on Population. Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

National Research Council. (1996). *Statistics on U.S. Immigration: An Assessment of Data Needs for Future Research*. B. Edmonston (Ed.). Washington, DC: National Academy Press.

National Research Council. (1997). *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration*. Panel on the Demographic and Economic Impacts of Immigration, J.P. Smith and B. Edmonston (Eds.). Washington DC: National Academy Press.

National Research Council. (1998). *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration*. J.P. Smith and B. Edmonston (Eds.). Washington DC: National Academy Press.

National Research Council. (2001). *America Becoming: Racial Trends and Their Consequences* (2 volumes). N.J. Smelser, W.J. Wilson, and F. Mitchell (Eds.). Commission on Behavioral and Social Sciences and Education. Washington DC: National Academy Press.

National Research Council. (2005). *Beyond the Market: Designing Nonmarket Accounts for the United States*. Panel to Study the Design of Nonmarket Accounts, K.G. Abraham and C. Mackie (Eds.). Committee on National Statistics, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

National Research Council. (2006a). *Hispanics and the Future of America*. Panel on Hispanics in the United States [and] Committee on Population, Division of Behavioral and Social Sciences and Education. M. Tienda and F. Mitchell (Eds.). Washington DC: The National Academies Press.

National Research Council. (2006b). *Multiple Origins, Uncertain Destinies: Hispanics and the American Future*. Panel on Hispanics in the United States and Committee on Population, Division of Behavioral and Social Sciences and Education. M. Tienda and F. Mitchell (Eds.). Washington DC: The National Academies Press.

National Research Council. (2013). *Developing New National Data on Social Mobility: A Workshop Summary*. A. Smith, Rapporteur. Committee on Population and Committee on National Statistics, Division of Behavioral and Social Sciences and Education. Washington, DC: The National Academies Press.

National Research Council and National Academy of Public Administration. (2010). *Choosing the Nation's Fiscal Future*. Committee on the Fiscal Future of the United States. Washington, DC: The National Academies Press.

Nordhaus, W., and Sztorc, P. (2013). *DICE 2013R: Introduction and User's Manual*. Second Edition. Available: http://www.econ.yale.edu/~nordhaus/homepage/documents/DICE_Manual_100413r1.pdf [April 2016].

OECD. (2013). *International Migration Outlook 2013*. Paris, France: OECD. Available: http://www.keepeek.com/Digital-Asset-Management/oecd/social-issues-migration-health/international-migration-outlook-2013_migr_outlook-2013-en#page1 [December 2016].

OECD. (2015). *International Migration Outlook 2015*. Paris: France: OECD. Available: http://www.oecd.org/migration/international-migration-outlook-1999124x.htm [October 2015].

OECD and World Health Organization. (2010, February). *International Migration of Health Workers* (policy brief). Geneva: OECD and World Health Organization. Available: http://www.who.int/hrh/resources/oecd-who_20 policy_brief_en.pdf [February 2016].

002947

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Olney, W.W. (2015). Remittances and the wage impact of immigration. *Journal of Human Resources*, 50(3), 694-727.

Orrenius, P.M., and Zavodny, M. (2007). Does immigration affect wages? A look at occupation-level evidence. *Labour Economics*, 14(5), 757-773.

Orrenius, P.M., and Zavodny, M. (2008). The effect of minimum wages on immigrants' employment and earnings. *Industrial and Labor Relations Review*, 61(4), 544-563.

Orrenius, P.M., and Zavodny, M. (2009, August). Do immigrants work in riskier jobs? *Demography*, 46(3), 535-551.

Orrenius, P.M., and Zavodny, M. (2014). *The Impact of Temporary Protected Status on Immgrants' Labor Market Outcomes*. Federal Reserve Bank of Dallas Research Department Working Paper No. 1415. Dallas, TX. Available: https://www.dallasfed.org/assets/documents/research/papers/2014/wp1415.pdf [April 2016].

Orrenius, P.M., and Zavodny, M. (2015). Does immigration affect whether U.S. natives major in science and engineering? *Journal of Labor Economics*, 33(3, S1), S79-S108.

Ortega, J. (2000). Pareto-improving immigration in an economy with equilibrium unemployment. *Economic Journal*, 110(460), 92-112.

Ottaviano, G.I.P., and Peri, G. (2005). Cities and cultures. *Journal of Urban Economics*, 58(2), 304-307.

Ottaviano, G.I.P., and Peri, G. (2012). Rethinking the effect of immigration on wages. *Journal of the European Economic Association*, 10(1), 152-197.

Paciorek, A.D. (2013). *The Long and the Short of Household Formation*. Finance and Economics Discussion Series, Divisions of Research and Statistics and Monetary Affairs. Federal Reserve Board, Washington, DC. Available: http://www.federalreserve.gov/pubs/feds/2013/201326/201326pap.pdf [September 2015].

Pagnini, D.L., and Morgan, S.P. (1990). Intermarriage and social distance among U.S. immigrants at the turn of the century. *American Journal of Sociology*, 96(2), 405-432.

Palumbo, T., and Siegel, P. (2004). *Accuracy of Data for Employment Status as Measured by the CPS-Census 2000 Match*. U.S. Census Bureau, Housing and Household Economics Study Division. Available: https://www.census.gov/pred/www/rpts/B.7%20Final%20Report.pdf [March 2016].

Partridge, M.D., and Rickman, D.S. (2008). Does a rising tide lift all metropolitan boats? Assessing poverty dynamics by metropolitan size and county type. *Growth and Change*, 39(2), 283-312.

Passel, J.S., and Fix, M. (1994). *Immigration and Immigrants: Setting the Record Straight*. The Urban Institute: Washington, DC. Available: http://webarchive.urban.org/publications/305184.html [June 2006].

Passel, J.S., and Cohn, D.V. (2014, November). *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14: Decline in Those from Mexico Fuels Most State Decreases*. Washington, DC: Pew Research Center's Hispanic Trends Project. Available: http://www.pewhispanic.org/2014/11/18/unauthorized-immigrant-totals-rise-in-7-states-fall-in-14/ [May 2016].

Passel, J.S., and Cohn, D.V. (2016). *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009*. Washington, DC: Pew Research Center's Hispanic Trends Project. Available: http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/ [September 2016].

Passel, J.S., and Suro, R. (2005). *Rise, Peak, and Decline: Trends in U.S. Immigration 1992-2004*. Pew Hispanic Center: Washington, DC. September. Available: http://pewhispanic.org/reports/report.php?ReportID=53 [August 2016].

Passel, J.S., Cohn, D.V., and Gonzalez-Barrera, A. (2013). *Population Decline of Unauthorized Immigrants Stalls, May Have Reversed*. Washington, DC: Pew Research Center. Available: http://www.pewhispanic.org/files/2013/09/Unauthorized-Sept-2013-FINAL.pdf [November 2015].

002948

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Peri, G. (2007). *Immigrants' Complementarities and Native Wages: Evidence from California*. NBER Working Paper No. W12956. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w12956.pdf [May 2016].

Peri, G. (2012). The effect of immigration on productivity: Evidence from U.S. states. *Review of Economics and statistics*, 94(1), 348-358.

Peri, G. (2014). *Do Immigrant Workers Depress the Wages of Native Workers?* IZA World of Labor 42. Bonn, Germany. Available: http://wol.iza.org/articles/do-immigrant-workers-depress-the-wages-of-native-workers [May 2016].

Peri, G., and Shih, K. (2015). *Foreign and Native Skilled Workers: What Can We Learn from H-1B Lotteries?* NBER Working Paper No. 21175. Cambridge, MA: National Bureau of Economic Research.

Peri, G., and Sparber, C. (2008). *Highly-Educated Immigrants and Native Occupational Choice. Centre for Research and Analysis of Migration*. Discussion Paper Series, CDP No 13. University College London: UK. Available: http://www.cream-migration.org/publ_uploads/CDP_13_08.pdf [May 2016].

Peri, G., and Sparber, C. (2009). Task specialization, immigration, and wages. *American Economic Journal: Applied Economics*, 1(3), 135-169.

Peri, G., and Sparber, C. (2011). Highly-educated immigrants and native occupational choice. *Industrial Relations*, 50(3), 385-411.

Peri, G., and Yasenov, V. (2015). *The Labor Market Effects of a Refugee Wave: Applying the Synthetic Control Method to the Mariel Boatlift*. NBER Working Paper No. 21801. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w21801 [May 2016].

Peri, G., Shih, K., and Sparber, C. (2014). *Foreign STEM Workers and Native Wages and Employment in U.S. Cities*. NBER Working Paper No. 20093. Cambridge, MA: National Bureau of Economic Research. Available: http://www.nber.org/papers/w20093.pdf?new_window=1 [May 2016].

Peri, G., Shih, K., and Sparber, C. (2015a). STEM workers, H1B visas, and productivity in U.S. cities. *Journal of Labor Economics*, 33(S1 Part 2), S225-S255.

Peri, G., Shih, K., and Sparber, C. (2015b). *Foreign and Native Skilled Workers: What Can We Learn from H-1B Lotteries?* NBER Working Paper No. 21175. Cambridge, MA: National Bureau of Economic Research.

Pew Charitable Trusts. (2014a). *Changing Patterns in U.S. Immigration and Population*. Issue brief. Washington, DC. Available: http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2014/12/changing-patterns-in-us-immigration-and-population [February 2016].

Pew Charitable Trusts (2014b). *Mapping Public Benefits for Immigrants in the States*. Washington, DC: Pew Charitable Trusts, 1-3. Available: http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2014/09/mapping-public-benefits-for-immigrants-in-the-states [May 2016].

Pew Research Center. (2015a, September). *Modern Immigration Wave Brings 59 Million to U.S., Driving Population Growth and Change Through 2065: Views of Immigration's Impact on U.S. Society Mixed*. Washington, DC. Available: http://www.pewhispanic.org/files/2015/09/2015-09-28_modern-immigration-wave_REPORT.pdf [March 2016].

Pew Research Center. (2015b). *Public's Policy Priorities Reflect Changing Conditions at Home and Abroad*. Washington, DC: Pew Research Center. Available: http://www.people-press.org/2015/01/15/publics-policy-priorities-reflect-changing-conditions-at-home-and-abroad/ [January 2016].

Polgreen, L., and Simpson, N.B. (2011). Happiness and international migration. *Journal of Happiness Studies*, 12(5), 819-840.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Portes, A. (2007, March). Migration, development, and segmented assimilation: A conceptual review of the evidence. *ANNALS of The American Academy of Political and Social Science*, 610(1), 73-97.

Portes, A., and Bach, R.L. (1985). *Latin Journey: Cuban and Mexican Immigrants in the United States*. Berkeley: University of California Press.

Portes, A., and Rumbaut, R. (1990). *Immigrant America: A Portrait*. Berkeley: University of California Press.

Portes, A., and Rumbaut, R. (2014). *Immigrant America: A Portrait* (4th Ed.) Berkeley: University of California Press.

Portes, A., and Zhou, M. (1996). Self-employment and the earnings of immigrants. *American Sociological Review*, 61(2), 219-230.

Preston, I. (2013). *The Effect of Immigration on Public Finances*. University College London: UK, Centre for Research and Analysis of Migration.

Qian, Z., and Lichter, D.T. (2011). Changing patterns of interracial marriage in a multiracial society. *Journal of Marriage and Family*, 73(5), 1065-1084.

Rapoport, H., and Docquier, F. (2006). The economics of migrants' remittances. In S.C. Kolm and J.M. Ythier (Eds.), *Handbook of the Economics of Giving, Altruism, and Reciprocity* (vol. 2, Ch. 17, 1135-1198). Elsevier.

Reimers, D.M. (1992). *Still the Golden Door: The Third World Comes to America*. New York: Columbia University Press.

Rho, D.T. (2013). *Immigrant Earnings Assimilation: The Role of the Firm*. Working Paper. Available: https://econ.duke.edu/uploads/assets/PhD%20Program/Rho,%20Deborah.pdf [May 2016].

Rho, D.T. (2014). *Essays in Economics of Immigration*. Department of Economics, Duke University, NC. Available: http://dukespace.lib.duke.edu/dspace/bitstream/handle/10161/9086/Rho_duke_0066D_12597.pdf?sequence=1 [May 2016].

Ribar, D.C. (2012, October). *Immigrants' Time Use: A Survey of Methods and Evidence*. IZA Discussion Paper Series No. 6931. Bonn, Germany. Available: http://www.iza.org/MigrationHandbook/20_Ribar_immigrants_time_use_survey.pdf [March 2016].

Richard, J.L. (2013). Unemployment of people of foreign origin in France: The role of discrimination. *Canadian Studies in Population*, 40(1-2), 75-88.

Rodriguez, E.R., and Tiongson, E.R. (2001). Temporary migration overseas and household labor supply: Evidence from urban Philippines. *International Migration Review*, 35(3), 709-725.

Romer, P.M. (1986, October). Increasing returns and long-run growth. *Journal of Political Economy*, 94(5), 1002-1037.

Romer, P.M. (1990). Endogenous technological change. *Journal of Political Economy*, 98(5), S71-S102.

Rowthorn, R. (2008). The fiscal impact of immigration in advanced economies. *Oxford Review of Economic Policy*, 24(3), 739-764.

Ruggles, S., Genadek, K., Goeken, R., Grover, J., and Sobek, M. (2015). *Integrated Public Use Microdata Series: Version 6.0 (machine-readable database)*. Minneapolis: University of Minnesota.

Saiz, A. (2003). Room in the kitchen for the melting pot: Immigration and rental prices. *Review of Economics and Statistics*, 85(3), 502-521.

Saiz, A. (2007). Immigration and housing rents in American cities. *Journal of Urban Economics*, 61(2), 345-371.

Saiz, A. (2008, July). *On Local Housing Supply Elasticity*. Philadelphia, PA: Wharton School, University of Pennsylvania. Available: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1193422 [May 2016].

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Saiz, A., and Wachter, S.M. (2011). Immigration and the neighborhood. *American Economic Journal: Economic Policy*, 3(2), 169-188.

Samuelson, P.A. (1948). *Economics*. McGraw-Hill Book Company. York, PA: The Maple Press Company.

Sanchez, G.J. (1999). Race, nation, and culture in recent immigration studies. *Journal of American Ethnic History*, 18(4), 66-84.

Saxenian, A.L. (1999). *Silicon Valley's New Immigrant Entrepreneurs*. San Francisco, CA: Public Policy Institute of California. Available: http://www.ppic.org/content/pubs/report/R_699ASR.pdf [May 2016].

Saxenian, A.L. (2002). Brain circulation: How high-skill immigration makes everyone better off. *Brookings Review*, 20(1), 28-31.

Schiff, M., and Sjoblom, M.C. (2008). *Panel Data on International Migration (PDIM) 1975-2000*. Ref. WLD_1975_PDIM_v01_M. Available: http://microdata.worldbank.org [October 2015].

Schmertmann, C.P. (1992, November). Immigrants' ages and the structure of stationary populations—with below-replacement fertility. *Demography*, 29(4), 595-612.

Schultz, T.W. (1980). Investment in entrepreneurial ability. *The Scandinavian Journal of Economics*, 82(4), 437-448.

Schumpeter, J.A. (1950). *Capitalism, Socialism, and Democracy*. 3rd ed. New York: Harper and Row.

Sevak, P., and Schmidt, L. (2014). Perspectives: Immigrants and retirement resources. *Social Security Bulletin*, 74(1), 27-45. Available: http://www.ssa.gov/policy/docs/ssb/v74n1/v74n1p27.html [June 2016].

Singer, A. (2004). *The Rise of New Immigrant Gateways*. Washington, DC: The Brookings Institute Center on Urban and Metropolitan Policy. Available: http://www.brookings.edu/~/media/research/files/reports/2004/2/demographics-singer/20040301_gateways.pdf [September 2015].

Singer, A. (2009). *The New Geography of United States Immigration*. Brookings Immigration Series, No. 3. Washington, DC: The Brookings Institution. Available: http://www.brookings.edu/~/media/Research/Files/Papers/2009/7/immigration geography-singer/07_immigration_geography_singer.PDF [January 2016].

Smith, C.L. (2012). The impact of low-skilled immigration on the youth labor market. *Journal of Labor Economics*, 30(1), 55-89.

Smith, J.P. (2014a). *Taxpayer Effects of Immigration*. IZA World of Labor 2014: 50. Available: http://wol.iza.org [May 2016].

Smith, J.P. (2014b). *The Human Capital (Schooling) of Immigrants in America*. Handbook of the Economics of International Migration, 1A, Chapter 4.

Smith, J.P., and Edmonston, B. (Eds.). (1997). *The New Americans: Economic, Demographic, and Fiscal Effects of Immigration*. Washington, DC: National Academy Press.

Snipp, C.M. (1989). *American Indians: The First of This Land*. New York: Russell Sage Foundation.

Social Security Administration. (2015). *The 2015 Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Federal Disability Insurance Trust Funds*. Washington, DC: U.S. Government Printing Office. Available: http://www.ssa.gov/OACT/tr/2015/tr2015.pdf [May 2016].

Solow, R.M. (1956). A contribution to the theory of economic growth. *Quarterly Journal of Economics*, LXX, 65-94.

Somerville, W., and Sumption, M. (2009). *Immigration and the Labor Market: Theory, Evidence, and Policy?* The Equality and Human Rights Commission, Migration Policy Institute: Washington, DC.

Copyright National Academy of Sciences. All rights reserved.

*604*     THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

State, B., Rodriguez, M., Helbing, D., and Zagheni, E. (2014). *Migration of Professionals to the US: Evidence from Linkedin Data*. In Proceedings of the 6th International Conference on Social Informatics (SocInfo), Barcelona, Spain.

Steinhardt, M.F. (2011). The wage impact of immigration in Germany: New evidence for skill groups and occupations. *B.E. Journal of Economic Analysis and Policy*, 11(2), 1-35.

Stokey, N.L. (1988, August). Learning-by-doing and the introduction of new goods. *Journal of Political Economy*, 96(4), 701-717.

Storesletten, K. (2003). Fiscal implications of immigration: A net present value approach. *Scandinavian Journal of Economics*, 105(3), 487-506.

Suro, R., Wilson, J.H., and Singer, A. (2011). *Immigration and Poverty in America's Suburbs*. *Metropolitan Opportunity Series*. Washington, DC: The Brookings Institution.

Taylor, E. (1999, March). The new economics of labour migration and the role of remittances in the migration process. *International Migration*, 37(1), 63-88.

Teich, A.H. (2014). Streamlining the visa and immigration systems for scientists and engineers. *Issues in Science and Technology*, 31(1), 55-64.

Terrazas, A. (2009). *Older Immigrants in the United States*. Washington, DC: Migration Policy Institute. Available: http://www.globalaging.org/elderrights/us/2009/immigrants.pdf [August 2015].

Theil, H. (1972). *Statistical Decomposition Analysis*. Amsterdam: North-Holland Publishing Company.

Thomas, B. (1973). *Migration and Economic Growth: A Study of Great Britain and the Atlantic Economy*, Cambridge: Cambridge University Press.

Tienda, M. (2002). Demography and the social contract. *Demography*, 39(4), 587-616.

Tienda, M. (2015). Multiplying diversity: Family unification and the regional origins of late-age US immigrants. *International Migration Review*. doi:10.1111/imre.12241.

Tienda, M., and Fuentes, N. (2014). Hispanics in metropolitan America: New realities and old debates. *Annual Review of Sociology*, 40(1), 499-520.

Trefler, D. (1998). Immigrants and natives in general equilibrium trade models. In J. Smith and B. Edmonston (Eds.), *The Immigration Debate: Studies on the Economic, Demographic, and Fiscal Effects of Immigration* (pp. 206-238). Washington, DC: National Academy Press.

Trejo, S.J. (2003). Intergenerational progress of Mexican-origin workers in the U.S. labor market. *Journal of Human Resources*, 38(3), 467-489.

United Nations Population Division. (2001). *Replacement Migration: Is it a Solution to Declining and Ageing Populations?* New York: United Nations.

U.S. Bureau of Labor Statistics. (2015a). *Union Members-2014*. News Release, USDL-15-0072. Washington, DC: U.S. Department of Labor. Washington, DC. Available: http://www.bls.gov/news.release/union2.t05.htm [February 2016].

U.S. Bureau of Labor Statistics. (2015b). *Consumer Expenditures in 2013*. BLS Reports, Report 1053, February.

U.S. Census Bureau. (2014, December). *Methodology, Assumptions, and Inputs for the 2014 National Projections*. Washington, DC. Available: http://www.census.gov/population/projections/files/methodology/methodstatement14.pdf [July 2015].

U.S. Census Bureau. (2015). *Population Estimates: Population, Population Change, and Estimated Components of Population Change: 2000 to 2014*. Washington, DC. Available: http://www.census.gov/popest/data/national/totals/2014/NST-EST2014-alldata.html and http://www.census.gov/popest/data/historical/2000s/vintage_2009/datasets.html [February 2016].

U. S. Department of Homeland Security. (2013). *Yearbook of Immigration Statistics: 2012*. Washington, DC: US Department of Homeland Security, Office of Immigration Statistics.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

U. S. Department of Homeland Security. (2014). *Yearbook of Immigration Statistics: 2013 Lawful Permanent Residents*. Washington, DC: U.S. Department of Homeland Security, Office of Immigration Statistics. Available: https://www.dhs.gov/publication/yearbook-immigration-statistics-2013-lawful-permanent-residents [March 2016].

Van Hook, J., Zhang, W., Bean, F.D., and Passel, J.S. (2006). Foreign-born emigration: A new approach and estimates based on matched CPS files. *Demography*, 43(2), 361-382.

Van Hook, J., Bean, F.D., Bachmeier, J.D., and Tucker, C. (2014, February). Recent trends in coverage of the Mexican-born population of the United States: Results from applying multiple methods across time. *Demography*, 51(2), 699-726. Available: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4029097/ [May 2016].

Vargas, A.J. (2016). Assimilation effects beyond the labor market: Time allocations of Mexican immigrants to the US. *Review of Economics of the Household*, 14(3), 625-668.

Vargas-Silva, C. (2013). The fiscal impact of immigrants: Taxes and benefits. In B. Chiswick and B. Miller (Eds.), *Handbook of the Economics of International Migration* (Ch. 16, 107-208]. Oxford, UK: Elsevier.

Vigdor, J. (2013). *Immigration and the Revival of American Cities*. Partnership for a New American Economy and Americas Society, Council of the Americas.

Wadhwa, V., Saxenian, A.L., Rissing, B., and Gereffi, G. (2007). *America's New Immigrant Entrepreneurs*. Duke University, NC, and UC Berkeley, CA. Available: http://people.ischool.berkeley.edu/~anno/Papers/Americas_new_immigrant_entrepreneurs_I.pdf [May 2016].

Warren, R., and Warren, J.R (2013). Unauthorized immigration to the United States: Annual estimates and components of change, by state, 1990 to 2010. *International Migration Review*, 47(2), 296-329.

Wasem, R.E. (2012). *Immigration of Foreign Nationals with Science, Technology, Engineering and Medicine (STEM) Degrees (R42530)*. Washington, DC: Congressional Research Service. Available: https://www.fas.org/sgp/crs/misc/R42530.pdf [June 2016].

Wasem, R.E. (2016). T*emporary Professional, Managerial, and Skilled Foreign Workers: Policy and Trends*. Congressional Research Service Report No. R43735. Washington, DC. Available: https://www.fas.org/sgp/crs/homesec/R43735.pdf [March 2016].

Waters, M., and Jimenez, T.R. (2005). Assessing immigrant assimilation: New empirical and theoretical challenges. *Annual Review of Sociology*, 31, 105-125.

Wennekers, S., and Thurik, R. (1999). Linking entrepreneurship and economic growth. *Small Business Economics*, 13(1), 27-55.

Wheaton, L. (2007). *Underreporting of Means-Tested Transfer Programs in the CPS and SIPP*. The Urban Institute, Washington, DC. Available: http://www.urban.org/research/publication/underreporting-means-tested-transfer-programs-cps-and-sipp [March 2016].

Wyman, M. (1993). *Round-Trip to America: The Immigrants Return to Europe, 1880-1930*. Ithaca, NY: Cornell University Press.

Xie, Y., and Killewald, A.A. (2012). *Is American Science in Decline?* Cambridge, MA: Harvard University Press.

Xie, Y., Killewald, A.A., and Near, C. (2016). Between- and within-occupation inequality: The case of high-status professions. *The ANNALS of the American Academy of Political and Social Science*, 663(1), 53-79.

Zak, P.J., Feng, Y., and Kugler, J. (2002). Immigration, fertility, and growth. *Journal of Economic Dynamics and Control*, 26(4), 547-576.

Zallman, L., Wilson, F.A., Stimpson, J.P., Bearse, A., Arsenault, L., Dube, B., Himmelstein, D.U., and Woolhandler, S. (**2015**). Unauthorized immigrants prolong the life of Medicare's trust fund. *Journal of General Internal Medicine*, *31*(1), 122-127.

Zeng, Z., and Xie, Y. (2004). Asian-Americans' earnings disadvantage reexamined: The role of place of education. *American Journal of Sociology*, 109(5), 1075-1108.

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Zimmermann, K.F. (2014, May). *Circular Migration: Why Restricting Labor Mobility Can Be Counterproductive*. IZA World of Labor 2014:1. Bonn, Germany. Available: http://wol.iza.org/articles/circular-migration-1.pdf [March 2016].

Zolberg, A.R. (2006). *A Nation by Design: Immigration Policy in the Fashioning of America*. Cambridge, MA: Harvard University Press.

002954

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

# Appendix

# Biographical Sketches

## PANEL MEMBERS

**FRANCINE D. BLAU** (*Chair*), Department of Economics, Cornell University, is a research associate at the National Bureau of Economic Research, a research fellow of the Institute for the Study of labor (IZA) and the Center for Economic Studies/Ifo Institute, and a research professor at the German Institute for Economic Research. She has written extensively on gender issues, immigration, wage inequality, and international comparisons of labor market outcomes. She was president of the Society of Labor Economists, the Midwest Economics Association, and the Labor and Employment Association; and vice president of the American Economic Association. She was editor of the *Journal of Labor Economics* and serves or has served on the editorial boards of the *American Economic Review*, *Journal of Economic Perspectives*, *Journal of Labor Economics*, *Labour Economics*, and *Industrial and Labor Relations Review,* among others. She is a fellow of the Society of Labor Economists, American Academy of Political and Social Science, and Labor and Employment Relations Association. She received the Carolyn Shaw Bell Award in 2001 from the American Economic Association and the IZA Prize in 2010 for outstanding achievement in labor economics. She has a B.S. in industrial and labor relations from Cornell University, and an M.A. and a Ph.D. in economics from Harvard University.

**MICHAEL BEN-GAD** is professor of economics at City, University of London, and has served as head of the Department of Economics. He has worked in the research department of the Bank of Israel and was a faculty

*607*

002955

Copyright National Academy of Sciences. All rights reserved.

member of the University of Houston and the University of Haifa and a visiting professor at the Central European University and the International School of Economics at Tbilisi State University. He serves on the academic advisory group of the Tax Administration Research Centre (TARC), sponsored by the UK Economic and Social Research Council, HM Treasury, and HM Customs and previously served on the council of the Israel Economic Association. His research focuses on dynamic macroeconomics with applications to taxation, public debt, the economic effects of immigration, optimal fiscal policy, and the emergence of multiple equilibria in models of economic growth. He has written on immigration, fiscal policy, macroeconomic theory, and defense policy and has published in many peer-reviewed journals. He has a B.A. in economics from the Hebrew University of Jerusalem, and an A.M. and a Ph.D. in economics from the University of Chicago.

**GEORGE J. BORJAS** is Robert W. Scrivner professor of economics and social policy in the John F. Kennedy School of Government at Harvard University, research associate at the National Bureau of Economic Research, research fellow at IZA, and an elected fellow of the Society of Labor Economists. His teaching and research interests focus on the impact of government regulations on labor markets, with an emphasis on the economic impact of immigration. His academic work provides a theoretical and empirical framework for analyzing the welfare effects and distributional consequences of immigration. He has authored numerous books as well as articles in peer-reviewed journals. He is an editor for the *Journal on Human Capital* and *The International Migration Review*. He has a B.S. in economics and mathematics from St. Peter's College, and an M.A., an M.Phil., and a Ph.D. in economics from Columbia University.

**CHRISTIAN DUSTMANN** is professor of economics at University College London, director of the Centre for Research and Analysis of Migration, and president of the European Association of Labour Economists. He has served as president of the European Society of Population Economics and scientific director of the Norface Programme on Migration. He is a research fellow of the Centre for Economic Policy Research and research associate of the Institute for Fiscal Studies. He is a labor economist whose research focus is migration, education, and wage structures, areas in which he has widely published. He has conducted research projects for national governments and international organizations and regularly advises government bodies, international organizations, and the media on migration issues. He has a B.A. in business economics from the University of Bielefeld, Germany, and a Ph.D. in economics from the European University Institute, Florence.

**BARRY EDMONSTON** is research professor in the Department of Soci-

002956

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

ology at the University of Victoria. His areas of interest include internal and international migration, population distribution, human ecology, and demographic methods. Another interest is Canadian demographic issues; he served as vice-president and president of the Canadian Population Society from 2008 to 2012. He currently serves on the demographic technical advisory committee to Statistics Canada. He has frequently organized joint Canada-U.S. forums at meetings of professional population societies and coauthored a chapter on international migration for the second edition of *Methods and Materials of Demography*. His current research includes major studies with colleagues on the socioeconomic integration of Asian immigrants and their children in Canada and the United States and on interethnic, internativity, and interreligious marriages in Canada, as well as studies of internal migration of immigrants and the elderly and living arrangements of the elderly. He recently was guest editor for a special issue of *Canadian Studies in Population* dealing with life-course perspectives on immigration. He has a B.A. from the University of Oregon, and a Ph.D. from the University of Michigan.

**ISAAC EHRLICH** is State University of New York (SUNY) and University at Buffalo (UB) distinguished professor, chair of the Economics Department in the College of Arts and Sciences, and Melvin H. Baker professor of American enterprise in the School of Management at UB, SUNY. He is director of the UB Center of Excellence on Human Capital, Technology Transfer, and Economic Growth and Development; a research associate of the National Bureau of Economic Research; a research fellow at IZA; and editor in chief of the *Journal of Human Capital*. Previously he held appointments at Tel-Aviv University and the University of Chicago and was a visiting fellow at the Hoover Institution of Stanford University, visiting professor at the Hong Kong University of Science and Technology, and visiting fellow at the Hong Kong Monetary Authority. He is the author of numerous articles in major refereed journals on law and economics, crime and corruption, human capital and health economics, advertising and information, risk and insurance, asset management, Social Security, and economic growth and development. He has edited two books and a special issue of the *Journal of Political Economy* on the problem of development. He has a B.A. from the Hebrew University of Jerusalem, and a Ph.D. from Columbia University.

**CHARLES HIRSCHMAN** is Boeing international professor in the Department of Sociology and the Daniel J. Evans School of Public Policy and Governance at the University of Washington-Seattle. He is a social demographer with interests in race and ethnicity, immigration to the United States, and social change in Southeast Asia. He recently completed a book manuscript

002957

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

based on longitudinal survey data from the University of Washington's Beyond High School project. Prior to 1987, he taught at Duke University and Cornell University. He teaches undergraduate classes on comparative and historical social change and on immigration and ethnicity and post-graduate courses on demography and on comparative race and ethnicity. He was president of the Population Association of America in 2005 and is an elected fellow of the American Academy of Arts and Sciences and the American Association for the Advancement of Science. Dr. Hirschman received his B.A. from Miami University, Ohio, and his Ph.D. from the University of Wisconsin.

**JENNIFER HUNT** is James Cullen professor of economics in the Department of Economics at Rutgers University. During 2013-2015, she served as deputy assistant secretary for microeconomic analysis in the Office of Economic Policy, U.S. Department of the Treasury, and as chief economist at the U.S. Department of Labor. Before joining Rutgers in 2011, she held positions at McGill University, the University of Montreal, and Yale University. Dr. Hunt is a research associate at the National Bureau of Economic Research, research fellow at the Centre for Economic Policy Research, and research fellow at IZA. She is co-editor of the *Journal of Human Resources* and associate editor of the *Journal of Labor Economics*. She has conducted research in the areas of employment and unemployment policy, immigration, wage inequality, the transition from communism, crime, and corruption. Her current research focuses on immigration and innovation in the United States, the U.S. science and engineering workforce, and wage inequality. Dr. Hunt has an S.B. in electrical engineering from the Massachusetts Institute of Technology, and a Ph.D. in economics from Harvard University.

**DOWELL MYERS** is professor of policy, planning, and demography in the Sol Price School of Public Policy at the University of Southern California, where he also directs the Population Dynamics Research Group. He is a member of the American Planning Association, American Sociological Association, Population Association of American, and the American Real Estate and Urban Economics Association. His research approach of integrated demography treats demographic factors as interwoven with aggregate behaviors and impacts, including public perceptions and reactions to demographic change. Recent research has focused on public narratives about immigration, aging, and taxation; projections of generational change in the United States, California, and Los Angeles; and the upward mobility of immigrants with duration of U.S. residence. He was an advisor to the Census Bureau, an academic fellow of the Urban Land Institute, and a member of the Governing Board of the Association of Collegiate Schools

002958

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

of Planning. He has received the Haynes Award for Research Impact. He has a B.A. in anthropology from Columbia University, an M.C.P. in city and regional planning from the University of California, Berkeley, and a Ph.D. in urban and regional planning from the Massachusetts Institute of Technology.

**PIA ORRENIUS** is vice president and senior economist in the research department at the Federal Reserve Bank of Dallas, where she manages the regional economy group. She is executive editor of *Southwest Economy* and works primarily on regional economic growth and demographic change. She co-edited *Ten Gallon Economy: Sizing up Texas' Economic Growth* (2015), co-wrote *Beside the Golden Door: Immigration Reform in a New Era of Globalization* (2010) and has published extensively on the labor market impacts of immigration, unauthorized immigration, and U.S. immigration policy. She is a research fellow at the Tower Center for Political Studies at Southern Methodist University and at IZA, an adjunct scholar at the American Enterprise Institute in Washington, D.C., and adjunct professor at Baylor University (Dallas campus), where she teaches in the executive MBA program. She was senior economist on the Council of Economic Advisers in the Executive Office of the President, Washington, D.C., in 2004-2005, advising the Bush administration on labor, health, and immigration issues. She holds a Ph.D. in economics from the University of California, Los Angeles, and bachelor's degrees in economics and Spanish from the University of Illinois at Urbana-Champaign.

**JEFFREY S. PASSEL** is a senior demographer at the Pew Research Center's Hispanic Trends Project. Previously he served as principal research associate at the Urban Institute's Labor, Human Services, and Population Center. His expertise focuses on immigration to the United States and the demography of racial and ethnic groups. Dr. Passel has authored numerous studies on immigrant populations in America, undocumented immigration, the economic and fiscal impact of the foreign-born, and the impact of welfare reform on immigrant populations. He regularly discusses Pew project findings in print and broadcast media. Dr. Passel has an M.A. in sociology from the University of Texas at Austin, and a Ph.D. in social relations from the Johns Hopkins University.

**KIM RUEBEN** is a senior fellow of the Urban Institute and director of the State and Local Finance Initiative of the Urban-Brookings Tax Policy Center at the Urban Institute. She is also an adjunct fellow at the Public Policy Institute of California (PPIC) and is currently serving on the Council of Economic Advisors to California State Controller Betty Yee. Her expertise focuses on state and local public finance and the economics of education;

002959

Copyright National Academy of Sciences. All rights reserved.

612        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

her research examines state and local tax policy, fiscal institutions, state and local budgets, issues of education finance, and teacher labor markets. Previously she was a member of the Washington DC Tax Revision Commission, was a research fellow at the PPIC; an adjunct professor at the Georgetown Public Policy Institute and at the Goldman School of Public Policy at the University of California, Berkeley; a visiting scholar at the San Francisco Federal Reserve Bank, and on the executive board of the American Education Finance Association. She has a B.S. in applied math-economics from Brown University, an M.S. in economics from the London School of Economics and Political Science, and a Ph.D. in economics from the Massachusetts Institute of Technology.

**MARTA TIENDA** is Maurice P. During '22 professor in demographic studies, professor of sociology and public affairs, and research associate in the Office of Population Research at Princeton University. Previously she held permanent positions at the universities of Chicago and Wisconsin–Madison and visiting appointments at New York University, Stanford, and Brown. Her research focuses on race and ethnic differences in various metrics of social inequality—ranging from poverty and welfare to education and employment—to address how ascribed attributes acquire social and economic significance. She is developing two research initiatives on age and immigration. She is an independent trustee of the Teachers Insurance Annuity Association, the Jacobs Foundation of Switzerland, and the Sloan Foundation and serves on the boards of the Population Reference Bureau and the President's Commission on Educational Excellence for Hispanics. She has served on the boards of Brown University, the Federal Reserve Bank of New York, the W.T. Grant Foundation, the Carnegie Corporation of New York, the Kaiser Family Foundation, and the Russell Sage Foundation and was president of the Population Association of America. She has a B.A. in Spanish (education) from Michigan State University, and an M.A. and a Ph.D. in sociology from the University of Texas at Austin.

**YU XIE** is Bert G. Kerstetter '66 university professor of sociology at Princeton University and has a faculty appointment at the Princeton Institute of International and Regional Studies. Previously he was distinguished university professor of sociology, statistics, and public policy at the University of Michigan and visiting chair professor at the Center for Social Research, Peking University. His main areas of interest are social stratification, demography, statistical methods, Chinese studies, and sociology of science. His recently coauthored *Marriage and Cohabitation, Statistical Methods for Categorical Data Analysis* and *Is American Science in Decline?* Dr. Xie has a B.S. in metallurgical engineering from Shanghai University of

002960

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

Technology, and, from the University of Wisconsin–Madison, an M.A. in the history of science, and an M.S. and a Ph.D. in sociology.

## CONSULTANTS

**GRETCHEN STOCKMAYER DONEHOWER** is a research specialist with the Center on the Economics and Demography of Aging at the University of California, Berkeley. Her work focuses on quantitative research methods and has contributed to research in population forecasting, the economics of population aging, primate ecology, residential segregation, and education. Her current research projects are on understanding the age dimension of economic activity and on adding a gender perspective to economic analysis by measuring the value of women's unpaid care services and housework. Previously she worked in private industry as an investment analyst and as a statistician for a software company and was a mathematics teacher in the U.S. Peace Corps in Nepal. She has a B.A. in economics and mathematics from Yale University, and an M.A. in statistics and a Ph.D. in demography, both from the University of California, Berkeley.

**RYAN D. EDWARDS** is associate professor of economics at Queens College, a member of the doctoral faculty at the Graduate Center at the City University of New York (CUNY), a faculty associate at the CUNY Institute for Demographic Research, and research associate in health economics at the National Bureau of Economic Research. Previously he held postdoctoral positions at Stanford University and the RAND Corporation and was a visiting professor at the University of California, a visiting scientist at Harvard University, and a staff economist on the U.S. Council of Economic Advisers. His research interests focus on the economics of aging and health, macroeconomics, public finance, and economic demography. He is a member of the American Economic Association and the Population Association of America. He has presented at numerous workshops and seminars and has served as a referee for journals including *American Economic Review, American Economic Journal, Applied Economics, Demographic Research,* and *Population Studies*. He has a B.A. in public and international affairs from Princeton University and a Ph.D. in economics from the University of California, Berkeley.

**SARAH GAULT** is a research assistant in the Urban-Brookings Tax Policy Center at the Urban Institute, contributing to the State and Local Finance Initiative. She works primarily on topics relating to state and local public finance and has also supported research on financial transaction taxes and the simplification of student financial aid. She holds a bachelor's degree in economics from the College of William and Mary, where she worked

002961

Copyright National Academy of Sciences. All rights reserved.

614        THE ECONOMIC AND FISCAL CONSEQUENCES OF IMMIGRATION

as a research assistant estimating Hispanic-white wage gaps for men and women.

**JULIA GELATT** is a research associate in the Center on Labor, Human Services, and Population at the Urban Institute, where her mixed-methods research focuses on immigration, child well-being, and early education. Her work on immigration includes a compilation of state policies toward immigrants and analysis of their impact on immigrant families' material well-being, a review of promising practices for connecting immigrant families to prekindergarten, a profile of the limited English proficient population in Washington, DC, and research on the implications of parents' and children's immigration status for children's health and well-being. Dr. Gelatt's work on child well-being includes a focus on instability in families' access to child care subsidies, analysis of the child care settings used by parents working nonstandard schedules, an examination of the contexts that shape parenting practices, and a study of the factors influencing immigrant families' child care choices. Previously she worked on topics related to U.S. immigration policy and immigrant integration at the Migration Policy Institute. She received her Ph.D. in sociology and social policy from Princeton University.

## STAFF

**CHRISTOPHER MACKIE** (*Study Director*) is a senior program officer with the Committee on National Statistics of the National Academies of Sciences, Engineering, and Medicine, where he specializes in economic measurement and statistics. He has directed projects on the measurement of self-reported well-being and on measuring civic engagement and social cohesion. He was study director for the expert committees that produced the reports *At What Price? Conceptualizing and Measuring Cost-of-Living and Price Indexes*; *Beyond the Market: Designing Nonmarket Accounts for the United States*; *Understanding Business Dynamics: An Integrated Data System for America's Future*; *Accounting for Health and Health Care: Approaches to Measuring the Sources and Costs of Their Improvement*; *Improving Measurement of Productivity in Higher Education;* and *Subjective Well-being: Measuring Happiness, Suffering, and Other Dimensions of Experience*. He is author of *Canonizing Economic Theory: How Theories and Ideas Are Selected in Economics*. He holds a Ph.D. in economics from the University of North Carolina and has held teaching positions at the University of North Carolina, North Carolina State University, and Tulane University.

002962

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

**ESHA SINHA** joined the Committee on National Statistics as an associate program officer in July 2009. Previously she worked with SUNY Binghamton student records on such topics as whether advanced placement or SAT scores are better predictors of college success and performance of transfer students. She is currently supporting two expert panels and one workshop and has worked on a variety of panel studies, workshops, and planning meetings under the Committee on National Statistics. She co-edited *Improving Measurement of Productivity in Higher Education* and was co-rapporteur of *National Patterns of R&D Resources: Future Directions for Contents and Methods: Summary of a Workshop*. She has an M.A. in economics from GIPE, India, and worked as research assistant in the Indian Institute of Management, Ahmedabad, before attending SUNY Binghamton. She has a Ph.D. in economics from SUNY Binghamton.

002963

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002964

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

## COMMITTEE ON NATIONAL STATISTICS

The Committee on National Statistics was established in 1972 at the National Academies of Sciences, Engineering, and Medicine to improve the statistical methods and information on which public policy decisions are based. The committee carries out studies, workshops, and other activities to foster better measures and fuller understanding of the economy, the environment, public health, crime, education, immigration, poverty, welfare, and other public policy issues. It also evaluates ongoing statistical programs and tracks the statistical policy and coordinating activities of the federal government, serving a unique role at the intersection of statistics and public policy. The committee's work is supported by a consortium of federal agencies through a National Science Foundation grant, a National Agricultural Statistics Service cooperative agreement, and several individual contracts.

002965

Copyright National Academy of Sciences. All rights reserved.

The Economic and Fiscal Consequences of Immigration

002966

Copyright National Academy of Sciences. All rights reserved.

8/19/24, 8:54 PM    Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala | The White House

Case 6:24-cv-00306-JCB  Document 124  Filed 11/07/24  Page 2974 of 4699  PageID #: 6139

MAY 07, 2024

# Fact Sheet: Third Ministerial Meeting on the Los Angeles DeclarationOn Migration and Protection in Guatemala

Nearly two years ago, in response to the historic challenge of migration and forced displacement, President Biden launched the Los Angeles Declaration on Migration and Protection, with 20 leaders from across the Western Hemisphere. The Los Angeles Declaration is a first-of-its-kind framework to promote coordinated action under three core pillars: (1) addressing root causes and supporting the integration of migrants to foster long-term stabilization; (2) expanding lawful pathways; and (3) strengthening humane enforcement.

On May 7, 2024, Guatemala hosted the third Los Angeles Declaration Ministerial with foreign ministers and senior representatives from 21 endorsing countries. Secretary of State Antony Blinken led the U.S. delegation, alongside White House Coordinator for the Los Angeles Declaration Marcela Escobari, Department of Homeland Security Senior Official Performing the Duties of the Deputy Secretary Kristie Canegallo, and USAID Acting Assistant Administrator for Latin America and the Caribbean Michael Camilleri. The United States is grateful for President Arévalo's leadership in hosting the Ministerial.

On behalf of the United States, Secretary Blinken announced $578 million in humanitarian, development, and economic assistance to support partner countries and host communities in responding to urgent humanitarian needs, expanding lawful pathways, and supporting the regularization and integration of migrants. The United States also announced expanded enforcement partnerships to deter irregular migration, including increased consequences for the smuggling networks that prey on vulnerable migrants. The U.S. Government reiterated its commitment to work alongside partners to establish a permanent, regionally-driven Secretariat to ensure that

002967

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2975 of 4699   PageID #: 6140

coordinated progress is sustained under the Los Angeles Declaration.

The endorsing countries presented progress toward their commitments under the Los Angeles Declaration and announced the following new initiatives.

<u>Strengthening Humane Enforcement</u>

- The United States took steps on May 6 to impose visa restrictions on executives of several Colombian maritime transportation companies for facilitating irregular migration to the United States. These are part of a broader set of U.S. actions targeting owners, executives, and senior officials of companies providing transportation by land, sea, or charter air designed for use primarily by persons intending to irregularly migrate to the United States. Earlier restrictions were placed on individuals in the charter air sector.

- The International Air Transport Association and several of its member airlines committed to concerted action to limit the use of commercial flights for irregular migration.

- The United States and Costa Rica announced the establishment of a new Biometric Data Sharing Partnership to enhance Costa Rica's biometric collection and matching, and strengthen its border management, thereby increasing safety and security in the region. The United States and Costa Rica also signed a memorandum of understanding outlining bilateral cooperation in countering trafficking in persons.

- The United States is deploying additional resources to Guatemala to increase security at land, air, and sea ports throughout the country, increasing screening and vetting in the region.

- The United States will expand public awareness of the CBP One™ mobile app among migrants seeking to enter the United States. From January 2023 through the end of March 2024, more than 547,000 individuals have used CBP One™ and presented themselves to a port of entry for processing, instead of risking their lives at the hands of smugglers.

- The United States leads the Countering Human Trafficking and Migrant Smuggling Action Package Committee under the Los Angeles Declaration, coordinating international efforts to target, investigate, arrest, and prosecute human smuggling organizations that are preying on vulnerable migrants.

- Partner countries reaffirmed their commitment to stem extracontinental irregular migration through increased use of transit visas, passenger vetting, and enforcement measures against entities and individuals that profit from irregular migration.

Expanding Lawful Pathways for Migration and Protection

- President Biden rebuilt our refugee resettlement program and led a historic expansion of lawful pathways to the United States and partner countries.  Under the President's Safe Mobility Offices initiative to deter irregular migration and expand lawful pathways in the Western Hemisphere, we are on track to increase six-fold the number of approved refugees from the region.  Already, over 21,000 individuals have been approved to resettle safely and legally in the United States through the Safe Mobility Offices in Guatemala, Costa Rica, Colombia, and Ecuador.

- Guatemala and the United States announced that the Safe Mobility Offices in Guatemala will expand eligibility to include Hondurans, Salvadorans, and Nicaraguans present in Guatemala.

- Costa Rica and the United States announced that the Safe Mobility Offices in Costa Rica will expand eligibility to accept Ecuadorians.

- The United States reaffirmed its commitment to strengthening lawful pathways. Under the Cuba, Haiti, Nicaragua, Venezuela (CHNV) parole process, flows of irregular migrants from these four countries have been reduced significantly, while 435,000 vetted and cleared individuals of these nationalities have been approved to lawfully enter the United States. Applicants must have a U.S.-based financial supporter, pass vetting and background checks, and meet other established criteria to receive advanced travel authorization. Once paroled on a case-by-case basis, CHNV nationals are eligible to apply for work authorization and start work immediately.

002969

- USAID announced plans to launch a new regional labor mobility initiative — "Alianza de Movilidad Laboral para las Américas" or "Labor Neighbors" — to increase access to lawful temporary labor pathways for new migrant-source and destination countries. The initiative will work with international organizations and other partners to provide technical assistance to countries across the region to identify eligible workers to meet pressing labor needs.

- The Department of Labor launched a $3 million project to strengthen protections for workers participating in U.S. temporary foreign worker programs. The United States also announced it is joining the International Labor Organization's Fair Recruitment Initiative and its Advisory Committee. The initiative seeks to ensure that domestic and cross-border recruitment practices are grounded in international labor standards, promote gender equality, and prevent human trafficking and forced labor. These steps reinforce the Biden Administration's Presidential Memorandum on Advancing Worker Empowerment, Rights, and High Labor Standards Globally and its steadfast commitment to protecting worker rights at home and around the world.

- Mexico announced that, since 2022, it has issued over 17,500 temporary visas to individuals seeking international protection to address labor shortages in the country. Additionally, Mexico has launched a pilot program in collaboration with the Haitian Embassy, International Organization for Migration, and the Tent Partnership to expand labor pathways, offering job opportunities and work permits to Haitian migrants.

- Costa Rica committed to continue modernizing its asylum system through digitalization, data-driven solutions, and adopting practices to streamline refugee status determination with support from UNHCR and the international community.

- Canada confirmed it will take UNHCR referrals from the Safe Mobility Offices, as part of Canada's ongoing commitment to this important initiative. Canada has also made significant progress on its commitment to welcome 15,000 migrants from the Americas region. Canada is also investing $75 million Canadian dollars over six years to fund capacity

building projects to strengthen migration and protection systems in the region.

<u>Addressing Root Causes and Supporting the Integration of Migrants to Foster Long-term Stabilization</u>

- The United States reaffirmed its commitment to addressing the root causes of irregular migration. The U.S. International Development Finance Corporation is announcing the approval of a $20 million direct loan to Cosami, a savings and loan cooperative, for low-income mortgages in rural Guatemala. Cosami's assistance will help finance the construction of borrowers' first homes, helping to improve living conditions, create jobs, and promote economic growth in lower-income communities.

- With initial support from the U.S. Government, the International Organization for Migration launched a new online platform and data portal for the Los Angeles Declaration, which enables endorsing countries to obtain, share, and disseminate best practices and data.

- Ecuador announced that, under a new regularization program, those who have already registered will be able to complete their process to obtain a temporary resident visa and more migrants will be able to apply for a temporary visa.

- Colombia announced a plan for regularization of irregular migrants through special permits for parents and legal guardians of children with valid Temporary Protective Status. Colombia also announced a new special permanent visa for Latin American and Caribbean migrants without regular status in the country. The Colombian government estimates these actions will benefit up to 600,000 individuals.

- Costa Rica committed to expand the Special Temporary Category regularization pathway and reduce barriers to access with continued assistance from the international community.

<p align="center">###</p>

JUNE 18, 2024

# FACT SHEET: President Biden Announces New Actions to Keep Families Together

Since his first day in office, President Biden has called on Congress to secure our border and address our broken immigration system. As Congressional Republicans have continued to put partisan politics ahead of national security – twice voting against the toughest and fairest set of reforms in decades – the President and his Administration have taken actions to secure the border, including:

- Implementing executive actions to bar migrants who cross our Southern border unlawfully from receiving asylum when encounters are high;

- Deploying record numbers of law enforcement personnel, infrastructure, and technology to the Southern border;

- Seizing record amounts of fentanyl at our ports of entry;

- Revoking the visas of CEOs and government officials outside the U.S. who profit from migrants coming to the U.S. unlawfully; and

- Expanding efforts to dismantle human smuggling networks and prosecuting individuals who violate immigration laws.

President Biden believes that securing the border is essential. He also believes in expanding lawful pathways and keeping families together, and that immigrants who have been in the United States for decades, paying taxes and contributing to their communities, are part of the social fabric of our country. The Day One immigration reform plan that the President sent to Congress reflects both the need for a secure border and protections for the long-term undocumented. While Congress has failed to act on these reforms, the Biden-Harris Administration has worked to strengthen our lawful immigration system. In addition to vigorously defending the DACA (Deferred Action for Childhood arrivals) policy, the Administration has extended Affordable Care Act coverage to DACA recipients and streamlined, expanded,

002972

and instituted new reunification programs so that families can stay together while they complete the immigration process.

Still, there is more that we can do to bring peace of mind and stability to Americans living in mixed-status families as well as young people educated in this country, including Dreamers. That is why today, President Biden announced new actions for people who have been here many years to keep American families together and allow more young people to contribute to our economy.

## Keeping American Families Together

- Today, President Biden is announcing that the Department of Homeland Security will take action to ensure that U.S. citizens with noncitizen spouses and children can keep their families together.

- This new process will help certain noncitizen spouses and children apply for lawful permanent residence – status that they are already eligible for – without leaving the country.

- These actions will promote family unity and strengthen our economy, providing a significant benefit to the country and helping U.S. citizens and their noncitizen family members stay together.

- In order to be eligible, noncitizens must – as of June 17, 2024 – have resided in the United States for 10 or more years and be legally married to a U.S. citizen, while satisfying all applicable legal requirements. On average, those who are eligible for this process have resided in the U.S. for 23 years.

- Those who are approved after DHS's case-by-case assessment of their application will be afforded a three-year period to apply for permanent residency. They will be allowed to remain with their families in the United States and be eligible for work authorization for up to three years. This will apply to all married couples who are eligible.

- This action will protect approximately half a million spouses of U.S. citizens, and approximately 50,000 noncitizen children under the age of 21 whose parent is married to a U.S. citizen.

002973

### Easing the Visa Process for U.S. College Graduates, Including Dreamers

- President Obama and then-Vice President Biden established the DACA policy to allow young people who were brought here as children to come out of the shadows and contribute to our country in significant ways. Twelve years later, DACA recipients who started as high school and college students are now building successful careers and establishing families of their own.

- Today's announcement will allow individuals, including DACA recipients and other Dreamers, who have earned a degree at an accredited U.S. institution of higher education in the United States, and who have received an offer of employment from a U.S. employer in a field related to their degree, to more quickly receive work visas.

- Recognizing that it is in our national interest to ensure that individuals who are educated in the U.S. are able to use their skills and education to benefit our country, the Administration is taking action to facilitate the employment visa process for those who have graduated from college and have a high-skilled job offer, including DACA recipients and other Dreamers.

###

002974

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 2982 of 4699 PageID #: 6147

JUNE 10, 2022

# Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables

Today, President Biden joins leaders from across the Western Hemisphere to present the Los Angeles Declaration on Migration and Protection at the Summit of the Americas. The Declaration seeks to mobilize the entire region around bold actions that will transform our approach to managing migration in the Americas. The Declaration is organized around four key pillars: (1) stability and assistance for communities; (2) expansion of legal pathways; (3) humane migration management; and (4) coordinated emergency response.

In preparation for the Summit, the United States and other countries in the region developed a suite of bold new migration-related deliverables.

## Pillar I: Stability and Assistance for Communities

Addressing the unprecedented migration crisis in the region requires us to rethink how we view multilateral development finance and how we manage the strains on our economies. Globally, International Financial Institutions (IFIs) and development assistance have been directed to poor and low-income countries, designations which no longer apply to most of Latin America and the Caribbean. The need for economic stabilization and support is particularly important in countries housing the more than six million refugees and migrants.

- **Belize will implement in August 2022 a program to regularize Central American and CARICOM migrants** who have been living illegally in the country for a specified time.

- **Colombia's leadership in responding to Venezuelan migrants and refugees with forward-leaning policies based on solidarity, humanitarian relief, and protection:** Colombia reaffirms its

commitment to fully implement its announcement of temporary protected status for displaced Venezuelan migrants and refugees in its territory. As of June 10, it has granted regularization documents to over 1.2 million individuals, allowing them to work legally, access public and private services, integrate successfully, and contribute to Colombia's economy and society. Colombia further reaffirms its commitment to grant regularization permits to 1.5M Venezuelan migrants and refugees in total, by the end of August 2022.

- **Costa Rica commits to plan for a renewal of the special temporary complementary protection category scheme for migrants from Venezuela, Nicaragua, and Cuba**, that have arrived prior to March 2020, contingent on obtaining necessary financial resources, and to convene an international task force to secure additional direct support and financial resources to support its implementation.

- **Ecuador issued an executive decree that creates a path to a regular migration status for Venezuelans who entered the country regularly via an official port of entry, but who are currently out of status.** This process includes unaccompanied or separated migrant children and a migration amnesty. It contemplates the provision of identification documents for the regularization process, taking into account the current difficulties facing Venezuelan citizens. It intends to expand this process to include all Venezuelans.

- **The United States will provide additional U.S. support for a crisis response mechanism on migration**. Working with Congress, we will provide an additional $25 million to the Global Concessional Financing Facility (GCFF) housed at the World Bank to prioritize countries in Latin America such as Ecuador and Costa Rica in their newly announced regularization programs for displaced migrant and refugee populations residing within their respective countries.  The new funding would support registration processes, the extension of social services, integration programs, and would benefit host communities that have generously opened their doors to the most vulnerable.

- **The United States will announce $314 million in new PRM and USAID funding for stabilization efforts in the Americas.** USAID and the State Department's Bureau of Population, Refugees, and Migration (PRM) will

002976

announce more than $314 million in new funding for humanitarian and development assistance for refugees and vulnerable migrants across the hemisphere. This includes support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.

**Pillar II: Legal Pathways and Protection**

Expanding legal pathways for protection and opportunity is at the heart of efforts to humanely address irregular migration in the Americas. The goal is to *change the way* people migrate. Countries in the region have strategically pegged priority legal pathway programs with the primary reasons for migrating: (1) jobs; (2) protection; and (3) family reunification.

- **Canada's resettlement and complementary pathways initiative:** Canada is welcoming record numbers of refugees and in line with Canada's immigration levels plans. As part of these growing efforts, Canada will increase refugee resettlement from the Americas and aims to welcome up to 4,000 individuals by 2028, providing durable solutions to a number of refugees in the region. Canada recognizes the important support of the UNHCR and the IOM in the region. Canada will also look to promote its regular pathways in the region to help provide opportunities including to those in vulnerable situations. For example, Canada will advance a promotion and recruitment efforts related to its Francophone Immigration Program which may offer opportunities to French speaking newcomers such as Haitians with skills and experience, some of which may gave have been displaced due to the pandemic.

- **Canada is addressing root causes and investing $26.9 million, in 2022-2023, in additional funding toward migration- and protection-related capacity building in the Americas.** This funding is supporting projects across Latin America and the Caribbean focused on supporting the socio-economic and labour market integration of refugees and migrants; improving border and migration management systems; contributing to the safeguarding of migrants, refugees and host communities' rights; advancing gender equality and inclusive economic growth; and preventing and tackling migrant smuggling and trafficking in persons.

- **Canada expects to welcome more than 50,000 agricultural workers from Mexico, Guatemala and the Caribbean in 2022.** Canada is a strong

000297

supporter of labour mobility and continues to actively promote regular pathways for migration, including temporary foreign worker programs that respond to employer labour needs, to address our labour market gaps and as alternatives to irregular migration.

- **Guatemala approves new legislation to promote legal labor migration programs.** On June 1, the Government of Guatemala approved new legislation to incentivize fair recruitment and expand legal pathways for its citizens. The legislation exempts airline tickets from value-added and departure taxes for those traveling for temporary work abroad contracts obtained through the Ministry of Labor.  The new initiative is part of a broader set of Guatemalan programs and policies to expand access to labor migration programs, ensure ethical recruitment, and promote legal protections for Guatemalan workers.

- **Mexico will expand the existing Border Worker Card program to include 10,000 to 20,000 additional beneficiaries.** This program allows greater labor mobility to meet employer needs in Mexico, promote economic development in Central America, and provide an alternative to irregular migration.

-  **Mexico will launch a new temporary labor program providing work opportunities in Mexico for 15,000 to 20,000 workers from Guatemala per year.**  The Government of Mexico aims to expand eligibility for that program to include Honduras and El Salvador in the medium-term.

- **Mexico will integrate 20,000 recognized refugees into the Mexican labor market over the next three years.** With the support of UNHCR, the program would connect individuals with legal status as recognized refugees in Mexico to work opportunities in regions with labor shortages. A joint initiative with UNHCR, the private sector and the Mexican Government, both refugees and firms will benefit from successful integration into Mexico's formal labor market.

- **The United States will launch the development of a $65 million U.S. Department of Agriculture (USDA) pilot program to support U.S. farmers hiring agricultural workers under the H-2A program.** In collaboration with other agencies, USDA is exploring a multi-year pilot

program funded by the President's American Rescue Plan to provide grants to agricultural employers that hire farmworkers from Northern Central American countries under the seasonal H-2A visa program and agree to additional protections to benefit both U.S. and H-2A workers. The pilot will promote the resiliency of our food and agricultural supply chain and three major Administration priorities: (1) driving U.S. economic recovery by addressing current labor shortages in agriculture; (2) reducing irregular migration through the expansion of legal pathways; and (3) improving working conditions for U.S. and migrant agricultural workers. USDA will enter into a cooperative agreement with the United Farm Workers of America (UFW), which will work with relevant stakeholders, including farmers, farmworkers, farmworker advocates and unions, to ensure that the agency benefits from a wide range of views in designing this program.

- **The United States will provide 11,500 H-2B nonagricultural seasonal worker visas for nationals of Northern Central America and Haiti.** To address labor shortages in key sectors of the U.S. economy and reduce irregular migration, the Department of Homeland Security (DHS) and Department of Labor (DOL) made an additional 11,500 H-2B visas available in late May. These visas are dedicated for nationals of the Northern Central America countries and Haiti for this fiscal year. This is combined with new employer oversight provisions.

- **The United States will roll out new Fair Recruitment Practices Guidance for Temporary Migrant Workers with the cooperation of major employers, including Walmart.** As the United States and various other countries expand temporary worker programs in the Western Hemisphere, President Biden recognizes the importance of safeguarding against exploitation of workers. This is why his Administration will issue first-of-its-kind "Guidance on Fair Recruitment Practices for Temporary Workers." The guidance promotes best practices for governments seeking to increase participation in the H-2 visa programs and employers relying on these programs. The United States has also mobilized the support of major U.S. retailer Walmart, which notes the importance of H-2A migrant workers to U.S. agriculture and that the fair recruitment guidance aligns with the company's own expectations around responsible recruitment.

- **The United States will commit to resettle 20,000 refugees from the Americas during Fiscal Years 2023 to 2024.** This represents a three-fold increase from this year and reflects the Biden Administration's strong commitment to welcoming refugees. The protection needs are significant in the Western Hemisphere. More than 5 million Venezuelans have been displaced in the Americas, and hundreds of thousands more people from other countries across Latin America and the Caribbean are also displaced [across borders]. As the United States scales up its resettlement operations in the Americas, we call on other governments to do the same.

- **The United States will increase resettlement of Haitian refugees.** Reflecting the President's commitment to support the people of Haiti, the United States also commits to receiving an increased number of referrals to the U.S. Refugee Admissions Program for Haitians. The United States encourages other governments to join us in strengthening legal pathways for protection and opportunity for Haitians and other displaced populations in the Americas.

- **The United States will resume and increase participation in the Haitian Family Reunification Parole Program.** The Department of Homeland Security will announce the resumption of the Haitian Family Reunification Parole Program, which allows certain eligible U.S. citizens and lawful permanent residents to apply for parole for their family members in Haiti. Additionally, U.S. Citizenship and Immigration Services will take steps to increase participation in the program by reducing barriers to access. New invitations to apply under the program are anticipated to be issued in early fall 2022.  Concurrently, the Department of State will increase efforts to process Haitian immigrant visas and reduce the existing backlog. State is in the process of assessing options to augment consular adjudicator staffing in Embassy Port-au-Prince and review additional operational efficiencies to decrease the immigrant visa backlog for Haitians.

- **The United States will resume the Cuban Family Reunification Parole Program.** Last month, the United States announced the resumption of operations for the Cuban Family Reunification Parole Program (CFRP). CFRP provides a safe, orderly pathway to the United States for certain Cuban beneficiaries of approved family-based immigrant petitions. DHS

002980

8/19/24, 6:24 PM    Fact Sheet: The Los Angeles Declaration on Migration and Protection - U.S. accord and foreign dignitaries—the W…

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 2988 of 4699 PageID #: 6153

will resume processing cases this summer, work with the Department of State to begin interviews in Cuba by early fall, and build capacity to consider and process approved applicants, thus contributing to migration accord targets over the next two years.

*Observer States*

- **Spain will double the number of labor pathways for Hondurans** to participate in Spain's circular migration programs.

## Pillar III: Humane Border Management

Securing borders with humane border management policies and practices is essential to reducing irregular migration and collaboratively managing migration across the hemisphere. The focus moving forward should be on: 1) humane border enforcement; 2) return of migrants lacking protection needs or other legal basis to remain; 3) facilitating returns to countries of most recent residence or origin; 4) support for assisted voluntary returns; and 5) strengthened bilateral and regional law enforcement information sharing and cooperation to combat migrant smuggling and human trafficking.

- **The United States will announce a multilateral "Sting Operation" to disrupt human smuggling networks across the Hemisphere.** The President will announce a first of its kind campaign, unprecedented in scale, to disrupt and dismantle smuggling networks in Latin America. In the last two months, the United States, led by DHS, has surged over 1,300 personnel throughout the region and invested over $50 million to support these activities. Through the end of May, efforts have produced approximately 20,000 total disruption actions including arrests and prosecutions, seizures of property such as houses and vehicles used to hide and smuggle people, and criminal investigations. DHS assesses that this has led to 900 fewer migrants arriving at the Southwest border each day, and we are just getting started. The U.S. will seek to expand efforts with other governments in the region to improve information sharing, build capacity, and advance criminal investigations.

- **The United States will improve the efficiency and fairness of asylum at the border.** In late May, DHS and Department of Justice began implementing a new process that improves and expedites processing of

asylum claims made by noncitizens subject to expedited removal, to ensure that those who are eligible for asylum are granted relief quickly, and those who are not are promptly removed. The new process is a further step toward a more functional and sensible asylum system that reduces the caseload in immigration courts while also providing individuals with a prompt and fair decision in their case. DHS is phasing in the implementation of this rule and when fully implemented, the rule will shorten the administrative process from several years to just several months.

JULY 27, 2023

# Labor Market Indicators Are Historically Strong After Adjusting for Population Aging

The U.S. labor market is historically strong, posting elevated and even record measures of labor force participation and employment. By some measures, however, these trends are masked by population aging, which reduces labor supply over time. This post illustrates four facts about the continuing strength of supply and demand after accounting for the impacts of aging.

## 1. Adjusting for population aging improves comparisons in labor market indicators over time.

The employment-to-population ratio (EPOP) and the labor force participation rate (LFPR) are two closely-watched labor market metrics. EPOP indicates the share of the population (age 16 and older) that is employed in a given month. LFPR is a labor supply metric that quantifies the share of the population (age 16 and older) who either have a job (employed) or are actively looking for one (unemployed). [1]

Over very short periods, such as a few months, these measures primarily only move because of either economic fluctuations or statistical noise in the survey that measures them. Over longer periods, however, changes in the composition of the workforce can weigh on these measures and make them less comparable over time. One major factor at play in the U.S. labor force over recent years is aging.

The U.S. population is getting older on average with each passing decade. Consequently, the share of Americans who are retired is steadily growing. That puts downward pressure on both EPOP and LFPR for reasons unrelated to near-term economic dynamics, and makes these measures harder to interpret as thermometers of economic health.[2]

002983

8/16/24, 9:56 PM · Labor Market Indicators Are Historically Strong After Adjusting for Population Aging | CEA | The White House

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 2991 of 4699 PageID #: 6156

## 2. Age-adjusted EPOP is nearly back to its prepandemic trend

The Bureau of Labor Statistics reports that the overall EPOP in June 2023 was 60.3 percent, still 0.8 percentage points below its February 2020 level. But how much of this decline is due to population aging versus other economic factors?

Figure 1 isolates the impact of aging on actual EPOP (solid line) by holding each age cohort's EPOP fixed at its February 2020 level but allowing its population share to evolve in line with actual data (dotted line). The adjusted line is falling at about a quarter of a percentage point per year, which is the rate at which EPOP and LFPR are declining based on aging, rather than other economic effects, such as the business cycle. Figure 1 illustrates that actual EPOP has returned to this age (and gender)-adjusted prepandemic trend.



**Figure 1. U.S. Employment to Population Ratio, Feb. 2020 – Present**
*Percent of population, age 16+*

**Council of Economic Advisers**
Sources: Bureau of Labor Statistics; CEA calculations.
*As of July 19, 2023 at 6:00pm.*

## 3. Prime-age EPOP is at its highest level since 2001

A common way to adjust labor market data for aging is to look at "prime-age" (age 25-54) individuals, which excludes older workers, who are more likely to be retired, and younger workers, who are more likely to be in school and

thus often not working or looking for work. The prime-age EPOP is now above February 2020 levels and is the highest it has been since April 2001. Prime-age men's EPOP is back to its prepandemic level while prime-age women's EPOP is currently the highest on record, dating back to 1948. Such a sharp improvement in the prime-age EPOP is an important indicator of the power of persistently tight labor markets, pulling more workers off the sidelines, and providing robust opportunities for job seekers.



**Figure 2. U.S. Prime-Age Employment-to-Population Ratio, 1990 - Present**
*Percent of population, age 25-54*

Council of Economic Advisers
Sources: Bureau of Labor Statistics; CEA calculations.
*As of July 19, 2023 at 6:00pm.*

# 4. Age-adjusted EPOP and LFPR are at the highest levels in decades.

A different way to isolate the effects of aging is to allow each age cohort's EPOP to change over time while holding constant that cohort's share of the population using February 2020 as the base period. This is the opposite of the exercise in Figure 1, where each cohort's EPOP was fixed but its population share allowed to float. The age-adjusted EPOP in June 2023 was the highest since at least 1981 (Figure 3). Since women's employment rates were lower in the period preceding 1981, the age-adjusted EPOP in June was likely the highest over an even longer historical period. An identical exercise with the LFPR (Figure 4) shows that the age-adjusted participation rate in June 2023 was consistent with rates last seen in 2001. These analyses lead to two important conclusions. First, when looking over extended periods of

time, labor market indicators should be age-adjusted to distinguish between secular demographic trends versus other cyclical economic effects. Second, after accounting for demographic shifts in labor supply and demand, the current U.S. labor market is unusually strong from a historical perspective, posting elevated and even record measures of participation and employment.



**Figure 3. U.S. Employment-to-Population Ratio, 1981 - Present**
*Percent of population, age 16+*

Council of Economic Advisers
Sources: Bureau of Labor Statistics; CEA calculations.
Note: Age-adjusted EPOP chain-weighted by age and sex using the Fisher Index.
*As of July 19, 2023 at 6:00pm.*



**Figure 4. U.S. Labor Force Participation Rate, 1981 - Present**
*Percent of population, age 16+*

Council of Economic Advisers
Sources: Bureau of Labor Statistics; CEA calculations.
Note: Age-adjusted LFPR chain-weighted by age and sex using the Fisher Index.
*As of July 19, 2023 at 6:00pm.*

002986

[1] More precisely, both EPOP and LFPR are measured by the Bureau of Labor Statistics (BLS) as a share of the 16+ civilian noninstitutional population.

[2] Although economic shocks may affect retirements, here we are isolating the longer-term secular decline in labor supply due to aging from other cyclical factors.

On average, the U.S. population is getting older, which affects labor market data by obscuring the pace of the pandemic recovery. In this post, CEA explores the LFPR and EPOP—measures of labor supply and demand—after adjusting for demographic changes. 1/https://t.co/3MCqy0tAg7

— Council of Economic Advisers (@WhiteHouseCEA) July 27, 2023

002987

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 2995 of 4699 PageID #: 6160

DECEMBER 28, 2023

# Mexico-U.S. Joint Communique: Mexico and the United States Reaffirm Their Shared Commitments on an Orderly, Humane and Regular Migration

President of Mexico Andrés Manuel López Obrador received yesterday in Mexico City a delegation of senior officials from the United States led by Secretary of State Antony Blinken, Secretary of Homeland Security Alejandro Mayorkas, and White House Homeland Security Advisor Elizabeth Sherwood-Randall. President López Obrador thanked President Joe Biden for sending the U.S. delegation to Mexico following the two leaders' telephone conversation last week focused on migration management.

The two countries reaffirmed their existing commitments on fostering an orderly, humane, and regular migration. This includes reinforcing our partnership to address the root causes of migration, such as poverty, inequality, and violence, and for the two countries' initiative for Cubans, Haitians, Nicaraguans and Venezuelans. Ongoing cooperation also includes enhanced efforts to disrupt human smuggling, trafficking, and criminal networks, and continuing the work to promote legal instead of irregular migration pathways. Also, both delegations agreed on the importance of maintaining and facilitating the vital bilateral trade at our shared border.

President López Obrador highlighted the commitment of President Biden to pursue regular, orderly, and secure migration. He stressed the need to continue the diplomatic and political engagement with all countries in the region, as well as investing in ambitious development programs throughout the entire hemisphere of the Americas. Both delegations underlined the efforts that the Biden administration is pursuing through development assistance and humanitarian aid, as well as advancing new private investments in the region.

002988

The delegations also discussed the benefit of regularizing the situation of long-term undocumented Hispanic migrants and DACA recipients, who are a vital part of the U.S. economy and society.

The two delegations agreed to meet again in Washington in January 2024 to continue to advance our strong partnership on migration management.

President López Obrador was accompanied by Alicia Bárcena Ibarra, Secretary of Foreign Affairs; Luisa María Alcalde Luján, Secretary of the Interior; Gen. Luis Cresencio Sandoval, Secretary of Defense; Alm. José Rafael Ojeda, Secretary of the Navy; Rosa Icela Rodríguez, Secretary of Security and Citizen Protection; Esteban Moctezuma Barragán, Mexican Ambassador to the United States; Arturo Félix Medina, Undersecretary of Human Rights, Population and Migration, SEGOB; Roberto Velasco Álvarez, Head of the Unit for North America; and Armando López Cárdenas, Advisor to the Commissioner, INM; and Alejandro Celorio, Legal Counselor, SRE.

On behalf of President Biden, the United States was represented by Antony Blinken, Secretary of State; Alejandro Mayorkas, Secretary of Homeland Security; Elizabeth Sherwood-Randall, White House Homeland Security Advisor; Ken Salazar, United States Ambassador to Mexico; and Katie Tobin, Deputy Assistant to the President and NSC Coordinator for the Los Angeles Declaration.

###

002989

**TAXES** > **STATE TAXES**

# Your Guide to State Income Tax Rates

By **Tonya Moreno, CPA** | Updated on January 23, 2023

✅ Reviewed by **Lea D. Uradu**

✅ Fact checked by **Lars Peterson**

## In This Article

Top Income Tax Rates by State

States Without Income Tax

States With Flat Tax Rates

State-by-State Comparison

Frequently Asked Questions (FAQs)



PHOTO: HALFPOINT / GETTY IMAGES

## Key Takeaways

California, Hawaii, New York, New Jersey, and Oregon have some of the highest state income tax rates in the country.

Seven U.S. states charge no tax on earned income at all.

Another 10 U.S states have a flat tax rate—everyone pays the same percentage regardless of how much they earn. [1]

Location is everything if you want to save a few income tax dollars. Overall, state tax rates range from 0% to more than 13%.

Learn which states have the highest tax rates, no taxes, and flat taxes; and see a complete list of tax rates for every state in the union.

002991



Source: Federation of Tax Administrators
Map: The Balance • Get the data • Add this chart to your site

the balance

# Top Income Tax Rates by State

Below, you'll find the top 10 states with the highest income tax rates.

---



SPONSORED BY
**DISCOVER PERSONAL LOANS**

Why Debt Consolidation
Is a Smart Financial
Strategy

**LEARN MORE** ›

| California | 13.3% |
| Hawaii | 11% |
| New York | 10.9% |
| New Jersey | 10.75% |
| Oregon | 9.9% |
| Minnesota | 9.85% |
| District of Columbia | 9.75% |
| Vermont | 8.75% |
| Iowa | 8.53% |
| Wisconsin | 7.65% |

California tops the list with the highest income tax rates in the country; its highest tax rate is 12.3%, but it also implements an additional tax on those with income of $1 million or more, which makes its highest actual tax rate 13.3%. [2] New Jersey and New York also implement this type of "millionaire's tax." [3] [4]

Other states have a top tax rate, but not all states have the same number of income brackets leading up to the top rate. For example, Hawaii has a top tax rate of 11% and 12 income brackets, while Iowa has a top tax rate of 8.53% and nine income brackets. [5] And although Washington, D.C.. is not a state, it has its own income tax rate.

# States Without Income Tax

002993

a gray area; it doesn't levy a tax on earned income, but it does tax interest and dividends at a flat 5%.

Since they don't collect income tax, some states generate revenue in other ways. Tennessee has one of the highest combined state and local sales tax rates in the country. [6] Your paycheck might be safe, but you'll be dinged at the cash register. New Hampshire and Texas have high property taxes in relation to home values. [7] Pennsylvania charged the highest tax on gasoline in 2021. [8]

# States With Flat Tax Rates

Among the states that do have income taxes, many residents get a break because the highest rates don't kick in until upper-income levels. But this isn't the case in the 10 states that have flat tax rates. The flat-tax states and their rates, from highest to lowest, can be seen in the table below. [5]

| STATE | FLAT TAX RATE |
|---|---|
| Massachusetts | 5% |
| Kentucky | 5% |
| New Hampshire | 5% (interest and dividend income only) |
| North Carolina | 4.99% |
| Illinois | 4.95% |
| Utah | 4.95% |
| Colorado | 4.55% |
| Michigan | 4.25% |

002994

| | |
|---|---|
| Indiana | 3.23% |
| Pennsylvania | 3.07% |

# A State-by-State Comparison of Income Tax Rates

The remaining states and Washington, D.C., charge a "progressive" tax on all income, based on tax brackets. The more you earn, the higher the percentage you'll pay in income tax on your top dollars. For example, California's top rate is 13.3%, but you'll only pay this on income over $1 million. [5]

The rates and income thresholds for individuals filing single for tax year 2022, including those states that have no income tax and those who tax at a flat rate, are as follows:

| STATE | TAX RATES | LOWEST AND HIGHEST INCOME BRACKETS |
|---|---|---|
| Alabama | 2% to 5% | $500 and $3,001 |
| Alaska | 0% | None |
| Arizona | 2.59% to 4.5% | $27,806 and $166,843 |
| Arkansas | 2% to 5.5% | $4,300 and $8,501 |
| California | 1% to 13.3% | $9,325 and $1 million |
| Colorado | 4.55% | Flat rate applies to all incomes |
| Connecticut | 3% to 6.99% | $10,000 and $500,000 |
| Delaware | 0% to 6.6% | $2,000 and $60,001 |

002995

| Florida | 0% | None |
|---------|-----|------|
| Georgia | 1% to 5.75% | $750 and $7,001 |
| Hawaii | 1.4% to 11% | $2,400 and $200,000 |
| Idaho | 1.125% to 6.5% | $1,568 and $7,939 |
| Illinois | 4.95% | Flat rate applies to all incomes |
| Indiana | 3.23% | Flat rate applies to all incomes |
| Iowa | 0.33% to 8.53% | $1,743 and $78,435 |
| Kansas | 3.1% to 5.7% | $15,000 and $30,000 |
| Kentucky | 5% | Flat rate applies to all incomes |
| Louisiana | 1.85% to 4.25% | $12,500 and $50,001 |
| Maine | 5.8% to 7.15% | $23,000 and $54,450 |
| Maryland | 2% to 5.75% | $1,000 and $250,000 |
| Massachusetts | 5% | Flat rate applies to all incomes |
| Michigan | 4.25% | Flat rate applies to all incomes |
| Minnesota | 5.35% to 9.85% | $28,080 and $171,221 |
| Mississippi | 0% to 5% | $5,000 and $10,001 |
| Missouri | 1.5% to 5.3% | $1,121 and $8,968 |
| Montana | 1% to 6.75% | $2,900and $17,400 |

| Nebraska | 2.46% to 6.84% | $3,340 and $32,210 |
|---|---|---|
| Nevada | 0% | None |
| New Hampshire | 5% | Flat rate on interest and dividend income only |
| New Jersey | 1.4% to 10.75% | $20,000 and $1 million |
| New Mexico | 1.7% to 5.9% | $5,500 and $210,000 |
| New York | 4% to 10.9% | $8,500 and $25 million |
| North Carolina | 4.99% | Flat rate applies to all incomes |
| North Dakota | 1.1% to 2.9% | $41,775 and $458,350 |
| Ohio | 0% to 3.99% | $25,000 and $110,650 |
| Oklahoma | 0.25% to 4.75% | $1,000 and $7,200 |
| Oregon | 4.75% to 9.9% | $3,750 and $125,000 |
| Pennsylvania | 3.07% | Flat rate applies to all incomes |
| Rhode Island | 3.75% to 5.99% | $68,200 and $155,050 |
| South Carolina | 0% to 7% | $3,110 and $15,560 |
| South Dakota | 0% | None |
| Tennessee | 0% | None |
| Texas | 0% | None |
| Utah | 4.95% | Flat rate applies to all incomes |

| Vermont | 3.35% to 8.75% | $42,150 and $213,150 |
| Virginia | 2% to 5.75% | $3,000 and $17,001 |
| Washington | 0% | None |
| Washington, D.C. | 4% to 9.75% | $10,000 and $1 million |
| West Virginia | 3% to 6.5% | $10,000 and $60,000 |
| Wisconsin | 3.54% to 7.65% | $12,760 and $280,950 |
| Wyoming | 0% | None |

# Frequently Asked Questions (FAQs)

## How is state income tax money used?

Tax revenue is used according to state budgets. The budgeting process differs by state, but in general, it mirrors the federal process of legislative and executive branches coming to a spending agreement.

## Where do you pay income tax for out-of-state work?

Always expect to file income taxes in the state where you live. If you cross state lines for your job, you may or may not have to file taxes in another state, too. Some states have agreements that allow workers to only file taxes where they live, regardless of where they work. Check with a tax professional to learn how state laws may apply to your situation.

002998

SOURCES ⊕

Part Of

# Best & Worst Taxes By State    〈    〉

Beautiful young interracial family at home with their cute daughter and little baby son having breakfast together.

A couple seated at a kitchen table review documents.

Cus map expla witho are A New

## Your Guide to State Income Tax Rates

## The Best and Worst Property Taxes by State

## 5 U$ Stat

1 of 10

2 of 10

3 of 1

# Related Articles

A person sits on the floor amid stacks of documents.

STATE TAXES

### What Is State Income Tax?

By Alene Laney

Couple doing taxes at home on laptop

STATE TAXES

### Where You'll Pay the Most in State and Local Taxes

By Tonya Moreno, CPA

002999

an income tax:
Washington, South
Dakota, Nevada,

US States With No Income Tax

By Tonya Moreno, CPA

---

A older couple
enjoying coffee on
the beach

STATE TAXES

**Guide to California Income Tax**

By Tonya Moreno, CPA

---

Aerial view of
urban street with
houses

STATE TAXES

**States With Local Income Taxes**

By Tonya Moreno, CPA

---

Millennial
business owner
working on laptop
in park surrounded

STATE TAXES

**The Best and Worst States for Business Taxes in
2023**

By Jean Murray

---

Couple standing
in the water at the
beach

STATE TAXES

**Which States Are the Most Tax-Friendly for
Retirees?**

By Tonya Moreno, CPA

---

Custom
illustration shows a
map of the United
States explaining

STATE TAXES

**5 US States Without a Statewide Sales Tax**

By Tonya Moreno, CPA

003000

STATE TAXES

## How To Charge Sales Tax for Out-of-State Customers

By Tonya Moreno, CPA

---

TAXABLE INCOME

## History of the US Federal Tax System

By Beverly Bird

---

STATE TAXES

## How To Prepare and File Your State Tax Return

By Tonya Moreno, CPA

---

STATE TAXES

## California Taxes Are Among the Highest in the Nation

By Tonya Moreno, CPA

---

STATE TAXES

## States With Flat Income Tax Rates for Tax Year 2022

By Tonya Moreno, CPA

examine
paperwork at a
table.

What Are Taxes?

By Rebecca Lake

---

TAXABLE INCOME

A smiling
taxpayer reviews
his tax return

**Understanding Income Tax Laws**

By William Perez

---

STATE TAXES

Idaho state
capitol building

**State Tax Chart: Income, Sales, Estate,
Inheritance, and Gift Taxes**

By Julie Garber

---



the balance

Follow Us

BUDGETING                    INVESTING

MORTGAGES                    ECONOMICS

BANKING                      SMALL BUSINESS



| | |
|---|---|
| About Us | Privacy Policy |
| Editorial Guidelines | Terms of Service |
| Diversity and Inclusion Pledge | Advertise |
| Careers | Contact |
| Your Privacy Choices | |



The Balance is part of the Dotdash Meredith publishing family.

003003



REPORT | NOVEMBER 2022

# How California can Lead on Retaliation Reforms to Dismantle Workplace Inequality

Authors:
*Tsedeye Gebreselassie*
*Nayantara Mehta*
*Irene Tung*

003004

### Acknowledgements

The authors would like to thank Ruth Silver Taube (Santa Clara County Wage Theft Coalition), Tia Koonse (UCLA Labor Center), Christopher Calhoun and Azucena Garcia-Ferro (SEIU California), and the membership and leadership of the California Coalition for Worker Power (CCWP) for their contributions to this report. Photo credits: Fight for $15 and a Union, Trabajadores Unidos.

Special thanks to our former NELP colleague Laura Huizar, for her leadership in developing the details of a retaliation fund.

We would also like to thank our NELP colleague Paul Sonn, for his contributions to policy development on just cause protections, and colleagues Cynthia Montes, Mónica Novoa, Eleanor Cooney, and Norman Eng for their expertise and support in the production of this report.

### About NELP

Founded in 1969, the nonprofit National Employment Law Project (NELP) is a leading advocacy organization with the mission to build a just and inclusive economy where all workers have expansive rights and thrive in good jobs. Together with local, state, and national partners, NELP advances its mission through transformative legal and policy solutions, research, capacity building, and communications. For more information, visit us at www.nelp.org

*Contents*

Introduction ............................................................................................................4

I.   Few Workers Who Experience Workplace Violations Report Them, and the Majority of Those that Do Report Experience Employer Retaliation as a Result .................................. 8

II.  Workers Cite Concerns about Employer Retaliation and the Threat of Job Loss As Major Reasons for Not Reporting Employer Violations  ............................................................ 10

III. Given Widespread Economic Precarity in California, Retaliatory Firings Can Have Catastrophic Consequences for Workers ......................................................................... 12

IV.  California's Anti-Retaliation Laws Fall Short Because They Force Workers to Bear Significant Financial Risk Before Holding Employers Accountable ................................... 14

V.   Unjust and Arbitrary Firings: California's At-Will Employment System Creates an Enormous Power Imbalance Between Workers and Employers, With Far Reaching Consequences in the Workplace and Beyond .................................................................. 15

    A. At-Will Employment Allows Employers to Fire Workers for Almost Any Reason or No Reason at All                                                                                      15

    B. Unfair and Arbitrary Firings are Common                                                      17

    C. At-Will Employment Coerces Workers into Accepting Harmful and Illegal Working Conditions                                                                                       18

VI.  Policy Recommendations: A Retaliation Hardship Fund, Consistency Across the Labor Code, and a State "Just Cause" Standard ......................................................................... 19

    A. Create a Retaliation Fund to Provide Workers with the Financial Support They Need When an Employer Retaliates                                                                      19

    B. Simplify California's Anti-Retaliation Laws to Help Workers Understand and Assert Their Rights                                                                                      20

    C. Adopt a State "Just Cause" Law to Protect Workers from Unfair and Arbitrary Firings                                                                                                21

VII. Conclusion ................................................................................................. 21

Appendix A – Key Elements  of a Retaliation Fund ........................................................... 22

Appendix B – Key Provisions of a "Just Cause" Law......................................................... 25

Appendix C – Survey Methodology.................................................................................... 29

Endnotes ............................................................................................................................. 30



**Introduction**

*"I think of my family. One has to work to survive. In this country and in this state, it is too expensive. Rent, food, everything is very expensive. But it is true that I have seen so much injustice, sometimes it even gives me fear, [but] I think, 'What job am I going to find?' because I have seen over the years that in the fast food industry there is a lot of discrimination, wage theft, many injustices that all workers experience. So that's why I like to participate, because this fear truly has to end. Being able to raise my voice has served a lot to my colleagues. They have followed me, been with me, and they have been able to raise their voices too." [1]*

*"After our boss knew that we were taking collective action, she was furious and began to cut our hours, give us the hardest shifts, like the closing shifts, and even fired employees. Retaliation is so common because many immigrant workers don't know their rights. We need to ensure a safe workplace and protection from retaliation, especially during this pandemic, when restaurant workers have to interact with customers and may be scared to speak up. I hope that other workers will hear our story and learn and protect their rights." [2]*

Workers across California in sectors such as food service, car wash, and caregiving are coming together to fight for owed wages and safer working conditions. The quotes above come from, respectively, the Fight for 15-led campaign for better conditions in the fast-food industry and a three-year organizing campaign supported by the Chinese Progressive Association and the Asian Law Caucus, which resulted in 22 restaurant workers recovering $1.6 million in stolen wages.

These campaigns are powerful examples of worker action and solidarity. However, there remains a fundamental power imbalance between workers and employers that makes it difficult for workers to raise complaints and take collective action to improve workplace conditions. Because employers can fire workers for almost any reason—or for no reason at all—under California's system of "at will" employment, workers often experience retaliation when speaking up about workplace conditions. Widespread economic insecurity makes the threat of losing one's job or income as a result of employer retaliation especially and immediately catastrophic.

To better understand the impact of employer retaliation and at-will firings in California, the National Employment Law Project (NELP) commissioned YouGov to conduct a survey of 1,000 adults in the California workforce in January 2022. The survey sample included workers aged 18-64 across the income spectrum and was representative by age, gender, race, and years of education. Survey responses revealed a high prevalence of workplace violations, low rates of violation reporting, high rates of employer retaliation, and frequent unfair and arbitrary firings. Key findings include:

- Thirty-eight percent of California workers have experienced a workplace violation.

- Only 10 percent of those workers reported them to a government agency, and almost half (47 percent) did not report violations to anyone.

- Of the workers who reported violations to their employer or to a government agency, a majority (116 of 216 respondents) experienced employer retaliation.

- Fifty-one percent of working Californians said that concern about employer retaliation would influence their decision about whether or not to report a workplace violation in the future.

- More than two in three California workers said access to a hardship fund that would provide them immediate monetary relief if they were retaliated against could help them report a future violation to a government agency.

- An overwhelming majority of working Californians—92 percent—support the establishment of a retaliation hardship fund that would provide one-time financial assistance to workers who file good faith complaints about employer retaliation.

- Forty-one percent of California workers have been fired or let go at some point. Less than one third of those workers (29 percent) said they were given fair warning before being fired, and most (64 percent) said they have never received severance pay.

- More than 40 percent of workers—including 46 percent of Latinx workers and 55 percent of Black workers—said that concern about being fired or disciplined may have prevented them from joining their co-workers to push for job improvements.

- A large majority of working Californians of all political parties—81 percent—support the adoption of laws protecting workers from unfair and arbitrary firings.

This report builds on the survey's findings to examine how retaliation and unfair firings permitted under today's at-will employment framework put workers at a fundamental disadvantage when it comes to exercising their rights. The report highlights the costs of this power imbalance for workers and their broader communities and offers the following policy recommendations to California lawmakers:

- Establish a retaliation fund to provide workers with the immediate economic support they need to exercise their rights.

- Bring the state's varied and complex array of anti-retaliation laws into harmony and ensure that the same protections for workers exist across the California Labor Code.

- Create a rebuttable presumption of retaliation within 90 days and ensure that penalties for retaliation consistently go directly to the worker rather than to the state's general fund.

003009

- Increase funding for the Labor Commissioner's Retaliation Complaint Investigation Unit to support its enforcement of more than 45 labor laws.

- Adopt a "just cause" policy to address arbitrary and unfair firings.

The first two sections of the report detail the survey's findings that few workers who experience workplace violations actually report it, and of those that do, a majority experience employer retaliation as a result. These findings are borne out by complaint data collected from the state's main workplace enforcement agencies. This retaliation is a major reason why workers do not come forward. The third section of the report describes some of the immediate catastrophic consequences that flow from employer retaliation, with many workers already just a paycheck or two away from being unable to cover their bills. Section 4 highlights some of the inadequacies in existing state anti-retaliation laws that force workers to bear significant financial risk before holding employers accountable. Section 5 situates workers' experiences in California's at-will employment system, where most employers can legally fire workers with no notice for almost any reason or no reason at all. At-will employment creates a climate of fear that undermines workers ability to speak up about mistreatment, and perpetuates longstanding racial inequities in the workplace. The survey's data confirms this, finding that unfair and arbitrary firings are common among California's workforce and that the threat of these firings coerces workers into accepting harmful working conditions. Finally, Section 6 offers the policy recommendations listed above.

**Why Do Workers Experience Retaliation?**

*Numerous studies confirm that workers, especially those in low-paying industries, experience high rates of workplace violations, including wage and hour violations, unsafe working conditions, and more. But workers in the US generally bear the burden of enforcing their own labor protections—worker complaints are virtually the only way that violations are brought to the attention of public agencies or the courts. When a worker comes forward to report a workplace violation, we know that employers often retaliate or threaten to retaliate against the worker. Under our current system, workers bear the entire risk of retaliation from their employer when they report violations.*

**What Does Retaliation Look Like?**

*Retaliation takes many shapes and can be difficult to pinpoint or prove. Employers, for example, may fire a worker, demote a worker, reduce a worker's hours, change a worker's schedule to a less favorable one, subject a worker to new forms of harassment, unfairly discipline a worker, threaten to report a worker or a worker's family member to immigration authorities, blacklist workers from future employment, and much more.*

003010

***What Does Retaliation Cost Workers?***

*When workers experience retaliation for trying to protect their rights, the costs can quickly escalate from both a financial and emotional standpoint, especially for the countless workers nationwide who live paycheck to paycheck. A worker may experience lost pay, for example, which can lead to missed bill payments, lower credit scores, eviction, repossession of a car or other property, suspension of a license, inability to pay child support or taxes, attorney's fees and costs, stress, trauma, and more.*

## I.      Few Workers Who Experience Workplace Violations Report Them, and the Majority of Those that Do Report Experience Employer Retaliation as a Result

Our survey of California's workforce found that 38 percent of respondents have experienced a workplace violation, but only 10 percent of those respondents reported the violation to a government agency. While more than a quarter (26 percent) have reported a violation to human resources and 29 percent have reported a violation to their supervisor, almost half (47 percent) of workers who experienced violations did not report them to anyone.

Of the workers who did report a violation, either to their employer or to a government agency (216 respondents), a majority (116 out of 216 respondents) indicated they experienced some form of retaliation for having reported that violation.





Of the workers that did report a violation either to their employer or a government agency, a majority indicated they experienced some form of retaliation for having reported that violation *(116 out of 216 respondents).*

State agency data, detailed below, corroborate our findings that employer retaliation is a serious problem in California with California enforcement agencies receiving tens of thousands of complaints each year alleging unlawful retaliation. Three of the principal agencies tasked with handling retaliation complaints for California workers are the US Equal Employment Opportunity Commission (EEOC), the Retaliation Complaint Investigation Unit (RCI) within the California Labor Commissioner's Office, and the California Civil Rights Department (formerly the Department of Fair Employment and Housing) (CRD). The EEOC handles complaints concerning workplace discrimination and related retaliation under various federal laws,[3] RCI enforces over four dozen California retaliation protection statutes,[4] and the CRD enforces the Fair Employment and Housing Act, Unruh Civil Rights Act, Disabled Persons Act, Ralph Civil Rights Act, Trafficking Victims Protection Act, and other anti-discrimination laws involving state-funded activities, along with retaliation stemming from workers' reliance on those laws.[5]

Data from these agencies spanning 2017 through 2019 shows:

- California workers submitted more than 69,000 complaints alleging retaliation to the EEOC, RCI, and CRD.

- In 2019 alone, the EEOC, RCI, and CRD received more than 24,000 complaints from California workers alleging unlawful retaliation.

- At the EEOC and CRD, retaliation complaints made up a significant share of all employment-related complaints.

- Retaliation complaints accounted for more than 50 percent of all charges filed with the EEOC.

- Retaliation complaints made up between 11 and 26 percent of employment-related complaints submitted to CRD for investigation.



003013

See Table 1 for more details on retaliation complaints submitted to the EEOC, RCI, and CRD based on publicly available data.

**Table 1.**

| Retaliation Complaints Submitted in California, 2017-2020 | | | | |
|---|---|---|---|---|
| **Agency** | **2017** | **2018** | **2019** | **2020** |
| **US Equal Employment Opportunity Commission**[6] | **2,752** <br><br>(50.7% of all state charges) | **2,183** <br><br>(50.3% of all state charges) | **2,319** <br><br>(54.2% of all state charges) | **2,306** <br><br>(55.8% of all state charges) |
| **Retaliation Complaint Investigation Unit within California Labor Commissioner's Office** | **4,178**[7] | **5,633**[8] | **6,515**[9] | **5,334**[10] |
| **California Civil Rights Department** | **1,094**[11] retaliation complaints for investigation <br><br>(11% of all employment complaints) | **2,785**[12] retaliation complaints for investigation <br><br>(26% of all employment complaints) | **2,717**[13] retaliation complaints for investigation <br><br>(19% of all employment complaints) | |
| | **8,468**[14] retaliation basis in complaints seeking a right-to-sue | **17,697**[15] retaliation basis in complaints seeking a right-to-sue | **13,181**[16] retaliation basis in complaints seeking a right-to-sue | |
| TOTAL | **16,492** | **28,298** | **24,732** | **Total (2017-2020): 69,522** |

## II.   Workers Cite Concerns about Employer Retaliation and the Threat of Job Loss As Major Reasons for Not Reporting Employer Violations

Even as state enforcement agencies receive tens of thousands of retaliation complaints per year, our survey findings and previous research in California reveal that filed complaints are just the tip of the iceberg when it comes to workplace violations and retaliation. Of the almost one in two California workers who experienced violations but did not report them, a majority (96 out of 179) indicated that concern about retaliation was a deterring factor.





**More than half of working Californians (51 percent) say that concern about retaliation would influence their decision to report a workplace violation in the future.**

More than 4 out of 10 survey respondents reported that concern about employer retaliation has possibly stopped them from speaking up about dangerous or unhealthy working conditions in the past. Black and Latinx workers were more likely than white workers to say that this was the case. Forty-nine percent of Black workers and 45 percent of Latinx workers indicated this was their experience, compared to 39 percent of white workers. Finally, more than half of working Californians (51 percent) said that concern about employer retaliation would influence their decision about whether or not to report a workplace violation in the future. These results show that retaliation concerns keep many workers from coming forward. Previous California worker surveys have presented similar findings.[17]

### III.   Given Widespread Economic Precarity in California, Retaliatory Firings Can Have Catastrophic Consequences for Workers

Members of the Pilipino Association of Workers and Immigrants described in focus group conversations that their economic needs and the need to have a job keep them in jobs where their rights are violated and where they endure conditions harmful to their health:

> *"Even if it isn't true, employers say that if you go to the Labor Commission, you won't be able to find a job. The employers have an association and have a blacklist of workers who filed claims."*

> *"We are not even paid the minimum wage, but we have tons of bills to pay. We don't have medical insurance. Our priority is remitting money back home, but, with low wages and bills, we don't have much money to send home. We end up having to take second and third jobs. We end up getting sick. When I was 40, it wasn't so bad, but now that I am 50, I have back pain and neck pain."* [18]

With many workers just a paycheck or two away from not being able to pay their bills, the real threat of being fired or having pay or hours cut can factor heavily in a worker's decision about whether to come forward with concerns.

Our survey found that 40 percent of the California workforce would be unable to cover a month or less of regular expenses if they lost their job. Seventy percent reported that it would be hard to make their next rent or mortgage payment, with nearly half of those reporting that it would be "very" hard.

Among survey respondents who had prior job losses, 79 percent also reported significant economic hardship from those job losses, including not being able to pay bills on time (40 percent), seeking food from a food bank (20 percent), delaying health care or medication





Seventy percent of survey respondents reported that it would be hard to make their next rent or mortgage payment if they lost their job.

(22 percent), and using all their savings (36 percent).

These survey results are consistent with numerous other reports detailing the economic insecurity of California's workforce. For example, according to the California Future of Work Commission's March 2021 report, the majority of renter households in the state pay more than 30 percent of their income toward housing.[19] According to the Northwestern Institute for Policy Research and the California Association of Food Banks, about one in every five Californians experiences food insecurity, meaning that they "do not know where their next meal will come from — with greater levels of hunger experienced by Black and Latinx families."[20] According to a Public Religion Research Institute study of California workers, almost half (47 percent) of California workers struggle with poverty, and they are more likely to be Latinx workers (60 percent of Californians who work and struggle with poverty are Latinx). [21]

Workers in California and across the country lack adequate emergency savings that could help them weather even a brief interruption in work. For example, a 2019 AARP national study found that 53 percent of households do not have an emergency savings account and highlighted how "people of color in the United States face a massive wealth gap compared to whites, and women have significantly less wealth than men."[22] It cited a Federal Reserve finding that "the median [B]lack family had just $3,600 in household wealth in 2018, the median Latino family had $6,600, and the median white family had $147,000."[23] In 2018, the Federal Reserve reported that 4 in 10 adults would have difficulty covering a hypothetical unexpected expense of $400.[24] More broadly, the Federal Reserve found that 3 in 10 adults are "either unable to pay their bills or are one modest financial setback away from hardship."[25]

Making matters worse, most California workers lack access to a meaningful safety net if they lose their job or part of their income.

First, while severance pay policies can sometimes provide some immediate financial support for workers who are laid off or who voluntarily resign, most workers across the income spectrum do not have access to such pay. Our survey found that only 14 percent of California workers who had lost jobs received severance pay after every job loss. Sixty-four percent of workers who lost jobs have never received severance pay.

Second, while an essential program, California's unemployment system does not offer workers reassurance that they can obtain quick and meaningful economic support in case of job loss. California workers may receive a maximum of only $450 per week in unemployment benefits. The California Budget & Policy Center has illustrated how that amount falls far short of what California workers need to support their families and look for work.[26] For "the majority of California renters with low incomes who spend at least half of their income on rent," current benefit levels mean that they would have to spend their entire unemployment benefit to pay rent alone without other income.[27] In addition, as the COVID-19 pandemic has starkly exposed, the California unemployment system is plagued by outdated infrastructure, long delays for benefits, abrupt suspensions, and concerns about fraud.[28] Even if the system worked efficiently for workers, a successful application for benefits still relies on employers "to exchange information that is necessary in determining

eligibility" with the Employment Development Department.[29] Workers who have been fired in retaliation will not generally expect their employer to cooperate with a request for unemployment assistance. Employers may even falsely report that a worker was fired for misconduct, making a worker initially ineligible for unemployment benefits and forcing them to appeal the denial, delaying benefits even longer. Furthermore, undocumented immigrant workers remain ineligible for unemployment benefits.[30]

This economic precarity heavily influences whether workers decide to raise workplace concerns, especially in an employment-at-will framework where employers can fire workers without cause and in an environment where protections against retaliation are inadequate and do not mitigate the immediate financial harm that comes with being fired, demoted, blacklisted, or otherwise punished for coming forward.

## IV.   California's Anti-Retaliation Laws Fall Short Because They Force Workers to Bear Significant Financial Risk Before Holding Employers Accountable

A 2019 NELP 50-state survey of anti-retaliation laws tied to the reporting of minimum wage or other wage-theft violations showed that California is one of a handful of states where the statutes include provisions that NELP considers minimally necessary to help deter retaliation and provide meaningful remedies for workers: a private right of action; state monetary penalties; attorneys' fees and costs for workers who file lawsuits; and both compensatory and punitive damages for workers.[31] The California Labor Commissioner alone is charged with enforcing over four dozen anti-retaliation statutes.[32] One of those relatively strong statutes is California Labor Code Section 98.6, which requires employers to pay up to $10,000 in penalties to workers who suffered retaliation, and Labor Code Section 1102.6, which shifts the burden of proof under Labor Code 1102.5 (the whistleblower statute) to the employer to demonstrate by clear and convincing evidence that there was a legitimate, independent reason for the adverse action.[33] And a number of other California statutes stand out nationally, such as those that expressly prohibit various forms of immigration-based retaliation[34] and do not require an adverse action and the recent 2017 amendment (SB 306) that allows the Labor Commissioner to seek a preliminary court injunction to stop retaliation with "reasonable cause" to believe a discrimination or retaliation violation has occurred.[35] These types of valuable tools should continue to form key components of any effort to fight retaliation.

However, despite various strengths, none of California's anti-retaliation laws provide workers who experience retaliation with monetary relief when they need it most: immediately or soon after an employer retaliates.

After experiencing retaliation, a worker must generally file a new complaint alleging unlawful retaliation. At that point, the worker assumes a difficult legal burden of proving that retaliation happened,[36] and retaliation investigations and litigation can take months or years before reaching a final decision. The CRD reported in 2019 that even after reducing the average number of days for the agency to close a case, the 2018 average was still 109

days.[37] In 2018, more than 6,000 CRD cases experienced a wait of 30 days or more just to complete the intake interview.[38] A FY 2019 report on California's Occupational Safety and Health program performance found that the California Division of Labor Standards Enforcement completed only one percent of its investigations within 90 days and that the average number of days for investigation completion was 582.[39] The EEOC informs complainants that the agency takes "approximately 10 months to investigate a charge."[40] And even when a court or agency finally orders an employer to pay a worker monetary damages after retaliation, getting an employer to actually pay the judgment presents its own challenge.[41]

In sum, by the time a worker obtains any relief from a retaliation investigation or lawsuit in California (if they do at all), a worker who was fired for reporting a violation or whose employer reduced their pay (e.g., by cutting hours or assigning a worker to a less desirable shift with fewer tip earnings) has suffered potentially devastating and long-term economic consequences. When workers across the state generally have little or no job security and most cannot afford even a $400 emergency, one missed or reduced paycheck can quickly snowball into a missed rent or mortgage payment; eviction; cut utilities; an inability to provide food, medicine, or school supplies for their children; a reduced credit score; late fees; unpaid child support or unpaid traffic fines with their own punitive repercussions; and more. This economic risk compounds the other serious risks that workers face when asserting their rights. When an employer retaliates, workers often endure painful emotional distress, ongoing harassment, or other unfair treatment at work. And workers who face detention or deportation because their employer reported them to immigration authorities experience uniquely traumatic consequences and potentially permanent separation from their families and community.

## V.     Unjust and Arbitrary Firings: California's At-Will Employment System Creates an Enormous Power Imbalance Between Workers and Employers, With Far Reaching Consequences in the Workplace and Beyond

### A. At-Will Employment Allows Employers to Fire Workers for Almost Any Reason or No Reason at All

One major reason that California workers lack strong protection from retaliation is that employers can generally fire workers for any reason or no reason at all, unless otherwise explicitly prohibited by law. Without protection from arbitrary and unfair firings, workers have a much harder time speaking up on the job and enforcing their rights.[42] And even when the law prohibits retaliatory firings for workers who file complaints with government agencies or organize at their workplaces, employers can easily deny that firings are motivated by retaliation and point to any other arbitrary reason as the impetus for firing.

The US is unique among industrialized nations in that employees can be fired abruptly—without notice, a chance to address employment problems, or even a stated reason—and left with bills due and no paycheck or severance pay. By contrast, Australia, Brazil, Japan, Mexico, the United

Kingdom, and most of the European Union, among many other countries, require employers to provide workers with a sufficient reason for termination.[43]

In the US, employment termination policies are generally regulated by state jurisdictions. Currently in California, employment is presumed to be at-will, meaning that an employer may discharge a worker at any time, without any reason or cause so long as no other law or employment contract is violated.

The at-will employment doctrine that allows employers to legally fire workers without warning or explanation was not determined through any democratic legislative process. Instead, conservative judges gradually imposed the doctrine through judicial rulings in the decades following the passage of the 13th Amendment, which banned slavery and most forms of servitude.[44]

A century and a half later, at-will employment still underpins the power imbalance between employers and workers. While both workers and employers take on a certain amount of risk when they enter an employment relationship, workers take on greater risk because their livelihood is at stake. In addition to not needing to give advance notice or justification for termination, employers also do not have to set clear performance standards, apply rules or expectations consistently, or even inform workers of how discipline or termination decisions are made. This stymies complaint-driven enforcement of workplace laws because workers have to weigh any action they take against the possibility of discipline and termination.

Lack of job-security protections also compounds the negative effects of systemic racism in the workplace and the labor market. Workers of color—especially Black and Latinx workers—face widespread systemic racism and segregation in the workplace and labor market, including a high prevalence of discrimination in the hiring process, on the job, and in disciplinary matters.[45] These circumstances mean that workers of color must contend with heightened challenges in an at-will employment system. Black workers—who are the "last hired, and first fired"—especially bear the brunt of the job insecurity caused by at-will firings.[46]

Our survey of the California workforce provides insight into unfair firings in the state, revealing how widespread the problem is and the many negative impacts for workers, families, and communities.



## B. Unfair and Arbitrary Firings are Common

Our findings show that an alarmingly large share of workers in California have experienced an unfair termination. More than 4 in 10 California workers have been fired or let go from a job at some point, and only 29 percent of those workers were given fair warning.



**Of those fired or let go from a job:**

**16%** Only 16% percent were offered training before termination

**29%** Only 29% were given fair warning

**32%** Only 32% received severance pay



Too many workers in CA have experienced an **unfair termination**.

Of workers who were fired or let go, just 16 percent said they were offered more training before termination. And fewer than one in three received severance pay.

A participant in the focus groups conducted with members of the CLEAN Carwash Worker Center described an experience of being fired after taking part in an investigation:

*"I worked at the [NAME OF EMPLOYER WITHHELD] for several years. During my time there an investigation began by the state of California to look into the conditions of work at the business. At this car wash, we did not have fixed hours of work. We were asked to arrive early and wait in an alley for work, sometimes for hours. We were never paid for this time. I was one of the worker leaders during the time and always shared what was happening at the car wash with the investigators. That was why they fired me on [DATE WITHHELD]. When that happened, I asked my manager why he was firing me. He said it was simply because there was no longer work for me. But they always told me that I was one of their best workers. I came back the next day and said, 'Did you fire me for speaking up on the job, for standing up for my rights, and fighting to improve the work conditions here?' But of course, he only repeated that I was no longer needed at the car wash."[47]*

Workers are aware that there is a risk of being fired anytime, even if not filing a formal complaint. When describing what she feels about work, one participant in a focus group with members of the Pilipino Worker Center said:

> *"For me, what I think about and bothers me is that our employer can fire us at any time they want to. What's more they have favoritism. That, I worry about."[48]*

### C. At-Will Employment Coerces Workers into Accepting Harmful and Illegal Working Conditions

At-will firings enable employers to use the threat of termination as a form of economic coercion. Under the at-will system, if workers fear the threat of unfair discipline or dismissal from managers, they will be more likely to accept low pay, unfavorable terms of employment, and poor working conditions; this is especially true for those with the least power in the labor market. Some may also feel pressure to accept illegal situations such as wage theft or health and safety hazards. Even if employers are not violating any actual laws, at-will employment can create pressure for workers to behave in ways that are detrimental to their well-being, such as deprioritizing their health needs, consenting to undesired overtime hours, refraining from taking time off, or enduring verbal abuse.

Our survey bears this out, with a significant share of California workers reporting pressure in their workplace to accept harmful and even illegal working conditions. Seventy-three percent of respondents worked while sick to avoid being fired. Forty-three percent reported that an employer pressured them to accept wage theft, or that they worked extra hours without pay to avoid being fired. More than a third (34 percent) of workers accepted pay that was less than what they were owed to avoid being fired.

Additionally, 39 percent of workers reported experiencing hazardous or unsafe working conditions, and 35 percent reported working at a dangerous or unreasonable pace, because of concern about possibly losing their jobs. Almost half (47 percent) of workers have endured verbal hostility from a manager or supervisor without saying anything, and two out of three workers (68 percent) also reported skipping breaks to avoid being fired.

More than half of respondents (53 percent) reported not asking for pay increases or benefits they felt they deserved for fear of job loss. Forty-two percent said that termination concerns also silenced them from speaking up about dangerous and unhealthy working conditions. And more than 40 percent of workers—including 46 percent of Latinx workers and 55 percent of Black workers—said that concern about being fired or disciplined may have prevented them from joining with their co-workers to push for job improvements.

These findings show in vivid detail how at-will employment goes hand in hand with exploitative working conditions. As one caregiving worker explained in a Pilipino Worker Center focus group:

> *"If you complain, the agency will tell you, 'Okay, will you like us to get another caregiver? Because either you like it or not. You do the job, we're going to pay you. That's it. If you cannot do the job, we're going to find another one.'"[49]*

A sushi delivery driver in a focus group conducted by the Chinese Progressive Association described being fired simply for raising a question about a delivery route:

> *"I'd have to deliver from the warehouse to pick up sushi from South San Francisco, then deliver in San Francisco and Berkeley and Alameda County. The route takes a lot of time to deliver. I didn't complain to the employer, but in the last week of my job, my route included delivery to San Jose. It didn't make sense since it was a different direction from my route, and I told my employer. He wasn't happy with what I told him. The next day he didn't give me a work schedule. The employer pretty much fired me. That day the boss told me to return the company car keys, and I will send someone to go to your home to retrieve the car. (Did they give any explanation why you were fired?) No."[50]*

People who have been formerly incarcerated by the US's anti-Black criminal legal system experience particular employment pressures that often cause them to accept poor working conditions. Probation, parole, and other court-surveillance and supervision programs regularly mandate maintaining or seeking employment as a standard set of conditions to remain free from incarceration. Twenty-five percent of state prison admissions are due to "technical rule violations" of parole.[51] Technical rule violations are not allegations of a new criminal offense but are violations of parole rules that regularly include passing alcohol and/or drug tests; satisfactory payment of criminal justice debt; completing court-mandated classes; maintaining curfew; and seeking and maintaining employment.[52] This threat of reincarceration drives many court-surveilled workers to enter and remain in jobs with depressed labor standards and to avoid speaking up about illegal working conditions.

## VI.   Policy Recommendations: A Retaliation Hardship Fund, Consistency Across the Labor Code, and a State "Just Cause" Standard

California's current legal system for handling workplace violations demands too much from workers and fails to curb widespread wage theft, discrimination, and unsafe and unfair working conditions. The state can more effectively support workers by addressing arbitrary firings, retaliation, and the financial consequences of employer retaliation.

### A. Create a Retaliation Fund to Provide Workers with the Financial Support They Need When an Employer Retaliates

California lawmakers should address the critical gap in today's anti-retaliation laws that leaves workers without economic support when they need it most, through a state-funded retaliation fund.

A retaliation fund would allow a worker who has reported a workplace violation to a state agency to access quick, meaningful, and one-time financial assistance if their employer retaliates against them (e.g., by firing, cutting pay or hours, demotion, blacklisting, etc.). The fund would directly fill the urgent gap left by California's existing anti-retaliation statutes, under which it can take months, if not years, for a worker to obtain financial support and a final decision on a retaliation complaint. The fund could draw on state general funds for an initial period of time and eventually be funded through penalties

003023

collected from employers who are found to have retaliated unlawfully.

The concept of a retaliation fund is not new. As NELP outlined in a 2021 report on retaliation funds, worker organizations have long used different types of mutual support funds to assist workers in exercising their rights.[53] California also already operates restitution funds for garment[54] and car wash workers[55] who are unable to obtain the compensation they are owed by employers through the legal system.

Such a fund could encourage significantly more workers to come forward with workplace violations. Our survey found that for more than two in three California workers, access to a retaliation hardship fund could help them report a future violation to a government agency. And an overwhelming majority of working Californians—92 percent—support the establishment of a retaliation hardship fund that would provide one-time financial assistance to workers who file good-faith complaints about employer retaliation. Appendix A outlines how such a fund in California could be structured and function.





Support for the establishment of a retaliation hardship fund is high among working Californians of all parties.

## B. Simplify California's Anti-Retaliation Laws to Help Workers Understand and Assert Their Rights

Lawmakers should create consistency across the state's Labor Code provisions addressing retaliation so that workers can more easily understand and enforce their rights. As part of this process, lawmakers should consistently apply existing laws that presume any harmful action an employer takes against a worker within 90 days after the worker asserts a basic workplace right is retaliation. For example, under existing law, California employers are presumed to have committed retaliation within 90 days and must prove otherwise in the warehouse and fast-food industry, as well as when their actions include immigration-related threats.[56] Lawmakers should also ensure that any penalties paid by employers, such as the up to $10,000 penalty for retaliation, goes to the worker rather than to the general fund.

California's laws need to be strongly worded and strongly enforced. When workers file complaints of retaliation with the Labor Commissioner's office, they should feel confident that their claims will be handled with the appropriate urgency. Unfortunately, despite increases in funding in the 2022 state budget, the Labor Commissioner's Retaliation Complaint Investigation Unit is still under-resourced, which creates challenges for enforcing the more than 45 labor laws and resolving its large backlog of cases. Lawmakers should substantially increase funding for the Retaliation Complaint Investigation Unit, which receives considerably less funding than the Labor Commissioner's Office Wage Claim Adjudication unit and the Bureau of Field Enforcement.

### C. Adopt a State "Just Cause" Law to Protect Workers from Unfair and Arbitrary Firings

Our survey found that a large majority—81 percent—of working Californians of all parties support the adoption of laws protecting workers from unfair and arbitrary firings. Replacing California's at-will firing system with a just-cause termination standard would require employers to provide legitimate reasons and fair warnings before terminating workers. Effective just-cause policies also require employers to notify workers of performance problems in advance and provide an opportunity to address them. And, when workers are fired, such policies guarantee severance pay or, if they were terminated without just cause, a right to reinstatement. Finally, by requiring a good reason for terminations, just-cause protections more effectively protect workers from retaliation when they insist on other workplace rights. Appendix B outlines the key provisions a California just-cause law should contain.

## VII.   Conclusion

The wellness of individual workers, their families, and their communities depends on their ability to thrive inside and outside of work. That is only possible when workers can fully exercise and enforce their workplace rights without concern for losing their jobs. Current California laws, however, perpetuate a deep power imbalance between workers and their employers that forces workers into harmful, unjust, and unstable working conditions. This power imbalance stems from unjust and arbitrary firings permitted under California's at-will employment system, rampant retaliation by employers, and economic insecurity. California workers simply have too much to lose if they raise concerns at work or report violations, despite existing anti-retaliation laws. A just-cause standard to end unfair firings, in addition to a retaliation fund to provide immediate economic support for workers contesting retaliatory job actions, would put California's workers on much stronger footing to demand better workplace conditions and to hold employers accountable.



# Appendix A – Key Elements of a Retaliation Fund

**What is a retaliation fund?**

- A retaliation fund allows a worker who has filed a wage-theft or other complaint with a state agency to access quick and meaningful financial assistance when their employer fires them or cuts part of their pay because of that complaint.

- Retaliation funds directly fill the urgent gap left by California's existing anti-retaliation statutes under which it can take months, if not years, for a worker to obtain a final decision on a retaliation complaint.

- Retaliation funds are not entirely new. As NELP outlined in its 2021 report on retaliation funds,[57] worker organizations have long used different types of mutual support funds to aid workers in exercising their rights.

- A variety of public and private economic hardship funds have played an important role in supporting workers and families. During the COVID-19 pandemic, for example, cities and states like Boston, New York City, Atlanta, San Antonio, Tucson, and Washington, DC established hardship funds to support impacted individuals and families.[58] Prior to the pandemic, states and localities proved that governments could establish funds to provide financial support to workers and others in a wide range of contexts. The federal Emergency Food and Shelter Program, for example, distributes funds to local governments that, in turn, distribute the funds to private nonprofit organizations who provide financial assistance to individuals facing economic hardship.[59] All states, including California, operate a compensation fund to provide financial support to victims of crime.[60]

- California also funds and operates restitution funds for garment[61] and car wash workers[62] who are unable to obtain the compensation they are owed by employers through the legal system. (Maine and Oregon operate similar funds for workers that are not industry specific.) In addition, California law has established the Travel Consumer Restitution Corporation, a fund to help California consumers who "suffer losses as a result of the bankruptcy, cessation of operations, insolvency, or material failure of a seller of travel to provide. . .transportation or travel services contracted."[63]

003026

**What kind of retaliation would the retaliation fund cover?**

- A worker would be able to receive financial support from the retaliation fund if their employer fired them or reduced their pay in any way because the worker filed a complaint about the employer with a state agency. The retaliation fund must define "adverse actions" broadly given the countless and often subtle ways in which employers retaliate. At a minimum, an "adverse action" that results in losing one's job or pay should include the following:
  - firing a worker
  - constructive discharging (where the employer creates a work environment that forces a worker to leave the job)
  - demoting a worker
  - blacklisting that keeps a worker from finding a new job
  - reducing hours
  - changing schedules in a way that impacts income
  - making immigration-based threats that force a worker to leave the job
  - reducing pay in other ways

**How much support should a worker recover from the retaliation fund?**

- A worker should be able to obtain a one-time financial assistance payment from the retaliation fund. This arrangement can draw from existing hardship models where one-time payments are not considered taxable income, making it easier for agencies to administer.

- In California, workers should be able to obtain at least $2,500 as a one-time payment.

- The primary objective in setting the amount of financial assistance available to workers through a retaliation fund is to ensure that financial support can meaningfully help sustain a worker while searching for a new job, processing their retaliation complaint, and responding to the financial and related consequences of losing a job or part of their pay due to retaliation.

**How would a retaliation fund be funded?**

- A California retaliation fund could be funded for an initial period of time with state general funds. The state can divert penalties for retaliation to maintain the retaliation fund in the future.

- Workers should not have to repay financial support received through the fund. The burden of repaying into the fund should fall to employers who are found to have retaliated unlawfully.

003027

- When a worker receives financial support from the retaliation fund, if the worker's employer is found to have unlawfully retaliated after a full investigation or court decision, the employer should be required to replenish the fund with three times the amount of financial support that the worker received. This would be similar to the way a growing number of states and cities, including California, require employers to pay treble (i.e., three times) damages for wage theft.

**How would workers access the fund? Who would be eligible?**

- Accessing financial support from a retaliation fund should be as simple as possible in order to provide support to a worker immediately after they lose their job or part of their pay due to retaliation.

- The following steps can help ensure quick access to meaningful financial support:

  o **Step 1.** A worker files a complaint with a state labor-enforcement agency alleging an employer violation (e.g., the worker submits a wage-theft complaint to the Labor Commissioner).

  o **Step 2.** The state labor-enforcement agency that receives a worker's complaint sends a notice of the complaint to the employer(s) named in the complaint, or the agency obtains evidence that the employer became aware of the complaint filed.

  o **Step 3.** If the employer fires the worker or reduces the worker's pay in what the worker reasonably believes amounts to retaliation for filing their complaint, the worker submits a good-faith complaint alleging retaliation to the labor-enforcement agency charged with administering the retaliation fund within 90 days of the alleged retaliation along with a request for financial support from the fund.

  o **Step 4.** The agency that administers the retaliation fund will review the request for financial support and issue a one-time payment to the worker as soon as possible. Critically, a worker should not have to wait until an investigation or court case determines whether retaliation occurred, because that takes months, if not years, and the delay would defeat the purpose of the fund: to provide support when a worker needs it most. In implementing a retaliation fund, the implementing agency must seek to support the worker when a worker has alleged retaliation in good faith.

**What safeguards can help avoid potential misuse?**

- While nothing should suggest that the proposed retaliation fund would be vulnerable to misuse by workers, some safeguards can assuage potential doubts:

- ○ The fund should only be available to workers who have filed a complaint with a labor-enforcement agency. Agencies can retain their existing discretion over whether to investigate each and every complaint.

- ○ If, in the course of an investigation, a worker is found to have intentionally lied or fabricated evidence, the agency administering the retaliation fund could revoke that worker's eligibility for all future support from the fund.

**What is the role of community partnerships in successful implementation of a fund?**

- Worker leaders, advocates, academics, and others with experience addressing wage-theft and other violations have long emphasized the need for enforcement agencies to form close partnerships with local, community-based organizations. In establishing a retaliation fund, California lawmakers should also ensure that the fund administrator can engage effectively with community organizations to successfully implement the fund, including through grants and formal agreements that allow community-based groups to conduct outreach, educate, help process complaints and requests for financial support, and so on.

003029



# Appendix B – Key Provisions of a "Just Cause" Law

1. **Good reason for discharge** – The core of a just-cause employment system is a requirement that the employer must show that there is a justifiable reason for discharging a worker, such as poor work performance that does not improve after feedback and coaching, violation of important employer policies, or employee misconduct. Just-cause systems also allow employers to discharge workers for bona fide economic reasons, such as when business declines or a position is no longer needed, without a need to show just cause.

2. **Duty on the employer** – Under a just-cause system, the employer is responsible for demonstrating a good reason for discharging the worker—the reverse of the current system, where employees must demonstrate that a firing was for an impermissible reason. Shifting that responsibility to the employer is widely recognized as key for protecting workers against arbitrary and unfair firings, including against firings that are currently illegal but where workers have difficulty enforcing their rights, such as in cases of racial discrimination or retaliation against whistleblowers.

3. **Certain activities are categorically protected** – Just-cause legislation should also clarify that certain reasons are categorically *not* grounds for discharge. Examples of categorically protected employee activities should include: (1) communicating to any person, including other employees, government agencies, or the public about job conditions; and (2) refusing to work under conditions that the employee reasonably believes would expose them, other employees, or the public to an unreasonable threat of illness or injury on the job.

4. **Fair notice to workers and opportunity to address problems** – Another key component is fair notice to the worker of any performance problems and the opportunity to address them before being discharged. This process, which is often called "progressive discipline," is well established. It also mirrors the process that many responsible employers already use: giving employees feedback and coaching on performance issues and support in addressing them before getting to the point of possible discharge. However, a just-cause policy should make clear that certain kinds of serious misconduct may trigger a bypass of the progressive discipline process and allow for immediate employer action. These should include conduct that threatens the safety or well-being of other people, such as violence or harassment.

5. **Equal coverage of temp and staffing employees** – Economic theory suggests that if it becomes more difficult for employers to discharge workers, they will shift employment to temp and staffing agencies because such employees are generally

not subject to the same standards. Therefore, it is crucial that just-cause employment protections apply equally to employees working through temp or staffing agencies. A just-cause policy should expressly address these issues—for example, by requiring the same showing of just cause for ending employment.

6. **Limits on defined-term employment** – Another key consideration for a just-cause policy is under what circumstances to allow employers to hire workers for defined projects or terms, after which their employment can end without a need to demonstrate just cause. Examples of reasonable defined-term employment might include short-term, seasonal jobs in industries that need additional staffing during certain times of the year, and projects for which the need for employees or the funding to pay them will end once the project is completed. However, it is important that such authorization for defined-term employment be limited to clearly defined circumstances that prevent it from becoming a loophole through which employers can meet ongoing staffing needs. In addition, during the course of such defined-term employment, just-cause protections against early discharge should apply.

7. **Protections to ensure economic discharges are not a loophole** – It is important to ensure that economic (i.e., non-performance-based) discharges, when they are necessary, do not become a means for sidestepping just-cause protections. Employers should be allowed to make economic discharges when business conditions warrant, but there should be standards for demonstrating their necessity to ensure they are not used to disguise otherwise impermissible discharges.

8. **Protections against intensive surveillance and monitoring** – Just-cause legislation is an opportunity to begin to address the harmful and discriminatory impact of employers' growing use of electronic surveillance, algorithmic decision-making, and automated employee evaluation systems. Electronic monitoring and decision-making can result in employees being disciplined and even discharged with little human involvement in those assessments. Pervasive monitoring of workers also means that minor infractions can easily be found and used to sidestep just-cause protections. Just-cause legislation should limit the use of data collected through electronic monitoring for termination and disciplinary decisions.

9. **Severance pay** – When workers are discharged—whether for just cause or economic reasons—providing severance pay is crucial for mitigating the very harmful economic impacts of job loss. Without severance pay, workers and families face dramatic income cuts and extreme hardship, including being unable to pay rent or a mortgage, potentially leading to eviction or foreclosure. To provide workers with a cushion as they search for new employment, just-cause protections should guarantee a basic period of severance pay, such as four weeks. Guaranteeing severance pay is not only fair and broadly popular, but it also avoids

the common employer practice of pressuring workers to sign away their rights in exchange for receiving severance pay.

10. **Strong remedies and relief** – A just-cause policy should include strong remedies for violations, including the right to reinstatement and money damages, together with additional penalties or liquidated damages that are sufficient to deter noncompliance. Money damages must reflect the full scope of damages that workers face. Without such meaningful sanctions for discharges without cause, any new just-cause policy would not achieve the goal of ensuring fair process before workers are subjected to job loss.

11. **Effective enforcement vehicles, including qui tam** – Government labor agencies simply do not have the capacity to adequately enforce employment protections on their own. Therefore, a just-cause policy should include effective tools to allow workers to bring enforcement actions on their own. These should include a private right of action, authorization for recovery of attorneys' fees, and authorization for "qui tam" enforcement. Similar to a private right of action, qui-tam enforcement allows workers and members of the public to supplement government agency enforcement by stepping into the government's shoes to bring enforcement proceedings as "private attorneys general." Significantly, it can allow representative organizations, such as unions or worker centers, to bring enforcement action, ensuring that the burden of challenging employer lawbreaking does not remain solely on individual workers, who may face retaliation.

12. **No waivers of rights permitted** – A just-cause policy should provide that workers' rights may not be waived through private agreements absent court or Department of Labor supervision and explicitly prohibit employers from requiring workers to enter into a private agreement to waive their just-cause and whistleblower rights.

13. **Rights that are enforceable before judges and juries, regardless of forced arbitration requirements and class/collective-action waivers** – Finally, a just-cause policy should ensure that its protections can be enforced by workers before judges and juries. Forced arbitration requirements deny workers the right to go before a judge and jury when their employer breaks the law. Instead, workers must bring any claims to a secret proceeding before a private arbitrator who is not accountable to the public. Because these arbitrators depend on corporations for repeat business, they strongly favor employers. Making matters even worse, class and collective-action waivers routinely incorporated into these requirements prevent groups of employees from banding together to challenge employer lawbreaking. An effective just-cause policy must ensure that forced arbitration requirements and class/collective-action waivers will not interfere with the ability of workers to enforce their rights under that policy.

003032



# Appendix C – Survey Methodology

Between January 7 and January 23, 2022, YouGov interviewed 1,152 respondents through an online survey. The respondents were then matched down to a sample of 1,000 to produce the final dataset. Respondents were collected as part of a California state representative sample as well as California resident oversamples of Black and Latinx respondents.

The respondents were matched to a sampling frame representing employed residents between 18 and 64 years of age. The sampling frame consisted of interlocking parameters of gender, age, race, and education. The frame was constructed by stratified sampling from the full 2020 Current Population Survey sample with selection within strata by weighted sampling with replacements (using the person weights on the public use file).

The matched cases were weighted to the sampling frame using propensity scores. The matched cases and the frame were combined, and a logistic regression was estimated for inclusion in the frame. The propensity score function included age, gender, race/ethnicity, years of education, and region. The propensity scores were grouped into deciles of the estimated propensity score in the frame and post-stratified according to these deciles.

The weights were then post-stratified on a four-way stratification of gender, age (4-categories), race (4-categories), and education (4-categories), to produce the final weight. The margin of error for the entire survey is ±3.6%



# Endnotes

[1] California Coalition for Worker Power (CCWP) Focus Group with California members of Fight for 15 and a Union, in Spanish, held in September 2021. On file with author.

[2] Chinese Progressive Association and Asian Americans Advancing Justice – Asian Law Caucus, Press Release, August 21, 2021, https://cpasf.org/updates/workers-at-popular-chinatown-restaurant-win-1-61-million-in-massive-wage-theft-settlement/.

[3] "Overview," U.S. Equal Employment Opportunity Commission, accessed November 2, 2021, https://www.eeoc.gov/overview.

[4] "Laws that Prohibit Retaliation and Discrimination," California Department of Industrial Relations, accessed November 2, 2021, https://www.dir.ca.gov/dlse/HowToFileLinkCodeSections.htm.

[5] Kevin Kish, *2019 Annual Report,* Department of Fair Employment and Housing, https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2020/10/DFEH_2019AnnualReport.pdf.

[6] "FY 2009 – 2020 EEOC Charge Receipts for CA," U.S. Equal Employment Opportunity Commission, accessed October 29, 2021, https://www.eeoc.gov/statistics/enforcement/charges-by-state/CA.

[7] Julie A. Su, *2017 Retaliation Complaint Report (Labor Code §98.75),* State of California Department of Industrial Relations, https://www.dir.ca.gov/dlse/RCILegReport2017.pdf.

[8] Patricia K. Huber, *2018 Retaliation Complaint Report (Labor Code §98.75),* State of California Department of Industrial Relations, https://www.dir.ca.gov/dlse/RCILegReport2018.pdf.

[9] Lilia García-Brower, *2019 Retaliation Complaint Report (Labor Code §98.75),* State of California Department of Industrial Relations, https://www.dir.ca.gov/dlse/RCILegReport2019.pdf.

[10] Lilia García-Brower, *2020 Retaliation Complaint Report (Labor Code §98.75),* State of California Department of Industrial Relations, https://www.dir.ca.gov/dlse/RCILegReport2020.pdf.

[11] Kevin Kish, *2017 Annual Report,* Department of Fair Employment and Housing, https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2018/08/August302018AnnualReportFinal.pdf (the 2017 annual report refers to retaliation complaints as those concerning "engagement in a protected activity").

[12] Kevin Kish, *2018 Annual Report,* Department of Fair Employment and Housing, https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2020/01/DFEH-AnnualReport-2018.pdf.

[13] Kish, *2019 Annual Report.*

[14] Kish, *2018 Annual Report.*

[15] Kish, *2018 Annual Report.*

[16] Kish, *2019 Annual Report.*

[17] See, e.g., Advancing Justice - Asian Law Caucus and University of California, Berkeley Labor Occupational Health Program, *Few Options, Many Risks: Low-Wage Asian and Latinx Workers in the COVID-19 Pandemic*, April 2021, https://www.advancingjustice-alc.org/news_and_media/covid-workers-report; Rakeen Mabud, Amity Paye, Maya Pinto, and Sanjay Pinto, *Foundations for a Just and Inclusive Recovery: Economic Security, Health and Safety, and Agency and Voice in the COVID-19 Era*, Color of Change, National Employment Law Project, TIME'S UP Foundation, and The Worker Institute at Cornell ILR, February 2021, https://www.nelp.org/publication/foundations-for-a-just-and-inclusive-recovery; San Diego State University Department of Sociology, Center on Policy Initiatives, and Employee Rights Center of San Diego, *Confronting Wage Theft: Barriers to Claiming Unpaid Wages in San Diego*, July 2017, https://ccre.sdsu.edu/_resources/docs/reports/labor/Confronting-Wage-Theft.pdf; Jora Trang, *Improving OSH Retaliation Remedies for Workers*, Worksafe,  June 2015, https://worksafe.org/file_download/inline/54b22018-1128-4141-842c-aebc9cdccf23; and Eileen Appelbaum and Ruth Milkman, Leaves That Pay: Employer and Worker Experiences with Paid Family Leave in California, 2011, https://cepr.net/documents/publications/paid-family-leave-1-2011.pdf.

[18] CCWP Focus Groups with California members of the Pilipino Association of Workers and Immigrants (PAWIS), in Tagalog, held in August 2021. On file with author.

[19] Institute for the Future for the California Future of Work Commission, *Future of Work in California: A New Social Compact for Work and Workers*, March 2021, https://www.labor.ca.gov/wp-content/uploads/sites/338/2021/02/ca-future-of-work-report.pdf.

[20] "Hunger Data," California Association of Food Banks, https://www.cafoodbanks.org/hunger-data/#:~:text=On%20average%2C%201%20out%20of,by%20Black%20and%20Latinx%20families.&text=This%20data%20is%20based%20off,not%20comparable%20to%20Phase%202 and Diane Schanzenbach and Natalie Tomeh, "Visualizing Food Insecurity," Northwestern Institute for Policy Research, July 14, 2020, https://www.ipr.northwestern.edu/state-food-insecurity.html (selecting for California, 23.9 percent of Black and 24.9 percent of Latinx respondents reported food insecurity).

[21] Robert P. Jones, Daniel Cox, Rob Griffin, Maxine Najle, Molly Fisch-Friedman, and Alex Vandermaas-Peeler, *A Renewed Struggle for the American Dream: PRRI 2018 California Workers Survey*, PRRI, 2018, https://irvine-dot-

org.s3.amazonaws.com/documents/295/attachments/2018_PRRI_California_Workers_Survey.pdf?1535415254.

[22] Catherine S. Harvey, "Unlocking the Potential of Emergency Savings Accounts," AAPR Public Policy Institute, October 2019, https://www.aarp.org/content/dam/aarp/ppi/2019/10/unlocking-potential-emergency-savings-accounts.doi.10.26419ppi.00084.001.pdf.

[23] Harvey, 2019.

[24] Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2018 – May 2019,* last updated May 28, 2019, https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-dealing-with-unexpected-expenses.htm.

[25] Board of Governors of the Federal Reserve System, 2019.

[26] Alissa Anderson, *Q&A: Unemployment Insurance, Labor Day Cliff & the Costs of Unemployment*, California Budget & Policy Center, August 2021, https://calbudgetcenter.org/resources/qa-unemployment-insurance-labor-day-cliff-the-costs-of-unemployment/

[27] Anderson, 2021.

[28] See, e.g., Lauren Hepler, "Is California blowing it on unemployment reform?," *CalMatters*, March 29, 2021, Economy, https://calmatters.org/economy/2021/03/california-unemployment-crisis-reform/; Marie Tae McDermott and Jill Cowan, "What to Know About the Delays in California's Unemployment Payments," *New York Times*, January 19, 2021, California Today, https://www.nytimes.com/2021/01/19/us/ca-unemployment-payments.html; "Governor Newsom Signs Legislation to Strengthen State Unemployment Insurance Delivery System," Office of Governor Gavin Newsom, October 5, 2021, https://www.gov.ca.gov/2021/10/05/governor-newsom-signs-legislation-to-strengthen-state-unemployment-insurance-delivery-system. https://www.gov.ca.gov/2021/10/05/governor-newsom-signs-legislation-to-strengthen-state-unemployment-insurance-delivery-system/

[29] "Responding to Unemployment Insurance Claim Notices," Employment Development Department, State of California, updated February 17, 2022, https://edd.ca.gov/en/Unemployment/Responding_to_UI_Claim_Notices.

[30] Sara Kimberlin, Aureo Dias Mesquita, and Kristin Schumacher, *Undocumented & Mixed-Status Families Are Blocked From Food Support*, California Budget & Policy Center, May 2021, https://calbudgetcenter.org/resources/undocumented-mixed-status-families-are-blocked-from-food-support/; Rebecca Smith, *Immigrant Workers' Eligibility for Unemployment Insurance*, National Employment Law Project, March 31, 2020, https://www.nelp.org/publication/immigrant-workers-eligibility-unemployment-insurance/.

[31] Laura Huizar, *Exposing Wage Theft Without Fear: States Must Protect Workers from Retaliation,* National Employment Law Project, June 2019, https://s27147.pcdn.co/wp-content/uploads/Retal-Report-6-26-19.pdf.

[32] "Laws that Prohibit Retaliation and Discrimination," California Department of Industrial Relations, accessed November 2, 2021, https://www.dir.ca.gov/dlse/HowToFileLinkCodeSections.htm.

[33] "Chapter 4. Division of Labor Standards Enforcement," California Labor Code, Division 1. Department of Industrial Relations, https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=LAB&sectionNum=98.6; "Chapter 5. Political Affiliations," California Labor Code, Division 2. Employment Regulation and Supervision, Part 3. Privileges and Immunities, https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=LAB&sectionNum=1102.6

[34] See, e.g., Daniel Costa, *California Leads The Way: A Look at California Laws That Help Protect Labor Standards for Unauthorized Immigrant Workers*, Economic Policy Institute, March 22, 2018, https://www.epi.org/publication/california-immigrant-labor-laws/.

[35] Davis Wright Tremaine LLP, "New California Law Raises the Stakes in Labor Commissioner Investigations and Whistleblower Suits," *JD Supra*, October 17, 2017, https://www.jdsupra.com/legalnews/new-california-law-raises-the-stakes-in-90245/.

[36] See, e.g., Lisa P. Mak, "Protecting Whistleblowers: Litigating Claims under Labor Code Section 1102.5," *Advocate Magazine*, May 2021, https://www.advocatemagazine.com/article/2021-may/protecting-whistleblowers (outlining how workers who litigate a retaliation claim under Labor Code Section 1102.5 have been subject to the McDonnell Douglas burden-shifting standard which places "the ultimate burden of persuasion" with the worker and under which an employer must "merely *produce* evidence of "legitimate, non-retaliatory reasons for the adverse action, but it does not need to *persuade* the trier of fact that it was actually motivated by those reasons"); Jenny R. Yang and Jane Liu, *Strengthening Accountability for Discrimination,* Economic Policy Institute, January 19, 2021 (discussing hurdles to bringing federal discrimination claims and explaining that "workers who file lawsuits face substantial barriers in succeeding on their claims in court due to the onerous legal standards" that "create enormous evidentiary hurdles for workers and disregard the reality of extreme information asymmetry where workers often lack access to the evidence that courts require to support employment discrimination claims"). Notably, the California Supreme Court has agreed to hear a case to determine whether the McDonnell Douglas burden-shifting standard applies to claims brought pursuant to Labor Code Section 1102.5 or whether Labor Code Section 1102.6 replaces that burden-shifting framework. *Lawson v. PPG Architectural Finishes*

(Case No. S266001) (Cal. Sup. Ct., received from the 9th Cir. On Dec. 8, 2020).

[37] Kevin Kish, *Tracking Outcomes: 2019 Report to the Joint Legislative Budget Committee*, Department of Fair Employment and Housing, March 1, 2019, https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2019/03/2019.03.01_DFEH_LAO_SupplementalReport.pdf (In 2018, only 64 percent of cases closed within 100 days. Eighty-three percent of cases closed within 180 days, 93 percent closed within 275 days, and all cases closed within 365 days).

[38] Kish, 2019.

[39] California Department of Industrial Relations, *FY 2019 Comprehensive Federal Annual Monitoring Evaluation (FAME) Report*, https://www.osha.gov/sites/default/files/2020-07/california_2019.pdf.

[40] "What You Can Expect After You File a Charge," U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/what-you-can-expect-after-you-file-charge.

[41] Eunice Hyunhye Cho, Tia Koonse, Anthony Mischel, "Hollow Victories: The Crisis in Collecting Unpaid Wages for California's Workers," National Employment Law Project and UCLA Labor Center (June 2013) https://s27147.pcdn.co/wp-content/uploads/2015/02/Hollow-Victories.pdf

[42] Kate Andrias and Alexander Hertel-Fernandez, *Ending At-Will Employment: A Guide for Just Cause Reform*, Roosevelt Institute, January 19, 2021, https://rooseveltinstitute.org/publications/ending-at-will-employment-a-guide-for-just-cause-reform/.

[43] Fair Work Act 2009 (Cth) s 387 (Austl.); C.L.T. art. 482 (Braz.); KSchG § 1(2) (Ger.); Unfair Dismissals Act 1977 § 6(4) (Ir.); Labor Contract Act, art. 16 (Japan); LFT art. 47 (Mex.); Employment Rights Act, c. 18, § 98 (Gr. Brit.)

[44] Clyde W. Summers, Employment at Will in the United States: The Divine Right of Employers 3, U. Pa. J. Lab. & Emp. L. 1, 65-86, (2000), https://www.law.upenn.edu/journals/jbl/articles/volume3/issue1/Summers3U.Pa.J.Lab.&Emp.L.65(2000). pdf; Herbert G. Gutman, Trouble on the railroads in 1873–1874: Prelude to the 1877 crisis?, Labor History, 2, 2, 1961, https://www.tandfonline.com/doi/abs/10.1080/0023656610858 3874?journalCo de=clah20

[45] Christian E. Weller, *African Americans Face Systematic Obstacles to Getting Good Jobs*, Center for American Progress, December 5, 2019, https://www.americanprogress.org/issues/economy/reports/2019/12/05/478150/african-americans-face-systematic-obstacles-getting-good-jobs/.

[46] Wei-hsin Yu and Shengwei Sun, *Falling in and Getting Out of Unemployment: Ethnoracial and Class Differences across Business Cycles*, prepared for the U.S. DEPARTMENT OF LABOR, https://www.dol.gov/sites/dolgov/files/OASP/legacy/files/Yu-DOL-Final-Paper.pdf.

[47] CCWP Focus Group with California members of the CLEAN Carwash Worker Center, in Spanish, held in October 2021. On file with author.

[48] CCWP Focus Group with California members of the Pilipino Worker Center, in English, held in October 2021. On file with author.

[49] CCWP Focus Group with California members of the Pilipino Worker Center, in English, held in October 2021. On file with author.

[50] CCWP Focus Group with California members of the Chinese Progressive Association, in Cantonese and Mandarin, held in October 2021. On file with author.

[51] The Council of State Governments Justice Center, *Confined and Costly: How Supervision Violations Are Filling Prisons and Burdening Budgets*, June 18, 2019, https://csgjusticecenter.org/wp-content/uploads/2020/01/confined-and-costly.pdf.

[52] Noah Zatz, Tia Koonse, Theresa Zhen, Lucero Herrera, Han Lu, Steven Shafer, and Blake Valenta, *Get to Work or Go to Jail: Workplace Rights Under Threat*, UCLA Institute for Research on Labor and Employment, March 2016, https://irle.ucla.edu/wp-content/uploads/2016/03/Get-To-Work-or-Go-To-Jail-Workplace-Rights-Under-Threat.pdf.

[53] Laura Huizar, *Retaliation Funds: A New Tool to Tackle Wage Theft*, National Employment Law Project, April 2021, https://s27147.pcdn.co/wp-content/uploads/NELP-Policy-Brief-Retaliation-Funds.pdf.

[54] "Garment Workers Will No Longer Wait Years for Stolen Wages," Bet Tzedek, June 29, 2019, https://www.bettzedek.org/2019/06/garment-workers-will-no-longer-wait-years-for-stolen-wages/.

[55] California Labor Code § 2065.

[56] California Labor Code §§ 2105 and 1019 (c); Bill text of the Fast Food Accountability and Standards Recovery Act, https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB257.

[57] Huizar, April 2021.

[58] "DHCD Tenant-Based Rental Assistance Program," Government of the District of Columbia, accessed November 2, 2021, https://coronavirus.dc.gov/page/dhcd-tenant-based-rental-assistance-program; "Boston Resiliency Fund," City of Boston, accessed November 2, 2021, https://www.boston.gov/departments/treasury/boston-resiliency-fund; "COVID-19 Emergency Relief Fund," City of New York, accessed November 2, 2021, https://www1.nyc.gov/site/fund/initiatives/covid-19-emergency-relief-funds.page#:~:text=In%20response%2C%20Mayor%20de%20Blasio,hourly%20workers%2C%20including%20immigrant%20workers; City of Atlanta, "Mayor Keisha Lance Bottoms Announces Atlanta COVID-19 Emergency Rental Assistance Program through United Way," press release, August 20, 2020, https://www.atlantaga.gov/Home/Components/News/News/13432/672; "COVID-19 & Texas Law: Rent & Legal Assistance," Texas State Law Library, accessed November 2, 2021, https://guides.sll.texas.gov/covid-19/rent-legal-assistance; Pablo Lopez, "Tucson City Council Approves Additional COVID-19 Relief Funds," KVOA.com, December 1, 2020, https://www.kvoa.com/coronavirus/tucson-city-council-approves-additional-covid-19-relief-funds/article_2c78e08e-ab62-54a8-94a9-887e7edb1698.html.

003036

[59] "EFSP," Emergency Food and Shelter National Board Program, accessed on November 2, 2021,https://www.efsp.unitedway.org/efsp/website/index.cfm.

[60] "State Crime Victims Compensation," Benefits.gov, accessed November 2, 2021, https://www.benefits.gov/benefit/4416; California Government Code § 13900 et seq.

[61] Bet Tzedek, 2019.

[62] California Labor Code § 2065.

[63] "What is the TCRC?," Travel Consumer Restitution Corporation, accessed November 2, 2021, https://tcrcinfo.org/; California Business & Professions Code § 17550.35 et seq.

003037



# FEDERAL REGISTER

Vol. 81

No. 86

Wednesday,

May 4, 2016

Part III

## Department of Homeland Security

8 CFR Parts 103 and 204
U.S. Citizenship and Immigration Services Fee Schedule; Proposed Rule

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103 and 204**

[CIS No. 2577–15; DHS Docket No. USCIS–2016–0001]

RIN 1615–AC09

**U.S. Citizenship and Immigration Services Fee Schedule**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Homeland Security (DHS) proposes to adjust certain immigration and naturalization benefit request fees charged by U.S. Citizenship and Immigration Services (USCIS). USCIS conducted a comprehensive fee review, after refining its cost accounting process, and determined that current fees do not recover the full costs of the services it provides. Adjustment to the fee schedule is necessary to fully recover costs for USCIS services and to maintain adequate service. DHS proposes to increase USCIS fees by a weighted average of 21 percent and add one new fee. In addition, DHS proposes to clarify that persons filing a benefit request may be required to appear for biometrics services or an interview and pay the biometrics services fee, and make a number of other changes.

**DATES:** Written comments must be submitted on or before July 5, 2016.

**ADDRESSES:** You may submit comments, identified by DHS Docket No. USCIS–2016–0001, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow this site's instructions for submitting comments.

• *Email:* You may email comments directly to USCIS at *uscisfrcomment@dhs.gov.* Include DHS Docket No. USCIS–2016–0001 in the subject line of the message.

• *Mail:* You may submit comments directly to USCIS by mailing them to Samantha Deshommes, Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2020. To ensure proper handling, please reference DHS Docket No. USCIS–2016–0001 on your correspondence. This mailing address may be used for paper or CD–ROM submissions.

• *Hand Delivery/Courier:* You may submit comments directly to USCIS by having them delivered to Samantha Deshommes, Acting Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2020. The contact telephone number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Joseph D. Moore, Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2130, telephone (202) 272–1969.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
III. Background
  A. Legal Authority and Guidance
  B. Full Cost Recovery
  C. New Statutory Fees for Certain H–1B and L–1 Petitions
IV. The Immigration Examinations Fee Account
  A. General Background
  B. Fee Review History
  C. USCIS Initiatives Funded Under the 2010 Fee Adjustment
  D. Processing Time Outlook
V. FY 2016/2017 Immigration Examinations Fee Account Fee Review
  A. Overall Approach
  B. Basis for Fee Schedule
  1. Costs
  2. Revenue
  3. No Discretionary Appropriations for RAIO, SAVE, Office of Citizenship, or Military Naturalization Costs
  4. New Fee for Annual Certification of Regional Center, Form I–924A
  5. Summary
VI. Fee Review Methodology
  A. Background
  1. ABC Methodology
  2. Continuing Low Volume Reallocation From FY 2010/2011 Fee Rule
  3. Applying Cost Reallocation to Other Form Types
  4. Reduced Fee for Application for Naturalization
  5. Holding the Biometric Services Fee at Its Current Level
  6. Continuing To Hold the Refugee Travel Document Fee to the Department of State Passport Fee
  7. Holding the Fee for a Petition by Entrepreneur To Remove Conditions (Form I–829) at Its Current Level
  B. Changes for the FY 2016/2017 Fee Review
  1. Interim Benefits
  2. I–485 Fee for Child Under 14, Filing With Parent
  3. One Fee for a Genealogy Records Request
  4. Dishonored Payments and Failure To Pay the Biometrics Services Fee
  5. Refunds
  C. Fee-Related Issues Noted for Consideration
  1. Premium Processing
  2. Accommodating E-Filing and Form Flexibility
  3. Fee Waivers
VII. Volume
  A. Workload Volume and Volume Projection Committee
  B. Fee-Paying Volume and Methodology
VIII. Completion Rates
IX. Proposed Fee Adjustments to Immigration Examinations Fee Account Immigration Benefits
X. Statutory and Regulatory Reviews
  A. Regulatory Flexibility Act
  B. Unfunded Mandates Reform Act
  C. Small Business Regulatory Enforcement Fairness Act
  D. Congressional Review Act
  E. Executive Orders 12866 and 13563 (Regulatory Planning and Review)
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Paperwork Reduction Act

## List of Acronyms and Abbreviations

ABC  Activity-Based Costing
BLS  Bureau of Labor Statistics
CFO  Chief Financial Officer
CNMI  Commonwealth of the Northern Mariana Islands
CPI  Consumer Price Index
DACA  Deferred Action for Childhood Arrivals
DOD  Department of Defense
DHS  Department of Homeland Security
DOL  Department of Labor
DOS  Department of State
EB–5  Employment-Based Immigrant Visa, Fifth Preference
EIN  Employer Identification Number
FASAB  Federal Accounting Standards Advisory Board
FBI  Federal Bureau of Investigation
FOIA  Freedom of Information Act
FY  Fiscal Year
GAO  Government Accountability Office
IEFA  Immigration Examinations Fee Account
INA  Immigration and Nationality Act of 1952
IPO  Investor Program Office
IOAA  Independent Offices Appropriations Act
NACARA  Nicaraguan Adjustment and Central American Relief Act
NAICS  North American Industry Classification System
OMB  Office of Management and Budget
RAIO  Refugee, Asylum, and International Operations Directorate
RFA  Regulatory Flexibility Act
SAVE  Systematic Alien Verification for Entitlements
SBA  Small Business Administration
TPS  Temporary Protected Status
UMRA  Unfunded Mandates Reform Act
USCIS  U.S. Citizenship and Immigration Services
USPHS  U.S. Public Health Service
VPC  Volume Projection Committee

## I. Public Participation

DHS invites you to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this proposed rule. Comments providing

the most assistance to DHS will reference a specific portion of the proposed rule, explain the reason for any recommended change, and include data, information, or authority that supports the recommended change.

*Instructions:* All submissions should include the agency name and DHS Docket No. USCIS–2016–0001 for this rulemaking. Providing comments is entirely voluntary. Regardless of how you submit your comment to DHS, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov* and will include any personal information you provide. Because the information you submit will be publicly available, you should consider limiting the amount of personal information in your submission. DHS may withhold information provided in comments from public viewing if DHS determines that such information is offensive or may affect the privacy of an individual. For additional information, please read the Privacy Act notice available through the link in the footer of *http://www.regulations.gov.*

*Docket:* For access to the docket, go to *http://www.regulations.gov* and enter this rulemaking's eDocket number: USCIS–2016–0001. The docket includes additional documents that support the analysis contained in this proposed rule to determine the specific fees that are proposed. These documents include:

• Fiscal Year (FY) 2016/2017

Immigration Examinations Fee Account Fee Review Supporting Documentation; and

• Small Entity Analysis for Adjustment of the U.S. Citizenship and Immigration Services Fee Schedule notice of proposed rulemaking (NPRM).

You may review these documents on the electronic docket. The software [1] used in computing the immigration benefit request fees [2] and biometric fees [3] is a commercial product licensed to USCIS that may be accessed on-site,

by appointment, by calling (202) 272–1969.[4]

**II. Executive Summary**

DHS proposes to adjust its fee schedule, which specifies the amount of the fee charged for each immigration and naturalization benefit request. The fee schedule was last adjusted on November 23, 2010. *See* 75 FR 58962 (Sept. 24, 2010) (final rule) (FY 2010/2011 Fee Rule).

U.S. Citizenship and Immigration Services (USCIS) is primarily funded by immigration and naturalization benefit request fees charged to applicants and petitioners. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA) and used to fund the cost of processing immigration benefit requests.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990, 31 U.S.C. 901–03, (CFO Act), and Office of Management and Budget (OMB) Circular A–25, USCIS reviews the fees deposited into the IEFA biennially and, if necessary, proposes adjustments to ensure recovery of costs necessary to meet national security, customer service, and adjudicative processing goals. USCIS completed a biennial fee review for FY 2016/2017 in 2015. The results indicate that current fee levels are insufficient to recover the full cost of activities funded by the IEFA.

USCIS calculates its fees to recover the full cost of USCIS operations, which do not include the limited appropriated funds provided by Congress. USCIS anticipates if it continues to operate at current fee levels, it will experience an average annual shortfall of $560 million between IEFA revenues and costs. This projected shortfall poses a risk of degrading USCIS operations funded by IEFA revenue. The proposed rule would eliminate this risk by ensuring full cost recovery. DHS proposes to adjust fees by a weighted average increase of 21 percent. The weighted average increase is the percentage difference between the current and proposed fees by immigration benefit type.[5] USCIS

discusses the overall increase proposed in this rule in terms of weighted average, as opposed to a straight average, because the figure represents a more accurate depiction of the overall effect that this proposed rule would have on fee revenue.

In addition to ensuring that fees for each specific benefit type are adequate to cover the USCIS costs associated with administering the benefit, the weighted average increase of 21 percent also accounts for USCIS costs for services that are not directly fee funded. For instance, DHS proposes certain changes to how USCIS funds the costs for fee-exempt benefit types through IEFA fee collections received from other fee-paying individuals seeking immigration benefits.[6] DHS also proposes to fund the costs of the Systematic Alien Verification for Entitlements (SAVE) program (to the extent not recovered from users),[7] and the Office of Citizenship [8] through the use of fees. The proposed fee schedule also accounts for increased costs to administer refugee processing. Revenues under the proposed rule would accommodate an anticipated increase in the refugee admissions ceiling to 100,000 for FY 2017. This is an increase of 30,000, or 43 percent, over the FY 2015 refugee admissions ceiling.

In addition to the overall increase to existing fees, DHS proposes to establish a new fee of $3,035 to recover the full cost of processing the Employment Based Immigrant Visa, Fifth Preference

---

[1] USCIS uses commercially available activity-based costing software, SAP Business Objects Profitability and Cost Management, to create financial models to implement activity-based costing (ABC), as described in the ABC Methodology section.

[2] Benefit request means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose. 8 CFR 1.2.

[3] DHS uses the terms biometric fees, biometric services fees, and biometric fee synonymously in this rule to describe the process and fee for capturing, storing, or using biometrics.

[4] This rule describes the ABC model and key inputs to that model (total budget, workload estimates, staffing, and completion rates), both here and in the supporting documentation in the docket.

[5] USCIS uses weighted average as opposed to a straight average because of the difference in volume by immigration benefit type and the resulting effect on fee revenue. See the FY 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation for further information. The 21% weighted average increase is a change in the average fee that must be paid per filing for a form that currently requires a fee as compared to the average

that would have to be paid per form as proposed in this rule. The sum of the current fees multiplied by the projected FY 2016/2017 fee paying receipts by immigration benefit type, divided by the total fee paying receipts = $332. The sum of the proposed fees multiplied by the projected FY 2016/2017 receipts by immigration benefit type, divided by the fee paying receipts = $403. There is a $71 difference between these two averages, or 21%.

[6] USCIS does not charge a fee for military naturalizations, as the Department of Defense (DOD) currently reimburses USCIS for costs related to such naturalizations. Accordingly, USCIS does not propose to increase fees to cover the costs of military naturalizations.

[7] The SAVE program was established in 1987 by the Immigration Reform and Control Act (IRCA), Pub. L. 99–603, § 121(c) (Nov. 6, 1986), which required the Commissioner of the Immigration and Naturalization Service (INS) to "implement a system for the verification of immigration status . . . so that the system is available to all States by not later than October 1, 1987." SAVE uses an internet-based service to assist Federal, state and local benefit-issuing and licensing agencies, and other governmental entities, in determining the immigration status of benefit or license applicants, so that only those applicants entitled to benefits or licenses receive them.

[8] The USCIS Office of Citizenship was established by section 451(f) of the Homeland Security Act of 2002. Pub. L. 107–296, § 451(f) (2002). The statute tasks the office with "promoting instruction and training on citizenship responsibilities for aliens interested in becoming naturalized citizens."

(EB–5) Annual Certification of Regional Center, Form I–924A.[9] While approved EB–5 Regional Centers are required to file Form I–924A annually, there is currently no filing fee and as a result, DHS does not fully recover the processing costs associated with such filings. DHS therefore proposes to establish a filing fee for this form.

DHS also proposes to establish a three-level fee for the Application for Naturalization (Form N–400). First, DHS would increase the standard fee for Form N–400 from $595 to $640. Second, DHS would continue to charge no fee to an applicant who meets the requirements of sections 328 or 329 of the Immigration and Nationality Act of 1952 (INA) with respect to military service and applicants with approved fee waivers. Third, DHS would charge a reduced fee of $320 for naturalization applicants with family income greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. DHS is proposing this change to increase access to United States citizenship.

DHS also proposes to remove regulatory provisions that prevent USCIS from rejecting an immigration or naturalization benefit request paid with a dishonored check or lacking the required biometric services fee until the remitter has been provided an opportunity to correct the deficient payment. Finally, DHS proposes to clarify that persons filing any benefit request may be required to appear for biometrics services or an interview and may be required to pay the biometrics services fee.

## III. Background

### A. Legal Authority and Guidance

DHS issues this proposed rule consistent with INA section 286(m), 8 U.S.C. 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants" [10]), and the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it

provides, and to recommend changes to the agency's fees).

This proposed rule is also consistent with non-statutory guidance on fees, the budget process, and federal accounting principles. See OMB Circular A–25, available at *http://www.whitehouse.gov/ omb/circulars_a025/*, 58 FR 38142 (July 15, 1993) (establishing federal policy guidance regarding fees assessed by federal agencies for government services); Federal Accounting Standards Advisory Board (FASAB) Handbook, Version 14 (06/15), SFFAS 4, No. 37, available at *http://files.fasab.gov/ pdffiles/handbook_sffas_4.pdf* (generally describing cost accounting concepts and standards, and defining "full cost" to include "direct and indirect costs that contribute to the output, regardless of funding sources."); *id.* at 33–42 (identifying various classifications of costs to be included and recommending various methods of cost assignment); *see also* OMB Circular A–11, Preparation, Submission, and Execution of the Budget, section 20.7(d), (g) (June 30, 2015)), *available at www.whitehouse.gov/sites/default/files/ omb/assets/a11_current_year/a11_ 2015.pdf* (providing guidance on the FY 2017 Budget and instructions on budget execution, offsetting collections, and user fees). DHS uses OMB Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined below. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of IEFA costs.[11]

Finally, this rule accounts for and is consistent with congressional appropriations for specific USCIS programs. Appropriated funding for USCIS for FY 2016 provided funding only for the E-Verify employment eligibility verification program in the amount of $119.7 million. See Consolidated Appropriations Act, 2016, Public Law 114–113, div. F, tit. IV (Dec. 18, 2015) (DHS Appropriations Act 2016).

### B. Full Cost Recovery

Consistent with the aforementioned authorities and sources, this proposed rule would ensure that USCIS recovers the full costs for its services and maintains an adequate level of service.

The proposed rule would do this in two ways. First, where possible, the proposed rule would set fees at levels sufficient to cover the full cost of the corresponding services.[12] DHS works with OMB and generally follows OMB Circular A–25, which "establishes federal policy regarding fees assessed for Government services and for sale or use of Government goods or resources." *See* OMB Circular A–25, *User Charges* (Revised), para. 6, 58 FR 38142 (July 15, 1993). A primary objective of OMB Circular A–25 is to ensure that federal agencies recover the full cost of providing specific services to users and associated costs. *See id.*, para. 5. Full costs include, but are not limited to, an appropriate share of:

• Direct and indirect personnel costs, including salaries and fringe benefits such as medical insurance and retirement;

• Physical overhead, consulting, and other indirect costs, including material and supply costs, utilities, insurance, travel, and rents or imputed rents on land, buildings, and equipment;

• Management and supervisory costs; and

• The costs of enforcement, collection, research, establishment of standards, and regulation. *Id.*

Second, this proposed rule would set fees at a level sufficient to fund overall requirements and general operations when no annual appropriations are received, fees are statutorily set at a level that does not recover costs, or DHS determines that a type of immigration benefit request should be exempt, in whole or in part, from payment of fees. As noted, Congress has provided that USCIS may set fees for providing

---

[9] This rule proposes to change the title of Form I–924A from "Supplement to Form I–924" to "Annual Certification of Regional Center."

[10] The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services.

[11] OMB Circulars A–25 and A–11 provide nonbinding internal Executive Branch direction for the development of fee schedules under the Independent Offices Appropriations Act (IOAA) and appropriations requests, respectively. See 5 CFR 1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS used the activity-based costing (ABC) methodology supported in Circulars A–25 and A–11 to develop the proposed fee schedule.

[12] INA section 286(m), 8 U.S.C. 1356(m), provides broader fee-setting authority and is an exception from the stricter costs-for-services-rendered requirements of the Independent Offices Appropriations Act, 1952, 31 U.S.C. 9701(c) (IOAA). See *Seafarers Int'l Union of N. Am.* v. *U.S. Coast Guard*, 81 F.3d 179 (D.C. Cir. 1996) (IOAA provides that expenses incurred by agency to serve some independent public interest cannot be included in cost basis for a user fee, although agency is not prohibited from charging applicant full cost of services rendered to applicant which also results in some incidental public benefits). Congress initially enacted immigration fee authority under the IOAA. See *Ayuda, Inc.* v. *Attorney General*, 848 F.2d 1297 (D.C. Cir. 1988). Congress thereafter amended the relevant provision of law to require deposit of the receipts into the separate Immigration Examinations Fee Account of the Treasury as offsetting receipts to fund operations, and broadened the fee-setting authority. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, sec. 210(d), 104 Stat. 2101, 2111 (Nov. 5, 1990). Additional values are considered in setting Immigration Examinations Fee Account fees that would not be considered in setting fees under the IOAA. See 72 FR at 29866–7.

adjudication and naturalization services at a level that will *ensure* recovery of the full costs of providing *all* such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. See INA section 286(m), 8 U.S.C. 1356(m).[13] DHS has interpreted this statutory fee-setting authority, including the authorization for DHS to collect "full costs" for providing "adjudication and naturalization services," as granting DHS broad discretion to include costs other than OMB Circular A–25 generally provides. *See OMB Circular A–25,* para. 6d1; INA section 286(m), 8 U.S.C. 1356(m). In short, DHS may charge fees at a level that will ensure recovery of all direct and indirect costs associated with providing immigration adjudication and naturalization services.[14]

Consistent with this historical position, this proposed rule would set fees at a level that will ensure recovery of the full operating costs of USCIS, the entity within DHS that provides almost all immigration adjudication and naturalization services. *See* Homeland Security Act (HSA), Public Law 107–296, sec. 451, 116 Stat. 2142 (Nov. 26, 2002) (6 U.S.C. 271). The statute authorizes recovery of the full costs of providing immigration adjudication and naturalization services. Congress has historically relied on this authority to support the vast majority of USCIS programs and operations, which are conducted as part of adjudication and naturalization service delivery. This conclusion is supported by Congress' historical appropriations to USCIS. USCIS receives only a small amount of appropriated funds annually, and the agency must use other means to fund, as

a matter of both discretion and necessity, all other USCIS operations.

Thus, for example, certain functions (such as SAVE [15] and the Office of Citizenship [16]), that USCIS has administered since DHS's inception as an integrated part of fulfilling USCIS's statutory responsibility to provide immigration adjudication and naturalization services, are not associated with specific fees, but may be IEFA-funded. Similarly, when a filing fee for a benefit such as Temporary Protected Status (TPS), capped by statute at $50, does not cover the cost of adjudicating these benefit requests, DHS may recover the difference with fees charged to other benefit requests. *See* INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B); 8 CFR 103.7(b)(1)(i)(MM); proposed 8 CFR 103.7(b)(1)(i)(NN). Finally, when DHS exempts certain foreign nationals from visa fees—for example, victims who assist law enforcement in the investigation or prosecution of acts of human trafficking (T nonimmigrant status) or certain other crimes (U nonimmigrant status)—the cost of processing those fee-exempt visas must be recovered by fees charged to other benefit requests. *See, e.g.,* proposed 8 CFR 103.7(b)(1)(i)(UU)–(VV).

In short, the full costs of USCIS operations cannot be as directly correlated or connected to a specific fee as OMB Circular A–25 advises. Nonetheless, DHS follows OMB Circular A–25 to the extent appropriate, including its direction that fees should be set to recover the costs of an agency's services in their entirety and that full costs are determined based upon the best available records of the agency. *Id.* DHS therefore applies the discretion provided in INA section 286(m), 8 U.S.C. 1356(m), to: (1) Use ABC to establish a model for assigning costs to specific benefit requests in a manner reasonably consistent with OMB

Circular A–25; (2) distribute costs that are not attributed to or driven by specific adjudication and naturalization services; [17] and (3) make additional adjustments to effectuate specific policy objectives.[18]

By approving the DHS annual appropriations that provide very limited funds to USCIS, Congress has consistently recognized that the "full" cost of operating USCIS, including SAVE and the Office of Citizenship, less any appropriated funding, is the appropriate cost basis for establishing IEFA fees. Nevertheless, in each biennial review, DHS adds refinements to its determination of immigration benefit fees, including the level by which fees match directly assignable, associated, and indirect costs.

*C. New Statutory Fees for Certain H–1B and L–1 Petitions*

The James Zadroga 9/11 Victim Compensation Fund Reauthorization Act increased Fees For Certain H–1B [19] And L–1 [20] Visa Petitioners. *See* Consolidated Appropriations Act, 2016, Public Law 114–113, div. O, tit. IV, sec. 402 (Dec. 18, 2015). These petitioners must submit an additional fee of $4,000 for certain H–1B petitions and $4,500 for certain L–1A and L–1B petitions postmarked on or after December 18, 2015. Proposed 8 CFR 103.7(b)(1)(i)(III)–(JJJ).

The additional fees apply to petitioners who employ 50 or more employees in the United States, with more than 50 percent of those employees in H–1B or L–1 (including L–1A and L–1B) nonimmigrant status.

---

[13] Congress has provided separate but similar authority for establishing USCIS genealogy program fees. *See* INA section 286(t), 8 U.S.C. 1356(t). The statute requires that genealogy program fees be deposited into the Examinations Fee Account and that the fees for such research and information services may be set at a level that will ensure the recovery of the full costs of providing all such services. Id. The methodology for calculating the genealogy program fees is discussed in a separate section later in this preamble.

[14] Congress has not defined either term with any degree of specificity for purposes of subsections (m) and (n). *See, e.g., Barahona* v. *Napolitano,* No. 10–1574, 2011 WL 4840716, at **6–8 (S.D.N.Y. Oct. 11, 2011) ("While the term 'full costs' appears self-explanatory, section 286(m) contains both silence and ambiguity concerning the precise scope that 'full costs' entails in this context."); *see also King* v. *Burwell,* 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.' So when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.' ") (quoting *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132–33 (2000)).

[15] SAVE has been funded almost exclusively by user fees and IEFA funds, as Congress has not provided any direct appropriated funds for the program since FY 2007. SAVE provides an "immigration adjudication . . . service" under sections 286(m) and (n) of the INA to Federal, state and local agencies who require immigration adjudication information in administering their benefits.

[16] The Office of Citizenship was created in the HSA at the same time as several other mission essential USCIS offices, such as those for legal, budget and policy. Like those offices, the Office of Citizenship has always been considered an essential part of the "adjudication and naturalization services" USCIS provides under sections 286(m) and (n) of the INA. An integral part of providing such services, as Congress recognized in creating the Citizenship office in section 451(f) of the INA, includes providing information to potential applicants for naturalization regarding the process of naturalization and related activities.

[17] The ABC model distributes indirect costs that are not assigned to specific fee-paying immigration benefit requests are reallocated to other fee-paying immigration benefit requests outside the model. For example, the model determines the direct and indirect costs for refugee and asylum workload. The costs associated with processing the refugee and asylum workload are reallocated outside the model to other fee-paying immigration benefit requests.

[18] DHS may reasonably adjust fees based on value judgments and public policy reasons where a rational basis for the methodology is propounded in the rulemaking. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

[19] The H–1B nonimmigrant classification allows U.S. employers to temporarily employ foreign workers in the United States to perform services in a specialty occupation, services of an exceptional nature relating to a Department of Defense cooperative research and development project, or services as a fashion model of distinguished merit or ability. INA section 101(a)(15)(H), 8 U.S.C. 1101(a)(15)(H).

[20] L–1 petitions are filed to transfer individuals who are employed outside the United States as executives or managers, or in positions that require specialized knowledge, to a position with the same or a related entity inside the United States. INA section 101(a)(15)(L), 8 U.S.C. 1101(a)(15)(L).

These petitioners must submit the additional fees with an H–1B or L–1 petition filed:

• Initially to grant status to a nonimmigrant described in subparagraph (H)(i)(b) or (L) of section 101(a)(15) of the Immigration and Nationality Act; or

• To obtain authorization for a nonimmigrant in such status to change employers.

USCIS began rejecting petitions after February 11, 2016 that do not include the additional Public Law 114–113 fee, if applicable. This fee is in addition to the Petition for a Nonimmigrant Worker (Form I–129) fee, the Fraud Prevention and Detection Fee, and the American Competitiveness and Workforce Improvement Act of 1998 fee (when required), as well as the premium processing fee (if applicable). These fees, when applicable, may not be waived. Public Law 114–113 fees will remain effective through September 30, 2025.

USCIS collects this revenue, but does not spend it. One half of the revenue collected from such fees goes to the General Fund of the Treasury. The other half is deposited by DHS into the 9–11 Response and Biometric Exit Account to fund a biometric entry-exit data system to track the lawful entrance and departure of all noncitizens at U.S. airports and land border crossings. After a total of $1,000,000,000 is deposited into the 9–11 Response and Biometric Exit Account, further revenue will be deposited in the general fund of the Treasury. The funds in the 9–11 Response and Biometric Exit Account will remain available until expended to U.S. Customs and Border Protection and/or other DHS components to implement the biometric entry-exit data system.

USCIS is already collecting these new statutory fees and is in the process of revising the instructions for the Petition for a Nonimmigrant Worker, Form I–129, and the Nonimmigrant Petition Based on Blanket L Petition, Form I–129S, to include them. DHS is required to charge these fees and has no authority to change them. DHS is proposing to publish these new statutory fees in the interest of transparency, information and clarity.

## IV. The Immigration Examinations Fee Account

### A. General Background

In 1988, Congress established the IEFA in the Treasury of the United States. See Public Law 100–459, sec. 209, 102 Stat. 2186 (Oct. 1, 1988) (codified as amended at INA sections 286(m) and (n), 8 U.S.C. 1356(m) and (n)). Fees deposited into the IEFA fund the provision of immigration adjudication and naturalization services. In subsequent legislation, Congress directed that the IEFA also fund the cost of asylum processing and other services provided to immigrants at no charge. See Public Law 101–515, sec. 210(d)(1) and (2), 104 Stat. 2101, 2121 (Nov. 5, 1990). Consequently, the immigration benefit fees were increased to recover these additional costs. See 59 FR 30520 (June 14, 1994).

### B. Fee Review History

Most recently, DHS published a revised USCIS fee schedule in its 2010/2011 Fee Rule that amended many USCIS fees to more accurately reflect the costs of services provided by USCIS. 75 FR 58962 (Sept. 24, 2010).[21] The rule was effective on November 23, 2010. The Department of Justice [22] also adjusted fees incrementally in 1994, and DHS adjusted fees in 2002, 2004, and 2005. See 59 FR 30520 (June 14, 1994); 66 FR 65811 (Dec. 21, 2001); 69 FR 20528 (Apr. 15, 2004); 70 FR 56182 (Sept. 26, 2005). After a decade of incremental changes, DHS published a comprehensive Fee Rule in 2007. See 72 FR 29851 (May 30, 2007). The documentation accompanying this proposed rule in the rulemaking docket at *www.regulations.gov* contains a historical fee schedule that shows the immigration benefit fee history since FY 1985.

USCIS reviews the IEFA every 2 years as required by the CFO Act and consistent with guidance in OMB Circular A–25. 31 U.S.C. 902(a)(8); OMB Circular A–25, section 8e. The CFO Act and OMB Circular A–25 require that fees be reviewed biennially so that fee-funded agencies monitor and adjust their fees in light of actual and projected expenses. *Id.*

Table 1 sets out the IEFA and biometric services fee schedule that took effect on November 23, 2010. DHS is proposing to change the fee schedule as a result of the 2016/2017 Fee Review. The table excludes statutory fees that DHS cannot adjust.

TABLE 1—CURRENT NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES

| Form No.[23] | Title | Fee |
|---|---|---|
| G–1041 | Genealogy Index Search Request | $20 |
| G–1041A | Genealogy Records Request (Copy from Microfilm) | 20 |
| G–1041A | Genealogy Records Request (Copy from Textual Record) | 35 |
| I–90 | Application to Replace Permanent Resident Card | 365 |
| I–102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 330 |
| I–129 | Petition for a Nonimmigrant Worker | 325 |
| I–129F | Petition for Alien Fiancé(e) | 340 |
| I–130 | Petition for Alien Relative | 420 |
| I–131 | Application for Travel Document [24] | 360 |
| I–140 | Immigrant Petition for Alien Worker | 580 |
| I–191 | Application for Advance Permission to Return to Unrelinquished Domicile | 585 |
| I–192 | Application for Advance Permission to Enter as Nonimmigrant | 585 |
| I–193 | Application for Waiver of Passport and/or Visa | 585 |
| I–212 | Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | 585 |
| I–290B | Notice of Appeal or Motion | 630 |
| I–360 | Petition for Amerasian, Widow(er), or Special Immigrant | 405 |
| I–485 | Application to Register Permanent Residence or Adjust Status | 985 |
| I–485 | Application to Register Permanent Residence or Adjust Status [25] | 635 |

---

[21] The phrase "FY 2010/2011 Fee Rule," as used in this proposed rule, encompasses the proposed rule, final rule, fee study, and all supporting documentation associated with the regulations effective as of November 23, 2010.

[22] The Homeland Security Act of 2002 abolished the Immigration and Naturalization Service (INS) and transferred the INS's immigration administration and enforcement responsibilities from the Department of Justice to DHS. The INS's immigration and citizenship services functions

were specifically transferred to the Bureau of Citizenship and Immigration Services, later renamed U.S. Citizenship and Immigration Services. See Public Law 107–296, § 451; 6 U.S.C. 271.

TABLE 1—CURRENT NON-STATUTORY IEFA IMMIGRATION BENEFIT REQUEST FEES—Continued

| Form No.[23] | Title | Fee |
|---|---|---|
| I–526 | Immigrant Petition by Alien Entrepreneur | 1,500 |
| I–539 | Application to Extend/Change Nonimmigrant Status | 290 |
| I–600 | Petition to Classify Orphan as an Immediate Relative | 720 |
| I–600A | Application for Advance Processing of Orphan Petition | 720 |
| I–601 | Application for Waiver of Ground of Excludability | 585 |
| I–601A | Application for Provisional Unlawful Presence Waiver | 585 |
| I–612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended). | 585 |
| I–687 | Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | 1,130 |
| I–690 | Application for Waiver of Grounds of Inadmissibility | 200 |
| I–694 | Notice of Appeal of Decision under Section 210 or 245A | 755 |
| I–698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of Pub. L. 99–603). | 1,020 |
| I–751 | Petition to Remove the Conditions of Residence | 505 |
| I–765 | Application for Employment Authorization | 380 |
| I–800 | Petition to Classify Convention Adoptee as an Immediate Relative | 720 |
| I–800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | 720 |
| I–817 | Application for Family Unity Benefits | 435 |
| I–824 | Application for Action on an Approved Application or Petition | 405 |
| I–829 | Petition by Entrepreneur to Remove Conditions | 3,750 |
| I–910 | Application for Civil Surgeon Designation | 615 |
| I–924 | Application for Regional Center Designation Under the Immigrant Investor Program [26] | 6,230 |
| I–929 | Petition for Qualifying Family Member of a U–1 Nonimmigrant | 215 |
| N–300 | Application to File Declaration of Intention | 250 |
| N–336 | Request for Hearing on a Decision in Naturalization Proceedings | 650 |
| N–400 | Application for Naturalization | 595 |
| N–470 | Application to Preserve Residence for Naturalization Purposes | 330 |
| N–565 | Application for Replacement Naturalization/Citizenship Document | 345 |
| N–600/600K | Application for Certification of Citizenship/Application for Citizenship and Issuance of Certificate under Section 322. | 600 |
|  | Immigrant visa DHS domestic processing fee [27] | 165 |
| Biometrics Fee | Biometric services | 85 |

*C. USCIS Initiatives Funded Under the 2010 Fee Adjustment*

In the FY 2010/2011 fee rule, USCIS committed to a set of goals and performance improvements that were aimed at increasing accountability, providing better customer service, and increasing efficiency. *See* 75 FR 33457–8. These performance enhancements were:

• *Deployment of Transformed Processes and System.* USCIS deployed the first release of its new electronic case management system, the Electronic Immigration System (ELIS), in the third quarter of FY 2012. ELIS was subsequently rebuilt using an agile software development methodology and simplified technology architecture. As a result of this effort, USCIS is able to deploy increased electronic processing capability to the system more quickly than the traditional software development approach. USCIS processed approximately 17 percent of agency intake of benefit requests in ELIS in fiscal year 2015. USCIS anticipates that approximately 30 percent of agency intake will be processed through ELIS by the end of fiscal year 2016; additional increased processing through ELIS is likely in fiscal year 2017.

• *Expanding the Use of Systems Qualified Adjudication to a Larger Share of USCIS Workload.* The term Systems Qualified Adjudication is now referred to as System Assisted Processing. This is a form of electronic pre-adjudication that improves the efficiency of processing benefit requests and affords immigration service officers more time to focus on complex adjudications. USCIS will continue to expand this approach where it is determined feasible as part of its business transformation initiative.

• *Integration of Productivity Measures in Future Fee Review Methodology.* DHS has stated in past fee rules that USCIS would integrate productivity measures into the underlying methodology it uses to conduct fee reviews. See, *e.g.*, 72 FR 29857 ("Future productivity enhancements will produce lower costs per unit that will be reflected in future price adjustments."). USCIS has done this and plans to continue to identify efficiency gains resulting from information technology investments and process improvements, including the cost savings that occur due to these changes, and ensure that those savings are incorporated into new fee amounts derived from future fee reviews.

---

[23] Form when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in a paper format or an electronic format as prescribed by USCIS on its official Internet Web site. The term "Form" followed by an immigration form number includes an approved electronic equivalent of such form as made available by USCIS on its official Internet Web site. *See* 8 CFR 1.2 and 299.1. Therefore, the word "form" is used in this rule in both the specific and general sense.

[24] As described more fully below, the fees for an Application for Travel Document to request a Refugee Travel Document are guided by the United States' obligations under the 1967 Protocol relating to the Status of Refugees (incorporating by reference Article 28 of the 1951 U.N. Convention relating to the Status of Refugees) and not calculated by the USCIS fee model. 8 CFR 103.7(b)(1)(i)(M)(2) and (3).

[25] This reduced fee is applied to "an applicant under the age of 14 years when [the application] is (i) submitted concurrently with the Form I–485 of a parent, (ii) the applicant is seeking to adjust status as a derivative of his or her parent, and (iii) the child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent." 8 CFR 103.7(b)(1)(i)(U)(2).

[26] DHS proposes to remove the word "Pilot" from the form title.

[27] DHS proposes to change the fee name to "USCIS Immigrant Fee." *See* proposed 8 CFR 103.7(b)(1)(i)(D).

*D. Processing Time Outlook*

USCIS acknowledges that since it last adjusted fees in FY 2010, the agency has experienced elevated processing times compared to the goals established in FY 2007. These processing delays have contributed to case processing backlogs. This can partially be attributed to having removed the surcharge previously applied to the IEFA fee schedule to recover costs related to the USCIS Refugee, Asylum, and International Operations Directorate (RAIO), SAVE, and the Office of Citizenship. This was done in anticipation of Congress granting the request for annual discretionary appropriations to fund these programs that was in the President's Budget. Those resources did not fully materialize and since FY 2012 USCIS has used other fee revenue to support these programs. DHS is proposing to adjust fees by a total weighted average increase of 21 percent; the total 21 percent weighted average increase would be allocated as follows:

• Reinstate a surcharge in the fee schedule to fully fund RAIO, SAVE, and the Office of Citizenship (approximately 8 percent);

• Account for reduced revenue stemming from an increase in fee waivers granted since FY 2010 (approximately 9 percent); and

• Recover the costs needed to sustain current operating levels while allowing for limited, strategic investments necessary to ensure the agency's information technology infrastructure is strengthened to protect against potential cyber intrusions, and to build the necessary disaster recovery and back-up capabilities required to effectively deliver the USCIS mission (approximately 4 percent).

Through this rule, USCIS expects to collect sufficient fee revenue to fully support RAIO, SAVE and the Office of Citizenship. This would allow USCIS to discontinue diverting fee revenue to fund these programs, thereby increasing resources to fund the personnel needed to improve case processing, reduce backlogs, and achieve processing times that are in line with the commitments in the FY 2007 Fee Rule, which USCIS is still committed to achieving.

In addition, to make current published processing time information more transparent and easier for customers to interpret, USCIS is evaluating the feasibility of calculating processing times using data generated directly from case management systems, rather than with self-reported performance data provided by Service Centers and Field Offices. Preliminary findings suggest that USCIS will be able to publish processing times sooner and with greater transparency by showing different processing times for each office and form type. USCIS is also considering publishing processing times using a range rather than using one number or date. This approach would show that, for example, half of cases are decided in between X and Y number of months.

USCIS also expects to improve the customer experience as we continue to transition to online filing and electronic processing of immigration applications and petitions. With the new person-centric electronic case processing environment, USCIS will possess the data needed to provide near-real-time processing updates to the customer that will identify the case status and time period lapsed between actions for each individual case. This will allow greater transparency to the public on how long it will take to process each case as it moves from stage to stage (*e.g.*, from biometrics collection, to interview, to decision).

USCIS is committed to giving stakeholders and customers the information they need, when they need it. To that end, it is transforming how it calculates and posts processing time information to improve the timeliness of such postings, but more importantly, to achieve greater transparency of USCIS case processing.

**V. FY 2016/2017 Immigration Examinations Fee Account Fee Review**

*A. Overall Approach*

USCIS manages three fee accounts:
1. The IEFA (which includes premium processing revenues),[28]
2. The Fraud Prevention and Detection Account,[29] and
3. The H–1B Nonimmigrant Petitioner Account.[30]

The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are both funded by statutorily set fees. The proceeds of these fees are divided among USCIS to use for fraud detection and prevention activities and for the National Science Foundation and the Department of Labor. DHS has no authority to adjust fees for these accounts.

The IEFA comprised approximately 94 percent of total funding for USCIS in FY 2015 and is the focus of this proposed rule. The FY 2016/2017 Fee Review encompasses three core elements:

• *Cost Projections*—The cost baseline is the estimated level of funding necessary to maintain an adequate level of operations and does not include program increases for new development, modernization, or acquisition. Proposed program increases are considered outside of the baseline. Cost projections for FY 2016/2017 are derived from the USCIS annual operating plan for FY 2015.

• *Revenue Status and Projections*—Actual revenue collections for a set 12-month period (June 2013—May 2014) are used to derive projections for the 2-year period of the fee review based on current and anticipated trends.

• *Cost and Revenue Differential*—The difference between anticipated costs and revenue, assuming no change in fees, is identified.

The primary objective of this fee review was to ensure that fee revenue provides sufficient funding to meet ongoing operating costs, including national security, customer service, and adjudicative processing needs.

*B. Basis for Fee Schedule*

When conducting the comprehensive fee review, USCIS reviewed its recent cost history, operating environment, and current service levels to determine the appropriate method to assign costs to particular form types. Overall, USCIS kept costs as low as possible and minimized non-critical program changes that would have increased costs.

1. Costs

The cost baseline is comprised of the resources (including both personnel and non-personnel expenses) necessary for each USCIS office to sustain operations. The baseline excludes new or expanded programs and significant policy changes. A detailed annual operating plan is the starting point for baseline estimates.

In developing estimates for program needs in FY 2016/2017, USCIS used the FY 2015 annual operating plan as the starting point and made necessary adjustments, including:

• *Pay inflation ($11.3 million in FY 2016 and $23.1 million in FY 2017)*. The assumed government-wide pay inflation rate is 1 percent for FY 2016 and 2 percent for FY 2017;

• *Additional staff ($166.7 million in FY 2016 and $171.6 million in FY 2017)*. Based on the results of the FY 2015 Staffing Allocation Model[31] and

---

[28] INA secs. 286(m), (n) & (u), 8 U.S.C. 1356(m), (n) & (u).

[29] INA secs. 214(c)(12)–(13), 286(v), 8 U.S.C. 1184(c)(12)–(13) 1356(v).

[30] INA secs. 214(c)(9), (11), 286(s), 8 U.S.C. 1184(c)(9), (11), 1356(s).

[31] The Staffing Allocation Model is a workforce planning model used to calculate estimates of staffing types and levels necessary to undertake

enhancement staffing requests submitted by program offices, USCIS projects that an additional 1,171 positions are needed to meet adjudicative processing goals and other USCIS mission objectives.

• *Additional resource requirements ($24.9 million in FY 2016 and $16.7 million in FY 2017).* These additional resources will sustain current operations to support the USCIS strategic goals.

• *Premium processing costs ($264.3 million in FY 2016 and $266.7 million in FY 2017).* In addition to continuing to cover costs associated with the Office of Transformation, USCIS plans to use premium processing fees to pay an annual average of $79.3 million in costs associated with administering premium-processing services and infrastructure improvements in the adjudications and customer services processes.[32] These costs pertain to the Service Center Operations staff adjudicating cases that requested premium processing service, transformation-related expenses (including the Office of Transformation Coordination personnel), and infrastructure investments being made to enhance the adjudication process and customer service.

• *FY 2016/2017 total projected costs for the Refugee, Asylum, and International Operations Directorate (RAIO) (including an increase in the refugee admissions ceiling to 100,000 for FY 2017), SAVE,[33] and the Office of Citizenship (including the Citizenship and Integration Grant Program) ($303.1 million).* This is an increase of $158 million, or 108 percent, over FY 2010 actual costs of $145.4 million. The costs for these programs were removed from the FY 2010/2011 model used to calculate the USCIS fee schedule in the 2010 Fee Rule, consistent with FY 2010 appropriations and consistent with the Administration's FY 2011 budget request. That budget request was not fulfilled, and USCIS was left to pay the costs of these programs after having removed the surcharge. *See* 75 FR 58963.

Table 2 summarizes adjustments to the FY 2015 cost baseline to reach the FY 2016 and FY 2017 cost baselines. After accounting for reductions, additional staff, and additional resource requirements, FY 2016 costs are 5 percent higher than the FY 2015 adjusted IEFA budget. FY 2017 costs are 2 percent higher than FY 2016 costs.

### TABLE 2—BASELINE ADJUSTMENTS

[Dollars in thousands]

| | |
|---|---|
| Total FY 2015 Adjusted IEFA Budget ................................ | $2,863,889 |
| Plus: Pay Inflation and Promotions/Within Grade Increases ................................ | 130,092 |

### TABLE 2—BASELINE ADJUSTMENTS—Continued

[Dollars in thousands]

| | |
|---|---|
| Plus: Net Additional Costs ........ | 137,381 |
| Less: Spending Adjustments ... | ¥122,338 |
| Total FY 2016 Adjusted IEFA Budget ................................ | $3,009,024 |
| Plus: Pay Inflation and Promotions/Within Grade Increases ................................ | 38,072 |
| Plus: Net Additional Costs ........ | 19,452 |
| Total FY 2017 Adjusted IEFA Budget ................................ | $3,066,548 |

The projected annual budget for the FY 2016/2017 biennial fee review period is $3.038 billion. This is a $767 million, or 34 percent, increase over the FY 2010/2011 adjusted annual budget of $2.271 billion. The main drivers of this increase are described in detail throughout this rule and the supporting documentation.

2. Revenue

The FY 2016/2017 Fee Review assumes that baseline revenue under the current fee schedule will increase from the FY 2010/2011 Fee Rule projection of $2.056 billion to $2.478 billion, an increase of approximately 9 percent. This results from a fee-paying volume increase of 13 percent despite a workload volume increase of 23 percent. *See* 75 FR 33456. Table 3 summarizes the projected cost differential.

### TABLE 3—IEFA COST BASELINE AND REVENUE COMPARISON

[Dollars in thousands]

| Fiscal year | FY 2016 | FY 2017 | FY 2016/2017 Average |
|---|---|---|---|
| Non-Premium Revenue ................................................................ | $2,507,683 | $2,448,596 | $2,478,139 |
| IEFA Cost Baseline ................................................................ | $3,009,024 | $3,066,548 | $3,037,786 |
| Difference ................................................................ | ($501,341) | ($617,952) | ($559,647) |

Historically, and for the purpose of the fee review, USCIS has reported costs and revenue using an average over the biennial time period. In Table 3, FY 2016 and 2017 costs and revenue are averaged to determine the projected Fee Rule amounts. Based on current immigration benefit and biometric services fees and projected volumes, fees are expected to generate $2.478 billion in average annual revenue in FY 2016 and FY 2017. For the same period, the average cost of processing benefit requests is $3.038 billion. This calculation results in an average annual deficit of $560 million.

3. No Discretionary Appropriations for RAIO, SAVE, Office of Citizenship, or Military Naturalization Costs

The current fee schedule is inadequate partly because it was established assuming that funds requested in the President's FY 2010 and FY 2011 budgets would be appropriated from Congress, yet those requests were not fulfilled. The FY 2010 and FY 2011 budgets requested $55 million and $259 million, respectively, to enable USCIS to remove the surcharge associated with refugee and asylum workload and military naturalization processing from immigration benefit request fees and to fund the cost of the SAVE program and the Office of Citizenship.[34] Before 2010, the USCIS fee schedule included a surcharge that could be used to recover the cost of adjudicating asylum, refugee, and military naturalization requests. *See* 72 FR 29667. The 2010 Fee Rule removed those costs and the surcharge from the fee structure. *See* 75 FR 58961, 58966. Congress, in its FY 2011

---

specific workload (*e.g.*, applications and petitions) levels at target processing times.

[32] Premium processing fees are a subset of IEFA fees separately designated by Congress. *See* INA section 286(u), 8 U.S.C. 1186(u).

[33] SAVE is partially funded by reimbursable revenue from Federal, state, and local governments. The proposed fees only fund the remaining SAVE costs that are not funded by reimbursable revenue.

[34] *See* Office of Management and Budget, Budget of the United States Government, Fiscal Year 2010, at 510–1 (2009), available at *http://www.gpo.gov/fdsys/pkg/BUDGET-2010-SUMMARY/pdf/BUDGET-2010-SUMMARY.pdf*.

continuing resolution, provided USCIS with only $29.95 million [35] of the requested $259 million to fund the refugee and asylum processing administered under the RAIO Directorate and military naturalization processing. *See* Public Law 112–10, sec. 1639 (Apr. 15, 2011). USCIS has not received any substantial appropriations for these programs since FY 2011. Similarly, USCIS received no FY 2016 discretionary appropriations for the SAVE program or for the Office of Citizenship. *See* DHS Appropriations Act 2016, Public Law 114–113, div. F. (Dec. 18, 2015).[36] To avoid ongoing funding shortfalls for these programs, USCIS assumes in its fee model that no appropriations will be received for workload related to RAIO, SAVE, or Office of Citizenship operations and related expense items for the FY 2016/2017 biennial period.

Therefore, DHS proposes to fund the USCIS costs for RAIO, SAVE, and the Office of Citizenship through IEFA fee collections received from other fee-paying individuals seeking immigration benefits. DHS proposes to set the fees at a level sufficient to recover full costs.

USCIS is, however, requesting reimbursement from DOD for costs related to military naturalizations. DOD has reimbursed USCIS for the cost of naturalization processing for eligible military service members since FY 2012. *See* 10 U.S.C. 1790 (providing that the Secretary of Defense may reimburse the Secretary of Homeland Security (Secretary) for actual costs incurred by USCIS for processing applications for naturalization, not to exceed $7,500,000 per fiscal year). The fee model presumes these reimbursements will continue in FY 2016/2017 and therefore does not seek to recover these costs through IEFA fee collections.

### 4. New Fee for Annual Certification of Regional Center, Form I–924A

DHS proposes to establish a new fee in this rule for Annual Certification of Regional Center, Form I–924A, to recover the full cost of processing this EB–5 benefit type. See proposed 8 CFR 103.7(b)(1)(i)(WW). Form I–924A is used by regional centers to demonstrate continued eligibility for their designation. See 8 CFR 204.6(m)(6). Regional centers must submit the form to USCIS annually or upon request. *Id.* Upon failure to file Form I–924A or to demonstrate continued promotion of economic growth, USCIS will issue a Notice of Intent to Terminate. *Id.* If the regional center fails to overcome the grounds alleged in the Notice of Intent to Terminate, USCIS will terminate the designation of the regional center. Id. The form helps USCIS ensure that regional centers are continuing to promote economic growth and are otherwise in compliance with all applicable program requirements. Further, the form assists investors seeking to invest in a regional center, as it provides the regional center and USCIS with a process for recording data regarding the regional center's activities and job creation that can be shared with potential investors on a case-by-case basis.[37] Although approved regional centers are required to file the Form I–924A annually, there is currently no filing fee and the processing cost is borne by other individuals paying fees for immigration benefits.

USCIS is proposing to establish a fee for the Form I–924A because USCIS incurs significant costs to review the Form I–924A and to administer the regional center program. In addition, the regional center program is continuing to grow rapidly.[38] With approximately 800 currently approved regional centers, USCIS must expend adjudicative resources to handle Form I–924A filings for which no fee is currently collected. Regional centers are often complex partnerships, limited liability companies, or other business entities involved in multiple commercial enterprises that may overlap or intertwine. These complex relationships must be described on the Form I–924A and the filing must be reviewed by USCIS to determine if the regional center continues to comply with program requirements. 8 CFR 204.6(m)(6) (requiring a regional center to provide USCIS with updated information to demonstrate the regional center is continuing to promote economic growth, including improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area). In addition, USCIS conducts site visits to some regional centers to verify the information provided in connection with its original application. USCIS also conducts onsite audits of a select number of regional centers each year to validate the information the center has provided and ensure that the objectives of the Immigrant Investor Program are being met. DHS is proposing to establish and collect a fee for Form I–924A to recoup the costs of carrying out these activities.

DHS proposes to establish the fee for the Form I–924A at $3,035. Proposed 8 CFR 103.7(b)(1)(i)(WW)(*1*). USCIS calculated this fee using the same ABC model used to calculate the other fees that DHS proposes in this rule. As with other proposed fees, projected adjudication hours determine part of the fee.

In addition to establishing the fee, DHS is clarifying the related regulations that provide for the annual regional center review related to the Form I–924A. In addition, a change is proposed to accommodate regional centers that seek to withdraw their designation. Proposed 8 CFR 204.6(m)(6)(vi). USCIS has received requests recently from regional centers seeking to withdraw their designation and discontinue their participation in the program. We currently have no procedure for this request and instead must proceed with the formal termination process of issuing a Notice of Intent to Terminate followed by a termination notice. Providing a withdrawal procedure will simplify the ability to terminate a regional center when the entity seeks to withdraw its designation. In conjunction with the fee, DHS wants to ensure that the requirements for continued participation for regional centers and the procedures to follow to meet the requirements are clear. Proposed 8 CFR 204.6(m)(6).

### 5. Summary

USCIS' projected FY 2016/2017 total operating costs are expected to exceed projected total revenue; this differential would be addressed with increased revenue. Under this proposed rule, increased revenue would be derived from a weighted average fee increase on existing immigration benefits and a new fee for Annual Certification of Regional Center, Form I–924A. The level of fee increase necessary to align costs and revenue is a weighted average of 21 percent. As noted earlier in this preamble, of the 21 percent weighted average increase, approximately four percent is directly attributable to cost increases for services included in the FY 2010/2011 Fee Rule. The remaining 17

---

[35] USCIS received $29.95 million and also reprogrammed $25 million from the prior year bringing the total spending authority to $54.95 million.

[36] USCIS did not receive appropriations for refugee and asylum processing or SAVE after FY 2011. USCIS received $2.5 million for the immigrant integration grants program in FY 2014 (Pub. L. 113–76) and FY 2013 (Pub. L. 113–6). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015 or FY 2016.

[37] USCIS will provide the information to prospective investors in response to written requests for government records through the Freedom of Information Act, consistent with applicable laws and policies regarding the disclosure of information.

[38] There were 340 designated regional centers required to file Form I–924A at the end of FY 2013, and 580 such centers at the end of FY 2014, representing a 70 percent increase in 1 year.

percent is attributable to services that the FY 2010/2011 Fee Rule did not take into consideration, either because DHS assumed that these services would be funded through appropriations, or because the incidence of fee waivers has increased following the publication of the FY 2010/2011 Fee Rule.

## VI. Fee Review Methodology

When conducting a fee review, USCIS reviews its recent cost history, operating environment, and current service levels to determine the appropriate method to assign costs to particular benefit requests. The methodology used in the review reflects a robust capability to calculate, analyze, and project costs and revenues.

USCIS uses commercially available ABC software to create financial models to calculate the costs for processing immigration benefit requests, including the costs for biometric services. Following the FY 2010/2011 Fee Rule, USCIS identified several key methodology changes to improve the accuracy of its ABC model, as discussed in the ''Methodology for the 2016/2017 Fee Review'' section in the Supporting Documentation. USCIS continues to update the ABC model with the most current information for fee review and cost management purposes.

### A. Background

ABC is a business management tool that assigns resource costs to operational activities and then to products and services. These assignments provide an accurate cost assessment of each work stream involved in producing the individual outputs of an agency or organization. The Federal Accounting Standards Advisory Board (FASAB) notes that ABC helps improve product costing by avoiding arbitrary indirect cost allocation and enables USCIS to conform to Managerial Cost Accounting Concepts and Standards for the Federal Government.[39]

### 1. ABC Methodology

DHS has included FY 2016/2017 Fee Review Supporting Documentation, including a detailed report on how it calculated the fee schedule proposed in the docket for this rulemaking. Comments are welcome on the supporting documentation and all aspects of this proposal. A summary of the fee study, calculations, methodology and conclusions follows.

### a. Resources

Resources equal the projected FY 2016/2017 annual cost baseline of $3.0 billion. USCIS designed the ABC model structure for FY 2016/2017 to resemble the structure of the FY 2015 annual operating plan. That plan is the detailed budget execution plan USCIS establishes at the beginning of the fiscal year consistent with the approved fiscal year spending authority and forecasted fee revenue.

### b. Resource Drivers and Resource Assignment

ABC uses resource drivers to assign resources to activities. (See Section VI.A.1.c. of this preamble for more information.) All resource costs are assigned to activities, so the total resources in the model equal the total cost of activities.

A common resource driver in ABC is the number of employees in an organization and the percentage of time they spend performing various activities. The FY 2016/2017 ABC model uses employee counts and activity information to assign resources to activities. USCIS refers to this process as the payroll title analysis. The payroll title analysis determines how employees contribute to the eleven activities in the fee review. When an office engages in more than one activity, USCIS uses operational information to prorate that office's time to multiple activities. Historical activity information is applied to projected staffing levels in FY 2016/2017. The ABC model assigns resources to activities using anticipated staffing levels and historical activity information from the payroll title analysis for each office.

USCIS assigns some costs directly to activities. For example, the contract awarded to support USCIS Application Support Center operations only pertains to the ''Perform Biometric Services'' activity. Therefore, the costs of this contract are assigned directly to this activity. Other overhead costs, including costs for the Office of Information Technology, service-level agreements, and USCIS contributions to the DHS working capital fund are prorated to each office based on the number of authorized positions in those offices, so that each office pays a proportionate share.

The allocation methods in the FY 2016/2017 review are in line with FASAB's Standard 4 on managerial cost accounting concepts. This fulfills the guideline for agencies to directly trace costs when feasible and to either assign costs on a cause-and-effect basis or allocate them in a reasonable and consistent way. Statement of Federal Financial Accounting Standards (SFFAS) 4, No. 126.

### c. Activities

In ABC, activities are the critical link between resources and cost objects. Activities represent work performed by an organization. USCIS allocates projected FY 2016/2017 operating costs (resources) to the following eleven activities:

• Inform the Public involves receiving and responding to customer inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach activities.

• *Perform Biometric Services involves the management of electronic biometric* information, background checks performed by the Federal Bureau of Investigation (FBI), and the collection, use, and reuse of collected biometric information to verify the identity of individuals seeking immigration benefits.

• Intake involves mailroom operations, data entry and collection, file assembly, fee receipting, adjudication of fee waiver requests, and file room operations.

• Conduct TECS [40] Check involves the process of comparing information on applicants, petitioners, requestors, beneficiaries, derivatives, and household members who apply for an immigration benefit against various Federal Government lookup systems.

• Records Management involves searching for and requesting files; creating temporary and/or permanent individual files; consolidating files; appending evidence submitted by applicants, petitioners, and requestors to existing immigration files; retrieving, storing, and moving files upon request; auditing and updating systems that track the location of files; and archiving inactive files.

• Make Determination involves adjudicating immigration benefit requests; making and recording adjudicative decisions; requesting and reviewing additional evidence; interviewing applicants, petitioners, or requestors; consulting with supervisors or legal counsel; and researching applicable laws and decisions on non-routine adjudications.

---

[39] *See* Federal Accounting Standards Advisory Board Handbook, Version 14 (06/15), SFFAS 4, No. 152.

[40] In previous reviews, USCIS called the ''Conduct TECS Check'' activity by different names, such as ''Conduct Interagency Border Inspection System Checks (IBIS)'' or ''Conduct Treasury Enforcement Communication System (TECS) Check.'' The system has changed names, and now ''TECS'' is the actual system name and is no longer an acronym.

• Fraud Detection and Prevention involves activities performed by the Fraud Detection and National Security Directorate in detecting, combating, and deterring immigration benefit fraud and addressing national security and intelligence concerns.

• Issue Document involves producing and distributing secure cards that identify the holder as a foreign national and also identifies his or her immigration status and/or employment authorization.

• Management and Oversight involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.

Since the 2010 Fee Rule, USCIS added two activities to the fee review.

• Direct Costs directly support a specific immigration benefit type. For instance, USCIS applies costs specific to naturalization, including conducting naturalization ceremonies and naturalization benefit requests.

• Systematic Alien Verification for Entitlements (SAVE) represents the cost of this program.[41] SAVE is an intergovernmental information-sharing program that helps Federal, state, and local benefit-issuing agencies, institutions, and licensing agencies (such as an individual state's department of motor vehicles) determine the immigration status of benefit applicants to help these agencies ensure that only those entitled to benefits or licenses receive them. Through the SAVE program, USCIS enters into reimbursable agreements with Federal, state, and local government agencies under the authority of the Economy Act and the Intergovernmental Cooperation Act of 1968 for those costs that can be directly assigned to SAVE. *See generally* 31 U.S.C. 1535; 31 U.S.C. 6501–6508, Public Law 97–258. These reimbursable agreements recover only a portion of the total program cost. Previously, USCIS treated SAVE as an overhead cost and did not consider the amounts recovered in the reimbursable agreements in calculating the costs of SAVE to be recovered by USCIS fees. USCIS has improved its model by distinguishing SAVE from other overheads. This may

enable USCIS to examine SAVE reimbursable fees paid by federal, state and local governments in the future.

d. Activity Drivers and Activity Assignment

The fourth stage in the ABC process assigns activity costs to specific immigration benefit requests (cost objects) using activity drivers. For most activities, USCIS assigns activity costs to cost objects based on the percentage of total projected volume because, for these activities, similar time and effort are involved for each benefit request. Unique activity drivers are used for two activities: Make Determination and Perform Biometric Services.

USCIS allocates the Make Determination activity across immigration benefit requests by projected adjudication hours. USCIS calculates projected adjudication hours by multiplying projected volumes by completion rates for most benefit types. Completion rates are the average amount of time that employees take to adjudicate immigration benefit requests.[42] Generally, the more time spent adjudicating a request, the more cost that gets assigned, and, therefore, the higher the fee. Please see Section VIII: Completion Rates for additional information.

The Perform Biometric Services activity uses a direct activity driver. All costs associated with this activity are assigned directly to the biometric services fee.

Activity costs are allocated to immigration benefit requests by the locations (service centers, field offices, etc.) that process them. USCIS uses data from the USCIS Performance Reporting Tool that, among other data points, include workload volumes, adjudication hours, and the number of completed requests by field office location and immigration benefit type. The Performance Reporting Tool also captures and records information on biometrics, records management, and customer service. For the FY 2016/2017 Fee Review, USCIS aligned its fee review metrics with the Performance Reporting Tool metrics used in the FY 2015 Staffing Allocation Model to ensure organizational alignment and consistency.

e. Cost Objects

Cost objects are the immigration benefit requests that USCIS processes. USCIS calculates a separate fee for

biometric services. The costs for the biometric services fee are derived from the costs of the Perform Biometric Services activity and a small amount of direct costs.[43] USCIS determines costs for most immigration benefit requests, including those for asylum and refugee protection. The IEFA costs of immigration benefit requests for which no revenue is recovered are redistributed to other benefit requests in a prorated manner.

f. Exclusion of Temporary or Uncertain Costs Items and Programs

USCIS excludes from the fee calculation model the costs and revenue associated with programs that are temporary by definition or where the program may diminish or cease to exist because the program is predicated on guidance only (and not preserved in regulations or statute). This exclusion applies to: The Application for TPS, Form I–821, proposed 8 CFR 103.7(b)(1)(i)(NN); Consideration of Deferred Action for Childhood Arrivals, (DACA), Form I–821D; and Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100) (Nicaraguan Adjustment and Central American Relief Act (NACARA)), Form I–881, proposed 8 CFR 103.7(b)(1)(i)(QQ). These programs are excluded from the FY 2016/2017 Fee Rule Supporting Documentation and this rule.[44]

DHS excludes projected revenue from expiring or temporary programs in setting the fees required to support baseline operations due to the uncertainty associated with such programs. For example, the Secretary may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately. TPS, however, is a temporary benefit, and

---

[41] USCIS is required to offer an automated or other system to verify the immigration status of applicants. Certain agencies determining eligibility for a number of specified Federal public benefits are required to use an automated or other such system to verify the immigration status of applicants. 42 U.S.C. 1320b–7. The automated verification system is entitled the Systematic Alien Verification for Entitlements (SAVE) program. INS and USCIS have refined and operated the SAVE program on a large scale for over 16 years.

[42] Time here means the amount of time a USCIS immigration service officer spends on an adjudication. This is different than cycle time, the amount of time an applicant, petitioner, or requestor spends waiting for an output.

[43] For a quick reference of the immigration benefits that currently require biometric services with the initial submission, see Form G–1055, Fee Schedule, at *http://www.uscis.gov/sites/default/files/files/form/g-1055.pdf.*

[44] For the purposes of this rule, DHS is including all requests funded from the IEFA in the term "benefit request" or "immigration benefit request" although the form or request may not be to request a benefit. For example, DACA is solely an exercise of prosecutorial discretion by DHS and not an immigration benefit, but would fit under the definition of "benefit request" solely for purposes of this rule. For historic receipts and completion information, see USCIS immigration and citizenship data available at *https://www.uscis.gov/tools/reports-studies/immigration-forms-data.*

TPS designations may be terminated.[45] INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). Likewise, DACA allows certain individuals who meet specific guidelines to request consideration of deferred action from USCIS to not be placed into removal proceedings or removed from the United States for a specified period unless terminated.[46] The DACA policy is an administrative exercise of prosecutorial discretion and it is implemented at the discretion of the agency. For NACARA, the eligible population will eventually be exhausted due to relevant eligibility requirements, including the date by which an applicant was required to have entered the United States. USCIS analyzes the distinct costs associated with processing these benefit types and excludes these costs from the ABC model. All fee revenue deposited into the IEFA is pooled and collectively used to finance USCIS operations. USCIS also responds to surges in customer demand for services by realigning resources to cover the cost of processing. Consequently, USCIS is capable of funding these programs even though their costs are not included in the fee model.

DHS excludes the costs and revenue associated with these programs because program eligibility is subject to the discretion of the Department. Given this discretion, USCIS has excluded the cost and workload of these programs from the fee review and does not propose to allocate overhead and other fixed costs to these workload volumes. This mitigates an unnecessary revenue risk, *i.e.*, that USCIS will not have enough revenue to recover full cost if the eligible populations diminish or cease to exist. As in prior fee reviews, USCIS has excluded both the cost and revenue associated with these programs from the fee review. By excluding programs that are temporary by definition, for which the population may diminish or cease to exist, DHS maintains the integrity of the ABC model, better ensures recovery of full costs, and mitigates revenue risk from unreliable sources.

2. Continuing Low Volume Reallocation From FY 2010/2011 Fee Rule

DHS uses its fee setting discretion to adjust certain immigration request fees that would be overly burdensome on applicants, petitioners, and requestors if set at recommended ABC model levels.

Historically, as a matter of policy, DHS has chosen to limit USCIS fee adjustments for certain benefit requests to the weighted average fee increase represented by the model output costs for fee-paying benefit types. *See* 75 FR 33461.[47] Any additional costs from these benefit request types beyond this calculated weighted average increase figure would be reallocated to other benefit types. In addition, as noted above, fees for the other benefit types would also be calculated to cover costs that are not directly supported by fees. This process is known as "Low Volume Reallocation."

In the fee review for this proposed rule, the model output costs identified a weighted average 8 percent cost increase across all fee-paying benefit types. Accordingly, consistent with prior practice, DHS proposes to limit the fee adjustments for certain benefit types to this 8 percent weighted average increase. These immigration benefit requests do not receive any additional cost reallocation for fee waivers, refugee, asylum or other programs. DHS does not believe that using the calculated 8 percent weighted average increase figure as a basis for fee increases for these benefit types would result in fees for other benefit types that would be overly burdensome on the applicants, petitioners or requestors.

DHS proposes to subject specific benefit types to the 8 percent weighted average increase because the combined effect of cost, fee-paying volume, and methodology changes since the last Fee Rule would otherwise place an inordinate fee burden on individuals requesting these types of benefits. For example, without Low Volume Reallocation, the Petition to Classify Orphan as an Immediate Relative, Form I–600, would have a fee of at least $2,258. DHS believes it would be contrary to the public interest to impose a fee of this amount on an estimated 15,000 potential adoptive parents each year. Similar reasoning led to the other forms chosen to be adjusted using Low Volume Reallocation. For this reason, DHS proposes to subject these benefit types to the calculated 8 percent weighted average increase. In other words, *consistent with past USCIS fee rules, DHS is proposing an 8 percent increase for each of these benefit types, based on the calculated 8 percent weighted average increase across all fee-paying benefit types as identified by the model.*

DHS recognizes that charging less than the full cost of adjudicating an

immigration benefit request requires USCIS to increase fees for other immigration benefit requests to ensure full cost recovery. This complies with INA section 286(m), which permits fees to cover those costs of providing applicants, petitioners, or requestors a service or part of a service "without charge."

DHS proposes to apply the Low Volume Reallocation methodology to the following USCIS forms:
- Notice of Appeal or Motion, Form I–290B
- Petition for Amerasian, Widow(er) or Special Immigrant, Form I–360
- Petition to Classify Orphan as an Immediate Relative, Form I–600
- Application for Advance Processing of an Orphan Petition, Form I–600A
- Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800
- Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A
- Request for Action on Approved Form I–800A, Form I–800A, Supplement 3
- Petition for Qualifying Family Member of a U–1 Nonimmigrant Form I–929
- Application to File Declaration of Intention, Form N–300
- Request for Hearing on a Decision in Naturalization Proceedings, Form N–336
- Application to Preserve Residence for Naturalization Purposes, Form N–470.

3. Applying Cost Reallocation to Other Form Types

As described below, DHS also proposes to limit fee increases for additional benefit types at the calculated 8 percent weighted average increase, even though the potential fee increases for these benefit types would not have imposed the same level of burden on affected requestors as the benefit types described in the preceding section.

First, DHS proposes to increase the Application for Naturalization, Form N–400, fee by the 8 percent weighted average increase described above.[48] As DHS stated in 2010, "DHS has determined that the act of requesting and obtaining U.S. citizenship deserves special consideration given the unique nature of this benefit to the individual applicant, the significant public benefit to the Nation, and the Nation's proud tradition of welcoming new citizens." 75 FR 33461. This rationale still holds

---

[45] Even though some TPS designations have been in place for a number of years, the Secretary could terminate them if the Secretary determines that the designation criteria are no longer met.

[46] *See* USCIS, Consideration of Deferred Action for Childhood Arrivals (DACA), *https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca*.

[47] This same methodology was used in the FY 2008/2009 Fee Rule. 72 FR 4910.

[48] See the 2016/2017 Fee Rule Supporting Documentation in the rulemaking docket for an explanation of how the weighted average is calculated.

true. DHS believes that by limiting the adjustment of the naturalization fee to the 8 percent weighted average increase, it would reinforce these principles by encouraging more immigrants to naturalize and fully participate in civic life. This proposal is also consistent with other DHS efforts to promote citizenship and immigrant integration.[49]

DHS also proposes to limit the adjustment of the fee for Application for Provisional Unlawful Presence Waiver, Form I–601A, and the Application for Employment Authorization, Form I–765. The current Form I–601A fee was not established by the 2010/2011 Fee Rule because it did not exist at that time. USCIS unfortunately has insufficient data on Form I–601A volumes and completion rates with which to use its fee calculation model to identify an appropriate fee with a sufficient level of confidence. Therefore, DHS has decided that proposing a weighted average increase at 8 percent of the current fee amount is appropriate until sufficient data becomes available. DHS will consider setting the fee for Form I–601A at the amount the model calculates if sufficient data are collected before the final rule is published.

DHS also proposes to apply the same 8 percent weighted average increase to the Form I–765 for humanitarian and practical reasons. Many individuals seeking immigration benefits face financial obstacles and cannot earn money through lawful employment in the United States until they receive an Employment Authorization Document (EAD).

Finally, as noted above, in the 2010 fee rule, DHS held fee increases for a number of benefit requests to the weighted average fee increase for all fee-paying immigration benefits. 75 FR 33461. In this rule, DHS proposes to not apply the 8 percent weighted average increase to a subset of those benefit requests, both because DHS has better data upon which to base proposed fees for those benefit requests, and because DHS believes the calculated fee is appropriate. Therefore, DHS no longer believes it is necessary to limit fee increases to the weighted average for the following USCIS forms:

- Application for Waiver of Grounds of Inadmissibility, Form I–690
- Waiver Forms, Forms I–191, I–192, I–193, I–212, I–601, I–602, I–612. Proposed 8 CFR 103.7(b)(1)(i)(O), (P), (Q), (R), (AA), (BB), (CC) & (EE).

Accordingly, the fees for these USCIS forms are proposed to be set at the level calculated in the ABC model, with adjustments.

### 4. Reduced Fee for Application for Naturalization

DHS proposes to establish a three-level fee for the Application for Naturalization, Form N–400. *See* 8 CFR 103.7(b)(1)(i)(AAA). First, as explained earlier in this preamble, DHS is proposing a fee for Form N–400 of $640, plus $85 for biometrics, for a total of $725. *Id.* Second, no fee is charged to an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service, or to an applicant who applies for and receives a full fee waiver. *Id.* at 103.7(b)(1)(i)(AAA)(2)–(c)(2).[50] Third, DHS proposes to permit naturalization applicants with household incomes greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines[51] to pay a fee of $320 plus an additional $85 for biometrics, for a total of $405. DHS has created a proposed new form, USCIS Form I–942, Request for Reduced Fee, that would be filed with the N–400. The form would provide a convenient guide for applicants to demonstrate that their income meets the level required to pay the reduced fee. The Paperwork Reduction Act section of this preamble provides information on how to comment on the proposed form.

DHS proposes the new reduced fee option to limit potential economic disincentives some eligible applicants may face when deciding whether or not to apply for naturalization. The proposed reduced fee option for low-income applicants supports the Administration's immigration integration policies[52] and the USCIS mission to support aspiring citizens. Nevertheless, USCIS is funded mainly from fees and we must collect a fee to recover at least some of the costs

associated with naturalization. DHS believes the reduced fee would help ensure that those immigrants whose goal it is to apply for naturalization are not unnecessarily limited by their economic means. DHS realizes that other fee payers would be required to bear the cost of the reduced fee, but believes the importance of naturalization justifies this slight shift of burden.[53]

USCIS is uncertain exactly how many new N–400 applicants would be eligible and apply for naturalization as a result of the reduced fee. In addition, DHS has no reliable data indicating how demand for filing an N–400 may change due to adjustments in the fee amount. Nonetheless, research on barriers to naturalization indicates a correlation between the N–400 filing fee and the number of applications submitted to USCIS. As the Center for the Study of Immigrant Integration stated:

Some evidence of price sensitivity was shown when USCIS increased the cost to naturalize from $400 to $595 (plus the costs of biometrics) in the middle of 2007: the result was a surge of applications just prior to the fee increase. As a result, there were nearly 1.4 million naturalization applications filed in 2007 but just over 500,000 in 2008.[54]

In addition, USCIS analyzed the 2012 American Community Survey and determined that 10 percent of new citizens who naturalized since 2000 reported incomes between 150 percent and 200 percent of the Federal Poverty Guidelines.[55] Independent university

---

[49] As noted later in this preamble, this rule proposes an option for naturalization applicants with family incomes greater than 150% and not more than 200% of the Federal Poverty Guidelines to pay a fee of $320 plus an additional $85 for biometric services, for a total of $405.

[50] As described elsewhere in this preamble, an applicant with a household income at or below 150 percent of the Federal Poverty Guidelines qualifies for a waiver of their entire fee under current USCIS policy.

[51] The guidelines are issued each year by the Department of Health and Human Services and updated periodically in the **Federal Register** under 42 U.S.C. 9902(2). The poverty guidelines are used as an eligibility criterion for a number of Federal programs. For further information on how the guidelines are used or how income is defined, see "Annual Update of the HHS Poverty Guidelines" at 81 FR 4036 (Jan. 25, 2016).

[52] *See* The White House Task Force on New Americans, Strengthening Communities by Welcoming All Residents, at 28–29 (2015), available at *https://www.whitehouse.gov/sites/default/files/docs/final_tf_newamericans_report_4-14-15_clean.pdf*.

[53] DHS previously stated that adjusting fee levels based on income would be administratively complex and would require higher costs to administer. *See* 75 FR 58971. Specifically, in 2010, DHS stated that a tiered fee system would impose an unreasonable cost and administrative burden, because it would require staff dedicated to income verification and necessitate significant information system changes to accommodate multiple fee scenarios. *See id.* DHS will need to reprogram intake operations for Form N–400 to recognize the new fee and documentation. Staff must be added to review the income documentation provided to determine if the applicant qualifies for the new fee. DHS has determined that the change proposed here, because it applies only to Form N–400 and the act of acquiring citizenship, is of sufficient value from a public policy standpoint to justify USCIS incurring the additional administrative and adjudicative burden.

[54] Manuel Pastor & Justin Scoggins, Center for the Study of Immigrant Integration, Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy 20 (Dec. 2012), available at *http://dornsife.usc.edu/assets/sites/731/docs/citizen_gain_web.pdf*.

[55] USCIS analyzed immigrants who reported naturalization since the year 2000. These represent people who recently became U.S. citizens. Approximately 24.7% were eligible for a fee waiver based on current criteria (2.2 million out of 8.9 million) because their household income is below 150% of the federal poverty guidelines. A further 10.3% (923,901 out of 8.9 million) would have been eligible for a partial fee waiver, since their income

research[56] estimated that about 12 percent of adult lawful permanent residents eligible to naturalize fell within the 150 to 200 percent of the Federal Poverty Guidelines. By averaging the 10 percent and the 12 percent from the two data sources, USCIS estimates 11 percent of average annual Form N–400 filings would be likely to qualify for the lower fee. The average FY 2016/2017 Application for Naturalization volume estimate is 821,500, excluding military naturalizations. USCIS expects that an average of 90,365 filers, 11 percent of the 821,500, would be eligible for the reduced fee of $405 (including the biometrics fee).[57] Assuming that all 90,365 would have paid the full fee of $725 for their Form N–400 and biometrics, this new N–400 fee would result in approximately $28.9 million in foregone fee revenue associated with adjudication of Form N–400. That amount of USCIS operating expenses would be funded using fee revenue from other fee increases proposed in this rule.

### 5. Holding the Biometric Services Fee at Its Current Level

DHS proposes to hold the biometric services fee at its current level of $85. Proposed and current 8 CFR 103.7(b)(1)(i)(C). While the model calculated a biometric services fee of $75, DHS believes that the importance of and uncertainty in the biometric services area justifies holding that fee at $85.

DHS has broad statutory authority to collect biometric information when such information is "necessary," or "material and relevant" to the administration and enforcement of the INA. *See, e.g.,* INA secs. 103(a), 235(d)(3), 264(a); 8 U.S.C. 1103(a), 1225(d)(3), 1304(a). The collection, use, and reuse of biometric data are integral to identity management, excluding people with criminal backgrounds, minimizing national security concerns, and maintaining program integrity. Over

the next few fiscal years the volume of requests for biometrics services, as well as the costs associated with those services, such as fees paid to the FBI for fingerprints and name checks, are uncertain. Therefore, a moderate amount above current full cost recovery calculation is justified to shield USCIS from that uncertainty.

In addition, DHS proposes to use its discretion in setting this fee to hedge against potential rising programmatic costs which USCIS cannot foresee or control. For example, new regulatory or statutory background check requirements may be borne out of increased national security concerns dictated by events or changing circumstances. For the same reasons, DHS is also proposing to clarify regulations pertaining to biometrics and the biometric services fee.

Current regulations provide both general authority for the collection of biometrics in connection with immigration and naturalization benefits as well as requirements specific to certain benefit types.[58] *See* 8 CFR 103.16(a). A related provision provides that an applicant, petitioner, sponsor, beneficiary, or other individual residing in the United States at the time of filing may be required to appear for fingerprinting. *See* 8 CFR 103.2(b)(9). The wording of the latter provision has resulted in questions and confusion about DHS authority to require biometrics and the associated biometric services fee beyond a case-by-case basis. While DHS believes its current biometrics and biometrics fee collections are fully authorized, DHS proposes changes to the latter provision to clarify its regulatory authority to require and conduct biometrics-based identity and background checks, and to collect the associated fees. In addition, DHS is clarifying this section with regard to the use of the term biometrics in place of the term fingerprints. DHS has been using the term biometrics for several years in multiple contexts. *See, e.g.,* 72 FR 4906 (Feb. 1, 2007) (discussing the proposed fee for immigration and naturalization benefit application and petition and biometric service processing activities and describing biometrics as fingerprints, photographs, and signatures). The term "biometrics" is also used throughout title 8 of the CFR. *See, e.g.,* 8 CFR 103.7(b)(1)(i)(C), 103.16, 103.17,

204.310(a)(3)(ii), 204.312(e)(3)(ii), 209.1(b), 212.7(e)(1)(i), 204.312(e)(3)(ii), 214.2(w)(15), 245.21(b). Therefore, DHS proposes to revise 8 CFR 103.2(b)(9) to clarify that any applicant, petitioner, sponsor, beneficiary, or requestor, or individual filing a request may be required to appear for biometrics collection or for an interview. This requirement may be imposed upon individual notice or as established in the applicable regulations or form instructions. *See* proposed 8 CFR 103.2(b)(9). DHS is also making conforming edits in 8 CFR 103.16(a) to provide that an individual may be required to submit biometric information by law, regulation, **Federal Register** notice or the form instructions applicable to the request type or if required in accordance with 8 CFR 103.2(b)(9). *See* proposed 8 CFR 103.16(a).

### 6. Continuing To Hold Refugee Travel Document Fee to the Department of State Passport Fee

Consistent with U.S. obligations under Article 28 of the 1951 Convention Relating to the Status of Refugees,[59] USCIS proposes to continue to charge a fee for Refugee Travel Documents similar to the charge for a U.S. passport book. *See* 75 FR at 58972 (discussing Article 28 standards for assessing charges for a Refugee Travel Document). Under this proposal, the fee for an Application for Travel Document, Form I–131, would be $575 for advance parole and any other travel document, as calculated by the fee model. *See* proposed 8 CFR 103.7(b)(1)(i)(M)(*3*). However, the current fees for Form I–131 for a Refugee Travel Document would be maintained at $135 for adults and $105 for children under the age of 16 years. These fees are the same as the Department of State (DOS) passport book fees,[60] plus biometrics if the applicant is between 14 and 79 years of age. *See* proposed 8 CFR 103.7(b)(1)(i)(M)(*1*)–(*2*).

falls between 150% and 200% of the federal poverty guidelines. Among immigrants who reported naturalizing in 2011 (737,618), 10.4% or 77,003 immigrants would have been eligible for a partial fee waiver.

[56] *See* Manuel Pastor, University of Southern California, Reducing Barriers to Citizenship: New Research and the Need for a Partial Fee Waiver (Jan. 8, 2015), available at *http://newamericanscampaign.org/wp-content/uploads/New-Research-on-Reducing-Barriers-to-Citizenship-1-8-15-Webinar-Powerpoint.pdf*.

[57] This is an estimate of the net impacts. Some who would have filed and paid the full fee would now opt to pay the reduced fee. Others who are eligible to seek a fee reduction based on income level may also qualify for a Federal means tested benefit in their state and thus qualify for a full fee waiver.

[58] *See, e.g.,* 8 CFR 103.16(a), 204.2(a)(2) (requiring evidence of the claimed relationship), 204.3(c)(3) (requiring fingerprinting), 204.2(d)(2)(vi) (authorizing blood testing), 245a.2(d) (requiring photographs and a completed fingerprint card), 316.4(a) (requiring three photographs and fingerprinting).

[59] The United States is party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6224, 606 U.N.T.S. 267 (1968), which incorporates articles 2 through 34 of the 1951 Convention. The United States is not party to the 1951 Convention. *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951.").

[60] The Refugee Travel Document fees are the same as the sum of the United States passport book application fee plus the additional execution fee that DOS charges for first time applicants.

7. Holding the Fee for a Petition by Entrepreneur To Remove Conditions (Form I–829) at Its Current Level

DHS proposes to hold the fee for the Petition by Entrepreneur to Remove Conditions, Form I–829, at its current level of $3,750. While the fee model calculated a fee of $2,353, DHS proposes to maintain the current fee for such petitions. Because of the recent and continued growth and maturation of the EB–5 Program, the costs over the next few fiscal years are uncertain because the final parameters of the program are still evolving, such as the number of employees and facilities necessary to carry out the enhanced review of EB–5 filings and site visits. This makes it uncertain whether EB–5 related fees will fully fund EB–5 program activities.

The EB–5 program was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. The EB–5 ''regional center program'' was later added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). The EB–5 immigrant classification allows qualifying individuals, and any accompanying or following to join spouses and children, to obtain lawful permanent resident (LPR) status if the qualifying individuals have invested, or are actively in the process of investing, $1 million in a new commercial enterprise. *See* INA section 203(b)(5)(A) and (C), 8 U.S.C. 1153(b)(5)(A) and (C). To qualify, the individual's investment must benefit the U.S. economy and create full-time jobs for 10 or more qualifying employees. INA section 203(b)(5)(A)(ii), 8 U.S.C. 1153(b)(5)(A)(ii). If the investment is in a Targeted Employment Area (TEA) (*i.e.,* a rural area or an area that has unemployment of at least 150% of the national average), the required capital investment amount is $500,000 rather than $1 million. INA section 203(b)(5)(C)(ii), 8 U.S.C. 1153(b)(5)(C)(ii); 8 CFR 204.6(f)(2). Entrepreneurs may meet the job creation requirements through the creation of indirect jobs by making qualifying investments within a new commercial enterprise associated with a regional center approved by USCIS for participation in the regional center program. INA section 203(b)(5), 8 U.S.C. 1153(b)(5); 8 CFR 204.6(e) and (m)(7).

To increase its support of Congress's objective in establishing the program, USCIS has recently implemented several changes to refine and improve

the delivery, security and integrity of the EB–5 Program.[61] USCIS established the Immigrant Investor Program Office (IPO) in Washington, DC at USCIS headquarters in 2012. Since that time, IPO has regularly added staff positions to focus both on managing the program and ensuring identification of fraud, national security, or public safety concerns within the program. In addition, USCIS plans to conduct more site visits to regional centers and associated commercial enterprises to verify information provided in regional center applications and investor petitions and to clarify its EB–5 regulations. DHS proposes to keep the Form I–829 at the current fee, above the full cost recovery calculation,[62] to shield USCIS against potential but likely rising costs. DHS believes the fee would still be set at an appropriate level and that it would not be overly burdensome to the Form I–829 filers, particularly considering the size of the investment required to participate in the program.

*B. Changes in the FY 2016/2017 Fee Review*

1. Interim Benefits

The FY 2016/2017 Fee Review isolates the workload volume and fee-paying percentage of Applications for Employment Authorization, Forms I–765, and Applications for Travel Document, Form I–131, that are not associated with Applications to Register Permanent Residence or Adjust Status, Forms I–485. This change helps DHS to more accurately calculate the fees necessary for cost recovery for all three benefit types.

Usually, the favorable adjudication of an immigration benefit request is necessary before the beneficiary will

receive ancillary benefits such as work and travel authorization. That is, USCIS only grants those ancillary benefits after, or at the same time as, it grants the underlying immigration status or benefit. In some situations, however, an individual may become entitled to a benefit because a case is pending adjudication. For example, a person who applies for adjustment of status would, in certain instances, be able to obtain work and/or travel authorization based on the pending immigration benefit request. 8 CFR 274a.12(c)(9). When this occurs, these ancillary benefits are referred to generally as ''interim benefits.''[63]

DHS currently permits applicants who file and pay the required fee for an Application to Register Permanent Residence or Adjust Status, Form I–485, to submit an Application for Employment Authorization, Form I–765, and/or an Application for Travel Document, Form I–131, without paying an additional fee. *See* 8 CFR 103.7(b)(1)(i)(M)(4) & (HH). Applicants may file Form I–765 and/or Form I–131 concurrently with Form I–485. Alternatively, they may also file these forms after USCIS accepts their Form I–485, but while the Form I–485 is still pending.

In the FY 2016/2017 Fee Review, USCIS determined the workload volume and fee-paying percentage of Forms I–765 and Forms I–131 that are not associated with Forms I–485. This methodology change enables USCIS to derive a fee-paying percentage for standalone Forms I–765 and Forms I–131, meaning those forms not filed concurrently with a Form I–485. By isolating stand-alone interim benefit customers from those concurrently filing Form I–485, USCIS can more accurately assess fee-paying percentages, fee-paying volumes, and fees for all three benefit types. As a result, DHS is confident that the fees for these three benefit types proposed in this rule are consistent with the ABC methodology for full cost recovery.

---

[61] USCIS is committed to strengthening and improving the overall administration of the EB–5 Program. The EB–5 Program encompasses Forms I–526, I–829, I–924, and I–924A. The cost baseline includes $16.0 million in FY 2016 and $15.9 million in FY 2017 for additional staff that would comprise a specialized team of forensic auditors, compliance officers, and other staff, whose primary focus would be to ensure regulatory compliance. This would directly contribute to the integrity of the program by providing the USCIS Investor Program Office with employees who have specialized knowledge required to adjudicate these benefits. In addition to enhanced staffing, USCIS would make additional IT systems investments to make case processing more efficient. USCIS would add $1.7 million in FY 2016 and $1.8 million in FY 2017 to improve the case management system and further develop its risk management strategy to ensure program compliance.

[62] If DHS had decided to adjust the fee consistent with the adjustment that DHS made to most other fees, the proposed fee would have decreased to $3,280. The proposed fee would have been higher than the model output because of Cost Reallocation. Other fees would also have been adjusted accordingly.

[63] The following case types are subject to appeal and frequently have an associated application for adjustment of status, thereby possibly warranting interim benefits: Immigrant Petition for Alien Workers, Form I–140; Petition for Amerasian, Widow(er) or Special Immigrant, Form I–360; Application for Permission to Reapply for Admission into the United States after Deportation or Removal, Form I–212; and Application for Waiver of Ground of Inadmissibility, Form I–601. Interim benefits may also be derived from an Application for Temporary Protected Status, Form I–821. DHS proposes free interim benefits in this rule only associated with a pending Application to Register Permanent Residence or Adjust Status, Form I–485.

003053

## 2. Form I–485 Fee for Child Under 14, Filing With Parent

USCIS proposes a fee of $750 for a child under the age of 14 years when filing Form I–485 concurrently with the application of a parent seeking classification as an immediate relative of a U.S. citizen, a family-sponsored preference immigrant, or a family member accompanying or following to join a spouse or parent under sections 201(b)(2)(A)(i), 203(a)(2)(A), or 203(d) of the INA, 8 U.S.C. 1151(b)(2)(A)(i), 1153(a)(2)(A), or 1153(d). Proposed 8 CFR 103.7(b)(1)(i)(U)(2). For this review, the proposed fee of $750 is the model output cost for a Form I–485 filed with Form I–131. Children under the age of 14 cannot work in the United States. These children, however, can travel. This is $390 less than the proposed fee of $1,140 for adults. Proposed 8 CFR 103.7(b)(1)(i)(U)(1).

Currently, the fee is $985 for an adult and $635 for a child under the age of 14 filing with a parent ($350 less than the fee for adults). 8 CFR 103.7(b)(1)(i)(U). In the 2010 Fee Rule, USCIS calculated the $635 fee outside of the model due to a lack of available data. The FY 2016/2017 Fee Review calculated the proposed $750 fee using actual data for each of the elements of the model. Therefore, the proposed fee for Form I–485 for a child under the age of 14 filing with a parent complies more closely with the ABC methodology for full cost recovery at a level that tracks its relative burden.

USCIS proposes to remove the provision at 8 CFR 103.7(b)(1)(i)(U)(iii) that states, ''The child's application is based on a relationship to the same individual who is the basis for the child's parent's adjustment of status, or under the same legal authority as the parent.'' *See* proposed 8 CFR 103.7(b)(1)(i)(U). This sentence is unnecessary because 8 CFR 103.7(b)(1)(i)(U)(ii) already requires that a child must adjust as a derivative to pay the lesser fee. *See* INA section 203(d), 8 U.S.C. 1153(d). This proposed revision is a clarifying change to remove a redundancy in the regulatory language; it would have no substantive effect.

## 3. One Fee for a Genealogy Records Request

USCIS has included the genealogy fees in the FY 2016/2017 IEFA fee review. The USCIS genealogy program processes requests for historical records of deceased individuals. *See* Final Rule, Establishment of a Genealogy Program, 73 FR 28026 (May 15, 2008). Before creating a genealogy program, USCIS

processed the requests as Freedom of Information Act (FOIA) request workload, which resulted in delays. *See* Proposed Rule, Establishment of a Genealogy Program, 71 FR 20357–8 (Apr. 20, 2006). DHS created the genealogy program to reduce delays for these requests. At the time, USCIS averaged 10,000 such requests over four years, *see id.,* and USCIS expected the workload to increase to 26,000 a year with the new program, *see* 71 FR 20361. USCIS determined that genealogy fees would range between $16 and $55. *See* 71 FR 20362. These proposed fees were based on projected volume and full cost of the program. *Id.* After considering the comments received on the proposed genealogy rule, the costs of providing this service, OMB Circular A–25 guidelines, and the fees charged for similar services, DHS set the fees for Forms G–1041 at $20 and G–1041A at $20 or $35 (depending on the format requested) in the final rule. 73 FR 28028; 8 CFR 103.7(b)(1)(i)(E)–(F). Requestors use the Genealogy Records Request, Form G–1041A, to obtain copies of USCIS historical records that may assist them in conducting genealogical research. Requestors use the Genealogy Index Search Request, Form G–1041, to request an index search of USCIS historical records.

The current genealogy program fees were not established based on the projected full cost of operating the genealogy research and information services of USCIS, although that was permitted by the authorizing law. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1).[64] At the time, USCIS did not have clearly segregated records of the full cost of operating its genealogy research and information services, and DHS has not since adjusted the genealogy program fees. But after seven years of operating the program, DHS now has reliable data to determine the new fees. USCIS has thus incorporated the genealogy records requests fees in the comprehensive costs recovery fee model with the aim to simplify the genealogy fee structure.

Current regulations state that the Form G–1041A fee is $20 for each file copy from microfilm and $35 for each hard copy. In some cases, the requestor may be unable to determine the fee, because the requestor will have a file number obtained from a source other than USCIS and therefore not know whether the format of the file is

microfilm or paper. In such cases, individuals may provide the lesser $20 amount and if USCIS discovers the relevant file is a paper file, USCIS will notify the requestor to remit an additional $15. In addition, USCIS will refund the records request fee only when the agency is unable to locate the file previously identified in response to the index search request. *See* 8 CFR 103.7(b)(1)(i)(F).

DHS proposes to charge a single $65 fee for Form G–1041A. *See* proposed 8 CFR 103.7(b)(1)(i)(F). Under the ABC model, USCIS projected the cost of the forms G–1041 and G–1041A to be $46 each. The cost is based on the projected volumes and costs of the genealogy program. The projected costs include a portion of Lockbox costs, genealogy contracts, and a portion of costs related to the division that handles genealogy, FOIA and similar USCIS workloads. The proposed $65 fee is based on the ABC model output, plus an additional $19 to recover the applicable administrative costs associated with funding these services, such as the USCIS Librarian and other genealogy research and information services.[65] Because the INA contains a separate fee setting authorization for the genealogy program to recover the full costs of providing all genealogy research and information services, DHS does not propose to adjust the ABC model output for genealogy fees using the cost reallocation methodology that was used to adjust the other fees for which the model output was not used. *See* INA section 286(t), 8 U.S.C. 1356(t). Administrative costs, such as the Management and Oversight activity cost, range from $33 to $426 for other immigration benefit fees. Had USCIS included all such costs in the proposed genealogy fees, it would have added at least $141 to the proposed genealogy fees. DHS proposes to add only $19 to the model output for estimated applicable costs for a total proposed fee of $65.

## 4. Dishonored Payments and Failure To Pay the Biometrics Services Fee

DHS proposes to amend the regulations regarding how USCIS will treat a benefit request accompanied by fee payment (in the form of check or other financial instrument) that is subsequently returned as not payable. Proposed 8 CFR 103.2(a)(7)(ii). DHS also proposes changes to provisions governing non-payment of the biometric service fee. Proposed 8 CFR 103.17(b).

---

[64] The statute requires genealogy program fees to be deposited as offsetting collections into the IEFA and that the fees for ''such research and information services'' may be set at a level that will ensure the recovery of the full costs of providing all such services. INA sec. 286(t)(1), 8 U.S.C. 1356(t)(1).

[65] The Cost Reallocation amount is $18. The additional $1 results from rounding the proposed fee to the nearest $5 increment.

Each of these proposed changes is described below.

Current regulations provide that when a check or other financial instrument used to pay a filing fee is subsequently returned as not payable, the remitter will be notified and requested to pay the filing fee and associated service charge within 14 calendar days, without extension. If the benefit request is pending and these charges are not paid within 14 days, the benefit request will be rejected as improperly filed.[66] *See* 8 CFR 103.2(a)(7)(ii). In addition, a receipt issued by a DHS officer for any remittance will not be binding upon DHS if the remittance is found uncollectible, and legal and statutory deadlines will not be deemed to have been met if payment is not made within 10 business days after notification by DHS of the dishonored form of payment. *See* 8 CFR 103.7(a)(2). Finally, if a benefit request is received by DHS without the correct biometric service fee, DHS will notify the applicant of the deficiency and take no further action until payment is received. 8 CFR 103.17(b)(1). Failure to submit the correct biometric service fee within the time allotted in the notice will result in denial of the benefit request. *Id.* In accordance with these provisions, when a payment is returned as non-payable, USCIS places the immigration benefit request on hold and suspends adjudication. If a check is dishonored or payment otherwise fails, USCIS assesses a $30 charge and pursues the unpaid fee and penalty using administrative debt collection procedures. If the biometrics services fee was required and is missing, USCIS generally provides the filer 30 days to correct the payment. If payment is made within the allotted time, USCIS resumes processing the benefit request. If the filer does not correct the payment, USCIS rejects the filing. If the biometric fee is not paid, USCIS considers the benefit request as abandoned.

DHS proposes to eliminate the three rules requiring that cases be held while deficient payments are corrected. *See* proposed 8 CFR 103.2(a)(7)(ii), 103.7(a)(2), 103.17(b). As a practical matter, USCIS clears payment checks through the Automated Clearing House (ACH) by converting checks to

electronic payments. Because USCIS converts checks into ACH payments, there is currently no or very little delay before USCIS knows whether the check is valueless. DHS is proposing that USCIS will not begin processing the benefit request until the payment has cleared. DHS anticipates that the proposed change would reduce the USCIS administrative costs for holding and tracking immigration benefit requests with rejected payments. This change would streamline USCIS' process for handling immigration benefit requests when payments are returned as not payable or do not include the required biometric services fee.

This proposal further recognizes that a fee is a fundamental aspect of the benefit request filing. For example, under current 8 CFR 103.2(a)(7)(ii), an H–1B cap-subject petition[67] that was submitted with a check that was dishonored would be able to preserve its place in the lottery as long as the petitioner paid the fee and the aforementioned $30 charge within 14 days.[68] Under proposed 8 CFR 103.2(a)(7)(ii), an H–1B cap-subject petition that is submitted with a check that is dishonored would be rejected and the receipt date would not be retained. By providing a 14-day correction window for dishonored checks, current regulations permit a benefit request paid with a dishonored payment instrument to secure a place in line ahead of a benefit request that was accompanied by a proper payment. DHS believes that this result is unfair, particularly because a rejected applicant, petitioner, or requestor may complete a new application and refile it immediately with proper payment.

DHS is also proposing minor changes to this same provision to clarify when USCIS would consider a benefit request received and when USCIS would reject a benefit request. Proposed 8 CFR 103.2(a)(7)(i)–(ii). Currently, numerous regulations address filing requirements for different benefits, including rejection

criteria.[69] To ensure clarity among these numerous regulations, DHS proposes to delete the reference to parts 204, 245, and 245a, and insert in its place a corresponding revision to 8 CFR 103.2(a)(7)(ii)(C) providing that a benefit request would be rejected if it is not, among other things, filed in compliance with the regulations governing the filing of the specific application, petition, form, or request. Finally, DHS proposes to address the possibility that special rules may apply for paying fees at a Department of Homeland Security office located outside of the United States. We propose to clarify fees paid in person overseas must be made payable in accordance with the guidance specific to the applicable U.S. Government office when submitting it. Proposed 8 CFR 103.7(a)(2).

**5. Refunds**

DHS proposes a minor change in the provision regarding USCIS fee refunds. *See* 8 CFR 103.2(a)(1) (providing that filing fees and biometric service fees are non-refundable.).[70] In general, and except for a premium processing fee under 8 CFR 103.7(e)(2)(i),[71] USCIS does not refund a fee regardless of the decision on the immigration benefit

---

[66] By contrast, DHS immediately rejects any application or petition submitted without a fee payment instrument. *See* 8 CFR 103.2(a)(1) ("Each benefit request or other document must be filed with fee(s) as required by regulation. Benefit requests which require a person to submit biometric information must also be filed with the biometric service fee in 8 CFR 103.7(b)(1), for each individual who is required to provide biometrics."); 8 CFR 103.2(a)(7)(i) ("A benefit request which is not signed and submitted with the correct fee(s) will be rejected.").

[67] Congress has established limits on the number of temporary workers who may be granted H–1B nonimmigrant status each fiscal year (commonly known as the "H–1B cap"). *See* INA section 214(g), 8 U.S.C. 1184(g). Due to the historically high demand for cap-subject H–1B workers, the H–1B cap usually is reached within days of the opening of the H–1B filing period for a new fiscal year.

[68] USCIS employs a random selection process after announcing a final date on which it will receive H–1B petitions. USCIS refers to this day as the "final receipt date." *See* 8 CFR 214.2(h)(8)(ii)(B). All petitions submitted properly prior to or on the "final receipt date" undergo a random selection process to determine which petitions can be processed to completion and, if otherwise eligible, which beneficiaries are able to receive an H–1B visa number.

[69] Current 8 CFR 103.2(a)(7)(i) states, in part, "[e]xcept as provided in 8 CFR parts 204, 245, or 245a, a benefit request will be considered received by USCIS as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format." 8 CFR 245.2(a)(2) requires a current priority date for proper filing, 8 CFR 245a.2(e) permits receipt at a Qualified Designated Entity as opposed to a USCIS office, and 8 CFR 204.5(a) provides that a petition is considered properly filed only if it is accompanied by any required individual labor certification. In addition, regulations specific to a given benefit request produce filing requirements beyond those required under 8 CFR 103.2. *See, e.g.,* 8 CFR 212.7(e)(5)(ii) (providing additional filing requirements for an application for a provisional unlawful presence waiver).

[70] USCIS is proposing no changes with regard to the prohibitions on refunds of a Notice of Appeal or Motion (Form I–290B) in 8 CFR 103.3(a)(2), which provide that the fee paid with an appeal filed too late or by a person or entity not entitled to file it will not be refunded regardless of the action taken. *See also* 8 CFR 103.5(a)(iii)(B) (requiring a motion to reopen to be accompanied by a *nonrefundable* fee as set forth in 8 CFR 103.7) (emphasis added). Likewise, no changes are proposed to the prohibition on refunds for a Genealogy Index Search Request (Form G–1041), proposed 8 CFR 103.7(b)(1)(i)(E), the limited refunds for a Genealogy Records Request (Form G–1041A), proposed 8 CFR 103.7(b)(1)(i)(F), or no refund of the DCL System Costs Fee. 8 CFR 103.7(b)(ii)(A).

[71] USCIS automatically refunds the fee for a Request for Premium Processing (Form I–907) if USCIS has not reached a final decision (approval, denial, notice of intent to deny, or request for evidence) or opened an investigation relating to the benefit request for which premium processing was requested within 15 days of its receipt. 8 CFR 103.7(e)(2). No changes are proposed to that provision.

request. USCIS will refund a fee if the agency determines that an administrative error occurred resulting in the incorrect collection of a fee. Examples of USCIS errors include:

• *Unnecessary filings.* Cases in which USCIS (or DOS in the case of an immigration benefit request filed overseas) erroneously requests that an individual file an unnecessary form along with the associated fee; and

• *Accidental payments.* Cases in which an individual pays a required fee more than once or otherwise pays a fee in excess of the amount due and USCIS (or the DOS in the case of an immigration benefit request filed overseas) erroneously accepts the erroneous fee.

DHS is proposing that 8 CFR 103.2(a)(1) be revised to provide that fees are "generally" not refunded. *See* proposed 8 CFR 103.2(a)(1). This would address concern that the current regulatory text does not explicitly permit refunds at DHS discretion. DHS currently grants such refunds because as electronic filings and associated electronic payments have increased, there has been an increase in the number of erroneous payments where refunds are appropriate. For example, an applicant may be charged twice in error due to technical issues related to the specific device, software, or internet connection used to pay the fee. In such a case, if the request is not rejected for an erroneous payment, a refund may be appropriate. DHS is proposing to continue the practice of providing these refunds in limited circumstances where refunds are justified. Applicants would continue to request refunds by calling the USCIS customer service line or submitting written requests to the office having jurisdiction over the relevant filing.

*C. Fee-Related Issues Noted for Consideration*

DHS has identified a number of issues that do not affect the 2016/2017 Fee Review but which, for a variety of reasons, merit some discussion. No changes are proposed related to the issues discussed in this section. USCIS may discuss these issues in future biennial fee reviews or in conjunction with other USCIS Fee Rules. DHS welcomes comments on all facets of the 2016/2017 Fee Review, this proposed rule, and USCIS fees in general, regardless of whether changes have been proposed here.

1. Premium Processing

USCIS is proposing no change to premium processing fees or regulations but notes it here for consideration due

to stakeholder interest, past comments, and correspondence on the subject. Section 286(u) of the INA, 8 U.S.C. 1356(u), authorizes DHS to establish and collect a fee for a premium processing service for employment-based petitions and applications. Revenue from premium processing fees fund the costs associated with providing the premium processing service, as well as infrastructure improvements in the adjudications and customer service processes.[72]

Congress set the premium processing fee at $1,000 and authorized USCIS to adjust the fee for inflation, as determined by the Consumer Price Index (CPI). USCIS adjusted the premium processing fee by using the CPI in the 2010 Fee Rule to $1,225. *See* 75 FR 58979; 8 CFR 103.7(b)(1)(i)(RR). Because projected premium processing revenue is sufficient to cover the projected costs of providing the premium service and other permissible infrastructure investments, USCIS is proposing no change to the premium processing fee. DHS is not barred from increasing the premium processing fee outside of rulemaking should circumstances require it.

DHS also notes that commenters regularly request that DHS: Extend premium processing beyond the limits of section 286(u) to other immigration benefit requests. *See* 75 FR 58978. The FY 2016/2017 Fee Review did not analyze the potential effect of premium processing for other forms. Congress established the premium processing fee at an amount it determined to be appropriate and permitted USCIS to increase it based on inflation. *Id.* USCIS has not incurred any operating deficits as a result of the amount of that fee. These fees more than cover the costs of providing premium processing for the associated benefits. Nevertheless, USCIS has many years' experience in processing certain employment-based cases using premium processing. It would be very difficult to estimate the staff, resources, and costs necessary to ensure the processing of additional benefit types within a certain time frame, especially when those cases may require other types of background checks, interviews and additional steps that USCIS does not generally control. Expanding the premium processing

program would require USCIS to estimate the costs of a service that does not currently exist with sufficient confidence that it can deliver the service promised and not impair service in other product lines. To study a potential new premium processing program would require the devotion of considerable resources. Thus, DHS proposes no extension of premium processing beyond its current usage. Comments, however, are welcome on that subject.

USCIS currently offers premium processing to business customers filing: A Petition for Nonimmigrant Worker, Form I–129, and an Immigrant Petition for Alien Worker, Form I–140, in certain visa classifications. In the 2007 and 2010 Fee Rules, USCIS indicated that it would dedicate premium processing fee revenue for transformation activities.[73] At that time, projected annual premium processing revenues and annual transformation investment costs were roughly equal. Since that time, the projected lifecycle costs of the transformation investment, which now includes USCIS' electronic immigration system, have decreased, whereas demand for USCIS premium processing services has grown, resulting in an imbalance between revenue and spending.

In the FY 2016/2017 Fee Review, USCIS identified $79.3 million in additional costs to be funded through premium processing fee revenue, thereby reducing the costs that USCIS must recover through its standard (non-premium) immigration benefit request fees. Consistent with INA section 286(u), 8 U.S.C. 1186(u), DHS intends to use premium processing revenue to pay for the salaries of immigration services officers that process this workload, associated supervisory and support staff, and associated non-personnel costs. Premium processing revenue will also be used to fund the salaries and benefits costs for Office of Transformation Coordination staff that manage USCIS' electronic immigration system and transformation investment.

---

[72] Premium processing fees are paid in addition to the regular form fee. For example, individuals would pay the proposed $700 fee for a Form I–140 under this rule, plus $1,225 for premium processing. Premium processing prioritizes the applicable application or petition for adjudication. The additional fee permits the devotion of specific resources to resolving that immigration benefit request.

[73] Transformation is an agency-wide effort to transition the agency from a fragmented, paper-based operational environment to a centralized environment facilitating electronic processing of requests for immigration benefits through the USCIS electronic immigration system (ELIS). This investment is a large-scale, complex undertaking to modernize USCIS business processes using information technology-enabled re-engineering. ELIS will employ the types of online customer accounts used in the private sector to manage transactions and track activities while helping USCIS enforce and administer the immigration laws. The revised processes, enabled by ELIS, will help USCIS meet customer expectations for on-demand information and immediate real-time electronic service over the Internet.

USCIS also identified additional costs for staff adjudicating requests for premium processing service, transformation-related expenses, and infrastructure investments being made to enhance the adjudication process and customer service, that the agency intends to fund with premium processing fee collections instead of continuing to use general filing fees.

## 2. Accommodating E-Filing and Form Flexibility

DHS has endeavored, as it did in the 2010 fee rule, to propose fees based on form titles instead of form numbers to avoid prescribing fees in a manner that could undermine the transformation process. *See* proposed 8 CFR 103.7(b)(1). Form numbers are included for informational purposes but are not intended to restrict the ability of USCIS to collect a fee for a benefit request that falls within the parameters of the adjudication for which the fee is promulgated. As USCIS modernizes its processes and systems to allow more people to file applications online, the agency may collect fees for requests that do not have a form number or do not have the same form number as described in regulations. This could occur, for example, if USCIS developed an online version of a request that individuals often submit with applications for employment authorization. In this situation, USCIS may find it best to consolidate the two requests without separately labelling the different sections pursuant to the relevant form numbers. DHS would still collect the required fee for the underlying benefit request as well as the request for employment authorization, but the actual online request would not necessarily contain form numbers corresponding to each separate request.

Likewise, if USCIS determines that efficiency and customer service would be improved by breaking apart Form I–131 into separate paper forms (for instance, USCIS could institute a separate form and form number for advance parole, humanitarian parole, parole in place, refugee travel documents, reentry permits, or boarding documents), USCIS could do so and continue to charge the Form I–131 fee that is included in this rule. This structure permits USCIS to change forms more easily without having to perform a new fee study each time the agency chooses to do so.

## 3. Fee Waivers

USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee. *See* 8 CFR 103.7(c). To request a fee waiver, the individual must submit a written waiver request for permission to have their benefit request processed without payment. The waiver request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. *See* 8 CFR 103.7(c)(2). There is no appeal of the denial of a fee waiver request. *See id.* Before 2007, USCIS could waive any fee, even where the fee waiver would be inconsistent with the underlying benefit request. For example, prior to 2007, USCIS could waive fees for companies seeking to sponsor foreign workers; individuals seeking status based on substantial business investments; or individuals seeking to sponsor foreign relatives to whom the sponsors must provide a financial safety net. *See* 72 FR 4912. Since 2007, however, DHS has limited the USCIS fees that may be waived in 8 CFR 103.7(c)(3) based on the general premise that fee waivers must be consistent with any financial considerations that apply to the status or benefit sought. *See* 8 CFR 103.7(c)(1)(ii).

Following the 2010 Fee Rule, USCIS also issued guidance to the field to streamline fee waiver adjudications and make them more consistent among offices and form types nationwide. *See* Policy Memorandum, PM–602–0011.1, Fee Waiver Guidelines as Established by the Final Rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26 (Mar. 13, 2011) ("Fee Waiver Policy"). This guidance clarifies what measures of income can be used and the types of documentation that are acceptable for individuals to present as demonstration that they are unable to pay a fee when requesting a fee waiver. In June 2011, USCIS issued the Request for Fee Waiver, Form I–912, which is an optional standardized form with instructions that can be used to request a fee waiver in accordance with the fee waiver guidance.[74] USCIS previously engaged in a holistic analysis of the individual's finances to determine inability to pay. *See, e.g.,* William R. Yates, Field Guidance on Granting Fee Waivers Pursuant to 8 CFR 103.7(c), dated March 4, 2004. Under the fee waiver guidance, USCIS established a streamlined process under which it will usually waive the entire fee and the biometric services fee for forms listed in 8 CFR 103.7(c)(3) for applicants who:

• Are currently receiving a means-tested benefit;

• Have household income at or below 150 percent of the Federal poverty level; or

• Are experiencing extreme financial hardship such as unexpected medical bills or emergencies. *AFM* Chapter 10.9(b).

The 2010 Fee Rule also authorized the USCIS Director to approve and suspend exemptions from fees or provide that the fee may be waived for a case or class of cases that is not otherwise provided in 8 CFR 103.7(c). *See* 75 FR 58990; 8 CFR 103.7(d).

As noted in the Fiscal Year (FY) 2016/2017 Immigration Examinations Fee Account Fee Review Supporting Documentation, the projected annual impact of fee waivers and exemptions has increased markedly since the 2010 Fee Rule from $191 million to $613 million. Applicants, petitioners, and requestors that pay a fee cover the cost of processing requests that are fee-waived or fee-exempt. Although DHS does not currently plan to do so, it may in the future revisit the USCIS fee waiver guidance with respect to what constitutes inability to pay under 8 CFR 103.7(c). DHS welcomes comment on this issue.

## VII. Volume

USCIS uses two types of volume data in the fee review. Workload volume is a projection of the total number of immigration benefit requests that will be received in a fiscal year. Fee-paying volume is a projection of the number of applicants, petitioners, and requestors that will pay a fee when filing requests for immigration benefits. Not all applicants, petitioners, or requestors pay a fee. Those applicants, petitioners, and requestors for whom USCIS grants a fee waiver or to whom an exemption applies are represented in the workload volume but not the fee-paying volume. Applicants, petitioners, and requestors that pay a fee fund the cost of processing requests for fee-waived or fee-exempt immigration benefit requests.

### A. Workload Volume and Volume Projection Committee

USCIS uses statistical time series modeling and immigration receipt data from the last 15 years, as well as the best available internal assessment of future developments (such as annualized data prepared by the USCIS Office of Performance and Quality) to develop workload volume projections. All relevant USCIS directorates and program offices are represented on the USCIS Volume Projection Committee

---

[74] The form and its instructions may be viewed at *http://www.uscis.gov/i-912*.

(VPC). The VPC forecasts USCIS workload volume with subject-matter-expert input from USCIS Service Centers, the National Benefits Center, the RAIO Directorate, and Regional, District, and Field Offices. Input from these offices helps refine projected volume estimates. The VPC reviews short- and long-term volume trends. In most cases, time series models provide volume projections by form type. The time series models use historical receipts data to determine patterns (such as level, trend, and seasonality) or correlations with historical events, which in turn are used to derive the projected receipts. Where possible, the models are also used to determine relationships between different benefit request types. Workload volumes are a key element used when determining the USCIS resources needed to process benefit requests within established adjudicative processing goals. They are also the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model.

TABLE 4—WORKLOAD VOLUME COMPARISON

| Immigration benefit request | Average annual FY 2010/2011 projected workload receipts | Average annual FY 2016/2017 projected workload receipts | Difference |
|---|---|---|---|
| I–90   Application to Replace Permanent Resident Card | 540,000 | 810,707 | 270,707 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 17,165 | 10,143 | ¥7,022 |
| I–129   Petition for a Nonimmigrant Worker | 395,000 | 432,156 | 37,156 |
| I–129F   Petition for Alien Fiancé(e) | 54,000 | 45,351 | ¥8,649 |
| I–130   Petition for Alien Relative | 690,520 | 911,349 | 220,829 |
| I–131/I–131A   Application for Travel Document | 256,255 | 256,622 | 367 |
| I–140   Immigrant Petition for Alien Worker | 75,000 | 88,602 | 13,602 |
| I–290B   Notice of Appeal or Motion | 28,734 | 24,706 | ¥4,028 |
| I–360   Petition for Amerasian, Widow(er) or Special Immigrant | 17,669 | 26,428 | 8,759 |
| I–485   Application to Register Permanent Residence or Adjust Status | 526,000 | 593,717 | 67,717 |
| I–526   Immigrant Petition by Alien Entrepreneur | 1,399 | 14,673 | 13,274 |
| I–539   Application to Extend/Change Nonimmigrant Status | 195,000 | 172,001 | ¥22,999 |
| I–600/I–600A; I–800/I–800A   Orphan Petitions | 25,241 | 15,781 | ¥9,460 |
| I–601A   Provisional Unlawful Presence Waiver | N/A | 42,724 | 42,724 |
| I–687   Application for Status as a Temporary Resident | 48 | 18 | ¥30 |
| I–690   Application for Waiver on Grounds of Inadmissibility | 74 | 21 | ¥53 |
| I–694   Notice of Appeal of Decision | 50 | 39 | ¥11 |
| I–698   Application to Adjust Status From Temporary to Permanent Resident | 704 | 91 | ¥613 |
| I–751   Petition to Remove the Conditions of Residence | 183,000 | 173,000 | ¥10,000 |
| I–765   Application for Employment Authorization | 720,000 | 747,825 | 27,825 |
| I–800A Supp. 3   Request for Action on Approved Form I–800A | N/A | 1,585 | 1,585 |
| I–817   Application for Family Unity Benefits | 1,750 | 2,069 | 319 |
| I–824   Application for Action on an Approved Application or Petition | 20,961 | 10,921 | ¥10,040 |
| I–829   Petition by Entrepreneur to Remove Conditions | 441 | 3,562 | 3,121 |
| I–910   Application for Civil Surgeon Designation | 3,410 | 609 | ¥2,801 |
| I–924   Application for Regional Center Designation Under the Immigrant Investor Program | 132 | 400 | 268 |
| I–924A   Annual Certification of Regional Center | N/A | 882 | 882 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | N/A | 575 | 575 |
| N–300   Application to File Declaration of Intention | 45 | 41 | ¥4 |
| N–336   Request for Hearing on a Decision in Naturalization Proceedings | 4,145 | 4,666 | 521 |
| N–400   Application for Naturalization | 693,890 | 830,673 | 136,783 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 621 | 362 | ¥259 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 29,298 | 28,914 | ¥384 |
| N–600/600K   Naturalization Certificate Applications | 45,347 | 69,723 | 24,376 |
| I–191, I–192, I–193, I–212, I–601, I–612   Waiver Forms | 31,432 | 71,527 | 40,095 |
| USCIS Immigrant Fee | 215,000 | 472,511 | 257,511 |
| G–1041   Genealogy Index Search Request | N/A | 3,605 | 3,605 |
| G–1041A   Genealogy Records Request | N/A | 2,410 | 2,410 |
| Subtotal | 4,772,331 | 5,870,989 | 1,101,459 |
| Biometrics | 2,048,177 | 3,028,254 | 980,077 |
| Grand Totals | 6,820,508 | 8,899,243 | 2,081,536 |

*B. Fee-Paying Volume and Methodology*

USCIS uses historical revenue and receipt data to determine the number of individuals that paid the fee for each immigration benefit type. Total revenue for an immigration benefit request is divided by its fee to determine the number of fee-paying immigration benefit requests. Fee-paying receipts are compared to the total number of receipts (workload volume) to determine a fee-paying percentage for each immigration benefit request. When appropriate, projected fee-paying volumes are adjusted to reflect filing trends and anticipated changes.

TABLE 5—FEE-PAYING VOLUME COMPARISON

| Immigration benefit request | Average annual FY 2010/2011 fee paying projection | Average annual FY 2016/2017 fee paying projection | Difference |
|---|---|---|---|
| I–90   Application to Replace Permanent Resident Card ............................................ | 518,400 | 718,163 | 199,763 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document ........... | 17,165 | 9,499 | ¥7,666 |
| I–129   Petition for a Nonimmigrant Worker ................................................... | 395,000 | 427,778 | 32,778 |
| I–129F   Petition for Alien Fiancé(e) ......................................................... | 39,960 | 39,277 | ¥683 |
| I–130   Petition for Alien Relative ........................................................... | 690,520 | 907,512 | 216,992 |
| I–131/I–131A   Application for Travel Document ................................................ | 192,255 | 194,461 | 2,206 |
| I–140   Immigrant Petition for Alien Worker ................................................... | 75,000 | 88,602 | 13,602 |
| I–290B   Notice of Appeal or Motion ........................................................... | 28,734 | 20,955 | ¥7,779 |
| I–360   Petition for Amerasian, Widow(er) or Special Immigrant ................................ | 6,957 | 8,961 | 2,004 |
| I–485   Application to Register Permanent Residence or Adjust Status .......................... | 480,000 | 473,336 | ¥6,664 |
| I–526   Immigrant Petition by Alien Entrepreneur .............................................. | 1,343 | 14,673 | 13,330 |
| I–539   Application to Extend/Change Nonimmigrant Status ...................................... | 195,000 | 171,616 | ¥23,384 |
| I–600/600A; I–800/800A   Orphan Petitions ..................................................... | 16,211 | 5,811 | ¥10,400 |
| I–601A   Provisional Unlawful Presence Waiver ................................................. | N/A | 42,724 | 42,724 |
| I–687   Application for Status as a Temporary Resident ........................................ | 43 | 0 | ¥43 |
| I–690   Application for Waiver on Grounds of Inadmissibility .................................. | 74 | 17 | ¥57 |
| I–694   Notice of Appeal of Decision .......................................................... | 50 | 39 | ¥11 |
| I–698   Application to Adjust Status From Temporary to Permanent Resident ..................... | 605 | 91 | ¥514 |
| I–751   Petition to Remove the Conditions of Residence ........................................ | 177,510 | 162,533 | ¥14,977 |
| I–765   Application for Employment Authorization .............................................. | 511,200 | 397,954 | ¥113,247 |
| I–800A Supp. 3   Request for Action on Approved Form I–800A ................................... | N/A | 746 | 746 |
| I–817   Application for Family Unity Benefits ................................................. | 1,750 | 1,988 | 238 |
| I–824   Application for Action on an Approved Application or Petition ......................... | 20,961 | 10,828 | ¥10,134 |
| I–829   Petition by Entrepreneur to Remove Conditions ......................................... | 256 | 3,562 | 3,306 |
| I–910   Application for Civil Surgeon Designation ............................................. | 1,160 | 609 | ¥551 |
| I–924   Application for Regional Center Designation Under the Immigrant Investor Program ... | 132 | 400 | 268 |
| I–924A   Annual Certification of Regional Center .............................................. | N/A | 882 | 882 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant ........................... | N/A | 257 | 257 |
| N–300   Application to File Declaration of Intention .......................................... | 45 | 36 | ¥9 |
| N–336   Request for Hearing on a Decision in Naturalization Proceedings ....................... | 4,145 | 3,593 | ¥553 |
| N–400   Application for Naturalization ........................................................ | 684,390 | 631,655 | ¥52,736 |
| N–470   Application to Preserve Residence for Naturalization purposes ......................... | 621 | 360 | ¥261 |
| N–565   Application for Replacement Naturalization/Citizenship Document ....................... | 24,903 | 23,491 | ¥1,413 |
| N–600/600K   Naturalization Certificate Applications .......................................... | 45,347 | 46,870 | 1,523 |
| I–191, I–192, I–193, I–212, I–601, I–612   Waiver Forms ....................................... | 31,432 | 41,902 | 10,470 |
| USCIS Immigrant Fee ........................................................................... | 215,000 | 472,511 | 257,511 |
| G–1041   Genealogy Index Search Request ....................................................... | N/A | 3,605 | 3,605 |
| G–1041A   Genealogy Records Request ........................................................... | N/A | 2,410 | 2,410 |
| Subtotal ...................................................................................... | 4,376,169 | 4,929,707 | 553,533 |
| Biometrics .................................................................................... | 1,950,603 | 2,598,639 | 648,036 |
| Grand Totals .................................................................................. | 6,326,772 | 7,528,346 | 1,201,569 |

## VIII. Completion Rates

USCIS completion rates are the average hours per adjudication of an immigration benefit request. They identify the adjudicative time required to complete (render a decision on) specific immigration benefit request types. The completion rate for each benefit type represents an average. Completion rates reflect what is termed "touch time" or the time an employee with adjudicative responsibilities actually handles the case. It does not reflect "queue time" or time spent waiting, for example, for additional evidence or supervisory approval. It does not reflect the total processing time customers can expect to wait for a decision on their case after USCIS accepts it.

USCIS requires the employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. Adjudication hours are divided by the number of completions for the same time period to determine an average completion rate. In addition to using this data to determine fees, completion rates help determine staffing allocations appropriate to handle the projected workload. The Office of Performance and Quality, field offices, and regional management scrutinize the data to ensure accuracy. When the data is inconsistent and anomalies are identified, the Office of Performance and Quality contacts the reporting office and makes necessary adjustments. USCIS has confidence in the data, given the consistency of reporting over the last several years. The continual availability of the information makes it easier for USCIS to update cost information more frequently for fee review and cost management purposes.

### TABLE 6—COMPLETION RATES PER BENEFIT REQUEST
[Projected adjudication hours/completion]

| Immigration benefit request | Service-wide |
|---|---|
| I–90    Application to Replace Permanent Resident Card | 0.21 |
| I–102    Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 0.48 |
| I–129    Petition for a Nonimmigrant Worker | 0.83 |
| I–129F    Petition for Alien Fiancé(e) | 0.65 |
| I–130    Petition for Alien Relative | 0.75 |
| I–131/I–131A    Application for Travel Document | 0.21 |
| I–140    Immigrant Petition for Alien Worker | 1.68 |
| I–290B    Notice of Appeal or Motion | 1.22 |
| I–360    Petition for Amerasian, Widow(er) or Special Immigrant | 1.97 |
| I–485    Application to Register Permanent Residence or Adjust Status | 1.63 |
| I–526    Immigrant Petition by Alien Entrepreneur | 6.50 |
| I–539    Application to Extend/Change Nonimmigrant Status | 0.40 |
| I–600/600A; I–800/800A    Orphan Petitions | 2.14 |
| I–601A    Application for Provisional Unlawful Presence Waiver | 2.84 |
| I–687    Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act | 4.12 |
| I–690    Application for Waiver on Grounds of Inadmissibility | 0.89 |
| I–694    Notice of Appeal of Decision under Section 210 or 245A | 2.10 |
| I–698    Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | 3.80 |
| I–751    Petition to Remove the Conditions of Residence | 0.99 |
| I–765    Application for Employment Authorization | 0.20 |
| I–800A Supplement 3    Request for Action on Approved Form I–800A | 1.10 |
| I–817    Application for Family Unity Benefits | 0.92 |
| I–824    Application for Action on an Approved Application or Petition | 0.59 |
| I–829    Petition by Entrepreneur to Remove Conditions | 5.50 |
| I–910    Application for Civil Surgeon Designation | 1.81 |
| I–924    Application for Regional Center Designation Under the Immigrant Investor Program | 40.00 |
| I–924A    Annual Certification of Regional Center | 5.00 |
| N–300    Application to File Declaration of Intention | 1.64 |
| N–336    Request for Hearing on a Decision in Naturalization Proceedings | 2.60 |
| N–400    Application for Naturalization | 1.25 |
| N–470    Application to Preserve Residence for Naturalization Purposes | 1.83 |
| N–565    Application for Replacement Naturalization/Citizenship Document | 0.59 |
| N–600/N–600K    Naturalization Certificate Applications | 1.00 |
| I–191, I–192, I–193, I–212, I–601, I–612    Waiver Forms | 1.18 |

USCIS does not calculate completion rates for the following immigration benefit requests, forms, or other services, due to the special nature of their processing as explained below:

• Biometric Services. Application Support Centers and the Biometrics Division incur certain costs, which are assigned to this fee. Completion rates are not necessary to assign processing activity costs to this product. *See* proposed 8 CFR 103.7(b)(1)(i)(C).

• USCIS Immigrant Fees. USCIS does not adjudicate immigrant visa benefit requests. Rather, individuals located outside of the United States apply with a Department of State overseas consular officer for an immigrant visa. If DOS issues the immigrant visa, the individual may apply with a U.S. Customs and Border Protection officer for admission to the United States as an immigrant at a port of entry. This fee represents USCIS costs to create and maintain files and to issue permanent resident cards to individuals who go through this process. *See* proposed 8 CFR 103.7(b)(1)(i)(D) (changing the fee's title to "USCIS Immigrant Fee").

• Refugee and Asylee Processing. Refugee Division and Asylum Division costs are not directly assigned to any fee and are covered by immigration benefit requests that pay fees. USCIS does not charge a fee for the following:

Æ Application for Asylum and Withholding of Removal, Form I–589;

Æ Registration for Classification as a Refugee, Form I–590;

Æ Application By Refugee For Waiver of Grounds of Excludability, Form I–602; and

Æ Refugee/Asylee Relative Petition, Form I–730.

• Other Forms Exempt from Fees. The following forms are also not discussed in this rule as applicants for these form types are exempt from paying a fee:

Æ Application for Posthumous Citizenship, Form N–644;

Æ Application for T Nonimmigrant Status, Form I–914; and

Æ Petition for U Nonimmigrant Status, Form I–918.

• Forms with Uncertain Fee Revenue. These form types may be terminated under current law, or may cease due to a reduction in the eligible population, and DHS proposes to not rely on their uncertain fee revenue streams for

recovering USCIS operational expenses. The following forms are excluded from discussion in this rule because, as discussed earlier in this preamble, this proposed rule does not propose to change or establish a special fee for those programs:

Æ Application for Temporary Protected Status, Form I–821; [75]

Æ Consideration of Deferred Action for Childhood Arrivals, Form I–821D; and

Æ Application for Suspension of Deportation or Special Rule Cancellation of Removal, Form I–881.[76]

### IX. Proposed Fee Adjustments to IEFA Immigration Benefits

Because projected USCIS costs for FY 2016 and 2017 exceed projected revenue by an average of $569 million each year, USCIS must adjust the fee schedule to recover the full cost of processing immigration benefits, and to continue to

[75] The proposed rule would, however, change the location of the reference to the fee in the Code of Federal Regulations (CFR). *See* proposed 8 CFR 103.7(b)(1)(i)(NN).

[76] The proposed rule would change the location of the reference to the fee in the CFR. *See* proposed 8 CFR 103.7(b)(1)(i)(QQ).

maintain or improve current service delivery standards.

After resource costs are identified, they are distributed to USCIS' primary processing activities in the ABC model.

Table 7 outlines total IEFA costs by activity.

TABLE 7—PROJECTED IEFA COSTS BY ACTIVITY

[Dollars in thousands]

| Activity | FY 2016 | FY 2017 | FY 2016/2017 average |
|---|---|---|---|
| Perform Biometrics Services | $194,670 | $197,837 | $196,254 |
| Make Determination | 1,268,309 | 1,302,756 | 1,285,533 |
| Management and Oversight | 588,262 | 592,151 | 590,206 |
| Inform the Public | 281,668 | 288,187 | 284,927 |
| Records Management | 238,271 | 240,777 | 239,524 |
| Fraud Detection and Prevention | 176,530 | 180,544 | 178,537 |
| Intake | 94,736 | 93,120 | 93,928 |
| Direct Costs | 56,444 | 58,476 | 57,460 |
| Conduct TECS Check | 52,829 | 53,994 | 53,412 |
| Issue Document | 31,975 | 32,632 | 32,304 |
| Systematic Alien Verification for Entitlements | 25,330 | 26,074 | 25,702 |
| Total IEFA Costs | 3,009,024 | 3,066,548 | 3,037,786 |

The activity costs are then distributed to the immigration benefit requests. Table 8 summarizes total revenue by immigration benefit request based on the proposed fee schedule.

TABLE 8—PROJECTED FY 2016/2017 AVERAGE ANNUAL REVENUE PER IMMIGRATION BENEFIT

[Dollars in thousands]

| Immigration benefit request | Revenue |
|---|---|
| G–1041   Genealogy Index Search Request | $234 |
| G–1041A   Genealogy Records Request | 157 |
| I–90   Application to Replace Permanent Resident Card | 326,764 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 4,227 |
| I–129   Petition for a Nonimmigrant worker | 196,778 |
| I–129F   Petition for Alien Fiancé(e) | 21,013 |
| I–130   Petition for Alien Relative | 485,519 |
| I–131/I–131A   Application for Travel Document | 111,815 |
| I–140   Immigrant Petition for Alien Worker | 62,021 |
| I–290B   Notice of Appeal or Motion | 14,145 |
| I–360   Petition for Amerasian Widow(er) or Special Immigrant | 3,898 |
| I–485   Application to Register Permanent Residence or Adjust Status | 539,603 |
| I–526   Immigrant Petition by Alien Entrepreneur | 53,923 |
| I–539   Application to Extend/Change Nonimmigrant Status | 63,498 |
| I–600/600A/800/800A   Orphan Petitions | 4,504 |
| I–601A   Provisional Unlawful Presence Waiver | 26,916 |
| I–690   Application for Waiver of Grounds of Inadmissibility | 12 |
| I–694   Notice of Appeal of Decision | 35 |
| I–698   Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | 152 |
| I–751   Petition to Remove Conditions on Residence | 96,707 |
| I–765   Application for Employment Authorization | 163,161 |
| I–800A Supplement 3   Request for Action on Approved Form I–800A | 287 |
| I–817   Application for Family Unity Benefits | 1,193 |
| I–824   Application for Action on an Approved Application or Petition | 5,035 |
| I–829   Petition by Entrepreneur to Remove Conditions | 13,356 |
| I–910   Application for Civil Surgeon Designation | 478 |
| I–924   Application for Regional Center Designation Under the Immigrant Investor Program | 7,109 |
| I–924A   Annual Certification of Regional Center | 2,677 |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant | 59 |
| N–300   Application to File Declaration of Intention | 10 |
| N–336   Request for Hearing on a Decision in Naturalization Proceedings | 2,515 |
| N–400   Application for Naturalization | 404,259 |
| N–470   Application to Preserve Residence for Naturalization Purposes | 128 |
| N–565   Application for Replacement Naturalization/Citizenship Document | 13,037 |
| N–600/N–600K   Application for Certificate of Citizenship | 54,838 |
| I–191, I–192, I–193, I–212, I–601, I–602, I–612   Waiver Forms | 38,968 |
| USCIS Immigrant Fee | 103,952 |
| Biometric Services | 220,884 |
| Grand Totals | 3,043,866 |

Table 9 depicts the current and proposed USCIS fees for immigration benefits and biometric services. For a more detailed description of the basis for the changes described in this table, see Appendix Table 4 in the FY 2016/ 2017 Fee Review Supporting Documentation accompanying this proposed rule.

### TABLE 9—PROPOSED FEES BY IMMIGRATION BENEFIT

| Immigration benefit request | Current fee ($) | Proposed fee ($) | Delta ($) | Percent change |
|---|---|---|---|---|
| G–1041   Genealogy Index Search Request ........................................ | $20 | $65 | $45 | 225 |
| G–1041A   Genealogy Records Request (Copy from Microfilm) .................... | 20 | 65 | 45 | 225 |
| G–1041A   Genealogy Records Request (Copy from Textual Record) ......... | 35 | 65 | 30 | 86 |
| I–90   Application to Replace Permanent Resident Card ......................... | 365 | 455 | 90 | 25 |
| I–102   Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | 330 | 445 | 115 | 35 |
| I–129   Petition for a Nonimmigrant worker ........................................ | 325 | 460 | 135 | 42 |
| I–129F   Petition for Alien Fiancé(e) ................................................. | 340 | 535 | 195 | 57 |
| I–130   Petition for Alien Relative .................................................... | 420 | 535 | 115 | 27 |
| I–131/I–131A   Application for Travel Document .................................. | 360 | 575 | 215 | 60 |
| I–140   Immigrant Petition for Alien Worker ........................................ | 580 | 700 | 120 | 21 |
| I–290B   Notice of Appeal or Motion ................................................. | 630 | 675 | 45 | 7 |
| I–360   Petition for Amerasian Widow(er) or Special Immigrant ............. | 405 | 435 | 30 | 7 |
| I–485   Application to Register Permanent Residence or Adjust Status ....... | 985 | 1,140 | 155 | 16 |
| I–526   Immigrant Petition by Alien Entrepreneur ................................ | 1,500 | 3,675 | 2,175 | 145 |
| I–539   Application to Extend/Change Nonimmigrant Status ..................... | 290 | 370 | 80 | 28 |
| I–600/600A/800/800A   Orphan Petitions ............................................ | 720 | 775 | 55 | 8 |
| I–601A   Application for Provisional Unlawful Presence Waiver ............... | 585 | 630 | 45 | 8 |
| I–687   Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act | 1,130 | 1,130 | 0 | 0 |
| I–690   Application for Waiver of Grounds of Inadmissibility .................. | 200 | 715 | 515 | 258 |
| I–694   Notice of Appeal of Decision ................................................. | 755 | 890 | 135 | 18 |
| I–698   Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) | 1,020 | 1,670 | 650 | 64 |
| I–751   Petition to Remove Conditions on Residence ............................. | 505 | 595 | 90 | 18 |
| I–765   Application for Employment Authorization ................................ | 380 | 410 | 30 | 8 |
| I–800A Supp. 3   Request for Action on Approved Form I–800A .............. | 360 | 385 | 25 | 7 |
| I–817   Application for Family Unity Benefits ...................................... | 435 | 600 | 165 | 38 |
| I–824   Application for Action on an Approved Application or Petition ........ | 405 | 465 | 60 | 15 |
| I–829   Petition by Entrepreneur to Remove Conditions ......................... | 3,750 | 3,750 | 0 | 0 |
| I–910   Application for Civil Surgeon Designation ................................ | 615 | 785 | 170 | 28 |
| I–924   Application for Regional Center Designation Under the Immigrant Investor Program | 6,230 | 17,795 | 11,565 | 186 |
| I–924A   Annual Certification of Regional Center ................................ | 0 | 3,035 | 3,035 | N/A |
| I–929   Petition for Qualifying Family Member of a U–1 Nonimmigrant ........ | 215 | 230 | 15 | 7 |
| N–300   Application to File Declaration of Intention ............................. | 250 | 270 | 20 | 8 |
| N–336   Request for Hearing on a Decision in Naturalization Proceedings ... | 650 | 700 | 50 | 8 |
| N–400   Application for Naturalization ................................................ | 595 | 640 | 45 | 8 |
| N–470   Application to Preserve Residence for Naturalization Purposes ...... | 330 | 355 | 25 | 8 |
| N–565   Application for Replacement Naturalization/Citizenship Document ... | 345 | 555 | 210 | 61 |
| N–600/N–600K   Application for Certificate of Citizenship .................... | 600 | 1,170 | 570 | 95 |
| I–191, I–192, I–193, I–212, I–601, I–602, I–612   Waiver Forms ............... | 585 | 930 | 345 | 59 |
| USCIS Immigrant Fee .................................................................. | 165 | 220 | 55 | 33 |
| Biometric Services ..................................................................... | 85 | 85 | 0 | 0 |

## X. Statutory and Regulatory Reviews

### A. Regulatory Flexibility Act

In accordance with the RFA, 5 U.S.C. 601(6), USCIS examined the impact of this rule on small entities. A small entity may be a small business (defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act, 15 U.S.C. 632), a small not-for-profit organization, or a small governmental jurisdiction (locality with fewer than 50,000 people). Below is a summary of the small entity analysis. A more detailed analysis is available in the rulemaking docket at *http://www.regulations.gov.*

Individuals rather than entities submit the majority of immigration and naturalization benefit applications and petitions. Entities that would be affected by this rule are those that file and pay the fees for certain immigration benefit applications and petitions. There are four categories of USCIS benefits that are subject to a RFA analysis for this rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Application for Civil Surgeon Designation, Form I–910; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924.[77]

DHS does not believe that the increase in fees proposed in this rule will have a significant economic impact on a substantial number of small entities that are filing Form I–129, Form I–140, or Form I–910. However, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I–924.

[77] Also captured in the dataset for Form I–924 is the Supplement Form I–924A, which regional centers must file annually to certify their continued eligibility for regional center designation.

DHS requests any data that would help to further assess the impact on small entities in the regional centers. DHS is publishing the initial regulatory flexibility analysis to aid the public in commenting on the small entity impact of its proposed adjustment to the USCIS Fee Schedule.

1. A Description of the Reasons Why the Action by the Agency Is Being Considered

DHS proposes to adjust certain immigration and naturalization benefit request fees charged by USCIS. USCIS has determined that current fees do not recover the full costs of services provided. As USCIS is nearly fully funded by fees, adjustment to the fee schedule is necessary to recover costs and maintain adequate service.

2. A Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

DHS's objectives and legal authority for this proposed rule are discussed in Section III of this preamble.

3. A Description and, Where Feasible, an Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply

Entities affected by this rule are those that file and pay fees for certain immigration benefit applications and petitions on behalf of a foreign national. These applications include Petition for Nonimmigrant Worker, Form I–129; Immigrant Petition for Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; and Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924. Annual numeric estimates of small entities affected by this fee increase total (in parentheses): Form I–129 (70,211), Form I–140 (17,812), Form I–910 (589), and Form I–924 (412).

This rule applies to small entities including businesses, non-profit organizations, and governmental jurisdictions filing for the above benefits. Form I–129 and Form I–140 will see a number of industry clusters affected by this rule (see Appendix A of the Small Entity Analysis for a list of industry codes). The fee for civil surgeon designation will apply to physicians requesting such designation. Finally, the Form I–924 will apply to any entity requesting approval and designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Also captured in the dataset for Form I–924 is the Supplement Form I–924A, which regional centers must file annually to

certify their continued eligibility for regional center designation.

a. Petition for a Nonimmigrant Worker, Form I–129

USCIS proposes to increase the fee for the Petition for a Nonimmigrant Worker, Form I–129, from $325 to $460, a $135 (42 percent) increase. Using a 12-month period of data on filings of Form I–129 from September 1, 2014 to August 31, 2015, USCIS collected internal data for each filing organization including the name, Employer Identification Number, city, state, ZIP code, and number/type of filings. Each entity may make multiple filings; for instance, there were 482,190 Form I–129 petitions, but only 84,490 unique entities that filed those petitions. Since the filing statistics do not contain information such as the revenue of the business, USCIS looked for this information by researching databases from third-party sources. USCIS used the subscription-based online database from Hoover's, as well as three open-access databases from Manta, Cortera, and Guidestar, to help determine an organization's small entity status and apply Small Business Administration size standards.

USCIS devised a methodology to conduct the small entity analysis based on a representative sample of the affected population for each form. To achieve a 95 percent confidence level and a 5 percent confidence interval on a population of 84,490 unique entities for Form I–129, USCIS used the standard statistical formula to determine a minimum sample size of 382 entities was necessary. Based on past experience, USCIS expected to find about 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, USCIS selected a sample size approximately 40 percent larger than the minimum necessary in order to allow for non-matches (filing organizations that could not be found in any of the four databases). Therefore, USCIS conducted searches on 534 randomly selected entities from the population of 84,490 unique entities for Form I–129.

The 534 searches for Form I–129 resulted in 404 instances where the name of the filing organization was successfully matched in the databases and 130 instances where the name of the filing organization was not found in the databases. Based on previous experience conducting regulatory flexibility analyses, USCIS assumes filing organizations not found in the online database are likely to be small entities. Thus, in order not to underestimate the number of small

entities affected by this rule, USCIS makes the conservative assumption to consider all of the non-matched entities as small entities for the purpose of this analysis. Among the 404 matches for Form I–129, 287 were determined to be small entities based on their reported revenue or employee count and their North American Industry Classification System (NAICS) code. Combining non-matches (130), matches missing data (27), and small entity matches (287), enables us to classify 444 of the 534 entities as small for Form I–129.

With an aggregated total of 444 out of a sample size of 534, DHS inferred that a majority, or 83.1 percent, of the entities filing Form I–129 petitions during the period were small entities. Furthermore, 284 of the 534 searched were small entities with the sales revenue data needed to estimate the economic impact of the proposed rule. Because these 284 small entities were a subset of the random sample of 534 searches, they were statistically significant in the context of this research. In order to calculate the economic impact of this rule, USCIS estimated the total costs associated with the proposed fee increase for each entity, divided by the sales revenue of that entity.[78] Based on the proposed fee increase of $135 for Form I–129, this would amount to an average impact of 0.08 percent on all 284 small entities with reported revenue data.

In terms of range, among the 284 small entities with reported revenue data, all experienced an economic impact of considerably less than 1.0 percent in the analysis, with the exception of one entity. Using the above methodology, the greatest economic impact imposed by this fee change totaled 2.55 percent on that one entity and the smallest totaled 0.0001 percent.

The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

b. Immigrant Petition for an Alien Worker, Form I–140

USCIS proposes to increase the fee for the Immigrant Petition for an Alien Worker, Form I–140, from $580 to $700, a $120 (21 percent) increase. Using a 12-month period of data on filings of Form I–140 petitions from September 1, 2014 to August 31, 2015, USCIS collected internal data similar to that of Form I–129. There were 101,245 Form I–140 petitions, but only 23,284 unique entities that filed those petitions. Again, USCIS used the third party sources of

---

[78] Total Cost to Entity = (Number of Petitions × $135)/Entity Sales Revenue.

data mentioned previously to search for revenue and employee count information.

USCIS used the same methodology as with Form I–129 to conduct the small entity analysis based on a representative sample of the affected population. To achieve a 95 percent confidence level and a 5 percent confidence interval on a population of 23,284 unique entities for Form I–140, USCIS used the standard statistical formula to determine that a minimum sample size of 378 entities was necessary. Again, based on past experience, USCIS expected to find about 40 to 50 percent of the filing organizations in the online subscription and public databases. Accordingly, USCIS oversampled in order to allow for non-matches (filing organizations that could not be found in any of the four databases).

USCIS conducted searches on 514 randomly selected entities from the population of 23,284 unique entities for Form I–140. The 514 searches resulted in 430 instances where the name of the filing organization was successfully matched in the databases and 84 instances where the name of the filing organization was not found in the databases. Based on previous experience conducting regulatory flexibility analyses, USCIS assumes filing organizations not found in the online databases are likely to be small entities. In order not to underestimate the number of small entities affected by this rule, USCIS makes the conservative assumption to consider all of the non-matched entities as small entities for the purpose of this analysis. Among the 430 matches for Form I–140, 290 were determined to be small entities based on their reported revenue or employee count and their NAICS code. Combining non-matches (84), matches missing data (19), and small entity matches (290), enables us to classify 393 of 514 entities as small for Form I–140.

With an aggregated total of 393 out of a sample size of 514, USCIS inferred that a majority, or 76.5 percent, of the entities filing Form I–140 petitions during the period were small entities. Furthermore, 287 of the 514 searched were small entities with the sales revenue data needed in order to estimate the economic impact of the proposed rule. Because these 287 small entities were a subset of the random sample of 514 searches, they were statistically significant in the context of this research. Similar to Form I–129, DHS estimated the total costs associated with the proposed fee increase for each entity, divided by the sales revenue of that entity in order to calculate the economic impact of this rule.

Among the 287 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent in the analysis. Using the above methodology, the greatest economic impact imposed by this fee change totaled 0.68 percent and the smallest totaled 0.000002 percent. The average impact on all 287 small entities with revenue data was 0.04 percent.

The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

Additionally, USCIS analyzed any cumulative impacts to Form I–129 and Form I–140, as well the individual analyses. USCIS wanted to determine if there were cumulative impacts when the forms were analyzed together. USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN. Only 3 entities had EINs that overlapped in both samples. Of these 3 entities, 2 of them were small entities and 1 was not a small entity. Only 1 entity submitted multiple Form I–129 petitions, while all 3 entities submitted multiple Form I–140 petitions. Due to little overlap in entities in the samples and the relatively minor impacts on revenue of fee increases of Forms I–129 and I–140, USCIS does not expect the combined impact of these two forms to be an economically significant burden on a substantial number of small entities.

c. Application for Civil Surgeon Designation, Form I–910

USCIS proposes to increase the fee for the Application for Civil Surgeon Designations, Form I–910, from $615 to $785, a $170 (28 percent) increase. Using a 12-month period of August 1, 2014 to July 31, 2015, USCIS collected internal data on the applicants. There were 719 Form I–910 applications, but only 602 unique entities that filed such applications. Again, USCIS used third party sources of data mentioned previously to search for revenue and employee count information.

Using the same methodology as with Form I–129 and Form I–140, USCIS conducted the small entity analysis based on a representative sample, with a 95 percent confidence level and a 5 percent confidence interval, of the population of 602 unique entities for Form I–910. USCIS determined that a minimum sample size of 235 entities was necessary. USCIS oversampled and conducted searches on 329 randomly selected entities for Form I–910.

The 329 searches for Form I–910 resulted in 252 instances where the name of the filing organization was successfully matched in the databases

and 77 instances where the name of the filing organization was not found in the databases. USCIS assumed again that filing organizations not found in the online databases are likely to be small entities, so USCIS considered all of the non-matched entities as small entities for the purpose of this analysis. Among the 252 matches for Form I–910, 240 were determined to be small entities based on their reported revenue or employee count and their NAICS code. Combining non-matches (77), matches missing data (5), and small entity matches (240), USCIS classified 322 of 329 entities as small for Form I–910.

With an aggregated total of 322 out of a sample size of 329, USCIS inferred that a majority, or 97.9 percent, of the entities filing Form I–910 applications were small entities. Furthermore, 238 of the 329 entities searched were small entities with the sales revenue data needed in order to estimate the economic impact of the proposed rule. Because these 238 small entities were a subset of the random sample of 329 searches, they were statistically significant in the context of this research.

Similar to Form I–129 and Form I–140, USCIS estimated the total costs associated with the proposed fee increase for each entity. Among the 238 small entities with reported revenue data, all experienced an economic impact considerably less than 1.0 percent in the analysis. The greatest economic impact imposed by this fee change totaled 0.61 percent and the smallest totaled 0.00002 percent. The average impact on all 238 small entities with revenue data was 0.09 percent.

The evidence suggests that the additional fee imposed by this rule does not represent a significant economic impact on these entities.

d. Regional Center Designation Under the Immigrant Investor Program, Form I–924 and I–924A

Congress created the EB–5 Program in 1990 under section 203(b)(5) of the INA to stimulate the U.S. economy through job creation and capital investment by foreign investors. Foreign investors have the opportunity to obtain lawful permanent residence in the United States for themselves, their spouses, and their minor unmarried children through a certain level of capital investment and associated job creation or preservation. There are two distinct EB–5 pathways for a foreign investor to gain lawful permanent residence: the Basic Program and the Regional Center Program. Both options require a capital investment from the foreign investor in a new commercial enterprise located within

the United States. The capital investment amount is generally set at $1,000,000, but may be reduced to $500,000 if the investment is made in a "Targeted Employment Area."

A regional center is an economic entity, public or private, that promotes economic growth, regional productivity, job creation, and increased domestic capital investment. Regional centers pool funds into development loans or equity for commercial space and real estate development projects. As of January 4, 2016, there were 790 USCIS-approved regional centers.[79] Entities seeking designation as regional centers file Form I–924 along with supporting materials. Approved regional centers are currently required to file the Supplement to Form I–924, Form I–924A, annually to demonstrate continued eligibility for regional center designation. DHS is proposing to change the name of the Form I–924A annual filing to "Annual Certification of Regional Center".

DHS proposes to increase the fee for the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924, from $6,230 to $17,795, an $11,565 (186 percent) increase. Additionally, DHS proposes to introduce a filing fee of $3,035 for Form I–924A. In proposing to establish this fee, DHS would also clarify the related regulations that provide for the annual regional center review related to Form I–924A. Currently, there is no procedure for regional centers seeking to withdraw their designation and discontinue their participation in the program. Formal termination is currently processed by USCIS issuing a Notice of Intent to Terminate and a subsequent termination notice. The proposed withdrawal procedure would allow a regional center to proactively request withdrawal without the need for the more formal notices sent out by USCIS. This proposed procedure would reduce administrative costs and time for the Department, while timely clarifying status to the requesting regional center. Over a 13-month period of August 1, 2014 through August 31, 2015, USCIS received a total of 412 Form I–924 applications.[80] These applications include the request for newly designated regional centers, as well as requests for continued designation for existing regional centers.

DHS was not able to determine the numbers of regional centers that would be considered small entities. Regional centers are difficult to assess because there is a lack of official data on employment, income, and industry classification for these entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above market return differentials. While USCIS attempted to treat the regional centers similar to the other entities in this analysis, we were not able to identify most of the entities in any of the online databases. Furthermore, while regional centers are an integral component of the EB–5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either $1 million or $500,000 per investor) that the regional center invests into a new commercial enterprise. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA.

Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue through the administrative fees charged to investors. Searching through several public Web sites, DHS gathers that administrative fees charged to investors could range between $30,000 and $100,000 per investor.[81] DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this rule could reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers that have revenues equal to or less than

$303,500 per year[82] (some of which we assume would be derived from administrative fees charged to individual investors) could experience a significant economic impact if we assume a fee increase that represents 1% of annual revenue is a "significant" economic burden under the RFA. DHS also assumes newly designated regional centers that have revenues equal to or less than $1,779,500 per year[83] could also experience a significant impact. DHS was able to obtain some sample data on 440 regional centers operating 5,886 projects. These 5,886 projects had a total of 54,506 investors, averaging 124 investors per regional center.[84] Assuming an average of 124 investors is a representative proxy of the regional centers, and that $30,000 is the minimum administrative fee charged by regional centers, then such fees would represent approximately $3,720,000 in revenue. In that case, the proposed filing fee increase for Form I–924 and the creation of a new fee for Form I–924A would not cause a significant economic impact to these entities. DHS requests information from the public on data sources on the average revenues collected by regional centers in the form of administrative fees and the extent to which regional centers may pass along the fee increases to the individual investors.

4. A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirement and the Types of Professional Skills Necessary for Preparation of the Report or Record

The proposed rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Forms I–129, I–140, I–910, or I–924 other than the fee adjustments. The proposed rule does not require any new professional skills for reporting.

5. An Identification, to the Extent Practicable, of All Relevant Federal Rules That May Duplicate, Overlap, or Conflict With the Proposed Rule

DHS is unaware of any duplicative, overlapping, or conflicting federal rules, but invites any comment and information regarding any such rules.

---

[79] USCIS Immigrant Investor Regional Centers: *http://www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/immigrant-investor-regional-centers#table*.

[80] Supplemental Form I–924A (Supplement to Form I–924) is captured in this dataset.

[81] Yen, Christine et al., "A Report on Source of Funds: Perils of the Administrative Fee." EB5 Investors Magazine (Aug. 20, 2015), available at: *http://www.eb5investors.com/magazine/article/A-Report-on-Source-of-Funds*. *See also* Green, Merritt. "The Costs of an EB-5 Regional Center Project Investment." (June 27, 2014), available at: *http://www.generalcounsellaw.com/the-cost-of-an-eb-5-regional-center-project-investment/*.

[82] Calculation: 1 percent of $303,500 = $3,035 (the new proposed fee for Form I–924A).

[83] Calculation: 1 percent of $1,779,500 = $17,995 (the new proposed fee for Form I–924).

[84] Department of Homeland Security, USCIS, Immigrant Investor Program Office.

6. Description of Any Significant Alternatives to the Proposed Rule That Accomplish the Stated Objectives of Applicable Statutes and That Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities Including Alternatives Considered Such as:

(1) Establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) Clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) Use of performance rather than design standards; and

(4) Any exemption from coverage of the rule, or any part thereof, for such small entities.

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to those eligible for fee waivers and exemptions. DHS funds the costs of providing services without charge by using a portion of the filing fees that are collected for other immigration benefits. Without an increase in fees, USCIS will be unable to maintain the level of service for immigration and naturalization benefits as it now provides. DHS considered the alternative of maintaining fees at the current level but with reduced services and increased processing times, but has decided that this would not be in the interest of applicants and petitioners. While most immigration benefit fees are paid by individuals, as described above, some also apply to small entities. USCIS seeks to minimize the impact on all parties, but in particular small entities. Another alternative would be to maintain fees at their current level for small entities. This alternative would avoid additional fee-burdens on small entities; however, small entities would experience negative effects due to the service reductions that would result in the absence of the fee adjustments proposed in this rule.

Without the fee adjustments proposed in this rule, significant operational changes would be necessary. Given current filing volume and other economic considerations, USCIS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as federal and contract staff, infrastructure spending on information technology and facilities, and training. Depending on the actual level of

workload received, these operational changes would result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service.

7. DHS Seeks Public Comment on the Following Questions

• Please provide comment on the numbers of small entities that may be affected by this rulemaking.

• Please provide comment on any or all of the provisions in the proposed rule with regard to the economic impact of this rule, paying specific attention to the effect of the rule on small entities in light of the above analysis, as well as the full analysis on regulations.gov.

• Please provide comment on any significant alternatives DHS should consider instead of the changes proposed by this rule.

• Please describe ways in which the rule could be modified to reduce burdens for small entities consistent with the INA and the CFO Act of 1990 requirements.

• Please identify all relevant federal, state or local rules that may duplicate, overlap or conflict with the proposed rule.

*B. Unfunded Mandates Reform Act*

The Unfunded Mandates Reform Act of 1995 (UMRA) requires certain actions to be taken before an agency promulgates any proposed or final rule "that is likely to result in promulgation of any rule that includes any Federal mandate that may result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year.[85] While this rule may result in the expenditure of more than $100 million by the private sector annually, the rulemaking is not a "Federal mandate" as defined for UMRA purposes,[86] as the payment of immigration benefit fees by individuals or other private sector entities is, to the extent it could be termed an enforceable duty, one that arises from participation in a voluntary Federal program, applying for immigration status in the United States.[87] Therefore, no actions were deemed necessary under the provisions of the UMRA.

*C. Small Business Regulatory Enforcement Fairness Act*

This rulemaking is a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rulemaking will result in an annual effect on the economy of more than $100,000,000 in order to generate the revenue necessary to fully fund the increased cost associated with the processing of immigration benefit applications and petitions and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants at no charge; and the full cost of providing similar benefits to other immigrants, as specified in the proposed regulation, at no charge. The increased costs would be recovered through the fees charged for various immigration benefit requests.

*D. Congressional Review Act*

The Congressional Review Act (5 U.S.C. 801 *et seq.*) requires rules to be submitted to Congress before taking effect. If implemented as proposed, we will submit to Congress and the Comptroller General of the United States a report regarding the issuance of the final rule prior to its effective date, as required by 5 U.S.C. 801.

*E. Executive Orders 12866 and 13563 (Regulatory Planning and Review)*

1. Background and Purpose of the Proposed Rule

Executive Orders 12866 and 13563 direct agencies to assess the costs and benefits of available alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This proposed rule has been designated an "economically significant regulatory action" under section 3(f)(1) of Executive Order 12866. Accordingly, OMB has reviewed the proposed rule.

USCIS projects an annual budget of $3.038 billion in FY 2016/FY 2017, a $767 million (34 percent) increase over the FY 2010/FY2011 Fee Review-adjusted annual budget of $2.271 billion. The implementation of this proposed rule would provide USCIS with an average of $546 million in FY 2016 and FY 2017 annual fee revenue above the FY 2010/FY 2011 levels, based on a projected annual fee-paying volume of 4.9 million immigrant benefit requests and 2.6 million requests for

---

[85] *See* 2 U.S.C. 1532(a).
[86] *See* 2 U.S.C. 658(6).
[87] *See* 2 U.S.C. 658(7)(A)(ii).

biometric services. USCIS would use this increase in revenue under subsections 286(m) and (n) of the INA, 8 U.S.C. 1356(m) and (n), to fund the full costs of processing immigration benefit requests and associated support benefits; the full cost of providing similar benefits to asylum and refugee applicants at no charge; and the full cost of providing similar benefits to others at no charge.

If USCIS does not adjust the current fees to recover the full costs of processing immigration benefit requests, it would be forced to make reductions in services provided to applicants and petitioners. These would reverse the considerable progress USCIS has made over the last several years to reduce the backlogs of immigration benefit filings, to increase the integrity of the immigration benefit system, and to

protect national security and public safety. The proposed revenue increase is based on USCIS costs and volume projections available at the time the rule was drafted. USCIS has placed in the rulemaking docket a detailed analysis that explains the basis for the annual fee increase. USCIS has included an accounting statement detailing the annualized costs of the proposed rule in Table 10 below.

TABLE 10—ACCOUNTING STATEMENT, FY 2016 THROUGH FY 2017

| Category | Primary estimate | Maximum estimate |
|---|---|---|
| Benefits: | | |
| Un-quantified Benefits ................................. | Maintain current level of service with respect to processing times, customer service, and efficiency levels. | |
| Transfers: | | |
| Annualized Monetized Transfers at 3% ....... | $546,429,650 | $546,429,650. |
| Annualized Monetized Transfers at 7% ....... | $546,429,650 | $546,429,650. |

| Category | Effects | Source |
|---|---|---|
| Effects on State, local, and/or tribal governments. | For those state, local, and/or tribal governments that submit petitions for nonimmigrant and immigrant workers, they would face an increase in filing fees. | NPRM, EO 12866/13563 Analysis. |
| Effects on small businesses ................................. | For those small businesses that submit petitions for nonimmigrant and immigrant workers, they would face an increase in filing fees. | NPRM, EO 12866/13563 Analysis, Small Entity Analysis. |

**2. Proposed Amendments and Impacts of Proposed Regulatory Change**

This proposed rule is intended to adjust current fees to ensure that USCIS is able to recover the full costs of the immigration services it provides and maintain adequate service. In addition to increasing fees, USCIS proposes the following amendments: provisions that USCIS will reject an immigration benefit request paid with a dishonored check; provisions that USCIS will reject an application that does not include the required biometric services fee; the institution of a reduced fee for the Application for Naturalization, Form N–400; and provisions that fee refunds will be provided at USCIS discretion.

**a. Dishonored Payments**

Earlier in this preamble USCIS explains its proposal to change how it will treat a benefit request accompanied by fee payment (in the form of check or other financial instrument) that is subsequently returned as not payable.[88] Current regulations provide that when a

check or other financial instrument used to pay a filing fee is subsequently returned as not payable, the remitter will be notified and requested to pay the filing fee and associated service charge within 14 calendar days, without extension.[89] If the benefit request is pending and these charges are not paid within 14 days, the benefit request will be rejected as improperly filed. In addition, a receipt issued by a DHS officer for any remittance will not be binding upon DHS if the remittance is found uncollectable, and legal and statutory deadlines will not be deemed to have been met if payment is not made within 10 business days after notification by DHS of the dishonored check.[90] In accordance with these provisions, when a payment is returned as not payable, USCIS places the immigration benefit request on hold, and suspends adjudication. If the check was dishonored or payment fails, USCIS assesses a $30 penalty and pursues the unpaid fee and penalty using administrative debt collection procedures.[91] If payment is made within the allotted time, USCIS resumes processing the application or benefit request. If a payment is not corrected by

the applicant, USCIS rejects the filing for nonpayment.[92]

DHS proposes to eliminate provisions requiring that applications or petitions be held while deficient payments are corrected. Under the proposed amendment, if a check or other financial instrument used to pay a filing fee is subsequently returned as not payable, the benefit request will be rejected as improperly filed.[93] If the benefit request was approved and finds payment to be deficient at a later time, the remitter will be requested to pay the filing fee plus the previously established $30 service charge within 14 calendar days, without extension.[94] If these charges are not paid, the approval will be automatically rejected for nonpayment.[95]

In order to get an estimate of the numbers of applicants who make a payment with a dishonored check or failed payment, USCIS analyzed the count of all returned and subsequently corrected payments of a credit card or check from fiscal years 2012 to 2015.[96] In FY 2015, 10,818 payments were returned (Table 11). Of those 10,818

---

[88] USCIS proposes to immediately reject and not accept for processing any applications and petitions submitted with invalid payments, e.g. an unsigned check or invalid bank account on an electronic payment. The subsequent identification as not payable would occur when an attempt is made to process the payment through a bank, but the bank does not honor the payment, e.g. returned for insufficient funds.

[89] See 8 CFR 103.2(a)(7)(ii).
[90] See 8 CFR 103.2(a)(7)(ii), 103.7(a)(2).
[91] See 8 CFR 103.7(a)(2).

[92] See 8 CFR 103.2(a)(7)(ii).
[93] See proposed 8 CFR 103.2(a)(7)(ii).
[94] See proposed 8 CFR 103.7(a)(2).
[95] Id.
[96] Corrected payments include any payment collected by USCIS after the return of an initial payment.

returned payments, 6,399 (59.2 percent) were later corrected. The average annual number of returned payments from FY 2012 to FY 2015 was 9,781 with an annual average of 6,478 payments (66.2 percent) later corrected. Assuming all included a current service fee of $30, the resulting total annual cost to applicants for returned payments is $293,430.[97]

TABLE 11—COUNT OF RETURNED AND CORRECTED CREDIT CARD/CHECK PAYMENTS, FY 2012–2015

| Year | Total returned payments | Total corrected payments | Percentage of corrected payments |
|---|---|---|---|
| 2015 | 10,818 | 6,399 | 59.2 |
| 2014 | 9,200 | 6,467 | 70.3 |
| 2013 | 9,785 | 6,496 | 66.4 |
| 2012 | 9,322 | 6,550 | 70.3 |
| Average | 9,781 | 6,478 | 66.2 |

Source: Department of Homeland Security, Immigration and Customs Enforcement, Burlington Finance Center.

The proposed provisions would require USCIS to reject these returned payments and associated benefit requests for nonpayment. The existing $30 service charge would continue to be imposed for benefit requests rejected when a financial institution does not honor a payment. USCIS anticipates that the prospect of rejection would encourage applicants to provide the correct filing fees at the time they submit an application or petition. However, USCIS recognizes that there would continue to be applicants who file an application with an incorrect fee and would be required to pay the $30 service fee. While USCIS knows currently this additional service fee averages to $293,430 for all applicants and anticipates it would be lower in the future, we do not have enough information at this time to estimate the degree of this decrease.

For applicants, filing fees are a required and fundamental aspect of the benefit being requested. By providing a 14-day window to correct for dishonored checks, the regulation currently permits a benefit request paid with a dishonored payment instrument to secure a place in line ahead of a benefit request that was accompanied by a proper payment, for what may be a time sensitive or numerically limited program. In all cases, rejected filings may be refiled immediately with the proper payment but there are some slight differences depending upon if the submission is paper-based or electronically filed. The USCIS online filing system will permit the rejected applications to remain accessible for the applicant to print and view. The original rejected electronic submission would not be available for resubmission with a new payment; however, the rejected submission may be used as a reference when a new application is being completed. In cases where the rejected submission is paper-based, the entire application/petition/request and supporting documentation are returned and can generally be refiled with the proper payment instrument.

The proposed amendments will provide several benefits to USCIS. First, USCIS currently clears payment checks via the ACH by converting checks to electronic payments. Because USCIS converts checks into ACH payments, there is currently little or no delay before USCIS knows whether the check is valueless. Thus, unlike in the past, USCIS would not begin adjudication until the check has cleared. USCIS benefits by streamlining the process for adjudicators to only begin work on those applications with properly filed fees, eliminating the need to hold applications. USCIS anticipates this streamlined process would help adjudicators to more efficiently process cases without the need to wait on payments. This change in process also provides parity to those applicants who file an application with the correct fees. In addition, the proposed amendments would lower USCIS administrative costs for holding and tracking applications and payments. The holding and tracking of applications requires physical storage space that would no longer be required with the proposed revisions. USCIS currently incurs administrative costs through tracking payments in postage costs and adjudicator time among other costs. USCIS recognizes the unique situation that these proposed changes may have on H–1B lottery regulations, which allow numbers available to petitions in the order in which the petitions are filed.[98] The H–1B lottery regulations allow the final receipt date to be any of the first 5 business days on which petitions subject to the applicable numerical limit may be received. USCIS then will randomly apply all of the numbers among the petitions received on any of those 5 business days and conduct a random selection among the petitions subject to the exemption under section 214(g)(5)(C) of the Act first. Currently, petitions are still eligible for the H–1B lottery, despite having dishonored checks or failed payments as long as the payments are corrected within the provided 14-day or 10-day timeframe.[99] These proposed changes, however, would remove these petitions from the H–1B lottery as the dishonored checks or failed payments would result in a rejected petition as improperly filed. USCIS does not have data at this time to estimate the impact on how many petitions may be affected by these proposed changes. USCIS is also unable to monetize the cost to the applicant of having a petition removed from the lottery. DHS requests comments on this impact.

b. Failure To Pay the Biometrics Services Fees

DHS also proposes amendments to eliminate provisions governing non-payment of the biometric service fee. Currently, if a benefit request is received by DHS without the correct biometric service fee, USCIS will notify the applicant of the deficiency and take no further action on the benefit request until payment is received.[100] Failure to submit the correct biometric service fee within the time allotted in the notice will result in denial of the benefit request. To comply with these provisions, if the biometrics services fee was required and is missing, USCIS places an application or petition on hold, and suspends adjudication. If payment is made within the allotted

[97] Calculation: 9,781 (average number of returned payments) * $30 (current service fee charge) = $293,430 (total cost for returned payments).

[98] See 8 CFR 214.2(h)(8)(ii)(B).
[99] See 8 CFR 103.2(a)(7)(ii).
[100] See 8 CFR 103.17(b)(1).

time, USCIS resumes processing the benefit request. If the biometric fee is not paid, the benefit request is denied as abandoned.

USCIS proposes to eliminate the provisions requiring that applications be held while deficient payments are corrected. USCIS is proposing that if a benefit request is received by USCIS without the correct biometric service fee, as specified in the form instructions, USCIS would reject the benefit request.

In order to analyze the number of people who do not pay the biometric fee, USCIS gathered 6 months of data from USCIS lockbox facilities.[101] The data covers from June 1, 2015 to November 30, 2015. During this 6-month period, USCIS lockbox facilities accepted 1,196,134 applications. Of these, 4,963 (.41 percent) of applicants were issued a notice alerting the applicant that their biometric fees were missing. Assuming this 6-month trend is typical of the number of deficient biometric fee notices, the proposed new provision will affect less than 1 percent of all applications received at the USCIS lockbox facilities. As previously mentioned, rejected filings may be refiled immediately. While applicants do not incur monetary costs associated with the rejection of an application, reapplying for benefits with the correct fees requires time. Again, USCIS anticipates this new provision would encourage applicants to file with the appropriate fees.

This change would streamline USCIS' process for handling applications and petitions when biometrics fees are not submitted when required. USCIS costs are reduced by eliminating the administrative handling costs associated with holding cases while biometric fees are collected.

c. Reduced Fee for Application for Naturalization

The current fee for the Application for Naturalization, Form N–400, is $595. In most cases, applicants must also pay an $85 biometrics fee, so the total cost for most applicants is $680. If an applicant cannot pay the fee, he or she can file a Request for Fee Waiver, Form I–912, along with their Form N–400. USCIS considers anyone with a household income below 150 percent of the Federal Poverty Guidelines to be eligible for a fee waiver. If USCIS approves an applicant's fee waiver, both the $595 Form N–400 fee and the $85 biometrics fee, where applicable, are waived.

DHS proposes to increase the Form N–400 fee from $595 to $640, a $45 (8 percent) increase. The biometrics fee would remain unchanged at $85. Therefore, if the proposed fees are implemented, the new costs of Form N–400 plus the biometric fee would total $725. DHS also proposes an additional fee option for those non-military naturalization applicants with family incomes greater than 150 percent and not more than 200 percent of the Federal Poverty Guidelines. Specifically, DHS proposes that such applicants would receive a 50 percent discount and only be require to pay a filing fee of $320 for the N–400, plus an additional $85 for biometrics (for a total of $405). DHS proposes this reduced fee option to limit any potential economic disincentives that some eligible naturalization applicants may face when deciding whether or not to seek citizenship. The lower fee would help ensure that those who have worked hard to become eligible for naturalization are not limited by their economic means. In order to qualify for this fee, the eligible applicant will have to submit a newly proposed Request for Reduced Fee, Form I–942, along with their Form N–400. Form I–942 will require the names of everyone in the household and documentation of the household income to determine if the applicant's household income is greater than 150 and not more than 200 percent of the Federal Poverty Guidelines.

As described earlier in the preamble, USCIS estimates that approximately 11 percent of all Form N–400 applicants, excluding military applicants, could qualify for the reduced fee. Given the non-military Form N–400 volume projection estimate of 821,500 annually, over the biennial period, USCIS expects that 90,365 filers will be included in the population eligible for the fee reduction.[102] While these 90,365 filers represent only the current number of applicants who would be eligible for the fee reduction, USCIS anticipates an increase in Form N–400 filings as a result of these proposed changes. USCIS anticipates that the reduced fee for applicants with qualifying incomes would remove economic barriers associated with the costs of associated fees and thus encourage more eligible applicants to file their Form N–400 applications. While USCIS anticipates an increase in Form N–400 filings due to this proposed fee reduction, we cannot predict how many more eligible applicants would file their Form N–400 applications as a result at this time.

USCIS has factored the estimated revenue loss from this product line into its fee model, so those costs are reallocated over other fee paying benefit requests. While the costs of the reduced fee are being reallocated to other fee-paying customers, DHS believes the benefits of providing a means to promote citizenship among those with limited economic means outweighs the cost reallocation impacts.

As previously mentioned, an eligible applicant would have to submit a Form I–942 along with their N–400 application to qualify for this reduced fee. While USCIS is not imposing an additional fee for Form I–942, we have estimated the opportunity cost of time to applicants to complete the form. The total opportunity cost of time for applicants would be $717,724, if all 90,365 eligible applicants apply for the reduced fee.[103] The federal minimum wage rate[104] of $7.25 was used as the hourly wage rate as the anticipated applicants are asserting they cannot afford to pay the full USCIS fee. The anticipated applicants are assumed to be from occupations having a less than average income. The Bureau of Labor Statistics (BLS) reports the average employer costs for employee compensation for all civilian workers in major occupational groups and industries. Using the most recent BLS report, DHS calculated a benefits-to-wage multiplier of 1.46 to estimate the full opportunity costs to applicants, including employee wages and salaries and the full costs of benefits such as paid leave, insurance, and retirement.[105] In order to anticipate the full opportunity cost of time to applicants, we multiplied the federal minimum wage rate by 1.46 to account for the full cost of employee benefits for a total of $10.59. The time burden estimate was developed by USCIS with an average of 45 minutes (or .75 of an hour) to complete Form I–942. Therefore, the opportunity cost of time per petition is

---

[101] While USCIS prefers to base assumptions on a longer time period (ideally 5 years), 6 months was the longest time period for which this data was available.

[102] Calculation: 821,500 * 11 percent.

[103] Total Opportunity Costs of Time to Applicants = Expected Filers (90,365) * (Full Cost of Employee Benefits ($10.59) * Time Burden (.75 hr.)).

[104] U.S. Department of Labor, Wage and Hour Division. The minimum wage in effect as of January 20, 2016. Available at *http://www.dol.gov/general/topic/wages/minimumwage*.

[105] The benefits-to-wage multiplier is calculated as follows: (All Workers Total Employee Compensation per hour)/(Wages and Salaries per hour). See Economic News Release, U.S. Department of Labor, Bureau of Labor Statistics, Table 1. Employer Costs per hour worked for employee compensation and costs as a percent of total compensation: Civilian workers, by major occupational and industry group (Sept. 2015),

available at *http://www.bls.gov/news.release/pdf/ecec.pdf*.

$7.94.[106] This additional burden is offset by the benefits received through a reduced fee.

### d. Refunds

DHS is also proposing to amend regulations for fee refunds. In general, and except for a premium processing fee under 8 CFR 103.7(e)(2)(i), USCIS does not refund a fee regardless of the decision on the immigration benefit request. USCIS makes very rare exceptions when USCIS determines that an administrative error occurred resulting in the inadvertent collection of a fee. USCIS errors may include:

• Unnecessary filings. Cases in which USCIS (or DOS in the case of an immigration benefit request filed overseas) erroneously requests that an individual file an unnecessary form along with the associated fee; and

• Accidental Payments. Cases in which an individual pays a required fee more than once or otherwise pays a fee in excess of the amount due and USCIS (or the DOS in the case of an immigration benefit request filed overseas) erroneously accepts the erroneous fee.

DHS is proposing to codify into regulation the continuance of providing these refunds under circumstances where refunds are necessary due to obvious USCIS error. Under this proposal, individuals would continue to request a refund by the current process. The current process requires that an individual call the customer service line or submit a written request for a refund to the office having jurisdiction over the relevant immigration benefit request.

Any USCIS refunds provided are generally due to obvious USCIS errors resulting from system behavior issues or human error. The anticipation of future electronic filings also spurs the need for this provision. Currently, DHS provides fee refunds and amounts to applicants as shown in Table 12. Over the past 3 fiscal years, an annual average of 5,363 refunds were provided by USCIS, resulting in an average of $2.1 million refunded. This is approximately $396 per refund. These numbers and amounts of refunds do not include premium processing refunds regulated under 8 CFR 103.7(e)(2)(i). In the context of the number of fees collected by USCIS, this average amount of refunds is still less than 1 percent of the total fees collected.

TABLE 12—AMOUNT AND NUMBER OF FEE REFUNDS PROVIDED BY USCIS

| Fiscal year | Amount refunded | Number of refunds |
|---|---|---|
| 2013 .................. | $2,674,290 | 7,405 |
| 2014 .................. | 1,805,006 | 4,198 |
| 2015 .................. | 1,890,638 | 4,485 |
| Average .......... | 2,123,311 | 5,363 |

Source: Department of Homeland Security, U.S. Immigration and Customs Enforcement, Burlington Finance Center.

These proposed amendments would benefit applicants that might accidently submit payments twice. USCIS anticipates this to be a bigger issue as more forms and associated fees begin to be collected through electronic means. Applicants would recoup any fees that were submitted due to these electronic systems issues. USCIS would benefit by having clear regulatory authority to justify the few cases in which refunds are provided.

There may be some administrative costs associated with the issuance of refunds to USCIS, as well as some time burden costs to USCIS adjudicators who process these refund requests. It may be possible to see a potential increase initially in requests for refunds due to the visibility of this rule; however, USCIS does not anticipate a sustained increase as the parameters of the refunds issued are not proposed to be changed from current policy. There may also be a potential increase in the time burden costs for USCIS adjudicators due to potential initial increases in refund requests. USCIS does not have cost estimates at this time indicating the number of hours required to process and issue these refunds. There may also be some opportunity costs of time to applicants who submit a refund request; however, USCIS anticipates this cost is offset by the benefit gained in receiving a refund.

### F. Executive Order 13132 (Federalism)

This proposed rule will not have substantial direct effects on the states, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This proposed rule meets the applicable standards set forth in

sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163 (1995) (PRA), DHS is required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. USCIS is revising two information collections, adding a new information collection in association with this rulemaking action, and requesting public comments on the proposed information collection changes as follows: Application for Naturalization, Form N–400, to collect information necessary to document the applicant's eligibility for the reduced fee proposed in this rule at 8 CFR 103.7(b)(1)(i)(AAA)(*1*); Annual Certification of Regional Center, Form I–924A, and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–924, to add the instructions necessary to require the annual fee; and, Request for Reduced Fee, Form I–942, to document the applicant's eligibility for the reduced fee. DHS is requesting comments on the information collection changes included in this rulemaking. Comments on this revised information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, such as permitting electronic submission of responses.

### Overview of Information Collection— Form N–400

a. *Type of information collection:* Revision of a Currently Approved Collection.

b. *Abstract:* USCIS uses the information gathered on Form N–400 to make a determination as to a respondent's eligibility to naturalize and become a U.S. citizen. USCIS is

---

[106] Calculation: $10.59 hourly wage rate * .75 hour.

proposing changes to the form instructions to notify the public of the information needed to document an applicant's eligibility for the proposed reduced fee.

c. *Title of Form/Collection:* Application for Naturalization.

d. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form N–400; USCIS.

e. *Affected public who will be asked or required to respond:* Individuals or households.

f. *An estimate of the total number of respondents:* 830,673 respondents.

g. *Hours per response:* The estimated hour burden per response for the paper filing of the N–400 is 9.17 hours per response. The estimated hour burden per response for the electronic filing of the N–400 is 3.5 hours per response. The estimated hour burden per response for the biometric processing associated with the N–400 is 1.17 hours per response.

h. *Total Annual Reporting Burden:* 8,118,167 hours.

**Overview of Information Collection— Forms I–924 and I–924A**

a. *Type of information collection:* Revision to a currently approved information collection.

b. *Abstract:* This collection is used to demonstrate a regional center's continued eligibility for regional center designation.

c. *Title of Form/Collection:* Application for Regional Center Designation Under the Immigrant Investor Program/Annual Certification of Regional Center.

d. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–924 and Form I–924A; USCIS.

e. *Affected public who will be asked or required to respond:* Businesses or other for-profit Entities; or State, local or Tribal Government

f. *An estimate of the total number of respondents:*
• Form I–924—400 respondents.
• Form I–924A—882 respondents.

g. *Hours per response:* For Form I– 924, 51 hours; and Form I–924A, 14 hours.

h. *Total Annual Reporting Burden:* 32,748 hours.

**Overview of Information Collection— Form I–942**

a. *Type of information collection:* New information collection.

b. *Abstract:* This collection is used for an applicant to request a reduced fee and document that annual household income is between 150% and 200% of the FPG.

c. *Title of Form/Collection:* Request for Reduced Fee.

d. *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–942, USCIS.

e. *Affected public who will be asked or required to respond:* Individuals.

f. *An estimate of the total number of respondents:* 90,365 respondents.

g. *Hours per response:* .75 hours.

h. *Total Annual Reporting Burden:* 67,774 hours.

Comments concerning these collections and forms can be submitted to the Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2020. Please include the OMB control number in the comment letter.

Please also submit comments on the forms to OMB by:
• *Email: oira_submission@omb.eop.gov;*
• *Facsimile* at 202–395–7285, or;
• *Mail:* Desk Officer for USCIS, Office of Information and Regulatory Affairs, Office of Management and Budget, 725 17th St. NW., Washington, DC 20503

The changes to the proposed fees will require minor amendments to USCIS forms to reflect the new fees. The necessary changes to the annual cost burden and to the forms will be submitted to OMB when a final rule is submitted to OMB.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedures, Authority delegations (government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, and Surety bonds.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

Accordingly, DHS proposes to amend chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552(a); 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C.1 *et seq.*); E.O. 12356, 47 FR 14874, 15557; 3 CFR, 1982 Comp., p. 166; 8 CFR part 2 ; Pub. L. 112–54.

■ 2. Section 103.2 is amended by:
■ a. Revising paragraph (a)(1);
■ b. Revising paragraph (a)(7); and
■ c. Revising paragraph (b)(9).
The revisions read as follows:

**§ 103.2   Submission and adjudication of benefit requests.**

(a) * * *

(1) *Preparation and submission.* Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions regardless of a provision of 8 CFR chapter I to the contrary. The form's instructions are hereby incorporated into the regulations requiring its submission. Each form, benefit request, or other document must be filed with the fee(s) required by regulation. Filing fees generally are non-refundable and, except as otherwise provided in this chapter I, must be paid when the benefit request is filed.

\*     \*     \*     \*     \*

(7) *Benefit requests submitted.* (i) USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii) A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:
(A) Signed with valid signature;
(B) Executed;
(C) Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and
(D) Submitted with the correct fee(s). If a financial instrument used to pay a fee is returned as unpayable, the filing will be rejected and a charge will be imposed in accordance with 8 CFR 103.7(a)(2).

(iii) A rejection of a filing with USCIS may not be appealed.

(b) * * *

(9) *Appearance for interview or biometrics.* USCIS may require any applicant, petitioner, sponsor, beneficiary, or individual filing a benefit request, or any group or class of such persons submitting requests, to appear for an interview and/or biometrics collection. USCIS may require the payment of the biometrics services fee in 8 CFR 103.7(b)(1)(i)(C) or that the individual obtain a fee waiver. Such appearance and fee may also be required by law, regulation, form instructions, or **Federal Register** notice applicable to the request type. USCIS will notify the affected person of the date, time and location of any required appearance under this paragraph. Any person required to appear under this paragraph

may, prior to the scheduled date and time of the appearance, either:

(i) Appear before the scheduled date and time;

(ii) For good cause, request that the biometric services appointment be rescheduled; or

(iii) Withdraw the benefit request.

\* \* \* \* \*

■ 4. Section 103.7 is amended by revising paragraphs (a)(2) and (b)(1) to read as follows:

### § 103.7  Fees.

\* \* \* \* \*

(a) \* \* \*

(2) Remittances must be drawn on a bank or other institution located in the United States and be payable in United States currency. Remittances must be made payable in accordance with the guidance specific to the applicable U.S. Government office when submitting to a Department of Homeland Security office located outside of the United States. Remittances to the Board of Immigration Appeals must be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8. A charge of $30.00 will be imposed if a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn. If the remittance is found uncollectible the provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date.

(b) *Amounts of fees.* (1) *Established fees and charges.* (i) *USCIS fees.* A request for immigration benefits submitted to USCIS must include the required fee as established under this section. The fees established in this section are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed below. The term "form" as defined in 8 CFR part 1, may include a USCIS-approved electronic equivalent of such form as USCIS may provide on its official Web site at *http:// www.uscis.gov.*

(A) *Certification of true copies:* $2.00 per copy.

(B) *Attestation under seal:* $2.00 each.

(C) *Biometric services fee.* For capturing, storing, and using biometric information (Biometric Fee). A service fee of $85 will be charged to pay for background checks and have their biometric information captured, stored, and used for any individual who is required to submit biometric information for an application, petition, or other request for certain immigration and naturalization benefits (other than asylum or refugee status) or actions.

USCIS will not charge a biometric service fee when:

(1) An applicant under 8 CFR 204.3 submits to USCIS a written request for an extension of the approval period of an Application for Advance Processing of an Orphan Petition ("Application"), if the request is submitted before the approval period expires and the applicant has not yet filed a Petition to Classify Orphan as an Immediate Relative ("Petition") in connection with the approved Application. The applicant may submit only one extension request without having to pay an additional biometric service fee. If the extension of the approval expires before the applicant files an associated Petition, then the applicant must file either a new Application or a Petition, and pay a new filing fee and a new biometric service fee.

(2) The application or petition fee for the associated request has been waived under paragraph (c) of this section; or

(3) The associated benefit request is one of the following:

(i) Application for Posthumous Citizenship, Form N–644;

(ii) Refugee/Asylee Relative Petition, Form I–730;

(iii) Application for T Nonimmigrant Status, Form I–914;

(iv) Petition for U Nonimmigrant Status, Form I–918;

(v) Application for Naturalization, Form N–400, by an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service under paragraph (b)(1)(i)(WW) of this section;

(vi) Application to Register Permanent Residence or Adjust Status, Form I–485, from an asylee under paragraph (b)(1)(i)(U) of this section;

(vii) Application To Adjust Status under Section 245(i) of the Act, Supplement A to Form I–485, from an unmarried child less than 17 years of age, or when the applicant is the spouse, or the unmarried child less than 21 years of age of a legalized foreign national and who is qualified for and has applied for voluntary departure under the family unity program from an asylee under paragraph (b)(1)(i)(V) of this section; or

(viii) Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360, meeting the requirements of paragraphs (b)(1)(i)(T)(*1*), (*2*), (*3*) or (*4*) of this section.

(D) *USCIS Immigrant Fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $220.

(E) *Request for a search of indices to historical records to be used in*

*genealogical research,* Form G–1041: $65. The search request fee is not refundable.

(F) *Request for a copy of historical records to be used in genealogical research,* Form G–1041A: $65. USCIS will refund the records request fee only when it is unable to locate the file previously identified in response to the index search request.

(G) *Application to Replace Permanent Resident Card,* Form I–90. For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name: $455.

(H) *Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document,* Form I–102. For filing a petition for an application for Arrival/ Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $445.

(I) *Petition for a Nonimmigrant Worker,* Form I–129. For filing a petition for a nonimmigrant worker: $460.

(J) *Petition for Nonimmigrant Worker in CNMI,* Form I–129CW. For an employer to petition on behalf of one or more beneficiaries: $460 plus a supplemental CNMI education funding fee of $150 per beneficiary per year. The CNMI education funding fee cannot be waived.

(K) *Petition for Alien Fiancé(e),* Form I–129F. For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $535; there is no fee for a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a United States citizen on a Petition for Alien Relative, Form I–130.

(L) *Petition for Alien Relative,* Form I–130. For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act: $535.

(M) *Application for Travel Document,* Form I–131. For filing an application for travel document:

(1) $135 for a Refugee Travel Document for an individual age 16 or older.

(2) $105 for a Refugee Travel Document for a child under the age of 16.

(3) $575 for advance parole and any other travel document.

(4) No fee if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007.

(N) *Immigrant Petition for Alien Worker,* Form I–140. For filing a petition to classify preference status of an alien

on the basis of profession or occupation under section 204(a) of the Act: $700.

(O) *Application for Advance Permission to Return to Unrelinquished Domicile,* Form I–191. For filing an application for discretionary relief under section 212(c) of the Act: $930.

(P) *Application for Advance Permission to Enter as a Nonimmigrant,* Form I–192. For filing an application for discretionary relief under section 212(d)(3) of the Act, except in an emergency case or where the approval of the application is in the interest of the United States Government: $930.

(Q) *Application for Waiver for Passport and/or Visa,* Form I–193. For filing an application for waiver of passport and/or visa: $930.

(R) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal,* Form I–212. For filing an application for permission to reapply for an excluded, deported or removed alien, an alien who has fallen into distress, an alien who has been removed as an alien enemy, or an alien who has been removed at government expense instead of deportation: $930.

(S) *Notice of Appeal or Motion,* Form I–290B. For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction: $675. The fee will be the same for appeal of a denial of a benefit request with one or multiple beneficiaries. There is no fee for an appeal or motion associated with a denial of a petition for a special immigrant visa filed by or on behalf of an individual seeking special immigrant visa or status as an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(T) *Petition for Amerasian, Widow(er), or Special Immigrant,* Form I–360. For filing a petition for an Amerasian, Widow(er), or Special Immigrant: $435. The following requests are exempt from this fee:

(1) A petition seeking classification as an Amerasian;

(2) A self-petition for immigrant status as a battered or abused spouse, parent, or child of a U.S. citizen or lawful permanent resident; or

(3) A petition for special immigrant juvenile status; or

(4) A petition seeking special immigrant visa or status an Iraqi or Afghan national who was employed by or on behalf of the U.S. Government in Iraq or Afghanistan.

(U) *Application to Register Permanent Residence or Adjust Status,* Form I–485. For filing an application for permanent

resident status or creation of a record of lawful permanent residence:

(1) $1,140 for an applicant 14 years of age or older; or

(2) $750 for an applicant under the age of 14 years when:

(i) The application is submitted concurrently for adjudication with the Form I–485 of a parent; and

(ii) The applicant is seeking to adjust status as a derivative of his or her parent;

(3) There is no fee if an applicant is filing as a refugee under section 209(a) of the Act.

(V) *Application to Adjust Status under Section 245(i) of the Act,* Supplement A to Form I–485. Supplement to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act: $1,000. There is no fee when the applicant is an unmarried child less than 17 years of age, when the applicant is the spouse, or the unmarried child less than 21 years of age of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program.

(W) *Immigrant Petition by Alien Entrepreneur,* Form I–526. For filing a petition for an alien entrepreneur: $3,675.

(X) *Application To Extend/Change Nonimmigrant Status,* Form I–539. For filing an application to extend or change nonimmigrant status: $370.

(Y) *Petition to Classify Orphan as an Immediate Relative,* Form I–600. For filing a petition to classify an orphan as an immediate relative for issuance of an immigrant visa under section 204(a) of the Act. Only one fee is required when more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters: $775.

(Z) *Application for Advance Processing of Orphan Petition,* Form I–600A. For filing an application for advance processing of orphan petition. (When more than one petition is submitted by the same petitioner on behalf of orphans who are brothers or sisters, only one fee will be required.): $775. No fee is charged if Form I–600 has not yet been submitted in connection with an approved Form I–600A subject to the following conditions:

(1) The applicant requests an extension of the approval in writing and the request is received by USCIS before the expiration date of approval; and

(2) The applicant's home study is updated and USCIS determines that proper care will be provided to an adopted orphan.

(3) A no fee extension is limited to one occasion. If the Form I–600A approval extension expires before submission of an associated Form I–600, then a complete application and fee must be submitted for any subsequent application.

(AA) *Application for Waiver of Ground of Inadmissibility,* Form I–601. For filing an application for waiver of grounds of inadmissibility: $930.

(BB) *Application for Provisional Unlawful Presence Waiver,* Form I–601A. For filing an application for provisional unlawful presence waiver: $630.

(CC) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended),* Form I–612. For filing an application for waiver of the foreign-residence requirement under section 212(e) of the Act: $930.

(DD) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act,* Form I–687. For filing an application for status as a temporary resident under section 245A(a) of the Act: $1,130.

(EE) *Application for Waiver of Grounds of Inadmissibility under Sections 245A or 210 of the Immigration and Nationality Act,* Form I–690. For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $715.

(FF) *Notice of Appeal of Decision under Sections 245A or 210 of the Immigration and Nationality Act* (or a petition under section 210A of the Act), Form I–694. For appealing the denial of an application under sections 210 or 245A of the Act, or a petition under section 210A of the Act: $890.

(GG) *Application to Adjust Status from Temporary to Permanent Resident* (Under Section 245A of Pub. L. 99–603), Form I–698. For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,670. The adjustment date is the date of filing of the application for permanent residence or the applicant's eligibility date, whichever is later.

(HH) *Petition to Remove Conditions on Residence,* Form I–751. For filing a petition to remove the conditions on residence based on marriage: $595.

(II) *Application for Employment Authorization,* Form I–765. $410; no fee if filed in conjunction with a pending or concurrently filed Form I–485 with fee that was filed on or after July 30, 2007.

(JJ) *Petition to Classify Convention Adoptee as an Immediate Relative,* Form I–800.

(1) There is no fee for the first Form I–800 filed for a child on the basis of an approved Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A, during the approval period.

(2) If more than one Form I–800 is filed during the approval period for different children, the fee is $775 for the second and each subsequent petition submitted.

(3) If the children are already siblings before the proposed adoption, however, only one filing fee of $775 is required, regardless of the sequence of submission of the immigration benefit.

(KK) *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A. For filing an application for determination of suitability to adopt a child from a Convention country: $775.

(LL) *Request for Action on Approved Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A, Supplement 3. This filing fee is not charged if Form I–800 has not been filed based on the approval of the Form I–800A, and Form I–800A Supplement 3 is filed in order to obtain a first extension of the approval of the Form I–800A: $385.

(MM) *Application for Family Unity Benefits,* Form I–817. For filing an application for voluntary departure under the Family Unity Program: $600.

(NN) *Application for Temporary Protected Status,* Form I–821. For first time applicants: $50. There is no fee for re-registration.

(OO) *Application for Action on an Approved Application or Petition,* Form I–824. For filing for action on an approved application or petition: $465.

(PP) *Petition by Entrepreneur to Remove Conditions,* Form I–829. For filing a petition by entrepreneur to remove conditions: $3,750.

(QQ) *Application for Suspension of Deportation or Special Rule Cancellation of Removal* (Pursuant to Section 203 of Pub. L. 105–100), Form I–881:

(1) $285 for adjudication by DHS, except that the maximum amount payable by family members (related as husband, wife, unmarried child under 21, unmarried son, or unmarried daughter) who submit applications at the same time will be $570.

(2) $165 for adjudication by the Immigration Court (a single fee of $165 will be charged whenever applications are filed by two or more foreign nationals in the same proceedings).

(3) The $165 fee is not required if the Form I–881 is referred to the Immigration Court by DHS.

(RR) *Application for Authorization to Issue Certification for Health Care Workers,* Form I–905. Cost: $230.

(SS) *Request for Premium Processing Service,* Form I–907. The fee must be paid in addition to, and in a separate remittance from, other filing fees. The fee to request premium processing: $1,225. The fee for a request for premium processing fee may be adjusted annually by notice in the **Federal Register** based on inflation according to the Consumer Price Index (CPI). The fee for Premium Processing Service may not be waived.

(TT) *Application for Civil Surgeon Designation,* Form I–910. For filing an application for civil surgeon designation: $785. There is no fee for an application from a medical officer in the U.S. Armed Forces or civilian physician employed by the U.S. Government who examines members and veterans of the Armed Forces and their dependents at a military, Department of Veterans Affairs, or U.S. Government facility in the United States.

(UU) *Application for T Nonimmigrant Status,* Form I–914. No fee.

(VV) *Application for U Nonimmigrant Status,* Form I–918. No fee.

(WW) *Application for Regional Center Designation under the Immigrant Investor Program,* Form I–924. For filing an application for regional center designation under the Immigrant Investor Program: $17,795.

(XX) *Annual Certification of Regional Center,* Form I–924A. To provide updated information and certify that an Immigrant Investor Regional Center has maintained their eligibility: $3,035.

(YY) *Petition for Qualifying Family Member of a U–1 Nonimmigrant,* Form I–929. For U–1 principal applicant to submit for each qualifying family member who plans to seek an immigrant visa or adjustment of U status: $230.

(ZZ) *Application to File Declaration of Intention,* Form N–300. For filing an application for declaration of intention to become a U.S. citizen: $270.

(AAA) *Request for a Hearing on a Decision in Naturalization Proceedings* (*Under section 336 of the Act*), Form N–336. For filing a request for hearing on a decision in naturalization proceedings under section 336 of the Act: $700. There is no fee if filed on or after October 1, 2004, by an applicant who has filed an Application for Naturalization under sections 328 or 329 of the Act with respect to military service and whose application has been denied.

(BBB) *Application for Naturalization,* Form N–400. For filing an application for naturalization: $640. Except:

(1) The fee for an applicant whose documented income is greater than 150% and not more than 200% of the federal poverty level is $320.

(2) No fee is charged an applicant who meets the requirements of sections 328 or 329 of the Act with respect to military service.

(CCC) *Application to Preserve Residence for Naturalization Purposes,* Form N–470. For filing an application for benefits under section 316(b) or 317 of the Act: $355.

(DDD) *Application for Replacement Naturalization/Citizenship Document,* Form N–565. For filing an application for a certificate of naturalization or declaration of intention alleged to have been lost, mutilated, or destroyed; for a certificate of citizenship in a changed name under section 343(c) of the Act; or for a special certificate of naturalization to obtain recognition as a citizen of the United States by a foreign state under section 343(b) of the Act: $555. There is no fee when this application is submitted under 8 CFR 338.5(a) or 343a.1 to request correction of a certificate that contains an error.

(EEE) *Application for Certificate of Citizenship,* Form N–600. For filing an application for a certificate of citizenship under section 309(c) or section 341 of the Act: $1,170. There is no fee for any application filed by a member or veteran of any branch of the United States Armed Forces.

(FFF) *Application for Citizenship and Issuance of Certificate under section 322 of the Act,* Form N–600K. For filing an application for citizenship and issuance of certificate under section 322 of the Act: $1,170.

(GGG) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* $1,500 or $750 for filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions.

(HHH) *Fraud detection and prevention fee.* $500 for filing certain H–1B and L petitions, and $150 for H–2B petitions as described in 8 CFR 214.2(h)(19).

(III) *9–11 Response and Biometric Entry-Exit Fee for H–1B Visa.* $4,000 for certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H–1B, L–1A or L–1B nonimmigrant status. Collection of this fee is scheduled to end on September 30, 2025.

(JJJ) *9–11 Response and Biometric Entry-Exit Fee for L–1 Visa.* $4,500 for

certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H–1B, L–1A or L–1B nonimmigrant status. Collection of this fee is scheduled to end on September 30, 2025.

\* \* \* \* \*

■ 5. Section 103.16 is amended by revising the first sentence of paragraph (a) to read as follows:

### § 103.16 Collection, use and storage of biometric information.

(a) *Use of biometric information.* An individual may be required to submit biometric information by law, regulation, **Federal Register** notice or the form instructions applicable to the request type or if required in accordance with 8 CFR 103.2(b)(9). \* \* \*

\* \* \* \* \*

■ 6. Section 103.17 is amended by revising paragraph (b) to read as follows:

### § 103.17   Biometric service fee.

\* \* \* \* \*

(b) *Non-payment.* If a benefit request is received by DHS without the correct biometric services fee as provided in the form instructions, DHS will reject the benefit request.

## PART 204—IMMIGRANT PETITIONS

■ 7. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1641; 8 CFR part 2.

■ 8. Section 204.6 is amended by revising paragraph (m)(6) to read as follows:

### § 204.6   Petitions for employment creation aliens.

\* \* \* \* \*

(m) \* \* \*

(6) *Continued participation requirements for regional centers.* (i) Regional centers approved for participation in the program must:

(A) Continue to meet the requirements of section 610(a) of the Appropriations Act.

(B) Provide USCIS with updated information annually, and/or as otherwise requested by USCIS, to demonstrate that the regional center is continuing to promote economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment in the approved geographic area, using a form designated for this purpose; and

(C) Pay the fee provided by 8 CFR 103.7(b)(1)(i)(WW).

(ii) USCIS will issue a notice of intent to terminate the designation of a regional center in the program if:

(A) A regional center fails to submit the information required in paragraph (m)(6)(i)(B) of this section, or pay the associated fee; or

(B) USCIS determines that the regional center no longer serves the purpose of promoting economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment.

(iii) A notice of intent to terminate the designation of a regional center will be sent to the regional center and set forth the reasons for termination.

(iv) The regional center will be provided 30 days from receipt of the notice of intent to terminate to rebut the ground or grounds stated in the notice of intent to terminate.

(v) USCIS will notify the regional center of the final decision. If USCIS determines that the regional center's participation in the program should be terminated, USCIS will state the reasons for termination. The regional center may appeal the final termination decision in accordance with 8 CFR 103.3.

(vi) A regional center may elect to withdraw from the program and request a termination of the regional center designation. The regional center must notify USCIS of such election in the form of a letter or as otherwise requested by USCIS. USCIS will notify the regional center of its decision regarding the withdrawal request in writing.

\* \* \* \* \*

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2016–10297 Filed 5–3–16; 8:45 am]
**BILLING CODE 9111–97–P**

**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB No. 1651-0111

**Welcome to the United States**
**I-94 Arrival/Departure Record**
**Instructions**

This form must be completed by all persons except U.S. Citizens, returning resident aliens, aliens with immigrant visas, and Canadian Citizens visiting or in transit.

Type or print legibly with pen in ALL CAPITAL LETTERS. Use English. Do not write on the back of this form.

This form is in two parts. Please complete both the Arrival Record (Items 1 through 17) and the Departure Record (Items 18 through 21).

When all items are completed, present this form to the CBP Officer.

Item 9 - If you are entering the United States by land, enter LAND in this space. If you are entering the United States by ship, enter SEA in this space.

5 U.S.C. § 552a(e)(3) Privacy Act Notice: Information collected on this form is required by Title 8 of the U.S. Code, including the INA (8 U.S.C. 1103, 1187), and 8 CFR 235.1, 264, and 1235.1. The purposes for this collection are to give the terms of admission and document the arrival and departure of nonimmigrant aliens to the U.S. The information collected on this form may be made available to other government agencies for law enforcement purposes or to assist DHS in determining your admissibility. All nonimmigrant aliens seeking admission to the U.S., unless otherwise exempted, must provide this information. Failure to provide this information may deny you entry to the United States and result in your removal.

CBP Form I-94 (05/08)

OMB No. 1651-0111

**Arrival Record**

Admission Number



1. Family Name

2. First (Given) Name

3. Birth Date (DD/MM/YY)

4. Country of Citizenship

5. Sex (Male or Female)

6. Passport Issue Date (DD/MM/YY)

7. Passport Expiration Date (DD/MM/YY)

8. Passport Number

9. Airline and Flight Number

10. Country Where You Live

11. Country Where You Boarded

12. City Where Visa Was Issued

13. Date Issued (DD/MM/YY)

14. Address While in the United States (Number and Street)

15. City and State

16. Telephone Number in the U.S. Where You Can Be Reached

17. Email Address

CBP Form I-94 (05/08)

**DEPARTMENT OF HOMELAND SECURITY**
U.S. Customs and Border Protection

OMB No. 1651-0111

**Departure Record**

Admission Number

18. Family Name

19. First (Given) Name

20. Birth Date (DD/MM/YY)

21. Country of Citizenship

CBP Form I-94 (05/08)

See Other Side                                                    STAPLE HERE

**This Side For Government Use Only**

**Primary Inspection**

Applicant's
Name _____

Date
Referred _____ Time _____ Insp. # _____

**I-94 Back**
**11" h x 4.5"w**
**Fonts:**
**Arial, Times**

**Reason Referred**

☐ 212A ☐ ☐   ☐ PP   ☐ Visa   ☐ Parole   ☐ L/O   ☐ TWOV

Other _____
_____
_____

**Secondary Inspection**

End Secondary
Time _____ Insp. # _____

Disposition _____

| 22. Occupation | 23. Waivers |
| 24. CIS A Number **A-** | 25. CIS FCO |
| 26. Petition Number | 27. Program Number |
| 28. ☐ Bond | 29. ☐ Prospective Student |

30. Itinerary/Comments

_____
_____
_____
_____
_____
_____
_____

31. TWOV Ticket Number

| | | | | | | | | | | | |

**Paperwork Reduction Act Statement:** An agency may not conduct or sponsor an information collection and a person is not required to respond to this information unless it displays a current valid OMB control number. The control number for this collection is 1651-0111. The estimated average time to complete this application is 8 minutes per respondent. If you have any comments regarding the burden estimate you can write to U.S. Customs and Border Protection, Asset Management, 1300 Pennsylvania Avenue, NW, Washington DC 20229

**Warning** A nonimmigrant who accepts unauthorized employment is subject to deportation.
*Important* Retain this permit in your possession; **you must surrender it when you leave the U.S.**
Failure to do so may delay your entry into the U.S. in the future.
You are authorized to stay in the U.S. only until the date written on this form. To remain past this date, without permission from Department of Homeland Security authorities, is a violation of the law.
**Surrender this permit when you leave the U.S.:**
  - By sea or air, to the transportation line;
  - Across the Canadian border, to a Canadian Official;
  - Across the Mexican border, to a U.S. Official
Students planning to reenter the U.S. within 30 days to return to the same school, see "Departure" on page 2 of Form I-20 **prior to surrendering this permit.**

**Record of Changes**

_____
_____
_____
_____

**Departure Record**

**Port:**
**Date:**
**Carrier:**
**Flight No./ Ship Name:**

003077

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 3085 of 4699 PageID #: 6250



U.S. Department of Homeland Security

# DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras

**Release Date:** July 7, 2023

*Biden-Harris Administration continues strategy to provide lawful pathways and reduce dangerous irregular migration*

WASHINGTON – The U.S. Department of Homeland Security (DHS) today announced the implementation of new family reunification parole (FRP) processes for Colombia, El Salvador, Guatemala, and Honduras, advancing the Biden-Harris Administration's successful combination of expanded lawful pathways and strengthened enforcement to reduce irregular migration. The FRP processes promote family unity and are part of the comprehensive measures announced in April by DHS and the Department of State (https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration).

The new processes are for nationals from Colombia, El Salvador, Guatemala, and Honduras whose family members are U.S. citizens or lawful permanent residents and who have received approval to join their family in the United States. Specifically, nationals of these countries can be considered for parole on a case-by-case basis for a period of up to three years while they wait to apply to become a lawful permanent resident.

"These new processes promote family unity and provide lawful pathways consistent with our laws and our values," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "The Department has proven that the expansion of safe, orderly, and lawful pathways, combined with strong enforcement, is effective in reducing dangerous, irregular migration to the United States."

Certain nationals of Colombia, El Salvador, Guatemala, and Honduras who are beneficiaries of an approved Form I-130, Petition for Alien Relative (https://www.uscis.gov/i-130) may be eligible to be considered for parole under the new processes. Qualifying beneficiaries must be outside the United States, meet all requirements, including screening and vetting and medical requirements, and must not have already received an immigrant visa.

The processes begin with the Department of State issuing an invitation to the petitioning U.S. citizen or lawful permanent resident family member whose Form I-130 (https://www.uscis.gov/i-130) on behalf of a Colombian, Salvadoran, Guatemalan, or Honduran beneficiary has been approved. Beneficiaries awaiting an immigrant visa could include certain children and siblings of U.S. citizens and certain spouses and children of permanent residents. The invited petitioner can then initiate the process by filing a request on behalf of the beneficiary and eligible family members to be considered for advance travel authorization and parole.

The new processes allow for parole only on a discretionary, case-by-case, and temporary basis upon a demonstration of urgent humanitarian reasons or significant public benefit, as well as a demonstration that the beneficiary warrants a favorable exercise of discretion. Individuals paroled into the United States under these processes will generally be considered for parole for up to three years and will be eligible to request employment authorization while they wait for their immigrant visa to become available. When their immigrant visa becomes available, they may apply to become a lawful permanent resident.

The Immigration and Nationality Act authorizes the Secretary of Homeland Security, in his discretion, to parole noncitizens into the United States temporarily on a case-by-case basis for urgent humanitarian reasons or significant public benefit. The parole authority has long been used to establish FRP processes administered by U.S. Citizenship and Immigration Services, including the Cuban Family Reunification Parole Program (https://www.uscis.gov/humanitarian/humanitarian-parole/the-cuban-family-reunification-parole-program), which was established in 2007, and the Haitian Family Reunification Parole Program (https://www.uscis.gov/humanitarian/humanitarian-parole/the-haitian-family-reunification-parole-hfrp-program), which was established in 2014.

The Federal Register Notices for Colombia (https://www.federalregister.gov/public-inspection/2023-14472/implementation-of-a-family-reunification-parole-process-for-colombians), El Salvador (https://www.federalregister.gov/public-inspection/2023-14475/implementation-of-a-family-reunification-parole-process-for-salvadorans), Guatemala (https://www.federalregister.gov/public-inspection/2023-14473/implementation-of-a-family-reunification-parole-process-for-guatemalans), and Honduras (https://www.federalregister.gov/public-inspection/2023-14474/implementation-of-a-family-reunification-parole-process-for-hondurans) provide more information on the FRP process and eligibility criteria.

003078

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)     CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)     FAMILY REUNIFICATION (/KEYWORDS/FAMILY-REUNIFICATION)

MIGRATION (/KEYWORDS/MIGRATION)     SECRETARY ALEJANDRO MAYORKAS (/KEYWORDS/SECRETARY-ALEJANDRO-MAYORKAS)

U. S. BORDER PATROL (/KEYWORDS/U-S-BORDER-PATROL)

U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) (/KEYWORDS/US-CITIZENSHIP-AND-IMMIGRATION-SERVICES-USCIS)

Last Updated: 07/07/2023

003079



U.S. Department of Homeland Security

# DHS Announces Process Enhancements for Supporting Labor Enforcement Investigations

**Release Date:** January 13, 2023

**En español**

*Changes Strengthen Efforts to Hold Unscrupulous Employers Accountable*

WASHINGTON – The U.S. Department of Homeland Security (DHS) has announced that noncitizen workers who are victims of, or witnesses to, the violation of labor rights, can now access a streamlined and expedited deferred action request process. Deferred action protects noncitizen workers from threats of immigration-related retaliation from the exploitive employers. Effective immediately, this process will improve DHS's longstanding practice of using its discretionary authority to consider labor and employment agency-related requests for deferred action on a case-by-case basis. Workers will be able to visit DHS.gov (/enforcement-labor-and-employment-laws) for additional information in English and Spanish and to submit requests. These improvements advance the Biden-Harris Administration's commitment to empowering workers and improving workplace conditions by enabling all workers, including noncitizens, to assert their legal rights.

"Unscrupulous employers who prey on the vulnerability of noncitizen workers harm all workers and disadvantage businesses who play by the rules," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "We will hold these predatory actors accountable by encouraging all workers to assert their rights, report violations they have suffered or observed, and cooperate in labor standards investigations.  Through these efforts, and with our labor agency partners, we will effectively protect the American labor market, the conditions of the American worksite, and the dignity of the workers who power our economy."

Workers are often afraid to report violations of law by exploitative employers or to cooperate in employment and labor standards investigations because they fear removal or other immigration-related retaliation by an abusive employer. Agencies tasked with enforcing labor and employment laws depend on the cooperation of these workers in their investigations. Refraining from reporting violations due to a fear of immigration-based retaliation creates unfair labor market conditions and perpetuates the commission of unlawful and inhumane acts by employers, including nonpayment of wages, the imposition of unsafe working conditions, and chilling workers' ability to organize and collectively bargain to improve such conditions. DHS's practice of offering discretionary protection on a case-by-case basis to noncitizen victims facilitates the ability of labor and employment agencies to more fully investigate worksite violations, supporting the agencies in fulfilling their mission and holding abusive employers accountable. By streamlining this process and helping to improve workplace conditions for all workers, today's announcement is one of many ways in which DHS is taking action to fulfill its commitment to U.S. workers, pursuant to the White House Task Force on Worker Organizing and Empowerment (https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/07/white-house-task-force-on-worker-organizing-and-empowerment-report/).

In addition to providing new guidance to labor agencies regarding processes to seek deferred action for certain workers, DHS will also provide for a single intake point for deferred action requests from noncitizen workers that are supported by labor enforcement agencies. The centralized intake process will allow DHS to efficiently review these time-sensitive requests, provide additional security to eligible workers on a case-by-case basis, and more fully support the mission of labor agencies. These process enhancements are consistent with Secretary Mayorkas' October 2021 memorandum (/publication/memorandum-worksite-enforcement), which directed DHS offices and agencies to ensure that DHS fulfills its critical role supporting the important work of labor agencies to enforce wage protections, workplace safety, labor rights, and other laws and standards.

DHS has long considered requests for deferred action submitted by noncitizen workers who fall within the scope of a labor agency investigation and/or enforcement action. Noncitizens will now be able to submit such requests to U.S. Citizenship and Immigration Services (USCIS) through a central intake point established specifically to support labor agency investigative and enforcement efforts. For deferred action requests from noncitizens who are in removal proceedings or have a final order of removal, upon reviewing the submission for completeness, USCIS will forward such requests to U.S. Immigration and Customs Enforcement (ICE) to make a final determination on a case-by-case basis. USCIS will consider all other deferred action requests on a case-by-case basis. USCIS will also consider all related employment authorization applications, including those related to deferred action requests decided by ICE. Given the often time-sensitive labor agency enforcement interests, efficient processing of deferred action and related applications for employment authorization will reduce potential risks to workers and retaliation by their employers under investigation.

In addition to satisfying individual criteria to facilitate case-by-case determinations, requests for deferred action submitted through this centralized process must include a letter (a Statement of Interest) from a federal, state, or local labor agency asking DHS to consider exercising its discretion on

003080

behalf of workers employed by companies identified by the agency as having labor disputes related to laws that fall under its jurisdiction. In addition to other elements, as detailed in DHS's Frequently Asked Questions (FAQs) (/enforcement-labor-and-employment-laws), the letter from the labor agency should include:

- The enforcement or jurisdictional interest of the labor agency and how it relates to the mission of the labor agency;
- The workers covered by the Statement of Interest;
- Why DHS's consideration of prosecutorial discretion with respect to these specific workers supports the labor agency's interest.

Consistent with existing practice, discretionary grants of deferred action under this process will typically last for a period of two years, subject to termination at any time. Individuals granted deferred action may be eligible for employment authorization under existing regulations, which require that they demonstrate an economic necessity for employment. They may also be eligible for subsequent grants of deferred action if a labor agency has a continuing investigative or enforcement interest in the matter identified in their original letter supporting DHS use of prosecutorial discretion.

For more information on USCIS and its programs, please visit uscis.gov (http://www.uscis.gov/) or follow us on Twitter (http://twitter.com/uscis) (http://twitter.com/uscis), Instagram (https://www.instagram.com/uscis) (https://www.instagram.com/uscis), YouTube (www.youtube.com/user/uscis) (http://www.youtube.com/user/uscis), Facebook (www.facebook.com/uscis/) (https://www.facebook.com/uscis/), and LinkedIn (www.linkedin.com/company/uscis) (https://www.linkedin.com/company/uscis).

\#\#\#

## Topics

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

SECRETARY ALEJANDRO MAYORKAS (/KEYWORDS/SECRETARY-ALEJANDRO-MAYORKAS)

U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) (/KEYWORDS/US-CITIZENSHIP-AND-IMMIGRATION-SERVICES-USCIS)

Last Updated: 01/18/2024

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528



September 28, 2007

Memorandum For:    Chief Counsel, U.S. Customs and Border Protection
Principal Legal Advisor, U.S. Immigration and Customs Enforcement
Chief Counsel, U.S. Citizenship and Immigration Services
Judge Advocate General, U.S. Coast Guard

From:    Gus P. Coldebella

Subject:    Clarification of the Relation Between Release Under Section 236 and
Parole Under Section 212(d)(5) of the Immigration and Nationality Act

I.    Question Presented

Is any release of an applicant for admission from immigration custody, including
"conditional parole" under section 236(a)(2) of the Immigration and Nationality Act (INA), a
"parole" of the alien into the United States for purposes of section 212(d)(5)(A) of the INA?

II.    Summary Conclusion

Parole under section 212(d)(5)(A) of the INA is a discretionary act exercised on a case-
by-base basis that is expressly limited to aliens applying for admission to the United States and
in which circumstances present "urgent humanitarian reasons" for the parole or the parole would
serve a "significant public benefit." Release under section 236(a)(2) of the INA, including
"conditional parole," is a separate and distinct procedure applicable to an alien who has been
arrested and detained pending a decision on whether he or she is to be removed from the United
States. Neither statute nor regulations provide that a release under section 236(a)(2) is to be
deemed a parole under section 212(d)(5)(A). Because some may read certain language in a 1998
opinion of the General Counsel of the former Immigration and Naturalization Service (INS),
*Authority to Parole Applicants for Admission Who are Not Also Arriving Aliens*, No. 98-10
(Aug. 21, 1998) (*1998 Parole Opinion*), as inconsistent with that conclusion, paragraph seven of
section III of the *1998 Parole Opinion* (Paragraph Seven) is superseded by the following

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

003082

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

analysis.[1]  Paragraph Seven is to be given no weight or effect by the Department of Homeland Security ("the Department" or "DHS") and its component agencies.[2]

III.    Analysis

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546, amended section 235(a)(1) of the INA to provide that an alien present in the United States who has not been admitted shall be deemed an applicant for admission.  The amendment thus expanded the group of aliens deemed applicants for admission to include not only aliens arriving at the ports-of-entry, *see* 8 C.F.R. §§ 1.1(q) (defining "arriving alien"), 1001.1(q) (same), but also aliens present in the United States without inspection or admission.  In 1998, the INS General Counsel considered whether applicants for admission other than arriving aliens were eligible for parole into the United States under INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).  The INS General Counsel concluded in the *1998 Parole Opinion* that such aliens were eligible for parole.  The Department concurs with this assessment.

In expounding on his reasoning, however, the INS General Counsel made the following statement:

> [R]elease under § 236 of the Act and 8 C.F.R. § 236.1(d)(1) should not be seen as a separate form of relief from custody [from parole under section 212(d)(5)(A)].  Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole . . . .  In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms.

*1998 Parole Opinion* at § III, ¶ 7.  Recent immigration cases have focused attention on the meaning and applicability of this language.  Applicants for admission have cited this language as

---

[1]    The analysis set forth herein also supersedes any prior opinions relying on Paragraph Seven, but only to the extent that the opinions rely on the superseded language.

[2]    In addition to the *1998 Parole Opinion* and opinions implicated by reference in footnote 1, *supra*, the General Counsel of the former Immigration and Naturalization Service (INS) issued other legal opinions and advisory memoranda to advise the INS.  These opinions and memoranda did not create any individual rights of action against INS under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*, or other laws, nor do they create any such rights against DHS.  Furthermore, because DHS is a newly-created department charged with, among other things, administering federal immigration law, these former INS opinions and memoranda do not bind the Office of the General Counsel of DHS from providing alternative guidance as it deems appropriate.

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

support for the position that merely by being released from custody on "conditional parole"[3] pursuant to section 236(a)(2)(B) of the INA. 8 U.S.C. § 1226(a)(2)(B), the applicant thereby has been paroled under section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A). *See, e.g., Ortega-Cervantes v. Gonzales*, --- F.3d ---, 2007 WL 2472487 (9th Cir. Sept. 4, 2007) (rejecting argument that aliens granted conditional parole under INA § 236 are "paroled into the United States" within the meaning of INA § 245(a)).

To date, the Ninth Circuit is the only court to have opined on this question. Although the court rejected the argument that release under INA § 236(a)(2)(B) constitutes "parole" for purposes of adjustment of status under INA § 245(a). 8 U.S.C. § 1255(a), *see Ortega-Cervantes*, 2007 WL 2472487 at *1; *5, cases in which aliens rely on the *1998 Parole Opinion* in support of the position rejected in *Ortega-Cervantes* remain pending under the jurisdiction of other circuit courts of appeal.[4] To ensure nationwide uniformity by Department personnel consistent with the Ninth Circuit's holding in *Ortega-Cervantes*, and because the interpretation of the *1998 Parole*

---

[3]     Section 236(a)(2) of the Act provides that an alien in removal proceedings may be released either on bond or "conditional parole." The origin of the term "conditional parole" can be traced back to at least 1952, when it was adopted in former INA § 242, the predecessor to INA § 236. "Conditional parole" referred to the release of a deportable alien from INS custody without bail. *See Rubenstein v. Brownell*, 206 F.2d 449, 455 (D.C. Cir. 1953) ("Section 242(a) authorizes the Attorney General to keep an alien in custody, release him on bond, or release him on conditional parole."). Similarly. section 23(a) of the Internal Security Act of 1950 had provided for the release from INS custody without bond of a deportable alien and termed it "conditional parole." *Lee Ah Youw v. Shaughnessy*. 102 F. Supp. 799, 800-01 (S.D.N.Y. 1952). Thus, under former INA § 242, a deportable alien could be released on "conditional parole" pending a final determination on deportability.

The 1952 Act also included section 212(d)(5). providing for the discretionary parole of excludable aliens. The term "parole" referred to a procedure to allow excludable aliens into the United States and which INS had utilized for many years prior to the codification of the term in INA § 212(d)(5) in 1952. *See Matter of R-*, 3 I&N Dec. 45, 46 (BIA 1947) ("Parole is an administrative device of long standing."). Prior to the 1952 Act, the enlargement of inadmissible aliens into the United States on parole had been fashioned out of necessity and without statutory sanction. *Matter of Conceiro*, 14 I&N Dec. 278, 279-80 (BIA), *aff'd, Conceiro v. Marks*, 360 F. Supp. 454 (S.D.N.Y. 1973). Under the 1952 regime, deportable aliens were not eligible for section 212 parole. *See Matter of K-H-C-*, 6 I&N Dec. 295, 298 (BIA 1954) ("The authority to continue or detain aliens in, or release them from custody, provided by [Section 242 of the INA] relates solely to an alien apprehended in deportation proceedings. . . . Since this authority relates solely to aliens apprehended in deportation proceedings, it has no application to an alien detained in an exclusion proceeding. Provision for the release of an excluded alien is found in section 212(d)(5)."). Therefore, while lexically similar. the terms "conditional parole" and "parole" referred to two wholly distinct concepts applicable to separate classes of aliens. Although IIRIRA expanded the class of aliens eligible for parole under section 212(d)(5), it did not eliminate the distinction between "conditional parole" under section 236 and parole under section 212.

[4]     *See, e.g., Francisco-Lorenzo v. Gonzales*, No. 06-0768-AG (2d Cir. petition filed Feb. 17. 2006) (considering petition for review of decision where the Board of Immigration Appeals (BIA) rejected the argument that "conditional parole" under INA § 236(a)(2) is to be equated with parole under INA § 212(d)(5)(A) and declined to follow *1998 Parole Opinion* to the extent it reasoned otherwise); *Espino Del Angel v. Gonzales*. No. 06-2832-AG (2d Cir. petition filed June 13, 2006) (same). Pursuant to joint stipulations. the petitions for review in *Francisco-Lorenzo* and *Espino Del Angel* were withdrawn. The cases are again pending before the Immigration Court for determination as to whether the petitioners were paroled into the United States.

3

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Opinion* forwarded by certain litigants is directly contrary to the language and structure of the INA, Paragraph Seven hereby is superseded by the analysis set forth in this memorandum.[5]

Parole under section 212(d)(5)(A) of the INA and release, including "conditional parole," under section 236 of the INA are separate and distinct procedures. *Ortega-Cervantes*, 2007 WL 2472487 at *7 ("Even after IIRIRA, the parole provisions of § 1182(d)(5)(A) and § 1226(a) continue to serve distinct purposes."). Parole under section 212(d)(5)(A) is a discretionary act exercised by DHS on a case-by-case basis and restricted to circumstances where urgent humanitarian reasons justify the parole or where a significant public benefit will result from the parole. By contrast, a release under section 236 may be justified by factors that would not be adequate for parole under section 212(d)(5)(A). *See, e.g., Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006) ("An Immigration Judge has broad discretion in deciding the factors that he or she may consider in custody redeterminations."). For example, a release under section 236 could be predicated on no more than a determination that the alien does not present a danger to persons or property, is not a threat to national security, and does not pose a flight risk. *See id.; Matter of Adeniji*, 22 I&N Dec. 1102, 1111-13 (BIA 1999). A release under section 236 need not be for humanitarian reasons or for a significant public benefit. Therefore, to hold that any release under section 236 is a parole under section 212(d)(5)(A) would be contrary to the statutory framework restricting parole under section 212(d)(5)(A) to specified circumstances. Moreover, automatically deeming a release under section 236 a parole under section 212(d)(5)(A) would violate the explicit statutory mandate that a parole under section 212(d)(5)(A) is permitted only after a case-by-case assessment based on the section 212(d)(5) criteria.[6] *See Ortega-Cervantes*, 2007 WL 2472487 at *8.

Equating a release under section 236 with parole under section 212(d)(5)(A) also would create a conflict with the regulations implementing the INA. Although the Executive Office for Immigration Review (EOIR), along with DHS, has authority under section 236 to make custody determinations, EOIR does not have authority to grant a section 212(d)(5)(A) parole. It was well-settled law at the time of IIRIRA's enactment, and at the time of the *1998 Parole Opinion*, that the parole authority under section 212(d)(5) of the INA had been exclusively delegated to the INS by the Attorney General since 1952, and that EOIR both lacked parole authority and would be ill-equipped to exercise parole authority even if it were available. *See Matter of United*

---

[5]   The Department's conclusion that release from custody under section 236(a)(2) is not deemed a parole under section 212(d)(5)(A) is consistent with the cases on which the INS General Counsel relied in Paragraph Seven of the *1998 Parole Opinion*. The cited cases address a separate issue regarding the legal status of aliens who have been paroled, and not whether all releases from custody amount to a parole. *See Leng May Ma v. Barber*, 357 U.S. 185 (1958) (considering whether paroled alien was eligible for relief under provision of the INA applicable to aliens "within the United States"); *Matter of L-Y-Y-*, 9 I&N Dec. 70 (BIA 1960) (considering whether exclusion proceedings may be converted to deportation proceedings following termination of alien's parole).

[6]   Significantly, only aliens "applying for admission" are eligible for parole under INA § 212(d)(5)(A), while release under INA § 236 is applicable to all aliens who have been arrested and detained pending a decision on whether the alien is to be removed from the United States.

4

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

*Airlines Flight UA802*, 22 I&N Dec. 777, 782  (BIA 1999) (noting that "the district director [of the INS] has exclusive jurisdiction to parole an alien into the United States"); *Matter of Singh*, 21 I&N Dec. 427, 434 (BIA 1996) (stating that neither the immigration judge nor the BIA has jurisdiction to exercise parole power); *Matter of Conceiro*, 14 I&N Dec. 278, 281-82 (BIA) (stating that BIA is "ill-equipped to make the inquiries and to conduct the investigations needed to make the summary decisions relating to the parole of recently arrived aliens"), *aff'd*, *Conceiro v. Marks*, 360 F. Supp. 454 (S.D.N.Y. 1973); 8 C.F.R. §§ 212.5(a) (listing those who can invoke parole authority under section 212(d)(5)(A) of the Act), 1212.5(a) (recognizing that granting of parole is done "by the Department of Homeland Security" and referencing 8 C.F.R. § 212.5).  As an authority delegated exclusively to the INS, the parole authority was transferred to DHS by the Homeland Security Act.  *See* 6 U.S.C. §§ 251–298.  The Department has retained the parole authority in its regulations as an authority to be exercised only by DHS; therefore, that authority is not one that may be exercised by EOIR under section 236(a)(2) or any other provision of the INA.  *See* 8 C.F.R. § 212.5(a); *cf.* 8 C.F.R. §§ 1236.1 (EOIR regulations setting forth release procedures under INA section 236), 1240.1 (listing authority of EOIR to determine applications under specified sections of the INA, and excluding section 212(d)(5)); *Matter of D-J-*, 23 I&N Dec. 572 (A.G. 2003) (considering EOIR release solely in terms of INA § 236 authority and standards).

    Furthermore, equating release under section 236 with parole under section 212(d)(5)(A) would create tension with the statutory scheme as implemented by DHS consistent with the intent of Congress.  For example, an alien who is arrested for being present in the United States without inspection and who is subsequently released under section 236 pending the outcome of removal proceedings, may, under such an interpretation, become eligible by virtue of the "parole" for certain benefits that would not otherwise be available—including ceasing to accrue unlawful presence time, *see* INA § 212(a)(9)(B)(ii), 8 U.S.C. § 1182(a)(9)(B)(ii); adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a), *see Ortega-Cervantes*, 2007 WL 2472487 at *8 ("Given that § 1255(i) permits unlawful entrants to adjust their status only under certain specified conditions, it would be odd to read § 1255(a) to authorize unlawful entrants who do not meet those conditions to seek adjustment of status whenever they are conditionally paroled pursuant to § 1226(a)."); and a discretionary grant of work authorization, *compare* INA § 236(a)(3), 8 U.S.C. § 1226(a)(3) (prohibiting work authorization for aliens released under section 236 unless otherwise eligible), *with* 8 C.F.R. § 274a.12(c)(11) (authorizing grants of employment authorization to aliens paroled under INA § 212).  Such an expansion of benefits is contrary to the overall structure of IIRIRA, which was designed to reduce, not increase, the opportunities available to aliens present without inspection.  Likewise, equating section 236 release with parole would drastically expand the frequency with which "parole" is granted, contrary to the purpose of section 602 of IIRIRA.[7]  *See Ortega-Cervantes*, 2007 WL 2472487 at *8 ("Congress responded in IIRIRA by narrowing the circumstances in which aliens could

---

[7]  IIRIRA § 602(a) amended INA § 212(d)(5)(A) by striking the phrase "for emergent reasons or for reasons deemed strictly in the public interest" and replacing it with "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," captioned under the title "Limitation on Use of Parole."

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

003086

FOR OFFICIAL USE ONLY
DO NOT RELEASE WITHOUT PRIOR AUTHORIZATION OF
THE OFFICE OF THE GENERAL COUNSEL

qualify for 'parole into the United States' under § 1182(d)(5)(A) and thus become eligible for adjustment of status.").

IV.    Conclusion

A release from custody of an applicant for admission under section 236(a)(2) of the INA without resolution of his or her admissibility is not a parole under section 212(d)(5)(A). Although sections 212(d)(5)(A) and 236(a)(2) both provide applicants for admission a means of securing temporary release from the physical custody of immigration officials. these provisions are separate and distinct. and the legal status of an applicant released under section 236 is not identical to that of an applicant paroled under section 212(d)(5)(A).  Equating section 236 release with section 212(d)(5) parole is contrary to the language. history. and policy of the INA and related regulations.  Due to the possibility that language in the *1998 Parole Opinion* could be read as suggesting otherwise. that language hereby is superseded.[8]

---

[8] By issuing this superseding memorandum, DHS neither concedes nor intends to suggest that the interpretation forwarded by the applicants in the cases cited above is a correct reading of the *1998 Parole Opinion*.  The language of Paragraph Seven is at best ambiguous, and the remainder of the opinion correctly reaffirms that parole under section 212(d)(5)(A) is restricted to situations where a case-by-case assessment determines certain circumstances to be present justifying parole of the alien.  *See, e.g., 1998 Parole Opinion* at § 3, ¶ 2 ("[T]he Attorney General must find, on a case-by-case basis, either that 'urgent humanitarian reasons' justify the parole, or that paroling the alien will yield a 'significant public benefit.'"); *id.* at § 3. ¶ 9 ("[T]he Service may, in the exercise of discretion. parole any applicant for admission, if the Service finds that parole would serve urgent humanitarian reasons or yield a significant public benefit.").  In fact, the Ninth Circuit explicitly rejected a broad reading of the *1998 Parole Opinion* suggested by the petitioner in that case.  *See Ortega-Cervantes*, 2007 WL 2472487 at *7 ("[T]he [*1998 Parole Opinion*] does not further state that every conditional parole under § 1226(a) necessarily constitutes a 'parole into the United States' within the meaning of § 1255(a).").

FOR OFFICIAL USE ONLY
PRIVILEGED ATTORNEY CLIENT COMMUNICATION
AND ATTORNEY WORK PRODUCT

003087



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

September 30, 2021

MEMORANDUM TO:    Tae D. Johnson
                  Acting Director
                  U.S. Immigration and Customs Enforcement

CC:               Troy Miller
                  Acting Commissioner
                  U.S. Customs and Border Protection

                  Ur Jaddou
                  Director
                  U.S. Citizenship and Immigration Services

                  Robert Silvers
                  Under Secretary
                  Office of Strategy, Policy, and Plans

                  Katherine Culliton-González
                  Officer for Civil Rights and Civil Liberties
                  Office for Civil Rights and Civil Liberties

                  Lynn Parker Dupree
                  Chief Privacy Officer
                  Privacy Office

FROM:             Alejandro N. Mayorkas
                  Secretary

SUBJECT:          Guidelines for the Enforcement of Civil Immigration Law

This memorandum provides guidance for the apprehension and removal of noncitizens.

I am grateful to you, the other leaders of U.S. Immigration and Customs Enforcement, and our frontline personnel for the candor and openness of the engagements we have had to help shape this guidance.  Thank you especially for dedicating yourselves – all your talent and energy – to the noble law enforcement profession.  In executing our solemn responsibility to enforce immigration

1

law with honor and integrity, we can help achieve justice and realize our ideals as a Nation.  Our colleagues on the front lines and throughout the organization make this possible at great personal sacrifice.

## I. Foundational Principle: The Exercise of Prosecutorial Discretion

It is well established in the law that federal government officials have broad discretion to decide who should be subject to arrest, detainers, removal proceedings, and the execution of removal orders.  The exercise of prosecutorial discretion in the immigration arena is a deep-rooted tradition.  The United States Supreme Court stated this clearly in 2012:

> "A principal feature of the removal system is the broad discretion exercised by immigration officials.  Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."

In an opinion by Justice Scalia about twelve years earlier, the Supreme Court emphasized that enforcement discretion extends throughout the entire removal process, and at each stage of it the executive has the discretion to not pursue it.

It is estimated that there are more than 11 million undocumented or otherwise removable noncitizens in the United States.  We do not have the resources to apprehend and seek the removal of every one of these noncitizens.  Therefore, we need to exercise our discretion and determine whom to prioritize for immigration enforcement action.

In exercising our discretion, we are guided by the fact that the majority of undocumented noncitizens who could be subject to removal have been contributing members of our communities for years.  They include individuals who work on the frontlines in the battle against COVID, lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways.  Numerous times over the years, and presently, bipartisan groups of leaders have recognized these noncitizens' contributions to state and local communities and have tried to pass legislation that would provide a path to citizenship or other lawful status for the approximately 11 million undocumented noncitizens.

The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them.  We will use our discretion and focus our enforcement resources in a more targeted way.  Justice and our country's well-being require it.

By exercising our discretionary authority in a targeted way, we can focus our efforts on those who pose a threat to national security, public safety, and border security and thus threaten America's well-being.  We do not lessen our commitment to enforce immigration law to the best of our ability.  This is how we use the resources we have in a way that accomplishes our enforcement mission most effectively and justly.

2

## II.  Civil Immigration Enforcement Priorities

We establish civil immigration enforcement priorities to most effectively achieve our goals with the resources we have.  We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security.

### A.  Threat to National Security

A noncitizen who engaged in or is suspected of terrorism or espionage, or terrorism-related or espionage-related activities, or who otherwise poses a danger to national security, is a priority for apprehension and removal.

### B.  Threat to Public Safety

A noncitizen who poses a current threat to public safety, typically because of serious criminal conduct, is a priority for apprehension and removal.

Whether a noncitizen poses a current threat to public safety is not to be determined according to bright lines or categories.  It instead requires an assessment of the individual and the totality of the facts and circumstances.

There can be aggravating factors that militate in favor of enforcement action.  Such factors can include, for example:

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record.

Conversely, there can be mitigating factors that militate in favor of declining enforcement action.  Such factors can include, for example:

- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;
- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;

3

003090

- time since an offense and evidence of rehabilitation;
- conviction was vacated or expunged.

The above examples of aggravating and mitigating factors are not exhaustive.  The circumstances under which an offense was committed could, for example, be an aggravating or mitigating factor depending on the facts.   The broader public interest is also material in determining whether to take enforcement action.  For example, a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct.  The specific facts of a case should be determinative.

Again, our personnel must evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly.  The overriding question is whether the noncitizen poses a current threat to public safety.  Some of the factors relevant to making the determination are identified above.

The decision how to exercise prosecutorial discretion can be complicated and requires investigative work.  Our personnel should not rely on the fact of conviction or the result of a database search alone.  Rather, our personnel should, to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue.  The gravity of an apprehension and removal on a noncitizen's life, and potentially the life of family members and the community, warrants the dedication of investigative and evaluative effort.

C.  Threat to Border Security

A noncitizen who poses a threat to border security is a priority for apprehension and removal.

A noncitizen is a threat to border security if:

(a) they are apprehended at the border or port of entry while attempting to unlawfully enter the United States; or

(b) they are apprehended in the United States after unlawfully entering after November 1, 2020.

There could be other border security cases that present compelling facts that warrant enforcement action.  In each case, there could be mitigating or extenuating facts and circumstances that militate in favor of declining enforcement action.  Our personnel should evaluate the totality of the facts and circumstances and exercise their judgment accordingly.

### III.  Protection of Civil Rights and Civil Liberties

We must exercise our discretionary authority in a way that protects civil rights and civil liberties. The integrity of our work and our Department depend on it.  A noncitizen's race, religion, gender, sexual orientation or gender identity, national origin, or political associations shall never be factors in deciding to take enforcement action.  A noncitizen's exercise of their First Amendment rights also should never be a factor in deciding to take enforcement action.  We must ensure that enforcement actions are not discriminatory and do not lead to inequitable outcomes.

This guidance does not prohibit consideration of one or more of the above-mentioned factors if they are directly relevant to status under immigration law or eligibility for an immigration benefit. For example, religion or political beliefs are often directly relevant in asylum cases and need to be assessed in determining a case's merit.

State and local law enforcement agencies with which we work must respect individuals' civil rights and civil liberties as well.

### IV.  Guarding Against the Use of Immigration Enforcement as a Tool of Retaliation for the Assertion of Legal Rights

Our society benefits when individuals – citizens and noncitizens alike – assert their rights by participating in court proceedings or investigations by agencies enforcing our labor, housing, and other laws.

It is an unfortunate reality that unscrupulous employers exploit their employees' immigration status and vulnerability to removal by, for example, suppressing wages, maintaining unsafe working conditions, and quashing workplace rights and activities.  Similarly, unscrupulous landlords exploit their tenants' immigration status and vulnerability to removal by, for example, charging inflated rental costs and failing to comply with housing ordinances and other relevant housing standards.

We must ensure our immigration enforcement authority is not used as an instrument of these and other unscrupulous practices.  A noncitizen's exercise of workplace or tenant rights, or service as a witness in a labor or housing dispute, should be considered a mitigating factor in the exercise of prosecutorial discretion.

### V.  The Quality and Integrity of our Civil Immigration Enforcement Actions

The civil immigration enforcement guidance does not compel an action to be taken or not taken. Instead, the guidance leaves the exercise of prosecutorial discretion to the judgment of our personnel.

5

To ensure the quality and integrity of our civil immigration enforcement actions, and to achieve consistency in the application of our judgments, the following measures are to be taken before the effective date of this guidance:

A.  Training

Extensive training materials and a continuous training program should be put in place to ensure the successful application of this guidance.

B.  Process for Reviewing Effective Implementation

A review process should be put in place to ensure the rigorous review of our personnel's enforcement decisions throughout the first ninety (90) days of implementation of this guidance. The review process should seek to achieve quality and consistency in decision-making across the entire agency and the Department.  It should therefore involve the relevant chains of command.

Longer-term review processes should be put in place following the initial 90-day period, drawing on the lessons learned.  Assessment of implementation of this guidance should be continuous.

C.  Data Collection

We will need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions we take pursuant to this guidance, both to ensure the quality and integrity of our work and to achieve accountability for it.

Please work with the offices of the Chief Information Officer; Strategy, Policy, and Plans; Science and Technology; Civil Rights and Civil Liberties; and Privacy to determine the data that should be collected, the mechanisms to collect it, and how and to what extent it can be made public.

D.  Case Review Process

We will work to establish a fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken. Discretion to determine the disposition of the case will remain exclusively with the Department.

**VI.  Implementation of the Guidance**

This guidance will become effective in sixty (60) days, on November 29, 2021.  Upon the effective date, this guidance will serve to rescind (1) the January 20, *2021 Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* issued by then-Acting Secretary David Pekoske, and (2) the *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* issued by Acting ICE Director Tae D. Johnson.

6

We will meet regularly to review the data, discuss the results to date, and assess whether we are achieving our goals effectively.  Our assessment will be informed by feedback we receive from our law enforcement, community, and other partners.

This guidance is Department-wide.  Agency leaders as to whom this guidance is relevant to their operations will implement this guidance accordingly.

## VII.  Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

Issue Date: 10/12/2021

Policy Statement 065-06

MEMORANDUM FOR:   Tae D. Johnson
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  Ur M. Jaddou
                  Director
                  U.S. Citizenship and Immigration Services

                  Troy A. Miller
                  Acting Commissioner
                  U.S. Customs and Border Protection

FROM:             Alejandro N. Mayorkas
                  Secretary

SUBJECT:   **Worksite Enforcement: The Strategy to Protect the American Labor Market,
           the Conditions of the American Worksite, and the Dignity of the Individual**

---

Thank you for your leadership as we work to more effectively accomplish our Department's critical missions.

Our worksite enforcement efforts can have a significant impact on the well-being of individuals and the fairness of the labor market. Our accomplishments in this area make clear that we can maximize the impact of our efforts by focusing on unscrupulous employers who exploit the vulnerability of undocumented workers. These employers engage in illegal acts ranging from the payment of substandard wages to imposing unsafe working conditions and facilitating human trafficking and child exploitation. Their culpability compels the intense focus of our enforcement resources.

In addition, unscrupulous employers harm each worker competing for a job. By exploiting undocumented workers and paying them substandard wages, the unscrupulous employers create an unfair labor market. They also unfairly drive down their costs and disadvantage their business competitors who abide by the law.

DHS's Role in Supporting Enforcement of Employment and Labor Standards
Page 2

We can most effectively protect the American labor market, the conditions of the American worksite, and the dignity of the individual by focusing our worksite enforcement efforts on unscrupulous employers.  This is how we will proceed.

## Fundamental Principles

Our Department has a critical role in ensuring that our Nation's workplaces comply with our laws.  To best achieve this goal, we must adopt immigration enforcement policies to facilitate the important work of the Department of Labor and other government agencies to enforce wage protections, workplace safety, labor rights, and other laws and standards.

We will serve these important interests by adopting policies and practices that achieve the following:

- Reduce the demand for illegal employment by delivering more severe consequences to exploitative employers and their agents;

- Increase the willingness of workers to report violations of law by exploitative employers and cooperate in employment and labor standards investigations; and,

- Broaden and deepen mechanisms for coordination between the Department of Homeland Security and the Department of Labor, the Department of Justice, the Equal Employment Opportunity Commission, the National Labor Relations Board, and state labor agencies.

## Policy Review

In furtherance of these interests, I am directing the following review of policies to facilitate the development of a Department-wide strategy in line with the principles outlined above:

1. Identify any existing and potential policies that have an impact on the Department's role in supporting the enforcement of employment and labor standards.  Such policies include, but are not limited to, ICE's worksite enforcement strategy, the 2011 Memorandum of Understanding between DHS and DOL (as amended in 2016)[1], and policies that may impede non-citizens workers, including victims of forced labor, from asserting their workplace rights.  Please present proposed recommendations to me within 60 days of the date of this memorandum.

2. Develop agency plans to alleviate or mitigate the fear that victims of, and witnesses to, labor trafficking and exploitation may have regarding their cooperation with law enforcement in the investigation and prosecution of unscrupulous employers.  These plans should, among other things, provide for the consideration of deferred action, continued presence, parole, and other available relief for noncitizens who are witnesses to, or victims of, abusive and exploitative labor practices.  In addition, these plans should

---

[1] Revised Memorandum of Understanding between the Department of Homeland Security and Labor Concerning Enforcement Activities at Worksites (Dec 7, 2011)

003096

DHS's Role in Supporting Enforcement of Employment and Labor Standards
Page 3

provide for the assistance noncitizen victims and witnesses need to participate actively in the investigations and consider ways to ensure that noncitizen victims and witnesses generally are not placed in immigration proceedings during the pendency of an investigation or prosecution.  Please present these agency plans to me within 60 days of the date of this memorandum.

3.  Identify the policies and measures that are in place to ensure that E-Verify is not manipulated to suppress unauthorized workers from, or to punish unauthorized workers for, reporting unlawful labor practices such as substandard wages, unsafe working conditions, and other forms of worker exploitation.  Review any available reports and studies of the use of E-Verify in the context of workplace rights and, within 60 days of this memorandum, please present proposed recommendations to me as to how E-Verify can be further strengthened to ensure it is not misused as a tool of exploitative labor practices.

**Immediate Guidance**

We will develop a Department-wide approach to worksite enforcement based upon our consideration of the plans and recommendations you present in response to this memorandum. In the interim, the following guidance will govern our worksite enforcement efforts:

- **Cease mass worksite operations.**  The deployment of mass worksite operations, sometimes resulting in the simultaneous arrest of hundreds of workers, was not focused on the most pernicious aspect of our country's unauthorized employment challenge: exploitative employers. These highly visible operations misallocated enforcement resources while chilling, and even serving as a tool of retaliation for, worker cooperation in workplace standards investigations.  Moreover, such operations are inconsistent with the Department's September 30, 2021 Guidelines for the Enforcement of Civil Immigration Law and the individualized assessment they require.  Given these concerns, please ensure we no longer conduct mass worksite operations and instead refocus our workplace enforcement efforts to better accomplish the goals outlined above.

- **Requests for prosecutorial discretion**.  I understand the Department of Labor has recently requested support in certain ongoing workplace standards investigations, including by asking that DHS consider whether to exercise prosecutorial discretion for workers who are victims of, or witnesses to, workplace exploitation.  These individual requests should be considered on a case-by-case basis, weighing all relevant facts and circumstances.  In evaluating these requests, the legitimate enforcement interests of a federal government agency should be weighed against any derogatory information to determine whether a favorable exercise of discretion is merited.

I look forward to working with you on these critical efforts.  Please do not hesitate to reach out to me to discuss any aspect of this memorandum.

Thank you again for your leadership.

003097



Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                                    Director
                                    U.S. Citizenship and Immigration Services

FROM:                        Jeh Charles Johnson
                                    Secretary

SUBJECT:                    **Families of U.S. Armed Forces Members and Enlistees**

By this memorandum, I hereby direct U.S. Citizenship and Immigration Services (USCIS) to issue new policies on the use of parole-in-place or deferred action for certain spouses, children, and parents of individuals seeking to enlist in the U.S. Armed Forces.

The authority of the Secretary of Homeland Security to parole an immigrant into the United States is expressly authorized by statute.  Section 212(d)(5)(A) of the *Immigration and Nationality Act* (INA) authorizes the Secretary "in his discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission into the United States."[1]

Although parole determinations must be made on an individualized basis, the authority has long been interpreted to allow for designation of specific classes of aliens for whom parole should be favorably considered, so long as the parole of each alien within the class is considered on a discretionary, case-by-case basis.  Further, it is generally accepted that this parole authority can lawfully be extended to persons outside the United States as well as persons inside the United States who have not been lawfully admitted.[2]  The latter use of parole is referred to as "parole-in-place."

---

[1] INA § 212(d)(5)(A); 8 U.S.C. § 1182(d)(5)(A).
[2] U.S. Citizenship and Immigration Services Policy Memorandum PM-602-0091 (Nov. 15, 2013).

1

Under current policy, family members of U.S military service members and veterans are eligible for parole-in-place.[3]  The Department of Defense has requested that the Department of Homeland Security expand the scope of its parole-in-place memorandum of November 2013 to encompass family members of U.S. citizens and lawful permanent residents who seek to enlist in the U.S. Armed Forces.  To support the military and its recruitment efforts, I hereby direct USCIS to work with the Department of Defense to address the availability of parole-in-place and deferred action for the spouse, parent, and child of a U.S. citizen or lawful permanent resident who seeks to enlist in the U.S. Armed Forces.

Further, I am also directing USCIS to consider the availability of deferred action, on a case-by-case basis, to those now undocumented family members of U.S. military service members and veterans who would be otherwise eligible for parole-in-place, but who were inspected and lawfully admitted to the United States.

---

[3] U.S. Citizenship and Immigration Services, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)*, November 15, 2013.

003099



U.S. Department of Homeland Security
Washington, DC 20528

February 11, 2022

MEMORANDUM FOR EMPLOYEES OF:
        U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
        U.S. CUSTOMS AND BORDER PROTECTION
        U.S. CITIZENSHIP AND IMMIGRATION SERVICES

FROM:     Tae D. Johnson
        Acting Director
        U.S. Immigration and Customs Enforcement

        Chris Magnus
        Commissioner
        U.S. Customs and Border Protection

        Ur M. Jaddou
        Director
        U.S. Citizenship and Immigration Services

SUBJECT:   **Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States**

---

**Purpose**

This guidance provides policy and operational instructions and defines DHS agency and office roles in accepting and considering requests for parole from noncitizen current and former military service members and their qualifying family members who are outside of the United States.[1]

In recognition of the profound commitment and sacrifice that current and former military service members and their families make and have made to the United States, the U.S. Department of Homeland Security (DHS) will accept and consider, on a case-by-case basis, parole requests under section 212(d)(5) of the Immigration and Nationality Act (INA)[2] from certain noncitizen current and former military service members and qualifying family members of current and

---

[1] *See* 8 C.F.R. §§ 2.1, 212.5; *see also* Memorandum of Agreement Between United States Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) For the purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States (Sept. 29, 2008) (DHS Parole MOA).
[2] 8 U.S.C. § 1182(d)(5).

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 2

former military service members who are outside the United States, so that they may seek return to the United States to better avail themselves of U.S. legal counsel and systems and gain access to certain veterans' benefits.

The July 2, 2021 DHS Component Memorandum for the Secretary of Homeland Security states, in pertinent part, that DHS Components will:

> Use DHS's prosecutorial discretion and other legal authorities to receive and review requests from certain previously removed former noncitizen service members and immediate family members of service members to return to the United States to facilitate better access to appropriate Veterans Affairs (VA) benefits, legal counsel, and the U.S. legal system for purposes of requesting post-conviction relief or reopening of removal proceedings, if warranted.  We will develop a Department-wide approach to reviewing requests for relief from removal by previously removed noncitizen service members and immediate family members of service members to support humane and consistent outcomes.[3]

**Background**

Throughout U.S. history, noncitizens have honorably served in the U.S. Armed Forces.  Although the INA contains specific provisions allowing noncitizen service members to apply for naturalization,[4] some noncitizen current and former service members may not have applied for naturalization or may have been denied naturalization and became subject to civil immigration enforcement and removal due to several possible factors, including criminal behavior.  However, prior removal, or certain criminal behavior, does not automatically disqualify some individuals from naturalization or other immigration benefits.  Additionally, prior removal or criminal behavior does not automatically disqualify former service members from benefits administered by the VA based on their prior service.  Allowing certain individuals to return to the United States to apply for and fully access these benefits will yield a significant public benefit by fulfilling our obligation to support the men and women who defend our Nation and to care for them and their families.

Military personnel are commonly exposed to health-harming conditions during their service, resulting in higher rates of physical and mental health conditions compared with the general population.[5]  Studies have shown that military veterans report higher rates of many health conditions compared with the general population, including physical health symptoms (e.g., pain, fatigue), chronic conditions (e.g., diabetes), mental health disorders (e.g., post-traumatic stress disorder, depression) and harmful substance use.  In many cases, barring a former service member from entering the United States limits their access to VA health services to which they

---

[3] See DHS's Commitment to Supporting Noncitizen Service Members, Veterans, and Immediate Family Members of Service Members Memorandum (July 2, 2021).
[4] INA § 329, 8 U.S.C. § 1440.
[5] Horyniak D., et al., *Deportation of Non-Citizen Military Veterans: A Critical Analysis of Implications for the Right to Health*, Global Public Health (Dec. 15, 2017), available at https://pubmed.ncbi.nlm.nih.gov/29243564/.

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 3

may otherwise be entitled.  Availability of, and access to, healthcare while living outside of the
United States may be limited for reasons including barriers to enrolling in public insurance plans,
challenges navigating unfamiliar health systems, and stigma and discrimination towards deported
former service members.  Additionally, the quality of available care may be sub-optimal due to
limited expertise in service-related health issues and lack of evidence-based treatment for some
health conditions (e.g., substance use dependence).

**Justification for Considering Parole Requests from Current and Former Military Members
and Their Families**

The Secretary of Homeland Security, in his discretion, may parole an individual "into the United
States temporarily under such conditions as he may prescribe only on a case-by-case basis for
urgent humanitarian reasons or significant public benefit."[6]  The Secretary may set the duration
of the parole based on the purpose for granting the parole request.  Parole is neither an
immigration status nor an admission to the United States,[7] and individuals who may be otherwise
inadmissible may be paroled into the United States.  DHS may terminate the parole at any time
and the individual's case shall continue "in the same manner as that of any other applicant for
admission to the United States."[8]

Parole for noncitizen current and former military service members and their families outside the
United States (to include those who were removed from the United States) generally would
provide a significant public benefit to the United States by recognizing the profound
commitment and sacrifice that military service members and their families have made to the
United States.  A grant of parole may promote family unity among military service members or
assist former military service members (and their family members) who may be eligible for
naturalization or other immigration benefits or post-conviction relief.  In certain cases, there also
may be an urgent humanitarian reason to permit former service members (or their family
members) to return to the United States to receive medical treatment and access VA benefits,
including care for physical and mental health conditions arising from their service, that may only
be available in the United States.  The decision whether to grant a parole request will be
determined on a case-by-case basis and upon a thorough review of the request and other relevant
information related to the noncitizen.

**Jurisdiction Over Parole Requests from Current and Former Military Members and Their
Families.**

Under current DHS guidelines, ICE generally has jurisdiction over parole requests for
individuals who are in removal proceedings, have final orders of removal or have been removed,
and individuals granted deferred action by ICE at any point after the commencement of removal
proceedings.[9]  Parole requests from previously removed service members and certain qualifying

---

[6] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).
[7] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).
[8] Id.; see also 8 C.F.R. § 212.5(c)-(e).
[9] See DHS Parole MOA (Sept. 29, 2008).

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 4

family members will therefore generally fall under ICE jurisdiction.  For other individuals who
do not fall under ICE's jurisdiction, USCIS will generally have jurisdiction to adjudicate the
parole request.  CBP has jurisdiction over all parole requests at the port of entry regardless of the
applicant having pending removal proceedings or having previously been removed and does not
require advance filing of a Form I-131, *Application for Travel Document*.  The Component that
adjudicates the parole requests for these individuals should also adjudicate the requests of any
derivative family members, whether accompanying the principal or following to join later.

Certain current and former service members and their qualifying family members residing
outside the United States, as described in this policy, may file a Form I-131 to request parole into
the United States from USCIS or ICE.  All Form I-131 filings will continue to be filed with a
USCIS Lockbox.  If the parole applicant falls under ICE jurisdiction as described above, USCIS
will direct the case to, or coordinate with ICE, as appropriate.  If the Form I-131 is approved by
USCIS or ICE, the individual may be issued an Advance Parole Document that allows the
individual to request parole at a port of entry where a CBP officer inspects the individual and
determines whether to authorize parole and the length of their parole period.

**Specialized Training for DHS Officers Considering Parole Requests from Current and
Former Military Members and Their Families**

Considering the unique circumstances and significant U.S. equities in supporting current and
former members of the military and their families, any officer who is assigned to review Form I-
131 parole requests under this guidance must receive specialized training developed in
coordination with the VA.

**Expedited Handling and Supervisory Level Review**

All parole requests that fall within these guidelines will be reviewed expeditiously and must
receive a supervisory review at the level determined by the component having jurisdiction over
the case, prior to issuing a final decision.  When the component with jurisdiction for the request
completes its review, the case will be forwarded to the supervisor for concurrence.  The
component will report decisions to the Immigrant Military Members and Veterans Initiative
(IMMVI) Interagency Group for tracking and reporting purposes.[10]

If a final decision cannot be reached within 90 days of receipt at the reviewing office, the
reviewing office will provide progress updates to the IMMVI Interagency Group at 60-day
intervals until a final determination is made.  The IMMVI Interagency Group will have a strictly
consultative and coordinating role and will not provide a binding or determinative opinion or
recommendation.

---

[10] The Immigrant Military Members and Veterans Initiative (IMMVI) is an interagency working group made up of
representatives from USCIS, ICE and CBP, the VA, and Department of Defense.

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 5

### Fees

The USCIS Director will exercise the authority under 8 CFR 103.7(d) to approve exemptions from any fee required by 8 CFR 103.7(b)(1)(i) for the initial Form I-131 and the initial Form I-765, *Application for Work Authorization*, (if applicable), as it is in the public interest and consistent with other applicable policy related to current and former members of the military. Family members must submit the appropriate fees with the forms or accompanying fee waiver request, using Form I-912, *Request for Fee Waiver*.

### Demonstrating Current and Former Service Membership and Military Service

It is the applicant's burden to establish that they are a current or former service member or are a qualifying family member under this policy and is responsible for providing evidence to meet their burden. Documentation that supports military service include the Certificate of Release or Discharge from Active Duty (DD Form 214), National Guard Report of Separation and Record of Service (NGB Form 22), or other official service or discharge document.

### Qualifying Familial Relationship

Military service sacrifice is not limited to the noncitizen current or former service member alone. To recognize that sacrifice and promote family unity, this guidance applies to certain family members of current and former service members.  Qualifying family members are:

- A current spouse,[11] child,[12] or unmarried son or daughter and their unmarried children who are under 21, of a current or former service member.
- Any current legal guardian[13] or surrogate of a current or former service member when the guardian or surrogate files a Form I-131 to request parole concurrently with the service member's application for naturalization using Form N-400, *Application for Naturalization*.

There is generally a significant public benefit to the parole of the qualifying family member due to family unity considerations and to recognize their sacrifice as a family member of a current or former service member.

Each qualifying family member may file Form I-131 independently and must be individually eligible for parole, such that there are urgent humanitarian reasons or a significant public benefit for their parole, and that the family member merits a favorable exercise of discretion.  A qualifying family member must provide all the required documentation to establish their family

---

[11] An individual is a spouse of the service member if the marriage was a valid marriage by the law of the place where the marriage was celebrated not contrary to U.S. public policy and is a bona fide marriage.
[12] *See* INA 101(b) and INA 101(c).
[13] A legal guardian or surrogate is a person designated by a court to exercise legal authority over the service member's affairs.

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 6

member's military service and a qualifying familial relationship, which may include a birth certificate, marriage certificate and prior divorce decrees, and court documentation of legal guardianship or surrogacy as applicable.

**Exercise of Discretion**

In evaluating parole requests on a case-by-case basis, DHS weighs all relevant considerations, including the significant public benefit interest and urgent humanitarian reasons for facilitating parole of current and former U.S. military members and qualifying family members residing outside the United States.  Absent significant negative factors, including any factors indicating that the applicant poses a national security[14] or current public safety threat,[15] parole would generally be an appropriate exercise of discretion for certain current and former U.S. military service members and the qualifying family members described above.  The applicant has the burden of establishing that he or she warrants a favorable exercise of discretion, and every application will be adjudicated and considered on a case-by-case basis, based on the totality of the facts and circumstances.

*Additional Factors to Consider*

The qualifying individual's military service or their qualifying family member's military service ordinarily weighs heavily in favor of parole, but this may be overcome if there is significant derogatory information indicating that the applicant poses a national security or current public safety threat.  Officers should refer to the DHS Guidelines for the Enforcement of Civil Immigration Law when assessing the totality of the circumstances on a case-by-case basis, which include the following examples:[16]

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record;
- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;

---

[14] DHS will determine whether a noncitizen poses a threat to United States sovereignty, territorial integrity, national interests, or institutions.  General criminal activity does not amount to a national security threat.
[15] *See* Guidelines for the Enforcement of Civil Immigration Law. (Sept. 30, 2021).
[16] *Id.*

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 7

- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;
- time since an offense and evidence of rehabilitation; and,
- conviction was vacated or expunged.

Additional factors to consider that apply to certain current and former U.S. military members and qualifying family members, include:

- pathway to naturalization or other immigration status;
- a need to access the U.S. legal system to assist with appeals of criminal convictions, discharge upgrade requests, and reopening removal proceedings, if appropriate;[17]
- medical conditions related to military service; and,
- a need for medical services with the VA that can only be accessed in the United States.

In evaluating parole requests, DHS will consider, as an exceptionally strong favorable factor, the fact that an applicant, or the qualifying family member of such an applicant, has filed a Form N-400 and appears to be prima facie eligible for naturalization under INA § 329.[18]

If the current or former service member or their family member does not appear eligible for naturalization, or other immigration status, DHS will not consider this a strong negative factor.

---

[17] Evidence, such as an affidavit, that addresses the former service member's access to counsel at the time of any prior removal proceeding or whether counsel at the time of any prior criminal plea provided accurate information about the possible immigration consequences of all charges is now required for the plea to be constitutionally sufficient under *Padilla v Kentucky*, 559 U.S. 356 (2010). However, *Padilla*'s requirement that counsel advise a defendant of a guilty plea's immigration consequences does not apply retroactively to convictions that became final prior to the issuance of the *Padilla* decision on March 31, 2010. *Chaidez v. United States*, 568 U.S. 342, 358 (2013). In some circuits, however, the *Chaidez* holding on retroactivity of *Padilla* does not apply to cases in which counsel had engaged in a material misrepresentation of the federal immigration consequences of the criminal plea, *see, e.g., United States v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016); *United States v. Chan*, 792 F.3d 1151 (9th Cir. 2015); whereas other circuit courts have held that *Chaidez* extends to attorney misadvice claims, *see, e.g., Chavarria v. United States*, 739 F.3d 360 (7th Cir. 2014).  State courts have varying rules on the retroactive applicability of *Padilla*.  If there is substantial and probative evidence that *Padilla* was violated or there was a material misrepresentation by counsel concerning the immigration consequences of a criminal plea, such evidence may tend to show that the applicant may benefit from improved access to the U.S. legal system to appeal a criminal conviction and thus may be considered a positive discretionary factor in the parole adjudication.
[18] See USCIS Policy Manual, Volume 12, Citizenship and Naturalization, Part I Military Members and their Families, Chapter 3, Military Service during Hostilities (INA 329) [12 USCIS-PM I.3] and Chapter 5, Application and Filing for Service Members (INA 328 and 329) [12 USCIS-PM I.5].

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 8

**Documentation**

It is the applicant's burden to establish that they are a current or former service member or are a qualifying family member under this policy and that they warrant a favorable exercise of discretion. [19]  The applicant is responsible for providing evidence to meet their burden.

**Parole Period and Re-Parole Requests**

If discretion to grant parole is favorably exercised, the responsible DHS component should authorize parole for a period of up to 12 months with the option for additional periods of authorized parole, also known as re-parole, in increments of up to 12 months, as appropriate. When determining the initial period of parole, factors to be considered include the estimated time needed for proper medical treatment, family unity, the complicated nature of post-conviction relief, or processing time delays with the Executive Office for Immigration Review and USCIS, as applicable to the individual's case.  DHS also may prescribe reasonable terms and conditions for the parole of any individual, including issuing parole for multiple entries, the giving of a bond, or periodic reporting of whereabouts.[20]

**Employment Authorization**

Recipients of parole under this policy may apply for employment authorization.[21]  The favorable exercise of discretion to grant parole to these beneficiaries generally should lead to approving employment authorization.  If approved, the employment authorization document should generally be issued to cover the same period as the parole.

**Advance Parole Documents to Facilitate Return to the United States after Temporary Travel Abroad**

If a beneficiary of this policy needs to travel outside the United States and return, the individual must file with USCIS a Form I-131 to request an Advance Parole Document prior to departing the United States.  Advance Parole may be issued for single or multiple entries.

**Parole in Place for Family Members of Current and Former U.S. Military Members**

This memorandum does not replace or change current USCIS policy guidance related to parole-in-place for certain family members of current and former U.S. military members inside the United States.

.

---

[19] See INA 291; 8 U.S.C. 1361
[20] *See* INA § 212(d)(5)(A); 8 C.F.R. § 212.5(c).
[21] 8 C.F.R. § 274a.12(c)(11).

**FOR OFFICIAL USE ONLY**

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 9

**No Private Rights Created**

This memorandum is not intended to, does not, and should not be construed to create, modify, or destroy any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

FOR OFFICIAL USE ONLY

**OHSS Estimate of Unauthorized Spouses of U.S. Citizens: Assumptions**

The OHSS estimate of the total unauthorized population as of Jan 1, 2022 is explained in detail in the public-facing Unauthorized Immigrant Population Estimate.[1]

To generate Table 2, "Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC":

- OHSS used its published estimate of the unauthorized population to generate assumptions about the total unauthorized population by citizenship and time in the United States:

| | Total | 10+ years | 8+ years | 5+ years |
|---|---|---|---|---|
| Overall | 10,990,000 | 9,340,000 | 9,880,000 | 10,630,000 |
| Mexico | 4,810,000 | 4,320,000 | 4,420,000 | 4,550,000 |
| NCA | 2,020,000 | 1,210,000 | 1,310,000 | 1,570,000 |
| Other W. Hem | 1,970,000 | 1,290,000 | 1,410,000 | 1,630,000 |
| Eastern Hem. | 2,180,000 | 1,850,000 | 1,960,000 | 2,110,000 |

- OHSS applied estimates of the breakout between entries without inspection (EWIs) and overstayers (OS) by citizenship:

| | Low EWI Estimates | | High EWI Estimates | |
|---|---|---|---|---|
| | EWI % | OS% | EWI % | OS% |
| Mexico | 55% | 45% | 75% | 25% |
| NCA | 70% | 30% | 90% | 10% |
| Other W. Hem | 40% | 60% | 60% | 40% |
| Eastern Hem. | 2% | 98% | 10% | 90% |

- OHSS estimated rates of marriage to U.S. citizens by citizenship and EWI vs OS status:

| | Low Marriage Estimates | | High Marriage Estimates | |
|---|---|---|---|---|
| | EWI % | OS% | EWI % | OS% |
| Mexico | 8% | 0% | 14% | 5% |
| NCA | 8% | 0% | 12% | 5% |
| Other W. Hem | 8% | 0% | 12% | 5% |
| Eastern Hem. | 8% | 0% | 12% | 5% |

- OHSS multiplied high and low assumptions for EWI vs overstayer and marriage rates by the total unauthorized population to generate high- and low-end estimates of numbers of spouses married to U.S. citizens by citizenship and EWI status (table 2). The high estimate of 12% for most countries comes from MPI's estimate of 12% of unauthorized immigrants being married to

---

[1] U.S. Dep't of Homeland Security, Office of Homeland Security Statistics (OHSS), *Estimates of the Unauthorized Immigrant Population Residing in the United States* (May 7, 2024), https://www.dhs.gov/ohss/topics/immigration/population-estimates/unauthorized-resident.

USC.[2] OHSS treats MPI's estimate as the high-end of our modeling range because more highly assimilated immigrants (such as those married to a USC) are likely to be overrepresented in the American Community Survey (which is the basis for MPI's estimate) relative to less highly assimilated immigrants. OHSS further assumed that Mexican nationals are married at slightly higher rates than nationals of other countries because unauthorized immigrants from Mexico from 10 or more years ago were more likely to have arrived as single adults (as opposed to single parents with young, minor children) than unauthorized immigrants from other countries.

- OHSS used the mid-point of high- and low- end assumptions to generate Table 3 (point estimates for the population estimated in Table 2).

- OHSS made assumptions about average the number of U.S. citizen and undocumented children per marriage based on a weighted average of fertility rates in migrants' countries of citizenship during the period of their migration to the United States. Based on UN fertility data for Mexico[3] (which was similar to other source countries during the period under consideration), OHSS assumed a total of 2.3 children per marriage. OHSS further assumes that about 95 percent of children of mixed status marriages are born in the U.S. (i.e., are the birth children of the mixed-status couple) and that about 5 percent enter with the unauthorized spouse (i.e., are the stepchildren of the U.S. citizen spouse).[4] This yields an estimate of 2.2 U.S. citizen children and 0.1 unauthorized immigrant children per family. OHSS multiplied these child-per-family rates by the number of mixed status families to generate the top two rows of Table 4. The bottom row of table 4 also adds in the U.S. citizen spouses to generate the total number of U.S. citizens in mixed-status families.

- OHSS used detailed estimates of the total unauthorized population by year of entry (based on Census ACS data and the residual methodology as described in its published unauthorized population estimate) to calculate average years since entry/average years of presence for the total unauthorized population and the population that has been present at least 10 years (Table 5).

---

[2] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US (last visited June 17, 2024).
[3] Source: World Population Prospects: The 2022 Revision | United Nations Population Division, *Total fertility rate (live births per woman)*, https://data.un.org/Data.aspx?q=mexico&d=PopDiv&f=variableID%3a54%3bcrID%3a484 (last visited June 17, 2024).
[4] The estimate of 5% is the midpoint of the OHSS estimated range of 0 to 10 percent, which was based on the rarity 10 or more years ago of unauthorized immigrants arriving with young, minor children. The phenomenon was so rare that CBP only began tracking them in 2012, at which time they were only 3% of all SWB encounters.

| Table 1: Estimated Unauthorized Immigrant Population as of Jan. 1, 2022 | |
|---|---|
| **Total** | **10,990,000** |
| Mexico | 4,810,000 |
| N. Central America | 2,020,000 |
| Other W. Hemisphere | 1,970,000 |
| E. Hemisphere | 2,180,000 |

**Table 2: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC, by Number of Years in the United States, Country, and Method of Entry, (low and high estimates)**

| | >10 years | | >8 years | | >5 years | | Total | |
|---|---|---|---|---|---|---|---|---|
| | low | high | low | high | low | high | low | high |
| **EWIs only** | | | | | | | | |
| Total | 300,000 | 700,000 | 320,000 | 730,000 | 340,000 | 790,000 | 390,000 | 890,000 |
| Mexico | 190,000 | 450,000 | 190,000 | 460,000 | 200,000 | 480,000 | 210,000 | 510,000 |
| N. Central America | 70,000 | 130,000 | 70,000 | 140,000 | 90,000 | 170,000 | 110,000 | 220,000 |
| Other W. Hemisphere | 40,000 | 90,000 | 50,000 | 100,000 | 50,000 | 120,000 | 60,000 | 140,000 |
| E. Hemisphere | 0 | 20,000 | 0 | 20,000 | 0 | 30,000 | 0 | 30,000 |
| **Overstayers only** | | | | | | | | |
| Total | 0 | 170,000 | 0 | 180,000 | 0 | 190,000 | 0 | 210,000 |
| Mexico | 0 | 50,000 | 0 | 60,000 | 0 | 60,000 | 0 | 60,000 |
| N. Central America | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 |
| Other W. Hemisphere | 0 | 30,000 | 0 | 30,000 | 0 | 30,000 | 0 | 40,000 |
| E. Hemisphere | 0 | 80,000 | 0 | 90,000 | 0 | 90,000 | 0 | 100,000 |
| **Total** | | | | | | | | |
| Total | 300,000 | 870,000 | 320,000 | 910,000 | 340,000 | 980,000 | 390,000 | 1,100,000 |
| Mexico | 190,000 | 510,000 | 190,000 | 520,000 | 200,000 | 540,000 | 210,000 | 570,000 |
| N. Central America | 70,000 | 140,000 | 70,000 | 150,000 | 90,000 | 180,000 | 110,000 | 230,000 |
| Other W. Hemisphere | 40,000 | 120,000 | 50,000 | 130,000 | 50,000 | 150,000 | 60,000 | 180,000 |
| E. Hemisphere | 0 | 110,000 | 0 | 110,000 | 0 | 120,000 | 0 | 120,000 |

**Table 3: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC, by Number of Years in the United States, Country, and Method of Entry, (point estimates)**

|  | > 10 years | > 8 years | > 5 years | Total |
|---|---|---|---|---|
| _EWIs only_ |  |  |  |  |
| Total | 500,000 | 525,000 | 565,000 | 640,000 |
| Mexico | 320,000 | 325,000 | 340,000 | 360,000 |
| N. Central America | 100,000 | 105,000 | 130,000 | 165,000 |
| Other W. Hemisphere | 65,000 | 75,000 | 85,000 | 100,000 |
| E. Hemisphere | 10,000 | 10,000 | 15,000 | 15,000 |
| _Overstayers only_ |  |  |  |  |
| Total | 85,000 | 90,000 | 95,000 | 105,000 |
| Mexico | 25,000 | 30,000 | 30,000 | 30,000 |
| N. Central America | 5,000 | 5,000 | 5,000 | 5,000 |
| Other W. Hemisphere | 15,000 | 15,000 | 15,000 | 20,000 |
| E. Hemisphere | 40,000 | 45,000 | 45,000 | 50,000 |
| _Total_ |  |  |  |  |
| Total | 585,000 | 615,000 | 660,000 | 745,000 |
| Mexico | 350,000 | 355,000 | 370,000 | 390,000 |
| N. Central America | 105,000 | 110,000 | 135,000 | 170,000 |
| Other W. Hemisphere | 80,000 | 90,000 | 100,000 | 120,000 |
| E. Hemisphere | 55,000 | 55,000 | 60,000 | 60,000 |

**Table 4: Estimates of USC Family Members Residing with Unauthorized Noncitizens**

|  | >10 years | | Total | |
|---|---|---|---|---|
|  | EWI | Total | EWI | Total |
| # of USC children | 1,100,000 | 1,290,000 | 1,410,000 | 1,640,000 |
| # of undoc children | 50,000 | 60,000 | 60,000 | 70,000 |
| total # of USCs in mixed-status families | 1,650,000 | 1,940,000 | 2,050,000 | 2,390,000 |

**Table 5: Noncitizen Spouses' Average Length of Presence in the United States**

| All | > 10 years |
|---|---|
| 20 years | 23 years |

Population Estimates

# Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022

Bryan Baker and Robert Warren
*April 2024*



Office of Homeland Security Statistics
U.S. Department of Homeland Security

003113

003114

This report presents annual estimates of the size and characteristics of the unauthorized immigrant population residing in the United States as of January 1 for the years 2018 through 2020 and for 2022.[1] The population must be estimated because there is no nationally representative survey or census that includes information on the legal status of foreign-born residents. Results are tabulated according to available demographic characteristics, including period of entry, country of origin, state of residence, age, and sex. As in previous editions, the estimates were calculated using the residual method in which the unauthorized population is the remainder (or residual) after the legally-resident, foreign-born population—naturalized citizens, children who derived citizenship from one or more parents, lawful permanent residents (LPRs), asylees, refugees, and certain nonimmigrants—is subtracted from the total foreign-born population.[2] The legally-resident subpopulation was estimated primarily based on the Department of Homeland Security's (DHS) administrative records along with modeled components of population change (such as emigration and mortality), and the total foreign-born population estimate was derived from the U.S. Census Bureau's American Community Survey (ACS) with adjustments for undercount and choice of reference date.

In summary, the Office of Homeland Security Statistics (OHSS) estimates 11.0 million unauthorized immigrants were living in the United States on January 1, 2022, down from 11.6 million in 2010 and up from 10.5 million in January 2020. This increase ends a declining trend from January 2016 to January 2020 or 2021.[3] Forty-four percent of unauthorized immigrants in 2022 were from Mexico, compared to 59 percent in 2010 and 55 percent in 2015. Seventy-nine percent entered prior to January of 2010 and 42 percent resided in California or Texas.

# Definitions

## LEGAL RESIDENTS

The legally-resident, foreign-born population, as defined for these estimates, includes naturalized citizens, children who derived citizenship from one or more parents, persons granted lawful permanent residence, persons granted asylum, persons admitted as refugees, and persons admitted as resident nonimmigrants (i.e., students and temporary workers, as opposed to tourists) who have unexpired authorized periods of admission.

## UNAUTHORIZED IMMIGRANTS

The resident unauthorized immigrant population is defined as all foreign-born noncitizens who are not legal residents as defined above. Most unauthorized immigrants either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. Persons who are beneficiaries of Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA) or other forms of prosecutorial discretion, or who are residing in the United States while awaiting removal proceedings in immigration court are included among the estimates of the unauthorized population. Unauthorized immigrants applying for adjustment to LPR status under the Immigration and Nationality Act (INA) are considered to be part of the resident unauthorized population until they have been granted lawful permanent residence. Individuals who were paroled into the United States are considered to be unauthorized immigrants until they are admitted or otherwise acquire immigration status.

---

[1] Estimates as of January 1, 2021 are not available due to limitations in the 2020 edition of the U.S. Census American Community Survey (ACS), as discussed below.

[2] Previous editions of this report are available at: https://www.dhs.gov/ohss/topics/immigration.  Although the method in this report is very similar to that used in earlier editions, the current report includes methodological updates that are discussed in the appendix.

[3] The last year of the declining trend is unknown because an estimate for January 2021 is unavailable, as discussed below.

003115

# Methodology Overview and Data

This report estimates two populations to derive the unauthorized immigrant population estimate: 1) the total foreign-born population living in the United States on January 1 of each year in the series, and 2) the legally-resident, foreign-born population on the same dates. The unauthorized immigrant population estimate is the residual when the second population is subtracted from the first population.

Data on the total foreign-born population that entered during 1980–2021 by country of birth, state of residence, year of entry, age, and sex were obtained or derived from the 2017–2019 and 2021 editions of the ACS.[4] The ACS is a nationally representative survey that collects information from U.S. households and other group living arrangements on social, demographic, and economic characteristics, including country of birth and year of entry of the foreign-born population.[5] Foreign-born residents who entered the United States prior to 1980 are assumed to be legally resident and are therefore excluded from the calculations.[6]

Data for several subsets of the legally-resident, foreign-born population are derived from DHS and other administrative records. Administrative records from U.S. Citizenship and Immigration Services (USCIS) include data on persons who obtained LPR status or naturalized, Department of State records include data on refugee arrivals, USCIS and the Department of Justice Executive Office for Immigration Review maintain records of persons granted asylum affirmatively or defensively, and the U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS) database includes person-level information on nonimmigrant arrivals, departures, and nonimmigrant status.[7] Each of these systems includes information on subjects' country of birth or nationality, state of residence, age, sex, category of admission, and year of entry.

OHSS generates its estimate of the unauthorized population by subtracting the legally-resident, foreign-born population from the total foreign-born population. Demographic data in the ACS and administrative records allow OHSS to generate estimates for the 10 leading countries of birth and states of residence and by age and sex.

See Appendix 1 for more detailed information on each component of the estimation process, including changes from previous editions of this report in the methods and data sources.

---

[4]   Data to estimate the population on January 1 of 2018, 2019, 2020, and 2022 were obtained from each of the prior years' ACS surveys. As a result of substantial challenges related to COVID-19, the 2020 ACS was not considered a reliable source for the purpose of this report (see Daily et al., 2021) and estimates as of January 1, 2021 are not available as a result.

[5]   OHSS uses the ACS to build its estimates because of its large sample size: about three million households per year, compared to about 100,000 annually for the Current Population Survey, which is the primary alternative source of national data on the foreign-born population.

[6]   The vast majority of otherwise-unauthorized immigrants who entered the United States prior to 1980 and who still reside in the country likely obtained lawful status prior to 2015 under Section 249 of the INA, which allows qualified persons who have resided continuously in the United States since prior to January 1, 1972 to apply for LPR status under the so-called registry provision, or under the Immigration Reform and Control Act (IRCA) of 1986 (Pub. L. No. 99-603, 100 Stat. 3359 (1986)), which allowed qualified persons who have resided continuously in the United States since prior to January 1, 1982 to adjust to lawful status.

[7]   The use of the ADIS database to estimate the legally resident nonimmigrant population represents a methodological change from previous editions of this report, in which the nonimmigrant population was estimated using trend-based modeling that could not be continued due to Coronavirus-Disease 2019 (COVID-19)-related disruption of nonimmigrant travel trends. See Appendix 1 for further discussion.

# Findings

**Figure 1**

**Unauthorized Immigrant Population Estimates by Year: 2000–2022**



Notes: The estimates for the 2005–2010 series were based on ACS vintages tied to the 2000 decennial census, the estimates for the 2010–2015, 2015–2018, and 2018–2020 series were based on ACS vintages tied to the 2010 decennial census, and the 2022 estimate was based on an ACS vintage tied to the 2020 decennial census. The estimate for 2018 has been updated compared to the previous edition of this report. Estimates for 2001–2004 and 2021 are not available. See Appendix 2 for details and values for each year estimated.
Source: Office of Homeland Security Statistics

Figure 1 summarizes OHSS' estimates of the unauthorized population for 2000, 2005–2020, and 2022. Readers should exercise caution when describing changes in these estimates over time because some year-to-year variation may reflect sampling error in the ACS and/or non-sampling error in the estimation method (see Appendix), and OHSS does not have a methodology to evaluate the statistical significance of these fluctuations. Longer-term trends are also difficult to interpret because of several disjunctures in the data series: estimates for 2000 are directly based on the 2000 Census; estimates for 2005–2010 are based on ACS data tied to the 2000 Census; estimates for 2010–2020 are based on ACS data tied to the 2010 Census; and estimates for 2022 are based on ACS data tied to the 2020 Census. In addition, estimates for 2015–2018 and 2018–2022 incorporate minor updates to improve upon the methodology employed in previous years. For each of the 2010, 2015, and 2018 break points, the figure includes estimates generated under earlier and later data sources/assumptions.

## Period of Entry

The size of the unauthorized immigrant population that arrived since 2010 declined by 280,000 from 2018 to 2020, then grew by 630,000 from 2020 to 2022 (Table 1 and Figure 2).  The vast majority of the population (79 percent) entered before 2010, but that percentage is declining (from 83 percent in 2018) as new unauthorized entrants arrive and earlier entrants emigrate, die, or adjust to legally resident status.

**Table 1**

**Unauthorized Immigrant Population Estimates by Period of Entry: 2018–2020 and 2022**

| Period of Entry | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| **Total** | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| **1980–1990** | 1,560,000 | 1,520,000 | 1,480,000 | 1,460,000 |
| **1990–1999** | 3,820,000 | 3,540,000 | 3,420,000 | 3,360,000 |
| **2000–2009** | 4,230,000 | 4,180,000 | 3,930,000 | 3,860,000 |
| **2010 or later** | 1,960,000 | 1,870,000 | 1,680,000 | 2,310,000 |

\* The estimate for 2018 has been updated compared to the previous edition of this report.

Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.

Source: Office of Homeland Security Statistics.

**Figure 2**

**Unauthorized Immigrant Population Estimates by Period of Entry: 2018–2020 and 2022**



\* The estimate for 2018 has been updated compared to the previous edition of this report.

Note: Estimates for 2021 are not available.

Source: Office of Homeland Security Statistics.

## ESTIMATES BY COUNTRY OF BIRTH

The unauthorized immigrant population from Mexico continued the decline observed in the previous edition of this report,[8] from 5.54 million in 2018 to 4.81 million in 2022, a reduction of about 0.73 million or 180,000 people per year (Table 2).[9] Despite this long-term declining trend, Mexico remains by far the largest country of origin for the unauthorized immigrant population.

After Mexico, the next largest unauthorized immigrant populations were from Guatemala, El Salvador, and Honduras. The numbers of unauthorized immigrants from Guatemala (750,000) and Honduras (560,000) increased from 2018 by 21 and 24 percent, respectively, mostly between January 2019 and January 2020, while the number from El Salvador (710,000) remained relatively unchanged from 2018.

Like Mexico, the unauthorized immigrant populations from India and China also declined during the period, both by substantial percentages.[10] The Indian population fell by 54 percent, or 260,000 people, from 480,000 in 2018 to 220,000 in 2022, while the Chinese population declined by 47 percent, or 180,000, from 390,000 to 210,000.

---

[8] See Baker, 2021.

[9] Throughout this report, percentages and percent change were calculated prior to rounding.

[10] This edition of the report groups Hong Kong and Macau with China, whereas previous editions did not.

The populations from Colombia (240,000) and Brazil (230,000) declined from 2018 to 2019 before increasing from 2019 through 2022 by about 3 to 5 percent per year. The population from Venezuela grew steadily by 17 percent per year, from 190,000 in 2018 to 320,000 in 2022.

**Table 2**

**Unauthorized Immigrant Population Estimates by Top 10 Countries of Birth: 2018–2020 and 2022**

| Country | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| Mexico | 5,540,000 | 5,350,000 | 4,970,000 | 4,810,000 |
| Guatemala | 620,000 | 670,000 | 780,000 | 750,000 |
| El Salvador | 730,000 | 750,000 | 750,000 | 710,000 |
| Honduras | 450,000 | 450,000 | 550,000 | 560,000 |
| Philippines | 370,000 | 360,000 | 340,000 | 350,000 |
| Venezuela | 190,000 | 220,000 | 260,000 | 320,000 |
| Colombia | 210,000 | 190,000 | 190,000 | 240,000 |
| Brazil | 190,000 | 180,000 | 190,000 | 230,000 |
| India | 480,000 | 390,000 | 340,000 | 220,000 |
| China, People's Republic | 390,000 | 330,000 | 270,000 | 210,000 |
| All other countries | 2,400,000 | 2,220,000 | 1,870,000 | 2,600,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available. The estimates for China include Hong Kong and Macau.
Source: Office of Homeland Security Statistics.

## Estimates by State of Residence

California and Texas remained the leading states of residence of the unauthorized population in 2022, with 2.6 million and 2.1 million people, respectively, together accounting for 42 percent of the total unauthorized population (Table 3). The next leading states were Florida (590,000), New Jersey (490,000), Illinois (420,000), and New York (410,000). The 10 leading states represented 72 percent of the total unauthorized population in 2022. From 2018 to 2022, the unauthorized population fell by nearly 100,000 in Florida and 200,000 in New York and increased by 110,000 in Texas.

**Table 3**

**Unauthorized Immigrant Population Estimates by Top 10 States of Residence: 2018–2020 and 2022**

| State | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| California | 2,640,000 | 2,620,000 | 2,410,000 | 2,600,000 |
| Texas | 1,950,000 | 1,950,000 | 1,900,000 | 2,060,000 |
| Florida | 680,000 | 650,000 | 610,000 | 590,000 |
| New Jersey | 460,000 | 390,000 | 400,000 | 490,000 |
| Illinois | 460,000 | 440,000 | 370,000 | 420,000 |
| New York | 600,000 | 510,000 | 370,000 | 410,000 |
| North Carolina | 360,000 | 340,000 | 360,000 | 360,000 |
| Georgia | 390,000 | 360,000 | 360,000 | 340,000 |
| Washington | 310,000 | 330,000 | 340,000 | 340,000 |
| Arizona | 340,000 | 330,000 | 340,000 | 290,000 |
| Other or Unknown | 3,380,000 | 3,200,000 | 3,040,000 | 3,090,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

## ESTIMATES BY AGE AND SEX

The unauthorized immigrant population aged from 2015 to 2022 (Figures 3 and 4 and Table 4). Although the total unauthorized population size declined by about 450,000 (4 percent, from 11.44 in 2015 million to 10.99 million in 2022) during this period, the number who were ages 18 to 34 declined by 1.8 million (49 percent), and the number ages 45 and older increased by 1.3 million (61 percent). While the overall trend in Figure 4 is supported by available data, some of the steep change from 2020 to 2022 may be related to the recalibration of the ACS series from a basis on the 2010 decennial census to the 2020 decennial census.[11]

**Figure 3**

**Unauthorized Immigrant Population Estimates by Age and Sex: 2022**



Source: Office of Homeland Security Statistics.

**Figure 4**

**Unauthorized Immigrant Population Estimates by Age Group: 2015–2022**



Note: Estimates for 2021 were not available and are shown as the averages for 2020 and 2022.
Source: Office of Homeland Security Statistics.

---

[11]   The timing of the increase in older males from 2020 to 2022 aligns with the recalibration of the ACS, and the size and character of the change are not consistent with the younger group aging in to the older group, the relatively small number of illicit border crossers in that age group, or changes in the populations of resident nonimmigrants or nonimmigrant overstayers; this suggests that the increase may be attributable to "corrections" to the size and/or demographic characteristics such as age in the ACS series rather than an actual increase.

**Table 4**

**Unauthorized Immigrant Population Estimates by Age and Sex: 2018–2020 and 2022**

| Age and Sex | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| **Males and Females** | | | | |
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| Under 18 | 1,100,000 | 1,050,000 | 1,010,000 | 1,230,000 |
| 18–24 | 990,000 | 940,000 | 840,000 | 760,000 |
| 25–34 | 2,920,000 | 2,700,000 | 2,420,000 | 2,120,000 |
| 35–44 | 3,630,000 | 3,480,000 | 3,330,000 | 3,380,000 |
| 45–54 | 2,040,000 | 2,100,000 | 2,110,000 | 2,420,000 |
| 55 and over | 890,000 | 830,000 | 820,000 | 1,080,000 |
| **Male** | | | | |
| Total | 6,010,000 | 5,780,000 | 5,510,000 | 5,960,000 |
| Under 18 | 570,000 | 550,000 | 540,000 | 630,000 |
| 18–24 | 550,000 | 480,000 | 460,000 | 410,000 |
| 25–34 | 1,590,000 | 1,500,000 | 1,290,000 | 1,140,000 |
| 35–44 | 1,890,000 | 1,840,000 | 1,770,000 | 1,850,000 |
| 45–54 | 1,040,000 | 1,060,000 | 1,090,000 | 1,320,000 |
| 55 and over | 380,000 | 350,000 | 370,000 | 610,000 |
| **Female** | | | | |
| Total | 5,560,000 | 5,330,000 | 5,000,000 | 5,030,000 |
| Under 18 | 530,000 | 500,000 | 470,000 | 600,000 |
| 18–24 | 450,000 | 450,000 | 380,000 | 350,000 |
| 25–34 | 1,330,000 | 1,200,000 | 1,130,000 | 970,000 |
| 35–44 | 1,740,000 | 1,640,000 | 1,560,000 | 1,520,000 |
| 45–54 | 1,000,000 | 1,040,000 | 1,020,000 | 1,110,000 |
| 55 and over | 510,000 | 480,000 | 450,000 | 470,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.

Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.

Source: Office of Homeland Security Statistics.

003121

# Alternative Estimates

### RESIDUAL ESTIMATES

The Pew Research Center and the Center for Migration Studies (CMS) also estimate the unauthorized immigrant population (see Passel and Krogstad, 2023, and Warren, 2024). The OHSS, Pew, and CMS estimates are generally similar, but key differences in methodological details mean the estimates are not identical. Some of these methodological differences are described below:

- Survey undercount. The residual model estimates the total foreign-born population based on U.S. Census survey data, but the Census is believed to under-count the foreign-born population—and particularly the unauthorized immigrant population—at higher rates than the native-born population. The exact degree of the undercount and how it may differ with time spent in the United States and for different sub-groups is unknown and must be estimated or modeled.

- Emigration modeling. The residual method uses estimates of the lawful permanent resident population which are based on previous immigration inflows, adjusted for mortality and emigration (i.e., lawful immigrants who depart the United States). Mortality rates can be estimated with precision based on standard demographic tables, but similar tables do not exist for emigration rates.

- Methods for estimating the nonimmigrant, refugee, and asylee populations. OHSS estimates nonimmigrants, refugees, and asylees based on previous admissions data, controlling for estimated deaths and observed or measured outflows. Pew and CMS identify these populations based on their expected characteristics in Census data. These methodological differences affect the estimated size of the legally-resident population and therefore have an influence on the estimated size of the unauthorized population.

- Techniques used to control for entry-year heaping in the ACS. Census data on the foreign-born population indicate an unexpectedly large number of immigrants who report entering the United States in 1980 (along with other round-numbered years) relative to surrounding years ("heaping" on 1980). Unauthorized immigrants who entered prior to 1980 are assumed to have legalized through the INA registry provision or the Immigration Reform and Control Act, so how analysts control for this heaping effect has an impact on the resulting population estimate.

- Base populations used in the residual method. The residual method used by OHSS starts with all foreign-born persons who entered in 1980 or later and subtracts off all legally-resident, foreign-born persons. One alternative would be to start with foreign-born noncitizens and subtract off all legally-resident, foreign-born noncitizens, i.e., to exclude naturalized citizens altogether from the calculations. Another alternative would be to start with the population who entered in 1982 or later instead of 1980. OHSS and Pew include naturalized citizens and people who entered in 1980–1981, whereas CMS does not. These different choices of starting populations can lead to different estimates due to recall bias (recollecting the exact year of entry), coverage changes, and/or over-reporting of citizenship in the ACS.

- Estimation date. Estimates for a given year may vary if they reflect different times of the year. For example, some residual estimates that use the ACS may reflect the average population size over the course of the year, whereas OHSS estimates are for January 1 of the given year.

These methodological differences result in some variation around a common "ballpark" estimate. In total, CMS estimated 10.94 million unauthorized immigrants living in the United States in 2022, compared to 10.99 million estimated by OHSS and 10.5 million estimated by Pew for 2021.[12] All three organizations show a generally declining trend from 2016 or earlier until around 2020. For unauthorized immigrants from Mexico, CMS estimated 4.45 million in 2022, compared to 4.81 million estimated by OHSS and 4.1 million estimated by Pew for 2021.

---

[12]  As of the time of this writing, 2022 estimates were not yet available from the Pew Research Center.

## "Inflow–Outflow" Estimates

In 2018, a team of academic researchers published a new estimate of the unauthorized population based on a different methodology (Fazel-Zarandi, Feinstein, and Kaplan 2018). Starting from an assumed 1990 baseline population of 3.5 million unauthorized immigrants, the Fazel-Zarandi et al. study combines separate estimates of population inflows (illegal entries and visa overstayers) and population outflows (deaths, emigration, repatriations, and acquisitions of legal status) to calculate year-over-year population changes. Their analysis aggregates inflow and outflow estimates over 16 years to produce an average estimate for 2016 of 22.1 million unauthorized immigrants.[13]

Preliminary research by OHSS replicates the Fazel-Zarandi et al. methodology and assesses the possibility that the size of the unauthorized population was in the range of 16.2–29.5 million on January 1, 2017, as Fazel-Zarandi et al. conclude, rather than 11.4 million as the DHS residual model estimates. One key finding is that the difference between Fazel-Zarandi et al.'s results and DHS's residual model is entirely driven by high estimated growth in Fazel-Zarandi et al.'s model during the 1990s—yet key data required for inflow-outflow modeling are not available for those years. These data limitations, along with a number of questionable modeling assumptions, give OHSS little confidence in Fazel-Zarandi et al.'s findings about population growth in 1990–2000.

---

[13] Fazel-Zarandi et al. assume probability distributions around each inflow and outflow component and simulate the model over a range of values; the simulation yields a range of estimated totals as of 2017 with a mean estimate 22.1 million and a 95 percent probability interval of between 16.2 and 29.5 million unauthorized immigrants.

003123

# Appendix 1: Component Estimation Details and Limitations

## Method and Components

The unauthorized immigrant population estimate is the residual when the estimated legally-resident population is subtracted from the estimated total foreign-born population. This appendix describes the methodology and estimated populations for each component of the 2022 estimate; see Table A1 for corresponding values for 2018–2020.

This edition of the report includes an update to the method for estimating the legally-resident nonimmigrant populations that takes advantage of continued maturation of the CBP ADIS data and that was necessitated by disruption in nonimmigrant travel trends during the COVID-19 pandemic. This update is described below.

No unauthorized immigrant population estimate is available for 2021 due to 2020 ACS data collection and validity challenges related to COVID-19. Among other challenges, pandemic precautions disrupted response rates by interrupting the distribution of the mail-in survey and by preventing in-person follow-up interviews. Further, the data that were successfully collected underrepresented people who were less educated, had lower incomes, or lived in multi-family dwellings—populations in which the unauthorized are over-represented. The Census Bureau ultimately decided that the 2020 ACS did not meet quality standards and elected not to release the usual single-year data products. Without this information on the population present in 2020, OHSS could not estimate the unauthorized immigrant population for January 2021.

## 1) Total foreign-born population

### a. Foreign-born population in 2021, entered 1980–2021 (38.1 million)

The initial estimate of the total foreign-born population that entered in 1980 to 2021 was obtained from the 2021 ACS Public Use Microdata Sample (PUMS), along with data on the distribution of the foreign-born population by country of origin, state of residence, year of entry, age, and sex. A 3-year moving average was applied to PUMS data for year of entry to reduce so-called heaping effects in which ACS survey responses disproportionately focus on round numbers.

Prior editions of this report reduced the overall PUMS estimate for the total foreign-born population to remove the Cuban-born population since all Cubans were assumed to take advantage of the Cuban Adjustment Act. The PUMS estimate was not reduced for Cubans entering in 2017 or later due to the termination in January 2017 of the wet-foot/dry-foot policy.

### b. Shift in reference date to January 1, 2022 (420,000)

The 2021 ACS estimates of the foreign-born population are "centered on" the middle of 2021 and therefore do not count the full population that arrived in 2021. For example, the 2019 ACS estimated about 50 percent more foreign-born persons who entered the United States in 2018 than the 2018 ACS estimated for the same entry-year cohort. Over the 2017–2019 ACS vintages,[14] this adjustment averaged 0.59. This report assumes the adjustment for 2021 entrants in the 2021 ACS will be similar and multiplies that estimate by 1.59.

---

[14] Ordinarily we would use the immediately preceding three ACS vintages (2018–2020), but the 2020 vintage was of insufficient quality due to COVID-19-related challenges.

c.  **Undercount of nonimmigrants in the ACS (280,000)**

The Census is believed to undercount nonimmigrants at higher rates than the native-born population. This report assumes that the undercount rate for nonimmigrants was 10 percent—the same rate assumed in DHS estimates for 2000 and 2005–2015 (U.S. Department of Homeland Security, 2003).

d.  **Undercount of LPRs, refugees, and asylees in the ACS (650,000)**

This report assumes the undercount rate for LPRs, refugees, and asylees in the ACS was 2.5 percent—the same rate assumed in DHS estimates for 2000 and 2005–2018 (U.S. Department of Homeland Security, 2003).

e.  **Undercount of unauthorized immigrants in the ACS (390,000)**

This report assumes that the undercount rate for unauthorized immigrants in the ACS is 13 percent for those who arrived in the most recent year and declines by 7.5 percent with each year of presence.[15] This is the same model used for the 2000 and 2015–2018 editions of this report.

f.  **Total estimated foreign-born population, January 1, 2022 (39.8 million)**

The sum of 1a. through 1e. (above) is the estimated foreign-born population on January 1, 2022 that entered the United States during the 1980–2021 period.

2)  **Legally-resident, foreign-born population**

g.  **LPR, refugee, and asylee flow, entered 1980–2021 (36.1 million)**

The 1980–2021 flow was calculated separately for LPRs, refugees, and asylees using DHS administrative data (Miller and Baker, 2023). LPRs consist of two groups: new arrivals and those who have adjusted status. New arrivals include all persons with immigrant visas issued by the Department of State who were admitted at a U.S. port of entry. For new arrival LPRs, the date of entry into the United States is the same as the date of approval for LPR status. For LPRs adjusting status, year of entry was assumed to be the most recent year of entry prior to adjustment.

The refugee and affirmative asylee populations were estimated by matching the previous 5 years of records for refugee arrivals and persons affirmatively granted asylum to records of LPR adjustment that occurred prior to January 1, 2022. The January 1, 2022 refugee and affirmative asylum populations consist of those persons who had not adjusted to LPR status by that date. Individual, detailed records were not readily available for defensive asylees, so that population was estimated by assuming the LPR adjustment rates were the same for defensive asylees as for affirmative asylees from the same country and granted asylum in the same year.

h.  **Mortality of legally-resident flow, 1980–2021 (3.5 million)**

Data are not collected on the mortality of the legally-resident, foreign-born population. The LPR population was survived forward in time (from the year in which LPR status was obtained to January 2022) using National Center for Health Statistics mortality rates by age and sex from 1999–2001 (Arias et al., 2008).

i.  **Emigration of legally-resident flow, 1980–2021 (6.7 million)**

Emigration is a major component of immigrant population change. In the absence of data that directly measure emigration from the United States, researchers have developed indirect estimates based largely on Census data. For this report, annual emigration rates were calculated from estimates of emigration of the foreign-born population based on 1980 and 1990 Census data (Ahmed and Robinson, 1994). The emigration model is similar to that used for the DHS LPR population estimates report, except that emigration risk was suspended until after naturalization for LPRs who became citizens. Further, refugees and asylees, with little likelihood of returning to their country of origin, were assumed not to emigrate. The model assumes 3.26 percent of new LPRs emigrate in their first year, declining by 5 percent per year of residence, resulting in a total effective emigration rate of 18.5 percent for this edition of the report.

---

[15]  This declining model was used for the 1990–2000 estimates published in 2003.

**j.  LPR, refugee, and asylee population, January 1, 2022 (26.0 million)**

Subtracting mortality (2h.) and emigration (2i.) from the LPR, refugee, and asylee flow during 1980−2021 (2g.) results in the total estimated LPR, refugee, and asylee resident population on January 1, 2022.

**k.  Nonimmigrant population, January 1, 2022 (2.8 million)**

The number of nonimmigrants living in the United States on January 1, 2022 was calculated by matching administrative records of nonimmigrant arrivals to subsequent records indicating departure in the CBP Arrival Departure Information System (ADIS), and then counting the number of resident-class nonimmigrants present in valid status during the 12-month period centered on January 1, 2022. The method starts with all admission records since October 2014, filtered to those reflecting admissions under nonimmigrant classes associated with residence.[16] Next, for the 15th of each month from July 2021 to June 2022, ADIS checks for matched records indicating departure or expiration of status prior to that date and omits those, leaving 12 monthly counts of resident-class nonimmigrants present in valid status. Lastly, averaging the 12 monthly counts yields an annual average count centered on January 1, 2022.

This method (counting arrival records in ADIS and filtering out any with a matching departure record or for a person whose status expired) is new to the 2018−2022 series. OHSS previously planned to implement the new method for the 2022 estimates and beyond, but not for earlier estimates, because October 2014 is the earliest arrival date available in the ADIS data, and that restriction means substantial numbers of nonimmigrants who entered before October 2014 are excluded from the 2018−2022 estimates as explained below (see Limitations section). The new method was updated earlier than planned because the previous method was reliant on the stability of travel trends over time and was compromised by sudden, extreme changes in travel patterns in response to COVID-19.

**l.  Estimated legally-resident, immigrant population, January 1, 2022 (28.8 million)**

Adding the population of LPRs, refugees, and asylees on January 1, 2022 (2j.) to the nonimmigrant population on the same date (2k.) results in the total estimated legally resident immigrant population in the United States on January 1, 2018.

### 3)  Unauthorized population
**m.  Estimated unauthorized population, January 1, 2018 (11.0 million)**

Subtracting the estimated legally-resident, foreign-born immigrant population (2l.) from the total foreign-born population on January 1, 2022 (1f.) yields the estimate of the unauthorized population.

## Limitations

Annual estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for estimation described above.

*Sampling error in the ACS.* The estimates of the total foreign-born population that moved to the United States in the 1980−2021 period are based on a sample and are thus subject to sampling variability. Actual year-to-year fluctuations in the population size may be larger or smaller than estimated in the ACS, particularly when the foreign-born population is subdivided by state of residence or country of origin. The estimated margin of error for the estimate of the total foreign-born population in the 2021 ACS PUMS at the 90 percent confidence level is plus or minus approximately 165,000.

*Assumptions about undercount of the foreign-born population in the ACS.* The foreign-born—particularly unauthorized immigrants and nonimmigrants—are less likely than native-born Americans to respond to or to be included in responses to government surveys. To control for undercount of these "hard to count" populations, analysts must make assumptions about the extent of the undercount and then adjust the ACS survey estimates accordingly. The estimates are sensitive to these undercount adjustments.

---

[16]  See Baker, 2021, for a list of nonimmigrant classes associated with residence.

*Assumptions about rates of emigration.* The preexisting legally-resident, foreign-born population declines over time through mortality and emigration. Mortality rates can be estimated from standard demographic tables, but current, nationally representative data necessary to construct similar tables for emigration rates do not exist. The estimates are sensitive to emigration modeling assumptions.

*Accuracy of year of entry reporting.* Census data suggest that respondents provide unreliable answers to the Census year-of-entry question ("When did this person come to live in the United States?"), with disproportionate numbers of responses "heaping" on round numbers. Errors also occur in converting DHS administrative dates for LPRs into year of entry dates.

*Assumptions about the nonimmigrant population estimate.* ADIS was designed for operational (not statistical reporting) purposes, and there are some important challenges and limitations when using it for population estimates. First, the accuracy of the counts is dependent on the completeness of the data feeds and the reliability of the matching algorithm. Departures by land into Mexico are generally not recorded, so some people who departed may continue to be counted as present until their status expires or until another record is generated that indicates absence from the country (e.g., the person attends a visa interview abroad or applies for admission at a port of entry). Next, people who change to another nonimmigrant class or adjust to LPR status while within the United States continue to be counted under their prior nonimmigrant class until they leave and are subsequently readmitted. Both of these challenges result in overcounts of nonimmigrants. On the other hand, all trips that started prior to October 1, 2014 are excluded, which results in undercounts that are large in the first few months or years, but converge to zero over time.[17] Further, the classes "associated with residency" do not conform perfectly to the definition of residence in the ACS.[18] For example, a tourist might stay in the United States visiting family for several months and be considered a "resident" in the ACS, but not in the DHS estimates. Conversely, student and worker classes are generally associated with residency, but some individuals admitted under those classes may be present too briefly to meet the ACS residency definition. No statistical or demographic adjustments were made to account for these limitations, but might be made in the future as the data system and methodology continue to mature.

*Accuracy of state of residence for the non-naturalized legally-resident, foreign-born population.* The state of residence for the non-naturalized, legally-resident, 1980−2022 entrants is assumed to be the state of residence on the date the most recent status (e.g., refugee, LPR) was obtained; however, the accuracy of the estimates may be affected by state-to-state migration that occurred between the date of the status change and January 1, 2022.

*Comparisons across years.* Although DHS has been producing annual estimates since 2005, comparisons across multiple years are problematic. In addition to sampling error and the uncertainty surrounding the estimates described above, the series of DHS estimates is not fully consistent. Estimates of the foreign-born population from the 2011−2019 ACS vintages were based on the 2010 Census (adjusted for births, deaths, and migration), whereas estimates from earlier ACS vintages were based on the 2000 Census, and estimates from the 2021 ACS were based on the 2020 Census. DHS also made minor methodological updates to take fuller advantage of available data beginning with the 2015−2018 estimates and changed the data source and methodology for estimating the resident nonimmigrant component starting with the revised estimate for 2018. Comparisons across multiple years should be interpreted with caution.

---

[17] For example, nonimmigrants who are admitted under the H1-B class and subsequently apply for an extension of stay may not be required to depart for 6 years or longer, so people admitted in FY 2014 or earlier on H1-B visas who didn't depart and arrive again by January 2018 were excluded from the 2018 estimates.

[18] In the ACS, an individual is considered to be a "resident" if the person was "living or staying [at the given address] for more than 2 months" or if they do not have another place to stay, even if they were staying at that address for less than 2 months.

003127

**Table A1-1**

**Component Estimates (in thousands) of the Unauthorized Immigrant Population: 2018–2020 and 2022**

| Age and Sex | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| **1) Foreign-born population** | | | | |
|   a.  Foreign-born population, entered 1980–2021 | 36,480,000 | 36,900,000 | 37,090,000 | 38,080,000 |
|   b.  Adjustment for shift in reference date from July 1, 2017 to January 1, 2022 | 690,000 | 590,000 | 550,000 | 420,000 |
|   c.  Undercount of nonimmigrants in ACS | 260,000 | 280,000 | 280,000 | 280,000 |
|   d.  Undercount of other legally resident immigrants (LPRs, recent refugee/asylee arrivals) in ACS | 610,000 | 620,000 | 640,000 | 650,000 |
|   e.  Undercount of unauthorized immigrant population in ACS | 520,000 | 470,000 | 410,000 | 390,000 |
|   f.  Estimated foreign-born population, January 1, 2022 | 38,560,000 | 38,860,000 | 38,970,000 | 39,820,000 |
| **2) Legally resident population** | | | | |
|   g.  LPR, refugee, and asylee flow January 1, 1980–December 31, 2021 | 32,650,000 | 33,700,000 | 34,800,000 | 36,140,000 |
|     h.  Mortality 1980–2021 | 2,570,000 | 2,780,000 | 3,000,000 | 3,450,000 |
|     i.  Emigration 1980–2021 | 5,690,000 | 5,950,000 | 6,180,000 | 6,680,000 |
|   j.  LPR, refugee, and asylee resident population, January 1, 2022 | 24,390,000 | 24,970,000 | 25,630,000 | 26,010,000 |
|   k.  Nonimmigrant population on January 1, 2022 | 2,590,000 | 2,790,000 | 2,830,000 | 2,830,000 |
|   l.  Estimated legally resident population, January 1, 2022 | 26,980,000 | 27,760,000 | 28,460,000 | 28,840,000 |
| **3) Unauthorized immigrant population** | | | | |
|   m.  Estimated resident unauthorized immigrant population, January 1, 2022 | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |

\* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

# Appendix 2: Updated Historical Estimates for January 2000 Through January 2022

**Table A2-1**

**Estimates of the Unauthorized population (in thousands) by Country of Birth and State of Residence: 2000, 2005–2020, and 2022**

| Country | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 | 2018** | 2019 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 8,460 | 10,490 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 | 11,570 | 11,110 | 10,510 | 10,990 |
| Mexico | 4,680 | 5,970 | 6,570 | 6,980 | 7,030 | 6,650 | 6,640 | 6,830 | 6,800 | 6,720 | 6,450 | 6,450 | 6,580 | 6,200 | 5,970 | 5,860 | 5,420 | 5,540 | 5,350 | 4,970 | 4,810 |
| Guatemala | 290 | 370 | 430 | 500 | 430 | 480 | 520 | 520 | 520 | 560 | 590 | 620 | 620 | 600 | 610 | 610 | 620 | 620 | 670 | 780 | 750 |
| El Salvador | 430 | 470 | 510 | 540 | 570 | 530 | 620 | 670 | 660 | 690 | 690 | 670 | 750 | 720 | 750 | 750 | 730 | 730 | 750 | 750 | 710 |
| Honduras | 160 | 180 | 280 | 280 | 300 | 320 | 330 | 380 | 380 | 360 | 390 | 390 | 440 | 420 | 430 | 500 | 450 | 450 | 550 | 560 | 560 |
| Philippines | 200 | 210 | 280 | 290 | 300 | 270 | 280 | 290 | 270 | 310 | 340 | 330 | 370 | 350 | 410 | 300 | 370 | 370 | 360 | 340 | 350 |
| Venezuela | *** | *** | *** | 60 | 50 | 50 | 30 | 50 | 50 | 60 | 50 | 40 | 80 | 80 | 100 | 120 | 190 | 190 | 220 | 260 | 320 |
| Colombia | 100 | 110 | 140 | 130 | 130 | 100 | 110 | 120 | 130 | 130 | 160 | 130 | 140 | 130 | 140 | 130 | 210 | 210 | 190 | 190 | 240 |
| Brazil | 100 | 170 | 210 | 190 | 180 | 150 | 180 | 150 | 150 | 130 | 110 | 110 | 100 | 100 | 110 | 150 | 200 | 190 | 180 | 190 | 230 |
| India | 120 | 280 | 210 | 220 | 160 | 200 | 200 | 270 | 240 | 260 | 320 | 390 | 470 | 450 | 560 | 490 | 540 | 480 | 390 | 340 | 220 |
| China | 190 | 230 | 170 | 290 | 280 | 220 | 120 | 130 | 300 | 280 | 210 | 190 | 230 | 320 | 320 | 420 | 410 | 410 | 390 | 330 | 210 |
| All others | 2,180 | 2,500 | 2,510 | 2,290 | 2,240 | 1,880 | 1,750 | 2,020 | 2,030 | 2,010 | 1,920 | 2,090 | 2,110 | 2,080 | 2,260 | 2,090 | 2,260 | 2,400 | 2,220 | 1,870 | 2,600 |

| State | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 | 2018** | 2019 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 8,460 | 10,500 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 | 11,570 | 11,110 | 10,510 | 10,990 |
| California | 2,510 | 2,770 | 2,790 | 2,840 | 2,850 | 2,600 | 2,570 | 2,910 | 2,830 | 2,820 | 2,780 | 2,730 | 2,880 | 2,760 | 2,860 | 2,790 | 2,610 | 2,640 | 2,620 | 2,410 | 2,600 |
| Texas | 1,090 | 1,360 | 1,620 | 1,710 | 1,680 | 1,680 | 1,770 | 1,780 | 1,790 | 1,830 | 1,750 | 1,850 | 1,940 | 1,860 | 1,910 | 1,870 | 1,940 | 1,950 | 1,950 | 1,900 | 2,060 |
| Florida | 800 | 850 | 960 | 960 | 840 | 720 | 760 | 730 | 740 | 730 | 740 | 710 | 810 | 540 | 610 | 610 | 660 | 680 | 650 | 610 | 590 |
| New Jersey | 350 | 380 | 420 | 470 | 400 | 360 | 370 | 440 | 420 | 430 | 410 | 450 | 440 | 420 | 450 | 450 | 460 | 460 | 390 | 400 | 490 |
| Illinois | 440 | 520 | 530 | 560 | 550 | 540 | 490 | 550 | 550 | 540 | 520 | 530 | 450 | 440 | 520 | 440 | 450 | 460 | 440 | 370 | 420 |
| New York | 540 | 560 | 510 | 640 | 640 | 550 | 460 | 690 | 630 | 580 | 610 | 570 | 590 | 630 | 630 | 620 | 520 | 600 | 510 | 370 | 410 |
| North Carolina | 260 | 360 | 360 | 380 | 380 | 370 | 390 | 390 | 400 | 360 | 400 | 390 | 390 | 370 | 360 | 320 | 350 | 360 | 340 | 360 | 360 |
| Georgia | 220 | 470 | 490 | 490 | 460 | 480 | 460 | 430 | 440 | 400 | 390 | 410 | 390 | 370 | 400 | 400 | 380 | 390 | 360 | 360 | 340 |
| Washington | 170 | *** | 280 | 260 | 260 | 230 | 200 | 260 | 270 | 240 | 280 | 270 | 260 | 280 | 280 | 290 | 310 | 330 | 340 | 340 | 340 |
| Arizona | 330 | 480 | 490 | 530 | 560 | 460 | 470 | 350 | 360 | 350 | 350 | 350 | 380 | 360 | 330 | 340 | 330 | 340 | 330 | 340 | 290 |
| All others | 1,750 | 2,750 | 2,860 | 2,940 | 2,980 | 2,760 | 2,840 | 3,040 | 3,100 | 3,110 | 3,010 | 3,190 | 3,430 | 3,420 | 3,430 | 3,300 | 3,390 | 3,380 | 3,200 | 3,040 | 3,090 |

*Revised to be consistent with estimates derived from the 2010 Census (U.S. Census Bureau, 2011).

**Revised to show the impact of the updated methodology.

***Estimates are not available.

Notes: Detail may not sum to totals because of rounding. Estimates shown for Colombia 2000–2013, Brazil 2010–2015, and Venezuela 2007–2015 are approximations based on historical estimation and project notes. The revised 2018 estimate and the 2019–2020 and 2022 estimates for China include Hong Kong and Macau, whereas the earlier estimates did not. Estimates for 2021 are not available.

Source: Office of Homeland Security Statistics.

# References

Ahmed, Bashir and J. Gregory Robinson, 1994. "Estimates of Emigration of the Foreign-Born Population: 1980–1990," Technical Working Paper No. 9, U.S. Bureau of the Census.

Arias, Elizabeth and Lester R. Curtin, Rong Wei and Robert N. Anderson, 2008. "U.S. Decennial Life Tables for 1999–2001, United States Life Tables," *National Vital Statistics Report* 57 (1), National Center for Health Statistics, Centers for Disease Control.

Baker, Bryan, 2021. "Population Estimates of Nonimmigrants Residing in the United States: Fiscal Years 2017–2019," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security.

Baker, Bryan, 2021. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security.

Daily, Donna, Patrick J. Cantwell, Karen Battle, and David G. Waddington, 2021. "ACS RESEARCH AND EVALUATION REPORT MEMORANDUM SERIES # ACS21-RER-04," U.S. Census Bureau.

Fazel-Zarandi, Mohammad M., Jonathan S. Feinstein, and Edward H. Kaplan, 2018. "The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016," PLOS One, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0201193.

Miller, Sarah, and Bryan Baker, 2023. "Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2023," Office of Homeland Security Statistics, U.S. Department of Homeland Security.

Passel, Jeffrey S. and Jens Manuel Krogstad, 2023. "What we know about unauthorized immigrants living in the U.S.," Pew Research Center, https://www.pewresearch.org/short-reads/2023/11/16/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

U.S. Census Bureau, 2011. "Change in Population Controls," American Community Survey Research Note.

U.S. Department of Homeland Security, 2003. "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000," http://www.dhs.gov/xlibrary/assets/statistics/publications/Ill_Report_1211.pdf.

Warren, Robert, 2024. "After a Decade of Decline, the US Undocumented Population Increased by 650,000 in 2022," Journal on Migration and Human Security, Center for Migration Studies, https://journals.sagepub.com/doi/10.1177/23315024241226624/.

003131

U.S. Department of Homeland Security
*Office of Homeland Security Statistics*

**Table 1: Estimated Unauthorized Immigrant Population as of Jan. 1, 2022**

| Total | 10,990,000 |
|---|---|
| Mexico | 4,810,000 |
| N. Central America | 2,020,000 |
| Other W. Hemisphere | 1,970,000 |
| E. Hemisphere | 2,180,000 |

Source: https://www.dhs.gov/ohss/topics/immigration/population-estimates/unauthorized-resident.

**Table 2: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC**
**by Number of Years in the United States, Country, and Method of Entry**
(low and high estimates)

|  | >10 years | | >8 years | | >5 years | | Total | |
|---|---|---|---|---|---|---|---|---|
|  | low | high | low | high | low | high | low | high |
| **EWIs only** | | | | | | | | |
| Total | 300,000 | 700,000 | 320,000 | 730,000 | 340,000 | 790,000 | 390,000 | 890,000 |
| Mexico | 190,000 | 450,000 | 190,000 | 460,000 | 200,000 | 480,000 | 210,000 | 510,000 |
| N. Central America | 70,000 | 130,000 | 70,000 | 140,000 | 90,000 | 170,000 | 110,000 | 220,000 |
| Other W. Hemisphere | 40,000 | 90,000 | 50,000 | 100,000 | 50,000 | 120,000 | 60,000 | 140,000 |
| E. Hemisphere | 0 | 20,000 | 0 | 20,000 | 0 | 30,000 | 0 | 30,000 |
| **Overstayers only** | | | | | | | | |
| Total | 0 | 170,000 | 0 | 180,000 | 0 | 190,000 | 0 | 210,000 |
| Mexico | 0 | 50,000 | 0 | 60,000 | 0 | 60,000 | 0 | 60,000 |
| N. Central America | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 |
| Other W. Hemisphere | 0 | 30,000 | 0 | 30,000 | 0 | 30,000 | 0 | 40,000 |
| E. Hemisphere | 0 | 80,000 | 0 | 90,000 | 0 | 90,000 | 0 | 100,000 |
| **Total** | | | | | | | | |
| Total | 300,000 | 870,000 | 320,000 | 910,000 | 340,000 | 980,000 | 390,000 | 1,100,000 |
| Mexico | 190,000 | 510,000 | 190,000 | 520,000 | 200,000 | 540,000 | 210,000 | 570,000 |
| N. Central America | 70,000 | 140,000 | 70,000 | 150,000 | 90,000 | 180,000 | 110,000 | 230,000 |
| Other W. Hemisphere | 40,000 | 120,000 | 50,000 | 130,000 | 50,000 | 150,000 | 60,000 | 180,000 |
| E. Hemisphere | 0 | 110,000 | 0 | 110,000 | 0 | 120,000 | 0 | 120,000 |

Source: DHS Office of Homeland Security Statistics estimates.

**Table 3: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC**
**by Number of Years in the United States, Country, and Method of Entry**
(point estimates)

|  | > 10 years | > 8 years | > 5 years | Total |
|---|---|---|---|---|
| **EWIs only** | | | | |
| Total | 500,000 | 525,000 | 565,000 | 640,000 |
| Mexico | 320,000 | 325,000 | 340,000 | 360,000 |
| N. Central America | 100,000 | 105,000 | 130,000 | 165,000 |
| Other W. Hemisphere | 65,000 | 75,000 | 85,000 | 100,000 |
| E. Hemisphere | 10,000 | 10,000 | 15,000 | 15,000 |
| **Overstayers only** | | | | |
| Total | 85,000 | 90,000 | 95,000 | 120,000 |
| Mexico | 25,000 | 30,000 | 30,000 | 35,000 |
| N. Central America | 5,000 | 5,000 | 5,000 | 10,000 |
| Other W. Hemisphere | 15,000 | 15,000 | 15,000 | 25,000 |
| E. Hemisphere | 40,000 | 45,000 | 45,000 | 50,000 |
| **Total** | | | | |
| Total | 585,000 | 615,000 | 660,000 | 765,000 |
| Mexico | 350,000 | 355,000 | 370,000 | 395,000 |
| N. Central America | 105,000 | 110,000 | 135,000 | 175,000 |
| Other W. Hemisphere | 80,000 | 90,000 | 100,000 | 130,000 |
| E. Hemisphere | 55,000 | 55,000 | 60,000 | 65,000 |

Source: DHS Office of Homeland Security Statistics estimates.

**Table 4: Estimates of USC Family Members Residing with Unauthorized Noncitizens**

|  | > 10 years residence | | Total | |
|---|---|---|---|---|
|  | Total | EWI | Total | EWI |
| # of USC children | 1,285,000 | 1,100,000 | 1,685,000 | 1,410,000 |
| # of undoc children | 60,000 | 50,000 | 75,000 | 65,000 |
| total # of USCs in mixed-status families | 1,930,000 | 1,650,000 | 2,525,000 | 2,110,000 |

**Table 5: Noncitizen Spouses' Average Length of Presence in the United States**

| > 10 years | Total |
|---|---|
| 23 years | 20 years |

**Table 6: Estimated PIP-Eligible Population: Age Distribution**

| Age group | Distribution |
|---|---|
| Total | 100% |
| <18 | 6% |
| 18-24 | 9% |
| 25-34 | 17% |
| 35-44 | 34% |
| 45-54 | 26% |
| 55 and over | 8% |

**Additional Statistical Estimates**

| EWI as percentage of unauthorized migrants | 44-63% |
|---|---|



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland Security

November 20, 2014

**MEMORANDUM FOR:**    León Rodriguez
Director
U.S. Citizenship and Immigration Services

Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

**FROM:**    Jeh Charles Johnson
Secretary

**SUBJECT:**    **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(ll), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

AILA InfoNet Doc. No. 14112002. (Posted 11/20/14)
003136

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**. The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

AILA InfoNet Doc. No. 14112002. (Posted 11/20/14)

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]

RIN 1615–AC68

## U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Final rule.

**SUMMARY:** This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. This rule also provides additional fee exemptions for certain humanitarian categories and makes changes to certain other immigration benefit request requirements. USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. DHS is adjusting the fee schedule to fully recover costs and maintain adequate service. This final rule also responds to public comments received on the USCIS proposed fee schedule published on January 4, 2023.

**DATES:** This final rule is effective April 1, 2024. Any benefit request postmarked on or after this date must be accompanied with the fees established by this final rule.

*Public Engagement date:* DHS will hold a virtual public engagement session during which USCIS will discuss the changes made in this final rule. The session will be held at 2 p.m. Eastern on Feb. 22, 2024. Register for the engagement here: *https://public.govdelivery.com/accounts/USDHSCIS/subscriber/new?topic_id=USDHSCIS_1081.*

USCIS will allot time during the session to answer questions submitted in advance. Please email questions to *public.engagement@uscis.dhs.gov* by 4 p.m. Eastern on Thursday, Feb. 8, 2024, and use ''Fee Rule Webinar'' in the subject link. Please note that USCIS cannot answer case-specific inquiries during the session.

**ADDRESSES:** *Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2021–0010 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Dr., Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Changes From the Proposed Rule
  D. Summary of Final Fees
  E. Summary of Costs and Benefits
  F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking
II. Background
  A. History
  B. Authority and Guidance
  C. Changes From the Proposed Rule
  D. Corrections
  E. Status of Previous USCIS Fee Regulations
  F. Severability
III. Related Rulemakings and Policies
  A. New Processes
  B. Effects of Temporary Programs or Discretionary Programs and Processes
  C. Lawful Pathways Rule
  D. Premium Processing—Emergency Stopgap USCIS Stabilization Act
  E. Premium Processing Inflation Adjustment
  F. EB–5 Reform and Integrity Act of 2022 and Related Rules
  G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers
  H. Citizenship and Naturalization and Other Related Flexibilities
  I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
IV. Response to Public Comments on the Proposed Rule
  A. Summary of Comments on the Proposed Rule
  B. General Feedback on the Proposed Rule
  C. Basis for the Fee Review
  D. FY 2022/2023 IEFA Fee Review
  E. Fee Waivers
  F. Fee Exemptions
  G. Fee Changes by Benefit Category
  H. Statutory and Regulatory Requirements
  I. Out of Scope
V. Statutory and Regulatory Requirements
  A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)
  B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)
  C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
  D. Unfunded Mandates Reform Act
  E. Executive Order 12132 (Federalism)
  F. Executive Order 12988 (Civil Justice Reform)
  G. Executive Order 13175 (Consultation and Coordination With Tribal Governments)
  H. Family Assessment
  I. National Environmental Policy Act (NEPA)
  J. Paperwork Reduction Act

## List of Acronyms and Abbreviations

AAO   Administrative Appeals Office
ABC   Activity-Based Costing
ACWIA   American Competitiveness and Workforce Improvement Act
APA   Administrative Procedure Act
APD   Advance Parole Documents
ASVVP   Administrative Site Visit and Verification Program
BFD   Bona Fide Determination
CAA   Cuban Adjustment Act of 1966
CBP   U.S. Customs and Border Protection
CFO   Chief Financial Officer
CFR   Code of Federal Regulations
CIS   The Office of the Citizenship and Immigration Services
COVID   Coronavirus Disease
CPI–U   Consumer Price Index for All Urban Consumers
DACA   Deferred Action for Childhood Arrivals
DHS   Department of Homeland Security
DOD   Department of Defense
DOJ   Department of Justice
DOL   Department of Labor
DOS   Department of State
EAD   Employment Authorization Document
EB–5   Employment-Based Immigrant Visa, Fifth Preference
EIN   Employer Identification Number
E.O.   Executive Order
EOIR   Executive Office for Immigration Review
FDNS   Fraud Detection and National Security Directorate
FOIA   Freedom of Information Act
FPG   Federal Poverty Guidelines
FR   Federal Register
FRFA   Final Regulatory Flexibility Analysis
FTE   Full-Time Equivalent
FY   Fiscal Year
GAO   Government Accountability Office
HHS   Department of Health and Human Services
HRIFA   Haitian Refugee Immigration Fairness Act
ICE   U.S. Immigration and Customs Enforcement
IEFA   Immigration Examinations Fee Account
IFR   Interim final rule
INA   Immigration and Nationality Act of 1952
INS   Immigration and Naturalization Service
IPO   Immigrant Investor Program Office
IRS   Internal Revenue Service
ISAF   International Security Assistance Forces
IT   information technology
IOAA   Independent Offices Appropriations Act
LPR   Lawful Permanent Resident
NACARA   Nicaraguan Adjustment and Central American Relief Act
NAICS   North American Industry Classification System
NARA   National Archives and Records Administration

NEPA   National Environmental Policy Act
NOID   Notice of Intent to Deny
NPRM   Notice of Proposed Rulemaking
NRC   National Records Centers
OAW   Operation Allies Welcome
OIG   DHS Office of the Inspector General
OIRA   Office of Information and Regulatory Affairs
OMB   Office of Management and Budget
OPT   Optional Practical Training
PRA   Paperwork Reduction Act of 1995
PRC   Permanent Resident Card or Green Card [1]
Pub. L.   Public Law
RFA   Regulatory Flexibility Act
RFE   Requests for Evidence
RIA   Regulatory Impact Analysis
SBA   Small Business Administration
SEA   Small Entity Analysis
Secretary   Secretary of Homeland Security
SIJ   Special Immigrant Juvenile
SNAP   Supplemental Nutrition Assistance Program
SSI   Supplemental Security Income
SSN   Social Security number
Stat.   U.S. Statutes at Large
STEM   Science, Technology, Engineering, and Mathematics
TPS   Temporary Protected Status
TVPRA   William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UMRA   Unfunded Mandates Reform Act of 1995
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services
USDA   U.S. Department of Agriculture
VAWA   Violence Against Women Act
VTVPA   Victims of Trafficking and Violence Protection Act of 2000

# I. Executive Summary

## A. Purpose of the Regulatory Action

DHS is adjusting the fee schedule for U.S. Citizenship and Immigration Services (USCIS) immigration benefit requests.[2] As stated in the proposed rule, USCIS is primarily funded by fees charged to applicants and petitioners for

---

[1] DHS uses the informal term "Green Card" interchangeably with or to refer to a Permanent Resident Card, USCIS Form I–551. See, *e.g.*, Green Card, at *https://www.uscis.gov/green-card* (last viewed Dec. 5, 2023).

[2] DHS uses the term "benefit request" throughout this rule as defined in 8 CFR 1.2 to mean any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit. The term benefit request applies regardless of if the title of the request uses the term petition (*e.g.*, Petition for Nonimmigrant Worker), application (*e.g.*, Application for Naturalization) or request (*e.g.*, Request for Fee Waiver). Accordingly, "requestor" is a synonym for applicant or petitioner. Immigration benefit request or benefit request is also used even if USCIS approval of the request does not result in an immigration benefit, status, visa, or classification, such as requests related to inadmissibility waivers and the USCIS genealogy program. Using the term benefit request reduces the ambiguity and confusion resulting from the repetitive use of application, petition, applicant, and petitioner, and improves readability without substantive legal effect. 76 FR 53764, 53767 (Aug. 11, 2011).

immigration and naturalization benefit requests. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA). These fee collections fund the cost of fairly and efficiently adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants or petitioners. The focus of this fee review is the fees that DHS has established and is authorized by INA section 286(m), 8 U.S.C 1356(m), to establish or change, collect, and deposit into the IEFA, which comprised approximately 96 percent of USCIS' total FY 2021 enacted spending authority; this fee review does not focus on fees that USCIS is required to collect but cannot change. Most of these fees have not changed since 2016 despite increased costs of federal salaries and inflation costs for other goods and services. This rule also revises the genealogy program fees established under INA section 286(t), 8 U.S.C. 1356(t), and those funds are also deposited into the IEFA. Premium processing fees established under INA section 286(u), 8 U.S.C. 1356(u) are also IEFA fees, but premium processing fees do not change in this rule.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), codified at 31 U.S.C. 901–03, and Office of Management and Budget (OMB) Circular A–25, USCIS conducted a comprehensive fee review for the Fiscal Year (FY) 2022/2023 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of services provided. DHS determined that adjusting USCIS' fee schedule is necessary to fully recover costs and maintain adequate service. This final rule also increases the populations that are exempt from certain fees and clarifies filing requirements for nonimmigrant workers, requests for premium processing, and other administrative requirements.

## B. Legal Authority

DHS's authority is in several statutory provisions. Section 102 of the Homeland Security Act of 2002,[3] 6 U.S.C. 112, and section 103 of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.

---

[3] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

Specific authority for establishing multiple USCIS fees is found in INA sec. 286, 8 U.S.C. 1356, and more specifically section 286(m), 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants").[4]

## C. Changes From the Proposed Rule

As explained more fully in part II.C. of this preamble, DHS is making several changes in this final rule based on comments received on the proposed rule or in exercising its authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on adequately funding USCIS, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. The changes are as follows:

### 1. Reduced Costs and Fees

DHS proposed to recover $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million. DHS removes approximately $726.7 million of average annual estimated costs by transferring costs to premium processing revenue, reducing the work to be funded by the Asylum Program Fee, and considering the budget effects of improved efficiency measures.

### 2. Changes in the Asylum Program Fee

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. In the final rule, DHS exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13). The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE

---

[4] The longstanding interpretation of DHS is that the "including" clause in INA sec. 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* INA sec. 286(m), 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

employees); and $600 for all other filers of Forms I–129 and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

3. Changes to Employment-Based Immigrant Visa, Fifth Preference (EB–5) Fees

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

4. Changes to H–1B Registration Fees

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). This change increases the estimated revenue generated by the H–1B registration fees in the final rule.

5. Online Filing Fees

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. *See* 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. *See* 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

6. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. In this final rule, (a) DHS holds several fees to the rate of inflation since the previous fee increase in 2016, and (b) if the proposed fee was less than the current fee adjusted for inflation, then DHS sets the fee in this rule at the level proposed. Except for certain employment-based benefit request fees, if proposed fees were less than the rate of inflation, then DHS finalizes the proposed fee or a lower fee. A comparison of current, proposed, and final fees can be found in Table 1.

7. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402, 459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings. *See* section II.C.; 8 CFR 106.3(b). The final rule also codifies the 2011 Fee Waiver Policy [5] criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the Federal Poverty Guidelines (FPG), or extreme financial hardship. *See* 8 CFR 106.3(a)(1).

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020).

DHS also decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because the child's eligibility for these means-tested benefits is dependent on household income.

8. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making five procedural changes in the final rule to address issues that it has experienced with fee-exempt and low-fee filings. First, the final rule provides that a duplicate filing that is materially identical to a pending immigration benefit request will be rejected. *See* 8 CFR 103.2(a)(7)(iv). Second, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). Third, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Fourth, the first sentence of proposed 8 CFR 106.1(c)(2), stated, ''If the benefit request was approved, the approval may be revoked upon notice.'' DHS is revising the first sentence to read, ''If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory

requirements applicable to the immigration benefit request.'' Reference to applicable statutes and regulations is also added to the last sentence of section 106.1(c)(2). Finally, this final rule provides that USCIS may not grant an appeal for which the fee is waived or exempt for adjudication without requiring a review by the official who made the unfavorable decision. 8 CFR 103.3(a)(2)(ii).

9. Adjustment of Status (Form I–485) and Family-Based Fees

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status, applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(ii).

The proposed rule also would have ($1,540). *See* 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay a lesser fee of $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii).

10. Adoption Forms

In the final rule, DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for second extensions, second change of country requests, and duplicate approval notices for both the orphan and the Hague process. These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. The final rule also provides that Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

11. Naturalization and Citizenship Fees

This final rule expands eligibility for paying half of the regular fee for Form N–400, Application for Naturalization. An applicant with household income at or below 400 percent of Federal Poverty Guidelines (FPG) may pay half price for

---

[5] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, ''Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26'' (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii).

12. Additional Changes

In the final rule:

• DHS deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).

• Removes the fee exemption for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–*, 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i).

• Provides a 30-day advance public notification requirement before a payment method will be changed. 8 CFR 106.1(b).

• Provides that an inflation only rule must adjust all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute).

## D. Summary of Final Fees

The fees established in this rule are summarized in the Final Fee(s) column in Table 1. Table 1 compares the current fees to the fees established in this rule. In addition, the new fees and exemptions are incorporated into the Form G–1055, Fee Schedule, as part of the docket for this rulemaking.

The Current Fee(s) column in Table 1 represents the current fees in effect rather than the enjoined fees from the 2020 fee rule.[6] Throughout this final rule, the phrase "current fees" refers to the fees in effect and not the enjoined fees.

In some cases, the current or final fees may be the sum of several fees. For example, several immigration benefit requests require an additional biometric services fee under the current fee structure. The table includes rows with

---

[6] USCIS provides filing fee information on the All Forms page at *https://www.uscis.gov/forms/all-forms*. You can use the Fee Calculator to determine the exact filing and biometric services fees for any form processed at a USCIS Lockbox facility. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Fee Calculator, *https://www.uscis.gov/feecalculator*. For a complete list of all USCIS fees, see Form G–1055, Fee Schedule, available from *https://www.uscis.gov/g-1055*.

and without the additional biometric services fee added to the Current Fee(s) column. In this final rule, DHS would eliminate the additional biometric services fee in most cases by including the costs in the underlying immigration benefit request fee. As such, the Final Fees(s) column does not include an additional biometric services fee in most cases.

Some other benefit requests are listed several times because in some cases DHS proposes distinct fees based on filing methods, online or paper. DHS will require fees for Form I–131, Application for Travel Document, and Form I–765, Application for Employment Authorization, when filed with Form I–485, Application to Register Permanent Residence or Adjust Status, in most cases. As such, Table 1 includes rows that compare the current fee for Form I–485 to various combinations of the final fees for Forms I–485, I–131, and I–765.

The table excludes statutory fees that DHS cannot adjust or can only adjust for inflation. Instead, the table focuses on the IEFA non-premium fees that DHS is changing in this rule.

**BILLING CODE 9111–97–P**

**6198**     **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-90 Application to Replace Permanent Resident Card (online filing) | $455 | $455 | $415 | -$40 | -9% |
| I-90 Application to Replace Permanent Resident Card (online filing) (with biometric services) | $540 | $455 | $415 | -$125 | -23% |
| I-90 Application to Replace Permanent Resident Card (paper filing) | $455 | $465 | $465 | $10 | 2% |
| I-90 Application to Replace Permanent Resident Card (paper filing) (with biometric services) | $540 | $465 | $465 | -$75 | -14% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $560 | $115 | 26% |
| I-129 Petition for a Nonimmigrant worker[7] | $460 | N/A | N/A | N/A | N/A |
| I-129 H-1 Classifications | $460 | $780 | $780 | $320 | 70% |
| I-129 H-1 Classifications (small employers and nonprofits)[8] | $460 | $780 | $460 | $0 | 0% |
| I-129 H-2A - Named Beneficiaries | $460 | $1,090 | $1,090 | $630 | 137% |
| I-129 H-2A - Named Beneficiaries (small employers and nonprofits) | $460 | $1,090 | $545 | $85 | 18% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $530 | $530 | $70 | 15% |
| I-129 H-2A - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $530 | $460 | $0 | 0% |
| I-129 H-2B - Named Beneficiaries | $460 | $1,080 | $1,080 | $620 | 135% |
| I-129 H-2B - Named Beneficiaries (small employers and nonprofits) | $460 | $1,080 | $540 | $80 | 17% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $580 | $580 | $120 | 26% |
| I-129 H-2B - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $580 | $460 | $0 | 0% |
| I-129 Petition for L Nonimmigrant workers | $460 | $1,385 | $1,385 | $925 | 201% |
| I-129 Petition for L Nonimmigrant workers (small employers and nonprofits) | $460 | $1,385 | $695 | $235 | 51% |

[7] The Form I-129 fees in this table are for the underlying form. Certain additional fees may be required by other regulations or statutes depending on factors such as the size of the business and the classification of the nonimmigrant beneficiary. *See* 8 CFR 106.2(c).

[8] The H-1B Registration Process Fee must be paid before this form is filed and fee is paid.

003144

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-129 Petition for O Nonimmigrant workers | $460 | $1,055 | $1,055 | $595 | 129% |
| I-129 Petition for O Nonimmigrant workers (small employers and nonprofits) | $460 | $1,055 | $530 | $70 | 15% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications[9] | $460 | $1,015 | $1,015 | $555 | 121% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (with biometric services)[10] | $545 | $1,015 | $1,015 | $470 | 85% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits)[11] | $460 | $1,015 | $510 | $50 | 11% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) (with biometric services)[12] | $545 | $1,015 | $510 | -$35 | -6% |
| I-129F Petition for Alien Fiancé(e) | $535 | $720 | $675 | $140 | 26% |
| I-130 Petition for Alien Relative (online filing) | $535 | $710 | $625 | $90 | 17% |
| I-130 Petition for Alien Relative (paper filing) | $535 | $820 | $675 | $140 | 26% |
| I-131 Application for Travel Document | $575 | $630 | $630 | $55 | 10% |
| I-131 Application for Travel Document (with biometric services) | $660 | $630 | $630 | -$30 | -5% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $165 | $30 | 22% |

[9] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[10] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[11] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[12] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

| **Table 1: Non-Statutory IEFA Immigration Benefit Request Fees** | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | $165 | -$55 | -25% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $135 | $30 | 29% |
| I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | $135 | -$55 | -29% |
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $575 | $575 | $0 | 0% |
| I-140 Immigrant Petition for Alien Workers[13] | $700 | $715 | $715 | $15 | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $930 | $0 | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) | $585 | $1,100 | $1,100 | $515 | 88% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $695 | $695 | $110 | 19% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $1,175 | $245 | 26% |
| I-290B Notice of Appeal or Motion | $675 | $800 | $800 | $125 | 19% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $435 | $515 | $515 | $80 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $1,440 | $300 | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $1,440 | $215 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $950 | $200 | 27% |
| I-526/526E Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $11,160 | $7,485 | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) | $370 | $525 | $420 | $50 | 14% |

[13] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
|---|---|---|---|---|---|
| **Table 1: Non-Statutory IEFA Immigration Benefit Request Fees** | | | | | |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) (with biometric services) | $455 | $525 | $420 | -$35 | -8% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) | $370 | $620 | $470 | $100 | 27% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) (with biometric services) | $455 | $620 | $470 | $15 | 3% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition | $775 | $920 | $920 | $145 | 19% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition (with biometric services for one adult) | $860 | $920 | $920 | $60 | 7% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600[14] | N/A | $455 | $455 | $455 | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $1,050 | $120 | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $1,105 | $795 | $165 | 26% |
| I-601A Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $795 | $80 | 11% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $1,240 | $1,240 | $110 | 10% |
| I-687 Application for Status as a Temporary Resident (with biometric services) | $1,215 | $1,240 | $1,240 | $25 | 2% |
| I-690 Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act | $715 | $985 | $905 | $190 | 27% |
| I-694 Notice of Appeal of Decision | $890 | $1,155 | $1,125 | $235 | 26% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $1,670 | $0 | 0% |

[14] This form is being created by this rule and did not previously exist.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | $1,670 | -$85 | -5% |
| I-751 Petition to Remove Conditions on Residence | $595 | $1,195 | $750 | $155 | 26% |
| I-751 Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $750 | $70 | 10% |
| I-765 Application for Employment Authorization (online filing) | $410 | $555 | $470 | $60 | 15% |
| I-765 Application for Employment Authorization (online filing) (with biometric services) | $495 | $555 | $470 | -$25 | -5% |
| I-765 Application for Employment Authorization (paper filing) | $410 | $650 | $520 | $110 | 27% |
| I-765 Application for Employment Authorization (paper filing) (with biometric services) | $495 | $650 | $520 | $25 | 5% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $925 | $920 | $145 | 19% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $925 | $920 | $60 | 7% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A | $385 | $455 | $455 | $70 | 18% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | $455 | -$15 | -3% |
| I-817 Application for Family Unity Benefits | $600 | $875 | $760 | $160 | 27% |
| I-817 Application for Family Unity Benefits (with biometric services) | $685 | $875 | $760 | $75 | 11% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $675 | $590 | $125 | 27% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | $9,525 | $5,775 | 154% |
| I-829 Petition by Investor to Remove Conditions (with biometric services) | $3,835 | $9,525 | $9,525 | $5,690 | 148% |

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $340 | $55 | 19% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | $340 | -$30 | -8% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | $340 | -$230 | -40% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $740 | $340 | $340 | -$315 | -48% |
| I-910 Application for Civil Surgeon Designation | $785 | $1,230 | $990 | $205 | 26% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $275 | $0 | -$230 | -100% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $1,200 | $0 | 0% |
| I-941 Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | $1,200 | -$85 | -7% |
| I-956 Application for Regional Center Designation | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | $4,470 | $1,435 | 47% |
| N-300 Application to File Declaration of Intention | $270 | $320 | $320 | $50 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (online filing) | $700 | $830 | $780 | $80 | 11% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (paper filing) | $700 | $830 | $830 | $130 | 19% |
| N-400 Application for Naturalization (online filing) | $640 | $760 | $710 | $70 | 11% |

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| N-400 Application for Naturalization (online filing) (with biometric services) | $725 | $760 | $710 | -$15 | -2% |
| N-400 Application for Naturalization (paper filing) | $640 | $760 | $760 | $120 | 19% |
| N-400 Application for Naturalization (paper filing) (with biometric services) | $725 | $760 | $760 | $35 | 5% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) | $320 | $380 | $380 | $60 | 19% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) (with biometric services) | $405 | $380 | $380 | -$25 | -6% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $420 | $65 | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document (online filing) | $555 | $555 | $505 | -$50 | -9% |
| N-565 Application for Replacement Naturalization/Citizenship Document (paper filing) | $555 | $555 | $555 | $0 | 0% |
| N-600 Application for Certificate of Citizenship (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600 Application for Certificate of Citizenship (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| USCIS Immigrant Fee | $220 | $235 | $235 | $15 | 7% |
| H-1B Registration Process Fee | $10 | $215 | $215 | $205 | 2,050% |
| Biometric Services | $85 | $30 | $30 | -$55 | -65% |
| G-1041 Genealogy Index Search Request (online filing) | $65 | $100 | $30 | -$35 | -54% |
| G-1041 Genealogy Index Search Request (paper filing) | $65 | $120 | $80 | $15 | 23% |
| G-1041A Genealogy Records Request (online filing) | $65 | $240 | $30 | -$35 | -54% |
| G-1041A Genealogy Records Request (paper filing) | $65 | $260 | $80 | $15 | 23% |
| G-1566 Request for Certificate of Non-Existence | $0 | $330 | $330 | $330 | N/A |

## E. Summary of Costs and Benefits

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate. The annualized transfer payments from the Department of Defense (DOD) to USCIS for Form N–400 filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DOD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer

payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

## F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking

DHS acknowledges the broad effects of the Coronavirus Disease (COVID–19) international pandemic on the United States broadly and the populations affected by this rule. Multiple commenters on the proposed rule wrote that increasing USCIS fees at this time would exacerbate the negative economic impacts that the United States has experienced from the COVID–19 pandemic.

DHS realizes the effects of COVID–19, and USCIS, specifically, is still dealing with the effects of COVID–19 on its workforce and processing backlog. COVID–19 affected the demand for immigration benefits and USCIS services, and, as all employers did, USCIS was required to adjust its workplaces to mitigate the impacts of the disease. DHS has procedures in place to deal with emergency situations as they arise but is no longer providing special accommodations associated with the pandemic.[15] USCIS considered the effects of COVID–19 on its workload volumes, revenue, or costs, along with all available data, when it conducted its fee review. DHS will also consider these effects in future fee rules. However, no changes were made in the fees and regulations codified in this final rule to address the effects of COVID–19. Further, Census data indicates that impacts of COVID–19 showed a dip in estimated sales, revenue, and value of shipments in 2020 followed by a recovery through the fourth quarter of 2021.[16] CDC ended the public health emergency due to the COVID–19 pandemic on May 11, 2023.[17] Although there may be some lingering economic

impacts from COVID–19, DHS does not believe these would have an impact on the number of filings by requestors. DHS notes that for certain forms and categories fee waivers may be available for people with financial hardship. *See* 8 CFR 106.3(a); Table 4B.

## II. Background

### A. History

On January 4, 2023, DHS published a proposed rule in the **Federal Register** (docket USCIS–2021–0010) at 88 FR 402. DHS published a correction on January 9, 2023, at 88 FR 1172.[18] On February 24, 2023, DHS extended the comment period an additional 5 days, to March 13, 2023, for a total comment period of 68 days. *See* 88 FR 11825. USCIS also held a public engagement event on January 11, 2023, and a software demonstration on March 1, 2023, to provide additional avenues for the interested public to hear about and provide feedback on the proposed fee rule.[19] In this final rule, DHS will refer to the initial proposed rule, correction, and extension collectively as the proposed rule.

### B. Authority and Guidance

DHS publishes this final rule under the Immigration and Nationality Act ("INA"), which establishes the Immigration Examinations Fee Account ("IEFA") for the receipt of fees it charges. INA section 286(m), 8 U.S.C. 1356(m). The INA allows DHS to set "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* The INA further provides that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* DHS also issues this final rule consistent with the Chief Financial Officer Act, 31 U.S.C. 901–03903 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees).

This final rule is also consistent with non-statutory guidance on fees, the budget process, and Federal accounting principles.[20] DHS uses Office of

---

[15] *See* USCIS, Immigration Relief in Emergencies or Unforeseen Circumstances available at *https://www.uscis.gov/newsroom/immigration-relief-in-emergencies-or-unforeseen-circumstances* (last reviewed/updated Aug. 16, 2023); USCIS, USCIS Announces End of COVID-Related Flexibilities available at *https://www.uscis.gov/newsroom/alerts/uscis-announces-end-of-covid-related-flexibilities* (last reviewed/updated Mar. 23, 2023).

[16] *See https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[17] *See* CDC, COVID–19 End of Public Health Emergency, available at *https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html* (last updated May 5, 2023).

[18] The document corrected two typographical errors in Table 1 of the proposed rule.

[19] *https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[20] *See* 58 FR 38142 (July 15, 1993) (revising Federal policy guidance regarding fees assessed by

Continued

Management and Budget (OMB) Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in this section. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of Immigration Examinations Fee Account (IEFA) costs.[21]

Finally, this final rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. In the proposed rule, DHS outlined the effects of appropriations for FY 2021 and FY 2022.[22] As explained in the proposed rule, Congress provided USCIS additional appropriations for very specific purposes in FY 2022.[23] Shortly before publication of the proposed rule, Congress passed a full year appropriation bill for FY 2023. Together, the total FY 2023 appropriations for USCIS were approximately $268.0 million. Congress appropriated USCIS approximately $243.0 million for E-Verify and refugee processing in FY 2023.[24] Approximately $133.4 million of the $243.0 million was for refugee processing, and the remainder was for E-Verify. In addition, Congress appropriated $25 million for the Citizenship and Integration Grant Program, which is available until September 30, 2024, the end of FY 2024. *Id.* This means that USCIS received $5 million more than in FY 2022, and it has 2 years to spend the full $25 million. Because USCIS anticipated appropriated funds for citizenship grants in both FY 2022 and FY 2023, the $20 million in FY 2022 and the $25 million in FY 2023 for citizenship grants are not part of the FY 2022/2023 IEFA fee review budget. For several years, USCIS had the authority to spend no more than $10 million for citizenship grants.[25] Until recently, that grant program funding came from the IEFA fee revenue or a mix of appropriations and fee revenue.[26] If USCIS does not receive appropriations for citizenship grants for FY 2024, then it could use any remaining amount from the $25 million appropriation in the Consolidated Appropriations Act, 2023.

In these cases, appropriation laws for FY 2022 and FY 2023 provide that the funds are only to be used for the specified purposes, and DHS is not required to reduce any current IEFA fee.[27] As explained in the proposed rule, these appropriations do not overlap with the fee review budget, which will fund immigration adjudication and naturalization services for future incoming receipts. USCIS cannot and does not presume congressional appropriations, especially given the lack of appropriations in the past. If this fee rule does not account for the possibility of no congressional funding in future years and Congress fails to fund a program, either the program cannot continue or USCIS will be forced to reallocate resources assigned to another part of the agency for this purpose. As such, DHS makes no changes to the final rule based on the appropriations for FY 2022 and FY 2023.

*C. Changes From the Proposed Rule*

This final rule adopts, with appropriate changes, the regulatory text in the proposed rule published in the **Federal Register** on January 4, 2023. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Proposed rule, 88 FR 402. DHS is making several changes in this final rule based on comments received on the proposed rule or as required by the effects of those changes. As explained throughout this preamble, DHS exercises its discretionary authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on numerous factors, including adequately funding USCIS operations, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. This final rule also relies on the justifications articulated in the proposed rule, except as modified and explained throughout this rule in response to public comments, intervening developments, and new information. As stated in the proposed rule, DHS is not repeating the amendatory instructions and regulatory text for ministerial, procedural, or otherwise non-substantive changes adopted from the 2020 fee rule. 88 FR 421. A description of each change is as follows:

1. Reduced Costs and Fees

DHS has revised the USCIS budget underlying the final rule. In the proposed rule, USCIS projected that its IEFA non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million, a $726.7 million or 14.1 percent decrease compared to the proposed rule. *See* Table 2 of this preamble.

---

Federal agencies for Government services); Federal Accounting Standards Advisory Board Handbook, Version 17 (06/18), ''Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts,'' SFFAS 4, available at *http://files.fasab.gov/pdffiles/handbook_sffas_4.pdf* (generally describing cost accounting concepts and standards, and defining ''full cost'' to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (July 31, 1995); OMB Circular A–11, ''Preparation, Submission, and Execution of the Budget,'' section 20.7(d), (g) (June 29, 2018), available at *https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf* (June 29, 2018) (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees).

[21] OMB Circulars A–25 and A–11 provide nonbinding internal executive branch direction for the development of fee schedules under IOAA and appropriations requests, respectively. *See* 5 CFR 1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS understands they reflect best practices and used the activity-based costing (ABC) methodology supported in Circulars A–25 and A–11 to develop the proposed fee schedule.

[22] *See* 88 FR 402, 415–417 (Jan. 4, 2023); *see also* Consolidated Appropriations Act, 2021 (Dec. 27, 2020), Public Law 116–260, at div. F, tit. IV; Consolidated Appropriations Act, 2022, Public Law 117–103 (Mar. 15, 2022) (''Pub. L. 117–103'') at div. F. tit. 4; Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021) (''Pub. L. 117–43'') at div. C. title V, sec. 2501.

[23] *See* 88 FR 402, 415–416 (Jan. 4, 2023); *see also* Public Law 117–103.

[24] *See* Consolidated Appropriations Act, 2023, Public Law 117–328, div. F, tit. IV (Dec. 29, 2022).

[25] Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116–6), FY 2020 (Pub. L. 116–93), and FY 2021 (Pub. L. 116–260).

[26] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113–6) and FY 2014 (Pub. L. 113–76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018.

[27] Public Law 117–43, at section 132, states, ''That such amounts shall be in addition to any other funds made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)).'' Likewise, Public Law 117–43, at section 2501, states ''That such amounts shall be in addition to any other amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)).'' Similar wording is in Public Law 117–328 in div F. tit. IV. USCIS has a long history of funding citizenship and integration grants from IEFA revenue, appropriations, or a mix of both.

| Table 2: FY 2022/2023 Proposed vs. Final FY 2022/2023 Fee Review Cost Projections (Dollars in Thousands) | | | | | |
|---|---|---|---|---|---|
| **Type** | **Proposed Rule Average** | **Final Rule Average** | **Difference** | **Change** | **Percent of Total Change** |
| Payroll | $3,347,853 | $3,186,683 | ($161,170) | -4.8% | 22% |
| Non-Payroll | $1,802,854 | $1,237,348 | ($565,506) | -31.4% | 78% |
| **Total** | **$5,150,707** | **$4,424,031** | **($726,676)** | **-14.1%** | **100%** |

DHS is authorized by INA section 286(m), 8 U.S.C. 1356(m), to set USCIS fees at a level to recover "the full costs" of providing "all" "adjudication and naturalization services," and "the administration of the fees collected." This necessarily includes support costs, and USCIS' current budget forecasts a deficit based on fully funding all of its operations. DHS must make up that difference either by cutting costs, curtailing operations, or increasing revenue. DHS examined USCIS recent budget history, service levels, and immigration trends to forecast its costs, revenue, and operational metrics in order to determine whether USCIS fees would generate sufficient revenue to fund anticipated operating costs. This increase in funding ensures that USCIS can meet its operational needs during the biennial period.

| Table 3: IEFA Non-Premium Cost and Revenue (at FY 2021 Levels) | | | |
|---|---|---|---|
| Dollars in Millions | | | |
| **Point of Comparison** | **FY 2022** | **FY 2023** | **FY 2022/2023 Average** |
| Non-Premium Revenue with Current Fees | $3,280.3 | $3,284.8 | $3,282.5 |
| Non-Premium Cost Projection | $4,422.0 | $4,426.1 | $4,424.0 |
| **Difference** | **$1,141.7** | **$1,141.3** | **$1,141.5** |

Reducing the budget allows DHS to finalize some fees that are lower than in the proposed rule and offer additional fee exemptions in response to public comments requesting lower fees. In this final rule, DHS removes approximately $726.7 million of average annual estimated costs by making the following changes:

• Transferring costs to Premium Processing revenue;

• Reducing the estimated marginal costs of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers Interim Final Rule to be funded; [28] and

• Including efficiency estimates based on improved efficiency measures.

DHS revises the estimated cost and revenue differential to $1,141.5 million in this final rule. *See* Table 3 of this preamble. DHS issues this final rule to adjust USCIS' fee schedule to recover the full cost of providing immigration

adjudication and naturalization services.

a. Transferring Costs to Premium Processing Revenue

DHS has historically excluded premium processing revenue and costs from its IEFA fee reviews and rulemakings to ensure that premium processing funds are available for infrastructure investments largely related to information technology, to provide staff for backlog reduction, and to ensure that non-premium fees were set at a level sufficient to cover the base operating costs of USCIS. This was done because the INA, as amended by the District of Columbia Appropriations Act of 2001 provided that premium processing revenue shall be used to fund the cost of offering premium service, as well as the cost of infrastructure improvements in adjudications and customer service processes. *See* 87 FR 1832. In the proposed rule at 88 FR 420, USCIS outlined its planned uses of premium processing revenue to provide premium

processing service, improve information technology infrastructure, and reduce backlogs. Therefore, revenue from premium processing, the costs for USCIS to provide premium processing service, the costs to improve information technology infrastructure, and the costs directed at reducing the backlog were not considered in the proposed fees.

On October 1, 2020, the Continuing Appropriations Act, which included the USCIS Stabilization Act, was signed into law, codifying new section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A). Among other things, the USCIS Stabilization Act established new premium processing fees and expanded the permissible uses of revenue from the collection of premium processing fees, including improvements to adjudication process infrastructure, responses to adjudication demands, and to otherwise offset the cost of providing adjudication and naturalization services. Then, on March 30, 2022, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

---

[28] 87 FR 18078 (Mar. 29, 2022).

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4.

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule, as DHS was still in the early stages of implementation. It stated that DHS would consider including premium processing revenue and costs in the final rule., as appropriate, as DHS would have more information about the revenue collected from premium processing services by the time DHS publishes a final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). As a result of additional information gathered over the passage of time since the proposed rule and the December 28, 2023 Adjustment to Premium Processing Fees final rule, 88 FR 89539, in this final rule, DHS has transferred $129.8 million in costs to premium processing to account for future premium processing revenue projections.

**b. Reducing the Work To Be Funded by the Asylum Program Fee**

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. DHS has begun implementation of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers (Asylum Processing IFR) (87 FR 18078 Mar. 29, 2022) rulemaking, but full implementation of the IFR is delayed while DHS resolves litigation around the Circumvention of Lawful Pathways rule. *See* 88 FR 31314 (May 16, 2023). Therefore, DHS needs to generate less revenue from the Asylum Program Fee than we estimated was needed in the proposed rule. Accordingly, we have provided a lower fee in this final rule for certain small employers and nonprofits in response to comments requesting lower fees for

these groups. Businesses with 25 or fewer full-time equivalent employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Nonprofits will pay $0. How DHS determined which businesses would receive such relief from the full fee is discussed later in this section. DHS estimates the revised Asylum Program Fee will generate approximately $313 million in revenue, compared to the $425 million that was estimated in the proposed rule from charging $600 with no exemptions or discounts.

DHS recognizes that reducing the USCIS budget due to the lower projected revenue from the Asylum Program Fee risks a revenue shortfall if the Asylum Processing IFR is fully implemented and the associated costs incurred. However, DHS's Asylum Processing IFR workload is somewhat flexible because DOJ can share some—though not all—of the workload. On the other hand, if the Asylum Processing IFR is not fully implemented, USCIS still has a significant need for the revenue. Although the amount of the fee was based on the costs of the Asylum Processing IFR, it was proposed ''. . . to fund part of the costs of administering the entire asylum program . . .'' 88 FR 849. USCIS Asylum Division expense estimates are over $400 million a year before adding the costs of the Asylum Processing IFR, and USCIS is regularly adding new asylum offices and capabilities. Thus, DHS projects that the total costs of the asylum program will exceed the revenue from the new fee even before any new capacity is added to implement the Asylum Processing IFR.

Further, DHS notes that USCIS cannot direct the revenue from the Asylum Program Fee precisely to the marginal costs that result from the implementation of the Asylum Processing IFR, as the Asylum Program Fee, like other fees, will be deposited into the general IEFA and not an account specific to the IFR or to the asylum program. In addition, if Asylum Division expenses are greatly reduced or funded by a Congressional appropriation, and USCIS determines the Asylum Program Fee is not needed, USCIS can pause collection of the Asylum Program Fee using the authority in 8 CFR 106.3(c). The costs for administering the asylum program not funded by the revenue collected from the Asylum Program Fee will continue to be funded by other fees.

**c. Including Processing Efficiency Estimates Based on Improved Efficiency Measures**

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[29] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing to achieve these goals.

**2. Changes in the Asylum Program Fee**

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. *See* 88 FR 402, 451 (Jan. 4, 2023). As explained in the proposed rule, DHS determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS arrived at the amount of the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and Form I–140, Immigrant Petition for Alien Worker, to collect the Asylum Processing IFR estimated annual costs. *Id.* The Asylum Program Fee adds a fee, only for Form I–129, I–129CW, and Form I–140 petitioners, in order to maintain lower fees for other immigration benefit requestors than if these asylum costs were spread among all other fee payers. The proposed rule provided examples of alternative Form I–485, Application to Register Permanent Residence or Adjust Status, and I–765, Application for Employment Authorization, proposed fees if those applications were burdened with the Asylum Processing IFR estimated annual costs. *Id* at 452. The proposed fees for Forms I–485, I–765, and others were lower with the shift of asylum program costs to employers through the new fee. If Forms I–129, I–129CW, and I–140 recover more of those

---

[29] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders'' (Mar. 29, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

003154

costs, then that means other forms need not recover as much, resulting in lower proposed fees for Forms I–485, I–765, and others that recovered more than full cost in the proposed rule. DHS stands by this approach to lower fees for other immigration benefit requestors less able to pay by limiting the Asylum Program Fee to Forms I–129, I–129CW, and I–140.

DHS summarizes and responds to the comments on the Asylum Program Fee in more detail in section IV.2.a. of this preamble. After considering public comments, in the final rule, DHS exercises its discretionary authority to establish fees, balancing the beneficiary-pays and ability-to-pay principles, and to address the negative effects that commenters stated would result, by exempting the Asylum Program Fee for nonprofit petitioners and reducing it by half for small employers. *See* 8 CFR 106.2(c)(13).[30] The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE employees); and $600 for all other filers of Forms I–129, I–129CW, and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

### 3. Defining Small Employer

DHS did not propose to provide any fee exemptions or discounts based on employer size. Many commenters, however, wrote that the proposed new fees for employment-based immigration benefit requests could make it difficult for small companies to pay the fees or it may hinder their ability to hire the workers they need. Balancing the need to shift the costs of services, adequately fund USCIS operations, and balance the beneficiary-pays and ability-to-pay principles, DHS determined that a discount based on the size of the business is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023).

The final rule defines "small employer" as having 25 or fewer full-time equivalent (FTE). *See* 8 CFR 106.1(f). When determining which employers should be considered small, DHS considered what definition could be administered to provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. The volume of

forms submitted to USCIS requires that benefit request intake be automated to the extent possible, including the analysis of whether the correct fee has been paid based on if the petitioner meets the criteria for the fee they have submitted with their request. DHS also considered other exemptions provided for the same or similar forms and how the term "small employer" is defined in other contexts. DHS reviewed INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), which provides that the ACWIA fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). Because the ACWIA fee and the Asylum Program fee are both applied to the Form I–129, DHS decided that using a consistent definition was preferable. DHS also determined that defining small employer as 25 or fewer full time equivalent employees was appropriate because: (1) it is consistent with what Congress has provided in statute that it considers small with regard to the applicability of certain fees for employment-based petitions submitted to USCIS; (2) DHS has a long history of administering the ACWIA fee, and (3) determining if the petitioner is eligible for the fee discount requires minimal additional evidence.[31] This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

### 4. Defining Nonprofit

DHS did not propose any relief from any fee in the proposed rule for nonprofit entities. Many commenters, however, wrote that the proposed new fees for nonprofits could make it difficult for the nonprofits to pay the fees or it may hinder their ability to hire the workers they need. DHS agrees that the type of organizations that qualify as a nonprofit generally provide a service to the public.[32] Nonprofit organizations may include religious, educational, or charitable organizations and may not be

required to pay federal taxes.[33] DHS understands that organizations that do not pursue monetary gain or profit must use funds for USCIS fees that they would otherwise use in pursuit of public and private service. Therefore, balancing the need to shift the costs of services, adequately funding USCIS operations, and the beneficiary-pays and ability-to-pay principles, DHS determined that a discount for nonprofits is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023). DHS acknowledges that allowing this discount for certain large non-profits, such as universities and hospitals, may seem inconsistent with the ability-to-pay principle. However, DHS notes that this treatment is consistent with their tax-exempt status and believes that the public service performed by these entities further justifies the fee discount.

DHS determined that the most appropriate definition for nonprofit is the definition in the Internal Revenue Code (IRC), specifically 26 U.S.C. 501(c)(3) (2023). 8 CFR 106.1(f)(2). As with the definition of small employer, DHS considered costs to USCIS, burden on petitioners, and intake and processing requirements. DHS also considered how the term nonprofit is defined in other contexts. Commenters that requested relief for nonprofits did not suggest an alternative definition for nonprofit than that used for Federal income tax purposes or as provided for the ACWIA fee reduction in 8 CFR 214.2(h)(19)(iv). The INA provides for a reduced ACWIA fee if a petitioner is "a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization." INA section 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A). The INA does *not* define "nonprofit" in terms of the IRC and the definitions of "institution of higher education" and "government research organization" in 8 CFR 214.2(h)(19)(iv)(B) are not tied to the IRC.

For ease of administration, DHS will not require that the petitioner nonprofit

---

[30] DHS recognizes that many small employers and nonprofits submit USCIS Form I–907, Request for Premium Processing, with their Form I–129. Because premium processing is an optional request for faster processing and not required to obtain an immigration benefit, DHS makes no changes to premium processing fees for those groups.

[31] As noted in the Paperwork Burden Act section of this final rule, and in the final form instructions for Forms I–129 and 140 provided in the docket, DHS will require that petitioners submit the first page of their most recent IRS Form 941, Employer's QUARTERLY Federal Tax Return. We will determine at intake if the petitioner has submitted the lower fee or no fee based on the number indicated in Part 1, question 1, Number of employees who received wages, tips, or other compensation for the pay period.

[32] *See* U.S. Department of the Treasury, U.S. Internal Revenue Service, Exempt Organization Types, *https://www.irs.gov/charities-non-profits/exempt-organization-types* (Page Last Reviewed or Updated: 05–Dec–2023).

[33] Nonprofits may be required to pay certain other taxes. *See*, U.S. Department of the Treasury, U.S. Internal Revenue Service, Federal Tax Obligations of Non-Profit Corporations at *https://www.irs.gov/charities-non-profits/federal-tax-obligations-of-non-profit-corporations.* (Page Last Reviewed or Updated: 05–Dec–2023).

status be limited to research or educational purposes, as in 8 CFR 214.2(h)(19)(iv)(B). DHS has decided that eligibility for fee reductions and fee exemptions for nonprofits provided in this final rule will be limited to nonprofit organizations approved by the Internal Revenue Service as a nonprofit entity under section 501(c)(3) of the IRC or as a government research organization, and that USCIS will not impose the burden on petitioners of demonstrating an educational or research purpose. This approach will ensure that the primary types of organizations eligible for the ACWIA fee reduction in the INA—educational institutions, nonprofit research organizations, and governmental research organizations—will also be eligible for the fee reductions and exemptions under this rule, as will other nonprofit entities with a charitable purpose under section 501(c)(3).

DHS considered including but will not include entities organized under 501(c)(4) and 501(c)(6) of the IRC in the definition of nonprofit in this rule. Tax-exempt organizations under section 501(c)(4) include social welfare organizations and local associations of employees, while tax-exempt organizations under 501(c)(6) include business leagues, chambers of commerce, real estate boards, boards of trade, and professional football leagues. *See* 26 U.S.C. 501(c)(4) & (6). Both types

of entities, unlike public charities under 501(c)(3), may engage in lobbying activities. Although 8 CFR 214.2(h)(19)(iv)(A) includes nonprofit or tax-exempt organizations under 501(c)(3), 501(c)(4), and 501(c)(6) for purposes of the ACWIA fee reduction, this eligibility is further cabined by 8 CFR 214.2(h)(19)(iv)(B), requiring that such entities have been "approved as a tax-exempt organization *for research or educational purposes* by the Internal Revenue Service" (emphasis added). As a practical matter, DHS experience indicates that few 501(c)(4) or 501(c)(6) entities are likely to be organized for research or educational purposes *and* meet the definition of "affiliated or related nonprofit entity" under 8 CFR 214.2(h)(19)(iii), which requires a close tie to an institution of higher education. Therefore, DHS has determined that in defining eligibility for nonprofit fee reductions and exemptions under this rule, it is appropriate to include 501(c)(3) entities while excluding 501(c)(4) and 501(c)(6) entities. This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

5. Changes to EB–5 Volume Forecasts

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information

than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

For the proposed rule, DHS estimated the EB–5 workload based on statistical modeling, immigration receipt data, and internal assessments, like other workload forecasts. 88 FR 402, 432–438. The proposed rule discussed that EB–5 receipts decreased from FY 2016 to FY 2020. 88 FR 402, 509–510. At the time of the proposed rule, DHS had very limited information upon which to base estimates of the new workload required by the EB–5 Reform and Integrity Act of 2022. *See id.* at 557. In this final rule, DHS updated the EB–5 workload estimates to account for the effect of the EB–5 Reform and Integrity Act of 2022. USCIS believes these estimates better represent the EB–5 filing receipts it can expect. Increasing the volume forecasts for EB–5 also increases the amount of revenue generated by the EB–5 workload for the final rule budget. As explained elsewhere, DHS has revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the EB–5 fees in the final rule. 88 FR 72870.

| Table 4: EB-5 Workload Forecast | | | |
|---|---|---|---|
| Immigration Benefit Request | Proposed Rule Average Annual Projected Receipts | Final Rule Average Annual Projected Receipts | Difference |
| I-526 Immigrant Petition by Alien Investor | 3,900 | 4,050 | 150 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,250 | 4,500 | 1,250 |
| I-956 Application for Regional Center Designation | 62 | 400 | 338 |
| I-956F Application for Approval of Investment in a Commercial Enterprise | N/A | 600 | 600 |
| I-956G Regional Center Annual Statement | 728 | 875 | 147 |
| I-956H Bona Fides of Persons Involved with Regional Center Program | N/A | 2,000 | 2,000 |
| I-956K Registration for Direct and Third-Party Promoters | N/A | 500 | 500 |
| EB-5 Receipts Forecast | 7,940 | 12,925 | 9,435 |

## 6. Changes to H–1B Registration Fee Volume Forecasts

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule is close to the 274,237 total registrations in the FY 2021 cap year.[34] However, after the proposed rule was published, a total of 780,884 petitioners registered for an FY 2024 cap-subject H–1B employee. This final rule forecast of 424,400, based on more recent data, is closer to the total registrations for the FY 2023 cap year. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the H–1B registration fees in the final rule. 88 FR 72870.

## 7. Online Filing Fees

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

As described in the proposed rule and supporting documentation, the cost savings USCIS experiences from online filing differs from form to form depending on many factors. Many commenters wrote that USIS was penalizing those who still filed on paper by making paper filing more expensive. The commenters misunderstand the policy goal of the online discount because DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. If the online discount was not provided, paper form fees would not decrease accordingly. DHS wants to incentivize online filing, but we proposed fees

based on the costs savings calculated in the ABC model.

In response to comments, DHS reevaluated the difference between online and paper fees. In the proposed rule, the proposed fee differences ranged from $0 to $110. In this final rule, DHS again has determined that online filing provides costs savings to USCIS and requestors, increases flexibility and efficiency in adjudications, and those benefits should be reflected in lower fees. However, in the final rule DHS takes the expected savings from online filing and divides it among all online filed forms by establishing that the fees for online filing will be $50 less than for the same request filed on paper.[35] Furthermore, DHS believes that the $50 reduced cost can be reasonably anticipated to be consistent for future USCIS online filing capabilities and has decided to provide that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g). DHS emphasizes it establishes the $50 difference because

---

[34] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

[35] DHS applies this discount to USCIS online filings only and does not apply this provision to fees set in this rule for immigration benefit requests that are submitted to either USCIS or CBP when the request is submitted and fee collected by CBP online. *See, e.g.,* 8 CFR 106.2(a)(13)—(15).

USCIS experiences moderately reduced costs from online filing. Additionally, applying a uniform $50 reduced cost for online filing to all forms will make the reduced fee easier for USCIS to administer and be less confusing to the public when calculating the fee. Although DHS believes that it should encourage online filing as a matter of sound policy, contrary to the suggestions of some commenters, DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. For applicants who experience a lack of access to computers or the internet, paper filing will generally remain an option.[36]

## 8. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. Consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 88 FR 402, 450–451. The proposed rule also included a provision to adjust fees by inflation in the future. 88 FR 402, 516.

DHS received many comments about the method that USCIS used to calculate how its costs should be dispersed among the requests for which fees are charged. Some commenters wrote that DHS should limit the increase in USCIS fees by the amount of inflation. DHS analyzed the suggestion and determined that from December 2016 (the month FY 2016/2017 fee rule went into effect) to June 2023,[37] the CPI–U increased by 26.37 percent.[38] Using the CPI–U as the measure for cost and fee increases is consistent with statutes that authorize DHS to adjust USCIS fees. *See, e.g.* section 286(u)(3)(C) of the INA, 8 U.S.C.

1356(u)(3)(C) (providing that DHS may adjust the premium fees based on the change in the CPI–U). DHS then calculated what the fees would be if adjusted by 26.37 percent, rounded to the nearest $5 increment, consistent with other fees (and reducing online filing fees by $50 as explained earlier). After considering the amount of the increase, as well as the impacts of the applicable fees on individual filers, DHS determined (1) that the additional revenue that would be generated by increasing the subject forms by inflation would be appropriate for expected revenue from those requests in the final rule, (2) increasing the fees by only inflation as suggested in public comments balanced the need to recover increased USCIS costs with the impacts of the fees on individuals and families, and (3) to the extent that an inflation adjustment did not recover the relative costs of the applicable requests, either other fees could be increased to make up the unrecovered costs using the ability to pay principle or USCIS could reduce its budget. In the final rule, except for certain employment-based benefit request fees, DHS finalized the fees at either the proposed fee level or the current fee adjusted for inflation, whichever was lower. A comparison of current, proposed, and final fees can be found in Table 1.

Some of the proposed fees set to increase less than inflation are the fees for Form N–400, Application for Naturalization, certain adoption-related forms (*e.g.,* Form I–600, Petition to Classify Orphan as an Immediate Relative and Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative), and other immigration benefit requests where DHS limited the proposed fee increase to 18 percent increase (not including biometrics fees), as described in the proposed rule. *See* 88 FR 402, 450–451, 486–487 (Jan. 4, 2023).

This final rule additionally holds several fees to the rate of inflation since the previous fee increase in 2016. For example, DHS adjusts the paper filing fees for Forms I–130, I–485, I–539, and I–751 by inflation.

DHS notes that an increase of a straight 26.37 percent based solely on inflation deviates from the ABC model that OMB Circular A–25 recommends, and the method generally used by DHS in past USCIS fee rules. However, as stated in past fee rules, the proposed rule, and in responses to comments in this rule, DHS is not strictly bound by A–25; nor is it limited to setting fees based on the costs of the service under 31 U.S.C. 9701. For public policy reasons, DHS may use and has used its

discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 81 FR 73308 (the 2016 final rule noted that the Application for Naturalization fee has not changed in nearly a decade and was being set at less than it would be if the 2007 fee were simply adjusted for inflation). DHS believes that this combination of limiting certain fee increases for policy reasons, setting fees using the ABC model, and adjusting fees by inflation, in addition to being responsive to public comments, provides a logical, reasonable, and balanced approach. For the proposed rule, and consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at activity-based costing (ABC) model output levels. 88 FR 402, 450–451. DHS is doing the same in the final rule.

## 9. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402, 459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings and adoptions. *See* Tables 5B, 7; 8 CFR 106.3(b). Many commenters requested that DHS provide more fee exemptions for humanitarian related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide more related fee exemptions. Normally, expanding fee waivers or exemptions may increase fees, as explained in the proposed rule. 88 FR 402, 450–451. However, in this final rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and fee-paying receipts. As such, DHS is implementing these fee exemptions without increasing fees for other benefit requests.

### a. No New Fee Waivers

DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits while changing some fee waivers to fee exemptions. Additional fee waivers

---

[36] USCIS Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, must be filed online, but no fee is required. See, *https://www.uscis.gov/i-134a,* last Reviewed/Updated: 08/11/2023.

[37] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 89539. DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

[38] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent.

would require USCIS to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

b. New Fee Exemptions

Many commenters requested that DHS provide more fee exemptions and free services for humanitarian-related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide fee exemptions for several additional forms. A summary of the current and new exemptions is provided below in Table 5A and 5B. The adoption related fee exemptions are in Table 7. Balancing beneficiary-pays and ability-to-pay and the funding needs of USCIS, DHS has determined that these additional fee exemptions are warranted for the following reasons.

Victims of Severe Form Of Trafficking (T Nonimmigrants)

In the proposed rule, DHS offered a fee exemption for T nonimmigrant status (''T visa'') applicants, T nonimmigrants, and their derivatives for Form I–290B, Notice of Appeal or Motion, only if filed for any benefit request filed before adjusting status or for Form I–485, Application to Register Permanent Residence or Adjust Status. In this final rule, DHS expands the exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824, Application for Action on an Approved Application or Petition, for this population in this final rule. As stated in the proposed rule, the T visa program is historically underused and the annual statutory cap of 5,000 has never been reached. *See* 88 FR 460. DHS aims to further encourage participation of eligible victims of trafficking in the T visa program by expanding fee exemptions as provided in this final rule. DHS believes that these expanded fee exemptions advance the humanitarian goals of the T visa program by reducing barriers for this particularly vulnerable population while meeting the agency's funding needs because of the relatively low receipts and cost transfer for these forms.[39] Also, providing these fee

exemptions helps to ensure parity of access to immigration relief for T visa applicants, T nonimmigrants, and their derivatives with similarly situated humanitarian categories of requestors. Finally, these additional exemptions will help account for the trauma and financial difficulties that T nonimmigrants may endure long after escaping their traffickers.

Victims of Qualifying Criminal Activity (U Nonimmigrants)

DHS provided fee exemptions in the proposed rule for U nonimmigrant status (''U visa'') petitioners and U nonimmigrants filing Form I–192, Form I–193, Form I–290B, and Form I–539 in limited circumstances. DHS expands these fee exemptions in this final rule such that Form I–192, Form I–193, and Form I–539 are fee exempt when filed by a U visa petitioner or U nonimmigrant at any time, and Form I–290B is also fee exempt if filed for ancillary forms associated with Form I–485. DHS also expands the fee exemption for Form I–765 to include initial, renewal, and replacement requests. Furthermore, DHS provides additional fee exemptions for Form I–131, Form I–485, Form I–601, Form I–824 and Form I–929 for this population. Providing these fee exemptions helps to ensure parity of access to immigration relief for U nonimmigrants with similarly situated humanitarian categories of requestors. These additional fee exemptions are provided in this final rule for the reasons stated in Section IV.F of this preamble where DHS responds to the public comments provided on the fees proposed for U nonimmigrants.

VAWA Form I–360 Self-Petitioners and Derivatives

DHS offered fee exemptions in the proposed rule for VAWA self-petitioners and derivatives filing Forms I–131, I–212 and I–601 depending on whether Forms I–360 and I–485 are filed concurrently or currently pending adjudication. Additionally, exemptions were proposed for Forms I–290B and I–485 when the Form I–485 is filed concurrently with the Form I–360, and for initial filers of I–765 for VAWA self-petitioners and derivatives. For the reasons stated in Section IV.F of this preamble in response to the public comments provided on VAWA self-petitioners, this final rule expands fee exemptions to include when Form I–360

and Form I–485 are filed separately and for some ancillary forms, when the I–485 is not pending. DHS also expands the fee exemption for Form I–290B filed by VAWA self-petitioners to include any benefit request filed before adjusting status or for Form I–485 and associated ancillary forms. Additionally, this final rule provides VAWA self-petitioners fee exemptions for Form I–601A, Form I–824, and Form I–765 renewal and replacement requests. Providing these fee exemptions helps to improve parity of access to immigration relief for VAWA self-petitioners with similarly situated humanitarian categories of requestors. On balance, the reduction of barriers to immigration relief for VAWA self-petitioners when compared with the relatively low transfer payment from the government to other benefit requestors supports DHS's decision to provide these fee exemptions.[40]

Conditional Permanent Residents filing an application for a waiver of the joint filing requirement based on battery or extreme cruelty.

For conditional permanent residents (CPRs) seeking a waiver of the Form I–751 joint-filing requirement based on battery or extreme cruelty, DHS provides an additional fee exemption in this final rule. DHS believes that CPRs filing under this exception are similarly situated to other VAWA requestors, for whom DHS has created new fee exemptions in the proposed rule and final rule. As the proposed rule noted with regards to VAWA self-petitioners, *see* 88 FR 402, 461 (Jan. 4, 2023), abused CPRs may still be living with their abuser or have recently fled their abusive relationship when filing Form I–751. Abusers often maintain control over financial resources to further the abuse, and victims may have to choose between staying in an abusive relationship and poverty and homelessness. *Id.* Therefore, CPRs who are victims of abuse may lack financial resources or access to their finances. DHS acknowledges that the proposed rule stated that it could not provide this fee exemption because Form I–751 petitioners can seek a joint-filing waiver on multiple grounds at once. *Id.* at 462. Upon reconsideration, however, DHS sees no reason that providing the fee exemption for CPRs who also request

---

[39] From FY 2018 through FY 2022, T nonimmigrants filed a five-year annual average of 311 Forms I–290B and a five-year annual average of 4 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from

the government to benefit requestors is calculated to be $171,672 for Form I–290B and $2,242 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

[40] From FY 2018 through FY 2022, VAWA self-petitioners filed an annual average of 1,273 Forms I–290B and an annual average of 314 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from the government to benefit requestors is calculated to be $1,550,128 for Form I–290B and $36,769 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

multiple waivers would be infeasible operationally. DHS further notes that CPRs requesting abuse waivers are a relatively small population, *id.;* RIA Table 47; so even without the budget reductions described earlier, this additional fee exemption would have minimal effect on USCIS revenue and other fees.

Abused Spouses and Children Adjusting Status Under CAA and HRIFA

In the proposed rule, DHS proposed a fee exemption for abused spouses and children adjusting status under CAA and HRIFA for Form I–290B only if filed for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824 for this population. DHS has determined that these new exemptions are warranted because these applicants can face many of the ongoing financial obstacles as other VAWA requestors, as discussed earlier. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories. Given the very low number of applicants for these two populations (*see* 88 FR 402, 462, Jan. 4, 2023), DHS anticipates that these additional fee exemptions will have a negligible impact on its budget.

Abused Spouses and Children Seeking Benefits Under NACARA and Abused Spouses and Children of LPRs or U.S. Citizens Under INA sec. 240A(b)(2)

For abused spouses and children seeking benefits under NACARA as well as abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2), DHS proposed fee exemptions for Form I–765 initial requests submitted under 8 CFR 274A.12(c)(10). In this final rule, DHS expands these fee exemptions to include Form I–I–765 renewal and replacement requests, as well as Form I–824 for both categories of requestors. DHS determined that these new exemptions are warranted because abused NACARA applicants may face many of the ongoing financial obstacles as other VAWA requestors, as discussed previously. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories.

Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries.

DHS proposed fee exemptions in the proposed rule for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries filing Form I–290B for any benefit request filed before adjusting status or Form I–485 and Form I–765 initial requests. In this final rule, DHS expands these fee exemptions for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485 and Form I–765 replacement and renewal requests. DHS also exempts the fee for Form I–824 for this population. DHS echoes the reasoning provided in the proposed rule as to why this population merits additional fee exemptions. *See* 88 FR 463. DHS believes that it is an inefficient use of USCIS resources to adjudicate individual fee waiver requests for this group when such requests will likely be granted. DHS also believes that the time saved in the adjudication process for these individuals will demonstrate the agency's "full and prompt cooperation, resources, and support" for this population as directed by the President.[41] Also, DHS experience indicates that many in the OAW population move often, and have experienced challenges in securing employment authorization documents (EADs) that have resulted in USCIS receiving many EADs back as undeliverable (for example, needing to relocate after being resettled in the United States, or not having their initial EAD properly transferred to their new address), which would have required them to submit additional requests such as Form I–765 with the fee to request a replacement EAD. DHS acknowledges that these challenges faced by this population result from circumstances beyond their control, and therefore provides expanded fee exemptions to improve their access to immigration benefits for which they are eligible.

Special Immigrant Juveniles (SIJs)

In the proposed rule, DHS proposed a fee exemption Form I–290B filed by SIJs for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this fee exemption to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also provides a fee exemption for SIJs filing Form I–601A and Form I–824. Notwithstanding that SIJs adjust status in the United States and do not generally need to use Form I–601A, some individuals in this category do file the form. Given the very small number of receipts, DHS provides a fee exemption for SIJs filing Form I–601A. DHS believes that these expanded fee exemptions align with the reasoning for exempting fees for this population given in the proposed rule (*see* 88 FR 463) and improves the parity of fee exemptions among similarly situated humanitarian and protection-based immigration categories.

Current and Former U.S. Armed Forces Service Members, Including Persons Who Served Honorably on Active Duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)

For current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K), 8 U.S.C. 1101(a)(27(K), DHS proposed a fee exemption for Form I–765 initial requests for the service member in the proposed rule. DHS expands this fee exemption in the final rule to include Form I–765 renewal and replacement requests for the service member. DHS provides these additional fee exemptions in furtherance of our commitment to reduce barriers and improve access to immigration benefits for individuals who served in the U.S. Armed Forces, as described in the proposed rule.[42] DHS also believes that providing a fee exemption for this population for Form I–765 renewal and replacement requests improves parity with similarly situated immigration categories like special immigrant Afghan and Iraqi translators and interpreters.

1. Summary Tables of Fee Exemption Changes in the Final Rule

Tables 5A, 5B, and 5C compare fee exemptions and fee waiver eligibility at three points in time: those currently in effect, those provided in the proposed

---

[41] *See* Memorandum on the Designation of the Department of Homeland Security as Lead Federal Department for Facilitating the Entry of Vulnerable Afghans into the United States, Aug. 29, 2021.

[42] *See* 88 FR 465 (noting DHS's involvement in the initiative to support service members, veterans, and their immediate family members in recognition of their commitment and sacrifice).

rule, and those provided in this final rule. These tables include fee exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and other immigration categories for which DHS is providing additional fee exemptions and waivers. These tables do not include all USCIS benefit requests or groups for which DHS currently provides or will provide a fee exemption or waiver in this rule or by policy.[43]

• Table 5A illustrates the fee exemptions and fee waiver eligibility existing before the effective date of this final rule ("current").

• Table 5B lists forms eligible for fee waivers as provided in the proposed rule, additional fee exemptions provided in the proposed rule, and additional fee exemptions provided in this final rule.

• Table 5C summarizes the available fee exemptions and fee waiver eligibility as of the effective date of this final rule, which includes currently available fee exemptions and the additional fee exemptions provided in the proposed rule.

**BILLING CODE 9111–97–P**

---

[43] For all other fee exemptions and fee waiver eligibility, *see* 8 CFR 106.2, 106.3.

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Victims of severe form of trafficking** (T nonimmigrants)[45] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(16) fee exempt for principals only)[46] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B[47]<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[48] | • Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(19) fee exempt for principals only and (c)(14) fee exempt for principals and derivatives)[49] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form I-929<br>• Form N-300 |

---

[44] "Current" refers to fee exemptions and forms eligible for fee waiver in effect before the effective date of this final rule.

[45] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

[46] No initial fee for principals who receive an EAD incident to status.

[47] In general, USCIS may waive the fee for Form I-290B, Notice of Appeal or Motion, under 8 CFR 103.7(c) if the noncitizen shows an inability to pay and (1) the appeal or motion is from a denial of an immigration benefit request for which no fee was required, or (2) the fee for the underlying application or petition could have been waived.

[48] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[49] There is no initial fee for principals who receive an EAD incident to status. *See* Form G-1055, Fee Schedule, available at *https://www.uscis.gov/g-1055*. There is also no fee associated with initial (c)(14) EADs issued based on a bona fide determination for principals and derivatives when the Form I-765 is filed. USCIS, "USCIS Policy Manual," Vol. 3, "Humanitarian Protection and Parole," Part C, "Victims of Crimes," Chp. 5, "Bona Fide Determination Process," available at *https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5* (last visited Oct. 27, 2023).

003162

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[50] | • Form I-360<br>• Form I-765 (initial category (c)(31) generally fee exempt for principals only)[51] | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[52] | None | • Form I-90<br>• Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[50] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA secs. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

[51] Currently, VAWA self-petitioners may check a box on Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, requesting a category (c)(31) EAD upon approval of the self-petition. This EAD is currently fee exempt. If the self-petitioner does not check this box, they must file a Form I-765 to request employment authorization under 8 CFR 274a.12(c)(14) designation or under 8 CFR 274a.12(c)(9) if applicable. The self-petitioner may also file a Form I-765 to request a category (c)(31) EAD if not initially requested on the Form I-360. All self-petitioners and derivatives filing a renewal or replacement request must file a Form I-765 with a fee or fee waiver request.

[52] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Abused spouses and children adjusting status under CAA and HRIFA**[53] | None | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)**[54] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form I-881<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[55] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[53] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[54] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765, Application for Employment Authorization, for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[55] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

**Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions**

| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
|---|---|---|
| **Abused Spouses of A, E-3, G, and H Nonimmigrants[56]** | • Form I-765V[57] | Not Applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Forces (ISAF) and their derivative beneficiaries** | • Form I-130 (for certain Special Immigrant Afghans)[58] <br>• Form I-290B (if filed to appeal Form I-360) <br>• Form I-360 <br>• Form I-485 (for certain Special Immigrant Afghans)[59] <br>• Form I-765 (initial filing for certain Afghans)[60] <br>• Form I-601 (for certain Special Immigrant Afghans)[61] <br>• Form I-824 (for certain Special Immigrant Afghans)[62] | • Form I-90 <br>• Form I-131 <br>• Form I-212 <br>• Form I-290B <br>• Form I-485 <br>• Form I-601 <br>• Form I-765 <br>• Form N-300 <br>• Form N-336 <br>• Form N-400 <br>• Form N-470 <br>• Form N-565 <br>• Form N-600 <br>• Form N-600K |
| **SIJs** | • Form I-360 | • Form I-90 <br>• Form I-131 <br>• Form I-290B <br>• Form I-485 |

[56] *See* INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[57] The fee exemption for Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse, for this category includes all initial, renewal, and replacement EADs.

[58] Filed with USCIS in the United States on behalf of any Afghan national (beneficiary) with a visa immediately available. Available through September 30, 2023.

[59] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, and applying to adjust status to permanent residence based on classification as Afghan special immigrants. Available through September 30, 2023.

[60] Afghan nationals and their derivative beneficiaries who were paroled into the United States on or after July 30, 2021 (eligibility category (c)(11)). Available through September 30, 2023.

[61] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, who file Form I-601, Application for Waiver of Grounds of Inadmissibility, associated with Form I-485, Application to Register Permanent Residence or Adjust Status, if filing as an Afghan Special Immigrant or any Afghan national with an approved Form I-130, Petition for Alien Relative, with a visa immediately available. Available through September 30, 2023.

[62] Filed for an Afghan holding a Special Immigrant Visa.

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS**[63] | • Form I-765 (initial TPS applicant, under 14 and over 65 who is requesting an initial EAD.)[64]<br>• Form I-821 (no fee for re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-590<br>• Form I-485<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial request) | • Form I-90<br>• Form I-290B<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

[63] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

[64] Note the fee exemption for Form I-765 initial EAD requests filed by initial TPS applicants under age 14 and over age 65 is removed by this rule.

003166

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[65]** | • Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600<br>• Form I-131 (for service members filing concurrently with an N-400) | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K<br>• Form I-765 |

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **Victims of severe form of trafficking (T** | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request before | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and | • Form I-90<br>• Form I-290B[71]<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470 |

[65] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[66] This table includes exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS is proposing additional fee exemptions. This table includes only those exemptions that DHS is required to provide under this statute, and it does not include all USCIS benefit requests or groups for which DHS currently provides or is proposing to provide an exemption in this rule or by policy. See regulatory text for all other fee exemptions and fee waivers.

[67] This column lists the additional fee exemptions that were provided in the proposed rule. all of which are maintained in the final rule. In addition, DHS will maintain all the current fee exemptions.

[68] This column lists the forms eligible for fee waivers from the proposed rule. The final rule exempts the fee for some of these forms, and the rest remain as fee waivers. There are no additional fee waivers in the final rule.

[71] Fee waivable for other forms including naturalization and citizenship related forms.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| nonimmigrants) [69] | adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[70] | associated ancillary forms)<br>• Form I-824 | • Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants) [72] | • Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed)<br>• Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[73] (initial, renewal, and replacement request)<br>• Form I-824<br>• Form I-929 | • Form I-90<br>• Form I-131<br>• Form I-192 (only if filed with or after Form I-485 is filed)<br>• Form I-193 (only if filed with or after Form I-485 is filed)<br>• Form I-290B (only if filed with or after Form I-485 is filed)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-** | • Form I-131 (only when Form I-360 and Form I-485 are | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B |

---

[69] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[70] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[72] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[73] The proposed fee exemption for U nonimmigrants or applicants for U not filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

003168

Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations    **6223**

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **petitioners and derivatives[74]** | concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360)<br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial category | benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A[76]<br>• Form I-765 (renewal, and replacement request)<br>• Form I-824 | • Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[74] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a), 8 U.S.C. 1101(a)(51), 1154(a).

[76] Note that while it is theoretically possible for a VAWA self-petitioner to use Form I-601A, Application for Provisional Unlawful Presence Waiver, it would be highly unlikely. Form I-601A is used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions for VAWA applicants, and so they typically choose to adjust status.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| | (c)(31) fee exempt for principals and derivatives)[75] | | |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty[77]** | • Form I-290B (only when filed for Form I-751) | • Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA[78]** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under NACARA[79]** | • Form I-765 (submitted under 8 CFR 274a.12(c)(10) initial request)<br>• Form I-881<br>• Form I-601 | Form I-765 (renewal and replacement request)<br>Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[75] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[77] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D), 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[78] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

[79] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| **Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]** | | | |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)[80]** | • Form I-601[81]<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial) | • Form I-765 (renewal, and replacement request)<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 |

[80] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[81] This proposed fee exemption has been removed from the final rule.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule**[67] | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule**[68] |
| | • Form I-765 (initial, renewal, and replacement). | • Form I-601A[82]<br>• Form I-824 | • Form N-600K |
| **TPS**[83] | Not applicable | none | • Biometrics Fee<br>• Form I-90<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | Not Applicable | none | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Refugees** | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | none | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. Armed Forces service** | • Form I-131<br>• Form I-360<br>• Form I-485 | • Form I-765 (renewal, and replacement | • Form I-90<br>• Form N-300<br>• Form N-470 |

[82] Although SIJs do not need to use Form I-601A, some do file the form. Form I-601A is typically used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions as well as certain inadmissibility grounds for SIJs, and as a result, SIJs adjust status in the United States and do not file Form I-601A.

[83] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

**Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]**

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| **members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)[84]** | • Form I-765 (initial request for service member) | request for service members) | • Form N-565<br>• Form N-600K |

**Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule**

| Category | Fee Exemptions | Fee Waiver Eligibility |
|---|---|---|
| **Victims of severe form of trafficking** (T nonimmigrants)[85] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[84] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[85] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

**6228**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765 (initial, renewal and replacement requests)[86] <br> • Form I-824 | |
| **Victims of qualifying criminal activity** (U nonimmigrants)[87] | • Form I-131 <br> • Form I-918 <br> • Form I-918, Supplement A <br> • Form I-918, Supplement B <br> • Form I-192 <br> • Form I-193 <br> • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) <br> • Form I-485 <br> • Form I-601 <br> • Form I-539 (only if filed before Form I-485 is filed) <br> • Form I-765 (initial, renewal, and replacement request)[88] <br> • Form I-929 <br> • Form I-824 | • Form I-90 <br> • Form N-300 <br> • Form N-336 <br> • Form I-290B <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 <br> • Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[89] | • Form I-360 <br> • Form I-131 <br> • Form I-212 <br> • Form I-290B (only if filed for any benefit request | • Form I-90 <br> • Form I-290B <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 |

[86] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[87] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[88] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[89] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
|  | filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A<br>• Form I-765(initial, renewal, and replacement request) (8 CFR 274a.12(c)(9), 8 CFR 274a.12 (c)(14), and (c)(31) fee exempt for principals and derivatives)[90]<br>• Form I-824 | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[91] | • Form I-290B (only when filed for Form I-751)<br>• Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA**[92] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[90] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[91] See INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[92] See INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
| --- | --- | --- |
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765(initial, renewal, and replacement request) <br> • Form I-824 | |
| **Abused spouses and children seeking benefits under NACARA**[93] | • Form I-765 (initial, renewal, and replacement request) (submitted under 8 CFR 274a.12(c)(10)) <br> • Form I-881 <br> • Form I-601 <br> • Form I-824 | • Form I-90 <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 <br> • Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[94] | • Form I-765 (initial, renewal, and replacement request) (8 CFR 274a.12(c)(10)) <br> • Form I-824 | • Form I-90 <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 <br> • Form N-600K |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[95] | • Form I-765V[96] | Not applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or** | • Form I-131 <br> • Form I-212 <br> • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90 <br> • Form I-290B <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 |

[93] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[94] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[95] *See* INA sec. 106, 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[96] The fee exemption for Form I-765V for this category includes all initial, renewal, and replacement EADs.

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| **on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-601<br>• Form I-824 | • Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-360<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS[97]** | • Form I-821 (only re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730 | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[97] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | |
| **Refugees** | • Form I-131<br>• Form I-131A<br>• Form I-485<br>• Form I-590<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial, renewal, and replacement request) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)**[98] | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request for service member)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600 | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K |

BILLING CODE 9111–97–C

c. Codifying Fee Waiver Eligibility Criteria

The proposed rule specified that discretionary waiver of fees requires that a waiver based on inability to pay be consistent with the status or benefit sought, including benefits that require demonstration of the applicant's ability to support himself or herself, or individuals who seek immigration status based on a substantial financial investment. *See* 88 FR 402, 593 (proposed 8 CFR 106.3(a)(1)(ii)). The final rule removes this regulatory text because it is redundant and unnecessary, as the forms eligible for fee waiver are enumerated at 8 CFR 106.3(a)(3). The final rule codifies that a person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

• Receipt of a means-tested benefit as defined in 8 CFR 106.1(f)(3) at the time of filing;

• Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

• Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.
*See* 8 CFR 106.3(a).

This change codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship.[99] While not a change

[98] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

[99] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee

to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the concerns of many commenters.

### d. No Mandatory Use of Form I–912

In the proposed rule, 8 CFR 106.3(a)(2) stated, "*Requesting a fee waiver.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form." In this final rule, USCIS will maintain the status quo of accepting either Form I–912 or a written request. The final rule will revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020), which states, "Requesting a fee waiver. To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request."

After considering public comments in response to the proposed requirement to submit Form I–912, DHS agrees with multiple points made by commenters. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors. *See* 88 FR 402, 458 (Jan. 4, 2023). Due to the multiple ways of establishing one's inability to pay, *see* 8 CFR 106.3(a)(1), Form I–912 may be complex for some requestors. DHS also recognizes that some requestors, particularly those who are struggling financially, may face difficulty accessing printing and internet services. DHS believes that flexibility is important in dealing with these populations, and allowing requestors to seek fee waivers via written request will improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers are requested by written request instead of Form I–912, continuing to allow written requests will not significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to

obtain a fee waiver by written request without filing Form I–912.

### e. Child's Means-Tested Benefit Is Evidence of Parent's Inability To Pay

After considering the comments on the proposed rule DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. Such benefits would include public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[100] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means-tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 instructions.

### 10. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making procedural changes in the final rule to address issues that it has experienced with fee-exempt and low fee-filings. DHS appreciates the concerns of commenters and is making changes to address those concerns by lowering many fees below the amount that was proposed, establishing discounts for small employers and nonprofits, and adding multiple fee exemptions. However, to provide the requested changes, DHS must make some adjustments to codified procedural requirements to mitigate some of the unintended consequences of providing limited discounts and free services and some of the actions for which those changes may provide an incentive.

### a. Duplicate Filings

The final rule provides that a duplicate filing that materially identical to a pending immigration benefit request may be rejected. *See* 8

CFR 103.2(a)(7)(iv). DHS did not initially propose to prohibit multiple filings of identical requests to deter multiple filings of requests that have no or minimal fee, to reduce backlogs, and to improve processing times.

DHS is concerned that the new fee exemptions listed above will lead to the filing of multiple or simultaneous filing of requests that could create jurisdictional conflicts between DHS offices or individual immigration service officers who adjudicate the same types of requests. For example, filing multiple Forms I–290B, Notice of Appeal or Motion, may lead to the filing of multiple motions, multiple appeals, or the simultaneous filing of motions and appeals that would create jurisdictional conflicts between the Administrative Appeals Office (AAO) and other DHS offices. USCIS must intake the request, process or reject the request, and incur the associated costs for each duplicate, multiple or original request even when no fee is required. Multiple filings increase costs to USCIS to reject or process and it may exacerbate backlogs because free services or those with minimal fees do not provide revenue that can be used to fund new processing capacity. Requesters who file multiple requests consume excessive USCIS resources to the detriment of those who file one legitimate request.

Although it seems self-evident that USCIS can reject a materially identical filing of the exact same form while a previous request for the same benefit for the same person is still pending, that authority is not codified. Historically, USCIS has accepted duplicate filings of certain forms assuming the fee would cover the duplicate adjudication effort, if any. USCIS experience in administering OAW, U4U, the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, and FRP has found that applicants submit multiple parole requests when they are fee exempt (as they are for OAW), as well as multiple Forms I–134A, Online Request to be a Supporter and Declaration of Financial Support, for the same prospective beneficiary. USCIS also receives duplicate Forms I–730, Refugee/Asylee Relative Petition, and Forms I–918, Petition for U Nonimmigrant Status, which do not have a filing fee. For some of these cases USCIS will adjudicate the initial and duplicate petitions on the merits, increasing costs to USCIS. Others are administratively closed, rejected, or consolidated with the duplicate request. All of these actions take time away from processing other requests. DHS is concerned that the reduction of fees for the additional

Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

[100] Soc. Sec. Admin., "Understanding Supplemental Security Income, What Is Income?" (2023), *https://www.ssa.gov/ssi/text-income-ussi.htm* (last visited Aug. 21, 2023).

forms provided in this rule, *see* Table 5B, will in the same way cause applicants to submit multiples of the same request.

This change is necessitated by DHS's decision to provide the additional free services in the fee rule as requested by commenters. As explained above, USCIS experience is that when a full cost recovery fee is charged, duplicate, identical filings are very uncommon, but when the request is free or minimal (such as with the $10 H–1B Registration Fee) they are submitted more frequently. Because this problem results from fee exempt filings, and this rule provides additional fee exemptions as requested by commenters, codifying this restriction as a related change to offset the possible negative effects of the relief is a logical outgrowth of the proposed rule.[101] USCIS already rejects or administratively closes a request that is materially identical to a request that is being adjudicated because a requester generally cannot receive two or more identical immigration statuses, classifications, visas, or benefits. Individuals generally do not have a substantive right to receive multiple issuances of identical immigration benefits, which by their nature are only of value at first issuance (*e.g.,* two green cards or two travel documents). Thus, DHS will only approve document replacement requests under certain circumstances such as when the document is lost, stolen, or destroyed. In addition, after employees have already processed one request and made a decision, requiring the same or another agency employee to process the same request all over again, while a backlog of requesters remain waiting for attention, is not an efficient use of agency resources, especially when the request has no fee. This minor change to USCIS intake procedures is procedural in nature and does not alter the substantive rights of individuals. DHS is codifying this practice to ameliorate unintended consequences that may logically flow from the actions we are taking to provide more fee relief in this rule. These changes are made in the final rule as a procedural change and thus public comment is not required. *See* 5 U.S.C. 553(b)(A). Therefore, DHS is adding new 8 CFR 103.2(a)(7)(iv) to provide that a request that is materially identical to a pending request may be rejected.

---

[101] An agency may make changes that follow logically from or reasonably develop the rules the agency proposed. *See, Air Transport Ass'n of America* v. *C.A.B.,* 732 F.2d 219 (D.C. Cir. 1984).

**b. Revocations**

The final rule changes to a minor extent the handling of an approved benefit request if an incorrect fee is submitted or if the fee payment instrument is dishonored. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*) and 106.1(c)(2).

DHS is authorized to charge fees and inherent in that authority is the authority to enforce the payment of the fee and sanction failure to pay the fee. Payment of a codified fee is a fundamental eligibility criterion for any immigration benefit request. Failure to pay the correct fee by falsifying or misrepresenting eligibility for a fee waiver, exemption, or discount, as well as a dishonored check, stop payment, credit card dispute, or closed account, renders the requester ineligible for the approved benefit. Without enforcement capability, failure to pay fees would have no ramifications and possibly cause considerable damage to the ability of USCIS to fund its operations. Regarding the fee discounts, DHS foresees the situation where a petitioner may submit a lower fee for which they may not qualify and USCIS may not catch that error at intake. For example, in the five fiscal years preceding the FY 2016/2017 fee rule, an average of 231 petitions per year were submitted with a Request for Premium Processing Service, Form I–907, accompanied by a check that was dishonored by the remitting bank. 81 FR 73292, 73314. For fiscal year 2023, as of July 15, 2023, USCIS received between 30 to 43 dishonored payments per month that were associated with a Form I–129 filing, with approximately 10 of those being dishonored for stop-payment. If a benefit approved under these circumstances is not revoked, petitioners would have the incentive to request premium processing services in order to receive a swift approval, knowing they would not face any consequences once the bank dishonors the premium processing payment. *Id.*

Accordingly, balancing the need to provide relief to those requesters who have less ability to pay with the need to fully fund DHS, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). This change will insulate USCIS against the falsification of fee discount eligibility and the negative revenue impacts that would cause. Further, many of the discounted fee requests will include a request for premium processing and USCIS may approve them in a few days. The alternative to

revocation on notice would be for USCIS to hold each benefit request until the financial instrument used to pay the fee has finally cleared or been rejected. In the interest of administrative efficiency and prompt processing of benefit requests, DHS has rejected that alternative. Thus, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Sending a Notice of Intent to Revoke (NOIR) will be more effective than billing for the unpaid fee because the requestor may simply ignore the bill while confident that it would cost USCIS more to attempt collection through litigation or other means. In most cases, the NOIR may be cured by payment of the correct amount.

The first sentence of proposed 8 CFR 106.1(c)(2), stated, "If the benefit request was approved, the approval may be revoked upon notice." DHS is revising 106.1(c)(2) to clarify that if the benefit request was approved, the approval may be revoked, upon notice, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. 8 CFR 106.1(c)(2). DHS does not in all cases have authority to revoke an approval upon notice. For example, DHS cannot administratively revoke naturalization and must use proceedings in a Federal district court following INA section 340(a), 8 U.S.C. 1451(a). Similarly, cancellation under INA section 342, 8 U.S.C. 1453, is the only route to pursue revocation if a certificate of citizenship or naturalization has already been issued. Accordingly, while these authorities already exist in statute and rulemaking is not required to implement them, in the final rule DHS is revising 8 CFR 106.1(c)(2) to explicitly acknowledge that USCIS' right to revoke an approval upon notice in cases where a fee payment is not honored may be subject to statutory limitations.

**c. No Initial Field Review for Fee Exempt Form I–290B**

When an affected party files an appeal of an initial USCIS decision, the USCIS officer who made the initial decision reviews the appeal case and decides whether the case warrants favorable action. *See* 8 CFR 103.3(a)(2)(ii). During their review, the officer decides whether the case warrants favorable action and if warranted, may reverse the initial unfavorable decision. If the officer determines that favorable action is not warranted, he or she must "promptly" forward the appeal to the AAO. *See* 8 CFR 103.3(a)(2)(iv). DHS did not propose exceptions to 8 CFR

103.3(a)(2)(ii) in the proposed rule. However, as outlined previously in this section, the final rule makes Form I–290B, Notice of Appeal or Motion, fee exempt for several new populations. *See* Table 48, in Section P. Fee Exemptions of RIA. To avoid fee exempt requests consuming excessive USCIS resources, in the case of a fee waived or fee exempt appeal under 8 CFR 106.3, this rule provides that USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision. *See* 8 CFR 103.3(a)(2)(ii) (providing that USCIS may forward the appeal for adjudication without a review by the official who made the unfavorable decision).

As stated previously in this section, free services do not provide revenue that can be used to fund new processing capacity. In addition, making an immigration benefit request may increase the volume of those filings. The review by the official who made the unfavorable decision is a step in the appeal process that costs USCIS time and money and exacerbates backlogs by requiring officers to review already decided cases. To minimize the workload on USCIS officers who are required to review a denied request after appeal that may be caused by free appeals, DHS is eliminating the regulatory requirement to review appeals before forwarding them to the AAO if the appeal was fee exempt or the fee was waived. Elimination of mandatory field review is likely to decrease appeal processing times. Based on the FY 2017 average time for the AAO to receive an appeal from the field, the elimination of mandatory field review could save up to 113 days in processing time, on average, for cases requiring AAO review. This change will expedite the appeals process and provide the affected party a quicker decision. This change is both a logical outgrowth of the proposed rule and a logical extension of changes made in the final rule at the request of commenters. In addition, affected parties would not incur costs from this change because it is a procedural matter of internal agency management. DHS does not anticipate any cost savings for USCIS from this change, as any savings will be offset by a full appellate review at the AAO.

**11. Adjustment of Status (Form I–485) and Family-Based Fees**

*a. Bundling of Fees for Form I–765 and I–131*

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status, applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. Instead, DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their Employment Authorization Document (EAD) while their Form I–485 is pending. *Id.* DHS is unbundling the forms to make USCIS processing times more efficient by eliminating Forms I–765 filed for individuals who are not in need of employment authorization or Forms I–131 for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need.

Nevertheless, after considering the public comments DHS decided to provide the half price Form I–765 to reduce the burden on low, middle-income, or working-class requesters. DHS acknowledges that many prospective applicants for lawful permanent resident (LPR) status may lack work authorization and therefore struggle to pay the filing fee for Form I–765. An applicant may request a fee waiver for Form I–765. *See* 8 CFR 106.3(a)(3)(ii)(F). In addition, Forms I–131 and I–765 are fee exempt for certain categories of applicants. *See* 8 CFR 106.3(b).

*b. Child Discount for Form I–485*

DHS initially proposed that children filing Form I–485 with their parents pay the same fee as adults, $1,540. 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii). The current $750 fee went into effect in December 2016 and the new $950 fee is based on the increase in the CPI–U (the amount of inflation) between December 2016 and June 2023, like other inflation adjusted fees in this rule. DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. DHS also understands the social benefit of family immigration and the potential impacts the proposed fee could have on children and families. Therefore, after reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950. Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for the Form I–765 and Form I–131. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

**12. Adoption Forms Changes**

After considering public comments, in the final rule DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for:

• Second extensions.
• Second change of country requests.
• Duplicate approval notices for both the orphan and the Hague process.

These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. Providing a second free extension will provide another 15 months of suitability approval validity at no additional cost to the applicants. DHS recognizes that intercountry adoptions may take an increasing amount of time because of factors outside the control of adoptive families, such as country conditions, and believes this will help reduce related burdens on adoptive families.

The final rule fee for the Supplement 3 for the orphan and Hague process will be $455. Petitioners will pay less under the final rule for most scenarios where they request action on a suitability application for the orphan or Hague process. Therefore, DHS believes the fees and new fee exemptions properly align with the needs of the adoption community while not unnecessarily shifting the USCIS adoption program costs by increasing fees for others.

**13. Naturalization and Citizenship Fees**

*a. Half Fee for Form N–400*

In the proposed rule, applicants with household incomes not more than 200 percent of the Federal Poverty Guidelines (FPG) would be eligible for the reduced fee for Form N–400, Application for Naturalization. *See* 88 FR 402, 487–488 (Jan. 4, 2023). However, DHS notes that in recent years only one third of new lawful permanent residents (LPR) naturalized within 6

years of obtaining LPR status,[102] and stakeholders have identified the fee for Form N–400 as a significant obstacle to naturalization.[103]

In response to public comments and additional stakeholder feedback, and in recognition of the financial gains immigrants obtain with naturalization and the benefits that the United States obtains from new naturalized citizens, this final rule expands eligibility for paying half of the regular fee for Form N–400. An applicant with household income at or below 400 percent of FPG may pay half price for their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). DHS believes that this change will provide additional relief to longtime residents who struggle to pay naturalization fees without requiring further fee increases for other forms to offset the cost. The increased income threshold for a reduced naturalization fee will also enable the United States to further benefit from newly naturalized citizens, including their greater civic involvement and tax revenues.[104]

b. Fee Exemption for Adoption Related Form N–600

The final rule provides that Forms N–600, Application for Certificate of Citizenship and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

Multiple commenters asked USCIS to provide Certificates of Citizenship for all children immigrating based on adoption at no additional cost, as the fee would be an unfair burden on adoptive families. Commenters opposed the increase to the filing fees for adoptive families whose children enter the United States on certain types of visas, reasoning that the certificate should be provided at no additional cost, once all the necessary legal steps have been completed, just as it is provided at no cost for adopted children who enter on a different type of visa for children with final adoptions (IR–3 and IH–3 visas). Commenters indicated that if a Certificate of Citizenship is not obtained at the time of adoption, this becomes a further burden for adoptees.

USCIS already provides Certificates of Citizenship to certain adopted children who come to the United States with a final adoption (children with an IR–3 or IH–3 visa)[105] and meet the conditions of INA sec. 320, 8 U.S.C. 1431, without them having to file a Form N–600 and without paying a fee. USCIS can do this because children with an IR–3 or IH–3 visa generally automatically acquire U.S. citizenship upon their admission to the United States as lawful permanent residents and USCIS can make a citizenship determination based on their underlying immigration approval (Form I–600 or Form I–800) without any additional evidence. In addition, these children are in visa categories that are only for adopted children who generally automatically acquire citizenship upon admission, and therefore USCIS can easily identify these children based on their visa category. USCIS is not able to provide Certificates of Citizenship without a Form N–600 for other categories of children, because USCIS cannot make a citizenship determination without additional evidence or cannot identify the children based on their visa category. For example, USCIS cannot issue Certificates of Citizenship without a Form N–600 for children immigrating based on adoption who do not have final adoptions (IR–4s and IH–4s) because they do not automatically acquire citizenship upon their admission and need to submit additional evidence of a full and final adoption for a subsequent citizenship determination. USCIS also cannot automatically issue Certificates of Citizenship to adopted children who are issued IR–2 visas, because stepchildren are also issued IR–2 visas but do not automatically acquire U.S. citizenship upon their admission. USCIS cannot automatically determine which children in these visa categories automatically acquire citizenship and which do not, and thus additional evidence submitted with the N–600 application is required. DHS recognizes the unique vulnerability of adopted children and the overall costs that adoptive families face and wishes to reduce the burden on adoptive families. DHS also notes a passport is available to obtain proof of citizenship without filing Form N–600 for adopted children who automatically acquire or derive citizenship. If adoptive families wish to seek a Certificate of

Citizenship, DHS cannot eliminate the requirement to file a Form N–600 for additional categories of adopted children (such as IR–2, IR–4, and IH–4). However, after considering many comments requesting a free N–600 or N–600K for adopted children, DHS will exempt individuals who are the subject of a final adoption for immigration purposes and meet (or met before age 18) the definition of child under section 101(b)(1)(E), (F), or (G) of the INA from Form N–600 filing fees. 8 CFR 106.2(b)(7). This will include adoptees who are over age 18 at the time of filing or adjudication of the N–600, but who met the definition of child under section 101(b)(1)(E), (F), or (G) of the INA before turning 18. DHS will also exempt children who are the subject of a final adoption for immigration purposes and meet the definition of child under section 101(b)(1)(E), (F), or (G) of the Act from Form N–600K filing fees.

DHS realizes that this exemption seems to favor adopted over biological children in allowing the filing without a fee. DHS did not take this perception lightly when considering whether adopted children should be able to file a fee exempt Form N–600/600K. In the end, DHS reasoned that many adoptive families have already paid USCIS fees for the Form I–600A/I–600, Form I–800A/I–800, or Form I–130, Petition for Alien Relative, whereas the Form N–600 fee may be the only USCIS fee that families of biological children would pay if they acquired citizenship under INA 301 or 309. DHS also recognizes that families may also choose to apply for a passport to document their child's citizenship in cases where a biological child automatically acquired citizenship. The exemption fits logically within the structure of this rule, and results in a minimal loss of revenue from adoptee/adopted child Form N–600 and N–600K fees. Thus, DHS has decided to respond favorably to the request of many commenters and exempt certain adoptees from the N–600 fee and adopted children from the N–600K fee. 8 CFR 106.2(b)(7) and (8).

14. Additional Changes

In the final rule DHS:
• Deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).
• Removes the fee exception for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a

---

[102] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Trends in Naturalization Rates: FY 2018 Update" (Sept. 2021), *https://www.uscis.gov/sites/default/files/document/reports/Trends_In_Naturalization_Rates_FY18_Update_Report.pdf.*

[103] *See, e.g.,* Comment Submitted by CASA, May 19, 2021, *https://www.regulations.gov/comment/USCIS-2021-0004-7122.*

[104] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, "U.S. Naturalization Policy," (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[105] *See* U.S. Citizenship & Immigr. Servs. U.S. Dep't of Homeland Security, "Your New Child's Immigrant Visa," *https://www.uscis.gov/adoption/bringing-your-internationally-adopted-child-to-the-united-states/your-new-childs-immigrant-visa/your-new-childs-immigrant-visa* (last updated Dec. 15, 2021), for visa categories for adopted children.

waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–,* 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i). Therefore, the form is not filed by that population, so the exemptions was not needed making the text superfluous.

• Codifies that USCIS will provide 30-day advance public notification before a currently acceptable payment method will be changed. 8 CFR 106.1(b). Commenters requested that advance notice be provided when a payment method is changed. As explained more fully in the responses to the comments on the subject, DHS is codifying this procedural requirement.

• Revises proposed 8 CFR 106.2(d)(2) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) may be increased by the rate of inflation by final rule. The change is limited only to clarify that all fees not fixed by statute are increased simultaneously. This change is explained more fully in the response to the public comments on this subject.

• Amends 8 CFR 204.5(p)(4)(ii) in this final rule by removing the clause ''but not to exceed the period of the alien's authorized admission'' so that the provision once again states that ''Employment authorization under this paragraph may be granted solely in 1-year increments.'' The last clause in § 204.5(p)(4)(ii), which is being removed in this final rule, was added in the 2020 Fee Rule in a revision that was intended to remove ''8 CFR 103.7(b)(1)'' and replace it with ''8 CFR 106.2.'' 85 FR 46922; 84 FR 62364. In neither the 2020 Fee Rule nor in the January 4, 2023, proposed rule did DHS explain why the rule added or retained the last clause, respectively. Although the proposed rule proposed to retain this clause, DHS has determined that the clause is unnecessary and potentially confusing. As explained in the 2016 final rule that created § 204.5(p), the 1-year grant of employment authorization is meant to be a stopgap measure for nonimmigrants facing compelling circumstances and, if granted, provides a period of authorized stay.[106]

### D. Corrections

DHS notes multiple non-substantive errors in the proposed rule as follows:

• The preamble to the proposed rule states, ''However, as to Forms *N–565* and N–600K, both the current fees and the proposed fees are less than the estimated cost (fee-paying unit cost) for each naturalization form.'' 88 FR 402, 485–486 (Jan. 4, 2023) (emphasis added). ''However, for Forms *N–565* and N–600K, the proposed fees are below the estimated cost from the ABC model, thus DHS proposes no discount for online filing of the N-forms.'' *Id.* at 486 (emphasis added). These statements were incorrect as to the Form N–565, Application for Replacement Naturalization/Citizenship Document, because the proposed fee was higher than its fee-paying unit cost. This error is immaterial to the final rule because the current N–565 fee is being increased by the rate of inflation as previously explained.

• DHS proposed to remove text from Form I–485, Supplement A, Supplement A to Form I–485, Adjustment of Status Under Section 245(i), regarding the statutory exemptions to the required INA sec. 245(i) statutory sum when the applicant is an unmarried child under 17 or the spouse or the unmarried child under 21 of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program. *See* 88 FR 402, 494 (Jan. 4, 2023). However, Form I–485, Supplement A, does not contain the language DHS proposed to remove. DHS further stated that it was unnecessary to codify the exemptions from the required INA sec. 245(i) sum into the CFR, but the proposed regulatory text did include the exemptions.

• The proposed regulatory text for 8 CFR 212.19(e) stated: ''An alien seeking an initial grant of parole or re-parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information.'' The second sentence was included in error and has been removed from the final rule.

### E. Status of Previous USCIS Fee Regulations

DHS issued a final rule to adjust the USCIS fee schedule on August 3, 2020, at 85 FR 46788. The rule was scheduled to become effective on October 2, 2020. However, that rule was preliminarily enjoined. *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rights Project* v. *USCIS,* 496 F. Supp. 3d 31 (D.D.C. 2020). Consequently, USCIS has not implemented the fees set out in the 2020 fee rule and is still using the fees set in the 2016 fee rule unless an intervening rulemaking has codified a different fee.[107] DHS discussed the effects of the injunctions and their relationship to this rule in detail in the proposed rule. *See* 88 FR 402, 420 (Jan. 4, 2023). This preamble discusses substantive changes that refer to the requirements of the regulations that existed before October 2, 2020.[108] Likewise, the regulatory impact analysis (RIA) for this proposed rule analyzes the impacts of the changes between the pre-2020 fee rule regulations that DHS is following under the injunctions and those codified in this rule.[109]

### F. Severability

In the approach that DHS adopts in this final rule, the new fees allow USCIS to recover full cost given projected volumes and all policy considerations. However, if DHS were prohibited from collecting any new fee for any reason, DHS believes this rule is structured so that a stay, injunction or vacatur of a fee set by this rule could be narrowly tailored to remedy the specific harm that a court may determine exists from the specific fee or fees challenged. USCIS would be able to continue operations, perhaps at a reduced level or by shifting resources in the absence of the fee until DHS is able to conduct new rulemaking to re-set fees and correct the deficiencies that resulted in the court order. Operating without one or a few of the new fees would be preferable to an invalidation of all the new fees, which would great disruption and deterioration of USCIS operations.

DHS believes that the provisions in this rule can function independently of each other. For example, the H–1B Registration Fee, Asylum Program Fee, and genealogy fees could be stalled while a new rule is undertaken without affecting all other fees generally. This would reduce USCIS projected revenue, carryover balances and require realignment of the USCIS budget and a reassessment of spending priorities. *See*

---

[106] See Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers Final Rule, 81 FR 82398, 82424–82425) (Nov. 18, 2016).

[107] *See* 86 FR 7493 (Jan. 29, 2021) (announcing that DHS is complying with the terms of the orders, not enforcing the regulatory changes set out in the 2020 rule, and accepting fees that were in place before October 2, 2020).

[108] As explained in the proposed rule, the effects of the injunction of the 2020 fee rule, intervening rules, and the codification but ineffectiveness of the 2020 fee rule may result in the standard of citing to the CFR print edition date being inaccurate because title 8 was amended by a number of rules in and since calendar year 2020. 88 FR 421. Therefore, regulations that existed on October 1, 2020 are followed by that date, and provisions that were codified by the 2020 fee rule are followed by the effective date of the 2020 fee rule, October 2, 2020.

[109] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, FY 2022–2023 Fee Review Regulatory Impact Analysis (Jan. 4, 2023), *https://www.regulations.gov/document/USCIS-2021-0010-0031.*

88 FR 402, 517 (Jan. 4, 2023). However, USCIS constantly assesses its budget and spending to avoid a deterioration in service considering its fees have not been increased since 2016. Additionally, the statutory authority for this rule provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services" and does not require that DHS *must* recover full costs. INA section 286(m), 8 U.S.C. 1356(m). Therefore, to protect the goals for which this rule is being proposed, DHS is codifying our intent that the provisions be severable so that, if necessary, the regulations overall can continue to function should a particular provision be stricken. *See* 8 CFR 106.6.

### III. Related Rulemakings and Policies

DHS is engaging in multiple rulemaking actions that are in various stages of development.[110] DHS realizes that policy and regulatory changes can affect staffing needs, costs, fee revenue, and processing times. DHS has considered each of these other rules for peripheral, overlapping, or interrelated effects on this rule, and has analyzed the potential effects of rules that may impact or substantively overlap with this proposal, if any. *See* 88 FR 402, 432 n.78 (Jan. 4, 2023).

DHS has also, to the extent possible, considered the effects, if any, on this rule of all intervening or future legislation and policy changes of which USCIS is aware. Immigration policy changes frequently, and initiatives may come about without being incorporated in a proposed and final rule simply due to the time required for rule development and finalization. DHS, therefore, does not and cannot assert that it knows and has considered every policy change that is planned or that may occur at all levels and agencies of the U.S. Government that may directly or indirectly affect this rule. However, DHS believes that it has examined and considered all relevant aspects of the problems that this rulemaking solves, responded to all substantive public comments, articulated a satisfactory analysis and reasoned explanation for each change and the rule, and not relied on factors which Congress has not intended us to consider. Specific recent and planned DHS rules and major policy changes and their effects on this rule are as follows:

### A. New Processes

#### 1. Uniting for Ukraine (U4U)

On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion.[111] Uniting for Ukraine (U4U) provides a pathway for Ukrainian citizens and their immediate family members who are outside the United States to come to the United States and stay temporarily for a 2-year period of parole. Ukrainians participating in U4U must have a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States.

#### 2. Operation Allies Welcome

On August 29, 2021, President Biden directed DHS to lead and coordinate ongoing efforts across the Federal Government to support vulnerable Afghans, including those who worked alongside the U.S. government in Afghanistan for the past 2 decades, as they safely resettle in the United States. USCIS is and has been responsible for large portions of the implementation of Operation Allies Welcome (OAW).[112]

#### 3. Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

Over the last year, DHS has implemented processes through which nationals of designated countries and their immediate family members may request to come to the United States in a safe and orderly way. DHS used emergency processing when implementing Uniting for Ukraine as well as new parole processes for certain Cubans,[113] Haitians,[114] Nicaraguans,[115] and Venezuelans.[116] Under these processes, qualified beneficiaries who are outside the United States and lack U.S. entry documents may be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

#### 4. Family Reunification Parole Processes

DHS also used emergency processing when establishing new family reunification parole (FRP) processes for certain Colombians,[117] Ecuadorians,[118] Salvadorans,[119] Guatemalans,[120] and Hondurans[121] and implementing procedural changes to the previously established Cuban[122] and Haitian[123] Family Reunification Parole processes. These FRP processes are available to certain petitioners who filed an approved Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary who is a national of Colombia, Cuba, El Salvador, Guatemala, Haiti, or Honduras, and their immediate family members. These processes allow an eligible beneficiary to be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

### B. Effects of Temporary or Discretionary Programs and Processes

As stated elsewhere, and in the proposed rule, Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS) country designations are both administrative exercises of discretion that may be granted on a case-by-case basis for certain periods. *See* 88 FR 402, 447 (Jan. 4, 2023). DACA grants are subject to intermittent renewal, extension, or termination at DHS's discretion. TPS country designations must be periodically reviewed and are subject to termination if the conditions for the designation no longer exist. Likewise, OAW, U4U, and processes for Cubans, Haitians, Nicaraguans, and Venezuelans are temporary processes established to address exigent circumstances. The FRP processes require that the petitioner first receive an invitation to be able to initiate the process. The invitation requirement allows DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. Given that these processes are temporary by definition or may be paused at the discretion of DHS, USCIS excluded the associated costs and workload from the fee review and did not propose to allocate overhead and other fixed costs to these workloads.[124]

---

[110] *See* Office of Information and Regulatory Affairs, "Fall 2023 Unified Agenda of Regulatory and Deregulatory Actions," *https://www.reginfo.gov/public/do/eAgendaMain* (last visited December 29, 2023).

[111] *See* USCIS, Uniting for Ukraine, at *https://www.uscis.gov/ukraine* (last visited Aug. 24, 2023).

[112] *See* U.S. Dep't of Homeland Sec, Operation Allies Welcome, *https://www.dhs.gov/allieswelcome* (last updated Nov. 27, 2023).

[113] 88 FR 1266 (Jan. 9, 2023); *see also* 88 FR 26329 (Apr. 28, 2023).

[114] 88 FR 1243 (Jan. 9, 2023); *see also* 26 FR 327 (Apr. 28, 2023).

[115] 88 FR 1255 (Jan. 9, 2023).

[116] 87 FR 63507 (Oct. 19, 2023); *see also* 88 FR 1279 (Jan. 9, 2023).

[117] 88 FR 43591 (July 10, 2023).

[118] 88 FR 78762 (Nov. 16, 2023).

[119] 88 FR 43611 (July 10, 2023).

[120] 88 FR 43581 (July 10, 2023).

[121] 88 FR 43601 (July 10, 2023).

[122] 88 FR 54639 (Aug. 11, 2023).

[123] 88 FR 54635 (Aug. 11, 2023).

[124] USCIS has considered the number of immigration benefit requests it will receive from noncitizens from Afghanistan who will stay permanently and safely resettle in the United States over the fee review period.

Excluding these initiatives or processes that are temporary from the fee review mitigates an unnecessary revenue risk, by ensuring that USCIS will have enough revenue to recover full cost regardless of DHS's discretionary decision to continue or terminate these initiatives. This allows DHS to maintain the integrity of its activity-based cost (ABC) model, ensure recovery of full costs, and mitigate revenue risk from unreliable sources. While the operational costs of adjudicating requests associated with these policies are carefully considered on a day-to-day basis, the proposed rule and this final rule exclude from the ABC model the costs and revenue associated with these processes.

## C. Lawful Pathways Rule

DHS and the U.S. Department of Justice (DOJ) recently published a final rule, Circumvention of Lawful Pathways. *See* 88 FR 31314 (May 16, 2023). Under the final rule, certain noncitizens who cross the southwest land border or adjacent coastal borders without authorization, and without having availed themselves of existing lawful, safe, and orderly pathways are presumed ineligible for asylum unless they meet certain limited exceptions. *See id* at 31449–52. The rule is projected to increase USCIS costs for operating the asylum program. *See* 88 FR 11704 (Feb. 23, 2023). While the costs of this rule were not considered in the proposed rule, DHS believes that USCIS' budget may be sufficient to cover these costs in the near term. Much of the cost for the Circumvention of Lawful Pathways rule will occur beyond the 2-year study cycle for the fee revenue required to be generated by this rule. Future fee rules will use more recent information and estimates, when available.

## D. Premium Processing—Emergency Stopgap USCIS Stabilization Act

As explained in the proposed rule, on October 1, 2020, the Continuing Appropriations Act, 2021, and Other Extensions Act (Continuing Appropriations Act) was signed into law. Public Law 116–159 (Oct. 1, 2020). The Continuing Appropriations Act included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), which allows USCIS to establish and collect additional premium processing fees and to use premium processing funds for expanded purposes. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u). Then, on March 30, 2023, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule and stated that DHS will consider including premium processing revenue and costs in the final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). In this final rule, DHS has transferred $129.8 million in costs to premium processing because of premium processing revenue projections. *See* section II.B of this preamble.

## E. Premium Processing Inflation Adjustment

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4. The total projected revenue to be collected from the new premium processing fees established by the final rule premium processing rule is too attenuated to be considered for this rule without placing USCIS at risk of revenue shortfalls if that revenue did not materialize. However, as noted earlier, this final fee rule transfers additional costs to premium processing revenue. Premium revenue will be considered in future fee studies.

## F. EB–5 Reform and Integrity Act of 2022 and Related Rules

As stated in the proposed rule, on March 15, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new Regional Center Program.[125] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover

the costs of providing such services, and complete the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

## G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers

On October 23, 2023, DHS proposed to amend its regulations governing H–1B specialty occupation workers. 88 FR 72870. The rule proposed to modernize and improve the efficiency of the H–1B program by amending several requirements for the subject nonimmigrant classifications, including to improve the integrity of the H–1B program. *Id.* Specifically, that rule proposes that USCIS would select registrations by unique beneficiary rather than by individual registration to reduce the potential for gaming the H–1B cap system and make it more likely that each beneficiary would have the same chance of being selected, regardless of how many registrations are submitted on their behalf. If that proposal is finalized as proposed, the actual number of H–1B Registrations may not be as high as projected in this rule. For example, the proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule was similar to the 274,237 total registrations in the FY 2021 cap year.[126] This final rule revises the H–1B registrations forecast to 424,400 based on more recent data, such as the total registrations for the FY 2023 cap year. The effect of modernizing H–1B requirements may result in a different H–1B registration volume than we forecast here. If that occurs, DHS will address the resulting revenue shortfall in a future fee rule, or in a separate rulemaking that directly addresses the H–1B Registration Fee and the changes made by the Modernizing rule, the H–1B registration process, and the need to recover the costs of USCIS.

---

[125] Div. BB of the Consolidated Appropriations Act, 2022, Public Law 117–103.

[126] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

*H. Citizenship and Naturalization and Other Related Flexibilities*

DHS expects to soon publish a notice that will propose amendments of its regulations governing citizenship and naturalization.[127] The notice will propose changes to naturalization eligibility regulations and other immigration benefit provisions that affect naturalization and acquisition of citizenship, remove outdated provisions, and amend provisions that are inconsistent with intervening laws. DHS has not incorporated any changes in this final rule because the Citizenship and Naturalization notice has not yet been adopted, and whether USCIS needs to update form fees due to the changes would not be determined until after implementation. Future fee rules will consider the effects of the changes if the notice becomes final.

*I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)*

Congress requires the submission of an additional fee of $4,000 for certain H–1B petitions and $4,500 for certain L–1A and L–1B petitions in section 402(g) of Div. O of the Consolidated Appropriations Act, 2016 (Pub. L.114–113) enacted December 18, 2015.[128] DHS proposed to republish the regulatory text that existed immediately before the 2020 fee rule. *See* 88 FR 402, 516. DHS did not receive any comments on this proposal. As such, this final rule republishes the proposed text for these fees. *See* 8 CFR 106.2(c)(8) and (9). However, DHS is proposing to address the 9–11 Response and Biometric Entry-Exit Fees for H–1B and L–1 Nonimmigrant Workers language in a separate rulemaking in the future.[129]

[127] *See* Office of Info. and Regulatory Affairs, Office of Mgmt. and Budget, Exec. Office of the President, "Fall 2023 Unified Agenda of Planned Regulatory Actions,'' RIN 1615–AC80, *https:// www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=1615-AC80* (last viewed Jan. 16, 2024).

[128] Section 402(g) of Div. O of Public Law 114–113 added a new section 411 to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note. Section 411 provided that the fees collected thereunder would be divided 50/50 between general Treasury and a new "9–11 Response and Biometric Exit Account," until deposits into the latter amounted to $1 billion, at which point further collections would go only to general Treasury. Deposits into the 9–11 account are available to DHS for a biometric entry-exit screening system as described in 8 U.S.C. 1365b.

[129] See Department of Homeland Security, Fall 2023 Regulatory Agenda, *9–11 Response & Biometric Entry-Exit Fees for H–1B and L–1 Visas, https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId=202310&RIN=1651-AB48* (last visited Dec. 20, 2023).

**IV. Response to Public Comments on the Proposed Rule**

*A. Summary of Comments on the Proposed Rule*

DHS provided a 65-day comment period following publication of the proposed rule. DHS received 7,973 public comment submissions in docket USCIS–2021–0010 in response to the proposed rule. Of the 7,973 submissions, 5,417 were unique submissions, 2,393 were form letter copies, 113 were duplicate submissions, 45 were not germane to the rule, and 5 contained comments and requests that were entirely outside of the scope of the rule. Most submissions[130] were anonymous or from individuals, schools or universities, advocacy groups, lawyers or law firms, legal assistance providers, community or social organizations, businesses, State and Federal elected officials, research organizations, religious organizations, local governments or tribes, unions, and business or trade associations. Some commenters expressed total support for the proposed rule or supported one or more specific provisions of the proposed rule without recommending changes. Most commenters opposed the rule and expressed unqualified opposition or opposition to one or more provisions without recommending changes. Many commenters provided mixed comments of both support for and opposition to various provisions of the proposed rule, provided general support with suggested revisions, provided general opposition with suggested revisions, or were unclear on whether the comment supported or opposed the proposed rule.

DHS reviewed all the public comments received in response to the proposed rule and addressed relevant comments in this final rule, grouped by subject area.

DHS also received several comments on subjects unrelated to the proposed fees that are outside of the proposed rule's scope. DHS has not individually responded to these comments but has summarized out of scope comments and provided a general response in Section IV.I of this preamble.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

*Comment:* Several commenters expressed general support for the

[130] The term "submission" refers to an entire submission letter submitted by a commenter. The term "comments" refers to parts or excerpts of the submission based on subject matter.

proposed rule. Some commenters expressed general support for the rule without providing additional rationale. Commenters expressed support for the rule reasoning that the fee adjustments would:

• Reduce processing times, increase staff, and reduce the backlog or wait times for decisions.
• Decrease fraud.
• Reflect USCIS' adjudication burden and need for sufficient financing to support effective processing of its vital services.
• Reduce USCIS' funding and operational issues that are caused by its status as a fee-funded agency.

A commenter urged USCIS to move forward with the proposed rule and respond forcefully to organizations that fail to acknowledge USCIS management has improved efficiencies despite lacking sufficient funds to sustain operations. The commenter stated that USCIS is capable of increasing efficiencies in a short period but said that it needs more congressional funding. Another commenter suggested that USCIS further increase its fees.

*Response:* DHS appreciates these commenters' support for the proposed rule and did not make any changes in this final rule based on them.

2. General Opposition to the Proposed Rule

Many commenters stated their general opposition to the proposed fees, the magnitude of the fee adjustments, charging fees in general, and specific proposed policy changes in the proposed rule. DHS summarizes and responds to these public comments in the following sections:

a. Immigration Policy Concerns

*Comment:* Many commenters opposed the proposed fee adjustments based on the burdens they would create. Commenters stated that the proposed fees would:

• Be a financial obstacle or prohibitively expensive, discourage people from immigrating to the United States, and be detrimental for the United States and immigrant communities.
• Encourage illegal immigration by creating significant barriers to and discouraging legal immigration.
• Strain resources with which immigrants can integrate into the United States.

*Response:* DHS's fee rule is not intended to reduce or limit immigration. These fee adjustments reflect DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate

services. Recognizing that fees impose a burden on fee-paying requestors and their communities, DHS is shifting its fee-setting approach away from sole emphasis on the beneficiary-pays principle toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 424–26 (Jan. 4, 2023). Nonetheless, USCIS filing fees are necessary to provide the resources required to perform the work associated with such filings. When fees do not fully recover costs, USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays in immigration request processing which can burden requestors, as well as their families, communities, and employers.

In this final rule, USCIS has made multiple adjustments to its budget to limit the extent of fee increases. Ordinarily, any decrease in the fee adjustments would require a decrease in USCIS' budget and a commensurate decrease in service levels. Rather than decrease service levels, in this final rule USCIS has shifted a portion of its budget from IEFA non-premium revenue to the IEFA premium processing revenue, in addition to current levels of premium processing in the overall USCIS budget. USCIS has also revised staffing estimates based on improved efficiency measures, which allowed a further reduction to the budget. Through these adjustments, DHS seeks to recover the full cost of the services provided by USCIS.

This final rule limits fee increases for several forms, including the Form I–130, Petition for Alien Relative, Form I–485, Application to Register Permanent Residence or Adjust Status, and Form I–765, Application for Employment Authorization, to an inflation-based increase. *See* Table 1. For reasons explained earlier in section II.C. of this preamble, the final rule also creates lower fees for certain small employers and nonprofits. Businesses with 25 or fewer employees will pay a $300 Asylum Program Fee instead of the $600 fee that larger businesses will pay, and nonprofits will pay no Asylum Program Fee. *See* 8 CFR 106.2(c)(13). In addition, many categories of Form I–129, Petition for Nonimmigrant Worker, now allow for half-price fees for businesses with 25 or fewer employees and nonprofits. *See* 8 CFR 106.2(a)(3)(ix); Table 1. The final rule also expands the number of forms that qualify for fee exemptions. *See* 8 CFR 106.3(b); Table 5B. Regarding integration concerns, the final rule increases the household income threshold to 400 percent of the FPG to enable more naturalization applicants to qualify for a reduced fee for Form N–

400, Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). These changes do not represent a change in fee policy or requirements. They are a continuation of the discretion that DHS typically exercises in setting USCIS fees. *See, e.g.,* 81 FR 73292, 73296–73297 (Oct. 24, 2016); 75 FR 58962, 58969–58970 (Sept. 24, 2010).

In addition to these changes in the final rule, DHS reiterates the steps it has taken to mitigate the burden of fee increases on fee-paying requestors. DHS has maintained some current fees and limited the increases for many others to levels at or below inflation. *See* Table 1. DHS includes a separate Asylum Program Fee to mitigate the scope of fee increases for individual requestors. *See* 8 CFR 106.2(c)(13); *see also* 88 FR 402, 451–454 (Jan. 4, 2023). For humanitarian immigration categories, DHS has expanded the availability of fee exemptions and waivers to ensure that the most vulnerable applicants are able to access protection-based relief. *See* 8 CFR 106.3; Table 5B; preamble sections IV.E. and IV.F. DHS is mindful that departures from the standard USCIS fee-setting methodology result in lower fees for some and higher fees for others. However, it believes that these fees balance access, affordability, equity, and benefits to the national interest while providing USCIS adequate funding.

DHS disagrees that the proposed fee increases are likely to incentivize irregular migration because the financial costs and other risks of irregular migration tend to be higher than USCIS fees,[131] and the economic benefits of lawful migration outweigh USCIS fees.[132] DHS believes that the consequences of not pursuing full cost recovery (processing delays, backlogs, and otherwise inadequate services) may be more likely to discourage lawful migration, since wait times may tend to have a stronger influence than financial costs on one's decision to pursue unlawful pathways of migration.[133] DHS

further notes that it focuses fee exemptions and waivers on humanitarian and protection-based immigration forms, where requestors are at a greater risk of pursuing irregular forms of migration. *See* 8 CFR 106.3; Table 5B.

*Comment:* Other commenters stated that the proposed rule would:

• Undermine U.S. national values.
• Be anti-immigrant, ''tantamount to a threat to American democracy,'' unfair, or unethical.
• Unduly place the burden of funding USCIS on immigrants.
• Isolate the United States internationally, reflect poorly on Americans, harm U.S. relations with other countries, and lead to other countries increasing their fees.

*Response:* DHS strongly disagrees that this fee rule represents a departure from U.S. values or is anti-immigrant, unfair, or unethical. DHS recognizes that increased fees create burdens for fee-paying requestors and their communities. However, it would not be more fair, ethical, pro-immigrant, or consistent with U.S. values to maintain current fee levels if this results in decreases in USCIS productivity. Because DHS does not receive congressional appropriations for the great majority of its operations, DHS must charge fees for the services it provides to ensure that those seeking to live and work in the United States can efficiently receive their benefits. Since 1990, the INA has specified that the government may set immigration adjudication and naturalization fees at a level that will ensure full cost recovery,[134] and past fee rules have consistently followed this approach.[135] By shifting its fee-setting approach away from the beneficiary-pays principle toward the historical balance of ability-to-pay and beneficiary-pays principles, DHS has sought to reduce barriers and promote accessibility to immigration benefits. *See* 88 FR 402, 424–25 (Jan. 4, 2023). As noted in the prior response, DHS has limited the increases in many forms and instituted new fee waivers and exemptions to reduce financial barriers to U.S. immigration benefits.

DHS does not believe that this final fee schedule poses significant consequences for foreign relations. Commenters failed to cite any examples of other countries raising immigration fees or otherwise retaliating in response

---

[131] *See, e.g.,* U.N. Office on Drugs & Crime, ''Smuggling of Migrants: The Harsh Search for a Better Life,'' *https://www.unodc.org/toc/en/crimes/migrant-smuggling.html#:~:text=The%20fees%20charged%20for%20smuggling,pay%20as%20much%20as%20%2410%2C000.* (last visited Sept. 5, 2023) (noting smuggling fees ranging from $2,000–$10,000 depending on point of origin).

[132] *See, e.g.,* California Immigrant Data Portal, ''Median Hourly Wage,'' available at *https://immigrantdataca.org/indicators/median-hourly-wage* (last visited Sept. 7, 2023) (noting that ''the median hourly wage for naturalized immigrants was $24, compared to $19 for lawful residents, and $13 for undocumented immigrants'').

[133] *See, e.g.,* David J. Bier, ''''Why Don't They Just Get in Line?' Barriers to Legal Immigration,'' Testimony, CATO Institute, Apr. 28, 2021, *https://www.cato.org/testimony/why-dont-they-just-get-line-barriers-legal-immigration* (identifying wait times as a primary driver of unlawful migration).

[134] *See* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, 104 Stat 2101 (1990).

[135] *See* 72 FR 4888, 4896 (Feb. 1, 2007); 75 FR 33446, 33472 (June 11, 2010); 81 FR 26904, 26905 (May 4, 2016); 88 FR 62280, 62282 (Nov. 14, 2019).

to fee increases by USCIS or the former Immigration and Naturalization Services (INS). DHS notes that other countries regularly charge fees for visas and other immigration benefits,[136] and only one foreign government entity submitted a comment on the proposed rule.[137] Unlike nonimmigrant visa fees set by the U.S. Department of State (DOS), the principle of reciprocity does not factor into USCIS fees. *Cf.* INA sec. 281, 8 U.S.C. 1351; 9 FAM 403.8.

*Comment:* A commenter stated USCIS should terminate "unlawful" special parole programs, as the creation of these unauthorized and unappropriated programs diverts agency resources from legitimate visa programs, resulting in fee increases and increased delays for many benefit requestors. The commenter stated that DHS should return to interpreting parole authority on a case-by-case basis to enhance DHS's ability to focus its resources on processing immigration benefits Congress has authorized and increase access to such benefits without unreasonable delays.

*Response:* DHS disagrees that the parole programs identified by this commenter are unlawful and believes that the legal authority for those programs has been adequately presented in their respective rules.[138] As stated earlier, the special parole processes mentioned by the commenter are necessary to address urgent humanitarian crises and aid in the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage and reduce irregular migration that could have worsened without timely action by the United States. *See, e.g.,* 88 FR 1243 (Jan. 9, 2023); *see also* 88 FR 26327 (Apr. 28, 2023). DHS acknowledges that, apart from International Entrepreneur Parole, the special parole processes require the use of limited USCIS budget resources. However, the case-by-case parole into the United States of noncitizens under special parole processes aids in the United States' effort to deter irregular migration from those countries by providing lawful, safe, orderly pathways to travel to the United States. *Id.* Also, unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the

United States through these processes are immediately eligible to apply for employment authorization throughout the duration of their parole period, allowing them to support themselves and contribute to the U.S. economy through labor, taxes, consumption of goods, and payment of rent and utilities in their new U.S. communities.[139]

As stated in the proposed rule, DHS excluded Form I–941, Application for Entrepreneur Parole, from this rule. *See* 88 FR 402, 424 n.47. The fee for Form I–941 will remain at $1,200, the level previously set to recover its anticipated processing costs to DHS and will not impact fees or processing times for other immigration benefit requests. 82 FR 5238, 5280 (Jan. 17, 2017).

b. Impact on Specific Benefit Categories

*Comment:* Multiple commenters stated that the proposed fees would be discriminatory, disproportionately burdensome, or otherwise harmful toward the following immigration categories:

• Undocumented individuals.
• Applicants pursuing legal residency and citizenship.
• Nonimmigrants such as foreign artists.
• Family-based immigration. Commenters stated that the proposed rules would be a hindrance to family unity, and would have a large impact on families and U.S. citizens sponsoring immigrant relatives, children, partners, fiancées, or spouses.
• Vulnerable and humanitarian immigrants, including refugees, survivors, and victims of crime escaping violence.

*Response:* DHS recognizes the burden that immigration fees may pose for certain requestors. Nonetheless, USCIS filing fees are necessary to provide the resources required to do the work associated with such filings. When fees do not fully recover costs USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays or other lapses in immigration request processing, which can result in additional burdens to requestors.

In general, the fees in this final rule are set to ensure full cost recovery for

USCIS. With limited exceptions, as noted in the proposed rule and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This approach is consistent with DHS's legal authorities. *See* INA sec. 286(m), 8 U.S.C. 1356(m). In this final rule, USCIS reduced the fee review budget, as explained earlier in section II.C of this preamble.

In certain instances, DHS establishes fees that do not represent the estimated full cost of adjudication in the proposed rule. *See* 88 FR 402, 450–451. In many cases, this is a result of DHS's refocus on balancing the beneficiary-pays principle with the ability-to-pay principle, whereby DHS has reduced or limited fee increases where a full cost increase would be particularly burdensome for requestors. By limiting many of the final fees to an inflation-based adjustment of the current fee, DHS addresses some of these comments.

Regarding individuals seeking to naturalize or obtain proof of citizenship, DHS has maintained the fees for common forms like Form N–400, Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), and Form N–600, Application for Certificate of Citizenship, at levels below full cost recovery (*See* Table 1; 88 FR 402, 486 (Table 14), Jan. 4, 2023), and expanded the availability of reduced fee N–400s, *see* 8 CFR 106.2(b)(3)(ii). Regarding family-based residency, DHS has limited the increase for common family-based forms such as Form I–130 and Forms I–129F, Petition for Alien Fiancé(e), to levels at or below inflation. *See* Table 1. Regarding artists and other employment-based nonimmigrants, the final rule limits the fee increase for Form I–129s to a level below inflation for many small-employer and nonprofit petitioners, *see* Table 1, eliminates the Asylum Program fee for nonprofit petitioners, and halves the Asylum Program fee for small-employer petitioners, *see* 8 CFR 106.2(c)(13).

In addition, this final rule expands fee exemptions and fee waivers for certain humanitarian categories including survivors, victims of crime, and refugees. *See* 8 CFR 106.3; Table 5B; *see also* 88 FR 402, 459–482 (Jan. 4, 2023). The new exemptions created by this rule include exemptions for T and U nonimmigrants, VAWA self-petitioners, Special Immigrant Juveniles (SIJs), and other benefit requestors. 8 CFR 106.3(b). Also, the Director of USCIS may,

---

[136] *See* Duncan Madden, "The World's Most Expensive Passports and Visas," Forbes, July 10, 2023, available at *https://www.forbes.com/sites/duncanmadden/2023/07/10/travel-expenses-the-cheapest-and-most-expensive-passports-and-visas/?sh=5e5de6ff6f1e* (last visited Sept. 5, 2023).

[137] *See Regulations.gov*, Comment Submitted by ARTS, *https://www.regulations.gov/comment/USCIS-2021-0010-7354*.

[138] *See* 88 FR 21694 (Apr. 11, 2023); 88 FR 1266 (Jan. 9, 2023); 88 FR 1243 (Jan. 9, 2023); 88 FR 1255 (Jan. 9, 2023); 88 FR 1279 (Jan. 9, 2023).

[139] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration," (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse et al., The White House Blog: "The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants," (Sept. 17, 2021) *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

consistent with applicable law, authorize additional fee exemptions when in the public interest, such as when necessary to address incidents such as an earthquake, hurricane, or other natural disasters affecting localized populations. *See* 8 CFR 106.3(c).

c. Impact on Specific Demographic Characteristics

*Comment:* Several commenters wrote that certain proposed fees are discriminatory, disproportionately burdensome, or otherwise harmful to people based on:
• Race, ethnicity, skin color, national origin, country of birth, or country of citizenship.
• Gender.
• Sexual orientation or gender identity.
• Age.
• Disability.
• Language.

*Response:* DHS did not design this fee schedule with any intent to deter requests from or discriminate against any group of people. The final fees are set to ensure full cost recovery while accounting for filers' ability to pay, irrespective of their membership in one of the groups identified by the commenters. As stated in the proposed rule, where DHS has determined that a fee in this rule may inequitably impact those who may be less able to afford it, DHS sets the fees below the ABC model output. *See* 88 FR 402, 426 (Jan. 4, 2023). In addition, we codify the fee waiver eligibility guidance that took effect in 2010 and expand fee exemptions for vulnerable or low-income populations, as described elsewhere in this preamble.

*Comment:* Some commenters wrote that the proposed fees would be particularly burdensome for low-income or economically disadvantaged people. Several commenters stated that, due to low wages of many immigrants, higher fees would create a high burden for benefit requestors and contribute to their economic insecurity, forcing them to choose between applications and other necessities. Commenters stated that the proposed fees would create hardship for some applicants and their families, threaten immigrants' ability to pay for rent, food, and necessities, and potentially cause some to go into debt. Commenters also stated that, to pay fees, low-income applicants may become victims of predatory loan schemes that offer high interest loans. An advocacy group expressed concern that increased fees could cause immigrants to remain or become uninsured.

*Response:* DHS is aware of the potential impact of fee increases on low-income and economically disadvantaged individuals and is sympathetic to these concerns. As discussed in the proposed rule and consistent with past practice, USCIS has limited fee adjustments for certain benefit requests. DHS recognizes that immigration application fees may be burdensome for these filers, and that those who choose to finance application fees through debt may be responsible for additional interest. With these types of concerns in mind, DHS has shifted its fee-setting approach away from the beneficiary-pays principle that guided the 2019/2020 fee rule and more toward the ability-to-pay principle. *See* 88 FR 402, 424–26 (Jan. 4, 2023). To keep many common forms affordable, DHS has kept their fees at or below full cost recovery or the rate of inflation. *See* Table 1. The rule codifies USCIS' guidance on fee waivers for individuals who are unable to pay. *See* 8 CFR 106.3(a). It also expands the number of forms that are eligible for fee exemptions and waivers, *see* Table 5B, and includes several policy adjustments designed to make fee waivers more readily accessible. *See* 88 FR 402, 458 (Jan. 4, 2023). For naturalization applicants who do not meet the requirements for a full fee waiver, DHS has made N–400 fee reductions more available by increasing the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). DHS focuses fee exemptions on vulnerable populations and waiver availability on those with an inability to pay. *See* 8 CFR 106.3; Table 5B. DHS recognizes that that there are many forms for which fee exemptions or fee waivers are not available but notes that it is limited by congressional expectation that many immigrants and nonimmigrants would possess means of self-support. *See* INA sec. 212(a)(4), 8 U.S.C. 1182(a)(4). DHS believes that this rule substantially mitigates many of commenters' concerns while ensuring that USCIS can recover full costs and fund its ongoing operations. DHS also recognizes that the immigration process can be complex, and that benefit requestors may still risk becoming victims of scams or fraud. We encourage requestors to use the information on the USCIS website to avoid becoming victims of common scams, fraud, or misconduct.[140]

d. Impact Based on Geography

*Comment:* Several commenters stated that the proposed rule and certain form fees would have a disproportionate effect on benefit requestors and communities in various parts of the country, including:
• Rural areas or small towns, where individuals may lack access to technology.
• High cost-of-living areas, where individuals are forced to choose between meeting basic needs and pursuing immigration benefits.
• Particular states and cities that have large immigrant populations or high poverty rates, where immigrants have less access to technology, or where nonprofits may be burdened by COVID–19 and recent natural disasters.

*Response:* DHS recognizes that certain individuals may experience more difficulty paying filing fees partly due to the area of the country in which they live and that this may have secondary effects on their communities. This rule is in no way intended to limit access to immigration benefits based on geography. Like past rules, this fee rule generally does not factor requestors' geographic locations in setting fees. Geography is only one of many factors that affect an individual's ability to pay, and geography may impact on individual's ability to pay differently depending on their profession, family, and other factors. For example, individuals living in high-cost areas may also benefit from higher wages, whereas individuals living in low-cost areas may face more limited job prospects. DHS considers it more effective to accommodate filers' ability to pay in the manners described earlier in this preamble. See section IV.E.3.a. of this preamble for a discussion of using the U.S. Department of Housing and Urban Development's (HUD) Mean Family Income (MFI), which accounts for the costs of living in different parts of the country, to determine eligibility for fee waivers.

e. Impact on Economy/Employers

*Comment:* Some commenters stated that raising immigration fees would:
• Hamper U.S. population growth and the country's ability to innovate in technology and culture.
• Deter workers.
• Have negative effects on the labor market by discouraging employers from hiring foreign workers.
• Create problems for retail, agriculture, construction, manufacturing, hospitality, and the labor pool in general.

*Response:* DHS disagrees that these fees will negatively affect the labor

---

[140] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Scams, Fraud, and Misconduct," available *at https://www.uscis.gov/scams-fraud-and-misconduct/scams-fraud-and-misconduct* (last visited Sept. 25, 2023).

market or other sectors described in the comment. With previous fee increases in 2010 and 2016, DHS has continued to see a steady increase in filing and has not seen a reduction in filing based on fee increases. It is possible that USCIS observes no price response to past fee increases because the value of immigration benefits is greater than the fees USCIS assesses to recover costs. DHS has no data that would indicate the fees would limit employers' ability to hire foreign workers or negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. Growing demand in the period immediately after the 2010 and 2016 fee increases reveals that, in setting fees at levels to recover only USCIS costs, all applicants enjoyed some cost savings or surplus relative to what the immigration benefit was truly worth to them. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA. While DHS appreciates that an increase in prices for immigration benefits affects some individuals' choices to pursue or not pursue those benefits, DHS notes that demand may also decrease due to declines in service quality when USCIS programs are not properly funded. Lastly, DHS reiterates that this final rule lowers the Asylum Program Fee and certain Form I–129 fees for small employers and nonprofits. *See* 8 CFR 106.2(a)(3)(ix), (c)(13); Table 1. These changes further mitigate any risk that these fees will negatively impact the labor market or other sectors of the economy.

*Comment:* Multiple commenters stated that the proposed fees are disproportionately burdensome, or otherwise harmful to the following types of petitioners:

• Smaller and midsized businesses and organizations, by further increasing labor costs associated with hiring immigrants.

• Nonprofits.

• Religious organizations.

*Response:* DHS recognizes that the impacts that increased fees can have on smaller and midsized firms, as well as nonprofit and religious institutions. *See* Small Entity Analysis. However, DHS notes that these organizations are also impacted by delayed processing times, backlogs, and other lapses in service that result if USCIS' operations are not adequately funded. Mindful of the difficulties that smaller and midsized firms and nonprofits (including religious institutions) may face, DHS has discounted the proposed fee increases of the requests that many such entities submit in this final rule, as

discussed in section II.C of this preamble. For small-employer and nonprofit petitioners, this final rule limits the fee increases for Form I–129. *See* 8 CFR 106.2(a)(3); Table 1. In addition, the final rule reduces the Asylum Program Fee by $300 for small employers and eliminates the Asylum Program Fee for nonprofit petitioners. *See* 8 CFR 106.2(c)(13).

*Comment:* Commenters also stated that the proposed fees would be harmful to nonprofit legal service providers and other organizations that serve immigrant communities. A commenter specified that the increased fees would result in case-handling delays for their immigration clients, which will divert resources from other casework and advocacy priorities.

*Response:* DHS recognizes the value of legal service providers and other groups that assist individuals in navigating its regulations and forms, and that fee increases can impact their ability to serve their clients. However, DHS believes that inadequate funding for USCIS (resulting in processing delays, backlogs, and otherwise inadequate service) would also impact these organizations' ability to deliver timely and effective legal services for their clients. As discussed earlier in this rule, the final rule contains several provisions that make immigration fees more affordable to the immigrant communities (often indigent and disadvantaged) that nonprofits serve.

*Comment:* Multiple commenters stated that the proposed rules would exacerbate the negative economic effects of:

• The COVID–19 pandemic (*e.g.,* job loss, inability to pay rent, labor shortages).

• Inflation.

• The war in Ukraine.

*Response:* DHS acknowledges that the last few years have been difficult on immigrant communities due to the COVID–19 pandemic, inflation, and various international crises including the war in Ukraine. However, these events have impacted USCIS' financial stability as well.[141] Without increased fees to adequately fund services, USCIS will inevitably experience decreases in the quality of its services, and it will be in a substantially worse position to manage future crises of these sorts when

they arise. DHS notes that, during the COVID pandemic, USCIS implemented many policy changes to accommodate requestors.[142] Also, the fee increases in this final rule will help fund USCIS' Uniting for Ukraine program, as well as other zero-fee or fee-exempt programs that address international, humanitarian crises, including refugee and asylum processing and DHS's FRP processes. Applicants continue to have fee waivers available for specific forms where they can demonstrate an inability to pay. *See* 8 CFR 106.3(a).

*Comment:* A commenter stated that the increased fees further enhance the control that corporations and employers have over foreign workers, as any worker would require their employer's assistance to be able to afford the fees.

*Response:* USCIS disagrees with the comment's premise that the beneficiary's ability to pay is a relevant factor in determining the appropriate fee for most employment-based visa petitions. In general, for employment-based petitions such as Form I–129 and some Form I–140s, it is the employing petitioner's decision whether to file a petition on any beneficiary's behalf, and the petitioner is generally expected to pay the fees associated with the filing of the petition. In some instances, the petitioning employer is required to pay certain fees and/or is precluded from charging the beneficiary certain fees.[143] To the degree that the commenter is concerned that employers may place abusive conditions on their decision to file employment-based visa petitions, DHS encourages foreign workers to report any illegal practices. DHS and USCIS are committed to helping protect the rights of foreign workers in the United States.[144]

---

[141] 88 FR 402, 426–429 (Jan. 4, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Uniting for Ukraine,'' *https://www.uscis.gov/ukraine* (last updated Sept. 20, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''I–134A, Online Request to be a Supporter and Declaration of Financial Support,'' *https://www.uscis.gov/i-134a* (last updated Nov. 15, 2023) ($0 filing fee).

[142] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''USCIS Response to COVID–19,'' *https://www.uscis.gov/archive/uscis-response-to-covid-19* (last updated Mar. 6, 2023).

[143] For example, employers are prohibited from charging job placement fees as a condition of employment for H–2 nonimmigrants, and H–2B beneficiaries are not permitted to pay any H–2B filing or Fraud Prevention and Detection fees. *See* 8 CFR 214.2(h)(5)(xi)(A), (6)(i)(B)–(D). Also, in some contexts, the employer is not authorized to deduct certain employer-related expenses, such as those related to preparation and filing of the Form I–129 petition, from the beneficiary's compensation. *See, e.g.,* 20 CFR 655.731(c)(9) (prohibiting H–1B petitioning employers from making certain wage deductions, such as deductions for employer-related fees associated with the preparation and filing of an H–1B petition). Finally, some fees are required by statute to be paid by the petitioning employer. *See* section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9) (imposing a fee on certain employers filing H–1B petitions).

[144] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Report Labor Abuses,'' *https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-*

003190

### f. Other General/Mixed Feedback on the Rule

*Comment:* Multiple commenters expressed concerns regarding the timing of the rule. Some commenters suggested delaying the increase given the current economic situation. One commenter asked how the proposal would affect current immigration benefit requests. Another suggested that the fees only apply to those who have not yet initiated any immigration process to accommodate individuals currently affected by USCIS's backlog. Other commenters stated DHS should give 4 to 6 months' notice before the new fees go into effect.

*Response:* DHS declines to delay effectiveness of this rule beyond the 60 days announced in the proposed rule. Because the proposed rule was published on January 4, 2023, DHS believes that interested parties will have received adequate notice of the forthcoming changes before their effective date. The new fees apply to any immigration benefit request postmarked on or after the effective date of this rule and do not affect any benefit requests that have already been submitted.[145] USCIS may accept the prior fee for benefit requests postmarked before the new fees take effect.

While the fees in this final rule generally affect customers who apply on or after the effective date, there are some special circumstances for Forms I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, and I–131, Application for Travel Document, as explained in the proposed rule. *See* 88 FR 402, 492 (Jan. 4, 2023). Specifically, individuals who filed a Form I–485 after July 30, 2007, (the FY 2008/2009 fee rule) and before this final rule takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(iv)(A). Those who filed Form I–485 before the FY 2008/2009 fee rule, or on or after the

---

*employees/report-labor-abuses* (last updated Mar. 13, 2023).

[145] USCIS permits FedEx, UPS, DHL and USPS to deliver paper benefit requests. Generally, USCIS records the receipt date as the actual date it physically receives a request at the correct filing location. 8 CFR 103.2(a)(7). However, when USCIS issues new fees, it generally considers the postmark on the package as the date the request was filed or submitted. The shipping date printed on the shipping label will be considered the postmark date. If there is no shipping date on the label, USCIS considers the date you printed the label to be the postmark date. If the label does not have a shipping date or print date, USCIS will assume that the postmark date is 10 days before it received the package.

effective date of this final rule, would pay separate fees for the interim benefits. The final rule implements a reduced fee of $260 for those applicants that must pay a fee for Form I–765 while their adjustment of status application is pending. *See* 8 CFR 106.2(a)(44)(i). Applicants for Form I–131 will pay the full fee of $630. *See* 8 CFR 106.2(a)(7)(iii).

DHS disagrees with the commenter's recommendation to apply the new fees only to those who have not initiated any immigration processes before the rule's effective date. While DHS appreciates the commenter's concerns regarding backlogs, the commenter's proposal could apply indefinitely for individuals who choose to delay certain steps in the immigration process, such as adjusting from nonimmigrant to LPR status or filing for naturalization. Furthermore, DHS calculated the fees assuming that they would generally apply to all forms filed after the rule's effective date, so the commenter's proposal would require further fee increases to account for the numerous filers who would continue to pay the prior fees.

As for upcoming filing periods for petitions that are subject to annual numerical limitations, the 60-day effective date of this final rule should provide a sufficient period for petitioners to adjust to the new fees and form versions. The H–1B cap petition filing period generally begins on April 1 of each year. USCIS has not announced the specific H–1B registration dates for FY 2025, but it is expected to be a roughly 14-day period in early- to mid-March. Neither date is affected by this rule.

### C. Basis for the Fee Review

DHS received comments on the legal authority or rationale of the rule, the need for it, and its general approach, which we address in the following subsections.

*Comment:* Regarding full cost recovery and use of the "ability to pay" and "beneficiary pays" principles, commenters stated:

• The proposed rule violates 8 U.S.C. 1356(m) by waiving fees for some beneficiaries and shifting the cost of those services to other beneficiaries.

• Only Congress, not DHS, has the legal authority to create waivers and exemptions.

• Congress did not authorize USCIS to raise fees by 40 percent, update fees based on inflation, or shift the cost of programs.

• Federal law and policy do not require USCIS to recover full costs through fees, and these costs should not be the only basis for determining fees.

• A commenter disagreed with the suppression of fees for benefits not explicitly exempted by law, and suggested adjusting fees based on the actual cost of the service and providing only those exemptions and waivers that are statutorily mandated.

• USCIS has arbitrarily decided which applicants bear the fee burden.

• USCIS suppresses fees for certain immigration benefits based on political preference.

However, other commenters stated:

• USCIS must consider the public good that arises from applicants receiving immigration benefits and whether they are affordable for applicants when setting fees.

• Disregarding the ability-to-pay considerations would be "arbitrary and capricious" under the Administrative Procedure Act (APA).

Other commenters wrote that USCIS' proposed ability-to-pay model violates the CFO Act, 31 U.S.C. 9701(b), which requires fees charged by agencies to be uniform and based on actual costs. They stated that adjusting fees based on ability-to-pay violates the statute. They stated that DHS lacks the legal discretion to provide discounts and shift costs except when explicitly directed by Congress.

Other comments on the fee-setting approach supported USCIS' proposal to shift away from the beneficiary-pays principle toward an ability-to-pay principle balanced with a beneficiary-pays approach. Some stated that USCIS should further shift funding toward immigration services for lower income applicants who do not qualify for fee waivers or exemptions but nevertheless are unable to afford fee increases. Others stated that USCIS did not strike an appropriate balance between ability-to-pay and the beneficiary-pays principles. Some commenters stated USCIS should rely even more heavily on the beneficiary-pays model. For example, one stated that fees should be based on the cost of the provided service, and costs for subsidized services should be spread across all fee-paying beneficiaries.

*Response:* As stated in the proposed rule, DHS is permitted but not required by law to recover all USCIS operating costs through fees. DHS has broad discretion to set USCIS fees to recover costs, and we generally adhere to longstanding guidance in setting fees. The U.S. Government Accountability Office (GAO) guidance for federal user fees, like USCIS immigration benefit request fees, states that agencies must balance efficiency, equity, revenue

003191

**6246** Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

adequacy, and administrative burden.[146] When discussing equity, GAO explains two different ways to ensure everyone pays their fair share. *Id.* As described by the GAO, under the beneficiary-pays principle, the beneficiaries of a service pay for the cost of providing that service. *Id.* Under the ability-to-pay principle, those who are more capable of bearing the burden of fees pay more for the service than those with less ability to pay. *Id.* A GAO audit of the 2007 fee rule found that the rule clearly described the trade-off between these two principles.[147]

In prior years, USCIS fees have given significant weight to the ability-to-pay principle. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request that someone else did not pay for. *See* 84 FR 62280, 62298 (Nov. 14, 2019). As we noted in the proposed rule, DHS appreciates that application of the ability-to-pay principle in immigration benefit fees may appear arbitrary because it results in certain fee payers funding the costs of USCIS-administered programs to which they receive no direct benefit. 88 FR 453. However, DHS determined that the fees did not result in a significant impact on a substantial number of small entities who file a request with USCIS. *Id.*

The final rule reverses some aspects of the 2020 fee rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). One change is a return to focusing fee-setting away from the beneficiary-pays principle back toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 425 (Jan. 4, 2023). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Requestors who pay a fee cover the cost of processing requests that are fee exempt, waived, or reduced. This approach is consistent with previous fee rules, comments on the 2020 fee rule, current injunctions, Executive Order (E.O.) 14012,[148] and public feedback. *See* 88 FR 402, 425–426 (Jan. 4, 2023).

DHS is not publishing this rule or setting USCIS fees under the authority of 31 U.S.C. 9701(b).[149] While the Independent Offices Appropriations Act (IOAA), codified at 31 U.S.C. 9701, grants broad authority to Federal agencies to assess user fees, the fees collected under that law are deposited in the general fund of the U.S. Treasury and are not directly available to the agency. USCIS fees are not required to be tied to the costs or value of services provided, and the revenue from the IEFA fees are available to USCIS until expended and are not deposited in the general fund of the U.S. Treasury. As explained in the proposed rule, "In that regard, in INA sec. 286(m), 8 U.S.C. 1356(m), Congress imposed on DHS an additional obligation—to recover the full cost of USCIS operations—over and above the advice in OMB Circular A–25 concerning the direct correlation or connection between costs and fees." 88 FR 402, 418 (Jan. 4, 2023). In 2010 DHS also stated in a fee rule that, "Additional values are considered in setting IEFA fees that could not be considered in setting fees under the IOAA." 75 FR 33449 (June 11, 2010) (internal cites omitted). The 2016 USCIS fee schedule proposed rule also described DHS latitude to set USCIS fees and such fees not being limited to the costs of the service. *See* 81 FR 26906–26907.

As for DHS using the ability-to-pay or beneficiary-pays principles in setting USCIS fees, INA sec. 286(m), 8 U.S.C. 1356(m), does not prescribe a precise framework, methodology, or philosophy for DHS to follow in setting USCIS fees, except to recover costs. DHS endeavors to set fees in a manner that is rational, fair, and based on the recommendations of fee setting experts. To that end, DHS generally adheres to OMB Circular A–25 and has followed the Activity-Based Costing (ABC) method. DHS has also considered the recommendations of the GAO, as described earlier.

DHS is authorized to recover the full cost of immigration adjudication and naturalization services, including similar services provided without charge to asylum applicants or other immigrants, through IEFA fees. *See* INA sec. 286(m), 8 U.S.C. 1356(m). There is a long history of using the ability-to-pay principle in USCIS fee-setting, as explained in the proposed rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). Other fee rules did not always use the term ability-to-pay but it has been a part of DHS and fee rules for a long time. For example, USCIS grants fee waivers based on demonstrated inability to pay, which is based on the ability-to-pay principle. *See* 8 CFR 103.7(c) (Oct. 1, 2020). In this final rule, DHS provides more fee exemptions, increases the income level for the reduced fee for Form N–400, Application for Naturalization, provides discounts for Form I–129, Petition for Nonimmigrant Worker, fees and the Asylum Program Fee, and exempts nonprofits from the Asylum Program Fee, all based on the ability-to-pay principle. *See new* 8 CFR 106.1(f), 106.2(a)(3), and 106(c)(13). Nothing in the DHS fee setting statute precludes DHS from providing discounts and shifting costs in such a manner.

*Comment:* DHS summarizes comments regarding the funding for the Fraud Detection and National Security Directorate (FDNS) as follows:

• General support for USCIS improving service levels and deterring fraud for nonimmigrant benefits.

• FDNS funding violates fiscal law principles and the APA.

• FDNS activities were delegated to Immigration and Customs Enforcement (ICE) and funded by specific congressional appropriations.

• Revenue should be used solely for adjudications and not for investigation functions more appropriate for ICE and U.S. Customs and Border Protection (CBP).

• Appropriated funding for ICE has increased by 150 percent while funding for immigration services has only increased modestly.

• While Congress gave USCIS limited investigative responsibilities when it created FDNS, its mission has expanded without statutory authority.

• Moving enforcement functions out of USCIS and into ICE and CBP would allow USCIS to redirect FDNS expenses into its core adjudicatory functions, improving efficiency, and reducing proposed fee increases.

• FDNS could be more efficient, for example, by curtailing frivolous referrals.

---

[146] *See* GAO, "Federal User Fees: A Design Guide" (May 29, 2008), *https://www.gao.gov/products/GAO-08-386SP,* at 7–12.

[147] *See* GAO, "Federal User Fees: Additional Analyses and Timely Reviews Could Improve Immigration and Naturalization User Fee Design and USCIS Operations" (Jan. 2009), *https://www.gao.gov/assets/gao-09-180.pdf,* at 12–15.

[148] Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 5, 2021).

[149] The statute cited by the commenters also permits discounts and shifting costs based on considerations of public policy or interests served and other relevant facts and does not require that fees charged by agencies be uniform and not deviate from actual costs. *See* 31 U.S.C. 9701(b)(2)(C)–(D).

• Most FDNS cases and investigations involve already adjudicated petitions, resulting in adjudicating H–1B petitions again.

• Requested clarification of whether administrative site visits that arise from premium processing cases are paid out of the general budget or the premium processing budget.

*Response:* USCIS appreciates the general support from the commenters who favored improving service levels and deterring fraud for nonimmigrant benefits. USCIS manages three fee accounts: (1) The IEFA (which includes premium processing revenues); (2) The Fraud Prevention and Detection Account, INA secs. 214(c)(12)–(13), 286(v), 8 U.S.C. 1184(c)(12)–(13), 1356(v); and (3) The H–1B Nonimmigrant Petitioner Account, INA secs. 214(c)(9), (11), 286(s), 8 U.S.C. 1184(c)(9), (11), 1356(s). The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are funded by statutorily set fees and divided among USCIS (for fraud detection and prevention), the National Science Foundation, and the Department of Labor (DOL). DHS does not have authority to adjust fees for these accounts; therefore, DHS cannot increase the fees to meet changing needs or costs. DHS interprets 8 U.S.C. 1356(v)(2)(B) as providing supplemental funding to cover activities related to fraud prevention and detection and not prescribing that only those funds may be used for that purpose. FDNS is funded from both the IEFA and the Fraud Prevention and Detection Account. The fees deposited in the Fraud Prevention and Detection Account that are fixed by statute are insufficient to cover the full costs of FDNS.

DHS disagrees that ensuring a petitioner is compliant with the terms and conditions of their petition through site visits or other FDNS workload is frivolous, a second adjudication, or duplicated by other DHS components. FDNS's work does not fall into "intelligence" and/or "investigations" work that the INA assigned to ICE. The Homeland Security Act of 2002 granted the Secretary of Homeland Security the authority to administer and enforce provisions of the INA, as amended, INA sec 101, 8 U.S.C. 1101 *et seq.* The Secretary, in Homeland Security Delegation No. 0150.1, delegated certain authorities to USCIS. One of many authorities delegated to USCIS in administering and enforcing immigration laws was the authority to "investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged

fraud with respect to applications or determinations within the USCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable." FDNS's activities fall squarely within this delegation. FDNS was established in 2004 in response to a congressional recommendation to establish an organization "responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner before granting immigration benefits." [150] FDNS fulfills the USCIS mission of enhancing both national security and the integrity of the legal immigration system by: (1) identifying threats to national security and public safety posed by those seeking immigration benefits; (2) detecting, pursuing, and deterring immigration benefit fraud; (3) identifying and removing systemic vulnerabilities in the process of the legal immigration system; and (4) acting as USCIS' primary conduit for information sharing and collaboration with other governmental agencies. FDNS also oversees a strategy to promote a balanced operation that distinguishes USCIS' administrative authority, responsibility, and jurisdiction from ICE's criminal investigative authority. The Secretary, in Homeland Security Delegation No. 0150.1, delegated several relevant authorities to USCIS, including the following:

• Authority under section 103(a)(1) of the INA, as amended, 8 U.S.C. 1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

• Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

• Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262–266 of the INA, 8 U.S.C. 1302–06.

• Authority to place noncitizens in removal proceeding by issuance of a Notice to Appear, and to cancel such

Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

• Authority to approve bonds issued under the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

• Authority to interrogate noncitizens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph noncitizens under section 287(a), (b), and (f) of the INA, 8 U.S.C. 1357, and under section 235(d) of the INA, 8 U.S.C. 1225(d).

• Authority under the immigration laws, including but not limited to section 310 and 341 of the INA (8 U.S.C. 1421 and 1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of noncitizens.

• Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. 1154 and 1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment-based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of EOIR.

• Authority to investigate suspected fraud by Regional Center and related entities and to take other actions to ensure the integrity of the Immigrant Investor (EB–5) Program.

• Authority under immigration laws to extend and change nonimmigrant status and to adjust the status of noncitizens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of noncitizens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

In 2017, the Secretary, in Homeland Security Delegation No. 15002, delegated the following certain law enforcement authorities to USCIS:

---

[150] *See* Conference Report to accompany H.R. 4567 [Report 108–774], "Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005," p. 74, *available at http://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf.*

**6248** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

• In matters under the jurisdiction of USCIS, to protect the national security and public safety, to conduct law enforcement activities, including accessing internet and publicly available social media content using a fictitious account or identity, provided that such activities shall only be conducted by properly trained and authorized officers, and in a manner consistent with the Reservations set forth in DHS Delegation Number 0150.1 and consistent with the Department's obligations to protect privacy and civil rights and civil liberties.

Regarding the Administrative Site Visit and Verification Program (ASVVP), DHS explained in the proposed rule how USCIS collects information on the costs associated with ASVVP and assigns the distinct costs for these site visits to Forms I–129, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and I–829, Petition by Investor to Remove Conditions on Permanent Resident Status. *See* 88 FR 402, 496 (Jan. 4, 2023). Those costs are not paid directly from premium processing revenue.

Therefore, DHS has determined that the commenters misunderstand the nature of FDNS in USCIS. FDNS efforts are integral to determining an applicant's eligibility for a benefit, and to maintain the integrity of the immigration system. DHS makes no changes to these final fees as a result.

1. Background and Fee Review History

*Comment:* Many commenters requested that DHS formally withdraw the previously enjoined 2020 fee rule to ensure that USCIS fees and policies would default to the current fee schedule rather than the 2020 fee structure, should the proposed rule be found unlawful. Many commenters stated that USCIS should sever the 2020 fee rule from the remainder of the currently proposed rule to not jeopardize the withdrawal. Other commenters requested that DHS formally withdraw the 2020 fee rule, reasoning that the current proposal reflects a considered policy judgment on the part of USCIS that those features of the 2020 Fee Schedule are undesirable as a policy matter and are inconsistent with the goals of Federal immigration laws.

*Response:* DHS understands the concerns of the commenters because the fees in the 2020 fee rule have been codified for at least 2 years. However, as explained in the proposed rule, DHS is operating under two preliminary injunctions related to the 2020 fee rule. *See* 88 FR 402, 420 (Jan. 4, 2023). DHS continues to comply with the terms of those orders and is not enforcing the regulatory changes set out in the 2020 fee rule. There is also a separate injunction related to fee waiver changes in 2019. *Id.* USCIS continues to accept the fees that were in place before October 2, 2020, and to follow the fee waiver guidance in place before October 25, 2019. DHS and the parties in *Immigrant Legal Resource Center* v. *Wolf, NWIRP, City of Seattle,* and the related cases agreed to, and the courts have approved, a stay of those cases while the agency undertook this fee review and prepared the proposed rule. These rulings did not vacate the 2020 fee rule as having been codified in contravention of the law; they only preliminarily enjoin them. Thus, to remove the 2020 fees from the Code of Federal Regulations, DHS must engage in notice and comment rulemaking. Because, as stated in this rule, DHS needs a new USCIS fee schedule forthwith, we have determined that it was more efficient to focus on replacing and revising the 2020 fee regulations than to expend the additional effort required to revert the 2020 fees back to the October 1, 2020, fees in a separate rulemaking. DHS makes no changes to the rule based on these comments.

*Comment:* Commenters stated that USCIS' pattern of doubling the percentage increase of previous rules in each subsequent fee rule is not sustainable.[151] They stated that fees have already been raised enough and there should be a ceiling to USCIS' previous, current, or proposed fee structures. One commenter stated that USCIS filing fees continue to increase over time and there is no stopgap or ceiling in mind to maintain the affordability of these benefits.

*Response:* DHS examined each fee in the proposed rule and the proposed fees represent DHS's best effort to balance access, affordability, equity, and the national interest while providing USCIS with the funding necessary to maintain adequate services. As the cost of employees, services, buildings, and supplies increase, so must our fees. However, several public comments stated that the proposed fee increases greatly exceeded the rate of inflation, and others wrote that they could understand the need for USCIS to keep up with inflation.[152] After considering the applicable comments, DHS has decided to reduce many fees in this rule from what were proposed and adopt the recommendations of commenters to increase the current fees only by the amount of inflation since the date those fees were established.

As stated in this rule and the proposed rule, DHS has generally adhered to ABC and cost reallocation to determine USCIS fees and has not adjusted IEFA non-premium fees by inflation since 2005. *See* Adjustment of the Immigration Benefit Application Fee Schedule, 70 FR 56182 (Sept. 26, 2005). After considering public comments, the amount inflation since the FY 2016/2017 fee rule, and the size of the fee increases, DHS has decided that adjusting certain fees by the rate of inflation strikes a balance between the need to increase revenue to recover USCIS costs and maintain affordability for some immigration benefit requests.[153]

2. Fee-Setting Approach

*Comment:* A commenter stated that recovering costs should not include USCIS having a "carryover balance" that exceeded the revenue necessary to adjudicate petitions.

*Response:* USCIS is primarily fee-funded, which means it must use carryover, or the unobligated or unexpended fee revenue accumulated from previous fiscal years, to continue operating at the beginning of each fiscal year or when costs otherwise exceed revenue. The INA authorizes DHS to set fees at a level to recover "the full costs" of providing "all" "adjudication and naturalization services," and "the administration of the fees collected." 8 U.S.C. 1356(m). Many USCIS administered immigration benefit requests, such as H–2B and H–1B petitions, see significant seasonal fluctuations in filings, which can result in seasonal fluctuations in USCIS revenue and spending. As GAO acknowledges, fee-funded agencies may need to designate funds as operating reserves to weather periods when

---

[151] One commenter compared the weighted average increase in the proposed rule with prior fee rules (in 2010 and 2016) and stated that these double every fee rule.

[152] Notwithstanding these comments, as discussed later in this preamble, other commenters wrote that they opposed DHS codifying authority to adjust fees based on the amount of inflation as measured by the difference in the CPI–U. 8 CFR 106.2(d).

[153] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 88 FR 89539 (Dec. 28, 2023). DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

revenue collections are lower than costs.[154]

The proposed rule explained how USCIS uses and estimates carryover balances. *See* 88 FR 402, 417, 426–427 (Jan. 4, 2023); *see also* IEFA Non-Premium Carryover Projections in the supporting documentation included in the docket to this rulemaking. Most Federal programs are financed by discretionary appropriations that receive an annual Treasury warrant, which establishes a cash balance in their accounts after enactment of appropriations.[155] USCIS' IEFA has permanent or indefinite warrant authority that allows for immediate access to carryover balances and revenue collections subject to the annual spending limits established by Congress. *Id.*

Carryover balances give USCIS and other fee-funded agencies flexibility throughout the fiscal year if costs exceed revenues. Historically, fee revenue in the first quarter of the fiscal year is low due to seasonal filing patterns. Therefore, USCIS requires carryover funds to pay Federal salaries and award certain contracts at the beginning of the fiscal year. USCIS manages its fee accounts to ensure that adequate carryover balances are generated and retained to:

• Cover the cost of processing immigration benefit requests that are pending adjudication at the end of the fiscal year.

• Serve as contingency funding in the event of an unexpected decline in fee collections.

• Cover the start-up costs of new or expanded programs before sufficient fee revenues from such programs are collected (if a fee is to be collected).

• Cover other valid contingencies.

DHS declines to make changes based on this comment, except for budget and operational changes described elsewhere in this final rule, which may affect the forecast for carryover balances.

*D. FY 2022/2023 IEFA Fee Review*

1. Projected Costs, and Revenue

*Comment:* A commenter asked USCIS to explain and justify how the percentage increase or change for each fee was calculated. Another commenter stated that the proposed rule provided

no data point(s) on the cost of resource usage about each form category and reasoned that without establishing effort estimates, an increase in fees could be arbitrary. A few commenters wrote that USCIS' projected costs and revenue are not credible.

*Response:* In the proposed rule, DHS provided information on how it calculated the budget and revenue and estimated costs for the fee review. *See* 88 FR 402, 426–432 (Jan. 4, 2023). DHS described the methodology it uses to assign those estimated costs in an ABC model. *See* 88 FR 402, 432–451 (Jan. 4, 2023); *see also* FY 2022/2023 IEFA Fee Review Supporting Documentation (supporting documentation), and FY 2022/2023 IEFA Fee Schedule Documentation (fee schedule documentation) both included in the docket as numbers USCIS–2021–0010–0028 and USCIS–2021–0010–0029 respectively for review and comment. DHS described how it assesses and proposed fees based on the ABC model results or policy decisions to maintain some current fees or limit some fee increases. *See* 88 402, FR 450–451. DHS describes changes to the fee review budget in sections II.C. and II.F. of this preamble.

Throughout the proposed rule, DHS referenced ABC model results, often called the model output, when discussing proposed fees. *See, e.g.,* 88 FR 402, 485–487, 503, 515–516 (Jan. 4, 2023). DHS included supplemental information associated with the FY 2022/2023 fee review results and corresponding proposed rule in the docket. The supporting documentation provided a functional overview of the fee review process and results. It includes estimated total cost and unit costs for each immigration benefit request in the fee review.[156] USCIS also demonstrated the ABC model software used for the fee review during the public comment period.[157]

DHS provides revised versions of the supplemental documents based on budget, staffing, or operational changes described elsewhere in this preamble but declines to make any other changes based on these comments.

DHS notes that fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The fees also cover the resources

required for intake of immigration benefit requests, customer support, fraud detection, accounting, human capital, legal counsel, training, and other administrative requirements.[158]

2. Methodology

Many commenters wrote with general concerns that the proposed increases to fees lack substantive support and transparency on how the agency calculates fee amounts based on workload and metrics used to review and adjust fees. More detailed comments on the methodology are in the following subsections.

a. Completion Rates (Average Hours per Adjudication of an Immigration Benefit Request)

*Comment:* Commenters expressed concern with growing adjudication times and increases in completion rates for forms and certain applications. Some commenters divided current or proposed fees by completion rates (average hours per adjudication of an immigration benefit request) to calculate hourly rates for immigration benefits. Commenters expressed concern with increasing hourly rates of their own determination, citing various forms. Commenters stated:

• USCIS' data shows a significant increase in completion rates without any corresponding change in statutory or regulatory requirements.

• Many forms have an increase in completion rates from 49 percent to 218 percent, despite the lack of statutory or regulatory changes.

• Many forms with increased completion rates show substantial proposed fee increases.

• They are concerned about completion rates for selected forms and suggested that USCIS work to eliminate or reduce inefficiencies.

• USCIS notes that they used pre-pandemic values for some, but not all, of the data used to project completion rates, and the lack of clarity on these differences raises questions about the validity of the data used in the ABC model.

• Most of the Form I–129F, Petition for Alien Fiancé(e), filings do not require applicant interviews or otherwise take up extreme officer

---

[154] See GAO, ''Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability,'' (Sept. 30, 2013), *https://www.gao.gov/assets/gao-13-820.pdf* (last visited May 3, 2023).

[155] *See generally* U.S. Department of the Treasury, Bureau of the Fiscal Service, ''Treasury Financial Manual,'' ''Chapter 2000.'' Available at *https://tfm.fiscal.treasury.gov/v1/p2/c200* (last viewed Aug. 27, 2023).

[156] For example, see Appendix Table 3: Projected Total Cost by Immigration Benefit Request in the supporting documentation for the proposed rule available at *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

[157] A transcript of the software demonstration is available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[158] In the supporting documentation for the proposed rule, see appendix tables 4–7 for details on how DHS proposed fees based on the ABC model results and results by fee review activity. Pages 10–12 define the activities in the appendix tables. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, *FY 2022/2023 IEFA Fee Review Supporting Documentation* (Jan. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

resources that would justify this substantial of an increase.

• Touch times for Form I–539 have increased even though USCIS has reinstated concurrent processing of H1/H4/Employment Authorization Document (EAD) and L1/L2/EAD applications, which should result in gains in process efficiency.

• Changes brought about by recent litigation should have reduced touch times for many forms, but instead touch times have increased.

• How touch time would be tracked and calculated using the costing model and if USCIS includes FDNS activity in its calculation of touch time.

• Increased form length is a major reason why USCIS adjudicators are spending 3.3 million additional hours reviewing petitions and USCIS must stop requiring unnecessary renewals of work permits.

• Commenters provided recommendations for reducing completion rates.

• Some applicants are paying ''over $1,000+/hour'' despite an adjudication burden of only a few hours for completion.

• USCIS' ''effective hourly rate'' is four times the prevailing wage for an attorney.

*Response:* USCIS used the best completion rate data available at the time to conduct the FY 2022/2023 fee review. In its last four fee rules, DHS has used USCIS completion rates to assign costs from the Make Determination activity to individual cost objects (*i.e.,* forms). USCIS continued this approach in the FY 2022/2023 fee review. As explained in the proposed rule, USCIS relied on completion rates before the pandemic to remove this effect from the fee review. *See* 88 FR 402, 446. USCIS used online filing data that included pandemic months. *See* 88 FR 402, 490. The mix of two time periods for two different data points should not affect the results of the ABC model. When online filing is available, USCIS often uses the same case management system to adjudicate both online and paper filings. As such, USCIS used the same completion rates for both online and paper filings.

DHS limited many of the proposed fee increases (*i.e.,* adoption-related form fees, Forms I–290B, Notice of Appeal or Motion, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, N–400, Application for Naturalization, etc.), as done in previous fee rules. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In other cases, DHS proposed to maintain the current fee (*i.e.,* Forms I–90 when filing online, I–131A, N–565, etc.). *See* 88 FR 402, 451 (Jan. 4, 2023). Some

other fees do not use completion rates (*i.e.,* I–131A, H–1B Registration Fee, USCIS Immigrant Fee, etc.). *See* 88 FR 402, 446–447 (Jan. 4, 2023). As explained elsewhere in this rule, many of the final fees are lower than in the proposed rule. For example, DHS limits the fee increase to inflation since the 2016 rule for Forms I–130, Petition for Alien Relative, I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, etc.

DHS appreciates the commenters' concerns about increased form length, timely service, and higher fees. USCIS continually strives to minimize the burden on requesters, meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. The proposed rule highlighted areas where USCIS may be able to increase efficiency or reduce adjudication time or staffing. *See* 88 FR 402, 529 (Jan. 4, 2023). However, it may be too early for USCIS to see results from these planned changes or recently implemented changes. Future fee rules may use more recent completion rates, which may include efficiencies or reduced adjudication times. As noted previously, fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The hourly adjudication rates calculated by some commenters must fund the cost of relevant administrative costs, technical and technological facilitation, and similar services provided at no or reduced charge that are not recovered from other fees. By limiting many of the final fees to an inflation-based adjustment of the current fee, rather than one calculated based on a completion rate, DHS addresses the concerns of the commenters who disagree with fees being based on completion rates and the relative complexity of the adjudication. With this approach, USCIS may continue to improve efficiency and adjudication times without overburdening customers with fees that are higher than inflation for family-based and humanitarian workloads, in most cases.

b. Other Comments on Methodology (*e.g.,* ABC Software/Models, Age of Data)

*Comment:* Multiple commenters also stated that the ABC model is flawed, or the documentation is insufficient for the following reasons:

• Documentation of the fee review methodology and inputs does not provide a comprehensive understanding of the study's execution.

• USCIS chose not to use actual cost values and instead relied on projections, and it could not identify information in the documentation that either explained with specificity how the projected values were determined or addressed potential observational errors that may have impacted cost projections.

• Documents provided to the public did not provide the insight necessary to ascertain how the data in the model was compared across the FYs that USCIS examined.

• The ABC model has underestimated the number of petitions that will be filed and therefore underestimated the impact on small and seasonal American businesses, farmers, and the public.

• Because USCIS is proposing that employment-based applications cover the cost for other benefits, underestimation of H–2B and H–2A filings shows that other employment filings are also off, and the proposed fees and cost offsets need to be further reviewed with more adequate data.

• USCIS should be more transparent on USCIS' ABC model and into calculation and review of fee levels.

• USCIS should provide a public forum whereby it describes to stakeholders how the methodology and data used in the ABC model allowed it to reach its conclusions.

• USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether its conclusions are justified or reasonable.

*Response:* The INA authorizes DHS to recover the costs of USCIS by collecting fees and the CFO Act requires us to do a fee review every 2 years. Neither statute requires use of any particular methodology. As stated in the proposed rule and this rule, DHS strives to follow OMB Circular A–25, as appropriate for the programs we administer. In doing so, DHS strives to allocate fees using activity-based costing, adjust fees using considerations of public policy, interests served, and other relevant facts, and consider the recommendations of GAO regarding beneficiary-pays and ability-to-pay principles to shift costs and set our final fees. Our adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision. Nonetheless, the commenter's assertion that our calculations or fee determination is incorrect is misplaced. DHS explains in the supporting documentation in the docket for this rule how each fee in the proposed rule and this rule were calculated. DHS

engages in discretionary cost shifting and adjusts before arriving at a final fee schedule. DHS outlined how the ABC model works in the proposed rule preamble and supporting documentation, consistent with previous fee rules. In addition, it shared model and fee schedule documentation in the docket. USCIS also provided a demonstration of the model, as requested, and placed a transcript of the demonstration in the docket.[159] During the demonstration, USCIS often referred to information in the docket to show how the model uses it. The information used to calculate specific fees is the best and most complete information available at the time of the fee review. Requests that were only developed or authorized relatively recently (*e.g.*, separate fees for Form I–129; Employment Based Immigrant Visa, Fifth Preference (EB–5) workloads; Asylum Processing IFR costs) may have limited data, not be fully implemented, or require assumptions for the new fees. USCIS will be able to refine this data in the future as programs mature or data collection begins, which will be used for future fee reviews. Some fee changes in the proposed rule and this final rule are outside of the ABC model, as discussed in the preamble and fee schedule documentation. *See, e.g.,* 88 FR 402, 450–454 (Jan. 4, 2023).

Information provided in the ABC model includes the cost projections, volume, and completion rates discussed in the preamble. *See, e.g.,* 88 FR 402, 426–452 (Jan. 4, 2023). The supporting documentation discussed additional information, such as staffing levels, fee review activities, and a functional overview of ABC in general and the USCIS ABC model. The model documentation provided functional and technical details on how the model works. It included diagrams, screenshots, lists, and tables for various aspects of the ABC model. Thus, DHS believes that we have explained and justified our calculations of the fees in this final rule.

As for the filing volume estimates, USCIS uses a volume projection committee (VPC) with statistical and analytical experts who systematically examine filing volumes to produce forecasts used in fee studies. The VPC examines past trends, forecasts, and varying models, and USCIS has found that the VPC reliably minimizes forecast errors that might occur if forecasting were left to self-interested parties. The

VPC projects filing volume several years ahead. USCIS has reviewed the comments from H–2A and H–2B employers that misunderstood the 25 named beneficiaries per petition requirement as a limit on the overall number of beneficiaries and argued the ratio of initial to continuing requests to be a superior basis for modeling annual growth of at least 15 percent in both H–2A and H–2B volumes, in perpetuity. USCIS agrees with one commenter that nature is unpredictable and demand for seasonal agricultural workers is volatile but disagrees with unsupported arguments that higher H–2A and H–2B volumes and thus revenues are self-evident. In the event less likely volumes did occur, commenters overlook that this would cause changes in the activities driving ABC model estimates of average costs and impact the revenue the fee would generate. Thus, USCIS must take care to neither over nor underestimate future, unknowable volumes without bias.

3. TPS and DACA (*e.g.,* Exclusion From Cost Model, I–821, I–765 Exemption for Certain TPS Applicants, and DACA Rulemaking)

*Comment:* Commenters provided the following comments on how the proposed rule would affect DACA requests, fees, and grantees:

• Increased fees would create hardship for DACA students required to renew their paperwork every 2 years.

• Higher fees increase the vulnerability of DACA recipients by raising the costs to maintain their documentation.

• USCIS should set DACA application fees at current or lower levels to address financial disparities faced by immigrant communities and working families.

• DACA recipients already pay a filing fee that other protected groups do not, and fee waivers are not a solution to the proposed increase.

• Maintain current DACA fees because DACA recipients were not considered in the financial modeling for the proposed rule.

• Some disagreed with the exclusion of DACA recipients from filing fee relief regardless of their potential financial hardship.

• The DACA program diverts agency resources from lawful immigrant programs, resulting in fee increases and longer processing times for applicants in other visa programs.

• USCIS should increase processing fees for DACA because the fee is lower than other requests, yet the burden is higher.

• DACA requestors broke the law so their fees should be punitive.

• DACA recipients should be able to request advance parole based on any grounds and be allowed to request a fee waiver.

*Response:* This rule makes no changes to DACA, the validity period for approved DACA renewals or how often DACA must be renewed, policies regarding DACA recipients' ability to request advance parole, or any DACA-specific fees. As explained in the proposed rule, DACA is a temporary act of enforcement discretion, may be terminated at any time, and thus it is a source of revenue on which DHS does not want the fiscal condition of USCIS to depend. *See* 88 FR 402, 454–455 (Jan. 4, 2023).

To request DACA, an individual must file Form I–821D, Consideration of Deferred Action for Childhood Arrivals, which has an $85 filing fee. The applicant must also file Form I–765, Application for Employment Authorization, together with Form I–821D for the DACA request to be complete. Form I–765 is a general form used by millions outside of the DACA population. It has a filing fee of $410, which increases in this final rule to $470 when filed online or $520 when filed on paper. All Form I–765 applicants pay the same fee, unless they are fee exempt or request a fee waiver. DHS found no differences in the burden of adjudicating Form I–765 for DACA than for any other Form I–765 and we have no policy reasons for capping their fee at a lower amount. In DHS's 2022 DACA rule, the total fee to submit a DACA request of $495 ($85 plus $410) was a reasonable proxy for the Government's costs of processing these forms. *See* 87 FR 53152, 53278 (Aug. 30, 2022).[160] However, that rule also stated that DHS planned to propose new USCIS fees in a separate rulemaking, and that the fee for Form I–765, may need to be adjusted because it has not changed since 2016. *Id.*

In DHS's 2022 DACA rule, DHS considered allowing fee waivers or fee exemptions for DACA requestors. *See* 87 FR 53152, 53237–53238. In that rule DHS recognized that some DACA

[159] *See* USCIS, ''USCIS Fee Rule Software Demonstration,'' Mar. 1, 2023, available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[160] On Sept. 13, 2023, the U.S. District Court for the Southern District of Texas issued a decision finding the DACA rule unlawful and expanding the original July 16, 2021 injunction and order of vacatur to cover the final rule. *See Texas v. United States,* No. 1:18–CV–00068 (S.D. Tex. Sept. 13, 2023), *appeal pending,* No. 23–40653 (5th Cir. filed Nov. 9, 2023); *see also* USCIS, ''Important Update on Deferred Action for Childhood Arrivals,'' available at *https://www.uscis.gov/newsroom/alerts/important-update-on-deferred-action-for-childhood-arrivals* (last reviewed/updated Sept. 18, 2023).

requestors may face economic hardship that affects their ability to pay the required fees. However, it noted that DACA, as an exercise of prosecutorial discretion that allows DHS to focus limited resources on higher priority cases, is not an immigration benefit or associated filing for which DHS is required to allow a request for a fee waiver under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and that it is appropriate for beneficiaries of this enforcement discretion to cover the cost of adjudication. *Id.* DHS declines to reverse that decision in this rule. This final rule sets fees for Form I–765 that are increased only by the rate of inflation since they were last established, and less than the proposed fees, as explained elsewhere in in section II.C.8 of this rule's preamble.

*Comment:* A commenter wrote that USCIS could allocate more resources to TPS based on how much an applicant paid in fees, and that TPS could receive faster processing if they paid more.

*Response:* As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting the fees required to support baseline operations due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). DHS realizes that USCIS has processing backlogs for Form I–821, Application for Temporary Protected Status, and we are working to reduce those backlogs and approve requests quickly. DHS is precluded from charging more for faster processing of the Form I–821 by INA sec. 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B), which caps the TPS registration fee at $50. While USCIS has implemented premium processing for some Form I–765 categories in March 2023, a TPS related Form I–765 was not one of them.[161] USCIS may offer premium processing for TPS-related Form I–765 filings as provided in 8 CFR 106.4 in the future as we develop more capacity to offer premium service to more requests. Meanwhile, DHS makes no changes to this rule based on this comment.

4. Processing Time Outlook and Backlogs

*Comment:* Many of the commenters opposed fee increases because of delays in processing times and dissatisfaction

with customer service. Commenters wrote:

• Conditional support for the fee increases if such increases will improve or not cause any backlogs and only if USCIS can process cases quickly and accelerate processing.

• USCIS should improve efficiency and achieve long term structural improvements without increasing fees, should focus first on improving efficiency and service provision as opposed to raising fees, include a processing time guarantee, establish a "binding" processing timeframe with each fee increase, reverse the fee increases if USCIS fails to meet specific processing times, and USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters questioned what mechanisms would hold USCIS to higher efficiency standards.

• USCIS should clear the backlog and decrease processing times, the current backlog and long processing times are not reasonable, processing times are getting longer without any justifying policy or legal changes, USCIS has "record-high" processing delays and backlogs and is not meeting legal guidelines for processing times, processing times increased over the last 6 years by as much as 218 percent.

• USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters stated the growing length of USCIS forms is a "major contributor" to the backlog.

• Applicants are not responsible for the backlog and should not carry its burden, the backlog is harmful for low-income applicants awaiting permanent residency or naturalization, and immigrant and nonimmigrant fees should bear the burden of cost for the backlog rather than U.S. citizens or noncitizen relatives.

• The backlog has a negative impact on many non-immigrant workers, DACA recipients, TPS holders, and other EAD applicants seeking to maintain their employment status in their current jobs and seeking USCIS services, and applicants from higher education seeking employment or other opportunities.

• Raising fees and hiring additional staff would be a "band-aid" solution to a flawed processing model that has created the current backlog crisis.

• Processing delays may deter many touring artists from performing in the United States and processing delays force some petitioners to pay the premium fees for international artists,

particularly given the specific timing demands of performing arts schedules.

• USCIS should improve processing so fewer applicants need to pay for premium processing.

• USCIS requires some dependents of long-term temporary workers to file extensions of status separate from the worker, contributing to the backlog.

• USCIS should reduce Requests for Evidence (RFE) as unnecessary complications that cause delays in processing, publish RFE issuance rates by adjudicator, and establish stricter requirements for responding to evidence and issuing RFEs.

• Recent RFE reductions by USCIS should be considered in the proposed filing fees.

• In response to the statement in the proposed rule that part of the 2022 congressional appropriations would be used to reduce current backlogs and delays, USCIS has not shown the capacity to quickly address developing backlogs and USCIS should not rely solely on yearly appropriations.

• Recommendations of several means of reducing backlog, including requesting annual appropriations if needed and adjusting fees annually based on staffing factors.

• The processing times and backlogs for the Form I–600A and I–600 series and Form I–800A and I–800 series should be reduced, and adjudication of adoption cases should be prioritized.

• Concerns about specific forms, including Form I–129 processing times are three to five times longer than mandated by statute for L–1 petitions.

• Form I–539 processing times have ballooned despite process changes that should have streamlined adjudication, for Form I–485, USCIS should promise a period of fewer than 6 months to process the form and its underlying petitions; applicants must file concurrent Forms I–485, I–131, and Form I–765, given the increasing processing times.

• These delays increase backlogs for Form I–129F. Because the processing time has increased in recent years, USCIS should not propose to significantly increase fees for the fiancé and spousal applications.

• Lengthy processing times for Form I–131, result in increased congressional inquiries, Ombudsman's inquiries, and expedite requests, all of which create greater inefficiencies.

• Further, processing delays make it difficult for students to anticipate their start dates on their applications and are not warranted given that the Form I–765 duplicates information that USCIS has already collected.

---

[161] USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," available at *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/ updated Mar. 6, 2023).

• For Form I–824, the simple purpose of this form should not necessitate processing times of 2–4 years.

• Form N–400 commenters recommended a case processing goal of 4–6 months and stated that increased vetting policies have increased processing times, despite stable rates of approval of applications.

• USCIS has a 1-to-3-month processing time for O–1 petitions (although the statutory requirement for adjudication is 14 days), so USCIS should refund the filing fee if processing takes longer.

• For K–1 visa holders applying for Adjustment of Status, processing time varies greatly depending on the applicant's location of residency and review of interim benefit requests for such applicants should be shorter given that those applicants' relationships and backgrounds have already been reviewed.

• Processing delays for F–1 student visas impede registrations from international students, which can diminish the students' contribution to U.S. innovation and limits revenue streams for U.S. colleges and universities.

• Lengthy J–1 waiver approval processing has caused interruptions in income or necessitated priority processing.

• DHS should avoid any Form N–400 fee increase by pursuing greater efficiencies and cost savings using technology.

• USCIS should refund the higher proposed fees if the agency does not process the following forms within its processing time goal: I–290B, I–800A, I–824, I–140, N–400, I–526, I–102, I–130, I–129F, I–360, I–129, I–90, I–539, I–131, I–765, I–485.

• Increased processing times and the need to hire new employees are problems of USCIS' own making through unnecessary RFEs, biometrics, in-person interviews, site visits, audits, and failure to take advantage of technological advances that could lead to more streamlined and cost-effective procedures. It is prudent for USCIS to increase fees because it has been 6 years since the last increase and the United States is experiencing widespread inflation, but USCIS should ensure that any increase improve the efficiency of its services and customer support.

*Response:* USCIS appreciates that its processing backlogs have a negative impact on many stakeholders who submit and rely on immigration benefit requests. USCIS is committed to timely processing goals and reducing its backlog. DHS acknowledges that since it last adjusted fees in FY 2016, USCIS has

experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29858–29859. Processing delays have contributed to case processing backlogs. USCIS total pending caseload has grown from approximately 4.7 million cases in December 2016, when DHS last adjusted IEFA non-premium fees, to approximately 8.9 million cases at the end of June 2023.[162] On top of these preexisting strains on USCIS, the COVID–19 pandemic constrained USCIS adjudication capacity by limiting the ability of USCIS to schedule normal volumes of interviews and biometrics appointments while maintaining social distancing standards. *See* 88 FR 402, 455 (Jan. 4, 2023). COVID flexibilities likely increased the time to respond to an RFE, as well as processing times.[163] Further, USCIS believes that the growing complexity of case adjudications in past years, including prior increases in the number of interviews required and RFE volumes, at the time contributed to higher completion rates and growing backlogs. *Id.*

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[164] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing in an effort to achieve these goals by the end of FY 2023. DHS automatically extended some EADs to help prevent renewal applicants from experiencing a lapse in employment authorization or documentation while their applications

remain pending. *See* 87 FR 26614 (May 4, 2022). Automatic extension of employment authorization or documentation allows some immigrants, including asylees, refugees, and TPS holders, to maintain their employment status in their current jobs. *Id* at 26615– 26617. To highlight other efforts toward reducing the backlog and processing times, USCIS published a progress report to demonstrate both how backlog reduction and humanitarian services were successfully supported by appropriations by Congress in FY 2022.[165] USCIS reduced the backlog for naturalization and the wait time for employment authorization, while expanding humanitarian efforts.[166] USCIS already delivered on one of the commitments in the progress report by implementing premium processing for all employer Form I–140 petitions for immigrant workers.[167] Since publishing the report, USCIS also announced that premium processing is available for certain students seeking Optional Practical Training (OPT) or Science, Technology, Engineering, and Mathematics (STEM) OPT extensions, as well as certain changes or extensions of nonimmigrant status.[168]

DHS appreciates the operational suggestions submitted by commenters regarding interviews, RFEs, online filing, prioritization of certain requests, USCIS office staffing, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find

---

[162] *See* USCIS, "Number of Service-wide Forms by Fiscal Year to Date, Quarter and Form Status 2017," available at *https://www.uscis.gov/sites/default/files/document/data/ECN_1893_-Quarterly_-_All_Forms_FY17Q1_Final.pdf* (last visited Sep. 29, 2023). USCIS, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, April 1, 2023—June 30, 2023," available at *https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2023_q3.pdf* (last visited Sep. 29, 2023).

[163] *See, e.g.,* USCIS, "USCIS Extends COVID–19-related Flexibilities" available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-covid-19-related-flexibilities-1* (last revised/updated Jan. 24, 2023).

[164] See USCIS, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work* (last visited Feb. 8, 2023).

[165] See USCIS, "USCIS Releases New Data on Effective Reduction of Backlogs, Support for Humanitarian Missions, and Fiscal Responsibility," *https://www.uscis.gov/newsroom/news-releases/uscis-releases-new-data-on-effective-reduction-of-backlogs-support-for-humanitarian-missions-and* (last visited Feb. 7, 2023).

[166] See USCIS, "Fiscal Year 2022 Progress Report," Dec. 2022, available at *https://www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf* (last visited Feb. 8, 2023).

[167] See USCIS, "USCIS Announces Final Phase of Premium Processing Expansion for EB–1 and EB–2 Form I–140 Petitions and Future Expansion for F–1 Students Seeking OPT and Certain Student and Exchange Visitors," *https://www.uscis.gov/newsroom/alerts/uscis-announces-final-phase-of-premium-processing-expansion-for-eb-1-and-eb-2-form-i-140-petitions* (last visited Feb. 7, 2023).

[168] See USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last visited Mar. 6, 2023); USCIS, "USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status," *https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last visited June 12, 2023).

efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). This entails evaluating the utility of interview requirements, biometrics submission requirements, RFEs, deference to previous decisions, and other efforts that USCIS believes may, when implemented, reduce the amount of adjudication officer time required, on average, per case. *Id.* Any improvements in these completion rates would, all else equal, reduce the number of staff and financial resources USCIS requires. Furthermore, USCIS is actively striving to use its existing workforce more efficiently, by investigating ways to devote a greater share of adjudication officer time to adjudications, rather than administrative work. All else being equal, increasing the average share of an officer's time spent on adjudication (that is, utilization rate) would increase the number of adjudications completed per officer and reduce USCIS' overall staffing and resource requirements.

USCIS based its fee review largely on existing data that do not presume the outcome of these efficiency initiatives. USCIS cannot assume significant efficiency gains in this rule in advance of such efficiency gains being measurably realized. Establishing more limited fees to account for estimated future efficiency could result in deficient funding, and USCIS would not be able to meet its operational requirements. USCIS also cannot refund fees if it does not meet its processing time goals as commenters suggest without incurring significant harm to its fiscal position, which would in turn only exacerbate backlogs. In contrast, if USCIS ultimately receives the resources identified in this rule and subsequently achieves significant efficiency gains, this could result in backlog reductions and shorter processing times. Those efficiency improvements would then be considered in future fee reviews, as indicated in the proposed rule. *See* 88 FR 402, 529–530 (Jan. 4, 2023).

Finally, regarding the current USCIS processing time for O–1 petitions, and the commenter's suggestion that USCIS should refund filing fees for O–1 petitions that take more than 14 days to adjudicate, DHS disagrees with the commenter's assertion that there is a generally applicable requirement to process O–1 petitions within 14 days. Rather, the statute and regulations refer to a non-binding 14-day processing time, after USCIS receives an advisory opinion, in the limited context where USCIS requests an advisory opinion from an appropriate labor organization. *See* 8 U.S.C. 1184(c)(6)(D); 8 CFR 214.2(o)(5)(i)(F). DHS will not adopt the

commenter's suggestion to refund O–1 petition filing fees in cases that take longer than 14 days to adjudicate. As with other filing fees, the O–1 petition filing fee is due at time of filing and is nonrefundable.

In sum, DHS understands the need for timely service, system improvements, and customer support. USCIS continually strives to meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. Fees have not been adjusted since 2016. Meanwhile, USCIS expanded its humanitarian efforts, often without appropriations or revenue to offset the additional cost.[169] This fee rule is intended to address such shortfalls and provide resources necessary to ensure adequate service. USCIS would be unable to adequately perform its mission if DHS allowed fee levels to remain insufficient while USCIS continued to explore and implement options for additional efficiencies.

*Comment:* Many of the commenters suggested operational improvements which they felt would reduce processing times or improve customer service. Commenters wrote:
• USCIS should add more electronic filing.
• USCIS should use interview waivers, evidence of employment authorization, the creation of a trusted filer program, remote interviews, phone appearances, grandfathering, penalty fees, extend validity periods of visas, and recapture and issue Green Card numbers that have gone unused to reduce costs and the backlog.
• Applicants should be given the name and email of their adjudicator to establish more transparent and efficient communication.
• USCIS should increase adjudicator hiring rates and training, and provide better training combined with managerial oversight and review of adjudications.
• USCIS should transparently include planned process improvements in its costing model.
• Form I–130, commenters recommended a simplified registration system to prevent USCIS from spending resources managing applications during lengthy waiting periods.
• USCIS should stop requiring unnecessary renewals of work permits, citing research that such renewals compose 20 percent of the case backlog.

• USCIS should stop printing Green Cards, and EAD cards for applicants who already have a Green Card.
• DHS should offer premium processing fees to alleviate long processing times for VAWA applicants coming from difficult situations.
• Combining the forms, fees, and adjudications for Forms N–400 and N–600 would save both families and USCIS considerable time and money.
• Effort to process Form I–751 has fallen by 11 percent over the past 6 years but processing time is increasing dramatically and does not comply with statutory timeframes. Fees for I–751 filers should be used to improve I–751 processing times and not for other higher priority forms.

*Response:* DHS appreciates the operational suggestions submitted by commenters regarding processing times, process improvement, customer service, interviews, streamlined filings, online filing, prioritization of certain requests, training, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). DHS considered these recommendations but declines to make changes in this rule. DHS may consider these changes again in future rulemakings.

*E. Fee Waivers*

1. General Comments

*Comment:* Multiple commenters expressed general support for the fee waiver provisions in the proposed rule, some without explanation and others for the following reasons:
• Fee waivers are important for immigration relief because they help families improve their stability, financially support themselves, and fully integrate into the workforce.
• The proposed rule would replace the enjoined 2019/2020 changes, which severely limited immigrants' access to fee waivers including the reduced fee option for low-income naturalization applicants. The proposed rule would revert to the inability to pay model for establishing eligibility for fee waivers, and avoid other issues in prior proposed fees.
• Many individuals apply for naturalization or a Certificate of Citizenship with a fee waiver.
• The proposed rule continues to allow fee waivers for forms associated with certain types of humanitarian benefits. The United States has a moral and legal obligation to protect persons fleeing persecution.

---

[169] For example, as described in section III.C. DHS established new parole processes for certain Cubans, Haitians, Nicaraguans, and Venezuelans, and new family reunification parole processes for certain Colombians, Salvadorans, Guatemalans, and Hondurans.

• The proposed rule would preserve existing fee waiver eligibility for low-income and vulnerable populations and ensure that the fee changes would not disproportionately impact people who are struggling financially. Fee waivers provide an opportunity for low-income individuals to become citizens of the United States and participate in the democratic process. Without fee waivers, many low-income individuals would not have an equal opportunity to access the pathway to citizenship.

• Many of the changes DHS proposed will prevent meritorious fee waiver requests from being denied on arbitrary bases, as is often now the case.

• Strengthening fee waivers supports union efforts to uplift the rights and status of those in need of increased agency in the labor market.

*Response:* DHS agrees with commenters regarding the importance of fee waivers and will maintain their availability as explained in the proposed rule.

2. Eligible Categories and Forms

*Comment:* Several commenters asked USCIS to balance fee increases by significantly expanding fee waiver eligibility. One commenter stated that DHS should expand the categories of applications eligible for fee waivers without specifying which additional categories should receive fee waivers. Another commenter encouraged USCIS to expand fee waivers to further ensure that all vulnerable noncitizens who cannot afford to pay filing fees are able to obtain a fee waiver and access immigration benefits without unreasonable delay or undue difficulty. Another commenter requested that USCIS allow for individual determinations as to whether a fee waiver should be granted for all applications. The commenter reasoned that categorical restrictions placed on fee waivers for certain applications combined with the increase in fees proposed will pose obstacles for many immigrants, resulting in the delay of immigrants' ability to apply for immigration relief.

*Response:* DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b); Table 5B. DHS believes that these expanded fee exemptions offer more certainty to those who are unable to pay application fees and create less burden because they do not require filing or processing of a fee waiver request. In addition, DHS is maintaining the household income level for assessing a requestor's ability to pay at 150 percent of the FPG instead of the 2019/2020 fee rule's lower threshold of 125 percent of the FPG. 8 CFR 106.3(a)(1)(i)(B). This fee rule also retains the authority for the Director of USCIS to provide exemptions from or waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law. *See* 8 CFR 106.3(c). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits. Additional fee waivers would limit USCIS' ability to fund necessary activities and would lead to additional backlogs and delays. Otherwise, USCIS would need to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

*Comment:* Multiple commenters wrote that USCIS should make additional family-related immigration benefits eligible for fee waivers. One commenter expressed concern that some Form I–129F petitioners and beneficiaries would have to go into debt to get married and recommended that DHS allow low-income individuals to request a waiver of the Form I–129F. Another commenter expressed opposition to the rule because fees cannot be waived for Forms I–130 and I–751.

*Response:* Contrary to the commenter's assertion, the fee for Form I–751, Petition to Remove Conditions on Residence, can be waived. 8 CFR 106.3(a)(3)(i)(C). In general, however, DHS does not consider Form I–129F, Petition for Alien Fiancé(e), and Form I–130, Petition for Alien Relative, appropriate for fee waivers because the petitioning U.S. citizen or LPR relative is statutorily required to demonstrate their ability to financially support the noncitizen beneficiary at the time of their admission as an LPR. *See* INA secs. 212(a)(4)(C)(ii) and 213A, 8 U.S.C. 1182(a)(4)(C)(ii) and 1183a. DHS does not believe that these USCIS fees represent an inordinate financial burden compared to the financial commitment required to fully support an immigrant relative.

*Comment:* A commenter expressed concern that the fee for Form I–539 is not waivable for T and U nonimmigrants when the form is filed concurrently with Form I–485. The commenter remarked that this would cause significant financial burden to victims filing U-visa and T-visa based Form I–485 applications, who often cannot hire a private attorney to help them file an I–485 in timely fashion, and the additional I–539 fee would further delay the ability of survivors in this situation to reconcile their expired status with the filing of a *nunc pro tunc* Form I–539 and Form I–485 application.

*Response:* In the proposed rule, DHS proposed to fully exempt the fee for a Form I–539, Applicant to Extend/Change Nonimmigrant Status, filed by applicants who have been granted T nonimmigrant status or are seeking to adjust status under INA sec. 245(l), 8 U.S.C. 1255, regardless of whether the form is filed before or concurrently with Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 402, 594 (Jan. 4, 2023) (proposed 8 CFR 106.3(b)(2)(vi)). DHS has maintained this fee exemption in the final rule. 8 CFR 106.3(b)(2)(vi); Table 5C. Furthermore, in response to comments, DHS has decided to extend the fee exemption for Form I–539 to include applicants who have been granted U nonimmigrant status or are seeking to adjust status under INA sec. 245(m), 8 U.S.C. 1255(m), regardless of whether the form is filed before or concurrently with Form I–485. 8 CFR 106.3(b)(5)(vi). That limited, additional fee exemption did not increase the fees for other fee payers. As explained elsewhere, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. These fee exemptions will enable the vulnerable population of U nonimmigrants to maintain their nonimmigrant status while applying to adjust to LPR status.

*Comment:* A commenter stated that fee waivers and exemptions should be extended to other critical forms for asylees, reasoning that asylees are just as vulnerable and meet the same legal definition as refugees. The commenter did not identify specific forms that should be eligible for a fee waiver but asserted that the following forms should be fee exempt: Form I–485 for asylees, Form I–765 renewal and replacement for asylees and asylum applicants, and Form I–290B for asylees and refugees when filed for Forms I–730 or I–485.

*Response:* All the forms identified by this commenter are eligible for a fee waiver. 8 CFR 106.3(a)(3)(ii)(D), (F), (iv)(C); Table 5B. Comments concerning fee exemptions are addressed later in the Section IV.F of this preamble.

*Comment:* Commenters stated that the proposed fee changes would unfairly categorize athletes as a classification

that can afford the fee increases and requested that a broader spectrum of forms, including the Form I–129 and Form I–140 when not filed by an employer, be eligible for fee waivers or reductions. Another commenter encouraged USCIS to consider a waiver option for O and P petitions, combined with a tiered structure (possibly based on maximum planned venue size), which the commenter reasoned would benefit all interests without jeopardizing potential U.S. revenue streams and the socioeconomic contributions of small- and medium-sized artists.

*Response:* DHS recognizes commenters' concerns regarding the affordability of Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, and that not all athletes or artists are wealthy. As further discussed in Section II. C of this preamble, in response to public comments and stakeholder feedback, DHS is codifying a discounted Form I–129 fee for small employer and nonprofit filers in this final rule. 8 CFR 106.2(a)(3)(ix). However, while DHS recognizes the economic and cultural contributions made by O and P nonimmigrants and I–140 self-petitioners, DHS does not believe that these factors justify fee-waiver eligibility or fee exemptions for Form I–129 and Form I–140 petitions. USCIS can only allow a limited number of forms to be eligible for fee waivers, or else it would require even further increases in fees to offset lost revenue. DHS has chosen to prioritize fee waivers for humanitarian and protection-related immigration forms where the beneficiary may not have a reliable income or their safety or health is an issue, and naturalization and citizenship-related forms to make naturalization accessible to all eligible individuals.[170] DHS notes that the process for assessing fee-waiver eligibility is generally designed for individuals, not organizational petitioners for O and P nonimmigrants because their ability to pay cannot be assessed under those guidelines (*e.g.,* receipt of a means-tested benefit, or household income below 150% of the FPG). *See* 8 CFR 106.3(a)(1)(i).

*Comment:* A commenter expressed concerns about the increasing frequency of fee waivers because it is possible for some applicants to obtain fee waivers through different forms and multiple filings. The commenter also asserted that applicants abuse fee waivers, reasoning that some individuals file multiple application types and request a fee waiver for each application to avoid

paying fees. Considering these concerns, the commenter recommended that no fee waivers be given for Forms N–400 and N–600.

*Response:* DHS believes the commenter's concern is unfounded. As discussed in Section IV.E.7 of this preamble, fees waiver requests, approvals, and foregone revenue have remained consistent over the last 10 years, and they are currently well below levels in FY 2015–17. *See* Table 6. DHS disagrees that an applicant seeking multiple fee waivers for different applications constitutes "abuse" because each subsequent form is required to be accompanied by its own fee waiver request, and each fee waiver request is considered on its own merits. Multiple fee waiver requests may reflect an ongoing inability to pay due to legitimate reasons such as low income or disability, which must be documented in each request.

*Comment:* A commenter stated that fee waivers should not be available for naturalization-related applications because U.S. citizenship is a privilege, not a right.

*Response:* DHS disagrees with the premise of this comment. The INA provides for the statutory, nondiscretionary right to apply for naturalization. *See* INA secs. 316, 319, 328, and 329; 8 U.S.C. 1427, 1430, 1439, and 1440. DHS acknowledges the advantages that new citizens obtain with naturalization, but also recognizes the significant benefits that the United States obtains from the naturalization of new citizens.[171] In maintaining fee waivers and reduced fees for naturalization-related applications, DHS seeks to promote naturalization and immigrant integration.[172] Because applicants may be unable to pay at the time of naturalization, USCIS believes that continuing to allow naturalization applicants to request fee waivers is in the best interest of the program and consistent with the statute.

*Comment:* One commenter stated there should be no full fee waivers for individuals who are not asylum, VAWA, T visa, or U visa-based requesters. The commenter expressed support for reduced fees but reasoned that it would cause USCIS to continue dedicating extra time and resources to verify and review the request for reduced fees. The commenter suggested that, if USCIS must keep fee waiver options for forms like the N–400 then it

should temporarily cancel the option for 1 year to see if it results in a decrease in filings. The commenter reasoned that, if there were a decrease, this would allow USCIS time to adjudicate current backlogs and recoup the full amount of fees for all new filings, and if there was a minimal decrease, it would inform future discussion of minimizing fee waivers.

*Response:* DHS disagrees with the commenter's proposal to limit full fee waivers to certain humanitarian categories and exclude others. DHS believes that there are equally deserving humanitarian categories, including refugees, Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA) adjustment applicants, Special Immigrant Afghans and Iraqis, SIJs, and TPS recipients. Furthermore, in recognition of the benefits that the United States receives when immigrants naturalize, DHS believes that waived and reduced fees should be available to all naturalization applicants regardless of class of admission. DHS disagrees with the commenter's rationale for temporarily suspending Form N–400, Application for Naturalization, fee waivers because this would arbitrarily burden immigrants who have recently become eligible for naturalization but do not have the funds to pay the fee. In FY 2021, USCIS waived 39,738 fees for Form N–400s and approved 2,606 reduced-fee requests, so DHS anticipates that a similar number of applicants would be prevented from applying for naturalization were it to temporarily suspend fee waivers and reductions for the Form N–400. Instead of limiting fee waivers for Form N–400, DHS has decided to raise the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). As for the commenter's assertion that suspending fee waivers and reductions would allow USCIS to decrease its backlog, we believe this would only result in a surge of Form N–400 filings once fee waivers and reductions were reinstituted. The commenter is correct that USCIS dedicates time and resources to review requests for fee waivers or reduced fees, but that effort is necessary and valuable for enabling low-income applicants to access immigration benefits, while also ensuring that only those who meet the requirements have their fees waived. On March 29, 2022, USCIS announced new actions to reduce backlogs, and announced that the Form N–400 cycle time goal is 6 months.[173] In FY 2023,

---

[170] *See* E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[171] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, "U.S. Naturalization Policy," (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[172] This is also consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[173] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium

USCIS greatly improved Form N–400 processing times to 6.3 months from 11.5 months in FY 2021.[174]

3. Eligibility

a. Means-Tested Benefits

*Comment:* Noting that the proposed rule would accept a child's receipt of public housing assistance as evidence of the parent's eligibility for a fee waiver when the parent resides in the same residence, commenters wrote that the proposal is limiting and requested that USCIS include a child's receipt of other means-tested benefits, including Medicaid, Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), and Supplemental Security Income (SSI) as acceptable evidence. A couple of these commenters stated that all other qualifying means-tested benefits programs similarly screen for financial hardship and inquire about assets and income for the applicant's household, and therefore any household member's receipt of a means-tested benefits should have the same probative value as a child's receipt of public housing assistance for fee waiver eligibility. One commenter said broadening the criteria for fee-waiver eligibility based on means-tested benefits will save USCIS time and effort adjudicating fee waiver requests and training staff, as evidence of receipt of means-tested benefits is often simpler to review than evidence of an entire household's income or financial hardship. Another commenter concluded that DHS has not provided a reasoned explanation of its choice to treat various public benefits differently. One commenter stated that in many cases only the applicant's child meets the criteria for a public benefit.

*Response:* After considering the comments on the proposed rule, DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. That would entail public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits

and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[175] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 form instructions.

*Comment:* A commenter recommended that USCIS expand evidence of receipt of means-tested benefits to include a benefits card, in lieu of the current requirements for a formal letter, notice, or other official documents. The commenter said this change would alleviate the administrative burden to those who would have to otherwise spend hours struggling to obtain a formal notice of receipt.

*Response:* DHS already accepts a benefits card as evidence of a means-tested benefit if the card shows the name of the benefit recipient, the name of the agency granting the public benefit, the type of benefit, and that the benefit is currently being received.[176] While it is unfortunate that not all benefit cards provide information about dates of receipt for the benefit, DHS believes that without this information a benefits card is not sufficient evidence that the fee waiver requestor currently receives the benefit.

b. Household Income at or Below 150 Percent FPG, and Suggested Income Levels

*Comment:* Some commenters wrote that they supported that DHS will continue to use the FPG to determine income thresholds for fee waiver purposes because it is a recognized national standard also used by other Federal programs.

*Response:* DHS appreciates the support and will continue to use the FPG as one means of assessing inability to pay.

*Comment:* Some commenters generally stated that the income eligibility limit for a fee waiver at 150 percent of FPG is too low or should be reconsidered. Multiple commenters suggested that USCIS increase the income threshold to establish an inability to pay to at or below 200 percent of the FPG, with some providing the following rationale:

• This would expand eligibility for those who earn too much to qualify for a fee waiver but too little to be able to afford the proposed fees.

• This would more accurately reflect the realities of low-income individuals, particularly as this rule seeks significant increases for fees for integral applications, such as employment authorization, permanent residence, and family petitions.

• This would impact a significant portion of the community of low-income immigrants. In 2019, immigrants who were at 150 percent to 199 percent of the Federal poverty level constituted one-third, or 4,503,000, of all low-income immigrants in the country.

• This would take into consideration applicants in states such as California, where cost of living and the poverty threshold for public benefit programs are higher.

• Survivors of domestic violence, sexual assault, and human trafficking may have a household income that puts them over 150 percent of the FPG, but they may face economic obstacles due to their victimization that impede their ability to pay immigration filing fees.

• This would be consistent with the income guidelines that federally funded legal aid agencies use per the Legal Services Corporation's regulations.

Other commenters recommended that DHS increase the eligibility threshold to at or below at least 300 percent of FPG. The commenters said there are people who would not qualify under the proposed rule's criteria and examples for "financial hardship" and are excluded from waived or reduced fees because they make a little more than 200 percent of FPG, despite their

---

Processing, and Provide Relief to Work Permit Holders'' Mar. 29, 2022, *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

[174] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year,'' *https://egov.uscis.gov/processing-times/historic-pt* (last visited Aug. 18, 2023).

[175] Soc. Sec. Admin., ''Understanding Supplemental Security Income, What Is Income?'' (2023), *https://www.ssa.gov/ssi/text-income-ussi.htm* (last visited Aug. 21, 2023).

[176] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''Additional Information on Filing a Fee Waiver,'' *https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, ''Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26'' (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf;* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form I–912, Instructions for Request for Fee Waiver 5 (Sept. 3, 2021), *https://www.uscis.gov/sites/default/files/document/forms/i-912instr.pdf.*

economic struggles and bona fide "inability to pay" for current immigration fees, let alone the proposed fee increases for citizenship, adjustment of status, and other benefit requests.

*Response:* DHS acknowledges that certain individuals may continue to face difficulty paying immigration fees despite having a household income that is above 150 percent of the FPG. However, DHS declines to further raise the income limit for fee waivers because increasing the number of requests that do not pay fees would require even greater fee increases for other fee-paying individuals, many of whom already face significant increases in fees with this new rule. Otherwise, USCIS' ability to maintain services and improve backlogs would be limited. However, DHS notes that the current fee rule contains several provisions that lessen the burdens for low-income filers. First, there are other ways of demonstrating inability to pay besides household income. An individual may demonstrate inability to pay if they or their spouse or child living in the same household are currently receiving a means-tested benefit, despite having household income over 150 percent of the FPG. *See* 8 CFR 106.3(a)(1)(i)(A). DHS fee waiver guidance provides that USCIS will accept Federal, State, or locally funded mean-tested benefits. Income limits for certain means-tested benefits vary by State and account for different costs of living.[177] DHS also accepts various forms of financial hardship as evidence of inability to pay. *See* 8 CFR 106.3(a)(1)(i)(C). In addition, DHS has significantly expanded the forms that are now fee exempt, which includes benefits for victims of trafficking, violent crimes, and domestic violence. *See* Table 5B. These requestors will not be required to request a fee waiver for certain forms. Finally, as explained in section II.C.13 of this preamble, DHS has significantly expanded the income limit under which N–400 applicants qualify for a reduced fee from the originally proposed 200 percent limit to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii).

*Comment:* Some commenters recommended adopting the Department of Housing and Urban Development (HUD)'s measure of Median Family Income (MFI) instead of the FPG to assess fee waiver eligibility based on household income. The commenters said HUD's approach is more realistic and equitable in determining who has

an inability to pay because it considers how an individual's geographic location impacts their cost of living, whether they live in real poverty, and, ultimately, their ability to afford an immigration benefit. The commenters disagreed with DHS's rationales for using the FPG: (1) having a consistent national standard, (2) maintaining consistency between fee waiver eligibility and other Federal programs, and (3) avoiding confusion. Commenters asserted that having a consistent national standard "is not a justification but instead a reason for questioning its use;" that the MFI is consistent with HUD's Federal programs and benefits; that receipt of means-tested HUD benefits can demonstrate inability to pay under DHS's other criteria; and that any potential confusion of switching to MFI could be addressed through training and public education campaigns.

Other commenters did not specifically advocate for MFI, but generally stated that USCIS should assess inability to pay based on a requestor's location and the high cost of living in certain areas of the country. Another commenter stated that USCIS should use more accurate means-tested standards without identifying why the current standards are inaccurate or recommending specific alternative standards.

*Response:* DHS recognizes that the cost of living in certain areas of the country is greater than in others, and therefore people with equal household incomes may face varying difficulty paying immigration fees due to their geographic location. However, DHS believes that this concern is mitigated by allowing receipt of a means-tested benefit to show inability to pay since, as commenters note, the income thresholds for some means-tested benefits vary by State and locality. Therefore, individuals who qualify for a means-tested benefit due to their higher cost of living may still qualify for a fee waiver, even if their household income is above 150 percent of the FPG. This concern is also mitigated for residents of Alaska and Hawaii, who have unique FPG charts.[178]

DHS believes that the benefits of using FPG outweigh those of HUD's median family income (MFI) when assessing an individual's ability to pay. Despite comments to the contrary, DHS believes it is important to have a consistent national standard for the

income threshold. Relying on a single, uniform standard reduces administrative costs in comparison to HUD's MFI, which would require requestors, legal service providers, and adjudicators to calculate fee waiver eligibility based on geographic area. Requestors often change their geographic location between filing for immigration benefits, and a consistent national standard would avoid potentially complicated inquiries into which geographic location is more appropriate in assessing their ability to pay. A consistent national standard also removes the incentive to misrepresent one's address to obtain a fee waiver. While DHS recognizes that MFI is used effectively for administering HUD's Federal programs and benefits, Department of Health and Human Services' (HHS) FPG is used more broadly throughout the Federal Government.[179] Using FPG also promotes internal consistency within USCIS since this measure is statutorily required for other eligibility determinations. *See* INA secs. 204(f)(4)(A)(ii) and 213A(h), 8 U.S.C. 1154(f)(4)(A)(ii) and 1183a(h). While DHS acknowledges that it is possible to mitigate confusion through training and public engagement, a more complicated legal determination will still tend to result in a higher rate of erroneous or lengthy filings and adjudications. Noting that many low-income requestors may lack access to legal assistance and face additional barriers to properly filing immigration forms, DHS believes that this population is better served by keeping the fee waiver process simple by using the FPG. Finally, DHS notes that using HUD MFI by State or county would not guarantee equitable results, since the cost of living can vary greatly within individual States and counties.

*Comment:* A commenter asked USCIS to begin using the Supplemental Poverty Measure (SPM) instead of the Federal Poverty Level (FPL) to determine who qualifies for a fee waiver, without explaining why the SPM is preferable. The commenter recommended that fee waivers be made available to any household earning less than 200 percent of the SPM.

*Response:* DHS declines to adopt the SPM for assessing eligibility for fee waivers because the SPM was not designed as a tool for assessing individual eligibility for public benefits. "The SPM is considered a research

---

[177] *See, e.g.,* Am. Council on Aging, "Medicaid Eligibility Income Chart by State", July 2023, *https://www.medicaidplanningassistance.org/medicaid-eligibility-income-chart/* (last updated July 10, 2023).

[178] U.S. Dept of Health & Human Servs., "HHS Poverty Guidelines for 2023," *https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines* (last visited Aug. 21, 2023).

[179] *See, e.g.,* Inst. for Research on Poverty, "What Are Poverty Thresholds And Poverty Guidelines?," *https://www.irp.wisc.edu/resources/what-are-poverty-thresholds-and-poverty-guidelines/* (last visited Aug. 14, 2023).

measure, because it is designed to be updated as techniques to quantify poverty and data sources improve over time, and because it was not intended to replace either official poverty statistics or eligibility criteria for anti-poverty assistance programs.'' [180] Determining whether a particular individual falls above or below the SPM would require a complex calculation of numerous factors that would increase administrative costs and be susceptible to error.[181]

*Comment:* A commenter noted that even though there is no requirement that an individual submit their taxes, USCIS routinely denies fee waivers based on applicants' statements, where taxes are unavailable, or where the taxes indicate the applicant is under the poverty threshold. Another commenter similarly stated that, in practice, fee waivers are mostly denied when sending in pay stubs or W–2 forms. The commenter further remarked that fee waiver adjudicators routinely request only a tax return be submitted to establish income. The commenter stated that the rule should more explicitly clarify that there is no requirement to submit a tax return to document fee waiver eligibility.

*Response:* DHS declines to modify the rule as recommended by the commenter because it is unnecessary. Per the revisions to Form I–912 published with this rule, an individual requesting a fee waiver may establish their household income through different forms of documentation, including Federal income tax returns, a W–2, or paystubs. USCIS denies fee waiver requests that are incomplete and does not issue RFEs for Form I–912. In FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6.

### c. Financial Hardship

*Comment:* A commenter remarked that fee waivers are ''almost impossible'' to obtain based on hardship, regardless of the quality or amount of documentation submitted to support such a request. Another commenter stated that requests for fee waivers

based on ''financial hardship'' for low-income and no-income individuals have been universally denied, without clarity provided as to the specific reasons for denial or what evidence would be considered sufficient.

*Response:* Although USCIS does not have approval or rejection data related to the specific criteria for fee waivers, DHS notes that in FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6. To help prevent erroneous denials of fee waiver requests based on financial hardship, the revised Form I–912 contains a non-exhaustive list of examples of causes of financial hardship. DHS intends to issue guidance clarifying that the burden of proof for inability to pay is a preponderance of the evidence, and that an officer may grant a request for fee waiver so long as the available documentation supports that the requestor is more likely than not unable to pay the fee. USCIS regularly trains its staff to avoid erroneous denials of fee waiver requests.

*Comment:* A commenter supported the proposal to provide USCIS officers a larger, non-exhaustive list of circumstances that may constitute a financial hardship. The commenter stated that its staff often receive fee waiver denials despite having provided evidence that clearly points to a significant financial hardship. The commenter said that, by adding such obvious forms of hardship as ''significant loss of work hours and wages,'' ''natural disaster,'' and ''victimization,'' DHS will provide much-needed guidance to both applicants and USCIS officers. In addition, the commenter stated that the proposal to include a catch-all category of hardship for ''[s]ituations that could not normally be expected in the regular course of life events'' will also provide applicants a more reliable basis on which to demonstrate that a particular event has led to hardship.

Another commenter also supported the proposed rule's suggested evidence of financial hardship, including an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation. The commenter recommended that such affidavits include those from legal aid agencies serving low-income populations, documenting their assessment that a requestor is low-income with minimal assets and consequently eligible for their free legal services. In addition, the commenter

said the term ''support services'' should be understood to include such legal services, as many legal aid agencies provide holistic services, which include helping clients access public benefits, health care, and housing. Moreover, the commenter said including legal services as ''support services'' would lead to more consistent adjudication of fee waiver requests for low-income applicants.

*Response:* DHS notes that, the current, proposed, and final instructions for Form I–912 permit that an affidavit describing the person's financial situation from a legal aid agency serving low-income populations may be acceptable evidence of a requestor's financial situation if they lack income. *See* 88 FR 402, 458 (Jan. 4, 2023) (''If the requestor is receiving support services, an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation.'').

*Comment:* One commenter suggested that mental or physical illness impacting an applicant's ability to work and pay the filing fee be explicitly included as a factor or incorporated into the proposed factors of ''victimization'' or ''situations that could not normally be expected in the regular course of life events.'' Otherwise, the rule could be read to exclude illnesses causing serious financial hardship and inability to pay filing fees if they are not an ''emergency or catastrophic.''

*Response:* Upon further review, DHS has incorporated this recommendation into the revised Form I–912 instructions. DHS believes that a mental or physical illness that impacts an individual's ability to work may amount to a similar level of financial hardship (depending on the individual's household income, financial assets, and other factors) as other examples listed in the form instructions, and therefore may qualify as a financial hardship with documentation of inability to work and information on income.

### d. Other/General Comments on Criteria and Burden of Proof

*Comment:* Several commenters stated that there are many people who do not qualify for fee waivers and do not have the financial means to afford the fees. Another commenter said, at a minimum, USCIS should offset the proposed fee increases by raising the eligibility threshold for fee waivers, and then provide means-tested fee waivers. Additionally, an individual commenter stated that underprivileged families

---

[180] Joseph Dalaker, Cong. Research Serv., R45031, ''The Supplemental Poverty Measure: Its Core Concepts, Development, and Use,'' (July 19, 2022), *https://crsreports.congress.gov/product/pdf/R/R45031#:~:text=The%20Supplemental%20Poverty%20Measure%20(SPM,a%20specified%20standard%20of%20living.*

[181] *See generally* Joseph Dalaker, Cong. Research Serv., R45031, ''The Supplemental Poverty Measure: Its Core Concepts, Development, and Use,'' (July 19, 2022), *https://crsreports.congress.gov/product/pdf/R/R45031#:~:text=The%20Supplemental%20Poverty%20Measure%20(SPM,a%20specified%20standard%20of%20living.*

should only have to pay a reduced fee or be given a fee waiver.

*Response:* DHS acknowledges commenters' concerns and believes that this final rule contains multiple provisions that increase the availability of fee waivers and reductions for those unable to pay. The rule codifies DHS policy guidance that a requestor will generally be found unable to pay if they receive a means-tested benefit, have a household income below 150 percent of the FPG, or are experiencing financial hardship. *See* 8 CFR 106.3(a)(1)(i). As discussed above, this rule broadens the ways that a requestor can establish eligibility through a fee waiver by allowing a household child's receipt of certain means-tested public benefits to demonstrate the parent's inability to pay. The final rule reduces the N–400 fee for applicants whose household income is less than or equal to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). The revised Form I–912 offers additional guidance on the types of evidence of financial hardship, which DHS believes will provide flexibility and reduce the burden for individuals seeking fee waivers. The form also clarifies when certain household members' income will not be considered in assessing whether a requestor is unable to pay. The final rule further addresses individuals' inability to pay by increasing the number of forms that are fee exempt. *See* Table 5B.

*Comment:* A couple of commenters supported DHS continuing to base inability to pay on a "range of evidentiary standards," including means-tested benefits, household income using the FPG, or financial hardship, but said such standards should not be applied categorically and must come with adequate guidance. The commenters said the current regulation provides insufficient guidance regarding evidence, given that many applicants for fee waivers are unlikely to have significant evidence, or the type of evidence USCIS requests to prove lack of income (as proving lack of income involves proving a negative). They said DHS should continue to allow officers to grant a request for a fee waiver in the absence of some of this documentation so long as the available documentation supports that the requestor is more likely than not unable to pay the fee, as allowed under the preponderance of the evidence standard. One of these commenters said more guidance should be provided regarding documentation, including training officers in the types of situations that, while they may not lend to written evidence that can be submitted to USCIS, support the need for a fee waiver as well as the

underlying humanitarian claim. The commenter said DHS should not only provide a list of possible evidence that includes both common proofs of financial need, such as taxes, pay stubs, and bills, but also informal types of acceptable evidence, such as written letters from roommates, affidavits from social or legal services organizations that condition services on lack of income, handwritten bills, and the like. Moreover, the commenter said DHS should also provide clear instructions that an officer can or should waive a fee upon a sworn statement from the applicant that they are a victim of abuse or exploitation. Another commenter said the rule should specify preferred and alternative types of evidence rather than mandatory evidence. Another commenter suggested USCIS clarify in the form instructions and guidance that these documents are non-exhaustive and that USCIS will consider other relevant evidence. A commenter stated fee waivers should be readily accessible with reasonable documentary requirements but did not specify what requirements they recommend.

*Response:* Under the current fee rule and USCIS policy, no type of evidence is categorically required to show eligibility for a fee waiver. The rule provides three different means of establishing eligibility to pay, *see* 8 CFR 106.3(a)(1)(i), and the Form I–912 instructions offer multiple examples of evidence that can be submitted in support of a fee waiver request. USCIS guidance will clarify that individuals seeking a fee waiver only have to establish eligibility by a preponderance of the evidence. *See* 88 FR 402, 458 (Jan. 4, 2023). However, DHS declines to adopt the commenter's recommended language that certain required documents are non-exhaustive, as this would be inappropriate for certain ways of proving inability to pay. For example, to confirm receipt of a means-tested benefit, a requestor is required to submit documentation that they are currently receiving a means-tested benefit that includes their name, the agency granting the benefit, type of benefit, and indication that the benefit is currently being received.

*Comment:* A couple of commenters wrote that they supported the implementation of more descriptive guidelines for the information collection requirements for the Form I–912. One commenter remarked that the new requirements are more realistic and flexible for applicants, reasoning that lower income applicants run into challenges when collecting documentation to support their fee waiver, for example by lacking a safe

place to store confidential information. The commenter further remarked that, coupled with the preponderance of the evidence standard, evidentiary guidance will also help potential applicants understand upfront whether they qualify for a fee waiver. Another commenter agreed with DHS broadening the list of documents that are sufficient to show that a person does not have any income—a circumstance that is frequently difficult to document—because it will reduce the documentary burden on applicants in the most precarious financial situations, while also reducing the burden on USCIS to review repeated fee waiver requests after denials.

*Response:* DHS appreciates the commenters' feedback.

*Comment:* A commenter stated that, while USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee, the rules provide no certainty even when the applicant provides the very types of inability-to-pay information identified in the regulations—applicants are merely "eligible" for a fee waiver if they meet the criteria. The commenter asked USCIS to modify the rule to clarify that "evidence of any of the three grounds is conclusive proof of eligibility for a fee waiver."

*Response:* DHS understands that the commenter wants more certainty for when a requestor will or will not have their fee waived, but we decline to adopt the commenter's proposal to treat any evidence of one of the three grounds as conclusive proof.

Even though the fee statute does not mention fee waivers, DHS has interpreted the discretion it vests in the agency to allow fee exemptions or waivers subject to certain conditions or criteria. Section 245(l)(7) of the INA requires DHS to permit certain requestors (those applying "for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of [Title 8]") to "*apply for*" fee waivers. 8 U.S.C. 1255(l)(7) (emphasis added). The statute, however, does not specify any standard for approving applications for such discretionary waivers.

In this rule, discretionary waivers of fees are limited to situations where the party requesting the benefit is unable to pay the prescribed fee. 8 CFR 106.3(a)(1)(i). A person can demonstrate an inability to pay the fee by establishing receipt of a means-tested benefit at the time of filing, household income at or below 150 percent of the

FPG at the time of filing, or extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee. 8 CFR 106.3(a)(1)(i). Finally, a person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form. 8 CFR 106.3(a)(2).

USCIS generally applies a burden of proof of preponderance of the evidence for the information provided with immigration benefit requests.[182] While DHS has increased the availability of fee waivers and clarified their requirements in this rule, it remains the requestor's burden to establish that they are more likely than not eligible for a fee waiver. *See* 88 FR 458. Because the fee statute does not specify any standard for approving applications for such discretionary waivers, DHS will retain the ability to determine that an individual who meets the fee waiver eligibility requirements does not merit a waiver in the exercise of discretion. *See* 8 CFR 106.3(a).

*Comment:* Commenters stated that DHS should modify its rules so that a fee waiver request would be automatically approved if not decided within 45 days.

*Response:* DHS declines to impose the commenter's deadline on USCIS adjudication of fee waiver requests. Imposing an arbitrary deadline on fee waiver reviews would require USCIS to allocate limited resources to prioritize fee waiver requests above most other adjudicative actions to prevent lost revenue and risk its ability to maintain adequate service levels. USCIS must retain the flexibility to assign resources where they are needed. Although USCIS received 532,417 fee waivers in FY 2022, an average of over 2,000 per workday, most fee waivers are adjudicated within 8 to 10 days at the Lockboxes and 90 percent are completed within 15 days. DHS acknowledges that some fee waiver requests took longer to adjudicate during the COVID–19 pandemic, but DHS is working diligently to deliver timely service.

*Comment:* Multiple commenters said fee waiver eligibility based on the stipulated bases should be incorporated into the regulatory text. A commenter said the preamble recites the current three grounds for fee waivers since 2010 but the actual proposed code section

only refers to inability to pay and does not specify these specific grounds. To prevent future confusion or interpretations, the commenter said the three grounds should be mentioned in the code itself since the preamble is not legally enforceable. Likewise, another commenter recommended that USCIS include the standards in the final rule so that they are codified and less susceptible to being modified by a future administration. The commenter said doing so would also formalize the adoption of such standards, which have been in use for over a decade. A commenter asked USCIS to incorporate the eligibility criteria into the Policy Manual at Volume 1, Part B, Chapter 4, as well as the proposed regulations.

*Response:* After considering the public comments, DHS has decided to codify the three means of demonstrating eligibility for a fee waiver at 8 CFR 106.3(a)(1)(i). USCIS intends to update the Policy Manual to reflect this when the final rule takes effect. However, while meeting any of the three criteria will make a requestor presumptively eligible for a fee waiver, USCIS will still retain the discretion to approve or deny a fee waiver. Denial of a fee waiver will result in rejection of a benefit request and neither the fee waiver denial nor the rejection may be appealed.

*Comment:* A commenter suggested that USCIS include receipt of financial aid through the Free Application for Federal Student Aid (FAFSA) as an additional way to prove eligibility for a fee waiver.

*Response:* DHS declines to adopt the commenter's proposal because there are many types of student financial aid obtainable by filing the FAFSA that do not reflect significant financial need and may not meet the definition of means-tested benefit as stated in this final rule, *see* 8 CFR 106.1(f)(3), such as grants, merit scholarships, and student loans.[183]

*Comment:* Multiple commenters recommended that USCIS adopt an appeals or formal review process for fee waiver denials.

*Response:* DHS also declines to adopt an appeals process for fee waiver denials because this would compound the time and costs of adjudicating fee-waivers and require that additional costs be transferred to fee-paying requestors. Those who believe that their fee waiver request was wrongfully denied may refile their request.

### 4. Authority

*Comment:* One commenter recommended that USCIS limit the Director of USCIS' discretion to authorize additional fee waivers, as put forth in the 2019/2020 fee rule. The commenter remarked that limiting such discretion is necessary to limit "politically motivated abuse" of fee waiver eligibility policies and protect fee-paying applicants from unfair cost increases to cover such abuse.

*Response:* This rule retains the feature of the prior 2019/2020 fee rule that permits the USCIS Director to delegate the discretionary fee waiver authority only to the USCIS Deputy Director.[184] USCIS declines to adopt the additional restrictions on discretionary waiver authority that were contained in the 2019/2020 fee rule. The commenter did not cite any past examples of "politically motivated abuse" of this discretionary authority. DHS believes that maintaining the authority for this extraordinary relief with the leaders of USCIS, coupled with the requirement that the authority only be exercised when consistent with the law, will ensure that it is administered consistently, timely, and responsibly.

### 5. Requiring Submission of Form I–912

*Comment:* Multiple commenters expressed concern that requiring the Form I–912 and not allowing applicants to make the request for a fee waiver via a written request would create an additional burden for applicants. One commenter requested that fee waivers remain expansive such that any written requests remain permitted. Some commenters asserted that, if an individual can successfully demonstrate the need for the fee waiver via a written request, USCIS should continue to accept them, and that requiring Form I–912 reduces flexibility for applicants with special circumstances. One commenter asserted that there would be a substantial time burden to complete the Form I–912 in lieu of an affidavit regarding their client's income and expenses, while another commented referred to fee waiver process as long and difficult." Another commenter said that printing, translating, completing, and sending the form requires additional costs that applicants who are in financial need likely do not have. Another commenter added that certain requestors may lack access to printers, internet services, or other infrastructure. The commenter also stated that the proposed Form I–912 is a complex nine-page form, with eleven pages of

---

[182] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual," Vol. 1, "General Policies and Procedures," Part E, "Adjudications," Chp. 4, "Burdens and Standards of Proof," *https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-4* (last updated Nov. 8, 2023).

[183] *See* U.S. Dep't of Educ., "Federal Student Aid, Types of Financial Aid: Loans, Grants, and Work-Study Programs," *https://studentaid.gov/understand-aid/types* (last visited Aug. 15, 2023).

[184] *Compare* 8 CFR 106.3(c), *with* 8 CFR 106.3(b) (Oct. 2, 2020).

instructions, and several of the form's questions may not apply to the requestor or require significant additional explanation that is better suited for an affidavit. The commenter added that requiring Form I–912 creates an unnecessary burden on pro se survivors, survivors with limited English proficiency, and high caseload service providers. A different commenter said the proposal places an undue burden especially on the most vulnerable groups who would otherwise qualify for immigration benefits. Other commenters said that requiring Form I–912 would disproportionally affect pro se applicants and those with limit English skills, and therefore allowing fee waiver requests without Form I–912 would align more closely with the "inability to pay" standard. Another commenter predicted that the proposed rule would require USCIS to scan and review extra pages of the Form I–912, and that USCIS would incur significant mailing costs due to rejections resulting from confusion around the complex form. One commenter asserted that allowing individuals to request a fee waiver via written request instead of Form I–912 would address the burden of COVID–19 on undocumented and immigrant communities that require access to forms to receive USCIS benefits.

*Response:* After considering public comments in response to the proposed requirement to submit Form I–912, DHS will continue to allow written statements in lieu of submitting Form I–912. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors, particularly those struggling financially. *See* 88 FR 402, 458 (Jan. 4, 2023).

DHS also recognizes that some requestors may experience an extra burden due to that printing, translating, completing, and sending the form requires additional costs that applicants, particularly those who are struggling financially. DHS also recognizes these applicants may need additional flexibilities, which may improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers currently are requested by written request instead of Form I–912, it is unlikely that continuing to allow written requests will significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to obtain a fee waiver by written request without filing Form I–912.

*Comment:* In response to the proposed rule's statement that more than 99 percent of fee waiver requested are submitted with Form I–912, multiple commenters stated it is preferable that the remaining requestors receive an RFE instead of a denial. These commenters suggested that these RFEs be accompanied by information related to the Form I–912 "as a means of proactively addressing potential confusion" regarding eligibility criteria. The commenters stated that this would be more consistent with E.O. 14012 and better facilitate access to immigration benefits.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. However, DHS will not issue RFEs in response to insufficient fee waiver requests. Holding and monitoring cases where an RFE was sent for a timely response would add burden to what is an already burdensome process for USCIS. USCIS will continue to review training and decision notices to improve adjudications of fee waivers and provide additional information for requestors.[185]

*Comment:* Multiple commenters recommended improvements to the Form I–912. One commenter stated that the form is inefficient and suggested reducing the number of unused pages by making them attachments rather than sections. Another commenter recommended that USCIS eliminate questions on the Form I–912 that are not relevant to fee waiver eligibility and ensure that supporting documentation is considered adequate. For example, the commenter suggested two questions be eliminated: Part 1, Question 2, which requests the applicant's immigrant or non-immigrant status; and Part 2, Question 6, which requests the applicant's Social Security number.

*Response:* DHS appreciates commenters' feedback regarding the length of Form I–912, Request for Fee Waiver. Depending on their ground of eligibility, as indicated on the form and instructions, requestors do not need to fill out every section of Form I–912. However, DHS does not believe that these unused sections, which can be easily skipped, create a substantial paperwork burden for requestors. Requiring requestors to locate and attach a separate addendum depending on their ground of eligibility could create a greater paperwork burden. DHS

notes that immigration status is relevant to eligibility because, for example, some fee waivers are specific to the requestor's immigration status. USCIS is revising the USCIS Form I–912 to reduce the time and cost burden to respondents. The Social Security number data field will be removed as part of those edits. DHS believes that a requestor's Social Security number no longer serves a purpose because Internal Revenue Service (IRS) tax return and tax account transcripts redact the filer's Social Security number. For further information on compliance with the Paperwork Reduction Act, see Section V.J of this preamble.

*Comment:* Another commenter wrote that low-income naturalization applicants who currently require a fee waiver are barred from applying for naturalization online because the Form I–912 cannot be filed online. The commenter stated as a matter of equity, both online and paper filings should be available to everyone, regardless of their income status. The commenter concluded that without an option for online filing of the Form I–912, paper filings for the Form N–400 would continue to cause inefficiencies.

*Response:* USCIS continues to work on incorporating Form I–912 and all forms into its online filing platforms.

*Comment:* A commenter stated that the Form I–912 is not statutorily required. The commenter further remarked that USCIS does not point to evidence that requiring Form I–912 for fee waiver requests produce more consistent results or relevant evidence in assisting fee waiver determinations.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. With regards to the assertions made by the commenter, DHS notes the following: The INA authorizes the Secretary to "prescribe such forms of [...] papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority." INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). The Form I–912 and other USCIS forms are used to solicit information relevant to benefit requests and facilitate standardized adjudication in a timely manner. As previously indicated, most requestors submit Form I–912 to request fee waivers. A 2019 paper showed that standardization of the fee waiver for citizenship applications in 2010 raised naturalization rates among low-income immigrants, and these gains were particularly sizable among those

---

[185] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Reduced Fee Request," *https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-reduced-fee-request* (last updated Oct. 31, 2023).

immigrants who typically face higher hurdles to accessing citizenship.[186]

*Comment:* A commenter recognized the need to create a more uniform policy for adjudicating requests for fee waivers. However, the commenter expressed concern that the list of expenses outlined in the Form I–912 fails to take into consideration necessary expenses often incurred by their clients and does not fairly represent their "inability to pay" the filing fees required. The commenter did not indicate what additional expenses should be included on the form.

*Response:* DHS interpreters this comment to refer to Part 6, Item 3 ("Total Monthly Expenses and Liabilities") of Form I–912. DHS notes that the list of expenses includes a check box for "other," and additional lines where requestors can list expenses not included in the list. Requestors can also include additional information about expenses in Part 11 ("Additional Information").

## 6. Evidence for VAWA, T, and U Requestors

*Comment:* Multiple commenters wrote in support of fee waivers for VAWA self-petitioners, as well as for T and U nonimmigrant status requestors. One commenter wrote that fee waivers help remove forms of coercion and control by human traffickers and abusive individuals by providing life-saving opportunities for victims of crime to escape these situations and access long-term stability. The commenter remarked that these benefits allow victims of crime to support law enforcement investigations that help prevent and punish serious crimes. Another commenter stated the importance of fee waivers as a tool for survivors to recover from financial abuse and that fee waivers make it possible for survivors to ensure their

safety or necessities when applying for immigration relief.

*Response:* DHS agrees that the availability of fee waivers and fee exemptions for vulnerable populations is important. DHS remains committed to the goals of its humanitarian programs and to providing fee waivers and fee exemptions for these populations as outlined in this final rule. *See* 8 CFR 106.3.

*Comment:* One commenter expressed support for USCIS' proposed clarification that an applicant is eligible for a fee waiver where they demonstrate inability to pay by a preponderance of the evidence. However, the commenter asked USCIS to adjudicate fee waiver requests for immigration benefits associated with or based on a pending or approved petition or application for VAWA benefits or T or U nonimmigrant status under the "any credible evidence" standard. The commenter concluded that the evidentiary standard for receipt of a fee waiver should not be more stringent than the evidentiary standard for the legal protections Congress created for survivors under VAWA and the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA).

*Response:* DHS acknowledges the difficulties that VAWA, T, and U requestors may face in obtaining evidence in support of fee waiver requests, which is why DHS has increased the number of fee-exempt forms for these groups in the final rule. *See* Table 5B; 8 CFR 106.3(b). For these fee-exempt requests, VAWA, T, and U requestors do not need to sustain any burden of proof to avoid paying a fee, which is consistent with the VTVPA. However, DHS believes that "preponderance of the evidence" remains the appropriate standard for adjudicating other fee waiver requests by VAWA, T, and U requestors. Most USCIS fee waiver requests involve naturalization and citizenship-based applications (N-Forms), which are filed multiple years after the requestor has received their protection-based form of relief and obtained LPR status. Mindful

of the difficulties that victim-based categories may continue to face in obtaining evidence to support fee waiver requests, DHS has provided flexibilities for VAWA, T, and U populations in requesting fee waivers. For example, the revised Form I–912 instructions issued with this rule provide that if a household member is an abuser or human trafficker, then their income will not be included in measuring the requestor's household income. In addition, the instructions also list victimization as an example of financial hardship causing a requestor to be unable to pay. Further, if a VAWA, T, or U requestor is unable to obtain documentation, they can explain why and submit other evidence to demonstrate their eligibility as provided in the Form I–912 instructions. However, the burden of proof remains on the individual who is requesting a fee waiver and DHS will not presume that a benefit request that is not already exempt from a fee should automatically receive a fee waiver.

## 7. Cost of Fee Waivers

*Comment:* One commenter stated that, in recent years, USCIS has transferred significant costs to fee-paying applicants and beneficiaries as the result of an overbroad fee waiver policy, and estimated foregone revenue has increased significantly. The commenter said that, in this proposed rule, DHS did not report how much revenue USCIS anticipates foregoing because of fee waiver projections.

*Response:* DHS believes that continued fee waivers for certain populations provides a crucial avenue for those who would have otherwise not been able to submit a request. Table 6 below summarizes historical fee waiver volume. Contrary to the commenter's assertion, waived fees as a proportion of IEFA revenue has been stable over time, and current levels are significantly below those in FYs 2015–2017. This does not demonstrate an overbroad fee waiver policy where waived fees have increased significantly.

---

[186] Vasil Yasenov, et al., "Standardizing the fee-waiver application increased naturalization rates of low-income immigrants," 116 (34) Proc. Nat'l Acad. Sci. U.S. 16768 (2019).

| FY | Receipts | Approvals | Denials | Waived Fees Estimate[188] | Percentage of IEFA Revenue |
|----|----------|-----------|---------|---------------------------|----------------------------|
| 2013 | 541,329 | 403,227 | 138,063 | $222,833,915 | 9% |
| 2014 | 572,835 | 457,576 | 115,163 | $248,726,775 | 10% |
| 2015 | 638,793 | 518,777 | 119,935 | $283,162,095 | 10% |
| 2016 | 753,402 | 627,959 | 125,118 | $344,293,760 | 12% |
| 2017 | 684,675 | 588,732 | 95,200 | $367,914,465 | 11% |
| 2018 | 535,412 | 460,821 | 74,616 | $293,494,715 | 9% |
| 2019 | 481,068 | 410,485 | 70,583 | $254,200,885 | 8% |
| 2020 | 406,112 | 329,571 | 76,543 | $207,677,895 | 6% |
| 2021 | 441,184 | 369,948 | 71,241 | $229,415,245 | 6% |
| 2022 | 532,417 | 448,702 | 83,616 | $246,603,960 | 7% |

Table 6. USCIS Fee Waiver Request Receipts, Approvals, and Denials, FY 2013 – FY 2022.[187]

*Comment:* A commenter requested that USCIS ensure that fee-paying applicants do not bear the costs of immigration benefit requests where fee waivers are inappropriate or unnecessary. The commenter recommended that USCIS adopt a different approach, consistent with the "beneficiary-pays" principle, that considers whether a fee waiver is either statutorily required or otherwise appropriate given the nature of the immigration benefit sought, particularly whether such beneficiaries are subject to the public charge ground of inadmissibility. The commenter wrote that INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, but that the

TVPRA requires DHS to permit fee waivers for certain applications. The commenter stated that USCIS should limit fee waivers to immigration benefits for which USCIS is required by law to consider a fee waiver, as was put forth in the 2019/2020 fee rule. They added that USCIS could allow fee waivers for humanitarian programs and applicants not subject to the public charge ground of inadmissibility or affidavit of support requirements under INA sec. 213A, 8 U.S.C. 1183a, including petitioners and recipients of Special Immigrant Juvenile (SIJ) classification and those classified as Special Immigrants based on an approved Form I–360. The commenter stated that USCIS should continue to preclude fee waivers from individuals that are required to have financial means for the status or benefit sought. Another commenter asserted that it is unfair that one out of eight petitions receive a fee exemption or waiver, and that humanitarian goals should be funded by Congress or DHS general appropriations rather than shifting lost revenue to other program fees.

*Response:* For reasons discussed in the proposed rule, *see* 88 FR 402, 424–426 (Jan. 4, 2023), and in section IV.C.4 of this preamble, DHS has decided to shift away from the beneficiary-pays model that was the primary objective of the 2019/2020 fee rule, and more toward the ability-to-pay approach that has historically guided USCIS fee schedules. While INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, the statute contemplates that DHS would

regularly do so for asylees and similarly situated classes of applicants. DHS considers this to be the more equitable approach in setting fees. In deciding which forms should be eligible for a fee waiver, DHS considered whether each waiver is statutorily required or otherwise appropriate given the nature of the immigration benefit sought, including whether the requestor would be subject to the public charge ground of inadmissibility. A fee waiver is unavailable in the case of immigration benefit requests that require demonstration of the applicant's ability to support themself, or that are based on a substantial financial investment by the petitioner.[189] Most fee-waivable forms involve humanitarian immigration categories in recognition of the financial difficulties faced by members of these groups.[190] DHS has generally made citizenship and naturalization forms eligible for waived and reduced fees in recognition of the social and economic benefits that the United States receives from new citizens.

---

[187] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Use of Fee Waivers, Fiscal Year 2023 Report to Congress" (June 20, 2023), *https://www.dhs.gov/sites/default/files/2023-08/23_0727_uscis_use_of_fee_waivers_q1.pdf.* Not all fee waiver applications are adjudicated in the same fiscal year that they are received. Likewise, not all approvals and denials occur in the same fiscal year in which a fee waiver request is filed. Thus, the number of approvals and denials does not equal fee waiver request receipts.

[188] Note that the budgetary impact of fee waivers is less than the total amount of waived fees, as it would be unreasonable to expect the same volume of filings absent the availability of fee waivers. Available USCIS fee waiver data lack the granularity necessary to delineate waived fees in cases of forms with multiple filing fees. The higher fee is assumed to estimate the waived fees. Additionally, the fee schedule change in December 2016 and the timing of fee waiver approvals may slightly skew FY 2017 waived fee estimates because of fee waiver adjudication timeframes (see footnote 16). Finally, automatic biometric services fee waivers associated with underlying forms that require biometrics are not captured adequately and are underreported.

[189] In 2007, regulations considerably limited which application types could apply for fee waivers from almost all of them to roughly one-third of them. *See* 72 FR 29851, 29874 (May 30, 2007). DHS made no changes to the types of applications that could apply for fee waivers in the 2010 and 2016 fee rules.

[190] While fee waivers are not generally available in employment-based cases, due to the unique circumstances present in the CNMI, an exception is Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, for an employer to petition on behalf of CW–1 nonimmigrant beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI). *See* 74 FR 55094, 55098 (Oct. 27, 2009).

8. Other Comments on Fee Waivers

*Comment:* A few commenters stated that the fee waiver process is lengthy or difficult. One commenter said that DHS should simplify the process for obtaining fee waivers to remove unnecessary barriers, without specifying how the process should be simplified or what barriers should be removed. Another commenter stated that the process of obtaining the requisite documentation to file a fee waiver request is difficult and delays the process of submitting applications by weeks or months. They also wrote that ability to work is often contingent upon obtaining certain immigration benefits, which creates financial hardship for applicants. Another commenter stated that fee waivers are not automatic and often add more time to an application, which negatively impacts immigrants in desperate situations.

*Response:* DHS acknowledges that obtaining a fee waiver requires the submission of evidence demonstrating the inability to pay that some requestors may find burdensome. Nevertheless, approving fee waivers without evidence of inability to pay would pose a fiscal risk to USCIS. Thus, DHS has decided that it will not approve fee waivers without determining the applicant is eligible under the fee waiver regulations. In this final rule, DHS has provided additional fee exemptions, *see* Table 5B, and updates to the Form I–912 for additional efficiencies and to minimize its burden, *see* 88 FR 402, 458 (Jan. 4, 2023). Form I–912 has an estimated time completion of one hour and ten minutes. USCIS strives to continually improve its case processing so that fee waivers can be adjudicated in a timely, effective manner while balancing access, affordability, and financial sustainability.

*Comment:* Multiple comments expressed concerns about the effect of denied fee waiver requests on application filing dates. One commenter recommended that USCIS treat the date that forms are received together with a fee waiver request as the official filing date ''for the Motion, Appeal or Case.'' The commenter asserted that current procedures and practices can result in denial of due process to indigent and low-income immigrants who seek fee waivers and recommended that USCIS should allow the applicant to recapture the initial filing date if they pay the required fee within 30 days of a fee waiver denial, which is similar to State courts' approach in civil or family cases. The commenter asserted that the USCIS' current approach violates VAWA confidentiality protections under 8

U.S.C. 1367 for immigrant crime victims because their cases are not logged as protected cases in USCIS systems until their fee waiver is granted. Another comment stated that USCIS' policy of not retaining a filing date for an application with a rejected fee waiver leads to low-income individuals facing difficult situations in which the only way to ensure an application will be filed before a relevant deadline is to pay a fee that they are financially unable to afford. Some commenters stated that denied Form I–730 petitioners often file the Form I–290B to seek reconsideration of erroneous denials. If the fee waiver for the Form I–290B is denied and the individual is unable to pay the fee, the individual is effectively denied the opportunity to contest the denial of the Form I–730, and the delay in process may result in the petitioner losing the option to resubmit the Form I–730 within the 2-year deadline.

*Response:* DHS considered all the suggestions made by these commenters but declines to adopt a policy of treating a denied fee waiver request as establishing a filing date for the underlying form for similar reasons that it does not accept an improperly filed Form I–130 or I–140 as establishing a priority date. *See* 8 CFR 204.1(b), 204.5(d). Were DHS to adopt such a policy, it would encourage the early filing of improperly completed forms to capture an advantageous filing or priority date. DHS regulations provide that the receipt date is the actual date of physical receipt at the location designated for filing such benefit request, with proper fee or approvable fee waiver request. 8 CFR 103.2(a)(7)(i). DHS disagrees that the regulation violates due process or 8 U.S.C. 1367 for a denied fee waiver request. In this final rule, DHS has further expanded the number of VAWA, T, and U-related forms that are fee exempt, *see* Table 5B, for which there will be no delay in applying protections under 8 U.S.C. 1367. For the remainder of VAWA, T, and U-related requests, the requestor should already be listed in USCIS systems as protected under 8 U.S.C. 1367. In the case of a Motion to Reopen for a denied Form I–730, Refugee/ Asylee Relative Petition, if the original, timely-filed Form I–290B, Notice of Appeal or Motion, is rejected due to a denied fee waiver request, USCIS may exercise its discretion to accept a subsequent, untimely Motion to Reopen. *See* 8 CFR 103.5(a)(1)(i). However, in the case of a Motion to Reconsider for a denied Form I–730, if the original, timely-filed Form I–290B is rejected due to a denied fee waiver request, USCIS

lacks discretion to accept a subsequent, untimely Motion to Reconsider. *See* 8 CFR 103.5(a)(1)(i).

*Comment:* Several commenters expressed concern over USCIS fee waiver denials, stating the following:

• Denials generally give no specific information as to why the applicant's evidence was deemed insufficient and is accompanied by boilerplate lists of evidence that may be submitted, even when the individual has submitted such evidence.

• Clearer fee waiver denials would decrease the volume of fee waiver requests and help with backlog and efficiency.

• Regulations should require fee waiver denials to provide some reasoning to specifically describe why the submitted evidence was not considered sufficient and what additional evidence would be deemed adequate for the application.

• Denials task the applicant with the impossibility of proving a negative by reiterating that tax filings and paystubs are proof of income, yet individuals with no income may have no income tax filings due to earning less than the IRS income tax filing threshold, nor paystubs during the period of unemployment.

*Response:* DHS acknowledges commenters' concerns that fee waiver denials do not receive a detailed, individualized denial letter. However, DHS must weigh this against the additional costs of individualized fee waiver denials and has decided to limit this cost in favor of the general expansion of fee exemptions and waivers contained in this rule. *See* Table 5B. As stated previously, USCIS receives over 2,000 fee waiver requests per workday and approves 84 percent of them. The current Form I–912 instructions allow requestors to provide evidence of lack of income by describing the situation that qualifies them for a fee waiver. The instructions also state that, if available, requestors may submit affidavits (*e.g.,* from religious institutions, nonprofits, community-based organizations, or similarly recognized organizations) indicating that the requestor is currently receiving some benefit or support from the organization verifying (or attesting) to their situation. DHS will continue to review the fee waiver process for areas that may be improved. In general, if a fee waiver request is denied, the form may be resubmitted without prejudice with additional documentation in support of the fee waiver or with the fees.

*Comment:* A few commenters said there is a lack of knowledge around fee

waiver eligibility and around the existence of fee waivers as a possibility for low-income individuals, which presents a barrier for those who are interested in applying for immigration benefits. The commenters stated that USCIS should accompany the proposed rule with public education efforts aimed at prospective applicants with clear, culturally sensitive, and multilingual information on fee waivers and the grounds for eligibility. The commenters further suggested USCIS include efforts used in the Interagency Strategy for Promoting Naturalization that was developed in E.O. 14012. Another commenter stated that creating more categories and avenues by which one can show proof for fee waivers does little if basic access and understanding on how to navigate forms is not there for the communities that need it most.

*Response:* DHS agrees that it is important to alert potential requestors to the existence of fee waivers. Every form instruction for which a fee waiver is possible notifies the requestor of their ability to request a fee waiver. USCIS is removing the option for a written request in this rule for the reasons stated earlier. However, USCIS will continue to provide information about fee waivers for all its forms and the reduced fee for Form N–400 on our website,[191] at stakeholder and public engagements and using other public education efforts. For example, USCIS routinely hosts local and virtual engagements on naturalization, in which we discuss fee waivers and the reduced N–400 fee.[192] The Form G–1055, Fee Schedule, also identifies which USCIS forms are eligible for a fee waiver.

*Comment:* A commenter asked USCIS to discontinue the different treatment of applications submitted with fees and with fee waivers. The commenter reasoned that their clients who request fee waivers often must wait noticeably longer than applicants who pay the filing fees to receive the receipt notices for their application. Moreover, the commenter stated, the delays in receipt notices has impeded their ability to

timely seek prosecutorial discretion for clients in removal proceedings based on their pending applications for relief before USCIS. The commenter concluded that this different treatment causes harm to their most vulnerable clients.

*Response:* USCIS strives to issue receipt notices in a timely manner for all forms. As discussed earlier in Section IV.E.4. of this preamble, USCIS adjudicates most fee waiver requests within days of receipt. However, it takes longer to issue a receipt for a form that is accompanied by a fee waiver request because fee payments clear almost immediately, while adjudicating the fee waiver request requires additional time to review the waiver request. This different treatment of fee waiver requests is justified by the additional processing steps that they require.

*Comment:* Commenters stated that USCIS should improve the fee waiver process by training adjudicators on fee waivers and otherwise addressing erroneous rejections and delays in issuing receipts.

*Response:* USCIS currently provides guidance and training to its officers on fee waivers. USCIS strives to continuously improve its training to reduce erroneous rejections and delays in receipts. DHS believes that codifying the rules for fee waiver eligibility and modifying the Form I–912 instructions will help to reduce erroneous rejections and delays.

*F. Fee Exemptions*

As discussed in the Changes from the Proposed Rule section, many commenters requested that DHS provide more fee exemptions and free services for humanitarian related benefit requests and DHS is providing more fee exemptions in the final rule. A summary of the current and new exemptions is provided above in Table 5A, 5B, and 5C.

1. Codification of Benefit Categories/ Classifications With Exemptions/No Fees

*Comment:* In the proposed rule DHS proposed to include several fee exemptions that are provided in guidance or form instructions or statute in the Code of Federal Regulations, although that action was not necessary for the exemptions to continue in effect. A couple of commenters generally expressed support for USCIS' proposal to codify fee exemptions in regulations without providing rationale to support this position. Another commenter wrote that the proposed codification of benefit requests with no fees and exemptions is in line with DHS's "best effort" to include the "benefits to the national

interest" when considering the fee schedule changes. Another commenter stated that codifying exemptions promotes stability and ease of access for applicants. One commenter further expressed appreciation for Tables 13A, B, and C in the proposed rule and suggested they be included in the final rule.

Some commenters welcomed the proposal to codify the fee exemption of Form I–360 for SIJs. The commenters reasoned that this population is particularly vulnerable, has no ability to work, and, therefore, lacks the financial means to pay fees for immigration benefit applications. The commenters further remarked that this codification would align with Congress' goal to protect vulnerable children when it created the SIJ classification.

A few commenters welcomed the codification of longstanding fee exemptions for those seeking humanitarian relief, including those applying for asylum, asylees, and refugees. Other commenters said the proposal to codify exemptions for these groups would be consistent with U.S. humanitarian values, as well as legal obligations under U.S. and international law to protect persons fleeing persecution. Multiple commenters welcomed DHS's proposal to codify in the regulations that there is no fee for Form I–589, Application for Asylum and for Withholding of Removal. A commenter wrote that they support the proposed codification, reasoning that it recognizes the importance of access to the asylum system, regardless of a person's financial situation. A couple of commenters stated that the codification would ensure that the United States remains among most parties to the 1951 Refugee Convention and 1967 Refugee protocol who do not charge a fee to apply for asylum. A few commenters wrote that the codification was welcome after the proposal to introduce a $50 asylum fee in the 2020 fee rule. A commenter stated that the previously proposed fee would have deterred those seeking protections afforded by Congress while creating vulnerabilities to trafficking and exploitation.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions in regulations and did not make any changes in this final rule based on these comments.

*Comment:* Several commenters welcomed DHS's plan to continue to provide a fee exemption for the initial filing of Form I–765 for asylees and those with pending asylum applications. One commenter agreed with DHS's determination that requiring a fee for the initial employment

---

[191] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Fee Waiver," *https:// www.uscis.gov/forms/filing-fees/additional- information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Fact Sheet: Request for Fee Waivers for Form N–400," *https:// www.uscis.gov/sites/default/files/document/fact- sheets/FactSheetI-912RequestforFeeWaiver ForFormN-400.pdf* (last visited Oct. 10, 2023).

[192] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Past Training Seminars," *https://www.uscis.gov/citizenship/ resources-for-educational-programs/register-for- training/uscis-past-training-seminars* (last updated Sept. 20, 2023).

authorization application would be unduly burdensome and would prevent some asylum seekers from obtaining lawful employment. Another commenter further reasoned that this approach aligns with the 1951 Convention Relating to the Status of Refugees, which requires ''sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals . . . .'' This commenter additionally wrote that providing fee-exempt access to employment authorization affords asylum seekers crucial opportunities to recover from trauma, pay for future immigration benefit fees, and access identification for physical and economic mobility. Another commenter further reasoned that access to employment authorization promotes children's health and well-being by providing protection from unsafe working conditions and exploitation as well as access to basic services.

Similarly, a couple of commenters expressed support for fee exemptions for persons admitted or paroled as refugees, including the proposed exemptions for EAD renewal and replacement, Form I–131, Application for Travel Document, and Form I–590, Registration for Classification as Refugee. One of the commenters agreed with DHS's reasoning that continuing to facilitate access to employment authorization and travel documents for those admitted or paroled as refugees is consistent with the 1951 Convention and 1967 Protocol. The commenter further reasoned that making travel documents accessible, which is not an overly costly or burdensome process for USCIS, reflects the reality of refugees who have a need to travel outside the United States for work or other purposes that support U.S. interests, but cannot do so if they unable to obtain a passport from the country from which they sought refuge.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions for refugee and asylees in regulation in this final rule.

*Comment:* A commenter wrote that Form G–1055 contains a typographical error that, if left uncorrected, would lead U nonimmigrants to erroneously believe they are fee exempt from an initial Form I–765 based on a concurrently filed or pending Form I–485. Specifically, the proposed Form G–1055 states that U nonimmigrants seeking to adjust status under INA sec. 245(m) will pay a $0 fee for an initial Form I–765 under category (c)(9), which the commenter said does not reflect the proposed regulation and preamble.

*Response:* Principal U nonimmigrants who are in the United States are exempt from fees associated with employment authorization when it is issued incident to status, and they are not required to file Form I–765, Application for Employment Authorization, to receive an EAD. *See* 88 FR 460; 8 CFR 214.14(c)(7). Principal U nonimmigrants who are outside the United States are fee exempt for fees associated with employment authorization issued incident to status once they enter the United States and file Form I–765 (initial request under 8 CFR 274a.12(a)(19) and (20)). *See* 88 FR 460. In the proposed rule, DHS proposed to expand fee exemptions for persons seeking or granted U nonimmigrant status for all forms filed before filing Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 460–461. As explained in section II.C.9 of this rule's preamble, DHS further expands fee exemptions in this final rule for persons seeking or granted U nonimmigrant status for all forms related to the U nonimmigrant status or adjustment of status under INA sec. 245(l), 8 U.S.C. 1255(l), including an initial Form I–765 for an EAD based on having a pending Form I–485. *See* 8 CFR 106.3(b)(5); Table 5B. DHS believes that these additional fee exemptions, as well as the publication of a final rule Form G–1055 Fee Schedule, mitigate the commenter's concerns.

*Comment:* A commenter discussed the current economic benefits of TPS, such as the tax revenue generated by TPS holders, and commended codifying the exemption for Form I–821 to secure the continuation of those benefits.

*Response:* DHS appreciates the commenter's support of the codification of the fee exemption for Form I–821, Application for Temporary Protected Status, when filed by a TPS holder seeking re-registration, *see* 8 CFR 106.2(a)(50)(ii), and did not make any changes in this final rule based on these comments.

### 2. Proposed Fee Exemptions

### a. General Support of Proposed Exemptions

*Comment:* Some commenters expressed general support for the proposed expansion of fee exemptions for certain humanitarian programs without further rationale.

*Response:* DHS maintains the fee exemptions as listed in the proposed rule and provides additional fee exemptions for certain humanitarian populations in this final rule. *See* Table 5B.

*Comment:* Many commenters expressed broad support for the various proposed fee exemptions for VAWA self-petitioners, U nonimmigrant status petitioners and T nonimmigrant status applicants, petitioners for SIJ classification, and other vulnerable populations. One commenter reasoned that the proposed exemptions would increase access to immigration relief for low-income survivors, and thus more completely achieve the goals of humanitarian programs to provide stability and safety from abuse.

Another commenter agreed with USCIS' assessment in the proposed rule that survivors of violence often experience financial abuse and have limited resources, even once they flee from their abusers. The commenter went on to cite research from DOJ, the Bureau of Justice Statistics (BJS), the Borgen Project, and others describing the relationship between domestic violence and financial hardship. Another commenter similarly cited research on the mental, psychological, financial, and legal challenges that survivors of violence face and stated that ensuring survivors' access to immigration benefits is essential to help them escape abusive situations and gain self-sufficiency following victimization.

Citing the INA and the legislative history of VAWA and T and U nonimmigrant status, a commenter said the expanded fee exemptions would align with legislative trends and congressional intent in creating protections for certain victims of crime. The commenter added that expanded access to fee exemptions is consistent with E.O. 14012. Another commenter wrote that the proposed exemptions would align with congressional intent while citing an October 11, 2000, statement from Senator Hatch and TVPRA. Another commenter similarly suggested that the proposed exemptions would align with congressional actions to protect victims of trafficking and abuse and asked USCIS to retain the exemptions in the final rule.

*Response:* DHS agrees that these populations are particularly vulnerable as victims of abuse or violence, and that, because of this victimization, many will lack the financial resources or employment authorization needed to pay for fees related to immigration benefits. DHS has maintained the proposed fee exemptions and provided additional fee exemptions for certain humanitarian populations in this final rule. *See* 8 CFR 106.3(b); Table 5B.

*Comment:* Numerous commenters agreed that expanded fee exemptions would eliminate the need for groups that disproportionately experience

financial hardship, and therefore already require a fee waiver, to apply for such waivers. One commenter added that the proposed exemptions would reduce the length of time that applicants for survivor-specific forms of relief would have to wait for a fee waiver to be adjudicated and a receipt notice issued.

Many commenters further reasoned that applying for fee waivers places undue burdens on vulnerable and pro se applicants to produce evidence and meet the filing requirements to obtain a favorable decision and access protections. For example, one commenter stated that many T nonimmigrant applicants lack evidence to support their fee waiver application, including tax forms, pay stubs, and bills in their own name. The commenter also described the harms for victims associated with waiver denials for failing to file proper forms or submit the desired evidence. Another commenter wrote that SIJs without LPR status do not qualify for means-tested benefits, and obtaining proper documentation of the receipt of benefits can be challenging for non-English-speaking populations navigating complex systems. The commenter added that, while fee waiver applications cost legal services providers time and resources to prepare and resubmit when needed, exemptions free up capacity for legal practitioners to prepare the merits of the immigration benefit case and assist more individuals seeking protections. Another commenter further stated that, particularly for vulnerable children who are almost always found eligible for a fee waiver, requesting a fee waiver is an unnecessary step that adds uncertainty to the application process. Another commenter reasoned that fee exemptions would ensure that vulnerable noncitizens do not forgo the opportunity to apply for humanitarian forms of relief.

One commenter, citing a 2016 Citizenship and Immigration Services (CIS) Ombudsman report on inconsistent fee waiver adjudications, said that the exemptions would avoid "arbitrary" fee waiver decisions that disproportionately affect vulnerable immigrant populations. Another commenter wrote that, in addition to reducing burdens associated with fee waivers, fee exemptions provide clarity for applicants and their families and allow them to better anticipate the costs of applying for protections. Multiple commenters wrote that eliminating the need to apply for a fee waiver through exemptions would in turn reduce administrative burdens and resources expended for USCIS to adjudicate

applications or engage in litigation arising from waiver rejections. Some commenters suggested that these efficiencies would allow USCIS to redirect staff resources away from processing and reviewing fee waiver requests toward adjudicating applications for humanitarian protection, and the resulting decrease in administrative burden to USCIS would mitigate erroneous denials and subsequent delays for survivors.

*Response:* DHS notes that this final rule maintains and codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship. *See* 8 CFR 106.3(a)(3). While not a change to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the commenters' concerns.

DHS agrees that there are costs to USCIS in adjudicating fee waivers beyond foregone revenue (*i.e.,* the total fees that fee-waived or fee-exempt requestors would have paid if they had paid the fees). DHS believes that replacing fee waivers with additional fee exemptions removes barriers for applicants who are similarly situated in terms of financial resources and employment prospects. In the proposed rule, DHS proposed fee exemptions for humanitarian populations, including VAWA self-petitioners and requestors for T and U nonimmigrant status, without reducing fee waiver availability. In this final rule, DHS provides additional fee exemptions for these populations as explained in section II.C.9.b. of this preamble.

DHS likewise expects a decrease in administrative burden associated with the processing of requests for fee waivers for categories of requestors that would no longer require a fee waiver because they will be fee exempt. DHS has not quantified the cost savings to USCIS associated with processing fee waiver requests, namely Form I–912. Furthermore, DHS's Regulatory Impact Analysis (RIA) estimates that the fee exemptions and reduction in fee waiver requests will result in quantifiable annual transfer payments from USCIS to the public and opportunity cost savings to the public from not completing and submitting a fee waiver request. *See* Regulatory Impact Analysis 3.P.

In general, where DHS has determined that immigration fees would inequitably impact the ability of those who may be less able to afford the

proposed fees to seek an immigration benefit for which they may be eligible, DHS has maintained fee exemptions, waivers, and reduced fees, and provided new fee exemptions to address accessibility and affordability. *See* 88 FR 402, 460–81 (Jan. 4, 2023).

b. T Nonimmigrants

*Comment:* A few commenters expressed support for the proposed change to exempt fees for all forms for T visa applicants, T nonimmigrants, and their derivatives through adjustment of status. One commenter agreed with USCIS' assessment that the proposal would help more victims of trafficking pursue immigration relief afforded to them by Congress. Another commenter wrote that the proposed rule would align with congressional intent under the TVPRA and international obligations under the Palermo Protocol.

*Response:* DHS appreciates the commenters' support of the proposed fee exemptions for T visa applicants, T nonimmigrants, and their derivatives, and finalizes these fee exemptions in this final rule. *See* 8 CFR 106.3(b)(2); Table 5C.

c. U Nonimmigrants

*Comment:* Commenters expressed support for expanded fee exemptions for petitioners for U nonimmigrant status because the combined associated fees to obtain protection prohibit many otherwise eligible petitioners from pursuing U nonimmigrant status. The commenters said the proposed rule would allow petitioners to pursue U nonimmigrant status more expeditiously while saving nonprofit agencies' time.

Other commenters wrote that they had concerns about the effects on U-nonimmigrants, specifically:

• U-nonimmigrants applying for adjustment of status should also be eligible for the same fee exemptions as T and VAWA adjustment applicants.

• U nonimmigrants are similarly situated to T nonimmigrants and VAWA self-petitioners because U nonimmigrants are vulnerable and have suffered similar harm and abuse, which impacts their physical, mental, and financial health due to ongoing trauma. The increased I–485 fee will be even more difficult for U nonimmigrants to cover.

• The higher volume of petitioners for U nonimmigrant status did not justify fewer fee exemptions because both groups remain vulnerable populations, and there are many more refugees than either U visa petitioners or T visa applicants, and it undermines DHS's ability-to-pay philosophy and

perpetuates barriers for vulnerable applicants for humanitarian relief.

• The fees would be prohibitively expensive for U nonimmigrants and VAWA self-petitioners, and total filing fees (I–485, I–765, and I–131) for a family of four would be more than 25 percent of the median annual household income ($44,666), not counting the cost of medical exams or attorney fees.

• Requiring U nonimmigrants and VAWA self-petitioners to pay the filing fees or submit fee waiver requests would be a significant drain on USCIS' limited staff and resources. Providing additional fee exemptions only for certain categories of vulnerable populations is ''arbitrary'' or ''unjustified.''

• A maximum of 10,000 U–1 nonimmigrants become eligible to file Form I–485 each year, and therefore fee exemptions for U nonimmigrant adjustment of status applications would have a minimal impact when considering all the fee generating cases filed each year with USCIS.

• The longer period of employment authorization available to U nonimmigrants compared to T nonimmigrants did not justify their disparate treatment because U nonimmigrants may be unable to work because of trauma and physical injuries.

• USCIS should provide further explanation as to why U nonimmigrants would be treated differently than T nonimmigrants and VAWA self-petitioners with regards to adjustment of status fees.

• DHS has not provided information on the level of the costs that would need to be shifted to other paying applicants if Form I–485 were fee exempted for U nonimmigrants, or the policy considerations counseling against such a shift of costs.

• U nonimmigrants who are victims of domestic abuse may lack income or savings after leaving the abusive situation and may only be able to obtain employment in low-wage positions with no benefits due to language barriers, lack of education and work experience, and the impact of trauma.

• Most petitioners for U nonimmigrant status cannot afford the Form I–485 filing fee despite a bona fide determination (BFD) or a grant of U nonimmigrant status, particularly those adjusting as whole family groups (U–1 and derivatives).

• Not all U nonimmigrant petitioners receive employment authorization through the BFD process, and the absence of a BFD process for T nonimmigrant status applicants, contrary to the T nonimmigrant status regulations, does not support the failure

to extend similar fee exemptions to U nonimmigrants.

• T visa holders may qualify for ''continuous presence,'' which allows for employment authorization, and they may receive refugee services from resettlement agencies.

• Even after obtaining employment authorization, U visa victims experience barriers to securing long term employment and earning capacity to pay for adjustment of status fees, and that the criminal proceedings tied to a U visa holder's victimization may not be completed within the 15-year wait between the receipt of employment authorization and the ability to adjust status. Participation in the labor force does not guarantee a rise out of poverty, according to a 2022 study from the Migration Policy Institute finding that more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year in 2019.

• Fee waivers are an insufficient substitute for fee exemptions because the small amount of money saved by USCIS limiting fee exemptions in this respect would not be worth the harm imposed on applicants. U nonimmigrant applicants will also lack the evidence needed for fee waivers. Fee waivers will endanger victims and their children by delaying access to the confidentiality protections victims receive when cases are considered filed and given an 8 U.S.C. 1367 flag in the Central Index System, which does not occur until the fee waiver has been adjudicated.

• Requiring U nonimmigrants to file a fee waiver increases the time that pro bono attorneys must dedicate to their cases.

• Adjudicating fee waivers increases administrative burden on USCIS, and fee waivers for U nonimmigrants and their children applying for adjustment of status ignores dynamics of domestic violence, sexual assault, coercion, and child abuse.

• Victims experience physical, economic, and psychological abuse years after leaving their abuser, including during the adjustment of status stage.

*Response:* DHS acknowledges that T and U nonimmigrants are both vulnerable populations that merit special consideration. After considering the comments, comparing these two victim populations, and weighing options to recover the costs of USCIS, DHS has decided to no longer treat T and U nonimmigrants differently with regard to fee exemptions in this final rule. In addition, DHS has expanded fee exemptions for U petitioners and U nonimmigrants to include Forms I–131,

I–192, I–193, I–290B, I–485, I–539, I–601, I–765 (adding renewal and replacement requests), I–824, and I–929. *See* 8 CFR 106.3(b)(5); Table 5B.

Although U nonimmigrants may possess employment authorization for a longer time than T nonimmigrants (88 FR 402, 461, Jan. 4, 2023) the impact of victimization can be lasting and far-reaching, even after the events giving rise to U nonimmigrant status eligibility have concluded.[193] Due to victimization, T and U nonimmigrants face similar employment and financial challenges, which justify similar fee exemptions. Expanding fee exemptions for U nonimmigrants could have resulted in higher fees to other fee payers because of the large number of U nonimmigrants who file Form I–485 and related forms.[194] However, rather than increase fees further than in the proposed rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. DHS has determined that the humanitarian nature of these programs warrants special consideration when weighed against the transfer of costs to other petitioners and applicants. DHS acknowledges the administrative burden placed on U petitioners and U nonimmigrants, as well as USCIS, by requiring fee waiver requests for this sizeable population, of whom a significant portion may be eligible for fee waivers but struggle to produce supporting documentation due to circumstances resulting from victimization.[195] The changes made in this final rule account for the similar financial circumstances of T and U nonimmigrants, the likelihood that U nonimmigrants would qualify for fee waivers, and the burden reduction in providing fee exemptions to U

---

[193] However, DHS disagrees with the commenter's characterization of the results of the 2022 study from the Migration Policy Institute (MPI). The commenter wrote that in 2019 more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year. However, the MPI report showed that 20 percent of full-time, year-round working immigrants made less than $25,000 a year. *See* Gelatt, et al, ''A Profile of Low-Income Immigrants in the United States,'' Figure 11, Migration Policy Institute (Nov. 2022) available at *https://www.migrationpolicy.org/sites/default/files/publications/mpi_low-income-immigrants-factsheet_final.pdf.*

[194] The fiscal year limit of 10,000 U visas only applies to U–1 principals and not to derivatives. *See* INA sec. 214(p)(2)(B), 8 U.S.C. 1184(p)(2)(B).

[195] However, with regards to certain forms, such as Form I–485, DHS disagrees that fee waivers may delay confidentiality protections for victims of crimes, since the applicant's protection will already be recognized in USCIS systems following approval of their Form I–918, Petition for U Nonimmigrant Status, or Form I–929.

nonimmigrants for Form I–485 and related forms.

### d. VAWA Self-Petitioners

*Comment:* A commenter expressed support for maintaining fee waivers for survivors seeking adjustment of status such as VAWA self-petitioners who are not filing concurrent I–360s and I–485s and conditional residents seeking waivers of joint filing requirements based on battery or extreme cruelty. Similarly, another commenter expressed support for streamlining the application process for vulnerable populations by providing fee exemptions.

Commenters expressed support for DHS's proposal to exempt certain VAWA-related application fees. A commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status. Another commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status.

However, some commenters wrote of concerns about fee exemptions and waivers for VAWA-based applications as follows:

• USCIS should exempt VAWA applicants from all fees through adjustment of status, regardless of whether Form I–485 was filed concurrently with Form I–360.

• USCIS should provide consistent fee exemptions for Forms I–485, I–212, I–601, and I–131 because this would reduce the significant burden on immigrant survivors who may face risks in having to gather the documents needed to support fee waivers.

• The proposed categories of exemptions were arbitrary and would create confusion, especially amongst pro se applicants who may be unaware of their ability to file concurrently.

• The proposed I–485 fees would be prohibitively expensive for VAWA self-petitioners who file their I–485 separately, and paying the fees could leave them vulnerable to debt and victimization.

• Some VAWA self-petitioners are ineligible to file their I–485 concurrently with the I–360, including self-petitioning spouses and children of LPRs who do not have current priority dates. As a result, this population of

self-petitioners would be unable to access a fee exemption for the I–485.

• Other situations exist where a VAWA self-petitioner may be unable to file or face difficulty filing their I–485 concurrently, including certain noncitizens who are in removal proceedings or have an outstanding order of removal; those with derivative children who will age out soon; those who need to file the I–360 quickly to obtain financial independence; or those whose I–130 was converted to a I–360 self-petition.

• It "strains logic" to deny fee exemptions and instead require fee waivers for VAWA self-petitioners where most will qualify for fee waivers.

• VAWA self-petitioners, VAWA cancellation of removal applicants, and battered spouse waiver applicants are amongst the victim cases that receive the most fee waivers and the fewest exemptions, and VAWA self-petitioner and derivative children should receive the same access to fee exemptions as SIJ children.

• Foreign-born spouses and children experience higher rates of abuse when the abuser is a U.S. citizen or LPR.

• Requiring some VAWA self-petitioners to pay the filing fees or submit fee waiver requests for form I–485 would drain USCIS' limited resources to investigate the status of the underlying I–360 to determine whether each form I–485 is fee exempt or if the application includes the proper filing fee or a fee waiver request.

*Response:* DHS acknowledges that VAWA self-petitioners are a particularly vulnerable population as victims of abuse who may not have the financial resources or access to their finances needed to pay for fees when initially filing for immigrant classification, adjustment of status, and associated forms.

DHS also acknowledges that for some VAWA self-petitioners, the ability to file Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and Form I–485 concurrently is beyond their control. As noted by the commenters, some VAWA self-petitioners are limited by visa priority dates, some are in removal proceedings or have an outstanding order of removal, and some may be the beneficiary of a Form I–130, Petition for Alien Relative, petition that was converted to a Form I–360 self-petition. DHS also acknowledges that in some situations the individual's need for safety puts them in a difficult position of deciding whether to pursue immigration benefits when they may not qualify for a fee exemption because they are not able to file Form I–360 and Form I–485 concurrently. Additionally,

VAWA self-petitioners may face challenges in obtaining evidence in support of fee waiver requests, adding a greater burden to the requestor in filing Form I–912. This burden to requestors, combined with the administrative burden to USCIS in processing a high volume of requests for these individuals, many of whom would qualify for a fee waiver, justify exempting VAWA self-petitioners from fees. Considering the benefit to VAWA self-petitioners and USCIS, as well as the humanitarian nature of this program, DHS has codified the fee exemptions in the proposed rule and incorporated additional fee exemptions in the final rule to include applications for adjustment of status and associated ancillary forms, regardless of whether they are filed concurrently with the VAWA Form I–360 self-petition. *See* 106.3(b)(6); Table 5B.

*Comment:* A commenter expressed concern that, under the new regulation, there would be no fee exemption for Form I–765s filed by a VAWA I–485 applicant. The commenter stated that, under current Form I–360 processing times, VAWA self-petitioners would have to wait 2 years and 8 months to obtain a fee exempt EAD. The commenter emphasized that these documents are often essential for a domestic violence survivor's recovery and future.

*Response:* DHS acknowledges the commenter's concerns regarding the availability employment authorization. For reasons discussed earlier, DHS has provided additional fee exemptions for VAWA self-petitioners in this final rule, including Form I–765 renewal and replacement requests after Form I–485 is filed. *See* 8 CFR 106.3(b)(6); Table 5B.

*Comment:* One commenter raised concerns that a fee exemption for Form I–601 Waiver of Inadmissibility in VAWA cases would only be available if the form is filed concurrently with Form I–485.

*Response:* DHS acknowledges the commenter's concerns regarding the availability of a fee exemption for Form I–601 for VAWA self-petitioners. As explained in section II.C.9 of this preamble, DHS expands fee exemptions in this final rule for VAWA self-petitioners to include Form I–601 filed by individuals who did not concurrently file Form I–360 and Form I–485. *See* 8 CFR 106.3(b)(6); Table 5B.

### e. Iraqi and Afghan Special Immigrants

*Comment:* A commenter wrote that they supported fee exemptions for Iraqi and Afghan special immigrant visa (SIV) and military applicants. Another commenter welcomed the expanded fee

exemptions for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF to all forms associated with filings from initial status filing through final adjudication of the adjustment of status application. The commenter reasoned that Afghans face financial hardships that prevent them from accessing the benefits that Congress intended to provide this population. The commenter further wrote that the exemptions would reduce the burdens on those who support Afghans, including military, veteran, faith, and other communities.

*Response:* DHS appreciates the support for fee exemptions for Iraqi and Afghan SIV and military applicants. As explained in section II.C.9 DHS further notes that in this final rule it has expanded fee exemptions for this group to include Form I–765 (renewal, and replacement request); Form I–290B (only if filed for any benefit request filed before adjusting status or for Form I–485 and in associated ancillary forms) and Form I–824. *See* Table 5B and 8 CFR 106.3(b)(3).

On August 29, 2021, President Biden directed the DHS to lead implementation of ongoing efforts across the government to support vulnerable Afghan nationals, including those who worked alongside the U.S. government in Afghanistan for the past two decades, as they safely resettle in the United States. These coordinated efforts are known as OAW, now transitioning to Operation Enduring Welcome (OEW). CBP has exercised its discretion to parole many Afghan nationals, on a case-by-case basis, into the United States for urgent humanitarian reasons. Further, the Department of State (DOS) continues to coordinate the travel of Afghan nationals to the United States. Many Afghan nationals are also applying to USCIS for immigration benefits such as parole, employment authorization, Afghan special immigrant status, lawful permanent residence, waivers of inadmissibility, asylum, TPS, and family-based petitions.

As we transition into OEW, helping Afghan nationals who are now U.S. citizens and LPRs bring their family members who are still in grave danger in Afghanistan out and into safety is an Administration priority. USCIS will continue to support family reunification by exempting certain fees and using the funds Congress appropriated for efforts under OAW and OEW.

Form I–824 is used to request further action on a previously approved application or petition. A spouse or unmarried child younger than 21 years following to join a principal immigrant may receive the same special immigrant classification as a principal Afghan special immigrant. Some the Afghan LPRs who adjusted status as Afghan special immigrant (SIV LPRs) under the OAW effort are now seeking follow-to-join immigration benefits for their spouse and eligible children outside the United States. To permit a spouse and eligible children to apply for an immigrant visa with DOS, an Afghan SIV LPR must file a Form I–824 asking USCIS to notify DOS of the principal Afghan special immigrant's adjustment of status in the United States.

USCIS is legally required to exempt this fee for Afghan SIVs under section 602(b)(4)(C) of the Afghan Allies Protection Act (8 U.S.C. 1101 note), which prohibits any fees ''in connection with an application for, or issuance of, an [Afghan SIV].'' DHS believes allowing a fee exemption for all Afghan SIV LPRs' Form I–824 filing fee will also help the continuing resettlement efforts and reunite separated family members under OAW and OEW.

### f. Special Immigrant Juveniles (SIJs)

*Comment:* A few commenters expressed support for the proposed exemptions for all forms associated with SIJ classification through final adjudication of the adjustment of status application. Citing obligations under international agreements, one commenter concluded that the proposed exemptions would represent a crucial step toward upholding international best practices related to neglected, abused, or exploited children who lack the necessary permanence, benefits, and protections to thrive. Another commenter wrote that SIJs are court-dependent; that they have experienced abuse, neglect, or abandonment; and that such exemptions would help youth achieve stability and self-sufficiency. Finally, the commenter recommended that USCIS make it clear that the rule would eliminate SIJs' application fees for any forms filed by SIJ petitioners or recipients before adjustment of status, in the event of future changes to immigration law and policy.

*Response:* DHS appreciates the support for fee exemptions for SIJs. As DHS explains in section II.C.9, it has expanded fee exemptions for this group to include Form I–290B (if filed for any ancillary forms associated with Form I–485). *See* Table 5B; 8 CFR 106.3(b)(3). DHS believes these regulations as written address the commenter's

concerns, but we note that this rule does not preclude any future changes to immigration law and regulations. This rule therefore also does not prevent changes based on future changes in law or regulations.

*Comment:* Multiple commenters expressed support for the proposed fee exemptions for SIJ petitioners and SIJ classified noncitizens, but also recommended extending the fee exemption to any Form I–765 filed by an SIJ petitioner, even if not associated with a pending application to adjust status. The commenters stated that this would help children who have been granted SIJ-based deferred action who apply for or renew employment authorization under the (c)(14) category while awaiting visa availability. A commenter also stated that this would help mitigate delays and reduce burden on USCIS.

*Response:* DHS appreciates commenters' feedback regarding the rule's fee exemptions for those seeking or granted SIJ classification, but believes these comments are based on a misreading of the proposed rule. The proposed and final rule exempts fees for any Form I–765 filed by a person seeking or granted SIJ classification, regardless of whether they have filed a Form I–485. *Compare* 8 CFR 106.3(b)(1)(v), *with* proposed 8 CFR 106.3(b)(1)(v). DHS believes that the rule, as drafted, makes this sufficiently clear and has therefore not made any changes in this final rule.

### g. Asylees and Refugees

*Comment:* Commenters expressed appreciation for the proposed fee exemptions for refugees submitting Form I–131 and for refugees submitting Form I–765 to renew or replace their EAD because such exemptions are consistent with the 1951 Refugee Convention and Congress's recognition that refugees are more likely than other immigrant populations to lack economic security and require support on their path to self-sufficiency. Another commenter similarly expressed support for USCIS' proposed fee exemptions for Form I–131 for persons admitted or paroled as refugees. Another commenter wrote that the cost burden should not be shifted to account for additional exemptions, and DHS should eliminate the refugee fee exemption for Form I–131, because a refugee with an ability to travel internationally can pay for Form I–131. The commenter also wrote that there is less justification for the I–131 fee exemption for refugees because those who possess the means to travel internationally should be able to pay the I–131 fee.

*Response:* DHS makes no changes in the final rule based on these comments. Consistent with congressional intent to provide refugees with support and assistance on their path to self-sufficiency, DHS has a long history of offering refugee travel documents at reduced cost. *See* 75 FR 58972; *see also* INA sec. 207(c)(3) (public charge ground of inadmissibility in INA sec. 212(a)(4) does not apply to refugees); *see also* INA sec. 412, 8 U.S.C. 1522 (authorizing a variety of benefits and services for refugees). DHS aligns with this long-standing policy in providing a fee exemption for refugees filing Form I–131. Furthermore, as explained in the proposed rule, the increase in other fees resulting from exempting refugees from paying the fee for Form I–131 is marginal. *See* 88 FR 495.

*Comment:* Regarding fees for asylum applicants and asylees, commenters wrote the following:

• Add fee exemption for asylum-based Form I–765 renewal and replacement requests.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–730. Form I–730 is the only vehicle for family reunification for asylees and refugees. I–730 petitioners have motion rights via the I–290B but no appellate rights and can only challenge a denied family reunification petition with an I–290B filed within 33 days of a denial. I–730 petitioners must file within two years of arrival as a refugee or grant of asylum and as a result are new arrivals to the United States and are categorically economically disadvantaged. The form I–730 itself is fee exempt. Most I–730 petitioners are likely to be fee waiver eligible, and so the I–290B form should be exempt from a fee in this category. Fee waiver eligibility for the I–290B is not sufficient because the asylee or refugee petitioner whose fee waiver application is denied is then time-barred from motioning to reopen or reconsider the I–730, since the rejection of an application for an insufficient fee or fee waiver application takes more than the 33-day period within which a petitioner can challenge the denial of the I–730. Considering that the proposed rule would make Form I–290B fee exempt for every other humanitarian category of noncitizen contemplated in the proposed rule, adding fee exemptions for asylees and refugees for these benefits in the final rule would constitute a logical outgrowth of the proposed regulation.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–485.

• Extend fee exemption for Form I–131 for asylees.

• Eliminate proposed fee exemption for refugees filing Form I–131.

• Asylees should not be treated differently from their humanitarian counterparts with respect to fee exemptions.

• DHS should exempt fees for all asylum-related benefits through adjustment of status.

• Add a fee exemption for Form I–485 for Asylum-based applicants. The same legal definition of a refugee applies to asylees, and that both vulnerable populations who face economic hardship, are eligible for public assistance, and are not subject to the public charge ground of inadmissibility. The proposed rule justifies new fee exemptions for refugees because refugees are not subject to the public charge ground of inadmissibility and because refugees have access to federally funded assistance. However, the same is true of asylees, and DHS does not explain why these justifications should not also lead to new fee exemptions for asylees.

• Justification for exempting fees related to humanitarian classifications— that the underlying status is fee-exempt and such applicants face economic hardships—apply equally to asylees.

• The proposed I–485 fee, along with the cost of a medical exam, would be prohibitively expensive.

• The rule "disingenuously" frames the I–589 fee exemption as a new benefit for asylum seekers even though this does not differ from the current fee schedule.

• Disagree that refugees are distinguishable from asylees because refugees are required to adjust status within one year while asylees are not required to do so, stating that most refugees do not in fact apply for adjustment one year after their admission.

• Asylees seek to adjust status as soon as possible to obtain stability for themselves and their family members.

• It is unfair to expect asylees to delay filing certain applications given the harmful impact that such delays will have on their ability to achieve stability, security, and family reunification; neither asylees nor refugees have gained sufficient financial security in their first year in such status in the United States to be able to afford the adjustment application fee.

• Asylum seekers often have little or no resources and experience ongoing financial hardship after a grant of asylum.

• Disagree that the large number of asylees justifies the differences in fee exemptions between refugees and asylees because the large number of asylees demonstrates a need to reduce barriers to permanent resident status for this vulnerable population.

• Providing fee exemptions for asylee I–485s could improve efficiency, since under the current rules some families can only afford to file one application at a time. This can cause derivatives to file *nunc pro tunc* I–589s before adjusting status if the principal asylee naturalizes or the derivatives ceases to meet the definition of a spouse or child before they adjust status.

• USCIS should reverse the 2020 rule and eliminate the asylum fee in the proposed rule which avoids the issues caused by prior proposed rules.

• DHS should codify fee exemptions for all forms filed by asylees through adjustment and family reunification because asylum seekers and recent asylees are vulnerable to exploitation and trafficking.

• DHS should exempt asylees from fees for a refugee travel document and that, if the I–131 fee was truly linked to the DOS fee for a U.S. passport, it would be one-tenth of the price because, unlike a ten-year passport, a refugee travel document is only valid for one year.

• Exempting fees for renewal Forms I–765 would benefit asylees and their communities through the ability to maintain employment and unexpired identity documents.

*Response:* Form I–589, Application for Asylum and for Withholding of Removal is fee exempt for all filers. *See* 8 CFR 106.2(a)(28). Asylees are exempted from the fees for Form I–602, Application by Refugee for Waiver of Inadmissibility Grounds, Form I–730, Refugee/Asylee Relative Petition and Form I–765, Application for Employment Authorization (initial request by asylees and initial request by asylum applicants). Most forms used by asylum applicants or asylees are already fee exempt or fee-waiver eligible. 8 CFR 106.3(b). DHS considered the views of the commenters, and the number of asylum-based filings made each year and decided that the transfer of the costs of such filings to other petitions and applications would result in an excessive shift to other fee payers. DHS acknowledges that additional fee exemptions for asylees could reduce financial burden on these applicants. DHS will continue to exempt the initial Form I–765 fee for persons with pending asylum applications. *See* 8 CFR 106.2(a)(43)(iii)(D) and (G).[196] DHS will

---

[196] Except for individuals applying under special procedures under the settlement agreement reached in *American Baptist Churches* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991).

also fee exempt applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum) for initial filings of Form I–765. *See* proposed 8 CFR 106.2(a)(4)(iii)(D) and (G).

DHS has decided to not exempt asylees from paying the fee for Form I–131 for refugee travel documents or advance parole (although at the lower passport fee level) [197] and Form I–485 for adjustment of status. Although asylees and refugees are in some respects similarly situated populations, refugees are required to apply to adjust status after they have been physically present in the United States for at least one year, while asylees are not required to apply for adjustment of status within a certain period. Therefore, DHS decided to not shift the costs of adjudicating requests from asylees for adjustment of status, refugee travel documents and advance parole to all or certain other fee payers. Asylees filing Forms I–485 and I–131 have the option to either pay the fees or request a fee waiver. DHS disagrees that the sole considerations for providing a fee exemption are that the underlying status is fee exempt and the requestors historically face economic hardships. As explained throughout this preamble, DHS exercises its discretionary authority to provide fee exemptions for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to the requestor and to USCIS, as well as humanitarian considerations and other policy objectives as supported by data. Though DHS may consider the similar circumstances of different categories of requestors in providing a fee exemption, as with VAWA, T nonimmigrant status, and U nonimmigrant status, whether the benefit request is submitted by populations with similar characteristics is not solely determinative of whether DHS provides a fee exemption. DHS disagrees that refugees and asylees should be provided the same fee exemptions simply because the two groups share similar characteristics. There are distinguishing characteristics between refugees and asylees. *See* INA 209, 8 U.S.C. 1159. Also, the population of asylees has far outnumbered the population of refugees in recent

years.[198] DHS believes that these differences in circumstance, in conjunction with the transfer of costs to other fee-paying benefit requestors, justifies providing certain fee exemptions for refugees and not for asylees because, overall, asylees are better able to time the filing of Form I–485 or an associated benefit request with their ability to pay the fees or request a fee waiver. DHS maintains this position in this final rule.

DHS disagrees that any potential decrease in *nunc pro tunc* filings of Form I–589 would reduce burdens to USCIS to such a degree that would justify the cost of this fee exemption. In FY 2022, of the total 41,160 Form I–589 filings, approximately 92 applications (0.2 percent) were filed *nunc pro tunc.* In the same year, Form I–485s filed by asylees accounted for 57,029 of the annual total of 608,734 Form I–485s filed (9 percent). Considering the 5-year annual averages of total Form I–485 filings (551,594) and fee-paying Form I–485 filings (471,625), on average, 85 percent of all Form I–485s are fee-paying. While not a direct comparison, the commenter's suggestion would result in additional forgone revenue on tens of thousands of Form I–485s to reduce *nunc pro tunc* I–589 filings that number less than 100 annually. Thus, the commenter's assertion that the additional fee exemption would reduce burden to USCIS is not supported by data and DHS declines to adopt the commenter's suggestion.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–730. DHS recognizes that we are providing a fee exemption for a Form I–290B filed by other populations in this final rule that have characteristics that resemble the population that files Form I–730. However, USCIS Form I–290B fee payment data indicates that affordability or accessibility has not generally been a problem for this population. Most individuals filing Form I–290B in association with a Form I–730 during FY 2019 through FY 2022 paid the filing fee. During this period, USCIS received a total of 376 Form I–290Bs filed in association with a Form I–730. Of those, only 57 (15 percent) were fee waived

while 269 (72 percent) paid the full fee. Additionally, rejections were low and decreased over time. Of the 376 total filings, 50 (13 percent) were rejected, with no rejections occurring in FY 2021 and only two occurring in FY 2022. The demonstrably low demand for fee waivers, combined with the low incidence of rejection, does not support the need for a fee exemption for this population. Additionally, DHS addresses the public's concerns regarding fee waiver adjudication as discussed earlier in this preamble by codifying eligibility requirements and providing clarifying guidance.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–485. The commenters did not provide any explanation as to why specifically form I–485 filed by a refugee or asylee should be entitled to a fee-exempt I–290B. Refugee-based I–485s are fee exempt and asylum-based I–485s are eligible for fee waiver, such that re-filing does not pose economic obstacles to economically disadvantaged refugee and asylee adjustment applicants.

DHS does not adopt the commenter's recommendation that the fee for asylees filing Form I–131 be prorated in accordance with the validity period of the refugee travel document relative to the 10-year passport. Consistent with U.S. treaty obligations, DHS does not charge a fee for a Refugee Travel Document that is greater than the fee charged for a U.S. passport.[199] This final rule sets the fee for Refugee Travel Documents using Form I–131, Application for Travel Document, at an amount which is far less than the Refugee Travel Document fee-paying unit cost [200] and equivalent to the current U.S. passport fee.[201] The requirement to match the fees is not related to the effective period that a requestor may use either document. In

[197] The fee for refugee travel documents is set at the same level as the fee for a U.S. passport consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees. *See* 8 CFR 106.2(a)(7)(i) and (ii).

[198] For example, in fiscal years 2019–2021, 48,888, 30,964, and 17,692 individuals respectively received asylum status, whereas 29,916, 11,840, and 11,454 individuals were admitted as refugees. *See* U.S. Dep't of Homeland Security, Office of Immigration Statistics, Annual Flow Report, Refugees and Asylees: 2021, available at *https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.*

[199] *See* Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees; 8 CFR 106.2(a)(7)(i) and (ii).

[200] *Compare* Table 1, *with* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4. The fee-paying unit cost for I–131 Refugee Travel Document is $535.

[201] At the time of this rulemaking, the DOS passport fees for a U.S. Passport Book consist of a $130 application fee and a $35 execution (acceptance) fee, for a total of $165. Children under 16 applying for a U.S. Passport Book pay a $100 application fee and a $35 execution (acceptance) fee, for a total of $135. *See* U.S. Department of State—Bureau of Consular Affairs, "U.S. Passports," "Passport Fees," available at *https://travel.state.gov/content/travel/en/passports/how-apply/fees.html* (last viewed Sept. 15, 2023).

general, DHS does not set fees to reflect an estimated monetary value of a benefit during its validity period. As explained earlier in this preamble, DHS charges fees at a level to ''ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.''[202] In this final rule, DHS maintains that the fee for asylees filing Form I–131 to request a refugee travel document will be kept below cost and consistent with the U.S. passport fee, increasing from $135 to $165. *See* Table 1.

h. TPS

*Comment:* Commenters asked USCIS to retain the fee exemption for Form I–765 filed by initial TPS applicants under age 14 and over age 65 because:

• An EAD might be the only identification available to an unaccompanied child and it plays a vital role in securing critical support.

• Increasing fees on children and retired or disabled adults is inconsistent with the balancing of equities cited throughout the proposed rule.

• These applicants would be required to seek a fee waiver with each application.

*Response:* DHS recognizes commenters' concerns but believes that our rationale in the proposed rule remains valid and not retaining the Form I–765 fee exemption for TPS applicants below age 14 and above age 65 is the best policy choice. There continues to be no fee for Form I–821 TPS re-registration and fee waivers are available for Form I–765 and initial Form I–821 for eligible applicants. *See* 8 CFR 106.3(a)(3).

As explained in the proposed rule, USCIS no longer requires TPS applicants to file Form I–765 for information collection purposes, and only requires it if the TPS applicant wants an EAD. Persons applying for TPS who do not wish to request employment authorization need only file Form I–821. The reason that the INS fee exempted a Form I–765 filed by initial TPS applicants under age 14 and over age 65 from a fee no longer exists. *See* 88 FR 463. Thus, DHS will maintain that all TPS applicants requesting employment authorization must pay the filing fee for Form I–765 or request a fee waiver.

i. Requests for Additional Fee Exemptions

*Comment:* Multiple commenters recommended that USCIS exempt fees for all survivor or victim-based applications because poverty and barriers to financial resources are felt across all survivor-based immigration categories. The commenter also stated that immigrant survivors often face additional financial burdens and safety risks when they try to gather documents needed to support fee waivers that might be controlled by abusers or exploitative employers.

One commenter recommended that DHS should exempt application fees for all forms of humanitarian relief through adjustment of status, since these populations face similar obstacles. The commenter added that DHS should provide a fee exemption for I–765 renewal and replacement applications for all humanitarian relief holders, including those based on a pending application for adjustment of status. The commenter stated that gaps in employment authorization can result in job loss. The commenter said that exempting humanitarian applicants from paying these fees would streamline the volume of fee waiver requests to adjudicate, lower personnel cost, and help ensure the continued economic independence of survivors.

*Response:* DHS acknowledges the commenters' concerns regarding the financial burden to individuals seeking survivor or victim-based immigration benefits. DHS weighed these considerations given the commenters' feedback against the number of VAWA-, T-, and U-related filings it receives each year and the transfer of costs to other petitions and applications if these filings were fee exempt through final adjudication of the adjustment of status application and emphasizes the benefit to survivors in providing additional fee exemptions, as well as the humanitarian nature of these programs, in this final rule. As a result, DHS provides additional fee exemptions in the final rule for VAWA, T nonimmigrant, and U nonimmigrant populations to include adjustment of status and associated forms. *See* 106.3(b)(6); *see also* Table 5B.

DHS declines to provide fee exemptions for all humanitarian categories of requestors for all forms filed through adjustment of status, as suggested by the commenter. DHS also notes that requests for humanitarian relief such as asylum (Form I–589), T nonimmigrant (Form I–914), U nonimmigrant (Form I–918), or VAWA self-petition (Form I–360), are fee

exempt. In this final rule DHS provides fee exemptions and fee waiver eligibility for forms filed through adjustment and associated ancillary forms by certain humanitarian categories of requestors consistent with our fee-setting approach as explained in this preamble.

DHS disagrees with the commenter's characterization of the provision of additional fee exemptions for certain humanitarian categories as ''arbitrary'' or ''unjustified'' as it applies to the proposed rule and this final rule. As described throughout this preamble, DHS maintains fee waivers, reduces fees, and provides new fee exemptions to address accessibility and affordability where DHS has determined that a different approach would inequitably impact the ability of those who may be less able to afford the fees to seek an immigration benefit for which they may be eligible. DHS believes this final rule represents our best effort to balance access, affordability, equity, and national interest while providing USCIS with the funding necessary to maintain adequate services.

*Comment:* One commenter stated that DHS should make I–765 applications filed under category (c)(14) fee exempt for victims and witnesses of workplace exploitation. The commenter said that applicants requesting employment authorization under this category will have either suffered or witnessed workplace abuse and will be at risk of termination or retaliation by their abusive employers, and some may also have recently lost their jobs or may be owed back wages. The commenter added that, because this basis for requesting deferred action and employment authorization is new, the anticipated volume of these requests will be low and will not materially burden USCIS if the fees for these Form I–765s are exempted.

*Response:* On October 12, 2021, DHS issued a Policy Statement in support of the worksite enforcement efforts being conducted by the Department of Labor (DOL) in conjunction with other government agencies. The goal of DHS's policy is to ensure that we maximize the impact through policy and practices that will reduce the demand for illegal employment and help noncitizens navigate the USCIS process. Noncitizens who fall within the scope of a labor agency investigation and have been granted deferred action may be eligible for deferred action-based employment authorization (Form I–765 (C14). However, the C14 employment classification is not unique to these applicants. For this reason, DHS declines to fee exempt the C14 classification for Form I–765. However,

---

[202] *See* INA sec. 286(m), 8 U.S.C. 1356(m). The longstanding interpretation of DHS is that the ''including'' clause in section 286(m) does not constrain DHS's fee authority under the statute. The ''including'' clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

DHS has expanded the availability of fee waivers to ensure that the most vulnerable applicants are able to access the relief that they need. *See* 8 CFR 106.3.(a)(3)(ii)(E).[203]

*Comment:* Some commenters stated that it is unclear if Form I–824 would be fee exempt for certain humanitarian categories, and USCIS should make it exempt for SIVs, U, T, VAWA, asylees, and refugees. Other commenters said that Form I–824 should be free because it is used when USCIS has made a mistake.

*Response:* DHS appreciates the commenters' concern that the proposed fee exemptions for Form I–824 lacked clarity. In this final rule, DHS provides a fee exemption for T visa applicants and T nonimmigrants, U visa petitioners and U nonimmigrants, VAWA, abused spouses and children categories, and SIVs for Form I–824. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide a fee exemption for Form I–824 for asylees and refugees as these populations may not use this form.

*Comment:* One commenter stated that for immigrant victims of crime and abuse eligible for humanitarian immigration relief, including T nonimmigrant status, U nonimmigrant status, relief under VAWA (including Form I–751s), CAA, HRIFA, and the Nicaraguan Adjustment and Central American Relief Act (NACARA), VAWA cancellation of removal, VAWA suspension of deportation, and SIJ classification, the Form I—290B should be fee exempt. The commenter explained that requiring indigent immigrants to file a fee waiver for this form highlights the problematic approach USCIS has historically taken to fee waiver requests that impedes due process and cuts off low-income immigrant crime victims from immigration relief they would otherwise be able to receive. Similarly, other commenters expressed concern with the exclusion of Form I–290B appeals of U-based adjustment of status from the fee exemption provisions. Another commenter stated that limiting fee exemptions for VAWA self-petitioners filing I–290Bs to when the I–485 and I–360 are concurrently filed limits due process and access to justice solely based on administrative technicality.

Multiple commenters stated that the Form I–290B should be exempt for refugees and asylees to the same extent that it is for other humanitarian immigration categories, though some also stated that Form I–290B need not be fee exempt for every benefit sought by an asylee or refugee. Commenters asserted that Form I–290B should be fee exempt when filed in connection Form I–730. One commenter emphasized that the I–730 is the only vehicle for family reunification for asylees and refugees, while another said that the lack of a fee exemption would result in numerous petitioners each year suffering the devastating consequences of family separation.

Additional commenters stated that adding fee exemptions for I–290Bs filed by asylees and refugees would constitute a logical outgrowth of the proposed regulation, which eases the fee burden on most humanitarian categories of requestors. The comments said that DHS should offset the cost of the I–290B fee exemption for refugees and asylees when filed in connection with the I–730 by retaining the fee requirement for I–131s filed by refugees because refugees with an ability to travel internationally presumably have an ability to pay for the I–131 and do not have the ''presumptive'' economic hardship that justifies other fee exemptions for this population.

*Response:* In this final rule, DHS provides a fee exemption for Form I–290B if it is filed for a motion or appeal of a denial of any benefit request before adjusting status or for Form I–485 and associated ancillary forms for the following humanitarian categories: T and U nonimmigrant status, VAWA, abused spouses and children adjusting status under CAA and HRIFA, SIV, and SIJ. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide additional fee exemptions for asylees and refugees in this final rule for the reasons discussed elsewhere in this preamble.

*Comment:* Some commenters recommended that DHS create fee exemptions for Form N–400s in certain situations, specifically:

• There should be an automatic fee waiver for all Form N–400 applicants with Form N–648 that meets the requirements for the medical certificate for disability exceptions.

• DHS should also provide fee exemptions for naturalization applications filed by refugees because the Refugee Convention calls on participants to facilitate the assimilation and naturalization of refugees as far as possible, and that DHS is obligated to ensure that the increased naturalization fees do not hinder the naturalization of refugees.

*Response:* DHS appreciates that many applicants filing Form N–648, Medical Certification for Disability Exceptions, may be unable to pay the Form N–400, Application for Naturalization, filing fee but declines to provide a general fee exemption in this situation. Fee-exemption eligibility must be determined at the time a form is received by USCIS. The adjudication of Form N–648 is performed at the time of the N–400 interview after an Immigration Services Officer (ISO) has verified that the N–648 relates to the applicant.[204] USCIS would be unable to determine whether the Form N–648 meets the requirements before exempting the Form N–400 fee. Furthermore, were USCIS to adjudicate Form N–648 at the time of receipt, before Form N–400, this would still require a full review of the applicant's A-file.[205] Because the ISO adjudicating the N–400 would be required to perform another full review of the applicant's A-file,[206] this would result in an inefficient duplication of USCIS efforts. In addition, not all applicants filing Form N–648 are unable to pay the Form N–400 fee. Form N–648 does not have any fee and applicants can still request a fee waiver or reduced-fee Form N–400 ($380) if they are unable to pay the online filing fee of $710, a $50 savings over the paper-based filing fee of $760.

Currently, refugees are provided fee exemptions for their immediate needs upon arrival and generally would not be eligible for naturalization until 5 years after entry into the United States. DHS believes that at the time refugees are for applying for naturalization they may be employed and able to pay fees. Additionally, the Refugee Convention calls on States to facilitate the assimilation and naturalization of refugees; however, fee exemptions are not a requirement under the Convention. Article 34 of the Refugee Convention states in part that States shall make every effort to reduce the cost of naturalization proceedings.[207]

---

[203] *See* DHS, ''Policy Statement 065–06: Worksite Enforcement: The strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual,'' available at *https://www.dhs.gov/sites/default/files/publications/memo_from_secretary_mayorkas_on_worksite_enforcement.pdf* (last viewed Sept. 1, 2023).

[204] *See* USCIS, ''USCIS Policy Manual,'' Vol. 12, ''Citizenship & Naturalization,'' Part E, ''English & Civics Testing & Exceptions,'' Chp. 3, ''Medical Disability Exception (Form N–648)'' [12 USCIS–PM E.3], available at *https://www.uscis.gov/policy-manual/volume-12-part-e-chapter-3* (last visited Aug. 25, 2023).

[205] *Id.*

[206] USCIS, ''USCIS Policy Manual,'' Vol. 12, ''Citizenship & Naturalization,'' Part B, ''Naturalization Examination,'' Chp. 3, ''Naturalization Interview,'' Section B, ''Preliminary Review of Application'' [12 USCIS–PM B.3(B)], available at *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-3* (last visited Aug. 25, 2023).

[207] While the United States is not a party to the 1951 Refugee Convention, it is party to the 1967
Continued

**6276** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

Although DHS has decided not to extend fee exemptions for naturalization to refugees, USCIS offers reduced fee options, and some applicants may be eligible for fee waivers.

*G. Fee Changes by Benefit Category*

1. General Fee Provisions

a. Fee Payment and Receipt Requirements

*Comment:* A commenter stated that applicants should retain the right to request credit card refunds, stating that this is one of the few means of recourse applicants have when facing apparently non-responsive government services. They stated that barring credit card disputes would diminish government transparency. A commenter stated that, where USCIS error prejudices individuals, filing fees should be refunded. A commenter wrote that the USCIS fee structure may confuse applicants and recommended that USCIS send a follow-up invoice rather than reject applications submitted with incomplete fees.

*Response:* USCIS is committed to meeting its processing time goals and reducing the immigration benefit request processing backlog. USCIS acknowledges that since it last adjusted fees in FY 2016, USCIS has experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29851, 29858–29859 (May 30, 2007). Processing delays have contributed to case processing backlogs. However, with the high volume of submissions that USCIS continues to experience, steps that may delay adjudication of a request or require special handling, such as holding cases while USCIS bills for unpaid or partially unpaid fees, would only exacerbate backlogs. Therefore, USCIS fees generally are non-refundable and must be paid when the benefit request is filed. *See* 8 CFR 103.2(a).

As explained in the proposed rule, credit card disputes are generally filed by requestors whose requests have been denied, who have changed their mind about their requests, or who have asserted that the service was not provided or was unreasonably delayed. *See* 88 FR 402, 483–484 (Jan. 4, 2023). USCIS makes its no-refund policy clear on its website.[208] Filing and biometric service fees are final and non-refundable, regardless of any action

USCIS takes on an application, petition, or request, or if requestors withdraw a request. However, when USCIS receives a payment in error, it may refund it. For example, USCIS refunds fees for Form I–131, Application for Travel Document, when erroneously paid for humanitarian parole on behalf of a beneficiary who is a Ukrainian citizen.[209] USCIS provides other examples on its website.[210] Often, USCIS has processed the request to completion and performed the work for which the fee was charged when the credit card dispute is lodged. DHS understands that no one wants to be determined ineligible and denied when they complete, submit, and pay for an immigration benefit request. However, DHS is authorized to charge fees to cover the cost of adjudicating requests and paying a fee is not a guarantee of a particular outcome.

USCIS also has fee payments withdrawn due to credit card disputes after the request is approved. When certain benefit request fee payments are dishonored or declined, or where an approved applicant successfully disputes their USCIS fee payment with their credit or debit card company, USCIS may send the requester an invoice for the unpaid fee. However, USCIS will generally send the requester a notice of intent to revoke (NOIR) the approval for the payment deficiency. The NOIR usually results in the amount due being paid, but if not, USCIS may revoke the approved benefit request. *See* 8 CFR 103.7(a)(2)(iii).

USCIS data indicates that the credit card dispute process defaults to the consumer, and it has become a popular method for credit card holders whose immigration benefit requests are denied and delayed getting their money back. When USCIS performs services for which a fee has not been paid, such as when a chargeback of the fee payment occurs, the costs incurred result in a drain on IEFA reserves that are meant for other uses. Longstanding DHS regulations at 8 CFR 103.2(a)(1) provide that fees paid to USCIS for immigration benefit requests will not be refunded regardless of the result of the benefit

request or how much time the adjudication requires. Consistent with that limitation, DHS proposed that fees paid to USCIS using a credit or debit card are not subject to dispute by the cardholder or charge-back by the issuing financial institution. *See* 8 CFR 106.1(e). USCIS is almost entirely fee funded. If every customer who experiences delays or is denied a benefit would be able to successfully dispute their USCIS fee payment with their credit card company, it could impose significant financial harm on USCIS. As stated elsewhere in this preamble, USCIS is working to reduce processing delays, and we have reduced the budget to be recovered by fees in this final rule as a result of increased efficiencies. DHS declines to make any changes to the final rule in response to these comments.

In addition, DHS is adding a clarifying provision to its regulations at 8 CFR 103.2(a)(7) governing the submission of benefit requests to ameliorate the risks that may result from the changes being made in the final rule. DHS is adding several fee discounts, fee waiver eligibility and fee exemptions in this final rule to address the concerns of commenters about the negative impacts of the new fees on low income, small employer, nonprofit, military, elderly, and young requestors. *See* 8 CFR 106.3(b) (new exemptions); 8 CFR 106.2(a)(3), (4), (11), and (c)(13) (discounts for small employers and nonprofits); 8 CFR 106.2(a)(3) & (4) (Form I–129 fee discounts); 8 CFR 106.2(a)(20)(ii) (child's fee for Form I–485, Application to Register Permanent Residence or Adjust Status); 8 CFR 106.2(b)(3)(ii) (discount for Form N–400, Application for Naturalization); 8 CFR 106.2(a)(32) and (46) (adoption fee exemptions); 8 CFR 106.2(b)(7)(ii) and (8) (adoption fee exemptions). USCIS will review the filing to determine if the requestor qualifies for a fee waiver, fee exemption, or lower fee when the request is received. However, to protect USCIS from requestors that may submit a lower fee for which they may not qualify and that USCIS may not catch at intake, DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied with the correct fee, USCIS may deny the request. 8 CFR 103.2(a)(7)(ii)(D)(1); *see also* 88 FR 402, 481–482. Further, because USCIS may adjudicate certain requests in a few days, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.*

*Comment:* Commenters opposed the proposal to allow USCIS to require that

Refugee Protocol, under which States agree to apply articles 2 through 34 of the Convention. *See* Protocol relating to the Status of Refugees art. 1, Dec. 16, 1966, 19 U.S.T. 6223.

[208] *See* USCIS, Filing Fees, available at *https://www.uscis.gov/forms/paying-uscis-fees* (last viewed on Sept. 22, 2022).

[209] *See* USCIS, Uniting for Ukraine, *https://www.uscis.gov/ukraine* (last reviewed/updated: June 1, 2023).

[210] *E.g.,* USCIS, USCIS Removes Biometrics Requirement for Form I–526E, Immigrant Petition by Regional Center Investor, petitioners, *https://www.uscis.gov/newsroom/alerts/uscis-removes-biometrics-requirement-for-form-i-526e-petitioners* (last reviewed/updated: Mar. 15, 2023); USCIS, Certain Petitioners for U Nonimmigrant Status May Receive a Refund for Applications for Employment Authorization Submitted Before Sept. 30, 2021, *https://www.uscis.gov/newsroom/alerts/certain-petitioners-for-u-nonimmigrant-status-may-receive-a-refund-for-applications-for-employment* (last reviewed/updated: Nov. 22, 2021).

certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method. *See* 8 CFR 106.1(b). The commenters stated that this could disallow payment methods such as cashier's checks or money orders, to the detriment of low-income applicants and petitioners who may not have internet access, U.S. bank accounts, established credit-scores, or access to reloadable debit cards necessary for some forms of payment. The commenters requested that USCIS accept cashier's checks and money orders as methods of payment for all applications, petitions, and requests. Some stated that access to internet and prepaid debit cards is limited for low-income applicants. Some stated that USCIS should not rely on public libraries to meet the need for internet access because of libraries' under-utilization. A commenter requested that any changes to acceptable payment methods should be accompanied with a widespread notice to the public of this change and a grace period to facilitate smooth processing and promote overall fairness.

A commenter stated that Form G–1450 payments are often improperly rejected even when all the information supplied is correct and legible and USCIS should allow submission of cashier's checks and money orders. Commenters also requested that Form I–140 and I–907 fees be payable from outside of the United States. A commenter suggested that a single check or money order be sufficient for all fees related to a single application to simplify returning funds from a money order.

*Response:* In this final rule, DHS does not restrict the method of payment for any immigration benefit request. This final rule clarifies the authority for DHS to prescribe certain types of payments for specific immigration benefits or methods of submission. DHS does not have data specific to USCIS benefit requestors' access to the internet or banking but understands that populations submitting requests may have attributes that make access to a bank account challenging. DHS acknowledges that some requestors may not use banks or use them on a limited basis for several reasons. It appears, however, that a person can alternatively purchase a pre-paid debit card, cashier check or money order that can be used to pay their benefit request fee.[211] In

addition, since 2018, requesters have been able to use a credit card to pay for a USCIS form filing fee that gets sent to and processed by one of the USCIS lockboxes or, for credit card transactions that do not exceed the limits set forth in the Treasury Financial Manual, split the fees between more than one credit card.[212] More recently, USCIS expanded a pilot program that allows credit card payments for service center filings.[213] The credit card used does not have to be the applicant's; however, the person who is the owner of the credit card must authorize use of his or her credit card. In addition, comments that libraries are underused indicate they remain available for free online services, access to information and computers that the public may use to read, complete, print or submit benefit requests. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

Regarding public notice, proposed changes to USCIS forms and instructions are typically published in the **Federal Register** for notice and comment. When USCIS finalizes a revised form, there is typically a grace period or advance notice before customers are required to use a revised version of the form. USCIS announces these changes on its website. When DHS expands or limits acceptable instruments locally, nationwide, or for certain USCIS benefit requests, it issues multiple communications and provides sufficient advance public notice to minimize adverse effects on any person who may have plans to pay using methods that may no longer be accepted.[214] Nevertheless, in response to the public comments and to provide more certainty to stakeholders, DHS has codified a 30-day advance public notification requirement before a

payment method will be changed. 8 CFR 106.1(b).

b. Biometric Services

*Comment:* A few commenters wrote support for eliminating the separation of biometrics fees from the fee associated with their underlying application. Commenters wrote:

• Combining fees would reduce confusion and promote efficiency.

• They supported including biometric fees but disagreed that doing so would lower fees overall.

• A commenter requested an online scheduling system for biometric appointments.

• They recommended reusing immutable or persistent biometrics, especially for highly iterative applications with shorter grant periods biometrics to mitigate administrative burdens.

• No fee should be paid when biometrics are reused.

A few commenters opposed absorbing the biometric services fee into other fees, stating:

• Not everyone is required to submit biometrics and people should not be required to pay for something that is not needed.

• It is disingenuous to suggest that integrating the biometrics fee into the required filing fee reduces fee burdens while simultaneously seeking to double the fees an individual would pay to adjust status.

• USCIS should eliminate the biometrics requirements for O–3 applicants, consistent with H and L applications to reduce confusion and streamline the application process because there is no reason to require biometrics information from O–3 applicants.

• USCIS could lower its costs by improving its communications with EOIR, especially for the purposes of coordinating asylum and I–94 grants.

*Response:* DHS agrees with the comments in favor of incorporating the cost of biometric services into the underlying immigration benefit request fees. This approach aims to simplify the fee structure, create a more user-friendly experience, reduce rejections of benefit requests for failure to include a separate biometric services fee, and better reflect how USCIS uses biometric information. As explained in the proposed rule, the biometric services information used to calculate the proposed fees included when USCIS may reuse information it already collected. *See* 88 FR at 484–485 (Jan. 4, 2023). As explained elsewhere in this rule, DHS limited the fee increases for some immigration benefit requests by inflation or a lower

---

[211] DHS understands that some commenters are concerned about the hidden fees of certain prepaid debit cards; however, many cards exist with no fees. *See, e.g.,* CardRates.com, 6 Best Prepaid Debit Cards with No Fees (Oct. 2023), available at *https://*

*www.cardrates.com/advice/best-prepaid-debit-cards-with-no-fees/* (last viewed Oct. 20, 2023).

[212] *See* USCIS Expands Credit Card Payment Option for Fees, *https://www.uscis.gov/news-releases/uscis-expands-credit-card-payment-option-fees* (last reviewed/updated Feb. 14, 2018).

[213] *See* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022).

[214] *See, e.g.,* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022); USCIS Updates Fee Payment System Used in Field Offices, available at *https://www.uscis.gov/news/news-releases/uscis-updates-fee-payment-system-used-field-offices* (last reviewed/updated Mar. 7, 2019).

percentage from the proposed rule. This includes benefit requests that typically require biometric services, such as Form I–90, Application to Replace Permanent Resident Card, Form I–485, and Form N–400. As such, the final fee for these forms is sometimes less than in the proposed rule.

The INA provides DHS with the specific authority to collect or require submission of biometrics in several sections. *See, e.g.,* INA section 235(d)(3), 8 U.S.C. 1225(d)(3) ("to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service"); INA section 287(b), 8 U.S.C. 1357(b) (powers of immigration officers and employees to administer oaths and take evidence); INA sections 333 and 335, 8 U.S.C. 1444 (requirement to furnish photographs for naturalization) and 1446 (investigation and examination of applicants for naturalization); INA section 262(a), 8 U.S.C. 1302(a) (requirement for noncitizens to register and be fingerprinted); INA section 264(a), 8 U.S.C. 1304(a) (authority to prescribe contents of forms required for alien registration); *see also* INA section 103(a)(3), 8 U.S.C. 1103(a)(3) (conferring broad authority on the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the" immigration laws). DHS regulations at 8 CFR 103.2(b)(9) accordingly provide that USCIS may require any applicant, petitioner, sponsor, beneficiary, or individual filing a benefit request, to submit biometrics, and pay the biometric services fee.

As USCIS has tried to adjust its biometrics policies over the years, it has been stymied by the separate fee requirement and how it would be collected. In addition, the separate fee results in many requests being rejected for failure of the preparer to accurately calculate the impact of the biometric services fee on the amount owed. This rule will provide DHS flexibility in its biometrics submission practices and policies to ensure that necessary adjustments can be made to meet emerging needs, conduct biometrics-based background checks, produce documents, and verify identities, while reducing filing rejections.

In June 2023, USCIS launched a new tool which allows customers to reschedule most biometric appointments before the date of the appointment.[215] USCIS periodically changes policies related to biometric collection, such as the forms requiring biometric services.[216] Removing the biometrics services fee as a separate requirement will streamline the ability of DHS and USCIS to change biometrics polices and need and workload dictates. However, those changes may be beyond the scope of the fee rule.

### c. Online/Electronic Filing

*Comment:* Many comments were received on the proposed changes to online and electronic filing. The commenters who were opposed to the different fees for online and paper filing wrote:

• They opposed having separate fees for online filing and paper filings without providing additional rationale.

• Paper filing fees should not differ from online filing because it would result in financial and digital inequities, contravene the objectives of E.O. 14012, burden applicants with low financial inclusion, discriminate against individuals with low income, certain disabilities, low literacy, inability to use technology, people living in rural or remote areas, who lack access to broadband and computers; citing a 2021 Pew Research Center research on race and access to internet and computers, and a 2022 study showing that one-in-five U.S. households including many racial and ethnic minority households are not connected to the internet.

• 2020 study on the "Digital Divide" during the COVID–19 pandemic; a 2020 DHS study on poverty and internet access indicating that one in six people living in poverty in the United States have no internet access, multiple sources on internet access in various locations, a 2021 Pew Research study of which older Americans seldom use the internet, and a 2022 publication on low rates of smartphone ownership among seniors.

• The fees would result in chaos and confusion for unrepresented people, including missed deadlines, rejected cases, and delays.

• Applicants should not be punished for being unable to file online.

• Many applicants cannot file online due to language barriers, lack of computer skills, as well as access and resources to submit online.

• The proposal would subject applicants with low tech literacy, such as seniors and people with lower education, to scams claiming to assist in digital filing.

• The proposal would disadvantage survivors of domestic violence, human trafficking, and other serious crimes who are not able to file applications for protected case types online.

• People with disabilities may require assistive technologies that they do not have access to, especially if they are survivors of violent crimes and research indicates higher rates of disabilities, varying needs, and the impact of violent crimes and abuse on persons with disabilities.

• Applicants who are most vulnerable and in need of assistance, such as lower income and the elderly who do not have the technology or savvy to handle a finicky electronic system, would be penalized.

• The system often is not compatible with immigration software used by attorneys to file for clients.

• Lower fees for online applications would discourage immigrants from seeking assistance from attorneys and legal representatives. Instead, applicants would try to complete the applications on their own eventually leading to errors.

• Low-income individuals may not be able to access representation to help them apply online for immigration benefits.

• USCIS should not rely on library access to provide for digital filing needs, citing a 2016 Pew Research Center study on underutilization in libraries and information security issues related to library computer reliance. USCIS did not account for varying resources and library computer availability, providing citations on different staffing issues and applicant needs that libraries may face.

• All online application forms should provide for fee waivers and exemptions. Because Form I–912 is not available online, many applicants must file paper and the proposal would impose an undue burden on low-income applicants.

• They do not support a tiered payment structure until online filing options were available to all applicants and forms.

• Expressed concerns for the equity impacts of the proposed electronic filing discount but supported the possible efficiency of using electronic filing.

• Paper filing costs no more than $20 more than electronic filing.

[215] USCIS, USCIS Launches Online Rescheduling of Biometrics Appointments, available at *https://www.uscis.gov/newsroom/news-releases/uscis-launches-online-rescheduling-of-biometrics-appointments* (last reviewed/updated July 6, 2023).

[216] *See, e.g.,* USCIS, USCIS Extends Temporary Suspension of Biometrics Submission for Certain Form I–539 Applicants, available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-temporary-suspension-of-biometrics-submission-for-certain-form-i-539-applicants* (last reviewed/updated Apr. 19, 2023).

• To charge less for an application or petition filed online is inappropriate, because USCIS' online filing system does not function properly and would only hinder proper filings and increase the backlog.

• The online filing system does not work properly, is difficult to use, and is not user-friendly.

• Recommended allowing applicants and their attorneys to log-in with the same account rather than using two separate computers and having separate logins, and that password reset, or lockout resolutions be simplified.

• Attorneys should be able to submit filings on behalf of their clients that the system should allow the use of Application Programming Interfaces.

• A glitch requires them to obtain a new USCIS attorney account for every filing they initiate.

• Expressed skepticism regarding how online filing would ensure that supporting documentation is properly received. They would prefer to file online, but that they cannot successfully do so as often information that is entered and submitted in the system is later lost or riddled with errors.

• Due to issues with the online system, they advise clients not to use it.

• Provided examples of how the system is not user friendly, prone to errors, and that USCIS' online account and filing software must be seriously improved.

• Form N–400 has exhibited poor data integrity when filed online.

• Filings, such as Form I–589, that require significant amounts of documentation organized in a particular manner are difficult to organize digitally rather than by an applicant's counsel.

• Recommended that USCIS provide both instructions and the ''online forms for discounted only benefit applications'' in several common foreign languages.

• USCIS should provide instructions and the online forms in at least several common foreign languages, and the proposal falls short of USCIS' own Language Access Plan. Many of the applications impacted under USCIS' proposed rule have not been translated into Chinese, Vietnamese, Tagalog, or Korean, or other languages.

• Expressed concern for the security of online filing and urged USCIS to ensure that applicants are not forced to use an unsafe system.

• Disagreed with fee increases without increases in service or efficiency and suggested improved and increased online-filing options.

• USCIS must explain an operational benefit to charging more for online filing, whether doing so would hasten a transition to online filing, and clearly explain the goal of the fee differential before proceeding with the proposal.

• Digital filing would increase processing time and cost any but the most complex applications.

• Because fees are higher for some of the online applications and that separate applications must be made for each family member, and that not all services are readily available online (such as rescheduling biometrics appointments) these are examples of an inefficient system.

• USCIS' platform cannot save data for more than 30 days and thus it is a poor site to enter data into.

• Allow Form I–485 to be filed online.

Commenters who supported different fees for online and paper filings wrote:

• Expressed support for a secure online portal that would enable online filings of all documents and forms so both USCIS and submitters could view and verify documents submitted and issued.

• Supported expanding online filing to reduce costs associated with H–2A filings.

• Supported the proposed online filing discount to support the transition to digital filing and related cost-savings.

• Expressed support for USCIS' current H–1B registration system and recommended that similar technological advancements be made for Form I–130 petitions.

• Improve the responsiveness of the e-Request tool to improve operational efficiency and address problem of principals separated from derivative applicants; handling requests to link family members together for more efficient adjudication; enabling counsel and applicants to address priority date issues, including inter-filing requests; and expediting requests.

• Make all filings available online and improve the USCIS online filing system, expand online filing to all immigrant and nonimmigrant benefits because this would improve efficiency.

Commenters requested online filing options for the following forms:

• All Form I–765 categories and applicants, especially those granted withholding of removal, T Nonimmigrants, U Nonimmigrants, VAWA self-petitioners, and people under an order of supervision.

• Form I–129.

• Form G–28. USCIS should update the G–28 to allow for electronic notifications and eliminate mailing of notices.

• Forms I–912 and I–942.

• Form I–485.

• Form I–539.

Commenters that wrote about USCIS online filing without commenting about the specific fees in the proposed rule, wrote:

• USCIS should improve its management of online accounts for immigration attorneys.

• USCIS should permit online filings for fee-waived and reduced N–400s.

• USCIS' digitization efforts have lagged those of other agencies and described ways that mail processing can be inefficient, including via erroneous rejections.

• The proposed incentives for digital filing are insufficient and recommended that USCIS develop an Application Programming Interface to facilitate a direct system-to-system data exchange with large volume filers.

• They hope for a fully digitized filing platform for every form that is fully compatible with attorney case management systems and capable of accepting attorney-filed forms.

• They recommend a system to accept scanned or uploaded application materials, to be funded by ''a dedicated funding stream'' separate from a fee increase.

• They recommend that USCIS install computers and scanners at USCIS Field Offices to assist applicants trying to electronically file applications and petitions.

• USCIS should confirm its continued provision to applicants of an option to use paper filing, and paper notices, especially Receipt Notices, RFEs, Notices of Intent to Deny (NOID), decisions and biometrics to ensure that applicants with temporary internet access are able to receive communications.

• They recommend that USCIS use email more often to provide notices as a cost-saving measure, and communicate via phone call, and video teleconference more often to improve operations, and to reduce delays and mistakes and ensure individuals receive the service they pay for.

• They request that USCIS adopt electronic signature technology to reduce administrative burdens on employers.

• USCIS should engage with stakeholders on a listening session to receive feedback on the online filing process and consult with immigration lawyers to determine how to improve electronic filing systems.

*Response:* DHS understands some commenters' desire for expansion of electronic filing. USCIS is actively planning the expansion of its online electronic filing platform for the submission and adjudication of immigration benefits. As of the end of

FY 2022, approximately 20 percent of USCIS intake was processed through online filing, and we are striving to increase that level. USCIS continues to improve the availability and user experience of online filing. The benefits of digital tools are not limited to customers that file online. Every submission completed online rather than through paper provides cost savings and operational efficiencies to both USCIS and our customers. USCIS scans some applications, petitions, and requests received on paper so that we can process them electronically. USCIS offers recommendations to avoid delays when filing paper; if more documents were filed electronically, it would reduce the time spent on scanning paper documents and free up more time for adjudication rather than administrative tasks.[217]

These benefits accrue throughout the immigration lifecycle of the individual and with the broader use of online filing. As such, DHS believes it should encourage online filing through discounted fees.

In response to comments, DHS reevaluated the difference between online and paper fees, as discussed earlier in this preamble. In this final rule, DHS provides that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g).

d. Premium Processing (*e.g.,* Business Days, Combined Payment, I–907, Expansion, Emergency Stopgap USCIS Stabilization Act)

*Comment:* DHS received the following comments on the proposed changes to premium processing:

• Many applicants need to use premium processing to avoid processing delays in standard processing services.

• Support for USCIS' goals of addressing backlog and processing delays with premium processing.

• They recommended providing expanded premium processing options because this change would both increase revenue and expedite processing.

• They described the proposed rule's approach as not sustainable and that it has caused standard processing delays.

• Premium processing email service is generally quite effective and more effective than the general USCIS E-request and telephone system.

• USCIS is creating an artificial backlog to generate more money off premium processing fees.

On the proposed change of premium processing times from calendar days to business days, commenters wrote:

• They support the change but also recommended clarifying the definition of business days as days on when USCIS service centers are open.

• The purpose and advantage of premium processing is its predictability, and it is appropriate to amend the 15-calendar day timeline to exclude predictable discrete events such as Federal holidays and weekends, but not unpredictable and unknown events such as building or weather-related closures, or ''other days the Federal Government chooses to close its offices.'' If USCIS chooses to finalize a change to business days it should only exclude weekends and Federal holidays from the timeline, rather than also excluding weather emergencies and other regional or unanticipated closures.

• Changing premium processing from calendar days to business days is reasonable because it is unreasonable to expect USCIS to work weekends and holidays.

• The proposed change would violate Federal regulations requiring the use of calendar days for required actions.

• USCIS' new position that the original USCIS interpretation of ''calendar day'' was incorrect is inconsistent with decades of USCIS practice and other Federal agencies' interpretations of ''day.'' USCIS' original interpretation of ''day'' as ''calendar day'' was not incorrect, and USCIS does not have legal support for the proposed change to a 15-business day processing timeframe.

• Congress did not change USCIS' use of calendar days for premium processing, which it could have done if that had been the congressional intent.

• The proposed change would mean processing would generally be completed after the 14-day timeframe required by statute.

• The longer timeframe would decrease the value of the premium service compared to standard processing.

• USCIS has proven it can successfully complete premium processing adjudications within 15 calendar days.

• The number of Federal holidays at the end of the year would complicate processing during one of the most active periods of the year for many U.S. arts agencies.

• The change to business days would reflect on DHS' inability to

accommodate a quick service for a substantial fee.

• The proposed change would reward inefficiency and shows a lack of appetite to improve service.

• The change would impose a burden on petitioners, and individuals and make it difficult to secure visas.

• O and P petitioners often must apply for visas at the last minute and the proposed change would make it very difficult to complete the process in a workable period.

• Tight employment processing timelines with the Department of Labor (DOL) leave no spare time for lengthening the premium processing timeframe.

• A concern with the existing practice of resetting the premium processing timeframe whenever a RFE or NOID is issued and recommendation that instead the timeframe be tolled until the applicant responds to RFEs and NOIDs because this approach would promote efficiency, accountability, and align with congressional intent.

• They recommended that USCIS define how notices would be provided to petitioners, consider electronic notices, and review internal procedures and policies to ensure efficient adjudication, predictability, and reliability for petitioners.

• USCIS needs to move resources during peak filing times for certain visa categories, especially for H–2B visas as they have unique scheduling time pressures.

• The premium processing fee should be decreased considering the decreased value of the premium processing service, given the proposed longer processing period of business days.

• Premium processing fees have been increased in the past without any improvement in processing times.

• The Form I–907 fee is unreasonable.

• Premium processing should be offered and maintained without the service interruptions that have been problematic in the past.

• USCIS should respond promptly to requests for premium processing and criticized RFEs as the first responses from USCIS.

• Physician National Interest Waiver (PNIW) petitions should be adjudicated within the 15-day timeframe rather than the 45-day timeframe.

• Premium processing should be maintained without service interruptions for Form I–539 applications and Form I–129 petitions.

*Response:* DHS disagrees that adjusting the timeframe for adjudicative action on a petition for which premium processing service has been requested from 15 calendar days to 15 business

days would meaningfully harm petitioning entities.[218]

DHS is adjusting the timeframe for premium processing for multiple reasons. The current timeframe does not consider the days on which government offices are closed and USCIS staff are unavailable to adjudicate cases, such as a Federal holiday. Therefore, a surge in applications may coincide with a period when USCIS staff have substantially less than 15 working days to receive and adjudicate a petition with premium processing. In the past, there have been instances when USCIS was unable to adjudicate all the petitions for which petitioners requested premium processing within the 15-calendar day timeframe. This led USCIS to refund the premium processing fee for petitions that were not adjudicated within 15 calendar days and to temporarily suspend premium processing service. DHS believes that extending the premium processing timeframe from 15 calendar days to 15 business days will allow USCIS adequate time to take adjudicative action on petitions and will provide petitioners with a consistent and predictable experience.

DHS understands that sometimes a petitioning employer needs USCIS to take quick adjudicative action. DHS appreciates that some regular petitioners for foreign workers have built in the current 15-calendar day processing into their planning for projects and we have fully considered the impacts on such firms in making this change. As stated in the proposed rule and Regulatory Impact Analysis, DHS believes that changing from calendar days to business days may reduce the need for USCIS to suspend premium processing for applications and petitions during peak seasons, and thus impacts only a very small number of applications and petitions whose Form I–907, Request for Premium Processing Service, could not be processed within the 15-calendar day timeframe. This may permit USCIS to offer premium processing to more applicants and petitioning businesses each year. The change will only increase the maximum time USCIS has to complete the adjudication, and the average time for well-prepared requests may not increase as a result. However, DHS believes the possibility that a petitioner requesting premium processing service may need to wait a few additional days for adjudicative action is a small cost to impose for being able to expand premium processing to more requests and reduce the likelihood of a refund or for future suspensions of premium processing service.

*Comment:* Commenters stated that premium processing should be expanded. A commenter recommended USCIS expand it to all applications across all categories. Other commenters recommended extending it to the following benefit requests:

• Form I–526 petitions.
• Form I–485 (asylum/refugee based).
• EADs and Form I–765 filings.
• Asylum seekers, to receive an interview and adjudication in a shorter period.
• Family-based immigration cases and all employment authorization applications.
• Naturalization interviews to recover costs.

*Response:* USCIS is working to expand premium processing services to all categories of Form I–539, Application to Extend/Change Nonimmigrant Status, and Form I–765, Application for Employment Authorization, by the end of FY 2025. *See* 87 FR 18227, 18228, 18235 (Mar. 30, 2022). In March 2023, USCIS began accepting premium processing requests for some students who had a pending Form I–765.[219] In June 2023, USCIS announced it would expand premium processing to some categories of Form I–539.[220] USCIS may expand premium processing service to other form types in future rulemakings. However, USCIS is also working to reduce processing times without the need for an additional premium processing service fee. *See* section III.D.4 of this preamble and 88 FR 402, 529–530 (Jan. 4, 2023). DHS has made no changes based on these comments.

e. Adjusting Fees for Inflation, Proposed 8 CFR 106.2(c)

*Comment:* Commenters discussed adjusting fees for inflation and the DHS proposed rule to codify the authority at 8 CFR 106.2(d) to increase fees using the Consumer Price Index (CPI–U). Commenters wrote:

• While some fees need to increase due to normal inflation, there is no reason that applications should increase so significantly.
• Fees should not be raised more than the current rate of inflation or cost-of-living.
• The fee increases should be tied to 7 percent inflation instead of the proposed increases.
• USCIS should not use inflation to further increase fees before 2025.
• USCIS should reconsider automatically increasing fees based on inflation.
• Increasing the fee regularly establishes a "moving target" for applicants and imposes a financial burden on low-income, survivor applicants, and applicants in need of assistance.
• They supported a mechanism to allow for nominal increases in fees in between the biennial fee reviews.
• Adjusting for inflation can provide more predictable and moderate fee increases than those included in the proposed rule.
• Because total inflation since January 2016 was 26.28 percent. Any fee with an increase less than this amount is operating at a relative discount.
• Providing for regular fee increases would remove consideration of "ability to pay" in fee setting.
• Regular fee increases would decrease USCIS' incentive to reduce the immigration backlog and improve administrative efficiency.

*Response:* After reviewing the public comments on the subject, DHS has decided to retain a provision that provides that DHS may adjust IEFA non-premium fees by the rate of inflation. *See* 88 FR 402, 516–517 (Jan. 4, 2023); 8 CFR 106.2(d). While the CFO Act, 31 U.S.C. 901–03, requires agencies to review their fees on a biennial basis and recommend changes, fee changes can be delayed by competing policy consideration and other deliberative matters, whereas a fee increase that is based on a precise mathematical inflation formula might avoid such a delay. An adjustment that is based on inflation would allow DHS to keep USCIS IEFA revenue in pace with costs more regularly. In addition, if DHS can adjust USCIS fees on a timelier basis to match inflation, the fees will be more incremental and more predictable than larger increases every few years. 88 FR 402, 516. As a result, regular inflation rate increases using a basic mathematical calculation are expected to result in smoother fee increases and less sticker shock from new fee rules.

---

[218] DHS did not propose any changes in premium processing fees. Premium processing fees were established by law and in other rulemakings. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u); Implementation of the Emergency Stopgap USCIS Stabilization Act, 87 FR 18227 (Mar. 30, 2022); Adjustment to Premium Processing Fees, 88 FR 89539 (Dec. 28, 2023).

[219] *See* USCIS, USCIS Announces Premium Processing: New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions, available at *https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/updated Mar. 6, 2023).

[220] *See* USCIS, USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status, available at *https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last reviewed/updated 6/12/2023).

Nevertheless, in this final rule, DHS is revising proposed 8 CFR 106.2(d)(2) to provide that the inflation adjustment would affect all fees that are not set by statute. In response to comments that requested DHS adjust fees by inflation instead of using the proposed fees, DHS decided to limit some fees to the lesser of either the proposed fee or the current fee adjusted for inflation. *See* section II.C. Changes from the Proposed Rule of this preamble.

2. Employment and Immigrant Investors

a. Asylum Program Fee

*Comment:* Many commenters submitted comments on the Asylum Program Fee and proposed 8 CFR 106.2(c)(13). Some commenters supported the proposed Asylum Program Fee and funding the asylum process through employment petition fees. Other commenters stated that, although this fee will apply to Form I–129 petitions for H–2A workers, it does not raise the same concerns that they included in their comment letter about worker mobility because it applies equally to all applications and therefore does not disincentivize hiring of H–2A workers already in the United States. Other commenters suggesting that the proposed fee be increased to eliminate the backlogs in other humanitarian fee-exempt programs. Others wrote that they supported cost shifting provided that a greater share is covered by employer petitions as a means of ensuring asylum seekers and other vulnerable groups are not harmed by DHS's funding structure, by shifting asylum costs to those applicants who are more likely to be in a financial position to afford to pay. Other commenters supported the proposed Asylum Program Fee until congressional funding is secured for such purposes.

Most commenters on the subject wrote that they opposed the proposed Asylum Program Fee. DHS summarizes the commenters as follows:

• Raising fees on employment-based applicants to subsidize asylum applicants would be unfair.

• The surcharge would exacerbate the costs borne by employers, nonprofits, and small businesses in particular, while decreasing demand for employment-based visas.

• The fee would have a chilling or deterrent effect on employment stakeholders regarding hiring foreign nationals.

• The decrease in demand for employment-based visas could lead to less revenue, or a lack of funding necessary to adjudicate benefits and facilitate a long-term solution to case backlogs.

• The negative impact of the Asylum Program Fee on businesses would have a downstream impact on consumers that they cannot afford while battling historic inflation.''

• International touring artists and American businesses are still recovering from the worldwide pandemic shutdown and cannot bear the burden of funding of the asylum program.

• The proposed fee is well beyond a cost-of-living increase or even today's inflation rate.

• The fee would have a disproportionately onerous effect on small businesses who are seeking relief from the financially detrimental effects of COVID–19 followed by a labor shortage.

• Employers or petitioners should not bear the burden for a program that is not connected or relevant to employment benefits.

• The asylum program should not be funded by taxing or on the backs of other petitioners who are already struggling financially, such as agricultural employers, academic institutions, or international musicians. Commenters assert that USCIS acknowledges this issue in the rule, but it fails to offer a response to this anticipated objection, while the primary reason for charging separate fees for Forms I–485, I–765, and I–131 in adjustment of status applications is to prevent this same imbalance.

• DHS should adopt a consistent approach and properly weigh the burden of the cost of the asylum program on I–129 and I–140 petitioners. Instead, they seem to allow for petitioners to bear the cost of unrelated programs only when it means an increase to USCIS revenue.

• This proposal will have a materially adverse and arguably discriminatory impact on petitioners that are already bearing the largest burden in the proposed rule while USCIS is suffering unprecedented processing backlogs and inefficiencies. Asking these stakeholders to incur significant additional costs for unrelated services without any commitment to address their specific concerns sends a message of disregard that will discourage businesses from developing or expanding operations in the United States.

• USCIS arguing that it is necessary to impose this surcharge so that USCIS can limit fee increases on other filings provides requester's no real option and either requires paying the Asylum Program Fee or not filing a petition.

• USCIS could request appropriated funds or use premium processing program revenue to subsidize much of

the $425 million cost of the asylum program.

• Subjecting H–2A petitioners to multiple asylum program fees for a single job order is not fair or reasonable.

• These additional fees will significantly impact IT and engineering staffing firms, which file Form I–129 for extensions of stay or status changes like a new job site more often than other employers. This commenter provided detailed information about the cost impacts to its members.

• Employers with limited resources will be less likely to cover visa fees for a worker's spouse or dependents, affecting a foreign worker's willingness or ability to take on employment in the United States.

• Such drastic increases in fees may suppress wage growth in industries where foreign workers are legitimately needed to supplement the domestic workforce. Employers who hire foreign workers should incur higher costs than they would for hiring U.S. workers, but these costs should come in the form of higher pay proffered to both U.S. and foreign workers and not petition fees.

• The proposal does not consider religious entities, many of which are small with limited budgets. Nonprofits and religious organizations provide significant benefit to the United States and asylees through outreach programs.

• Many health care providers and hospitals in medically underserved areas will not be able to sponsor needed physicians, nurses, and other health care professionals.

• The Asylum Program Fee would have a negative impact on the higher education community. Many universities with limited funds would no longer be able to sponsor specialized international researchers and other diverse faculty and staff.

• The ability to pay principle does not recognize the impact that an extra fee will have on U.S. higher education and related nonprofits with limited funding, such as public funds and specific, limited research grants.

• Because of the financial ecosystem of some institutes of higher education, they would be challenged by the fee, because of funding inequity between departments, lack of large endowments or high tuition rates, and reliance on Federal grants. A university is composed of numerous, smaller departments and units, each of which has a budget and is responsible for bearing the cost of immigration filings for its international employees.

• The Asylum Program Fee would penalize employers for utilizing legal avenues to hire foreign workers.

• Regarding H–2A employers:

○ There are already more employment costs for H–2A employers from increased administration and costs to achieve compliance.

○ Employers hiring H–2A workers are already facing increased input costs with no commensurate market price increase from purchasers.

○ The Asylum Program Fee would be penalizing small and seasonal American businesses for trying to hire a legal workforce.

○ Farmers in the H–2A program face extraordinary cost and burdens for the requirements of a legal guest worker program.

○ The fact that many individuals living in foreign lands see the land of the free and the home of the brave as a safe and secure shelter to the too often unspeakable horror they may face at home is a testament to the beacon that the United States represents. However, taxing agricultural employers to fund the mechanisms for providing secure shelter is arbitrary and capricious and an abuse of discretion.

○ The DHS statement that H–2A employers have more ability to pay is arbitrary and completely inaccurate according to the U.S. Department of Agriculture (USDA) Economic Research Service report on Farm Household Well-being. Many households report negative farm income.

○ USDA data on the H–2A program indicates that the Asylum Program Fee increases the financial burden of the employer with no ability to recover these added costs.

○ Questioning the factual basis behind the ability to pay presumption, a commenter said many of the other visa classifications included in the proposed rule are for voluntary travel, but the use of H–2A workers is a necessary part of business.

○ The outlook for 2023 does not indicate that farmers will have income to pay additional fees.

○ USCIS should not put the U.S. food supply in jeopardy by requiring agricultural worker visas to include an unnecessary asylum fee.

○ Farm employers are having a very difficult time staying in business and this fee will create a financial burden upon the H–2A program that they rely upon for most of their labor resource.

○ The Asylum Program Fee is unreasonable and overburdensome and USCIS must realize that the program is what keeps labor-intensive agriculture afloat.

• When an international artist applies for an O or P visa they plan on touring and therefore are not reimbursed for visa costs. This change signals to the international arts community that their contribution to cultural influence is not welcome.

• The Asylum Program Fee would have a potentially discriminatory impact on beneficiaries from countries with severely backlogged immigrant visa quotas, such as India. The fee would have a disparate impact on individuals who are on the path to lawful permanent residence but are required to maintain nonimmigrant status for decades because of the lack of immigrant visa availability. Other commenters expressed similar concerns about the disparate treatment of foreign nationals, and their employers, from certain countries that are disproportionately affected by the visa backlog, like India and China, as employers must file more Form I–129 and Form I–140 petitions for the employee than for similarly situated individuals in order to maintain their status while they wait for an immigrant visa to become available.

• The Asylum Program Fee shows a lack of understanding and reinforces the stereotype that the arts, extraordinary ability, and business communities can afford such fee increases.

• The fee should be spread around all the applications, not just targeting what DHS seems to view as the most lucrative applications.

• DHS' ability to pay determination is conclusory and unsubstantiated, and therefore primed to be found arbitrary and capricious.

• The rule does not transfer the cost of asylum to all other fee-paying applicants but to business petitioners only, with the greatest impact on small businesses, nonprofits, start-ups, and religious organizations while also ignoring the ability to pay methodology announced in this rule.

• While it may be true that businesses in general have more ability to pay compared to asylum seekers, this fee increase is disproportionately burdensome to U.S. small and seasonal businesses.

• The Asylum Program Fee is arbitrary because it is based on an estimate, and USCIS failed to provide actual historical data on asylum claims and associated workload that the public can evaluate to determine if DHS's proposed fee amount and allocation of the fee on certain petition filers is warranted or reasonable.

• The added burden on business immigration applicants is unjustified because USCIS relied on a statistically insignificant sample to measure ability-to-pay. Forms I–129 and I–140 account for just 10 percent of fee-paying receipts, but would bear the burden of asylum case processing, along with other fee increases.

• Table 11 of the proposed rule provides estimated costs for FY 2022 and FY 2023; the proposed rule does not explain how it arrived at its total estimated costs since there is no list of itemized expenses. Without specific program cost data, the commenter said the $600 fee has no basis in fact.

• USCIS' Small Entity Analysis (SEA) of nonprofit institutions relies on unsupported assumptions about the burden to nonprofits and is silent on the benefits of nonprofits to the nation. The analysis does not fully discuss the impact on distributing asylum fees across all application types, so it is difficult to accept these assumptions without reviewing the impact for comparison.

• Until DHS acknowledges the distinction between for profit and nonprofit employers, DHS is asking nonprofit employers to fund what the U.S. Congress is unwilling to do.

• There is no justification for asking employers to pay an additional fee that may curb H–2B program participation at the very time that the administration seeks to expand pathways to legal employment for migrants. The premise that H–2B employers can absorb the cost of funding the asylum program and other processing activities is entirely flawed. The rule assumes, without evidence, that all H–2B employers have an ability to pay fees that are 200 percent higher than the current fees.

• There is no evidence in the record showing that companies currently using H–1B visas can more easily afford this fee than family-based petitioners.

• The fee does not take into consideration true ability to pay, particularly for H–1B employers.

• USCIS regulations require some Form I–129 fees, like the H–1B fees, to be paid by the employer rather than the beneficiary, so there is no leeway for the affected parties to negotiate among themselves on who is better able to pay the fee.

• Imposing a flat fee tied solely to asylum seekers suggests that such individuals are the sole factor in USCIS' challenges in processing employment-based applications, rather than challenges that USCIS faces because of policies instituted under the prior administration, increased volumes of applications, delays in staffing and staff retention, legislative inaction, and longstanding backlogs.

• It is unfair to impose costs on employers and workers that USCIS creates, as well as unnecessary since USCIS can reduce costs at any time.

003229

• DHS should direct the limited pool of USCIS fees toward core adjudicative functions needed to keep it more efficient, rather than toward a flawed new asylum program whose truncated timeline deprives asylum seekers of a fair opportunity to present their cases.

• Congress did not provide DHS with the discretion to set fees based on the agency's apparent political agenda.

• Imposing a $600 surcharge on Form I–129 and Form I–140 petitioners is the wrong approach to funding this important national obligation, as well as an extraordinary and unparalleled overreach of authority by USCIS. Section 286(m) of the INA provides a statutory basis to recover the costs of the asylum program by setting adjudication and naturalization fees at a level sufficient to recover the costs of the asylum program, but never in the history of USCIS has there been a decision to impose a surcharge on a discrete group of filers to fund services to another discrete and distinct group of filers. This is a distortion of the statute and the ability to pay concept, upon which USCIS primarily justifies this decision.

• This fee is a gross overreach of authority and USCIS has never imposed a surcharge as significant as this upon a distinct population of stakeholders for the sole benefit of another group of stakeholders.

• The INA does not authorize the creation of new fee categories, nor is there ambiguity in INA section 286, 8 U.S.C. 1356 that would allow such a regulatory invention. Creation of the new proposed fee category would require a statutory authority, and the agency is on a path that courts will likely find impermissible.

• The current $30–$85 charges per asylum applicant paid into IEFA is all that is allowed per statute. Depositing fees into IEFA does not convert it to funds to adjudicate asylum cases. Using IEFA to adjudicate asylum will overwhelm the purpose of the IEFA.

• The fee is unjustified and USCIS should secure congressional funding to efficiently adjudicate asylum applications.

• The costs for any asylum program should be paid out of the Treasury instead of using a rulemaking undertaken by the Executive Branch.

• Congressional appropriations with a reduction in enforcement, detention, and deterrence costs, should be the priority.

Commenters suggested that the following entities be exempted from an Asylum Program Fee:

• U.S. higher education and related nonprofits (*e.g.,* cap-exempt employers)

following the same logic of exempting U.S. higher education and related nonprofit organizations from the ACWIA Training Fee.

• Government research organizations, also consistent with precedent afforded by ACWIA.

• Nonprofit entities.

• Religious organizations.

• Individual employers that cannot pay the fee.

• Certain small businesses.

• Healthcare facilities.

• H–2A and H–2B petitioners.

Other commenters suggested alternatives to the proposed Asylum Program Fee. Those commenters wrote:

• Instead of the proposed $600 fee, a small stipend from asylum cases ($50 per case) would seem consionable to help with the border crisis. Another commenter suggested a $200 fee.

• USCIS should distribute the asylum fee across all form types or fee payers.

• The Asylum Program Fee should be based on the size or revenue of the employer filing the petition.

• The asylum program should be supplemented by businesses that operate within the multimillion-dollar range.

• USCIS should use a sliding scale for employers based on net revenues and/or number of employees.

• USCIS should instead charge a fee to asylum applicants or their sponsors. Asylum seekers hire lawyers and other services to arrive in the United States, so they should be able to afford an additional fee.

• USCIS should adopt a model like the H–1B program, whereby asylum seekers would be required to obtain a U.S. sponsor, who would pay a small application or program fee.

• Many commenters suggested that, if the Asylum Program Fee must remain, employers should only be required to pay the fee one time.

• The Asylum Program Fee should only be assessed for the initial petition filed by an employer, like the Fraud Prevention and Detection and Public Law 114–113 fees, and not subsequent transfers, extensions, renewals, and changes of status.

• A $100 fee could be assessed once, like the H–1B Prevention and Detection Fee.

• The fee could be structured like the Fraud Fee, required once at a higher education institution when filing Form I–129.

• USCIS should implement a premium processing program for asylum interviews to recover case processing costs, reduced asylum division staffing, or fees for non-USCIS-certified immigration attorneys representing

asylum seekers or use premium processing fees to finance free asylum applications.

• USCIS should consider other funds in addressing asylum processing including premium processing fees.

• USCIS should take a more balanced approach to accommodate the costs of humanitarian processing, including by (1) considering projections for premium processing revenues in setting fees, and (2) expanding opportunities for employment authorization for migrants and asylum seekers on parole in the United States.

• The asylum fee should be divided between the Forms I–129, I–485, N–400, and Form I–90, which would decrease the Asylum Program Fee per application/petition to a more manageable $155.

• USCIS could implement a registration fee to provide an initial stream of revenue, like the H–1B Registration Fee.

• If asylum filings will be increasing, USCIS should consider implementing an "after you have been settled" filing fee for all asylum cases (like the Form I–751 for marriage-based Green Card cases) to recoup some of the costs from asylees.

To mitigate the impact of the Asylum Program Fee on small entities commenters suggested the following alternatives:

• USCIS should also reduce the amount for other small business entities like how the ACWIA fee is currently assessed.

• DHS should establish tiers of fee pricing based on revenue, number of employees, type of visa, or number of workers per petition.

• DHS should limit the frequency of asylum fee payments by small entities (*e.g.,* to once or twice per employee for H–1B, or once per worker per season for H–2A/H–2B). Meaning, the Asylum Program Fee would only apply to initial petitions. It would not apply to amendments or extensions using Form I–129, similar to ACWIA.

• DHS should establish a lower tier of fee pricing for small nonprofits, exempt nonprofits, or limit the frequency of paying this fee to once per worker category.

• USCIS should phase-in the new fee over at least 2–3 years.

• Should the number of people seeking asylum suddenly drop the NPRM indicates the Department will nonetheless continue to collect the fees. The Department instead should describe what fee will be charged based on different asylum workload levels.

• DHS should explain how the estimated costs were calculated and

how the potential impact on the employer community was assessed, including the potential of fees to decrease should the system become less burdened by asylum seekers. Commenters asserted that USCIS must explain how it has calculated this fee amount and inform the business community of the cadence and metrics by which the agency will review the fee, to determine whether it should decrease over a prescribed period, exist in perpetuity, or sunset on a specific date, or end if the asylum crisis ends.

• Regarding USCIS' statement that it will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and any funding appropriated for it when DHS develops its final fee rule, commenters supported the agency's humanitarian mission and encouraged USCIS to provide additional details regarding how it will determine the final fee amount and any future adjustments.

• Because DHS will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and funding appropriated for it in the final fee rule, the fee should be delayed until the funding is more certain and can be recalculated.

• USCIS should consider reviewing this fee more frequently than the others because of the variability of migration patterns and whether the fee should be distributed more uniformly amongst those seeking immigration benefits.

• The USCIS fee schedule proposal was published several weeks before DHS and DOJ published its Circumvention of Lawful Pathways proposed rule, thus USCIS' assumptions regarding future asylee flows will need to be reconsidered.

*Response:* As explained in the proposed rule, DHS calculated the Asylum Program Fee by dividing estimated annual costs by forecasted workload. *See* 88 FR 402, 451–454 (Jan. 4, 2023). The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay using USCIS' standard costing and fee calculation methodologies. *See* 88 FR 402, 451 (Jan. 4, 2023). DHS did not propose this Asylum Program Fee without having carefully considered its implications and effects, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023).

By law, USCIS is required to conduct a fee review every 2 years. Therefore, all fees, including the Asylum Program Fee, will be reviewed biennially. DHS is authorized to set fees at a level that will ensure full recovery of the costs of

providing services, including the costs of services provided without charge to asylum applicants or other immigrants. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Consistent with other immigration benefit requests where fees are waived or held below the cost of providing the service, the cost of the Asylum Program has always been incorporated into and spread across other immigration benefit requests for which a fee is paid. DHS considered the impact of spreading the cost of the Asylum Program across various requests, including Forms I–485 and I–765. However, DHS decided to assign these costs only to Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, as explained in the proposed rule. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS requested $375.4 million in appropriated funding for USCIS asylum adjudications in FY 2023.[221] However, USCIS did not receive the funding. In the absence of appropriations, USCIS must fund the asylum program through fee revenue.

As explained in section II.C. Changes from Proposed Rule of this preamble, after considering the public comments, DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 full-time equivalent (FTE) employees.

USCIS considered the various concerns raised by commenters that suggested that the $600 Asylum Program Fee would cause indirect secondary, tertiary, and downstream economic impacts on many facets of the U.S. Examples cited by the commenters included exacerbating the effects on consumers of inflation and the COVID–19 pandemic, increasing costs for already unprofitable farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, exacerbating the plight of nationals of certain countries such as India and China, and generally writing that DHS failed to analyze the effects of the new fee. DHS has accounted for the direct costs of the Asylum Program fee, and our data indicates that the Asylum Program Fee will not have the deleterious effects on multiple parts of U.S. economy that the commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing

relief to nonprofits and small employers in this final rule.

*Comment:* Multiple commenters, including a business association and a professional association, suggested USCIS create tiered levels for different types of fees. For example, a business association recommended tiered fee levels for the proposed asylum fee where smaller companies would pay a lesser amount for the asylum fee. The association further proposed tiered asylum fees that would apply to more immigration benefit requests aside from Forms I–129 and I–140, thus not placing this cost burden entirely on the business community. Additionally, the commenter requested a set limit on the number of times an entity must pay the asylum program fee for a specific beneficiary.

*Response:* As explained elsewhere in this final rule, DHS creates lower fees for certain small employers and nonprofits in this rule. Businesses with 25 or fewer FTE employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Non-profits will pay $0. DHS carefully considered the implications and effects of the Asylum Program Fee, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023). As explained above and in the RIA, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. In this final rule, DHS implements lower fees for certain small businesses and nonprofits using Form I–129. DHS believes this tiered approach accommodates these commenter's concerns by offering lower fees for some small employers and nonprofits. DHS considered the suggestion but declines to limit the number of times an entity must pay the Asylum Program Fee for a specific beneficiary because determining if the fee exemption applied at intake would require a check of systems to determine if the beneficiary had a fee paid for them in the past, and that would delay intake and processing and add to USCIS cost.

b. EB–5 Program and Fees (I–526/526E, I–829, I–956/956F/956G), Reform and Integrity Act (Not Related to Small Entities/RFA/Quantitative Impacts)

*Comment:* Many commenters submitted comments on the EB–5 Program and fees. Some commenters expressed support for increasing the EB–5 investment visa's filing fee reasoning the fee hike could rule out unqualified investors as well as ensure integrity and quality in applicants to a highly demanded visa. Others disapproved of the investor filing fees

---

[221] DHS, Budget-in-Brief Fiscal Year 2023 at 77, available from *https://www.dhs.gov/publication/fy-2023-budget-brief* (last updated Mar. 28, 2022).

**6286** **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

but wrote that the proposed increase in fees for Regional Centers is arguably reasonable given the due diligence requirements imposed by new laws.

Many commenters wrote that they did not support the proposed EB–5 program fees including Forms I–956, I–956G, I–526E, and I–829. Those comments are summarized as follows:

• The increase in fees for EB–5 visas would make legal immigration to the United States more difficult, particularly the ability for investors to sponsor temporary workers.

• The fee increases associated with the EB–5 Immigrant Investor categories would have a chilling effect on an invaluable, job-creating visa category and would not provide adequate assurances for improved service or shorter processing timelines.

• The proposed rule will cause EB–5 program related applicants to shoulder an unsustainably high financial burden that could threaten the reputation and longevity of the program.

• Stakeholders might support the proposed fee increases for the EB–5 program if they were accompanied by improved case processing times.

• USCIS does not anticipate using the additional fees to provide additional resources or staff for EB–5 program related filing despite exceptionally high processing times.

• Before modifying fees for EB–5 services, USCIS must first conduct a fee study compliant with statutory provisions of the Reform and Integrity Act. Because the fee study has not been conducted, the proposed EB–5 program fees in the rule are premature and should therefore be withdrawn from the final rule, and EB–5 program fees must be set at levels that ensure full cost recovery of only the costs of providing its services.

• The proposed increase is unjustified for Form I–829 because it does not require a considerable number of staff.

• USCIS should retain the fee on the Form I–829 for investors who have already filed their Form I–526 petitions because they had not budgeted for a 154 percent fee increase when deciding to permanently move to the United States.

• The proposed fee for the Form I–526 increased despite a reduction in the Form I–526 adjudication burden, and USCIS does not claim to track adjudication times on Form I–526.

• The idea that a higher fee for Form I–526 may reduce adjudication times is not supported by historical precedent. Processing times for EB–5 related filings have increased year after year since 2016, without measurable increases in productivity.

• USCIS should institute expedited processing, specifically, for the Form I–526 to reduce the legal burden on investors and to avoid delaying positive impacts to the economy.

• The proposed fee increases for Form I–526 and Form I–526E should only apply in cases where petitions can be processed within 12 years or the proposed fee for these forms should reduce by at least 50 percent.

• Because filing Form I–526E does not require adjudication of the underlying project, its fee should be lower than the fee for Form I–526.

• The proposed fee for the first time filing a Form I–956 would be excessive if USCIS cannot guarantee adjudication time will be less than a year.

• USCIS should make a distinction between a Form I–956 filed for the first time for a Regional Center designation and a Form I–956 filed for amendments such as reporting a name or ownership change. The proposed fee would be more understandable for new designations but would be excessive for amendments. Requiring Form I–956 for making amendments to Regional Center Designation and requiring annual renewal of designation status contribute to a heightened overall filing volume for such form.

• The proposed rule relies on inaccurate inputs and inappropriately forecasts a small number of incoming EB–5 receipts to cover the cost.

• Prior fee increases did not improve processing speeds; commenters are concerned that this increase would not augment staffing levels sufficiently to create any change.

• Delayed processing can cause investors to lose their investment; adjudication times should be 3–6 months for Form I–956 applications and 1–2 years for Forms I–526, I–526E, and I–829 petitions.

Some commenters wrote in support of the proposed EB–5 program fees or provided additional suggestions. Those comments are summarized as follows:

• The price increase should lead to improved efficiencies, such as processing timelines of less than one year. USCIS should hire more staff to accelerate processing and decisions on Form I–829.

• The increase for Form I–526 is a fair cost for the adjudication required the first time USCIS processes an EB–5 investment project.

• USCIS should publish reduced adjudication timelines for the Form I–526 given its proposed filing bifurcation and the proposed increase in its fee.

*Response:* DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee methodology as much as possible, and to avoid overuse of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

DHS disagrees with commenters who suggest that the EB–5 Reform and Integrity Act of 2022 precludes DHS from adjusting EB–5 program fees in this rule. As mentioned in the proposed rule and acknowledged by many commenters, the EB–5 Reform and Integrity Act of 2022 requires DHS to complete a fee study not later than 1 year after the date of the law's enactment; and then, not later than 60 days after the completion of the study, set fees for EB–5 related immigration benefit requests to recover the costs of providing such services and completing the adjudications, on average, within certain time frames. DHS realizes that the EB–5 Reform and Integrity Act of 2022 instructs DHS to complete the required fee study within one year, but that law requires a fee calculation method that is different from what DHS generally uses, *see* INA 286(m), 8 U.S.C. 1356(m), OMB Circular A–25 suggests, and most agencies follow. 88 FR 402, 471 (discussing full cost recovery and relevant guidance). In its fee rulemakings DHS has set USCIS immigration benefit requests generally with the goal of improving or achieving reasonable processing times, but not with the relatively short and precise processing times aspired to in the EB–5 Reform and Integrity Act of 2022. *See, e.g.,* 72 FR at 29858–59 (discussing USCIS plans to reduce processing times for certain request by twenty percent by the end of FY 2009); 81 FR at 26910 (discussing the rule's goal to achieve processing times that are in line with the commitments in the FY 2007 Fee Rule). The EB–5 Reform and Integrity Act of 2022, on the other hand, requires DHS to set the fees at a level that will provide USCIS with the resources necessary to process EB–5 benefit

003232

requests within certain time parameters, that are generally shorter than what USCIS currently achieves. The EB–5 Reform and Integrity Act of 2022 also differs from INA section 286(m), 8 U.S.C. 1356(m), in that it limits the costs of free or discounted USCIS immigration benefit requests that can be transferred or funded by the EB–5 fees.[222] DHS is actively engaged in the work required to determine the fees under that law. Meanwhile, DHS has not adjusted its fees since 2016, is obligated under the CFO Act to review is fees and is authorized by the INA to set fees to recover USCIS costs.

As DHS stated in the proposed rule, the EB–5 Reform and Integrity Act of 2022 provides that the fee study required by 106(a) does not require DHS to adjust USCIS fees in the interim. *See* 88 FR 402, 420, 508–511 (Jan. 4, 2023); *see also* Public Law 117–103, sec. 106(f). No legislative history exists to explain how that provision should be read in conjunction with section 106(a). More importantly, the statute does not *prohibit* the modification of fees under INA 286(m), 8 U.S.C. 1356(m), prior to the completion of the fee study and rulemaking contemplated by section 106. Stated differently, by suggesting that the section need not be construed to require modification of the fees before completion of the study, section 106(f) necessarily implies that fees may be modified (*i.e.,* what is not required is permitted). Therefore, DHS interprets the provision to mean that the provisions of the law are not effective until DHS takes the steps it requires to be implemented; and that any requirement for DHS to set fees to achieve the processing time goals under section 106(b) of the EB–5 Reform and Integrity Act of 2022 are dependent on completion of the fee study and rulemaking contemplated by section 106. A different interpretation would prevent DHS from adjusting fees to recover the costs of normal processing until the fee study and rulemaking under section 106 is complete, a result that would be inconsistent with the broad purpose of section 106, which is to accelerate adjudications. Accordingly, DHS interprets "[N]otwithstanding" in section 106(b) of the EB–5 Reform and Integrity Act of 2022 to mean that section 106 requires DHS to establish fees to achieve the processing time goals set out in section 106(b), but that authority and its

separate study requirements exist separately from (or "notwithstanding") INA section 286(m), 8 U.S.C. 1356(m), and therefore do not preclude USCIS from instituting new EB–5 program fees while that effort is undertaken. The fees that DHS sets in accordance with section 106 will go beyond normal cost recovery and effectively supersede section 286(m), 1356(m), to achieve processing time goals. Meanwhile, DHS establishes new fees for the EB–5 program forms in this rule using the same full cost recovery model used to calculate EB–5 fees since the program's inception and not the parameters required by the EB–5 Reform and Integrity Act of 2022. *See* 88 FR 402, 420 (Jan. 4, 2023). Accordingly, DHS will collect the fees established in this rule under INA sec. 286(m), 8 U.S.C. 1356(m), for the EB–5 program until the fees established under section 106(a) of the EB–5 Reform and Integrity Act of 2022 are codified and take effect.

Regarding concerns raised about processing times, DHS appreciates that USCIS is experiencing considerable backlogs in the processing of EB–5 related forms. USCIS is committed to adjudicate cases and reduce processing times, and USCIS continues to look for efficiencies in the EB–5 program, especially now as we implement the new legislation efficiently and effectively. Across our agency, we are working diligently to fill vacancies and IPO is no exception. While many of these positions remain unfilled due to attrition, prior budget constraints, and the prior hiring freeze, we are working to increase our staffing levels to support the mission. It is important to note too that in addition to adjudicating cases, IPO requires the time and subject matter expertise of our adjudications staff to address other necessary efforts, including implementation of the new legislation, litigation response, FOIA requests, public inquiries, and others.

USCIS understands the desire to receive prompt service, and the agency strives to provide the best level of service possible. USCIS also recognizes that lengthy processing times place a strain on EB–5 investors who are awaiting the adjudication of their immigration benefits. DHS proposed higher fees to fund additional USCIS staff generally and for EB–5 workload specifically, and other reasons identified in the proposed rule. *See, e.g.,* 88 FR 402, 417–419, 509–510 (Jan. 4, 2023). USCIS cannot commit to across-the-board processing time reductions as adjudications involve case-by-case review of complex applications and related supplementary information.

*Comment:* Commenters expressed the following concerns with EB–5 completion rates:

• USCIS' completion rates for processes related to the EB–5 classification are based on questionable data and are an inaccurate measure for proposing fees.

• USCIS officials have admitted under oath that the time to adjudicate Form I–526 is not actually tracked and instead based on assumed metrics, which calls into question many other adjudication figures cited by USCIS.

• Even assuming these adjudication figures are available and accurate, it is difficult to justify such a substantial increase in completion rates from FY 2017 to FY 2023 for some forms, including Forms I–526 and I–829, given no substantial changes in EB–5 regulations across that period.

• Commenters expressed confusion about the methodology used to determine the proposed fee increase for Form I–526 filings, given recent procedural changes and the lack of adjudication tracking for this form.

• A commenter asked the basis for the adjudication time for Form I–526 increasing by 240 percent, considering the reduced adjudication burdens after the shift of work from Form I–526 to other forms.

• A commenter stated that the manhours the proposed rule stated that officers spent on each application is nonsensical and that, if accurate, there would be no backlog.

• USCIS has not provided any statistics on the adjudication of Form I–956 and it is difficult to justify a completion rate significantly higher than the rate for Form I–924.

• USCIS should pursue a comprehensive study of the overall fee structure for EB–5 forms.

*Response:* DHS strives to make its fee schedules equitable, balancing the ability to pay and beneficiary pays principles, using the best information available. DHS is not required to precisely calculate the amount of time required to process all requests or the burden of one immigration benefit request or program relative to the entire realm of USCIS responsibilities. However, DHS follows OMB Circular A–25 to the extent possible and uses subject-matter expertise to estimate completion rates for the EB–5 program forms. The completion rates are estimates developed by Office of Performance Quality, using data and subject matter expert input from the Field Operations Directorate's (FOD's) IPO. Additionally, USCIS estimated the completion rates of the EB–5 forms by extrapolating from similarly complex

---

[222] EB–5 Reform and Integrity Act of 2022, Pub. L. 117–103, section 106(c)(1) (providing that the EB–5 fees may exceed the levels determined necessary in an amount equal to the amount paid by all other fee-paying requests to cover the costs of requests charged no or reduced fees).

adjudications, and by surveying personnel who were experts on EB–5 request processing. While INA section 286(m), 8 U.S.C. 1356(m), requires USCIS fees to be based on the total costs for USCIS to carry out adjudication and naturalization services, which could be affected by the amount of time required to process requests, it does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or perceived market rates and values. DHS has investigated the concerns of the commenters and believes the estimates used to determine the fees for Forms I–526, I–829, I–956, and other EB–5 workloads are reasonable.

c. H–1B Registration Fee

Numerous commenters expressed support for the proposed fee increase for H–1B registration. Commenters wrote:

• Employers should be willing to sponsor an employee with any reasonable fee.

• The fee increase would give more opportunities to talented foreign students in STEM fields; assist small and mid-size U.S. companies; and improve USCIS efficiencies and adjudicator wellbeing.

• The proposed increase of the H–1B pre-registration fee would help address ongoing H–1B lottery abuse, whereby companies can submit multiple, frivolous registrations for a single candidate.

• With H–1B lottery abuse and a 57-percent increase in registrations from 2020 to 2023, the fee increase would cover USCIS' operation costs and help to avoid false cap registrations. False registrations harm the legal rights of other applicants who are hired through standard processes and who later apply for the H–1B visa to continue working for the same company.

• The increased registration fee would discourage companies from enrolling potential employees in the lottery before they accept an offer or start working, which disadvantages existing employees.

• USCIS should raise the fee further to mitigate abuse and other related concerns to stop lottery abuse, suggesting fees ranging from $500 to $3,000.

• The increase in the H–1B fee to $215 is too low because if an employer sincerely wants to recruit highly skilled foreign nationals, they should be willing to pay more. A higher fee would fund USCIS operations and reduce abusive petitions.

• General agreement with the fee increase, but the proposed fee would not help to mitigate abuse.

• USCIS should consider duplicate registrations based on SSNs or passport IDs.

Multiple commenters expressed opposition to the proposed fee increase for H–1B pre-registration. Those comments are summarized as follows:

• The rule would negatively impact employers and small businesses.

• The registration fee would disincentivize registration, creating a chilling effect on recruitment and stifling technological innovation.

• The increase in filing fees would create an unequal system whereby small businesses would be unable to hire and retain H–1B workers, unlike Fortune 500 companies that can afford the higher fees.

• USCIS should foster a healthy and even-handed competition between small and large businesses that are interested in hiring H–1B workers.

• USCIS should consider a smaller, 100-percent increase to $20 instead of the proposed increase.

• The registration fee increase is unfair, unreasonable, or unjustified. The electronic registration program was designed to reduce costs and increase efficiencies in the H–1B process. If USCIS knew soon after the program's creation that it was not sufficiently recuperating costs, it should not have proceeded with implementation.

• The fee increase is in direct opposition to the justifications DHS lists in the **Federal Register** for the changes to the fee structure. The commenters provided the following reasoning:

○ The proposal is contrary to law and fails to meet the intended goal of the electronic H–1B registration program to eliminate unnecessary costs and mitigate the inefficient use of both government and petitioner resources.

○ The proposed H–1B registration fee is contrary to the implementing regulation, which stated that the registration fee was to be nominal. The proposed fee defies this stated goal and exceeds the amount necessary to run the annual selection process. The proposed fee is unlawful.

○ Increasing user fees rarely deter alleged misuse of a program, and instead adds unnecessary burdens to the legitimate use of the H–1B program. The fee would not likely dissuade any who may attempt to increase the odds, but instead would price some companies out of the market.

○ The proposed 2,050-percent increase to the H–1B registration fee is one of the only processing fees that does not cover processing, as DHS

specifically confirms that there are no costs associated with adjudicating an H–1B registration.

○ The proposal would not reduce barriers and promote accessibility but would amount to an unjustifiable mechanism for generating revenue without providing benefits to most companies paying the fee.

• The fee is unjustifiable and arbitrary, and DHS should conduct its promised review to calculate H–1B registration costs, beyond the vague existing references to costs to inform the public and conduct management and oversight before raising registration fees by more than 2,000 percent.

• DHS should provide additional transparency regarding how it arrives at a final fee amount and how it will allocate the additional funding to benefit the H–1B registration process.

• USCIS should reference activity costs for a) informing the public, and b) management and oversight with more specificity, and clarify the justification for the $129 component of the H–1B fee allocated to Management and Oversight.

• The registration fee is only slightly less than substantive Form I–129 ($147) and Form N–400 ($150) fees despite this being an automated, computer-generated selection with no adjudication involved.

• No fee should be required for informing the public and for management and oversight, because the activity is conducted online at effectively zero cost or only occurs during a short period of the year. Even if fees are required, the fees should drop when the number of registrations increases. The fee is unjustified and should be rescinded.

• USCIS is taking a narrow view in presuming employers can pay the increased registration fee because the H–1B registration system is a lottery and increasing the fee by over 2,000 percent would be unfair.

• USCIS has not considered the cumulative costs to employers or the actual budgets of a company. While companies may appear to have a high net income, the fee increase is substantial enough to affect whether a company can employ or continue to employ a foreign national.

• The proposed fee would not eliminate multiple registrations; USCIS should consider disregarding H–1B registrations from different organizations filed for the same candidate.

• USCIS should raise the registration fee for each additional entry, suggesting $200 for the first entry, $400 for the second, $800 for the third, and $1,600 for the fourth.

• Petitioners engaging in lottery abuse should face penalties.

• USCIS should not use fees as a mechanism to deter multiple entries in the H–1B lottery pool, because a higher fee would not assist in this effort. Instead, USCIS should keep fees low to encourage employers to sponsor international talent and place a cap on multiple (two to three) entries with the same passport number.

• USCIS should evaluate this fee carefully to promote fairness and efficiency in the lottery system. If selected, the applicant's registration fee should be counted toward the Form I–129 filing fee to reduce burdens for small businesses.

• USCIS must revise the *my.uscis.gov* website to allow registrants, applicants, and petitioners to pay filing fees directly and submit filings prepared by attorneys. The new fee coupled with the current system would yield unworkable results, such as credit card company penalties that would block large-scale registrations and unduly prejudice potential beneficiaries.

• USCIS should clarify the timeline for implementing the proposed H–1B registration fee, because it is unclear if the fee would go into effect before the next H–1B cap lottery.

• Reliance on application fees such as the one for the H–1B registration generates perverse incentives. Because the H–1B lottery is random, many large firms sponsor more migrants than they need, and these factors cause the H–1B visa program to subsidize other areas of the immigration process. Because USCIS lacks the funding to promptly review applications, that distortion is tolerable since the H–1B visas are profitable.

*Response:* When DHS established the current $10 fee, USCIS lacked sufficient data to precisely estimate the costs of the registration process, but we implemented the $10 fee as a measure to provide an initial stream of revenue to fund part of the costs to USCIS of operating the registration program. *See* 84 FR 60307 (Nov. 8, 2019). The electronic registration program has made the H–1B selection process more efficient, both for H–1B petitioners and USCIS, by no longer requiring the preparation and submission of Form I–129 for all petitioners before they knew it would be adjudicated. Form I–129 now need only be filed by petitioners with selected registrations who wish to petition for an H–1B worker. The implementing regulation specifically anticipated that this temporary, nominal fee would ultimately increase based on new data, stating, ''Following implementation of the registration fee provided for in this rule, USCIS will

gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery.'' *See* 84 FR 888 (Jan. 31, 2019); *see also* 84 FR 60307, 60309 (Nov. 8, 2019). Given that $10 was an intentionally low and temporary fee, DHS disagrees with some commenters' characterization that the proposed fee should not increase substantially. DHS clearly explained in the proposed rule that the proposed $215 H–1B registration fee was based on empirical cost estimates, as anticipated in the implementing regulation. *See* 88 FR 402, 500–501 (Jan. 4, 2023). DHS based the proposed fee on the activity costs for two activities: Inform the Public and Management and Oversight. *Id.* The fee review supporting documentation provides definitions of these activities. Inform the Public involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives. As explained in the supporting documentation, Inform the Public includes the offices responsible for public affairs, legislative affairs, and customer service at USCIS. Management and Oversight involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals. The proposed rule stated that the registration selection was automated, but that does not mean that USCIS incurs no costs in operating and maintaining the system or that registration fees should not fund some of the costs of services provided without charge as permitted by the INA.

As explained in the proposed rule, DHS is authorized to fund all USCIS operating costs and absent other funding mechanisms we must adjust fees to maintain an adequate level of USCIS service. *See* 88 FR 402, 417–419 (Jan. 4, 2023). DHS does not establish the H–1B Registration Fee at $215 without having carefully considered the implications and effects of such an increase. DHS understands that the beneficiaries of H–1B petitions help the U.S. lead the world in science, technology, and innovation. At the same time, DHS is charged with establishing a fee schedule that will fund USCIS using authorized, available, and appropriate means. Faced with the imperative of adequately funding USCIS to ensure the fair and efficient functioning of the legal immigration system, DHS has determined that increasing the H–1B

Registration Fee to recover the costs of the registration system is the option that minimizes burden for the most individuals and entities overall.

DHS has limited data with which to estimate the impact of the increased H–1B Registration Fee upon the number of H–1B registrations. The Price Elasticity section of this rule's RIA shows H–1B petitioners did not reduce requests for H–1B workers in response to the 2016 Fee Rule's 42-percent increase of the Form I–129 fee from $325 to $460. In October of 2021, Congress increased the fee for premium processing of H–1B petitions from $1,440 to $2,500. In reports to Congress submitted before and after the $1,060 (74 percent) increase, although suspension of premium processing may have impacted pre-FY 2020 levels, USCIS observes the percentage of initial Form I–129 H–1B petitions requesting premium processing increased from 37 percent to 47 percent in the first year of higher fees and to 53 percent in FY 2022.[223] In addition to premium processing, the median H–1B registrant demonstrates the continued ability to pay for the assistance of an accredited representative as well as median annual compensation to beneficiaries of $118,000 in FY 2022 and benefits. In contrast to affordability concerns raised in public comments, USCIS observes the quantity of registrants and registrations increasing, including a constant share of small entities (as measured across SEAs for the FY10, FY16, FY20 and current rule), despite these cost increases that would be applicable when filing the subsequent petition. The price elasticity section of the RIA further describes that the registration fee increase comprises less than a 1-percent increase in the total cost to an H–1B employer, relative to the total costs of compensation, benefits, technical assistance, and premium processing fees. Lastly, the Final Regulatory Flexibility Act for this rule (and the separate more detailed SEA) describes the impacts on Forms I–129 for all classifications, I–140, I–360, I–910, genealogy forms, and immigrant investor forms in this final rule to minimize the magnitude and scope of adverse impacts to small entities, including the many small businesses

---

that register and petition for H–1B workers.

A comment about fee increases "chilling demand" for H–1B workers cited since-published NBER research showing that winning the opportunity to file a cap-subject H–1B petition was associated with improved chances of winning a patent, improved chances of obtaining additional external funding, and improved chances of a successful initial public offering over the subsequent five years.[224] USCIS reviewed this research and agrees the findings underscore that the H–1B lottery facilitates employer access to highly valued foreign workers. The study's impacts are measured against many firms that registered for H–1B workers and were selected zero times. In conducting the Small Entity Analysis (SEA) for this final rule, USCIS observed that while some Small Business Administration (SBA)-classified small entities file hundreds of H–1B registrations to be selected to petition for a cap-subject visa, more than ten times that number had only one or two H–1B petitions. While it is not possible to know how each small entity may respond to the combined price increase of the H–1B Registration Fee, Form I– 129 H–1B Fees, and the Asylum Program Fee, any such price response might reasonably be most pronounced among those small entities with the greatest number of valid H–1B workers and registrations. A direct impact of any reduction to the number of registrations submitted would be reducing the number of registrations that any one potential petitioner would need to submit for that petitioner's registrations to be selected and for them to be able to hire the same quantities of H–1B workers. Thus, small businesses that submit fewer H–1B registrations would see marginally increased likelihood of their registration being selected in the lottery, and roughly 85 percent of H–1B petitioners are also small entities.

DHS emphasizes that the H–1B Registration Fee is set at $215 to recover the costs of USCIS administering the legal immigration system. As stated in the proposed rule and multiple sections of this final rule, DHS appreciates the significant contributions of immigrants to the U.S., and this final rule is not intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and

contribute to the economy. DHS considered the comments that suggested that the $215 fee would result in far fewer registrations being submitted and those that wrote that the fee should be much higher than $215 to deter fraud. As stated in the proposed rule, USCIS's ability to generate the necessary revenue through this rule depends on the volumes of forms that pay fees not falling short of the total projected. 88 FR 402, 528 (Jan. 4, 2023). DHS notes the estimated burden of H–1B registration is 0.5 hours plus 0.17 hours for account creation and that this burden is 4.67 hours less than the full petition burden of 2.34 hours for Form I–129, 2 hours for the H Classification Supplement, and 1 hour for the H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement. Although this rule's RIA depicts a baseline with unchanged fees, DHS recognizes many employers seek assistance from outsourced attorneys who, at $196.85 per hour loaded wage, would cost $919 more if the random lottery selections were made on full petitions rather than registrations. Future fee rules will reconsider the H– 1B registration fee and other rulemakings may consider operational changes to the H–1B registration process. In this final rule, DHS has decided to establish the H–1B Registration fee at a level needed to fund the costs of the registration system, but not at such a high dollar amount to present serious risk of disincentivizing valid registrations or chilling valid participation in the H–1B program, including by small businesses.

### d. I–129 Nonimmigrant Workers, Separate Fees (Not Related to Asylum Program Fee)

*Comment:* Many commenters expressed general opposition to Form I– 129 fee increases. Commenters wrote:

• USCIS should reconsider the proposed Form I–129 fees.

• The fee increases would have an adverse effect on cultural life in the United States, higher education institutions, nonprofits, non-major-league athletes, the agricultural community, highly skilled foreign workers and U.S. employers.

• The increase and separation of Form I–129 fees would compound confusion and lead to rejections.

• The proposed separation of forms, processes, and fees based on nonimmigrant classifications was overly complicated and USCIS should instead simplify these processes.

• They opposed all separate Form I– 129 fee increases of over 7 percent, because employment-based immigration

offers a substantial source of revenue for the United States.

• The many changes proposed for Form I–129 petitions would have dire consequences for large and small businesses and firms, would deter recruitment of foreign talent, repel entrepreneurship, exacerbate labor shortages, lead to retaliatory actions from other countries, and amount to millions of dollars in additional costs for multiple large multinational firms.

• The fee increases are unprecedented with significant disparities among categories. For example, comments questioned the difference between H–1B and TN fees.

• H–2A and H–2B completion rates are based on the first six months of FY 2021, and it is not clear whether this is based on actual data collected or estimates of future projections.

• The proposed fees would disproportionately affect the hiring of Mexican citizens, for whom TN petitions are mandatory.

• The increased fees would incentivize employers to challenge RFEs and denials and litigate in Federal court to bypass the appeals process.

• Given the magnitude of the proposed fee increases, USCIS should consider whether it is accurately calculating the funding needed to adjudicate immigration benefit requests without imposing an unreasonable burden on employers.

*Response:* In this rule, DHS implements the fees for all types of Form I–129, as described in the proposed rule. *See* 88 FR 402, 495–500 (Jan. 4, 2023). DHS proposed different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries.

The fees established by this rule better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. Part of the proposed fee was based on the adjudication hours and completion rates for various Form I–129 categories. As explained in the proposed rule, USCIS does not have separate completion rates for the TN classification. *See* 88 FR 402, 499 (Jan. 4, 2023). Currently, USCIS adjudicators report TN hours on these classifications in a catch-all Form I–129 category. *Id.* However, USCIS adjudicators report hours for H–1B petitions separately. As such, DHS proposed separate fees for TN applications than H–1B petitions using different hours information, despite commenters' statements on the

---

[224] *See* Dimmock, S.G, et al (2021) Give Me Your Tired, Your Poor, Your High-Skilled Labor: H–1B Lottery Outcomes and Entrepreneurial Success. Management Science 68(9):6950–6970. *https:// doi.org/10.1287/mnsc.2021.4152.*

similarities between the two workloads. If USCIS has more detailed information to further distinguish between Form I–129 categories in the future, then DHS may use it in establishing fees in subsequent fee rules. As explained in the proposed rule, USCIS began tracking Form I–129 adjudication hours by petitions for H–2A and H–2B petitions involving named or unnamed beneficiaries in FY 2021. *See* FR 402, 498 (Jan. 4, 2023). The FY 2022/2023 fee review considered the first 6 months of that data because it was the most recent available at the time of the FY 2022/2023 fee review. *Id.* DHS believes this 6 months of data is still reasonable to use. Future fee reviews will use a full year of information if it is available.

DHS does not believe that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners. However, DHS is implementing lower Form I–129 fees for small employers and nonprofits, as described in section II. C. *See* 8 CFR 106.2(a)(3). These lower fees should alleviate some of the concerns raised by commenters, such as the effect on nonprofits and small businesses. We broadly address concerns on other petitioners, such as agricultural or cultural employers, in section IV.B.2.e of this preamble.

Should a petitioner wish to appeal a decision after a denial, they may file Form I–290B. As explained in the proposed rule, DHS limited the proposed fee for Form I–290B, consistent with past fee rules, 88 FR 402, 450–451, and adopts the proposed fee for Form I–290B in this final rule.

DHS does not separate Form I–129 into different forms for different classifications in this rule. DHS disagrees with commenters that separate Form I–129 fees will create confusion and delays. Some petitioners or applicants already pay different fee amounts based on whether statutory fees apply or the services they choose. In some cases, certain petitioners must pay statutory fees in addition to a base filing fee. For example, several statutory fees exist for H and L nonimmigrant workers.[225] H–2B and R nonimmigrant classifications have a different premium processing fee from all other nonimmigrant classifications. USCIS provides several optional checklists to help navigate the specific requirements

[225] Various statutory fees apply to H and L nonimmigrants. For more information on the fees and statutory authority, see USCIS, "H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker," available at *https://www.uscis.gov/forms/all-forms/h-and-l-filing-fees-for-form-i-129-petition-for-a-nonimmigrant-worker* (last updated/reviewed Feb. 2, 2018).

of some nonimmigrant classifications. DHS makes no changes to this rule based on these comments.

*Comment:* Commenters raised the following concerns with the proposed fees and their effects on small businesses and nonprofits:

• The unnecessary and unjustified proposal would disproportionately increase economic burdens on small businesses.

• Small organizations and nonprofits that cannot absorb the fee increases would ultimately limit petitions submitted on behalf of foreign workers, which they said would result in the loss of a critical resource across various industries and decrease U.S. competitiveness.

• USCIS should reduce the proposed fees for ACWIA petitioners so that public institutions can better allocate limited funds to STEM professionals needed for patient care or health care research.

• USCIS should consider a tiered fee for the Form I–129 based on business size as a solution in the absence of comprehensive immigration reforms.

○ The increased fee for H–2A petitions with named beneficiaries makes sense, but USCIS should keep the fee for unnamed beneficiaries at $460 per petition.

Commenters wrote that USCIS should exempt Form I–129 petitions from a fee for the following types of petitioners:

• Governmental research organizations.
• Nonprofit institutions.
• Academic institutions.
• Religious institutions.
• Cap-exempt employers.
• Nonprofit organizations.
• Higher education institutions.
• Small businesses.
• Agricultural employers.
• If the beneficiary is a currently on a student work visa, an artist, or a performer.

*Response:* In response to these comments, DHS implements lower Form I–129 fees for qualifying petitioners. *See* section II.C of this preamble. To qualify for the lower fee, petitioners must be a nonprofit organization or a small employer of 25 or fewer FTE employees. *See new* 8 CFR 106.1(f). In many cases, these lower I–129 fees are approximately half of the proposed fee. *See* 8 CFR 106.2(a)(3). In some cases, DHS maintains the current $460 fee. *Id.* These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule. DHS has reviewed the comments and has decided not to provide any fee exemptions for Form I–129 because the petitioner would generally need to have

the capacity to employ the beneficiary and pay any applicable wages and benefits at the time of their admission or upon a grant of status based on the petition approval. Meaning, if an employer cannot afford USCIS fees, then it is unlikely that they would be able to afford to employ the beneficiary of their petition.

DHS considered the volume and content of the comments on this subject, many pointing out the cultural, economic, and scientific benefits that inure to the United States from the ability of institutions being able to hire talented foreign nationals to assist them in their pursuits. DHS agrees with the commenters and has decided that some accommodation should be made for Form I–129 petitioners, such as cultural or scientific employers, that may have very little revenue or profit or lack budgetary flexibility such that they would benefit from some relief from the increased fees. Therefore, DHS has decided to provide a reduced Form I–129 fee for small employers and nonprofits. DHS broadly addresses other comments from employers in section IV.B.2.e of this preamble.

*Comment:* Many commenters expressed opposition to the proposal to cap the number of beneficiaries on Form I–129 petitions at 25 beneficiaries. Comments in opposition to the proposal to limit petitions to 25 beneficiaries stated the following:

• They would have a serious adverse effect on O and P filings, increase the work of USCIS officers, and raising questions as to how O–2 and P petitions should be filed and will be adjudicated, based on the regulatory requirements.

• This proposal was based on an audit of H–2 petitions, and there is no evidence to suggest that this proposed rule would be equitable for the O or P classification or those who have only a few beneficiaries.

• The proposal would require numerous petitions for large ensembles, imposing additional financial burdens on nonprofits and performing arts groups.

• The proposed cap would negatively impact Australia's creative imports to the United States.

• The increase in fees would have a chilling effect on growers' ability to afford to transfer workers as allowed by the regulation.

• The proposal would penalize employers who have developed longstanding relationships with H–2 workers.

• Employers with few beneficiaries or employers that submit multiple petitions, would subsidize the costs of

003237

large employers with many beneficiaries.

• In the O–2 and P context, groups must include more beneficiaries than what may be needed for U.S. performances, and theatrical groups cannot perform with a limited subset of performers or crew.

• Limiting petitions to 25 named beneficiaries does not align with DHS's goal of accurately reflecting differing burdens of adjudication and adjudicating petitions more effectively. It is less efficient for USCIS to review multiple petitions, as opposed to reviewing one.

• The proposal generates unnecessary burdens and confusion for entities to file multiple petitions.

• The need to file multiple petitions would create complications with respect to meeting the requirement that 75 percent of the members of a group applying for a P–1B visa must have belonged to the group for at least 1 year.

• Confusion could lead to mistakes when applying with the Department of State due to individuals using the incorrect receipt number.

• A large group of individuals covered by various petitions may not be able to identify which petition number applies to them upon arriving at a consular office to obtain their visas.

• The proposal introduces increased risk of inconsistent adjudication and delays, and would create logistical problems such as one employer's petitions moving at different speeds or with different outcomes.

• This raises various questions around union consultations and principal petitions, and the increased separation of petitions from the principal petition could result in more RFEs.

• This is arbitrary and the fee structure impermissibly discriminates against employers with fewer workers on named petitions.

• DHS failed to provide the public with data regarding the number of names typically listed on named petitions.

• DHS has not afforded the public sufficient opportunity to comment on the rationale for limiting petitions to 25 named beneficiaries.

• USCIS should continue to process P petitions based on current practices, and instead consider an audit of the O and P classification to better determine the need or feasibility of increased fees or separation of petitions based on beneficiary numbers.

• USCIS should use a sliding scale for petitions with more than 40 beneficiaries.

• USCIS should determine a fee structure that allows all named beneficiaries to remain on a single petition, such as a cost per beneficiary or per group fee structure.

• Instead of capping petitions at 25 beneficiaries, USCIS should require a higher fee for petitions involving more than 25 workers on a per-worker basis as Department of Labor (DOL) does for H–2A fees.

• The new fees are arbitrary and capricious because it would have perverse consequences for returning workers who have been previously vetted by USCIS while petitioners recruiting new unnamed workers would pay lower USCIS fees to hire workers that were not previously vetted.

• USCIS is creating a substantial incentive for employers to submit petitions with unnamed beneficiaries.

• USCIS' reference to background checks as justification for higher fees for named beneficiaries is misplaced because visa applicants are already subject to background checks at consulates abroad.

• DHS fails to explain why it performs background checks on named beneficiaries listed in a petition and fails to consider the alternative to rely on DOS to conduct background checks or take public comment on such a proposal.

• Charging fees based on whether H–2A beneficiaries are named or unnamed is not necessary to address the disparity in resources required for processing petitions because unnamed beneficiaries are less resource intensive for USCIS to process.

• A disparity in government resources needed should not be dispositive in setting fees.

• The proposed fee structure already adopts the OIG's recommended solution to the resource disparity and places a cap on the number of beneficiaries that an employer may name in a single petition.

• USCIS could tie the fee to the number of workers requested—whether named or unnamed—to ensure small employers do not bear a disproportionate share of processing costs imposed by large employers.

• The proposed separation of fees for unnamed beneficiaries is unfair to H–2B users who are requesting returning workers through the H–2B supplemental cap allocation process that USCIS created, which requires naming workers.

*Response:* DHS disagrees with the commenters that stated a limit on the number of named beneficiaries would harm most petitioners. As explained in the proposed rule, a report by the DHS

Office of Inspector General (OIG) reviewed whether the fee associated with the filing of H–2 petitions is equitable and effective.[226] It made three recommendations. DHS adopts the first recommendation by implementing fees based on the time necessary to adjudication a petition. DHS adopts the second recommendation by implementing separate fees for petitions with named workers. We explained the cost differences in the proposed rule, how petitioners filing petitions with low named beneficiary counts subsidize the cost of petitioners filing petitions with high named beneficiary counts, and how the limit on the number of named beneficiaries results in a more equitable fee schedule. 88 FR 402, 498 (Jan. 4, 2023). We explained that USCIS would perform background checks on named workers. DHS agrees with commenters that DOS will perform background checks for the programs that DOS administers, in accordance with DOS's own policies. As explained in the proposed rule, DHS is expanding the limit to named workers to other Form I–129 petitions, such as the O classification, to make the fee structure more equitable like the OIG report recommended for H–2 petitions. 88 FR 402, 498–499.

DHS declines to implement a fee per named worker as an alternative to the 25 named beneficiary limit, as some commenters suggested. Creating and maintaining such as system would be administratively burdensome. DHS does not require additional per beneficiary fees for other multi-beneficiary benefit requests, such as Form I–539. Such a system would complicate intake and adjudication by requiring USCIS to determine the correct fee was paid for the number of beneficiaries requested.

Regarding the assertion that it is unfair to H–2B petitioners for returning workers through the H–2B supplemental cap allocation process to require naming beneficiaries in the supplemental process, naming beneficiaries on petitions has been required under the statutory cap exemption that was last in effect for FY 2016. Subsequent H–2B supplemental caps have permitted returning workers to be requested as unnamed beneficiaries in all iterations that have included this requirement, with eligibility of such workers determined by DOS in the visa application process. Thus, the limit on named beneficiaries in this rule will not

---

[226] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

003238

have the effect the commenter suggested it will.

Commenters did not provide data to refute that petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. As shown in the RIA for this final rule, many petitions with named beneficiaries request 1–25 named beneficiaries. For example, 99.7 percent of O petitions from FY 2018 to FY 2022 requested 1–25 named beneficiaries. In the same timeframe, 98 percent P petitions requested 1–25 named beneficiaries. Meaning, the vast majority of these petitioners will only need to file one petition despite the limit on the named beneficiaries implemented in this rule. No changes were made based on these comments, except for the small employer discounts discussed earlier in this preamble. See section II.C. Changes from the Proposed Rule.

*Comment:* Many commenters in opposition to the proposal to limit petitions to 25 beneficiaries suggested policy or operational changes. Commenters stated the following:

• USCIS should create an online beneficiary submission option on a secure site where the petitioner would list each beneficiary's information and upon submission of the full list, would receive a confirmation page included with the petition filed with USCIS.

• DHS should review whether it is necessary to conduct a background check of named beneficiaries on every petition, given that in every extension or transfer request the named beneficiaries will have already cleared a background check and been admitted to the United States.

• If USCIS raises the fees for named workers, it must stop unnecessarily requiring naming in the supplemental process.

• USCIS should automatically approve unnamed petitions without a fee, and not raise fees for named beneficiaries, which would save employers time and money, preserve agency resources, and reduce the usual H–2 filing fees.

• USCIS should require DOL to certify H–2A and H–2B recurring jobs for up to 3 years to provide more visas under the H–2B annual cap, reduce unauthorized immigration, and foster employment and economic growth.

• The proposed fee changes for named beneficiaries would hinder H–2 worker mobility by discouraging U.S. employers from hiring H–2 workers already present in the United States and seeking to change employers. A 2015–2017 analysis of human trafficking on temporary work visas, a Farmworker

Justice report on worker abuse, and a survey of returned H–2A workers in Mexico, indicate that this lack of mobility would amplify existing power imbalances between employers and workers and lead to coercion, intimidation, legal violations, trafficking, and forced labor.

• USCIS should abandon its proposal to increase the Form I–129 fee for named beneficiaries to benefit H–2 workers by empowering them to leave unhealthy or illegal work environments and incentivize H–2 employers to provide competitive working conditions and wages.

• The lack of worker mobility is a core flaw of the H–2A program by tying workers to a single employer, and the proposed rule would create another obstacle for workers seeking other employment in the United States.

*Response:* DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through future guidance or rulemaking. For example, DHS proposed changes to H–2 program which may address some comments on worker mobility, if adopted in a future final rule. *See* 88 FR 65040 (Sept. 20, 2023). However, DHS declines to make any of these H–2-specific policy and procedure changes in this final fee rule. USCIS's fee study determined the agency's costs of processing petitions for named H–2 workers are greater than the costs of processing petitions for unnamed H–2 workers. While commenters allege that studies indicated a causal link between DHS filing fees, lack of mobility and abuse, USCIS reviewed these studies and found that they contain no specific references to the fees set in this rule. While worker violations, including serious reports of trafficking of H–2 workers do occur, neither DHS nor the commenters can prescribe here what improvements in worker mobility reasonably would be achieved per dollar of subsidized named H–2 fee.

(1) H–1B Classification

*Comment:* Multiple commenters expressed general opposition to the proposed H–1B fee increases, with many citing impacts to U.S. companies, workers, and the economy. Commenters stated that increases in the H–1B fee would be detrimental to various U.S. employers, such as educational institutions, health care institutions, and technology companies limiting their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important

workers, thereby stifling innovation. Commenters wrote:

• The fee increase for H–1B visas would make legal immigration more difficult.

• The increased filing fees for H–1B visas would result in dire consequences for thousands of international students seeking employment in the United States and discourage small firms from hiring individuals on F–1 visas.

• USCIS should exclude petitions for H–1B workers from the proposed fee increases altogether, because high processing and legal fees make it difficult for applicants to find new employers.

• USCIS should further increase H–1B fees because H–1B jobs are generally much higher paying jobs than the H–2A or H–2B and are for a longer duration.

• USCIS should waive the H–1B requirement for individuals with an approved Form I–140 petition.

• USCIS should raise the cap on H–1B visas to increase revenue.

*Response:* DHS acknowledges that a higher fee may affect certain employers from hiring H–1B workers, but we have analyzed the impacts of the new fees (RIA and SEA) and there is no evidence that the H–1B fees in this rule are increased to the extent that U.S. industries and the U.S. economy may lose some the skilled workforce this program provides.[227] DHS acknowledges that some petitioners may incur additional legal fees. The economic analysis does not describe every immigrant's situation. Rather, DHS presents our best estimates of the effect of the rule. As stated earlier, USCIS is almost entirely fee funded, meaning that tax revenues from the salaries of H–1B workers do not indirectly provide funding for USCIS. As such, DHS sets USCIS fees without consideration for tax revenues from H–1B workers. In any event, an adjustment in immigration and naturalization benefit request fees is necessary because USCIS cannot maintain adequate service levels, at its current level of spending, without lasting impacts on operations. The new fee schedule was calculated by benefit request, as explained elsewhere. As explained throughout this preamble, DHS exercises its discretionary authority to set fees for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to

---

[227] *See* USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https://www.regulations.gov/document/USCIS-2021-0010-0031; see also* USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https://www.regulations.gov/document/USCIS-2021-0010-0033.*

the requestor and to USCIS. The price elasticity analysis for Form I–129 indicated that after the last fee increase, I–129 volumes increased when the fee increased and remained around the same level in the following years. While counterintuitive to conventional theory that quantities demanded decrease in response to price increases, DHS believes this data supports that H–1B petitioners will be willing to pay the higher fees set in this rule.

In this final rule, for nonprofits and businesses with 25 or fewer FTE employees (including any affiliates and subsidiaries) filing Form I–129 for the applicable nonimmigrant classification, DHS is setting the fee at either the current $460 fee or half of the new fee whichever is higher. *See* 8 CFR 106.2(a)(3)(i).

DHS declines to make the other changes suggested by these commenters.

*Comment:* Some commenters expressed support for the proposed H–1B fee increases. Commenters wrote:

• They supported the proposed increase in H–1B filing fees because the proposed fee increase would help USCIS process cases faster and hire more employees.

• The fee increase would be nominal relative to applicants' salaries, and any additional expense would not be noticeable as it would be spread over the duration of the visa status.

*Response:* DHS appreciates that some commenters support the proposed fees. DHS agrees with commenters that the fee increases may allow USCIS to hire more adjudicators. DHS believes that the final fees for H–1B petitions should remain affordable for employers.

(2) H–2 Classifications

*Comment:* Commenters stated that fee increases would particularly impact farms that rely on the H–2A program. Commenters stated:

• The fee will have a negative impact on agricultural employers, the food supply system, future generations of farmers, small businesses and hinder the ability of employers to move forward with capital improvements and hire additional workers.

• The H–2A fee increases fees above the pay that applicants receive for their labor.

• The significant added costs for H–2A workers in the rule would jeopardize the sustainability of U.S. farms and ranches.

• The 1,470-percent increase in fees is a cost agricultural employers would never be able to recover.

• Agriculture continues to absorb unpredictable costs outside of their control, including those associated with inflation, input costs, and depressed farm income. According to USDA data, compared to 2022, labor costs in 2023 will rise by 7 percent, and farm and ranch production expenses are expected to rise by 4 percent–24 percent and 18 percent higher than a decade ago, respectively.

*Response:* DHS understands the need for nonimmigrant workers to meet seasonal or agricultural demands, or both, in the United States and is mindful of the costs for employers involved in doing so. DHS appreciated the important role of farmers and ranches in our food supply system. However, the commenters did not supply any data to quantify how increased fees will jeopardize the U.S. food supply system for future generations of farmers and ranchers. As such, the filing fee for unnamed H–2A workers will be increasing from $460 to $530 per petition (15 percent increase from current fee) and the filing fee for named H–2A workers will be increasing from $460 to $1,090 per petition (137 percent increase from current fee), with a maximum of 25 named workers per each H–2A petition. The change in these filing fees, as provided in this final rule, is consistent with the proposed rule. A report by the DHS OIG [228] reviewed whether the fee structure associated with the filing of H–2 petitions is equitable and effective, and recommended separate fees for petitions with named workers, which, due to the need to verify eligibility of individually named workers, is more costly to USCIS than the costs associated with adjudicating petitions filed on behalf of unnamed workers. However, after considering the comments on the proposed rule, DHS has decided to provide lower fees to accommodate petitioners with 25 or fewer employees and nonprofits, as explained elsewhere in this rule. *See new* 8 CFR 106.1(f). Depending on the nonimmigrant classification for which it is filed, Form I–129 fees will be the proposed fee, $460, or half of the proposed fee. *See* 8 CFR 106.2(a)(3). These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule.

*Comment:* Additional comments on the H–2A and H–2B fee increases are as follows:

○ The proposed H–2B fee increases would price travel businesses out of the program entirely and employers would abandon the program due to increasing complexity and burdens. Thus, the program is likely to be used less, diminishing the fees collected by USCIS for visa services, as USCIS articulates in the proposed rule.

○ Based on a 2011 study on immigration and U.S. jobs, the proposed fees would reduce operations and services for businesses who cannot meet their workforce needs, particularly for seasonal operations. Instead of raising fees, USCIS should modernize its procedures for H–2B processing, adjudication, and job postings to reduce costs associated with compliance and application.

○ If small and seasonal businesses continue to experience rising costs, U.S. consumers would be left to foot the costs, leading to more inflation.

*Response:* DHS' prepared a price elasticity analysis for both the proposed and final rules and placed it in this rule's docket for the public to review and comment on. That analysis indicates that the proposed fees in the rule may not reduce program participation or affect an H–2B petitioner's ability to meet their workforce needs.[229] Nevertheless, to address the commenters' concerns, as described earlier in this rule, DHS implements lower fees for Form I–129 for petitioners with 25 or fewer employers and nonprofit organizations from what were in the proposed rule. *See new* 8 CFR 106.1(f) and 106.2(a)(3). DHS maintains the current fee for H–2A and H–2B petitions with only unnamed beneficiaries for petitioners with 25 or fewer employers and nonprofit organizations. *See* 8 CFR 106.2(a)(3)(iii) and 106.2(a)(3)(v).

DHS appreciates the suggestions of commenters for modernization and integration of the U.S. Department of Labor, DHS, and U.S. Department of State processes for requesting and issuing visas but most of the suggestions are not within DHS's statutory authority or this fee schedule rulemaking. DHS is working toward online filing for H–2B petitions, which we agree would benefit the agency and program users alike. However, such an enhancement may not result in the significant cost reductions that commenters assert will occur, particularly when it requires systems development and programming. When online filing becomes available for H–2B petitions, this rule provides that an "online filing discount" of $50 would generally apply. In addition, the

---

[228] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf*.

[229] See USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https://www.regulations.gov/document/USCIS-2021-0010-0031*. See also USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https://www.regulations.gov/document/USCIS-2021-0010-0033*.

reduced Form I–129 filing fee for small employers addresses most of the concerns about the impact on hospitality, amusement, recreation, and other seasonal industries.

*Comment:* Comments on the H–2 ABC model results were as follows:

• The estimates USCIS used for the H–2B program are vastly different than publicly available data. USCIS underestimated the H–2A and H–2B volumes. USCIS should update its ABC model with proper numbers and consider ways to reduce the cost of employers who are seeking to hire a legal workforce amid U.S. labor shortages. At a minimum, the H–2B fees should not exceed the revised ABC model's cost to perform the H–2B functions.

• The H–2A and H–2B program fees should not exceed the revised ABC model's cost.

*Response:* As explained in the proposed rule, DHS proposed H–2A and H–2B fees that are higher than the ABC model output to offset limited fee increases for some other benefits requests and workloads without fees. *See* 88 FR 402, 451 (Jan. 4, 2023).

Regarding comments on H–2A and H–2B volumes, USCIS used the best information available at the time of the fee review. The average annual estimates for the FY 2022/2023 Fee Review may be more or less than actual receipts in those years. The H–2B program may periodically receive supplemental visas based on joint rulemakings by DHS and DOL.[230] Those increases are temporary. As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting USCIS fees due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). While TPS designations and DACA are the largest such programs, the same rationale may apply to temporary increases in H–2B visas. DHS will evaluate these fees, volume forecasts and ABC model results in future fee reviews using all available data at that time.

### (3) L Classification

*Comment:* Commenters on the L-classification fee increases wrote the following:

• The fee increase for the L nonimmigrant worker petition cannot be

justified, because the same immigration benefit costs five times as much in the United States as it does in Canada. An increase of this magnitude runs contrary to the intent and spirit of free trade agreements between the United States and foreign countries.

• For intracompany transferees under the L–1 program, petitioners may prioritize applications administered by the DOS over USCIS.

• The burden of fee increases may divert limited resources of small- to medium-sized companies away from research and development initiatives, job growth, and other investments.

• They questioned whether the fee increase for L–1 petitions would allow USCIS to render decisions within 30 days in alignment with INA section 214(c)(2)(C), or whether petitioners would have to pay a premium processing fee to have petitions adjudicated within "a reasonable amount of time."

• USCIS should partner with CBP to return to allowing L–1 extensions at the port of entry for Canadian citizens. Before 2019, Canadian citizens could obtain a renewed L–1 at a U.S. port of entry, but CBP stopped processing such applications after a policy change by DHS. Reverting to the policy of allowing CBP to handle such applications would reduce the volume of Form I–129 applications.

*Response:* DHS disagrees with commenters that it did not provide justification for the proposed fee for L petitions using Form I–129. DHS provided the rationale in the proposed rule. *See* 88 FR 402, 495–496. DHS data relating to past fee increases and the small entity impact analysis that accompanies this rule indicate that the moderate fee increases in this rule will not appreciably affect the research, development, employee expansion, and investment budgets of the affected petitioners. *See* Small Entity Analysis, Section 4.C. DHS adjudicates all L-nonimmigrant petitions as expeditiously as possible, and the new fees provided in this rule will allow us to maintain or improve current service levels. In response to comments, DHS provides that L petitions filed by nonprofits and businesses with 25 or fewer employees will pay a $695 Form I–129 fee which is approximately half of the full fee of $1,385 for other L petitions. *See* 8 CFR 106.2(a)(3)(vi) and (ix). DHS has no control over the fees that Canada may charge for similar services. DHS appreciates the commenters' suggestions for policy and process improvements, such as partnering with CBP to allow L–1 extensions for Canadians. We fully considered them and may implement

them through future guidance or a rulemaking. DHS declines to make any other changes to this rule based on these comments.

### (4) O and P Classifications

Many commenters submitted comments about the increase in fees for O and P visas. The commenters oppose the fee increases, stating the following:

• The proposed fee increases would impose financial impacts on the arts, entertainment, and non-major-league sports industries while deterring companies and nonprofits from recruiting foreign talent to the United States.

• The proposed fee increases would deter foreign workers and artists from coming to the United States.

• The proposal would be mutually damaging to the United States and its foreign counterparts, as it would result in increased prices for U.S. audiences and foregone cultural, diplomatic, and economic opportunities. Furthermore, deterring foreign talent would stifle USCIS revenue.

• The negative ripple effect of the proposed fee increases would extend to U.S. cities and businesses that depend on the revenue generated by performances. Based on a 2021 study by Oxford Economics, in 2019 live entertainment supported 913,000 U.S. jobs and increased GDP by more than $130 billion. Furthermore, out-of-town visitors who attend local concerts spent more than $30 billion in U.S. communities in the same year.

• The proposal runs counter to the Administration's September 30, 2022, E.O. on "Promoting the Arts, the Humanities, and Museum and Library Services', which pledged to, "strengthen America's creative and cultural economy, including by enhancing and expanding opportunities for artists, humanities scholars, students, educators, and cultural heritage practitioners, as well as the museums, libraries, archives, historic sites, colleges and universities, and other institutions that support their work."

• The proposed rule contradicts the White House Fact Sheet issued on January 21, 2022, which states the belief that "one of America's greatest strengths is our ability to attract foreign talent."

• The proposed fee increases would be cruel, unjust, or arbitrary as they apply to orchestras and artists.

• The proposed fees would result in a system whereby O and P visas would only be accessible to the highest earners among international performers, venues, and performing arts companies.

• USCIS misapplied the ability-to-pay principle and fails to recognize that O

---

[230] *See, e.g.,* USCIS, USCIS Reaches H–2B Cap for Second Half of FY 2023 and Announces Filing Dates for the Second Half of FY 2023 Supplemental Visas, available from *https://www.uscis.gov/ newsroom/alerts/uscis-reaches-h-2b-cap-for-second-half-of-fy-2023-and-announces-filing-dates-for-the-second-half-of* (last reviewed/updated Mar. 2, 2023).

and P petitioners are not necessarily employers, and in the case of the arts, the foreign national or group often pays the USCIS fees.

• The increased fees would be coupled with additional financial and administrative burdens, such as legal fees, RFEs, premium processing, and the cost of touring, itself. Furthermore, in some itinerary-based professions, the O visa is only granted for a short period, and extensions are costly.

• The O and P fee increases would result in a retaliatory increase in fees by other countries such as Canada and the U.K., generating negative impacts on U.S. artists and performers.

• The fees would limit the international touring industry with broad impacts on the U.S. economy, including decreased Federal and State tax revenue and decreased patronization of businesses by artists and audiences.

• The fee increases do not respect the USCIS-approved Reciprocal Exchange Agreement, covering the reciprocal exchange of U.S. and Canadian artists across respective borders.

• Most touring artists are engaged to perform in small venues, and the proposed increase in fees would block such venues from engaging international artists, leaving only larger employers, venues, and acts with access to cross-border diversity in programming.

• The proposed fees would compound the economic risks associated with inconsistent application processing times, uneven interpretation and implementation of the statute, and unwarranted requests for additional evidence.

• The increase in fees would compound the complexity of an already unpredictable petition process, making the process of petitioning for foreign artists beyond the reach of small- and mid-size organizations, which are most likely to serve communities of color and other marginalized groups.

• The Average Impact Percentage of the fee increase on P visa applicants was not realistically assessed and would likely exceed the estimate USCIS provided in Table 32 of the proposed rule. The Impact Percentage would represent 20.6 percent of the work completed with a P–2 visa. Unlike O visas, P visas are shorter in duration, generate less income, and are usually requested by self-employed artists or smaller organizations.

• The USCIS' SEA underestimated the impact of the proposed fees increase on nonprofit organizations and did not include any performing arts organization (North American Industry Classification System (NAICS) code 711).

• The impact on nonprofit performing arts organizations would be unconscionable should the fees increase to the proposed levels for O and P classifications coupled with the proposed cap on the number of beneficiaries on Form I–129 petitions.

Considering the above concerns related to O and P petition fees, several commenters offered alternatives to the proposed changes, including:

• Conduct an economic assessment of the impact of O and P petition fee increases on the music and entertainment industry before finalizing the rule.

• Postpone implementation of the new fees or give petitioners time to adapt to the change in fees to accommodate the time-sensitive nature of performing arts planning.

• Increase fees based on annual revenue, the number of visas requested, or the number of employees working at a petitioning company, so that larger companies would pay for the extra expenses covered by USCIS fees.

• Implement a tiered structure— based on revenue, length of stay, or venue size, or for individuals who are active in more lucrative industries—to increase accessibility and stability for lower-income applicants.

• Significantly reduce the proposed O and P visa fees such as at $500 or less or increase them by no more than $40 or 1 to 5 percent.

• USCIS should not assign ASVVP costs to H–3, P, or Q petitions when they do not require site visits.

• In the SEA, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by Employer Identification Number (EIN) and revenue. Only one entity had an EIN that overlapped in both samples; this was a large entity that submitted three Form I–129 petitions and a single Form I–140 petition. The commenter suggested this was not reflective of the experience of the commenter, which filed roughly 100 Form I–129 petitions, all for O and P status, between October 1, 2019, and September 30, 2020.

Numerous commenters objected to or expressed concern with the proposed fees and suggested corresponding policy or operational changes, including:

• U.S. stakeholders have already provided USCIS with detailed plans for improvements to USCIS processing of Form I–129 petitions for O and P visas, as outlined in its "Recommendations for Performing Arts Visa Policy."

• The unique nature of scheduling international guest artists requires that the visa process be efficient, affordable, and reliable so that U.S. audiences may experience artistic and cultural events.

Congress affirmed the time-sensitive nature of arts events when writing the 1991 Federal law regarding O and P visas, in which USCIS was instructed to process visas in 14 days.

• The requirement for P petitions that there be no gap in work of more than 1 month would require multiple filings, which further increases the fees paid by the foreign group to come to the United States. The maximum allowed gap of 5– 6 months for O–1B petitions and a 1- year maximum classification period for P nonimmigrants would have a similar effect.

• USCIS should separate the P petition from the miscellaneous H–3, P, Q and R classifications, as the proposed combination includes 14 possible requested nonimmigrant classifications, 10 of which are P classifications. USCIS should separate the P classification for purposes of this proposal or add it to the O classification proposal.

• Keeping the O and P together, or separating the P classification out, would allow for better training of USCIS officers on the specific nuances of the O and P classifications given the similarities in the regulatory requirements for the two classifications (*i.e.,* advisory opinions from applicable union/labor organizations, agents as petitioners, etc.).

• Extend the 3-year authorized period of stay for O and P nonimmigrants to at least 5 years or lower processing fees in exchange for a shorter, 3-month validity period of stay for O an P nonimmigrants.

• Eliminate the unnecessary P visa requirement for Canadian musicians to save USCIS resources and mirror the Canadian policy for visiting U.S. musicians or adopt a system like the UK's Certificate of Sponsorship for performers from Visa Waiver Program countries.

• USCIS should retain information on file for those groups who tour the United States regularly to reduce the need to begin the visa application process anew each time.

• The United States should maintain and prolong the 48-month extension to the Interview Waiver Program, up to 4 years, to alleviate the burden of the visa process.

• USCIS' practice is to deny requests for expedited processing of O and P petitions, which leads to worthy organizations facing prohibitive and obscene filing fees.

• The proposed changes do not adequately address the underlying concerns related to USCIS processing of O and P petitions.

*Response:* DHS agrees with the commenters' views that the arts,

003242

entertainment, and sports industries are vitally important and beneficial. However, DHS reiterates that the fees established in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. DHS does not intend to deter or unduly burden petitioners requesting workers in these, or other, industries but any preferential treatment provided to these petitioners is borne by other petitioners, applicants, and requestors.

USCIS conducted a comprehensive fee review and determined that its costs have increased considerably since its previous fee adjustment. As explained in the proposed rule, the fees for Form I–129 were calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. *See* 402, 495–500. At its current level of spending, USCIS cannot maintain adequate service levels without lasting impacts on operations. *See* 88 FR 402, 426–430, 528; *see also* section IV.D.4 of this preamble. Therefore, DHS needs to adjust fees. Nevertheless, after considering the comments from petitioners for O and P nonimmigrant workers who wrote that they are a small organization with few or no employees, or they are a nonprofit, DHS has decided to lower the fee for a Form I–129 and the Asylum Program Fee filed by either an employer with 25 or fewer employees or one that is a nonprofit entity. 8 CFR 106.2(a)(3) and 106.2(c)(13). As stated elsewhere in this rule, as with any free service or reduced fee provided in this rule, this change requires that DHS shift some of the costs of an employer with 25 or fewer employees or a nonprofit entity petitioning for O and P nonimmigrant workers to other applicants and petitioners.

DHS respectfully disagrees that an increase in fees contradicts the White House's January 21, 2022, Fact Sheet, would be mutually damaging to the United States and its foreign counterparts, or would lead to an increase in the complexities of the petition process. Nevertheless, the lower Form I–129 fees for small employers and nonprofits, as described earlier may alleviate this concern from some commenters.

DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through guidance or a future rulemaking.

(5) R Classification

*Comment:* Multiple commenters provided feedback in opposition to the proposed fee increases for R–1 workers. These commenters wrote:

• R–1 workers offer substantial benefits to the United States in the form of service, outreach, and diverse cultural perspectives and experiences. Considering existing financial barriers for R–1 workers, sponsoring religious organizations and nonprofits would struggle to retain these workers if the proposed fees were implemented.

• The proposed rule fails to recognize the unique role of clergy in society as essential workers and the impact that such fee increases would have on the ability of U.S. religious organizations to fill needed positions with foreign clergy. Based on data from the Bureau of Labor Statistics, 48 percent of U.S. clergy were at least 55 years old, and, between 2018 and 2016, growth in clergy employment opportunities would see an 8-percent growth.

• The fee increases for R–1 petitions would have a chilling effect on U.S. religious organizations and prevent them from carrying out their religious and social mission. The Religious Worker Visa Program is important for providing critical services and addressing the specific needs of ethnic groups, including the Hispanic, Asian, and African communities, as well as the needs of vulnerable populations. The program also assists religious organizations that face obstacles in using traditional employment-related categories, which historically have not fit their situations.

• The fees would disproportionately affect small religious organizations, parishes, and communities that share a charitable function in the United States.

• The proposal departs from prior practice by treating this category like other employment categories. The commenter wrote that fee adjustments for religious workers should weigh the nonprofit nature of the sponsor.

• USCIS should not increase the fee for R–1 visa petitions because the volume of R–1 petitions is low compared to other visa categories and the fee increase would not generate substantial revenue for USCIS but would hurt U.S. nonprofit religious organizations.

• USCIS grouped R–1 visas with the same increase in fees as E–2s (investors), P–1s (professional athletes and performers), and TNs (Mexican/Canadian professionals), but R–1 petitions are filed by nonprofit organizations on behalf of religious workers and neither the organizations nor workers can absorb the proposed increased costs.

• A 2- to 5-percent increase in R immigrant worker fees would be more understandable than the proposed increase from $460 to about $1,000.

*Response:* As explained in the proposed rule, DHS proposed a Form I–129 fee that included the cost of religious workers and other visa classifications. *See* 88 FR 402, 499 (Jan. 4, 2023). Past DHS rulemakings resulted in no decrease in the number of Form I–129 filings for any nonimmigrant classification, and our analysis for this rule indicates that the fees established will not result in any detectable effect on the number of petitioners who choose to petition for nonimmigrant religious workers. DHS has no data, and the commenters provide none, that supports their assertion that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners, churches, religious organizations, or small entities who wish to petition for a nonimmigrant religious worker. However, as many commenters noted, many petitioners for religious workers may be nonprofit organizations. Therefore, as explained more fully elsewhere in section II.C. of this preamble, after considering the comments, and, to alleviate any potential burden on nonprofit religious entities, DHS implements a lower Form I–129 fees for nonprofits in this rule. *See* 8 CFR 106.2(a)(3)(ix). DHS also exempts nonprofits from the Asylum Program Fee. *See* 8 CFR 106.2(c)(13)(i).

(6) H–3, E, Q, and TN Classifications

Several commenters expressed opposition to the fee increases for E and TN classifications. Commenters wrote:

• The fee increases would be antithetical to the special designation afforded to North American Free Trade Agreement countries and Australia.

• The fee for TN when filed with CBP is only $50 while a TN filed with USCIS is over $1,000.

*Response:* DHS recognizes that the E and TN nonimmigrant classifications are available to foreign nationals from certain countries with which the United States has entered into an international agreement, or with which the United States maintains a qualifying treaty of commerce and navigation. Typically, the opportunities accorded to certain noncitizens to obtain these visas are based insofar as practicable on the treatment accorded to U.S. nationals in similar classifications. While U.S. obligations under the international agreements or treaties, as implemented by the United States, permit qualifying nationals of the signatory countries to seek admission to the United States for a temporary period, the agreements do not include provisions that limit the U.S. government from recouping the full

003243

cost of administering the E and TN programs. Furthermore, no provisions finalized in this rule would alter the existing general eligibility criteria for either the E or TN classifications, thus maintaining the special designations afforded to these countries.

The Form I–129 fees finalized in this rule are based on USCIS costs and not CBP costs. Although CBP charges fees for some services, most CBP funding comes from appropriations instead of fees, unlike USCIS. For example, CBP's FY 2021 enacted budget totaled approximately $16.3 billion, of which $14.7 billion came from discretionary appropriations.[231] The remaining approximate $1.6 billion or 10 percent came from a mix of discretionary and mandatory fee accounts. As such, CBP fees may not necessarily need to recover the full cost. DHS declines to make any changes to this rule based on these comments.

e. I–140 Immigrant Petition for Alien Worker (Not Related to Asylum Program Fee)

*Comment:* Commenters suggested process changes to Form I–140. A commenter, citing a USCIS memo, encouraged USCIS to issue an EAD after Form I–140 approval, reasoning that such an approach would advance efforts toward "continuous improvement at USCIS." A commenter expressed concern that some Form I–140 applications may be "duplicate" filings in cases where an applicant is downgrading from an EB–2 to an EB–3 classification due to changing visa availability. The commenter suggested creating a new form for a "request to transfer underlying basis of classification" wherein an applicant may provide proof of EB–2 approval to downgrade their employment visa classification to EB–3, to reduce overall receipt volumes for Form I–140.

*Response:* DHS may consider these comments in future rules or policy changes but declines to address these comments with changes in this rule. These comments focus on changes to the immigration process that are out of scope of this fee rule.

f. I–765 Employment Authorization/ EAD (Not Related to Other Bins/ Exemptions)

(1) General
Comments submitted regarding Form I–765 stated:

• EAD applicants are not employed, and they will struggle to afford the increase.
• USCIS should explain Form I–765 fee increase.
• Increasing costs for EAD renewal will disrupt employment for workers waiting to have their asylum case adjudicated.
• The proposed fee increase for Form I–765 will delay employment authorization for applicants, restricting their economic and civic participation.
• The fee would negatively impact families, international students, and low-income noncitizens who may be ineligible for public benefits and fee waivers.
• Increasing the fee for Form I–765 will exacerbate the current labor shortage.
• USCIS should continue the 180-day EAD status extension and apply the automatic extension to spouses of high-skilled workers.
• If DHS increases the I–765 fee, all EADs should have at minimum a 2-year validity period.
• DHS should issue an EAD to adjustment of status applicants for a period of 4–5 years or longer to reduce the need to adjudicate benefits.
• For humanitarian category applicants, USCIS should provide EADs more quickly and offer a fee waiver or a reduced fee option.
• The settlement agreement in *Edakunni* v. *Mayorkas* requires USCIS to grant an automatic extension to H–4 nonimmigrants who filed their H–4-based EAD renewal on time and extend employment authorization opportunities for L–2 nonimmigrants with valid nonimmigrant status.
• Employment authorization should be provided to J–2 spouses.
• USCIS should not require derivative applicants seeking an extension of status to request employment authorization separate from the principal's H–1B petition.
• USCIS should allow filing of Form I–765 by an approved Form I–140 beneficiary, because allowing noncitizens with approved immigrant petitions to work is an approach endorsed by Congress and statute and would reduce the number of H–1B renewals, saving USCIS time.
• USCIS should issue employment authorization cards without a formal expiration date. Instead, the card should say the application is pending and provide a link or QR code to check its status.
• USCIS should automatically issue EADs to adjustment of status applicants because the information required should already be on file or permit a Form I–

797C receipt notice to serve as an employment authorization.
• Increasing the Form I–765 fee while increasing fees for other employment related benefits forms will impose a disproportionate burden on the employer community because Form I–765 is fundamental to their feasibility to preserve jobs and livelihoods.
• The increased fee may deter eligible workers from utilizing USCIS' new Labor Agency Investigation-Based Deferred Action because of finances.
• Increasing the Form I–765 fee would burden nonimmigrant workers who need to maintain lawful employment and enjoy full labor rights.
• It is notable that there is a fee reduction in online filing for Form I–765 compared to paper filing, however, USCIS needs to improve its online system.

*Response:* DHS is sympathetic to the financial needs of low-income individuals. Thus, this rule maintains all existing fee waivers policies, including those for Form I–765. Individuals or families that meet specific criteria, including receiving a means-tested benefit, are eligible to request a fee waiver. USCIS is working on making the fee waiver process available online, but at this time, Form I–912, Request for Fee Waiver, must be mailed, along with the completed USCIS application or petition and supporting documentation, and cannot be submitted online. As explained elsewhere in this rule, DHS expands fee exemptions for certain populations, including some Form I–765 applicants. DHS notes that there is no fee for an initial Form I–765 filed by an asylum applicant, *see* 8 CFR 106.2(a)(44)(ii)(G), and the renewal fee requests can be waived for applicants who can demonstrate that they are unable to pay, *see* 8 CFR 106.2(a)(3)(ii)(E).

While the proposed rule did not have a specific section on Form I–765, it explained the general methodology for assessing proposed fees, including the proposed fee for Form I–765. *See* 88 FR 402, 450–451 (Jan. 4, 2023). However, the final rule uses a different approach for the Form I–765 implemented in this rule. As explained earlier, in this final rule DHS limits the increase for many fees by inflation and rounds to the nearest $5. The current fee is $410. When adjusted for inflation, it would be $518.[232] As such, DHS is setting the

---

[231] *See* DHS, U.S. Customs and Border Protection Budget Overview Fiscal Year 2023 Congressional Justification available at *https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Customs%20and%20Border%20Protection_Remediated.pdf* (last visited Sep. 20, 2023).

[232] DHS calculated inflation by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (1 + [305.109 − 241.432]/241.432 = .2637 × 100 = 26.37 percent. The current $410 fee

paper filing fee at $520, a 27 percent increase from the current $410 fee. *See* 8 CFR 106.2(a)(44). As explained earlier, DHS is implementing a $50 discount for online filing in most cases. *See* 8 CFR 106.1(g). Therefore, DHS is setting the online filing fee Form I–765 at $470, only $60 more than the current fee of $410. In addition, as explained in the proposed rule and later in this rule, DHS is setting separate filing fees for Form I–765 when filed concurrently with Form I–485 or as benefit requests based on a pending Form I–485 filed on or after the effective date of this rule. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their EAD while their Form I–485 is pending. *Id.*

DHS declines to codify a new validity period of employment authorization for any category in this rule because the length of EAD validity is not directly related to USCIS fees and the other changes proposed. In addition, 8 CFR 274a.12(a) and (c) provide that USCIS may, in its discretion, determine the validity period assigned to any EAD or document issued evidencing a noncitizen's authorization to work in the United States, thus EAD validity periods are generally not codified in regulations such as those being published by this rule. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.

DHS believes limiting the Form I–765 fee increase to the change in inflation, lowering fees for online filing or when filing with Form I–485, continuing to offer fee waivers, and expanding fee exemptions addresses concerns raised by commenters.

(2) Students

*Comment:* Increased fees would create hardships for foreign students, in part because they tend to be low-income and have difficulties finding sponsors.

*Response:* The commenters have not provided evidence that indicates foreign students tend to be low-income individuals or that increased fees would create hardships for foreign students, specifically. In addition, as explained throughout this rule, USCIS is fee funded, and absent another source of revenue to finance its operations, it must charge fees. When lower fees, fee waivers and exemptions are provided

multiplied by 126.37 percent is $518.12. DHS rounds all USCIS fees to the nearest $5 increment.

for a population, the cost of the immigration benefit request for which the fee is lowered must either be recovered in the form of higher fees for another group, or USCIS' limited funding reserves must be depleted to cover those costs. DHS declines to provide discounts to Form I–765 on the basis that the applicant is a student. However, as explained elsewhere in this preamble, DHS is limiting the fee increase for Form I–765 to the change in inflation since the last fee rule. DHS also is setting an online filing fee for Form I–765 that is $50 less than the paper filing fee. Generally, students are eligible for online filing. These changes from the proposed rule will benefit students and all other Form I–765 applicants that will pay the new fee.

(3) DACA

*Comment:* DACA recipients should receive an exemption to the I–765 fee increase because DACA fees and costs were not considered in the fee model so the exemption should be granted without needing to alter USCIS' financial analysis. The fee would hinder DACA recipients from renewing their employment authorizations and exacerbate the burden of DACA status renewal fees and other costs for those with uncertain status.

*Response:* DHS does not believe the $520 fee will hinder DACA recipients from renewing their EADs that have allowed them to earn income in lawful employment in the United States. In addition, as DHS stated in the DACA rule, DHS believes that maintaining the existing fee structure with limited fee exemptions strikes the appropriate balance and declined to modify the rule to extend fee waivers or exemptions for DACA-related I–765s. 87 FR 53152, 53237 (Aug. 30, 2022). Likewise, DHS declines to make any changes based on these comments in this rule.

g. Other/General Comments on Employment-Based Benefits

Commenters on employment-based benefits generally stated:

• They are opposed to any increase in fees for employment-based visa holders and their employers because costs and timeline burdens are already high for this population.

• USCIS employment-based benefit request fees should be used to process H–1B and H–4 visas, rather than other visa categories.

• USCIS should commit to deciding normal applications in 1 month. RFEs and delays are tactics to generate more revenue. USCIS should commit to delivering a certain number of employment-based benefit request decisions each day.

• USCIS should increase the fees for family and humanitarian-based petitions and not for employment-based petitions. USCIS should allocate its resources to process each form according to how much revenue it generates.

• These fee increases will burden the business community rather than improve upon services render or save costs.

• Increased fees for employment-based petitions would further burden academic research employees whose grants specify a salary budget that includes visa costs. USCIS fees are an ineffective use of public grant funds aimed at research.

• USCIS should allow applicants awaiting an employment-based benefit decision to pay a one-time fee, suggesting $5,000 per applicant, and file for adjustment of status along with an EAD and travel documentation to provide stability for those who have been waiting in the queue for a decade or more.

• USCIS should restrict the EB–1C category because fraud is preventing researchers and scientists from moving to the United States.

• USCIS should not waste any Green Cards for employment-based categories because providing Green Cards increases the backlog.

• USCIS should reimplement the known employer program because the agency should possess sufficient information and data to establish a permanent program. The program could lower costs and increase efficiency for employers, particularly those who frequently file petitions in large volumes.

• USCIS should continue development and implementation of a trusted employer program that allows established and well-known employers to file their petitions more easily. USCIS expected a trusted employer program would promote simplicity and efficiency in the benefit application process for employers, while allowing USCIS to further protect benefit integrity, ensure consistency with respect to adjudications, and reduce the need for fraud detection at the individual level for such employers.

*Response:* DHS discusses processing times, backlog reduction, family-based fees versus employment-based fees, and the uses of fee revenue elsewhere in this rule. The other comments summarized above are about changes to programs and policies and not directly about the fees or changes that were proposed in the proposed rule; thus, DHS declines to make any changes based on these comments.

3. Citizenship and Naturalization

a. N–400 Application for Naturalization

*Comment:* Some commenters expressed support for the fee increase for Form N–400, writing:

• The fee increase was justified given inflation.

• The increase was minimal.

• The Form N–400 application should remain accessible based on applicants' ability to pay, which the proposed rule would accomplish.

*Response:* DHS appreciates commenters' feedback and has made no changes in the final rule based on these comments. DHS sets the Form N–400 fee as in the proposed rule, except that the final fee schedule now includes $50 discount for online filing.

*Comment:* Multiple commenters expressed opposition to the increased fee for Form N–400. Commenters indicated that increasing the Form N–400 fees would price out many immigrants who are often low-income or below the Federal poverty level. Some added that the increase would impact many applicants who face difficulty affording the current fee but do not qualify for a fee waiver or reduced fee. Several commenters reasoned that the fee increase would discourage immigrants from becoming citizens and contributing more to the country. Many commenters similarly urged USCIS to incentivize naturalization and make processing fees more affordable. The commenters added that naturalization increases earning potential and security so applicants can more fully participate in civic life.

*Response:* DHS appreciates these commenters' concerns regarding the affordability of naturalization and recognizes the benefits of naturalization for new citizens and the United States. However, DHS has only increased the fee for Form N–400 with biometrics by $35 (4.8 percent increase), which is substantially below the rate of inflation since the last fee increase (approximately 26 percent as of June 2023). Previously, most applicants had to pay a separate $85 fee for biometrics. The final rule also incorporates a $50 discount for online filing ($710), *see* 8 CFR 106.1(g), which is *below* the prior fee for a Form N–400 with biometrics. In addition, fee waivers are available to all naturalization applicants who are receiving means-tested public benefits, whose household incomes are at or below 150 percent of the Federal Poverty Guidelines (FPG), or who are experiencing extreme financial hardship such as unexpected medical bills or emergencies. *See* 8 CFR 106.3(a)(1)(i).

Nevertheless, in response to commenters' concerns about the affordability of applying for naturalization, DHS has broadened the availability of a reduced fee N–400 to applicants whose household incomes fall at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). Considering this change along with those accommodations already made for Applications for Naturalization, DHS does not believe that the new N–400 fee will prevent or discourage eligible noncitizens from applying for naturalization.

*Comment:* While expressing appreciation for the limited fee increase for Form N–400, a commenter stated that DHS should seek ways to make Form N–400 more affordable and included as an example offering a discount for families who jointly file two or more Form N–400s. The commenter stated that eligible Green Card holders may opt to renew their status instead of naturalizing if application fees become unaffordable.

*Response:* DHS declines to adopt the commenter's recommended discount for family members who file N–400s simultaneously because joint N–400 filings would result in minimal, if any, processing efficiencies for USCIS. Unlike an application for adjustment of status, where the principal applicant's spouse and children may derive eligibility through the principal, *see* INA section 203(d), 8 U.S.C. 1153(d), every naturalization applicant must independently establish their eligibility for U.S. citizenship. *See* 8 CFR 316.2(b). Although each family member is required to submit their own Form N–400, fee waivers and the additional reduced-fee eligibility for household income less than or equal to 400 percent of the FPG should provide sufficient relief from the cost of fees for those who are unable to pay. *See* 8 CFR 106.2(b)(3)(ii), 106.3(a)(3)(i)(I). In addition, USCIS now extends Green Cards up to 24 months from expiration for those applicants who file Form N–400.[233] Therefore, DHS does not believe that the limited fee increase for Form N–400 will cause a significant number of naturalization-eligible applicants to renew their Green Cards instead of applying to naturalize.

*Comment:* Multiple commenters expressed concerns with the fact that the Form N–400 fee would be below full cost recovery. A research organization

stated that this would shift naturalization costs to visa applicants and reasoned that this would negatively impact integration since a Green Card is a prerequisite for naturalization and a non-immigrant visa is often itself a prerequisite for a Green Card. Another commenter urged USCIS to stop subsidizing the Form N–400 process by charging a fee that is below the cost of the benefit. The commenter stated that U.S. citizenship is a privilege with great value. The commenter also stated that immigrants do not need additional incentive to naturalize, and that by eliminating this subsidy USCIS could improve case processing for other stakeholders such as highly skilled workers, students with advanced degrees, or doctors and other work critical to the U.S. economy. The commenter also asserted that this ''subsidy'' is paid more by immigrants who have stayed in the country longer and must renew their visas multiple times, such as employment-based immigrants from China and India.

*Response:* DHS acknowledges these commenters' concerns but believes they are outweighed by the importance of naturalization to individual beneficiaries and the United States as a whole. Naturalization facilitates integration of immigrants into American society. Upon naturalizing, new citizens can vote in public elections, participate in jury duty, and run for elected office where citizenship is required. Moreover, there are proven, beneficial economic and civic outcomes for immigrants who become citizens, which include increased earnings and homeownership. These earning gains from naturalization may translate to greater city, State, and Federal tax revenues.[234] E.O. 14012 instructed DHS to ''make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee.'' E.O. 14012, 86 FR 8277 (Feb. 5, 2021). DHS has held the fee for Form N–400 below the estimated cost to USCIS of adjudicating the form since 2010, as explained in the proposed rule. *See* 88 FR 402, 487 (Jan. 4, 2023). DHS has determined that shifting costs of naturalization to other applicants in this manner is desirable given the significant value that the United States obtains from the naturalization of new citizens. Many commenters on the 2020 fee rule stated that the fee would deter eligible applicants and cost can be a prohibitive

---

[233] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA2022–26 Policy Alert, ''Extension of Permanent Resident Card for Naturalization Applicants'' (Dec. 9, 2022), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20221209-ExtendingPRC.pdf.*

[234] *See* Holly Straut-Eppsteiner, Cong. Research Serv., R43366, ''U.S. Naturalization Policy'' (May 2021), at 2–3, *https://crsreports.congress.gov/product/pdf/R/R43366.*

barrier for would-be naturalization applicants. *See* 85 FR 46788, 46855 (Aug. 3, 2020). DHS is committed to promoting naturalization and immigrant integration and making sure that naturalization is readily accessible. For these reasons, DHS will continue to provide fees for naturalization applications on Form N–400 at an amount less than its estimated costs and recover some of its costs from other fee payers using the cost reallocation methodology.[235]

*Comment:* Multiple commenters wrote that USCIS should increase the income limitations for Form N–400 fee waivers to include more low-income applicants. By contrast, a different commenter asserted that fee waivers should not be available for Form N–400, since becoming a U.S. citizen is a privilege.

*Response:* DHS acknowledges commenters' concerns regarding the affordability of naturalization but believes that this fee schedule makes naturalization practically available to all eligible low-income applicants. Applicants whose household income is at or below 150 percent of the FPG, who are receiving a means-tested public benefit, or who are experiencing extreme financial hardship are eligible for a full waiver of the N–400 fee. *See* 8 CFR 106.3(a)(1)(i). Furthermore, the reduced N–400 fee ($320) will be available to applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). So, for example, members of a four-person household would qualify for the reduced fee if their household income was at or below $120,000 per year, which is greater than the median income for a household of four in most states.[236] Online N–400 filers are also eligible for a $50 discount. *See* 8 CFR 106.1(g). DHS believes that these measures are sufficient to ensure that naturalization is financially feasible for all eligible applicants. DHS disagrees with the assertion that fee waivers should not be available to naturalization applicants. DHS acknowledges that naturalization is a significant

immigration benefit, but, as noted earlier, believes that the United States also benefits significantly from newly naturalized citizens.

*Comment:* Many commenters expressed opposition to the increased fees for those filing a Form N–400 who do not need to provide biometrics, reasoning that this would burden elderly applicants. Another commenter likewise asserted that the fee increase would disproportionately impact the elderly and further urged USCIS to lower the cost for filing a reduced-fee Form N–400 without biometrics for the same reason.

*Response:* DHS disagrees that the N–400 fee increase disproportionately burdens elderly applicants because, since 2017, all naturalization applicants have been required to provide biometrics regardless of their age, unless they qualify for a fingerprint waiver due to certain medical conditions.[237] DHS acknowledges that commenters' concerns regarding Form N–400 fee increases may apply to applicants who do not require biometrics due to certain medical conditions. However, as discussed in the proposed rule, DHS believes that incorporating biometric service fees into immigration benefit requests will simplify the fee structure, reduce application rejections for failure to pay the correct fees, and better reflect how USCIS uses biometric information. *See* 88 FR 402, 484 (Jan. 4, 2023). These efficiencies will enable USCIS to maintain lower immigration benefit fees for applicants in general. In addition, the commenter presumes that being elderly equates with poor financial condition. Applicants who are low-income, receiving a means-tested public benefit, or experiencing extreme financial hardship are eligible for a waived or reduced N–400 fee. *See* 8 CFR 106.3(a)(1)(i), 106.2(b)(3)(ii). Also, the fee increase for applicants who do not require biometrics (19 percent) is less than the rate of inflation since the last fee increase (26 percent as of June 2023), and that this increase is mitigated for applicants who file online. *See* 8 CFR 106.1(g).

b. Reduced Fee N–400, Reversal of 2020 Rule's Removal of the Reduced Fee N–400

*Comment:* Multiple commenters expressed support for a reduced fee for Form N–400, under which qualifying applicants requiring biometric services would pay $25 less than under the previous fee schedule. However, multiple commenters recommended that USCIS increase the income limit for a reduced fee. A commenter wrote that many of its clients would not qualify for a waived or reduced fee or be able to afford the fee for Form N–400. Other commenters stated USCIS should consider increasing the percentage multiplier threshold for a reduced fee because the current poverty guidelines are outdated. A commenter opposed the 19 percent increase to the reduced fee for applicants who do not require biometric services.

*Response:* In response to public comments and additional stakeholder feedback, and in recognition of the enormous benefits that the United States obtains from new naturalized citizens, DHS has raised the income limits for a reduced fee Form N–400 to include applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). This change, coupled with the fee waiver for those who are unable to pay the Form N–400 fee, will make naturalization more available to all eligible applicants. The FPG are updated yearly by the U.S. Department of Health and Human Services (HHS).[238] And the fee increase for those who do not require biometric services applies to a small portion of Form N–400 filers since, as stated earlier, Form N–400 applicants require biometrics services regardless of age. Applicants who do not require biometrics due to a medical condition may also qualify for a full fee waiver if they are low income and receive a means-tested benefit due to their medical condition. *See* 8 CFR 106.3(a)(1)(i)(A).

c. N–600/600K

*Comment:* While one commenter expressed general support for increasing fees for Forms N–600 and N–600K, many commenters expressed strong opposition to these fee increases, reasoning that existing fees are already too high and that the increases may impose an undue burden on parents seeking evidence of citizenship or naturalization for their children.

---

[235] Based on filing volume trends in recent years, USCIS forecasts an increase of 62,165 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* Table 7, Workload Volume Comparison.

[236] *Compare* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form I–864P, "2023 HHS Poverty Guidelines for Affidavit of Support," *https://www.uscis.gov/i-864p* (last updated Mar. 1, 2023), *with* U.S. Dep't of Justice, "Census Bureau Median Family Income By Family Size, Cases Filed Between May 15, 2022 and Oct 31, 2022," *https://www.justice.gov/ust/eo/bapcpa/20220515/bci_data/median_income_table.htm* (last visited Aug. 21, 2023).

[237] See U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA–2017–03, Policy Alert, "Biometrics Requirements for Naturalization" (July 26, 2017), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20170726-NaturalizationBiometrics.pdf* ; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual", Vol. 12, "Citizenship & Naturalization", Part B, "Naturalization Examination", Chp. 2, "Background and Security Checks", Sec. B, "Fingerprints" [12 USCIS–PM B.2(B)], *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-2* (last updated Nov. 8, 2023).

[238] See U.S. Dep't of Health & Human Servs, HHS Poverty Guidelines for 2023, *https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines* (last visited Aug. 21, 2023).

Another commenter stated that the fee increase for Forms N–600 and N–600K would have a significant negative impact on farmworkers, who are an economically disadvantaged segment of the population. A couple of commenters reasoned that the proposed fees would deter families from obtaining the documentation needed to prove the U.S. citizenship of foreign-born individuals.

*Response:* DHS recognizes commenters' concerns about the fee increases for Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. However, the Form N–600 fee remains significantly below its estimated cost under the USCIS ABC model. For example, had DHS proposed to recover full cost on Form N–600, the fee would have been $1,835 when filed online and $2,080 when filed on paper. *See* 88 FR 402, 489 (Jan. 4, 2023). The current fee increases for both forms are slightly less than the rate of inflation since the last fee schedule. Applicants may request a waiver of the Form N–600 and N–600K fees. *See* 8 CFR 106.3(a)(3)(i)(L), (M). Approximately 47 percent of Form N–600 filers and 26 percent of Form N–600K filers receive such fee waivers. *See* 88 FR 402, 488 (Jan. 4, 2023). Children of U.S. citizens may obtain evidence of citizenship by applying for a U.S. passport, which is a less expensive alternative to applying for a Certificate of Citizenship through Form N–600. Therefore, DHS maintains the Form N–600 and N–600K fees at the amounts that were proposed. 8 CFR 106.2(b)(7), (8).

For a discussion on fee exemptions for Form N–600 and Form N–600K for certain adoptees see section IV.G.5.d. of this preamble.

*Comment:* A couple of commenters expressed concern that the cost of a Certificate of Citizenship will be nearly twice the cost to apply for naturalization. Another commenter suggested that the fee amounts for Form N–600 should not exceed those for Form N–400 and the two fees should be reversed. A religious organization likewise suggested that the fee for Form N–600 be made comparable to the reduced fee for Form N–400, adding that Form N–600 should be reasonably affordable such that applicants do not have to struggle financially to obtain proof of citizenship.

*Response:* DHS appreciates these commenters' concerns but believes that the difference in fees for Forms N–400 and N–600 is justified by multiple factors. First, there is a significant difference in the fee-paying unit cost between Form N–400 ($1,150) and Form

N–600 ($1,429).[239] Also, the fee difference is justified by the difference in urgency between these two groups of applicants. Individuals who derive citizenship from their parents are legally U.S. citizens and may access the benefits of citizenship without filing Form N–600. Such individuals may obtain proof of citizenship through less expensive means such as applying for a U.S. passport. By contrast, an applicant for naturalization cannot access the benefits of citizenship until their Form N–400 has been adjudicated and they have taken the oath of allegiance. Given the different stakes for these groups of applicants, it makes sense for DHS to lower barriers to filing Form N–400. As noted earlier, because of the importance of naturalization to individual applicants and American society, DHS has sought to keep the Form N–400 fee at an affordable level that is below full cost recovery. Finally, maintaining a low Form N–400 fee is consistent with E.O. 14012's goal to "make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee." E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

*Comment:* Another commenter suggested that, as an alternative to the current fee waiver policy, USCIS create a fee exemption for Form N–600 and N–600K applicants who can verify they lack access to a birth certificate. The commenter stated that applicants who qualify for the waiver would often be children, who would otherwise apply for a passport if they possessed a birth certificate.

*Response:* DHS declines to adopt the commenter's proposal because it would diverge from both the ability-to-pay and the beneficiary-pays principles and these forms are currently eligible for fee waivers. DHS recognizes that some Form N–600 and N–600K applicants may be unable to afford the application fees due to the same reasons that they lack birth certificates, for example, because they were admitted to the United States as refugees. However, some applicants may still possess the means to pay these filing fees despite their lack of a birth certificate. The existing fee waiver criteria (receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship) are more directly related to an applicant's ability to pay. *See* 8 CFR 106.3(a)(1)(i).

### d. Other/General Comments on Fees, and Limiting Fee Increases (N–300, N–336, N–470, N–565)

*Comment:* An individual commenter suggested that, in comparison to Form N–600, the Form N–565 fee should be increased as applicants tend to lose, laminate, or give the original document to a different agency or entity that never give it back.

*Response:* DHS believes that the current fee structure satisfies the commenter's concerns. The final fee for Form N–565, Application for Replacement Naturalization/Citizenship Document, ($505 online, $555 paper) recovers more than the full fee-paying unit cost of the application ($453), while the Form N–600 fee ($1,335 online, $1,385 paper) recovers less than the fee-paying unit cost ($1,429).[240] DHS believes that further increases to the Form N–565 fee would be excessively burdensome for applicants who need to obtain a new Certificate of Naturalization or Citizenship, Declaration of Intention, or Repatriation Certificate.

*Comment:* One commenter stated that USCIS should consider reducing the fee for Form N–565. The commenter said that a replacement naturalization certificate should be affordable, since an accurate and up-to-date certificate is necessary for accessing important government services. Multiple commenters stated that the fee for Form N–565 is unfair in comparison to the fees that U.S. born citizens pay for a replacement birth certificate. One of these commenters asserted that the Form N–565 fee treats naturalized citizens as "second class citizens," and, without evidence, that naturalization certificates and birth certificates include the same safeguards and features against unlawful duplication. Finally, one commenter wrote that they supported the Form N–565 fee remaining the same without providing additional rationale.

*Response:* DHS acknowledges commenters' concerns about the affordability of Form N–565. Although DHS will maintain the proposed Form N–565 filing fee for paper applications, DHS will now offer a $50 discount for Form N–565 when filed online. DHS also notes that the paper-filed Form N–565 is now less expensive in terms of real dollars since the FY 2016/2017 fee rule, given the rate of inflation since then.[241] While DHS recognizes that

---

[239] *See* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[240] For fee-paying unit costs in this final rule, see Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[241] Inflating the current N–565 fee of $555 from December 2016 to June 2023 would raise the fee to $700 (rounded to the nearest $5).

having an up-to-date citizenship document is helpful for accessing government services, DHS believes it is also important for individuals to be able to access naturalization or proof of citizenship in the first place, which is why Forms N–400, N–600, and N–600K are priced less expensively relative to their fee-paying unit costs. As explained in the proposed rule, DHS decided to hold the current fee for Form N–565 to allow this form to fund some of the costs of other forms and limit the fee increase for other forms. *See* 88 FR 402, 450 (Jan. 4, 2023). Furthermore, DHS notes the number of Form N–565 filings is limited, applicants may request a fee waiver, and there is no fee when seeking to correct a certificate due to USCIS error. *See* 8 CFR 106.3(a)(3)(i)(K); 8 CFR 106.2(b)(6). Some new citizens may also possess other, less expensive means of obtaining proof of citizenship such as applying for a U.S. passport. DHS considers the cost for obtaining a replacement U.S. birth certificate irrelevant to the cost of filing Form N–565, as the primary purposes of these two forms are fundamentally different. Also, Certificates of Naturalization and Citizenship contain many security features that may not appear on birth certificates, making Certificates of Naturalization and Citizenship less susceptible to fraud.[242] Issuance of a replacement certificate of citizenship or naturalization may also require that the applicant appear for an interview or provide biometrics.[243] DHS will retain the proposed fee for a paper filing of Form N–565 of $555. Consistent with the general initiative to encourage online filing, DHS will reduce the fee for an electronically filed N–565 by $50, to $505. *See* 8 CFR 106.1(g).

*Comment:* A few commenters wrote that they opposed increasing the fee for Form N–336 because:

• It would impose a barrier for low-income and working-class applicants to appeal or obtain a hearing if USCIS denies their naturalization application.

• It could deter applicants from pursuing legitimate challenges to denials of their naturalization applications.

• It would limit access to appeals for these applicants, which is counter to USCIS' FY 2023–2026 Strategic Plan goals for promoting quality adjudications and reducing undue barriers to naturalization.

*Response:* DHS acknowledges commenters' concerns regarding the fee increase for Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), but the Department does not believe that the new filing fee would deter Form N–336 filings. The 19 percent fee increase is reasonable because it is below the 26 percent rate of inflation since the last fee rule. DHS has reduced the increase for some filers by including the N–336 amongst the benefits that receive a $50 discount for online filing. *See* 8 CFR 106.1(g). Applicants who are unable to pay the Form N–336 fee may request that it be waived. *See* 8 CFR 106.3(a)(3)(i)(H). Depending on the circumstances of their cases, some applicants may choose to refile Form N–400 at the reduced filing fee rather than file Form N–336. Also, N–336 filers may benefit from the other fees for naturalization-related forms, which received lower increases to reduce barriers for naturalization applicants in general.

*Comment:* A commenter agreed with the proposed fee increase for Form N–336 because higher naturalization fees will prevent those who need public assistance from seeking citizenship, preventing strain on U.S. public assistance systems.

*Response:* DHS appreciates the support for the N–336 fee. However, DHS disagrees with the commenter's premise that naturalization fees should be set at a level that limits access to public assistance and does not believe the increased fee for Form N–336 will further that goal. Applicants who receive a means-tested benefit are eligible for a waiver of the fees for naturalization-related forms. *See* 8 CFR 106.3(a)(1)(i)(A), (a)(3).

### 4. Humanitarian

#### a. NACARA

*Comment:* A commenter wrote that Guatemalans and Salvadorans who are eligible for NACARA rely on Form I–881 and therefore the proposal to increase fees would impose financial

burdens on Latino immigrants. Furthermore, while acknowledging the proposed reduction of fees for Form I–881 applications for families, the commenter said this reduction would not affect the significant number of Form I–881 applicants who are individuals.

*Response:* As explained in the proposed rule, the IEFA fees for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)), have not changed since 2005. *See* 88 FR 402, 515–516 (Jan. 4, 2023). DHS proposed to limit the fee increase for Form I–881, like adoption-related or naturalization fees. *See* 88 FR 402, 450–451 (Jan. 4, 2023). This rule combines the current individual and family tiered fee schedule into a single Form I–881 fee because there is no cost data to support limiting the amount charged to a family. Additionally, the new fee of $340 is less than the cost to adjudicate the form (approximately 14 percent of the cost of adjudication), and at a 19 percent increase to individual filers, the fee increase is below the CPI–U of 26.37 percent.[244] DHS is not setting any fees in this rule to deter requests from families, specific nationalities, or any immigrants based on their financial or family situation or demographics from accessing immigrant benefits and we have no evidence or experience in setting fees that indicates that the fees would have such an unintended effect. DHS acknowledges the commenter's concerns regarding the increased fee for Form I–881 for an individual adjudicated by DHS ($285 to $340). This fee in the final rule reflects a 19 percent increase in the filing fee for Form I–881 for an individual adjudicated by DHS, which is below the rate of inflation since the current IEFA fees for Form I–881 were last changed in 2005. All other IEFA fees for Form I–881 decreased, when compared to the current total fees including the fee for biometric services.

The proposed rule included a provision that would eliminate the separate biometric service fee requirement in most cases. *See* 88 FR 402, 484–485 (Jan. 4, 2023). For a family, the fee for Form I–881 adjudicated by EOIR remains at $165 (0 percent increase); for an individual, the fee for Form I–881 adjudicated by DHS with biometric services is 8 percent

---

[242] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Commonly Used Immigration Documents", *https://www.uscis.gov/save/commonly-used-immigration-documents* (last updated Mar. 23, 2023); *cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting over 14,000 different versions of birth certificates in circulation, and varying security features among vital records offices).

[243] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form N–565, Instructions for Application for Replacement Naturalization/Citizenship Document (Dec. 8, 2021), *https://www.uscis.gov/sites/default/files/document/forms/n-565instr.pdf; cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting that 85–90% for birth certificate fraud encountered by former INS and passport services is the result of genuine birth certificates held by imposters).

[244] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent. *See* 88 FR 402, 515 (Jan. 4, 2023); Table 1.

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 3257 of 4699 PageID #: 6422

lower; for a family, the fee for Form I–881 adjudicated by DHS is 40 percent lower; and for two people, the fee for Form I–881 adjudicated by DHS with biometric services is 54 percent lower in this rule. *See* 88 FR 402, 408–409 (Jan. 4, 2023). Furthermore, DHS recognizes that abused spouses and children under NACARA must file for VAWA benefits while in immigration proceedings, and they are a particularly vulnerable population. Therefore, DHS provides a fee exemption for abused spouses and children under NACARA filing Form I–881, as well as ancillary Form I–765 (submitted under 8 CFR 274a.12(c)(10)). *See* 8 CFR 106.3(b)(7). For other applicants who are unable to pay the fee, Form I–881 is also eligible for a fee waiver. *See* 8 CFR 106.3(a)(3)(i)(F).

b. Qualifying Family Member of a U–1 Nonimmigrant

*Comment:* Commenters wrote that USCIS' proposal to increase the fees for relief for family members of a U-visa petitioner would undermine the rights of survivors of crimes and the U.S. criminal legal system. Commenters requested that DHS keep derivative petitions for U-visa petitioners affordable to incentivize individuals to report when they have been a victim of crime and to prioritize public safety and family unity.

*Response:* DHS is committed to the goals of our humanitarian programs. In this final rule, DHS provides additional fee exemptions for petitioners for U nonimmigrant status because of the humanitarian nature of the program and the likelihood that individuals who would file requests in this category would qualify for fee waivers. *See* 8 CFR 106.3(b)(5). For example, DHS provides a fee exemption for Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant. DHS believes it is an important policy decision to provide a fee exemption for the Form I–929 to continue to provide for this vulnerable population and promote family unity in line with other humanitarian status requestors. Furthermore, a fee exemption for Form I–929 is consistent with the fee exemptions provided for most forms associated with U nonimmigrant status. *See* 8 CFR 106.3(b).

c. Other/General Comments on Humanitarian Benefits

*Comment:* A commenter stated that DHS should impose a fee for Form I–589, Application for Asylum and for Withholding of Removal. The commenter recommends that the fee represent the costs associated with an asylum application. They believe the

INA authorizes fees "for the consideration of an asylum application, for employment authorization, and adjustment of status under section 209(b), not to exceed the costs in adjudicating the applications." A commenter generally supported USCIS' proposal to keep humanitarian fees the same.

*Response:* The enjoined 2020 rule included a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, despite opposition from many commenters. *See* 85 FR 46788 (Aug. 3, 2020). DHS acknowledges the commenters' concerns about asylum seekers' inability to pay the fees and humanitarian plight of legitimate asylum seekers. In recognition of the circumstances, the proposed rule withdraws the $50 fee imposed in the 2020 rule. DHS will continue to accept Form I–589, Application for Asylum and for Withholding of Removal with no fee. Furthermore, the initial filing of the applicant's Form I–765, Application for Employment Authorization, has no fee. *See* 88 FR 402, 464 (Jan. 4, 2023); 8 CFR 106.2(a)(44). Asylum seekers often come to the United States with limited economic resources and are dependent on family and charitable organizations for survival. DHS believes that these fee exemptions will eliminate the additional financial burden for asylum seekers and maintain accessibility of the affirmative asylum program, which provides eligible applicants critical humanitarian protection from return to persecution. DHS data indicates that this population would be eligible for fee waivers and requiring a fee for asylum applications and their Form I–765, but permitting fee waivers, would be costly and inefficient in creating a fee for asylum applicants who are not eligible for an EAD until their application has been pending for 150 days. *See* 8 CFR 208.7(a)(1). DHS declines to make any changes based on this comment.

5. Family-Based

a. Alien Fiancé

*Comment:* A commenter stated that the fee increases would force more U.S. citizens to travel to other countries and get married out of sheer desperation. One commenter also said that employers are more able to bear rising immigration costs than families. Another commenter stated after the pandemic, many have lost their jobs and find it difficult to pay rent, and that raising the cost of the fiancée visa goes against USCIS's humanitarian mission and the mission to reunite families.

*Response:* USCIS understands the economic situation that many families face today. DHS is authorized to set fees at a level that ensures recovery of the full cost of providing the adjudication services for the programs USCIS administers. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable able to sustain an adequate level of service. USCIS has not had a fee increase in the I–129F since 2016 to fund the processing of these applications. As noted earlier in Section I.D. of this preamble, DHS will raise the fee for Form I–129F, Petition for Alien Fiancé(e) from $535 to $675 (26 percent), which amounts to a decrease of $45 (6 percent) from the original proposed fee. *Compare* 8 CFR 106.2(a)(5) and Table 1, *with* 88 FR 402, 409 (Jan. 4, 2023). The final increase is consistent with a 26 percent rate of inflation since the last fee increase in December 2016, as of June 2023. The fee for the Form I–129F resulted from application of the standard USCIS fee methodology. DHS values its role in assisting U.S. citizens who wish to bring a foreign national fiancé to the United States to marry and is sensitive to the extra burden that the increased filing fee may impose. DHS understands that being separated from loved ones and having to wait to start a life together may be frustrating. However, DHS does not believe that the I–129F fee increase will encourage out-of-country marriages, since, if the couple marries abroad, instead of paying $675 to file the I–129F for their fiancé to immigrate, the petitioner would need to file Form I–130, Petition for Alien Relative, for their spouse to immigrate. This final rule increases the fee for online I–130 filings to $625 and paper filings to $675; therefore, out-of-country marriage would not result in a significant cost savings. *See* 8 CFR 106.2(a)(6), and 8 CFR 204.1; Table 1. Also, as a general matter, DHS does not waive fees where the petitioner will eventually need to complete an affidavit of support in order for the beneficiary to obtain LPR status. To adjust status, a K-visa applicant must demonstrate that they are not likely to become a public charge, *see* INA section 212(a)(4), 8 U.S.C. 1182(a)(4), which requires an affidavit of support from the petitioning spouse, *see* INA sections 212(a)(4)(C) and 213A, 8 U.S.C. 1182(a)(4)(C) and 1183A. Applicants may file a fee waiver request for Form I–751, Petition to Remove Conditions on Residence, *see* 8 CFR 106.3(a)(3)(c), which is required for most fiancé(e)s

after adjustment of status in order to remove the conditional basis of their LPR status, *see* INA section 216 and 245(d), 8 U.S.C. 1186a and 1255(d). However, because a fee waiver would be inconsistent with the financial support requirement and public charge ground of inadmissibility. Therefore, fee waivers for the Form I–129F will not be provided.

b. Petition for Alien Relative

*Comment:* Multiple comments expressed concern about the cost of the proposed fee increase for the Form I–130. Commenters wrote:

• The fee threatens to violate the right to family enshrined in the Universal Declaration of Human Rights and other human rights standards that the United States has agreed to uphold.

• The proposed Form I–130 fee would exclude immigrants from our workforce and our broader community.

• The fee increase could split families by forcing some petitioners to file for one family members at a time, which would further undermine family unity.

• Absence of fee waivers for I–130 petitions would worsen these effects.

*Response:* DHS appreciates the concerns of commenters but reiterates that USCIS is funded almost exclusively by fees, *see* INA section 286(m), 8 U.S.C. 1356(m), and without proper funding, USCIS will lack the resources to keep pace with incoming benefit requests. The increase in the I–130 fee is necessary to provide the resources required to do the work associated with such filings. The Form I–130 fee increase (electronically filed), from $535 to $625 (17 percent), has been reduced by $45 (6 percent) from the proposed rule. See 8 CFR 106.2(a)(6).

USCIS understands the importance of facilitating family unity, as well as the advantages that LPR status provide to new immigrants. However, by statute, Form I–130 petitioners must have access to sufficient financial resources to support all beneficiaries, in addition to the petitioner's entire household, for the beneficiary to obtain LPR status. *See* INA sections 1182(a)(4)(C) and 213A, 8 U.S.C. 1183(a)(4)(C) and 1183A. A petitioner seeking to file for several family members, may lack the financial resources for all the family members to adjust at the same time, forcing the petitioner to bring one beneficiary over at a time. However, the I–864, Affidavit of Support Under Section 213A of the INA, allows the petitioner to count the income and assets of members of the household who are related by birth, marriage or adoption, and allows the beneficiary to provide a joint sponsor to meet the minimum income

requirement.[245] As previously mentioned, USCIS's humanitarian mission is to provide protection to individuals in need of shelter or aid from disasters, oppression, emergency medical issues and other urgent circumstances as provided through specific humanitarian programs.[246] Although the 1948 Universal Declaration of Human Rights (UDHR) speaks to the right to marry, the UDHR does not prohibit fees for family-based visa petitions and, in any event, is only a nonbinding, aspirational document.[247] USCIS, moreover, is not limiting individuals' right to marry or build a family. USCIS also disagrees that an increase in the fee disrupts USCIS' humanitarian efforts under this rule.

DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. Acknowledging that downward adjustments for some groups may result in upward adjustments for other groups, DHS saw no decreases in benefit requests which it can attribute to the fee adjustments in 2016 and has no data that would indicate that the fees for family-based benefit requests in this final rule would prevent applicants from submitting petitions.[248] While DHS shifts some of the costs of humanitarian programs in this rule to other benefit requests based on the ability to pay, there are many benefit requests that are used by families and low-income individuals, and shifting all family-based benefit request costs to non-

family-based requests would increase non-family based fees to the point of being unbalanced and unsustainable. DHS recognizes the burden that fee increases may impose on some families and low-income individuals. As a general matter, DHS does not waive fees for petitions that require the petitioners to demonstrate that they will be able to support their beneficiary financially, or that eventually require the beneficiary to file of an affidavit of support. In order to consular process or adjust status, the Form I–130 beneficiary must submit Form I–864, Affidavit of Support Under Section 213A of the INA with their visa petitions and adjustment of status applications, to document the petitioner's or joint sponsor's ability to financially support the noncitizen beneficiary. A fee waiver would be inconsistent with this financial support requirement; therefore, DHS declines to allow fee waivers for the Form I–130. With that context in mind, and following review of the public comments received, DHS has determined that the final fee for Form I–130 is not inordinately high.

DHS acknowledges that it allows fee waivers for Form I–751, Petition to Remove Conditions on Residence, even though in most cases the petitioning relative's obligation to support the conditional permanent resident (CPR) will still exist when the CPR files Form I–751. However, there are multiple differences between these forms that justify the difference in fee-waiver availability. First, having a sufficient level of financial support is not a legal requirement for removal of conditions on residence, whereas it is a legal requirement for admission as a lawful permanent resident under a family-based visa category. *Compare* INA 216, 8 U.S.C. 1186a, *with* INA 212(a)(4)(C), 8 U.S.C. 1182(a)(4)(C). Although the sponsor of Form I–864, Affidavit of Support Under Section 213A of the INA, has an ongoing responsibility to support the CPR, their inability or unwillingness to do so has no legal bearing on the CPR's eligibility to have their conditions removed. Also, there may be intervening circumstances after a noncitizen obtains CPR status that would make it impossible or impractical for them to obtain financial support from sponsor(s) of their Form I–864 (*e.g.,* death or divorce). Second, Form I–130 receipts are significantly larger than I–751 receipts. In fact, Form I–130 was the most common form received by USCIS in FY 2022.[249] For these reasons,

[245] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Affidavit of Support web page, *https://www.uscis.gov/green-card/green-card-processes-and-procedures/affidavit-of-support* (last updated Mar. 19, 2021).

[246] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Humanitarian web page, *https://www.uscis.gov/humanitarian* (last visited Aug. 22, 2023).

[247] *See* United Nations, "Universal Declaration of Human Rights," *https://www.un.org/en/about-us/universal-declaration-of-human-rights* (last visited Aug. 22, 2023). The Declaration is only a resolution of the U.N. General Assembly and thus is only a non-binding, aspirational document. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734 (2004) (observing that declarations like the UDHR are merely aspirational and that "do [ ] not of [their] own force impose obligations as a matter of international law," and thus are of "little utility" in discerning norms of customary international law).

[248] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "2020 USCIS Statistical Annual Report," *https://www.uscis.gov/sites/default/files/document/reports/2020-USCIS-Statistical-Annual-Report.pdf* (last visited Aug. 22, 2023).

[249] *See* U.S. Citizenship and Immigr. Servs, U.S. Dep't of Homeland Security, "Number of Service-
Continued

allowing a fee waiver for Form I–130 would likely result in a much higher level of uncollected fees that would have to be transferred to other fee payers. Finally, petitioners have greater flexibility in deciding when to file Form I–130, whereas in general Form I–751 must be filed within a specific 90-day window. *See* INA 216(d)(2)(A), 8 U.S.C. 1186a(d)(2)(A). Therefore, Form I–130 petitioners possess greater flexibility in accumulating funds to pay the fee for the petition. For these reasons, DHS makes Form I–751 eligible for a fee waiver but does not do so for Form I–130.

*Comment:* Another commenter stated that the proposed I–130 fee increase was disproportionate and that the fee should be kept at its current level, without providing further explanation.

*Response:* Fees do not merely cover the cost of adjudication time. The fees also cover the resources required for intake of immigration benefit requests, customer support, and administrative requirements. DHS recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, absent an alternative source of revenue, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. As noted in the final rule, the fee increases for an electronically filed Form I–130 has been reduced to $625 (17 percent increase). *See* Table 1; 8 CFR 106.2(a)(6).

*Comment:* Another comment said that an equitable way of raising revenue would be to increase the cost for Forms I–130 filed by an LPR and decrease the cost for Forms I–130 filed by citizens.

*Response:* Creating a separate fee schedule within the I–130 form based on the filer's status would create additional burden on processing time to validate the filer's status. In addition, the fee schedule suggested would be more regressive in nature since many LPR filers who seek to file for family members already have a longer wait time for the visa to become available than their U.S. citizen counterparts where an immediate relative under INA 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), would have a visa immediately available.[250] Placing additional financial

burden on LPR filers would be regressive because it may delay their ability to file and, together with the longer wait for visa availability for LPR filers, has the potential to extend the amount of time it will take to reunite with family members. Therefore, DHS declines to make any changes based on this comment.

### c. Remove Conditions on Residence

Several commenters discussed the proposed fee increase for Form I–751. Those comments are summarized as follows:

• The proposed fee increase would create burdens for low-income individuals, immigrants, and their families, and particularly be a burden on applicants seeking to file Form I–751 on the grounds of divorce who are ineligible for fee waivers.

• The fee is cruel because an applicant must apply before the 2-year anniversary of their marriage to protect against deportation and separation from their spouse.

• The fee would be a barrier for victims of domestic violence who need to file Form I–751 on their own.

• The fee for Form I–751 along with other proposed fee increases undermines the rule's objective to balance the competing beneficiary-pays and ability-to-pay models, promote immigrant integration, and reduce barriers to immigration benefits.

• The fee would be a barrier to citizenship and lawful permanent residence.

• There is no rational basis for a fee increase that is 73 percent higher than the last proposed increase.

• The I–751 fee is unreasonable because applicants have already proven their eligibility for permanent residence and only must demonstrate that their family relationship has continued.

• A large fee increase is unreasonable because Form I–751 is only a reapproval of a previously successful application and is redundant when applicants are shortly afterwards applying for naturalization, and yet it requires USCIS an average of 18 months to complete.

• The proposed fee increase for Form I–751 is much greater than for other forms requiring similar levels of effort to adjudicate.

• The increase in the I–751 fee is too large and creates a large burden on petitioners.

• USCIS should extend the validity of conditional marriage-based Green Cards from 24 months to 36 months to streamline the Green Card process,

allow applicants to skip unnecessary paperwork required for the removal of conditions by directly applying for naturalization, and eliminate unnecessary work for USCIS and fees on families.

*Response:* DHS acknowledges the increased Form I–751 fee will render the process of removing conditions on residence more expensive and has considered the comments. As previously mentioned, USCIS is primarily fee based and therefore must recover operating costs through fees, including the cost of fee waived or exempt workloads. DHS acknowledges commenters' concerns about the proposed fee increase for the Form I–751 and has decreased the form fee from the proposed $1,195 to $750, capping it at approximately 26 percent for inflation. *See* 8 CFR 106.2(a)(43). Fees are created to cover the resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, administrative processing, and the Form I–751 interview by an officer if it is not waived. DHS offers fee waivers for Form I–751 petitioners who are unable to pay and there is no filing fee for conditional permanent residents seeking to remove conditions on their status by filing for battery or extreme cruelty waivers under INA section 216(c)(4). *See* 8 CFR 106.3(a)(3)(i)(C); 8 CFR 106.2(a)(43). In addition, DHS has recently reduced the financial burden on Form I–751 petitioners by automatically extending the validity period of conditional Green Cards for 48 months beyond the card's expiration date when the Form I–751 is properly filed.[251] This reduces potential fees for filing a Form I–90, Application to Replace Permanent Resident Card, ($415 online) while an applicant's Form I–751 is pending. DHS believes this policy addresses most of the commenter's concerns and declines to make any further changes.

*Comment:* Some commenters wrote that the Form I–751 fee should be less than the fee for Form I–130, Petition for Alien Relative. One commenter stated that Form I–751 is redundant, and the proposed fee is disproportionately expensive relative to the time that it takes to adjudicate Forms I–751 and I–130. Another commenter suggested that if the cost of filing the form is based on the level of effort required by DHS to process the form, then filing the form

---

wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022'', available at *https://www.uscis.gov/sites/ default/files/document/data/Quarterly_All_Forms_ FY2022_Q4.pdf* (last updated Oct. 2022) (In FY 2022, USCIS received 873,073 Form I–130s, but only 122,803 Form I–751s.).

[250] See Bureau of Consular Affairs, U.S. Dep't of State, ''Travel.State.Gov., The Visa Bulletin,''

*https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html* (last visited Sept. 8, 2023).

[251] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, ''USCIS Extends Green Card Validity for Conditional Permanent Residents with a Pending Form I–751 or Form I–829'' (Jan. 23, 2023), *https://www.uscis.gov/newsroom/alerts/ uscis-extends-green-card-validity-for-conditional-permanent-residents-with-a-pending-form-i-751-or.*

should only cost 28 percent more than Form I–130, rather than the proposed 41 percent difference.

*Response:* In passing the Immigration Fraud Amendments of 1986, Public Law 99–639, 100 Stat. 3537, Congress recognized short-duration marriages as presenting a higher risk for immigration fraud and requiring additional scrutiny.[252] The higher proposed fee for Form I–751 than Form I–130 was based in part on completion time for Form I–751 (1.54 hours) in comparison Form I–130 (1.11 hours).[253] As previously mentioned, DHS acknowledges commenters' concerns about the Form I–751 fee and has decreased the proposed $1,195 fee to $750, capping it at 26 percent for inflation; likewise, the Form I–130 paper-based filing has also

been capped at 26 percent ($675) and the discounted rate for online filing is $625 (17 percent). *See* 8 CFR 106.2(a)(6), 106.2(a)(43); Table 1. DHS notes that it limits most fees by inflation and offers a $50 online filing fee discount in most cases, as explained elsewhere in this rule.

d. Adoption-Related Forms

Some commenters requested that DHS provide more fee exemptions and free services for adoption related benefit requests. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be provided for free. Consistent with past fee rules, DHS proposed to limit the increase of adoption-related fees. *See* 88 FR 503; 81 FR 73298. DHS reduces fee burdens on adoptive families by covering some of the costs attributable to the adjudication

of certain adoption-related requests with fees collected from other immigration benefit requests. *Id.* In this rule, that includes a free first and second extension or change in country or a request for a duplicate notice. A summary of the new exemptions is listed in Table 8 below. Although other forms may not need to be filed by adoptees, fee waivers are available for adoptees for Forms I–90, N–400, N–336, N–565, N–600,[254] N–600K.

**BILLING CODE 9111–97–P**

---

[252] *See generally* INA section 216, 8 U.S.C. 1186a.

[253] *See* 88 FR 402, 448, Table 10 (Jan. 4, 2023).

[254] USCIS issues a Certificate of Citizenship to adopted children who are admitted to the United States with an IR–3 visa (visa category for children from non-Hague Adoption Convention countries adopted abroad by U.S. citizens) or an IH–3 visa (visa category for children from Hague Adoption Convention countries adopted abroad by U.S. citizens) without the filing of a Form N–600, Application for Certificate of Citizenship, and fee, if the child meets all requirements of section 320 of the Act, 8 U.S.C. 1431.

| Table 7: Adoption Fees | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee** | **Proposed Rule Fee** | **Final Fee** |
| • I-600 Petition to Classify Orphan as an Immediate Relative [255] | $775 ($860 with biometric services for one adult) | $920 (with all biometric) (19% increase) | $920 |
| ○ First Form I-600 with approved and valid Form I-600A | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are birth siblings before the proposed adoption | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are not birth siblings | $775 (for each additional petition) | $920 | $920 |

003254

Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations   **6309**

| | | | |
|---|---|---|---|
| before the proposed adoption | | | |
| ○ Form I-600 combination filing exemption: Change in marital status while Form I-600 combination filing suitability determination is pending | $0 | $0 | $0 |
| ○ Form I-600 combination filing change in marital status after suitability approval | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • I-600A Application for Advance Processing of an Orphan Petition | $775 ($860 with biometric services for one adult) | $920 (18% increase) | $920 |
| ○ Change in marital status while Form I-600A is pending | $0 | $0 | $0 |
| ○ Change in marital status after Form I-600A approval | $775 ($860 with biometric services) | $920 (18% increase) | $920 |
| • Form I-600A/I-600 Supplement 1 (Listing of Adult Member of the Household) | $0 | $0 | $0 |
| • Form I-600A/I-600 Supplement 2 (Consent to Disclose Information) | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| ● Form I-600A/I-600 Supplement 3 (Request for Action on Approved Form I-600A/I-600) | (N/A)[256] | $455 | $455 |
| ○ First extension of Form I-600A approval or first change of country | (N/A) | $455 | $0 |
| ○ Second extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $0 |
| ○ Second change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $0 |
| ○ Third and subsequent extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $455 |
| ○ Third and subsequent change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $455 |

| | | | |
|---|---|---|---|
| Significant change and updated home study and there is no request for a first or second extension of Form I-600A approval or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.[257] | (N/A)[258] | $455[259] | $455[260] |
| Duplicate Approval Notice | (N/A – must use the Form I-824 with $465 fee) | $455 | $0 |
| • Form I-800 Petition to Classify Convention Adoptee as an Immediate Relative | $775 | $920 (19% increase) | $920 |
| ○ First Form I-800 with an approved and valid Form I-800A. | $0 | $0 | $0 |
| ○ If more than one Form I- | $0 | $0 | $0 |

| | | | | |
|---|---|---|---|---|
| | 800 is filed for an approved and valid Form I-800A for children who are birth siblings before the proposed adoption | | | |
| ○ | If more than one Form I-800 is filed based on an approved and valid Form I-800A for children who are not birth siblings before the proposed adoption | $755 (for each additional petition) | $920 | $920 |
| ○ | Form I-800 Supplement 1, Consent to Disclose Information. | $0 | $0 | $0 |
| • | Form I-800A Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 ($860 with biometrics for one adult) | $920 (includes biometric fee) (18% increase) | $920 |
| ○ | Change in marital status while Form I-800A is pending | $0 | $0 | $0 |
| ○ | Change in marital status after approval of Form I-800A | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • | Form I-800A Supplement 1 | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| Listing of Adult Member of the Household | | | |
| • Form I-800A Supplement 2, Consent to Disclose Information. | $0 | $0 | $0 |
| • Form I-800A Supplement 3 (Request for Action on Approved Form I-800A)<br>○ First extension of the approval of Form I-800A<br>○ First change in Convention country after the approval of Form I-800A | $0 | $0 | $0 |
| ○ Second extension of the approval of Form I-800A<br>○ Second change in Convention country after the approval of Form I-800A | $385<br><br>($470 with biometrics fee for 1) | $455 | $0 |
| ○ Third or subsequent extension of Form I-800A approval<br>○ Third or subsequent change in Convention country after the approval | $385<br>($470 with biometrics fee for 1) | $455 | $455 |

| | | | |
|---|---|---|---|
| of Form I-800A | | | |
| • Request for duplicate approval notice | $385 | $455 | $0 |
| • Significant change and updated home study and there is no request for a first or second extension of Form I-800A approval or first or second change of Hague Adoption Convention country on the same Supplement 3[261] | $385[262] | $455[263] | $455[264] |
| Form N-600, Application for Certificate of Citizenship<br>• For certain adoptees | $1,170 | $1385<br>$1335 (online filing) | $0 |
| Form N-600K, Application for Citizenship and Issuance of | $1,170 | $1385<br>$1335 (online filing) | $0 |
| Certificate Under Section 322<br>• For certain adoptees | | | |

BILLING CODE 9111–97–C

[255] A biometric services fee is required for each petitioner, spouse, and any adult household member aged 18 or older unless you filed Form I-600A and any adult members of your household are within the 15-month biometric services validity period.

[256] Currently being submitted through a written request.

[257] The petitioner would be seeking a reissuance of the approval notice after the adjudication and review of the significant change and updated home study.

[258] Currently being submitted through written request.

[259] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request for an extension of Form I-600A approval or first change of country request.

003260

The final rule also addresses the omission of concurrent filings under 8 CFR 204.3(d)(3) in two places. First, the final rule addresses a discrepancy between current 8 CFR 204.3(h)(13), which provides that an orphan petition will be denied if filed after the advanced processing application has expired, and current 8 CFR 204.3(d)(3), which permits concurrent filing of an orphan petition with an advanced processing application. Under current practice, concurrent filing is permitted even if a prior advanced processing application expired. Therefore, DHS is revising 8 CFR 204.3(h)(13) to clarify that an orphan petition filed after approval of the advanced processing application has expired will not be denied on that basis if the petition is a concurrent filing under 8 CFR 204.3(d)(3) with a new advanced processing application. Second, the final rule adds a reference to concurrent filing at 8 CFR 204.3(h)(14), acknowledging that after a Form I–600 petition is revoked, a new Form I–600A may be filed rather than a Form I–600 combination filing. See 8 CFR 204.3(h)(14)(iii).

*Comment:* Multiple commenters expressed opposition to the proposed fees for adoption-related Forms I–600A, I–600, I–800A, and I–800, indicating that the fees are an additional expense without an increase in services or efficiencies. Some commenters stated that adopted children should be considered vulnerable populations and granted fee exemptions just like other groups DHS considered vulnerable populations meriting fee exemptions. A few commenters suggested that DHS provide an additional fee exemption for non-related children being adopted by the same family. Some commenters

agreed with DHS' conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, but still had overall concerns with perceived fee increases.

*Response:* DHS has included additional fee exemptions in this final rule as discussed above. DHS notes that the proposed fees and final fees for adoption forms limit the increase of adoption-related fees in this rule consistent with previous fee rules. This fee increase is in part a result of inflation and being implemented with the intent to maintain current services. The average two-parent adoptive family will generally pay less for filing Form I–600A, Application for Advanced Processing of an Orphan Petition, Form I–600, Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, and Form I–800 than they pay now because the biometrics services fees will be incorporated into the filing fee. This continues the DHS policy of reducing the fee burden on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications through the fees collected from other immigration benefit requests. To reduce the burden on adoptive families, DHS applied the reduced weighted average increase of 18 percent, which may vary slightly because of rounding fees to the nearest $5. *See* 88 FR 402, 450–451 (Jan. 4, 2023).

If DHS used the estimated fee-paying unit cost from the ABC model, the Form I–600A, would have a fee of at least $1,333 in this final rule.[265] Applying the reduced weighted average of 18 percent to the current fee of $775 increases the main filing fee by just $145 to $920 for Forms I–600, I–600A, I–800 and I–800A. However, because the biometrics will be incorporated in the filing fee, most applicant households will experience a cost savings in their application filings. A two-parent household pays $945 under the current fee structure (for a suitability application, biometric services fees, and a petition for a child filed while the suitability approval is still valid). The $920 proposed fee with biometrics incorporated would be $25 less than the current fee of $775 plus two separate $85 biometrics fees for such household.

In addition, DHS already provides, and will continue to provide, the

following fee exemptions for Forms I–600A, I–600, I–800A, and I–800:

• First beneficiary for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Birth siblings for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Filing fee for a new I–600A, I–800A, or I–600 combination filing because the marital status of the applicant changed while their request for a suitability determination was pending.

The proposed rule and final rule approach of providing a fee exemption for birth siblings, but not for non-birth siblings, is consistent with the special treatment afforded in the INA to ''natural siblings.'' The INA allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than up to age 16, only if the beneficiary is the ''natural sibling'' of another foreign-born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. *See* sections 101(b)(1)(F)(ii) and (G)(iii) of the INA; 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term ''natural sibling,'' DHS generally uses the term ''birth sibling'' synonymously, which includes half-siblings but does not include adoptive siblings. The INA does not afford special treatment to non-birth siblings, and the proposed and final rule are consistent with the spirit of the INA. The adjudication of an adoption petition is extensive and unique to the circumstance of the child. The adjudication of an adoption petition is not less extensive for unrelated children because they are being adopted by the same adoptive parents and therefore a fee is required to recover costs. Otherwise, even more costs of adoption adjudications would have to be shifted to people applying for other immigration benefits.

Although DHS will not provide additional fee exemptions for the main Forms I–600A, I–600, I–800A or I–800, DHS will provide additional fee exemptions for:

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 (in certain scenarios).

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

• Form N–600, Application for Certificate of Citizenship (for certain adoptees).

• Form N–600K, Application for Citizenship and Issuance of Certificate (for adopted children).

---

[260] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I–600A approval or first or second change of country request.

[261] The petitioner would be seeking the issuance of an updated approval notice after the adjudication and review of the significant change and updated home study.

[262] Prospective adoptive parents currently must pay the $385 Supplement 3 fee to request a new approval notice unless they are also filing a first-time request for an extension of Form I–800A approval or change of country on the same Supplement 3.

[263] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request for an extension of Form I–800A approval or first change of country request on the same Supplement 3.

[264] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I–800A approval or first or second change of country request on the same Supplement 3.

[265] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

We address these new few exemptions in the following discussion on specific adoption-related comments.

*Comment:* Commenters opposed the proposed Form I–600A/I–600 Supplement 3 fee for certain requests for action on suitability applications for the orphan process combined with the proposed reduction to suitability approval validity time on Form I–600A from 18 months to 15 months. Commenters disagreed with DHS's rationale that shortening the validity period would reduce the burden on adoptive parents and service providers who must deal with multiple expiration dates, reasoning that this would instead create a burden and that DHS should instead align all validity periods to an 18-month timeframe. Although some commenters agreed with DHS's conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, they stated that shortened suitability approval timeframes (from 18 months to 15 months) for orphan cases would impact the number of needed additional extensions and therefore fees. However, commenters expressed support for the proposed fee exemption for the initial extension, reasoning that it appropriately recognizes applicants' additional paperwork and the lighter workload of such cases.

*Response:* The proposed rule and the final rule create some efficiencies for the orphan process like efficiencies already in place for Hague Adoption Convention cases. The rule aligns the suitability approval validity periods for both Orphan and Hague adoptions to the suitability approval, therefore, limiting to only one date to review both for applicants and USCIS. It also creates a dedicated supplement (Form I–600A/Form I–600 Supplement 3) for requests for action on suitability applications so that adoptive parents do not have to draft their own written correspondence or use Form I–824, Application for Action on an Approved Application or Petition. The fee exemption has been expanded to the second extension as well.

Although this rule creates a new supplemental form for the orphan process, having a fee for certain requests for action on suitability applications will not be new. The proposed fee structure will be the same type of process and will be the same as the existing fee structure for the Hague Adoption Convention process. Adoptive parents have been required to use Form I–824 for certain requests for action for the orphan process, for which they paid a current fee of $465, and would have

paid the new $590 fee for Form I–824 set in this final rule. In comparison, the new Supplement 3 fee of $455 is $10 less than the current fee for Form I–824.

Under the proposed rule, the only scenario where adoptive families would have paid more was if they requested a new suitability determination separately from a first-time extension or a change of country request. Petitioners would have paid less under the proposed rule for many scenarios where they request action on a suitability application for the orphan process.

The proposed fees would have been a reduction in fees for petitioners for change of country requests for the orphan process. There would have been a $0 change in fee for a first-time change of county request because those have been, and would have continued to be, fee exempt. Petitioners would have paid $10 less for subsequent change of country requests.

The proposed fees would have also been a reduction in fees for petitioners for duplicate approval notices for the orphan process. Petitioners would have paid $10 less. The proposed fees would have also been a reduction in fees for extension requests. Even with reducing the validity period from 18 months to 15 months for the orphan process, provided petitioners filed their Form I–600 petition within 2.5 years (30 months) of their Form I–600A approval, they would not have had any extension fees. This is because USCIS does not require petitioners to continue to file extensions of their suitability application approval after they file the petition. Petitioners would also have paid less for a subsequent suitability approval. Currently, after a prospective adoptive parent has used the one-time, no fee extension, the prospective adoptive parent cannot further extend the orphan suitability approval and must begin with a new suitability application or combination filing, with a current fee of $775 plus a biometric services fee. Under the proposed process with the new Supplement 3, they would have the option to pay $320 less for a second extension ($455 to extend via new supplement instead of having to file a new Form I–600A with full fee of $775 plus the biometric services fee).

As explained in the section II.C. Changes from the Proposed Rule, DHS is providing additional fee exemptions for adoptive families in this final rule. Specifically, DHS will also provide fee exemptions for:
• Second extensions.
• Second change of country requests.
• Duplicate approval notices for both the orphan and the Hague process.

*Comment:* Some commenters stated that DHS should not place limitations on using the Supplement 3 to extend Form I–600A approval to use the orphan process when countries transition to the Hague Adoption Convention process.

*Response:* Generally, other countries have requested that DHS limit the ability of transition cases to continue indefinitely to limit the confusion that having two simultaneously running adoption processes causes to its administrative bodies and judicial systems. The DHS proposal and Final Rule allows adoptive parents who have taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force additional time to complete the adoption process under the non-Hague process. The final rule will also permit adoptive parents to use the Supplement 3 to request an increase in the number of children they are approved to adopt from a transition country, but only if the additional child is a birth sibling of a child they have already adopted or are in the process of adopting as a transition case and the birth sibling is identified and petitioned for before the Form I–600A approval expires, unless the Convention country prohibits such birth sibling cases from proceeding as transition cases. However, DHS reasonably limits the ability of adoptive parents to indefinitely request extensions of the validity period of the Form I–600A approval, the ability of adoptive parents to request an increase in the number of non-birth sibling children they are approved to adopt, and the processing of transition cases under the non-Hague process. DHS will maintain the provision as proposed.

*Comment:* A commenter opposed removing the regulation that provides for DHS to extend suitability approvals under the orphan process without the prospective adoptive parents requesting one in certain scenarios.

*Response:* DHS is responsible for ensuring adoptive parents are suitable throughout the intercountry adoption process, and therefore does not believe we should extend approvals without determining whether the prospective adoptive parents remain suitable. Furthermore, DHS does not have such a provision for the Hague Adoption Convention process. Removing this provision for the orphan process will help further align the orphan process with the Hague Adoption Convention process, a process which is designed to provide safeguards for all parties to an adoption.

### f. Other Comments on Family-Based Benefits

*Comment:* Commenters stated that raising the fees for family-based applications will make it more difficult to reunite with family members abroad. The fee increases would undermine the well-being of immigrants and family unity, force families to choose between the peace, unity, and security that family-based immigration was created to support, and paying for more immediate necessities like food, housing, and healthcare. USCIS should distinguish between single and family applicants because family applications take more effort to process, and individual applications would be less expensive. Applicants should be made aware of how long the maximum wait time could be.

*Response:* DHS acknowledges the difficulties that come with being separated from family members abroad. However, case processing backlogs make it difficult for all family members to reunite. USCIS is funded by fees and it cannot make progress in alleviating backlogs without raising fees to at least keep up with the rate of inflation and recovering the costs to process applications with approved fee waivers. Additionally, creating and maintaining a new system of tiered pricing would be administratively complex and may require even higher costs than outlined in the proposed rule as well as delay intake and exacerbate backlogs. The fee increases for many family-based petitions (Forms I–129F, I–130, and all adoption-related petitioners/ applications) are limited to inflation or less. *See* 8 CFR 106.2.

### 6. Adjustment of Status and Waivers

#### a. I–485: Application To Register Permanent Residence or Adjust Status

(1) Form I–485 and Separate Form I–131 and I–765 Fees

*Comment:* Many comments were submitted about the proposed fee increases for Forms I–485, I–765, and I–131 and the separation of fees for Forms I–131 and I–765 when filed with Form I–485. Many commenters expressed concern that the increased fees for Form I–485 and unbundled interim benefits would be unduly burdensome and render these benefits unaffordable to many eligible applicants, including those who are low or middle income or working class. Specifically, commenters stated the following:

• The Form I–485 fee is not waivable in most cases that do not involve humanitarian exemptions or exemptions from public charge inadmissibility.

• The fee changes run counter to the ability-to-pay principal and the President's directive to reduce barriers to immigration.

• The proposed fees would impede family unity and harm the public interest by forcing families to either exclude certain members (most likely children) from applying with the entire family, by delaying or foregoing applying altogether.

• The higher fees would force some adjustment of status applicants to forego or delay filing Form I–765, which would prevent them from working and supporting themselves, paying for basic human needs such as food, housing, medical care, and transportation, obtaining other government-issued documents (such as a driver's license, State identification card, or a Social Security number), or accessing public benefits and community services.

• Adjustment of status applicants who forego an EAD would be more likely to rely on public benefits or charity while their Form I–485 is pending, or pursue unauthorized employment where they would be vulnerable to exploitation.

• Without an EAD, employed adjustment of status applicants would have to endure the stress of potentially losing their job.

• Higher fees would result in more Form I–485 applicants being unable to afford legal representation, which would increase processing times and administrative costs due to RFEs, and in more applicants turning to unscrupulous lending institutions or relying on credit cards or other high-interest mechanisms to pay their expenses and benefit fees.

*Response:* DHS acknowledges the difficulty some individuals and families encounter in balancing paying for the rising costs of basic needs and benefits, and that employment authorization is often key to the success of immigrants in the United States. However, DHS believes that we have balanced the filing options with separate costs and discounts in this final rule to further mitigate the cost burden to applicants. *See* 8 CFR 106.2(a)(7), (21), (44). The new separate fees represent DHS's best effort to reduce barriers to immigration through balancing affordability, benefits, family unity, and ability to pay, while maintaining adequate services.[266]

DHS is not codifying the proposed fees about which the commenters are commenting, and the separate fees are only increased by inflation or less

(which is less than the full cost of adjudicating these applications). DHS disagrees that an increase in fees proportionate to the level of inflation would necessarily result in more Form I–485 applicants being unable to afford legal representation. The inflation-only increase means that the Form I–485 fee is the same in real dollars as the current fee was when it was last updated in 2016. Thus, assuming that attorneys' fees increased consistent with inflation, an applicant who could have afforded to hire an attorney in 2016 would generally be able to afford an attorney today, all other things remaining equal. Furthermore, USCIS designs its forms with the goal of making them usable by the general public without the need to hire counsel. USCIS also continues to make efforts to reduce the frequency of RFEs, including revising forms and instructions using plain language to reduce the burden of information collections, and through rulemakings that clarify and modernize ambiguous definitions or inconsistent adjudication. Therefore, DHS disagrees that the fee increase for Form I–485 would directly result in an inability to pay for legal representation when necessary or borrowing from unscrupulous lenders, and finds no evidence to support commenters' contention that fewer applicants choosing to pay for legal representation would result in quantifiable impacts to RFEs or processing times. Currently, Form I–485 and interim benefits are separated and adjudicated by different units. USCIS's practice of adjudicating these forms is not expected to change with the separation of these benefits; therefore, it is not expected that requests will have any additional impact on processing times or administrative costs.

Based on the comments and further review of the fees, DHS has decided to:

• Reduce the fee for Form I–485 from $1,540 in the proposed rule to $1,440 in the final rule.

• Limit the Form I–765 fee for those who filed USCIS Form I–485 after the effective date of this rule to $260, half the cost for filing Form I–765 on paper.

• Provide a $490 discount for applicants (principal or derivative) under age 14 when they file Form I–485 concurrently with a parent.

• Continue to charge Form I–485 applicants who want an advance parole document a full fee for Form I–131 ($630).

*See* 8 CFR 106.2(a)(21); 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii) and (iv).

DHS has determined that unbundling the forms will assist USCIS making processing times more efficient by

---

[266] *See* 88 FR 402, 492, Table 16 (Jan. 4, 2023); 88 FR 402, 433–442, 491–495.

eliminating Form I–765s filed for individuals who are not in need of employment authorization or Form I–131s for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need. Applicants who are unable to pay the fee and exempt from the public charge ground of inadmissibility may apply for a waiver of the fee for Form I–485. *See* 8 CFR 106.3(a)(3)(iv)(C). Many humanitarian and protection-based classifications pay no fee for Form I–485. *See* 8 CFR 106.3(b); Table 5C. DHS believes the discounted Form I–765 fee may limit burden for low, middle-income, or working-class members. DHS also notes that the fee for Form I–765 is waivable for any I–485 applicant who is unable to pay the fee, *see* 8 CFR 106.3(a)(3)(ii)(F), and Forms I–131 and I–765 are fee exempt for certain categories of applicants, *see* 8 CFR 106.3(b); Table 5C.

*Comment:* Commenters also expressed concerns that adjustment of status applicants would forego or delay filing Form I–131. Specifically, commenters stated the following:

• Some wrote that these Form I–485 applicants would be trapped in the United States while their adjustment of status applications were pending, and be unable to travel to see family or leave the United States temporarily if they faced urgent issues.

• A commenter wrote that DHS should end the requirement that I–485 applicants obtain advance parole before travel if they possess lawful nonimmigrant status.

• A commenter said that advance parole is more critical than ever given increased Form I–485 processing times.

• Another stated it was "borderline extortion" to require Form I–485 applicants to pay for travel authorization given the long wait time for Form I–485.

• A commenter said the adjustment process is "illusory" because adjustment applications require several years for adjudication and associated applications for travel and employment authorization require over 15 months.

• Travel authorization would alleviate family separation for adjustment of status applicants who have been unable to travel outside the United States for many years.

• Unbundling of interim benefits would force more I–485 applicants to seek emergency travel requests if emergencies arose, which would put additional strain on USCIS field offices.

• USCIS should drop the requirement for lawful nonimmigrants to apply for advance parole.

• USCIS could better manage the process of providing advance parole by dropping the requirement for lawful nonimmigrants to apply for and receive advance parole incident to the filing of Form I–485, allowing for travel with a pending Form I–485, extending the validity of Advance Parole Documents (APDs) for individuals with a pending Form I–485 until USCIS can render a decision or to coincide with current processing times.

• Employment and travel authorization is important given long processing times for Form I–485, and the I–131 and I–765 should not be separated from the I–485 fee, as this will increase the filing costs and may make adjustment of status unattainable for some.

• Some I–485 applicants wait long periods of time to have their applications adjudicated due to processing times, backlogs, and visa retrogression, and these applicants must pay for I–765 and I–131 renewals.

• The proposed Form I–485 fee increases were unjustified considering USCIS backlogs and processing delays. Commenters said that, to justify the fee increases, USCIS would need to improve its processing of Form I–485 and related applications so that they are adjudicated within a reasonable timeframe.

*Response:* It is correct that some applicants must obtain advance parole before departing the United States with a pending Form I–485 to avoid abandoning the adjustment of status application. *See* 8 CFR 245.2(a)(4)(ii)(A). The advance parole document is generally issued for one year to allow for the processing of an applicant's Form I–485. USCIS does not have the ability to administratively track all Form I–131 applicants continually to determine whether the Form I–485, is still pending, has been abandoned, or denied. Therefore, USCIS cannot extend an Advance Parole Document validity to coincide with a pending Form I–485. Separating the Form I–131 fee from the Form I–485 fee does not alter that has always been true—noncitizens requesting the benefit of advance parole are generally required to pay a fee to USCIS for the adjudication of the benefit request. While recovering the costs for the adjudication of that benefit request was previously accomplished through a bundled fee, the fee was still present. Separating the fees ensures that noncitizens are only paying for the benefits that they want or need. If an applicant has no need for an advance parole document, they would no longer be required to pay a bundled fee which includes a benefit they do not want or need. Continuing to provide the Form I–131, Application for Travel Document, with no fee increases I–131 processing times by creating incentive to apply for a benefit that an applicant may not need, leading to longer wait times to those who are truly in need and may be unable to leave. The approach taken by DHS in this final rule ensures that only those noncitizens who want or need advance parole pay the associated fee. Separating the fees and ensuring that only those who want or need the benefit pay the fee would not prevent individuals from traveling. It will provide an adequate cost recovery mechanism for USCIS and reduce unnecessary fee burdens on applicants who do not seek travel authorization. DHS strongly rejects the commenter's suggestion that charging a fee in association with the adjudication of a benefit request is "extortion," as USCIS has the statutory authority to establish and charge fees to ensure recovery of the full cost of providing services. *See* INA section 286(m) and 8 U.S.C. 1356(m). DHS declines to adopt the proposal not to require advance parole for Form I–485 applicants who possess nonimmigrant status, which could result in excessive continuances of Form I–485s for applicants who can freely travel outside the country while their applications are pending and who for good cause find themselves unable to return in time for their interview [267] DHS disagrees with the characterization of the adjustment process as "illusory," noting that USCIS adjudicated 608,734 Form I–485s in FY 2022.[268]

*Comment:* Commenters expressed concern for the effect that the increased fees for Forms I–485, I–765, and I–131 would have on certain groups, including:

• Asylees and other vulnerable groups, who tend to be low income or have limited financial resources, and require a refugee travel document to travel internationally and an EAD to obtain a REAL ID compliant form of identification.

• Victims of sexual and domestic violence and trafficking who do not pursue, or are ineligible for, survivor-

---

[267] *See* 8 CFR 103.2(b)(9)(ii), (13)(ii) (allowing interview continuances for good cause).

[268] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022," *https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2022_Q4.pdf* (last updated Oct. 2022).

specific adjustment of status or do not qualify for a fee exemption.

• Afghan applicants and their families, many of whom served alongside U.S. troops and have been paroled into the United States, whose adjustment of status and interim benefit fees would not be waived.

• Student applicants with limited financial resources.

• International religious workers.

• K–1 fiancé(e)s, who have already gone through a long review process before entry.

• Conflicts with DHS's goal of treating all who apply for interim benefits the same and conflicts with the INA, which "states a clear preference for family-based immigration by completely eliminating quotas for select family-based categories."

• Proposed fees for Form I–485 and interim benefits were unjustified or unreasonable.

• Many commenters expressed concern with the size of the fee increases, which some characterized as "exorbitant," particularly when filing Forms I–485, I–765, and I–131 together.

• Fee increases significantly outpace the rate of inflation since the last fee increase in 2016.

• Fees are already set at a level sufficient to cover the cost of adjudicating the Forms I–131 and I–765 filed with them.

• Filers are "shouldering the burden" of fee waivers and exemptions for other immigration forms.

*Response:* Although fee increases may impact individuals differently, DHS believes that it has balanced the new fee schedule by providing a reduced fee for Form I–765 when filed with Form I–485 and separating the fee for Form I–131, which some people may not need. As indicated in the proposed rule, continuing to combine the fees together would increase the fees dramatically. DHS in its fee review did not target specific groups and recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing.

*Comment:* One commenter stated that, if Congress were to pass the Dream Act, *see* S. 264, 117th Cong. (2021), or similar legislation, the Act's beneficiaries would have to pay these additional fees to obtain permanent resident status.

*Response:* As the commenter indicated, Congress has not passed the Dream Act and therefore DHS has not

made any changes based on this comment. Congress may choose to provide for specific fees in the Dream Act or similar legislation.

*Comment:* One commenter alleged that the new fees were "clear punishment" for employment-based applicants from India who filed Form I–485s during fiscal years 2021–22 but who have not been approved due to visa retrogression. Some commenters said that expecting employment-based adjustment applicants to pay a fee every time they renew their Form I–765 or Form I–131 is unfair because as they are stuck in this limbo due to visa date or retrogression and for no fault of their own. Others expressed concern that individuals who filed Forms I–485, I–765, and I–131 before the effective date of the fee change would be subject to additional fees for Forms I–765 and I–131 renewals as a result of the unbundling.

*Response:* DHS disagrees that this fee is a punishment for any specific groups who have not been approved due to visa retrogression or membership in a class of individual and recognizes that many individuals of various nationalities filing the Form I–485 have experienced long wait times to be reunited with family. Congress determines the policy on visa limitations, and eliminating quotas is outside the purview of this rulemaking. DHS notes again that individuals who filed a Form I–485 after July 30, 2007 (the FY 2008/2009 fee rule), and before this change takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

*Comment:* A commenter wrote that USCIS was passing along the costs of mismanagement from prior administrations to current and future Form I–485 applicants. Another wrote that, by separating the Form I–485 from interim benefit fees, USCIS was getting extra income from its processing backlogs. Commenters questioned the rationale and assumptions underlying DHS's justification for unbundling the fees for Forms I–485, I–765, and I–131. Some asserted that these forms are usually filed concurrently, so the combined fee increase for those forms is more important than the increase for Form I–485 alone. Another commenter stated that raising the Form I–485 fee would bring no financial benefit to USCIS because adjustment applicants are relatively low compared to other visas and immigration applications.

*Response:* USCIS did not realize the operational efficiencies that DHS envisioned when it combined fees for Form I–485 and interim benefits, which

was implemented to address the same commenter accusation of a revenue incentive.[269] In fiscal year 2022, USCIS received 599,802 Form I–485s. USCIS has no data to indicate that it takes less time to adjudicate interim benefits bundled with a Form I–485 than it does to adjudicate standalone Form I–131 and I–765 filings. Individuals applying for adjustment of status are not required to request a travel document or employment authorization. With combined interim benefit fees, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price. Unbundling allows individuals to pay for only the services requested. Thus, many individuals may not pay the full combined price for Forms I–485, I–131, and I–765. DHS recently increased the maximum validity period to 5 years for initial and renewal Employment Authorization Documents (EADs) for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[270] This new policy could reduce the number of EAD extensions an applicant might need to file, further reducing an applicant's financial burden.[271]

*Comment:* A commenter asserted that applicants should not have to pay for an EAD or Advance Parole when they are entitled to them because of their pending Form I–485, while another stated that it makes no sense to charge separate fees for Form I–485 and interim benefits if they are all being processed as part of the same package.

*Response:* DHS notes that an EAD, when issued in connection with a pending I–485, and Advance Parole are discretionary benefits, and as such there is no "entitlement" to them under the statute or regulations. *See* 8 CFR 223.2(e); 8 CFR 274a.13(a)(1). Although applicants may submit forms together in one envelope or online, each receipt and adjudication have a different process and associated cost as they are separate

[269] *See* Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 72 FR 4888, 4894 (Feb. 1, 2007) (stating, "This creates the perception that USCIS gains by processing cases slowly.").

[270] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last updated Sept. 27, 2023).

[271] *See* Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants, 87 FR 26614 (May 4, 2022).

benefits and have separate eligibility requirements. To improve efficiency and reduce Form I–765 processing times for Form I–485 applicants, USCIS may decouple Form I–765s from Form I–131s filed at the same time. Since February 1, 2022, when possible, USCIS adjudicates an applicant's Form I–765 first. If approved, USCIS will issue an EAD without any notation about advance parole. Form I–131s are adjudicated separately and if approved, USCIS will issue an advance parole document.[272]

*Comment:* Some commenters stated that the DHS's rationale for the current fee increases conflict with is rationale for originally bundling the forms in 2007. Some said that DHS raised the Form I–485 fee in 2007 to include fees for Forms I–765 and I–131, yet DHS is now raising the fee for the Form I–485 while unbundling the other benefits. One commenter stated that DHS originally justified bundling these forms to allow applicants to work and travel during the long Form I–485 processing times, but these processing times are even longer now.

*Response:* In the FY 2008/2009 fee rule, the decision was made to allow applicants who properly file and pay for the Form I–485 to file for interim benefits for no additional fee. During the 2016/2017 fee review, DHS reviewed the cost of bundling the benefits with the Form I–485. *See* 81 FR 26903, 26918 (May 4, 2016). However, USCIS has determined that continuing the practice of bundling will further contribute to backlogs by incentivizing unnecessary filings, increase the cost of the Form I–485 for all filers, and increase the cost of Forms I–765 and I–131 for other filers. *See* 88 CFR 491–495.

By continuing to bundle the forms, the weighted average fee increases for Form I–485 and interim benefits would have been 51 percent. Therefore, applicants would have paid much more to bundle Forms I–485, I–131 and I–765. DHS is separating fees for interim benefit applications and Form I–485 applications to keep the fees lower for most the greatest number of applicants.

Based on the data and comments, DHS will provide for separate fees for each form to account for people who may not file for all three forms. However, DHS understands that most people would request an EAD with their Form I–485 filing and therefore has provided for a lower fee for Form I–765

that is concurrently filed with Form I–485.

*Comment:* Commenters claimed that maintaining a bundled fee for Forms I–485, I–765, and I–131 would be more efficient. A commenter claimed that DHS had not specified how a separate fee for the Forms I–765 and I–131 would decrease processing times. Another commenter stated that, by requiring separate benefit requests for interim benefits, the changes will increase processing times and result in inconsistent adjudications. Another commenter said that unbundling Forms I–485, I–765, and I–131 will cause applicants to file these forms at different times as needed, which reduces early, systematic processing of packets systematically in mail rooms and service centers. A commenter wrote that unbundling would require adjustment applicants to submit multiple individual applications, which would increase work and costs for USCIS and potentially negate the benefits sought by USCIS. A commenter asserted that keeping Forms I–485, I–765, and I–131 bundled would incentivize USCIS to process Form I–485s in a timely manner to avoid Forms I–131 and I–765 renewals, while another stated that separate fees would create a perverse incentive for USCIS to delay adjudication of benefits and Form I–485 applications as a financial reward for inefficiency.

*Response:* DHS maintains that the unbundling of Forms I–485, I–765, and I–131 would help decrease processing times. Currently, some applicants file all three forms without needing the benefits of advance parole or employment authorization while they await the adjudication of their adjustment of status application because of the one-fee model. This results in the adjudication of benefits that applicants may not otherwise want or need. By unbundling the forms, DHS is trying to limit the cost for certain benefits for those who do not need them. By limiting the number of individuals applying for unnecessary benefits, DHS will also decrease the total number of applications filed, direct resources toward adjudicating those benefit requests that are needed and decrease overall processing times for advance parole and employment authorization. DHS notes that separating the fees for Forms I–485, I–765, and I–131 would not prevent applicants from submitting these forms concurrently. DHS agrees that, in some cases, applicants may choose to file Forms I–765 or I–131 at different times as needed, which aligns with DHS's goal for applicants to only apply for those benefits they want or need without

having other fee-paying applicants subsidize those benefits. DHS disagrees that this will reduce orderly, systematic processing of these applications. Applicants are already required to submit individual forms for the different benefits of adjustment of status, employment authorization, and advance parole.

DHS disagrees that unbundling the Forms I–485, I–765, and I–131 creates an incentive for DHS to increase processing times. Rather, the fees listed in this rule reflect the cost of adjudication of the specific benefits requests, accounting for increased costs to USCIS since the publication of the last fee rule and limiting fees for those applicants who do not need certain ancillary benefits.

*Comment:* Some commenters said that the new unbundled fees would confuse applicants. One said that separating the fees would impact nonprofit organizations that help applicants by requiring them to retrain staff to adapt to the change.

*Response:* DHS understands changes in fees impact organizations that help applicants file forms and new fees may be confusing. Form G–1055 will provide a list of all fees, fee exemptions, reduced fees, and fee waiver eligible forms which should clarify all the fee provisions for applicants and nonprofit organizations. As previously indicated, DHS generally reviews fees every two years, as required by the CFO Act, 31 U.S.C. 901–03, but has not been able to increase fees since 2016 to keep up with increased costs. DHS did not make any changes based on this comment.

*Comment:* Commenters expressed concern that the increased fees for Forms I–485 and I–765 would adversely affect the U.S. workforce and economy. Commenters said it would cause fewer individuals to work, which would reduce tax revenues and otherwise harm the U.S. economy. A commenter stated that this could lead to more individuals working without authorization and decreased economic gains for the United States. Another commenter predicted that increased cost for these applications would encourage individuals to move to other countries and lead to brain drain. Another stated that the Form I–485 fee increase would hurt businesses' ability to sponsor highly skilled workers who are crucial to STEM-related sectors. More generally, one commenter cited research showing the economic gains and poverty reduction when migrants obtain LPR status.

*Response:* DHS understands the vital role our immigrant communities play in the workforce and economy. DHS

---

[272] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland, "I–765, Application for Employment Authorization" *https://www.uscis.gov/i-765* (last updated Mar. 8, 2022).

003266

appreciates the comments and data provided which cited research depicting economic gains and poverty reduction when LPR status is obtained; however, there was no analysis or discussion provided by commentors how individuals and businesses make difficult trade-offs to afford valuable immigration benefits. DHS is aware of research suggesting that employment authorization, LPR status, and citizenship are associated with higher incomes despite little consensus concerning how much of these differences remain after controlling for abilities and other factors. DHS continues to follow research on high-skill migration but finds no basis supporting commenters' claims that fee increases under this rule could be reasonably expected to result in a "brain drain."

Before the FY 2008/2009 fee rule, applicants paid separate fees for Forms I–765 and I–131 benefits while waiting for their Form I–485 to be adjudicated. The 2008/2009 fee rule allowed applicants to pay for the I–485 and file the interim benefits at no additional cost. Due to inflation and the enjoined 2020 fee rule, USCIS recognized that the fee was insufficient to recover costs associated with these filings. In addition, with no filing fees for the interim benefits, it provided adverse incentive for filers who may not need the benefits and contributed to longer processing times. For these reasons, USCIS has calculated the fee for the Form I–485 to allow applicants to file and pay the interim benefits separately and as needed. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[273]

*Comment:* Commenters stated that the increased fees for adjustment of status and interim benefits undermine USCIS' goal of promoting naturalization by preventing or delaying people from obtaining permanent residency. Some commenters suggested that the increased fees for Forms I–485, I–765, and I–131 were intended to discourage immigration and naturalization. A commenter wrote that obtaining LPR status also facilitates deeper integration and allows migrants to more fully participate in civic life, and therefore fees for lawful permanent residence should be as low as possible. A commenter stated that, by delaying or preventing individuals from filing applications, the fee increases would negatively impact USCIS, which is primarily funded by application fees.

*Response:* DHS does not believe that the new fees undermine the goals of promoting naturalization or prevent people from obtaining lawful permanent residence. As previously indicated, USCIS is mostly dependent on form fees without appropriations. DHS must balance increased costs and burdens to applicants but does not intend to discourage immigration or naturalization. After recent fee increases, USCIS did not see a decrease in filings that it can attribute to fee increases. DHS notes that it continues to set the fee for Form N–400 below full cost recovery to promote naturalization and immigrant integration. *See* 88 FR 402, 487 (Jan. 4, 2023).

*Comment:* A few commenters expressed frustration with situations where the I–485 is adjudicated before the I–765 or I–131, potentially resulting in wasted applications fees if the applications are unbundled, and asked whether fees would be refunded in these situations.

*Response:* DHS understands that an applicant may receive the final notice that their Form I–765 or I–131 has been adjudicated after receiving a decision on their Form I–485; however, costs associated with each application begin at intake and continue through final adjudication. In this final rule, DHS has revised 8 CFR 103.2(a)(1) to provided that filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS.[274]

In general, USCIS does not refund a fee or application once it has made it through intake regardless of the decision on the application.[275] There are only a few exceptions, such as refund of the premium processing service fee under 8 CFR 106.4(f)(4), when USCIS made an error which resulted in the application being filed inappropriately, or when an incorrect fee was collected. DHS proposed to revise 8 CFR 103.2(a)(1) to provide that fees are "generally" not refunded. This would address concerns that the current regulatory text does not explicitly permit refunds at DHS discretion.

DHS declines to make further policy changes based on these comments.

*Comment:* Instead of the proposed fees for Form I–485 and interim benefits, commenters proposed the following alternatives:

• Maintain the current policy of allowing applicants to file their I–485 with applications for interim benefits at no additional cost.

• Automatically grant employment authorization and advance parole to applicants for adjustment of status, which USCIS already allows in different situations.

• Issue automatic interim EADs in times of processing delays.

• Restore the fee for Form I–485 to the true cost of processing the form.

• Set the fee for Form I–485 with interim benefits and biometrics fees at $1,540, which is a 35 percent difference from current fees of $1,140.

• Offer a discounted fee and streamlined approval processes for Forms I–765 and I–131 that are concurrently filed with Form I–485.

• Exempt fees for Forms I–765 and I–131 renewals while Form I–485 is pending.

• Maintain the bundled fees for the initial I–765 and I–131, and only charge separate fees for renewals; or at least allow the initial I–765 to remain bundled.

• Apply the fee increases only to I–485 applicants who had not filed their underlying petitions before the effective date.

• Extend EAD and Advance Parole validity periods to the compensate for increased fees for interim benefits.

• Cap the amount of fees paid by immediate family members applying together.

• Waive or reduce fees for Form I–485 and associated interim benefits for family-based petitions.

• Automatically grant interim benefits to K–1 fiancé(e)s.

*Response:* DHS has reviewed the proposals and determined that providing a lower fee for Form I–765 filed with Form I–485 and maintaining the full Form I–131 fee is appropriate and balances the cost to Form I–485 applicants who wish to also file Forms I–765 and I–131, while limiting the cost burden. Although work is authorized for some individuals because of their immigration status or circumstances, for example, asylees, parolees or U nonimmigrants, USCIS does not provide

---

[274] The entirety of 8 CFR 103.2(a)(1) is republished for ease of editing and context but only the fourth sentence in 8 CFR 103.2(a)(1) is revised.

[275] When USCIS rejects an immigration benefit request as required by 8 CFR 103.2(a)(7) the fee is returned to the requestor. DHS does not consider the act of returning a fee for a rejected request that is not provided a receipt number as a "refund" because the requestor's payment is not processed.

003267

**6322** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

automatic EAD cards to Form I–485 applicants.[276] However, DHS is providing the following changes to mitigate some of the financial burden to applicants:

• DHS is providing a 50 percent filing discount on the Form I–765 when the I–485 is filed with a fee and the Form I–485 is still pending. *See* 8 CFR 106.2(a)(44)(i).

• Applicants who filed their Form I–485 on or after July 30, 2007, and before the effective date of the rule will not be subject to the new fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

• USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[277]

DHS believes that these changes mitigate the proposed fee increases. DHS declines to make any further adjustments based on these comments.

(2) Fees for Children Under 14 Filing With Parent

*Comment:* Multiple commenters expressed opposition to the elimination of the lower filing fee for derivative children under 14 filing concurrently with a parent. Some commenters disagreed with the DHS's rationale for eliminating the lower fee for Form I–485 applicants under the age of 14. Commenters stated that:

• The increased fee would be significant and overly burdensome, with some remarking that the fee would more than double.

• Given the uncoupled fees for interim benefits and the inclusion of biometrics costs, applicants under 14 would be paying more for less benefits.

• The fee increase for a child's application in addition to unbundling the employment authorization and advance parole document request would

make adjustment of status unaffordable to some applicants.

• The fee increase would impede family reunification and runs contrary to other policy objectives.

• The fee increase would force some families to stagger or delay I–485 applications for certain family members.

• Fee changes for applicants under 14 would impose and increase burdens on groups or price out applicants who are low-income or experiencing poverty.

• A fee increase would threaten children's health, education, safety, security, and future.

• They disagreed that there is no cost basis for different I–485 fees for adults and derivative children.

• USCIS' failure to track the difference in adjudication times for I–485s based on the age of the applicant did not justify the assumption that there was no difference in adjudication time based on age.

• DHS failed to consider that young children are less likely to have inadmissibility and discretionary issues that would delay adjudications, such as immigration violations, criminal history, and misrepresentation.

• DHS did not address potential efficiencies in adjudicating two related I–485s submitted concurrently by family members.

• It should take less time to process a child's application after the agency has processed the parents concurrently filed one.

• The fee increase included unnecessary costs for biometrics services since children under 14 are exempt from these requirements.

• They disagreed with DHS' rationale that only a small percentage of adjustment applicants are children.

• DHS's rationale ignored the effects of the fee increase on other family members.

• The increased fee would reduce applications for adjustment of status by children.

• This would undermine DHS's goals of encouraging naturalization and family integration.

• The fee increase would undercut the social and economic benefits of family-based immigration.

*Response:* DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. After reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950 (27 percent increase over

the current fee). Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A). A child filing Form I–485 after the effective date of the final rule, concurrently with a parent or as a standalone, will pay $260 for Form I–765 (50 percent discount) and $630 for an advance parole document, if requested (10 percent increase). *See* 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii). Furthermore, applicants who are unable to pay the fee for Form I–485 and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C).

(3) INA Sec. 245(i) Statutory Sum Clarification

*Comment:* Another commenter wrote that the penalty fee under INA section 245(i), 8 U.S.C. 1255(i), should be increased to $2,000, but acknowledged that this would require congressional action.

*Response:* The commenter correctly notes that the additional fee for adjustment of status under INA 245(i), 8 U.S.C. 1255(i), is determined by statute, and so can only be changed by Congress. *See* INA 245(i)(1), 8 U.S.C. 1255(i)(1).

(4) Other Comments on Form I–485 Fees

*Comment:* One commenter stated that the fee increase was inconsistent with E.O. 14091 because it did not consider the disproportionate impact the change would have on lower income applicants of color, particularly larger families coming from Central and South America.

*Response:* DHS believes that this rule is consistent with E.O. 14091. DHS recognizes that fees may impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate consistent with the ability-to-pay principle. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. The proposed rule included a $1,540 fee for Form I–485. *See* 88 FR 402, 407 (Jan. 4, 2023). In recognition of comments and the impacts on applicants, DHS has decreased the filing fee to $1,440, limiting the fee increase to the change in inflation as of June 2023 (26 percent). To further mitigate the cost burden, the final rule will also continue to provide a discount for children aged 14 and under who concurrently file with a parent, which

---

[276] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Employment Authorization Document," *https://www.uscis.gov/ green-card/green-card-processes-and-procedures/ employment-authorization-document* (last updated Feb. 11, 2022); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Certain Afghan and Ukrainian Parolees Are Employment Authorized Incident to Parole," *https://www.uscis.gov/newsroom/alerts/certain- afghan-and-ukrainian-parolees-are-employment- authorized-incident-to-parole* (last updated Nov. 21, 2022).

[277] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https:// www.uscis.gov/newsroom/alerts/uscis-increases- employment-authorization-document-validity- period-for-certain-categories* (last updated Sept. 27, 2023).

will assist larger families seeking to adjust. *See* 8 CFR 106.2(a)(21)(ii). Under the final rule, applicants who are unable to pay the fee and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C). USCIS has also proposed additional fee exemptions for certain applicants seeking to adjust under humanitarian and protection-based immigration categories. *See* 8 CFR 106.3(b). DHS acknowledges that many applicants for adjustment of status are not eligible for fee waivers or exemptions. At the same time, various INA provisions contemplate that most adjustment of status applicants will have means of support. *See, e.g.,* INA section 212(a)(4), 8 U.S.C. 1182(a)(4); INA section 213A, 8 U.S.C. 1183a; *see also* E.O. 14019, 11(b) ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations.").

*Comment:* Asylee families would be particularly hurt if forced to stagger their Form I–485 filings due to the increase in fees, since the principal asylee would have to delay naturalization until the remaining family members adjust status, otherwise some derivative applicants would become ineligible to adjust status.

*Response:* DHS recognizes the potential difficulties that result when certain asylee family members decide to adjust and naturalize before others, which requires the remaining unadjusted family members to file *nunc pro tunc* asylum applications. However, DHS notes that the fee for Forms I–485 and I–765 may be waived for asylees (who are exempt from the public charge ground of inadmissibility) who are unable to pay. *See* 8 CFR 106.3(a)(iv)(C), (ii)(F). Therefore, asylee families who are unable to pay the fees for these forms should not have to stagger the adjustment applications of different family members. DHS has considered the comments regarding the Form I–485 and reduced the proposed fee to a 26 percent increase in the filing fee for Form I–485, *see* Table 1, and maintained a lower filing fee for children under the age of 14 filing concurrently with a parent, 8 CFR 106.2(a)(21)(ii). DHS has limited the Form I–485 fee increase by requiring fees for concurrently filed requests for interim benefits (Forms I–765 and I–131) but limited the fee for the Form I–765 while a Form I–485 is pending to $260. 8 CFR 106.2(a)(7), (21) & (44)(i). DHS believes that these changes in the final rule will limit staggering of Form I–485s for asylee families and *nunc pro tunc* asylum applications.

*Comment:* A commenter recommended narrowing and adding a fee for Supplement J when filed after Form I–485, such that Supplement J would not be required for re-assigning classifications on a pending Form I–485 and would not "restart the clock" for Form I–485 portability.

*Response:* DHS considered the commenter's suggestions concerning the use of Form I–485, Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), and the potential for charging a fee in a new context as described. USCIS has generally not required applicants to pay a fee for many forms that are supplemental in nature, for example, Form I–130A, Supplemental Information for Spouse Beneficiary. The Form I–485, Supplement J, is to confirm a bona fide job offer or transfer the underlying basis of their adjustment of status application to a different petition. Requesting applicants to pay a new fee to port to a new job would present a new financial burden for the applicant that could prevent some intending immigrants from being able to take advantage of the portability provisions in the American Competitiveness in the Twenty-First Century Act of 2000 (AC21). *See* INA section 204(j), 8 U.S.C. 1154(j). The commenter's other suggestions are outside the scope of this rulemaking; therefore, DHS makes no changes based on this comment.

**b. Inadmissibility Waivers**

*Comment:* Commenters opposed the proposed fee increase for Forms I–192, I–212, and I–601, writing:

• Fees for these forms are already high relative to other immigration fees.

• These forms are often used by individuals with criminal or immigration violations, the higher fees could exacerbate racial and economic inequities within the criminal and immigration systems.

• Increasing the Form I–192 fee could deter individuals from applying, including Canadian applicants who would continue to reside in Canada but contribute to the U.S. economy if not for the fee increase.

• Raising the fee for Form I–192 could cause many families who do not qualify for a fee waiver to not be able to apply due to limited resources.

• USCIS proposed fee increases for Form I–212 will harm mid- to low-income applicants and survivors of sexual violence and human trafficking.

• Increases in fees for Forms I–212 and I–192 are unreasonable due to the existing delays in processing and the

fees applicants must pay for other forms.

*Response:* As stated elsewhere, DHS examined each fee in the proposed rule and the fees proposed represent DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate services. DHS notes that the increased fees for Form I–192, Application for Advance Permission to Enter as a Nonimmigrant and Form I–601 are only $170 (18 percent increase) and $120 (13 percent increase), respectively, which are below the rate of inflation since the last fee increase (approximately 26 percent). For these forms, the fee increases (18 percent and 13 percent) remain below that for other benefits.

DHS acknowledges that some proposed fees are significantly higher than the current fees. This is the case for Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal, because DHS proposes to not limit the fee increase as it has done in the past, for policy reasons. *See* 81 FR 26904, 26915–26916 (May 4, 2016). In the FY 2016/2017 fee rule, DHS stopped limiting the fee increase for inadmissibility waivers like Forms I–212 and I–601. *See* 81 FR 73292, 73306–73307 (Oct. 24, 2016). DHS is not proposing to limit the fee increase for Form I–212 because other proposed fees would have to increase to recover the full costs. Additionally, DHS already provides fee exemptions for vulnerable populations, including survivors of sexual violence and human trafficking, for all forms filed through final adjudication for adjustment of status to LPR, including Form I–485 and associated forms. *See* 8 CFR 106.3(b); *see also* Preamble, Table 5C. For example, abused spouses and children filing under CAA and HRIFA are fee exempt for Form I–485 and associated forms, including Form I–212, as they file for VAWA benefits on Form I–485. *See* 8 CFR 106.3(b)(4).

**c. Form I–601A, Application for Provisional Unlawful Presence Waiver**

*Comment:* The comments received on the proposed fee for the Form I–601A, are as follows:

• In the absence of legislation, Form I–601A is imperative for mixed-status families to remain together. While a fee adjustment may be appropriate DHS should reconsider and reduce the proposed 75 percent increase.

• The proposed fee increase for Form I–601A is inappropriate given the current processing times and backlog.

**6324** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

• DHS failed to justify why Form I–601A warrants such a high fee because the number of cases and completion rates have decreased.

• The proposed fee increase for Form I–601A would discourage and delay individuals from consular processing and undermine the purpose of the provisional waiver.

• A 75-percent fee increase for Form I–601A is too high because applicants who need a Form I–601A also must pay fees for Form I–130, Form I–485, and consular processing.

• Because Form I–601A requires a demonstration of extreme hardship DHS should treat it like other humanitarian applications and raise its fee only 19 percent.

• The Form I–601A proposed fee increase would disproportionately impact minority communities, because BIPOC individuals are more affected by racial inequities in the immigration justice systems.

*Response:* DHS acknowledges the increased Form I–601A, Application for Provisional Unlawful Presence Waiver, fee would increase the costs for applicants and has considered the comments. As previously mentioned, USCIS is primarily fee-based and therefore must recover operating costs through fees which must incorporate cost to process forms which have fee waivers or exemptions. DHS notes that applicants filing Form I–601A are only consular processing and are not filing Form I–485 for adjustment of status. DHS does not have data indicating that the new Form I–601A fees would disproportionately impact BIPOC communities, and commenters offered no evidence indicating the form is disproportionately used by BIPOC communities. However, DHS has considered comments regarding the Form I–601A and reduced the proposed fee to the amount of inflation as described in section I.C. of this preamble. DHS agrees that Form I–601A is important for family unity and needed by certain noncitizens who have resided in the United States for a long time to normalize their status. DHS also recognizes that Form I–601A applicants tend to lack employment authorization and so may possess less means to pay a significant fee increase. Therefore, DHS proposes a 26 percent increase in the filing fee for Form I–601A to $795, which limits the fee increase to the change in inflation between December 2016 and June 2023.

7. Genealogy and Records Request Fees, Forms G–1041, Genealogy Index Search Request, G–1041A, Genealogy Records Requests, and G–1566, Request for a Certificate of Non-Existence

*Comment:* Numerous commenters generally opposed increasing fees for genealogy search and records requests. Some individual commenters expressed opposition to the proposed fees for genealogy records, without providing further rationale. Other commenters, many identifying themselves as professional genealogists or individual genealogists, opposed the proposed increased fees, stating that they oppose the fee increase for the following reasons:

• Current fees are already cost-prohibitive without further increase.

• They opposed the 2020 fee increase and they oppose the new proposed rule.

• The proposed fee increase would create a burden on or entirely deter individuals and amateur researchers seeking to learn more about their family histories.

• The proposed fees are too high or would otherwise be beyond the means of most Americans.

• The USCIS genealogy program is an illegal interpretation of the Freedom of Information Act (FOIA).

• USCIS has not demonstrated the need for its proposed increased fees on genealogy forms with information about the adjudication, other data, or its fee increase methodology.

• The proposed fee does not reflect the cost to USCIS of finding and providing a record or would otherwise effectively serve to shift the costs of other USCIS services to this program to help USCIS meet its budget shortfall.

• USCIS' estimated costs for the genealogy program are incorrect based on the commenter's own analysis and USCIS should provide clarification of the USCIS estimates.

• USCIS should reduce the proposed fee increases based on an hourly rate, in line with other agencies.

• USCIS should provide information on its records management processes and clarify which records have been digitized, the effort required to search the MiDAS system and the reasoning behind wait times for its genealogy records program.

• Commenters supported the proposed fee increase if it would reduce wait times for genealogical record requests.

• USCIS should not raise fees on genealogy records requests until it demonstrates an improvement in services.

• A commenter supported a smaller fee increases to account for inflation and staffing shortages.

• How will individuals who placed index orders before the implementation of the rule be charged for the actual records if they do not receive their index searches until after the rule has been implemented.

• The new fees would disproportionately burden professional genealogical and historical researcher communities, in some cases prevent them from doing their work entirely, harm genealogical businesses because of the high cost and long wait times.

• USCIS records are also important for accessing records in the homeland of an immigrant.

• The proposed fee increase in addition to long wait times would impact the repatriation of veterans' remains by limiting the ability of the U.S. military-hired genealogists to access documents related to kinship that are vital to the process and have a disproportionate impact on immigrant veterans.

• The fee increases would harm citizens seeking dual citizenship because foreign ministries require documents from USCIS. Individuals who cannot afford the fee would be unable to have their legal rights recognized in foreign countries.

• Many individuals undertaking genealogy research for legal purposes are financially constrained thus the proposed fee increases would block access to the records.

• The fee increase would interfere with access to records for kinship and lineage judgments in settling estates.

• Genealogy records are increasingly important in fields such as law and medicine, for racial justice projects, and for law enforcement forensic purposes.

• Moving the program to the National Records Center (NRC) has not helped, hampered efficiency, and added steps to obtain records not located at the NRC, such as for certain C-Files.

• Genealogy Index Search results are often filled with errors in need of correcting, due to inadequate staff training.

*Response:* DHS recognizes commenters' concerns regarding the scope of the fee increases for Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Records Request, in the proposed rule. The proposed increase reflected changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. *See* 88 FR 402, 512 (Jan. 4, 2023). The INA authorizes DHS to set the genealogy fee for providing genealogy

research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1). The INA is different and separate from the FOIA. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget, as explained in the proposed rule. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS does not discretely identify and track genealogy program expenditures. The same office that researches genealogy requests, the National Records Center, also performs other functions, such as FOIA operations, retrieving, storing, and moving files. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. At that time, the projected costs included a portion of lockbox costs and of other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *See* 81 FR 26903, 26919 (May 4, 2016). The estimation methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. *See* 88 FR 402, 512. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS proposed correcting that in this rule. USCIS estimates that there are approximately 6 genealogy positions out of the total 24,266 positions in the fee review. *Id.*

In the proposed rule and in the 2020 rule, USCIS incorporated a new activity in the ABC model, Research Genealogy, to estimate the cost of the program at the National Records Center (NRC). *See* 88 FR 402, 512. This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program. DHS estimated the costs of the genealogy program using this methodology and subsequently proposed to base the fees for Forms G–1041 and G–1041A on these revised cost estimates. *Id.* As explained in the proposed rule, the revised fees and regulations may allow some customers to file a single search request with a single fee and still receive the genealogy information that they requested. *See* 88 FR 402, 511–512. The proposal to include pre-existing digital records, if they exist, via email in response to the initial search request

would also be more efficient than the current process. *Id.*

As explained earlier, DHS limits many of the fee increases in this final rule by inflation, and after considering the above comments, we are including the fees for Forms G–1041 and G–1041A in that group of requests. DHS used the approximate 26 percent inflation between December 2016, the effective month of the FY 2016/2017 fee rule, and June 2023 to increase the current $65 fees. When adjusted for inflation, the fees would be $82.[278] DHS rounded inflation adjusted fees to the nearest $5 dollar increment, consistent with other fees, making them $80. Some online filing fees are $50 less than paper filing fees, as explained earlier in this rule. As such, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $30, the fee for a paper filed G–1041 as $80, the fee for Form G–1041A, Genealogy Records Request, when filed online as $30, and the fee for a paper filed G–1041A as $80. Therefore, DHS is setting the fees at less than the proposed fees, meaning they do not recover the relative cost to USCIS for operating the genealogy program as calculated in the proposed rule, and less than we are authorized to charge under INA section 286(t)(1), 8 U.S.C. 1356(t). The online Form G–1041 and G–1041A filing fees are less than the current fees, which means they do not recover full cost under the methodology that DHS used to calculate them in the FY 2016/2017 fee rule. As such, other immigration benefit request fees will continue to subsidize the genealogy program. DHS declines to make other changes in this final rule in response to these comments.

*Comment:* Commenters opposed the new records fees, currently stating the Request for a Certificate of Non-Existence is untimely, obtaining the required information often requires multiple requests, and there is no verifiable justification for these proposed increases and fee implementation.

*Response:* In the proposed rule, DHS proposed a new fee for Form G–1566, Request for a Certificate of Non-Existence. *See* 88 FR 402, 513. Individuals often use this service to gather genealogical records that allow them to claim the citizenship of another nation. Previously, USCIS operated the Certificate of Non-Existence request

process informally and at no cost to individuals requesting a certificate. DHS calculated the fee to recover the estimated full cost of processing these requests as $330. *Id.* The proposed fee for a request for a Certificate of Non-Existence is based on the same ABC model used to calculate the other proposed fees. USCIS created a new activity for this workload, called Certify Nonexistence, in the ABC model. *Id.* Previous fee reviews captured this work as part of the Records Management activity. See the supporting documentation accompanying this rule for more information on the activities in the ABC model.

DHS has reviewed our calculations in response to the public comments and determined that this fee is consistent with the full cost recovery model used for this rule to generate revenue to mitigate the need for other fee payers to fund the costs of providing certificates, as explained in the proposed rule. *See* 88 FR 402, 513 (Jan. 4, 2023). DHS appreciates the public's feedback the Form G–1566, Request for a Certificate of Non-Existence fee, but DHS declines to make changes in this final rule in response to these comments. DHS sets the fee for Form G–1566 at $330. *See* 8 CFR 106.2(c)(12).

*Comment:* Some commenters claimed that taxpayers have already paid to acquire, manage, and store these records. Some commenters felt that taxpayers already support the government substantially and should not be charged for access to records. Many commenters expressed opposition to paying any fees to access genealogical records, because the service is already funded by taxpayers, should be funded by taxpayers, or that the records already "belong to the American people."

*Response:* DHS understands the commenters' concerns regarding the potential for duplicative payment. However, as explained in the proposed rule, USCIS is primarily funded by fees. *See* 88 FR 402, 415–417, 512 (Jan. 4, 2023). USCIS does not receive taxpayer funds for the genealogy program, nor do taxes pay for the acquisition, management, or storage of records in USCIS' custody. Therefore, DHS must recover the estimated full cost of the genealogy and records programs through USCIS' fees. DHS has explicit authority to recover the costs of providing genealogical services via genealogy fees. *See* INA section 286(t), 8 U.S.C. 1356(t). As explained earlier, the fees for Forms G–1041 and G–1041A will not recover their full cost, but other USCIS fees will offset their cost.

*Comment:* Numerous commenters discussed turning the records over to

---

[278] DHS calculated the difference between December 2016 CPI–U (241.432) and June 2023 CPI–U (305.109), as 63.677 or 26.37 percent as explained earlier. Multiplying the current fees ($65) by 26.37 percent equals $82.14. Calculation: $65 *1.2637 = 82.1405.

the National Archives and Records Administration (NARA) so the public can access them for free or at a lesser cost. Some of these commenters elaborated further, and we summarize these comments as follows:

• NARA has demonstrated its ability to efficiently respond to records requests, much more quickly and at a lower cost.

• NARA could manage records more efficiently, access them more freely, and reproduce them more economically, as preserving and providing access to historical records of the Federal Government is one of NARA's core missions and areas of expertise.

• Transferring genealogy records to NARA would be a straightforward solution to USCIS' stated reason for raising fees on genealogy records requests, namely that the agency incurs overhead costs associated with storing and managing the records. The commenter additionally recommended that, where applicable, records disposition agreements should be updated to allow the transfer of records to NARA.

• USCIS needs to comply with its own retention schedules and send appropriate records to NARA.

• USCIS should develop a plan to ensure all A-Files are added to USCIS' Central Index System (CIS) to make them eligible for transfer to NARA. Similarly, USCIS records should be adjusted to meet NARA's specifications.

• By not transferring required files to NARA, USCIS is not only hurting individuals requesting documents, but also other Federal Government agencies.

• Commenters indicated general confusion as to why genealogical records are treated differently depending on when a citizen was naturalized, with older records being handled by NARA and newer records by USCIS.

• In addition to transferring additional records to NARA, USCIS has a restriction in place on some records currently possessed by NARA, such as Alien Registration forms, which the commenters recommended that the agency lift.

• NARA's fees are too expensive, without specifying any NARA fee amount.

*Response:* On June 3, 2009, USCIS signed an agreement to transfer records to NARA.[279] NARA's holdings of A-

Files will grow as USCIS continues to transfer records, as allowable under current retention schedules. USCIS strives to adhere to its records retention schedules and transfer files to NARA expeditiously when records are eligible for transfer. Unfortunately, issues such as incomplete or non-existent file indices and other operational difficulties may inhibit and delay such transfers. DHS agrees that NARA is the appropriate repository for permanently retained records as USCIS has deemed necessary. DHS declines to make any changes in this final rule in response to these comments. NARA is not operated or fully funded by USCIS. Therefore, fees and policy associated with NARA are out of scope in this rulemaking.

*Comment:* Some commenters opined on the relationship between the USCIS genealogy program and the FOIA. Commenters wrote that USCIS' genealogy program was instituted to reduce burdens on FOIA and speed up the records request process, but the genealogy program has failed in its effort and instead delays processing and increased fees. Others wrote that if USCIS considers genealogy records requests to be FOIA requests, they should not carry fees higher than standard FOIA fees. Commenters similarly wrote that USCIS' practices were inefficient because the genealogy program was created to alleviate burdens on FOIA staff, but still relies on FOIA staff to review requests, which results in increased wait times. A commenter wrote that if the genealogy program is intended to serve as an alternative to the standard FOIA process, USCIS should cease subjecting genealogy records requests to FOIA reviews.

Commenters stated that some of USCIS' record requests should be subject to the standard process for FOIA requests, but that instead, USCIS denies FOIA requests to collect revenue from the records requests. Commenters expressed concern that some A-Files are relegated to the genealogy program, where requestors are required to pay a fee for files created before May 1, 1951, while individuals requesting files after that date are not. The commenters added that USCIS places requestors in arbitrary categories and as a result, its processes are inconsistent with FOIA requirements. Similarly, a commenter stated that many genealogy program fees are not authorized by statute and that USCIS cannot force requesters to pay a fee for records that should be available under FOIA. The commenter added that USCIS' genealogy program was illegal on these grounds.

*Response:* There is no conflict between FOIA and DHS' operation of the USCIS genealogical program, nor is USCIS constrained in establishing fees for its genealogical services to the levels established under FOIA. As stated earlier, USCIS genealogy fees use specific legal authority separate from the FOIA. The INA authorizes DHS to set the genealogy fee for providing genealogy research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1).

USCIS formerly processed requests for historical records under FOIA or Privacy Act programs but the demand for historical records grew dramatically. USCIS determined a genealogy request would be a more suitable process as historical records requested through FOIA were usually released in full because the subjects of the requested documents are deceased and therefore no FOIA exemptions applied to withhold the information. *See* 71 FR 20357, 20368 (Apr. 20, 2006). As authorized by law, the USCIS genealogy program was established to relieve the FOIA and Privacy Act programs from burdensome requests that require no FOIA or Privacy Act expertise, place requesters and the Genealogy staff in direct communication, provide a dedicated queue and point of contact for genealogists and other researchers seeking access to historical records, cover expenses through fees for the program, and reduce the time to respond to requests. *Id.* at 20364.

DHS appreciates the commenters' concerns regarding differences between the FOIA process and the genealogical index search and records request processes. Before 2017, the USCIS staff who processed FOIA requests also processed some genealogical records requests, particularly records from 1951 or later. However, USCIS moved the genealogical program to the NRC in 2017. Since that time, dedicated USCIS genealogical staff process all genealogical records requests. Commenters are mistaken in stating that the genealogy program sends appropriately filed genealogy requests through the FOIA process. DHS acknowledges that both FOIA requests and genealogical records requests are subject to review under the Privacy Act of 1974 to ensure that USCIS does not inappropriately release information to third parties. However, USCIS' genealogy program is distinct from the FOIA program and the fees that DHS establishes for Forms G–1041 and G–

---

[279] *See* National Archives, Alien Files (A-Files) page, available at *https://www.archives.gov/ research/immigration/aliens#:~:text= The%20United%20States%20Citizenship%20and %20Immigration%20Service%20%28USCIS%29, 100%20years%20after%20the%20immigrant %27s%20year%20of%20birth* (last viewed on Aug. 22, 2023).

1041A are authorized by the INA, not FOIA. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Multiple commenters stated that the proposed fee increases for record requests seems to be a punishment for citizens who want access to ancestors' records. Multiple commenters stated that records would be "held hostage" by demanding exorbitant and unjustified fees to access documents on immigration ancestors. The commenters wrote that these records should already be publicly accessible under the law.

*Response:* DHS rejects the characterization of the proposed fees to punish or hold hostage individuals who seek records related to their ancestors via the USCIS genealogy program. Rather, and as explained earlier in this section, the fees for Forms G–1041 and G–1041A established by this rule will be set at a level lower than what it costs USCIS to administer them and lower than the INA authorizes. In addition, online filing fees will be less than the current fees. As such, users of these forms will continue to have access to USCIS records.

*Comment:* Many commenters stated that implementation of increased fees should not occur without careful explanation and discussion of alternatives. Commenters generally recommended digitizing and making genealogy records available free online or at conveniently located government offices. One commenter suggested making a public version of USCIS genealogy records and added that it would result in thousands of saved hours for USCIS and NARA employees. The commenter also stated that privacy concerns associated with USCIS transferring records to NARA are not based on any real risks. A different commenter stated that there is no reason to significantly redact information on such old immigration genealogy records.

A couple of commenters suggested licensing the digitization of these records to a repository, such as Ancestry.com, for the benefit of genealogists if the records must be monetized. A couple of commenters recommended making USCIS genealogy records available according to the same rules as those of the U.S. Census, in that the records can be released without review if they are 72 years old or older.

Multiple other commenters recommended allowing genealogy groups or companies to volunteer to digitize and upload USCIS' records to be made available for free online, or to otherwise rely on genealogists to digitize and publish the records for USCIS. A commenter recommended hiring additional staff to help respond to records requests more efficiently, such as archivists and librarians, or otherwise recruit volunteers to help respond to requests.

*Response:* DHS agrees with the commenters' reasoning that filing index search requests and records request online increases efficiency, and all else equal, reduces the cost to USCIS of providing the associated services. As explained earlier, DHS limited the fee increases for Forms G–1041 and G–1041A to inflation since the FY 2016/2016 fee rule. There is also $50 difference between the fee for a form filed online and a form filed on paper. DHS appreciates the alternatives suggested by commenters such as licensing the digitization of records, hiring librarians or archivists, or recruiting volunteers to help manage the requests. DHS may consider these alternatives in the future but declines to make any changes to the final rule in response to these comments.

*Comment:* Some commenters focused on genealogy request processing times. Many stated that USCIS should clear the backlog of genealogy requests or reduce processing times. A commenter stated that genealogists are only asking for fair and reasonable processing times, not expedited ones. Others stated that USCIS should offer specific data on processing times for this form and explain how it plans to reduce the backlog. Numerous commenters addressed frustrations with genealogy wait times and expressed concern for a fee increase without a commitment to service improvements. Other comments on the processing time for genealogical records include the following:

• The backlog is a huge burden on elderly Japanese Americans seeking to recover genealogical records that could explain their families' histories during WWII internment.

• The delays are harmful to the livelihoods of professional genealogists and to the projects of serious researchers.

• The genealogy backlog is because USCIS is tasking itself with a mission outside its purview.

• The longer time to process records during COVID would now become the new standard for service.

• Requestors cannot afford to request records when they do not have clarity of the wait times or process involved.

• Processing delays are unreasonably longer than the current processing times for Alien Files (A-Files) FOIA requests numbered above 8 million, particularly given that the genealogical records are shorter.

• Quicker processing time for A-File requests is court-mandated, leaving fewer USCIS resources available to process non-A-file FOIA requests, thus creating further backlog for those requests. Those backlogs violate FOIA requirements, and the commenter plans to litigate the violation.

*Response:* In addition to the proposed fee increase, the proposed rule proposes changes to genealogy processing. *See* 88 FR 402, 511–512 (Jan. 4, 2023). Ultimately, DHS expects these changes may allow USCIS to provide genealogy search results and historic records more quickly when pre-existing digital records exist. Currently, the genealogy process consists of two separate forms. When requestors submit Form G–1041, Genealogy Index Search Request, on paper or electronically, USCIS searches for available records. If no record is found, then USCIS notifies the requestor by mail or email. If USCIS identifies available records, then USCIS provides details on the available records, but does not provide the copies of the actual records. Under current regulations, a requestor must file Form G–1041A, Genealogy Records Request, with a fee for each file requested, before USCIS provides any records that it found because of the search request. As such, USCIS staff must search for the records previously identified in an index search to complete a records request. Under the proposed process, USCIS would provide requestors with preexisting digital records, if they exist, in response to a Form G–1041, Genealogy Index Search Request. *Id.* The USCIS process and regulations changes may decrease the time an applicant has to wait for records. For approximately 70 percent of index searches, USCIS may provide electronic copies of digital records, USCIS may not identify any records, or customers may not follow-up with a records request for hardcopies. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS anticipates that these changes will help to reduce processing times and reduce the backlog of genealogy requests. DHS declines to make any changes to the final rule in response to these comments.

**8. Other Fees**

**a. Form I–90 Replace Permanent Resident Card**

*Comment:* Commenters said that the proposed rule further discouraged naturalization by proposing a Form N–400 fee that is higher than the Form I–90 fee. Similarly, a commenter said fees for Forms I–90 and N–400 should be comparable instead of the proposed $295–305 difference between the two

fees. The commenter stated that potential applicants might decide which benefit to pursue based on fees, particularly those unable to qualify for a fee waiver or reduced fee request. The commenter added that making the Form N–400 fee comparable to the Form I–90 fee would also reduce financial barriers to naturalization. Another commenter expressed concern that, as fees increase over time, renewing permanent residency status is becoming more burdensome for long-term permanent residents.

*Response:* DHS acknowledges that this final rule establishes a Form N–400 fee which is higher than the Form I–90 fees. DHS does not intend to discourage naturalization and seeks to achieve full cost recovery. As explained in the proposed rule, DHS used its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In the case of Form I–90 when filed online, DHS maintained the current fee to some forms and limits the fee increase for those other forms. *See* 88 FR 402, 451 (Jan. 4, 2023). One of the forms with a limited fee increase is Form N–400. As such, if an applicant chooses to renew their permanent residence card, commonly called a Green Card, some part of their fee helps maintain a more affordable Form N–400 fee for others.[280] By keeping Form I–90 fees lower than Form N–400 fees, DHS avoids passing an additional burden to LPRs that may never wish to naturalize. Form N–400 also requires more adjudication time than Form I–90. Additionally, an LPR may need to pay the fee for Form I–90 every 10 years to renew their Green Card, whereas a naturalization applicant may only need to pay the fee once. DHS believes maintaining separate fees for both Forms I–90 and N–400 allows applicants to pay only the fee for the benefit they request. By limiting the fee for Form N–400, but allowing it to be higher than Form I–90, DHS believes it strikes the right balance of both the beneficiary pays and ability-to-pay

principles. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter commended USCIS for extending permanent residence cards for 2 years for LPRs who file Form N–400, thus avoiding the extra expense of filing Form I–90.[281] However, they urged USCIS to implement an automatic extension to all expiring Green Cards with a pending Form N–400, stating that this would improve efficiency in processing Forms N–400 and I–90. A commenter strongly encouraged USCIS to remove the proposed fee increase and eliminate the requirement to renew a Green Card.

*Response:* In December 2022, USCIS announced an automatic two-year extension of Green Cards for LPRs who have applied for naturalization.[282] The extension applies to all applicants who filed Form N–400 on or after December 12, 2022. LPRs who filed for naturalization before December 12, 2022, will not receive a Form N–400 receipt notice with the extension. If their Green Card expires, they generally must still file Form I–90 or receive an Alien Documentary Identification and Telecommunication (ADIT) stamp in their passport, to maintain valid evidence of their LPR status. While this was not retroactive and it does not apply to LPRs who did not apply for naturalization, DHS agrees that it improved efficiency in processing Forms N–400 and I–90 for LPRs who wish to naturalize.

DHS declines to automatically extend all Green Cards for an additional 2 years. LPRs who lose their Green Card generally must still file Form I–90, even if they have applied for naturalization and received the automatic extension under this updated policy. The INA requires that noncitizens carry within their personal possession proof of registration, such as the Green Card and any evidence of extensions or they may be subject to criminal prosecution. *See* INA sec. 264(e), 8 U.S.C. 1304(e).

DHS observes that a Green Card generally does not expire until 10 years after it is issued to the LPR. For individuals who are familiar with the

regulatory requirements,[283] this should be sufficient time for the applicant to take appropriate action, including renewing the card or naturalizing before the card expires.[284] Generally, LPRs become eligible to naturalize after 5 years of obtaining LPR status. *See, e.g.,* INA sec. 316(a), 8 U.S.C. 1427(a); 8 CFR 316.2(a)(3).

b. Form I–131, Application for Travel Document, Form I–131A, Request for Carrier Documentation

*Comment:* USCIS should charge sponsorship fees for the parole programs for additional revenue that USCIS could use to process EADs.

*Response:* DHS proposed no changes to the various parole programs which use Form I–131 and makes no changes based on these comments. DHS finalizes the fee exemption for Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, used to request to be a supporter and agree to provide financial support to a beneficiary and undergo background checks as part of certain special parole processes. *See* 8 CFR 106.2(a)(10). As indicated elsewhere in this preamble, DHS does not generally waive or exempt fees where the petitioner must demonstrate the ability to support a beneficiary. However, DHS has previously provided fee exemptions for humanitarian programs and DHS considers these new parole programs humanitarian programs. While being approved as a supporter requires a certain level of financial means, the objective is to establish the supporter for the parolee which is separate from the application. In addition, Form I–134A does not result in an immigration status. In the case of recently instituted FRP processes, the Form I–134A petitioner has already paid the full fee to file Form I–130 on behalf of the beneficiary. *See, e.g.,* 88 FR 43611, 43616 (July 10, 2023). Thus, DHS has decided to maintain a fee exemption for Form I–134A. If a fee becomes necessary, DHS will establish one in a future rulemaking.

---

[280] To reduce the risk of fraud and counterfeiting, USCIS redesigns the Permanent Resident Card every three to five years. Introduction of new card designs does not mean that cards with previous designs are invalid. Both current and previous cards remain valid until the expiration date shown on the card (unless otherwise noted, such as through an automatic extension of the validity period of a Permanent Resident Card as indicated on a Form I–797, Notice of Action, or in a **Federal Register** notice). These cards are also known as "Green Cards." We will use the term Green Cards when referring to Permanent Resident Cards throughout this rule because it may be clearer to the public.

[281] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https:// www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[282] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https:// www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[283] USCIS also provides educational products and resources to welcome immigrants, promote English language learning, educate on rights and responsibilities of citizenship, and prepare immigrants for naturalization and civic participation. In addition, USCIS provides grants, materials and technical assistance to organizations that prepare immigrants for citizenship. The USCIS Citizenship Resource Center helps users better understand the citizenship process and gain the necessary skills required to be successful during the naturalization interview and test. *See https:// www.uscis.gov/citizenship.*

[284] *See* USCIS, *https://www.uscis.gov/green-card/ after-green-card-granted/renew-green-card.*

## c. Form I–290B, Notice of Appeal or Motion

*Comment:* A commenter encouraged DHS to maintain the current fee for Form I–290B. They stated that that individuals should not have to pay a higher fee to resolve USCIS errors. They stated that USCIS retains the revenue whether the appeal or motion to reopen succeeds.

*Response:* DHS appreciates the concerns of the commenters and does not intend to hinder applicants, petitioners, or requestors from receiving benefits for which they are eligible. At the same time, DHS must recover the full costs of the services that USCIS provides. In this case, DHS proposed to limit the fee increase for Form I–290B, Notice of Appeal or Motion, as explained in the proposed rule. *See* 88 FR 402, 450–451 (Jan. 4, 2023). The formula DHS used for the Form I–290B proposed fee was the same as other limited fee increases, such as Form N–400. *Id.* The proposed fee was $800, $125 or 19 percent higher than the current fee of $675. While DHS did not propose the fee based on inflation, the proposed rule noted that the fee increases were less than inflation when discussing the proposed fee for Form N–400. *See* 88 FR 402, 486–487 (Jan. 4, 2023). Because DHS used the same formula to propose fees for Forms I–290B and N–400, the comparison applies here as well.

There is only one fee for Form I–290B regardless of the underlying petition, application, or request. In addition, the final rule has provided a fee exemption for Form I–290B for certain humanitarian forms, and fee waivers are available to some Form I–290B applicants who are receiving a means-tested public benefit, whose household incomes are at or below 150 percent of the FPG, or who are experiencing extreme financial hardship. *See* 8 CFR 106.3(a)(ii)(C) and 8 CFR 106.3(b). USCIS uses the fees to fund adjudication services regardless of whether the petition or application is approved. This applies to all forms and not just Form I–290B.

## d. Form I–360 Petition for Amerasian, Widow(er) or Special Immigrant

*Comment:* Commenters stated that the increase in fees for Form I–360 would discourage individuals who are facing life-threatening events from seeking security and force victims to remain in abusive relationships.

*Response:* DHS notes that Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant, currently has no fees for noncitizens self-petitioning as a battered or abused spouse, parent, or child of a U.S. citizen or LPR, SIJ, or Iraqi or Afghan national who worked for or on behalf of the U.S. Government in Iraq or Afghanistan. Therefore, DHS does not believe that victims seeking safety would be impacted by the fees as they are already exempt from the fees. *See* 8 CFR 106.3.

## e. Form I–539 Extend/Change Nonimmigrant Status

*Comment:* Several commenters provided input on the proposed fee change for Form I–539. The commenters wrote:

• Form I–539 fee increases would negatively impact international students.

• USCIS should encourage international students to choose the United States for their studies, rather than potentially deter them with higher fees.

• Form I–539 fee increases are fair but suggested USCIS open this form to online filing.

• The Form I–539 application process is already confusing.

• USCIS should consider alternative proposed fees, such that the burden of increases would be shared more equitably among affected individuals.

*Response:* DHS recognizes the importance of encouraging international students and that attending school in the U.S. can be financially burdensome on students. In addition, DHS recognizes the need for flexibility in allowing other classes of nonimmigrants to change their status. For these reasons, this Final Rule lowers the proposed Form I–539 fee from $620 to $470 for paper filings, and from $525 to $470 for online filings. These final increases (27% paper, 14% online) are near or below the rate of inflation since the last fee increase (26% as of June 2023), and are consistent with one commenter's alternative proposal that all fees be raised by a minimum amount to ensure that everyone's costs have kept up with inflation.

However, before obtaining an F–1 visa, the student must provide documentary evidence of their ability to pay for their course of study and living expenses while enrolled.[285] The new fees include the biometric fees where applicable and the online application process is making filing less complicated with online payment option available.

*Comment:* An individual commenter said the Form I–539 fee increases are fair. However, this commenter stated that Form I–539 cannot be filed online if it includes a Form I–539A, and that USCIS should allow these to be filed online.

*Response:* USCIS continues to improve the availability and user experience of online filing. However, recommended changes to USCIS's internal systems for form processing are outside the scope of this rulemaking.

*Comment:* USCIS should allow appeals of denials of extensions of stay for T and U nonimmigrants.

*Response:* The Form I–539 is outside the jurisdiction of the AAO and therefore applicants are not able to file an appeal the denials of Form I–539. However, applicants may file a motion to reopen or reconsider the decision within 30 days (33 days if the decision was mailed). Changes to this policy are outside the scope of this rulemaking.

## f. Military-Related Benefits

*Comment:* One commenter asserted that there should be a fee exemption for all applications filed by children, and their mothers, who were fathered in East Asia by U.S. personnel during the Vietnam and Korean Wars, and that the costs for these applications should be charged to the Department of Defense. The commenter said that there should be similar fee exemptions for all children of U.S. military personnel born or conceived during deployment.

*Response:* Amerasians (born after Dec. 31, 1950, and before Oct. 23, 1982) may file Form I–360. Congress enacted the Amerasian Homecoming Act on October 22, 1982, to allow a person born in Korea, Vietnam, Laos, Kampuchea (Cambodia), or Thailand after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen, to seek admission to the United States and adjustment of status to LPR. There is currently no fee for petitioners seeking classification as an Amerasian. *See* 8 CFR 106.2(a)(17)(i). Those who qualify under the Amerasian Homecoming Act, who are not subject to the public charge ground of inadmissibility,[286] may also request a waiver of the Form I–485 fee if they are unable to pay. *See* 8 CFR 106.3(a)(iv)(C). Other Amerasians remain subject to the public charge ground of inadmissibility,[287] however, so DHS cannot exempt or waive their I–485 fee. Policy changes relating to

---

[285] *See* 22 CFR 41.61(b)(1)(ii); 9 FAM 402.5–5(G), Adequate Financial Resources (last updated Oct. 17, 2023); *see also* 8 CFR 214.2((f)(1)(i)(B).

[286] *See* USCIS Policy Manual, Vol. 7, Adjustment of Status, Part P, Other Adjustment Programs, Chp. 9, Amerasian Immigrants [7 USCIS–PM P.9], available at *https://www.uscis.gov/policy-manual/volume-7-part-p-chapter-9* (last visited Sept. 8, 2023).

[287] *Id.*

003275

eligibility are outside the scope of this rulemaking.

9. Republished Conforming Amendments

As stated in the proposed rule at 88 FR 421, DHS proposed to retain many provisions that were codified in the 2020 fee rule although enjoined. No comments were received on those proposed changes. Thus, this rule codifies them as proposed. In addition, for clarity and to avoid unnecessary length in this rule, DHS is not repeating the amendatory instructions and regulatory text for certain changes that were made by the 2020 fee rule if the provision is ministerial, procedural, or otherwise non-substantive, such as a regulation cross reference, form number or form name.

*H. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* A commenter requested that USCIS ensure that implementation of any fee increase, and processing changes take place with adequate advance notice—months rather than days—to petitioners and provide for sufficient time for related adjudicator training. The commenter stated that, in the weeks surrounding the previous fee increases, petitions submitted with the appropriate fee were erroneously rejected by USCIS service centers, jeopardizing time-sensitive performing arts events. The commenter concluded that appropriate steps that must be taken to ensure that fee increases do not result in unwarranted petition rejections. One commenter asked for a postponement of the rulemaking to allow further analysis from the public and better justification from the agency. Another commenter said USCIS should also revise the proposed fee schedule rule so that it does not move away from the notice of public rulemaking and comment process, under APA. Another commenter said USCIS should not change immigration application fees outside of the Administrative Procedure Act (APA) notice of public rulemaking and public comment processes, and removing the public process from fee adjustment would subject USCIS to legal vulnerabilities.

*Response:* This final rule complies with the APA. DHS issued a proposed rule in the **Federal Register** on January 4, 2023, and accepted public comments on the proposed rule through March 13, 2023. DHS provided a comprehensive explanation in the proposed rule for why the new fees are required and the rationale for the fee adjustment. DHS

fully considered the issues raised in the public comments and made some adjustments in response, as detailed in responses throughout this final rule. DHS is unaware of petitions submitted with the appropriate fee being erroneously rejected by USCIS service centers when fees were previously changed. This final rule is effective 60 days from date of publication in the **Federal Register**, consistent with 5 U.S.C. 553(d) and 801(a)(3)(A)(ii), which should provide sufficient notice of the new fees before they are due. Any application, petition, or request postmarked on or after this rule's effective date must be accompanied with the fees established by this final rule.

*Comment:* Multiple commenters voiced concern that basing future fee increases on the CPI–U while forgoing the comment and rulemaking process would violate the APA and requested that USCIS remove this provision (Section VII, T. Adjusting Fees for Inflation) from the final rule.

*Response:* USCIS believes that reestablishing 8 CFR 103.7(b)(3) (Oct. 1, 2020), which was removed by the 2020 fee rule, is not in violation of the APA. As described in the proposed rule and reiterated in this final rule, an inflation-adjustment provision was part of the regulations for many years before the 2020 fee rule and, because the 2020 fee rule has been preliminarily enjoined, an inflation-adjustment provision is currently in effect, 8 CFR 103.7(b)(3) (Oct. 1, 2020). In this rule, USCIS is requiring that such future fee changes would be made in a rule that would document the rate of inflation to be applied and how the new fees are calculated. 8 CFR 106.2(d).

DHS disagrees that applying an inflation adjustment violates the APA. While raising a fee is arguably something the public would want to comment on, the public has had that chance to comment on the method and use of an inflation adjustment in the proposed rule. Notice and comment on future inflation-based adjustments would be unnecessary because DHS's actions would be limited to issuing a final rule that follows a mathematical calculation of an increase in costs and not policy considerations. Inflation affects the entire economy and effectively decreases USCIS's revenue by the rate of inflation for whatever period DHS does not adjust fees for CPI–U.

In this final rule, DHS has revised 8 CFR 106.2(d) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) must be adjusted by the rate of

inflation. That is, DHS would not shift costs from one payor to another for policy reasons by adjusting only some fees and not others, for instance. Such adjustments would simply use basic math to maintain the value of our revenue dollar and would be procedural, thus not requiring notice and comment.

*Comment:* Another commenter stated that, if DHS cannot credibly establish the amount of time required to process petitions according to the number of named beneficiaries on the petition, then DHS lacks a rational basis upon which to assign specific fees associated with processing various petitions. The commenter said DHS's assignment of costs and associated fees for petitions is, by definition, arbitrary and capricious in violation of the APA. The commenter also said USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether DHS's conclusions are justified or reasonable.

*Response:* DHS is not required to precisely calculate the amount of time required to process petitions according to the number of named beneficiaries on the petition. As stated in the proposed rule, OMB Circular A–25 reflects that activity-based costing (ABC) methodology is a best practice to develop government agency fee schedules, and DHS established a model for assigning costs to specific benefit requests in a manner reasonably consistent with A–25. 88 FR 402, 418 (Jan. 4, 2023). While DHS follows OMB Circular A–25 to the extent possible, INA sec. 286(m), 8 U.S.C. 1356(m), authorizes DHS to charge fees for adjudication and naturalization services at a level to ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Those costs may be affected by the amount of time required to process requests but the law does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or the perceived market rates and values of such services. DHS strives to make its fee schedules equitable, using the best information available, and USCIS will continue to monitor the time spent on specific adjudications to refine the fee setting model for future fee rules. However, while DHS tries to follow ABC (*i.e.,* assign USCIS costs through fees based on where its resources are expended), we do not assert that each of the fees in this rule precisely reflects the

relative time spent, nor are we required to do so.

DHS disagrees that it did not provide information used in the ABC model. As the commenter notes, USCIS used 6 months of FY 2021 adjudication hours in the completion rates that it provided. *See* 88 FR 402, 498 (Jan. 4, 2023). These are actual hours from FY 2021, the first year where USCIS began tracking Form I–129, Petition for Nonimmigrant Worker, adjudication hours by petitions for named or unnamed beneficiaries. *Id.* As explained in the proposed rule, USCIS requires most employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. *See* 88 FR 402, 446 (Jan. 4, 2023). USCIS used these reported actual hours from FY 2021 as a forecast for FY 2022 and FY 2023 because it was the best information available at the time of the fee review.

*Comment:* A commenter wrote that the administrative record for the rule is incomplete, and the rule does not contain sufficient data to allow informed comments. The commenter said the charts and tables included in the proposed rule's supporting documents are not illuminating on the need for the proposed fee increase, and a meaningful commentary is impossible without access to the true data the agency relied upon. The commenter also noted that the phone number referenced in the rule to call and make an appointment to view the data was never answered, and the only other number listed was incorrect. The commenter stated that, only after threats of litigation was an appointment gained, and even then, the commenter did not have access to the system, but were essentially limited to an "infomercial" on the system's features. The commenter concluded that the agency's conduct raises serious questions about the legitimacy of the data on which it claims to rely.

*Response:* DHS has posted all public comments and supporting documents for the proposed rule in the public docket for review, scrutiny, and comment. USCIS also used a software program and spreadsheets to perform certain calculations, and offered the public a chance to review the software, as we have historically done as a courtesy for fee rules.

It is unfortunate that a commenter had difficulty arranging an appointment to review the fee model. Despite those issues, DHS understands that the appointment with this specific commenter was still arranged, and the meeting occurred as requested. During the software demonstration, USCIS often asked whether there were any questions or whether anything was unclear.[288] USCIS received very few questions during the meeting and demonstrated both how the ABC model software works and how it uses or produces the information in the docket. At one point, according to the transcript of the meeting in the docket, the attendees stated that "So far everything is clearer than what we were expecting." USCIS cannot grant the public access to its USCIS financial systems directly including the USCIS ABC model software. USCIS pays for a limited license of the software and additional capacity for external stakeholder access would increase the cost of the software licenses, the number of servers required, and require additional support for managing access and security. Those costs would be paid from USCIS fee revenue, further increasing fees. Regardless, the software is highly technical, so public access may not be meaningful. DHS believes that the presentation provided on how USCIS uses the software, the model documentation and other supporting documentation available in the docket, and the explanations provided in the proposed rule and this rule, provide sufficient transparency for the public to review and comment on how USCIS fees are established.

The commenter's second assertion—that the proposed rule's supporting documents do not explain the need for the proposed fee increase—does not appear to be supported by the facts or the record. The operating budget of USCIS, as reflected in the supporting documents, the President's annual budget and the annual DHS appropriation bills, reflect that USCIS needs more money. The commenter may disagree with or not understand how the USCIS budget will be allocated among immigration benefit requests for which a fee will be paid, but how the USCIS budget will be funded by the total fee-paying requests is left to DHS discretion. While that discretion must be exercised in a rational manner as required by the APA, DHS has clearly explained in the proposed rule, and this final rule, how we have assigned and shifted USCIS operating costs based on relative complexity of the adjudication and value judgments about the specific benefit request.

*Comment:* A commenter stated that in the proposed rule, USCIS did not propose an increase to the current $85 filing fee for form I–821D. The commenter stated that, if USCIS increases this fee in the final rule, DHS must engage in a new rulemaking and comment period because such a change would not be a logical outgrowth of the current proposed rule to satisfy the APA notice requirement.

*Response:* DHS has not changed the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, in this rule. *See* 8 CFR 106.2(a)(51).

## 2. Impacts and Benefits (E.O. 12866 and 13563)

### a. Costs/Transfers

#### (1) Impacts on Applicants

*Comment:* A commenter stated that the increased fees would have a detrimental impact on their large immigrant population already struggling with the effect of the COVID–19 pandemic. One commenter stated the recent increases in rents (upwards of 10.6 percent year over year) and the rise in inflation and prices (consumer prices up 9.1 percent over the year ended June 2022) while salaries have not increased at the same rate or in some cases not at all (the federal minimum wage has remained stagnant at $7.25 since 2009 and a survey of U.S. companies reported an overall average salary increase of 3.4 percent in 2022). The commenter reported that it is unfair to immigrant applicants who are more financially burdened than they have been in the past to confront significant fee increases. It is especially unreasonable to expect that immigrants who do not currently have employment authorization would have the means to pay these heightened fees when they are unable to legally earn wages in the United States.

*Response:* DHS understands that inflation has had a profound effect on the U.S. economy and on the finances of immigrant populations and has carefully considered it throughout the final rule, especially when setting fees. Additionally, DHS understands that the federal minimum wage has been at $7.25 per hour since 2009. Nevertheless, many states also have minimum wage laws and in cases where an employee is subject to both state and federal minimum wage laws, the employee is entitled to the higher of the two minimum wages.[289] In the final rule, DHS will set USCIS fees at the level required to recover the full cost of providing immigration adjudication and naturalization services, as permitted or required by law, with adjustments to

[288] For a transcript of the meeting, see *Regulations.gov*, Comment Submitted by USCIS, available at *https://www.regulations.gov/comment/ USCIS-2021-0010-4141* (Mar. 2, 2023).

[289] DOL, "Minimum Wage," available at *https:// www.dol.gov/general/topic/wages/minimumwage* (last visited Sept. 21, 2023).

provide certain fee exemptions and waivers for low-income immigrants. The final rule also provides for many requests that an applicant whose income is less than 150 percent of the FPG may request that their fee be waived. Furthermore, DHS is implementing new fee structures to mitigate some of the costs, making employment authorization more attainable. For example, DHS is providing a $50 discount for the Form I–765, Application for Employment Authorization, when filed online for most EAD classifications. Additionally, applicants who file Form I–485, Application to Register Permanent Residence or Adjust Status, will pay $260 (half of the regular Form I–765 fee) for their Form I–765 to request employment authorization when filed concurrently with their Form I–485 or while the Form I–485 is pending.

*Comment:* One commenter stated that the proposed fee structure potentially reinforces rather than eliminates barriers facing Denver's immigrant and refugee communities, particularly those who wish to apply for adjustment of status or naturalization. The commenter stated that Denver's immigrant and refugee communities work hard to navigate the immigration and naturalization processes, but often fall short due to numerous barriers, including the high cost of filing fees, where most of the nearly 60 processes USCIS listed fees for are over $400.00. This cost remains significant for many individuals who live on a fixed income and often must choose between caring for themselves, their families, or maintaining expenses. Seventeen percent of Denver's immigrant and refugee families were living below the federal poverty level in 2019. Denver's immigrant and refugee residents are still recovering financially from the COVID–19 pandemic, making the high cost of immigration paperwork and filing fees inaccessible to many.

*Response:* DHS is aware of the potential impact of fee increases on certain populations including low-income individuals and is sympathetic to these concerns. As a result, DHS not only offers fee waivers and fee exemptions, but also uses its fee-setting discretion to adjust certain immigration benefit request fees down if USCIS believes they may be overly burdensome on applicants, petitioners, and requestors (*e.g.,* Form N–400, Application for Naturalization, and the adoptions forms as discussed previously). As discussed in the final rule and consistent with past practice, USCIS will limit fee adjustments for certain benefit requests to a set

percentage increase above current fees and many other fees are adjusted only by the amount of inflation.

*Comment:* Citing research from the Cato Institute, a commenter wrote that the increase in fees will have a disproportionately harmful effect on communities and students of color, many of whom are already facing issues of food insecurity and homelessness.

*Response:* DHS recognizes that the fee increases may create an economic hardship for some families. Furthermore, DHS acknowledges the studies and data cited suggesting that many families struggle to afford healthcare and face other financial challenges relating to food and shelter. In the final rule, after considering public comments, DHS has increased the availability of fee waivers, has added fee exemptions, and has limited the fee increases for certain immigration benefit requests that we have determined may be overly burdensome.

(2) Impacts on Employers/Sponsors

*Comment:* A trade association wrote that accumulated costs from filing repeated petitions for workers and their families would harm U.S. businesses. Citing statistics from the 2023 Envoy Immigration Trends Report, the commenter wrote that increased fees may cause U.S. companies to rethink their strategic planning and investment forecasts with respect to their U.S.-based operations and moved some of their operations offshore, which could hurt the U.S. economy.

*Response:* On page 31 of the cited report, the following question was presented to U.S. companies in the survey: ''In January 2023, the U.S. government proposed fee increases for several common immigration applications (H–1B, Adjustment of Status, etc.). What changes do you plan to make to your company's global immigration strategy in response to the planned increase in U.S. immigration filing fees?'' Seventy-two percent of respondents said they plan to reduce immigration-related costs for employees; 67 percent plan to look abroad to hire, transfer, or relocate foreign national employees; 48 percent plan to hire fewer employees requiring sponsorship; 23 percent had not assessed changes to company policies; and 23 percent reported no impact. The responses to this direct question do not clearly indicate that U.S. businesses will increase offshoring as a direct result of changes in the USCIS fee schedule. Further, the survey did not ask the financial burden that U.S. companies would experience from changes in the fee schedule. Thus, the survey does not

clearly indicate that the new fee schedule would have any negative impacts on U.S. companies. Additionally, DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values. DHS adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision.

*Comment:* A commenter wrote that the proposal to cap the number of beneficiaries on Form I–129 petitions to 25 beneficiaries, based on USCIS data from March 2023, would increase costs on H–2 employers by $30.1 million annually. The 25 named worker cap and the 2023 DOL rule requiring employers to file separately for each type of worker could increase that amount to over $40 million. Many employers, often small businesses, cannot pass these costs onto customers because of consumer preferences and the competition from employers that hire unauthorized labor.

*Response:* DHS acknowledges that the higher Form I–129 fees must be paid by U.S. companies that hire foreign nationals. However, USCIS must fund itself through fees unless DHS receives a congressional appropriation to do so. In the final rule, DHS sets the fees in this final rule for all nonimmigrant classifications petitioned for using Form I–129 after considering comments provided on the proposed rule based on the average cost of adjudication for the relevant visa classes. DHS data indicate (see RIA Section 3H, tables 23 through 25 and SEA, tables 6 through 9) that the limit of 25 named beneficiaries per petition established in this final rule will significantly limit the amount of cross-subsidization between petitions with few named workers and many named workers. Previously a single petition might contain a single named worker or hundreds of named workers, meaning that the fees paid for petitions for a few employees were covering the processing costs for petitions for many employees. Given the disparity between the cost of adjudicating a petition with a single named worker and the cost of adjudicating a petition with hundreds of named workers, limiting the number of named beneficiaries per petition to 25 effectively limits the amount of cross-subsidization per petition, and overall cost of adjudications between petitions.

Nevertheless, as described in section II.C, DHS is reducing the fees for Form I–129 for small employers and nonprofits in this final rule.

*Comment:* Commenters cited statistics, including a study from the USDA, demonstrating that the rise in H–2A fees would exacerbate the shift of agricultural production to foreign countries.

*Response:* While imports of fruits and vegetables have generally increased since the year 2000, no data directly or indirectly links immigration fees, such as for H–2A workers, to this rise. It is even more uncertain how the current fees would contribute to this rise, given many other factors in play, such as U.S. consumer demand for year-round availability of fresh fruits and vegetables and free trade agreements that provide access to increased supplies of fresh fruit and vegetables.[290]

*Comment:* Commenters involved in the agricultural industry wrote that the proposed rule does not account for already high costs of operation, including from new DOL regulations, that would be exacerbated by increased fees.

*Response:* DHS understands that farm production expenditures have generally increased in recent years and that farmers face numerous challenges in managing the costs of operations. Similarly, USCIS needs to manage its own operating expenditures and needs to adjust the fee schedule as necessary to fully recover increasing costs and maintain adequate service.

*Comment:* An advocacy group wrote that the fees would create barriers for research institutions to hire workers in STEM fields. The commenter cited studies to demonstrate the importance of foreign workers to STEM research in the United States.

*Response:* DHS recognizes that immigrants and international students make significant contributions to the U.S. technology industry and appreciates the concern that the fees might create hiring barriers. However, we do not believe there is an established causal relationship between higher fees and a decline in highly skilled foreign-born scientific researchers in academia. The SEA details the economic impact of the fees by classification, 25 or fewer, 25 or more FTE, non-profits, and by NAICS code, see Discussion on of Impact Section 4(C)(I–IV) tables 6 through 18.

## 3. Paperwork Reduction Act

*Comment:* USCIS received approximately 34 comments requesting a reduction in form length and reduced frequency of form revision changes. One commenter wrote that USCIS should return forms to their streamlined lengths, avoid collecting unnecessary quantities of information, and eliminate redundancies.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual information collection (IC) instructions by consolidating it into the USCIS Form G–1055, Fee Schedule, and placing it online on the USCIS website *www.uscis.gov/*. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those Paperwork Reduction Act (PRA) actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. Outside of this rule, USCIS continually analyzes all its collections of information to minimize the time and cost burden to respondents, confirms the utility of the content and requirements, and ensures compliance with the regulations, statutes, and policies that govern the benefit. Only the information needed to adjudicate the benefit properly and efficiently is collected. An imbalance of information collection has negative effects on both the applicant and adjudicators. USCIS information collections are analyzed on a scheduled basis, as technologies evolve, and as laws change. USCIS makes attempts to consolidate as many changes as possible into a single Paperwork Reduction Act of 1995 (PRA) action to limit the number of editions published. When a new edition is published—unless the new version is required immediately, for example, by statute or regulation—USCIS generally allows time for the previous edition of a request form submitted or in-transit to process, before enforcing a no prior edition rejection.

*Comment:* USCIS received three comments requesting fee waiver, reduced fee, and fee exemption information be retained in the individual information collection instructions.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual IC instructions by consolidating it into the USCIS Form G–1055, Fee Schedule. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those PRA actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. The USCIS Form G–1055 provides a centralized resource of information, accessible information, and promotes the use of innovative tools like the Fee Calculator for an enhanced user experience. DHS realizes that this change will require requestors to either have the current printed version of Form G–1055 or access to *www.uscis.gov/* to determine the fee for their request and if it is eligible for a fee waiver. However, all USCIS forms must either be accessed via the internet, or a paper version ordered by calling the USCIS Contact Center, including a paper Form G–1055.

*Comment:* USCIS received several comments requesting changes to content contained in specific ICs.

*Response:* The changes that USCIS is making to forms or instructions in conjunction with this final rule are limited to those that are related to this rulemaking. Changes to USCIS immigration benefit request forms requested by commenters that are outside of the scope of this rule will not be made at this time, but they may be considered for future form revisions.

## 4. Alternatives

*Comment:* A commenter stated that USCIS is increasing fees in a thoughtful manner but requested that USCIS earmark fee increases for H–1B and EB–5 applications to increase staffing for review of the backlog.

*Response:* As explained in the proposed rule, the FY 2022/2023 fee review budget does not include separate line items budgeted directly for backlog reduction. *See* 88 FR 402, 416 (Jan. 4, 2023). USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction that may be provided, such as in FY 2022. *Id.* DHS is aware of the problems that our backlog presents, and we are making a concerted effort to address them, but we make no changes to the rule in response to these comments.

*Comment:* A commenter requested that USCIS consider significant alternatives that would provide it with the funding it needs to operate

---

[290] Davis, Wilma and Gary Lucier, Vegetable and Pulses Outlook: April 2021, VGS–366, U.S. Department of Agriculture, Economic Research Service, April 16, 2021. Kenner, Bart, Statistic: Macroeconomics & Agriculture, Amber Waves Magazine, U.S. Department of Agriculture, Economic Research Service, September 1, 2020.

**6334** Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

efficiently. The commenter stated the regulatory analyses needs to be republished by USCIS and provide stakeholders with both notice of revisions in their analysis and an opportunity for public comment on those revisions.

*Response:* DHS addressed planned increases in efficiency in the proposed rule and other alternatives to increasing fees. *See* 88 FR 402, 529 (Jan. 4, 2023). In this preamble, DHS addresses similar comments to this in section IV.D.4. DHS makes no changes to this final rule based on these comments.

*Comment:* A commenter stated that USCIS did not consider more modest alternatives at its disposal in developing the proposed rule. While citing case law, the commenter reasoned that agencies are required to ''examine the relevant data and articulate a satisfactory explanation for [the] action, including a 'rational connection between the facts found and the choice made.'' The commenter went on to list several alternatives to the rule, such as allowing O–1B visa portability, modifying the O–1B visa validity period, allowing visa waiver requests, and allowing B–1 visa exceptions for promotional appearances and unscripted programming.

*Response:* The commenter's suggestions are beyond the scope of this fee rule or would be overly administratively burdensome to implement and would exacerbate costs and backlogs. As discussed previously, DHS prepared a fee study, analyzed all the relevant data, and has clearly articulated a rational basis for adjusting USCIS fees in this rule. However, as discussed elsewhere in this final rule, DHS sets lower fees for Form I–129 and the Asylum Program Fee that may reduce the burden for small businesses and nonprofits. DHS declines to make any other changes based on this comment.

*Comment:* Many commenters wrote that DHS should consider seeking appropriations for USCIS. Commenters opined that appropriations could reduce backlogs, subsidize costly fees, fund asylum processing, and generally support processing humanitarian applications. Similar comments about Federal appropriations as an alternative to increased fees include:

• Congress should fix USCIS operations and financial standing, funding backlog reduction efforts, hiring officers, and officer training.

• The biennial review process provides an important opportunity for Congress to review the IEFA.

• Transfer funding to USCIS from the budgets of other DHS components, like CBP.

• Redirect DoD funds to USCIS.
• Provide appropriations for the USCIS genealogy program.

• DHS should avoid any Form N–400 fee increase by seeking congressional appropriations for naturalization processing.

Similarly, commenters stated that USCIS should cut costs before proposing increased fees.

*Response:* DHS agrees that added congressional appropriation would lower USCIS fees. However, USCIS is currently mostly a fee-funded agency. Recent congressional appropriations for USCIS were limited to specific programs such as grants for promotion and education related to U.S. citizenship or E-Verify. DHS will continue seeking congressional appropriations where appropriate. In the meantime, DHS needs to establish fees for the continued operations of the USCIS. DHS believes that increased USCIS fees are necessary for it to effectively achieve its mission and fulfil statutory mandates. USCIS faithfully adheres to the immigration laws and carefully considers the pros, cons, costs, and ramifications of all policy initiatives it undertakes. In its FY 2022/2023 fee review, USCIS estimated total costs to the agency of providing immigration adjudication and naturalization services. As explained earlier in this preamble, DHS reduced the fee review budget but there is still a significant difference between revenue with current fees and estimated future costs. As such, DHS adjusts fees as explained in this rule.

*Comment:* Many commenters suggested alternative approaches to the proposed fee changes. Several commenters requested that USCIS consider phasing in fee increases over time, because the proposed fee changes would negatively impact artists and performing arts organizations. For example, a business association requested a phased-in approach for H–1B and O–1 applicants over the course of the next 3 to 5 years. Other commenters suggested that USCIS implement a progressive or ''sliding scale'' fee structure, including reduced fees for smaller, independent entities. A commenter suggested the genealogy fee increases be implemented over a 3-year period, reducing shock and impact to the genealogical community. The commenter went onto further suggest after a 3-year period establish a standard annual increase in the fees to cover increased operation costs.

*Response:* DHS understands the concept of rate shock, and we agree that

not having adjusted fees in 7 years makes the impact seem more severe. However, USCIS is risking a revenue deficit, and gradually adjusting the USCIS fee schedule over multiple years would ensure that USCIS would not recover full cost and would be unable to fully fund its operational requirements. DHS is addressing this concern in part by codifying the inflation adjustment provision in 8 CFR 106.2(d) so we can adjust USCIS fees on a timelier basis to match cost and provide smoother fee increases. In addition, because of the volume of requests that USCIS receives, intake must be automated and programming the system to search for multiple fees indexed based on varying characteristics (a sliding scale) would add delays and costs to USCIS intake of requests. Nevertheless, as stated earlier and as requested by these commenters, DHS has decided to provide a lower fee for Forms I–129, I–140, Immigrant Petition for Alien Workers, and Asylum Program Fee for small employers and nonprofit entities. In addition, DHS considered other reasonable alternatives to this final rule in response to comments, but we decline to make more changes in this final rule.

*Comment:* A few commenters suggested fee changes for musical artists be calculated by generated revenue, reasoning that higher income artists could afford the fees compared to independent artists. Similarly, an individual commenter proposed to raise the percentage of income taxes on higher earning workers; in the case of performing artists with major foreign corporate backing, the commenter said an additional fee or restrictions could be applied, such as a percentage guaranteed from the promoter or corporate entity in exchange for allowing operations or artists to enter the United States. Additionally, a company suggested, instead of increasing the visa fees, that USCIS collect fees on the back end by charging foreign bands a small percentage of their earnings, which would be withheld by the venues and sent to the government. Many commenters requested a minimum fee increase instead of the suggested increases, with the suggested amounts ranging from a 50 percent increase to a 10 percent increase or less.

*Response:* In this section we are responding to comments about the effects of the fees on different nonimmigrant categories. However, these comments may be addressed by the responses that we provided in section IV.G.2.d of this preamble where we address comments on the Form I–129 fees in general. DHS considered the commenters' suggestions for sliding

scales based on income, revenue, etc., and what would provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. USCIS intake must be automated and whether the petitioner meets the criteria for a fee must be instantaneously determined. Too complex of a sliding scale would add delays and costs to USCIS intake of requests. Therefore, as explained earlier in this preamble, DHS has decided to provide a reduced Form I–129 fee for small employer and nonprofits. *See* 8 CFR 106.1(f); 8 CFR 106.2(a)(3)(ix). In addition, this final rule exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13).

*Comment:* To minimize fee increases, a commenter suggested including the additional funds generated from premium processing and requested that USCIS consider all available and anticipated funds when determining final filing fees.

Many commenters wrote about the Emergency Stopgap USCIS Stabilization Act and USCIS premium processing fees. Commenters wrote:

• USCIS has not made a complete analysis of the revenue available to fund operations when setting fee levels, premium processing revenue must be included in the analysis.

• USCIS should consider more premium processing fees before adopting steep fee increases.

• USCIS has recently expanded premium processing and thus has greater resources to consider.

• USCIS should use revenue from premium processing to maintain the premium processing program before using it for other programs.

• Regarding USCIS' position that future revenues from premium processing are too attenuated to incorporate into the fee study requires that USCIS specify plans for such revenues once they are received.

• The USCIS Stabilization Act was passed during a unique point of congressional interaction with USCIS, and that the congressional intent was to avoid destabilization in the agency, such as the difference in the levels of service and processing times experienced between the applicants who can afford premium processing fees and the low-income applicants who cannot.

• USCIS should consider ways to use premium processing revenue to create a more equitable model.

• Revenues and data received from premium processing expansions in recent years provide USCIS sufficient certainty to include these revenues in fee determinations.

• DHS should delay the final rulemaking and fee determinations until it uses all potential streams of premium processing revenue and revenue predictions will be more stable.

• USCIS should use revenue generated by the premium processing program to maintain the program at its current levels of service and processing times.

• Commenters are encouraged that USCIS recognizes the exclusion and left open the possibility that USCIS will apply premium processing revenue to non-premium fees in the final rule.

• USCIS should reject modeling based on premium processing because it favors business immigration.

*Response:* DHS considered premium processing fees and revenue in the FY 2022/2023 fee review. DHS has determined that premium processing revenue was not sufficient to appreciably affect non-premium fees when it proposed fees. *See* 88 FR 402, 419 (Jan. 4, 2023). As shown in the supporting documentation for the proposed rule, the enacted premium processing budget was approximately $648 million in FY 2019 and approximately $658 million in FY 2020.[291] However, Table 6 of the proposed rule showed that the projected cost and revenue differential was approximately $1,868 million, significantly more than the enacted premium processing budget in FY 2019 or FY 2020. USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction in FY 2022. *See* 88 FR 402, 416 (Jan. 4, 2023). However, DHS revised the fee review budget in this final rule by transferring additional costs to premium processing revenue, as described earlier in this preamble. See section II.C.1. Reduced Costs and Fees.

*Comment:* Commenters suggested that USCIS incorporate recommendations from a June 2022 Office of the Ombudsman report into the final rule.

*Response:* The commenters are likely referring to the Citizenship and Immigration Services Ombudsman 2022 Annual Report to Congress.[292] USCIS

responses to the Ombudsman's annual reports are available online.[293] DHS notes that this final rule implements one recommendation from the 2022 report by adjusting fees for inflation. The CIS Ombudsman's 2023 Annual Report to Congress noted that an inflation-adjustment provision was part of the proposed rule.[294] DHS greatly appreciates the insight offered by the Citizenship and Immigration Services Ombudsman. USCIS works closely with the Ombudsman's office in addressing their concerns and improving our services, and we will consider including recommendations from that office in future rulemakings.

*Comment:* A couple of commenters requested that USCIS create a streamlined process for musician visas and suggested reducing the cost of reoccurring visas for musicians who have previously been granted a visa in the United States. One commenter suggested that USCIS review both O and P visas with the aim of establishing a new reciprocal arrangement between music exporting nations by creating a specific trade agreement that promotes an affordable and efficient system, that fosters access, and increases the mobility of touring musicians, crew, and industry professionals to work between Australia and the United States. Another commenter recommended that USCIS work with stakeholder groups, including immigration advocacy organizations, to develop fair and sustainable funding solutions. One commenter requested that USCIS create an international arts parole application. Others suggested an option for a 3-year visa be offered based on travel history and security profile for those artists who are in high demand reasoning that this would lower the administrative burden on USCIS and lower the overall cost for the artist.

*Response:* As we stated earlier, DHS greatly appreciates the contributions made to the U.S. by O and P nonimmigrants and we have made changes in the final rule to address comments from the O and P visa stakeholder community. However, the changes that these commenters suggest

---

[291] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, IEFA Fee Review Supporting Documentation (Jan. 2023), Appendix Table 1: FY 2019–2020 Enacted IEFA by Program/ Activity at page 29, available from *https:// www.regulations.gov/document/USCIS-2021-0010-0028.*

[292] For this and other CIS Ombudsman annual reports, see DHS, Citizenship and Immigration

Services Ombudsman Annual Reports, available at *https://www.dhs.gov/publication/ombudsman-annual-reports* (last updated July 6, 2023).

[293] USCIS, USCIS Responses to Annual Reports to Congress, available at *https://www.uscis.gov/tools/ ombudsman-liaison/uscis-responses-to-annual-reports-to-congress* (last reviewed/updated May 5, 2023).

[294] CIS Ombudsman, Annual Report 2023, available at *https://www.dhs.gov/sites/default/files/ 2023-07/ 2023%20Annual%20Report%20to%20Congress_0.pdf* (June 30, 2023) at page 103 (page 113 of the PDF).

are largely beyond the scope of a USCIS fee rule. DHS may consider these suggestions in a future rulemaking but declines to make any changes in this final rule based on these comments.

*Comment:* To overcome budget shortfalls, an individual commenter recommended that USCIS increase visa fees for skilled international workers who earn over $100,000 annually.

*Response:* As discussed in multiple places in this final rule, DHS is increasing the fees for Forms I–129, I–140 and H–1B Registration from their current amounts in this rule and establishing an Asylum Program Fee, while providing discounts for small employers and nonprofits. DHS declines to base the fees on the salary of the beneficiary because doing so would be very difficult to administer.

*I. Out of Scope*

*Comment:* Commenters submitted several comments that suggested changes to immigration laws, policies, programs, and practices that are not related to fees or relevant to any changes proposed in the proposed rule. Thus, they are outside the scope of the rulemaking. The commenters stated:

• DHS should implement effective deterrence policies to enforce Federal law and reduce costs associated with mass undocumented immigration, rather than raise fees for U.S. businesses.

• Policies that deter mass undocumented immigration and related-mass asylum fraud will positively impact USCIS' budget and reduce the scale at which fee-paying applicants and petitioners must pay to support USCIS' asylum program.

• USCIS should broaden eligibility for EADs or reintroduce the automatic grant of EADs during case processing delays.

• USCIS should extend the validity date of benefits to address the financial burdens of renewals (*e.g.,* extending the validity period for EADs and advance parole to 3 years); USCIS should update their records so that FOIA requests or congressional reporting may provide accurate information on fee waiver grant rates for these humanitarian categories.

• DHS should eliminate the rule that adjustment of status applications is considered abandoned if an applicant leaves the country without obtaining advance parole, which contributes significantly to the backlog of advance parole applications.

• It is an ineffective use of USCIS resources to review each I–765 and I–131 petition filed by adjustment applicants as if they are independent applications.

• USCIS should implement simpler language in the Form N–400.

• USCIS should combine Forms N–400 and N–600 to reduce adjudication time and save costs.

• USCIS should adopt remote interviews for naturalization and adjustment applications and oath ceremonies to reduce expenses, delays, and difficulties for applicants.

• DHS should provide clear guidance to adjudicators and in policy that reflects the breadth of its interpretation of the TVPRA and update its records to reflect this for purposes of FOIA requests or congressional reporting.

• With regards to Systematic Alien Verification of Entitlements program fees, that leveraging State resources to fill the gap for agencies seeking to comply with Federal law places the states in the difficult position of satisfying a mandate in the absence of Federal appropriations.

• On Form I–485, question 61, regarding public charges, be changed such that, if an applicant has, or has had, an exempt status, they are not subject to the public charge rule, and allow such applicants to skip to question 69; additionally, the commenter recommended that the instructions be updated to include a list of exempt statuses.

• Change adjustment of status abandonment provisions to only apply to applicants who are not under exclusion, deportation, or removal proceedings.

• USCIS should stop requiring extensions of status when not legally required for dependents of temporary workers and should admit them to the end of the validity of principal applicants' extension as long as the qualifying relationship exists. USCIS already automatically terminates dependent children's status when they reach 21 years of age, and spouses can independently alert USCIS if a marriage ends.

• USCIS should reduce barriers to travel and improve the process of providing APDs and not consider a pending Form I–131 for advance parole to be abandoned by travel abroad.

• Waivers of filing fees should not be interpreted as a public charge admission because not everyone can raise funding for filing fees given that wages are not keeping up with the rate of inflation.

*Response:* DHS fully considered the comments in this rule and whether their suggestions could be adopted. The comments above request changes that go beyond fees and require either analysis of their impacts or public comment on their effects so that they exceed what DHS can include in this final rule under

the APA. DHS may consider the points raised by commenters in future policy changes or rulemakings.

**V. Statutory and Regulatory Requirements**

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)*

E.O. 12866, as amended by Executive Order 14094, and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of E.O. 12866, as amended by Executive Order 14094, because its annual effects on the economy exceed $200 million in any year of the analysis. Accordingly, OMB has reviewed this rule.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS for Form N–400, Application for Naturalization, filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

DHS has prepared a full analysis according to E.O. 12866 and E.O. 13563, which can be found in the docket for this rulemaking. Table 9 presents the accounting statement showing the transfers, costs, and benefits associated with this regulation as required by OMB Circular A–4.

OMB A–4 Accounting Statement

**BILLING CODE 9111–97–P**

| Table 9. OMB A-4 Accounting Statement - ($ in millions, 2022; period of analysis: FY 2024 through FY 2033) | | | | |
|---|---|---|---|---|
| **Category** | **Primary Estimate** | **Minimum Estimate** | **Maximum Estimate** | **Source Citation** |
| **BENEFITS** | | | | |
| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The changes in the final rule will provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees. Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules will allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation.<br><br>The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced fees for electronic filings, reduced reapplications for premium processing and for many applicants, limited fee increases and additional fee exemptions and fee waivers to reduce fee burdens.<br><br>Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. | | | RIA |
| **COSTS** | | | | |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$157 | | | RIA |
| Annualized quantified, but un-monetized, costs | N/A | | | |
| Qualitative (unquantified) costs | Expanding the population of applicants using eligible for N-400 reduced fees and applicants eligible for fee waivers and exemptions will increase the administrative burden on the agency | | | |

|  | to process these forms. |  |
|---|---|---|
| **TRANSFERS** |  |  |
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%) $888 | RIA |
| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%)  $241 | RIA |
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%) $0.20 | RIA |
| *Miscellaneous Analyses/Category* | *Effects* |  |
| *Effects on state, local, and/or tribal governments* | *None* | Preamble |
| *Effects on small businesses* | DHS does not believe that the increase in fees in the rule will have a significant economic impact on a substantial number of small entities that file Forms I-129, I-140, I-910, or I-360. DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I–924) or Form I-956G (formerly I-924A). DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Final Regulatory Flexibility Analysis (FRFA) and Small Entity Analysis (SEA) |
| *Effects on wages* | *None* | None |
| *Effects on Growth* | *None* | None |

Quantified Annual Economic Impacts of
the Fee Schedule: NPRM vs Final Rule

| Table 10. Quantified Annual Economic Impacts of the Fee Schedule: NPRM vs Final Rule | | | | |
|---|---|---|---|---|
| **Category** | **NPRM** Undiscounted | **Final Rule** Undiscounted | **Difference** | **Percent Difference** |
| Total Costs to Applicants/Petitioners | $575,100,190 | $302,692,154 | -$272,408,036 | -47% |
| Total Cost Savings to Applicants/Petitioners | $42,721,052 | $145,686,202 | $102,965,150 | 241% |
| **Net Costs** | **$532,379,138** | **$157,005,952** | **-$375,373,186** | -71% |
| **Transfer Payments from applicants/petitioners to USCIS (fee increases)** | **$1,612,127,862** | **$887,571,832** | **-$724,556,030** | -45% |
| **Transfer Payments from USCIS to applicants/petitioners (exemptions, waivers, discounts, reduced fees)** | **$116,372,429** | **$241,346,879** | **$124,974,450** | 107% |
| **Transfer Payments from DoD to USCIS (Military N-400 reimbursements)** | **$222,145** | **$197,260** | **-$24,885** | -11% |
| **Net Transfer Payments to USCIS** | **$1,495,977,578** | **$646,422,213** | **-$849,555,365** | -57% |
| Source: USCIS Analysis | | | | |

Table 10 above shows that total costs were reduced by 47 percent in the final rule. This is mainly a result of the discounted fees given to Form I–129 and I–140 petitioners who are employers with 25 or fewer full-time equivalent (FTE) workers or non-profit entities. There was a significant increase in cost savings mainly because of the lower fees for filing forms electronically as well as lower fees for filing Forms I–90 and I–131. Mainly because of the increase in cost savings, net costs were reduced by 71 percent in the final rule. Transfer payments from applicants/petitioners to USCIS were reduced by 45 percent mainly because of the lower fees for Form I–485 applicants concurrently filing a Form I–765, lower fees for applicant under the age of 14 years filing Form I–485 with a parent and lower fees for the online filing of forms. Transfer payments from USCIS to applicants/petitioners increased significantly by 107 percent. This increase is mainly attributable to changes to fee exemptions (see Table 48 in standalone RIA for additional information). Transfer payments from USCIS to applicants/petitioners as a result of fee exemptions increased by 70-percent ($181,225,564) from the NPRM estimates ($106,821,450). Transfer payments from DoD to USCIS were reduced by 11 percent. Finally, net transfer payments to USCIS were reduced by 57 percent in the final rule, from NPRM estimates. DHS notes that the variation in costs, cost savings and transfer payments from the proposed rule to the final rule is also influenced by the change in annual average populations used throughout the economic analysis. In the proposed rule, DHS generally used 5-year annual averages from FY 2016 through 2020 and in the final rule DHS uses 5-year annual averages from FY 2018 through 2022.

Summary Table of the Economic Impacts of the Final Fee Schedule

Table 11 provides a detailed summary of the final rule and its impacts.

003286

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| 1. **Resubmission of Dishonored or Returned Payments, Fee Payment Method, and Non-Refundability** | If a check or other financial instrument used to pay a fee is dishonored or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br>• If the instrument used to pay a fee is dishonored or returned a second time, USCIS may reject or deny the filing.  Financial instruments dishonored or declined or returned for any reason other than insufficient funds, will not be resubmitted, and such filings may be rejected or denied. Credit cards that are declined for any reason will not be resubmitted.<br><br>• DHS may reject a request that is accompanied by a check or other financial instrument that is dated more than one year before the request is received. | Quantitative: Applicants-<br>• An increase in transfer payments from applicants/petitioners to USCIS of approximately $658,396 (annual average amount USCIS refunds to applicants/petitioners) due to nonrefundable fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Clarifying dishonored or returned payment resubmission and non-refundability policies, limiting the age of checks to be presented and limiting payment options will reduce administrative burdens and fee processing errors for USCIS.<br><br>• USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment.<br><br>• USCIS will lose fewer credit card disputes. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Will codify authority to limit payment options so that USCIS may require certain fees be paid using a specific payment method.<br><br>• Clarifies that fees are generally nonrefundable regardless of the result of the request or how much time the request requires to be adjudicated.<br><br>• Clarifies that fees paid to USCIS using a credit or debit card cannot be disputed. | | |
| 2.  **Eliminate $30 Returned Check Fee** | • Eliminate the $30 charge for dishonored payments. | Quantitative: Applicants<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | Quantitative: Applicants –<br>• DHS estimates the annual cost savings to applicants/petitioners will be $414,150.<br><br>Qualitative: Applicants –<br>• Applicants who submit bad checks will no longer have to pay a fee.<br><br>DHS/USCIS –<br>• This change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |

003288

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **3. Changes to Biometric Services Fee** | • For nearly all benefit types, DHS will incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable.<br><br>• Retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | Quantitative: Applicants<br>• As a result of the $55 reduction in the biometric services fee, TPS and the Executive Office for Immigration Review (EOIR) applicants will experience a total of $10,007,965 in reduced fees annually. This represents transfer payments from USCIS to the fee payers as USCIS will now incur the indirect costs of providing the biometric services.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None | Quantitative: Applicants –<br>• None.<br><br>Qualitative: Applicants –<br>• Incorporating the biometric services fee into the underlying benefit request filing fee will benefit applicants by simplifying the payment process.<br><br>• May also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>DHS/USCIS –<br>• Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| **4. Naturalization and Citizenship Related Forms** | • Limit the increase of Form N-400 fees to $760 for paper filers and $710 for online filers.<br>• Increase fees to Forms N-300, N-336, N-400, N-470, N-600 and N-600K.<br><br>• Increase the Form N-400 reduced fee to $380.<br><br>• Make the request for a reduced fee available to applicants with incomes under 400 | Quantitative: Applicants<br>• Increase in fees to Forms N-300, N-336, N-400 (paper), N-470, N-565 (paper), N-600 and N-600K will result in an increase in transfer payments from the fee-paying applicants to USCIS of $30,182,790 annually.<br><br>• Increase in transfer payments from USCIS to Form N-400 reduced fee | Qualitative: Applicants-<br><br>• Limited fee increases allow more residents, especially those with financial and income constraints to seek citizenship.<br><br>• Cost savings of $5,981,330 to applicants filing Forms N-400 and N-565 online.<br><br>• Expanding the eligible population of N-400 reduced fee applicants will benefit an unknown number of applicants who could not afford the full fee, but can |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG.<br><br>• Keep the existing statutory fee exemptions for military members and veterans who file Forms N-400 and N-600. | applicants of $46,088,170 due to the change in reduced fee eligibility criteria to applicants with incomes under 400 percent of the FPG.<br><br>• Increase in transfer payments from DoD to USCIS of $197,260 annually for N-400 (military only) reimbursements.<br><br>Qualitative: Applicants –<br>  • None<br><br>DHS/USCIS –<br>• Expanding the population of N-400 reduced fee applicants will increase the administrative burden on the agency to process these additional forms with 50 percent less in fees. | now pay 50 percent less in fees. |
| **5. Fees for Filing Online** | • Lower fees for online filings of immigration benefit requests for which both paper and online filing options are available. The forms include Form I-90, Form I-130, Form I-539, Form I-765, Form N-336, Form N-400, Form N-565, Form N-600, Form N-600K, Form G-1041, and Form G-1041A. | Quantitative: Petitioners<br>• Increase in transfer payments of $17,706,510 from Form I-130 online filers to USCIS.<br><br>DHS/USCIS-<br>  • None.<br><br>Qualitative: Petitioners –<br>• None.<br><br>DHS/USCIS –<br>  • None. | Quantitative: Petitioners-<br><br>• Cost savings of $56,796,180 to applicants filing Forms I-90, I-539 and I-765 online.<br><br>Qualitative:<br><br>Petitioners-<br>• Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.<br><br>DHS/USCIS – |

**Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations   **6345**

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | | • USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.<br><br>• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records will not be physically moved around to different adjudication offices.<br><br>• Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |
| **6.  Form I-485, Application to Register Permanent Residence or Adjust Status** | • Increase Form I-485 fees for adults and children under the age of 14 concurrently filing with a parent.<br><br>• Charge separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. | Quantitative: Applicants-<br>• Total increase in transfer payments from applicants filing Form I-485 to USCIS of $391,920,525.<br><br>This includes the following:<br>• The increase in the Form I-485 fees will result in approximately $18,273,710 in transfer payments annually from applicants filing I-485 (only) to USCIS.<br><br>• Separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I-485 will result in transfer payments from applicants to USCIS of $367,192,615 annually.<br><br>• Transfer payments from applicants to | Quantitative: Applicants-<br>• Not estimated.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Unbundling the fee for Form I-485 from Forms I-131 and I-765 will better reflect the cost of adjudication. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | USCIS of $6,454,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent.<br><br>Qualitative: Applicants –<br><br>• None.<br><br>DHS/USCIS –<br>• None. | |
| 7. **Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • Separate the fee for Form I-131A from other travel document fees. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Allows USCIS to assess the cost of providing services for this immigration benefit and better align fees in future fee reviews. |
| 8. **Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • Charge different fees for Form I-129, based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries.<br>• Increase H-1B registration fees from $10 to $215<br><br>• Limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers. | Quantitative: Applicants –<br>• Increase in transfer payments from Form I-129/I-129CW petitioners to USCIS of $217,571,880. This includes transfer payments from H-1B registrants to USCIS of $71,428,355.<br><br>• Costs of $254,764,500 to Form I-129/I-129CW petitioners due to the new Asylum Program fees.<br><br>DHS/USCIS –<br>• Not estimated.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS – | Quantitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• A benefit of the different fees for the Form I-129 classifications is that it will allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification.<br><br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |

003292

**Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations   **6347**

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Charge a new Asylum Program fee to Form I-129/I-129CW petitioners.<br><br>• Provide reduced Form I-129/I-129CW fees and Asylum Program fees for businesses with 25 or less full-time equivalent employees and nonprofit businesses.<br><br>• The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer full-time equivalent employees, and $600 for all other I-129 filers. | • None. | |
| **9. Adjustments to Premium Processing** | • Change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service.<br><br>• Permit combined payments of the premium processing service fee with the remittance of other filing fees. | Quantitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative:<br>Applicants –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated.<br><br>DHS/USCIS –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS will have additional business days to process petitions when premium processing request volumes are high and the 15 calendar days include multiple non-business days such as weekends and holidays.<br><br>• USCIS will be able to make premium processing more consistently available and expand this service to the |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | | newly designated classifications and categories allowed by the USCIS Stabilization Act.<br><br>Qualitative: Applicants and DHS/USCIS –<br>• Allowing combined payments reduces unnecessary burdens on petitioners, applicants, and DHS. |
| **10. Intercountry Adoptions** | • Clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for Forms I-600A and I-800A approvals in an orphan case from 18 to 15 months to remove inconsistencies between Forms I-600A and I-800A approval periods and validity of the U.S. Federal Bureau of Investigation (FBI) background check.<br><br>• Create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600.<br><br>• Provide fee exemptions for some applicants who file Form I-600A/I-600 | Quantitative: Applicants-<br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 will cost $146,954 annually.<br><br>• The increase to the current fees for Forms I-600/600A/800/800A will result in transfer payments from applicants to USCIS of approximately $265,440 annually.<br><br>• Transfer payments from USCIS to the public of $4,023,570 due to fee exemptions to Form I-600A/I-600 Supplement 3, Form I-800A Supplement 3 and adoption-based Forms N-600 and N-600K.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS-<br>• None. | Quantitative: Applicants –<br>• None.<br><br>Quantitative: Petitioners-<br><br>• Cost savings of $3,375 to applicants filing Form I-800A Supplement 3 due to a reduction in fees.<br><br>Qualitative: Applicants –<br>• Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates.<br><br>• These changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for |

003294

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | Supplement 3, Form I-800A Supplement 3, Form N-600 or Form N-600K for newly adopted children. | | prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>DHS/USCIS –<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br><br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
| **11. Immigrant Investors** | • DHS will increase fees to Forms I-526/I-526E[295], I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the Employment-Based Immigrant Visa, Fifth Preference (EB-5) program. | Quantitative: Applicants-<br>• Annual transfer payments from EB-5 investors and regional centers to USCIS will be approximately $44,746,040.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| **12. Changes to Genealogy Search and Records Requests** | • Revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• Change the index search request process so that USCIS may provide requesters with digital records via | Quantitative: Applicants-<br>• Annual transfer payments from fee paying applicants to USCIS of $813,900 due to increased fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• Cost savings of $380,415 to applicants filing Forms G-1041, G-1041A online.<br>Qualitative: Applicants –<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>DHS/USCIS –<br>• Reduce costs for mailing, records processing, and |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | email in response to the initial search request.<br><br>• Lower the fees for the online filing of Forms G-1041 and G-1041A, from $65 to $30 to reflect the lower marginal costs to USCIS from online filing.<br><br>• For requestors who choose to submit via mail option, DHS will increase the fee from $65 to $80, for G-1041 and G-1041A.<br><br>• Charge a fee of $330 for requests for a Certificate of Non-Existence. | | storage costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |
| 13. **Fees Shared by CBP and USCIS** | • Increase fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP): Form I-192, Form I-193, Form I-212, and Form I-824. | Quantitative: Applicants-<br>• Increase in annual transfer payments of $11,826,730 from fee payers to USCIS and CBP.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• A single fee for each shared form will reduce confusion for individuals interacting with CBP and USCIS.<br><br>DHS/USCIS –<br>• None. |
| 14. **Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 [NACARA]** | • Adjust the fee for Form I-881 and combine the current multiple fees charged for an individual or family into a single fee of $340 for each filing of Form I-881. | Quantitative: Applicants-<br>• Transfer payments of $18,260 annually from I-881 individual filers to USCIS.<br><br>• Transfer payments from USCIS to I-881 family applicants of $1,610 since this fee is less than the cost to adjudicate the application. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | Qualitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • None. | • A single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15.  Fee Waivers** | • Expand the categories of requestors and related forms eligible for a fee waiver. <br><br> • Codify the existing criteria in USCIS guidance regarding eligibility requirements for a fee waiver. | Quantitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • None. <br><br> Qualitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • None. | Quantitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • None. <br><br> Qualitative: Applicants – <br> • More simplified and streamlined system to process fee waivers. <br><br> DHS/USCIS – <br> • None |
| **16.  Fee Exemptions** | • Will provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries[296]: <br> • Victims of Severe Form of Trafficking (T Nonimmigrants) <br> • Victims of Qualifying Criminal Activity (U Nonimmigrants) <br> • Violence Against Women Act (VAWA) Form I-360 Self-Petitioners and Derivatives <br> • Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty <br> • Abused Spouses and Children Adjusting Status under the | Quantitative: Applicants- <br> • Transfer payments of approximately $181,225,564 annually from USCIS to the public. <br><br> Qualitative: Applicants – <br> • None. <br><br> DHS/USCIS – <br> • None. | Quantitative: Applicants- <br> • Cost savings of about $40,184,477 to the public for no longer having to complete and submit Form I-912. <br><br> Qualitative: Applicants – <br> • Individuals who are unable to afford immigration benefit request fees will benefit from filing a request with no fees. <br><br> DHS/USCIS – <br> • Decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA)<br>• Abused Spouses and Children Seeking Benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)<br>• Abused Spouses and Children of lawful permanent residents (LPRs) or U.S. Citizens under the Immigration and Nationality Act (INA) Section 240A(b)(2)<br>• Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Forces (ISAF) (SI1 and SI2)<br>• Special Immigrant Juveniles (SIJs)<br>• Temporary Protected Status (TPS)<br>• Asylees<br>• Refugees<br>• Persons Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | | |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| **17.  Additional Fee Adjustments** | DHS will increase fees for the following forms:<br>• I-90 (paper)<br>• I-102<br>• I-130 (paper)<br>• I-131<br>• I-140<br>• I-601<br>• I-612<br>• I-290B<br>• I-360<br>• I-539 (paper)<br>• I-601A<br>• I-687/I-690/I-694<br>• I-751<br>• I-765 (paper)<br>• I-817<br>• I-910<br>• I-929 | Quantitative:<br>Applicants-<br>• An increase in transfer payments from fee payers to USCIS of approximately $171,861,361 annually.<br><br>• Costs of $47,780,700 for Form I-140 petitioners due to the new Asylum Program fees.<br><br>Qualitative:<br>Applicants –<br>• None. | Quantitative:<br>Applicants-<br>• Cost savings of $41,926,275 to applicants filing Forms I-90 and I-131 as a result of lower fees.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| **18.  Adjusting USCIS Fees for Inflation** | • DHS to use the CPI-U as the inflation index for fee adjustments between comprehensive fee rules. The actual impacts of such adjustments will be analyzed in a future rule should DHS exercise this authority. | Quantitative:<br>Applicants-<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative: Applicants<br><br>• None.<br><br>Qualitative:<br><br>DHS/USCIS –<br><br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |
| Source: USCIS analysis.<br>Note: The dollar amounts in this table are undiscounted. | | | |

BILLING CODE 9111–97–C

---

[295] Combines both Forms I–526, Immigrant Petition by Standalone Investor and I–526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

[296] These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under 8 CFR 106.2 for which DHS to codify that there is no fee.

*B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)*

1. Changes From the Proposed Rule's IRFA

Since the IRFA, the major changes made in the final rule that could affect entities are as follows:

• The Asylum Program Fee is $0 for nonprofits, $300 for employers with 25 or fewer full-time equivalent (FTE) workers, and $600 for all other Form I–129, I–129CW, Petition for a CNMI-Only

Nonimmigrant Transitional Worker, and those filing Form I–140, Immigrant Petition for Alien Workers. The proposed rule stated that the Asylum Program Fee would be $600 for all such filers.

• Employers with 25 or fewer FTE workers and nonprofits receive a discount on fees for Form I–129, Petition for Nonimmigrant Worker and Form I–129CW.

• A $50 reduced fee for forms filed online, except in limited circumstances,

such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. The proposed rule provided various reduced fees for each form filed online.

2. Overview of the FRFA

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. In accordance with the RFA, USCIS has prepared a FRFA that examines the impacts of the interim final rule on small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. In addition, the courts have held that the RFA requires an agency to perform a FRFA of small entity impacts only when a rule directly regulates small entities. The complete detailed SEA [297] is available in the rulemaking docket at *http://www.regulations.gov*.

Individuals, rather than small entities, submit most of the immigration and naturalization benefit applications and petitions. The final rule would affect small entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a small entity analysis for this final rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–956 (formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (formerly Form I–924 amendment) and the Regional Center Annual Statement, Form I–956G (formerly Form I–924A).

This FRFA contains the following:
• A statement of the need for, and objectives of, the rule.
• A statement of the significant issues raised by the public comments in response to the initial regulatory

flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule because of such comments.
• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule based on the comments.
• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.
• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.
• A description of the steps the agency has taken to minimize significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

DHS is publishing this FRFA to respond to public comments and provide further information on the likely impact of this rule on small entities. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refers the reader to these analyses where additional detail is available.

a. Summary Findings of the FRFA

• The increase in fees may have a significant economic impact (greater than 1 percent) on some small entities that file I–129, I–140, I–910, or I–360.

During the FRFA, DHS found no comments that provided additional data for the forms below:
• For Forms I–956, I–956F and I–956G, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file these forms.
• For the genealogy forms, DHS also does not have sufficient data on the requestors that file Forms G–1041, Index Search Request and Form G–1041A, Genealogy Records Request, to determine whether such filings were made by entities or individuals. Thus,

DHS is unable to determine if the fee increases for genealogy searches are likely to have a significant economic impact on small entities.

**Form I–129 Small Entities**

• *Form I–129 Small Entities with More than 25 Full-Time Equivalent (FTE) Employees*
○ 302 of the 1,643 matched small entities searched were small entities with more than 25 employees.
○ Among the 302 small entities, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent.
○ The small entities with greater than 1 percent impact were mostly H–1B filers (18 of 327) that filed multiple petitions.
○ The greatest economic impact imposed by the fee changes was 7.06 percent and the smallest was 0.002 percent.
○ The average economic impact from the H–1B registration and petition fee increase on all 241 filers was 0.06 percent; the greatest economic impact was 1.35 percent and the smallest was 0.0004 percent.
• *Form I–129 Small Entities with 25 or Fewer Full-Time Equivalent (FTE) Employees*
○ 876 of the 1,643 entities searched, were small entities with 25 or fewer FTE employees.
○ Among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 95 (10.8 percent) experienced an economic impact greater than 1 percent.
○ The small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 95) that mostly filed multiple petitions.
○ The greatest economic impact imposed by the fee changes was 4.21 percent and the smallest was 0.003 percent.
○ The average economic impact from the H–1B registration and petition fee increase on all 682 filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent.
• *Form I–129 Nonprofit Small Entities*
○ 14 of the 1,643 entities searched were nonprofit small entities. All 14 of these nonprofit small entities petitioned for H–1B workers.
○ All 14 nonprofits small entities experienced an economic impact of less than 1 percent.
○ The greatest economic impact imposed by the fee changes was 0.82 percent and the smallest was 0.003 percent.
○ The average economic impact from the registration and petition fee

[297] DHS, USCIS SEA for the USCIS Fee Schedule Final Rule.

increases on all H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent.

**Form I–140 Small Entities**

• DHS identified 126 small entities with reported revenue data in the sample.

• Of the 126 small entities, 46 had more than 25 FTE employees and 80 had 25 or fewer FTE employees. There were no nonprofit small entities with reported revenue data in the sample.

• All 46 small entities with more than 25 FTE employees experienced an economic impact of less than 1 percent. The greatest economic impact imposed by the fees was 0.25 percent and the smallest was 0.0001 percent.

• For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent. The smallest economic impact imposed by the fee increase was 0.002 percent.

Form I–910 Small Entities

• 179 matched entities with reported revenues were considered small entities.

• All 179 small entities experienced an economic impact of less than 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.91 percent and the smallest was 0.001 percent.

Form I–360 Small Entities

• 174 entities with reported revenues were considered small entities.

• All 174 small entities experienced an economic impact below 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.08 percent and the smallest was 0.001 percent.

b. A Statement of Need for, and Objectives of the Rule

DHS issues the final rule consistent with INA sec. 286(m),[298] which authorizes DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and the CFO Act,[299] which requires each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees. DHS is

adjusting the fee schedule for DHS immigration and naturalization benefit applications after conducting a comprehensive fee review for the FY 2022/2023 biennial period and determining that current fees do not recover the full costs of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

c. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, A Statement of the Assessment of the Agency of Such Issues, and A Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

DHS published the proposed rule along with the IRFA on January 4, 2023, with the comment period ending March 13, 2023. During the comment period, DHS received approximately 260 submissions from interested individuals and organizations on the proposed rule's impacts on small entities regarding the RFA. The comments did result in one major revision to the small entity analysis in the final rule that is relevant to the effects on small businesses, small organizations, and small governmental jurisdictions presented in this FRFA. More specifically, DHS agreed that the random sample size for Form I–129 could be larger due to the size of this population and expanded the sample from 650 entities to 4,746 entities in the FRFA. DHS summarizes and responds to the public comments in this Final Rule.

*Comment:* Numerous commenters generally opposed the rule on the grounds that it would negatively impact the U.S. economy.

*Response:* DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede or limit legal immigration. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, 2016, and 2020 and has no data that would indicate that

the fees for family-based benefit requests, lawful permanent residence, and naturalization in this final rule would prevent applicants from filing.

DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, and almost all industries. Immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and welcoming new citizens helps the U.S. economy. DHS acknowledges in its analyses accompanying this rule that the higher fees must be paid by U.S. companies that hire foreign nationals, but DHS has no data that indicate that higher fees will affect the supply of lower skilled laborers, impede immigration to the detriment of the labor force, result in noncitizens being unable to work, cause employers to lay off employees, undermine the jobs and wages of domestic workers with limited education performing low-skill jobs, or increase unemployment among immigrant workers. DHS knows that immigrants make important contributions in research and science. However, we have no data that support the assertion that the increased fees would result in many fewer residents accessing a desired immigration status for which they are eligible.

*Comment:* One commenter stated that businesses would pass costs to consumers, contributing to inflation.

*Response:* DHS recognizes that some businesses may pass on these increased fees to their customers but cannot determine the exact impact this would have on overall inflation in the United States.

*Comment:* One commenter wrote that the proposed rule would create barriers to naturalization, which would limit the ability of immigrants to contribute to the economy.

*Response:* In recognition of the importance of naturalization and integration of new citizens in the U.S., since 2010 DHS has held the fee for Form N–400, Application for Naturalization, below the estimated cost to USCIS of adjudicating the form. DHS recognizes the importance of naturalization to new citizens and the U.S. economy. DHS also understands that the fee increase for the naturalization application may affect those applying. However, DHS continues to offer fee waivers to naturalization applicants who are unable to pay their fee. Additionally, in this rule DHS increases eligibility for the reduced fee N–400 from 200 percent to 400 percent of the FPG. Therefore, DHS does not believe that the fee

---

[298] See 8 U.S.C. 1356(m).

[299] See 31 U.S.C. 901–03.

increase to Form N–400 will create barriers to naturalization.

*Comment:* Several commenters generally opposed the rule on the grounds that it would negatively impact employers. Other commenters wrote that the proposed rule would have negative effects on the labor market by discouraging employers from hiring foreign workers. A trade association stated that most significant cost increases for various immigration benefits are targeted at American companies of all sizes and across all industries, and that the exorbitant fee increases would have a profoundly negative impact on the U.S. economy. The commenter adds that the fee hikes will exacerbate their current inability to adequately meet their workforce needs and hinder their ability to compete in the marketplace. The commenter also stated that USCIS failed to comply with the RFA requirements because it did not consider significant alternatives to the proposed rule that would have lessened the negative impact on the business community. The commenter adds that USCIS failed to properly analyze the employer data for companies that filed Form I–129 for needed workers by using a very small random sample.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016. Therefore, DHS has no data from previous fee schedules that would indicate that the fees would discourage employers from hiring foreign workers, which would negatively impact the labor market.

DHS disagrees that it failed to comply with the RFA requirements because DHS considered significant alternatives in the proposed rule. In terms of the random sample size for Form I–129, DHS agrees that the sample size could be larger due to the size of this population and for the final rule we have expanded the sample from 650 entities to 4,746 entities. DHS used a 95 percent confidence level and a 2 percent confidence level (margin of error) for the Form I–129 sample size. In the proposed rule, DHS used a 95 percent confidence level and a 5 percent confidence level. The impacts on small entities are discussed in detail in section d of the FRFA.

*Comment:* Several commenters wrote that the rule would create problems specifically for the labor pool in retail, agriculture, construction, manufacturing, and hospitality. Other commenters stated that the proposed fee increases would negatively impact small businesses by further increasing labor costs associated with hiring immigrants.

*Response:* DHS agrees that immigrants are crucial for many industries including retail, agriculture, construction, manufacturing, and hospitality. DHS does not believe the fees established in this rule will reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals, and that some businesses may pass on these increased fees to their customers. However, DHS must fund USCIS through fees. More importantly, DHS saw no significant or limited decreases in the number of I–129 benefit requests submitted, including H–2A and H–2B after its fee adjustments in 2010, and 2016 and has no data that indicate that increased fees will affect the supply of laborers in these industries. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses that are posted for public review as supporting documents in the rulemaking docket. In the SEA (see Table 7), DHS calculated the estimated economic impact of the fee increase on a sample of small entities. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [300] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[301] Among the sample of 1,192 small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 petitions to employ foreign nationals.

*Comment:* A couple of commenters stated that fees would be an added burden to nonprofits serving immigrant communities.

*Response:* DHS recognizes the value of the various groups including nonprofits, which assist individuals to navigate its regulations and immigration benefit requests. As previously stated, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. Nonetheless, DHS understands the importance of maintaining access to immigration benefit requests for individuals and organizations. DHS further notes that this final rule expands the availability of fee exemptions for humanitarian and protection-based immigration categories and fee waivers for individuals who are unable to pay request fees, which should reduce the burden on non-profits that assist individuals who are applying for humanitarian or protection-based status or who are low-income. *See* Tables 4B, 4C.

*Comments on Form I–129 (H–1B)*

*Comment:* Several commenters stated that increases in the H–1B fee would be detrimental to employers like medical centers, universities, and technology companies as follows:

• The fees will limit their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important workers, creating an economic burden for those institutions and stifling innovation.

• The fee increases could have a significant impact on small businesses, nonprofit healthcare facilities, and educational institutions that hire employees on H–1B specialty occupation visas because these entities are not generally able to absorb these enormous increases.

• The fee increases would stifle innovation and hurt start-ups and small businesses, citing data from the U.S. Bureau of Labor Statistics demonstrating that these entities rely on immigrant workers due to labor shortages in the United States.

• The increased fees will decrease the demand for the H–1, O, E–3, and TN visas and create a financial hardship for its performing arts centers.

• The fee increases will make hiring highly skilled workers unaffordable.

• USCIS did not account for funding differences between a venture capital start-up and a university basic science lab in its SEA.

• DHS did not analyze impacts to government research organizations in the SEA for the proposed rule.

---

[300] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[301] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

Additional analyses on the number of nonimmigrant petitions filed by these organizations would help USCIS better understand the rule's impact on other government organizations.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS also acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016 and has no data that would indicate that the fees would limit employers' ability to hire foreign workers, which would negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities including nonprofits that submitted benefit requests (Form I–129). Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [302] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[303] Among the sample of 1,192 [304] small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create an economic burden and stifle innovation for a significant number of small entities that file H–1B benefit requests to employ foreign nationals.

*Comments on Form I–129 (O and P Nonimmigrants and Their Petitioners)*

*Comment:* Numerous commenters, mostly individuals, said the increase in fees for touring artists would have detrimental effects on the performing arts industry and the U.S. economy, including negative impacts to employment within the music industry and financial losses for businesses that benefit from live performances. Commenters stated that music venues, record labels, and booking agencies would suffer financially, and increased fees for touring artists would increase the costs of tickets and merchandise. The proposed fee increases would have a negative impact on U.S. culture and diversity, by harming the performing arts sector. Many commenters expressed support of the arts without stating a position on the rule, requested that DHS keep prices affordable for artists, or structure fee increases in a way that benefits Americans and international artists.

*Response:* DHS acknowledges that the arts are important and beneficial to the economy. Nevertheless, the fees DHS establishes in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. Any preferential treatment provided to petitioners for performers and musicians would mean that the costs for their petitions are borne by other petitioners, applicants, and requestors.

For Form I–129 (O and P visa classifications), among the 48 small entities with reported revenue data identified in the SEA, 45 (94 percent) experienced an economic impact of considerably less than 1 percent of revenue in the analysis.[305] While DHS sympathizes with touring artists, small traveling musicians, and other entities in the performing arts industry, our analysis indicates that the additional fee imposed by this rule does not represent a significant economic impact on most of these types of small entities. Therefore, DHS has no data that would indicate that the fees in this rule would have a negative impact on U.S. culture and diversity by harming the performing arts sector.

*Comments on Form I–129 (H–2A)*

*Comment:* Some commenters stated that fee increases would impact farms that rely on the H–2A program. Another commenter stated that USCIS does not properly account for small farms in their analysis of costs on livestock producers. A couple of commenters stated that the proposed changes were unfair to farmers and expressed concern with the proposed use of a business's total revenue as the determining factor in how much a business or farm must pay in fees. The commenters added that the practice is "devoid of economic basis" because some farms have little to no profit despite high total revenue.

*Response:* As noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. DHS respectfully disagrees with the commenter who stated that USCIS did not properly account for small farms in their analysis of costs on livestock producers. DHS used recent data to examine the direct impacts to small entities for Forms I–129 and has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities who file for H–2A visas. To determine if a final rule would have a significant economic impact on affected small entities, SBA suggests 1 percent of revenue as a measure for determining economic impacts.[306] DHS believes this measure is the most useful for the FRFA, based on the available data for the relevant small entities. All 36 small entities that submitted Form I–129 petitions for H–2A nonimmigrant workers and reported revenue data experienced an economic impact of less than 1 percent.[307] Therefore, the data that DHS has indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 for H–2A temporary agricultural employees.

*Comment:* Multiple commenters said the regulatory flexibility analysis is flawed because it does not distinguish between petitions for named and unnamed H–2B nonimmigrants in assessing the impact on small entities and it did not consider the 25 named worker limitation in calculating the regulatory impact.

*Response:* The commenter is correct that the IRFA did not capture the full fee increases to small entities that file for named beneficiaries because DHS did not consider the 25 named worker limitation in its analysis. DHS apologizes for this error. We have incorporated the full estimated fee increases to small entities in the FRFA. The full detailed analysis is found in the

---

[302] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[303] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

[304] H–1Bs accounted for about 79% of the entities in the random sample.

[305] The average economic impact on these 45 small entities was 0.11 percent.

[306] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19, SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[307] The average economic impact on these 36 small entities was 0.20 percent.

stand-alone SEA in the docket of this final rulemaking, tables 6 through 10 for all I–129 classifications impacts.

*Comment:* A commenter stated that the proposed fees will have a significant impact on small businesses and DHS incorrectly calculated impacts to small entities because:

• It used gross income of filers as reported on Forms I–129 and I–140 instead of net income.

• It does not consider the impact of additional fees that can be accumulated from premium processing or hiring temporary workers for seasonal jobs.

• Fees would impede small or nonprofit entities' ability to compete with larger entities, hiring and economic growth.

• Many small employers pay for immigration fees of the family members of workers.

• Small businesses will have to file multiple H–1B petitions for workers that move outside of a Metropolitan Statistical Area.

*Response:* DHS disagrees that its calculations to estimate the economic impacts of the fee increases on small entities are incorrect. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [308] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities. [309][310] DHS believes this measure is the most useful for the FRFA, based on the available revenue data for the relevant small entities. Additionally, DHS has no data that would indicate that the fees in this rule would impede small or nonprofit entities' ability to compete with larger entities in their hiring and economic growth and the commenter provided no study or empirical data to support that assertion.

*Comment:* Several commenters opposing the proposed Asylum Program Fee wrote:

○ USCIS' analysis of the cumulative effect of the increased fees for the Form I–129 and Form I–140 on small

businesses in Section X.B of the rule was done specifically in the context of small entities, and it does not assess the full scope of the cumulative effects of the proposed fee increases, which the commenter interpreted as a punitive effect on employers who file both forms.

○ Small businesses are less able to pay these fees than large firms, but this fee increase relies mostly on fees levied to small businesses, which contradicts the premise of the program by shifting the burden to those who cannot afford these new costs.

○ Many small businesses would not have the ability to pay for all the petitions they need to file to meet their workforce needs.

○ The Asylum Program Fee disproportionately impacts small and medium sized businesses that may experience staffing shortfalls, for which Congress designed temporary and permanent worker programs to fill.

○ Passing asylum program expenses to other immigrants would only reduce demand for immigration benefits. This would result in a decrease in funding sufficient to provide a long-term solution to the asylum backlog. Additionally, increasing fees will result in fewer immigrants with the necessary resources to obtain or rectify their status.

○ USCIS ignores the impact this fee would have on small businesses who will pay this fee, and thus risks creating an arbitrary and capricious rule.

○ DHS fails to address differences between large petitioners and smaller employers and relies on a false presumption that employers of all sizes are equally situated to bear the financial burden of the fee increases.

○ The proposal is arbitrary and capricious and an unreasonable action without consideration of the facts.

○ Small businesses are already struggling to support their immigrant employees and they may be unable to pay these filing fees, which in turn may raise questions related to hiring discrimination.

*Response:* DHS's rule in no way is intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS does not have data that would indicate that the fees in this rule would result in fewer immigrants being able to obtain or rectify their status. However, as explained in the preamble responding to comments specific to Forms I–129 and I–140, and the Asylum Program Fee, DHS has reduced fees for Forms I–129 and reduced the Asylum Program Fee for small employers and nonprofit entities. See 8 CFR 106.

c. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments.

A comment was submitted by the Chief Counsel for Advocacy of the U.S. Small Business Administration (Advocacy). Advocacy outlined several concerns and recommendations in its public comment:

• The IRFA erroneously states that small entities will not have significant costs from this rule. The IRFA is deficient and underestimates the economic impact of this rule on small entities, as the rule will be detrimental to thousands of small businesses, undermining their sustainability and competitiveness.

• The IRFA incorrectly averages all industries within a visa category and should identify and individually analyze the top industries that use the H–2B visa by six-digit NAICS code, such as landscaping, hotel, restaurant, and forestry industries. Advocacy further suggested that USCIS breakdown these industries by firm size to assess the impact of the rule on different sized small entities.

• The sample size used in the IRFA to analyze small businesses is too small and is not a representative sample across affected entities by industry. Further, the sample should be randomized based on clear stratification sectors. Advocacy also suggested that USCIS use publicly available economic data of small entities in affected industries from the U.S. Census Bureau to supplement its analysis.

• The number of small nonprofit entities is underestimated. Advocacy suggested that there are many more NAICS codes that could be used, which may include small nonprofits, including theater companies, dance companies, and performing arts.

• USCIS' economic analysis underestimates the compliance costs from the proposed rule, stating that small businesses are less able to pay the fees for temporary visas and the Asylum Program Fee, but the proposed fee increases rely mostly on fees levied to the small business community.

• An RFA analysis requires a detailed categorization of economic impacts by different sizes of small businesses within affected industries, but USCIS used average revenues of all small entities, which underestimates the impact of the proposed rule on the smallest businesses and nonprofits.

---

[308] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed Dec. 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[309] DHS has used this same measure of impact in previous fee rules. *See* 81 FR 73292 (Oct. 24, 2016); 85 FR 46900 (Aug. 3, 2020).

[310] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19. SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis.

○ The proposed fees will be significant for smaller farm operations that rely upon the H–2A visa as their primary workforce.

○ Small seasonal H–2B employers with low revenues and profit margins will be unable to afford the proposed fees.

○ The proposed rule would hinder innovative start-ups that use the H–1B visa from obtaining needed staff in niche areas where there are few American workers.

○ Small nonprofit employers, such as arts groups, do not have the discretionary funds to pay the proposed fees and Asylum Program Fee surcharge.

● The cost estimates in the IRFA are underestimated because the proposed limit of 25 named workers per petition was not incorporated. For example, an H–2B employer who currently files one petition for 150 named workers would need to file 6 petitions in the proposed rule. The entity would also be paying the Asylum Program Fee surcharge six times.

○ The IRFA underestimates the number of petitions that H–2A visa employers could file including (a) additional petitions due to the 25 named workers limit, (b) duplicate fees for the same group of workers in the same season, (c) continuing yearly costs for employers, and (d) the impact of the conflicting recent DOL final rule on Adverse Effect Wage Rates [311] that would separate H–2A visa jobs and potentially require small farms and ranches to submit more petitions.

○ Small businesses utilizing the H–2B visa would be facing increased costs if they (a) file multiple petitions because of the lottery process, (b) filed for an extension of a few weeks for these workers, (c) obtain supplemental visa petitions to obtain returning workers, and (d) transfer workers between winter and summer seasons.

○ The cost estimates of the registration fee for the H–1B visa lottery are underestimated in the IRFA. USCIS does not adjudicate registrations received through the H–1B registration process because it is automated and the IRFA only estimated the registration costs for small businesses if they obtain a visa. However, the lottery selection rate was 26 percent in FY2023.

○ The IRFA fails to capture the cumulative yearly costs for an employer filing an H–1B petition for a worker because the petition allows a stay for up to 3 years and can be extended another

3 years with another petition. Further, an employer would face increased costs if it were to amend the employment terms of the worker or petition the same worker to stay permanently with an I–140 petition.

○ USCIS has failed to analyze the numbers of entities and economic impacts of this rule on O & P visa small employers and nonprofits. The proposed rule would significantly multiply the number and costs of obtaining these visas and shut out these small entities from international talent.

● The IRFA does not consider regulatory alternatives as required by the RFA sec. 603(c).

● USCIS should consider establishing tiered general fees and asylum fees, which can be based on revenue size or employees, to minimize the economic impact of the proposed rule on the smallest businesses.

● USCIS should consider limiting the frequency and number of asylum fee payments, particularly for the same worker.

● USCIS should consider establishing a lower tier of pricing for general fees and asylum fees for small nonprofit entities.

● For small employers utilizing the H–2A, H–2B, O, and P visas, USCIS should consider increasing the limit on the number of workers per petition to 50 instead of 25.

*Response:* DHS respectfully disagrees with Advocacy, that we failed to comply with the RFA requirements and should publish a Supplemental Initial Regulatory Flexibility Analysis. DHS emphasizes that it has followed the written requirements of the RFA when conducting both the IRFA and FRFA and also reviewed the guidelines [312] provided by the SBA Office of Advocacy to complete both the IRFA and FRFA. The RFA does not require highly prescriptive quantitative analysis. For example, when conducting an IRFA, the RFA simply requires "a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule [313] . . .". In addition, the RFA does not require quantification of impacts when preparing an IRFA or FRFA when the preparing agency believes such quantification is not practicable or reliable,[314] although DHS did provide such quantification when possible. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS also acknowledges in this FRFA and supplemental SEA that the rule will

have a significant economic impact on some small entities. DHS analyzed and updated the FRFA using the same methodology as the IFRA, to analyze the economic impact of fee changes made in the final rule on small entities, for all I–129 classifications and forms listed above. DHS presented evidence through its IRFA analysis, in the NPRM by sampling and estimating the impacts compared to the threshold of 1 percent of revenue, to determine if the final rule will have a significant economic impact on affected small entities. DHS has no evidence, nor has Advocacy provided any evidence to show that this rule will be detrimental to thousands of small businesses by making it cost prohibitive for small businesses and small nonprofits to hire necessary staff, shut them out of vital immigration programs, or undermine their sustainability and competitiveness. DHS has discussed related issues in-depth in both the supplemental RIA (price elasticity) and the comprehensive economic impacts relating to the various fees in SEA and we refer Advocacy to these analyses where a detailed analysis is available. DHS's rule is not intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services because USCIS must fund itself through fees unless it receives a congressional appropriation to do so.

DHS disagrees with Advocacy that USCIS' IRFA failed to identify affected small business industries, underestimates the number of small nonprofit entities, underestimates the economic impact of this rule and that it did not consider regulatory alternatives that minimize the impact of this rule on small entities. DHS respectfully points Advocacy to the detailed SEA that clearly illustrates that DHS identified affected small businesses by NAICS code in its analysis. In the IRFA, USCIS used a statistically valid sample size that drew a large enough population to observe the impacts to small entities/industries with the associated fee increases. The statistically valid sample that DHS conducted (see SEA, Section 3—Source and Methodology) used business and open-access databases to match from NAICS code, revenue and employee count for each entity in the sample. As a result of the Advocacy comments, USCIS increased the sample sizes to address concerns the IRFA samples were too small. A list of NAICS codes for each entity matched in Forms I–129, I–140, I–910 and I–360 can be

[311] U.S. Department of Labor, Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States, 88 FR 12760 (Feb. 28, 2023).

[312] SBA Guide How to Comply with the RFA.
[313] See Section 603(b)(4) of the RFA.
[314] See Section 607 of the RFA.

found in Appendix A, along with the SBA small entity threshold for each industry cluster.[315]

To determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue, and some based on the number of employees. In cases where the matched entity was a direct subsidiary, DHS recorded data for the parent organization. In cases where the entity was a single-location franchise, DHS recorded the single location's data. Once entities were matched, those that had relevant data were compared to the size standards provided by the SBA to determine whether they were small or not. Those that could not be matched or compared were assumed to be small under the presumption that non-small entities would have been identified by one of the databases at some point in their existence. As detailed in the proposed rule preamble, and IRFA section, USCIS stated alternatives to the proposed fees, and the likely impacts to applicant, petitioners, and to USCIS.

Based on public comments including Advocacy's, DHS has taken steps to further improve its analyses and has made changes to the final rule within the FRFRA and SEA. DHS has increased (tripled) the sample size for the Form I–129 analysis. This expanded sample size will encompass even more small entities and nonprofits in the various visa classifications including H–2A, H–2B, H–3, O, P, L, Q, R, E, TN, and CW, in addition to the H–1B classification. DHS has also updated the Form I–129 section of the SEA by categorizing the economic impacts of small businesses within industries for the various visa classifications. In doing so, USCIS has identified the top industries that use the various visas by six-digit NAICS code. Additionally, DHS has revised the FRFRA to incorporate the full estimated fee increases to small entities that file Form I–129 by accurately counting the number of petitions filed for petitions with named beneficiaries. The full analysis is found in the stand-alone SEA in the docket of the final rulemaking. The results of the final rule's SEA with a larger sample size are like the results of the proposed rule's SEA. In general, the fee increases are not economically significant to a substantial number of

small entities. However, DHS does recognize and acknowledges that the fee increases may affect some small entities.

USCIS considered the various concerns raised by Advocacy that suggested that the new fees in this rule would cause indirect secondary, tertiary and downstream economic impacts on many facets of the U.S. that were not accounted for in the analysis of the proposed rule. Advocacy repeated the concerns of many other commenters about the fees exacerbating the effects of inflation on consumers and the COVID–19 pandemic, increasing costs for farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, and exacerbating the plight of nationals of certain countries such as India and China. DHS analyzed the effects of the new fees and accounted for the direct costs of the fees as required by the RFA and applicable Executive Orders and our data indicates that the fees will not have the deleterious effects on multiple parts of U.S. economy that Advocacy and commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing relief to nonprofits and small employers in this final rule.

d. A Description of and an Estimate of the Number of Small Entities To Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available

Below is a summary of the SEA. The complete detailed SEA is available in the rulemaking docket at *https://www.regulations.gov*. The SEA has a full analysis of small entities sampled for each form described below, in the FRFRA.

Entities affected by the final rule are those that file and pay fees for certain immigration benefit requests on behalf of a foreign national. These petitions/applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; Form I–956 (formerly Form I–924), Application for Regional Center Designation Under the EB–5 Regional Pilot Program, Form I–956F, Application for Approval of an Investment in a Commercial Enterprise (formerly Form I–924 amendment) and Form I–956G (formerly Form I–924A), Regional Center Annual Statement. Annual numeric estimates of the small entities impacted by this fee increase

total (in parentheses): Form I–129 (84,814 entities), Form I–140 (14,440 entities), Form I–910 (500 entities), and Form I–360 (1,566 entities).[316] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities and therefore, does not provide numeric estimates for Form I–956, Form I–956G, or Forms G–1041 and G–1041A.[317]

The rule applies to small entities, including businesses, nonprofit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140 would see a few industry clusters impacted by this rule (see Appendix B through E of the SEA for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360). The fee for civil surgeon designation would apply to physicians requesting such designation. Any entity petitioning on behalf of a religious worker and filing Form I–360 would pay a fee. Finally, DHS is creating new forms as stated above, as part of the EB–5 Reform and Integrity Act of 2022. Since Form I–956/I–956F/I–956G will be new forms and historical data does not exist; therefore, DHS will use historical data of the previous Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and Form I–924A, Annual Certification of Regional Center, as a proxy for the analysis. The Form I–956 would impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–956 is also Form I–956F and Form I–956G. I–956F regional centers must file to obtain approval of an Investment in a Commercial Enterprise. Approved regional centers must file I–956G annually to establish continued eligibility for regional center designation.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[318] If professional genealogists and researchers submitted

---

[315] SBA size standards effective May 2, 2022, located at *https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf* (last visited Oct. 1, 2023).

[316] Calculation: 100,135 Form I–129 × 84.7% = 84,814 small entities; 27,093 Form I–140 × 54.3% = 14,440 small entities; 500 Form I–910 × 100% = 500 small entities; 1,648 Form I–360 × 95.0% = 1,566 small entities.

[317] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

[318] *See* "Establishment of a Genealogy Program," 73 FR 28026 (May 15, 2008).

003306

such requests in the past, they did not identify themselves as commercial requestors and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

(1) Petition for a Nonimmigrant Worker, Form I–129 Funding the Asylum Program With Additional Fee To Be Paid by Form I–129 Requestors

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[319] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the benefit

request fee requestors must pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will have different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, requestors can file petitions or applications for many different types of nonimmigrant workers. DHS will have separate H–2A and H–2B fees for petitions with named workers and unnamed workers. DHS will limit the number of named beneficiaries that may be included on a single petition for H–2A, H–2B, O, H–3, P, Q and R workers to 25. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with

each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with fewer beneficiaries who effectively subsidize the cost of petitioners filing petitions with more beneficiaries. USCIS data indicate that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. Therefore, the establishment of different fees will better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification.

DHS will charge Form I–129 petitioners a form fee, registration fee (H–1B only), CNMI Educational Fund fee (I–129 CW only)[320] and an Asylum Program Fee. A summary of the fees in the final rule is shown in Table 12a,b below. DHS will establish new fees to be paid by employers who file either a Form I–129 or Form I–129CW based on the number of FTE workers the small entity employs and its nonprofit status. Small entities will pay the associated fee for the visa classification benefit request according to whether it is a:

(1) Small entity with greater than 25 FTE employees,

(2) Small entity with 25 or fewer FTE employees, or

(3) Nonprofit small entity.

| Table 12a. Form I-129 Entities by Visa Classifications (Matched and Unmatched) | | | | | |
|---|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Entities with 25 or fewer FTE Employees** | **Entities with more than 25 FTE Employees** | **Entities with Unknown Employees** | **Total Number of Entities** | **Total Nonprofit Entities** |
| H-1B | 949 | 556 | 1,362 | 2,867 | 107 |
| H-2A | 43 | 2 | 106 | 151 | 1 |
| H-2B | 13 | 6 | 26 | 45 | 0 |
| O | 57 | 41 | 113 | 211 | 9 |
| L-1A / L-1B / LZ | 86 | 102 | 238 | 426 | 2 |
| H-3/P/Q/R/HSC/E/TN/CW | 92 | 69 | 161 | 322 | 7 |
| **Total Number of Entities** | **1,240** | **776** | **2,006** | **4,022** | **126** |

Source: USCIS Analysis

Note:
Matched entities have reported revenue and employment data, while unmatched entities have no reported revenue or employment data.

---

[319] *See* 8 CFR 106.2(c)(13).

[320] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only

transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of

the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers.

Each H–1B registration will require a $215 registration fee.[321] Petitioners filing H–1B petitions that are not subject to the annual H–1B numerical allocations (*e.g.*, extension petitions or cap-exempt filer petitions) would not have to submit a registration and thus would not pay the registration fee. The Asylum Program Fee ($0 for nonprofits, $300 for small employers with 25 or fewer employees, and $600 for all others filing Forms I–129, Petition for a Nonimmigrant Worker, I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and I–140, Immigrant Petition for Alien Workers) will be included with each Form I–129 classification (if applicable) and will apply to all fee-paying receipts for Forms I–129 and I–129CW. For example, it will apply to all initial petitions, changes of status, and extensions of stay that use Form I–129.

| Table 12b. Fee Summary Table for Form I-129 Petitioners (Matched Only) | | | | |
|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Small Entities with more than 25 FTE Employees** | **Small Entities with 25 or Fewer FTE Employees** | **Nonprofit Small Entities** | **Registration fee for cap-subject H-1B visas** |
| *Number of entities in impact analyses with reported revenue and employment data* | 302 | 876 | 14 | |
| H-1B | $995* | $675* | $675* | $215 |
| H-2A – Named Beneficiaries | $1,090 | $545 | $545 | |
| H-2B – Named Beneficiaries | $1,080 | $540 | $540 | |
| H-2A – Unnamed Beneficiaries | $530 | $460 | $460 | |
| H-2B – Unnamed Beneficiaries | $580 | $460 | $460 | |
| O-1/O-2 | $1,055 | $530 | $530 | |
| L-1A/L-1B/LZ Blanket | $1,385 | $695 | $695 | |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,015 | $510 | $510 | |
| Asylum Program Fee | $600 | $300 | $0 | |

Note: *The H-1B fee includes the antecedent $215 registration fee that is paid before filing the Form I-129 for cap-subject H-1B visas. This H-1B Registration fee is separate from the I-129H-1B form fee. Note: The CW fee includes a $30 CNMI Educational Fund fee; however, the fee is not included in this analysis because the five entities in the sample that petitioned for a CW nonimmigrant worker visa had no reported revenue data and thus an economic impact could not be estimated.
Note: Asylum Program Fee applies to all Form I-129 petition visa classifications.

The fees are calculated below to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker by small entity size and nonprofit status.

(1) Small Entities With More Than 25 FTE Employees

DHS will increase the fees paid for all worker types for small entities with more than 25 FTE employees filing Form I–129 from the current filing fee of $460. For H–1B petitions, the registration fee ($215) is added to the base form fee ($780) to make $995. The Asylum Program Fee of $600 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall fee for cap-subject H–1B classification petitions of $1,595 ($995+ $600). The fee adjustments and percentage increases are summarized in Table 13.

---

[321] USCIS in this SEA used the H–1B I–129, Petition for a Nonimmigrant Worker fee of $995. This fee includes the $780 proposed fee for H–1B Classification and the $215 fee for H–1B Registration (current $10 to $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H–1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H–1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H–1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $780 fee. *See* 84 FR 60307 (Nov. 8, 2019); Regulatory Impact Analysis in the docket on *regulations.gov*, Section (3)(H) Separate Fees for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted up to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H–1B petitions. The H–1B registration applies to small entities and non-profits with no difference on employee size.

**Table 13. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with More than 25 FTE Employees**

| Visa Classification Immigration Benefit Request | A Current Fee | B Final Fee | C Asylum Program Fee | D Total Final Fee | E Difference in Fee Increase | F Percent Change |
|---|---|---|---|---|---|---|
| | | | | D=B+C | E=D-A | F=(D−A)/A |
| H-1B | $470 | $995 | $600 | $1,595 | $1,125 | 239.4% |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 | $1,230 | 267.4% |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 | $1,220 | 265.2% |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 | $670 | 145.7% |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 | $720 | 156.5% |
| O-1/O-2 | $460 | $1,055 | $600 | $1,655 | $1,195 | 259.8% |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 | $1,525 | 331.5% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 | $1,155 | 251.1% |

Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $780 base fee and a $215 registration fee ($780 + $215 = $995).

To calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported sales revenue of that entity.[322] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee increase ($205) is added to the base form fee increase ($780) and results in an overall increase for H–1B classification petitioners of $995. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity.

DHS determined that 302 of the 1,643 matched small entities searched, were small entities with more than 25 FTE employees.[323] Depending on the immigration benefit request, the average economic impact on these 302 small entities with revenue and employment data ranges from 0.01 to 0.59 percent as shown in Table 14a. Among the 302 small entities with reported revenue and employment data, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent. Table 14b shows the count of small entities with more than 25 FTE employees by Form I–129 Classification and their economic impacts. Those small entities with

greater than 1 percent impact were mostly H–1B filers (18 of 27) that filed multiple petitions and collectively had well below average reported revenues compared to the average revenue for all 302 small entities.[324] The average economic impact from the registration fee on all 241 H–1B filers was 0.06 percent; the greatest economic impact was 1.35 percent, and the smallest was 0.0004 percent. The average impact on the 302 small entities with revenue data were 0.33 percent. The greatest economic impact imposed by the fee changes on all 302 small entities with more than 25 FTE employees was 7.06 percent and the smallest was 0.002 percent per entity.

[322] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[323] Entities in the population without complete or with no EIN information (such as incomplete

employee data or revenue information), were removed before the sample was selected for this analysis.

[324] The number of H–1B petitions filed by these 18 entities ranged from 4 to 411. The average annual revenue reported by these 18 entities was $4.9 million whereas the average annual revenue

for all 302 entities in the sample was $11.9 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 18 entities that filed multiple petitions.

003309

**Table 14a: Form I-129 Classifications Economic Impacts on Small Entities with More than 25 FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $995 | 0.31% |
| H-2A – Named Beneficiaries | $1,230 | 0.02% |
| H-2B – Named Beneficiaries | $1,220 | 0.32% |
| H-2A – Unnamed Beneficiaries | $670 | 0.01% |
| H-2B – Unnamed Beneficiaries | $720 | 0.18% |
| L-1A/L-1B/LZ Blanket | $1,195 | 0.29% |
| O-1/O-2 | $1,525 | 0.38% |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,155 | 0.59% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $780 base fee increase and a $205 registration fee increase ($780 + $205 = $995).

**Table 14b: Count of Small Entities with More than 25 FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 223 | 18 | 241 |
| H-2A – Named Beneficiaries | 1 | 0 | 1 |
| H-2B – Named Beneficiaries | 3 | 1 | 4 |
| L-1A/L-1B/LZ Blanket | 23 | 3 | 26 |
| O-1/O-2 | 11 | 2 | 13 |
| CW, H-3, HSC, E, TN, Q, P, and R | 14 | 3 | 17 |
| **Total** | **275** | **27** | **302** |

Source: USCIS analysis.

(2) Small Entities With 25 or Fewer FTE Employees

DHS will increase the base form fee filed for all worker types for small entities with 25 or fewer FTE employees filing Form I–129 from the current base filing fee of $460, apart from H–1B, H–2A-Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries. For H–1B petitions, the registration fee ($215) is added to the base form fee ($460), totaling $675. The Asylum Program Fee of $300 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall increase for cap-subject H–1B classification petitions of $975 ($675 + $300). The fee adjustments and percentage increases are summarized, shown in Table 15.

**Table 15. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with 25 or Fewer FTE Employees**

| Visa Classification Immigration Benefit Request | A Current Fee | B Final Fee | C Asylum Program Fee | D Total Final Fee D=B+C | E Difference in Fee Increase E=D-A | F Percent Change F=(D−A)/A |
|---|---|---|---|---|---|---|
| H-1B | $470 | $675 | $300 | $975 | $505 | 107.4% |
| H-2A – Named Beneficiaries | $460 | $545 | $300 | $845 | $385 | 83.7% |
| H-2B – Named Beneficiaries | $460 | $540 | $300 | $840 | $380 | 82.6% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $300 | $830 | $370 | 80.4% |
| O-1/O-2 | $460 | $695 | $300 | $995 | $535 | 116.3% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $300 | $810 | $350 | 76.1% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increases, DHS estimated the total costs associated with the final fee increase for each small entity with 25 or fewer FTE employees and divided that amount by the sales revenue of that entity.[325] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall fee for H–1B classification petitions of $505 ($300 + $205). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 876 of the 1,643 entities searched, were small entities with fewer than 25 FTE employees.[326]

**Table 16a: Form I-129 Classifications Economic Impacts on Small Entities with 25 or Fewer FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $505 | 0.45% |
| H-2A – Named Beneficiaries | $385 | 0.21% |
| H-2B – Named Beneficiaries | $380 | 0.08% |
| H-2A – Unnamed Beneficiaries | $300 | 0.16% |
| H-2B – Unnamed Beneficiaries | $300 | 0.06% |
| L-1A/L-1B/LZ Blanket | $370 | 0.16% |
| O-1/O-2 | $535 | 0.21% |
| CW, H-3, HSC, E, TN, Q, P, and R | $350 | 0.14% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $300 base fee increase and a $205 registration fee increase ($300 + $205 = $505).

Depending on the immigration benefit request, the average economic impact on the 876 small entities with revenue and employment data ranges from 0.06 to 0.45 percent as shown in Table 16a. The average economic impact on all 876 small entities was 0.39 percent. Table 16b shows that among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 195 (10.8 percent) experienced an economic impact greater than 1 percent. Those small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 195) that mostly filed multiple petitions and collectively had well below average reported revenues compared to the

---

[325] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[326] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

average revenue for all 876 small entities.[327] The average economic impact from the registration fee on all 682 H–1B filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent. The greatest economic impact imposed by the fee changes on all 876 small entities with 25 or fewer FTE employees was 4.21 percent, and the smallest was 0.003 percent per entity.

| Table 16b: Count of Small Entities with 25 or Fewer FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact. | | | |
|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Economic Impact Less than 1 percent** | **Economic Impact Greater than 1 percent** | **Total** |
| H-1B | 591 | 91 | 682 |
| H-2A – Named Beneficiaries | 35 | 0 | 35 |
| H-2B – Named Beneficiaries | 12 | 0 | 12 |
| L-1A/L-1B/LZ Blanket | 51 | 2 | 53 |
| O-1/O-2 | 31 | 1 | 32 |
| CW, H-3, HSC, E, TN, Q, P, and R | 61 | 1 | 62 |
| **Total** | **781** | **95** | **876** |
| Source: USCIS analysis. | | | |

(3) Nonprofit Small Entities

DHS will increase the base fee filed for all worker types for nonprofit small entities filing Form I–129 from the current base filing fee of $460, except for H–1B, H–2A–Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries.[328] For H–1B petitions, the registration fee ($215) is added to the base fee ($460) and results in an overall fee for cap-subject H–1B classification petitions of $675. Nonprofit small entities are exempt from paying the Asylum Program Fee. The fee adjustments and percentage increases are summarized, shown in Table 17.

| Table 17. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Nonprofit Small Entities | | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| **Visa Classification Immigration Benefit Request** | **Current Fee** | **Final Fee** | **Asylum Program Fee** | **Total Final Fee** | **Difference in Fee Increase** | **Percent Change** |
| | | | | D=B+C | E=D-A | F=(D–A)/A |
| H-1B | $470 | $675 | $0 | $675 | $305 | 43.6% |
| H-2A – Named Beneficiaries | $460 | $545 | $0 | $545 | $85 | 18.5% |
| H-2B – Named Beneficiaries | $460 | $540 | $0 | $540 | $80 | 17.4% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $0 | $530 | $70 | 15.2% |
| O-1/O-2 | $460 | $695 | $0 | $695 | $235 | 51.1% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $0 | $510 | $50 | 10.9% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P—1, P—1S, P—2, P—2S, P—3, P—3S, R1, E—1, E—2, E—3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increase, DHS estimated the total costs associated with the final fee increase for each nonprofit small entity and divided that amount by the sales revenue of that entity.[329] H–1B

---

[327] The number of H–1B petitions filed by these 91 entities ranged from 1 to 60 (86 of 91 entities filed five or more H–1B petition). The average annual revenue reported by these 91 entities was $0.6 million whereas the average annual revenue for all 876 entities in the sample was $2.5 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 91 entities.

[328] Nonprofits in this analysis include entities that identify with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business

Associations), and 813930 (Labor Unions and Similar Labor Organizations).

[329] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Since there was no increase in the H–1B form fee for nonprofit small entities, the $205 registration fee is the only increase for these petitioners. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 14 of the 1,643 entities searched were nonprofit small entities.[330]

All 14 of these nonprofit small entities petitioned for H–1B workers; there were no recorded petitions for the other classifications. Table 18 shows that the average economic impact on the 14 entities was 0.23 percent. All 14 nonprofit small entities experienced an economic impact of less than 1 percent. The average economic impact from the registration fee on all 14 H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent. The greatest economic impact imposed by the fee changes on all 14 nonprofit small entities was 0.82 percent and the smallest was 0.003 percent per entity.

**Table 18: Form I-129 Classifications Economic Impacts on Nonprofit Small Entities with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $205 | 0.23% |
| H-2A – Named Beneficiaries | $85 | N/A |
| H-2B – Named Beneficiaries | $80 | N/A |
| H-2A – Unnamed Beneficiaries | $0 | N/A |
| H-2B – Unnamed Beneficiaries | $0 | N/A |
| L-1A/L-1B/LZ Blanket | $70 | N/A |
| O-1/O-2 | $235 | N/A |
| CW, H-3, HSC, E, TN, Q, P, and R | $50 | N/A |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase only includes the $205 registration fee increase because the base fee was unchanged.

(4) Impacts by NAICS Code

DHS analyzed the average economic impact imposed by the fee increases on the 1,643 small entities with reported sales revenue data by NAICS code. Table 19 shows the top 10 NAICS industries that use the Form I–129 for all classifications by the number of petitions filed during FY 2022 and the average impact on those entities. All the top 10 NAICS industries that use Form I–129 experienced an economic impact of less than 1.0 percent of revenue.

---

[330] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

| Table 19. Top 10 Industries that Use the Form I-129 by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 541618-Other Management Consulting Services | 303 | 0.87% |
| 541211-Offices of Certified Public Accountants | 748 | 0.82% |
| 541512-Computer Systems Design Services | 260 | 0.60% |
| 541511-Custom Computer Programming Services | 1,880 | 0.50% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 306 | 0.49% |
| 541611-Administrative Management and General Management Consulting Services | 227 | 0.35% |
| 541612-Human Resources Consulting Services | 422 | 0.35% |
| 518210-Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services | 258 | 0.26% |
| 513210-Software Publishers | 1,721 | 0.22% |
| 541330-Engineering Services | 309 | 0.17% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) database (Jan. 31, 2023). | | |

The top NAICS industries that utilize the Form I–129 for H–1B [331] classification experienced an economic impact of less than 1.0 percent of revenue in the analysis (Table 20).

---

[331] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., ''H–1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models,'' *https:// www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations* (last updated Sept. 15, 2023).

| Table 20. Top 10 Industries that Use the Form I-129 for H-1B by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 621111-Offices of Physicians (except Mental Health Specialists) | 15 | 0.38% |
| 541612-Human Resources Consulting Services | 7 | 0.29% |
| 541511-Custom Computer Programming Services | 28 | 0.20% |
| 541600-Management, Scientific, and Technical Consulting Services | 9 | 0.14% |
| 541330-Engineering Services | 20 | 0.11% |
| 541990-All Other Professional, Scientific and Technical Services | 6 | 0.06% |
| 621210-Offices of Dentists | 6 | 0.06% |
| 561400-Business Support Services | 17 | 0.05% |
| 541618-Other Management Consulting Services | 6 | 0.04% |
| 513210-Software Publishers | 9 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

The top NAICS industries that use Form I–129 H–2A [332] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 21).

| Table 21. Top Industries that Use the Form I-129 H-2A for Named Beneficiaries by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 445230-Fruit and Vegetable Retailers | 3 | 0.35% |
| 111998-All Other Miscellaneous Crop Farming | 26 | 0.30% |
| 112111-Beef Cattle Ranching and Farming | 4 | 0.15% |
| 111991-Sugar Beet Farming | 2 | 0.10% |
| 112990-All Other Animal Production | 1 | 0.08% |
| 115111-Cotton Ginning | 4 | 0.02% |
| 115113-Crop Harvesting, Primarily by Machine | 3 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

Most of the top NAICS industries that use the Form I–129 H–2B [333] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 22). One of the top NAICS industries experienced an impact of greater than 1.0 percent.

[332] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2A Temporary Agricultural Workers," available *https:// www.uscis.gov/working-in-the-united-states/ temporary-workers/h-2a-temporary-agricultural- workers* (last updated Nov. U.S. Dep't of Homeland

Security, "H–2A Temporary Agricultural Workers," *https://www.uscis.gov/working-in-the-united-states/ temporary-workers/h-2a-temporary-agricultural- workers* (last updated Nov. 8, 2023).

[333] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2B Temporary Non-

Agricultural Workers," *https://www.uscis.gov/ working-in-the-united-states/temporary-workers/h- 2b-temporary-non-agricultural-workers* (last updated Jan. 12, 2024).

| Table 22. Top Industries that Use the Form I-129 H-2B for Named Beneficiaries by Six-Digit NAICS Code. | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 713930-Marinas | 3 | 1.14% |
| 112512-Shellfish Farming | 1 | 0.31% |
| 111421-Nursery and Tree Production | 2 | 0.26% |
| 541940-Veterinary Services | 1 | 0.05% |
| 561730-Landscaping Services | 11 | 0.06% |
| 236220-Commercial and Institutional Building Construction | 4 | 0.03% |
| 444240-Nursery, Garden Center, and Farm Supply Retailers | 1 | 0.01% |
| 561400-Specialized Design Services | 1 | 0.01% |
| 484110-General Freight Trucking, Local | 1 | 0.01% |

Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

For Form I–129 (O [334] and P [335] classifications), among the 1,643 small entities with reported revenue data identified in the SEA, most of the top industries by NAICS code experienced an economic impact of considerably less than 1.0 percent of revenue in the analysis. Three of the top NAICS industries experienced an impact of greater than 1.0 percent (Table 23).

[334] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "O–1 Visa: Individuals with Extraordinary Ability or Achievement," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/o-1-visa-individuals-with-extraordinary-ability-or-achievement* (last updated Mar. 3, 2023).

[335] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1A Athlete," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1a-athlete* (last updated Mar.

26, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1B A Member of an Internationally Recognized Entertainment Group," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1b-a-member-of-an-internationally-recognized-entertainment-group* (July 19, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–2 Individual Performer or Part of a Group Entering to Perform Under a Reciprocal Exchange Program," *https://www.uscis.gov/working-in-the-united-states/*

*temporary-workers/p-2-individual-performer-or-part-of-a-group-entering-to-perform-under-a-reciprocal-exchange-program* (Feb. 24, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–3 Artist or Entertainer Coming to Be Part of a Culturally Unique Program," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-3-artist-or-entertainer-coming-to-be-part-of-a-culturally-unique-program* (last visited Feb. 24, 2021).

| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
|---|---|---|
| 721310-Rooming and Boarding Houses, Dormitories, and Workers' Camps | 35 | 1.73% |
| 112120-Dairy Cattle and Milk Production | 6 | 1.55% |
| 541890-Other Services Related to Advertising | 4 | 1.05% |
| 236115-New Single-family Housing Construction (Except For-Sale Builders) | 18 | 0.54% |
| 622210-Psychiatric and Substance Abuse Hospitals | 7 | 0.37% |
| 621511-Medical Laboratories | 8 | 0.34% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 23 | 0.24% |
| 516120-Television Broadcasting Stations | 5 | 0.15% |
| 621493-Freestanding Ambulatory Surgical and Emergency Centers | 6 | 0.09% |
| 523940-Portfolio Management and Investment Advice | 5 | 0.08% |

**Table 23. Top Industries that Use the Form I-129 (O&P) by Six-Digit NAICS Code.**

Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

*Small Entity Classifications*

With an aggregated total of 4,022 small entities out of a sample size of 4,746 entities, DHS inferred that 84.7 percent of the entities filing Form I–129 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations) were not-for-profit. Most of the sample consisted of small businesses when looked at by type of small entity. There are 4 small governmental jurisdictions in the sample and 126 small not-for-profits.

(2) Immigrant Petition for an Alien Worker, Form I–140

*a. Funding the Asylum Program With Form I–140 Petition Fees*

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file a Form I–140, Immigrant Petition for Alien Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[336] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will increase fees for Form I–140 from $700 to $715, an increase of 2 percent ($15). The total fees for each entity in the analysis will include the I–140 form fee and the relevant Asylum Program Fee. The Asylum Program Fee will be dependent on the number of FTE employees and nonprofit status of the entity. Hence, calculation of fees in this analysis will be as follows:

• The total fee for small entities that employ more than 25 FTE workers will include the $600 Asylum Program Fee

for a total of $1,315 ($715 + $600). This is an overall increase of $615 (88 percent) per petition, from current costs of $700.

• The total fee for small entities that employ 25 or fewer FTE employees will include the $300 Asylum Program Fee for a total of $1,015 ($715 + $300), an overall increase of $315 (45 percent) per petition, from current costs of $700.

• The total fee for nonprofit small entities will consist of only the I–140 form fee as there are no Asylum Program Fees to be paid by nonprofit entities. Total fees will be $715, an increase of $15 (2 percent).

To calculate the economic impact of the final rule fees, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[337] Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. DHS identified 126 small entities with reported revenue data in the sample. Of the 126 small entities, 46 had greater than 25 FTE employees and 80 had 25 or fewer FTE

[336] *See* 8 CFR 106.2(c)(13).

[337] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

**6372** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

employees. There were no nonprofit small entities with reported revenue data in the sample. All 46 small entities with greater than 25 FTE employees experienced an economic impact of less than 1 percent. The average impact on these 46 entities was 0.03 percent. The greatest economic impact imposed by the fees in the final rule was 0.25 percent and the smallest was 0.0001 percent.

For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent, which was the greatest economic impact imposed by the fees in the final rule. The smallest economic impact imposed by the fee increase was 0.002 percent.

a. Small Entity Classification

With an aggregated total of 299 out of a sample size of 550, DHS inferred that most, or 54.3 percent, of the entities filing Form I–140 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form, DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 712110 (Museums), 813319 (Other Social Advocacy Organizations), 813410 (Civic and Social Organizations), 813910 (Business Associations), and 813940 (Political Organizations) were not-for-profit. The sample of Form I–140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 13 small not-for-profits.

b. Cumulative Impact of Form I–129 and Form I–140 Petitions

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine the economic impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN and revenue. Ninety entities had an EIN that overlapped in both samples; there were

59 large entities and 31 small entities that submitted both Form I–129 petitions and Form I–140 petitions.[338] Of the 31 small entities, 8 entities had revenue data reported in databases Data Axle, *Manta.com, Cortera.com,* or *Guidestar.org.*

Three of the 8 overlapping sample entities with revenue data had Form I–129 economic impacts of greater than 1 percent. Of the sample entities that overlapped, 3 entities had Form I–129 economic impacts of 1.95 percent, 6.62 percent, and 6.92 percent, respectively. All 8 overlapping sample entities had Form I–140 economic impacts of less than 1 percent. Although 3 overlapping small entities had Form I–129 economic impacts of greater than 1 percent, USCIS does not expect the combined impacts of Form I–129 and Form I–140 to be an economically significant burden on most small entities. This is due to little overlap in entities in the samples and the mostly minor economic impacts from the Forms I–129 and I–140 fee increases and Asylum Program Fees.

(3) Application for Civil Surgeon Designation, Form I–910

USCIS will increase fees for Form I–910 to $990. This is an increase of 26 percent ($205) from the current fee of $785. To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[339] Because entities can file multiple requests, the analysis considers the number of requests submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. In the sample, 179 matched entities with reported revenues were considered small entities. All 179 small entities experienced an economic impact of less than 1 percent. The greatest economic impact of the increased fees was 0.91 percent, and the smallest was 0.001 percent per entity. The average impact on all 179 small entities with revenue data was 0.05 percent.

---

[338] Total Impact to Entity = (Number of Petitions Submitted per Entity × Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

[339] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue.

a. Small Entity Classification

With an aggregated total of 300 out of a sample size of 300, DHS inferred that most, or 100.0 percent, of the entities filing Form I–910 requests were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), and 813990 (Other Similar Organizations (except Business, Professional, Labor, and Political Organizations)) were not-for-profit. The sample of Form I–910 consisted of all small businesses, with no small governmental jurisdictions in the sample and no small not-for-profits.

(4) Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS will increase the fees for entities that file Form I–360 from $435 to $515, an increase of $80 (18.4 percent). Using the business provider databases, DHS determined that 174 entities matched and were considered small entities. To calculate the economic impact of the increase for each entity, DHS divided the costs associated with the fee increase by the sales revenue of that entity.[340] The results indicated that all 174 small entities with reported revenue data experienced an economic impact well below 1 percent. The greatest economic impact imposed by this final fee change was 0.08 percent and the smallest was 0.001 percent per entity. The average impact on all 174 small entities with revenue data was 0.01 percent.

DHS also analyzed the costs of the final rule on the petitioning small entities relative to the costs of the typical employee's salary. The SBA

---

[340] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/ Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

Guidelines provide that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the small entities in the sector.[341] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $60,180 for clergy,[342] $60,540 for directors of religious activities and education,[343] and $45,420 for other religious workers.[344] Based on an average of 1.29 religious workers [345] petitioned-for per entity, the additional average annual cost will be $103.20 per small entity.[346] The additional costs per small entity in this final rule represents only 0.17 percent of the average annual salary for clergy, 0.17 percent of the average annual salary for directors of religious activities and education, and 0.23 percent of the average annual salary for all other religious workers.[347]

a. Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that most, or 95 percent, of the entities filing Form I–360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 813110 (Religious Organizations), 813410 (Civic and Social Organizations), 813920 (Professional Organizations), and 813990 (Other Similar Organizations except Business, Professional, Labor, and Political Organizations) were not-for-profit. The sample population of Form I–360 consisted mainly of small businesses. There were no small governmental jurisdictions in the sample and 145 small not-for-profits primarily composed of religious institutions.

(5) Genealogy Requests—Genealogy Index Search Request, Form G–1041, Genealogy Records Request, Form G–1041A and Certificate of Non-Existence, Form G–1566

In the final rule, DHS increased the fee for the Genealogy Index Search Request, Form G–1041 and Form G–1041A, from $65 to $80, an increase of $15 (23 percent) for those who mail in this request on paper. The fee for requestors who use the online electronic Form G–1041 or G–1041A version decreased from $65 to $30, a decrease of $35 (−54 percent). DHS will also establish a fee of $330 for individuals submitting a Form G–1566, Request for a Certificate of Non-Existence, once approved by OMB.[348]

The affected population includes individuals who use Form G–1041 to request a search of USCIS historical indices, individuals who use Form G–1041A to obtain copies of USCIS historical records found through an index request, and individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. DHS estimates that an annual average of 6,755 Form G–1041 index search requests and 4,608 Form G–1041A records requests were received during FY 2018 through FY 2022 as shown in Table 24. For both forms, more than 90 percent of the requests were submitted electronically. DHS estimates that an annual average of 2,443 receipts for Form G–1566 will be made.

---

[341] Office of Advocacy, SBA, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," p. 19 *https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf* (last visited Aug. 22, 2023).

[342] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Clergy," *https://www.bls.gov/oes/2022/may/oes212011.htm* (last visited Aug. 22, 2023).

[343] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Directors of Religious Activities and Education," *https://www.bls.gov/oes/2022/may/oes212021.htm* (last visited Aug. 22, 2023).

[344] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Religious Workers, All Other," *https://www.bls.gov/oes/2022/may/oes212099.htm* (last visited Aug. 22, 2023).

[345] USCIS calculated the average filing per small entity of 1.29 petitions, from the Form I–360 Sample with Petition Totals in Appendix E of this analysis. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 224/174 = 1.29 average petitions filed per small entity. Note, this calculation includes only small entities with reported revenue data, *i.e.*, matched small entities.

[346] Calculation: 1.29 average petitions per small entity × $80 increase in petition fees = approximately $103.20 additional total cost per small entity.

[347] Calculation: ($103.20 additional cost per small entity/$60,180 clergy salary) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$60,540 directors of religious activities and education) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$45,420 other religious workers) × 100 = 0.23 percent.

[348] The fee will be established in the FY 2022/2023 rule and will be required with the submission of Form G–1566 if it is approved by OIRA before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed by DHS as provided in 8 CFR 299.1.

**Table 24. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2018 through FY 2022**

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 2021 | 207 | 7,220 | 7,427 | 97% |
| 2022 | 124 | 8,901 | 9,025 | 99% |
| **5-year Total** | **1,095** | **32,782** | **33,877** | |
| **5-year Annual Average** | **219** | **6,556** | **6,775** | 97% |
| | | | | |
| Fiscal Year | Form G-1041A (Paper Filing) | Form G-1041A (Online Filing) | Total | Percentage Filed Online |
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 333 | 3,407 | 3,740 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 2021 | 309 | 5,451 | 5,760 | 95% |
| 2022 | 190 | 5,168 | 5,358 | 96% |
| **5-year Total** | **1,474** | **21,566** | **23,040** | |
| **5-year Annual Average** | **295** | **4,313** | **4,608** | 94% |
| Fiscal Year | Certificate of Non-Existence Form G-1566 | | | |
| 2018 | 1,442 | | | |
| 2019 | 1,516 | | | |
| 2020 | 1,784 | | | |
| 2021 | 2,948 | | | |
| 2022 | 4,527 | | | |
| **5-year Total** | **12,217** | | | |
| **5-year Annual Average** | **2,443** | | | |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB). Feb. 2, 2023.
Note: IRIS tracks the online percentage of index searches and records requests.

DHS has previously determined that requests for historical records are usually made by individuals.[349] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests. DHS

asked for comment on this in the proposed rule and received no comments or data. DHS recognizes that some small entities may be impacted by the increased fees but cannot determine how many or the exact impact.

(6) Application for Regional Center Designation Under the EB–5 Regional Center Pilot Program, Form I–956 (Formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (Formerly Form I–924 Amendment) and I–956G (Formerly Form I–924A)

Congress created the EB–5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB–5 regional center program was later

added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). As amended, the EB–5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,000 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. See INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). Such investment amounts are not necessarily

---

[349] See 73 FR 28026 (May 15, 2008).

003320

indicative of whether the regional center is characterized appropriately as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 5, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117–103). The EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new EB–5 Regional Center Program.[350] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and complete

the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

The various program fees and changes as a result of the EB–5 Reform Integrity Act of 2022 will be discussed in a separate future EB–5 rulemaking.

Despite the changes in the law and program, DHS' final fees are based on the currently projected staffing needs to meet the adjudicative and administrative burden of the IPO pending the fee study required by section 106(a) of the EB–5 Reform and Integrity Act of 2022.

The fee for Form I–956 (formerly Form I–924) and Form I–956F [351]

(formerly Form I–924 Amendment) is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee. The fee for Form I–956G (formerly Form I–924A) is $4,470, a $1,435 or 47 percent increase from the current $3,035 fee. During the 5-year period from FY 2018 through FY 2022, USCIS received a total of 249 annual Form I–956 (formerly Form I–924) regional centers applications and 3,260 Form I–956G (formerly Form I–924A) annual statements, with annual averages 62 and 652 respectively (see Table 25).

The annual filing volume projections in this rule are based on historical volumes and trends. Section 105(a) of the EB–5 Reform and Integrity Act of 2022 directs USCIS to conduct a study of the fees charged in the administration of the EB–5 program. Form I–956F and other changes are too new for DHS to accurately estimate impacts on filing volumes. DHS will address these additional impacts resulting from the EB–5 Reform and Integrity Act of 2022 in a future rulemaking.[352]

**Table 25. Annual Receipts for Form I-956, Application for Regional Center Designation under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2018 through FY 2022**

| Fiscal Year | Form I-956 | Form I-956G |
|---|---|---|
| 2018 | 122 | 787 |
| 2019 | 79 | 808 |
| 2020 | 34 | 702 |
| 2021 | 14 | 434 |
| 2022 | 0[353] | 529 |
| **5-year Total** | **249** | **3,260** |
| **5-year Annual Average** | **62** | **652** |

Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, Consolidated/ELIS, PAS-SQL Dashboard, Updated Sept. 25, 2023.

Note: I-956G are the annual statements to be submitted by these approved regional centers. For Form I-956, DHS used a 4-year annual average.

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small

entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and

financial activities, some of which may play a direct or indirect role in linking

[350] Consolidated Appropriations Act, 2022, Public Law 117–103, Div. BB.

[351] *See* EB–5 Reform and Integrity Act of 2022, Public Law 117–103, Sec. 106(a) (Mar. 15, 2022) (authorizing the same fee for Form I–956F as Form I–956).

[352] DHS may reevaluate EB–5 fees to meet the additional fee guidelines of EB–5 Reform and

Integrity Act of 2022 sec. 106(c). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

[353] Zero reported receipts in FY2022 were due to EB–5 program and database system changes. DHS acknowledges that these changes may result in slightly lower annual average estimates for this form. There is a separate rulemaking pertaining to the EB–5 program that is currently being drafted and will elaborate more on the populations and various programs changes with the Eb–5 Integrity Act, volume projections and new forms.

investor funds to NCEs [354] and job-creating projects or entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above-market return differentials.

While DHS attempted to treat regional centers like the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB–5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $800,000 if the investment is in a TEA project(s) which includes certain rural areas and areas of high unemployment, or $1,050,000 for a non-TEA project per investor, in a U.S. business that will create or, in certain circumstances, preserve at least 10 full-time jobs in the United States for qualifying employees) [355] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I–956 (formerly Form I–924), I–956F (formerly Form I–924 Amendment), and I–956G (formerly Form I–924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information

provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions to analyze the small entity status of regional centers. In the DHS proposed rule "EB–5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers.[356] DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this Final Rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[357]

e. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary For Preparation of the Report or Record

The final rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Form I–129, I–140, I–910, I–360, G–1041, G–1041A, I–956 (formerly Form I–924), or I–956G (formerly I–924A). This final rule does not require any new professional skills for reporting.

f. A Description of the Steps the Agency has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees collected for other immigration benefits. Without an increase in fees, DHS will not be able to maintain the level of service for immigration and naturalization benefits that it now provides.

DHS has considered the alternative of maintaining fees at the current level with reduced services and increased processing times but has determined that this will not be in the interest of applicants and petitioners. Therefore, this alternative was rejected. While most immigration benefit fees apply to individuals, as described previously, some also apply to small entities. DHS seeks to minimize the impact on all parties, small entities in particular.

Another alternative to the increased economic burden of the fee adjustment is to maintain fees at their current level for small entities. The strength of this alternative is that it assures that no additional fee-burden is placed on small entities; however, small entities will experience negative effects due to the service reductions that will result in the absence of the fee adjustments in this final rule. Without the fee adjustments provided in this final rule, significant operational changes to USCIS would be necessary. Given current filing volume considerations, DHS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as Federal and contract staff, infrastructure spending on IT and facilities, and training. Depending on the actual level of workload received, these operational changes could result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would

---

[354] A "new commercial enterprise" is "any for-profit organization formed in the United States for the ongoing conduct of lawful business . . . that receives, or is established to receive, capital investment from [employment-based immigrant] investors." INA sec. 203(b)(5)(D)(vi), 8 U.S.C. 1153(b)(5)(D)(vi).

[355] *See* 84 FR 35750, 35808 (July 24, 2019). This amount by investor is determined between a designated Targeted Employment Area and non-Targeted Employment Area.

[356] *Id.*

[357] Calculation: 1% of $447,000 = $4,470 (the new fee for Form I–956G; formerly Form I–924A).

ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service. In the final rule, DHS will provide reduced fees for Form I–129 nonprofit entities and entities with 25 or less FTE workers. DHS will also reduce Asylum Program fees for Form I–129 and I–140 nonprofit entities and entities with 25 or less FTE workers. While making accommodations in the final rule for small employers and nonprofit entities, DHS is not codifying any exemption from coverage of the rule, or any part thereof, for small entities as that term is defined by the SBA. Determining if the petitioner would be ''small'' under the SBA definition would require USCIS to track many NAICS codes, review revenue, and require an adjudication of the fee discount eligibility before intake. DHS decided to define small employers as employers with 25 or fewer FTE workers because INA sec. 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), provides that the American Competitiveness and Workforce Improvement Act (ACWIA fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). SBA has determined in accordance with 13 CFR 121.903(a) that the size standard adopted in this rule appropriate. Therefore, for the reasons explained more fully elsewhere in the preamble to the final rule, DHS chose this approach.

### C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)

The Congressional Review Act (CRA) was included as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* This final rule is covered by the definition provided in section 804 of SBREFA. *See* 5 U.S.C. 804(2)(A).

### D. Unfunded Mandates Reform Act

Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on state, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by state, local, and tribal governments, in the aggregate,

or by the private sector.[358] This final rule is not expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($192 million in 2022 dollars), based on the CPI–U.[359] DHS does not believe this proposed rule would impose any unfunded Federal mandates on state, local, and tribal governments, in the aggregate, or on the private sector. This final rule does not contain a Federal mandate as the term is defined under UMRA.[360] The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

### E. E.O. 12132 (Federalism)

E.O. 13132 was issued to ensure the appropriate division of policymaking authority between the States and the Federal Government and to further the policies of the Unfunded Mandates Act. This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, it is determined that this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. E.O. 12988 (Civil Justice Reform)

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3(a) and 3(b)(2) of E.O. 12988.

---

[358] *See* 2 U.S.C. 1532(a).

[359] *See* BLS, ''Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month,'' available at *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202212.pdf* (last visited Jan. 19, 2023). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2022); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2022 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(292.655 − 152.383)/152.383] * 100 = (140.272/152.383) * 100 = 0.92052263 * 100 = 92.05% = 92%(rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.92 = $192 million in 2022 dollars.

[360] The term ''Federal mandate'' means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

### G. E.O. 13175 (Consultation and Coordination with Tribal Governments)

This final rule will not have ''Tribal implications'' under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

### H. Family Assessment

DHS has reviewed this final rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[361] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[362] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this proposed regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by state or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

By increasing immigration benefit request fees, this action will impose a slightly higher financial burden on some families that petition for family members to join them in the United States. On the other hand, the rule will provide USCIS with the funds necessary to carry out adjudication and naturalization services and provide similar services for free to disadvantaged populations, including asylees, refugees, individuals with TPS, and victims of human trafficking. DHS also limits the fee increases in this rule to inflation for all fees submitted by

---

[361] See 5 U.S.C. 601 note.

[362] Public Law 105–277, 112 Stat. 2681 (1998).

individuals and sets fees for adoption and naturalization related forms at below their relative cost to USCIS. DHS has no data that indicate that this final rule will have any impacts on disposable income or the poverty of certain families and children, including U.S. citizen children. DHS has also added several fee exemptions in this final rule to what was proposed, and the rule contains a process to waive fees for immigration benefits when the person submitting the request is unable to pay the fee. DHS believes that the benefits of the new fees justify the financial impact on the family, that this rulemaking's impact is justified, and no further actions are required. DHS also determined that this rule will not have any impact on the autonomy or integrity of the family as an institution.

I. National Environmental Policy Act

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act (NEPA), applies to them and, if so, what degree of analysis is required. DHS's "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01 (Directive 023–01) [363] and "Instruction Manual 023–01–001–01 Revision 01, Implementation of the National Environmental Policy Act" (Instruction Manual) [364] establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ)

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("Categorical Exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d).

The Instruction Manual, Appendix A, Table 1 lists Categorical Exclusions that DHS has found to have no such effect. Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect. [365]

This final rule implements the authority in the INA to establish fees to fund immigration and naturalization services of USCIS. DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from this final rule. DHS finds promulgation of the rule clearly fits within categorical exclusion A3,

established in the Department's NEPA implementing procedures.

This final rule is a standalone regulatory action and is not part of any larger action. In accordance with its NEPA implementing procedures, DHS has determined that the final rule would not result in any major Federal action that would significantly affect the quality of the human environment, nor any extraordinary circumstances exist that would create the potential for significant environmental effects requiring further analysis and review. Therefore, this final rule is categorically excluded and no further NEPA analysis or documentation is required.

J. Paperwork Reduction Act

Under the PRA, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. In compliance with the PRA, DHS published an NPRM on January 4, 2023, in which comments on the revisions to the information collections associated with this rulemaking were requested. Any comments received on information collection activities were related to the fees being established within the rulemaking. DHS responded to those comments in Section III. of this final rule. The Information Collection table below shows the summary of forms that are part of this rulemaking.

**BILLING CODE 9111–97–P**

| Table 26: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0096 | G-1041 | Genealogy Index Search Request | Revision of a Currently Approved Collection |
| | G-1041A | Genealogy Records Request (For each microfilm or hard copy file) | |
| 1615-0156 | G-1566 | Request for a Certificate of Non-Existence | Revision of a Currently Approved Collection |
| 1615-0079 | I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | Revision of a Currently Approved Collection |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |

[363] See DHS, "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01, Oct. 31, 2014, available at *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%2023-01%20Rev%2001_508compliantversion.pdf*.

[364] See DHS, "Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)," Nov. 6, 2014, available at *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-*

*01-001-01%20Rev%2001_508%20Admin%2Rev.pdf*.

[365] Instruction Manual 023–01–001–01, Revision 1, at V.B(2)(a) through (c).

**Table 26: Information Collection**

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0001 | I-129F | Petition for Alien Fiancé(e) | Revision of a Currently Approved Collection |
| 1615-0010 | I-129S | Nonimmigrant Petition Based on Blanket L Petition | Revision of a Currently Approved Collection |
| 1615-0012 | I-130 | Petition for Alien Relative | Revision of a Currently Approved Collection |
| | I-130A | Supplemental Information for Spouse Beneficiary | |
| 1615-0013 | I-131 | Application for Travel Document | Revision of a Currently Approved Collection |
| 1615-0135 | I-131A | Application for Travel Document (Carrier Documentation) | Revision of a Currently Approved Collection |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0016 | I-191 | Application for Relief Under Former Section 212(c) of the INA | Revision of a Currently Approved Collection |
| 1615-0017 | I-192 | Application for Advance Permission to Enter as Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0018 | I-212 | Application for Permission to Reapply for Admission into the United States After Deportation or Removal | Revision of a Currently Approved Collection |
| 1615-0095 | I-290B | Notice of Appeal or Motion | Revision of a Currently Approved Collection |
| 1615-0020 | I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Revision of a Currently Approved Collection |
| 1615-0023 | I-485 | Application to Register Permanent Residence or Adjust Status | Revision of a Currently Approved Collection |
| | I-485A | Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | |
| | I-485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | |
| 1615-0026 | I-526 | Immigrant Petition by Standalone Investor | Revision of a Currently Approved Collection |
| | I-526E | Immigrant Petition by Regional Center Investor | |
| 1615-0003 | I-539 | Application to Extend/Change Nonimmigrant Status | Revision of a Currently Approved Collection |
| 1615-0027 | I-566 | Interagency Record of Request – A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status | Revision of a Currently Approved Collection |

**Table 26: Information Collection**

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600A/I-600 Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600A/I-600 Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600A/I-600 Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0029 | I-601 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0123 | I-601A | Application for Provisional Unlawful Presence Waiver | Revision of a Currently Approved Collection |
| 1615-0069 | I-602 | Application by Refugee for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0030 | I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | Revision of a Currently Approved Collection |
| 1615-0032 | I-690 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0035 | I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | Revision of a Currently Approved Collection |
| 1615-0038 | I-751 | Petition to Remove Conditions on Residence | Revision of a Currently Approved Collection |
| 1615-0040 | I-765 | Application for Employment Authorization | Revision of a Currently Approved Collection |
| 1615-0137 | I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | Revision of a Currently Approved Collection |
| 1615-0005 | I-817 | Application for Family Unity Benefits | Revision of a Currently Approved Collection |
| 1615-0043 | I-821 | Application for Temporary Protected Status | Revision of a Currently Approved Collection |
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0044 | I-824 | Application for Action on an Approved Application or Petition | Revision of a Currently Approved Collection |
| 1615-0045 | I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Revision of a Currently Approved Collection |
| 1615-0046 | I-854A | Inter-Agency Alien Witness and Informant Record | No material or non-substantive change to a currently approved collection |

| Table 26: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0072 | I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | Revision of a Currently Approved Collection |
| 1615-0082 | I-90 | Application to Replace Permanent Resident Card | Revision of a Currently Approved Collection |
| 1615-0048 | I-907 | Request for Premium Processing Service | Revision of a Currently Approved Collection |
| 1615-0114 | I-910 | Application for Civil Surgeon Designation | Revision of a Currently Approved Collection |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |
| 1615-0099 | I-914 | Application for T nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0104 | I-918 | Petition for U nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0106 | I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0136 | I-941 | Application for Entrepreneur Parole | Revision of a Currently Approved Collection |
| 1615-0159 | I-956 | Application for Regional Center Designation | Revision of a Currently Approved Collection |
| | I-956F | Application for Approval of an Investment in a Commercial Enterprise | |
| | I-956G | Regional Center Annual Statement | |
| | I-956H | Bona Fides of Persons Involved with Regional Center Program | |
| | I-956K | Registration for Direct and Third-Party Promoters | |
| 1615-0050 | N-336 | Request for a Hearing on a Decision in Naturalization Proceedings | Revision of a Currently Approved Collection |
| 1615-0052 | N-400 | Application for Naturalization | Revision of a Currently Approved Collection |
| 1615-0056 | N-470 | Application to Preserve Residence for Naturalization Purposes | Revision of a Currently Approved Collection |
| 1615-0091 | N-565 | Application for Replacement of Naturalization/Citizenship Document | Revision of a Currently Approved Collection |
| 1615-0057 | N-600 | Application for Certificate of Citizenship | Revision of a Currently Approved Collection |
| 1615-0087 | N-600K | Application for Citizenship and Issuance of Certificate under Section 322. | Revision of a Currently Approved Collection |
| 1615-0144 | OMB-64 | H-1B Registration Tool | Revision of a Currently Approved Collection |

BILLING CODE 9111-97-C

This final rule requires additional changes to the following OMB control numbers to collect information necessary to determine fees, fee waivers, and fee exemptions. These changes include updating instructions and data collections. Please see the accompanying PRA documentation for the full analysis. The table below shows

the summary of forms that required additional changes based on this rulemaking.

| Table 27: Information Collections Impacted by Final Rule | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600/A Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600/A Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600/A Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |

*Petition for a Nonimmigrant Worker, Form I–129*

USCIS received some comments on the Petition for a Nonimmigrant Worker, Form I–129 filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129 as part of this final rule. These changes required a reassessment of the Form I–129's time burden.

*Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW*

USCIS received some comments on the CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129CW form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129CW as part of this final rule. These changes required a reassessment of the Form I–129CW's the time burden.

*Immigrant Petition for Alien Workers, Form I–140*

USCIS received some comments on the Immigrant Petition for Alien Workers, Form I–140 and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with 25 or fewer FTE employees. As a result of these changes, DHS has made changes to the Form I–140 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–140 as part of this final rule. These changes required a reassessment of the Form I–140's the time burden.

*Petition To Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A*

USCIS received some comments on the Petition to Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A filling fee. DHS responded to those comments in Section III. of this final rule. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be

provided for free. As a result of these changes, DHS has made changes to the Forms I–600 and I–600A, and Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 form and instructions. To identify the impacted respondents and apply the appropriate fee amount; additional data collection elements and instructions were added to the Form I–600, I–600A and I–600A/I–600, Supplement 3 as part of this final rule. These changes required a reassessment of the Form I–600 and I–600A's the time burden. There was no impact to an I–600A/I–600, Supplement 3's time burden. Form I–600A/I–600 Supplement 1, Listing of Adult Member of the Household and Form I–600A/I–600 Supplement 2, Consent to Disclose Information.

*Request for Fee Waiver, Form I–912*

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020). Additionally, USCIS received some comments on the Application for Fee Waiver, Form I–912 requesting that USCIS expand the types of means-tested benefits received by a child as evidence for a fee waiver. DHS responded to those comments in Section III. of this final rule. After considering the comments on the proposed rule, DHS has decided to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. DHS has made changes to the I–912 instructions. DHS also made changes to the Forms I–912 form and instructions to streamline data collection and clarifying instruction contents as part of this final rule. These changes required a reassessment of the Form I–912's the time burden.

USCIS is consolidating all information related to Form fees, fee exemptions, and how to submit fee payments into Form G–1055, Fee Schedule. Most fee-related language, including language from sections *What is the Filing Fee, How to Check If the Fees Are Correct, Fee Waiver,* and *Premium Processing* content is being removed from individual Form Instructions documents, which results in a per-response hour burden reduction for many USCIS information collections and an overall total hour burden

reduction for the USCIS information collection inventory. In accordance with the PRA, DHS included an information collection notice in the proposed rule and each of the proposed, revised information collection instruments were posted for public comment.

Differences in information collection request respondent volume and fee model filing volume projections.

DHS notes that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the model used to calculate the fee amounts in this final rule. For example, the fee calculation model projects 1,666,500 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,179,494. As stated in section V.B.1.a of this preamble, the Volume Projection Committee forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality), changes in policies, economic conditions, or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 or 5-year period, with less consideration of the volume effects on planned or past policy changes. Although the RIA uses similar historic average volumes, RIAs isolate the impacts of proposed policy using models that may use different periods of analysis and often make simplifying assumptions about costs such as information collection burdens not caused by the regulation. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations

(Government agencies), Fees, Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 106*

Citizenship and naturalization, Fees, Immigration.

*8 CFR Part 204*

Administrative practice and procedure, Adoption and foster care, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 240*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Immigration.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103—IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); Pub. L. 112–54, 125

Stat 550 (8 U.S.C. 1185 note); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54; 125 Stat. 550; 31 CFR part 223.

■ 2. Section 103.2 is amended by revising and republishing paragraphs (a)(1), (a)(7), and (b)(19)(iii)(A) to read as follows:

### § 103.2   Submission and adjudication of benefit requests.

(a) * * *

(1) *Preparation and submission.* Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions regardless of a provision of 8 CFR chapter I to the contrary. Each form, benefit request, or other document must be filed with the fee(s) required by regulation. Filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS. Except as otherwise provided in this chapter I, fees must be paid when the request is filed or submitted.

* * * * *

(7) *Benefit requests submitted.* (i) USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii) A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:

(A) Signed with valid signature;

(B) Executed;

(C) Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and

(D) Submitted with the correct fee(s). Every form, benefit request, or other document that requires a fee payment must be submitted with the correct fee(s).

(*1*) If USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may reject or deny the request. If the benefit request was approved when USCIS determines the correct fee was not paid, the approval may be revoked upon notice.

(*2*) If a check or other financial instrument used to pay a fee is dishonored, declined, or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is dishonored, declined, or returned a second time, the filing may be rejected or denied.

(*3*) Financial instruments dishonored, declined, or returned for any reason other than insufficient funds, including but not limited to when an applicant, petitioner, or requestor places a stop payment on a financial instrument will not be resubmitted, and any immigration benefit request or request for action filed with USCIS may be rejected or denied regardless of whether USCIS has begun processing the request or already taken action on a case. Credit cards that are declined for any reason will not be resubmitted.

(*4*) If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

(iii) A rejection of a filing with USCIS may not be appealed.

(iv) Unless otherwise provided in this title, only one of the same benefit request as defined in 8 CFR 1.2 may be submitted at a time or while the same request is pending. If more than one materially identical requests are submitted, USCIS may reject one at its discretion. For purposes of this section, a motion to reopen or reconsider and an appeal that is filed on the same decision will be considered a duplicate request.

(b) * * *

(19) * * *

(iii) * * *

(A) USCIS will send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent or their attorney or accredited representative of record, as specified on the form instructions.

* * * * *

■ 3. Section 103.3 is amended by revising paragraph (a)(2)(ii) to read as follows:

### § 103.3   Denials, appeals, and precedent decisions.

(a) * * *

(2) * * *

(ii) *Reviewing official.* The official who made the unfavorable decision being appealed shall review the appeal unless the affected party moves to a new jurisdiction. In that instance, the official who has jurisdiction over such a proceeding in that geographic location shall review it. In the case of a fee waived or exempt appeal under 8 CFR 106.3, USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision.

* * * * *

■ 4. Section 103.7 is revised and republished to read as follows:

### § 103.7   Fees.

(a) *Department of Justice (DOJ) fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted with the fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of immigration court fees.* An immigration judge may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8, 1003.24, and 1103.7.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the ''United States Department of Justice,'' in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL system costs fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00; or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student* (*Form I–17*). (i) For filing a petition for school certification: $3,000 plus a site visit fee of $655 for each location required to be listed on the form.

(ii) For filing a petition for school recertification: $1,250, plus a site visit

003330

fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00; or

(ii) $32 for a family (applicant, spouse, and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00. The application fee may be waived by DHS.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00; or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If fingerprints are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting fingerprint checks before accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) *Fee Remittance for F, J, and M Nonimmigrants (Form I–901).* The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations.* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual ''Passenger Travel Reports via Sea and Air'' tables.*

(i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation, Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities under section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement).* $50.00.

(12) *Request for authorization for parole of an alien into the United States.* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 5. Section 103.17 is revised and republished to read as follows:

### § 103.17   Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. When a biometric services fee is required, USCIS may reject a benefit request submitted without the correct biometric services fee.

■ 6. Section 103.40 is revised and republished to read as follows:

### § 103.40   Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* USCIS provides on its website at *https://www.uscis.gov/records/genealogy* the required forms in electronic versions: Genealogy Index Search Request or Genealogy Records Request.

(c) *Required information.* Genealogical research requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for everyone searched. All requests for records or index searches must include the individual's:

(1) Full name (including variant spellings of the name and/or aliases, if any).

(2) Date of birth, at least as specific as a year.

(3) Place of birth, at least as specific as a country and the country name at the time of the individual's immigration or naturalization if known.

(d) *Optional information.* To better ensure a successful search, a genealogical research request may include everyone's:

(1) Date of arrival in the United States.

(2) Residence address at time of naturalization.

(3) Names of parents, spouse, and children if applicable and available.

(e) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(1) C-Files must be identified by a naturalization certificate number.

(2) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(3) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(f) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(g) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(h) *Processing of paper record copy requests.* This service is designed for

requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

■ 7. Part 106 is revised and republished to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec.
106.1    Fee requirements.
106.2    Fees.
106.3    Fee waivers and exemptions.
106.4    Premium processing service.
106.5    Authority to certify records.
106.6    DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 note); Pub. L. 115–218, 132 Stat. 1547; Pub. L. 116–159, 134 Stat. 709.

### § 106.1   Fee requirements.

(a) *General.* Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2.

(b) *Remittance source and method.* Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location. USCIS will provide at least a 30-day public notice before amending the payment method required for a fee.

(c) *Dishonored payments.* If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. If the approved benefit request requires multiple fees, this paragraph (c) would apply if any fee submitted is not honored, including a fee to request premium processing under § 106.4. Other fees that were paid for a benefit request that is revoked upon notice under this paragraph (c) will be retained

and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed in accordance with 8 CFR 103.3, the applicable form instructions, and other statutes or regulations that may apply.

(d) *Expired payments.* DHS is not responsible for financial instruments that expire before they are deposited. USCIS may reject any filing for which required payment cannot be processed due to expiration of the financial instrument.

(e) *Credit and debit card disputes.* Fees paid to USCIS using a credit or debit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

(f) *Definitions.* For the purposes of this part, the term:

(1) *Small employer* means a firm or individual that has 25 or fewer full-time equivalent employees in the United States, including any affiliates and subsidiaries.

(2) *Nonprofit* means organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. 501(c)(3), or governmental research organizations as defined under 8 CFR 214.2(h)(19)(iii)(C).

(3) *Means tested benefit* means, as determined by USCIS, a public benefit where the agency granting the benefit considers income and resources. Means-tested benefits may be federally, state, or locally funded. In general, for a benefit that was granted based on income, USCIS considers it a means-tested benefit.

(4) *Federal Poverty Guidelines* means the poverty guidelines updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2).

(g) *Online filing discount.* Unless otherwise provided in this part, the fee for forms filed online with USCIS, using the electronic system prescribed by USCIS, will be an amount that is $50 lower than the fee prescribed in § 106.2.

### § 106.2   Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name $465.

(i) If the applicant was issued a card but never received it: No fee.

(ii) If the applicant's card was issued with incorrect information because of DHS error and the applicant is filing for a replacement: No fee.

(iii) If the applicant has reached their 14th birthday after their existing card will expire after their 16th birthday: No fee.

(2) *Application for Replacement/ Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $560.

(i) For nonimmigrant member of the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing; and

(iv) For replacement for DHS error: No fee.

(3) *Petition or Application for a Nonimmigrant Worker, Form I–129.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker: $780. For small employers and nonprofits: $460.

(ii) Petition for H–2A Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,090.

(iii) Petition for H–2A Nonimmigrant Worker with only unnamed beneficiaries: $530. For small employers and nonprofits: $460.

(iv) Petition for H–2B Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,080.

(v) Petition for H–2B Nonimmigrant Worker with only unnamed beneficiaries: $580. For small employers and nonprofits: $460.

(vi) Petition for L Nonimmigrant Worker: $1,385.

(vii) Petition for O Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,055.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,015.

(ix) For small employers and nonprofits as defined in § 106.1(f), the fees in paragraphs (a)(3)(ii), (a)(3)(iv), (a)(3)(vi), (a)(3)(vii), and (a)(3)(viii) of this section will be one-half the amount in those paragraphs rounded to the nearest $5 increment.

(x) Additional fees in paragraph (c) of this section may apply.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.*

(i) For an employer to petition on behalf of CW–1 nonimmigrant

beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $1,015.

(ii) For small employers and nonprofits: $460. For the Semiannual Report for CW–1 Employers (Form I–129CWR): No fee.

(iii) Additional fees in paragraph (c) of this section may apply.

(5) *Petition for Alien Fiancé(e), Form I–129F.* (i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $675.

(ii) For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130: No fee.

(6) *Petition for Alien Relative, Form I–130.* For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act: $675.

(7) *Application for Travel Document, Form I–131.* (i) Refugee Travel Document for asylee and lawful permanent resident who obtained such status as an asylee 16 years or older: $165.

(ii) Refugee Travel Document for asylee or lawful permanent resident who obtained such status as an asylee under the age of 16: $135.

(iii) Advance Parole, Reentry Permit, and other travel documents: $630.

(iv) There is no fee for a travel document for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee, while the I–485 remains pending.

(v) There is no fee for parole requests from current or former U.S. armed forces service members.

(vi) The discount in section 106.1(g) does not apply to paragraphs (a)(7)(i) and (ii) of this section.

(8) *Application for Carrier Documentation, Form I–131A.* For filing an application to allow an individual who loses their approved travel document to apply for a travel document (carrier documentation) to board an airline or other transportation carrier to return to the United States: $575.

(9) *Declaration of Financial Support, Form I–134.* To provide financial support to a beneficiary of certain immigration benefits for the duration of their temporary stay in the United States. No fee.

(10) *Online Request to be a Supporter and Declaration of Financial Support, Form I–134A.* To request to be a supporter and agree to provide financial support to a beneficiary and undergo background checks as part of certain special parole processes. No fee.

(11) *Immigrant Petition for Alien Worker, Form I–140.* For filing a petition to classify preference status of an alien based on profession or occupation under section 204(a) of the Act: $715.

(12) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for discretionary relief under section 212(c) of the Act: $930.

(13) *Application for Advance Permission to Enter as a Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (13), or (14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,100. The online filing discount in § 106.1(g) applies when this form is submitted to USCIS but does not apply to this paragraph when the form is submitted to CBP.

(14) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $695. The discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(15) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported, or removed alien; an alien who has fallen into distress; an alien who has been removed as an alien enemy; or an alien who has been removed at Government expense: $1,175. The online filing discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(16) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction, and for filing a motion to reopen or reconsider a USCIS decision: $800.

(i) The fee will be the same for appeal of or motion on a denial of a benefit request with one or multiple beneficiaries.

(ii) There is no fee for conditional permanent residents who filed a waiver of the joint filing requirement based on battery or extreme cruelty and filed a Notice of Appeal or Motion (Form I–290B) when their Petition to Remove the Conditions on Residence (Form I–751) was denied.

(17) *Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360:* $515. There is no fee for the following:

(i) A petition seeking classification as an Amerasian;

(ii) A petition seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner;

(iii) A petition for Special Immigrant Juvenile classification;

(iv) A petition seeking special immigrant classification as Afghan or Iraqi translator or interpreter, Iraqi national employed by or on behalf of the U.S. Government, or Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or a surviving spouse or child of such a person; or

(v) A petition for a person who served honorably on active duty in the U.S. armed forces filing under section 101(a)(27)(K) of the Act.

(18) *Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–361.* Filed in support of Form I–360, Petition to Classify Public Law 97–359 Amerasian as the Child, Son, or Daughter of a United States Citizen. No fee.

(19) *Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–363.* For a beneficiary of a petition for a Public Law 97–359 Amerasian to request enforcement of the guarantee of financial support and legal custody executed by the beneficiary's sponsor. No fee.

(20) *Record of Abandonment of Lawful Permanent Resident Status, Form I–407.* To voluntarily abandon status as a lawful permanent resident. No fee.

(21) *Application to Register Permanent Residence or Adjust Status, Form I–485.* For filing an application for permanent resident status or creation of a record of lawful permanent residence:

(i) $1,440 for an applicant 14 years of age or older; or

(ii) $950 for an applicant under the age of 14 years who submits the application concurrently with the Form I–485 of a parent.

(iii) There is no fee for the following:

(A) An applicant who is in deportation, exclusion, or removal proceedings before an immigration judge, and the court waives the application fee.

(B) An applicant who served honorably on active duty in the U.S. armed forces who is filing under section 101(a)(27)(K) of the Act.

(22) *Application to Adjust Status under Section 245(i) of the Act, Form I–*

*485 Supplement A.* Supplement A to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act a sum of $1,000 be paid while the applicant's, "Application to Register Permanent Residence or Adjust Status," is pending, unless payment of the additional sum is not required under section 245(i) of the Act, including:

(i) If applicant is unmarried and under 17 years of age: No fee.

(ii) If the applicant is the spouse or unmarried child under 21 years of age of a legalized alien and attaches a copy of a USCIS receipt or approval notice for a properly filed Form I–817, Application for Family Unity Benefits: No fee.

(23) *Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–485J.* To confirm that the job offered in Form I–140, Immigrant Petition for Alien Workers, remains a bona fide job offer that the beneficiary intends to accept once we approve the Form I–485, Application to Register Permanent Residence or Adjust Status, or request job portability under INA section 204(j) to a new, full-time, permanent job offer that the beneficiary intends to accept once we approve the Form I–485. No fee.

(24) *Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities, Form I–508.* To waive certain diplomatic rights privileges, exemptions, and immunities associated with your occupational status. No fee.

(25) *Immigrant Petition by Standalone or Regional Center Investor, Forms I–526 and I–526E.* To petition USCIS for status as an immigrant to the United States under section 203(b)(5) of the Act.

(i) Immigrant Petition by Standalone Investor, Form I–526: $11,160.

(ii) Immigrant Petition by Regional Center Investor, Form I–526E: $11,160.

(26) *Application To Extend/Change Nonimmigrant Status, Form I–539.* For certain nonimmigrants to extend their stay or change to another nonimmigrant status, CNMI residents applying for an initial grant of status, F and M nonimmigrants applying for reinstatement, and persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant. $470. There is no fee for Nonimmigrant A, G, and NATO.

(27) *Interagency Record of Request— A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status, Form I–566.* For dependent employment authorization as an eligible A–1, A–2, G–1, G–3, G–4, or NATO 1–6 dependent; or change or adjustment of status to, or from, A, G or NATO status. No fee.

(28) *Application for Asylum and Withholding of Removal, Form I–589.* To apply for asylum and withholding of removal. No fee.

(29) *Registration for Classification as a Refugee, Form I–590.* To determine eligibility for refugee classification and resettlement in the United States. No fee.

(30) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative: $920.

(i) There is no fee for the first Form I–600 filed for a child based on an approved *Application for Advance Processing of an Orphan Petition,* Form I–600A, during the Form I–600A approval period.

(ii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I–600 petition submitted.

(iv) This filing fee is not charged if a new Form I–600 combination filing is filed due to a change in marital status while the prior Form I–600A or Form I–600 combination filing is pending.

(v) This filing fee is charged if a new Form I–600 combination filing is filed due to a change in marital status after the Form I–600A or Form I–600 combination filing suitability determined is approved.

(31) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $920.

(i) This filing fee is not charged if a new Form I–600A is filed due to a change in marital status while the prior Form I–600A is pending.

(ii) This filing fee is charged if a new Form I–600A is filed due to a change in marital status after the Form I–600A is approved.

(32) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change of non-Convention country; or a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–600A, or to obtain a first or second change of non-Hague Adoption Convention country during the Form I–600A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is also a request for a first or second extension of the Form I–600A approval, or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the approval of the Form I–600A and third or subsequent changes of non-Hague Adoption Convention country.

(33) *Application for Waiver of Ground of Inadmissibility, Form I–601.* To seek a waiver of grounds of inadmissibility if you are inadmissible to the United States and are seeking an immigrant visa, adjustment of status, certain nonimmigrant statuses, or certain other immigration benefits. $1,050. For applicants for adjustment of status of Indochina refugees under Public Law 95–145. No fee.

(34) *Application for Provisional Unlawful Presence Waiver, Form I–601A.* To request a provisional waiver of the unlawful presence grounds of inadmissibility under section 212(a)(9)(B) of the Act. $795.

(35) *Application by Refugee for Waiver of Grounds of Inadmissibility, Form I–602.* For a refugee who has been found inadmissible to the United States to apply for a waiver of inadmissibility for humanitarian reasons, family unity, or national interest. No fee.

(36) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I–612.* For J–1 and J–2 visas holders and their families to apply for a waiver of the two-year foreign residence requirement. $1,100.

(37) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* To apply for a waiver of inadmissibility for an applicant for adjustment of status under section 245A or 210 of the Act. $1,240.

(38) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under section 210 or 245A of the Act: $905.

(39) *Report of Immigration Medical Examination and Vaccination Record (Form I–693).* For adjustment of status applicants to establish they are not inadmissible to the United States on health-related grounds. No fee.

(40) *Notice of Appeal of Decision under Sections 245A or 210 of the*

*Immigration and Nationality Act, Form I–694.* For appealing the denial of an application under section 210 or 245A of the Act, or a petition under section 210A of the Act: $1,125.

(41) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,670.

(42) *Refugee/Asylee Relative Petition, Form I–730.* For a refugee to request a spouse and unmarried child be approved to join them in the United States. No fee.

(43) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $750. There is no fee for a conditional permanent resident spouse or child who files a waiver of the joint filing requirement based on battery or extreme cruelty.

(44) *Application for Employment Authorization, Form I–765.* To request employment authorization and/or an Employment Authorization Document (EAD). $520.

(i) For an applicant who filed USCIS Form I–485 with a fee after April 1, 2024, and their Form I–485 is still pending: $260. The online filing discount in § 106.1(g) does not apply to this paragraph.

(ii) There is no fee for an initial Employment Authorization Document for the following:

(A) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee;

(B) Dependents of certain government and international organizations or NATO personnel;

(C) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(D) Persons granted asylee status (AS1, AS6);

(E) Citizen of Micronesia, Marshall Islands, or Palau;

(F) Persons granted Withholding of Deportation or Removal;

(G) Applicant for Asylum and Withholding of Deportation or Removal including derivatives;

(H) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E–1 employees; and

(I) Current or former U.S. armed forces service members.

(iii) Request for replacement Employment Authorization Document based on USCIS error: No fee.

(iv) There is no fee for a renewal or replacement Employment Authorization Document for the following:

(A) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and paid the appropriate Form I–485 filing fee;

(B) Dependent of certain foreign government, international organization, or NATO personnel;

(C) Citizen of Micronesia, Marshall Islands, or Palau; and

(D) Persons granted withholding of deportation or removal.

(45) *Application for Employment Authorization for Abused Nonimmigrant Spouse, Form I–765V.* Used for certain abused nonimmigrant spouses to request an employment authorization document (EAD). No fee.

(46) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* For filing a petition to classify a Convention adoptee as an immediate relative:

(i) There is no fee for the first Form I–800 filed for a child based on an approved *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A, during the Form I–800A approval period.

(ii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I–800 petition submitted.

(47) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $920.

(i) This filing fee is not charged if a new Form I–800A is filed due to a change in marital status while the prior Form I–800A is pending.

(ii) This filing fee is charged if a new Form I–800A is filed due to a change in marital status after the Form I–800A is approved.

(48) *Request for Action on Approved Form I–800A, Form I–800A Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change in Convention country; or a request for a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–800A, or to obtain a first or second change of Hague Adoption

Convention country during the Form I–800A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is a request for a first or second extension of the Form I–800A approval, or a first or second change of Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the Form I–800A approval and third or subsequent changes of Hague Adoption Convention country.

(49) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $760.

(50) *Application for Temporary Protected Status, Form I–821.* For an eligible national of a designated country or a person without nationality who last habitually resided in the designated country to apply for Temporary Protected Status (TPS).

(i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services.

(iv) The online filing discount in § 106.1(g) does not apply to paragraphs (a)(50)(i) and (a)(50)(ii) of this section.

(51) *Consideration of Deferred Action for Childhood Arrivals, Form I–821D.* To request that USCIS consider granting or renewing deferred action under 8 CFR 236.21–236.25. $85. The online filing discount in § 106.1(g) does not apply to this section.

(52) *Application for Action on an Approved Application or Petition, Form I–824.* To request additional action on a previously approved benefit request. $590.

(53) *Petition by Investor to Remove Conditions on Permanent Resident Status, Form I–829.* For a conditional permanent resident who obtained status through qualified investment to remove the conditions on their residence. $9,525.

(54) *Inter-Agency Alien Witness and Informant Record, Form I–854.* To request an alien witness and/or informant receive classification as an S nonimmigrant. No fee.

(55) *Affidavit of Support Under Section 213A of the INA, Form I–864.* For immigrants to show they have adequate means of financial support and are not likely to rely on the U.S. government for financial support. No fee.

**6390** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

(i) *Contract Between Sponsor and Household Member, Form I–864A.* For a household member to promise to support sponsored immigrants. No fee.

(ii) *Affidavit of Support Under Section 213A of the INA, Form I–864EZ.* To show that the applying immigrant has adequate means of financial support and is not likely to rely on the U.S. government for financial support. No fee.

(iii) *Request for Exemption for Intending Immigrant's Affidavit of Support, Form I–864W.* To establish that an applicant is exempt from the Form I–864 requirements. No fee.

(iv) *Sponsor's Notice of Change of Address, Form I–865.* To report a sponsor's new address and/or residence. No fee.

(56) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.* To apply for suspension of deportation or special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act.

(i) $340 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS: No fee.

(iii) If filing Form I–881 as a VAWA self-petitioner, including derivatives, as defined under section 101(a)(51)(F) of the Act: No fee.

(57) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905.* For an organization to apply for authorization to issue certificates to health care workers. $230.

(58) *Request for Premium Processing Service, Form I–907.* The Request for Premium Processing Service fee will be as provided in § 106.4. The online filing discount in § 106.1(g) does not apply to a request for premium processing.

(59) *Request for Civil Surgeon Designation, Form I–910.* To apply for civil surgeon designation. $990.

(60) *Request for Fee Waiver, Form I–912.* To request a fee waiver. No fee.

(61) *Application for T Nonimmigrant Status, Form I–914.* To request temporary immigration benefits for a victim of a severe form of trafficking in persons, also known as human trafficking. No fee.

(i) *Supplement A to Form I–914, Application for Immigrant Family Member of a T–1 Recipient.* To request temporary immigration benefits for eligible family members of a victim of a severe form of trafficking in persons. No fee.

(ii) *Supplement B to Form I–914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.* For a law enforcement agency to certify that a trafficking victim is being helpful to law enforcement during the detection, investigation, or prosecution of the trafficking. No fee.

(62) *Petition for U Nonimmigrant Status, Form I–918.* For a victim of qualifying criminal activity to petition for temporary immigration benefits. No fee.

(i) *Supplement A to Form I–918, Petition for Qualifying Family Member of U–1 Recipient.* To request temporary immigration benefits for qualifying family members of a victim of qualifying criminal activity. No fee.

(ii) *Supplement B to Form I–918, U Nonimmigrant Status Certification.* For a law enforcement agency to certify that an individual is a victim of qualifying criminal activity and has been, is being, or is likely to be helpful to law enforcement in the detection, investigation, or prosecution of the qualifying criminal activity. No fee.

(63) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status. No fee.

(64) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur. $1,200.

(65) *Application for Regional Center Designation, Form I–956.* To request designation as a regional center or to request an amendment to an approved regional center. $47,695.

(66) *Application for Approval of Investment in a Commercial Enterprise, Form I–956F.* To request approval of each particular investment offering through an associated new commercial enterprise. $47,695.

(67) *Regional Center Annual Statement, Form I–956G.* To provide updated information and certify that a Regional Center under the Immigrant Investor Program has maintained its eligibility. $4,470.

(68) *Bona Fides of Persons Involved with Regional Center Program, Form I–956H.* For each person involved with a regional center to attest to their compliance with section 203(b)(5)(H) of the Act. No fee.

(69) *Registration for Direct and Third-Party Promoters, Form I–956K.* For each person acting as a direct or third-party promoter (including migration agents) of a regional center, any new commercial enterprises, an affiliated job-creating entity, or an issuer of securities intended to be offered to immigrant investors in connection with a particular capital investment project. No fee.

(b) *N Forms.* (1) *Application to File Declaration of Intention, Form N–300.* For a permanent resident to declare their intent to become a U.S. citizen. $320.

(2) *Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336, Form N–336.* To request a hearing before an immigration officer on the denial of Form N–400, Application for Naturalization. $830. There is no fee for an applicant who has filed an *Application for Naturalization* under section 328 or 329 of the Act with respect to military service and whose application has been denied.

(3) *Application for Naturalization, Form N–400.* To apply for U.S. citizenship. $760. The following exceptions apply:

(i) No fee is charged an applicant who meets the requirements of section 328 or 329 of the Act with respect to military service.

(ii) The fee for an applicant whose documented household income is less than or equal to 400 percent of the Federal Poverty Guidelines: $380. The discount in section 106.1(g) does not apply to this section.

(4) *Request for Certification of Military or Naval Service, Form N–426.* To request that the Department of Defense verify military or naval service. No fee.

(5) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* Application for a lawful permanent resident who must leave the United States to preserve their residence to pursue naturalization. $420.

(6) *Application for Replacement Naturalization/Citizenship Document, Form N–565.* To apply for a replacement Declaration of Intention; Naturalization Certificate; Certificate of Citizenship; or Repatriation Certificate; or to apply for a special certificate of naturalization as a U.S. citizen to be recognized by a foreign country. $555. There is no fee when this application is submitted under 8 CFR 338.5(a) to request correction of a certificate that contains an error.

(7) *Application for Certificate of Citizenship, Form N–600.* To apply for a Certificate of Citizenship. $1,385.

(i) There is no fee for any application filed by a current or former member of any branch of the U.S. armed forces on their own behalf.

(ii) There is no fee for an application filed on behalf of an individual who is the subject of a final adoption for immigration purposes and meets (or met before age 18) the definition of child

under section 101(b)(1)(E), (F), or (G) of the Act.

(8) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* Application for children who regularly reside outside the United States to apply for citizenship based on a U.S. citizen parent. $1,385. There is no fee for an application filed on behalf of a child who is the subject of a final adoption for immigration purposes and meets the definition of child under section 101(b)(1)(E), (F), or (G) of the Act.

(9) *Application for Posthumous Citizenship, Form N–644.* To request citizenship for someone who died because of injury or disease incurred in or aggravated by service in an active-duty status with the U.S. armed forces during a specified period of military hostilities. No fee.

(10) *Medical Certification for Disability Exceptions, Form N–648.* For a naturalization applicant to request an exception to the English and civics testing requirements for naturalization because of physical or developmental disability or mental impairment. No fee.

(c) *G Forms, statutory fees, and non-form fees*—(1) *Genealogy Index Search Request, Form G–1041.* The fee is due regardless of the search results. $80.

(2) *Genealogy Records Request, Form G–1041A.* USCIS will refund the records request fee when it cannot find any file previously identified in response to the index search request. $80.

(3) *USCIS immigrant fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $235.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for Form I–129CW.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *CNMI education funding fee.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions. The fee amount will be as prescribed in the form instructions and:

(i) The employer must pay the fee for each beneficiary and for each year or partial year of requested validity; and

(ii) Beginning in FY 2020, the $200 fee may be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index for All Urban Consumers (CPI–U).

(8) *9–11 response and biometric entry-exit fee for H–1B Visa.* For certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,000. Collection of this fee is scheduled to end on September 30, 2027.

(9) *9–11 response and biometric entry-exit fee for L–1 Visa.* For certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,500. Collection of this fee is scheduled to end on September 30, 2027.

(10) *Claimant under section 289 of the Act.* For American Indians who are born in Canada and possess at least 50 percent American Indian blood to request lawful permanent resident status. No fee.

(11) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $215.

(iii) This fee is not subject to the online discount provided in § 106.1(g).

(12) *Request for Certificate of Non-Existence, G–1566.* For a certification of non-existence of a naturalization record. $330.

(13) *Asylum Program Fee.* In addition to the fees required by § 106.2(a)(3), (a)(4) and (a)(11), to fund the asylum program, the Asylum Program Fee must be paid by any petitioner filing a *Petition for a Nonimmigrant Worker,* Form I–129 under 8 CFR 214.2, *Petition for a CNMI-Only Nonimmigrant Transitional Worker,* Form I–129CW under 8 CFR 214.2(w), or an *Immigrant Petition for Alien Worker,* Form I–140 under 8 CFR 204.1(a). $600. For petitions:

(i) Filed by a nonprofit as defined in § 106.1(f): No fee.

(ii) Filed by a small employer as defined in § 106.1(f): $300.

(iii) The online filing discount provided in § 106.1(g) does not apply to this fee.

(d) *Inflationary adjustment.* The fees prescribed in this section that are not set or limited by statute may be adjusted, but not more often than once per year,

by publication of a rule in the **Federal Register** that:

(1) Is based on the amount of inflation as measured by the difference in the CPI–U as published by the U.S. Department of Labor, U.S. Bureau of Labor Statistics in April of the year of the last fee rule and the year of the adjustment under this section.

(2) Adjusts all fees that are not set by statute based on the amount of inflation.

(3) Rounds the fees calculated by the amount of inflation to the nearest $5 increment.

## § 106.3 Fee waivers and exemptions.

(a) *Waiver of fees.* (1) *Eligibility.* The party requesting the benefit must be unable to pay the prescribed fee. A person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

(i) Receipt of a means-tested benefit as defined in § 106.1(f)(3) at the time of filing;

(ii) Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

(iii) Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.

(2) *Requesting a fee waiver.* To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request.

(3) *USCIS fees that may be waived.* Only the following fees may be waived:

(i) The following fees for the following forms may be waived without condition:

(A) Application to Replace Permanent Resident Card (Form I–90);

(B) Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (Form I–191);

(C) Petition to Remove the Conditions of Residence (Form I–751);

(D) Application for Family Unity Benefits (Form I–817);

(E) Application for Temporary Protected Status (Form I–821);

(F) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881) (under section 203 of Pub. L. 105–110);

(G) Application to File Declaration of Intention (Form N–300);

(H) Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336 (Form N–336);

(I) Application for Naturalization (Form N–400);

(J) Application to Preserve Residence for Naturalization Purposes (N–470);

(K) Application for Replacement Naturalization/Citizenship Document (N–565);

(L) Application for Certificate of Citizenship (N–600); and

(M) Application for Citizenship and Issuance of Certificate under section 322 of the Act (N–600K).

(ii) The following form fees may be waived based on the conditions described in paragraphs (a)(3)(ii)(A) through (F) of this section:

(A) Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I–129CW) for a E–2 CNMI investor. Waiver of the fee for Form I–129CW does not waive the requirement for a E–2 CNMI investor to pay any fees in § 106.2(c) that may apply.

(B) An Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for CW–2 nonimmigrant status;

(C) Application for Travel Document (Form I–131), when filed to request humanitarian parole;

(D) Notice of Appeal or Motion (Form I–290B), when there is no fee for the underlying application or petition or that fee may be waived;

(E) Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act (Form I–694), if the underlying application or petition was fee exempt, the filing fee was waived, or was eligible for a fee waiver;

(F) Application for Employment Authorization (Form I–765), except persons filing under category (c)(33), Deferred Action for Childhood Arrivals; and

(G) Petition for Nonimmigrant Worker (Form I–129) or Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for E–2 CNMI Investor for an extension of stay.

(iii) Any fees associated with the filing of any benefit request under 8 U.S.C. 1101(a)(51) and those otherwise self-petitioning under 8 U.S.C. 1154(a)(1) (VAWA self-petitioners), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status), 8 U.S.C. 1105a (battered spouses of A, G, E–3, or H nonimmigrants), 8 U.S.C. 1229(b)(2) (special rule cancellation for battered spouse or child), and 8 U.S.C. 1254a(a) (Temporary Protected Status).

(iv) The following fees may be waived only if the person is exempt from the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4):

(A) Application for Advance Permission to Enter as Nonimmigrant (Form I–192);

(B) Application for Waiver for Passport and/or Visa (Form I–193);

(C) Application to Register Permanent Residence or Adjust Status (Form I–485); and

(D) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(4) *Immigration Court fees.* The provisions relating to the authority of the immigration judges or the Board to waive fees prescribed in paragraph (b) of this section in cases under their jurisdiction can be found at 8 CFR 1003.8 and 1003.24.

(b) *Humanitarian fee exemptions.* Persons in the following categories are exempt from paying certain fees as follows:

(1) Persons seeking or granted Special Immigrant Juvenile classification who file the following forms related to the Special Immigrant Juvenile classification or adjustment of status under section 245(h) of the Act, 8 U.S.C. 1255(h):

(i) Application for Travel Document (Form I–131).

(ii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iii) Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application for Waiver of Ground of Inadmissibility (Form I–601).

(v) Application for Employment Authorization (Form I–765).

(vi) Application for Action on an Approved Application or Petition (Form I–824).

(2) Persons seeking or granted T nonimmigrant status who file the following forms related to T nonimmigrant status or adjustment of status under INA section 245(l), 8 U.S.C. 1255(l):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an

Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824). (3) Persons seeking or granted special immigrant visa or status as Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries, who file the following forms related to the Special Immigrant classification or adjustment of status under such classification:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for initial Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(4) Persons seeking or granted adjustment of status as abused spouses and children under the Cuban Adjustment Act (CAA) and the Haitian Refugee Immigration Fairness Act (HRIFA) are exempt from paying the following fees for forms related to those benefits:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust

Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(5) Persons seeking or granted U nonimmigrant status who file the following forms related to U nonimmigrant status or adjustment of status under INA section 245(m), 8 U.S.C. 1255(m):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824).

(x) Petition for Qualifying Family Member of a U–1 Nonimmigrant (Form I–929).

(6) Persons seeking or granted immigrant classification as VAWA self-petitioners and derivatives as defined in section 101(a)(51)(A) and (B) of the Act or those otherwise self-petitioning for immigrant classification under section 204(a)(1) of the Act, 8 U.S.C. 1154(a)(1), are exempt from paying the following fees for forms related to the benefit:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B) if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(vi) Application for Provisional Unlawful Presence Waiver (Form I–601A).

(vii) Application for Employment Authorization (Form I–765) for initial, renewal, and replacement requests submitted under 8 CFR 274a.12(c)(9) and (14) and section 204(a)(1)(K) of the Act.

(viii) Application for Action on an Approved Application or Petition (Form I–824).

(7) Abused spouses and children applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA) are exempt from paying the following fees for forms related to the benefit:

(i) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)) (Form I–881).

(ii) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(iii) Application for Employment Authorization (Form I–765) submitted under 8 CFR 274a.12(c)(10).

(iv) Application for Action on an Approved Application or Petition (Form I–824).

(8) Battered spouses and children of a lawful permanent resident or U.S. citizen applying for cancellation of removal and adjustment of status under section 240A(b)(2) of the Act are exempt from paying the following fees for forms related to the benefit:

(i) Application for Employment Authorization (Form I–765) for their initial request under 8 CFR 274a.12(c)(10).

(ii) Application for Action on an Approved Application or Petition (Form I–824).

(9) Refugees, persons paroled as refugees, or lawful permanent residents who obtained such status as refugees in the United States are exempt from paying the following fees:

(i) Application for Travel Document (Form I–131).

(ii) Application for Carrier Documentation (Form I–131A).

(iii) Application for Employment Authorization (Form I–765).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(c) *Director's waiver or exemption exception.* The Director of USCIS may authorize the waiver of or exemption from, in whole or in part, a form fee required by § 106.2 that is not otherwise

waivable or exempt under this section, if the Director determines that such action is in the public interest and consistent with the applicable law. This discretionary authority may be delegated only to the USCIS Deputy Director.

**§ 106.4   Premium processing service.**

(a) *General.* A person may submit a request to USCIS for premium processing of certain immigration benefit requests, subject to processing timeframes and fees, as described in this section.

(b) *Submitting a request.* A request must be submitted on the form and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to other filing fees. USCIS may require the premium processing service fee be paid in a separate remittance from other filing fees and preclude combined payments in the applicable form instructions.

(c) *Designated benefit requests and fee amounts.* Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: $2,805.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: $2,805.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: $1,685.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: $2,805.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: $2,805.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: $2,805.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: $2,805.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: $2,805.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: $1,685.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: $2,805.

(11) Petition for classification under section 203(b)(1)(A) of the Act: $2,805.

(12) Petition for classification under section 203(b)(1)(B) of the Act: $2,805.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: $2,805.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: $2,805.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: $2,805.

(17) Petition for classification under section 203(b)(1)(C) of the Act: $2,805.

(18) Petition for classification under section 203(b)(2) of the Act, involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: $1,965.

(20) Application under section 248 of the Act to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: $1,965.

(21) Application for employment authorization: $1,685.

(d) *Fee adjustments.* The fee to request premium processing service may be adjusted by notification in the **Federal Register** on a biennial basis based on the percentage by which the Consumer Price Index for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the second preceding calendar year.

(e) *Processing timeframes.* The processing timeframes for a request for premium processing are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: 15 business days.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: 15 business days.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: 15 business days.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: 15 business days.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: 15 business days.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: 15 business days.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: 15 business days.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: 15 business days.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: 15 business days.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: 15 business days.

(11) Petition for classification under section 203(b)(1)(A) of the Act: 15 business days.

(12) Petition for classification under section 203(b)(1)(B) of the Act: 15 business days.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: 15 business days.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: 15 business days.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: 15 business days.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: 15 business days.

(17) Petition for classification under section 203(b)(1)(C) of the Act: 45 business days.

(18) Petition for classification under section 203(b)(2) of the Act involving a waiver under section 203(b)(2)(B) of the Act: 45 business days.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: 30 business days.

(20) Application under section 248 of the Act I to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: 30 business days.

(21) Application for employment authorization: 30 business days.

(22) For the purpose of this section a business day is a day that the Federal Government is open for business, and does not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons. The closure may be nationwide or in the region where the adjudication of the benefit for which premium processing is sought will take place.

(f) *Processing requirements and refunds.* (1) USCIS will issue an approval notice, denial notice, a notice of intent to deny, or a request for evidence within the premium processing timeframe.

(2) Premium processing timeframes will commence:

(i) For those benefits described in paragraphs (e)(1) through (16) of this section, on the date the form prescribed by USCIS, together with the required fee(s), are received by USCIS.

(ii) For those benefits described in paragraphs (e)(17) through (21) of this section, on the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

(3) In the event USCIS issues a notice of intent to deny or a request for evidence of the premium processing timeframe will stop and will recommence with a new timeframe as specified in paragraphs (e)(1) through (21) of this section on the date that USCIS receives a response to the notice of intent to deny or the request for evidence.

(4) Except as provided in paragraph (f)(5) of this section, USCIS will refund the premium processing service fee but continue to process the case if USCIS does not take adjudicative action described in paragraph (f)(1) of this section within the applicable processing timeframe as required in paragraph (e) of this section.

(5) USCIS may retain the premium processing fee and not take an adjudicative action described in paragraph (f)(1) of this section on the request within the applicable processing timeframe, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the immigration benefit request.

(g) *Availability.* (1) USCIS will announce by its official internet website, currently *https://www.uscis.gov,* the benefit requests described in paragraph (c) of this section for which premium processing may be requested, the dates upon which such availability commences or ends, or any conditions that may apply.

(2) USCIS may suspend the availability of premium processing for immigration benefit requests designated for premium processing if circumstances prevent the completion of processing of a significant number of

such requests within the applicable processing timeframe.

### § 106.5  Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

### § 106.6  DHS severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, or held unenforceable as to any person or circumstance, the remaining provisions and applications will continue in effect.

## PART 204—IMMIGRANT PETITIONS

■ 7. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 8. Section 204.3 is amended by:
■ a. Revising and republishing the definitions of "Advanced processing application" and "Orphan petition" in paragraph (b);
■ b. Revising and republishing paragraph (d) introductory text; and
■ c. Revising paragraphs (h)(3), (7), (13), and (14).

The revisions and republications read as follows:

### § 204.3  Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

*    *    *    *    *

(b) * * *

*Advanced processing application* means Form I–600A (Application for Advance Processing of an Orphan Petition) completed in accordance with the form's instructions and submitted with the required supporting documentation and the fee as required in 8 CFR 106.2. The application must be signed in accordance with the form's instructions by the married petitioner and spouse, or by the unmarried petitioner.

*    *    *    *    *

*Orphan petition* means Form I–600 (Petition to Classify Orphan as an Immediate Relative). The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. The petition must be signed in accordance with the form's instructions by the married

petitioner and spouse, or the unmarried petitioner.

*    *    *    *    *

(d) *Supporting documentation for a petition for an identified orphan.* Any document not in the English language must be accompanied by a certified English translation. If an orphan has been identified for adoption and the advanced processing application is pending, the prospective adoptive parents may file the orphan petition at the USCIS office where the application is pending. The prospective adoptive parents who have an approved advanced processing application must file an orphan petition and all supporting documents within 15 months of the date of the approval of the advanced processing application. If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned under paragraph (h)(7) of this section. If the prospective adoptive parents file the orphan petition after the approval period of the advanced processing application has expired, the petition will be denied under paragraph (h)(13) of this section. Prospective adoptive parents who do not have an advanced processing application approved or pending may file the application and petition concurrently on one Form I–600 if they have identified an orphan for adoption. An orphan petition must be accompanied by full documentation as follows:

*    *    *    *    *

(h) * * *

(3) *Advanced processing application approved.* If the advanced processing application is approved:

(i) The prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the approval date.

(ii) USCIS may extend the validity period for the approval of a Form I–600A if requested in accordance with 8 CFR 106.2(a)(32). Form I–600A/I–600 Supplement 3 cannot be used to:

(A) Seek extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–600A approval but must be filed on or before the date on which the validity period expires if the applicant seeks an extension.

(B) Extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country.

(C) Request a change of country to a Hague Adoption Convention transition

country for purposes of becoming a transition case if another country was already designated on the Form I–600A or the applicant previously changed countries.

(iii) Form I–600A/I–600 Supplement 3 may only be used to request an increase in the number of children the applicant/petitioner is approved to adopt from a transition country if: the additional child is a birth sibling of a child whom the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(iv) If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for each of the additional children, to the maximum number approved.

(v) It does not guarantee that the orphan petition will be approved.

*    *    *    *    *

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within the validity period of the advanced processing application:

(i) The application will be deemed abandoned;

(ii) Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the biometric checks;

(iii) The director will dispose of documentation relating to biometrics checks in accordance with current policy; and

(iv) Such abandonment will be without prejudice to a new filing at any time with fee.

*    *    *    *    *

(13) *Orphan petition denied: petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied unless it is filed concurrently with a new advanced processing application under 8 CFR 204.3(d)(3). This action will be without prejudice to a new filing at any time with fee.

(14) *Revocation.* (i) The approval of an advanced processing application or an orphan petition shall be automatically revoked in accordance with 8 CFR 205.1

003341

if an applicable reason exists. The approval of an advanced processing application or an orphan petition shall be revoked if the director becomes aware of information that would have resulted in denial had it been known at the time of adjudication. Such a revocation or any other revocation on notice shall be made in accordance with 8 CFR 205.2.

(ii) The approval of a Form I–600A or Form I–600 combination filing is automatically revoked if before the final decision on a beneficiary's application for admission with an immigrant visa or for adjustment of status:

(A) The marriage of the applicant terminates; or

(B) An unmarried applicant marries.

(iii) Revocation is without prejudice to the filing of a new Form I–600A or Form I–600 combination filing, with fee, accompanied by a new or updated home study, reflecting the change in marital status. If a Form I–600 had already been filed based on the approval of the prior Form I–600A and a new Form I–600A is filed under this paragraph (h)(14) rather than a Form I–600 combination filing, then a new Form I–600 must also be filed. The new Form I–600 will be adjudicated only if the new Form I–600A is approved.

\*     \*     \*     \*     \*

■ 9. Section 204.5 is amended by revising and republishing paragraph (p)(4) to read as follows:

### §204.5   Petitions for employment-based immigrants.

\*     \*     \*     \*     \*

(p) \* \* \*

(4) *Application for employment authorization.* (i) To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must:

(A) File an application for employment authorization with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions.

(B) Submit biometric information in accordance with the applicable form instructions.

(ii) Employment authorization under this paragraph may be granted solely in 1-year increments.

\*     \*     \*     \*     \*

■ 10. Section 204.312 is amended by revising and republishing paragraphs (e)(1) and (e)(3) to read as follows:

### §204.312   Adjudication of the Form I–800A.

\*     \*     \*     \*     \*

(e) \* \* \*

(1) A notice of approval expires 15 months after the date of the approval, unless approval is revoked. USCIS may

extend the validity period for the approval of a Form I–800A only as provided in paragraph (e)(3) of this section.

\*     \*     \*     \*     \*

(3)(i) If the validity period for a Form I–800A approval is about to expire, the applicant:

(A) May file Form I–800A Supplement 3 as described in 8 CFR 106.2(a)(48) to request an extension.

(B) May not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval but must do so on or before the date on which the validity period expires if the applicant seeks an extension.

(ii) Any Form I–800A Supplement 3 that is filed to obtain an extension or update of the approval of a Form I–800A or to request a change of Hague Convention countries must be accompanied by:

(A) A statement, signed by the applicant under penalty of perjury, detailing any changes to the answers given to the questions on the original Form I–800A;

(B) An updated or amended home study as required under 8 CFR 204.311(u); and

(C) A photocopy of the Form I–800A approval notice.

(iii) If USCIS continues to be satisfied that the applicant remains suitable as the adoptive parent of a Convention adoptee, USCIS will extend the approval of the Form I–800A for the same period of validity as the initial filing.

(iv) There is no limit to the number of extensions that may be requested and granted under this section, so long as each request is supported by an updated or amended home study that continues to recommend approval of the applicant for intercountry adoption and USCIS continues to find that the applicant remain suitable as the adoptive parent(s) of a Convention adoptee.

■ 11. Section 204.313 is amended by revising and republishing paragraph (a) to read as follows:

### §204.313   Filing and adjudication of a Form I–800.

(a) *When to file.* Once a Form I–800A has been approved and the Central Authority has proposed placing a child for adoption by the petitioner, the petitioner may file the Form I–800. The petitioner must complete the Form I–800 in accordance with the instructions that accompany the Form I–800 and sign the Form I–800 personally. In the case of a married petitioner, one spouse cannot sign for the other, even under a

power of attorney or similar agency arrangement. The petitioner may then file the Form I–800 with the stateside or overseas USCIS office or the visa issuing post that has jurisdiction under § 204.308(b) to adjudicate the Form I–800, together with the evidence specified in this section and the filing fee specified in 8 CFR 106.2, if more than one Form I–800 is filed for children who are not birth siblings.

\*     \*     \*     \*     \*

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 12. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2. Section 212.1(q) also issued under sec. 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 13. Section 212.19 is amended by revising and republishing paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

### §212.19   Parole for entrepreneurs.

\*     \*     \*     \*     \*

(b) \* \* \*

(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

\*     \*     \*     \*     \*

(c) \* \* \*

(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file an application for entrepreneur parole with USCIS on the form prescribed by USCIS with the required fee and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

\*     \*     \*     \*     \*

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole will be

required to submit biometric information.

\* \* \* \* \*

(h) \* \* \*

(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

\* \* \* \* \*

(j) *Reporting of material changes.* An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if they will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

\* \* \* \* \*

## PART 214—NONIMMIGRANT CLASSES

■ 14. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 15. Section 214.1 is amended by republishing paragraph (c)(5) to read as follows:

### § 214.1   Requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(c) \* \* \*

(5) *Decision on application for extension or change of status.* Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of

USCIS. The denial of an application for extension of stay may not be appealed.

\* \* \* \* \*

■ 16. Section 214.2 is amended by:
■ a. Revising and republishing paragraphs (e)(8)(iii) through (v), (e)(23)(viii), (h)(2)(i)(A), (h)(2)(ii), (h)(5)(i)(B), and (h)(19)(i) introductory text;
■ b. Revising paragraph (m)(14)(ii) introductory text;
■ c. Revising and republishing paragraphs (o)(2)(iv)(F), (p)(2)(iv)(F), and (q)(5)(ii);
■ d. Republishing the definition for "Petition" in paragraph (r)(3);
■ e. Revising paragraph (r)(5);
■ f. Republishing paragraph (w)(5) and (w)(15)(iii); and
■ g. Revising paragraph (w)(16).
The revisions and republications read as follows:

### § 214.2   Special requirements for admission, extension, and maintenance of status.

\* \* \* \* \*

(e) \* \* \*
(8) \* \* \*
(iii) *Substantive changes.* Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) *Non-substantive changes.* Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment that would affect the alien's eligibility for E classification. Further, prior approval is not required if corporate changes occur which do not affect the previously approved employment relationship or are otherwise non-substantive. To facilitate admission, the alien may:

(A) Present a letter from the treaty-qualifying company through which the alien attained E classification explaining the nature of the change;

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change; or

(C) Apply directly to Department of State for a new E visa reflecting the change. An alien who does not elect one of the three options contained in paragraphs (e)(8)(iv)(A) through (C) of this section, is not precluded from demonstrating to the satisfaction of the immigration officer at the port-of-entry in some other manner, his or her admissibility under section 101(a)(15)(E) of the Act.

(v) *Advice.* To request advice from USCIS as to whether a change is substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

\* \* \* \* \*

(23) \* \* \*
(viii) *Information for background checks.* USCIS may require an applicant for E–2 CNMI Investor status, including but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

\* \* \* \* \*

(h) \* \* \*
(2) \* \* \*
(i) \* \* \*

(A) *General.* A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

\* \* \* \* \*

(ii) *Multiple beneficiaries.* Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance with paragraph (h)(6)(i)(E) of this section must be filed separately.

\* \* \* \* \*

(5) \* \* \*
(i) \* \* \*

(B) *Multiple beneficiaries.* The total number of beneficiaries of a petition or series of petitions based on the same

temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or fewer and does not exceed the number of positions indicated on the relating temporary labor certification.

* * * * *

(19) * * *

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

* * * * *

(m) * * *

(14) * * *

(ii) *Application.* An M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but not more than 90 days before the program end date. The designated school official must certify on Form I–538 that:

* * * * *

(o) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

* * * * *

(p) * * *

(2) * * *

(iv) * * *

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3 beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

* * * * *

(q) * * *

(5) * * *

(ii) *Petition for multiple participants.* The petitioner may include up to 25 named participants on a petition. The petitioner shall include the name, date of birth, nationality, and other identifying information required on the petition for each participant. The petitioner must also indicate the United States consulate at which each participant will apply for a Q–1 visa. For participants who are visa-exempt under 8 CFR 212.1(a), the petitioner must indicate the port of entry at which each participant will apply for admission to the United States.

* * * * *

(r) * * *

(3) * * *

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

* * * * *

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period spent in R–1 status does not exceed a maximum of 5 years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

* * * * *

(w) * * *

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

* * * * *

(15) * * *

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(16) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant or extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

* * * * *

■ 17. Section 214.14 is amended by revising and republishing paragraph (c)(1) introductory text to read as follows:

**§ 214.14   Alien victims of certain qualifying criminal activity.**

* * * * *

(c) * * *

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit a Petition for U Nonimmigrant Status on the form prescribed by USCIS, and initial evidence to USCIS in accordance with this paragraph (c)(1) and the form instructions. A petitioner who received interim relief is not required to submit initial evidence with a Petition for U Nonimmigrant Status if he or she is relying on the law enforcement certification and other evidence that was submitted with the request for interim relief.

* * * * *

**PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL**

■ 18. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681); 8 CFR part 2.

■ 19. Section 240.63 is amended by revising and republishing paragraph (a) to read as follows:

**§ 240.63   Application process.**

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed, Application for Suspension of Deportation, before the effective date of the form prescribed by USCIS may apply with USCIS by submitting the completed Application for Suspension of Deportation attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

* * * * *

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 20. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

■ 21. Section 244.6 is revised and republished to read as follows:

### § 244.6   Application.

(a) An application for Temporary Protected Status (TPS) must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

(b) An applicant for TPS may also request an employment authorization document under 8 CFR part 274a by filing an Application for Employment Authorization in accordance with the form instructions and in accordance with 8 CFR 106.2 and 106.3.

■ 22. Section 244.17 is amended by republishing paragraph (a) to read as follows:

### § 244.17   Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests that they do so.

*       *       *       *       *

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 23. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1252, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 24. Section 245.1 is amended by:
■ a. Revising paragraph (f); and
■ b. Removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

### § 245.1   Eligibility.

*       *       *       *       *

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States.

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 25. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 26. Section 245a.2 is amended by republishing paragraph (e)(3) to read as follows:

### § 245a.2   Application for temporary residence.

*       *       *       *       *

(e) * * *
(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*       *       *       *       *

■ 27. Section 245a.3 is amended by republishing paragraph (d)(3) to read as follows:

### § 245a.3   Application for adjustment from temporary to permanent resident status.

*       *       *       *       *

(d) * * *
(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*       *       *       *       *

■ 28. Section 245a.4 is amended by republishing paragraph (b)(5)(iii) to read as follows:

### § 245a.4   Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

*       *       *       *       *

(b) * * *

(5) * * *
(iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*       *       *       *       *

■ 29. Section 245a.12 is amended by republishing paragraph (d) introductory text to read as follows:

### § 245a.12   Filing and applications.

*       *       *       *       *

(d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

*       *       *       *       *

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 30. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

■ 31. Section 264.5 is amended by revising paragraph (a) to read as follows:

### § 264.5   Application for a replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 106.2.

*       *       *       *       *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 32. The authority citation for part 274a is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 114–74, 129 Stat. 599 (28 U.S.C. 2461 note); 8 CFR part 2.

■ 33. Section 274a.12 is amended by revising and republishing paragraphs (b)(9), (13), and (14) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

*       *       *       *       *

(b) * * *
(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), under 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker under section 101(a)(15)(H)(i)(b)(1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another

003345

organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H).

\*      \*      \*      \*      \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), under 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), under 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

\*      \*      \*      \*      \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2024–01427 Filed 1–30–24; 4:15 am]

**BILLING CODE 9111–97–P**

## Adjudicator's Field Manual

**NOTE: The USCIS Policy Manual is our centralized online repository for immigration policies. We are working quickly to update and move material from the Adjudicator's Field Manual to the Policy Manual. Please check that resource, along with our Policy Memoranda page, to verify information you find in the Adjudicator's Field Manual. If you have questions or concerns about any discrepancies among these resources, please contact PolicyFeedback@uscis.dhs.gov.**

### Chapter 21 Family-based Petitions and Applications.

21.1     General Information About Relative Visa Petitions

21.2     Factors Common to the Adjudication of All Relative Petitions has been partially superseded by the USCIS Policy Manual as of May 22, 2024.

21.3     Petition for a Spouse

21.4     Petition for a Child, Son, or Daughter has been partially superseded by the USCIS Policy Manual as of May 22, 2024.

21.5     Petition for an Orphan has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.

21.6     Petition for Hague Convention Adoptee has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.

21.7     Petition for an Amerasian has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 19, 2021.

21.8     Petition for a Parent has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

21.9     Petition for a Sibling has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

21.10    Refugee/Asylee Relative Petition

21.11    Petition for Spouse, Child, or Parent of Certain Deceased U.S. Armed Forces Members

21.12    Process for Responding to Requests by the Department of State (DOS) to Accept a Locally Filed Form I-130, Petition for Alien Relative has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of February 1, 2020.

21.13    [Reserved]

21.14    Self-Petitions by Abused Spouses and Children has been superseded by USCIS Policy Manual, Volume 3: Humanitarian Protection and Parole as of February 10, 2022.

21.15   Self-Petitions by Abused Parents of U.S. Citizens has been superseded by USCIS Policy Manual, Volume 3: Humanitarian Protection and Parole as of February 10, 2022.

21.16   Adoption as a Basis for Immigration Benefits has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.

**21.1 General Information About Relative Visa Petitions.**

(a) <u>Historical Information Regarding Visa Petitions</u> .

In the aftermath of World War I, Congress passed a number of laws restricting immigration to the U.S. by both numbers and qualifications. [Previously, there were restrictions barring certain types of individuals based on individual shortcomings (e.g., the Act of March 3, 1875 which barred convicts and prostitutes, and the Act of August 3, 1882, which barred criminals, paupers, and "mental and physical defectives"), and on race (i.e., the Chinese Exclusion Act of May 6, 1882).] In order to qualify for an imm igrant visa (itself a new post-WWI innovation), the alien had to fall within one of the quota categories, or be exempt therefrom. The visa petition was then created as the vehicle for establishing that an alien fell into one of the higher quota categories, or was quota-exempt.

Over the years, the definitions of the various immigrant visa categories have changed with the passage of new legislation, and the requirements have been interpreted and reinterpreted through volumes of case law. However, the need for an approved immigrant visa petition to qualify for most visa classifications has remained a basic requirement of the system of legal immigration to the United States. It is no exaggeration to say that professional adjudication of immigrant visa petitions is one of the keystone s to ensuring that the system works as intended.

(b) <u>Organization of This Chapter</u> .

Many of the basic visa petition adjudication procedures and issues are similar regardless of the form being filed or the classification being sought. Those basic procedures are discussed in **subchapter 21.2** . **Subchapters 21.3** through 21.10 are organized according to the relationship of the petitioner to the beneficiary and discuss those aspects of the adjudication procedures and issues which are unique to those particular relationships. Accordingly, it is intended that the users of this field manual review both subchapter 21.2 and the relevant individual relationship subchapter when seeking information.

(c) <u>Special Parole and Deferred Action Considerations.</u>

On November 15, 2013, USCIS, pursuant to the authority conferred upon the Secretary of Homeland Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), issued a Policy Memorandum guiding the exercise of discretion with respect to applications for parole by designated family members of U.S. military personnel and veterans. On November 20, 2014, the Secretary directed USCIS to issue new policies on the use of both parole in place and deferred action for certain family members of certain military personnel, veterans, and individuals who are seeking to enlist in the U.S. military. See Secretary of Homeland Security Memorandum, "Families of U.S. Armed Forces Members and Enlistees" (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf

These new policies support the Department of Defense (DoD) in several ways, including by:

- Elaborating on general USCIS deferred action policies by identifying factors that are of particular relevance to discretionary determinations involving military personnel, veterans, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist military members, veterans, and their families in navigating our complex immigration system;

- Facilitating military morale and readiness and supporting DoD recruitment policies by considering temporarily deferring the removal of certain military family members;

- Furthering the goal of the Military Accessions Vital to the National Interest (MAVNI) program to recruit certain foreign nationals whose skills are considered vital to the national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans, who have served and sacrificed for our nation, and their families.

For guidance on parole in place for certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(1). For guidance on deferred action for certain enlistees and certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(2).


(1) <u>Special Parole Consideration for Spouses, Parents, Sons, and Daughters of Active Duty Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged.</u>

The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, USCIS grants parole in place only sparingly. The fact that the individual is a spouse, parent, son, or daughter of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve, or an individual who previously served on active duty in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve (if the former service member was not dishonorably discharged and either is living or died while the family member was residing in the United States), however, ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual. If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate. To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

- Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

- Evidence of the family relationship (this may include proof of filing a petition in certain cases – see AFM 21.1(c)(3) below);

- Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve, or an individual who (whether still living or deceased) previously served on active duty in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173) (in the case of family members of veterans (whether still

living or deceased), the service member must not have received a dishonorable discharge upon separation from the military)

- In the case of surviving family members, proof of residence in the United States at the time of the service member's death;

- Two identical, color, passport style photographs; and

- Evidence of any additional favorable discretionary factors that the requestor wishes considered.

Individuals who have obtained parole in place are eligible to apply for work authorization for the period of parole if they can demonstrate economic necessity. See 8 CFR 274a.12(c)(11), (14). See Form I-765, Application for Employment Authorization.

Parole in place may be granted only to individuals who are present without admission and are therefore applicants for admission. Individuals who were admitted to the United States but are currently present in the United States beyond their periods of authorized stay are not eligible for parole in place, as they are no longer applicants for admission.

(2) Deferred Action Consideration for Spouses, Parents, and Sons and Daughters of Active Duty Military Personnel, Individuals in the Selected Reserve of the Ready Reserve, and Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military or the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged; and for MAVNI and other Enlistees in the Delayed Entry Program and their Spouses, Parents, and Sons and Daughters.

(A) Deferred Action for DoD Delayed Entry Program Enlistees (Including MAVNI Recruits) and Certain Family Members.

Individuals who have no previous military experience and are seeking to enlist in the U.S. Armed Forces must sign a contract by which they enter into the Delayed Entry Program (DEP) for a maximum of 365 days while awaiting Basic Training. While in the DEP, there can be delays in starting active duty for the Active Components or initial active duty for training for the Reserve Components.

Individuals who enlist in the military through the Military Accessions Vital to the National Interest (MAVNI) program may also enter the DEP. The MAVNI program allows certain foreign nationals to enlist in the military to fill positions where there are critical shortages in health care and foreign language skills. See the DoD MAVNI program fact sheet for further details: http://www.defense.gov/news/mavni-fact-sheet.pdf.

Most MAVNI recruits are in a lawful nonimmigrant status at the time that they enlist. For example, it is common for a J-1 foreign exchange visitor or F-1 foreign student to enlist in the U.S. military through MAVNI. Through no fault of their own, MAVNI recruits in the DEP may fall out of their lawful status while waiting to enter Basic Training. This may occur, for example, in cases where an F-1 foreign student completes his or her program of study while waiting to enter Basic Training in the DEP. In the same way, the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits. In addition, family members might lack status either because they are present without being admitted or paroled, or because they were admitted or paroled but overstayed their authorized periods of stay even before their MAVNI or other DEP family member entered the DEP.

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence. In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative. Certain factors, however, are of particular relevance to the exercise of that discretion when deferred action requests are submitted by individuals in DEP and their family members. Particularly strong positive factors specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's authorized period of stay expires while in the DEP); and

- Being the spouse, parent, son, or daughter of a MAVNI recruit or other individual in the DEP (even if present in the United States without an authorized status).

The presence of one or more of the preceding factors does not guarantee a grant of deferred action but may be considered a strong positive factor weighing in favor of granting deferred action. The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present.

If an individual described in either of the two bullets above is granted deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate. If the individual withdraws from the DEP or becomes disqualified from joining the military, any period of deferred action for the family member may be terminated. See AFM Chapter 21.1(c)(2)(C) for guidance on filing requests for deferred action. See AFM Chapter 21.1(c)(1) for guidance on parole in place.


(B) <u>Deferred Action for Certain Family Members of Active Duty Members of the U.S. Military, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military or in the Selected Reserve of the Ready Reserve and Were Not Dishonorably Discharged</u>.

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence. In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative. Certain factors, however, are of particular relevance to the exercise of that discretion when deferred action requests are submitted by the family members of military personnel and veterans. One particularly strong positive factor specific to such requests is that the person has been admitted and is the spouse, parent, son, or daughter of an individual who is serving, or has previously served on active duty in the U.S. military or in the Selected Reserve of the Ready Reserve (if the former service member was not dishonorably discharged and either is living or died while the family member was residing in the United States). Such an individual ordinarily fits the guidelines for parole under section 21.1(c)(1) above, except for being statutorily ineligible solely because of his or her prior admission. See INA §§ 212(d)(5)(A), 235(a)(1), 8 U.S.C. §§ 1182(d)(5)(A), 1225(a)(1). The presence of the preceding factor does not guarantee a grant of deferred action but may be considered a strong positive factor weighing in favor of granting deferred action. The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present. If USCIS grants deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate.


(C) <u>Filing Request for Deferred Action</u>.

To request deferred action, one must submit the following to the director of the USCIS office with jurisdiction over the requestor's place of residence:

- Letter stating basis for the deferred action request [See AFM 21.1(c)(2)(A) and (c)(2)(B)];

- Evidence supporting a favorable exercise of discretion in the form of deferred action as elaborated in AFM 21.1(c)(2)(A) and (c)(2)(B) – (e.g., evidence of family member's current or previous military service, or alien's or family member's enlistment in the DEP; note that in the case of family members of veterans, whether still living or deceased, the service member must not have received a dishonorable discharge upon separation from the military);

- Proof of family relationship, if applying based on family relationship to military member, veteran, or enlistee (this may include proof of filing a petition in certain cases - see section below);

- In the case of surviving family members, proof of residence in the United States at the time of the service member's death;

- Proof of identity and nationality (including a birth certificate, a passport and/or identification card, driver's license, notarized affidavit(s), etc.);

- If applicable, any document the alien used to lawfully enter the United States (including, but not limited to, Form I-94, Arrival/Departure Record, passport with visa and/or admission stamp, and any other documents issued by other components of DHS or legacy INS);

- Form G-325A, Biographic Information (for Deferred Action);

- Two identical, color, passport style photographs; and

- Evidence of any additional discretionary factors that the requestor would like USCIS to consider.

Individuals who have obtained deferred action are eligible to apply for work authorization for the period of deferred action if they can demonstrate economic necessity. See 8 CFR 274a.12(c)(11), (14). See Form I-765, Application for Employment Authorization.

A requestor who has legal representation must submit a properly completed Form G-28, Notice of Entry as Attorney or Accredited Representative.


(3) Petition Filing Requirement for Certain Parole or Deferred Action Requests.

USCIS encourages applicants to continue on a path toward lawful permanent resident status whenever applicable. In cases where it is applicable, USCIS encourages the filing of a Form I-130, Petition for Alien Relative (or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant) to allow USCIS to use an established process in evaluating the bona fides of the pertinent family relationship. In some cases where subsequent parole in place or renewal of deferred action is requested, such filing may be required (see AFM 21.1(c)(3)(A) below). USCIS checks the bona fides of the qualifying family relationship in all parole in place and deferred action requests regardless of whether the Form I-130 (or Form I-360) has been filed.

In all cases where a Form I-130 or Form I-360 has been filed, USCIS may grant either parole in place, as provided in AFM 21.1(c)(1), or deferred action, as provided in AFM 21.1.(c)(2), as long as the applicant's Form I-130 (or Form I-360) is pending or approved (and still valid). Even in cases where the Form I-130 or Form I-360 is required, it does not need to be approved prior to a grant of either parole in place or

deferred action. Upon receiving the receipt notice for the Form I-130 or Form I-360, the alien may file the request for either parole in place or deferred action with the USCIS office with jurisdiction over the alien's place of residence. The request for either parole in place or deferred action must include documentation to establish an eligible family relationship. Such evidence may include a previously approved petition.

<u>Note</u>: Proof of filing the Form I-130 or Form I-360 is not required, even in applicable cases, for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2). See AFM 21.1(c)(3)(B).


(A) <u>Petition Required for Request for Subsequent Parole in Place or Renewal of Deferred Action</u>.

Active Duty military members, individuals in the Selected Reserve of the Ready Reserve, individuals who have previously served on active duty in the U.S. military or in the Selected Reserve of the Ready Reserve, and DEP enlistees, if eligible to file a Form I-130 on behalf of a family member requesting subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) or (c)(2), must submit a completed Form I-130 for the family member, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-130 instructions for more information on who may file.)

Surviving spouses, parents, sons, and daughters of deceased service members and veterans (described above) who were residing in the United States at the time of the service member's death and who are eligible to file Form I-360 on their own behalf must submit a completed Form I-360, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-360 instructions for more information on who may file. See also the USCIS web site at: http://www.uscis.gov/military/family-based-survivor-benefits/survivor-benefits-relatives-us-citizen-military-members.)

The Form I-130 (or Form I-360) filing requirement for requests for subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2) applies only to requests that are submitted on or after November 23, 2017 (one year after publication of memorandum updating AFM 21.1).


(B) <u>Cases where Petition is Not Required at Any Time</u>.

Individuals who are ineligible to file a Form I-130 or a Form I-360 are not required to do so; they may still request parole in place or deferred action, as applicable. In particular, MAVNI recruits in the DEP are not eligible to file Form I-130 and therefore not required to do so. MAVNI recruits may, however, become eligible for naturalization under INA § 329(a) upon entering active duty. Recruits typically must wait until they naturalize before filing a Form I-130 for any eligible family members.

Proof of filing the Form I-130 (or Form I-360) also is not required, even in applicable cases, for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2).

**21.2 Factors Common to the Adjudication of All Relative Visa Petitions.**

(a) <u>Filing and Receipting of Relative Petitions</u> .

(1) <u>Statutory Definitions of Relationships Covered</u> .

USCIS has the responsibility of determining if the beneficiary of a relative visa petition is eligible for the classification sought. As the adjudicating officer, you will make that determination. Therefore, you must be completely familiar with the statutory definitions of relatives as well as the applicable regulations and precedent decisions. The classes of eligible alien relatives are enumerated in sections 201(b), 203(a), 207(c)(2), and 208(b)(3) of the Act and Public Law 97-359:

(A) **Section 201(b)** of the Act covers aliens exempt from numerical limitations and includes "immediate relatives" of United States citizens:

·    **Spouse** , which is not really a defined term under the Act or regulations, although **section 101(a)(35)** of the Act does exclude spouses acquired through unconsummated proxy marriages. Also, section 7 of the Defense of Marriage Act (Pub. L. 104-199) clarifies the term (see Chapter 21.3 of this field manual).

·    **Child** , as that term is defined in paragraphs (A) through (E) of **section 101(b)(1)** of the Act

·    **Orphan** , as that term is defined in section **101(b)(1)(F)** of the Act, who has been, or will be, adopted abroad

·    **Orphan** , as that term is defined in section **101(b)(1)(F)** of the Act, who will be coming to the U.S. to be adopted in legal proceedings in this country

·    **Parent** , as that term is defined in **section 101(b)(2)** of the Act

(B) **Section 203(a)** covers aliens eligible for preferential consideration based on a familial relationship to a citizen or LPR of the U.S. Unlike the immediate relative petitions, the dependents (spouse and child(ren)) of a beneficiary of a preference petition receive derivative immigrant visa classification if they are accompanying or following to join the principal beneficiary. ("Accompanying" refers to a dependent who is immigrating concurrently with, or who has an immigrant visa issued within 6 months after, the principal alien's admission or adjustment; "following to join" refers to an alien who is immigrating more than 6 months after the principal alien, but based on a relationship which existed at the time of the principal alien's immigration, provided that relationship still exists at the time of the dependent's application for admission to the United States.) The family-based preference classifications are:

·　**First preference** under section 203(a)(1) includes the unmarried sons and daughters of United States citizens;

·　**Second preference** under section 203(a)(2) includes the spouses, children, and unmarried sons and daughters of lawful permanent resident aliens;

| Note 1 |
| --- |
| If a lawful permanent resident acquired a dependent prior to such LPR's immigration or adjustment (the LPR had already married the spouse or the parent-child had been established), the dependent could qualify for a following to join visa classification and would not need a second preference petition or a second preference quota number. |

| Note 2 |
| --- |
| Frequently, the child of an LPR can qualify either as a principal beneficiary (child of LPR) based on a visa petition filed on behalf of the child; or as a derivative (child of the spouse of an LPR) through the petition filed by the LPR for the other parent. This is not always the case, since sometimes the child can only qualify as the child of the spouse, as with a stepchild of an LPR who is over 18 at the time the LPR married the child's parent. |

The derivative classification, of course, requires no separate visa petition. The decision on whether to file one visa petition (for the spouse only) or multiple visa petitions (one for spouse and one for each of the LPR's children) is up to the petitioning LPR. Either approach has advantages:

–　The advantage of filing one petition is that only one fee must be paid and only one set of supporting

documents has to be filed. This can result in considerable savings in time and money, especially if the LPR has a large, multi–child family. Furthermore, should situations change (e.g., if the principal beneficiary dies or the marriage ends in divorce) and individual petitions for the children become necessary, the new petitions will be accorded the same filing date as the original petition (see 8 CFR 204.2 (a)(4)).

‒    The advantage of filing multiple petitions is that each beneficiary can act independently. If one of the children needs to immigrate before the others are ready to travel (e.g., if a daughter wants to join her LPR mother in the U.S. to begin school in the U.S. while her father remains in the home country to care for a sibling who is finishing school there), that child may do so.

| Note 3 |
| --- |
| In accordance with **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) , non-citizen nationals of the U.S. may also file petitions pursuant to section 203(a)(2) of the Act. |

·    **Third preference** under section 203(a)(3) includes the married sons and daughters of United States citizens;

·    **Fourth preference** under section 203(a)(4) includes the brothers and sisters of United States citizens.

(C) **Section 207(c)(2)** of the Act covers the relatives of an alien admitted to the United States as a refugee and includes:

·    The **spouse of a refugee** , provided the spousal relationship existed at the time the refugee was first admitted to the United States in that status; and

·    The **child of a refugee** , provided the parent-child relationship between the refugee and the child existed at the time of the refugee's admission to the United States, or the child was in *utero* at the time of the father's admission as a refugee. **Note:** In refugee matters, to qualify as "accompanying" the derivative must be admitted within <u>four </u>months of the principal's admission (see **8 CFR 207.7(a)** and contrast with the <u>six </u>month timeframe for immigrant visa cases as discussed in paragraph 21.2(a)(1)(B) above).

(D) **Section 208(b)(3)** of the Act covers the relatives of an alien granted asylum status (an "asylee") and includes:

· The **spouse of an asylee** , provided the spousal relationship existed at the time the asylee was granted such status in the United States; and

· The **child of an asylee** , provided the parent-child relationship between the refugee and the child existed at the time of the refugee's admission to the United States, or the child was in *utero* at the time the father's asylum application was granted.

| Note |
| --- |
| Nonimmigrant relative petitions for K and V nonimmigrants are discussed in **Chapter 37** of this field manual. |

(2) <u>Petition Form</u> .

· Form I-130 (Petition for Alien Relative) is filed with USCIS by a United States citizen or lawful permanent resident on behalf of an alien relative to establish eligibility for the exemption or preference.

· Form I-360 is used to classify an alien as an Amerasian, Widow(er), or as a Special Immigrant. With regards to relatives, it includes those who are:

– The widow or widower of a U.S. citizen. The form allows such person to petition for himself or herself, and to petition for his or her child. The widow or widower of an LPR cannot self-petition. Likewise, the child of a deceased citizen cannot self-petition; the child must be included in his or her parent's widow/widower self-petition.

– A battered spouse or child of a U.S. citizen or LPR. This category also includes certain persons who would have fallen within this category, except that the marriage to the citizen or LPR was bigamous, as well as certain former battered spouses and children of citizens or LPRs.

− An Amerasian under Publ. L. 97-359, as amended by subsequent legislation.

| |
|---|
| **Note:** |
| Form I-360 is also used for a number of other (non-relative) special immigrant classifications which are discussed in **Chapter 22** of this field manual. |

· Form I-600 is used to petition for an orphan who has been identified.

· Form I-600A is used to petition for an orphan if the orphan is to be named later.

· Form I-730 is used by an alien who has been admitted as a refugee under section 207 of the Act, or granted asylee status under section 208 of the Act, to bring a spouse or child to the United States as a derivative refugee or asylee.

(3) <u>Priority Dates</u> .

Preference aliens need a priority date for visa issuance, and that date is generally established when the petition, filed on the alien's behalf, is properly signed by the petitioner and the fee has been collected by USCIS . The priority date is the chronological date which establishes the preference alien's place on a waiting list maintained by the Department of State for issuance of the immigrant visa. (See also **Chapter 21.1** of this field manual.)

(A) <u>General</u> .

The priority date, in most instances, is the date the visa petition was properly filed at a USCIS office. If the visa petition is filed at a consulate abroad, and the petitioner is under the jurisdiction of the consulate, the priority date or filing date is the date the petition was received at the consular office if the petition can be approved by the consular officer. For those cases not within the jurisdiction of the consular office, no filing date is accorded until such time as they are received by the appropriate USCIS office in the States. The filing

date should be recorded on the appropriate line on the front of the petition with an explanation for any priority date which is different from the date on which USCIS date-stamped the petition when it was originally filed by the petitioner.

(B) Petition Not Properly Filed .

If, during normal processing a delay results from deficiencies in the initial filing, the priority date will be established only when the petition is properly signed by the petitioner and the fee has been collected by USCIS . If questions arise concerning the filing of the petition which cannot be resolved through a check of the Fee Receipting System, (FARES), or other fee collection system, then the director may consider the date of receipt of the petition to be the priority date. Where a petition is returned to the petitioner because the fee has not been paid, or the petition has not been signed, the petitioner should be informed on the Form I-797 that the petition has not been properly filed and no priority date has been es tablished. If you use a later date than the initial date-stamp on the petition as the filing date, you should indicate the reason for using the later date in the Remarks Block on the petition. An example of the format which you may use in the Remarks Block follows:

Priority date not established on date filed because...

a. Fee not paid until_____.

b. Petition not signed until_____.

(4) Chapter 21.2(a)(4) replaced with Memorandum - Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children (REVISED); Effect of FY 2010 DHS Appropriations Act on eligibility to immigrate after death of visa petitioner. See **Appendix 21-7** . [Replacement and addition 12-02-2009]

(b) Adjudicative Procedures .

(1) Review of the Petition .

The basic adjudication procedures and concerns discussed in chapters 10 through 17 of this field manual apply to relative petitions. Adjudicators who are not already familiar with these matters should review those chapters before adjudicating relative petitions.

(A) Underline{General} .

You must carefully review the answer to each question on the petition and determine if the information is relevant and correct. People preparing petitions sometimes provide incorrect, inaccurate, or misleading information, and you must detect mistakes and misinformation in order to properly adjudicate the petition. Some errors are inadvertent; others are deliberate. Examples of common problems associated with the execution and filing of petitions are:

·   Failure to include the requisite fee;

·   Failure to sign the petition;

·   Reversal of petitioner's and beneficiary's names (the terms "petitioner" and "beneficiary" sometimes confuse people);

·   Failure to answer relevant questions;

·   Use of "N/A" to answer relevant questions; and,

·   Erroneously listing the current date as the birth date for the petitioner or the beneficiary.

| **Note** |
|---|

> You should be aware that the use of the term "N/A" is a common ploy used to try to conceal relevant information (e.g., prior marriages, children, beneficiary's status in the United States) by implying the answer is "none" without actually stating it. Therefore, "N/A" should generally not be considered an acceptable answer.

(B) <u>Item-by-Item Review</u> .

Chapter 21.2(b)(1)(B), Item-by-Item Review, has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

Special attention should be paid to the following items:

· <u>Name</u> . The names of the petitioner and the beneficiary are basic in establishing identity and are extremely important when trying to locate any relating USCIS records. They also provide clues concerning marriages, illegitimacy, adoption, and other issues for which a name differentiation is normal. Any substantial variation in these names, when compared with USCIS or other records, must be satisfactorily explained by the submission of additional documents, affidavits, or other appropriate means.

· <u>Date and Place of Birth</u> . This information is essential as it relates to the identity of the individual and is often necessary to locate any relating USCIS records. Additionally, it may determine eligibility for the benefit sought. For example, a petition filed to accord immediate relative classification to a parent or fourth preference classification to a brother or sister requires a review of the petitioner's date of birth because the petitioner must be at least 21 years of age at the time of filing. A large difference in age between the petitioner and beneficiary on a spouse petition is often the first indication you will have that the marriage may have be en contracted solely for the purpose of gaining an immigration benefit (with or without the knowledge and complicity of the petitioner). On petitions for parents, brothers, sisters, children, sons, or daughters, the petitioner's and the beneficiary's birth dates may have a definite bearing on the claimed relationship. Also, the law governing the place where and when the individual was born must be considered in determining eligibility for many benefits. Because of the variance in individual state law as well as in foreign laws, the adjudicator will, ofte ntimes, have to rely on a report from the Library of Congress (see **Chapter 14.10** of this field manual), interim decisions, General Counsel Opinions, or other resources to determine eligibility.

· <u>Previously-Filed Visa Petitions</u> . The answer to this question may provide you with valuable information pertinent to your case. A previously-filed petition may contain the necessary evidence or information that was missing or may indicate a lack of eligibility for the benefit sought. If the petition or other record reflects that a previous petition has been filed by the petitioner, and it is believed that the prior

petition may contain evidence or information pertinent to the adjudication of the present petition, then the prior petition s hould be obtained where possible.

·   United States Citizenship of Petitioner . If the petitioner is a United States citizen, proof of citizenship must be submitted with the petition. In most cases, a birth certificate, Naturalization Certificate, Certificate of Citizenship, or U.S. passport will be submitted. **8 CFR 204.1(g)(1)(i - vi )** stipulates the acceptable documents to be presented as evidence of U.S. citizenship. USCIS does not post-audit citizenship claims and, therefore, evidence that the petitioner is a U.S. citizen must be submitted with the petition. If the petitioner was born outside the United States and derived citizenship, but has not applied for a Certificate of Citizenship, the case should be returned to the petitioner to resolve his/her citizenship status at a district office.

**8 CFR 204.1(f)(2)** allows for the submission of legible, true copies of original documents; however, USCIS reserves the right to require submission of original documents when deemed necessary.

If it appears the petitioner may have expatriated or lost U.S. citizenship, the petition should be referred to the district office having jurisdiction. The district office is able to interview and obtain a question and answer statement or affidavit from the petitioner. Then, the case will be referred to the Citizenship section with all the supporting evidence, and with a memorandum of the conclusion that the petitioner has lost citizenship. The Citizenship section will furnish an informal opinion as to whet her the case would have been referred to Headquarters under outstanding instructions, had it arisen in the Citizenship section. If so, the case is referred to Headquarters, through the office of the regional director, and will attach its comments and recommendation. This referral is not a certification and the petitioner should not be informed of it.

·   Lawful Residence Status of Petitioner . **8 CFR 204(g)(1)(vii)** gives the specific requirements for evidence of lawful permanent residence. Generally, the petitioner will submit a copy of his/her Form I-551. If the original is seen by the adjudicator, verify an alien's status by noting "I-551 seen" or "file seen" beside the petitioner's "A" number. Immediately return the Form I-551 to the petitioner unless the authenticity of the document is questionable.

If the petitioner does not submit Form I-551, conduct a record check in USCIS to verify status. If the relating file cannot be located or does not contain a record of admission for permanent residence, you should attempt to verify arrival pursuant to Chapter 7A of the Records Operations Handbook . If that is unsuccessful, request the alien to submit any document he or she may have which was issued or endorsed by USCIS which may bear on the claim to permanent resident status.

In doubtful cases, the petition should be sent to, and the petitioner referred to, the district office having jurisdiction. An interview should be conducted if there is a question that a document or a record relates to the petitioner.

You should accord the petitioner the benefit of any presumption of lawful admission under **8 CFR 101** to which he or she may be entitled (see **Chapter 23.4** of this field manual).

You should also determine if the petitioner's status as a lawful permanent resident has been lost. If the petitioner's file contains a signed Form I-407 (Record of Abandonment of Residence), but the petitioner contends that he or she had no intentions of abandoning U.S. residence and that the Form I-551 or other document was lifted in error, the case should be referred to the district office for interview.

In the case of a permanent resident who has not yet received Form I-551, the temporary stamp showing processing for Form I-551 is acceptable evidence of permanent residence. This stamp may be in the petitioner's passport or on Form I-181.

· <u>Relationship</u> . Mistakes are often made on this item. Generally, the mistake consists of reversing the relationship; for example, listing the relationship as "father" when a parent is petitioning for a child. Often the intent is obvious in which case you may correct the error (making sure to initial your correction). The relationship must be established by the supporting documents and any other available evidence.

· <u>Prior Marriages of the Petitioner and Beneficiary</u> . The response to this question is very important because it may have a definite bearing on eligibility for the benefit sought. For example, a "child" cannot be married; a "spouse" must have been legally free to marry when the current marriage was contracted; and a marriage is generally necessary for a child to be considered legitimate. The answer given on the petition may not be completely accurate; therefore, all evidence and information should be carefully reviewed to ascertain if a prior marriage, for w hich you have no evidence of termination, may have occurred. Birth certificates of the subject's children, prior INS or USCIS records, and marriage certificates are good sources of evidence of prior marriages. It is extremely important that this issue be completely resolved and documented for the record. All evidence that was necessary to establish termination of any prior marriages must be made a part of the record.

| **Note** |
| --- |

> A son or daughter who is unmarried and under age 21 is a child. Unmarried does not mean "never married" and a previously married son or daughter under age 21 is a "child." This raises the distinct possibility that someone might engage in divorce fraud in order to qualify for an immigration benefit. As we do not recognize a marriage which is contracted solely to circumvent immigration law, we also do not recognize a divorce which is obtained solely to circumvent immigration law.

·   Marital Status of Beneficiary . This question has a definite bearing on eligibility for the benefit sought. You should be careful to verify the answer from the evidence and information furnished. It is not uncommon for a petitioner filing on behalf of a son or daughter to claim the beneficiary has never been married when, in fact, the person is currently married. Some indications that a person may be married, even though the marriage is undeclared, are:

–   Age . Some nationalities and cultures tend to marry at a fairly young age. If the beneficiary is abnormally old to be an unmarried person in a particular country, this may indicate an undeclared marriage.

–   Children . If the beneficiary has children, there is a strong possibility a marriage exists or did exist. The children's birth certificates will help resolve this.

–   Service Records , Records, such as a visa application, Form I-213, affidavit, and previously filed application or petition, may indicate the subject's marital status.

·   Petition Submitted Concurrently for Other Relatives . If the petition indicates the petitioner is filing for other relatives at the same time, all the petitions should be considered simultaneously, if possible. However, remember that all petitions stand alone and each must be documented individually. Therefore, a clearly approvable petition should not be held in abeyance pending the adjudication of the other relative's questionable petition. Be aware that generally with "joint" petitions, documents pertaining to all or some of the petitions may be attached t o only one of the petitions. In such a situation, check all the petitions for documentation, as this may save the needless return of a petition. Each petition must be accompanied by the necessary supporting documents, either originals or the acceptable copies, before being approved. The supporting documents must be made part of the Service record relating to that particular case.

(C) Discretionary Procedures for Petitioning Military Members and Their Dependents . [Chapter added on 09-22-2009 ]

When adjudicating a standalone Form I-130 filed by a military member on behalf of his or her alien spouse or child, Service Center ISOs must follow the steps below:

·   Review every properly filed petition in chronological order by the receipt date;

·   Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE); and

| **Note** |
| --- |
| The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone* Form I-130 *and Jointly Filed* Form I-751 *: Discretionary Procedures for Petitioning Military Members and Their Dependents, Sept.* 22, 2009. See **Appendix 21-8** . |

·   Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved. See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and Their Dependents, Sept.* 22, 2009. See **Appendix 21-8**

The detailed steps that the ISO must follow are listed in **Appendix 21-9** .

(2) Types of Primary Documentation .

All petitions must be supported by primary evidence, if available. The standard sources of primary documents are:

(A) USCIS Records .

One of the most valuable, yet often overlooked, sources of information to verify a claimed relationship is the records of USCIS itself. When primary evidence such as birth certificates, marriage certificates or divorce decrees is not provided in support of a family-based petition, or where the authenticity of such documents is in question, USCIS records relating to the petitioner or other close relatives may verify or refute information claimed in the petition. Records showing acceptance in another USCIS proceeding of a claim to U.S. citizenship, marriage, birth of a child, etc. may serve to support such a claim in a later petition, or to refute a contradictory claim.

(B) <u>Federal, State and Local Records</u> .

In the United States, vital records are usually kept by State and local authorities. In some cases (e.g., where an event took place while the party in question was in the military), the vital records may be kept by a branch of the federal government.

(C) <u>Foreign Documentation</u> .

To determine if documentary evidence is available from another country, refer to the Department of State's Foreign Affairs Manual (FAM).

(3) <u>Secondary Evidence</u> .

One problem common to all categories of petitions is the unavailability or alleged unavailability of documents. You should always refer to the FAM any time a petitioner alleges that documents cannot be obtained. When the FAM shows that primary documents are generally available in the country at issue, but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available is required before USCIS will accept secondary evidence. If primary evidence is not available, and if this fact is certified by the issuing authority, secondary evidence (as described in **8 CFR 204.1** and on the I-130 instructions sheet) may be accepted. Furthermore, secondary evidence (e.g.,school records, baptismal certificates, etc.) is also used in conjunction with primary evidence that carries little probative value like a delayed birth certificate.

(A)Documents should be examined critically for alterations, authenticity, validity, and proper certification. **8 CFR 204.1(f)** ("Supporting Documentation") reads, in pertinent part:

( 1 ) Documentary evidence consists of those documents which establish the United States citizenship or lawful permanent resident status of the petitioner and the claimed relationship of the petitioner to the beneficiary.... When the FAM shows that primary documents are generally available in the country of issue but the petitioner claims that his or her document is unavailable, a letter from the appropriate registrar stating that the document is not available will be required before USCIS will accept secondary evidence.

( 2 ) Original documents or legible, true copies of original documents are acceptable. USCIS reserves the right to require submission of original documents when deemed necessary.

(B) **8 CFR 204.1(g)** lists, in detail, the requirements for primary and secondary evidence.

(4) <u>Adequacy of Evidence</u> .

(A) <u>"Law of the Land"</u> .

To evaluate the adequacy of evidence, you must be aware that the law of the state or country where the act (marriage, divorce, legitimation, or adoption) took place generally governs the validity of the relationship established or terminated. You should check the published precedent decisions if there is a question on this issue. If the precedent decisions and other available references do not resolve the issue, you should request an advisory opinion from the Library of Congress (see **Chapter 14.10** of this field manual). Your office may also have available copies of previous Library of Congress opinions for reference.

(B) <u>Exceptions</u> .

Although the law of the land generally governs the validity of a relationship, it does not follow that all legal relationships will confer benefits under the Act. For example, a marriage contracted solely for the purpose

003368

of gaining immigration benefits and not intended to create a life together as man and wife, though valid in the place where contracted, is not valid for benefits under the Act, and a proxy marriage is not considered valid under the Act unless consummated. Furthermore, in some countries it m ay be possible to establish a same-sex relationship which is not in compliance with the provisions of section 7 of the Defense of Marriage Act (110 Stat 2419 amending 28 U.S.C. 115, prohibiting federal law recognition of same-sex marriages) and would therefore not be recognized for immigration purposes (see **Chapter 21.3** ).

(5) <u>Determining the Meaning of a Document</u> .

You must ensure that the document accepted is, in fact, what it is purported to be. A marriage license is different from a marriage certificate (the former allows the couple in question to get married in a given jurisdiction and within a given time period, the latter is evidence that the marriage has been celebrated). Likewise, often you will find that what appears to be a divorce decree is in reality a petition for divorce or a separation decree, neither of which legally terminates a marriage. Some decrees may be granted with qualification, such as a prohibition against marriage within a specific period of time, and therefore are not valid unless the qualifications are met. Others may specify that the decree will not become final until some future date or is null if the woman becomes pregnant during a specified period of time.

| **Note** |
| --- |
| Even in countries where a condition is placed on a decree, that same country might not honor the condition. For example, in Mexico divorce decrees prohibiting remarriage within a certain amount of time do not invalidate a subsequent marriage performed before time limit. When in doubt, solicit an opinion from the Library of Congress (see **Chapter 14.10** of this *field manual* ). |

(6) <u>Documentation Already in the USCIS File</u> .

The petitioner is required to submit all required documentation with the petition. However, in some instances, the petitioner may advise USCIS that the required document can only be located in the petitioner's file. If so, USCIS should request the file to attempt to locate the document in question.

(7) <u>Evidence in Undocumented Cases</u> .

Primary evidence of birth, marriage, death, divorce, and adoption is sometimes unavailable. In these cases,

affidavits by the petitioner and other persons having personal knowledge of the events that created the relationship, and other evidence such as family photographs, blood tests, signature specimen forms, and evidence of transmittal of remittances to the petitioner's family may be considered. In many countries where the lack of primary evidence is known to be a fact, you need not require a certificatio n of the non-existence of a record before you accept secondary evidence. Blood tests may be required in these cases. You should always refer to the FAM for primary document availability. The regulations at **8 CFR 204.1(g)(2)** give specifics as to what type of secondary evidence to request. See *Matter of Tanessa Amelia Pagan* , ID 3378 (BIA 1999).

Any information furnished should be carefully scrutinized for consistency with claims made in the visa petition and information contained in USCIS records, particularly with regard to names, relationships, dates and place of birth, and dates and places of marriages.

When a petitioner seeks to confer immediate relative or preference classification on the basis of an alleged relationship between an adoptive parent and an adopted child (or adopted son or daughter) and no formal adoption decree is available, or, if such a decree is submitted and its authenticity is considered suspect, the petitioner should be required to submit secondary evidence of the alleged relationship. Such secondary evidence may consist of copies of affidavits, photographs, remittances, or other evi dence of support, or letters and other documents bearing upon the validity of the adoption. Such evidence should be made part of the record of proceeding.

In **Matter of Kwan** , 14 I&N Dec. 175 (BIA 1972) , involving a visa petition on behalf of an adopted daughter, the BIA provided a useful guide to the kind of secondary evidence which should be required in an undocumented case. The following is an excerpt from that decision:

Inasmuch as most Chinese adoption cases must be decided without benefit of a recorded formal decree of adoption, it is permissible to resort to other forms of probative evidence in order to reach a decision as to the validity of the adoption.

For instance, it would be proper for the petitioner to submit affidavits executed by (1) both adoptive parents, (2) witnesses to the adoption ceremony, and (3) relatives and neighbors. The absence of such affidavits is a factor the petitioner must satisfactorily explain. Affidavits submitted should (1) state the nature of the affiant's relationship, if any, to the parties, (2) set forth the basis of the affiant's knowledge, and (3) contain a statement of the facts the affiant knows regarding the adoption, r ather than mere conclusory statements as to the existence of the adoption.

**Matter of Kwan** describes and explains the necessity of good secondary evidence. You should require similar secondary evidence; make it a part of the record of proceeding when primary evidence of birth, marriage, death or divorce is not available to establish a claimed relationship between a petitioner and beneficiary. Attach the originals or copies of secondary evidence you considered in reaching a decision to any approved petition you forward to a National Visa Center (NVC) . You should not approve the petition unless you are satisfied from the evidence submitted that the petitioner has met the burden of proof.

(8) <u>Affidavits</u> .

When considering secondary evidence, you must usually evaluate sworn affidavits to determine the validity of the relationship. Be sure that the affidavits contain all the specified elements as required by the secondary evidence regulation. You should analyze the affidavits carefully and compare them with any available information to determine if inconsistencies exist. When all the affidavits are worded the same, it indicates that the words are not necessarily those of the affiant and may cast some doubt on the affidavits' validity. When that situation arises, it is often beneficial, if possible, to have the affiant appear for a personal interview to determine what he or she personally knows about the claimed relationship and how the knowledge was acquired.

You should always try to obtain some legal or official document to corroborate affidavits. In some cases it is not possible, but usually the case will indicate something else is available, such as school records, census records, military or draft records, income statements, or social security records. Though the corroborating evidence may be nothing more than information furnished to another agency by the petitioner or beneficiary, it may establish that the relationship was claimed prior to seeking immigrat ion benefits and can be very helpful in verifying the claimed relationship.

(9) <u>Evidence of Status in the United States</u> .

(A) <u>United States Citizenship of Petitioner</u> .

When a USCIS employee has verified the petitioner's status, the notation "proof seen" will be placed beside the citizenship information on the petition and initialed. If a naturalization or citizenship certificate is presented in person, it shall be handed back to the petitioner. If a petition has been mailed in with the certificate attached, it shall be certified by the first employee reviewing the application. The certificate shall then be sent directly back to the petitioner by certified or registered mail. Form G-3 47 should be used to

obtain the naturalization file of any petitioner who is unable to furnish his certificate number and date and place of naturalization or where there is reason to suspect that the petitioner may have been expatriated.

Some petitioners who claim U.S. citizenship through birth in the U.S. are in fact aliens. The following may indicate an alien is making a false claim to U.S. citizenship:

· Delayed birth certificate;

· Delayed baptismal certificate;

· Unavailability of school records;

· No census records of the individual;

· Individual not in the military or registered for the draft;

· No baptismal certificate when of a faith normally baptized;

· No official documents (claim based solely on affidavits);

· Unable to speak English;

· Illiterate, when of an age group for which illiteracy is uncommon;

· No knowledge of area of predominant residence in the U.S.;

003372

· No knowledge of mother, father, and/or brothers or sisters (check the number of prior births on the birth certificate);

· Siblings and/or parents born abroad;

· Claims raised abroad and only recently learned of U.S. citizenship; no satisfactory explanation for means of entry into U.S.;

· Social security card obtained late in life, or the number does not correspond to the claimed place of issuance;

This list is by no means complete, nor can each factor be applied to all cases. Many of the elements discussed can only be developed through personal interview. If the petitioner's citizenship is in question, an interview should be conducted.

(B) <u>Lawful Residence Status of Petitioner</u>.

Ideally, an LPR filing an I-130 petition will submit a photocopy of a currently valid Form I-551 to verify his or her LPR status. However, the instructions on the Form I-130 require an LPR petitioner to submit his or her original "Form I-151 or I-551" (and do not even specify that the Form I-551 must be a currently valid one). On the other hand, even in the absence of documentation, regulations at **8 CFR 103.2(b)(17)** allow for verification of claimed LPR status through USCIS records "at the discretion of the adjudicating officer." Furthermore, **section 264(e)** of the Act requires an LPR (18 years of age and over) to carry his or her Form I-551 at all times. Accordingly, the documentation submitted by the petitioner might range from an original valid Form I-551, to a photocopy of such Form I-551, to an obsolete document, to no document at all; and the action of the USCIS employee or contractor upon receiving a Form I-130 will vary according to the documentation submitted:

· If the petitioner submits an original valid Form I-551, depending on local office policy, either:

−    Make a photocopy of the Form I-551 to accompany the petition and return the original to the petitioner, or

−    Annotate the Form I-130 in block 14a "Original, valid Form I-551 seen and returned;" add the date and the appropriate identifier (e.g., your stamp number or your initials); and return the Form I-551 to the petitioner.

·    If the petitioner submits a photocopy of a valid Form I-551, no verification or annotation action is required at this point.

·    If the petitioner submits an original Form I-151, or an original but expired Form I-551, make a photocopy of the document and annotate that photocopy "Expired card seen and returned to petitioner with instructions to apply for replacement" adding the date and your identifier. Then return the card to the petitioner with a Form I-90 and an explanation that the petitioner must apply for a replacement card (see **Chapter 51** of this field manual).

·    If the petitioner submits a photocopy of a Form I-151, or of an expired Form I-551, no verification or annotation action is required at this point.

·    If the petitioner submits none of the above or no documentation at all, but claims in block 14a of the Form I-130 to be a lawful permanent resident, depending on local policy, either:

−    Annotate block 14a of the Form I-130 "No documentation submitted," adding the date and your identifier (which will require verification from USCIS records in accordance with **8 CFR 103.2(b)(17)** , as discussed above), or

−    Return the Form I-130 to the petitioner with instructions to submit the required documentation.

| |
|---|
| <u>**Note**</u> |

003374

> Regardless of the action taken at the point of receipt by the USCIS employee or contractor, the adjudicating officer has full responsibility for determining the petitioner's status and standing at the time of adjudication.

Even though the petitioner presents evidence of permanent residence and USCIS records verify the status, the adjudicating officer must determine if the petitioner is _entitled_ to the status or is deportable. A visa petition should not be approved until questions concerning the petitioner's deportability are resolved.

One of the most frequent problems in this area concerns petitioners who gained entry into the United States as children or unmarried sons or daughters, and whose pending petitions establish that they were actually married before entering the United States. These particular cases should be transferred out to the operations branch for their disposition and most likely to a district or local office for full interview and adjudication. The results could lead to prosecution of the petitioner and the possible los s of his/her lawful permanent residence status.

> **Note**
>
> When admitting a "marriageable age" immigrant with a "child" or "unmarried son or daughter" visa (including the "accompanying to join" child classifications), or adjusting an alien in such category, it is always a good idea to verify that the person is still unmarried and to so annotate the visa or adjustment application. This will assist in establishing that the alien committed fraud if it is later determined that he or she was already married at the time. The same pertains to derivative refugees and asyle es being admitted under the RE-3 classification or granted AS-3 classification.

(C) _Status in the United States as a Non-citizen National_ .

An American Samoan (including a Swain's Islander), as a non-citizen national, may file a relative visa petition for a spouse, child or unmarried son or daughter under second preference (see **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) ). A non-citizen national will generally present a Certificate of Identity showing United States nationality, a United States passport, or a birth certificate as evidence of his or her status in this country. Chapter 12.8 of the Inspector's Field Manual contains additional information on non-citizen nationals.

(D) _Status in the United States as a Refugee or Asylee_ .

A refugee or asylee will generally present a copy of his or her I-94 showing that he or she has been

admitted as a refugee or granted refugee status. He or she may also present a refugee travel document (Form I-571) as evidence of his or her status. Any doubts regarding the petitioner's status in the United States should be resolved through a review of his or her A-file, and, if necessary, a personal interview.

---

**Note**

Remember that under **8 CFR 207.7(d)** and **8 CFR 208.20**, a Form I-730 can only be filed within the first 2 years after the refugee's underline admission as a refugee or the asylee's grant of asylee status (a departure and return on a refugee travel document does not begin a new 2-year time period).

---

(10) Evidence of Relationship .

General information about documentation is contained in **Chapter 11** of this field manual. More specific information on the documentation required to establish a specific relationship is discussed in each of the subchapters (21.3 through 21.10) of this chapter.

(11) Insufficient Documentation .

If the documentation submitted by the petitioner does not adequately prove or disprove all issues involving the standing of the petitioner or the relationship between the petitioner and the beneficiary, you have 3 (or in some offices, 4) means of resolving the outstanding issues:

(A) Requests for Evidence .

When the USCIS determines that the evidence is not sufficient, an explanation of the deficiency will be provided and additional evidence will be requested. Service centers use Form I-797 and districts use Form I-72 to make such request. In accordance with 8 CFR 204.1(h), the petitioner will be given sixty (60) days to present additional evidence, withdraw the petition, request a decision based on the submitted evidence, or request additional time to respond. If the Director determines that the initial sixty (60) day peri od is insufficient to permit the presentation of additional documents, the Director may provide an additional sixty (60) days for the submission. The total time shall not exceed 120 days, unless unusual circumstances exist. Failure to respond to a request for additional evidence will result in a decision based on the evidence previously submitted. [ **Note:** Compare and contrast 8 CFR 204.1(h) (which allows up to two 60-day periods for response) and 8 CFR 103.2(b)(8) (which allows a single 84-day period for response). Since

there is an apparent conflict between to these two regulatory provisions, we have to give the applicant or petitioner for a benefit under 8 CFR 204 the more generous provision. Also, because 204.1(h) is specific to section 204, it has more relevance to relative visa petitions ]

When you request additional information, inform the petitioner what must be completed, corrected, or submitted. It is important that you inform the petitioner of ALL deficiencies, (remember to consider the allowable time for resubmission stipulated by **8 CFR 204.1(h)** ), so the petition is 100% complete and ready for adjudication. Returning of a petition without stipulating all the deficiencies results in additional work for USCIS because of the unnecessary additional handling prior to final decision. This results in complaints from the petitioner concerning inefficiency and delays, in Congressional interest due to the petitioner's discontent with the Service's inordinate processing time for the petition, and in a bad public image of USCIS .

A petition should not be returned, or additional information requested, if there is sufficient documentation to allow a decision to be rendered. For example, if a permanent resident alien files a petition on behalf of a brother submitting both birth certificates indicating a common father and different mothers, but fails to submit other documentation, the petition should not be returned as deficient. The evidence submitted clearly establishes the petitioner's ineligibility to file (because a LPR cannot petition for a sibling), and additional evidence will not alter the situation; therefore, the petition would be properly denied on the evidence of record rather than returned requesting additional documentation. Any evidence reques ted must be necessary and pertinent to the decision in the case.

(B) Interview .

The Service Centers are not set up to conduct interviews; however situations will arise that occasion an interview. These occasions would require a petition referral to the local office having jurisdiction over the petitioner (and/or beneficiary if in the U.S.). (The referral must include a memorandum explaining the reason for the referral and the concerns or issues which must be explored at the interview.) The local office, according to its availability, would then schedule the interview. Each Service Cent er usually has a specified policy as to how to accomplish this referral. Once a case has been referred to a local office, that office becomes the adjudicating office and has full responsibility for the petition; the petition is not to be returned to the Service Center for post-interview adjudication.

Most petitions will be completed without the need of a personal interview; however, the facts of an individual case may indicate that a personal interview is appropriate. Most interviews concern the bona fides of a marriage in spouse petition proceedings or the petitioner's status in the United States.

Usually, a written or taped record of the interview(s) is made to document the proceedings and the interview is used to render a decision.

Interviews are time-consuming and should be requested only when absolutely necessary. If conducted properly, interviews can be very beneficial in helping one reach a decision on a case.

See **Chapter 15** of this field manual for a discussion of interview techniques and procedures.

| Note |
|------|
| Upon completion of the interview, the adjudicating office should provide the Service Center with feedback regarding the results of the interview. This will both give the Service Center officer credit for a case well-referred and will enable the Service Center to refine its referral criteria. |

(C) Investigation . See **Chapter 10.5(d)** of this field manual.

(D) Field Examination . See **Chapter 17** of this field manual.

(c) Adjudicative Issues .

Chapter 21.2(c), Adjudicative Issues, has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(1) Burden of Proof .

The adjudication of visa petitions is an administrative proceeding. In administrative proceedings, the petitioner bears the burden of proof to establish eligibility for the benefit sought. **Matter of Brantigan** , 11 I & N Dec. 453 (BIA 1966) .

003378

(2) <u>Review and Rebuttal Rights</u> .

The adjudicating officer must keep in mind the fact that the petitioner must be given the opportunity to inspect and rebut any adverse information used in arriving at the decision to deny or revoke a petition. The one exception pertains to material classified under E.O. 12356. In accordance with **8 CFR 103.2(b)(16)(iv)** , the petitioner must still be given a summary (authorized by a regional director) of the general nature of the information and the opportunity to rebut it if it can be done without jeopardizing the safety of the information and the source. (See **Matter of Tahsir** , 16 I&N Dec. 56 (BIA 1976) and Chapter 10.19 of this field manual.)

(3) <u>Order of Processing</u> .

Generally speaking, relative petitions should be adjudicated in the order in which they are received. However, the regulations and policies recognize that exceptions to this general rule may be made under certain circumstances (see **Chapter 10.11** of this field manual).

(4) <u>Rules of Evidence</u> .

Strict rules of evidence used in criminal proceedings do not apply in administrative proceedings. Usually, any oral or documentary evidence may be used in a visa petition proceeding.

Petitioners may submit photocopies of documents in support of the petition, but must be able to submit the original documents upon request. The original document which was photocopied must, of course, be a genuine document which was obtained from the authorized keeper of the records.

Copies of public documents, certified by the person having custody of the originals, are generally admissible. Official foreign documents should be certified by the lawful custodian and authenticated by U.S. consular officers, except in cases signatory to the Hague Convention of Legalizations. The absence of an official record may be proved by a written statement signed by an appointed deputy that, after a diligent search, no record of entry of the event is found to exist in the records of the custodian's o ffice.

A statement that a particular record does not exist is, of course, not evidence of the veracity of the claim being presented; it merely allows you to consider other evidence. Any such claims should be carefully reviewed. For example, someone who quit high school in the 9 th grade might claim that he graduated from another high school in the same area whose records he knows to have been destroyed in a fire, so that anyone checking on the claim would be advised that the records (of the school which the person did not attend) are unavailable. The verifying inspector would not know that the records a different school (the one the person briefly attended) exist and reveal that the person did not graduate.

(5) <u>Derivative Beneficiaries</u> .

Any alien classified as an immediate relative must be the direct beneficiary of an approved petition for that classification. Therefore the child of an alien approved for immediate relative spouse classification is not eligible for derivative classification and must have a petition filed on his or her behalf.

However, the children and, in some cases, the spouse of an alien approved for family preference classification, may be included in the principal alien's preference visa petition. The derivative beneficiary will be accorded the same family preference classification and the same priority date as the principal alien.

If the derivative child of a second preference beneficiary reaches the age of 21 years prior to the issuance of a visa to the principal alien parent, a separate petition will be required for that child. The petition must be filed by the same petitioner that filed for the principal alien parent, and, if approved, would retain the original priority date. Remember, this retention of the original priority date only applies when the derivative child's principal alien parent is accorded second preference classifi cation.

When adjudicating a petition, it is important to determine if there are family members eligible to derive benefits from the petition.

If the family is in the United States and the principal alien is outside the United States, the derivative beneficiaries may be eligible for adjustment of status under section 245 of the Act once the principal alien has immigrated (provided they are not subject to the bars contained in sections 245(a) or 245(c) of the Act), and should be so notified.

(6) <u>Special Concerns about Particular Nationalities</u>.

(A) <u>Chinese Visa Petitions</u>.

Prior to 1931, the prevailing standards or guidelines for marriages, adoptions, and other civil proceedings which might be considered in connection with an I-130 were determined by Chinese Customary Rite. This was true also in Hong Kong, a British Crown Colony.

In 1931, the *Chinese Civil Code* was instituted in mainland China, codifying much of the Customary Rite and becoming the governing law of the land. Books IV and V of the Civil Code relate to family affairs and include all the regulations as to what constituted a valid marriage, divorce, or adoption.

The Chinese Civil Code remained in effect in mainland China until the Communist takeover, which started in early 1949, and was essentially completed by 1950. The Communist government evolved its own civil code, eliminating many of the discriminatory or "decadent" provisions of the Chinese Civil Code. For example, under the Communist government, adoption was permitted solely in the interest of the child, to provide the child with a home, education, and parental guidance, and was no longer permitted for the purpose of instituting an heir to continue a family name. The stigma of illegitimacy was removed, theoretically, by eliminating any distinctions made by the law between children whose parents were married and those whose parents were not. Once paternity was established, the child was considered legitimate.

Therefore, in order for a petition filed by a petitioner from mainland China on behalf of a beneficiary fitting this scenario to be considered for approval, paternity must be shown. The regulations with reference to primary and secondary evidence would apply here also. Once the relationship has been proven, the petition will be adjudicated as any other.

After diplomatic relations were reestablished in the early 1970s, the need for documentation to support relative petitions became more urgent, and the Communist government developed a certificate of family relationship or notarial certificate. Since there was and is no uniform nationwide system of registration, the information contained in the certificates must be obtained from interviews and local records and should carry no more weight than an affidavit prepared by a witness. The BIA corroborated this vie w in **Matter of Cheung** , 17 I&N Dec. 365 (BIA 1980) which was modified by **Matter of May** ,18 I&N Dec. 381 (BIA 1983) which states that notarial certificates are issued on the basis of primary documentation submitted by

the applicant or as a result of investigation by notarial office staff and **while generally reliable, are best used in conjunction with other supporting evidence.**

(B) <u>Petitions on Behalf of Aliens from Yemen</u> .

Chapter 21.2(c)(6)(B), Petitions on Behalf of Aliens from Yemen, has been superseded by USCIS Policy Manual, Volume 1: General Policies and Procedures as of November 23, 2021.

(d) <u>Anti-fraud Measures</u> .

Some cases contain information which should alert you that there may be a problem with the case. You should be aware of the indications of fraud or ineligibility and try to detect and deny those cases. It is important to remember that a case may be bona fide notwithstanding the fact that, on the surface, it appears fraudulent. Each case must be decided individually based on the evidence of record.

| |
|---|
| **Note:** |
| Remember that the statute does not provide for the use of administrative discretion in the adjudication of a relative visa petition. Furthermore, the admissibility of the beneficiary is not at issue. If the beneficiary is eligible for the benefit sought, the petition must be approved, regardless of any and all unfavorable aspects of the alien's history and character. However, if during the course of the adjudication of the visa petition you encounter grounds of inadmissibility or unfavorable discretionary f actors, you should make sure that such grounds or factors are properly documented and brought to the attention of the immigration officer considering the alien's application for adjustment of status or the consular officer considering the alien's application for an immigrant visa. |

If fraud is suspected, there are a number of methods by which you can seek to resolve the concerns, including (but not limited to):

(1) <u>Parentage Testing</u> .

(A) <u>General</u> .

Parentage testing is used to establish a claimed relationship for benefits under the Immigration and Nationality Act. Such testing may be appropriate to establish a parental relationship in support or a petition for a child, son, or daughter (Form I-130). The procedures discussed herein may also apply to establishing the biological parent of a foreign-born adopted child to support an orphan petition (Form I-600) or to establishing a parental relationship for citizenship cases (Form N-600). In addition, thes e procedures may be used to establish a parental relationship for refugee and asylum relative petitions (Form I-730).

(B) <u>Authority to Require Parentage Testing</u> .

A petitioner must establish eligibility for a requested immigration benefit. An application or petition must be filed with any initial evidence required by regulation or by the form instructions. Any evidence submitted is considered part of the relating petition or application and may establish eligibility. 8 CFR 103.2(b)(1).

In the case of a petition for a child, son, or daughter, the petitioner must provide evidence of the claimed relationship. 8 CFR 204.2(d)(2). The initial evidence for a child, son, or daughter includes a birth certificate. When a birth certificate is unavailable, the petitioner must demonstrate that it is not available and submit secondary evidence, such as a baptismal certificate, or church or school records. If the petitioner demonstrates that both initial and secondary evidence is unavailable, two or mor e affidavits may be substituted. However, the unavailability of a birth certificate creates a presumption of ineligibility for the benefit, and any alternative evidence submitted must be evaluated for its authenticity and credibility. 8 CFR 103.2(b)(2)(i) and 204.2(d)(2)(v).

A director may also require that Blood Group Antigen or Human Leukocyte Antigen (HLA) blood parentage testing be conducted on the child, son, or daughter and putative mother and father to establish eligibility for a benefit. 8 CFR 204.2(d)(2)(vi). Statistical analysis of these tests provides a likelihood of parentage. These test results will often establish or disprove the claimed parental relationship. Since blood parentage testing can be a valuable tool to verify a relationship, it may generally be requir ed when initial and secondary forms of evidence have proven insufficient to prove a claimed relationship. As a result of technological advances, field offices should be aware that Blood Group Antigen and HLA tests are no longer widely available for testing by laboratories, and are not considered to be as reliable as DNA tests.

Although a director may require blood parentage testing, he or she has no statutory or regulatory authority to require DNA testing. However, when initial and secondary forms of evidence have proven inconclusive and blood parentage testing does not clearly establish the claimed parental relationship, field offices may

003383

have no alternative to suggesting DNA testing as a means of establishing the relationship. The petitioner has the burden of proof when the evidence submitted has not satisfied his evidentiary t hreshold and the USCIS would otherwise deny the petition without more conclusive evidence such as that which DNA testing could provide. In such cases, field offices should inform the petitioner that:

·   DNA testing is absolutely voluntary;

·   The costs of DNA testing and related expenses (such as doctor's fees and the cost of transmitting testing materials and blood samples) must be borne exclusively by the petitioner; and

·   Submitting to DNA testing is in no way a guarantee of the approval of the petition.

Field offices should keep in mind that no parentage testing, including DNA testing, is 100 percent conclusive. **[(b)(2) or (b)(7)(E)]**

While blood testing is not and should not be a routine part of the adjudications process, it can be an extremely valuable tool in cases when it otherwise would be impossible to verify a relationship. Parentage blood tests involve laboratory procedures performed on blood samples or other genetic material obtained from the child and putative parent or parents. The statistical analysis of the blood test provides a likelihood of parentage if the putative parent is not excluded. The likelihood of parentage is gr eater with increased information. Increasing the number of genetic testing systems tested provides stronger results, while the absence of information diminishes the strength of results. Officers should be aware that parentage testing is an extremely fact-driven procedure. A laboratory may more accurately determine what tests to run based on specific facts. A more accurate answer will be provided by the laboratory if the Officer provides the laboratory with suspicions of fraud or other pertinent facts.

(C) Minimum Standards .

·   Parties tested : The most accurate results are received when the alleged mother, father and child available for testing. However, testing of only the mother and child or father and child are also acceptable.

003384

·   <u>Statistical probability</u> : All tests must produce a 99.5% statistical probability for the conclusion of results to establish parentage. Laboratories can continue with a battery of tests until a 99.5% conclusion of parentage is established. After testing the samples from all parties, laboratories will produce a conclusion of parentage which will inform field offices which tests were administered and the conclusion for the results they obtained.

·   <u>Preferred test</u> : The preferred test is the Polymerase Chain Reaction (PCR) test drawn with a buccal swab or a PCR test based on a blood sample.

Please see below for a more detailed explanation of the parentage testing process and procedures.

(D) <u>Blood Testing</u> .

Blood consists of red and white blood cells, platelets and liquid plasma. Each component of the blood contains several antigens or "markers." The blood group antigens are structures on the surface of the blood cells that help to distinguish individuals within a population. The antigens, inherited from the parents, are controlled by genes on a pair of chromosomes. Each parent contributes one of each chromosome pair carrying the genes that determine the detectable properties of an offspring's blood. The prese nce or a specific antigen indicates a particular genetic composition or marker. Conclusions in parentage blood testing are based upon the principle that the child inherits genetic markers in his or her blood from each of his or her biological parents.

(E) <u>Conventional Blood Tests</u> .

There are four basic tests used in conventional blood testing:

·   basic red cell antigens (ABO, MN, CcDEe);

·   extended red cell antigens;

·    white cell antigens (HLA); and

·    red cell enzymes and serum proteins.

The laboratory begins by conducting the first test. If parentage cannot be ruled out based on the results of the first test, the laboratory will conduct the second test. The process continues until either the putative parent can be entirely excluded or a good statistical probability is established that the relationship is bona fide.

(F) <u>DNA Testing</u> .

DNA (deoxyribonucleic acid) parentage testing provides an alternative to more conventional parentage blood testing methods. DNA testing can be especially useful in countries with limited medical and transportation facilities because, unlike HLA testing, it does not require the use of live human blood cells, which must be tested within just a few days, and are sometimes difficult to obtain. DNA parentage testing can often provide conclusive results even when not all parties are available for testing.

Officers should be aware that parentage testing technology changes rapidly. Whereas HLA blood testing was widely used until 1994, it is now rarely used. Restriction Fragment Length Polymorphism (RFLP) tests which have been widely used since 1994 are now being phased out by laboratories in the U.S. The DNA test which is most recommended for use in parentage testing is the Polymerase Chain Reaction (PCR) test. Although DNA testing has traditionally been accomplished through blood testing, buccal (mouth or che ek cavity) swabs are an alternative to drawing brood for testing. Cells are drawn from the inside cheek using a long cotton swab. As opposed to blood testing, buccal swab testing does not require the assistance of a physician, and is non-invasive. Nevertheless, it is recommended that only a person specially trained to collect a tissue sampling perform the procedure in order to ensure the quantity is sufficient for testing.

(G) <u>Parentage Testing Procedures</u> . (Chapter 21.2(d)(1)(G) Revised 04/08/2005; AFM 05-10)

The American Association of Blood Banks (AABB) accredits parentage-testing laboratories for a two-year period. The current list of AABB accredited parentage testing laboratories is contained in **Appendix 21-3** of this field manual. To access this list, click on the web links listed in Appendix 21-3. Offices may accept parentage testing results only from laboratories on this list.

| **Note** |
|---|
| The accreditation standards were developed by the committee on parentage testing of the AABB under a grant from the Federal Office of Child Support Enforcement of the U.S. Department of Health and Human Services and with assistance of special consultants and representatives from the American Bar Association, American Medical Association, American Society of Clinical Pathologists, American Society for Histocompatibility and Immunogenetics and the College of American Pathologists. |

The burden of proof is on the petitioner to show that the laboratory chosen is accredited by the AABB.

When a field office requires blood testing or suggests DNA testing, it should provide the petitioner with the list of AABB accredited laboratories. Field offices should be aware that the state designations on the list are for laboratory headquarters. Many laboratories have collection sites in many different states and locations. The petitioner must select a laboratory, contact the laboratory directly, and make the necessary arrangements for conducting the tests. To ensure the integrity of the test results, all stages of parentage testing must be conducted under appropriate safeguards. These safeguards must include strict controls concerning:

·   protection of the chain of custody of blood or tissue samples;

·   identification of the parties to be tested, generally by photographing individuals being tested; and

·   correct presentation of test results.

Communication should be directly between the laboratory and the civil surgeon or panel physician or the field office. Under no circumstances should a third party, including the individuals being tested, be permitted to carry or transport blood or tissue samples or test results. Since the applicant bears full financial responsibility for testing, USCIS has no objection to that person receiving a copy of the test results from the laboratory or panel physician. It is imperative that the same facility tests bot h the alleged child and the alleged parent(s). Where the petitioner is physically present in the U.S., a U.S.-based lab must conduct the tests and relay the results. Instructions usually require the participation of a witness, identification taken from all (adult) parties involved, and photographs taken of all parties.

(H) <u>Analysis of Test Results</u> .

In all cases of parentage testing, laboratories should provide the statistical probability for the conclusion for the results they obtain. Offices should use the following interpretations of the plausibility of parentage to analyze test results. In general, AABB standards mandate 99 percent to be the minimum requirement for the proof of parentage. However, this statement does not mean that all test results 99 percent and higher should be accepted as conclusive proof of parentage, or that all test results be low 99 percent exclude parentage. The type of parentage test performed, the genetic profile of the local population, and facts specific to the case will all affect the percentage that an office should require establishing a parental relationship. Field offices should provide laboratories with non-genetic evidence, which may affect the lab's assumptions in performing the testing, analysis of the results or the number of genetic markers tested.

| Plausibility of Parentage (Percent) | Interpretation |
| --- | --- |
| 99.80 - 99.90 | Practically Proved |
| 99.1 - 99.80 | Extremely Likely |
| 95 - 99 | Very Likely |
| 90 - 95 | Likely |
| 80 - 90 | Undecided |
| Less than 80 | Not Useful |

Please note that in societies where intra-family marriage is common, close relatives will share many genetic markers and the test results of an aunt, uncle, or grandparent of a beneficiary may appear to establish the claimed parental relationship. The statistics used in paternity testing are designed for evaluating an alleged father as compared to unrelated men. Unlike the random population where persons may share genetic markers by chance, related men will share genetic markers by descent. First degree rel atives, such as father, brother or son, will share 50% of their genetic material on average. Therefore, directors should consult with local physicians and parentage testing laboratories, and consider local fraud patterns, to determine the appropriate tests and particular test results to reliably establish the parental relationship in questionable cases. Officers should ask labs to calculate both a father-child and uncle-child or sibling relationship in these cases and should examine reports provided by the laboratory to ensure that sufficient testing was done to distinguish between family members. Officers should feel free to contact the laboratory for clarification if the lab's findings are inconclusive. Labs are able to conduct tests on additional genetic markers if necessary to resolve inconclusive cases.

(I) <u>Questions</u> .

003388

Questions regarding the appropriate parentage test to use to establish a claimed relationship or analysis of the test results may be directed to the parentage-testing laboratory selected by the petitioner. Questions regarding this policy should be directed to the Residence and Status Branch, Adjudications Division at 202-514-4754.

(2) <u>EPIC checks</u> . See Chapter 32.6 of the Inspector's Field Manual.

(3) <u>Interview</u> . See **Chapter 15** of this field manual.

(4) <u>Investigation</u> . See **Chapter 10.5** of this field manual.

(5) <u>Field Examination</u> . See **Chapter 17** of this field manual.

(6) <u>The Immigration Marriage Fraud Amendments of 1986 (IMFA)</u> .

In 1986, Congress amended the Immigration and Nationality Act to provide that if an alien obtains lawful permanent residence based on a marriage that is less than 2 years old at the time of the alien's admission or adjustment to permanent residence, the alien's permanent residence is on a conditional basis. The "condition" is that the alien and the spouse through whom the status was obtained must file an I-751 petition to remove the conditional basis of the residence two years after the immigration or adjus tment (see **Chapter 21.3** and **Chapter 25.1** of this field manual). This requirement pertains only to those aliens who obtain status directly through the alien's marriage to the petitioner, or (in the case of a child) through the marriage of the alien's parent to the petitioner. It does not apply to other relationships, such as a derivative spouse or child of a beneficiary (e.g., a F3-2 or F3-3 immigrant). Properly used, IMFA is a powerful anti-fraud tool, since it enables USCIS to fully adjudicate a case both before the alien obtains LPR status and once again when he or she seeks removal of the conditions. The effectiveness of this second adjudication can be even further enhanced if officers adjudicating the I-130 petition or the I-485 adjustment application provide guidance (in the form of memorandum in the A-file or electronic notes once the automated support systems have such capacity) regarding items to be aware of when adjudicating the Form I-751 .

However, if improperly used, IMFA can be very ineffective. Officers adjudicating the I-130 petition must guard against the temptation to "let the I-485 and I-751 adjudicators worry about the fraud." Likewise,

officers adjudicating the I-751 petitions must guard against the temptation to say, "Well, it looked enough to the I-130 adjudicator and the I-485 adjudicator, so it must be OK." The system only works if each officer adjudicating each step of the process takes full responsibility for detecting and deterring fraud in his or her stage of the process.

(e) <u>The Child Status Protection Act of 2002 (CSPA)</u> . (Revised AD07-04; 04-11-08)

The CSPA amended the Immigration and Nationality Act (Act) to permit an applicant for certain immigration benefits to retain classification as a child under the Act, even if he or she has reached the age of 21. The CSPA added section 201(f) for applicants seeking to qualify as Immediate Relatives and section 203(h) for applicants seeking to benefit under a preference category, including derivative beneficiaries.

(1) <u>CSPA Coverage</u>

(i) <u>Adjustment as an Immediate Relative (IR)</u> .

The CSPA amended section 201(f) of the Act to fix the age of an alien beneficiary on the occurrence of a specific event (e.g. filing a petition). If the alien beneficiary is under the age of 21 on the date of that event, the alien will not age out and continue to be eligible for permanent residence as an IR. It does not matter whether the alien reaches the age of 21 before or after the enactment date of the CSPA, when the petition was filed, or how long the alien took after petition approval to apply for pe rmanent residence provided the alien did not have a final decision prior to August 6, 2002 on an application for permanent residence based on the immigrant visa petition upon which the alien claims to be a child.

(A) <u>Petition Initially Filed as Immediate Relative (IR) Child</u> .

Chapter 21.2(e)(1)(i)(A), Petition Initially Filed as Immediate Relative (IR) Child, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(B) <u>Petition Initially Filed as Child of a Lawful Permanent Resident (LPR).</u>

If an alien is seeking to adjust status on the basis of being an immediate relative child, and the petition serving as the basis for the adjustment was first filed for classification as a family-sponsored immigrant based on the parent being a lawful permanent resident and the petition was later converted, due to the naturalization of the parent, to a petition to classify the alien as an IR, then the age of the alien on the date of the parent's naturalization is the alien's age for CSPA purposes. If the alie n was under the age of 21 on the date of the petitioning parent's naturalization, the alien will not age out.

(C) <u>Petition Initially Filed as Married Son or Daughter of a U.S. Citizen (USC)</u> .

If an alien is seeking to adjust as an immediate relative child, and the petition serving as the basis for such adjustment was first filed for classification as a married son or daughter of a U.S. citizen, but the petition was later converted, due to the legal termination of the alien's marriage, to a petition to classify the alien as an immediate relative, then the age of the alien on the date of the termination of the marriage is the alien's age for CSPA purposes. If the alien was under the age of 21 on t he date of the termination of the marriage, the alien will not age out.

(ii) <u>Adjustment Under a Preference Category</u> .

The beneficiary's CSPA age is determined using the formula below. If the petition is approved and the priority date becomes current before the alien's CSPA age reaches 21, then a one-year period begins during which the alien must apply for permanent residence in order for CSPA coverage to continue.

It does not matter if the alien aged out before or after the enactment date of the CSPA, so long as the petition is filed before the child reaches the age of 21 provided the alien did not have a final decision prior to August 6, 2002 on an application for permanent residence based on the immigrant visa petition upon which the alien claims to be a child.

(A) <u>CSPA Age Formula</u> .

Chapter 21.2(e)(1)(ii)(A), CSPA Age Formula, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(B) Direct Beneficiaries .

The number of days that a petition is pending is the number of days between the date that it is properly filed (receipt date) and the date an approval is issued on the petition, including any period of administrative review.

In the case of a petition where adjustment is sought as the child of an LPR (F2A) and it is determined that the age of the beneficiary is over the age of 21 for CSPA purposes, if the petitioner naturalizes then the petition is to be automatically converted to the appropriate first or third family preference category for that petitioner and beneficiary (so long as marriage occurred after the naturalization of the petitioner). The beneficiary will retain the priority date in this case.

(C) Derivative Beneficiaries – Family and Employment-Based .

Chapter 21.2(e)(1)(ii)(C), Derivative Beneficiaries – Family and Employment-Based, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(D) Derivative Diversity Visa (DV) Applicants .

Chapter 21.2(e)(1)(ii)(D), Derivative Diversity Visa (DV) Applicants, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(E) Sought to Acquire .

Chapter 21.2(e)(1)(ii)(E), Sought to Acquire, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(2) CSPA Coverage for Specific Aliens Not Covered Under Previous Guidance

(i) Limited CSPA Coverage for K4 Aliens .

The CSPA does not apply to aliens obtaining K2 or K4 nonimmigrant visas or extensions. An alien in K4 status may utilize the CSPA upon seeking adjustment of status because a K4 alien seeks to adjust as an IR on the basis of an approved Form I-130, which is filed under section 204 of the Act. This is because the USC petitioner who filed the nonimmigrant visa petition on behalf of the K3 parent must file a Form I-130 on behalf of the K4 alien before the K4 seeks to adjust status pursuant to 8 CFR 245.1(i). T his necessarily requires the existence of a parent-child relationship between the USC and the K4 alien. Accordingly, the CSPA should be applied to K4 applicants as described in paragraph 21.2(e)(1)(i).

(ii) Limited CSPA Coverage Option for K2 Aliens .

An alien in K2 status does not have a visa petition filed on his or her behalf under section 204. Consequently, a K2 alien cannot utilize the CSPA when seeking to adjust status. Although not required, USCIS may accept a Form I-130 filed by the USC petitioner based on a parent-child relationship between the USC petitioner and the K2 alien (e.g. where the USC petitioner has married the K1 and K2 is not yet 18 years old). This will allow an alien who once was a K2 to adjust on the basis of a petition filed und er section 204 of the Act and will allow him/her to utilize the CSPA when seeking to adjust status in some cases.

Exercising this option requires: (1) an existing parent-child relationship between the USC petitioner and the K2 alien, and (2) paying the requisite fees associated with Forms I-130 and I-485, Application To Register Permanent Residence or Adjust Status. This guidance does not create a petitionable relationship for K2s or K4s where none exists.

(iii) CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and who subsequently filed an application for permanent residence that was denied solely because he or she aged out.

Chapter 21.2(e)(2)(iii), CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and who subsequently filed an application for permanent residence that was denied solely because he or she aged out, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(iv) <u>CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and did not subsequently apply for permanent residence</u> .

Chapter 21.2(e)(2)(iv), CSPA coverage for preference aliens who did not have an application for permanent residence pending on August 6, 2002 and did not subsequently apply for permanent residence, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(3) <u>CSPA Section 6 Opting-Out Provisions</u> .

Beneficiaries of 2nd preference I-130 petitions that were automatically converted to family first preference upon the petitioning parent's naturalization may exercise the "opt-out" provision of section 6 even if the petition in question was originally filed in the F2A category but has now converted to F2B. Aliens seeking to utilize this opt-out provision should file a request in writing with the District Office having jurisdiction over the beneficiary's residence. Adjudicators do not need to determine the a ge of the alien when a section 6 opt-out request is received.

(4) <u>Visa Availability Date Regression</u> .

Chapter 21.2(e)(4), Visa Availability Date Regression, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

(5) <u>Inapplicability of the CSPA</u> .

Chapter 21.2(e)(5), Inapplicability of the CSPA, has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 23, 2018.

| **Note:** |
| --- |
| There is an **Appendix** to this chapter showing how the guidance would be applied to some specific scenarios. |

(6) <u>Priority Date Retention Requests</u> .

(A) Officers may encounter certain petitions that are eligible for assignment of an earlier priority date. The assignment of an earlier priority date is only permitted for those petitions filed by the same petitioner, on behalf of the same principal beneficiary. However, not every petition filed by the same petitioner on behalf of the same principal beneficiary will qualify. First and foremost, only approved petitions may qualify. Furthermore, those petitions which have been denied, revoked, or from which an immigrant visa has already been used do not qualify. See 8 CFR 204.2(h) .

(B) Officers may encounter adjustment of status cases involving applicants eligible to adjust status in the F2B category based on having automatically converted from a derivative in the F2A category to a principal in the F2B category (upon reaching the age of 21) whether or not the petitioner for the F2A petition filed a subsequent petition to classify the applicant as a principal under F2B. An assignment under the F2B category is permitted, and is considered to have happened automatically on the original petition, despite the fact that the applicant does not have a separate petition filed on his or her behalf to classify him or her in the F2B category. The original priority date available to the derivative beneficiary once classified pursuant to the F2A category is retained and applied to F2B classification - without need for a separate petition as previously indicated in the regulations. See 8 C.F.R. 204.2(a)(4) .

(C) If the principal beneficiary of an F2B petition (petition #2) was <u>previously</u> the derivative beneficiary of a petition filed pursuant to sections 203(a)(1) , (3) , (4) , or 203(b) , and the petitioner of petition #2 was not the petitioner on the previous petition (petition #1), then petition #2 is NOT entitled to the older priority date. See 8 CFR 204.1(b); 22 CFR 42.53(a). Instead, petition #2 should be assigned a priority date based on the date of filing. Send the standard notice of denial of priority date retention provided through the appropriate chain of command. Continue to otherwise adjudicate the petition on its merits in accordance with applicable law, regulations, and policies.

---

**Example 1:**  Alice is an LPR. She files a petition for her husband, Barney, for F2A classification. Their son, Charlie, is listed as a derivative. Charlie ages out. Barney adjusts status.

---

Scenario 1: Barney files a petition on behalf of Charlie for classification as an F2B. This petition cannot retain the priority date from the petition filed by Alice because it was filed by a different petitioner.

Scenario 2: Alice files a petition on behalf of Charlie for classification as an F2B. This petition can retain the priority date from the petition filed by Alice for Barney because it is the same petitioner filing on behalf of the same beneficiary.

---

```
┌─────────────────────────────────────────────────────────────────────┐
│                                                                     │
└─────────────────────────────────────────────────────────────────────┘
```

---

**Example 2:**  David is a USC. He files a petition on behalf of his brother, Eric. Eric's daughter, Fanny, is listed as a derivative. Fanny ages out. Eric adjusts status.

Scenario: Eric files a petition for Fanny for classification as an F2B. This petition cannot retain the priority date from the petition filed by David because it was filed by a different petitioner.

---

(D) If an individual files an application for adjustment of status in the F2B or F1 classification based on previous F2A derivative classification, but the petitioner did not file a new (subsequent) petition on behalf of the individual, the individual may be eligible for adjustment of status if:

(i) he or she was previously the derivative beneficiary of an approvable F2A petition;

(ii) he or she qualifies as the son or daughter of the original petitioner (take particular care that step-relationships were created before the applicant turned 18); and

(iii) all other eligibility requirements are met.

---

**Example 3:**  Gregory is an LPR. He files a petition for his wife, Heather. Heather's son, Igor, is listed as a derivative beneficiary on the petition, but he ages out. Heather adjusts status.

Scenario 1: Igor was 17 years old when his mother married Gregory. He files an application for adjustment of status in the F2B category. Igor qualifies as Gregory's stepson and may use the priority date from the petition filed on behalf of his mother to adjust status.

Scenario 2: Igor was 19 years old when his mother married Gregory. He files an application for adjustment of status in the F2B category. Igor does not qualify as Gregory's stepson and is not eligible to

---

adjust status in the F2B category, so the application must be denied on the basis that there is no visa available to him because he is not eligible for an immigrant visa classification.

(E) If an application for adjustment of status is pending based on INA 245(a) or (i), and visa availability is solely contingent upon a request for priority date retention for which the applicant is not eligible, the officer must deny the application for adjustment of status. If, however, it appears that the applicant is prima facie eligible to adjust on a different visa petition or different section of law, and was so eligible at the time the applicant filed the application for adjustment of status, the officer should request additional evidence as needed, and adjudicate the application based on the alternative basis of eligibility. In such a case, if the application is ultimately denied, the adjudicator should address both the reasons for denial on the original basis, as well as the reasons for denial on the alternate basis. If the applicant was not prima facie eligible on another basis at the time the applicant filed the application for adjustment of status, the officer may not adjudicate the application on any other basis, and must deny the application based upon the original basis.

(F) Officers may encounter motions to reopen or motions to reconsider which are filed by applicants who were previously denied adjustment of status.

·    If the motion is solely contingent on a request for priority date retention for which the applicant is not eligible, the officer must deny the motion.

·    If the applicant demonstrates that they were, at the time of filing for adjustment of status, prima facie eligible on an alternative basis for adjustment that was not considered before denial, then the officer must reopen the application and adjudicate the application based on the alternative basis of eligibility.

| **Note** |
| --- |
| Eligibility pursuant to the alternative basis for adjustment of status must have existed at the time the underlying application for adjustment of status (not the motion) was filed. |

(f) Adam Walsh Child Protection and Safety Act of 2006, (Adam Walsh Act), Pub. L. 109-248 . [Section 21.2(f) replaced 04-28-2007; previous Sections 21.2(f)-(h) renumbered as 21.2(g)-(i)]

(1) Background .

**Title IV of the Adam Walsh Act, "Immigration Law Reforms to Prevent Sex Offenders from Abusing Children"** contains two provisions that amend the Immigration and Nationality Act (the Act).

·    **Section 402(a) of the Adam Walsh Act** amends sections **204(a)(1)(A)(i)** and **204(a)(1)(B)(i)** of the Act to prohibit U.S. citizens and lawful permanent residents who have been convicted of any "specified offense against a minor" from filing a family-based immigrant petition on behalf of any beneficiary, unless the Secretary of Homeland Security (the Secretary) determines, in his sole and unreviewable discretion, that the petitioner "poses no risk to the beneficiary."

Section 402(b) of the Adam Walsh Act amends section **101(a)(15)(K)** of the Act to bar U.S. citizens convicted of these offenses from filing nonimmigrant visa petitions to classify their fiancé(e)s, spouses, or minor children as eligible for "K" nonimmigrant status, unless the Secretary determines, in his sole and unreviewable discretion, that the petitioner poses no risk to the beneficiary.

A petitioner who has been convicted of a specified offense against a minor is not simply prohibited from filing on behalf of a minor child. The petitioner is prohibited from filing on behalf of "any" family-based beneficiary under sections 204(a)(1)(A)(i) and 204(a)(1)(B)(i) of the Act or in accordance with section 101(a)(15)(K) of the Act.

Section 401 of the Adam Walsh Act amends section **237(a)(2)(A)** of the Act by adding a new subparagraph (v). Under new section 237(a)(2)(A)(v), an alien who is convicted under new 18 USC 2250, for failing to register as a sex offender, is subject to removal as a deportable alien.

(2) Statutory Definitions .

(A) Beneficiary .

"Any beneficiary" includes a spouse, a fiancé(e), a parent, an unmarried child, an unmarried son or daughter over 21 years of age, an orphan, a married son or daughter, a brother or sister, and any derivative beneficiary permitted to apply for an immigrant visa on the basis of his or her relationship to the principal beneficiary of a family-based petition.

003398

(B) <u>Specified Offense Against a Minor</u>.

The term "specified offense against a minor" means an offense against a minor (defined as an individual who has not attained the age of 18 years) that involves any of the following:

· An offense (unless committed by a parent or guardian) involving kidnapping;

· An offense (unless committed by a parent or guardian) involving false imprisonment;

· Solicitation to engage in sexual conduct;

· Use in a sexual performance;

· Solicitation to practice prostitution;

· Video voyeurism as described in 18 USC 1801;

· Possession, production, or distribution of child pornography;

· Criminal sexual conduct involving a minor, or the use of the Internet to facilitate or attempt such conduct; or

· Any conduct that by its nature is a sex offense against a minor.

003399

The statutory list of criminal activity in the Adam Walsh Act that may be considered a specified offense against a minor is stated in relatively broad terms and takes into account that these offenses may be named differently in a wide variety of Federal, State and foreign criminal statutes.

With one exception, the statutory list is not composed of specific statutory violations. As defined in the relevant criminal statute, for a conviction to be deemed a specified offense against a minor, the essential elements of the crime for which the petitioner was convicted must be substantially similar to an offense defined as such in the Adam Walsh Act.

(C) Poses No Risk to Beneficiary .

USCIS interprets the "poses no risk to the beneficiary" provision to mean that the petitioner must pose no risk to the safety or well-being of the beneficiary, which includes the principal beneficiary and any alien derivative beneficiary.

(3) Field Guidance .

(A) Applicability of the Adam Walsh Act .

Title IV of the Adam Walsh Act does not include a specific effective date. For this reason, it entered into force on July 27, 2006, the date of enactment. In general, an application for benefits under the Act is adjudicated according to the facts and law as they exist on the date of decision. See Matter of Alarcon , 20 I&N Dec. 557 (BIA 1992).

(B) Determining "Specified Offense Against a Minor .

(i)    Operational Procedures .

003400

On July 28, 2006, **http://www.uscis.gov/files/pressrelease/AdamWalshAct072806.pdf** USCIS field offices were directed to issue a Request for Evidence (RFE) for all police arrest records and court disposition documents and schedule the petitioner for fingerprints if the petitioner's IBIS check revealed a hit for any offense that is or potentially may be a "specified offense against a minor" as defined above.

If there is an IBIS hit or some other indication that a lawful permanent resident petitioner may have a conviction for a specified offense against a minor as defined in the Adam Walsh Act, the case must be handled in accordance with current IBIS procedures as it relates to an "egregious public safety threat."

| Note |
|---|
| As defined by the Memorandum of Agreement between USCIS and United States Immigration and Customs Enforcement (ICE) on the Issuance of Notices to Appear to Aliens Encountered During an Adjudication, and accompanying policy memorandum entitled, "Disposition of Cases Involving Removable Aliens," July 11, 2006, ICE may decide to initiate removal proceedings against any lawful permanent resident who is deportable under section 237(a)(2)(A)(v) of the Act (conviction for having failed to register as a sex offende r). |

If the offense meets the definition of an egregious public safety threat, adjudication of the petition must be suspended and an appropriate referral to ICE must be completed in accordance with current "egregious public safety threat" procedures.

Otherwise, if the petition has already been approved or is currently being adjudicated and there is an IBIS hit or some other indication that the petitioner may have a conviction of a specified offense against a minor as defined in the Adam Walsh Act, the adjudicator must issue an RFE or Notice of Intent to Revoke (NOIR) for all police arrest records and court disposition documents.

If the petitioner was an "Ident" based on previous fingerprinting, the adjudicator must obtain a current rap sheet per local procedures instead of scheduling the petitioner for fingerprinting. Otherwise, the adjudicator must schedule the petitioner for fingerprinting in accordance with service center or field office procedures, which will be processed without fee.

(ii)    <u>Adjudicative Review of Evidence</u> .

If the petitioner fails to respond to the RFE or NOIR, the petition should be denied or revoked accordingly.

If the fingerprint results and the evidence submitted in response to an RFE or NOIR indicate that the petitioner was not convicted of a specified offense against a minor as defined by the Adam Walsh Act, the adjudicator should proceed with the adjudication of the petition in accordance with **8 CFR 204** and other pertinent regulations.

If, after review of the fingerprint results and the evidence submitted in response to the RFE or NOIR, the adjudicator determines that either of the following two instances exists, the adjudicator should forward the file, through appropriate supervisory channels, to local USCIS counsel for review and opinion:

·    The adjudicator is unsure whether the petitioner's conviction may be considered a specified offense against a minor, or

·    The criminal case against the petitioner is still pending or the disposition of the case is still unknown.

If, after review of the fingerprint results the evidence submitted in response to the RFE or NOIR, the adjudicator finds that the petitioner has been convicted of a specified offense against a minor as defined by the Adam Walsh Act, the adjudicator must determine whether the petitioner poses a risk to the beneficiary, as described below.

(C) Determining "Poses No Risk to Beneficiary ."

(i) Adjudicative Review of Evidence .

The critical purpose of **section 402 of the Adam Walsh Act** is to ensure that an intended alien beneficiary is not placed at risk of harm from the person seeking to facilitate the alien's immigration to the United States. USCIS, therefore, may not approve a family-based petition ( Form I-130 or I-129F ) if the petitioner has a conviction for a specified offense against a minor unless USCIS first determines that the petitioner poses no risk to the beneficiary with respect to whom a petition was filed. Under section 402 of the Adam

Walsh Act, this determination is entrusted to the discretion of the Secretary, who has the "sole and unreviewable" authority to decide whether a petitioner poses any risk to the intended beneficiary.

To avoid denial of a petition or the revocation of a prior approval, a petitioner who has been convicted of a specified offense against a minor must submit evidence of rehabilitation and any other relevant evidence that clearly demonstrates, beyond any reasonable doubt, that he or she poses no risk to the safety and well-being of his or her intended beneficiary(ies). The initially filed petition or response to an RFE or NOIR must include whatever evidence and legal argument the petitioner wants USCIS to con sider in making its risk determination. Examples of such evidence include, but are not limited to:

·    Certified records indicating successful completion of counseling or rehabilitation programs;

·    Certified evaluations conducted by licensed professionals, such as psychiatrists, clinical psychologists, or clinical social workers, which attest to the degree of a petitioner's rehabilitation or behavior modification;

·    Evidence demonstrating intervening good and exemplary service to the community or in the uniformed services;

·    Certified copies of police reports and court records relating to the offense (the court records must include the original indictment or other charging document, any superseding charging document, any pre-sentencing report, and the conviction judgment); and

·    News accounts and trial transcripts describing the nature and circumstances surrounding the petitioner's specified offense(s) against a minor and any other criminal, violent, or abusive behavior incidents, arrests, and convictions.

The determination of whether a petitioner's evidence is credible, and the weight and probative value to be given that evidence, shall be within the sole and unreviewable discretion of USCIS.

(ii) <u>Decision</u> .

In determining whether a petitioner poses any risk to his or her intended beneficiary, the adjudicator must consider all known factors that are relevant to determining whether the petitioner poses any risk to the safety and well-being of the beneficiary. Factors that should be considered include, but are not limited to, the following:

·   The nature and severity of the petitioner's specified offense(s) against a minor, including all facts and circumstances underlying the offense(s);

·   The petitioner's criminal history;

·   The nature, severity, and mitigating circumstances of any arrest(s), conviction(s), or history of alcohol or substance abuse, sexual or child abuse, domestic violence, or other violent or criminal behavior that may pose a risk to the safety or well-being of the principal beneficiary or any derivative beneficiary;

·   The relationship of the petitioner to the principal beneficiary and any derivative beneficiary;

·   The age and, if relevant, the gender of the beneficiary;

·   Whether the petitioner and beneficiary will be residing either in the same household or within close proximity to one another; and

·   The degree of rehabilitation or behavior modification that may alleviate any risk posed by the petitioner to the beneficiary, evidenced by the successful completion of appropriate counseling or rehabilitation programs and the significant passage of time between incidence of violent, criminal, or abusive behavior and the submission of the petition.

Given the critical purpose of section 402 of the Adam Walsh Act, the adjudicator must automatically presume that risk exists in any case where the intended beneficiary is a child, irrespective of the nature and severity of the petitioner's specified offense and other past criminal acts and irrespective of whether the

003404

petitioner and beneficiary will be residing either in the same household or within close proximity to one another.

The burden is upon the petitioner to rebut and overcome the presumption of risk by providing credible and persuasive evidence of rehabilitation and any other relevant evidence that proves, beyond any reasonable doubt, that he or she poses no risk to the intended child beneficiary.

In cases where none of the intended beneficiaries are children, the adjudicator must closely examine the petitioner's specified offense and other past criminal acts to determine whether the petitioner poses any risk to the safety or well-being of the adult beneficiary.

For example, past acts of spousal abuse or other acts of violence must certainly be considered. The fact that a petitioner's past criminal acts may have been perpetrated only against children or that the petitioner and beneficiary will not be residing either in the same household or within close proximity to one another may not, in and of themselves, be sufficient to convince USCIS that the petitioner poses no risk to the adult beneficiary.

The burden is upon the petitioner to prove, beyond any reasonable doubt, that he or she poses no risk to the intended adult beneficiary.

Unless the adjudicator can conclude, based on the evidence, that the petitioner poses no risk to the beneficiary, the adjudicator must deny the petition and clearly articulate the factual basis for the determination.

If the adjudicator is uncertain as to whether the petitioner poses no risk to the beneficiary, or if the adjudicator is finding it difficult to articulate the factual basis for the denial, the adjudicator should consult with his or her supervisor and/or USCIS counsel.

(iii) Headquarters Clearance of Approval Recommendations .

If the adjudicator finds that the petitioner poses no risk to the beneficiary, the adjudicator must seek the

003405

guidance and direction of USCIS Headquarters, Regulations and Product Management Division, before approving the petition. Adjudicators are prohibited from exercising favorable discretion in such instances without the consent of USCIS Headquarters.

(D) <u>Revocation of Approved Petitions</u> .

If, at any time prior to adjustment of status or consular processing, USCIS becomes aware that the petitioner has a conviction for a specified offense against a minor, steps may be taken to revoke the approved family-based immigrant visa petition or reopen and reconsider the Form I-129F .

For immigrant visa petitions that have already been approved, **section 205** of the Act provides discretion to revoke approval for "good and sufficient cause."

For a case in which a Form I-130 has been approved, revocation of the approval under **8 CFR 205.2** would be appropriate, if the petitioner has been convicted of a specified offense against a minor and the adjudicator finds that the petitioner poses any risk to the beneficiary.

Therefore, an IBIS check on the petitioner of the family-based immigrant petition must be valid at the time the beneficiary adjusts status. If the IBIS check on the petitioner is not valid at the time of adjustment, IBIS must be re-run and any resulting hits treated in accordance with current IBIS procedures.

For Form I-129F , **8 CFR 103.5(a)(5)(ii)** provides authority to reopen and reconsider the decision on the petition. Thus, in a case in which a Form I-129F has been approved, it would be appropriate to reopen the case and deny it if the petitioner has been convicted of a specified offense against a minor and the adjudicator finds that the petitioner poses any risk to the beneficiary.

(E) <u>Administrative Appeals of Denied or Revoked Petitions</u> .

Traditionally, the denial or revocation of Form I-130 and Form I-360 (in specified cases) has been subject to appeal to the Board of Immigration Appeals (BIA). See **8 CFR 1003.1(b)(5)** .

The denial or revocation of orphan (Forms I-600 and I-600A ) and fiancé(e) cases (Form I-129F) may be appealed to the Administrative Appeals Office (AAO). As required in Chapter 10.7(b)(5) of this manual, a decision denying or revoking approval of a Form I 600 or Form I 600A must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

To aid in the proper presentation of the appealed denial or revocation, each field office must advise Headquarters of any notice of appeal filed with the BIA in any case denied or revoked under **section 402 of the Adam Walsh Act** . Section 402 of the Adam Walsh Act does not affect the AAO's jurisdiction in Form I-600, I-600A, and I-129F cases.

(F) Centralization of AWA-applicable Visa Petitions (Forms I-130 and I-129F) at the Vermont Service Center .

As of March 22, 2011, service center adjudication of all relative visa petitions subject to the Adam Walsh Act (AWA) is centralized at the VSC. Using the procedures set forth in this section, all other service centers will transfer Forms I-130 or I-129F in their possession to the VSC upon determining preliminarily that AWA applies.

(i) Sources of Information. An officer adjudicating a Form I-130 or Form I 129F may identify derogatory information on criminality through any of the following sources:

- Front-end search,

- Back-end referral from an adjudicator based on a hit in TECS or IBIS Manifest, or

- Non-IBIS referral from an adjudicator based on criminal documents in the file or other documents indicating criminality.

(ii) Sufficiency of Information. The following derogatory information s sufficient to determine preliminarily that AWA applies:

- An NCIC sexual offender registry hit, unless it can be conclusively demonstrated that the victim was an adult or that the charge was dismissed, withdrawn, or the prosecution entered "no prosecution [nolle prosequi]."

- A TECS hit revealing anything sexual in nature, unless it can be conclusively demonstrated that the victim was an adult or that the investigation has been closed (with no resulting arrest), dismissed, recorded as "no prosecution," or withdrawn.

- A review of NN16 / NN11 indicates any sexual offense, unless it can be conclusively demonstrated that the victim was an adult or that the charge was dismissed, recorded as "no prosecution," or withdrawn.

003407

- A check of any system reveals derogatory information involving kidnapping or false imprisonment (unless the offense was committed by parent or guardian).

**Note:** All AWA-related files that are transferred to the VSC must contain a timely and unexpired AWA petitioner criminality-resolution memorandum. The resolution memorandum will detail all criminality issues related to the petition and indicate that a preliminary AWA determination has been made.

(iii) Cases with Scheduled Fingerprinting Appointments. Where the petitioner has a history of criminality, the petition has been transferred to the VSC after the originating service center issued a fingerprint-appointment notice, and the petitioner later fails to appear for (or seeks postponement of) the originally scheduled fingerprinting appointment, the VSC will do the following:

(a) determine whether it is necessary to reschedule the fingerprinting appointment;
(b) if so, apply its local fingerprint scheduling procedures; and
(c) determine whether the petition should undergo AWA-related review and adjudication.

(iv) Post-adjudication Transfers to the VSC. Where an originating service center or the VSC has already adjudicated the underlying petition, but where new derogatory evidence is uncovered, or where a remand from the Board of Immigration Appeals (BIA) requires that a service center review the case for possible AWA determinations, the originating service center should forward the case to the VSC for reconsideration.

**Note:** If there is a concurrently filed Form I-485 associated with the underlying petition that was to be adjudicated by the originating service center, that Form I-485 will also be adjudicated by the VSC. Additionally, if an AWA-related case is remanded by the BIA to an originating service center, the originating service center should transfer the case to the VSC for AWA-related review and adjudication. In those cases, the originating service center must also provide the petitioner with written notice of the case transfer.

(v) File Transfer. The originating service center will package and send to the VSC all files where there has been a preliminary determination that the petition warrants review as an AWA-related case. The following procedure applies:

- Create a manifest for each box detailing the file receipt and box numbers.

- Record the number of files and list the corresponding barcodes on the manifest.

- Number each box (e.g., "1 of 4") for each shipment (a copy of the manifest should be maintained by the audit team of the sending service center).

- Place a copy of the manifest in the box.

- Send an electronic copy of each manifest via email to the VSC after every shipment, detailing the contents of each shipment.

- Relocate each file to VSC in CLAIMS using "Relocated to new jurisdiction (VSC)" and "batch transfer forward" in NFTS to the VSC shipping destination.

- Affix an AWA cover sheet to each AWA-related case file being transferred to the VSC (see attached uniform AWA cover sheet). For previously batched AWA case shipments, use only one cover sheet for each batch.

- Provide written notice to each petitioner regarding the transfer of the underlying petition or application

- Forward all AWA petitions to the following VSC shipping address:

DHS-USCIS Vermont Service Center
Attn: AWA TEAM
75 Lower Welden Street
St. Albans, VT 05479-0001

(vi) Post-shipment Audit. VSC will audit each shipment of AWA files, as follows:

- The audit will consist of random checks (i.e., samples will be pulled from each box) to an AQL of 1.5 % Level II of ANSI/ASQ Z1.4 2003.*

- The audit will:

    o   Verify that the files have been properly transferred forward in NFTS;

    o   Verify that the files have been properly manifested;

    o   Verify that the files have been properly relocated in CLAIMS "Transferred to new jurisdiction (VSC)";

    o   Verify the files are I-130s and I-129Fs; and

    o   Verify the I-130 and I-129F data is in CLAIMS 3.

- Once the petition is received at the VSC, all files will be routed to the designated AWA shelf in Essex "Attn: AWA BCU Team" for review and processing. Each file must be clearly marked so that BCU is aware that the petition has been identified as an AWA petition.

(vii) Jurisdiction over AWA-related Determinations. The decision to centralize the adjudication of AWA-related petitions filed does not alter the VSC's ability to refer petitions to district offices when an interview is deemed necessary or an investigation of suspected fraud is merited. In those instances, the VSC will retain exclusive authority to make all AWA-related determinations. Any case referred to a district office should be accompanied by a completed AWA-approval worksheet indicating the VSC has determined that the petitioner poses no risk to his or her intended beneficiary.

(g) <u>Post-Adjudication Actions</u> .

(1) <u>Decision - Approvals</u>

(A) <u>Notification</u>.

Chapter 21.2(g)(1)(A), Notification, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(B) <u>Form I-797</u>.

Chapter 21.2(g)(1)(B), Form I-797, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(C) <u>Beneficiary in the United States and Eligible for Adjustment of Status.</u>

Chapter 21.2(g)(1)(C), Beneficiary in the United States and Eligible for Adjustment of Status, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(D) <u>Beneficiary in the United States, But Ineligible for Adjustment of Status</u>.

If the beneficiary is in the United States, but the file indicates ineligibility for adjustment of status, forward the approved petition to the National Visa Center (NVC), with reference to the consulate abroad. It is to be noted also that all immigrant petitions designated as "homeless" petitions will be forwarded to NVC. Designation on the I-130 for a consulate other than one in the beneficiary's country of birth or country of last residence may only be made by the petitioner. Under no circumstances shoul d an officer advise a petitioner to designate a country other than the appropriate consulate having jurisdiction.

(E) <u>Section 243(d) Sanctions and Waivers Thereof</u>.

Section 243(d) sanctions can be imposed against countries which fail to cooperate in the removal of their nationals who have been ordered removed from the United States. Upon being advised by the Attorney General that a particular country is not cooperating, the Secretary of State orders consular officers not to issue either immigrant visas or nonimmigrant visas, or both, to nationals of that country. (The Secretary of State may also choose to apply sanctions against only certain visa categories.) Unless su ch sanctions are waived by the consular officer on an individual case basis, an alien seeking a visa subject to the sanctions cannot be issued a visa. Unlike the former section 243(g) sanctions, which required adjudicators to annotate visa petitions when sanctions were waived, there is no action required by adjudicators to either implement or waive section 243(d) sanctions. Furthermore, even if sanctions have been imposed, they have no effect on applications (e.g., adjustment applications, change of status applications, waiver applications) handled by USCIS .

There are currently no countries subject to sanctions under section 243(d) of the Act with regard to immigrant visas.

(2) Denials .

Chapter 21.2(g)(2), Denials, has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

The appellate body (if any) to which the appe al is filed depends on the type of relative petition involved:

·    The appeal from a denial of a Form I-130 petition is made to the Board of Immigration Appeals (BIA) on Form EOIR-29.

·    The appeal from a denial of a Form I-360 filed by a widow(er) is made to the BIA on Form EOIR-29.

| **Note** |
| --- |
| Any appeal on a case where the BIA has appellate jurisdiction must be accepted and forwarded to the BIA, even if it is not timely filed. The BIA will decide whether to consider the case. |

· The appeal from a denial of a Form I-360 <u>filed by a battered spouse</u> is made to the Office of Administrative Appeals on Form I-290B.

· The appeal from a denial of a Form I-600 or I-600A is made to the Office of Administrative Appeals.

· The denial of a Form I-730 is not appealable.

Notify the petitioner in writing of the decision and the right to appeal. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(3) <u>Issuance of a Notice To Appear (NTA)</u> .

Upon completion of adjudication of a visa petition filed on behalf of an alien who is illegally in the United States, the adjudicating officer must consider whether USCIS or DHS should initiate removal proceedings through the issuance of a Notice to Appear. Generally, NTAs should be issued if the beneficiary is illegally in the United States and is not immediately eligible to apply for adjustment of status (e.g., if he or she is subject to bars to adjustment contained in sections 245(a) or 245(c) of the Act ).

Only certain officials have the regulatory authority to issue NTAs (see **8 CFR 239.1** ) and the director of each office or center determines which unit within that office or center exercises that authority. For example, in some offices, upon completion of adjudicative action, cases are referred from the Adjudications Branch to the Investigations Branch for consideration of NTA issuance; in other offices the NTA is prepared by the Adjudications Branch and signed by the ADD for Examinations or ADD for Adjudications. Follow the procedures set forth in your local office or center.

(h) <u>Revocation of Approval</u> .

The approval of a relative petition may be revoked under **section 205** of the Act and **8 CFR 205** if certain conditions arise or are discovered. Revocations can be divided into 2 areas: Automatic revocation and Revocation Upon Notice.

(1) <u>Automatic Revocation</u> .

(A) <u>Grounds for Automatic Revocation</u> .

The grounds for automatic revocation are set forth in **8 CFR 205.1(a)** . Officers should be familiar with each of the events spelled out in the regulation. Under each of these grounds, the revocation is automatic when the specified events occurs, regardless of whether USCIS is aware of its occurrence or not, and regardless of when (or even whether) USCIS provides notification of the revocation. For example, if an alien who is the beneficiary of an approved 2 nd preference visa petition as the unmarried son or daughter of a lawful permanent resident marries before immigrating to the United States or adjusting status, the petition's approval is revoked. It should be noted that although it is the event of the marriage which triggers the revocation, the revocation itself is as of the date of the petition's approval (in automatic revocation proceedings, revocation upon notice is different). Furthermore, because the petition's approval has been revoked, it does not bec ome valid again if the marriage of the beneficiary is terminated through divorce or death of the beneficiary's spouse. (However, if the marriage is annulled by a court of competent authority, the legal effect is that the marriage never occurred and therefore, neither did the revocation.)

(B) <u>Notification</u> .

Once USCIS becomes aware of the revocation, it must notify the consular post to which the petition was sent (or the National Visa Center, as appropriate) of the revocation and provide a copy of that notice to the petitioner at his or her last known address, or at the estate of the petitioner, as appropriate. As always, if a G-28 is on file indicating that the petitioner has or had legal representation in the petition process, the petitioner's copy of the notice is sent to the legal representative. Again, it is import ant to understand that under 8 CFR 205.1(a) it is the event which triggers the automatic revocation, not the notice; and that the revocation is as of the date of the petition's approval, not as of the date of the notice.

(C) <u>Discretionary Authority to Not Automatically Revoke Approval</u> .

Although revocation of approval is automatic under **8 CFR 205.1(a)(3)(i)(C)** , when the petitioner has died there are circumstances under which the Attorney General may exercise his or her discretion to not revoke the approval. Such discretionary authority is delegated to the district director or service center

director who approved the petition, and may be exercised when he or she "determines that for humanitarian reasons revocation would be inappropriate."

The Affidavit of Support (AOS) requirement at section 213A of the Act rendered such "humanitarian reinstatement" moot as there was no sponsor to sign the AOS. Congress remedied this by passing the Family Sponsor Immigration Act, Pub. L. 107-150, that allows for the use of a "substitute sponsor." Now, if a visa petitioner dies after approval of the petition, but prior to the beneficiary adjusting status or immigrating to the U.S., the beneficiary may use a "substitute sponsor" on the AOS.

To request humanitarian reinstatement of a revoked petition, the beneficiary should send a written request for reinstatement to the USCIS service center or field office that approved the petition except that, if the beneficiary has properly filed an application for adjustment of status with USCIS, the written request should be submitted to the USCIS office with jurisdiction over the adjustment application. The written request must include a copy of the approval notice for the revoked petition, the death certificate of the petitioner (or other qualifying relative) and, if required by section 213A of the Act and 8 CFR part 213a, a Form I-864 from a substitute sponsor and proof of the substitute sponsor's relationship to the beneficary. If the director decides that humanitarian reinstatement is not warranted, this decision should be communicated, in writing, to the beneficiary. There is no appeal from a determination not to exercise this discretionary authority. If the director decides that humanitarian reinstatement is warranted, the beneficiary should be notified and the decision forwarded to either the Department of State (if the beneficiary is abroad) or to the USCIS officer adjudicating the beneficiary's adjustment application (if the beneficiary is present in the U.S.).

While there are no other rules or precedents on how to apply this discretionary authority, reinstatement may be appropriate when revocation is not consistent with ?the furtherance of justice,? especially in light of the goal of family unity that is the underlying premise of our nation?s immigration system.? In particular, reinstatement is generally appropriate as a matter of discretion, if section 204(l) of the Act and Chapter 10.21 of this *AFM* would support approval of the petition if it were still pending.? For cases that are not covered by section 204(l) of the Act, the reinstatement request will be addressed in light of the factors that USCIS has traditionally considered in acting on reinstatement requests, which include:

- The impact of revocation on the family unit in the United States, especially on U.S. citizen or LPR relatives or other relatives living lawfully in the United States;

- The beneficiary's advanced age or poor health;

- The beneficiary's having resided in the United States lawfully for a lengthy period;

- The beneficiary's ties to his or her home country; and

- Significant delay in processing the case after approval of the petition and after a visa number has become available, if the delay is reasonably attributable to the Government, rather than the alien.

Although family ties in the United States are a major consideration, there is no strict requirement for the alien beneficiary to show extreme hardship to the alien, or to relatives already living lawfully in the United States, in order for the approval to be reinstated.? If the alien is required to have a Form I-864 affidavit of support, however, there must be a Form I-864 from a substitute sponsor.? 8 C.F.R. ? 205.1(a)(3)(i)(C).

| **Note** |
| --- |
| [Note removed on 12-02-2009] See Appendix 21-8. [Appendix 21-8 added on 12-02-2009] |

(D) <u>Conversion to Another Visa Classification</u> .

Under certain circumstances, the triggering event not only makes the beneficiary <u>ineligible</u> for the visa classification under which the petition was originally approved, it also makes him or her <u>eligible</u> for a different visa classification. For example, when an unmarried son of a U.S. citizen reaches age 21, he is no longer eligible for immediate relative classification as the child of a U.S. citizen (IR-2), but the same event makes him eligible for first preference classification as the unmarried son of a U.S. citizen (F1-1). Likewise, if the unmarried adult daughter of a citizen marries, she is no longer eligible for first preference classification, but the same event makes her eligible for third prefere nce classification as the married daughter of a citizen (F3-1). Paragraphs (G) and (H) of 8 CFR 205.1(a)(3) provide that under such circumstances not only is the approval for the original classification automatically revoked, but the same petition is automatically converted to (i.e., approved for) the new classification. The priority date of the newly-converted petition is the date on which that petition was originally filed (albeit for another classification), not the date on which the conversion occurred.

Similarly, if the petitioner in a second preference case naturalizes, the petition is automatically converted to the new classification for which the beneficiary becomes eligible ["spouse of LPR" (F2-1) becomes "spouse of citizen" (IR-1); "child of LPR" (F2-2) becomes "child of citizen (IR-2)"; "unmarried son or daughter of LPR" (F2-4) becomes "unmarried son or daughter of U.S. citizen" (F1-1)].

| **Note** |
| --- |
| An alien who is eligible for F2-3 derivative classification as the child of an alien classified F2-1 is not the beneficiary of a petition filed on his or her behalf. Accordingly, upon the naturalization of the LPR who petitioned for such child's parent, there is no conversion that can occur. A new petition would have to be filed for such child. If the child qualifies for classification as the child of the newly-naturalized citizen (i.e., step-child or adopted child), that citizen may file an immediate rela tive petition. If the child does not so qualify, then his mother or father (the spouse of the newly-naturalized citizen) may file a second preference petition on the child's behalf once he or she becomes an LPR. |

(E) <u>Amerasian Petitions</u> .

Special circumstances apply to the automatic revocation of Amerasian petitions which are discussed in subchapter 21.7 .

(2) <u>Revocation Upon Notice</u> .

In addition to those situations covered under the automatic revocation provisions of **8 CFR 205.1** , there are other situations where USCIS determines that the approval of a petition should be revoked for what **section 205** of the Act refers to as "good and sufficient cause." For example, if subsequent to the approval of a petition for a (natural) sibling, USCIS learned that the sibling relationship had previously been terminated by the adoption of the petitioner out of the family, there would be good and sufficient cause for revocation of approval of the petition upon notice.

(A) <u>Triggering Event</u> .

Under 8 CFR 205.2(a) USCIS can initiate revocation proceedings on a visa petition any time "the necessity of the revocation comes to the attention of the Service." While this may be the result of a particular triggering event (such as USCIS learning that the petitioner had been adopted out of the natural family unit in the example above), there does not need to be a specific "triggering event" (as with automatic revocation); instead there can be a series of events that leads to the conclusion that the petition's approval should be revoked. These events could have occurred either before or after the original approval, or some might have occurred before approval and others after.

(B) <u>Good and Sufficient Cause</u> .

The BIA has held that good and sufficient cause exists where the evidence of record at the time of issuance of the notice of intent, if unexplained and unrebutted, would warrant a denial ( *see* **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) ).

(C) <u>Notice of Intent</u> .

When it appears that revocation upon notice is appropriate, USCIS sends the petitioner a Notice of Intent to Revoke, setting forth the reasons (the "good and sufficient causes") why revocation is appropriate. It is important that all the valid reasons for which USCIS intends to revoke the petition be spelled out in the notice, since the petition is only required to respond to, and the ultimate decision can only be based on, reasons which were specified in the notice. In addition to a specific statement of the facts and evidence underlying the proposed revocation, the notice must advise the petitioner of his or her right to review and rebut the evidence. Quite simply, the BIA has held that "a decision to revoke approval of a visa petition will not be sustained where the notice of intent was not properly issued" ( *see* **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) ).

(D) <u>Burden of Proof</u> .

In revocation proceedings, as in all visa petition proceedings, the burden of proof rests with the petitioner. This does not change simply because USCIS is now the party proposing the action of revocation. USCIS's requirement is to set forth the good and sufficient grounds in the notice of intent (and to meet the other requirements of the notice). Once this has been done, the burden of proof is on the petitioner to establish eligibility for the benefit sought (see **Matter of Cheung** , 12 I&N Dec. 715 (BIA, 1968) .

(E) <u>Response to Notice</u> .

The petitioner should be given 30 days to respond to the notice of intent to revoke. If the petitioner requests additional time to respond, and USCIS is satisfied that he or she is not simply seeking to delay the revocation, additional time may be granted to respond to the notice. If the petitioner does not respond within the allotted time, or if the response is inadequate to meet the petitioner's burden of proof, the approval should be revoked through a formal order attached to a notice of decision (Form I-292), with appropriate appeal forms.

(F) <u>Appeal Rights</u> .

As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal

003417

rights and the opportunity to file a motion to reopen or reconsider. The petitioner has the same appeal rights from a decision to revoke upon notice as he or she would have from a decision to deny the petition. If a denial of the petition would be appealable to the BIA on Form EOIR 29, so is the revocation; if it would be appealable to the AAO on Form I 290B, so is the revocation. The petitioner also has a right to file a motion to reopen or reconsider the decision revoking the petition approval.

(G) Date of Revocation .

When a petition is revoked upon notice, the revocation is effective as of the date on which the decision becomes final.

(i) Precedent Decisions .

(1) Relating Index Topics .

The foregoing are only a few selected precedent or interim decisions particularly important to the adjudication of the particular petitions. To locate other relevant decisions refer to the index of administrative decisions under the following subtitles:

| Adoption | Immediate Relatives | Quota Preference |
|----------|---------------------|------------------|
| Annulment | Legitimation | Stepparent, question of |
| Child | Marriage | Visa, petition for |
| Divorce | Nonquota Immigration | Visa Petition, revocation of |

(2) Synopses of Selected Precedent Decisions .

(A) Precedent decisions of general applicability:

003418

· **Matter of O–** , 8 I&N Dec. 295 (BIA 959) . Admissibility of beneficiary is not relevant to decision of visa petition.

· **Matter of C–** , 9 I&N Dec. 433 (BIA 1961) . - There is no provision for retroactive approval of a petition. Furthermore, only the petitioner (not the beneficiary) can appeal a decision on a visa petition.

· **Matter of Brantigan** , 11 I&N Dec. 493 (BIA 1966) ; and **Matter of Phillis** , 15 I&N Dec. 385 (BIA 1975) . Burden of proof to establish eligibility for the benefit sought lies with the petitioner.

· **Matter of Pearson** , 13 I&N Dec. 152 (BIA 1969) . Failure to prosecute is a valid ground for denial when petitioner fails to comply with a reasonable request to appear for interview.

· **Matter of Varela** , 13 I&N Dec. 453 (BIA 1970) ; distinguished by **Matter of Pagnerre** , 13 I&N Dec. 688 (BIA 1971) . Death of the petitioner terminates relationship; this petition filed prior to the death may not be approved.

· **Matter of Herrera** , 13 I&N Dec. 755 (BIA 1971) ; followed by **Matter of Serna** , 16 I&N Dec. 643 (BIA 1978) . A delayed birth certificate plus delayed secondary evidence does not meet the requirements of 8 CFR 204.2(a).

· **Matter of Ah San** , 15 I&N Dec. 315 (BIA 1975) . Non-citizen nationals of the U.S. may file petitions pursuant to section 203(a)(2) of the Act.

· **Matter of Nevarez** , 15 I&N Dec. 550 (BIA 1976) . English translations of foreign language documents are required notwithstanding the documents were entered into evidence by the Service.

· **Matter of Aviles** , 15 I&N Dec. 588 (BIA 1976) ; **Matter of Mintah** , 15 I&N Dec. 540 (BIA 1975) . Reopening visa petition proceedings on a Service motion after an appeal to the BIA has been taken is prohibited. The District Director loses jurisdiction on such cases once the appeal is filed.

·   **Matter of Cintron** , 16 I&N Dec. 9 (BIA 1976) . A petition withdrawn by the petitioner may not be denied.

·   **Matter of Tahsir** , 16 I&N Dec. 56 (BIA 1976) ; **Matter of Calilao** , 16 I&N Dec. 104 (BIA 1977) . A decision may not be based on adverse evidence if the petitioner is unaware of it.

·   **Matter of Calilao** , 16 I&N Dec. 104 (BIA 1977) . A petition may be filed for a beneficiary who is currently an LPR under removal proceedings.

·   **Matter of Serna** , 16 I&N Dec. 643 (BIA 1978) . A delayed birth certificate is given weight on a case by case basis and is not always sufficient to establish U.S. citizenship.

·   **Matter of DaBaase** , 16 I&N Dec. 720 (BIA 1979) . Reopening of visa petition proceedings may not be instituted by the beneficiary; the right lies solely with the petitioner.

·   **Matter of Bardouille** , 18 I&N Dec. 114 (BIA1981) . A beneficiary of a visa petitioner must be fully qualified at the time the visa petition is filed.

(B) Precedent decisions pertaining to section 204(c) of the Act:

·   **Matter of F−** , 9 I&N Dec. 684 (BIA, 1962) ; Matter of Samsen, 15 I&N Dec. 28 (BIA, 1974). The decision on section 204(c) applicability must be made on all the evidence.

·   **Matter of Cabeliza** , 11 I&N Dec. 812 (BIA 1966) . Section 204(c) contains no statute of limitations and applies to any subsequently filed petition.

·   **Matter of Rahmati** , 16 I&N Dec. 538 (BIA 1978) . A finding that a previous marriage was non-viable

does not necessarily indicate it was contracted solely for immigration purposes; therefore, such a finding does not conclusively place an alien within 204(c).

·   **Matter of Agdinaoay** , 16 I&N Dec. 545 (BIA 1978) . A finding of deportability under section 241(c)(2) provides a basis for determination that section 204(c) is applicable for subsequent visa petition proceedings.

·   **Matter of May** , 18 I&N Dec. 381 (BIA 1983) ; and **Matter of Chu** , 19 I&N Dec. 81 (BIA 1984) ; **Matter of Ma** , 20 I&N Dec. 394 (BIA 1991) . Certificates issued by notarial offices in the People's Republic of China shall be accepted as evidence that both the adoptive relationship was created and that the adoption was valid. However, notarial certificates shall not be regarded as conclusive proof because of the potential for fraud or error in issuance. Lack of corroborating evidence, contradicting evidence and unexplained inconsistencies are indications of possible fraud or error.

·   **Matter of Villanueva** , 19 I&N Dec. 101 (BIA 1984) . Unless void on its face, a **valid** U.S. passport issued to an individual as a citizen of the U.S. is not subject to collateral attack in administrative immigration proceedings, but constitutes conclusive proof of such person's U.S. citizenship.

·   **Matter of Obaigbena** , 19 I&N Dec. 533 (BIA 1988) . Where a petitioner fails to timely and substantively respond to the notice of intention to deny or to make a reasonable request for an extension, the Board will not consider any evidence first proffered on appeal as its review is limited to the record of proceeding before the district director; for further consideration, a new visa must be filed.

·   **Matter of Hilaire** , 19 I&N Dec. 566 (BIA 1988) . Although a petitioner may submit certified copies of documents, the Service may still require the originals in order to determine authenticity.

(C) Precedent decisions pertaining to revocation of approval:

·   **Matter of Cheung** , 12 I&N Dec. 715 (BIA, 1968) . The burden of proof in revocation proceedings rests with the petitioner.

003421

·   **Matter of Zaidan** , 19 I&N Dec. 297 (BIA 1985) . Since there is no provision for appellate review when a visa petition is automatically revoked under 8 CFR 205.1, the Board lacks jurisdiction over appeals dealing with the automatic revocation of a petition.

·   **Matter of Estime** , 19 I&N Dec. 450 (BIA, 1987) . A decision that sets forth requirements for a notice of intent to revoke (see also **Matter of Arias** , 19 I&N Dec. 568 (BIA 1988) ; **Matter of Tawfik** , 20 I&N Dec. 166 (BIA 1990) ; and **Matter of Li** , 20 I&N Dec. 700 (BIA 1993) ).

·   **Matter of Arias** , 19 I&N Dec. 568 (BIA 1988) . A decision to revoke approval of a visa petition can only be grounded upon, and the petitioner is only obligated to respond to, the factual allegations specified in the notice of intention to revoke.

**21.3 Petition for a Spouse.**

(a) <u>Petition By Citizen or LPR for a Spouse</u> .

In addition to the general filing and adjudication procedures and issues discussed in **Chapter 21.2** of this *field manual* , this section will discuss matters more specific to the adjudication of an I-130 petition filed by a citizen or LPR on behalf of his or her spouse.

(1) <u>Procedural Concerns Particular to Spousal Petitions</u> .

(A) <u>Concurrent Filing of I-130 and I-485</u> .

A petitioner may file a Form I-130, Petition for Alien Relative, and the beneficiary may file a Form I-485, Application to Register Permanent Residence or Adjust Status, concurrently in certain circumstances. In order to file concurrently, the Form I-130 petitioner and the Form I-485 applicant (who is also the Form I-130 beneficiary) must, at the time of filing, meet all the eligibility requirements of both forms. For example:

·   If the beneficiary of the Form I-130 is subject to INA 212(e) as an exchange visitor who has neither complied with nor obtained a waiver of the 2-year foreign residency requirement, the Form I-485 cannot be filed concurrently. The Form I-130 can be filed separately.

·   If the petitioner is an LPR and second preference visa numbers are not "current," i.e. available, the beneficiary cannot concurrently file Form I-485. Again, the Form I-130 would have to be filed separately.

·   If the Form I-130 beneficiary entered on a K nonimmigrant visa and the Form I-130 petitioner is not the same person who filed the Form I-129F on the beneficiary's behalf, then the beneficiary is prohibited from adjusting status under INA 245(a). See INA 245(d). A Form I-130 may be filed by a different petitioner, but the beneficiary must consular process or be readmitted in a different non-immigrant classification. (Note: There are also limited exceptions available if the applicant is adjusting in the United States based on T nonimmigrant status (for victims of a severe form of trafficking in persons) or U nonimmigrant status (for victims of qualifying criminal activity).)

003423

Family-based Form I-485s generally require the Form I-130 petitioner to be the sponsor and executor of Form I-864, Affidavit of Support under INA 213A. The Form I-864 must generally be submitted with the beneficiary's Form I-485. INA 213A.  While there is no age requirement for a petitioner filing a spousal Form I-130, a Form I-130 petitioner cannot execute a Form I-864 unless he or she is at least 18 years old. INA 213A(f)(1)(B) and (f)(5). In cases where a joint sponsor is used to meet the income requirements, the joint sponsor must also be at least 18 years of age. In cases where the petitioning spouse is deceased and a substitute sponsor is needed, the substitute sponsor that executes a Form I-864 must also be at least 18 years of age.  INA 213A(f)(1)(B) and (f)(5).

If the Form I-130 petitioner is under age 18, he/she cannot execute a Form I-864.  A joint sponsor 18 years of age or older cannot remedy an underage sponsor's ineligibility to execute a Form I-864, as the purpose of a joint sponsor is only to cure the petitioner's inability to meet the income requirements.  Therefore, if the Form I-130 petitioner cannot execute a Form I-864 due to being under the age of 18, the beneficiary will be inadmissible under INA 212(a)(4)  based on his or her failure to submit a sufficient Form I-864 as required. The beneficiary will be ineligible to file for adjustment of status based on that underlying Form I-130 until the Form I-130 petitioner turns 18.

For more information about Affidavits of Support, see AFM Chapter 20.5; or the Policy Manual Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section D, Determine Admissibility, Subsection 2, Affidavit of Support Under Section 213A of the Act (Form I-864) [7 USCIS-PM A.6(D)(2)].

(B) Supporting Documents .

As with other relative petitions, documentation must be submitted to establish both the standing of the petitioner (evidence of U.S. citizenship or lawful permanent residence) and validity of relationship (evidence of the lawful marriage of the petitioner and beneficiary and of the termination of any and all prior marriages of both parties). In addition, in the case of spousal petitions, the supporting documentation must include ADIT-style photographs of both the petitioner and the beneficiary. If the petitioner has failed to provide any of these documents, either:

·    Send the petitioner an RFE requesting the missing documentation; or

·    If the I-130 was filed concurrently with the beneficiary's adjustment application, require the petitioner to bring the missing documentation to the interview.

(2) <u>Adjudication Issues</u> .

In addition to the more general adjudication issues discussed in subchapter 21.2, pay particular attention to these concerns pertaining specifically to spousal visa petitions:

(A) <u>Proxy Marriages</u> .

**Section 101(a)(35)** of the Act provides that the term "spouse", "wife", or "husband" does not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present together at the ceremony, unless the marriage has been consummated afterwards. (Note: Consummation of a marriage can only occur after the ceremony, there is no such thing as "pre-consummation" of a marriage.)

(B) <u>Validity of a Marriage Celebrated in a Foreign Country</u> .

One may normally presume the validity of a marriage upon presentation of a marriage certificate, duly certified by the custodian of the official record. As a general rule, the validity of a marriage is judged by the law of the place of celebration. If the marriage is voidable but no court action to void the marriage has taken place, it will be considered valid for immigration purposes. However, if a marriage is valid in the country where celebrated but considered offensive to public policy of the United States, it will not be recognized as valid for immigration purposes. Plural marriages fall within this category.

(C) <u>Marriage Between Close Relatives</u> .

In some foreign countries, and some states in the United States, marriages between close relatives (e.g., cousins) are permitted under certain circumstances. In cases where such marriages do not offend the laws of the state where the parties reside, the marriage will be recognized for immigration purposes.

(D) <u>Marriage Involving Minor(s).</u>

003425

There are no statutory minimum age requirements for the petitioner or beneficiary of a Form I-130 spousal petition.  In some U.S. states and in some foreign countries, marriage involving a minor is generally not allowed but may be permitted under certain circumstances, including where there is parental consent, a judicial order, emancipation of the minor, pregnancy of the minor, etc. (Note: Although the INA definition of "child" includes being under 21 years of age, in family law, a "minor" in a marriage context is generally defined as an individual under 18 years of age.)

However, a marriage involving a minor warrants special attention. Officers should evaluate all marriages involving a minor for evidence that: 1) the marriage was lawful in the place it was celebrated and on the date it was celebrated, 2) if the couple resides outside the place of celebration, the marriage is recognized as valid in the U.S. state where the couple currently resides or will presumably reside and does not violate the state of residence's public policy, and 3) the marriage is bona fide, and the minor(s) provided full, free, and informed consent to enter into the marriage.

Note: U.S. state laws vary in setting minimum age requirements to marry and exceptions that may permit minors to marry. Some U.S. states do not have an age floor below which a minor cannot marry if an exception applies. However, there may still be public policy considerations that would result in the domicile refusing to confer reciprocity to an out of state marriage involving a minor.

Note: The officer can generally rely upon a marriage certificate, court decree or parental consent as probative evidence of the minor's consent. However, if the case presents forced marriage issues, please consult with headquarters and/or your regional office through your normal supervisory chain.

(i) Legality of Marriage in the Place of Celebration.

Where the record does not establish the legality of the marriage, officers should issue an RFE for evidence that the marriage was lawful in the place where it was celebrated and on the date it was celebrated. The petitioner bears the burden of proof [See *Matter of Brantigan*, 11 I&N Dec. 493 (BIA 1966)] and must provide evidence that the minor(s) met the legal minimum age requirements in the place of celebration or that the minor(s) qualified for an exception to the general age requirements. If you have questions about the legality of a marriage involving a minor, please contact local USCIS counsel.

Note: Officers retain discretion to deny a petition without first issuing an RFE or NOID when required initial evidence was not submitted or the evidence of record fails to establish eligibility.  See AFM 10.5(a) and AFM 10.5(b).

Note: Regardless of the age of the petitioner and beneficiary at the time the I-130 petition is adjudicated, officers should ensure that any marriage that involved a minor was valid at the time it was entered into. Matter of P, 4 I&N Dec. 610 (Decided by the AG March 18, 1952).

(ii) Validity of the Marriage in Petitioner and Beneficiary's State of Residence or Presumed State of Residence and State Public Policy Considerations.

If the marriage involving a minor was lawfully entered into in the place where it was celebrated, whether domestically or overseas, but the couple now lives in or can be expected to live in a different place at the time of adjudication, officers should determine whether the marriage is or will be recognized as valid in the petitioner's current or presumed state of residence. (Note: A marriage complying with all the requirements of the state of celebration might nevertheless be deemed invalid if it is invalid under the laws of a state where one of the parties is domiciled at the time of the marriage and where both parties intend to make their home afterward, or if it violates a strong public policy of the state of domicile. See *Matter of Zappia*, 12 I. & N. Dec. 439 (BIA 1967); Matter of Da Silva, 15 I. & N. Dec. 778, 779 (BIA 1976).)


Where the beneficiary resides abroad, unless otherwise indicated or known to the officer, officers should presume that the couple will reside in the petitioner's state of residence [See *Matter of Manjoukis*, 13 I&N Dec. 705 (BIA 1971)]. The officer should consult with local USCIS counsel for assistance in determining the validity of the marriage or considering whether to issue an RFE for the petitioner to establish whether the marriage is or will be recognized as valid in the petitioner's current or presumed state of residence. For example, the petitioner may provide evidence that the state Attorney General's Office recognizes the marriage involving a minor, which was celebrated out of state. [Note: Officers retain discretion to deny the petition without first issuing an RFE or NOID when required initial evidence was not submitted or the evidence of record fails to establish eligibility.  See AFM 10.5(a) and AFM 10.5(b).]


Where it is unclear whether the marriage is or will be recognized as valid outside the place of celebration, officers should also determine whether the marriage violates the public policy of the new place of residence. A state's public policy is often reflected in specific criminal statutes that penalize undesirable or offensive conduct. Officers should look at the state's criminal statutes or consult with local counsel to determine whether the marriage is contrary to the state's public policy. A marriage involving a minor may be legal in the place of celebration but void under the state law of the minor's residence as contrary to state public policy. Conversely, state law may prohibit the marriage of a person under age 16, but may recognize as valid an out of state marriage of a resident under age 16 [See *Matter of Da Silva*, 15 I&N Dec. 778 (BIA 1976)]. The assessment as to whether a marriage violates state public policy is a case-by-case determination and involves the facts surrounding the parties, the marriage, and U.S. state law.  Officers should contact local counsel if it appears that the petitioner has not met his or her burden of establishing that the marriage would not violate the public policy of the state of residence despite being legal in the place of celebration. (Note: Some states will not recognize a marriage as valid if celebrated outside the state because the parties intended to evade the marriage restrictions in that state. These are generally referred to as 'evasion laws'.)


(iii) Bona Fides of the Marriage, Including Forced Marriage Considerations.

Officers must also consider the bona fides of the marriage and all other eligibility requirements as they evaluate a marriage involving a minor. A marriage cannot be considered bona fide if it was entered into for the sole purpose of evading U.S. immigration law. See *Matter of Laureano*, 19 I&N Dec. 1 (BIA 1983).


A marriage that was entered into without the consent of one or both parties is not considered bona fide for immigration purposes. Generally, an officer may rely upon a marriage certificate, court decree, or parental

consent as probative evidence of the minor's consent unless the case involves forced marriage indicators, such as an affidavit from the victim or a communication from Department of State (Note: Instances of forced marriage are almost always self-identified). Forced marriage is a marriage entered into without the full, free, and informed consent of one or both parties to the marriage, regardless of age. (Note: For additional information, please see the USCIS Forced Marriage webpage, at https://www.uscis.gov/humanitarian/forced-marriage.) Forced marriage should not be confused with the cultural practice of arranged marriage, where families may be involved in selecting a partner.  USCIS will consider any evidence that a forced marriage exists in its determination of whether the marriage is bona fide. If you have reason to believe that the marriage underlying an I-130 spousal petition may have been forced, please consult with headquarters and/or your regional office through your normal supervisory chain.

If the marriage involving a minor: (1) was legal in the place of celebration; (2) is recognized as valid in the couple's current or presumed state of residence and there are no state public policy concerns; (3) is bona fide and there are no indications of a forced marriage; and all other eligibility requirements have been met, then officers must approve a Form I-130 spousal petition involving the lawful marriage of a minor.

Note:  While there is no minimum age associated with being party to a Form I-130 spousal petition, any sponsor executing Form I-864 (including the Form I-130 petitioner, any joint sponsor, and/or a substitute sponsor) must be at least 18 years of age at the time the Form I-864 is executed. The Form I-864 must generally be submitted with the beneficiary's Form I-485. For more information about Affidavit of Support Considerations, AFM Chapter 20.5; AFM Chapter 21.3(a)(1)(A); and Policy Manual Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section D, Determine Admissibility, Subsection 2, Affidavit of Support Under Section 213A of the Act (Form I-864) [7 USCIS-PM A.6(D)(2)].

(iv)  Interview Guidelines for Form I-130 Spousal Petitions Involving a Minor.

USCIS has the authority to interview any petitioner or beneficiary, including a minor. *See* 8 CFR 103.2(b)(7) and 8 CFR 103.2(b)(9). While the eligibility of a spousal relationship for immigration purposes is generally assessed in person by USCIS when the alien spouse applies to adjust status or by Department of State when the alien spouse applies for an Immigrant Visa, USCIS has determined that Form I-130 spousal petitions involving a minor party warrant special consideration due to the possible vulnerabilities associated with marriage involving minor(s).

To better examine the eligibility of the spousal relationship for immigration purposes, service center officers must refer the following standalone Form I-130 spousal petitions for interview when the case appears approvable under Section D (i) − (iii):

1. All Form I-130 spousal petitions in which the petitioner or the beneficiary is less than 16 years of age; and

2. All Form I-130 spousal petitions in which the petitioner or the beneficiary is 16 or 17 years of age and there are 10 years or more difference between the ages of the spouses.

USCIS may interview either party to an I-130 spousal petition (petitioner or beneficiary), including minors and adults. The interview of the Form I-130 spousal petitioner and/or beneficiary should follow the same procedures as the interviews USCIS already conducts during the Form I-485 spousal adjustments. Generally, officers should ask the usual questions to evaluate the relationship for immigration purposes, while remaining aware of the unique nature of interviewing minors. Interviews of minors must be conducted with sensitivity and may warrant special considerations, including determining whether a trusted adult should be present and conducting additional rapport building. Interviews involving minors may require additional lines of questioning if the officer suspects the minor is a victim of forced marriage or human trafficking.

Please note, while this population warrants special consideration, spousal relationships involving a minor should not be viewed as inherently fraudulent or containing elements of forced marriage.

For further guidance on Interviewing the Petitioner or Beneficiary of a Form I-130 spousal petition, please see Section I below.

(E) <u>Fraudulent Marriage Prohibition</u> .

Section 204(c) of the Act provides that:

Notwithstanding the provisions of subsection (b) no petition shall be approved if (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws[,] or (2) the Attorney General has determined that the ali en has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

If there is evidence that the beneficiary has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws, the petition must be denied. However, the evidence of the attempt or conspiracy must be contained in the alien's file. (See also **8 CFR 204.2(a)(1)(ii)** .)

| **Note** |
|---|
| Section 204(c) prohibits the approval of <u>any</u> petition, not just an I-130 petition. Accordingly, if an alien has attempted of conspired to enter into a fraudulent marriage, USCIS would also be barred from approving an I-140 petition filed in his or her behalf. |

(F) <u>Freedom to Marry</u> .

The parties to a marriage must be legally free to marry. Some people "marry" with a bona fide intent to have a life together as man and wife, but the marriage is not valid because one of the parties was not legally free to marry when the marriage was contracted. Although the I-130 petition asks for the names of all prior spouses, the response to the question is sometimes inaccurate. The reasons given for an inaccurate answer are numerous, but the most common reasons are:

·    Desire to conceal prior marriage(s) from spouse;

·    Separated for many years and unsure if legally divorced;

·    Even though legally divorced, not in possession of the divorce decree and unwilling to take time to get it;

·    Not divorced because divorce is not allowed in the person's country of origin (e.g., the Philippines).

(G) <u>Legal Separation vs. Divorce or Annulment</u> .

A legal separation is not proof of marital capacity. A final decree of divorce, annulment or death must be presented as proof of termination of a prior marriage. If either party's prior marriage(s) has/have been terminated by divorce or annulment, the petitioner must establish that the divorce or annulment is valid under the laws of the place where pronounced. It must then be judged by the law of the jurisdiction where the parties to the divorce were actually residing at the time of the divorce.

(H) <u>Legal Separation vs. Separate Cohabitation</u>.

You may deny the visa petition in cases where the parties entered into a valid marriage, but have since obtained a legal separation prior to the final adjudication of the visa petition. However, if the parties entered into a valid marriage, have not obtained a legal separation, but simply reside separately, the petition may not be denied merely because of such separate cohabitation. The issue of separate cohabitation is relevant, however, in determining the intent of the parties at the time of the marriage.

(I) <u>Interviewing Petitioner and Spouse</u>.

This section provides general guidance on interviewing the petitioner or beneficiary of an I-130 spousal petition. If the marriage involves a minor, the officer should follow the guidance below and the guidance provided in subsection (D)(iv), Interview Guidelines for Form I-130 Spousal Petitions Involving a Minor.

You will often have to question both the petitioner and the beneficiary to determine whether the marriage is bona fide. Remember that the issue to be resolved during the interview is the bona fides of the marriage, not its "viability" (i.e., the probability of the parties remaining married for a long time). USCIS is not in the business of determining (or even speculating about) viability. Although the petitioner and the beneficiary may not appear to have a "viable" marriage, the petition may be approved if the marriage is valid and was not entered into solely for immigration purposes.

On the other hand, a marriage which was contracted solely for immigration purposes does not confer benefits under the Act. A number of factors may raise questions about the intent of the marriage, and therefore necessitate more in depth questioning (see **Chapter 15** regarding interviewing techniques), or even a field examination (see **Chapter 17** ) or an investigation (see **Chapter 10.5(d)** ). Some indications that a marriage may have been contracted solely for immigration benefits include:

·   Large disparity of age;

·   Inability of petitioner and beneficiary to speak each other's language;

·   Vast difference in cultural and ethnic background;

·   Family and/or friends unaware of the marriage;

·   Marriage arranged by a third party;

·   Marriage contracted immediately following the beneficiary's apprehension or receipt of notification to depart the United States;

·   Discrepancies in statements on questions for which a husband and wife should have common knowledge;

·   No cohabitation since marriage;

·   Beneficiary is a friend of the family;

·   Petitioner has filed previous petitions in behalf of aliens, especially prior alien spouses.

A sham marriage has been defined by the BIA as a marriage which may comply with all the formal requirements of the law but which the parties entered into with no intent, or "good faith", to live together and which is designed solely to circumvent the immigrations laws. Sham marriages are not recognized for immigration purposes. See **Matter of Patel** , 19 I&N Dec. 774 (BIA 1988).

(J) Same Sex Marriages .

In *United States v. Windsor*, 133 S. Ct. 2675 (2013), the Supreme Court held that section 3 of the Defense of Marriage Act (DOMA) (1 U.S.C. § 7), which previously had barred recognition of same-sex marriages for Federal purposes, is unconstitutional. As a result, same-sex marriage is now a lawful basis for all immigration benefits based on marriage.

In order to be valid for immigration purposes, a same-sex marriage must meet all of the same requirements as an opposite-sex marriage. As with opposite-sex relationships, a civil union, domestic partnership, or other relationship that is not recognized as a legal marriage in the place of celebration is not considered a marriage for immigration purposes.

A same-sex marriage that is legally valid in the jurisdiction in which it was celebrated is valid for immigration purposes, regardless of whether the jurisdiction in which the parties reside recognizes same-sex marriage. See Matter of Zeleniak, 26 I. & N. Dec. 158 (BIA 2013).

(K) Transgender issues and marriage. [Revised 8/10/12; PM-602-0061.1, AD12-02]

Prior to the Supreme Court's ruling in *United States v. Windsor*, 133 S. Ct. 2675 (June 27, 2013), benefits involving the marriage of transgender individuals could be granted pursuant to the Board of Immigration Appeals decision in *Matter of Lovo-Lara*, 23 I&N Dec. 746 (BIA 2005). *Lovo-Lara* provides that benefits based upon marriage may be approved on the basis of a marriage between a transgender individual and an individual of the other gender if the Petitioner/Applicant establishes 1) the transgender individual has legally changed his or her gender and *subsequently*[1] married an individual of the other gender, 2) the marriage is recognized as a heterosexual marriage under the law where the marriage took place (*Matter of Lovo-Lara, supra*), and 3) the law where the marriage took place does not bar a marriage between a transgender individual and an individual of the other gender. *Lovo-Lara* remains binding precedent for marriages that were celebrated in a jurisdiction that does not allow same-sex marriages. However, following *Windsor*, whether a spouse is transgender has no bearing on the validity of the marriage that was celebrated in a jurisdiction that recognizes same-sex marriage.

A timely registered marriage certificate from the appropriate civil authority is prima facie evidence of the validity of a marriage. When an officer determines, based on the record or through interview or other means, that a party to a petition has changed gender, the officer must ascertain that the marriage is a valid marriage under the laws of the jurisdiction in which it was contracted.

The validity of the marriage must be established by the preponderance of the evidence. As with most administrative immigration proceedings, the petitioner bears the "preponderance of the evidence" burden. Thus, even if there is some doubt, if the petitioner submits relevant, probative, and credible evidence that leads the director to believe that the claim is "probably true" or "more likely than not," the applicant or petitioner has satisfied the standard of proof. See *United States v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (defining "more likely than not" as a greater than 50 percent probability of something occurring). As such, officers should be satisfied that this burden is met if the marriage is recognized in the jurisdiction in which it was contracted. USCIS will presume the validity of the marriage involving a transgender individual in the absence of jurisdictional law and/or precedent that would place the validity of such marriage in doubt.

Only in jurisdictions where a specific law or precedent either prohibits or sets specific requirements for a legal change of gender, and does not permit same-sex marriage, is the individual required to demonstrate that he or she has met the specific requirements needed to establish the legal change of gender and the

validity of the marriage. The individual may also show, in an appropriate case, that the law barring a legal change of gender for purposes of marriage has changed and that the marriage is valid under current law, or that under the particular facts of the case and law of the jurisdiction in question, the marriage should be recognized (for example, if state law recognizes neither gender change nor same-sex marriage, then a marriage between a couple that is same-sex as a result of gender change of one of the parties may be considered lawful).

Where an individual claims to have legally changed his or her gender, USCIS will recognize that claim based upon the following documentation:

- Amended birth certificate; or

- Other official recognition of new gender, such as a passport, court order, certificate of naturalization or citizenship, or driver's license (note that some jurisdictions may have a lower threshold for issuing a driver's license than to establish a legal change of gender for purposes of the marriage laws, and USCIS would require additional evidence that the individual met the threshold for marriage, if applicable); or

- Medical certification of the change in gender from a licensed physician (a Doctor of Medicine (M.D.) or Doctor of Osteopathy (D.O.)). This is based on standards[2] and recommendations[3] of the World Professional Association for Transgender Health, who are recognized as the authority in this field by the American Medical Association.[4] Medical certification of gender transition received from a licensed physician (an M.D. or D.O.) is sufficient documentation, alone, of gender change. If the physician certifies the gender transition, USCIS will not question the certificate by asking for specific information about the individual's treatment. Additional information about medical certifications:

  - For the purposes of this chapter only an M.D. or a D.O. qualifies as a licensed physician. Officers may accept medical certifications from any number of specialties as well as from general practitioners.

  - Statements from persons who are not licensed physicians, such as psychologists, physician assistants, nurse practitioners, social workers, health practitioners, chiropractors, are not acceptable.

  - The medical certification should include the following information:

    - Physician's full name;

    - Medical license or certificate number;

    - Issuing state, country, or other jurisdiction of medical license/certificate;

    - Drug Enforcement Administration registration number assigned to the doctor or comparable foreign registration number, if applicable;

    - Address and telephone number of the physician;

    - Language stating that the individual has had appropriate clinical treatment for gender transition to the new gender (male or female);

    - Language stating that he/she has either treated the applicant in relation to the applicant's change in gender or has reviewed and evaluated the medical history of

003434

the applicant in relation to the applicant's change in gender and that he/she has a doctor/patient relationship with the applicant

Sex reassignment surgery is *not* required in order for USCIS to approve a Form I-130 to establish a legal change of gender unless the law of the place of marriage clearly requires sex reassignment surgery in order to accomplish a change in legal gender and the jurisdiction does not permit same-sex marriage. The *fact* of sex reassignment surgery, however, would generally be reflected in the medical certification. USCIS will not ask for records relating to any such surgery.

These documents are listed in order of evidentiary preference. Officers must recognize, however, that the personal circumstances and jurisdictions involved in an individual's case will affect availability of specific types of documentation. As evidence of the new gender, officers should treat an amended birth certificate as carrying the same weight as USCIS would normally give to other timely registered primary evidence.

This guidance also applies to the adjudication of all immigration benefits based upon marriage, including but not limited to a Petition for Alien Fiancé(e). In the case of a proposed marriage involving a transgender individual, the petition may be approved assuming the same conditions are met for legal gender change and validity of the marriage as described above. If the record indicates the parties' specific intent to marry in a jurisdiction where the marriage would not be valid, the officer will issue an intent to deny in which the petitioner is informed that the marriage would not be valid for immigration purposes and why. USCIS will provide the petitioner the opportunity to submit evidence that USCIS's interpretation of the jurisdiction's law and/or precedent is incorrect or provide an affidavit attesting that the intended marriage will take place in a jurisdiction where the marriage will be valid for immigration purposes.

The same principles for determining the validity of a marriage involving a transgender individual for a spousal Petition for Alien Relative apply to those who may derive an immigrant or nonimmigrant benefit by virtue of a spousal relationship.

If an officer has questions about the validity of a marriage involving a transgender individual, the officer should contact local USCIS counsel.

As in all adjudications, if an officer finds significant substantive discrepancies, has reason to question the accuracy or authenticity of documents submitted, or finds other indicators of fraud, the case may be referred to FDNS in accordance with current national and local policies.

---

| |
|---|
| As in all adjudications, if an officer finds significant substantive discrepancies, has reason to question the accuracy or authenticity of documents submitted, or finds other indicators of fraud, the case may be referred to FDNS in accordance with current national and local policies. |

(L) <u>Immigration Marriage Fraud Amendments of 1986 </u>.

In an effort to deter immigration-related marriage fraud, Congress passed the Marriage Fraud Amendments of 1986 on November 10, 1986. This legislation had a major effect on the adjudication of relative petitions, including:

·    In many cases, certain conditions had to be met prior to the acceptance or approval of certain petitions on behalf of spouses (see paragraphs (L) and (M).

·    Criminal penalties were added or enhanced for individuals who were convicted of having engaged in a fraudulent marriage.

·    An alien's lawful permanent residence is "conditional" if the qualifying marriage occurred less than 2 years prior to the alien's immigration or adjustment. The provision requires that a conditional resident alien seek removal of the conditional basis of the residence shortly before the second anniversary of the date on which he or she immigrated or adjusted (see **Chapter 25** regarding removal of conditions).

(M) <u>Marriage within Five Years of Obtaining LPR Status</u> .

**Section 204(a)(2)(A)** of the Act generally prohibits the approval of a visa petition filed by a lawful permanent resident for a spouse within 5 years of the date on which the petitioner became a LPR if that LPR obtained his or her residence status through a prior marriage. The LPR can overcome this prohibition if he or she establishes by clear and convincing evidence that the prior marriage was not entered into with the purpose of evading the immigration laws, or that the prior marriage ended through death. **8 CFR 204.2(a)(1)(i)** specifies the type of evidence which the petitioner must submit to meet the clear and convincing standard. If the petitioner falls within this restriction and has not submitted the requisite evidence, send him or her a letter explaining the deficiency and requesting additional evidence. If satisfactory evidence is not submitted within 60 days (or 120 days if the petitioner has requested and been granted additional time), deny the petition.

(N) <u>Marriage During Proceedings</u> .

There is a general prohibition against approval of visa petition filed on behalf of an alien by a United States citizen or a lawful permanent resident spouse if the marriage creating the relationship occurred on or after November 10, 1986, and while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto. Issues concerning determination of commencement and termination of proceedings and exemptions are covered in **8 CFR 245.1(c)(9)** , except that the burden in visa petition proceedings to establish eligibility for the exemption in **8 CFR 245.1(c)(9)(iii)(F)** rests with the petitioner. The petitioner can request an exemption if he or she:

(i) Is able to establish through clear and convincing evidence that:

· the marriage was entered into in good faith; and

· the marriage was not entered into for the purpose of obtaining LPR status for the beneficiary; or

(ii) The alien beneficiary has resided outside the United States for at least two years after the date of the marriage.

| **Note** |
| --- |
| If the alien was deported from the United States (or was a "self- deport"), he or she may need permission to reapply before immigrating to the United States, but not before the I-130 may be approved. (See **Chapter 43** of this field manual.) |

(3) <u>Closing Action</u> . See Chapter 21.2(g) of this field manual.

(b) <u>Petition for Widow(er)</u> .

(1) <u>Background</u> .

The Immigration Act of 1990 expanded the definition of immediate relatives to include spouses of United States citizens who had been married at least two years before their spouse died. A widow(er) of a U.S. citizen may file a petition on his or her own behalf to be classified as an immediate relative under Section 201(b) of the Act. **Section 201(b)(2)(A)(i)** of the Act and **8 CFR 204.2(b)** govern the process. An alien who obtains an immigrant visa or adjustment of status through this process is not subject to the conditional resident provisions of section 216 of the Act.

(2) <u>Procedure</u> .

An eligible widow or widower may apply for immediate relative classification by filing Form I-360 concurrently with his or her adjustment application with the Service Center having jurisdiction over the petitioner's residence. If the petitioner resides outside the United States, the I-360 petition should be filed with the USCIS office or American consulate having jurisdiction over such residence.

(3) Eligibility ,

Widow(er) may be classified as an immediate relative if:

· He/she was married for at least two years to a United States citizen ( **Note:** The United States citizen must have been a U.S. citizen at the time of death, but did not have to have the status of a U.S. citizen for the entire two year period);

· The petition was filed within two years of the death of the citizen spouse or before November 29, 1992, if the citizen spouse died before November 29, 1990;

· The alien petitioner and the citizen spouse were not legally separated at the time of the U.S. citizen's death; and

· The alien spouse has not remarried.

(4) Evidence .

The petition must be accompanied by the following evidence:

· Evidence of citizenship of the United States citizen (birth certificate, certificate of naturalization, certificate of citizenship, or U.S. passport); and

003438

· Evidence of the relationship, which includes:

– Marriage certificate issued by civil authorities;

– Proof of the terminations of all prior marriages of both husband and wife (divorce or annulment decrees or death certificates of prior spouses); and

– Death certificate of the U.S. citizen issued by civil authorities.

Primary evidence of the relationship (as listed above) is preferred. If the primary evidence is not available, secondary evidence may be considered (see **Chapter 11** of this field manual).

(5) Adjudication Issues .

The adjudication of an I-360 petition filed by a widow or widower is quite similar to the adjudication of an I-130 petition filed by a citizen for his or her spouse. The basic eligibility requirements are the same (status of petitioner and relationship between the petitioner and the beneficiary), and the significant concerns are the same (dissolution of any and all prior marriages, fraud, etc.). The most significant difference in the adjudication is the obvious one: the citizen cannot be questioned as to th e bona fides of the marriage. However, the burden of proof still rests with the petitioner (who in this case is also the beneficiary), and the resolution of questions regarding the bona fides of the marriage is still the petitioner's responsibility. The basic techniques for determining whether the marriage is suspect still exist: examination of the paper trail; formal interrogation of the petitioner; and field examination or investigation.

Factors which may lead you to doubt the bona fides of the marriage and to more intensively question the petitioner (or to call for a field examination or investigation) include:

· A large age discrepancy between the petitioner and the (now) deceased citizen at the time of the marriage;

003439

· Ill health of the citizen at the time of the marriage, although this is obviated to some extent by the requirement that the marriage be in existence for at least 2 years before the death of the citizen;

· Lack of common residence of the petitioner and the citizen prior to the latter's demise;

· Lack of intermingling of financial assets and liabilities (and other resources and obligations).

(6) Closing Action .

(A) Approval .

If the petition is approved:

· Place the examiner's approval stamp in the Action Block on the petition;

· Sign your name;

· Annotate the petition with the proper classification (IW1) and the consulate selected by the petitioner;

· If the petitioner will be applying for an immigrant visa, forward the petition to the Department of State's National Visa Center;

· If the widow(er) is in the U.S. and is eligible for adjustment of status under Section 245 of the Act, retain the approved petition and write "245 Adjust" in the Consulate box.

003440

(B) Underline{Denial} .

If the petition is denied, notify the widow(er) in writing of the reasons for the denial. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(7) Underline{Child of Petitioning Widow(er)} .

A child of a petitioning widow(er) classified as an immediate relative is also eligible for classification as an immediate relative. Except as provided in section 423 of the Patriot Act (see paragraph (b)(8)), no separate petition is filed for such child. The child of the petitioning widow(er) need not be the child of the deceased citizen and could have been born either before, during, or after the marriage of the petitioner to the (now) deceased citizen. However, the child would **not** be eligible for derivative classification under the widow(er) provision if:

· He or she has reached the age of 21;

· He or she is married;

· The petitioning widow(er) has remarried;

· He or she was born after date on which the petitioning widow(er) immigrated to the U.S.

| **Note 1** |
|---|
| When the widow/widower provisions were first incorporated into the law (1990), there was no provision for the child of such widow or widower. The provision which allows for immediate relative classification for the child was added by **section 219(b)(1)** of the Technical Corrections Act of 1994. If a |

widow(er) who immigrated under the pre-1994 version of this provision had a child who (still) qualifies under the 1994 revision, that child can immigrate under this provision, without the filing of a new petition.

**Note 2**

Although the statute is silent on whether the child must be accompanying or following to join the petitioning widow(er)/parent, **8 CFR 204.2(b)(4)** states that the child "may accompany or follow to join." Accordingly, by regulation, the child cannot be admitted or adjusted unless and until the petitioning widow(er)/parent has been admitted or adjusted.

(8) Special Provisions Added by the USA Patriot Act of 2001 .

In response to the September 11, 2001, terrorist attack on the World Trade Center and the Pentagon, Congress passed Public Law 107- 56, Act of October 26, 2001, 115 Stat. 272 (the "USA Patriot Act"). **Section 423** of that law expanded the widow(er) self-petition entitlement for widow(er)s of citizens killed as a direct result of those terrorist acts. It did so in two significant ways:

·    It provided that an otherwise qualifying widow(er) of a citizen killed in the terrorist attacks of that day may self-petition without any regard to the length of the marriage; and

·    It provided that any child of a U.S. citizen who was killed in one of the terrorist acts of September 11, 2001, may file a petition for status as an immediate relative child within two years of the death of the parent, regardless of changes in age or marital status. (In other words, he or she must have met the definition of child on September 11, 2001, but could have turned 21 and/or married after that date.) As a result of the child's ability to self-petition, the regulatory "accompanying or following to j oin" requirement that normally attaches to the child of a widow(er) (see Note 2 of paragraph (b)(6)) does not apply in the case of a child of a citizen killed as a direct result of the September 11, 2001 terrorist attack.

All other statutory requirements remain unchanged, as do all other aspects of the adjudication of the I-360 petition described in this field manual.

**Note**

> Although a child of a citizen killed as a direct result of the September 11, 2001, terrorist attacks on the World Trade Center and the Pentagon may self-petition even if he/she has married, there is no visa category for the spouse or child of such self-petitioning child. If such self-petitioning child has a spouse or child of his/her own, he/she would have to immigrate first and then file a 2 nd preference petition for such spouse or child.

(c) <u>Precedent Decisions Relating to Spouse Petitions</u> .

In addition to the decisions cited in section 21.2(h), which apply to I-130 petitions in general, the following precedents apply to petitions filed for a spouse:

·   **Matter of B–** , 5 I&N Dec. 698 (BIA 1954) . A proxy marriage must be consummated to be valid for benefits under the I&N Act.

·   **Matter of M–** , 8 I&N Dec. 217 (BIA 1958) . Where no bona fide husband-wife relationship was intended, a marriage is deemed invalid for immigration purposes regardless of whether it would be considered valid under the domestic law of the jurisdiction where it was performed.

·   **Matter of Agoudemos** , 10 I&N Dec. 444 (BIA 1964) ; **Matter of G–** , 9 I&N Dec. 89 (BIA 1960) . A marriage which is voidable but not void without any action to void the marriage is generally valid for benefits under the I&N Act.

·   **Matter of H–** , 9 I&N Dec. 640 (BIA 1962) . A polygamous marriage, though valid where contracted, is not recognized for immigration purposes.

·   **Matter of Zappia** , 12 I&N Dec. 439 (BIA 1967) . A marriage complying with all the requirements of the state of celebration might nevertheless be deemed invalid if it is invalid under the laws of the state where the parties are domiciled at the time of the marriage and where both intend to make their home afterward or if it violates a strong public policy of the state of domicile.

·   **Matter of Pearson** , 13 I&N Dec. 152 (BIA 1969) . The marriage following a divorce can only be considered valid if the divorce is considered valid under the laws of the place where the marriage was contracted.

· **Matter of Phillis** , 15 I&N Dec. 385 (BIA 1975) . The facts of an individual case may suggest or imply that the marriage was entered into solely for the purpose of obtaining immigration benefits. The mere denial of fraud does not overcome the inference and is insufficient to sustain the petitioner's burden of proof.

· **Matter of Weaver** , 16 I&N Dec. 730 (BIA 1979) .The validity of a divorce should be governed by the law of the state where the parties were domiciled at the time of the divorce.

· **Matter of P–** , 4 I&N Dec. 610 (BIA 1952) . The validity of a marriage is generally governed by the law of the place where it is celebrated.

· **Matter of Lenning** , 17 I&N Dec. 476 (BIA 1980) . A petition was properly denied where the parties entered into a formal, written separation agreement notwithstanding the fact that the marriage had not been finally dissolved by an absolute divorce decree.

· **Matter of W–** , 8 I&N Dec. 16 (BIA 1958) . A Mexican "mail order" divorce, not ordinarily recognized as valid by California courts,.was not valid for immigration purposes, thus the applicant was not legally free to marry.

· **Matter of Kurys** , 11 I&N Dec. 315 (BIA 1965) . A visa petition filed under compulsion of a court order by a petitioner who stated that a bona fide marital relationship did not exist and that she did not intend to live with her husband is properly denied. The petition was not filed in good faith.

· **Matter of Arenas** , 15 I&N Dec. 174 (BIA 1975) . In determining the validity of a marriage for immigration purposes, the law of the place of celebration of the marriage will generally govern. Under Section 2.22 of the Texas Family Code, a marriage is void if either party was married and the prior marriage is not dissolved. However, the marriage becomes valid when the prior marriage is dissolved and the parties continue to reside together as husband and wife and present themselves to others as being married.

· **Matter of DaSilva** , 15 I&N Dec.778 (BIA 1976) . A marriage between an uncle and his niece is valid

for immigration purposes for a couple who reside in New York but who marry in Georgia where marriage between and uncle and niece are legal. Since the marriage was legally contracted in Georgia and is thus not regulated by New York law nor violative of New York public policy, the marriage is recognized as valid in New York and is valid for immigration purposes.

·   **Matter of Magana** , 17 I&N Dec. 111 (BIA 1979) . Where the respondent entered the United States as the spouse of a citizen, concealing the fact of his prior marriage in Mexico, a decree from a Washington state court declaring the Mexican marriage invalid from its inception will not be given retroactive effect for immigration purposes.

·   **Matter of Laureano** , 19 I&N Dec. 1 (BIA 1983) . A marriage entered into for the primary purpose of circumventing the immigration laws, commonly referred to as fraudulent or sham marriage, is not recognized for the purpose of obtaining immigration benefits.

·   **Matter of Kumah** , 19 I&N Dec. 290 (BIA 1985) . A Ghanaian court decree of divorce is accepted as evidence that a customary divorce was validly obtained, however, it is not deemed to be conclusive proof of the facts certified therein because of the potential for fraud or error in the issuance.

·   **Matter of Zeleniak** , 26 I. & N. Dec. 158 (BIA 2013). Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7, is no longer an impediment to the recognition of lawful same-sex marriages and spouses under the Immigration and Nationality Act if the marriage is valid under the laws of the jurisdiction where it was celebrated.

**Notes:**

[1] Please consult with OCC in cases where the marriage was originally an opposite-sex marriage celebrated in a state that does not recognize same-sex marriage, and one of the spouses changed gender after the marriage.    Return

[2] Standards of Care, 7th Version (2012), World Professional Association for Transgender Health (WPATH)    Return

[3] Identity Recognition Statement (2010), World Professional Association for Transgender Health (WPATH),    Return

[4] American Medical Association. Res. 122; A-08, Removing Barriers to Care for Transgender Patients (2008)    Return

**21.4 Petition by Citizen or Lawful Permanent Resident for a Child, Son or Daughter has been partially superseded by the USCIS Policy Manual as of November 19, 2021.**

(a) <u>Eligibility Requirements</u>.

Chapter 21.4(a), Eligibility Requirements, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of August 5, 2021.

(b) <u>Form and Filing Issues</u>.

Form I-130 is used by a citizen or lawful permanent resident to petition for his or her child, son or daughter. [It is also used by either to petition for a spouse and by a citizen to petition for a parent or sibling (see Chapter 21.3, Chapter 21.8 and Chapter 21.9).] It may be filed through a Service Center, or at a local office if filed concurrently with an adjustment application.

(c) <u>General Adjudicative Issues</u>.

Regardless of the circumstances under which an immigrant visa petition is filed on behalf of a child, son or daughter, there are four basic adjudicative issues which must be taken into consideration: the petitioner's status, the beneficiary's age, the beneficiary's marital status, and the relationship between the petitioner and the beneficiary.

| **Note** |
| --- |
| With each of these factors, the criteria must be met not just at the time of filing, but also at the time of the adjudication of the petition, in order for the petition to be approved. Furthermore, in most circumstances, the criteria must continue to be met after the petition's approval and until the beneficiary becomes an LPR; otherwise, the petition's approval may be revoked. (See **Chapter 20.3** of this field manual.) |

·   <u>Petitioner's Status</u> - The petitioner may be a citizen of the U.S. or a lawful permanent resident of the U.S. The relationships for which the petition may be filed depend on the petitioner's status (see below). The evidence which must be submitted to establish the petitioner's status as a citizen or LPR is specified in

8 CFR 204.1(g). Any doubts about the status of an LPR or naturalized citizen should be resolved through a review of the petitioner's A-file.

· Age of Beneficiary - The age of the beneficiary affects the classification under which a petition may be approved. If under age 21 and unmarried, the (otherwise eligible) beneficiary is considered to be a child; if 21 or older or if married, the (otherwise eligible) beneficiary is considered a son or daughter (see below).

· Marital Status of Beneficiary - One of the most frequent problems arising in this category is that a beneficiary who is reputed to be unmarried may actually be married. In the case of a petition filed by citizen, this can affect the classification under which the petition is approved; in the case of a petition filed by a LPR, it makes the difference between an approval and a denial:

| PETITIONER | MARITAL STATUS & AGE OF THE BENEFICIARY | RESULT |
|---|---|---|
| Citizen | Unmarried and under age 21 | Immediate Relative |
| Citizen | Unmarried and 21 or older | 1 st Family Preference |
| Citizen | Married (any age) | 3 rd Family Preference |
| LPR | Unmarried and under age 21 | 2a Family Preference* |
| LPR | Unmarried and 21 or older | 2b Family Preference* |
| LPR | Married (any age) | Not eligible |

| **\* Note** |
|---|
| While 2a and 2b are both 2nd preference classifications, quota numbers for the 2a sub-group (which is limited to spouses and unmarried children of LPRs) are much more readily available. |

Since a lawful permanent resident can petition on behalf of an unmarried son or daughter regardless of age, you must be satisfied that the beneficiary has either never been married or has terminated any and all prior marriages before you approve the petition. Any doubts about the beneficiary's marital status should be resolved through an interview at a local office.

· Relationship Between Petitioner and Beneficiary - This is the most complex issue to the considered in the adjudication of a petition for a child, son or daughter. In examining this issue, it is important to keep in mind not only the nature of the relationship (e.g., legitimate child, illegitimate child, adopted child), but also the point at which the relationship existed (e.g., the child's age at the time of the marriage between his or her parent and stepparent or at the time of the petitioner's acquisition of status). Each possibility is discussed separately under section (d) of this subchapter.

003447

·    <u>Assisted Reproductive Technology (ART)</u>

Chapter 21.4(c), General Adjudicative Issues - Assisted Reproductive Technology (ART), has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of August 5, 2021.

(d) <u>Adjudicative Issues Pertaining to Relationship Between Petitioner and Beneficiary</u>.

The following list of issues provide guidance on specific familial relationships. Adjudicators should also be aware of the issues discussed in the relevant precedent decisions pertaining to petitions for a child, son or daughter (see Chapter 23.4(g)).

(1) <u>Child Born in Wedlock (Formerly Referred to as "Legitimate Child")</u>.

Chapter 21.4(d)(1), Child Born in Wedlock, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of August 5, 2021.

(2) <u>Step Child</u>.

See **8 CFR 204.2(d)(2)(iv)** for information regarding primary evidence for a stepchild.

(A) <u>Creation of the Stepparent-Stepchild Relationship</u>.

A stepchild relationship is created whenever a parent of the child marries someone (other than the child's other parent) before the child's 18 th birthday. The relationship is created automatically as a result of the marriage, assuming that the marriage is not a sham or does not violate the Defense of Marriage Act - see *Matter of Teng* , 15 I. & N. Dec 516 (BIA 1975) and **Chapter 21.3** of this field manual.)

(B) <u>Termination of Stepparent-Stepchild Relationship</u>.

Normally, a step relationship terminates when a marriage ends, especially if it ends in divorce. See *Matter of Simicevic* , 10 I. & N. Dec. 363 (BIA 1963). However, under certain circumstances a step relationship may continue after the death of the natural parent or even after the legal separation or divorce of the stepparent and natural parent if there is an ongoing relationship between the stepparent and stepchild (see *Matter of Pagnerre* , 13 I. & N. Dec. 173 (BIA 1971), *Matter of Mowrer* , 17 I. & N. Dec. 613 (BIA 1981), and *Matter of Mourillon* , 18 I. & N. Dec. 122 (BIA 1981)). If the marriage ends in annulment, however, the step relationship is deemed to have never existed because legally the marriage never existed.

| **Note** |
| --- |
| The creation of a step relationship in no way terminates the relationship between the child and his or her other natural parent (i.e., the one who did not marry the stepparent). It is neither unusual nor improper for a child who acquired LPR status through a stepparent to later petition for the other natural parent once the child naturalizes and reaches the age of 21. |

(C) <u>Petition by Wife of Natural Father</u>.

In some cases, although a natural father may be ineligible to petition for his illegitimate child, a stepparent-stepchild relationship may exist under the Act between the child and the wife of the natural father even if she has never seen or cared for the child. See *Matter of McMillan* , 17 I. & N. Dec. 605 (BIA 1981).

(3) <u>Legitimated Child</u>.

See **8 CFR 204.2(d)(2)(ii)** for information regarding primary evidence for a legitimated child or son or daughter.

Some nationalities are not concerned with the formal legalization of a relationship; therefore, a child may be raised in a household in a parent-child relationship when legally there is no relationship. A petition based on that relationship could not normally be approved.

In considering petitions for parents or children, you must take into account the laws governing the places of residence of the parents and of the child in addition to the restrictions of the Act. Some countries require formal court action to legitimate a child, while others do not. You may find a case where the father of an illegitimate child acknowledges paternity of a child, but that acknowledgment may or may not have constituted legitimation. If the petitioner fails to establish that the beneficiary has been legitimated, you should then consider whether the beneficiary may qualify as a child born out of wedlock with whom the petitioner has a bona-fide parent-child relationship (see paragraph (4)).

While legitimation has historically applied to father-child relationships, the non-genetic gestational mother of a child born through ART may be required to take action after the birth of the child to formalize the legal relationship. Whether such action is required depends on the law of the relevant jurisdiction.

(4) Child Born out of Wedlock (Formerly Referred to as "Illegitimate Child").

Chapter 21.4(d)(4), Child Born out of Wedlock, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of August 5, 2021.

(5) Child Adopted While Under the Age of 16.

Chapter 21.4(d)(5), Child Adopted While Under the Age of 16, has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.

(f) Final Decision.

(A) Denial.

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner in writing of the reasons. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(B) <u>Approval</u> .

Chapter 21.4(f)(B), Approval, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(C) <u>Revocation Proceedings Based on Adverse Information</u> .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See **Chapter 20.3** of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition. See, generally, **8 CFR 205** and **Chapter 20.3** of this field manual regarding revocation of petitions. See also **Chapter 20.4** of this field manual regarding withdrawal of petitions.

(g) <u>Precedent Decisions</u>.

(1) <u>Precedents Pertaining to a Petition on Behalf of a Child</u>.

·   *Matter of M-*, 8 I. & N. Dec. 118 (BIA 1958, Attorney General 1959); *Matter of Lee*, 11 I. & N. Dec. 911 (BIA 1966); *Matter of Cho*, 16 I. & N. Dec. 188 (BIA 1977). Residence requirement of section 101(b)(1)(E) may include residence occurring prior the formal adoption decree.

· Matter of Kirby , 13 I. & N. Dec. 173 (BIA 1969). A child adopted in accordance with requirements of section 101(b)(1)(E) of the Act is not entitled to benefits from a petition filed by the natural parents.

· **Matter of Pagnerre** , 13 I. & N. Dec. 688 (BIA 1971). A stepparent-stepchild relationship may continue after the death of the alien's natural parent terminates the marriage which created the relationship if there is a continuing parent-child relationship.

· *Matter of Stultz* , 15 I. & N. Dec. 362 (BIA 1974 and 1975; Attorney General 1975). Adulterine children, irrespective of the time of birth, should be treated like any other illegitimate children under section 101(b)(1)(B) of the Act.

· *Matter of Teng* , 15 I. & N. Dec. 516 (BIA 1975). Where there is a sham marriage and no actual familial relationship between the stepchildren are not entitled to be considered the children of the U.S. citizen.

· *Matter of Cariago* , 15 I. & N. Dec. 716 (BIA 1976). Retroactive adoption decree does not confer benefits under the Act when actual adoption did not take place prior to the limiting age.

· *Matter of Cho* , 16 I. & N. Dec. 188 (BIA 1977). "Proxy" adoption valid where contracted is generally valid for INS (now USCIS) purposes.

· *Matter of Cabucana* , 16 I. & N. Dec. 217 (BIA 1977). Jurisdiction of the person, as well as jurisdiction over the subject matter is not necessarily a prerequisite for a valid adoption. (Overrules Matter of Dela Cruz, 15 I. & N. Dec. 580 (BIA 1976).)

· *Matter of Au Yeung* , 16 I. & N. Dec. 540 (BIA 1978). An alien, who is admitted to the U.S. as an "eligible orphan" pursuant to section 101(b)(1)(F) of the Act, and is never adopted by the petitioning U.S. citizen "parent", and who leaves the U.S., is not eligible for preference status as the "son" of the petitioning U.S. citizen "parent"since the relationship never came into existence.

· *Matter of Reyes* , 17 I. & N. Dec. 512 (BIA 1980). To be "legitimated" pursuant to section 101(b)(1)(C),

the legitimating act must have placed the child in all respects on the same footing as if begotten and born in wedlock.

·   *Matter of Mowrer* , 17 I. & N. Dec. 613 (BIA 1981). When the marriage creating the stepparent-stepchild relationship is terminated through divorce, it must be determined whether a family relationship has continued to exist as a matter of fact between the stepparent and stepchild.

·   *Matter of McMillan* , 17 I. & N. Dec. 605 (BIA 1981). Persons who become stepchildren through the marriage of a natural parent prior to their 18 th birthday fall within section 101(b)(1)(B) without further qualification (i.e., there is no need to show a close family unit).

·   *Matter of Clahar* , 18 I. & N. Dec. 1 (BIA 1981). A child within the scope of the Jamaican Status of Children Act of 1976 is included within the definition of a legitimated "child" as set forth in section 101(b)(1).

·   *Matter of Richard* , 18 I. & N. Dec. 208 (BIA 1982); *Matter of Mesias* , 18 I. & N. Dec. 298 (BIA 1982); *Matter of Cherismo* , 19 I. & N. Dec. 25 (BIA 1984). Under the Civil Code of Haiti, as amended by the 1959 Presidential Decree, children born out of wedlock after January 27, 1959, and acknowledged by their natural father have the same rights and obligations as legitimate children. (This precedent is country specific to Haiti.)

·   *Matter of Fakalata* , 18 I. & N. Dec. 213 (BIA 1982). In order to prove that customary adoption is valid for immigration purposes, the petitioner must establish that the adoption creates a legal status or relationship which is recognized by the government of the place where it occurred as carrying with it substantial legal rights and obligations.

·   *Matter of Drigo* , 18 I. & N. Dec. 223 (BIA 1982); **Matter of Atembe** , 19 I. & N. Dec. 427 (BIA 1986). The beneficiary does not qualify for immigration priority date to which the beneficiary was not entitled at the time of the filing of the visa petition. (Relates to the change in age requirement of section 101(b)(1)(E) for adopted children.)

·   *Matter of Oduro* , 18 I. & N. Dec. 421 (BIA 1983). Under Massachusetts law, legitimation of a person born out of wedlock is affected only by an acknowledgment of paternity (or judicial declaration of paternity) and the marriage of his/her natural parents. The LPR petitioner's natural, acknowledged offsprings who

were born out of wedlock and whose natural parents never married did not qualify as the petitioner's "legitimated children". (This precedent is specific to Massachusetts.)

· **Matter of Cardoso** , 19 I. & N. Dec. 5 (BIA 1983). Legislation passed on May 21, 1980, in the Republic of Cape Verde resulted in no distinction between legitimate and illegitimate children and all children have equal rights under this law. Consequently, a beneficiary, who is born in Cape Verde on or after October 1, 1976, is deemed the legitimate "child" of his or her natural father under section 101(b)(1)(A) of the Act, whereas a beneficiary who was under eighteen years of age on that date is deemed the legitimated "child" o f his or her natural father under section 101(b)(1)(C) of the Act. (This precedent is country specific to Cape Verde.)

· **Matter of Hernandez** , 19 I. & N. Dec. 14 (BIA 1983). To qualify under section 101(b)(1)(C), a change in law making all children legitimate must occur prior to the child's 18th birthday.

· **Matter of Repuyan** , 19 I. & N. Dec. 119 (BIA 1984). Mere visit is not sufficient to fulfill two-year residence requirement under section 101(b)(1)(E).

· **Matter of Awwal** , 19 I. & N. Dec. 617 (BIA 1988). Even where there is an ongoing actual family relationship between a stepparent and a stepchild, that relationship cannot be recognized under section 101(b)(1)(B) of the Act where the marriage creating the step-relationship was a sham. *Matter of Teng* , 15 I. & N. Dec. 516 (BIA l975), clarified.

· **Matter of Vizcaino** , 19 I. & N. Dec. 644 (BIA 1988). Section 101(b)(1)(D) of the Act, as amended by P.L. 99-603, 100 Stat. 3359, is applicable to all visa petitions filed after the date that the law went into effect.

· **Matter of Pineda** , 20 I. & N. Dec. 70 (BIA 1989). Discusses the evidence relevant to establishing a bona fide parent-child relationship, requiring at minimum a showing of emotional and/or financial ties or an active concern by the father for the child's support, instruction, and general welfare for purposes of establishing eligibility under section 101(b)(1)(D) of the Act.

· **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989). Where an adoption has been effected, be it intra-family or otherwise, and the adopted child continues to reside in the same household with the natural parent or parents during the period in which the adoptive parent seeks to establish his or her compliance

with the statutory residence requirement of section 101(b)(1)(E) of the Act, the petitioner has the burden of establishing that the adoptive parent exercised primary parental control during that period of residence. Eviden ce of parental control may take many forms, including competent objective evidence that the adoptive parent owns or maintains the property where the child resides, provides financial support and day-to-day care, and assumes responsibility for important decisions in the child's life. The evidence must clearly establish the physical living arrangements of the adopted child, adoptive parents, and the child's natural parents during the period of time in which the adoptive parent seeks to establish compliance wi th the residence requirement of the statute and, where a fraudulent or ad hoc adoption is suspected, during any period following the adoption which the adjudicating officer deems appropriate. Where a petitioner establishes compliance with the statutory requirements of section 101(b)(1)(E) of the Act, demonstrating, where necessary, primary parental control during the parties' residence with one another, the relationship will be presumed bona fide in the absence of evidence indicating otherwise.

·   **Matter of Marquez** , 20 I. & N. Dec. 160 (BIA 1990). Rejects a strict statutory interpretation of section 101(b)(1)(E) of the Act, and relies instead upon the legislative history of the statute which indicates that Congress did not intend to recognize *ad hoc* adoptions designed to circumvent the immigration laws. This decision found that an adoptive relationship to be more akin to marital relationships than to step-relationships, and thus, in certain cases, the bona fides of adoptions will be determined. Visa petitions involving the specter of sham adoptions which generally arise in adoptions by a close relative where the relationship between the natural parent and the adopted child does not appear to change subsequent to the adoption will be analyzed under the standards set forth in **Matter of Cuello** , 20 I. & N. Dec. 94 (BIA 1989).

(2) <u>Precedent Decisions Pertaining to a Petition for a Son or Daughter</u> .

·   *Matter of Coker* , 14 I. & N. Dec. 521 (BIA 1974). To qualify as a son or daughter for preference classification, the beneficiary of the visa petition must once have qualified as a "child" of the petitioner under section 101(b)(1) of the Act.

·   *Matter of Wong* , 16 I. & N. Dec. 87 (BIA 1977). Beneficiary of a visa petition classified as an "unmarried son" or "unmarried daughter" who obtains an immigrant visa and enters the U.S. in that classification, but who at the time of entry was actually married, may be deportable notwithstanding a subsequent annulment is granted *ab initio* .

·   *Matter of Aldecoaotalora* , 18 I. & N. Dec. 430 (BIA 1983). Where the beneficiary was divorced for the sole purpose of obtaining immigration benefits and continued to reside with and own property jointly with her former husband in what by all appearances is a marital relationship; such a divorce is considered a sham and is not acceptable for immigration purposes.

---

[1]But see paragraph (d)(3) describing where parentage may be recognized through legitimation where some action is taken post-birth to formalize the legal relationship. In the case of post-birth legitimation, the legal parent-child relationship relates back to the time of birth.

[2]If the petitioner was unable to obtain a statement from the Central Authority in the appropriate COO addressing the child's habitual residence, the interim PM stated the notice criteria applied to adoption decrees issued one month after the publication date – therefore, the notice criteria applies to adoptions issued on or after February 3, 2014.

**21.5 Petition for an Orphan has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.**

**21.6 Petition for Hague Convention Adoptee has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.**

**21.7 Petition for an Amerasian has been superseded by USCIS Policy Manual, Volume 7: Adjustment of Status as of May 19, 2021.**

**21.8 Petition for a Parent.**

(a) <u>Eligibility Requirements</u> .

(1) <u>Status</u> .

Only a citizen of the U.S. may file a visa petition for a parent. A petition filed by a LPR must be denied.

(2) <u>Age</u> .

The petitioner must be at least 21 years old at the time of filing.

(3) <u>Relationship</u> .

In order for the beneficiary to be considered the parent of the petitioner:

· The petitioner must have once qualified as the child of the beneficiary under one or more of the definitions contained in section 101(b)(1) of the Act; and

· The relationship must continue to exist, even though the petitioner is over age 21 and, therefor, no longer a child. If the relationship has been terminated (as would happen in the case of a stepparent-stepchild relationship if marriage between the stepparent and natural parent were to be terminated by divorce or annulment, or would happen in the case of any other parent-child relationship if the child were to be given up for adoption), the beneficiary would no longer be eligible for classification as a par ent, even though the petitioner had once been considered to be the beneficiary's child.

The requirements for establishing the parent-child relationship are the same as with petitions for children,

except that the roles of the petitioner and the beneficiary are reversed (see **Chapter 21.4** of this field manual).

(b) <u>Filing Requirements</u> .

In accordance with the instructions on the form, the petitioner must file an I-130 petition, with fee and all supporting documents, with:

· the appropriate Service Center, or

· the local office having jurisdiction over the beneficiary's location in the U.S., if the beneficiary is filing a concurrent Form I-485.

(c) <u>Adjudication</u> .

(1) <u>Evidence to Support a Petition for a Parent</u> .

In addition to evidence of U.S. citizenship as listed in paragraphs (i) through (vi) of **8 CFR 204.1(g)** , the petitioner must also provide evidence of the claimed relationship. See the references below:

· **8 CFR 204.2(f)(2)(i)** – Primary evidence if the petitioner is a <u>legitimate</u> son or daughter of the beneficiary;

· **8 CFR 204.2(f)(2)(ii)** – Primary evidence if the petitioner is a <u>legitimated</u> son or daughter of the beneficiary;

·   **8 CFR 204.2(f)(2)(iii)** – Primary evidence if the petitioner is an <u>illegitimate</u> son or daughter of the beneficiary; and

·   **8 CFR 204.2(f)(2)(iv)** – Primary evidence if the petitioner is the <u>adopted</u> son or daughter of the beneficiary.

If primary evidence is not available, secondary evidence may be submitted by the petitioner and considered by the adjudicator. See **8 CFR 204.1(g)(2)** and **8 CFR 204.2(d)(v)** and **Chapter 11.1** of this field manual.

(2) <u>Petitions for More than Two Parents</u>.

There is no limitation on the number of parents for whom a single petitioner may file visa petitions. For example, if the (alien) natural parents of the petitioner divorced and both remarried other aliens prior to the petitioner's 18 th birthday, the petitioner could file petitions for his natural mother, his natural father, his stepmother and his stepfather.

(3) <u>Fraud</u>.

While not as common as marriage fraud, parent-child fraud is a serious problem. The same techniques used to detect and deter fraud in petitions filed for children (e.g., DNA tests) apply to petitions filed for parents. See **Chapter 21.2** of this field manual.

(4) <u>Final Decision</u>.

(A) <u>Approval</u>.

Chapter 21.8(c)(4)(A), Approval, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

003462

(B) Denial . If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(C) Revocation Proceedings Based on Adverse Information .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See Chapter 20.3 of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition.

(5) Derivative Beneficiaries .

There are no provisions in the law for issuance of a visa to a dependent spouse or child of a parent of U.S. citizen. If the person in question qualifies as a (step)parent or sibling of the citizen, then that citizen can file a separate petition on his or her behalf. If the person in question does not so qualify, (e.g., if the person in question married the petitioner's parent subsequent to the petitioner's 18 th birthday) the parent of the citizen could file a second preference petition on his or her behalf, provided all other requirements are met. This may involve considerable delay between the immigration of the petitioner's parent and the person in question, since the process would require (1) the immigration of the parent, (2) the filing and adjudication of an I-130 petition by the newly-immigrated parent, (3) the availability of a second preference visa number, and (4) all necessary steps and checks in the vi sa issuance process.

(d) <u>Precedent Decisions</u> .

In addition to the following precedent decisions pertaining to visa petitions filed on behalf of parents, the adjudicator should also be familiar with precedents pertaining to visa petitions filed on behalf of children (see **Chapter 21.3** ):

·   *Matter of Hassan* , 16 I. & N. Dec. 16 (BIA, 1976) – In order for a son or daughter to confer immediate relative status upon a parent, the petitioner must be a U.S. citizen, at least 21 years of age, and must have once qualified as the "child" of the beneficiary as defined in 101(b) of the Act.

·   *Matter of Fong* , 17 I. & N. Dec. 212 (BIA, 1980) – The fact that a petitioner has already successfully petitioned for a natural parent does not preclude approval of a visa petition filed on behalf of a stepparent in the absence of a statutory bar such as that existing in section 101(b)(1)(E) of the Act with respect to the natural parents of an adopted child.

·   **Matter of Li** , 20 I. & N. Dec. 700 (BIA, 1993) - An adopted child may not confer immigration benefits upon a natural parent without regard to whether the adopted child has been accorded or could be accorded immigration benefits by virtue of his or her adoptive status. An adopted child may not confer immigration benefits upon his or her natural sibling, because their common natural parent no longer has the status of parent of the adopted child for immigration purposes.

**21.9 Petition for a Sibling.**

(a) <u>Establishing the Standing of the Petitioner</u> .

Only a U.S. citizen who is 21 years of age or older may file a petition for a brother or sister for classification under section 203(a)(4).

(b) <u>Establishing a Qualifying Relationship</u> .

It must be established that the petitioner and beneficiary are or once were "children of a common parent" within the meaning of section **101(b)(1)** and **(2)** of the Act. A consanguineous (i.e., blood) relationship between the petitioner and the beneficiary is not required (see *Matter of Hueng* , 15 I. & N. Dec. 145 and *Matter of Garner* , 15 I. & N. Dec. 215). The parent-child relationships can be established through any of the means recognized in the definition of child contained in section 101(b)(1) of the Act (i.e., through birth, through adoption, or through a marriage creating a steprelationship). As in the case of a stepparent-stepchild relationship, a stepsibling relationship is normally dissolved should the marriage of the parent and stepparent end in divorce or annulment (see the discussion under **Chapter 21.4** ). It may help, therefore, to look upon the adjudication of a petition for a sibling as being more of an adjudication of two separate relationships: the relationship between the petitioner and his/her parent, and the relationship between the beneficiary and that same parent. An example may help to illustrate this point:

John Smith married Mary Jones. At the time of the marriage, John Smith had a 19 year old son, Fred, and Mary Jones had a 17 year old daughter, Betty and a 22 year old son, Steve. Fred was the legitimate offspring of John's prior marriage, and Betty and Steve were the legitimate offspring of Mary's prior marriage, both prior marriages having been legally dissolved. Of the 5, only Fred is a citizen of the U.S., the rest being neither citizens nor LPRs. Because Fred was over age 18 at the time of the marriage, he is not considered to be Mary's stepson under immigration law; likewise, Steve is not considered to be Fred's stepson. Betty, on the other hand, became John's stepdaughter because she was under age 18. Under immigration law:

·    Fred and Betty are children of John and are therefore siblings through John only, but not through Mary.

·    Betty and Steve, being the children of Mary and her first husband, are siblings through both of their blood parents.

·    Fred is not Mary's son and Steve is not John's son, so (not having a common parent) they are not siblings at all.

If Fred is a citizen, he may file a petition for his sister Betty once he turns 21. He may not file a petition for Steve. Of course, if Betty immigrates to the U.S. and later naturalizes, she may then file a petition for her brother Steve.

(c) <u>Adjudication</u>.

(1) <u>Evidence</u>.

(A) TThe documentation required to establish a sibling relationship varies and depends entirely on the common parent(s) through whom the relationship occurs. Therefore, officers should carefully review the supporting documents to ensure that both the petitioner and beneficiary have a parent-child relationship with the claimed common parent(s), as defined at INA 101 (b)(1)-(2). The following sections of the regulations discuss the primary or secondary evidence necessary to support a petition for a sibling, depending on the nature of the sibling relationship:

·    **8 CFR 204.2(g)(2)(i)** – primary evidence, if the siblings share a common mother or are the legitimate children of a common father;

·    **8 CFR 204.2(g)(2)(ii)** – primary evidence, if either or both siblings are legitimated;

·    **8 CFR 204.2(g)(2)(iii)** – primary evidence, if either sibling is illegitimate;

·    **8 CFR 204.2(g)(2)(iv)** – primary evidence for stepsiblings; and

·   **8 CFR 204.2(d)(2)(v)** and **(iv)** – secondary evidence of parent-child relationships.

(B) <u>DNA Evidence</u>. When USCIS determines that primary evidence is unavailable or unreliable, it may suggest and accept DNA test results as evidence of a full-sibling relationship (where siblings share two biological parents) or a half-sibling relationship (where siblings share one biological parent). Test results should be evaluated for probative value according to the guidance contained in the chart below. Please note that there are currently no regulations requiring a petitioner or beneficiary to submit DNA test results.

**Overview of Guidance for Sibling DNA Test Results**

| DNA Test Result | Full-Sibling Interpretation | Half-Sibling Interpretation |
|---|---|---|
| **90% or higher**[1] | **Relationship Supported** – Probative evidence that the claimed relationship exists. | **Relationship Supported** – Probative evidence that the claimed relationship exists. |
| **9% to 89%**[2] | **Inconclusive Result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab.[3] | **Inconclusive Result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab.[4] |
| **Below 9%**[5] | **Relationship Not Supported** – Probative evidence that the claimed relationship does not exist. | **Inconclusive result** – By itself, the test result is not sufficient to establish the claimed relationship without additional affirmation from an AABB-accredited lab. [6]<br><br>In contrast to full-sibling results, this result for half-siblings does not necessarily mean the claimed relationship does not exist. |

**Full- and Half-Sibling Test Results Demonstrating 90 Percent Probability or Higher are Probative Evidence of the Claimed Relationship**

Adjudicators must consider DNA test results reflecting 90 percent probability or higher to be probative evidence of a full- or half-sibling relationship. When an officer determines that primary evidence is unavailable or unreliable, the officer may consider DNA test results reflecting 90 percent probability or higher as sufficient to establish the claimed relationship and forego securing additional evidence. However, petitioners are generally expected to submit other available evidence of the claimed sibling relationship (such as primary evidence, secondary evidence, affidavits, or an explanation as to why it is not possible to submit additional evidence) and evidence of legitimation or a bona fide father-child relationship, if necessary. Generally, a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) will not be required for additional explanation or evidence of the relationship when the record contains a probative DNA test

result.  Where evidence is submitted in addition to DNA test results, adjudicators must consider all evidence in the totality of the circumstances. While a DNA test result may indicate that a relationship is supported, any other evidence to the contrary must also be considered.

**Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship**

USCIS considers DNA results reflecting less than 90 percent, but greater than or equal to 9 percent probability, to be inconclusive evidence of a full-sibling relationship. A valid full-sibling relationship may exist, even when a DNA test result reflects less than 90 percent probability.  However, due to the significant variation between inconclusive results, officers should not consider inconclusive results to either support or weaken the case for the existence of the claimed relationship, unless the results include independent clarification from the AABB-accredited lab that demonstrates to the officer that the claimed relationship is more likely than not to exist. For example, comparisons of the test results of the petitioner and beneficiary against the test results of other relatives may lead the lab to indicate that the claimed relationship exists, even if the test results of the petitioner and beneficiary do not reach 90 percent.[7] Where a result is inconclusive, an officer must continue to evaluate the remaining evidence in the totality of the circumstances to determine whether the claimed relationship is more likely than not to exist.

**Full-Sibling Test Results Below 9 Percent Probability Demonstrate that the Claimed Relationship Does Not Exist**

USCIS considers DNA results for full-siblings reflecting less than 9 percent probability to be exclusionary, or as evidence that the claimed full-sibling relationship does not exist. Where DNA test results do not support the existence of a full-sibling relationship, the officer must continue to review other evidence of the claimed relationship. In some rare cases, the remaining evidence may be sufficient to establish a half-sibling or step-sibling relationship.

**Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship**

Due to the considerable variations in DNA test results for valid half-sibling relationships, USCIS considers half-sibling test results reflecting less than 90 percent probability to be inconclusive for immigration purposes. While an inconclusive result does not necessarily indicate that the claimed relationship does not exist, officers should not consider inconclusive results for half-siblings to either support or weaken the case for the existence of the claimed relationship, unless the results include independent clarification from the AABB-accredited lab, and they demonstrate to the officer that the claimed relationship is more likely than not to exist.[8] Where a result is inconclusive, an officer must continue to evaluate the remaining evidence in the totality of the circumstances. Unlike full-sibling test results, a half-sibling test result below 9 percent does not rule out the possibility that the claimed half-sibling relationship exists.

**Encouraging Testing Against Additional Family Members**

Direct sibling-to-sibling testing is normally performed when it is not possible to test against the common parent(s). Some labs have reported that, when a DNA test is conducted for immigration purposes, the lab may incorrectly believe that it can only test the individuals named on the petition. However, where the

003468

claimed sibling relationship is valid, testing against additional family members improves the likelihood of test results, and thereby reduces the need to issue additional RFEs, NOIDs, or denials. The AABB standards encourage accredited labs to recommend testing against additional relatives, as appropriate.

Including additional family members, particularly first-degree relatives, such as parents and other siblings, or second-degree relatives, such as aunts, uncles, and cousins, in the testing may produce more conclusive results. Therefore, when an RFE or NOID includes a suggestion to undergo voluntary DNA testing, officers should suggest that the petitioner include additional relatives, particularly the shared parent(s), if possible.

**Significance of Type of Relationship Test Conducted**

The type of test conducted by the lab may also impact the ultimate result.  For example, when half-siblings explicitly request a half-sibling test rather than a full-sibling test, they will receive a stronger test result.  Conversely, when half-siblings incorrectly request a full-sibling test, they will receive skewed results. The lab may guide a customer as to which test may be appropriate after reviewing initial results. The AABB-accredited lab has sole discretion to set the parameters of the test that will be conducted.

**Loci Tested in Sibling Relationships**

USCIS guidance for test results that fall below 90 percent is based upon testing at 20 loci. A locus (or loci, in plural) is a genetic marker which indicates a specific location on the DNA strand. Test results that fall below 90 percent probability have the strongest conclusions if they show 20 loci were tested. Each lab report indicates by name which loci have been tested and, thereby, displays the number of loci tested.

In January 2018, the AABB Relationship Testing Subcommittee revised its standards to require accredited labs to test at least 20 loci for full- and half-sibling relationships where results appear lower than 90 percent (inconclusive or exclusionary). Results that measure at or above 90 percent will not be subject to a minimal loci requirement.

Where DNA testing was conducted after January 1, 2018, (the effective date of the 13th edition of the AABB standards) officers will not need to verify the number of loci tested. However, when evaluating a result that was conducted before January 1, 2018, officers will need to verify the number of loci tested, if a result falls below 90 percent probability.

In general, the officer must advise the petitioner, in writing, of the option to request that the AABB-accredited lab test to 20 loci and/or test against additional relatives to improve the accuracy of results when:

- The result falls below 90 percent probability and fewer than 20 loci were tested;

- The claimed relationship has not otherwise been established by a preponderance of the evidence; and

- The petitioner was not previously advised that results will have the strongest probability if tested to 20 loci.

**Parent–Child Test Results**

USCIS policy on parentage testing remains unchanged.  Parent-child DNA test results between one or both claimed siblings and the claimed common parent will be considered according to current policy relating to DNA testing for parent-child relationships.[9]

**Step-Sibling Relationships**

When DNA test results do not establish the validity of the claimed relationship, but other evidence appears to support a step-sibling relationship, the officer may continue to review the relationship as a step-sibling relationship, if appropriate. For example, if a petitioner submits DNA test results that exclude the possibility of a biological relationship, but the file contains evidence, such as marriage certificates or birth certificates, that indicate the existence of a step-sibling relationship, the adjudicator may evaluate the relationship as a step-sibling relationship.

(2) Fraud .

Eligibility for relative classification as a brother or sister depends upon the petitioner establishing that both petitioner and beneficiary were "children" of a common parent. This relationship is usually established through the submission of the birth certificates of the petitioner and beneficiary, as well as evidence of the relationship between their parents, where appropriate. Some indications that a birth certificate attempting to establish a sibling relationship may be fraudulent include:

· A delayed birth certificate for either the petitioner or the beneficiary might indicate an attempt to document a relationship that does not exist. (Or it might not, since there are also legitimate reasons for obtaining a delayed birth certificate.)

· Birth certificates from countries that are experiencing economic problems or political turmoil should be given special attention. The incentive to leave those countries is great and that fact sometimes causes petitioners who would otherwise obey the law to submit fraudulent documents in support of petitions on behalf of aliens from those countries.

· Some countries change governments frequently. One indication that a birth certificate may be fraudulent is an issuance date that is prior to or after the government of a country came into or went out of

003470

existence. Officers should be familiar enough with the political backgrounds of the countries so that they are able to detect this type of fraud.

While not as common as marriage fraud, sibling fraud is a potential problem. The same techniques used to detect and deter fraud in petitions filed for children (e.g., DNA tests) apply to petitions filed for parents. See **Chapter 21.2** of this field manual.

(4) <u>Final Decision</u> .

(A) <u>Approval</u> .

Chapter 21.9(c)(4)(A), Approval, has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of May 22, 2024.

(B) <u>Denial</u> .

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about appeal rights and the opportunity to file a motion to reopen or reconsider.

(C) <u>Revocation Proceedings Based on Adverse Information</u> .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the approving office with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the USCIS office of origin receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to revoke the approval of the petition. The petitioner is to be given the choice of withdrawing the petition or having a determination of eligibility made in formal revocation proceedings. (See **Chapter 20.3** of this field manual.) The USCIS office must notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the petition is not withdrawn and the approval is not revoked, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary has applied or will apply for an immigrant visa. If the adverse information was developed at an overseas DHS office, a memorandum explaining the reasons for not revoking the petition's approval must be attached to the approved petition.

(d) <u>Precedent Decisions</u> .

In addition to the following decisions, adjudicating officers should be aware of precedents pertaining to visa petitions for parents (see **Chapter 21.8** of this field manual) and those pertaining to spousal visa petitions (see **Chapter 21.3** of this field manual).

·    **Matter of Van Pamelen** , 12 I. & N. Dec.11 (BIA, 1966) – Acknowledgment , but not legitimation, by natural father did not give petitioner standing to petition for sibling through the common father. ( **Note:** This case was decided before the amendments to section 101(b)(1)(E) of the Act allowing a parent-child relationship with the father if the child was born out of wedlock.)

·    **Matter of Mahal** , 12 I. & N. Dec. 409 (BIA, 1967) – Citizen may petition for a sibling born to a common father and different mother where father was married to both mothers in a polygamous relationship if polygamy is legal in the country of the parents marriages and residence. ( **Note:** This case was decided before the amendments to section 101(b)(1)(E) of the Act allowing a parent-child relationship with the father if the child was born out of wedlock.)

·    **Matter of Wong-Setoo** , 12 I. & N. Dec.484 (BIA, 1967) – Petition for a blood niece as a sibling is denied where petitioner's parents "adopted" the beneficiary (their own granddaughter) in China, since adoption of a grandchild is illegal in China.

·    **Matter of Campbell** , 13 I. & N. Dec. 552 (BIA, 1970) – This decision was overruled by Matter of Heung (see below).

·    *Matter of Butterfly* , 14 I. & N. Dec. 460 (BIA, 1973) – Citizen may not petition for sibling adopted by

003472

petitioner's mother where the adoption did not meet the provisions of section 101(b)(1) of the Act in that the beneficiary was over 18 at the time of the adoption.

· **Matter of Kim** , 14 I. & N. Dec. 561 (BIA, 1974) – Citizen cannot petition for sibling who is the child of the same father and the father's concubine if sibling was never legitimated. (This case was specific to Korea and was overruled in part by *Matter of Lee* , 16 I. & N. Dec. 305 (BIA 1977).)

· **Matter of Heung** , 15 I. & N. Dec.145 (BIA, 1974) – Citizen may petition for stepsibling ( *Matter of Campbell* overruled).

· **Matter of Garner** , 15 I. & N. Dec. 215 (BIA, 1975) – While the term "sister" is not defined in the Act, petitioner must establish that he/she and sibling once qualified as the children of a common parent as provided in sections 101(b)(1) and (2) of the Act.

· **Matter of Kwong** , 15 I. & N. Dec. 312 (BIA, 1975) – Citizen cannot petition for sibling who was born to father's concubine in Hong Kong if the concubine did not occupy the status of a *tsip* . Such status requires concubine to enter the household of the man and his principal wife and to accept position subordinate to the principal wife. which did not occur in this case.

· **Matter of Mourillon,** 18 I. & N. Dec. 122 (BIA 1981). In order to qualify as stepsiblings, either (1) the marriage which created the step-relationships must continue to exist, or (2) where parties to that marriage have legally separated or the marriage also terminated by death or divorce, a family relationship must continue to exist as a matter of fact between the "stepsiblings".

· **Matter of Li** , 20 I. & N. Dec. 700 (BIA, 1993) - An adopted child may not confer immigration benefits upon a natural parent without regard to whether the adopted child has been accorded or could be accorded immigration benefits by virtue of his or her adoptive status. An adopted child may not confer immigration benefits upon his or her natural sibling, because their common natural parent no longer has the status of parent of the adopted child for immigration purposes.

Footnotes

[1] This does not require testing to 20 loci.

[2] This assumes testing to 20 loci. This row includes results between 89 and 89.99 percent.

[3] For further discussion of the additional affirmation from an AABB-accredited lab, see *Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[4] For further discussion of the additional affirmation from an AABB-accredited lab, see *Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[5] This assumes testing to 20 loci.

[6] For further discussion of the additional affirmation from an AABB-accredited lab, see *Half-Sibling Test Results Below 90 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed below.

[7] In one case, a lab was able to test the petitioner against the beneficiary and also test the petitioner and beneficiary separately against a third sibling. The test results indicated a 44.99 percent probability between the petitioner tested against the beneficiary, a 99.99 percent probability between the petitioner tested against the third sibling, and a 99.96 percent probability between the beneficiary tested against the third sibling.  In evaluating these results, the lab director concluded the following: "Results such as those obtained when testing (the petitioner) against (the beneficiary) can occur even if they are truly full siblings because there is no obligate sharing of alleles in siblings like there is in a parent/child relationship…Using the basic rules of logic, there is a very strong indication that all three are full siblings. Additionally, there are no genetic loci at which four alleles would occur. If it were true that some loci displayed five or six alleles, there would have to be more than two total parents for the three tested alleged siblings. Since this is not true and the indicated Siblingship Indexes were obtained, I feel that the data indicate strongly that all three individuals share the same parents."

[8] For further discussion of the additional affirmation from an AABB-accredited lab, see *Full-Sibling Test Results Between 9 and 89 Percent Probability are Inconclusive Evidence of the Claimed Relationship*, as detailed above.

[9] The relationship between each sibling and the claimed common parent must be individually established.  When one sibling's relationship to the common parent is established through primary and/or secondary evidence already contained in the record, the petitioner may only need to submit additional evidence of the claimed relationship between the other sibling and the common parent.  *See* Aytes, Michael, PM, *Genetic Relationship Testing; Suggesting DNA Tests, Revisions to the Adjudicator's Field Manual (AFM) Chapter 21 (AFM Update AD07-25)*, March 19, 2008  (http://www.uscis.gov/files/pressrelease/genetic_testing.pdf) for additional information on the use of DNA testing to establish a parent-child relationship.

**21.10 Refugee / Asylee Relative Petitions.**

(a) <u>Background</u> .

**Section 207(c)(2)** of the Act entitles a qualifying spouse or child of a refugee to be admitted as a refugee if accompanying or following to join the refugee. **Section 208(b)(3)** of the Act entitles a qualifying spouse or child of an asylee to be granted asylum status if accompanying or following to join the asylee.

(b) <u>Eligibility Requirements</u> .

A Form I-730 ("Refugee/Asylee Relative Petition") may be filed on behalf of either a spouse or a child (i.e., a person meeting the definition contained in paragraphs (A) through (E) of section 101(b)(1) of the Act) by an alien who has been admitted to the United States as a refugee or has been granted asylee status in the United States. A separate Form I-730 must be filed for each beneficiary.

(c) <u>Form and Filing Issues</u> .

Form I-730 must be filed with the Nebraska Service Center.

By regulation, the Form I-730 must be filed within two years of the date on which the refugee petitioner arrived in the United States or was granted asylum status, with the following exceptions:

·   If the alien acquired his or her status on or prior to February 27, 1998, the petition could have been filed at any time prior to February 28, 2000.

·   If USCIS determines that valid humanitarian reasons exist for extending the filing deadline, it may do so. (There is no set limit on the length of extension which may be granted.)

003475

| Note |
|---|
| If more than 2 years have passed since the refugee arrived in the U.S. or asylum status was granted, and neither of the exceptions applies, the petitioner's only option is to wait until he or she becomes a lawful permanent resident and then file a Form I-130, Petition for Alien Relative. |

(d) <u>General Adjudication Issues</u>.


· <u>Petitioner's Status</u> - A petitioner must be either a refugee or an asylee in the U.S. when the Form I-730 is filed. If, pursuant to section **209(a)** or section **209(b)** of the Act, he or she adjusts status to that of lawful permanent resident before the petition is approved, the petition may still be approved and the beneficiary may receive derivative status (provided all other requirements are met).


· <u>Age of (Child) Beneficiary</u> - For asylum and refugee applications pending on or filed after August 6, 2002, whether or not a son or daughter may continue to be classified as a child is based on the age of the derivative at the time the refugee or asylee application is filed. As long as the child was under 21 on the date of filing the asylum or refugee application, he or she will continue to be classified as a child for purposes of adjudicating the refugee or asylum application, This provision continues to protect the beneficiary afte r the approval of the Form I-730, through the admission process, and (in the case of a dependent asylee) the section 209(b) adjustment process. (Section 209(a), under which a refugee or derivative refugee "adjusts" to permanent resident status, does not require that a derivative refugee have continued to qualify as the child of a refugee, so aging out is not an issue.) See **section 207(c)(2)(B)** and **section 208(b)(3)(B)** of the Act. These special provisions do not apply to beneficiaries who had aged out prior to the filing of an I-730 petition on their behalf or whose I-730 petition had been denied prior to August 6, 2002.


· <u>Marital Status of Beneficiary</u> - A child must be unmarried in order to qualify as a beneficiary of an I-730 petition.


· <u>Time at Which Relationship Was Created</u> - Generally, in order to qualify as a spouse or child of a refugee or asylee for Form I-730 purposes, the relationship must have existed at the time the petitioner/parent acquired refugee or asylee status (except for in *utero* children, see below). Relationships created after that date do not qualify <u>for Form I-730 petition purposes</u>, although the refugee or asylee may be eligible to file a second preference petition for the same individual once that refugee or asylee adjusts to LPR status.

Unlike other classifications, the regulations at 8 CFR 207.7 and 8 CFR 208.21 governing following to join dependents of refugees and asylees allow a child to qualify even if the child was not born until after the petitioner acquired refugee or asylee status, provided such child was in *utero* (i.e., had been conceived) prior to the date on which the petitioner acquired such status. Accordingly, an I-730 petition may be approved for a child who was born within approximately 9 months after the date on which the petitioner acquired status, so long as the beneficiary falls within one of the definitions of child set forth in section 101(b)(1) of the Act.

---

**Note**

A child might qualify as the child of the principal refugee or asylee even if the petitioner is not the birth father or birth mother as a matter of fact. For example, the petitioner may have been married to the child's mother when the child was born, but may also have been in the United States continuously since prior to the earliest possible date of the child's conception. First, the law of the place of birth of the child may conclusively establish that the mother's husband is the legal birth father. Second, even if the law does not establish a legal parental relationship, when a child is born as the legal child of only one partner of a married couple, the child is considered the "step-child" of the other partner for immigration purposes. See <u>Matter of Stultz</u>, 15 I&N Dec. 362 (AG 1975). Because the child qualifies as the petitioner's "step-child" under INA 101(b)(1)(B), you do not need to decide if the child is the petitioner's child under INA 101(b)(1)(A), (C), or (D).

---

· <u>Relationship Between the Petitioner and the Beneficiary</u> - With the exception of the issues covered in the preceding bullets, the same relationship issues that pertain to an I-130 petition for a spouse or child pertain to an I-730 petition for the same relationship. Accordingly, in adjudicating an I-730 petition, the adjudicator should be aware of, and follow, the relating guidance set forth in Chapter 21.2, Chapter 21.3 and Chapter 21.4 of this field manual.

· <u>For Adopted Child(ren- Effects of the Adoption - An adopted child, as defined in INA 101(b)(1)(E), can be the beneficiary of a Form I-730. See chapter 21.16 of this AFM for information on what qualifies as an "adoption" for immigration purposes.</u>

(e) <u>Final Decision</u> .

(1) <u>Approval</u> .

If no adverse information is developed in a case at a USCIS office, the adjudicating officer shall approve the petition and either:

·   Send the approved Form I-730 to the National Visa Center, which will in turn forward it to the appropriate overseas post. (See Chapter 16.2(d) and Chapter 16.3(b) of the *Inspector's Field Manual* for information regarding admission of derivative refugees and asylees at ports-of-entry); or

·   Retain the approved petition in the beneficiary's file (i.e., A-file is one is pre- existing or receipt/petition file if no A-file exists) and invite him or her to apply for derivative refugee/asylee status if he or she is in the U.S.

| **Note** |
| --- |
| Previously, a Visas Ninety-Two (in the case of a derivative asylee) or Visas Ninety-Three (in the case of a derivative refugee) cable would have been sent to the appropriate U.S. embassy or consulate. Although the practice of sending a cable has been discontinued, I-730 petition approvals are still known as "Visas 92" and "Visas 93" cases. |

(2) Denial .

If the petitioner fails to establish eligibility for the benefit sought, the adjudicating officer shall deny the petition and notify the petitioner of the reasons in writing. There is no appeal from the denial of an I 730 petition. As required in Chapter 10.7(b)(5) of this manual, the decision must include information about the opportunity to file a motion to reopen or reconsider.

(3) Reopening Proceedings Based on Adverse Information .

If adverse information is developed subsequent to the approval of the petition, the petition will be returned to the Nebraska Service Center with a memorandum (and supporting evidence) setting forth the arguments for revocation. When the Nebraska Service Center receives the petition with the adverse information, that office shall notify the petitioner of the derogatory information and of the Bureau's intent to reopen the decision to approve the petition. The petitioner is to be given the choice of withdrawi ng the petition or having a determination of eligibility made in reopened proceedings. There is no appeal from the revocation

of a Form I-730. After the new decision has been made, the Nebraska Service Center will notify the immigration or consular officer who developed the adverse information by memorandum of the final action.

If the reopened petition is not withdrawn or denied, the petition and all attachments must be forwarded to the consulate or embassy where the beneficiary is being processed for Form I-730 benefits. If the adverse information was developed at an overseas DHS office or a consular post, a memorandum explaining the reasons for not reopening and denying the petition must be attached to the re-affirmed petition.

(e) <u>Precedent Decisions</u> .

To date, there have been no precedent decisions relating to Refugee/Asylee Relative Petitions.

**21.11 Petition for Spouse, Child, or Parent of Certain Deceased U.S. Armed Forces Members [Chapter added 04-03-2006; AD05-34]**

(a) <u>General Eligibility: Immediate Relative Benefits under Section 1703 of Public Law 108-136</u> .

(See **Appendix 21-4** for relevant section of Public Law 108-136.)

Section 1703(a) of Public Law 108-136 provides that a surviving alien spouse, child, or parent of a U.S. citizen may be classified as an immediate relative if the U.S. citizen:

- served honorably in an active duty status in the military, air, or naval forces of the United States; and

- died as a result of injury or disease incurred in or aggravated by combat.

Similarly, sections **1703(c) and (d) of Public Law 108-136** provide that a surviving alien spouse, child, or parent of a lawful permanent resident (LPR) may be classified as an immediate relative if the LPR:

- served honorably in an active duty status in the military, air, or naval forces of the United States;

- died as a result of injury or disease in or aggravated by combat; and

- has been granted posthumous citizenship under section **329A** of the Act.

The adjudicator may treat such surviving alien spouse, child, or parent as an immediate relative (IR) for purposes of sections **201(b)(2)(A)(i)** , **204(a)(1)(A)(ii)** , and **245** of the Act if the surviving family member satisfies the other applicable requirements of section **1703 of Public Law 108-136** and is otherwise eligible for the immigration benefit(s) sought.

(1) <u>Spouse, Child, or Parent of United States Citizen Member of the Armed Forces</u>

Section 1703(a) provides that a surviving alien spouse, child, or parent of a United States citizen member of the Armed Forces can remain classified as an immediate relative under certain circumstances.

    (A) <u>Spouse or Child</u>

(i)    <u>The alien spouse or child must file</u> **Form I-360.** In cases where the qualifying U.S. citizen died on or after November 24, 2003, the alien spouse or child may file **Form I-360** with fee within 2 years of the qualifying U.S. citizen's death. In cases where the qualifying U.S. citizen died on or after September 11, 1999, but prior to November 24, 2003, the alien spouse or child must have filed the **Form I-360** on or before November 24, 2005.

(ii)    <u>Special Consideration for the Spouse</u> . The alien spouse must have been the spouse of the U.S. citizen at the time of the U.S. citizen's death and cannot have been legally separated from the U.S. citizen at that time. Unlike other provisions of the Act, there is no requirement that the marriage must have existed for a specific length of time. The spouse will cease to qualify as an immediate relative if he or she remarries prior to obtaining lawful permanent residence based on his or her relationship to the deceased U.S. citizen.

(iii)    <u>Special Consideration for the Child</u> . The alien child will remain classifiable as an immediate relative even if he or she marries or turns 21 years of age.

(B) <u>Parent</u>

(i)    <u>The alien parent must file</u> **Form I-360** . In cases where the qualifying U.S. citizen died on or after November 24, 2003, the alien parent may file **Form I-360** with fee within 2 years of the qualifying U.S. citizen's death. In cases where the qualifying U.S. citizen died on or after September 11, 1999, but prior to November 24, 2003, the alien parent must have filed the **Form I-360** on or before November 24, 2005.

(ii)    <u>Special Consideration for the Parent</u> . The alien parent will remain classifiable as an immediate relative irrespective of the U.S. citizen's age at the time of the U.S. citizen's death. The standard requirement that a U.S. citizen must be over the age of 21 in order to petition for his or her parents does not apply.

(2) <u>Spouse, Child, or Parent of Lawful Permanent Resident (LPR) Member of Armed Forces</u>

Section **1703(c) and (d) of Public Law 108-136** provide that a surviving alien spouse, child, or parent of an LPR member of the armed forces may be classified as an immediate relative under certain circumstances.

(A) <u>Spouse or Child</u>

The alien spouse or child must either:

(i)    be the beneficiary of an approved **Form I-130** filed by the deceased LPR under section **203(a)(2)** of the Act as a spouse or child of a lawful permanent resident or

(ii)    self-petition by filing a **Form I-360** to obtain an immediate relative classification within 2 years of the qualifying LPRs posthumous naturalization.

(B) <u>Parent</u> . The alien parent must file **Form I-360** to obtain an immediate relative classification within 2 years of the deceased LPRs posthumous naturalization.

(C) <u>Eligibility for Interim Relief and Benefits</u> . If present in the United States, the alien spouse, child, or parent is eligible for deferred action, an Employment Authorization Document (EAD), and/or advance parole, as necessary. The office with jurisdiction over the **Form I-360** may grant such benefits.

(b) <u>USCIS Interpretation of "Died as a result of…Combat"</u>

Consistent with the statutory definition of "combat-related disability" as well as United States Department of Defense (DOD), United States Veterans Affairs (VA), and United States Coast Guard (USCG) standards used to make combat-related disability determinations, the adjudicator is directed to interpret "died as a result of injury or disease incurred in or aggravated by combat" to mean:

(1) The death is attributable to an injury or disease for which the member was awarded the Purple Heart; or

(2) The death resulted from an injury or disease that was incurred or aggravated:

(A) as a direct result of armed conflict;

(B) while engaged in hazardous service;

(C) in the performance of duty under conditions simulating war; or

(D) through an instrumentality of war.

To determine if a death related to a particular incident is combat-related, the adjudicator should consult the guidelines that are currently used by DOD, as in the following:

(1) Purple Heart

"Death attributable to an injury or disease for which the service member was awarded the Purple Heart" means that the service member received a Purple Heart for such injury or disease and also died as a result of such injury or disease. Generally, the death is associated with an incident involving armed conflict.

(2)(A) Direct Result of Armed Conflict

"Death resulting from an injury or disease that was incurred or aggravated as a direct result of armed conflict" means that the service member's injury or disease was sustained or further exacerbated in armed hostilities and such injury or disease resulted in the service member's death. Armed conflict includes war, expedition, occupation of an area or territory, battle, skirmish, raid, invasion, rebellion, insurrection, guerilla action, riot, or any other action in which service members are engaged with a hostile or belligerent nation, faction, force, or terrorists. Armed conflict may also include incidents involving a service member while interned as a prisoner of war, while detained against the service member's will in custody of a hostile or belligerent force, or while escaping or attempting to escape from such confinement, prisoner of war, or detained status. Evidence simply demonstrating that the service member's death occurring during a period of war, in an area of armed conflict, or while the service member participated in combat operations is insufficient to show that the service member's death directly resulted from armed conflict.

(2)(B) While Engaged in Hazardous Service

"Death resulting from an injury or disease that was incurred or aggravated while engaged in hazardous service" means that the service member died from an injury or disease that was the direct result of actions taken in the performance of such service. Hazardous service includes, but is not limited to, aerial flight, parachute duty, demolition duty, experimental stress duty, and diving duty. Hazardous service does not include travel to and from hazardous service duty or actions incidental to a normal duty status.

(2)(C) In the Performance of Duty Under Conditions Simulating War

"Death resulting from an injury or disease that was incurred or aggravated in the performance of duty under conditions simulating war" means that a service member's participation in a combat simulation activity caused or exacerbated an injury or disease, which resulted in the service member's death. The performance of duty under conditions simulating war includes participation in military training, such as war games, practice alerts, tactical exercises, airborne operations, leadership reaction courses, grenade and live fire weapons practice, bayonet training, hand-to-hand combat training, repelling, and negotiation of combat confidence and obstacle courses. Incurring or aggravating an injury or disease during military training without participation in combat simulation activity, however, is not considered combat-related. Consequently, the performance of duty under conditions simulating war does not include physical training activities, such as calisthenics and jogging or formation running and supervised sport activities.

(2)(D) Instrumentality of War

"Death resulting from an injury or disease that was incurred or aggravated through an instrumentality of war" means that the instrumentality of war caused the service member's injury or disease, which resulted in the service member's death. Sustaining or aggravating an injury or disease during an actual period of war, however, is not required. An instrumentality of war is a vehicle, vessel, or device designated primarily for Military Service and intended for use in Military Service at the time the service member's injury or disease was incurred or aggravated. An instrumentality of war may also include an instrumentality that is not designated primarily for Military Service if use of, or occurrence involving, such instrumentality subjects the service member to a hazard or risk peculiar to Military Service. Therefore, a determination that a service member's death resulted from an instrumentality of war may include instances where the death occurred in any period of service as a result of such diverse causes as: wounds caused by a military weapon; accidents involving a military combat vehicle; or injury or sickness caused by fumes, gases, or explosion of military ordinance, vehicles, or material.

(c) Evaluation of Evidence Addressing "Died as a Result of…Combat"

It is the responsibility of the surviving alien spouse, child, or parent of the deceased service member to prove that the service member "died as a result of injury or disease incurred in or aggravated by combat." The adjudicator should make reasonable efforts to verify whether the service member died of a combat-related injury or disease by contacting the appropriate DOD, VA, or USCG office when necessary. The adjudicator should exercise normal judgment and discretion when reviewing evidence submitted to establish that the service member's death was combat-related and when determining whether the service member "died as a result of injury or disease incurred in or aggravated by combat."

(1) Evidence .

Evidence should include, but is not limited to, the following:

(A) The service member's death certificate, if such certificate indicates that the service member's death was attributable to a combat-related injury or disease;

(B) Purple Heart certificate, other combat decoration, or DOD or USCG service records showing the award of a Purple Heart or combat decoration and, if available, accompanying citations explaining that the service member's death was attributable to an injury or disease for which the service member was awarded the Purple Heart or other combat decoration;

(C) DOD or USCG forms, service records, service medical records, reports, or casualty notification telegrams indicating that the service member's death was the result of an injury or disease that qualified the service member or the service member's family for a Combat-Related Special Compensation (CRSC) benefit or demonstrating a causal relationship between an injury or disease that resulted in the service member's death and a combat-related incident or activity;

(D) VA administrative, adjudicative, medical, or clinical records or reports showing that the service member's death was the result of an injury or disease that qualified the service member or the service member's family for a Combat-Related Special Compensation (CRSC) benefit or demonstrating a causal

relationship between an injury or disease that resulted in the service member's death and a combat-related incident or activity; and/or

(E) Other credible documentation that is not issued or endorsed by DOD, VA, or USCG but sufficiently proves that the service member's death resulted from an injury or disease incurred in or aggravated by a combat-related incident or activity.

Evidence demonstrating that DOD, VA, or USCG has determined that the service member's death was combat-related or qualified for a CRSC benefit clearly meets the "died as a result of injury or disease incurred in or aggravated by combat" provision.

(2) Consultation with DOD, VA, and/or USCG

The adjudicator should consult with the appropriate office within DOD, VA, and/or USCG under the following conditions:

(A) The adjudicator cannot determine eligibility, because the submitted DOD, VA, and/or USCG-issued and endorsed documents are inconclusive.

(B) The evidence has not been issued and endorsed by DOD, VA, or USCG, and the evidence is inconsistent with the circumstances, conditions, and/or hardships of the service member's active duty status assignments and responsibilities or is otherwise unsatisfactory.

**Appendix 21-5** contains a list of DOD, VA, and USCG offices that serve as points-of-contact. If more detailed information for DOD, VA, or USCG points-of-contact is needed, the adjudicator should contact the California Service Center, Posthumous Citizenship for Military Casualties and Derivative Citizenship Team, at the following email address: CSCN644.REF9@dhs.gov .

(d) Jurisdiction and Filing Instructions .

(1) **Form I-360** and **Form I-485** Jurisdiction . An alien in the United States who qualifies for benefits under section **1703** as an immediate relative and who needs to file **Form I-360** may file **Form I-360** alone or concurrently with **Form I-485** . Both the California Service Center (CSC) and the USCIS district office that has jurisdiction over the alien's place of residence for family-based petitions and applications may accept a stand-alone **Form I-360** or **Form I-360** concurrently filed with **Form I-485** . However, if the alien is currently residing outside of the United States, he or she needs to file only **Form I-360** with the USCIS overseas office having jurisdiction over the alien's place of residence or with the appropriate Consular Section of the U.S. Embassy. If the **Form I-360** is approved overseas, the alien will be issued an immigrant visa.

(2) **Form I-130** and **Form I-485** Jurisdiction . An alien spouse or child residing in the United States who qualifies for benefits under section **1703(c)** as an immediate relative and who is the beneficiary of a qualifying approved **Form I-130** may file for adjustment of status. The alien should file **Form I-485** with the USCIS office that has jurisdiction over the alien's place of residence for family-based applications for adjustment of status.

(3) Filing **Form I-360** . The alien should check box "K" in Part 2 and write "PUBLIC LAW 108-136" in the space provided. The alien should submit the following with **Form I-360** :

(A) Proof of the alien's identity, such as a passport or foreign birth certificate with English translation.

(B) Evidence showing that the alien was the bona fide spouse, child, or parent of the deceased U.S. citizen or LPR member of the U.S. Armed Forces, such as a birth certificate or marriage certificate. A surviving spouse should submit proof of termination of any prior marriages for both the surviving spouse and the deceased service member. The surviving spouse should also submit documentation showing that the marriage was entered in good faith, such as holding joint accounts and property leases, filing joint income tax returns, and/or testimonials by credible witnesses/acquaintances regarding the spousal relationship.

(C) A copy of the deceased service member's death certificate.

(D) Documentation showing that the deceased member of the U.S. Armed Forces was a U.S. citizen or was granted citizenship, such as a birth certificate, naturalization certificate, certificate of citizenship, or posthumous naturalization certificate (N-645).

(E) Certified proof issued by the appropriate military department showing that the deceased member of the U.S. Armed Forces served honorably in an active duty status in the military, air, or naval forces of the United States.

(F) Evidence demonstrating that the deceased member of the U.S. Armed Forces died as a result of injury or disease incurred in or aggravated by combat. See section s (b) and (c) of this subchapter.

(4) Approved **Form I-130** . If the alien's qualifying **Form I-130** has been approved and the alien has not yet established eligibility under section **1703(c) or (d) of Public Law 108-136** , the alien should submit the evidence and documentation noted in (d)(3) of t his subchapter when filing **Form I-485** in the United States or when applying for an immigrant visa prior to entry into the United States. The adjudicator handling the approved **Form I-130** should write "PUBLIC LAW 108-136" in the "Remarks" section of the form.

(5) Filing **Form I-485** . Refer to instructions in **Chapter 23.5(d)(2)** .

**21.12 Process for Responding to Requests by the Department of State (DOS) to Accept a Locally Filed Form I-130, Petition for Alien Relative has been superseded by USCIS Policy Manual, Volume 6: Immigrants as of February 1, 2020.**

**21.13 Reserved**

**21.14 Self-Petitions by Abused Spouses and Children has been superseded by USCIS Policy Manual, Volume 3: Humanitarian Protection and Parole as of February 10, 2022.**

**21.15 Self Petitions by Parents of U.S. Citizens has been superseded by USCIS Policy Manual, Volume 3: Humanitarian Protection and Parole as of February 10, 2022.**

**21.16 Adoption as a Basis for Immigration Benefits has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.**

**Appendix 21–1 List of States Recognizing Common Law Marriages and their Requirements.**

BASIC CRITERIA : Merely living together is NOT enough to validate a common law marriage. The four basic requirements for a valid common law marriage are:

· The parties must live together.

· The parties must present themselves to others as a married couple. Some ways of doing this are by using the same last name, referring to one another as husband or wife, and filing a joint tax return.

· Although not defined, the parties must have been together for a significant period of time.

· The parties must intend to be married.

JURISDICTION : There are a limited number of states which currently have statutory provisions allowing for common law marriages. (However, under Article IV, Section 1 of the Constitution, every state is required to recognize as valid a common-law marriage that was "celebrated" in another state.) The following states, sometimes with restrictions, recognize common law marriages performed by parties living together within their jurisdiction and meeting certain other criteria:

· Alabama     The requirements for a common-law marriage are: (1) capacity; (2) an agreement to be husband and wife; and (3) consummation of the marital relationship

· Colorado     A common-law marriage may be established by proving cohabitation and a reputation of being married

· Georgia     Recognized only if performed by January 1, 1997

· Idaho     Recognized only if performed by January 1, 1996

· Iowa     The requirements for a common-law marriage are: (1) intent and agreement to be married; (2) continuous cohabitation; and (3) public declarations that the parties are husband and wife.

003491

· Kansas     For a man and woman to form a common-law marriage, they must: (1) have the mental capacity to marry; (2) agree to be married at the present time; and (3) represent to the public that they are married.

· Montana     The requirements for a common-law marriage are: (1) capacity to consent to the marriage; (2) an agreement to be married; (3) cohabitation; and (4) a reputation of being married.

· New Hampshire     Common law marriages are recognized only at death and only for probate purposes. (N.H. RSA. 457:39)

· Ohio     Recognized only if performed by October 10, 1991

· Oklahoma     To establish a common-law marriage, a man and woman must (1) be competent; (2) agree to enter into a marriage relationship; and (3) cohabit

· Pennsylvania     A common-law marriage may be established if a man and woman exchange words that indicate that they intend to be married at the present time

· Rhode Island     The requirements for a common-law marriage are: (1) serious intent to be married and (2) conduct that leads to a reasonable belief in the community that the man and woman are married

· South Carolina     A common-law marriage is established if a man and woman intend for others to believe they are married

· Texas     A man and woman who want to establish a common-law marriage must sign a form provided by the county clerk. Or, they must (1) agree to be married, (2) cohabit, and (3) represent to others that they are married

· Utah     For a common-law marriage, a man and woman must (1) be capable of giving consent and getting married; (2) cohabit; and (3) have a reputation of being husband and wife

· Washington, D.C.     The requirements for a common-law marriage are: (1) an express, present intent to be married and (2) cohabitation.

(Added AD01-16)

**Appendix 21-2 Orphan Case Related Cables to Consulates has been superseded by USCIS Policy Manual, Volume 5: Adoptions as of November 19, 2021.**

**Appendix 21-2e The Child Status Protection Act of 2002 (CSPA) (Revised AD07-04; 04-11-08)**

The following examples reflect how the guidance would be applied to some specific scenarios.

A.    Form I-129F was approved and the K1 entered the country with a K2 who was then 17. The marriage between the K1 and USC petitioner occurred within 90 days and before the child's 18th birthday. The USC petitioner then files an I-130 on behalf of the K2 when the K2 is 20 years old. Consequently the K2 would be treated as if he or she is an immediate relative for CSPA purposes and his or her eligibility for permanent residence would be 20, the beneficiary's age on the date the form I-130 was filed on his or her behalf. See **Chapter 21.2(e)(1)(i)** .

B.    An immigrant visa petition was filed when the beneficiary was under the age of 21 and approved before August 6, 2002. After August 6, 2002, the beneficiary filed Form I-485 within one year of visa availability. USCIS determined that the CSPA did not apply because no petition or application was pending on the August 6, 2002, and the alien received a denial solely because he or she aged out. Based on this new CSPA guidance, the applicant may be eligible for CSPA benefits. The alien may file a new application for adjustment of status today. USCIS will adjudicate the current Form I-485 as if it had been filed within one year of visa availability. See **Chapter 21.2(e)(2)(iii)** .

C.    An immigrant visa petition was filed when the beneficiary was under the age of 21 and subsequently approved. The beneficiary did not file Form I-485 within one year of visa availability because previous USCIS guidance indicated that they would not benefit from the CSPA. Based on this new CSPA guidance, the applicant may be eligible for CSPA benefits. The alien may file a Form I-485, and USCIS will adjudicate the Form I-485 as if it had been filed within one year of visa availability. See **Chapter 21.2(e)(2)(iii)** , a nd **(iv)** .

D.    An immigrant visa petition (either a Form I-130 or a Form I-140) was filed in 2000 when the derivative beneficiary was 20. When the petition was filed, the priority date for the principal's classification was current. The visa petition was not approved until 2007, and a Form I-485 was filed one month after approval. The derivative beneficiary's "age" for CSPA purposes would be 20 (the beneficiary was 27 when the I-485 was filed, but the visa petition was pending for 7 years). This derivative beneficiary can benefit from the CSPA since he or she applied for permanent residence within one year of visa number availability. The visa availability date in this example is the immigration petition approval date. Thus, this derivative beneficiary would be able to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

E.     An immigrant visa petition (either a Form I-130 or a Form I-140) was filed in 2000 when the derivative beneficiary was 20. The visa petition is approved exactly one year later in 2001. A visa becomes available exactly 5 years later in 2005 and the principal files an I-485 immediately. The application is approved in 2007 and the beneficiary applies for adjustment of status one month after approval of the principal's application. The derivative beneficiary's "age" for CSPA purposes would be 24 (the beneficiar y is 25 in 2005 when the visa became available, but the visa petition was pending for 1 year). Not only would this derivative beneficiary be considered over the age of 21, this beneficiary could not benefit from the provisions of the CSPA because he or she did not file a Form I-485 within one year of the principal's visa becoming available. Thus, t his derivative beneficiary would be unable to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

F.     An immigrant visa petition (either Form I-130 or Form I-140) was filed and denied in 2000 when the derivative beneficiary was 20. The petitioner filed a timely appeal with the AAO/BIA which, in 2006, sustained the appeal, remanded the matter, and directed the petition approved (on grounds other than the new availability of the CSPA). On the date of approval, visas are available for the principal's classification. The principal and derivative beneficiaries each file a Form I-485 six months later. The derivat ive beneficiary's "age" for CSPA purposes would be 20 (the beneficiary is 27 in 2007, but the Form I-140 was pending for 7 years). Thus this beneficiary would be eligible to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(C)** .

G.     An immigrant visa petition (either Form I-130 or a Form I-140) was filed and denied in 2000 when the beneficiary was 20. The petitioner filed a timely motion to reopen, and, in 2007, the motion to reopen is granted (on grounds other than the new availability of the CSPA). The petition is then approved and a visa is available to the beneficiary on the date of approval, and the alien files a Form I-485 nine months later. The beneficiary's "age" for CSPA purposes would be 20 (the beneficiary is 27 today, but t he Form I-130 was pending for 7 years). Thus, this beneficiary would be eligible to retain classification as a child. See Chapter **21.2(e)(1)(ii)(A)** and **(B)** .

**Appendix 21–3 American Association Of Blood Banks.**

( Revised 04/08/2005; *AFM* 05-10)

Editor's Note: The following information was obtained from:

American Association of Blood Banks
8101 Glenbrook Road
Bethesda, MD 20814-2749

| Phone | (301) 907-6977 |
|---------|-----------------|
| FAX | (301) 907-6895 |
| Website | www.aabb.org |
| Email | aabb@aabb.org |

Part A: Accredited Parentage Testing Laboratories. A current list of the AABB accredited parentage testing laboratories can be viewed
at: http://www.aabb.org/About_the_AABB/Stds_and_Accred/aboutptlabs.htm . You must access the AABB website set forth above to obtain current laboratory information. The USCIS office is no longer providing a paper list of the AABB facilities due to the transient nature of this information.

Please be advised that the AABB website lists only the headquarters or primary location for each AABB laboratory. In fact, many of the laboratories listed have multi-state and/or multi-site locations despite being listed under only one state. Therefore, it is necessary to go to the selected laboratory's website to identify all locations and contact information for that particular laboratory.

**April 2005**

**Fact Sheet**

American Association of Blood Banks ("AABB")Accredited Parentage Testing Laboratories

Parentage testing, or what is also referred to as blood testing or DNA testing, must be conducted by an American Association of Blood Banks ("AABB") accredited laboratory.

A current list of the AABB accredited parentage testing laboratories can be viewed
at: **http://www.aabb.org/About_the_AABB/Stds_and_Accred/aboutptlabs.htm** . You must access the AABB website set forth above to obtain current laboratory information. The USCIS office is no longer providing a paper list of the AABB facilities due to the transient nature of this information.

003497

Please be advised that the AABB website lists only the headquarters or primary location for each AABB laboratory. In fact, many of the laboratories listed have multi-state and/or multi-site locations despite being listed under only one state. Therefore, it is necessary to go to your selected laboratory's website to identify all locations and contact information for that particular laboratory.

Any questions regarding the actual parentage testing procedures or test results should be directed to the AABB parentage testing laboratory selected.

**PART B:** GENERAL POLICIES

| ITEM | ISSUE | YES | NO | N/A |
|------|-------|-----|-----|-----|
| 1.100 | PERSONNEL | | | |
| 1.101 | Is the laboratory under the direction of an individual(s) with a doctoral degree who is/are qualified by advanced training and/or experience in parentage testing | | | |
| 1.102 | Is there evidence that the director(s) is/are spending adequate amounts of time as DIRECTOR | | | |
| 1.103 | Is there evidence of personal review of the cases by a director | | | |
| 1.104 | Are there clear-cut assignments of responsibility for: | | | |
| 1.105 | Day-to-day performance of specific tests | | | |
| 1.106 | Scheduling of tests | | | |
| 1.107 | Implementation of quality control | | | |
| 1.108 | Maintenance of laboratory records | | | |
| 1.109 | Review of laboratory performance | | | |
| 1.110 | Delegation of responsibility in director's absence | | | |
| 1.111 | Is there evidence of interaction between the director and staff | | | |
| 1.112 | If not, comment | | | |

**REFERENCE**

003498

PI.110      The laboratory shall be under the direction of an individual/individuals with a doctoral degree who is/are qualified by advanced training and/or experience in parentage testing.

PI.130      A qualified individual must be available to act as an expert witness in the event that legal testimony related to the test results is required.

**EXPLANATION**

The director of a parentage testing laboratory is the most important component of that laboratory. The director provides expertise and ensures that the technical staff are competent to perform their duties. It is the director's responsibility to establish and review policies and procedures that ensure accurate test results. In addition, the laboratory director usually serves as the expert witness and as such must be familiar with all aspects of paternity testing and be able to interpret results for individu als unfamiliar with medical technology and terminology.

The director must have a doctoral degree in an area such as medicine, genetics, biology, or other related fields. The director should be able to demonstrate experience and expertise in those methods the laboratory employs for paternity testing (HLA, red cell antigen tests, enzymes and proteins, DNA). In some larger laboratories, expertise in a given area (such as DNA testing) may be provided by another individual. The laboratory director, however, must still be conversant with all areas of testing and is re sponsible for the results of testing performed in all areas. It is essential that a laboratory director have adequate experience to detect possible errors in test performance or in the interpretation of test results. Adequate experience is difficult to quantify. It cannot be measured necessarily by years of experience or number of cases reviewed, nor can it be assumed based upon education or coursework. Adequate experience can only be demonstrated in the way that the individual directs his or her laboratory , through the care given to case review, through response to errors or problems, through the procedures and protocols established for the performance of the testing, through interactions with the staff, and through demonstration of adequate understanding of the genetics and statistics that form the foundation of the science of parentage testing. Failure of a director to adequately demonstrate sufficient experience and general competence to the satisfaction of the inspector may result in a deficiency.

**1.113** Personal review of all cases by a director is required, as this individual is responsible for all results generated by the laboratory, This shall be documented by having the director sign all reports. In addition, the director and/or his/her designee must review and sign or initial important worksheets, autoradiograms, and other pertinent test results. The director shall also review the laboratory's procedures manual and indicate that review by initialing and dating the document. And, there should be eviden ce that the director reviews results of external (and internal if appropriate) proficiency tests. Corrective action, where appropriate, must be documented.

Some large laboratories may find it necessary or practical to have multiple directors. Thus, there may be several individuals who sign paternity test reports. However, each individual in that laboratory who reviews and signs those reports must meet the qualifications of a paternity laboratory director outlined above. In addition, there must still be one individual who has the overall responsibility for the paternity testing laboratory. Any change in director(s) must be reported to the AABB within 30 days.

Authority for the technical and clerical aspects of the laboratory functions may be delegated. In some institutions the director may arrange for consultative services to augment existing services or for the purpose of dealing with problems requiring special expertise.

The director is also responsible for the development, implementation, and review of the quality assurance (QA) program of the laboratory. The QA program developed and administered by the Director must include procedures for training staff and reviewing their competency periodically. In addition, policies for quality control of reagents and the periodic maintenance of equipment must be a part of the QA plan. The QA plan must also define acceptable limits for all equipment and reagents and must indicate the c ourse of action when these limits are not achieved.

Records must be maintained for at least 5 years unless local law requires a longer retention time. All paternity files are to be considered confidential and stored with security.

**1.211** B **EXPLANATION**

The laboratory shall have a quality plan in place that describes how the facility plans to develop their quality program, including a time line.

In the future, the laboratory will be required to have a quality program m place that monitors performance to ensure that predetermined quality criteria are met and that laboratory improvement is a management goal. Responsibility for the ongoing implementation of the quality program may be assigned to a designated individual(s), but is ultimately the responsibility of the laboratory director. The quality program must address the items found in the Quality System Essentials (Association Bulletin 97-4).

|  | 10 ESSENTIAL |
|---|---|
| Organization | A table of organization or description of organization is to be included in this section in which lines of responsibility are clearly shown. The individual(s) responsible for the quality program is named here. The goals of the organization and a quality statement should be defined and written. |
|  |  |
| Personnel | Job descriptions that define educational and experience requirements, duties and responsibilities, and lines of authority are to be included in this section. A description of the training program for new hires and documentation of appropriate training prior to on-line responsibility are also kept here as well as documents of periodic evaluations and competency for each staff member. |
|  |  |

| | |
|---|---|
| Equipment | Each item of equipment must be listed with a unique inventory number. Records of calibration, schedules of periodic maintenance with dates of activity, and repairs are to be kept in this section. |
| | |
| Supplier Issues | A list of suppliers/vendors of all scientific items and services is maintained. The list should document the names of the vendors with addresses, phone and FAX numbers, and what items/services are provided by each vendor. |
| | |
| Process Control | This section contains a description of all the various quality control procedures in place with a calendar schedule of set intervals for checks. A policy should be established to follow when established limits are exceeded. It should also list the various proficiency tests used in the laboratory and what action is taken if a nonconsensual result is reported. Separate notebooks should be used to store the actual quality control data and the proficiency testing records. |
| | |
| Documents and Records | A model format for writing a standard operating procedure (SOP) should display the various sections of the procedure in a set order. There should also be a description of how SOPs are changed and how data entries in records are to be changed when appropriate. The length of time for the retention of records should be established as well as security for any offsite storage. |
| | |
| Incidents, Errors and Accidents | A process must be in place to investigate errors, accidents, and credible complaints. Clients whose challenges about test results appear to have merit must be offered a repeat test at no charge by the laboratory, or, if the client chooses, in another laboratory accredited by the /LA.BB. The director should advise the client to prepare a written appeal to the Parentage Testing Program Unit if the client and director disagree on the merit of the challenge. Errors must be investigated to determine root cause a nd appropriate action must be taken. Documentation must be kept on errors and accidents regarding discovery, root cause analysis, and corrective action taken. |
| | |
| Assessments Process | There must be a schedule for internal assessments. The director and the responsible head of the quality program (if not the director) shall establish specific items for periodic review. Appropriate assessments might include test result discrepancies, completeness of records, sigma and delta calculations in RFLP analysis, paternity index and power of exclusion (PE) consistency checks, etc. The director and the responsible head of the quality program (if not the director) should set Improvement goals with timetables for process improvement activities. Appropriate study areas might include DNA extraction yields, background noise on autorads, number (%) of redraws, etc. |
| | |

003501

| Facilities and Safety | There shall be a description of the safety training program for the staff and records of periodic participation by each staff member must be kept. |
|---|---|
|  |  |

**Appendix 21-4 Public Law 108-136 (National Defense Authorization Act for Fiscal Year 2004), Sec. 1701. Requirements for Naturalization through Service in the Armed Forces of the United States has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

**Appendix 21-5 U.S. Department of Defense, U.S. Department of Veterans Affairs, and U.S. Coast Guard Points-of-Contact for Public Law 108-136 (National Defense Authorization Act for Fiscal Year 2004) has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

**Appendix 21-6 Adam Walsh Child Protection and Safety Act of 2006**

[Appendix added 02-08-2007]

TITLE IV--IMMIGRATION LAW REFORMS TO PREVENT SEX OFFENDERS FROM ABUSING CHILDREN

SEC. 401. FAILURE TO REGISTER A DEPORTABLE OFFENSE.

Section 237(a)(2)(A) of the Immigration and Nationality Act (8 U.S.C. 1227(a)(2)(A)) is amended--

(1) by redesignating clause (v) as clause (vi); and

(2) by inserting after clause (iv) the following new clause:

"(v) Failure to register as a sex offender.--

Any alien who is convicted under section 2250 of title 18, United States Code, is deportable."

SEC. 402. BARRING CONVICTED SEX OFFENDERS FROM HAVING FAMILY-BASED PETITIONS APPROVED.

(a) Immigrant Family Members.--Section 204(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)), is amended--

(1) in subparagraph (A)(i), by striking "Any" and inserting "Except as provided in clause (viii), any";

(2) in subparagraph (A), by inserting after clause (vii) the following:

003505

"(viii)(I) Clause (i) shall not apply to a citizen of the United States who has been convicted of a specified offense against a minor, unless the Secretary of Homeland Security, in the Secretary's sole and unreviewable discretion, determines that the citizen poses no risk to the alien with respect to whom a petition described in clause (i) is filed.

"(II) For purposes of subclause (I), the term 'specified offense against a minor' is defined as in section 111 of the Adam Walsh Child Protection and Safety Act of 2006."; and

(3) in subparagraph (B)(i)--

(A) by striking "(B)(i) Any alien" and inserting the following: "(B)(i)(I) Except as provided in subclause (II), any alien"; and

(B) by adding at the end the following:

"(I) Subclause (I) shall not apply in the case of an alien lawfully admitted for permanent residence who has been convicted of a specified offense against a minor (as defined in subparagraph (A)(viii)(II)), unless the Secretary of Homeland Security, in the Secretary's sole and unreviewable discretion, determines that such person poses no risk to the alien with respect to whom a petition described in subclause (I) is filed.".

(b) Nonimmigrants.--Section 101(a)(15)(K) (8 U.S.C. 1101(a)(15)(K)), is amended by inserting "(other than a citizen described in section 204(a)(1)(A)(viii)(I)" after "citizen of the United States" each place that phrase appears.

**Appendix 21-7 Legislation Affecting Certain Surviving Spouses and Visa Petitioners [Appendix added on 12-02-2009]**

**U.S. Department of Homeland Security**
20 Massachusetts Ave., NW
Washington, DC 20529



U.S. Citizenship
and Immigration
Services

HQDOMO 70/6.1.1-P
70/6.1.3-P
*AFM* Update AD10-09

# Interoffice Memorandum

To:     Executive Leadership

From:   Donald Neufeld /s/
        Acting Associate Director
        Domestic Operations Directorate

        Lori Scialabba /s/ Joanna Ruppel for
        Associate Director
        Refugee, Asylum, and International Operations Directorate

        Pearl Chang /s/
        Acting Chief
        Office of Policy and Strategy

Date:   December 2, 2009

SUBJECT:   Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children (REVISED)

           Effect of FY2010 DHS Appropriations Act on eligibility to immigrate after death of visa petitioner

           Revisions to Adjudicator's Field Manual (AFM) Chapter(s) 21.2(a)(4) and (h)(1)(C)
           (AFM Update AD10-09)

## I.  Purpose

This memorandum supersedes an earlier memorandum on this subject, dated November 13, 2009, and provides updated guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of Forms I-130, petitions for alien relative, and I-485, application to register permanent residence or adjust status, filed by surviving spouses of deceased U.S. citizens and the qualifying children of the surviving spouses.  This new guidance is based on the enactment of section 568(c) of the Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009), which provides

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 2

relief for these aliens.  Section 568(c) entered into force on October 28, 2009, the date of
enactment.

Sections 568(d) and (e) of the FY2010 DHS Appropriations Act, which provide relief for aliens
who are surviving beneficiaries of certain pending or approved petitions filed by certain
qualifying categories of noncitizens, will be addressed in a separate memorandum.

## II.  Background

### A.   Prior Policy and Related Litigation

For many years, U.S. immigration policy has been that a Form I-130 could not be approved if the
petitioner died while the Form I-130 was pending.  *See Matter of Sano,* 19 I&N Dec. 299 (BIA
1985); *Matter of Varela,* 13 I&N Dec. 453 (BIA 1970).  As far back as 1938, our immigration
regulations have provided for the revocation of the approval of a visa petition upon the
petitioner's death.  More recently, the regulations, while maintaining that general policy, have
provided for discretion, for "humanitarian reasons," to reinstate the approval.  8 C.F.R. §
205.1(a)(3)(i)(C)(2).  Also, since 2006, 8 C.F.R. § 204.2(i)(1)(iv) and 205.1(a)(3)(i)(C)(1) have
provided that the automatic revocation provision does not apply to a spousal immediate relative
visa petition, if the deceased petitioner and the alien widow(er) had been married at least two
years when the petitioner died.

Over the past several years, widow(er)s of citizens who had died before the second anniversary
of the underlying marriages have challenged this long-standing policy as being inconsistent with
the statute.  The federal courts of appeals have split on the legal issue.  *Compare Robinson v.
Napolitano,* 554 F.3d 358 (3d Cir. 2009) (sustaining agency view that petitioner's death while
a Form I-130 is pending ends the beneficiary's eligibility); *petition for cert. filed,* No. 09- 94 (U.S.
filed July 23, 2009), *with Taing v. Napolitano,* 567 F.3d 19 (1st Cir. 2009) (holding agency
policy violative of statute); *Lockhart v. Napolitano,* 561 F.3d 611 (6th Cir. 2009) (same); *and
Freeman v. Gonzales,* 444 F.3d 1031 (9th Cir. 2006) (same).  The issue has engendered much
litigation before the federal district courts in recent months, with most courts ruling against the
agency.  Among the unfavorable decisions is the class action ruling in *Hootkins v. Napolitano,*
___ F. Supp. 2d ___, 2009 WL 2222839 (C.D. Cal. Apr. 28, 2009), which is on appeal to the
Ninth Circuit Court of Appeals.  Other cases are pending in district courts throughout the United
States.

### B.  Section 568(c) of FY2010 DHS Appropriations Act

Congress, however, recently acted to resolve the issue.  On October 28, 2009, the President
signed into law the FY2010 DHS Appropriations Act.  Section 568(c) of the new law amends the
second sentence in section 201(b)(2)(A)(i) of the INA so that, for a widow(er) of a citizen to
qualify as an immediate relative, it is no longer necessary for the couple to have been married at
least two years when the citizen died.  The second sentence of section 201(b)(2)(A)(i) now reads,

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 3

> In the case of an alien who was the spouse of a citizen of the United States and
> was not legally separated from the citizen at the time of the citizen's death, the
> alien (and each child of the alien) shall be considered, for purposes of this
> subsection, to remain an immediate relative after the date of the citizen's death
> but only if the spouse files a petition under [section 204(a)(1)(A)(ii) of the INA]
> within 2 years after such date and only until the date the spouse remarries.

When a widow(er) qualifies as an immediate relative under the second sentence in section
201(b)(2)(A)(i) of the INA, his or her children, as defined in sections 101(b)(1) and 201(f) of the
INA, also qualify.  The amendment made by section 568(c) applies equally to aliens abroad who
are seeking immigrant visas and aliens in the United States who are seeking adjustment of status.
The amendment applies to any alien whose spouse died before October 28, 2009, and who had a
Form I-130 pending on October 28, 2009.  If no Form I-130 was pending, then an alien whose
U.S. citizen spouse died before October 28, 2009, and before the second anniversary of their
marriage, may file a visa petition under section 204(a)(1)(A)(ii) of the INA so long as (a) the
alien has not remarried, and (b) the petition is filed no later than October 28, 2011.

Section 568(c) relates only to the impact of the citizen's death on the alien's eligibility for
classification as an immediate relative.  All other requirements for approval of a visa petition
remain in force.  In particular, the alien must still establish that he or she was the citizen's legal
spouse, and that the marriage was a bona fide marriage and not an arrangement solely to confer
immigration benefits on the alien.  If the alien was in removal proceedings at the time of the
marriage, the "clear and convincing evidence" standard in section 245(e)(3) of the INA will still
apply to the adjudication of the visa petition.  If the necessary visa petition is approved, the alien
may then seek an immigrant visa or adjustment of status.  The alien must still establish that he or
she is admissible as an immigrant and, in an adjustment case, that he or she meets all other
adjustment eligibility requirements and merits a favorable exercise of discretion.

In light of this new legislation, the policy guidance stated in the November 8, 2007,
memorandum entitled "Effect of Form I-130 Petitioner's Death on Authority to Approve the
Form I-130" (*AFM* Update AD08-04) is obsolete.  This memorandum amends the Adjudicator's
Field Manual to remove the material added in that earlier memorandum.

## III. Policy Guidance and AFM Update

### *AFM* Update

1. Chapter 21.2 of the *AFM* entitled "Factors Common to the Adjudication of All Relative Visa
   Petitions" is amended by

   a.  Removing chapter 21.2(a)(4)
   b.  Removing the **Note** at the end of chapter 21.2(h)(1)(C).

003510

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 4

### A. __Widow(er)s with pending cases__

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act makes the amendment to the second sentence in INA section 201(b)(2)(A)(i) applicable to any visa petition or adjustment application "pending on or after the date of enactment."  As noted, the date of enactment is October 28, 2009.

#### 1. _Reopening of pending Form I-130 cases_

For purposes of this amendment, a Form I-130 will be deemed "pending" on October 28 2009, if the deceased citizen had filed a Form I-130 on or before that date but:

- USCIS has not adjudicated the Form I-130;

- USCIS denied the Form I-130, but USCIS granted a motion to reopen or reconsider, so that the Form I-130 is, again, pending;

- USCIS denied the Form I-130, but has not yet ruled on a motion to reopen or reconsider;

- USCIS denied the Form I-130, but the alien's appeal from that decision is pending before the Board of Immigration Appeals (BIA) or the period for appeal of the adverse USCIS decision to the BIA had not yet expired; or

- The USCIS or BIA decision denying the Form I-130 is the subject of pending litigation before a federal court (including cases in which the district court issued a decision before October 28, 2009, but the appeals period established by law had not yet expired).

Under 8 C.F.R. § 204.2(i), a citizen's spousal Form I-130 is automatically converted to a widow(er)'s Form I-360 if, on the date of the citizen's death, the beneficiary qualifies as a widow(er) under the second sentence in section 201(b)(2)(A)(i).  Under section 568(c) of the FY2010 DHS Appropriations Act, these aliens now qualify under the second sentence.  Thus, any Form I-130 that is "pending" as described in the preceding paragraph will be deemed to be, and adjudicated as, a widow(er)'s Form I-360.

In any Form I-130 case in which a motion to reopen or for reconsideration was filed, but not acted on, USCIS will grant the motion and make a new decision in light of section 568(c) of the FY2010 DHS Appropriations Act.

Any Form I-130 that is the subject of litigation in any federal court on the issue of the effect of the petitioner's death is, as of the date of this memorandum, reopened for a new decision in light of section 568(c) of the FY2010 DHS Appropriations Act.   The beneficiary need not file a separate motion.  Nor does it matter, for purposes of reopening the Form I-130, whether the beneficiary is currently in the United States or abroad.  If the decision denying or terminating action on the Form I-130 was pending in any court on October 28, 2009, the decision is now

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 5

reopened.  USCIS will therefore make a new decision in light of section 568(c) of the FY2010
DHS Appropriations Act.

Cases challenging the denial of a spousal immediate relative Form I-130 based on the
petitioner's death have been filed in district courts throughout the United States.  USCIS officers
must consult with the appropriate regional or service center counsel to identify those cases that
are the subject of litigation that was pending on October 28, 2009.  Once a case is identified as
subject to reopening under this memorandum, the USCIS officer will notify the alien in writing
that the Form I-130 is reopened in light of section 568(c) of the FY2010 DHS Appropriations
Act, and will be readjudicated as a Form I-360.

If it is determined that a Form I-130 had been filed but was not "pending" on October 28, 2009,
because a USCIS decision denying the Form I-130 had become final before October 28, 2009
(and no administrative appeal or civil action challenging the denial was pending on October 28,
2009), please refer to part III(B) of this memorandum.

> 2.    *Reopening of pending Form I-485 cases*

Section 568(c)(2)(A) of the FY2010 DHS Appropriations Act also makes the amendment
applicable to any Form I-485 that was pending on the date of enactment.  A Form I-485 is
deemed "pending" on the date of enactment if it was filed before the deceased citizen's death
but:

- USCIS has not adjudicated the Form I-485

- USCIS denied the Form I-485, but USCIS granted a motion to reopen or reconsider, so
  that the Form I-485 is, again, pending

- USCIS denied the Form I-485, but has not yet ruled on a motion to reopen or reconsider;

- The Form I-485 is the subject of litigation before a federal court (including cases in
  which the district court issued a decision before October 28, 2009, but the appeals period
  established by law had not yet expired).

With this guidance memo, USCIS also reopens, without the need for a formal motion, any Form
I-485 that is the subject of litigation on this issue in any federal court, if USCIS still has
jurisdiction to act on the Form I-485.  As with the reopening of the related Form I-130, the
USCIS officer will notify the applicant in writing that the Form I-485 is reopened in light of
section 568(c) of the FY2010 DHS Appropriations Act.

In the case of a widow(er) who entered the United States as a K-1 nonimmigrant, and filed a
Form I-485 after marrying the deceased citizen who had filed the Form I-129F, ordinarily there
will not be a Form I-130.  If the Form I-485 is still "pending" as described in this memo, and
USCIS still has jurisdiction to act on it, the Form I-485 will also be reopened for a new decision
in light of section 568(c) of the FY2010 DHS Appropriations Act, without the need for a formal

motion.  Since no Form I-130 is required for a K-1 nonimmigrant to seek adjustment after marrying the K petitioner within the period specified by statute, the K-1 nonimmigrant will also be deemed the beneficiary of a Form I-360 if the K-1 nonimmigrant now qualifies as a widow(er).  The K-1 nonimmigrant still may not adjust on any basis other than the K-1 nonimmigrant's having married the citizen petitioner who filed the Form I-129F.

Some aliens may have been placed into removal proceeding after USCIS denied their Forms I-485.  Except for "arriving aliens," this factor would mean that USCIS no longer has jurisdiction to adjudicate the Form I-485.  8 C.F.R. § 245.2(a)(1) and 1245.2(a)(1).  USCIS would have jurisdiction to adjudicate the Form I-485 only if the Executive Office for Immigration Review (EOIR) terminated the removal proceeding.  Whether to support or oppose terminating a removal proceeding is a matter for U.S. Immigration and Customs Enforcement to decide, not USCIS.  If a USCIS office reopens a Form I-130 involving an alien in removal proceedings, the USCIS office must, through the appropriate USCIS counsel, advise the local counsel for U.S. Immigration and Customs Enforcement.

Some aliens whose citizen spouses had died may have left the United States voluntarily, without obtaining a grant of advance parole.  Others may have left after obtaining advance parole, but may have remained abroad after expiration of the Form I-512.  Under 8 C.F.R. § 245.2(a)(ii)(4)(B), these aliens have abandoned their adjustment applications.  Also abandoned is the adjustment application of an alien who left as the result of removal proceedings.  8 C.F.R. § 245.2(a)(4)(ii)(A).  In these situations, a Form I-485 will not be deemed "pending" for purposes of section 568(c)(2)(A).  However, where section 568(c) applies to the approved Form I-130, and the Form I-130 has been approved as a Form I-360, the alien approved on that I-360 who has left the United States may apply for an immigrant visa abroad.

3.   *Petition already approved before death*

If a widow(er) is the beneficiary of a Form I-130 that was approved before the citizen petitioner's death, it is not necessary for the widow(er) to request humanitarian reinstatement of the approval.  Under 8 C.F.R. § 204.2(i)(1)(iv), the approved Form I-130 is automatically converted to an approved Form I-360.  Any children of the widow(er) will also be eligible to seek an immigrant visa or adjustment of status based on the converted petition.

There may be some cases in which a spousal immediate relative Form I-130 was approved, but the approval was revoked automatically under 8 C.F.R. 205.1(a)(3)(i)(C) upon the citizen petitioner's death.  If the alien is now eligible for classification as the widow(er) of a citizen under section 568(c)(2)(A) of the  FY2010 DHS Appropriations Act , the approval will be deemed to have been reinstated, effective October 28, 2009.  No separate request for reinstatement is necessary.  Under 8 C.F.R. § 204.2(i)(1)(iv), the Form I-130 will be deemed to be an approved Form I-360.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 7

4.    *Admissibility issues*

Whether an alien is actually admissible is not germane in adjudicating a Form I-130.  *Matter of O-*, 8 I&N Dec. 295 (BIA 1959).  The only issue resolved by enactment of section 568(c) of the FY2010 DHS Appropriations Act is that the death of the citizen spouse, by itself, does not make the widow(er) ineligible for immediate relative classification. Thus, the alien must still be admissible as an immigrant to obtain adjustment of status or an immigrant visa.

For those aliens, however, who had pending Form I-130 cases, and who now can benefit from section 568(c) of the FY2010 DHS Appropriations Act, two inadmissibility grounds warrant special consideration.  The first is section 212(a)(9)(B)(i) of the Act, under which an alien is inadmissible if the alien seeks admission within a specified period after the alien leaves the United States, if the alien has accrued a lengthy period of unlawful presence.  The second is section 212(a)(9)(A), under which an alien who has been removed (or who left the United States while under a final administrative order of removal) must obtain consent to reapply, if the alien seeks admission within the period set in section 212(a)(9)(A).

It is important to note that the special provisions in this memorandum relating to INA section 212(a)(9)(A) and (B) apply only to an alien who was the beneficiary of a Form I-130 that was filed by a now-deceased spouse petitioner, and that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act.  The purpose of these special provisions is simply to minimize the adverse effect on these aliens of the disputed, and now resolved, issue of the impact of the death of the petitioning spouse on the alien's eligibility.

a.  Unlawful presence

By specifying, in section 568(c)(2)(A) of the FY2010 DHS Appropriations Act, that the amendment should apply to pending cases, Congress indicated its desire to resolve these cases fully.  For this reason, for purposes of INA section 212(a)(9)(B)(i), if an alien remained in the United States while awaiting the outcome of Form I-130 that can now be approved as a Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act, the alien will be deemed *not* to have accrued any unlawful presence.  This protection applies even if the alien was not actually in a lawful status while the now-converted Form I-360 was pending.

An alien who had a Form I-130 pending on October 28, 2009, but who is present in the United States without a lawful admission or parole generally cannot obtain adjustment under INA section 245(a).  Rather, the alien must generally seek adjustment under INA section 245(i).  But this relief is not available to an alien who did not have a petition or labor certification filed before April 30, 2001.  Thus, even if the Form I-130 can now be approved as a Form I-360, the alien may need to leave the United States to obtain an immigrant visa.  But since, under this guidance memorandum, the alien will be deemed *not* to have accrued any unlawful presence, he or she will not be inadmissible under INA section 212(a)(9)(B)(i).

Again, these special provisions relating to the accrual of unlawful presence apply only to an alien who is the beneficiary of a spousal immediate relative Form I-130 that was pending on October

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 8

28, 2009, and that is now approved under section 568(c)(2)(A) of the FY2010 DHS
Appropriations Act and 8 C.F.R. § 204.2(i)(1)(iv) as a widow(er)'s Form I-360:  the widow(er)
and his or her accompanying child(ren).  Ordinarily, the pendency of a visa petition, itself, does
not prevent accrual of unlawful presence.  A pending adjustment application, by contrast, does
prevent accrual of unlawful presence.  *Adjudicator's Field Manual* chapter 40.9(b)(3)(A).  Most
aliens who have been in litigation because the death of a spouse led to denial of the Form I-130
are probably already protected from unlawful presence under the ordinary provisions in the
AFM.  This broader protection against unlawful presence, for this narrow class of cases, is
designed to maximize the ability of those aliens whose specific situations gave rise to the new
legislation to fully benefit from it.

> b. Consent to reapply for admission after removal

These protections against accrual of unlawful presence apply even if the alien was actually
removed from the United States under a removal order.  Still, because the alien was removed
under a valid order, the alien is inadmissible under INA section 212(a)(9)(A)(i) or (ii).  USCIS,
however, has discretion under section 212(a)(9)(A)(iii) to consent to the alien's re-application for
admission.  USCIS should generally exercise discretion favorably and grant an application for
consent to reapply under section 212(a)(9)(A)(iii), if:

- The Form I-130 that had been filed by the alien's spouse has now been approved as a
  Form I-360 under section 568(c) of the FY2010 DHS Appropriations Act;

- The alien is otherwise admissible, and

- The alien's case does not present significant adverse factors beyond the removal itself.

A USCIS adjudicator will not deny a Form I-212 filed by an alien whose case was in litigation
on October 28, 2009, and whose Form I-130 has been approved as a Form I-360 under section
568(c)(2)(A) of the FY2010 DHS Appropriations Act without consulting USCIS Headquarters
through appropriate channels.

> *5. Remarriage*

Any immediate relative Form I-130 that was filed on behalf of the spouse of a U.S. citizen, and
that was pending on October 28, 2009, is no longer a spousal immediate relative Form I-130.
By operation of 8 C.F.R. § 204.2(i)(1)(iv), what was filed as a spousal immediate relative Form
I-130 is now a widow(er)'s Form I-360.  The converted Form I-360 may be approved only if the
beneficiary, who is now also deemed to be the petitioner, qualifies as the widow(er) of a citizen,
as described in INA section 201(b)(2)(A)(i).  Eligibility for classification as an immediate
relative continues "only until the date the spouse remarries."

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 9

### 6. *Ninth Circuit cases*

In acting on the guidance in this memorandum, USCIS adjudicators must keep in mind that the *Hootkins* case was certified as a class action.  Thus, an individual need not be a *named* Plaintiff in *Hootkins* in order for his or her Form I-130 and Form I-485 to be reopened under this memorandum.  If an individual has not already been identified as a member of the *Hootkins* class, that individual may make a written request to have his or her Form I-130 and Form I-485 reopened and readjudicated.  The purpose of the written request is simply to *identify* the case as a *Hootkins* case.  The individual is not required to pay the filing fee for a motion to reopen.  The case will be considered a *Hootkins* class member case if the case was denied on or after August 30, 2001,[1] and:

- either the citizen spouse petitioner or the alien spouse beneficiary lived in the Ninth Circuit when the citizen spouse died; or

- a USCIS office in the Ninth Circuit made the prior decision on the Form I-130 or Form I-485.

### B.  Widow(er)s without pending cases

The alien widow(er) of a citizen who died before October 28, 2009, but who did not have a Form I-130 pending on that date, may now file a Form I-360, provided that he or she does so no later than October 28, 2011, and has not remarried.  FY2010 DHS Appropriations Act § 568(c)(2)(B). Section 568(c)(2)(B) applies if the citizen spouse did not file a Form I-130 on the alien spouse's behalf before dying.  But it also applies if there was a Form I-130 filed, but the decision denying the Form I-130 had become administratively final before October 28, 2009, because the decision was not the subject of any type of administrative or judicial review that was pending on October 28, 2009.  Note that section 568(c)(2)(B)(i) says the Form I-360 must be filed "not later than the date that is 2 years after the date of the enactment."  Thus, a Form I-360 that is filed *on* October 28, 2011, will still be timely.  A Form I-360 filed on or after October 29, 2011, will be untimely.

For any case in which a citizen dies on or after October 28, 2009, the alien widow(er) must file the Form I-360 within 2 years of the citizen's death.

### C.        Children of widow(er)s

The child of a widow(er) whose Form I-360 is approved may, as specified in the second sentence of INA section 201(b)(2)(A)(i) and in INA section 204(a)(1)(A)(ii), be included in the widow(er)'s petition.  Whether an individual qualifies as the widow(er)'s "child" is determined according to INA sections 101(b)(1) and 201(f).

---

[1] Any case denied before August 30, 2001, is time-barred under 28 U.S.C. § 2401(a).  But even if a Ninth Circuit case is not considered "pending" because of *Hootkins*, the alien may still be eligible to immigrate as the widow(er) of a citizen, if the alien has not remarried and files the Form I-360 no later than October 28, 2011.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 10

In a case in which the deceased citizen had filed a Form I-130 for his or her spouse, and the
Form I-130 can now be adjudicated as a Form I-360 widow(er)'s petition, the child(ren) of the
widow(er) will be deemed to be included in the converted Form I-360.  Thus, it will not be
necessary to act on any separate Form(s) I-130 that the deceased citizen may have filed for the
widow(er)'s children.  And the child(ren) of the widow(er) will be deemed included in the
converted Form I-360 even if the deceased citizen had not filed any Form(s) I-130 for the
child(ren).

Note that, in light of INA section 201(f), whether an individual qualifies as the "child" of a
widow(er) depends on the individual's age when the visa petition was filed.  For those cases that
were pending on October 28, 2009, the Form I-360 filing date is deemed to be the date on which
the deceased citizen filed the prior Form I-130.  If a widow(er) has an unmarried son or daughter
who was under 21 when the deceased citizen filed the Form I-130, that individual will still be
deemed to be under 21 for purposes of the widow(er)'s now-converted Form I-360.

### D.  Affidavits of support

Under section 212(a)(4)(C)(i)(I) of the INA, a Form I-864 (Affidavit of Support under Section
213A of the Act) is *not* required in the case of the widow(er) of a citizen and the widow(er)'s
accompanying children.[2]

### E.  Conversion of deferred action applications filed under prior guidance

While remedial legislation was pending in Congress, the Secretary of Homeland Security
directed the use of deferred action relief to allow widow(er)s of citizen whose cases may have
been affected by the legislation to remain in the United States.  In the September 4, 2009
Memorandum, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their
Children," USCIS designated the Form I-360 as the form an individual would use to request
deferred action under the Secretary's policy.

Now that Congress has enacted the legislation, any Form I-360 that had been filed to obtain
deferred action relief, and that has not yet been adjudicated as a deferred action request, will now
be considered to be, and adjudicated as, a widow(er)'s visa petition under 8 C.F.R. § 204.2(b).  If
the Form I-360 has already been approved as a deferred action request, it will be reopened and
adjudicated as a visa petition under 8 C.F.R. § 204.2(b).  It is not necessary for the alien to file a
formal motion, nor to pay a new Form I-360 filing fee.  Additionally, any prior grant of deferred
action relief need not be rescinded and should remain undisturbed.

---

[2] There may be an individual case in which, regardless of the Form I-864 issue, the factors specified in INA section
212(a)(4)(B) and the standard public charge guidance, as published at 64 Fed. Reg. 28689 (1999), will support a
finding that a widow(er) is inadmissible as an alien likely to become a public charge.  Even in this case, a Form I-
864 is not required.  Rather, since the statute does not specifically require the Form I-864, the Form I-134 can be
used instead.  8 C.F.R. § 213a.5.  It is important to note that, on a Form I-134, the sponsor does not have to meet the
requirements in INA section 213A(f), and so does *not* need to be someone who could have been a "substitute
sponsor" in a case in which a Form I-864 actually is required.

SUBJECT: Additional Guidance Regarding Surviving Spouses of
Deceased U.S. Citizens and their Children (FY2010 DHS Appropriations Act)
AFM Update 10-09
Page 11

Under the deferred action guidance, an alien could file a Form I-765, application for employment
authorization, only if the deferred action request had been granted.  Now that a Form I-360 that was filed
to request deferred action is deemed to be a widow(er)'s visa petition, the alien can, if otherwise eligible,
file a Form I-485 even before the approval of the Form I-360.  8 C.F.R § 245.2(a)(2)(i)(B).  Filing the
Form I-485 permits the alien to file a Form I-765.  8 C.F.R. § 274a.12(c)(9).


### F.  Implementation

Section 568(c) of the FY2010 DHS Appropriations Act became effective on October 28, 2009,
the date of enactment.  USCIS offices and centers, therefore, are to begin implementing the
instructions established in this memorandum immediately.  USCIS adjudicators should note that
Congress clearly intended to benefit the aliens affected by these provisions.

***AFM* Transmittal Memorandum Revisions.  The *AFM* Transmittal Memorandum button is
revised by adding a new entry, in numerical order, to read:**

| AD 10-09 [Date of Signature] | **Chapter 21.2** | This memorandum removes chapter 21.2(a)(4) and the **Note** at the end of chapter 21.2(h)(1)(C) to reflect enactment of section 568(c) of Public Law 111-83. |
|---|---|---|


### H.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations
through appropriate channels.  For cases adjudicated overseas, questions should be directed to
the International Operations Division, Programs Branch.

This memorandum is not intended to, and does not, create any right or benefit, substantive or
procedural, enforceable at law or in equity, by any party against the United States, its
departments, agencies or entities, its officers, employees, or agents, or any other person.

**Distribution**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

**Appendix 21-8 Memorandum – Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and Their Dependents [Appendix added 09-22-2009] has been partially superseded by USCIS Policy Manual, Volume 6: Immigrants as of December 12, 2023**

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations*
Washington, DC  20529-2110



**U.S. Citizenship
and Immigration
Services**

SEP 2 2 2009

HQ 70/6.1.8
HQ 70/6.1.1
AD 09-47

Memorandum

TO:        Service Center Directors

FROM:    Barbara Velarde
            Chief, Service Center Operations

SUBJECT:  Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for
            Petitioning Military Members and their Dependents

            Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and
            Appendix 21-7 (AFM Update AD09-47)

**1. Purpose**

This memorandum provides policy guidance to service centers adjudicating a standalone Form I-
130, *Petition for Alien Relative*,[1] or jointly filed Form I-751, *Petition to Remove Conditions on
Residence*,[2] filed by a military member on behalf of his or her alien spouse or child.  For purposes of
this memo, military member is defined as any United States citizen (USC) or lawful permanent
resident (LPR) active duty member of any branch of the U.S. Armed Forces who is currently
deployed.[3]  This includes activated reservists and mobilized National Guardsmen.

The guidance in this memorandum supersedes the Memorandum: *Guidance on the Processing of
Form I-751, Petition to Remove Conditions on Residence, Filed by Conditional Permanent Residents
Overseas on Official Military or Government Orders,* dated June 2, 2006.

**2. Background**

When a petitioner files a standalone Form I-130 or jointly filed Form I-751, he or she must provide
specific information to establish the bona fides of the relationship between the petitioner and his or
her spouse or child.  When a military member is the petitioner, service center Immigration Service
Officers (ISOs) may use this guidance to determine what types of specific documents military

---

[1] Standalone I-130s do not include I-130s filed concurrently with Form I-485, *Application to Register Permanent
Residence or to Adjust Status.*
[2] This memorandum only applies to Form I-130 or Form I-751 filed by a military member.  It does not restrict nor
expand the interview waiver criteria for other petitioners.
[3] This includes, but is not limited to, Permanent Change of Station (PCS) orders or Deployment Orders issued to the
military member for a permanent tour of duty.

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

members may be able to provide to establish bona fides of the marriage.  This guidance will also enable service centers to adjudicate most cases involving military members without having to relocate them to a field office for interview.

## 3. Guidance

### Evidence pertaining to military members

USCIS service centers reviewing a standalone Form I-130 or jointly filed Form I-751 will evaluate every properly filed petition in chronological order by the receipt date.

The ISO will review the file for the following:

- Evidence that the petition involves an active duty military member;

- Evidence establishing that the active duty military member is deployed;

- Evidence of the claimed relationship:

    o If the military member is filing the petition on behalf of an alien spouse, evidence establishing a bona fide marriage between the alien and the military member; and

    o If the military member is filing the petition on behalf of an alien child, evidence establishing a parent-child relationship between the child and the military member.

Military-specific evidence can be deemed as strong evidence towards the bona fides of the marriage.. Such evidence may include but is not limited to the following.

- All pages of the service member's Form DD-1172, "Application for Uniformed Services Identification Card DEERS Enrollment," naming dependents

- Dependent's Military Identification and Privilege Card

- Form DD-1278, "Certificate of Overseas Assignment to Support Application to File Petition for Naturalization"

- Copy of Permanent Change of Station (PCS) orders issued to the service member for permanent tour of duty overseas that specifically name the spouse or child

- Designation of the beneficiary on the military members' Group Life Insurance (SGLI) policy

- Evidence of a Family Service Members' Group Life Insurance (FSGLI) policy

- Evidence of the military member's health insurance policy on behalf of dependent

2

003521

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military
Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7
(AFM Update AD09-47)

- Documentation showing that the spouse and/or child resides in military base/post housing

- Powers of Attorney life insurance designation (general or specific)

- Military TRICARE medical ID card for usage of military medical facilities

- Leave and Earnings Statement showing: Family Separation Allowance or allotments to dependents

- Living will and/or last will and testament

- Pre-authorization for emergency financial assistance

- A copy of the service member's Record of Emergency Data

**<u>Adjudicative actions for I-130 and I-751 petitions filed by military members</u>**

If the I-130 or I-751[4] petition is approvable, the ISO will approve the petition and follow the normal
post-adjudication process.

If the ISO cannot approve the petition, and the petition cannot be statutorily denied (for example,
because it was based on a non-qualifying relationship), the ISO will send the military member a
Request for Evidence (RFE).  The ISO will do the following:

(a) Issue the RFE to the military member's last known (physical or APO/FPO) address.

(b) If the service center receives a response to the RFE, the ISO will continue the adjudication process.

(c) If there is no response to the RFE within the appropriate RFE response period (12 weeks), or the RFE is returned as undeliverable, the ISO will place the petition on hold for up to 18 months.

(d) If 18 months have passed since the service center placed the case on hold, the ISO will deny the petition if the petitioner is no longer in the military; otherwise, the ISO will administratively close the petition. Upon request, the petitioner may, at any time, request to reopen/reactivate the petition at no charge to the petitioner.

---

[4] If there is evidence that a conditional permanent resident (CPR) spouse or child has filed an N-400 application, the ISO
will not adjudicate any I-751 filed to remove the conditions on that spouse's or child's status.  Instead, the ISO will
transfer the I-751, and the N-400 if accompanying the I-751, to the appropriate field office for adjudication.  For
additional guidance, please refer to the memorandum, *<u>Conditional Permanent Residents and Naturalization under
Section 319(b) of the Act Revisions to Adjudicator's Field Manual (AFM), Chapters 25 (AFM Update AD09-28)</u>*, dated
August 4, 2009.  See also AFM chapter 25.1 (k)(2)(d).  If there is no N-400 application, the ISO will proceed with
adjudication of the I-751 petition.

003522

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

If the service center receives a response from the petitioner, the ISO will do the following:

a) If the petition is approvable, the ISO will approve the petition and continue with the normal post-adjudication process.

b) If the evidence submitted is insufficient to support approval, the ISO will place the petition on an overseas hold until the military member returns to the U.S.

c) If the military member notifies USCIS of his or her return,[5] the ISO will take the case off hold and relocate it to the appropriate field office.  See AFM chapter 21.2 (b)(1).

d) If 18 months have passed since the service center placed the case on overseas hold, and the military member has not notified USCIS of return to the U.S., the ISO will administratively close the petition.  The ISO must notify the petitioner that the case is being administratively closed because USCIS must conduct an interview to proceed with a decision.  The notice should advise the petitioner that he or she may, at any time after returning to the U.S., request to reopen/reactivate the petition at no charge to the petitioner.

**4. Adjudicator's Field Manual Update:**

**The AFM is revised to add Chapters 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7.**

## 21.2 Factors Common to the Adjudication of All Relative Visa Petitions.

\*   \*   \*

(b) Adjudicative Procedures.

\*   \*   \*

   (1) Review of the Petition.

\*   \*   \*

     (C)  Discretionary Procedures for Petitioning Military Members and Their Dependents. [Chapter added on (date memo signed)]

When adjudicating a standalone Form I-130 filed by a military member on behalf of his or her alien spouse or child, service center ISOs must follow the steps below:

- Review every properly filed petition in chronological order by the receipt date;

---

[5] Notification of return may occur via an AR-11 change of address or direct correspondence.

4

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military
Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7
(AFM Update AD09-47)

- Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE);

> **Note**
> The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents.  See Appendix 21-7;*

- Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved.  See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents.  See Appendix 21-7;*

The detailed steps that the ISO must follow are listed in Appendix 21-7

## 25.1  Immigration Marriage Fraud Amendments of 1986.

\*   \*   \*

### (c)  Filing of Removal of Conditions.

\*   \*   \*

#### (3)  Discretionary Procedures for Petitioning Military Members and Their Dependents.  [Chapter added on (date memo signed)]

When adjudicating a Form I-751 filed by a military member on behalf of his or her alien spouse or child, service center ISOs must follow the steps below:

- Review every properly filed petition in chronological order by the receipt date;

- Determine whether the petition involves an active duty military member (by checking the file for military orders) before issuing a request for evidence (RFE);

> **Note**
> The evidence necessary for the issuance of an RFE in this situation includes but is not limited to the list of documents listed in the memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents.  See Appendix 21-7;*

003524

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

- Review the evidence submitted to determine the nature of the member's deployment; the claimed bona fides of the marriage and relationship to any children involved.  See memo entitled *Standalone Form I-130 and Jointly Filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents.  See Appendix 21-7*;

| If | And the ISO believes | Then |
|---|---|---|
| The evidence to support the standalone I-130 is received and all items provided are sufficient | that the I-130 petition is approvable | the ISO will approve standalone Form I-130 and continue the normal post adjudication process |
| The evidence to support the I-751 is received and all items provided are sufficient | that the I-751 petition is approvable | the ISO will approved the Form I-751 and continue the normal post adjudication process.  If there are any interfiled or concurrently filed N-400 applications, the ISO must refer to the 319(b) memorandum for further guidance. |

6

003525

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

**Appendix 21-7    Form I-130 and Form I-751 Adjudication Steps for USCIS Service Center Immigration Services Officers (ISOs)   Appendix added [date memo signed]; AD09-47]**

| If | Then |
|---|---|
| The ISO cannot approve the petition and the petition cannot be statutorily denied (e.g., the petition is based on a non-qualifying relationship) | The ISO will send the military member an RFE for additional documentation to establish claimed relationships or to address other deficiencies to the military member's last known (physical or APO/FPO) address. |
| The service center receives a response to the RFE | The ISO will continue the adjudication and post adjudication  processes. |
| The RFE response is still insufficient the ISO will | The ISO will place  the petition on an overseas hold until the military member returns to the U.S. |
| There is no response to the RFE within the appropriate RFE response period (12 weeks) | The ISO will place the petition on hold for up to 18 months. |
| The response to the RFE is returned as undeliverable the ISO will | The ISO will place the petition on hold for up to 18 months. |
| Eighteen (18) months have passed since the service center placed the petition on hold | The ISO will either:<br><br>(a) deny the petition if the petitioner is no longer in the military<br><br>Or<br><br>(b)  administratively close the petition if the petitioner is still in the military. |
| The petition is denied | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |
| The petition is administratively close | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |

003526

Standalone Form I-130 and Jointly filed Form I-751: Discretionary Procedures for Petitioning Military Members and their Dependents
Additions to *Adjudicator's Field Manual*, Chapter 21.2(b)(1)(C) and 25.1(c)(3) and Appendix 21-7 (AFM Update AD09-47)

**4. *AFM* Transmittal Memoranda Revisions.**   The *AFM* Transmittal Memoranda button is revised by adding new entry, in numerical order, to read:

| AD09-47 [dated memo signed] | Chapters:<br>• **21.2(b)(1)(C)(2)**<br>• **25.1(c)(3)**<br>**Appendix 21-7** | The AFM is updated to add Chapter 21.2(b)(1)(C) and Appendix 21-7.  The chapter and appendix set forth adjudicative procedure that Immigration Services Officers must follow when adjudicating standalone Forms I-130.<br><br>The AFM is updated to add Chapter 25.1(c )(3), "Discretionary Procedures for Military Members and their Dependents. |
|---|---|---|

**5. Use**

This memorandum is intended solely for the training and guidance of USCIS personnel in performing their duties relative to the adjudication of applications.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**6. Contact Information**

Questions regarding the operational guidance in this memorandum may be directed through appropriate channels to Felicia Cameron, Program Manager in Service Center Operations Division or Heather Evelyn, Program Manager in Service Center Operations Division.

003527

Department of Homeland Security
U.S. Citizenship and Immigration Services

**G-1056, USCIS
Internal Clearance Routing Sheet**

| | | | |
|---|---|---|---|
| **Originating Office:** | Office of Service Center Operations | **Originating Official:** | Bryan Christian |
| **Contact Officer:** | Felicia Cameron | **Contact Number:** | 202-272-8169 |
| **Date:** | 08/04/2009 | **Suspense Date:** | 08/12/2009 |
| **Subject:** | Military Members on the MFAS Terminate Report | | |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

•This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

**FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):**

☐ Unrestricted Dissemination     ☒ Internal Dissemination Only     ☐ Restricted Dissemination- explanation attached
  ☐ Press needed     ☒ Leadership Alert
  ☐ USCIS.gov posting     ☒ USCIS Daily News
  ☐ All outlets     ☒ Intranet Posting
*All web publishing requires completion of Form G-1019*

**ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):**

| USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | X | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | | | | Regulatory Management Division | | | |
| | | | | | | | | | | | |

Reviewer Signature (or Designate) _[signature]_ assoc. Coune / Date: 09/13/09
                                   aLD
Office: _Office of the Chief Counsel_

Check one:

☐ Concur          ☐ Concur w/edits          ☐ Non-Concur (attach explanation)

    ☐ *If notes are attached, check this box*

**OFFICE OF THE DIRECTOR**

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

Department of Homeland Security
U.S. Citizenship and Immigration Services

**G-1056, USCIS**
**Internal Clearance Routing Sheet**

| | |
|---|---|
| **Originating Office:** Office of Service Center Operations | **Originating Official:** Bryan Christian |
| **Contact Officer:** Felicia Cameron | **Contact Number:** 202-272-8169 |
| **Date:** 08/04/2009 | **Suspense Date:** 08/12/2009 |
| **Subject:** Military Members on the MFAS Terminate Report | |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

•This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

**FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):**

- [ ] **Unrestricted Dissemination**
  - [ ] Press needed
  - [ ] USCIS.gov posting
  - [ ] All outlets
  - *All web publishing requires completion of Form G-1019*
- [x] **Internal Dissemination Only**
  - [x] Leadership Alert
  - [x] USCIS Daily News
  - [x] Intranet Posting
- [ ] **Restricted Dissemination- explanation attached**

**ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):**

| USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A | USCIS Office | CNC | FYI | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | × | | | Regulatory Management Division | | | |

Reviewer Signature (or Designate) *Gary Nowick for J Buege*        Date: 9 Sept 2009

Office: DOMO / OFO

Check one:
- [x] Concur          [ ] Concur w/edits          [ ] Non-Concur (attach explanation)
- [ ] *If notes are attached, check this box*

**OFFICE OF THE DIRECTOR**

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

003529

Department of Homeland Security
U.S. Citizenship and Immigration Services

**G-1056, USCIS**
**Internal Clearance Routing Sheet**

| | |
|---|---|
| **Originating Office:** | Office of Service Center Operations |
| **Contact Officer:** | Felicia Cameron |
| **Date:** | 08/04/2009 |
| **Subject:** | Military Members on the MFAS Terminate Report |

| | |
|---|---|
| **Originating Official:** | Bryan Christian |
| **Contact Number:** | 202-272-8169 |
| **Suspense Date:** | 08/12/2009 |

**EXECUTIVE SUMMARY:**

This memorandum provides guidance to the Service Centers on how to handle military I-751 cases:

• This memorandum provides policy guidance to Service Centers when requesting military-specific documentation through the issuance of a Request for Evidence (RFE) for certain deployed United States citizen (USC) or lawful permanent resident (LPR) military members filing Form I-130, Petition for Alien Relative, and filing Form I-751, Petition to Remove Conditions on Residence.

**FINAL PUBLICATION AND DISSEMINATION (CHECK APPROPRIATE BOX):**

| | | |
|---|---|---|
| ☐ Unrestricted Dissemination | ☒ Internal Dissemination Only | ☐ Restricted Dissemination- explanation attached |
| ☐ Press needed | ☒ Leadership Alert | |
| ☐ USCIS.gov posting | ☒ USCIS Daily News | |
| ☐ All outlets | ☒ Intranet Posting | |
| *All web publishing requires completion of Form G-1019* | | |

**ROUTING AND CLEARANCE (CHECK ONE BOX FOR EACH OFFICE):**

| USCIS Office | C/NC | F/I | N/A | USCIS Office | C/NC | F/I | N/A | USCIS Office | C/NC | F/I | N/A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administration | | | | Communication | | | | Ombudsman Liaison | | | |
| Administrative Appeals | | | | Congressional Relations | | | | Policy & Strategy | | | |
| Chief Financial Officer | | | | Domestic Operations | | | | Refugee, Asylum, International | | | |
| Chief Counsel | | | | Human Capital | | | | Security | | | |
| Chief Information Officer | | | | National Security and Records Verification | | | | Transformation | | | |
| Citizenship | | | | Field Operations | | | | Regulatory Management Division | | | |
| | | | | Service Center Operations | × | | | | | | |

**Reviewer Signature (or Designate)** _____     **Date:** _____

**Office:** _____

**Check one:**

☐ Concur          ☐ Concur w/edits                    ☐ Non-Concur (attach explanation)

☐ *If notes are attached, check this box*

**OFFICE OF THE DIRECTOR**

| Office | Signature | Action | | | Date |
|---|---|---|---|---|---|
| | | C | NC | N/A | |
| Executive Secretariat | | | | | |
| Chief of Staff | | | | | |
| Deputy Director | | | | | |
| Director | | | | | |

Form G-1056 (Rev. 06/08/06)

003530

**Appendix 21-9 Form I-130 and Form I-751 Adjudication Steps for USCIS Service Center Immigration Services Officers (ISOs) [Appendix added 09-22-2009]**

| If | Then |
|---|---|
| The ISO cannot approve the petition and the petition cannot be statutorily denied, e.g., the petition is based on a non-qualifying relationship | The ISO will send the military member an RFE for additional documentation to establish claimed relationships or to address other deficiencies to the military member's last known (physical or APO/FPO) address. |
| The Service Center receives a response to the RFE | The ISO will continue the adjudication and post adjudication processes. |
| The RFE response is still insufficient the ISO will | The ISO will place the petition on an overseas hold until the military member returns to the country-regionplaceU.S. |
| There is no response to the RFE within the appropriate RFE response period (12 weeks) | The ISO will place the petition on hold for up to 18 months. |
| The response to the RFE is returned as undeliverable the ISO will | The ISO will place the petition on hold for up to 18 months. |
| Eighteen (18) months have passed since the Service Center placed the petition on hold | The ISO will either: (a) Deny the petition if the petitioner is no longer in the military Or (b) Administratively close the petition if the petitioner is still in the military. |
| The petition is denied | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |
| The petition is administratively closed | The ISO will reopen and/or reactive the petition upon the petitioner's request (at anytime and at no charge to the petitioner). |

**Appendix 21-10 Memorandum – Processing N–400s Filed Under INA 328 and 329 When Applicant Fails to Responds to a Request for Evidence has been superseded by USCIS Policy Manual, Volume 12: Citizenship and Naturalization as of January 22, 2013.**

## Appendix: Eligibility for Public Benefits

If the applicant provide evidence from a federal, state, local, or tribal agency administering a public benefit, as defined in 8 CFR 212.21(b), specifically showing that the applicant does not qualify or would not qualify for such public benefit by virtue of, for instance, the applicant's annual gross household income or prospective immigration status or length of stay, consider assigning greater positive weight.

*Qualified Aliens*

Generally, under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), "qualified aliens" are eligible for federal means-tested benefits after 5 years, are not eligible for "specified federal programs," and states are allowed to determine whether the qualified alien is eligible for "designated federal programs."[1] The following table provides a list of immigration categories that are qualified aliens under PRWORA.[2]

**Qualified Aliens under PRWORA**

| Category | Subject to Public Charge Inadmissibility under 212(a)(4)? |
| --- | --- |
| An alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act (INA) | Generally no,[3] however, a lawful permanent resident is subject to public charge inadmissibility under INA 212(a)(4) if one of the situations in INA 101(a)(13)(C) applies |
| An alien who is granted asylum under INA 208 | No |
| A refugee who is admitted to the United States under INA 207 | No |
| An alien who is paroled into the United States under INA 212(d)(5) for a period of at least 1 year[4] | Yes[5] |

---

[1] See Title IV of Pub. L. 104-193, 110 Stat. 2105, 2260-77 (Aug 22, 1996).

[2] See Section 431 of Pub. L. 104-193, 110 Stat. 2105, 2274 (Aug. 22, 1996) (codified at 8 U.S.C. 1641). See Section 107(b)(1) of the Trafficking Victims Protection Act of 2000, 22 U.S.C. 7105(b)(1).

[3] Lawful permanent residents seeking entry into the United States typically are not applicants for admission, and therefore, generally are not subject to INA 212(a), including INA 212(a)(4), but lawful permanent residents described in INA 101(a)(13)(C), are regarded as seeking admission and generally are subject to inadmissibility grounds.

[4] Parole is not a category of admission. See INA 101(a)(13)(B). See INA 212(d)(5).

[5] While an alien paroled into the United States is not subject to an admission determination at the time the decision to parole the alien is made, if an alien who has been paroled into the United States is applying for an immigration benefit for which admissibility is required, for example, adjustment of status, the parolee will be subject to INA 212(a)(4) in the context of seeking the subsequent immigration benefit.

003533

Appendix: Eligibility for Public Benefits

**Qualified Aliens under PRWORA**

| Category | Subject to Public Charge Inadmissibility under 212(a)(4)? |
|---|---|
| An alien whose deportation is being withheld under INA 243(h)[6] or INA 241(b)(3), as amended | No |
| An alien who is granted conditional entry under INA 203(a)(7) (as in effect before April 1, 1980) | No |
| An alien who is a Cuban and Haitian entrant as defined in Section 501(e) of the Refugee Education Assistance Act of 1980, Pub. L. 96-422, 94 Stat. 1809, 1810 (October 10, 1980) | No |

The Trafficking Victims Protection Act of 2000 further provided that an alien who is a victim of a severe form of trafficking in persons, or an alien classified as a nonimmigrant[7] is eligible for benefits and services under any federal or state program or activity funded or administered by any official or agency.[8] These aliens are generally exempt from the public charge inadmissibility ground.[9]

*Federal Public Benefits Designations*

With certain exceptions, aliens who were not "qualified aliens," including nonimmigrants and unauthorized aliens, were generally barred from obtaining federal benefits.[10] In addition to the federal public benefits definitions, PRWORA categorizes the benefits into the following categories:

- Specified federal programs;

- Designated federal programs; and

- Federal means-tested benefits.

The following tables provide a summary of the definition of federal public benefit and the three categories of public benefits under PRWORA as applicable to aliens and qualified aliens.

---

[6] As in effect immediately before the effective date of Section 307 of Division C of Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996).

[7] See INA 101(a)(15)(T)(ii).

[8] See Section 107(b)(1) of the Trafficking Victims Protection Act of 2000, 22 U.S.C. 7105(b)(1).

[9] However, while lawful permanent residents seeking entry into the United States typically are not applicants for admission, and therefore, generally are not subject to INA 212(a) (including INA 212(a)(4)), a lawful permanent resident described in INA 101(a)(13)(C) is regarded as seeking admission and is subject to INA 212(a)(4).

[10] See Section 401(a) of PRWORA, Pub. L. 104-193, 110 Stat. 2105, 2261 (codified at 8 U.S.C. 1611(a)).

003534

Appendix: Eligibility for Public Benefits

### PRWORA Public Benefits Summary

| Federal Public Benefit | |
|---|---|
| **Definition** 8 U.S.C. 1611(c)(1) and (c)(2) | 8 U.S.C. 1611(c)(1) <br><br> • Any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and <br><br> • Any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to a person, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States. <br><br> 8 U.S.C. 1611(c)(1) and (c)(2) <br><br> The definition of federal public benefit does not include the following: <br><br> • Any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States or to a citizen of a freely associated state;[11] <br> • Benefits where there is a reciprocal treaty agreement for payment with another country for nonimmigrant aliens authorized to work or aliens admitted as lawful permanent residents; or <br> • Professional license issued to or renewed by a foreign national not physically present in the United States. |
| **Exceptions from the definition** 8 U.S.C. 1611(b) | • Medical assistance for emergency medical condition.[12] <br> • Short-term, non-cash, in-kind emergency disaster relief. <br> • Public health assistance for immunizations for immunizable diseases and for testing and treatment of symptoms of communicable diseases. <br> • Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) as specified by the Attorney General, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.[13] |

---

[11] If Section 141 of the applicable compact of free association approved in Public Law 99-239 or 99-658 (or a successor provision) is in effect.

[12] See 42 U.S.C. 1396(v)(3).

[13] See 66 FR 3613 (Jan. 16, 2001). See 61 FR 45985 (Aug. 30, 1996).

003535

Appendix: Eligibility for Public Benefits

**PRWORA Public Benefits Summary**

| Federal Public Benefit | |
|---|---|
| | • Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under Title V of the Housing Act of 1949 or any assistance under Section 1926c of Title 7 which the alien is receiving since before August 22, 1996.<br>• Any benefit payable under Title II of the Social Security Act[14] to an alien who is lawfully present[15] in the United States, any benefit if nonpayment of such benefit would contravene an international agreement described in Section 233 of the Social Security Act,[16] any benefit if nonpayment would be contrary to Section 202(t) of the Social Security Act,[17] or any benefit payable under Title II of the Social Security Act to which entitlement is based on an application filed in or before August 1996.<br>• Any benefit[18] relating to the Medicare program to an alien who is lawfully present in the United States[19] with respect to benefits payable under part A of such title,[20] who was authorized to be employed with respect to wages attributable to such benefits.<br>• Any benefit payable under the Railroad Retirement Act of 1974[21] or the Railroad Unemployment Insurance Act[22] to an alien who is lawfully present in the United States or to an alien residing outside the United States.<br>• Receipt of benefits on or before August 22, 1996 (including SSI and SNAP (Food Stamps)). |
| **Categories of Aliens Eligible** 8 U.S.C. 1611(a) | • Qualified aliens |
| **Categories of Aliens Not Eligible** 8 U.S.C. 1611(a) | • Aliens not listed as qualified aliens |

---

[14] See 42 U.S.C. 401-434.
[15] See 8 CFR 1.3(a).
[16] 42 U.S.C. 433.
[17] 42 U.S.C. 402(t).
[18] Benefits payable under Title XVIII of the Social Security Act. See 42 U.S.C. 1395-1395*lll*.
[19] See 8 CFR 1.3(a).
[20] See 42 U.S.C. 1395c to 1395i-5.
[21] See 45 U.S.C. 231-231v.
[22] See 45 U.S.C. 351-369.

003536

**Appendix: Eligibility for Public Benefits**

**PRWORA Public Benefits Summary**

| Specified Federal Program | |
|---|---|
| **Definition** 8 U.S.C 1612(a)(3) | <ul><li>SSI[23]</li><li>SNAP (Food Stamps)[24]</li></ul> |
| **Exemption** | <ul><li>Qualified aliens eligible after 5 years</li></ul> Certain grandfathering provision for aliens already receiving SSI[25] and SNAP[26]<br><br>SNAP (Food-Stamps) specific exemptions:<br><br><ul><li>Children under 18.[27]</li><li>SNAP (Food Stamps) by aliens who were lawfully residing in the United States on August 22, 1996 and were over the age of 65.</li><li>SNAP (Food Stamps) Hmong and Highland Laotians tribe members who are lawfully residing in the United States and were members of a Hmong or Highland Laotian tribe at the time that the tribe rendered assistance to U.S. personnel by taking part in a military or rescue operation during the Vietnam era,[28] and the spouse, unmarried dependent child, or un-remarried surviving spouse of such persons.</li></ul> |
| **Categories of Aliens Eligible** | <ul><li>Lawful permanent residents with 40 Social Security quarters[29]</li><li>Veterans and active duty military with honorable service lawfully residing in the United States, and their spouses and unmarried dependent children[30]</li><li>American Indians born in Canada[31] or who are members of an Indian tribe[32]</li><li>Aliens who were receiving SSI on August 22, 1996[33]</li><li>Aliens who were lawfully residing in the United States on August 22, 1996 and blind or disabled[34]</li></ul> |

---

[23] See 42 U.S.C. 1381-1383f.
[24] See Food Stamp Act of 1977.
[25] In addition, there are certain extensions for SSI benefits through fiscal year 2011. See 8 U.S.C. 1612(a)(2)(M).
[26] See 8 U.S.C. 1612(a)(2)(D).
[27] See 8 U.S.C. 1612(a)(2)(J).
[28] As defined in 38 U.S.C. 101.
[29] See 8 U.S.C. 1612(a)(2)(B).
[30] See 8 U.S.C. 1612(a)(2)(C).
[31] See 8 U.S.C. 1612(a)(2)(G). See INA 289.
[32] See 8 U.S.C. 1612(a)(2)(G). See 25 U.S.C 5304(e) (defining Indian tribe).
[33] See 8 U.S.C. 1612(a)(2)(E).
[34] See 8 U.S.C. 1612(a)(2)(F).

003537

### Appendix: Eligibility for Public Benefits

### PRWORA Public Benefits Summary

| Specified Federal Program | |
|---|---|
| | The following categories are eligible for benefits within the first 7 years:[35]<br>• Refugee from the time of admission and asylee from the time status was granted;<br>• Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253[36] or section 241(b)(3) of such Act, as amended;[37]<br>• Cuban and Haitians entrant from the time the status was granted;[38] and Amerasians[39] |
| Categories of Aliens Not Eligible | • Qualified aliens and all other aliens |

### PRWORA Public Benefits Summary

| Designated Federal Programs[40] | |
|---|---|
| Definition<br>8 U.S.C. 1612(b) | • TANF[41]<br>• Social Services Block Grant[42]<br>• Medicaid[43] |
| Categories of Aliens Eligible | States are authorized to determine the eligibility of an alien who is a qualified alien (as defined in 8 U.S.C. 1641) for any designated federal program.<br><br>The following categories are eligible for designated federal programs without a time limit: |

---

[35] See 8 U.S.C. 1612(a)(2)(A).

[36] As in effect immediately before the effective date of Section 307 of Division C of Pub. L. 104-208 [110 Stat. 3009-546 (Sept. 30, 1996).

[37] 8 U.S.C. 1231(b)(3).

[38] As defined in Section 501(e) of the Refugee Education Assistance Act of 1980.

[39] See Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1988 (as contained in Section 101(e) of Pub. L. 100–202, 101 Stat. 1329, and amended by the 9th proviso under migration and refugee assistance in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1989, Pub. L. 100–461, 102 Stat. 2268, as amended).

[40] An alien who was lawfully residing in the United States and receiving benefits on August 2, 1996, would have continued to receive benefits until January 1, 1997. In addition, an alien who was receiving SSI would still be eligible to receive Medicaid. See 8 U.S.C. 1612(b)(2)(F).

[41] See 42 U.S.C. 601-619.

[42] See 42 U.S.C. 1397-1397h.

[43] See 42 U.S.C. 1396 to 1396w-5.

003538

### Appendix: Eligibility for Public Benefits

### PRWORA Public Benefits Summary

| Designated Federal Programs[40] | |
|---|---|
| | • Lawful permanent residents with 40 Social Security quarters[44] <br> • Veterans and active duty personnel lawfully residing in the United States, with a discharge of honorable service who fulfill minimum active-duty service requirements, and their spouse and unmarried dependent child or unmarried surviving spouse[45] <br> • American Indian born in Canada  or who is a member of an Indian tribe would still be eligible for Medicaid[46] <br><br> Medicaid, the following categories are eligible for benefits within the first 7 years and Social Services Block Grants and TANF for the first 5 years:[47] <br> • Refugee from the time of admission and asylee from the time status was granted; <br> • Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253[48] or section 241(b)(3) of such Act, as amended;[49] <br> • Cuban and Haitians entrant from the time the status was granted;[50] and <br> • Amerasians[51] |
| **Categories of Aliens Not Eligible** | Aliens not listed as qualified aliens |

### PRWORA Public Benefits Summary

| Federal Means-Tested Benefits | |
|---|---|
| **Definition** <br> 8 U.S.C. 1613 | No statutory definition under PRWORA, however, some agencies have defined which benefits would be considered means-tested.[52] |

---

[44] See 8 U.S.C. 1612(b)(2)(B).
[45] See 8 U.S.C. 1612(b)(2)(C).
[46] See 8 U.S.C. 1612(b)(2)(E).
[47] See 8 U.S.C. 1612(b)(2)(A).
[48] As in effect immediately before the effective date of section 307 of division C of Pub. L. 104-208, 110 Stat. 3009.
[49] 8 U.S.C. 1231(b)(3).
[50] As defined in section 501(e) of the Refugee Education Assistance Act of 1980.
[51] See Section 584 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1988 (as contained in Section 101(e) of Pub. L. 100–202, 101 Stat. 1329, and amended by the 9th proviso under migration and refugee assistance in title II of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1989, Pub. L. 100–461, 102 Stat. 2268, as amended).
[52] See *Federal Means-Tested Public Benefits*, 63 FR 36653 (July 7, 1998).

003539

**Appendix: Eligibility for Public Benefits**

**PRWORA Public Benefits Summary**

| Federal Means-Tested Benefits | |
|---|---|
| **Categories of Aliens Eligible** | In addition, qualified aliens eligible for all other means-tested benefits after 5 years of entry.<br><br>However, all aliens are eligible for the following programs:[53]<br>• Emergency Medical assistance 8 U.S.C. 1611(b)(1)(A)<br>• Short-term, non-cash, in-kind emergency disaster relief.<br>• National School Lunch Act<br>• Child Nutrition Act of 1966<br>• Public health assistance for immunizations<br>• Payments for foster care and adoption<br>• Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter)<br>• Programs of student assistance the Higher Education Act of 1965<br>• Means-tested programs under the Elementary and Secondary Education Act of 1965<br>• Benefits under the Head Start Act<br>• Benefits under title I of the Workforce Innovation and Opportunity Act<br>• Food Stamps for children under 18<br><br>In addition, the following aliens are eligible for federal means-tested benefits:[54]<br>• Refugees and asylees;<br>• Aliens whose deportation was withheld under section 243(h) of the Act, 8 U.S.C. 1253;<br>• Cuban and Haitian entrants;[55]<br>• Amerasians;[56]<br>• Veterans lawfully residing in the United States, with a discharge of honorable service who fulfill minimum active-duty service requirement, and active duty personnel lawfully residing in the United States, and their spouse and unmarried dependent child or unmarried surviving spouse;[57] and<br>• American Indian born in Canada  or who is a member of an Indian tribe[58] |

---

[53] See 8 U.S.C. 1613(c).
[54] See 8 U.S.C. 1613(b)(1).
[55] See Section 501(e) of the Refugee Education Assistance act of 1980.
[56] See 8 U.S.C. 1612(a)(2)(A)(i)(V).
[57] See 8 U.S.C. 1613(b)(2).
[58] See 8 U.S.C. 1613(d).

003540

Appendix: Eligibility for Public Benefits

**PRWORA Public Benefits Summary**

| Federal Means-Tested Benefits | |
|---|---|
| **Categories of Aliens Not Eligible** | Aliens who enter the United States on or after August 22, 1996,  not listed as qualified aliens |

*Public Benefits Exempt under PRWORA*

Although PRWORA provided a broad definition of public benefits that only qualified aliens are eligible to receive,[59] it also made certain public benefits available even to non-qualified aliens.[60] Congress excluded certain benefits, such as contracts, professional licenses, and commercial licenses from the "federal public benefit" definition.[61] In addition, Congress further provided that the following public benefits are available to all aliens, regardless of whether a person is a qualified alien:[62]

- Medical assistance under Title XIX of the Social Security Act[63] (or any successor program to such title) for care and services that are necessary for the treatment of an emergency medical condition[64] of the alien involved and are not related to an organ transplant procedure, if the alien involved otherwise meets the eligibility requirements for medical assistance under the State plan approved under such title (other than the requirement of the receipt of aid or assistance under Title IV of the Social Security Act,[65] supplemental security income benefits under Title XVI of the Social Security Act,[66] or a state supplementary payment).

- Short-term, non-cash, in-kind emergency disaster relief.[67]

- Public health assistance (not including any assistance under Title XIX of the Social Security Act)[68] for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease.

---

[59] See Section 401(c) of Pub. L. 104-193, 110 Stat. 2105, 2262 (codified as amended at 8 U.S.C. 1611(c)). Only qualified aliens may be eligible for certain benefits. See 8 U.S.C. 1641.
[60] See 8 U.S.C. 1611(b).
[61] See 8 U.S.C. 1611(c)(2).
[62] See 8 U.S.C. 1611(b).
[63] See 42 U.S.C. 1396 et seq.
[64] As defined in Section 1903(v)(3) of the Social Security Act, 42 U.S.C. 1396b(v)(3).
[65] See 42 U.S.C. 601 et seq.
[66] See 42 U.S.C. 1381 et seq.
[67] Such relief would include a range of services and benefits provided by the Federal Emergency Management Agency and other agencies. For instance, it would include the Disaster Supplemental Nutrition Assistance Program (D-SNAP), which "gives food assistance to low-income households with food loss or damage caused by a natural disaster." See DHS, Disaster Assistance.gov, *Disaster Supplemental Nutrition Assistance Program (D-SNAP)*.
[68] See 42 U.S.C. 1396 et seq.

003541

Appendix: Eligibility for Public Benefits

- Programs, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter) specified by the Attorney General, in the Attorney General's sole and unreviewable discretion after consultation with appropriate federal agencies and departments, which (i) deliver in-kind services at the community level, including through public or private nonprofit agencies; (ii) do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources; and (iii) are necessary for the protection of life or safety.

- Programs for housing or community development assistance or financial assistance administered by the Secretary of Housing and Urban Development, any program under Title V of the Housing Act of 1949,[69] or any assistance under Section 1926c of Title 7, to the extent that the alien is receiving such a benefit on August 22, 1996.

These benefits[70] were further clarified by the Department of Justice and some of the agencies that administer these public benefits. On January 16, 2001, the Department of Justice published a notice of final order, "Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation,"[71] which indicated that PRWORA does not preclude aliens from receiving police, fire, ambulance, transportation (including paratransit), sanitation, and other regular, widely available services programs, services, or assistance. In addition, the notice provided for a three-part test in identifying excluded benefits and services for the protection of life and safety. Specified programs must satisfy all three prongs of this test:

- The government-funded programs, services, or assistance specified are those that: deliver in-kind (non-cash) services at the community level, including through public or private non-profit agencies or organizations; do not condition the provision, amount, or cost of the assistance on the individual recipient's income or resources; and serve purposes of the type described in the list below, for the protection of life or safety.

- The community-based programs, services, or assistance are limited to those that provide in-kind (non-cash) benefits and are open to persons needing or desiring to participate without regard to income or resources. Programs, services, or assistance delivered at the community level, even if they serve purposes of the type described, are not within this specification if they condition on the individual recipient's income or resources: (a) the provision of assistance; (b) the amount of assistance provided; or (c) the cost of the assistance provided on the individual recipient's income or resources.

---

[69] See 42 U.S.C. 1471 et seq.
[70] Described in 8 U.S.C. 1611(b).
[71] See *Final Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*, 66 FR 3613 (Jan. 16, 2001). See *Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation*, 61 FR 45985 (Aug. 30, 1996).

003542

**Appendix: Eligibility for Public Benefits**

- Included within the specified programs, services, or assistance determined to be necessary for the protection of life or safety are the following types of programs:

  - Crisis counseling and intervention programs; services and assistance relating to child protection, adult protective services, violence and abuse prevention, victims of domestic violence or other criminal activity; or treatment of mental illness or substance abuse;

  - Short-term shelter or housing assistance for the homeless, for victims of domestic violence, or for runaway, abused, or abandoned children;

  - Programs, services, or assistance to help individuals during periods of heat, cold, or other adverse weather conditions;

  - Soup kitchens, community food banks, senior nutrition programs such as meals on wheels, and other such community nutritional services for persons requiring special assistance;

  - Medical and public health services (including treatment and prevention of diseases and injuries) and mental health, disability, or substance abuse assistance necessary to protect life or safety;

  - Activities designed to protect the life or safety of workers, children and youths, or community residents; and

  - Any other programs, services, or assistance necessary for the protection of life or safety.

003543

003544

# Department of Homeland Security

## United States Citizenship and Immigration Services

### Budget Overview



**Fiscal Year 2024**
**Congressional Justification**

Department of Homeland Security

United States Citizenship and Immigration Services

# Table of Contents

*United States Citizenship and Immigration Services* .................................................................. 1

Appropriation Organization Structure ......................................................................................... 3

Budget Comparison and Adjustments ........................................................................................... 4

Personnel Compensation and Benefits .......................................................................................... 9

Non Pay Budget Exhibits ............................................................................................................... 11

Supplemental Budget Justification Exhibits .............................................................................. 13

003545

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services

## Appropriation Organization Structure

| Organization Name | Level | Fund Type (* Includes Defense Funding) |
|---|---|---|
| **United States Citizenship and Immigration Services** | **Component** | |
| **Operations and Support** | **Appropriation** | |
| Employment Status Verification | PPA | Discretionary - Appropriation |
| Application Processing | PPA | Discretionary - Appropriation |
| **Federal Assistance** | **Appropriation** | |
| Citizenship and Integration Grants | PPA | Discretionary - Appropriation |
| **Immigration Examinations Fee Account** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |
| Field Operations | PPA | Mandatory - Fee |
| Fraud Detection and National Security | PPA | Mandatory - Fee |
| Service Center Operations | PPA | Mandatory - Fee |
| Support Services | PPA | Mandatory - Fee |
| Immigration Policy and Support | PPA | Mandatory - Fee |
| Refugee and Asylum Operations | PPA | Mandatory - Fee |
| Immigration Records and Applicant Services | PPA | Mandatory - Fee |
| Premium Processing (Including Transformation) | PPA | Mandatory - Fee |
| **EB-5 Integrity Fund** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |
| **H-1B Nonimmigrant Petitioner Account** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |
| **Fraud Prevention and Detection Account** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |

**CIS - 3**

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
### Budget Comparison and Adjustments
### Appropriation and PPA Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget |
|---|---|---|---|
| **Operations and Support** | **$389,504** | **$242,981** | **$855,194** |
| Employment Status Verification | $114,504 | $109,611 | $111,865 |
| Application Processing | $275,000 | $133,370 | $743,329 |
| **Federal Assistance** | **$20,000** | **$25,000** | **$10,000** |
| Citizenship and Integration Grants | $20,000 | $25,000 | $10,000 |
| **Immigration Examinations Fee Account[1]** | **$4,944,463** | **$5,595,175** | **$5,868,997** |
| Adjudication Operations | $1,832,963 | $2,174,211 | $2,389,083 |
| *Field Operations* | - | *$1,051,375* | *$1,168,497* |
| *Fraud Detection and National Security* | - | *$263,779* | *$295,134* |
| *Service Center Operations* | - | *$576,702* | *$643,097* |
| *Support Services* | - | *$282,355* | *$282,355* |
| Immigration Policy and Support | $1,297,020 | $1,218,924 | $1,293,872 |
| Refugee and Asylum Operations | $435,753 | $431,450 | $380,405 |
| Immigration Records and Applicant Services | $478,752 | $456,732 | $474,930 |
| Premium Processing (Including Transformation) | $899,975 | $1,313,858 | $1,330,707 |
| **Fraud Prevention and Detection Account** | **$52,870** | **$53,960** | **$56,140** |
| Adjudication Operations | $52,870 | $53,960 | $56,140 |
| **H-1B Nonimmigrant Petitioner Account** | **$15,000** | **$20,000** | **$20,000** |
| Adjudication Operations | $15,000 | $20,000 | $20,000 |
| **E.B-5 Integrity Fund** | - | - | **$8,760** |
| Adjudication Operations | - | - | $8,760 |
| **Total** | **$5,421,837** | **$5,937,116** | **$6,819,091** |

[1] Totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS - 4

003547

**Department of Homeland Security**  **United States Citizenship and Immigration Services**

## United States Citizenship and Immigration Services
## Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Operations and Support | 1,342 | 847 | $389,504 | 965 | 914 | $242,981 | 3,996 | 3,124 | $855,194 | 3,031 | 2,210 | $612,213 |
| Federal Assistance | - | - | $20,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| Immigration Examinations Fee Account[2] | 20,654 | 18,649 | $4,944,463 | 21,659 | 20,576 | $5,595,175 | 22,512 | 20,650 | $5,868,997 | 853 | 74 | $273,822 |
| Fraud Prevention and Detection Account | 185 | 176 | $52,870 | 185 | 176 | $53,960 | 185 | 176 | $56,140 | - | - | $2,180 |
| H-1B Nonimmigrant Petitioner Account | - | - | $15,000 | - | - | $20,000 | - | - | $20,000 | - | - | - |
| EB-5 Integrity Fund | - | - | - | - | - | - | 40 | 35 | $8,760 | 40 | 35 | $8,760 |
| **Total** | **22,181** | **19,672** | **$5,421,837** | **22,809** | **21,666** | **$5,937,116** | **26,733** | **23,985** | **$6,819,091** | **3,924** | **2,319** | **$881,975** |
| Subtotal Discretionary - Appropriation | 1,342 | 847 | $409,504 | 965 | 914 | $267,981 | 3,996 | 3,124 | $865,194 | 3,031 | 2,210 | $597,213 |
| Subtotal Mandatory - Fee | 20,839 | 18,825 | $5,012,333 | 21,844 | 20,752 | $5,669,135 | 22,737 | 20,861 | $5,953,897 | 893 | 109 | $284,762 |

## Component Budget Overview

The FY 2024 Budget includes $865.2M, 3,996 positions; and 3,124 full-time equivalents (FTE) in discretionary budget authority for the U.S. Citizenship and Immigration Services (USCIS). This funding level represents an increase of $597.2M above the FY 2023 Enacted.

The FY 2024 Budget also estimates $6.0B in total mandatory budget authority for the Immigration Examinations Fee Account (IEFA), the H-1B Nonimmigrant Petitioner Account, EB-5 Integrity Fund, and the Fraud Prevention and Detection Account (FPDA).

The funding enables USCIS to fully meet its mission requirements, including the following:

---

[2] FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS - 5

003548

**Department of Homeland Security**                                    **United States Citizenship and Immigration Services**

- Strengthen and effectively administer the immigration system;
- Strengthen National security safeguards and combat fraud;
- Reinforce quality and consistency in administering immigration benefits.

The FY 2024 discretionary funding supports the E-Verify Program (Employment Status Verification PPA), the Citizenship and Integration Grant Program, and Application Processing.

The Employment Status Verification (ESV) PPA provides funds for the operations, mission support, and associated management and administration costs of E-Verify. E-Verify is an internet-based program that enables an employer to determine a newly hired employee's eligibility to work in the United States by verifying information reported on an employee's Form I-9, Employment Eligibility Verification, against data from the Department of Homeland Security, Social Security Administration, Department of State, and Departments of Motor Vehicles of participating States.

The Application Processing PPA provides funding for staffing, supplies, and equipment that supports the Administration's priority of decreasing application processing times, reducing the backlog, and expanding humanitarian processing efforts for additional asylum adjudication work and supporting the refugee affairs program. Application Processing supports up to 125,000 refugee admissions, and aids in processing credible fear applications including the adjudication of affirmative asylum applications as well as the adjudication of credible fear screenings, reasonable fear screenings, and asylum merits interviews for certain individuals placed in expedited removal.

USCIS Citizenship and Integration Grant Program is funded via the Federal Assistance account. In FY 2024, USCIS expects to award $10.0M in grants to organizations that help prepare lawful permanent residents (LPRs) for naturalization.[3] The grants aim to promote prospective citizens' inclusion into American civic life by funding educational programs designed to increase their knowledge of English, U.S. history, and civics.

---

[3] For a list of past grant recipients, please visit: https://www.uscis.gov/citizenship/organizations/grant-program

**CIS - 6**

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget |
|---|---|---|---|
| **Enacted/Request** | $5,328,334 | $5,414,843 | $6,505,516 |
| Carryover - Start of Year | $1,576,510 | $2,301,239 | $1,739,091 |
| Recoveries | $123,099 | $76,000 | $76,000 |
| Rescissions to Current Year/Budget Year | ($2,612) | ($36,145) | - |
| Net Sequestered Resources | ($8,744) | ($12,998) | ($28,128) |
| Reprogramming/Transfers | ($7,332) | $3,208 | - |
| Supplementals | $193,000 | - | - |
| CHIMP | ($4,000) | ($4,000) | ($4,000) |
| **Total Budget Authority** | **$7,198,255** | **$7,742,646** | **$8,288,479** |
| Collections - Reimbursable Resources | $77,005 | $75,000 | $75,000 |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$7,275,260** | **$7,817,147** | **$8,363,479** |
| Obligations (Actual/Estimates/Projections)[4],[5] | $4,883,916 | $6,015,056 | $6,881,867 |
| Obligations – Reimbursable | $83,687 | $63,000 | $74,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 22,181 | 22,809 | 26,733 |
| Enacted/Request FTE | 19,672 | 21,666 | 23,985 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 19,194 | 22,809 | 26,733 |
| FTE (Actual/Estimates/Projections) | 18,501 | 21,666 | 23,985 |

[4] This total includes Operation Allies Welcome obligations.
[5] Totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS - 7

003550

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Collections – Reimbursable Resources
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Canada/UK Visa | - | - | $9,500 | - | - | $9,500 | - | - | $9,500 |
| Department of Defense - Department of Defense | - | - | $7,500 | - | - | $7,500 | - | - | $7,500 |
| Department of Health and Human Services - Department Wide | - | - | $5 | - | - | $5 | - | - | $5 |
| Department of Homeland Security - Department of Homeland Security | - | - | $952 | - | - | $952 | - | - | $952 |
| Department of Homeland Security - Federal Emergency Management Agency | - | - | $12,994 | - | - | $12,994 | - | - | $12,994 |
| Department of Homeland Security - U.S. Customs and Border Protection | - | - | $19,154 | - | - | $19,154 | - | - | $19,154 |
| Department of Homeland Security - U.S. Immigration and Customs Enforcement | - | - | $12,500 | - | - | $12,500 | - | - | $12,500 |
| Department of Justice - Department of Justice | - | - | $311 | - | - | $311 | - | - | $311 |
| Department of State | - | - | - | - | - | - | - | - | - |
| SAVE Collections | - | - | $12,000 | - | - | $12,000 | - | - | $12,000 |
| Department of Homeland Security – CISA | - | - | $74 | - | - | $74 | - | - | $74 |
| General Service Administration (GSA) | - | - | $10 | - | - | $10 | - | - | $10 |
| **Total Collections** | - | - | **$75,000** | - | - | $75,000 | - | - | $75,000 |

CIS - 8

003551

Department of Homeland Security

United States Citizenship and Immigration Services

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
### Personnel Compensation and Benefits
**Pay Summary**
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 President's Budget | | | | FY 2023 to FY 2024 Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Operations and Support | 1,342 | 847 | $159,102 | $187.84 | 965 | 914 | $131,919 | $144.33 | 3,996 | 3,124 | $566,596 | 181.35 | 3,031 | 2,210 | $434,677 | $37.02 |
| Immigration Examinations Fee Account[b] | 20,654 | 18,649 | $2,787,629 | $149.48 | 21,659 | 20,576 | $3,214,766 | $156.24 | 22,512 | 20,650 | $3,478,371 | 168.44 | 853 | 74 | $263,605 | $12.20 |
| Fraud Prevention and Detection Account | 185 | 176 | $25,978 | $147.60 | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | 161.63 | 0 | 0 | $1,379 | $7.83 |
| EB-5 Integrity Fund | - | - | - | - | - | - | - | - | 40 | 35 | $5,593 | 159.80 | 40 | 35 | $5,593 | $159.80 |
| Total | 22,181 | 19,672 | $2,972,709 | $151.11 | 22,809 | 21,666 | $3,373,753 | $155.72 | 26,733 | 23,985 | $4,079,007 | $170.06 | 3,924 | 2,319 | $705,254 | $14.35 |
| | | | | | | | | | | | | | | | | |
| Subtotal Discretionary - Appropriation | 1,342 | 847 | $159,102 | $187.84 | 965 | 914 | $131,919 | $144.33 | 3,996 | 3,124 | $566,596 | $181.35 | 3,031 | 2,210 | $434,677 | $37.02 |
| Subtotal Mandatory - Fee | 20,839 | 18,825 | $2,813,607 | $149.46 | 21,844 | 20,752 | $3,241,834 | $156.22 | 22,737 | 20,861 | $3,512,411 | $168.37 | 893 | 109 | 270,577 | $6.25 |

[b] FTE and Amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS - 9

003552

Department of Homeland Security

United States Citizenship and Immigration Services

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget[7] | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $2,084,976 | $2,346,716 | $2,811,810 | $465,094 |
| 11.3 Other than Full-time Permanent | $14,856 | $15,404 | $16,460 | $1,056 |
| 11.5 Other Personnel Compensation | $85,807 | $109,615 | $172,608 | $62,993 |
| 12.1 Civilian Personnel Benefits | $787,070 | $900,807 | $1,076,803 | $175,996 |
| 13.0 Benefits for Former Personnel | - | $1,211 | $1,326 | $115 |
| **Total - Personnel Compensation and Benefits** | **$2,972,709** | **$3,373,753** | **$4,079,007** | **$705,254** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 22,181 | 22,809 | 26,733 | 3,924 |
| FTE - Civilian | 19,672 | 21,666 | 23,985 | 2,319 |

[7] Totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS - 10**

003553

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Non Pay Budget Exhibits
### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Operations and Support | $230,402 | $111,062 | $288,598 | $177,536 |
| Federal Assistance | $20,000 | $25,000 | $10,000 | ($15,000) |
| Immigration Examinations Fee Account[8] | $2,156,834 | $2,380,409 | $2,390,626 | $10,217 |
| Fraud Prevention and Detection Account | $26,892 | $26,892 | $27,693 | $801 |
| H-1B Nonimmigrant Petitioner Account | $15,000 | $20,000 | $20,000 | - |
| EB-5 Integrity Fund | - | - | $3,167 | $3,167 |
| **Total** | **$2,449,128** | **$2,563,363** | **$2,740,084** | **$176,721** |
| Subtotal Discretionary - Appropriation | $250,402 | $136,062 | $298,598 | $162,536 |
| Subtotal Mandatory - Fee | $2,198,726 | $2,427,301 | $2,441,486 | $14,185 |

---

[8] Totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS - 11**

003554

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

## Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget[9] | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $55,111 | $41,565 | $81,246 | $39,681 |
| 22.0 Transportation of Things | $12,510 | $16,107 | $16,087 | ($20) |
| 23.1 Rental Payments to GSA | $314,434 | $281,140 | $279,819 | ($1,321) |
| 23.2 Rental Payments to Others | $1,616 | $5,464 | $12,893 | $7,429 |
| 23.3 Communications, Utilities, & Miscellaneous | $54,424 | $97,302 | $97,302 | - |
| 24.0 Printing and Reproduction | $7,669 | $14,856 | $14,856 | - |
| 25.1 Advisory & Assistance Services | $788,924 | $790,702 | $799,763 | $9,061 |
| 25.2 Other Services from Non-Federal Sources | $98,255 | $51,537 | $135,521 | $83,984 |
| 25.3 Other Purchases of goods and services | $435,103 | $361,323 | $361,323 | - |
| 25.4 Operations & Maintenance of Facilities | $3,134 | $2,725 | $2,725 | - |
| 25.6 Medical Care | $1 | - | - | - |
| 25.7 Operation & Maintenance of Equipment | $111,762 | $213,430 | $213,986 | $556 |
| 26.0 Supplies & Materials | $35,607 | $39,726 | $40,566 | $840 |
| 31.0 Equipment | $456,851 | $545,222 | $596,733 | $51,511 |
| 32.0 Land and Structures | $49,408 | $72,358 | $72,358 | - |
| 41.0 Grants, Subsidies, and Contributions | $20,091 | $25,000 | $10,000 | ($15,000) |
| 42.0 Insurance Claims and Indemnities | $4,228 | $4,906 | $4,906 | - |
| **Total - Non Pay Budget Object Class** | **$2,449,128** | **$2,563,363** | **$2,740,084** | **$176,721** |

---

[9] Totals for FY 2024 do not match the numbers displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS - 12

003555

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Supplemental Budget Justification Exhibits
### FY 2024 Counter Unmanned Aerial Systems (CUAS) Funding

The FY 2024 Budget for USCIS does not include any funding for Counter Unmanned Aerial Systems.

CIS - 13

003556

Department of Homeland Security

United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Status of Congressionally Requested Studies, Reports and Evaluations

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2022 | April 14, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | USCIS continues to have the authority to accept private donations to support the Citizenship and Integration Grant Program. The Committee directs USCIS to provide an update on its planned use of this authority not later than 30 days after the date of enactment of this Act, to include efforts undertaken to solicit private donations. | Transmitted - November 4, 2022 |
| 2022 | April 27, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Budget Justification Materials.-... Within 30 days of the date of enactment of this Act, USCIS shall confer with the Committees on the PPA structure to be used for future budget requests. | Transmitted - February 17, 2022 |
| 2022 | April 29, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Within the total amount provided, $87,619,000 is available until September 30, 2023, for application processing. Not later than 45 days after the date of enactment of this Act, USCIS shall brief the Committees on an updated spending and hiring plan, which shall include the funding provided in support of application processing, and shall also include a detailed breakout, by mission critical occupation category, of the total USCIS funded position levels, which shall include positions supported by fee funding, to provide a complete picture of USCIS's funded position levels for its various workstreams, which shall then be used to compare against realized hiring execution. | Transmitted - June 1, 2022 |
| 2022 | May 14, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.—USCIS shall provide the Committees a plan within 60 days of the date of enactment of this Act to establish a quarterly, public report on all backlogs, frontlogs, and pending forms, for all form types, which shall also indicate the form's processing goal. | Drafted - In Review |
| 2022 | May 14, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Trusted Employer Program—Within 60 days of the date of enactment of this Act, USCIS shall provide a report to the Committee on the operation of the pilot program from 2016 to 2020 for the Trusted Employer Program, including information regarding any cost savings to the agency, cost savings to petitioners, and operational and security benefits to the agency. | Transmitted - August 11, 2022 |
| 2022 | May 14, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Virtual Processes and Ceremonies – Not later than 60 days after the date of enactment of this Act, USCIS shall provide the Committees with an analysis of the feasibility of leveraging video and audio teleconferencing capabilities to: (1) support remote refugee interviews; and (2) remotely administer the oath of citizenship during circumstances that impede the regular administration of naturalization ceremonies. | Transmitted - June 2, 2022 |
| 2022 | May 16, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | p. 92 - Asylum Seeker Access to Employment Authorization. —The Committee recognizes the importance of employment authorization for asylum seekers awaiting the outcome of their cases, including individuals with positive Credible Fear or Reasonable Fear determinations or who have expressed a fear of return to their home countries and intend to apply for asylum or withholding of removal. The Committee directs DHS to establish a centralized mechanism for asylum seekers to | Pending |

CIS - 14

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Year | Date | Act | Description | Status |
|---|---|---|---|---|
| 2022 | May 16, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | apply for employment authorization online and to brief the Committee not later than 60 days after the date of enactment of this Act on its plan to meet this objective, including a projected schedule for meeting anticipated milestones. Further, the Committee directs USCIS to reduce printing and reproduction costs related to the cumbersome Form I–765 and to brief the Committee not later than 60 days after the date of enactment of this Act on a plan for achieving this Act, including any anticipated resource savings and timeliness metrics. | Transmitted - November 14, 2022 |
| 2022 | June 7, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | H–2B Visa Program Oversight.—Not later than 60 days after the date of enactment of this Act, the Department shall brief the Committee on the administrative remedies the Department of Labor has issued in each of the last three fiscal years against entities or persons who violate H–2B requirements. The report should contain, but not be limited to: (1) a list of entities or persons cited, by industry and violation; (2) the number of H–2B workers impacted and the nature of those impacts; (3) the effects on the domestic workforce; (4) the number of entities or persons debarred from the H–2B program due to violations; (5) a description of the criteria and methodology for debarment decisions; and (6) a justification for why any repeat offenders have been allowed to continue to participate in the program. | Drafted - In Review |
| | | Consolidated Appropriation Act 2022 (P.L. 117-103) | Not later than 60 days after the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H–2B program, including a tabulation of the percentage of overall visas issued to the top 15 employers. | |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Not later than 90 days after the date of enactment of this Act, USCIS is directed to make available, on a publicly accessible website, an interactive dashboard detailing the number of forms received, processed, approved, denied, and pending by month, along with the average processing time and the number of forms pending for more than six months, for each of the following: (1) form I–130 (Petition for Alien Relative); (2) form I–485 (Application to Register Permanent Residence or Adjust Status), delineated by application type or filing category; (4) form I–751 (Petition to Remove Conditions on Residence); (5) form N–400 (Application for Naturalization); and (6) form I–765 (Employment Authorization Document). The dashboard shall include historical data beginning not later than fiscal year 2016; be updated monthly by not later than the tenth business day following the end of each month; and permit the downloading of the underlying data in a searchable and sortable spreadsheet format. USCIS shall make every effort to continuously expand the dataset on this website to eventually include all forms. | Pending |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Asylum Processing — Not later than 90 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that details its efforts and specific actions, if any, to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes. | Pending |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.—USCIS is directed to ensure that timeliness performance measures for all forms are developed, implemented, and routinely assessed. Within 90 days of the date of enactment of this Act, USCIS shall report to the Committees on measures implemented to promptly reduce processing delays and provide the Committees a list of adjudication processing goals and whether the goal is required by statute, regulation, or is set internally. | Drafted - In Review |

CIS - 15

003558

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| Year | Date | Statute | Requirement | Status |
|---|---|---|---|---|
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | USCIS Quarterly Budget and Productivity Reporting— USCIS shall brief the Committee within 90 days of the date of enactment of this Act and quarterly thereafter on budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall detail the spending of each directorate and office (compared to projections), provide revenue and expenses delineated by form type, other agency expenses including payments or transfers to other Federal agencies, and carryover or reserve fund projections and spending. USCIS shall ensure the agency maintains a sufficient carryover balance to provide stability amid fluctuating receipts. Additionally, USCIS shall develop productivity measures that convey the baseline capacity and capabilities for processing applications and petitions and capture the impact of investments in personnel, technology, or changes to processes and policies on such measures. Updates on USCIS performance against these measures shall be included with the quarterly budget reporting. | Drafted - In Review |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Electronic Processing— In addition to the requirements in Section 4103 of the USCIS Stabilization Act (Public Law 116-159) and not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to brief the Committees on its progress with further developing and implementing the plan, which shall include the following additional detailed information: (1) cost and schedule plans for 12 months; (2) cost and schedule actuals against the plans; (3) identification and justification for slippage in cost and/or schedule; (4) identification of any risks, and mitigation strategies to address such risks; (5) identification of any technological challenges facing the agency; (6) an examination of whether expanded premium processing could facilitate end-to-end electronic processing for all immigration benefit requests, and if so, the resulting project plan, including timelines and cost estimates for USCIS and customers; and (7) a plan for promoting public adoption, including by engaging with industry partners as applicable. USCIS shall specifically highlight the status of its efforts to establish a centralized mechanism for asylum seekers to apply for employment authorization online, including a projected schedule for meeting anticipated milestones. Further, USCIS shall review whether Form I-765 can be more narrowly tailored to reduce paperwork and workloads, while still ensuring proper eligibility and security and shall include its plan for achieving this goal, including any anticipated resource savings and timeliness metrics, in the next semi-annual briefing. | Pending |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | E-Verify— USCIS shall examine and brief the Committees, within 90 days of the date of enactment of this Act, on a plan to implement an appeal process for a final nonconfirmation within the E-Verify system, as well as improvements in outreach efforts and training tools to assist employers in improving the accuracy of information they submit into the system. | Transmitted - October 13, 2022 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Use of Fee Waiver - Within 90 days of the date of enactment of this Act, USCIS shall brief the Committees on its policies regarding the use of full and partial fee waivers for applicants, petitioners, and requestors. | Transmitted - November 2, 2022 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Military Naturalization Applications – Absent exigent circumstances or additional time applicants may need to respond to Requests for Evidence or Notices of Intent to Deny, USCIS shall ensure that military naturalization applications are processed within six months, as was required by the Military Personnel Citizenship Processing Act of 2008 (Public Law 110-3 82). USCIS is directed to continue to build upon its military naturalization promotion program, in conjunction with the Department of Defense, to ensure all military service members and their families learn about and consider their eligibility to apply for naturalization before the military service member's separation | Transmitted - October 27, 2022 |

003559

**Department of Homeland Security** — United States Citizenship and Immigration Services

| Year | Date | Authority | Requirement | Status |
|---|---|---|---|---|
| | | | from the military, and to help military families navigate the naturalization process. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committees on the status of meeting these goals, including any efforts to streamline processes and improve the overall experience for service members and their families. | |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Refugee Admissions.—The Department shall submit to the Committee and make available to the public on its website not later than 90 days after the date of enactment of this Act the following information for each of fiscal years 2018 through 2021: the number of USCIS staff assigned to the Refugee Corps at the Refugee Affairs Division of USCIS and the number of refugee processing circuit rides conducted; the number of USCIS Refugee Corps officers assigned to each circuit ride; the destination region and country for each circuit ride; the number of refugee interviews conducted by USCIS; and the number of approvals and denials issued by USCIS. | Transmitted - January 6, 2023 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Workload Staffing Modeling—USCIS shall brief the Committee within 90 days of the date of enactment of this Act on a plan to develop a strategic agency-wide workload staffing model that incorporates the impact of personnel, existing assets, and capabilities on USCIS operations. The model should reflect the impact of business transformation initiatives such as IT, business process reengineering, and the streamlining of data required on forms from applicants/petitioners. While the model shall not assume that work will be performed by employees detailed from other agencies to perform core USCIS mission duties, the model shall incorporate historical attrition and hiring delays to inform realistic staffing on-board assumptions. The model should be able to provide to USCIS data on the expected impacts that changes in USCIS assets and capabilities are expected to have on reducing backlogs and allowing USCIS the ability to test how changes in business processes and policies will impact its workforce, assets, and customers. | Transmitted - November 30, 2022 |
| 2022 | July 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | H.R. 116-458; p. 77 - Systematic Alien Verification for Entitlements (SAVE) Program.—Not later than 120 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that includes calculations of the percentage of all SAVE inquiries from user agencies made pursuant to mandates in Federal law and the percentage related to benefits for which Federal law does not require immigration status verification. The report shall provide this information for the last three fiscal years. In addition, the report shall include estimates of the per-inquiry and total amount of SAVE operational costs not recouped in user fees for each fiscal year. | Transmitted – January 6, 2023 |
| 2022 | September 11, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.— ....Additionally, within 180 days of the date of enactment of this Act, USCIS shall develop and brief the Committees on a comprehensive Backlog Elimination Plan, modeled on prior successful efforts by USCIS to eliminate their backlogs in 2004–2006, along with any associated staffing models to support such plan. | Pending |
| 2022 | September 11, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Trauma-Informed Support—Within 180 days of the date of enactment of this Act, USCIS shall brief the Committee any current training for employees who are regularly exposed to, or engage with, trauma survivors. | Transmitted - October 4, 2022 |
| 2022 | September 12, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | B-1 Visa Holders—The Committee directs the Secretary to submit a report no later than 180 days after the date of enactment of this Act on B-1 personal or domestic workers, including the visa holder's year of birth; gender; country of citizenship and birth; date of visa issuance and expiration; and the city, state, and zip code where the visa holder will be working. The report shall also be made available to the public. | Transmitted - September 29, 2022 |

CIS - 17

003560

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| | | | | |
|---|---|---|---|---|
| 2022 | September 12, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | H-2B Visa Distribution—The Department shall, in consultation with the Department of Labor, examine the impacts of the current H–2B visa semiannual distribution on employers, employees, and agency operations and to provide the Committee with a briefing on the study not later than 180 days after the date of enactment of this Act. | Transmitted - November 14, 2022 |
| 2022 | September 12, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Report on Nonimmigrant Visas— Within 180 days of the enactment of this Act, USCIS shall provide to the Committee a monthly report on nonimmigrant visas granted to individuals from each country subject to a designation of Temporary Protected Status (TPS) [note that this information would need to come from the Department of State]. | Transmitted - October 12, 2022, and monthly thereafter |
| 2023 | January 28, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS continues to have the authority to accept private donations to support the Citizenship and Integration Grant Program. The Committee directs USCIS to provide an update on its planned use of this authority not later than 30 days after the date of enactment of this Act, to include efforts undertaken to solicit private donations. | Transmitted – January 27, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall provide the Committees a plan, within 60 days of the date of enactment of this Act, to establish a quarterly, public report on all backlogs, frontlogs, and pending forms for all form types. The report shall include the number of applicants or petitioners in each USCIS backlog, frontlog, or pending status, including beneficiaries where applicable, by form type; and shall include the length of the status associated with the relevant form type. | Pending |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS is directed to continue to make available, on a publicly accessible website in a downloadable, searchable, and sortable format, a report containing not less than the previous 12 months of semimonthly data on: (1) the number of noncitizens determined to have a credible or reasonable fear of- (a) persecution, as defined in section 235(b)(l)(B)(v) of the Immigration and Nationality Act; or (b) torture, as defined in section 208.30 of title 8, Code of Federal Regulations (as in effect on January 1, 2018); (2) the total number of cases received by U.S. Citizenship and Immigration Services to adjudicate credible or reasonable fear claims, as described in paragraph (1), and the total number of cases closed; and (3) the total pending asylum operations workload. Such report shall also disaggregate the data described above with respect to the following subsets: (1) claims submitted by aliens detained at a U.S. Immigration and Customs Enforcement family residential center or an emergency family shelter; (2) claims submitted by aliens, organized by each subdivision of legal or administrative authority under which claims are reviewed; and (3) the job series of the personnel reviewing the claims. Not later than 60 days after the date of enactment of this Act, and quarterly thereafter, USCIS shall provide a briefing to the Committees on the implementation of the Credible Fear and Asylum Processing Interim Final Rule. The briefing shall include data on the number of credible fear interviews and Asylum Merits Interviews conducted; outcomes of such interviews, including, but not limited to, the number approved, denied, administratively closed, and pending cases; the Field Office location of such interviews; and whether the individual was represented. USCIS shall report publicly the number of individuals referred to immigration or criminal proceedings, or otherwise referred for an enforcement action. | Pending |

**CIS - 18**

003561

**Department of Homeland Security**

## United States Citizenship and Immigration Services

| Year | Date | Act | Description | Status |
|---|---|---|---|---|
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Within 60 days of the date of enactment of this Act and quarterly thereafter, the Department shall provide the Committees with updated reports on all applications and petitions for which fees are waived and any budgetary impacts resulting from the issuances of such waivers. | Pending |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall brief the Committee, not later than 60 days after the date of enactment of this Act, and in coordination with the Department of Labor, on efforts to prevent fraud and abuse in the H-2A and H-2B visa programs and efforts to ensure that employers, agents, attorneys, and recruiters who have been debarred by the Department of Labor cannot continue to participate in the programs. | Pending |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 60 days after the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H-2B program, including a tabulation of the percentage of overall visas issued to the top 15 employers. | Pending |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | The Committee is concerned about the claims made in the OIG's January 6, 2022, report (OIG-22-10) regarding USCIS's management and implementation of the U Visa program. Not later than 60 days after the date of enactment of this Act, USCIS shall brief the Committee on the implementation of the recommendations included in the OIG report, including its rationale for not concurring with some of the OIG recommendations. | Drafted - In Review |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 90 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that details its efforts to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes. | Pending |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall coordinate with relevant Federal agencies that provide services to individuals who have been granted asylum to ensure that such persons are appropriately referred and informed of available services. Not later than 90 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees on efforts to refer asylees for services. | Pending |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to make available on a publicly accessible website: (1) the total number of pending employment authorization applications filed by individuals with pending applications for asylum or withholding of removal pursuant to 8 C.F.R. 274a.12(c)(8); and (2) the total number of such applications that have been pending 60 or fewer days, 61–90 days, 91–120 days, 121–179 days, and 180 or more days. | Pending |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall provide semi-annual briefings to the Committees on budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall detail spending by directorate and office, with comparisons to initial projections; revenue and expenses delineated by form type; other agency expenses, including payments or transfers to other Federal agencies; and carryover or reserve fund projections and spending. USCIS shall ensure the agency maintains a sufficient carryover balance to provide stability amid fluctuating receipts. Additionally, USCIS shall establish a baseline for current application and petition processing capacity, along with metrics for measuring the impact of investments in personnel, technology, and changes to processes and policies on productivity. Updates on USCIS performance against these metrics shall be included with the briefings. | Pending |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall provide a semi-annual briefing to the Committees on its electronic processing efforts, as described in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103), including its efforts to establish a centralized mechanism for asylum seekers to apply for employment authorization online. Further, USCIS shall explore options, including through technology, to increase access to | Pending |

CIS - 19

003562

**Department of Homeland Security** — **United States Citizenship and Immigration Services**

| Year | Act | Date | Requirement | Status |
|---|---|---|---|---|
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | interviews and other processes for individuals who may not be geographically located near a users Field Office.<br><br>USCIS shall ensure all regulatory, statutory, and court-ordered or stipulated agreement timelines are met for all applications for employment authorization. Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to make available on a publicly accessible website:<br>(1) the total number of pending employment authorization applications filed; and<br>(2) the total number of such applications that have been pending for 60 or fewer days, 61– 90 days, 91– 120 days, 121– 179 days, and 180 or more days.<br>The website shall also summarize, on an annual basis, all existing processing time goals, the source of the time goal, and whether the agency met the time goal for the prior fiscal year. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | Within 90 days of the date of enactment of this Act, USCIS shall provide a briefing on the status of its plans to modernize and improve the quality and accuracy of information submitted into the E-Verify system, including the status of its efforts to implement an appeal process for a non-confirmation within the E-Verify system. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | Also, not later than 90 days after the date of enactment of this Act, the Department, in consultation with the Department of Labor, shall brief the Committee on the impacts of the current H–2B visa semiannual distribution on employers, employees, and agency operations. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | The Committee urges USCIS to continue to reevaluate its international footprint requirements to optimize its ability to meet its mission needs in a cost-effective manner. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committee on its international operations, its reliance on operations in foreign locations, and its plans for changing its international footprint over the next five fiscal years, along with estimated budget and operational impacts of such changes. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | The agreement provides sufficient resources for USCIS to meet the Presidential Determination on refugee admissions for the fiscal year. Within 90 days of the date of enactment of this Act, USCIS shall provide a briefing to the Committees on its detailed plan to achieve the Presidential Determination on refugee admissions for Fiscal Year 2023.<br>The briefing shall include, for fiscal year 2022, the information identified under this heading in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103) related to staffing, interviews, approvals, and denials.<br>USCIS shall examine whether any burdensome administrative or inefficiencies currently exist in the refugee admissions process including whether any duplicative fingerprint requirements exist that slow refugee admissions and shall include such information in the briefing to the Committees. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | March 29, 2023 | Not later than 90 days after the date of enactment of this Act and quarterly thereafter, USCIS shall make the following information available on a publicly accessible website:<br>(1) the total number of SIJ petitions pending before USCIS and the length of time each case has been pending;<br>(2) the total number of SIJ adjudications, broken down by grant or denial and the average length of time SIJ petitions were pending prior to adjudication, decision, or issuance of a Request for Evidence (RFE) or Notice of Intent to Deny (NOID);<br>(3) the total number of RFEs and NO IDs issued; and | Drafted - In Review |

CIS - 20

003563

**Department of Homeland Security** — **United States Citizenship and Immigration Services**

| Year | Act | Description | Status |
|---|---|---|---|
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | (4) the total numbers of SIJ petitions that have been pending for 60 or fewer days, 61 - 90 days, 91–120 days, 121–179 days, and 180 or more days. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Notice of Funding Opportunity (NOFO). - The Committee looks forward to working with USCIS on improvements to this grant program, such as reviewing the guidelines and requirements set forth in the Notice of Funding Opportunity (NOFO) to be sure that no unnecessary or overly restrictive conditions are preventing otherwise qualified prospective grant recipient organizations from participating. Not later than five business days prior to the finalization of the NOFO, USCIS shall brief the Committee on any changes to the execution of the program, including changes in the qualifications and expectations of grant recipients. Not later than 120 days after the date of enactment of this Act, USCIS shall brief the Committee on its metrics for evaluating the success of this grant program. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 120 days after the date of enactment of this Act, USCIS shall provide a report to the Committee that includes calculations for the prior three fiscal years of the percentage of all SAVE inquiries from user agencies made pursuant to mandates in Federal law and the percentage related to benefits for which Federal law does not require immigration status verification. In addition, the report shall provide an overview of the funding profile for the program, to include total operational costs, the program's reimbursement model, and the extent to which program costs are not fully recovered by user fees. The Committee expects that this program will not rely on fees paid by applicants and petitioners for immigration benefits; accordingly, the report shall also include any plans to achieve full-cost recovery. | Drafted - In Review |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 120 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees regarding the status of its efforts in each field office to facilitate the registration of U.S. Citizens upon completion of their oath ceremonies. At a minimum, the briefing shall include details on agreements and partnerships with the appropriate state or local officials or agencies, or non-profits, as appropriate, and how USCIS works with the appropriate entities to electronically transfer voter information, or to pursue other avenues to reduce paperwork and facilitate voter registration for these individuals upon successfully obtaining U.S. Citizenship. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 120 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees that updates the information required under this heading in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103). The briefing shall include data outputs from the Staffing Allocation Model and the Model of Operational Planning in order to provide the Committees a better understanding of what the budget request and anticipated fee funded resources will support and the associated projections for improvements in performance. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | The Committee directs the Secretary to submit a report not later than 180 days after the date of enactment of this Act that includes summary data on B–1 personal or domestic workers, including visa holders' years of birth; genders; countries of citizenship and birth; dates of visa issuance and expiration; and the cities and states where the visa holders will be working. The report shall employ data disclosure avoidance measures to protect personally identifiable data and be made available to the public. The Secretary shall promptly inform the Committee if a Federal agency partner does not comply with a request to provide relevant records needed to complete the report. | Pending |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Additionally, within 180 days of the date of enactment of this Act, USC IS shall provide a briefing to the Committees on a plan for addressing ongoing backlogs and frontlogs. | Pending |

CIS - 21

003564

**Department of Homeland Security**

**United States Citizenship and Immigration Services**

| 2023 | June 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | Not later than 180 days after the date of enactment of this Act, USCIS shall brief the Committee on the number of individuals enrolled in the Filipino War Veteran Parole Program. The briefing shall also discuss opportunities to shorten the wait times for family members of Filipino World War II veterans and more quickly process the permanent resident applications of those enrolled in the Filipino War Veteran Parole Program, along with any resources and authorities needed. | Pending |
| --- | --- | --- | --- | --- |
| 2023 | June 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall, in coordination with the Department of Labor's Office of Foreign Labor Certification, timely post public information provided by employers on Form I-129 and associated filings regarding recruiters, recruiting agents, or agencies they plan to use. | Pending |
| 2023 | June 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-396) | USCIS shall also establish a process whereby workers may confirm that they are the beneficiaries of H-2A or H-2B petitions and can receive information about their own immigration status, including their authorized period of stay and the status of any requested visa extensions. | Pending |

**CIS - 22**

003565

Department of Homeland Security

United States Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Authorized/Unauthorized Appropriations

| Budget Activity (Dollars in Thousands) | Last year of Authorization Fiscal Year | Authorized Level Amount | Appropriation in Last Year of Authorization Amount | FY 2024 President's Budget Amount |
|---|---|---|---|---|
| **Operations and Support** | N/A | **$631,745** | **$707,395** | **$855,194** |
| Employment Status Verification | 2002 | $631,745 | $707,395 | $111,865 |
| Application Processing | N/A | N/A | N/A | $743,329 |
| **Federal Assistance** | N/A | **N/A** | **N/A** | **$10,000** |
| Citizenship and Integration Grants | N/A | N/A | N/A | $10,000 |
| **Fee Accounts** | N/A | **Such sums as are available** | **Such sums as are available** | **Such sums as are available** |
| Immigration Examinations Fee | 1988 | Such sums as are available | Such sums as are available | Such sums as are available |
| H-1B Non-immigrant Petitioner | 1998 | Such sums as are available | Such sums as are available | Such sums as are available |
| Fraud Prevention and Detection | 2004 | Such sums as are available | Such sums as are available | Such sums as are available |
| EB-5 Integrity Fund | 2022 | Such sums as are available | Such sums as are available | Such sums as are available |

CIS - 23

003566

Department of Homeland Security                                                                                    United States Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Proposed Legislative Language

### Operations and Support

For necessary expenses of U.S. Citizenship and Immigration Services for operations and support, including for the E-Verify Program and for the Refugee and International Operations Programs, *application processing, and additional support for asylum adjudication workloads,* [$242,981,000] *$855,194,000: Provided,* That such amounts shall be in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): *Provided further,* That not to exceed $5,000 shall be for official reception and representation expenses.

| Language Provision | Explanation |
|---|---|
| ..., *application processing, and additional support for asylum adjudication workloads* | Funding is requested for backlog reduction and asylum adjudication work in FY 2024. |
| ... [$242,981,000] *$855,194,000* | Dollar change only. |

### Federal Assistance

For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, [$25,000,000] *$10,000,000[*, to remain available until September 30, 2024].

| Language Provision | Explanation |
|---|---|
| ... [$25,000,000] *$10,000,000* | Dollar change only. |
| ... [*, to remain available until September 30, 2024]* | Updated for period of availability. This is no longer requested as two-year funding. Historically, one-year funding availability has been requested for $10 million in funding. |

CIS - 24

003568

# Department of Homeland Security

## United States Citizenship and Immigration Services

### Strategic Context



**Fiscal Year 2024**
**Congressional Justification**

USCIS - 1

# United States Citizenship and Immigration Services

## Strategic Context

## Component Overview

The U.S. Citizenship and Immigration Services (USCIS) administers the Nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

The strategic context presents the performance budget by tying together programs with performance measures that gauge the delivery of results to our stakeholders. DHS has integrated a mission and mission support programmatic view into a significant portion of the Level 1 Program, Project, or Activities (PPAs) in the budget. A mission program is a group of activities acting together to accomplish a specific high-level outcome external to DHS, and includes operational processes, skills, technology, human capital, and other resources. Mission support programs are those that are cross-cutting in nature and support multiple mission programs. Performance measures associated with USCIS's mission programs are presented in two measure sets, strategic and management measures. Strategic measures communicate results delivered for our agency mission and are considered our Government Performance and Results Act Modernization Act (GPRAMA) measures. Additional supporting measures, known as management measures, are displayed to enhance connections to resource requests. The measure tables indicate new measures and those being retired, along with historical data if available.

***Employment Status Verification:*** The electronic employment eligibility verification E-Verify program enables enrolled employers to confirm the work authorization of their newly hired employees quickly and easily. E-Verify is an Internet-based system that compares information from an employee's Form I-9, Employment Eligibility Verification, to records available to DHS to confirm employment eligibility within seconds.

*Strategic Measures*

| Measure Name: | Percent of workers determined to be Employment Authorized after an initial mismatch | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure reports the number of cases in which adjudicating officials in the E-Verify program find a person employment authorized under U.S. law after the program issued the person under examination with a Tentative Non-Confirmation (TNC) of eligibility for employment, and the person in question contested this initial mismatch. In cases when an employee contests an eligibility determination, the program's Legal Instrument Examiners (LIEs) make a final determination of the employee's eligibility for employment and transmits the determination both to the hiring employer and to VIS.  Ensuring the accuracy of E-Verify program processing reflects the program's intent to minimize negative impacts imposed upon those entitled to employment in the U.S. while ensuring the integrity of immigration benefits by effectively detecting and preventing cases of unauthorized employment. | | | | | | |
| **Fiscal Year:** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** |
| Targets: | ≤0.60% | ≤0.50% | ≤0.40% | ≤0.40% | ≤0.40% | ≤0.30% | ≤0.30% |
| Results: | 0.16% | 0.21% | 0.23% | 0.13% | 0.11% | TBD | TBD |
| Explanation of Result: | E-Verify continues to be very successful in matching employees to their government records during the initial electronic matching phase.  In those rare cases where the electronic check does not find a match, it is very rare that the applicant will contest the case and | | | | | | |

003569

**United States Citizenship and Immigration Services**                                     **Strategic Context**

be found to be employment authorized.  USCIS continues to improve its processes through E-Verify enhancements such as mismatch letter notices to employees and Self Check, a free online service that allows an individual to check his or her employment eligibility.

***Fraud Prevention and Detection Account:*** The Fraud Prevention and Detection program supports activities related to preventing and detecting immigration benefit fraud. The program leads efforts to identify threats to national security and public safety, deter, detect, and combat immigration benefit fraud, and remove systemic and other vulnerabilities. This is part of the Fraud Prevention and Detection Fee Account.

*Strategic Measures*

| Measure Name: | Percent of system generated notifications related to national security, public safety, or fraud reviewed and addressed for pending applications within 60 day | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | This measure gauges the timely resolution of system generated notifications SGNs related to national security, public safety, or fraud for immigration benefits in cases pending a decision to approve or deny immigration benefits.  SGNs provide continuous vetting capabilities to alert FDNS to investigate potential issues of concern.  Program officers may resolve the notification by determining that there is no basis for continuing the investigation or that a basis exists which warrants the opening of a fraud, public safety, or national security case in the Fraud Detection and National Security Data System (FDNS-DS).  Continuous vetting of information helps safeguard the integrity of the nation's lawful immigration system. | | | | | | |
| **Fiscal Year:** | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| **Targets:** | --- | --- | 85% | 80% | 80% | 80% | 80% |
| **Results:** | --- | --- | 85% | 75% | 82% | TBD | TBD |
| **Explanation of Result:** | USCIS significantly improved its performance in triaging SGNs during FY 2022 by realizing the benefits of multiple long-term initiatives. Foremost, FDNS and the USCIS Office of Information Technology (OIT) deployed a modernization of the ATLAS rules based platform in August 2021, which provided a more stable cloud-based environment and opportunities to utilize newer technologies in FY 2022 and beyond.  Secondly, FDNS, with support from OIT, deployed technology SGN optimizations which allowed refined algorithms to best isolate derogatory information in systems connected to ATLAS while reducing unnecessary notifications. USCIS has also trained new officers to bolster SGN triaging skillsets and increase compliance with best practices.  The combination of technological improvements to the ATLAS architecture, focused development on increasing SGN efficiency and effectiveness, and ongoing training to promote best practices enabled USCIS to improve overall performance and meet this strategic measure. | | | | | | |

***Immigration Examinations Fee Account:***  The Immigration Services program supports and promotes lawful immigration by processing benefit requests, so that only those eligible for immigration benefits are approved. This includes processing refugee and asylum applications as well as providing assimilation services for lawful immigrants.  This is part of the Immigration Examinations Fee Account and the H-1B Nonimmigrant Petitioner Fee Account.

*Strategic Measures*

| Measure Name: | Average processing time for adjustment of status to Permanent Resident Applications (I-485) (in months) |
|---|---|

**USCIS - 3**

# United States Citizenship and Immigration Services

Strategic Context

| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
|---|---|---|---|---|---|---|---|
| Description: | This measure assesses the ability of the Field Operations Directorate (FOD) to meet adjudication processing goals for the Form I-485, Application to Register Permanent Residence or Adjust status. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |
| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| Targets: | --- | --- | --- | --- | --- | ≤10.0 | ≤10.0 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Average processing time for detainees claiming Credible Fear (in days) | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses how quickly the program processes the credible fear claims of individuals held in ICE-operated detention centers. Specifically, for individuals claiming persecution or a well-founded fear of persecution or harm on account of his or her race, religion, nationality, membership in a particular social group, or political opinion if returned to their country. This measure reports the average number of days between individuals expressing their fear and the program completing the case. By evaluating how quickly the credible fear claims of detained individuals are completed, the program can assess the effectiveness of a critical element of the agency's goal to secure borders through effective use of detention capacity. | | | | | | |
| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| Targets: | --- | --- | --- | --- | --- | ≤14.0 | ≤14.0 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Average processing time for naturalization applications (N-400) (in months) | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the ability of the Field Operations Directorate (FOD) to meet its published adjudication processing goals for the Applications for Naturalization (N-400). An N-400 is filed by an individual applying to become a United States citizen. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |
| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| Targets: | --- | --- | --- | --- | --- | ≤8.0 | ≤8.0 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Average processing time to adjudicate form I-129 (Petition for Nonimmigrant Worker) (in months) |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure assesses the ability of the Field Operations Directorate (FOD) to meet its published adjudication processing goals for the Applications for Naturalization (N-400). This measure assesses the ability of the Service Center Operations Directorate (SCOPS) to meet its published adjudication processing goals of Form I-129. Petition for a Nonimmigrant Worker. An I-129 is filed on behalf of a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training, as an E-1, E-2, E-3, |

003571

**United States Citizenship and Immigration Services**                                                                          Strategic Context

H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN nonimmigrant worker. This process time information will help determine if the organization has the capability and capacity to process petitions and will also be used to make operational decisions. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. an individual applying to become a United States citizen. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure.

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | --- | ≤2.0 | ≤2.0 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Average processing time to adjudicate form I-140 (Immigrant Petition for Alien Worker) (in months) |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure assesses the ability of Service Center Operations (SCOPS) to meet its published adjudication processing goals for the Immigrant Petition for Alien Worker (I-140). An I-140 is filed on behalf of an immigrant worker to come to the United States permanently to perform services or labor as an E11, E12, E13, E21, E31, E32, or EW3 immigrant worker. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | --- | ≤4.0 | ≤4.0 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Number of asylum determinations |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure gauges the total number of asylum determinations to approve, deny, refer to an Immigration Judge, or administratively close cases related to refugee and asylum. Individuals physically present in the U.S. may apply for asylum, regardless of their country of nationality or current immigration status, if they were persecuted or have a fear that they will be persecuted because of their race, nationality, religion, membership in a particular social group, or political opinion. The processing of asylum determinations advances the objective to adjudicate protection, humanitarian, and other immigration benefits. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | 65,000 | 50,000 | 65,000 | 65,000 |
| Results: | --- | --- | --- | --- | 41,453 | TBD | TBD |

| Explanation of Result: | Throughout FY 2022, RAIO has shifted its adjudicative strength across various programs and functional areas both internal and external. RAIO Affirmative Asylum determination completions are negatively impacted by growing credible and reasonable fear, refugee, and parole caseloads, and by providing substantial assistance to other priority humanitarian programs. |

**USCIS - 5**

003572

**United States Citizenship and Immigration Services**

**Strategic Context**

| Corrective Action: | Appropriation funding was allocated and increases in workforce will be directly applied to backlog reduction and operational resource shortages. USCIS' ability to meet the target will improve when staffing vacancies are reduced, the proficiency of new hires increases, and USCIS international footprint is expanded to meet overseas interviewing demands that are heavily augmented. All corrections will continue to advance at a positive rate as USCIS is able to refocus the asylum workforce specifically on the Affirmative Asylum application process. |
| --- | --- |

| Measure Name: | Percent of approved applications for naturalization that were appropriately decided |
| --- | --- |
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure assesses the validity of final decisions by program adjudicators to approve all electronic N-400 Naturalization Forms received through USCIS Electronic Immigration System (ELIS) by reporting the findings of regular quality reviews of these decisions by experienced subject matter experts (SMEs).  The program conducts quality reviews by drawing a statistically valid random sample of approved N-400s on a quarterly basis.  Insuring that the program provides immigration services accurately and with full documentary support through quality reviews identifies opportunities to improve training and business processes and enhances confidence in the legal immigration system. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Targets: | 99% | 99% | 99% | 99% | 99% | 99% | 99% |
| Results: | 99% | 99% | 99% | 0% | 100% | TBD | TBD |

| Explanation of Result: | During FY 2022, FOD continued to enhance the security and integrity of processing Naturalization cases through the continued implementation of process efficiencies, which included the increased review and processing of electronic case filing and scanning, continuous training efforts, rapid hiring, and the use of overtime hours funded largely through recent Congressional appropriations. In addition, automated electronic security checks enhanced the integrity of the immigration system at the critical naturalization stage of the process.  FOD also expanded the use of video interviews of applicants that added additional flexibilities to the adjudication process. |
| --- | --- |

| Measure Name: | Percent of approved applications for permanent residence that were appropriately decided |
| --- | --- |
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure assesses the validity of final decisions by program adjudicators to approve Form I-485 applications to register for permanent residence or to adjust status by reporting the findings of regular quality reviews of these decisions by experienced subject matter experts (SMEs).  The program conducts quality reviews of these cases, drawing a statistically valid random sample of approved I-485s on a quarterly basis.  Insuring that the program provides immigration services accurately and with full documentary support through quality reviews identifies opportunities to improve training and business processes and enhances confidence in the legal immigration system. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Targets: | 99% | 99% | 99% | 99% | 99% | 99% | 99% |
| Results: | 99% | 99% | 96% | 0% | 100% | TBD | TBD |

| Explanation of Result: | In FY 2022, FOD expanded its comprehensive interview strategy for Adjustment of Status cases, in order to better utilize resources by waiving interviews when the record establishes eligibility for the immigration benefit.  This allowed for better triaging and routing of cases to officers, based on officer experience and case complexity.  Additionally, more family based I-485s were ingested and processed electronically, allowing for more efficient security checks and improved overall integrity of the immigration system. |
| --- | --- |

USCIS - 6

**United States Citizenship and Immigration Services**  —  **Strategic Context**

| Measure Name: | Percent of naturalization cases where derogatory information was identified and resolved prior to taking the oath of allegiance | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | This measure gauges the rate at which derogatory information is identified and resolved before N-400 Form naturalization applicants take the oath at which the final the Oath of Allegiance at a naturalization ceremony. Taking the oath at a ceremony completes the process of becoming a U.S. citizen for approved applicants. USCIS employs continual vetting of applicants and a final check for derogatory information close to the oathing ceremony to ensure that ineligible applicants are not naturalized due to criminal activity, national security, or public safety concerns. Continuous vetting ensures the integrity of the immigration system and protects our national security. | | | | | | |
| **Fiscal Year:** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** |
| **Targets:** | --- | --- | 100% | 100% | 100% | 100% | 100% |
| **Results:** | --- | --- | 100% | 100% | 100% | TBD | TBD |
| **Explanation of Result:** | This measure gauges the rate at which derogatory information is identified and resolved by USCIS before an N-400 Form (Naturalization Application) applicant takes the final the Oath of Allegiance at a naturalization ceremony. Taking the oath at a ceremony completes the process of becoming a U.S. citizen for approved applicants. USCIS employs continual vetting of applicants and a final check for derogatory information close to the oathing ceremony to ensure that applicants who are ineligible due to criminal activity, national security, or public safety concerns are not naturalized. Continuous vetting ensures the integrity of the immigration system and protects our national security. | | | | | | |

| Measure Name: | Percent of pending cases that are considered backlog | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | The measure assesses the proportion of pending cases considered as backlog. Backlog is defined as the number of cases pending within the government's control that exceed target processing time for each form. This measure will help senior leadership assess the effectiveness of the agency's multiple initiatives for reducing the backlog. These initiatives include strategic staffing, technology enhancements, regulatory and policy changes, and the use of overtime. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |
| **Fiscal Year:** | **FY 2018** | **FY 2019** | **FY 2020** | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** |
| **Targets:** | --- | --- | --- | --- | --- | ≤42.2% | ≤36.5% |
| **Results:** | --- | --- | --- | --- | --- | TBD | TBD |

| Measure Name: | Percent of refugee and asylum adjudications that were legally sufficient | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | This measure assesses the ability of officers to adjudicate asylum and refugee determinations for Forms I-589 and Form I-590 in a legally sufficient manner. An adjudication is legally sufficient if the analysis breaks down the determination that an applicant does or does not qualify for asylum or refugee status into explanations and conclusions that makes clear to the reviewer the rationale behind the final determination. A panel of subject matter experts are convened to review a sample of refugee and asylum adjudications. The panel may sustain the decision to grant, recommend denial, or send the file back to the appropriate field office for correction or more | | | | | | |

003574

# United States Citizenship and Immigration Services

**Strategic Context**

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | 90% | 90% | 90% |
| Results: | --- | --- | --- | --- | 90% | TBD | TBD |

**Explanation of Result:** This FY 2022 annual measure will be reported on pending final analysis in Q2 of FY 2023.

information if it is determined that procedures were not correctly followed, or the case is lacking sufficient interview evidence. This measure helps ascertain the quality of decisions and to improve the policy and procedural guidance, training, and processes used in conducting asylum and refugee adjudications.

| Measure Name: | Percent of respondents satisfied with the citizenship and immigration-related support received from the USCIS Contact Center |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |

**Description:** This measure gauges the overall satisfaction of support received from the USCIS Contact Center based on accuracy of information, responsiveness to public inquiries, and accessibility to information. The Qualtrics Automated Omnichannel Survey Tool captures live feedback after customers complete their interaction with the contact center through the IVR, telephony, virtual assistant, live chat agent, myUSCIS account experience, and/or website. The survey question that pertains to this measure is: "I am satisfied with the service I received from the USCIS Contact Center," rated on a scale of 1 to 5, with 1 being "strongly disagree" and 5 being "strongly agree." Scores of 4 and 5 are included in the results of this measure. Providing quality customer service helps to ensure applicants receive the information they need and increases trust in the Federal government.

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | 80.0% | 80.0% | 80.0% |
| Results: | --- | --- | --- | --- | 84.5% | TBD | TBD |

**Explanation of Result:** The survey data covers the USCIS Contact Center, a multi-tiered operation providing immigration assistance to over 14 million callers a year. FY 2022 Q4 showed increases in customer satisfaction for 6 out of 7 survey questions. The largest percentage increases were observed in the questions "Employees I interacted with were helpful" (increased from 83.2% to 84.5%) and "I am satisfied with the service I received from the USCIS Contact Center" (increased from 79.5% to 80.7%). This increase in satisfaction was attributed to USCIS' continuous content refinement of the Interactive Voice Response (IVR) system's capabilities which give more callers the ability to resolve their inquiry using self-service. USCIS plans in the future to provide more robust online account services to increase the capability for self-service for needs such as address changes, expedite requests, and other requests commonly handled by the Contact Center.

| Measure Name: | Percent of students with increased test scores after attending courses funded through USCIS Grant Programs |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |

**Description:** This measure reports on the success of grant recipients to increase knowledge of English necessary for permanent resident students receiving services under the program to pass the naturalization test. Students receive specialized civics-based English as a Second Language (ESL) training on vocabulary and grammar needed to know in order to successfully navigate the naturalization test and interview. Grant recipients are required to use a nationally normed standardized test of English language proficiency for student placement and assessment of progress. This measure evaluates the percentage of students receiving civics-based English as a second language (ESL) classes who demonstrate a one point or greater increase in score. The classes equip immigrants with the tools they need to be successful throughout their journey to become new U.S. citizens.

**USCIS - 8**

003575

**Strategic Context**

## United States Citizenship and Immigration Services

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | 80.0% | 80.0% | 80.0% |
| Results: | --- | --- | --- | --- | 82.3% | TBD | TBD |
| Explanation of Result: | During FY 2022, the Office of Citizenship (OoC) initiated hybrid grantee monitoring and was able to resume in-person site visits to provide technical support. Grantee performance has stabilized at/above the targeted performance level after falling off a bit in FY 2020 – FY 2021, due to COVID interruptions of service delivery. Grantees have seen success in implementing hybrid approaches to course delivery and have added digital literacy to their educational programs. | | | | | | |

| | |
|---|---|
| **Measure Name:** | Total number of attendees at USCIS naturalization sessions |
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure assesses the effectiveness of the program's effort toward public engagement. These engagements include, but are not limited to, presentations by leadership, webinars, trainings, stakeholder events, conference presentations, summits, panel discussions, meetings, roundtables, and serving as guest speakers. Information sessions will include scheduled engagements, both virtual and in-person, conducted for the public under the coordination of the USCIS Office of Citizenship, Partnerships, and Engagement (OCPE). This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | --- | 85,000 | 90,000 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

*Management Measures*

| | |
|---|---|
| **Measure Name:** | Accuracy rate of USCIS's processing of manual verifications for Systematic Alien Verification for Entitlements referrals |
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure tracks the accuracy of manual verifications conducted for the Systematic Alien Verification for Entitlements (SAVE) program. A SAVE verification involves federal, state, tribal, or local government agency which grants licenses or benefits verifying an applicant's immigration status. If SAVE cannot match an applicant's data to a database record from U.S. Government systems used to adjudicate immigration benefits in the initial search, customer agencies pursue further verification if requested by the applicant. Status Verifiers (SV) perform these additional queries manually to determine the applicant's immigration status. SAVE referrals are sampled quarterly to verify the work provided by SV correctly reflects the immigration status on record for persons seeking benefits from other Government agencies. Conducting accurate SAVE verifications ensures that federally funded benefits are awarded correctly to non-citizen applicants and recipients. |

| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| Targets: | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Results: | 99.0% | 99.1% | 99.0% | 99.3% | 99.1% | TBD | TBD |
| Explanation of Result: | USCIS strives to ensure policies, internal processes and procedures are clearly defined and consistently implemented across the various field offices. To accomplish these objectives, USCIS does a quarterly review of verification work performed by status | | | | | | |

**USCIS - 9**

003576

## United States Citizenship and Immigration Services

**Strategic Context**

verifiers to determine whether SAVE referrals were resolved correctly, and also conducts periodic process reviews to evaluate how well staff are following their Standard Operating Procedures (SOPs).

| **Measure Name:** | Average processing time to adjudicate Premium Processing form I-129 (Petition for Nonimmigrant Worker) (in days) | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | This measure assesses the ability of the Service Center Operations Directorate (SCOPS) to meet its published adjudication processing goals for the Premium Processing of Form I-129, Petition for a Nonimmigrant Worker. An I-129 is filed on behalf of a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training, as an E-1, E-2, E-3, H-1B, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN nonimmigrant worker.  This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly.  External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |

| **Fiscal Year:** | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | --- | ≤15.0 | ≤15.0 |
| **Results:** | --- | --- | --- | --- | --- | TBD | TBD |

| **Measure Name:** | Average processing time to adjudicate Premium Processing form I-140 (Immigrant Petition for Alien Worker) (in days) | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |
| **Description:** | This measure assesses the ability of the Field Operations Directorate (FOD) to meet its published adjudication processing goals for the Premium Processing Immigrant Petition for Alien Worker (I-140).  An I-140 is filed on behalf of an immigrant worker to come to the United States permanently to perform services or labor as an E11, E12, E13, E21, E31, E32, or EW3 immigrant worker.  This process time information will help determine if the organization has the capability and capacity to process immigrant applications and will also be used to make operational decisions.  This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly.  External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |

| **Fiscal Year:** | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | --- | ≤15.0 | ≤15.0 |
| **Results:** | --- | --- | --- | --- | --- | TBD | TBD |

**USCIS - 10**

United States Citizenship and Immigration Services

Strategic Context

| Measure Name: | Percent of actionable refugee interviews conducted | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the progress in conducting refugee interviews needed to feed the pipeline of individuals eligible for refugee admission to the U.S. Interview results are used to verify identity and make eligibility recommendations to immigration officers that inform adjudication decisions on refugee applications. Refugee interviews are considered actionable if there are no external factors preventing officers from interviewing cases presented by the Department of State, Bureau of Population, Refugees, and Migration (PRM). The main purpose of the refugee interview is to elicit and provide information related to eligibility for refugee status. Each interview may involve multiple individuals connected to a single refugee case. | | | | | | |
| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| Targets: | --- | --- | --- | --- | 95% | 95% | 95% |
| Results: | --- | --- | --- | --- | 98% | TBD | TBD |
| Explanation of Result: | RAIO exceeded this target for 4 consecutive quarters.  By September 30, the International Refugee Affairs Division interviewed 97.8% of adjusted actionable refugee cases for circuit rides ending on or before the close of Q4. | | | | | | |

| Measure Name: | Percent of eligible immigration benefit requests processed electronically | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure gauges the degree to which immigration applications, petitions, and other eligible requests are electronically processed. USCIS provides a digital platform of services used to complete intake, case management, and adjudicative tasks.  Ultimately, electronic processing reduces case processing times, improves adjudication rates, increases data quality, and enhances the customer experience.  The targets for this measure also reflect the reality that USCIS will maintain a degree of paper/manual processing for those benefits that represent a very small portion of filings. | | | | | | |
| Fiscal Year: | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
| Targets: | --- | --- | --- | --- | 60% | 70% | 80% |
| Results: | --- | --- | --- | --- | 55% | TBD | TBD |
| Explanation of Result: | Target measure was not achieved due to emerging priorities, which included Operation Allies Welcome (OAW) and Uniting for Ukraine (U4U).  This resulted in diverting IT development resources.  The following forms were planned to be made available for electronic processing but were not completed: I-131, I-140, I-751, I-485, and I-765 C03 A/B/C, C08, C09, C11, and C14. | | | | | | |
| Corrective Action: | USCIS will work with business stakeholders to reassess the forms that will be digitized in FY 2023 and beyond, and update its target measures. | | | | | | |

USCIS - 11

003578

Operations and Support

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *Operations and Support*



**Fiscal Year 2024**
**Congressional Justification**

United States Citizenship and Immigration Services

003579

CIS – O&S - 1

United States Citizenship and Immigration Services

Operations and Support

# Table of Contents

*Operations and Support* .................................................................................................**1**

   Budget Comparison and Adjustments........................................................3

   Summary of Budget Changes ....................................................................6

   Justification of Pricing Changes ...............................................................7

   Justification of Program Changes ..............................................................8

   Personnel Compensation and Benefits.....................................................12

   Non Pay Budget Exhibits..........................................................................14

  *Employment Status Verification – PPA* ....................................................15

     Budget Comparison and Adjustments....................................................15

     Personnel Compensation and Benefits...................................................20

     Non Pay Budget Exhibits.......................................................................22

  *Application Processing – PPA* ................................................................24

     Budget Comparison and Adjustments....................................................24

     Personnel Compensation and Benefits...................................................28

     Non Pay Budget Exhibits.......................................................................31

**CIS – O&S - 2**

003580

United States Citizenship and Immigration Services

Operations and Support

## Operations and Support

## Budget Comparison and Adjustments

### Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Employment Status Verification | 389 | 370 | $114,504 | 321 | 302 | $109,611 | 321 | 302 | $111,865 | - | - | $2,254 |
| Application Processing | 953 | 477 | $275,000 | 644 | 612 | $133,370 | 3,675 | 2,822 | $743,329 | 3,031 | 2,210 | $609,959 |
| **Total** | **1,342** | **847** | **$389,504** | **965** | **914** | **$242,981** | **3,996** | **3,124** | **$855,194** | **3,031** | **2,210** | **$612,213** |
| Subtotal Discretionary - Appropriation | 1,342 | 847 | $389,504 | 965 | 914 | $242,981 | 3,996 | 3,124 | $855,194 | 3,031 | 2,210 | $612,213 |

The U.S. Citizenship and Immigration Services (USCIS) Operations and Support (O&S) appropriation provides funding for ongoing mission operations, mission support, and associated management and administration (M&A) costs for the E-Verify program and application processing support.

The O&S Appropriation supports the following Level I Program, Project, and Activities (PPAs):

**Employment Status Verification (ESV):** E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available in the Department of Homeland Security (DHS), Social Security Administration (SSA), Department of State (DoS), and State and local systems (DMVs).

The ESV PPA provides funding for E-Verify, which is one component of USCIS's immigration records and identity services directorate. The other component is the Systematic Alien Verification for Entitlements (SAVE) program, which is funded within USCIS' Immigration Examinations Fee Account (IEFA). Due to the similarities between E-Verify and SAVE, both programs use the Verification Information System (VIS) and secondary IT systems and services. Shared costs are distributed between the two programs.

CIS – O&S – 3

United States Citizenship and Immigration Services

**Application Processing:** The Application Processing PPA provides funding for staff, equipment, and support services to process non-revenue generating refugee and asylum applications and petitions as well as those applications that are part of the backlog workload across USCIS' Field Operations and Service Center Operations directorates. This funding continues to support a refugee admissions ceiling up to 125,000, protection screening for migrants interdicted at sea, adjudication of certain parole and following-to-join refugee and asylee relative petitions, refugee travel documents, related appeals, and also supports the adjudication of affirmative asylum applications as well as the adjudication of credible fear screenings, reasonable fear screenings, and asylum merits interviews for certain individuals placed in expedited removal. Support services encompass a wide range of oversight, infrastructure, and administrative functions to enable adjudicative operations such as policy and procedural guidance, training, travel arrangements, hiring, data management, analysis, reporting, procurement actions, emergency management, budget, personal property management, facilities, and records.

003582

United States Citizenship and Immigration Services

Operations and Support

# Operations and Support
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Enacted/Request** | **$389,504** | **$242,981** | **$855,194** |
| Carryover – Start of Year | $4,082 | $48,101 | - |
| Recoveries | $187 | - | - |
| Rescissions to Current Year/Budget Year | ($2,612) | ($36,145) | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | ($7,332) | $3,208 | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | **$383,829** | **$258,145** | **$855,194** |
| Collections – Reimbursable Resources | - | - | - |
| Collections – Other Sources | - | - | - |
| **Total Budget Resources** | **$383,829** | **$258,145** | **$855,194** |
| Obligations (Actual/Estimates/Projections) | $329,311 | $258,145 | $855,194 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 1,342 | 965 | 3,996 |
| Enacted/Request FTE | 847 | 914 | 3,124 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 797 | 965 | 3,996 |
| FTE (Actual/Estimates/Projections) | 421 | 914 | 3,124 |

CIS – O&S - 5

003583

United States Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2022 Enacted | 1,342 | 847 | $159,102 | $230,402 | $389,504 |
| FY 2023 Enacted | 965 | 914 | $131,919 | $111,062 | $242,981 |
| FY 2024 Base Budget | 965 | 914 | $131,919 | $111,062 | $242,981 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Civilian Pay Raise Total | - | - | $5,187 | - | $5,187 |
| Annualization of Prior Year Pay Raise | - | - | $1,065 | - | $1,065 |
| Total Pricing Changes | - | - | $6,252 | - | $6,252 |
| Total Adjustments-to-Base | - | - | $6,252 | - | $6,252 |
| FY 2024 Current Services | 965 | 914 | $138,171 | $111,062 | $249,233 |
| Total Transfers | - | - | - | - | - |
| Asylum Adjudications-IEFA Realignment | 794 | 794 | $143,454 | $41,941 | $185,395 |
| Asylum Adjudications-Ramp Up to 150K Caseload | 1,241 | 621 | $103,688 | $52,807 | $156,495 |
| Backlog Reduction | 996 | 795 | $181,283 | $82,788 | $264,071 |
| Total Program Changes | 3,031 | 2,210 | $428,425 | $177,536 | $605,961 |
| FY 2024 Request | 3,996 | 3,124 | $566,596 | $288,598 | $855,194 |
| FY 2023 TO FY 2024 Change | 3,031 | 2,210 | $434,677 | $177,536 | $612,213 |

003584

United States Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Justification of Pricing Changes
*(Dollars in Thousands)*

|  | | FY 2024 President's Budget | | |
|---|---|---|---|---|
|  | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 - Civilian Pay Raise Total** | - | - | **$5,187** | - | **$5,187** |
| Employment Status Verification | - | - | $1,697 | - | $1,697 |
| Application Processing | - | - | $3,490 | - | $3,490 |
| **Pricing Change 2 - Annualization of Prior Year Pay Raise** | - | - | **$1,065** | - | **$1,065** |
| Employment Status Verification | - | - | $557 | - | $557 |
| Application Processing | - | - | $508 | - | $508 |
| **Total Pricing Changes** | - | - | **$6,252** | - | **$6,252** |

### Pricing Change 1 – Civilian Pay Raise Total:

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and the Annualization of Prior Year Pay Raise, which totals $133M.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2024 5.2 percent civilian pay increase. It is calculated by adding the Base pay and the Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (5.2 percent) and then by three-fourths to account for nine months of the 2024 calendar year.

### Pricing Change 2 – Annualization of Prior Year Pay Raise:

Base Activity Funding: This pricing change accounts for the last quarter of civilian pay funding from the FY 2023 Congressional Justification.

Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2023 4.6 percent civilian pay increase. It is calculated by adding the civilian portion of FY 2022 Congressional Justification Base pay and the FY 2023 Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (4.6 percent) and then by one-fourth to account for three months of the 2023 calendar year.

003585

United States Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Justification of Program Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2024 President's Budget | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Pay Amount | Non-Pay Amount | Amount | |
| **Program Change 1 - Asylum Adjudications-IEFA Realignment** | **794** | **794** | **$143,454** | **$41,941** | **$185,395** | |
| Application Processing | 794 | 794 | $143,454 | $41,941 | $185,395 | |
| **Program Change 2 - Asylum Adjudications-Ramp Up to 150K Caseload** | **1,241** | **621** | **$103,688** | **$52,807** | **$156,495** | |
| Application Processing | 1,241 | 621 | $103,688 | $52,807 | $156,495 | |
| **Program Change 3 - Backlog Reduction** | **996** | **795** | **$181,283** | **$82,788** | **$264,071** | |
| Application Processing | 996 | 795 | $181,283 | $82,788 | $264,071 | |
| **Total Program Changes** | **3,031** | **2,210** | **$428,425** | **$177,536** | **$605,961** | |

## Program Change 1 –Asylum Adjudications-IEFA Realignment:

| *($ in thousands)* | Pos | FTE | Amount |
| --- | --- | --- | --- |
| Base: Current Services & Transfers | - | - | - |
| Program Change | 794 | 794 | $185,395 |

### Description
The FY 2024 Budget includes an increase of 794 Positions, 794 FTE, and $185.4M for asylum adjudications and screenings. USCIS has been making investments and staffing up in a phased approach with 266 positions funded in FY 2022 and 528 positions funded in FY 2023 through IEFA. The FY 2024 Budget seeks to shift these 794 positions from IEFA funding to appropriated funding.

### Justification
In support of *Executive Order 14010: Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*, DHS and Department of Justice (DOJ) began implementing the Asylum Processing rule to support creating a more efficient and orderly process that facilitates timely adjudications and adherence to standards of fairness and due process for asylum seekers arriving at our borders.

This shift in funding source would provide the resources within the USCIS appropriated budget to support the payroll and other associated staffing costs to handle the processing of asylum adjudications, credible fear screenings, and asylum merit interviews. USCIS is primarily funded by immigration and naturalization benefit fees charged to applicants and petitioners; however, this asylum-related workload does not generate revenue and requires that the burden of these costs be borne by the pool of fee-paying applicants and petitioners for other USCIS form types.

United States Citizenship and Immigration Services                                                    Operations and Support

## Performance

USCIS aims to be better situated to support the Administration's and Nation's commitment to providing safe and orderly processing of asylum seekers and being a Nation of welcome. With the phased implementation of the Asylum Processing Interim Final Rule (IFR), which was announced on May 31, 2022, the USCIS Asylum Division has jurisdiction over the asylum applications of certain individuals placed in expedited removal and allows USCIS to retain and adjudicate applications for asylum and for withholding of removal who have received a positive credible fear determination, and are scheduled for an Asylum Merits Interview; rather than placing those individuals into removal proceedings with an immigration judge.

With this proposed funding, the 794 positions have the capacity to process up to 75,000 credible fear cases and maintain its capacity to conduct up to 52,500 Asylum Merits Interviews under the rule.

## Program Change 2 – Asylum Adjudications-Ramp Up to 150K Caseload:

| (\$ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 794 | 794 | \$185,395 |
| Program Change | 1,241 | 621 | \$156,495 |

## Description

The FY 2024 Budget includes an additional increase of 1,241 Positions, 621 FTE, and \$156.5M for asylum adjudications in support of the Asylum Processing IFR. This funding provides for the payroll, other associated staffing costs, and general expenses, which include increased interpreter and transcription services for credible fear workloads, new facilities, and physical security to house the increased staff, and an IT solution to handle the increasing caseloads.

## Justification

Implementation is taking place in a phased manner, and will grow as USCIS builds operational capacity over time. USCIS has analyzed a range of credible fear cases to estimate staffing requirement costs, and USCIS expects volumes to fall within a primary estimate range of 150,000 credible fear cases.

These resources for increased USCIS capacity under the Asylum Processing IFR would allow for increases in the volume of cases that can be routed for credible fear screenings under the rule and potentially for Asylum Merits Interviews; as well as allow DHS and USCIS to reduce the estimated budget requirements funded by IEFA fees accordingly.

## Performance

With this proposed funding, the 2,035 positions in total will have the capacity to process up to 150,000 credible fear cases and increase its capacity to conduct 105,000 Asylum Merits Interviews under the rule.

Prior to the Asylum Processing IFR, the process for hearing and deciding these asylum cases currently takes several years on average, due to existing court backlogs. Through a gradual process, and when fully implemented, the rule will shorten the administrative process from several years to several months. Increased capacity helps achieve the rule's objective of providing a meaningful way to ensure that those subject to expedited removal who are eligible for asylum are granted relief quickly, and those who are not are promptly removed.

As also previously indicated, USCIS is primarily funded by immigration and naturalization benefit fees charged to applicants and petitioners. As DHS proposes to adjust these fees for the considerable costs increases due to higher demand since 2016, DHS has estimated that the associated requirements of the Asylum Processing Rule will be funded by a $600 Asylum Program Fee to be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Worker, to ensure full cost of operations are recovered. DHS has determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. With this support, DHS may reduce USCIS' estimated IEFA resource requirements and the fees necessary to generate those resources in a final fee rule.

## Program Change 3 – Backlog Reduction:

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | - | - | - |
| Program Change | 996 | 795 | $264,072 |

## Description

The FY 2023 Budget includes an increase of 996 Positions, 795 FTE, and $264.1M to support USCIS's multi-year effort of reducing the backlog and pending caseload. This program change includes a realignment of 644 positions from IEFA, while further supporting the hiring of an additional 352 positions to expedite the elimination of the backlog.

## Justification

As part of the U.S. Government Accountability Office's (GAO) recommendations in its report[1] on actions needed to address pending caseload, GAO states that USCIS should identify resources necessary to address its case backlog and inform key stakeholders, such as the Office of Management and Budget and Congress. Building on the FY 2022 and FY 2023 President's Budget, USCIS continues to communicate the resources that are required and will be required to eliminate the backlog over a sustained multi-year period.

---

[1] GAO Report 21-529 – *U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload* (https://www.gao.gov/products/gao-21-529)

# United States Citizenship and Immigration Services

## Operations and Support

In FY 2022, the Department of Homeland Security Appropriations Act (P.L. 117-103) crucially funded 644 backlog reduction positions in Operations and Support, which in part has reversed months of steady and incremental increases in the backlog starting April 2020, which coincided with the COVID-19 pandemic. This funding has demonstrated a measurable decrease of approximately 307,000 forms from its height in January 2022 of 5,258,000 down to 4,951,000, as of December 2022 - see Figure 1.

Addressing the backlog is a priority for the Administration and USCIS senior leadership. USCIS understands the impact that decision delays have on applicants and petitioners, and USCIS recognizes that its core mission is to ensure the timely processing of immigration requests with fairness, integrity, and respect for all we serve. USCIS will expand current efforts through increased capacity (additional FTE, overtime, expanded contractual support, and miscellaneous expenses) as well as a continued focus on efficiency. The current fee collections do not support the rapid increase in capacity needed to make the significant progress that is necessary to have a large impact on reducing the backlog. Sustained funding for backlog reduction is necessary to ultimately eliminate the current backlog.

## Performance

This funding supports the downward trend of the backlog realized in FY 2022 as a result of increased staff to support backlog reduction efforts.



*Figure 1: Backlog Trends, December 2017 – December 2022 (Backlog Forms in Thousands)*

003589

United States Citizenship and Immigration Services — Operations and Support

# Operations and Support
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 President's Budget | | | | FY 2023 to FY 2024 Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Employment Status Verification | 389 | 370 | $48,105 | $130.01 | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $45,212 | $149.71 | - | - | $2,254 | $7.46 |
| Application Processing | 953 | 477 | $110,997 | $232.70 | 644 | 612 | $88,961 | $145.36 | 3,675 | 2,822 | $521,384 | $184.74 | 3,031 | 2,210 | $432,423 | $39.38 |
| Total | 1,342 | 847 | $159,102 | $187.84 | 965 | 914 | $131,919 | $144.33 | 3,996 | 3,124 | $566,596 | $181.35 | 3,031 | 2,210 | $434,677 | $37.02 |
| Subtotal Discretionary - Appropriation | 1,342 | 847 | $159,102 | $187.84 | 965 | 914 | $131,919 | $144.33 | 3,996 | 3,124 | $566,596 | $181.35 | 3,031 | 2,210 | $434,677 | $37.02 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $113,612 | $100,061 | $388,220 | $288,159 |
| 11.3 Other than Full-time Permanent | $736 | $2,244 | $2,332 | $88 |
| 11.5 Other Personnel Compensation | $2,066 | $5,178 | $59,611 | $54,433 |
| 12.1 Civilian Personnel Benefits | $42,688 | $24,436 | $116,385 | $91,949 |
| 13.0 Benefits for Former Personnel | - | - | $48 | $48 |
| Total - Personnel Compensation and Benefits | $159,102 | $131,919 | $566,596 | $434,677 |
| **Positions and FTE** | | | | |
| Positions - Civilian | 1,342 | 965 | 3,996 | 3,031 |
| FTE - Civilian | 847 | 914 | 3,124 | 2,210 |

003590

United States Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Permanent Positions by Grade – Appropriation
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| SES | - | 1 | 1 | - |
| GS-15 | 30 | 22 | 50 | 28 |
| GS-14 | 137 | 178 | 615 | 437 |
| GS-13 | 130 | 181 | 1,139 | 958 |
| GS-12 | 896 | 437 | 1,558 | 1,121 |
| GS-11 | 47 | 29 | 263 | 234 |
| GS-10 | 3 | 4 | 238 | 234 |
| GS-9 | 97 | 48 | 57 | 9 |
| GS-8 | - | 5 | 5 | - |
| GS-7 | 2 | 39 | 49 | 10 |
| GS-6 | - | 7 | 7 | - |
| GS-5 | - | 13 | 13 | - |
| GS-4 | - | 1 | 1 | - |
| **Total Permanent Positions** | **1,342** | **965** | **3,996** | **3,031** |
| Total Perm. Employment (Filled Positions) EOY | 593 | 965 | 3,996 | 3,031 |
| Unfilled Positions EOY | 749 | - | - | - |
| **Position Locations** | | | | |
| Headquarters Civilian | 613 | 441 | 1,568 | 1,127 |
| U.S. Field Civilian | 724 | 521 | 2,401 | 1,880 |
| Foreign Field Civilian | 5 | 4 | 42 | 38 |
| **Averages** | | | | |
| Average Personnel Costs, ES Positions | - | $164,300 | $170,872 | $6,572 |
| Average Personnel Costs, GS Positions | $110,810 | $105,371 | $109,586 | $4,215 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

003591

**United States Citizenship and Immigration Services**

**Operations and Support**

## Operations and Support
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Employment Status Verification | $66,399 | $66,653 | $66,653 | - |
| Application Processing | $164,003 | $44,409 | $221,945 | $177,536 |
| **Total** | **$230,402** | **$111,062** | **$288,598** | **$177,536** |
| Subtotal Discretionary - Appropriation | $230,402 | $111,062 | $288,598 | $177,536 |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $16,461 | $29,228 | $73,200 | $43,972 |
| 22.0 Transportation of Things | $7 | $670 | $670 | - |
| 23.1 Rental Payments to GSA | $3,750 | $9,222 | $9,222 | - |
| 23.2 Rental Payments to Others | $438 | $2,944 | $12,691 | $9,747 |
| 23.3 Communications, Utilities, & Miscellaneous | $51 | - | $139 | - |
| 24.0 Printing and Reproduction | $12 | $139 | $139 | - |
| 25.1 Advisory & Assistance Services | $107,652 | $11,712 | $16,247 | $4,535 |
| 25.2 Other Services from Non-Federal Sources | $31,960 | $208 | $97,676 | $97,468 |
| 25.3 Other Purchases of goods and services | $11,151 | $11,791 | $11,791 | - |
| 25.4 Operations & Maintenance of Facilities | - | $258 | $258 | - |
| 25.7 Operation & Maintenance of Equipment | $9,916 | $44,283 | $44,283 | - |
| 26.0 Supplies & Materials | $17,669 | $268 | $1,341 | $1,073 |
| 31.0 Equipment | $31,335 | $339 | $21,080 | $20,741 |
| **Total - Non Pay Budget Object Class** | **$230,402** | **$111,062** | **$288,598** | **$177,536** |

003592

## *Employment Status Verification – PPA*

## Budget Comparison and Adjustments

## Comparison of Budget Authority and Request

*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Employment Status Verification | 389 | 370 | $114,504 | 321 | 302 | $109,611 | 321 | 302 | $111,865 | - | - | $2,254 |
| Total | 389 | 370 | $114,504 | 321 | 302 | $109,611 | 321 | 302 | $111,865 | - | - | $2,254 |
| Subtotal Discretionary - Appropriation | 389 | 370 | $114,504 | 321 | 302 | $109,611 | 321 | 302 | $111,865 | - | - | $2,254 |

### PPA Level I Description

The ESV PPA provides funds for the operations, mission support, and associated management and administration costs of E-Verify. E-Verify is authorized by the *Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)* and is administered by SSA and USCIS. USCIS facilitates compliance with U.S. immigration law by providing E-Verify program support, user support, training, outreach, compliance, and developing innovative technological solutions to streamline employment eligibility verification.

In the E-Verify process, employers create cases based on information from an employee's Form I-9, Employment Eligibility Verification, which is electronically compared to records available in DHS, SSA, DoS, and DMVs. The employer usually receives a response within a few seconds either confirming the employee's employment eligibility or indicating that the employee needs to take further action to complete the case due to a data mismatch, what was provided on the Form I-9 and what the government has in its records. Cases that cannot be resolved automatically are manually resolved by E-Verify or SSA employees.

This PPA also funds USCIS's E-Verify Account Compliance and Engagement Branch, which protects E-Verify against system misuse through activities such as identifying and resolving compliance issues, notifying employers of noncompliant behaviors, and offering compliance assistance in the form of emails, phone calls, desk reviews, and site visits. USCIS conducts these monitoring and compliance activities to prevent misuse, abuse, discrimination, breach of privacy, and suspected fraudulent use of E-Verify under applicable laws, rules, regulations, and agency policies.

As of September 30, 2022, there were over 1,072,000 employers enrolled in E-Verify; of those enrolled, approximately 300,800 actively used E-Verify and ran 49 million queries in FY 2022. Approximately 1,300 new employers enroll in E-Verify per week.

Operations and Support

Employment Status Verification – PPA

The following table depicts the actual E-Verify workload for FY 2022 and projections for FY 2023 and FY 2024 Budget:

| E-Verify Actual and Projected Workload for FY 2022- FY 2024 | | | | |
|---|---|---|---|---|
| Activity | FY 2022 Actuals | FY 2023 Projection | FY 2024 Projection | Change from FYs 2023-2024 |
| **E-Verify** | | | | |
| E-Verify Cases | 49,000,000 | 50,000,000 | 52,000,000 | 2,000,000 |
| E-Verify cases requiring secondary review by staff | 414,000 | 384,500 | 396,000 | 11,500 |
| E-Verify cases requiring additional review by staff | 61,000 | 78,100 | 84,200 | 6,100 |
| Enrolled Employers (Cumulative) | 1,072,000 | 1,170,000 | 1,270,000 | 100,000 |
| **Account Compliance** | | | | |
| Emails | 280,270 | 370,000 | 460,270 | 90,270 |
| Compliance Calls | 3,087 | 4,500 | 5,500 | 1,000 |
| Desk Reviews | 130 | 400 | 490 | 90 |
| Site Visits | - | 36 | 46 | 10 |
| Enhanced Compliance Assistance | 3045 | 3045 | 3495 | 450 |
| Case Reviews | 1,928 | 2,500 | 3,000 | 500 |
| Webinars | 389 | 397 | 405 | 8 |
| **Total Employer Actions** | **288,849** | **380,878** | **473,206** | **92,328** |

CIS – O&S - 16

003594

Operations and Support

Employment Status Verification – PPA

| E-Verify Actual and Projected External Actions from FY 2022 - FY 2024 | | | | |
|---|---|---|---|---|
| External Actions | FY 2022 Actuals | FY 2023 Projection | FY 2024 Projection | Change from FY 2023-2024 |
| Referrals to Immigration and Customs Enforcement (Fraud) | 38 | 50 | 75 | 25 |
| Referrals to Department of Justice (Discrimination) | 389 | 500 | 600 | 100 |
| Law Enforcement Requests (LERs) - IER, ICE, Other Agencies | 111 | 125 | 150 | 25 |
| Referrals from DOJ (IMARR) | - | - | - | - |
| Locked Social Security Numbers (SSNs) | 1,772 | 1,952 | 2,132 | 180 |
| Total External Activity | 2,310 | 2,627 | 2,957 | 330 |

CIS – O&S - 17

003595

# Employment Status Verification – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Enacted/Request** | **$114,504** | **$109,611** | **$111,865** |
| Carryover - Start of Year | - | - | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | ($1,368) | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | $1,368 | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | **$114,504** | **$109,611** | **$111,865** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$114,504** | **$109,611** | **$111,865** |
| Obligations (Actual/Estimates/Projections) | $114,301 | $109,611 | $111,865 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 389 | 321 | 321 |
| Enacted/Request FTE | 370 | 302 | 302 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 219 | 321 | 321 |
| FTE (Actual/Estimates/Projections) | 246 | 302 | 302 |

Operations and Support

Employment Status Verification – PPA

# Employment Status Verification – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2022 Enacted | 389 | 370 | $48,105 | $66,399 | $114,504 |
| FY 2023 Enacted | 321 | 302 | $42,958 | $66,653 | $109,611 |
| FY 2024 Base Budget | 321 | 302 | $42,958 | $66,653 | $109,611 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Civilian Pay Raise Total | - | - | $1,697 | - | $1,697 |
| Annualization of Prior Year Pay Raise | - | - | $557 | - | $557 |
| Total Pricing Changes | - | - | $2,254 | - | $2,254 |
| Total Adjustments-to-Base | - | - | $2,254 | - | $2,254 |
| FY 2024 Current Services | 321 | 302 | $45,212 | $66,653 | $111,865 |
| Total Transfers | - | - | - | - | - |
| Total Program Changes | - | - | - | - | - |
| FY 2024 Request | 321 | 302 | $45,212 | $66,653 | $111,865 |
| FY 2023 TO FY 2024 Change | - | - | $2,254 | - | $2,254 |

CIS – O&S - 19

003597

Operations and Support

Employment Status Verification – PPA

# Employment Status Verification-PPA
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 President's Budget | | | | FY 2023 to FY 2024 Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Employment Status Verification | 389 | 370 | $48,105 | $130.01 | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $45,212 | $149.71 | - | - | $2,254 | $7.46 |
| Total | 389 | 370 | $48,105 | $130.01 | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $45,212 | $149.71 | - | - | $2,254 | $7.46 |
| Subtotal Discretionary - Appropriation | 389 | 370 | $48,105 | $130.01 | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $45,212 | $149.71 | - | - | $2,254 | $7.46 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $34,590 | $31,034 | $32,661 | $1,627 |
| 11.5 Other Personnel Compensation | $638 | $564 | $593 | $29 |
| 12.1 Civilian Personnel Benefits | $12,877 | $11,360 | $11,958 | $598 |
| **Total - Personnel Compensation and Benefits** | **$48,105** | **$42,958** | **$45,212** | **$2,254** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 389 | 321 | 321 | - |
| FTE - Civilian | 370 | 302 | 302 | - |

003598

Operations and Support

Employment Status Verification – PPA

# Pay Cost Drivers

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Other Personnel Costs | 370 | $48,105 | $130.01 | 302 | $42,958 | $142.25 | 302 | $45,212 | $149.71 | - | $2,254 | $7.46 |
| Total - Pay Cost Drivers | 370 | $48,105 | $130.01 | 302 | $42,958 | $142.25 | 302 | $45,212 | $149.71 | - | $2,254 | $7.46 |

## Explanation of Pay Cost Driver

**Other Personnel:** Funds for personnel that support the operations, mission support, associated management, and administration of E-Verify. Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise and FY 2024 pay raise.

CIS – O&S - 21

003599

Operations and Support

Employment Status Verification – PPA

# Employment Status Verification – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Employment Status Verification | $66,399 | $66,653 | $66,653 | - |
| **Total** | **$66,399** | **$66,653** | **$66,653** | **-** |
| | | | | |
| Subtotal Discretionary - Appropriation | $66,399 | $66,653 | $66,653 | - |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $157 | $428 | $428 | - |
| 22.0 Transportation of Things | $7 | - | - | - |
| 23.1 Rental Payments to GSA | $3,750 | $6,078 | $6,078 | - |
| 23.2 Rental Payments to Others | $63 | $2,944 | $2,944 | - |
| 23.3 Communications, Utilities, & Miscellaneous | $51 | | | - |
| 24.0 Printing and Reproduction | $12 | $139 | $139 | - |
| 25.1 Advisory & Assistance Services | $38,017 | $4,606 | $4,606 | - |
| 25.2 Other Services from Non-Federal Sources | $1,774 | $208 | $208 | - |
| 25.3 Other Purchases of goods and services | $11,151 | $7,179 | $7,179 | - |
| 25.4 Operations & Maintenance of Facilities | - | $258 | $258 | - |
| 25.7 Operation & Maintenance of Equipment | $9,916 | $44,283 | $44,283 | - |
| 26.0 Supplies & Materials | $84 | $191 | $191 | - |
| 31.0 Equipment | $1,417 | $339 | $339 | - |
| **Total - Non Pay Budget Object Class** | **$66,399** | **$66,653** | **$66,653** | **-** |

CIS – O&S - 22

Operations and Support

Employment Status Verification – PPA

## Non Pay Cost Drivers

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Verification Information System (VIS) Development and Operations | $30,679 | $41,942 | $41,942 | - |
| Social Security Administration Reimbursement and Technology Enhancements | $8,200 | $7,179 | $7,179 | - |
| Telephony - Contact Center | $3,750 | $6,078 | $6,078 | - |
| Rental Payments to General Services Administration (GSA) | $3,226 | $2,340 | $2,340 | - |
| Other Costs | $20,544 | $9,114 | $9,114 | - |
| **Total - Non-Pay Cost Drivers** | **$66,399** | **$66,653** | **$66,653** | **-** |

## Explanation of Non-Pay Cost Drivers

**Verification Information System (VIS) Development and Operations (Formerly VIS O&M) – Sustainment of System:** Cost includes day-to-day operations and application maintenance. This includes teams to provide development, security, and operations (DevSecOps) services to support United States Citizenship and Immigration Services (USCIS) Information Technology (IT) system delivery. The teams perform operations and maintenance activities and modernizing complex, legacy, large-scale, Internet-facing websites and IT systems in a cloud environment using forward-thinking, modern, open-source technologies and backend systems with heavy customer engagement. There are no projected changes to this cost driver.

**Social Security Administration Reimbursements and Technology Enhancements:** Reimbursement to the SSA for all E-Verify queries that cannot be resolved electronically. These costs are dependent upon query volume and include technology enhancements supporting electronic query resolution through the SSA's E-Verify SSA Tentative Non-confirmation Automated Response system (EV-STAR), which allows SSA personnel to query VIS for information. There are no projected changes to this cost driver.

**Telephony – Contact Center:** This cost driver funds the USCIS enterprise Telephony Call Center Solution to service its Verification callers. It uses the technology that allows people to interact and transmit voice over a data network. Callers can speak their information and the interactive voice recognition (IVR) transmits it into a case management tool, Salesforce, used by the Verification call representatives. There are no projected changes to this cost driver.

**Rental Payments to General Services Administration (GSA):** Rental Payments to GSA for USCIS facilities space. The FY 2024 amount is based on recent GSA estimates provided in FY 2022. There are no projected changes to this cost driver.

**Other Costs:** Funds the remaining costs for the general operating expenses, technical contract support, outreach, and associated management and administration of E-Verify. There are no projected changes to this cost driver.

Operations and Support

Application Processing – PPA

## Application Processing – PPA

### Budget Comparison and Adjustments

**Comparison of Budget Authority and Request**
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Application Processing | 953 | 477 | $275,000 | 644 | 612 | $133,370 | 3,675 | 2,822 | $743,329 | 3,031 | 2,210 | $609,959 |
| Total | 953 | 477 | $275,000 | 644 | 612 | $133,370 | 3,675 | 2,822 | $743,329 | 3,031 | 2,210 | $609,959 |
| Subtotal Discretionary - Appropriation | 953 | 477 | $275,000 | 644 | 612 | $133,370 | 3,675 | 2,822 | $743,329 | 3,031 | 2,210 | $609,959 |

### PPA Level I Description

The Application Processing PPA provides funding for asylum adjudications and processing applications, including high volumes of backlogged cases in the Field Office Directorate, Service Center Operations Directorate, and the Refugee, Asylum and International Operations Directorate (RAIO) with long processing times, by funding additional staff, equipment, and support services. The funding for backlog reduction will support additional staff and contract support to continue a multiyear effort to reduce the backlog. The backlog reduction effort will focus on the forms with the highest volumes of backlogged cases and the longest processing times.

This PPA also provides funding to support RAIO's International and Refugee Affairs Division (IRAD) operations. IRAD administers the U.S. Refugee Admissions Program (USRAP), along with the other USRAP partners; oversees USCIS international operations; and manages certain domestic and international parole adjudications. With regard to refugee processing, IRAD is responsible for interviewing and vetting refugee applicants identified by DoS for possible resettlement to the United States. This PPA supports ongoing efforts to create the next generation of refugee processing in an electronic and secure environment, maximizes remote technologies as appropriate; provides timely and in-depth training to adjudicators; and meets the ever-changing demands of shifting populations of vulnerable refugee populations worldwide. IRAD is also responsible for conducting protection screenings for certain migrants interdicted at sea, which is done by specially trained refugee officers either in-person on Coast Guard cutters or remotely.

003602

**Operations and Support**                                                        **Application Processing – PPA**

Regarding parole, IRAD is responsible for the administration of the Secretary of Homeland Security's exercise of authority to grant parole to certain individuals outside the United States for urgent humanitarian or significant public benefit reasons, including special parole programs or populations at particular risk as authorized by the Administration's priorities. This authority is generally carried out through domestic adjudication by IRAD's Humanitarian Affairs Branch, although adjudication of certain special parole program applications requires front-end processing by other USCIS components followed by final adjudication after interviews in international locations. IRAD manages USCIS' permanent international presence and its expected footprint expansion, where it is most cost effective and efficient to do so, in support of Administration priorities related to refugee, parole, and other international programs. USCIS international offices adjudicate follow-to-join relative petitions for asylee and refugee family members located outside of the United States; verify the authenticity of evidence submitted in support of immigration benefit applications and petitions; share the workload to interview and vet refugee applicants; and staff administration of international special parole programs.

With the implementation of the Asylum Processing IFR (effective May 31, 2022), the Asylum Division has jurisdiction over the asylum applications of certain individuals placed in expedited removal who receive a positive credible fear determination and are scheduled for an Asylum Merits Interview (AMI). The AMI explores an applicant's eligibility for asylum, as well as statutory withholding of removal and withholding or deferral of removal under the Convention against Torture (CAT). The Asylum Division adjudicates asylum applications processed under the IFR by deciding whether the individual is eligible for asylum and warranting of a grant of asylum as a matter of discretion and, for any case where asylum is not granted by USCIS, an additional determination is produced related to whether the applicant demonstrated eligibility for withholding or deferral of removal based on the record before USCIS. Additionally, if a case processed under the IFR has dependents, the Asylum Division interviews all dependents on a case who have the ability to testify sufficient to make a determination as to whether there is a significant possibility they have experienced past harm or fear future harm that could be an independent basis for asylum, statutory withholding of removal, or withholding or deferral of removal under CAT and, if asylum is not granted to the principal applicant by USCIS, an "independent basis determination" is also produced for every dependent.

## Summary of FY 2024 Budget Request
*(Dollars in Thousands)*

|  | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **Application Processing** | **3,675** | **2,822** | **$521,384** | **$221,945** | **$743,329** |
| Refugee and International Operations | 644 | 612 | $92,959 | $44,409 | $137,368 |
| Backlog Reduction | 996 | 795 | $181,283 | $82,788 | $264,071 |
| Asylum Adjudications | 2,035 | 1,415 | $247,142 | $94,748 | $341,890 |

**CIS – O&S - 25**

003603

## Application Processing – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Enacted/Request** | $275,000 | $133,370 | $743,329 |
| Carryover - Start of Year | - | $47,914 | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | ($35,958) | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | ($7,488) | $3,208 | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | **$267,512** | **$148,534** | **$743,329** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$267,512** | **$148,534** | **$743,329** |
| Obligations (Actual/Estimates/Projections) | $213,384 | $148,534 | $743,329 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 953 | 644 | 3,675 |
| Enacted/Request FTE | 477 | 612 | 2,822 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 578 | 644 | 3,675 |
| FTE (Actual/Estimates/Projections) | 175 | 612 | 2,822 |

Operations and Support

Application Processing – PPA

## Application Processing – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2022 Enacted** | 953 | 477 | $110,997 | $164,003 | $275,000 |
| **FY 2023 Enacted** | 644 | 612 | $88,961 | $44,409 | $133,370 |
| **FY 2024 Base Budget** | 644 | 612 | $88,961 | $44,409 | $133,370 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| Civilian Pay Raise Total | - | - | $3,490 | - | $3,490 |
| Annualization of Prior Year Pay Raise | - | - | $508 | | $508 |
| **Total Pricing Changes** | - | - | $3,998 | - | $3,998 |
| **Total Adjustments-to-Base** | - | - | $3,998 | - | $3,998 |
| **FY 2024 Current Services** | 644 | 612 | $92,959 | $44,409 | $137,368 |
| **Total Transfers** | - | - | - | - | - |
| Asylum Adjudications-IEFA Realignment | 794 | 794 | $143,454 | $41,941 | $185,395 |
| Asylum Adjudications-Ramp Up to 150K Caseload | 1,241 | 621 | $103,688 | $52,807 | $156,495 |
| Backlog Reduction | 996 | 795 | $181,283 | $82,788 | $264,071 |
| **Total Program Changes** | 3,031 | 2,210 | $428,425 | $177,536 | $605,961 |
| **FY 2024 Request** | 3,675 | 2,822 | $521,384 | $221,945 | $743,329 |
| **FY 2023 TO FY 2024 Change** | 3,031 | 2,210 | $432,423 | $177,536 | $609,959 |

003605

Operations and Support

Application Processing – PPA

## Application Processing Verification-PPA
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

|  | FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 President's Budget | | | | FY 2023 to FY 2024 Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Application Processing | 953 | 477 | $110,997 | $232.70 | 644 | 612 | $88,961 | $145.36 | 3,675 | 2,822 | $521,384 | $184.74 | 3,031 | 2,210 | $432,423 | $39.38 |
| Total | 953 | 477 | $110,997 | $232.70 | 644 | 612 | $88,961 | $145.36 | 3,675 | 2,822 | $521,384 | $184.74 | 3,031 | 2,210 | $432,423 | $39.38 |
| Subtotal Discretionary - Appropriation | 953 | 477 | $110,997 | $232.70 | 644 | 612 | $88,961 | $145.36 | 3,675 | 2,822 | $521,384 | $184.74 | 3,031 | 2,210 | $432,423 | $39.38 |

### Pay by Object Class
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $79,022 | $69,027 | $355,559 | $286,532 |
| 11.3 Other than Full-time Permanent | $736 | $2,244 | $2,332 | $88 |
| 11.5 Other Personnel Compensation | $1,428 | $4,614 | $59,018 | $54,404 |
| 12.1 Civilian Personnel Benefits | $29,811 | $13,076 | $104,427 | $91,351 |
| 13.0 Benefits for Former Personnel | - | - | $48 | $48 |
| Total – Personnel Compensation and Benefits | $110,997 | $88,961 | $521,384 | $432,423 |
| Positions and FTE | | | | |
| Positions - Civilian | 953 | 644 | 3,675 | 3,031 |
| FTE - Civilian | 477 | 612 | 2,822 | 2,210 |

003606

Operations and Support

Application Processing – PPA

## Pay Cost Drivers

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | Amount | Rate | FTE | Amount | FTE | Rate |
| Immigration Services Officer | 290 | $67,491 | $232.73 | 75 | $12,378 | $165.04 | $179,217 | $207.91 | 862 | $166,839 | 787 | $42.87 |
| Asylum Officer | 66 | $15,256 | $231.15 | - | - | - | $137,743 | $176.59 | 780 | $137,743 | 780 | $176.59 |
| Refugee Officer | 115 | $26,761 | $232.70 | 465 | $65,629 | $141.14 | $69,042 | $148.48 | 465 | $3,413 | - | $7.34 |
| Adjudication Officer | 3 | $726 | $242.00 | 14 | $2,249 | $160.64 | $2,833 | $202.36 | 14 | $584 | - | $41.71 |
| Other Personnel Costs | 3 | $763 | $254.33 | 58 | $8,705 | $150.09 | $132,501 | $189.02 | 701 | $123,796 | 643 | $38.93 |
| Other PC&B Costs | - | - | - | - | - | - | $48 | - | - | $48 | - | - |
| Total - Pay Cost Drivers | 477 | $110,997 | $232.70 | 612 | $88,961 | $145.36 | $521,384 | $184.74 | 2,822 | $432,423 | 2,210 | $39.38 |

## Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds the salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. These positions supplement the other positions currently adjudicating immigration benefits that are funded by the fee accounts. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and staffing requirements for backlog reduction and the Asylum Processing Interim Final Rule.

**Asylum Officer:** This cost driver funds the salaries and benefits of USCIS Asylum Officers. Asylum Officers adjudicates asylum applications, review the applications for supporting evidence, conduct asylum protection interviews, research appropriate information, and interpret and apply appropriate policy, regulations, and precedent decisions to make formal, written eligibility determinations. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and staffing requirements for backlog reduction and the Asylum Processing Interim Final Rule.

**Refugee Officer:**
This cost driver funds the salaries and benefits of USCIS Refugee Officers. Refugee Officers establish identity and make findings of eligibility for refugee and related benefits by analyzing facts, identifying and examining documents for authenticity, and researching and analyzing appropriate information, law, and country conditions. Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise and the FY 2024 pay raise.

CIS – O&S - 29

003607

Application Processing – PPA

**Operations and Support**

**Adjudication Officer:** This cost driver funds the salaries and benefits of USCIS Adjudication Officers. Adjudication Officers review applications for immigration benefits and make decisions regarding these requests based on their extensive knowledge of immigration laws and practices. These positions supplement the other positions currently adjudicating immigration benefits that are funded by the fee accounts. Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise and the FY 2024 pay raise.

**Other Personnel Costs:** Funds for personnel that support the operations, mission support, associated management, and administration of Application Processing. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and staffing requirements for backlog reduction and the Asylum Processing Interim Final Rule.

**Other PC&B Costs:** This cost driver funds estimated benefits paid to former personnel and includes pensions, annuities, and other benefits due to former employees or their survivors based on (at least in part) the length of service to the Government.

CIS – O&S - 30

003608

Operations and Support

Application Processing – PPA

## Application Processing – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Application Processing | $164,003 | $44,409 | $221,945 | $177,536 |
| **Total** | **$164,003** | **$44,409** | **$221,945** | **$177,536** |
| | | | | |
| Subtotal Discretionary - Appropriation | $164,003 | $44,409 | $221,945 | $177,536 |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $16,304 | $28,800 | $72,772 | $43,972 |
| 22.0 Transportation of Things | - | $670 | $670 | - |
| 23.1 Rental Payments to GSA | $3,144 | $3,144 | $3,144 | - |
| 23.2 Rental Payments to Others | $375 | - | $9,747 | $9,747 |
| 25.1 Advisory & Assistance Services | $69,635 | $7,106 | $11,641 | $4,535 |
| 25.2 Other Services from Non-Federal Sources | $30,186 | - | $97,468 | $97,468 |
| 25.3 Other Purchases of goods and services | - | $4,612 | $4,612 | - |
| 26.0 Supplies & Materials | $17,585 | $77 | $1,150 | $1,073 |
| 31.0 Equipment | $29,918 | - | $20,741 | $20,741 |
| **Total - Non Pay Budget Object Class** | **$164,003** | **$44,409** | **$221,945** | **$177,536** |

003609

Operations and Support

Application Processing – PPA

## Non Pay Cost Drivers

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Asylum Adjudications | - | - | $94,748 | $94,748 |
| Backlog Reduction Capacity Costs | $144,797 | - | $82,788 | $82,788 |
| Refugee Travel | $14,418 | $28,800 | $28,800 | - |
| Other Refugee Costs | $4,788 | $15,609 | $15,609 | - |
| **Total - Non-Pay Cost Drivers** | **$164,003** | **$44,409** | **$221,945** | **$177,536** |

### Explanation of Non-Pay Cost Drivers

**Asylum Adjudications:** All costs associated with the adjudication of credible fear interviews and asylum applications. This cost driver supports interpreter and transcription services, facilities expansion, and physical security to support additional staffing and interview spaces, IT case management systems, background checks, and other necessary support contracts, supplies, and equipment. This is a new cost driver for FY 2024 with some costs transferred from IEFA. Costs are expected to increase as USCIS increases capacity to support up to 150,000 credible fear cases, and 105,000 subsequent merit interviews.

**Backlog Reduction Capacity Costs:** USCIS's backlog reduction capacity requires a significant investment across the enterprise. This cost driver supports an array of necessary expenses as USCIS moves forward with implementing its backlog reduction plan, which include funds for contract costs for case file management, funds for provisioning equipment to support increased video interviewing, additional IT equipment and supply purchases, travel, onboarding, and training expenses.

**Refugee Travel:** All costs associated with travel and circuit rides in support of refugee interviews to various locations in Africa, Asia, Latin America/Caribbean, Middle East, and Europe are determined in consultation with the DoS. There is no anticipated change in this cost driver.

003610

**Operations and Support**

**Application Processing – PPA**

**Other Refugee Costs:** This cost driver will support administrative support services contracts for field and headquarters organizational units, medical examinations, required training, parole programs, international offices and deployment of associated personnel, International Cooperative Administrative Support Services, and Capital Security Cost Sharing. For administrative support service contracts, this includes contracts with the International Organization for Migration (IOM) (or the most cost-effective and secure service provider) for local travel needs where infrastructure does not support transportation of officers to refugee centers, travel facilitation for individuals denied refugee status but granted parole under the Central American Minor Refugee and Parole Program, and additional service contracts that may be necessary for operations such as interpreters, services, and equipment to support staffing periods of high-volume protections screenings for at-sea interdictions below the level of a Presidentially-declared mass migration event (e.g., support for operations at the Guantanamo Bay Naval Base in Cuba), and medical examinations for employees traveling abroad. All Worldwide Refugee Officers and staff deployed on international rotations must maintain medical clearances, and the medical services have been required to comply with COVID mitigation measures. For USCIS refugee officers, it is required that all attend the RAIO Directorate Officer Training Program. There is no anticipated change in this cost driver.

003611

003612

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *Federal Assistance*



**Fiscal Year 2024**
**Congressional Justification**

CIS – FA - 1

United States Citizenship and Immigration Services                                        Federal Assistance

# Table of Contents

*Federal Assistance* .................................................................................................................**1**

   Budget Comparison and Adjustments.................................................................................3

   Summary of Budget Changes .............................................................................................5

   Justification of Program Changes .......................................................................................6

   Non Pay Budget Exhibits....................................................................................................7

*Citizenship and Integration Grants – PPA* ..........................................................................8

   Budget Comparison and Adjustments.................................................................................8

   Non Pay Budget Exhibits..................................................................................................12

United States Citizenship and Immigration Services

Federal Assistance

Federal Assistance

## Budget Comparison and Adjustments

## Comparison of Budget Authority and Request

*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Citizenship and Integration Grants | - | - | $20,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| **Total** | **-** | **-** | **$20,000** | **-** | **-** | **$25,000** | **-** | **-** | **$10,000** | **-** | **-** | **($15,000)** |

The U.S. Citizenship and Immigration Services (USCIS) Federal Assistance appropriations provides funding for the Citizenship and Integration Grant Program.

The Federal Assistance appropriation includes the following Level 1 Program, Project, and Activity (PPA):

**Citizenship and Integration Grants**[1]**:** The Citizenship and Integration Grant Program (CIGP) expands the availability of high-quality services throughout the Nation as part of a multifaceted USCIS effort to provide citizenship preparation resources, support, and information to immigrants and immigrant-serving organizations.

---

[1] For additional information on the USCIS Citizenship and Integration Grant program, please visit: https://www.uscis.gov/citizenship/organizations/grant-program.

United States Citizenship and Immigration Services

Federal Assistance

## Federal Assistance
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Enacted/Request** | $20,000 | $25,000 | $10,000 |
| Carryover - Start of Year | - | - | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | $20,000 | $25,000 | $10,000 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $20,000 | $25,000 | $10,000 |
| Obligations (Actual/Estimates/Projections) | $20,000 | $25,000 | $10,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | - | - |
| FTE (Actual/Estimates/Projections) | - | - | - |

CIS – FA - 4

003615

United States Citizenship and Immigration Services

Federal Assistance

## Federal Assistance
### Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2022 Enacted | - | - | - | $20,000 | $20,000 |
| FY 2023 Enacted | - | - | - | $25,000 | $25,000 |
| FY 2024 Base Budget | - | - | - | $25,000 | $25,000 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Total Pricing Changes | - | - | - | - | - |
| Total Adjustments-to-Base | - | - | - | - | - |
| FY 2024 Current Services | - | - | - | $25,000 | $25,000 |
| Total Transfers | - | - | - | - | - |
| Citizenship and Integration Grants Adjustment | - | - | - | ($15,000) | ($15,000) |
| Total Program Changes | - | - | - | ($15,000) | ($15,000) |
| FY 2024 Request | - | - | - | $10,000 | $10,000 |
| FY 2023 TO FY 2024 Change | - | - | - | ($15,000) | ($15,000) |

003616

United States Citizenship and Immigration Services

Federal Assistance

## Federal Assistance
## Justification of Program Changes

| | Positions | FTE | FY 2024 President's Budget | | |
|---|---|---|---|---|---|
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 - Citizenship and Integration Grants Adjustment** | - | - | - | ($15,000) | ($15,000) |
| Citizenship and Integration Grants | - | - | - | ($15,000) | ($15,000) |
| **Total Program Changes** | - | - | - | ($15,000) | ($15,000) |

## Program Change 1 – Citizenship and Integration Grants Adjustment:

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | - | - | $25,000 |
| Program Change | - | - | ($15,000) |

**Description**

This program change will decrease federal assistance (FA) awards funding by 60 percent to return this program to its historically requested levels.

**Justification**

Since 2009, the CIGP has awarded $132M through 579 competitive grants to immigrant serving-organizations across the country and the District of Columbia to provide citizenship preparation services. Between 2013 and 2021, the program has historically and steadily been funded at an average level of approximately $10M, which consistently resulted in grants to roughly 41 organization annually.

**Performance**

This budget proposes to maintain funding for the CIGP at $10M. FA award funds are used to provide citizenship preparation services to immigrants who are preparing for the naturalization test and interview. Services include classroom instruction and legal services to assist immigrants with completion of the naturalization application. This funding level will award 35 grants and provide approximately 22,000 immigrants with citizenship preparation services, while also continuing to support recent enhancements to this program such as the two newly established Regional Hub and Innovations in Citizenship Education grant programs.

003617

United States Citizenship and Immigration Services

Federal Assistance

# Federal Assistance
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Citizenship and Integration Grants | $20,000 | $25,000 | $10,000 | ($15,000) |
| **Total** | **$20,000** | **$25,000** | **$10,000** | **($15,000)** |

### Non Pay by Object Class
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 41.0 Grants, Subsidies, and Contributions | $20,000 | $25,000 | $10,000 | ($15,000) |
| **Total – Non Pay Budget Object Class** | **$20,000** | **$25,000** | **$10,000** | **($15,000)** |

CIS – FA - 7

003618

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA

## Budget Comparison and Adjustments

## Comparison of Budget Authority and Request

*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Citizenship and Integration Grants | - | - | $20,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| **Total** | **-** | **-** | **$20,000** | **-** | **-** | **$25,000** | **-** | **-** | **$10,000** | **-** | **-** | **($15,000)** |
| Subtotal Discretionary - Appropriation | - | - | $20,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |

## PPA Level I Description

**Citizenship and Integration Grant Program:** This PPA funds the USCIS Citizenship and Integration Grant Program, which awards grants to organizations that help prepare Lawful Permanent Residents (LPRs) for naturalization. The grants aim to promote prospective citizens' inclusion into American civic life by funding educational programs designed to increase their knowledge of English, U.S. history, and civics. In addition, through these grant opportunities, USCIS expands the availability of high-quality citizenship preparation services and provides opportunities for immigrants to gain knowledge and training necessary to promote their integration into the fabric of American society. Increased learning opportunities and additional citizenship instruction resources in communities help immigrants gain the tools to become successful citizens and meet their responsibilities as U.S. citizens.

The tables below reflect program award funds from FY 2021 – FY 2024, as well as FY 2022 actual and projected FY 2023 - FY 2025 program outputs and outcomes.

| Financial Assistance Awards | FY 2021 Actual | FY 2022 Actual | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|---|
| Amount Funded | $10,000 | $20,000 | $25,000 | $10,000 |
| Grants Awarded | 40 | 66 | 76 | 35 |

003619

**Federal Assistance**

**Citizenship and Integration Grants – PPA**

| Accomplishments | FY 2022 Actual | | FY 2023 Projected[2] | | FY 2024 Projected[3] | | FY 2025 Projected | |
|---|---|---|---|---|---|---|---|---|
| (Award Year Reporting) Number of Grantees | $10,000 | | $15,000 | | $22,500 | | $17,500 | |
| Per-year Funding | FY 2020 | FY 2021 | FY 2021 | FY 2022 | FY 2022 | FY 2023 | FY 2023 | FY 2024 |
| | $5,000 | $5,000 | $5,000 | $10,000 | $10,000 | $12,500 | $12,500 | $5,000 |
| Total Number of Grantees | 79 | | 106 | | 142 | | 111 | |
| | FY 2020 | FY 2021 | FY 2021 | FY 2022 | FY 2022 | FY 2023 | FY 2023 | FY 2024 |
| | 39 | 40 | 40 | 66 | 66 | 76 | 76 | 35 |
| Monitoring Visits Conducted | 8 | | 27 | | 30 | | 27 | |
| Total Permanent Residents Served | 22,890 | | 34,300 | | 51,500 | | 40,000 | |
| Total students enrolled in citizenship classes | 8,900 | | 13,350 | | 20,000 | | 15,500 | |
| Total clients provided with naturalization eligibility screenings | 14,325 | | 21,500 | | 32,200 | | 25,000 | |
| Total N-400 applications for naturalization submitted to USCIS | 10,500 | | 15,750 | | 23,500 | | 18,000 | |

---

[2] Generally the accomplishments (i.e. the immigrants served, screenings, etc) are typically recorded in a 2-year period of performance following the year of obligations. For example, the increase in funding from $10M annually to $20M in FY 2022 will only begin to produce an increase in the number of Lawful Permanent Residents (LPRs) served starting in FY 2023. This is because the period of performance for grants awarded the $20M in FY 2022 funding begins on Oct. 1, 2022 (at the beginning of FY 2023).

[3] Projections are based on the FY 2023 appropriation of $25M enacted.

**CIS – FA – 9**

Federal Assistance

# Citizenship and Integration Grants – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Enacted/Request** | $20,000 | $25,000 | $10,000 |
| Carryover - Start of Year | - | - | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | $20,000 | $25,000 | $10,000 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $20,000 | $25,000 | $10,000 |
| Obligations (Actual/Estimates/Projections) | $20,000 | $25,000 | $10,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | - | - |
| FTE (Actual/Estimates/Projections) | - | - | - |

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2022 Enacted | - | - | - | $20,000 | $20,000 |
| FY 2023 Enacted | - | - | - | $25,000 | $25,000 |
| FY 2024 Base Budget | - | - | - | $25,000 | $25,000 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Total Pricing Changes | - | - | - | - | - |
| Total Adjustments-to-Base | - | - | - | - | - |
| FY 2024 Current Services | - | - | - | $25,000 | $25,000 |
| Total Transfers | - | - | - | - | - |
| Citizenship and Integration Grants Adjustment | - | - | - | ($15,000) | ($15,000) |
| Total Program Changes | - | - | - | ($15,000) | ($15,000) |
| FY 2024 Request | - | - | - | $10,000 | $10,000 |
| FY 2023 TO FY 2024 Change | - | - | - | ($15,000) | ($15,000) |

CIS – FA – 11

003622

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Citizenship and Integration Grants | $20,000 | $25,000 | $10,000 | ($15,000) |
| **Total** | **$20,000** | **$25,000** | **$10,000** | **($15,000)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $20,000 | $25,000 | $10,000 | ($15,000) |

### Non Pay by Object Class
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 41.0 Grants, Subsidies, and Contributions | $20,000 | $25,000 | $10,000 | ($15,000) |
| **Total - Non Pay Budget Object Class** | **$20,000** | **$25,000** | **$10,000** | **($15,000)** |

003623

Federal Assistance

Citizenship and Integration Grants – PPA

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Citizenship Instruction and Naturalization Application Services Grant | $13,700 | $17,000 | $7,000 | ($10,000) |
| Community and Regional Integration Network Grant | $1,300 | $1,300 | $1,300 | - |
| Regional Hub Program | $3,000 | $4,000 | $1,200 | ($2,800) |
| Innovations in Citizenship Education Program | $2,000 | $2,700 | $500 | ($2,200) |
| **Total - Non-Pay Cost Drivers** | **$20,000** | **$25,000** | **$10,000** | **($15,000)** |

## Explanation of Non Pay Cost Driver

**Citizenship Instruction and Naturalization Application Services (CINAS) Grant:** The Citizenship Instruction and Naturalization Application Services Grant is for public or nonprofit organizations that prepare immigrants for citizenship by offering both citizenship instruction and naturalization application services. In FY 2022, USCIS increased the maximum award amount to $300,000, the first such increase since 2013. This was a much-needed change, given the cumulative inflation rate of more than 28 percent between 2013 and 2022. In FY 2022, USCIS established multiple funding levels, aligned to performance metrics, in order to allow smaller organizations to participate. This cost driver is decreasing to restore program funding back to historic levels.

**Community and Regional Integration Network Grant (CARING):** The second opportunity (formerly known as the *Refugee and Asylee Integration Services* Program) is for organizations that provide extended integration services to vulnerable immigrant populations who entered the United States through USCIS' humanitarian programs or benefitted from those programs while already in the United States. These groups often experience unique challenges with civic, linguistic, economic, cultural, and institutional integration when resettling in the United States, which may impact their progress toward full civic integration. As with the CINAS grant, in order to allow smaller organizations the opportunity to participate, USCIS established multiple funding levels that are aligned to a range of performance metrics. The maximum award amount for this grant was not increased in FY 2022, but USCIS intends to raise it commensurately with the rate of inflation. The target organizations for this grant are groups providing extended integration services to immigrant populations who entered the U.S. through USCIS' humanitarian programs or benefitted from those programs while already in the United States. There is no change to this cost driver.

**Regional Hub:** A revitalization of the hub and spoke model of the FY 2010-FY 2011 USCIS National Capacity Building grant program, the Regional Hub Program is intended to fund regional or statewide citizenship support networks that build in capacity among their affiliates/members to provide direct citizenship preparation services to immigrants, especially in underserved areas. This model enhances the traditional direct services grant programs (CINAS and CARING) through the principal awardee's provision of ongoing capacity building and technical assistance, overall programmatic and fiscal management of all grant-funded activities, and management of sub-awardees' program performance and outcomes. The sub-awardees must develop or expand and enhance a direct citizenship preparation program, including citizenship instruction services and naturalization

CIS – FA – 13

003624

Federal Assistance                                                                    Citizenship and Integration Grants – PPA

application services, in conjunction with the principal awardee. The target organizations for this grant are Regional or statewide citizenship support networks that build capacity among their affiliates/members to provide direct citizenship preparation services to immigrants. This cost driver is decreasing to restore program funding back to historic levels.

**Innovations in Citizenship Education Grant:** The Innovations in Citizenship Education Grant considers proposed innovations that address an existing challenge within the citizenship preparation field, such as engaging hard-to-reach populations, developing digital access and literacy, or supporting traditionally underserved groups. The target organizations for this grant are for-profit and nonprofit organizations that foster creative approaches to preparing immigrants for naturalization and encouraging the civic, linguistic, and cultural integration of immigrants into their communities. It is expected that projects will enhance citizenship education opportunities; build the capacity of other immigrant-serving organizations; and/or develop new citizenship education tools or resources that can be shared with a broad audience. FY 2022 awards supported a wide range of projects. Some examples include: revising the free USALearns website, which teaches English and U.S. citizenship by providing engaging multimedia content and educational activities; developing a citizenship curriculum to bridge the gap between "zero" English proficiency and the "high beginner" level needed to enter most citizenship preparation programs; the development of visual gesture materials to prepare deaf immigrants for the citizenship test; and the creation of a mobile citizenship classroom by creating portable sites/classrooms with desks and teaching equipment. USCIS will be receiving preliminary outcomes of the FY 2022 funding cycle in mid-FY 2023. This cost driver is decreasing to restore program funding back to historic levels.

003625

003626

Immigration Examinations Fee Account

United States Citizenship and Immigration Services

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *Immigration Examinations Fee Account*



**Fiscal Year 2024**
**Congressional Justification**

CIS – IEFA - 1

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Table of Contents

*Immigration Examinations Fee Account* .............................................................................1

   Budget Comparison and Adjustments................................................................................3

   Summary of Budget Changes ...........................................................................................11

   Justification of Pricing Changes ......................................................................................12

   Justification of Program Changes ....................................................................................15

   Personnel Compensation and Benefits.............................................................................20

   Non Pay Budget Exhibits..................................................................................................25

003627

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

| (Dollars in Thousands) | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| | Amount | Amount | Amount | Amount |
| IEFA Premium | $1,244,039 | $1,259,374 | $1,325,745 | $66,371 |
| IEFA Non Premium | $3,590,798 | $3,794,811 | $4,219,404 | $424,593 |
| **Total[1]** | **$4,834,837** | **$5,054,185** | **$5,545,149** | **$490,964** |
| Subtotal Mandatory - Fee | $4,834,837 | $5,054,185 | $5,545,149 | $490,964 |

The Immigration Examinations Fee Account (IEFA) is the primary funding source for U.S. Citizenship and Immigration Services (USCIS). The IEFA provides the resources to:

- Strengthen and effectively administer the immigration system.
- Strengthen national security safeguards and combat fraud.
- Reinforce quality and consistency in administering immigration benefits.

**Fee Authority:** The IEFA is authorized via Section 286(m) of the *Immigration and Nationality Act* (8 U.S.C. 1356(m)). A separate provision for premium processing is authorized under section 286(u) by the same act (8 U.S.C. 1356(u)). This act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allows for the expansion of premium processing to new categories of petitions and applications.

**Fee Uses:** Fees collected with the submission of immigration benefit applications and petitions are deposited into IEFA and used to fund the full cost of processing immigration benefit requests, including the cost of providing services without charge to applicants whose fees are waived or to whom a fee exemption applies.

---

[1] Fee Collections: These values reflect actual (FY 2022), estimated (FY 2023), and projected (FY 2024) fee receipts.

**CIS – IEFA - 3**

003628

**United States Citizenship and Immigration Services**                                   **Immigration Examinations Fee Account**

The IEFA supports the following activities:

- **Adjudication Operations:** Contains Directorate and Program Offices (DPOs) responsible for adjudicating applications in regional, district, and field offices for immigration and visa benefit applications both in person and those not requiring interviews. Also included are anti-fraud and public safety components affiliated with processing benefits and associated overhead. Included in this PPA are the following DPOs and the duties they perform:

  o **Field Operations (FOD):** Processing of immigration benefit applications while ensuring the security and integrity of the immigration system where an in-person interview is required. USCIS primarily accomplishes this through its network of domestic district and field offices.

  o **Fraud Detection and National Security (FDNS):** Leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system.

  o **Service Center Operations (SCOPS):** Processing of immigration benefit applications while ensuring the security and integrity of the immigration system where an in-person interview is generally not required. USCIS primarily accomplishes this through its five service centers: California Service Center, Nebraska Service Center, Potomac Service Center, Texas Service Center, and the Vermont Service Center.

  o **Support Services:** Managing of the USCIS field overhead, such as guard services, janitorial services, rent, and others. The support services also include the managing of USCIS headquarters overhead, such as litigation settlements, postage fees and others.

- **Immigration and Policy and Support:** Contains policy and advisory components as well as program office components not included elsewhere. Also includes components responsible for management of space, contracts, training, human resources, as well as costs associated with design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise.

- **Refugee and Asylum Operations[2]:** Supports the Refugee, Asylum and International Operations directorate (RAIO) where it is responsible for adjudicating asylum and refugee status applications for individuals seeking protection from persecution and facilitates the process for qualifying relatives of admitted refugees and approved asylees to immigrate to the United States. This activity also supports protection screening of individuals claiming a fear of return (e.g., credible fear screening), and certain migrants interdicted at sea. In addition, the asylum division adjudicates affirmative asylum applications, including conducting applicant interviews, and conducts credible fear screenings for certain individuals placed in expedited removal and reasonable fear screenings for certain individuals subject to final administrative removal

---

[2] This is in addition to funding requested in USCIS's Operation and Support budget for USCIS' International and Refugee Affairs Division (IRAD), asylum adjudications to support the Credible Fear and Asylum Processing Interim Final Rule, and asylum backlog reduction; which is in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in 8 U.S.C. 1356(m).

**United States Citizenship and Immigration Services**                                                    **Immigration Examinations Fee Account**

or reinstatement of removal. The Asylum Division also conducts non-refoulement interviews (NRIs), Safe Third Country screenings at the Canadian Border, processes domestic Form I-730 petitions filed by refugees, and adjudicates applications for suspension of deportation or cancellation of removal under the *Nicaraguan Adjustment and Central American Relief Act* (NACARA 203). The Asylum Division is also mandated to interview and adjudicate the asylum applications from Operation Allies Welcome Afghan applicants on a strictly expedited timeframe per the *Afghanistan Supplemental Appropriations Act, 2022* (P.L. 117-43).

- Immigration Records and Applicant Services: Contains DPOs that primarily provide interaction and services to the general public and associated overhead, as well as provides for the development of both external public products and internal communications, the administration of biometric services, responses to Freedom of Information Act (FOIA) requests, and verification of employment and immigration status.

- Premium Processing (Including Transformation)[3]: Expenditures from the collection of premium processing fees in front line DPOs (RAIO, FOD and SCOPS) and program office components to support information technology and other infrastructure improvements in adjudication processes, personnel and contracts supporting the processing of premium processing requests, other costs associated with overheads and the lockbox operations, and otherwise offset the cost of providing adjudications and naturalization services.

**Change Mechanism:** Notice and comment rulemaking for non-premium funds; direct final rule for premium funds.

- Non-premium: USCIS conducts a biennial fee review, which takes into consideration existing operations, workload volume forecasts, and proposed policy initiatives to determine if current fees will recover the full cost of its operations including the cost of services provided at no charge. If USCIS determines its fees will not recover full cost, then the Department of Homeland Security (DHS) may propose to adjust its fees via a notice and comment rulemaking in the Federal Register. DHS receives public comments on USCIS' Notice of Proposed Rulemaking (NPRM), incorporates feedback as appropriate, and publishes a final rule in the Federal Register to adjust fees.

- Premium: USCIS is authorized to adjust its premium processing fee on a biennial basis by the percentage (if any) by which the Consumer Price Index for All Urban Consumers (CPI-U) for the month of June preceding the date on which such adjustment takes effect exceeds CPI-U for the same month of the second preceding calendar year. DHS issues a direct final rule in the Federal Register to reflect this change and notify the public.

USCIS published the FY 2022/2023 IEFA Fee Rule Notice of Public Rule Making (NPRM) in the Federal Register on January 4, 2023. The Public Comment period for this NPRM ends March 13, 2023. The NPRM proposes updates to the current Fee Schedule and additional changes in forms and fee structure.[4]   The Final IEFA Fee Rule is estimated for publication in FY 2024.

---

[3] The uses of premium processing fees are statutorily defined in 8 U.S.C. 1356(u).
[4] For additional information, see the Unified Agenda entry for the USCIS fee schedule at Federal Register: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**CIS – IEFA - 5**

003630

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

Premium processing was expanded under the *Emergency Stopgap USCIS Stabilization Act that was included in the Continuing Appropriations Act, 2021 and Other Extensions Act*, P.L. 116-159. This act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allows for the expansion of premium processing to new categories of petitions and applications. Notably, it authorized the expansion of premium processing beyond the current I-129, Petition for a Nonimmigrant Worker, and I-140, Immigrant Petition for Alien Worker forms. The act also explicitly allows for premium processing of the I-539, Application to Extend/Change Nonimmigrant Status, and the I-765, Application for Employment Authorization. Expansion of premium processing to benefits not included in Section 4102(b)(1) or requested using a form for which premium processing was available on August 1, 2020, which requires notice and comment rulemaking to implement.[5] DHS published a final rule which codified changes made by the *Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act)*.[6] The *USCIS Stabilization Act* requires that when DHS implements the expansion of immigration benefit types that are designated for premium processing, it must not result in an increase in processing times for immigration benefit requests not designated for premium processing or an increase in regular processing of immigration benefit requests so designated.[7] Premium processing will be made available for newly designated immigration benefit requests only when DHS determines that it will have the resources in place to adjudicate the requests within the time required, and that the availability of premium processing for that immigration benefit request will not adversely affect other immigration benefit requests not designated for premium processing or the regular processing of immigration benefit requests so designated. *Id.*

**Previous Changes:**

Current non-premium fees became effective on December 23, 2016.[8] DHS is operating under two injunctions that preclude it from implementing or following the changes made by the 2020 fee rule, as well as an injunction that precludes it from implementing the 2019 fee waiver revisions.[9] The fee for petitions that were previously designated for premium processing service was last adjusted on October 1, 2020, in accordance with P.L. 116-159. USCIS implemented the new premium processing fees on October 19, 2020.[10] DHS codified further premium processing changes in a final rule, effective May 31, 2022.

---

[5] The expanded premium processing for I-140 E13 and I-140 EB-2 NIW took effect beginning August 1, 2022. For additional information, please see: https://www.uscis.gov/newsroom/alerts/uscis-to-implement-second-phase-of-premium-processing-for-certain-previously-filed-eb-1-and-eb-2.

[6] See 87 FR 18227: Implementation of the Emergency Stopgap USCIS Stabilization Act. For additional information, please see: https://www.federalregister.gov/documents/2022/03/30/2022-06742/implementation-of-the-emergency-stopgap-uscis-stabilization-act.

[7] *See* Pub. L. 116-159, sec. 4102(c) (Oct. 1, 2020).

[8] For additional information on non-premium fee changes, please see 81 FR 73292: https://www.govinfo.gov/app/details/FR-2016-10-24/2016-25328.

[9] See 86 FR 7493: https://www.federalregister.gov/documents/2021/01/29/2021-02044/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration.

[10] USCIS, Premium Processing Fee Increase Effective Oct. 19, 2020, https://www.uscis.gov/news/premium-processing-fee-increase-effective-oct-19-2020 (last reviewed/updated 10/16/2020).

CIS – IEFA - 6

003631

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

**Recovery Rate:** IEFA non-premium fees are intended to recover full cost. Premium fees are not intended to recover full cost. The charts below are provided to identify the recovery rate over the past five years.

## Historical Collections and Cost Recovery Rate[11]

| (Dollars in Thousands) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Non-Premium) | $3,331,435 | $3,318,284 | $3,334,165 | $3,726,269 | $3,590,798 | $17,300,951 |
| Total of Eligible Expenses | $3,427,938 | $3,793,542 | $3,367,355 | $3,540,254 | $3,537,038 | $17,666,127 |
| Cost Recovery % | 97.2% | 87.5% | 99.0% | 105.3% | 101.5% | 97.9% |

| (Dollars in Thousands) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Premium) | $480,137 | $577,327 | $493,000 | $987,116 | $1,244,039 | $3,781,619 |
| Total of Eligible Expenses | $542,098 | $536,463 | $528,474 | $761,681 | $872,076 | $3,240,792 |
| Cost Recovery % | 88.6% | 107.6% | 93.3% | 129.6% | 142.7% | 116.7% |

**Changes in Fee Collections:** USCIS projects increased filing volumes in FY 2024. USCIS' volume projections assume that the pandemic will have limited impact by FY 2023, leading to higher volumes of approved immigrant visas and additional immigrant visa revenue in FY 2024. Given the fee-paying rates in the relevant revenue forecast, all else equal, increased workload volume may equate to higher collections.

USCIS also forecasts increased premium processing revenue in FY 2024. The "*Emergency Stopgap USCIS Stabilization Act*" included in P.L. 116-159 allowed USCIS to establish and collect additional premium processing fees and authorized their use for expanded purposes. The statute also permits USCIS to expand premium processing to certain benefit requests. USCIS plans to phase in additional premium processing availability for other eligible benefit requests, which will increase forecast volumes for premium revenue.

USCIS has incorporated these increased fees in the FY 2024 budget under the assumption of a mid-year implementation. Part of the increase in fees covers non-fee funded applications by USCIS, most notably fee waivers and statutory exemptions.

---

[11] Includes minor variations due to rounding.

CIS – IEFA - 7

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Immigration Examinations Fee Account
## Budget Spending Authority Request[12]
### (Dollars in Thousands)

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget[13] | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Adjudication Operations | 12,790 | 11,431 | $1,832,963 | 13,434 | 12,762 | $2,174,211 | 14,116 | 13,004 | $2,389,083 | 682 | 242 | $214,872 |
| Field Operations | - | - | - | 7,329 | 6,963 | $1,051,375 | 7,701 | 7,095 | $1,168,497 | 372 | 133 | $117,122 |
| Fraud Detection and National Security | - | - | - | 1,955 | 1,857 | $263,779 | 2,054 | 1,892 | $295,134 | 99 | 35 | $31,355 |
| Service Center Operations | - | - | - | 4,150 | 3,942 | $576,702 | 4,361 | 4,017 | $643,097 | 211 | 75 | $66,395 |
| Support Services | - | - | - | - | - | $282,355 | - | - | $282,355 | - | - | - |
| Immigration Policy and Support | 2,919 | 2,674 | $1,297,020 | 2,919 | 2,773 | $1,218,924 | 3,200 | 2,957 | $1,293,872 | 281 | 184 | $74,948 |
| Refugee and Asylum Operations | 2,180 | 1,943 | $435,753 | 1,809 | 1,719 | $431,450 | 1,665 | 1,287 | $380,405 | (144) | (432) | ($51,045) |
| Immigration Records and Applicant Services | 1,384 | 1,295 | $478,752 | 1,384 | 1,315 | $456,732 | 1,418 | 1,356 | $474,930 | 34 | 41 | $18,198 |
| Premium Processing (Including Transformation) | 1,381 | 1,306 | $899,975 | 2,113 | 2,007 | $1,313,858 | 2,113 | 2,046 | $1,330,707 | - | 39 | $16,849 |
| **Total** | **20,654** | **18,649** | **$4,944,463** | **21,659** | **20,576** | **$5,595,175** | **22,512** | **20,650** | **$5,868,997** | **853** | **74** | **$273,822** |
| Subtotal Mandatory - Fee | 20,654 | 18,649 | $4,944,463 | 21,659 | 20,576 | $5,595,175 | 22,512 | 20,650 | $5,868,997 | 853 | 74 | $273,822 |

12 "Budget Spending Authority Request" refers to the funding USCIS anticipates to obligate, as opposed to "Budget Authority" which refers to budget resources.
13 FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

003633

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024[14] |
|---|---|---|---|
| **Collections (Actuals/Estimates/Projections)** | $4,834,837 | $5,054,185 | $5,545,149 |
| Carryover - Start of Year | $1,533,835 | $2,190,225 | $1,663,536 |
| Recoveries | $121,301 | $76,000 | $76,000 |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | ($7,351) | ($12,503) | ($27,985) |
| Reprogramming/Transfers (CHIMP) | ($4,000) | ($4,000) | ($4,000) |
| Supplementals | $193,000 | - | - |
| **Total Budget Authority** | **$6,671,622** | **$7,303,907** | **$7,252,700** |
| Collections - Reimbursable Resources | $77,005 | $75,000 | $75,000 |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$6,748,627** | **$7,384,487** | **$7,327,700** |
| **Projected Obligations** | | | |
| Obligations[15] | $4,878,463 | $5,595,175 | $5,868,997 |
| Operation Allies Welcome (OAW) Obligations | $66,000 | $62,776 | $62,776 |
| Obligations - Reimbursables | $75,000 | $63,000 | $74,000 |
| **Actual Obligations** | | | |
| Obligations | $4,474,715 | - | - |
| Obligations – Reimbursable | $83,687 | - | - |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 20,654 | 21,659 | 22,512 |
| Enacted/Request FTE | 18,649 | 20,576 | 20,650 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 18,231 | 21,659 | 22,512 |
| FTE (Actual/Estimates/Projections) | 17,911 | 20,576 | 20,650 |

---

[14] FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.
[15] Tied to "Budget Spending Authority Request" which refers to the funding USCIS anticipates to obligate, as opposed to "Budget Authority" which refers to budget resources.

**CIS – IEFA - 9**

003634

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Collections – Reimbursable Resources
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Canada/UK Visa | - | - | $9,500 | - | - | $9,500 | - | - | $9,500 |
| Department of Defense - Department of Defense | - | - | $7,500 | - | - | $7,500 | - | - | $7,500 |
| Department of Health and Human Services - Department Wide | - | - | $5 | - | - | $5 | - | - | $5 |
| Department of Homeland Security - Department of Homeland Security | - | - | $952 | - | - | $952 | - | - | $952 |
| Department of Homeland Security - Federal Emergency Management Agency | - | - | $12,994 | - | - | $12,994 | - | - | $12,994 |
| Department of Homeland Security - U.S. Customs and Border Protection | - | - | $19,154 | - | - | $19,154 | - | - | $19,154 |
| Department of Homeland Security - U.S. Immigration and Customs Enforcement | - | - | $12,500 | - | - | $12,500 | - | - | $12,500 |
| Department of Justice - Department of Justice | - | - | $311 | - | - | $311 | - | - | $311 |
| SAVE Collections | - | - | $12,000 | - | - | $12,000 | - | - | $12,000 |
| Department of Homeland Security – CISA | - | - | $74 | - | - | $74 | - | - | $74 |
| General Service Administration (GSA) | - | - | $10 | - | - | $10 | - | - | $10 |
| **Total Collections** | - | - | **$75,000** | - | - | **$75,000** | - | - | **$75,000** |

**CIS – IEFA - 10**

003635

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Immigration Examinations Fee Account
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay | Non-Pay | Amount |
|---|---|---|---|---|---|
| **FY 2022 Enacted** | 20,654 | 18,649 | $2,787,629 | $2,156,834 | $4,944,463 |
| **FY 2023 Enacted** | 21,659 | 20,576 | $3,214,766 | $2,380,409 | $5,595,175 |
| **FY 2024 Base Budget** | 21,659 | 20,576 | $3,214,766 | $2,380,409 | $5,595,175 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Transfers** | - | - | - | - | - |
| **Pricing Changes** | - | - | - | - | - |
| Annualization of Prior Year Pay Increase | - | - | $36,970 | - | $36,970 |
| Civilian Pay Raise Total | - | - | $126,818 | - | $126,818 |
| Asylum Processing Rule Annualization for a 75,000 Credible Fear Interview Caseload | - | - | $31,511 | $13,489 | $45,000 |
| FY 2023 Pay Annualization | - | 366 | $57,703 | - | $57,703 |
| **Total Pricing Changes** | - | 366 | $253,002 | $13,489 | $266,491 |
| **Total Adjustments-to-Base** | - | 366 | $253,002 | $13,489 | $266,491 |
| **FY 2023 Current Services** | 21,659 | 20,942 | $3,467,768 | $2,393,898 | $5,861,666 |
| Anticipated Fee Rule Positions | 2,291 | 1,146 | $236,577 | $38,669 | $275,246 |
| Realignment of Backlog Reduction to Operations and Support | (644) | (644) | ($82,520) | - | ($82,520) |
| Realignment of Asylum Adjudications to Operations and Support | (794) | (794) | ($143,454) | ($41,941) | ($185,395) |
| **Total Program Changes** | 853 | (292) | $10,603 | ($3,272) | $7,331 |
| **FY 2024 Request**[16] | 22,512 | 20,650 | $3,478,371 | $2,390,626 | $5,868,997 |
| **FY 2023 to FY 2024 Change** | 853 | 74 | $263,605 | $10,217 | $273,822 |

**CIS – IEFA - 11**

---

[16] FTE and amount totals do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2024 President's Budget | | |
| --- | --- | --- | --- | --- | --- |
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 – Annualization of Prior Year Pay Raise** | - | - | **$36,970** | - | **$36,970** |
| Adjudication Operations | - | - | $21,466 | - | $21,466 |
| *Field Operations* | - | - | *$11,711* | - | *$11,711* |
| *Fraud Detection and National Security* | - | - | *$3,123* | - | *$3,123* |
| *Service Center Operations* | - | - | *$6,632* | - | *$6,632* |
| Immigration Policy and Support | - | - | $6,823 | - | $6,823 |
| Refugee and Asylum Operations | - | - | $3,715 | - | $3,715 |
| Immigration Records and Applicant Services | - | - | $2,551 | - | $2,551 |
| Premium Processing (Including Transformation) | - | - | $2,415 | - | $2,415 |
| **Pricing Change 2 – Civilian Pay Raise Total** | - | - | **$126,818** | - | **$126,818** |
| Adjudication Operations | - | - | $73,635 | - | $73,635 |
| *Field Operations* | - | - | *$40,172* | - | *$40,172* |
| *Fraud Detection and National Security* | - | - | *$10,716* | - | *$10,716* |
| *Service Center Operations* | - | - | *$22,747* | - | *$22,747* |
| Immigration Policy and Support | - | - | $23,404 | - | $23,404 |
| Refugee and Asylum Operations | - | - | $12,744 | - | $12,744 |
| Immigration Records and Applicant Services | - | - | $8,750 | - | $8,750 |
| Premium Processing (Including Transformation) | - | - | $8,285 | - | $8,285 |

CIS – IEFA - 12

**United States Citizenship and Immigration Services**

| | | | | | Immigration Examinations Fee Account |
|---|---|---|---|---|---|
| **Pricing Change 3 – Asylum Processing Rule Annualization for a 75,000 Credible Fear Interview Caseload** | - | | $31,511 | $13,489 | **$45,000** |
| Refugee and Asylum Operations | - | - | $31,511 | $13,489 | $45,000 |
| **Pricing Change 4 – FY 2023 Pay Annualization** | - | 366 | **$57,703** | - | **$57,703** |
| Adjudication Operations | - | 223 | $35,158 | - | $35,158 |
| *Field Operations* | - | 121 | $19,077 | - | $19,077 |
| *Fraud Detection and National Security* | - | 33 | $5,203 | - | $5,203 |
| *Service Center Operations* | - | 69 | $10,878 | - | $10,878 |
| Immigration Policy and Support | - | 43 | $6,779 | - | $6,779 |
| Refugee and Asylum Operations | - | 37 | $5,833 | - | $5,833 |
| Immigration Records and Applicant Services | - | 24 | $3,784 | - | $3,784 |
| Premium Processing (Including Transformation) | - | 39 | $6,149 | - | $6,149 |
| **Total Pricing Changes** | - | 366 | **$253,002** | **$13,489** | **$266,491** |

## Pricing Change 1 – Annualization of Prior Year Pay Raise

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $3.2B.

Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2023 4.6 percent civilian pay increase. It is calculated by adding the base pay of the FY 2022 Congressional Justification and the FY 2023 Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (4.6 percent) and then by one-fourth to account for three months of the 2023 calendar year.

## Change 2 – Civilian Pay Raise Total

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $3.3B.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2024 with a 5.2 percent civilian pay increase. It is calculated by adding Base pay, Pay Base of the Annualization of FY 2023 Program Changes and the Annualization of Prior Year

CIS – IEFA - 13

003638

United States Citizenship and Immigration Services                    **Immigration Examinations Fee Account**

Pay Raise pricing change, multiplying by the pay rate increase (5.2 percent) and then by three-fourths to account for nine months of the 2024 calendar year.

**Pricing Change 3 – Asylum Processing Rule Annualization for a 75,000 Credible Fear Interview Caseload**

Base Activity Funding: The base funding of this activity reflects a total of 794 positions, 794 FTE, and $135.0M.

Pricing Change Explanation: This annualization of $45.0M represents the remaining costs needed to support up to 75,000 credible fear cases. This pricing change will increase pay to $138.1M and non-pay to $41.9M which is consistent with costs needed to support up to 75,000 credible fear cases.

**Pricing Change 4 – FY 2023 Pay Annualization**

Base Activity Funding: The base funding of this activity reflects a total of 732 positions, 366 FTE, and $57.7M.

Pricing Change Explanation: This annualization of $57.7M represents the remaining costs needed to support up to 732 positions that were added in FY 2023 as enhancements.

003639

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Justification of Program Changes

| | Positions | FTE | FY 2024 President's Budget | | |
| --- | --- | --- | --- | --- | --- |
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 – Anticipated Fee Rule Positions** | **2,291** | **1,146** | **$236,577** | **$38,669** | **$275,246** |
| Adjudication Operations | 1,326 | 663 | $143,653 | $23,479 | $167,132 |
| *Field Operations* | *723* | *362* | *$78,371* | *$12,810* | *$91,181* |
| *Fraud Detection and National Security* | *193* | *96* | *$20,905* | *$3,417* | *$24,322* |
| *Service Center Operations* | *410* | *205* | *$44,377* | *$7,253* | *$51,630* |
| Immigration Policy and Support | 281 | 141 | $32,611 | $5,331 | $37,942 |
| Refugee and Asylum Operations | 650 | 325 | $57,637 | $9,421 | $67,058 |
| Immigration Records and Applicant Services | 34 | 17 | $2,676 | $437 | $3,113 |
| **Program Change 2 – Realignment of Asylum Adjudications to Operations and Support** | **(794)** | **(794)** | **($143,454)** | **($41,941)** | **($185,395)** |
| Refugee and Asylum Operations | (794) | (794) | ($143,454) | ($41,941) | ($185,395) |
| **Program Change 3 – Realignment of Backlog Reduction from IEFA** | **(644)** | **(644)** | **($82,520)** | - | **($82,520)** |
| Adjudication Operations | (644) | (644) | ($82,520) | - | ($82,520) |
| Field Operations | (351) | (351) | ($45,019) | - | ($45,019) |
| Fraud Detection and National Security | (94) | (94) | ($12,009) | - | ($12,009) |
| Service Center Operations | (199) | (199) | ($25,492) | - | ($25,492) |
| **Total Program Changes** | **853** | **(292)** | **$10,603** | **($3,272)** | **$7,331** |

CIS – IEFA - 15

003640

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Program Change 1 – Anticipated Fee Rule Positions

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 21,659 | 20,576 | $5,595,175 |
| Program Change | 2,291 | 1,146 | $275,246 |

### Description

USCIS has increased the FY 2024 pay budget by $275.2M from FY 2023 to account for changes due to an anticipated implementation of the FY 2022/2023 fee rule and for initiatives that require additional pay resources to meet mission goals.

### Justification

It has been almost seven years since USCIS raised fees and the agency's current fees fall short of recovering the full cost of USCIS's operational needs. The fees proposed in the new rule will allow USCIS to recover operational costs, re-establish and maintain timely case processing and prevent the accumulation of future case backlogs. These positions are being requested with the understanding that the FY 2022/2023 feel rule is not on a set timeline and the implementation date may vary. USCIS will be required to adjust the application of this program change based on implementation date of the FY 2022/2023 fee rule.

### Performance

The 2,291 positions in this program change are necessary to meet adjudicative processing goals and other USCIS mission objectives, including administrative functions. This additional staffing requirement reflects the fact that it takes USCIS longer to adjudicate many workloads than was planned for in the FY 2016/2017 fee rule and that workload volumes and operational needs have grown.

## Program Change 2 – Realignment of Asylum Adjudications to Operations and Support

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 794 | 794 | $185,395 |
| Program Change | (794) | (794) | ($185,395) |

### Description

The FY 2024 Budget includes a realignment of 794 Positions, 794 FTE, and $185.4M for the Refugee and Asylum Operations PPA. The decrease in positions from this PPA is in direct correlation with the request to fund these positions within the Operations and Support Congressional Justification chapter of USCIS' budget request for FY 2024. These 794 positions have the capacity to process up to 75,000 credible fear cases. In FY 2022, 266 positions were funded to support up to 35,000 credible fear cases. In FY 2023, an additional 528 positions were funded to total 794 positions and

**United States Citizenship and Immigration Services**                                                    **Immigration Examinations Fee Account**

$135 million in funding. In FY 2024 an additional $45 million in annualization and $5.4 million in pay raises was added to the $135 million for a total of $185.4 million in current services for asylum adjudications.

**Justification**

USCIS is primarily funded by immigration and naturalization benefit fees charged to applicants and petitioners; however, the workload these positions support do not generate revenue and requires that the burden of these costs be borne by the small pool of fee-paying applicants and petitioners. This shift in funding source would eliminate the extra burden on fee-paying applicants to support the payroll and other associated staffing costs to handle the processing of credible fear interviews and asylum adjudications.

**Performance**

USCIS will fully implement the Asylum Processing Interim Final Rule, as of May 31, 2022. USCIS may retain the asylum and withholding of the removal application of certain individuals found to have a credible fear, rather than placing the individuals into removal proceedings with an immigration judge. USCIS will increase its capacity to conduct Asylum Merits Interviews under this rule and the movement of these positions to discretionary funding will provide USCIS with full flexibility to successfully carry out this new mission.

As DHS proposes to adjust these fees for the considerable costs increases due to higher demand since 2016, DHS has estimated that the associated requirements of the Asylum Processing Rule will be funded by a $600 Asylum Program Fee to be paid by employers who file either a Form I-129, Petition for a Nonimmigrant Worker, or Form I-140, Immigrant Petition for Alien Worker, to ensure full cost of operations are recovered. DHS has determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. With this realignment, DHS may reduce USCIS' estimated IEFA resource requirements and the fees necessary to generate those resources in a final fee rule.

**Program Change 3 – Realignment of Backlog Reduction from IEFA**

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 644 | 644 | $82,520 |
| **Program Change** | **(644)** | **(644)** | **($82,520)** |

**Description**

The FY 2024 Budget includes a decrease of 644 Positions, 644 FTE, and $82.5M which was used to support the reduction of USCIS backlogs in FY 2023. The decrease in positions from this PPA is in direct correlation with the request to fund these positions within the Operations and Support Congressional Justification chapter of USCIS' budget request for FY 2024. This program was originally funded through appropriations in FY 2022 and was not funded in FY 2023. Rather than eliminate the progress and work that had been accomplished through the backlog effort, USCIS supported the backlog reduction effort through IEFA funds. USCIS absorbed the 477 onboarded personnel from Operations and Support in FY 2022 and continued hiring up to 644 positions through FY 2023.

**CIS – IEFA - 17**

United States Citizenship and Immigration Services                                      Immigration Examinations Fee Account

**Justification**

As part of the U.S. Government Accountability Office's (GAO) recommendations in its report[17] on actions needed to address pending caseload, GAO states that USCIS should identify resources necessary to address its case backlog and inform key stakeholders, such as the Office of Management and Budget and Congress.

Addressing the backlog is a priority for the Administration and USCIS senior leadership. The current fee collections do not support the financial burden required to have an impact on reducing the backlog. Sustained funding for backlog reduction is necessary to ultimately eliminate the current backlog. USCIS understands the impact that decision delays have on applicants and petitioners and USCIS recognizes that its core mission is to ensure the timely processing of immigration requests with fairness, integrity, and respect for all we serve. USCIS is requesting to transfer the current support of this program from fee funds and expand current efforts through increased capacity (additional FTE, additional overtime, expanded contractual support, additional equipment and supply purchases, and onboarding and training expenses) under appropriations.

**Performance**

This transfer of funding and positions supports the downward trend of the backlog realized in FY 2022 as a result of increased staff to support backlog reduction efforts through appropriated funds. Without appropriated funds, USCIS will be unable to support backlog reduction efforts to make any real progress in the near future.

---

[17] GAO Report 21-529 – U.S. Citizenship and Immigration Services: Actions Needed to Address Pending Caseload (https://www.gao.gov/products/gao-21-529)

003643

**Immigration Examinations Fee Account**

**United States Citizenship and Immigration Services**

**Graphic 1: Backlog Trends, December 2017 – December 2022**

| Month | Value |
|---|---|
| Dec-22 | 4,951 |
| Nov-22 | 4,998 |
| Oct-22 | 4,990 |
| Sep-22 | 5,043 |
| Aug-22 | 5,067 |
| Jul-22 | 5,210 |
| Jun-22 | 5,207 |
| May-22 | 5,093 |
| Apr-22 | 5,055 |
| Mar-22 | 5,169 |
| Feb-22 | 5,233 |
| Jan-22 | 5,258 |
| Dec-21 | 5,066 |
| Nov-21 | 4,789 |
| Oct-21 | 4,551 |
| Sep-21 | 4,376 |
| Aug-21 | 4,260 |
| Jul-21 | 4,122 |
| Jun-21 | 3,980 |
| May-21 | 3,816 |
| Apr-21 | 3,746 |
| Mar-21 | 3,685 |
| Feb-21 | 3,696 |
| Jan-21 | 3,454 |
| Dec-20 | 3,356 |
| Nov-20 | 3,280 |
| Oct-20 | 3,135 |
| Sep-20 | 2,886 |
| Aug-20 | 2,899 |
| Jul-20 | 2,805 |
| Jun-20 | 2,716 |
| May-20 | 2,580 |
| Apr-20 | 2,405 |
| Mar-20 | 2,443 |
| Feb-20 | 2,451 |
| Jan-20 | 2,558 |
| Dec-19 | 2,576 |
| Nov-19 | 2,558 |
| Oct-19 | 2,481 |
| Sep-19 | 2,495 |
| Aug-19 | 2,638 |
| Jul-19 | 2,661 |
| Jun-19 | 2,540 |
| May-19 | 2,492 |
| Apr-19 | 2,578 |
| Mar-19 | 2,602 |
| Feb-19 | 2,652 |
| Jan-19 | 2,656 |
| Dec-18 | 2,592 |
| Nov-18 | 2,506 |
| Oct-18 | 2,453 |
| Sep-18 | 2,430 |
| Aug-18 | 2,370 |
| Jul-18 | 2,412 |
| Jun-18 | 2,333 |
| May-18 | 2,237 |
| Apr-18 | 2,252 |
| Mar-18 | 2,380 |
| Feb-18 | 2,459 |
| Jan-18 | 2,242 |
| Dec-17 | 2,493 |

003644

CIS – IEFA - 19

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| Organization (Dollars in Thousands) | FY 2022 Enacted | | | | FY 2023 Enacted | | | | FY 2024 President's Budget[18] | | | | FY 2023 to FY 2024 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations | 12,790 | 11,431 | $1,681,439 | $147.09 | 13,434 | 12,762 | $1,784,493 | $139.83 | 14,116 | 13,004 | $1,975,885 | $151.94 | 682 | 242 | $191,392 | $12.11 |
| Field Operations | - | - | - | - | 7,329 | 6,963 | $973,536 | $139.82 | 7,701 | 7,095 | $1,077,848 | $151.92 | 372 | 132 | $104,312 | $12.10 |
| Fraud Detection and National Security | - | - | - | - | 1,955 | 1,857 | $259,698 | $139.85 | 2,054 | 1,892 | $287,636 | $152.03 | 99 | 35 | $27,938 | $12.18 |
| Service Center Operations | - | - | - | - | 4,150 | 3,942 | $551,259 | $139.84 | 4,361 | 4,017 | $610,401 | $151.95 | 211 | 75 | $59,142 | $12.11 |
| Immigration Policy and Support | 2,919 | 2,674 | $475,306 | $177.75 | 2,919 | 2,773 | $587,127 | $211.73 | 3,200 | 2,957 | $656,744 | $222.10 | 281 | 184 | $69,617 | $10.37 |
| Refugee and Asylum Operations | 2,180 | 1,943 | $303,616 | $156.26 | 1,809 | 1,719 | $330,899 | $192.50 | 1,665 | 1,287 | $298,885 | $232.23 | -144 | -432 | ($32,014) | $39.73 |
| Immigration Records and Applicant Services | 1,384 | 1,295 | $175,850 | $135.79 | 1,384 | 1,315 | $201,903 | $153.54 | 1,418 | 1,356 | $219,664 | $161.99 | 34 | 41 | $17,761 | $8.45 |
| Premium Processing (Including Transformation) | 1,381 | 1,306 | $151,418 | $115.94 | 2,113 | 2,007 | $310,344 | $154.63 | 2,113 | 2,046 | $327,193 | $159.92 | 0 | 39 | $16,849 | $5.29 |
| **Total** | **20,654** | **18,649** | **$2,787,629** | **$149.48** | **21,659** | **20,576** | **$3,214,766** | **$156.24** | **22,512** | **20,650** | **$3,478,371** | **$168.44** | **853** | **74** | **$263,605** | **$12.20** |
| Mandatory - Fee | 20,654 | 18,649 | $2,787,629 | $149.48 | 21,659 | 20,576 | 3,214,766 | $156.24 | 22,512 | 20,650 | 3,478,371 | $168.44 | 853 | 74 | $263,605 | $12.20 |

---

[18] FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS – IEFA - 20

003645

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget[19] | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $1,953,010 | $2,227,531 | $2,399,374 | $171,843 |
| 11.3 Other than Full-time Permanent | $14,116 | $13,156 | $14,124 | $968 |
| 11.5 Other Personnel Compensation | $83,017 | $103,683 | $112,204 | $8,521 |
| 12.1 Civilian Personnel Benefits | $737,486 | $869,185 | $951,391 | $82,206 |
| 13.0 Benefits for Former Personnel | - | $1,211 | $1,278 | $67 |
| **Total - Personnel Compensation and Benefits** | **$2,787,629** | **$3,214,766** | **$3,478,371** | **$263,605** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 20,654 | 21,659 | 22,512 | 853 |
| FTE - Civilian | 18,649 | 20,576 | 20,650 | 74 |

---

[19] FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS – IEFA - 21**

003646

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Pay Cost Drivers

| Pay Cost Drivers (Dollars in Thousands) | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget[20] | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 11,352 | $1,559,575 | $137.40 | 12,002 | $1,714,001 | $142.81 | 12,045 | $1,854,532 | $153.97 | 43 | $140,531 | $11.16 |
| Asylum Officer | 1,048 | $158,802 | $151.53 | 1,136 | $178,931 | $157.51 | 1,140 | $193,590 | $169.82 | 4 | $14,659 | $12.31 |
| Adjudication Officer | 279 | $58,966 | $211.35 | 277 | $60,854 | $219.69 | 278 | $65,845 | $236.85 | 1 | $4,991 | $17.16 |
| Refugee Officer | 235 | $37,968 | $161.57 | - | - | - | - | - | - | - | - | - |
| Hearings and Appeals | 69 | $15,459 | $224.04 | 71 | $16,534 | $232.87 | 71 | $17,826 | $251.07 | - | $1,292 | $18.20 |
| Other | 5,667 | $956,859 | $168.85 | 7,090 | $1,244,446 | $175.52 | 7,116 | $1,346,578 | $189.23 | 26 | $102,132 | $13.71 |
| Total – Pay Cost Drivers | 18,649 | $2,787,629 | $149.48 | 20,576 | $3,214,766 | $156.24 | 20,650 | $3,478,371 | $168.44 | 74 | $263,605 | $12.20 |

## Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and the annualized hiring and onboarding of additional positions.

**Asylum Officer:** This cost driver funds salaries and benefits of USCIS Asylum Officers. Asylum Officers conduct interviews, process Credible Fear claims, and adjudicate asylum applications that are not made in Immigration Court. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and the annualized hiring and onboarding of additional positions.

**Adjudication Officer:** This cost driver funds the salaries and benefits of USCIS Adjudication Officers. Adjudication Officers review applications for immigration benefits and make decisions regarding these requests based on their extensive knowledge of immigration laws and practices. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, and FY 2024 pay raise.

**Refugee Officer:** This cost driver funds the salaries and benefits of USCIS Refugee Officers. Refugee Officers establish identity and make findings of eligibility for refugee benefits by analyzing facts, examining documents (including identifying documents) for authenticity, and researching and

[20] FTE and amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

CIS – IEFA - 22

003647

**United States Citizenship and Immigration Services**                                        **Immigration Examinations Fee Account**

analyzing appropriate information, law, and country conditions. In FY 2023, USCIS is proposing to realign IRAD's fee-funded positions to appropriations in the USCIS' FY 2023 Operations and Support under the Application Processing PPA. This realignment will move 155 Refugee Officer positions along with approximately $23.2M in associated FTE dollars.

**Hearings and Appeals:** This cost driver funds salaries and benefits of USCIS Hearings and Appeals staff. Hearings and Appeals staff support a wide range of legal services involving administrative, criminal, and civil prosecutions in support of mandamus and other immigration-related litigation actions. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, and FY 2024 pay raise.

**Other:** This cost driver funds salaries and benefits of non-Mission Critical Occupation Positions that include: legal, privacy, policy and strategy, equal opportunity and inclusion, procurement operations; management of property, plant, and equipment, and other material resources; budget, planning and performance measures, strategic sourcing, financial and capital asset management; human resources and personnel recruitment, hiring, training, leadership development, employee benefits, and work-life programs, immigration forms, print services, and the management of security and emergency management operations. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2024 pay raise, and the annualized hiring and onboarding of additional positions.

**CIS – IEFA - 23**

003648

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Permanent Positions by Grade – Appropriation
### *(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Total, SES | 80 | 78 | 78 | - |
| GS-15 | 1,076 | 1,104 | 1,219 | 115 |
| GS-14 | 2,495 | 2,510 | 2,574 | 64 |
| GS-13 | 4,214 | 4,443 | 4,504 | 61 |
| GS-12 | 6,268 | 6,705 | 6,788 | 83 |
| GS-11 | 1,004 | 1,068 | 1,080 | 12 |
| GS-10 | 46 | 76 | 3 | (73) |
| GS-9 | 3,504 | 3,634 | 4,014 | 380 |
| GS-8 | 29 | 30 | 33 | 3 |
| GS-7 | 1,561 | 1,621 | 1,787 | 166 |
| GS-6 | 226 | 234 | 259 | 25 |
| GS-5 | 144 | 149 | 165 | 16 |
| GS-4 | 7 | 7 | 8 | 1 |
| GS-3 | - | - | - | - |
| GS-2 | - | - | - | - |
| **Total Permanent Positions** | **20,654** | **21,659** | **22,512** | **853** |
| Total Perm. Employment (Filled Positions) EOY | 18,231 | 21,659 | 22,512 | 853 |
| Unfilled Positions EOY | 2,423 | - | - | - |
| **Position Locations** | | | | |
| Headquarters Civilian | 4,303 | 4,050 | 4,210 | 160 |
| U.S. Field Civilian | 16,311 | 17,609 | 18,302 | 693 |
| Foreign Field Civilian | 40 | - | - | - |
| **Averages** | | | | |
| Average Personnel Costs, ES Positions | $191,440 | $199,959 | $208,857 | $8,898 |
| Average Personnel Costs, GS Positions | $104,351 | $108,995 | $113,845 | $4,850 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

# Immigration Examinations Fee Account

CIS – IEFA - 24

003649

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Non Pay Budget Exhibits

## Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget[21] | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Adjudication Operations | $151,524 | $389,718 | $413,198 | $23,480 |
| Field Operations | - | $77,839 | $90,649 | $12,810 |
| Fraud Detection and National Security | - | $4,081 | $7,498 | $3,417 |
| Service Center Operations | - | $25,443 | $32,696 | $7,253 |
| Support Services | - | $282,355 | $282,355 | |
| Immigration Policy and Support | $821,714 | $631,797 | $637,128 | 5,331 |
| Refugee and Asylum Operations | $132,137 | $100,551 | $81,520 | ($19,031) |
| Immigration Records and Applicant Services | $302,902 | $254,829 | $255,266 | 437 |
| Premium Processing (Including Transformation) | $748,557 | $1,003,514 | $1,003,514 | 0 |
| **Total** | **$2,156,834** | **$2,380,409** | **$2,390,626** | **$10,217** |
| | | | | |
| Subtotal Mandatory – Fee | $2,156,834 | $2,380,409 | $2,390,626 | $10,217 |

---

[21] Amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS – IEFA - 25**

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

## Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget[22] | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $37,561 | $11,248 | $6,601 | ($4,647) |
| 22.0 Transportation of Things | $11,783 | $14,717 | $14,717 | - |
| 23.1 Rental Payments to GSA | $308,350 | $269,584 | $268,263 | ($1,321) |
| 23.2 Rental Payments to Others | $1,178 | $2,520 | $202 | ($2,318) |
| 23.3 Communications, Utilities, & Miscellaneous | $52,729 | $95,658 | $95,658 | - |
| 24.0 Printing and Reproduction | $7,657 | $14,717 | $14,717 | - |
| 25.1 Advisory & Assistance Services | $663,978 | $756,696 | $758,760 | $2,064 |
| 25.2 Other Services from Non-Federal Sources | $66,244 | $51,278 | $37,794 | ($13,484) |
| 25.3 Other Purchases of goods and services | $423,941 | $349,521 | $349,521 | - |
| 25.4 Operations & Maintenance of Facilities | $3,119 | $2,452 | $2,452 | - |
| 25.6 Medical Care | $1 | - | - | - |
| 25.7 Operation & Maintenance of Equipment | $100,714 | $168,015 | $168,015 | - |
| 26.0 Supplies & Materials | $17,736 | $39,256 | $38,855 | ($401) |
| 31.0 Equipment | $408,116 | $527,483 | $557,807 | $30,324 |
| 32.0 Land and Structures | $49,408 | $72,358 | $72,358 | - |
| 41.0 Grants, Subsidies, and Contributions | $91 | - | - | - |
| 42.0 Insurance Claims and Indemnities | $4,228 | $4,906 | $4,906 | - |
| **Total - Non Pay Budget Object Class** | **$2,156,834** | **$2,380,409** | **$2,390,626** | **$10,217** |

_____

[22] Amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS – IEFA - 26**

**United States Citizenship and Immigration Services**

**Immigration Examinations Fee Account**

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| USCIS Support Contracts and Miscellaneous Services | $70,975 | $315,858 | $319,293 | $3,435 |
| Rental Payments to General Services Administration (GSA) | $308,350 | $248,766 | $267,084 | $18,318 |
| Development Contract | $307,485 | $157,706 | $159,421 | $1,715 |
| O&M and Software Licensing | $239,027 | $126,921 | $128,301 | $1,380 |
| Service Center Operations Support Contract | - | $142,268 | $142,268 | - |
| Network | - | $126,468 | $126,468 | - |
| Federal Bureau of Investigation IAA | $65,209 | $84,806 | $85,728 | $922 |
| Program Office Related Expenses | $39,249 | $90,119 | $90,119 | - |
| USCIS Initiatives predominantly involving Printing, Training, Equipment, Transportation of Things, Travel, and Supplies | - | $74,243 | $75,050 | $807 |
| Overheads & Shared Services | $96,435 | $83,295 | $83,295 | - |
| Lockbox IAA | $77,570 | $83,030 | $83,030 | - |
| Lease Acquisitions Program | $72,749 | $82,665 | $82,665 | - |
| MyUSCIS | - | $77,639 | $77,639 | - |
| Application Support Center Operations Contract | $61,845 | $62,065 | $62,740 | $675 |
| Other Rent and Utilities | $53,907 | $59,751 | $40,295 | ($19,456) |
| IT Security | - | $57,615 | $58,242 | $627 |
| Card Production & Security Identification Contracts | $5,902 | $55,541 | $56,145 | $604 |
| Record Contract Support | $27,077 | $56,286 | $56,286 | - |
| National Benefits Center Records Contract | $86,091 | $48,264 | $48,264 | - |
| Data Center and Cloud | - | $38,371 | $38,788 | $417 |
| Office of Chief Information Officer (OCIO) Operations | - | $27,256 | $27,552 | $296 |
| Infrastructure-Information Technology Field Services (ITFS) | - | $29,328 | $29,328 | - |
| Background Investigations | - | $27,769 | $27,769 | - |
| Field Office Records Contract | $22,890 | $24,423 | $24,423 | - |
| HR Support Services | $18,345 | $22,884 | $22,884 | - |
| Interpreter and Transcription Services | $24,866 | $20,697 | $20,697 | - |

003652

**United States Citizenship and Immigration Services**

**Immigration Examinations Fee Account**

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Freedom of Information Act (FOIA) Contract | $1,589 | $16,391 | $16,569 | $178 |
| Cyber Security Contracts | $136,831 | $16,285 | $16,462 | $177 |
| Employment Based (EB-5) Program | - | $19,158 | $19,158 | - |
| Contact Center | $31,696 | $11,231 | $11,353 | $122 |
| Department of State (DOS) IAA Economy Act w/Consular Affairs | $12,600 | $12,600 | $12,600 | - |
| Systematic Alien Verification for Entitlements (SAVE) support and services | $8,775 | $8,926 | $8,926 | - |
| Physical Security Support | $15,941 | $8,766 | $8,766 | - |
| Federal Oaths IAA | $6,427 | $5,655 | $5,655 | - |
| Federal Law Enforcement Training Center | $673 | $4,726 | $4,726 | - |
| Technical Operations Center (TOC) (Formerly known as Network Operations Center) | $85,882 | $4,469 | $4,469 | - |
| Asylum Vetting Center | - | $4,025 | $4,025 | - |
| Capital Security Cost Share and International Cooperative Administrative Support Services | $7,057 | $2,807 | $2,807 | - |
| Other Costs | $271,391 | $41,336 | $41,336 | - |
| Total Non Pay[23] | **$2,156,834** | **$2,380,409** | **$2,390,626** | **$10,217** |

## Explanation of Non-Pay Cost Drivers

This provides an explanation of the major non pay cost drivers:

- **USCIS Support Contracts and Miscellaneous Services:** This cost driver includes contracts and services that support Field Operations, Service Center Operations, Asylum, Information Technology, Immigration Records and Identity Services, External Affairs, Contracting, and other USCIS Program Offices. These contracts and services include things such as maintenance contracts, shredding services, contractual services for human resources, case management, file storage, county court services, and other miscellaneous cost drivers.
- **Rental Payments to the General Services Administration (GSA):** This cost driver funds rental payments to GSA for USCIS facilities space, per USCIS' most recent estimates.
- **Development Contract:** This cost driver provides IT development in three Task Areas: Transformation DevOps, Integration and Configuration Services (ICS) and User Experience Design and User Interface Design (UXD).
- **O&M and Software Licensing:** This cost driver procures licenses, subscriptions, and maintenance for the software and hardware comprising the USCIS IT infrastructure, and supports multi-cloud hosting environment for mission critical systems. Software licenses and products aid in maintaining USCIS systems and build future systems in a consistent manner across the USCIS enterprise environment.

---

[23] Amount totals for FY 2024 do not match the figures displayed in the FY 2024 Budget Appendix due to a print timing issue.

**CIS – IEFA - 28**

**Immigration Examinations Fee Account**

**United States Citizenship and Immigration Services**

- **Service Center Operations Support Contract:** This cost driver funds contractual costs for correspondence management, fee receipting, data entry, and file operations support for four of the five USCIS service centers: California Service Center, Nebraska Service Center, Texas Service Center, and Vermont Service Center. This contract is overseen by the Service Center Operations and Office of Intake and Document Production as USCIS continues to transition to an electronic adjudicative process.

- **Network:** This cost driver funds and supports the Back Office Refresh effort as part of the United States Citizenship and Immigration Services Information Technology Asset Replacement plan to provide funding and deployments to upgrade network, infrastructure, hardware, or other improved technological replacements across USCIS on a continuous schedule. The wireless network deployments are part of USCIS' initiative to provide wireless network capabilities to all USCIS offices. Having wide-spread wireless network capabilities provides constant internet connection world-wide, creating a more efficient environment to enhance the immigration application process, while allowing USCIS to support the public by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

- **Federal Bureau of Investigation IAA:** This cost driver funds DHS-USCIS required background checks during the immigration benefit process. The background check process is a critical element in USCIS's mission to ensure the integrity of the U.S. immigration system. This process identifies individuals who may pose a risk to our national security or public safety. The process also identifies other derogatory information that may affect eligibility for the immigration benefit sought. As part of the background check process, the USCIS IRIS Directorate's Biometrics Division is responsible for collecting biometrics capture from applicants, who seek to obtain immigration benefits in the United States; biometrics capture is then transmitted electronically to the Department of Justice (DOJ)– Federal Bureau of Investigations (FBI) [DOJ-FBI] to run the fingerprint checks and name checks. DOJ-FBI will receive and process non-criminal justice fingerprint requests from DHS-USCIS and provide results of fingerprint requests to DHS-USCIS. Unit costs are set by reimbursable agreement with the FBI.

- **Program Office Related Expenses:** This cost driver funds administrative support contracts for File Room, Regulatory Support, Data Strategy Services, Disability Accommodation, and Transcription/Translation contracts.

- **USCIS Initiatives predominantly involving Printing, Training, Equipment, Transportation of Things, Travel, and Supplies:** This cost driver funds initiatives predominantly involving Printing, Training, Equipment, Transportation of Things, Travel, and Supplies for every USCIS directorates and program office to maintain current operations.

- **Overheads & Shared Services:** This cost driver funds USCIS overhead requirements like Guard Services, credit monitoring, some attorney fees, etc.

- **Lockbox IAA** – This cost driver funds for services provided by its fiscal agent to collect and deposit revenue from immigration fees. The lockbox performs the initial intake and data entry of applications, scanning of materials, transmission of data to USCIS case management systems, transfer of files to USCIS processing centers, and depositing of checks into USCIS' Treasury accounts. There is no change in this cost driver.

- **Lease Acquisitions Program:** This cost driver funds the acquisition of space and facilities.

- **MyUSCIS:** This cost driver funds the MyUSCIS investment which provides an integrated, simplified, transparent digital experience that makes it easy for customers to understand the benefits process, apply for benefits, view information about their case, and contact USCIS for support.

- **Application Support Center Operations Contract:** This cost driver funds the Application Support Center (ASC) contract which supports facilities and labor costs to operate 131 ASC sites in the U.S. and its territories. The ASC program was established by an Act of Congress in

**United States Citizenship and Immigration Services**                                 **Immigration Examinations Fee Account**

1997 to capture biometric and biographic data for the Immigration and Naturalization Service (INS), now USCIS. Annually, the ASCs process a significant portion of all applicants seeking immigration benefits. ASC workload is dependent on current immigration policies and customer population size.

- **Other Rent and Utilities:** This cost driver funds rental payments to non-GSA facilities as well as costs for utilities and telecommunications associated with facilities.

- **IT Security:** This cost driver funds the Information Security investment which prepares and conducts Certification and Accreditation (CA) audits and reports. Also conducts annual system reviews, assists in preparation of business cases, and monitors all cognizant plans of actions and milestones (POAM). This also provides incident detection, resolution, and reporting capability. Includes fundamental analysis, test, forensics, continuity planning, and classified network processing support. Finally, this investment contributes towards continually informing program managers of security requirements.

- **Card Production & Security Identification Contracts:** This cost driver funds the Secure Identification Platform (SIP) Card Production System and Technology Refresh.

- **Records Contract Support:** Records and Operations services supporting all incoming, retrieval, and compaction of A-files at the National Records Center.

- **National Benefits Center Records Contract:** The Records Contract for the National Benefits Center is essential for the pre-adjudication, staging and distribution of benefit applications for the 88 field offices throughout USCIS' Field Operations Directorate. The Records Contract handles over 1 million applications each year that are distributed 21 days in advance of scheduled applicant interviews to maintain constant workflow to each field office. There is no change to this cost driver.

- **Data Center and Cloud:** This cost driver funds the USCIS Cloud and Data Center SRI investment which manages the development and integration of enterprise data center infrastructure by providing production data center environments to legacy USCIS programs. Currently, the program is migrating all applications to the cloud and will be leveraging Amazon Web Services (AWS), Microsoft Azure and Google Cloud Platform (GCP) to provide more efficient immigration application processes to the public. The program is in the support lifecycle phase.

- **Office of Chief Information Officer (OCIO) Operations:** This cost driver funds the CIO and IT leadership team to efficiently plan and manage the enterprise technology environment. Supported activities include planning, consulting, innovation, project and program management, travel, training, supplies, and vendor management.

- **Infrastructure-Information Technology Field Services (ITFS):** This cost driver funds the Infrastructure-Information Technology Field Services (I-ITFS) investments which supports the operations and maintenance infrastructure of the immigration system. This investment consists of an enterprise Service Desk which includes Tier I, Incident and Problem Management support, Deskside Support, Deployment Services, Hardware Maintenance, and Asset Management. I-EUS I-ITFS provides an enterprise contract vehicle for purchasing information technology hardware and minimal maintenance support.

- **Background Investigations:** This cost driver funds all investigations for USCIS. USCIS' Office of Security and Integrity evaluates each background investigation to determine whether an applicant is an acceptable risk.

- **Field Office Records Contract:** Provides administrative and clerical support for USCIS Field Offices.

- **HR Support Services:** This cost driver funds HR Support services for Employee Assistance Program and Professional Development.

- **Interpreter and Transcription Services:** This cost driver provides funds for interpreter and transcription contracts.

**CIS – IEFA - 30**

003655

**Immigration Examinations Fee Account**

United States Citizenship and Immigration Services

- **Freedom of Information Act (FOIA) Contract:** This cost driver funds support services (FOIA processors) in support of FOIA/Privacy Act (PA) requests.
- **Cyber Security Contracts:** This cost driver supports security programs responsible for the protection of the USCIS network, systems, and information ensuring a reliable and secure environment.
- **Employment Based (EB-5) Program:** This cost driver funds general expenses to support the EB-5 program, the costs associated with a new form build out, and additional support to the Administrative Appeals Office as mandated by the *EB-5 Reform and Integrity Act*.
- **Contact Center:** This cost driver funds nationwide contact center contracts to operate the bilingual (English/Spanish) USCIS Contact Center.
- **Department of State (DOS) IAA Economy Act w/ Consular Affairs:** This cost driver funds the DOS interagency agreement for services, such as cashiering services, overseas verifications, DNA sample collection, and processing of forms such as certain Form I-130 Immediate Relative Petitions, Form I-131A Travel Document (Carrier Documentation), and Form I-730 Refugee/Asylee Following-to-Join Petitions, DOS provides for USCIS at overseas consular and embassy locations.
- **Systematic Alien Verification for Entitlements (SAVE) Support and Services:** This cost driver funds the Verification Information System webservices along with the Telephony Contact Center, program management support, licensing, independent test evaluation, and other operating expenses required to run the SAVE program.
- **Physical Security Support:** This cost driver funds PIV card issuance and Protective Security.
- **Federal Oaths IAA:** USCIS reimburses the Administrative Office of the United States Courts (AOUSC) for naturalization oaths administered to Immigration and Naturalization Act (INA) approved applicants at naturalization ceremonies organized and conducted by United States Federal District Courts.
- **Federal Law Enforcement Training Center:** This cost driver provides reimbursement for training of FDNS personnel at the Federal Law Enforcement Training Center.
- **Technical Operations Center (TOC) (Formerly known as Network Operations Center):** This cost driver provides support to the USCIS Local Area Network (LAN) which constitutes approximately 5,000 devices and 600 voice and data circuits across the United States and USCIS overseas locations. This also funds IT support including deployments, field services, USCIS service desk, service center and enterprise infrastructure services to all USCIS sites which is approximately 230 Contiguous U.S. (CONUS) and 28 Outside Contiguous U.S. (OCONUS) offices.
- **Asylum Vetting Center:** This cost driver funds the Asylum Vetting Center which supports the new facility in Atlanta, GA. The Asylum Vetting Center serves a variety of projects such as Domestic Processing of I-730s (Refugee/Asylee Relative Petition), I-589 Intake (Application for Asylum and for Withholding of Removal), a variety of administrative support projects for Asylum Division, and FDNS investigations, security reporting.
- **Capital Security Cost Share and International Cooperative Administrative Support Services:** This cost driver aims to provide new, safe, and secure U.S. diplomatic overseas facilities. RAIO must pay a prorated portion of these costs based on staffing numbers.
- **Other Costs:** Funds the remaining management and support costs for the day-to-day operations across USCIS.

CIS – IEFA – 31

003656

**United States Citizenship and Immigration Services**

**Immigration Examinations Fee Account**

## Operational Activities

The USCIS website[24] provides information on activities supported through IEFA. In general, applicants can check case status, check processing times, find USCIS office locations, and file certain form online. The public may also be interested in learning about citizenship, the USCIS electronic reading room, and certain data and statistics. While large amounts of data regarding USCIS operational activities is available online, below are additional highlights of specific activities that are generally not provided via the website.

## Fraud Detection and National Security (FDNS)

The FDNS Data System (FDNS-DS) records, tracks, and manages immigration inquiries, investigative referrals, law enforcement requests, and case determinations involving benefit fraud, criminal activity, public safety, and national security concerns.

**Fraud Detection Referrals Processed[25]**

| Workload Type | FY 2022 Actual[26] | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|
| **Total Referrals** | **117,441** | **121,000** | **124,000** |
| National Security Concerns | 6,750 | 7,400 | 7,600 |
| Public Safety Cases | 9,143 | 9,900 | 10,000 |
| Fraud Leads | 23,987 | 25,000 | 26,000 |
| Fraud Cases | 12,646 | 13,500 | 14,000 |
| Requests for Assistance | 54,540 | 57,000 | 58,000 |
| Request for Overseas Verification | 479 | 500 | 500 |
| Administrative Site Visit and Verification Program (ASVVP) | 4,037 | 2,000 | 2,000 |
| Targeted Site Visit and Verification Program (TSVVP) | 5,859 | 5,700 | 5,900 |

## Biometrics

The Identity and Information Management Division (IIMD) is responsible for collecting biometric and biographic data from applicants and petitioners that are required to provide this data when they request immigration benefits in the United States.

[24] For additional information, please visit: http://www.uscis.gov.

[25] For the purpose of this document, the term "referral" indicates any request for FDNS to review, investigate, or support USCIS workload. This differs from the standard definition of FDNS-DS "referral" that does not include requests to FDNS to conduct administrative investigations of fraud.

[26] Case type and subtype data is as of September 30, 2022 for FY 2022 data. FDNS-DS is an active system. Cases may be created, deleted, converted, or merged at any time. As of Q3 FY 2022, FDNS began incorporating business forecasting into its referral projections as a best practice, rather than exclusively creating straight line referral projections derived from trends in recent actuals. The new projection method has resulted in a more stable and accurate referral forecast. Source: Fraud Detection and National Security Data System (FDNS-DS).

**CIS – IEFA - 32**

003657

**United States Citizenship and Immigration Services**                                    **Immigration Examinations Fee Account**

The following table depicts actual workload volumes for FY 2022, and projected volumes for FY 2023 and FY 2024 for the USCIS Biometrics program, which consists of applicant/petitioner processing at an Application Support Centers (ASC), as well as fingerprint checks and name checks with the FBI. FBI checks increased in FY 2021 and leveled in FY 2022 as USCIS reopened ASCs, instituted fingerprint reuse, and cleared the queue. Now that the queue is cleared, USCIS is trending back to pre-pandemic projections in FY 2023 and FY 2024 barring any unforeseen circumstances. When required by USCIS, applicants and petitioners appear at an ASC to have their biometrics (fingerprints, photographs, and signatures) collected. The biometrics are used for identity verification, as well as for performing the required FBI checks for security purposes. USCIS reimburses the FBI for the cost of these security checks. The biometrics workload is a derivative of immigration benefit application and petition receipts.

| Activity | FY 2022 Actuals | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|
| Individuals Processed at an ASC | 2,467,043 | 3,000,000 | 3,000,000 |
| FBI Fingerprint Checks | 4,406,042 | 4,216,800 | 4,343,304 |
| FBI Name Checks | 1,983,910 | 1,758,444 | 1,811,197 |

Immigration Policy and Support
This Directorate contains policy and advisory components as well as program office components not included elsewhere, and also includes components responsible for management of space, contracts, training, human resources, as well as costs associated with the design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise. Support for a variety of USCIS headquarters offices include the Office of the Director, Administration, Investment Management Division, Chief Financial Officer, Chief Counsel, Privacy, Contracting, Policy and Strategy, Equal Opportunity and Inclusion, Human Capital and Training, Security and Integrity, and External Affairs (Legislative and Intergovernmental Affairs and Public Affairs).

003658

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

The following table depicts actual and projected workloads for select functions:

| Responsible Office | Workload Measure | FY 2022 Actuals | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|---|
| Office of Human Capital and Training | Personnel Actions[27] | 40,183 | 44,000 – 46,000 | 45,000 – 47,000 |
| Office of Human Capital and Training | Employees Attending BASIC Immigration Adjudicator Training | 628 | 960 | 960 |
| Office of Security and Integrity | Adjudicative Determinations[28] | 3,307 | 9,000 | 9,000 |
| Office of Security and Integrity | Entry on Duty (EOD) Determinations[29] | 13,742 | 9,500 | 9,500 |
| Office of Equal Opportunity and Inclusion | Formal Complaint Filings[30] | 104 | 145 | 180 |
| Office of Equal Opportunity and Inclusion | Disability Accommodation[31] | 1,560 | 1,600 | 1,700 |
| Office of Equal Opportunity and Inclusion | Informal Complaint Filings | 180 | 210 | 250 |
| Office of Equal Opportunity and Inclusion | Anti-Harassment Contracts[32] | 351 | 421 | 505 |

---

[27] These figures have been updated since the estimate included in the FY 2023 USCIS IEFA Congressional Justification to adjust for a new internal job process and a surge in USCIS' hiring.

[28] Includes suitability, fitness, and security, reinvestigation, and Secure Compartmented Information (SCI) eligibility case types not including contract-to-contract transfers or internal employee selections, or applications of reciprocity.

[29] Includes contractor new hires, federal new hires, and transfers from other Federal agencies.

[30] Formal complaint filing for future years are anticipated to increase as the agency grows significantly as a result increased hiring and personnel growth. This growth will create additional supervisory positions tied to the additional workforce which, will likely result in non-selection complaints arising from assertions that non-selection occurred because of a discriminatory reason.

[31] Significant increase in accommodation request in FY 2022 resulting from employees returning to the offices and many requests tied to employees seeking to continue to work from home. These figures are more in line with pre-pandemic levels of accommodation request activity.

[32] It is expected there will continue to be increases in FY 2023 and FY 2024 as anti-harassment training increases and the Office of Equal Opportunity and Inclusion begins to refer harassment allegations raised in the EEO complaint process to its Anti-Harassment Program, as required by Equal Employment Opportunity Commission guidance.

CIS – IEFA - 34

**United States Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

## USCIS Contact Center

The USCIS Contact Center provides a pathway for applicants to obtain consistent, accurate information and answers to immigration case questions. Tier 1 inquiries are managed by contractors, and the more complicated inquiries are routed to Tiers 2 and 3 and are handled by experienced USCIS Federal staff.[33] USCIS Contact Center is refining channel strategy and limiting inbound and outbound calling while increasing use of chats and webform/email communication with customers. The following table depicts actual and projected Tier 1, Tier 2, Tier 3 call, and chat volumes:

| Call Centers | FY 2022 Actuals | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|
| **Call and Chat Volume** | | | |
| Tier 1 | 4,183,985 | 5,500,000 | 4,000,000 |
| Tier 2 | 1,795,700 | 1,800,000 | 1,600,000 |
| Tier 3 | 179,570 | 180,000 | 160,000 |

## Systematic Alien Verification for Entitlements (SAVE)

The Systematic Alien Verification for Entitlements (SAVE) Program provides immigration information to federal, state, and local benefit-issuing agencies, institutions, and licensing agencies to assist in determining public benefit eligibility. SAVE provides individualized training, support, and customer service for agency users.

In FY 2024, USCIS is increasing SAVE user fees to fully fund the program. The current user fee is $0.50 per initial verification request handled by the SAVE system, plus an additional $0.50 for any additional manual verification request processed by SAVE status verification personnel. USCIS will incorporate a phased-in user fee increase to about $3.10 per verification request, regardless of whether the case involves additional verification.

Budget and cost allocation analysis over the past several years has highlighted a need to increase the SAVE budget to $51.2 million. Historically, SAVE user agency fees have funded about 30 percent of the $30-35 million SAVE operating budget. The remaining 70 percent has been funded by IEFA and Premium Processing fees, subject to some fluctuation.

The following table depicts SAVE workload actuals for FY 2022, and projections for FY 2023 and FY 2024. Staffing is mainly driven by SAVE second and third step queries, which are those that cannot be automatically resolved and manually require employees to research the case and provide a response to the agency.

---

[33] Tier 1: The first level of live assistance, Tier 1, is managed by contractors who can provide general information and assist with inquiries for case status and similar.
Tier 2: More complicated inquiries are escalated to the next level of live service, Tier 2, which is staffed by Immigration Services Officers (ISO).
Tier 3: If an ISO is unable to resolve an inquiry, the officer can further escalate this to a supervisor at Tier 3.

**CIS – IEFA – 35**

003660

United States Citizenship and Immigration Services

Immigration Examinations Fee Account

As of September 30, 2022, there were over 17,000,000 SAVE queries; of those, approximately 1,174,000 required second step and 350,000 required third step. At the end of FY 2022, there were 1,195 agencies enrolled in SAVE.

| Systematic Alien Verification for Entitlements (SAVE) Actual and Projected Workload for FY 2022 - FY 2024 | | | |
|---|---|---|---|
| Activity | FY 2022 Actuals | FY 2023 Projected | FY 2024 Projected |
| SAVE Automated Queries | 17,000,000 | 18,300,000 | 18,401,000 |
| SAVE Queries requiring second step review by staff | 1,174,000 | 860,000 | 921,500 |
| SAVE Queries requiring third step review by staff | 350,000 | 681,000 | 620,000 |
| SAVE Registered Agencies (Cumulative) | 1,195 | 1,205 | 1,211 |

CIS – IEFA - 36

003661

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *H-1B Nonimmigrant Petitioner Account*



**Fiscal Year 2024**

**Congressional Justification**

CIS – H1B - 1

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# Table of Contents

*H-1B Nonimmigrant Petitioner Account* **1**

Budget Comparison and Adjustments..........................3

Summary of Budget Changes ...................................6

Non Pay Budget Exhibits...........................................7

**CIS – H1B - 2**

003663

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# H-1B Nonimmigrant Petitioner Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| H-1B Nonimmigrant Petitioner Fee Account[1] | - | - | $23,743 | - | - | $24,068 | - | - | $24,856 | - | - | $788 |
| **Total** | - | - | **$23,743** | - | - | **$24,068** | - | - | **$24,856** | - | - | **$788** |
| Subtotal Mandatory - Fee | - | - | $23,743 | - | - | $24,068 | - | - | $24,856 | - | - | $788 |

**Fee Authority:** The H-1B Nonimmigrant Petitioner Fee Account was established by Section 286(s) of the Immigration and Nationality Act (8 U.S.C. 1356(s)) and amended by the American Competitiveness and Workforce Improvement Act of 1998 (ACWIA), Public Law 105-277, Division C, Title IV, 112 Stat. 2681. The ACWIA fee was reauthorized and made permanent by the L-1 Visa and H-1B Visa Reform Act of 2004 (part of the Consolidated Appropriations Act, 2005, Public Law 108-447, 118 Stat. 2809, 3351-61 (2004)).

**Fee Uses:** U.S. Citizenship and Immigration Service' (USCIS) H-1B Nonimmigrant Petitioner Account supports activities related to the processing of petitions for nonimmigrant workers in the H-1B visa classification. The H-1B visa program allows U.S. employers to temporarily employ foreign workers in specialty occupations. USCIS receives 5 percent of the collections generated by these fees to fund USCIS' immigration benefit adjudication efforts, while the remaining 95 percent of ACWIA collections are deposited in accounts managed by the Department of Labor and the National Science Foundation.

**Change Mechanism:** Statutory. Requires action through House and Senate Judiciary Committees, and passage into law.

**Previous Changes:** The H-1B Visa Reform Act reauthorized and increased the ACWIA fee. Section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9), requires certain H-1B petitioners with more than 25 employees in the United States to pay an ACWIA fee of $1,500, while similar petitioners with 25 or fewer employees in the United States pay an ACWIA fee of $750.

**Recovery Rate:** The fee was not designed for full cost recovery for H-1B petition processing.

---

[1] Fee Collections: These values reflect actual (FY 2022), estimated (FY 2023), and projected (FY 2024) fee receipts.

**CIS – H1B - 3**

003664

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

## Historical Collections and Cost Recovery Rate

| *(Dollars in Thousands)* | FY 2018 | FY 2019 | FY 2020 | FY 2021[2] | FY 2022 | Five-Year Total |
|---|---|---|---|---|---|---|
| **Total Amount of Fee Collected** | $19,499 | $19,590 | $19,129 | $26,682 | $23,743 | $108,643 |
| Total of Eligible Expenses | $15,000 | $15,000 | $35,000 | $14,333 | $14,909 | $94,242 |
| Cost Recovery % | 130.00% | 130.60% | 54.70% | 186.20% | 159.25% | 132.15% |

**Changes in Fee Collections:** The H-1B Non-Immigrant Petitioner account fees are set in statute and in the past there has been very little fluctuation in annual revenue. For FY 2024, USCIS is projecting an increase of form volume, yielding slightly increased revenues.

---

[2] Pursuant to P.L. 116-260, Division H, Title I, Section 115, $7,500,000 was rescinded from the H-1B Nonimmigrant Petitioner Account, in an amount that is equal to the amount that became available on October 1, 2020, pursuant to the temporary rescission in Section 115 of Division A of the Further Consolidated Appropriations Act, 2020 (Public Law 116–94). When factoring in this rescission for FY 2021, the cost recovery rate is 133.83%.

003665

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# H-1B Nonimmigrant Petitioner Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Collections (Actuals/Estimates/Projections)** | $23,743 | $24,068 | $24,856 |
| Carryover - Start of Year[3] | $18,608 | $27,688 | $31,737 |
| Recoveries | $507 | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | ($260) | ($19) | ($45) |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | **$42,597** | **$51,737** | **$56,548** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$42,597** | **$51,737** | **$56,548** |
| Obligations (Actuals/Estimates/Projections) | $14,909 | $20,000 | $20,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Estimates/Estimates/Projections) | - | - | - |
| FTE (Estimates/Estimates/Projections) | - | - | - |

[3] The minimum carryover target is equivalent to an average of actual first quarter (Q1) obligations during the last three fiscal years (FY), i.e., $1,990,914. This method may produce a larger reserve than may be needed as it does not factor in projected current year fee collections. In other words, it provides sufficient time for current year collections to be realized by Q2 without hindering operations in Q1. USCIS considers external factors in determining planned obligations. These factors may include, but are not limited to net sequestration between the prior FY and the upcoming FY, planned policy and/or regulatory changes, etc.

**CIS – H1B - 5**

003666

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# H-1B Nonimmigrant Petitioner Account
## Summary of Budget Changes
### (Dollars in Thousands)

| | Positions | FTE | Pay Amount | Non-Pay Amount[4] | Amount |
|---|---|---|---|---|---|
| FY 2022 Enacted | - | - | - | $15,000 | $15,000 |
| FY 2023 Enacted | - | - | - | $20,000 | $20,000 |
| FY 2024 Base Budget | - | - | - | $20,000 | $20,000 |
| Total Pricing Changes | - | - | - | - | - |
| Total Adjustments-to-Base | - | - | - | - | - |
| FY 2024 Current Services | - | - | - | $20,000 | $20,000 |
| FY 2024 Request | - | - | - | $20,000 | $20,000 |
| FY 2023 To FY 2024 Change | - | - | - | - | - |

---

[4] These values reflect estimated (FY 2022), estimated (FY 2023), and projected (FY 2024) obligations.

**CIS – H1B - 6**

003667

United States Citizenship and Immigration Services

# H-1B Nonimmigrant Petitioner Account
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Adjudication Operations | $15,000 | $20,000 | $20,000 | - |
| **Total** | **$15,000** | **$20,000** | **$20,000** | **-** |
| Subtotal Mandatory - Fee | $15,000 | $20,000 | $20,000 | - |

### Non Pay by Object Class
*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 23.1 Rental Payments to GSA | $2,000 | $2,000 | $2,000 | - |
| 25.1 Advisory & Assistance Services | $13,000 | $18,000 | $18,000 | - |
| **Total - Non Pay Budget Object Class** | **$15,000** | **$20,000** | **$20,000** | **-** |

**CIS – H1B - 7**

003668

United States Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Service Center Operations Support Services Contract | $13,000 | $18,000 | $18,000 | - |
| Rental Payments to General Services Administration (GSA) | $2,000 | $2,000 | $2,000 | - |
| **Total – Non Pay Cost Drivers** | **$15,000** | **$20,000** | **$20,000** | **-** |

### Explanation of Non Pay Cost Drivers

**Service Center Operations Support Services Contract:** This funds contractual costs for correspondence management, fee receipting, data entry, and file operations support for four of the five USCIS service centers: California Service Center, Nebraska Service Center, Texas Service Center, and Vermont Service Center. The SCOSS contract shared costs are distributed between the IEFA and H-1B account. There are no projected changes to this cost driver.

**Rental Payments to General Services Administration (GSA):** The FY 2024 amount is based on projections developed by USCIS' Facilities Division, using information provided by the GSA. There are no projected changes to this cost driver.

CIS – H1B - 8

003669

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *Fraud Prevention and Detection Account*



**Fiscal Year 2024**

**Congressional Justification**

003670

CIS – FPDA - 1

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Table of Contents

*Fraud Prevention and Detection Account* ...........................................................................1

Budget Comparison and Adjustments............................................................................3

Summary of Budget Changes ........................................................................................7

Justification of Pricing Changes ....................................................................................8

Personnel Compensation and Benefits.........................................................................10

Non Pay Budget Exhibits..............................................................................................14

003671

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections

*(Dollars in Thousands)*

|  | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Fraud Prevention and Detection Account[1] | $60,250 | $59,849 | $61,557 | $1,708 |
| **Total** | **$60,250** | **$59,849** | **$61,557** | **$1,708** |
| Subtotal Mandatory - Fee | $60,250 | $59,849 | $61,557 | $1,708 |

**Fee Authority:** The Fraud Prevention and Detection Account (FPDA) is authorized via Section 286(v) of the *Immigration and Nationality Act* (INA) (8 U.S.C. 1356 (v)) and the L-1 Visa and H-1B Visa Reform Act of 2004 (part of Pub. L. 108-447). FPDA supports the operations, mission support, and associated management and administration (M&A) costs related to preventing and detecting fraud in the adjudication of all immigration benefit types.

**Fee Uses:** FPDA directly supports U.S. Citizenship and Immigration Services (USCIS) efforts to strengthen the integrity of the United States' immigration system. FPDA resources enable USCIS operations to identify threats to national security and public safety, detect and combat immigration benefit fraud, and remove systemic and other vulnerabilities. USCIS receives one-third of the collections generated by the fees to fund a portion of USCIS' fraud detection and prevention efforts.

The FPDA funds a portion of the operational costs for the Fraud Detection and National Security Directorate (FDNS) and Service Center Operations Directorate (SCOPS). FDNS leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system.

The FPDA funds salaries and benefits for 115 FDNS positions and 70 SCOPS positions. Resources from the FPDA are not sufficient to fund all of USCIS' fraud detection and national security programs and represent a portion of the overall staff required to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system. Therefore, these activities are also supported by the Immigration Examinations Fee Account (IEFA).

---

[1] Fee Collections: These values reflect actual (FY 2022), estimated (FY 2023), and projected (FY 2024) fee receipts.

**CIS – FPDA - 3**

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

The following table provides a summary of the total USCIS fraud detection referrals processed:

**Fraud Detection Referrals Processed[2]**

| Workload Type | FY 2022 Actual[3] | FY 2023 Projected | FY 2024 Projected |
|---|---|---|---|
| **Total Referrals** | **117,441** | **121,000** | **124,000** |
| National Security Concerns | 6,750 | 7,400 | 7,600 |
| Public Safety Cases | 9,143 | 9,900 | 10,000 |
| Fraud Leads | 23,987 | 25,000 | 26,000 |
| Fraud Cases | 12,646 | 13,500 | 14,000 |
| Requests for Assistance | 54,540 | 57,000 | 58,000 |
| Request for Overseas Verification | 479 | 500 | 500 |
| Administrative Site Visit and Verification Program (ASVVP) | 4,037 | 2,000 | 2,000 |
| Targeted Site Visit and Verification Program (TSVVP) | 5,859 | 5,700 | 5,900 |

**Change Mechanism:** Statutory. Requires action through the House and Senate Judiciary Committees, and passage into law.

**Previous Changes: Last change was made through the L-1 Visa and H-1B Visa Reform Act of 2004 (part of Pub. L. 108-447). The Act amended section 214(c) of the INA by adding a new subsection (c)(12) which imposed a $500 fraud prevention and detection fee on certain employers filing H-1B petitions.**

**Recovery Rate:** This fee is not designed to be full cost recovery. The recovery rate in FY 2022 was 133.9 percent.

---

[2] For the purpose of this document, the term "referral" indicates any request for FDNS to review, investigate, or support USCIS workload. This differs from the standard definition of FDNS-DS "referral" that does not include requests to FDNS to conduct administrative investigations of fraud.

[3] Case type and subtype data is as of September 30, 2022 for FY 2022 data. FDNS-DS is an active system. Cases may be created, deleted, converted, or merged at any time. As of Q3 FY 2022, FDNS began incorporating business forecasting into its referral projections as a best practice, rather than exclusively creating straight line referral projections derived from trends in recent actuals. The new projection method has resulted in a more stable and accurate referral forecast. Source: Fraud Detection and National Security Data System (FDNS-DS).

**CIS – FPDA – 4**

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Historical Collections and Cost Recovery Rate

| (Dollars in Thousands) | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | Five-Year Total |
|---|---|---|---|---|---|---|
| **Total Amount of Fee Collected** | $51,285 | $52,139 | $41,692 | $40,375 | $60,250 | $245,741 |
| Total of Eligible Expenses | $62,099 | $43,873 | $77,116 | $36,679 | $44,981 | $264,748 |
| **Cost Recovery %** | 82.6% | 118.8% | 54.1% | 110.1% | 133.9% | 92.8% |

**Changes in Fee Collections:** USCIS does not anticipate any statutory changes in FY 2024 that would affect collections. USCIS fee collections increased in FY 2022 compared to prior years, due to increasing I-129, Petition for a Nonimmigrant Worker, filings. This increase in filings is in part due to jointly published temporary final rules which allowed the Department of Labor and Department of Homeland Security to increase the FY 2022 H-2B allocation by up to 55,000 additional visas.[4] Subsequently, the Department of Homeland Security and the Department of Labor are issuing a temporary final rule that makes available 64,716 additional H-2B temporary nonagricultural worker visas for FY 2023.[5] USCIS anticipates this trend to continue and sustain fee revenue levels through FY 2024.

---

[4] This increase in the cap is in accordance with Section 204 of Division O of the Consolidated Appropriations Act, 2022, Public Law 117-103, which provided the secretary of DHS with the authority to make available additional H-2B visas for FY 2022. For additional information, please see: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-non-agricultural-workers/temporary-increase-in-h-2b-nonimmigrant-visas-for-fy-2022

[5] For more information: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Collections (Actuals/Estimates/Projections)** | $60,250 | $59,849 | $61,557 |
| Carryover - Start of Year | $19,985 | $35,225 | $41,137 |
| Recoveries | $1,104 | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | ($1,133) | $23 | ($98) |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | **$80,206** | **$95,097** | **$102,596** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$80,206** | **$95,097** | **$102,596** |
| Obligations (Actuals/Estimates/Projections) | $44,981 | $53,960 | $56,140 |
| **Personnel: Positions and FTE** |  |  |  |
| Enacted/Request Positions | 185 | 185 | 185 |
| Enacted/Request FTE | 176 | 176 | 176 |
| **Onboard and Actual FTE** |  |  |  |
| Onboard (Actuals/Estimates/Projections) | 166 | 185 | 185 |
| FTE (Actuals/Estimates/Projections) | 169 | 176 | 176 |

CIS – FPDA - 6

003675

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Fraud Prevention and Detection Account
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2022 Enacted** | 185 | 176 | $25,978 | $26,892 | $52,870 |
| **FY 2023 President's Budget** | 185 | 176 | $27,068 | $26,892 | $53,960 |
| **FY 2024 Base Budget** | 185 | 176 | $27,068 | $26,892 | $53,960 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Transfers** | - | - | - | - | - |
| Annualization of Prior Year Pay Raise | - | - | $311 | - | $311 |
| Civilian Pay Raise Total | - | - | $1,068 | - | $1,068 |
| Fraud Detection and National Security Program Support Contract | - | - | - | $801 | $801 |
| **Total Pricing Changes** | - | - | $1,379 | $801 | $2,180 |
| **Total Adjustments-to-Base** | - | - | $1,379 | $801 | $2,180 |
| **FY 2024 Current Services** | 185 | 176 | $28,447 | $27,693 | $56,140 |
| **Total Program Changes** | - | - | - | - | - |
| **FY 2024 Request** | 185 | 176 | $28,447 | $27,693 | $56,140 |
| **FY 2023 TO FY 2024 Change** | - | - | $1,379 | $801 | $2,180 |

**CIS – FPDA - 7**

003676

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | | FY 2024 President's Budget | | | |
|---|---|---|---|---|---|
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 – Annualization of Prior Year Pay Raise** | - | - | $311 | - | $311 |
| Adjudication Operations | - | - | $311 | - | $311 |
| **Pricing Change 2 – Civilian Pay Raise** | - | - | $1,068 | - | $1,068 |
| Adjudication Operations | - | - | $1,068 | - | $1,068 |
| **Pricing Change 3 – Fraud Detection and National Security Program Support Contract** | - | - | - | $801 | $801 |
| Adjudication Operations | - | - | - | $801 | $801 |
| **Total Pricing Changes** | - | - | $1,379 | $801 | $2,180 |

## Pricing Change 1 – Annualization of Prior Year Pay Raise

Base Activity Funding:   This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $26.2M.

Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2023 4.6 percent civilian pay increase. It is calculated by identifying the costs of civilian pay funding in the Base and Annualizations, backing out the impact of the first three quarters of the calendar year 2023 pay increase, and then multiplying that amount by one-quarter of the pay increase rate.

## Pricing Change 2 – Civilian Pay Raise Total

Base Activity Funding:   This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $27.4M.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2024 5.2 percent civilian pay increase. It is calculated by adding Base pay, Pay Base of the Annualization of FY 2023 Program Changes and the Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (5.2 percent) and then by three-fourths to account for nine months of the 2024 calendar year.

## Pricing Change 3 –Fraud Detection and National Security Program Support Contract:

**United States Citizenship and Immigration Services**                                          **Fraud Prevention and Detection Account**

Base Activity Funding: This pricing change impacts the National Security Program Support Contract, which totals $6.8M. This funds a portion of contractual costs to continue to deploy advanced fraud detection devices and techniques and intelligence-driven planning in systems that facilitate the operation of every FDNS software application, and which currently facilitates the development of the FDNS-Data System (FDNS-DS) successor application, NexGen.

Pricing Change Explanation: This pricing change represents increased costs in FY 2024 with no change in services rendered. The increase in cost is derived from increased vendor costs/expenses such as increased overhead and other expenses associated with fulfilling the support contract for USCIS. The total increase in cost to USCIS is $801K bringing the FY 2024 total to $7.6M.

003678

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations | 185 | 176 | $25,978 | $147.60 | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | $161.63 | - | - | $1,379 | $7.83 |
| **Total** | **185** | **176** | **$25,978** | **$147.60** | **185** | **176** | **$27,068** | **$153.80** | **185** | **176** | **$28,447** | **$161.63** | **-** | **-** | **$1,379** | **$7.83** |
| Mandatory – Fee | 185 | 176 | $25,978 | $147.60 | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | $161.63 | - | - | $1,379 | $7.83 |

The FTE Rate calculation does not include Object Class 11.8-Special Personal Services Payments or 13.0-Benefits for Former Personnel.

## Explanation of Pay Cost Summary

This summarizes the pay summary by Directorate for the Adjudication Operations PPA:

- **Adjudication Operations:** Contains Directorate and Program Offices (DPOs) responsible for adjudicating applications in regional, district, and field offices for immigration and visa benefit applications both in person and those not requiring interviews. Also included are anti-fraud and public safety components affiliated with processing of benefits.
  - **Service Center Operations (SCOPS):** 70 positions, 67 FTE, and $9.7M
    Processing of immigration benefit applications while ensuring the security and integrity of the immigration system where an in-person interview is generally not required. USCIS primarily accomplishes this through its five service centers: California Service Center, Nebraska Service Center, Potomac Service Center, Texas Service Center, and the Vermont Service Center.
  - **Fraud Detection and National Security (FDNS):** 115 positions, 109 FTE, and $18.5M
    Leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system.

CIS – FPDA - 10

003679

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $18,354 | $19,124 | $20,101 | $977 |
| 11.3 Other than Full-time Permanent | $4 | $4 | $4 | $0 |
| 11.5 Other Personnel Compensation | $724 | $754 | $793 | $39 |
| 12.1 Civilian Personnel Benefits | $6,896 | $7,186 | $7,549 | $363 |
| **Total - Personnel Compensation and Benefits** | **$25,978** | **$27,068** | **$28,447** | **$1,379** |
| **Positions and FTE** | | | | |
| Positions – Civilian | 185 | 185 | 185 | - |
| FTE - Civilian | 176 | 176 | 176 | - |

**CIS – FPDA - 11**

003680

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Pay Cost Drivers

| | FY 2022 Enacted | | FY 2023 Enacted | | FY 2024 President's Budget | | FY 2023 to FY 2024 Change | |
|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 166 | $24,502 | $147.60 | 166 | $25,530 | $153.80 | 166 | $26,831 | $161.63 | - | $1,301 | $7.83 |
| Other Costs | 10 | $1,476 | $147.60 | 10 | $1,538 | $153.80 | 10 | $1,616 | $161.60 | - | $78 | $7.80 |
| Total – Pay Cost Drivers | 176 | $25,978 | $147.60 | 176 | $27,068 | $153.80 | 176 | $28,447 | $161.63 | - | $1,379 | $7.83 |

## Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds the salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions, and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications.  The increase in this cost driver is due to the FY 2023 pay raise annualization and FY 2024 civilian pay raise.

**Other Costs:** This cost driver funds the salaries and benefits of other support personnel within FPDA. The increase in this cost driver is due to the FY 2023 pay raise annualization and FY 2024 civilian pay raise

003681

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Permanent Positions by Grade – Appropriation
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| GS-15 | 6 | 6 | 6 | - |
| GS-14 | 22 | 22 | 22 | - |
| GS-13 | 83 | 83 | 83 | - |
| GS-12 | 55 | 55 | 55 | - |
| GS-11 | 2 | 2 | 2 | - |
| GS-9 | 14 | 14 | 14 | - |
| GS-7 | 3 | 3 | 3 | - |
| **Total Permanent Positions** | **185** | **185** | **185** | **-** |
| Total Perm. Employment (Filled Positions) EOY | 166 | 185 | 185 | - |
| Unfilled Positions EOY | 19 | - | - | - |
| **Position Locations** | | | | |
| Headquarters Civilian | 10 | 10 | 10 | - |
| U.S. Field Civilian | 174 | 174 | 174 | - |
| Foreign Field Civilian | 1 | 1 | 1 | - |
| **Averages** | | | | |
| Average personnel Costs, ES Positions | - | - | - | - |
| Average Personnel Costs, GS Positions | $104,283 | $108,659 | $112,897 | $4,238 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

CIS – FPDA - 13

003682

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Non Pay Budget Exhibits
### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Adjudication Operations | $26,892 | $26,892 | $27,693 | $801 |
| **Total** | **$26,892** | **$26,892** | **$27,693** | **$801** |
| Subtotal Mandatory – Fee | $26,892 | $26,892 | $27,693 | $801 |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $1,089 | $1,089 | $1,205 | $116 |
| 22.0 Transportation of Things | $720 | $720 | $700 | ($20) |
| 23.1 Rental Payments to GSA | $334 | $334 | $334 | - |
| 23.3 Communications, Utilities, & Miscellaneous | $1,644 | $1,644 | $1,644 | - |
| 25.1 Advisory & Assistance Services | $4,294 | $4,294 | $4,294 | - |
| 25.2 Other Services from Non-Federal Sources | $51 | $51 | $51 | - |
| 25.3 Other Purchases of goods and services | $11 | $11 | $11 | - |
| 25.4 Operation and Maintenance of Facilities | $15 | $15 | $15 | - |
| 25.7 Operation and Maintenance of Equipment | $1,132 | $1,132 | $1,688 | $556 |
| 26.0 Supplies & Materials | $202 | $202 | $356 | $154 |
| 31.0 Equipment | $17,400 | $17,400 | $17,395 | ($5) |
| **Total - Non Pay Budget Object Class** | **$26,892** | **$26,892** | **$27,693** | **$801** |

CIS – FPDA - 14

United States Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Non Pay Cost Drivers

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Validation Instrument for Business Enterprises (VIBE) | $12,216 | $12,216 | $12,216 | - |
| Fraud Detection and National Security Program Support Contract | $6,839 | $6,839 | $7,640 | $801 |
| Rental Payments to General Services Administration (GSA) | $1,978 | $1,978 | $1,978 | - |
| Other Costs | $5,859 | $5,859 | $5,859 | - |
| **Total – Non Pay Cost Drivers** | **$26,892** | **$26,892** | **$27,693** | **$801** |

## Explanation of Non Pay Cost Driver

**Validation Instrument for Business Enterprises (VIBE):** Covers operating costs and the IT support contract for the VIBE system. USCIS uses this system to validate the business operations and financial viability of organizations seeking to employ foreign workers, and to identify possible benefit fraud based on FDNS fraud analysis and fraud referrals from USCIS adjudicators and other government agencies. There are no projected changes to this cost driver.

**Fraud Detection and National Security Program Support Contract:** This funds a portion of contractual costs to deploy advanced fraud detection devices and techniques and intelligence-driven planning. The increase of this cost driver is due to the increased vendor costs to support this contract.

**Rental Payments to the General Services Administration (GSA):** Rental Payments to GSA for USCIS facilities space. There are no projected changes to this cost driver.

**Other Costs:** Funds the remaining management and support costs for processing immigration benefit applications while ensuring the security and integrity of the immigration system. There are no projected changes to this cost driver.

CIS – FPDA - 15

003684

EB-5 Integrity Fund

United States Citizenship and Immigration Services

003685

# Department of Homeland Security

## *United States Citizenship and Immigration Services*

### *EB-5 Integrity Fund*



**Fiscal Year 2024**

**Congressional Justification**

CIS – EB5 - 1

United States Citizenship and Immigration Services

EB-5 Integrity Fund

# Table of Contents

*EB-5 Integrity Fund*..................................................................1

    Budget Comparison and Adjustments...................................3

    Summary of Budget Changes ..............................................6

    Personnel Compensation and Benefits..................................8

    Non Pay Budget Exhibits....................................................12

003686

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| EB-5 Integrity Fund[1] | - | $8,760 | $8,760 | - |
| **Total** | **-** | **$8,760** | **$8,760** | **-** |
| Subtotal Mandatory - Fee | - | $8,760 | $8,760 | - |

USCIS administers the EB-5 Immigrant Investor Program, which was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. First enacted as a pilot in 1992 and regularly reauthorized since then, investors may also qualify for EB-5 classification by investing through regional centers designated by USCIS based on proposals for promoting economic growth.

**Fee Authority:** Section 102 of *the EB-5 Reform and Integrity Act of 2022*, Division BB of *the Consolidated Appropriations Act, 2022* (P.L. 117-103) amended Section 203(b)(5) *of the Immigration and Nationality Act*, and subsequently established a special fund in the U.S. Treasury, known as the "EB-5 Integrity Fund" (8 U.S.C. 1153(b)(5)(J)). The EB-5 Integrity Fund collections include an annual fee of $20,000 from each Regional Center with more than 20 investors; or an annual fee of $10,000 from each Regional Center with 20 or fewer total investors in the preceding fiscal year in its new commercial enterprises. A $1,000 fee is also collected for each petition filed under Section 204(a)(1)(H) – granting immigrant status for EB-5 petitioners; this fee is in addition to the fees established for each petition to recover the cost of adjudication under Section 286(m) – IEFA.

**Fee Uses:** The EB-5 Integrity Fund supports new activities for U.S. Citizenship and Immigration Service' (USCIS); primarily the Field Operations Directorate's (FOD) Investor Program Office (IPO) and the Fraud Detection and National Security (FDNS) Directorate. The Integrity Fund allows USCIS to monitor and investigate international program-related events and promotional-related events, and ensure investor compliance with applicable source of funds provisions; detect and investigate fraud and other crimes; determine whether Regional Centers, New Commercial Enterprises (NCEs), Job-Creating Entities (JCEs), investors and their families are complying with immigration laws; and conduct audits and site visits.

---

[1] Fee Collections: These values reflect estimated (FY 2023) and projected (FY 2024) fee receipts.

United States Citizenship and Immigration Services

EB-5 Integrity Fund

**Change Mechanism**: Per 8 U.S.C. 1153(b)(5)(J)(ii)(III) and Section 106 of the EB-5 Reform and Integrity Act of 2022, the Secretary of Homeland Security may increase fees through the regulatory process to ensure full recovery of the costs to provide aforementioned services, achieve efficient processing, and complete timely adjudications.

**Previous Changes**: N/A

**Recovery Rate**: The fee was designed for full cost recovery for EB-5 Reform and Integrity Act.

CIS – EB5 - 4

003688

United States Citizenship and Immigration Services

# EB-5 Integrity Fund
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|
| **Collections (Actuals/Estimates/Projections)** | - | $8,760 | $8,760 |
| Carryover - Start of Year | - | - | $8,261 |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | ($499) | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | - | $8,261 | $17,021 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | - | $8,261 | $17,021 |
| Obligations (Actuals/Estimates/Projections) | - | - | $8,760 |
| **Personnel: Positions and FTE** | - | - | |
| Enacted/Request Positions | - | - | 40 |
| Enacted/Request FTE | - | - | 35 |
| **Onboard and Actual FTE** | - | - | |
| Onboard (Actuals/Estimates/Projections) | - | - | 40 |
| FTE (Actuals/Estimates/Projections) | - | - | 35 |

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2022 Enacted** | - | - | - | - | - |
| **FY 2023 President's Budget** | - | - | - | - | - |
| **FY 2024 Base Budget** | - | - | - | - | - |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Transfers** | - | - | - | - | - |
| **Total Pricing Changes** | - | - | - | - | - |
| **Total Adjustments-to-Base** | - | - | - | - | - |
| **FY 2024 Current Services** | - | - | - | - | - |
|  EB-5 Integrity Fund-Realignment | 40 | 35 | $5,593 | $3,167 | $8,760 |
| **Total Program Changes** | 40 | 35 | $5,593 | $3,167 | $8,760 |
| **FY 2024 Request** | 40 | 35 | $5,593 | $3,167 | $8,760 |
| **FY 2023 TO FY 2024 Change** | 40 | 35 | $5,593 | $3,167 | $8,760 |

CIS – EB5 - 6

003690

United States Citizenship and Immigration Services

# EB-5 Integrity Fund
## Justification of Program Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non Pay Amount | Amount |
|---|---|---|---|---|---|
| | | | **FY 2024 President's Budget** | | |
| **Program Change 1 – EB-5 Integrity Fund-Realignment** | **40** | **35** | **$5,593** | **$3,167** | **$8,760** |
| Adjudication Operations | 40 | 35 | $5,593 | $3,167 | $8,760 |
| **Total Program Changes** | **40** | **35** | **$5,593** | **$3,167** | **$8,760** |

## Program Change 1 – EB-5 Integrity Fund-Realignment:

| *($ in thousands)* | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | - | - | - |
| Program Change | 40 | 35 | $8,760 |

## Description
The FY 2024 Budget includes an increase to realign the pay and non pay cost related to the compliance and enforcement aspects of the EB-5 Reform and Integrity Act.

## Justification
The positions will support USCIS's mission by enabling the IPOs to conduct investigations and detect and investigate fraud or other crimes. This staffing is necessary to comply with the EB-5 Reform and Integrity Act and to meet statutory enforcement requirements.

## Performance
Properly staffing this program will allow USCIS to monitor and investigate program-related events and promotional-related events; ensure investor compliance with applicable source of funds provisions; detect and investigate fraud and other crimes; determine whether regional centers, New Commercial Enterprises (NCEs), Job-Creating Entities (JCEs), investors and their families are complying with immigration laws; and conduct audits and site visits. These mission critical positions will reduce the number of violators by imposing authorized sanctions, restore confidence in foreign investments and will attract further foreign direct investment into the U.S.

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's budget | | | FY 2023 to FY 2024 Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations | - | - | - | - | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,593 | $159.80 |
| **Total** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **40** | **35** | **$5,593** | **$159.80** | **40** | **35** | **$5,593** | **$159.80** |
| Mandatory – Fee | - | - | - | - | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,593 | $159.80 |

## Explanation of Pay Cost Summary

This summarizes the pay summary by Directorate for the Adjudication Operations PPA:

- **Adjudication Operations:** Contains Directorate and Program Offices (DPOs) responsible for regulatory and programmatic compliance, as well as fraud and national security concerns.
  - **Field Operations Directorate's (FOD) Investor Program Office (IPO):** 21 positions, 18 FTE, and $2.8M
    - Administers the EB-5 Program, and adjudicates applications and petitions while striving to ensure that program participants, including immigrant investors and principals operating U.S. regional centers, comply with program requirements.
  - **Fraud Detection and National Security (FDNS):** 19 positions, 17 FTE, and $2.7M
    - Leads the fraud and national security aspects of the mission, and charged with preventing, detecting, and responding to allegations of fraud in the program.

CIS – EB5 - 8

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | - | - | $4,115 | $4,115 |
| 12.1 Civilian Personnel Benefits | - | - | $1,478 | $1,478 |
| **Total - Personnel Compensation and Benefits** | - | - | **$5,593** | **$5,593** |
| **Positions and FTE** | | | | |
| Positions – Civilian | - | - | 40 | 40 |
| FTE - Civilian | - | - | 35 | 35 |

003693

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## Pay Cost Drivers

| | FY 2022 Enacted | | | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2023 to FY 2024 Change | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Financial Crime Auditors | - | - | - | - | - | - | 13 | $2,150 | $165.38 | 13 | $2,150 | $165.38 |
| Immigration Officers and Intelligence Research Specialists | | | | | | | 17 | $2,748 | $161.65 | 17 | $2,748 | $161.65 |
| Other Cost | | | | | | | 5 | $695 | $139.00 | 5 | $695 | $139.00 |
| **Total – Pay Cost Drivers** | - | - | - | - | - | - | **35** | **$5,593** | **$159.80** | **35** | **$5,593** | **$159.80** |

### Explanation of Pay Cost Drivers

**Financial Crime Auditor:** This cost driver funds the salaries and benefits of USCIS financial crime auditors. Financial crime auditors monitor and investigate program-related events and promotional-related events and ensure investor compliance with applicable source of funds provisions.

**Immigration Officers and Intelligence Research Specialists:** This cost driver funds the salaries and benefits of USCIS Immigration Officers (IO) and Intelligence Research Specialists (IRS). IO's and IRS' detect and investigate fraud and other crimes; determine whether regional centers, New Commercial Enterprises (NCEs), Job-Creating Entities (JCEs), investors and their families are complying with immigration laws; and conduct audits and site visits.

**Other Costs:** This cost driver funds the salaries and benefits of other support personnel within IPO and FDNS who support the administration of regional center audits, and provide technical assistance and direct support to IPO management and staff in matters relating to travel.

003694

United States Citizenship and Immigration Services

# EB-5 Integrity Fund
## Permanent Positions by Grade –Appropriation
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| GS-15 | - | - | - | - |
| GS-14 | - | - | 4 | - |
| GS-13 | - | - | 22 | - |
| GS-12 | - | - | 14 | - |
| GS-11 | - | - | - | - |
| GS-9 | - | - | - | - |
| GS-7 | - | - | | - |
| **Total Permanent Positions** | - | - | **40** | - |
| Total Perm. Employment (Filled Positions) EOY | - | - | - | - |
| Unfilled Positions EOY | - | - | | - |
| **Position Locations** | | | | |
| Headquarters Civilian | - | - | 40 | - |
| U.S. Field Civilian | - | - | - | - |
| Foreign Field Civilian | - | - | - | - |
| **Averages** | | | | |
| Average personnel Costs, ES Positions | - | - | - | - |
| Average Personnel Costs, GS Positions | - | - | $117,571 | - |
| Average Grade, GS Positions | - | - | 13 | - |

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| Adjudication Operations | - | - | $3,167 | $3,167 |
| **Total** | **-** | **-** | **$3,167** | **$3,167** |
| | | | | |
| Subtotal Mandatory – Fee | - | - | $3,167 | $3,167 |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | - | - | $240 | $240 |
| 25.1 Advisory & Assistance Services | - | - | $2,462 | $2,462 |
| 26.0 Supplies & Materials | - | - | $14 | $14 |
| 31.0 Equipment | - | - | $451 | $451 |
| **Total - Non Pay Budget Object Class** | **-** | **-** | **$3,167** | **$3,167** |

CIS – EB5 - 12

003696

United States Citizenship and Immigration Services

EB-5 Integrity Fund

## Non Pay Cost Drivers

| | FY 2022 Enacted | FY 2023 Enacted | FY 2024 President's Budget | FY 2023 to FY 2024 Total Changes |
|---|---|---|---|---|
| Advisory Support Contract | - | - | $2,462 | $2,462 |
| Other Cost | - | - | $705 | $705 |
| **Total – Non Pay Cost Drivers** | - | - | **$3,167** | **$3,167** |

## Explanation of Non Pay Cost Driver

**Advisory Support Contract:** Covers contractual cost for information technology development of a compliance referral system. IPO compliance referrals are not currently in any case management system. This system would allow for USCIS to begin to systematically collect and track these referrals leading to an enhanced ability to monitor and assess non-compliance trends in the program. Additionally this would help IPO more readily identify areas for improvement as the program continues to evolve and change. This information was identified in the latest U.S. Government Accountability Office audit for IPO.[2]

**Other Costs:** Funds the remaining management and support, equipment, and supplies costs in order to monitor and ensure compliance with the requirements under section of the EB-5 Reform and Integrity Act of 2022.

---

[2] GAO-23-105389SU, *Immigrant Investor Program: Opportunities Exist to Improve Fraud and National Security Risk Monitoring*, Published: Dec 06, 2022. Members of Congress or congressional staff who wish to obtain this report should call or e-mail the Congressional Relations Office (202) 512-4400 or congrel@gao.gov. All others who wish to obtain one or more of these products should follow the instructions found on Requesting Restricted Products.

003698

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Budget Overview*



**Fiscal Year 2025**

**Congressional Justification**

CIS - 1

The header at top:

Department of Homeland Security

U.S. Citizenship and Immigration Services

# Table of Contents

*U.S. Citizenship and Immigration Services* .......................................................................................1

Appropriation Organization Structure .................................................................................................3

Budget Comparison and Adjustments .................................................................................................4

Personnel Compensation and Benefits.................................................................................................9

Non Pay Budget Exhibits...................................................................................................................11

Supplemental Budget Justification Exhibits ......................................................................................13

003699

Department of Homeland Security

U.S. Citizenship and Immigration Services

# U.S. Citizenship and Immigration Services
## Appropriation Organization Structure

| | Level | Fund Type (* Includes Defense Funding) |
|---|---|---|
| **United States Citizenship and Immigration Services** | **Component** | |
| **Operations and Support** | **Appropriation** | |
| Employment Status Verification | PPA | Discretionary - Appropriation |
| Application Processing | PPA | Discretionary - Appropriation |
| Refugee, Asylum, and International Operations | PPA | Discretionary - Appropriation |
| **Federal Assistance** | **Appropriation** | |
| Citizenship and Integration Grants | PPA | Discretionary - Appropriation |
| **Immigration Examinations Fee Account** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |
| Immigration Policy and Support | PPA | Mandatory - Fee |
| Refugee, Asylum, and International Operations | PPA | Mandatory - Fee |
| Immigration Records and Applicant Services | PPA | Mandatory - Fee |
| Premium Processing (Including Transformation) | PPA | Mandatory - Fee |
| **H-1B Nonimmigrant Petitioner Account** | **Appropriation** | |
| Service Center Operations | PPA | Mandatory - Fee |
| **Fraud Prevention and Detection Account** | **Appropriation** | |
| District Operations | PPA | Mandatory - Fee |
| Service Center Operations | PPA | Mandatory - Fee |
| Asylum, Refugee, and International Operations | PPA | Mandatory - Fee |
| **EB-5 Integrity Fund** | **Appropriation** | |
| Adjudication Operations | PPA | Mandatory - Fee |

CIS - 3

003700

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
## Budget Comparison and Adjustments
## Appropriation and PPA Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget |
|---|---|---|---|
| **Operations and Support** | $242,981 | $242,981 | $255,230 |
| Employment Status Verification | $109,611 | $109,611 | $110,230 |
| Application Processing | $133,370 | $133,370 | - |
| Refugee, Asylum, and International Operations | - | - | $145,000 |
| **Federal Assistance** | $25,000 | $25,000 | $10,000 |
| Citizenship and Integration Grants | $25,000 | $25,000 | $10,000 |
| **Immigration Examinations Fee Account** | $4,921,520 | $5,944,570 | $6,474,978 |
| Immigration Examination Fee Account: Non-Premium | $3,838,685 | $4,543,266 | $4,989,648 |
| Immigration Examination Fee Account: Premium | $1,082,835 | $1,401,304 | $1,485,330 |
| **H-1B Nonimmigrant Petitioner Account** | $16,867 | $18,125 | $17,366 |
| H-1B Nonimmigrant Petitioner Fee Account | $16,867 | $18,125 | $17,366 |
| **Fraud Prevention and Detection Account** | $45,813 | $51,632 | $51,944 |
| Fraud Prevention and Detection Account | $45,813 | $51,632 | $51,944 |
| **EB-5 Integrity Fund** | $8,066 | $8,760 | $8,760 |
| EB-5 Integrity Fund | $8,066 | $8,760 | $8,760 |
| **Total** | $5,260,247 | $6,291,068 | $6,818,278 |

NOTE: Mandatory Accounts/Fees reflect actual (FY 2023), estimated (FY 2024), and projected (FY 2025) fee receipts consistent with the FY 2025 President's Budget Appendix.

**CIS – 4**

003701

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
## Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Operations and Support | 965 | 914 | $242,981 | 965 | 914 | $242,981 | 994 | 928 | $255,230 | 29 | 14 | $12,249 |
| Federal Assistance | - | - | $25,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| Immigration Examinations Fee Account | 21,659 | 20,576 | $5,595,175 | 23,411 | 20,975 | $5,901,379 | 24,213 | 23,107 | $6,609,338 | 802 | 2,132 | $707,959 |
| Fraud Prevention and Detection Account | 185 | 176 | $53,960 | 185 | 176 | $56,140 | 185 | 176 | $56,929 | - | - | $789 |
| H-1B Nonimmigrant Petitioner Account | - | - | $20,000 | - | - | $20,000 | - | - | $20,000 | - | - | - |
| EB-5 Integrity Fund | - | - | - | 40 | 35 | $8,760 | 40 | 35 | $8,918 | - | - | $158 |
| **Total** | **22,809** | **21,666** | **$5,937,116** | **24,601** | **22,100** | **$6,254,260** | **25,432** | **24,246** | **$6,960,415** | **831** | **2,146** | **$706,155** |
| Subtotal Discretionary - Appropriation | 965 | 914 | $267,981 | 965 | 914 | $267,981 | 994 | 928 | $265,230 | 29 | 14 | ($2,751) |
| Subtotal Mandatory - Fee | 21,844 | 20,752 | $5,669,135 | 23,636 | 21,186 | $5,986,279 | 24,438 | 23,318 | $6,695,185 | 802 | 2,132 | $708,906 |

## Component Budget Overview

The FY 2025 Budget includes $265.2M, 994 positions; and 928 full-time equivalents (FTE) in discretionary budget authority for the U.S. Citizenship and Immigration Services (USCIS).

The FY 2025 Budget also estimates $6.7B in total mandatory budget authority for the Immigration Examinations Fee Account (IEFA), the H-1B Nonimmigrant Petitioner Account, EB-5 Integrity Fund, and the Fraud Prevention and Detection Account (FPDA).

The funding enables USCIS to meet its mission requirements, including the following:
- Strengthen and effectively administer the immigration system.
- Strengthen National security safeguards and combat fraud.
- Reinforce quality and consistency in administering immigration benefits.

**CIS - 5**

U.S. Citizenship and Immigration Services

003702

**Department of Homeland Security**                                                                 **U.S. Citizenship and Immigration Services**

The FY 2025 discretionary funding supports the E-Verify Program (Employment Status Verification PPA), the Citizenship and Integration Grant Program, Application Processing, and Refugee, Asylum, and International Operations.

The Employment Status Verification (ESV) PPA provides funding for E-Verify, which is one component of USCIS's Immigration Records and Identity Services directorate. E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available in the Department of Homeland Security (DHS), Social Security Administration (SSA), Department of State (DoS), and State and local systems (DMVs). The other component is the Systematic Alien Verification for Entitlements (SAVE) program, which is funded within USCIS' Immigration Examinations Fee Account (IEFA). USCIS plans to increase SAVE user fees to fully fund the program. Due to the similarities between E-Verify and SAVE, both programs use the Verification Information System (VIS) and secondary IT systems and services. Shared costs are distributed between the two programs.

The Refugee, Asylum and International Operations PPA provides funding for staff, equipment, and support services to process generally non-revenue generating refugee and asylum applications and petitions. This funding continues to support a refugee admission ceiling up to 125,000, protection screening for migrants interdicted at sea, adjudication of certain parole and following-to-join refugee and asylee relative petitions, processing of refugee travel document requests and related appeals, as well as international operations. This PPA would also support fraud detection, national security, and public safety operations related to these programs. Support services encompass a wide range of oversight, infrastructure, and administrative functions to enable adjudicative operations such as policy and procedural guidance, training, quality assurance, travel arrangements, hiring, data management, analysis, reporting, process improvement/innovation, external communications, interagency liaison, procurement actions, emergency management, budget, personal property management, facilities, and records.

The Citizenship and Integration Grant Program (CIGP) is funded via the Federal Assistance account. CIGP expands the availability of high-quality services throughout the Nation as part of a multifaceted USCIS effort to provide citizenship preparation resources, support, and information to immigrants and immigrant-serving organizations.

**CIS - 6**

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
## Collections – Reimbursable Resources
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Canada/UK Visa | - | - | $6,242 | - | - | $7,200 | - | - | $7,500 |
| Department of Defense | - | - | $7,499 | - | - | $7,500 | - | - | $7,873 |
| Department of Health and Human Services – Department Wide | - | - | $3 | - | - | $3 | - | - | $3 |
| Department of Homeland Security | - | - | $824 | - | - | $2,000 | - | - | $2,100 |
| Department of Homeland Security - Federal Emergency Management Agency | - | - | $2,024 | - | - | $8,750 | - | - | $6,823 |
| Department of Homeland Security - Office of the Secretary & Executive Management | - | - | $3,983 | - | - | - | - | - | - |
| Department of Homeland Security - U.S. Customs and Border Protection | - | - | $10,527 | - | - | $18,197 | - | - | $17,845 |
| Department of Homeland Security - U.S. Immigration and Customs Enforcement | - | - | $12,440 | - | - | $16,000 | - | - | $15,748 |
| Department of Justice | - | - | $154 | - | - | $200 | - | - | $200 |
| Department of State | - | - | $222 | - | - | $150 | - | - | $112 |
| Other Independent Agencies | - | - | $83 | - | - | - | - | - | - |
| SAVE Collections | - | - | $4,900 | - | - | $15,000 | - | - | $16,796 |
| **Total Collections** | - | - | **$48,901** | - | - | **$75,000** | - | - | **$75,000** |

CIS - 8

Department of Homeland Security

U.S. Citizenship and Immigration Services

# United States Citizenship and Immigration Services
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | **$5,260,247** | **$6,291,068** | **$6,818,278** |
| Carryover - Start of Year | $2,301,239 | $2,158,500 | $2,155,123 |
| Recoveries | $116,452 | $76,000 | $76,000 |
| Rescissions to Current Year/Budget Year | ($36,145) | - | - |
| Net Sequestered Resources | ($3,478) | ($55,779) | ($30,209) |
| Reprogramming/Transfers | $3,208 | - | - |
| Supplementals | - | $755,000 | - |
| CHIMP | ($4,000) | ($4,000) | ($4,000) |
| **Total Budget Authority** | **$7,637,523** | **$9,220,789** | **$9,015,192** |
| Collections - Reimbursable Resources | $48,901 | $75,000 | $75,000 |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$7,686,424** | **$9,295,789** | **$9,090,192** |
| Obligations (Actual/Estimates/Projections) | $5,478,583 | $1,022,981 | $267,874 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 22,809 | 24,601 | 25,432 |
| Enacted/Request FTE | 21,666 | 22,100 | 24,246 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 20,689 | 24,601 | 25,432 |
| FTE (Actual/Estimates/Projections) | 20,095 | 22,100 | 24,246 |

CIS - 7

003705

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | | FY 2024 Annualized CR | | | | FY 2025 President's Budget | | | | FY 2024 to FY 2025 Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Operations and Support | 965 | 914 | $131,919 | $144.33 | 965 | 914 | $131,919 | $144.33 | 994 | 928 | $144,507 | $155.72 | 29 | 14 | $12,588 | $11.39 |
| Immigration Examinations Fee Account | 21,659 | 20,576 | $3,214,766 | $156.18 | 23,411 | 20,975 | $3,291,256 | $156.85 | 24,213 | 23,107 | $3,737,869 | $161.71 | 802 | 2,132 | $446,613 | $4.86 |
| Fraud Prevention and Detection Account | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | $161.63 | 185 | 176 | $29,236 | $166.11 | - | - | $789 | $4.48 |
| EB-5 Integrity Fund | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,751 | $164.31 | - | - | $158 | $4.51 |
| **Total** | **22,809** | **21,666** | **$3,373,753** | **$155.66** | **24,601** | **22,100** | **$3,457,215** | **$156.38** | **25,432** | **24,246** | **$3,917,363** | **$161.52** | **831** | **2,146** | **$460,148** | **$5.14** |
| Subtotal Discretionary - Appropriation | 965 | 914 | $131,919 | $144.33 | 965 | 914 | $131,919 | $144.33 | 994 | 928 | $144,507 | $155.72 | 29 | 14 | $12,588 | $11.39 |
| Subtotal Mandatory - Fee | 21,844 | 20,752 | $3,241,834 | $156.16 | 23,636 | 21,186 | $3,325,296 | $156.90 | 24,438 | 23,318 | $3,772,856 | $161.75 | 802 | 2,132 | $447,560 | $4.85 |

CIS - 9

003706

Department of Homeland Security

U.S. Citizenship and Immigration Services

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $2,346,716 | $2,382,167 | $2,652,891 | $270,724 |
| 11.3 Other than Full-time Permanent | $15,404 | $15,337 | $13,077 | ($2,260) |
| 11.5 Other Personnel Compensation | $109,615 | $74,906 | $92,698 | $17,792 |
| 12.1 Civilian Personnel Benefits | $900,807 | $983,370 | $1,157,444 | $173,874 |
| 13.0 Benefits for Former Personnel | $1,211 | $1,235 | $1,253 | $18 |
| **Total - Personnel Compensation and Benefits** | **$3,373,753** | **$3,457,215** | **$3,917,363** | **$460,148** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 22,809 | 24,601 | 25,432 | 831 |
| FTE - Civilian | 21,666 | 22,100 | 24,246 | 2,146 |
| Positions – Military | - | - | - | - |
| FTE - Military | - | - | - | - |

**CIS - 10**

003707

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
### Non Pay Budget Exhibits

## Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Changes |
|---|---|---|---|---|
| Operations and Support | $111,062 | $111,062 | $110,723 | ($339) |
| Federal Assistance | $25,000 | $25,000 | $10,000 | ($15,000) |
| Immigration Examinations Fee Account | $2,380,409 | $2,610,123 | $2,871,469 | $261,346 |
| Fraud Prevention and Detection Account | $26,892 | $27,693 | $27,693 | - |
| H-1B Nonimmigrant Petitioner Account | $20,000 | $20,000 | $20,000 | - |
| EB-5 Integrity Fund | - | $3,167 | $3,167 | - |
| **Total** | **$2,563,363** | **$2,797,045** | **$3,043,052** | **$246,007** |
| Subtotal Discretionary - Appropriation | $136,062 | $136,062 | $120,723 | ($15,339) |
| Subtotal Mandatory - Fee | $2,427,301 | $2,660,983 | $2,922,329 | $261,346 |

003708

**Department of Homeland Security**

**U.S. Citizenship and Immigration Services**

## Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Changes |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $41,565 | $60,435 | $53,291 | ($7,144) |
| 22.0 Transportation of Things | $16,107 | $13,455 | $13,519 | $64 |
| 23.1 Rental Payments to GSA | $281,140 | $279,819 | $276,406 | ($3,413) |
| 23.2 Rental Payments to Others | $5,464 | $3,146 | $749 | ($2,397) |
| 23.3 Communications, Utilities, & Miscellaneous | $97,302 | $135,594 | $137,099 | $1,505 |
| 24.0 Printing and Reproduction | $14,856 | $8,895 | $8,782 | ($113) |
| 25.1 Advisory & Assistance Services | $790,702 | $1,029,780 | $1,289,058 | $259,278 |
| 25.2 Other Services from Non-Federal Sources | $51,537 | $54,607 | $55,235 | $628 |
| 25.3 Other Purchases of goods and services | $361,323 | $382,251 | $395,613 | $13,362 |
| 25.4 Operations & Maintenance of Facilities | $2,725 | $2,872 | $2,654 | ($218) |
| 25.7 Operation & Maintenance of Equipment | $213,430 | $224,046 | $189,128 | ($34,918) |
| 26.0 Supplies & Materials | $39,726 | $27,731 | $27,956 | $225 |
| 31.0 Equipment | $545,222 | $490,181 | $524,319 | $34,138 |
| 32.0 Land and Structures | $72,358 | $55,064 | $55,064 | - |
| 41.0 Grants, Subsidies, and Contributions | $25,000 | $25,082 | $10,093 | ($14,989) |
| 42.0 Insurance Claims and Indemnities | $4,906 | $4,087 | $4,087 | - |
| Total - Non-Pay Budget Object Class | $2,538,363 | $2,797,045 | $3,033,052 | $246,007 |

**CIS - 12**

003709

Department of Homeland Security

U.S. Citizenship and Immigration Services

**U.S. Citizenship and Immigration Services**
**Supplemental Budget Justification Exhibits**

**FY 2025 Counter Unmanned Aerial Systems (CUAS) Funding**

The FY 2025 Budget for USCIS does not include any funding for Counter Unmanned Aerial Systems.

**CIS - 13**

003710

Department of Homeland Security

U.S. Citizenship and Immigration Services

## U.S. Citizenship and Immigration Services
### FY 2023 – FY 2025 Cyber Security Funding
*(Dollars in Thousands)*

| NIST Framework | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget |
|---|---|---|---|
| Detect | $1,672 | $1,944 | $1,993 |
| Identify | $10,383 | $7,173 | $7,321 |
| Protect | $59,159 | $58,179 | $59,822 |
| Recover | $153 | $215 | $217 |
| Respond | $15,702 | $14,856 | $15,261 |
| **Grand Total** | **$87,069** | **$82,367** | **$84,614** |

**CIS - 14**

003711

Department of Homeland Security

U.S. Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Status of Congressionally Requested Studies, Reports and Evaluations

| Fiscal Year | Due Date | Reference/Citation | Requirement | Status |
|---|---|---|---|---|
| 2022 | May 14, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.—USCIS shall provide the Committees a plan within 60 days of the date of enactment of this Act to establish a quarterly, public report on all backlogs, frontlogs, and pending forms, for all form types, which shall also indicate the form's processing goal. | Transmitted April 12, 2023 |
| 2022 | May 16, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Asylum Seeker Access to Employment Authorization.—The Committee recognizes the importance of employment authorization for asylum seekers awaiting the outcome of their cases, including individuals with positive Credible Fear or Reasonable Fear determinations or who have expressed a fear of return to their home countries and intend to apply for asylum or withholding of removal. The Committee directs DHS to establish a centralized mechanism for asylum seekers to apply for employment authorization online and to brief the Committee not later than 60 days after the date of enactment of this Act on its plan to meet this objective, including a projected schedule for meeting anticipated milestones. Further, the Committee directs USCIS to reduce printing and reproduction costs related to the cumbersome Form I–765 and to brief the Committee not later than 60 days after the date of enactment of this Act on a plan for achieving this goal, including any anticipated resource savings and timeliness metrics. | Transmitted April 3, 2023 |
| 2022 | June 7, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | H-2B Visa Program Reporting - Not later than 60 days after the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H-2B program, including a tabulation of the percentage of overall visas issued to the top 15 employers. | Transmitted March 10, 2023 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Asylum Processing — Not later than 90 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that details its efforts and specific actions, if any, to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes. | Transmitted November 1, 2023 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.—USCIS is directed to ensure that timeliness performance measures for all forms are developed, implemented, and routinely assessed. Within 90 days of the date of enactment of this Act, USCIS shall report to the Committees on measures implemented to promptly reduce processing delays and provide the Committees a list of adjudication processing goals and whether the goal is required by statute, regulation, or is set internally. | Transmitted April 12, 2023 |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | USCIS Quarterly Budget and Productivity Reporting— USCIS shall brief the Committee within 90 days of the date of enactment of this Act and quarterly thereafter on the budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall detail the spending of each directorate and office (compared to projections), provide revenue and expenses delineated by form type, other agency expenses including payments or transfers to | Transmitted October 11, 2023 |

CIS - 15

# Department of Homeland Security

## U.S. Citizenship and Immigration Services

| | | | | |
|---|---|---|---|---|
| | | | other Federal agencies, and carryover or reserve fund projections and spending. USCIS shall ensure the agency maintains a sufficient carryover balance to provide stability amid fluctuating receipts. Additionally, USCIS shall develop productivity measures that convey the baseline capacity and capabilities for processing applications and petitions and capture the impact of investments in personnel, technology, or changes to processes and policies on such measures. Updates on USCIS performance against these measures shall be included with the quarterly budget reporting. | |
| 2022 | June 13, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Electronic Processing— In addition to the requirements in Section 4103 of the USCIS Stabilization Act (Public Law 116-159) and not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to brief the Committees on its progress with further developing and implementing the plan, which shall include the following additional detailed information: (1) cost and schedule plans for 12 months; (2) cost and schedule actuals against the plans; (3) identification and justification for slippage in cost and/or schedule; (4) identification of any risks, and mitigation strategies to address such risks; (5) identification of any technological challenges facing the agency; (6) an examination of whether expanded premium processing could facilitate end-to-end electronic processing for all immigration benefit requests, and if so, the resulting project plan, including timelines and cost estimates for USCIS and customers; and (7) a plan for promoting public adoption, including by engaging with industry partners as applicable. USCIS shall specifically highlight the status of its efforts to establish a centralized mechanism for asylum seekers to apply for employment authorization online, including a projected schedule for meeting anticipated milestones. Further, USCIS shall review whether Form I-765 can be more narrowly tailored to reduce paperwork and workloads, while still ensuring proper eligibility and security and shall include its plan for achieving this goal, including any anticipated resource savings and timeliness metrics, in the next semi-annual briefing. | Transmitted September 18, 2023 |
| 2022 | September 11, 2022 | Consolidated Appropriation Act 2022 (P.L. 117-103) | Backlog Reporting and Processing Times.— ...Additionally, within 180 days of the date of enactment of this Act, USCIS shall develop and brief the Committees on a comprehensive Backlog Elimination Plan, modeled on prior successful efforts by USCIS to eliminate their backlogs in 2004–2006, along with any associated staffing models to support such plan. | Transmitted July 7, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Backlog Reporting and Processing Times – USCIS shall provide the Committees a plan, within 60 days of the date of enactment of this Act, to establish a quarterly, public report on all backlogs, frontlogs, and pending forms for all form types. The report shall include the number of applicants or petitioners in each USCIS backlog, frontlog, or pending status, including beneficiaries where applicable, by form type; and shall include the length of this status associated with the relevant form type. | Transmitted April 12, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Credible Fear and Asylum Processing Interim Final Rule – USCIS is directed to continue to make available, on a publicly accessible website in a downloadable, searchable, and sortable format, a report containing not less than the previous 12 months of semimonthly data on: (1) the number of noncitizens determined to have a credible or reasonable fear of- (a) persecution, as defined in section 235(b)(l)(B)(v) of the Immigration and Nationality Act; or (b) torture, as defined in section 208.30 of title 8, Code of Federal Regulations (as in effect on January 1, 2018); (2) the total number of cases received by U.S. Citizenship and Immigration Services to adjudicate credible or reasonable fear claims, as described in paragraph (1), and the total number of cases | Transmitted July 10, 2023; October 16, 2023 |

CIS - 16

003713

**Department of Homeland Security**

**U.S. Citizenship and Immigration Services**

| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | closed; and (3) the total pending asylum operations workload. Such report shall also disaggregate the data described above with respect to the following subsets: (1) claims submitted by aliens detained at a U.S. Immigration and Customs Enforcement family residential center or an emergency family shelter; (2) claims submitted by aliens, organized by each subdivision of legal or administrative authority under which claims are reviewed; and (3) the job series of the personnel reviewing the claims. Not later than 60 days after the date of enactment of this Act, and quarterly thereafter, USCIS shall provide a briefing to the Committees on the implementation of the Credible Fear and Asylum Processing Interim Final Rule. The briefing shall include data on the number of credible fear interviews and Asylum Merits Interviews conducted; outcomes of such interviews, including, but not limited to, the number approved, denied, administratively closed, and pending cases; the Field Office location of such interviews; and whether the individual was represented. USCIS shall report publicly the number of individuals referred to immigration or criminal proceedings, or otherwise referred for an enforcement action. | Transmitted June 20, 2023; August 16, 2023; October 13, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Fee Waivers and Exemptions – Within 60 days of the date of enactment of this Act and quarterly thereafter, the Department shall provide the Committees with updated reports on all applications and petitions for which fees are waived and any budgetary impacts resulting from the issuances of such waivers. | Transmitted July 18, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | H-2A and H-2B Visas – USCIS shall brief the Committee, not later than 60 days after the date of enactment of this Act, and in coordination with the Department of Labor, on efforts to prevent fraud and abuse in the H-2A and H-2B visa programs and efforts to ensure that employers, agents, attorneys, and recruiters who have been debarred by the Department of Labor cannot continue to participate in the programs. | Transmitted March 10, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | H-2B Visa Program Reporting – Not later than 60 days after the date of enactment of this Act, the Department shall report to the Committee on the distribution of visas granted through the H-2B program, including a tabulation of the percentage of overall visas issued to the top 15 employers. | Transmitted March 10, 2023 |
| 2023 | February 27, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | U Visa – The Committee is concerned about the claims made in the OIG's January 6, 2022, report (OIG–22–10) regarding USCIS's management and implementation of the U Visa program. Not later than 60 days after the date of enactment of this Act, USCIS shall brief the Committee on the implementation of the recommendations included in the OIG report, including its rationale for not concurring with some of the OIG recommendations. | Transmitted July 5, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Asylum Processing – Not later than 90 days after the date of enactment of this Act, USCIS shall provide a report to the Committees that details its efforts to reduce the backlog of asylum applications, while ensuring that asylum applicants are properly reviewed for security purposes. | Transmitted November 1, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Asylum Processing – USCIS shall coordinate with relevant Federal agencies that provide services to individuals who have been granted asylum to ensure that such persons are appropriately referred and informed of available services. Not later than 90 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees on efforts to refer asylees for services. | Transmitted June 6, 2023 |

003714

**Department of Homeland Security**

**U.S. Citizenship and Immigration Services**

| Year | | Act | Description | Transmitted |
|---|---|---|---|---|
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Asylum Seeker Access to Employment Authorization - Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to make available on a publicly accessible website: (1) the total number of pending employment authorization applications filed by individuals with pending applications for asylum or withholding of removal pursuant to 8 C.F.R. 274a.12(c)(8); and (2) the total number of such applications that have been pending 60 or fewer days, 61–90 days, 91–120 days, 121–179 days, and 180 or more days. | Transmitted April 5, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Budget and Productivity Reporting - USCIS shall provide semi-annual briefings to the Committees on budget operations, including revenue projections, actual spending, and other financial forecasts. At a minimum, the briefing shall detail spending by directorate and office, with comparisons to initial projections; revenue and expenses delineated by form type; other agency expenses, including payments or transfers to other Federal agencies; and carryover or reserve fund projections and spending. USCIS shall ensure the agency maintains a sufficient carryover balance to provide stability amid fluctuating receipts. Additionally, USCIS shall establish a baseline for current application and petition processing capacity, along with metrics for measuring the impact of investments in personnel, technology, and changes to processes and policies on productivity. Updates on USCIS performance against these metrics shall be included with the briefings. | Transmitted June 27, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Electronic Processing - USCIS shall provide a semi-annual briefing to the Committees on its electronic processing efforts, as described in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103), including its efforts to establish a centralized mechanism for asylum seekers to apply for employment authorization online. Further, USCIS shall explore options, including through technology, to increase access to interviews and other processes for individuals who may not be geographically located near a users Field Office. | Transmitted September 18, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Employment Authorizations - USCIS shall ensure all regulatory, statutory, and court-ordered or stipulated agreement timelines are met for all applications for employment authorization. Not later than 90 days after the date of enactment of this Act, and quarterly thereafter, USCIS is directed to make available on a publicly accessible website: (1) the total number of pending employment authorization applications filed; and (2) the total number of such applications that have been pending for 60 or fewer days, 61–90 days, 91–120 days, 121–179 days, and 180 or more days. The website shall also summarize, on an annual basis, all existing processing time goals, the source of the time goal, and whether the agency met the time goal for the prior fiscal year. | Transmitted April 3, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | E-Verify - Within 90 days of the date of enactment of this Act, USCIS shall provide a briefing on the status of its plans to modernize and improve the quality and accuracy of information submitted into the E-Verify system, including the status of its efforts to implement an appeal process for a non-confirmation within the E-Verify system. | Transmitted April 19, 2023 |
| 2023 | March 29, 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | H-2B Visa Program Reporting - Also, not later than 90 days after the date of enactment of this Act, the Department, in consultation with the Department of Labor, shall brief the Committee on the impacts of the current H–2B visa semiannual distribution on employers, employees, and agency operations. | Transmitted April 25, 2023 |

CIS - 18

003715

003716

# Department of Homeland Security

## U.S. Citizenship and Immigration Services

| Year | Authority | Date | Description | Transmitted |
|------|-----------|------|-------------|-------------|
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | March 29, 2023 | International Operations Division - The Committee urges USCIS to continue to reevaluate its international footprint requirements to optimize its ability to meet its mission needs in a cost-effective manner. Not later than 90 days after the date of enactment of this Act, USCIS shall brief the Committee on its international operations, its reliance on operations in foreign locations, and its plans for changing its international footprint over the next five fiscal years, along with estimated budget and operational impacts of such changes. | Transmitted July 14, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | March 29, 2023 | Refugee Admissions – The agreement provides sufficient resources for USCIS to meet the Presidential Determination on refugee admissions for the fiscal year. Within 90 days of the date of enactment of this Act, USCIS shall provide a briefing to the Committees on its detailed plan to achieve the Presidential Determination on refugee admissions for Fiscal Year 2023. The briefing shall include, for fiscal year 2022, the information identified under this heading in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103) related to staffing, interviews, approvals, and denials. USCIS shall examine whether any burdensome administrative or inefficiencies currently exist in the refugee admissions process including whether any duplicative fingerprint requirements exist that slow refugee admissions and shall include such information in the briefing to the Committees. | Transmitted June 8, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | April 28, 2023 | Notice of Funding Opportunity (NOFO). – The Committee looks forward to working with USCIS on improvements to this grant program, such as reviewing the guidelines and requirements set forth in the Notice of Funding Opportunity (NOFO) to be sure that no unnecessary or overly restrictive conditions are preventing otherwise qualified prospective grant recipient organizations from participating. Not later than five business days prior to the finalization of the NOFO, USCIS shall brief the Committee on any changes to the execution of the program, including changes in the qualifications and expectations of grant recipients. Not later than 120 days after the date of enactment of this Act, USCIS shall brief the Committee on its metrics for evaluating the success of this grant program. | Transmitted May 18, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | April 28, 2023 | SAVE Inquiries - Not later than 120 days after the date of enactment of this Act, USCIS shall provide a report to the Committee that includes calculations for the prior three fiscal years of the percentage of all SAVE inquiries from user agencies made pursuant to mandates in Federal law and the percentage related to benefits for which Federal law does not require immigration status verification. In addition, the report shall provide an overview of the funding profile for the program, to include total operational costs, the program's reimbursement model, and the extent to which program costs are not fully recovered by user fees. The Committee expects that this program will not rely on fees paid by applicants and petitioners for immigration benefits; accordingly, the report shall also include any plans to achieve full-cost recovery. | Transmitted April 24, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | April 28, 2023 | Voter Registration for New Citizens - Not later than 120 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees regarding the status of its efforts in each field office to facilitate the registration of U.S. Citizens upon completion of their oath ceremonies. At a minimum, the briefing shall include details on agreements and partnerships with the appropriate state or local officials or agencies, or non-profits, as appropriate, and how USCIS works with the appropriate entities to electronically transfer voter information, or to pursue other avenues to reduce paperwork and facilitate voter registration for these individuals upon successfully obtaining U.S. Citizenship. | Transmitted May 18, 2023 |

CIS - 19

**Department of Homeland Security** | **U.S. Citizenship and Immigration Services**

| Year | Act | Requirement | Status |
|---|---|---|---|
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Workload Staffing Modeling - Not later than 120 days after the date of enactment of this Act, USCIS shall provide a briefing to the Committees that updates the information required under this heading in the explanatory statement accompanying the fiscal year 2022 funding Act (Public Law 117-103). The briefing shall include data outputs from the Staffing Allocation Model and the Model of Operational Planning in order to provide the Committees a better understanding of what the budget request and anticipated fee funded resources will support and the associated projections for improvements in performance. | Transmitted June 15, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | B-1 Visa Report - The Committee directs the Secretary to submit a report not later than 180 days after the date of enactment of this Act that includes summary data on B-1 personal or domestic workers, including visa holders' years of birth; genders; countries of citizenship and birth; dates of visa issuance and expiration; and the cities and states where the visa holders will be working. The report shall employ data disclosure avoidance measures to protect personally identifiable data and be made available to the public. The Secretary shall promptly inform the Committee if a Federal agency partner does not comply with a request to provide relevant records needed to complete the report. | Transmitted September 20, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Backlog Reporting - Additionally, within 180 days of the date of enactment of this Act, USCIS shall provide a briefing to the Committees on a plan for addressing ongoing backlogs and frontlogs. | Transmitted July 7, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Filipino World War II Veteran Visa Backlog - Not later than 180 days after the date of enactment of this Act, USCIS shall brief the Committee on the number of individuals enrolled in the Filipino War Veteran Parole Program. The briefing shall also discuss opportunities to shorten the wait times for family members of Filipino World War II veterans and more quickly process the permanent resident applications of those enrolled in the Filipino War Veteran Parole Program, along with any resources and authorities needed. | Transmitted September 18, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | H-2A and H-2B Visa Website Posting - USCIS shall, in coordination with the Department of Labor's Office of Foreign Labor Certification, timely post public information provided by employers on Form I-129 and associated filings regarding recruiters, recruiting agents, or agencies they plan to use. USCIS shall also establish a process whereby workers may confirm that they are the beneficiaries of H-2A or H-2B petitions and can receive information about their own immigration status, including their authorized period of stay and the status of any requested visa extensions. | Transmitted August 16, 2023 |
| 2023 | Consolidated Appropriation Act 2023 (P.L. 117-328) | Military Naturalization - The briefing required under this heading in House Report 117-396 shall be due not later than 90 days after the date of enactment of this Act. Additionally, on February 2, 2021, President Biden issued an "Executive Order on Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans," in which he directed DHS and the State and Justice Departments to partner with the Defense Department to "facilitate naturalization for . . . members of the military." Not later than 30 days after the date of enactment of this Act, the Department shall brief the Committee on its progress in implementing this executive order, particularly as it relates to initiating naturalization during basic training. | Transmitted May 4, 2023 |

003717

Department of Homeland Security

U.S. Citizenship and Immigration Services

## United States Citizenship and Immigration Services
## Authorized/Unauthorized Appropriations

| Budget Activity (Dollars in Thousands) | Last year of Authorization | Authorized Level | | Appropriation in Last Year of Authorization | | FY 2025 President's Budget | |
|---|---|---|---|---|---|---|---|
| | Fiscal Year | Amount | | Amount | | Amount | |
| **Operations and Support** | N/A | **$631,745** | | **$707,395** | | **$255,230** | |
| Employment Status Verification | 2002 | $631,745 | | $707,395 | | $110,230 | |
| Refugee, Asylum, and International Operations | N/A | N/A | | N/A | | $145,000 | |
| **Federal Assistance** | N/A | **N/A** | | **N/A** | | **$10,000** | |
| Citizenship and Integration Grants | N/A | N/A | | N/A | | $10,000 | |
| **Fee Accounts** | N/A | **Such sums as are available** | | **Such sums as are available** | | **Such sums as are available** | |
| Immigration Examinations Fee | 1988 | Such sums as are available | | Such sums as are available | | Such sums as are available | |
| H-1B Non-immigrant Petitioner | 1998 | Such sums as are available | | Such sums as are available | | Such sums as are available | |
| Fraud Prevention and Detection | 2004 | Such sums as are available | | Such sums as are available | | Such sums as are available | |
| EB-5 Integrity Fund | 2022 | Such sums as are available | | Such sums as are available | | Such sums as are available | |

003718

Department of Homeland Security

U.S. Citizenship and Immigration Services

# U.S. Citizenship and Immigration Services
## Proposed Legislative Language

### Operations and Support

For necessary expenses of U.S. Citizenship and Immigration Services for operations and support, including for the E-Verify Program and for the Refugee and International Operations Programs, [application processing, and additional support for asylum adjudication workloads,][$855,194,000] $255,230,000, of which $3,500,000 shall remain available until September 30, 2026: Provided, That such amounts shall be in addition to any other amounts made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m)): Provided further, That not to exceed $5,000 shall be for official reception and representation expenses.

| Language Provision | Explanation |
|---|---|
| ...[application processing, and additional support for asylum adjudication workloads.] | Language eliminated to account for the reduced scope of operations proposed within the account. |
| ... [$855,194,000] $255,230,000 | Dollar change only. |
| ...., of which $3,500,000 shall remain available until September 30, 2026 | Two-year funding is requested to provide flexibility in opening international offices. The ability to add an office at or at a U.S. Embassy or Consulate abroad is contingent upon DoS approval through the National Security Decision Directive (NSDD)-38 process which gives a Chief of Mission control over the size, composition, and mandate of a mission abroad. The process to obtain all necessary approvals and funding, establish and fill new positions, and complete IT and other logistical set-up in-country can take 8 to 12 months or more. |

### Federal Assistance

For necessary expenses of U.S. Citizenship and Immigration Services for Federal assistance for the Citizenship and Integration Grant Program, $10,000,000.

| Language Provision | Explanation |
|---|---|
| N/A | No change |

CIS - 22

003719

003720

# Department of Homeland Security

## United States Citizenship and Immigration Services

### Strategic Context



**Fiscal Year 2025**

**Congressional Justification**

United States Citizenship and Immigration Services

Strategic Context

# United States Citizenship and Immigration Services

## Strategic Context

### Component Overview

The U.S. Citizenship and Immigration Services (USCIS) administers the Nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

The strategic context presents the performance budget by tying together programs with performance measures that gauge the delivery of results to our stakeholders. DHS has integrated a mission and mission support programmatic view into a significant portion of the Level 1 Program, Project, or Activities (PPAs) in the budget. A mission program is a group of activities acting together to accomplish a specific high-level outcome external to DHS, and includes operational processes, skills, technology, human capital, and other resources. Mission support programs are those that are cross-cutting in nature and support multiple mission programs. Performance measures associated with USCIS's mission programs are presented in two measure sets, strategic and management measures. Strategic measures communicate results delivered for our agency mission and are considered our Government Performance and Results Act Modernization Act (GPRAMA) measures. Additional supporting measures, known as management measures, are displayed to enhance connections to resource requests.

***Employment Status Verification***:  The electronic employment eligibility verification E-Verify program enables enrolled employers to confirm the work authorization of their newly hired employees quickly and easily. E-Verify is an Internet-based system that compares information from an employee's Form I-9, Employment Eligibility Verification, to records available to DHS to confirm employment eligibility within seconds.

*Strategic Measures*

| Measure Name: | Percent of workers determined to be Employment Authorized after an initial mismatch | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | | |
| **Description:** | This measure reports the number of cases in which adjudicating officials in the E-Verify program find a person employment authorized under U.S. law after the program issued the person under examination with a Tentative Non-Confirmation (TNC) of eligibility for employment, and the person in question contested this initial mismatch. In cases when an employee contests an eligibility determination, the program's Legal Instrument Examiners (LIEs) make a final determination of the employee's eligibility for employment and transmits the determination both to the hiring employer and to VIS. Ensuring the accuracy of E-Verify program processing reflects the program's intent to minimize negative impacts imposed upon those entitled to employment in the U.S. while ensuring the integrity of immigration benefits by effectively detecting and preventing cases of unauthorized employment. | | | | | | | |
| **Fiscal Year:** | **FY 2019** | **FY 2020** | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** | **FY 2025** | |
| **Targets:** | ≤0.50% | ≤0.40% | ≤0.40% | ≤0.40% | ≤0.30% | ≤0.30% | ≤0.30% | |
| **Results:** | 0.21% | 0.23% | 0.13% | 0.11% | 0.13% | TBD | TBD | |
| **Explanation of Result:** | E-Verify continues to be successful in matching employees to their government records during the initial electronic matching phase. In those cases where the electronic check does not find a match, it is very rare that the applicant will contest the case and be found to be employment authorized. USCIS continues to improve its processes through E-Verify enhancements such as mismatch letter notices to employees and Self Check, a free online service that allows an individual to check his or her employment eligibility. The numerator for | | | | | | | |

CIS - 2

003721

## United States Citizenship and Immigration Services

**Strategic Context**

| the FY 2023 result is 42,646 verified as "Employment Authorized" after an initial mismatch, and the denominator is 32,680,621 total verified as "Employment Authorized" |
|---|

***Fraud Prevention and Detection:*** The Fraud Prevention and Detection program supports activities related to preventing and detecting immigration benefit fraud. The program leads efforts to identify threats to national security and public safety, deter, detect, and combat immigration benefit fraud, and remove systemic and other vulnerabilities.

*Strategic Measures*

| Measure Name: | Percent of completed social media checks found in compliance with applicable privacy policies | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | Operational use of social media for security checks is a defined workload process conducted by the Headquarters Fraud Detection and National Security Directorate (HQFDNS) Social Media Division (SMD) that requires checks for certain immigration requests, as a matter of policy, or based on an articulated justification or for detecting, pursuing, and deterring immigration request fraud. The measure will ensure social media checks comply with Privacy oversight requirements as demonstrated by results of privacy assessments on this process conducted monthly and reported quarterly by USCIS Office of Privacy. | | | | | | |
| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Targets: | --- | --- | --- | --- | --- | 95.00% | 95.00% |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

*Management Measures*

| Measure Name: | Average number of social media checks completed per full time equivalent during the work year | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | Operational use of social media for security checks is a defined workload process conducted by the Headquarters FDNS (HQFDNS) Social Media Division (SMD) that requires checks for certain form types or groups of immigration requests, as a matter of policy, or based on an articulated justification or for detecting, pursuing, and deterring immigration request fraud. The measure will ensure social media checks continue to meet efficiency requirements and that all FDNS Immigration Officers assigned to perform checks can do so within expected time frames and levels of productivity. | | | | | | |
| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Targets: | --- | --- | --- | --- | --- | 660 | 660 |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

***Immigration Services:*** The Immigration Services program supports and promotes lawful immigration by processing benefit requests, so that only those eligible for immigration benefits are approved. This includes processing refugee and asylum applications as well as providing assimilation services for lawful immigrants.

CIS - 3

**United States Citizenship and Immigration Services**
*Strategic Measures*

Strategic Context

| Measure Name: | Average processing time for Application to Register Permanent Residence or Adjust Status (I-485) (in months) | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the ability of the Field Operations Directorate (FOD) to meet adjudication processing goals for the Form I-485, Application to Register Permanent Residence or Adjust status. | | | | | | |
| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Targets: | --- | --- | --- | --- | ≤10.0 | ≤10.0 | ≤10.0 |
| Results: | --- | --- | --- | --- | 15.6 | TBD | TBD |
| Explanation of Result: | While processing times continue to be elevated and above their target level, FOD expects continued improvement in processing times going into FY 2024. While processing times have continued to show slight improvement, FOD has also begun to shift support to DHS priority activities which may affect future processing times. | | | | | | |
| Corrective Action: | FOD incrementally increased its adjudicative capacity through continued hiring and staffing, additional use of overtime, and enhanced process efficiencies, all of which contributed to continued improvement in processing times during FY 2023. FOD's implementation of a new set of 18-month goals positively increased completions and reduced the number of pending cases during FY 2023. FOD has continued to encourage family based I-485 applicants to submit I-693 medical certifications, which were often missing from submissions, which has reduced the need to send Requests for Evidence, thereby reducing processing times during FY 2023. FOD's plan for FY 2024 is to use all available employment-based visas, and, secondarily, prioritize family based and other I-485 workloads. | | | | | | |

| Measure Name: | Average processing time for Applications for Naturalization (N-400) (in months) | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the ability of FOD to meet its published adjudication processing goals for the Applications for Naturalization (N-400). An N-400 is filed by an individual applying to become a United States citizen. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |
| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
| Targets: | --- | --- | --- | --- | ≤8.0 | ≤8.0 | ≤8.0 |
| Results: | --- | --- | --- | --- | 7.6 | TBD | TBD |
| Explanation of Result: | The reduction in processing times has been the result of continued hiring and staffing across FOD, implementation of enhanced process efficiencies, and the use of overtime hours. While processing times have continued to show slight improvement, FOD has also begun to shift support to DHS priority activities which may affect future processing times. | | | | | | |

| Measure Name: | Average processing time for detainees claiming Credible Fear (in days) |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |
| Description: | This measure assesses how quickly the program processes the credible fear claims of individuals held in ICE-operated detention centers. Specifically, for individuals claiming persecution or a well-founded fear of persecution or harm on account of his or her race, religion, nationality, membership in a particular social group, or political opinion if returned to their country. This measure reports the average number of days between individuals expressing their fear and the program completing the case. By evaluating how quickly the credible |

## United States Citizenship and Immigration Services

Strategic Context

fear claims of detained individuals are completed, the program can assess the effectiveness of a critical element of the agency's goal to secure borders through effective use of detention capacity.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | ≤14.0 | ≤14.0 | ≤14.0 |
| Results: | --- | --- | --- | --- | 12.7 | TBD | TBD |

**Explanation of Result:** The FY 2023 performance target was met despite the magnitude of credible fear screenings. USCIS achieved this by diverting staff from other workloads, including affirmative asylum; increasing credible fear work hours; and leveraging detailees from across USCIS. There are currently more than 250 non-asylum office staff assigned to the credible fear workload. In FY 2023, the Refugee, Asylum, and International Operations (RAIO) Directorate provided credible fear training to 672 USCIS employees from 11 USCIS components who assisted with credible fear screenings after Title 42 flexibilities were lifted at the Southwest border. Reaching the credible fear target was also made possible because RAIO prioritized technology and staffed the Global case management team to develop new capabilities and efficiencies to streamline Southwest border case processing.

| Measure Name: | Average processing time to adjudicate form I-129 (Petition for Nonimmigrant Worker) (in months) |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |

**Description:** This measure assesses the ability of the Service Center Operations Directorate (SCOPS) to meet its published adjudication processing goals for the processing of Form I-129, Petition for a Nonimmigrant Worker. An I-129 is filed on behalf of a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training, as an E-1, E-2, E-3, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN nonimmigrant worker. This process time information will help determine if the organization has the capability and capacity to process petitions and will also be used to make operational decisions.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | ≤2.0 | ≤4.0 | ≤4.0 |
| Results: | --- | --- | --- | --- | 2.7 | TBD | TBD |

**Explanation of Result:** The average processing time of 2.7 months Includes all I-129 Non-PP Sub-types. A high number of I-129 petitions request premium processing; in some classifications premium processing makes up the vast majority of cases which are received (H-2B, for example). Because premium processing takes precedence, SCOPS is challenged to process non-premium forms within standard processing timeframes. Additionally, in FY 2023, officers were sent to support credible fear details at the Southwest border, which diverted SCOPS resources from core activities.

**Corrective Action:** SCOPS will continue to prioritize premium processing cases and seek efficiencies to continue delivering on core activities, while also planning for the possibility that SCOPS resources continue to be diverted to other priority activities (e.g., credible fear details), which may affect future processing times.

| Measure Name: | Average processing time to adjudicate form I-140 (Immigrant Petition for Alien Worker) (in months) |
|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System |

**Description:** This measure assesses the ability of SCOPS to meet its published adjudication processing goals for the Immigrant Petition for Alien Worker (I-140). An I-140 is filed on behalf of an immigrant worker to come to the United States permanently to perform services or labor as an immigrant worker. This measure applies to E11, E12, E21 (non-national interest waiver (NIW)), E32, E31, and EW3 classifications.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|

CIS - 5

003724

**United States Citizenship and Immigration Services**

Strategic Context

| | | | | | | ≤8.0 | ≤8.0 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | --- | TBD | TBD |
| **Results:** | --- | --- | --- | --- | --- | 4.7 | TBD |

**Explanation of Result:** The average processing time of 4.7 months includes all I-140 Non-PP Sub-types. SCOPS is seeing high volume of I-140 premium filings, which is at times requiring overtime to keep up with the premium workload. Because premium processing takes precedence and premium goals must be met, SCOPS is challenged to process non-premium forms within standard processing timeframes. Additionally, in FY 2023, officers were sent to support the credible fear details at the southern Southwest border, which diverted SCOPS resources from core activities.

**Corrective Action:** SCOPS will continue to prioritize premium processing cases and seek efficiencies to continue delivering on core activities, while also planning for the possibility that SCOPS resources continue to be diverted to other priority activities (e.g., credible fear details), which may affect future processing times.

| **Measure Name:** | Number of asylum determinations | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |

**Description:** This measure gauges the total number of asylum determinations to approve, deny, refer to an Immigration Judge, or administratively close cases related to refugee and asylum. Individuals physically present in the U.S. may apply for asylum, regardless of their country of nationality or current immigration status, if they were persecuted or have a fear that they will be persecuted because of their race, nationality, religion, membership in a particular social group, or political opinion. The processing of asylum determinations advances the objective to adjudicate protection, humanitarian, and other immigration benefits.

| **Fiscal Year:** | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | 50,000 | 65,000 | 65,000 | 65,000 |
| **Results:** | --- | --- | --- | 41,453 | 56,706 | TBD | TBD |

**Explanation of Result:** Due to the lifting of the Title 42 public health order on May 11, 2023, and the Department's increased use of expedited removal and screening interviews conducted while noncitizens are in Border Patrol custody, most Asylum Division resources were diverted to the Southwest border workload to meet Departmental and administration priorities. Even though the number of migrants encountered by the Border Patrol has dropped, the number of screening referrals from the Border Patrol to the Asylum Division continues to grow, impacting the ability of staff to interview and complete affirmative cases, as all staff were reassigned to the Southwest border workload. The number of completions did not completely stall during Q3 and Q4, because the Asylum Division completed post-interview cases when there was available time.

**Corrective Action:** In FY 2024, the Asylum Division will strive to allocate more resources to affirmative asylum cases, with reduced allocations to Southwest border screenings. Part of this effort will focus on completing affirmative asylum decisions that do not require an interview and on completing post-interview affirmative asylum cases. The Asylum Division believes this will increase the overall number of completions in FY 2024.

| **Measure Name:** | Percent of approved applications for naturalization that were appropriately decided | | | | | | |
|---|---|---|---|---|---|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System | | | | | | |

**Description:** This measure assesses the validity of final decisions by program adjudicators to approve all electronic N-400 Naturalization Forms received through USCIS Electronic Immigration System (ELIS) by reporting the findings of regular quality reviews of these decisions by experienced subject matter experts (SMEs). The program conducts quality reviews by drawing a statistically valid random sample of approved N-400s on a quarterly basis. Insuring that the program provides immigration services accurately and with full documentary

CIS - 6

003725

## United States Citizenship and Immigration Services

**Strategic Context**

support through quality reviews identifies opportunities to improve training and business processes and enhances confidence in the legal immigration system.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Results: | 99.0% | 99.0% | 0.00% | 100.0% | 100.0% | TBD | TBD |

**Explanation of Result:** During the current reporting cycle, FOD increased its online bandwidth capabilities, enabling to increase its use of video interviewing, and streamlining more of its N-400 processes in the Electronic Immigration System (ELIS) environment. ELIS improvements have also increased processing efficiencies and reduced the likelihood of human errors during the adjudication process. Additionally, FOD continued to increase its hiring and staffing, which has enabled it to increase its adjudicative capacity and commit greater resources to manage the processing of its increased workload.

| Measure Name: | Percent of approved Applications to Register Permanent Residence or Adjust Status (I-485s) that were appropriately decided |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure assesses the validity of final decisions by program adjudicators to approve Form I-485 applications to register for permanent residence or to adjust status by reporting the findings of regular quality reviews of these decisions by experienced subject matter experts (SMEs). The program conducts quality reviews of these cases, drawing a statistically valid random sample of approved I-485s on a quarterly basis. Insuring that the program provides immigration services accurately and with full documentary support through quality reviews identifies opportunities to improve training and business processes and enhances confidence in the legal immigration system. |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Results: | 99.0% | 95.7% | 0.0% | 100.0% | 100.0% | TBD | TBD |

**Explanation of Result:** During the current reporting cycle, FOD continued to increase the number of I-485 cases received and adjudicated through the use of the Electronic Immigration System (ELIS), which has enabled its adjudication officers to streamline the processing of its cases. FOD continued to increase its utilization of ELIS to process I-485 cases throughout FY 2023. The use of ELIS reduces the likelihood of human errors during the adjudication process. Additionally, FOD continued to increase its hiring and staffing, which has allowed it to increase its adjudicative capacity and commit greater resources to manage the processing of its increased workload.

| Measure Name: | Percent of naturalization cases where derogatory information was identified and resolved prior to taking the oath of allegiance |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure gauges the rate at which derogatory information is identified and resolved before N-400 Form naturalization applicants take the final Oath of Allegiance at a naturalization ceremony. Taking the oath at a ceremony completes the process of becoming a U.S. citizen for approved applicants. USCIS employs continual vetting of applicants and a final check for derogatory information close to the oathing ceremony to ensure that ineligible applicants are not naturalized due to criminal activity, national security, or public safety concerns. Continuous vetting ensures the integrity of the immigration system and protects our national security. |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Results: | --- | 100.0% | 100.0% | 100.0% | 100.0% | TBD | TBD |

CIS – 7

**United States Citizenship and Immigration Services** — Strategic Context

| | |
|---|---|
| **Explanation of Result:** | This measure gauges the rate at which derogatory information is identified and resolved by USCIS before an N-400 Form (Naturalization Application) applicant takes the final the Oath of Allegiance at a naturalization ceremony. Taking the oath at a ceremony completes the process of becoming a U.S. citizen for approved applicants. During FY 2023, FOD consistently met its quarterly target by continuing to employ careful vetting of applicants and a final check for derogatory information close to the oathing ceremony to ensure that applicants who are ineligible due to criminal activity, national security, or public safety concerns are not naturalized. |

| **Measure Name:** | Percent of pending cases that are considered backlog |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure assesses the proportion of pending forms considered as backlog. Backlog is defined as the number of cases pending within the government's control that exceed accepted goals for processing the case. For example, one goal is for USCIS to process all N-400 applications within five months of receipt; cases still pending after five months would be considered backlog. This measure will help senior leadership assess the effectiveness of the agency's multiple initiatives for reducing the existing backlog. These initiatives include strategic staffing, technology enhancements, regulatory and policy changes, and the use of overtime. This measure supports the DHS Strategic Goal Objective of Administering the Immigration System to ensure it is administered efficiently and fairly. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the measure. |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | ≤42.20% | ≤60.00% | ≤50.00% |
| **Results:** | --- | --- | --- | --- | 57.20% | TBD | TBD |

| **Explanation of Result:** | USCIS continues to have significant backlogs in Form I-765, Application for Employment Authorization (EAD) Document, Form I-589 Application for Asylum and for Withholding of Removal, Form I-90, Application to Replace Permanent Resident Card, Form I-485 Application to Register Permanent Residence or Adjust Status, and Form I-130, Petition for Alien Relative. The backlog of Form N-400, Application for Naturalization, has been reduced by 100,000 cases since the beginning of the fiscal year. |
|---|---|
| **Corrective Action:** | USCIS has developed a comprehensive backlog reduction plan and regularly monitors and reports on the status of the backlog by form type and changes over time to OMB and Congressional requestors, among others. USCIS has a multipronged approach to addressing the backlog which includes hiring to its fully authorized level, training and onboarding new hires, implementing policies, and enhancing technologies to improve operational efficiencies. |

| **Measure Name:** | Percent of refugee and asylum applications that were appropriately decided |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure assesses the validity of final decisions by program adjudicators on Form I-589 and Form I-590 refugee and asylum applications. A panel of subject matter experts is convened to review a sample of completed applications to determine whether the final decision was appropriately decided. The panel may sustain the decision, recommend a different decision or send the file back to the appropriate component for correction or additional information if it is determined that critical procedures were not correctly followed or the case is lacking sufficient interview evidence. Ensuring that the program provides immigration services accurately and with full documentary support through quality reviews identifies opportunities to improve training and business processes and enhances confidence in the legal immigration system. |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | 90.00% | 90.00% | 90.00% | 90.00% | 90.00% |

CIS - 8

003727

**United States Citizenship and Immigration Services**

Strategic Context

| | | | | | | |
|---|---|---|---|---|---|---|
| **Results:** | --- | --- | --- | 76.40% | 82.70% | TBD | TBD |

**Explanation of Result:** The FY 2023 Form I-589 quality assurance review was cancelled as a result of the lifting of Title 42 and the subsequent diverting of Asylum Division resources to address the credible fear workload. The statistics for the FY 2023 legal sufficiency measure for RAIO rely exclusively on the results of the FY 2023 Form I-590 quality assurance review. Preliminary results for the FY 2023 Form I-589 quality assurance review indicates that 82.7 percent of cases were found to be legally sufficient.

**Corrective Action:** Proposed corrective actions include updating the International and Refugee Affairs Division (IRAD) Inadmissibility Grounds and Waivers Lesson Plan to provide additional guidance around eliciting testimony and analyzing arrests; creating a plan for a virtual library, including roles and responsibilities for management of relevant country of origin information (COI) resources that can be used to establish elements of a claim; providing a training on the proper use of COI; and incorporating additional COI training into IRAD's foundational training for new refugee officers.

| **Measure Name:** | Percent of respondents satisfied with the citizenship and immigration-related support received from the USCIS Contact Center |
|---|---|

**Strategic Alignment:** 3.1 : Administer the Immigration System

**Description:** This measure gauges the overall satisfaction of support received from the USCIS Contact Center based on accuracy of information, responsiveness to public inquiries, and accessibility to information. The Qualtrics Automated Omnichannel Survey Tool captures live feedback after customers complete their interaction with the contact center through the IVR, telephony, virtual assistant, live chat agent, myUSCIS account experience, and/or website. The survey question that pertains to this measure is "I am satisfied with the service I received from the USCIS Contact Center," rated on a scale of one to five, with one being "strongly disagree" and five being "strongly agree". Scores of four and five are included in the results of this measure. Providing quality customer service helps to ensure applicants receive the information they need and increases trust in the Federal government.

| **Fiscal Year:** | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | 80.0% | 80.0% | 80.0% | 80.0% |
| **Results:** | --- | --- | --- | 84.5% | 85.5% | TBD | TBD |

**Explanation of Result:** This GPRA measure captures customer satisfaction with the first level of the USCIS Contact Center live support, which is provided by the USCIS vendor at Tier 1. At this level of engagement, Tier 1 provides general immigration information, case status updates, and escalates inquiries they cannot resolve to USCIS Immigration Services Officers (ISOs) at Tier 2. USCIS surpassed its customer service goal every quarter during FY 2023 despite intermittent technical issues within Qualtrics, an automated survey tool, and various other systems.

| **Measure Name:** | Percent of students with increased test scores after attending courses funded through USCIS Grant Programs |
|---|---|

**Strategic Alignment:** 3.1 : Administer the Immigration System

**Description:** This measure reports on the success of grant recipients to increase knowledge of English necessary for permanent resident students receiving services under the program to pass the naturalization test. Students receive specialized civics-based English as a Second Language (ESL) training on vocabulary and grammar needed to know in order to successfully navigate the naturalization test and interview. Grant recipients are required to use a nationally normed standardized test of English language proficiency for student placement and assessment of progress. This measure evaluates the percentage of students receiving civics-based English as a second language (ESL) classes who demonstrate a one point or greater increase in score. The classes equip immigrants with the tools they need to be successful throughout their journey to become new U.S. citizens.

| **Fiscal Year:** | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|

CIS – 9

**United States Citizenship and Immigration Services**

Strategic Context

| | | | | | | |
|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | 80.0% | 80.0% | 80.0% |
| **Results:** | --- | --- | --- | 82.3% | 83.2% | TBD |

(far right column: Targets 80.0% / Results TBD)

**Explanation of Result:** Citizenship students had increased test scores after attending citizenship courses funded through the USCIS Citizenship and Integration Grant Program. Due to significant increases in Congressional appropriations in FY 2022, the Citizenship and Integration Grant Program now includes four different types of funding opportunities. This data reflects student success across all funding opportunities.

| | |
|---|---|
| **Measure Name:** | Percent of total USCIS benefits workload processed digitally in case management systems |
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure identifies the percent of the Agency workload that is received for processing within the ELIS and Global case management systems. This measure will provide visibility into USCIS' efforts to increase the volume of digital processing resulting in improved efficiencies, enhanced accessibility, data security, and better user experience for applicants and USCIS personnel. All USCIS Directorates are stakeholders for this measure due to the large number of benefit forms (and subcategories) that are processed within ELIS and Global. |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | --- | 75.00% | 80.00% |
| **Results:** | --- | --- | --- | --- | --- | TBD | TBD |

| | |
|---|---|
| **Measure Name:** | Total number of attendees at USCIS public engagements |
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure assesses the effectiveness of the program's effort toward public engagement. These engagements include, but are not limited to, presentations by leadership, webinars, trainings, stakeholder events, conference presentations, summits, panel discussions, meetings, roundtables, and serving as guest speakers. Public engagements will include scheduled engagements, both virtual and in-person, conducted for the public under the coordination of the USCIS Office of Citizenship, Partnerships, and Engagement (OCPE). |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| **Targets:** | --- | --- | --- | --- | 80,000 | 90,000 | 90,000 |
| **Results:** | --- | --- | --- | --- | 132,946 | TBD | TBD |

**Explanation of Result:** OCPE exceeded this performance target. The consolidation of the field community relations specialists into OCPE facilitated comprehensive, coordinated engagement in FY 2023 that supported numerous agency priorities, including citizenship, parole, Temporary Protected Status, and public charge. OCPE also facilitated critical engagements to support the Task Force for New Americans and the Naturalization Working Group.

*Management Measures*

| | |
|---|---|
| **Measure Name:** | Accuracy rate of USCIS's processing of manual verifications for Systematic Alien Verification for Entitlements referrals |
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |
| **Description:** | This measure tracks the accuracy of manual verifications conducted for the Systematic Alien Verification for Entitlements (SAVE) program. A SAVE verification involves Federal, state, tribal, or local government agency which grants licenses or benefits verifying an applicant's immigration status. If SAVE cannot match an applicant's data to a database record from U.S. Government systems used to |

**CIS - 10**

003729

# United States Citizenship and Immigration Services

## Strategic Context

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% | 99.0% |
| Results: | 99.1% | 99.0% | 99.3% | 99.1% | 98.4% | TBD | TBD |

**Explanation of Result:** During Q4 FY 2023, technology and process improvements applied on SAVE systems led to lower number of routine manual cases resulting in a higher proportion of complex manual cases. This attributed to a slightly lower accuracy rate for FY 2023 (98.4 percent).

**Corrective Action:** The SAVE program is diligently applying corrective measures to reduce manual SAVE cases. This is accomplished with a multi-pronged approach of People, Process and Technology improvements.

adjudicate immigration benefits in the initial search, customer agencies pursue further verification if requested by the applicant. Status Verifiers (SV) perform these additional queries manually to determine the applicant's immigration status. SAVE referrals are sampled quarterly to verify the work provided by SV correctly reflects the immigration status on record for persons seeking benefits from other Government agencies. Conducting accurate SAVE verifications ensures that Federally funded benefits are awarded correctly to non-citizen applicants and recipients.

---

| Measure Name: | Average processing time to adjudicate Premium Processing form I-129 (Petition for Nonimmigrant Worker) (in days) |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |

**Description:** This measure assesses the ability of SCOPS to meet its published adjudication processing goals for the Premium Processing of Form I-129, Petition for a Nonimmigrant Worker. An I-129 is filed on behalf of a nonimmigrant worker to come to the United States temporarily to perform services or labor, or to receive training, as an E-1, E-2, E-3, H-1B, H-2A, H-2B, H-3, L-1, O-1, O-2, P-1, P-1S, P-2, P-2S, P-3, P-3S, Q-1, R-1, or TN nonimmigrant worker. This process time information will help determine if the organization has the capability and capacity to process petitions and will also be used to make operational decisions.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | ≤15.0 | ≤15.0 | ≤15.0 |
| Results: | --- | --- | --- | --- | 12.2 | TBD | TBD |

**Explanation of Result:** SCOPS met its premium processing goals for FY 2023.

---

| Measure Name: | Average processing time to adjudicate Premium Processing form I-140 (Immigrant Petition for Alien Worker) (in days) |
|---|---|
| **Strategic Alignment:** | 3.1 : Administer the Immigration System |

**Description:** This measure assesses the ability of SCOPS to meet its published adjudication processing goals for the Premium Processing Immigrant Petition for Alien Worker (I-140). An I-140 is filed on behalf of an immigrant worker to come to the United States permanently to perform services or labor as an immigrant worker. This measure applies to E11, E12, E21 (non-national interest waiver (NIW)), E32, E31, and EW3 classifications.

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | ≤15.0 | ≤15.0 | ≤15.0 |
| Results: | --- | --- | --- | --- | 15.2 | TBD | TBD |

**Explanation of Result:** SCOPS met its premium processing goal for FY 2023.

**CIS - 11**

**United States Citizenship and Immigration Services**

<div align="right">Strategic Context</div>

| Measure Name: | Percent of actionable refugee interviews conducted | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the progress in conducting refugee interviews needed to feed the pipeline of individuals eligible for refugee admission to the US. Interview results are used to verify identity and make eligibility recommendations to immigration officers that inform adjudication decisions on refugee applications. Refugee interviews are considered actionable if there are no external factors preventing officers from interviewing cases presented by the Department of State, Bureau of Population, Refugees, and Migration (PRM). The main purpose of the refugee interview is to elicit and provide information related to eligibility for refugee status. Each interview may involve multiple individuals connected to a single refugee case. | | | | | | |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | 95.00% | 95.00% | 95.00% | 95.00% |
| Results: | --- | --- | --- | 97.80% | 97.50% | TBD | TBD |
| Explanation of Result: | In FY 2023, refugee interviewing demand continued to increase, with RAIO conducting in-person initial interviews for 94,247 individuals across 77 different countries, completing 97.5 percent of actionable in-person refugee interviews for the year. | | | | | | |

| Measure Name: | Percent of Humanitarian, Adjustment, Removing Conditions, and Travel Service Center employees onboarded | | | | | | |
|---|---|---|---|---|---|---|---|
| Strategic Alignment: | 3.1 : Administer the Immigration System | | | | | | |
| Description: | This measure assesses the ability of the SCOPS to meet its targeted goals to Enter On Duty (EOD) and onboard all employees within the Humanitarian, Adjustment, Removing Conditions, and Travel (HART) Service Center. This information will help determine if the organization has the capability and capacity to process petitions/applications and will also be used to make operational decisions. External factors such as immigration policies, economic security, and issues like the COVID-19 pandemic could have a negative impact on the results for this measure. | | | | | | |

| Fiscal Year: | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|---|
| Targets: | --- | --- | --- | --- | --- | 95.00% | 98.00% |
| Results: | --- | --- | --- | --- | --- | TBD | TBD |

<div align="center">CIS - 12</div>

003732

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Operations and Support*



**Fiscal Year 2025**
**Congressional Justification**

CIS – O&S - 1

U.S. Citizenship and Immigration Services                                    Operations and Support

# Table of Contents

*Operations and Support* .................................................................................................................1

   Budget Comparison and Adjustments .................................................................. 3

   Summary of Budget Changes ............................................................................... 6

   Justification of Pricing Changes ........................................................................... 7

   Justification of Transfers ...................................................................................... 9

   Justification of Program Changes ....................................................................... 10

   Personnel Compensation and Benefits ............................................................... 13

   Non Pay Budget Exhibits .................................................................................... 15

   *Employment Status Verification – PPA* .......................................................... 16

      Budget Comparison and Adjustments ............................................... 16

      Personnel Compensation and Benefits .............................................. 21

      Non Pay Budget Exhibits .................................................................. 23

   *Application Processing – PPA* ......................................................................... 26

      Budget Comparison and Adjustments ............................................... 26

      Personnel Compensation and Benefits .............................................. 29

      Non Pay Budget Exhibits .................................................................. 31

   *Refuge, Asylum and International Operation – PPA* ....................................... 33

      Budget Comparison and Adjustments ............................................... 33

      Personnel Compensation and Benefits .............................................. 37

      Non Pay Budget Exhibits .................................................................. 40

**CIS – O&S - 2**

003733

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support

### Budget Comparison and Adjustments

### Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Employment Status Verification | 321 | 302 | $109,611 | 321 | 302 | $109,611 | 321 | 287 | $110,230 | - | (15) | $619 |
| Application Processing | 644 | 612 | $133,370 | 644 | 612 | $133,370 | - | - | - | (644) | (612) | ($133,370) |
| Refugee, Asylum, and International Operations | - | - | - | - | - | - | 673 | 641 | $145,000 | 673 | 641 | $145,000 |
| Total | 965 | 914 | $242,981 | 965 | 914 | $242,981 | 994 | 928 | $255,230 | 29 | 14 | $12,249 |
| Subtotal Discretionary - Appropriation | 965 | 914 | $242,981 | 965 | 914 | $242,981 | 994 | 928 | $255,230 | 29 | 14 | $12,249 |

The U.S. Citizenship and Immigration Services (USCIS) Operations and Support (O&S) appropriation provides funding for ongoing mission operations, mission support, and associated management and administration (M&A) costs for the E-Verify, Application Processing, and Refugee, Asylum and International Operations.

The O&S Appropriation supports the following Level I Program, Project, and Activities (PPAs):

**Employment Status Verification (ESV):** The ESV PPA provides funding for E-Verify, which is one component of USCIS's immigration records and identity services directorate. E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available in the Department of Homeland Security (DHS), Social Security Administration (SSA), Department of State (DoS), and State and local systems (DMVs). The other component is the Systematic Alien Verification for Entitlements (SAVE) program, which is funded within USCIS' Immigration Examinations Fee Account (IEFA). USCIS plans to increase SAVE user fees to fully fund the program. Due to the similarities between E-Verify and SAVE, both programs use the Verification Information System (VIS) and secondary IT systems and services. Shared costs are distributed between the two programs.

003734

**U.S. Citizenship and Immigration Services**                                                    **Operations and Support**

**Application Processing:** The activities contained within this PPA are shifting to the new Refugee, Asylum and International Operations PPA.

**Refugee, Asylum and International Operations (RAIO):** The Refugee, Asylum and International Operations PPA provides funding for staff, equipment, and support services to process generally non-revenue generating refugee and asylum applications and petitions. This funding continues to support a refugee admission ceiling up to 125,000, protection screening for migrants interdicted at sea, adjudication of certain parole and following-to-join refugee and asylee relative petitions, processing of refugee travel document requests and related appeals, as well as international operations. This PPA would also support fraud detection, national security, and public safety operations related to these programs. Support services encompass a wide range of oversight, infrastructure, and administrative functions to enable adjudicative operations such as policy and procedural guidance, training, quality assurance, travel arrangements, hiring, data management, analysis, reporting, process improvement/innovation, external communications, interagency liaison, procurement actions, emergency management, budget, personal property management, facilities, and records.

**U.S. Citizenship and Immigration Services**  **Operations and Support**

# Operations and Support
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | $242,981 | $242,981 | $255,230 |
| Carryover - Start of Year | $48,101 | - | - |
| Recoveries | $139 | - | - |
| Rescissions to Current Year/Budget Year | ($36,145) | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | $3,208 | - | - |
| Supplementals | - | $755,000 | - |
| **Total Budget Authority** | **$258,284** | **$997,981** | **$255,230** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$258,284** | **$997,981** | **$255,230** |
| Obligations (Actual/Estimates/Projections) | $252,959 | $997,981 | $255,230 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 965 | 965 | 994 |
| Enacted/Request FTE | 914 | 914 | 928 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 813 | 965 | 994 |
| FTE (Actual/Estimates/Projections) | 797 | 914 | 928 |

CIS – O&S - 5

003736

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2023 Enacted** | **965** | **914** | **$131,919** | **$111,062** | **$242,981** |
| **FY 2024 Annualized CR** | **965** | **914** | **$131,919** | **$111,062** | **$242,981** |
| **FY 2025 Base Budget** | **965** | **914** | **$131,919** | **$111,062** | **$242,981** |
| **Total Technical Changes** | **-** | **-** | **-** | **-** | **-** |
| **Total Annualizations and Non-Recurs** | **-** | **-** | **-** | **-** | **-** |
| 2025 Civilian Pay Raise | - | - | $2,099 | - | $2,099 |
| 2024 Civilian Pay Raise | - | - | $6,916 | - | $6,916 |
| 2023 Civilian Pay Raise Annualization | - | - | $1,065 | - | $1,065 |
| Capital Security Cost Sharing | - | - | - | $265 | $265 |
| **Total Pricing Changes** | **-** | **-** | **$10,080** | **$265** | **$10,345** |
| **Total Adjustments-to-Base** | **-** | **-** | **$10,080** | **$265** | **$10,345** |
| **FY 2025 Current Services** | **965** | **914** | **$141,999** | **$111,327** | **$253,326** |
| **Total Transfers** | **-** | **-** | **-** | **-** | **-** |
| FTE and Travel Reduction | - | (15) | ($2,284) | ($51) | ($2,335) |
| IRAD Support Positions | 29 | 29 | $4,792 | - | $4,792 |
| Reduction to Contractual Services | - | - | - | ($553) | ($553) |
| **Total Program Changes** | **29** | **14** | **$2,508** | **($604)** | **$1,904** |
| **FY 2025 Request** | **994** | **928** | **$144,507** | **$110,723** | **$255,230** |
| **FY 2024 TO FY 2025 Change** | **29** | **14** | **$12,588** | **($339)** | **$12,249** |

CIS – O&S - 6

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2025 President's Budget | | |
| --- | --- | --- | --- | --- | --- |
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 - 2025 Civilian Pay Raise** | - | - | **$2,099** | - | **$2,099** |
| Employment Status Verification | - | - | $687 | - | $687 |
| Application Processing | - | - | $1,412 | - | $1,412 |
| **Pricing Change 2 - 2024 Civilian Pay Raise** | - | - | **$6,916** | - | **$6,916** |
| Employment Status Verification | - | - | $2,263 | - | $2,263 |
| Application Processing | - | - | $4,653 | - | $4,653 |
| **Pricing Change 3 - 2023 Civilian Pay Raise Annualization** | - | - | **$1,065** | - | **$1,065** |
| Employment Status Verification | - | - | $557 | - | $557 |
| Application Processing | - | - | $508 | - | $508 |
| **Pricing Change 4 - Capital Security Cost Sharing** | - | - | - | **$265** | **$265** |
| Application Processing | - | - | - | $265 | $265 |
| **Total Pricing Changes** | - | - | **$10,080** | **$265** | **$10,345** |

## Pricing Change 1 – 2025 Civilian Pay Raise:

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and the Annualization of Prior Year Pay Raise, which totals $139.9M.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2025 2.0 percent civilian pay increase. It is calculated by adding Base pay, the FY 2024 Pay Raise and the 2023 Civilian/Military Pay Raise Annualization pricing change, multiplying by the pay rate increase (2.0 percent) and then by three-fourths to account for nine months of the 2025 calendar year.

## Pricing Change 2 – 2024 Civilian Pay Raise:

Base Activity Funding: This pricing change impacts FY 2024 civilian pay funding in Base and Annualizations, which total $133.0M.

Pricing Change Explanation: This pricing change represents the costs of the full FY 2024 5.2 percent civilian pay increase. It is calculated by adding the FY 2023 Enacted Base Pay, Pay base of the Annualization of FY 2023 Enacted Program Changes, and the Annualization of Prior Year Pay Raise pricing change, and multiplying by the pay rate increase (5.2 percent).

CIS – O&S - 7

U.S. Citizenship and Immigration Services

Operations and Support

## Pricing Change 3 – 2023 Civilian Pay Raise Annualization:

Base Activity Funding: This pricing change accounts for the last quarter of civilian pay funding from the FY 2023 Enacted appropriation.

Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2023 4.6 percent civilian pay increase. It is calculated by adding the FY 2022 Enacted Base pay, the pay funding from the FY 2023 Enacted Base pay, and the FY 2023 enacted civilian inflation and multiplying by the pay rate increase (4.6 percent) and then by one-fourth to account for three months of the 2024 calendar year.

## Pricing Change 4 – Capital Security Cost Sharing:

Base Activity Funding: This pricing change represents increased costs to USCIS for staff overseas, which total $0.3M.

Pricing Change Explanation: This Pricing Change reflects increases in the cost of Capital Security Cost Sharing agreements with the Department of State. Currently, IRAD maintains eight (8) international field offices in seven (7) countries with plans to open an additional four (4) offices by the end of FY 2024.[1]

---

[1] For a current list of USCIS international immigration offices, please see: https://www.uscis.gov/about-us/find-a-uscis-office/international-immigration-offices

CIS – O&S - 8

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Justification of Transfers
*(Dollars in Thousands)*

|  | | FY 2025 President's Budget | | | |
| --- | --- | --- | --- | --- | --- |
|  | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Transfer 1 - IRAD Realignment** | - | - | - | - | - |
| Application Processing | (644) | (612) | ($95,534) | ($44,674) | ($140,208) |
| Refugee, Asylum, and International Operations | 644 | 612 | $95,534 | $44,674 | $140,208 |

**Transfer 1 –IRAD Realignment**: Transfers all funding associated with the International and Refugee Affairs Division (IRAD) and related fraud detection, national security, and public safety operations related to these programs to the new proposed RAIO PPA. This will improve USCIS PPA structure by aligning IRAD-related costs to a designated PPA created for the interview and adjudication work specifically performed in those programs and will provide further delineation of USCIS' humanitarian work.

CIS – O&S - 9

003740

U.S. Citizenship and Immigration Services

Operations and Support

# Operations and Support
## Justification of Program Changes
*(Dollars in Thousands)*

| | | | FY 2025 President's Budget | | |
| --- | --- | --- | --- | --- | --- |
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 - FTE and Travel Reduction** | - | **(15)** | **($2,284)** | **($51)** | **($2,335)** |
| Employment Status Verification | - | (15) | ($2,284) | ($51) | ($2,335) |
| **Program Change 2 - IRAD Support Positions** | **29** | **29** | **$4,792** | **-** | **$4,792** |
| Refugee, Asylum, and International Operations | 29 | 29 | $4,792 | - | $4,792 |
| **Program Change 3 - Reduction to Contractual Services** | **-** | **-** | **-** | **($553)** | **($553)** |
| Employment Status Verification | - | - | - | ($553) | ($553) |
| **Total Program Changes** | **29** | **14** | **$2,508** | **($604)** | **$1,904** |

**Program Change 1 – FTE and Travel Reduction:**

| *($ in thousands)* | Pos | FTE | Amount |
| --- | --- | --- | --- |
| Base: Current Services & Transfers | 321 | 302 | $47,073 |
| Program Change | - | (15) | ($2,335) |

**Description**
The FY 2025 Budget includes a decrease of $2.3M and 15 FTE to the E-Verify program based on FY 2023 End-of Year onboard levels and the associated travel cost for those positions.

**Justification**
E-Verify is the service that supports the U.S. economy and employers' ability to hire employees and ensure a legal workforce. In FY 2023, USCIS ended the fiscal year with a staffing level of 259 positions, reducing vacancies by nearly 40 percent. While the program has made significant strides in hiring up to funded levels, capacity for hiring has impacted the program's ability to staff sufficiently. Of the current vacancies, the program has taken workload planning and hiring actions to fill 95 percent, with plans to reach 100 percent fill rate by end of FY 2025. As a result, USCIS has conservatively identified a one-time reduction of FTE and corresponding travel funding in FY 2025.

U.S. Citizenship and Immigration Services | Operations and Support

**Performance**

E-Verify will sustain operation and maintenance (O&M) and will mitigate negative impacts to the program's ability to confirm identities and employment eligibility in a timely manner. Performance metrics will be sustained at existing processing times. E-Verify is taking workload planning and hiring actions to fill 100 percent of vacant positions and implement strategies to reduce the attrition rate. E-Verify will strive to balance its resources to address high priority technical changes and continue to manage the workload associated with the programs growth, to meet the fast-moving immigration policies, and to ensure needed customer service and technical support for the April 2024 deployment of the authorized demonstration project referred to as E-Verify+. Through technology and innovations such as E-Verify+, USCIS anticipates to mitigate the impacts of increasing manual case workloads and customer service inquiries through operating efficiencies.

**Program Change 2 – IRAD Support Positions:**

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 644 | 612 | $140,208 |
| Program Change | 29 | 29 | $4,792 |

**Description**

This program change will increase IRAD's base by 29 positions, 29 FTE, and $4.8M. This change funds 29 IRAD support positions which were previously funded by fee accounts. These positions are already onboard and currently support the IRAD mission under the Fraud Detection and National Security Directorate (FDNS).

**Justification**

The FY 2023 Enactment appropriated funding for IRAD and all IRAD staff. However, 29 positions that directly support IRAD were inadvertently omitted. This change will properly account for all staff directly supporting the interview and adjudication work performed in IRAD.

**Performance**

FDNS supports IRAD by reviewing and investigating, as appropriate, refugee and other case types in IRAD's area of responsibility with fraud, national security, or public safety indicators. FDNS works in partnership with IRAD to bolster program integrity and ensures that adjudicators have the information they need, in the form of an FDNS work product, in order to make an informed final adjudicative decision. With this solution, USCIS will have properly aligned staffing and resources to review and adjudicate case work as intended.

**Operations and Support**

**U.S. Citizenship and Immigration Services**

**Program Change 3 – Reduction to Contractual Services:**

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | - | - | $4,606 |
| Program Change | - | - | ($553) |

**Description**

This program change will decrease E-Verify's non-pay base by $0.6M gained from transitioning E-Verify's telephonic systems.

**Justification**

Prior estimates in non-pay costs included additional maintenance and transition costs associated with the USCIS enterprise Telephony Call Center Solution. USCIS will migrate from its current telephony system to a new enterprise system. As the migration is on schedule, these cost reductions reflect a revised projection for maintaining and operating the new system.

**Performance**

USCIS will continue to service its Verification callers to allow people to interact and transmit voice through its data network into the case management tool. USCIS does not anticipate any negative impacts and will continue to explore additional areas to improve or find operational efficiencies.

**CIS – O&S - 12**

003743

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | | FY 2024 Annualized CR | | | | FY 2025 President's Budget | | | | FY 2024 to FY 2025 Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Employment Status Verification | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $42,958 | $142.25 | 321 | 287 | $44,181 | $153.94 | - | (15) | $1,223 | $11.70 |
| Application Processing | 644 | 612 | $88,961 | $145.36 | 644 | 612 | $88,961 | $145.36 | - | - | - | - | (644) | (612) | ($88,961) | ($145.36) |
| Refugee, Asylum, and International Operations | - | - | | | - | - | | | 673 | 641 | $100,326 | $156.51 | 673 | 641 | $100,326 | $156.51 |
| Total | 965 | 914 | $131,919 | $144.33 | 965 | 914 | $131,919 | $144.33 | 994 | 928 | $144,507 | $155.72 | 29 | 14 | $12,588 | $11.39 |
| | | | | | | | | | | | | | | | | |
| Subtotal Discretionary - Appropriation | 965 | 914 | $131,919 | $144.33 | 965 | 914 | $131,919 | $144.33 | 994 | 928 | $144,507 | $155.72 | 29 | 14 | $12,588 | $11.39 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $100,061 | $100,061 | $105,550 | $5,489 |
| 11.3 Other than Full-time Permanent | $2,244 | $2,244 | $29 | ($2,215) |
| 11.5 Other Personnel Compensation | $5,178 | $5,178 | $5,527 | $349 |
| 12.1 Civilian Personnel Benefits | $24,436 | $24,436 | $33,401 | $8,965 |
| **Total - Personnel Compensation and Benefits** | **$131,919** | **$131,919** | **$144,507** | **$12,588** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 965 | 965 | 994 | 29 |
| FTE - Civilian | 914 | 914 | 928 | 14 |

003744

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Permanent Positions by Grade – Appropriation
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| SES | 1 | 1 | 3 | 2 |
| GS-15 | 22 | 22 | 31 | 9 |
| GS-14 | 178 | 178 | 235 | 57 |
| GS-13 | 181 | 181 | 184 | 3 |
| GS-12 | 437 | 437 | 384 | (53) |
| GS-11 | 29 | 29 | 43 | 14 |
| GS-10 | 4 | 4 | 6 | 2 |
| GS-9 | 48 | 48 | 104 | 56 |
| GS-8 | 5 | 5 | - | (5) |
| GS-7 | 39 | 39 | 3 | (36) |
| GS-6 | 7 | 7 | - | (7) |
| GS-5 | 13 | 13 | 1 | (12) |
| GS-4 | 1 | 1 | - | (1) |
| **Total Permanent Positions** | **965** | **965** | **994** | **29** |
| Total Perm. Employment (Filled Positions) EOY | 965 | 965 | 994 | 29 |
| **Position Locations** | | | | |
| Headquarters Civilian | 52 | 52 | 52 | - |
| U.S. Field Civilian | 895 | 895 | 924 | 29 |
| Foreign Field Civilian | 18 | 18 | 18 | - |
| **Averages** | | | | |
| Average Personnel Costs, ES Positions | $250,697 | $250,697 | $269,007 | $18,310 |
| Average Personnel Costs, GS Positions | $127,805 | $127,805 | $137,140 | $9,335 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

CIS – O&S - 14

003745

U.S. Citizenship and Immigration Services

Operations and Support

## Operations and Support
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Employment Status Verification | $66,653 | $66,653 | $66,049 | ($604) |
| Application Processing | $44,409 | $44,409 | - | ($44,409) |
| Refugee, Asylum, and International Operations | - | - | $44,674 | $44,674 |
| **Total** | **$111,062** | **$111,062** | **$110,723** | **($339)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $111,062 | $111,062 | $110,723 | ($339) |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $29,228 | $29,228 | $21,396 | ($7,832) |
| 22.0 Transportation of Things | $670 | $670 | $734 | $64 |
| 23.1 Rental Payments to GSA | $9,222 | $9,222 | $5,809 | ($3,413) |
| 23.2 Rental Payments to Others | $2,944 | $2,944 | $547 | ($2,397) |
| 23.3 Communications, Utilities, & Miscellaneous | - | - | $144 | $144 |
| 24.0 Printing and Reproduction | $139 | $139 | $26 | ($113) |
| 25.1 Advisory & Assistance Services | $11,712 | $11,712 | $30,616 | $18,904 |
| 25.2 Other Services from Non-Federal Sources | $208 | $208 | $384 | $176 |
| 25.3 Other Purchases of goods and services | $11,791 | $11,791 | $11,812 | $21 |
| 25.4 Operations & Maintenance of Facilities | $258 | $258 | $40 | ($218) |
| 25.7 Operation & Maintenance of Equipment | $44,283 | $44,283 | $6,032 | ($38,251) |
| 26.0 Supplies & Materials | $268 | $268 | $493 | $225 |
| 31.0 Equipment | $339 | $339 | $32,679 | $32,340 |
| 41.0 Grants, Subsidies, and Contributions | - | - | $11 | $11 |
| **Total - Non Pay Budget Object Class** | **$111,062** | **$111,062** | **$110,723** | **($339)** |

003746

## Employment Status Verification – PPA

Employment Status Verification – PPA

### Budget Comparison and Adjustments

## Comparison of Budget Authority and Request

*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Employment Status Verification | 321 | 302 | $109,611 | 321 | 302 | $109,611 | 321 | 287 | $110,230 | - | (15) | $619 |
| **Total** | 321 | 302 | $109,611 | 321 | 302 | $109,611 | 321 | 287 | $110,230 | - | (15) | $619 |
| Subtotal Discretionary - Appropriation | 321 | 302 | $109,611 | 321 | 302 | $109,611 | 321 | 287 | $110,230 | - | (15) | $619 |

### PPA Level I Description

The ESV PPA provides funds for the operations, mission support, and associated management and administration costs of E-Verify. E-Verify is authorized by the *Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)* and is administered by SSA and USCIS. USCIS facilitates compliance with U.S. immigration law by providing E-Verify program support, user support, training, outreach, compliance, and developing innovative technological solutions to streamline employment eligibility verification.

In the E-Verify process, employers create cases based on information from an employee's Form I-9, Employment Eligibility Verification, which is electronically compared to records available in DHS, SSA, DoS, and DMVs. The employer usually receives a response within a few seconds either confirming the employee's employment eligibility or indicating that the employee needs to take further action to complete the case due to a data mismatch, between what was provided on the Form I-9 and what the government has in its records. Cases that cannot be resolved automatically are manually resolved by E-Verify or SSA employees.

This PPA also funds USCIS's E-Verify Account Compliance and Engagement Branch, which protects E-Verify against system misuse through activities such as identifying and resolving compliance issues, notifying employers of noncompliant behaviors, and offering compliance assistance in the form of emails, phone calls, desk reviews, and site visits. USCIS conducts these monitoring and compliance activities to prevent misuse, abuse, discrimination, breach of privacy, and suspected fraudulent use of E-Verify under applicable laws, rules, regulations, and agency policies.

As of September 30, 2023, there are 1,178,000 employers enrolled in E-Verify; of those enrolled, approximately 321,000 actively used E-Verify and ran over 45.6 million queries in FY 2023. Approximately 2,600 new employers enroll in E-Verify per week.

**Operations and Support**

**Employment Status Verification – PPA**

The following table depicts the actual E-Verify workload for FY 2023 and projections for FY 2024 and FY 2025 Budget:

| E-Verify Actual and Projected Workload for FY 2023- FY 2025 | | | | |
|---|---|---|---|---|
| **Activity** | **FY 2023 Actuals** | **FY 2024 Projection** | **FY 2025 Projection** | **Change from FYs 2024-2025** |
| **E-Verify** | | | | |
| E-Verify Cases | 45,600,000 | 46,600,000 | 49,100,000 | 2,500,000 |
| E-Verify cases requiring secondary review by staff | 406,300 | 440,000 | 470,000 | 30,000 |
| E-Verify cases requiring additional review by staff | 56,200 | 59,400 | 62,900 | 3,500 |
| Enrolled Employers (Cumulative) | 1,181,000 | 1,270,000 | 1,370,000 | 100,000 |
| **Account Compliance** | | | | |
| Emails | 347,055 | 382,000 | 422,000 | 40,000 |
| Compliance Calls | 7,668 | 7,700 | 8,700 | 1,000 |
| Desk Reviews | 396 | 425 | 475 | 50 |
| Site Visits | - | - | 20 | 20 |
| Case Reviews | 2,506 | 2,600 | 3,100 | 500 |
| Webinars | 213 | 469 | 471 | 2 |
| **Total Employer Actions** | **357,838** | **393,194** | **434,766** | **41,572** |

**CIS – O&S - 17**

003748

**Operations and Support**

**Employment Status Verification – PPA**

| E-Verify Actual and Projected External Actions from FY 2023 – FY 2025 | | | | |
|---|---|---|---|---|
| **External Actions** | **FY 2023 Actuals** | **FY 2024 Projection** | **FY 2025 Projection** | **Change from FY 2024-2025** |
| Referrals to Immigration and Customs Enforcement (Fraud) | 46 | 75 | 100 | 25 |
| Referrals to Department of Justice (Discrimination) | 595 | 500 | 600 | 100 |
| Law Enforcement Requests (LERs) – IER, ICE, Other Agencies | 208 | 235 | 260 | 25 |
| Referrals from DOJ (IMARR) | - | - | - | - |
| Locked Social Security Numbers (SSNs) | 2,539 | 3,500 | 4,400 | 900 |
| **Total External Activity** | **3,388** | **4,310** | **5,360** | **1,050** |

**CIS – O&S - 18**

003749

Operations and Support

Employment Status Verification – PPA

# Employment Status Verification – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | $109,611 | $109,611 | $110,230 |
| Carryover - Start of Year | - | - | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | $109,611 | $109,611 | $110,230 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $109,611 | $109,611 | $110,230 |
| Obligations (Actual/Estimates/Projections) | $107,008 | $109,611 | $110,230 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 321 | 321 | 321 |
| Enacted/Request FTE | 302 | 302 | 287 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 259 | 321 | 321 |
| FTE (Actual/Estimates/Projections) | 248 | 302 | 287 |

CIS – O&S - 19

003750

Operations and Support

Employment Status Verification – PPA

# Employment Status Verification – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2023 Enacted** | 321 | 302 | $42,958 | $66,653 | $109,611 |
| **FY 2024 Annualized CR** | 321 | 302 | $42,958 | $66,653 | $109,611 |
| **FY 2025 Base Budget** | 321 | 302 | $42,958 | $66,653 | $109,611 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| 2025 Civilian Pay Raise | - | - | $687 | - | $687 |
| 2024 Civilian Pay Raise | - | - | $2,263 | - | $2,263 |
| 2023 Civilian Pay Raise Annualization | - | - | $557 | - | $557 |
| **Total Pricing Changes** | - | - | $3,507 | - | $3,507 |
| **Total Adjustments-to-Base** | - | - | $3,507 | - | $3,507 |
| **FY 2025 Current Services** | 321 | 302 | $46,465 | $66,653 | $113,118 |
| **Total Transfers** | - | - | - | - | - |
| FTE and Travel Reduction | - | (15) | ($2,284) | ($51) | ($2,335) |
| Reduction to Contractual Services | - | - | - | ($553) | ($553) |
| **Total Program Changes** | - | (15) | ($2,284) | ($604) | ($2,888) |
| **FY 2025 Request** | 321 | 287 | $44,181 | $66,049 | $110,230 |
| **FY 2024 TO FY 2025 Change** | - | (15) | $1,223 | ($604) | $619 |

003751

Operations and Support

Employment Status Verification – PPA

## Employment Status Verification-PPA
### Personnel Compensation and Benefits

**Pay Summary**
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total | | | FY 2024 to FY 2025 Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Employment Status Verification | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $42,958 | $142.25 | 321 | 287 | $44,181 | $153.94 | - | (15) | $1,223 | $11.70 |
| **Total** | **321** | **302** | **$42,958** | **$142.25** | **321** | **302** | **$42,958** | **$142.25** | **321** | **287** | **$44,181** | **$153.94** | **-** | **(15)** | **$1,223** | **$11.70** |
| | | | | | | | | | | | | | | | | |
| Subtotal Discretionary - Appropriation | 321 | 302 | $42,958 | $142.25 | 321 | 302 | $42,958 | $142.25 | 321 | 287 | $44,181 | $153.94 | - | (15) | $1,223 | $11.70 |

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $31,034 | $31,034 | $31,282 | $248 |
| 11.5 Other Personnel Compensation | $564 | $564 | $609 | $45 |
| 12.1 Civilian Personnel Benefits | $11,360 | $11,360 | $12,290 | $930 |
| **Total - Personnel Compensation and Benefits** | **$42,958** | **$42,958** | **$44,181** | **$1,223** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 321 | 321 | 321 | - |
| FTE - Civilian | 302 | 302 | 287 | (15) |

**CIS – O&S - 21**

003752

**Operations and Support**

**Employment Status Verification – PPA**

## Pay Cost Drivers

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Other Personnel Costs | 302 | $42,958 | $142.25 | 302 | $42,958 | $142.25 | 287 | $44,181 | $153.94 | (15) | $1,223 | $11.70 |
| Total - Pay Cost Drivers | 302 | $42,958 | $142.25 | 302 | $42,958 | $142.25 | 287 | $44,181 | $153.94 | (15) | $1,223 | $11.70 |

**Explanation of Pay Cost Driver**

**Other Personnel:** Funds for personnel that support the operations, mission support, associated management, and administration of E-Verify. Changes to this cost driver in the budget reflect an overall increase due to the annualization of prior year pay raises and FY 2025 pay raise, despite a one-time reduction of FTE as USCIS reduces vacancies.

**CIS – O&S - 22**

**Operations and Support**

# Employment Status Verification – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Employment Status Verification | $66,653 | $66,653 | $66,049 | ($604) |
| **Total** | **$66,653** | **$66,653** | **$66,049** | **($604)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $66,653 | $66,653 | $66,049 | ($604) |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $428 | $428 | $220 | ($208) |
| 23.1 Rental Payments to GSA | $6,078 | $6,078 | $4,159 | ($1,919) |
| 23.2 Rental Payments to Others | $2,944 | $2,944 | - | ($2,944) |
| 24.0 Printing and Reproduction | $139 | $139 | $10 | ($129) |
| 25.1 Advisory & Assistance Services | $4,606 | $4,606 | $12,425 | $7,819 |
| 25.2 Other Services from Non-Federal Sources | $208 | $208 | $364 | $156 |
| 25.3 Other Purchases of goods and services | $7,179 | $7,179 | $11,115 | $3,936 |
| 25.4 Operations & Maintenance of Facilities | $258 | $258 | $40 | ($218) |
| 25.7 Operation & Maintenance of Equipment | $44,283 | $44,283 | $5,778 | ($38,505) |
| 26.0 Supplies & Materials | $191 | $191 | $51 | ($140) |
| 31.0 Equipment | $339 | $339 | $31,887 | $31,548 |
| **Total - Non Pay Budget Object Class** | **$66,653** | **$66,653** | **$66,049** | **($604)** |

Employment Status Verification – PPA

CIS – O&S - 23

003754

**Operations and Support**

**Employment Status Verification – PPA**

## Non Pay Cost Drivers

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Verification Information System (VIS) Development and Operations | $41,942 | $41,942 | $32,691 | ($9,251) |
| Social Security Administration Reimbursement and Technology Enhancements | $7,179 | $7,179 | $11,115 | $3,936 |
| Rental Payments to General Services Administration (GSA) | $2,340 | $2,340 | $4,159 | $1,819 |
| Telephony - Contact Center | $6,078 | $6,078 | $1,447 | ($4,631) |
| Other Costs | $9,114 | $9,114 | $16,637 | $7,523 |
| **Total - Non-Pay Cost Drivers** | **$66,653** | **$66,653** | **$66,049** | **($604)** |

## Explanation of Non-Pay Cost Drivers

**Verification Information System (VIS) Development and Operations (Formerly VIS O&M) – Sustainment of System:** Cost includes day-to-day operations and application maintenance. This includes teams to provide development, security, and operations (DevSecOps) services to support United States Citizenship and Immigration Services (USCIS) Information Technology (IT) system delivery. The teams perform operations and maintenance activities and modernizing complex, legacy, large-scale, Internet-facing websites, and IT systems in a cloud environment using forward-thinking, modern, open-source technologies and backend systems with heavy customer engagement. This contract is critical for continuing to improve E-Verify by providing the resources for the E-Verify Next Gen project and integration to USCIS's person centric identity services (PCIS). The Verification Division (VER) is currently on two sole source limited contracts that cover this scope work; however, it's anticipated that a new contract will be awarded that may result in efficiencies.

**Social Security Administration Reimbursements and Technology Enhancements:** The SSA reimbursable agreement is in support of the E-Verify program. It supports the Administration's Immigration enforcement initiatives. Under E-Verify, registered employers verify the employment eligibility of newly hired employees by entering employee data into an online system that accesses SSA and DHS databases. SSA performs work for DHS USCIS' E-Verify program to resolve mismatched cases. An increase is anticipated as the number of transactions that SSA is processing on behalf of E-Verify has increased since the reopening of SSA offices.

**Rental Payments to General Services Administration (GSA):** Rental Payments to GSA for USCIS facilities space. The FY 2025 amount is based on overhead guidance that estimates an increase in the of USCIS GSA rent cost.

**CIS – O&S - 24**

003755

Operations and Support                                              **Employment Status Verification – PPA**

**Telephony – Contact Center:** This cost driver funds the USCIS enterprise Telephony Call Center Solution to service its Verification callers. It uses technology that allows people to interact and transmit voice over a data network. Callers can speak their information and the interactive voice recognition (IVR) capability transmits it into a case management tool, Salesforce, used by the Verification call representatives. In FY 2024 USCIS will migrate from its current telephony system to a new enterprise system. Prior FY costs included maintaining both systems and the associated transition costs. As the migration is on schedule, these costs reflect a revised projection for maintaining and operating the new system.

**Other Costs:** Funds the remaining costs for the general operating expenses, technical contract support, outreach, and associated management and administration of E-Verify. This cost driver includes IT and non-IT costs to include Amazon Web Services (AWS), cost estimating support, various software/hardware purchases, and operational testing and evaluation. AWS demand consumption cost is estimated to rise as the organization moves to more cloud-based applications.

**CIS – O&S - 25**

003756

Operations and Support

*Application Processing – PPA*

Application Processing – PPA

## Budget Comparison and Adjustments

### Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Application Processing | 644 | 612 | $133,370 | 644 | 612 | $133,370 | - | - | - | (644) | (612) | ($133,370) |
| Total | 644 | 612 | $133,370 | 644 | 612 | $133,370 | - | - | - | (644) | (612) | ($133,370) |
| Subtotal Discretionary - Appropriation | 644 | 612 | $133,370 | 644 | 612 | $133,370 | - | - | - | (644) | (612) | ($133,370) |

**PPA Level I Description**

The Application Processing PPA provided funding for contract costs for case file management; funds for provisioning equipment to support increased video interviewing, additional IT equipment and supply purchases, increased travel, and onboarding and training expenses necessary as USCIS moves forward with implementing its International and Refugee Affairs Directorate (IRAD) program. The activities within this PPA are being realigned to the Refugee, Asylum and International Operations PPA.

Operations and Support

## Application Processing – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | **$133,370** | **$133,370** | - |
| Carryover - Start of Year | $47,914 | - | - |
| Recoveries | $99 | - | - |
| Rescissions to Current Year/Budget Year | ($35,958) | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | $3,208 | - | - |
| Supplementals | - | $755,000 | - |
| **Total Budget Authority** | **$148,633** | **$888,370** | - |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$148,633** | **$888,370** | - |
| Obligations (Actual/Estimates/Projections) | $145,951 | $888,370 | - |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 644 | 644 | - |
| Enacted/Request FTE | 612 | 612 | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 554 | 644 | - |
| FTE (Actual/Estimates/Projections) | 549 | 612 | - |

003758

Operations and Support

Application Processing – PPA

## Application Processing – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2023 Enacted** | **644** | **612** | **$88,961** | **$44,409** | **$133,370** |
| **FY 2024 Annualized CR** | **644** | **612** | **$88,961** | **$44,409** | **$133,370** |
| **FY 2025 Base Budget** | **644** | **612** | **$88,961** | **$44,409** | **$133,370** |
| **Total Technical Changes** | **-** | **-** | **-** | **-** | **-** |
| **Total Annualizations and Non-Recurs** | **-** | **-** | **-** | **-** | **-** |
| 2025 Civilian Pay Raise | - | - | $1,412 | - | $1,412 |
| 2024 Civilian Pay Raise | - | - | $4,653 | - | $4,653 |
| 2023 Civilian Pay Raise Annualization | - | - | $508 | - | $508 |
| Capital Security Cost Sharing | - | - | - | $265 | $265 |
| **Total Pricing Changes** | **-** | **-** | **$6,573** | **$265** | **$6,838** |
| **Total Adjustments-to-Base** | **-** | **-** | **$6,573** | **$265** | **$6,838** |
| **FY 2025 Current Services** | **644** | **612** | **$95,534** | **$44,674** | **$140,208** |
| IRAD Realignment | (644) | (612) | ($95,534) | ($44,674) | ($140,208) |
| **Total Transfers** | **(644)** | **(612)** | **($95,534)** | **($44,674)** | **($140,208)** |
| **Total Program Changes** | **-** | **-** | **-** | **-** | **-** |
| **FY 2025 Request** | **-** | **-** | **-** | **-** | **-** |
| **FY 2024 TO FY 2025 Change** | **(644)** | **(612)** | **($88,961)** | **($44,409)** | **($133,370)** |

003759

Operations and Support

Application Processing – PPA

# Application Processing Verification-PPA
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total | | |
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Application Processing | 644 | 612 | $88,961 | $145.36 | 644 | 612 | $88,961 | $145.36 | - | - | - | - | (644) | (612) | ($88,961) | ($145.36) |
| Total | 644 | 612 | $88,961 | $145.36 | 644 | 612 | $88,961 | $145.36 | - | - | - | - | (644) | (612) | ($88,961) | ($145.36) |
| | | | | | | | | | | | | | | | | |
| Subtotal Discretionary - Appropriation | 644 | 612 | $88,961 | $145.36 | 644 | 612 | $88,961 | $145.36 | - | - | - | - | (644) | (612) | ($88,961) | ($145.36) |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $69,027 | $69,027 | - | ($69,027) |
| 11.3 Other than Full-time Permanent | $2,244 | $2,244 | - | ($2,244) |
| 11.5 Other Personnel Compensation | $4,614 | $4,614 | - | ($4,614) |
| 12.1 Civilian Personnel Benefits | $13,076 | $13,076 | - | ($13,076) |
| **Total - Personnel Compensation and Benefits** | **$88,961** | **$88,961** | **-** | **($88,961)** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 644 | 644 | - | (644) |
| FTE - Civilian | 612 | 612 | - | (612) |

CIS – O&S - 29

003760

Operations and Support

Application Processing – PPA

## Pay Cost Drivers

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 75 | $12,378 | $165.04 | 75 | $12,378 | $165.04 | - | | - | (75) | ($12,378) | ($165.04) |
| Refugee Officer | 465 | $65,629 | $141.14 | 465 | $65,629 | $141.14 | - | | - | (465) | ($65,629) | ($141.14) |
| Adjudication Officer | 14 | $2,249 | $160.64 | 14 | $2,249 | $160.64 | - | | - | (14) | ($2,249) | ($160.64) |
| Other Personnel Costs | 58 | $8,705 | $150.09 | 58 | $8,705 | $150.09 | - | | - | (58) | ($8,705) | ($150.09) |
| Total - Pay Cost Drivers | 612 | $88,961 | $145.36 | 612 | $88,961 | $145.36 | - | | - | (612) | ($88,961) | ($145.36) |

### Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds the salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. These positions supplement the other positions currently adjudicating immigration benefits that are funded by the fee accounts. Changes to this cost driver reflect a net decrease of the annualization of prior year pay raise, FY 2025 pay raise, and the shift of IRAD to the RAIO PPA.

**Refugee Officer:** This cost driver funds the salaries and benefits of USCIS Refugee Officers. Refugee Officers establish identity and make findings of eligibility for refugee and related benefits by analyzing facts, identifying, and examining documents for authenticity, and researching and analyzing appropriate information, law, and country conditions. Changes to this cost driver in the budget reflect the net decrease of the annualization of prior year pay raise, the FY 2025 pay raise, and the shift of IRAD to the RAIO PPA.

**Adjudication Officer:** This cost driver funds the salaries and benefits of USCIS Adjudication Officers. Adjudication Officers review applications for immigration benefits and make decisions regarding these requests based on their extensive knowledge of immigration laws and practices. These positions supplement the other positions currently adjudicating immigration benefits that are funded by the fee accounts. Changes to this cost driver in the budget reflect a net decrease of the annualization of prior year pay raise, the FY 2025 pay raise, and the shift of IRAD to the RAIO PPA.

**Other Personnel Costs:** Funds for personnel that support the operations, mission support, associated management, and administration of Application Processing. Changes to this cost driver reflect a net decrease of the annualization of prior year pay raise, FY 2025 pay raise, and the shift of IRAD to the RAIO PPA.

003761

Operations and Support

Application Processing – PPA

## Application Processing – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Application Processing | $44,409 | $44,409 | - | ($44,409) |
| **Total** | **$44,409** | **$44,409** | **-** | **($44,409)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $44,409 | $44,409 | - | ($44,409) |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $28,800 | $28,800 | - | ($28,800) |
| 22.0 Transportation of Things | $670 | $670 | - | ($670) |
| 23.1 Rental Payments to GSA | $3,144 | $3,144 | - | ($3,144) |
| 25.1 Advisory & Assistance Services | $7,106 | $7,106 | - | ($7,106) |
| 25.3 Other Purchases of goods and services | $4,612 | $4,612 | - | ($4,612) |
| 26.0 Supplies & Materials | $77 | $77 | - | ($77) |
| **Total - Non Pay Budget Object Class** | **$44,409** | **$44,409** | **-** | **($44,409)** |

CIS – O&S - 31

003762

Operations and Support

Application Processing – PPA

## Non Pay Cost Drivers

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| IRAD Travel | $28,800 | $28,800 | - | ($28,800) |
| Other IRAD Costs | $15,609 | $15,609 | - | ($15,609) |
| Total - Non-Pay Cost Drivers | $44,409 | $44,409 | - | ($44,409) |

### Explanation of Non-Pay Cost Drivers

**IRAD Travel:** All costs associated with travel and circuit rides in support of refugee interviews to various locations in Africa, Asia, Latin America/Caribbean, Middle East, and Europe are determined in consultation with the DoS. The decrease is a result of the shift of IRAD to the RAIO PPA.

**Other IRAD Costs:** This cost driver will support administrative support services contracts for field and headquarters organizational units, medical examinations, required training, parole programs, international offices and deployment of associated personnel, International Cooperative Administrative Support Services, and Capital Security Cost Sharing. For administrative support service contracts, this includes contracts with the International Organization for Migration (IOM) (or the most cost-effective and secure service provider) for local travel needs where infrastructure does not support transportation of officers to refugee centers and travel facilitation for individuals denied refugee status but granted parole under the Central American Minor Refugee and Parole Program, and additional service contracts that may be necessary for operations such as interpreters, services, and equipment to support staffing periods of high-volume protections screenings for at-sea interdictions below the level of a Presidentially-declared mass migration event (e.g., support for operations at the Guantanamo Bay Naval Base in Cuba), and medical examinations for employees traveling abroad. All Worldwide Refugee Officers and staff deployed on international rotations must maintain medical clearances, and the medical services have been required to comply with COVID mitigation measures. For USCIS refugee officers, it is required that all attend the RAIO Directorate Officer Training Program. The decrease is a result of the shift of IRAD to the RAIO PPA.

003763

Operations and Support

Refugee, Asylum and International Operations – PPA

### Refugee, Asylum and International Operation – PPA

## Budget Comparison and Adjustments

### Comparison of Budget Authority and Request

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Refugee, Asylum, and International Operations | - | - | - | - | - | - | 673 | 641 | $145,000 | 673 | 641 | $145,000 |
| **Total** | **-** | **-** | **-** | **-** | **-** | **-** | **673** | **641** | **$145,000** | **673** | **641** | **$145,000** |
| Subtotal Discretionary - Appropriation | - | - | - | - | - | - | 673 | 641 | $145,000 | 673 | 641 | $145,000 |

## PPA Level I Description

The Refugee, Asylum and International Operations Directorate (RAIO) is responsible for adjudicating asylum and refugee status applications for individuals seeking protection from persecution, as well as other humanitarian benefits and services.

This PPA also provides funding to support RAIO's International and Refugee Affairs Division (IRAD) operations. IRAD administers the U.S. Refugee Admissions Program (USRAP), along with the other USRAP partners; oversees USCIS international operations; and manages adjudication of certain international and domestic parole requests. With regard to refugee processing, IRAD is responsible for interviewing and vetting refugee applicants identified by DoS for possible resettlement to the United States. This PPA supports ongoing efforts to create the next generation of refugee processing in an electronic and secure environment; maximizes remote technologies as appropriate; provides timely and in-depth training to adjudicators; and meets the ever-changing demands of shifting populations of vulnerable refugee populations worldwide. IRAD is also responsible for conducting protection screenings for certain migrants interdicted at sea, which is done by specially trained refugee officers either in-person on U.S. Coast Guard cutters or remotely.

003764

**Operations and Support**                    **Refugee, Asylum and International Operations – PPA**

Regarding parole, IRAD is responsible for the administration of the Secretary of Homeland Security's exercise of authority to grant parole on a case-by-case basis to certain individuals outside the United States for urgent humanitarian or significant public benefit reasons, including special parole programs or populations at particular risk as authorized by the Administration's priorities. This authority is generally carried out through domestic adjudication, although adjudication of certain special parole program applications requires front-end processing by other USCIS components followed by final adjudication after interviews in international locations or streamlined parole processing handled outside of IRAD. In addition, IRAD manages USCIS' permanent international presence and its expected footprint expansion, where it is most cost effective and efficient to do so, in support of Administration priorities related to refugee, parole, and other USCIS international programs and benefits or requests. USCIS international offices adjudicate following-to-join relative petitions for asylee and refugee family members located outside of the United States; verify the authenticity of evidence submitted in support of immigration benefit applications and petitions; share the workload to interview and vet refugee applicants; and staff administration of certain international special parole programs. In addition, this PPA funds critical support of fraud detection, national security, and public safety issues across all IRAD operations.

003765

Operations and Support

Refugee, Asylum and International Operations – PPA

# Refuge, Asylum and International Operations – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | - | - | **$145,000** |
| Carryover - Start of Year | - | - | - |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | - | - | **$145,000** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | - | - | **$145,000** |
| Obligations (Actual/Estimates/Projections) | - | - | $145,000 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | 673 |
| Enacted/Request FTE | - | - | 641 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | - | 673 |
| FTE (Actual/Estimates/Projections) | - | - | 641 |

003766

Operations and Support

Refugee, Asylum and International Operations – PPA

## Refuge, Asylum and International Operations – PPA
### Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2023 Enacted** | - | - | - | - | - |
| **FY 2024 Annualized CR** | - | - | - | - | - |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| **Total Pricing Changes** | - | - | - | - | - |
| **Total Adjustments-to-Base** | - | - | - | - | - |
| **FY 2025 Current Services** | - | - | - | - | - |
| IRAD Realignment | 644 | 612 | $95,534 | $44,674 | $140,208 |
| **Total Transfers** | 644 | 612 | $95,534 | $44,674 | $140,208 |
| IRAD Support Positions | 29 | 29 | $4,792 | | $4,792 |
| **Total Program Changes** | 29 | 29 | $4,792 | - | $4,792 |
| **FY 2025 Request** | 673 | 641 | $100,326 | $44,674 | $145,000 |
| **FY 2024 TO FY 2025 Change** | 673 | 641 | $100,326 | $44,674 | $145,000 |

003767

Operations and Support

Refuge, Asylum and International Operations – PPA

# Refuge, Asylum and International Operations – PPA
## Personnel Compensation and Benefits

### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Refuge, Asylum, and International Operations | - | - | - | - | - | - | - | - | 673 | 641 | $100,326 | $156.51 | 673 | 641 | $100,326 | $156.51 |
| **Total** | - | - | - | - | - | - | - | - | 673 | 641 | $100,326 | $156.51 | 673 | 641 | $100,326 | $156.51 |
| Subtotal Discretionary - Appropriation | - | - | - | - | - | - | - | - | 673 | 641 | $100,326 | $156.51 | 673 | 641 | $100,326 | $156.51 |

### Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 11.1 Full-time Permanent | - | - | $74,268 | $74,268 |
| 11.3 Other than Full-time Permanent | - | - | $29 | $29 |
| 11.5 Other Personnel Compensation | - | - | $4,918 | $4,918 |
| 12.1 Civilian Personnel Benefits | - | - | $21,111 | $21,111 |
| **Total - Personnel Compensation and Benefits** | - | - | **$100,326** | **$100,326** |
| **Positions and FTE** | | | | |
| Positions - Civilian | - | - | 673 | 673 |
| FTE - Civilian | - | - | 641 | 641 |

003768

**Operations and Support**                                                                 **Refugee, Asylum and International Operations – PPA**

## Pay Cost Drivers

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Refugee Officer | - | - | - | - | - | - | 382 | $59,285 | $155.20 | 382 | $59,285 | $155.20 |
| Fraud Detection and National Security (FDNS) Officer | - | - | - | - | - | - | 47 | $8,042 | $171.11 | 47 | $8,042 | $171.11 |
| International Officer | - | - | - | - | - | - | 29 | $4,630 | $159.66 | 29 | $4,630 | $159.66 |
| Adjudication Officer | - | - | - | - | - | - | 15 | $2,373 | $158.20 | 15 | $2,373 | $158.20 |
| Other Personnel Costs | - | - | - | - | - | - | 168 | $25,996 | $154.74 | 168 | $25,996 | $154.74 |
| Total - Pay Cost Drivers | - | - | - | - | - | - | 641 | $100,326 | $156.51 | 641 | $100,326 | $156.51 |

## Explanation of Pay Cost Drivers

**Refugee Officer:** USCIS Refugee Officers establish identity, conduct interviews, and make findings of eligibility for refugee and related benefits by applying complex laws, regulations, and procedures to the facts through examination and assessment of the weight and credibility of evidence, research and analysis of country conditions, and detection and prevention of fraud, national security, and public safety concerns. Refugee Officers also conduct protection screenings of migrants interdicted at sea. This cost driver rolls up the core refugee adjudications positions, including Refugee Officers (GS-9/11/12), Senior Refugee Officers (GS-13), and first-line Supervisory Refugee Officers (GS-13/14). Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise and the FY 2025 pay raise, and the shift of IRAD funds from the Application Processing PPA to the RAIO PPA.

**Fraud Detection and National Security (FDNS) Officer:** USCIS FDNS Officers are dedicated to supporting the operations in this PPA through detection, deterrence, and administrative investigations of immigration-related fraud, identification, review, and vetting of cases involving national security concerns, developing and implementing efficient vetting policies and procedures, and serving as USCIS's primary conduit for information sharing and collaboration with the law enforcement and intelligence communities.

**International Officer:** USCIS International Officers are deployed to international field offices for tours of one to four years. International Officers play a critical role in adjudication and processing a wide variety of immigration benefit applications, including refugee status, asylee/refugee family petitions, and applications for family reunification parole; supporting the U.S. Refugee Affairs Program (USRAP); exercising vigilance in matters involving fraud detection and national security; sustaining effective intergovernmental relationships; providing information services to the public, foreign governments, and U.S. interagency colleagues; and advancing USCIS strategic priorities. This cost driver rolls up International Adjudication Officers (GS-13) and International Field Office Directors (GS-14). Salaries and benefits for internationally-deployed staff are subject to the Department of State Standardized Regulations (DSSR) and Federal Travel Regulations (FTR) and include items such as transfer-related expenses to relocate the employee and eligible family members, housing, education, and post-specific benefits and allowances such as danger pay, post differential, and travel allowances. Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise, the FY 2025 pay raise, and the shift of IRAD funds from the Application Processing PPA to the RAIO PPA.

**Operations and Support**                                                  Refugee, Asylum and International Operations – PPA

**Adjudication Officer:** USCIS Adjudications Officers review and make decisions on humanitarian parole and related applications by applying complex laws, regulations, and procedures to the facts through examination and assessment of the weight and credibility of evidence, research and analysis of country conditions, and detection and prevention of fraud, national security, and public safety concerns. This cost driver rolls up the core parole adjudications positions, including Parole Adjudication Officers (GS-9/11/12), Senior Adjudication Officers (GS-13), and first-line Supervisory Adjudication Officers (GS-14). Changes to this cost driver in the budget reflect an increase due to the annualization of prior year pay raise, the FY 2025 pay raise, and the shift of IRAD funds from the Application Processing PPA to the RAIO PPA.

**Other Personnel Costs:** This group includes positions such as leadership, management (second-line and above), supervisors, and other staff (e.g., Headquarters Officers) who generally do not adjudicate, but support adjudications through functions such as training, policy and planning, resource management, technology innovations, oversight, logistical support, and external communication, liaison, and representation. This cost driver also includes non-officer leadership, operations and mission support, analysis, administration, and related supervisory and management positions. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, FY 2025 pay raise, and the shift of IRAD funds from the Application Processing PPA to the RAIO PPA.

003770

**Operations and Support**

Refuge, Asylum and International Operations – PPA

## Refuge, Asylum and International Operations – PPA
### Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Refugee, Asylum, and International Operations | - | - | $44,674 | $44,674 |
| **Total** | - | - | **$44,674** | **$44,674** |
| | | | | |
| Subtotal Discretionary - Appropriation | - | - | $44,674 | $44,674 |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | - | - | $21,176 | $21,176 |
| 22.0 Transportation of Things | - | - | $734 | $734 |
| 23.1 Rental Payments to GSA | - | - | $1,650 | $1,650 |
| 23.2 Rental Payments to Others | - | - | $547 | $547 |
| 23.3 Communications, Utilities, & Miscellaneous | - | - | $144 | $144 |
| 24.0 Printing and Reproduction | - | - | $16 | $16 |
| 25.1 Advisory & Assistance Services | - | - | $18,191 | $18,191 |
| 25.2 Other Services from Non-Federal Sources | - | - | $20 | $20 |
| 25.3 Other Purchases of goods and services | - | - | $697 | $697 |
| 25.7 Operation & Maintenance of Equipment | - | - | $254 | $254 |
| 26.0 Supplies & Materials | - | - | $442 | $442 |
| 31.0 Equipment | - | - | $792 | $792 |
| 41.0 Grants, Subsidies, and Contributions | - | - | $11 | $11 |
| **Total - Non Pay Budget Object Class** | - | - | **$44,674** | **$44,674** |

**Operations and Support**

Refugee, Asylum and International Operations – PPA

## Non Pay Cost Drivers

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Other IRAD Costs | - | - | $23,498 | $23,498 |
| IRAD Travel | - | - | $21,176 | $21,176 |
| **Total - Non-Pay Cost Drivers** | **-** | **-** | **$44,674** | **$44,674** |

## Explanation of Non-Pay Cost Drivers

**Other IRAD Costs:** This cost driver supports non-travel, non-payroll general expense costs (rents, communications, utilities, equipment, shipping, supplies, printing etc.) in support of refugee, parole, and international office operations. This includes administrative support service contract(s); contracts with the International Organization for Migration (IOM) (or the most cost-effective and secure service provider) for local travel needs where infrastructure does not support transportation of staff to refugee centers; travel facilitation for individuals granted parole under the Central American Minors Program; and any additional contracts that may be necessary for operations such as language interpretation, information technology, and other services or goods. Also included are fees for required Department of State medical examinations for internationally deployed staff; required training; International Cooperative Administrative Support Services (ICASS) and Capital Security Cost Sharing (CSCS) paid to DoS related to international operations; and salaries of locally employed foreign service nationals in international field offices. Other costs or contracts may also be needed due to surges in protection screenings for at-sea interdictions below the level of a Presidentially declared mass migration event triggering Department of Defense funding (e.g., support for operations at Naval Station Guantanamo Bay in Cuba). The increase is a result of the shift of IRAD funds from the Application Processing PPA to the RAIO PPA, and to account for the increase in cost of Capital Security Cost Sharing agreements with the Department of State.

**IRAD Travel:** The large majority of travel costs are associated with travel on circuit ride in support of refugee interviews to various worldwide locations, which are determined in consultation with the DoS. In addition, there are travel costs supporting certain parole programs and surges in maritime migration screenings. Travel costs are also related to opening and operating USCIS international field offices, including site visits; liaison or temporary operations in advance of new office openings; operational trips, such as refugee interviews; and costs associated with travel entitlements for internationally deployed employees and eligible family members residing overseas. The increase is a result of the shift of IRAD funds from the Application Processing PPA to the RAIO PPA.

003773

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Federal Assistance*



**Fiscal Year 2025**

**Congressional Justification**

CIS – FA - 1

U.S. Citizenship and Immigration Services

Federal Assistance

# Table of Contents

*Federal Assistance* .................................................................................................**1**

  Budget Comparison and Adjustments ...................................................... 3

  Summary of Budget Changes ...................................................................... 5

  Justification of Program Changes .............................................................. 6

  Non Pay Budget Exhibits ............................................................................ 7

*Citizenship and Integration Grants – PPA* ........................................... 8

  Budget Comparison and Adjustments ...................................................... 8

  Non Pay Budget Exhibits .......................................................................... 12

**CIS – FA - 2**

003774

U.S. Citizenship and Immigration Services

Federal Assistance

## Federal Assistance

### Budget Comparison and Adjustments

### Comparison of Budget Authority and Request

*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Citizenship and Integration Grants | - | - | $25,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| **Total** | **-** | **-** | **$25,000** | **-** | **-** | **$25,000** | **-** | **-** | **$10,000** | **-** | **-** | **($15,000)** |
| Subtotal Discretionary - Appropriation | - | - | $25,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |

The U.S. Citizenship and Immigration Services (USCIS) Federal Assistance appropriations provides funding for the Citizenship and Integration Grant Program.

The Federal Assistance appropriation includes the following Level 1 Program, Project, and Activity (PPA):

**Citizenship and Integration Grants[1]:** The Citizenship and Integration Grant Program (CIGP) expands the availability of high-quality services throughout the Nation as part of a multifaceted USCIS effort to provide citizenship preparation resources, support, and information to immigrants and immigrant-serving organizations.

---

[1] For additional information on the USCIS Citizenship and Integration Grant program, please visit: https://www.uscis.gov/citizenship/organizations/grant-program.

003775

U.S. Citizenship and Immigration Services

Federal Assistance

# Federal Assistance
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | $25,000 | $25,000 | $10,000 |
| Carryover - Start of Year | - | $2,644 | $2,644 |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | $25,000 | $27,644 | $12,644 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $25,000 | $27,644 | $12,644 |
| Obligations (Actual/Estimates/Projections) | $22,356 | $25,000 | $12,644 |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | - | - |
| FTE (Actual/Estimates/Projections) | - | - | - |

**CIS – FA - 4**

003776

U.S. Citizenship and Immigration Services

Federal Assistance

## Federal Assistance
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2023 Enacted | - | - | - | $25,000 | $25,000 |
| FY 2024 Annualized CR | - | - | - | $25,000 | $25,000 |
| FY 2025 Base Budget | - | - | - | $25,000 | $25,000 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Total Pricing Changes | - | - | - | - | - |
| Total Adjustments-to-Base | - | - | - | - | - |
| FY 2025 Current Services | - | - | - | $25,000 | $25,000 |
| Total Transfers | - | - | - | - | - |
| Citizenship and Integration Grants Adjustment | - | - | - | ($15,000) | ($15,000) |
| Total Program Changes | - | - | - | ($15,000) | ($15,000) |
| FY 2025 Request | - | - | - | $10,000 | $10,000 |
| FY 2024 TO FY 2025 Change | - | - | - | ($15,000) | ($15,000) |

003777

U.S. Citizenship and Immigration Services

Federal Assistance

# Federal Assistance
## Justification of Program Changes
*(Dollars in Thousands)*

| | | | FY 2025 President's Budget | | |
|---|---|---|---|---|---|
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 - Citizenship and Integration Grants Adjustment** | - | - | - | ($15,000) | ($15,000) |
| Citizenship and Integration Grants | - | - | - | ($15,000) | ($15,000) |
| **Total Program Changes** | - | - | - | ($15,000) | ($15,000) |

## Program Change 1 – Citizenship and Integration Grants Adjustment

| *($ in thousands)* | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | - | - | $25,000 |
| Program Change | - | - | ($15,000) |

### Description
This program change will decrease Federal Assistance (FA) awards funding by 60 percent to return this program to its historically requested levels.

### Justification
Since 2009, the CIGP has awarded $155.0M through 644 competitive grants to immigrant serving-organizations across the country and the District of Columbia to provide citizenship preparation services. Now in its 15th year, the program has helped more than 300,000 LPRs prepare for citizenship. Between 2013 and 2021, the program has historically and steadily been funded at an average level of approximately $10.0M, which consistently resulted in grants to roughly 41 organization annually.

### Performance
This budget proposes to maintain funding for the CIGP at $10.0M. FA award funds are used to provide citizenship preparation services to immigrants who are preparing for the naturalization test and interview. Services include classroom instruction and legal services to assist immigrants with completion of the naturalization application. This funding level will award 33 grants and provide approximately 13,000 immigrants with citizenship preparation services.

CIS – FA - 6

003778

U.S. Citizenship and Immigration Services

Federal Assistance

## Federal Assistance
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Citizenship and Integration Grants | $25,000 | $25,000 | $10,000 | ($15,000) |
| **Total** | **$25,000** | **$25,000** | **$10,000** | **($15,000)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $25,000 | $25,000 | $10,000 | ($15,000) |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 41.0 Grants, Subsidies, and Contributions | $25,000 | $25,000 | $10,000 | ($15,000) |
| **Total - Non Pay Budget Object Class** | **$25,000** | **$25,000** | **$10,000** | **($15,000)** |

CIS – FA – 7

003779

Federal Assistance

Citizenship and Integration Grants – PPA

## Citizenship and Integration Grants – PPA

### Budget Comparison and Adjustments

### Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Citizenship and Integration Grants | - | - | $25,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |
| **Total** | - | - | **$25,000** | - | - | **$25,000** | - | - | **$10,000** | - | - | **($15,000)** |
| Subtotal Discretionary - Appropriation | - | - | $25,000 | - | - | $25,000 | - | - | $10,000 | - | - | ($15,000) |

**PPA Level I Description**
**Citizenship and Integration Grant Program:** This PPA funds the USCIS Citizenship and Integration Grant Program, which awards grants to organizations that help prepare Lawful Permanent Residents (LPRs) for naturalization. The grants aim to promote prospective citizens' inclusion into American civic life by funding educational programs designed to increase their knowledge of English, U.S. history, and civics. In addition, through these grant opportunities, USCIS expands the availability of high-quality citizenship preparation services and provides opportunities for immigrants to gain knowledge and training necessary to promote their integration into the fabric of American society. Increased learning opportunities and additional citizenship instruction resources in communities help immigrants gain the tools to become successful citizens and meet their responsibilities as U.S. citizens.

The following tables reflect program award funds from FY 2022 – FY 2025, as well as FY 2023 actual and projected FY 2024 - FY 2026 program outputs and outcomes.

| Financial Assistance Awards | FY 2022 Actual | FY 2023 Actual | FY 2024 Projected | FY 2025 Projected |
|---|---|---|---|---|
| Amount Funded | $20,000 | $25,000 | $25,000 | $10,000 |
| Grants Awarded | 66 | 65 | 65 | 33 |

003780

Federal Assistance

Citizenship and Integration Grants – PPA

| Accomplishments[2] | FY 2023 Actual | | FY 2024 Projected | | FY 2025 Projected | | FY 2026 Projected | |
|---|---|---|---|---|---|---|---|---|
| (Award Year Reporting) Number of Grantees | $15,000 | | $22,500 | | $25,000 | | $17,500 | |
| Per-year Funding | FY 2021 | FY 2022 | FY 2022 | FY 2023 | FY 2023 | FY 2024 | FY 2024 | FY 2025 |
| | $5,000 | $10,000 | $10,000 | $12,500 | $12,500 | $12,500 | $12,500 | $5,000 |
| Total Number of Grantees | 106 | | 131 | | 130 | | 98 | |
| | FY 2021 | FY 2022 | FY 2022 | FY 2023 | FY 2023 | FY 2024 | FY 2024 | FY 2025 |
| | 40 | 66 | 66 | 65 | 65 | 65 | 65 | 33 |
| Monitoring Visits Conducted | 19 | | 24 | | 23 | | 18 | |
| Total Permanent Residents Served | 27,562 | | 34,060 | | 33,800 | | 25,480 | |
| Total students enrolled in citizenship classes | 10,115 | | 12,497 | | 12,402 | | 9,350 | |
| Total clients provided with naturalization eligibility screenings | 17,447 | | 21,563 | | 21,398 | | 16,131 | |
| Total N-400 applications for naturalization submitted to USCIS | 11,802 | | 14,580 | | 14,469 | | 10,907 | |

[2] Generally, the accomplishments (i.e. the immigrants served, screenings, etc) are typically recorded in a 2-year period of performance following the year of obligations. For example, the increase in funding from $10M annually to $20M in FY 2022 will only begin to produce an increase in the number of Lawful Permanent Residents (LPRs) served starting in FY 2023. This is because the period of performance for grants awarded the $20M in FY 2022 funding begins on Oct. 1, 2022 (at the beginning of FY 2023).

**CIS – FA - 9**

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Enacted/Request** | $25,000 | $25,000 | $10,000 |
| Carryover - Start of Year | - | $2,644 | $2,644 |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | - | - | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| **Total Budget Authority** | $25,000 | $27,644 | $12,644 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $25,000 | $27,644 | $12,644 |
| Obligations (Actual/Estimates/Projections) | $22,356 | $25,000 | $12,644 |
| **Personnel: Positions and FTE** |  |  |  |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** |  |  |  |
| Onboard (Actual/Estimates/Projections) | - | - | - |
| FTE (Actual/Estimates/Projections) | - | - | - |

CIS – FA - 10

003782

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| **FY 2023 Enacted** | - | - | - | $25,000 | $25,000 |
| **FY 2024 Annualized CR** | - | - | - | $25,000 | $25,000 |
| **FY 2025 Base Budget** | - | - | - | $25,000 | $25,000 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| **Total Pricing Changes** | - | - | - | - | - |
| **Total Adjustments-to-Base** | - | - | - | - | - |
| **FY 2025 Current Services** | - | - | - | $25,000 | $25,000 |
| **Total Transfers** | - | - | - | - | - |
| Citizenship and Integration Grants Adjustment | - | - | - | ($15,000) | ($15,000) |
| **Total Program Changes** | - | - | - | ($15,000) | ($15,000) |
| **FY 2025 Request** | - | - | - | $10,000 | $10,000 |
| **FY 2024 TO FY 2025 Change** | - | - | - | ($15,000) | ($15,000) |

CIS – FA – 11

003783

Federal Assistance

Citizenship and Integration Grants – PPA

# Citizenship and Integration Grants – PPA
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Citizenship and Integration Grants | $25,000 | $25,000 | $10,000 | ($15,000) |
| **Total** | **$25,000** | **$25,000** | **$10,000** | **($15,000)** |
| | | | | |
| Subtotal Discretionary - Appropriation | $25,000 | $25,000 | $10,000 | ($15,000) |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 41.0 Grants, Subsidies, and Contributions | $25,000 | $25,000 | $10,000 | ($15,000) |
| **Total - Non Pay Budget Object Class** | **$25,000** | **$25,000** | **$10,000** | **($15,000)** |

CIS – FA - 12

003784

Federal Assistance

Citizenship and Integration Grants – PPA

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Citizenship Instruction and Naturalization Application Services Grant | $17,000 | $17,000 | $9,000 | ($8,000) |
| Citizenship Education Expansion Academy | - | - | $1,000 | $1,000 |
| Community and Regional Integration Network Grant | $1,300 | $1,300 | - | ($1,300) |
| Regional Hub Program | $4,000 | $4,000 | - | ($4,000) |
| Innovations in Citizenship Education Program | $2,700 | $2,700 | - | ($2,700) |
| **Total - Non-Pay Cost Drivers** | **$25,000** | **$25,000** | **$10,000** | **($15,000)** |

## Explanation of Non Pay Cost Driver

**Citizenship Instruction and Naturalization Application Services (CINAS) Grant:** The Citizenship Instruction and Naturalization Application Services Grant is for public or nonprofit organizations that prepare immigrants for citizenship by offering both citizenship instruction and naturalization application services. This cost driver is decreasing to restore program funding back to historic levels.

**Citizenship Education Expansion Academy:** The Citizenship Education Expansion Academy (CEEA) funding opportunity is a new program that provides support to organizations that have not previously received USCIS grant funding. Grantees will participate in a required 12-month curriculum and upon completion will implement their citizenship education programs in year two with USCIS Office of Citizenship staff support. In addition to meeting citizenship education programmatic quality indicators, grantee success will also be measured by successfully completing the required training, obtaining accreditation, and submitting a specified number of N-400, Applications for Naturalization, at no charge to clients. Through this grant, USCIS hopes to encourage organizations outside USCIS' typical applicant pool to expand the availability of high quality naturalization preparation services in underserved areas and eventually increasing the pool of organizations which are competitive for CINAS funding.

**Community and Regional Integration Network Grant (CARING):** The Community and Regional Integration Network Grant (formerly known as the *Refugee and Asylee Integration Services Program*) is for organizations that provide extended integration services to vulnerable immigrant populations who entered the United States through USCIS' humanitarian programs or benefitted from those programs while already in the United States. These groups often experience unique challenges with civic, linguistic, economic, cultural, and institutional integration when resettling in the United States, which may impact their progress toward full civic integration. As with the CINAS grant, in order to allow smaller organizations the opportunity to participate, USCIS established multiple funding levels that are aligned to a range of performance metrics. The target organizations for this grant are groups providing extended integration services to immigrant populations who entered the U.S. through USCIS' humanitarian programs or benefitted from those programs while already in the United States. USCIS is not pursuing this grant program in FY 2025.

CIS – FA – 13

003785

Federal Assistance                                                                  Citizenship and Integration Grants – PPA

**Regional Hub:** A revitalization of the hub and spoke model of the FY 2010-FY 2011 USCIS National Capacity Building grant program, the Regional Hub Program is designed to build community and organizational capacity to identify, support, and prepare LPRs for citizenship. To achieve this goal, recipients will help create or expand citizenship networks and provide technical assistance to individual network members that offer citizenship instruction and naturalization application services. Through a hub and spoke funding model, the Regional Hub grant will more holistically support LPRs on the pathway to citizenship and encourage the integration of LPRs into their receiving communities. USCIS is not pursuing this grant program in FY 2025.

**Innovations in Citizenship Preparation Grant:** The Innovations in Citizenship Education Grant considers proposed innovations that address an existing challenge within the citizenship preparation field, such as engaging hard-to-reach populations, developing digital access and literacy, or supporting traditionally underserved groups. The target organizations for this grant are for-profit and nonprofit organizations that foster creative approaches to preparing immigrants for naturalization and encouraging the civic, linguistic, and cultural integration of immigrants into their communities. It is expected that projects will enhance citizenship education opportunities; build the capacity of other immigrant-serving organizations; and/or develop new citizenship education tools or resources that can be shared with a broad audience. FY 2023 awards supported a wide range of projects. Some examples include: a no-code software tool to serve LPRs, a mobile citizenship clinic, a new curriculum to support applicants with low literacy and low English proficiency, a digital literacy bootcamp, a project-based curriculum, a citizenship preparation and immigration legal services program for rural immigrants where citizenship services may be non-existent. USCIS is not pursuing this grant program in FY 2025.

CIS – FA – 14

003786

003787

# Department of Homeland Security

## U.S. Citizenship and Immigration Services

### Immigration Examinations Fee Account



**Fiscal Year 2025**

**Congressional Justification**

CIS – IEFA - 1

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

# Table of Contents

*Immigration Examinations Fee Account* ........................................................................................1

    Budget Comparison and Adjustments.................................................................................3

    Summary of Budget Changes ..........................................................................................12

    Justification of Pricing Changes .....................................................................................13

    Justification of Program Changes ...................................................................................15

    Personnel Compensation and Benefits............................................................................20

    Non-Pay Budget Exhibits ...............................................................................................25

003788

U.S. Citizenship and Immigration Services

# Immigration Examinations Fee Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Immigration Examination Fee Account: Non-Premium | $3,838,685 | $4,543,266 | $4,989,648 | $446,382 |
| Immigration Examination Fee Account: Premium | $1,082,835 | $1,401,304 | $1,485,330 | $84,026 |
| **Total** | **$4,921,520** | **$5,944,570** | **$6,474,978** | **$530,408** |
| Subtotal Mandatory - Fee | $4,921,520 | $5,944,570 | $6,474,978 | $530,408 |

The Immigration Examinations Fee Account (IEFA) is the primary funding source for U.S. Citizenship and Immigration Services (USCIS). The IEFA provides the resources to:

- Strengthen and effectively administer the immigration system.
- Strengthen national security safeguards and combat fraud.
- Reinforce quality and consistency in administering immigration benefits.

**Fee Authority:** The IEFA is authorized via Sections 286(m), (n), (t), and (u) of the *Immigration and Nationality Act* (INA) (8 U.S.C. 1356(m), (n), (t), (u)). In addition, section 286(u) of the INA, 8 U.S.C. 1356(u), provides the Secretary with authority to establish and collect a premium fee for the premium processing of certain immigration benefit types. The *Continuing Appropriations Act, 2021 and Other Extensions Act*, P.L. 116-159, which was signed into law on October 1, 2020, contains the *Emergency Stopgap USCIS Stabilization Act* (USCIS Stabilization Act). The USCIS Stabilization Act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allows for the expansion of premium processing to new categories of petitions and applications.

**Fee Uses:** Fees collected with the submission of immigration benefit requests are deposited into IEFA and used to fund the full cost of processing immigration benefit requests, including the cost of providing services without charge to applicants whose fees are waived or to whom a fee exemption applies.

003789

U.S. Citizenship and Immigration Services                                    Immigration Examinations Fee Account

The IEFA supports the following activities:

- Adjudication Operations: Contains Directorate and Program Offices (DPOs) responsible for adjudicating applications domestically at field offices, the National Benefits Center, and the Immigrant Investor Program Office for immigration and visa benefit applications both in person and those not requiring interviews. Also included are anti-fraud and public safety components.

  ○ Field Operations (FOD): Processing of immigration benefit applications while ensuring the security and integrity of the immigration system where an in-person interview is required. USCIS primarily accomplishes this through its network of domestic district and field offices, the National Benefits Center for pre-processing and the Immigrant Investor Program Office.

  ○ Fraud Detection and National Security (FDNS): Leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system.

  ○ Service Center Operations (SCOPS): Processing of immigration benefit applications while ensuring the security and integrity of the immigration system where an in-person interview is generally not required. USCIS primarily accomplishes this through its service centers: California Service Center, Nebraska Service Center, Potomac Service Center, Texas Service Center, Vermont Service Center, and the Humanitarian, Adjustment, Removing Conditions and Travel Documents Service Center.

  ○ Support Services: Managing of the USCIS field overhead, such as guard services, janitorial services, rent, and others. The support services also include the managing of USCIS headquarters overhead, such as litigation settlements, postage fees and others.

- Immigration Policy and Support: Contains policy and advisory components as well as program office components not included elsewhere. Also includes components responsible for management of space, contracts, security, emergency management, enterprise risk management, training, human resources, as well as costs associated with design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise.

- Refugee, Asylum, and International Operations: The Refugee, Asylum and International Operations Directorate (RAIO) is responsible for adjudicating asylum and refugee status applications for individuals seeking protection from persecution. RAIO also facilitates the process for qualifying relatives of admitted principal refugees and approved principal asylees to immigrate to the United States. This activity also supports protection screening of certain migrants interdicted at sea. In addition, the Asylum Division adjudicates affirmative asylum applications, including conducting applicant interviews, and conducts credible fear screenings for certain individuals placed in expedited removal and reasonable fear screenings for certain individuals subject to final administrative removal or reinstatement of removal. The Asylum Division also conducts Safe Third Country screenings at the Canadian Border, conducts initial domestic processing of Form I-730 petitions filed by refugees, and adjudicates applications for suspension of deportation or cancellation of removal under *the Nicaraguan Adjustment and Central American Relief Act* (NACARA 203). The Asylum Division is also mandated to interview and adjudicate the

CIS – IEFA - 4

**U.S. Citizenship and Immigration Services**                                                    **Immigration Examinations Fee Account**

asylum applications from Operation Allies Welcome Afghan applicants on a strictly expedited timeframe per the *Afghanistan Supplemental Appropriations Act, 2022* (P.L. 117-43). In addition, with the implementation of the Asylum Processing IFR (effective May 31, 2022), the Asylum Division has jurisdiction over the asylum applications of certain individuals placed in expedited removal who receive a positive credible fear determination and are scheduled for an Asylum Merits Interview (AMI). The AMI explores an applicant's eligibility for asylum, as well as statutory withholding of removal and withholding or deferral of removal under the Convention against Torture (CAT). The Asylum Division adjudicates asylum applications processed under the IFR by deciding whether the individual is eligible for asylum and warranting of a grant of asylum as a matter of discretion and, for any case where asylum is not granted by USCIS, an additional determination is produced related to whether the applicant demonstrated eligibility for withholding or deferral of removal based on the record before USCIS. Additionally, if a case processed under the IFR has dependents, the Asylum Division interviews all dependents on a case who have the ability to testify sufficient to make a determination as to whether there is a significant possibility they have experienced past harm or fear future harm that could be an independent basis for asylum, statutory withholding of removal, or withholding or deferral of removal under CAT and, if asylum is not granted to the principal applicant by USCIS, an "independent basis determination" is also produced for every dependent.

- Immigration Records and Applicant Services: Contains DPOs that primarily provide interaction and services to the general public and associated overhead, as well as provides for the development of both external public products and internal communications, the administration of biometric services, responses to Freedom of Information Act (FOIA) requests, and immigration status.

- Premium Processing (Including Transformation)[1]: Expenditures from the collection of premium processing fees in front line DPOs (RAIO, FOD and SCOPS) and program office components to support information technology and other infrastructure improvements in adjudication processes, personnel and contracts supporting the processing of premium processing requests, other costs associated with overheads and the lockbox operations, and otherwise offset the cost of providing adjudications and naturalization services.

**Change Mechanism:** Notice and comment rulemaking for non-premium funds; direct final rule for premium funds.

- Non-premium: USCIS conducts a biennial fee review, which takes into consideration existing operations, workload volume forecasts, and proposed policy initiatives to determine if current fees will recover the full cost of its operations including the cost of services provided at no charge. If USCIS determines its fees will not recover full cost, then the Department of Homeland Security (DHS) may propose to adjust its fees via a notice and comment rulemaking in the Federal Register. DHS receives public comments on USCIS' Notice of Proposed Rulemaking (NPRM), incorporates feedback as appropriate, and publishes a final rule in the Federal Register to adjust fees.

- Premium: USCIS is authorized to adjust its premium processing fee on a biennial basis by the percentage (if any) by which the Consumer Price Index for All Urban Consumers (CPI-U) for the month of June preceding the date on which such adjustment takes effect exceeds CPI-U for the same month of the second preceding calendar year. DHS issues a direct final rule in the Federal Register to reflect this change and notify the public.

---

[1] The uses of premium processing fees are statutorily defined in 8 U.S.C. 1356(u).

**CIS – IEFA - 5**

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

USCIS published the FY 2022/2023 IEFA Fee Rule Notice of Public Rule Making (NPRM) in the Federal Register on January 4, 2023. The Public Comment period for this NPRM ended March 13, 2023. The NPRM proposed updates to the current Fee Schedule and additional changes in forms and fee structure.[2] The Final IEFA Fee Rule was published on January 31, 2024, with an effective date of April 1, 2024.[3]

Premium processing was expanded under the USCIS Stabilization Act that was included in the *Continuing Appropriations Act, 2021 and Other Extensions Act*, P.L. 116-159. This act increased the fee for petitions that were previously designated for premium processing service, broadened the authorized use of funds, and allows for the expansion of premium processing to new categories of petitions and applications. Notably, it authorized the expansion of premium processing beyond the current I-129, Petition for a Nonimmigrant Worker, and I-140, Immigrant Petition for Alien Worker forms. The act also explicitly allows for premium processing of the I-539, Application to Extend/Change Nonimmigrant Status, and the I-765, Application for Employment Authorization. Expansion of premium processing to benefits not included in Section 4102(b)(1) or requested using a form for which premium processing was available on August 1, 2020, which requires notice and comment rulemaking to implement.[4] DHS published a final rule which codified changes made by the USCIS Stabilization Act.[5] The USCIS Stabilization Act requires that when DHS implements the expansion of immigration benefit types that are designated for premium processing, it must not result in an increase in processing times for immigration benefit requests not designated for premium processing or an increase in regular processing of immigration benefit requests so designated.[6] Premium processing will be made available for newly designated immigration benefit requests only when DHS determines that it will have the resources in place to adjudicate the requests within the time required, and that the availability of premium processing for that immigration benefit request will not adversely affect other immigration benefit requests not designated for premium processing or the regular processing of immigration benefit requests so designated. On December 28, 2023, USCIS issued a final fee rule to increase premium processing fees in accordance with inflation for the period of June 2021 to June 2023. The effective date of the final fee rule is February 26, 2024.[7]

**Previous Changes:**

Current non-premium fees became effective on December 23, 2016.[8]  The fee for petitions that were previously designated for premium processing service was last adjusted on October 1, 2020, in accordance with P.L. 116-159. USCIS implemented the new premium processing fees on October 19, 2020.[9] DHS codified further premium processing changes to expand the forms eligible for premium processing in a final rule, effective May 31, 2022.

[2] For additional information, see the Unified Agenda entry for the USCIS fee schedule at Federal Register: U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

[3] https://www.federalregister.gov/documents/2024/01/31/2024-01427/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration

[4] The expanded premium processing for I-140 E13 and I-140 EB-2 NIW took effect beginning August 1, 2022. For additional information, please see: https://www.uscis.gov/newsroom/alerts/uscis-to-implement-second-phase-of-premium-processing-for-certain-previously-filed-eb-1-and-eb-2. In March 2023, USCIS announced expanding premium processing to certain I-765 categories. See https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt. In June 2023, USCIS announced expanding premium processing to certain I-539 categories. See https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status.

[5] See 87 FR 18227: Implementation of the Emergency Stopgap USCIS Stabilization Act. For additional information, please see: https://www.federalregister.gov/documents/2022/03/30/2022-06742/implementation-of-the-emergency-stopgap-uscis-stabilization-act

[6] See Pub. L. 116-159, sec. 4102(c) (Oct. 1, 2020), https://www.congress.gov/116/plaws/publ159/PLAW-116publ159.pdf

[7] https://www.federalregister.gov/documents/2023/12/28/2023-28529/adjustment-to-premium-processing-fees

[8] For additional information on non-premium fee changes, please see 81 FR 73292; https://www.govinfo.gov/app/details/FR-2016-10-24/2016-25328.

[9] USCIS, Premium Processing Fee Increase Effective Oct. 19, 2020, https://www.uscis.gov/news/premium-processing-fee-increase-effective-oct-19-2020 (last reviewed/updated 10/16/2020).

CIS – IEFA – 6

U.S. Citizenship and Immigration Services

**Immigration Examinations Fee Account**

**Recovery Rate:** IEFA non-premium fees are intended to recover full cost. Premium fees are not intended to recover full cost. The charts below are provided to identify the recovery rate over the past five years.

Until the new fee rule takes effect on April 1, 2024, USCIS will continue to collect fees under the FY 2016/2017 Fee Rule.[10]

---

[10] USCIS current fee schedule: https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf

**CIS – IEFA – 7**

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Historical Collections and Cost Recovery Rate[11]

| *(Dollars in Thousands)* | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Non-Premium) | $3,318,284 | $3,334,165 | $3,726,269 | $3,590,798 | $3,838,685 | $17,808,201 |
| Total of Eligible Expenses | $3,793,542 | $3,367,355 | $3,540,254 | $3,537,038 | $3,861,198 | $18,099,387 |
| Cost Recovery % | 87.5% | 99.0% | 105.3% | 101.5% | 99.4% | 98.4% |

| *(Dollars in Thousands)* | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Five-Year Total |
|---|---|---|---|---|---|---|
| Immigration Examinations Fee Account (Premium) | $577,327 | $493,000 | $987,116 | $1,244,039 | $1,082,835 | $4,384,317 |
| Total of Eligible Expenses | $536,463 | $528,474 | $761,681 | $872,076 | $1,216,570 | $3,915,264 |
| Cost Recovery % | 107.6% | 93.3% | 129.6% | 142.7% | 89.0% | 112.0% |

**Changes in Fee Collections:** USCIS projects increased filing volumes in FY 2024. USCIS' volume in FY 2023 had limited impact from the pandemic; however, delays in receipts of anticipated revenue from expanded premium processing, in addition to increases in non-fee-paying forms filed has consistently shown revenue slightly below forecast in FY 2023. Based on the Volume Projection Committee forecast for increased volume, USCIS anticipates adjusted revenue in FY 2024. Given the fee-paying rates in the relevant revenue forecast, all else equal, increased workload volume may equate to higher collections. USCIS also forecasts increased premium processing revenue in FY 2024. The USCIS Stabilization Act included in P.L. 116-159 allowed USCIS to establish and collect additional premium processing fees and authorized their use for expanded purposes. The statute also permits USCIS to expand premium processing to certain benefit requests. In FY 2023, USCIS expanded premium processing availability to some categories of I-539s and I-765s. USCIS anticipates an increase in Premium Processing receipts in the latter half of FY 2024 due to the implementation of an inflationary fee adjustment for all premium processing fees.

USCIS projects the implementation of increased premium processing fees and the new fee rule for FY 2025 are projected to be consistent with prior non-election years.

---

[11] Includes minor variations due to rounding.

**CIS – IEFA – 8**

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Immigration Examinations Fee Account
## Budget Spending Authority Request[12]
(Dollars in Thousands)

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Adjudication Operations | 13,434 | 12,762 | $2,174,211 | 13,244 | 11,866 | $2,124,624 | 13,619 | 12,856 | $2,336,969 | 375 | 990 | $212,344 |
| Field Operations | 7,329 | 6,963 | $1,051,375 | 7,447 | 6,672 | $1,040,649 | 7,725 | 7,327 | $1,177,268 | 278 | 655 | $136,619 |
| Fraud Detection and National Security | 1,955 | 1,857 | $263,779 | 1,596 | 1,430 | $266,092 | 1,693 | 1,586 | $299,506 | 97 | 156 | $33,414 |
| Service Center Operations | 4,150 | 3,942 | $576,702 | 4,201 | 3,764 | $622,267 | 4,201 | 3,943 | $664,569 | - | 179 | $42,301 |
| Support Services | - | - | $282,355 | - | - | $195,616 | - | - | $195,626 | - | - | $10 |
| Immigration Policy and Support | 2,919 | 2,773 | $1,218,924 | 3,316 | 2,971 | $1,413,157 | 3,425 | 3,326 | $1,526,859 | 109 | 355 | $113,702 |
| Refugee and Asylum Operations | 1,809 | 1,719 | $431,450 | 2,014 | 1,805 | $424,950 | 2,195 | 2,152 | $546,219 | 181 | 347 | $121,269 |
| Immigration Records and Applicant Services | 1,384 | 1,315 | $456,732 | 1,544 | 1,383 | $605,760 | 1,557 | 1,505 | $675,328 | 13 | 122 | $69,568 |
| Premium Processing (Including Transformation) | 2,113 | 2,007 | $1,313,858 | 3,293 | 2,950 | $1,332,888 | 3,417 | 3,268 | $1,523,963 | 124 | 318 | $191,075 |
| **Total** | **21,659** | **20,576** | **$5,595,175** | **23,411** | **20,975** | **$5,901,379** | **24,213** | **23,107** | **$6,609,338** | **802** | **2,132** | **$707,959** |
| Subtotal Mandatory - Fee | 21,659 | 20,576 | $5,595,175 | 23,411 | 20,975 | $5,901,379 | 24,213 | 23,107 | $6,609,338 | 802 | 2,132 | $707,959 |

**CIS – IEFA - 9**

---

[12] "Budget Spending Authority Request" refers to the funding USCIS anticipates to obligate, as opposed to "Budget Authority" which refers to budget resources.

003795

## Immigration Examinations Fee Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Collections (Actual/Estimates/Projections)** | **$4,921,520** | **$5,944,570** | **$6,474,978** |
| Carryover - Start of Year | $2,190,225 | $2,090,061 | $2,093,511 |
| Recoveries | $114,994 | $76,000 | $76,000 |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | ($4,233) | ($55,335) | ($30,234) |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| CHIMP | ($4,000) | ($4,000) | ($4,000) |
| **Total Budget Authority** | **$7,218,506** | **$8,051,296** | **$8,610,255** |
| Collections - Reimbursable Resources | $48,901 | $75,000 | $75,000 |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$7,267,407** | **$8,126,296** | **$8,685,255** |
| **Obligations** | | | |
| Projected Obligations | $5,595,175 | $5,901,379 | $6,609,338 |
| Projected Obligations Reimbursables | $63,000 | $74,000 | $74,000 |
| **Actual Obligations** | | | |
| Actual Obligations | $5,133,330 | - | - |
| Obligations Reimbursables | $44,016 | - | - |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | 21,659 | 23,411 | 24,213 |
| Enacted/Request FTE | 20,576 | 20,975 | 23,107 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | 19,710 | 23,411 | 24,213 |
| FTE (Actual/Estimates/Projections) | 19,128 | 20,975 | 23,107 |

**CIS – IEFA - 10**

003796

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Immigration Examinations Fee Account
## Collections – Reimbursable Resources
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Canada/UK Visa | - | - | $6,242 | - | - | $7,200 | - | - | $7,500 |
| Department of Defense | - | - | $7,499 | - | - | $7,500 | - | - | $7,873 |
| Department of Health and Human Services – Department Wide | - | - | $3 | - | - | $3 | - | - | $3 |
| Department of Homeland Security | - | - | $824 | - | - | $2,000 | - | - | $2,100 |
| Department of Homeland Security - Federal Emergency Management Agency | - | - | $2,024 | - | - | $8,750 | - | - | $6,823 |
| Department of Homeland Security - Office of the Secretary & Executive Management | - | - | $3,983 | - | - | - | - | - | - |
| Department of Homeland Security - U.S. Customs and Border Protection | - | - | $10,527 | - | - | $18,197 | - | - | $17,845 |
| Department of Homeland Security - U.S. Immigration and Customs Enforcement | - | - | $12,440 | - | - | $16,000 | - | - | $15,748 |
| Department of Justice | - | - | $154 | - | - | $200 | - | - | $200 |
| Department of State | - | - | $222 | - | - | $150 | - | - | $112 |
| Other Independent Agencies | - | - | $83 | - | - | - | - | - | - |
| SAVE Collections | - | - | $4,900 | - | - | $15,000 | - | - | $16,796 |
| **Total Collections** | - | - | **$48,901** | - | - | **$75,000** | - | - | **$75,000** |

**CIS – IEFA - 11**

003797

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Immigration Examinations Fee Account
## Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2023 Enacted | 21,659 | 20,576 | $3,214,766 | $2,380,409 | $5,595,175 |
| FY 2024 Annualized CR | 23,411 | 20,975 | $3,291,256 | $2,610,123 | $5,901,379 |
| FY 2025 Base Budget | 23,411 | 20,975 | $3,291,256 | $2,610,123 | $5,901,379 |
| **Total Technical Changes** | - | - | - | - | - |
| **Total Annualizations and Non-Recurs** | - | - | - | - | - |
| 2025 Civilian Pay Raise | | - | $54,149 | - | $54,149 |
| Filled Vacancies | - | 1,745 | $318,695 | - | $318,695 |
| **Total Pricing Changes** | - | 1,745 | $372,844 | - | $372,844 |
| **Total Adjustments-to-Base** | - | 1,745 | $372,844 | - | $372,844 |
| **FY 2025 Current Services** | 23,411 | 22,720 | $3,664,100 | $2,610,123 | $6,274,223 |
| **Total Transfers** | - | - | - | - | - |
| Enhancements | 831 | 416 | $78,561 | $261,346 | $339,907 |
| IRAD Support Positions | (29) | (29) | ($4,792) | - | ($4,792) |
| **Total Program Changes** | 802 | 387 | $73,769 | $261,346 | $335,115 |
| **FY 2025 Request** | 24,213 | 23,107 | $3,737,869 | $2,871,469 | $6,609,338 |
| **FY 2024 TO FY 2025 Change** | 802 | 2,132 | $446,613 | $261,346 | $707,959 |

CIS – IEFA - 12

003798

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2025 President's Budget | | |
|---|---|---|---|---|---|
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 – 2025 Civilian Pay Raise** | - | - | **$54,149** | - | **$54,149** |
| Adjudication Operations | - | - | $29,290 | - | $29,290 |
| Field Operations | - | - | $15,660 | - | $15,660 |
| Fraud Detection and National Security | - | - | $4,196 | - | $4,196 |
| Service Center Operations | - | - | $9,424 | - | $9,424 |
| Support Services | - | - | $10 | - | $10 |
| Immigration Policy and Support | - | - | $9,393 | - | $9,393 |
| Refugee and Asylum Operations | - | - | $5,034 | - | $5,034 |
| Immigration Records and Applicant Services | - | - | $3,615 | - | $3,615 |
| Premium Processing (Including Transformation) | - | - | $6,817 | - | $6,817 |
| **Pricing Change 2 – Filled Vacancies** | - | 1,745 | **$318,695** | - | **$318,695** |
| Adjudication Operations | - | 803 | $147,676 | - | $147,676 |
| Field Operations | - | 516 | $95,093 | - | $95,093 |
| Fraud Detection and National Security | - | 108 | $19,705 | - | $19,705 |
| Service Center Operations | - | 179 | $32,878 | - | $32,878 |
| Immigration Policy and Support | - | 300 | $54,927 | - | $54,927 |
| Refugee and Asylum Operations | - | 271 | $48,921 | - | $48,921 |

CIS – IEFA - 13

003799

**U.S. Citizenship and Immigration Services**

| | | | | Immigration Examinations Fee Account | |
|---|---|---|---|---|---|
| Immigration Records and Applicant Services | - | 115 | $21,034 | - | $21,034 |
| Premium Processing (Including Transformation) | - | 256 | $46,137 | - | $46,137 |
| **Total Pricing Changes** | **-** | **1,745** | **$372,844** | **-** | **$372,844** |

## Change 1 – 2025 Civilian Pay Raise

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $3.6B.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2025 2.0 percent civilian pay increase. It is calculated by adding the Base and Annualization amounts, multiplying by the pay rate increase (2.0 percent) and then by three-fourths to account for nine months of the 2025 calendar year.

## Pricing Change 2 – Filled Vacancies

Base Activity Funding: The base funding of this activity reflects a total of 23,411 positions, 20,975 FTE, and $3.3B.

Pricing Change Explanation: This pricing change represents the salaries and benefits cost associated with backfilling existing vacancies projected at the beginning of FY 2025. The majority of these hires support front line operations in our field and service centers as well as the asylum program with aims of increasing USCIS' rate of adjudications, which is needed to mitigate future application and petition backlog growth. This increased spending will ensure that USCIS has the spending authority available to onboard staff in FY 2025. USCIS has an aggressive and achievable hiring target of current vacant positions for the remainder of FY 2024 and through FY 2025.

003800

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Justification of Program Changes
*(Dollars in Thousands)*

| | | FY 2025 President's Budget | | |
| --- | --- | --- | --- | --- |
| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
| **Program Change 1 – Enhancements** | **831** | **416** | **$78,561** | **$261,346** | **$339,907** |
| Adjudication Operations | 375 | 187 | $28,361 | $7,018 | $35,379 |
| Field Operations | 278 | 139 | $20,146 | $5,720 | $25,866 |
| Fraud Detection and National Security | 97 | 48 | $8,215 | $1,298 | $9,513 |
| Immigration Policy and Support | 109 | 55 | $10,921 | $38,461 | $49,382 |
| Refugee and Asylum Operations | 210 | 105 | $27,187 | $44,919 | $72,106 |
| Immigration Records and Applicant Services | 13 | 7 | $939 | $43,980 | $44,919 |
| Premium Processing (Including Transformation) | 124 | 62 | $11,153 | $126,968 | $138,121 |
| **Program Change 2 – IRAD Support Positions** | **(29)** | **(29)** | **($4,792)** | **-** | **($4,792)** |
| Refugee and Asylum Operations | (29) | (29) | ($4,792) | - | ($4,792) |
| **Total Program Changes** | **802** | **387** | **$73,769** | **$261,346** | **$335,115** |

**Program Change 1 – Enhancements:**

| *($ in thousands)* | Pos | FTE | Amount |
| --- | --- | --- | --- |
| Base: Current Services & Transfers | - | - | - |
| Program Change | 831 | 416 | $339,907 |

**Description**
This program change will increase IEFA's base pay and non-pay by 831 Pos, 416 FTE, and a total of $339.9M.

**Administrative, Overhead, SAVE, and Other Costs: The enhancements will increase costs by 280 Pos, 140 FTE, and a total of $34.4M.** Costs related to the legal program, as the Agency continues to face an increase in litigation over the last couple years along with increased requests for legal review and advice associated with operational adjudications. Funds also support the Agency's growing needs to execute requested new property projects and continuing property projects in future fiscal years. Funds support Q Flow licenses so that all of the Asylum Division field offices will assist the Agency in providing improved efficiencies to process the growing affirmative asylum backlog that requires in person interviews and decision service.

**CIS – IEFA - 15**

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

**Cybersecurity: The enhancements will increase costs by 11 Pos, 6 FTE, and a total of $38.7M.** Costs ensure USCIS is not in jeopardy of being unable to respond and recover from a cybersecurity attack, which is at the heart of safeguarding the homeland by deterring, detecting, and addressing technical vulnerabilities in the immigration system. USCIS is working to comply with Executive Order (EO) 14028, Improving the Nation's Cybersecurity, and the additional directions, guidance, and standards established for Zero Trust by 30 September 2024. This will improve cybersecurity posture in an ever-evolving dynamic threat environment that protects USCIS' infrastructure, systems, data, and people.

**Expedited Activities & Expedited Application Processing: The enhancements will increase costs by 83 Pos, 42 FTE, and a total of $29.3M.** USCIS is looking at ways to increase automation and reduce reliance on manual work in the processing of both paper and unstructured or semi structured data included in scanned documents. USCIS will also leverage the RAIO directorate's data for streamlined case processing and backlog reduction, validate and analyze data from asylum, refugee, and parole processing, in addition to supporting RAIO program evaluation overall. These funds will continue to increase efficiency of I-590 vetting, provide more robust vetting for the I-589 and comply with policy guidance issued through the National Security Council and DHS.

**Identity Information and Customer Service: The enhancements will increase costs by 5 Pos, 3 FTE, and a total of $20.4M.** Funding will allow USCIS to obtain licenses for Robotic Process Automation (RPA). RPA allows the Agency to introduce automations that streamline and make administrative tasks more efficient and accurate. This leads to increased efficiency in responding to customer inquiries. Funds also support a media campaign to promote awareness about the rights, responsibilities, and importance of citizenship and encourage lawful permanent residents (LPRs) to apply for naturalization support of the Executive Order on Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, Section 5. There are over 9 million Legal Permanent Residents (LPRs) who are eligible to apply for naturalization.

**Humanitarian Services: The enhancements will increase costs by 0 Pos, 0 FTE, and a total of $45.5M.** Costs supporting anticipated increases in interpreter services, Department of State Inter-agency Agreements (i.e., collection and processing of certain forms types, biometrics, overseas document verification or information verification investigations, and cashiering services), and other support costs such as additional logistical support, oversight, training, reporting and analysis, mission support, communications and outreach, knowledge management, and policy development.

**IT Systems Development and Maintenance: The enhancements will increase costs by 0 Pos, 0 FTE, and a total of $51.9M.** Costs supporting the update/modernization of the current data collection system to transition to an automated, efficient data collection and data transfer method; reducing the risk of potential errors and data integrity issues, strengthening our performance analysis, and positioning our office to respond to numerous internal and external data requests with accurate and timely statistics and information. The digital credential initiative will enable secure, privacy-respecting, and verifiable digital Green Cards that will maximize its value in government (i.e., Customs and Border Protection at border crossings) and non-government (i.e., age and identity verification) interactions. The technology behind digital Green Cards will also enable digital Employment Authorization Documents (EAD), Naturalization Certificates, Secure Notices, and electronic decision signing. Provide user-friendly and cost-effective automated services that align training with standardized processes to keep up with the ever-changing responsibilities and training needs of a USCIS employee.

**CIS – IEFA - 16**

003802

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

**Lockbox Operations: The enhancements will increase costs by 12 Pos, 6 FTE, and a total of $25.3M.** Funds to support the I-589 Digitization effort. Costs for Lockbox operations are increasing as USCIS transitions new and high-priority workloads to Lockbox intake, including I-589 development work, I-907 Premium Processing development work, and I-526/E development work. With the increase in projected volumes, additional funding is required to mail the PRCs (Permanent Resident Cards) and EADs (Employment Authorization Documents) to customers, and to mail the personalized immigration benefit to applicants via US Priority Mail and remail Post Office Non-Deliverables to updated addresses for the beneficiary.

**Naturalization Processing: The enhancements will increase costs by 20 Pos, 10 FTE, and a total of $18.7M.** Costs for expanded Biometric ATLAS screening capabilities with real time person screening capability to validate identities. This work will support integration work with CBP and other DHS partners. Funds would support the efforts required to initiate the development of a system at the unclassified National Security System level which would address critical and urgent needs to create and preserve anonymity of certain immigration officers working on S visas and other classified cases where both the subject and the officer need protection. Also requested funding used for a comprehensive case tracking system to effectively track and prioritize adjudications for the hundreds and thousands of pending applications in its backlog. A robust case tracking system would also proactively prevent new case filings from falling through the cracks contributing to the backlog.

**Processing of Non-Naturalization Applications: The enhancements will increase costs by 333 Pos, 166 FTE, and a total of $33.6M.** Funding to support setting up a virtual Benefits Integrity Office to process the parole/reparole caseload.

**Records Management: The enhancements will increase costs by 37 Pos, 18 FTE, and a total of $17.3M.** Costs support the implementation of enterprise content management services for official records, so that the Agency can support strategy development and execution of Public Law 116-159, section 4103 by providing efficiencies in the end-to-end digital workflow.

**Threat Detection and Prevention: The enhancements will increase costs by 50 Pos, 25 FTE, and a total of $24.8M.** Funding will support ongoing fraud prosecutions nationwide along with roll out the new national security policy which will replace Controlled Application Review and Resolution Program (CARRP). Support for technical development to aid FDNS' detection and review of significant derogatory information, critical data analysis, advancement of tools, and development of programs to meet mission needs.

**Justification**

As USCIS continues to see increased volumes of receipts for immigration petitions and applications, an increase of support costs and personnel is needed to keep up with the demand for services. As the number of officers increase to process immigration petitions and applications, the number of support personnel is also needed to provide training, legal advice, and other support activities to those officers. In addition to keeping up with demand for immigration benefits, USCIS is also investing in efficiency initiatives aimed at online filing, electronic case processing, digitization,

003803

**U.S. Citizenship and Immigration Services**                     **Immigration Examinations Fee Account**

robotic process automation, and artificial intelligence and machine learning technology. These initiatives can ultimately lead to reducing the backlog by reducing the tasks requiring manual processing and reducing case processing times.

## Performance

With the ever-increasing caseload of USCIS, these enhancements are necessary to enable USCIS to meet the demands of expected workflows. These enhancements will help increase the percent of eligible immigration benefit requests processed electronically. With end-to-end electronic adjudication USCIS aims to decrease the backlog. Performance surrounding the number of closed fraud referrals will be maintained at a manageable level as referral numbers continue to rise. USCIS would see a decrease in the case resolution unit analyst error rate through digital processing by lowering the burden on USCIS program offices and adjudicators. The average cycle time for processing entry on duty determinations would go down allowing increased onboarding rates. The percent of cyber security activities measured against *OMB M-22-09 - Moving the U.S. Government Toward Zero Trust Cybersecurity Principles* will increase protecting USCIS from existing cyber threats.

003804

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Program Change 2 – IRAD Support Positions:

| *($ in thousands)* | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 29 | 29 | $4,792 |
| Program Change | (29) | (29) | ($4,792) |

**Description**
This program change will decrease IEFA's base by $4.8M, 29 positions, and 29 FTE. This change is to reduce positions and funding that supports 29 IRAD support positions which will be funded by Operations and Support instead of IEFA. These positions are already onboard and currently support the IRAD mission under the Fraud Detection and National Security Directorate (FDNS).

**Justification**
The FY 2023 Enactment appropriated funding for IRAD and all IRAD staff were to be converted to appropriated funds. However, 29 positions that directly support IRAD were inadvertently omitted and continued to be supported by IEFA. This change will properly account for all staff directly supporting the interview and adjudication work performed in IRAD within Operations and Support.

**Performance**
FDNS supports IRAD by reviewing and investigating, as appropriate, refugee and other case types in IRAD's area of responsibility with fraud, national security, or public safety indicators. FDNS works in partnership with IRAD to bolster program integrity and ensures that adjudicators have the information they need, in the form of an FDNS work product, in order to make an informed final adjudicative decision. With this solution, USCIS will have properly aligned staffing and resources to review and adjudicate case work as intended.

CIS – IEFA - 19

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| Organization (Dollars in Thousands) | FY 2023 Enacted | | | | FY 2024 Annualized CR | | | | FY 2025 President's Budget | | | | FY 2024 to FY 2025 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations | 13,434 | 12,762 | $1,784,493 | $139.78 | 13,244 | 11,866 | $1,804,948 | $152.05 | 13,619 | 12,856 | $2,010,275 | $156.31 | 375 | 990 | $205,327 | $4.26 |
| Field Operations | 7,329 | 6,963 | $973,536 | $139.78 | 7,447 | 6,672 | $948,923 | $142.22 | 7,725 | 7,327 | $1,079,822 | $147.38 | 278 | 655 | $130,899 | $5.16 |
| Fraud Detection and National Security | 1,955 | 1,857 | $259,698 | $139.78 | 1,596 | 1,430 | $260,017 | $181.83 | 1,693 | 1,586 | $292,133 | $184.19 | 97 | 156 | $32,116 | $2.36 |
| Service Center Operations | 4,150 | 3,942 | $551,259 | $139.78 | 4,201 | 3,764 | $595,310 | $158.16 | 4,201 | 3,943 | $637,612 | $161.71 | - | 179 | $42,302 | $3.55 |
| Support Services | - | | - | - | | | $698 | | - | - | $708 | - | | | $10 | |
| Immigration Policy and Support | 2,919 | 2,773 | 587,127 | $211.65 | 3,316 | 2,971 | $571,313 | $192.22 | 3,425 | 3,326 | $646,554 | $194.33 | 109 | 355 | $75,241 | $2.11 |
| Refugee and Asylum Operations | 1,809 | 1,719 | $330,899 | $192.42 | 2,014 | 1,805 | $286,677 | $158.77 | 2,195 | 2,152 | $363,027 | $168.64 | 181 | 347 | $76,350 | $9.87 |
| Immigration Records and Applicant Services | 1,384 | 1,315 | $201,903 | $153.48 | 1,544 | 1,383 | $219,914 | $158.95 | 1,557 | 1,505 | $245,502 | $163.07 | 13 | 122 | $25,588 | $4.12 |
| Premium Processing (Including Transformation) | 2,113 | 2,007 | $310,344 | $154.57 | 3,293 | 2,950 | $408,404 | $138.39 | 3,417 | 3,268 | $472,511 | $144.54 | 124 | 318 | $64,107 | $6.15 |
| Total | 21,659 | 20,576 | $3,214,766 | $156.18 | 23,411 | 20,975 | $3,291,256 | $156.85 | 24,213 | 23,107 | $3,737,869 | $161.71 | 802 | 2,132 | $446,613 | $4.86 |
| Mandatory - Fee | 21,659 | 20,576 | $3,214,766 | $156.18 | 23,411 | 20,975 | $3,291,256 | $156.85 | 24,213 | 23,107 | $3,737,869 | $161.71 | 802 | 2,132 | $446,613 | $4.86 |

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023<br>Enacted | FY 2024<br>Annualized CR | FY 2025<br>President's Budget | FY 2024 to FY 2025<br>Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $2,227,531 | $2,257,890 | $2,552,451 | $264,561 |
| 11.3 Other than Full-time Permanent | $13,156 | $13,089 | $13,044 | ($45) |
| 11.5 Other Personnel Compensation | $103,683 | $68,935 | $86,356 | $17,421 |
| 12.1 Civilian Personnel Benefits | $869,185 | $950,107 | $1,114,765 | $164,658 |
| 13.0 Benefits for Former Personnel | $1,211 | $1,235 | $1,253 | $18 |
| **Total - Personnel Compensation and Benefits** | **$3,214,766** | **$3,291,256** | **$3,737,869** | **$446,613** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 21,659 | 23,411 | 24,213 | 802 |
| FTE - Civilian | 20,576 | 20,975 | 23,107 | 2,132 |

CIS – IEFA - 21

003807

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Pay Cost Drivers

| Pay Cost Drivers (Dollars in Thousands) | FY 2023 Enacted | | | FY 2024 Annualized CR[13] | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 12,002 | $1,714,001 | $142.81 | 10,026 | $1,504,704 | $150.08 | 10,651 | $1,644,035 | $154.35 | 625 | $139,331 | $4.27 |
| Asylum Officer | 1,136 | $178,931 | $157.51 | 1,270 | $197,376 | $155.41 | 1,555 | $252,691 | $162.50 | 285 | $55,315 | $7.09 |
| Adjudication Officer | 277 | $60,854 | $219.69 | 247 | $37,710 | $152.67 | 307 | $51,436 | $167.54 | 60 | $13,726 | $14.87 |
| Hearings and Appeals | 71 | $16,534 | $232.87 | 60 | $11,533 | $192.22 | 62 | $12,084 | $194.90 | 2 | $551 | $2.68 |
| Other Personnel | 7,090 | $1,243,235 | $175.35 | 9,372 | $1,538,698 | $164.18 | 10,532 | $1,776,369 | $168.66 | 1,160 | $237,671 | $4.48 |
| Other PC&B Costs | - | $1,211 | - | - | $1,235 | - | - | $1,254 | - | - | $19 | - |
| Total – Pay Cost Drivers | 20,576 | $3,214,766 | $156.18 | 20,975 | $3,291,256 | $156.85 | 23,107 | $3,737,869 | $161.71 | 2,132 | $446,613 | $4.86 |

### Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. Changes to this cost driver reflect an increase due to the FY 2025 pay raise, and the annualized hiring of additional positions.

**Asylum Officer:** This cost driver funds salaries and benefits of USCIS Asylum Officers. Asylum Officers conduct interviews, process Credible Fear claims, and adjudicate asylum applications that are not made in Immigration Court. Changes to this cost driver reflect an increase due to the FY 2025 pay raise, and the annualized hiring of additional positions.

**Adjudication Officer:** This cost driver funds the salaries and benefits of USCIS Adjudication Officers. Adjudication Officers review applications for immigration benefits and make decisions regarding these requests based on their extensive knowledge of immigration laws and practices. Changes to this cost driver reflect an increase due to the FY 2025 pay raise, and the annualized hiring of additional positions.

---

[13] In the FY 2024 Congressional Justification (CJ), the "Immigration Services Officer" cost driver included Immigration Services Analysts which is reflected in the "FY 2023 Enacted" column. For this CJ, the Immigration Services Analysts were moved into the "Other Personnel" cost driver because these positions do not perform adjudications, which is reflected beginning in the "FY 2024 Annualized CR" column.

**CIS – IEFA - 22**

003808

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

**Hearings and Appeals:** This cost driver funds salaries and benefits of USCIS Hearings and Appeals staff. Hearings and Appeals staff support a wide range of legal services involving administrative, criminal, and civil prosecutions in support of mandamus and other immigration-related litigation actions. Changes to this cost driver reflect an increase due to the FY 2025 pay raise, and the annualized hiring of additional positions.

**Other:** This cost driver funds salaries and benefits of non-Mission Critical Occupation Positions that include: legal, privacy, policy and strategy, equal opportunity and inclusion, procurement operations; management of property, plant, and equipment, and other material resources; budget, planning and performance measures, strategic sourcing, financial and capital asset management; human resources and personnel recruitment, hiring, training, leadership development, employee benefits, and work-life programs, immigration forms, print services, and the management of security and emergency management operations. Changes to this cost driver reflect an increase due to the FY 2025 pay raise, and the annualized hiring of additional positions.

003809

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

# Immigration Examinations Fee Account
## Permanent Positions by Grade – Appropriation
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| SES | 78 | 94 | 94 | - |
| GS-15 | 1,104 | 1,098 | 1,210 | 112 |
| GS-14 | 2,510 | 3,014 | 3,146 | 132 |
| GS-13 | 4,443 | 5,058 | 5,201 | 143 |
| GS-12 | 6,705 | 5,669 | 5,896 | 227 |
| GS-11 | 1,068 | 1,472 | 1,553 | 81 |
| GS-10 | 76 | 49 | 49 | - |
| GS-9 | 3,634 | 3,555 | 3,608 | 53 |
| GS-8 | 30 | 51 | 51 | - |
| GS-7 | 1,621 | 2,261 | 2,301 | 40 |
| GS-6 | 234 | 424 | 424 | - |
| GS-5 | 149 | 663 | 677 | 14 |
| GS-4 | 7 | 2 | 2 | - |
| GS-3 | - | 1 | 1 | - |
| **Total Permanent Positions** | **21,659** | **23,411** | **24,213** | **802** |
| Total Perm. Employment (Filled Positions) EOY | 19,710 | 23,411 | 24,213 | 802 |
| Unfilled Positions EOY | 1,949 | - | - | - |
| **Position Locations** | | | | |
| Headquarters Civilian | 1,200 | 1,297 | 1,341 | 44 |
| U.S. Field Civilian | 20,459 | 22,114 | 22,872 | 758 |
| **Averages** | | | | |
| Average Personnel Costs, ES Positions | $199,959 | $209,457 | $218,673 | $9,216 |
| Average Personnel Costs, GS Positions | $108,995 | $114,172 | $119,196 | $5,024 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

**CIS – IEFA - 24**

003810

# Immigration Examinations Fee Account
## Non-Pay Budget Exhibits
### Non-Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Adjudication Operations | $389,718 | $319,676 | $326,694 | $7,018 |
| Field Operations | $77,839 | $91,726 | $97,446 | $5,720 |
| Fraud Detection and National Security | $4,081 | $6,075 | $7,373 | $1,298 |
| Service Center Operations | $25,443 | $26,957 | $26,957 | - |
| Support Services | $282,355 | $194,918 | $194,918 | - |
| Immigration Policy and Support | $631,797 | $841,844 | $880,305 | $38,461 |
| Refugee and Asylum Operations | $100,551 | $138,273 | $183,192 | $44,919 |
| Immigration Records and Applicant Services | $254,829 | $385,846 | $429,826 | $43,980 |
| Premium Processing (Including Transformation) | $1,003,514 | $924,484 | $1,051,452 | $126,968 |
| **Total** | **$2,380,409** | **$2,610,123** | **$2,871,469** | **$261,346** |
| | | | | |
| Subtotal Mandatory – Fee | $2,380,409 | $2,610,123 | $2,871,469 | $261,346 |

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Non-Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $11,248 | $29,762 | $30,450 | $688 |
| 22.0 Transportation of Things | $14,717 | $12,085 | $12,085 | - |
| 23.1 Rental Payments to GSA | $269,584 | $268,263 | $268,263 | - |
| 23.2 Rental Payments to Others | $2,520 | $202 | $202 | - |
| 23.3 Communications, Utilities, & Miscellaneous | $95,658 | $133,950 | $135,311 | $1,361 |
| 24.0 Printing and Reproduction | $14,717 | $8,756 | $8,756 | - |
| 25.1 Advisory & Assistance Services | $756,696 | $993,312 | $1,233,686 | $240,374 |
| 25.2 Other Services from Non-Federal Sources | $51,278 | $54,348 | $54,800 | $452 |
| 25.3 Other Purchases of goods and services | $349,521 | $370,449 | $383,790 | $13,341 |
| 25.4 Operations & Maintenance of Facilities | $2,452 | $2,599 | $2,599 | - |
| 25.7 Operation & Maintenance of Equipment | $168,015 | $178,075 | $181,407 | $3,332 |
| 26.0 Supplies & Materials | $39,256 | $27,093 | $27,093 | - |
| 31.0 Equipment | $527,483 | $471,996 | $473,794 | $1,798 |
| 32.0 Land and Structures | $72,358 | $55,064 | $55,064 | - |
| 41.0 Grants, Subsidies, and Contributions | - | $82 | $82 | - |
| 42.0 Insurance Claims and Indemnities | $4,906 | $4,087 | $4,087 | - |
| **Total – Non Pay Budget Object Class** | **$2,380,409** | **$2,610,123** | **$2,871,469** | **$261,346** |

CIS – IEFA - 26

003812

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Non-Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| IT Systems Development and Maintenance | $544,353 | $547,954 | $599,810 | $51,856 |
| Overhead Costs | $348,954 | $596,187 | $596,348 | $161 |
| Identity Information and Customer Service | $383,260 | $340,008 | $359,834 | $19,826 |
| Naturalization Processing | $203,336 | $247,428 | $264,221 | $16,793 |
| Lockbox Operations | $144,907 | $212,987 | $237,748 | $24,761 |
| Administrative | $171,103 | $162,795 | $167,989 | $5,194 |
| Expedited Activities | $182,862 | $118,541 | $121,951 | $3,410 |
| Humanitarian Services | $89,330 | $74,157 | $119,608 | $45,451 |
| Threat Detection and Prevention | $32,895 | $96,571 | $117,221 | $20,650 |
| Expedited Application Processing | $38,000 | $55,857 | $71,463 | $15,606 |
| Cybersecurity | $25,332 | $29,760 | $67,430 | $37,670 |
| Records Management | $40,137 | $43,034 | $57,395 | $14,361 |
| Processing of Non-Naturalization Applications | $6,727 | $6,853 | $12,205 | $5,352 |
| Systematic Alien Verification for Entitlements (SAVE) | $11,153 | $11,443 | $11,698 | $255 |
| Freedom of Information Act (FOIA) | $16,391 | $9,101 | $9,101 | - |
| Other Costs | $141,669 | $57,447 | $57,447 | - |
| **Total Non-Pay** | **$2,380,409** | **$2,610,123** | **$2,871,469** | **$261,346** |

## Explanation of Non-Pay Cost Drivers

**IT Systems Development and Maintenance:** IT costs associated with developing new systems and maintaining existing ones. Costs include workstation refresh, quality and Independent Verification & Validation (IV&V) Services for Delivery (QISD), Databricks, Software, and Software License/Maintenance Agreements.

**Overhead Costs:** Costs include shared service cost such as: rent, Federal Protective Services (FPS) security, guard services, mail and postage, and utilities.

CIS – IEFA - 27

003813

**U.S. Citizenship and Immigration Services**                    **Immigration Examinations Fee Account**

**Identity Information and Customer Service:** Costs associated with providing information to the public and facilitating public interaction with USCIS. Costs include Person-Centric Identity Management (PCIM) development and implementation costs, Electronic Immigration System (ELIS) helpdesk, Worldwide Refugee Admissions Processing System (WRAPS), Citizenship and Immigration Data Repository (CIDR) Application Development, and Customer Engagement Center.

**Naturalization Processing:** This cost driver funds costs associated with processing naturalization applications such as costs for conducting the naturalization ceremony.

**Lockbox Operations:** This cost driver funds services provided by its fiscal agent to collect and deposit revenue from immigration fees. The Lockbox performs the initial intake and data entry of applications, scanning of materials, transmission of data to USCIS case management systems, transfer of files to USCIS processing centers, and depositing of checks into USCIS' Treasury accounts.

**Administrative:** This cost driver contains non-pay administrative costs. Contains the non-premium costs for the Lease Acquisitions Program which funds the acquisition of space and facilities. Contains permanent change of station (PCS) costs, training, supplies, transit subsidy, equipment purchases, bulk mail, General Services Administration (GSA) leased vehicles, and travel not associated with any other non-pay cost driver category. Also contains support contracts such as Email as a Service, software licenses, leadership development, virtual conferencing contracts, and Program Management Office (PMO) Support Services. The increase in administrative costs is attributed to the increase in training and equipment costs for onboarding additional personnel.

**Expedited Activities:** Costs from the Premium account used for other purposes. Contains the National Benefits Center (NBC) Records Contract, the lease acquisition program costs funded by premium funds, GSA Rent, FPS, background investigations and other costs.

**Humanitarian Services:** Costs supporting Asylum, Interpreter and Transcription Services, Travel, Training, and the Asylum Vetting Center.

**Threat Detection and Prevention:** Security costs associated with non-cybersecurity threat detection and prevention. Costs include background investigations, National Counterterrorism Center interagency agreement, and Integrated Security Support Management System agreement with DHS.

**Expedited Application Processing:** Non-pay costs from the Premium account for premium processing of applications. This includes the cost for the Next Gen Service Center Operations Support Contract. This cost driver funds contractual costs for correspondence management, fee receipting, data entry, and file operations support for four of the five USCIS service centers: California Service Center, Nebraska Service Center, Texas Service Center, and Vermont Service Center. This contract is overseen by the Service Center Operations and Office of Intake and Document Production as USCIS continues to transition to an electronic adjudicative process.

**Cybersecurity:** This cost driver supports security programs responsible for the protection of the USCIS network, systems, and information ensuring a reliable and secure environment.

003814

**U.S. Citizenship and Immigration Services**                                                **Immigration Examinations Fee Account**

**Records Management:** All defined costs that support the processing of non-FOIA records retrieval and general records retention. Costs include the NARA Interagency Agreement, and National Records Center shipping and supplies.

**Processing of Non-Naturalization Applications:** Costs that support non-naturalization, non-humanitarian front line work.

**Systematic Alien Verification for Entitlements (SAVE):** This cost driver funds the Verification Information System webservices along with the Telephony Contact Center, program management support, licensing, independent test evaluation, and other operating expenses required to run the SAVE program.

**Freedom of Information Act (FOIA):** This cost driver funds support services (FOIA processors) in support of FOIA/Privacy Act (PA) requests.

**Other Costs:** Funds the remaining management and support costs for the day-to-day operations across USCIS.

**Operational Activities**
The USCIS website provides information on activities supported through IEFA. In general, applicants can check case status, check processing times, find USCIS office locations, and file certain forms online. The public may also be interested in learning about citizenship, the USCIS electronic reading room, and certain data and statistics. [14] While large amounts of data regarding USCIS operational activities is available online, below are additional highlights of specific activities that are generally not provided via the website.

Electronic Processing
Filing electronically makes applying for immigration benefits easier, less error-prone, and increases operational efficiencies by eliminating manual processes. USCIS has a goal of enabling electronic processing for all forms by FY 2026. In FY 2023, nearly 40 percent of all applications, petitions, and requests (and required payments) were filed electronically by its customers. New online forms added in FY 2023 included:

- Form I-589, Application for Asylum and for Withholding of Removal;
- Form I-134, Declaration of Financial Support;
- Form I-134A, Request to be a Supporter and Declaration of Financial Support;
- Form I-131, Application for Travel Document; and
- Form I-907, Request for Premium Processing Service for concurrent filing with Form I-765, Application for Employment Authorization and Form I-539, Application to Extend/Change Nonimmigrant Status.

USCIS also expanded online filing for Form I-765 to asylum-based categories (c)(8), Pending Asylum and Withholding of Removal Applicants and Applicants for Pending Asylum under the ABC Settlement Agreement, and (c)(11), Parole, and expanded Form N-600, Application for Certificate of Citizenship, to active military and veteran filers.

---

[14] https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data

**CIS – IEFA - 29**

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Online Filing by Form Type

| Form Type | FY 2023 Actual | FY 2024 Projected | FY 2025 Projected |
|---|---|---|---|
| **Total Online Forms** | **5,062,079** | **4,550,459** | **4,609,768** |
| I-90 | 372,785 | 448,666 | 454,314 |
| I-130 | 328,935 | 340,220 | 333,710 |
| I-131 | 11,068 | 14,210 | 14,789 |
| I-134 | 163,899 | N/A | N/A |
| I-134A | 1,961,487 | 1,260,000 | 1,260,000 |
| I-539 | 110,041 | 78,466 | 79,445 |
| I-589 | 276,781 | 236,813 | 236,813 |
| I-765 | 1,009,827 | 1,280,096 | 1,386,822 |
| I-821 | 193,415 | 230,108 | 235,421 |
| I-821D | 100,603 | 87,703 | 102,643 |
| I-907 | 28,564 | 26,842 | 27,735 |
| N-336 | 2,623 | 2,582 | 2,582 |
| N-400 | 459,997 | 500,840 | 431,580 |
| N-565 | 19,626 | 19,524 | 19,524 |
| N-600 | 21,072 | 21,254 | 21,254 |
| N-600K | 3,197 | 3,135 | 3,135 |

**CIS – IEFA - 30**

003816

U.S. Citizenship and Immigration Services

Immigration Examinations Fee Account

## Fraud Detection and National Security (FDNS)

The FDNS Data System (FDNS-DS–NexGen) records, tracks, and manages immigration inquiries, investigative referrals, law enforcement requests, and case determinations involving benefit fraud, criminal activity, public safety, and national security concerns.

### Fraud Detection Referrals Processed[15]

| Workload Type | FY 2023 Actuals[16] | FY 2024 Projected | FY 2025 Projected |
|---|---|---|---|
| **Total Referrals** | **160,400** | **169,600** | **170,400** |
| National Security Concerns | 6,300 | 6,600 | 6,700 |
| Public Safety Review | 1,700 | 1,800 | 1,850 |
| Public Safety Cases | 7,400 | 7,800 | 7,850 |
| Fraud Review[17] | 22,700 | 24,000 | 24,200 |
| Fraud Cases | 12,900 | 13,600 | 13,700 |
| Workload Mission Record[18] | 100,000 | 105,800 | 106,000 |
| Intel | 1,700 | 1,900 | 1,900 |
| Administrative Site Visit and Verification Program (ASVVP) | 2,200 | 2,300 | 2,300 |
| Targeted Site Visit and Verification Program (TSVVP) | 5,500 | 5,800 | 5,900 |

## Biometrics

The Identity and Information Management Division (IIMD) is responsible for collecting biometric and biographic data from applicants and petitioners that are required to provide this data when they request immigration benefits in the United States.

The following table depicts actual and projected workload volumes for FY 2023, FY 2024, and FY 2025 for the USCIS Biometrics program, which consists of applicant/petitioner processing at an Application Support Centers (ASC), as well as fingerprint checks and name checks with the FBI. When required by USCIS, applicants and petitioners appear at an ASC to have their biometrics (fingerprints, photographs, and signatures) collected. The biometrics are used for identity verification, as well as for performing the required FBI checks for security purposes. USCIS reimburses the FBI for the cost of these security checks. The biometrics workload is a derivative of immigration benefit application and petition receipts. USCIS has been

---

[15] For the purpose of this document, the term "referral" indicates any request for FDNS to review, investigate, or support USCIS workload. This differs from the standard definition of FDNS-DS "referral" that does not include requests to FDNS to conduct administrative investigations of fraud.
[16] FDNS is reporting annualized numbers from the Agency's legacy investigative case management system, FDNS-DS, for Fiscal Year (FY) 2023.
[17] With the release of FDNS-DS NexGen, Fraud Reviews became synonymous with Leads in FDNS-DS.
[18] With the release of FDNS-DS-NexGen, Workload Mission Records replaced most of the Request for Assistance record types.

CIS – IEFA – 31

003817

## U.S. Citizenship and Immigration Services

### Immigration Examinations Fee Account

undergoing some process improvement initiatives to reduce growing backlogs and to address the increase in immigration benefit applications which has led to a commensurate increase in the volume of biometric submissions. These initiatives include re-mapping of ASC appointments while giving due consideration to the distance an applicant must travel to an appointment, extending the length of time fingerprints may be used before requiring new biometrics collection, and streamlining the systems used to check for derogatory information.

| Activity | FY 2023 Actuals | FY 2024 Projected | FY 2025 Projected[19] |
|---|---|---|---|
| Individuals Processed at an ASC | 3,147,485 | 3,200,000 | 3,300,000 |
| FBI Fingerprint Checks | 5,370,575 | 5,996,520 | 5,820,915 |
| FBI Name Checks | 2,761,499 | 2,986,569 | 3,076,166 |

Immigration Policy and Support

This Directorate contains policy and advisory components as well as program office components not included elsewhere, and includes components responsible for management of space, contracts, training, human resources, as well as costs associated with the design, development, and deployment of IT services and solutions in support of immigration policy and the USCIS enterprise. Support for a variety of USCIS headquarters offices include the Office of the Director, Administration, Investment Management Division, Chief Financial Officer, Chief Counsel, Privacy, Contracting, Policy and Strategy, Equal Opportunity and Inclusion, Human Capital and Training, Security and Integrity, Office of Investigations, and External Affairs (Legislative and Intergovernmental Affairs and Public Affairs).

---

[19] USCIS expects to see a drop in FBI Fingerprint Checks in FY 2025 for two reasons: 1) Historically, N-400, Application for Naturalization, receipts are expected to increase during the election year (FY 2024) and forecasted to drop the year after (FY 2025); 2) The FY 2022/2023 Fee Rule published January 31, 2024 is scheduled for implementation on April 1, 2024, which brings an anticipated increase in filings ahead of implementation. For FBI Name Check, projections were not updated, and all trends are tracking as expected. Due to differences in the form types and when/how the different background checks are implemented, FBI Name Check and FBI Fingerprint Check volumes are calculated differently--thus the reason why FBI Name Checks volumes are not forecasted to drop in FY 2025.

**CIS – IEFA - 32**

U.S. Citizenship and Immigration Services

The following table depicts projected workloads for select functions:

| Responsible Office | Workload Measure | FY 2023 Actuals | FY 2024 Projected | FY 2025 Projected |
|---|---|---|---|---|
| Office of Human Capital and Training | Personnel Actions | 36,210 | 44,300 – 48,300 | 48,300 – 50,300 |
| Office of Human Capital and Training | Employees Attending BASIC Immigration Adjudicator Training | 1,195 | 1,300 | 1,400 |
| Office of Security and Integrity | Adjudicative Determinations[20] | 6,250 | 6,250 | 6,250 |
| Office of Security and Integrity | Entry on Duty (EOD) Determinations[21] | 12,000 | 12,000 | 12,000 |
| Office of Equal Opportunity and Inclusion | Formal Complaint Filings[22] | 110 | 150 | 180 |
| Office of Equal Opportunity and Inclusion | Disability Accommodation[23] | 1,933 | 2,100 | 2,250 |
| Office of Equal Opportunity and Inclusion | Informal Complaint Filings | 164 | 200 | 225 |
| Office of Investigations | Anti-Harassment Contacts[24] | 662 | 761 | 875 |
| Office of Investigations | Anti-Harassment Investigations | 418 | 480 | 552 |

USCIS Contact Center

The USCIS Contact Center provides a pathway for applicants to obtain consistent, accurate information and answers to immigration case questions. Tier 1 inquiries are managed by contractors, and the more complicated inquiries are routed to Tiers 2 and 3 and are handled by experienced USCIS Federal staff.[25] USCIS Contact Center is refining channel strategy and limiting inbound and outbound calling while increasing use of chats and webform/email communication with customers. The following table depicts projected Tier 1 and Tier 2 call and chat volumes:

---

[20] Includes suitability, fitness, and security, reinvestigation, and Secure Compartmented Information (SCI) eligibility case types not including contract-to-contract transfers or internal employee selections, or applications of reciprocity.

[21] Includes contractor new hires, Federal new hires, and transfers from other Federal agencies.

[22] Formal complaint filing for future years are anticipated to increase as the Agency grows significantly as a result increased hiring and personnel growth. This growth will create additional supervisory positions tied to the additional workforce which, will likely result in non-selection complaints arising from assertions that non-selection occurred because of a discriminatory reason.

[23] Significant increase in accommodation request in FY 2023 resulting from employees returning to the offices and many requests tied to employees seeking to continue to work from home. These figures are more in line with pre-pandemic levels of accommodation request activity.

[24] It is expected there will continue to be increases in FY 2024 and FY 2025 as anti-harassment training increases and the Office of Equal Opportunity and Inclusion begins to refer harassment allegations raised in the EEO complaint process to the Office of Investigations USCIS Anti-Harassment Program, as required by Equal Employment Opportunity Commission guidance. The USCIS Anti-Harassment Program was officially transferred from the Office of Equal Opportunity and Inclusion to the Office of Investigations in March 2023.

[25] Tier 1: The first level of live assistance, Tier 1, is managed by contractors who can provide general information and assist with inquiries for case status and similar. Tier 2: More complicated inquiries are escalated to the next level of live service, Tier 2, which is staffed by Immigration Services Officers (ISO).

003819

**U.S. Citizenship and Immigration Services**

**Immigration Examinations Fee Account**

| Call and Chat Volume | | | |
|---|---|---|---|
| Call Centers | FY 2023 Actuals | FY 2024 Projected | FY 2025 Projected |
| Tier 1 | 5,877,000 | 5,500,000 | 5,500,000 |
| Tier 2 | 1,798,000 | 2,600,000 | 2,600,000 |

Systematic Alien Verification for Entitlements (SAVE)

The Systematic Alien Verification for Entitlements (SAVE) Program provides immigration information to Federal, State, and local benefit-issuing agencies, institutions, and licensing agencies to assist in determining public benefit eligibility. SAVE provides individualized training, support, and customer service for Agency users.

In FY 2024, USCIS increased SAVE user fees to fully fund the program. The prior user fee was $0.50 per initial verification request handled by the SAVE system, plus an additional $0.50 for any additional manual verification request processed by SAVE status verification personnel. USCIS is incorporating a phased-in user fee increase to $3.10 per verification request, regardless of whether the case involves additional verification requests.

| Fiscal Year | Federal Agency User Fee | Non-Federal Agency User Fee | Federal Agency User Fee Revenue (Dollars in Thousands) | Non-Federal Agency User Fee Revenue (Dollars in Thousands) | USCIS IEFA and Premium Processing Fee Funding (Dollars in Thousands) |
|---|---|---|---|---|---|
| FY 2023[26] | $0.50 | $0.50 | $3,850 | $5,100 | $34,510 |
| FY 2024 | $1.50 | $1.00 | $10,670 | $9,430 | $31,100 |
| FY 2025 | $2.25 | $1.50 | $16,010 | $14,150 | $21,050 |
| FY 2026 | $3.10 | $2.00 | $22,050 | $18,860 | $10,290 |
| FY 2027 | $3.10 | $2.50 | $22,050 | $23,580 | $5,570 |
| FY 2028 | $3.10 | $3.10 | $22,050 | $29,230 | $88 Surplus |

Budget and cost allocation analysis over the past several years has highlighted a need to increase the SAVE budget to $51.2M. Historically, SAVE user agency fees have funded about 22-30 percent of the $33.0-$42.0M SAVE operating budget. The remaining 70-78 percent has been funded by IEFA and Premium Processing fees, subject to some fluctuation.[27]

---

[26] FY 2023 revenue amounts are estimates and not actuals.

[27] Please see the report on SAVE Inquiries Made Pursuant to Mandates in Federal Law for additional information: https://www.dhs.gov/sites/default/files/2023-06/USCIS%20-%20SAVE%20Inquiries%20FY%202023%20%282%29%29.pdf

CIS – IEFA – 34

**U.S. Citizenship and Immigration Services**

**Immigration Examinations Fee Account**

The following table depicts SAVE workload actuals and projections for FY 2023, FY 2024, and FY 2025. Staffing is mainly driven by SAVE second and third step queries, which cannot be automatically resolved and require employees to manually research the case and provide a response to the Agency.

As of September 30, 2023, for FY 2023, there were over 21,500,000 SAVE queries; of those, approximately 1,036,000 required second step and 732,000 required third step. At the end of FY 2023, there were 1,198 agencies enrolled in SAVE.

| Systematic Alien Verification for Entitlements (SAVE) Projected Workload for FY 2023 - FY 2025 | | | |
|---|---|---|---|
| **Activity** | **FY 2023 Actuals** | **FY 2024 Projected** | **FY 2025 Projected** |
| **SAVE Automated Queries** | 21,579,000 | 23,300,000 | 23,500,000 |
| **SAVE Queries requiring second step review by staff** | 1,036,300 | 1,100,000 | 1,200,000 |
| **SAVE Queries requiring third step review by staff** | 732,100 | 900,000 | 1,000,000 |
| **SAVE Registered Agencies (Cumulative)** | 1,198 | 1,205 | 1,211 |

**CIS – IEFA - 35**

003821

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *H-1B Nonimmigrant Petitioner Account*



**Fiscal Year 2025**

**Congressional Justification**

CIS – H1B - 1

003822

# Table of Contents

*H-1B Nonimmigrant Petitioner Account*

Budget Comparison and Adjustments.................................................... 3

Summary of Budget Changes .............................................................. 6

Non Pay Budget Exhibits...................................................................... 7

**1**

003823

U.S. Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# H-1B Nonimmigrant Petitioner Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

|  | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| H-1B Nonimmigrant Petitioner Fee Account | $16,867 | $18,125 | $17,366 | ($759) |
| **Total** | $16,867 | $18,125 | $17,366 | ($759) |
| Subtotal Mandatory – Fee | $16,867 | $18,125 | $17,366 | ($759) |

**Fee Authority**: The H-1B Nonimmigrant Petitioner Fee Account was established by Section 286(s) of the *Immigration and Nationality Act* (8 U.S.C. 1356(s)) and amended by the *American Competitiveness and Workforce Improvement Act of 1998* (ACWIA), Public Law 105-277, Division C, Title IV, 112 Stat. 2681. The ACWIA fee was reauthorized and made permanent by the *L-1 Visa and H-1B Visa Reform Act of 2004* (part of the *Consolidated Appropriations Act, 2005*, Public Law 108-447, 118 Stat. 2809, 3351-61 (2004)).

**Fee Uses**: U.S. Citizenship and Immigration Service' (USCIS) H-1B Nonimmigrant Petitioner Account supports activities related to the processing of petitions for nonimmigrant workers in the H-1B visa classification. The H-1B visa program allows U.S. employers to temporarily employ foreign workers in specialty occupations. USCIS receives five percent of the collections generated by these fees to fund USCIS' immigration benefit adjudication efforts, while the remaining 95 percent of ACWIA collections are deposited in accounts managed by the Department of Labor who receive 55 percent and the National Science Foundation who receive 40 percent.

**Change Mechanism**: Statutory. Requires action through House and Senate Judiciary Committees, and passage into law.

**Previous Changes**: The H-1B Visa Reform Act reauthorized and increased the ACWIA fee. Section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9), requires certain H-1B petitioners with more than 25 employees in the United States to pay an ACWIA fee of $1,500, while similar petitioners with 25 or fewer employees in the United States pay an ACWIA fee of $750.

**Recovery Rate**: The fee was not designed for full cost recovery for H-1B petition processing.

003824

# H-1B Nonimmigrant Petitioner Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

| | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Collections (Actual/Estimates/Projections)** | $16,867 | $18,125 | $17,366 |
| Carryover - Start of Year | $27,688 | $25,599 | $23,652 |
| Recoveries | $652 | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | $392 | ($72) | $43 |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| CHIMP | - | - | - |
| **Total Budget Authority** | $45,599 | $43,652 | $41,061 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $45,599 | $43,652 | $41,061 |
| **Obligations** | | | |
| Projected Obligations | $20,000 | $20,000 | $20,000 |
| Projected Obligations Reimbursables | - | - | - |
| **Actual Obligations** | | | |
| Actual Obligations | $20,000 | - | - |
| Obligations Reimbursables | - | - | - |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | - | - |
| Enacted/Request FTE | - | - | - |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | - | - |
| FTE (Actual/Estimates/Projections) | - | - | - |

**CIS – H1B - 4**

U.S. Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

## Historical Collections and Cost Recovery Rate

| (Dollars in Thousands) | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Five-Year Total |
|---|---|---|---|---|---|---|
| **Total Amount of Fee Collected** | **$19,590** | **$19,129** | **$26,682** | **$23,743** | **$16,867** | **$106,011** |
| Total of Eligible Expenses | $15,000 | $35,000 | $14,333 | $14,909 | $20,000 | $99,242 |
| **Cost Recovery %** | **130.6%** | **54.7%** | **186.2%** | **159.3%** | **84.3%** | **106.8%** |

**Changes in Fee Collections:** The H-1B Nonimmigrant Petitioner account fees are set in statute, and in the past, there has been very little fluctuation in annual revenue. There was a high of revenue in FY 2021, but it has now declined for two consecutive years. FY 2021 and FY 2022 were anomalous years and may have reflected a surge of pent-up H-1B demand that occurred immediately after the COVID-19 Pandemic. For FY 2024, USCIS projects a slight increase of form volume, yielding slightly increased revenue from FY 2023. USCIS then projects a slight decrease in revenue in FY 2025.

003826

## H-1B Nonimmigrant Petitioner Account
### Summary of Budget Changes
*(Dollars in Thousands)*

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2023 Enacted | - | - | - | $20,000 | $20,000 |
| FY 2024 Annualized CR | - | - | - | $20,000 | $20,000 |
| FY 2025 Base Budget | - | - | - | $20,000 | $20,000 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| Total Pricing Changes | - | - | - | - | - |
| Total Adjustments-to-Base | - | - | - | - | - |
| FY 2025 Current Services | - | - | - | $20,000 | $20,000 |
| Total Transfers | - | - | - | - | - |
| Total Program Changes | - | - | - | - | - |
| FY 2025 Request | - | - | - | $20,000 | $20,000 |
| FY 2024 TO FY 2025 Change | - | - | - | - | - |

CIS – H1B - 6

003827

U.S. Citizenship and Immigration Services

H-1B Nonimmigrant Petitioner Account

# H-1B Nonimmigrant Petitioner Account
## Non Pay Budget Exhibits
### Non Pay Summary
*(Dollars in Thousands)*

|  | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Service Center Operations |  | $20,000 | $20,000 | - |
| **Total** |  | **$20,000** | **$20,000** | **-** |
|  |  |  |  |  |
| Subtotal Mandatory - Fee |  | $20,000 | $20,000 | - |

### Non Pay by Object Class
*(Dollars in Thousands)*

|  | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 23.1 Rental Payments to GSA | $2,000 | $2,000 | $2,000 | - |
| 25.1 Advisory & Assistance Services | $18,000 | $18,000 | $18,000 | - |
| **Total - Non Pay Budget Object Class** | **$20,000** | **$20,000** | **$20,000** | **-** |

CIS – H1B - 7

003828

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Service Center Operations Support Services Contract | $18,000 | $18,000 | $18,000 | - |
| Rental Payments to General Services Administration (GSA) | $2,000 | $2,000 | $2,000 | - |
| **Total – Non Pay Cost Drivers** | **$20,000** | **$20,000** | **$20,000** | **-** |

## Explanation of Non Pay Cost Drivers

**Service Center Operations Support Services (SCOSS) Contract:** Funds contractual costs for correspondence management, fee receipting, data entry, digital operations, and file operations support for five USCIS service centers: California Service Center, Nebraska Service Center, Texas Service Center, Vermont Service Center, and Potomac Service Center. The SCOSS contract shared costs are distributed between the IEFA and H-1B account. The projected change to this cost driver is the implementation of the SCOSS Contractor Conversion Initiative. This initiative will convert SCOSS contractors to Federal positions over the course of three fiscal years. The conversion began in FY 2023 and is projected to be complete in FY 2025 which will effectively conclude the SCOSS contract.

**Rental Payments to General Services Administration (GSA):** The FY 2025 amount is based on projections developed by USCIS' Facilities Division, using information provided by the GSA. There are no projected changes to this cost driver.

# Department of Homeland Security

## *U.S. Citizenship and Immigration Services*

### *Fraud Prevention and Detection Account*



**Fiscal Year 2025**
**Congressional Justification**

003830

CIS – FPDA - 1

# Table of Contents

*Fraud Prevention and Detection Account* ...........................................................................1

Budget Comparison and Adjustments.................................................................................3

Summary of Budget Changes .............................................................................................7

Justification of Pricing Changes ........................................................................................8

Personnel Compensation and Benefits................................................................................9

Non Pay Budget Exhibits...................................................................................................13

**CIS – FPDA - 2**

003831

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account

## Budget Comparison and Adjustments

### Comparison of Fee Collections

*(Dollars in Thousands)*

|  | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Fraud Prevention and Detection Account | $45,813 | $51,632 | $51,944 | $312 |
| Total | $45,813 | $51,632 | $51,944 | $312 |
| Subtotal Mandatory - Fee | $45,813 | $51,632 | $51,944 | $312 |

**Fee Authority:** The Fraud Prevention and Detection Account (FPDA) is authorized via Section 286(v) of the *Immigration and Nationality Act* (INA) (8 U.S.C. 1356 (v)) and the *L-1 Visa and H-1B Visa Reform Act of 2004* (part of Pub. L. 108-447). FPDA supports the operations, mission support, and associated management and administration (M&A) costs related to preventing and detecting fraud in the adjudication of all immigration benefit types.

**Fee Uses:** FPDA directly supports U.S. Citizenship and Immigration Services (USCIS) efforts to strengthen the integrity of the United States' immigration system. FPDA resources enable USCIS operations to identify threats to national security and public safety, detect and combat immigration benefit fraud, and remove systemic and other vulnerabilities. USCIS receives one-third of the collections generated by the fees to fund a portion of USCIS' fraud detection and prevention efforts.

The FPDA funds a portion of the operational costs for the Fraud Detection and National Security Directorate (FDNS) and Service Center Operations Directorate (SCOPS). FDNS leads the Agency's efforts to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system.

The FPDA funds salaries and benefits for 115 FDNS positions and 70 SCOPS positions. Resources from the FPDA are not sufficient to fund all of USCIS' fraud detection and national security programs and represent a portion of the overall staff required to determine whether individuals or organizations filing for immigration benefits pose a threat to national security, public safety, or the integrity of the Nation's immigration system. Therefore, these activities are also supported by the Immigration Examinations Fee Account (IEFA). The following table provides a summary of the total USCIS fraud detection referrals processed:

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Fraud Detection Referrals Processed[1]

| Workload Type | FY 2023 Actuals | FY 2024 Projected | FY 2025 Projected |
|---|---|---|---|
| **Total Referrals** | **160,400** | **169,000** | **169,700** |
| National Security Concerns | 6,300 | 6,600 | 6,700 |
| Public Safety Reviews | 1,700 | 1,800 | 1,850 |
| Public Safety Cases | 7,400 | 7,800 | 7,850 |
| Fraud Reviews[2] | 22,700 | 24,000 | 24,200 |
| Fraud Cases | 12,900 | 13,600 | 13,700 |
| Workload Mission Record[3] | 100,000 | 105,800 | 106,000 |
| Intel | 1,700 | 1,900 | 1,900 |
| Administrative Site Visit and Verification Program (ASVVP) | 2,200 | 2,000 | 2,000 |
| Targeted Site Visit and Verification Program (TSVVP) | 5,500 | 5,500 | 5,500 |

**Change Mechanism:** Statutory. Requires action through the House and Senate Judiciary Committees, and passage into law.

**Previous Changes:** Last change was made through the L-1 Visa and H-1B Visa Reform Act of 2004 (part of Pub. L. 108-447). The Act amended section 214(c) of the INA by adding a new subsection (c)(12) which imposed a $500 fraud prevention and detection fee on certain employers filing H-1B petitions.

**Recovery Rate:** This fee is not designed to be full cost recovery. The recovery rate in FY 2023 was 91.7 percent.

---

[1] For the purpose of this document, the term "referral" indicates any request for FDNS to review, investigate, or support USCIS workload. This differs from the standard definition of FDNS-DS-NexGen "referral" that does not include requests to FDNS to conduct administrative investigations of fraud.

[2] With the release of FDNS-DS NexGen, Fraud Reviews became synonymous with Leads in FDNS-DS

[3] With the release of FDNS-DS-NexGen, Workload Mission Records replaced most of the Request for Assistance record types.

**CIS – FPDA - 4**

003833

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Historical Collections and Cost Recovery Rate

| (Dollars in Thousands) | FY 2019 | FY 2020 | FY 2021[2] | FY 2022 | FY 2023 | Five-Year Total |
|---|---|---|---|---|---|---|
| **Total Amount of Fee Collected** | $52,139 | $41,692 | $40,375 | $60,250 | $45,813 | $240,269 |
| Total of Eligible Expenses | $43,873 | $77,116 | $36,679 | $44,981 | $49,938 | $252,587 |
| **Cost Recovery %** | 118.8% | 54.1% | 110.1% | 133.9% | 91.7% | 95.1% |

**Changes in Fee Collections:** USCIS does not anticipate any statutory changes in FY 2025 that would affect collections. USCIS fee collections increased in FY 2023 compared to prior years, due to increasing I-129, Petition for a Nonimmigrant Worker, filings. In FY 2023, the Department of Homeland Security and the Department of Labor issued a temporary final rule that made available 64,716 additional H-2B temporary nonagricultural worker visas for FY 2023 and FY 2024.[4] Following this trend, USCIS forecasts similar volume and revenue levels for H-2B applications in FY 2025.[5]

---

[4] For more information: https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers
[5] Subject to Congressional extension of the H-2B supplemental visa exemption (e.g., P.L. 117-328, Division O, Title III, Section 303, Supplemental Visa Exemption)

003834

# Fraud Prevention and Detection Account
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Collections (Actual/Estimates/Projections)** | $45,813 | $51,632 | $51,944 |
| Carryover - Start of Year | $35,225 | $32,590 | $27,750 |
| Recoveries | $667 | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | $823 | ($332) | ($18) |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| CHIMP | - | - | - |
| **Total Budget Authority** | **$82,528** | **$83,890** | **$79,676** |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | **$82,528** | **$83,890** | **$79,676** |
| **Obligations** |  |  |  |
| Projected Obligations | $53,960 | $56,140 | $56,929 |
| Projected Obligations Reimbursables | - | - | - |
| **Actual Obligations** |  |  |  |
| Actual Obligations | $49,938 | - | - |
| Obligations Reimbursables | - | - | - |
| **Personnel: Positions and FTE** |  |  |  |
| Enacted/Request Positions | 185 | 185 | 185 |
| Enacted/Request FTE | 176 | 176 | 176 |
| **Onboard and Actual FTE** |  |  |  |
| Onboard (Actual/Estimates/Projections) | 166 | 185 | 185 |
| FTE (Actual/Estimates/Projections) | 170 | 176 | 176 |

**CIS – FPDA - 6**

003835

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Summary of Budget Changes
### (Dollars in Thousands)

| | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2023 Enacted | 185 | 176 | $27,068 | $26,892 | $53,960 |
| FY 2024 Annualized CR | 185 | 176 | $28,447 | $27,693 | $56,140 |
| FY 2025 Base Budget | 185 | 176 | $28,447 | $27,693 | $56,140 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| 2025 Civilian Pay Raise | - | - | $433 | - | $433 |
| 2024 Civilian Pay Raise | - | - | $356 | - | $356 |
| Total Pricing Changes | - | - | $789 | - | $789 |
| Total Adjustments-to-Base | - | - | $789 | - | $789 |
| FY 2025 Current Services | 185 | 176 | $29,236 | $27,693 | $56,929 |
| Total Transfers | - | - | - | - | - |
| Total Program Changes | - | - | - | - | - |
| FY 2025 Request | 185 | 176 | $29,236 | $27,693 | $56,929 |
| FY 2024 TO FY 2025 Change | - | - | $789 | - | $789 |

CIS – FPDA - 7

003836

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2025 President's Budget | | Amount |
|---|---|---|---|---|---|
| | | | Pay Amount | Non-Pay Amount | |
| **Pricing Change 1 – 2025 Civilian Pay Raise** | - | - | $433 | - | $433 |
| District Operations | | | $268 | - | $268 |
| Service Center Operations | | | $165 | - | $165 |
| **Pricing Change 2 – 2024 Civilian Pay Raise** | - | - | $356 | - | $356 |
| District Operations | | | $220 | - | $220 |
| Service Center Operations | | | $136 | - | $136 |
| **Total Pricing Changes** | - | - | $789 | - | $789 |

**Pricing Change 1 – 2025 Civilian Pay Raise**

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $28.8M.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2025 2.0 percent civilian pay increase. It is calculated by adding Base pay, Pay Base of the Annualization of FY 2024 Program Changes and the Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (2.0 percent) and then by three-fourths to account for nine months of the 2025 calendar year.

**Pricing Change 2 – 2024 Civilian Pay Raise**

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $27.4M.

Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2024 5.2 percent civilian pay increase. It is calculated by identifying the costs of civilian pay funding in the Base and Annualizations, backing out the impact of the first three quarters of the calendar year 2024 pay increase, and then multiplying that amount by one-quarter of the pay increase rate.

003837

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | | FY 2024 Annualized CR | | | | FY 2025 President's Budget | | | | FY 2024 to FY 2025 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| District Operations | 115 | 109 | $17,187 | $157.68 | 115 | 109 | $17,618 | $161.63 | 115 | 109 | $18,106 | $166.11 | - | - | $488 | $4.48 |
| Service Center Operations | 70 | 67 | $9,881 | $147.48 | 70 | 67 | $10,829 | $161.63 | 70 | 67 | $11,130 | $166.12 | - | - | $301 | $4.49 |
| Total | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | $161.63 | 185 | 176 | $29,236 | $166.11 | - | - | $789 | $4.48 |
| Subtotal Mandatory - Fee | 185 | 176 | $27,068 | $153.80 | 185 | 176 | $28,447 | $161.63 | 185 | 176 | $29,236 | $166.11 | - | - | $789 | $4.48 |

003838

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | $19,124 | $20,101 | $20,659 | $558 |
| 11.3 Other than Full-time Permanent | $4 | $4 | $4 | - |
| 11.5 Other Personnel Compensation | $754 | $793 | $815 | $22 |
| 12.1 Civilian Personnel Benefits | $7,186 | $7,549 | $7,758 | $209 |
| **Total - Personnel Compensation and Benefits** | **$27,068** | **$28,447** | **$29,236** | **$789** |
| **Positions and FTE** | | | | |
| Positions - Civilian | 185 | 185 | 185 | - |
| FTE - Civilian | 176 | 176 | 176 | - |

**CIS – FPDA - 10**

003839

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Change | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Immigration Services Officer | 166 | $25,530 | $153.80 | 166 | $26,831 | $161.63 | 166 | $27,575 | $166.11 | - | $744 | $4.48 |
| Other Costs | 10 | $1,538 | $153.80 | 10 | $1,616 | $161.60 | 10 | $1,661 | $166.10 | - | $45 | $4.50 |
| Total – Pay Cost Drivers | 176 | $27,068 | $153.80 | 176 | $28,447 | $161.63 | 176 | $29,236 | $166.11 | - | $789 | $4.48 |

## Explanation of Pay Cost Drivers

**Immigration Services Officer:** This cost driver funds the salaries and benefits of USCIS Immigration Services Officers. Immigration Services Officers research and analyze applications, petitions, and supporting documentation; interview petitioners and applicants to assess credibility; and deny or grant petitions and applications. The increase in this cost driver is due to the FY 2024 pay raise annualization and the FY 2025 civilian pay raise.

**Other Costs:** This cost driver funds the salaries and benefits of other support personnel within FPDA. The increase in this cost driver is due to the FY 2024 pay raise annualization and the FY 2025 civilian pay raise.

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Fraud Prevention and Detection Account
## Permanent Positions by Grade –Appropriation
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| GS-15 | 6 | 6 | 6 | - |
| GS-14 | 22 | 22 | 22 | - |
| GS-13 | 83 | 83 | 83 | - |
| GS-12 | 55 | 55 | 55 | - |
| GS-11 | 2 | 2 | 2 | - |
| GS-9 | 14 | 14 | 14 | - |
| GS-7 | 3 | 3 | 3 | - |
| **Total Permanent Positions** | **185** | **185** | **185** | **-** |
| Total Perm. Employment (Filled Positions) EOY | 185 | 185 | 185 | - |
| **Position Locations** | | | | |
| Headquarters Civilian | 10 | 10 | 10 | - |
| U.S. Field Civilian | 174 | 174 | 174 | - |
| Foreign Field Civilian | 1 | 1 | 1 | - |
| **Averages** | | | | |
| Average Personnel Costs, GS Positions | $108,659 | $113,494 | $118,545 | $5,051 |
| Average Grade, GS Positions | 12 | 12 | 12 | - |

CIS – FPDA - 12

003841

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

# Fraud Prevention and Detection Account
## Non Pay Budget Exhibits
### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| District Operations | $13,645 | $13,929 | $13,929 | - |
| Service Center Operations | $12,939 | $13,456 | $13,456 | - |
| Asylum, Refugee and International Operations | $308 | $308 | $308 | - |
| **Total** | **$26,892** | **$27,693** | **$27,693** | **-** |
| Subtotal Mandatory - Fee | $26,892 | $27,693 | $27,693 | - |

CIS – FPDA - 13

003842

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | $1,089 | $1,205 | $1,205 | - |
| 22.0 Transportation of Things | $720 | $700 | $700 | - |
| 23.1 Rental Payments to GSA | $334 | $334 | $334 | - |
| 23.3 Communications, Utilities, & Miscellaneous | $1,644 | $1,644 | $1,644 | - |
| 25.1 Advisory & Assistance Services | $4,294 | $4,294 | $4,294 | - |
| 25.2 Other Services from Non-Federal Sources | $51 | $51 | $51 | - |
| 25.3 Other Purchases of goods and services | $11 | $11 | $11 | - |
| 25.4 Operations & Maintenance of Facilities | $15 | $15 | $15 | - |
| 25.7 Operation & Maintenance of Equipment | $1,132 | $1,688 | $1,688 | - |
| 26.0 Supplies & Materials | $202 | $356 | $356 | - |
| 31.0 Equipment | $17,400 | $17,395 | $17,395 | - |
| **Total - Non Pay Budget Object Class** | **$26,892** | **$27,693** | **$27,693** | **-** |

CIS – FPDA - 14

003843

U.S. Citizenship and Immigration Services

Fraud Prevention and Detection Account

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Validation Instrument for Business Enterprises (VIBE) | $12,216 | $12,216 | $12,216 | - |
| Fraud Detection and National Security Program Support Contract | $6,839 | $7,640 | $7,640 | - |
| Rental Payments to General Services Administration (GSA) | $1,978 | $1,978 | $1,978 | - |
| Other Costs | $5,859 | $5,859 | $5,859 | - |
| **Total – Non Pay Cost Drivers** | **$26,892** | **$27,693** | **$27,693** | **-** |

## Explanation of Non Pay Cost Driver

**Validation Instrument for Business Enterprises (VIBE):** Covers operating costs and the IT support contract for the VIBE system. USCIS uses this system to validate the business operations and financial viability of organizations seeking to employ foreign workers, and to identify possible benefit fraud based on FDNS fraud analysis and fraud referrals from USCIS adjudicators and other government agencies. There are no projected changes to this cost driver.

**Fraud Detection and National Security Program Support Contract:** This funds a portion of contractual costs to deploy advanced fraud detection devices and techniques and intelligence-driven planning. There are no projected changes to this cost driver.

**Rental Payments to the General Services Administration (GSA):** Rental Payments to GSA for USCIS facilities space. There are no projected changes to this cost driver.

**Other Costs:** Funds the remaining management and support costs for processing immigration benefit applications while ensuring the security and integrity of the immigration system. There are no projected changes to this cost driver.

CIS – FPDA - 15

003844

003845

EB-5 Integrity Fund

U.S. Citizenship and Immigration Services

# Department of Homeland Security

## U. S. Citizenship and Immigration Services

### EB-5 Integrity Fund



**Fiscal Year 2025**

**Congressional Justification**

CIS – EB5 - 1

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

# Table of Contents

*EB-5 Integrity Fund* ....................................................................................................................1

    Budget Comparison and Adjustments.......................................................................................3

    Summary of Budget Changes ...................................................................................................6

    Personnel Compensation and Benefits.....................................................................................8

    Non Pay Budget Exhibits........................................................................................................ 12

003846

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

# EB-5 Integrity Fund

## Budget Comparison and Adjustments

### Comparison of Fee Collections
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| EB-5 Integrity Fund | $8,066 | $8,760 | $8,760 | - |
| Total | $8,066 | $8,760 | $8,760 | - |
| Subtotal Mandatory - Fee | $8,066 | $8,760 | $8,760 | - |

USCIS administers the EB-5 Immigrant Investor Program, which was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign investors. Immigrant investors choose between two investment options, either the Regional Center Program, introduced by Congress in 1992 and authorized through 2027 or standalone projects. Regional centers focus on development in specific geographic areas in the U.S. with the intended benefits of economic growth, increased export sales, improved regional productivity, job creation, and increased domestic capital investment and are the predominant investment option chosen by immigrant investors.[1]

**Fee Authority**: Section 102 of the *EB-5 Reform and Integrity Act of 2022*, Division BB of the *Consolidated Appropriations Act, 2022* (P.L. 117-103) amended Section 203(b)(5) of *the Immigration and Nationality Act*, and subsequently established a special fund in the U.S. Treasury, known as the "EB-5 Integrity Fund" (8 U.S.C. 1153(b)(5)(J)). The EB-5 Integrity Fund collections include an annual fee of $20,000 from each Regional Center with more than 20 investors; or an annual fee of $10,000 from each Regional Center with 20 or fewer total investors in the preceding fiscal year in its new commercial enterprises. A $1,000 fee is also collected for each petition filed under Section 204(a)(1)(H) – granting immigrant status for EB-5 petitioners; this fee is in addition to the fees established for each petition to recover the cost of adjudication under Section 286(m) – IEFA.

**Fee Uses**: The EB-5 Integrity Fund is to be used by DHS for the following: Conducting investigations , including monitoring and investigating program-related events and promotional activities and ensuring that an alien investor's funds associated with the alien's investment were obtained from a lawful source and through lawful means; detecting and investigating fraud or other crimes; determining whether regional centers, new

---

[1] Departments of State, Justice, and Commerce, the Judiciary and Related Agencies Appropriations Act of 1992, Pub. L. No. 102-395, Title VI, § 610(a) (Oct. 6, 1992).

U.S. Citizenship and Immigration Services

**EB-5 Integrity Fund**

commercial enterprises, job-creating entities, and alien investors (and their alien spouses and alien children) comply with U.S. immigration laws; conducting audits and site visits; and for other purposes as the Department of Homeland Security (DHS) determines necessary.

**Change Mechanism**: Per 8 U.S.C. 1153(b)(5)(J)(ii)(III) and Section 106 of the *EB-5 Reform and Integrity Act of 2022*, the Secretary of Homeland Security may increase fees through the regulatory process to ensure full recovery of the costs to provide aforementioned services, achieve efficient processing, and complete timely adjudications.

**Previous Changes**: N/A

**Recovery Rate**: The fee was designed for full cost recovery.

### Historical Collections and Cost Recovery Rate

| (Dollars in Thousands) | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | Five-Year Total |
|---|---|---|---|---|---|---|
| **Total Amount of Fee Collected** | - | - | - | - | $8,066 | $8,066 |
| Total of Eligible Expenses | - | - | - | - | - | - |
| **Cost Recovery %** | - | - | - | - | 100.0% | 100.0% |

003848

# EB-5 Integrity Fund
## Budget Authority and Obligations
*(Dollars in Thousands)*

|  | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|
| **Collections (Actual/Estimates/Projections)** | $8,066 | $8,760 | $8,760 |
| Carryover - Start of Year | - | $7,606 | $7,566 |
| Recoveries | - | - | - |
| Rescissions to Current Year/Budget Year | - | - | - |
| Net Sequestered Resources | ($460) | ($40) | - |
| Reprogramming/Transfers | - | - | - |
| Supplementals | - | - | - |
| CHIMP | - | - | - |
| **Total Budget Authority** | $7,606 | $16,326 | $16,326 |
| Collections - Reimbursable Resources | - | - | - |
| Collections - Other Sources | - | - | - |
| **Total Budget Resources** | $7,606 | $16,326 | $16,326 |
| **Obligations** | | | |
| Projected Obligations | - | $8,760 | $8,918 |
| Projected Obligations Reimbursables | - | - | - |
| **Actual Obligations** | | | |
| Actual Obligations | - | - | - |
| Obligations Reimbursables | - | - | - |
| **Personnel: Positions and FTE** | | | |
| Enacted/Request Positions | - | 40 | 40 |
| Enacted/Request FTE | - | 35 | 35 |
| **Onboard and Actual FTE** | | | |
| Onboard (Actual/Estimates/Projections) | - | 40 | 40 |
| FTE (Actual/Estimates/Projections) | - | 35 | 35 |

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Summary of Budget Changes
*(Dollars in Thousands)*

|  | Positions | FTE | Pay Amount | Non-Pay Amount | Amount |
|---|---|---|---|---|---|
| FY 2023 Enacted | - | - | - | - | - |
| FY 2024 Annualized CR | 40 | 35 | $5,593 | $3,167 | $8,760 |
| FY 2025 Base Budget | 40 | 35 | $5,593 | $3,167 | $8,760 |
| Total Technical Changes | - | - | - | - | - |
| Total Annualizations and Non-Recurs | - | - | - | - | - |
| 2025 Civilian Pay Raise | - | - | $85 | - | $85 |
| 2024 Civilian Pay Raise | - | - | $73 | - | $73 |
| Total Pricing Changes | - | - | $158 | - | $158 |
| Total Adjustments-to-Base | - | - | $158 | - | $158 |
| FY 2025 Current Services | 40 | 35 | $5,751 | $3,167 | $8,918 |
| Total Transfers | - | - | - | - | - |
| Total Program Changes | - | - | - | - | - |
| FY 2025 Request | 40 | 35 | $5,751 | $3,167 | $8,918 |
| FY 2024 TO FY 2025 Change | - | - | $158 | - | $158 |

CIS – EB5 - 6

003850

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Justification of Pricing Changes
*(Dollars in Thousands)*

| | Positions | FTE | FY 2025 President's Budget | | |
| --- | --- | --- | --- | --- | --- |
| | | | Pay Amount | Non-Pay Amount | Amount |
| **Pricing Change 1 - 2025 Civilian Pay Raise** | - | - | $85 | - | $85 |
| Adjudication Operations (Immigration Services) | - | - | $85 | - | $85 |
| **Pricing Change 2 - 2024 Civilian Pay Raise** | - | - | $73 | - | $73 |
| Adjudication Operations (Immigration Services) | - | - | $73 | - | $73 |
| **Total Pricing Changes** | - | - | $158 | - | $158 |

## Pricing Change 1 – 2025 Civilian Pay Raise

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $5.7M.

Pricing Change Explanation: This pricing change represents the costs of the first three quarters of the calendar year 2025 with a 2.0 percent civilian pay increase. It is calculated by adding Base pay and the Annualization of Prior Year Pay Raise pricing change, multiplying by the pay rate increase (2.0 percent) and then by three-fourths to account for nine months of the 2025 calendar year.

## Pricing Change 2 – 2024 Civilian Pay Raise

Base Activity Funding: This pricing change impacts civilian pay funding in the Base and Annualizations, which totals $5.4M.
Pricing Change Explanation: This pricing change represents the costs of the fourth quarter of the calendar year 2024 5.2 percent civilian pay increase. It is calculated by identifying the costs of civilian pay funding in the Base and Annualizations, backing out the impact of the first three quarters of the calendar year 2024 pay increase, and then multiplying that amount by one-quarter of the civilian pay increase rate.

CIS – EB5 - 7

003851

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

# EB-5 Integrity Fund
## Personnel Compensation and Benefits
### Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | | FY 2024 Annualized CR | | | | FY 2025 President's Budget | | | | FY 2024 to FY 2025 Total Changes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate | Pos. | FTE | Amount | Rate |
| Adjudication Operations (Immigration Services) | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,751 | $164.31 | - | - | $158 | $4.51 |
| Total | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,751 | $164.31 | - | - | $158 | $4.51 |
| Subtotal Mandatory - Fee | - | - | - | - | 40 | 35 | $5,593 | $159.80 | 40 | 35 | $5,751 | $164.31 | - | - | $158 | $4.51 |

## Explanation of Pay Cost Summary

This summarizes the pay summary by Directorate for the Adjudication Operations PPA:

- **Adjudication Operations:** Contains Directorate and Program Offices (DPOs) responsible for regulatory and programmatic compliance, as well as fraud and national security concerns.
  - **Field Operations Directorate's (FOD) Investor Program Office (IPO):** Administers the EB-5 Program and adjudicates applications and petitions while striving to ensure that program participants, including immigrant investors and principals operating U.S. regional centers, comply with program requirements.
  - **Fraud Detection and National Security (FDNS):** Leads the fraud and national security aspects of the mission, and charged with preventing, detecting, and responding to allegations of fraud in the program.

003852

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| 11.1 Full-time Permanent | - | $4,115 | $4,231 | $116 |
| 12.1 Civilian Personnel Benefits | - | $1,478 | $1,520 | $42 |
| **Total - Personnel Compensation and Benefits** | **-** | **$5,593** | **$5,751** | **$158** |
| **Positions and FTE** | | | | |
| Positions - Civilian | - | 40 | 40 | - |
| FTE - Civilian | - | 35 | 35 | - |

**CIS – EB5 - 9**

003853

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 President's Budget | | | FY 2025 OMB Submission | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate | FTE | Amount | Rate |
| Program Auditor | - | - | - | 13 | $2,150 | $165.38 | 13 | $2,211 | $170.08 | - | $61 | $4.70 |
| FDNS Personnel | - | - | - | 17 | $2,748 | $161.65 | 17 | $2,825 | $166.18 | - | $77 | $4.53 |
| Other Costs | - | - | - | 5 | $695 | $139.00 | 5 | $715 | $143.00 | - | $20 | $4.00 |
| **Total – Pay Cost Drivers** | **-** | **-** | **-** | **35** | **$5,593** | **$159.80** | **35** | **$5,751** | **$164.31** | **-** | **$158** | **$4.51** |

### Explanation of Pay Cost Drivers

**Program Auditor:** This cost driver funds the salaries and benefits of the USCIS Regional Center Program auditors. Auditors monitor and examine program-related events and promotional-related events and ensure investor compliance with applicable regulation of the immigrant investor program. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, and FY 2025 pay raise.

**FDNS Personnel:** This cost driver funds personnel who perform non-routine administrative investigations into immigration fraud, financial crimes, and national security concerns that are mandated by the EB-5 Reform and Integrity Act to protect the program, its investors, and economic development projects throughout the U.S. These investigations may occur inside or outside of the U.S. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, and FY 2025 pay raise.

**Other Costs:** This cost driver funds the salaries and benefits of other support personnel within IPO and FDNS who support the administration of regional center audits and provide technical assistance and direct support to IPO management and staff in matters relating to travel. Changes to this cost driver reflect an increase due to the annualization of prior year pay raise, and FY 2025 pay raise.

003854

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

# EB-5 Integrity Fund
## Permanent Positions by Grade –Appropriation
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| GS-14 | - | 4 | 4 | - |
| GS-13 | - | 22 | 22 | - |
| GS-12 | - | 14 | 14 | - |
| **Total Permanent Positions** | - | **40** | **40** | - |
| Total Perm. Employment (Filled Positions) EOY | - | 40 | 40 | - |
| **Position Locations** | | | | |
| U.S. Field Civilian | - | 40 | 40 | - |
| **Averages** | | | | |
| Average Personnel Costs, GS Positions | - | $13 | $13 | - |
| Average Grade, GS Positions | - | 117,571 | 120,886 | 3,315 |

CIS – EB5 - 11

003855

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## EB-5 Integrity Fund
## Non Pay Budget Exhibits

### Non Pay Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| Adjudication Operations (Immigration Services) | - | $3,167 | $3,167 | - |
| **Total** | - | **$3,167** | **$3,167** | - |
| | | | | |
| Subtotal Mandatory - Fee | - | $3,167 | $3,167 | - |

### Non Pay by Object Class
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Change |
|---|---|---|---|---|
| 21.0 Travel and Transportation of Persons | - | $240 | $240 | - |
| 25.1 Advisory & Assistance Services | - | $2,462 | $2,462 | - |
| 26.0 Supplies & Materials | - | $14 | $14 | - |
| 31.0 Equipment | - | $451 | $451 | - |
| **Total - Non Pay Budget Object Class** | - | **$3,167** | **$3,167** | - |

CIS – EB5 - 12

003856

U.S. Citizenship and Immigration Services

EB-5 Integrity Fund

## Non Pay Cost Drivers
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget | FY 2024 to FY 2025 Total Changes |
|---|---|---|---|---|
| Advisory Support Contract | - | $2,462 | $2,462 | - |
| Other Costs | - | $705 | $705 | - |
| **Total – Non Pay Cost Drivers** | **-** | **$3,167** | **$3,167** | **-** |

## Explanation of Non Pay Cost Driver

**Advisory Support Contract:** Covers contractual cost for information technology development of a compliance referral system. IPO compliance referrals are not currently in any case management system. This system would allow for USCIS to begin to systematically collect and track these referrals leading to an enhanced ability to monitor and assess non-compliance trends in the program. Additionally, this would help IPO more readily identify areas for improvement as the program continues to evolve and change. This information was identified in the latest U.S. Government Accountability Office audit for IPO.[2] There are no projected changes to this cost driver.

**Other Costs:** Funds the remaining management and support, equipment, and supplies costs in order to monitor and ensure compliance with the requirements permitted under the *EB-5 Reform and Integrity Act of 2022*. There are no projected changes to this cost driver.

---

[2] GAO-23-105389SU, *Immigrant Investor Program: Opportunities Exist to Improve Fraud and National Security Risk Monitoring*, Published: Dec 06, 2022. Members of Congress or congressional staff who wish to obtain this report should call or e-mail the Congressional Relations Office (202) 512-4400 or congrel@gao.gov. All others who wish to obtain one or more of these products should follow the instructions found on Requesting Restricted Products.

8/28/24, 12:58 AM
Certain Individuals Requesting Parole Can Now File Form I-131 Online | USCIS

**U.S. Citizenship and Immigration Services**

Home > Newsroom > All News > Alerts > Certain Individuals Requesting Parole Can Now File Form I-131 Online

# Certain Individuals Requesting Parole Can Now File Form I-131 Online

Release Date : 06/09/2023

U.S. Citizenship and Immigration Services (USCIS) today announced that certain individuals requesting parole based on urgent humanitarian reasons or significant public benefit can file Form I-131, Application for Travel Document, online.

The following individuals are eligible to file Form I-131 online:

- Individuals requesting parole based on urgent humanitarian reasons or significant public benefit for an individual outside the United States (under application types 1.e. or 1.f. on the paper Form I-131), who are not seeking initial parole under a USCIS family reunification parole process (i.e., Cuban Family Reunification Parole Program, Haitian Family Reunification Parole Program, or Filipino World War II Veterans Parole Program); or

- Individuals already paroled inside the United States who are requesting a new period of parole, or re-parole (under application types 1.e. or 1.f. on the paper Form I-131), to remain in the United States.

To file Form I-131 online, individuals must first visit my.uscis.gov to create a USCI no cost to create an online account, which offers a variety of features, including t



Need Help?
Chat with Emma™

003858

status updates, access all notices, and upload additional evidence.

Online filing of Form I-131 is not available for individuals requesting initial parole under USCIS family reunification parole processes. However, noncitizens already paroled into the United States under USCIS family reunification parole processes may apply for re-parole online to remain in the United States.

Online filing is also not available to individuals already inside the United States filing Form I-131 to request a re-entry permit, refugee travel document, Temporary Protected Status (TPS) travel authorization document, Advance Parole Document (including those already paroled into the United States who want to seek parole back into the U.S. after a departure), advance permission to travel for Commonwealth of the Northern Mariana Islands (CNMI) long-term residents, or individuals seeking a waiver of the filing fee for Form I-131. These individuals must continue to file the paper Form I-131 by mail.

Please note, however, that individuals already paroled inside the United States who want to request a new parole period, or re-parole, to remain in the United States as a parolee, may file Form I-131 online. For more information about the streamlined re-parole application process for Afghan parolees, see the Re-Parole Process for Certain Afghans webpage.

If you file Form I-131 online, but are not eligible to file online, we will deny your application and will not refund the fee you paid.

For more information about which forms are eligible for online filing, visit our Forms Available to File Online page.

For more information about online filing, including helpful videos and filing tips, please visit our File Online page.

Last Reviewed/Updated: 06/09/2023



MENU

Home > Newsroom > All News > News Releases > Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade

# Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade

Release Date : 02/09/2024

*New USCIS data show progress on customer experience, employment-based immigration, naturalization, and humanitarian work*

**WASHINGTON**— Today U.S. Citizenship and Immigration Services (USCIS) is releasing end of fiscal year (FY) 2023 data that illustrate the agency's progress in meeting its strategic priorities. The USCIS workforce has worked tirelessly over the past year to uphold America's promise as a nation of welcome and possibility by reducing backlogs, improving customer experience, addressing humanitarian needs, and strengthening employment-based immigration.

"I'm so proud of the USCIS workforce and our dedication to fairness, integrity, and respect for all we serve," said USCIS Director Ur M. Jaddou. "We've completed a record number of cases, responded to emerging crises around the globe with essential humanitarian relief, and applied innovative solutions to improve customer experience and reduce backlogs."

## Reducing Backlogs

In FY 2023, USCIS received 10.9 million filings and completed more than 10 million pending cases– both record-breaking numbers in the agency's history. In doing so, USCIS reduced overall backlogs by 15%. Among USCIS' record number of case completions in FY 2023, the agency administered the Oath of Allegiance to more than 878,500 new U.S. citizens, including 12,000 members of the military, effectively eliminating the backlog of naturalization applications . The median processing time for naturalization applicants decreased from 10.5 months to 6.1 months by the end of the fiscal year, achieving the agency's longstanding goal and significantly reducing waiting times for most individuals seeking U.S. citizenship.

## Improving Customer Experience

USCIS implemented several new technology solutions that meaningfully advance the customer experience for those navigating our immigration system. Our new self-service tool for online rescheduling of biometrics appointments was used to reschedule over 33,000 such appointments, and our new enterprise change of address capabilities enabled over 430,000 address changes.

Need Help?
Chat with Emma™

through Dec. 2023. This tool is expected to reduce USCIS Contact Center phone inquiries by up to 31%, or approximately 1.5 million inquiries annually. From August to September 2023, USCIS received more than 16,000 field office appointment requests using our online request form, while a new text-ahead capability for callers to our 1-800 number gives them a more predictable call-back window and reduces missed calls.

## Strengthening Immigration for Workers and Employers

In FY 2023, USCIS and the Department of State helped meet the needs of U.S. employers by issuing more than 192,000 employment-based immigrant visas – far above the pre-pandemic number – and, for the second year running ensured that no available visas went unused. The agency further supported U.S. employers and noncitizen workers in FY 2023 by increasing the maximum validity period of Employment Authorization Documents (EADs) to five years for adjustment of status applicants. We clarified eligibility for a range of immigration services, including the International Entrepreneur Rule, the EB-1 immigrant visa for individuals of extraordinary ability and outstanding professors and researchers, and the waiver of the two-year foreign residence requirement for J-1 cultural and educational exchange visitors (including foreign medical graduates). We proposed a new rule to strengthen worker protections and the integrity of the H-2 temporary worker program.

USCIS also removed the biometrics fee and appointment requirement for applicants for a change or extension of nonimmigrant status and updated the agency's interpretation of the Child Status Protection Act to prevent many child beneficiaries of noncitizen workers from "aging out" of child status, allowing them to seek permanent residence along with their parents.

## Fulfilling Our Humanitarian Mission

USCIS continues to address growing humanitarian needs around the globe, as individuals seek protection in the United States from oppression, violence, and other urgent circumstances. At a time when the world is experiencing the greatest displacement of people since World War II, our agency's dedicated employees continue to advance our humanitarian mission and provide protection to vulnerable populations.

USCIS interviewed over 100,000 refugee applicants – more than double the amount completed in the previous fiscal year – resulting in the admission and resettlement of over 60,000 refugees. As of the end of FY 2023, USCIS completed more than 52,000 asylum cases; this included prioritizing process of asylum cases for Afghan alliance and their families. USCIS also completed a record-breaking 146,000 credible fear and reasonable fear screenings of individuals expressing a fear of return after being encountered at the border.

In FY 2023, USCIS continued to support Biden-Harris Administration efforts to establish lawful pathways that allow for the safe and orderly processing of individuals into the United States through the implementation of new processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV); the creation of new family reunification processes for individuals from Colombia, El Salvador, Guatemala, and Honduras, and the modernization of existing processes for Cuba and Haiti; and by maintaining support for the Uniting for Ukraine (U4U) process. As of the end of FY 2023, more than 150,000 Ukrainian nationals and their immediate family members had entered the United States under the U4U process and nearly 238,000 individuals through the CHNV process. USCIS is also a key partner in the Safe Mobility Office initiative, one of the many ways the United States is facilitating access to safe and lawful pathways in partner countries in Central and South America to prevent refugees and vulnerable migrants from undertaking dangerous journeys and discourage criminal smugglers who endanger the lives of vulnerable noncitizens. USCIS also announced enhancements to the Central American Minors Program, including expanding eligibility criteria for such children to qualify for access to the U.S. Refugee Admissions Program.

003861

8/18/24, 6:24 PM    USCIS Announces Unprecedented Reduction of Immigration Cases in Fiscal Year 2023, Reduces the Case Backlog for the First Time in …

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 3869 of 4699 PageID #: 7084

USCIS announced the creation of its sixth service center, the Humanitarian, Adjustment, Removing Conditions, and Travel Documents (HART) Service Center, which focuses on adjudicating benefits requests filed by vulnerable populations. USCIS made significant strides in recruiting, hiring, onboarding, and training new hires, growing the HART Service Center by almost 90% in FY23, and enhancing agency capabilities to adjudicate humanitarian and related cases.

### Looking Ahead

In FY 2024, the agency is continuing to build on this progress while monitoring and addressing remaining processing delays. USCIS will work to maintain the median processing times of 30 days for certain EAD applications filed by individuals who entered the United States after scheduling an appointment through the CBP One mobile application or through the CHNV processes. The agency also proposed new rules to modernize and improve the efficiency and integrity of the H-1B program for specialty occupation workers. USCIS will work to maintain naturalization processing times and utilize all available employment-based visas.

As a fee-funded agency, USCIS achieved all these accomplishments within the constraints of a fee schedule that was last updated in 2016.  We announced a new fee schedule that allows USCIS to more fully recover our operating costs, reestablish and maintain timely case processing, support the development and implementation of tools that further increase our efficiency and improve the customer experience, and help prevent the accumulation of future case backlogs. We continue to call on Congress to pass the Administration's supplemental funding request, including additional resources for USCIS to cover projected shortfalls and hire additional personnel.

USCIS will continue to build capacity for processing historically high referrals for protection screenings at the southern border, while focusing remaining resources on the unprecedented number of pending affirmative asylum applications. USCIS will continue to increase refugee adjudications to support the target of admitting 125,000 refugees this fiscal year. USCIS also plans to increase refugee processing in the Western Hemisphere through the Safe Mobility Office initiative and is on track to admit between 35,000 and 50,000 refugees from the Western Hemisphere this fiscal year, the largest number from this region in history.

To enhance accessibility for those we serve, USCIS will also continue efforts to expand our international footprint outside the United States and remains committed to Operation Enduring Welcome for Afghan allies. USCIS will also invest additional resources to stand up the HART Service Center.

Finally, USCIS will implement new online filing tools to enhance the customer experience, including adding organizational accounts, launching online filing of H-1B petitions on Form I-129, Petition for a Nonimmigrant Worker, and adding an additional electronic intake channel for submission of forms and evidence in PDF format.

For more information on USCIS and our programs, please visit uscis.gov or follow us on Twitter⧉, Instagram⧉, YouTube⧉, and Facebook⧉.

⤢ Close All   ⤢ Open All

---

Progress on Reducing Backlogs                                                                              ⌄

---

003862

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 3870 of 4699 PageID #: 7085

Naturalizing New U.S. Citizens    ⌄

Enhancing Customer Experience    ⌄

Strengthening Immigration for Workers and Employers    ⌄

Fulfilling Our Humanitarian Mission    ⌄

⤢ Close All    ⤢ Open All

Last Reviewed/Updated: 02/09/2024

003863

## Fee Schedule



| | |
|---|---|
| **Department of Homeland Security** | **USCIS** |
| U.S. Citizenship and Immigration Services | **Form G-1055** |

### U.S. Citizenship and Immigration Services
### Fee Schedule
### Effective April 1, 2024

The table below presents the fees, effective April 1, 2024, for all U.S. Citizenship and Immigration Services (USCIS) forms. Each application, petition, or request must be accompanied by the correct fee(s) unless you are exempt from paying the fee(s) or are eligible for a fee waiver.  If the fee is incorrect, the application, petition, or request will be rejected.

**Filing Online**
You may file certain forms online as indicated in the table below.  If you file your form online (see **www.uscis.gov/file-online**), the system will guide you through the process of paying your fees with a credit, debit, or pre-paid card.  Bank account withdrawals are also available when paying online.

**Filing by Mail**
If you are filing your application, petition, or request by mail, please visit our website for filing guidance, at **www.uscis.gov/forms/filing-guidance/form-filing-tips**.  Fees for applications or petitions can be paid by check, money order or credit card:

**1) Payments by Checks or Money Orders.**  You may pay fees with bank drafts, cashier's checks, certified checks, personal checks, and money orders that are drawn on U.S. financial institutions and payable in U.S. funds.  Make the check or money order payable to U.S. Department of Homeland Security, do not use the initials "USDHS" or "DHS."  Generally, you must mail your check or money order together with your application or petition.  Use a separate check or money order for each application or petition you submit.  Do not combine the filing fees for multiple applications or petitions into one check or money order.  If paying by check or money order for a single form that requires multiple fees, pay each fee with a separate check or money order, unless noted otherwise below or in the form instructions.

**NOTE:** If you send USCIS a check, we will convert it into an electronic funds transfer (EFT).  This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check.  The debit from your account will usually take 24 hours and your bank will show it on your regular account statement.  You will not receive your original check back.  We will destroy your original check but will keep a copy of it.  If USCIS cannot process the EFT for technical reasons, you authorize us to process the copy in place of your original check.  If your check is returned as unpayable, we may reject your application, petition, or request.

**2) Payments by Credit Card.**  You may pay your fee(s), using a credit card.  Please see Form G1450 (**http://www.uscis.gov/g-1450**), Authorization for Credit Card Transactions, for more information.

**Filing at a USCIS Office**
If you are filing your application or petition at a USCIS office; cash, a cashier's check or money order cannot be used to pay for the filing and/or biometric services fee.  The only payment options accepted at an USCIS office are payment through pay.gov via a credit card, debit card or with a personal check.

**Fee Waivers**
Certain filers may qualify for a fee waiver for certain forms.  See Form I-912, Request for Fee Waiver, at **http://www.uscis.gov/i-912** to determine if you are eligible for a fee waiver.  If you are not eligible for a fee waiver, you must submit the correct fee(s).  You cannot file online if you are requesting a fee waiver.  You must file paper versions of Form I-912, or your written request for a fee waiver, and the form for which you are requesting a fee waiver.

**Fee Exemptions**

Fee-exempt forms and filing categories list $0 as the Filing Fee. You do not need file Form I-912 or make a formal request to qualify for a fee exemption. However, the fee exemptions in this schedule only indicate that the form is free to file. They do not indicate eligibility to file those benefit requests in all circumstances. Eligibility to file a particular benefit request is set forth in the applicable regulations and form instructions.

**How to Use the Table Below:**

You may search for a specific form by entering a form number, a form name, or a fee in the search box.  The forms listed below are generally ordered alphabetically, in ascending order.  Forms with various filing fees will be listed more than once to display the different fees for each filing purpose.

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **USCIS Immigrant Fee (https://my.uscis.gov/uscis-immigrant-fee)** | If you are immigrating to the United States as a lawful permanent resident. | $235 |
| | Children who enter the United States under the orphan or Hague adoption programs. | $0 |
| | Iraqi and Afghan special immigrants | $0 |
| | Other Afghan nationals | $0 (through Sept. 30, 2024) |
| | Returning lawful permanent residents (SB-1s) | $0 |
| | K nonimmigrants | $0 |
| **Claimant under INA 289,  American Indian Born in Canada** | **General filing** | $0 |
| **AR-11 Alien's Change of Address Card (https://www.uscis.gov/ar-11)** | **General filing** | $0 |
| **EB-5 Integrity Fund Fee (https://www.uscis.gov/integrityfund)** | Annual Integrity Fund Fee for regional centers with over 20 total investors in the preceding fiscal year. | $20,000 |
| | Annual Integrity Fund Fee for regional centers with 20 or fewer total investors in the preceding fiscal year. | $10,000 |
| **EOIR-29 Notice of Appeal to the Board of Immigration Appeals from a Decision of a DHS Officer (https://www.uscis.gov/eoir-29)** | **General filing** | $110 |
| **G-28 Notice of Entry of Appearance as Attorney or Accredited Representative (https://www.uscis.gov/g-28)** | **General filing** | $0 |

003865

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **G-28I**<br>**Notice of Entry of Appearance as Attorney in Matters Outside the Geographical Confines of the United States (https://www.uscis.gov/g-28i)** | **General filing** | $0 |
| **G-325A**<br>**Biographic Information (for Deferred Action)**<br>**(https://www.uscis.gov/g-325a)** | **General filing** | $0 |
| **G-639**<br>**Freedom of Information/ Privacy Act Request**<br>**(https://www.uscis.gov/about-us/freedom-information-and-privacy-act-foia)** | **General filing** | USCIS will notify you if a fee must be submitted after we review your request |
| **G-845**<br>**Verification Request**<br>**(https://www.uscis.gov/g-845)** | **General filing** | $0 |
| **Form G-845 Supplement, Verification Request**<br>**(https://www.uscis.gov/g-845-supplement)** | **General filing** | $0 |
| **G-884**<br>**Request for the Return of Original Documents**<br>**(https://www.uscis.gov/g-884)** | **General filing** | $0 |
| **G-1041**<br>**Genealogy Index Search Request**<br>**(https://www.uscis.gov/g-1041)** | **General filing** | Paper Filing: $80<br>Online Filing: $30 |
| **G-1041A**<br>**Genealogy Records Request**<br>**(https://www.uscis.gov/g-1041a)** | **General filing** | Paper Filing: $80<br>Online Filing: $30 |
| **G-1145**<br>**e-Notification of Application/Petition Acceptance**<br>**(https://www.uscis.gov/g-1145)** | **General filing** | $0 |
| **G-1450**<br>**Authorization for Credit Card Transactions**<br>**(https://www.uscis.gov/g-1450)** | **General filing** | $0 |

003866

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **G-1566**<br>**Request for a Certificate of Non-Existence ([https://www.uscis.gov/g-1566](https://www.uscis.gov/g-1566))** | **General filing** | $330 |
| **H-1B**<br>**Registration Tool ([https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process](https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process))** | **General filing** | 2024: $10 **(per beneficiary)**<br>2025 and after: $215 **(per beneficiary)** |
| **I-9**<br>**Employment Eligibility Verification ([https://www.uscis.gov/i-9](https://www.uscis.gov/i-9))** | **General filing** | $0 |
| **I-90**<br><br>**Application to Replace Permanent Resident Card ([https://www.uscis.gov/i-90](https://www.uscis.gov/i-90))** | **General filing, unless noted below.** | Paper Filing: $465<br>Online Filing: $415 |
| | If you have reached your 14th birthday and your existing card will expire **before** your 16th birthday. | Paper Filing: $465<br>Online Filing: $415 |
| | If you have reached your 14th birthday, and your existing card will expire **after** your 16th birthday. | $0 |
| | If you are filing because we issued your previous card, but you never received it, and it was returned as undeliverable to USCIS. | $0 |
| | If you are filing because we issued the card with incorrect information because of a Department of Homeland Security (DHS) error. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions ([https://www.uscis.gov/i-912](https://www.uscis.gov/i-912))** | $0 |
| **I-102**<br>**Application for Replacement/Initial Nonimmigrant Arrival-Departure Document ([https://www.uscis.gov/i-102](https://www.uscis.gov/i-102))** | **General filing, unless noted below.** | $560 |
| | If you are filing to correct your Form I-94, I-94W, or Form I-95 through no fault of your own and you were admitted to the United States by U.S. Customs and Border Protection (CBP) at an airport or seaport<br><br>after April 30, 2013 and were issued an electronic Form I-94 by CBP, or you require a replacement paper Form I-94 issued by CBP, and you cannot obtain your Form I-94 from the CBP website. | $0 |
| | If you are filing as a nonimmigrant member of the U.S. armed forces. | Initial Request $0<br>Subsequent Request $560 |

003867

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | If you are filing as a participant in a North Atlantic Treaty Organization (NATO) armed forces or civil component. | Initial Request $0 Subsequent Request $560 |
| | If you are filing as a nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA). | Initial Request $0 Subsequent Request $560 |
| | If you are filing for a replacement for DHS error. | $0 |
| **I-129** **Petition for a Nonimmigrant Worker (https://www.uscis.gov/i-129)** | **Varies** | **See Appendix A: I-129** |
| **I-129CW** **Petition for a CNMI-Only Nonimmigrant Transitional Worker (https://www.uscis.gov/i-129cw)** | **General filing, unless noted below.** | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees |
| | **Additional Fees:** 1. Asylum Program Fee    a. If you are filing as a Regular Petitioner    b. If you are filing as a Nonprofit.    c. If you are filing as a Small Employer. If paying by check or money order, submit the fee separately. | a. $600 b. $0 c. $300 |
| | 2. Pub. L. 110-229 requires you to pay a supplemental educational funding fee per beneficiary, per year.  This fee cannot be waived.  If paying by check or money order, submit the fee separately | 2. $210 per beneficiary, per year |
| | 3. Pub. L. 110-229, as revised by the Northern Mariana Islands U.S. Workforce Act of 2018, requires you to pay the Fraud Prevention and Detection Fee for each petition.  This fee cannot be waived.  If paying by check or money order, submit the fee separately. | 3. $50 |
| | **Certain petitioners may be eligible for a Fee Waiver of the General filing fee.** **See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0, plus additional fees |
| **I-129CWR** **Semiannual Report for CW-1 Employers (https://www.uscis.gov/i-129cwr)** | **General filing** | $0 |

003868

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-129F**<br>**Petition for Alien Fiancé(e)**<br>(**https://www.uscis.gov/i-129f**) | **General filing, unless noted below.** | $675 |
| | For K-3 status based on the Form I-130, Petition for Alien Relative (**https://www.uscis.gov/i-130**), you filed. | $0 |
| **I-129S**<br>**Nonimmigrant Petition Based on Blanket L Petition**<br>(**https://www.uscis.gov/i-129s**) | **General filing**<br>**Additional Fees:** | $0, plus additional fees, if applicable |
| |    1.  **Fraud Prevention and Detection Fee**<br><br>      The L-1 Visa Reform Act of 2004 requires some petitioners to submit a **$500** Fraud Prevention and Detection Fee.<br><br>      **a.  Visa Applications filed with the U.S. Department of State.** The Secretary of State will collect the **$500** fee from the petitioner through a beneficiary:<br><br>         **i.**  Who applies at a U.S. Embassy or U.S. Consulate for an L-1 visa; and<br><br>         **ii.**  On whose behalf the petitioner is seeking L-1 approval based on an approved blanket L petition.<br><br>      *Submit the fee in a separate check or money order to the Department of State.*<br><br>      **b.  Visa-Exempt Petitions filed with DHS (USCIS or U.S. Customs and Border Protection).** The Secretary of Homeland Security will collect the **$500** fee from a petitioner who seeks:<br><br>         **i.**  Initial approval of L-1 classification for a beneficiary; or<br><br>         **ii.**  Approval of an L nonimmigrant to continue employment with an entity different from the previous petitioner.<br><br>      *Submit the fee in a separate check or money order to the Department of Homeland Security.*<br><br>      The **Fraud Prevention and Detection Fee**, when applicable, may not be waived and is not refundable, regardless of any action taken on the petition.<br><br>   2.  **Public Law 114-113 Fee**<br><br>      Public Law (Pub. L.) 114-113 requires some petitioners filing an L-1 petition to pay a **$4,500** fee.  Petitioners must pay this fee if:<br><br>      **a.** They are required to pay the $500 Fraud |    1.  $500<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>   2.  $4,500 |

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | Prevention and Detection fee; | |
| | **b.** They employ 50 or more individuals in the United States; | |
| | **c.** More than 50 percent of those employees are in H-1B, L-1A, or L-1B nonimmigrant status; **and** | |
| | **d.** The petition is filed before October 1, 2025. | |
| | The **Pub. L. 114-113 Fee**, when applicable, may not be waived and is not refundable, regardless of any action taken on the petition. | |
| | *Submit the fee in a separate check or money order to the Department of Homeland Security.* | |
| **I-130** <br> **Petition for Alien Relative** <br> (**https://www.uscis.gov/i-130**) | **General filing, unless otherwise noted below.** | Paper Filing: $675 <br> Online Filing: $625 |
| | Filed on behalf of Afghan nationals (beneficiary) with immigrant visa immediately available. | $0 (through Sept. 30, 2024) |
| **I-131** <br> **Application for Travel Document** <br> (**https://www.uscis.gov/i-131**) | **Varies** <br><br> Fee determined based on how form is submitted. | Varies |
| | If you are a refugee, a person paroled as a refugee, or a lawful permanent resident who obtained such status as a refugee in the United States. | $0 |
| | To request parole based on urgent humanitarian reasons or significant public benefit for an individual outside the United States. <br><br> For individuals already paroled inside the United States who are requesting a new period of parole, or re-parole to remain in the United States. | Paper Filing: $630 <br> Online Filing: $580 |
| | If you are filing for a **replacement** document because the document we issued to you contains incorrect information due to our error. | $0 |
| | If you are filing for a **replacement** document because your previous document was issued, but you did not receive it due to USCIS or USPS error. | $0 |
| | If filing for a **Reentry Permit** | Paper Filing: $630 |
| | If filing for a **Refugee Travel Document** for an asylee or lawful permanent resident who obtained such status as an asylee, who is: <br><br> 1. Under 16 years of age; <br><br> 2. 16 years of age or older. | 1. $135 <br><br> 2. $165 |
| | If you filed Form I-485 on or after July 30, 2007, and before April 1, 2024, you paid the required Form I-485 filing fee, and your Form I-485 is still | $0 |

003870

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | pending. | |
| | If filing for an **Advance Parole Document** | Paper Filing: $630 |
| | If you filed Form I-485 on or after July 30, 2007, and before April 1, 2024, you paid the required Form I-485 filing fee, and your Form I-485 is still pending. | $0 |
| | If you are filing as a person seeking or granted special immigrant visa or status as: <br><br> • An Afghan or Iraqi translator or interpreter; <br><br> • An Iraqi national employed by or on behalf of the U.S. Government; <br><br> • An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or <br><br> • A derivative beneficiary of one of the above. | $0 |
| | If you are a current or former U.S. armed forces service member. | $0 |
| | If you are filing as a part of the Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI). | $0 |
| | If you are filing as a spouse, child, or legal guardian of a current or former U.S. armed forces service member. | Paper Filing: $630 |
| | If you are filing as a person seeking adjustment of status as a Special Immigrant Juvenile. | $0 |
| | If you are filing as a person seeking adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA). | $0 |
| | If you are filing as a person seeking adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are filing as a person seeking adjustment of status as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a person granted U nonimmigrant status or seeking adjustment of status under INA 245(m). | $0 |
| | If you are filing as a person granted T nonimmigrant status or seeking adjustment of status under INA 245(l). | $0 |

003871

| | | |
|---|---|---|
| | If you are requesting initial parole (including parole in place), advance parole, or re-parole as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 2017, and January 20, 2021 (Ms. L. v. ICE, 18-cv-00428 (S.D. Cal.)). | $0 (through Dec. 11, 2029) |
| | If you are requesting **parole in place (PIP)** as:<br>• Active-duty member of the U.S. armed forces;<br>• Individual in the Selected Reserve of the Ready Reserve; or<br>• Individual who (whether still living or deceased) previously served on active duty or in the Selected Reserve of the Ready Reserve. | $0 |
| | If you are requesting **parole in place (PIP)** on any other basis not listed above. | Paper Filing: $630 |
| | If filing for **Advance Permission to Travel for CNMI Long-Term Residents.** | Paper Filing: $630 |
| | Certain Afghan nationals who entered the United States with an OAR or PAR Class of Admission, or who are the spouse or child of an Afghan national paroled with that classification  and are requesting re-parole, including those requesting an Employment Authorization Document (EAD) upon approval of the new period of parole (re-parole) in **Part 8.** (effective May 26, 2023 to September 30, 2024). | $0 (through Sept. 30, 2024) |
| | If you have been referred for parole by the U.S. Government. | $0 (through Sept. 30, 2024) |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions**<br>(**https://www.uscis.gov/i-912**) | $0 |
| **I-131A**<br>**Application for Carrier Documentation**<br>(**https://www.uscis.gov/i-131a**) | **General filing, unless noted below.**<br>You must pay the fee online (**https://my.uscis.gov/travel-document/eligibility**) | $575 |
| | If you are a refugee, a person paroled as a refugee, or a lawful permanent resident who obtained such status as a refugee in the United States. | $0 |
| **I-134**<br>**Declaration of Financial Support**<br>(**https://www.uscis.gov/i-134**) | **General filing** | $0 |
| **I-134A**<br>**Online Request to be a Supporter** | **General filing** | $0 |

003872

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| and Declaration of Financial Support (https://www.uscis.gov/i-134a) | | |
| I-140 **Immigrant Petition for Alien Workers** (https://www.uscis.gov/i-140) | **General filing** | $715 plus additional fees, if applicable |
| | **Additional Fees:** 1. Asylum Program Fee    a.  If you are filing as a Regular Petitioner    b.  If filing as a Nonprofit    c.  If filing as a Small Employer If paying by check or money order, submit the fee separately. | a. $600 b. $0 c. $300 |
| I-191 **Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA)** (https://www.uscis.gov/i-191) | **General filing** | $930 |
| | Certain applicants may be eligible for a Fee Waiver. See **Form I-912 Instructions** (https://www.uscis.gov/i-912) | $0 |
| I-192 **Application for Advance Permission to Enter as a Nonimmigrant** (https://www.uscis.gov/i-192) | **General filing, unless noted below.** | $1,100 |
| | If you are filing as a petitioner for U nonimmigrant status (including derivatives). | $0 |
| | If you are filing as an applicant for T nonimmigrant status (including derivatives). | $0 |
| | If filing with U.S. Customs and Border Protection (CBP). **If you are applying to CBP, use the following guidelines when you prepare your check or money order for the Form I-192 filing fee:** **1.**  The check or money order must be made payable to **Customs and Border Protection**.  The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency.  Certain CBP-designated Ports-of-Entry may accept payment in the form of cash or credit cards. We recommend that you contact the CBP preclearance office or CBP Port of Entry where you intend to be processed for payment instructions. Please visit the CBP website at **www.cbp.gov** (go to the search box and type "Form I-192," "I-192," "192," or "waiver"). **2.  Special Instructions for Citizens of Palau, the Federated States of Micronesia, or the Marshall Islands.**  You may contact the nearest U.S. Embassy | $1,100 |

003873

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | or U.S. Consulate to receive payment instructions. You may also receive instructions by emailing the CBP/Admissibility Review Office (ARO) at: aroinquirywaiver@cbp.dhs.gov. | |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>See **Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | $0 |
| **I-193**<br>**Application for Waiver of Passport and/or Visa (https://www.uscis.gov/i-193)** | **General filing, unless noted below.** | $695 |
| | If you are filing as a petitioner for U nonimmigrant status (including derivatives). | $0 |
| | If you are filing as an applicant for T nonimmigrant status (including derivatives). | $0 |
| | Certain applicants may be eligible for a Fee Waiver.<br><br>See **Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | $0 |
| **I-212**<br>**Application for Permission to Reapply for Admission Into the United States After Deportation or Removal**<br>(**https://www.uscis.gov/i-212**) | **General filing, unless noted below.** | $1,175 |
| | If you are applying for a nonimmigrant visa, you may contact the U.S. Consulate with jurisdiction over your nonimmigrant visa to receive payment instructions. | $1,175 |
| | If you are applying with the Department of Justice, Executive Office for Immigration Review (EOIR) during removal proceedings, you must submit the payment as instructed by the immigration court with jurisdiction over your case.  For information about EOIR, visit EOIR's website at **www.usdoj.gov/eoir**. | $1,175 |
| | If you are applying with U.S. Customs and Border Protection (CBP) at a Port of Entry, use the following guidelines when you prepare your check or money order for the Form I-212 filing fee:<br><br>**1.**  You must make your check or money order payable to **U.S. Customs and Border Protection**. Certain CBP-designated Ports of Entry and certain CBP-designated pre-clearance offices may accept payment in the form of cash or credit cards.  We recommend that you contact the CBP pre-clearance office or CBP Port of Entry where you intend to be processed for payment instructions.  To locate the CBP pre-clearance office or CBP Port of Entry, visit CBP's website at **www.cbp.gov**.<br><br>**2.**  If you are a citizen of Palau, the Federal States of Micronesia, or the Marshall Islands, you may contact CBP at Guam Port of Entry or the nearest U.S. Embassy or U.S. Consulate to receive payment | $1,175 |

003874

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | instructions.  To locate the U.S. Embassy or U.S. Consulate, visit the Department of State's website at **www.state.gov**. | |
| | If you are filing with USCIS as a person seeking or granted special immigrant visa or status as:<br><br>• An Afghan or Iraqi translator or interpreter;<br><br>• An Iraqi national employed by or on behalf of the U.S. Government;<br><br>• An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or<br><br>• A derivative beneficiary of one of the above. | $0 |
| | If you are filing with USCIS as a person seeking or granted adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA) or the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are filing with USCIS as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **I-290B**<br>**Notice of Appeal or Motion**<br>**(https://www.uscis.gov/i-290b)** | **General filing, unless noted below.** | $800 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification (only if filed for any benefit request filed before adjusting status or a motion filed for Form I-485 and an associated ancillary form). | $0 |
| | If you are filing as a person seeking or granted T nonimmigrant status (including derivatives) (only if filed for any benefit request filed before adjusting status or for Form I-485 and an associated ancillary form). | $0 |
| | If you are filing as a petitioner for U nonimmigrant status (including derivatives) (only if filed for any benefit request filed before adjusting status or for Form I-485 and an associated ancillary form). | $0 |
| | If you are filing as a person seeking or granted special immigrant visa or status as: | $0 |

003875

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | • An Afghan or Iraqi translator or interpreter;<br><br>• An Iraqi national employed by or on behalf of the U.S. Government;<br><br>• An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or<br><br>• A derivative beneficiary of one of the above.<br><br>If Form I-290B is filed for any benefit request filed before adjusting status or a motion filed for a Form I-485. | |
| | If this is the first I-290B filing for a parole request (Form I-131) filed on behalf of a national of Afghanistan outside the U.S., and that parole request was denied between August 1, 2021, and September 30, 2023. | $0 |
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA) - if Form I-290B is filed for any benefit request filed before adjustment of status or a motion filed on an Application to Register Permanent Residence or Adjust Status (Form I-485). | $0 |
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA) - if Form I-290B is filed for any benefit request filed before adjustment of status or a motion filed on an Application to Register Permanent Residence or Adjust Status (Form I-485). | $0 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives):<br><br>• For any benefit request filed before adjustment of status, a motion on an Application to Register Permanent Residence or Adjust Status (Form I-485), or an associated ancillary form. | $0 |
| | If you are a conditional permanent resident filing a waiver of the joint filing requirement (Form I-751) based on battery or extreme cruelty. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |

003876

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-356**<br>**Request for Cancellation of Public Charge Bond**<br>(**https://www.uscis.gov/i-356**) | **General filing** | $0 |
| **I-360**<br>**Petition for Amerasian, Widow(er), or Special Immigrant**<br>(**https://www.uscis.gov/i-360**) | **General filing, unless noted below.** | $515 |
| | If you are filing for or as an Amerasian special immigrant. | $0 |
| | If you are self-petitioning under Violence Against Women Act (VAWA) as an abused spouse or child of a U.S. citizen or lawful permanent resident, or an abused parent of a U.S. citizen son or daughter. | $0 |
| | If you are filing as a Special Immigrant Juvenile. | $0 |
| | If you are filing as an:<br><br>• Afghan or Iraqi national who worked with the U.S. armed forces as a translator or interpreter, or the surviving spouse and children of a deceased principal;<br><br>• Iraqi national who worked for or on behalf of the U.S. Government in Iraq, or the surviving spouse and children of a deceased principal; or<br><br>• Afghan national who worked for or on behalf of the U.S. Government or the International Security Assistance Force (ISAF) in Afghanistan, or the surviving spouse and children of a deceased principal. | $0 |
| | If you are a filing as a person who served honorably on active duty in the U.S. armed forces filing under the Immigration and Nationality Act (INA) section 101(a)(27)(K). | $0 |
| **I-361**<br>**Affidavit of Financial Support and Intent to Petition for Legal Custody of Public Law 97-359 Amerasian**<br>(**https://www.uscis.gov/i-361**) | **General filing** | $0 |
| **I-363**<br>**Request to Enforce Affidavit of Financial Support and Intent to Petition for Custody for Public Law 97-359 Amerasian**<br>(**https://www.uscis.gov/i-363**) | **General filing** | $0 |

003877

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-407**<br>**Record of Abandonment of Lawful Permanent Resident Status**<br>(**https://www.uscis.gov/i-407**) | **General filing** | $0 |
| **I-485**<br>**Application to Register Permanent Residence or Adjust Status for applicant over the age of 14**<br>(**https://www.uscis.gov/i-485**) | **General filing, unless noted below.** | $1,440 |
| | If under 14 years of age and submitting Form I-485 concurrently with the Form I-485 of one parent. | $950 |
| | If you are filing as an applicant who served honorably on active duty in the U.S. armed forces and who is filing under INA section 101(a)(27)(K). | $0 |
| | If you are a refugee or you were paroled as a refugee. | $0 |
| | If you are in deportation, exclusion, or removal proceedings before an immigration judge, and the court waives your application fee. | $0 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| | If you are filing as a U nonimmigrant seeking adjustment of status under INA section 245(m). | $0 |
| | If you are filing as a T nonimmigrant seeking adjustment of status under INA section 245(l). | $0 |
| | If you are filing as a person seeking or granted special immigrant visa or status as:<br><br>• An Afghan or Iraqi translator or interpreter;<br><br>• An Iraqi national employed by or on behalf of the U.S. Government;<br><br>• An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or<br><br>• A derivative beneficiary of one of the above. | $0 |
| | If you are filing under Section 13 of Pub. L. 85-316 as an Afghan Diplomat or immediate family member who held valid A or G status on July 14, 2021. | $0 |
| | If you are filing as a person seeking adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA). | $0 |
| | If you are filing as a person seeking adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |

003878

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | If you are filing as a person seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a Haitian child who was paroled into the United States as an adopted child of a U.S. citizen with an approved or pending Form I-800 seeking to adjust status. | $0 (through Sept. 30, 2024) |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **I-485A**<br>**Supplement A to Form I-485, Adjustment of Status Under Section 245(i) (https://www.uscis.gov/i-485supa)** | **General filing, unless noted below.** | $1,000 |
| | If you are an unmarried child under 17 years of age. | $0 |
| | If you are the spouse or unmarried child under 21 years of age of a legalized alien and have attached a copy of a USCIS receipt or approval notice for a properly filed Form I-817, Application for Family Unity Benefits. **(https://www.uscis.gov/i-817)** | $0 |
| **I-485J**<br>**Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) (https://www.uscis.gov/i-485supj)** | **General filing** | $0 |
| **I-508**<br>**Waiver of Certain Rights, Privileges, Exemptions, and Immunities (https://www.uscis.gov/i-508)** | **General filing** | $0 |
| **I-526**<br>**Immigrant Petition by Standalone Investor (https://www.uscis.gov/i-526)** | **General filing** | $11,160 |
| **I-526E**<br>**Immigrant Petition by Regional Center Investor (https://www.uscis.gov/i-526e)** | **General filing** | $11,160 |
| | If you file an initial Form I-526E on or after October 1, 2022, you must include a separate fee of $1,000 as required by the EB-5 Reform and Integrity Act of 2022.  This additional amount does not apply to an amendment request. | $1,000 |

003879

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | If paying by check or money order, submit the fee separately. | |
| **I-539**<br>**Application to Extend/Change Nonimmigrant Status**<br>(**https://www.uscis.gov/i-539**) | **General filing, unless noted below.** | Paper Filing: $470<br>Online Filing: $420 |
| | If filing into or out of A, G, or NATO nonimmigrant status. | $0 |
| | Victims of severe form of trafficking (T nonimmigrants). | $0 |
| | Victims of qualifying criminal activity (U nonimmigrants). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | $0 |
| **I-566**<br>**Interagency Record of Request - A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status**<br>(**https://www.uscis.gov/i-566**) | **General filing** | $0 |
| **I-589**<br>**Application for Asylum and for Withholding of Removal**<br>(**https://www.uscis.gov/i-589**) | **General filing** | $0 |
| **I-590**<br>**Registration for Classification as a Refugee** | **General filing** | $0 |
| **I-600**<br>**Petition to Classify Orphan as an Immediate Relative**<br>(**https://www.uscis.gov/i-600**) | **General filing, unless noted below.** | $920 |
| | If you are filing your first Form I-600 petition during your Form I-600A approval period. | $0 |
| | If you file more than one Form I-600 during your Form I-600A approval period for children who are not birth siblings before the proposed adoption. | $920<br>for the second and any subsequent non-birth siblings |
| | If you are filing more than one Form I-600 during your Form I-600A approval period for children who are birth siblings before the proposed adoption. | $0 |
| | New Combination filing: If you previously filed a Form I-600 combination filing and your marital | $920 |

003880

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | status changed after the suitability approval. | |
| | New Combination filing: If your marital status changes while your previous Form I-600 combination filing petition is pending, you must submit a new Form I-600 combination filing. | $0 |
| **I-600A** **Application for Advance Processing of an Orphan Petition** (**https://www.uscis.gov/i-600a**) | **General filing, unless noted below.** | $920 |
| | Filed due to change in marital status after prior Form I-600A is approved. | $920 |
| | Filed due to change in marital status while prior Form I-600A is pending. | $0 |
| **I-600A/I-600** **Supplement 1 Listing of Adult Member of the Household** (**https://www.uscis.gov/i-600a**) and (**https://www.uscis.gov/i-600**) | **General filing** | $0 |
| **I-600A/I-600** **Supplement 2 Consent to Disclose Information** (**https://www.uscis.gov/i-600a**) and (**https://www.uscis.gov/i-600**) | **General filing** | $0 |
| **I-600A/I-600** **Supplement 3 Request for Action on Approved Form I-600A/I-600** (**https://www.uscis.gov/i-600a**) and (**https://www.uscis.gov/i-600**) | **General filing, unless noted below.** | $455 |
| | Filed for a **FIRST** or **SECOND** extension of your Form I-600A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** extension of your Form I-600A. | $455 |
| | Filed for a new approval notice based on a significant change and updated home study after we approved your Form I-600A or Form I-600 and there is no request for a first or second extension of your Form I-600A approval or a first or second change of non-Hague Adoption Convention country on the same Supplement 3. | $455 |
| | Filed for a **FIRST** or **SECOND** change to a new non-Hague Adoption Convention country for which you were not previously approved in your suitability determination. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** change to a new non-Hague Adoption Convention country for which you were not previously approved in your suitability determination. | $455 |

003881

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | Filed for a duplicate approval notice. | $0 |
| **I-601**<br>**Application for Waiver of Grounds of Inadmissibility**<br>(**https://www.uscis.gov/i-601**) | **General filing, unless noted below.** | $1,050 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| | If you are filing as a person seeking or granted T nonimmigrant status. | $0 |
| | If you are filing as a person seeking or granted U nonimmigrant status. | $0 |
| | If you are filing as a person seeking or granted special immigrant visa or adjustment of status as:<br><br>• An Afghan or Iraqi translator or interpreter;<br>• An Iraqi national employed by or on behalf of the U.S. Government;<br>• An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or<br>• A derivative beneficiary of one of the above. | $0 |
| | If you are an Afghan national who is the beneficiary of an approved Form I-130 with an immigrant visa immediately available | $0 (through Sept. 30, 2024) |
| | If you are filing this form in connection with a Form I-485 under Section 13 of Pub. L. 85-316 as an Afghan Diplomat or immediate family member who held valid A or G status on July 14, 2021. | $0 |
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA). | $0 |
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are an abused spouse or child seeking benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA). | $0 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | For applicants for adjustment of status of Indochina refugees under Pub. L. 95-145. | $0 |
| | If you are filing as a Haitian child paroled into the United States as an adopted child of a U.S. citizen | $0 (through Sept. 30, 2024) |

003882

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | with an approved or pending Form I-800 seeking to adjust status. | |
| | **Certain applicants may be eligible for a Fee Waiver.** | |
| | **See Form I-912 Instructions (https://www.uscis.gov/i-912)** | |
| **I-601A**<br>**Application for Provisional Unlawful Presence Waiver (https://www.uscis.gov/i-601a)** | General filing | $795 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| **I-602**<br>**Application by Refugee for Waiver of Inadmissibility Grounds (https://www.uscis.gov/i-602)** | General filing | $0 |
| **I-612**<br>**Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) (https://www.uscis.gov/i-612)** | General filing | $1,100 |
| **I-687**<br>**Application for Status as a Temporary Resident Under Section 245A of the INA (https://www.uscis.gov/i-687)** | General filing | $1,240 |
| **I-690**<br>**Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act (https://www.uscis.gov/i-690)** | General filing | $905 |
| **I-693**<br>**Report of Immigration Medical Examination and Vaccination Record (https://www.uscis.gov/i-693)** | General filing | $0 |
| **I-694**<br>**Notice of Appeal of Decision Under** | General filing, unless noted below. | $1,125 |

003883

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| Section 210 or 245A of the Immigration and Nationality Act (**https://www.uscis.gov/i-694**) | Certain applicants may be eligible for a Fee Waiver.<br><br>See Form I-912 Instructions (**https://www.uscis.gov/i-912**) | $0 |
| I-698<br>**Application to Adjust Status From Temporary to Permanent Resident (Under Section 245A of the INA) (https://www.uscis.gov/i-698)** | General filing | $1,670 |
| I-730<br>**Refugee/Asylee Relative Petition (https://www.uscis.gov/i-730)** | General filing | $0 |
| I-751<br>**Petition to Remove Conditions on Residence (https://www.uscis.gov/i-751)** | General filing | $750 |
| | Conditional permanent residents, spouse, or child who filed a waiver of the joint filing requirement based on battery or extreme cruelty. | $0 |
| | Certain applicants may be eligible for a Fee Waiver.<br><br>See Form I-912 Instructions (**https://www.uscis.gov/i-912**) | $0 |
| I-765<br>**Application for Employment Authorization (https://www.uscis.gov/i-765)** | Varies | **See Appendix B: I-765** |
| I-765V<br>**Application for Employment Authorization for Abused Nonimmigrant Spouse (https://www.uscis.gov/i-765v)** | General filing | $0 |
| I-800<br>**Petition to Classify Convention Adoptee as an Immediate Relative (https://www.uscis.gov/i-800)** | General filing, unless noted below. | $920 |
| | If you file more than one Form I-800 during your Form I-800A approval period, for children who are not birth siblings before the proposed adoption. | $920 for each non-birth sibling |
| | If you are filing your first Form I-800 during your Form I-800A approval period. | $0 |
| | If you are filing more than one Form I-800 during your Form I-800A approval period for children who are birth siblings before the proposed adoption. | $0 |

003884

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-800**<br>**Supplement 1 Consent to Disclose Information**<br>(**https://www.uscis.gov/i-800**) | **General filing** | $0 |
| **I-800A**<br>**Application for Determination of Suitability to Adopt a Child from a Convention Country**<br>(**https://www.uscis.gov/i-800a**) | **General filing, unless noted below** | $920 |
| | If filed due to a change in marital status after approval of a prior Form I-800A. | $920 |
| | If filed due to a change in marital status while a prior Form I-800A is pending. | $0 |
| **I-800A**<br>**Supplement 1 Listing of Adult Member of the Household.**<br>(**https://www.uscis.gov/i-800a**) | **General filing** | $0 |
| **I-800A**<br>**Supplement 2 Consent to Disclose Information**<br>(**https://www.uscis.gov/i-800a**) | **General filing** | $0 |
| **I-800A**<br>**Supplement 3 Request for Action on Approved Form I-800A**<br>(**https://www.uscis.gov/i-800a**) | **General filing, unless noted below.** | $455 |
| | Filed for a **FIRST or SECOND** extension of your Form I-800A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** extension of your Form I-800A. | $455 |
| | Filed for a new approval notice based on a significant change and updated home study after we approved your Form I-800A, and there is no request for a first or second extension of your Form I-800A approval or a first or second change of Hague Adoption Convention country on the same Supplement 3. | $455 |
| | Filed for a **FIRST** or **SECOND** change in Convention country after the approval of Form I-800A. | $0 |
| | Filed for a **THIRD** or **SUBSEQUENT** change in Convention country after we approved your Form I-800A. | $455 |
| | Filed for a duplicate approval notice. | $0 |
| **I-817**<br>**Application for Family Unity Benefits**<br>(**https://www.uscis.gov/i-817**) | **General filing, unless noted below.** | $760 |
| | **Certain applicants may be eligible for a Fee** | $0 |

003885

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | Waiver.<br><br>**See Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | |
| **I-821**<br>**Application for Temporary Protected Status** (**https://www.uscis.gov/i-821**) | If you are filing for **initial** registration. | $50 plus additional fees |
| | Submitted through USCIS-recognized state or local government legal services clinics hosted through December 31, 2024. | $0 (no additional fees) |
| | If you are filing for **re-registration**. | $0 plus additional fees |
| | **Additional Fees:** Biometric Services Fee<br><br>Payment for this fee may be made in the form of a single check or money order when also paying the initial registration fee, or as two separate checks or money orders. | $30 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | $0 |
| **I-821D**<br>**Consideration of Deferred Action for Childhood Arrivals** (**https://www.uscis.gov/i-821d**) | **General filing** | $85 |
| **I-824**<br>**Application for Action on an Approved Application or Petition** (**https://www.uscis.gov/i-824**) | **General filing, unless otherwise noted below.** | $590 |
| | If you are filing as a person seeking or granted special immigrant visa or status as:<br><br>• An Afghan or Iraqi translator or interpreter;<br><br>• An Iraqi national employed by or on behalf of the U.S. Government;<br><br>• An Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or<br><br>• A derivative beneficiary of one of the above. | $0 |
| | If you are filing as a person seeking or granted immigrant classification as a Violence Against Women Act (VAWA) self-petitioner (including derivatives). | $0 |
| | If you are filing as a person seeking or granted Special Immigrant Juvenile classification. | $0 |
| | If you are filing as a person seeking or granted T nonimmigrant status. | $0 |

003886

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA). | $0 |
| | If you are filing as a person seeking or granted adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA). | $0 |
| | If you are filing as a person seeking or granted U nonimmigrant status. | $0 |
| | If you are an abused spouse or child applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA). | $0 |
| | If you are a battered spouse or child of a lawful permanent resident or U.S. citizen applying for cancellation of removal or adjustment of status under INA section 240A(b)(2). | $0 |
| **I-829**<br>**Petition by Investor to Remove Conditions on Permanent Resident Status (https://www.uscis.gov/i-829)** | **General filing** | $9,525 |
| **I-854**<br>**Inter-Agency Alien Witness and Informant Record (https://www.uscis.gov/i-854)** | **General filing** | $0 |
| **I-864**<br>**Affidavit of Support Under Section 213A of the INA (https://www.uscis.gov/i-864)** | **General filing** | $0 |
| **I-864A**<br>**Contract Between Sponsor and Household Member (https://www.uscis.gov/i-864a)** | **General filing** | $0 |
| **I-864EZ**<br>**Affidavit of Support Under Section 213A of the INA (https://www.uscis.gov/i-846ez)** | **General filing** | $0 |
| **I-864W**<br>**Request for Exemption for Intending Immigrant's Affidavit of Support (https://www.uscis.gov/i-864w)** | **General filing** | $0 |

003887

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-865**<br>**Sponsor's Notice of Change of Address**<br>(**https://www.uscis.gov/i-865**) | **General filing** | $0 |
| **I-881**<br>**Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100, NACARA)**<br>(**https://www.uscis.gov/i-881**) | **General filing, unless noted below.** | $340 |
| | If you are filing as an abused spouse or child applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA). | $0 |
| | If you are filing with the Immigration Court (Executive Office of Immigration Review).  The court will charge a single fee separate from the USCIS filing fee for applications filed by one or more applicants in the same proceeding. | $165 Immigration Court fee |
| | If we refer the application to the Immigration Court, the court will not charge a fee separate from the USCIS filing fee (if any). | $0 Immigration Court fee |
| | **Certain applicants may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions** (**https://www.uscis.gov/i-912**) | $0 |
| **I-905**<br>**Application for Authorization to Issue Certification for Health Care Workers**<br>(**https://www.uscis.gov/i-905**) | **General filing** | $230 |
| **I-907**<br>**Request for Premium Processing Service**<br>(**https://www.uscis.gov/i-907**) | To determine if Premium Processing is available for your benefit request, please visit our website at **www.uscis.gov/I-907** or call the USCIS Contact Center at **800-375-5283** (TTY **800-767-1833**).<br><br>*The Premium Processing fee is in addition to all other applicable filing fees.  You must submit the Premium Processing fee separately from other filing fees.  Form I-907 may not be filed by a beneficiary or co-applicant of the primary form for which premium processing is being requested.<br><br>The following benefit requests are designated under the regulations for Premium Processing Service.  Please be aware that you may only request premium processing for a benefit if USCIS has announced on its website that premium processing is available for that benefit. | Varies |

003888

| Form Number and Title | Filing Category | | Filing Fee |
|---|---|---|---|
| | Form I-129, Petition for Nonimmigrant Worker | H-1B nonimmigrant classification | Paper Filing: $2,805* Online Filing: $2,805* |
| | | E-1, E-2, E-3, H-3, L1 (including Blanket L-1), O, P, Q, or TN nonimmigrant classification | Paper Filing: $2,805* |
| | | H-2B or R nonimmigrant classification | Paper Filing: $1,685* |
| | Form I-140, Immigrant Petition for Alien Workers | EB-1 (E11, E12, E13), EB-2 (E21 NIW, E21 non-NIW), or EB-3 (E31, E32, EW3) immigrant classification | Paper Filing: $2,805* |
| | Form I-539, Application to Extend/Change Nonimmigrant Status | F-1, F-2, J-1, J-2, M-1, or M-2 nonimmigrant classification | Paper Filing: $1,965* Online Filing: $1,965* |
| | Form I-765, Application for Employment Authorization | I-765 categories | Paper Filing: $1,685* Online Filing: $1,685* |
| **I-910** **Application for Civil Surgeon Designation (https://www.uscis.gov/i-910)** | **General filing** | | $990 |
| **I-912** **Request for Fee Waiver (https://www.uscis.gov/i-912)** | **General filing** | | $0 |
| **I-914** **Application for T Nonimmigrant Status (https://www.uscis.gov/i-914)** | **General filing** | | $0 |
| **I-914 Supplement A** **Application for Family Member of a T-1 Recipient (https://www.uscis.gov/i-914)** | **General filing** | | $0 |
| **I-914 Supplement B** **Declaration of Law Enforcement Officer for Victim of Trafficking in Persons (https://www.uscis.gov/i-914)** | **General filing** | | $0 |
| **I-918** **Petition for U Nonimmigrant Status** | **General filing** | | $0 |

003889

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| (https://www.uscis.gov/I-918) | | |
| I-918 Supplement A<br>Petition for Qualifying Family Member of U-1 Recipient (https://www.uscis.gov/I-918) | General filing | $0 |
| I-918 Supplement B<br>U Nonimmigrant Status Certification (https://www.uscis.gov/I-918) | General filing | $0 |
| I-929<br>Petition for Qualifying Family Member of a U-1 Nonimmigrant (https://www.uscis.gov/i-929) | General filing | $0 |
| I-941<br>Application for Entrepreneur Parole (https://www.uscis.gov/i-941) | General filing | $1,200 |
| I-945<br>Public Charge Bond (https://www.uscis.gov/i-945) | General filing | $0 |
| I-956<br>Application for Regional Center Designation (https://www.uscis.gov/i-956) | General filing | $47,695 |
| I-956F<br>Application for Approval of an Investment in a Commercial Enterprise (https://www.uscis.gov/i-956f) | General filing | $47,695 |
| I-956G<br>Regional Center Annual Statement (https://www.uscis.gov/i-956g) | General filing | $4,470 |
| I-956H<br>Bona Fides of Persons Involved with Regional Center Program (https://www.uscis.gov/i-956h) | General filing | $0 |
| I-956K<br>Registration for Direct and Third-Party Promoters (https://www.uscis.gov/i-956k) | General filing | $0 |

003890

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **N-300**<br>**Application to File Declaration of Intention (https://www.uscis.gov/n-300)** | **General filing, unless noted below.** | $320 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-336**<br>**Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336 (https://www.uscis.gov/n-336)** | **General filing, unless noted below.**<br>Fee determined based on how form is submitted. | Paper Filing: $830<br>Online Filing: $780 |
| | If you filed Form N-400 under INA sections 328 or 329 with respect to military service and your application has been denied. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-400**<br>**Application for Naturalization (https://www.uscis.gov/n-400)** | **General filing, unless noted below.**<br>Fee determined based on how form is submitted.<br><br>*You cannot file online if you are requesting a fee waiver or a reduced fee; you must file a paper Form N-400.* | Paper Filing: $760<br>Online Filing: $710 |
| | If your documented annual household income is not more than 400 percent of the Federal Poverty Guidelines and you submit supporting documentation with your application. | Paper Filing: $380 |
| | If you meet the requirements of INA sections 328 or 329 with respect to military service. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions.**<br>**(https://www.uscis.gov/i-912)** | $0 |
| **N-426**<br>**Request for Certification of Military or Naval Service (https://www.uscis.gov/n-426)** | **General filing** | $0 |
| **N-470**<br>**Application to Preserve Residence for Naturalization Purposes (https://www.uscis.gov/n-470)** | **General filing, unless noted below** | $420 |
| | **Certain applicants may be eligible for a Fee Waiver.**<br><br>**See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-565**<br>**Application for Replacement** | **General filing, unless noted below.** | Paper Filing: $555<br>Online Filing: $505 |

003891

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **Naturalization/ Citizenship Document (https://www.uscis.gov/n-565)** | Fee determined based on how form is submitted. | |
| | If you are filing because your certificate contains incorrect information due to USCIS error. | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.** **See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-600 Application for Certificate of Citizenship (https://www.uscis.gov/n-600)** | **General filing, unless noted below.** Fee determined based on how form is submitted. | Paper Filing: $1,385 Online Filing: $1,335 |
| | If you are filing as a current or former member of any branch of the U.S. armed forces on your own behalf. | $0 |
| | If you are filing on behalf of an individual who is the subject of a final adoption for immigration purposes and meets (or met before 18 years of age) the definition of child under INA sections 101(b)(1)(E), (F), or (G). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.** **See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-600K Application for Citizenship and Issuance of Certificate Under Section 322 (https://www.uscis.gov/n-600k)** | **General filing, unless noted below.** Fee determined based on how form is submitted. | Paper Filing: $1,385 Online Filing: $1,335 |
| | If you are filing on behalf of a child who is the subject of a final adoption for immigration purposes and meets the definition of child under section INA sections 101(b)(1)(E), (F), or (G). | $0 |
| | **Certain applicants may be eligible for a Fee Waiver.** **See Form I-912 Instructions (https://www.uscis.gov/i-912)** | $0 |
| **N-644 Application for Posthumous Citizenship (https://www.uscis.gov/n-644)** | **General filing** | $0 |
| **N-648 Medical Certification for Disability Exceptions (https://www.uscis.gov/n-648)** | **General filing** | $0 |

Contact Center: If you have additional questions, you may call the USCIS Contact Center at **800-375-5283** (TTY **800-767-1833**)

003892

| Form Number and Title | Form Name and Category | Filing Fee |
|---|---|---|
| **I-129**<br>**Petition for a Nonimmigrant Worker**<br>(https://www.uscis.gov/i-129) | **Petition for a Nonimmigrant Worker** | Varies |
| | If you are filing an E-1, E-2, E-2C, E-3, or TN petition. | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees, if applicable |
| | If you are filing an H-3 petition.<br>*(limited to 25 beneficiaries per petition)* | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees, if applicable |
| | If you are filing an O petition.<br>*(limited to one beneficiary per petition for O-1; limited to 25*<br>*beneficiaries per petition for O-2)* | $1,055 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $530 plus additional fees, if applicable |
| | If you are filing a P petition.<br>*(limited to 25 beneficiaries per petition)* | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees, if applicable |
| | If you are filing a Q petition.<br>*(limited to 25 beneficiaries per petition)* | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees, if applicable |
| | If you are filing an R petition. | $1,015 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $510 plus additional fees, if applicable |
| | **Additional Fees:**<br>   1.  Asylum Program Fee<br>      a.  If you are filing as a Regular Petitioner<br>      b.  If you are filing as a Nonprofit<br>      c.  If you are filing as a Small Employer<br><br>If paying by check or money order, submit the fee separately. | a.  $600<br>b.  $0<br>c.  $300 |
| | **An applicant for E-2 CNMI investor nonimmigrant status under 8 CFR 214.2(e)(23) may be eligible for a Fee Waiver.**<br>**See Form I-912 Instructions**<br>**(https://www.uscis.gov/i-912)** | $0 |
| **I-129 – H-2A petitions** | If you are filing an H-2A petition with named workers.<br>*(limited to 25 beneficiaries per petition)* | $1,090 plus additional fees |

| Form Number and Title | Form Name and Category | Filing Fee |
|---|---|---|
| | If you are filing as a Small Employer or Nonprofit. | $545 plus additional fees, if applicable |
| | If you are filing an H-2A petition with unnamed workers. *(no limit to number of beneficiaries per petition)* | $530 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $460 plus additional fees, if applicable |
| | **Additional Fees:**<br><br>1. Asylum Program Fee<br>   a. If you are filing as a Regular Petitioner<br>   b. If you are filing as a Nonprofit<br>   c. If you are filing as a Small Employer.<br><br>If paying by check or money order, submit the fee separately. | a. $600<br>b. $0<br>c. $300 |
| **I-129 – H-2B petitions** | If you are filing an H-2B petition with named workers. *(limited to 25 beneficiaries per petition)* | $1,080 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $540 plus additional fees |
| | If you are filing H-2B petition with unnamed workers. *(no limit to number of beneficiaries per petition)* | $580 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $460 plus additional fees |
| | **Additional Fees:**<br><br>1. H-2B petitioners must submit an additional Fraud Prevention and Detection fee.  If paying by check or money order, submit the fee separately.<br><br>2. Asylum Program Fee<br>   a. If you are filing as a Regular Petitioner<br>   b. If you are filing as a Nonprofit<br>   c. If you are filing as a Small Employer.<br><br>If paying by check or money order, submit the fee separately. | 1. $150<br><br><br><br>2. Varies<br>a. $600<br>b. $0<br>c. $300 |
| **I-129 – H-1B and H-1B1 petitions** | If you are filing H-1B or H-1B1 petitions. | Paper Filing: $780 plus additional fees<br>Online Filing: $730 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | Paper Filing: $460 plus additional fees, if applicable<br>Online Filing: $460 plus additional fees, if applicable |
| | **Additional Fees:**<br><br>1. Asylum Program Fee<br><br>   a. If you are filing as a Regular Petitioner<br>   b. If you are filing as a Non-profit<br>   c. If you are filing as a Small Employer | 1. Varies<br><br>a. $600<br>b. $0<br>c. $300 |

003894

| | | |
|---|---|---|
| | If paying by check or money order, submit the fee separately. | |
| | 2. H-1B petitioners must submit a Fraud Prevention and Detection fee if they are:<br>   a. Seeking initial approval of H-1B nonimmigrant status for a beneficiary; or<br>   b. Seeking approval to employ an H-1B nonimmigrant currently working for another petitioner.<br>Petitioners for Chile or Singapore H-1B1 Free Trade Nonimmigrants do not have to pay the Fraud Prevention and Detection fee.  Fraud Prevention and Detection fee, when applicable, may not be waived.  If paying by check or money order, submit the fee separately. | 2. $500 |
| | 3. H-1B petitioners are required to submit an additional fee mandated by Public Law 114-113, if:<br>   a. They are required to submit the Fraud Prevention and Detection fee;<br>   b. They employ 50 or more individuals in the United States; and<br>   c. More than 50 percent of those employees are in H-1B, L-1A, or L-1B nonimmigrant status.<br>If paying by check or money order, submit the fee separately. | 3. $4,000 |
| | 4. American Competitiveness and Workforce Improvement Act (ACWIA).  Petitioners filing for:<br>   a. An H-1B nonimmigrant; or<br>   b. A Chile or Singapore H-1B1 Free Trade Nonimmigrant must submit an additional ACWIA fee, unless they are exempt under Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>To determine which ACWIA fee to pay, complete Section 2 of the H-1B Data Collection and Filing Fee Exemption Supplement.<br><br>Payment for this fee may be made in the form of a single check or money order for the total amount due (filing fee + ACWIA fee), or as two separate checks or money orders (one for the ACWIA fee and one for the filing fee). | 4. $1,500 or $750, depending on number of workers the petitioner employs |
| **I-129 – L petitions** | If you are filing L petitions. | $1,385 plus additional fees |
| | If you are filing as a Small Employer or Nonprofit. | $695 plus additional fees, if applicable |

003895

| Form Number and Title | Form Name and Category | Filing Fee |
|---|---|---|
| | **Additional Fees:**<br>1. Asylum Program Fee<br>    a. If you are filing as a Regular Petitioner<br>    b. If you are filing as a Nonprofit<br>    c. If you are filing as a Small Employer.<br><br>If paying by check or money order, submit the fee separately.<br><br>2. L petitioners must submit a Fraud Prevention and Detection fee if they are:<br><br>    a. Seeking initial approval of L nonimmigrant status for a beneficiary;<br>    b. Seeking approval to employ an L nonimmigrant currently working for another petitioner; or<br>    c. For blanket petitions, seeking approval for an L nonimmigrant to continue employment with an entity different from the previous petitioner.<br><br>If paying by check or money order, submit the fee separately.<br><br>3. L-1 petitioners are required to submit an additional fee mandated by Public Law 114-113, if:<br><br>    a. They are required to submit the Fraud Prevention and Detection fee;<br>    b. They employ 50 or more individuals in the United States; and<br>    c. More than 50 percent of those employees are in H-1B, L-1A, or L-1B nonimmigrant status.<br><br>If paying by check or money order, submit the fee separately. | 1. Varies<br>  a. $600<br>  b. $0<br>  c. $300<br><br><br>2. $500<br><br><br><br><br><br><br><br><br><br><br>3. $4,500 |

## Appendix B: I-765

| Form Number and Title | Filing Category | Filing Fee |
|---|---|---|
| **I-765**<br>**Application for Employment Authorization**<br>(**https://www.uscis.gov/i-765**) | **General filing, unless noted below.**<br>Fee determined based on how form is submitted. | Paper Filing: $520<br>Online Filing: $470 |
| | If you filed Form I-485 with a fee on or after April 1, 2024 and your Form I-485 is still pending. | Paper Filing: $260<br>Online Filing: $260 |
| | If you are filing under the **special ABC procedures** for category **(c)(8)** as an asylum applicant with a pending Form I-589, Application for Asylum and for Withholding of Removal. | Paper Filing: $520<br>Online Filing: $470 |
| | If you are requesting an EAD under category **(a)(12)** or **(c)(19)** as a Temporary Protected Status (TPS) applicant. | Paper Filing: $520 |

003896

| | | Online Filing: $470 |
|---|---|---|
| | If you are filing under category **(c)(33)**, consideration of Deferred Action for Childhood Arrivals. | Paper Filing: $520 Online Filing: $470 |
| | If you are filing for **replacement** EAD because the card we issued to you contains incorrect information due to our error. | $0 |
| | If you are filing for an **initial** EAD under category **(c)(8)**, an asylum applicant with a pending Form I-589, Application for Asylum and for Withholding of Removal, including derivatives, and you are **NOT** filing under the special ABC procedures. | $0 |
| | If you are filing for an **initial** EAD based on an initial period of parole or a **renewal** EAD based on a period re-parole as a child or family member affected by family separations at the United States-Mexico border by DHS between the dates of January 20, 2017, and January 20, 2021 (*Ms. L. v. ICE*, 18-cv-00428 (S.D. Cal.)). | $0 (through Dec. 11, 2029) |
| **I-765** (continued) | If you are filing for an **initial** Employment Authorization Document (EAD) under one of the following categories: <br><br> • (a)(3) Refugee; <br><br> • (a)(4) Paroled as refugee; <br><br> • (a)(5) Asylee; <br><br> • (a)(7) N-8 (Parent of alien classed as SK3) or N-9 nonimmigrant (Child of N-8) nonimmigrants; <br><br> • (a)(8) Citizen of Micronesia, Marshall Islands, or Palau; <br><br> • (a)(10) Granted Withholding of Deportation or Removal; <br><br> • (a)(16) Victim of severe form of trafficking (T-1); <br><br> • (a)(19) U-1 nonimmigrant; <br><br> • (a)(20) U-2, U-3, U-4, U-5 nonimmigrant; <br><br> • (c)(1), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel; <br><br> • (c)(2) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E-1 employees; <br><br> • (c)(8) All other Applicant for Asylum and Withholding of Deportation or Removal including derivatives with pending Form I-589; <br><br> • (c)(9) or (c)(16) Current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and who paid the Form I-485 filing fee; <br><br> • (c)(9) Special Immigrant Juvenile seeking to adjust status; | $0 |

003897

|  |  |  |
|---|---|---|
| **I-765**<br><br>**(continued)** | <ul><li>(c)(9) T nonimmigrant seeking to adjust status under INA section 245(l);</li><li>(c)(9) Persons seeking adjustment of status as a Special Immigrant Iraqi or Afghan national;</li><li>(c)(9) Persons seeking adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA);</li><li>(c)(9) Persons seeking adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA);</li><li>(c)(9) U nonimmigrant seeking to adjust status under INA section 245(m);</li><li>(c)(9) Persons seeking adjustment of status as a Violence Against Women Act (VAWA) self-petitioner (including derivatives);</li><li>(c)(10) Abused spouses and children applying for benefits under  the Nicaraguan Adjustment and Central American Relief Act (NACARA);</li><li>(c)(10) Abused spouses and children of lawful permanent residents or U.S. citizens applying for cancellation of removal and adjustment of status under INA section 240A(b)(2);</li><li>(c)(11) Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI);</li><li>(c)(11) Special Parole processes for certain Afghan nationals paroled into the United States (I-765 filings through Sept. 30, 2024);</li><li>(c)(11) Special Parole processes for Afghan nationals who were paroled into the United States:<ul><li>Between July 31, 2021, and December 16, 2022;</li><li>After September 30, 2022, and are spouses or children of Afghan nationals paroled between July 31, 2021, and December 16, 2022; or</li><li>After September 30, 2023, and are parents or legal guardians of Afghan unaccompanied children paroled between July 31, 2021, and December 16, 2022;</li></ul></li><li>(c)(11) Special Parole processes for Ukrainian nationals paroled into the United States:<ul><li>Between February 24, 2022, and September 30, 2024;</li><li>After September 30, 2023, and are spouses or children of Ukrainian nationals paroled between February 24, 2022, and September 30, 2024;</li><li>After September 30, 2023, and are parents, legal</li></ul></li></ul> |  |

003898

|  |  |  |
|---|---|---|
|  | guardians, or primary caregivers of Ukrainian unaccompanied children paroled between February 24, 2022, and September 30, 2024; |  |
|  | • (c)(14) Deferred action if filed by a petitioner seeking U-1, U-2, U-3, U-4, or U-5 nonimmigrant status; |  |
|  | • (c)(14) Deferred action if filed by a Special Immigrant Juvenile; |  |
|  | • (c)(14) Deferred action if filed by a Violence Against Women Act (VAWA) self-petitioner (including derivatives); |  |
|  | • (c)(25) T-2, T-3, T-4, T-5, or T-6 nonimmigrant; |  |
|  | • (c)(31) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition; |  |
|  | • Current or former U.S. armed forces service members; or |  |
|  | • Submitted through USCIS-recognized state or local government legal services clinics through December 31, 2024, for eligible parolees and those filing Form I-821. |  |
| **I-765** (continued) | If you are filing for a **renewal** EAD under one of the following categories: | $0 |
|  | • (a)(3) Refugee; |  |
|  | • (a)(4) Paroled as refugee; |  |
|  | • (a)(8) Citizen of Micronesia, Marshall Islands, or Palau; |  |
|  | • (a)(10) Granted Withholding of Deportation or Removal; |  |
|  | • (a)(16) Victim of severe form of trafficking (T-1 nonimmigrant); |  |
|  | • (a)(19) U-1 nonimmigrant; |  |
|  | • (a)(20) U-2, U-3, U-4, U-5 nonimmigrant; |  |
|  | • (c)(1), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel; |  |
|  | • (c)(9) or (c)(16) Current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and who paid the Form I-485 filing fee; |  |
|  | • (c)(9) Special Immigrant Juvenile seeking to adjust status; |  |
|  | • (c)(9) T nonimmigrant seeking to adjust status under INA section 245(l); |  |

003899

| | | |
|---|---|---|
| **I-765**<br>**(continued)** | • (c)(9) U nonimmigrant seeking to adjust status under INA section 245(m); | |
| | • (c)(9) Persons seeking adjustment of status as a Special Immigrant Iraqi or Afghan national; | |
| | • (c)(9) Persons seeking adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA); | |
| | • (c)(9) Persons seeking adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA); | |
| | • (c)(9) Persons seeking adjustment of status as a Violence Against Women Act (VAWA) Form I-360 self-petitioner (including derivatives); | |
| | • (c)(10) Abused spouses and children applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA); | |
| | • (c)(10) Abused spouses and children of lawful permanent residents or U.S. citizens applying for cancellation of removal and adjustment of status under INA section 240A(b)(2). | |
| | • (c)(11) Special Parole Process for Operation Allies Welcome (OAW) Afghan nationals who were paroled into the United States or who had an approved Form I-131 on or before May 26, 2023 (applies to I-765 filings through July 31, 2024); | |
| | • (c)(11) Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI); | |
| | • (c)(14) Deferred action if filed by a petitioner for U-1, U-2, U-3, U-4, or U-5 nonimmigrant status; | |
| | • (c)(14) Deferred action if filed by a Special Immigrant Juvenile; | |
| | • (c)(14) Deferred action if filed by a Violence Against Women Act (VAWA) Form I-360 self-petitioner (including derivatives); | |
| | • (c)(25) T-2, T-3, T-4, T-5, or T-6 nonimmigrant; or | |
| | • (c)(31) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition; | |
| | • Current or former U.S. armed forces service members. | |
| | If you are requesting a **replacement** EAD because your | $0 |

003900

| | |
|---|---|
| **I-765**<br>**(continued)** | previously issued card was **lost**, **stolen**, or **damaged**, but has not expired, but you are filing under one of the following categories:<br><br>• (a)(3) Refugee;<br><br>• (a)(4) Paroled as refugee;<br><br>• (a)(8) Citizen of Micronesia, Marshall Islands, or Palau;<br><br>• (a)(10) Granted Withholding of Deportation or Removal;<br><br>• (a)(16) Victim of severe form of trafficking (T-1 nonimmigrant);<br><br>• (a)(19) U-1 nonimmigrant;<br><br>• (a)(20) U-2, U-3, U-4, U-5 nonimmigrant;<br><br>• (c)(1), (c)(4), or (c)(7) Dependent of certain foreign government, international organization, or NATO personnel;<br><br>• (c)(9) or (c)(16) Current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and you paid the Form I-485 filing fee;<br><br>• (c)(9) Special Immigrant Juvenile seeking to adjust status;<br><br>• (c)(9) T nonimmigrant seeking to adjust status under INA section 245(l);<br><br>• (c)(9) Persons seeking adjustment of status as a Special Immigrant Iraqi or Afghan national;<br><br>• (c)(9) Persons seeking adjustment of status as an abused spouse or child under the Cuban Adjustment Act (CAA);<br><br>• (c)(9) Persons seeking adjustment of status as an abused spouse or child under the Haitian Refugee Immigration Fairness Act (HRIFA);<br><br>• (c)(9) U nonimmigrant seeking to adjust status under INA section 245(m);<br><br>• (c)(9) Persons seeking adjustment of status as a Violence Against Women Act (VAWA) Form I-360 self-petitioner (including derivatives);<br><br>• (c)(10) Abused spouses and children applying for benefits under  the Nicaraguan Adjustment and Central American Relief Act (NACARA);<br><br>• (c)(10) Abused spouses and children of lawful | |

003901

|  |  | permanent residents or U.S. citizens applying for cancellation of removal and adjustment of status under INA section 240A(b)(2); |  |
|  |  | • (c)(11) Special Parole processes for Operation Allies Welcome (OAW) Afghan nationals paroled into the United States (I-765 filings through September 30, 2024); |  |
|  |  | • (c)(11) Special Parole processes for Immigrant Military Members and Veterans Initiative (IMMVI); |  |
|  |  | • (c)(14) Deferred action if filed by a petitioner for U-1, U-2, U-3, U-4, or U-5 nonimmigrant status; |  |
|  |  | • (c)(14) Deferred action if filed by a Special Immigrant Juvenile; |  |
|  |  | • (c)(14) Deferred action if filed by a Violence Against Women Act (VAWA) Form I-360 self-petitioner (including derivatives); |  |
|  |  | • (c)(25) T-2, T-3, T-4, T-5, or T-6 nonimmigrant; |  |
|  |  | • (c)(31) Principal beneficiaries or derivative children of an approved Violence Against Women Act (VAWA) self-petition; or |  |
|  |  | • Current or former U.S. armed forces service members. |  |
|  | **Certain applicants may be eligible for a Fee Waiver. See Form I-912 Instructions** (**https://www.uscis.gov/i-912**) |  | $0 |

003902



## Petition for Alien Relative

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-130**
OMB No. 1615-0012
Expires 02/28/2027

| For USCIS Use Only | Fee Stamp | Action Stamp |
|---|---|---|

**A-Number**

A-

**Initial Receipt**

**Resubmitted**

| Relocated | Section of Law/Visa Category | | |
|---|---|---|---|
| Received | ☐ 201(b) Spouse - IR-1/CR-1 | ☐ 203(a)(1) Unm. S/D - F1-1 | ☐ 203(a)(2)(B) Unm. S/D - F2-4 |
| Sent | ☐ 201(b) Child - IR-2/CR-2 | ☐ 203(a)(2)(A) Spouse - F2-1 | ☐ 203(a)(3) Married  S/D - F3-1 |
| Completed | ☐ 201(b) Parent - IR-5 | ☐ 203(a)(2)(A) Child - F2-2 | ☐ 203(a)(4) Brother/Sister - F4-1 |

| Approved | Petition was filed on (Priority Date mm/dd/yyyy): | ☐ Field Investigation | ☐ Personal Interview | ☐ 204(a)(2)(A) Resolved |
|---|---|---|---|---|
| | | ☐ Previously Forwarded | ☐ Pet. A-File Reviewed | ☐ I-485 Filed Simultaneously |
| Returned | PDR request granted/denied - New priority date (mm/dd/yyyy): | ☐ 203(g) Resolved | ☐ Ben. A-File Reviewed | ☐ 204(g) Resolved |

**Remarks**

At which USCIS office (e.g., NBC, VSC, LOS, CRO) was Form I-130 adjudicated? _____

| To be completed by an attorney or accredited representative (if any). | | | |
|---|---|---|---|
| ☐ **Select this box if Form G-28 is attached.** | **Volag Number** (if any) | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |

▶ **START HERE - Type or print in black ink.**

If you need extra space to complete any section of this petition, use the space provided in **Part 9. Additional Information.**
**Complete and submit as many copies of Part 9., as necessary, with your petition.**

### Part 1.  Relationship (You are the Petitioner.  Your relative is the Beneficiary)

1. I am filing this petition for my (Select **only one** box):

   ☐ Spouse    ☐ Parent    ☐ Brother/Sister    ☐ Child

2. If you are filing this petition for your child or parent, select the box that describes your relationship (Select **only one** box):

   ☐ Child was born to parents who were married to each other at the time of the child's birth

   ☐ Stepchild/Stepparent

   ☐ Child was born to parents who were not married to each other at the time of the child's birth

   ☐ Child was adopted (not an Orphan or Hague Convention adoptee)

3. If the beneficiary is your brother/sister, are you related by adoption?    ☐ Yes    ☐ No

4. Did you gain lawful permanent resident status or citizenship through adoption?    ☐ Yes    ☐ No

### Part 2.  Information About You (Petitioner)

1. Alien Registration Number (A-Number) (if any)

   ▶ A-

2. USCIS Online Account Number (if any)

   ▶

3. U.S. Social Security Number (if any)

   ▶

#### Your Full Name

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

## Part 2.  Information About You (Petitioner) (continued)

### Other Names Used (if any)

Provide all other names you have ever used, including aliases, maiden name, and nicknames.

**5.a.** Family Name (Last Name)

**5.b.** Given Name (First Name)

**5.c.** Middle Name

### Other Information

**6.** City/Town/Village of Birth

**7.** Country of Birth

**8.** Date of Birth (mm/dd/yyyy)

**9.** Sex     ☐ Male   ☐ Female

### Mailing Address

**10.a.** In Care Of Name

**10.b.** Street Number and Name

**10.c.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**10.d.** City or Town

**10.e.** State           **10.f.** ZIP Code

**10.g.** Province

**10.h.** Postal Code

**10.i.** Country

**11.** Is your current mailing address the same as your physical address?     ☐ Yes   ☐ No

If you answered "No" to **Item Number 11.**, provide information on your physical address in **Item Numbers 12.a. - 13.b.**

### Address History

Provide your physical addresses for the last five years, whether inside or outside the United States.  Provide your current address first if it is different from your mailing address in **Item Numbers 10.a. - 10.i.**

**Physical Address 1**

**12.a.** Street Number and Name

**12.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**12.c.** City or Town

**12.d.** State           **12.e.** ZIP Code

**12.f.** Province

**12.g.** Postal Code

**12.h.** Country

**13.a.** Date From (mm/dd/yyyy)

**13.b.** Date To (mm/dd/yyyy)     PRESENT

**Physical Address 2**

**14.a.** Street Number and Name

**14.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**14.c.** City or Town

**14.d.** State           **14.e.** ZIP Code

**14.f.** Province

**14.g.** Postal Code

**14.h.** Country

**15.a.** Date From (mm/dd/yyyy)

**15.b.** Date To (mm/dd/yyyy)

### Your Marital Information

**16.** How many times have you been married?     ▶

**17.** Current Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced
☐ Widowed   ☐ Separated   ☐ Annulled

**Part 2.  Information About You** (Petitioner) (continued)

**18.**  Date of  Current Marriage (if currently married) (mm/dd/yyyy)

*Place of Your Current Marriage (if married)*

**19.a.**  City or Town

**19.b.**  State

**19.c.**  Province

**19.d.**  Country

*Names of All Your Spouses (if any)*

Provide information on your current spouse (if currently married) first and then list all your prior spouses (if any).

**Spouse 1**

**20.a.**  Family Name (Last Name)

**20.b.**  Given Name (First Name)

**20.c.**  Middle Name

**21.**  Date Marriage Ended (mm/dd/yyyy)

**Spouse 2**

**22.a.**  Family Name (Last Name)

**22.b.**  Given Name (First Name)

**22.c.**  Middle Name

**23.**  Date Marriage Ended (mm/dd/yyyy)

*Information About Your Parents*

**Parent 1's Information**

Full Name of Parent 1

**24.a.**  Family Name (Last Name)

**24.b.**  Given Name (First Name)

**24.c.**  Middle Name

**25.**  Date of Birth (mm/dd/yyyy)

**26.**  Sex   ☐ Male   ☐ Female

**27.**  Country of Birth

**28.**  City/Town/Village of Residence

**29.**  Country of Residence

**Parent 2's Information**

Full Name of Parent 2

**30.a.**  Family Name (Last Name)

**30.b.**  Given Name (First Name)

**30.c.**  Middle Name

**31.**  Date of Birth (mm/dd/yyyy)

**32.**  Sex   ☐ Male   ☐ Female

**33.**  Country of Birth

**34.**  City/Town/Village of Residence

**35.**  Country of Residence

*Additional Information About You (Petitioner)*

**36.**  I am a (Select **only one** box):

☐ U.S. Citizen   ☐ Lawful Permanent Resident

**If you are a U.S. citizen, complete Item Number 37.**

**37.**  My citizenship was acquired through (Select **only one** box):

☐ Birth in the United States

☐ Naturalization

☐ Parents

**38.**  Have you obtained a Certificate of Naturalization or a Certificate of Citizenship?   ☐ Yes   ☐ No

If you answered "Yes" to **Item Number 38.**, complete the following:

**39.a.**  Certificate Number

**39.b.**  Place of Issuance

**39.c.**  Date of Issuance (mm/dd/yyyy)

## Part 2.  Information About You (Petitioner) (continued)

If you are a lawful permanent resident, complete **Item Numbers 40.a. – 41.**

**40.a.** Class of Admission

**40.b.** Date of Admission (mm/dd/yyyy)

Place of Admission

**40.c.** City or Town

**40.d** State

**41.** Did you gain lawful permanent resident status through marriage to a U.S. citizen or lawful permanent resident?

☐ Yes   ☐ No

### *Employment History*

Provide your employment history for the last five years, whether inside or outside the United States.  Provide your current employment first.  If you are currently unemployed, type or print "Unemployed" in **Item Number 42.**

**Employer 1**

**42.** Name of Employer/Company

**43.a.** Street Number and Name

**43.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**43.c.** City or Town

**43.d.** State   **43.e.** ZIP Code

**43.f.** Province

**43.g.** Postal Code

**43.h.** Country

**44.** Your Occupation

**45.a.** Date From (mm/dd/yyyy)

**45.b.** Date To (mm/dd/yyyy)   **PRESENT**

**Employer 2**

**46.** Name of Employer/Company

**47.a.** Street Number and Name

**47.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**47.c.** City or Town

**47.d.** State   **47.e.** ZIP Code

**47.f.** Province

**47.g.** Postal Code

**47.h.** Country

**48.** Your Occupation

**49.a.** Date From (mm/dd/yyyy)

**49.b.** Date To (mm/dd/yyyy)

## Part 3.  Biographic Information

**NOTE:** Provide the biographic information about you, the petitioner.

**1.** Ethnicity (Select **only one** box)

☐ Hispanic or Latino
☐ Not Hispanic or Latino

**2.** Race (Select **all applicable** boxes)

☐ White
☐ Asian
☐ Black or African American
☐ American Indian or Alaska Native
☐ Native Hawaiian or Other Pacific Islander

**3.** Height   Feet ☐   Inches ☐

**4.** Weight   Pounds ☐ ☐ ☐

**5.** Eye Color (Select **only one** box)

☐ Black   ☐ Blue   ☐ Brown
☐ Gray   ☐ Green   ☐ Hazel
☐ Maroon   ☐ Pink   ☐ Unknown/Other

## Part 3.  Biographic Information (continued)

**6.** Hair Color (Select **only one** box)

☐ Bald (No hair)   ☐ Black   ☐ Blond
☐ Brown   ☐ Gray   ☐ Red
☐ Sandy   ☐ White   ☐ Unknown/Other

## Part 4.  Information About Beneficiary

**1.** Alien Registration Number (A-Number) (if any)

▶ A-

**2.** USCIS Online Account Number (if any)

▶

**3.** U.S. Social Security Number (if any)

▶

### Beneficiary's Full Name

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

### Other Names Used (if any)

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.

**5.a.** Family Name (Last Name)

**5.b.** Given Name (First Name)

**5.c.** Middle Name

### Other Information About Beneficiary

**6.** City/Town/Village of Birth

**7.** Country of Birth

**8.** Date of Birth (mm/dd/yyyy)

**9.** Sex   ☐ Male   ☐ Female

**10.** Has anyone else ever filed a petition for the beneficiary?

☐ Yes   ☐ No   ☐ Unknown

**NOTE:**  Select "Unknown" *only* if you do not know, and the beneficiary also does not know, if anyone else has ever filed a petition for the beneficiary.

### Beneficiary's Physical Address

If the beneficiary lives outside the United States in a home without a street number or name, leave **Item Numbers 11.a.** and **11.b.** blank.

**11.a.** Street Number and Name

**11.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**11.c.** City or Town

**11.d.** State   **11.e.** ZIP Code

**11.f.** Province

**11.g.** Postal Code

**11.h.** Country

### Other Address and Contact Information

Provide the address in the United States where the beneficiary intends to live, if different from **Item Numbers 11.a. - 11.h.** If the address is the same, type or print "SAME" in **Item Number 12.a.**

**12.a** Street Number and Name

**12.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**12.c.** City or Town

**12.d.** State   **12.e.** ZIP Code

Provide the beneficiary's address outside the United States, if different from **Item Numbers 11.a. - 11.h.** If the address is the same, type or print "SAME" in **Item Number 13.a.**

**13.a.** Street Number and Name

**13.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**13.c.** City or Town

**13.d.** Province

**13.e.** Postal Code

**13.f.** Country

**14.** Daytime Telephone Number (if any)

## Part 4.  Information About Beneficiary (continued)

**15.** Mobile Telephone Number (if any)

**16.** Email Address (if any)

### Beneficiary's Marital Information

**17.** How many times has the beneficiary been married?

▶

**18.** Current Marital Status

☐ Single, Never Married    ☐ Married    ☐ Divorced

☐ Widowed    ☐ Separated    ☐ Annulled

**19.** Date of  Current Marriage (if currently married) (mm/dd/yyyy)

### Place of Beneficiary's Current Marriage (if married)

**20.a.** City or Town

**20.b.** State

**20.c.** Province

**20.d.** Country

### Names of Beneficiary's Spouses (if any)

Provide information on the beneficiary's current spouse (if currently married) first and then list all the beneficiary's prior spouses (if any).

**Spouse 1**

**21.a.** Family Name (Last Name)

**21.b.** Given Name (First Name)

**21.c.** Middle Name

**22.** Date Marriage Ended (mm/dd/yyyy)

**Spouse 2**

**23.a.** Family Name (Last Name)

**23.b.** Given Name (First Name)

**23.c.** Middle Name

**24.** Date Marriage Ended (mm/dd/yyyy)

### Information About Beneficiary's Family

Provide information about the beneficiary's spouse and children.

**Person 1**

**25.a.** Family Name (Last Name)

**25.b.** Given Name (First Name)

**25.c.** Middle Name

**26.** Relationship

**27.** Date of Birth (mm/dd/yyyy)

**28.** Country of Birth

**Person 2**

**29.a.** Family Name (Last Name)

**29.b.** Given Name (First Name)

**29.c.** Middle Name

**30.** Relationship

**31.** Date of Birth (mm/dd/yyyy)

**32.** Country of Birth

**Person 3**

**33.a.** Family Name (Last Name)

**33.b.** Given Name (First Name)

**33.c.** Middle Name

**34.** Relationship

**35.** Date of Birth (mm/dd/yyyy)

**36.** Country of Birth

## Part 4.  Information About Beneficiary (continued)

**Person 4**

**37.a.** Family Name (Last Name)

**37.b.** Given Name (First Name)

**37.c.** Middle Name

**38.** Relationship

**39.** Date of Birth (mm/dd/yyyy)

**40.** Country of Birth

**Person 5**

**41.a.** Family Name (Last Name)

**41.b.** Given Name (First Name)

**41.c.** Middle Name

**42.** Relationship

**43.** Date of Birth (mm/dd/yyyy)

**44.** Country of Birth

### Beneficiary's Entry Information

**45.** Was the beneficiary **EVER** in the United States?

☐ Yes   ☐ No

If the beneficiary is currently in the United States, complete **Items Numbers 46.a. - 46.d.**

**46.a.** He or she arrived as a (Class of Admission):

**46.b.** Form I-94 Arrival-Departure Record Number

▶

**46.c.** Date of Arrival (mm/dd/yyyy)

**46.d.** Date authorized stay expired, or will expire, as shown on Form I-94 or Form I-95 (mm/dd/yyyy) or type or print "D/S" for Duration of Status

**47.** Passport Number

**48.** Travel Document Number

**49.** Country of Issuance for Passport or Travel Document

**50.** Expiration Date for Passport or Travel Document (mm/dd/yyyy)

### Beneficiary's Employment Information

Provide the beneficiary's current employment information (if applicable), even if they are employed outside of the United States.  If the beneficiary is currently unemployed, type or print "Unemployed" in **Item Number 51.a.**

**51.a.** Name of Current Employer (if applicable)

**51.b.** Street Number and Name

**51.c.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**51.d.** City or Town

**51.e.** State

**51.f.** ZIP Code

**51.g.** Province

**51.h.** Postal Code

**51.i.** Country

**52.** Date Employment Began (mm/dd/yyyy)

### Additional Information About Beneficiary

**53.** Was the beneficiary **EVER** in immigration proceedings?

☐ Yes   ☐ No

**54.** If you answered "Yes," select the type of proceedings and provide the location and date of the proceedings.

☐ Removal   ☐ Exclusion/Deportation

☐ Rescission   ☐ Other Judicial Proceedings

**55.a.** City or Town

**55.b.** State

**56.** Date (mm/dd/yyyy)

## Part 4.  Information About Beneficiary (continued)

If the beneficiary's native written language does not use Roman letters, type or print his or her name and foreign address in their native written language.

**57.a.** Family Name (Last Name)

**57.b.** Given Name (First Name)

**57.c.** Middle Name

**58.a.** Street Number and Name

**58.b.** ☐ Apt.  ☐ Ste.  ☐ Flr.

**58.c.** City or Town

**58.d.** Province

**58.e.** Postal Code

**58.f.** Country

If filing for your spouse, provide the last address at which you physically lived together.  If you never lived together, type or print, "Never lived together" in Item Number 59.a.

**59.a.** Street Number and Name

**59.b.** ☐ Apt.  ☐ Ste.  ☐ Flr.

**59.c.** City or Town

**59.d.** State

**59.e.** ZIP Code

**59.f.** Province

**59.g.** Postal Code

**59.h.** Country

**60.a.** Date From (mm/dd/yyyy)

**60.b.** Date To (mm/dd/yyyy)

The beneficiary is in the United States and will apply for adjustment of status to that of a lawful permanent resident at the U.S. Citizenship and Immigration Services (USCIS) office in:

**61.a.** City or Town

**61.b.** State

The beneficiary will not apply for adjustment of status in the United States, but he or she will apply for an immigrant visa abroad at the U.S. Embassy or U.S. Consulate in:

**62.a.** City or Town

**62.b.** Province

**62.c.** Country

**NOTE:**  Choosing a U.S. Embassy or U.S. Consulate outside the country of the beneficiary's last residence does not guarantee that it will accept the beneficiary's case for processing.  In these situations, the designated U.S. Embassy or U.S. Consulate has discretion over whether or not to accept the beneficiary's case.

## Part 5.  Other Information

**1.** Have you **EVER** previously filed a petition for this beneficiary or any other alien?  ☐ Yes  ☐ No

If you answered "Yes," provide the name, place, date of filing, and the result.

**2.a.** Family Name (Last Name)

**2.b.** Given Name (First Name)

**2.c.** Middle Name

**3.a.** City or Town

**3.b.** State

**4.** Date Filed (mm/dd/yyyy)

**5.** Result (for example, approved, denied, withdrawn)

If you are also submitting separate petitions for other relatives, provide the names of and your relationship to each relative.

**Relative 1**

**6.a.** Family Name (Last Name)

**6.b.** Given Name (First Name)

**6.c.** Middle Name

**7.** Relationship

## Part 5.  Other Information (continued)

**Relative 2**

**8.a.** Family Name
(Last Name)

**8.b.** Given Name
(First Name)

**8.c.** Middle Name

**9.** Relationship

**WARNING:** USCIS investigates the claimed relationships and verifies the validity of documents you submit.  If you falsify a family relationship to obtain a visa, USCIS may seek to have you criminally prosecuted.

**PENALTIES:**  By law, you may be imprisoned for up to 5 years or fined $250,000, or both, for entering into a marriage contract in order to evade any U.S. immigration law.  In addition, you may be fined up to $10,000 and imprisoned for up to 5 years, or both, for knowingly and willfully falsifying or concealing a material fact or using any false document in submitting this petition.

## Part 6.  Petitioner's Statement, Contact Information, Declaration, and Signature

**NOTE:**  Read the **Penalties** section of the Form I-130 Instructions before completing this part.

### Petitioner's Statement

**NOTE:**  Select the box for either **Item Number 1.a.** or **1.b.**  If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this petition and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 7.** read to me every question and instruction on this petition and my answer to every question in
_____ ,
a language in which I am fluent.  I understood all of this information as interpreted.

**2.** ☐ At my request, the preparer named in **Part 8.**,
_____ ,
prepared this petition for me based only upon information I provided or authorized.

### Petitioner's Contact Information

**3.** Petitioner's Daytime Telephone Number

**4.** Petitioner's Mobile Telephone Number (if any)

**5.** Petitioner's Email Address (if any)

### Petitioner's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date.  Furthermore, I authorize the release of any information from any of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this petition, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)** I provided or authorized all of the information contained in, and submitted with, my petition;

**2)** I reviewed and understood all of the information in, and submitted with, my petition; and

**3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

### Petitioner's Signature

**6.a.** Petitioner's Signature (sign in ink)

➡

**6.b.** Date of Signature (mm/dd/yyyy)

**NOTE TO ALL PETITIONERS:**  If you do not completely fill out this petition or fail to submit required documents listed in the Instructions, USCIS may deny your petition.

## Part 7.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter if you used one.

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**3.c.** City or Town

**3.d.** State [ ]   **3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and [ ], which is the same language provided in **Part 6.**, **Item Number 1.b.**, and I have read to this petitioner in the identified language every question and instruction on this petition and his or her answer to every question.  The petitioner informed me that he or she understands every instruction, question, and answer on the petition, including the **Petitioner's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.** Interpreter's Signature (sign in ink)

**7.b.** Date of Signature (mm/dd/yyyy)

## Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**3.c.** City or Town

**3.d.** State [ ]   **3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

**Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner** (continued)

### *Preparer's Contact Information*

**4.**   Preparer's Daytime Telephone Number

[                                    ]

**5.**   Preparer's Mobile Telephone Number (if any)

[                                    ]

**6.**   Preparer's Email Address (if any)

[                                    ]

### *Preparer's Statement*

**7.a.**  ☐  I am not an attorney or accredited representative but have prepared this petition on behalf of the petitioner and with the petitioner's consent.

**7.b.**  ☐  I am an attorney or accredited representative and my representation of the petitioner in this case
☐ extends ☐ does not extend beyond the preparation of this petition.

**NOTE:**  If you are an attorney or accredited representative whose representation extends beyond preparation of this petition, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this petition.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner.  The petitioner then reviewed this completed petition and informed me that he or she understands all of the information contained in, and submitted with, his or her petition, including the **Petitioner's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this petition based only on information that the petitioner provided to me or authorized me to obtain or use.

### *Preparer's Signature*

**8.a.**   Preparer's Signature (sign in ink)

[                                    ]

**8.b.**   Date of Signature (mm/dd/yyyy)   [                    ]

## Part 9.  Additional Information

If you need extra space to provide any additional information within this petition, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this petition or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

**2.** A-Number (if any) ▶ **A-**

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.**

**7.a.** Page Number

**7.b.** Part Number

**7.c.** Item Number

**7.d.**

## Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-131F**
OMB No. 1615-0161
Expires 02/28/2025

---

► **START HERE**

### Part 1.  Request Type

Select the request type below.

I am requesting parole in place under INA section 212(d)(5)(A) as the:

**1.**  ☐ Spouse of a U.S. Citizen

**2.**  ☐ Stepchild of a U.S. Citizen; Parent's I-131F Receipt Number (if applicable): [                    ]

### Part 2.  Information About You

**1.**  Your Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name (if applicable) |
|---|---|---|
|  |  |  |

**2.**  Other Names Used (if applicable)

| Family Name (Last Name) | Given Name (First Name) | Middle Name (if applicable) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**3.**  Current U.S. Mailing Address or Safe Address (if applicable)

In Care Of Name (if any)
[                    ]

Street Number and Name                     Apt. Ste. Flr.   Number
[                    ] ☐ ☐ ☐ [          ]

City or Town                     State   ZIP Code
[                    ] [    ] [          ]

**4.**  Current U.S. Physical Address (if different from the above address)

In Care Of Name (if any)
[                    ]

Street Number and Name                     Apt. Ste. Flr.   Number
[                    ] ☐ ☐ ☐ [          ]

City or Town                     State   ZIP Code
[                    ] [    ] [          ]

---

## Part 2.  Information About You (continued)

### Other Information

5. Alien Registration Number (A-Number) (if any)
   ▶ A-

6. Country of Birth

7. Country of Citizenship or Nationality

8. Gender
   ☐ Male   ☐ Female   ☐ Another Gender Identity

9. Date of Birth (mm/dd/yyyy)

10. Marital Status
    ☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Separated   ☐ Annulled

11. Date of Marriage (mm/dd/yyyy)

12. U.S. Social Security Number (if any)
    ▶

13. USCIS Online Account Number (if any)
    ▶

14. Most Recent Form I-94 Arrival/Departure Record Number (if any)

### Other Information About Your U.S. Citizen Spouse or Stepparent

15. Your U.S. Citizen Spouse's or Stepparent's Full Name

    Family Name (Last Name)          Given Name (First Name)          Middle Name (if applicable)

16. Your U.S. Citizen Spouse's or Stepparent's Date of Birth (mm/dd/yyyy)

17. Your U.S. Citizen Spouse's or Stepparent's U.S. Social Security Number (if any)
    ▶

## Part 3.  Your Biographic Information

1. Ethnicity (Select **only one** box)
   ☐ Hispanic or Latino   ☐ Not Hispanic or Latino

2. Race (Select **all applicable** boxes)
   ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☐ White

3. Height   Feet [     ] Inches [     ]   4. Weight   Pounds [  ][  ][  ]

5. Eye color (Select **only one** box)
   ☐ Black   ☐ Blue   ☐ Brown   ☐ Gray   ☐ Green   ☐ Hazel   ☐ Maroon   ☐ Pink   ☐ Unknown/Other

6. Hair color (Select **only one** box)
   ☐ Bald (No hair)   ☐ Black   ☐ Blond   ☐ Brown   ☐ Gray   ☐ Red   ☐ Sandy   ☐ White   ☐ Unknown/Other

## Part 4.  Processing Information

1. Date you began your continuous physical presence in the United States. (mm/dd/yyyy)

2. Have you EVER been in any exclusion, deportation, removal, or rescission proceedings?    ☐ Yes   ☐ No

3. Have you EVER been arrested for, charged with, or convicted of a felony or misdemeanor, including incidents handled in juvenile court, in the United States? Do not include minor traffic violations unless they were alcohol or drug-related.    ☐ Yes   ☐ No

4. Have you EVER been arrested for, charged with, or convicted of a crime in any country other than the United States?    ☐ Yes   ☐ No

5. Have you EVER or are you NOW engaged in activities that could be reasonable grounds for concluding that you are a danger to public safety or to the security of the United States?    ☐ Yes   ☐ No

6. If you have ever filed a Form I-601A, Application for a Provisional Unlawful Presence Waiver, with USCIS, provide the receipt number:

7. Explain how you qualify for parole in place, including information regarding the significant public benefit or urgent humanitarian reasons warranting a grant of parole, and why you believe you merit a favorable exercise of discretion. Upload copies of any supporting documents or evidence you want USCIS to consider.

## Part 5. Applicant's Contact Information, Certification, and Signature (Read the information on penalties and travel warnings in the form Instructions before completing Part 5.)

### Applicant's Contact Information

Provide your daytime telephone number, mobile telephone number (if any), and email address (if any).

1. Applicant's Daytime Telephone Number

2. Applicant's Mobile Telephone Number (if any)

3. Applicant's Email Address

### Applicant's Certification and Signature

I certify, under penalty of perjury, that I provided or authorized all of the responses and information contained in and submitted with my application, I read and understand or, if interpreted to me in a language in which I am fluent by the interpreter listed in **Part 6.**, understood, all of the responses and information contained in, and submitted with, my application (as explained to me by the interpreter), and that all of the responses and the information are complete, true, and correct. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for this request and to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

4. Applicant's Signature    ➡    Date of Signature (mm/dd/yyyy)

**Part 6. Interpreter's Contact Information, Certification, and Signature (if applicable) (If no interpreter was used, skip to Part 7.)**

*Interpreter's Full Name*

**1.** Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name

*Interpreter's Contact Information*

**3.** Interpreter's Daytime Telephone Number

**4.** Interpreter's Mobile Telephone Number (if any)

**5.** Interpreter's Email Address (if any)

*Interpreter's Certification and Signature*

I certify, under penalty of perjury, that I am fluent in English and                                          ,
and I have interpreted every question on the application and Instructions and interpreted the applicant's answers to the questions in that language, and the applicant informed me that they understood every instruction, question, and answer on the application.

**6.** Interpreter's Signature

Date of Signature (mm/dd/yyyy)

**Part 7.  Contact Information, Certification, and Signature of the Person Preparing this Application, if Other Than the Applicant**

*Preparer's Full Name*

**1.** Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name

*Preparer's Contact Information*

**3.** Preparer's Daytime Telephone Number

**4.** Preparer's Mobile Telephone Number (if any)

**5.** Preparer's Email Address (if any)

*Preparer's Certification and Signature*

I certify, under penalty of perjury, that I prepared this application for the applicant at their request and with express consent and that all of the responses and information contained in and submitted with the application are complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that they understand the responses and information in or submitted with the application.

**6.** Preparer's Signature

Date of Signature (mm/dd/yyyy)

# NOTICE OF OFFICE OF MANAGEMENT AND BUDGET ACTION

Date      08/16/2024

Department of Homeland Security

U.S. Citizenship and Immigration Services

FOR CERTIFYING OFFICIAL:      Robert Dorr

FOR CLEARANCE OFFICER:      Tyrone Huff

In accordance with the Paperwork Reduction Act, OMB has taken action on your request received

08/15/2024

ACTION REQUESTED:   New collection (Request for a new OMB Control Number)

TYPE OF REVIEW REQUESTED:      Emergency

ICR REFERENCE NUMBER:      202407-1615-002

AGENCY ICR TRACKING NUMBER:      I-131F

TITLE:      I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

LIST OF INFORMATION COLLECTIONS: See next page

OMB ACTION:  Approved with change

OMB CONTROL NUMBER:      1615-0161

The agency is required to display the OMB Control Number and inform respondents of its legal significance in accordance with 5 CFR 1320.5(b).

EXPIRATION DATE:  02/28/2025                  DISCONTINUE DATE:

| BURDEN: | RESPONSES | HOURS | COSTS |
|---|---|---|---|
| Previous | 0 | 0 | 0 |
| New | 1,100,000 | 1,285,185 | 283,250,000 |
| Difference | | | |
| Change due to New Statute | 0 | 0 | 0 |
| Change due to Agency Discretion | 1,100,000 | 1,285,185 | 283,250,000 |
| Change due to Agency Adjustment | 0 | 0 | 0 |
| Change due to PRA Violation | 0 | 0 | 0 |

TERMS OF CLEARANCE:      OIRA approves the emergency request for a period of six months, contingent on the following: USCIS will publish a 60-day Federal Register notice to begin normal processing under the PRA within 60 days of this approval; USIS will implement certain de minimis changes requested by EOP reviewers as soon as practically possible but prior to the expiration of the 6 month emergency period; and as part of the 3-year renewal PRA package, USCIS will incorporate certain agreed-upon substantive form changes flagged by EOP reviewers during OIRA review of the Form I-131F filing guide.

OMB Authorizing Official:      Dominic J. Mancini

Deputy Administrator,

Office Of Information And Regulatory Affairs

003919

| List of ICs | | | |
|---|---|---|---|
| IC Title | Form No. | Form Name | CFR Citation |
| Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens | I-131F (Online E-File) | Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens | 8 CFR 274a.12(c)(11) |
| Biometrics | | | 8 CFR 103 |



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Information Technology*
Washington, DC 20529

U.S. Citizenship
and Immigration
Services

# Memorandum

TO:          Richard Revesz
             Administrator,
             Office of Information and Regulatory Affairs,
             Office of Management and Budget

THROUGH:     Eric Hysen                       ERIC N        Digitally signed by ERIC
             DHS Chief Information Officer     HYSEN         N HYSEN
                                                            Date: 2024.08.14
                                                            09:45:25 -04'00'

FROM:        Samantha Deshommes
             USCIS Office of Policy and Strategy,     SAMANTHA L    Digitally signed by
             Chief, Regulatory Coordination Division  DESHOMMES     SAMANTHA L DESHOMMES
                                                                    Date: 2024.08.13 11:43:37
                                                                    -04'00'

SUBJECT:     Request for Emergency OMB Paperwork Reduction Act (PRA) Clearance – USCIS Form
             I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren
             of U.S. Citizens.

**Purpose:** U.S. Citizenship and Immigration Services (USCIS) requests emergency approval for Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, a new collection of information. USCIS is seeking approval for the collection of information under 5 C.F.R.§ 1320.13(a)(2)(ii) and (iii).

**Background:** Family unity is a bedrock objective of the U.S. immigration system. While U.S. immigration law generally provides noncitizens who are married to U.S. citizens with the opportunity to apply for lawful permanent resident (LPR) status while remaining in the United States, the requirement to be inspected and admitted or paroled prevents many families from availing themselves of this benefit, even though they otherwise qualify for LPR status.

Recognizing the hardships that American families and communities face as a result of obstacles such as this, President Joseph R. Biden in 2021 directed the U.S. Department of Homeland Security (DHS) and other agencies to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers as appropriate and consistent with applicable law."[i]

Furthermore, on June 18, 2024, President Biden announced that DHS would take action to preserve the unity of mixed status families by establishing a process for certain noncitizen spouses and stepchildren to

access LPR status without requiring them to depart the United States. DHS is now working to implement that process and open it up for applications by August 19, 2024.

**Discussion:** Consistent with the President's announcement, DHS is establishing a process for certain noncitizens who are married to a U.S. citizen (or are the noncitizen stepchild of a U.S. citizen) and are present in the United States without admission or parole, to request parole in place under section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A).

DHS is publishing a notice in the *Federal Register* titled, "Implementation of Keeping Families Together" and creating Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, to implement this process as an online, electronically filed collection of information. Form I-131F will be used by eligible noncitizens to request parole in place under this process.

Establishing the new Form I-131F is essential to the effective adjudication of parole in place requests and subsequent immigration benefit requests submitted by eligible individuals. Emergency processing is justified because USCIS must quickly collect the requested information to fulfill its mission of implementing the President's announcement and meet public expectations that USCIS will begin accepting applications by August 19, 2024. In addition, for various reasons, significant public harm is reasonably likely to result if USCIS were to seek public comment before the process is implemented. First, the hardships these families have endured will continue, undermining the President's directive to eliminate barriers to the immigration system and promote family unity and security. Second, individuals who may be considered for parole in place under this process are already susceptible to fraud perpetrated by consultants and others seeking to game the system, who make false promises to secure parole for a fee, before the process is actually implemented. Put simply, noncitizens face a heightened risk of being victimized by immigration scammers the longer it takes to implement this process. To mitigate these risks, the President's announced process should be implemented swiftly—by August 19.

USCIS seeks emergency processing of the Form I-131F in accordance with 5 C.F.R. § 1320.13. USCIS certifies that the requirements of 5 C.F.R. § 1320.13(a) are met and that:

- The collection of information is needed immediately and is essential to the mission of the agency.
- The use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information.

USCIS greatly appreciates the timely consideration of this request.

**Recommendation**: DHS recommends the emergency approval of this collection of information under 5 C.F.R. § 1320.13.

---

[i] Exec. Order No. 14012, *Restoring Faith in Our Legal Immigration System and Strengthening Integration and Inclusion Efforts for New Americans*, 86 Fed. Reg. 8277 (Feb. 5, 2021).

STATEMENT FOR
**APPLICATION FOR PAROLE IN PLACE FOR CERTAIN NONCITIZEN SPOUSES
AND STEPCHILDREN OF U.S. CITIZENS
OMB Control No.: 1615-NEW COLLECTION INSTRUMENT(S): FORM I-131F**


**A.  Justification**

1.      **Explain the circumstances that make the collection of information necessary.
        Identify any legal or administrative requirements that necessitate the collection.
        Attach a copy of the appropriate section of each statute and regulation mandating
        or authorizing the collection of information.**

Section 212(d)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(d)(5))
provides the Secretary of Homeland Security with the discretionary authority to parole
applicants for admission into the United States "temporarily, under such conditions as the
Secretary may prescribe, only on a case-by-case basis for urgent humanitarian reasons or
significant public benefit." INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); see also 6
U.S.C. 202(4) (charging the Secretary with the responsibility for "[e]stablishing and
administering rules…governing…parole").

On June 18, 2024, President Biden announced that the U.S. Department of Homeland
Security (DHS) would implement a parole in place process for certain noncitizen spouses
of U.S. citizens (and noncitizen stepchildren of U.S. citizens).  Pursuant to the Secretary's
statutory authorities, including sections 103(a) and 212(d)(5)(A) of the INA, 8 U.S.C.
1103(a), 1182(d)(5)(A), the Secretary has the discretionary authority to establish a
process by which certain aliens are permitted to apply for parole in place within the
United States.  Currently, individuals can file Form I-131, Application for Travel
Document, to request certain types of parole from U.S. Citizenship and Immigration
Services (USCIS).  The current version of Form I-131 available for use by filers does not
include an ability to specifically request parole in place.  A revised version of Form I-131
was recently approved by OMB [June 17, 2024; 1615-0013], and will, for the first time,
include an option for applicants to request parole in place.  However, as a multi-use form
that includes requests for re-entry permits, refugee travel documents, advance parole
documents, and initial parole documents for individuals who are outside the United
States, the Form I-131 collects limited information related to parole in place filings and
does not have the data fields necessary to support the parole in place process being
established for certain noncitizen spouses and stepchildren of U.S. citizens.  Moreover,
the revised Form I-131 is not yet available for online or paper filing.

Due to the volume of estimated respondents and the need to collect specific information
and evidence that is not required for other types of parole in place requests, USCIS has
created a new information collection specifically for the parole in place process for
certain noncitizen spouses of U.S. citizens (and noncitizen stepchildren of U.S. citizens).
Applicants filing a request for parole in place under this process would file online using

1

the Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens.

Any individual may be required to submit biometric information if the regulations or form instructions require such information or if requested in accordance with 8 CFR 103.2(b)(9). DHS may collect and store for present or future use, or reuse, by electronic or other means, the biometric information submitted by an individual.  DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws.  *See* 8 CFR 103.16. Individuals requesting parole in place as the spouse or stepchild of a U.S. citizen must provide biometrics as part of the requirements for establishing eligibility.

**Authorities:**  8 U.S.C. 1103(a) and 1182(d)(5)(A); 6 U.S.C. 202, 271

**This Emergency Revision:**
In this emergency request, U.S. Citizenship and Immigration Services (USCIS) seeks approval to collect information for the purpose of considering, on a case-by-case basis, requests for parole in place from certain noncitizens who are married to a U.S. citizen (and from noncitizen stepchildren of U.S. citizens) and are present in the United States without admission or parole.

Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens., will be used by noncitizens who are present in the United States without admission or parole to request a temporary period of parole in place under the Parole Process for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, announced on June 18, 2024.

DHS, in its discretion, may grant parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit to any noncitizen who is an applicant for admission. This authority extends to noncitizens present in the United States who have not been lawfully admitted, a practice known as parole in place.  If USCIS approves Form I-131F filed by a noncitizen seeking parole in place under this parole process, the noncitizen will receive a Form I-94, Arrival/Departure Record, which is evidence of their parole.

If granted parole in place, the noncitizen would be able to immediately apply for employment authorization as a parolee pursuant to 8 C.F.R. 274a.12(c)(11). If granted parole in place, these parolees may also become eligible to file an application to adjust their status to that of lawful permanent resident based on their relationship to their U.S. citizen spouse or stepparent.  USCIS has estimated that approximately 550,000 individuals could apply for parole in place. Upon approval of an I-131F, applicants may apply for other immigration benefits once eligible.

2.     **Indicate how, by whom, and for what purpose the information is to be used.  Except for a new collection, indicate the actual use the agency has made of the information**

003924

**received from the current collection.**

Form I-131F will be used by certain noncitizens to request parole in place on the basis of being a qualified noncitizen spouse or stepchild of a U.S. citizen who is present in the United States without admission or parole under the Parole Process for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens.  USCIS will use the information collected on the form to verify the applicant's status and determine their eligibility to obtain parole in place. These requests will be considered on a case-by-case basis.

Noncitizens filing Form I-131F are required to provide biometrics and undergo background and security vetting in connection with the application.  As part of the procedures for conducting these security checks, biometrics submission requirements and guidance are contained in the form instructions.  USCIS retains its authority to fingerprint individuals, on an as needed, case-by-case basis.  Applicants will file Form I-131F online.

3.      **Describe whether, and to what extent, the collection of information involves the use of automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses, and the basis for the decision for adopting this means of collection.  Also describe any consideration of using information technology to reduce burden.**

This information collection provides the most efficient means for gathering and processing information for an applicant to request parole in place on the basis of being a qualified noncitizen spouse or stepchild of a U.S. citizen. The form also collects biographic information about the beneficiary to be used for biographic security screening and information concerning why the beneficiary warrants a discretionary grant of parole.

Form I-131F will only be available for online filing. The burden for setting up a USCIS online account is covered under the USCIS Online Account Access information collection (OMB control number 1615-0122).

USCIS uses various tools to collect feedback from end users of USCIS information collections. These tools include surveys or focus groups designed to collect general information, as well as public feedback submitted to USCIS either in response to an official solicitation of public comments from Federal Register publications or submitted proactively through USCIS' robust external outreach activities with stakeholders (see, e.g., www.uscis.dhs.gov/outreach).  USCIS also performed usability testing on USCIS Forms I-765, N-400, and I-485 (the three forms with the highest-filing volume) with the goal of studying cross-cutting issues that impact the responding public across the entirety of the USCIS collections of information. Form I-131F is a new information collection, designed based off user feedback from USCIS Form I-134A, Online Request to be a Supporter and Declaration of Financial Support and USCIS Form I-131, Application for Travel Document. USCIS monitored the submission process of these forms, analyzed the feedback that it received from respondents, as well as input from internal assessment of

3

user experience to design Form I-131F.

In addition to feedback from external stakeholders, our analysis considers consultation with internal agency stakeholders regarding such activities including, but not limited to, document submission, evidentiary requirements, and like activities. USCIS extensively engages with various program, policy, and intake teams for feedback on the information collections.  USCIS analyzes the results of all these efforts to identify necessary modifications to the collection tools approved for use under the Paperwork Reduction Act. Such modifications could include clarifying edits, potential question removal, and instructional updates, all intended to further support the respondent's experience in complying with a collection of information. The collection of information proposed in this current submission is the cumulative result of analysis and studies conducted. USCIS is creating this information collection to account for populations of noncitizens that will request parole in place as the spouse or stepchild of a U.S. citizen. This information collection is crucial to ensuring that the appropriate information and supporting evidence is provided by the applicant for USCIS to determine eligibility for the benefit being sought.

4.    **Describe efforts to identify duplication.  Show specifically why any similar information already available cannot be used or modified for use for the purposes described in Item 2 above.**

USCIS programs impose no duplication of efforts because similar information that can be used to determine eligibility for parole in place as the noncitizen spouse or stepchild of a U.S. citizen under Parole Process for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, online Form I-131F, is not collected through other USCIS collections or programs.  USCIS requires applicants under this control number to appear at a USCIS Application Support Center (ASC) to provide an electronic photograph and fingerprints.

USCIS has also investigated the information that may be obtained from other Federal programs and agencies and has determined that the information necessary to determine if the individual is eligible to request parole in place as the noncitizen spouse or stepchild of a U.S. citizen is not available through other Federal sources.

5.    **If the collection of information impacts small businesses or other small entities (Item 5 of OMB Form 83-I), describe any methods used to minimize burden.**

This collection of information does not have an impact on small businesses or other small entities.

6.    **Describe the consequence to Federal program or policy activities if the collection is not conducted or is conducted less frequently, as well as any technical or legal obstacles to reducing burden.**

The collection of this information is required to verify the status of applicants who are

4

requesting parole in place as a qualified noncitizen spouse or stepchild of a U.S. citizen and to determine whether the applicant is eligible for a discretionary grant of parole in place.  The inability of USCIS to collect information for this purpose may result in noncitizens who entered the United States without being inspected and admitted or paroled being unable to potentially adjust their status to that of a lawful permanent resident while in the United States even though they may have a qualifying relationship with a U.S. citizen. Instead, these noncitizens would have to seek an immigrant visa abroad at a U.S. consulate or embassy, and their departure from the United States can cause them to become inadmissible to the United States, requiring them to seek a waiver of that inadmissibility (if available), the process for which may be lengthy.

Alternatively, this group of noncitizens may file Form I-601A, Application for Provisional Unlawful Presence Waiver, prior to departing the United States and if Form I-601A is approved, they would have to depart the United States to seek an immigrant visa from Department of State. Even with an approved Form I-601A, such a departure could result in extended separation due to consular backlogs with significant disruption to families here in the United States, and the Form I-601A approval does not guarantee that a waiver will be granted or that the beneficiary would be able to reenter the United States after departure if other grounds of inadmissibility may apply to their case.

7.    **Explain any special circumstances that would cause an information collection to be conducted in a manner:**

- **Requiring respondents to report information to the agency more often than quarterly;**

- **Requiring respondents to prepare a written response to a collection of information in fewer than 30 days after receipt of it;**

- **Requiring respondents to submit more than an original and two copies of any document;**

- **Requiring respondents to retain records, other than health, medical, government contract, grant-in-aid, or tax records for more than three years;**

- **In connection with a statistical survey, that is not designed to produce valid and reliable results that can be generalized to the universe of study;**

- **Requiring the use of a statistical data classification that has not been reviewed and approved by OMB;**

- **That includes a pledge of confidentiality that is not supported by authority established in statute or regulation, that is not supported by disclosure and data security policies that are consistent with the pledge, or which unnecessarily impedes sharing of data with other agencies for compatible confidential use; or**

5

- **Requiring respondents to submit proprietary trade secret, or other confidential information unless the agency can demonstrate that it has instituted procedures to protect the information's confidentiality to the extent permitted by law.**

This information collection is conducted in a manner consistent with the guidelines in 5 CFR 1320.5(d)(2).

8.   **If applicable, provide a copy and identify the data and page number of publication in the Federal Register of the agency's notice, required by 5 CFR 1320.8(d), soliciting comments on the information collection prior to submission to OMB. Summarize public comments received in response to that notice and describe actions taken by the agency in response to these comments.  Specifically address comments received on cost and hour burden.**

**Describe efforts to consult with persons outside the agency to obtain their views on the availability of data, frequency of collection, the clarity of instructions and recordkeeping, disclosure, or reporting format (if any), and on the data elements to be recorded, disclosed, or reported.**

**Consultation with representatives of those from whom information is to be obtained or those who must compile records should occur at least once every 3 years - even if the collection of information activity is the same as in prior periods. There may be circumstances that may preclude consultation in a specific situation. These circumstances should be explained.**

USCIS is seeking emergency approval under 5 CFR 1320.13 and, as such, has not yet published a notice in the Federal Register. Public comments will be solicited, and this information collection request will go through a normal Paperwork Reduction Act (PRA) approval process, including a response to all comments received from the public, no later than six months after the approval of this emergency request.

9.   **Explain any decision to provide any payment or gift to respondents, other than remuneration of contractors or grantees.**

USCIS does not provide any payment for benefit sought.

10.   **Describe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation or agency policy.**

There are no statutory or regulatory confidentiality provisions that apply to noncitizen spouses or stepchildren of U.S. citizens specifically under this parole in place process. However, DHS applies the protections of the Privacy Act of 1974, 5 U.S.C. 552a, which restricts the disclosure of personally identifiable information maintained by Federal Agencies, to all individuals as a matter of policy. Additionally, if qualifying noncitizen

6

spouses or stepchildren of U.S. citizens apply for other benefit types that provide special protections from disclosure or confidentiality, the statutory and regulatory provisions governing those benefit requests will apply.  In particular, noncitizens who apply for asylum are protected by the confidentiality provisions of 8 CFR 208.6 and 1208.6, while applicants who have applied for T nonimmigrant status, for U nonimmigrant status, or a VAWA self-petition will be protected by the confidentiality provisions of 8 U.S.C. 1367.

This collection is covered under the following Privacy Impact Assessments:
- DHS/USCIS/PIA-056 - USCIS Electronic Information System (USCIS ELIS); and,
- DHS/USCIS/PIA-071 - myUSCIS Account Experience.

The collection is covered under the following System of Records Notices:
- DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, September 18, 2017, 82 FR 43556;
- DHS/USCIS-007 Benefits Information System, October 10, 2019, 84 FR 54622; and,
- DHS/USCIS-018 Immigration Biometric and Background Check (IBBC) System of Records, July 31, 2018, 83 FR 36950.,

**11.   Provide additional justification for any questions of a sensitive nature, such as sexual behavior and attitudes, religious beliefs, and other matters that are commonly considered private.  This justification should include the reasons why the agency considers the questions necessary, the specific uses to be made of the information, the explanation to be given to persons from whom the information is requested, and any steps to be taken to obtain their consent.**

USCIS will collect the Spouse or Parent's Social Security Number (SSN).  The SSN will enable USCIS to expedite the confirmation of the U.S. citizen spouse or stepparent who is identified as the qualifying relative for purposes of the parole in place process for the noncitizen spouse or stepchild. The SSN information is used to establish and corroborate the U.S. citizen's identity, especially since not all U.S. citizens have a U.S. passport or A-number (naturalized citizens).

**12.   Provide estimates of the hour burden of the collection of information.  The statement should:**

- **Indicate the number of respondents, frequency of response, annual hour burden, and an explanation of how the burden was estimated. Unless directed to do so, agencies should not conduct special surveys to obtain information on which to base hour burden estimates.  Consultation with a sample (fewer than 10) of potential respondents is desirable.  If the hour burden on respondents is expected to vary widely because of differences in activity, size, or complexity, show the range of estimated hour burden, and explain the reasons for the**

variance.  Generally, estimates should not include burden hours for customary and usual business practices.

- If this request for approval covers more than one form, provide separate hour burden estimates for each form and aggregate the hour burdens in Item 13 of OMB Form 83-I.

- Provide estimates of annualized cost to respondents for the hour burdens for collections of information, identifying and using appropriate wage rate categories. The cost of contracting out or paying outside parties for information collection activities should not be included here.  Instead, this cost should be included in Item 14.

| Type of Respondent | Form Name / Number | No. of Respondents<br>A | No. of Responses per Respondent<br>B | Total Number of Responses<br>C (=AxB) | Avg. Burden per Response (in hours)<br>D | Total Annual Burden (in hours)<br>E (=CxD) | Avg. Hourly Wage Rate<br>F | Total Annual Respondent Cost<br>(=ExF) |
|---|---|---|---|---|---|---|---|---|
| Individuals or Households | Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, I-131F (Online e-file) | 550,000 | 1 | 550,000 | 1.1667 | 641,685 | $45.96 | $29,491,843 |
| Individuals or Households | Biometrics | 550,000 | 1 | 550,000 | 1.17 | 643,500 | $45.96 | $29,575,260 |
| Total | | | | 1,100,000 | | 1,285,185 | | $59,067,103 |

*The above Average Hourly Wage Rate is the May 2023 Bureau of Labor Statistics average wage for All Occupations of $31.48 times the wage rate benefit multiplier of 1.46 (to account for benefits provided) equaling $45.96.*
*\*\* USCIS is seeking emergency approval under 5 CFR 1320.13.  USCIS has estimated that as many as 550,000 individuals could apply for parole in place during the first 14 months of the process. USCIS expects this to be the totality of submission.  To keep the information collection approved, USCIS will be initiate a future PRA action, reviewing the number of receipted fillings to adjust respondents at that time.*

13.   **Provide an estimate of the total annual cost burden to respondents or record keepers resulting from the collection of information.  (Do not include the cost of any hour burden shown in Items 12 and 14).**

- The cost estimate should be split into two components:  (a) a total capital and start-up cost component (annualized over its expected useful life); and (b) a total operation and maintenance and purchase of services component.  The estimates should take into account costs associated with generating, maintaining, and disclosing or providing the information.  Include descriptions of methods used to

8

estimate major cost factors including system and technology acquisition, expected useful life of capital equipment, the discount rate(s), and the time period over which costs will be incurred.  Capital and start-up costs include, among other items, preparations for collecting information such as purchasing computers and software; monitoring, sampling, drilling and testing equipment; and record storage facilities.

- If cost estimates are expected to vary widely, agencies should present ranges of cost burdens and explain the reasons for the variance.  The cost of purchasing or contracting out information collection services should be a part of this cost burden estimate.  In developing cost burden estimates, agencies may consult with a sample of respondents (fewer than 10), utilize the 60-day pre-OMB submission public comment process and use existing economic or regulatory impact analysis associated with the rulemaking containing the information collection, as appropriate.

- Generally, estimates should not include purchases of equipment or services, or portions thereof, made: (1) prior to October 1, 1995; (2) to achieve regulatory compliance with requirements not associated with the information collection; (3) for reasons other than to provide information or keep records for the government; or (4) as part of customary and usual business or private practices.

There are no capital, start-up, operational or maintenance costs associated with this collection of information. For informational purposes only, the filing fee for Form I-131F is $580, and applicants will file the form online.

This information collection may impose some out-of-pocket costs on respondents in addition to the time burden for the form's preparation. Costs may include payments for document translation and preparation services, attorney and legal fees, postage, and costs associated with gathering documentation.  USCIS estimates that the average cost for these activities is $515.00. The estimated out of pocket cost to respondents is 550,000 respondents multiplied by the average cost per response of $515 = **$283,250,000**.

14. **Provide estimates of annualized cost to the Federal government.  Also, provide a description of the method used to estimate cost, which should include quantification of hours, operational expenses (such as equipment, overhead, printing, and support staff), and any other expense that would not have been incurred without this collection of information.  Agencies also may aggregate cost estimates from Items 12, 13, and 14 in a single table.**

The estimated cost to the government, which is funded by USCIS user fee collections, is calculated by multiplying the estimated number of respondents (550,000) x the filing fee for the collection ($580).  The total cost to the Federal government is **$319,000,000**.

15. **Explain the reasons for any program changes or adjustments reporting in Items 13**

003931

**or 14 of the OMB Form 83-I.**

There are no program changes or adjustments as this is a new information collection.

**16.**     **For collections of information whose results will be published, outline plans for tabulation, and publication.  Address any complex analytical techniques that will be used.  Provide the time schedule for the entire project, including beginning and ending dates of the collection of information, completion of report, publication dates, and other actions.**

This information collection will not be published for statistical purposes.

**17.**     **If seeking approval to not display the expiration date for OMB approval of the information collection, explain the reasons that display would be inappropriate.**

USCIS will display the expiration date for OMB approval of this information collection.

**18.**     **Explain each exception to the certification statement identified in Item 19, "Certification for Paperwork Reduction Act Submission," of OMB 83-I.**

USCIS does not request an exception to the certification of this information collection.

**B.**     **Collections of Information Employing Statistical Methods.**

There is no statistical methodology involved with this collection.

10


U.S. Citizenship
and Immigration
Services

My Account ▾          Resources ▾          |          Sign Out

## File a Form

Select the form you want to file online. Once you start your form, we will automatically save your information for 30 days, or from the last time you worked on the form.

**Fee waiver:**  If you are requesting a fee waiver, you cannot file online.  You must file a paper version of both the Form I-912, Request for Fee Waiver and the form for the specific benefit you are requesting. You can review the fee waiver guidance at www.uscis.gov/feewaiver.

## Select the form you want to file online.

| I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens ▾ |
| --- |

Use this form to apply for certain noncitizens who are present in the United States without admission or parole to request a temporary period of parole.

**Start form**

Return to top

**Topics**     **Contact Us**     **Citizenship**     **Schedule An Appointment**     **Find A Doctor**     **Find A Class**


U.S. Citizenship
and Immigration
Services



**Contact USCIS**


**USCIS.gov**
**An official website of the U.S. Department of Homeland Security**

About USCIS

Accessibility

Budget and Performance

DHS Components

Freedom of Information Act

No FEAR Act Data

Privacy and Legal Disclaimers

Site Map

Office of the Inspector General

The White House

USA.gov


National Terrorism Advisory System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

003933

## I-131F: Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, is used by certain noncitizens who are present in the United States without admission or parole to request a temporary period of parole.

DHS, in its discretion, may grant parole on a case-by-case basis for significant public benefit or urgent humanitarian reasons to any noncitizen who is an applicant for admission. This authority extends to noncitizens present in the United States who have not been lawfully admitted, a practice known as "parole in place." If we approve Form I-131F filed for a noncitizen spouse or stepchild of a U.S. citizen seeking parole in place, the noncitizen spouse or stepchild of a U.S. citizen will receive a Form I-94, Arrival/Departure Record, which is evidence of their parole.

**Note:** Form I-94 does not authorize entry into the United States. Individuals granted parole in place as a noncitizen spouse or stepchild of a U.S. citizen who depart the United States without first obtaining an Advance Parole Document may be precluded from returning as someone who is inadmissible to the United States, and may also be ineligible for future immigration benefits.

Visit the Keeping Families Together page for more information.

### ✅ Before You Start Your Application

#### 📖 Eligibility

A separate Form I-131F must be filed for each noncitizen spouse or stepchild of a U.S. citizen seeking parole in place.

A noncitizen spouse or stepchild of a U.C. citizen may request parole in place under this process if they:

- Are present in the United States without admission or parole;
- Have been continuously physically present in the United States
  - Since at least June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen OR
  - As of June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;
- Have:
  - A legally valid marriage to a U.S. Citizen as of June 17, 2024 (see NOTE), if seeking parole in place as the spouse of a U.S. citizen OR
  - A parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;
- Do not have any disqualifying criminal history; and
- Do not pose a threat to national security and public safety.

**Note:** If you were admitted to the United States (such as with a nonimmigrant visa), you are not eligible for parole in place as a noncitizen spouse or stepchild because you are not an applicant for admission, even if you overstayed your nonimmigrant status or are otherwise in the United States past your authorized period of stay.

**Note:** If your U.S. citizen spouse or stepparent has died prior to submitting your parole request, you may still qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen as long as a legally valid marriage was entered into on or before June 17, 2024.

**Note:** Even if you meet the above criteria to seek a discretionary grant of parole under this process, USCIS may deny your request if we determine, as a matter of discretion, that a grant of parole is not warranted in your case.

**Note:** If you are in removal proceedings or have an order of removal, you may still qualify for parole. However, if parole is granted, you will likely have fewer additional days with the immigration court prior to seeking additional immigration benefits from USCIS.

#### Revocation or termination of parole

USCIS may revoke your grant of parole in place if you make a materially false representation or concealment in this application. DHS may also terminate your parole at any time if we determine that your continued presence in the United States is no longer warranted. Issuance of a Notice to Appear (NTA) placing you in removal proceedings after you are granted parole will constitute written notice of parole termination. If you depart the United States after you are granted parole, your parole automatically terminates.

#### 🔧 Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form N-131F, we will deny your application and may deny any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

#### 💳 Fee

We will automatically calculate the cost for you before you submit your application. For specific information about fees applicable to this form, see Form G-1055.

**Refund policy:** USCIS does not refund fees, regardless of any action we take on your application, petition or request, or how long USCIS takes to reach a decision. By continuing this transaction, you acknowledge that you must submit fees in the exact amount and that you are paying the fees for a government service. Please refer to the instructions for the form(s) you are filing for additional information or you may call the USCIS Contact Center at 800-375-5283. For TTY (deaf or hard of hearing) 800-767-1833.

#### 📄 Documents you may need

We will automatically determine which documents you should provide us as you fill out your application. At the time of filing, you must submit all evidence and supporting documentation listed.

#### 🖐 Biometric services appointment

All applicants must submit biometrics at a USCIS Application Support Center (ASC). After you have filed this application, USCIS will notify you in writing of the time and location for your biometric services appointment. Failure to appear for biometrics submission may result in us denying your application.

Biometrics will be used to conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application.

At your biometrics appointment, you must sign an oath reaffirming that:

- You provided or authorized all information in the application;
- You reviewed and understood all of the information contained in, and submitted with, the application; and
- All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your application.

#### 📄 USCIS Contact Center

For additional information on the application and instructions about where to file, change of address, and other questions, visit the USCIS Contact Center page or call at 800-375-5283 (TTY 800-767-1833). The USCIS Contact Center provides information in English and Spanish.

### ➡ After You Submit Your Petition

#### ☑ Track your case online

After you submit your form, you can track its status through your USCIS account. Sign into your account often to check your case status and read any important messages from USCIS.

#### ↩ Respond to requests for information

If we need more information from you, we will send you a Request for Evidence (RFE) or Request for Information (RFI). You can respond to our request and upload your documents through your USCIS account.

#### 💬 Request for interview

We may request that you appear at a USCIS office for an interview based on your application. During your interview, USCIS may request you to provide biometrics to verify your identity and/or update background and security checks.

#### 🖐 Provide your biometrics

We will contact you to schedule an appointment at an Application Support Center near you. At the appointment, we will get your fingerprints, photograph, and signature.

<button>Next</button>



Return to top

Topics · Contact Us · Citizenship · Schedule An Appointment · Find A Doctor · Find A Class

U.S. Citizenship and Immigration Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS · Freedom of Information Act · Office of the Inspector General
Accessibility · No FEAR Act Data · The White House
Budget and Performance · Privacy and Legal Disclaimers · USA.gov
DHS Components · Site Map

## ⚙ Completing Your Form Online

**📱 Filing online**

Submitting your form online is the same as mailing in a completed paper form. They both gather the same information and cost the same.

**⚙ Complete the Getting Started section first**

You should answer all questions in the Getting Started section first so we can best customize the rest of your online form experience.

**☑ Provide as many responses as you can**

You should provide as many responses as you can. Incomplete fields or sections and missing information can slow down the process after you submit your form.

**☐ We will automatically save your responses**

We will automatically save your information when you select next to go to a new page or navigate to another section of the form. We will save your information for 30 days from today, or from the last time you worked on the form.

**▭ How to continue filling out your form**

After you start your form, you can sign in to your account to continue where you left off.

**☑ Decision**

The decision on Form I-131F involves a case by case determination of whether you have established eligibility for parole in place. Approval of Form I-131F does not guarantee eligibility for any future immigration benefits. USCIS will notify you of our decision in writing.

### DHS Privacy Notice

**AUTHORITIES:** USCIS is collecting the information requested on this application, and the associated evidence, under INA sections 103, 208(c)(1)(C), 211, 212(d)(5)(A), 215 and 8 CFR sections 211.1(a)(3-4), 212.5, and 223.1-223.3.

**PURPOSE:** The primary purpose for providing the requested information on this application is to apply for parole (Form I-94, Arrival/Departure Record) based on urgent humanitarian reasons or a significant public benefit. DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in USCIS denying your application.

**ROUTINE USES:** DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices (DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System, DHS/USCIS-007 Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check) and the published privacy impact assessments (DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems and DHS/USCIS/PIA-051 Case and Activity Management for International Operations) which you can find at www.dhs.gov/privacy. DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

### Paperwork Reduction Act

"USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 1.667 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. The collection of biometrics is estimated to require 1.17 hours. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:

U.S. Citizenship and Immigration Services
Office of Policy and Strategy, Regulatory Coordination Division
5900 Capital Gateway Drive, Mail Stop #2140
Camp Springs, MD 20588-0009

Do not mail your completed Form I-131F to this address.

OMB No. 1615-NEW
Expires

**🔒 Security reminder**

If you do not work on your form for more than 30 days, we will delete your data in order to prevent storing personal information indefinitely.

Back    Start





An official website of the United States government   Here's how you know ∨

U.S. Citizenship
and Immigration
Services

My Account ▾     Resources ▾     |     Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an...

Getting Started        ‹

**Type of request**

Preparer and interpreter
information

Preparer information

Interpreter information

About You              ›

Evidence               ›

Review & Submit        ›

You must complete all fields with an asterisk (*) to submit this form.

I am requesting parole in place under INA section
212(d)(5)(A) as the: *

○ Spouse of a United States Citizen

○ Stepchild of a United States Citizen

Back        Next

Return to top

Topics        Contact Us        Citizenship        Schedule An Appointment        Find A Doctor        Find A Class

About USCIS              Freedom of Information Act        Office of the Inspector General

Accessibility            No FEAR Act Data                  The White House

Budget and Performance   Privacy and Legal Disclaimers     USA.gov

DHS Components           Site Map

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

U.S. Citizenship
and Immigration
Services

Contact USCIS

National Terrorism Advisory
System

NTAS

ACTIVE
BULLETIN
Put this widget on your web page

003306



An official website of the United States government   Here's how you know ⌄

**U.S. Citizenship and Immigration Services**

My Account ⌄     Resources ⌄     |     Sign Out

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an…

**Getting Started** ⌃
- **Type of request**
- Preparer and interpreter information
- Preparer information
- Interpreter information

About You ⌄
Evidence ⌄
Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## I am requesting parole in place under INA section 212(d)(5)(A) as the: *

○ Spouse of a United States Citizen

● Stepchild of a United States Citizen

## What is your parent's I-131F receipt number? (if applicable)

☐ I do not have or know the I-131F receipt number.

Provide a 13-character receipt number, beginning with 3 capitalized letters followed by 10 digits.

Back     Next

Topics     Contact Us     Citizenship     Schedule An Appointment     Find A Doctor     Find A Class

**U.S. Citizenship and Immigration Services**

Contact USCIS

USCIS.gov
An official website of the **U.S. Department of Homeland Security**

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



003938



An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

**Getting Started** ⌃

Type of request

**Preparer and interpreter
information**

Preparer information

Interpreter information

About You ⌄

Evidence ⌄

Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

### Is someone assisting you with completing this application?

● Yes

○ No

### Is a preparer assisting you with completing this application?

A preparer is anyone who completes or helps you complete all or part of your application using information and answers that you provide.

● Yes

○ No

### Is an interpreter assisting you with completing this application?

An interpreter is anyone who translates or helps you translate all or part of your application using information and answers that you provide.

● Yes

○ No

[ Back ]    [ Next ]

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

 U.S. Citizenship
and Immigration
Services



**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS            Freedom of Information Act        Office of the Inspector General
Accessibility          No FEAR Act Data                 The White House
Budget and Performance  Privacy and Legal Disclaimers   USA.gov
DHS Components         Site Map


National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

003939

An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄     Resources ⌄     |     Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

**Getting Started** ⌃
- Type of request
- Preparer and interpreter information
- **Preparer information**
- Interpreter information

About You ⌄
Evidence ⌄
Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## What is your preparer's full name?

Given name (first name)

Family name (last name)

## What is your preparer's business or organization name?

☐ My preparer is not part of a business or organization.

## What is your preparer's contact information?

Daytime telephone number

Provide a 10-digit phone number.

Mobile telephone number

☐ My preparer does not have a mobile telephone number.

Provide a 10-digit phone number.

Email address

☐ My preparer does not have an email address.

Example: user@domain.com

Back     Next

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship
and Immigration
Services

**Contact USCIS**

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



National Terrorism Advisory System
NTAS
ACTIVE BULLETIN
READ MORE
Put this widget on your web page

An official website of the United States government   Here's how you know

U.S. Citizenship
and Immigration
Services

My Account    Resources    Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

**Getting Started**                  ^

Type of request

Preparer and interpreter
information

Preparer information

**Interpreter information**

About You                            ⌄

Evidence                             ⌄

Review & Submit                      ⌄

You must complete all fields with an asterisk (*) to submit this form.

## What is your interpreter's full name?

Given name (first name)                Family name (last name)

## What is your interpreter's business or organization name?

☐ My interpreter is not part of a business or organization.

## What is your interpreter's contact information?

**Daytime telephone number**

Provide a 10-digit phone number.

**Mobile telephone number**
☐ My interpreter does not have a mobile telephone number.

Provide a 10-digit phone number.

**Email address**
☐ My interpreter does not have an email address.

Example: user@domain.com

## What language is your interpreter using to interpret this application for you?

Back                    Next

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

U.S. Citizenship
and Immigration
Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS                 Freedom of Information Act      Office of the Inspector General
Accessibility               No FEAR Act Data                The White House
Budget and Performance      Privacy and Legal Disclaimers   USA.gov
DHS Components              Site Map

National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

An official website of the United States government    Here's how you know ⌄

and Immigration Services

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an…

Getting Started ⌄

**About You** ⌃

**Your name**

Your contact information

When and where you were born

Describe yourself

Other Information

Processing information

Qualification for parole

Evidence ⌄

Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## What is your current legal name?

Your current legal name is the name on your birth certificate, unless it changed after birth by a legal action such as marriage or court order. Do not provide any nicknames here.

Given name (first name)

Middle name (if applicable)

Family name (last name) *

## Have you used any other names since birth?

Other names used may include nicknames, aliases, and maiden names.

◉ Yes

○ No

Provide all other names you have ever used, including aliases, maiden name, and nicknames. For each name used, provide the date of birth used with that name.

Given name (first name)

Middle name (if applicable)

Family name (last name)

[ + Add another ]

[ Back ]          [ Next ]



Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship and Immigration Services

**Contact USCIS**

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



An official website of the United States government   Here's how you know ⌄

U.S. Citizenship

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an...

Getting Started ⌄

**About You** ⌃

Your name

**Your contact information**

When and where you were born

Describe yourself

Other Information

Processing information

Qualification for parole

Evidence ⌄

Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## How can we contact you?

Daytime telephone number

Provide a 10-digit phone number.

Mobile telephone number (if any)

☐ This is the same as my daytime telephone number.

Provide a 10-digit phone number.

Email address (if any) *

Example: user@domain.com

## What is your U.S. current mailing address or Safe Address (if applicable)?

In care of name (if any)

Address line 1 *

Street number and name

Address line 2

Apartment, suite, unit, or floor

City or town *          State/Province *          Zip code/Postal code *

Provide a 5 or 9-digit
ZIP code.

## Is your current mailing address the same as your physical address?

⦿ Yes

○ No

## What is your physical address?

Provide your current U.S. physical address.

In care of name (if any)

Address line 1 *

Street number and name

Address line 2

Apartment, suite, unit, or floor

City or town *          State/Province *          Zip code/Postal code *

Provide a 5 or 9-digit
ZIP code.

Back          Next

Return to top



Topics     Contact Us     Citizenship     Schedule An Appointment     Find A Doctor     Find A Class

U.S. Citizenship
and Immigration
Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS          Freedom of Information Act          Office of the Inspector General
Accessibility          No FEAR Act Data          The White House
Budget and Performance          Privacy and Legal Disclaimers          USA.gov
DHS Components          Site Map

NTAS
National Terrorism Advisory
System
ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

An official website of the United States government   Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄     Resources ⌄     |   Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started ⌄

**About You** ⌃

Your name

Your contact information

**When and where you were born**

Describe yourself

Other Information

Processing information

Qualification for parole

Evidence ⌄

Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## What is your date of birth? *

MM/DD/YYYY

## What is your country of birth? *

Use the current name of the country. Do not use historical, ethnic, provincial, or other local names.

⌄

## What is your country of citizenship or nationality? *

Provide the name of the country where you are a citizen and/or national. If you do not have citizenship in any country, select Stateless.

⌄

Back          Next

Return to top

Topics     Contact Us     Citizenship     Schedule An Appointment     Find A Doctor     Find A Class



U.S. Citizenship
and Immigration
Services



**Contact USCIS**

 USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS           Freedom of Information Act       Office of the Inspector General

Accessibility          No FEAR Act Data                 The White House

Budget and Performance  Privacy and Legal Disclaimers   USA.gov

DHS Components         Site Map



003944

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an...

**Getting Started**

**About You**
- Your name
- Your contact information
- When and where were you born
- **Describe yourself**
- Other Information
- Processing information
- Qualification for parole

**Evidence**

**Review & Submit**

You must complete all fields with an asterisk (*) to submit this form.

## What is your gender?

Based on your selection, a gender of "M" (male), "F" (female), or "X" (another gender identity) will be reflected on your secure documents if your application is approved.

- ○ Male
- ○ Female
- ○ Another gender identity

## What is your ethnicity?

Hispanic or Latino refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.

- ○ Hispanic or Latino
- ○ Not Hispanic or Latino

## What is your race?

Select all that apply. Your race is different from your ethnicity and should reflect your geographical origins.

- ☐ American Indian or Alaska Native ❓
- ☐ Asian ❓
- ☐ Black or African American ❓
- ☐ Native Hawaiian or Other Pacific Islander ❓
- ☐ White ❓

## What is your height?

Feet
[ ▾ ]

Inches
[ ▾ ]

## What is your weight?

Pounds
[        ]

Provide a weight between 30 and 699 pounds.

## What is the color of your eyes?

[ ▾ ]

## What is the color of your hair?

[ ▾ ]

[ Back ]          [ Next ]

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

**U.S. Citizenship and Immigration Services**

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

National Terrorism Advisory System
NTAS
ACTIVE BULLETIN
READ MORE
Put this content on your web page

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov

An official website of the United States government   Here's how you know

U.S. Citizenship
and Immigration Services

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an...

Getting Started

**About You**
Your name
Your contact information
When and where were you born
Describe yourself
**Other Information**
Processing information
Qualification for parole

Evidence

Review & Submit

You must complete all fields with an asterisk (*) to submit this form.

## What is your A-Number?

The A-Number refers to your immigration file number provided by U.S. immigration officials. We use your A-Number to identify your immigration records. It is a seven to nine-digit number that begins with an "A" and can be found on correspondence you have received from DHS or USCIS or on immigration court records.

☑ I do not have or know my A-Number.

Provide a 7, 8, or 9-digit number. If your A-number is fewer than 9 digits, the system will automatically add zero(s) after the "A" and before the first digit to there is a total of 9 digits, for example: A001234567.

## What is your U.S. Social Security number (SSN)?

☑ I do not have or know my U.S. Social Security number.

Provide a 9-digit Social Security number.

## What is your USCIS Online Account Number?

You will only have an Online Account Number, or OAN, if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you.

If you do not have a receipt number that begins with IOE, you do not have an OAN.

(The OAN is not the same as an A-Number.)

☑ I do not have or know USCIS Online Account Number.

Provide a 12-digit Online Account Number.

## What is your most recent Form I-94 Arrival/
## Departure Number?

If CBP or USCIB issued you a Form I-94, Arrival/Departure Record, provide your Form I-94 number and date that your authorized period of stay expires or expired (as shown on your Form I-94). The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**Note** If you were admitted to the United States when you last entered the country, you will not be eligible for parole in place as a noncitizen spouse or stepchild of a U.S. citizen.

☑ I do not have or know my Form I-94 record number.

## What is your marital status? *

○ Single, Never married
● Married
○ Divorced
○ Widowed
○ Marriage annulled
○ Separated

## When did you marry your current spouse?

MM/DD/YYYY

## What is your United States Citizen spouse's or
## stepparent's current legal name? *

Their current legal name is the same on their birth certificate, unless it changed after birth by a legal action such as marriage or court order. Do not provide any nicknames here.

Given name (first name)

Middle name (if applicable)

Family name (last name)

## What is your United States Citizen spouse's or
## stepparent's date of birth? *

MM/DD/YYYY

## What is your United States Citizen spouse's or
## stepparent's U.S Social Security number (SSN)? *

☑ I do not have or know their U.S. Social Security number.

Provide a 9-digit Social Security number.

Back    Next

Return to top

Topics   Contact Us   Citizenship   Schedule An Appointment   Find A Doctor   Find A Class

U.S. Citizenship
and Immigration
Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimer
Site Map

Office of the Inspector General
The White House
USA.gov

National Terrorism
Advisory System
NTAS



You must complete all fields with an asterisk (*) to submit this form.

**When did you begin your continuous physical presence in the United States?** *

MM/DD/YYYY

**Have you EVER been in any exclusion, deportation, removal, or rescission proceedings?** *

This includes if you were issued a Form I-862, Notice to Appear, but did not receive a hearing date in immigration court. If you do not know if you have a removal order or are currently in immigration proceedings, you can use your A-Number to look up your immigration court case status. You can also call the EOIR hotline: 1-800-898-7180 / 304-625-2050 / TDD: 800-828-1120.

Note: If you have a removal order but did not depart the United States (an unexecuted removal order) or failed to depart the United States pursuant to a grant of voluntary departure, you will be presumed ineligible for parole in place under this process unless you can establish that there are significant favorable factors that outweigh the removal order and any other adverse factors. If you have an executed removal order, you are ineligible for parole in place under this process.

○ Yes
○ No

**Have you EVER been arrested for, charged with, or convicted of a felony or misdemeanor, including incidents handled in juvenile court, in the United States?** *

Do not include minor traffic violations unless they were alcohol or drug-related.

○ Yes
○ No

**Have you EVER been arrested for, charged with, or convicted of a crime in any country other than the United States?** *

Additional information about disqualifying criminal history, as well as information on criminal convictions that will result in a presumption of ineligibility that may be overcome if you can establish that there are mitigating factors, may be found by Visiting our Frequently Asked Questions About Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens page.

○ Yes
○ No

**Have you EVER or are you NOW engaged in activities that could be reasonable grounds for concluding that you are a danger to public safety or to the security of the United States?** *

Additional information about disqualifying criminal history, as well as information on criminal convictions that will result in a presumption of ineligibility that may be overcome if you can establish that there are mitigating factors, may be found by Visiting our Frequently Asked Questions About Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens page.

○ Yes
○ No

**Have you ever filed a Form I-601A, Application for a Provisional Unlawful Presence Waiver, with USCIS?**

○ Yes
○ No

**What is the receipt number of the Form I-601A?**

If you have ever filed Form I-601A, Application for Provisional Unlawful Presence Waiver, with USCIS, provide the receipt number. You should include the receipt number for your Form I-601A regardless of whether USCIS has issued a final decision on your Form I-601A or if it is still pending.

Back | Next

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an...

Getting Started

About You
  Your name
  Your contact information
  When and where were you born
  Describe yourself
  Other Information
  Processing Information
  Qualification for parole

Evidence

Review & Submit

Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class

U.S. Citizenship and Immigration Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov

An official website of the United States government    Here's how you know ⌄

and Immigration
Services

My Account ⌄    Resources ⌄    Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started    ⌄

**About You**    ∧

Your name

Your contact information

When and where were you born

Describe yourself

Other Information

Processing information

**Qualification for parole**

Evidence    ⌄

Review & Submit    ⌄

You must complete all fields with an asterisk (*) to submit this form.

## Explain how you qualify for parole in place, including information regarding the significant public benefit or urgent humanitarian reasons warranting a grant of parole, and why you believe you merit a favorable exercise of discretion.

You must explain how you qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen in the space provided, including any specific factors that support your request or may be considered in overcoming a rebuttable presumption of ineligibility. Include copies of any supporting documents or evidence you want USCIS to consider. USCIS will use the information provided in your parole request and supporting evidence, along with the results of background and security checks and any other relevant information available to or requested by USCIS, to determine whether parole is warranted based on a significant public benefit or urgent humanitarian reasons and whether you merit a favorable exercise of discretion.

**Provide an explanation. Your answer must be at least 750 characters. ***

0 / 2000

[ Back ]    [ Next ]

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

 U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

USCIS.gov
**An official website of the** U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov


National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄     Resources ⌄     |    Sign Out

**I-131F, Application for Parole in Place for Certain Noncitizen Spouses an…**

Getting Started    ⌄

About you    ⌄

**Evidence**    ⌃

**Photo identity document**

Evidence of your relative's status as a U.S. Citizen

Evidence of qualifying relationship

Evidence of continuous physical presence

Evidence of disposition of any criminal record

Additional evidence

Review & Submit    ⌄

You must complete all fields with an asterisk (*) to submit this form.

## Photo Identity Document

Upload a copy of an official photo identity document showing your photo, name, and date of birth. For example:

- A valid government-issued driver's license;
- Passport identity page;
- Any national identity document from your country of origin bearing your photo;
- Any school-issued form of identification with photo; or
- Any other official identity document with a photo.

**Note:** The copy must clearly show the photo and identity information. Expired documents are acceptable.

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|-----------|----------|--------|
| this-is-my-evidence | Support Evidence | 🗑 Delete |

[ Back ]     [ Next ]

Return to top



Topics     Contact Us     Citizenship     Schedule An Appointment     Find A Doctor     Find A Class

U.S. Citizenship
and Immigration
Services



**Contact USCIS**



USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



National Terrorism Advisory System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE BULLETIN
READ MORE

Put this widget on your web page

003949



U.S. Citizenship
and Immigration
Services

My Account ▾    Resources ▾    |    Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started   ▾

About you   ▾

**Evidence**   ⌃

Photo identity document

**Evidence of your relative's status
as a U.S. Citizen**

Evidence of qualifying relationship

Evidence of continuous physical
presence

Evidence of disposition of any
criminal record

Additional evidence

Review & Submit   ▾

You must complete all fields with an asterisk (*) to submit this form.

## Evidence of Your Relative's Status as a U.S. Citizen

Upload a copy of evidence that your relative referenced in Getting Started is
a U.S. citizen. For example:

- U.S. birth certificate;
- Naturalization Certificate;
- Certificate of Citizenship;
- Consular Report of Birth Abroad; or
- U.S. passport.

## File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English
  translation and the translator's certification with each original
  document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces,
  periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

---

**Choose** or drop files here to upload

---

| File Name | Document | Action |
|-----------|----------|--------|
| this-is-my-evidence | Support Evidence | 🗑 Delete |

[ Back ]              [ Next ]

---

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship
and Immigration
Services



**Contact USCIS**



USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

003950

An official website of the United States government   Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started                              ⌄

About you                                    ⌄

**Evidence**                                 ⌃

Photo identity document

Evidence of your relative's status as
a U.S. Citizen

**Evidence of qualifying
relationship**

Evidence of continuous physical
presence

Evidence of disposition of any
criminal record

Additional evidence

Review & Submit                             ⌄

You must complete all fields with an asterisk (*) to submit this form.

## Evidence of Qualifying Relationship

Upload a copy of evidence of your qualifying spouse or stepchild
relationship to the U.S. citizen referenced in Getting Started. For example:

- Marriage certificate;
- Documentation of termination of any previous marriages, if
  applicable;
- Birth certificate with your noncitizen parent's name, if you are filing as
  the stepchild of a U.S. citizen;
- Death certificate of your U.S. citizen spouse, U.S. citizen stepparent, or
  noncitizen parent, if applicable.

## File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English
  translation and the translator's certification with each original
  document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces,
  periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

---

**Choose** or drop files here to upload

---

| File Name | Document | Action |
|-----------|----------|--------|
| this-is-my-evidence | Support Evidence | 🗑 **Delete** |

[ Back ]                                    [ **Next** ]

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship
and Immigration
Services



**Contact USCIS**



USCIS.gov
An official website of the **U.S. Department of Homeland Security**

About USCIS            Freedom of Information Act       Office of the Inspector General
Accessibility          No FEAR Act Data                The White House
Budget and Performance Privacy and Legal Disclaimers   USA.gov
DHS Components         Site Map



National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

003951

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an…

Getting Started

About you

**Evidence**

Photo identity document

Evidence of your relative's status as a U.S. Citizen

Evidence of qualifying relationship

**Evidence of continuous physical presence**

Evidence of disposition of any criminal record

Additional evidence

Review & Submit

You must complete all fields with an asterisk (*) to submit this form.

## Evidence of Continuous Physical Presence

Upload copies of any of the following documents:

- Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence that connects you to your presence at that address;
- Tax returns or tax receipts;
- School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities of physicians and the dates of the treatment or hospitalization;
- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);
- Money order receipts for money sent in or out of the country; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; insurance policies; receipts; postmarked letters;
- Attestations by religious entities, unions, or other organizations to your physical presence; or
- Any other document you believe is relevant.

**Note:** You must submit sufficient documentation to establish your continuous physical presence for the entire period of time required, but you do not need to submit documentation for every day, week, or month within that period. USCIS will evaluate the totality of the evidence to determine whether you have established continuous physical presence for the required period of time (since at least June 17, 2014 for spouses or as of June 17, 2024 for stepchildren).

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Arrest record and disposition | 🗑 Delete |

Back    Next

Return to top

| Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class |



U.S. Citizenship
and Immigration
Services

f  t  in  instagram  youtube  ✉

**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



National Terrorism Advisory System
NTAS
ACTIVE BULLETIN
READ MORE
Put this widget on your web page



An official website of the United States government   Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄   Resources ⌄   Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an...

Getting Started ⌄

About you ⌄

**Evidence** ⌃

  Photo identity document

  Evidence of your relative's status as
  a U.S. Citizen

  Evidence of qualifying relationship

  Evidence of continuous physical
  presence

  **Evidence of disposition of any
  criminal record**

  Additional evidence

Review & Submit ⌄

You must complete all fields with an asterisk (*) to submit this form.

## Evidence of Disposition of any Criminal Record

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must upload evidence demonstrating the results of the arrest or charges brought against you.

**Note:** If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

- If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable order confirming that no charges were filed for each arrest. If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.
- If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order). If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.
- If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

   - An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

   - An original statement from the court that no record exists of your arrest or conviction.
- If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.

**Note:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol- or drug-related.

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file



**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Arrest record and disposition | 🗑 Delete |

[ Back ]   [ **Next** ]



Topics   Contact Us   Citizenship   Schedule An Appointment   Find A Doctor   Find A Class

U.S. Citizenship
and Immigration
Services

f  t  in  ⌾  ▶  ✉

**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov

National Terrorism Advisory System

NTAS
READ MORE

ACTIVE BULLETIN
Put this widget on your web page



An official website of the United States government   Here's how you know ∨

U.S. Citizenship
and Immigration
Services

My Account ∨   Resources ∨   Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started ∨

About you ∨

**Evidence** ∧

Photo identity document

Evidence of your relative's status as
a U.S. Citizen

Evidence of qualifying relationship

Evidence of continuous physical
presence

Evidence of disposition of any
criminal record

**Additional evidence**

Additional Information ∨

Review & Submit ∨

You must complete all fields with an asterisk (*) to submit this form.

### Additional Evidence You Want To Provide

You can provide any additional evidence demonstrating the significant
public benefit or urgent humanitarian reasons warranting a grant of parole
and evidence of any additional favorable discretionary factors that you
would like us to consider, including any information that may be
considered in overcoming a rebuttable presumption of ineligibility.

#### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English
  translation and the translator's certification with each original
  document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces,
  periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

| **Choose** or drop files here to upload |
| --- |

| File Name | Document | Action |
| --- | --- | --- |
| this-is-my-evidence | Other Supporting Documents | 🗑 Delete |

| Back | | Next |
| --- | --- | --- |



Return to top

**Topics**   **Contact Us**   **Citizenship**   **Schedule An Appointment**   **Find A Doctor**   **Find A Class**



U.S. Citizenship
and Immigration
Services

Contact USCIS

USCIS.gov
**An official website of the** U.S. Department of Homeland Security

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov





U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for
Parole in Place for Certain
Noncitizen Spouses an…

Getting Started                    ⌄
About you                          ⌄
Evidence                           ⌄

**Review & Submit**               ⌃

**Review your application**

Your application summary

Preparer certification

Preparer signature

Interpreter certification

Interpreter signature

Your certification and
signature

## Check your application before you submit

Please review your ${formType} and check it for accuracy and
completeness before you submit it.

We encourage you to provide as many responses as you can throughout the
${formType}. Missing or incomplete information may slow down the review
process after you submit your ${formType}.

You can return to this page to review your ${formType} as many times as
you want before you submit it.

### Your fee

ⓘ  Your form filing fee is: [$XXX]

**Refund policy:** USCIS does not refund fees, regardless of any action we take
on your application, petition or request, or how long USCIS takes to reach a
decision. By continuing this transaction, you acknowledge that you must
submit fees in the exact amount and that you are paying the fees for a
government service.

### Alerts and warnings

✓  We found no alerts or warnings in your application.

Back                              Next

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

U.S. Citizenship
and Immigration
Services

Contact USCIS

USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS              Freedom of Information Act       Office of the Inspector General
Accessibility            No FEAR Act Data                 The White House
Budget and Performance   Privacy and Legal Disclaimers    USA.gov
DHS Components           Site Map



National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

003955





An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    | Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

Getting Started                    ⌄
About You                          ⌄
Evidence                           ⌄
**Review & Submit**                ⌃
    Review your application
    Your application summary
    **Preparer certification**
    Preparer signature
    Interpreter certification
    Interpreter signature
    Your certification and
    signature

## Preparer's certification and signature

Your preparer must read and agree to the certification below.



I certify, under penalty of perjury, that I prepared this
application for the applicant at their request and with
express consent and that all the responses and
information contained in and submitted with the
application are complete, true, and correct and reflects
only information provided by the applicant. The
applicant reviewed the responses and information and
informed me that they understand the responses and
information in or submitted with the application.

As the applicant's preparer, you must sign on paper and provide
your signature page to the applicant. Follow these steps:

 1. Download the Preparer Signature page

 2. Print the Preparer Signature page

 3. Read and sign the Preparer Signature page

 4. Give the signed Preparer Signature page to
   the applicant

-----------------------------------------

The applicant will need to scan and upload your completed
signature page on the next screen.

Back                        Next

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class

 U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

 USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS              Freedom of Information Act      Office of the Inspector General
Accessibility            No FEAR Act Data                The White House
Budget and Performance   Privacy and Legal Disclaimers   USA.gov
DHS Components           Site Map


National Terrorism Advisory
System
NTAS
NATIONAL TERRORISM ADVISORY SYSTEM
ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

003957



U.S. Citizenship
and Immigration
Services

An official website of the United States government    Here's how you know ⌄

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

Getting Started ⌄

About You ⌄

Evidence ⌄

**Review & Submit** ⌃

Review your application

Your application summary

Preparer certification

**Preparer signature**

Interpreter certification

Interpreter signature

Your certification and
signature

## Preparer Signature Upload

Scan and upload your preparer's completed signature page below.

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

Back    Next

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

USCIS.gov
**An official website of the** U.S. Department of Homeland Security

About USCIS

Accessibility

Budget and Performance

DHS Components

Freedom of Information Act

No FEAR Act Data

Privacy and Legal Disclaimers

Site Map

Office of the Inspector General

The White House

USA.gov



National Terrorism Advisory System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE BULLETIN
READ MORE

Put this widget on your web page

003958



An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

Getting Started            ⌄
About You                  ⌄
Evidence                   ⌄

**Review & Submit**        ⌃

Review your application

Your application summary

Preparer certification

Preparer signature

**Interpreter certification**

Interpreter signature

Your certification and
signature

### Interpreter's certification and signature

Your interpreter must read and agree to the certification below.



I certify, under penalty of perjury, that I am fluent in
English and [Fillable language field], and I have
interpreted every question on the application and
Instructions and interpreted the applicant's answers to
the questions in that language, and the applicant
informed me that they understood every instruction,
question, and answer on the application.

As the applicant's interpreter, you must sign on paper and
provide your signature page to the applicant. Follow these steps:

 1. Download the Interpreter Signature page

 2. Print the Interpreter Signature page

 3. Read and sign the Interpreter Signature page

 4. Give the signed Interpreter Signature page to
the applicant

----------------------------------------

The applicant will need to scan and upload your completed
signature page on the next screen.

Back            Next

Return to top

Topics      Contact Us      Citizenship      Schedule An Appointment      Find A Doctor      Find A Class



f    t    in    [instagram]    [youtube]    ✉

**Contact USCIS**

 USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS            Freedom of Information Act       Office of the Inspector General
Accessibility          No FEAR Act Data                 The White House
Budget and Performance  Privacy and Legal Disclaimers   USA.gov
DHS Components         Site Map



003959



An official website of the United States government    Here's how you know ⌄

U.S. Citizenship
and Immigration
Services

My Account ⌄    Resources ⌄    Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

Getting Started                    ⌄
About You                          ⌄
Evidence                           ⌄

**Review & Submit**                ⌃
  Review your application
  Your application summary
  Interpreter certification
  **Interpreter signature**
  Your certification and
  signature

## Interpreter Signature Upload

Scan and upload your interpreter's completed signature page below.

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

```
          Choose or drop files here to upload
```

[ Back ]                              [ Next ]

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class


U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS            Freedom of Information Act       Office of the Inspector General
Accessibility          No FEAR Act Data                 The White House
Budget and Performance Privacy and Legal Disclaimers    USA.gov
DHS Components         Site Map



003960



An official website of the United States government   Here's how you know ⌄

and Immigration
Services

My Account ⌄        Resources ⌄        |        Sign Out

I-131F, Application for
Parole in Place for
Certain Noncitizen
Spouses an…

Getting Started                    ⌄

About You                          ⌄

Evidence                           ⌄

**Review & Submit**                ⌃

Review your application

Your application summary

Preparer certification

Preparer signature

Interpreter certification

Interpreter signature

**Your certification and
signature**

## Applicant certification and signature

You must read and agree to the certification below. If you knowingly and
willfully falsify or conceal a material fact or submit a false document with
your application, we can deny your application and may deny any other
immigration benefit. You may also face criminal prosecution and penalties
provided by the law.



I certify, under penalty of perjury, that I provided or
authorized all of the responses and information
contained in and submitted with my application, I read
and understand or, if interpreted to me in a language in
which I am fluent by the interpreter listed in the Getting
Started section of this application, understood, all of the
responses and information contained in, and submitted
with, my application (as explained to me by the
interpreter), and that all of the responses and the
information are complete, true and correct. Furthermore,
I authorize the release of any information from any and
all of my records that USCIS may need to determine my
eligibility for an immigration request and to other entities
and persons where necessary for the administration and
enforcement of U.S. immigration law.

☑ I have read and agree to the applicant's statement

### Applicant Signature

You must provide your digital signature below by typing your full
legal name. We may deny your application if you do not
completely fill out this application or fail to submit required
documents. We will record the date of your signature with your
application.

[                                                          ]

[ Back ]                              [ Next ]

Topics        Contact Us        Citizenship        Schedule An Appointment        Find A Doctor        Find A Class

 U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

 USCIS.gov
An official website of the U.S. Department of Homeland Security

About USCIS              Freedom of Information Act        Office of the Inspector General

Accessibility            No FEAR Act Data                  The White House

Budget and Performance   Privacy and Legal Disclaimers     USA.gov

DHS Components           Site Map



 and Immigration Services

An official website of the United States government    Here's how you know ⌄

My Account ⌄    Resources ⌄    |    Sign Out

I-131F, Application for Parole in Place for Certain Noncitizen Spouses an…

Getting Started ⌄

About You ⌄

Evidence ⌄

**Review & Submit** ⌃

Review your application

Your application summary

Preparer certification

Preparer signature

Interpreter certification

Interpreter signature

Your certification and signature

**Pay and submit**

### Pay for and submit your application

The final step to submit your Form I-131, Application for Travel Document, is to pay the required fee.

Your application fee is: [$XXX.00]

**Refund policy:** By continuing this transaction, you agree that you are paying for a government service and that the filing fee, biometric services fee and all related financial transactions are final and not refundable, regardless of any action USCIS takes on an application, petition or request, or how long USCIS takes to reach a decision. You must submit all fees in the exact amounts.



We will send you to Pay.gov — our safe, secure payment website — to pay your fees and submit your form online.

Here are the steps in the payment and submission process:

1. Provide your billing information on Pay.gov

2. Provide your credit card or U.S. bank account information

3. Submit your payment

Pay.gov will redirect you to a uscis.gov confirmation screen, which will include your receipt number. Please keep a copy of your receipt number for your records. You can track the status of your application through your USCIS online account.

**Pay and submit**

Back    Next

Return to top

**Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class**

 U.S. Citizenship and Immigration Services

    

**Contact USCIS**


About USCIS            Freedom of Information Act        Office of the Inspector General
Accessibility          No FEAR Act Data                 The White House
Budget and Performance  Privacy and Legal Disclaimers   USA.gov
DHS Components          Site Map


National Terrorism Advisory System
NTAS
NATIONAL TERRORISM ADVISORY SYSTEM
ACTIVE BULLETIN
READ MORE
Put this widget on your web page

003982

An official website of the United States government   Here's how you know ⌄

**U.S. Citizenship and Immigration Services**

My Account ▼          Resources ▼          Sign Out

## You successfully submitted your I-131F

We will contact you if we have any questions or need additional information. You can track the status of your form through your USCIS online account.

**Go to my cases**

---

Return to top

| Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class |



**U.S. Citizenship and Immigration Services**



**USCIS.gov**
**An official website of the U.S. Department of Homeland Security**

| About USCIS | Freedom of Information Act | Office of the Inspector General |
| Accessibility | No FEAR Act Data | The White House |
| Budget and Performance | Privacy and Legal Disclaimers | USA.gov |
| DHS Components | Site Map | |

**Contact USCIS**

National Terrorism Advisory System



003663



U.S. Citizenship
and Immigration
Services

My Account ▼     Resources ▼     Sign Out

## You did not submit your I-131F

Your payment failed because your credit or debit card was declined.

You can try again now to sign and submit your form or save and exit. We will save your form for 30 days from when you started it.

**Sign and submit**

Return to top

| Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class |
|---|---|---|---|---|---|




U.S. Citizenship
and Immigration
Services

**Contact USCIS**



USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS
Accessibility
Budget and Performance
DHS Components

Freedom of Information Act
No FEAR Act Data
Privacy and Legal Disclaimers
Site Map

Office of the Inspector General
The White House
USA.gov



National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

*Put this widget on your web page*

093984

## I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

**Submitted on** January 13, 2023   |   **Receipt #** IOE9169555103

View PDF ▼

 **I-131F notices will not be sent by mail**

We will send all Form I-131F notices and correspondence to your USCIS online account. **You must print your biometric services appointment notice and bring it with you to your biometrics appointment.** To ensure you have the latest information about your case, sign into your USCIS online account often to receive important messages and check your case status.

| Case status | Case history | **Documents** |

## USCIS Notices

**Reminder**: You must print your biometric services appointment notice and bring it with you to your biometrics appointment.

| File | Date Sent | Action |
|------|-----------|--------|
| Appointment-Scheduled.pdf | January 13, 2023 | N/A |
| Receipt-Notice.pdf | January 13, 2023 | N/A |

## Unsolicited evidence

Unsolicited evidence is any additional information or evidence that we did not request from you. If you upload evidence that we did not request from you, USCIS will consider the timeliness and relevance of this information when making a decision about your case.

**Upload evidence**

003965



An official website of the United States government   Here's how you know ▾

U.S. Citizenship
and Immigration
Services

My Account ▾    Resources ▾    |    Sign Out

My Cases     My Clients     File a Form     My Legal Team

My Cases > View Case

# View Case

Applicant: **Lastname, Firstname**



I-131F, Application for Parole in Place for Certain
Noncitizen Spouses and Stepchildren of U.S. Citizens

**Submitted on** January 13, 2023  |  **Receipt #** IOE9169555103

View PDF ▾        Withdraw G-28

ℹ  **I-131F notices will not be sent by mail**

We will send all Form I-131F notices and correspondence to your and your client's USCIS online accounts. **Your client must print their biometric services appointment notice and bring it with them to their biometrics appointment.** To ensure you have the latest information about this case, sign into your USCIS online account often to receive important messages and check the case status.

| Case status | Evidence | **Notices** | Case History |

## USCIS Notices

**Reminder**: Your client must print their biometric services appointment notice and bring it with them to their biometrics appointment.

| File | Date Sent | Action |
| --- | --- | --- |
| Appointment-Scheduled.pdf | January 13, 2023 | N/A |
| Receipt-Notice.pdf | January 13, 2023 | N/A |



U.S. Citizenship
and Immigration
Services

My Account ▼      Resources ▼      |      Sign Out

My Cases      My Clients      File a Form      My Team

# My Cases

You may file a form or view your cases and H-1B registrations. You will see online filed cases, as well as paper-filed cases that have linked to your account, in the tables below.

**File a Form**

| Cases | H-1B registrations |
|---|---|

| **Drafts (57)** | Submitted (40) |
|---|---|

| 🔍 Search for clients and cases | **Search** |
|---|---|

Filter by ⌃

**Status**
Select one ▼

**Form**
Select one ▼

✕ Clear filters

🔄 **Refresh Table**

| Client | Forms | Beneficiary | Status ❓ | Action |
|---|---|---|---|---|
| Company Name | I-129 | Bene Name | ⚠️ Draft expires 03/31/2023 | View draft |
| Company Name | I-129 | Bene Name | ⚠️ Draft expires 03/31/2023 | View draft |
| Last Name, First Name | I-821 + I-765 | None | ⚠️ Draft expires 03/31/2023 | View draft |
| Last Name, First Name | I-131F | None | Ready to pay and submit | View draft |
| Last Name, First Name | N-400 | Bene Name | Ready to pay and submit | View draft |
| Last Name, First Name | I-129: Petition for a Noni... | Bene Name | 🔒 Locked for editing | View draft |

| Rows per page: 25 ▼ | 1 - 25 of 57 | ‹ Back    Next › |
|---|---|---|

---

Return to top

**Topics**      **Contact Us**      **Citizenship**      **Schedule An Appointment**      **Find A Doctor**      **Find A Class**



U.S. Citizenship
and Immigration
Services

[f] [Twitter] [in] [Instagram] [YouTube] [✉]

**Contact USCIS**

---

USCIS.gov
**An official website of the** U.S. Department of Homeland Security



National Terrorism Advisory
System

ONTAS

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

**About USCIS**          Freedom of Information Act          Office of the Inspector General

Accessibility          No FEAR Act Data          The White House

Budget and Performance          Privacy and Legal Disclaimers          USA.gov

DHS Components          Site Map

003967



An official website of the United States government    Here's how you know ⌄

and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out



I-131, Application for
Travel Document

Getting Started                 ⌄
About You                       ⌄
Application Information          ⌄
Evidence                        ⌄
Additional Information          ⌄

**Review & Submit**              ⌃
  Review your application
  Your application summary
  Preparer certification
  Preparer signature
  Interpreter certification
  Interpreter signature
  **Your certification and
  signature**

## Applicant certification and signature

You must read and agree to the certification below. If you knowingly and
willfully falsify or conceal a material fact or submit a false document with
your application, we can deny your application and may deny any other
immigration benefit. You may also face criminal prosecution and penalties
provided by the law.



I certify, under penalty of perjury, that I provided or
authorized all of the responses and information
contained in and submitted with my application, I read
and understand or, if interpreted to me in a language in
which I am fluent by the interpreter listed in the Getting
Started section of this application, understood, all of the
responses and information contained in, and submitted
with, my application (as explained to me by the
interpreter), and that all of the responses and the
information are complete, true and correct. Furthermore,
I authorize the release of any information from any and
all of my records that USCIS may need to determine my
eligibility for an immigration request and to other entities
and persons where necessary for the administration and
enforcement of U.S. immigration law.

☑ I have read and agree to the applicant's statement

### Applicant Signature

You must provide your digital signature below by typing your full
legal name. We may deny your application if you do not
completely fill out this application or fail to submit required
documents. We will record the date of your signature with your
application.

[                                                    ]

Back                                    Next

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



**U.S. Citizenship
and Immigration
Services**

**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

About USCIS              Freedom of Information Act        Office of the Inspector General
Accessibility            No FEAR Act Data                  The White House
Budget and Performance   Privacy and Legal Disclaimers     USA.gov
DHS Components           Site Map



National Terrorism Advisory
System

NTAS
ACTIVE
BULLETIN
READ MORE
Put this widget on your web page



An official website of the United States government    Here's how you know ⌄

and Immigration
Services

My Account ⌄    Resources ⌄    |    Sign Out

### I-131, Application for Travel Document

- Getting Started ⌄
- About You ⌄
- Application Information ⌄
- Evidence ⌄
- Additional Information ⌄
- **Review & Submit** ⌃
  - Review your application
  - Your application summary
  - Preparer certification
  - Preparer signature
  - Your signature
  - **Pay and submit**

## Pay for and submit your application

The final step to submit your Form I-131, Application for Travel Document, is to pay the required fee.

Your application fee is: [$XXX.00]

**Refund policy:** By continuing this transaction, you agree that you are paying for a government service and that the filing fee, biometric services fee and all related financial transactions are final and not refundable, regardless of any action USCIS takes on an application, petition or request, or how long USCIS takes to reach a decision. You must submit all fees in the exact amounts.



We will send you to Pay.gov — our safe, secure payment website — to pay your fees and submit your form online.

Here are the steps in the payment and submission process:

1. Provide your billing information on Pay.gov
2. Provide your credit card or U.S. bank account information
3. Submit your payment

Pay.gov will redirect you to a uscis.gov confirmation screen, which will include your receipt number. Please keep a copy of your receipt number for your records. You can track the status of your application through your USCIS online account.

**Pay and submit**

Back    Next

Return to top

Topics    Contact Us    Citizenship    Schedule An Appointment    Find A Doctor    Find A Class



U.S. Citizenship
and Immigration
Services

    

**Contact USCIS**

 **USCIS.gov**
**An official website of the U.S. Department of Homeland Security**

About USCIS    Freedom of Information Act    Office of the Inspector General
Accessibility    No FEAR Act Data    The White House
Budget and Performance    Privacy and Legal Disclaimers    USA.gov
DHS Components    Site Map



National Terrorism Advisory System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

003968

An official website of the United States government   Here's how you know ˅

U.S. Citizenship
and Immigration
Services

My Account ▼      Resources ▼      Sign Out

# You successfully submitted your I-131

We will contact you if we have any questions or need additional information. You can track the status of your form through your USCIS online account.

**Go to my cases**

Return to top

| Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class |
|--------|-----------|-------------|-------------------------|---------------|--------------|



**Contact USCIS**

U.S. Citizenship
and Immigration
Services

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

| About USCIS | Freedom of Information Act | Office of the Inspector General |
|-------------|---------------------------|--------------------------------|
| Accessibility | No FEAR Act Data | The White House |
| Budget and Performance | Privacy and Legal Disclaimers | USA.gov |
| DHS Components | Site Map | |



National Terrorism Advisory
System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM

ACTIVE
BULLETIN
READ MORE

Put this widget on your web page

003970

U.S. Citizenship
and Immigration
Services

My Account ▼      Resources ▼      Sign Out

## You did not submit your I-131

Your payment failed because your credit or debit card was declined.

You can try again now to sign and submit your form or save and exit. We will save your form for 30 days from when you started it.

**Sign and submit**

Return to top

| Topics | Contact Us | Citizenship | Schedule An Appointment | Find A Doctor | Find A Class |
|---|---|---|---|---|---|

U.S. Citizenship
and Immigration
Services

**Contact USCIS**

USCIS.gov
**An official website of the U.S. Department of Homeland Security**

| About USCIS | Freedom of Information Act | Office of the Inspector General |
|---|---|---|
| Accessibility | No FEAR Act Data | The White House |
| Budget and Performance | Privacy and Legal Disclaimers | USA.gov |
| DHS Components | Site Map | |

National Terrorism Advisory System

NTAS
NATIONAL TERRORISM ADVISORY SYSTEM
ACTIVE
BULLETIN
READ MORE
Put this widget on your web page

003971



# Declaration of Financial Support

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 11/30/2026

▶ **START HERE - Type or print in black ink.**

## Part 1.  Basis for Filing

**1.**   I am filing this form on behalf of:   ☐ Myself as the beneficiary.   ☐ Another individual who is the beneficiary.

## Part 2.  Information about the Beneficiary

Complete **Part 2.** regardless of whether you are filing this form on behalf of yourself as the beneficiary or on behalf of another individual who is the beneficiary.

**1.**   Beneficiary's Current Legal Name (**Do not** provide a nickname.)

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

**2.**   Other Names Used

Provide all other names the beneficiary has ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |
| | | |

**3.**   Date of Birth (mm/dd/yyyy)    **4.**   Gender    **5.**   Alien Registration Number (A-Number) (if any)

☐ Male   ☐ Female    ▶ **A-**

**6.**   Place of Birth

City or Town

State or Province

Country

**7.**   Country of Citizenship or Nationality

**8.**   Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Legally Separated   ☐ Marriage Annulled

☐ Other (Explain):

003972

**Part 2.  Information about the Beneficiary** (continued)

9.   Beneficiary's Mailing Address

In Care Of Name (if any)

Street Number and Name                                                      Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                               State    ZIP Code

Province                          Postal Code          Country

10.   Are the beneficiary's mailing address and physical address the same?              ☐ Yes  ☐ No

If you answered "No" to **Item Number 10.**, provide your physical address in **Item Number 11.**

11.   Beneficiary's Physical Address

In Care Of Name (if any)

Street Number and Name (Do **not** provide a PO Box in this space unless it is your **ONLY** address.)   Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                               State    ZIP Code

Province                          Postal Code          Country

*Beneficiary's Anticipated Length of Stay*

12.   Beneficiary's Anticipated Period of Stay in the United States

From (mm/dd/yyyy)

To (select one):

☐ (mm/dd/yyyy)

☐ No End Date

---

## Part 2.  Information about the Beneficiary (continued)

### *Beneficiary's Financial Information*

Provide information about the beneficiary's income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8. Additional Information**.

**Beneficiary's Income**

13.   Provide all of the information requested in the table below about the beneficiary, all of the beneficiary's dependents, and any other individuals the beneficiary financially supports (do not include any individuals named in **Part 3.**).  Information about assets that are not based on employment should be added in **Item Number 16.** and not in **Item Number 13.**

| Individual's Full Name (First, Middle, Last) (do not include any individuals named in **Part 3.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Beneficiary (Type or print "Self" if you are filing for yourself as the beneficiary or "Beneficiary" if someone is agreeing to support you in **Part 3.**) | Income contribution to the beneficiary annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income **$** |  |

14.   Does any of the beneficiary's total income (including income from dependents and other individuals who contribute to the beneficiary's income, excluding any individuals named in **Part 3.**) come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?     ☐ Yes   ☐ No

15.   If you answered "Yes" to **Item Number 14.**, what amount of the beneficiary's total income comes from an illegal activity or source?     $ _____

---

003974

**Part 2.  Information about the Beneficiary** (continued)

**Beneficiary's Assets**

**16.** In the table below, provide the amounts of assets available to the beneficiary for the expected period of his or her stay (excluding assets from any individuals named in **Part 3.**).  Attach evidence showing that the beneficiary has these assets.

| Full Name of Asset Holder (First, Middle, Last) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Current Cash Value (U.S. dollars)  $ |  |
|  | **TOTAL** (U.S. dollars)  $ |  |

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

If you are not the beneficiary named in **Part 2.**, complete **Part 3.**

**1.** Current Legal Name (**Do not** provide a nickname.)

Family Name (Last Name)

Given Name (First Name)

Middle Name

**2.** Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 8. Additional Information**.

Family Name (Last Name)

Given Name (First Name)

Middle Name

**3.** Current Mailing Address

In Care Of Name (if any)

Street Number and Name

Apt. Ste. Flr.  ☐ ☐ ☐  Number

City or Town

State

ZIP Code

Province

Postal Code

Country

003975

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

**4.**   Is your current mailing address the same as your current physical address?      ☐ Yes    ☐ No

If you answered "No" to **Item Number 4.**, provide your current physical address in **Item Numbers 5.**

**5.**   Physical Address

In Care Of Name (if any)

Street Number and Name                                                 Apt.Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                 State    ZIP Code

Province                         Postal Code         Country

### *Other Information*

**6.**   Date of Birth (mm/dd/yyyy)

**7.**   Place of Birth

City or Town                                                 State or Province

Country

**8.**   Alien Registration Number (A-Number) (if any)      **9.**   USCIS Online Account Number (if any)

▶ **A-**                                    ▶

### *Immigration Status*

**10.**   What is your current immigration status?  Provide documentation as provided in the instructions.

☐ U.S. Citizen

☐ U.S. National

☐ Lawful Permanent Resident   A-Number

▶ **A-**

☐ Nonimmigrant   Form I-94 Arrival-Departure Record Number

▶

Other (Explain):

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

### Employment Information

11.  Employment Status

☐ Employed (full-time, part-time, seasonal, self-employed)   ☐ Unemployed or Not Employed   ☐ Retired

☐ Other (Explain): _____

If you indicated that you are employed in **Item Number 11.**, provide the information requested in **Item Numbers 12. - 13.**

12.  **A.**  ☐ I am currently employed as a/an                     Name of Employer

_____     _____

**B.**  ☐ I am currently self-employed as a/an

_____

13.  Current Employer's Address

Street Number and Name                                    Apt.Ste. Flr.   Number

_____   ☐ ☐ ☐   _____

City or Town                                              State   ZIP Code

_____   _____   _____

Province                     Postal Code         Country

_____   _____   _____

### Financial Information

Provide information about your income and assets.  If you need additional space to complete any **Item Number** in this section, use the space provided in **Part 8.  Additional Information**.

**Income**

14.  Provide all of the information requested in the table below about yourself, all of your dependents, and any other individuals you financially support (do not include any individuals named in **Part 2.**).  Information about assets that are not based on employment should be added in **Item Number 17.** and not in **Item Number 14.**

| Full Name (First, Middle, Last) (do not include any individuals named in **Part 2.**) | Date of Birth (mm/dd/yyyy) | Relationship to the Individual Agreeing to Financially Support (Type or print "Self" for Individual Agreeing to Financially Support the Beneficiary) | Income Contribution to the Beneficiary Annually (if none, type or print $0) |
|---|---|---|---|
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  |  | $ |
|  |  | **Total** Number of Dependents |  |
|  |  | Total Income $ |  |

003977

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.** (continued)

15. Does any of the income listed above come from an illegal activity or source (such as proceeds from illegal gambling or illegal drug sales)?  ☐ Yes  ☐ No

16. If you answered "Yes" to **Item Number 15.**, what amount of income comes from an illegal activity?  $ [          ]

### Assets

17. Fill out the table below regarding the assets available to **you** (do not include any assets from any individuals named in **Part 2.**). Attach evidence showing you have these assets.

| Full Name of Asset Holder (you or your household member) | Type of Asset | Amount (Cash Value) (U.S. dollars) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Current Cash Value (U.S. dollars)  $ |  |
|  | **TOTAL** (U.S. dollars)  $ |  |

### *Financial Responsibility for Other Beneficiaries*

18. Have you previously submitted a Form I-134 on behalf of a person other than the beneficiary listed on this Form I-134?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 18.**, provide the information requested in **Item Numbers 19. - 20.**  If you need additional space to complete this section, use the space provided in **Part 8. Additional Information**.

19. Person 1

Family Name (Last Name)  [          ]   Given Name (First Name)  [          ]   Middle Name  [          ]

A-Number
► A- [        ]   Date Submitted (mm/dd/yyyy)  [          ]

20. Person 2

Family Name (Last Name)  [          ]   Given Name (First Name)  [          ]   Middle Name  [          ]

A-Number
► A- [        ]   Date Submitted (mm/dd/yyyy)  [          ]

## Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2. (continued)

### *Intent to Provide Specific Contributions to the Beneficiary*

**21.** I ☐ intend ☐ do not intend to make specific contributions to the support of the beneficiary named in **Part 2.**

Explain the contribution.  For example, if you intend to furnish room and board, state for how long.  If you intend to provide money, state the amount in U.S. dollars and whether it is to be given in a lump sum, weekly, or monthly, and for how long.  If you need additional space, use **Part 8. Additional Information**.

<br>

## Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf)

If you are the beneficiary and are filing Form I-134 on your own behalf, complete and sign **Part 4.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### *Beneficiary's Statement*

**NOTE:** Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.** I, as the beneficiary, certify the following:

**A.** ☐ I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

**B.** ☐ The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 7.,** _____, prepared this declaration for me based only upon information I provided or authorized.

### *Beneficiary's Contact Information*

**3.** Beneficiary's Daytime Telephone Number

**4.** Beneficiary's Mobile Telephone Number (if any)

**5.** Beneficiary's Email Address (if any)

### *Beneficiary's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

## Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf) (continued)

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)** I reviewed and provided or authorized all of the information in my declaration;

**2)** I understood all of the information contained in, and submitted with, my declaration; and

**3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that I will be able to financially support myself while in the United States.

That I am willing and able to pay for necessary expenses for the duration of my temporary stay in the United States.

### Beneficiary's Signature

**6.** Beneficiary's Signature

➡

Date of Signature (mm/dd/yyyy)

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary

If you are filing Form I-134 on behalf of someone else (the beneficiary listed in **Part 2.**), complete and sign **Part 5.**

**NOTE:**  Read the **Penalties** section of the Form I-134 Instructions before completing this section.

### Statement of Individual Agreeing to Financially Support the Beneficiary

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.** I, as the individual agreeing to financially support the beneficiary, certify the following:

**A.** ☐ I can read and understand English, and I have read and understand every question and instruction on this declaration and my answer to every question.

**B.** ☐ The interpreter named in **Part 6.** read to me every question and instruction on this declaration and my answer to every question in _____, a language in which I am fluent and I understood

**2.** ☐ At my request, the preparer named in **Part 7.**, _____, prepared this declaration for me based only upon information I provided or authorized.

### Contact Information of Individual Agreeing to Financially Support the Beneficiary

**3.** Daytime Telephone Number

**4.** Mobile Telephone Number (if any)

**5.** Email Address (if any)

003980

## Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary (continued)

### *Certification of Individual Agreeing to Financially Support the Beneficiary*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the Department of State may require that I submit original documents to USCIS or the Department of State at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or the Department of State may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this declaration, in supporting documents, and in my USCIS or the Department of State records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

**1)** I reviewed and provided or authorized all of the information in my declaration;

**2)** I understood all of the information contained in, and submitted with, my declaration; and

**3)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my declaration, I understand all of the information contained in, and submitted with, my declaration, and that all of this information is complete, true, and correct.

That this declaration is made by me to assure the U.S. Government that the person named in **Part 2.** will be financially supported while in the United States.

That I am willing and able to receive, maintain, and support the person named in **Part 2.** to better ensure that such persons will have sufficient financial resources or financial support to pay for necessary expenses for the period of his or her temporary stay in the United States.

I acknowledge that I have read this section, and I am aware of my responsibilities as an individual agreeing to financially support the beneficiary.

### *Signature of Individual Agreeing to Financially Support the Beneficiary*

**6.**  Signature

➡️

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL INDIVIDUALS AGREEING TO FINANCIALLY SUPPORT THE BENEFICIARY:**  If you do not completely fill out this declaration or if you fail to submit required documents listed in the Instructions, USCIS or the Department of State may deny or not consider your declaration.

## Part 6.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**  Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

003981

**Part 6.  Interpreter's Contact Information, Certification, and Signature** (continued)

### *Interpreter's Mailing Address*

**3.**   Street Number and Name                                                    Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town                                                                            State        ZIP Code

Province                                    Postal Code                    Country

### *Interpreter's Contact Information*

**4.**   Interpreter's Daytime Telephone Number          **5.**   Interpreter's Mobile Telephone Number (if any)

**6.**   Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and                                              which is the same language specified in **Part 4.**
or in **Part 5.**, **Item B.** in **Item Number 1.**, and I have read to this individual agreeing to financially support the beneficiary in the
identified language every question and instruction on this declaration and his or her answer to every question.  The individual agreeing
to financially support the beneficiary informed me that he or she understands every instruction, question, and answer on the
declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and has verified the
accuracy of every answer.

### *Interpreter's Signature*

**7.**   Interpreter's Signature                                                           Date of Signature (mm/dd/yyyy)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary**

Provide the following information about the preparer.

### *Preparer's Full Name*

**1.**   Preparer's Family Name (Last Name)                     Preparer's Given Name (First Name)

**2.**   Preparer's Business or Organization Name (if any)

**Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary** (continued)

### Preparer's Mailing Address

**3.**  Street Number and Name

Apt. Ste. Flr. ☐ ☐ ☐   Number

City or Town

State

ZIP Code

Province

Postal Code

Country

### Preparer's Contact Information

**4.**  Preparer's Daytime Telephone Number

**5.**  Preparer's Mobile Telephone Number

**6.**  Preparer's Email Address (if any)

### Preparer's Statement

**7.**  **A.** ☐  I am not an attorney or accredited representative but have prepared this declaration on behalf of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) and with that individual's consent.

**B.** ☐  I am an attorney or accredited representative and my representation of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) in this case ☐ extends  ☐ does not extend beyond the preparation of this declaration.

**NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this declaration at the request of the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself).  The individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself) then reviewed this completed declaration and informed me that he or she understands all of the information contained in, and submitted with, his or her declaration, including the **Certification of the Individual Agreeing to Financially Support the Beneficiary**, and that all of this information is complete, true, and correct.  I completed this declaration based only on information that the individual agreeing to financially support the beneficiary provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.**  Preparer's Signature

Date of Signature (mm/dd/yyyy)

## Part 8.  Additional Information

If you need extra space to provide any additional information within this declaration, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this declaration or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

1. Family Name (Last Name)        Given Name (First Name)        Middle Name

2. A-Number (if any) ▶ A-

3. **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

4. **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

5. **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

6. **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

003984



## Instructions for Petition for Amerasian, Widow(er), or Special Immigrant

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-360**
OMB No. 1615-0020
Expires 02/28/2026

---

## What Is the Purpose of Form I-360?

This petition is used to classify an alien as:

1. An Amerasian;

2. A Widow or Widower of a U.S. citizen;

3. Special immigrants are defined below.  These special immigrants may also use this form for EB-4 Fourth Preference:

   **A.** Special Immigrant Juvenile;

   **B.** Religious Worker;

   **C.** Panama Canal Company Employee, Canal Zone Government Employee, U.S. Government in the Canal Zone Employee;

   **D.** Physician;

   **E.** G-4 International Organization Employee or Family Member or NATO-6 Employee or Family Member;

   **F.** U.S. Armed Forces Member;

   **G.** Afghanistan or Iraq National who worked with the U.S. Armed Forces as a translator;

   **H.** Iraq National who worked for or on behalf of the U.S. Government in Iraq;

   **I.** Afghanistan National who worked for or on behalf of the U.S. Government or the International Security Assistance Force (ISAF) in Afghanistan;

   **J.** An abused spouse or child of a U.S. citizen or lawful permanent resident, or an abused parent of a U.S. citizen son or daughter pursuant to the Violence Against Women Act (VAWA);

   **K.** Broadcasters; or

   **L.** Other classifications not listed above may be eligible to use Form I-360.  Please check **www.uscis.gov/i-360** for updates.

---

## Who May File Form I-360?

### *Amerasian*

If you are 18 years of age or older, you may file this petition for a beneficiary (including yourself) who was born in Korea, Vietnam, Laos, Kampuchea, or Thailand after December 31, 1950, and before October 22, 1982, and was fathered by a U.S. citizen.  A U.S. corporation may also file this petition for a beneficiary.

You **must** file the petition with:

1. Copies of evidence showing that the beneficiary was born in one of the above countries between those dates.  If the beneficiary was born in Vietnam, you **must** also submit a copy of his or her Vietnamese identification card, or an affidavit explaining why it is not available;

2. Copies of evidence establishing the parentage of the beneficiary, and that the beneficiary's biological father was a U.S. citizen.  Examples of documents that you may submit are:  birth or baptismal records or other religious documents; local civil records; an affidavit, correspondence, or evidence of financial support from the father; photographs of the father (especially with the child); or, absent other documents, affidavits from knowledgeable witnesses that detail the parentage of the child and how they know such facts;

3. Photograph of the beneficiary; and

4. If the beneficiary is married, a copy of the marriage certificate and proof of the termination of any prior marriages.

The sponsorship documents noted below are also required.  You may file these documents with the petition or wait until U.S. Citizenship and Immigration Services (USCIS) reviews the petition and requests them.  However, not filing them with the petition will add to the overall processing time.

1. Form I-361, Affidavit of Financial Support and Intent to Petition for Legal Custody of Public Law 97-359 Amerasian, executed by the sponsor with the evidence of financial ability required by that form.  Note that the original sponsor remains financially responsible for the Amerasian if any subsequent sponsor fails in this area.

2. Copies of evidence showing that the sponsor is at least 21 years of age and is a U.S. citizen or lawful permanent resident.

### *Widow or Widower of a U.S. Citizen*

You may file this petition for yourself if:

1. You were married to a U.S. citizen who is now deceased and who was a U.S. citizen at the time of death;

2. Your U.S. citizen spouse died less than two years before the date on which you filed this petition;

3. You were not legally separated from your U.S. citizen spouse at the time of his or her death; and

4. You have not remarried.

   **NOTE:**  If your U.S. citizen spouse filed Form I-130 for you before his or her death, and it was approved or still pending, you do not need to file this petition.  Under 8 CFR 204.2(i)(1)(iv), your U.S. citizen spouse's Form I-130 was converted to a widow(er)'s Form I-360 when your U.S. citizen spouse died.

You **must** file the petition with:

1. A copy of your marriage certificate to the U.S. citizen and proof of termination of any prior marriages for either of you;

2. Copies of evidence that your spouse was a U.S. citizen, such as a birth certificate, if he or she was born in the United States or a Naturalization Certificate or Certificate of Citizenship issued by USCIS; Form FS-240, Report of Birth Abroad of a Citizen of the United States; or a U.S. passport that was valid at the time of the citizen's death; and

3. A copy of the death certificate of your U.S. citizen spouse.

### *Special Immigrant Juvenile*

You may file this petition for a beneficiary (including yourself) who:

1. Is present in the United States;

2. Is unmarried and less than 21 years of age;

3. Has been declared dependent upon a juvenile court in the United States, or who such a court has legally committed to or placed under the custody of an agency or department of a state, or an individual or entity appointed by a state or juvenile court;

003986

4. Has been the subject of a determination by a juvenile court in the United States that reunification with one or both of the juvenile's parents is not viable due to abuse, neglect, abandonment, or a similar basis under state law; and

5. Has been the subject of administrative or judicial proceedings that determined that it would not be in the juvenile's best interest to be returned to the juvenile's or his or her parent's country of citizenship or nationality or last habitual residence.

The petition **must** be filed with:

1. A copy of the juvenile's birth certificate or other evidence of his or her age pursuant to 8 CFR 204.11(d)(2);

2. A copy of the court or administrative documents that establishes eligibility for this classification, including the specific findings of fact or other relevant evidence in support of the judicial determinations; and

3. Written consent from the U.S. Department of Health and Human Services (HHS) if the juvenile is in the custody of HHS and the juvenile court order altered the juvenile's HHS custody status or placement.

   **NOTE:** After a special immigrant juvenile becomes a lawful permanent resident, his or her natural or prior adoptive parents may **NOT** receive any immigration benefit based on **their** relationship to the juvenile.

## Special Immigrant Religious Worker

A U.S. employer may file this petition for a beneficiary who seeks to enter the United States to be employed full time by a bona fide nonprofit religious organization in the United States (or a bona fide organization that is affiliated with the religious denomination in the United States) to work:

1. Solely as a minister of that religious denomination;

2. In a religious vocation either in a professional or non-professional capacity; or

3. In a religious occupation either in a professional or non-professional capacity.

The beneficiary may file this petition on his or her own behalf.

To qualify, the beneficiary **must** have been:

1. A member of a religious denomination that has a bona fide nonprofit religious organization in the United States for at least the two years immediately preceding the filing of the petition; and

2. Working continuously, after turning 14 years of age, in one of the positions described above, either abroad or in the United States, for at least two years immediately preceding the filing of the petition.

**NOTE:** All religious workers, other than ministers, immigrating to the United States as special immigrant religious workers **must** immigrate or adjust to lawful permanent resident status before the established sunset (expiration) date. Statutory amendments may extend this date. USCIS will provide information on its website at **www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fourth-preference-eb-4/religious-workers/special-immigrant-religious-workers** if the date is extended.

You **must** file the petition with evidence relating to the petitioning organization, including;

1. A currently valid determination letter from the Internal Revenue Service (IRS) establishing that the organization is a tax exempt organization;

2. For a religious organization that is recognized as tax exempt under a group tax exemption, a currently valid determination letter from the IRS establishing that the group is tax-exempt;

3. For a bona fide organization that is affiliated with the religious denomination, if the organization was granted tax-exempt status under section 501(c)(3) of the Internal Revenue Code of 1986, or subsequent amendment or equivalent sections of prior enactments of the Internal Revenue Code, as something other than a religious organization, including:

003987

**A.** A currently valid determination letter from the IRS establishing that the organization is a tax-exempt organization;

**B.** Documentation that establishes the religious nature and purpose of the organization, such as a copy of the organizing instrument that specifies the purposes of the organization;

**C.** Organizational literature, such as books, articles, brochures, calendars, flyers, and other literature describing the religious purpose and nature of the activities of the organization; and

**D.** A religious Denomination Certification (part of Form I-360) completed, signed, and dated by the religious organization certifying that the petitioning organization is affiliated with the religious denomination;

4. An employer Attestation (part of Form I-360) and certification completed, signed, and dated by an authorized official of the prospective employer of the beneficiary seeking religious worker status;

5. Verifiable evidence of how the prospective employer intends to compensate the beneficiary, including salaried or non-salaried compensation;

6. Evidence that the beneficiary has been a member of the religious denomination during at least the two years immediately preceding the petition;

7. Evidence to establish that the beneficiary has been working continuously, after turning 14 years of age, in one of the positions listed above, either abroad or in the United States, for at least the two years immediately preceding the petition; and

8. Evidence to establish the beneficiary is qualified to perform the duties of the offered position.

### Special Immigrant Based on Employment With the Panama Canal Company, Canal Zone Government, or U.S. Government in the Canal Zone

You may file this petition for a beneficiary who, at the time the Panama Canal Treaty of 1977 entered into force, was:

1. A resident in the Canal Zone and had been employed by the Panama Canal Company or Canal Zone Government for at least one year;

2. A Panamanian national and either honorably retired from U.S. Government employment in the Canal Zone with a total of 15 or more years of faithful service; or

3. Employed for 15 years and honorably retired or was an employee of the Panama Canal Company or Canal Zone Government, had performed faithful service for 5 years or more as an employee, and whose personal safety, or the personal safety of his or her spouse or child, is in danger as a direct result of the special nature of his or her employment and as a direct result of the Treaty.

You **must** file the petition with:

1. A letter from the Panama Canal Company, Canal Zone Government, or U.S. Government agency employing the beneficiary in the Canal Zone, indicating the length and circumstances of employment and any retirement or termination; and

2. Copies of evidence to establish any claim of danger to personal safety.

### Special Immigrant Physician

You may file this petition for a beneficiary who:

1. Graduated from a medical school or is qualified to practice medicine in a foreign state;

2. Was fully and permanently licensed to practice medicine in the United States on January 9, 1978, and was practicing medicine in a U.S. state on that date;

3. Entered the United States as an H or J nonimmigrant before January 9, 1978; and

4. Has been continuously present in the United States and continuously engaged in the practice or study of medicine since the date of such entry.

You **must** file the petition with:

1. Letters from the beneficiary's employers detailing his or her employment since January 8, 1978, including the current employment; and

2. Copies of relevant documents that demonstrate that the beneficiary meets all the above criteria.

### Special Immigrant G-4 International Organization Employee or Family Member or NATO-6 Employee or Family Member

You may be eligible to apply for classification as a special immigrant if you are a recently-retired, long-term G-4 nonimmigrant employee of a qualifying international organization entitled to enjoy privileges, exemptions, and immunities under the International Organizations Immunities Act, a relative of such an employee, or a long-term civilian employee of NATO (under the NATO-6 classification) or their relative.  To determine if you are eligible, contact the qualifying international organization, the employing NATO office, or your local USCIS office. You **must** file the petition with:

1. A letter from the international organization demonstrating that it is a qualifying organization and explaining the circumstances of qualifying employment and the immigration status held by the beneficiary; and

2. For family members, copies of evidence documenting the familial relationship to the employee.

### Armed Forces Member

You may file this petition for yourself if:

1. You have served honorably on active duty in the U.S. Armed Forces after October 15, 1978;

2. You originally lawfully enlisted outside the United States under a treaty or agreement in effect on October 1, 1991, for a period or periods that total:

    A. Twelve years, and you were never separated from such service except under honorable conditions; or

    B. Six years, and you are now on active duty, and have reenlisted to incur a total active duty service obligation of at least 12 years;

3. You are a national of an independent state that maintains a treaty or agreement allowing nationals of that state to enlist in the U.S. Armed Forces each year; and

4. The executive department under which you have served or are serving has recommended you for this special immigrant status.

You **must** file the petition with:

1. Certified proof, issued by the authorizing official of the executive department in which you are serving or have served, that you have the required honorable active duty service and/or commitment; and

2. Your birth certificate.

003989

**VAWA Self-Petitioning Spouse or Child of a U.S. Citizen or Lawful Permanent Resident or a VAWA Self-Petitioning Parent of U.S. Citizen Son or Daughter**

**Alternate and/or Safe Address.**  If you do not feel safe in receiving correspondence regarding this petition at your home address, provide an alternate and/or safe mailing address in **Part 1.**, **Item Number 7.**  This address may be a post office box, the address of a friend, your attorney, a community-based organization that is helping you, or any other address where you can safely and punctually receive mail.  If an alternate and/or safe mailing address is not provided in **Part 1.**, **Item Number 7.**, USCIS may use the address of your preparer, if any.

If you are living abroad at the time of filing your petition, you may file the petition if:

1. The abuser is an employee of the U.S. Government;

2. The abuser is a member of the uniformed services; or

3. You were subjected to battery or extreme cruelty in the United States.

You may petition for immediate relative or family-sponsored immigrant classification for yourself (also known as a self-petition) if you:

1. Have a qualifying relationship with an abusive U.S. citizen or lawful permanent resident;

   A. Are now or were the spouse of an abusive U.S. citizen or lawful permanent resident;

   B. Are the child of an abusive U.S. citizen or lawful permanent resident; or

   C. Are the parent of an abusive U.S. citizen son or daughter who is at least 21 years of age when filing this petition;

2. Are eligible for immigrant classification based on that relationship;

3. Are now residing with or have resided with the U.S. citizen or lawful permanent resident abuser in the past;

4. Have been battered by or have been the subject of extreme cruelty perpetrated by:

   A. Your U.S. citizen or lawful permanent resident spouse during the marriage, or you are the parent of a child who has been battered by or has been the subject of extreme cruelty perpetrated by your abusive U.S. citizen or lawful permanent resident spouse during your marriage;

   B. Your U.S. citizen or lawful permanent resident parent while residing with that parent; or

   C. Your U.S. citizen son or daughter;

5. Are a person of good moral character; and

6. Are a spouse, and entered into the marriage to the U.S. citizen or lawful permanent resident abuser in good faith.

**NOTE:**  You may file a self-petition within two years of the date of the U.S. citizen abuser's death, within two years of the U.S. citizen or lawful permanent resident abuser's loss of status as a result of an incident of domestic violence, or within two years of the termination of the marriage to the U.S. citizen or lawful permanent resident abuser if there is a connection between the termination of the marriage and the battery or extreme cruelty.  For self-petitioning spouses, you may remarry after USCIS approves your self-petition without affecting your eligibility to become a lawful permanent resident or have grounds for revocation of the approved self-petition.

**EVIDENCE.**  You may file your self-petition with any credible relevant evidence of your eligibility.  The determination of what evidence is credible and the weight to be given that evidence is within the sole discretion of USCIS; therefore, you are encouraged to provide the following documentation:

1. Evidence of the abuser's U.S. citizenship or lawful permanent resident status;

2. Marriage and divorce decrees, birth certificates, or other evidence of your legal relationship to the abuser;

003990

3. One or more documents showing that you and the abuser have resided together, such as employment records, utility receipts, school records, hospital or medical records, birth certificates of children, mortgages, rental records, insurance policies, or affidavits;

4. Evidence of the abuse, such as reports and affidavits from police, judges and other court officials, medical personnel, school officials, clergy, social workers, and other social service agency personnel.  If you have an order of protection, or have taken other legal steps to end the abuse, you should submit copies of those court documents;

5. If you are 14 years of age or older, your affidavit of good moral character accompanied by a local police clearance, state-issued criminal background check, or similar report from each locality or state in the United States or abroad where you have resided for six or more months during the 3-year period immediately before the filing of your self-petition; and

6. If you are a spouse, submit evidence showing your marriage was entered in good faith, such as proof that one spouse has been listed as the other's spouse on insurance policies, property leases, properly filed tax forms, or bank statements.  You may also submit your affidavit or affidavits of others who have knowledge of your courtship, wedding ceremony, shared residence, and other life experiences, if available.

**NOTE:**  A VAWA self-petitioning spouse or child of a U.S. citizen or lawful permanent resident, or a VAWA self-petitioning parent of a U.S. citizen son or daughter, may submit any relevant credible evidence in place of the suggested evidence.

**Public Service Information**

The National Domestic Violence Hotline provides information, crisis intervention, and referrals to local service providers, including legal assistance organizations, to victims of domestic violence or anyone calling on their behalf at **1-800-799-7233**.  For TTY (deaf or hard of hearing) call:  **1-800-787-3224**.

The Hotline services are available 24 hours a day, 7 days a week, toll-free from anywhere in the United States, Puerto Rico, or the U.S. Virgin Islands.  The staff and volunteers speak both English and Spanish and have access to translators in 139 languages.

**Employment Authorization.**  If USCIS approves your self-petition and you currently reside in the United States, you will also receive employment authorization.  USCIS will issue your Employment Authorization Document (EAD) with eligibility category (c)(31).  Select "Yes" if you want USCIS to send you a (c)(31) EAD as evidence of that authorization. Select "No" if you wish to request employment authorization separate from this self-petition (for example, an EAD with eligibility category (c)(14) based on deferred action).

### *Afghanistan or Iraq National Supporting U.S. Armed Forces as a Translator*

You may file this petition for yourself if:

1. You are a national of Afghanistan or Iraq;

2. You worked directly with the U.S. Armed Forces or the Chief of Mission as a translator for a period of at least 12 months;

3. You have obtained a favorable written recommendation from a general or flag officer in the chain of command of the U.S. Armed Forces unit that you supported; and

4. Before filing this petition, you were cleared by a background check and screening, as determined by the Chief of Mission or a general or flag officer in the chain of command of the U.S. Armed Forces unit that you supported.

The petition **must** be filed with:

1. A copy of your passport or birth certificate showing that you are a national of Afghanistan or Iraq;

2. A favorable written recommendation from the Chief of Mission or a general or flag officer in the chain of command of the U.S. Armed Forces unit that you supported;

003991

3. Evidence you worked directly with the U.S. Armed Forces or under Chief of Mission authority, as a translator or interpreter for a period of at least 12 months; and

4. Evidence that you cleared a background check and screening as determined by the Chief of Mission or a general or flag officer in the chain of command of the U.S. Armed Forces unit that you supported.

### *Iraq National Who Was Employed by or on Behalf of the U.S. Government in Iraq*

You may file this petition for yourself if:

1. You are a national of Iraq;

2. You have established to the satisfaction of the Chief of Mission, Embassy Baghdad, or the designee of the Chief of Mission, that you were or are employed by or on behalf of the U.S. Government in Iraq between March 20, 2003 and September 30, 2013, for a period of at least one year.  (Please note, the deadline to apply for Chief of Mission approval was September 30, 2014.  Applications submitted after this date cannot be accepted or processed.);

3. You have established to the satisfaction of the Chief of Mission, or the designee of the Chief of Mission, that you provided faithful and valuable service to the U.S. Government.  Your senior supervisor **must** submit a recommendation to the U.S. Government or, if your senior supervisor has left the employer or left Iraq, either the person who is currently occupying that position or someone in a more senior position with the employing entity;

4. You have established to the satisfaction of the Chief of Mission, or the designee of the Chief of Mission, that you have experienced or are experiencing an ongoing serious threat as a consequence of being employed by or on behalf of the U.S. Government;

5. You have or will have cleared a background check and appropriate screening as determined by the Secretary of Homeland Security; and

6. You are otherwise eligible to receive an immigrant visa and are admissible to the United States for permanent residence, excluding the grounds of inadmissibility specified in section 212(a)(4) of the Immigration and Nationality Act (INA).

   You are entitled to claim status as a surviving spouse or child if you are also classifiable as a special immigrant described in section 1244 of Public Law (Pub. L.) 110-181 if you are the spouse or child of a principal beneficiary who had a petition approved by USCIS, but the petition was terminated after its approval due to the death of the principal beneficiary.

You **must** file the petition with:

1. A copy of your passport, birth certificate, or national identification card showing that you are a national of Iraq.  If the document is in a foreign language, you **must** provide a certified English translation;

2. A positive recommendation from your senior supervisor or the person currently occupying that position, or a more senior person if your senior supervisor has left the employer or has left Iraq, confirming employment of at least one year between March 20, 2003 to September 30, 2013;

3. Proof of risk assessment conducted by the Chief of Mission or the designee of the Chief of Mission;

4. Proof of independent review conducted by the Chief of Mission or the designee of the Chief of Mission of records maintained by the U.S. Government or hiring organization or entity to confirm employment and faithful and valuable service to the U.S. Government; and

5. A copy of the front and back of your Form I-94 Arrival-Departure Record, if you are physically present in the United States.

*Afghan National Who Was Employed by or on Behalf of the U.S. Government or the International Security Assistance Force (ISAF), or its successor, in Afghanistan*

**NOTE:** USCIS is transitioning to the U.S. Department of State (DOS) responsibility for adjudicating SIV petitions filed by Afghan nationals who were employed by or on behalf of the U.S. Government or the ISAF (or its successor) in Afghanistan.

The Form DS-157 you file together with the other documents required to apply for Chief of Mission Approval (as listed at **https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html**) has replaced the Form I-360.  Email all necessary documentation to: **AfghanSIVApplication@state.gov**.

If you have received a Chief of Mission Approval letter which does NOT contain the sentence "A signed DS-157 submitted by the principal applicant named above is hereby approved as a petition for classification as a special immigrant under section 203(b)(4) of the Immigration and Nationality Act", **you should still file Form I-360 with USCIS, according to the instructions below**.

**If you started the SIV application process on or after July 20, 2022, DO NOT file a Form I-360 with USCIS.**  You must file Form DS-157 together with the documents required to apply for Chief of Mission Approval as listed here: **https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html**. Email all necessary documentation to: **AfghanSIVApplication@state.gov**.

You may file Form DS-157, Petition for Special Immigrant Classification for Afghan SIV Applicants, with DOS if:

1. You are a citizen or national of Afghanistan; and

2. You were employed by or on behalf of the U.S. government or the International Security Assistance Force (ISAF), or its successor, in Afghanistan between October 7, 2001 and December 31, 2023, for a period of not less than one year; or

3. You are the surviving spouse or surviving unmarried child under age 21 of a deceased spouse or parent who met the criteria in 1 and 2  above.

**Only individuals described in the following categories should file Form I-360 with USCIS, according to the instructions below:**

1. You are currently in the United States and have received Chief of Mission Approval;

2. You are currently in the United States and have already been granted Chief of Mission Approval, but you did not sign your previously filed Form DS-157; or

3. You are either inside or outside the United States, have been granted Chief of Mission Approval but did not file a Form DS-157 with your COM application.

You may file this petition for yourself if:

1. You are a national of Afghanistan;

2. You have established to the satisfaction of the Chief of Mission for Afghanistan, or the designee of the Chief of Mission that you were employed by or on behalf of the U.S. Government or ISAF (or its successor) in Afghanistan between October 7, 2001 and December 31, 2023, for a period not less than one year;

3. You have provided faithful and valuable service to the U.S. Government or ISAF (or its successor).  Your senior supervisor **must** submit a recommendation to the U.S. Government or, if your senior supervisor has left the employer or left Afghanistan, either the person who is currently occupying that position or someone in a more senior position with the employing entity must submit the recommendation;

4. You have experienced or are experiencing an ongoing serious threat as a consequence of being employed by or on behalf of the U.S. Government or ISAF;

5. You have or will have cleared a background check and appropriate screening as determined by the Secretary of Homeland Security; and

003993

6. You are otherwise eligible to receive an immigrant visa and are admissible to the United States for permanent residence, excluding the grounds of inadmissibility specified in INA section 212(a)(4) (8 U.S.C. 1182(a)(4)).

7. You are entitled to apply for classification as a special immigrant described in Section 602(b) of Pub. L. 111-8 as a surviving spouse or child if you are the spouse or unmarried child under age 21 of a principal beneficiary who:

   **A.** Met the employment requirements at the time of their death, and you subsequently filed for and received Chief of Mission approval;

   **B.** Submitted an application for Chief of Mission Approval that included you as an accompanying spouse or child, and the Chief of Mission approved the application, or

   **C.** Had a petition approved by USCIS, but the petition was terminated after its approval due to the death of the principal beneficiary.

You **must** file the petition with:

1. A copy of your passport, birth certificate, or national identification card showing that you are a national of Afghanistan.  If the document is in a foreign language, you **must** provide a certified English translation;

2. A positive recommendation from your senior supervisor or the person currently occupying that position, or a more senior person if your senior supervisor has left the employer or has left Afghanistan, confirming employment of at least one year between October 7, 2001 and December 31, 2023;

3. A copy of the Chief of Mission Approval;

4. Proof of risk assessment conducted by the Chief of Mission or the designee of the Chief of Mission;

5. Proof of independent review conducted by the Chief of Mission or the designee of the Chief of Mission of records maintained by the U.S. Government or ISAF, hiring organization, or entity to confirm employment and faithful and valuable service to the U.S. Government or ISAF; and

6. A copy of your Form I-94 Arrival-Departure Record, if you are physically present in the United States.  If you were issued a paper Form I-94, provide a copy of the front and back of the Form I-94.

### Broadcasters

Under section 203(b)(4) of the INA, the International Broadcasting Bureau of the United States Broadcasting Board of Governors (BBG), or a grantee of the BBG, may petition for a beneficiary (and the beneficiary's accompanying spouse and children) to work as a broadcaster for the BBG or a grantee of the BBG in the United States.  For the purposes of this section, the terms:

1. **BBG grantee** means Radio Free Asia, Inc. (RFA), Radio Free Europe/Radio Liberty, Inc. (RFE/RL), or the Middle East Broadcasting Network (MBN); and

2. **Broadcaster** means a reporter, writer, translator, editor, producer, or announcer for news broadcasts; hosts for news broadcasts, news analysis, editorial and other broadcast features; or a news analysis specialist.  The term broadcaster does not include individuals performing purely technical or support services for the BBG or a BBG grantee.

All Form I-360 petitions submitted by the BBG or a BBG grantee on behalf of a beneficiary for a broadcaster position with the BBG or BBG grantee **must** be accompanied by a signed and dated supplemental attestation that contains the following information about the beneficiary:

1. The job title and a full description of the job to be performed; and

2. The broadcasting expertise held by the beneficiary, including how long the beneficiary has been performing duties that relate to the prospective position or a statement as to how the beneficiary possesses the necessary skills that make him or her qualified for the broadcasting-related position within the BBG or BBG grantee.

Follow the instructions on Form I-360 on where to file your petition.

### *Petitioning for an Employment-Based Fourth Preference Immigrant*

To petition for an EB-4 special immigrant, your employer **must** file Form I-360.  However, there are certain situations where you, the employee, may self-petition on your own behalf.  Review the petition instructions to see if you are eligible to self-petition and what required supporting evidence needs to be included.

## General Instructions

We provide free forms through the USCIS website.  To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Signature.**  You (or your signing authority) must properly complete your petition.  USCIS will not accept a stamped or typewritten name in place of any signature on this petition.  If you are under 14 years of age, your parent or legal guardian may sign the petition on your behalf.  A legal guardian may also sign for a mentally incompetent person.  If your petition is not signed, or if the signature is not valid, we will reject your petition.  See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.**  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

**Evidence.**  When you file your petition, you must submit all evidence and supporting documents listed in these Instructions.

**Biometric Services Appointment.**  USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  If we determine that a biometric services appointment is necessary, we will send you an appointment notice with the date, time, and location of your appointment.  If you are currently overseas, your notice will instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to schedule an appointment.

At your biometrics appointment, you must sign an oath reaffirming that:

1.  You provided or authorized all information in the petition;

2.  You reviewed and understood all of the information contained in, and submitted with, your petition; and

3.  All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your petition.

**Copies.**  You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document.  USCIS may request an original document at any time during our process.  If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:**  If you submit original documents when they are not required or requested, **USCIS may destroy them after we receive them.**

003995

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate, and that they are competent to translate from the foreign language into English. The certification must also include their signature, printed name, the signature date, and their contact information.

**USCIS Contact Center.** For additional information on the petition and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call at **800-375-5283** (TTY **800-767-1833**). The USCIS Contact Center provides information in English and Spanish.

**Disability Accommodations/Modifications.** To request a disability accommodation/modification, follow the instructions on your appointment notice or at **www.uscis.gov/accommodationsinfo**.

**How to Complete Form I-360**

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this petition, use the space provided in **Part 15. Additional Information** or attach a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed. If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4. **USCIS Online Account Number.** You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you. If you do not have a receipt number that begins with IOE, you do not have an OAN. The OAN is not the same as an A-Number.

5. **Form I-94, Arrival/Departure Record.** If U.S. Customs and Border Protection (CBP) or USCIS issued you a Form I-94, Arrival/Departure Record, provide your Form I-94 number and date that your authorized period of stay expires or expired (as shown on your Form I-94). The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

   **NOTE:** If CBP admitted you into the United States at an airport or seaport after April 30, 2013, they may have issued you an electronic Form I-94 instead of a paper Form I-94. You may visit the CBP website at **www.cbp.gov/i94** to obtain a paper version of your electronic Form I-94. CBP **does not** charge a fee for this service. Some travelers may also be able to obtain a replacement Form I-94 from the CBP website for free if they were admitted to the United States at a land border, airport, or seaport after April 30, 2013, with a passport or travel document and received a paper Form I-94 from CBP. If you cannot obtain your Form I-94 from the CBP website, you may obtain it by filing Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Record, with USCIS. We **do** charge a fee for this service. See the USCIS website at **www.uscis.gov/i-102** for more information.

   **Passport and Travel Document Numbers.** If you used a passport or travel document to travel to the United States, enter the passport or travel document information in the appropriate space on the petition, even if the passport or travel document is currently expired.

6. **Part 11. Petitioner's Statement, Contact Information, Declaration, and Signature (Individual).**

   **IMPORTANT:** Complete this section **ONLY** if you are an individual filing this petition for yourself. If you are filing Form I-360 to petition for another person or as an authorized signatory of an organization, complete **Part 12. Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory**.

003996

Select the appropriate box to indicate whether you read this petition yourself or whether you had an interpreter assist you.  If someone assisted you in completing the petition, select the box indicating that you used a preparer.  Further, you must sign and date your petition and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every petition **MUST** contain the signature of the petitioner (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

7. **Part 12.  Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory.**

   **IMPORTANT:**  Complete this section **ONLY** if you are filing Form I-360 to petition for another person or as an authorized signatory of an organization.  If you are an individual filing this petition for yourself, complete **Part 11. Petitioner's Statement, Contact Information, Declaration, and Signature (Individual)**.

   Select the appropriate box to indicate whether you read this petition yourself or whether you had an interpreter assist you.  If someone assisted you in completing the petition, select the box indicating that you used a preparer.  Further, you must sign and date your petition and provide your name, title, daytime telephone number, mobile telephone number (if any), and email address (if any).  Every petition **MUST** contain the signature of the petitioner or authorized signatory of the organization.  A stamped or typewritten name in place of a signature is not acceptable.

8. **Part 13.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this petition to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the petition.

9. **Part 14.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner.**  This section must contain the signature of the person who completed your petition, if other than you, the petitioner.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 13.** and **Part 14.**  If the person who completed this petition is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this petition **MUST** sign and date the petition.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your petition is an attorney or accredited representative whose representation extends beyond preparation of this petition, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or Form G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, along with your petition.

---

   **We recommend that you review your copy of your completed petition before you go to your biometric services appointment at a USCIS ASC.**  At your appointment, USCIS will allow you to complete the petition process only if you are able to confirm, under penalty of perjury, that all of the information in your petition is complete, true, and correct.  If you are not able to make that attestation in good faith at that time, we will require you to return for another appointment.

---

## Where To File?

Please see our website at **www.uscis.gov/i-360** for the most current information about where to file this petition.

## Address Change

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous residence.  For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

003997

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox.

## Processing Information

**USCIS will reject any Form I-360 that is not signed or accompanied by the correct filing fee and send you a notice that Form I-360 is deficient.**  You may correct the deficiency and resubmit Form I-360.  A petition is not considered properly filed until accepted by USCIS.

**Initial Processing.**  Once USCIS accepts your petition, we will check it for completeness.  If you do not properly complete this petition, you will not establish a basis for your eligibility and we may reject or deny your petition.

**Request for More Information.**  USCIS may request that you provide more information or evidence to support your petition.  We may also request that you provide the originals of any copies you submit.  If we request an original document from you, we will return it to you after USCIS determines it is no longer needed.

**Request for Interview.**  We may request that you appear at a USCIS office for an interview based on your petition.  During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-360 involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS will notify you of our decision in writing.

## USCIS Forms and Information

To ensure you are using the latest version of this petition, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-360, we will deny your petition and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## USCIS Compliance Review and Monitoring

By signing this petition, you have stated under penalty of perjury (28 U.S.C. section 1746) that all information and documentation submitted with this petition are complete, true, and correct.  You also authorize the release of any information from your records that USCIS may need to determine your eligibility for the immigration benefit you are seeking and consent to USCIS verifying such information.

The Department of Homeland Security (DHS) has the authority to verify any information you submit to establish eligibility for the immigration benefit you are seeking at any time.  Our legal authority to verify this information is in 8 U.S.C. sections 1103, 1155, and 1184, and 8 CFR parts 103, 204, 205, and 214.  To ensure compliance with applicable laws and authorities, we may verify information before or after your case is decided.

Agency verification methods may include, but are not limited to:  reviewing public records and information; contacting through written correspondence; using the internet, fax, other electronic transmission, or telephone; making unannounced physical site inspections of residences and locations of employment; and interviewing people.  USCIS will use the information we obtain to assess your compliance with the laws and to determine your eligibility for an immigration benefit.

Subject to the restrictions under 8 CFR 103.2(b)(16), USCIS will provide you with an opportunity to address any adverse or derogatory information that may result from a compliance review, verification, or site visit before a decision is made on your request.  For a visit after your request is approved, USCIS will provide you with an opportunity to address any adverse or derogatory information which may result in revocation or termination of an approval.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this petition, and the associated evidence, is collected under the Immigration and Nationality Act section 222, 8 U.S.C. sections 1107(a)(27), 1103, 1153(b), and 1202, and 8 CFR parts 103 and 204.  If this petition is filed pursuant to VAWA, the information contained herein is also protected under 8 U.S.C. section 1367.

**PURPOSE:**  The primary purpose for providing the requested information on this petition is to determine if you have established eligibility for the immigration benefit for which you are filing.  DHS will use the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in a rejection or denial of your petition.

**ROUTINE USES:**  DHS may share the information you provide on this petition with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records] which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.  If the information contained in Form I-360 is protected under 8 U.S.C. section 1367, any sharing with Federal, state, local, or foreign agencies will be done in accordance with 8 U.S.C. section 1367.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1.917 hours per response (except 2.917 hours per response for Iraqi or Afghan Nationals who were employed by or on behalf of the U.S. Government in Iraq or Afghanistan, and 2.167 hours per response for Religious Workers), including the time for reviewing instructions, gathering the required documentation and information, completing the petition, preparing statements, attaching necessary documentation, and submitting the petition.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0020.  **Do not mail your completed Form I-360 to this address.**



# Petition for Amerasian, Widow(er), or Special Immigrant

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-360**

OMB No. 1615-0020
Expires 02/28/2026

| For USCIS Use Only | Fee Stamp | Action Block |
|---|---|---|

| **For USCIS Use Only** |  |
|---|---|
| **Returned** |  |
| **Resubmitted** |  |
| **Relocated** | **Received** |
|  | **Sent** |

**Remarks:**
☐ Petitioner/Applicant Interviewed
☐ Interviewed Beneficiary Interviewed
☐ I-485 Filed Concurrently
☐ Bene "A" File Reviewed

**Classification**

**Consulate**

**Priority Date**

| **To be completed by an Attorney or Accredited Representative** (if any). | ☐ **Select this box if Form G-28 or G-28I is attached.** | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |
|---|---|---|---|

▶ **START HERE - Type or print in black ink.**

## Part 1.  Information About Person or Organization Filing This Petition

**NOTE:**  You must complete **Part 1.** as the petitioner if you are filing this petition on behalf of another person.  If you are a Violence Against Women Act (VAWA) self-petitioner or special immigrant juvenile, skip to **Part 1., Item Number 7.**

**1.** Your Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|

**2.** USCIS Online Account Number (if any)   ▶

**3.** U.S. Social Security Number (if any)

**4.** Alien Registration Number (A-Number) (if any)   ▶  **A-**

**5.** Individual IRS Tax Number (if any)   ▶

**6.** Mailing Address

In Care Of Name (if any)

Organization Name (if applicable)

| Street Number and Name | Apt. Ste. Flr. | Number |
|---|---|---|
| ☐ ☐ ☐ | |

| City or Town | State | ZIP Code |
|---|---|---|

| Province | Postal Code | Country |
|---|---|---|

## Part 1.  Information About Person or Organization Filing This Petition (continued)

**7.**  Alternate and/or Safe Mailing Address

If you are a VAWA self-petitioning spouse, child, parent, or a special immigrant juvenile and do not want U.S. Citizenship and Immigration Services (USCIS) to send notices about this petition to your home, you may provide an alternate and/or safe mailing address.

In Care Of Name (if any)

Street Number and Name                                          Apt. Ste. Flr.   Number

□ □ □

City or Town                                                          State      ZIP Code

Province                              Postal Code           Country

## Part 2.  Classification Requested

Select **only one** box.

**1.**  **A.**  □  Amerasian

**B.**  □  Widow(er) of a U.S. citizen

**C.**  □  Special Immigrant Juvenile

**D.**  □  Special Immigrant Religious Worker

**(1)**  Will the beneficiary be working as a minister?     □ Yes    □ No

**E.**  □  Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government, or U.S. Government in the Canal Zone

**F.**  □  Special Immigrant Physician

**G.**  □  Special Immigrant G-4 International Organization Employee or Family Member or NATO-6 Employee or Family Member

**H.**  □  Special Immigrant Armed Forces Member

**I.**  □  Self-Petitioning Spouse of Abusive U.S. citizen or Lawful Permanent Resident

**J.**  □  Self-Petitioning Child of Abusive U.S. citizen or Lawful Permanent Resident

**K.**  □  VAWA Self-Petitioning Parent of a U.S. citizen son or daughter

**L.**  □  Special Immigrant Afghanistan or Iraq National who worked with the U.S. Armed Forces as a translator

**M.**  □  Special Immigrant Iraq National who was employed by or on behalf of the U.S. Government

**N.**  □  Special Immigrant Afghanistan National who was employed by or on behalf of the U.S. Government or the International Security Assistance Force (ISAF) in Afghanistan

**O.**  □  Broadcasters

**P.**  □  Other

Provide the name of the classification below.

## Part 3.  Information About the Person for Whom This Petition Is Being Filed

**NOTE:**  On this petition, the "beneficiary" or "self-petitioner" means the person for whom this petition is being filed.  If you provided an alternate and/or safe mailing address above, you must also complete **Part 3.**

1.  Your Full Name

Family Name (Last Name)

Given Name (First Name)

Middle Name

2.  Mailing Address

In Care Of Name (if any)

Street Number and Name

Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town

State   ZIP Code

Province

Postal Code

Country

### *Other Information*

3.  Date of Birth  (mm/dd/yyyy)

4.  Country of Birth

5.  U.S. Social Security Number (if any)

▶

6.  A-Number (if any)

▶ **A-**

7.  Marital Status   ☐ Single   ☐ Married   ☐ Divorced   ☐ Widowed

Complete **Item Numbers 8. - 15.** if this person is in the United States.  If an item number is not applicable or the answer is "none," leave the space blank.  Provide information below for the passport or other document used at the time of last arrival to the United States.

8.  Date of Last Arrival (mm/dd/yyyy)

9.  Form I-94 Number or I-95 Crewman's Landing Permit

▶

10.  Passport Number

11.  Travel Document Number

12.  Country of Issuance for Passport or Travel Document

13.  Expiration Date for Passport or Travel Document (mm/dd/yyyy)

14.  Current Nonimmigrant Status

15.  Date current status expired, or will expire, as shown on Form I-94 or I-95 (mm/dd/yyyy)

## Part 4.  Processing Information

1.  If the person listed in **Part 3.** is outside the U.S., is ineligible to adjust status in the U.S., or does not wish to adjust status in the U.S., provide the following information about the U.S. Consulate at which the person prefers to apply for an immigrant visa.

**U.S. Consulate**

**A.**  City or Town

**B.**  Country

## Part 4.  Processing Information (continued)

**2.** If a U.S. address was provided in **Part 3.**, type or print the person's foreign address below.  If he or she does not maintain a foreign address, list the city or town and country of last foreign residence.  If his or her native alphabet does not use Roman letters, type or print his or her name and foreign address in the native alphabet.

**A.** Your Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |

**B.** Mailing Address

Street Number and Name

Apt. Ste. Flr.   Number

City or Town

| Province | Postal Code | Country |
|---|---|---|
|  |  |  |

**3.** Gender of the beneficiary:   ☐ Male   ☐ Female

**4.** **A.** Are you filing any other petitions or applications with this one?   ☐ Yes   ☐ No

   **B.** If you answered "Yes" to **Item A.** in **Item Number 4.**, how many?

If you answer "Yes" to **Item Numbers 5. - 6.**, provide an explanation in the space provided in **Part 15. Additional Information**.

**5.** Is the beneficiary in removal proceedings?   ☐ Yes   ☐ No

**6.** Has the beneficiary ever worked in the U.S. without permission?  (If you are applying for a special immigrant juvenile status, you are not required to answer this item number.)   ☐ Yes   ☐ No

**7.** Is an application for adjustment of status attached to this petition?   ☐ Yes   ☐ No

## Part 5.  Information About the Spouse and Children of the Person for Whom This Petition Is Being Filed

**NOTE:** Depending on the classification you seek, you can either file this petition for another person or for yourself.  On this petition, the "beneficiary" or "self-petitioner" means the person for whom this petition is being filed, whether that person is yourself or another person.

**1.** If you are filing as a self-petitioning spouse, have any of your children filed separate self-petitions?   ☐ Yes   ☐ No

**2.** **Person 1**

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
|  |  |  |

| Date of Birth  (mm/dd/yyyy) | Country of Birth |
|---|---|
|  |  |

Relationship              A-Number (if any)

☐ Spouse   ☐ Child   ▶ **A-**

**Part 5.  Information About the Spouse and Children of the Beneficiary** (continued)

3.   **Person 2**

Family Name (Last Name)                    Given Name (First Name)                    Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship          A-Number (if any)

☐ Child        ▶ **A-**

4.   **Person 3**

Family Name (Last Name)                    Given Name (First Name)                    Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship          A-Number (if any)

☐ Child        ▶ **A-**

5.   **Person 4**

Family Name (Last Name)                    Given Name (First Name)                    Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship          A-Number (if any)

☐ Child        ▶ **A-**

6.   **Person 5**

Family Name (Last Name)                    Given Name (First Name)                    Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship          A-Number (if any)

☐ Child        ▶ **A-**

7.   **Person 6**

Family Name (Last Name)                    Given Name (First Name)                    Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship          A-Number (if any)

☐ Child        ▶ **A-**

**Part 5.  Information About the Spouse and Children of the Beneficiary** (continued)

**8.**   **Person 7**

Family Name (Last Name)

Given Name (First Name)

Middle Name

Date of Birth  (mm/dd/yyyy)

Country of Birth

Relationship        A-Number (if any)

☐ Child        ▶ **A-**

**9.**   **Person 8**

Family Name (Last Name)

Given Name (First Name)

Middle Name

Date of Birth  (mm/dd/yyyy)

Country of Birth

Relationship        A-Number (if any)

☐ Child        ▶ **A-**

**10.**   **Person 9**

Family Name (Last Name)

Given Name (First Name)

Middle Name

Date of Birth  (mm/dd/yyyy)

Country of Birth

Relationship        A-Number (if any)

☐ Child        ▶ **A-**

**Part 6.  Complete Only If Filing for an Amerasian**

*Information About the Mother of the Amerasian*

**1.**   Mother's Full Name

Family Name (Last Name)

Given Name (First Name)

Middle Name

**2.**   **A.**  Is the mother still alive?        ☐ Unknown   ☐ Yes   ☐ No

   **B.**  If you answered "Yes" to **Item A**. in **Item Number 2.**, provide her address below.

In Care Of Name (if any)

Street Number and Name

Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town

State

ZIP Code

Province

Postal Code

Country

Form I-360  Edition  04/01/24

004005

**Part 6.  Complete Only If Filing for an Amerasian** (continued)

**C.**  If you answered "No" to **Item A.** in **Item Number 2.**, provide her date of death (mm/dd/yyyy).

*Information About the Father of the Amerasian*

If possible, attach a notarized statement from the father regarding parentage.  If there is a question you cannot fully answer in the space provided on this petition, use the space provided in **Part 15. Additional Information**.

**3.**  Father's Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|

**4.**  Date of Birth  (mm/dd/yyyy)     **5.**  Country of Birth

**6.  A.**  Is the father still alive?                    ☐ Unknown   ☐ Yes   ☐ No

**B.**  If you answered "Yes" to **Item A**. in **Item Number 6.**, provide his address below.

In Care Of Name (if any)

Street Number and Name                              Apt. Ste. Flr.   Number
                                                    ☐ ☐ ☐

City or Town                                        State   ZIP Code

Province                        Postal Code   Country

**C.**  If you answered "No" to **Item A.** in **Item Number 6.**, provide his date of death (mm/dd/yyyy).

**D.**  Daytime Telephone Number (if any)      **E.**  Work Telephone Number (if any)

At the time the Amerasian was conceived:

**7.  A.**  The father was in the military (indicate branch of service below).

☐ Army   ☐ Air Force   ☐ Navy   ☐ Marine Corps   ☐ Coast Guard

**B.**  Provide the father's service number:

**C.**  ☐  The father was not in the military and was not a civilian employed abroad.  (Attach a full explanation of the circumstances.)

**Part 7.  Complete Only If Filing as a Widow/Widower**

**1.**  Full Name of U.S. Citizen Husband or Wife Who Died

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|

**2.**  Date of Birth (mm/dd/yyyy)   **3.**  Country of Birth                **4.**  Date of Death (mm/dd/yyyy)

**Part 7.  Complete Only If Filing as a Widow/Widower** (continued)

5.  At time of death, your spouse was a (Select **only one**):

A.  ☐  U.S. citizen born in the United States

B.  ☐  U.S. citizen born abroad to U.S. citizen parents

C.  ☐  U.S. citizen through naturalization

(1)  Provide A-Number (if any)  ▶  A-  [ ][ ][ ][ ][ ][ ][ ][ ][ ]

D.  ☐  Other (Explain)

[                                                                    ]

6.  How many times have you been married?  [                    ]

7.  How many times was your spouse married?  [                    ]

8.  A.  When did you and your spouse get married (mm/dd/yyyy)?  [                    ]

B.  Where did you and your spouse get married?  [                    ]

9.  A.  Did you remarry after the death of your spouse?  ☐ Yes  ☐ No

B.  If you answered "Yes" to **Item A.** in **Item Number 9.**, provide the date that you remarried (mm/dd/yyyy).  [                    ]

10.  If you are filing as a widow(er), were you legally separated at the time of the U.S. citizen's death?  ☐ Yes  ☐ No

**NOTE:**  If you answered "Yes" to **Item Number 10.**, provide an explanation in the space provided in **Part 15. Additional Information**.

**Part 8.  Complete Only If Filing for a Special Immigrant Juvenile**

*Information About the Juvenile*

1.  List any other names used:

A.  Family Name (Last Name)  [                    ]  Given Name (First Name)  [                    ]  Middle Name  [                    ]

B.  Family Name (Last Name)  [                    ]  Given Name (First Name)  [                    ]  Middle Name  [                    ]

Answer the following questions regarding the person for whom the petition is being filed.  If you answer "No" to **Item A.** in **Item Number 2.**, provide an explanation in the space provided in **Part 15. Additional Information**.

2.  A.  Have you been declared dependent on a juvenile court in the United States OR has a juvenile court legally committed you to, or placed you under the custody of, an agency, department of a state, or an individual or entity?  ☐ Yes  ☐ No

B.  Provide the name of the state agency, department, or court-appointed organization or individual with which you are placed below.

[                                                                    ]

C.  Are you currently under the jurisdiction of the juvenile court that made your placement or custody determination identified in **Item B.** in **Item Number 2.** above?  ☐ Yes  ☐ No

## Part 8.  Complete Only If Filing for a Special Immigrant Juvenile (continued)

3.  **A.**  If you answered "Yes" to **Item C.** in **Item Number 2.** above, are you currently residing in your court-ordered placement? ☐ Yes  ☐ No

    **B.**  If you answered "No" to **Item C.** in **Item Number 2.** above, select your reason below.

      ☐ You were adopted or placed in a permanent guardianship or another permanent living arrangement (other than reunification with the abusive parents).

      ☐ You aged-out of the juvenile court's jurisdiction and the order was terminated based on age.

      ☐ Other.  (If you selected "Other," provide an explanation in the space provided in **Part 15. Additional Information**.)

4.  **A.**  A juvenile court has determined that reunification with ☐ one or ☐ both of my parents is not viable due to:

      ☐ Abuse   ☐ Neglect   ☐ Abandonment

      ☐ Similar basis under state law (specify):

    **B.**  If you selected "one" in **Item A.** in **Item Number 4.**, provide the name of that parent below.

5.  Has it been determined in judicial or administrative proceedings that it would not be in your best interest to be returned to your or your parent's country of citizenship or nationality or last habitual residence? ☐ Yes  ☐ No

6.  **A.**  Are you currently or were you previously in the custody of the U.S. Department of Health and Human Services (HHS)? ☐ Yes  ☐ No

    **B.**  If you answered "Yes" to **Item A.** in **Item Number 6.**, and you are in HHS custody, did the juvenile court order determine or alter your custody status or placement? ☐ Yes  ☐ No

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition

### *Prospective Employer Attestation*

1.  Provide the following information about the prospective employer.

    **A.**  Number of members of the prospective employer's organization

    **B.**  Number of employees working at the same location where the beneficiary will be employed

    **C.**  Number of aliens holding special immigrant or nonimmigrant religious worker status who are currently employed or were employed within the past five years

    **D.**  Number of Special Immigrant Religious Worker (Form I-360) and Nonimmigrant Religious Worker (Form I-129) petitions submitted by the prospective employer within the past five years

    **E.**  Number of Special Immigrant Religious Worker (Form I-360) petitions submitted by the beneficiary during the last five years

2.  Has the beneficiary or have any of the beneficiary's dependent family members previously been admitted to the United States for a period of stay in the Religious Worker (R) classification during the last five years? ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 2.**, provide the beneficiary's and any dependent family member's prior periods of stay in the R classification in the United States during the last five years.  Be sure to provide only those periods when the beneficiary and/or family members were actually in the United States in the R classification.  Provide the beneficiary's information in **Item Number 3.** below.  For dependent family members, use the space provided in **Part 15. Additional Information.**

**NOTE:**  Submit photocopies of Form I-94 Arrival-Departure Record, Form I-797 (Notice of Action), and/or other USCIS documents identifying these periods of stay in the R classification.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information.**

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

**3.**   Beneficiary

Family Name (Last Name)

Given Name (First Name)

Middle Name

Period of Stay

From (mm/dd/yyyy)

To (mm/dd/yyyy)

**4.**   Provide a summary of the type of responsibilities of those employees, other than the beneficiary, who work at the same location where the beneficiary will be employed.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information**.

Position

Summary of the Type of Responsibilities for That Position

**5.**   Describe the relationship, if any, between the religious organization in the United States and the organization abroad of which the beneficiary is a member.

**6.**   Provide the following information about the prospective employment.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information**.

**A.**   Title of position offered

**B.**   The beneficiary will be working (select one of the following):

☐   As a minister

☐   In a religious vocation

☐   In a religious occupation

**C.**   Detailed description of the beneficiary's proposed daily duties

**D.**   Description of the beneficiary's qualifications for the position offered

**E.**   Description of the proposed salaried and/or non-salaried compensation

**F.**   Provide the specific addresses or locations where the beneficiary will be working

Company Name

Street Number and Name

Apt. Ste. Flr.   Number

☐ ☐ ☐

City or Town

State

ZIP Code

Province

Postal Code

Country

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

Answer **Item Numbers 7. - 13.** about the prospective employer.  If you answer "No" for **Item Numbers 7. - 13.**, provide an explanation in the space provided in **Part 15. Additional Information**.

**7.**  The prospective employer is a bona fide non-profit religious organization or a bona fide organization that is affiliated with the religious denomination and is tax exempt as described in section 501(c)(3) of the Internal Revenue Code of 1986, subsequent amendment, or equivalent sections of prior enactments of the Internal Revenue Code.  If the prospective employer is affiliated with the religious denomination, complete the Religious Denomination Certification included in this petition.  ☐ Yes  ☐ No

If you answered "Yes," select the applicable box and attach the appropriate documentation to the petition.

**A.**  ☐  A currently valid determination letter from the Internal Revenue Service (IRS) establishing that the organization is a tax-exempt organization;

**B.**  ☐  A currently valid determination letter from the IRS establishing that the organization is recognized as tax-exempt under a group tax exemption; or

**C.**  ☐  If you are claiming that the prospective employer is a bona fide organization that is affiliated with the religious denomination, provide the following:

**(1)**  ☐  A currently valid determination letter from the IRS establishing that the organization is a tax-exempt organization;

**(2)**  ☐  Documentation that establishes the religious nature and purpose of the organization, such as a copy of the organizing instrument of the organization that specifies the purposes of the organization;

**(3)**  ☐  Organizational literature, such as books, articles, brochures, calendars, flyers, and other literature describing the religious purpose and nature of the activities of the organization; and

**(4)**  ☐  A completed religious denomination certification, signed and dated, certifying that the petitioning organization is affiliated with the religious denomination.

**8.**  The prospective employer is willing and able to provide salaried and/or non-salaried compensation at a level that the beneficiary and any dependents will not become a public charge.  ☐ Yes  ☐ No

**9.**  The funds to pay the beneficiary's compensation do not include any monies obtained from the beneficiary, excluding reasonable donations or tithing to the religious organization.  ☐ Yes  ☐ No

**10.**  The beneficiary will not engage in secular employment, and the prospective employer will provide salaried and/or non-salaried compensation.  ☐ Yes  ☐ No

**11.**  The offered position is full time, requiring at least an average of 35 hours of work per week.  ☐ Yes  ☐ No

**12.**  The beneficiary has been a religious worker for at least two years immediately before Form I-360 was filed and is otherwise qualified for the position offered.  ☐ Yes  ☐ No

**13.**  The beneficiary has been a member of the prospective employer's denomination for at least two years immediately before Form I-360 was filed.  ☐ Yes  ☐ No

### *Prospective Employer Attestation (must be completed by the prospective employer even if the beneficiary is filing on his or her own behalf)*

**I certify or attest under penalty of perjury under the laws of the United States of America that the contents of this attestation, and the evidence submitted, are true and correct.**

**14.**  Signature of an Authorized Official of the Prospective Employer (sign in ink) | Date of Signature (mm/dd/yyyy)

**Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition** (continued)

*Printed Name and Title of Signatory for Prospective Employer*

**15.** Family Name (Last Name)          Given Name (First Name)          Middle Name

**16.** Title of the Signatory

*Mailing Address*

**17.** Employer/Organization Name

Street Number and Name                          Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                          State          ZIP Code

*Contact Information*

**18.** Daytime Telephone Number          **19.** Fax Number (if any)

**20.** Email Address (if any)

*Religious Denomination Certification (to be completed only if the prospective employer is affiliated with a religious denomination)*

**I certify under penalty of perjury, that** the prospective employer,                          ,

is affiliated with this Religious Denomination,                          , and that the attesting
religious organization within the religious denomination is tax-exempt as described in section 501(c)(3) of the Internal Revenue Code
of 1986, or equivalent sections of prior enactments of the Internal Revenue Code.  The contents of this certification are true and
correct to the best of my knowledge.

**21.** Signature of the Authorized Representative of the Religious Denomination (sign in ink)          Date of Signature (mm/dd/yyyy)

*Printed Name and Title of the Signatory of the Religious Denomination*

**22.** Family Name (Last Name)          Given Name (First Name)          Middle Name

**23.** Title of the Signatory

**Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition** (continued)

*Information About the Attesting Religious Organization Within the Religious Denomination*

24.  Name of Attesting Religious Organization Within the Religious Denomination

25.  Street Number and Name                                              Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                                              State     ZIP Code

26.  Daytime Telephone Number                    27.  Fax Number (if any)

28.  Email Address (if any)                          29.  IRS Tax Number of the Attesting Religious Organization

**Part 10.  Complete Only If Filing as a VAWA Self-Petitioning Spouse or Child of a U.S. Citizen or Lawful Permanent Resident or a VAWA Self-Petitioning Parent of a U.S. Citizen Son or Daughter**

**NOTE:  For the safety and protection of all VAWA self-petitioners, information regarding a filing will only be provided to the self-petitioner or their designated attorney or representative with a valid Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative.**

1.  Full Name of U.S. citizen or Lawful Permanent Resident Abuser

Family Name (Last Name)                          Given Name (First Name)                 Middle Name

2.  Date of Birth (mm/dd/yyyy)        3.  Country of Birth                          4.  Date of Death (mm/dd/yyyy)

5.  Your abuser is now, or was, a (Select one):

A.  ☐   U.S. citizen born in the United States

B.  ☐   U.S. citizen born abroad to U.S. citizen parents

C.  ☐   U.S. citizen through naturalization

(1)  Provide A-Number (if known)  ► A-

D.  ☐   U.S. Lawful Permanent Resident

(1)  Provide A-Number (if any)  ► A-

E.  ☐   Other (Explain)

6.  How many times have you been married?              ►

7.  How many times was your abuser married (if known)?  ►

**Part 10.  Complete Only If Filing as a VAWA Self-Petitioning Spouse or Child of a U.S. Citizen or Lawful Permanent Resident or a VAWA Self-Petitioning Parent of a U.S. Citizen Son or Daughter** (continued)

8.  **A.**  When did you and your abuser get married?  (If you are a self-petitioning child or self-petitioning parent, type or print "N/A.")
(mm/dd/yyyy)

**B.**  Where did you and your abuser get married?  (If you are a self-petitioning child or self-petitioning parent, type or print "N/A.")

9.  When did you live with your abuser?

From (mm/dd/yyyy)                    To (mm/dd/yyyy)

Include any other dates you have lived off/on with your abuser in the space provided in **Part 15. Additional Information**.

10.  Provide the last address at which you lived together with your abuser.

Street Number and Name                                          Apt. Ste. Flr.  Number

City or Town                                                    State    ZIP Code

Province                          Postal Code          Country

11.  Provide the last date that you lived together with your abuser at this address.

From (mm/dd/yyyy)                    To (mm/dd/yyyy)

12.  I am currently residing in the United States and I request an Employment Authorization Document.      ☐ Yes  ☐ No

**Part 11.  Petitioner's Statement, Contact Information, Declaration, and Signature** (Individual)

**IMPORTANT:**  Complete this section **ONLY** if you are an individual filing this petition for yourself.  If you are filing Form I-360 to petition for another person or as an authorized signatory of an organization, complete **Part 12. Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory.**

**NOTE:**  Read the **Penalties** section of the Form I-360 Instructions before completing this part.

*Petitioner's Statement*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

1.  Petitioner's Statement Regarding the Interpreter
    **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this petition and my answer to every question.

    **B.**  ☐  The interpreter named in **Part 13.** read to me every question and instruction on this petition and my answer to every question in _____ , a language in which I am fluent.  I understand all of this information as interpreted.

2.  Petitioner's Statement Regarding the Preparer
    ☐  At my request, the preparer named in **Part 14.**, _____ , prepared this petition for me based only upon information I provided or authorized.

## Part 11.  Petitioner's Statement, Contact Information, Declaration, and Signature (Individual) (continued)

### Petitioner's Contact Information

**3.**   Petitioner's Daytime Telephone Number

**4.**   Petitioner's Mobile Telephone Number (if any)

**5.**   Petitioner's Email Address (if any)

### Petitioner's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this petition, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

   **1)**  I provided or authorized all of the information contained in, and submitted with, my petition;

   **2)**  I reviewed and understood all of the information in, and submitted with, my petition; and

   **3)**  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

### Petitioner's Signature

**6.**   Petitioner's Signature

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL PETITIONERS:**  If you do not completely fill out this petition or fail to submit required documents listed in the Instructions, USCIS may deny your petition.

## Part 12.  Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory

**IMPORTANT:**  Complete this section **ONLY** if you are filing Form I-360 to petition for another person or as an authorized signatory of an organization.  If you are an individual filing this petition for yourself, complete **Part 11. Petitioner's Statement, Contact Information, Declaration, and Signature (Individual).**

**NOTE:**  Read the **Penalties** section of the Form I-360 Instructions before completing this part.

### Petitioner's or Authorized Signatory's Statement

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**   Petitioner's Statement Regarding the Interpreter

   **A.**   ☐   I can read and understand English, and I have read and understand every question and instruction on this petition and my answer to every question.

   **B.**   ☐   The interpreter named in **Part 13.** read to me every question and instruction on this petition and my answer to every question in

   a language in which I am fluent.  I understand all of this information as interpreted.

**Part 12.  Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory** (continued)

**2.**    Petitioner's Statement Regarding the Preparer

☐   At my request, the preparer named in **Part 14.**, [_____],

prepared this petition for me based only upon information I provided or authorized.

### *Authorized Signatory's Contact Information*

**3.**    Authorized Signatory's Family Name (Last Name)        Authorized Signatory's Given Name (First Name)

**4.**    Authorized Signatory's Title        **5.**    Authorized Signatory's Daytime Telephone Number

**6.**    Authorized Signatory's Mobile Telephone Number (if any)        **7.**    Authorized Signatory's Email Address (if any)

### *Petitioner's or Authorized Signatory's Declaration and Certification*

Copies of any documents submitted are exact photocopies of unaltered, original documents, and I understand that, as the petitioner, I may be required to submit original documents to USCIS at a later date.

I authorize the release of any information from my records, or from the petitioning organization's records, to USCIS or other entities and persons where necessary to determine eligibility for the immigration benefit sought or where authorized by law.  I recognize the authority of USCIS to conduct audits of this petition using publicly available open source information.  I also recognize that any supporting evidence submitted in support of this petition may be verified by USCIS through any means determined appropriate by USCIS, including but not limited to, on-site compliance reviews.

If filing this petition on behalf of an organization, I certify that I am authorized to do so by the organization.

I certify, under penalty of perjury, that I have reviewed this petition, I understand all of the information contained in, and submitted with, my petition, and all of this information is complete, true, and correct.

### *Petitioner's or Authorized Signatory's Signature*

**8.**    Petitioner's or Authorized Signatory's Signature        Date of Signature (mm/dd/yyyy)

➡

**NOTE TO ALL PETITIONERS AND AUTHORIZED SIGNATORIES:**  If you do not completely fill out this petition or fail to submit required documents listed in the Instructions, USCIS may delay a decision on or deny your petition.

## Part 13.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**  Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

### *Interpreter's Mailing Address*

**3.**  Street Number and Name

Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town

State  ZIP Code

Province

Postal Code  Country

### *Interpreter's Contact Information*

**4.**  Interpreter's Daytime Telephone Number

**5.**  Interpreter's Mobile Telephone Number (if any)

**6.**  Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and _____, which is the same language specified in **Part 11.**, **Item B.** in **Item Number 1.**, or in **Part 12.**, **Item B.** in **Item Number 1.**, and I have read to this petitioner or the authorized signatory in the identified language every question and instruction on this petition and his or her answer to every question.  The petitioner or authorized signatory informed me that he or she understands every instruction, question, and answer on the petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification,** and has verified the accuracy of every answer.

### *Interpreter's Signature*

**7.**  Interpreter's Signature (sign in ink)

Date of Signature (mm/dd/yyyy)

004016

## Part 14.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner

Provide the following information about the preparer.

### Preparer's Full Name

**1.** Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.** Street Number and Name

Apt. Ste. Flr.  Number

City or Town

State   ZIP Code

Province

Postal Code

Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Number

**6.** Preparer's Email Address (if any)

### Preparer's Statement

**7.   A.** ☐ I am not an attorney or accredited representative but have prepared this petition on behalf of the petitioner and with the petitioner's consent.

**B.** ☐ I am an attorney or accredited representative and my representation of the petitioner in this case
☐ extends ☐ does not extend beyond the preparation of this petition.

**NOTE:**  If you are an attorney or accredited representative whose representation extends beyond preparation of this petition, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, with this petition.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner or authorized signatory. The petitioner has reviewed this completed petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification,** and informed me that all of this information in the form and in the supporting documents is complete, true, and correct.

### Preparer's Signature

**8.** Preparer's Signature (sign in ink)

Date of Signature (mm/dd/yyyy)

## Part 15.  Additional Information

If you need extra space to provide any additional information within this petition, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this petition or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.**  Family Name (Last Name)                Given Name (First Name)                Middle Name

**2.**  A-Number (if any)  ▶  **A-**

**3.**  **A.** Page Number      **B.** Part Number      **C.** Item Number

   **D.**

**4.**  **A.** Page Number      **B.** Part Number      **C.** Item Number

   **D.**

**5.**  **A.** Page Number      **B.** Part Number      **C.** Item Number

   **D.**

**6.**  **A.** Page Number      **B.** Part Number      **C.** Item Number

   **D.**

# Application to Register Permanent Residence
## or Adjust Status



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-485**
OMB No. 1615-0023
Expires 02/28/2026

| For USCIS Use Only | | |
|---|---|---|

**Preference Category:**

**Country Chargeable:**

**Priority Date:**

**Date Form I-693 Received:**

Receipt

Action Block

- [ ] Applicant Interviewed
- [ ] Interview Waived

Date of
Initial Interview: _____

Lawful Permanent
Resident as of: _____

**Section of Law**
- [ ] INA 209(a)
- [ ] INA 209(b)
- [ ] INA 245(a)
- [ ] INA 245(i)
- [ ] INA 245(m)
- [ ] INA 249
- [ ] Sec. 13, Act of 9/11/57
- [ ] Cuban Adjustment Act
- [ ] Other _____

| To be completed by an attorney or accredited representative (if any). | | | |
|---|---|---|---|

- [ ] **Select this box if Form G-28 is attached.**

**Volag Number** (if any)

**Attorney State Bar Number** (if applicable)

**Attorney or Accredited Representative USCIS Online Account Number** (if any)

▶ **START HERE - Type or print in black ink.**

A-Number ▶ A- _____

**NOTE TO ALL APPLICANTS:**  If you do not completely fill out this application or fail to submit required documents listed in the Instructions, U.S. Citizenship and Immigration Services (USCIS) may deny your application.

## Part 1.  Information About You (Person applying for lawful permanent residence)

### *Your Current Legal Name (do not provide a nickname)*

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

### *Other Names You Have Used Since Birth (if applicable)*

**NOTE:**  Provide all other names you have ever used, including your family name at birth, other legal names, nicknames, aliases, and assumed names.  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.

**2.a.** Family Name (Last Name)

**2.b.** Given Name (First Name)

**2.c.** Middle Name

**3.a.** Family Name (Last Name)

**3.b.** Given Name (First Name)

**3.c.** Middle Name

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

### *Other Information About You*

**5.** Date of Birth (mm/dd/yyyy)

**NOTE:**  In addition to providing your actual date of birth, include any other dates of birth you have used in connection with any legal names or non-legal names in the space provided in **Part 14. Additional Information**.

**6.** Sex  [ ] Male  [ ] Female

**7.** City or Town of Birth

A-Number ▶ **A-**

## Part 1.  Information About You (Person applying for lawful permanent residence) (continued)

**8.** Country of Birth

**9.** Country of Citizenship or Nationality

**10.** Alien Registration Number (A-Number) (if any)

▶ **A-**

**NOTE:** If you have **EVER** used other A-Numbers, include the additional A-Numbers in the space provided in **Part 14. Additional Information**.

**11.** USCIS Online Account Number (if any)

▶

### U.S. Mailing Address

**12.a.** In Care Of Name (if any)

**12.b.** Street Number and Name

**12.c.** ☐ Apt. ☐ Ste. ☐ Flr.

**12.d.** City or Town

**12.e.** State          **12.f.** ZIP Code

### Alternate and/or Safe Mailing Address

If you are applying based on the Violence Against Women Act (VAWA) or as a special immigrant juvenile, human trafficking victim (T nonimmigrant), or victim of a qualifying crime (U nonimmigrant) and you do not want USCIS to send notices about this application to your home, you may provide an alternative and/or safe mailing address.

**13.a.** In Care Of Name (if any)

**13.b.** Street Number and Name

**13.c.** ☐ Apt. ☐ Ste. ☐ Flr.

**13.d.** City or Town

**13.e.** State          **13.f.** ZIP Code

### Social Security Card

**14.** Has the Social Security Administration (SSA) ever officially issued a Social Security card to you?

☐ Yes ☐ No

If you answered "Yes," provide the information requested in **Item Number 15.**

**15.** Provide your U.S. Social Security Number (SSN).

▶

**16.** Do you want the SSA to issue you a Social Security card? (You must also answer "Yes" to **Item Number 17. Consent for Disclosure**, to receive a card).

☐ Yes ☐ No

**17.** **Consent for Disclosure:** I authorize disclosure of information from this application to the SSA as required for the purpose of assigning me an SSN and issuing me a Social Security Card.

☐ Yes ☐ No

### Recent Immigration History

Provide the information for **Item Numbers 18. - 24.** if you last entered the United States using a passport or travel document.

**18.** Passport Number Used at Last Arrival

**19.** Travel Document Number Used at Last Arrival

**20.** Expiration Date of this Passport or Travel Document (mm/dd/yyyy)

**21.** Country that Issued this Passport or Travel Document

**22.** Nonimmigrant Visa Number from this Passport (if any)

Place of Last Arrival into the United States

**23.a.** City or Town

**23.b.** State

**24.** Date of Last Arrival (mm/dd/yyyy)

A-Number ▶ **A-**

## Part 1.  Information About You (Person applying for lawful permanent residence) (continued)

When I last arrived in the United States, I:

**25.a.** ☐ Was inspected at a port of entry and admitted as (for example, exchange visitor; visitor, waived through; temporary worker; student):

**25.b.** ☐ Was inspected at a port of entry and paroled as (for example, humanitarian parole, Cuban parole):

**25.c.** ☐ Came into the United States without admission or parole.

**25.d.** ☐ Other:

If you were issued a Form I-94 Arrival-Departure Record Number:

**26.a.** Form I-94 Arrival-Departure Record Number

▶

**26.b.** Expiration Date of Authorized Stay Shown on Form I-94 (mm/dd/yyyy)

**26.c.** Status on Form I-94 (for example, class of admission, or paroled, if paroled)

**27.** What is your current immigration status (if it has changed since your arrival)?

Provide your name exactly as it appears on your Form I-94 (if any)

**28.a.** Family Name (Last Name)

**28.b.** Given Name (First Name)

**28.c.** Middle Name

## Part 2.  Application Type or Filing Category

**NOTE:**  Attach a copy of the Form I-797 receipt or approval notice for the underlying petition or application, as appropriate.

**I am applying** to register lawful permanent residence or adjust status to that of a lawful permanent resident based on the following immigrant category (select **only one** box).  (See the Form I-485 Instructions for more information, including any **Additional Instructions** that relate to the immigrant category you select.):

**1.a.  Family-based**

☐ Immediate relative of a U.S. citizen, Form I-130

☐ Other relative of a U.S. citizen or relative of a lawful permanent resident under the family-based preference categories, Form I-130

☐ Person admitted to the United States as a fiancé(e) or child of a fiancé(e) of a U.S. citizen, Form I-129F (K-1/K-2 Nonimmigrant)

☐ Widow or widower of a U.S. citizen, Form I-360

☐ VAWA self-petitioner, Form I-360

**1.b.  Employment-based**

☐ Alien worker, Form I-140

☐ Alien entrepreneur, Form I-526

**1.c.  Special Immigrant**

☐ Religious worker, Form I-360

☐ Special immigrant juvenile, Form I-360

☐ Certain Afghan or Iraqi National, Form I-360 or Form DS-157

☐ Certain international broadcaster, Form I-360

☐ Certain G-4 international organization or family member or NATO-6 employee or family member, Form I-360

**1.d.  Asylee or Refugee**

☐ Asylum status (INA section 208), Form I-589 or Form I-730

☐ Refugee status (INA section 207), Form I-590 or Form I-730

**1.e.  Human Trafficking Victim or Crime Victim**

☐ Human trafficking victim (T Nonimmigrant), Form I-914 or derivative family member, Form I-914A

☐ Crime victim (U Nonimmigrant), Form I-918, derivative family member, Form I-918A, or qualifying family member, Form I-929

A-Number ▶ **A-**

## Part 2.  Application Type or Filing Category (continued)

**1.f.**   **Special Programs Based on Certain Public Laws**

☐  The Cuban Adjustment Act

☐  The Cuban Adjustment Act for battered spouses and children

☐  Dependent status under the Haitian Refugee Immigrant Fairness Act

☐  Dependent status under the Haitian Refugee Immigrant Fairness Act for battered spouses and children

☐  Lautenberg Parolees

☐  Diplomats or high ranking officials unable to return home (Section 13 of the Act of September 11, 1957)

☐  Indochinese Parole Adjustment Act of 2000

**1.g.**   **Additional Options**

☐  Diversity Visa program

☐  Continuous residence in the United States since before January 1, 1972 ("Registry")

☐  Individual born in the United States under diplomatic status

☐  Other eligibility

**2.**   Are you applying for adjustment based on the Immigration and Nationality Act (INA) section 245(i)?

☐ Yes   ☐ No

**NOTE:** If you answered "Yes" to **Item Number 2.**, you must have selected a family-based, employment-based, special immigrant, or Diversity Visa immigrant category listed above in **Item Numbers 1.a. - 1.g.** as the basis for your application for adjustment of status.  Fill out the rest of this application **and** Supplement A to Form I-485, Adjustment of Status Under Section 245(i) (Supplement A).  For detailed filing instructions, read the Form I-485 Instructions (including any **Additional Instructions** that relate to the immigrant category that you selected in **Item Numbers 1.a. - 1.g.**) and Supplement A Instructions.

## *Information About Your Immigrant Category*

If you are the **principal applicant**, provide the following information.

**3.**   Receipt Number of Underlying Petition (if any)

**4.**   Priority Date from Underlying Petition (if any)

(mm/dd/yyyy)

If you are a **derivative applicant** (the spouse or unmarried child under 21 years of age of a principal applicant), provide the following information for the **principal applicant**.

Principal Applicant's Name

**5.a.**   Family Name (Last Name)

**5.b.**   Given Name (First Name)

**5.c.**   Middle Name

**6.**   Principal Applicant's A-Number (if any)

▶ **A-**

**7.**   Principal Applicant's Date of Birth

(mm/dd/yyyy)

**8.**   Receipt Number of Principal's Underlying Petition (if any)

▶

**9.**   Priority Date of Principal Applicant's Underlying Petition (if any) (mm/dd/yyyy)

## Part 3.  Additional Information About You

**1.**   Have you ever applied for an immigrant visa to obtain permanent resident status at a U.S. Embassy or U.S. Consulate abroad?

☐ Yes   ☐ No

If you answered "Yes" to **Item Number 1.**, complete **Item Numbers 2.a. - 4.** below.  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.

Location of U.S. Embassy or U.S. Consulate

**2.a.**   City

**2.b.**   Country

**3.**   Decision (for example, approved, refused, denied, withdrawn)

**4.**   Date of Decision (mm/dd/yyyy)

A-Number ▶ **A-**

## Part 3.  Additional Information About You (continued)

### *Address History*

Provide physical addresses for everywhere you have lived during the last five years, whether inside or outside the United States.  Provide your current address first.  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.

Physical Address 1 (current address)

**5.a.**  Street Number and Name

**5.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**5.c.**  City or Town

**5.d.**  State        **5.e.**  ZIP Code

**5.f.**  Province

**5.g.**  Postal Code

**5.h.**  Country

Dates of Residence

**6.a.**  From (mm/dd/yyyy)

**6.b.**  To (mm/dd/yyyy)        `Present`

Physical Address 2

**7.a.**  Street Number and Name

**7.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**7.c.**  City or Town

**7.d.**  State        **7.e.**  ZIP Code

**7.f.**  Province

**7.g.**  Postal Code

**7.h.**  Country

Dates of Residence

**8.a.**  From (mm/dd/yyyy)

**8.b.**  To (mm/dd/yyyy)

Provide your most recent address outside the United States where you lived for more than one year (if not already listed above).

**9.a.**  Street Number and Name

**9.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**9.c.**  City or Town

**9.d.**  State        **9.e.**  ZIP Code

**9.f.**  Province

**9.g.**  Postal Code

**9.h.**  Country

Dates of Residence

**10.a.**  From (mm/dd/yyyy)

**10.b.**  To (mm/dd/yyyy)

### *Employment History*

Provide your employment history for the last five years, whether inside or outside the United States.  Provide the most recent employment first.  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.

Employer 1 (current or most recent)

**11.**  Name of Employer or Company

Address of Employer or Company

**12.a.**  Street Number and Name

**12.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**12.c.**  City or Town

**12.d.**  State        **12.e.**  ZIP Code

**12.f.**  Province

**12.g.**  Postal Code

**12.h.**  Country

**13.**  Your Occupation

A-Number ▶ **A-**

## Part 3.  Additional Information About You (continued)

Dates of Employment

**14.a.** From (mm/dd/yyyy)

**14.b.** To (mm/dd/yyyy)

Employer 2

**15.** Name of Employer or Company

Address of Employer or Company

**16.a.** Street Number and Name

**16.b.** ☐ Apt.  ☐ Ste.  ☐ Flr.

**16.c.** City or Town

**16.d.** State

**16.e.** ZIP Code

**16.f.** Province

**16.g.** Postal Code

**16.h.** Country

**17.** Your Occupation

Dates of Employment

**18.a.** From (mm/dd/yyyy)

**18.b.** To (mm/dd/yyyy)

Provide your most recent employment outside of the United States (if not already listed above).

**19.** Name of Employer or Company

Address of Employer or Company

**20.a.** Street Number and Name

**20.b.** ☐ Apt.  ☐ Ste.  ☐ Flr.

**20.c.** City or Town

**20.d.** State

**20.e.** ZIP Code

**20.f.** Province

**20.g.** Postal Code

**20.h.** Country

**21.** Your Occupation

Dates of Employment

**22.a.** From (mm/dd/yyyy)

**22.b.** To (mm/dd/yyyy)

## Part 4.  Information About Your Parents

### *Information About Your Parent 1*

Parent 1's Legal Name

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

Parent 1's Name at Birth (if different than above)

**2.a.** Family Name (Last Name)

**2.b.** Given Name (First Name)

**2.c.** Middle Name

**3.** Date of Birth (mm/dd/yyyy)

**4.** Sex  ☐ Male  ☐ Female

**5.** City or Town of Birth

**6.** Country of Birth

A-Number ▶ **A-** [ ][ ][ ][ ][ ][ ][ ][ ][ ]

## Part 4.  Information About Your Parents (continued)

**7.** Current City or Town of Residence (if living)

**8.** Current Country of Residence (if living)

### Information About Your Parent 2

Parent 2's Legal Name

**9.a.** Family Name (Last Name)

**9.b.** Given Name (First Name)

**9.c.** Middle Name

Parent 2's Name at Birth (if different than above)

**10.a.** Family Name (Last Name)

**10.b.** Given Name (First Name)

**10.c.** Middle Name

**11.** Date of Birth (mm/dd/yyyy)

**12.** Sex   ☐ Male   ☐ Female

**13.** City or Town of Birth

**14.** Country of Birth

**15.** Current City or Town of Residence (if living)

**16.** Current Country of Residence (if living)

## Part 5.  Information About Your Marital History

**1.** What is your current marital status?

☐ Single, Never Married   ☐ Married   ☐ Divorced

☐ Widowed   ☐ Marriage Annulled

☐ Legally Separated

**2.** If you are married, is your spouse a current member of the U.S. armed forces or U.S. Coast Guard?

☐ N/A   ☐ Yes   ☐ No

**3.** How many times have you been married (including annulled marriages and marriages to the same person)?

### Information About Your Current Marriage (including if you are legally separated)

If you are currently married, provide the following information about your current spouse.

Current Spouse's Legal Name

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

**5.** A-Number (if any)

▶ **A-** [ ][ ][ ][ ][ ][ ][ ][ ][ ]

**6.** Current Spouse's Date of Birth (mm/dd/yyyy)

**7.** Date of Marriage to Current Spouse (mm/dd/yyyy)

Current Spouse's Place of Birth

**8.a.** City or Town

**8.b.** State or Province

**8.c.** Country

Place of Marriage to Current Spouse

**9.a.** City or Town

**9.b.** State or Province

**9.c.** Country

**10.** Is your current spouse applying with you?   ☐ Yes   ☐ No

004025

A-Number ▶ A- [               ]

## Part 5. Information About Your Marital History (continued)

### Information About Prior Marriages *(if any)*

If you have been married before, whether in the United States or in any other country, provide the following information about your prior spouse. If you have had more than one previous marriage, use the space provided in **Part 14. Additional Information** to provide the information below.

Prior Spouse's Legal Name (provide family name before marriage)

**11.a.** Family Name
(Last Name) [               ]

**11.b.** Given Name
(First Name) [               ]

**11.c.** Middle Name [               ]

**12.** Prior Spouse's Date of Birth (mm/dd/yyyy) [          ]

**13.** Date of Marriage to Prior Spouse (mm/dd/yyyy) [          ]

Place of Marriage to Prior Spouse

**14.a.** City or Town
[               ]

**14.b.** State or Province
[               ]

**14.c.** Country
[               ]

**15.** Date Marriage with Prior Spouse Legally Ended
(mm/dd/yyyy) [          ]

Place Where Marriage with Prior Spouse Legally Ended

**16.a.** City or Town
[               ]

**16.b.** State or Province
[               ]

**16.c.** Country
[               ]

## Part 6. Information About Your Children

**1.** Indicate the total number of ALL living children (including adult sons and daughters) that you have.

**NOTE:** The term "children" includes all biological or legally adopted children, as well as current stepchildren, of any age, whether born in the United States or other countries, married or unmarried, living with you or elsewhere and includes any missing children and those born to you outside of marriage. [          ]

Provide the following information for each of your children. If you have more than three children, use the space provided in **Part 14. Additional Information**.

Child 1

Current Legal Name

**2.a.** Family Name
(Last Name) [               ]

**2.b.** Given Name
(First Name) [               ]

**2.c.** Middle Name [               ]

**3.** A-Number (if any)
▶ A- [               ]

**4.** Date of Birth (mm/dd/yyyy) [               ]

**5.** Country of Birth
[               ]

**6.** Is this child applying with you? ☐ Yes ☐ No

Child 2

Current Legal Name

**7.a.** Family Name
(Last Name) [               ]

**7.b.** Given Name
(First Name) [               ]

**7.c.** Middle Name [               ]

**8.** A-Number (if any)
▶ A- [               ]

**9.** Date of Birth (mm/dd/yyyy) [               ]

**10.** Country of Birth
[               ]

**11.** Is this child applying with you? ☐ Yes ☐ No

A-Number ▶ A-

## Part 6.  Information About Your Children (continued)

Child 3

Current Legal Name

**12.a.** Family Name (Last Name)

**12.b.** Given Name (First Name)

**12.c.** Middle Name

**13.** A-Number (if any)  ▶ A-

**14.** Date of Birth (mm/dd/yyyy)

**15.** Country of Birth

**16.** Is this child applying with you?   ☐ Yes  ☐ No

## Part 7.  Biographic Information

**1.** Ethnicity (Select **only one** box)
- ☐ Hispanic or Latino
- ☐ Not Hispanic or Latino

**2.** Race (Select **all applicable** boxes)
- ☐ White
- ☐ Asian
- ☐ Black or African American
- ☐ American Indian or Alaska Native
- ☐ Native Hawaiian or Other Pacific Islander

**3.** Height          Feet ☐   Inches ☐

**4.** Weight          Pounds ☐ ☐ ☐

**5.** Eye Color (Select **only one** box)
- ☐ Black      ☐ Blue       ☐ Brown
- ☐ Gray       ☐ Green      ☐ Hazel
- ☐ Maroon     ☐ Pink       ☐ Unknown/Other

**6.** Hair Color (Select **only one** box)
- ☐ Bald (No hair)  ☐ Black   ☐ Blond
- ☐ Brown           ☐ Gray    ☐ Red
- ☐ Sandy           ☐ White   ☐ Unknown/Other

## Part 8.  General Eligibility and Inadmissibility Grounds

**1.** Have you **EVER** been a member of, involved in, or in any way associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world including any military service?   ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 1.**, complete **Item Numbers 2. - 13.b.** below.  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.  If you answered "No," but are unsure of your answer, provide an explanation of the events and circumstances in the space provided in **Part 14. Additional Information**.

Organization 1

**2.** Name of Organization

**3.a.** City or Town

**3.b.** State or Province

**3.c.** Country

**4.** Nature of Group

Dates of Membership or Dates of Involvement

**5.a.** From (mm/dd/yyyy)

**5.b.** To (mm/dd/yyyy)

Organization 2

**6.** Name of Organization

**7.a.** City or Town

**7.b.** State or Province

**7.c.** Country

**8.** Nature of Group

A-Number ▶ A-

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

Dates of Membership or Dates of Involvement

**9.a.** From (mm/dd/yyyy)

**9.b.** To (mm/dd/yyyy)

Organization 3

**10.** Name of Organization

**11.a.** City or Town

**11.b.** State or Province

**11.c.** Country

**12.** Nature of Group

Dates of Membership or Dates of Involvement

**13.a.** From (mm/dd/yyyy)

**13.b.** To (mm/dd/yyyy)

Answer **Item Numbers 14. - 86.b.** Choose the answer that you think is correct.  If you answer "Yes" to any questions **(or if you answer "No," but are unsure of your answer)**, provide an explanation of the events and circumstances in the space provided in **Part 14. Additional Information**.

**14.** Have you **EVER** been denied admission to the United States? ☐ Yes ☐ No

**15.** Have you **EVER** been denied a visa to the United States? ☐ Yes ☐ No

**16.** Have you **EVER** worked in the United States without authorization? ☐ Yes ☐ No

**17.** Have you **EVER** violated the terms or conditions of your nonimmigrant status? ☐ Yes ☐ No

**18.** Are you presently or have you **EVER** been in removal, exclusion, rescission, or deportation proceedings? ☐ Yes ☐ No

**19.** Have you **EVER** been issued a final order of exclusion, deportation, or removal? ☐ Yes ☐ No

**20.** Have you **EVER** had a prior final order of exclusion, deportation, or removal reinstated? ☐ Yes ☐ No

**21.** Have you **EVER** held lawful permanent resident status which was later rescinded? ☐ Yes ☐ No

**22.** Have you **EVER** been granted voluntary departure by an immigration officer or an immigration judge but failed to depart within the allotted time? ☐ Yes ☐ No

**23.** Have you **EVER** applied for any kind of relief or protection from removal, exclusion, or deportation? ☐ Yes ☐ No

**24.a.** Have you **EVER** been a J nonimmigrant exchange visitor who was subject to the two-year foreign residence requirement? ☐ Yes ☐ No

If you answered "Yes" to **Item Number 24.a.**, complete **Item Numbers 24.b. - 24.c.**  If you answered "No" to **Item Number 24.a.**, skip to **Item Number 25.**

**24.b.** Have you complied with the foreign residence requirement? ☐ Yes ☐ No

**24.c.** Have you been granted a waiver or has Department of State issued a favorable waiver recommendation letter for you? ☐ Yes ☐ No

### Criminal Acts and Violations

For **Item Numbers 25. - 45.**, you must answer "Yes" to any question that applies to you, even if your records were sealed or otherwise cleared, or unless someone, including a judge, law enforcement officer, or attorney, told you that you no longer have a record.  You must also answer "Yes" to the following questions whether the action or offense occurred here in the United States or anywhere else in the world.  If you answer "Yes" to **Item Numbers 25. - 45.**, use the space provided in **Part 14. Additional Information** to provide an explanation that includes why you were arrested, cited, detained, or charged; where you were arrested, cited, detained, or charged; when (date) the event occurred; and the outcome or disposition (for example, no charges filed, charges dismissed, jail, probation, community service).

**25.** Have you **EVER** been arrested, cited, charged, or detained for any reason by any law enforcement official (including but not limited to any U.S. immigration official or any official of the U.S. armed forces or U.S. Coast Guard)? ☐ Yes ☐ No

**26.** Have you **EVER** committed a crime of any kind (even if you were not arrested, cited, charged with, or tried for that crime)? ☐ Yes ☐ No

A-Number ▶ A-

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

**27.** Have you **EVER** pled guilty to or been convicted of a crime or offense (even if the violation was subsequently expunged or sealed by a court, or if you were granted a pardon, amnesty, a rehabilitation decree, or other act of clemency)?

☐ Yes ☐ No

**NOTE:** If you were the beneficiary of a pardon, amnesty, a rehabilitation decree, or other act of clemency, provide documentation of that post-conviction action.

**28.** Have you **EVER** been ordered punished by a judge or had conditions imposed on you that restrained your liberty (such as a prison sentence, suspended sentence, house arrest, parole, alternative sentencing, drug or alcohol treatment, rehabilitative programs or classes, probation, or community service)?

☐ Yes ☐ No

**29.** Have you **EVER** been a defendant or the accused in a criminal proceeding (including pre-trial diversion, deferred prosecution, deferred adjudication, or any withheld adjudication)?

☐ Yes ☐ No

**30.** Have you **EVER** violated (or attempted or conspired to violate) any controlled substance law or regulation of a state, the United States, or a foreign country?

☐ Yes ☐ No

**31.** Have you **EVER** been convicted of two or more offenses (other than purely political offenses) for which the combined sentences to confinement were five years or more?

☐ Yes ☐ No

**32.** Have you **EVER** illicitly (illegally) trafficked or benefited from the trafficking of any controlled substances, such as chemicals, illegal drugs, or narcotics?

☐ Yes ☐ No

**33.** Have you **EVER** knowingly aided, abetted, assisted, conspired, or colluded in the illicit trafficking of any illegal narcotic or other controlled substances?

☐ Yes ☐ No

**34.** Are you the spouse, son, or daughter of a foreign national who illicitly trafficked or aided (or otherwise abetted, assisted, conspired, or colluded) in the illicit trafficking of a controlled substance, such as chemicals, illegal drugs, or narcotics and you obtained, within the last five years, any financial or other benefit from the illegal activity of your spouse or parent, although you knew or reasonably should have known that the financial or other benefit resulted from the illicit activity of your spouse or parent?

☐ Yes ☐ No

**35.** Have you **EVER** engaged in prostitution or are you coming to the United States to engage in prostitution?

☐ Yes ☐ No

**36.** Have you **EVER** directly or indirectly procured (or attempted to procure) or imported prostitutes or persons for the purpose of prostitution?

☐ Yes ☐ No

**37.** Have you **EVER** received any proceeds or money from prostitution?

☐ Yes ☐ No

**38.** Do you intend to engage in illegal gambling or any other form of commercialized vice, such as prostitution, bootlegging, or the sale of child pornography, while in the United States?

☐ Yes ☐ No

**39.** Have you **EVER** exercised immunity (diplomatic or otherwise) to avoid being prosecuted for a criminal offense in the United States?

☐ Yes ☐ No

**40.** Have you **EVER**, while serving as a foreign government official, been responsible for or directly carried out violations of religious freedoms?

☐ Yes ☐ No

**41.** Have you **EVER** induced by force, fraud, or coercion (or otherwise been involved in) the trafficking of persons for commercial sex acts?

☐ Yes ☐ No

**42.** Have you **EVER** trafficked a person into involuntary servitude, peonage, debt bondage, or slavery?  Trafficking includes recruiting, harboring, transporting, providing, or obtaining a person for labor or services through the use of force, fraud, or coercion.

☐ Yes ☐ No

**43.** Have you **EVER** knowingly aided, abetted, assisted, conspired, or colluded with others in trafficking persons for commercial sex acts or involuntary servitude, peonage, debt bondage, or slavery?

☐ Yes ☐ No

**44.** Are you the spouse, son or daughter of a foreign national who engaged in the trafficking of persons and have received or obtained, within the last five years, any financial or other benefits from the illicit activity of your spouse or your parent, although you knew or reasonably should have known that this benefit resulted from the illicit activity of your spouse or parent?

☐ Yes ☐ No

**45.** Have you **EVER** engaged in money laundering or have you **EVER** knowingly aided, assisted, conspired, or colluded with others in money laundering or do you seek to enter the United States to engage in such activity?

☐ Yes ☐ No

A-Number ▶ A-

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

### Security and Related

Do you intend to:

**46.a.** Engage in any activity that violates or evades any law relating to espionage (including spying) or sabotage in the United States?  ☐ Yes ☐ No

**46.b.** Engage in any activity in the United States that violates or evades any law prohibiting the export from the United States of goods, technology, or sensitive information?  ☐ Yes ☐ No

**46.c.** Engage in any activity whose purpose includes opposing, controlling, or overthrowing the U.S. Government by force, violence, or other unlawful means while in the United States?  ☐ Yes ☐ No

**46.d.** Engage in any activity that could endanger the welfare, safety, or security of the United States?  ☐ Yes ☐ No

**46.e.** Engage in any other unlawful activity?  ☐ Yes ☐ No

**47.** Are you engaged in or, upon your entry into the United States, do you intend to engage in any activity that could have potentially serious adverse foreign policy consequences for the United States?  ☐ Yes ☐ No

Have you **EVER**:

**48.a.** Committed, threatened to commit, attempted to commit, conspired to commit, incited, endorsed, advocated, planned, or prepared any of the following:  hijacking, sabotage, kidnapping, political assassination, or use of a weapon or explosive to harm another individual or cause substantial damage to property?  ☐ Yes ☐ No

**48.b.** Participated in, or been a member of, a group or organization that did any of the activities described in **Item Number 48.a.**?  ☐ Yes ☐ No

**48.c.** Recruited members or asked for money or things of value for a group or organization that did any of the activities described in **Item Number 48.a.**?  ☐ Yes ☐ No

**48.d.** Provided money, a thing of value, services or labor, or any other assistance or support for any of the activities described in **Item Number 48.a.**?  ☐ Yes ☐ No

**48.e.** Provided money, a thing of value, services or labor, or any other assistance or support for an individual, group, or organization who did any of the activities described in **Item Number 48.a.**?  ☐ Yes ☐ No

**49.** Have you **EVER** received any type of military, paramilitary, or weapons training?  ☐ Yes ☐ No

**50.** Do you intend to engage in any of the activities listed in any part of **Item Numbers 48.a. - 49.**?  ☐ Yes ☐ No

**NOTE:**  If you answered "Yes" to any part of **Item Numbers 46.a. - 50.**, explain what you did, including the dates and location of the circumstances, or what you intend to do in the space provided in **Part 14. Additional Information**.

Are you the spouse or child of an individual who **EVER**:

**51.a.** Committed, threatened to commit, attempted to commit, conspired to commit, incited, endorsed, advocated, planned, or prepared any of the following:  hijacking, sabotage, kidnapping, political assassination, or use of a weapon or explosive to harm another individual or cause substantial damage to property?  ☐ Yes ☐ No

**51.b.** Participated in, or been a member or a representative of a group or organization that did any of the activities described in **Item Number 51.a.**?  ☐ Yes ☐ No

**51.c.** Recruited members, or asked for money or things of value, for a group or organization that did any of the activities described in **Item Number 51.a.**?  ☐ Yes ☐ No

**51.d.** Provided money, a thing of value, services or labor, or any other assistance or support for any of the activities described in **Item Number 51.a.**?  ☐ Yes ☐ No

**51.e.** Provided money, a thing of value, services or labor, or any other assistance or support to an individual, group, or organization who did any of the activities described in **Item Number 51.a.**?  ☐ Yes ☐ No

**51.f.** Received any type of military, paramilitary, or weapons training from a group or organization that did any of the activities described in **Item Number 51.a.**?  ☐ Yes ☐ No

**NOTE:**  If you answered "Yes" to any part of **Item Number 51.**, explain the relationship and what occurred, including the dates and location of the circumstances, in the space provided in **Part 14. Additional Information.**

**52.** Have you **EVER** assisted or participated in selling, providing, or transporting weapons to any person who, to your knowledge, used them against another person?  ☐ Yes ☐ No

A-Number ▶ A-

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

**53.** Have you **EVER** worked, volunteered, or otherwise served in any prison, jail, prison camp, detention facility, labor camp, or any other situation that involved detaining persons? ☐ Yes ☐ No

**54.** Have you **EVER** been a member of, assisted, or participated in any group, unit, or organization of any kind in which you or other persons used any type of weapon against any person or threatened to do so? ☐ Yes ☐ No

**55.** Have you **EVER** served in, been a member of, assisted, or participated in any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, rebel group, guerilla group, militia, insurgent organization, or any other armed group? ☐ Yes ☐ No

**56.** Have you **EVER** been a member of, or in any way affiliated with, the Communist Party or any other totalitarian party (in the United States or abroad)? ☐ Yes ☐ No

**57.** During the period from March 23, 1933 to May 8, 1945, did you ever order, incite, assist, or otherwise participate in the persecution of any person because of race, religion, national origin, or political opinion, in association with either the Nazi government of Germany or any organization or government associated or allied with the Nazi government of Germany? ☐ Yes ☐ No

Have you **EVER** ordered, incited, called for, committed, assisted, helped with, or otherwise participated in any of the following:

**58.a.** Acts involving torture or genocide? ☐ Yes ☐ No

**58.b.** Killing any person? ☐ Yes ☐ No

**58.c.** Intentionally and severely injuring any person? ☐ Yes ☐ No

**58.d.** Engaging in any kind of sexual contact or relations with any person who did not consent or was unable to consent, or was being forced or threatened? ☐ Yes ☐ No

**58.e.** Limiting or denying any person's ability to exercise religious beliefs? ☐ Yes ☐ No

**59.** Have you **EVER** recruited, enlisted, conscripted, or used any person under 15 years of age to serve in or help an armed force or group? ☐ Yes ☐ No

**60.** Have you **EVER** used any person under 15 years of age to take part in hostilities, or to help or provide services to people in combat? ☐ Yes ☐ No

**NOTE:**  If you answered "Yes" to any part of **Item Numbers 52. - 60.**, explain what occurred, including the dates and location of the circumstances, in the space provided in **Part 14. Additional Information.**

### Public Charge

**61.** Are you subject to the public charge ground of inadmissibility under INA section 212(a)(4)? ☐ Yes ☐ No

If you answered  "Yes" to **Item Number 61.**, complete **Item Numbers 62. - 68.d.** below.  If you answered "No" to **Item Number 61.**, go to **Item Number 69.a.**  If you need extra space to complete this section, use the space provided in **Part 14. Additional Information**.

**62.** What is the size of your household?

**63.** Indicate your annual household income.
- ☐ $0-27,000
- ☐ $27,001-52,000
- ☐ $52,001-85,000
- ☐ $85,001-141,000
- ☐ Over $141,000

**64.** Identify the total value of your household assets.
- ☐ $0-18,400
- ☐ $18,401-136,000
- ☐ $136,001-321,400
- ☐ $321,401-707,100
- ☐ Over $707,100

A-Number ▶ A-

## Part 8. General Eligibility and Inadmissibility Grounds (continued)

**65.**  Identify the total value of your household liabilities (including both secured and unsecured liabilities).

☐ $0   ☐ $1-10,100   ☐ $10,101-57,700   ☐ $57,701-186,800   ☐ Over $186,800

**66.**  What is the highest degree or level of school you have completed?

☐ Grades 1 through 11   ☐ 12th grade  - no diploma   ☐ High school diploma, GED, or alternative credential

☐ 1 or more years of college credit, no degree   ☐ Associate's degree   ☐ Bachelor's degree

☐ Master's degree   ☐ Professional degree (JD, MD, DMD, etc.)   ☐ Doctorate degree

**67.**  List your certifications, licenses, skills obtained through work experience, and educational certificates.

_____

_____

_____

_____

_____

_____

_____

**68.a.**  Have you ever received Supplemental Security Income (SSI), Temporary Assistance for Needy Families (TANF), or State, Tribal, territorial, or local, cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names)?   ☐ Yes   ☐ No

**68.b.**  Have you ever received long-term institutionalization at government expense?   ☐ Yes   ☐ No

**68.c.**  If your answer to **Item Number 68.a.** is "Yes," list the specific benefit(s) you received, the start and end dates of each period of receipt, and the dollar amount of benefits received.

| Benefit Received | Start Date | End Date | Dollar Amount |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**68.d.**  If your answer to **Item Number 68.b.** is "Yes," list the name, city, and state for each institution, the start and end dates of each period of institutionalization, and the reason you were institutionalized.

| Institution Name/City/State | Date From | Date To | Reason |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

A-Number ▶ A-  ☐☐☐☐☐☐☐☐☐

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

### *Illegal Entries and Other Immigration Violations*

**69.a.** Have you **EVER** failed or refused to attend or to remain in attendance at any removal proceeding filed against you on or after April 1, 1997? ☐ Yes ☐ No

**69.b.** If your answer to **Item Number 69.a.** is "Yes," do you believe you had reasonable cause? ☐ Yes ☐ No

**69.c.** If your answer to **Item Number 69.b.** is "Yes," attach a written statement explaining why you had reasonable cause.

**70.** Have you **EVER** submitted fraudulent or counterfeit documentation to any U.S. Government official to obtain or attempt to obtain any immigration benefit, including a visa or entry into the United States? ☐ Yes ☐ No

**71.** Have you **EVER** lied about, concealed, or misrepresented any information on an application or petition to obtain a visa, other documentation required for entry into the United States, admission to the United States, or any other kind of immigration benefit? ☐ Yes ☐ No

**72.** Have you **EVER** falsely claimed to be a U.S. citizen (in writing or any other way)? ☐ Yes ☐ No

**73.** Have you **EVER** been a stowaway on a vessel or aircraft arriving in the United States? ☐ Yes ☐ No

**74.** Have you **EVER** knowingly encouraged, induced, assisted, abetted, or aided any foreign national to enter or to try to enter the United States illegally (alien smuggling)? ☐ Yes ☐ No

**75.** Are you under a final order of civil penalty for violating INA section 274C for use of fraudulent documents? ☐ Yes ☐ No

### *Removal, Unlawful Presence, or Illegal Reentry After Previous Immigration Violations*

**76.** Have you **EVER** been excluded, deported, or removed from the United States or have you ever departed the United States on your own after having been ordered excluded, deported, or removed from the United States? ☐ Yes ☐ No

**77.** Have you **EVER** entered the United States without being inspected and admitted or paroled? ☐ Yes ☐ No

Since April 1, 1997, have you been unlawfully present in the United States:

**78.a.** For more than 180 days but less than a year, and then departed the United States? ☐ Yes ☐ No

**78.b.** For one year or more and then departed the United States? ☐ Yes ☐ No

**NOTE:**  You were unlawfully present in the United States if you entered the United States without being inspected and admitted or inspected and paroled, or if you legally entered the United States but you stayed longer than permitted.

Since April 1, 1997, have you **EVER** reentered or attempted to reenter the United States without being inspected and admitted or paroled after:

**79.a.** Having been unlawfully present in the United States for more than one year in the aggregate? ☐ Yes ☐ No

**79.b.** Having been deported, excluded, or removed from the United States? ☐ Yes ☐ No

### *Miscellaneous Conduct*

**80.** Do you plan to practice polygamy in the United States? ☐ Yes ☐ No

**81.** Are you accompanying another foreign national who requires your protection or guardianship but who is inadmissible after being certified by a medical officer as being helpless from sickness, physical or mental disability, or infancy, as described in INA section 232(c)? ☐ Yes ☐ No

**82.** Have you **EVER** assisted in detaining, retaining, or withholding custody of a U.S. citizen child outside the United States from a U.S. citizen who has been granted custody of the child? ☐ Yes ☐ No

**83.** Have you **EVER** voted in violation of any Federal, state, or local constitutional provision, statute, ordinance, or regulation in the United States? ☐ Yes ☐ No

**84.** Have you **EVER** renounced U.S. citizenship to avoid being taxed by the United States? ☐ Yes ☐ No

Have you **EVER:**

**85.a.** Applied for exemption or discharge from training or service in the U.S. armed forces or in the U.S. National Security Training Corps on the ground that you are a foreign national? ☐ Yes ☐ No

A-Number ▶  A-

## Part 8.  General Eligibility and Inadmissibility Grounds (continued)

**85.b.** Been relieved or discharged from such training or service on the ground that you are a foreign national?  ☐ Yes ☐ No

**85.c.** Been convicted of desertion from the U.S. armed forces?  ☐ Yes ☐ No

**86.a.** Have you **EVER** left or remained outside the United States to avoid or evade training or service in the U.S. armed forces in time of war or a period declared by the President to be a national emergency? ☐ Yes ☐ No

**86.b.** If your answer to **Item Number 86.a.** is "Yes," what was your nationality or immigration status immediately before you left (for example, U.S. citizen or national, lawful permanent resident, nonimmigrant, parolee, present without admission or parole, or any other status)?

## Part 9.  Accommodations for Individuals With Disabilities and/or Impairments

**NOTE:**  Read the information in the Form I-485 Instructions before completing this part.

**1.** Are you requesting an accommodation because of your disabilities and/or impairments?  ☐ Yes ☐ No

If you answered "Yes" to **Item Number 1.**, select any applicable box in **Item Numbers 2.a. - 2.c.** and provide an answer.

**2.a.** ☐ I am deaf or hard of hearing and request the following accommodation.  (If you are requesting a sign-language interpreter, indicate for which language (for example, American Sign Language).):

**2.b.** ☐ I am blind or have low vision and request the following accommodation:

**2.c.** ☐ I have another type of disability and/or impairment. (Describe the nature of your disability and/or impairment and the accommodation you are requesting.)

## Part 10.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:**  Read the **Penalties** section of the Form I-485 Instructions before completing this part.  You must file Form I-485 while in the United States.

### Applicant's Statement

**NOTE:**  Select the box for either **Item Number 1.a.** or **1.b.**  If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 11.** read to me every question and instruction on this application and my answer to every question in

a language in which I am fluent, and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 12.**,

prepared this application for me based only upon information I provided or authorized.

### Applicant's Contact Information

**3.** Applicant's Daytime Telephone Number

**4.** Applicant's Mobile Telephone Number (if any)

**5.** Applicant's Email Address (if any)

A-Number ▶ A-

## Part 10.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature (continued)

### Applicant's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I understand that if I am a male who is 18 to 26 years of age, submitting this application will automatically register me with the Selective Service System as required by the Military Selective Service Act.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1)  I reviewed and understood all of the information contained in, and submitted with, my application; and

2)  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### Applicant's Signature

**6.a.** Applicant's Signature (sign in ink)

▶

**6.b.** Date of Signature (mm/dd/yyyy)

**NOTE TO ALL APPLICANTS:**  If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 11.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

A-Number ▶ A-

## Part 11.  Interpreter's Contact Information Certification, and Signature (continued)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and

which is the same specified in **Part 10.**, **Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question.  The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.**  Interpreter's Signature (sign in ink)

**7.b.**  Date of Signature (mm/dd/yyyy)

## Part 12.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.**  Preparer's Family Name (Last Name)

**1.b.**  Preparer's Given Name (First Name)

**2.**  Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.**  Street Number and Name

**3.b.**  ☐ Apt.  ☐ Ste.  ☐ Flr.

**3.c.**  City or Town

**3.d.**  State          **3.e.**  ZIP Code

**3.f.**  Province

**3.g.**  Postal Code

**3.h.**  Country

### Preparer's Contact Information

**4.**  Preparer's Daytime Telephone Number

**5.**  Preparer's Mobile Telephone Number (if any)

**6.**  Preparer's Email Address (if any)

### Preparer's Statement

**7.a.**  ☐  I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

**7.b.**  ☐  I am an attorney or accredited representative and my representation of the applicant in this case ☐ extends ☐ does not extend beyond the preparation of this application.

**NOTE:**  If you are an attorney or accredited representative, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

A-Number ► A-

## Part 12.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant (continued)

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant.  The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.a.**   Preparer's Signature (sign in ink)

**8.b.**   Date of Signature (mm/dd/yyyy)

---

**NOTE:  Do not complete Part 13. until the USCIS Officer instructs you to do so at the interview.**

---

## Part 13.  Signature at Interview

I swear (affirm) and certify under penalty of perjury under the laws of the United States of America that I know that the contents of this Form I-485, Application to Register Permanent Residence or Adjust Status, subscribed by me, including the corrections made to this application, **numbered** [ ] **through** [ ], are complete, true, and correct.  All additional pages submitted by me with this Form I-485, **on numbered pages** [ ] **through** [ ] are complete, true, and correct.  All documents submitted at this interview were provided by me and are complete, true, and correct.

Subscribed to and sworn to (affirmed) before me

USCIS Officer's Printed Name or Stamp

Date of Signature (mm/dd/yyyy)

Applicant's Signature (sign in ink)

USCIS Officer's Signature (sign in ink)

A-Number  ▶  **A-**

## Part 14.  Additional Information

If you need extra space to provide any additional information within this application, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number, Part Number,** and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.**  Family Name
(Last Name)

**1.b.**  Given Name
(First Name)

**1.c.**  Middle Name

**2.**  A-Number (if any)  ▶  **A-**

**3.a.**  Page Number    **3.b.**  Part Number    **3.c.**  Item Number

**3.d.**

**4.a.**  Page Number    **4.b.**  Part Number    **4.c.**  Item Number

**4.d.**

**5.a.**  Page Number    **5.b.**  Part Number    **5.c.**  Item Number

**5.d.**

**6.a.**  Page Number    **6.b.**  Part Number    **6.c.**  Item Number

**6.d.**

**7.a.**  Page Number    **7.b.**  Part Number    **7.c.**  Item Number

**7.d.**

004038



# Instructions for Application to Register
# Permanent Residence or Adjust Status

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-485**

OMB No. 1615-0023
Expires 02/28/2026

| Table of Contents | |
|---|---|

**Form I-485 Main Instructions** — **Page**

What Is the Purpose of Form I-485? — **2**

Who May File Form I-485? — **2**

Who May Not Be Eligible to Adjust Status? — **3**

When Should I File Form I-485? — **4**

General Instructions — **4**

What Evidence Must You Submit with Form I-485? — **10**

Where To File? — **16**

Address Change — **16**

Processing Information — **16**

USCIS Forms and Information — **17**

Penalties — **17**

USCIS Compliance Review and Monitoring — **17**

USCIS Privacy Act Statement — **18**

Paperwork Reduction Act — **18**

Checklist — **18**

**Additional Instructions**

Additional Instructions — **19**

Additional Instructions for Family-Based Applicants — **19**

Additional Instructions for Employment-Based Applicants — **21**

Additional Instructions for Special Immigrants — **22**

Additional Instructions for Human Trafficking Victims and Crime Victims — **23**

Additional Instructions for Asylees and Refugees — **29**

Additional Instructions for Applicants Filing Under Special Adjustment Programs — **30**

Additional Categories — **37**

004039

## What Is the Purpose of Form I-485?

Form I-485, Application to Register Permanent Residence or Adjust Status, is used by a person in the United States to apply for lawful permanent resident status.  Throughout these Instructions, we will sometimes refer to Form I-485 as an application for adjustment of status or as an adjustment application.

## Who May File Form I-485?

The Immigration and Nationality Act (INA) and certain other Federal laws provide many different ways to adjust status to that of a lawful permanent resident.  This is often informally referred to as applying for a "green card."

The eligibility requirements for adjustment of status may vary depending on the immigrant category you are applying under.  For more information on adjustment of status eligibility and discretion, go to the U.S. Citizenship and Immigration Services (USCIS) website at **www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-status**.  Furthermore, you must be **physically present** in the United States to file this application.

You may apply as the person who directly qualifies for an immigrant category ("principal applicant") or, in some cases, as a family member of the principal applicant ("derivative applicant").  Whether you are a principal or derivative applicant, you must file your own Form I-485.

1. **Principal Applicant**

   The principal applicant is usually the individual named as the beneficiary of an immigrant petition or who is otherwise qualified to adjust status.  A principal applicant must designate which immigrant category he or she is applying under by selecting the appropriate box listed on Form I-485, **Part 2. Application Type or Filing Category, Item Numbers 1.a. - 1.g.**

   Each category has specific requirements for adjustment of status.  In addition to these Instructions, read the **Additional Instructions** (found after the Form I-485 Main Instructions) for your immigrant category to determine if any additional requirements apply to you.

2. **Derivative Applicant** (files based on a principal applicant)

   A principal applicant's spouse and children, who are not beneficiaries of their own immigrant petition, may be eligible to apply for adjustment under the same immigrant category as the principal applicant.  These family members are called "derivative applicants."  A derivative applicant must designate which immigrant category he or she is applying under by selecting the appropriate box listed on Form I-485, **Part 2. Application Type or Filing Category, Item Numbers 1.a. - 1.g.**

   Some immigrant categories do not allow for derivative applicants, while a few categories allow additional family members to apply as derivative applicants.  See the **Additional Instructions** for more details.

   Under U.S. immigration law, you are a "child" if you are unmarried, under 21 years of age, and meet the definition of "child" found in the INA and USCIS policy guidance.  Visit **www.uscis.gov/tools/glossary** for more information on the definition of "child."  You may still be considered a child for immigration purposes even after turning 21 years of age if you qualify under the provisions of the Child Status Protection Act (CSPA).  For more information on CSPA, see **www.uscis.gov/green-card/green-card-processes-and-procedures/child-status-protection-act/child-status-protection-act-cspa**.

3. **Other Immigrant Categories**

   If you are filing for adjustment of status based on an immigrant category not listed in **Part 2.**, **Item Numbers 1.a. - 1.g.**, select the "Other Eligibility" box in **Item Number 1.g.** and type or print the immigrant category you are applying under.  These immigrant categories include, but are not limited to:

   A. Special immigrants not listed in **Part 2.**, **Item Number 1.c.** (for example, certain U.S. armed forces members, Panama Canal Zone employees, and physicians);

004040

**B.**  Polish or Hungarian parolee;

**C.**  Private immigration bill signed into law; and

**D.**  Registration of lawful permanent residence status based on a presumption of lawful admission.

If you would like more information on how to file under any of these categories, call the USCIS Contact Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833** or visit **www.uscis.gov/green-card/other-ways-get-green-card**.

---

## Who May Not Be Eligible to Adjust Status?

**Bars to Adjustment of Status**

You are generally ineligible for adjustment of status if one or more adjustment bars in INA sections 245(a), (c), (d), and/or (e) apply to you.  However, adjustment bars do not apply to every type of immigrant category and your category might exempt you from certain adjustment bars.  For example, certain adjustment bars do not apply to immediate relatives of U.S. citizens, Violence Against Women Act (VAWA)-based applicants, or certain special immigrants.  In addition, some employment-based applicants might be eligible for an exemption to some adjustment bars.  For more information, visit **https://www.uscis.gov/forms/explore-my-options/green-card-eligibility**.

**Exception Under INA section 245(i)**

You may be able to adjust status under INA section 245(i) even if you are subject to one or more adjustment bars and are therefore ineligible for adjustment of status under INA section 245(a).  See separate instructions for adjusting status under INA section 245(i), titled "**Instructions for Supplement A to Form I-485, Adjustment of Status Under Section 245(i).**"

INA section 245(i) is not an immigrant category by itself.  In order to adjust status using INA section 245(i), you must be eligible for an immigrant visa under a family-based, employment-based, special immigrant, or Diversity Visa category.  You must select one of the immigrant categories listed in **Part 2.**, **Item Numbers 1.a. - 1.g.** as the basis for your application for adjustment of status.  See the **Additional Instructions** for more information on your specific immigrant category.

**Grounds of Inadmissibility**

Immigration laws specify acts, conditions, and conduct that can make foreign nationals ineligible for lawful permanent resident status.  These acts, conditions, and conduct are outlined in INA section 212(a) and are called **grounds of inadmissibility**.  For more information, visit **https://www.uscis.gov/forms/explore-my-options/green-card-eligibility**.

You are inadmissible to the United States and may not adjust status to a lawful permanent resident if you fall under one or more of the grounds of inadmissibility that apply to your immigrant category.  Depending on your immigrant category, some grounds may not apply to you.

If you are inadmissible, you may be eligible for a waiver of the ground of inadmissibility or another form of relief.  If your waiver application or other form of relief is granted, your application to adjust status may be approved.

**Exchange Visitors**

If you are or were a J-1 or J-2 nonimmigrant exchange visitor and are subject to the 2-year foreign residence requirement of INA section 212(e), you may not apply to adjust status unless you have complied with the foreign residence requirement, have been granted a waiver of that requirement, or were issued a favorable waiver recommendation letter from U.S. Department of State (DOS).

004041

**Certain A, G, and E Nonimmigrants**

If you have A, G, or E nonimmigrant status, or an occupation that would entitle you to such status, and as a result hold certain diplomatic rights, privileges, exemptions, and immunities, you are ineligible for adjustment of status unless you submit a waiver of those rights, privileges, exemptions, and immunities.

## When Should I File Form I-485?

This section provides general information on when you should file Form I-485.

**Principal Applicant**

In general, if you are filing as a beneficiary of an immigrant visa petition (such as Form I-130, Form I-140, or Form I-360), you may file an adjustment application only after USCIS has approved your petition and an immigrant visa number is immediately available.  There are, however, some immigrant categories that allow you to file Form I-485 before USCIS approves your petition (this is known as "concurrent filing"), provided that approval of the petition would make a visa number immediately available and you meet all other filing requirements.  See the **Additional Instructions** for category-specific information on when you may file Form I-485.

Visit the USCIS website at **www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates** for information on visa availability and priority dates, and the DOS website at **www.travel.state.gov/content/visas/en/law-and-policy/bulletin.html** to view the Visa Bulletin.

More information about concurrent filing is available at **www.uscis.gov/green-card/green-card-processes-and-procedures/concurrent-filing** and in the instructions for Forms I-130, I-140, and I-360.

**Derivative Adjustment Applicant**

With the exception of U nonimmigrants, asylees, and refugees, USCIS cannot approve your Form I-485 as a derivative applicant until the principal applicant has been granted lawful permanent resident status.

If you are currently the spouse or child (unmarried and under 21 years of age) of a principal applicant, you may file Form I-485 if an immigrant visa is immediately available to you and you meet all the filing requirements.  You may file at any of the following times:

1.  At the same time the principal applicant files Form I-485;

2.  After the principal applicant filed a Form I-485 that remains pending a final decision by USCIS;

3.  After USCIS approves the principal applicant's Form I-485, if the principal applicant is still a lawful permanent resident and if, at the time of the principal applicant's Form I-485 approval, you were the principal applicant's spouse or child; or

4.  After the principal applicant obtained an immigrant visa and entered the United States as a lawful permanent resident if the principal applicant is still a lawful permanent resident and, at the time of the principal applicant's entry, you were the principal applicant's spouse or child.

## General Instructions

We provide free forms through the USCIS website.  To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Form G-325A, Biographic Information.**  Form G-325A is no longer required.  You do not need to submit a separate Form G-325A with this Form I-485.  **Parts 1.** and **3.** of this Form I-485 meet the requirements of 8 CFR 245.2(a)(3)(i) by collecting the biographical information formerly required on Form G-325A

004042

**Signature.** You (or your signing authority) must properly complete your application. USCIS will not accept a stamped or typewritten name in place of any signature on this application. If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf. (See the **Additional Instructions** that relates to Individuals Born Under Diplomatic Status in the United States, for one exception.) A legal guardian may also sign for a mentally incompetent person. If your application is not signed, or if the signature is not valid, we will reject your application. See 8 CFR 103.2(a)(7)(ii)(A). If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.** USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes. The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.** See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

**Evidence.** At the time of filing, you must submit all evidence and supporting documentation listed in the **What Evidence Must You Submit with Form I-485** section of these Instructions. Evidence requirements may vary depending on the immigrant category you are applying under. See the **Additional Instructions** for information on whether any general evidence requirements do not apply to you, or if you have other evidence requirements specific to your immigrant category.

**Biometric Services Appointment.** USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition. If we determine that a biometric services appointment is necessary, we will send you an appointment notice with the date, time, and location of your appointment. If you are currently overseas, your notice will instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to schedule an appointment.

At your biometrics appointment, you must sign an oath reaffirming that:

1. You provided or authorized all information in the application;

2. You reviewed and understood all of the information contained in, and submitted with, your application; and

3. All of this information was complete, true, and correct at the time of filing.

If you fail to attend your biometric services appointment, we may deny your application.

For applicants and dependents who appear before an immigration judge, failure to attend a biometric services appointment, without good cause, may result in the immigration judge finding that your application was abandoned, and USCIS may also deny any other application you filed with USCIS.

**Copies.** You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document. USCIS may request an original document at any time during our process. If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:** If you submit original documents when they are not required or requested, **USCIS or the Immigration Court may destroy them after we receive them.**

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate, and that they are competent to translate from the foreign language into English. The certification must also include their signature, printed name, the signature date, and their contact information.

**USCIS Contact Center.** For additional information on the application and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call at **800-375-5283** (TTY **800-767-1833**). The USCIS Contact Center provides information in English and Spanish.

**Disability Accommodations/Modifications.** To request a disability accommodation/modification, follow the instructions on your appointment notice or at **www.uscis.gov/accommodationsinfo**.

**Selective Service.** Most males between 18 and 26 years of age are required by the Military Selective Service Act to register with the Selective Service System. Nonimmigrants are not required to register. If USCIS approves your application, we will send your name, current address, Social Security number, date of birth, and the date you filed the application to the Selective Service System for registration. Men can register at a local post office or at the website, **www.sss.gov**.

If USCIS does not approve your application, you are still required to register with the Selective Service System by using another means. If you have already registered, the Selective Service System will check its records to avoid any duplication.

**Acknowledgement of Selective Service.** Review the Selective Service Acknowledgement in **Part 10.** The purpose of this acknowledgement is to confirm that you understand USCIS will be sending your information to the Selective Service System for registration.

### How To Complete Form I-485

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this application, use the space provided in **Part 14. Additional Information** or attach a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A," unless otherwise directed. If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None," unless otherwise directed.

4. **Country of Birth and Country of Citizenship. Part 1., Item Numbers 8. - 9.** and (if applicable), **Part 4., Item Numbers 6. and 14.**, and **Part 6., Item Numbers 5., 10.**, and **15.** Provide the name of the country of your birth and the name of the country of your citizenship. Use the current names of the country of your birth and country of your citizenship. If you do not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 14. Additional Information.**

5. **USCIS Online Account Number (if any).** You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you. If you do not have a receipt number that begins with IOE, you do not have an OAN. The OAN is not the same as an A-Number.

6. **Alternate and/or Safe Address.** If you are filing an adjustment of status application based on VAWA or as a special immigrant juvenile, human trafficking victim (T nonimmigrant), or crime victim (U nonimmigrant) and you do not feel safe receiving mail about this application at your home address, provide an alternative, safe mailing address in **Part 1., Item Numbers 13.a. - 13.f.** This address may be a post office box, the address of a friend, your attorney, a community-based organization that is helping you, or any other address where you can safely and timely receive mail. If you do not provide an alternate, safe address in **Part 1., Item Numbers 13.a. - 13.f.**, USCIS may use the address of the preparer you listed on your Form I-485. If you do not use a preparer and do not provide a safe address, then USCIS will use the U.S. Mailing Address you provide in **Part 1., Item Numbers 12.a. - 12.f.**

004044

7. **Questions regarding Social Security Number (SSN).  Part 1.**, **Item Number 14.** asks if the Social Security Administration (SSA) has ever officially issued you a Social Security Card.  If the SSA ever issued a Social Security card to you in your name or a previously used name such as your maiden name, then you must enter the SSN from your card in **Item Number 15.**

If your application is approved, the SSA may assign you an SSN and issue you a Social Security card, or issue you a replacement card.  If you want the SSA to assign you a Social Security number and issue you a Social Security card, or issue you a new or replacement Social Security card, then answer "Yes" to both **Item Number 16.** and **Item Number 17.**

You are not required to request an SSN using this application.  Completing **Item Numbers 14. - 17.** is optional.  However, you must have an SSN properly assigned in your name to work in the United States.

If your employer uses E-Verify to confirm new employees' eligibility to legally work in the United States, the information you provide on Form I-9, Employment Eligibility Verification, will be compared to data in SSA and DHS databases.  Employees must have an SSN in order for E-Verify to confirm their eligibility to legally work in the United States.

**NOTE:**  Based on existing confidentiality provisions (see 8 U.S.C. 1255a(c)(5) and Section (c)(5) of Pub. L. 106-553), USCIS will not share information with SSA if an applicant files Form I-485 based on the legalization program in Section 245A of the INA or the LIFE Act (Pub. L. 106-553), as amended by the LIFE Act Amendments (Pub. L. 106-544).  Applicants covered by these confidentiality provisions may not waive them and should contact SSA after the approval of their Form I-485.

8. **Form I-94 Arrival/Departure Record.**  If U.S. Customs and Border Protection (CBP) or USCIS issued you a Form I-94, Arrival/Departure Record, provide your Form I-94 number and date that your authorized period of stay expires or expired (as shown on Form I-94).  The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**NOTE:**  If CBP admitted you into the United States at an airport or seaport after April 30, 2013, they may have issued you an electronic Form I-94 instead of a paper Form I-94.  You may visit the CBP website at **www.cbp.gov/i94** to obtain a paper version of your electronic Form I-94.  CBP **does not** charge a fee for this service.  Some travelers may also be able to obtain a replacement Form I-94 from the CBP website for free if they were admitted to the United States at a land border, airport, or seaport after April 30, 2013, with a passport or travel document and received a paper Form I-94 from CBP.  If you cannot obtain your Form I-94 from the CBP website, you may obtain it by filing Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Record, with USCIS.  USCIS does charge a fee for Form I-102.  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

**Passport and Travel Document Numbers.**  If you used a passport or travel document to travel to the United States, enter either the passport or travel document information in the appropriate space on the application, even if the passport or travel document is currently expired.

9. **Biographic Information.**  Provide the biographic information requested in **Part 7.**, **Item Numbers 1. - 6.**  Providing this information as part of your application may reduce the time you spend at your USCIS ASC appointment as described in the **Biometric Services Appointment** section of these Instructions.

   A. **Ethnicity and Race.**  Select the boxes that best describe your ethnicity and race.

   **Categories and Definitions for Ethnicity and Race**

   (1) **Hispanic or Latino.**  A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.  (**NOTE:**  This category is only included under Ethnicity in **Part 7.**, **Item Number 1.**)

   (2) **American Indian or Alaska Native.**  A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

004045

(3) **Asian.**  A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

(4) **Black or African American.**  A person having origins in any of the black racial groups of Africa.

(5) **Native Hawaiian or Other Pacific Islander.**  A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

(6) **White.**  A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

B.  **Height.**  Select the values that best match your height in feet and inches.  For example, if you are five feet and nine inches, select "5" for feet and "09" for inches.  Do not enter your height in meters or centimeters.

C.  **Weight.**  Enter your weight in pounds.  If you do not know your weight, or need to enter a weight under 30 pounds or over 699 pounds, enter "000."  Do not enter your weight in kilograms.

D.  **Eye Color.**  Select the box that best describes the color of your eyes.

E.  **Hair Color.**  Select the box that best describes the color of your hair.

10. **Part 8.  General Eligibility and Inadmissibility Grounds.**  Select the answer you think is correct.  If you answer "Yes" to any questions **(or if you answer "No," but are unsure of your answer)**, provide an explanation of the events and circumstances in the space provided in **Part 14. Additional Information**.

If you answer "Yes" to **Part 8.**, **Item Number 61.**, you are required to complete **Item Numbers 62. - 68.**d.  To find out whether you are subject to the public charge ground of inadmissibility, see the USCIS Policy Manual Volume 8, Part G, Chapter 3 at **https://www.uscis.gov/policy-manual/volume-8-part-g-chapter-3**.

For **Part 8.**, **Item Number 62.**, the following individuals are members of your household and should be includes in your household size:

•    You;

•    Your spouse, if physically residing with you;

•    Your parents, if physically residing with you;

•    Your unmarried siblings under 21 years of age, if physically residing with you;

•    Your children as defined in INA 101(b)(1), if physically residing with you;

•    Any other individuals (including a spouse or child not physically residing with you) who are listed as dependents on your federal income tax return; and

•    Any other individuals who list you as a dependent on their federal income tax return.

For **Part 8.**, **Item Number 63.**, please check the appropriate box for your household's annual income.  You may include income provided to your household from sources who are not members of your household, including but not limited to alimony or child support.  You must exclude any income from Supplemental Security Income (SSI); Temporary Assistance for Needy Families (TANF); State, Tribal, territorial, or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names).  You must also exclude any income from illegal activities or sources such as proceeds from illegal gambling or drug sales.

For **Part 8.**, **Item Number 64.**, please check the appropriate box for the total value of your household assets.  You must exclude any assets from illegal activities or sources such as proceeds from illegal gambling or drug sales.  You may not include assets that are not owned by the members of your household.

For **Part 8.**, **Item Number 65.**, please check the appropriate box for the total value of your household liabilities (including both secured and unsecured liabilities).  Only include liabilities owed by members of your household.

For **Part 8.**, **Item Number 67.**, please list all of your certifications, licenses, skills obtained through work experience, and educational certificates.  This includes but is not limited to your workforce skills, training, licenses for specific occupations or professions, foreign language skills, and certificates documenting mastery or apprenticeships in skilled trades or professions.  Educational certificates are issued by an educational institution (or a training provider) and certify that an occupation specific program of study was completed.

If you answer "Yes" to **Part 8.**, **Item Number 68.a.**, complete the table in **Part 8.**, **Item Number 68.c.**, showing the dates of receipt and dollar amount received of public cash assistance for income maintenance:  Supplemental Security Income (SSI); Temporary Assistance for Needy Families (TANF); State, Tribal, territorial, or local cash benefit programs for income maintenance (often called "General Assistance" in the State context, but which also exist under other names).

**NOTE:  Item Numbers 68.a. - 68.d.** are only asking about public benefits (in other words, public cash assistance for income maintenance and long-term institutionalization at government expense) you received in the past or are currently receiving at the time the Form I-485 is filed, and where you were/are a listed beneficiary.  Do not include any public benefits for which you are not listed as a beneficiary, even if you assisted with the application.  Do not include benefits that you only applied for, or were approved to receive in the future but have not received in the past and/or are not currently receiving.  Do not include public benefits you received only on behalf of another individual.

If you answer "Yes" to **Part 8.**, **Item Number 68.b.**, complete the table **Part 8.**, **Item Number 68.d.** showing the name, city, and state of each institution in which you received long-term institutionalization at government expense.  Do not include imprisonment for conviction of a crime or institutionalization for short periods for rehabilitation purposes.  If you believe that your institutionalization violated Federal law, including the American Disabilities Act or the Rehabilitation Act, you must submit documentation to support your claim.

For more information on the receipt of public benefits and its impact on public charge inadmissibility determinations, please see USCIS Policy Manual Volume 8, Part G, at **https://www.uscis.gov/policy-manual/volume-8-part-g** and the Public Charge Resources web content at **https://www.uscis.gov/green-card/green-card-processes-and-procedures/public-charge/public-charge-resources**.

11. **Part 10.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature.**  Select the appropriate box to indicate whether you read this application yourself or whether you had an interpreter assist you.  If someone assisted you in completing the application, select the box indicating that you used a preparer.  Further, you must sign and date your application and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every application **MUST** contain the signature of the applicant (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

12. **Part 11.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the application.

13. **Part 12.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant.**  This section must contain the signature of the person who completed your application, if other than you, the applicant.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 11.** and **Part 12.**  If the person who completed this application is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this application **MUST** sign and date the application.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your application is an attorney or accredited representative, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your application.

> **We recommend that you review your copy of your completed application before you go to your biometric services appointment at a USCIS ASC.**  At your appointment, USCIS will allow you to complete the application process only if you are able to confirm, under penalty of perjury, that all of the information in your application is complete, true, and correct.  If you are not able to make that attestation in good faith at that time, we will require you to return for another appointment.

## What Evidence Must You Submit with Form I-485?

The specific evidence you are required to submit with your application may vary depending on the immigrant category you are filing under.  Read about each type of evidence below to see if it applies to you; see also the **Additional Instructions** for more category-specific information.

You must submit all evidence requested in these Instructions with your application.  If you fail to submit required evidence, USCIS may reject or deny your application for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

Failure to submit all required evidence and documentation when filing Form I-485 may also delay processing of your application and any related applications based on Form I-485, such as Form I-765, Application for Employment Authorization, or Form I-131, Application for Travel Document.

If you are unable to submit the required primary evidence (for example, a birth certificate or marriage certificate), you may provide secondary evidence (for example, church or school records) instead if you can explain why the primary evidence is unavailable.  If you are unable to submit secondary evidence, you may submit two or more affidavits, sworn to or affirmed by individuals who are not parties to the immigration benefit sought and who have direct personal knowledge of the event and circumstances.  You must also explain why primary and secondary evidence are unavailable.

1. **Photographs**

   You **must** submit two identical color passport-style photographs of yourself taken recently.  The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

   The photos must be 2 by 2 inches with a full face, frontal view.  Head height should measure 1 to 1 3/8 inches from the top of your hair to the bottom of your chin, and eye height should measure between 1 1/8 to 1 3/8 inches from the top of your eyes to the bottom of the photo.  Your head must be bare unless you are wearing headwear as required by your religious denomination.  Use a pencil or felt pen to lightly print your name and A-Number (if any) on the back of the photos.

2. **Government-Issued Identity Document with Photograph**

   All Form I-485 applicants should submit a photocopy of a government-issued identity document that has their photograph.  Typically, this will be your passport or similar document, even if the passport is now expired.  It can also be any other government-issued identity document such as a driver's license or military identification document.

3. **Birth Certificate**

   All Form I-485 applicants, except refugees and asylees, must submit a photocopy of their birth certificate issued by the appropriate civil authority from the country of birth.  Although refugees and asylees are not required to submit a photocopy of their birth certificate, if the birth certificate is available, refugees and asylees should submit a copy of the birth certificate.  USCIS will only accept a long-form birth certificate which lists at least one parent.

   If your birth certificate is unavailable or does not exist, you must prove its unavailability or nonexistence and provide acceptable alternative evidence of birth.  (Refugees and asylees do not need to prove unavailability or nonexistence of their birth certificate.)  You can look up your country of birth on the following website, **https://travel.state.gov/ content/travel/en/us-visas/Visa-Reciprocity-and-Civil-Documents-by-Country.html**, to see if birth certificates are known to be unavailable or nonexistent in that country.

004048

If this resource shows that birth certificates from your country of birth are generally unavailable or nonexistent, you do not need to do anything to prove that your birth certificate is unavailable or nonexistent.

If this resource does not show that birth certificates from your country of birth are generally unavailable or nonexistent, you must submit an original document from the relevant governmental authority explaining why your birth record does not exist and indicate whether similar records for the time and place are available.

When your birth certificate is not available or does not exist, you must submit other acceptable evidence relating to the facts of your birth, such as church or school records, hospital or medical records, personal affidavits, or similar evidence.

**4.  Inspection and Admission or Inspection and Parole**

Unless applying under INA section 245(i), most Form I-485 applicants must submit photocopies of documentation showing they were inspected by an immigration officer and either admitted or paroled into the United States.  The following types of applicants do NOT need to submit documentation of inspection and admission or parole:  registry applicants, asylees, VAWA self-petitioners, special immigrant juveniles, T nonimmigrants applying under INA section 245(l), U nonimmigrants applying under INA section 245(m), and individuals born under diplomatic status in the United States.

You must establish any claim that you were admitted or paroled into the United States.

This evidence must relate to your most recent arrival into the United States.  Submit copies of the following documents, if available:

**A.**  Passport page with admission or parole stamp (issued by a U.S. immigration officer);

**B.**  Passport page with nonimmigrant visa; and

**C.**  Form I-94 Arrival-Departure Record (See **Form I-94 Arrival-Departure Record** in the **General Instructions** section of these Instructions).

If you cannot produce this primary evidence, and DHS has no record of the admission or parole, USCIS will presume that you came into the United States without admission or parole.

You may, however, provide secondary evidence (records maintained in the ordinary course of business by any individual or organization other than DHS) to support your claim that you were admitted or paroled.

If no secondary evidence is available, you may submit separate written statements, signed under penalty of perjury under United States law, from yourself and from any other individuals who have personal knowledge of the circumstances of your claimed admission or parole.  Any statement should explain in detail when and where you came into the United States; what travel documents you had, if any; whether you showed them to the immigration inspector; any questions the immigration inspector asked; and any other details about your claimed admission or parole.

**5.  Documentation of Your Immigrant Category** (see **Part 2.**, **Item Numbers 1.a. - 1.g.** of Form I-485)

All Form I-485 applicants must submit evidence showing that they are eligible for adjustment of status in a particular immigrant category.

**Filing as a Beneficiary of an Immigrant Petition**

If you are filing as a beneficiary of an immigrant petition, you generally must submit a photocopy of Form I-797, Approval Notice, for your petition (or the principal applicant's petition, if you are a derivative applicant), as appropriate.

If you are filing as a principal applicant and your immigrant category allows you to file Form I-485 before your petition is approved, you may submit your Form I-485 together with:

**A.**  Your immigrant petition; or

**B.** A photocopy of Form I-797, Receipt Notice, for your immigrant petition.

If you are filing as a derivative applicant based on the principal applicant's petition, you may submit your Form I-485 together with a photocopy of:

**A.** Form I-797, Approval or Receipt Notice, for the principal applicant's immigrant petition (if applicable); and

**B.** Form I-797, Approval or Receipt Notice, for the principal applicant's Form I-485 (if applicable) or a copy of the principal applicant's Form I-551 (Green Card) (if applicable).

**Filing Your Form I-485 Based on a Category That Does Not Require an Underlying Petition**

If you are filing your Form I-485 based on a category that does not require an underlying immigrant petition, you must submit other documentation.  See the **Additional Instructions** for more category-specific information.

6. **Marriage Certificate and Other Proof of Relationship**

If you are filing Form I-485 as the derivative applicant spouse of the principal applicant, you generally must submit a photocopy of your marriage certificate issued by the appropriate civil authority where the marriage took place. Refugee derivative applicant spouses do not need to submit a photocopy of the marriage certificate.  There are also some immigrant categories that require the principal applicant to submit a marriage certificate (for example, K-1 nonimmigrants (person admitted to the United States as a fiancé(e)), abused spouses and children under the Cuban Adjustment Act (CAA), Haitian Refugee Immigration Fairness Act (HRIFA) dependents, and abused spouses and children under HRIFA).  See the **Additional Instructions** for more category-specific information.

If either party to this marriage was previously married, you must also submit evidence to prove the legal termination of any prior marriages, typically a divorce certificate or death certificate.  If a required marriage certificate (or divorce certificate or death certificate) is unavailable or does not exist, you must demonstrate its unavailability/nonexistence and provide other acceptable evidence as explained above for birth certificates.

If you are filing as the derivative applicant child of the principal applicant and your birth certificate does not show that the principal applicant is your parent, you must submit a photocopy of your parents' marriage certificate, your adoption certificate, or other proof of your parent-child relationship with the principal applicant.  Refugee derivative applicant children, however, do not need to submit proof of the parent-child relationship with the principal applicant.

7. **Evidence of Continuously Maintaining a Lawful Status Since Arrival in the United States**

Anyone applying under the following immigrant categories must submit evidence to show they have continuously maintained lawful immigration status while in the United States and are therefore not barred from adjustment by INA section 245(c)(2):  applicants applying under a family-based preference category or an employment-based preference category; special immigrant religious workers, Afghan or Iraqi nationals, and international broadcasters; and selectees under the Diversity Visa Lottery program.

Acceptable evidence may include, but is not limited to, copies of the following documents:

**A.** Form I-797 approval notices for all extensions and changes of nonimmigrant status;

**B.** Form I-94 Arrival-Departure Record, including printouts of paperless I-94 admissions;

**C.** Form I-20, Certificate of Eligibility for Nonimmigrant (F-1) Student Status - For Academic and Language Students, or Form I-20, Certificate of Eligibility for Nonimmigrant (M-1) Student Status - For Vocational Students, including all pages containing notations by authorized school officials;

**D.** Form DS-2019 (formerly IAP 66), Certificate of Eligibility for Exchange Visitor (J-1) Status, including all pages containing notations by authorized exchange visitor program officials; or

**E.** Passport page with an admission or parole stamp (issued by a U.S. immigration officer).

Include evidence for every time you entered the United States and for the time periods spent in the United States.  See the **Additional Instructions** for information on whether your specific immigrant category requires this evidence.

If you are applying as an employment-based first preference, second preference, or third preference applicant or as a fourth preference special immigrant religious worker and you believe you are exempted from this bar by INA section 245(k), you should submit evidence to prove you qualify for this exemption.  For more information, see **www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-status**.

8. **Affidavit of Support/Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) (Supplement J)**

   A. **Affidavit of Support**

   Submit an Affidavit of Support (Form I-864) if your Form I-485 is based on your entry as a fiancé(e), a relative visa petition (Form I-130) filed by your relative, or an employment-based visa petition (Form I-140) related to a business that is five percent or more owned by your family.

   B. **Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) (Supplement J)**

   If your Form I-485 is related to an employment based visa petition (Form I-140) filed in an employment-based immigrant visa category that requires a job offer, and you are filing Form I-485 after the employer filed the Form I-140 on your behalf, you must file Form I-485 Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability under INA Section 204(j) (Supplement J), together with your Form I-485.  For more information about this requirement, please read the instructions to Supplement J.  If you are filing Form I-485 together with a Form I-140 filed on your behalf, you do not need to file Supplement J at this time.  At any time during the adjudication process, USCIS may request that you file Supplement J.

   **NOTE:**  Individuals seeking or granted a National Interest Waiver of the job offer requirement and individuals seeking or granted classification as an alien of extraordinary ability under INA section 203(b)(1)(A) do not need to file Supplement J.  Because these employment-based immigrant visa categories are not tied to a specific job offer, individuals seeking or granted classification as an alien of extraordinary ability, or seeking or granted a National Interest Waiver of the job offer requirement, do not have to file Supplement J when filing Form I-485 or to request job portability under INA section 204(j).

   If you filed Form I-140 as a self-petitioner, you must intend to work in the occupational field specified in the Form I-140.  You must provide a signed statement confirming this intent, unless you are filing Form I-485 together with your Form I-140.

   **Job Portability.**  If you properly filed Form I-485 and it remains pending with USCIS for 180 days or more after filing, you may be eligible to "port" to a job other than the one offered in the Form I-140.  The new job offer must be for a permanent, full-time position in the same or similar occupational classification as the job offered in the Form I-140 that is the basis of your Form I-485.  You must file Supplement J in order to request such job portability.  For more information, please read the instructions to Supplement J.  You may also visit the USCIS website at **www.uscis.gov**.

9. **Evidence of Financial Support**

   In general, you must demonstrate that you are not likely to become a public charge.  This means you must show that you will be able to financially support yourself as a lawful permanent resident living indefinitely in the United States.  Generally, all immediate relative and family-based adjustment applicants (beneficiaries of Form I-129F, Petition for Alien Fiancé(e), and Form I-130, Petition for Alien Relative) must have a Form I-864.  Some employment-based applicants must also have a Form I-864, Affidavit of Support Under Section 213A of the Act (whether they are beneficiaries of a Form I-140, Immigrant Petition for Alien Worker, or a Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, if filed in relation to certain employment-based immigrant visa classifications).  See the Instructions for Form I-864 to determine when Form I-864 is required and whether an exemption may be available.  If you are exempt from the Affidavit of Support requirement, you may need to file Form I-864W, Intending Immigrant's Affidavit of Support Exemption.

   For more information about Form I-864 requirements, visit **www.uscis.gov/i-864**.  For more information about the Form I-864W, visit **www.uscis.gov/i-864w**.  For more information on how receiving public benefits may impact how USCIS determines if you are likely to become a public charge, visit **www.uscis.gov**.

004051

**10. Report of Immigration Medical Examination and Vaccination Record (Form I-693)**

Form I-485 applicants for adjustment of status are required to have a medical examination to show that they are free from health conditions that would make them inadmissible.  This does not apply to registry applicants and individuals born under diplomatic immunity in the United States.  If you are filing Form I-485 under the nonimmigrant fiancé(e), asylee, or refugee category, see the Form I-693, Report of Immigration Medical Examination and Vaccination Record, Instructions for more information on whether you need to submit the full Form I-693 or only certain parts because you already had a medical examination overseas.

Only a USCIS designated civil surgeon can perform this medical examination in the United States.  The civil surgeon must document the results of your medical examination on Form I-693.  For more information on the medical examination, see the Form I-693 Instructions.

You are **NOT** required to submit Form I-693 at the time you file your adjustment application, but may do so if you wish.  Because of the time-limited validity of Form I-693, you may choose to submit your Form I-693 after you file your Form I-485.  You may also submit Form I-693 in person at an interview in a USCIS field office, if an interview is required.  By waiting to submit Form I-693, you may avoid having to repeat the immigration medical examination.

For more information about Form I-693 requirements, visit **www.uscis.gov/i-693**.

**11. Certified Police and Court Records of Criminal Charges, Arrests, or Convictions**

You must submit certified police and court records for any criminal charges, arrests, or convictions you may have.

**A.** If you were **EVER** arrested or detained by a law enforcement officer for any reason **anywhere** in the world, including the United States, and no criminal charges were filed, you must submit:

  **(1)** An original or certified copy of the complete arrest report; and

  **(2)** Either an official statement by the arresting or detaining agency or prosecutor's office **OR** an applicable court order that indicates the final disposition of your arrest or detention;

**B.** If you were **EVER** charged for any reason (even if you were not arrested) **anywhere** in the world, including the United States, you must submit:

  **(1)** An original or certified copy of the complete arrest report; and

  **(2)** Certified copies of **BOTH** the indictment, information, or other formal charging document **AND** the final disposition of each charge (for example, a dismissal order or acquittal order);

**C.** If you were **EVER** convicted or placed in an alternative sentencing or rehabilitative program (such as probation, drug treatment, deferred adjudication, or community service program) **anywhere** in the world, including the United States, you must submit:

  **(1)** An original or certified copy of the complete arrest report;

  **(2)** Certified copies of the following:  the indictment, information, or other formal charging document; any plea agreement, whether in the form of a court filing or recording in a hearing transcript; and the final disposition for each incident (for example, conviction record, deferred adjudication order, probation order); and

  **(3)** Either an original or certified copy of your probation or parole record showing that you completed the mandated sentence, conditions set for the deferred adjudication, or rehabilitative program **OR** documentation showing that you completed the alternative sentencing or rehabilitative program; or

**D.** If you **EVER** had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record **anywhere** in the world, you must submit:

  **(1)** An original or certified copy of the complete arrest report; the indictment, information, or other formal charging document; any plea agreement, whether in the form of a court filing or recording in a hearing transcript; and the final disposition for each incident (for example, conviction record, deferred adjudication order, probation order); and

004052

**(2)** A certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction.

You must disclose all arrests and charges, even if the arrest occurred when you were a minor.  An adjudication of juvenile delinquency is not a "conviction" under U.S. immigration law, but a juvenile can be charged as an adult for an offense committed while a juvenile.  If you were convicted as an adult, there is a conviction, regardless of whether you were tried before a criminal court or a juvenile court.  An adjudication of juvenile delinquency could also be relevant to the exercise of discretion.  If you claim that an arrest resulted in adjudication of delinquency, and not in a conviction, you must submit a copy of the court document that establishes this fact.

In general, you do **not** need to submit documentation relating to traffic fines and incidents that did not involve an actual physical arrest if the penalty was only a fine of less than $500 or points on your driver's license.  However, you must submit such documentation if the traffic incident resulted in criminal charges or involved alcohol, drugs, or injury to a person or property.

If you are not able to obtain certified copies of any court disposition relating to **Items 11.A. - 11.D.**, please submit:

**A.** An explanation of why the documents are not available, including (if possible) a certificate from the custodian of the documents explaining why the documents are not available;

**B.** Any secondary evidence that shows the disposition of the case; or

**C.** If secondary evidence is also not available, one or more written statements, signed under penalty of perjury under 28 U.S.C. section 1746, by someone who has personal knowledge of the disposition.

## 12.  Waiver of Inadmissibility

If you are inadmissible to the United States based on one or more grounds of inadmissibility outlined in INA section 212(a), you cannot adjust status unless you qualify for a waiver of inadmissibility or other form of relief.  Whether or not you qualify for a waiver or other form of relief depends on the grounds of inadmissibility that apply to you and the specific immigrant category you are applying under.

If USCIS (or the Immigration Court, if you are in deportation, exclusion, or removal proceedings) determines that none of the grounds of inadmissibility apply to you, then you are admissible to the United States and there is no need for you to file a waiver of inadmissibility or other form of relief.

If USCIS (or the Immigration Court, if you are in deportation, exclusion, or removal proceedings) determines that a ground of inadmissibility does apply to you, you may need to seek a waiver or other form of relief that would eliminate the inadmissibility.

You can learn more about waivers and other forms of relief by reading the Instructions for Form I-601, Application for Waiver of Grounds of Inadmissibility, at **www.uscis.gov/I-601**, and Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal, at **www.uscis.gov/I-212**.  Refugee and asylee applicants for adjustment of status should also see Form I-602, Application by Refugee for Waiver of Grounds of Excludability, at **www.uscis.gov/I-602**.

## 13.  Documentation Regarding J-1 or J-2 Exchange Visitor Status

If you previously held or currently hold J-1 (principal) or J-2 (dependent) nonimmigrant exchange visitor status, you must submit copies of all relevant Forms IAP-66 and/or Forms DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status, ever issued to you (if available).  You must also submit copies of all available J-1 or J-2 nonimmigrant visas issued to you, and copies of all available Form I-94 and passport pages with entry stamps showing your admission to the United States in J-1 or J-2 status.

In addition, if your J status made you subject to the 2-year foreign residence requirement of INA section 212(e), you must submit documentation to show that you complied with the foreign residence requirement, have been granted a waiver of the requirement before filing Form I-485, or were issued a favorable waiver recommendation letter from DOS before filing Form I-485.  You can show you complied with the requirement by submitting evidence to prove you resided in the appropriate home country for at least two years since your exchange visitor program ended.  For information about waiver of the requirement, see the Instructions for Form I-612, Application for Waiver of the Foreign Residence Requirement.

004053

**14. Waiver of Diplomatic Rights, Privileges, Exemptions, and Immunities**

If you currently hold A, G, or E nonimmigrant status and you enjoy certain diplomatic privileges and immunities as a result of that status, you must submit Form I-508, Application for Waiver of Rights, Privileges, Exemptions and Immunities (and Form I-508F for French nationals) with your Form I-485.  In addition, if you have A, G, or NATO nonimmigrant status, you must file Form I-566, Interagency Record of Request - A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status, with your Form I-485.

**15. Evidence relating to the Public Charge Ground of Inadmissibility**

Applicants, with one exception, are not required to provide any initial evidence relating to the public charge ground of inadmissibility with their adjustment of status application.  If you believe that your institutionalization violated federal law, including the American Disabilities Act or the Rehabilitation Act, you must submit documentation to support your claim.  If USCIS requires additional evidence to determine if you are inadmissible under the public charge ground of inadmissibility, it will issue a Request for Evidence and consider all evidence that you provide in response.

## Where To File?

Please see our website at w**ww.uscis.gov/i-485** for the most current information about where to file this application.

If you are in proceedings in Immigration Court (that is, if you have been served with Form I-221, Order to Show Cause and Notice of Hearing; Form I-122, Notice to Applicant for Admission Detained for Hearing Before an Immigration Judge; Form I-862, Notice to Appear; or Form I-863, Notice of Referral to Immigration Judge, that DHS filed with the Immigration Court), you should file this application with the appropriate Immigration Court.  The DHS attorney will provide you with pre-order filing instructions regarding background and security investigations.

## Address Change

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous residence. For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

If you are already in proceedings in Immigration Court, you must also notify the Immigration Court on EOIR Form 33/IC, Alien's Change of Address Form/Immigration Court, of any changes of address within five days of the change in address.  The EOIR Form 33/IC is available on the EOIR website at **www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing**.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox.

## Processing Information

**You must be physically present in the United States and provide a United States address to file this application.**

**Initial Processing.**  Once USCIS accepts your application, we will check it for completeness.  If you do not properly complete this application, you will not establish a basis for your eligibility and we may reject or deny your application.

**Requests for More Information.**  We may request that you provide more information or evidence to support your application.  We may also request that you provide the originals of any copies you submit.  If USCIS or the Immigration Court requests an original document from you, we will return it to you after USCIS or the Immigration Court determines it no longer needs your original.

004054

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your application. During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-485 involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS or the Immigration Court will notify you of our decision in writing.

**If You Leave the United States While Your Application Is Pending**

**If you are applying for adjustment of status under INA section 245**, and you travel anywhere outside the United States (including brief visits to Canada or Mexico) while your application is pending, USCIS will deny your Form I-485 unless:

1. Before you leave the United States, you obtain a grant of advance parole by filing Form I-131, you depart and return to a U.S. port of entry while the Advance Parole Document is valid, and you are paroled into the United States upon your return; or

2. You are an H, L, V, or K3/K4 nonimmigrant who is maintaining lawful nonimmigrant status and you return with a valid H, L, V, or K3/K4 nonimmigrant visa.

**If you are applying for adjustment of status under INA section 209** because you were admitted as a refugee or granted asylum, you may travel abroad and return to the United States with a refugee travel document.  You may obtain a refugee travel document by filing Form I-131 as specified in the Form I-131 Instructions.  However, see Form I-131 Instructions for a travel warning regarding voluntary re-availment.

**If you are applying for registry under INA section 249 and 8 CFR 249**, you do not abandon your registry application by traveling abroad while it is pending.  However, if you do not obtain an Advance Parole Document, you may not be able to return lawfully to the United States.  You may obtain an Advance Parole Document by filing Form I-131 as specified in the Form I-131 Instructions.

## USCIS Forms and Information

To ensure you are using the latest version of this application, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-485, we will deny your Form I-485 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## USCIS Compliance Review and Monitoring

By signing this application, you have stated under penalty of perjury (28 U.S.C. section 1746) that all information and documentation submitted with this application are complete, true, and correct.  You also authorize the release of any information from your records that USCIS may need to determine your eligibility for the immigration benefit you are seeking and consent to USCIS verifying such information.

DHS has the authority to verify any information you submit to establish eligibility for the immigration benefit you are seeking at any time.  Our legal authority to verify this information is in 8 U.S.C. sections 1103, 1155, and 1184, and 8 CFR parts 103, 204, 205, and 214.  To ensure compliance with applicable laws and authorities, we may verify information before or after your case is decided.

004055

Agency verification methods may include, but are not limited to: reviewing public records and information; contacting through written correspondence; using the internet, fax, other electronic transmission, or telephone; making unannounced physical site inspections of residences and locations of employment; and interviewing people.  USCIS will use the information we obtain to assess your compliance with the laws and to determine your eligibility for an immigration benefit.

Subject to the restrictions under 8 CFR 103.2(b)(16), USCIS will provide you with an opportunity to address any adverse or derogatory information that may result from a USCIS compliance review, verification, or site visit before a decision is made on your request or after the agency has initiated an adverse action which may result in rescission or termination of lawful permanent resident status.  For a visit after your request is approved, USCIS will provide you with an opportunity to address any adverse or derogatory information which may result in revocation or termination of an approval.

## USCIS Privacy Act Statement

**AUTHORITIES:**  The information requested on this application, and the associated evidence, is collected under INA sections 101 et seq., as amended, and related public laws and regulations.

**PURPOSE:**  The primary purpose for providing the requested information on this application is to determine if you have established eligibility to adjust status to that of a permanent resident of the United States or register permanent residence.  DHS will use the information you provide to grant or deny your application to adjust status to lawful permanent resident.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your application.

**ROUTINE USES:**  DHS may share the information you provide on this application with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records] which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 6.987 hours minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  The collection of biometrics is estimated to require 1.17 hours.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0023.  **Do not mail your completed Form I-485 to this address.**

## Checklist

☐  I have signed Form I-485 in **Part 10.**, **Item Number 6.a.**

☐  I have included the appropriate fee, if not exempted or waived.

☐  I have read these Instructions and the following **Additional Instructions** (if any) relating to my specific immigrant category.

☐ I have included all of the required documentation listed in these Instructions and in the following **Additional Instructions** (if any) relating to my specific immigrant category.

## Additional Instructions

The purpose of these additional instructions is to provide more specific information on each immigrant category.  You must read the additional instructions that apply to your specific immigrant category as well as the previous main instructions for Form I-485.  If your immigrant category is not discussed here, it is because there are no additional instructions for that category.

## Additional Instructions for Family-Based Applicants

### Immediate relative of a U.S. citizen (Form I-130, Petition for Alien Relative)

Immediate relatives of U.S. citizens include the following relatives of U.S. citizens:  spouses, unmarried children under 21 years of age, and parents (if the U.S. citizen is 21 years of age or older).

Immediate relatives do not have to wait until Form I-130 is approved to file Form I-485.  You may file your Form I-485 together with your Form I-130, while Form I-130 is pending, or after your Form I-130 is approved.  Immediate relatives always have a visa available once Form I-130 is approved.

Derivative applicants are not allowed in this category.

### Other relative of a U.S. citizen or relative of a lawful permanent resident under the family-based preference categories (Form I-130)

Family-based preference categories include:  unmarried sons and daughters (21 years of age and older) of U.S. citizens; spouses, unmarried children (under 21 years of age) and unmarried sons and daughters (21 years of age and older) of lawful permanent residents; married sons and daughters of U.S. citizens; and brothers and sisters of U.S. citizens (if the U.S. citizen is 21 years of age or older).

If a visa is immediately available, applicants filing under a family-based preference immigrant category do not have to wait until Form I-130 is approved to file Form I-485.  If a visa is immediately available, you may file your Form I-485 together with your Form I-130, while Form I-130 is pending, or after your Form I-130 is approved.  Otherwise, you may file your Form I-485 only after your Form I-130 is approved and a visa is immediately available.  See the **When Should I File Form I-485** section for more information.

### Person admitted to the United States as a fiancé(e) or child of a fiancé(e) of a U.S. citizen (Form I-129F) (K-1/K-2 nonimmigrant)

Nonimmigrant fiancé(e) beneficiaries of Form I-129F always have a visa available, but may file Form I-485 only after marrying the U.S. citizen (Form I-129F petitioner) within the requisite 90-day period after admission to the United States on a K-1 visa.

In addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must submit a copy of the marriage certificate to show that the K-1 nonimmigrant fiancé(e) married the U.S. citizen (Form I-129F petitioner) in the 90-day period.  This additional requirement applies to both K-1 principal and K-2 derivative applicants.

004057

## Widow or widower of a U.S. citizen

If you are the widow(er) of a deceased individual who was a U.S. citizen at the time of death, you may be eligible to file Form I-485.

If your deceased citizen spouse did not file Form I-130 for you before dying, you may file Form I-360 as long as you file Form I-360 no more than two years after the date your spouse died.  You do not have to wait until Form I-360 is approved to file Form I-485.  You may file your Form I-485 together with your Form I-360, while your Form I-360 is pending, or after your Form I-360 is approved.  Widow(er)s always have a visa available once Form I-360 is approved.

Your deceased citizen spouse may have filed Form I-130 for you before dying.  In this case, you may file Form I-485 while Form I-130 is pending or after it is approved.  If Form I-130 is approved, it will be considered an approved Form I-360.

When filing your Form I-485, you should provide a copy of the Form I-797 Approval Notice or Receipt for the Form I-130 filed on your behalf or the Form I-360 you filed (unless you are filing Form I-360 together with your Form I-485). See the **When Should I File Form I-485** section above for more information.

## VAWA self-petitioner (Form I-360)

You may file under this category if you are the victim of battery or extreme cruelty by a U.S. citizen or lawful permanent resident who is your spouse (or former spouse) or parent, OR if you are the victim of battery or extreme cruelty by a U.S. citizen who is your son or daughter and is at least 21 years of age.  Special confidentiality protections (described at 8 U.S.C. section 1367) apply to you as the VAWA self-petitioner.  8 U.S.C. section 1367 provides two forms of critical protection for VAWA self-petitioners.  The first form of protection is a prohibition on adverse determinations against the victim based on information provided solely by their abuser and other prohibited sources.  The second form of protection is a prohibition on disclosure of any information about the victim to third parties, except in certain very limited circumstances.

If a visa is immediately available, applicants filing as VAWA self-petitioners do not have to wait until Form I-360 is approved to file Form I-485.  If a visa is immediately available, you may file your Form I-485 together with your Form I-360, while your Form I-360 is pending, or after your Form I-360 is approved.  Otherwise, you may file your Form I-485 only after your Form I-360 is approved and a visa is immediately available.  See the **When Should I File Form I-485** section above for more information.

**NOTE:**  VAWA-based applicants for adjustment of status are exempt from Affidavit of Support requirements; however, each applicant must include Form I-864W with the adjustment application.

**NOTE:**  USCIS will not accept requests for Change of Address submitted online, mailed to USCIS Lockbox facilities, or by telephonic requests at the USCIS Contact Center for adjustment of status applications filed by VAWA self-petitioners. For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS Contact Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

### Derivative Applicants

Children of principal applicants may file as derivative applicants.  However, you may not file as a derivative if the principal applicant is a self-petitioning parent of an abusive U.S. citizen son or daughter.

004058

## Additional Instructions for Employment-Based Applicants

### *Alien worker (Form I-140, Immigrant Petition for Alien Worker)*

This category applies to the following employment-based immigrant preference classifications:  first preference -- including foreign nationals with extraordinary ability, outstanding professors and researchers, or certain multinational executives and managers; second preference -- members of the professions holding advanced degrees or foreign nationals of exceptional ability; and third preference -- skilled workers, professionals, and other workers.

If a visa is immediately available, an applicant in the employment-based preference immigrant category does not have to wait until Form I-140 is approved to file Form I-485.  If a visa is immediately available, you may file your Form I-485 together with your Form I-140, while your Form I-140 is pending, or after your Form I-140 is approved.  Otherwise, you may file your Form I-485 only after your Form I-140 is approved and a visa is immediately available.  See the **When Should I File Form I-485** section above for more information.

**Evidence of Financial Support**

In general, if you are filing Form I-485 based on employment, you do not need to submit Form I-864, Affidavit of Support Under Section 213A of the Act.  However, you must file Form I-864 if your Form I-140 was filed by a relative who is a U.S. citizen or lawful permanent resident or by a for-profit entity if 5% or more of the ownership interest is held by a relative who is a U.S. citizen or lawful permanent resident.  In this context, "relative" means a U.S. citizen or lawful permanent resident who is your husband, wife, father, mother, child, adult son, adult daughter, or a U.S. citizen who is your brother or sister.

**Request for Job Portability**

If you properly filed Form I-485 and it remains pending with USCIS for 180 days or more after filing, you may be eligible to "port" to a job other than the one offered in Form I-140, under the authority of INA section 204(j).  The new job offer must be for a permanent, full-time position in the same or similar occupational classification as the job offered in the Form I-140 that is the basis of your Form I-485.  You may request such job portability by sending a typed or printed request to USCIS which includes a letter from the new employer providing details about the new job and any other documentation needed to establish eligibility for portability.  For more information, visit the USCIS website at **www.uscis.gov**.

**National Interest Waiver (NIW) Physicians**

You may qualify for a National Interest Waiver if you worked full time as a physician for a total of five years (not including work while in J-1 status) in a designated medical shortage area or at a Veterans Administration healthcare facility, and a Federal agency or state department of public health has determined such work is in the public interest.

USCIS will not approve your Form I-485 as an NIW physician until you submit evidence showing you have completed the full five years of required employment.  You must submit evidence within 120 days of completing the five years of required employment.  USCIS will consider your Form I-485 ready for final processing and adjudication once you submit this evidence.

### *Alien entrepreneur (Form I-526, Immigrant Petition by Alien Entrepreneur)*

Alien entrepreneurs are foreign nationals who have invested, or are actively in the process of investing, $1 million (or $500,000 in a rural or high unemployment area) in a new commercial enterprise which will benefit the U.S. economy and create at least 10 full-time jobs for U.S. citizens, lawful permanent residents, and certain other authorized workers.

If you are filing your Form I-485 under the alien entrepreneur (immigrant investor) category, you may not file your Form I-485 until USCIS first approves your Form I-526, Immigrant Petition by Alien Entrepreneur, and a visa is immediately available.

004059

**Evidence of Financial Support**

If you are filing Form I-485 as an immigrant investor, you do not need to submit evidence of financial support.

## Additional Instructions for Special Immigrants

### Religious worker (Form I-360)

Special immigrant religious workers are members of a religious denomination who will be working as a minister or in another professional capacity in a religious vocation or occupation for the denomination's bona fide nonprofit religious organization in the United States.

If you are filing your Form I-485 under the special immigrant religious worker category, you may not file your Form I-485 until USCIS first approves your Form I-360, and a visa is immediately available.

Except for ministers, all other religious workers and their derivatives must have their Form I-485 approved on or before the end date of this program (sunset date).  Statutory amendments may extend this date.  For information on the sunset date, please visit the USCIS website at **www.uscis.gov/working-united-states/permanent-workers/employment-based-immigration-fourth-preference-eb-4/special-immigrant-religious-workers**.

### Special immigrant juvenile (Form I-360)

Special immigrant juveniles are unmarried, under 21 years of age at the time of filing Form I-360, and have a qualifying order from a state juvenile court (see 8 CFR 204.11(a) for the definition of a juvenile court) that makes the findings required under INA section 101(a)(27)(J).

If an employment-based fourth preference (EB-4) immigrant visa is immediately available, applicants filing as special immigrant juveniles do not have to wait until Form I-360 is approved to file Form I-485.  If a visa is immediately available, you may file your Form I-485 together with your Form I-360, while your Form I-360 is pending, or after your Form I-360 is approved.  Otherwise, you may file your Form I-485 only after your Form I-360 is approved and a visa is immediately available.  See the **When Should I File Form I-485** section above for more information.

**NOTE:**  USCIS considers anyone granted special immigrant juvenile classification to have been paroled into the United States for the purpose of special immigrant juvenile based adjustment, regardless of how you actually arrived in the United States.  When filling out **Part 1. Information About You** of the Form I-485, please list how you actually arrived in the United States.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as a special immigrant juvenile, you do not need to submit evidence of financial support.

### Certain Afghan or Iraqi national (Form I-360)

Special immigrant Afghan or Iraqi nationals are:  nationals of Afghanistan or Iraq who worked with the U.S. armed forces or U.S. Coast Guard as translators; Iraqi nationals who were employed by or on behalf of the U.S. Government; or Afghan nationals who were employed by or on behalf of the U.S. Government in Afghanistan, in the International Security Assistance Force (ISAF), or in a successor mission to ISAF.

If you are filing your Form I-485 under the special immigrant Afghan or Iraqi national category, you may not file your Form I-485 until USCIS first approves your Form I-360 and a visa is available immediately.

004060

### Certain G-4 international organization or NATO-6 employee or family member (Form I-360)

Special immigrant G-4 or NATO-6 employees or family members include:  retired officers or employees of an international organization or NATO (and spouses), surviving spouses of deceased officers or employees of an international organization or NATO, and unmarried sons or daughters of current or retired officers or employees of an international organization or NATO.

If a visa is immediately available, a special immigrant G-4 international organization or NATO-6 employee or family member does not have to wait until Form I-360 is approved to file Form I-485.  If a visa is immediately available, you may file your Form I-485 together with your Form I-360, while your Form I-360 is pending, or after your Form I-360 is approved.  Otherwise, you may file your Form I-485 only after your Form I-130 is approved and a visa is immediately available.  See the **When Should I File Form I-485** section above for more information.

**Additional Evidence Requirements**

As a special immigrant G-4 international organization or NATO-6 employee or family member, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, the principal applicant must also submit:

1.  A copy of every page of your passport and any other document showing residence and physical presence in the U.S. for the required time period (see **www.uscis.gov/greencard** for more information); and

2.  Evidence that you maintained your G-4, N, or NATO-6 nonimmigrant status since your last entry into the United States.

## Additional Instructions for Human Trafficking Victims and Crime Victims

### Human trafficking victim (T Nonimmigrant, Form I-914) or derivative family member (Form I-914A)

You may apply to adjust status under INA section 245(l) if you are a victim of human trafficking who was admitted to the United States in T nonimmigrant status, maintained continuous physical presence for the required period of time, are a person of good moral character, and have complied with reasonable requests to assist law enforcement authorities in the investigation or prosecution of acts of trafficking, would suffer extreme hardship involving unusual and severe harm upon removal from the United States or were under 18 years of age at the time of the victimization that qualified you for T nonimmigrant status.  Special confidentiality protections (described at 8 U.S.C. section 1367) apply to you as a human trafficking victim.  8 U.S.C. section 1367 provides two forms of critical protection for human trafficking victims.  The first form of protection is a prohibition on adverse determinations against the victim based on information provided solely by their abuser and other prohibited sources.  The second form of protection is a prohibition on disclosure of any information about the victim to third parties, except in certain very limited circumstances.

If you are a principal applicant (T-1 nonimmigrant), you may file Form I-485 only after you have been in the United States for the following time period, whichever is less:

1.  A continuous period of at least three years since you were first admitted as a T-1 nonimmigrant; or

2.  A continuous period during the investigation or prosecution of acts of trafficking, and the Attorney General has determined the investigation or prosecution is complete.

If you are a derivative applicant (T-2 through T-6 nonimmigrant), you may file Form I-485 only once the principal applicant has met the above physical presence requirement.

**Evidence of Financial Support**

If you are filing Form I-485 as a T nonimmigrant, you do not need to submit evidence of financial support.

004061

**Additional Evidence Requirements**

As a human trafficking victim, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the main instructions, principal and derivative applicants must also submit:

1. Evidence you were lawfully admitted in T nonimmigrant status and continue to hold such status at the time you file Form I-485; and

2. Evidence that adjustment of status is warranted as a matter of discretion.

In addition, principal applicants must also submit:

1. Evidence of continuous physical presence;

2. Evidence of good moral character; and

3. Evidence you complied with reasonable requests for assistance in the investigation or prosecution of the acts of trafficking or evidence that you would suffer extreme hardship involving unusual and severe harm upon removal from the United States or evidence that you were under 18 years of age at the time of the victimization that qualified you for T nonimmigrant status.

**Evidence of Continuous Physical Presence**

You do not need to submit documentation showing that you were present in the United States on every single day during the requisite period of physical presence, but you should not have significant chronological gaps in your documentation.

To show continuous physical presence, you must submit **Items 1. - 3.** below.

1. Copies of every page of your passport or equivalent travel document (or valid explanation of why you do not have such a document).

2. Documentation of any departure from, and return to, the United States while in T-1 nonimmigrant status, including:

    A. Date of departure;

    B. Place of departure;

    C. Length of departure;

    D. Manner of departure (plane, boat, etc.);

    E. Date of return;

    F. Place of return; and

    G. Affidavit

3. Evidence establishing continuous physical presence, which may include, but is not limited to:

    A. Documentation issued by any governmental or nongovernmental authority, provided the documentation contains your name, was dated at the time it was issued, and contains the normal signature, seal, or other authenticating instrument of the authorized representative of the issuing authority;

    B. Educational documents;

    C. Employment records;

    D. Certification that you filed Federal or state income tax returns showing that you attended school or worked in the United States throughout the entire continuous physical presence period;

    E. Documents showing installment payments, such as a series of monthly rent receipts or utility bills;

**F.** A list of the type and date of documents already contained in your DHS file that establishes physical presence, such as, but not limited to, a written copy of a sworn statement given to a DHS officer, a document from the law enforcement agency attesting to the fact that you have continued to comply with requests for assistance, the transcript of a formal hearing, and Form I-213, Record of Deportable-Inadmissible Alien; or

**G.** Your own affidavit attesting to your continuous physical presence.

**NOTE:**  If you do not have documentation to establish continuous physical presence, you must explain why in an affidavit and provide additional affidavits from others with first-hand knowledge who can attest to your continuous physical presence with specific facts.  Your affidavit alone is not sufficient to show continuous physical presence.

**NOTE:**  Generally, if you departed from the United States for any trip that lasted longer than 90 days or for multiple trips that together exceeded 180 days, you failed to maintain continuous physical presence unless you can establish that:

**1.** Your absence was necessary to assist in the investigation or prosecution of acts of trafficking; or

**2.** An official involved in the investigation or prosecution of acts of trafficking certifies that the absence was otherwise justified.

**NOTE:**  If you have less than three years of continuous physical presence since you were first admitted as a T-1 nonimmigrant, you must submit a document signed by the Attorney General of the United States (or designee) stating that the investigation or prosecution is complete.

**Evidence of Good Moral Character**

Before USCIS can approve your application, USCIS must find that you are a person of good moral character according to INA section 101(f).

In order to demonstrate good moral character, you must submit:

**1.** Your own affidavit attesting to your good moral character; and

**2.** A local police clearance or a state-issued criminal background check from each locality or state in the United States that you have resided in for six or more months while you were in T-1 nonimmigrant status.  If local police clearances, criminal background checks, or similar reports are not available for any location where you resided, you may include an explanation and submit other evidence about your good moral character while you resided at that location.

You may also submit other credible evidence of good moral character, such as affidavits from responsible persons who can knowledgeably attest to your good moral character.

If you are under 14 years of age, you do not need to submit evidence of good moral character.  However, if there is reason to believe that you may lack good moral character, USCIS may require evidence of good moral character.

**Evidence of Compliance with Reasonable Requests for Assistance in the Investigation or Prosecution OR Evidence That You Were Under 18 Years of Age at the Time of the Victimization OR Evidence of Extreme Hardship Involving Unusual and Severe Harm**

You must submit evidence that shows you:

**1.** Complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking;

**2.** Were under 18 years of age at the time of the victimization that qualified you for T nonimmigrant status; or

**3.** Would suffer extreme hardship involving unusual and severe harm if removed from the United States.

**Evidence of Compliance with Reasonable Requests for Assistance**

Evidence that you continue to comply with any reasonable request for assistance in the investigation or prosecution of trafficking in persons includes, but is not limited to:

**1.** Your own affidavit describing how you continue to comply with any reasonable requests;

004063

2. A statement from a Federal, state, or local law enforcement official describing how you complied with any reasonable requests;

3. A re-signed and dated Form I-914, Supplement B;

4. Trial transcripts;

5. Court documents;

6. Police reports; and

7. News articles.

If you assisted law enforcement when you received your T-1 nonimmigrant status and are no longer assisting law enforcement, you should describe in a written statement why you are no longer assisting.  Reasons may include, but are not limited to:

1. The investigation or prosecution is complete;

2. Your T-1 nonimmigrant status is based on your willingness to assist but you were not needed, and you continue to be willing to assist but your assistance is still not needed;

3. You were not asked to assist after being granted T-1 nonimmigrant status; or

4. A request for assistance was not reasonable (See 8 CFR Section 214.11(a) for more information).

USCIS may consult the Attorney General of the United States if appropriate.

**NOTE:** If you were not required to comply with any reasonable requests for assistance in the investigation or prosecution when you received your T-1 nonimmigrant status (because you were under 18 years of age or suffered trauma at the time of victimization that excepted you from the compliance requirement), you should include an affidavit stating that you were not subject to the compliance requirement.

### Evidence of Extreme Hardship Involving Unusual and Severe Harm

Alternatively, you may also submit evidence that you will suffer extreme hardship involving unusual and severe harm if you are removed from the United States.  Proving extreme hardship involving unusual and severe harm requires you to meet a higher standard of proof than other extreme hardship standards in immigration law.  The extreme hardship cannot be based on current or future economic harm, or the lack of or disruption to social or economic opportunities.  USCIS may consider both traditional extreme hardship factors and the factors associated with having been a victim of a severe form of trafficking in persons, as well as relevant country condition reports or any other public or private sources of information.  However, USCIS will only consider factors that show hardship to you, not to other people or your family members. See 8 CFR 214.11(i) for a list of factors.

You should include evidence to document all factors that are relevant to you.  However, if the basis of your current extreme hardship claim is a continuation of the extreme hardship claimed in your application for T-1 nonimmigrant status, you do not need to re-document the entire claim.  Instead, submit evidence to establish that your previously established extreme hardship is ongoing.

**NOTE:** USCIS is not bound by its previous extreme hardship determination.

### Discretion

Adjustment of status based on T nonimmigrant status is not an automatic benefit, so you bear the burden of showing that USCIS should use its discretion to approve your adjustment of status application.  When making a discretionary decision on your application, USCIS may take into account all factors, including those acts that would otherwise make you inadmissible.

Generally, favorable factors such as family ties, hardship, and length of residence in the United States, may be sufficient for USCIS to use its discretion to approve your application.  However, when adverse factors are present in your case, you may offset these by submitting supporting documentation of favorable factors you wish USCIS to consider.  See 8 CFR 245.23(e)(3).

### *Crime victim (U Nonimmigrant, Form I-918), derivative family member (Form I-918A), or qualifying family member (Form I-929)*

You may apply to adjust status under INA section 245(m) if you are a victim of certain specified crimes who was admitted to the United States in U nonimmigrant status, maintained continuous physical presence for the required period of time, and have complied with reasonable requests to assist law enforcement authorities in the investigation or prosecution of the criminal activity.  Special confidentiality protections (described at 8 U.S.C. section 1367) apply to you as a crime victim.  8 U.S.C. section 1367 provides two forms of critical protection for crime victims.  The first form of protection is a prohibition on adverse determinations against the victim based on information provided solely by their abuser and other prohibited sources.  The second form of protection is a prohibition on disclosure of any information about the victim to third parties, except in certain very limited circumstances.

Both principal and derivative applicants may file Form I-485 only after they have been physically present in the United States for a continuous period of at least three years since being admitted as a U nonimmigrant.  Applicants must continue to be physically present through the date that USCIS makes a decision on this application.

Additionally, certain qualifying family members may also apply for adjustment of status.  Your approved Form I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant, confirms that you are a qualifying family member who may file Form I-485.  You must also show that the qualifying family relationship that formed the basis of your Form I-929 approval exists at the time the principal applicant (U-1 nonimmigrant) becomes a lawful permanent resident and continues to exist until USCIS makes a decision on your Form I-485.

### Evidence of Financial Support

If you are filing Form I-485 as a U nonimmigrant, you do not need to submit evidence of financial support.

### Additional Evidence Requirements

As a U nonimmigrant, you must submit evidence showing you meet certain requirements specific to this immigrant visa category.  Therefore, in addition to the evidence listed in the main instructions, principal and derivative applicants must also submit:

1. Evidence of continuous physical presence; and

2. Evidence that adjustment of status is warranted as a matter of discretion.

In addition, principal applicants must also submit evidence that they complied with reasonable requests for assistance in the investigation or prosecution of the qualifying criminal activity.

### Evidence of Continuous Physical Presence

You do not need to submit documentation showing that you were present in the United States on every single day of the three-year U nonimmigrant status period, but you should not have significant chronological gaps in your documentation.

To show continuous physical presence, you must submit **Items 1. - 4.** below:

1. Copies of every page of your passports or equivalent travel documents (or valid explanation of why the applicant does not have such a document);

2. Documentation of any departure from, and return to, the United States while in U nonimmigrant status, including:

    A. Date of departure;

    B. Place of departure;

    C. Length of departure;

    D. Manner of departure (plane, boat, etc.);

    E. Date of return; and

    F. Place of return;

004065

3. Evidence establishing continuous physical presence, including but not limited to:

   A. Documentation issued by any governmental or nongovernmental authority as long as the documentation contains your name, was dated at the time it was issued, and contains the normal signature, seal, or other authenticating instrument of the authorized representative of the issuing authority;

   B. Educational documents;

   C. Employment records;

   D. Certification that you filed Federal or state income tax returns showing that you attended school or worked in the United States throughout the entire continuous physical presence period;

   E. Documents showing installment payments, such as a series of monthly rent receipts or utility bills; or

   F. A list of the type and date of documents already contained in your DHS file that establishes physical presence, such as, but not limited to, a written copy of a sworn statement given to a DHS officer, a document from the law enforcement agency attesting to the fact that you have continued to comply with requests for assistance, the transcript of a formal hearing; and Form I-213, Record of Deportable-Inadmissible Alien; and

4. Your own affidavit attesting to your continuous physical presence.

If you do not have documentation to establish continuous physical presence, you must explain why in an affidavit and provide additional affidavits from others with first-hand knowledge who can attest to your continuous physical presence with specific facts.  Your affidavit alone is not sufficient to show continuous physical presence.

Generally, you have failed to maintain continuous physical presence if you departed from the United States for any trip that lasted longer than 90 days or for multiple trips that together exceeded 180 days.  To show that you maintained continuous physical presence despite taking these trips, you must submit a certification from the agency that signed Form I-918, Supplement B, in support of your U nonimmigrant status stating that:

1. Your absence was necessary in order to assist in the investigation or prosecution of the qualifying criminal activity; or

2. Your absence was otherwise justified.

### Evidence of Compliance with Reasonable Requests for Assistance in the Investigation or Prosecution of the Qualifying Criminal Activity

You are required to provide ongoing assistance, as needed, to law enforcement agencies involved in the investigation or prosecution of the qualifying criminal activity.  8 CFR 245.24(a)(5) defines "refusal to provide assistance in a criminal investigation or prosecution" as a refusal by the U nonimmigrant to provide assistance to law enforcement authorities after being granted U nonimmigrant status.

To show you have met this requirement, you must submit evidence that, from the time you filed for U nonimmigrant status until you file Form I-485, you have complied with (or did not unreasonably refuse to comply with) reasonable requests for assistance in the investigation or prosecution of the qualifying criminal activity.  You are required to provide ongoing assistance until USCIS adjudicates your Form I-485.

The evidence may include:

1. A newly executed Form I-918, Supplement B, U Nonimmigrant Status Certification;

2. A photocopy of the original Form I-918, Supplement B, with a new date and signature from the certifying agency;

3. Documentation on official letterhead from the certifying agency stating that you have not unreasonably refused to cooperate in the investigation or prosecution of the qualifying criminal activity;

4. An affidavit describing any efforts you made to obtain a newly executed Form I-918, Supplement B, or other evidence describing whether you received any requests to provide assistance in the criminal investigation or prosecution of the qualifying criminal activity, and your response to these requests; or

5. Court documents, police reports, news articles, copies of reimbursement forms for travel to and from court, and affidavits of other witnesses or officials.

004066

If you submit an affidavit, it must include:

1. A description of all instances when you were requested to provide assistance in the criminal investigation or prosecution of persons in connection with the qualifying criminal activity after you were granted U nonimmigrant status and how you responded to such requests;

2. Any identifying information you have about the law enforcement personnel involved in the case;

3. Any information you have about the status of the criminal investigation or prosecution, including any charges filed and the outcome of any criminal proceedings, or whether the investigation or prosecution was dropped and the reasons why; and

4. If you have refused a request for assistance in the investigation or prosecution, you must provide a detailed explanation of why you refused to comply with requests for assistance and why you believed that the requests for assistance were unreasonable.

**NOTE:**  In certain cases, this requirement of ongoing assistance may require someone other than the principal applicant to provide evidence to USCIS.  For example, in some U nonimmigrant cases, the U-1 petitioner was a child (or incompetent or incapacitated) and was not directly required to provide the assistance in an investigation or prosecution of the qualifying criminal activity.  In these cases, someone other than the child, such as a parent, guardian, or next friend provided the assistance.  This person may need to provide evidence of continued assistance (or that there was no unreasonable refusal to comply) with an investigation or prosecution of the qualifying criminal activity.

### Discretion

Adjustment of status based on U nonimmigrant status is not an automatic benefit, so you bear the burden of showing that USCIS should use its discretion to approve your adjustment of status application.  When making a discretionary decision on your application, USCIS may take into account all factors, including those acts that would otherwise make you inadmissible.

Generally, favorable factors such as family ties, hardship, and length of residence in the United States, may be sufficient for USCIS to use its discretion to approve your application.  However, when adverse factors are present in your case, you may offset these by submitting supporting documentation of favorable factors you wish USCIS to consider.  See 8 CFR 245.24(d)(11).

## Additional Instructions for Asylees and Refugees

If you are an asylee, you may be eligible to adjust status under INA section 209(b) if you have been physically present in the United States for one year after your grant of asylum, your status has not been terminated, and you still qualify as an asylee or the spouse or child of an asylee.

### Derivative Applicants

Asylee derivative applicants may file Form I-485 with the principal applicant or independently from the principal applicant.  However, asylee derivative applicants should submit proof of relationship to the principal applicant.  See the **Marriage Certificate and Other Proof of Relationship** section in the **What Evidence Must You Submit with Form I-485** section.

### Evidence of Financial Support

If you are filing Form I-485 as an asylee, you do not need to submit evidence of financial support.

004067

**Additional Evidence Requirements**

As an asylee, you must submit evidence showing you meet certain requirements specific to this immigrant category. Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, principal and derivative applicants must also submit evidence of asylum status (such as a copy of the asylum approval notice from USCIS or the immigration court order granting you asylum).

### Refugee Status

If you were admitted as a refugee, you may be eligible to adjust status under INA section 209(a) once you have been physically present in the United States for one year after being admitted to the United States in refugee status and if your status has not been terminated.

**Derivative Applicants**

Refugee derivative applicants may file Form I-485 with the principal applicant or independently from the principal applicant.

**Evidence of Financial Support**

If you are filing Form I-485 as a refugee, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As a refugee, you must submit evidence showing you meet certain requirements specific to this immigrant category. Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, principal and derivative applicants must also submit evidence of refugee status, such as a Form I-94 or a Refugee Travel Document (Form I-571).

### Additional Instructions for Applicants Filing Under Special Adjustment Programs

### Cuban Adjustment Act (CAA)

You may apply for adjustment of status if you are a native or citizen of Cuba who was inspected and admitted or paroled into the United States after January 1, 1959, and you have been physically present in the United States for at least one year or if you are a spouse or unmarried child of a Cuban described above (regardless of your nationality or place of birth) who was inspected and admitted or paroled after January 1, 1959, and you have been physically present in the United States for at least one year.

**Derivative Applicants**

As a spouse or child of a qualifying CAA applicant, you may file to adjust status as a derivative applicant under the CAA regardless of your nationality or place of birth.  Furthermore, you may apply under the CAA regardless of how long your relationship with the qualifying CAA applicant has existed.  Whether your relationship began before or after your Cuban spouse or parent became a lawful permanent resident does not matter.

**Evidence of Financial Support**

If you are filing Form I-485 based on the CAA, you do not need to submit evidence of financial support.

004068

**Additional Evidence Requirements**

As a CAA applicant, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, principal applicants must also submit:

1. Evidence of being a native or citizen of Cuba; and

2. Evidence that you have been physically present in the United States for at least one year.

**Evidence of Being a Cuban Native** (If You Were Born in Cuba)

Examples of evidence submitted by principal applicants that demonstrates being a Cuban native can include but are not limited to:

1. An expired or unexpired Cuban passport *(Pasaporte de la Republica de Cuba)* that lists the holder's place of birth as being Cuba; and

2. A Cuban birth certificate issued by the appropriate civil registry in Cuba.  (**Note:** A Cuban birth certificate acknowledging a birth outside of Cuba or Cuban consular birth record issued for a principal applicant who was not born in Cuba is not sufficient to prove Cuban citizenship.)

**Evidence of Cuban Citizenship** (If You Were Born Outside of Cuba)

Examples of evidence submitted by principal applicants that demonstrates Cuban citizenship can include but are not limited to:

1. An unexpired Cuban passport *(Pasaporte de la Republica de Cuba)*;

2. Nationality Certificate *(Certificado de Nacionalidad)*; and

3. Citizenship Letter *(Carta de Ciudadania)*.

In addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, derivative applicants must submit:

1. Evidence you have been physically present in the United States for at least one year; and

2. Evidence that you reside with the principal applicant.

If you are a derivative applicant, you do not need to submit evidence of Cuban birth or citizenship.  As mentioned above, you may file to adjust status as a derivative applicant under the CAA regardless of your nationality or place of birth.

**Evidence of Physical Presence and Inspection and Admission or Inspection and Parole**

CAA adjustment is available only to applicants who have been inspected and admitted or inspected and paroled into the United States.  If you are present in the United States without inspection, you are not eligible for CAA adjustment unless you first present yourself to USCIS and USCIS paroles you under INA section 212(d)(5)(A), pending a final determination of your admissibility.

If you are a Cuban native or citizen who has already been physically present in the United States for at least one year at the time DHS paroles you, then you may apply for adjustment of status immediately after being paroled.  The law does not require the one-year period of physical presence to occur after your parole.

004069

### CAA for Abused Spouses and Children

You may apply for adjustment of status if you are an abused spouse or child of a CAA-eligible spouse or parent.  Special confidentiality protections (described at 8 U.S.C. section 1367) apply to you as the abused spouse or child of a principal CAA-eligible spouse or parent.  8 U.S.C. section 1367 provides two forms of critical protection.  The first form of protection is a prohibition on adverse determinations against the victim based on information provided solely by their abuser and other prohibited sources.  The second form of protection is a prohibition on disclosure of any information about the victim to third parties, except in certain very limited circumstances.

You may apply under the CAA for abused spouses and children regardless of how long your relationship existed.  It also does not matter whether your relationship began before or after your Cuban spouse or parent became a lawful permanent resident.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as an abused spouse or child under the CAA, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As a CAA abused spouse or child, you must submit evidence showing you meet certain requirements specific to this adjustment program.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit:

1. Evidence that you resided with your abusive Cuban spouse or parent at some point during the qualifying relationship as a spouse or child;

2. Evidence that you have been physically present in the United States for at least one year;

3. Evidence of battery or extreme cruelty;

4. Evidence that the termination of your marriage was connected to the abuse (if applicable); and

5. Evidence that the abusive Cuban spouse died within two years of when you filed an application for adjustment of status (if applicable).

**Evidence of Physical Presence and Inspection and Admission or Inspection and Parole**

The law does not require the one-year period of physical presence to occur after your parole.

Abused spouses and children of CAA-eligible applicants must have been inspected and admitted or inspected and paroled into the United States.  If you are present in the United States without inspection, you are not eligible for CAA adjustment unless you first present yourself to DHS and DHS paroles you under INA section 212(d)(5)(A), pending a final determination of your admissibility.

**Evidence of Battery or Extreme Cruelty**

Evidence of battery should show that your spouse or parent committed an intentional, non-consensual, harmful, or offensive physical act of violence towards you or your child.  Some examples include, but are not limited to, rape, molestation, forced prostitution, punching, biting, kidnapping, kicking, choking, and sexual abuse.

Evidence of extreme cruelty should show that your spouse or parent committed non-physical acts of violence or threats of violence demonstrating a pattern or intent to control you or gain your compliance.  Some examples include, but are not limited to, controlling what you do and who you see and talk to; denying access to food, family, or medical treatment; threats of physical harm to you or your family; threats to commit suicide; or threats of deportation.

You must submit documentation demonstrating your CAA-eligible spouse or parent subjected you to battery or extreme cruelty during the qualifying relationship.  Evidence may include:

1. Reports and affidavits from police, judges, or other court officials;

2. Copies of legal documents related to orders of protection or other legal processes that address the abuse;

3. Affidavits from persons who witnessed or have knowledge of the abusive acts;

4. Reports or affidavits from medical personnel, school officials, and clergy;

5. Reports or affidavits from social workers or other social service agency personnel;

6. Documentation to show you sought safe haven in a family violence shelter or similar place; or

7. Photographs of injuries.

USCIS will consider any credible evidence, as defined in INA 204(a)(1)(J), that is relevant to the application.  USCIS has the sole discretion to determine what evidence is credible and what weight to give that evidence.

**Evidence of Death of the Cuban Spouse (if applicable)**

If your abusive Cuban spouse has died, you may file Form I-485 within two years of your abusive Cuban spouse's death, as long as you lived with your abusive Cuban spouse at some point during the qualifying relationship.  You must submit evidence of the death (such as a death certificate).

**Evidence of Termination of the Marriage (if applicable)**

If the marriage ended in divorce or was annulled, you may file Form I-485 within two years of the termination of the marriage as long as you demonstrate that:

1. You lived with your abusive Cuban spouse; and

2. The battery or extreme cruelty by your Cuban spouse and the termination of your marriage are connected.

---

### *Dependent Status under Haitian Refugee Immigrant Fairness Act (HRIFA)*

Although the qualifying period has closed for principal HRIFA applicants, dependents of those principal applicants may still file for adjustment of status if they meet certain requirements.  You may apply if you are a Haitian national residing in the United States who is a dependent spouse, child, or unmarried son or daughter of a HRIFA applicant.  In addition, your relationship to the principal must have existed at the time the principal applicant was granted adjustment of status and must continue to exist at the time you are granted adjustment of status.  You may not file under this category if you are eligible for adjustment of status under any other provision of law.

**Evidence of Financial Support**

If you are filing Form I-485 as a dependent under the HRIFA, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As a HRIFA dependent, you must submit evidence showing you meet certain requirements specific to this immigrant category.

In addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, unmarried sons or daughters (21 years of age or older) applying as HRIFA dependents must also submit:

1. Evidence of Haitian nationality;

2. Evidence that the qualifying relationship to the principal existed at the time the principal was granted adjustment of status and that the relationship still exists;

3. Evidence you have been physically present in the United States for a continuous period starting no later than December 31, 1995, and continuing until you are granted adjustment of status; and

**4.**   A statement that lists, and evidence of, all departures from and arrivals in the United States since December 31, 1995.

**Evidence of Nationality**

If you acquired Haitian nationality other than through birth in Haiti, provide a copy of the certificate of naturalization or certificate of citizenship issued by the Haitian government.

**Evidence of Continuous Physical Presence**

If you are an unmarried son or daughter (21 years of age or older), you must submit evidence that you were physically present in the United States for a continuous period since December 31, 1995.  USCIS considers your physical presence to be "continuous" despite:  any absences from the United States that totaled 180 days or less in the aggregate; any absences for which you received advance parole before departing the United States and you returned to the United States according to the conditions listed on the advance parole document; or any absences from the United States occurring after October 21, 1988, and before July 12, 1999, provided you departed the United States before December 31, 1988.

### HRIFA Eligibility for Abused Spouses and Children

You may apply to adjust status if you are an abused spouse or child of a HRIFA-eligible spouse or parent.  Furthermore, you may apply for adjustment of status as an abused spouse or child even if your principal HRIFA-eligible spouse or parent has not filed for adjustment of status.  Special confidentiality protections (described at 8 U.S.C. section 1367) apply to you as the abused spouse or child of a qualifying HRIFA principal.  8 U.S.C. section 1367 provides two forms of critical protection.  The first form of protection is a prohibition on adverse determinations against the victim based on information provided solely by their abuser and other prohibited sources.  The second form of protection is a prohibition on disclosure of any information about the victim to third parties, except in certain very limited circumstances.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as an abused spouse or child under the HRIFA, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As an abused spouse or child under the HRIFA, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit evidence of:

**1.**   Haitian nationality; and

**2.**   Evidence of battery or extreme cruelty.

**Evidence of Nationality**

You must submit evidence of your Haitian nationality.  If you acquired Haitian nationality other than through birth in Haiti, provide a copy of the certificate of naturalization or certificate of citizenship issued by the Haitian government.

**Evidence of Battery or Extreme Cruelty**

Evidence of battery should show that your spouse or parent committed an intentional, non-consensual, harmful, or offensive physical act of violence towards you or your child.  Some examples include, but are not limited to, rape, molestation, forced prostitution, punching, biting, kidnapping, kicking, choking, and sexual abuse.

004072

Evidence of extreme cruelty should show that your spouse or parent committed non-physical acts of violence or threats of violence demonstrating a pattern or intent to control you or gain your compliance.  Some examples include, but are not limited to, controlling what you do and who you see and talk to; denying access to food, family, or medical treatment; threats of physical harm to you or your family; threats to commit suicide; or threats of deportation.

You must submit documentation demonstrating your HRIFA-eligible spouse or parent subjected you to battery or extreme cruelty during the qualifying relationship.  Evidence may include:

1.  Reports and affidavits from police, judges, or other court officials;

2.  Copies of legal documents relating to orders of protection or other legal processes addressing the abuse;

3.  Affidavits from persons who witnessed or have knowledge of the abusive acts;

4.  Reports or affidavits from medical personnel, school officials, and clergy;

5.  Reports or affidavits from social workers or other social service agency personnel;

6.  Documentation to show you sought safe-haven in a family violence shelter or similar place; or

7.  Photographs of injuries.

### Former Soviet Union and Indochinese Parolee (Lautenberg Parolees)

If you are or were a national of the former Soviet Union, Vietnam, Cambodia, or Laos who was previously denied refugee status but then was inspected and paroled into the United States for humanitarian reasons before September 30, 2012, you may apply for adjustment of status if you have been physically present in the United States for one year after being paroled.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as a Lautenberg parolee, you do not need to submit evidence of financial support.

**Report of Immigration Medical Examination and Vaccination Record (Form I-693)**

You only need to submit the full Form I-693 if your medical examination was not completed overseas or you had a Class A condition at the time of the overseas exam.  If your medical examination was completed overseas, you did not have a Class A condition at the time of the exam, and you are applying for adjustment within two years of parole into the United States, then you only need to submit the vaccination portion of Form I-693.  (You may submit Form I-693 with your Form I-485 or at a later time.  See the **Report of Immigration Medical Examination and Vaccination Record (Form I-693)** section in the **What Evidence Must You Submit with Form I-485** for more information.)

**Additional Evidence Requirements**

As a Lautenberg parolee, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit evidence that:

1.  You are or were a national of the former Soviet Union (including nationals of any of the currently independent countries that formerly were members of the Union of Soviet Socialist Republics, as well as Estonia, Latvia, and Lithuania), Vietnam, Laos, or Cambodia, if not contained in your birth certificate; and

2.  You were denied refugee status.

**Denied Refugee Status**

Under the Lautenberg program, applicants must first have been denied refugee status before their parole into the United States.  Provide evidence of denied refugee status, if available.

004073

*Diplomats or High Ranking Officials Unable to Return Home (Section 13 of the Act of September 11, 1957)*

You may apply for adjustment of status if you are a foreign national who entered the United States under diplomatic or semi-diplomatic status and then failed to maintain lawful status, and you can demonstrate compelling reasons why you cannot return to the country represented by the government which accredited you.  Such persons are sometimes referred to as Section 13 applicants.

**Derivative Applicants**

You may apply as a derivative if you are the immediate family member of a Section 13 applicant.  The DOS definition of immediate family member is broader for A and G nonimmigrants than other nonimmigrant classifications.  Immediate family members are described in 22 CFR 41.21(a)(3) as the spouse and unmarried sons and daughters (whether by blood or adoption) who are not members of some other household, and who will reside regularly in the household of the principal.  Furthermore, immediate family members also include individuals who:

1.  Are not members of some other household;

2.  Will reside regularly in the principal applicant's household;

3.  Are recognized by the sending government as immediate family members of the principal applicant as demonstrated by eligibility for rights and benefits, such as the issuance of a diplomatic or official passport, travel or other allowances; and

4.  Are individually authorized by DOS.

**Additional Evidence Requirements**

As a Section 13 applicant, you must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, principal applicants must also submit:

1.  Evidence that you were admitted into the United States in A-1, A-2, G-1, or G-2 nonimmigrant status;

2.  Evidence that you performed diplomatic or semi-diplomatic duties (custodial, clerical, or menial duties are not sufficient);

3.  Evidence of compelling reasons why you or a member of your family is unable to return to the country represented by the government which accredited you;

4.  Evidence establishing that granting your adjustment of status would be in the national interest of the United States;

5.  Form I-508, Waiver of Rights, Privileges, Exemptions and Immunities under INA section 247(b) (and Form I-508F, if you are a French national); and

6.  Form I-566, Interagency Record of Request.

In addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, derivative applicants must also submit:

1.  Evidence that you were admitted into the United States in A-1, A-2, G-1, or G-2 nonimmigrant status;

2.  Evidence establishing that granting your adjustment of status would be in the national interest of the United States;

3.  Form I-508, Waiver of Rights, Privileges, Exemptions and Immunities under INA section 247(b) (and Form I-508F, if you are a French national); and

4.  Form I-566, Interagency Record of Request.

**Failing to Maintain Status**

If you were admitted to the United States as an A or G nonimmigrant, you will maintain an A or G nonimmigrant status as long as the U.S. Secretary of State recognizes you as being entitled to such status.  Therefore, you maintain your status until DOS terminates your diplomatic status.

004074

DOS is responsible for terminating an individual's diplomatic status and for determining the date of an individual's termination of status.  DOS requires foreign missions to submit Form DS-2008 (Notice of Termination of Diplomatic, Consular, or Foreign Government Employment) to DOS, without delay, when employees of foreign missions terminate their employment status.  For further information regarding termination of diplomatic status, please contact DOS.

**DOS Consultation**

After your adjustment of status interview with USCIS, USCIS will consult with DOS.  DOS will make a recommendation on the merits of your application.  Once USCIS receives the recommendation, we will make a decision on your application.

**Visa Availability**

Only 50 adjustments under this category are allowed per year.  You may wish to consider applying under another immigrant category, if possible, due to this category's numerical limitation.

### *Indochinese Parole Adjustment Act of 2000*

You may apply to adjust status if you are a national of Vietnam, Cambodia, or Laos who was inspected and paroled into the United States before October 1, 1997 from Vietnam under the Orderly Departure Program (ODP), a refugee camp in East Asia, or a displaced person camp administered by the United Nations High Commissioner for Refugees (UNHCR) in Thailand.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 under the Indochinese Parole Adjustment Act, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

You must submit evidence showing you meet certain requirements specific to this immigrant category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit:

1.   Evidence of Vietnamese, Cambodian, or Laotian citizenship or nationality; and

2.   Evidence of physical presence in the United States before and on October 1, 1997.

## Additional Categories

### *Diversity Visa Program*

Certain foreign nationals who were selected in the Diversity Visa (DV) lottery ("selectee") for the current fiscal year may apply for adjustment of status.  Your selection letter, provided by DOS, confirms that you may qualify to apply for adjustment under this category.

Derivative applicants may file in this category only if they were listed as derivative family members in the principal's DV lottery application.

You may file Form I-485 only when a visa is immediately available.  For information on visa availability for DV applicants, visit the USCIS website at **www.uscis.gov/greencard**.

004075

You and your derivatives may only receive a DV through the end of the specific fiscal year for which you were selected. USCIS cannot approve any DV adjustment application after September 30 of the relevant fiscal year.  Beginning October 1, USCIS must deny any DV adjustment application that remains pending from the prior fiscal year.

USCIS cannot guarantee that it will be able to adjudicate your application before the end of a fiscal year.  Therefore, you are encouraged to file as soon as you are eligible.

**Evidence of Financial Support**

If you are filing Form I-485 as a DV applicant, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As a DV applicant, you must submit evidence showing you meet certain requirements specific to this immigrant category. Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, principal and derivative applicants must also submit:

1.  Evidence of the principal applicant's selection in the DV lottery; and

2.  Evidence that any derivative applicants were originally included in the DV lottery entry (if applicable).

In addition, principal applicants must also submit evidence of the required education or work experience to qualify for adjustment as a DV applicant.

**Evidence of Selection in DV Lottery**

You must provide a copy of the principal applicant's DOS Selection Letter for the DV lottery and a copy of the receipt from DOS for the DV lottery processing fee.

**Evidence of Relationship**

If derivative applicants are filing Form I-485 based on the principal applicant's Selection Letter, you must provide evidence that the principal applicant included the derivative applicants in the entry when entering the DV lottery for the current fiscal year.

If the DV selectee becomes a spouse or parent (whether of a natural, adopted, or stepchild) after submitting the qualifying online DV lottery entry, the spouse and children are eligible for derivative status for immigration purposes.  However, the qualifying marriage, birth, or adoption must occur before the DV selectee becomes a lawful permanent resident.  If the qualifying marriage, birth, or adoption occurs after the DV selectee becomes a lawful permanent resident, then the DV selectee may petition for eligible family members in an appropriate family-based category.

**Evidence of Education or Work Experience**

Principal applicants must provide one of the following:

1.  A high school diploma or its equivalent (Successful completion of a 12-year course of elementary and secondary education in the United States or successful completion of a formal course of elementary and secondary education in another country that is comparable to a high school education in the United States.  Only formal courses of study meet this requirement.  Correspondence programs or equivalency certificates, such as the General Equivalency Diploma (GED), are not acceptable); or

2.  Two years of work experience within the past five years in an occupation requiring at least two years of training or experience.

---

### *Continuous Residence in the United States Since Before January 1, 1972 (Registry)*

Certain foreign nationals who entered the United States prior to January 1, 1972 and have maintained continuous U.S. residence since then may apply to register their lawful permanent resident status.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as an applicant for Registry, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As a Registry applicant, you must submit evidence showing you meet certain requirements specific to this registration category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit:

1.  Evidence you entered the United States before January 1, 1972; and

2.  Evidence establishing continuous residence since entry.

**Evidence of Entry Before January 1, 1972**

You may show evidence of entry by submitting at least one document showing presence in the United States before January 1, 1972.  You may submit as many documents as necessary.

**Evidence of Continuous Residence**

You may establish continuous residence even if you have made numerous brief departures from the United States.

You may submit as many documents as necessary to establish continuous residence during the period of time since your claimed date of entry.  Examples of the types of evidence you may submit include:

1.  Copy of passport pages with nonimmigrant visa, admission, or parole stamps;

2.  Form I-94 Arrival-Departure Record;

3.  Income tax records;

4.  Mortgage deeds or leases;

5.  Insurance premiums and policies;

6.  Birth, marriage, and death certificates of immediate family members;

7.  Medical records;

8.  Bank records;

9.  School records;

10. All types of receipts that contain identifying information about you;

11. Census records;

12. Social Security records;

13. Newspaper articles concerning you;

14. Employment records;

15. Military records;

16. Draft records;

17. Car registrations;

18. Union membership records; and

19. Affidavits from credible witnesses having a personal knowledge of your residence in the United States, submitted with the witness' contact information.

Although you may submit affidavits, you should provide some type of additional evidence to support the application.

### *Individual Born under Diplomatic Status in the United States*

You may apply to register your lawful permanent resident status if you are a foreign national born in the United States to a foreign diplomatic officer accredited to the United States (listed in DOS's Diplomatic List ("Blue List")) and you have maintained continuous residence in the United States since birth.

If you are under 18 years of age, your parent or legal guardian must prepare and sign Form I-485 on your behalf.

Derivative applicants are not allowed in this category.

**Evidence of Financial Support**

If you are filing Form I-485 as an individual born under diplomatic status in the United States, you do not need to submit evidence of financial support.

**Additional Evidence Requirements**

As an individual born in diplomatic status, you must submit evidence showing you meet certain requirements specific to this registration category.  Therefore, in addition to the evidence listed in the **What Evidence Must You Submit with Form I-485** section, you must also submit:

1.  Official confirmation of the diplomatic classification and occupational title of your parent at the time of your birth;

2.  A list of all your arrivals in and departures from the United States;

3.  Proof of your continuous residence in the United States; and

4.  Form I-508, Waiver of Rights, Privileges, Exemptions and Immunities under INA section 247(b) (and Form I-508F, if you are a French national).

**Evidence of Diplomatic Status**

International law states that individuals born in the United States to a foreign diplomatic officer accredited to the United States are not subject to the jurisdiction of the United States.  You are also not a U.S. citizen under the Fourteenth Amendment to the Constitution.  However, you may be considered a lawful permanent resident at birth.

If one of your parents was listed on the Blue List at the time you were born in the United States, you may file Form I-485 in this category.  Both parents do not have to be listed on the Blue List.  The Blue List is available at **https://www.state.gov/resources-for-foreign-embassies/diplomatic-list/.**  However, if one of your parents was a U.S. citizen at the time of your birth, then you are already a U.S. citizen from birth and do not need to file this application.

**Evidence of Continuous Residence**

You must establish that you have not abandoned your residence in the United States.  One of the tests for whether you retained lawful permanent resident status is your continuous residence in the United States.

You may establish continuous residence in the United States since entry even if you have made numerous brief departures from the United States.  You may submit as many documents as necessary to establish continuous residence in the United States.  Examples of the types of evidence you may submit include:

1.  Copy of passport pages with nonimmigrant visa, admission, or parole stamps;

2.  Form I-94 Arrival-Departure Record;

3.  Income tax records;

4.  Mortgage deeds or leases;

5.  Insurance premiums and policies;

6.  Birth, marriage, and death certificates of immediate family members;

7.  Medical records;

**8.** Bank records;

**9.** School records;

**10.** All types of receipts that contain identifying information about you;

**11.** Census records;

**12.** Social Security records;

**13.** Newspaper articles concerning you;

**14.** Employment records;

**15.** Military records;

**16.** Draft records;

**17.** Car registrations;

**18.** Union membership records; and

**19.** Affidavits from credible witnesses having a personal knowledge of your residence in the United States, submitted with the witness' contact information.

Although you may submit affidavits, you should provide some type of additional evidence to support the application.



# Application for Waiver of Grounds of Inadmissibility

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-601**
OMB No. 1615-0029
Expires 02/28/2026

| For USCIS Use Only | Fee Stamp | Initial Receipt | Resubmitted | Action Block |
|---|---|---|---|---|
| | | **Relocated** | | |
| | | Received | Sent | |

**Benefits Category**
☐ **Immigrant**  ☐ **Adjustment of Status**  ☐ **TPS**
☐ **V Nonimmigrant**  ☐ **K Nonimmigrant**

**Inadmissible Under**
☐ **212(a)(1)** _____  ☐ **212(a)(3)** _____  ☐ **212(a)(6)** _____  ☐ **212(a)(10)** _____
☐ **212(a)(2)** _____  ☐ **212(a)(4)** _____  ☐ **212(a)(9)** _____  ☐ **Other** _____

| To be completed by an Attorney or Accredited Representative (if any). | ☐ Select this box if Form G-28 is attached or G-28I is attached. | Attorney State Bar Number (if applicable) | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|---|

▶ **START HERE - Type or print in black ink.**

## Part 1.  Information About You

**1.** Alien Registration Number (A-Number) (if any)
▶ **A-** _____

**2.** USCIS Online Account Number (if any)
▶ _____

### Your Full Name

**3.a.** Family Name (Last Name) _____
**3.b.** Given Name (First Name) _____
**3.c.** Middle Name _____

### Other Names Used

List all other names you have ever used, including maiden names, aliases, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 10. Additional Information**.

**4.a.** Family Name (Last Name) _____
**4.b.** Given Name (First Name) _____
**4.c.** Middle Name _____

## Mailing Address

**NOTE:**  If you are outside of the United States, provide a U.S. mailing address if available.  If a U.S. mailing address is not available, provide your mailing address outside the United States.

**5.a.** In Care Of Name _____

**5.b.** Street Number and Name _____

**5.c.** ☐ Apt. ☐ Ste. ☐ Flr. _____

**5.d.** City or Town _____

**5.e.** State _____ **5.f.** ZIP Code _____

**5.g.** Province _____

**5.h.** Postal Code _____

**5.i.** Country _____

**6.** Is your current physical address the same as your mailing address?  ☐ Yes ☐ No

If you answered "No" to **Item Number 6.,** provide your physical address in **Item Numbers 7.a. - 7.h.**

## Part 1. Information About You (continued)

### Physical Address

**7.a.** Street Number and Name

**7.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**7.c.** City or Town

**7.d.** State   **7.e.** ZIP Code

**7.f.** Province

**7.g.** Postal Code

**7.h.** Country

### Other Information

**8.** U.S. Social Security Number (if any) ▶

**9.** Gender ☐ Male ☐ Female

**10.** Date of Birth (mm/dd/yyyy)

**11.** City or Town of Birth

**12.** Province of Birth (if applicable)

**13.** Country of Birth

**14.** Country of Citizenship or Nationality

If you seek a visa and you were already interviewed by a U.S. Department of State (DOS) consular officer at a U.S. Embassy or U.S. Consulate, provide the information requested in **Item Numbers 15.a. - 15.b.**

**15.a.** DOS Consular Case Number (if available)

**15.b.** The location of the U.S. Embassy or U.S. Consulate where your visa application is being or will be made

City

Country

**16.a.** Are you filing this application after you have already filed Form I-485, Application to Register Permanent Residence or Adjust Status? ☐ Yes ☐ No

**16.b.** If you answered "Yes" to **Item Number 16.a.,** provide the USCIS Receipt Number for your Form I-485.
▶

**17.a.** Are you filing this application after you have already filed Form I-821, Application for Temporary Protected Status? ☐ Yes ☐ No

**17.b.** If you answered "Yes" to **Item Number 17.a.,** provide the USCIS Receipt Number for your Form I-821, if any.
▶

**18.a.** Have you previously filed Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal? ☐ Yes ☐ No

**18.b.** If you answered "Yes" to **Item Number 18.a.,** provide the USCIS Receipt Number for your Form I-212, if any.
▶

**18.c.** Where did you file your application (for example, USCIS Office, U.S. Port-of-Entry, Immigration Court)?

**18.d.** Date Filed (mm/dd/yyyy)

**19.** Are you submitting Form I-212 along with this application? ☐ Yes ☐ No

## Part 2. U.S. Entry Information

Provide information for your previous periods of stay in the United States, beginning with your most recent arrival date.

**NOTE:** If you need extra space to complete this section, use the space provided in **Part 10. Additional Information.**

**1.a.** Date You Entered the U.S. (mm/dd/yyyy)

**1.b.** Immigration Status At the Time of Your Entry Into the U.S.

**1.c.** Location at Which You Entered the U.S.

**1.d.** U.S. City or Town Where You Lived

**2.a.** Date You Entered the U.S. (mm/dd/yyyy)

## Part 2.  U.S. Entry Information (continued)

**2.b.**  Date You Departed the U.S. (mm/dd/yyyy)

**2.c.**  Immigration Status At the Time of Your Reentry Into the U.S.

**2.d**  Location at Which You Entered the U.S.

**2.e.**  U.S. City or Town Where You Lived

## Part 3.  Biographic Information (for USCIS Applicant only)

**1.**  Ethnicity (Select **only one** box)
- ☐ Hispanic or Latino
- ☐ Not Hispanic or Latino

**2.**  Race (Select **all applicable** boxes)
- ☐ White
- ☐ Asian
- ☐ Black or African American
- ☐ American Indian or Alaska Native
- ☐ Native Hawaiian or Other Pacific Islander

**3.**  Height          Feet ☐ Inches ☐

**4.**  Weight          Pounds ☐☐☐

**5.**  Eye Color (Select **only one** box)
- ☐ Black        ☐ Blue        ☐ Brown
- ☐ Gray         ☐ Green       ☐ Hazel
- ☐ Maroon       ☐ Pink        ☐ Unknown/Other

**6.**  Hair Color (Select **only one** box)
- ☐ Bald (No hair)   ☐ Black      ☐ Blond
- ☐ Brown            ☐ Gray       ☐ Red
- ☐ Sandy            ☐ White      ☐ Unknown/Other

## Part 4.  Reasons for Inadmissibility

Select all of the following grounds that you believe, according to the best of your knowledge, or that you were told, apply to you. Only select the applicable grounds listed under the immigration benefit you are seeking.

If you were ever arrested or convicted, provide the disposition (outcome) for all arrests or convictions (for example, dismissed from the appropriate authority).  You also **will be required** to provide **certified** court records or dispositions for all convictions.

If you are seeking a waiver of inadmissibility because you have a Class A Tuberculosis condition (as defined by U.S. Department of Health and Human Services (HHS) regulations), you must complete **Part 11.** of this application.

If you are seeking a waiver of inadmissibility because you have a history of physical or mental disorders, you must attach the information requested in the instructions.

### Section A

**I am an applicant for an immigrant visa or adjustment of status (other than based on T nonimmigrant status or based on classification as a Special Immigrant Juvenile, see Section B below), or for K or V nonimmigrant status, and I believe or I was told that I am inadmissible because (review Form I-601 Instructions for a detailed explanation of the individual grounds of inadmissibility listed below):**

Select all grounds that you believe apply to you.

**1.**  ☐ I have a communicable disease of public health significance.  (A list of communicable diseases of public health significance can be found in the **Specific Instructions** section of Form I-601 Instructions.)

**2.**  ☐ I seek an exemption from the vaccination requirement because vaccinations are against my religious beliefs or moral convictions.

**3.**  ☐ I have or had a physical or mental disorder and behavior (or history of behavior that is likely to recur) associated with the disorder, which has posed or may pose a threat to the property, safety, or welfare of myself or others.

**4.**  ☐ I have been involved in a crime of moral turpitude (other than a purely political offense).

**5.**  ☐ I have been involved in a controlled substance violation according to the laws and regulations of any state, the United States, or a foreign country related to a single offense of simple possession of 30 grams or less of marijuana.

**6.**  ☐ I have been convicted of two or more offenses (other than purely political offenses), for which the combined sentences to confinement were five years or more.

**7.**  ☐ I am coming to the U.S. to engage in prostitution or, in the past 10 years, I have engaged in prostitution (including receiving the proceeds of, in full or in part), procurement of prostitution, or I continue to engage in prostitution or procurement of prostitution.

**8.**  ☐ In the past 10 years, I have (either directly or indirectly) procured, attempted to procure, or to import prostitutes or persons for the purpose of prostitution.

## Part 4.  Reasons for Inadmissibility (continued)

9. ☐ I came to the United States or I am coming to the United States to engage in any other unlawful commercialized vice whether or not it is related to prostitution.

10. ☐ I have been involved in serious criminal activity and have asserted immunity from prosecution.

11. ☐ I am or I have been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate of the party,) domestic or foreign.

12. ☐ I have sought to procure an immigration benefit by fraud or by concealing or misrepresenting a material fact (immigration fraud or misrepresentation.)

13. ☐ I have been engaged in alien smuggling.

14. ☐ I am subject to a civil penalty because I was the subject of a final order for violation of the Immigration and Nationality Act (INA) section 274C.

15. ☐ I am subject to the 3-year or the 10-year bar to admissibility because I was previously unlawfully present in the United States in excess of either 180 days or one year or more, respectively, and subsequently departed the United States.

16. ☐ I was previously removed from the United States. (See instructions for Nicaraguan Adjustment and Central American Relief Act (NACARA) and Haitian Refugee Immigration Fairness Act (HRIFA) applicants only.  All other applicants file Form I-212.)

17. ☐ I have been ordered removed or I have been unlawfully present in the United States for more than one year, in the aggregate, and I subsequently reentered or attempted to reenter without being admitted.  (See instructions for NACARA, HRIFA, and the instructions for approved Violence Against Women Act (VAWA) self-petitioners only.  Other applicants file Form I-212.)

18. ☐ Other (specify):

_____

_____

### Section B

**I am applying for adjustment of status based on a valid T nonimmigrant status or based on classification as a Special Immigrant Juvenile and I believe or I was told that I am inadmissible because:**

19. ☐ Specify (Review Form I-601 Instructions for a detailed explanation of the individual grounds of inadmissibility related to your Form I-601.)

_____

_____

### Section C

**I am applying for TPS and I believe or I was told that I am inadmissible because:**

Select all grounds that you believe, according to the best of your knowledge, or that you were told apply to you.

20. ☐ I have a communicable disease of public health significance.  (A list of communicable diseases of public health significance can be found in the **Specific Instructions** section of Form I-601 Instructions.)

21. ☐ I have or had a physical or mental disorder and behavior (or a history of behavior that is likely to recur) associated with the disorder, which has posed or may pose a threat to the property, safety, or welfare of myself or others.

22. ☐ I am or have been a drug abuser or drug addict as described in U.S. Department of Health and Human Services (HHS) Regulations.  See 42 CFR 34.

23. ☐ I have been involved in a controlled substance violation according to the laws and regulations of any state, the United States, or a foreign country related to a single offense of simple possession of 30 grams or less of marijuana.

24. ☐ I am coming to the U.S. to engage in prostitution or, in the past 10 years, I have engaged in prostitution (including receiving the proceeds of, in full or in part,) procurement of prostitution, or I continue to engage in prostitution or procurement of prostitution.

25. ☐ In the past 10 years, I have (either directly or indirectly,) procured, attempted to procure, or to import prostitutes or persons for the purpose of prostitution.

26. ☐ I came to the United States or I am coming to the United States to engage in any other unlawful commercialized vice, whether or not is related to prostitution.

27. ☐ I have been involved in serious criminal activity and have asserted immunity from prosecution.

28. ☐ I did not attend or did not remain at a removal proceeding to determine my inadmissibility or deportability.

## Part 4.  Reasons for Inadmissibility (continued)

29. ☐ I have sought to procure an immigration benefit by fraud or by concealing or misrepresenting a material fact (immigration fraud or misrepresentation).

30. ☐ I falsely represented myself as a U.S. citizen.

31. ☐ I have been engaged in alien smuggling.

32. ☐ I am subject to a civil penalty because I have been the subject of a final order for violation of INA section 274C.

33. ☐ I am ineligible for U.S. citizenship because I departed from or remained outside the United States to avoid or evade training or service in the armed forces in a time of war or national emergency.

34. ☐ I have practiced polygamy since I entered the United States or I intend to practice polygamy in the United States.

35. ☐ I am accompanying another alien who is inadmissible after being certified to be helpless under INA section 232(c) and I am inadmissible because that other alien requires my protection or guardianship.

36. ☐ I have detained, retained, or withheld the custody of a child having a lawful claim to U.S. citizenship, outside the United States, from a person granted custody.

37. ☐ I was an unlawful voter who voted in violation of a Federal, state, or local constitutional provision, statute, ordinance, or regulation.

38. ☐ I am a former U.S. citizen who renounced my citizenship in order to avoid taxation by the United States.

39. ☐ Other (specify):

### Your Inadmissibility Statement

In the space provided in **Item Number 40.**, provide a statement and a full explanation of the acts, convictions, and/or medical conditions that you believe or you were told make you inadmissible.

Your statement must indicate when you engaged in the acts that you believe make you inadmissible, the date of all convictions, or the date of any medical diagnosis.  You **must** provide this information even if the information is also in the documents that you submit with your application.

If you need extra space to complete your statement, use the space provided in **Part 10. Additional Information** or attach a separate letter.  If you include a separate letter, indicate in **Item Number 39.** that you are attaching a letter.

40.

## Part 5.  Information About Your Qualifying Relatives

Provide information for your U.S. citizen or lawful permanent resident through whom you are eligible to submit this application.  In **Item Number 9.**, provide a statement explaining the extreme hardship that you or your qualifying relative (U.S. citizen, lawful permanent resident, or other qualified parent or child) has or will experience if you are refused the immigration benefit you are seeking.  It is not necessary for an SIJ to complete **Part 5.** of the application.

☐  Select here if you are a VAWA self-petitioner and would like to claim extreme hardship to yourself.  (If you are only claiming extreme hardship for yourself, you can skip to **Item Number 9.**  If you have additional qualifying relatives to whom you would like to claim extreme hardship, provide their information below.)

### Relative's Full Name

**1.a.**  Family Name (Last Name)

**1.b.**  Given Name (First Name)

**1.c.**  Middle Name

### Physical Address

**2.a.**  Street Number and Name

**2.b.**  ☐ Apt.  ☐ Ste.  ☐ Flr.

**2.c.**  City or Town

**2.d.**  State

**2.e.**  ZIP Code

**2.f.**  Province

**2.g.**  Postal Code

**2.h.**  Country

### Contact Information

**3.**  Daytime Telephone Number (if any)

**4.**  Email Address (if any)

### Other Information

**5.**  What is your relative's relationship to you?

**6.**  What is your relative's immigration status?

**7.**  Relative's A-Number (if any)

▶ A-

**8.**  Date of Birth (mm/dd/yyyy)

☐  Select this box if you have additional relatives through whom you claim eligibility and use the space provided in **Part 10. Additional Information** to provide the same information as requested in **Part 5., Item Numbers 1.a. - 8.**

### Statement From Applicant (Extreme Hardship)

In the space provided below, explain the extreme hardship that your qualifying relative (or yourself if you are a VAWA self-petitioner) would experience if you are refused the immigration benefit you are seeking.  For more information on extreme hardship, see Form I-601 Instructions.  If you need extra space to complete your statement, use the space provided in **Part 10. Additional Information** or attach a separate letter.  Indicate in **Item Number 9.** if you are attaching a separate letter.  The letter must be submitted at the same time as your Form I-601 application.

**9.**

## Part 6.  Information About Your Other Relatives With Ties to the United States

Provide information for any other U.S. citizen, lawful permanent resident, or any other family members you would like considered in deciding your case.  In the space provided in **Item Number 9.**, include a statement explaining why you believe your application should be approved as a matter of discretion, with the favorable factors outweighing the unfavorable factors in your case.

### Relative's Full Name

**1.a.**  Family Name (Last Name)

**1.b.**  Given Name (First Name)

**1.c.**  Middle Name

## Part 6.  Information About Your Other Relatives With Ties to the United States (continued)

### Physical Address

**2.a.** Street Number and Name _____

**2.b.** ☐ Apt.  ☐ Ste.  ☐ Flr. _____

**2.c.** City or Town _____

**2.d.** State _____   **2.e.** ZIP Code _____

**2.f.** Province _____

**2.g.** Postal Code _____

**2.h.** Country _____

### Contact Information

**3.** Daytime Telephone Number (if any) _____

**4.** Email Address (if any) _____

### Other Information

**5.** What is your relative's relationship to you? _____

**6.** What is your relative's immigration status? _____

**7.** Relative's A-Number (if any)
► A- _____

**8.** Date of Birth (mm/dd/yyyy) _____

☐ Select this box if you have any other relatives with ties to the United States and use the space provided in **Part 10. Additional Information** to provide the same information as requested in **Part 6., Item Numbers 1.a. - 8.**

### Statement From Applicant (Discretion)

In the space provided below, explain why you believe your application should be approved as a matter of discretion, with the favorable outweighing the unfavorable factors in your case. For more information on discretion, see Form I-601 Instructions. If you need extra space to complete your statement, use the space provided in **Part 10. Additional Information** or attach a separate letter.  Indicate in **Item Number 9.** if you are attaching a separate letter.  The letter must be submitted at the same time as your Form I-601 application.

**9.** _____

## Part 7.  Applicant's Contact Information, Certification, and Signature

### Applicant's Contact Information

Provide your daytime telephone number, mobile telephone number (if any), and email address (if any).

**1.** Applicant's Daytime Telephone Number _____

**2.** Applicant's Mobile Telephone Number (if any) _____

**3.** Applicant's Email Address (if any) _____

### Applicant's Certification and Signature

I certify, under penalty of perjury, that I provided or authorized all of the responses and information contained in and submitted with my application, I read and understand or, if interpreted to me in a language in which I am fluent by the interpreter listed in **Part 8.**, understood, all of the responses and information contained in, and submitted with, my application, and that all of the responses and the information is complete, true, and correct. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for an immigration request and to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

**4.a.** Applicant's Signature (sign in ink)
➡ _____

**4.b.** Date of Signature (mm/dd/yyyy) _____

## Part 8.  Interpreter's Contact Information, Certification, and Signature

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name

### Interpreter's Contact Information

**3.** Interpreter's Daytime Telephone Number

**4.** Interpreter's Mobile Telephone Number (if any)

**5.** Interpreter's Email Address (if any)

### Interpreter's Certification and Signature

I certify, under penalty of perjury, that I am fluent in English and _____,
and I have interpreted every question on the application and Instructions and interpreted the applicant's answers to the questions in that language, and the applicant informed me that they understood every instruction, question, and answer on the application.

**6.a.** Interpreter's Signature

**6.b.** Date of Signature (mm/dd/yyyy)

## Part 9.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name

### Preparer's Contact Information

**3.** Preparer's Daytime Telephone Number

**4.** Preparer's Mobile Telephone Number (if any)

**5.** Preparer's Email Address (if any)

### Preparer's Certification and Signature

I certify, under penalty of perjury, that I prepared this application for the applicant at their request and with express consent and that all of the responses and information contained in and submitted with the application is complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that they understand the responses and information in or submitted with the application.

**6.a.** Preparer's Signature (sign in ink)

**6.b.** Date of Signature (mm/dd/yyyy)

## Part 10.  Additional Information

If you need extra space to provide any additional information within this application, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, **and Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name
(Last Name)

**1.b.** Given Name
(First Name)

**1.c.** Middle Name

**2.** A-Number (if any) ▶ **A-**

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.**

004088

## Part 11.  Statement for Applicants With a Class A Tuberculosis Condition (As Defined By HHS Regulations)

To be completed for applicants with a Class A Tuberculosis Condition (as defined by HHS Regulations).

### Statement by Applicant

Upon admission to the United States, I will go directly to the health department named in the section below; present all X-rays used in the visa medical examination to substantiate diagnosis; submit to such examinations, treatment, isolation, and medical regimen as may be required; and remain under the prescribed treatment or observation, whether on an inpatient or outpatient basis, until discharged.

**1.a.** Signature of Applicant (sign in ink)

**1.b.** Date of Signature (mm/dd/yyyy)

### Statement by Local (City or County) Health Department

**NOTE:** The physician at the local health department in the area where the alien plans to reside should complete this statement.

I agree to supply any treatment or observation necessary for the proper management and continued care of the alien's tuberculosis condition.

Within 30 days of the alien reporting for care, I agree to submit a summary of my initial evaluation of the alien's condition, indicate presumptive diagnosis, and provide test results and plans for future care of the alien to the State Health Department Official named in the **Endorsement of State Health Department Official** section and to the **Division of Global Migration and Quarantine (E03), Centers for Disease Control and Prevention (CDC), Atlanta, Georgia 30333.**

I also agree to report the alien if the alien has not reported within 30 days after receiving notice from the Division of Global Migration and Quarantine, CDC.

Satisfactory financial arrangements have been made.  (This statement does not relieve the alien from submitting evidence, as required by a U.S. Consulate, to establish that the alien is not likely to become a public charge.)

I represent (select the appropriate box and give the complete name, address, certification, and contact information of the health department):

**2.a.** ☐ City Health Department

**2.b.** ☐ County Health Department

**3.** Name of Health Department

### Physical Address

**4.a.** Street Number and Name

**4.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**4.c.** City or Town

**4.d.** State            **4.e.** ZIP Code

### Physician's Certification

**5.a.** Signature of Physician (sign in ink)

**5.b.** Date of Signature (mm/dd/yyyy)

**5.c.** Physician's Family Name (Last Name)

**5.d.** Physician's Given Name (First Name)

### Physician's Contact Information

**6.** Daytime Telephone Number

**7.** Email Address (if any)

### Arrangement for Medical Care by the Applicant or His or Her Sponsor

Arrange for medical care (of the applicant) and have the appropriate health departments complete **Statement by Local (City or County) Health Department** and **Endorsement of State Health Department Official** sections.

**Provide the following information:**

Address where you (the sponsor) or the applicant plan to reside in the United States:

**8.a.** Street Number and Name

**8.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**8.c.** City or Town

**8.d.** State            **8.e.** ZIP Code

## Part 11.  Statement for Applicants With a Class A Tuberculosis Condition (As Defined By HHS Regulations) (continued)

### *Endorsement of State Health Department Official*

**NOTE:**  The State Health Department Official in the area where the applicant plans to reside should complete this statement.

Endorsement signifies recognition of the local health department that completed the **Statement by Local (City or County) Health Department** section for the purpose of providing care and treatment of the applicant's tuberculosis condition, and that the local health department is within your jurisdiction.  Endorsement also signifies recognition that the applicant will be residing within your state's health jurisdiction.

**Endorsed by:**

**9.a.**  Signature of State Health Department Official (sign in ink)

**9.b.**  Date of Signature (mm/dd/yyyy)

**10.**  Name of State Health Department

### *Physical Address*

**11.a.**  Street Number and Name

**11.b.**  ☐ Apt.  ☐ Ste.  ☐ Flr.

**11.c.**  City or Town

**11.d.**  State

**11.e.**  ZIP Code

### *Contact Information*

**12.**  Daytime Telephone Number

**13.**  Email Address (if any)

**NOTE to the Applicant and his or her Sponsor:**  If you need assistance, contact USCIS at the National Customer Service Center at **1-800-375-5283**.  You may also schedule an appointment online at **www.uscis.gov**.  Select "Schedule an Appointment" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

**NOTE to the Applicant:**  If you are approved for a waiver and after admission to the United States, you fail to comply with the terms, conditions, and controls that were imposed with the grant of the waiver, you may be subject to removal under INA section 237(a).



# Instructions for Application for
# Waiver of Grounds of Inadmissibility

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-601**
OMB No. 1615-0029
Expires 02/28/2026

---

## What is the Purpose of Form I-601?

An individual who is ineligible to be admitted to the United States as an immigrant or to adjust status in the United States, and certain nonimmigrant applicants who are inadmissible, must file this application to seek a waiver of certain grounds of inadmissibility.

Review the **Who May File Form I-601** section of these Instructions to determine your eligibility to submit this application. This section outlines possible waivers and can help you determine if you need a qualifying family relationship to be eligible to file. Information on qualifying family members is listed in the **Reasons for Inadmissibility** section of these Instructions.

The **Reasons for Inadmissibility** section of these Instructions outlines requirements you must establish in order to have a particular ground of inadmissibility waived.

**NOTE:** Use Form I-601A, Application for Provisional Unlawful Presence Waiver, to request a provisional waiver of the ground of inadmissibility for unlawful presence in the United States under Immigration and Nationality Act (INA) section 212(a)(9)(B) only. DO NOT use Form I-601 if you are applying for a provisional unlawful presence waiver.

---

## Who May File Form I-601?

Whether you are eligible for a waiver depends on the immigration benefit you are seeking and the reason for your inadmissibility. Below is a list that details which immigrant benefits allow for a waiver of certain grounds of inadmissibility. Go to the page number listed to obtain more information.

**Categories**

**If you are an applicant for an immigrant, K, or V nonimmigrant visa (and you are outside the United States, have had a visa interview with a consular officer, and during the interview, you were found inadmissible,) or you are an applicant for adjustment of status to lawful permanent residence (excluding adjustment categories listed below,) you may file this application to obtain relief from the following grounds:**

1. Health-related grounds of inadmissibility (INA section 212(a)(1)) ............................................................**9**

2. Certain criminal grounds of inadmissibility (INA section 212(a)(2))........................................................**11**

3. Immigration fraud and misrepresentation (INA section 212(a)(6)(c))......................................................**11**

4. Immigrant membership in totalitarian party (INA section 212(a)(3))........................................................**12**

5. Alien smuggler (INA section 212(a)(6)(E)) ...............................................................................................**12**

6. Being subject to civil penalty (INA section 212(a)(6)(F)) ........................................................................**12**

7. The 3-year or 10-year bar due to previous unlawful presence in the United States (INA section 212(a)(9)(B)) .......**13**

**If you are an applicant for Temporary Protected Status (TPS),** you may file this application to obtain relief from the following grounds:

1. Most grounds of inadmissibility listed in INA section 212(a) ...................................................................**13**

---

**If you are an applicant for adjustment of status under the Nicaraguan Adjustment and Central American Relief Act (NACARA) 202 or Haitian Refugee Immigration Fairness Act (HRIFA) 902, y**ou may file this application to obtain relief from the following grounds:

1. All grounds listed for the adjustment of status applicants except the 3-year or 10-year bar due to previously unlawful presence in the United States (See pages relating to the adjustment of status applicants, listed above.) ..................**14**

2. Aliens previously removed (INA section 212(a)(9)(A)) ...........................................................................**14**

3. Unlawfully present after previous immigration violations (INA section 212(a)(9)(C)) ............................................**14**

**If you are an applicant for an immigrant visa or adjustment of status as a Violence Against Women Act (VAWA) self-petitioner or the child of a VAWA self-petitioner,** you may file this application to obtain relief from the following grounds:

1. All grounds listed for the adjustment of status applicants.  (See pages relating to the adjustment of status applicants, listed above.) ......................................................................................................................**15**

2. Unlawfully present after previous immigration violations (INA section 212(a)(9)(C)) ............................................**15**

**NOTE:**  VAWA self-petitioners (and their children) seeking adjustment have a special form of relief available if they are inadmissible under the 3-year or 10-year bar (INA section 212(a)(9)(B)(i)).  VAWA self-petitioners (and their children) who are not eligible for this special form of relief, but meet the requirements for the waiver under INA section 212(a)(9)(B)(v), may file Form I-601.  See the **You Are an Approved VAWA Self-Petitioner or the Child of an Approved VAWA Self-Petitioner Seeking a Waiver Under INA Section 212(a)(9)(C)(iii) for Being Unlawfully Present After Previous Immigration Violations Under INA Section 212(a)(9)(C)** of these Instructions.

**If you are an applicant for adjustment of status based on T nonimmigrant status,** you may file this application to obtain relief from the following grounds:

1. Most grounds listed in INA section 212(a) ......................................................................................................**15**

**If you are an applicant for adjustment of status as a Special Immigrant Juvenile (SIJ) based on an approved Form I-360,** you may file this application to obtain relief from the following grounds:

1. Most grounds listed in INA section 212(a) ......................................................................................................**16**

## How Long Is a Waiver Valid?

Except as provided below, if you are granted a waiver of grounds of inadmissibility in connection with your immigrant visa or adjustment of status application, the waiver is valid indefinitely.  This is true even if you do not obtain your immigrant visa, or immigrant admission, or adjustment of status, or if you lose your legal permanent resident (LPR) status.

**NOTE:**  If this Form I-601 is approved, the waiver that is granted will apply **only** to the grounds of inadmissibility and those crimes, incidents, events, or conditions that you have included in your application.  For this reason, it is important that you disclose all conduct or conditions that may cause you to be inadmissible and list all grounds of inadmissibility for which you seek a waiver.

The following waivers are either conditional or limited to certain benefits.

**Convention Adoptee.**  If you obtain a waiver in connection with Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative, the approval of your waiver is conditioned upon the final issuance of an immigrant or nonimmigrant visa based on the final approval of Form I-800.

004092

**K Nonimmigrant Visa Applicant.**  If you obtain a waiver in connection with an application for a K-1 or K-2 nonimmigrant visa, the approval of your waiver is conditioned upon the marriage of the K-1 visa applicant and the K-1 visa petitioner after the K-1 nonimmigrant visa applicant is admitted to the United States.

**Conditional Resident.**  If you obtain a waiver in connection with an application for lawful permanent residence on a conditional basis under INA section 216 or INA section 216A, the validity of the waiver automatically ceases with the termination of such residence.  No separate notification of termination of the waiver is needed, and you cannot appeal the termination of the waiver.  However, if the immigration judge determines that you are not removable based on the termination of your conditional resident status, the waiver will become effective again.

**TPS Applicant.**  If you obtain a waiver in connection with Form I-821, Application for Temporary Protected Status, the waiver is only valid for the TPS application.  If granted, the waiver will apply to subsequent TPS re-registration applications, but not to any other immigration benefit requests.

## General Instructions

U.S. Citizenship and Immigration Services (USCIS) provides forms free of charge through the USCIS website.  In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have Internet access, you may call the USCIS National Customer Service Center at **1-800-375-5283** and ask that we mail a form to you.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**. If you are filing this application electronically, you must follow the instructions provided on the USCIS website at **www.uscis.gov/file-online**.

**Signature.**  Each application must be properly signed and filed.  For all signatures on this application, USCIS will not accept a stamped or typewritten name in place of a signature.  If you are under 14 years of age, your parent or legal guardian may also sign the application on your behalf.  A legal guardian may also sign for a mentally incompetent person.

**Filing Fee.**  See Form G-1055, Fee Schedule, available at **www.uscis.gov/g-1055**, for all information on filing fees.

**Biometric Services Fee.**  If you file this application with USCIS, you do not need to include a biometric services fee at the time you submit your application.  If you are later notified that you must submit biometrics, you will receive a biometric services appointment notice with instructions on how to submit the additional biometric services fee.  If you file this application with an agency other than USCIS, please check with that agency to determine if and when you must submit a biometric services fee.

**Evidence.**  At the time of filing, you must submit all evidence and supporting documentation listed in the **Specific Instructions** and/or **What Evidence Must You Submit** section of these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide fingerprints, photograph, and/or signature at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application, petition, or request.  After USCIS receives your application and ensures it is complete, we will inform you in writing if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

004093

1.  You provided or authorized all information in the application;

2.  You reviewed and understood all of the information contained in, and submitted with, your application; and

3.  All of this information was complete, true, and correct at the time of filing.

If you fail to attend your biometric services appointment, USCIS may deny your application.

If you file this application with an agency other than USCIS, review the instructions provided by that agency to determine whether you should provide biometrics.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application, petition, or request.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**NOTE:**  If you submit original documents when not required or requested by USCIS, **your original documents may be immediately destroyed upon receipt.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification must include the translator's signature.  DHS recommends the certification contain the translator's printed name and the date and the translator's contact information.

## How to Fill Out Form I-601

1.  Type or print legibly in black ink.

2.  If you need extra space to complete any item within this application, use the space provided in **Part 10. Additional Information** or attach a separate sheet of paper; type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3.  Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A," unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None," unless otherwise directed.

| Specific Instructions |
|---|

**Part 1.  Information About You**

**Item Number 1.  Alien Registration Number (A-Number)** (if any)**.**  An Alien Registration Number, otherwise known as an "A-Number," is typically issued to persons who apply for, or are granted, certain immigration benefits.  In addition to USCIS, U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), Executive Office for Immigration Review (EOIR), and U.S. Department of State (DOS) may also issue an A-Number to certain aliens.  If you were issued an A-Number, type or print it in the spaces provided.  If you do not have an A-Number, or if you cannot remember it, leave this space blank.

004094

**Item Number 2.  USCIS Online Account Number** (if any).  If you have previously filed an application, petition, or request using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications, petitions, or requests on a paper form via a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  If you received such a notice, your USCIS Online Account Number can be found at the top of the notice.  If you were issued a USCIS Online Account Number, enter it in the space provided.  The USCIS Online Account Number is not the same as an A-Number.

**Item Numbers 3.a. - 3.c.  Your Full Name.**  Provide your full legal name as shown on your identity documents or legal change of name document in the spaces provided.

**Item Numbers 4.a. - 4.c.  Other Names Used.**  Provide other names you have used since birth, including your maiden name, any nicknames, and any names that appear in your documents.  If you need extra space to complete this section, use the space provided in **Part 10. Additional Information** to provide other names used.

**Item Numbers 5.a. - 5.i.  Mailing Address.**  Provide a valid mailing address.  Use an address in the United States, if one is available.  If you do not have a U.S. mailing address, provide your foreign mailing address.

**Item Numbers 6. - 7.h.  Physical Address.**  If the place where you live is different from your mailing, type or print the address where you currently live.

**Item Number 8.  U.S. Social Security Number** (if any).  Provide your U.S. Social Security Number.  Also include all social security numbers you have ever used.  If you need extra space to complete this section, use the space provided in **Part 10. Additional Information** to provide additional U.S. Social Security Numbers.

**Item Number 9.  Gender.**  Select the box that indicates whether you are male or female.

**Item Number 10.  Date of Birth.**  Provide your date of birth in mm/dd/yyyy format in the space provided.

**Item Numbers 11. - 13.  Place of Birth.**  Provide the name of the city or town, province, and country where you were born.  Type or print the name of the country as it was named when you were born, even if the country's name has changed or the country no longer exists.

**Item Number 14.  Country of Citizenship or Nationality.**  Type or print the name of the country where you are currently a citizen or national.  If you are stateless, type or print the name of the country where you were last a citizen or national.  If you are a citizen or national of more than one country, type or print the name of the foreign country that issued your last passport.

**Item Numbers 15.a. - 15.b.  Form I-601 Waivers Filed with Immigrant Visa or K or V Nonimmigrant Visa Applications.**  If you are seeking an immigrant visa or a K or V nonimmigrant visa and you were already interviewed by a DOS consular officer, provide the DOS Consular Case Number for your visa application (if available) and indicate where your visa interview occurred (that is, the location of the U.S. Embassy or U.S. Consulate.)

**Item Numbers 16.a. - 16.b.  Form I-601 Waivers Filed with Adjustment of Status Applications.**  If you are filing this application after you have filed an application to adjust your immigration status to that of a lawful permanent resident, provide the USCIS receipt number for your Form I-485.

**Item Numbers 17.a. - 17.b.  Form I-601 Waivers Filed with Temporary Protected Status Applications.**  If you are filing your Form I-601 after you have already filed Form I-821, provide the USCIS receipt number for your Form I-821.

**Item Numbers 18.a. - 19.  Form I-601 Waivers Filed with Consent to Reapply Applications.**  If you previously filed an application for consent to reapply, provide the USCIS receipt number for your Form I-212.  If you are filing Form I-212 with your Form I-601, select "Yes" for **Item Number 19.**

004095

**Part 2.  U.S. Entry Information**

**Item Number 1.a.  Date You Entered the United States.**  Beginning with your most recent arrival in the United States, provide the date you entered the United States in the mm/dd/yyyy format.

**Item Number 1.b.  Immigration Status at the Time You Entered the United States.**  Provide the letter and number that correlates with your status when you re-entered the United States.

**Item Numbers 1.c. - 1.d.  Location at Which You Entered the United States and U.S. City or Town Where You Lived.**  Provide the location where you entered the United States and the city or town where you lived.

**Item Numbers 2.a. - 2.e.**  If you were previously in the United States on multiple occasions, continue to list your periods of stay, beginning with **Item Number 2.a.**  If you need extra space to list other periods of stay, use the space provided in **Part 10. Additional Information**.

**Part 3.  Biographic Information** (for USCIS Applicants only)

Provide the biometrics information requested in **Part 3.**, **Item Numbers 1. - 6.**  Providing this information as part of your application also may reduce the time you spend at your USCIS ASC appointment as described in the **Biometric Services Appointment** section of these Instructions.

**Item Numbers 1. - 2.  Ethnicity and Race.**  Select the boxes that best describe your ethnicity and race.

**Categories and Definitions for Ethnicity and Race**

1. **Hispanic or Latino.**  A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.  (**NOTE:**  This category is only included under Ethnicity in **Part 3.**, **Item Number 1.**)

2. **White.**  A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

3. **Asian.**  A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

4. **Black or African American.**  A person having origins in any of the black racial groups of Africa.

5. **American Indian or Alaska Native.**  A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

6. **Native Hawaiian or Other Pacific Islander.**  A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

**Item Number 3.  Height.**  Select the values that best match your height in feet and inches.  For example, if you are five feet and nine inches, select "5" for feet and "09" for inches.  Do not enter your height in meters or centimeters.

**Item Number 4.  Weight.**  Enter your weight in pounds.  If you do not know your weight, or need to enter a weight under 30 pounds or over 699 pounds, enter "000."  Do not enter your weight in kilograms.

**Item Number 5.  Eye Color.**  Select the box that best describes the color of your eyes.

**Item Number 6.  Hair Color.**  Select the box that best describes the color of your hair.

**Part 4.  Reasons for Inadmissibility**

This section outlines requirements you must establish in order to have a particular ground of inadmissibility waived. Before completing **Part 4.**, carefully read through the Instructions.

004096

**Section A.  Item Numbers 1. - 18.  Applicants for Immigrant Visa, Adjustment of Status (other than based on T nonimmigrant status or based on classification as a Special Immigrant Juvenile), or K or V Nonimmigrant Status.**  Select all of the grounds of inadmissibility that you believe, to the best of your knowledge, apply to you.  If a ground of inadmissibility does not appear in **Item Numbers 1. - 18.**, complete **Item Number 19.**, and specify the applicable ground of inadmissibility or other circumstances or conduct which you believe make you inadmissible to the United States.

**Section B.  Item Number 19.  T Nonimmigrants or Special Immigrant Juveniles Applying for Adjustment of Status.**  Specify the grounds of inadmissibility that, to the best of your knowledge, apply to you.

**Section C.  Item Numbers 20. - 39.  Applicants for Temporary Protected Status.**  Select the grounds of inadmissibility that you believe, to the best of your knowledge, apply to you.  If a ground of inadmissibility does not appear in **Item Numbers 20. - 39.**, complete **Item Number 40.**, and specify the applicable ground of inadmissibility and other circumstances or conduct which you believe make you inadmissible to the United States.

**Section D.  Item Number 40.  Your Inadmissibility Statement.**  Provide a statement that explains the acts, convictions, and/or medical conditions you believe make you inadmissible to the United States.  Include dates for all convictions and certified court documents, including judgments that show the disposition of any criminal arrests and/or convictions.

**Part 5.  Information About Your Qualifying Relatives**

Provide information about your qualifying relative through whom you are claiming eligibility for a waiver.  Pay close attention to which qualifying family relationship you must establish when applying for a waiver.  The different waivers require different qualifying relationships.  The required relationship is discussed in the **Reasons for Inadmissibility** section.

**Item Numbers l.a. - l.c. Relative's Full Name.**  Provide the full name of your qualifying relative.

**Item Numbers 2.a. - 4.  Physical Address and Contact Information.**  Provide the physical address where your qualifying relative currently resides in the spaces provided.  Include his or her current daytime telephone number and email address (if any).

**Item Numbers 5. - 8.  Other Information.**  Indicate your relationship to your qualifying relative through whom you are claiming eligibility for a waiver (for example, U.S. citizen or LPR spouse, parent, or child.)  Also provide your relative's current immigration status, A-Number (if any), and date of birth in the mm/dd/yyyy format.  If you have additional qualifying relatives through whom you claim eligibility, select the box under **Item Number 8.** and provide your other qualifying relative's name, relationship to you, current immigration status, A-Number (if any), and date of birth in the mm/dd/yyyy format.

**Item Number 9.  Statement from Applicant (Extreme Hardship).**  Explain the extreme hardship your qualifying relative (for example, U.S. citizen or LPR spouse, parent, or child) would experience if you were refused admission to the United States.

**Note to K-1 and K-2 Nonimmigrant Visa Applicants**

Since you do not have the requisite relationship to a citizen or lawful permanent resident of the United States to qualify for a waiver, you must enter one of the following in **Part 5.**

**Information About Qualifying Relatives**

1.  **If you are a fiancé(e) of a U.S. citizen:**

     **A.**  Complete **Item Numbers 1.a. - 8.** with information about the U.S. citizen who filed a fiancé(e) petition on your behalf; and

     **B.**  Type or print "Prospective Spouse" in the space provided for **Item Number 5.**

2. **If you are the child of a fiancé(e) of a U.S. citizen and will be under 18 years of age when your parent marries that person:**

    A. Complete **Item Numbers 1.a. - 8.** with information about the U.S. citizen who filed a fiancé(e) petition on your parent's behalf; and

    B. Type or print "Prospective Step-Parent" in the space provided for **Item Number 5.**

3. **If you are the child of a fiancé(e) of a U.S. citizen, and will be at least 18 years of age but under 21 years of age when your parent marries such person:**

    A. Complete **Item Numbers 1.a. - 8.** with information about your parent who will marry the U.S. citizen who filed a fiancé(e) petition on your parent's behalf;

    B. Type or print "Parent" in the space provided for **Item Number 5.**; and

    C. Type or print "Prospective LPR" in the space provided for **Item Number 6.**

USCIS will conditionally approve the waiver application if USCIS determines that you will be eligible for an immigrant waiver of inadmissibility upon your (or your parent's) proposed bona fide marriage to the K nonimmigrant petitioner. The condition imposed on the approval is the celebration of the proposed bona fide marriage between you (or your parent) and the K visa petitioner. If that marriage occurs, the waiver becomes valid indefinitely (although subject to 8 CFR 212.7(a)(4)(iv)) even if you later abandon or otherwise lose lawful permanent resident status. If you do not (or your parent does not) marry the K visa petitioner, you remain inadmissible for purposes of any application for a benefit on any basis other than the proposed marriage between you (or your parent) and the K visa petitioner.

**Part 6.  Information About Your Other Relatives with Ties to the United States**

**Item Numbers l.a. - l.c. Relative's Full Name.** Provide the full name of your relative.

**Item Numbers 2.a. - 4. Physical Address and Contact Information.** Provide the physical address where your relative currently resides in the spaces provided. Include his or her current daytime telephone number and email address (if any).

**Item Numbers 5. - 8.  Other Information.** Indicate your relationship to your other relatives in the United States and provide his or her current immigration status, A-number (if any), and date of birth in the mm/dd/yyyy format.

**Item Number 9.  Statement from Applicant (Discretion).** Explain why you believe your application should be approved as a matter of discretion, if applicable, and why the favorable factors in your case should outweigh the unfavorable factors.

**Part 7.  Applicant's Contact Information, Certification, and Signature**

You must sign and date your application and, if applicable, provide your daytime telephone number, mobile telephone number, and email address. The signature of a parent or legal guardian, if applicable, is acceptable. A stamped or typewritten name in place of a signature is not acceptable.

**Part 8.  Interpreter's Contact Information, Certification, and Signature**

If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any). The interpreter must sign and date the application.

**Part 9.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant**

The person who completed your application, if other than the applicant must sign this section. If the same individual acted as your interpreter and your preparer, then that person should complete both **Part 7.** and **Part 8.** A stamped or typewritten name in place of a signature is not acceptable.

004098

**Part 10.  Additional Information**

**Item Numbers 1.a. - 6.d.**  If you need extra space to provide any additional information within this application, use the space provided in **Part 10. Additional Information**.  If you need more space than what is provided in **Part 10.**, you may make copies of **Part 10.** to complete and file with your application, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

<div style="border:1px solid black; padding:10px;">

We recommend that you print or save a copy of your completed application to review in the future and for your records.  We recommend that you review your copy of your completed application before you come to your biometric services appointment at a USCIS ASC.  At your appointment, USCIS will permit you to complete the application process only if you are able to confirm, under penalty of perjury, that all of the information in your application is complete, true, and correct.  If you are not able to make that attestation in good faith at that time, USCIS will require you to return for another appointment.

</div>

## Reasons for Inadmissibility

Go to the section for the immigration benefit you are seeking.  Select or enter all grounds of inadmissibility that you believe or that you have been told apply to you.

Then, use the space provided in **Part 4., Item Number 40.** to provide a statement explaining in your own words, the acts, convictions, and medical conditions that you believe make you inadmissible.  Include copies of any documents that support your statement.  Records of convictions must be certified court documents.  An uncertified copy is not sufficient.

**You Are Seeking a Waiver Under INA Section 212(g) of Health-Related Grounds of Inadmissibility Under INA Section 212(a)(1)**

1.  **You Are Seeking a Waiver Under INA Section 212(g)(1) for Inadmissibility Due to a Communicable Disease of Public Health Significance**

    You must file this application if you seek a waiver of inadmissibility based on a communicable disease of public health significance.

    Communicable diseases of public health significance are defined in 42 CFR 34.2(b) and include, but are not limited to:

    **A.** Class A tuberculosis condition (as defined by Health and Human Services (HHS) regulations);

    **B.** Chancroid;

    **C.** Gonorrhea;

    **D.** Granuloma inguinale;

    **E.** Lymphogranuloma venereum;

    **F.** Syphilis, infectious stage;

    **G.** Hansen's disease (leprosy), infectious; or

    **H.** Any other communicable disease as determined by the U.S. Secretary of HHS and as defined at 42 CFR 34.2(b).

    **The application may be approved if:**

    **A.** You are the spouse, parent, unmarried son or daughter; unmarried minor lawfully adopted child of a U.S. citizen, an alien lawfully admitted for permanent residence, or of an alien who has been issued an immigrant visa, or if you are the fiancé(e) of a U.S. citizen or the fiancé(e)'s child; or

004099

**B.**  You are a VAWA self-petitioner.

If you have a Class A Tuberculosis Condition (as defined by HHS regulations), you and the physician at the local health department in the area where you plan to reside must complete **Part 11. Statement for Applicants With a Class A Tuberculosis Condition (As Defined By HHS Regulations).**

**2.  You are Seeking a Waiver Under INA Section 212(g)(2)(C) of the Vaccination Requirement**

You must file this application if you seek an exemption from the vaccination requirement because vaccinations are against your religious beliefs or moral convictions.  You must establish with evidence that:

**A.**  You are opposed to vaccinations in any form;

**B.**  Your objection is based on religious beliefs or moral convictions; and

**C.**  Your belief or conviction is sincere.

**3.  You are Seeking a Waiver Under INA Section 212(g)(3) for Inadmissibility Due to Physical or Mental Disorder and Associated Harmful Behavior**

You must file this application if you seek a waiver of inadmissibility based on a physical or mental disorder with associated harmful behavior.  Harmful behavior is behavior that poses, may pose, or has posed a threat to the property, safety, or welfare of you or others.  You also must submit this application if you seek a waiver to overcome inadmissibility based on a history of a physical or mental disorder with behavior associated with the disorder that has posed a threat to the property, safety, or welfare of you or others, and that is likely to recur or to lead to other harmful behavior.

In addition to this application, you must submit a complete medical history and a report that addresses the following:

**A.**  Your physical or mental disorder and the behavior associated with the disorder that poses, has posed, or may pose in the future a threat to your property, safety, or welfare or the property, safety, or welfare of others.  The report should also provide details of any hospitalization, institutional care, or any other treatment you may have received in connection with your disorder;

**B.**  Findings regarding your current physical condition, including, if applicable, reports of chest X-rays and a serologic test, if you are 15 years of age or older, and other pertinent diagnostic tests;

**C.**  Findings regarding the mental or physical disorder, including a detailed prognosis that should specify, based on a reasonable degree of medical certainty, the possibility that the harmful behavior is likely to recur or that other harmful behavior associated with the disorder is likely to occur; and

**D.**  A recommendation concerning treatment that is reasonably available in the United States and that is reasonably expected to significantly reduce the likelihood that the physical or mental disorder will result in harmful behavior in the future.

The adjudicating agency will refer the medical report to the U.S. Public Health Service for review.  The U.S. Public Health Service may require you to submit additional assurances.

**You Are Seeking a Waiver Under INA Section 212(h) or (i) for Certain Criminal Grounds of Inadmissibility Under INA Section 212(a)(2) or for Immigration Fraud or Misrepresentation Under INA Section 212(a)(6)(c)**

**1.  Criminal Grounds**

If you are found inadmissible based on criminal grounds, you may seek a waiver of inadmissibility for the following:

**A.**  A crime involving moral turpitude (CIMT);

**NOTE:** You are not inadmissible for having committed a CIMT, and do not need to file a waiver:  if the crime was a purely political offense; if the crime was a CIMT but you committed only one CIMT, were under 18 years of age at the time you committed the crime and were released from any confinement to a prison or correctional institution imposed for the crime more than 5 years before application; or if the crime was a CIMT, but you committed only one CIMT, for which the maximum possible sentence is 1 year or less of imprisonment, and the actual sentence you received was 6 months or less.

**B.** A controlled substance violation of the laws and regulations of any country or U.S. state related to a single offense of simple possession of 30 grams or less of marijuana;

**C.** Two or more convictions, other than purely political ones, for which the sentences to confinement were a total of five years or more;

**D.** Prostitution;

**E.** Unlawful commercialized vice whether or not related to prostitution; and

**F.** Certain aliens involved in serious criminal activity who have asserted immunity from prosecution.

**With the application, you must establish one of the following:**

**A.** You are inadmissible only because of your participation in prostitution, including having procured others for prostitution or having received the proceeds of prostitution, but you have been rehabilitated and your admission to the United States will not be contrary to the national welfare, safety, or security;

**B.** At least 15 years have passed since the activity or event that makes you inadmissible, you have been rehabilitated, and your admission to the United States will not be contrary to the national welfare, safety, or security;

**C.** Your qualifying U.S. citizen, lawful permanent resident relative (spouse, son, daughter, parent), or K visa petitioner would experience extreme hardship if you were denied admission; **or**

**D.** You are an approved VAWA self-petitioner.

For information about how you can establish hardship, see the **What Evidence Must You Submit** section of these Instructions.

**NOTE:** If you are convicted of a violent or dangerous crime, the agency adjudicating your application may not approve the waiver unless there is an extraordinary circumstance, such as one involving national security or foreign policy considerations, or if denying your admission would cause exceptional and extremely unusual hardship.  Even if that standard is met, the agency adjudicating your application may still deny your request for a waiver as a matter of discretion.  See 8 CFR 212.7(d).

**NOTE:** According to INA section 212(h), a waiver cannot be granted if you have been convicted of (or admitted committing acts that constitute) murder or criminal acts involving torture, or an attempt or conspiracy to commit murder or a criminal act involving torture.

**2. Immigration Fraud or Misrepresentation**

If you are inadmissible because you sought to procure an immigration benefit by fraud or misrepresented a material fact (INA section 212(a)(6)(C)(i)), you may seek a waiver by filing this application.

**NOTE:**  If you are inadmissible based on a false claim to be a U.S. citizen (INA section 212(a)(6)(C)(ii)), and if you made your false claim on or after September 30, 1996, a waiver under INA section 212(i) is not available to you and you should not file this application.

**A.** Your qualifying U.S. citizen, or lawful permanent resident relative (spouse or parent), or the K visa petitioner would experience extreme hardship if you were denied admission; or

**B.** You are a VAWA self-petitioner and you or your U.S. citizen, lawful permanent resident, or qualified parent or child would experience extreme hardship if you were denied admission.

004101

For information about how you can establish hardship, see the **What Evidence Must You Submit** section of these Instructions.

**You Are Seeking a Waiver Under INA Section 212(a)(3)(D)(iv) for Inadmissibility Because of Immigrant Membership in a Totalitarian Party Under INA Section 212(a)(3)(D)(i)**

If you are inadmissible for having been a member of or affiliated with the Communist or any other totalitarian party (or subdivision or affiliate thereof), whether domestic or foreign, you may apply for a waiver under INA section 212(a)(3)(D)(iv) if you are the parent, spouse, son, daughter, brother, or sister of a U.S. citizen; a spouse, son, or daughter of an alien lawfully admitted for permanent residence; or if you are the K-1 fiancé(e) of a U.S. citizen.  The waiver may be granted for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest, if you are not a threat to the security of the United States.

**You Are Seeking a Waiver Under INA Section 212(d)(11) or (12) for Smuggling Under INA Section 212(a)(6)(E) or for Being Subject of Civil Penalty Under INA Section 212(a)(6)(F)**

If you are inadmissible for having engaged in alien smuggling (INA section 212(a)(6)(E)(i)), you may apply for a waiver under INA section 212(d)(11).  The agency adjudicating your application may grant the waiver for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest.

However, the agency adjudicating your application can only grant this waiver if you have encouraged, induced, assisted, or abetted, or aided only an individual who at the time of such action was your spouse, parent, son, or daughter (and no other individual) to enter the United States in violation of the law, and;

1.   You are an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily, not under an order of removal, and who is otherwise admissible to the United States as a returning resident under INA section 211(b); or

2.   You are seeking admission or adjustment of status as an immediate relative under INA section 201(b)(2)(A), as an immigrant under INA section 203(a) (preference allocation for family-sponsored immigrants based on the first, second, or third preference, but not on the fourth preference), or as the fiancé(e) of a U.S. citizen or the fiancé(e)'s child.

If you are inadmissible because you have been the subject of a final order for violation of INA section 274C, you may apply for a waiver under INA section 212(d)(12).  A waiver may be granted for humanitarian purposes or to assure family unity if no previous civil monetary was imposed against you under INA section 274C, and the offense was committed solely to assist, aid, or support your spouse or child (and not another individual); and

1.   You are an alien lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily, not under an order of removal, and who is otherwise admissible to the United States as a returning resident under INA section 211(b); or

2.   You are seeking admission or adjustment of status as an immediate relative under INA section 201(b)(2)(A), as an immigrant under INA section 203(a) (preference allocation for family-sponsored immigrants), or as the fiancé(e) (or his or her children) of a U.S. citizen.

**You Are Seeking a Waiver of Inadmissibility Under INA Section 212(a)(9)(B)(v) of the 3-Year or 10-Year Unlawful Presence**

If you are inadmissible because you were previously unlawfully present in the United States either for longer than 180 days, but less than 1 year (resulting in a 3-year bar), or 1 year or more (resulting in a 10-year bar), you may seek a waiver by filing this application.

With the application, you must establish that your qualifying U.S. citizen or lawful permanent resident relative (spouse or parent) or K visa petitioner would experience extreme hardship if you were denied admission.

004102

For VAWA self-petitioners, see special instructions below.

For information about how you can establish extreme hardship, see the **What Evidence Must You Submit** section of these Instructions.

**NOTE:**  Applicants for adjustment based on T nonimmigrant status (victims of a severe form of trafficking) seeking exemption from only INA section 212(a)(9)(B) **DO NOT** need to file this Form I-601.

### You Are a TPS Applicant Seeking a Waiver of Grounds of Inadmissibility Under INA Section 244(c)(2)(A)(ii)

If you are a Temporary Protected Status (TPS) applicant applying for a waiver of any relevant ground of inadmissibility listed in INA section 212, you must establish that the approval of your waiver is warranted for humanitarian purposes, to assure family unity or is otherwise in the public interest.  In **Part 4.**, **Item Number 39.**, you must provide all information that supports your request for a waiver for one or more of the above reasons.

You do not need to file this application if you are a TPS applicant and you are inadmissible for any of the following reasons:

1. Public charge (INA section 212(a)(4));

2. Labor Certifications and qualifications for certain immigrants (INA section 212(a)(5));

3. Aliens present without admission or parole (INA section 212(a)(6)(A));

4. Stowaways (INA section 212(a)(6)(D));

5. Student visa violators (INA section 212(a)(6)(G));

6. Documentation requirements for immigrants and nonimmigrants (INA section 212(a)(7));

7. Certain aliens previously removed (INA section 212(a)(9)(A));

8. Aliens unlawfully present (INA section 212(a)(9)(B)); or

9. Aliens unlawfully present after previous immigration violations (INA section 212(a)(9)(C)).

### No waiver is available to TPS applicants for the following grounds of inadmissibility:

1. Crime involving moral turpitude (CIMT under INA section 212(a)(2)(A)(i)(I));

    If your offense falls under a statutory exception, you are not inadmissible for having committed a CIMT.  Since you are not inadmissible in these instances, you also do not need to apply for a waiver on this application.  The exceptions are:

    **A.** A purely political offense;

    **B.** If you committed only one CIMT, you were under 18 years of age at the time, and you committed the crime (and were released from confinement), more than 5 years before your application; or

    **C.** If you committed only one CIMT for which the maximum possible sentence was 1 year or less of imprisonment, and the actual sentence you received was not more than 6 months of imprisonment.

2. Controlled substance violations (INA section 212(a)(2)(A)(i)(II)), however, you may apply for a waiver on this application if your offense was a single offense relating to simple possession of 30 grams or less of marijuana;

3. Multiple criminal convictions (INA section 212(a)(2)(B)) (purely political offenses do not make you inadmissible);

4. Controlled substance traffickers (INA section 212(a)(2)(C));

5. General security and related grounds (INA section 212(a)(3)(A));

6. Terrorist activities (INA section 212(a)(3)(B));

7. Adverse foreign policy consequences for the United States (INA section 212(a)(3)(C));

004103

8.  Immigrant membership in totalitarian party (INA section 212(a)(3)(D)); and

9.  Participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing (INA section 212(a)(3)(E)).

**NOTE:**  Although certain grounds of inadmissibility do not apply to TPS applicants, they may still apply to you if you seek an immigration benefit other than TPS, in the future.  In addition, a waiver granted for TPS is valid only for purposes of your application for TPS.  If you seek an immigrant visa or adjustment of status, you may need to apply for an additional waiver at that time.

**You Are Seeking Adjustment of Status Under NACARA Section 202, or HRIFA Section 902, and a Waiver of Grounds of Inadmissibility Based on Prior Removal Under INA Section 212(a)(9)(A) or For Being Unlawfully Present After Previous Immigration Violations Under INA Section 212(a)(9)(C)**

If you are a NACARA or HRIFA applicant for adjustment of status under section 202 of NACARA or section 902 of HRIFA, and you are inadmissible, you may apply for a waiver of inadmissibility based on the same grounds as an individual seeking adjustment of status based on the general adjustment of status provision (INA section 245(a)).  However, you do not need a waiver of the 3-year or 10-year bar due to previous unlawful presence in the United States as INA section 212(a)(9)(B) does not apply to NACARA or HRIFA applicants seeking adjustment of status.

In addition, if you are inadmissible under INA section 212(a)(9)(A) or (C), you may apply for a waiver of these grounds of inadmissibility while present in the United States.  You seek this waiver by filing Form I-601 and not Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal (also known as "Consent to Reapply"), the form that is normally used to apply for relief from these grounds of inadmissibility under INA section 212(a)(9)(A)(iii) or (C)(ii).

When adjudicating your waiver application, USCIS will consider the same factors that would be considered if you were seeking consent to reapply.  Factors that may be considered include, but are not limited to:

1.  Length of time you have lived in the United States, whether lawfully or unlawfully;

2.  Whether you have any criminal records;

3.  Your immigration history in the United States;

4.  Your family ties to U.S. citizens or to aliens living lawfully in the United States;

5.  Whether the denial of your application would impose hardship on you or your relatives and the degree of that hardship;

6.  Likelihood that you will become a lawful permanent resident in the near future;

7.  Your employment history in the United States and the continued need for your services;

8.  Whether you are a person of good moral character; and

9.  Any other factor that you believe should be considered in deciding your case.

In addition to this application, you should either use the space provided in **Part 10. Additional Information** or submit a brief statement explaining why your application should be granted.  Submit documentary evidence that may support your claims.

For information about how you can establish hardship, see the **What Evidence Must You Submit** section of these Instructions.

**You Are an Approved VAWA Self-Petitioner or the Child of an Approved VAWA Self-Petitioner Seeking a Waiver Under INA Section 212(a)(9)(C)(iii) for Being Unlawfully Present After Previous Immigration Violations Under INA Section 212(a)(9)(C)**

In general, an applicant seeking adjustment of status or an immigrant visa as a VAWA self-petitioner may apply for a waiver of inadmissibility based on the same grounds as an individual seeking adjustment of status.

004104

In addition, the INA provides special forms of relief for an approved VAWA self-petitioner and the children of approved VAWA self-petitioner, who are applying for adjustment of status or an immigrant visa, but who are inadmissible under INA section 212(a)(6)(A)(i), section 212(a)(9)(B)(i), or section 212(a)(9)(C)(i).

**You should only file Form I-601 to seek a waiver if you are inadmissible under INA section 212(a)(9)(C)(i).  You do not need to file this application if you are inadmissible under INA sections 212(a)(6)(A)(i) or 212(a)(9)(B)(i), as explained in the NOTES below.**

**If you are inadmissible under INA section 212(a)(9)(C)(i):**  USCIS has discretion to waive this ground of inadmissibility under INA section 212(a)(9)(C)(iii) for an approved VAWA self-petitioner and his or her child, if the self-petitioner can establish a "connection" between the battery or extreme cruelty that is the basis for the VAWA claim and the self-petitioner's removal, departure from the United States, reentry or reentries into the United States, or attempted reentry into the United States.

If you seek such a waiver, complete Form I-601 and attach evidence that shows the "connection" between the battery or extreme cruelty and your removal, departure from the United States, your reentry or reentries, or attempted reentry into the United States.

**NOTE:**  You do not need to file Form I-601 if you are an approved VAWA self-petitioner (or that person's child) seeking adjustment of status and if you are inadmissible under INA section 212(a)(6)(A)(i) (presence in the United States without admission or parole, or arrival in the United States, other than at an open U.S. Port-of-Entry.)  According to USCIS policy, you are eligible for adjustment of status under INA section 245(a) regardless of your unlawful entry and USCIS also considers inadmissibility under INA section 212(a)(6)(A)(i) waived for a beneficiary of an approved VAWA self-petition. Because inadmissibility under INA section 212(a)(6)(A)(i) ends when you leave the United States, you do not have to submit any special documentation with an immigrant visa application that is based on your approved VAWA self-petition.

**NOTE:  You do not need to file Form I-601 if you are an approved VAWA self-petitioner (or that person's child) and inadmissible under INA section 212(a)(9)(B)(i) (3-year or 10-year bar to admission).**  You may be exempt from this inadmissibility if you, the approved VAWA self-petitioner or your child, can establish a substantial connection between the battery or extreme cruelty that is the basis for your VAWA claim and the violation of your prior nonimmigrant admission. You must submit evidence of the substantial connection with your Form I-485, Application to Register Permanent Residence or Adjust Status, or your immigrant visa application.

If you cannot establish a substantial connection, but meet the requirements for the waiver of INA section 212(a)(9)(B)(i), you may file Form I-601.  The waiver may be granted if your qualifying U.S. citizen or lawful permanent resident relative (spouse or parent) would experience extreme hardship if you were denied admission.

For information about how you can establish extreme hardship, see the **What Evidence Must You Submit** section of these Instructions.

**You Are an Applicant for Adjustment of Status Based on T Nonimmigrant Status**

If you are an applicant for adjustment of status based on T nonimmigrant status, you may obtain a waiver of almost any ground of inadmissibility listed in INA section 212(a) that was not previously waived in connection with your T Nonimmigrant Status.

If you are inadmissible based on health-related grounds (INA section 212(a)(1)), the waiver may be approved if granting the waiver is in the national interest.

If you are inadmissible based on any other grounds, USCIS may grant the waiver if the activities making you inadmissible were caused by or were incident to your trafficking victimization and granting the waiver is in the national interest.

No waiver of inadmissibility is available to adjustment of status applicants based on T nonimmigrant status for any of the following grounds of inadmissibility:

1.  Security-related ground (INA section 212(a)(3));

2.  International child abductors (INA section 212(a)(10)(C)); or

3.   Former citizens who renounced citizenship to avoid taxation (INA section 212(a)(10)(E)).

**NOTE:  You may not need to file Form I-601 if you are inadmissible only because you have been unlawfully present in the United States and then departed (INA section 212(a)(9)(B)).**  You may be exempt from the 3-year or 10-year bar if you can establish that your victimization was at least one central reason for your unlawful presence in the United States. You should submit evidence with your Form I-485 to demonstrate that the victimization you suffered was a central reason for your unlawful presence in the United States.

### You Are an Applicant for Adjustment of Status as a Special Immigrant Juvenile

If you are applying for adjustment of status based on your approved Form I-360 classifying you as an SIJ, INA section 245(h) contains waiver authority specific to you.

Some grounds of inadmissibility do not apply to you.  You do not need to obtain a waiver if you are inadmissible based on:

1.   Public charge (INA section 212(a)(4));

2.   Labor certification (INA section 212(a)(5)(A));

3.   Aliens present without admission or parole (INA section 212(a)(6)(A));

4.   Immigration fraud or misrepresentation (INA section 212(a)(6)(C));

5.   Stowaways (INA section 212(a)(6)(D));

6.   Documentation requirements (INA section 212(a)(7)(A)); and

7.   Unlawful presence (INA section 212(a)(9)(B)).

The following grounds of inadmissibility **cannot** be waived under INA section 245(h):

1.   Conviction of certain crimes (INA section 212(a)(2)(A)) (except for a single offense of simple possession of 30 grams or less of marijuana);

2.   Multiple criminal convictions (INA section 212(a)(2)(B)) (except for a single offense of simple possession of 30 grams or less of marijuana);

3.   Controlled substance traffickers (INA section 212(a)(2)(C)) (except for a single offense of simple possession of 30 grams or less of marijuana);

4.   Security and related grounds (INA section 212(a)(3)(A));

5.   Terrorist activity (INA section 212(a)(3)(B));

6.   Foreign policy related (INA section 212(a)(3)(C)); and

7.   Participants in Nazi persecution, genocide, or the commission of any act of torture, or extrajudicial killing (INA section 212(a)(3)(E)).

If you are inadmissible under any other provisions of INA section 212(a), you must file Form I-601 with your adjustment application.  Your inadmissibility may be waived if doing so is justified for humanitarian purposes, family unity, or for other reasons in the public interest.  You do not need to show extreme hardship for a waiver under INA section 245(h). You do not need a qualifying relative for a waiver under INA section 245(h).  The relationship to your natural parents or prior adoptive parents will not be considered a factor in making a decision on your waiver application.  Therefore, it is not necessary for an SIJ to complete **Part 5.** of the application.

## What Evidence Must You Submit?

In support of your application, you should provide evidence that establishes why you may qualify for a waiver of inadmissibility.  In all cases, you must show that the approval of your application is warranted as a matter of discretion, with the favorable factors outweighing the unfavorable factors in your case.  In **Part 6.**, **Item Number 9.**, include a statement explaining why you believe your application should be approved as a matter of discretion, with the favorable factors outweighing the unfavorable factors in your case.  If you include a separate letter that contains the statement explaining why you believe your application should be approved as a matter of discretion, you must type or print into the space provided in **Item Number 9.** that you are attaching a letter.  The letter must be submitted at the same time as your Form I-601 application.

**NOTE:**  If you are filing as an SIJ, and seeking a waiver under INA section 245(h), you may explain in **Part 6.**, **Item Number 9.**, why your waiver should be granted for humanitarian purposes, family unity, or other reasons in the public interest.

Depending on the type of waiver you seek, this information and evidence may include, but is not limited to:

1. Affidavits from you or other individuals;

2. Police reports from any country you lived in;

3. Complete court records about any conviction or charge from any country;

4. If applicable, evidence of rehabilitation;

5. Any evidence you may wish to submit to establish that your admission to the United States would not be against the national welfare, public safety, or national security;

6. Medical reports;

7. If you are applying for a waiver from a ground of inadmissibility that requires a showing of extreme hardship and you are the spouse, parent, son, or daughter of a U.S. citizen or an alien lawfully admitted for permanent residence, the fiancé(e) of a U.S. citizen, or if you are a VAWA self-petitioner (or his or her child), you must submit evidence establishing the family relationship (such as a birth certificate or marriage certificate, etc.) and include evidence that shows your denial of admission would result in **extreme hardship** to your qualifying relative (the U.S. citizen or lawful permanent resident spouse, parent, child, or your U.S. citizen fiancé(e)), or to yourself (or other qualifying individuals) if you are a VAWA self-petitioner.  Pay close attention to the qualifying relationship that you have to establish.  While the relationships appear to be similar, the various waiver provisions contain different qualifying family relationships.  The requirements that need to be established for each waiver are listed in **Reasons for Inadmissibility**.  In **Part 5.**, **Item Number 9.**, include a statement explaining why your denial of admission would result in extreme hardship to your qualifying relative.  If you include a separate letter that contains the statement, you must type or print into the space provided in **Item Number 9.** that you are attaching a letter.  The letter must be submitted at the same time as your Form I-601 application.

   **Factors that USCIS considers when determining extreme hardship include, but are not limited to:**

   A. **Health.**  For example:  Ongoing or specialized treatment required for a physical or mental condition, availability and quality of such treatment in the foreign country, anticipated duration of the treatment, chronic vs. acute or long vs. short-term care, and need for the applicant to assist with any physical or mental conditions;

   B. **Financial Consideration.**  For example:  Future employability, loss due to sale of a home or business, termination of a professional practice, decline in standard of living, ability to recoup short-term losses, cost of extraordinary needs such as special education or training for children with special needs, and cost of care for family members (elderly and sick parents);

   C. **Education.**  For example:  Loss of opportunity for higher education, lower quality or limited scope of education options, disruption of current program, requirement to be educated in a foreign language or culture with ensuing loss of time or pay level, availability of special requirements, such as training programs or internships in specific fields;

**D. Personal Considerations.** For example:  Close relatives in the United States and their country of birth or citizenship, separation from spouse or children, ages of involved parties, length of residence and community ties in the United States; and

**E. Special Factors.** For Example:  Cultural, language, religious, and ethnic obstacles; valid fears of persecution, physical harm, or injury; social ostracism or stigma; and lack of access to social institutions (official or unofficial) for support, guidance, or protection.

**Evidence of extreme hardship may include, but is not limited to:**

**A.** Affidavits from the qualifying relative or other individuals with personal knowledge of the claimed hardships;

**B.** Expert opinions;

**C.** Evidence of employment or business ties, such as payroll records or tax statements;

**D.** Evidence of monthly expenditures such as a mortgage, rental agreement, bills and invoices;

**E.** Other financial records supporting any claimed financial hardships;

**F.** Medical documentation and/or evaluations by medical professionals supporting any claimed medical hardships;

**G.** Records of membership in community organizations, volunteer confirmation, and evidence of cultural affiliations;

**H.** Birth, marriage, or adoption certificates supporting any claimed family ties;

**I.** Country-condition reports; and

**J.** Any other evidence you believe supports the claimed hardships.

**8.** If you are a VAWA self-petitioner and you seek a waiver under INA section 212(a)(9)(C)(iii), submit any evidence that you believe establishes a connection between the battery or extreme cruelty that is the basis for the VAWA claim and your removal or departure from the United States, reentries or attempted reentry into the United States, and unlawful return or attempted unlawful return;

**9.** If you are an applicant for adjustment based on your T nonimmigrant status and you seek a waiver under INA section 212(a)(1) or INA section 212(a)(4), submit any evidence that demonstrates it would be in the national interest to waive these grounds.  If you are seeking a waiver under any other INA section 212(a) ground, submit evidence that shows it would be in the national interest to waive that ground.  Also, you must demonstrate that the activities rendering you inadmissible were caused by or were related to your victimization; or

**10.** If you are a TPS applicant, submit any evidence that demonstrates that granting your waiver would serve humanitarian purposes, family unity, or be in the public interest.

**NOTE:**  Your application should be supported by documentary evidence, or you should explain in detail why you cannot obtain such evidence.  Mere assertions will not suffice.  Medical assertions should be supported by a medical professional's statement.

| **Where To File?** |
| --- |

Please see our website at **www.uscis.gov/I-601** or call our National Customer Service Center at **1-800-375-5283** for the most current information about where to file this application.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

## Address Change

An applicant who is not a U.S. citizen must notify USCIS of his or her new address within 10 days of moving from his or her previous residence.  For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS National Customer Service Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

**NOTE:**  Do not submit a change of address request to USCIS Lockbox facilities because the Lockbox does not process change of address requests.

**For information on filing a change of address with EOIR:**  Download the appropriate Form EOIR-33 from the EOIR website at **www.justice.gov/eoir/formslist.htm** and proceed in accordance with the Instructions given on that form.

## Processing Information

You must have a United States address to file this application.

**Initial Processing.**  Once USCIS accepts your application, we will check it for completeness.  If you do not completely fill out this application, you will not establish a basis for your eligibility and USCIS may reject or deny your application.

**Requests for More Information.**  We may request that you provide more information or evidence to support your application.  We may also request that you provide the originals of any copies you submit.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview (for USCIS applicants).**  We may request that you appear at a USCIS office for an interview based on your application.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your fingerprints, photograph, and/or signature to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-601 involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS will notify you of the decision in writing or, for applications filed electronically, through an electronic notice.

## USCIS Forms and Information

To ensure you are using the latest version of this application, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Tools," then under "Self Service Tools," select "Appointments" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-601, we will deny your Form I-601 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act section 212(a).

**PURPOSE:**  The primary purpose for providing the requested information on this application is to ensure that USCIS has all relevant information necessary to determine if you have established eligibility for the waiver of inadmissibility for which you are filing.  DHS uses the information you provide to grant or deny the benefit you are seeking.  If you file this application in immigration court in connection with an application for relief from removal from the United States, the immigration court will use the information you provide to grant or deny the waiver you are seeking.  If your case is appealed, the Board of Immigration Appeals will use the information you provide in deciding the appeal.

**DISCLOSURE:** The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision in your case or result in denial of your application.

**ROUTINE USES:**  DHS may share the information you provide on this application, and any additional requested evidence, with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses, as described in the associated published system of records notices [DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System, DHS/USCIS-007 - Benefits Information System and DHS/USCIS-018 Immigration Biometric and Background Check] and published privacy impact assessments [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems and DHS/USCIS/PIA-051 Case and Activity Management for International Operations,], which can be found at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.  If you file this application in immigration court in connection with an application for relief from removal from the United States, the Executive Office for Immigration Review may share the information you provide on this application with other Federal, state, local, and foreign government agencies and authorized organizations.  Executive Office for Immigration Review follows approved routine uses, as described in the associated published system of records notices [EOIR-001 Records and Management Information System] which can be found at **www.justice.gov**.  Executive Office for Immigration Review may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1.467 hours per response in paper format, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  The collection of biometrics is estimated to require 1 hour and 10 minutes.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0029.  **Do not mail your completed Form I-601 to this address**.

## Application for Provisional Unlawful Presence Waiver

### Department of Homeland Security
U.S. Citizenship and Immigration Services

| For USCIS Use Only | Initial Receipt | Fee Stamp | Action Block |
|---|---|---|---|
| | Resubmitted | Relocated | |
| | | Received | Sent | |

| To be completed by an attorney or BIA-accredited representative (if any). | ☐ Select this box if Form G-28 is attached to represent the applicant. | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |
|---|---|---|---|

▶ **START HERE - Type or print in black ink.**

## Part 1. Information About You

Provide the following information about yourself.

**1.** Alien Registration Number (A-Number) (if any)

▶ **A-**

**2.** U.S. Social Security Number (if any)

**3.** USCIS Online Account Number (if any)

▶

### Your Full Name

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

### Other Names Used (if any)

**5.a.** Family Name (Last Name)

**5.b.** Given Name (First Name)

**5.c.** Middle Name

**6.a.** Family Name (Last Name)

**6.b.** Given Name (First Name)

**6.c.** Middle Name

### Your U.S. Mailing Address

**7.a.** In Care Of Name

**7.b.** Street Number and Name

**7.c.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**7.d.** City or Town

**7.e.** State        **7.f.** ZIP Code

**8.** Is your current physical address the same as your mailing address?        ☐ Yes   ☐ No

If you answered "No" to **Item Number 8.**, provide your physical address in **Item Numbers 9.a. - 9.e.**

### Your U.S. Physical Address

**9.a.** Street Number and Name

**9.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**9.c.** City or Town

**9.d.** State        **9.e.** ZIP Code

### Other Information

**10.** Gender   ☐ Male   ☐ Female

**11.** Date of Birth (mm/dd/yyyy)

## Part 1.  Information About You (continued)

**12.**  City or Town of Birth

**13.**  Country of Birth

**14.**  Country of Citizenship or Nationality

**15.a.**  Mother's Family Name (Last Name)

**15.b.**  Mother's Given Name (First Name)

**16.a.**  Father's Family Name (Last Name)

**16.b.**  Father's Given Name (First Name)

### Your Last Entry Into the United States

**17.**  Date of Entry (On or about mm/dd/yyyy)

**18.a.**  Place or Port-of-Entry (Actual or approximate city or town)

**18.b.**  State

**19.**  Immigration Status (At the time of entry)

### Your Previous Entries Into the United States

You were previously in the United States as follows:

**20.a.**  Place or Port-of-Entry (Actual or approximate city or town)

**20.b.**  State

**21.a.**  From (On or about mm/dd/yyyy)

**21.b.**  To (On or about mm/dd/yyyy)

**22.**  Immigration Status (At the time of entry)

**23.a.**  Place or Port-of-Entry (Actual or approximate city or town)

**23.b.**  State

**24.a.**  From (On or about mm/dd/yyyy)

**24.b.**  To (On or about mm/dd/yyyy)

**25.**  Immigration Status (At the time of entry)

**26.**  Are there other previous entries?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 26.**, include the place of entry, dates, and your immigration status at the time of entry for any other prior entries in the space provided in **Part 9. Additional Information**.

### Your Immigration or Criminal History

**27.**  Are you currently in removal, exclusion, or deportation proceedings in which there is no final order issued by the immigration judge, the Board of Immigration Appeals, a DHS officer, or a Federal court yet?  (This includes proceedings under INA section 239, an exclusion or deportation proceeding initiated before April 1,1997, a Visa Waiver Program removal proceeding under INA section 217, expedited removal under INA 235, and a request for a judicial removal order under INA section 238(c))?  ☐ Yes  ☐ No

If you answered "No" to **Item Number 27.**, go to **Item Number 29.a.**  If you answered "Yes" to **Item Number 27.**, select the statement below (either **Item Number 28.a.** or **28.b.**) that most accurately describes your current situation.

**28.a.**  ☐  I am in removal, exclusion, or deportation proceedings that are administratively closed and, at the time of filing my Form I-601A, have not been placed back on EOIR's calendar to continue my removal, exclusion, or deportation proceedings.

**NOTE:**  You may be eligible for a provisional unlawful presence waiver.  Provide a copy of the administrative closure order.  Also, if U.S. Citizenship and Immigration Services (USCIS) approves your provisional unlawful presence waiver, it is important that you resolve your removal, exclusion, or deportation proceedings before you depart the United States for your immigrant visa interview.

## Part 1.  Information About You (continued)

28.b. ☐  I am currently in removal, exclusion, or deportation proceedings that are not administratively closed, or in removal, exclusion, or deportation proceedings that were administratively closed, but EOIR has placed my proceedings back on its calendar in order to continue them.

**NOTE:**  You are ineligible for a provisional unlawful presence waiver unless your proceedings are administratively closed at the time you file your Form I-601A, and the proceedings have not been put back on EOIR's calendar to continue your removal, exclusion, or deportation after having been previously administratively closed.

29.a. Are you currently subject to a final order of removal, exclusion or deportation?  (This includes an order entered in proceedings under INA section 239, an exclusion or deportation order entered in proceedings initiated before April 1, 1997, a Visa Waiver Program removal order under INA section 217, an expedited removal order under INA section 235, and a judicial order under INA section 238(c))? ☐ Yes ☐ No

**NOTE:**  If you answered "Yes" to **Item Number 29.a.**, you are ineligible for a provisional unlawful presence waiver unless you applied for, and USCIS has already approved, an application for permission to reapply for admission under INA section 212(a)(9)(A)(iii) and 8 CFR 212.2 on Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal.  If you have already applied for and if USCIS has already granted you permission to reapply for admission, provide the relevant information in **Item Number 29.b.**  If you answered "No" to **Item Number 29.a.**, go to **Item Number 31.**

29.b. USCIS Receipt Number for Your Approved Form I-212:

▶ [                    ]

**NOTE:**  You may also provide a copy of the approval notice that USCIS sent to you when it approved your Form I-212.

30.a. Has DHS served you with a DHS Form I-871, giving you notice that DHS intends to reinstate a prior deportation, exclusion, or removal order against you as permitted under INA section 241(a)(5)? ☐ Yes ☐ No

30.b. If you answered "Yes" to **Item Number 30.a.**, has DHS served you with a final decision reinstating a prior deportation, exclusion, or removal order under INA section 241(a)(5)? ☐ Yes ☐ No

31. Are you currently subject to a grant of voluntary departure that has not expired and that was granted to you by the immigration judge or the Board of Immigration Appeals during removal, exclusion, or deportation proceedings? ☐ Yes ☐ No

**NOTE:**  If you answered "Yes" to **Item Number 31.**, you are ineligible for a provisional unlawful presence waiver.

If you were granted voluntary departure in the past, but then you withdrew your voluntary departure request or otherwise terminated voluntary departure you should not select "Yes" to **Item Number 31.**  In this case you may be in removal proceedings or you may be the subject of a final order of removal, deportation, or exclusion.  You should select the statements that apply to you in **Item Numbers 27. - 28.b.** or **Item Number 29.a.**  If you filed a motion to withdraw your voluntary departure request, please submit a copy with your Form I-601A.

Answer **Item Numbers 32. - 38.**  If you answer "Yes" to any question in **Item Numbers 32. - 38.**, your application for a provisional unlawful presence waiver may be denied as a matter of discretion.  For each "Yes" response for **Item Numbers 32. - 38.**, provide the location and date of the event and a brief description in **Part 9. Additional Information.**  For **Item Number 34.**, if you were arrested but not charged with any crime or offense, provide a statement or other documentation from the arresting authority, prosecutor's office, or court to show that you were not charged with any crime or offense.  If you answer "Yes" to **Item Number 35.**, you must provide all related court dispositions.

32. Have you **EVER** knowingly and willfully given false or misleading information to a U.S. Government official while applying for an immigration benefit or to gain entry or admission into the United States? ☐ Yes ☐ No

33. Have you **EVER** been engaged in alien smuggling? ☐ Yes ☐ No

34. Have you **EVER** been arrested, cited, or detained by a law enforcement officer (including immigration and military officers) in the United States, your home country, and/or any other country for any reason other than traffic violations? ☐ Yes ☐ No

35. Have you **EVER** been charged, indicted, convicted, imprisoned, or jailed in the United States, your home country, and/or any other country for any crime or offense? ☐ Yes ☐ No

36. Have you **EVER** trafficked in or are you **NOW** trafficking in any controlled substance? ☐ Yes ☐ No

## Part 1.  Information About You (continued)

**37.** Are you **NOW** or have you **EVER** knowingly assisted, abetted, conspired, or colluded with others in the unlawful trafficking of any controlled substance? ☐ Yes ☐ No

**38.** Are you **NOW** or have you **EVER** been engaged in prostitution? ☐ Yes ☐ No

Answer **Item Numbers 39.a. - 45.**  If you answer "Yes" to any question in **Item Numbers 39.a. - 45.**, your application for a provisional unlawful presence waiver may be denied as a matter of discretion.  For each "Yes" response for **Item Numbers 39.a. - 45.**, provide a complete explanation in **Part 9. Additional Information**.

Have you **EVER** ordered, incited, called for, committed, assisted, helped with, or otherwise participated in any of the following:

**39.a.** Acts involving torture or genocide? ☐ Yes ☐ No

**39.b.** Killing any person? ☐ Yes ☐ No

**39.c.** Intentionally and severely injuring any person? ☐ Yes ☐ No

**39.d.** Engaging in any kind of sexual contact or relations with any person who was being forced or threatened? ☐ Yes ☐ No

**39.e.** Limiting or denying any person's ability to exercise religious beliefs? ☐ Yes ☐ No

Have you **EVER**:

**40.a.** Served in, been a member of, assisted in, or participated in any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, rebel group, guerilla group, militia, or insurgent organization? ☐ Yes ☐ No

**40.b.** Served in any prison, jail, prison camp, detention facility, labor camp, or any other situation that involved detaining persons? ☐ Yes ☐ No

**41.** Have you **EVER** been a member of, assisted in, or participated in any group, unit, or organization of any kind in which you or other persons used any type of weapon against any person or threatened to do so? ☐ Yes ☐ No

**42.** Have you **EVER** assisted or participated in selling or providing weapons to any person who to your knowledge used them against another person, or in transporting weapons to any person who to your knowledge used them against another person? ☐ Yes ☐ No

**43.** Have you **EVER** received any type of military, paramilitary, or weapons training? ☐ Yes ☐ No

**44.** Have you **EVER** recruited, enlisted, conscripted, or used any person under 15 years of age to serve in or help an armed force or group? ☐ Yes ☐ No

**45.** Have you **EVER** used any person under 15 years of age to take part in hostilities, or to help or provide services to people in combat? ☐ Yes ☐ No

## Part 2.  Biographic Information

**1.** Ethnicity (Select **only one** box)
   ☐ Hispanic or Latino
   ☐ Not Hispanic or Latino

**2.** Race (Select **all applicable** boxes)
   ☐ White
   ☐ Asian
   ☐ Black or African American
   ☐ American Indian or Alaska Native
   ☐ Native Hawaiian or Other Pacific Islander

**3.** Height   Feet ☐   Inches ☐

**4.** Weight   Pounds ☐☐☐

**5.** Eye Color (Select **only one** box)
   ☐ Black   ☐ Blue   ☐ Brown
   ☐ Gray   ☐ Green   ☐ Hazel
   ☐ Maroon   ☐ Pink   ☐ Unknown/Other

**6.** Hair Color (Select **only one** box)
   ☐ Bald (No hair)   ☐ Black   ☐ Blond
   ☐ Brown   ☐ Gray   ☐ Red
   ☐ Sandy   ☐ White   ☐ Unknown/Other

## Part 3.  Information About Your Immigrant Visa Case

Provide the basis on which you are immigrating to the United States using the check boxes below.  (Select **only one** box)

**1.a.** ☐ Diversity Visa Program Selectee or Derivative

**1.b.** ☐ Immediate Relative Petition (Form I-130)

**1.c.** ☐ Preference-Based Family Petition (Form I-130), including Derivatives

**1.d.** ☐ Employment-Based Petition (Form I-140), including Derivatives

**1.e.** ☐ Special Immigrant/Widow Petition (Form I-360), including Derivatives

If you selected **Item Number 1.a.** because you are a Diversity Visa (DV) Program selectee or derivative, provide information about your (or your spouse's or parent's) DV case:

**2.a.** DOS DV Case Number (KCC Case Number)

▶ [                    ]

DV Program Selectee's Full Name (If you are a derivative and your parent or spouse is the DV Program Selectee)

**2.b.** Family Name (Last Name) [                    ]

**2.c.** Given Name (First Name) [                    ]

**2.d.** Middle Name [                    ]

If you selected **Item Numbers 1.b.**, **1.c.**, **1.d.**, or **1.e.** provide the following information about the approved immigrant visa petition (Form I-130, Form I-140, or Form I-360) that was filed on your (or your spouse's or parent's) behalf, or that you used to self-petition on your behalf, that is your basis to immigrate and the related Department of State (DOS) immigrant visa application.

**3.a.** USCIS Receipt Number

▶ [                    ]

**3.b.** DOS Consular Case Number (NVC Case Number)

▶ [                    ]

**Petitioner Name** (Provide the full name of the family member or the company who petitioned for you (or your spouse or parent).)

**3.c.** Family Name (Last Name) [                    ]

**3.d.** Given Name (First Name) [                    ]

**3.e.** Middle Name [                    ]

**3.f.** Company or Organization Name [                    ]

## Part 4.  Information About Your Qualifying Relative

Provide the following information about the qualifying relative (the U.S. citizen or Lawful Permanent Resident (LPR) spouse or parent) who would experience extreme hardship if you were refused admission to the United States.

### Your Qualifying Relative's Full Name and Relationship to You

**1.a.** Family Name (Last Name) [                    ]

**1.b.** Given Name (First Name) [                    ]

**1.c.** Middle Name [                    ]

**2.a.** ☐ U.S. Citizen Spouse

**2.b.** ☐ U.S. Citizen Parent

**2.c.** ☐ LPR Spouse

**2.d.** ☐ LPR Parent

### Your Other Qualifying Relative

**3.** Do you have more than one qualifying relative (U.S. citizen or LPR spouse or parent)?   ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 3.**, provide the other qualifying relative's name and your relationship to the qualifying relative in **Item Numbers 4.a. - 5.d.** Also provide evidence of the U.S. citizenship or LPR status of the other qualifying relative with your application.  See the **What Evidence Must I Submit With Form I-601A** section of the Instructions.

### Additional Qualifying Relative's Full Name and Relationship to You

**4.a.** Family Name (Last Name) [                    ]

**4.b.** Given Name (First Name) [                    ]

**4.c.** Middle Name [                    ]

**5.a.** ☐ U.S. Citizen Spouse

**5.b.** ☐ U.S. Citizen Parent

**5.c.** ☐ LPR Spouse

**5.d.** ☐ LPR Parent

## Part 5.  Statement From Applicant

In the space provided, explain in detail why you believe USCIS should approve your application for a provisional unlawful presence waiver as a matter of discretion.  Provide all of the reasons you believe support your application for this waiver, including information about the extreme hardship your qualifying relatives would experience if you were refused admission to the United States.  If you need extra space to complete your statement, use the space provided in **Part 9. Additional Information**.

## Part 6.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-601A Instructions before completing this section.  You must file Form I-601A while in the United States.

### Applicant's Statement

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.**  If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 7.** read to me every question and instruction on this application and my answer to every question in

_____,

a language in which I am fluent, and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 8.**,

_____,

prepared this application for me based only upon information I provided or authorized.

### Applicant's Contact Information

**3.** Applicant's Daytime Telephone Number

_____

**4.** Applicant's Mobile Telephone Number (if any)

_____

**5.** Applicant's Email Address (if any)

_____

### Applicant's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

## Part 6.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature (continued)

I understand that USCIS will require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, I will be required to sign an oath reaffirming that:

**1)** I reviewed and understood all of the information contained in, and submitted with, my application; and

**2)** All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### Applicant's Signature

**6.a.** Applicant's Signature

**6.b.** Date of Signature (mm/dd/yyyy)

**NOTE TO ALL APPLICANTS:**  If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 7.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

**1.b.** Interpreter's Given Name (First Name)

**2.** Interpreter's Business or Organization Name (if any)

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**3.c.** City or Town

**3.d.** State      **3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and                              , which is the same language specified in **Part 6., Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question.  The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.** Interpreter's Signature

**7.b.** Date of Signature (mm/dd/yyyy)

## Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**3.c.** City or Town

**3.d.** State          **3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Telephone Number (if any)

**6.** Preparer's Email Address (if any)

### Preparer's Statement

**7.a.** ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

**7.b.** ☐ I am an attorney or accredited representative and my representation of the applicant in this case extends/ does not extend beyond the preparation of this application.

> **NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant.  The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.a.** Preparer's Signature

**8.b.** Date of Signature (mm/dd/yyyy)

## Part 9.  Additional Information

If you need extra space to provide any additional information within this application, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name
(Last Name)

**1.b.** Given Name
(First Name)

**1.c.** Middle Name

**2.** A-Number (if any) ▶ **A-**

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.**

**7.a.** Page Number

**7.b.** Part Number

**7.c.** Item Number

**7.d.**

Form I-601A   Edition   04/01/24

004119



## Instructions for Application for
## Provisional Unlawful Presence Waiver

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-601A**
OMB No. 1615-0123
Expires 02/28/2026

---

### What Is the Purpose of Form I-601A?

Certain immigrant visa applicants who are relatives of U.S. citizens or Lawful Permanent Residents (LPRs) may use this application to request a provisional waiver of the unlawful presence grounds of inadmissibility under Immigration and Nationality Act (INA) section 212(a)(9)(B), before they depart the United States to appear at a U.S. Embassy or U.S. Consulate for an immigrant visa interview.

---

### Who May File Form I-601A?

**You may file this application to seek a provisional unlawful presence waiver if you:**

1. Are physically present in the United States;

2. Are at least 17 years of age at the time of filing;

3. Have an immigrant visa case pending with Department of State (DOS) because you:

   **A.** Are the principal beneficiary of an approved Form I-130, Petition for Alien Relative, an approved Form I-140, Petition for Alien Worker, or an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, and have paid the immigrant visa processing fee to DOS, and you are currently in the process of obtaining your immigrant visa;

   **B.** Have been selected by DOS to participate in the Diversity Visa (DV) Program (that is, you are a DV Program selectee) and are currently in the process of obtaining your immigrant visa; or

   **C.** Are the spouse or child of a principal beneficiary of an approved immigrant visa petition and have paid the immigrant visa processing fee to DOS, or you are the spouse or child of a DV Program selectee (that is, you are a DV Program derivative), and you are currently in the process of obtaining your immigrant visa; and

   **NOTE:**  The Child Status Protection Act (CSPA) permits certain beneficiaries of immigrant visa petitions to retain classification as a child even if they have reached 21 years of age. Visit the U.S. Citizenship and Immigration Services (USCIS) website at **www.uscis.gov/green-card/green-card-processes-and-procedures/child-status-protection-act-cspa** for more information.

   **NOTE TO DV PROGRAM SELECTEES AND DERIVATIVES:**  Because a DV Program selectee or derivative can only be issued a diversity immigrant visa during the fiscal year for which the DV Program selectee registered, you can only obtain a provisional unlawful presence waiver while you are in the process of obtaining the immigrant visa with DOS.  You are in the process of obtaining an immigrant visa if the DOS Kentucky Consular Center (KCC) has assigned you a DV case number, and you are awaiting an immigrant visa interview while in the United States.

4. Believe you are or will be inadmissible only for a period of unlawful presence in the United States that was:

   **A.** More than 180 days, but less than 1 year, during a single stay (INA section 212(a)(9)(B)(i)(I)); or

   **B.** One year or more during a single stay (INA section 212(a)(9)(B)(i)(II)).

---

004120

## Who is NOT Eligible to Receive a Provisional Unlawful Presence Waiver?

**You are not eligible for a provisional unlawful presence waiver and USCIS will deny your application if any of the following apply to you:**

1. You do not meet all of the requirements listed in the **Who May File Form I-601A** section of these Instructions;

2. You have Form I-485, Application to Register Permanent Residence or Adjust Status, pending with USCIS;

3. You are in removal proceedings, unless your removal proceedings are administratively closed and have not been placed back on the Department of Justice (DOJ), Executive Office for Immigration Review (EOIR) calendar to continue your removal proceedings at the time you file your Form I-601A;

   **NOTE:**  Even if your removal proceedings are administratively closed, you are still "in removal proceedings" until EOIR terminates or dismisses your case.  You are, however, eligible to apply for a provisional unlawful presence waiver if EOIR has not placed your removal proceedings back on its calendar to continue your removal proceedings.

4. You are subject to an administratively final order of removal, exclusion, or deportation that has been entered or issued against you (including an in absentia order under INA section 240(b)(5)) unless, you applied for, and USCIS has already granted, an application for permission to reapply for admission under section 212(a)(9)(A)(iii) of the Act and 8 CFR 212;

   **NOTE:**  Permission to reapply for admission is also called "consent to reapply."  The application is filed on Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal.  For more information on Form I-212, please visit USCIS' website at **www.uscis.gov/I-212**.

5. The Department of Homeland Security (DHS) has entered a final decision reinstating a prior deportation, exclusion, or removal order against you under INA 241(a)(5) by serving you with a Form I-871, Notice of Intent/Decision to Reinstate Prior Order, before you filed the provisional unlawful presence waiver application or while the provisional unlawful presence waiver application is pending;

   **NOTE:**  You are not yet ineligible for the provisional unlawful presence waiver if DHS has only served you with a notice that DHS intends to reinstate a prior deportation, exclusion, or removal order, but only if DHS enters a final order reinstating the prior deportation, exclusion, or removal order.  **You must still let USCIS know, if DHS has served you with the notice that DHS intends to reinstate the order, since that fact may be material to the adjudication of your application.**

6. You are currently subject to an unexpired grant of voluntary departure from the immigration judge or the BIA; or

7. You fail to establish that your U.S. citizen or LPR spouse or parent would experience extreme hardship if you are refused admission to the United States or that USCIS should approve your application as a matter of discretion.  You must establish that refusal to admit you would result in extreme hardship to your U.S. citizen or LPR spouse or parent.  You must also establish that your case warrants a favorable exercise of discretion by showing that favorable factors in your case should be given more weight than the unfavorable factors.

## Can I File Other Forms with Form I-601A?

Form I-601A is a standalone application.  You cannot file Form I-601A with **any** other applications, petitions, or requests for immigration benefits.  You also should not file any other applications, petitions, or requests for immigration benefits with Form I-601A or request that these applications, petitions, or requests for immigration benefits be considered **with** Form I-601A.

If you submit your Form I-601A with **any** of the following forms, your application will be **REJECTED** and returned to you with any fees paid:

1. Application to Register Permanent Residence or Adjust Status (Form I-485);

2. Petition for Alien Relative (Form I-130);

3.   Application for Permission to Reapply for Admission Into the United States After Deportation or Removal (Form I-212);

4.   Application for Travel Document (Form I-131); or

5.   Application for Employment Authorization (Form I-765).

**NOTE:** You may file Form G-1145, E-Notification of Application/Petition Acceptance, with Form I-601A to request that USCIS electronically notify you when USCIS accepts your Form I-601A application.

**NOTE:  Applicants for provisional unlawful presence waivers cannot seek adjustment of status in the United States based on Form I-601A.** A provisional unlawful presence waiver is only effective if the applicant departs the United States, attends the immigrant visa interview scheduled by DOS at a U.S. Embassy or U.S. Consulate abroad, and the consular officer finds that the applicant is eligible for the immigrant visa.  For more information about the immigrant visa process, visit the DOS website at **www.state.gov**.

## What Should I Do After I File Form I-601A?

After you file your Form I-601A, it is important that you provide all required paperwork for your immigrant visa to the Department of State, National Visa Center (NVC).  The NVC cannot schedule your immigrant visa interview **until** it receives all of your immigrant visa paperwork.  Failure to submit the required paperwork will delay your case.

## What Should I Do Once USCIS Approves My Provisional Unlawful Presence Waiver?

1.   **If you are in removal proceedings, resolve your removal proceedings.**  If you are in removal proceedings and USCIS approves your Form I-601A, it is important that you resolve your removal proceedings **before** you leave the United States.  Leaving the United States before your removal proceedings are resolved may delay processing of your immigrant visa based on another ground of inadmissibility.  Leaving the United States before your removal proceedings are resolved may also result in the automatic revocation of your approved provisional unlawful presence waiver.  Visit the USCIS website at **www.uscis.gov/provisionalwaiver** for information about how to resolve your removal proceedings before you depart the United States.

2.   **Depart the United States to attend your immigrant visa interview.**  You must depart the United States to attend your immigrant visa interview for the provisional unlawful presence waiver to become fully effective.  If you fail to do this, your provisional unlawful presence waiver will not take effect and the approval may no longer be valid.

## How Long Is My Approved Provisional Unlawful Presence Waiver Valid and When Can USCIS Revoke It?

1.   **Validity of an approved waiver.**  An approved provisional unlawful presence waiver takes effect once you depart the United States, you appear for your immigrant visa interview, and the DOS consular officer determines you are otherwise admissible to the United States and eligible for an immigrant visa.  Once your waiver takes effect, it is valid indefinitely for the period of unlawful presence that was waived.

2.   **Revocation of an approved waiver.**  An approved provisional unlawful presence waiver is automatically revoked and no longer valid if:

A.   You enter or attempt to reenter the United States without inspection and admission or parole:

(1)   While your application for a provisional unlawful presence waiver is pending with USCIS;

(2)   After your provisional unlawful presence waiver is approved; or

(3)   Before your immigrant visa is issued;

**B.** The DOS consular officer determines at the immigrant visa interview that you are ineligible to receive the immigrant visa because you are inadmissible on grounds other than the 3-year or 10-year unlawful presence bars;

**C.** The immigrant visa petition that was the basis for the provisional unlawful presence waiver is at any time revoked, withdrawn, or rendered invalid, but not otherwise reinstated for humanitarian reasons or converted to a widow or widower petition (Form I-360);

**D.** DOS terminates your immigrant visa registration in accordance with INA section 203(g), and it has not been reinstated; or

**E.** The DOS consular officer determines that you are ineligible for the immigrant visa.

## What Happens If My Provisional Unlawful Presence Waiver is Denied or Revoked or If I Withdraw My Pending Application?

If your provisional unlawful presence waiver is denied or is approved, but subsequently revoked, or you withdraw your pending application:

1. **You may depart the United States to attend your immigrant visa interview and apply for a waiver abroad.** At your immigrant visa interview at the U.S. Embassy or U.S. Consulate abroad, DOS will make an admissibility determination.  If DOS determines you are inadmissible, based on unlawful presence or other grounds, you may file Form I-601, Application for Waiver of Grounds of Inadmissibility, with USCIS from abroad, if a waiver is available to you.

2. **You may file a new Form I-601A along with the required fees.**  You must still meet all the eligibility requirements for the provisional unlawful presence waiver at the time of filing, including requirements to be physically present in the United States and to appear for your biometric services appointment at a USCIS Application Support Center (ASC).

3. **USCIS may initiate removal proceedings.**  Denial of your provisional unlawful presence application does not automatically trigger initiation of removal proceedings.  USCIS will follow its current guidelines for initiation of removal proceedings.  For more information on USCIS guidance for referral of cases and issuance of Notices to Appear (NTAs) in cases involving inadmissible and removable aliens, visit the USCIS website at **www.uscis.gov/provisionalwaiver**.

## How Does a Pending or Approved Provisional Unlawful Presence Waiver Affect My Immigration Status?

The filing or approval of an application for a provisional unlawful presence waiver does not affect your current immigration status in the United States.  A pending or approved provisional unlawful presence waiver:

1. **Does NOT provide interim benefits.**  Filing this application does not give you interim benefits such as employment authorization or eligibility to apply for advance parole to return to the United States.  A pending or approved waiver also does not give you any interim benefits while your immigrant visa application is pending with DOS;

2. **Does NOT provide lawful status.**  If you are not otherwise maintaining lawful status in the United States, the filing or approval of this waiver application alone does not give you lawful immigration status in the United States;

3. **Does NOT stop the accrual of unlawful presence or provide protection from removal.**  A pending or approved waiver will not prevent the Department of Homeland Security (DHS) from initiating removal proceedings against you or actually removing you from the United States.  A pending or approved waiver also does not protect you from accruing additional unlawful presence while still in the United States;

4. **Does NOT remove the requirement to depart the United States and seek an immigrant visa.** If your provisional unlawful presence waiver is approved, you must still depart the United States to process your immigrant visa at a U.S. Embassy or U.S. Consulate abroad. The approval of a provisional unlawful presence waiver **does not** make you eligible for adjustment of status in the United States. For more information on adjustment of status, visit the USCIS website at **www.uscis.gov/greencard**;

5. **Does NOT guarantee immigrant visa issuance.** A DOS consular officer will determine if you are eligible for an immigrant visa. There are many reasons why individuals are ineligible for an immigrant visa, and this provisional unlawful presence waiver only provisionally covers one ground of inadmissibility resulting from unlawful presence in the United States. For more information about immigrant visa requirements, consult the DOS website at **http://nvc.state.gov**; and

6. **Does NOT guarantee admission to the United States.** Having an approved waiver or immigrant visa does not guarantee your admission to the United States. A U.S. Customs and Border Protection (CBP) officer will make a determination when you apply for admission at a U.S. Port-of-Entry.

---

| **What Happens If I Depart the United States While My Form I-601A Is Pending or If I Enter or Attempt to Reenter Without Inspection and Admission or Parole?** |
| --- |

All applicants for a provisional unlawful presence waiver must be in the United States at the time of filing Form I-601A and appear for biometrics capture at a USCIS ASC.

USCIS may consider your case abandoned and deny it pursuant to 8 CFR 103.2(b)(13) if you do not appear for biometrics capture, if you do not respond to a request for evidence (RFE), or if you do not appear for an interview when requested by USCIS.

If you depart the United States, and at any time before or after filing Form I-601A, enter or attempt to reenter the United States without inspection and admission or parole, you may be placed in removal proceedings, may be subject to additional grounds of inadmissibility that would render you ineligible for a provisional unlawful presence waiver, and any approval of Form I-601A would be automatically revoked.

---

| **General Instructions** |
| --- |

We provide free forms through the USCIS website. To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**. If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Signature.** You (or your signing authority) must properly complete your application. USCIS will not accept a stamped or typewritten name in place of any signature on this application. If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf. A legal guardian may also sign for a mentally incompetent person. If your application is not signed, or if the signature is not valid, we will reject your application. See 8 CFR 103.2(a)(7)(ii)(A). If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.** USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes. The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.** See Form G-1055, Fee Schedule, available at **www.uscis.gov/g-1055**, for all information on filing fees.

**Evidence.** When you file your application, you must submit all evidence and supporting documents listed in the **Specific Instructions** and/or **What Evidence Must I Submit With Form I-601A** sections of these Instructions.

---

004124

**Biometric Services Appointment.**  USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  If we determine that a biometric services appointment is necessary, we will send you an appointment notice with the date, time, and location of your appointment.  If you are currently overseas, your notice will instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to schedule an appointment.

At your biometrics appointment, you must sign an oath reaffirming that:

1.  You provided or authorized all information in the application;

2.  You reviewed and understood all of the information contained in, and submitted with, your application; and

3.  All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your application.

**Copies.**  You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document.  USCIS may request an original document at any time during our process.  If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:**  If you submit original documents when they are not required or requested, **USCIS may destroy them after we receive them.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that they are competent to translate from the foreign language into English.  The certification must also include their signature, printed name, the signature date, and their contact information.

**USCIS Contact Center.**  For additional information on the application and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call at **800-375-5283** (TTY **800-767-1833**).  The USCIS Contact Center provides information in English and Spanish.

**Disability Accommodations/Modifications.**  To request a disability accommodation/modification, follow the instructions on your appointment notice or at **www.uscis.gov/accommodationsinfo**.

### How To Complete Form I-601A

1.  Type or print legibly in black ink.

2.  If you need extra space to complete any item within this application, use the space provided in **Part 9. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3.  Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A," unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None," unless otherwise directed.

---

| Specific Instructions |
|---|

**Approved Immigrant Visa Case or DV Program Selectee or Derivative**

To apply for a provisional unlawful presence waiver, you must have an immigrant visa case pending with DOS based on:

1.  An approved immigrant visa petition and payment of the immigrant visa processing fee to DOS; or

2.  Selection by DOS to participate in the DV Program for the fiscal year for which you registered.

**Immigrant Visa Processing**

DOS processes immigrant visas for foreign nationals who wish to immigrate permanently to the United States from abroad, including foreign nationals who are ineligible to adjust their status to that of an LPR in the United States.

**Based on a USCIS-Approved Immigrant Visa Petition**

USCIS sends the approved immigrant visa petition to the DOS NVC for consular processing of the immigrant visa if Form I-130, Petition for Alien Relative, Form I-140, Immigrant Petition for Alien Worker, or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, indicates that the beneficiary will seek an immigrant visa through the consular process abroad or if the beneficiary is not eligible to adjust status in the United States.  Once the NVC receives this approved immigrant visa petition, the NVC sends the beneficiary instructions on how to initiate the immigrant visa process and pay the immigrant visa processing fee.

You must have already paid the DOS immigrant visa processing fee and must provide USCIS with a copy of your DOS-issued immigrant visa processing fee receipt or other evidence of fee payment when you submit your provisional unlawful presence waiver application.  You must submit the DOS immigrant visa processing fee receipt or other evidence of fee payment for the NVC case associated with the approved immigrant visa petition.  Contact the NVC if you need another copy of your DOS-issued immigrant visa processing fee receipt.

**Based on the Diversity Visa Program**

DOS administers the DV Program.  To participate in the program, a foreign national must register with DOS during the designated registration period.  If DOS selects the foreign national from the pool of registrants to continue the DV process, DOS instructs the DV Program selectee and any derivatives on how to obtain an immigrant visa.

If you are a DV Program selectee or derivative, you can submit a provisional unlawful presence waiver request to USCIS as soon as you are selected.  You must submit a printout from the DV Entrant Status Check page of the DOS Electronic Diversity Visa system website at **www.dvlottery.state.gov/**, confirming that you are a DV Program selectee or derivative.

**NOTE:**  DV Program selectees and derivatives DO NOT need to show that they have already paid the DOS immigrant visa processing fee and they DO NOT have to submit a copy of the DOS-issued immigrant visa processing fee receipt.

**Extreme Hardship to a Qualifying Relative**

You must show that you have a U.S. citizen or LPR spouse or parent (qualifying relative) who would experience extreme hardship if you are refused admission to the United States.  The qualifying relative does not need to be the relative who filed the immigrant visa petition, but he or she must be your U.S. citizen or LPR spouse or parent.  For information about how you can show extreme hardship to your qualifying relative, see **Extreme Hardship** in the **What Evidence Must I Submit With Form I-601A** section of these Instructions.

**NOTE to parents of a U.S. citizen or LPR child:**  A U.S. citizen or LPR child is not a qualifying relative for the purpose of showing extreme hardship in this application.  USCIS will not consider extreme hardship experienced by your U.S. citizen or LPR children except to the extent that it affects the extreme hardship your U.S. citizen or LPR spouse or parent would experience.

**NOTE to surviving relatives:**  If your U.S. citizen or LPR spouse or parent filed your immigrant visa petition, but died after filing the immigrant visa petition on your behalf, USCIS will consider the U.S. citizen or LPR spouse's or parent's death the functional equivalent of extreme hardship to the U.S. citizen or LPR spouse or parent, if you resided in the United States at the time of the death and you continue to reside in the United States.

004126

You must still complete **Part 3. Information About Your Immigrant Visa Case** and **Part 4. Information About Your Qualifying Relative** with information about the Form I-130 petitioner.  In **Part 5. Statement From Applicant**, you must explain why you believe USCIS should approve your application for a provisional unlawful presence waiver as a matter of discretion.  You must also provide a copy of the U.S. citizen or LPR spouse's or parent's death certificate with your application.

**This application is divided into nine parts.  See below for greater detail.**

**Part 1.  Information About You**

In this section, provide the requested information about yourself.

**Item Number 1.  Alien Registration Number (A-Number)** (if any).  Provide your A-Number.  We use your A-Number to identify your immigration records.  It begins with an "A" and can be found on correspondence you have received from USCIS, U.S. Immigration and Customs Enforcement (ICE), or DOJ Executive Office of Immigration Review (EOIR) during immigration proceedings in court.

**Item Number 2.  U.S. Social Security Number** (if any).  Provide your U.S. Social Security number.  If you do not have a U.S. Social Security number, type or print "N/A."

**Item Number 3.  USCIS Online Account Number** (if any).  You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE.  If you filed the form online, you can find your OAN in your account profile.  If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you.  If you do not have a receipt number that begins with IOE, you do not have an OAN.  The OAN is not the same as an A-Number.

**Item Numbers 4.a. - 4.c.  Your Full Name.**  Provide your full legal name in the spaces provided.

**Item Numbers 5.a. - 6.c.  Other Names Used** (if any).  Provide all the names you have used, including maiden name, married names, and nicknames in the space provided.

**Item Numbers 7.a. - 7.f.  Your U.S. Mailing Address.**  Provide the address where you would like to receive written correspondence regarding your application.

**Item Numbers 8. - 9.e.  Your U.S Physical Address.**  Provide your physical address if it is different from your mailing address.

**Item Number 10.  Gender.**  Indicate whether you are male or female. **Date of Birth** (mm/dd/yyyy).  Provide your date of birth in mm/dd/yyyy format.

**Item Number 11.  Date of Birth** (mm/dd/yyyy).  Provide your date of birth in mm/dd/yyyy format.

**Item Numbers 12. - 13.  Place of Birth.**  Provide the city or town and country where you were born in the spaces provided.

**Item Number 14.  Country of Citizenship or Nationality.**  Provide the name of the country where you are a citizen and/or national.  This is not necessarily the country where you were born.  If you do not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 9. Additional Information.**

**Item Numbers 15.a. - 16.b.  Your Mother's and Father's Full Legal Name.**  Provide the full legal name for your parents in the spaces provided.

**Item Numbers 17. - 19.  Your Last Entry Into the United States.**  In the appropriate fields, provide the actual or approximate date and place where you last entered the United States and your immigration status, if any, at the time of entry.

If you were inspected at a port-of-entry as an applicant for admission, and the U.S. Customs and Border Protection officer then admitted or paroled you, provide the place of the port-of-entry and your immigration status at the time of entry (for example, immigrant, any nonimmigrant classification, or parolee).

If you came into the United States without inspection by U.S. Customs and Border Protection at a port-of-entry, type or print "PWI" as your immigration status.

004127

**Item Numbers 20.a. - 26.  Your Previous Entries Into the United States** (if applicable)**.**  In the appropriate fields, provide the date when (on or about) you previously entered the United States and the place (actual or approximate) for each prior entry into the United States.  Also provide your immigration status at the time of each prior entry.

If you were inspected at a port-of-entry as an applicant for admission, and then the U.S. Customs and Border Protection Officer admitted or paroled you, provide the place of the port-of-entry and your immigration status at the time of entry (for example, immigrant, any nonimmigrant classification, or parolee).

If you came into the United States without inspection by U.S. Customs and Border Protection at a port-of-entry, type or print "PWI" as your immigration status.

If you need extra space to complete this section, use the space provided in **Part 9. Additional Information**.

**Item Numbers 27. - 45.  Your Immigration or Criminal History.**  Provide information about any and all immigration or criminal history.

1.   **Immigration Proceedings (Item Numbers 27. - 30.)**

   **Item Number 27.  You Are In Removal Proceedings But There Is No Final Order Yet.**  Indicate whether you are currently in removal, exclusion, or deportation proceedings because the immigration judge, the Board of Immigration Appeals, or a Federal court has not issued an order in your case yet.  You are generally not eligible for a provisional unlawful presence waiver unless your case is administratively closed and has not been put back on the court's docket at the time you file your Form I-601A.

   If you answer "Yes" to **Item Number 27.**, you should proceed to **Item Numbers 28.a - 28.b.**  Based on the scenario that applies to you in **Item Numbers 28.a. - 28.b.**, you may be eligible for a provisional unlawful presence waiver.

   If your removal proceedings were terminated, you must submit a copy of all documents relating to the removal, deportation, or exclusion proceedings, including the order terminating the removal proceedings.  If removal proceedings were terminated, you are not in removal proceedings.

**Item Numbers 28.a. - 28.b.  Removal Proceedings Administratively Closed or Removal Proceedings Put Back on EOIR's Calendar to Continue The Case.**  Indicate which statement applies to you if you are currently in removal, deportation, or exclusion proceedings.  Provide the evidence requested in the scenario that applies to you.

If your case is administratively closed and has not been put back on EOIR's calendar to continue your case, you may be eligible for a provisional unlawful presence waiver.  If your case was administratively closed but has been put back on EOIR's calendar to continue your case, you are ineligible for a provisional unlawful presence waiver.

**Item Numbers 29.a. - 29.b.  Being Subject to Final Order of Removal, Exclusion, or Deportation.**  Indicate whether you are currently subject to a final order of removal, exclusion, or deportation.

**NOTE:**  If you answer "Yes" to **Item Number 29.a.**, you are ineligible for a provisional unlawful presence waiver unless you applied for and USCIS has already approved an application for permission to reapply for admission under INA section 212(a)(9)(A)(iii) and 8 CFR 212.2 on Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal.  If you have already applied for, and USCIS has already granted, you permission to reapply for admission, provide the relevant information about the approved Form I-212 in **Item Number 29.b.**  You may also provide a copy of the approval notice that USCIS sent to you when it approved your Form I-212.

**Item Number 30.a.  Reinstated Removal.**  Indicate in **Item Number 30.a.** whether DHS has served you with a Form I-871, Notice of Intent/Decision to Reinstate Prior Order, indicating that DHS intends to reinstate a prior deportation, exclusion, or removal order against you under INA section 241(a)(5).

**Item Number 30.b.**  If you answered "Yes" to **Item Number 30.a.**, indicate whether DHS has entered a final order reinstating a prior deportation, exclusion, or removal proceeding.

**Item Number 31.  Being Subject To An Unexpired Grant Of Voluntary Departure.**  Indicate whether you are currently subject to an unexpired grant of voluntary departure that was granted to you by an immigration judge or the Board of Immigration Appeals (BIA) during your removal proceedings.

004128

If you are currently subject to an unexpired grant of voluntary departure from the immigration judge or the BIA, you are not eligible for a provisional unlawful presence waiver.  If you were granted voluntary departure in the past, but then you withdrew your voluntary departure request or otherwise terminated voluntary departure you should not select "Yes" to **Item Number 31.**  In this case, you may be in removal proceedings or you may be the subject of a final order of removal, deportation or exclusion.  You should select the statements that apply to you in **Item Numbers 27. - 28.b.** or **Item Number 29.a.**

If you withdrew your request for voluntary departure or otherwise terminated the voluntary departure, please provide a copy of all the relevant court documents.

If you did not depart during the voluntary departure period, you now have an outstanding final order of removal, deportation, or exclusion.  You should not select "Yes" to **Item Number 31.**, but "Yes" to **Item Number 29.a.**

**2.  Criminal History (Item Numbers 32. - 45.)**

   **A.**  If you answer "Yes" to any question in **Item Numbers 32. - 38.**, provide the location, date, and a brief description of the event in **Part 9. Additional Information**.  If you answer "Yes" to any question in **Item Numbers 39.a. - 45.**, provide a complete explanation in **Part 9. Additional Information**.  The provisional unlawful presence waiver only addresses the inadmissibility grounds associated with unlawful presence under INA section 212(a)(9)(B)(i).  USCIS may deny your application as a matter of discretion due to unfavorable factors related to your criminal and/or immigration history unless you are able to establish that you warrant a favorable exercise of discretion.

   **B.**  If you were arrested or detained, but not charged with any crime or offense, you must provide information about the event regardless of the country where the event occurred.

   **C.**  If you were charged with a crime, you must provide certified court dispositions showing the court proceedings' outcome.  You must also provide copies of arrest reports, statements of charges, indictment information, or any other charging document issued against you.  You **MUST** provide this information even if:

   **(1)**  Your records were expunged;

   **(2)**  You were placed in an alternative sentencing or rehabilitation program (for example, diversion, deferred prosecution, withheld adjudication, deferred adjudication);

   **(3)**  Your records were sealed or otherwise cleared; or

   **(4)**  Anyone, including a judge, law enforcement officer, or attorney, told you that you no longer have a criminal record.

   **D.**  If you were arrested but not charged with a crime or offense, you must provide the arrest report as well as documentation from the arresting authority, prosecutor's office, or court, if available, showing that you were not charged with a crime or offense.

   **E.**  If you have ever engaged in, ordered, incited, assisted, or otherwise participated in any human rights violations (for example, acts involving torture, genocide, or human trafficking; murder; severely injuring someone; engaging in sexual activity with anyone made to participate by force or threat), you must provide information about the events, place, date, and description regardless of the country where the events occurred.


**Part 2.  Biographic Information**

Provide the biographic information requested in **Part 2.**, **Item Numbers 1. - 6.**  Providing this information as part of your application may reduce the time you spend at your USCIS ASC appointment as described in the **Biometric Services Appointment** section of these Instructions.

**Item Numbers 1. - 2.  Ethnicity and Race.**  Select the boxes that best describe your ethnicity and race.

**Categories and Definitions for Ethnicity and Race**

1.  **Hispanic or Latino.**  A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.  (**NOTE:** This category is only included under Ethnicity in **Part 2.**, **Item Number 1.**)

2. **American Indian or Alaska Native.**  A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

3. **Asian.**  A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

4. **Black or African American.**  A person having origins in any of the black racial groups of Africa.

5. **Native Hawaiian or Other Pacific Islander.**  A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

6. **White.**  A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Item Number 3.  Height.**  Select the values that best match your height in feet and inches.  For example, if you are five feet and nine inches, select "5" for feet and "09" for inches.  Do not enter your height in meters or centimeters.

**Item Number 4.  Weight.**  Enter your weight in pounds.  If you do not know your weight, or need to enter a weight under 30 pounds or over 699 pounds, enter "000."  Do not enter your weight in kilograms.

**Item Number 5.  Eye Color.**  Select the box that best describes the color of your eyes.

**Item Number 6.  Hair Color.**  Select the box that best describes the color of your hair.

**Part 3.  Information About Your Immigrant Visa Case**

In this section, provide information about the approved immigrant visa petition (either Form I-130, Form I-140, or I-360), and the status of your immigrant visa application at the NVC.

**Item Numbers 1.a. - 1.e.**  Provide the basis on which you are immigrating to the United States (Select **only one** box).

**NOTE:**  If you are a Diversity Visa (DV) program selectee or derivative, provide the information requested in **Item Numbers 2.a. - 2.d.**  If you are not filing this application as a Diversity Visa Selectee, skip to **Item Number 3.**

**Item Number 2.a.  DOS DV Program Case Number.**  Provide the DV Case number that was assigned to you (or your spouse or parent) by the KCC when you (or your spouse or parent) became a DV Program selectee.  You can find the number on your printout from the DV Entrant Status Check page of the DOS Electronic Diversity Visa system website at **www.dvlottery.state.gov/**.

**Item Numbers 2.b. - 2.d.  DV Program Selectee's Full Name.**  (If you are not filing this application as a Diversity Visa Selectee, skip to **Item Number 3.**)  If you are filing as the derivative of a DV program selectee, provide the name of the principal DV Program selectee (your spouse or your parent).

**Item Number 3.**  If you are (or your spouse or parent) is the beneficiary of an immigrant visa petition filed by a family member or an employer, provide the information requested in **Item Number 3.**

**Item Number 3.a.  USCIS Receipt Number.**  Provide the receipt number for the approved immigrant visa petition that was filed on your (or your spouse's or parent's) behalf or that you used to self-petition on your behalf.  Submit a copy (if available) of the petition approval notice (Form I-797, Notice of Action).  This will assist USCIS in processing your application for a provisional unlawful presence waiver.  Failure to provide a copy of the immigrant visa petition approval notice may result in processing delays or in the rejection of your application.

**NOTE:**  Failure to provide a copy of the petition approval notice will not, by itself, result in the denial of your application.

**Item Number 3.b.  DOS Consular Case Number (NVC Case Number).**  Provide your consular case number (also called the NVC case number).  It is located on your receipt for the DOS immigrant visa processing fee.  The NVC case number must correspond to the approved immigrant visa petition you listed in **Part 3.**, **Item Number 3.a.**

**Item Numbers 3.c. - 3.f.  Petitioner's Full Name and Company or Organization Name.**  Provide the full name of the family member or company who filed Form I-130, Form I-140, or Form I-360 on your (or your spouse's or parent's) behalf.  If you self-petitioned using Form I-140 or Form I-360, type or print "Self."

004130

**Part 4.  Information About Your Qualifying Relative**

In this section, provide information about the U.S. citizen or LPR spouse or parent you believe would experience extreme hardship if you were refused admission to the United States.

**Item Numbers l.a. - 2.d.  Your Qualifying Relative's Full Name and Relationship to You.**  Provide the full name of your qualifying relative and indicate whether the qualifying relative is your U.S. citizen or LPR spouse or parent.

**Item Number 3.  Your Other Qualifying Relative.**  Indicate whether you have another qualifying relative (U.S. citizen or LPR spouse or parent) who would experience extreme hardship if you were refused admission to the United States.  If you answer "Yes," provide the name, relationship, and evidence of U.S. citizenship or LPR status in the United States of the additional qualifying relative in the space provided.

**Item Numbers 4.a. - 5.d.  Additional Qualifying Relative's Full Name and Relationship to You.**  Provide the full name of your additional qualifying relative and indicate whether the additional qualifying relative is your U.S. citizen or LPR spouse or parent.

**Part 5.  Statement from Applicant**

In the space provided, describe all the reasons that you believe support your application for a provisional unlawful presence waiver.  If you need extra space to complete your statement, use the space provided in **Part 9. Additional Information**.

Your statement must explain why you believe your qualifying relative would experience extreme hardship if you are refused admission to the United States.  For information about how you can show extreme hardship, see **Extreme Hardship** in the **What Evidence Must I Submit With Form I-601A** section of these Instructions.

Your statement must also explain why you believe USCIS should approve your waiver application as a matter of discretion.  Approval of a provisional unlawful presence waiver is discretionary, and the USCIS officer will weigh favorable and unfavorable factors presented in your case to determine whether he or she should approve your request. You should explain why you believe USCIS should approve your application for a provisional unlawful presence waiver because of the favorable factors, and why the unfavorable factors should not carry as much weight as the favorable ones.

**Part 6.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature**

**Item Numbers 1.a. - 6.b.**  Select the appropriate box to indicate whether you read this application yourself or whether you had an interpreter assist you.  If someone assisted you in completing the application, select the box indicating that you used a preparer.  Further, you must sign and date your application and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every application **MUST** contain the signature of the applicant (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 7.  Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, the interpreter must fill out this section; provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the application.

**Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant**

**Item Numbers 1.a. - 8.b.**  This section must contain the signature of the person who completed your application, if other than you, the applicant.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 7.** and **Part 8.**  If the person who completed this application is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this application **MUST** sign and date the application.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your application is an attorney or accredited representative, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your application.

**Part 9.  Additional Information**

**Item Numbers 1.a. - 7.d.**  If you need extra space to provide any additional information within this application, use the space provided in **Part 9. Additional Information**.  If you need more space than what is provided in **Part 9.**, you may make copies of **Part 9.** to complete and file with your application, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

---

**We recommend that you print or save a copy of your completed application to review in the future and for your records.  We recommend that you review your copy of your completed application before you come to your biometric services appointment at a USCIS ASC.**  At your appointment, USCIS will allow you to complete the application process only if you are able to confirm, under penalty of perjury, that all of the information in your application is complete, true, and correct.  If you are not able to make that attestation in good faith at that time, we will require you to return for another appointment.

---

## What Evidence Must I Submit With Form I-601A?

You must submit all evidence requested in these Instructions with your application.  If you fail to submit required evidence, USCIS may reject or deny your application for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

If you are unable to submit the required primary evidence (for example, a birth certificate or marriage certificate), you may provide secondary evidence (for example, court orders, church or school records) instead if you can explain why the primary evidence is unavailable.  If you are unable to submit secondary evidence, you may submit two or more affidavits, sworn to or affirmed by individuals who are not parties to the immigration benefit sought and who have direct personal knowledge of the event and circumstances.  You must also explain why primary and secondary evidence are unavailable.

**Immigrant Visa Petition Approval Notice or DOS Electronic Diversity Visa Entrant Status Check Print Out**

You must submit a copy (if available) of the USCIS approval notice (Form I-797, Notice of Action) for the immigrant visa petition (Form I-130, Form I-140, or Form I-360) that was filed on your (or your spouse's or parent's) behalf or that you used to self-petition on your behalf.  If the immigrant visa petition was filed on your spouse's or parent's behalf, you must submit evidence establishing your relationship to your spouse or parent.  See the **Relationship to Qualifying Relative** section in these Instructions for a list of evidence that can be submitted.  If you are a DV Program selectee or derivative, you must submit a printout from the DV Entrant Status Check page of the DOS Electronic Diversity Visa system, that confirms you (or your spouse or parent) are a DV Program selectee.  If you are a DV program derivative spouse or child, you must also submit evidence establishing your relationship to the DV program selectee.  See **Relationship to Qualifying Relative** section in these Instructions for a list of evidence that can be submitted.

Having a copy of the immigrant visa petition approval notice or printout from the DV Entrant Status Check page of the DOS Electronic Diversity Visa system showing you are a DV Program selectee will assist USCIS in processing your application for a provisional unlawful presence waiver.

---

004132

Failure to provide a copy of the petition approval notice or printout from the DV Entrant Status Check page of the DOS Electronic Diversity Visa system will not, by itself, result in a denial of your application. However, failure to provide a copy of these documents may result in processing delays or in the rejection of your application. See the **Specific Instructions** section of these Instructions for more information.

**DOJ EOIR Administrative Closure Order**

You must submit a copy (required where applicable) of the administrative closure order issued by EOIR.

**Approval Notice (Form I-797, Notice of Action) for Form I-212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal**

If you are subject to an administratively final order of removal, exclusion, or deportation that has been entered or issued against you (including an in absentia order under INA section 240(b)(5) of the Act) and you applied for, and USCIS has already approved, an application for permission to reapply for admission into the United States after deportation or removal under INA section 212(a)(9)(A)(iii) of the Act and 8 CFR 212.2, you may submit a copy of the approval notice that USCIS sent to you.

**DOS Immigrant Visa Processing Fee Receipt** (for immediate relatives, family-sponsored, and employment-based immigrant visa applicants only)

If you are seeking your immigrant visa based on an approved immigrant visa petition (Form I-130, Form I-140, or Form I-360), you must submit a copy of your fee receipt for your DOS immigrant visa processing fee. Place this fee receipt on top of your Form I-601A when you submit your application. See the **Specific Instructions** section of these Instructions for more information.

**NOTE:** If you are applying for a provisional unlawful presence waiver based on your selection as a DV Program selectee or derivative, you do not need to provide a copy of the DOS immigrant visa processing fee receipt with your provisional unlawful presence waiver application.

**Relationship to Qualifying Relative**

If you are seeking your immigrant visa based on an approved family-sponsored immigrant visa petition and claim extreme hardship to a U.S. citizen or LPR spouse or parent who is the immigrant visa petitioner, you do not need to present evidence of your relationship to the petitioner. The immigrant visa petitioner will have already presented this evidence when he or she filed the immigrant visa petition (Form I-130 or Form I-360).

You must submit evidence that shows the qualifying relationship if:

1. You are seeking your immigrant visa based on an approved employment-based immigrant visa petition;

2. You are a DV Program selectee or derivative; or

3. You are seeking your immigrant visa based on an approved family-sponsored immigrant visa petition and you claim extreme hardship to a qualifying relative who is not the immigrant visa petitioner.

You must submit the following evidence to establish the relationship.

1. To your **spouse**:

   A. A copy of your marriage certificate; and

   B. If either you or your spouse were previously married, copies of documents showing that all prior marriages were legally terminated.

2. To your **mother**:

   A. A copy of your birth certificate that shows your name and the name of your mother; and

   B. If your mother's name has changed since your birth and is different from what is shown on your birth certificate, a copy of the legal document that authorized the name change.

004133

3.   To your **father**:

    A.   A copy of your birth certificate that shows both parents' names;

    B.   A copy of your parents' marriage certificate or other evidence that shows you were legitimated before reaching 18 years of age;

    C.   Evidence of legal termination of your parents' prior marriages, if any; or

    D.   If you were born out of wedlock and were not legitimated before reaching 18 years of age, you must include any evidence establishing that a bona fide parent-child relationship existed between you and your father while you were unmarried and under 21 years of age.  You may include evidence that your father lived with you, supported you, or otherwise showed continuing parental interest in your welfare.

4.   To your **step-parent**:

    A.   A copy of your birth certificate that shows your parents' names;

    B.   A copy of the marriage certificate between your natural parent and step-parent that established the relationship before you reached 18 years of age; and

    C.   Evidence of legal termination of any prior marriages for your natural parent and step-parent, if applicable.

5.   To your **adoptive parent**:

    A.   A copy of the final adoption decree listing the individual as your adoptive parent; and

    B.   Evidence that your adoptive parent adopted you before you reached 16 years of age (or reached 18 years of age if your adoptive parent also adopted your natural sibling) and that your adoptive parent had legal custody of you and resided with you for at least two years.

**Citizenship or LPR Status of a Qualifying Relative**

If you are seeking your immigrant visa based on an approved family-sponsored immigrant visa petition and claim extreme hardship to a U.S. citizen or LPR spouse or parent who is the immigrant visa petitioner, you do not need to present evidence of the immigrant visa petitioner's U.S. citizenship or LPR status.  The immigrant visa petitioner will have already presented this evidence when he or she filed the immigrant visa petition (Form I-130 or Form I-360).

You must submit evidence that shows the qualifying relative is a U.S. citizen or LPR if:

1.   You are seeking your immigrant visa based on an approved employment-based immigrant visa petition;

2.   You are a DV Program selectee or derivative; or

3.   You are seeking your immigrant visa based on an approved family-sponsored immigrant visa petition and you claim extreme hardship to a qualifying relative who is not the immigrant visa petitioner.

Evidence of U.S. citizenship includes, but is not limited to, any of the following:

1.   If your relative was born in the United States, a copy of his or her birth certificate, issued by a civil registrar, vital statistics office, or other civil authority of a U.S. state, county, municipal authority, or territory;

2.   A copy of your relative's naturalization certificate or certificate of citizenship issued by USCIS or the former Immigration and Naturalization Service (INS);

3.   A copy of your relative's unexpired U.S. passport; or

4.   A copy of your relative's DOS-issued Form FS-240, Report of Birth Abroad of a Citizen of the United States.

004134

Evidence of LPR status is established by submitting a copy of your qualifying relative's permanent resident card.  You must submit a copy of the front and back of your qualifying relative's permanent resident card.  If your qualifying relative has not yet received his or her permanent resident card, submit copies of the biographic pages of your qualifying relative's passport, and copies of the pages in your qualifying relative's passport, or any other USCIS or former INS issued evidence that shows your qualifying relative's LPR status.

**Admission or Parole at a Port-of-Entry**

If you claim in **Part 1.**, **Item Numbers 17. - 19.**, of the application that, on your last arrival in the United States, you were inspected by U.S. Customs and Border Protection at a port-of-entry, and then admitted or paroled, please submit your Form I-94, a copy of your passport with an admission or parole stamp or other DHS-issued evidence of your admission or parole.

If you cannot produce this evidence, and DHS has no record of the admission or parole, USCIS will presume that you came into the United States without inspection and admission or parole.

You may, however, provide secondary evidence (records maintained in the ordinary course of business by any individual or organization other than DHS) to support your claim that you were admitted or paroled.

If no secondary evidence is available, you may submit written statements, signed under penalty of perjury under United States law, from yourself and from any other individuals who have personal knowledge of the circumstances of your claimed admission or parole.

**Extreme Hardship**

You may submit any evidence to support your claim that your qualifying relative would experience extreme hardship if you are refused admission to the United States and your U.S. citizen or LPR spouse or parent must remain in the United States without you or relocate abroad to reside with you outside of the United States.  Factors USCIS considers when determining extreme hardship include, but are not limited to:

1. **Health.**  Examples include:  Ongoing or specialized treatment required for a physical or mental condition, availability or quality of such treatment in the foreign country, anticipated treatment duration, whether the condition is long term, and whether it is chronic or acute;

2. **Financial considerations.**  Examples include:  Future employability, loss due to sale of home or business or termination of a professional practice, a decline in standard of living, ability to recoup short-term losses, cost of extraordinary needs (such as special education or training for children with special needs), or the cost of care for family members such as elderly or sick parents;

3. **Education.**  Examples include:  Loss of opportunity for higher education, lower quality or limited scope of education options, disruption of a current program, requirement to be educated in a foreign language or culture with ensuing loss of time or grade, and availability of special requirements, such as training programs or internships in specific fields;

4. **Personal considerations.**  Examples include:  Close relatives in the United States and country of birth or citizenship, separation from spouse or children, ages of involved parties, and length of residence and community ties in the United States; and

5. **Special factors.**  Examples include:  Cultural, language-related, religious, and ethnic obstacles; valid fears of persecution, physical harm, or injury; social ostracism or stigma; and lack of access to social institutions or structures (official or unofficial) that provide support, guidance, or protection.

**Evidence of extreme hardship includes, but is not limited to:**

1. Expert opinions;

2. Evidence of employment or business ties (for example, payroll records or tax statements);

3. Evidence of monthly expenditures (for example, receipts from mortgage, rental or bill payments);

4. Other financial records that support any claimed financial hardships;

5.  Medical documentation or evaluations by medical professionals that support any claimed medical hardships;

6.  Records of membership in community organizations or confirmation of volunteer service, and evidence of cultural affiliations;

7.  Certificates of birth, marriage, or adoption that support any claimed family ties;

8.  Affidavits or statements signed under the penalty of perjury (as permitted by 28 USC 1746), or letters from the qualifying relative or other individuals with personal knowledge of the claimed hardships.

9.  Country condition reports; and

10. Any other evidence you believe supports the claimed extreme hardships.

**NOTE:**  USCIS will consider extreme hardship only to a qualifying relative.  If you describe extreme hardship to yourself or anyone other than a qualifying U.S. citizen or LPR spouse or parent, you must show how this extreme hardship affects the extreme hardship your qualifying U.S. citizen or LPR spouse or parent would experience if you are refused admission to the United States.

**Establishing That Your Case Warrants A Favorable Exercise of Discretion**

Approval of Form I-601A is discretionary.  To determine if your case warrants a favorable exercise of discretion, USCIS will review the evidence in the records and weigh all favorable and unfavorable factors when deciding whether to approve your application as a matter of discretion.  You should describe the favorable and unfavorable factors in your case and explain why you think the favorable factors should be given more weight.

**Some favorable factors may include, but are not limited to:**

1.  Close family ties in the United States;

2.  Hardship to your relatives who are U.S. citizens or LPRs, or to yourself, or your employer in the United States;

3.  Evidence of reformation and rehabilitation;

4.  Length of lawful presence in the United States and your immigration status while you were lawfully present;

5.  Evidence of respect for law and order, good moral character, and family responsibilities or intent to hold family responsibilities;

6.  Absence of significant undesirable or negative factors; and

7.  Likelihood that you will become an LPR in the near future.

**Some unfavorable factors may include, but are not limited to:**

1.  Evidence of bad moral character, including criminal tendencies reflected by past convictions or an ongoing unlawful activity or continuing police record;

2.  Repeated violations of U.S. immigration laws and a willful disregard for other laws;

3.  Absence of close family ties or hardships;

4.  Fraudulent marriage to a U.S. citizen for the purpose of gaining an immigration benefit; and

5.  Unauthorized employment in the United States.

---

| **Where To File?** |
|---|

Please see our website at **www.uscis.gov/I-601A** for the most current information about where to file this application.

---

## Address Change

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous residence.  For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox.

## Processing Information

**USCIS will reject your Form I-601A if it is not signed or accompanied by the correct fees.  USCIS will send you a notice that Form I-601A is deficient.  USCIS will also reject Form I-601A if you:**

1.  Fail to provide your full name, U.S. physical address, and date of birth;

2.  Are under 17 years of age;

3.  Do not include evidence of an approved immigrant visa petition filed on behalf of you, your spouse, or your parent or yourself (if you self-petitioned), or evidence that DOS selected you or your spouse or parent as a DV Program selectee;

4.  Have an immigrant visa case based on an approved immigrant visa petition and you **do not** include documentation, such as the DOS immigration visa processing fee receipt that shows you have paid DOS the immigrant visa processing fee.

5.  Have indicated on the application that DOS initially acted **before January 3, 2013**, to schedule the immigrant visa interview or have not selected either box in **Part 3.**, **Item Number 5.**

If USCIS rejects your Form I-601A, we will return it to you with any fees you submitted with the application.  You may correct the deficiency and resubmit your Form I-601A.  An application is not considered properly filed until accepted by USCIS.  **If USCIS denies your application after fully adjudicating your Form I-601A, USCIS will not refund the fees originally submitted with your Form I-601A.**

**IMPORTANT:  You must have a United States address to file this application.**

**Initial Processing.**  Once USCIS accepts your application we will check it for completeness.  If you do not properly complete this application, you will not establish a basis for your eligibility and we may reject or deny your application.

**Requests for More Information.**  USCIS may request that you provide more information or evidence to support your application.  We may also request that you provide the originals of any copies you submit.  If we request an original document from you, we will return it to you after USCIS determines it is no longer needed.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your application.  During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-601A involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS will notify you of our decision in writing.

## USCIS Forms and Information

To ensure you are using the latest version of this application, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false, altered, forged, or counterfeited writing or document with your Form I-601A, we will deny your Form I-601A and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act sections 212(a)(9)(B) (i)(I) and (II), and 212(a)(9)(B)(v).

**PURPOSE:**  The primary purpose for providing the requested information on this application is to determine if you have established eligibility for the provisional unlawful presence waiver.  DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number, and any requested evidence, may delay a final decision or result in denial of your application.

**ROUTINE USES:**  DHS may share the information you provide on this application with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses, as described in the associated published system of records notices [DHS-USCIS-001 - Alien File, Index, and National File Tracking System and DHS-USCIS-007 - Benefits Information System] and published privacy impact assessment [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems], which you can find at **www. dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1.317 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.  The collection of biometrics is estimated to require 1 hour and 10 minutes.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0123.  **Do not mail your completed Form I-601A to this address.**

## Is My Form I-601A Complete?

Ensure that you have completed **ALL** of the following actions before you file your Form I-601A with USCIS.

☐    If I am filing as the principal or derivative beneficiary or as the self-petitioner of an approved immigrant visa petition, I placed documentation showing that I paid **DOS the immigrant visa processing fee** on top of my Form I-601A and supporting documentation.

☐    If I am filing as a Diversity Visa program selectee or derivative, I placed documentation showing that I (or my parent or spouse) was selected by DOS to participate in the DV Program on top of my Form I-601A and supporting documentation.

004138

☐ If I am in removal, exclusion, or deportation proceedings, I included a copy of my **administrative closure order** from the U.S. Department of Justice, Executive Office for Immigration Review (EOIR).

☐ If I have an administratively final order of removal, exclusion, or deportation that has been entered or issued against me (including an in absentia order under INA section 240(b)(5)) but I applied and USCIS already approved, an application for permission to reapply for admission to the United States after deportation or removal (Form I-212), I included my USCIS Receipt number in **Part 1.**, **Item Number 29.b.** on Form I-601A or I included a copy of the approval notice that USCIS sent when it notified me of the Form I-212 approval, or both.

☐ I included arrest records and conviction documents for any criminal offenses, if applicable.

☐ I completed every applicable item on my Form I-601A, including my full name, my U.S. mailing and physical addresses, and my date of birth.  I attached documents to support my statements, when requested, on Form I-60lA or in the **What Evidence Should I Submit With Form I-601A** section of these Instructions.

☐ In **Part 3. Information About Your Immigrant Visa Case**, I provided information about the approved immigrant visa petition (Form I-130, Form I-140, or Form I-360) that was filed on my (or my spouse's or parent's) behalf, or that I filed as a self-petitioner, and I attached a copy (if available) of the immigrant visa petition approval notice (Form I-797, Notice of Action).

☐ In **Part 3.**, I provided information about my DOS immigrant visa case.

☐ In **Part 4. Information About Your Qualifying Relative**, I provided information about my qualifying relatives and I explained the extreme hardship to my qualifying relatives in **Part 4.**  I also explained in **Part 4.** why USCIS should approve my application for a provisional unlawful presence waiver as a matter of discretion.

☐ I read the **Penalties** section of these Instructions and I (or a parent or legal guardian, if applicable) signed this Form I-601A.

☐ I included the required filing fee.



# Instructions for Application for Employment Authorization

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-765**
OMB No. 1615-0040
Expires 02/28/2027

## What Is the Purpose of Form I-765?

Certain foreign nationals who are in the United States may file Form I-765, Application for Employment Authorization, to request employment authorization and an Employment Authorization Document (EAD).  Other foreign nationals whose immigration status authorizes them to work in the United States without restrictions may also use Form I-765 to apply to U.S. Citizenship and Immigration Services (USCIS) for an EAD that shows such authorization.  Review the **Who May File Form I-765** section of these Instructions to determine whether you should use Form I-765.

Foreign nationals may also apply for a Social Security number and card on Form I-765 following the guidelines in the **Specific Instructions** section of these Instructions, **Part 2. Information About You, Item Numbers 13.a. - 17.b.**

If you are a lawful permanent resident, a conditional permanent resident, or a nonimmigrant only authorized for employment with a specific employer under 8 CFR 274a.12(b), do **not** use Form I-765.

### Definitions

**Employment Authorization Document (EAD):**  The EAD is the card (also known as Form I-688A, Form I-688B, Form I-766, or any successor document) issued as evidence that the holder is authorized to work in the United States.

**Initial EAD:**  An EAD issued to an eligible applicant for the first time under a specific eligibility category.

**Renewal EAD:**  An EAD issued to an eligible applicant after the expiration of a previous EAD issued under the same category.

**Replacement EAD:**  An EAD issued to an eligible applicant when the previously issued EAD was lost, stolen, damaged, or contains errors, such as a misspelled name.

**NOTE:**  For more information regarding employment authorization documents, visit **www.uscis.gov/greencard/employment-authorization-document**.

## Who May File Form I-765?

You may file Form I-765 if you fall within one of the eligibility categories below.  For some categories, employment authorization is granted with your underlying immigration status (called "incident to status" employment authorization).  For example, asylees and refugees have employment authorization as soon as they obtain such status.  In these cases, your EAD is issued upon approval of your Form I-765, and the EAD is evidence of your employment authorization.  For other categories such as parolees or individuals with deferred action, USCIS must first approve your Form I-765 before you are eligible to accept employment in the United States.  Once your Form I-765 is approved, USCIS will issue your EAD.  You must type or print your eligibility category in **Part 2.**, **Item Number 27.**, on Form I-765.  Enter only one category number on the application.  For example, if you are a refugee applying for an EAD, type or print "(a)(3)" in **Item Number 27.**

**Please note that a person with a pending application for an immigration benefit or request might have a different category number than the person who was already granted the benefit or request.  For example certain pending asylum applicants are category "(c)(8)," but a person already granted asylum is category "(a)(5)."**

**Asylee/Refugee Categories (and their Spouses and Children)**

1. **Refugee--(a)(3).**  If an initial Form I-765 was not already prepared for you before your arrival as a refugee in the United States, or if you are requesting to renew your EAD, file Form I-765 with a copy of one of the following:  your stamped Form I-94, Arrival-Departure Record; your Final Notice of Eligibility for Resettlement (approval letter); or your Form I-797 Notice approving your derivative refugee status based on a Form I-730, Refugee/Asylee Relative Petition (if approved while in the United States).

   **NOTE:**  If you were admitted as a refugee and have applied under the Immigration and Nationality Act (INA) section 209 to adjust to lawful permanent resident status using Form I-485, Application to Register Permanent Residence or Adjust Status, file Form I-765 under category (a)(3) as a refugee.  Do not file Form I-765 under eligibility category (c)(9) as an INA section 245 adjustment applicant.

2. **Paroled as a Refugee--(a)(4).**  File Form I-765 with a copy of your Form I-94, passport, or travel document. Commonwealth of the Northern Mariana Islands (CNMI), and other humanitarian or significant public benefit parolees (such as Cuban Family and Haitian Family Reunification Parole programs), should file under the category (c)(11), not as a refugee under (a)(4).

3. **Asylee (Granted Asylum)--(a)(5).**  File Form I-765 with a copy of one of the following:  your stamped Form I-94 indicating asylee status; a USCIS Asylum approval letter; an order granting asylum signed by an Executive Office for Immigration Review (EOIR) immigration judge (IJ); or a Form I-797 Notice approving your derivative asylee status based on a Form I-730 (if approved while in the United States).

   **NOTE:**  If you are an asylee and have applied under INA section 209 to adjust to lawful permanent resident status using Form I-485, file Form I-765 under category (a)(5) as an asylee.  Do not file Form I-765 under eligibility category (c)(9) as an INA section 245 adjustment applicant.

4. **Granted Withholding of Deportation or Removal--(a)(10).**  File Form I-765 with a copy of the EOIR IJ's signed order granting withholding of deportation or removal.

5. **Pending Asylum and Withholding of Removal Applicants and Applicants for Pending Asylum under the ABC Settlement Agreement--(c)(8).**  If you have a pending Form I-589, Application for Asylum and for Withholding of Removal, or you are awaiting further consideration of a pending asylum application under INA section 235(b)(1)(B)(ii) following a positive credible fear determination, refer to **Special Filing Instructions for Those With Pending Asylum Applications--(c)(8) in the Required Documentation** section of these Instructions.

**Nationality Categories**

1. **Citizen of Micronesia, the Marshall Islands, or Palau--(a)(8).**  File Form I-765 with evidence you were admitted to the United States as a citizen of the Federated States of Micronesia (CFA/FSM), the Marshall Islands (CFA/MIS), or Palau under agreements between the United States and the former trust territories.

2. **Deferred Enforced Departure (DED)--(a)(11).**  File Form I-765 with evidence of your identity and nationality. If you are without nationality, submit evidence of your residence in the last country in which you habitually resided. You should also state your basis for claiming that you are covered by DED and provide evidence (if available) for your claim.

3. **Temporary Protected Status (TPS)--(a)(12) and (c)(19).**  File Form I-765 with your Form I-821, Application for Temporary Protected Status, or evidence that we accepted or approved your initial Form I-821.  Include evidence of your nationality and identity as required by the Form I-821 Instructions.  If an EOIR IJ or the Board of Immigration Appeals (BIA) granted TPS, and you are requesting your first EAD or are re-registering for the first time, you must submit a copy of the EOIR IJ or BIA order that granted TPS with your Form I-765 (such as a copy of your Form I-821 that the EOIR IJ or BIA approved).  You must also follow the instructions for filing your application as described in the most recent TPS Federal Register notice regarding a TPS designation, re-designation, or extension for your country.  Please check the USCIS website at **www.uscis.gov/tps** for procedures to register or re-register for TPS, including obtaining an EAD, if your country has been designated for TPS.

If your non-expired TPS EAD is lost, stolen, or damaged, file Form I-765 with required fees to request a replacement. Include a copy of your approval notice for TPS (if you have been approved) or a copy of your previous Form I-797 Notice for Form I-821 if your TPS application is still pending.

**A. Category (a)(12) EAD:** We may issue you a category (a)(12) EAD if your TPS application was approved, you requested an EAD, and you were not previously issued a category (c)(19) EAD that runs through the current TPS designation, re-designation, or extension period for your country.

**Re-registration for TPS:** File your Form I-765, Form I-821, and a letter indicating that this application is for TPS re-registration. Include a copy (front and back) of your last available TPS document (for example, an EAD, Form I-94, passport, or travel document, or a Form I-797 Notice).

**NOTE:** To re-register for TPS, you must file Form I-821; however, you do not need to file Form I-765 if you do not want an EAD.

**B. Category (c)(19) EAD:** A category (c)(19) EAD is a temporary benefit under TPS under 8 CFR Part 244. We may issue you a category (c)(19) EAD if you have a pending Form I-821, and you are *prima facie* eligible for TPS.

**4. Nicaraguan Adjustment and Central American Relief Act (NACARA) Section 203 Applicants Who Are Eligible to Apply for NACARA Relief With USCIS--(c)(10).** See the Instructions to Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 (NACARA)), to determine if you are eligible to apply for NACARA 203 relief.

If you are eligible to apply for NACARA 203 relief with USCIS, you may file Form I-765 together with your Form I-881. See our website at **www.uscis.gov/I-881** for the most current information on where to file Form I-881. If you are eligible to file Form I-881 with EOIR, or if you have already filed Form I-881 with USCIS or EOIR, see the **Where to File** section of these Instructions.

**5. Dependent of TECRO E-1 Nonimmigrant--(c)(2).** File Form I-765 with the required certification from the American Institute in Taiwan if you are the spouse or unmarried dependent son or daughter of an E-1 employee of the Taipei Economic and Cultural Representative Office.

**Foreign Students Categories**

**1. F-1 Student Seeking Optional Practical Training (OPT) in a Position Directly Related to Major Area of Study**

**NOTE:** If you are an F-1 student filing for initial or extension of OPT, please note that your OPT and your employment authorization will be automatically terminated if you change educational program levels or transfer to another school. Working in the United States without authorization may result in your removal from the United States or denial of re-entry. Consult your Designated School Official (DSO) for additional details.

**A. Pre-Completion OPT--(c)(3)(A).** File Form I-765 up to 90 days before being enrolled for one full academic year, provided that the period of employment will not start before you have completed one full academic year. The one full academic year need not necessarily have been completed while you were in F-1 status; if you completed the one-year requirement while in another valid nonimmigrant status and you are now in valid F-1 status, you are eligible to apply for OPT. Include evidence of having been lawfully enrolled on a full-time basis for one full academic year at a college, university, conservatory, or seminary approved by the U.S. Immigration and Customs Enforcement (ICE) Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students. Also, include all previously used Student and Exchange Visitor Information System (SEVIS) numbers and evidence of any previously authorized curricular practical training (CPT) or OPT and academic level at which each was authorized. You must include a Certificate of Eligibility of Nonimmigrant (F-1) Student Status (Form I-20) endorsed by the DSO before filing Form I-765.

**B. Post-Completion OPT--(c)(3)(B).** File Form I-765 up to 90 days before, but no later than 60 days after, your program end date. Use **Part 6. Additional Information** to provide all previously used SEVIS numbers and evidence of any previously authorized CPT or OPT and the academic level at which it was authorized.

**NOTE:**  You **must** file your Form I-765 within 30 days of the date that your DSO enters the recommendation for OPT into your SEVIS record.  If you fail to do so, we will deny your OPT request.

**C.  24-Month Extension for STEM Students (Students With a Degree in Science, Technology, Engineering, or Mathematics)--(c)(3)(C).**  File Form I-765 up to 90 days before the expiration of your current OPT, if you are requesting a 24-month STEM extension.  Include evidence the degree that is the basis for the STEM OPT extension is in one of the degree programs currently listed on the STEM Designated Degree Program List. Additionally, submit the employer's name as listed in E-Verify, along with the E-Verify Company Identification Number, or a valid E-Verify Client Company Identification Number for the employer with whom you are seeking the 24-month STEM OPT extension.  You must provide this information in **Part 2.**, **Item Numbers 28.a. - 28.c.**, of Form I-765.  You must include a copy of the Form I-20 endorsed by the DSO within 60 days before filing Form I-765.

**NOTE:**  If you are applying for a STEM OPT extension based on a previously earned STEM degree, you must also include a copy of your prior STEM degree and evidence that the institution is currently accredited by the U.S. Department of Education and certified by the SEVP.

**D.  F-1 Student Offered Off-Campus Employment Under the Sponsorship of a Qualifying International Organization--(c)(3)(ii).**  File Form I-765 with the international organization's letter of certification that the proposed employment is within the scope of its sponsorship and a copy of the Form I-20 with the employment page completed by the DSO certifying eligibility for employment.

**E.  F-1 Student Seeking Off-Campus Employment Due to Severe Economic Hardship--(c)(3)(iii).**  File Form I-765 with a copy of the Form I-20 that includes the employment page completed by the DSO certifying eligibility for off-campus employment due to severe economic hardship caused by unforeseen circumstances beyond your control.  Include evidence that:

**(1)** You have been in F-1 status for one full academic year;

**(2)** You are in good standing as a student;

**(3)** You are carrying a full course of study;

**(4)** Acceptance of employment will not interfere with your carrying a full course of study;

**(5)** The employment is necessary to avoid severe economic hardship due to unforeseen circumstances beyond your control; and

**(6)** On-campus employment is unavailable or is not sufficient to meet the needs that have arisen due to the unforeseen circumstances.

**F.  J-2 Spouse or Minor Child of an Exchange Visitor--(c)(5).**  File Form I-765 with a copy of Form DS-2019, evidence the J-1 principal foreign national is currently maintaining status, and evidence any income from this employment authorization will not be used to support the J-1 principal foreign national.  Also, provide evidence you are currently maintaining status and include evidence of all previously authorized periods of J-2 employment.

**G.  M-1 Student Seeking Post-Completion OPT After Completing Studies--(c)(6).**  File Form I-765 with a copy of the Form I-20 endorsed by the DSO certifying eligibility for employment together with Form I-539, Application to Change/Extend Nonimmigrant Status, if applicable, completed according to the Form I-539 Instructions.  We must receive the completed forms before, but not more than 90 days before, your program end date.  If applicable, your Form I-539 must request an extension of stay that covers the requested period of post-completion OPT and a 30-day departure period.

**NOTE:**  You may request one month of OPT for every four months of full-time study you have completed as an M-1 student.

004143

**Categories for Eligible Dependents of Employees of Diplomatic Missions, International Organizations, or NATO**

1. **Dependent of A-1 or A-2 Foreign Government Officials--(c)(1).** Submit Form I-765 with Form I-566, Interagency Record of Request-A, G, or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G, or NATO Status, Dependent Employment Authorization, through your diplomatic mission to the Department of State (DOS).  DOS will forward all favorably endorsed applications directly to USCIS for adjudication.

2. **Dependent of G-1, G-3, or G-4 Nonimmigrant--(c)(4).** Submit Form I-765 together with Form I-566 through your international organization to DOS.  The United Nations (UN) and UN missions located in New York City should submit such applications to the U.S. Mission to the UN (USUN).  DOS or USUN will forward all favorably endorsed applications directly to USCIS for adjudication.

3. **Dependent of NATO-1 Through NATO-6--(c)(7).** If you are a dependent of a North Atlantic Treaty Organization (NATO) nonimmigrant who is stationed at Supreme Allied Command Transformation (SACT), NATO/HQ, submit Form I-765 with Form I-566 to:

   **USLO to NATO/HQ SACT**
   **7857 Blandy Road, Suite 200**
   **Norfolk, VA 23551-2491**

   If you are a dependent of a NATO nonimmigrant who is stationed outside of NATO/HQ SACT, submit Form I-765 with Form I-566 to the Defense Attaché's Office at the embassy of the NATO member that employs the foreign national.  For more details on NATO member embassy contacts and on documents required, visit the DOS website **www.state.gov/ofm** under the topic "Dependent Work Authorization."

   If you have questions regarding the process or document requirements, email **OFM-EAD@state.gov**.

**Employment-Based Nonimmigrant Categories**

1. **B-1 Nonimmigrant Who Is the Personal or Domestic Servant of a Nonimmigrant Employer--(c)(17)(i).** File Form I-765 with:

   **A.** Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document);

   **B.** Evidence that your employer is a B, E, F, H, I, J, L, M, O, P, Q, or TN nonimmigrant;

   **C.** Evidence you worked for the employer for at least one year before the employer entered the United States, or your employer regularly employs personal and domestic servants and has done so for a period of years before coming to the United States;

   **D.** Evidence you have either worked for this employer as a personal or domestic servant for at least one year, or evidence you have at least one year of experience as a personal or domestic servant; and

   **E.** Evidence establishing you have a residence abroad that you have no intention of abandoning.

2. **B-1 Nonimmigrant Domestic Servant of a U.S. Citizen--(c)(17)(ii).** File Form I-765 with:

   **A.** Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document);

   **B.** Evidence that your employer is a U.S. citizen;

   **C.** Evidence that your employer has a permanent home abroad or is stationed outside the United States and is temporarily visiting the United States, OR evidence that your employer's current assignment in the United States will not be longer than four years; and

   **D.** Evidence that your employer has employed you as a domestic servant abroad for at least six months before your admission to the United States.

004144

3. **B-1 Nonimmigrant Employed by a Foreign Airline--(c)(17)(iii).** File Form I-765 with:

   A. Evidence of your lawful B nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

   B. A letter from the airline fully describing your duties and stating your position would entitle you to E nonimmigrant status except for the fact that you are not a national of the same country as the airline, or because there is no treaty of commerce and navigation in effect between the United States and that country.

4. **Spouse of an E-1 Treaty Trader, E-2 Treaty Investor, or E-3 Specialty Occupation Professional from Australia--(a)(17).** File Form I-765 with:

   A. Evidence of your lawful E nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

   B. Evidence of your spouse's lawful E nonimmigrant status (for example, a copy of your spouse's Form I-94, passport, or other travel document) and your marriage certificate.

   **NOTE:** Other relatives or dependents of E nonimmigrants in E status are not eligible for employment authorization and cannot file under this category.

5. **Spouse of an L-1 Intracompany Transferee--(a)(18).** File Form I-765 with:

   A. Evidence of your lawful L nonimmigrant status (for example, your Form I-94, passport, or other travel document); and

   B. Evidence of your spouse's lawful L nonimmigrant status (for example, a copy of your spouse's Form I-94, passport, or other travel document) and your marriage certificate.

   **NOTE:** Other relatives or dependents of L nonimmigrants in L status are not eligible for employment authorization and cannot file under this category.

6. **Spouse of an E-2 Commonwealth of Northern Mariana Islands (CNMI) Investor--(c)(12).** File Form I-765 with the required evidence listed under **Special Filing Instructions for Spouses of E-2 CNMI Investors** in the **Required Documentation** section of these Instructions.

   **NOTE:** If you are the spouse of a principal E-2 CNMI investor who obtained status on the basis of a Foreign Retiree Investment Certification, you are not eligible for employment authorization and cannot file under this category.

7. **Spouse of an H-1B Nonimmigrant--(c)(26).** File Form I-765 along with documentation of your current H-4 admission or extension of stay. You must also submit documentation establishing either your spouse is the beneficiary of an approved Form I-140, Immigrant Petition for Alien Worker, or your spouse received H-1B status based on the American Competitiveness in the Twenty-First Century Act (AC21) sections 106(a) and (b).  For your convenience, you may file Form I-765 with Form I-539.  However, we will not process your Form I-765, until  after we have adjudicated your Form I-539. You may also file Form I-765 at the same time as your Form I-539 and your H1-B spouse's Form I-129, Petition for a Nonimmigrant Worker.  Please see the USCIS website at **www.uscis.gov/I-765** for the most current information on where to file this benefit request.

   A. **Proof of Your Status.**  Submit a copy of your current Form I-797 Notice for Form I-539, or Form I-94 showing your admission as an H-4 nonimmigrant or your most recent approved extension of stay; and

   B. **Proof of Relationship to the Principal H-1B.**  Submit a copy of your marriage certificate.  If you cannot submit a copy of your current Form I-797 Notice, Form I-94, or marriage certificate, we will consider secondary evidence of your relationship.

   C. **Basis for Work Authorization.**  Acceptable documentation includes:

   (1) **Approved Form I-140.**  Submit evidence the H-1B principal is the beneficiary of an approved Form I-140. You may show this by submitting a copy of your spouse's Form I-797 Notice for Form I-140; or

004145

**(2) H-1B Principal Received AC21 106(a) and (b) Extension.**  Submit evidence that your spouse has been admitted or granted an extension of stay under AC21 sections 106(a) and (b).  You may show this by submitting copies of your spouse's passports, prior Form I-94s, and current and prior Form I-797 Notices for Form I-129.  In addition, submit evidence to establish one of the following bases for the H-1B extension of stay.

**(a) Based on Filing of a Permanent Labor Certification Application.**  Submit evidence your spouse is the beneficiary of a Permanent Labor Certification Application that was filed at least 365 days prior to the date the period of admission authorized under AC21 sections 106(a) and (b) took effect.  You may show this by submitting a print out from the Department of Labor's (DOL) website or other correspondence from DOL showing the status of your spouse's Permanent Labor Certification Application.  If DOL certified the Permanent Labor Certification, you must also submit a copy of Form I-797 Notice for Form I-140 establishing the Form I-140 was filed within 180 days of DOL certifying the Permanent Labor Certification; or

**(b) Based on a Pending Form I-140.**  If the preference category sought for the principal H-1B spouse does not require a Permanent Labor Certification Application with DOL, submit evidence your spouse's Form I-140 was filed at least 365 days prior to the date the period of admission authorized under AC21 sections 106(a) and (b) took effect.  You may show this by submitting a copy of the Form I-797 Notice for Form I-140.

**(c) Secondary Evidence.**  If you do not have the evidence listed in **Items (a) or (b)** above, you may ask us to consider secondary evidence in support of your application for employment authorization as an H-4 spouse.  For example, in establishing the Basis for Employment Authorization as described in **Items (1)** and **(2)**, you may submit the receipt number of your spouse's most current Form I-129 extension of stay or Form I-140 approved on your spouse's behalf.

Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your Form I-765.  For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

**8. Principal Beneficiary of an Approved Employment-Based Immigrant Petition Facing Compelling Circumstances--(c)(35).**  File Form I-765 with documents showing that you are eligible for an initial grant or a renewal of employment authorization under the (c)(35) eligibility category.

**A. Initial Application:**  If this is your first application for compelling circumstances employment authorization under the (c)(35) eligibility category, **and** an immigrant visa number is not yet available to you, you may be eligible if:

**(1)** You have NOT filed Form I-485;

**(2)** You have a Form I-140 approved on your behalf;

**(3)** You are in the United States in a valid E-3, H-1B, H-1B1, O-1, or L-1 nonimmigrant status; and

**(4)** You face compelling circumstances.

**See Item C. Supporting Evidence by Principal below for more information regarding what documents to submit with your application, including additional requirements where you have been convicted of certain crimes.**

**B. Renewal Application:**  If you already have employment authorization under the (c)(35) eligibility category, you may be eligible for renewal if:

**(1)** You have a Form I-140 approved on your behalf; and

**(2)** You face compelling circumstances **and** an immigrant visa is not authorized for issuance based on your priority date according to the relevant Final Action Date in the Department of State Visa Bulletin in effect on the date the application for a renewal of employment authorization is filed; **OR**

The difference between your priority date and the Final Action Date for your preference category and country of chargeability is one year or less according to the Department of State Visa Bulletin in effect on the date your renewal application is filed.  This means that your priority date cannot be more than one year earlier or one year later than the Department of State cut-off date in the Visa Bulletin applicable to your preference category and country of chargeability in effect on the date your renewal application is filed.  If this is the basis for your renewal application, you are not required to show compelling circumstances; **AND**

**(3)** You file your renewal application on Form I-765 with USCIS before your current employment authorization expires.  You are not required to be in a valid nonimmigrant status when you file your renewal application.

**See Item C. Supporting Evidence by Principal below for more information regarding what documents to submit with your application, including additional requirements where you have been convicted of certain crimes.**

**C. Supporting Evidence by Principal**

**(1) Proof You Are in the United States in E-3, H-1B, H-1B1, O-1, or L-1 Nonimmigrant Status.**  For initial applications, submit a copy of your Arrival-Departure Record (Form I-94) showing your admission as an E-3, H-1B, H-1B1, O-1, or L-1 nonimmigrant, or a copy of your current Form I-797 Notice for Form I-129.

**(2) Proof of Your Approved Form I-140.**  For initial and renewal applications, submit a copy of a Form I-797 Notice for Form I-140 showing the Immigrant Petition has been approved on your behalf.

**(3) Evidence You Are Facing Compelling Circumstances While You Wait for Your Immigrant Visa to Become Available.**  For initial and, if applicable, renewal applications based on compelling circumstances, USCIS will review the documents you provide to determine, in its discretion, whether you have established compelling circumstances.  USCIS makes this discretionary determination on a case-by-case basis according to the documents submitted and the totality of the record.  You should submit any credible evidence you believe supports your claim of compelling circumstances.

**(4) Secondary Evidence.**  If you do not have the evidence listed in **Items (1)** or **(2)** above, you may ask us to consider secondary evidence in support of your application for employment authorization.  For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

**(5) Proof of Arrests and Conviction.**  For initial and renewal applications, you must submit documentation of any arrests and/or convictions.  If you were ever convicted of a felony or two or more misdemeanors, you cannot be granted employment authorization under this eligibility category.  USCIS will make the determination as to whether your crimes fall into either of these categories.  You must, however, provide information and any supporting documentation on all crimes which you were convicted of so USCIS can make an appropriate decision.  Provide certified copies of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

**NOTE:**  USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime.

**D. Traffic Violations and Arrests**

Do not select the "Yes" box for **Part 2.**, **Item Number 30.**, on the application or submit documentation if you only have had minor traffic violations.  Minor traffic violations do NOT include violations that are alcohol- or drug-related.  If you were **ARRESTED** for any traffic offense, select the "Yes" box for **Item Number 30.** on the application and provide arrest and disposition documentation so USCIS can properly assess whether your arrest and/or conviction may impact your employment authorization eligibility.

**NOTE:  Provide the conviction and disposition documentation even if your records were sealed, expunged, or otherwise cleared.**  You must provide the documentation even if anyone, including a judge, law enforcement officer, or attorney told you that you no longer have a record or that you do not have to disclose the information.

Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your application for employment authorization.

004147

**9.  Spouse or Unmarried Child of a Principal Beneficiary of an Approved Employment-Based Immigrant Petition--(c)(36).**  File Form I-765 along with supporting documentation for an initial grant or a renewal of employment authorization under the (c)(36) eligibility category.  You may file your application **WITH** your spouse's or parent's application under (c)(35).  You may file your application while your spouse's or parent's application under (c)(35) is **PENDING** or **AFTER** your spouse's or parent's application has been approved by USCIS.  If filing with your spouse's or parent's application, USCIS will not adjudicate your Form I-765 until after USCIS has adjudicated your spouse's or parent's Form I-765 first.

**A.  Initial Application:**  If this is your first application for employment authorization under the (c)(36) eligibility category, you may be eligible if:

**(1)** You are the spouse or unmarried child of an individual who is filing or who has been approved for compelling circumstances employment authorization under (c)(35) (See **Proof of Relationship to the Principal Beneficiary of the Approved Form I-140** section below);

**(2)** Your spouse's or parent's application for compelling circumstances employment authorization under (c)(35) has been approved or is pending with USCIS (not required if you are filing your application at the same time as your spouse's or parent's application under (c)(35)); and

**(3)** You were in a valid nonimmigrant status when your spouse or parent applies for initial employment authorization under the (c)(35) eligibility category.

**See Item C. Supporting Evidence by Spouse or Unmarried Child below for more information regarding what documents to submit with your application, including additional requirements if you have been arrested or convicted.**

**B.  Renewal Application:**  You may be eligible to renew your application under the (c)(36) eligibility category if:

**(1)** You file Form I-765 before your current employment authorization expires;

**(2)** You are the spouse or unmarried child of an individual who is filing or who has been approved for compelling circumstances employment authorization under (c)(35) (See **Proof of Relationship to the Principal Beneficiary of the Approved Form I-140** below); and

**(3)** Your spouse's or parent's application for compelling circumstances employment authorization under (c)(35) has been approved or is pending with USCIS (not required if you are filing your application at the same time as your spouse's or parent's renewal application under (c)(35)).

You are not required to be in a valid nonimmigrant status when you file your renewal application.

**See Item C. Supporting Evidence by Spouse or Unmarried Child below for more information regarding what documents to submit with your application, including additional requirements if you have been arrested or convicted.**

**C.  Supporting Evidence by Spouse or Unmarried Child**

**(1) Proof of Your Nonimmigrant Status.**  For initial applications only, submit a copy of your Arrival-Departure Record (Form I-94) showing your admission as a nonimmigrant, a copy of your current Form I-797 Notice for Form I-129, or a copy of your current Form I-797 Notice for Form I-539.

**(2) Proof of Relationship to the Principal Beneficiary of the Approved Form I-140.**  For initial and renewal applications, if you are applying as the spouse of a principal beneficiary of an approved Form I-140, submit a copy of the marriage certificate and if applicable, copies of documents showing the legal termination of all other marriages by you or your spouse.  If you are applying as the child of a principal beneficiary of an approved Form I-140, submit a copy of your birth certificate or other documents to demonstrate you qualify as the principal beneficiary's child.  If you cannot submit a copy of your marriage certificate or birth certificate, USCIS will consider secondary evidence.

004148

(3) **Proof the Spouse or Parent Principal Beneficiary was Granted or has Applied for Employment Authorization Under Eligibility Category (c)(35).**  For initial and renewal applications, if you submit your Form I-765 after your spouse or parent receives employment authorization under eligibility category (c)(35), submit a copy of your spouse's or parent's employment authorization document or submit a copy of your spouse's or parent's Form I-797 Notice for Form I-765.

If your spouse's or parent's application under (c)(35) is **pending** when you file your Form I-765, submit a copy of your spouse's or parent's Form I-797 Notice for the pending Form I-765.  USCIS will not adjudicate your Form I-765 until USCIS has adjudicated your spouse's or parent's Form I-765.

(4) **Secondary Evidence.**  If you do not have the evidence listed in **Items (1)**, **(2)**, or **(3)** above, you may ask us to consider secondary evidence in support of your application for employment authorization.  For additional information on secondary evidence, see **Evidence** in the **General Instructions** section of these Instructions.

(5) **Proof of Arrests and Convictions.**  For initial and renewal applications, you must submit documentation of any arrests and/or convictions.  If you were ever convicted of a felony or two or more misdemeanors committed, you cannot be granted employment authorization under this eligibility category.  USCIS will make the determination as to whether your crimes fall into either of these categories.  You must, however, provide information and any supporting documentation on all crimes which you were convicted of so USCIS can make an appropriate decision.  Provide certified copies of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

**NOTE:**  USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime.

**D.  Traffic Violations and Arrests**

Do not select the "Yes" box for **Part 2.**, **Item Number 31.b.**, on the application or submit documentation if you only have had minor traffic violations.  Minor traffic violations do NOT include violations that are alcohol- or drug-related.  If you were **ARRESTED** for any traffic offense, select the "Yes" box for **Item Number 31.b.** on the application and provide arrest and disposition documentation so USCIS can properly assess whether your arrest and/or conviction may impact your employment authorization eligibility.

**NOTE:  Provide the conviction and disposition documentation even if your records were sealed, expunged, or otherwise cleared.**  You must provide the documentation even if anyone, including a judge, law enforcement officer, or attorney, told you that you no longer have a record or that you do not have to disclose the information.

Failure to provide the evidence listed above or secondary evidence may result in the delay or denial of your application for employment authorization.

**Department of State Visa Bulletin**.  USCIS will adjudicate all applications for initial or renewal employment authorization according to the Visa Bulletin in effect on the date the application is filed.  To see the current Visa Bulletin, please go to **www.state.gov/travel** and click the link to the Visa Bulletin.

**Priority Dates.**  For more information about priority dates, please visit our Visa Availability and Priority Date website at **www.uscis.gov**.

**Filing Location.**  Please see the USCIS website at **www.uscis.gov/i-765** for the most current information on where to file your application for initial or renewal employment authorization under the (c)(35) or (c)(36) eligibility categories.

**Family-Based Nonimmigrant Categories**

1. **K-1 Nonimmigrant Fiancé(e) of U.S. Citizen or K-2 Dependent--(a)(6).**  File Form I-765 along with evidence of your admission (for example, copies of your Form I-94, passport, or other travel document) and your K visa.  You are only authorized to work under this category during your 90 days in K-1 or K-2 status.  You cannot renew this EAD.  If you submit subsequent EAD applications, other than for replacement of a lost, stolen, or damaged card or a card that contains incorrect data, you must apply on a different basis.  If you have a pending application for adjustment of status, you should file under category (c)(9).

2. **K-3 Nonimmigrant Spouse of U.S. Citizen or K-4 Dependent--(a)(9).**  File Form I-765 along with evidence of your admission (for example, copies of your Form I-94, passport, or other travel document) and your K visa.

3. **Family Unity Program--(a)(13).**  If you are filing for initial or extension of family unity benefits, complete and submit Form I-817, Application for Family Unity benefits, according to the filing instructions on Form I-817.  We will issue an EAD if we approve your Form I-817.  No Form I-765 is necessary, unless you are filing for replacement of a non-expired lost, stolen, damaged, or incorrect card.

4. **LIFE Family Unity--(a)(14).**  If you are applying for initial employment authorization under section 1504 of the LIFE Act Amendments, complete and submit Form I-817.  We will issue an EAD if we approve your Form I-817; no Form I-765 is necessary unless you are filing for replacement of a non-expired lost, stolen, damaged, or incorrect card.

5. **V-1, V-2, or V-3 Nonimmigrant--(a)(15).**  If you were granted V status or an extension of V status while in the United States, file Form I-765 with evidence of your V status (for example, an approval notice, your Form I-94, passport, or other travel document).  If you are in the United States but you have not yet filed an application for V status, you may file Form I-765 at the same time as you file your application for V status.  We will adjudicate this application after adjudicating your application for V status.

**Adjustment of Status Categories**

1. **Adjustment Applicant under Section 245--(c)(9).**  File Form I-765 together with Form I-485, Application to Register Permanent Residence or Adjust Status, or if filing separately, submit a copy of your I-485 receipt notice or other evidence that your Form I-485 is pending.

   **NOTE:**  If you are an asylee or refugee and have applied to adjust to lawful permanent resident status on Form I-485, file Form I-765 under category (a)(5) as an asylee or (a)(3) as a refugee.  Do not file under eligibility category (c) (9). You will need to pay the filing fee or obtain a fee waiver for Form I-765 if your Form I-485 is still pending with USCIS and this is not your first EAD as a refugee or asylee and you did not pay the Form I-485 filing fee for any reason.  See USCIS Form G-1055, Fee Schedule, available at **www.uscis.gov/g-1055**, for all information on filing fees.

2. **Registry Applicant Based on Continuous Residence Since January 1, 1972--(c)(16).**  File Form I-765 together with your Form I-485 or, if filing separately, submit a copy of your Form I-485 receipt notice or other evidence that your Form I-485 is pending.

3. **Renewal EAD for National Interest Waiver Physicians:**  If you are requesting a renewal EAD based on your pending adjustment of status application and an approved National Interest Waiver Physician petition, you must also include evidence of your meaningful progress toward completing the National Interest Waiver obligation (for example, documentation of employment in any period during the previous year, such as copies of W-2 forms).  If you did not work as a National Interest Waiver Physician during any period of the previous year, you must explain why and provide a statement of future intent to work as a physician in a qualifying location.

**Other Categories**

1. **Legalization Temporary Resident Pursuant to INA Sections 245A or 210--(a)(2).**  File Form I-765 with a copy of your approval notice for Form I-687, Application for Status as a Temporary Resident Under Section 245A of the INA, or other evidence that your Form I-687 is approved; OR File Form I-765 with a copy of your approval notice for Form I-700, Application for Status as a Special Agricultural Worker, or other evidence that your Form I-700 is approved.

2. **N-8 or N-9 Nonimmigrant--(a)(7).**  File Form I-765 with evidence of your lawful N nonimmigrant status (for example, your Form I-94, passport, or other travel document).

3. **Applicant for Cancellation of Removal--(c)(10).**  File Form I-765 with evidence one of the following forms is pending with EOIR:  EOIR-42A or EOIR-42B.

4. **Applicant for Legalization Pursuant to INA Section 210--(c)(20).**  File Form I-765 with a copy of your receipt notice for Form I-700, Application for Status as a Temporary Resident Under Section 210 of the INA, or other evidence that your Form I-700 is pending.

004150

5. **Applicant for Legalization Pursuant to INA Section 245A--(c)(22).** File Form I-765 with a copy of your receipt notice for Form I-687, Application for Status as a Temporary Resident Under Section 245A of the INA, or Form I-698, Application to Adjust Status from Temporary to Permanent Resident Under Section 245A of the INA, or other evidence that your Form I-687 or I-698 is pending.

6. **Parole--(c)(11).** File Form I-765 with a copy of your valid, unexpired Form I-94, passport, or other travel document showing you were paroled into the United States for urgent humanitarian reasons or reasons of significant public benefit.

   **NOTE:** If you are in expedited removal under INA 235(b)(1)(A) or in expedited removal and have a pending credible fear determination under 8 CFR 208.30, you are not eligible for an initial EAD under the (c)(11) eligibility category.

7. **Deferred Action--(c)(14).** File Form I-765 with a copy of the order, notice, or other document reflecting the grant of deferred action and proof that you have an economic necessity to work. We will consider whether you have an economic necessity to work by reviewing your current annual income, your current annual expenses, and the total current value of your assets. Provide this financial information on Form I-765WS, Form I-765 Worksheet. If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet. Supporting evidence is not required, but USCIS will accept and review any documentation that you submit. You do not need to include other household members' financial information to establish your own economic necessity.

8. **Consideration of Deferred Action for Childhood Arrivals--(c)(33).**

   You must file Form I-765 with Form I-821D, Consideration of Deferred Action for Childhood Arrivals, if you meet the guidelines described in the Form I-821D Instructions. Enter (c)(33) in **Part 2.**, **Item Number 27.**, as the eligibility category under which you are applying.

   You must file Form I-765 Worksheet to demonstrate that you have an economic necessity to work. We will consider whether you have an economic necessity to work by reviewing your current annual income, your current annual expenses, and the total current value of your assets. Provide this financial information on Form I-765WS. If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet. Supporting evidence is not required, but USCIS will accept and review any documentation that you submit. You do not need to include other household members' financial information to establish your own economic necessity.

9. **Final Order of Deportation or Removal, including Deferral of Removal under the Convention Against Torture--(c)(18).** File Form I-765 with a copy of the EOIR IJ's Order of Removal and Form I-220B, Order of Supervision (if any). Additional factors that may be considered include, but are not limited to, the following:

   A. Existence of a dependent spouse and/or children in the United States who rely on you for support;

   B. Existence of economic necessity to be employed; and

   C. Anticipated length of time before you can be removed from the United States.

10. **LIFE Legalization Applicant--(c)(24).** File Form I-765 with evidence that you were a Catholic Social Services (CSS), League of United Latin American Citizens (LULAC), or Zambrano class member applicant before October 1, 2000 and a copy of the Form I-797 Notice or other evidence that your Form I-485 is pending.

11. **T-1 Nonimmigrant--(a)(16).** If you are filing Form I-914, Application for T Nonimmigrant Status, and request an EAD as part of that application, you do not need to file Form I-765. If you are currently in T-1 nonimmigrant status and did not request an EAD when you filed your Form I-914, you may file Form I-765 to request an EAD. If you were granted T-1 nonimmigrant status and want to request a replacement of an EAD, file Form I-765 along with evidence of your T-1 nonimmigrant status (for example, an approval notice).

    If you have filed Form I-539 to extend your T-1 nonimmigrant status, you may file Form I-765 to request a renewal of your EAD, along with evidence of your T nonimmigrant status (for example, an approval notice). You may file Form I-765 together with Form I-539 or after we approve your Form I-539. If you file Form I-765 after we approve your Form I-539, submit a copy of your I-539 approval notice.

004151

12. **T-2, T-3, T-4, T-5, or T-6 Nonimmigrant--(c)(25).** File Form I-765 along with proof of your derivative T nonimmigrant status. If you obtained derivative T nonimmigrant status while in the United States, you must submit a copy of the approval notice for your T nonimmigrant status. If you were admitted to the United States as a T nonimmigrant, you must submit a copy of your passport with your T nonimmigrant visa. If you were granted derivative T nonimmigrant status and want to request replacement of an EAD, file Form I-765 along with evidence of your derivative T nonimmigrant status (for example, an approval notice).

If you (or the T-1 principal foreign national) filed Form I-539 to extend your T-2, T-3, T-4, T-5, or T-6 nonimmigrant status in conjunction with an extension of the principal T-1 nonimmigrant's status, you may file Form I-765 to request an initial or renewal EAD, along with evidence of your nonimmigrant status (for example, an approval notice or copy of your passport with your T nonimmigrant visa). You may also file Form I-765 together with Form I-539 or after we approve your Form I-539. If you file Form I-765 after we approve your Form I-539, submit a copy of your Form I-539 approval notice.

**NOTE:** Derivative family members of T-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States. If you are a derivative family member who is outside the United States, do not file Form I-765.

13. **T Nonimmigrant Adjustment of Status--(c)(9).** If you filed Form I-485 to adjust your status from a T-1, T-2, T-3, T-4, T-5, or T-6 nonimmigrant to a lawful permanent resident, you may file Form I-765 together with Form I-485 if you are seeking an EAD. You should also include evidence of your T nonimmigrant status (for example, an approval notice or copy of your passport with your T nonimmigrant visa). If you file Form I-765 after filing Form I-485, submit a copy of your Form I-485 receipt notice. While your Form I-485 is pending, we will extend T nonimmigrant status until a decision is made on your Form I-485.

14. **U-1 Nonimmigrant--(a)(19).** If you are currently residing in the United States and your Form I-918, Petition for U Nonimmigrant Status, is approved, you will receive employment authorization incident to status and USCIS will send you an EAD as evidence of that authorization. You do not need to file Form I-765. If you resided outside the United States when your Form I-918 was approved, you must file Form I-765 with USCIS when you enter the United States. You must submit a copy of your passport with your U nonimmigrant visa.

If we granted your U nonimmigrant status and you want to request a replacement of an EAD, file Form I-765 along with evidence of your U nonimmigrant status (for example, an approval notice).

If you have filed Form I-539 to extend your U-1 nonimmigrant status, you may file Form I-765 to request a renewal of your EAD, along with evidence of your U-1 nonimmigrant status (for example, an approval notice). You may file Form I-765 together with Form I-539, or after we approve your Form I-539. If you file Form I-765 after we approve your Form I-539, submit a copy of your I-539 approval notice.

**NOTE:** U-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States. If you have an approved Form I-918 but are outside the United States, do not file Form I-765 until you have entered the United States.

**NOTE:** If the statutory cap is reached within a fiscal year and USCIS uses the waiting list process described at 8 CFR 214.14(d)(2), U-1 petitioners for U nonimmigrant status in the United States can file Form I-765 to apply for an EAD based on deferred action ((c)(14)). An application for employment authorization based on deferred action can only be approved after DHS has issued deferred action in your case, regardless of when Form I-765 is filed.

15. **U-2, U-3, U-4, or U-5--(a)(20).** You may file Form I-765 at the same time as Form 918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient, or you may file Form I-765 at a later time. If USCIS has granted you derivative U nonimmigrant status, file Form I-765 along with proof of your derivative U nonimmigrant status. If you obtained derivative U nonimmigrant status while in the United States, you must submit a copy of the approval notice for that status. If you were admitted to the United States as a U nonimmigrant, you must submit a copy of your passport with your U nonimmigrant visa.

004152

If you (or the principal U-1 nonimmigrant) filed Form I-539 to extend your U-2, U-3, U-4, or U-5 nonimmigrant status, you may file Form I-765 to request an initial or renewal EAD, along with evidence of your nonimmigrant status (for example, an approval notice or copy of your passport with your U nonimmigrant visa).  You may file Form I-765 together with Form I-539 or after we approve your Form I-539.  If you file Form I-765 after we approve your Form I-539, submit a copy of your Form I-539 approval notice.

**NOTE:**  Derivative family members of U-1 nonimmigrants living outside the United States are not eligible to receive an EAD until they lawfully enter the United States.  If you are a derivative family member who is outside the United States, do not file Form I-765.

**NOTE:**  If the statutory cap is reached within a fiscal year and USCIS uses the waiting list process described at 8 CFR 214.14(d)(2), derivative family members of U-1 petitioners for U nonimmigrant status in the United States can file Form I-765 to apply for an EAD based on deferred action ((c)(14)).  An application for employment authorization based on deferred action can only be approved after DHS has issued deferred action in your case, regardless of when Form I-765 is filed.

16. **U Nonimmigrant Adjustment of Status--(c)(9).**  If you filed Form I-485 to adjust your status from a U-1, U-2, U-3, U-4 or U-5 Nonimmigrant to a lawful permanent resident, you may file Form I-765 along with Form I-485 if you are seeking an EAD.  You should also include evidence of your U nonimmigrant status (for example, an approval notice or copy of your passport with your U nonimmigrant visa).  If you file Form I-765 after filing your Form I-485, submit a copy of your Form I-485 receipt notice.  While your Form I-485 is pending, we will extend your U nonimmigrant status until we make a decision on your Form I-485.

17. **VAWA Self-Petitioners--(c)(31).**  If you are the principal beneficiary or derivative child of an approved VAWA self-petition, you are eligible for work authorization.  If you are filing a Form I-360 VAWA self-petition, and request an initial EAD as the principal beneficiary of the self-petition, you do not need to file Form I-765.  Principal beneficiaries of an approved VAWA self-petition seeking a renewal or replacement EAD and derivative children seeking an EAD must use Form I-765.  File Form I-765 with evidence of the principal beneficiary's approved Form I-360 VAWA self-petition (for example, a copy of the VAWA self-petition approval notice).

18. **A-3 or G-5 Nonimmigrant--(c)(14).**  If you have filed a pending civil action against your employer because your employer violated the terms of your employment contract or conditions of your employment, you may file Form I-765 to request deferred action and receive work authorization.  File Form I-765 with a copy of the civil complaint filed in court and proof of lawful admission into the United States in A-3 or G-5 status (for example, a copy of your passport with your A-3 or G-5 nonimmigrant visa).  If you are requesting renewal after your initial employment authorization is granted, file Form I-765 with evidence that the civil case is still pending (for example, a recent court docket update).

## General Instructions

USCIS provides forms free of charge through the USCIS website.  In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** (TTY **1-800-767-1833**) and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.

**Signature.**  Each application must be properly signed and filed.  For all signatures on this application, USCIS will not accept a stamped or typewritten name in place of a signature.  If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf.  A legal guardian may also sign for a mentally incompetent person.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of the original, handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten, ink signature.

**Filing Fee.**  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

004153

**Evidence.**  When you file your application, you must submit all evidence and supporting documents listed in the **Required Documentation** and/or **Specific Instructions** sections of these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  After USCIS receives your application and ensures it is complete, we will inform you in writing if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1.  You provided or authorized all information in the application;

2.  You reviewed and understood all of the information contained in, and submitted with, your application; and

3.  All of this information was complete, true, and correct at the time of filing.

If you fail to attend your biometric services appointment, USCIS may deny your application.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application or petition.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**NOTE:**  If you submit original documents when not required or requested by USCIS, **your original documents may be immediately destroyed after we receive them.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification must include the translator's signature.  DHS recommends the certification contain the translator's printed name, the signature date, and the translator's contact information.

**How To Fill Out Form I-765**

1.  Type or print legibly in black ink.

2.  If you need extra space to complete any item within this application, use the space provided in **Part 6. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3.  Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

---

| Specific Instructions |
| --- |

**Part 1.  Reason for Applying.**

You must select one **Item Number** that best describes your reason for applying:

**Item Number 1.a.**  Inital permission to accept employment.

**Item Number 1.b.**  Replacement of a lost, stolen, or damaged EAD, or correction of your EAD not due to USCIS error.

**NOTE:**  Replacement (correction) of an employment authorization document due to USCIS error does not require a new Form I-765 and filing fee.  See USCIS Form G-1055, Fee Schedule, available at **www.uscis.gov/g-1055**, for all information on filing fees.

**Item Number 1.c.**  Renewal of your permission to accept employment.  If you select **Item Number 1.c.**, attach a copy of your previous EAD.


**Part 2.  Information About You**

**Item Numbers 1.a. - 1.c.  Your Full Legal Name.**  Provide your full legal name as shown on your birth certificate or legal change of name document in the spaces provided.

**Item Numbers 2.a. - 4.c.  Other Names Used.**  Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

**Item Numbers 5.a. - 5.f.  Your U.S. Mailing Address.**  You must provide a valid mailing address in the United States.  You may list a valid U.S. residence, APO, or commercial address.  You may also list a U.S. Post Office address (PO Box) if that is how you receive your mail.  If your mail is sent to someone other than yourself, please include an "In Care Of Name" as part of your mailing address.  If your U.S. mailing address is in a U.S. territory and it contains an urbanization name, list the urbanization name in the "In Care Of Name" space provided.  We will send your EAD to this address.  Do not use the attorney's or other legal representative's address.

**NOTE:**  If you have a pending or approved Form I-360 VAWA self-petition, Form I-914, Application for T Nonimmigrant Status, or Form I-918, Petition for U Nonimmigrant Status, and do not feel safe receiving correspondence regarding this application at your residential address, provide a safe mailing address.  You may provide a post office box (PO Box) or the address of a friend, your attorney, a community-based organization that is helping you, or any other address where you can safely and punctually receive mail.  If an alternate or safe mailing address is not provided, USCIS may use the address of your attorney or preparer, if any.  If your safe mailing address is not the same as the address where you currently reside, provide your U.S. physical address in **Item Numbers 6.a. - 6.e.**

**Item Numbers 7.a. - 7.e.  U.S. Physical Address.**  Type or print your physical address in the spaces provided.

**Item Number 8.  Alien Registration Number (A-Number)** (if any)**.**  An Alien Registration Number, otherwise known as an "A-Number," is typically issued to people who apply for, or are granted, certain immigration benefits.  In addition to USCIS; ICE, U.S. Customs and Border Protection (CBP), EOIR, and the DOS may also issue an A-Number to certain foreign nationals.  If you were issued an A-Number, type or print it in the spaces provided.  If you are renewing your EAD, this number may be listed as the USCIS Number on the front of the card.  If you have more than one A-Number, use the space provided in **Part 6. Additional Information** to provide the information.  If you do not have an A-Number or if you cannot remember it, leave this space blank.

**Item Number 9.  USCIS Online Account Number** (if any)**.**  If you have previously filed an application or petition using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications or petitions on a paper form through a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  You may find your USCIS Online Account Number at the top of the notice.  The USCIS Online Account Number is not the same as an A-Number.  If you were issued a USCIS Online Account Number, enter it in the space provided.

**Item Number 10.  Gender.**  Select the box that indicates whether you are male or female.

**Item Number 11.  Marital Status.**  Select the box that describes the marital status you have on the date you file Form I-765.

004155

**Item Numbers 12.  Previous Application for Employment Authorization from USCIS.**  If you have applied for employment authorization in the past, select "Yes" for **Item Number 12.**  Provide copies of your previous EADs, if available.

**Item Numbers 13.a. - 17.b.  Questions regarding Social Security Number (SSN).  Item Number 13.a.** asks you if the Social Security Administration (SSA) has ever officially issued you a Social Security card.  If the SSA ever issued a Social Security card to you in your name or a previously used name such as your maiden name, then you must enter the SSN from your card in **Item Number 13.b.**

If your request for employment authorization is approved, the SSA may assign you an SSN and issue you a Social Security card, or issue you a replacement card.  If you want the SSA to assign you a Social Security number and issue you a Social Security card, or issue you a new or replacement Social Security card, then answer "Yes" to both **Item Number 14.** and **Item Number 15.**  You must also provide your father's and given names at birth in **Item Numbers 16.a. - 17.b.**  SSA will use **Item Numbers 16.a. -17.b.** in issuing you a Social Security card.

You are not required to request an SSN using this application.  Completing **Item Numbers 14. - 17.b.** is optional. However, you must have an SSN properly assigned in your name to work in the United States.

**NOTE:**  If your employer uses E-Verify to confirm new employees' eligibility to legally work in the United States, the information you provide on Form I-9, Employment Eligibility Verification, will be compared to data in SSA and DHS databases.  Employees must have an SSN in order for E-Verify to confirm their eligibility to legally work in the United States.

**Item Number 18.a. - 18.b.  Country or Countries of Citizenship or Nationality.**  Type or print the name of the country or countries where you are currently a citizen or national.

1.  If you are stateless, type or print the name of the country where you were last a citizen or national.

2.  If you are a citizen or national of more than one country, type or print the name of the foreign country that issued your last passport.

**Item Numbers 19.a. - 19.c.  Place of Birth.**  Enter the name of the city, town, or village; state or province; and country where you were born.  Type or print the name of the country as it was named when you were born, even if the country's name has changed or the country no longer exists.

**Item Number 20.  Date of Birth.**  Enter your date of birth in mm/dd/yyyy format in the space provided.  For example, type or print October 5, 1967 as 10/05/1967.

**Item Numbers 21.a. - 21.e.  Form I-94 Arrival-Departure Record.**  If CBP or USCIS issued you a Form I-94, Arrival-Departure Record, provide your Form I-94 number.  The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**NOTE:**  If CBP admitted you into the United States at an airport or seaport after April 30, 2013, they may have issued you an electronic Form I-94 instead of a paper Form I-94. You may visit the CBP website at **www.cbp.gov/i94** to obtain a paper version of your electronic Form I-94. CBP **does not** charge a fee for this service. Some travelers may also be able to obtain a replacement Form I-94 from the CBP website for free if they were admitted to the United States at a land border, airport, or seaport after April 30, 2013, with a passport or travel document and received a paper Form I-94 from CBP. If you cannot obtain your Form I-94 from the CBP website, you may obtain it by filing Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Record, with USCIS.  USCIS does charge a fee for Form I-102.  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

**Passport and Travel Document Numbers.**  If you used a passport or travel document to travel to the United States, enter either the passport or travel document information in the appropriate space on the application, even if the passport or travel document is currently expired.

**Item Number 22.  Date of Your Last Arrival Into the United States, On or About.**  Provide the date on which you last entered the United States in mm/dd/yyyy format.

004156

**Item Number 23.  Place of Your Last Arrival Into the United States.**  Provide the location where you last entered the United States.

**Item Number 24.  Immigration Status at Your Last Arrival.**  Provide the letter and number that correlates with your status when you last entered the United States.  For example, if you last entered the United States as a **temporary visitor for pleasure**, **B-2**, type or print "B-2 visitor" in the space provided.

**Item Number 25.  Your Current Immigration Status or Category.**  Provide your current immigration status.  For example, if your current status is **student academic**, **F-1**, type or print "F-1 student" in the space provided.

**Item Number 26.  Student and Exchange Visitor Information System (SEVIS) Number** (if any)**.**  If you were issued a SEVIS number, enter it in the space provided.

**Item Number 27.  Eligibility Category.**  Refer to the list of the eligibility categories in the **Who May File Form I-765** section of these Instructions.  Find your eligibility category, and enter it in the space provided.

**Item Numbers 28. - 28.c.  (c)(3)(C) STEM OPT Eligibility Category.**  If you entered eligibility category **(c)(3)(C)** in **Item Number 27.**, provide your degree level and major (for example, Bachelor's degree in English), your employer's name as listed in E-Verify, your employer's E-Verify Company Identification Number, or a valid E-Verify Client Company Identification Number in the space provided.

**Item Number 29.  (c)(26) Eligibility Category.**  If you entered eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker, in the space provided.

**Item Number 30.  (c)(8) Eligibility Category.**  If you entered the eligibility category **(c)(8)** in **Item Number 27.**, provide an answer to the question "Have you have **EVER** been arrested for and/or convicted of any crime?"  If you answered "Yes" to **Item Number 30.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8)** in the **Required Documentation** section of the Instructions for information about providing court dispositions.

**Item Number 31.a. - 31.b.  (c)(35) and (c)(36) Eligibility Category.**  If you entered the eligibility category **(c)(35)** or **(c)(36)** in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140 or the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.  Provide an answer to the question "Have you **EVER** been arrested for and/or convicted of any crime?"

**NOTE:**  If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories, Items 8. - 9.** in the **Who May File Form I-765** section of the Instructions for information about providing court dispositions.

**Part 3.  Applicant's Statement, Contact Information, Declaration, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  Select the appropriate box to indicate whether you read this application yourself or whether you had an interpreter assist you.  If someone assisted you in completing the application, select the box indicating that you used a preparer.  Further, you must sign and date your application and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every application **MUST** contain the signature of the applicant (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 4.  Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, the interpreter must fill out this section; provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the application.

004157

**Part 5.  Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant**

**Item Numbers 1.a. - 8.b.**  This section must contain the signature of the person who completed your application, if other than you, the applicant.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 4.** and **Part 5.**  If the person who completed this application is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this application **MUST** sign and date the application.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your application is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your application.

**Part 6.  Additional Information**

**Item Numbers 1.a. - 7.d.**  If you need extra space to provide any additional information within this application, use the space provided in **Part 6. Additional Information**.  If you need more space than what is provided in **Part 6.**, you may make copies of **Part 6.** to complete and file with your application, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> **We recommend that you print or save a copy of your completed application to review in the future and for your records.**

## Required Documentation

You must file all applications with the documents required below, the particular evidence required for each category listed in the **Who May File Form I-765** section of these Instructions.

If you are required to show economic necessity for your category, submit a list of your assets, income, and expenses.  Provide this financial information on Form I-765WS, Form I-765 Worksheet.  If you would like to provide an explanation, complete **Part 3. Explanation** of the worksheet.

Assemble the documents in the following order.

1.  The appropriate filing fee, if applicable.  See USCIS Form G-1055, Fee Schedule, available at **www.uscis.gov/g-1055**, for all information on filing fees.

2.  Your properly signed application.

3.  You must submit the following documents.

    **A.**  A copy of at least one of the following documents:  Form I-94, Arrival-Departure Record (front and back), a printout of your electronic Form I-94 from **www.cbp.gov/i94**, passport, or other travel document.  If you are filing Form I-765 under the (c)(9) category, copies of any of the above are not required.

    **B.**  A copy of your last EAD (front and back).  If you were not previously issued an EAD, you must submit a copy of a government-issued identity document (such as a passport) showing your picture, name, and date of birth; a birth certificate with photo ID; a visa issued by a foreign consulate; or a national ID document with photo and/or fingerprint.  The identity document photocopy must clearly show your facial features and contain your biographical information.

**NOTE:**  If you are filing under the (c)(33) category, you are not required to submit additional documentation beyond what you submit with Form I-821D under **2. What documents do you need to provide to prove identity** in the **Evidence for Initial Requests Only** section of the Form I-821D Instructions.

**C.**  Photographs

You **must** submit two identical color passport-style photographs of yourself taken recently.  The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

The two identical passport-style photos must be 2 by 2 inches.  The photos must be in color with a full face, frontal view, on a white to off-white background.  Head height should measure 1 to 1 3/8 inches from the top of your hair to the bottom of your chin, and eye height is between 1 1/8 to 1 3/8 inches from the top of your eyes to the bottom of photo.  Your head must be bare unless you are wearing headwear as required by a religious denomination of which you are a member.  Using a pencil or felt pen, lightly print your name and A-Number (if any) on the back of the photo.

**Special Filing Instructions for Those With Pending Asylum Applications--(c)(8)**

You are subject to a 150-day waiting period after the filing of your asylum application, before you can apply for an EAD, and an additional 30-day period before we can issue you an EAD, for a total of 180 days.  The number of days a completed asylum application is considered pending does not include any delays requested or caused by you while your application is pending with the USCIS asylum office or with an EOIR IJ.  (See 8 CFR 208.7.)  This time period during which your asylum application is pending before we may grant you an EAD is called the "180-day asylum EAD clock."  We may reject your Form I-765 if you file it before the 150-day waiting period has elapsed.  Some examples of delays that may be caused by you while your application is pending with the USCIS Asylum Office include, but are not limited to:

1.  Failure to appear at your interview or fingerprint appointment;

2.  Failure to receive and acknowledge your asylum decision in person (if required);

3.  A request to reschedule your interview for a later date;

4.  A request to transfer your case to a new asylum office or interview location, including when the transfer is based on a new address;

5.  A request to provide additional evidence after your interview; and

6.  If you are required to provide a competent interpreter at your interview, failure to provide a competent interviewer.

Additionally, if you fail to appear for your interview with a USCIS asylum office or for a hearing before an EOIR IJ, you may be ineligible for an EAD.

If you have received a Recommended Approval notice from the USCIS asylum office recommending a grant of asylum, you do not need to wait 150 days and may apply for an EAD immediately upon receipt of this notice.  Provide a copy of your notice as evidence of your recommended approval with your Form I-765.

If you are a category (c)(8) applicant who has met the requisite 150-day waiting period to file Form I-765, not including delays caused or requested by you, file your Form I-765 with the following evidence, where applicable.

1.  If your asylum application was filed with USCIS, a copy of the following:  the USCIS Acknowledgement of Receipt that was provided to you and your USCIS Asylum Interview Notice (scheduling, re-scheduling, or cancelling your asylum interview); your Form I-797C Notice (ASC appointment notice) for the biometrics appointment for your asylum application; or other evidence that your asylum application was filed with USCIS.

2.  If you lodged or filed your asylum application with the Executive Office for Immigration Review (EOIR), acknowledgement of receipt of your application or other available evidence.

3.  If an EOIR IJ has denied your asylum and withholding of removal relief, but you met the requisite 180-day waiting period prior to the EOIR IJ's decision in your case, evidence that you:

    **A.**  Timely appealed the EOIR IJ's decision on your asylum application to the BIA and the appeal remains pending; and

    **B.**  If applicable, evidence that you timely appealed the BIA decision on your asylum application to a U.S. Court of Appeals and that decision remains pending.

**4.** If your asylum application has been remanded to an EOIR IJ for further adjudication of your underlying asylum claim:

    **A.**  A copy of the BIA decision and order remanding your case to the EOIR IJ; and

    **B.**  Evidence that your asylum claim remains under review by the EOIR IJ.

**5.** **Evidence of Arrests and Conviction.**  For initial and renewal applications, you are required to submit evidence of any arrests and/or convictions.  If you have been convicted of an aggravated felony, you cannot be granted employment authorization under this eligibility category.  USCIS will make the determination as to whether your convictions meet the definition of aggravated felony.  You must, however, provide information and any supporting documentation on all crimes which you were convicted of so USCIS can make an appropriate decision.  Provide a certified copy of all arrest reports, court dispositions, sentencing documents, and any other relevant documents.

    **NOTE:**  USCIS may, in its discretion, deny your application if you have been arrested and/or convicted of any crime.

**Asylum and Withholding of Deportation Applicants (with a pending Form I-589) who filed before January 4, 1995**

You may file Form I-765 at any time; however, we will only grant your employment authorization if we find that your asylum application is not frivolous.  File Form I-765 with a copy of the following documents, where applicable:

**1.** Your date-stamped previously filed Form I-589;

**2.** If you filed your Form I-589 with the former Immigration and Naturalization Service (INS), an INS Acknowledgement of Receipt;

**3.** A USCIS Asylum Interview Notice (scheduling, re-scheduling, or cancelling your asylum interview);

**4.** Form I-797 Notice, Fingerprint Notification (for a fingerprint appointment for your Form I-589);

**5.** If you filed your Form I-589 in exclusion or deportation proceedings, evidence that your Form I-589 was filed with EOIR;

**6.** If you are currently in exclusion or deportation proceedings, a copy of Form I-221, Order to Show Cause and Notice of Hearing, or Form I-122, Notice to Applicant for Admission Detained for Hearing Before Immigration Judge; or

**7.** Evidence that your Form I-589 remains under administrative or judicial review.

**Asylum application under the ABC Settlement Agreement--(c)(8).**  If you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement, American Baptist Churches v. Thornburgh, 760 F. Supp. 976 (N.D. Cal. 1991), you are entitled to an EAD under the ABC settlement agreement.  Follow the instructions contained in this section when filing your Form I-765.

You must have filed your asylum application (Form I-589) with us (INS or USCIS) or with an EOIR IJ to receive an EAD. Therefore, submit evidence that you have previously filed a complete asylum application when you submit Form I-765. You are not required to submit this evidence when you apply, but it will help us process your request more efficiently.

If you are requesting an initial EAD under this category, you do not need to pay the filing fee.  If you are requesting a renewal or replacement EAD, you must pay the filing fee.  Mark your application as follows:

**1.** Type or print "ABC" in the top right corner of your EAD application.  You must identify yourself as an ABC class member if you are applying for an EAD under the ABC settlement agreement.

**2.** Type or print "(c)(8)" in **Part 2.**, **Item Number 27.**, of the application.

**3.** Select the box in **Part 3.**, **Item Number 6.**, of this application.

You are entitled to an EAD without regard to the merits of your asylum claim.

Your Form I-765 will be decided within 60 days if:

1. You pay the filing fee;

2. You have a complete pending asylum application on file; and

3. You correctly mark your application as described above.  You must pay the filing fee for an initial EAD request.  If you cannot pay the filing fee for an EAD, you may apply for a fee waiver under 8 CFR 103.7(c).

**Special Filing Instructions for Spouses of E-2 CNMI Investors--(c)(12)**

Spouses of certain principal E-2 CNMI investors (E-2C) are eligible to seek employment in the CNMI.  An EAD issued under this category is only valid for employment in the CNMI.

To determine if you are eligible for an EAD under this section, you must determine what type of investor certificate was issued by the CNMI to your spouse, the principal E-2 CNMI investor.  If your spouse was issued either a Long-Term Business Certificate or Foreign Investment Certificate, you may be eligible for an EAD under this category.  If your spouse was issued a Foreign Retiree Investment Certification, you are not eligible to receive an EAD under this category.

File Form I-765 with:

1. Documentation (such as a marriage certificate) establishing a legal marriage;

2. Documentation (such as divorce or death certificates) establishing the termination of any prior marriages of you and your spouse (if applicable);

3. Documentation establishing that you reside in the CNMI;

4. Documentation establishing that your spouse has obtained E-2C status;

5. Documentation establishing that you have obtained E-2C status as a dependent; and

6. A copy of your spouse's CNMI issued Long-Term Business Certificate or Foreign Investment Certificate.

---

| **Where to File?** |
| --- |

Please see our website at **www.uscis.gov/I-765** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this application.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** (TTY **1-800-767-1833**).  The USCIS Contact Center provides information in English and Spanish.

If you are requesting an EAD as an initial TPS applicant or a TPS beneficiary, see the Form I-821 Instructions and the most recent Federal Register notice regarding a TPS designation, re-designation, or extension for your country for additional guidance and filing location.  You can find information on countries designated for TPS on our website at **www.uscis.gov/tps**.

**Premium Processing**

To determine if your requested classification or category is available for Premium Processing, please visit the USCIS website at **www.uscis.gov/forms/how-do-i-use-premium-processing-service**.  If you are requesting Premium Processing Services, you must also file **Form I-907, Request for Premium Processing Service,** with the filing fee.

## Address Change

An applicant who is not a U.S. citizen must notify USCIS of his or her new address within 10 days of moving from his or her previous residence.  For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** (TTY **1-800-767-1833**).  The USCIS Contact Center provides information in English and Spanish.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing  Information

You must have a United States address to file this application.

**Initial processing.**  Once USCIS accepts your application, we will check it for completeness.  If you do not completely fill out this application, you will not establish a basis for your eligibility and USCIS may reject or deny your application.

**Requests for More Information.**  USCIS may request that you provide more information or evidence to support your application.  We may also request that you provide the originals of any copies you submit.  If we request an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your application.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-765 involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS will notify you of the decision in writing.

**Approval.**  If your application is approved, we will either mail your EAD to you or we may require you to visit your local USCIS office to pick it up.

**Denial.**  If USCIS cannot approve your application, you will receive a written notice explaining the basis of your denial.

## USCIS Forms and Information

To ensure you are using the latest version of this application, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Make an Appointment" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-765, we will deny your Form I-765 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

004162

## SSA Privacy Act Statement

Sections 205(c) and 702 of the Social Security Act authorizes SSA to collect information to assign you an SSN and issue a Social Security card. The information you furnish on this application is voluntary. However, failure to provide the requested information may prevent SSA from issuing you an SSN and Social Security card. SSA will maintain the information used to assign you an SSN and issue you a Social Security card in SSA's system of records [Master Files of Social Security Number (SSN) Holders and SSN Applications, 60-0058]. Complete lists of approved routine uses for the information used to assign you an SSN and issue you a Social Security card are available in the System of Records Notice 60-0058, available at **www.ssa.gov**.

## DHS Privacy Notice

**AUTHORITIES:** The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act, 8 U.S.C. section 1324a, and 8 CFR 274a.13.

**PURPOSE:** The primary purpose for providing the requested information on this application is to determine eligibility for certain aliens who are temporarily in the United States requesting an Employment Authorization Document. DHS uses the information you provide to grant or deny the benefit you are seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your application.

**ROUTINE USES:** DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses, as described in the associated published system of records notices [DHS/USCIS-001 – Alien File, Index, and National File Tracking System; DHS/USCIS-007 – Benefit Information System; DHS/USCIS-010 – Asylum Information and Pre-Screening; and DHS/USCIS-017 Refugee Case Processing and Security Screening Information System] and the published privacy impact assessments [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems; DHS/USCIS/PIA-027 Asylum Division; DHS/USCIS/PIA-056 USCIS Electronic Immigration System; and DHS/USCIS/PIA-068 Refugee Case Processing and Security Vetting], which you can find at **www.dhs.gov/privacy**. DHS may also share this information as appropriate for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 4.317 hours per response, including the time for reviewing  instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. The collection of biometrics is estimated to require 1 hour and 10 minutes. The public reporting burden for the collection of information for Form I-765WS is estimated at 30 minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0040. **Do not mail your completed Form I-765 to this address.**

THE UNITED STATES OF AMERICA

I-797 | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES



# Affidavit of Support Under Section 213A of the INA

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-864**

OMB No. 1615-0075
Expires 01/31/2026

| For USCIS Use Only | **Affidavit of Support Submitter**<br>☐ Petitioner<br>☐ 1st Joint Sponsor<br>☐ 2nd Joint Sponsor<br>☐ Substitute Sponsor<br>☐ 5% Owner | **Section 213A Review**<br>☐ MEETS requirements   ☐ DOES NOT MEET requirements<br>Reviewed By:_____<br>Office: _____<br>Date (mm/dd/yyyy): _____ | **Number of Support Affidavits in File**<br>☐ 1   ☐ 2<br><br>**Remarks** |
|---|---|---|---|

| **To be completed by an attorney or accredited representative** (if any). | ☐ Select this box if Form G-28 or G-28I is attached. | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |
|---|---|---|---|

▶ **START HERE - Type or print in black ink.**

## Part 1.  Basis For Filing Affidavit of Support

I, _____,
am the sponsor submitting this affidavit of support because
(Select **only one** box):

**1.a.** ☐ I am the petitioner.  I filed or am filing for the immigration of my relative.

**1.b.** ☐ I filed an alien worker petition on behalf of the intending immigrant, who is related to me as my
_____

**1.c.** ☐ I have an ownership interest of at least 5 percent in
_____
which filed an alien worker petition on behalf of the intending immigrant, who is related to me as my
_____

**1.d.** ☐ I am the only joint sponsor.

**1.e.** ☐ I am the   ☐ first   ☐ second of two joint sponsors.

**1.f.** ☐ The original petitioner is deceased.  I am the substitute sponsor.  I am the intending immigrant's
_____

**NOTE:  If you are filing this form as a sponsor, you must include proof of your U.S. citizenship, U.S. national status, or lawful permanent resident status.**

## Part 2.  Information About the Principal Immigrant

**1.a.** Family Name (Last Name) _____

**1.b.** Given Name (First Name) _____

**1.c.** Middle Name _____

### Mailing Address

**2.a.** In Care Of Name _____

**2.b.** Street Number and Name _____

**2.c.** ☐ Apt.  ☐ Ste.  ☐ Flr. _____

**2.d.** City or Town _____

**2.e.** State _____   **2.f.** ZIP Code _____

**2.g.** Province _____

**2.h.** Postal Code _____

**2.i.** Country _____

### Other Information

**3.** Country of Citizenship or Nationality _____

**4.** Date of Birth (mm/dd/yyyy) _____

**5.** Alien Registration Number (A-Number) (if any)
▶ A- _____

**6.** USCIS Online Account Number (if any)
▶ _____

**7.** Daytime Telephone Number _____

## Part 3.  Information About the Immigrants You Are Sponsoring

**1.** I am sponsoring the principal immigrant named in **Part 2.**

☐ Yes ☐ No  (Applicable only if you are sponsoring family members in **Part 3.** as the second joint sponsor or if you are sponsoring family members who are immigrating more than six months after the principal immigrant)

**2.** ☐ I am sponsoring the following family members immigrating at the same time or within six months of the principal immigrant named in **Part 2.** (Do not include any relative listed on a separate visa petition.)

**3.** ☐ I am sponsoring the following family members who are immigrating more than six months after the principal immigrant.

### Family Member 1

**4.a.** Family Name (Last Name)

**4.b.** Given Name (First Name)

**4.c.** Middle Name

**5.** Relationship to Principal Immigrant

**6.** Date of Birth (mm/dd/yyyy)

**7.** Alien Registration Number (A-Number) (if any)
▶ A-

**8.** USCIS Online Account Number (if any)
▶

### Family Member 2

**9.a.** Family Name (Last Name)

**9.b.** Given Name (First Name)

**9.c.** Middle Name

**10.** Relationship to Principal Immigrant

**11.** Date of Birth (mm/dd/yyyy)

**12.** Alien Registration Number (A-Number) (if any)
▶ A-

**13.** USCIS Online Account Number (if any)
▶

### Family Member 3

**14.a.** Family Name (Last Name)

**14.b.** Given Name (First Name)

**14.c.** Middle Name

**15.** Relationship to Principal Immigrant

**16.** Date of Birth (mm/dd/yyyy)

**17.** Alien Registration Number (A-Number) (if any)
▶ A-

**18.** USCIS Online Account Number (if any)
▶

### Family Member 4

**19.a.** Family Name (Last Name)

**19.b.** Given Name (First Name)

**19.c.** Middle Name

**20.** Relationship to Principal Immigrant

**21.** Date of Birth (mm/dd/yyyy)

**22.** Alien Registration Number (A-Number) (if any)
▶ A-

**23.** USCIS Online Account Number (if any)
▶

### Family Member 5

**24.a.** Family Name (Last Name)

**24.b.** Given Name (First Name)

**24.c.** Middle Name

**25.** Relationship to Principal Immigrant

**26.** Date of Birth (mm/dd/yyyy)

**27.** Alien Registration Number (A-Number) (if any)
▶ A-

**28.** USCIS Online Account Number (if any)
▶

## Part 3.  Information About the Immigrants You Are Sponsoring (continued)

29. Enter the total number of immigrants you are sponsoring on this affidavit which includes the principal immigrant listed in **Part 2.**, any immigrants listed in **Part 3.**, **Item Numbers 1. - 28.** and (if applicable), any immigrants listed for these questions in **Part 11. Additional Information**. Do not count the principal immigrant if you are only sponsoring family members entering more than 6 months after the principal immigrant.

## Part 4.  Information About You (Sponsor)

### Sponsor's Full Name

1.a.  Family Name (Last Name)

1.b.  Given Name (First Name)

1.c.  Middle Name

### Sponsor's Mailing Address

2.a.  In Care Of Name

2.b.  Street Number and Name

2.c.  ☐ Apt.  ☐ Ste.  ☐ Flr.

2.d.  City or Town

2.e.  State

2.f.  ZIP Code

2.g.  Province

2.h.  Postal Code

2.i.  Country

3.  Is your current mailing address the same as your physical address?   ☐ Yes  ☐ No

If you answered "No" to **Item Number 3.**, provide your physical address in **Item Numbers 4.a. - 4.h.**

### Sponsor's Physical Address

4.a.  Street Number and Name

4.b.  ☐ Apt.  ☐ Ste.  ☐ Flr.

4.c.  City or Town

4.d.  State

4.e.  ZIP Code

4.f.  Province

4.g.  Postal Code

4.h.  Country

### Other Information

5.  Country of Domicile

6.  Date of Birth (mm/dd/yyyy)

7.  City or Town of Birth

8.  State or Province of Birth

9.  Country of Birth

10.  U.S. Social Security Number (Required)  ▶

Citizenship or Residency

11.a.  ☐ I am a U.S. citizen.

11.b.  ☐ I am a U.S. national.

11.c.  ☐ I am a lawful permanent resident.

12.  Sponsor's A-Number (if any)  ▶ A-

13.  Sponsor's USCIS Online Account Number (if any)  ▶

Military Service (To be completed by petitioner sponsors only.)

14.  I am currently on **active duty** in the U.S. Armed Forces or U.S. Coast Guard.   ☐ Yes  ☐ No

| For USCIS Use Only | |
|---|---|

## Part 5.  Sponsor's Household Size

**NOTE:  Do not count any member of your household more than once.**

**Persons you are sponsoring in this affidavit:**

**1.**  Provide the number you entered in **Part 3., Item Number 29.**

**Persons NOT sponsored in this affidavit:**

**2.**  Yourself.  `1`

**3.**  If you are currently married, enter "1" for your spouse.

**4.**  If you have dependent children, enter the number here.

**5.**  If you have any other dependents, enter the number here.

**6.**  If you have sponsored any other persons on Form I-864 or Form I-864EZ who are now lawful permanent residents, enter the number here.

**7.**  **OPTIONAL:**  If you have siblings, parents, or adult children with the same principal residence who are combining their income with yours by submitting Form I-864A, enter the number here.

**8.**  Add together **Part 5., Item Numbers 1. - 7.** and enter the number here.

Household Size:  `1`

## Part 6.  Sponsor's Employment and Income

**I am currently:**

**1.**  ☐ Employed as a/an

**2.**  Name of Employer 1

**3.**  Name of Employer 2 (if applicable)

**4.**  ☐ Self-Employed as a/an (Occupation)

**5.**  ☐ Retired Since (mm/dd/yyyy)

**6.**  ☐ Unemployed Since (mm/dd/yyyy)

**7.**  My current individual annual income is:
$

**Income you are using from any other person who was counted in your household size,** including, in certain conditions, the intending immigrant.  (See Form I-864 Instructions.)  Please indicate name, relationship, and income.

**Person 1**

**8.**  Name

**9.**  Relationship

**10.**  Current Income   $

**Person 2**

**11.**  Name

**12.**  Relationship

**13.**  Current Income   $

**Person 3**

**14.**  Name

**15.**  Relationship

**16.**  Current Income   $

**Person 4**

**17.**  Name

**18.**  Relationship

**19.**  Current Income   $

| For USCIS Use Only | Household Size<br>☐ 1   ☐ 2   ☐ 3<br>☐ 4   ☐ 5   ☐ 6<br>☐ 7   ☐ 8   ☐ 9<br>☐ Other _____ | Poverty Guideline<br>Year: _2 0____<br><br>Poverty Line:<br>$ _____ | Remarks |
|---|---|---|---|

## Part 6. Sponsor's Employment and Income (continued)

**20.** **My Current Annual Household Income** (Total all lines from **Part 6. Item Numbers 7., 10., 13., 16.,** and **19.**; the total will be compared to Federal Poverty Guidelines on Form I-864P.)   $ _____

**21.** ☐ The people listed in **Item Numbers 8., 11., 14.,** and **17.** have completed Form I-864A. I am filing along with this affidavit all necessary Form I-864As completed by these people.

**22.** ☐ One or more of the people listed in **Item Numbers 8., 11., 14.,** and **17.** do not need to complete Form I-864A because he or she is the intending immigrant and has no accompanying dependents.

Name
_____

### Federal Income Tax Return Information

**23.a.** Have you filed a Federal income tax return for each of the three most recent tax years?   ☐ Yes   ☐ No

**NOTE:** You **MUST** attach a photocopy or transcript of your Federal income tax return for only the most recent tax year.

**23.b.** ☐ (Optional) I have attached photocopies or transcripts of my Federal income tax returns for my second and third most recent tax years.

My total income (adjusted gross income on Internal Revenue Service (IRS) Form 1040EZ) as reported on my Federal income tax returns for the most recent three years was:

| | Tax Year | Total Income |
|---|---|---|
| **24.a.** Most Recent | | $ |
| **24.b.** 2nd Most Recent | | $ |
| **24.c.** 3rd Most Recent | | $ |

**25.** ☐ I was not required to file a Federal income tax return as my income was below the IRS required level and I have attached evidence to support this.

## Part 7. Use of Assets to Supplement Income (Optional)

If your income, or the total income for you and your household, from **Part 6., Item Numbers 20.** or **24.a. - 24.c.**, exceeds the Federal Poverty Guidelines for your household size, **YOU ARE NOT REQUIRED** to complete this **Part 8.** Skip to **Part 8.**

**Your Assets (Optional)**

**1.** Enter the balance of all savings and checking accounts.   $ _____

**2.** Enter the net cash value of real-estate holdings. (Net value means current assessed value minus mortgage debt.)   $ _____

**3.** Enter the net cash value of all stocks, bonds, certificates of deposit, and any other assets not already included in **Item Number 1.** or **Item Number 2.**   $ _____

**4.** Add together **Item Numbers 1. - 3.** and enter the number here.   **TOTAL:** $ _____

**Assets from Form I-864A., Part 4., Item Number 3.d., for:**

**5.a.** Name of Relative
_____

**5.b.** Your household member's assets from Form I-864A (optional).   $ _____

**Assets of the principal sponsored immigrant** (optional).

The principal sponsored immigrant is the person listed in **Part 2., Item Numbers 1.a. - 1.c.** Only include the assets if the principal immigrant is being sponsored by this affidavit of support.

**6.** Enter the balance of the principal immigrant's savings and checking accounts.   $ _____

**7.** Enter the net cash value of all the principal immigrant's real estate holdings. (Net value means investment value minus mortgage debt.)   $ _____

**8.** Enter the current cash value of the principal immigrant's stocks, bonds, certificates of deposit, and other assets not included in **Item Number 6.** or **Item Number 7.**   $ _____

| For USCIS Use Only | **Household Size**<br>☐ 1  ☐ 2  ☐ 3<br>☐ 4  ☐ 5  ☐ 6<br>☐ 7  ☐ 8  ☐ 9<br>☐ Other _____ | **Poverty Guideline**<br>Year: _2 0_ <br><br>Poverty Line:<br>$ _____ | **Sponsor's Household Income**<br>*(Page 5, Line 10)*<br>$ _____ | **Remarks** |
|---|---|---|---|---|
| | | | *The total value of all assets, line 10, must equal 5 times (3 times for spouses and children of USC's, or 1 time for orphans to be formally adopted in the U.S.) the difference between the poverty guidelines and the sponsor's household income, line 10.* | |

## Part 7. Use of Assets to Supplement Income (Optional) (continued)

**9.** Add together **Item Numbers 6. - 8.** and enter the number here.  $ _____

**Total Value of Assets**

**10.** Add together **Item Numbers 4., 5.b.**, and **9.** and enter the number here.

**TOTAL:** $ _____

## Part 8. Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-864 Instructions before completing this part.

### *Sponsor's Contract*

Please note that, by signing this Form I-864, you agree to assume certain specific obligations under the Immigration and Nationality Act (INA) and other Federal laws. The following paragraphs describe those obligations. Please read the following information carefully before you sign Form I-864. If you do not understand the obligations, you may wish to consult an attorney or accredited representative.

**What is the Legal Effect of My Signing Form I-864?**

If you sign Form I-864 on behalf of any person (called the intending immigrant) who is applying for an immigrant visa or for adjustment of status to a lawful permanent resident, and that intending immigrant submits Form I-864 to the U.S. Government with his or her application for an immigrant visa or adjustment of status, under INA section 213A, these actions create a contract between you and the U.S. Government. The intending immigrant becoming a lawful permanent resident is the consideration for the contract.

Under this contract, you agree that, in deciding whether the intending immigrant can establish that he or she is not inadmissible to the United States as a person likely to become a public charge, the U.S. Government can consider your income and assets as available for the support of the intending immigrant.

**What If I Choose Not to Sign Form I-864?**

The U.S. Government cannot make you sign Form I-864 if you do not want to do so. But if you do not sign Form I-864, the intending immigrant may not become a lawful permanent resident in the United States.

**What Does Signing Form I-864 Require Me To Do?**

If an intending immigrant becomes a lawful permanent resident in the United States based on a Form I-864 that you have signed, then, until your obligations under Form I-864 terminate, you must:

**A.** Provide the intending immigrant any support necessary to maintain him or her at an income that is at least 125 percent of the Federal Poverty Guidelines for his or her household size (100 percent if you are the petitioning sponsor and are on active duty in the U.S. Armed Forces or U.S. Coast Guard, and the person is your husband, wife, or unmarried child under 21 years of age); and

**B.** Notify U.S. Citizenship and Immigration Services (USCIS) of any change in your address, within 30 days of the change, by filing Form I-865.

**What Other Consequences Are There?**

If an intending immigrant becomes a lawful permanent resident in the United States based on a Form I-864 that you have signed, then, until your obligations under Form I-864 terminate, the U.S. Government may consider (deem) your income and assets as available to that person, in determining whether he or she is eligible for certain Federal means-tested public benefits and also for state or local means-tested public benefits, if the state or local government's rules provide for consideration (deeming) of your income and assets as available to the person.

This provision does **not** apply to public benefits specified in section 403(c) of the Welfare Reform Act such as emergency Medicaid; short-term, non-cash emergency relief; services provided under the National School Lunch and Child Nutrition Acts; immunizations and testing and treatment for communicable diseases; and means-tested programs under the Elementary and Secondary Education Act.

**What If I Do Not Fulfill My Obligations?**

If you do not provide sufficient support to the person who becomes a lawful permanent resident based on a Form I-864 that you signed, that person may sue you for this support.

## Part 8.  Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature (continued)

If a Federal, state, local, or private agency provided any covered means-tested public benefit to the person who becomes a lawful permanent resident based on a Form I-864 that you signed, the agency may ask you to reimburse them for the amount of the benefits they provided.  If you do not make the reimbursement, the agency may sue you for the amount that the agency believes you owe.

If you are sued, and the court enters a judgment against you, the person or agency that sued you may use any legally permitted procedures for enforcing or collecting the judgment.  You may also be required to pay the costs of collection, including attorney fees.

If you do not file a properly completed Form I-865 within 30 days of any change of address, USCIS may impose a civil fine for your failing to do so.

**When Will These Obligations End?**

Your obligations under a Form I-864 that you signed will end if the person who becomes a lawful permanent resident based on that affidavit:

- **A.** Becomes a U.S. citizen;

- **B.** Has worked, or can receive credit for, 40 quarters of coverage under the Social Security Act;

- **C.** No longer has lawful permanent resident status and has departed the United States;

- **D.** Is subject to removal, but applies for and obtains, in removal proceedings, a new grant of adjustment of status, based on a new affidavit of support, if one is required; or

- **E.** Dies.

**NOTE:**  Divorce **does not** terminate your obligations under Form I-864.

Your obligations under a Form I-864 that you signed also end if you die.  Therefore, if you die, your estate is not required to take responsibility for the person's support after your death.  However, your estate may owe any support that you accumulated before you died.

### Sponsor's Statement

**NOTE:**  Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this affidavit and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 9.** read to me every question and instruction on this affidavit and my answer to every question in

[                                    ],

a language in which I am fluent, and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 10.**,

[                                    ],

prepared this affidavit for me based only upon information I provided or authorized.

### Sponsor's Contact Information

**3.** Sponsor's Daytime Telephone Number

[                                    ]

**4.** Sponsor's Mobile Telephone Number (if any)

[                                    ]

**5.** Sponsor's Email Address (if any)

[                                    ]

### Sponsor's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or the U.S. Department of State (DOS) may require that I submit original documents to USCIS or DOS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or DOS may need to determine my eligibility for the benefit that I seek.

I furthermore authorize release of information contained in this affidavit, in supporting documents, and in my USCIS or DOS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I certify, under penalty of perjury, that all of the information in my affidavit and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my affidavit and that all of this information is complete, true, and correct.

- **A.** I know the contents of this affidavit of support that I signed;

- **B.** I have read and I understand each of the obligations described in **Part 8.**, and I agree, freely and without any mental reservation or purpose of evasion, to accept each of those obligations in order to make it possible for the immigrants indicated in **Part 3.** to become lawful permanent residents of the United States;

- **C.** I agree to submit to the personal jurisdiction of any Federal or state court that has subject matter jurisdiction of a lawsuit against me to enforce my obligations under this Form I-864;

004171

## Part 8.  Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature (continued)

**D.**  Each of the Federal income tax returns submitted in support of this affidavit are true copies, or are unaltered tax transcripts, of the tax returns I filed with the IRS;

**E.**  I understand that, if I am related to the sponsored immigrant by marriage, the termination of the marriage (by divorce, dissolution, annulment, or other legal process) will not relieve me of my obligations under this Form I-864; and

**F.**  I authorize the Social Security Administration to release information about me in its records to USCIS and DOS.

### *Sponsor's Signature*

**6.a.**  Sponsor's Signature

**6.b.**  Date of Signature (mm/dd/yyyy)

**NOTE TO ALL SPONSORS:**  If you do not completely fill out this affidavit or fail to submit required documents listed in the Instructions, USCIS or DOS may deny your affidavit.

## Part 9.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.a.**  Interpreter's Family Name (Last Name)

**1.b.**  Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

### *Interpreter's Mailing Address*

**3.a.**  Street Number and Name

**3.b.**  ☐ Apt.  ☐ Ste.  ☐ Flr.

**3.c.**  City or Town

**3.d.**  State

**3.e.**  ZIP Code

**3.f.**  Province

**3.g.**  Postal Code

**3.h.**  Country

### *Interpreter's Contact Information*

**4.**  Interpreter's Daytime Telephone Number

**5.**  Interpreter's Mobile Telephone Number (if any)

**6.**  Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and

which is the same language specified in **Part 8., Item Number 1.b.**, and I have read to this sponsor in the identified language every question and instruction on this affidavit and his or her answer to every question.  The sponsor informed me that he or she understands every instruction, question, and answer on the affidavit, including the **Sponsor's Declaration and Certification**, and has verified the accuracy of every answer.

### *Interpreter's Signature*

**7.a.**  Interpreter's Signature

**7.b.**  Date of Signature (mm/dd/yyyy)



## Part 10.  Contact Information, Declaration, and Signature of the Person Preparing this Affidavit, if Other Than the Sponsor

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Telephone Number (if any)

**6.** Preparer's Email Address (if any)

### Preparer's Statement

**7.a.** ☐ I am not an attorney or accredited representative but have prepared this affidavit on behalf of the sponsor and with the sponsor's consent.

**7.b.** ☐ I am an attorney or accredited representative and my representation of the sponsor in this case

☐ extends ☐ does not extend beyond the preparation of this affidavit.

**NOTE:** If you are an attorney or accredited representative, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, with this affidavit.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this affidavit at the request of the sponsor.  The sponsor then reviewed this completed affidavit and informed me that he or she understands all of the information contained in, and submitted with, his or her affidavit, including the **Sponsor's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this affidavit based only on information that the sponsor provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.a.** Preparer's Signature

**8.b.** Date of Signature (mm/dd/yyyy)

## Part 11.  Additional Information

If you need extra space to provide any additional information within this affidavit, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this affidavit or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name
(Last Name)

**1.b.** Given Name
(First Name)

**1.c.** Middle Name

**2.** A-Number (if any)

▶ **A-**

**3.a.** Page Number   **3.b.** Part Number   **3.c.** Item Number

**3.d.**

**4.a.** Page Number   **4.b.** Part Number   **4.c.** Item Number

**4.d.**

**5.a.** Page Number   **5.b.** Part Number   **5.c.** Item Number

**5.d.**

**6.a.** Page Number   **6.b.** Part Number   **6.c.** Item Number

**6.d.**

**7.a.** Page Number   **7.b.** Part Number   **7.c.** Item Number

**7.d.**

004174

# Instructions for Affidavit of Support
## Under Section 213A of the INA



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-864**
OMB No. 1615-0075
Expires 01/31/2026

---

## What is the Purpose of Form I-864?

This affidavit is required for most family-based immigrants and some employment-based intending immigrants to show that they have adequate means of financial support and are not likely to become a public charge.

---

## How is Form I-864 Used?

This affidavit is a contract between a sponsor and the U.S. Government.  Completing and signing Form I-864 makes you the sponsor.  You must show on this affidavit that you have enough income and/or assets to maintain the intending immigrants and the rest of your household at 125 percent of the Federal Poverty Guidelines.  By signing Form I-864, you are agreeing to use your resources to support the intending immigrants named in this affidavit, if it becomes necessary.

The submission of this affidavit may make the sponsored immigrant ineligible for certain Federal, state, or local means-tested public benefits, because an agency that provides means-tested public benefits will consider your resources and assets as available to the sponsored immigrant when determining his or her eligibility for the program.

If the immigrant sponsored in this affidavit does receive one of the designated Federal, state or local means-tested public benefits, the agency providing the benefit may request that you repay the cost of those benefits.  That agency can sue you if the cost of the benefits provided is not repaid.

Not all benefits are considered as means-tested public benefits.  See Form I-864P, Poverty Guidelines, for more information on which benefits are covered by this definition, or the contract in **Part 8. Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature** of Form I-864 for a list of benefits explicitly not considered means-tested public benefits.

---

## Who Needs to Submit Form I-864?

The following immigrants are required by law to submit Form I-864 completed by the petitioner to obtain an immigrant visa overseas or to adjust status to that of a lawful permanent resident in the United States:

1. All immediate relatives of U.S. citizens (spouses, unmarried children under 21 years of age, and parents of U.S. citizens 21 years of age and older);

2. All family-based preference immigrants (unmarried sons and daughters of U.S. citizens, spouses and unmarried sons and daughters of lawful permanent residents, married sons and daughters of U.S. citizens, and brothers and sisters of U.S. citizens 21 years of age and older); and

3. Employment-based preference immigrants in cases only when a U.S. citizen, lawful permanent resident, or U.S. national relative filed the immigrant visa petition or such relative has a significant ownership interest (five percent or more) in the entity that filed the petition.

---

## Are There Exceptions to Who Needs to Submit Form I-864?

The following types of intending immigrants do not need to file Form I-864:

---

1. Any intending immigrant who has earned or can receive credit for 40 qualifying quarters (credits) of work in the United States.  In addition to their own work, intending immigrants may be able to secure credit for work performed by a spouse during marriage and by their parents while the immigrants were under 18 years of age. The Social Security Administration (SSA) can provide information on how to count quarters of work earned or credited and how to provide evidence of such.  See the SSA website at **https://www.ssa.gov/myaccount/** for more information;

2. Any intending immigrant who will, upon admission, acquire U.S. citizenship under section 320 of the Immigration and Nationality Act (INA), as amended by the Child Citizenship Act of 2000 (CCA);

3. Self-petitioning widows or widowers who have an approved Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant; and

4. Self-petitioning battered spouses and children who have an approved Form I-360.

**NOTE:**  If you qualify for one of the exemptions listed above, submit Form I-864W, Intending Immigrant's Affidavit of Support Exemption, instead of Form I-864.

## General Instructions

U.S. Citizenship and Immigration Services (USCIS) provides forms free of charge through the USCIS website.  In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

**Signature.**  Each affidavit must be properly signed and filed.  For all signatures on this affidavit, USCIS will not accept a stamped or typewritten name in place of a signature.  You must be at least 18 years of age to act as a sponsor and sign Form I-864.  A legal guardian may also sign for a mentally incompetent person.

If you are under guardianship, your legal guardian may print your name and sign Form I-864 for you.  "Legal guardian" includes any person who is appointed and authorized by law to protect your estate as a result of your incapacity.  The legal guardian must present proof of the appointment as legal guardian of your estate and a copy of an order from the appointing court or agency specifically permitting the guardian to make your income and assets available for the support of the sponsored immigrant.

**Filing Fee.**  There is no filing fee to file Form I-864 with USCIS.  For information on processing fees when filing with the U.S. Department of State (DOS), see **www.travel.state.gov**.

**Evidence.**  At the time of filing, you must submit all evidence and supporting documentation listed in the **Specific Instructions** and **Specific Requirements** sections of these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide fingerprints, photograph, and/or signature at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application, petition, or request.  After USCIS receives your contract and ensures it is complete, we will inform you in writing if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1. You provided or authorized all information in the affidavit;

2. You reviewed and understood all of the information contained in, and submitted with, your affidavit; and

**3.**   All of this information was complete, true, and correct at the time of filing.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application, petition, or request.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**NOTE:**  If you submit original documents when not required or requested by USCIS, **your original documents may be immediately destroyed upon receipt.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification must include the translator's signature.  The Department of Homeland Security (DHS) recommends the certification contain the translator's printed name and the date and the translator's contact information.

**How to Fill Out Form I-864**

1.   Type or print legibly in black ink.

2.   If you need extra space to complete any item within this affidavit, use the space provided in **Part 11. Additional Information** or attach a separate sheet of paper; type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3.   Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A," unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None," unless otherwise directed.

---

| Specific Instructions |
|---|

**Part 1.  Basis for Filing Affidavit of Support**

Provide your full name (the sponsor) in the space provided, then select the **Item Number** that reflects your basis for filing Form I-864.

**Item Number 1.a.**  Select this box if you are the petitioner who is filing or who has already filed Form I-129F, Petition for Alien Fiancé(e), for a fiancé(e); Form I-130, Petition for Alien Relative, for a family member; Form I-600, Petition to Classify Orphan as an Immediate Relative, for an orphan; or Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative, for a convention adoptee.

**Item Number 1.b.**  Select this box if you are filing or have filed Form I-140, Immigrant Petition for Alien Worker, for your husband, wife, father, mother, child, adult son or daughter, brother, or sister and indicate your relationship to the beneficiary in the space provided.

**Item Number 1.c.**  Select this box if you have an ownership interest of at least five percent in a business, corporation, or other entity that filed or is filing Form I-140 for your husband, wife, father, mother, child, adult son or daughter, brother, or sister.  Indicate the name of the business you have an ownership interest in, and your relationship to the beneficiary in the spaces provided.

**Item Number 1.d.**  Select this box if you are the only joint sponsor.

**Item Number 1.e.**  Select this box if you are either of two joint sponsors.

004177

**NOTE:** A joint sponsor does not have to be related to the intending immigrant. Indicate whether you are the only joint sponsor or one of two joint sponsors. Check with the petitioning sponsor or the intending immigrant if you are not certain.

**Item Number 1.f.** Select this box if you are the substitute sponsor. A substitute sponsor is a sponsor who is completing Form I-864 on behalf of an intending immigrant whose original Form I-130 petitioner has died after the Form I-130 was approved, but before the intending immigrant obtained lawful permanent residence. The substitute sponsor must be related to the intending immigrant in one of the following ways: spouse, parent, mother-in-law, father-in-law, sibling, child (at least 18 years of age), son, daughter, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, or legal guardian. The substitute sponsor must also be a U.S. citizen, lawful permanent resident, or U.S. national. If you are a substitute sponsor, you must sponsor each intending immigrant.

**Part 2. Information About the Principal Immigrant**

The principal immigrant is the intending immigrant who is the primary beneficiary of the visa petition.

**Item Numbers 1.a. - 1.c. Name.** Provide the full name of the principal immigrant.

**Item Numbers 2.a. - 2.i. Mailing Address.** Provide the mailing address of the principal immigrant.

**Item Number 3. Country of Citizenship or Nationality.** Provide the country of citizenship or nationality of the principal immigrant.

**Item Number 4. Date of Birth.** Provide the date of birth of the principal immigrant in mm/dd/yyyy format.

**Item Number 5. Alien Registration Number (A-Number)** (if any). An Alien Registration Number (A-Number) is a number assigned by the former Immigration and Naturalization Service (INS) or U.S. Citizenship and Immigration Services (USCIS). People with A-Numbers can locate the number on their INS or USCIS-issued documentation. If the intending immigrants you are sponsoring have not previously been in the United States or have only been in the United States as tourists, they may not have A-Numbers.

**Item Number 6. USCIS Online Account Number** (if any). If you have previously filed an application, petition, or request using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system. You can find your USCIS Online Account Number by logging in to your account and going to the profile page. If you previously filed certain applications, petitions, or requests on a paper form via a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number. If you received such a notice, your USCIS Online Account Number can be found at the top of the notice. If you were issued a USCIS Online Account Number, enter it in the space provided. The USCIS Online Account Number is not the same as an A-Number.

**Item Number 7. Daytime Telephone Number.** Provide a daytime telephone number with area code for the principal immigrant.

**Part 3. Information About the Immigrants You Are Sponsoring**

**Item Number 1.** Indicate whether you are sponsoring the principal immigrant listed in **Part 2.** of Form I-864. Select "No" if you are sponsoring only intending immigrants listed in **Part 3.**, **Item Numbers 4.a. – 28.** and (if applicable) in **Part 11. Additional Information**, and not the principal immigrant listed in **Part 2.** This only applies if you are sponsoring family members in **Part 3.** and **Part 11. Additional Information**, as the second joint sponsor.

004178

**Item Number 2.  Family Members Immigrating Within Six Months.**  The immigrant you are sponsoring (the principal immigrant) may bring a spouse and/or children to the United States.  If the spouse and/or children will travel with the principal immigrant, or within six months of the principal immigrant's entry into the United States and you are sponsoring them, you should list the names and other requested information in the spaces provided in **Item Number 2.**  If any dependents are not immigrating, will immigrate more than six months after the principal immigrant arrives in the United States, or you are not sponsoring them, then do not list their names here.  A separate Form I-864 is required for them when they apply for their immigrant visas.

**Item Numbers 4.a. - 28.  Family Members Immigrating More Than Six Months After the Principal Immigrant.**  If you are filing this Form I-864 for the principal immigrant's family members who are immigrating more than six months after the principal immigrant, you should list the names and other requested information in the spaces provided in **Item Numbers 4.a. - 28.**

**Item Number 29.**  Type or print the total number of immigrants you are sponsoring on this affidavit from **Item Numbers 1.a. - 28.**, including any immigrants listed for these questions in **Part 11. Additional Information**.

**Part 4.  Information About You (Sponsor)**

**Item Numbers 1.a. - 1.c.  Sponsor's Full Name.**  Provide your (the sponsor's) full name.

**Item Numbers 2.a. - 3.  Sponsor's Mailing Address.**  Provide your (the sponsor's) current mailing address.

**Item Numbers 4.a. - 4.h.  Sponsor's Physical Address.**  Provide the physical address where you (the sponsor) live, if different from your mailing address.

**Item Number 5.  Country of Domicile.**  Indicate the country where you maintain your principal residence and where you plan to reside for the foreseeable future.  If your mailing address and/or place of residence is not in the United States, but your country of domicile is the United States, you must attach a typed or printed explanation and documentary evidence indicating how you meet the domicile requirement.  If you are not currently living in the United States, you may meet the domicile requirement if you can submit evidence to establish that any of the following conditions apply:

1. **You are employed by a certain organization.**

   Some individuals employed overseas are automatically considered as domiciled in the United States because of the nature of their employment.  The qualifying types of employment include employment by:

   **A.**  The U.S. Government;

   **B.**  An American institution of research recognized by the Secretary of Homeland Security (you may find the list of qualifying institutions at 8 CFR 316.20);

   **C.**  A U.S. firm or corporation engaged in whole or in part in the development of foreign trade and commerce with the United States, or a subsidiary of such a firm or corporation;

   **D.**  A public international organization in which the United States participates by treaty or statute;

   **E.**  A religious denomination having a bona fide organization in the United States, if the employment abroad involves the person's performance of priestly or ministerial functions on behalf of the denomination; or

   **F.**  A religious denomination or interdenominational missionary organization having a bona fide organization in the United States, if the person is engaged solely as a missionary.

2. **You are living abroad temporarily.**

   If you are not currently living in the United States, you must provide proof that your trip abroad is temporary and that you have maintained your domicile in the United States.  Examples of proof include:

   **A.**  Your voting record in the United States;

   **B.**  Records of paying U.S. state or local taxes;

   **C.**  Having property in the United States;

   **D.**  Maintaining bank or investment accounts in the United States;

   **E.**  Having a permanent mailing address in the United States; or

   **F.**  Other proof such as evidence that you are a student studying abroad or that a foreign government has authorized a temporary stay.

**3.** **You intend in good faith to reestablish your domicile in the United States no later than the date of the intending immigrant's admission or adjustment of status.**

**Item Number 6.  Date of Birth.**  Provide your date of birth in the mm/dd/yyyy format.

**Item Numbers 7. - 9.  Location of Birth.**  Provide the city or town, state or province, and country of your birth.

**Item Number 10.  U.S. Social Security Number** (Required)**.**  INA Section 213A(i) requires you to include your U.S. Social Security Number on Form I-864.  If you do not have a U.S. Social Security Number, you must obtain one before submitting Form I-864.  If you do not provide your information, USCIS cannot accept your Form I-864, and the intending immigrants may not immigrate to the United States.  USCIS may use your U.S. Social Security Number to verify and, if necessary, to enforce your obligations under Form I-864.

**Item Numbers 11.a. - 11.c.  Citizenship or Residency.**  You must provide proof that you are a U.S. citizen, U.S. national, or lawful permanent resident for joint and substitute sponsors and for relatives of employment-based immigrants who file Form I-864.  Petitioning relatives who have already filed proof of their citizenship or immigration status with Form I-129F, Form I-130, Form I-600, or Form I-600A do not need to submit proof of their status with this affidavit.

**1.** Proof of U.S. citizen or U.S. national status includes a copy of your birth certificate, certificate of naturalization, certificate of citizenship, consular report of birth abroad to U.S. citizen parents, or a copy of the biographic data page of your U.S. passport.

**2.** Proof of lawful permanent resident status includes a photocopy of both sides of the Permanent Resident Card or Alien Registration Receipt Card (Form I-551), or a photocopy of an unexpired temporary Form I-551 stamp in either a foreign passport or DHS Form I-94 Arrival-Departure Record.

**3.** If applicable, also provide the sponsor's A-Number in **Item Number 12.**

**Item Number 12.  Sponsor's Alien Registration Number** (if any)**.**  An Alien Registration Number (A-Number) is a number assigned by the former INS or USCIS.  People with A-Numbers can locate the number on their INS or USCIS-issued documentation.

**Item Number 13.  Sponsor's USCIS Online Account Number** (if any)**.**  If you (the sponsor) have previously filed an application, petition, or request using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications, petitions, or requests on a paper form via a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  If you received such a notice, your USCIS Online Account Number can be found at the top of the notice.  If you were issued a USCIS Online Account Number, enter it in the space provided.  The USCIS Online Account Number is not the same as an A-Number.

**Item Number 14.  Military Service.**  Select "Yes" if you are the petitioning sponsor and on active duty in the U.S. Army, Marines, Navy, Air Force, or Coast Guard, other than for training.  If you provide evidence that you are currently on active duty in the U.S. Armed Forces or U.S. Coast Guard and you are petitioning for your spouse and/or minor child, you will need to demonstrate income at only 100 percent of the poverty level for your household size, instead of at 125 percent of the poverty level.  (See Form I-864P, Poverty Guidelines, for information on the poverty levels.)  Select "No" if you are not on active duty in the U.S. Armed Forces or U.S. Coast Guard.  This provision does not apply to joint and substitute sponsors.

004180

**Part 5.  Sponsor's Household Size**

Add together the number of persons for whom you are financially responsible.  Some of these persons may not be residing with you.  Make sure you do not count any individual more than once.  In some cases the same person could fit into two categories.  For example, your spouse, whom you would enter in **Item Number 3.**, might also be a lawful permanent resident for whom you have already sponsored using Form I-864 (**Item Number 6.**).  If you included your spouse in **Item Number 3.**, do not include him or her again in **Item Number 6.**

**Item Number 1.**  Provide the number you entered in **Part 3.**, **Item Number 29.**  If you or someone else is completing Form I-864 on a computer, this box will auto-populate.

**Item Number 2.**  This field is auto-populated to "1."

**Item Number 3.**  Type or print "1" if you are married.  Type or print "0" if you are not married.

**Item Number 4.**  Type or print the number of unmarried children you have who are under 21 years of age, even if you do not have legal custody of these children.  You may exclude any unmarried children under 21 years of age, if these children have reached majority under the law of their place of domicile and you do not claim them as dependents on your Federal income tax returns.

**Item Number 5.**  Type or print the number of any other dependents.  You must include each and every person whom you have claimed as a dependent on your most recent Federal income tax return, even if that person is not related to you.  Even if you are not legally obligated to support that person, you must include the person if, in fact, you did support that person and claimed the person as a dependent.

**Item Number 6.**  Type or print the number of lawful permanent residents whom you are currently obligated to support based on your previous submission of Form I-864 as a petitioning, substitute, or joint sponsor, or Form I-864EZ, Affidavit of Support Under Section 213A of the INA, as a petitioning sponsor.  Include only those persons who have already immigrated to the United States.  Do not include anyone for whom your obligation to support has ended through the sponsored immigrant's acquisition of U.S. citizenship, death, abandonment of lawful permanent residence in the United States, acquisition of 40 quarters of earned or credited work in the United States, or obtaining a new grant of adjustment of status while in removal proceedings based on a new affidavit of support, if one is required.

**Item Number 7.**  This question gives you the option of including certain other non-dependent relatives who are living in your residence as part of your household size.  Such relatives may include your mother, father, sister, brother or adult children, if they are living in your residence.  However, the only reason to include these relatives in your household size is if you need to include their income when you calculate your household income for purposes of meeting the income requirement for this affidavit.  To be considered, any relative included in this category must sign and submit Form I-864A, Contract Between Sponsor and Household Member.

**Item Number 8.  Household Size.**  Add together **Part 5.**, **Item Numbers 1. - 7.** and type or print the number in the space provided.  If you or someone else is completing Form I-864 on a computer, this box will auto-populate.

**Part 6.  Sponsor's Employment and Income**

**Item Numbers 1. - 6.  Sponsor's Employment.**  Select all the boxes that apply to you.  You, as the sponsor, may not rely on a household member's income from illegal acts, such as proceeds from illegal gambling or drug sales, to meet the income requirement even if the household member paid taxes on that income.

**Item Number 7.  Current Individual Annual Income.**  Type or print your current, individual, earned or retirement, annual income that you are using to meet the requirements of this affidavit and indicate the total in the space provided.

You may include evidence supporting your claim about your expected income for the current year if you believe that submitting this evidence will help you establish ability to maintain sufficient income.  You are not required to submit this evidence, however, unless specifically instructed to do so by a U.S. Government official.  For example, you may include a recent letter from your employer, showing your employer's address and telephone number, and indicating your annual salary.  You may also provide pay stubs showing your income for the previous six months.  If your claimed income includes alimony, child support, dividend or interest income, or income from any other source, you may also include evidence of that income.

**Item Numbers 8. - 22.  Current Annual Household Income.**  This section is used to determine the sponsor's household income.  If your individual annual income listed in **Item Number 7.** is greater than 125 percent (or 100 percent if you are on active duty in the U.S. Armed Forces or U.S. Coast Guard and sponsoring your spouse or child) of the Federal Poverty Guidelines for your household size from **Part 5., Item Number 8.**, you do not need to include any other household member's income.  See Form I-864P for information on the Federal Poverty Guidelines.

To determine the filing requirements for your relatives included in **Part 6., Item Numbers 8. - 19.**, follow the instructions below.

1.  If you included the income of your spouse listed in **Part 5., Item Number 3.**, any child listed in **Part 5., Item Number 4.**, any dependent listed in **Part 5., Item Number 5.**, or any siblings, parents, or adult children listed in **Part 5., Item Number 7.**, each one of these individuals must be over 18 years of age and must complete Form I-864A.

2.  If you included the income of the intending immigrant who is your spouse (he or she would be counted in **Part 5., Item Number 1.**), you must provide evidence that his/her income will continue from the current source after obtaining lawful permanent resident status.  He or she does not need to complete Form I-864A unless he or she has accompanying children.

3.  If you included the income of the intending immigrant who is not your spouse, (he or she would be counted on **Part 5., Item Number 1.**), evidence that his or her income will continue from a lawful source after obtaining lawful permanent resident status must be provided and the intending immigrant must provide evidence that he or she is living in your residence.  He or she does not need to complete Form I-864A, unless he or she has an accompanying spouse or children.

**NOTE:**  If you have listed additional household members in **Part 11. Additional Information**, you must include their income and information when answering **Item Numbers 20. - 22.** when applicable.

**Item Numbers 23.a. - 25.  Federal Income Tax Return Information.**  You must provide either an Internal Revenue Service (IRS) transcript or a photocopy from your own records of your Federal individual income tax return for the most recent tax year.  If you believe additional returns may help you to establish your ability to maintain sufficient income, you may submit transcripts or photocopies of your Federal individual income tax returns for the three most recent years.

You are not required to have the IRS certify the transcript or photocopy unless specifically instructed to do so by a Government official; a plain transcript or photocopy is acceptable.

Do not submit copies of your state income tax returns.  **Do not** submit any tax returns that you filed with any foreign government unless you claim that you were not required to file a Federal individual income tax return with the United States Government and you wish to rely on the foreign return solely to establish the amount of your income that is not subject to tax in the United States.

If you provide a photocopy of your Federal individual income tax returns, you must include a copy of each and every Form W-2 and Form 1099 that relates to your returns.  Do not include copies of these forms if you provide an IRS transcript of your Federal individual income tax returns rather than a photocopy unless you filed a joint income tax return with your spouse and are qualifying using only your income.

If you selected **Part 6., Item Number 2.** that you are self-employed, you should have completed one of the following forms with your Federal income tax return:  Schedule C (Profit or Loss from Business), Schedule D (Capital Gains), Schedule E (Supplemental Income or Loss), or Schedule F (Profit or Loss from Farming).  You must include each and every Form 1040 Schedule, if any, that you filed with your Federal income tax return.

004182

As stated previously, you must submit an IRS transcript or copy of your Federal individual income tax return for the most recent tax year.  If you choose to rely on income from the three most recent tax years, you must submit an IRS transcript or copy of your Federal individual income tax return.  If you were required to file a Federal income tax return for that tax year but did not do so, you must file all late returns with the IRS and attach an IRS transcript or copy of your late return and submit it with Form I-864.  If you were not required to file a Federal income tax return under U.S. tax law because your income was too low, attach a typed or printed explanation.  If you were not required to file a Federal income tax return under U.S. tax law for any other reason, attach a typed or printed explanation including evidence of the exemption and how you are subject to it.  Residence outside of the United States does not exempt U.S. citizens or lawful permanent residents from filing a U.S. Federal income tax return.  See **Filing Requirements** in the IRS Form 1040 Filing Instructions to determine whether you were required to file.

For purposes of this affidavit, the line for Total Income on IRS Forms 1040 and 1040A will be considered when determining income.  For persons filing IRS Form 1040 EZ, the line for adjusted gross income will be considered.

**Obtaining Tax Transcripts.**  You may use IRS Form 4506-T to request tax transcripts from the IRS.  Complete IRS Form 4506-T with the ending date for each of your three most recent tax years listed in **Item Numbers 24.a. - 24.c.**  Follow all instructions for completing and filing Form 4506-T with the IRS.

**NOTE:**  Do not leave the boxes for **Item Number 24.a.** blank.  Type or print the most recent tax year and your total income for that most recent tax year.  If the amount was zero, type or print "zero" or if you were not required to file a Federal income tax return type or print "N/A" for not applicable.

**Part 7.  Use of Assets to Supplement Income** (Optional)

Only complete **Part 7.** if you need to use the value of assets to meet the income requirements.  If your Current Annual Household Income (indicated in **Part 6.**, **Item Number 15.**) is equal to or more than needed to meet the income requirement as shown by the current Federal Poverty Guidelines (Form I-864P) for your household size (indicated in **Part 5.**, **Item Number 8.**), you do not need to complete **Part 7.**  If your total household income does not meet the requirement, you may submit evidence of the value of your assets, the sponsored immigrant's assets, and/or assets of a household member that can be used, if necessary, for the support of the intending immigrants.  The value of assets of all of these persons may be combined in order to meet the necessary requirement.

Only assets that can be converted into cash within one year and without considerable hardship or financial loss to the owner may be included.  The owner of the asset must include a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

You may include the net value of your home as an asset.  The net value of the home is the appraised value of the home, minus the sum of any and all loans secured by a mortgage, trust deed, or other lien on the home.  If you wish to include the net value of your home, then you must include documentation demonstrating that you own it, a recent appraisal by a licensed appraiser, and evidence of the amount of any and all loans secured by a mortgage, trust deed, or other lien on the home.  You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

**Item Numbers 1. - 4.  Assets**.  To use your own assets, you must complete **Part 7.**, **Item Numbers 1. - 4.** and submit corresponding evidence with this affidavit.  Supporting evidence must be attached to establish location, ownership, date of acquisition, and value of any real estate holding.

**Item Numbers 5.a. - 5.b.  Household Member's Assets.**  To use the assets of a relative (spouse, adult son or daughter, parent, or sibling), the relative must reside with you and have completed Form I-864A with accompanying evidence of assets.  Form I-864A and accompanying evidence of assets is submitted with Form I-864.  You may use the assets of more than one relative who resides with you so long as you submit a complete Form I-864A with evidence of assets for each such relative.

004183

**Item Numbers 6. - 9.  Assets of the Intending Immigrant.**  You may use the assets of the intending immigrant regardless of where he or she resides.  The intending immigrant must provide evidence of such assets with this affidavit. Add together **Item Numbers 6. - 8.** and type or print the total number in **Item Number 9.**  Form I-864A is not required to document the intending immigrant's assets.

**Item Number 10.  Total Value of Assets.**  In order to qualify based on the value of your assets, the total value of your assets must equal at least five times the difference between your total household income and the current Federal Poverty Guidelines for your household size.  However, if you are a U.S. citizen and you are sponsoring your spouse or child age 18 years of age or older, the total value of your assets must only be equal to at least three times the difference.  If the intending immigrant is a foreign national orphan who will be adopted in the United States after he or she acquires legal permanent residence, and who will, as a result, acquire citizenship under section 320 of the INA, the total value of your assets need only equal the difference.

**Example of How to Use Assets:**  If you are petitioning for a parent and the poverty line for your household size is $22,062 and your current income is $18,062, the difference between your current income and the poverty line is $4,000. In order for assets to help you qualify, the combination of your assets, plus the assets of any household member who is signing Form I-864A, plus any available assets of the sponsored immigrant, would have to equal five times this difference (5 x $4,000).  In this case, you would meet the income requirements if the net value of the assets equaled at least $20,000.

### Part 8.  Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature

Read the contract carefully, then sign and date the affidavit.  If you do not sign and date the affidavit, the intending immigrant you are sponsoring cannot be issued a visa or be granted adjustment of status.

**Item Numbers 1.a. - 6.b.**  Select the appropriate box to indicate whether you read this affidavit yourself or whether you had an interpreter assist you.  If someone assisted you in completing the affidavit, select the box indicating that you used a preparer.  Further, you must sign and date your affidavit and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every affidavit **MUST** contain the signature of the sponsor (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

### Part 9.  Interpreter's Contact Information, Certification, and Signature

**Item Numbers 1.a. - 7.b.**  If you used anyone as an interpreter to read the Instructions and questions on this affidavit to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the affidavit.

### Part 10.  Contact Information, Declaration, and Signature of the Person Preparing this Affidavit, if Other Than the Sponsor

**Item Numbers 1.a. - 8.b.**  This section must contain the signature of the person who completed your affidavit, if other than you, the sponsor.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 9.** and **Part 10.**  If the person who completed this affidavit is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this affidavit **MUST** sign and date the affidavit.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your affidavit is an attorney or accredited representative, and his or her representation extends beyond preparation of this affidavit, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, along with your affidavit.

**Part 11.  Additional Information**

**Item Numbers 1.a. - 7.d.**  If you need extra space to provide any additional information within this affidavit, use the space provided in **Part 11. Additional Information**.  If you need more space than what is provided in **Part 11.**, you may make copies of **Part 11.** to complete and file with your affidavit, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> We recommend that you print or save a copy of your completed affidavit to review in the future and for your records.

## Specific Requirements

**Who Completes and Signs Form I-864?**

A sponsor completes and signs Form I-864.  A sponsor is required to be at least 18 years of age and domiciled in the United States, or its territories or possessions (See **Part 4. Information About You (Sponsor)** section of these Instructions for more information on domicile).  The petitioning sponsor must sign and complete Form I-864, even if a joint sponsor also submits an I-864 to meet the income requirement.  The list below identifies who must become sponsors by completing and signing a Form I-864, when it is required.

1. The U.S. citizen, lawful permanent resident, or U.S. national who filed Form I-129F, Petition for Alien Fiancé(e), for a fiancé(e); Form I-130, Petition for Alien Relative, for a family member; Form I-600, Petition to Classify Orphan as an Immediate Relative, for an orphan; or Form I-800, Petition to Classify Convention Adoptee as an Immediate Relative, for a Convention adoptee.

2. The U.S. citizen, lawful permanent resident, or U.S. national who filed Form I-140, Immigrant Petition for Alien Worker, for a spouse, parent, son, daughter, or sibling who:

   A. Has a significant ownership interest (five percent or more) in the business which filed the employment-based immigrant visa petition; or

   B. Is related to the intending immigrant as a spouse, parent, son, daughter, or sibling.

**What Are the Income Requirements?**

To qualify as a sponsor, you must demonstrate that your income is at least 125 percent of the current Federal Poverty Guidelines for your household size.  The Federal poverty line, for purposes of this affidavit, is updated annually and can be found on Form I-864P, Poverty Guidelines, on the USCIS website at **www.uscis.gov**.

If you are on active duty in the U.S. Armed Forces, including the Army, Marines, Navy, Air Force, or Coast Guard, and you are sponsoring your spouse or minor child, you only need to have an income of 100 percent of the Federal Poverty Guidelines for your household size.  This provision does not apply to joint or substitute sponsors.

**How Do I Count Household Size?**

Your household size includes yourself and the following individuals, no matter where they live:  any spouse, any dependent children under 21 years of age, any other dependents listed on your most recent Federal income tax return, all persons being sponsored in this affidavit of support, and any immigrants previously sponsored with Form I-864 or Form I-864 EZ, Affidavit of Support Under Section 213A of the INA, whom you are still obligated to support.  If necessary to meet the income requirements to be a sponsor, you may include additional relatives (adult children, parents, or siblings) as part of your household size as long as they have the same principal residence as you and promise to use their income and resources in support of the intending immigrants.

004185

**What if I Cannot Meet the Income Requirements?**

If your income alone is not sufficient to meet the requirement for your household size, the intending immigrant will be ineligible for an immigrant visa or adjustment of status, unless the requirement can be met using any combination of the following:

1. Income from any relatives or dependents living in your household or dependents listed on your most recent Federal income tax return who signed Form I-864A, Contract Between Sponsor and Household Member;

2. Income from the intending immigrant, if that income will continue from the same source after immigration, and if the intending immigrant is currently living in your residence.  If the intending immigrant is your spouse, his or her income can be counted regardless of current residence, but it must continue from the same source after he or she becomes a lawful permanent resident;

3. The value of your assets, the assets of any household member who has signed Form I-864A, or the assets of the intending immigrants; or

4. A joint sponsor whose income and/or assets equal at least 125 percent of the Federal Poverty Guidelines.  (See the **What is a Joint Sponsor** section of these Instructions for more information.)

**How Can My Relatives and Dependents Help Me Meet the Income Requirements?**

You may use the income of your spouse and/or any other relatives living in your residence if they are willing to be jointly responsible with you for the intending immigrants you are sponsoring.  If you have any unrelated dependents listed on your Federal income tax return you may include their income regardless of where they reside.

The income of such household members and dependents can be used to help you meet the income requirements if they complete and sign Form I-864A, Contract Between Sponsor and Household Member, and if they are at least 18 years of age when they sign the affidavit.

**Can the Intending Immigrant Help Me Meet the Income Requirements?**

If certain conditions are met, an intending immigrant's income can help you meet the income requirement.  If the intending immigrant is your spouse, his or her income can be included if it will continue from the same source after he or she obtains lawful permanent resident status.

If the intending immigrant is another relative, there are two requirements:

1. The income must be continuing from the same source after he or she obtains lawful permanent resident status; and

2. The intending immigrant must currently live with you in your residence.

Evidence must be provided to support both requirements, however, an intending immigrant whose income is being used to meet the income requirement does not need to complete Form I-864A, Contract Between Sponsor and Household Member, unless the intending immigrant has a spouse and/or children immigrating with him or her.  In this instance, the contract relates to support for the spouse and/or children.

**Does Receipt of Means-Tested Public Benefits Disqualify Me From being a Sponsor?**

No.  Receipt of means-tested public benefits does not disqualify anyone from being a sponsor, however, means-tested public benefits cannot be accepted as income for the purposes of meeting the income requirement.

**How Can I Use Assets to Qualify?**

You may use assets to supplement income if the consular or immigration officer is convinced that the monetary value of the asset could reasonably be made available to support the sponsored immigrant and converted to cash within one year without undue harm to the sponsor or his or her family members.  You may not include an automobile unless you show that you own at least one working automobile that you have not included.

004186

### What is a Joint Sponsor?

If the person who is seeking the immigration of one or more of his or her relatives cannot meet the income requirements, a joint sponsor who can meet the requirements may submit Form I-864 to sponsor all or some of the family members.

A joint sponsor can be any U.S. citizen, lawful permanent resident, or U.S. national who is at least 18 years of age, domiciled in the United States, or its territories or possessions, and willing to be held jointly liable with the petitioner for the support of the intending immigrant.  A joint sponsor does not have to be related to the petitioning sponsor or the intending immigrant.

If the first joint sponsor completes Form I-864 for some rather than all the family members, a second qualifying joint sponsor will be required to sponsor the remaining family members.  There may be no more than two joint sponsors.  A joint sponsor must be able to meet the income requirements for all the persons he or she is sponsoring without combining resources with the petitioning sponsor or a second joint sponsor.  Any dependents applying for an immigrant visa or adjustment of status more than six months after immigration of the intending immigrants must be sponsored by the petitioner but may be sponsored by an original joint sponsor or a different joint sponsor.

**NOTE:**  Even if one or more Form I-864s are submitted for an intending immigrant, the petitioning sponsor remains legally accountable for the financial support of the sponsored immigrant along with the joint sponsors.  The petitioning sponsor must complete and submit a signed Form I-864 for the intending immigrant even if a joint sponsor will be used.  The petitioning sponsor must also provide his or her Federal income tax return for the most recent tax year with supporting tax documents unless otherwise not required to file a Federal income tax return for the most recent tax year.

### What Is a Substitute Sponsor?

A substitute sponsor is a sponsor who is completing Form I-864 on behalf of an intending immigrant whose original Form I-130 petitioner has died after Form I-130 was approved, but before the intending immigrant obtained legal permanent residence.

The substitute sponsor must be related to the intending immigrant in one of the following ways:  spouse, parent, mother-in-law, father-in-law, sibling, child (at least 18 years of age), son, daughter, son-in-law, daughter-in-law, brother-in-law, sister-in-law, grandparent, grandchild, or legal guardian.  The substitute sponsor must also be a U.S. citizen, lawful permanent resident, or U.S. national.

If you are a substitute sponsor, you must indicate that you are related to the intending immigrant in one of the ways listed above and include evidence proving that relationship.  The beneficiary must also file this affidavit along with a typed or printed statement explaining the reasons why the Form I-130 visa petition should be reinstated, having been revoked following the petitioner's death.  The beneficiary must also include a copy of the Form I-130 approval notice.

### How Long Does My Obligation as a Sponsor Continue?

Your obligation to support the immigrants you are sponsoring in this Affidavit of Support will continue until the sponsored immigrant becomes a U.S. citizen, or can be credited with 40 qualifying quarters of work in the United States.

Although 40 qualifying quarters of work (credits) generally equates to 10 years of work, in certain cases the work of a spouse or parent adds qualifying quarters.  The Social Security Administration can provide information on how to count qualifying quarters (credits) of work.

The obligation also ends if you or the sponsored immigrant dies or if the sponsored immigrant ceases to be a lawful permanent resident.  Divorce does not end the sponsorship obligation.

### Do I Need to Submit a Separate Affidavit for Each Family Member?

You must submit a Form I-864 Affidavit of Support for each intending immigrant you are sponsoring.  You may submit photocopies if you are sponsoring more than one intending immigrant listed on the same affidavit of support.

004187

Separate affidavits of support are required for intending immigrants for whom different Form I-130, Form I-600, or Form I-800 family-based petitions were filed.  For instance, if you are sponsoring both parents, each will need an original affidavit of support and accompanying documentation since you were required to submit separate Form I-130 visa petitions for each parent.  Often a spouse or minor children obtain visas or adjust status as dependents of a relative, based on the same visa petition.  If you are sponsoring such dependents, you only need to provide a photocopy of the original Form I-864, as long as these dependents are immigrating at the same time as the principal immigrant or within six months of the time he or she immigrates to the United States.  You do not need to provide copies of the supporting documents for each of the photocopied Form I-864s.

## What Is the Filing Fee?

There is no filing fee to file Form I-864 with USCIS.  For information on processing fees when filing with DOS, see **www.travel.state.gov**.

## Where To File?

Please see our website at **www.uscis.gov/i-864** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this affidavit.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.  For information on filing with DOS, see **www.travel.state.gov**.

## Address Change

A sponsor who is not a U.S. citizen must notify USCIS of his or her new address within 10 days of moving from his or her previous residence.  To do this, you must complete and file Form I-865, Sponsor's Change of Address.  For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.  For information on reporting a change of address to DOS, see **www.travel.state.gov**.

**NOTE:**  Do not complete Form I-865 at the same time that you complete Form I-864.  You should complete and submit Form I-865 to USCIS only when the address you indicated on the original Form I-864 has changed.

This requirement does not relieve a lawful permanent resident sponsor from filing a change of address within 10 days of the change.  For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.**  Once USCIS or DOS accepts your affidavit we will check it for completeness.  If you do not completely fill out this affidavit, you will not establish a basis for your eligibility and USCIS or DOS may reject or deny your affidavit.

004188

**Requests for More Information.**  We may request that you provide more information or evidence to support your affidavit.  We may also request that you provide the originals of any copies you submit.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your affidavit.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your fingerprints, photograph, and/or signature to verify your identity and/or update background and security checks.

## USCIS Forms and Information

To ensure you are using the latest version of this affidavit, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have Internet access, you may order USCIS forms by calling the Forms Request Line at **1-800-870-3676**.  You may also obtain forms and information by calling the USCIS National Customer Service Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Schedule an Appointment" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.  If filing with DOS, see **www.travel.state.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-864, we will deny your Form I-864 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

The U.S. Government may pursue verification of any information provided on or in support of this affidavit, including employment, income, or assets with the employer, financial or other institutions, the IRS, or the Social Security Administration.  If you include in this affidavit of support any information that you know to be false, you may be liable for criminal prosecution under the laws of the United States.

If you fail to provide notice of your change of address, as required by 8 U.S.C. 1183a(d) and 8 CFR 213a.3, you may be liable for the civil penalty established by 8 U.S.C. 1183a(d)(2).  The amount of the civil penalty will depend on whether you failed to provide this notice because you were aware that the immigrants you sponsored had received Federal, state, or local means-tested public benefits.

If the failure to report your change of address occurs with knowledge that the sponsored immigrant received means-tested public benefits (other than benefits described in section 401(b), 403(c)(2), or 4ll(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which are summarized in **Part 8. Sponsor's Contract, Statement, Contact Information, Declaration, Certification, and Signature** of Form I-864) such failure may result in a fine of not less than $2,000 or more than $5,000.  Otherwise, the failure to report your change of address may result in a fine not less than $250 or more than $2,000.

004189

## USCIS Privacy Act Statement

**AUTHORITIES:**  The information requested on this affidavit, and the associated evidence, is collected under the Immigration and Nationality Act section 213A.

**PURPOSE:**  The primary purpose for providing the requested information on this affidavit is to show that the applying immigrant has adequate means of financial support without concern of becoming reliant on the U.S. Government for financial support.  DHS will use the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your affidavit.  INA section 213A(i) requires the collection of your Social Security number.  Failure to provide the requested information, and any requested evidence, may prevent USCIS from accepting and approving this affidavit, and the intending immigrant may not be able to immigrate to the United States.

**ROUTINE USES:**  DHS may share the information you provide on this affidavit with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001-Alien File, Index, National File Tracking System of Records] which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 6 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the affidavit, preparing statements, attaching necessary documentation, and submitting the affidavit.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0075.  **Do not mail your completed Form I-864 to this address.**

## Checklist

**The following items must be submitted with Form I-864:**

**For ALL sponsors:**

☐ A copy of your individual Federal income tax return, including W-2s for the most recent tax year, or a statement and/or evidence describing why you were not required to file.  Also include a copy of each and every Form 1099, Schedule, and any other evidence of reported income.  You may submit this information for the most recent three tax years, pay stubs from the most recent six months, and/or a letter from your employer if you believe any of these items will help you qualify.

**For SOME sponsors:**

☐ If you are currently self-employed, a copy of your Schedule C, D, E, or F from your most recent Federal income tax return which establishes your income from your business.

☐ If you are sponsoring more than one intending immigrant listed on the same affidavit of support, photocopies of the original affidavit of support may be submitted for any additional intending immigrants listed.  Copies of supporting documentation are not required for these family members.

☐ If you are the petitioning sponsor and on active duty in the U.S. Armed Forces or U.S. Coast Guard and are sponsoring your spouse or child using 100 percent of the Federal Poverty Guidelines, proof of your active military status.

☐ If you are using the income of persons in your household or dependents to qualify, a separate Form I-864A for each person whose income you will use.  However, an intending immigrant whose income is being used needs to complete Form I-864A only if his or her spouse and/or children are immigrating with him or her.

☐ Proof of their residency in your household and relationship to you if they are not the intending immigrants or are not listed as dependents on your Federal income tax return for the most recent tax year.

☐ Proof that the intending immigrant's current employment will continue from the same source if his or her income is being used.

☐ A copy of their individual Federal income tax return, including W-2s and 1099s, for the most recent tax year, or evidence that they were not required to file.  You may submit this information for the most recent three years if you believe it will help you qualify.

☐ If you use your assets or the assets of a household member to qualify, documentation of assets establishing location, ownership, date of acquisition, and value.  Evidence of any liens or liabilities against these assets.

☐ A separate Form I-864A for each household member using assets other than for the intending immigrant.

☐ If you are a joint sponsor, substitute sponsor, or the relative of an employment-based immigrant requiring an affidavit of support, proof of your U.S. citizenship status, lawful permanent resident status, or U.S. national status.

☐ For U.S. citizens or U.S. nationals, a copy of your birth certificate, passport, or certificate of naturalization or citizenship.

☐ For lawful permanent residents, a copy of both sides of your Form I-551, Permanent Resident Card.

If your legal guardian is signing this Form I-864 for you, the legal guardian must present:

☐ Proof of an appointment as legal guardian of your estate; and

☐ A copy of an order from the appointing court or agency specifically permitting the legal guardian to make your income and assets available for the support of the sponsored immigrant.

004191



## Contract Between Sponsor and Household Member

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-864A**

OMB No. 1615-0075
Expires 01/31/2026

| For Government Use Only |
|---|

**This Form I-864A relates to a household member who:**

☐ **IS** the intending immigrant     ☐ **IS NOT** the intending immigrant

Reviewed By: _____

Location: _____   Date (mm/dd/yyyy): _____

| To be completed by an attorney or accredited representative (if any). | ☐ Select this box if Form G-28 or G-28I is attached. | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |
|---|---|---|---|

▶ **START HERE - Type or print in black ink.**

### Part 1.  Information About You (the Household Member)

#### Full Name

**1.a.** Family Name (Last Name) _____

**1.b.** Given Name (First Name) _____

**1.c.** Middle Name _____

#### Mailing Address

**2.a.** In Care Of Name _____

**2.b.** Street Number and Name _____

**2.c.** ☐ Apt. ☐ Ste. ☐ Flr. _____

**2.d.** City or Town _____

**2.e.** State _____  **2.f.** ZIP Code _____

**2.g.** Province _____

**2.h.** Postal Code _____

**2.i.** Country _____

**3.** Is your current mailing address the same as your physical address?   ☐ Yes ☐ No

If you answered "No" to **Item Number 3.**, provide your physical address.

#### Physical Address

**4.a.** Street Number and Name _____

**4.b.** ☐ Apt. ☐ Ste. ☐ Flr. _____

**4.c.** City or Town _____

**4.d.** State _____  **4.e.** ZIP Code _____

**4.f.** Province _____

**4.g.** Postal Code _____

**4.h.** Country _____

#### Other Information

**5.** Date of Birth (mm/dd/yyyy) _____

**Place of Birth**

**6.a.** City or Town _____

**6.b.** State or Province _____

**6.c.** Country _____

**7.** U.S. Social Security Number (if any) ▶ _____

**8.** USCIS Online Account Number (if any) ▶ _____

## Part 2.  Your (the Household Member's) Relationship to the Sponsor

Select **Item Number 1.a.**, **1.b.**, or **1.c.**

**1.a.** ☐ I am the intending immigrant and also the sponsor's spouse.

**1.b.** ☐ I am the intending immigrant and also a member of the sponsor's household.

**1.c.** ☐ I am **not** the intending immigrant.  I am the sponsor's household member.  I am related to the sponsor as his/her:

  ☐ Spouse

  ☐ Son or Daughter (at least 18 years of age)

  ☐ Parent

  ☐ Brother or Sister

  ☐ Other Dependent (Specify)

  [                                        ]

## Part 3.  Your (the Household Member's) Employment and Income

**I am currently:**

**1.** ☐ Employed as a/an

  [                                        ]

**2.** Name of Employer Number 1

  [                                        ]

**3.** Name of Employer Number 2 (if applicable)

  [                                        ]

**4.** ☐ Self employed as a/an

  [                                        ]

**5.** ☐ Retired from (Company Name)

  [                                        ]

  Since (mm/dd/yyyy) [                    ]

**6.** ☐ Unemployed since (mm/dd/yyyy) [                ]

**7.** **My current individual annual income is:**

  $ [                    ]

## Part 4.  Your (the Household Member's) Federal Income Tax Information and Assets

**1.a.** Have you filed a Federal income tax return for each of the three most recent tax years?   ☐ Yes  ☐ No

**NOTE:**  You **MUST** attach a photocopy or transcript of your Federal income tax return for only the most recent tax year.

**1.b.** ☐ (Optional) I have attached photocopies or transcripts of my Federal income tax returns for my second and third most recent tax years.

My total income (adjusted gross income on IRS Form 1040EZ) as reported on my Federal income tax returns for the most recent three years was:

|  |  | Tax Year | Total Income |
|---|---|---|---|
| **2.a.** | Most Recent | [        ] | $ [            ] |
| **2.b.** | 2nd Most Recent | [        ] | $ [            ] |
| **2.c.** | 3rd Most Recent | [        ] | $ [            ] |

**My assets (complete only if necessary).**

**3.a.** Enter the balance of all cash, savings, and checking accounts.   $ [            ]

**3.b.** Enter the net cash value of real-estate holdings.  (Net value means assessed value minus mortgage debt.)   $ [            ]

**3.c.** Enter the cash value of all stocks, bonds, certificates of deposit, and other assets not listed on **Item Numbers 3.a.** or **3.b.**   $ [            ]

**3.d.** Add together **Item Numbers 3.a.**, **3.b.**, and **3.c.** and enter the number here.   $ [            ]

## Part 5.  Sponsor's Promise, Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:**  Read the **Penalties** section of the Form I-864A Instructions before completing this part.

**I, THE SPONSOR,**

[                                        ] ,

(Print Name)

in consideration of the household member's promise to support the following intending immigrants and to be jointly and severally liable for any obligations I incur under the affidavit of support, promise to complete and file an affidavit of support on behalf of the following named intending immigrants.

[                                        ]

(Indicate Number)

**Part 5.  Sponsor's Promise, Statement, Contact Information, Declaration, Certification, and Signature** (continued)

**Intending Immigrant Number 1**

**Name**

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

**2.** Date of Birth (mm/dd/yyyy)

**3.** Alien Registration Number (A-Number, if any)
► A-

**4.** U.S. Social Security Number (if any)
►

**5.** USCIS Online Account Number (if any)
►

**Intending Immigrant Number 2**

**Name**

**6.a.** Family Name (Last Name)

**6.b.** Given Name (First Name)

**6.c.** Middle Name

**7.** Date of Birth (mm/dd/yyyy)

**8.** Alien Registration Number (A-Number, if any)
► A-

**9.** U.S. Social Security Number (if any)
►

**10.** USCIS Online Account Number (if any)
►

**Intending Immigrant Number 3**

**Name**

**11.a.** Family Name (Last Name)

**11.b.** Given Name (First Name)

**11.c.** Middle Name

**12.** Date of Birth (mm/dd/yyyy)

**13.** Alien Registration Number (A-Number, if any)
► A-

**14.** U.S. Social Security Number (if any)
►

**15.** USCIS Online Account Number (if any)
►

**Intending Immigrant Number 4**

**Name**

**16.a.** Family Name (Last Name)

**16.b.** Given Name (First Name)

**16.c.** Middle Name

**17.** Date of Birth (mm/dd/yyyy)

**18.** Alien Registration Number (A-Number, if any)
► A-

**19.** U.S. Social Security Number (if any)
►

**20.** USCIS Online Account Number (if any)
►

**Intending Immigrant Number 5**

**Name**

**21.a.** Family Name (Last Name)

**21.b.** Given Name (First Name)

**21.c.** Middle Name

**22.** Date of Birth (mm/dd/yyyy)

**23.** Alien Registration Number (A-Number, if any)
► A-

**24.** U.S. Social Security Number (if any)
►

**25.** USCIS Online Account Number (if any)
►

**Sponsor's Statement**

**NOTE:**  Select the box for either **Item Number 26.a.** or **26.b.** If applicable, select the box for **Item Number 27.**

**26.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this contract and my answer to every question.

## Part 5.  Sponsor's Promise, Statement, Contact Information, Declaration, Certification, and Signature (continued)

**26.b.** ☐ The interpreter named in **Part 7.** read to me every question and instruction on this contract and my answer to every question in

[_____],

a language in which I am fluent, and I understood everything.

**27.** ☐ At my request, the preparer named in **Part 8.**,

[_____],

prepared this contract for me based only upon information I provided or authorized.

### Sponsor's Contact Information

**28.** Sponsor's Daytime Telephone Number

[_____]

**29.** Sponsor's Mobile Telephone Number (if any)

[_____]

**30.** Sponsor's Email Address (if any)

[_____]

### Sponsor's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that U.S. Citizenship and Immigration Services (USCIS) or the U.S. Department of State (DOS) may require that I submit original documents to USCIS or DOS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS or DOS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this contract, in supporting documents, and in my USCIS or DOS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I certify, under penalty of perjury, that all of the information in my contract and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my contract and that all of this information is complete, true, and correct.

### Sponsor's Signature

**31.a.** Sponsor's Signature

[_____]

**31.b.** Date of Signature  (mm/dd/yyyy)   [_____]

**NOTE TO ALL SPONSORS:**  If you do not completely fill out this contract or fail to submit required documents listed in the Instructions, USCIS may deny your contract.

## Part 6.  Your (the Household Member's) Promise, Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:**  Read the **Penalties** section of the Form I-864A Instructions before completing this part.

**I, THE HOUSEHOLD MEMBER,**

[_____],

(Print Name)

in consideration of the sponsor's promise to complete and file an affidavit of support on behalf of the above named intending immigrants.

[_____]

(Print number of intending immigrants noted in **Part 5. Sponsor's Promise, Statement, Contact Information, Declaration, Certification and Signature.**)

**A.** Promise to provide any and all financial support necessary to assist the sponsor in maintaining the sponsored immigrants at or above the minimum income provided for in the Immigration and Naturalization Act (INA) section 213A(a)(1)(A) (not less than 125 percent of the Federal Poverty Guidelines) during the period in which the affidavit of support is enforceable;

**B.** Agree to be jointly and severally liable for payment of any and all obligations owed by the sponsor under the affidavit of support to the sponsored immigrants, to any agency of the Federal Government, to any agency of a state or local government, or to any other private entity that provides means-tested public benefits;

**C.** Certify under penalty under the laws of the United States that the Federal income tax returns submitted in support of the contract are true copies or unaltered tax transcripts filed with the Internal Revenue Service;

**D.** **Consideration where the household member is also the sponsored immigrant:**  I understand that if I am the sponsored immigrant and a member of the sponsor's household that this promise relates only to my promise to be jointly and severally liable for any obligation owed by the sponsor under the affidavit of support to any of my dependents, to any agency of the Federal Government, to any agency of a state or local government, or to any other private entity that provides means-tested public benefits and to provide any and all financial support necessary to assist the sponsor in maintaining any of my dependents at or above the minimum income provided for in INA section 213A(a)(1)(A) (not less than 125 percent of the Federal Poverty Guideline) during the period which the affidavit of support is enforceable.

## Part 6.  Your (the Household Member's) Promise, Statement, Contact Information, Declaration, Certification, and Signature (continued)

**E.**    I understand that, if I am related to the sponsored immigrant or the sponsor by marriage, the termination of the marriage (by divorce, dissolution, annulment, or other legal process) will not relieve me of my obligations under this Form I-864A.

**F.**    I authorize the Social Security Administration to release information about me in its records to the Department of State and U.S. Citizenship and Immigration Services (USCIS).

### *Your (the Household Member's) Statement*

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** ☐   I can read and understand English, and I have read and understand every question and instruction on this contract and my answer to every question.

**1.b.** ☐   The interpreter named in **Part 7.** read to me every question and instruction on this contract and my answer to every question in

[                                        ],

a language in which I am fluent, and I understood everything.

**2.** ☐   At my request, the preparer named in **Part 8.**,

[                                        ],

prepared this contract for me based only upon information I provided or authorized.

### *Your (the Household Member's) Contact Information*

**3.**    Your (the Household Member's) Daytime Telephone Number

[                                        ]

**4.**    Your (the Household Member's) Mobile Telephone Number (if any)

[                                        ]

**5.**    Your (the Household Member's) Email Address (if any)

[                                        ]

### *Your (the Household Member's) Declaration and Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS or DOS may require that I submit original documents to USCIS or DOS at a later date.  Furthermore, I authorize the release of any information from any and all of my records that USCIS or DOS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this contract, in supporting documents, and in my USCIS or DOS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I certify, under penalty of perjury, that all of the information in my contract and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my contract and that all of this information is complete, true, and correct.

### *Your (the Household Member's) Signature*

**6.a.**   Your (the Household Member's) Printed Name

[                                        ]

**6.b.**   Your (the Household Member's) Signature

[                                        ]

**6.c.**   Date of Signature (mm/dd/yyyy)

[                                        ]

**NOTE TO ALL HOUSEHOLD MEMBERS:**  If you do not completely fill out this contract or fail to submit required documents listed in the Instructions, USCIS may deny your contract.

## Part 7.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.a.**   Interpreter's Family Name (Last Name)

[                                        ]

**1.b.**   Interpreter's Given Name (First Name)

[                                        ]

**2.**    Interpreter's Business or Organization Name (if any)

[                                        ]

## Part 7.  Interpreter's Contact Information, Certification, and Signature (continued)

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and

which is the same language specified in **Part 5.**, **Item Number 26.b.** or **Part 6.**, **Item Number 1.b.**, and I have read to this sponsor or household member in the identified language every question and instruction on this contract and his or her answer to every question.  The sponsor or household member informed me that he or she understands every instruction, question, and answer on the contract, including the **Sponsor's** or **Household Member's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.** Interpreter's Signature

**7.b.** Date of Signature   (mm/dd/yyyy)

## Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Contract, if Other Than the Sponsor or Household Member

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Telephone Number (if any)

**6.** Preparer's Email Address (if any)

004197

## Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Contract, if Other Than the Sponsor or Household Member (continued)

### Preparer's Statement

**7.a.** ☐ I am not an attorney or accredited representative but have prepared this contract on behalf of the sponsor and household member and with the sponsor's or household member's consent.

**7.b.** ☐ I am an attorney or accredited representative and my representation of the sponsor and household member in this case ☐ extends ☐ does not extend beyond the preparation of this contract.

**NOTE:**  If you are an attorney or accredited representative, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, with this contract.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this contract at the request of the sponsor and household member.  The sponsor and household member then reviewed this completed contract and informed me that he or she understands all of the information contained in, and submitted with, his or her contract, including the **Sponsor's** or **Household Member's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this contract based only on information that the sponsor and household member provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.a.** Preparer's Signature

_____

**8.b.** Date of Signature (mm/dd/yyyy) _____

004198

## Part 9.  Additional Information

If you need extra space to provide any additional information within this contract, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this contract or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name
(Last Name)

**1.b.** Given Name
(First Name)

**1.c.** Middle Name

**2.** A-Number (if any)

▶ **A-**

**3.a.** Page Number    **3.b.** Part Number    **3.c.** Item Number

**3.d.**

**4.a.** Page Number    **4.b.** Part Number    **4.c.** Item Number

**4.d.**

**5.a.** Page Number    **5.b.** Part Number    **5.c.** Item Number

**5.d.**

**6.a.** Page Number    **6.b.** Part Number    **6.c.** Item Number

**6.d.**

**7.a.** Page Number    **7.b.** Part Number    **7.c.** Item Number

**7.d.**

004199

# Instructions for Contract Between Sponsor and Household Member



**Department of Homeland Security**

U.S. Citizenship and Immigration Services

**USCIS**
**Form I-864A**
OMB No. 1615-0075
Expires 01/31/2026

---

## What Is the Purpose of Form I-864A?

Form I-864A, Contract Between Sponsor and Household Member, is an attachment to Form I-864, Affidavit of Support Under Section 213A of the INA.  A separate Form I-864A must be used for each household member whose income and/or assets are being used by a sponsor to qualify.  Each Form I-864A is completed and signed by two individuals: a sponsor who is completing Form I-864 **and** a household member who is promising to make his or her income and/or assets available to the sponsor to help support the sponsored immigrants.  The combined signing of this contract constitutes an agreement that the household member is responsible along with the sponsor for the support of the individuals named in this contract.

This contract must be submitted **with** Form I-864.

Form I-864A may only be used when a sponsor's income and assets do not meet the income requirements of Form I-864 and the qualifying household member chooses to combine his or her resources with the income and/or assets of a sponsor to meet the requirements.  The obligations of the household member under this contract terminate when the obligations of the sponsor under the Affidavit of Support terminate.

For additional information, see the Immigration and Nationality Act (INA) section 213A and part 213a of Title 8 of the Code of Federal Regulations.

### What Is a Sponsor?

A sponsor is:

1.  The petitioning relative;

2.  A relative with a significant ownership interest in the petitioning entity; **or**

3.  A substitute in the case of a deceased petitioner, or another person accepting joint and several liability with the sponsor; **AND**

4.  Someone who completes and files Form I-864 on behalf of an intending immigrant.  A sponsor must be an individual and may not be an enterprise, a business, or any other type of organization.

### Who May Be Considered a Household Member for Purposes of Form I-864A?

For purposes of this contract, one or more of the following individuals may sign the Form I-864A as a household member if at least 18 years of age:

1.  The intending immigrant, if the sponsor seeks to rely on an intending immigrant's continuing income to establish the sponsor's ability to support the intending immigrant's spouse or children;

2.  The spouse, parent, child, adult son or daughter, or sibling relative of the sponsor, if that relative has the same principal residence as the sponsor; or

3.  Any other individual whom the sponsor has lawfully claimed as a dependent on the sponsor's most recent Federal income tax return even if that person does not live at the same residence as the sponsor.  If more than one individual agrees to help support the sponsored immigrant, each individual must sign a separate Form I-864A.

### How Can the Intending Immigrant Be Considered a Household Member?

Listed below are two ways that the intending immigrant may be considered to be a household member for the purposes of pooling income with the sponsor to meet the Affidavit of Support requirements:

---

1.  The intending immigrant has the same principal residence as the sponsor and the intending immigrant can establish that his or her income will continue from a lawful source, even after acquisition of lawful permanent residence; or

2.  The intending immigrant is the sponsor's spouse and the intending immigrant can show that his or her income will continue from a lawful source after acquisition of lawful permanent residence.

### Why Does a Household Member Complete Form I-864A?

A household member completes this contract if the household member's income and/or assets will be used to demonstrate the sponsor's ability to meet the income requirements and to maintain the sponsored immigrant at an annual income at the level specified in INA section 213A(f)(l)(E) or section 213A(f)(3).

### If the Intending Immigrant Is a Household Member, Must He or She Complete This Contract?

If you are the intending immigrant and the sponsor is including your income on Form I-864 to meet the eligibility requirements, you need to complete this contract only if you have accompanying dependents. If you are the intending immigrant and the sponsor is including only your assets on Form I-864, you do not need to complete this contract, even if you have accompanying dependents.

## General Instructions

U.S. Citizenship and Immigration Services (USCIS) provides forms free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**. If you do not have Internet access, you may call the USCIS National Customer Service Center at **1-800-375-5283** and ask that we mail a form to you. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.** Each contract must be properly signed and filed. For all signatures on this contract, USCIS will not accept a stamped or typewritten name in place of a signature. You must be at least 18 years of age to act as a sponsor and sign Form I-864A. A legal guardian may also sign for a mentally incompetent person.

If you are under guardianship, your legal guardian may print your name and sign Form I-864A for you. "Legal guardian" includes any person who is appointed and authorized by law to protect your estate as a result of your incapacity. The legal guardian must present proof of the appointment as legal guardian of your estate and a copy of an order from the appointing court or agency specifically permitting the guardian to make your income and assets available for the support of the sponsored immigrant.

**Filing Fee.** There is no filing fee to file Form I-864A with USCIS. For information on processing fees when filing with the U.S. Department of State (DOS), see **www.travel.state.gov**.

**Evidence.** At the time of filing, you must submit all evidence and supporting documentation listed in the **Specific Instructions** and/or **What Evidence Must You Submit** sections of these Instructions.

**Biometric Services Appointment.** USCIS may require that you appear for an interview or provide fingerprints, photograph, and/or signature at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application, petition, or request. After USCIS receives your contract and ensures it is complete, we will inform you in writing if you need to attend a biometric services appointment. If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1.  You provided or authorized all information in the contract;

2.  You reviewed and understood all of the information contained in, and submitted with, your contract; and

**3.**   All of this information was complete, true, and correct at the time of filing.

**Copies.**   You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application, petition, or request.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**NOTE:**  If you submit original documents when not required or requested by USCIS, **your original documents may be immediately destroyed upon receipt**.

**Translations.**   If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification must include the translator's signature.  The Department of Homeland Security (DHS) recommends the certification contain the printed name and the date and the translator's contact information.

**How To Fill Out Form I-864A**

**1.**   Type or print legibly in black ink.

**2.**   If you need extra space to complete any item within this contract, use the space provided in **Part 9. Additional Information** or attach a separate sheet of paper; type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**3.**   Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A," unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None," unless otherwise directed.

---

| Specific Instructions |
| --- |

This contract is divided into nine parts.  The sponsor completes **Part 5. Sponsor's Promise, Statement, Contact Information, Declaration, Certification, and Signature** of this contract and the household member completes **Parts 1. - 4.**, and **6**.  The information below provides detailed information to help you complete this contract.

**Part 1.  Information About You (the Household Member)**

**Item Numbers l.a. - l.c.  Full Name.**  Provide your full name.

**Item Numbers 2.a. - 3.  Mailing Address.**  Provide the address where you receive mail.

**Item Numbers 4.a. - 4.h.  Physical Address.**  If you reside in a location different than where you receive mail, provide the address in the space provided.

**Item Number 5.  Date of Birth.**  Provide your date of birth in the mm/dd/yyyy format.

**Item Numbers 6.a. - 6.c.  Place of Birth.**  Provide the city or town, state or province, and country where you were born.

**Item Number 7.  U.S. Social Security Number** (if any).  Provide your U.S. Social Security Number if you have one.

**Item Number 8.  USCIS Online Account Number** (if any)**.**  If you have previously filed an application, petition, or request using the USCIS online filing system (previously called USCIS Electronic Immigration System (USCIS ELIS)), provide the USCIS Online Account Number you were issued by the system.  You can find your USCIS Online Account Number by logging in to your account and going to the profile page.  If you previously filed certain applications, petitions, or requests on a paper form via a USCIS Lockbox facility, you may have received a USCIS Online Account Access Notice issuing you a USCIS Online Account Number.  If you received such a notice, your USCIS Online Account Number can be found at the top of the notice.  If you were issued a USCIS Online Account Number, enter it in the space provided.  The USCIS Online Account Number is not the same as an A-Number.

**Part 2.  Your (the Household Member's) Relationship to the Sponsor**

**Item Numbers 1.a. - 1.c.**  Select the item which best reflects your relationship to the sponsor.

If you select **Item Number 1.a.** (married to the sponsor), you do not have to reside with the sponsor, but you must provide proof that your income will continue from a lawful source after immigration.

If you select **Item Number 1.b.** (not married to the sponsor), you must provide proof that you currently have the same principal residence as the sponsor and that your income will continue from a lawful source after immigration.

If you are the household member completing this contract, but are not the intending immigrant, select **Item Number 1.c.**, and select the box below that describes your relationship to the sponsor.  If you select "Other Dependent," you must be listed as a dependent on the sponsor's most recent Federal income tax return.  You do not have to provide proof that you have the same principal residence as the sponsor.  If you select any other relative except for spouse, you must provide proof of the relationship and that you have the same principal residence as the sponsor.

**Part 3.  Your (the Household Member's) Employment and Income**

**Item Numbers 1. - 6.  Your (the Household Member's) Employment.**  Select all boxes that apply to you.  A sponsor may not rely on a household member's income from illegal activities, such as proceeds from illegal gambling or drug sales, to meet the income requirements, even if the household member paid taxes on that income.

**Item Number 7.  Current Individual Annual Income.**  Enter your current individual earned or retirement annual income that you are using to meet the requirements of this contract and type or print the total on this line.

You may include evidence supporting your claim about your expected income for the current year if you believe that submitting this evidence will help you establish an ability to maintain sufficient income.  You are not required to submit this evidence, however, unless specifically instructed to do so by a government official.  For example, you may include a recent letter from your employer, showing your employer's address and telephone number, and indicating your annual salary.  You may also provide pay stubs showing your income for the previous six months.  If your claimed income includes alimony, child support, dividend or interest income, or income from any other source, you may also include evidence of ability to maintain that income.

**Part 4.  Your (the Household Member's) Federal Income Tax Information and Assets**

You must provide either an Internal Revenue Service (IRS) transcript or a photocopy from your own records of your Federal individual income tax return for the most recent tax year.  If you believe additional returns may help you to establish your ability to maintain sufficient income, you may submit transcripts or photocopies of your Federal individual income tax returns for the three most recent years.

You are not required to have the IRS certify the transcript or photocopy unless specifically instructed to do so by a government official; a plain transcript or photocopy is acceptable.

Do not submit copies of your state income tax returns.  Do not submit any tax returns that you filed with any foreign government unless you are claiming that you were not required to file a Federal income tax return with the United States government and you wish to rely on the foreign return solely to establish the amount of your income that was not subject to tax in the United States.

004203

If you provide a photocopy of your tax returns, you must include a copy of each and every Form W-2 and Form 1099 that relates to your returns.  Do not include copies of these forms if you provide an IRS transcript of your returns rather than a photocopy **unless you filed a joint Federal income tax return with your spouse.**

If you selected **Item Number 1.b.** in **Part 3.**, that you are self-employed, you should have completed one of the following forms with your Federal income tax return:  Schedule C (Profit or Loss from Business), Schedule D (Capital Gains), Schedule E (Supplemental Income or Loss), or Schedule F (Profit or Loss from Farming).  You must include each and every Form 1040 Schedule, if any, that you filed with your Federal income tax return.

As stated previously, you must submit an IRS transcript or copy of your Federal individual income tax return for the most recent tax year.  If you choose to rely on income from the three most recent tax years, you must submit an IRS transcript or copy of your Federal individual income tax return.  If you were required to file a Federal income tax return for that tax year but did not do so, you must file any and all late returns with the IRS and attach an IRS transcript or copy of your late return and submit it with Form I-864A.  If you were not required to file a Federal income tax return under U.S. tax law because your income was too low, attach a typed or printed explanation.

If you were not required to file a Federal income tax return under U.S. tax law for any other reason, attach a typed or printed explanation including evidence of the exemption and how you qualified for it.  Residence outside of the United States does not exempt U.S. citizens or lawful permanent residents from filing a U.S. Federal income tax return.  See Filing Requirements in the IRS Form 1040 Filing Instructions to determine whether you were required to file.

For purposes of this contract, the line for Total Income on IRS Forms 1040 and 1040A will be considered when determining income.  For persons filing IRS Form 1040 EZ, the line for Adjusted Gross Income will be considered.

**Obtaining Tax Transcripts.**  You may use IRS Form 4506-T to request tax transcripts from the IRS.  Complete IRS Form 4506-T with the ending date for each of your three most recent tax years listed on line 9.  Follow all instructions for completing and filing Form 4506-T with the IRS.

**Item Number 1.**  Select the box if you filed a Federal income tax return for each of the three most recent tax years and have attached the required photocopy or transcript of your Federal income tax return for only the most recent year.

**Item Numbers 2.a. - 2.c.  Most Recent Tax Year Total Income.**  Indicate the most recent tax year and your Total Income for that most recent tax year.  If that amount was zero, enter "zero" or "N/A" for non-applicable.  If applicable, select the Optional box indicating that you have attached photocopies or transcripts of your Federal income tax returns for your second and third most recent tax years.

**Item Numbers 3.a. - 3.d.  Assets.**  Complete this item only if the sponsor is using the value of your assets to help meet the requirements of the affidavit of support.  If you are using only your income to help the sponsor meet the requirements, do not complete this item.

If you are the intending immigrant and have no accompanying dependents, then do not list your assets on this contract.  Instead, you must list your assets in **Part 7., Item Numbers 6. - 10.** of the Form I-864 and do not need to complete this form.

Only assets that can be converted into cash within one year and without considerable hardship or financial loss to the owner may be included.  The owner of the asset must include a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

You may include the net value of your home as an asset.  The net value of the home is the appraised value of the home, minus the sum of any and all loans secured by a mortgage, trust deed, or other lien on the home.

If you wish to include the net value of your home, you must include documentation demonstrating that you own it, a recent appraisal by a licensed appraiser, and evidence of the amount of any and all loans secured by a mortgage, trust deed, or other lien on the home.  You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

004204

**Part 5.  Sponsor's Promise, Statement, Contact Information, Declaration, Certification, and Signature**

**Item Numbers 1.a. - 31.b.**  If the sponsor you are promising to make your income available to is sponsoring the principal intending immigrant (the sponsor should have "Yes" as his or her answer to **Part 3.**, **Item Number 1.** of his or her Form I-864), you should list the intending immigrant in **Part 5.**, **Item Numbers 1.a. - 1.c.** and then list any spouse and any and all children that are listed in the sponsor's Form I-864 in the spaces that follow in **Part 5.** of Form I-864A.

If the sponsor you are promising to make your income available to is **not** sponsoring the intending immigrant (this should be true only in cases with two joint sponsors, with "No" selected on **Part 3.**, **Item Number 1.** of his or her Form I-864), in **Part 5.**, **Item Numbers 1.a. - 1.c.**, list any spouse and any and all children that appear on the sponsor's Form I-864, in the spaces that follow in **Part 5.** of Form I-864A.

Select the appropriate box to indicate whether you read this contract yourself or whether you had an interpreter assist you. If someone assisted you in completing the contract, select the box indicating that you used a preparer.  Further, you must sign and date your contract and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every contract **MUST** contain the signature of the sponsor (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 6.  Your (the Household Member's) Promise, Statement, Contact Information, Declaration, Certification, and Signature**

**Item Numbers 1.a. - 6.c.**  Read the household member's promise carefully, type or print your name in the spaces provided in **Part 6.** then sign and date the contract.  **If you do not type or print your name in the Signature section and sign and date the contract, the intending immigrant cannot be issued a visa or be granted adjustment of status based upon the income and/or assets listed on this contract.**

If you are under guardianship, your legal guardian may type or print your name on Form I-864A for you to sign.  See **General Instructions** for definition of "legal guardian."

Select the appropriate box to indicate whether you read this contract yourself or whether you had an interpreter assist you. If someone assisted you in completing the contract, select the box indicating that you used a preparer.  Further, you must sign and date your contract and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every contract **MUST** contain the signature of the household member (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 7.  Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1.a. - 7.b.**  If you used anyone as an interpreter to read the instructions and questions on this contract to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the contract.

**Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Contract, if Other Than the Household Member**

**Item Numbers 1.a. - 8.b.**  This section must contain the signature of the person who completed your contract, if other than you, the sponsor or household member.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 7.** and **Part 8.**  If the person who completed this contract is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you prepare this contract **MUST** sign and date the contract.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your contract is an attorney or accredited representative, he or she must also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, along with your contract, if his or her representation extends beyond preparation of this contract.

**Part 9.  Additional Information**

**Item Numbers 1.a. - 7.d.**  If you need extra space to provide any additional information within this contract, use the space provided in **Part 9. Additional Information**.  If you need more space than what is provided in **Part 9.**, you may make copies of **Part 9.** to complete and file with your contract, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> We recommend that you print or save a copy of your completed contract to review in the future and for your records.

## What Evidence Must You Submit?

You must submit all evidence requested in these Instructions with your contract.  If you fail to submit required evidence, USCIS may reject or deny your contract for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

## What Is The Filing Fee?

There is no filing fee to file form I-864A.  For information on processing fees when filing with DOS, see **www.travel.state.gov**.

## Where to File?

This contract **MUST** be filed with Form I-864.

For additional information, please see our USCIS website at **www.uscis.gov/I-864** or call our USCIS National Customer Service Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.  For information on filing with DOS, see **www.travel.state.gov**.

## Address Change

A sponsor who is not a U.S. citizen must inform USCIS of his or her new address within 10 days of moving from his or her previous residence.  For reporting a change of address to USCIS, you must complete and file Form I-865, Sponsor's Change of Address.  For information on filing Form I-865, go to the USCIS website at **www.uscis.gov/I-865** or contact the USCIS National Customer Service Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

**NOTE:  Do not complete Form I-865 at the same time that you complete Form I-864A.**  You should complete and submit Form I-865 to USCIS only when the address you indicated on the original Form I-864A has changed.

This requirement does not relieve a lawful permanent resident sponsor from filing a change of address within 10 days of the change.  For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or contact the National Customer Service Center at **1-800-375-5283**.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.  For information on reporting a change of address to the Department of State, see **www.travel.state.gov**.

**NOTE:**   Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.**  Once USCIS or the Department of State accepts your contract we will check it for completeness.  If you do not completely fill out this contract, you will not establish a basis for your eligibility and USCIS or the Department of State may reject or deny your contract.

**Requests for More Information.**  We may request that you provide more information or evidence to support your contract.  We may also request that you provide the originals of any copies you submit.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your contract.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your fingerprints, photograph, and/or signature to verify your identity and/or update background and security checks.

## USCIS Forms and Information

To ensure you are using the latest version of this contract, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call:  **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Schedule an Appointment" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-864A, we will deny your Form I-864A and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

The government may pursue verification of any information provided on or in support of this contract, including employment, income, or assets with the employer, financial or other institutions, the IRS, or the Social Security Administration.  If you include in this contract any information that you know to be false, you may be liable for criminal prosecution under the laws of the United States.

If you fail to give notice of your change of address, as required by 8 U.S.C. 1183a(d) and 8 CFR 213a.3, you may be liable for the civil penalty established by 8 U.S.C. 1183a(d)(2).  The amount of the civil penalty will depend on whether you failed to provide this notice because you were aware that the immigrants you sponsored had received Federal, state, or local means-tested public benefits.

If the failure to report your change of address occurs with knowledge that the sponsored immigrant received means-tested public benefits (other than benefits described in section 401(b), 403(c)(2), or 4ll(b) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which are summarized in the contract in **Part 8.** of Form I-864,) such failure may result in a fine of not less than $2,000 or more than $5,000.  Otherwise, the failure to report your change of address may result in a fine not less than $250 or more than $2,000.

004207

## USCIS Privacy Act Statement

**AUTHORITIES:**  The information requested on this contract, and the associated evidence, is collected under the Immigration and Nationality Act section 213A.

**PURPOSE:**  The primary purpose for providing the requested information on this contract is to show that the applying immigrant has adequate means of financial support without concern of becoming reliant on the U.S. Government for financial support.  DHS will use the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of  your contract.  INA section 213A(i) requires the collection of your Social Security number.  Failure to provide the requested information, and any requested evidence, may prevent USCIS from accepting and approving this contract, and the intending immigrant may not be able to immigrate to the United States.

**ROUTINE USES:**  The Department of Homeland Security (DHS) may share the information you provide on this contract with other Federal, state, local, and foreign government agencies and authorized organizations.  Social Security numbers may be verified with the Social Security Administration.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-007 - Benefits Information System and DHS/USCIS-001 - Alien File, Index, and National File Tracking System of Records] which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1 hour and 45 minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the contract, preparing statements, attaching necessary documentation, and submitting the contract.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0075.  **Do not mail your completed Form I-864A to this address.**

004208

## Checklist

The following items must be submitted with Form I-864A:

**For ALL sponsors:**

☐ A copy of your individual Federal income tax return, including W-2s for the most recent tax year, or a statement and/or evidence describing why you were not required to file.  Also include a copy of each and every Form 1099, Schedule, and any other evidence of reported income.  You may submit this information for the most recent three tax years, pay stubs from the most recent six months, and/or a letter from your employer if you believe any of these items will help you qualify.

**For SOME sponsors:**

If your legal guardian is signing this Form I-864A for you, the legal guardian must present:

☐ Proof of the appointment as legal guardian of your estate; and

☐ A copy of an order from the appointing court or agency specifically permitting the legal guardian to make your income and assets available for the support of the sponsored immigrant.

004209



## Instructions for Request for Fee Waiver

**Department of Homeland Security**

U.S. Citizenship and Immigration Services

**USCIS**
**Form I-912**

OMB No. 1615-0116
Expires 02/28/2026

---

### What Is the Purpose of Form I-912?

You may request a fee waiver if you are unable to pay the filing fees or biometric services fees for an application or petition that is eligible for a fee waiver.  When you request a fee waiver, you must clearly demonstrate that you are unable to pay the fees.  For purposes of this form, the Requestor is the primary applicant or petitioner requesting the immigration benefit and fee waiver.  The Requestor can also be the parent or legal guardian of a child or person with a physical, developmental, or mental disability who is the primary applicant or petitioner.  If an individual is under 14 years of age, a parent or legal guardian may sign the request on behalf of that person.

Please note the Form I-912 must be submitted in the name of the primary applicant requesting the immigration benefit and waiver.

You can find the list of applications and petitions that are eligible for a fee waiver at **www.uscis.gov/I-912** or refer to 8 CFR 106.3(a)(3).  For filing tips and additional information, see **www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver**.

You do not need to submit Form I-912 for an application or petition that does not require a filing fee or if you qualify for a fee exemption based on your immigration status.  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fee exemptions available.

---

### Forms Eligible for Fee Waiver

Below is a list of applications and petitions U.S. Citizenship and Immigration Services (USCIS) will consider for a fee waiver and the conditions that must be met to be eligible for a fee waiver.  Under current fee waiver regulations, USCIS can only approve fee waivers for certain forms or certain filings of a particular form type, when fee waiver requirements are met.

You may file this form to request a fee waiver for any of the following benefit requests or services:

- Application to Replace Permanent Resident Card (Form I-90);

- Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) (Form I-191);

- Petition to Remove Conditions on Residence (Form I-751);

- Application for Family Unity Benefits (Form I-817);

- Application for Suspension of Deportation or Special Rule Cancellation of Removal (Form I-881) (Pursuant to Section 203 of Public Law 105 - 110 NACARA );

- Application to File Declaration of Intention (Form N-300);

- Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA) (Form N-336);

- Application for Naturalization (Form N-400);

- Application to Preserve Residence for Naturalization Purposes (N-470);

- Application for Replacement Naturalization/Citizenship Document (N-565);

- Application for Certificate of Citizenship (N-600); and

- Application for Citizenship and Issuance of Certificate Under Section 322 (N-600K).

---

For the following forms under certain conditions:

- Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I-129CW) E-2 CNMI investor;

- Petition for Nonimmigrant Worker (Form I-129) only in the case of a noncitizen applying for E-2 CNMI Investor for an extension of stay;

- Application to Extend/Change Nonimmigrant Status (Form I-539), only in the case of a noncitizen applying for CW-2 nonimmigrant status or in the case of a noncitizen applying for E-2 CNMI Investor for an extension of stay;

- Application for Travel Document (Form I-131), when filed to request humanitarian parole;

- Notice of Appeal or Motion (Form I-290B), when there is no fee for the underlying application or petition or when the fee for the underlying application or petition may be waived;

- Notice of Appeal of Decision Under Section 210 or 245A of the Immigration and Nationality Act (Form I-694), if the underlying application or petition was fee exempt, the filing fee was waived, or was eligible for a fee waiver;

- Application for Employment Authorization (Form I-765), except persons filing under category (c)(33), Deferred Action for Childhood Arrivals (DACA); and

- Application for Temporary Protected Status (Form I-821) and associated biometric services fee, when filed as a first-time applicant.

For the following forms if the applicant is exempt from public charge ground of inadmissibility under INA section 212(a)(4):

- Application for Advance Permission to Enter as a Nonimmigrant (Form I-192);

- Application for Waiver of Passport and/or Visa (Form I-193);

- Application to Register Permanent Residence or Adjust Status (Form I-485); and

- Application for Waiver of Grounds of Inadmissibility (Form I-601).

If not otherwise fee exempt, you may apply for a fee waiver for ANY application or petition that is related to status as a:

1. Battered spouse of A, G, E-3, or H nonimmigrant;

2. Battered spouse or child of a lawful permanent resident or U.S. citizen under INA section 240A(b)(2);

3. T nonimmigrant;

4. Temporary Protected Status;

5. U nonimmigrant; or

6. VAWA self–petitioner and derivative(s);

7. Conditional permanent resident (CPR) filing a waiver of the joint filing requirement based on battery or extreme cruelty;

8. Abused spouses and children adjusting status under the Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act of 1998 (HRIFA);

9. Abused spouses and children seeking benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA);

10. Special Immigrant Juveniles;

11. Asylees; or

12. Refugees.

You may not file Form I-912 if you are requesting consideration for DACA.  There are no fee waivers for DACA.  Fee exemptions will be available in limited circumstances.  See the Deferred Action for Childhood Arrivals Fee exemption at **www.uscis.gov/forms/forms-and-fees/guidance-exemption-fee-form-i-765-filed-request-consideration-deferredaction-childhood-arrivals** for more details.

## How to File Form I-912

You must file this fee waiver request with all applications and petitions for which you are requesting a fee waiver.  If you are filing joint forms that have fees (for example, I-485 and I-765), you only need to file one Form I-912.  You do not have to file a separate Form I-912 for the filing fee and the biometric services fee (if applicable).

You may file one Form I-912 for all family-related applications or petitions filed at the same time.  For example, if you file Form I-765, Application for Employment Authorization, and your spouse and children are filing separate Form I-765s at the same time, you only need to file one Form I-912 for all Form I-765s.  You must send all forms together.

## General Instructions

We provide free forms through the USCIS website.  To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Signature.**  You (or your signing authority) must properly complete your request.  USCIS will not accept a stamped or typewritten name in place of any signature on this request.  If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf.  A legal guardian may also sign for a mentally incompetent person.  If your request is not signed, or if the signature is not valid, we will reject your request.  See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Evidence.**  When you file your request, you must submit all evidence and supporting documents listed in the **Specific Instructions** section of these Instructions.

**Copies.**  You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document.  USCIS may request an original document at any time during our process.  If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:**  If you submit original documents when they are not required or requested, **USCIS may destroy them after we receive them.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that they are competent to translate from the foreign language into English.  The certification must also include their signature, printed name, the signature date, and their contact information.

**USCIS Contact Center.**  For additional information on the request and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call at **800-375-5283** (TTY **800-767-1833**).  The USCIS Contact Center provides information in English and Spanish.

004212

**Disability Accommodations/Modifications.** To request a disability accommodation/modification, follow the instructions on your appointment notice or at **www.uscis.gov/accommodationsinfo**.

**How To Complete Form I-912**

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this request, use the space provided in **Part 10. Additional Information** or attach a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed. If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

---

| Specific Instructions |
| --- |

**Part 1.  Basis for Your Request**

**Item Number 1.** Select a basis for your request. You are not required to complete the entire section of this request. Rather, select one basis or more for which you may qualify and complete the corresponding section as explained below in Parts **4.**, **5.**, and **6.**

**Item  Number 2.** Provide your current immigrant or nonimmigrant status.

**Part 2.  Information About You (Requestor)**

**Item  Number 1.** Select if you are a parent or legal guardian filing on behalf of the person seeking the fee waiver.

**Item Number 2.  Full Name.** Provide your full name. If you have two last names, include both in the Family Name box and use a hyphen (-) if appropriate. If you do not have a middle name, type or print "N/A."

**Item Number 3.  Other Names Used** (if any)**.** Provide all other names you have used, including your maiden name.

**Item Number 4.  Alien Registration Number (A-Number)** (if any)**.** Provide your A-Number. We use your A-Number to identify your immigration records. It begins with an "A" and can be found on correspondence you have received from the Department of Homeland Security (DHS) or USCIS. If you do not have an A-Number, type or print "N/A."

**Item Number 5.  USCIS Online Account Number.** You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you. If you do not have a receipt number that begins with IOE, you do not have an OAN. The OAN is not the same as an A-Number.

**Item Number 6.  Date of Birth** (mm/dd/yyyy)**.** Provide your date of birth in mm/dd/yyyy format. For example, enter May 1, 1979, as 05/01/1979.

**Item Number 7.  U.S. Social Security Number** (if any)**.** Provide your U.S. Social Security number. If you do not have a U.S. Social Security number, type or print "N/A."

---

004213

**Item Number 8.  Marital Status.**  Indicate your current marital status.

**Part 3.  Applications and Petitions for Which You are Requesting a Fee Waiver**

**Item Number 1.**  Complete the table for yourself and each person requesting a fee waiver with you.  Provide the form numbers and the total number of applications and petitions for which you and any family members are requesting a fee waiver.

**Part 4.  Means-Tested Benefits**

**Item Number 1.**  If you, your spouse, your parent (if you are under 21 or disabled), or your child living with you receives a means-tested benefit, complete the table.  You must attach supporting documentation.  If you provide sufficient proof that you or your qualifying family member receive a means-tested benefit, your fee waiver will generally be approved.

A means-tested benefit is a public benefit where a person's eligibility for the benefit, the amount of the benefit, or both, is based on the person's income and resources.  USCIS will consider means-tested benefits that are Federally, state, or locally funded and granted by the benefit agency.

Examples of means-tested benefit programs are Medicaid, Supplemental Nutrition Assistance Program (known as "SNAP" and formerly called Food Stamps), Temporary Assistance to Needy Families (TANF), and Supplemental Security Income (SSI), or other public assistance.  Consult with your benefit-granting agency or your legal advisor to determine whether any Federal, state, or local public benefit that you may receive qualifies as a means-tested benefit.

For the purposes of determining an inability to pay the filing fee of the petition or application, the following are not considered means-tested benefits:  Medicare; unemployment benefits; Social Security retirement benefits; Social Security Disability Insurance (SSDI); Social Security Retirement, Survivors, and Disability Insurance (RSDI); or student financial aid.

1.  **Individual Receipt of a Means-Tested Benefit**

    **A.**  The individual must demonstrate personal receipt of a means-tested benefit.  When a parent is residing with a child who is receiving public housing or Section 8 benefits, Medicaid, Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), or Supplemental Security Income (SSI), the parent is also considered to be receiving the means-tested benefit.

    **B.**  If a child is the sole applicant, the child may provide an individual means-tested benefit or a custodial parent's means-tested benefit, if living in the same household.

    **C.**  If multiple children are filing at the same time, each child must have an individual receipt of a means-tested benefit or be under the parent's household who is receiving a means-tested benefit.  USCIS considers children living in the same household to be receiving the means-tested benefit if the parent(s) are also living in the same household.

2.  **Family Member's Means-Tested Benefits**

    **A.**  Your spouse and unmarried children under 21 years of age living with you will normally qualify for a fee waiver as part of your household if you are receiving means-tested benefits.

    **B.**  If your spouse is receiving a means-tested benefit, you will normally qualify for a fee waiver as long as you are residing with your spouse and are not legally separated.

    **C.**  You may use a child's public housing or Section 8 subsidy, Medicaid, SNAP, TANF, or SSI if the child is living in the same household.

    **D.**  If you are 21 years of age or older, you cannot use a parent's means-tested benefits (such as SSI), even if the parent is living with you, as evidence of your eligibility for a fee waiver unless you are disabled and your parent is your legal guardian or surrogate.  However, you may use information about your parent's means-tested benefits to support a fee waiver request under **Part 6. Financial Hardship** if the award letter or benefit approval document indicates the total household income and you are otherwise eligible under those criteria.

**3.  Documentation**

   **A.**  To qualify for a fee waiver, the evidence that you provide must demonstrate that you are currently receiving the means-tested benefit.   This evidence can be in the form of a letter, notice, or other agency documents that indicate that the benefit is being received.

   **B.**  Documentation must contain:

   **(1)**  Your name (or the name of the person receiving the benefit);

   **(2)**  The name of the agency granting the public benefit;

   **(3)**  The type of benefit; and

   **(4)**  An indication that the benefit is currently being received (for example, a recently dated letter or document with effective dates, date of renewal or period the approval ends, if available).

   **C.**  If the documentation is more than 12 months old and the benefit is still being received, provide additional evidence that shows the benefit is currently being received.

**Part 5.  Income at or Below 150 Percent of the Federal Poverty Guidelines**

To qualify for the fee waiver, your adjusted gross household income must be at or below 150 percent of the Federal Poverty Guidelines, at the time of filing, based on your household size.  The Federal Poverty Guidelines are established by the Secretary of the Department of Health and Human Services annually.  To obtain information on the current Federal Poverty Guidelines, visit our Web site at **www.uscis.gov/I-912P** and review Form I-912P, Poverty Guidelines for Fee Waiver Request.

**Your Employment Status**

**Item Number 1.  Employment Status.**  Indicate your current employment status.  If you are both employed and a student, select Other and provide an explanation.

**Item Number 2.**  Indicate if you are currently receiving unemployment benefits.  If applicable, provide the date that you became unemployed and include the total amount of unemployment benefits you have received in **Item Number 7.**

**Item Number 3.**  Indicate the total number of people living in your household.  If you are applying for any immigration benefits (such as for adjustment of status) based on a pending or approved petition or application for VAWA benefits or T or U nonimmigrant status and your head of household, the person upon whose tax return you are listed as a dependent, or one of your household members is or was your abuser or human trafficker, do not list that person in **Item Numbers 3 - 5.** or their income in **Item Numbers 6. - 8.** below**.**

Household members include the following people, who are dependent on your income, your spouse's income, or the head of household's income, as part of your household size:

1.  You;

2.  The head of your household (if not you).  If the child is applying individually, provide the information of the primary custodial parent;

   **A.**  You are the head of household if you filed the most recent Federal tax return for your household (includes filing as head of household) or earned the majority of the income for your household.

   **B.**  If you are not the head of household, the head of household is the person who filed the most recent Federal tax return on which you are listed as a dependent or the person who provides the majority of your household's income.  If you already have or are applying for Special Immigrant Juvenile (SIJ) classification, do not include any foster or group home household members.

3.  Your spouse, if living with you (if you are separated or your spouse is not living with you, do not include your spouse); or

**4.** Any family members living in your household who are dependent on your income, your spouse's income, or the head of household's income, including:

    **A.** Your children or legal wards who are unmarried and under 21 years of age, and who live with you;

    **B.** Your children or legal wards who are unmarried, are over 21 years of age but under 24 years of age, are full-time students, and who live with you when not at school;

    **C.** Your children or legal wards who are unmarried and for whom you are the legal guardian because they are physically or developmentally disabled or mentally impaired to the extent that they cannot adequately care for themselves and cannot establish, maintain, or re-establish their own household;

    **D.** Your parents who live with you; and

    **E.** Any other dependents listed on your Federal tax return or your spouse or head of household's Federal tax returns.

**Item Number 4.** Indicate the total number of people living in your household who are earning income, including yourself.

**Item  Number 5.** Provide the name of the head of household for your household if it is someone other than you.

**Your Annual Adjusted Household Income**

**Item Number 6.** Your Annual Income.  Provide information on your annual income.  If you filed a Federal tax return, enter the amount from Line 37 (adjusted gross income) on Internal Revenue Service (IRS) Form 1040, U.S. Individual Income Tax Return.  If you have not filed a Federal tax return, take your total household wage income (before any deductions) for the previous 12-month period and enter that amount as your household's annual income.  If you have not filed a Federal income tax return but you have an IRS Form W-2, Wage and Tax Statement, that covers the previous 12-month period, take your total wage income, deduct Federal, state, and local income taxes withheld, and enter that amount as your household's annual wage income.

**Documentation.** To document your annual income, provide copies of the following:

**1.** A copy of your most recent Federal tax return, if available;

**2.** If you did not file a Federal tax return, or if your Federal tax return does not properly reflect your current income, submit copies of consecutive pay statements (stubs) for a minimum of the past month, recent Form W-2, Form SSA-1099, or statements from your employers on business stationery showing salary or wages paid;

**3.** If you are a student and not living with your parents or are not claimed as a dependent on your parents' Federal tax return, do not include your parents' incomes.  You should only provide proof of your income or documentation that shows you are not required to file a Federal or state tax return, such as proof that you are a full-time student as supporting documentation;

**4.** If you are recently unemployed, and your annual income on your Federal tax return or other proof of income is above 150 percent of the Federal Poverty Guidelines, describe your particular situation that you believe qualifies you for a fee waiver in **Part 5.**, **Item Number 9.**  Provide information regarding any unemployment benefits you are currently receiving;

**5.** If you do not have any income, financial support, or cannot provide evidence of income, describe your particular situation that you believe qualifies you for a fee waiver in **Part 5.**, **Item Number 9.**  If available, you may submit affidavits from, for example, religious institutions, non-profits, community-based organizations, or similarly recognized organizations, indicating that you are currently receiving some benefit or support from the organization verifying (or attesting to) your situation.

**Item Number 7.  Annual Adjusted Income of All Household Members.**  Provide the annual income from all family members counted as part of your household.

1.  If a person lives with you, but does not contribute financial support to your household, then you should not include this person's income when calculating your household income.

2.  If you are separated or still married, but do not live with your spouse, do not include your spouse's income.  However, you must include any financial support your spouse provides to your household.

3.  You must include any ongoing additional income or additional financial assistance that you or your household members receive and provide documentation that is not otherwise listed in your taxes.  If you do not have documentation of your additional income or additional financial assistance then you must provide an explanation in **Part 10.  Additional Information.**

4.  If you are applying for any immigration benefits (such as for adjustment of status) based on the Violence Against Women Act (VAWA), or T or U nonimmigrant status under the Victims of Violence and Trafficking Protection Reauthorization Act, do not provide your spouse's income.  You do not need to include as a household member or provide income for:

    • Any person in the household who is or was the requestor's abuser, human trafficker, or perpetrator; or

    • A person who is or was a member of the abuser, human trafficker, or perpetrator's household.

5.  If you are a full-time student, over 21 years of age but under 24 years of age, are unmarried, and are living with your parents, or you are claimed as a dependent on your parents' Federal tax return, include your parents' income.  You must provide a copy of both parents' Federal tax returns and your own Federal tax return, or provide proof of income as supporting documentation.

6.  If members of your household are recently unemployed, and your annual household income on your Federal tax return or other proof of income is above 150 percent of the Federal Poverty Guidelines, describe your particular situation that you believe qualifies you for a fee waiver in **Part 5., Item Number 9.**

**Documentation.**  To document your household members' incomes, provide the following:

1.  A copy of each household member's most recent Federal tax return, if available;

2.  If the household member did not file a Federal tax return, or if the tax return does not properly reflect their current income, submit copies of consecutive pay statements (stubs) for a minimum of the past month, a recent Form W-2, Form SSA-1099, or employer statements on business stationery showing salary or wages paid; or

3.  If you do not have any income or cannot provide evidence of income for your household, describe your particular situation in **Part 5., Item Number 9.**  If applicable, you may submit affidavits from religious institutions, non-profits, or community-based organizations verifying that you are currently receiving some benefit or support from them.  In addition, if no unemployment compensation is being received, you may submit a letter of termination from the employer.

You must document additional financial assistance as income.  Include the following information:

1.  Documentation such as parental support; alimony; child support; educational stipends; pensions; Social Security; royalties, pensions, veterans benefits; unemployment benefits; and consistent or regular financial support from adult children, parents, dependents, or other people living in your household.

2.  A court order of any child support or documentation that indicates the actual amount of child support amount being received (for example, bank statements or IRS Form W-2), or documentation from an agency providing the other income or financial assistance.

3.  A copy of your most recent Federal tax return, if available.  If you are receiving unemployment benefits, the tax document, IRS Form 1099-MISC, is not enough to establish total income.  Provide information regarding any unemployment benefits you are currently receiving in **Part 5., Item Number 9.**

004217

**Item Number 8. Total Adjusted Gross Household Income.**  Provide the total household income.  Add the amounts from **Item Numbers 5.**, **6.**, and **7.**  USCIS will compare this amount to the Federal Poverty Guidelines.

If you do not have any income, financial support, or cannot provide evidence of income, describe your particular situation that you believe qualifies you for a fee waiver in **Part 5.**, **Item Number 9.**  If applicable, you may submit affidavits from religious institutions, non-profits, or community-based organizations verifying that you are currently receiving some benefit or support from them.

**Item Number 9.**  Indicate whether any information (including marital status, income, and list of dependents) in your Federal tax return is different from what you indicate in Form I-912.  Provide the reasons for any changes in circumstances and any differences between the tax returns and information in your Form I-912.  If you need to explain anything else about your circumstances that affect the income determination, use the space provided in **Part 10. Additional Information.**

## Part 6.  Financial Hardship

**Item Number 1.**  Provide details about your financial hardship.  This may include, but is not limited to:

- Medical bills for yourself, spouse, child or parent.

- Letter of termination or receipt of unemployment benefits.

- Pay statements indicating change in income.

- Letter of eviction.

- Letter from homeless shelter services or statement of lack of income.

- Military  Deployment orders.

- Documentary assistance from Federal Emergency Management Agency (FEMA)  or other assistance, insurance documents.

- Documentation of insurance documentation or assistance from FEMA or other program.

- Documentation of bills for utilities and mortgages.

- Documentation of income.

- Documentation of substantial financial losses.

- Victimization - provide receipt notice for filing under VAWA, T, or U category.

- Divorce decree or death certificate and documentation of income loss.

You may also complete this section if your income is above 150 percent of the Federal Poverty Guidelines as defined in **Part 5.** and you believe you have special circumstances that warrant a fee waiver.

**Documentation.**  Provide documentation related to your financial hardship including information on income and the following based on the type of circumstance:

- Medical bills for yourself, spouse, child or parent.

- Letter of termination or receipt of unemployment benefits.

- Pay statements indicating change in income.

- Letter of eviction.

- Letter from homeless shelter services or statement of lack of income.

- Military Deployment orders.

- Documentation of insurance or assistance from Federal Emergency Management Agency (FEMA) or other program.

004218

- Documentation of bills for utilities and mortgages.

- Documentation of income.

- Documentation of substantial financial losses.

- Victimization - provide receipt notice for filing under VAWA, T, or U category.

- Divorce decree or death certificate and documentation of income loss.

**Item Number 2.**  List the types of assets you have, the dollar value of those assets, and the total dollar value of your assets.  Include the following assets:

1. Cash, checking and savings accounts, annuities, stocks, and bonds.  These are assets that easily covert into cash; and

2. Other property or assets that you can easily convert into cash without incurring a hardship.

Do not include your retirement account (401K plans or Individual Retirement Accounts (IRA)) as assets unless this is your sole means of income.

**Documentation.**  You must document your income and provide a complete list, description, and an estimate of the value of your assets that you can easily convert into cash and any liabilities.

**Item Number 3.  Total Monthly Expenses and Liabilities.**  Provide your average monthly costs for all applicable categories provided.

**Documentation.**  Provide evidence, where possible, such as copies of monthly bills and payments, and documentation for monthly expenses and any extenuating circumstances, such as medical bills.  If you cannot provide evidence of income, you may submit affidavits from religious institutions, non-profits, or community-based organizations verifying that you are currently receiving some benefit or support from them.

**Part 7.  Requestor's Statement, Contact Information, Certification, and Signature**

**Item Numbers 1. - 6.**  Select the appropriate box to indicate whether you read this request yourself or whether you had an interpreter assist you.  If someone assisted you in completing the request, select the box indicating that you used a preparer.  Further, you must sign and date your request and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every request **MUST** contain the signature of the requestor (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**Part 8.  Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1. - 7.**  If you used anyone as an interpreter to read the Instructions and questions on this request to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the request.

**Part 9.  Contact Information, Declaration, and Signature of the Person Preparing this Request, if Other Than the Requestor**

**Item Numbers 1. - 8.**  This section must contain the signature of the person who completed your request, if other than you, the requestor.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 8.** and **Part 9.**  If the person who completed this request is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this request **MUST** sign and date the request.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your request is an attorney or accredited representative, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or Form G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographic Confines of the United States, along with your request.

**Part 10. Additional Information**

**Item Numbers 1. - 6.**  If you need extra space to provide any additional information within this request, use the space provided in **Part 10. Additional Information.**  If you need more space than what is provided in **Part 10.**, you may make copies of **Part 10.** to complete and file with your request, or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

> **We recommend that you print or save a copy of your completed request for your records.**

**Where To File?**

Mail your Form I-912, along with the completed USCIS applications or petitions, and all supporting documentation according to the **Where to File** section in the Instructions of the application or petitions for which you are requesting a fee waiver.

**Address Change**

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous residence.  For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox.

**Processing Information**

**Decision.**  The decision on Form I-912 involves a determination of whether you have established eligibility for the fee waiver.  USCIS will notify you of the decision in writing.  If USCIS denies your fee waiver request, the notice will include information on resubmitting your application or petition.  For certain immigration benefits, you may have only a limited period of time in which to resubmit your application or petition with the proper filing fee.  Please review the Instructions for the application or petition for which you want USCIS to consider a fee waiver to determine when to refile.

004220

## USCIS Forms and Information

To ensure you are using the latest version of this request, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-912, we will deny your fee waiver request and may deny any other immigration benefit.  In addition, you may face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this request, and the associated evidence, is collected under the Immigration and Nationality Act sections 286 and 8 CFR 106.3.

**PURPOSE:**  The primary purpose for providing the requested information on this form is to determine if you have established eligibility for a fee waiver for the associated immigration benefit in which you are filing.  The Department of Homeland Security (DHS) uses the information you provide to grant or deny the immigration benefit you are seeking

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your request and rejection of your application or petition based on non-payment of the filing fee.

**ROUTINE USES:**  DHS may share the information you provide on this request with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS-USCIS-007- Benefits Information System and DHS-USCIS-001-Alien File, Index, and National File Tracking System of Records] which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 1.095 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the request, preparing statements, attaching necessary documentation, and submitting the request.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capitol Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0116.  **Do not mail your completed Form I-912 to this address.**

004221

# Request for Fee Waiver

USCIS
Form I-912
OMB No. 1615-0116
Expires: 02/28/2026

**Department of Homeland Security**

U.S. Citizenship and Immigration Services

| For USCIS Use Only | **Application Receipted At** (Select **only one** box) | | |
|---|---|---|---|
| | ☐ **USCIS Field Office** | | ☐ **USCIS Service Center** |
| | ☐ Fee Waiver Approved    ☐ Fee Waiver Denied | | ☐ Fee Waiver Approved    ☐ Fee Waiver Denied |
| | Date:_____    Date:_____ | | Date:_____    Date:_____ |

▶ **START HERE - Type or print in black ink.**

> **If you need extra space to complete any section of this request or if you would like to provide additional information about your circumstances, use the space provided in Part 10. Additional Information. Complete and submit as many copies of Part 10., as necessary, with your request.**

## Part 1.  Basis for Your Request (Each basis is further explained in the **Specific Instructions** section of the Form I-912 Instructions)

Select at least one basis or more for which you may qualify and provide supporting documentation for any basis you select.  You only need to qualify and provide documentation for one basis for U.S. Citizenship and Immigration Services (USCIS) to grant your fee waiver.  If you choose, you may select more than one basis.  You must provide supporting documentation for each basis you want considered.

1.  **A.** ☐ I am, my spouse is, or the head of household living in my household is currently receiving a means-tested benefit. (Complete **Parts 2. - 4.** and **Parts 7. - 9.**)

   **B.** ☐ My household income is at or below 150 percent of the Federal Poverty Guidelines.  (Complete **Parts 2. - 3.**, **Part 5.**, and **Parts 7. - 9.**)

   **C.** ☐ I have a financial hardship.  (Complete **Parts 2. -3.** and **Parts 6. - 9.**)

2.  What is your current immigrant or nonimmigrant status?

   _____

## Part 2.  Information About You (Requestor)

Provide information about yourself if you are the person requesting a fee waiver for a petition or application that you are filing for yourself.  If you are the parent or legal guardian filing on behalf of a child or person with a developmental or mental impairment, provide information about the child or person for whom you are filing this form.

1.  ☐ Check here if you are a parent or legal guardian filing on behalf of the person seeking the fee waiver.

2.  Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

3.  Other Names Used (if any)

   List all other names you have used, including nicknames, aliases, and maiden name.

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |
| | | |

4.  Alien Registration Number (A-Number) (if any)     5.  USCIS Online Account Number (if any)

   ▶ A- _____              ▶ _____

## Part 2.  Information About You (Requestor) (continued)

**6.** Date of Birth (mm/dd/yyyy)

**7.** U.S. Social Security Number (if any)

▶

**8.** Marital Status

☐ Single, Never Married   ☐ Married   ☐ Divorced   ☐ Widowed   ☐ Marriage Annulled   ☐ Separated

☐ Other (Explain)

## Part 3.  Applications and Petitions for Which You Are Requesting a Fee Waiver

**1.** In the table below, add the form numbers of the applications and petitions for which you are requesting a fee waiver.

| Applications or Petitions for You and Your Family Members | | | | | |
|---|---|---|---|---|---|
| **Full Name** | **A-Number** (if any) | | **Date of Birth** | **Relationship to You** | **Forms Being Filed** |
| | A- | | | Self | |
| | A- | | | | |
| | A- | | | | |
| | A- | | | | |
| | | | **Total Number of Forms** (including self) | | |

## Part 4.  Means-Tested Benefits

If you selected **Item Number 1.A.** in **Part 1.**, complete this section.

**1.** If you, your spouse, or the head of household (including parent if the child is under 21 years of age) living with you is receiving any means-tested benefits, list the information in the table below and attach supporting documentation.  If you are the parent or legal guardian filing on behalf of a child or person with a physical disability or developmental or mental impairment, provide information about the child or person for whom you are filing this form if they are receiving a means-tested benefit.

| Means-Tested Benefit Recipients | | | | | |
|---|---|---|---|---|---|
| **Full Name of Person Receiving the Benefit** | **Relationship to You** | **Name of Agency Awarding Benefit** | **Type of Benefit** | **Date Benefit was Awarded** | **Date Benefit Expires** (or must be renewed) |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Part 5.  Income at or Below 150 Percent of the Federal Poverty Guidelines

Provide information about your adjusted gross income.  See Instructions for more details.

If you selected **Item Number 1.B.** in **Part 1.**, complete this section.

### *Your Employment Status*

1.  Employment Status

    ☐ Employed (full-time, part-time, seasonal, self-employed)  ☐ Unemployed or Not Employed  ☐ Retired  ☐ Other (Explain)

2.  If you are currently unemployed, are you currently receiving unemployment benefits?  ☐ Yes  ☐ No

    **A.**  Date you became unemployed (mm/dd/yyyy)

3.  What is your total household size

4.  What is the total number of household members earning income including yourself

5.  Name of head of household (if not you):

### *Your Annual Household Income*

Provide information about your adjusted gross income and the adjusted gross income of all family members counted as part of your household.  You must list all amounts in U.S. dollars.

6.  Your Annual Adjusted Gross Income  $ 

7.  Annual Adjusted Gross Income of All Family Members

    Provide the annual adjusted gross income of all family members counted as part of your household.  (Do not include the amount provided in **Item Number 6.**)  $ 

8.  Total Adjusted Gross Household Income (add the amounts from **Item Numbers 6.** and **7.**)  $ 

9.  Has anything changed since the date you filed your Federal tax returns or is there any difference in your circumstances from the information on your petition?  (For example, your marital status, income, or number of dependents as related to documents provided.)  ☐ Yes  ☐ No

    If you answered "Yes" **to Item Number 9.**, provide an explanation below.  Provide documentation if available.  You may also use this space to provide any additional information about your circumstances that you would like USCIS to consider.

## Part 6.  Financial Hardship

If you selected **Item Number 1.C.** in **Part 1.**, complete this section.

1.  You may also use this space to provide any additional information about your circumstances that you would like U.S. Citizenship and Immigration Services (USCIS) to consider.  If you or any family members have a situation that has caused you to incur expenses, debts, or loss of income, describe the situation in the box below.  Specify the amounts of the expenses, debts, and income losses in as much detail as possible.  This may include homelessness, major medical debt for yourself or a family member, and natural disasters declaration posted to **www.uscis.gov**.

2.  If you have cash or assets that you can quickly convert to cash, list those in the table below.  For example, bank accounts, stocks, or bonds.  (Do not include retirement accounts.)

| Assets | |
|---|---|
| **Type of Asset** | **Value** (U.S. Dollars) |
| | |
| | |
| | |
| **Total Value of Assets** | |

3.  Total Monthly Expenses and Liabilities                                                                    $ [            ]

Provide the total monthly amount of your expenses and liabilities.  You must add all of the expense and liability amounts and type or print the total amount in the space provided.  Type or print "0" in the total box if there are none.  Select the types of expenses or liabilities you have each month and provide evidence of monthly payments, where possible.

☐ Rent and/or Mortgage          ☐ Loans and/or Credit Cards     ☐ Other

☐ Food                          ☐ Car Payment                   _____

☐ Utilities                     ☐ Commuting Costs               _____

☐ Child and/or Elder Care       ☐ Medical Expenses              _____

☐ Insurance                     ☐ School Expenses               _____

## Part 7. Requestor's Statement, Contact Information, Certification, and Signature

The person whose information is provided in **Part 2.** may sign on behalf of the entire household. If the person listed in **Part 2.** is under 14 years of age, a parent or legal guardian may sign on their behalf.

**NOTE:** Read the **Penalties** section of the Form I-912 Instructions before completing this part.

Select the box for either **Item A.** or **B.** in **Item Number 1.** If applicable, select the box for **Item Number 2.**

1. Requestor's Statement Regarding the Interpreter

    **A.** ☐ I can read and understand English, and I have read and understand every question and instruction on this request and my answer to every question**.**

    **B.** ☐ The interpreter named in **Part 8.** read to me every question and instruction on this request and my answer to every question in _____, a language in which I am fluent, and I understood everything.

2. Requestor's Statement Regarding the Preparer (if applicable)

    ☐ At my request, the preparer named in **Part 9.**, _____, prepared this request for me based only upon information I provided or authorized.

### *Requestor's Contact Information*

3. Requestor's Daytime Telephone Number

    _____

4. Requestor's Mobile Telephone Number (if any)

    _____

5. Requestor's Email Address (if any)

    _____

### *Requestor's Certification*

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this request, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I certify, under penalty of perjury, that I provided or authorized all of the information in my request, I understand all of the information contained in, and submitted with, my request, and that all of this information is complete, true, and correct.

I certify that the information provided by the requestor in **Part 7.** applies to the household members identified in **Part 3.**

**WARNING:** If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-912, USCIS will deny your fee waiver request and may deny any other immigration benefit. In addition, you may face severe penalties provided by law and may be subject to criminal prosecution.

### *Requestor's Signature*

6. Requestor's Signature                                    Date of Signature (mm/dd/yyyy)

    ➤ _____    _____

**NOTE TO ALL REQUESTORS:** If you do not completely fill out this request or fail to submit required documents listed in the Instructions, USCIS may deny your request.

## Part 8.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

**1.**  Interpreter's Family Name (Last Name)

Interpreter's Given Name (First Name)

**2.**  Interpreter's Business or Organization Name (if any)

### *Interpreter's Mailing Address*

*(USPS ZIP Code Lookup)*

**3.**  Street Number and Name

Apt.  Ste.  Flr.  Number

City or Town

State  ZIP Code

Province

Postal Code

Country

### *Interpreter's Contact Information*

**4.**  Interpreter's Daytime Telephone Number

**5.**  Interpreter's Mobile Telephone Number (if any)

**6.**  Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and _____, which is the same language specified
in **Part 7., Item B.** in **Item Number 1.**, and I have read to this requestor in the identified language every question and instruction on
this request and his or her answer to every question.  The requestor informed me that he or she understands every instruction, question,
and answer on the request, including the **Applicant's Certification**, and has verified the accuracy of every answer.

### *Interpreter's Signature*

**7.**  Interpreter's Signature

Date of Signature (mm/dd/yyyy)

## Part 9.  Contact Information, Declaration, and Signature of the Person Preparing this Request, if Other Than the Requestor

Provide the following information about the preparer for (if applicable).

### *Preparer's Full Name*

**1.** Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### *Preparer's Mailing Address*

**3.** Street Number and Name

Apt. Ste. Flr. Number

City or Town

State ZIP Code

Province

Postal Code

Country

### *Preparer's Contact Information*

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Telephone Number (if any)

**6.** Preparer's Email Address (if any)

### *Preparer's Statement*

**7. A.** ☐  I am not an attorney or accredited representative but have prepared this request on behalf of the requestor and with the requestor's consent.

**B.** ☐  I am an attorney or accredited representative and my representation of the requestor in this case

☐ extends ☐ does not extend beyond the preparation of this request.

**NOTE:**  If you are an attorney or accredited representative, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, with this request.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this request at the request of the requestor.  The requestor then reviewed this completed request and informed me that he or she understands all of the information contained in, and submitted with, his or her request, including the **Applicant's Certification**, and that all of this information is complete, true, and correct.  I completed this request based only on information that the requestor provided to me or authorized me to obtain or use.

### *Preparer's Signature*

**8.** Preparer's Signature

➡

Date of Signature (mm/dd/yyyy)

## Part 10.  Additional Information

If you need extra space to provide any additional information within this request, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this request or attach a separate sheet of paper.  Include your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers.

**1.**  Family Name (Last Name)        Given Name (First Name)        Middle Name

**2.**  A-Number (if any) ▶ **A-**

**3.**  **A.** Page Number        **B.** Part Number        **C.** Item Number

**D.**

**4.**  **A.** Page Number        **B.** Part Number        **C.** Item Number

**D.**

**5.**  **A.** Page Number        **B.** Part Number        **C.** Item Number

**D.**

**6.**  **A.** Page Number        **B.** Part Number        **C.** Item Number

**D.**



**U.S. Citizenship and Immigration Services**

# Fiscal Year 2022 Progress Report

## December 2022



MISSION STATEMENT

USCIS upholds America's promise as a nation of welcome and possibility with fairness, integrity, and respect for all we serve.

## FISCAL YEAR 2022 PROGRESS REPORT

USCIS is committed to eliminating unnecessary barriers, restoring faith in the immigration system, and improving transparency, efficiency, and the customer experience. This Fiscal Year (FY) 2022 Progress Report highlights new data illustrating both progress and challenges in fulfilling the agency's mission.

Crucial appropriations by Congress in FY 2022 supported recent progress on both backlog reduction and humanitarian services. Continued congressional support is critical to eliminate current net backlogs and achieve a robust humanitarian mission, while a new fee rule will help prevent the accumulation of additional backlogs in the future.

## CONTENTS

I. REDUCING BACKLOGS THROUGH INNOVATION ........................................................................ 3

II. ADDRESSING LABOR SHORTAGES ...................................................................................... 7

III. FULFILLING OUR HUMANITARIAN MISSION .......................................................................... 9

IV. FROM FISCAL CRISIS TO FISCAL RESPONSIBILITY .............................................................. 11

V. CONCLUSION ..................................................................................................................... 14

# I. REDUCING BACKLOGS THROUGH INNOVATION

Although there is much work ahead to deliver timely decisions to all customers, USCIS continues to apply every workforce, policy, and operational tool at its disposal to reduce backlogs and processing times. The following examples from FY 2022 demonstrate success in reducing certain backlogs, and represent innovations that will help in our continued efforts to reduce backlogs in other programs.

## Naturalizing New U.S. citizens

Thanks to the commitment and dedication of the USCIS workforce, as well as crucial appropriations from Congress, in FY 2022 the agency welcomed more than 1 million new U.S. citizens. This represents a 62 percent reduction in the net backlog of naturalization applications (Form N-400) from the end of FY 2021 to FY 2022, and the highest number of naturalized citizens in almost 15 years.

**Naturalization case trends**



*Above: In FY 2022, USCIS completed 1,075,700 naturalization applications (Form N-400) and administered the Oath of Allegiance for 967,400 new U.S. citizens. Including derivatives (Forms N-400, N-600, N-600k, N-336, and I-551), USCIS completed 1,122,300 naturalization cases and naturalized 1,023,200 new U.S. citizens.*

## Workforce: Utilizing all available employment-based immigrant visas

Together, USCIS and the Department of State issued all available employment-based immigrant visas in FY 2022 – double the pre-pandemic number. This was an all-hands-on-deck effort across the agency given that any unused visas at the end of the fiscal year would become unavailable starting on Oct. 1, 2022, the start of FY 2023. In the final quarter, USCIS worked cases 7 days a week to effectively address pending applications. This surge of overtime resources was made possible by congressional appropriations specifically directed for backlog reduction efforts.

**Total number of employment-based immigrant visas issued**



*Above: Total employment-based immigrant visa numbers approved by DHS and the State Dept., by country of origin and fiscal year. Note that the total cap in FY 2022 was over 281,000, due to unused family-sponsored visa numbers carrying over from FY 2021, and Congress allowed nearly 6,400 EB-5 visa numbers to carry over to FY 2023. FY 2019 represents a typical year in terms of the worldwide and per-country caps set by statute.*

## Policy: Restoring and extending work authorization

In FY 2022, a growing number of noncitizens with valid Employment Authorization Documents (EADs) faced a lapse in employment authorization while waiting for their renewal EAD applications to be processed. The root of this problem was reduced agency capacity during the COVID-19 pandemic, compounded by a sudden and dramatic increase in EAD filings.

USCIS implemented a temporary final rule, published in May 2022, that extended the EAD validity period for over 400,000 noncitizens and immediately restored the ability to work for tens of thousands of noncitizens whose EADs had expired through no fault of their own. This innovation continues to benefit USCIS customers as we work to eliminate backlogs for pending EAD applications.

**Total number of expired EADs held by certain asylum applicants**



*Above: Total number of expired EADs where an asylum seeker filed a renewal application (Form I-765) prior to expiration of their previous EAD. The EAD auto-extension rule was published on May 3, 2022.*

## Operations: Reducing EAD wait times

While extending EAD validity times creates a temporary solution, USCIS continues to focus its efforts on permanently eliminating the backlogs. USCIS has implemented operational improvements that increase efficiency, enhance system integrity, and reduce processing times.

For immigrant visa applicants awaiting an EAD renewal, for example, the pending caseload has returned to a normal level. This EAD renewal category is well on track to meet USCIS Director Ur M. Jaddou's ambitious backlog reduction goals for the coming year. We are pursuing similar progress in other EAD categories and our programs generally, in further support of reducing backlogs and returning to normal inventory levels.

**Total number of pending EAD renewals filed by adjustment of status applicants**



*Above: Monthly total number of pending EAD renewal applications (Form I-765) filed by applicants for adjustment of status.*

# II. ADDRESSING LABOR SHORTAGES

USCIS took several actions over the past year to address U.S. labor shortages, above and beyond the agency's commitment to reducing backlogs across the board. This included making more temporary visas available to U.S. businesses, as well as clarifying policies to ensure access and transparency for employment-based programs.

## More temporary visas for seasonal workers at U.S. businesses

Through joint rulemakings between the Department of Homeland Security (DHS) and the Department of Labor, USCIS is making available more supplemental H-2B nonagricultural worker visas than ever before, in addition to ensuring robust protections for U.S. and foreign workers alike. Furthermore, the H-2B Worker Protection Taskforce was created to focus on addressing possible threats to H-2B program integrity, H-2B workers' fundamental vulnerabilities, and the impermissible use of the program to avoid hiring U.S. workers.

**Total number of *supplemental* H-2B visas made available**



*Above: Total number of supplemental H-2B seasonal nonagricultural worker visas made available or announced by fiscal year. Note that this is in addition to the baseline of 66,000 H-2B visas that are normally available each fiscal year.*

## New clarity and services for U.S. employers and noncitizen workers

USCIS further supported U.S. employers and noncitizen workers through key developments for employment-based immigration in FY 2022. These policy developments ensured U.S. businesses and noncitizen workers could access the immigration system, while understanding program guidelines and procedures. Efforts include the following:

- Publishing a comprehensive menu of options for professionals in science, technology, engineering, and math (STEM) to work in the United States, along with detailed policy guidance for those seeking O-1 status for individuals of "extraordinary ability" or EB-2 green cards with a "national interest waiver" that allows self-petitioning by individuals of exceptional ability or holding advanced degrees.

- Authorizing spouses of E and L visa holders to work immediately, without the requirement to apply and wait for an EAD, and applying the automatic extension of employment authorization for renewal EAD applications filed by these E and L spouses as well as certain H-4 spouses.

- Implementing major reforms to the EB-5 immigrant investor program following bipartisan passage of the EB-5 Reform and Integrity Act.

- Establishing a process for healthcare and childcare workers to make an expedited request for processing of initial EAD applications that have been pending for more than 90 days, or renewal applications that would expire within 30 days or have already expired.

- Initiating the expansion of premium processing, while adhering to the congressional requirement that such services must not cause an increase in processing times for regular immigration benefit requests.

- Issuing double the typical number of employment-based immigrant visas, as discussed above.

## New commitments for FY 2023

In the coming months, USCIS is prepared to build on this progress by:

- Implementing premium processing for all employer petitions for immigrant workers (Form I-140) and certain EAD applications for students and exchange visitors (Form I-765).

- Removing the requirement to submit biometrics for applicants for change and extension of nonimmigrant status (Form I-539).

- Simplifying several major forms, including the applications for EADs (Form I-765), adjustment of status (Form I-485), and naturalization (Form N-400).

# III. FULFILLING OUR HUMANITARIAN MISSION

Over the last fiscal year, USCIS has risen to meet a growing humanitarian need by those seeking assistance or protection from oppression, violence, and other urgent circumstances. The agency remains committed to pursuing critical improvements in administering these programs in FY 2023.

- In support of vulnerable Afghans, including those who worked alongside the United States in Afghanistan for the past two decades, USCIS has completed over 92,000 EAD applications, almost 2,500 Adjustment of Status applications, over 2,700 asylum applications, over 15,000 Special Immigrant Visa (SIV) petitions, and over 7,000 family-based immigrant petitions as of mid-November 2022. USCIS interviewed over 6,250 refugee applicants from Afghanistan, completing decisions for over 2,000 applications, and adjudicated Temporary Protected Status (TPS) requests filed beginning in May, when the country became eligible.

- USCIS has confirmed the financial suitability of over 177,000 supporters for the Uniting for Ukraine (U4U) process, and over 82,000 Ukrainians and their immediate family members have been paroled into the United States under the U4U process.

- USCIS has implemented several new TPS designations, redesignations, and extensions, including for Afghanistan, Burma, Cameroon, Ethiopia, Haiti, Somalia, Sudan, Syria, Ukraine, Venezuela, and Yemen. In FY 2021 and FY 2022 combined, USCIS received 483,000 initial TPS applications — an extraordinary number of new filings, of which nearly half have been approved.

## Policy Improvements

In addition to responding to immediate humanitarian needs, USCIS improved policies within many of its humanitarian programs. The following list highlights some of the accomplishments made in the last year.

*Special Immigrant Juveniles (SIJ)*
- Made critical regulatory and policy updates, providing much-needed clarity to both adjudicators and the public and providing direct relief to approximately 55,000 SIJ classified noncitizens.

*Victims of Domestic Violence, Other Serious Crime, and Trafficking*
- Published comprehensive policy guidance on T visa and VAWA self-petition adjudications, issued law enforcement resource guides for both the T and U visas, and introduced a process by which U visa applicants can more quickly access benefits to ensure their safety and stability.

*Asylum and Refugees*
- DHS and DOJ published the Credible Fear and Asylum Processing interim final rule, which allows for the transfer of jurisdiction over some applications for asylum for individuals subject to expedited removal from EOIR to USCIS, and swift review of those protection claims.

- USCIS, with interagency partners, began refugee processing of Afghan applicants at Camp As Sayliyah in Qatar, with the aim of completing refugee processing within 30 days. DHS and DOS announced exemptions to the terrorism-related inadmissibility grounds, allowing eligible Afghans to qualify for protection and immigration benefits on a case-by-case basis where they pose no risk to national security or public safety and have undergone rigorous screening and vetting.

## Moving Forward in Fiscal Year 2023

Looking ahead, USCIS remains committed to continuing, and expanding, its robust public engagement on humanitarian immigration programs as well as exploring policy and operational measures to improve processing times for humanitarian benefits. This includes:

- Improving the asylum filing process, through launching e-filing for the Form I-589 Application for Asylum and for Withholding of Removal and transferring the paper Form I-589 filing location from USCIS Service Centers to the Lockbox to improve intake efficiency.

- Providing refugee applicant notices and case status updates through myUSCIS, as part of an effort to create efficiencies in refugee processing.

- Sharing notices and case status updates via myUSCIS for all Form I-131 humanitarian parole requests submitted to the USCIS Lockbox.

- Streamlining the adjudications, and improving processing times, of Form I-131 Advance Parole applications.

- Continuing use of the direct hiring authority in FY 2023 for officers working on protection cases.

- Adding more adjudicators and exploring policy and operational efficiencies in the VAWA/U/T portfolios to improve processing times.

- Resuming quarterly VAWA/U/T stakeholder engagements and reinvigorating regular engagements on the local level.

- Publishing several proposed and final rules in FY 2023 to further clarify eligibility requirements and promote efficient and consistent adjudications of certain humanitarian benefits.

- Publishing revised forms and more clarifying policy guidance and providing additional training support for adjudicators at applicable Service Centers on domestic violence, sexual assault, and trafficking to help improve consistency in adjudications.

- Leveraging technology solutions to increase the integrity and efficiency of TPS case processing.

# IV. FROM FISCAL CRISIS TO FISCAL RESPONSIBILITY

## Fiscal Crisis in 2020

As a predominantly (96%) fee-funded agency, USCIS keeps a cash reserve to cover the agency's expenses over the coming months. Although USCIS had long targeted $1 billion as a safe cash reserve level, due to high spending in FY 2019 that continued into FY 2020, actual cash reserves decreased to only $176 million by February 2020.

**Monthly USCIS revenue, expenses, and cash reserves in FY 2020**



*Above: Monthly USCIS revenue, expenses, and cash reserves (carryover balance) throughout FY 2020, in $ millions. The COVID-19 pandemic began in the United States in March 2020. Cash reserves subsequently increased in part due to USCIS closing out prior-year obligations.*

In April and May of 2020, receipts decreased dramatically due to the pandemic, and revenue dropped by 40 percent. Facing low cash reserves and a possible inability to make payroll, the agency initiated a hiring freeze and issued furlough notices to 70 percent of its workforce.

Fortunately, revenue began to rebound by June 2020. Furlough notices were revoked, but adjudication capacity was severely impaired by the continued hiring freeze, workforce attrition, and $500 million in budget cuts that included reducing contract worker staffing at the National Benefits Center by over 1,000 positions. These contract workers play a critical role in preparing cases for adjudication by our USCIS workforce.

# Returning to Fiscal Strength

During the first year of the Biden-Harris Administration, USCIS was able to lift the hiring freeze and began the lengthy process of recruiting and hiring back to authorized levels. USCIS has returned to firmer fiscal footing, with cash reserves well on their way to the designated target level, to ensure the agency avoids another fiscal crisis. Effective management of current reserves, combined with implementation of an upcoming new fee rule, will allow USCIS to continue the hiring surge, enhance technology investments, and seek further operational improvements to achieve greater efficiency and improve customer service throughout the agency.

**Monthly USCIS revenue, expenses, and cash reserves in FY 2022**



*Above: Monthly USCIS revenue, expenses, and cash reserves (carryover balance) throughout FY 2022, in $ millions.*

## Turning the Tide on Backlogs

The hiring freeze, which ran from May 1, 2020, through March 31, 2021, led to an immediate and steep reduction in the number of USCIS adjudicators, as employees who left the agency could not be replaced, including the 1,000 contract support staff. At the same time, COVID-19 caused USCIS to close in-person work for three months, followed by many more months of adjustments to respond to new COVID safety protocols, sending the agency scrambling for solutions to meet its mission to adjudicate millions of requests each year. As a result, the total USCIS net backlog—that is, the number of cases pending longer than agency processing time goals—doubled by December 2021.

In early 2022, USCIS stopped the growth of the backlog through an ongoing hiring surge and drive to find new efficiencies in case processing. The dedicated workforce of USCIS is turning the tide on its pending caseload, even while bolstering government-wide efforts such as Operation Allies Welcome and Uniting for Ukraine.

**USCIS pending caseload and total number of immigration officers**



*Above: USCIS' total pending caseload by month, consisting of net backlog (pending cases outside of target processing times) and recent pending (cases still within target processing times). "Number of Immigration Officers Onboard" refers to the total number of adjudicators (immigration service officers and asylum officers), excluding supervisors, employed by USCIS during a given month.*

# V. CONCLUSION

In the months ahead, USCIS plans to build on its FY 2022 progress by implementing premium processing for all petitions for immigrant workers (Form I-140) and certain employment authorization applications (Form I-765) for students and exchange visitors; establishing a permanent biometrics exemption for all applicants for change of nonimmigrant status and extension of nonimmigrant stay (Form I-539); and simplifying several common forms, including the applications for employment authorization (Form I-765), adjustment of status (Form I-485), and naturalization (Form N-400).

This progress on both backlog reduction and humanitarian services was supported by crucial appropriations by Congress in FY 2022. Going forward, USCIS will require continued congressional support to help *eliminate* its current net backlogs and meet its humanitarian mission, and plans to pursue a new fee rule to prevent the accumulation of new backlogs in the future.

USCIS will continue to expand its robust public engagement on humanitarian immigration programs as well as explore policy and operational measures to improve processing times for humanitarian benefits.

While we've made progress in FY 2022, we recognize there is more to do to eliminate unnecessary barriers, restore faith in the immigration system, and improve transparency, efficiency, and the customer experience. We remain committed to these goals and anticipate more progress, as outlined, in the coming year.

Para tener acceso a este sitio en Español, presione aquí (./historic-pt-es)

# Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year

## Fiscal Year 2019 to 2024 (up to June 30, 2024)

Next Page (./historic-pt-2) **Median Processing Times (in Months)**

The number of months shown is the median. It represents the time it took to complete half of the cases in a given time period.

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|------------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance, replacement or renewal | 7.8 | 8.3 | 5.2 | 1.2 | 9.1 | 1.1 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3.3 | 3.9 | 4.0 | 7.8 | 5.2 | 3.6 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (Premium filed) | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (non Premium filed) | 4.7 | 2.3 | 1.8 | 2.3 | 2.5 | 2.1 |
| I-129F | Petition for Alien Fiancé(e) | All Classifications | 5.2 | 4.6 | 8.0 | 12.1 | 13.9 | 8.8 |
| I-130 | Petition for Alien Relative | Adoptions | 17.1 | 22.3 | 27.7 | 35.4 | 49.2 | 34.3 |
| I-130 | Petition for Alien Relative | Immediate Relative | 8.6 | 8.3 | 10.2 | 10.3 | 11.8 | 11.4 |
| I-131 | Application for Travel Document | Advance Parole Document | 4.5 | 4.6 | 7.7 | 7.3 | 5.8 | 5.9 |
| I-131 | Application for Travel Document | Parole in Place | 3.3 | 4.8 | 4.9 | 4.7 | 5.4 | 4.1 |
| I-131 | Application for Travel Document | Travel Document | 2.8 | 4.0 | 7.2 | 10.6 | 15.9 | 14.5 |

004244

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|---|---|---|---|---|---|---|---|---|
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (Premium filed) | 0.3 | 0.3 | 0.4 | 0.3 | 0.3 | 0.3 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (non Premium filed) | 5.8 | 4.9 | 8.2 | 9.3 | 4.3 | 6.8 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Immigrant Petition (All Classifications) | 16.8 | 11.4 | 5.5 | 8.4 | 6.8 | 3.2 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | 6.7 | 6.9 | 12.9 | 22.6 | 22.9 | 13.6 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on refugee admission more than 1 year ago | 9.4 | 9.3 | 7.1 | 14.1 | 21.6 | 13.6 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 10.0 | 8.8 | 9.9 | 11.0 | 8.6 | 6.4 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Family-based adjustment applications | 10.9 | 9.3 | 12.9 | 10.6 | 11.4 | 9.4 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on Cuban Adjustment Act of 1966 (CAA) | 11.3 | 7.1 | 8.5 | 5.5 | 3.3 | 4.3 |
| I-485[1] | Application to Register Permanent Residence or to Adjust Status | All Other Adjustment of Status | 24.0 | 32.7 | 8.7 | 5.4 | 7.0 | 10.1 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an investor who wishes to immigrate to the United States | 19.0 | 31.1 | 32.5 | 44.2 | 50.0 | 53.3 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All Extend/Change Applications | 4.4 | 4.8 | 9.6 | 6.8 | 5.8 | 2.7 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | U.S. citizen filing to adopt an orphan | 1.2 | 3.2 | 5.3 | 6.3 | 5.8 | 7.1 |
| I-600A | Application for Advance Processing of Orphan Petition | U.S. citizen who plans to adopt a foreign-born child | 2.0 | 2.8 | 3.5 | 3.0 | 3.0 | 3.1 |

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|-----------|
| I-601A | Application for Provisional Unlawful Presence Waiver | Provisional Waiver of INA 212(a)(9)(B) | 8.7 | 11.2 | 17.1 | 31.7 | 43.0 | 41.6 |
| I-730[5] | Asylee Relative Petition | Petition for accompanying family members of an asylee | 12.9 | 15.3 | 18.9 | 27.3 | 8.9 | 6.5 |
| I-751 | Petition to Remove the Conditions on Residence | Removal of conditions on lawful permanent resident status (spouses and children of U.S. citizens and lawful permanent residents) | 14.9 | 13.8 | 13.6 | 18.2 | 20.8 | 25.1 |
| I-765 | Application for Employment Authorization | All other applications for employment authorization | 3.3 | 2.4 | 3.0 | 4.7 | 3.2 | 2.8 |
| I-765 | Application for Employment Authorization | Based on an approved, concurrently filed, I-821D, Consideration of Deferred Action for Childhood Arrivals (c)(33). | 1.1 | 1.1 | 1.9 | 0.5 | 1.0 | 1.8 |
| I-765 | Application for Employment Authorization | Based on a pending asylum application | 2.0 | 2.5 | 3.2 | 9.2 | 1.6 | 0.5 |
| I-765 | Application for Employment Authorization | Based on a pending I-485 adjustment application | 5.1 | 4.8 | 7.1 | 6.7 | 5.5 | 3.7 |
| I-765 | Application for Employment Authorization | Based on parole | 6.1 | 4.7 | 0.6 | 1.1 | 1.3 | 0.8 |
| I-800 | Petition to Classify Convention Adoptee as an Immediate Relative | Petition to classify Convention Adoptee as an Immediate Relative | 0.6 | 0.7 | 0.9 | 0.9 | 1.0 | 1.1 |

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|-----------|
| **I-800A** | Application for Determination of Suitability to Adopt a Child from a Convention Country | Application for Determination of Suitability to Adopt a Child from a Convention Country | 1.6 | 1.9 | 2.5 | 2.3 | 2.1 | 2.8 |
| **I-817** | Application for Family Unity Benefits | Voluntary departure under the family unity program and LIFE Act family unity | 9.5 | 5.3 | 5.9 | 7.1 | 8.5 | 7.2 |
| **I-821** | Application for Temporary Protected Status | To request or reregister for TPS | 6.4 | 2.2 | 4.1 | 10.2 | 11.8 | 6.0 |
| **I-821D** | Consideration of Deferred Action for Childhood Arrivals | Request for Initial Deferred Action | 8.9 | 5.5 | 5.9 | N/A | N/A | N/A |
| **I-821D** | Consideration of Deferred Action for Childhood Arrivals | Request for Renewal of Deferred Action | 1.1 | 1.1 | 1.8 | 0.5 | 1.0 | 1.8 |
| **I-824** | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 7.1 | 6.0 | 4.4 | 6.0 | 3.6 | 8.5 |
| **I-829** | Petition by Investor to Remove Conditions on Permanent Resident Status | Removal of conditions on lawful permanent resident status (immigrant investors) | 25.9 | 24.8 | 34.5 | 45.5 | 49.4 | 41.5 |
| **I-914[2]** | Application for T Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of trafficking in persons, and immediate family | 16.2 | 18.6 | 18.0 | 12.9 | 12.3 | 13.8 |
| **I-918[3]** | Petition for U Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of qualifying criminal activity, and their qualifying family | 48.7 | 54.3 | 53.6 | 59.0 | 57.5 | 49.2 |

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|---|---|---|---|---|---|---|---|---|
| I-924 | Application For Regional Center Designation Under the Immigrant Investor Program | I-924 - Application For Regional Center Designation Under the Immigrant Investor Program | 18.8 | 19.1 | 22.1 | N/A | N/A | N/A |
| N-400 | Application for Naturalization | Application for Naturalization | 10.0 | 9.1 | 11.5 | 10.5 | 6.1 | 4.9 |
| N-565 | Application for Replacement Naturalization/Citizenship Document | U.S. citizen applying for a replacement of naturalization or citizenship certificate | 2.4 | 3.6 | 6.7 | 10.8 | 8.1 | 5.3 |
| N-600 | Application for Certificate of Citizenship | Application for recognition of U.S. citizenship | 7.1 | 5.1 | 5.8 | 6.3 | 6.9 | 4.4 |
| N-600K | Application for Certificate of Citizenship and Issuance of Certificate Under Section 322 | Application for Citizenship and Issuance of Certificate | 6.4 | 5.7 | 9.6 | 6.1 | 7.0 | 6.2 |
| Waivers[4] | Waivers | Excluding I-601A | 10.3 | 7.3 | 7.6 | 8.0 | 11.6 | 19.7 |

Next Page (./historic-pt-2)

Table Key:

N/A Not available.

References:

[1] Excludes EOIR Adjustment applications.

[2] Includes I-914A, Application for Family Member of T-1 Recipient.

[3] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient.

[4] Includes the following applications filed to waive exclusionary grounds: Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[5] Excludes petitions for accompanying family members of a refugee.

[6] FY2024 uses data from October 1, 2023 to June 30, 2024.

Note(s):

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Processing times may differ from previously published reports due to system updates and post-adjudicative outcomes.

3) Discrepancies from past historical processing time reports may exist due to differences in reporting procedures.

4) Some of the forms have been aggregated.

5) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. Visa regressed I-485s and revoked petitions or applications are excluded. Additional information on visa retrogression can be found on our website (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).

6) Historical processing times are not comparable to the processing times posted on the USCIS processing times webpage (https://egov.uscis.gov/processing-times/) for certain form types due to different methodologies (for example, cycle time methodology versus processing time methodology). For more information, visit the Case Processing Times webpage (https://egov.uscis.gov/processing-times/more-info).

7) From FY2017 through FY2021, the processing time for the I-918/I-918A is calculated using the receipt date to waitlist determination date. Beginning in FY 2022, the processing time is calculated using the receipt date to Bona Fide Determination (BFD) review.

8) Consistent with the July 16, 2021 order (https://www.uscis.gov/DACADecisionStateofTexas) from the Southern District of Texas that prohibits DHS from granting initial DACA requests, USCIS has suspended calculations of processing times for initial DACA requests. The 5.9 months historical processing time listed for initial DACA requests was current as of June 30, 2021.

9) Statutory authorization related to the EB-5 Immigrant Investor Regional Center Program expired at midnight on June 30, 2021. For information regarding Form I-526 petition processing, and the impact of the lapse in statutory authorization related to the EB-5 Immigrant Investor Regional Center Program, please see: https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program).

10) The federal fiscal year is from October 1st through September 30th.

11) Beginning in FY2024 the following I-765 classifications: based on a pending I-485 adjustment application, based on parole, and based on asylum applications were retroactively added for FY 2013 through FY 2023.

**Source(s):**

1) Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Electronic Immigration System (ELIS), C3 Consolidated, C4 Consolidated, INFACT, queried June 2024.

## ⬀ Other case processing times resources

Reducing Processing Backlogs (./reducing-processing-backlogs)

Frequently Asked Questions About Processing Times (./processing-times-faqs)

004249

When to expect to receive your Green Card (./expect-green-card)

Check current processing times (./home)

Processing information for the I-765 (./i765)

Affirmative Asylum Interview Scheduling
(http://www.uscis.gov/humanitarian/refugees-
asylum/asylum/affirmative-asylum-scheduling-bulletin)

Administrative Appeals Office (https://www.uscis.gov/about-
us/directorates-and-program-offices/administrative-appeals-office-
aao/aao-processing-times)

Parole Processing (https://www.uscis.gov/humanitarian/humanitarian-
parole/parole-processing)

 Case management tools

Inquire about a case outside normal processing time
(https://egov.uscis.gov/e-request/displayONPTForm.do?
entryPoint=init&sroPageType=onpt)

Check your case status (https://egov.uscis.gov/casestatus/landing.do)

Update your mailing address (https://egov.uscis.gov/coa/)

Ask about missing mail (https://egov.uscis.gov/e-Request/Intro.do)

Correct a typographical error (https://egov.uscis.gov/e-
request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)

Request appointment accommodations (https://egov.uscis.gov/e-
request/displayAccomForm.do?
entryPoint=init&sroPageType=accommodations)

## Feedback

**Let us know what you think about our redesigned Processing Times webpage at
ProcessingTimesFeedback@uscis.dhs.gov
(mailto:ProcessingTimesFeedback@uscis.dhs.gov)        (Please do not submit
case-specific inquiries).**

Return to top

**Topics
(https://www.uscis.gov/topics)**

**Forms
(https://www.uscis.gov/forms)**

**Newsroom
(https://www.uscis.gov/newsro**

**Citizenship
(https://www.uscis.gov/citizenship)**

**Green Card
(https://www.uscis.gov/green-
card)**

**Laws
(https://www.uscis.gov/laws-
and-policy)**

**Tools
(https://www.uscis.gov/tools)**

(https://www.facebook.com/uscis) (https://twitter.com/uscis) (https://www.youtube.com/uscis) (https://www.instagram.com/uscis)

## Contact USCIS
## (https://www.uscis.gov/about-
## us/contact-us)

(https://www.dhs.gov)

USCIS.gov
**An official website of the U.S. Department of
Homeland Security (https://www.dhs.gov)**

**National
Terrorism
Advisory
System**

About USCIS
(https://www.uscis.gov/about-us)

Accessibility
(https://www.uscis.gov/website-
policies/accessibility)

Budget and Performance
(https://www.uscis.gov/about-
us/budget-planning-and-performance)

DHS Components
(https://www.uscis.gov/website-
policies/dhs-component-websites)

Freedom of Information Act
(https://www.uscis.gov/records/request-
records-through-the-freedom-of-
information-act-or-privacy-act)

No FEAR Act Data
(https://www.uscis.gov/about-us/equal-
employment-opportunity/equal-
employment-opportunity-data-posted-
pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers
(https://www.uscis.gov/website-
policies/privacy-and-legal-disclaimers)

Site Map
(https://www.uscis.gov/sitemap)

Office of the Inspector General
(https://www.oig.dhs.gov/)

The White House
(https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

004251

Para tener acceso a este sitio en Español, presione aquí (./historic-pt-es)

# Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year

## Fiscal Year 2019 to 2024 (up to June 30, 2024)

Next Page (./historic-pt-2)  ## Median Processing Times (in Months)

The number of months shown is the median. It represents the time it took to complete half of the cases in a given time period.

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|------------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| I-90 | Application to Replace Permanent Resident Card | Initial issuance, replacement or renewal | 7.8 | 8.3 | 5.2 | 1.2 | 9.1 | 1.1 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arrival/Departure Record | Initial issuance or replacement of a Form I-94 | 3.3 | 3.9 | 4.0 | 7.8 | 5.2 | 3.6 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (Premium filed) | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 |
| I-129 | Petition for a Nonimmigrant Worker | Nonimmigrant Petition (non Premium filed) | 4.7 | 2.3 | 1.8 | 2.3 | 2.5 | 2.1 |
| I-129F | Petition for Alien Fiancé(e) | All Classifications | 5.2 | 4.6 | 8.0 | 12.1 | 13.9 | 8.8 |
| I-130 | Petition for Alien Relative | Adoptions | 17.1 | 22.3 | 27.7 | 35.4 | 49.2 | 34.3 |
| I-130 | Petition for Alien Relative | Immediate Relative | 8.6 | 8.3 | 10.2 | 10.3 | 11.8 | 11.4 |
| I-131 | Application for Travel Document | Advance Parole Document | 4.5 | 4.6 | 7.7 | 7.3 | 5.8 | 5.9 |
| I-131 | Application for Travel Document | Parole in Place | 3.3 | 4.8 | 4.9 | 4.7 | 5.4 | 4.1 |
| I-131 | Application for Travel Document | Travel Document | 2.8 | 4.0 | 7.2 | 10.6 | 15.9 | 14.5 |

004252

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (Premium filed) | 0.3 | 0.3 | 0.4 | 0.3 | 0.3 | 0.3 |
| I-140 | Immigrant Petition for Alien Workers | Immigrant Petition (non Premium filed) | 5.8 | 4.9 | 8.2 | 9.3 | 4.3 | 6.8 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Immigrant Petition (All Classifications) | 16.8 | 11.4 | 5.5 | 8.4 | 6.8 | 3.2 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on grant of asylum more than 1 year ago | 6.7 | 6.9 | 12.9 | 22.6 | 22.9 | 13.6 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on refugee admission more than 1 year ago | 9.4 | 9.3 | 7.1 | 14.1 | 21.6 | 13.6 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Employment-based adjustment applications | 10.0 | 8.8 | 9.9 | 11.0 | 8.6 | 6.4 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Family-based adjustment applications | 10.9 | 9.3 | 12.9 | 10.6 | 11.4 | 9.4 |
| I-485 | Application to Register Permanent Residence or to Adjust Status | Based on Cuban Adjustment Act of 1966 (CAA) | 11.3 | 7.1 | 8.5 | 5.5 | 3.3 | 4.3 |
| I-485[1] | Application to Register Permanent Residence or to Adjust Status | All Other Adjustment of Status | 24.0 | 32.7 | 8.7 | 5.4 | 7.0 | 10.1 |
| I-526 | Immigrant Petition By Alien Entrepreneur | For use by an investor who wishes to immigrate to the United States | 19.0 | 31.1 | 32.5 | 44.2 | 50.0 | 53.3 |
| I-539 | Application to Extend/Change Nonimmigrant Status | All Extend/Change Applications | 4.4 | 4.8 | 9.6 | 6.8 | 5.8 | 2.7 |
| I-600 | Petition to Classify Orphan as an Immediate Relative | U.S. citizen filing to adopt an orphan | 1.2 | 3.2 | 5.3 | 6.3 | 5.8 | 7.1 |
| I-600A | Application for Advance Processing of Orphan Petition | U.S. citizen who plans to adopt a foreign-born child | 2.0 | 2.8 | 3.5 | 3.0 | 3.0 | 3.1 |

004253

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|-----------|
| **I-601A** | Application for Provisional Unlawful Presence Waiver | Provisional Waiver of INA 212(a)(9)(B) | 8.7 | 11.2 | 17.1 | 31.7 | 43.0 | 41.6 |
| **I-730[5]** | Asylee Relative Petition | Petition for accompanying family members of an asylee | 12.9 | 15.3 | 18.9 | 27.3 | 8.9 | 6.5 |
| **I-751** | Petition to Remove the Conditions on Residence | Removal of conditions on lawful permanent resident status (spouses and children of U.S. citizens and lawful permanent residents) | 14.9 | 13.8 | 13.6 | 18.2 | 20.8 | 25.1 |
| **I-765** | Application for Employment Authorization | All other applications for employment authorization | 3.3 | 2.4 | 3.0 | 4.7 | 3.2 | 2.8 |
| **I-765** | Application for Employment Authorization | Based on an approved, concurrently filed, I-821D, Consideration of Deferred Action for Childhood Arrivals (c)(33). | 1.1 | 1.1 | 1.9 | 0.5 | 1.0 | 1.8 |
| **I-765** | Application for Employment Authorization | Based on a pending asylum application | 2.0 | 2.5 | 3.2 | 9.2 | 1.6 | 0.5 |
| **I-765** | Application for Employment Authorization | Based on a pending I-485 adjustment application | 5.1 | 4.8 | 7.1 | 6.7 | 5.5 | 3.7 |
| **I-765** | Application for Employment Authorization | Based on parole | 6.1 | 4.7 | 0.6 | 1.1 | 1.3 | 0.8 |
| **I-800** | Petition to Classify Convention Adoptee as an Immediate Relative | Petition to classify Convention Adoptee as an Immediate Relative | 0.6 | 0.7 | 0.9 | 0.9 | 1.0 | 1.1 |

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|-----------|
| I-800A | Application for Determination of Suitability to Adopt a Child from a Convention Country | Application for Determination of Suitability to Adopt a Child from a Convention Country | 1.6 | 1.9 | 2.5 | 2.3 | 2.1 | 2.8 |
| I-817 | Application for Family Unity Benefits | Voluntary departure under the family unity program and LIFE Act family unity | 9.5 | 5.3 | 5.9 | 7.1 | 8.5 | 7.2 |
| I-821 | Application for Temporary Protected Status | To request or reregister for TPS | 6.4 | 2.2 | 4.1 | 10.2 | 11.8 | 6.0 |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Initial Deferred Action | 8.9 | 5.5 | 5.9 | N/A | N/A | N/A |
| I-821D | Consideration of Deferred Action for Childhood Arrivals | Request for Renewal of Deferred Action | 1.1 | 1.1 | 1.8 | 0.5 | 1.0 | 1.8 |
| I-824 | Application for Action on an Approved Application or Petition | To request further action on an approved application or petition | 7.1 | 6.0 | 4.4 | 6.0 | 3.6 | 8.5 |
| I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Removal of conditions on lawful permanent resident status (immigrant investors) | 25.9 | 24.8 | 34.5 | 45.5 | 49.4 | 41.5 |
| I-914[2] | Application for T Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of trafficking in persons, and immediate family | 16.2 | 18.6 | 18.0 | 12.9 | 12.3 | 13.8 |
| I-918[3] | Petition for U Non-immigrant Status | Provide temporary immigration benefits to an alien who is a victim of qualifying criminal activity, and their qualifying family | 48.7 | 54.3 | 53.6 | 59.0 | 57.5 | 49.2 |

004255

| Form | Form Description | Classification or Basis for Filing | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024[6] |
|------|-----------------|-----------------------------------|---------|---------|---------|---------|---------|---------|
| **I-924** | Application For Regional Center Designation Under the Immigrant Investor Program | I-924 - Application For Regional Center Designation Under the Immigrant Investor Program | 18.8 | 19.1 | 22.1 | N/A | N/A | N/A |
| **N-400** | Application for Naturalization | Application for Naturalization | 10.0 | 9.1 | 11.5 | 10.5 | 6.1 | 4.9 |
| **N-565** | Application for Replacement Naturalization/Citizenship Document | U.S. citizen applying for a replacement of naturalization or citizenship certificate | 2.4 | 3.6 | 6.7 | 10.8 | 8.1 | 5.3 |
| **N-600** | Application for Certificate of Citizenship | Application for recognition of U.S. citizenship | 7.1 | 5.1 | 5.8 | 6.3 | 6.9 | 4.4 |
| **N-600K** | Application for Certificate of Citizenship and Issuance of Certificate Under Section 322 | Application for Citizenship and Issuance of Certificate | 6.4 | 5.7 | 9.6 | 6.1 | 7.0 | 6.2 |
| **Waivers[4]** | Waivers | Excluding I-601A | 10.3 | 7.3 | 7.6 | 8.0 | 11.6 | 19.7 |

Next Page (./historic-pt-2)

Table Key:

N/A Not available.

References:

[1] Excludes EOIR Adjustment applications.

[2] Includes I-914A, Application for Family Member of T-1 Recipient.

[3] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient.

[4] Includes the following applications filed to waive exclusionary grounds: Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[5] Excludes petitions for accompanying family members of a refugee.

[6] FY2024 uses data from October 1, 2023 to June 30, 2024.

Note(s):

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Processing times may differ from previously published reports due to system updates and post-adjudicative outcomes.

004256

3) Discrepancies from past historical processing time reports may exist due to differences in reporting procedures.

4) Some of the forms have been aggregated.

5) Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. Visa regressed I-485s and revoked petitions or applications are excluded. Additional information on visa retrogression can be found on our website (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression) (https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression).

6) Historical processing times are not comparable to the processing times posted on the USCIS processing times webpage (https://egov.uscis.gov/processing-times/) for certain form types due to different methodologies (for example, cycle time methodology versus processing time methodology). For more information, visit the Case Processing Times webpage (https://egov.uscis.gov/processing-times/more-info).

7) From FY2017 through FY2021, the processing time for the I-918/I-918A is calculated using the receipt date to waitlist determination date. Beginning in FY 2022, the processing time is calculated using the receipt date to Bona Fide Determination (BFD) review.

8) Consistent with the July 16, 2021 order (https://www.uscis.gov/DACADecisionStateofTexas) from the Southern District of Texas that prohibits DHS from granting initial DACA requests, USCIS has suspended calculations of processing times for initial DACA requests. The 5.9 months historical processing time listed for initial DACA requests was current as of June 30, 2021.

9) Statutory authorization related to the EB-5 Immigrant Investor Regional Center Program expired at midnight on June 30, 2021. For information regarding Form I-526 petition processing, and the impact of the lapse in statutory authorization related to the EB-5 Immigrant Investor Regional Center Program, please see: https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program).

10) The federal fiscal year is from October 1st through September 30th.

11) Beginning in FY2024 the following I-765 classifications: based on a pending I-485 adjustment application, based on parole, and based on asylum applications were retroactively added for FY 2013 through FY 2023.

Source(s):

1) Department of Homeland Security, U.S. Citizenship and Immigration Services, USCIS Electronic Immigration System (ELIS), C3 Consolidated, C4 Consolidated, INFACT, queried June 2024.

⬈  Other case processing times resources

Reducing Processing Backlogs (./reducing-processing-backlogs)

Frequently Asked Questions About Processing Times (./processing-times-faqs)

004257

When to expect to receive your Green Card (./expect-green-card)

Check current processing times (./home)

Processing information for the I-765 (./i765)

Affirmative Asylum Interview Scheduling
(http://www.uscis.gov/humanitarian/refugees-
asylum/asylum/affirmative-asylum-scheduling-bulletin)

Administrative Appeals Office (https://www.uscis.gov/about-
us/directorates-and-program-offices/administrative-appeals-office-
aao/aao-processing-times)

Parole Processing (https://www.uscis.gov/humanitarian/humanitarian-
parole/parole-processing)

 ## Case management tools

Inquire about a case outside normal processing time
(https://egov.uscis.gov/e-request/displayONPTForm.do?
entryPoint=init&sroPageType=onpt)

Check your case status (https://egov.uscis.gov/casestatus/landing.do)

Update your mailing address (https://egov.uscis.gov/coa/)

Ask about missing mail (https://egov.uscis.gov/e-Request/Intro.do)

Correct a typographical error (https://egov.uscis.gov/e-
request/displayTypoForm.do?entryPoint=init&sroPageType=typoError)

Request appointment accommodations (https://egov.uscis.gov/e-
request/displayAccomForm.do?
entryPoint=init&sroPageType=accommodations)

### Feedback

**Let us know what you think about our redesigned Processing Times webpage at
ProcessingTimesFeedback@uscis.dhs.gov
(mailto:ProcessingTimesFeedback@uscis.dhs.gov)        (Please do not submit
case-specific inquiries).**

Return to top

**Topics
(https://www.uscis.gov/topics)**

**Forms
(https://www.uscis.gov/forms)**

**Newsroom
(https://www.uscis.gov/newsro**

**Citizenship
(https://www.uscis.gov/citizenship)**

**Green Card
(https://www.uscis.gov/green-
card)**

**Laws
(https://www.uscis.gov/laws-
and-policy)**

**Tools
(https://www.uscis.gov/tools)**

(https://www.facebook.com/uscis)(https://twitter.com/uscis)(https://www.instagram.com/uscis)(https://www.youtube.com/uscis)(https://www.linkedin.com/company/uscis)

## Contact USCIS
## (https://www.uscis.gov/about-
## us/contact-us)

(https://www.dhs.gov)   USCIS.gov

**An official website of the U.S. Department of
Homeland Security (https://www.dhs.gov)**

About USCIS
(https://www.uscis.gov/about-us)

Accessibility
(https://www.uscis.gov/website-
policies/accessibility)

Budget and Performance
(https://www.uscis.gov/about-
us/budget-planning-and-performance)

DHS Components
(https://www.uscis.gov/website-
policies/dhs-component-websites)

Freedom of Information Act
(https://www.uscis.gov/records/request-
records-through-the-freedom-of-
information-act-or-privacy-act)

No FEAR Act Data
(https://www.uscis.gov/about-u
employment-opportunity/equa.
employment-opportunity-data-posted-
pursuant-to-the-no-fear-act)

Privacy and Legal Disclaimers
(https://www.uscis.gov/website-
policies/privacy-and-legal-disclaimers)

Site Map
(https://www.uscis.gov/sitemap)

Office of the Inspector General
(https://www.oig.dhs.gov/)

The White House
(https://www.whitehouse.gov/)

USA.gov (https://www.usa.gov/)

004259

# Instructions for Form I-130, Petition for Alien Relative, and Form I-130A, Supplemental Information for Spouse Beneficiary



**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-130/I-130A**
OMB No. 1615-0012
Expires 02/28/2027

---

## What Is the Purpose of Form I-130?

A citizen or lawful permanent resident of the United States may file Form I-130, Petition for Alien Relative, with U.S. Citizenship and Immigration Services (USCIS) to establish the existence of a relationship to certain alien relatives who wish to immigrate to the United States.

---

## Who May File Form I-130?

1.  If you are a U.S. citizen, you must file a separate Form I-130 for each eligible relative.  You may file Form I-130 for:

    **A.**  Your spouse;

    **B.**  Your unmarried children under 21 years of age;

    **C.**  Your unmarried sons or daughters 21 years of age or older;

    **D.**  Your married sons or daughters of any age;

    **E.**  Your brothers or sisters (you must be 21 years of age or older); and

    **F.**  Your mother or father (you must be 21 years of age or older).

2.  If you are a lawful permanent resident of the United States, you must file a separate Form I-130 for each eligible relative.  You may file Form I-130 for:

    **A.**  Your spouse;

    **B.**  Your unmarried child under 21 years of age; and

    **C.**  Your unmarried son or daughter 21 years of age or older.

**NOTE:**

1.  If you are filing for your spouse, he or she must complete and sign Form I-130A, Supplemental Information for Spouse Beneficiary.  If your spouse is overseas, Form I-130A must still be completed, but your spouse does not have to sign Form I-130A.  Form I-130A must be submitted with Form I-130.

2.  There is no visa category for married children of lawful permanent residents.  If you are a lawful permanent resident and you filed Form I-130 for your unmarried son or daughter, but your son or daughter marries before immigrating to the United States or adjusting status to lawful permanent resident, we will deny or automatically revoke your petition.

3.  Non-citizen U.S. nationals (as defined in the Immigration and Nationality Act (INA) section 308) have the same rights as lawful permanent residents to petition for family members.  If you are a U.S. national born in American Samoa or Swains Island (or who otherwise qualifies as a non-citizen U.S. national, as described in INA section 308), you should indicate in **Part 2.**, **Item Number 36.** of the petition that you are a lawful permanent resident.  You do not need to list an Alien Registration Number (A-Number) in **Part 2.**, **Item Number 1.** of the petition.

4.  If the beneficiary qualifies under **Items 1.C.**, **1.D.**, or **1.E.** above, you are not required to file separate petitions for the beneficiary's spouse or unmarried children under 21 years of age.  They are considered derivative beneficiaries and you should list them in **Part 4.** of this petition.

---

**5.** If you are the lawful permanent resident petitioner and the beneficiary qualifies under **Items 2.A.**, **2.B.**, or **2.C.** above, you are not required to file separate petitions for the beneficiary's unmarried children under 21 years of age.  They are considered derivative beneficiaries and you should list them in **Part 4.** of this petition.

**6.** The derivative beneficiaries described in **Items 4.** and **5.** above may apply for an immigrant visa along with the beneficiary.

## Who May Not File Form I-130?

You may **NOT** file Form I-130 for a person in the following categories:

**1.** An adoptive parent or adopted child, if the adoption took place after the child turned 16 years of age, or if the child has not been in the legal custody and has not lived with the parents for at least 2 years before filing the petition;

**2.** A natural parent, if you gained lawful permanent resident status or U.S. citizenship through adoption or as a special immigrant juvenile;

**3.** A stepparent or stepchild, if the marriage that created the relationship took place after the child turned 18 years of age;

**4.** A spouse, if you and your spouse were not both physically present at the marriage ceremony, unless the marriage was consummated;

**5.** A spouse, if you gained lawful permanent resident status through a prior marriage to a U.S. citizen or lawful permanent resident, unless:

**A.** You are now a naturalized U.S. citizen;

**B.** You have been a lawful permanent resident for at least five years;

**C.** You can establish by clear and convincing evidence that you did not enter the prior marriage (through which you gained your lawful permanent resident status) in order to evade any U.S. immigration law; or

**D.** Your prior marriage through which you gained your immigrant status was terminated by the death of your former spouse;

**6.** A spouse, if you married your spouse while he or she was the subject of an exclusion, deportation, removal, or rescission proceeding regarding his or her right to be admitted into or to remain in the United States, or while a decision in any of these proceedings was before any court on judicial review.  However, you may be eligible for the bona fide marriage exemption under INA section 245(e)(3) if:

**A.** You request in writing a bona fide marriage exemption and prove by clear and convincing evidence that the marriage is legally valid where it took place and that you and your spouse married in good faith and not for the purpose of obtaining lawful permanent resident status for your spouse and that no fee or any other consideration (other than appropriate attorney fees) was given to you for your filing of this petition.  The request must be submitted with Form I-130; or

**B.** Your spouse has lived outside the United States, after the marriage, for a period of at least two years;

**7.** Any person, if USCIS determines that he or she entered into or attempted or conspired to enter into a marriage in order to evade U.S. immigration laws; and

**8.** A grandparent, grandchild, nephew, niece, uncle, aunt, cousin, or parent-in-law.

004261

## General Instructions

We provide free forms through the USCIS website.  To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Signature.**  You (or your signing authority) must properly complete your petition.  USCIS will not accept a stamped or typewritten name in place of any signature on this petition.  If you are under 14 years of age, your parent or legal guardian may sign the petition on your behalf.  A legal guardian may also sign for a mentally incompetent person.  If your petition is not signed, or if the signature is not valid, we will reject your petition.  See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.**  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

**Evidence.**  When you file your petition, you must submit all evidence and supporting documents listed in the **General Requirements** section of these Instructions.

**Biometric Services Appointment.**  USCIS may require you to appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  If we determine that a biometric services appointment is necessary, we will send you an appointment notice with the date, time, and location of your appointment.  If you are currently overseas, your notice will instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to schedule an appointment.

At your biometrics appointment, you must sign an oath reaffirming that:

1.  You provided or authorized all information in the petition;

2.  You reviewed and understood all of the information contained in, and submitted with, your petition; and

3.  All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your petition.

**Copies.**  You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document.  USCIS may request an original document at any time during our process.  If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:**  If you submit original documents when they are not required or requested, **USCIS may destroy them after we receive them.**

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification must also include their signature, printed name, the translation date, and their contact information.

**USCIS Contact Center.**  For additional information on the petition and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call at **800-375-5283** (TTY **800-767-1833**).  The USCIS Contact Center provides information in English and Spanish.

004262

**Disability Accommodations/Modifications.**  To request a disability accommodation/modification, follow the instructions on your appointment notice or at **www.uscis.gov/accommodationsinfo**.

**How To Complete Form I-130**

1. Type or print legibly in black ink.

2. If you need extra space to complete any item within this petition, use the space provided in **Part 9. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks, "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4. Enter dates in mm/dd/yyyy format.  If you cannot provide an exact date, provide an approximate date in the same format and include an explanation in **Part 9. Additional Information.**

5. **USCIS Online Account Number.**  You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE.  If you filed the form online, you can find your OAN in your account profile.  If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you.  If you do not have a receipt number that begins with IOE, you do not have an OAN.  If you were issued a USCIS Online Account Number, enter it in the space provided at **Part 2., Item Number 2.**  The OAN is not the same as an A-Number.

6. **Part 3. Biographic Information.**  Provide the biographic information requested in **Part 3., Item Numbers 1. - 6.**  Providing this information as part of your petition may reduce the time you spend at your USCIS ASC appointment as described in the **Biometric Services Appointment** section of these Instructions.

   A. **Ethnicity and Race.**  Select the boxes that best describe your ethnicity and race.

      **Categories and Definitions for Ethnicity and Race**

      (1) **Hispanic or Latino.**  A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.  (**NOTE:** This category is only included under Ethnicity in **Part 3., Item Number 1.**)

      (2) **American Indian or Alaska Native.**  A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

      (3) **Asian.**  A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

      (4) **Black or African American.**  A person having origins in any of the black racial groups of Africa.

      (5) **Native Hawaiian or Other Pacific Islander.**  A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

      (6) **White.**  A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

   B. **Height.**  Select the values that best match your height in feet and inches.  For example, if you are five feet and nine inches, select "5" for feet and "09" for inches.  Do not enter your height in meters or centimeters.

   C. **Weight.**  Enter your weight in pounds.  If you do not know your weight, or need to enter a weight under 30 pounds or over 699 pounds, enter "000."  Do not enter your weight in kilograms.

004263

   **D.  Eye Color.**  Select the box that best describes the color of your eyes.

   **E.  Hair Color.**  Select the box that best describes the color of your hair.

**7.  Form I-94 Arrival/Departure Record.**  Complete **Part 4., Item Numbers 46.b. - 50.**, of the petition regarding the admission or travel document for the beneficiary.

   If U.S. Customs and Border Protection (CBP) or USCIS issued the beneficiary a Form I-94, Arrival/Departure Record, provide the beneficiary's Form I-94 number and date that his or her authorized period of stay expires or expired (as shown on Form I-94).  The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

   **NOTE:**  If CBP admitted the beneficiary into the United States at an airport or seaport after April 30, 2013, he or she may have been issued an electronic Form I-94 instead of a paper Form I-94.  The beneficiary may visit the CBP website at **www.cbp.gov/i94** to obtain a paper version of his or her electronic Form I-94.  CBP **does not** charge a fee for this service.  Some travelers may also be able to obtain a replacement Form I-94 from the CBP website for free if they were admitted to the United States at a land border, airport, or seaport after April 30, 2013, with a passport or travel document and received a paper Form I-94 from CBP.  If the beneficiary cannot obtain his or her Form I-94 from the CBP website, he or she may obtain it by filing Form I-102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Record, with USCIS.  USCIS does charge a fee for Form I-102.  See Form G-1055, available at **www.uscis.gov/forms**, for specific information about the fees applicable to this form.

   **Passport and Travel Document Numbers.**  Complete **Part 4., Item Numbers 45. - 50.**, as applicable, if the beneficiary relative used a passport or travel document to travel to the United States, enter the passport or travel document information in the appropriate space on the petition, even if the passport or travel document is currently expired.

**8.  Part 6.  Petitioner's Statement, Contact Information, Declaration, and Signature.**  Select the appropriate box to indicate whether you read this petition yourself or whether you had an interpreter assist you.  If someone assisted you in completing the petition, select the box indicating that you used a preparer.  Further, you must sign and date your petition and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every petition **MUST** contain the signature of the petitioner (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

**9.  Part 7.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this petition to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the petition.

**10.  Part 8.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner.**  This section must contain the signature of the person who completed your petition, if other than you, the petitioner.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 7.** and **Part 8.**  If the person who completed this petition is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this petition **MUST** sign and date the petition.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your petition is an attorney or accredited representative whose representation extends beyond preparation of this petition, he or she may be obliged to also submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your petition.

---

**We recommend that you review your copy of your completed petition before you go to your biometric services appointment at a USCIS ASC.**  At your appointment, USCIS will allow you to complete the petition process only if you are able to confirm, under penalty of perjury, that all of the information in your petition is complete, true, and correct.  If you are not able to make that attestation in good faith at that time, we will require you to return for another appointment.

---

004264

## General Requirements

1. **Does approval of this petition mean that my family member is automatically a lawful permanent resident or they can immediately immigrate to the United States?**

   No.  An approved petition does not give the beneficiary automatic lawful permanent resident status or permission to immediately immigrate to the United States.

2. **When will a visa become available?**

   When a petition is approved for the spouse, unmarried children under 21 years of age, or parents of a U.S. citizen, these persons are classified as immediate relatives, which means visas are immediately available to them.

   When a petition is approved for a U.S. citizen's sibling or married or adult son or daughter, or for a lawful permanent resident's spouse, child, or unmarried son or daughter, it is assigned to the appropriate visa preference category.  Each year, a limited number of immigrant visas are available for each preference category.  The visas are processed in the order in which the petitions are properly filed and accepted by us.  To be considered properly filed, a petition must be fully completed and signed, and the filing fee must be paid.

   For a monthly report on the dates when immigrant visas are available, call the U.S. Department of State at **1-202-663-1541**, or visit their website at **www.travel.state.gov**.

3. **What documents do you need to show that you are a U.S. citizen?**

   **A.** A copy of your birth certificate, issued by a civil registrar, vital statistics office, or other civil authority showing that you were born in the United States;

   **B.** A copy of your naturalization certificate or certificate of citizenship issued by USCIS or the former Immigration and Naturalization Service (INS);

   **C.** A copy of Form FS-240, Consular Report of Birth Abroad (CRBA), issued by a U.S. Embassy or U.S. Consulate;

   **D.** A copy of your unexpired U.S. passport; or

   **E.** An original statement from a U.S. consular officer verifying that you are a U.S. citizen with a valid passport.

   If you do not have any of the above documents and you were born in the United States, see the **What if an official document is not available** section of these Instructions.

4. **What documents do you need to show that you are a lawful permanent resident?**

   If you are a lawful permanent resident, you must file your petition with a copy of the front and back of your Permanent Resident Card (Form I-551).  If you have not yet received your card, submit copies of your passport biographic page and the page showing admission as a lawful permanent resident, or other evidence of permanent resident status issued by USCIS or the former INS.

5. **What documents do you need to prove family relationship?**

   You have to prove that there is a family relationship between you and the beneficiary.  If you are filing for a relative listed below, submit the following documentation to prove the family relationship.

   **A. A spouse:**

   **(1)** A copy of your marriage certificate;

   **(2)** If either you were or your spouse was previously married, submit copies of documents showing that each of the prior marriages was legally terminated; and

   **(3)** You **must** submit two identical color passport-style photographs of yourself and your spouse (if he or she is in the United States) taken within 30 days of filing this petition.  The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

The two identical color passport-style photos must be 2 by 2 inches.  The photos must be in color with full face, frontal view on a white to off-white background.  Head height should measure 1 to 1 3/8 inches from top of hair to bottom of chin, and eye height is between 1 1/8 to 1 3/8 inches from bottom of photo.  Your head must be bare unless you are wearing headwear as required by a religious denomination of which you are a member.  Using a pencil or felt pen, lightly print your name and A-Number (if any) on the back of the photo.

**NOTE:  In addition to the required documentation listed above, you should submit one or more of the following types of documentation that may prove you have a bona fide marriage:**

**(1)**   Documentation showing joint ownership of property;

**(2)**   A lease showing joint tenancy of a common residence, meaning you both live at the same address together;

**(3)**   Documentation showing that you and your spouse have combined your financial resources;

**(4)**   Birth certificates of children born to you and your spouse together;

**(5)**   Affidavits sworn to or affirmed by third parties having personal knowledge of the bona fides of the marital relationship.  Each affidavit must contain the full name and address of the person making the affidavit; date and place of birth of the person making the affidavit; and complete information and details explaining how the person acquired his or her knowledge of your marriage; or

**(6)**   Any other relevant documentation to establish that there is an ongoing marital union.

**NOTE:  You must submit clear and convincing evidence that you and your spouse entered into the marriage in good faith and not for immigration purposes if you married your spouse while your spouse was the subject of an exclusion, deportation, removal, or rescission proceeding (including during the judicial review of any one of these proceedings); or you are a lawful permanent resident that obtained your permanent residence through a prior marriage that was not determined by the death of your spouse and you are filing your petition for your spouse that you were married within five years of obtaining your permanent residence.**

**B.   A child and you are the mother:**  Submit a copy of the child's birth certificate showing your name and the name of your child.

**C.   A child and you are the father:**  Submit a copy of the child's birth certificate showing both parents' names, your marriage certificate to the child's mother, and proof of legal termination of the parents' prior marriages, if any, issued by civil authorities.

**D.   A child born out of wedlock and you are the father:**  Submit evidence that you and the mother were married while the child was under 18 years of age, or submit evidence that the child was legitimated under the law of the child's residence or domicile, or under the law of your residence or domicile, before the child reached 18 years of age.  If your child was not legitimated before reaching 18 years of age, you must file your petition with copies of evidence that a bona fide parent-child relationship existed between you and the child before the child reached 21 years of age.  This may include evidence that you lived with the child, supported him or her, or otherwise showed continuing parental interest in the child's welfare.

**E.   A brother or sister:**  Submit a copy of your birth certificate and a copy of your brother's or sister's birth certificate showing that you have at least one common parent.  If you and your brother or sister have a common father but different mothers, submit copies of the marriage certificates showing that your father was married to each mother, as well as copies of documents showing that any prior marriages of either your father or mothers were legally terminated.  If you and your brother or sister are related through adoption or a stepparent, or if you have a common father and either of you were not legitimated before you turned 18 years of age, see **Items D., H.,** and **I.** in these Instructions for additional information on proving your family relationship.

**F.   A mother:**  Submit a copy of your birth certificate showing your name and your mother's name.

004266

**G. A father:**  Submit a copy of your birth certificate showing the names of both parents.  Also submit a copy of your parents' marriage certificate establishing that your father was married to your mother.  If either your mother or father were previously married, submit copies of documents showing that each of the prior marriages was legally terminated.  If you are filing for a stepparent or adoptive parent, or if you are filing for your father and you were born out of wedlock, see **Items D.**, **H.**, and **I.** in these Instructions for additional information on proving your family relationship.

**H. Stepparent/Stepchild:**  If your petition is based on a stepparent-stepchild relationship, you must file your petition with a copy of the marriage certificate of the stepparent to the child's natural parent showing that the marriage occurred before the child turned 18 years of age, copies of documents showing that any prior marriages were legally terminated (if applicable), and a copy of the stepchild's birth certificate.

**I. Adoptive parent or adopted child:**  If you and the person you are filing for are related by adoption, you must submit a copy of the adoption decree showing that the adoption took place before the child turned 16 years of age.

If you adopted a child under 16 years of age, and you also adopted the older sibling of that child, you may file a petition for the older child if the adoption occurred before the older child turned 18 years of age.  You must submit a copy of the adoption decree showing that the adoption of the sibling occurred before the sibling turned 18 years of age.

In either case, you must also submit copies of evidence that each child was in the legal custody of and resided with the parents who adopted him or her for at least two years before or after adoption.  Only a court or recognized government entity may grant legal custody, and it is usually granted at the time the adoption is finalized.  However, if legal custody is granted by a court or recognized government entity prior to the adoption, that time may count toward fulfilling the 2-year legal custody requirement.

**6. Notice to persons filing for spouses, if you have been married less than two years.**

If you have been married less than two years on the date your spouse has obtained permanent resident status, USCIS will grant your spouse conditional permanent resident status for two years under INA section 216.  USCIS then requires both you and your spouse to file Form I-751, Petition to Remove Conditions on Residence, during the **90-day period immediately before your spouse's conditional permanent resident status expires**.

Conditional permanent residents have the same rights, privileges, responsibilities, and duties as all other lawful permanent residents.  A conditional permanent resident is not limited in his or her right to apply for naturalization, file petitions on behalf of qualifying relatives, or reside permanently in the United States as an immigrant in accordance with U.S. immigration laws.

**NOTE:**  If your spouse fails to timely file Form I-751 to remove the conditional basis of his or her spouse's permanent resident status, USCIS will terminate his or her permanent resident status and begin removal proceedings.

**7. What if a name has changed?**

If either you or the person you are filing for is using a name that is not the same name shown on the relevant documents, you must file your petition with copies of the legal documents reflecting the name change, such as a marriage certificate, adoption decree, or court order.

**8. What if an official document is not available?**

In this situation, submit a statement from the appropriate civil authority certifying that the document or documents are not available.  You must also submit secondary evidence, which may include one or more of the following records listed below.

**A. Religious record:**  A copy of a document bearing the seal of the religious organization showing that the baptism, dedication, or comparable rite occurred within two months after birth, and showing the date and place of the child's birth, date of the religious ceremony, and the names of the child's parents.

**B. School record:**  A letter from the authority (preferably the first school attended) showing the date of admission to the school, the child's date of birth or age at that time, place of birth, and names of the parents.

C. **Census record:**  State or Federal census records showing the names, place of birth, date of birth, or the age of the person listed.

D. If records like those described above are not available, then you may submit two or more written statements from individuals who were living at the time and who have personal knowledge of the event you are trying to prove, such as the date and place of birth, marriage, or death.  The individuals making the written statements do not have to be U.S. citizens.  Each written statement must contain the following information regarding the individual making the written statement:  his or her full name, address, date and place of birth, full information concerning the event, and complete details explaining how the individual acquired personal knowledge of the event.

Finally, each individual's written statement must include the following declaration, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on [date], [signature]."

E. **For parent-child relationships only:**  If other forms of evidence have proven inconclusive, the petitioner may submit on a voluntary basis other evidence of a birth parent and birth child relationship to include deoxyribonucleic acid (DNA) testing.  DNA test results will only be accepted by USCIS from parentage-testing laboratories accredited by the American Association of Blood Banks (AABB).  A list of laboratories can be viewed at **www.aabb.org/sa/facilities/Pages/RTestAccrFac.aspx**.

## Where To File?

Please see our website at **www.uscis.gov/i-130** for the most current information about where to file this petition.

## Address Change

A petitioner who is not a U.S. citizen must notify USCIS of his or her new address within 10 days of moving from his or her previous residence.  For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox.

## Processing Information

**Initial Processing.**  Once USCIS accepts your petition we will check it for completeness.  If you do not properly complete this petition, you will not establish a basis for your eligibility and we may reject or deny your petition.

**Requests for More Information.**  USCIS may request that you provide more information or evidence to support your petition.  We may also request that you provide the originals of any copies you submit.  If we request an original document from you, we will return it to you after USCIS determines it is no longer needed.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your petition.  During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-130 involves a determination of whether you have established eligibility for the immigration benefit you are seeking.  USCIS will notify you of our decision in writing.

004268

## USCIS Forms and Information

To ensure you are using the latest version of this petition, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-130, we will deny your Form I-130 and may deny any other immigration benefit.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## USCIS Compliance Review and Monitoring

By signing this petition, you have stated under penalty of perjury (28 U.S.C. section 1746) that all information and documentation submitted with this petition are complete, true, and correct.  You also authorize the release of any information from your records that USCIS may need to determine your eligibility for the immigration benefit you are seeking and consent to USCIS verifying such information.

The Department of Homeland Security (DHS) has the authority to verify any information you submit to establish eligibility for the immigration benefit you are seeking at any time.  USCIS' legal authority to verify this information is in 8 U.S.C. sections 1103, 1155, and 1184, and 8 CFR Parts 103, 204, 205, and 214.  To ensure compliance with applicable laws and authorities, USCIS may verify information before or after your case is decided.

Agency verification methods may include, but are not limited to:  review of public records and information; contact via written correspondence, the Internet, facsimile, other electronic transmission, or telephone; unannounced physical site inspections of residences and locations of employment; and interviews.  USCIS will use information obtained through verification to assess your compliance with the laws and to determine your eligibility for an immigration benefit.

Subject to the restrictions under 8 CFR 103.2(b)(16), USCIS will provide you with an opportunity to address any adverse or derogatory information that may result from a USCIS compliance review, verification, or site visit after a formal decision is made on your case or after the agency has initiated an adverse action which may result in revocation or termination of an approval.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this petition, and the associated evidence, is collected under the Immigration and Nationality Act (INA) section 204.

**PURPOSE:**  The primary purpose for providing the requested information on this petition is to determine if you have established eligibility for the immigration benefit for which you are filing.  DHS will use the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:**  The information you provide is voluntary.  However failure to provide the requested information, including your Social Security number, and the requested evidence, may delay a final decision in your case or result in denial of your petition.

004269

**ROUTINE USES:**  DHS may share the information you provide on this form with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records forms [DHS/USCIS–001 – Alien File, Index, and National File Tracking System and DHS/USCIS–007 – Benefits Information System] and the published privacy impact assessments [DHS/USCIS/PIA-003 Integrated Digitization Document Management Program (IDDMP), DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems, and DHS/USCIS/PIA-051 Case and Activity Management for International Operations], which you can find at **www.dhs.gov/privacy**.  DHS may also share the information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for Form I-130 is estimated at 1.817 hours per response and Form I-130A is estimated at 50 minutes per response, including the time for reviewing instructions, gathering the required documentation and information, completing the forms, preparing statements, attaching necessary documentation, and submitting the forms.  The collection of biometrics is estimated to require 1 hour and 10 minutes.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to:  U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0012.  **Do not mail your completed Form I-130 or Form I-130A to this address.**

## Checklist

**For all Form I-130 petitioners:**

☐  Did you answer each question on Form I-130?

☐  Did you sign and date the petition?

☐  Did you enclose the correct filing fee for each petition?

☐  Did you submit proof of your U.S. citizenship or lawful permanent resident status?

☐  Did you submit other required supporting evidence?

☐  If you have an attorney or accredited representative, did you include a completed Form G-28?

**For Form I-130 spouse petitioners:**

☐  Did you include two photographs of your spouse beneficiary?

☐  Did you include a completed and signed Form I-130A?

☐  Did you include two photographs of you (spouse petitioner)?

004270



# Instructions for Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-131F**

OMB No. 1615-xxxx
Expires xx/xx/xxxx

## What Is the Purpose of Form I-131F?

Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, is used by certain noncitizens who are present in the United States without admission or parole to request a temporary period of parole.

DHS, in its discretion, may grant parole on a case-by-case basis for significant public benefit or urgent humanitarian reasons to any noncitizen who is an applicant for admission. This authority extends to noncitizens present in the United States who have not been lawfully admitted, a practice known as "parole in place." If we approve Form I-131F filed for a noncitizen spouse or stepchild of a U.S. citizen seeking parole in place, the noncitizen spouse or stepchild of a U.S. citizen will receive a Form I-94, Arrival/Departure Record, which is evidence of their parole.

**NOTE:** Form I-94 does not authorize entry into the United States after departure. Individuals granted parole in place as a noncitizen spouse or stepchild of a U.S. citizen who depart the United States without first obtaining an Advance Parole Document may be precluded from returning as someone who is inadmissible to the United States, and may also be ineligible for future immigration benefits.

See the USCIS website at **https://www.uscis.gov/keepingfamiliestogether** for more information.

## Who May File Form I-131F?

A separate Form I-131F must be filed for each noncitizen spouse or stepchild of a U.S. citizen seeking parole in place.

A noncitizen spouse or stepchild of a U.S. citizen may request parole in place under this process if they:

1. Are present in the United States without admission or parole;

2. Have been continuously physically present in the United States:

    **A.** Since at least June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen OR

    **B.** Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;

3. Have:

    **A.** A legally valid marriage to a U.S. citizen as of June 17, 2024 (see **NOTE**), if seeking parole in place as the spouse of a U.S. citizen OR

    **B.** A parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;

4. Do not have any disqualifying criminal history; and

5. Do not pose a threat to national security and public safety.

**NOTE:** If your U.S. citizen spouse or stepparent has died prior to submitting your parole request, you may still qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen as long as a legally valid marriage was entered into on or before June 17, 2024.

**NOTE:** Even if you meet the above criteria to seek a discretionary grant of parole, USCIS may deny your request if we determine, as a matter of discretion, that a grant of parole is not warranted in your case.

**NOTE:** If you are in removal proceedings or have an order of removal, you may still qualify for parole. However, if parole is granted, you will likely have to take additional steps with the immigration court prior to seeking additional immigration benefits from USCIS.

To request parole in place as a noncitizen spouse of a U.S. citizen, select **Part 1., Item Number 1.** To request parole in place as the noncitizen stepchild of a U.S. citizen, select **Part 1., Item Number 2.**

You must also provide the following types of documentation, where applicable (see **Required Evidence** for more information):

1. Evidence of your qualifying relationship to a U.S. citizen spouse or stepparent, such as:

    **A.** Proof of your spouse/stepparent's status as a U.S. citizen, such as a copy of their birth certificate or naturalization certificate;

    **B.** Marriage certificate;

    **C.** Documentation of termination of any previous marriages;

    **D.** Birth certificate, if you are applying as the stepchild of a U.S. citizen;

    **E.** Death certificate of your U.S. citizen spouse, U.S. citizen stepparent, or noncitizen parent, if applicable;

2. Evidence that you have been continuously physically present during the required time period;

3. Evidence of any arrests, criminal charges, and final court disposition(s), if any, and

4. Evidence of any additional favorable discretionary factors that you would like us to consider (if applicable).

**NOTE:** If you were admitted to the United States (such as with a nonimmigrant visa), you are not eligible for parole in place as a noncitizen spouse or stepchild because you are not an applicant for admission, even if you overstayed your nonimmigrant status or are otherwise in the United States past your authorized period of stay.

---

| General Instructions |
| --- |

**Signature.** You must properly complete your application. USCIS will not accept a stamped or typewritten name in place of any signature on this application. If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf. A legal guardian may also sign for a mentally incompetent person. If your application is not signed, or if the signature is not valid, we will reject your application. See 8 CFR 103.2(a)(7)(ii)(A).

**Evidence.** When you file your application, you must submit all evidence and supporting documents listed in the **Required Evidence** and **Specific Instructions** sections of these Instructions.

**Biometric Services Appointment.** All applicants must submit biometrics at a USCIS Application Support Center (ASC). After you have filed this application, USCIS will notify you in writing of the time and location for your biometric services appointment. Failure to appear for biometrics submission may result in us denying your application.

Biometrics will be used to conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application.

At your biometric services appointment, you must sign an oath reaffirming that:

1. You provided or authorized all information in the application;

2. You reviewed and understood all of the information contained in, and submitted with, your application; and

3. All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your application.

**Copies.** You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document. USCIS may request an original document at any time during our process. If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:** If you submit original documents when they are not required or requested, **USCIS may destroy them** in accordance with Federal Regulations and applicable general or agency-specific records schedules. USCIS will not automatically return them to you.

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate and that they are competent to translate from the foreign language into English. The certification must also include their signature, printed name, the signature date, and their contact information.

**USCIS Contact Center.** For additional information on the application and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at **www.uscis.gov/contactcenter** or call **800-375-5283** (TTY **800-767-1833**). The USCIS Contact Center provides information in English and Spanish.

### How To Complete Form I-131F

1. If you need extra space to complete any item within this application, attach/upload a separate sheet of paper. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

2. Answer all questions fully and accurately. If a question does not apply to you (for example, if you have never filed a Form I-601A and the question asks, "Provide the receipt number of your Form I-601A"), you should type or print "N/A" unless otherwise directed.

---

**Specific Instructions**

---

This application is divided into **7 parts**.

### Part 1. Application Type

**Item Numbers 1. - 2.** Select the appropriate box to indicate whether you are applying for parole in place as the spouse or the stepchild of a U.S. citizen. If you are applying as the stepchild of a U.S. citizen and your parent is also filing a Form I-131F, please have your parent file their Form I-131F on your Form I-131F where prompted.

### Part 2. Information About You

**Item Number 1. Your Full Name.** Your current legal name is the name on your birth certificate unless it changed after birth by a legal action such as a marriage or court order. Do not provide a nickname.

**Item Number 2. Other Names Used.** Provide all other names you have ever used, including aliases, maiden name, and nicknames.

**Item Number 3. Current U.S. Mailing Address (Safe Address, if applicable).** Provide the address in the United States where you would like to receive written correspondence regarding your application.

If you have a pending or approved petition or application for Violence Against Women Act (VAWA) benefits, as a human trafficking victim (T nonimmigrant), or as a victim of qualifying criminal activity (U nonimmigrant), and you do not feel safe receiving mail about this application at your physical address, provide a **safe mailing address in this field**. You may provide a post office box (PO Box) or the address of a friend, your attorney, a community-based organization that is helping you, or any other address where you can safely and timely receive mail.

**Item Number 4. Current U.S. Physical Address**. Provide your physical address (the address in the United States where you currently physically live) if it is different from your mailing address.

**Item Number 5. Alien Registration Number (A-Number) (if any).** Provide your A-Number. A-Number refers to your immigration file number provided by U.S. immigration officials. We use your A-Number to identify your immigration records. It is an eight or nine-digit number that begins with an "A" and can be found on correspondence you have received from DHS or USCIS or on immigration court records. If you do not have an A-Number, type or print "N/A." USCIS will assign one to you.

**Item Number 6. Country of Birth.** Use the current name of the country. Do not use historical, ethnic, provincial, or other local names.

**Item Number 7. Country of Citizenship or Nationality.** Provide the name of the country where you are a citizen and/ or national. This is not necessarily the country where you were born. If you do not have citizenship in any country, type "stateless" and provide an explanation in your supporting documentation. For more information on statelessness, please see **www.uscis.gov/humanitarian/statelessness**.

**Item Number 8. Gender.** Indicate how you identify.

**Item Number 9. Date of Birth.** Always use eight numbers to show your date of birth. Type the date in this order: Month, Day, Year. For example, type or print May 1, 1958, as 05/01/1958. USCIS will not permit submission of your Form I-131F if you do not provide a date of birth.

**Item Number 10. Marital Status.** Select the option that corresponds to your current marital status.

**Item Number 11. Date of Marriage.** Always use eight numbers to show your date of marriage. Type the date in this order: Month, Day, Year. For example, type or print May 1, 2020, as 05/01/2020. Leave this field blank if you are not married.

**Item Number 12. U.S. Social Security Number (if any).** Provide your U.S. Social Security number. If you do not have a U.S. Social Security number, type "N/A."

**Item Number 13. USCIS Online Account Number (if any).** You will only have a USCIS Online Account Number (OAN) if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you. If you do not have a receipt number that begins with IOE, you do not have an OAN. The OAN is not the same as an A-Number.

**Item Number 14. Form I-94, Arrival/Departure Record (if any).** If CBP or USCIS issued you a Form I-94, Arrival/ Departure Record, provide your last Form I-94 number. The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**NOTE:** If you were admitted to the United States when you last entered the country, you will not be eligible for parole in place as a noncitizen spouse or stepchild of a U.S. citizen.

004274

**Item Number 15. Your U.S. Citizen Spouse's or Stepparent's Full Name.** Your U.S. citizen spouse's or stepparent's legal name is the name on their birth certificate unless it changed after birth by a legal action such as a marriage or court order. Do not provide a nickname.

**Item Number 16. Your U.S. Citizen Spouse's or Stepparent's Date of Birth.** Always use eight numbers to show their date of birth. Type the date in this order: Month, Day, Year. For example, type or print May 1, 1958, as 05/01/1958.

**Item Number 17. Your U.S. Citizen Spouse's or Stepparent's U.S. Social Security Number (if any).** Provide your U.S. citizen spouse's or stepparent's U.S. Social Security number. If they do not have a U.S. Social Security number, type "N/A."

**Part 3. Biographic Information**

Provide your biographic information. Providing this information as part of your application may reduce the time you spend at your USCIS ASC appointment as described in the **Biometric Services Appointment** section of these Instructions.

**Item Numbers 1. - 2. Ethnicity and Race.** Select the boxes that best describe your ethnicity and race.

---

### Categories and Definitions for Ethnicity and Race

1. **Hispanic or Latino.** A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. (**NOTE:** This category is only included under Ethnicity in **Part 3.**, **Item Number 1.**)

2. **American Indian or Alaska Native.** A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment.

3. **Asian.** A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

4. **Black or African American.** A person having origins in any of the black racial groups of Africa.

5. **Native Hawaiian or Other Pacific Islander.** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

6. **White.** A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

**Item Number 3. Height.** Select the values that best match your height in feet and inches. For example, if you are five feet and nine inches, select "5" for feet and "09" for inches. Do not enter your height in meters or centimeters.

**Item Number 4. Weight.** Enter your weight in pounds. If you do not know your weight or need to enter a weight under 30 pounds or over 699 pounds, enter "000." Do not enter your weight in kilograms.

**Item Number 5. Eye Color.** Select the box that best describes the color of your eyes.

**Item Number 6. Hair Color.** Select the box that best describes the color of your hair.

**Part 4. Processing Information**

**Item Number 1.** Provide the date that you began your continuous physical presence in the United States (mm/dd/yyyy). Always use eight numbers to show the date. Type the date in this order: Month, Day, Year. For example, type or print June 17, 2014, as 06/17/2014.

---

004275

**Item Number 2.** Indicate whether you have ever been in proceedings before the immigration court. This would include if you were issued a Form I-862, Notice to Appear, but did not receive a hearing date in immigration court. If you do not know if you have a removal order or are currently in immigration proceedings, you can use your A-Number to look up your immigration court case status at **https://acis.eoir.justice.gov/en/**. You can also call the EOIR hotline: **1-800-898-7180** / **304-625-2050** / TDD: **800-828-1120**.

**NOTE:** If you have a removal order but did not depart the United States (an unexecuted removal order) or failed to depart the United States pursuant to a grant of voluntary departure, you will be presumed ineligible for parole in place under this process unless you can establish that there are significant favorable factors that outweigh the removal order and any other adverse factors. If you have an executed removal order, you are ineligible for parole in place under this process.

**Item Number 3.** Indicate whether you have ever been arrested for, charged with, or convicted of a felony or misdemeanor, including incidents that were handled in juvenile court, in the United States. Do not include minor traffic violations unless they were alcohol or drug-related.

**Item Number 4.** Indicate whether you have ever been arrested for, charged with, or convicted of a crime in any country other than the United States.

**NOTE for Item Numbers 3. - 4.:** You will not be eligible for parole in place under this process if you, anywhere in the world:

- Have pending criminal charges; or
- Have been convicted of a felony or certain misdemeanors.

**NOTE:** Additional information about disqualifying criminal history, as well as information on criminal convictions that will result in a presumption of ineligibility that may be overcome if you can establish that there are mitigating factors, may be found at our Frequently Asked Questions About Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens page.

**Item Number 5.** Indicate whether you have ever or you are now engaged in activities that could be reasonable grounds for concluding you are a danger to public safety or to the security of the United States.

**NOTE:** You will not be eligible for parole in place as a noncitizen spouse or stepchild of a U.S. citizen if you are found to be a danger to the national security or public safety of the United States.

**Item Number 6.** If you have ever filed Form I-601A, Application for Provisional Unlawful Presence Waiver, with USCIS, provide the receipt number. You should include the receipt number for your Form I-601A regardless of whether USCIS has issued a final decision on your Form I-601A or if it is still pending.

**Item Number 7.** You must explain how you qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen in the space provided, including any specific factors that support your request or may be considered in overcoming a rebuttable presumption of ineligibility. Include copies of any supporting documents or evidence you wish considered. USCIS will use the information provided in your parole request and supporting evidence, along with the results of background and security checks and any other relevant information available to or requested by USCIS, to determine whether parole is warranted based on a significant public benefit or urgent humanitarian reasons and whether you merit a favorable exercise of discretion.

### Part 5. Applicant's Statement, Contact Information, Certification, and Signature

**Item Numbers 1. - 4.** You must sign and date your application and, if applicable, provide your daytime telephone number, mobile telephone number, and email address. The signature of a parent or legal guardian, if applicable, is acceptable.

004276

**Part 6. Interpreter's Contact Information, Certification, and Signature**

**Item Numbers 1. - 6.** If you used anyone as an interpreter to read the Instructions and questions on this application to you in a language in which you are fluent, you must fill out the interpreter's information.

**Part 7. Contact Information of the Person Preparing this Application, if Other Than the Applicant**

**Item Numbers 1. - 6.** If someone other than you completed your application, you must fill out the preparer's information. If the same individual acted as your interpreter and your preparer, then you should complete both **Part 6.** and **Part 7.** for that individual.

---

> **We recommend that you review your copy of your completed application before you go to your biometric services appointment at a USCIS ASC.** At your appointment, USCIS will allow you to complete the application process only if you are able to confirm, under penalty of perjury, that all of the information in your application is complete, true, and correct. If you are not able to make that attestation in good faith at that time, we will require you to return for another appointment.

---

### Required Evidence

You must file your application with all required evidence. Not submitting required evidence will delay the issuance of the document you are requesting. USCIS may request additional information or evidence or may request that you appear at a USCIS office for biometrics submission or an interview. (See **Item 7. Biometric Services Requirement** below.)

1. **Photo Identity Document**

   You must include a **copy of an official photo identity document showing your photo, name, and date of birth.** Examples include but are not limited to:

   **A.** A valid government-issued driver's license;

   **B.** Passport identity page;

   **C.** Any national identity document from your country of origin bearing your photo;

   **D.** Any school-issued form of identification with photo; or

   **E.** Any other official identity document with a photo.

   **NOTE:** The copy must **clearly** show the photo and identity information. Expired documents are acceptable.

2. **Evidence of Your Relative's Status as a U.S. Citizen**

   You must include a copy of evidence that your relative referenced in **Part 1.** is a U.S. citizen, such as a copy of their:

   **A.** U.S. birth certificate;

   **B.** Naturalization Certificate;

   **C.** Certificate of Citizenship;

   **D.** Consular Report of Birth Abroad; or

   **E.** U.S. passport.

3. **Evidence of Qualifying Relationship**

   You must include a copy of evidence of your qualifying spouse or stepchild relationship to the U.S. citizen referenced in **Part 1.**, such as:

   **A.** Marriage certificate;

   **B.** Documentation of termination of any previous marriages, if applicable;

---

C. Birth certificate with your noncitizen parent's name, if you are filing as the stepchild of a U.S. citizen;

D. Death certificate of your U.S. citizen spouse/stepparent or your noncitizen parent, if applicable.

**4. Evidence of Continuous Physical Presence**

Submit copies of any of the following documents:

A. Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

B. Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence that connects you to your presence at that address;

C. Tax returns or tax receipts;

D. School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and the periods of school attendance;

E. Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities of physicians and the dates of the treatment or hospitalization;

F. Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

G. Money order receipts for money sent in or out of the country; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements; contracts to which you have been a party; insurance policies; receipts; postmarked letters;

H. Attestations by religious entities, unions, or other organizations to your physical presence; or

I. Any other document you believe is relevant.

**NOTE:** You must submit sufficient documentation to establish your continuous physical presence for the entire period of time required, but you do not need to submit documentation for every day, week, or month within that period. USCIS will evaluate the totality of the evidence to determine whether you have established continuous physical presence for the required period of time (since at least June 17, 2014 for spouses or of June 17, 2024 for stepchildren).

**5. Evidence of Disposition of Any Criminal Record**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you. If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

A. If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable order confirming that no charges were filed for each arrest. If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.

B. If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order). If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.

004278

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

    **(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

    **(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol or drug-related.

**6.** **Any additional evidence demonstrating the significant public benefit or urgent humanitarian reasons warranting a grant of parole and evidence of any additional favorable discretionary factors that you would like us to consider, including any information that may be considered in overcoming a rebuttable presumption of ineligibility.**

**7.** **Revocation or Termination of Parole**

USCIS may revoke your grant of parole in place if you make a materially false representation or concealment in this application. DHS may also terminate your parole at any time if we determine that your continued presence in the United States is no longer warranted. Issuance of a Notice to Appear (NTA) placing you in removal proceedings after you are granted parole will constitute written notice of parole termination. If you depart the United States after you are granted parole, your parole automatically terminates.

---

| **Where to File?** |
|---|

Form I-131F must be filed online in accordance with these instructions and any additional information or guidance posted on **www.uscis.gov**. Please note that failure to file this application online or otherwise as required by these instructions may result in rejection, processing delays, or denial.

---

| **Address Change** |
|---|

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous address. For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

---

| **Processing Information** |
|---|

**Initial Processing.** Once USCIS accepts your application, we will check it for completeness. If you do not properly complete this application, you will not establish a basis for your eligibility and we may reject or deny your application.

**Requests for More Information.** USCIS may request that you provide more information or evidence to support your application. We may also request that you provide the originals of any copies you submit. If we request an original document from you, we will return it to you after USCIS determines it is no longer needed.

**Requests for Interview.** We may request that you appear at a USCIS office for an interview based on your application. During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

---

004279

**Decision.** The decision on Form I-131F involves a case by case determination of whether you have established eligibility for parole in place. Approval of Form I-131F does not guarantee eligibility for any future immigration benefits. USCIS will notify you of our decision in writing.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-131F, we will deny your application and may deny any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:** USCIS is collecting the information requested on this application, and the associated evidence, under INA sections 103, 208(c)(1)(C), 211, 212(d)(5)(A), 215 and 8 CFR sections 211.1(a)(3-4), 212.5, and 223.1-223.3.

**PURPOSE:** The primary purpose for providing the requested information on this application is to apply for parole (Form I-94, Arrival/Departure Record) based on urgent humanitarian reasons or a significant public benefit. DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in USCIS denying your application.

**ROUTINE USES:** DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System, DHS/USCIS-007 Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check] and the published privacy impact assessments [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which you can find at **www.dhs.gov/privacy**. DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 1.1667 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. The collection of biometrics is estimated to require 1.17 hours. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0000. **Do not mail your completed Form I-131F to this address.**

004280



# Declaration of Financial Support

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-134**
OMB No. 1615-0014
Expires 11/30/2026

---

## What Is the Purpose of Form I-134?

Some immigration benefits that involve a temporary stay in the United States require U.S. Citizenship and Immigration Services (USCIS) to determine whether the applicant or beneficiary of the request has sufficient financial resources or financial support to pay for expenses during the temporary stay. The individual who signs and submits Form I-134 must establish that he or she has both sufficient financial resources and access to those funds to support the beneficiary listed on Form I-134 for the duration of the beneficiary's stay in the United States.

This version of Form I-134, Declaration of Financial Support, replaces the previously titled "Form I-134, Affidavit of Support."

## Who Must File Form I-134?

Certain individuals applying for parole based on urgent humanitarian reasons or significant public benefit filed on Form I-131, Application for Travel Document, must submit this form with Form I-131. Form I-134 is filed either by the applicant for parole on his or her own behalf, or by another individual on the parole applicant's behalf.

**NOTE:** Whether or not the beneficiary of this Form I-134 will have sufficient means of support while in the United States is an important factor in determining whether to exercise discretion to authorize parole. We require evidence that the beneficiary of this Form I-134 has financial support for the duration of his or her stay in the United States. Lack of evidence of financial support while in the United States is a strong negative factor that may lead to a denial of parole.

## Who May File Form I-134?

You may file this form on behalf of yourself or on behalf of a B, F, or M nonimmigrant requesting extension of stay or change of status.

Form I-134 may also be requested by Department of State in certain instances.

**Do not use Form I-134 if the beneficiary you are agreeing to financially support must have Form I-864, Affidavit of Support Under Section 213A of the INA, filed on his or her behalf instead.**

## Submission of Declaration

If you are agreeing to financially support more than one beneficiary, you must submit a separate Form I-134 for each beneficiary. You, as the individual agreeing to financially support the beneficiary, must sign your full name on the form.

---

004281

## General Instructions

USCIS provides forms free of charge through the USCIS website.  To view, print, or fill out our forms, you should use the latest version of Adobe Reader, which you can download for free at **http://get.adobe.com/reader/**.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Signature.**  Each declaration must be properly signed and filed.  For all signatures on this declaration, USCIS will not accept a stamped or typewritten name in place of a signature.  A legal guardian may also sign for a mentally incompetent person.  If the request is not signed or if the requisite signature on the request is not valid, USCIS will reject the request.  See 8 CFR 103.2(a)(7)(ii)(A).  If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS will deny the request.

**Validity of Signatures.**  USCIS will consider a photocopied, faxed, or scanned copy of the original handwritten signature valid for filing purposes.  The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.**  There is no filing fee to file Form I-134.

**Evidence.**  You must submit all evidence requested in these Instructions with your declaration.  If you fail to submit required evidence, USCIS may reject or deny your declaration for failure to submit requested evidence or supporting documents in accordance with 8 CFR 103.2(b)(1) and these Instructions.

**Biometric Services Appointment.**  USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application or petition.  After USCIS receives your declaration and ensures it is complete, we will inform you if you need to attend a biometric services appointment.  If an appointment is necessary, the notice will provide you the location of your local or designated USCIS Application Support Center (ASC) and the date and time of your appointment or, if you are currently overseas, instruct you to contact a U.S. Embassy, U.S. Consulate, or USCIS office outside the United States to set up an appointment.

If you are required to provide biometrics, at your appointment you must sign an oath reaffirming that:

1.  You provided or authorized all information in the declaration;

2.  You reviewed and understood all of the information contained in, and submitted with, your declaration; and

3.  All of this information was complete, true, and correct at the time of filing.

**Copies.**  You should submit legible photocopies of documents requested, unless the Instructions specifically state that you must submit an original document.  USCIS may request an original document at the time of filing or at any time during processing of an application or petition.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Translations.**  If you submit a document with information in a foreign language, you must also submit a full English translation.  The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English.  The certification should also include the translator's signature, printed name, the signature date, and the translator's contact information.

### How To Fill Out Form I-134

1.  Type or print legibly in black ink.

2. If you need extra space to complete any item within this declaration, use the space provided in **Part 8. Additional Information** or attach a separate sheet of paper.  Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

3. Answer all questions fully and accurately.  If a question does not apply to you (for example, if you have never been married and the question asks "Provide the name of your current spouse"), type or print "N/A" unless otherwise directed.  If your answer to a question which requires a numeric response is zero or none (for example, "How many children do you have" or "How many times have you departed the United States"), type or print "None" unless otherwise directed.

4. **Part 4.  Statement, Contact Information, Certification, and Signature of the Beneficiary (if filing Form I-134 on his or her own behalf).**  You must sign in **Part 4.** if you are filing Form I-134 on your own behalf.  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone helped you complete the declaration, select the box indicating that you used a preparer.  You also must sign and date your declaration and provide your daytime telephone number, mobile telephone number, and email address.  A stamped or typewritten name in place of a signature is not acceptable.

5. **Part 5.  Statement, Contact Information, Certification, and Signature of the Individual Agreeing to Financially Support the Beneficiary.**  You must sign **Part 5.** if you are filing Form I-134 on behalf of someone else (a beneficiary).  Select the appropriate box to indicate whether you read this declaration yourself or whether you had an interpreter assist you.  If someone assisted you in completing the declaration, select the box indicating that you used a preparer.  Further, you must sign and date your declaration and provide your daytime telephone number, mobile telephone number (if any), and email address (if any).  Every declaration **MUST** contain the signature of the individual agreeing to financially support the beneficiary (or parent or legal guardian, if applicable).  A stamped or typewritten name in place of a signature is not acceptable.

6. **Part 6.  Interpreter's Contact Information, Certification, and Signature.**  If you used anyone as an interpreter to read the Instructions and questions on this declaration to you in a language in which you are fluent, the interpreter must fill out this section, provide his or her name, the name and address of his or her business or organization (if any), his or her daytime telephone number, his or her mobile telephone number (if any), and his or her email address (if any).  The interpreter must sign and date the declaration.

7. **Part 7.  Contact Information, Declaration, and Signature of the Person Preparing this Declaration, if Other Than the Individual Agreeing to Financially Support the Beneficiary.**  If someone other than you, the individual agreeing to financially support the beneficiary (which is the beneficiary if filing on behalf of him or herself), completed your declaration, this section must contain the signature.  If the same individual acted as your interpreter **and** your preparer, that person should complete both **Part 6.** and **Part 7.**  If the person who completed this declaration is associated with a business or organization, that person should complete the business or organization name and address information.  Anyone who helped you complete this declaration **MUST** sign and date the declaration.  A stamped or typewritten name in place of a signature is not acceptable.  If the person who helped you prepare your declaration is an attorney or accredited representative, he or she may also need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with your declaration.

---

**We recommend that you print or save a copy of your completed declaration to review in the future and for your records.**

---

### Specific Instruction

**Part 1.  Basis for Filing.**  Select the appropriate box for **Item Number 1.**

Select the first box if you are the beneficiary who is the alien applying for an immigration benefit.  A beneficiary may file Form I-134 on his or her own behalf.

---

004283

Select the second box if you are the individual agreeing to financially support the beneficiary.

**Part 2.  Information about the Beneficiary**

The beneficiary is the alien who is applying for an immigration benefit.  A beneficiary may file Form I-134 on behalf of himself or herself.

**Item Number 1.  Beneficiary's Current Legal Name.**  Provide the beneficiary's legal name, as shown on his or her birth certificate or legal name change document.  If the beneficiary has two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print the beneficiary's last, first, and middle names in each appropriate field.

**Item Number 3.  Date of Birth.**  Enter the beneficiary's date of birth in mm/dd/yyyy format in the space provided.  For example, type or print October 5, 1967 as 10/05/1967.

**Item Number 4.  Gender.**  Provide the beneficiary's gender.

**Item Number 5.  Alien Registration Number (A-Number).**  Provide the beneficiary's A-Number.  The A-Number is the number used to identify an individual's immigration records.  It begins with an "A" and can be found on correspondence the beneficiary received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 6.  Place of Birth.**  Enter the name of the city or town, state or province, and country where the beneficiary was born.  Type or print the name of the country as it was named when the beneficiary was born, even if the country's name has changed or the country no longer exists.

**Item Number 7.  Country of Citizenship or Nationality.**  Provide the name of the country where the beneficiary is a citizen and/or national.  This is not necessarily the country where the beneficiary was born.  If the beneficiary does not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 8. Additional Information**.

**Item Number 8.  Marital Status.**  Select the appropriate box.

**Item Numbers 9. - 11.  Beneficiary's Physical Address.**  Provide the physical address where the beneficiary lives.

**Item Number 12.  Beneficiary's Anticipated Length of Stay.**  Enter the anticipated start date of the beneficiary's stay in the United States in **Item Number 12.**  Select the option that matches the anticipated end date of the beneficiary's stay.  If the beneficiary's stay has an end date, you must enter the anticipated end date in mm/dd/yyyy format in the space provided for that option.  If the beneficiary's anticipated stay does not have an end date, select the "No End Date" option.

**Item Number 13.  Beneficiary's Income.**  Provide information on any income the beneficiary will receive.  If the beneficiary will not receive any income, then type or print $0 in the table. Do not include any individuals named in **Part 3.**

**Item Numbers 14. - 15.**  Identify whether any of the beneficiary's total income comes from an illegal activity or source, such as proceeds from illegal gambling or illegal drug sales or other activities and identify the amount.  Do not include income from illegal gambling or illegal drug sales attributed to any individuals named in **Part 3.**

**Item Number 16.  Beneficiary's Assets.**  Provide information about any assets available to the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether the assets are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 3.**

You may include the net value of the beneficiary's home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you list the net value of the beneficiary's home, then you must include documentation demonstrating that the beneficiary owns the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of the beneficiary's automobile unless the beneficiary has more than one automobile, and at least one automobile is not included as an asset.  Submit evidence of the value of the assets listed.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

004284

**Part 3.  Information About the Individual Agreeing to Financially Support the Beneficiary Named in Part 2.**

**Item Number 1.  Current Legal Name.**  Provide the full name of the individual who is agreeing to financially support the beneficiary named in **Part 2**.  Provide your legal name, as shown on your birth certificate or legal name change document.  If you have two last names, include both and use a hyphen (-) between the names, if appropriate.  Type or print your last, first, and middle names in each appropriate field.

**Item Number 8.  Alien Registration Number (A-Number).**  Provide your A-Number.  Your A-Number is the number used to identify your immigration records.  It begins with an "A" and can be found on correspondence you have received from the Department of Homeland Security (DHS) or USCIS.

**Item Number 10.  Immigration Status.**  Select the appropriate box for your current immigration status.  Provide evidence of your status.  A U.S. citizen or U.S. national may submit a copy of a birth certificate, certificate of naturalization, certificate of citizenship, consular report of birth abroad to U.S. parents, or a copy of the biographic data page on your U.S. passport.  Proof of lawful permanent resident status includes a photocopy of both sides of the Permanent Resident Card or Alien Registration Receipt Card (Form I-551), or a photocopy of an unexpired temporary Form I-551 stamp in either a foreign passport or DHS Form I-94 Arrival Departure Record.  Proof of lawful nonimmigrant status may include a copy of an unexpired visa in a foreign passport.

**Item Number 17.  Assets.**  Provide information about any assets you will use to support the beneficiary for the anticipated period of his or her stay.  List only assets that can be converted into cash within 12 months and that will be used to support the beneficiary while the beneficiary is in the United States.  Provide the value of all assets listed in U.S. dollars, regardless of whether they are held in the United States or outside of the United States.  Do not include assets from any individuals named in **Part 2.**

You may include the net value of a home as an asset.  The net value of the home is the appraised value of the home, minus the sum of all loans secured by a mortgage, trust deed, or other lien on the home.  If you include the net value of your home, then you must include documentation demonstrating that you own the home, a recent appraisal by a licensed appraiser, and evidence of the amount of all loans secured by a mortgage, trust deed, or other lien on the home.

You may not include the net value of an automobile unless you show that you have more than one automobile, and at least one automobile is not included as an asset.

Submit evidence of the value of your or your household members' assets.  Evidence must include the name of the asset holder, a description of the asset, proof of ownership, and the basis for the owner's claim of its net cash value.

## Supporting Evidence (for beneficiary and person providing support to beneficiary)

As the beneficiary or the person who agrees to financially support the beneficiary, you must show you have sufficient income or financial resources to support the beneficiary.

Evidence should consist of copies of any of the documents listed below that apply.

Failure to provide evidence of sufficient income or financial resources may result in the denial of the foreign national's application for a visa or his or her removal from the United States.

Submit in duplicate evidence of income and resources, as appropriate:

1.  Statement from an officer of the bank or other financial institutions with deposits, identifying the following details regarding the account:

    **A.**  Date account opened;

    **B.**  Total amount deposited for the past year; and

    **C.**  Present balance.

2.  Statement(s) from your employer on business stationery showing:

    **A.**  Date and nature of employment;

004285

    **B.**  Salary paid; and

    **C.**  Whether the position is temporary or permanent.

**1.**  Copy of last U.S. federal income tax return filed (tax transcript); or

**2.**  List containing serial numbers and denominations of bonds and name of record owner(s).

## What Is the Filing Fee?

There is no filing fee for Form I-134.

## Where to File?

Please see our website at **www.uscis.gov/I-134** or visit the USCIS Contact Center at **www.uscis.gov/contactcenter** to connect with a USCIS representative for the most current information about where to file this declaration.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

## Address Change

If you are not a U.S citizen or U.S. national, you must notify USCIS of your new address within 10 days of moving from your previous residence.  For information on filing a change of address, go to the USCIS website at **www.uscis.gov/addresschange** or reach out to the USCIS Contact Center at **www.uscis.gov/contactcenter** for help.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**NOTE:**  Do not submit a change of address request to the USCIS Lockbox facilities because the Lockbox does not process change of address requests.

## Processing Information

**Initial Processing.**  Once USCIS accepts your declaration, we will check it for completeness.  If you do not completely fill out this declaration, you will not establish a basis of support for the beneficiary or for yourself (if you are applying on your own behalf), and USCIS or the Department of State may reject or deny your declaration.

**Requests for More Information.**  USCIS or Department of State may request that you provide more information or evidence to support your declaration.  We may also request that you provide the originals of any copies you submit.  If USCIS requests an original document from you, it will be returned to you after USCIS determines it no longer needs your original.

**Requests for Interview.**  We may request that you appear at a USCIS office for an interview based on your declaration.  At the time of any interview or other appearance at a USCIS office, we may require that you provide your biometrics to verify your identity and/or update background and security checks.

**Decision.**  The decision on Form I-134 involves a determination of whether you have established a basis of support for the beneficiary seeking an immigration benefit.  USCIS will notify you of the decision in writing.

## USCIS Forms and Instructions

To ensure you are using the latest version of this declaration, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may call the USCIS Contact Center at **1-800-375-5283** and ask that we mail a form to you.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Please visit us at **www.uscis.gov/contactcenter** to get basic information about immigration services and ask questions about a pending case.  Through our digital self-help tools and live assistance, the USCIS Contact Center provides a pathway for you to get consistent, accurate information and answers to immigration case questions.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-134, we will deny your Form I-134 and may deny any other immigration benefit the beneficiary seeks.  In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:**  The information requested on this declaration, and the associated evidence, is collected under the Immigration and Nationality Act (INA), sections 1101, 1182(a)(4), 1183, 1184(a), and 1258.

**PURPOSE:**  The primary purpose for providing the requested information on this declaration is to show that the applying immigrant has enough financial support to live without concern of becoming reliant on U.S. Government welfare.

**DISCLOSURE:**  The information you provide is voluntary.  However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your immigration benefit.

**ROUTINE USES:**  DHS may share the information you provide on this declaration and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations.  DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check.] and the published privacy impact assessments [DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, DHS/USCIS/PIA-051 Case and Activity Management for International Operations (CAMINO), and DHS/USCIS/PIA-003 Integrated Digitization Document Management Program (IDDMP).] which you can find at **www.dhs.gov/privacy**.  DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

004287

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number.  The public reporting burden for this collection of information is estimated at 2 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the declaration, preparing statements, attaching necessary documentation, and submitting the declaration.  Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:  U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0014.  **Do not mail your completed Form I-134 to this address.**

# One-Year Anniversary of the Humanitarian, Adjustment, Removing Conditions, and Travel Documents (HART) Service Cente

This month marks the one-year anniversary of the Humanitarian, Adjustment, Removing Conditions, and Travel Documents (HART) Service Center. The HART Service Center is the sixth service center within USCIS' Service Center Operations Directorate (SCOPS) and the first to focus on humanitarian and other workloads.

The HART Service Center was created to prioritize and enhance processing of humanitarian caseloads within USCIS and to reduce backlogs associated with these forms. By centralizing humanitarian form types, the HART Service Center promotes cohesive and consistent adjudications, while a dedicated workforce improves the quality and efficiency of our humanitarian caseload processing. These applications and benefits affect the most vulnerable noncitizens, and the HART Service Center positively impacts the quality, timeliness, and scale of our humanitarian processing abilities.

In this first year, the HART Service Center has many accomplishments.

**Process Improvements**

- Decreased the Form I-601A, Application for Provisional Unlawful Presence Waivers (Form I-601A), backlog by more than 5,000 cases since the start of fiscal year (FY) 2024.
- Significantly reduced the backlog for Form I-730, Refugee/Asylee Relative Petitions (Form I-730), that have been pending over 90 days to under 200 cases.
- Focused on third-party scanning for Form I-918, Petition for U Nonimmigrant Status (Form I-918) and Form I-730 to make operations at the HART Service Center fully electronic and fully remote for these caseloads.

**Staffing**

The HART Service Center exceeded its goal of being 60-85% staffed for FY 2023 by onboarding 379 employees, bringing staffing levels to 86%. The HART Service Center anticipates being 95-98% staffed by quarter 2, ahead of our goal of reaching this staffing level by the end of FY 2024. A specially trained and dedicated workforce will improve the quality of processing humanitarian caseloads and ensure our services are helping stabilize vulnerable populations and improve consistency in adjudications.

**Training**

As of March 2024, 322 employees have completed HART Service Center operations training on victim awareness and secondary trauma, and training on Form I-360, Petition for Amerasian, Widow(er), or Special immigrant, for VAWA self-petitioners; Form I-601A; Form I-730; and bona fide determinations (BFDs) and waiting list determinations for Form I-918. Our experienced adjudicating officers have made this possible through their dedication not only to their own work, but through their coaching and mentoring of our new employees in addition to completing adjudications.

**Adjudicative Efficiency**

We are already seeing an increase in production and completions with some of the form types adjudicated at the HART Service Center. In just the first four months of FY 2024, the HART Service Center has:

- Completed 12,880 Forms I-601A in the first four months of FY 2024, compared with 9,080 in FY 2023;
- Completed 37,363 BFDs for Form I-918 in the first four months of FY 2024, compared to 31,833 in FY 2023; and
- Completed 54,755 of all form types in the first four months of FY 2024, compared to 68,181 in FY 2023.

**More Information**

We invite you to attend our national engagement on the one-year anniversary of the HART Service Center on Wednesday, March 27 from 1-2 pm Eastern. You can also review our new Frequently Asked Questions.

For more information on USCIS and our programs, please visit uscis.gov or follow us on X (formerly Twitter), Instagram, YouTube, Facebook and LinkedIn.

Last Reviewed/Updated: 03/25/2024

I-131, Application for Travel Document
Military Parole in Place Receipts, Approvals, Denials
Fiscal Year 2010 to 2024 (as of June 13, 2024)



U.S. Citizenship
and Immigration
Services

| Fiscal Year | Receipts | Approvals | Denials |
|---|---|---|---|
| **TOTAL** | **81,774** | **60,506** | **10,209** |
| | | | |
| 2010 | - | - | - |
| 2011 | 5 | - | - |
| 2012 | 7 | - | - |
| 2013 | 18 | 3 | - |
| 2014 | 2,586 | 1,421 | 123 |
| 2015 | 3,643 | 2,731 | 348 |
| 2016 | 5,023 | 4,047 | 485 |
| 2017 | 6,630 | 4,796 | 742 |
| 2018 | 7,004 | 5,003 | 1,067 |
| 2019 | 7,991 | 5,455 | 1,101 |
| 2020 | 6,690 | 4,919 | 1,186 |
| 2021 | 8,285 | 6,265 | 1,284 |
| 2022 | 10,495 | 7,189 | 1,178 |
| 2023 | 12,352 | 10,030 | 1,409 |
| 2024 | 11,045 | 8,647 | 1,286 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

C3, queried 6/2024, TRK 15184.



I-131 Military Parole in Place

004292

**Number of I-601A Applications Receipts That Were Filed with a G-28**
**As of Fiscal Year 2018  - Fiscal Year 2023**

| Receipt FY | Filed G-28 | Didn't File G-28 | Total Filed I-601A |
|---|---|---|---|
| 2018 | 48,097 | 13,540 | 61,637 |
| 2019 | 41,604 | 10,757 | 52,361 |
| 2020 | 42,807 | 9,667 | 52,474 |
| 2021 | 34,057 | 7,780 | 41,837 |
| 2022 | 29,844 | 6,403 | 36,247 |
| 2023 | 29,963 | 5,528 | 35,491 |
| **FY 18 - FY 23** | **226,372** | **53,675** | **280,047** |

Source: OP&S, PRD, C3. Queried July 17, 2024

Notes: Data reflects C3 cases only. No data was found in ELIS.

Report reflects the most up-to-date data available at the time the database is queried.

Counts may differ from those reported previously due to system updates.

Data Request PRD-416



U.S. Citizenship
and Immigration
Services

MENU

Home  >  Policy Manual  >  Volume 12 - Citizenship and Naturalization  >  Part G - Spouses of U.S. Citizens  >  Chapter 2 - Marriage and Marital Union for Naturalization

# Chapter 2 - Marriage and Marital Union for Naturalization

**Guidance**

Resources (9)

Appendices (1)

Updates (6)

History (0)

## A. Validity of Marriage

## 1. Validity of Marriages in the United States or Abroad

*Validity of Marriage for Immigration Purposes*

The applicant must establish validity of his or her marriage. In general, the legal validity of a marriage is determined by the law of the place where the marriage was celebrated ("place-of-celebration rule"). Under this rule, a marriage is valid for immigration purposes in cases where the marriage is valid under the law of the jurisdiction in which it is performed.[1]

In all cases, the burden is on the applicant to establish that he or she has a valid marriage with his or her U.S. citizen spouse for the required period of time.[2] In most cases, a marriage certificate is prima facie evidence that the marriage was properly and legally performed.

USCIS does not recognize the following relationships as marriages, even if valid in the place of celebration:

- Polygamous marriages;[3]

- Certain marriages that violate the strong public policy of the state of residence of the couple;[4]

- Civil unions, domestic partnerships, or other such relationships not recognized as marriages in the place of celebration;[5]

- Relationships where one party is not present during the marriage ceremony ~~unless~~ the marriage has been consummated;[6] or



Need Help?
Chat with Emma™

004294

- Relationships entered into for purposes of evading immigration laws of the United States.[7]

*Validity of Marriage Between Two Persons of the Same Sex*

In June 2013, the Supreme Court held that section 3 of the Defense of Marriage Act (DOMA), which had limited the terms "marriage" and "spouse" to opposite-sex marriages for purposes of all federal laws, was unconstitutional.[8] In accordance with the Supreme Court decision, USCIS determines the validity of a same-sex marriage by the place-of-celebration rule, just as USCIS applies this rule to determine the validity of an opposite-sex marriage.[9]

Therefore, in cases of marriage between persons of the same sex, officers will review the laws of the jurisdiction in which the marriage took place to determine if the jurisdiction recognizes same-sex marriages and the marriage otherwise is legally valid.

Since the place-of-celebration rule governs same-sex marriages in exactly the same way that it governs opposite-sex marriages, unless the marriage is polygamous or otherwise falls within an exception to the place-of-celebration rule as discussed above, the legal validity of a same-sex marriage is determined exclusively by the law of the jurisdiction where the marriage was celebrated.

If the same-sex couple now resides in a jurisdiction different from the one in which they celebrated their marriage, and that jurisdiction does not recognize same-sex marriages, the officer will look to the law of the state where the marriage was celebrated in order to determine the validity of the marriage. The domicile state's laws and policies on same-sex marriages will not affect whether USCIS will recognize a marriage as valid.

*Validity of Marriage in Cases Involving Transgender Persons*

USCIS accepts the validity of a marriage in cases involving transgender persons if the state or local jurisdiction in which the marriage took place recognizes the marriage as a valid marriage, subject to the exceptions described above (such as polygamy).[10]

## 2. Validity of Foreign Divorces and Subsequent Remarriages

The validity of a divorce abroad depends on the interpretation of the divorce laws of the foreign country that granted the divorce and the reciprocity laws in the state of the United States where the applicant remarried.[11] If the divorce is not final under the foreign law, remarriage to a U.S. citizen is not valid for immigration purposes.[12]

An officer should ensure that the court issuing the divorce had jurisdiction to do so.[13] Foreign divorce laws may allow for a final decree even when the applicants are not residing in the country. Some states, however, do not recognize these foreign divorces and do not provide reciprocity. The applicant and his or her former spouse's place of domicile at the time of the divorce is important in determining whether the court had jurisdiction.

## 3. Evidence

The burden is on the applicant to establish that he or she is in a valid marriage with his or her U.S. citizen spouse for the required period of time.[14] A spouse of a U.S. citizen must submit with the naturalization application an official civil record to establish that the marriage is legal and valid. If an official civil record

cannot be produced, secondary evidence may be accepted on a case-by-case basis. An officer has the right to request an original record if there is doubt as to the authenticity of the record.[15]

# B. Common Law Marriage

The concept of common law marriage presupposes an honest good-faith intention on the part of two persons, free to marry, to live together as husband and wife from the inception of the relationship. Some states recognize common law marriages and consider the parties to be married.[16] In order for a common law marriage to be valid for immigration purposes:

- The parties must live in that jurisdiction; and

- The parties must meet the qualifications for common law marriage for that jurisdiction.

Other states may recognize a common law marriage contracted in another state even if the recognizing state does not accept common law marriage as a means for its own residents to contract marriage.

USCIS recognizes common law marriages for purposes of naturalization if the marriage was valid and recognized by the state in which the marriage was established.[17] This applies even if the naturalization application is filed in a jurisdiction that does not recognize or has never recognized the principle of common law marriage.

The officer should review the laws of the relevant jurisdiction on common law marriages to determine whether the applicant and spouse should be considered to be married for purposes of naturalization and when the marriage commenced.

# C. U.S. Citizenship from Time of Filing until Oath

In order to take advantage of the special naturalization provisions for spouses of U.S. citizens, the applicant's spouse must be and remain a U.S. citizen from the time of filing until the time the applicant takes the Oath of Allegiance. An applicant is ineligible for naturalization under these provisions if his or her spouse is not a U.S. citizen or loses U.S. citizenship status by denaturalization or expatriation prior to the applicant taking the Oath of Allegiance.[18]

# D. Marital Union and Living in Marital Union

## 1. Married and Living in Marital Union

In general, all naturalization applicants filing on the basis of marriage to a U.S. citizen must continue to be the spouse of a U.S. citizen from the time of filing the naturalization application until the applicant takes the Oath of Allegiance. In addition, some spousal naturalization provisions require that the applicant "live in marital union" with his or her citizen spouse for at least 3 years immediately preceding the date of filing the naturalization application.[19] USCIS considers an applicant to "live in marital union" with his or her citizen spouse if the applicant and the citizen actually reside together.

An applicant does not meet the married and "living in marital union" requirements if:

004296

- The applicant is not residing with his or her U.S. citizen spouse at the time of filing or during the time in which the applicant is required to be living in marital union with the U.S. citizen spouse; or

- The marital relationship is terminated at any time prior to taking the Oath of Allegiance.

If the applicant ceases to reside with his or her U.S. citizen spouse between the time of filing and the time at which the applicant takes the Oath of Allegiance, the officer should consider whether the applicant met the living in marital union requirement at the time of filing.

There are limited circumstances where an applicant may be able to establish that he or she is living in marital union with his or her citizen spouse even though the applicant does not actually reside with the citizen spouse.[20]

In all cases where it is applicable, the burden is on the applicant to establish that he or she has lived in marital union with his or her U.S. citizen spouse for the required period of time.[21]

## 2. Loss of Marital Union due to Death, Divorce, or Expatriation

*Death of U.S. Citizen Spouse*

An applicant is ineligible to naturalize as the spouse of a U.S. citizen if the U.S. citizen dies any time prior to the applicant taking the Oath of Allegiance.[22] However, if the applicant is the surviving spouse of a U.S. citizen who died during a period of honorable service in an active-duty status in the U.S. armed forces, the applicant may be eligible for naturalization based on his or her marriage under a special provision.[23]

*Divorce or Annulment*

A person's marital status may be terminated by a judicial divorce or by an annulment. A divorce or annulment breaks the marital relationship. The applicant is no longer the spouse of a U.S. citizen if the marriage is terminated by a divorce or annulment. Accordingly, such an applicant is ineligible to naturalize as the spouse of a U.S. citizen if the divorce or annulment occurs before or after the naturalization application is filed.[24]

The result of annulment is to declare a marriage null and void from its inception. An annulment is usually retroactive, meaning that the marriage is considered to be invalid from the beginning. A court's jurisdiction to grant an annulment is set forth in the various divorce statutes and generally requires residence or domicile of the parties in that jurisdiction. When a marriage has been annulled, it is documented by a court order or decree.

In contrast, the effect of a judicial divorce is to terminate the status as of the date on which the court entered the final decree of divorce. When a marriage is terminated by divorce, the termination is entered by the court with jurisdiction and is documented by a copy of the final divorce decree. USCIS determines the validity of a divorce by examining whether the state or country which granted the divorce properly assumed jurisdiction over the divorce proceeding.[25] USCIS also determines whether the parties followed the proper legal formalities required by the state or country in which the divorce was obtained to determine if the divorce is legally binding.[26] In all cases, the divorce must be final.

An applicant's ineligibility for naturalization as the spouse of a U.S. citizen due to the death of the citizen spouse or to divorce is not cured by the subsequent marriage to another U.S. citizen.

*Expatriation of U.S. Citizen Spouse*

An applicant is ineligible to naturalize as the spouse of a U.S. citizen if the U.S. citizen has expatriated any time prior to the applicant taking the Oath of Allegiance for naturalization.[27]

# 3. Failure to be Living in Marital Union due to Separation

*Legal Separation*

A legal separation is a formal process by which the rights of a married couple are altered by a judicial decree but without eliminating the marital relationship.[28] In most cases, after a legal separation, the applicant will no longer be actually residing with his or her U.S. citizen spouse, and therefore will not be living in marital union with the U.S. citizen spouse.

However, if the applicant and the U.S. citizen spouse continue to reside in the same household, the marital relationship has been altered to such an extent by the legal separation that they will not be considered to be living together in marital union.

Accordingly, an applicant is not living in marital union with a U.S. citizen spouse during any period of time in which the spouses are legally separated.[29] An applicant who is legally separated from his or her spouse during the time period in which he or she must be living in marital union is ineligible to naturalize as the spouse of a U.S. citizen.

*Informal Separation*

In many instances, spouses will separate without obtaining a judicial order altering the marital relationship or formalizing the separation. An applicant who is no longer actually residing with his or her U.S. citizen spouse following an informal separation is not living in marital union with the U.S. citizen spouse.

However, if the U.S. citizen spouse and the applicant continue to reside in the same household, an officer must determine on a case-by-case basis whether an informal separation before the filing of the naturalization application renders an applicant ineligible for naturalization as the spouse of a U.S. citizen. [30] Under these circumstances, an applicant is not living in marital union with a U.S. citizen spouse during any period of time in which the spouses are informally separated if such separation suggests the possibility of marital disunity.

Factors to consider in making this determination may include:

- The length of separation;

- Whether the applicant and his or her spouse continue to support each other and their children (if any) during the separation;

- Whether the spouses intend to separate permanently; and

- Whether either spouse becomes involved in a relationship with others during the separation.[31]

*Involuntary Separation*

004298

Under very limited circumstances and where there is no indication of marital disunity, an applicant may be able to establish that he or she is living in marital union with his or her U.S. citizen spouse even though the applicant does not actually reside with citizen spouse. An applicant is not made ineligible for naturalization for not living in marital union if the separation is due to circumstances beyond his or her control, such as:[32]

- Service in the U.S. armed forces; or

- Required travel or relocation for employment.

USCIS does not consider incarceration during the time of required living in marital union to be an involuntary separation.

## Footnotes

[^ 1] See, for example, *Matter of Lovo-Lara*, 23 I&N Dec. 746 (BIA 2005); *Matter of Da Silva*, 15 I&N Dec. 778 (BIA 1976); *Matter of H-*, 9 I&N Dec 640 (BIA 1962).

[^ 2] See 8 CFR 319.1(b)(1).

[^ 3] See *Matter of H-*, 9 I&N Dec. 640 (BIA 1962). Polygamous marriages are not recognized as a matter of federal public policy. However, note that battered spouses who had a bigamous marriage may still be eligible for naturalization. See INA 204(a)(1)(A)(iii)(II) and INA 319(a).

[^ 4] This is a narrow exception that under BIA case law generally has been limited to situations, such as certain incestuous marriages, where the marriage violates the criminal law of the state of residence. See *Matter of Da Silva*, 15 I&N Dec 778 (BIA 1976); *Matter of Zappia*, 12 I&N Dec. 439 (BIA 1967); *Matter of Hirabayashi*, 10 I&N Dec 722 (BIA 1964); *Matter of M*, 3 I&N Dec. 465 (BIA 1948). Note that as discussed below, if the state of residence has a public policy refusing to recognize same-sex marriage, this will not result in a same-sex marriage being considered invalid for immigration purposes if it is valid in the place of celebration.

[^ 5] If the relationship is treated as a marriage, however, such as a "common law marriage," it will be recognized.

[^ 6] See INA 101(a)(35).

[^ 7] See *Matter of Laureano*, 19 I&N Dec. 1 (BIA 1983); *Matter of Phillis*, 15 I&N Dec. 385 (BIA 1975; *Matter of M-*, 8 I&N Dec. 217 (BIA 1958).

[^ 8] See *United States v. Windsor*, 133 S. Ct. 2675 (2013). See 1 U.S.C. 7 (section 3 of DOMA). See the Defense of Marriage Act (DOMA), Pub.L. 104-199 (PDF), 110 Stat. 2419 (September 21, 1996).

[^ 9] Prior to the Supreme Court decision, *United States v. Windsor*, USCIS did not recognize relationships between two persons of the same sex as marriages or intended marriages in accordance with section 3 of DOMA.

[^ 10] Officers should consult OCC in cases where the marriage was originally an opposite-sex marriage celebrated in a state that does not recognize same-sex marriage, and one of the spouses changed gender after the marriage.

004299

[^ 11] See *Matter of Luna*, 18 I&N Dec. 385 (BIA 1983). See *Matter of Ma*, 15 I&N Dec. 70 (BIA 1974).

[^ 12] See *Matter of Ma*, 15 I&N Dec. 70, 71 (BIA 1974). See *Matter of Miraldo*, 14 I&N Dec. 704 (BIA 1974).

[^ 13] For example, law requires both parties to be domiciled in the country at the time of divorce, but that was not the case. See *Matter of Hosseinian*, 19 I & N Dec. 453 (BIA 1987). See *Matter of Weaver*, 16 I&N Dec. 730 (BIA 1979). See *Matter of Luna*, 18 I&N Dec. 385 (BIA 1983).

[^ 14] See 8 CFR 319.1(b)(1).

[^ 15] See 8 CFR 103.2(b). See 8 CFR 319.1 and 8 CFR 319.2.

[^ 16] For purposes of determining whether a common law marriage exists, see statutes and case law for the appropriate jurisdiction.

[^ 17] The date a common law marriage commences is determined by laws of the relevant jurisdiction.

[^ 18] See 8 CFR 319.1(b)(2)(i) and 8 CFR 319.2(c).

[^ 19] See INA 319(a). See 8 CFR 319.1(a)(3) and 8 CFR 319.1(b).

[^ 20] See 8 CFR 319.1(b)(2)(ii)(C) and guidance below on "Involuntary Separation" under the paragraph "Failure to be Living in Marital Union due to Separation." See Volume 12, Citizenship and Naturalization, Part G, Spouses of U.S. Citizens, Chapter 2, Marriage and Marital Union for Naturalization, Section 3, Failure to be Living In Marital Union due to Separation [12 USCIS-PM G.2(D)(3)].

[^ 21] See 8 CFR 319.1(b)(1).

[^ 22] See 8 CFR 319.1(b)(2)(i). See 8 CFR 319.2(c).

[^ 23] See INA 319(d). See Part I, Military Members and their Families, Chapter 9, Spouses, Children, and Surviving Family Benefits, Section D, Naturalization for Surviving Spouse, Child, or Parent of Service Member (INA 319(d)) [12 USCIS-PM I.9(D)].

[^ 24] See 8 CFR 319.1(b)(2)(i) and 8 CFR 319.2(c).

[^ 25] See *Matter of Hussein*, 15 I&N Dec. 736 (BIA 1976).

[^ 26] See *Matter of Luna*, 18 I&N Dec. 385 (BIA 1983).

[^ 27] See 8 CFR 319.1(b)(2)(i). See 8 CFR 319.2(c). See INA 337.

[^ 28] See for example, *Nehme v. INS*, 252 F.3d 415, 422-27 (5th Cir. 2001) (Discussing legal separation for purposes of derivation of citizenship).

[^ 29] See 8 CFR 319.1(b)(2)(ii)(A).

[^ 30] See 8 CFR 319.1(b)(2)(ii)(B).

[^ 31] See *U.S. v. Moses*, 94 F. 3d 182 (5th Cir. 1996).

[^ 32] See 8 CFR 319.1(b)(2)(ii)(C).

004300

004301



 USCIS Only Internal Version

[Home](#) > [Policy Manual](#) > [Volume 7 - Adjustment of Status](#) > [Part B - 245(a) Adjustment](#) > Chapter 2 - Eligibility Requirements

# Chapter 2 - Eligibility Requirements

**Guidance**

[Resources (30)](#)

[Appendices (2)](#)

[Updates (9)](#)

[History (2)](#)

A [noncitizen](#) must meet certain eligibility requirements to adjust status to that of a lawful permanent resident (LPR).

| INA 245(a) Adjustment of Status Eligibility Requirements |
|---|
| The applicant must have been:<br><br>• Inspected and admitted into the United States; or<br>• Inspected and paroled into the United States. |
| The applicant must properly file an adjustment of status application. |
| The applicant must be physically present in the United States. |
| The applicant must be eligible to receive an immigrant visa. |
| An immigrant visa must be immediately available when the applicant files the adjustment of status application[1] and at the time of final adjudication.[2] |

Need Help?
Chat with Emma™

004302

| INA 245(a) Adjustment of Status Eligibility Requirements |
|---|
| The applicant must be admissible to the United States for lawful permanent residence or eligible for a waiver of inadmissibility or other form of relief. |
| The applicant merits the favorable exercise of discretion.[3] |

## A. "Inspected and Admitted" or "Inspected and Paroled"

In 1960, Congress amended INA 245(a) and made adjustment of status available to any otherwise eligible applicant who has been "inspected and admitted or paroled" into the United States.[4] Since 1960, the courts, legacy Immigration and Naturalization Service, and USCIS have read the statutory language "inspected and admitted or paroled" as:

- Inspected and admitted into the United States; or
- Inspected and paroled into the United States.

This requirement must be satisfied before the noncitizen applies for adjustment of status.[5] If an applicant has not been inspected and admitted or inspected and paroled before filing an adjustment application, the officer must deny the adjustment application.[6]

The inspected and admitted or inspected and paroled requirement does not apply to the following noncitizens seeking adjustment of status:

- INA 245(i) applicants; and
- Violence Against Women Act (VAWA) applicants.[7]

Special immigrant juveniles (SIJ) and other special immigrants are not exempt from this requirement. However, statutory provisions expressly state that these special immigrants are considered paroled for adjustment eligibility purposes. Accordingly, the beneficiaries of approved SIJ petitions meet the inspected and admitted or inspected and paroled requirement, regardless of their manner of arrival in the United States.[8] Certain special immigrants also meet this requirement.[9]

## 1. Inspection

*Authority*

Per delegation by the Secretary of Homeland Security, U.S. Customs and Border Protection (CBP) has jurisdiction over and exclusive inspection authority at ports-of-entry.[10]

*Definition and Scope*

Inspection is the formal process of determining whether a noncitizen may lawfully enter the United States. Immigration laws as early as 1875 specified that inspection must occur prior to a noncitizen's landing in or entering the United States and that prohibited noncitizens were to be returned to the country from which

004303

they came at no cost or penalty to the conveyor or vessel.[11] Inspections for air, sea, and land arrivals are now codified in the Immigration and Nationality Act (INA), including criminal penalties for illegal entry.[12]

To lawfully enter the United States, a noncitizen must apply and present himself or herself in person to an immigration officer at a U.S. port of entry when the port is open for inspection.[13] A noncitizen who arrives at a port of entry and presents himself or herself for inspection is an applicant for admission. Through the inspection process, an immigration officer determines whether the noncitizen is admissible and may enter the United States under all the applicable provisions of immigration laws.

As part of the inspection, the noncitizen must:

- Present any and all required documentation, including fingerprints, photographs, other biometric identifiers, documentation of status in the United States, and any other requested evidence to determine the noncitizen's identity and admissibility; and

- Establish that he or she is not subject to removal under immigration laws, Executive Orders, or Presidential Proclamations.[14]

In general, if the noncitizen presents himself or herself for questioning in person, the inspection requirement is met.[15] Nonetheless, if the noncitizen enters the United States by falsely claiming U.S. citizenship, the noncitizen is not considered to have been inspected by an immigration officer. In addition, the entry is not considered an admission for immigration purposes.[16]

*Inspection Outcomes*

Upon inspection, the officer at the port of entry typically decides one of the following outcomes for the noncitizen:

- The officer admits them;

- The officer paroles them;

- The officer allows them to withdraw his or her application for admission and depart immediately from the United States;[17]

- The officer denies them admission into the United States; or

- The officer defers the inspection to a later time at either the same or another CBP office or a port of entry.[18]

# 2. Admission[19]

A noncitizen is admitted if the following conditions are met: [20]

- The noncitizen applied for admission as an "alien" at a port of entry; and

- An immigration officer inspected the applicant for admission as an "alien" and authorized him or her to enter the United States in accordance with the procedures for admission.[21]

A noncitizen who meets these two requirements is admitted, even if the person obtained the admission by fraud.[22] Likewise, the noncitizen is admitted, even if the CBP officer performed a cursory inspection.

As long as the noncitizen meets the procedural requirements for admission, the noncitizen meets the inspected and admitted requirement for adjustment of status.[23] Any type of admission can meet the

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 4312 of 4699 PageID #:  7477

inspected and admitted requirement, which includes, but is not limited to, admission as a nonimmigrant, an immigrant, or a refugee.

Notwithstanding, if the noncitizen makes a false claim to U.S. citizenship or to U.S. nationality at the port of entry and an immigration officer permits the noncitizen to enter the United States, the noncitizen has not been admitted.[24] A U.S. citizen arriving at a port of entry is not subject to inspection; therefore, a noncitizen who makes a false claim to U.S. citizenship is considered to have entered without inspection.[25]

Similarly, a noncitizen who entered the United States after falsely claiming to be a returning LPR is not considered to have been procedurally inspected and admitted because a returning LPR generally is not an applicant for admission.[26] An LPR returning from a temporary trip abroad would only be considered to be seeking admission or readmission to the United States if any of the following factors applies:

- The LPR has abandoned or relinquished his or her LPR status;

- The LPR has been absent from the United States for a continuous period in excess of 180 days;

- The LPR has engaged in illegal activity after having departed the United States;

- The LPR has departed from the United States while under legal process seeking his or her removal from the United States, including removal proceedings under the INA and extradition proceedings;

- The LPR has committed an offense described in the criminal-related inadmissibility grounds, unless the LPR has been granted relief for the offense;[27] or

- The LPR is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.[28]

*Evidence of Admission*

An Arrival/Departure Record (Form I-94), including a replacement[29] when appropriate, is the most common document evidencing a noncitizen's admission.[30] The following are other types of documentation that may be accepted as proof of admission into the United States:

- Admission stamp in passport, which may be verified using DHS systems;

- Employment Authorization Card (Form I-688A), for special agricultural worker applicants, provided it was valid during the last claimed date of entry on the adjustment application;

- Temporary Resident Card (Form I-688), for special agricultural workers or legalization applicants granted temporary residence, provided it was valid during the last claimed date of entry on the adjustment application; and

- Border Crossing Card (Form I-586 or Form DSP-150[31]), provided it was valid on the date of last claimed entry.

When inspected and admitted to the United States, the following nonimmigrants are exempt from the issuance of an Arrival/Departure Record:[32]

- A Canadian citizen admitted as a visitor for business, visitor for pleasure, or who was permitted to directly transit through the United States;

- A nonimmigrant residing in the British Virgin Islands who was admitted only to the United States Virgin Islands as a visitor for business or pleasure;[33]

004305

- A Mexican national admitted with a B-1/B-2 Visa and Border Crossing Card (Form DSP-150) at a land or sea port of entry as a visitor for business or pleasure for a period of 30 days to travel within 25 miles of the border; and

- A Mexican national in possession of a Mexican diplomatic or official passport.[34]

In these situations, an applicant should submit alternate evidence to prove his or her inspection and admission to the United States. This may include a Border Crossing Card, plane tickets evidencing travel to the United States, or other corroborating evidence.

## 3. Parole

*Authority*

The Secretary of Homeland Security delegated parole authority to USCIS, CBP, and U.S. Immigration and Customs Enforcement (ICE).[35]

*Definition and Scope*

A noncitizen is paroled if the following conditions are met:

- They are seeking admission to the United States at a port of entry; and

- An immigration officer inspected them as an "alien" and permitted them to enter the United States without determining whether they may be admitted into the United States.[36]

A grant of parole is a temporary and discretionary act exercised on a case-by-case basis. Parole, by definition, is not an admission.[37]

*Paroled for Deferred Inspection[38]*

On occasion, CBP grants deferred inspection to arriving aliens found inadmissible during a preliminary inspection at a port of entry. Deferred inspection is generally granted only after CBP:

- Verifies the person's identity and nationality;

- Determines that the person would likely be able to overcome the identified inadmissibility by obtaining a waiver or additional evidence; and

- Determines that the person does not present a national security risk to the United States.

The decision to defer inspection is at the CBP officer's discretion.

If granted deferred inspection, CBP paroles the person into the United States and defers completion of the inspection to a later time. A person paroled for a deferred inspection typically reports for completion of inspection within 30 days of the deferral[39] to a CBP office with jurisdiction over the area where the person will be staying or residing in the United States.[40]

The grant of parole for a deferred inspection satisfies the "inspected and paroled" requirement for purposes of adjustment eligibility.[41]

*Urgent Humanitarian Reasons or Significant Public Benefit*

004306

DHS may parole a noncitizen based on urgent humanitarian or significant public benefit reasons.[42] DHS may grant urgent humanitarian or significant public benefit parole only on a case-by-case basis.[43] Any type of urgent humanitarian, significant public benefit, or deferred inspection-directed parole meets the "paroled into the United States" requirement.[44]

*Parole in Place: Parole of Certain Noncitizens Present Without Admission or Parole*

A noncitizen who is present in the United States without inspection and admission or inspection and parole is an applicant for admission.[45] DHS can exercise its discretion to parole such a person into the United States.[46] In general, USCIS grants parole in place only sparingly.

The fact that a person is a spouse, child, or parent of an active duty member of the U.S. armed forces, a member in the Selected Reserve of the Ready Reserve, or someone who previously served in the U.S. armed forces or the Selected Reserve of the Ready Reserve ordinarily weighs heavily in favor of parole in place. Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such a person.

If DHS grants parole before a person files an adjustment application, the applicant meets the "inspected and paroled" requirement for adjustment. Parole in place does not permit approval of an adjustment application that was filed before the grant of parole.[47]

Parole in place does not relieve the applicant of the need to meet all other eligibility requirements for adjustment of status and the favorable exercise of discretion.[48] For example, except for immediate relatives and certain other immigrants, an applicant must have continuously maintained a lawful status since entry into the United States.[49]

*Conditional Parole*

Conditional parole is also known as release from custody. This is a separate and distinct process from parole and does not meet the "inspected and paroled" requirement for adjustment eligibility.[50]

*Evidence of Parole*

Evidence of parole includes:

- A parole stamp on an advance parole document;[51]

- A parole stamp in a passport; or

- An Arrival/Departure Record (Form I-94) endorsed with a parole stamp.[52]

## 4. Commonwealth of the Northern Mariana Islands

A Commonwealth of the Northern Mariana Islands (CNMI) applicant who is granted parole meets the inspected and paroled requirement. On May 8, 2008, the Consolidated Natural Resources Act was signed into law, which replaced the CNMI's prior immigration laws and extended most U.S. immigration law provisions to the CNMI for the first time in history.[53] The transition period for implementation of U.S. immigration law in the CNMI began on November 28, 2009.

As of that date, all noncitizens present in the CNMI (other than LPRs) became present in the United States by operation of law without admission or parole. In recognition of the unique situation caused by the extension of U.S. immigration laws to the CNMI, all noncitizens present in the CNMI on or after that date

004307

who apply for adjustment of status are considered applicants for admission[54] to the United States and are eligible for parole.

Because of these unique circumstances, USCIS grants parole to applicants otherwise eligible to adjust status to serve as both an inspection and parole for purposes of meeting the requirements for adjustment. Under this policy, the USCIS Guam Field Office or the USCIS Saipan Application Support Center grants parole to an applicant otherwise eligible for parole and adjustment immediately prior to approving the adjustment of status application.

# 5. Temporary Protected Status

A grant of temporary protected status (TPS)[55] is not, in itself, an admission for purposes of adjustment under INA 245(a).[56]

Therefore, a noncitizen who entered the United States without having been inspected and admitted or inspected and paroled, and who is subsequently granted TPS, does not meet the inspected and admitted or inspected and paroled requirement under INA 245(a) for adjustment.[57] However, a grant of TPS does not prevent a noncitizen from demonstrating eligibility for INA 245(a) adjustment if the noncitizen was inspected and admitted or inspected and paroled when last entering the United States.

For purposes of adjustment of status under INA 245, a noncitizen with TPS is considered as being in and maintaining lawful status as a nonimmigrant only during the period that TPS is in effect.[58] TPS does not cure any previous failure to maintain continuously a lawful status in the United States.[59]

*Admission Following Travel Abroad with Prior Consent*

TPS beneficiaries may travel abroad temporarily with the prior consent of DHS under INA 244(f)(3). [60] When DHS provides prior consent to a TPS beneficiary to travel abroad, it documents that consent by issuing a TPS travel authorization document to the beneficiary.[61] Upon returning to the United States in accordance with the terms of DHS's prior authorization, a TPS beneficiary must be inspected and admitted into TPS, with certain exceptions.[62] TPS beneficiaries whom DHS has inspected and admitted into TPS after such authorized travel are "inspected and admitted" for purposes of adjustment of status under INA 245(a).[63] This is true even if the TPS beneficiary was present without admission or parole when initially granted TPS.[64] However, travel with TPS authorization does not execute an outstanding removal order. [65]

*Past Treatment of Travel Abroad with Prior Consent*

Previously, USCIS issued TPS beneficiaries advance parole documents under 8 CFR 244.15, which references the advance parole provisions as the procedure to authorize travel. Upon returning from abroad, TPS beneficiaries with advance parole documents were inspected and, if eligible, paroled into the United States. The treatment of such parole for purposes of INA 245(a) varied over the years, as summarized in the table below.

**Effect of Authorized Travel on TPS Beneficiaries Under Applicable Policy**

| Date of Departure | Did Parole or Admission Upon Return Satisfy INA 245(a)? |
|---|---|

| Date of Departure | Did Parole or Admission Upon Return Satisfy INA 245(a)? |
|---|---|
| From December 12, 1991, until February 25, 2016 | While there was no stated agency policy, noncitizens were generally considered paroled for the purpose of INA 245(a) (regardless of whether the beneficiary had been admitted or paroled before departing). |
| From February 25, 2016, until August 20, 2020 | Yes, regardless of whether the beneficiary had been admitted or paroled before departing.[66] |
| After August 20, 2020, until July 1, 2022 | No, the beneficiary's status as admitted or paroled for INA 245(a) was unchanged by travel.[67] |
| On or after July 1, 2022 | Yes, regardless of whether the beneficiary had been admitted or paroled before departing.[68] |

[Redaction - Start]

For a more detailed discussion of the treatment of authorized travel for TPS beneficiaries, see the Appendix: Past Treatment of Temporary Protected Status-Authorized Travel [7 USCIS-PM B.2, Appendices Tab].

[Redaction - End]

*Retroactive Application of Current Policy*

In some cases, explained below, USCIS applies the current policy retroactively and considers past travel to have resulted in an inspection and admission for purposes of INA 245(a), even if the policy or practice in place at the time the travel occurred instructed otherwise.

Past travel must meet each of the following requirements to be considered for retroactive application of current guidance:

- The noncitizen obtained prior authorization to travel abroad temporarily on the basis of being a TPS beneficiary;[69]

- The noncitizen's TPS was not withdrawn, or the designation for their foreign state (or part of a foreign state) was not terminated or did not expire during their travel;[70]

- The noncitizen returned to the United States in accordance with the authorization to travel; and

- Upon return, the noncitizen was inspected by INS or DHS at a designated port of entry and paroled or otherwise permitted to pass into the territorial boundaries of the United States in accordance with the TPS-based travel authorization.[71]

If the past travel does not meet each of these requirements, USCIS applies the policy that was in effect at the time of departure.[72] If the past travel does meet each of these requirements, USCIS will consider retroactive application of the current guidance.

004309

In cases arising in the Fifth Circuit, USCIS treats the authorized reentry after any qualifying prior travel as an inspection and admission, regardless of the procedure used when the TPS beneficiary was permitted to reenter the United States and regardless of whether the travel documentation refers to advance parole.[73]

[Redaction - Start]

If the noncitizen resides in the Fifth Circuit (Texas, Louisiana or Mississippi) and the case is adjudicated in the Fifth Circuit, the case arises in the Fifth Circuit. If the case is adjudicated in the Fifth Circuit, but the noncitizen does not reside there (or vice-versa), officers should consult their local counsel.

[Redaction - End]

Elsewhere, USCIS determines on a case-by-case basis whether a noncitizen who was paroled or otherwise permitted to enter after TPS-authorized travel under prior guidance should be treated as inspected and admitted for purposes of a given adjudication. USCIS makes the determination to apply this guidance retroactively based on the circumstances of the individual case, with consideration of any reliance on the prior policy, applicable law, and any other factors relevant to the individual application.

In cases arising outside of the Fifth Circuit, the officer first considers whether treating qualifying prior travel as an admission, rather than parole, is necessary for the approval of the application. In most cases, whether the prior entry is treated as an admission or a parole does not affect the outcome of an application for adjustment of status under INA 245(a).[74] If the distinction between admission and parole does not affect the outcome, the officer does not make a retroactivity determination.

Where the distinction between admission and parole is critical to the outcome of the adjudication, the officer assesses the individual case to determine whether to consider a prior return from TPS-authorized travel as an admission. In most instances, when the officer determines that an applicant meets all other eligibility requirements and merits adjustment of status in the exercise of discretion, it would be appropriate for the officer, on a case-by-case basis, to deem the prior parole to be an admission under the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (MTINA).[75]

*Five-Factor Test for Retroactivity Determination (Retail Union Test)*

The officer must apply the following five-factor test in any retroactivity determination for adjustment of status applications arising outside of the Fifth Circuit:[76]

- Factor 1: Whether the effect of TPS-authorized travel has previously been considered;

- Factor 2: Whether the new policy regarding the effect of TPS-authorized travel represents an abrupt departure from well-established practice or merely attempts to clarify an unsettled area of law;

- Factor 3: The extent to which the adjustment of status applicant to whom the new policy would apply relied on the former rule;[77]

- Factor 4: The burden (if any) that retroactive application of the policy would impose on the adjustment of status applicant; and

- Factor 5: The statutory interest in applying the new policy despite the applicant's reliance on the old policy.[78]

In the context of an adjustment of status application involving prior TPS-authorized travel, consideration of factors 1, 2, and 5 should be consistent across most cases:

004310

- The effect of TPS-authorized travel under MTINA is not a question of first impression, as USCIS and INS had prior policy and practice on the question (factor 1);

- USCIS' adoption of the interpretation described in this guidance is a change from USCIS' prior practice and guidance (factor 2); and

- There is a strong statutory interest in applying the best interpretation of the statute (factor 5).

While factors 1 and 2 may weigh against retroactive application of this policy change, factor 5 generally weighs in favor of retroactive application.

The officer also considers whether a particular applicant relied on either *Matter of Z-R-Z-C-* or DHS's prior use of advance parole to implement TPS travel (factor 3).[79] If the applicant did rely on past policy or practice, the officer considers whether retroactive application of the new policy would negatively affect or otherwise burden the applicant due to such reliance (factor 4).

Accordingly, retroactivity determinations usually center on factors 3 and 4. In most cases the change in interpretation does not create a significant burden on the applicant but is instead favorable to the applicant, and the officer may deem a prior parole an admission for purposes of the adjustment of status application.

In the rare event that a TPS beneficiary relied on being paroled into the United States, rather than being inspected and admitted, in a way that negatively impacts eligibility for adjustment of status, the officer weighs the negative impact against the other factors in the *Retail Union* test on a case-by-case basis.[80] In this assessment, the negative impact carries significant weight, and because factors 1 and 2 also weigh against retroactivity, officers should generally avoid retroactive application if the applicant would be harmed.[81] However, if the harm in a particular case is outweighed by the other factors, then the officer may deem a prior parole an admission in that case.

USCIS expects that, under the *Retail Union* test, retroactive application of the current policy is appropriate in most adjustment of status applications and favorable to the applicants.

# 6. Asylum[82]

An asylee whose adjustment application is based on his or her asylee status adjusts under INA 209(b).[83] An asylee, however, may seek to adjust under INA 245(a) if the asylee prefers to adjust on a basis other than the asylee's status. This may arise in cases where, for example, an asylee marries a U.S. citizen and subsequently seeks to adjust status as an immediate relative of a U.S. citizen rather than under the asylee provision. In order to adjust under INA 245(a), however, the asylee must meet the eligibility requirements that apply under that provision.

There may be circumstances where asylees are not able to meet certain requirements for adjustment under INA 245(a). For instance, a noncitizen who enters without inspection and is subsequently granted asylum does not satisfy the inspected and admitted or inspected and paroled requirement.[84] On the other hand, an asylee who departs the United States and is admitted or granted parole upon return to a port of entry meets the inspected and admitted or inspected and paroled requirement.

# 7. Waved Through at Port-of-Entry

In some cases, a noncitizen may claim that he or she arrived at a port of entry and presented himself or herself for inspection as a noncitizen, but the inspector waved (allowed to pass) him or her through the port of entry without asking any questions.

Where a noncitizen physically presents himself or herself for questioning and makes no knowing false claim to U.S. citizenship, the noncitizen is considered to have been inspected even though he or she volunteers no information and is asked no questions by the immigration authorities. Such a noncitizen satisfies the inspected and admitted requirement of INA 245(a) as long as the noncitizen sufficiently proves that he or she was indeed waved through by an immigration official at a port of entry. [85]

An officer may find that an adjustment applicant satisfies the inspected and admitted requirement based on a claim that he or she was waved through at a port of entry if:

- The applicant submits evidence to support the claim, such as third-party affidavits from those with personal knowledge of the facts stated in the affidavits and corroborating documentation; and

- The officer determines that the claim is credible. [86]

The burden of proof is on the applicant to establish eligibility for adjustment of status. [87] Accordingly, the applicant must support and sufficiently establish the claim that he or she was admitted as a noncitizen and not as a presumed U.S. citizen. For example, if the applicant was in a car with U.S. license plates and with U.S. citizens onboard, the applicant should submit persuasive evidence to establish he or she physically presented himself or herself to the inspector and was admitted as a noncitizen. [88]

## B. Properly Filing an Adjustment Application

To adjust status, a noncitizen must file an Application to Register Permanent Residence or Adjust Status (Form I-485) in accordance with the form instructions. The adjustment application must be properly signed and accompanied by the appropriate fee. [89] The application must be filed at the correct filing location, as specified in the form instructions. USCIS rejects adjustment applications if the application is:

- Filed at an incorrect location;

- Not filed with the correct fee, unless granted a fee waiver;

- Not properly signed; or

- Filed when an immigrant visa is unavailable. [90]

## C. Eligible to Receive an Immigrant Visa

### 1. General Eligibility for an Immigrant Visa

An adjustment applicant must be eligible to receive an immigrant visa. An applicant typically establishes eligibility for an immigrant visa through an immigrant petition in one of the categories listed in the table below.

**Eligibility to Receive an Immigrant Visa**

| Immigrant Category | Petition | Who May Qualify |
|---|---|---|
| Family-Based | Petition for Alien Relative (Form I-130) | • Immediate relatives of U.S. citizens[91]<br>• Unmarried sons and daughters of U.S. citizens (21 years of age and older)<br>• Spouses and unmarried children (under 21 years of age) of LPRs<br>• Unmarried sons and daughters of LPRs<br>• Married sons and daughters of U.S. citizens<br>• Brothers and sisters of U.S. citizens (if the U.S. citizen is 21 years of age or older) |
| Family-Based | Petition for Alien Fiancé(e) (Form I-129F) | • Fiancé(e) of a U.S. citizen |
| Family-Based | Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360) | • Widow or widower of a U.S. citizen<br>• VAWA self-petitioners |
| Employment-Based | Immigrant Petition for Alien Worker (Form I-140) | • Priority workers<br>• Members of the professions holding an advanced degree or persons of exceptional ability<br>• Skilled workers, professionals, and other workers |
| Employment-Based | Immigrant Petition by Standalone Investor (Form I-526) | • Standalone Investors |
| Employment-Based | Immigrant Petition by Regional Center Investor (Form I-526E) | • Regional Center Investors |

004313

| Immigrant Category | Petition | Who May Qualify |
|---|---|---|
| Special Immigrants | Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360) | • Religious workers<br>• Certain international employees<br>• Panama Canal Zone employees<br>• Certain physicians<br>• International organization officers and employees<br>• Special immigrant juveniles<br>• Certain U.S. armed forces members<br>• Certain broadcasters<br>• Certain Afghanistan and Iraq nationals |
| Diversity Immigrant Visa[92] | Not applicable (Diversity visas do not require a USCIS-filed petition) | • Diversity immigrants |

## 2. Dependents

The spouse and children of certain family-based, employment-based, and Diversity Immigrant Visa adjustment applicants may also obtain LPR status through their relationship with the principal applicant. Because the spouse and children do not have an independent basis to adjust status apart from their relationship to the principal immigrant, they are "dependents" of the principal for purpose of eligibility for adjustment of status.

Dependents do not have their own underlying immigrant petition and may only adjust based on the principal's adjustment of status. In general, dependent applicants must have the requisite relationship to the principal both at the time of filing the adjustment application and at the time of final adjudication.[93]

## 3. Concurrent Filing

The immigrant petition establishing the underlying basis to adjust is typically filed before the noncitizen files the adjustment application. In some instances, the applicant may file the adjustment application at the same time the immigrant petition is filed.[94]

## D. Immigrant Visa Immediately Available at Time of Filing and at Time of Approval

004314

In general, an immigrant visa must be available before a noncitizen can apply for adjustment of status.[95] An immigrant visa is always available to applicants seeking adjustment as immediate relatives. Visas are numerically limited for most other immigrant categories eligible to adjust; applicants in these numerically limited categories may need to wait until a visa is available before they can file an adjustment application. Furthermore, an immigrant visa must be available for issuance on the date USCIS approves any adjustment application.[96]

# E. Admissible to the United States

An adjustment of status applicant must be admissible to the United States.[97] An applicant who is inadmissible may apply for a waiver of the ground of inadmissibility, if a waiver is available, or another form of relief. The applicable grounds of inadmissibility and any available waivers depend on the immigrant category under which the applicant is applying.[98]

# F. Bars to Adjustment of Status

An applicant may not be eligible to apply for adjustment of status if one or more bars to adjustment applies.[99] The bars to adjustment of status may apply to applicants who either entered the United States in a particular status or manner, or committed a particular act or violation of immigration law.[100] The table below refers to noncitizens ineligible to apply for adjustment of status, unless otherwise exempt.[101]

### Noncitizens Barred from Adjustment of Status

| Noncitizen | INA Section | Entries and Periods of Stay to Consider | Exempt from Bar |
|---|---|---|---|
| Crewman[102] | 245(c)(1) | Only most recent permission to land, or admission prior to filing for adjustment | VAWA-based applicants |

| Noncitizen | INA Section | Entries and Periods of Stay to Consider | Exempt from Bar |
|---|---|---|---|
| In Unlawful Immigration Status on the Date the Adjustment Application is Filed<br><br>OR<br><br>Who Failed to Continuously Maintain Lawful Status Since Entry into United States[103]<br><br>OR<br><br>Who Continues in, or Accepts, Unauthorized Employment Prior to Filing for Adjustment | 245(c)(2)[104] | All entries and time periods spent in the United States (departure and return does not remove the ineligibility)[105] | VAWA-based applicants<br><br>Immediate relatives[106]<br><br>Certain special immigrants[107]<br><br>245(k) eligible[108] |
| Admitted in Transit Without a Visa (TWOV) | 245(c)(3) | Only most recent admission prior to filing for adjustment | VAWA-based applicants |
| Admitted as a Nonimmigrant Without a Visa under a Visa Waiver Program[109] | 245(c)(4) | Only most recent admission prior to filing for adjustment | VAWA-based applicants<br><br>Immediate relatives |
| Admitted as Witness or Informant[110] | 245(c)(5) | Only most recent admission prior to filing for adjustment | VAWA-based applicants |
| Who is Deportable Due to Involvement in Terrorist Activity or Group[111] | 245(c)(6) | All entries and time periods spent in the United States | VAWA-based applicant[112] |

| Noncitizen | INA Section | Entries and Periods of Stay to Consider | Exempt from Bar |
|---|---|---|---|
| Seeking Adjustment in an Employment-based Immigrant Category and Not in a Lawful Nonimmigrant Status | 245(c)(7) | Only most recent admission prior to filing for adjustment | VAWA-based applicants<br><br>Immediate relatives and other family-based applicants<br><br>Special immigrant juveniles[113]<br><br>245(k) eligible[114] |
| Who has Otherwise Violated the Terms of a Nonimmigrant Visa[115]<br><br>OR<br><br>Who has Ever Engaged in Unauthorized Employment[116] | 245(c)(8)[117] | All entries and time periods spent in the United States (departure and return does not remove the ineligibility)[118] | VAWA-based applicants<br><br>Immediate relatives[119]<br><br>Certain special immigrants<br><br>245(k) eligible[120] |

In all cases, the applicant is subject to any and all applicable grounds of inadmissibility even if the applicant is not subject to any bar to adjustment, or is exempt from any or all the bars to adjustment.

## 1. Overlapping Bars

Some bars to adjustment may overlap in their application, despite their basis in separate sections of the law.[121] For example, an applicant admitted under the Visa Waiver Program who overstays the admission is barred by both INA 245(c)(2) and INA 245(c)(4). Because some bars overlap, more than one bar can apply to an applicant for the same act or violation. In such cases, the officer should address each applicable adjustment bar in the denial notice.

## 2. Exemptions from the Bars[122]

Congress has provided relief from particular adjustment bars to certain categories of immigrants such as VAWA-based adjustment applicants, immediate relatives, and designated special immigrants.

Furthermore, INA 245(k) exempts eligible applicants under the employment-based 1st, 2nd, 3rd and certain 4th preference[123] categories from the INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8) bars.

Specifically, an eligible employment-based adjustment applicant may qualify for this exemption if the applicant failed to maintain a lawful status, engaged in unauthorized employment, or violated the terms of his or her nonimmigrant status (admission under a nonimmigrant visa) for 180 days or less since his or her most recent lawful admission.[124]

# Footnotes

[^ 1] See Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions, Section B, Definition of Properly Filed [7 USCIS-PM A.3(B)].

[^ 2] See Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section C, Verify Visa Availability [7 USCIS-PM A.6(C)].

[^ 3] See Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 4] As originally enacted, INA 245(a) made adjustment available only to a noncitizen who "was lawfully admitted…as a bona fide nonimmigrant and who is continuing to maintain that status." See Immigration and Nationality Act of 1952, Pub. L. 82-414 (PDF), 66 Stat. 163, 217 (June 27, 1952). Admission as a bona fide nonimmigrant remained a requirement until 1960. See Pub. L. 86-648 (PDF) (July 14, 1960). Congress amended that threshold requirement several times. The 1960 amendment removed the requirement of admission as a bona fide nonimmigrant.

[^ 5] See 8 CFR 245.1(b)(3).

[^ 6] See legacy Immigration and Naturalization Service (INS) General Counsel Opinion 94-28, 1994 WL 1753132 ("Congress enacted INA 245 in such a manner that persons who entered the U.S. without inspection are ineligible to adjust"). See S. Rep. 86-1651, 1960 U.S.C.C.A.N. 3124, 3136 ("This legislation will not benefit the alien who has entered the United States in violation of the law") and 3137 ("The wording of the amendments is such as not to grant eligibility for adjustment of status to alien crewmen and to aliens who entered the United States surreptitiously"). See Matter of Robles (PDF), 15 I&N Dec. 734 (BIA 1976) (explaining that entry into the United States after intentionally evading inspection is a ground for deportation under (then) INA 241(a)(2)).

[^ 7] See INA 245(a).

[^ 8] See INA 245(h)(1), which states that SIJ-based applicants are considered paroled into the United States for purposes of INA 245(a).

[^ 9] See INA 245(g), which holds that certain special immigrants, as defined under INA 101(a)(27)(k), are considered paroled into the United States for purposes of INA 245(a).

[^ 10] See Delegation of Authority to the Commissioner of U.S. Customs and Border Protection, Department of Homeland Security (DHS) Delegation No. 7010.3.

[^ 11] See Section 5 of the Act of March 3, 1875, 18 Stat. 477. See Sections 6, 8, 10, and 11 of the Act of March 3, 1891, 26 Stat. 1084. See Sections 8, 12, 16, and 18 of the Act of February 20, 1907, 34 Stat. 898. See Sections 10, 15, and 16 of the Immigration Act of 1917, Pub. L. 301 (February 5, 1917).

004318

[^ 12] See INA 231-235 and INA 275. See *Matter of Robles* (PDF), 15 I&N Dec. 734 (BIA 1976) (holding that entry into the United States after intentionally evading inspection is a ground for deportation under (then) INA 241(a)(2)).

[^ 13] See 8 CFR 235.1(a). See *Matter of S-* (PDF), 9 I&N Dec. 599 (BIA 1962) (inspection is the process that determines a noncitizen's initial right to enter the United States upon presenting himself or herself for inspection at a port of entry). See *Ex Parte Saadi*, 23 F.2d 334 (S.D. Cal. 1927).

[^ 14] See INA 235(d). See 8 CFR 235.1(f)(1).

[^ 15] See *Matter of Areguillin* (PDF), 17 I&N Dec. 308 (BIA 1980), and *Matter of Quilantan* (PDF), 25 I&N Dec. 285 (BIA 2010), which held that a noncitizen who had physically presented himself or herself for questioning and made no knowing false claim of citizenship had satisfied the inspected and admitted requirement of INA 245(a); alternatively, a noncitizen who gains admission to the U.S. upon a knowing false claim to U.S. citizenship cannot be deemed to have been inspected and admitted. See *Matter of Pinzon* (PDF), 26 I&N Dec. 189 (BIA 2013).

[^ 16] See *Reid v. INS*, 420 U.S. 619, 624 (1975) (a noncitizen who enters the United States based on a false claim to U.S. citizenship is excludable under former INA 212(a)(19), or INA 212(a)(6)(C) today, and considered to have entered without inspection).

[^ 17] See INA 235(a)(4).

[^ 18] Deferred inspection is a form of parole. A noncitizen who is deferred inspection is paroled into the United States for the period of time necessary to complete the inspection. See 8 CFR 235.2(c). For more information on deferred inspection, see Subsection 3, Parole [7 USCIS-PM B.2(A)(3)].

[^ 19] See INA 101(a)(13)(A). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) amended the statute by changing the concept of "entry" to "admission" and "admitted." See Section 301(a) of IIRIRA, Division C of Pub. L. 104-208 (PDF), 110 Stat. 3009, 3009-575 (September 30, 1996). INA 101(a)(13)(B) clarifies that parole is not admission.

[^ 20] See INA 101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Legislative history does not elaborate on the meaning of "lawful."

[^ 21] See 8 CFR 235.1(f)(1).

[^ 22] See *Matter of Areguilin* (PDF), 17 I&N Dec. 308 (BIA 1980). See INA 291 (burden of proof). See *Emokah v. Mukasey*, 523 F.3d 110 (2nd Cir 2008). While it is an "admission," procuring admission by fraud or willful misrepresentation is illegal and has several consequences. For example, the noncitizen may be inadmissible and removable. See INA 212(a)(6)(C) and INA 237(a)(1)(A).

[^ 23] See *Matter of Quilantan* (PDF), 25 I&N Dec. 289, 290 (BIA 2010). See *Matter of Areguilin* (PDF), 17 I&N Dec. 308 (BIA 1980). See INA 245(a). The noncitizen is not inadmissible as an illegal entrant under INA 212(a)(6)(A)(i). For more information on admissibility, see Volume 8, Admissibility [8 USCIS-PM].

[^ 24] See *Matter of Pinzon* (PDF), 26 I&N Dec. 189 (BIA 2013) (a noncitizen who enters the United States by falsely claiming U.S. citizenship is not deemed to have been inspected by an immigration officer, so the entry is not an "admission" under INA 101(a)(13)(A)).

004319

[^ 25] See *Reid v. INS*, 420 U.S. 619, 624 (1975). See *Matter of S-* (PDF), 9 I&N Dec. 599 (BIA 1962). A noncitizen who makes a false claim to U.S. citizenship is inadmissible for making the claim (INA 212(a)(6)(C)(ii)). The noncitizen may also be inadmissible for presence without admission or parole (INA 212(a)(6)(A)(i)) and unlawful presence after previous immigration violations (INA 212(a)(9)(C)).

[^ 26] Such noncitizens are inadmissible for presence without admission or parole and may be inadmissible for unlawful presence after previous immigration violations. See INA 212(a)(6)(A)(i) and INA 212(a)(9)(C).

[^ 27] See INA 212(a)(2). See INA 212(h) and INA 240A(a).

[^ 28] See INA 101(a)(13)(C). See generally *Matter of Collado-Munoz*, 21 I&N Dec. 1061 (BIA 1997). The noncitizen who enters by making a false claim to LPR status at a port of entry and who is permitted to enter is inadmissible for presence without admission or parole (INA 212(a)(6)(A)(i)) and fraud and misrepresentation (INA 212(a)(6)(C)(i)). The noncitizen may also be inadmissible for unlawful presence after previous immigration violations. See INA 212(a)(9)(C).

[^ 29] This will typically be documented by an approved Application for Replacement/Initial Nonimmigrant Arrival-Departure Document (Form I-102).

[^ 30] CBP or USCIS can issue an Arrival/Departure Record (Form I-94). If admitted to the United States by CBP at an airport or seaport after April 30, 2013, CBP may have issued an electronic Form I-94 to the applicant instead of a paper Form I-94. To obtain a paper version of an electronic Form I-94, visit the CBP website. Some travelers admitted to the United States at a land border, airport, or seaport, after April 30, 2013, with a passport or travel document and who were issued a paper Form I-94 by CBP may also be able to obtain a replacement Form I-94 from the CBP website. Applicants may also obtain Form I-94 by filing an Application for Replacement/Initial Nonimmigrant Arrival-Departure Record (Form I-102), with USCIS.

[^ 31] U.S. Department of State Form DSP-150.

[^ 32] See 8 CFR 235.1(h)(1)(i)-(v).

[^ 33] See 8 CFR 212.1(b).

[^ 34] See 8 CFR 212.1(c).

[^ 35] See Delegation to the Bureau of Citizenship and Immigration Services, DHS Delegation No. 0150.1; Delegation of Authority to the Assistant Secretary for U.S. Immigration and Customs Enforcement, DHS Delegation No. 7030.2; Delegation of Authority to the Commissioner of U.S. Customs and Border Protection, DHS Delegation No. 7010.3.

[^ 36] See INA 212(d)(5)(A).

[^ 37] See INA 101(a)(13)(B) and 212(d)(5)(A).

[^ 38] See 8 CFR 235.2.

[^ 39] CBP generally issues a Notice to Appear 30 days after a person's non-appearance for the deferred inspection, so an officer should review the relevant case and lookout systems for any entries related to CBP.

[^ 40] CBP generally creates either an A-file or T-file to document the deferred inspection.

004320

[^ 41] See legacy Immigration and Naturalization Service (INS) General Counsel Opinion 94-28, 1994 WL 1753132 (whether deferred inspection constitutes parole for purposes of adjustment of status under INA 245).

[^ 42] See INA 212(d)(5).

[^ 43] See INA 212(d)(5).

[^ 44] Only parole under INA 212(d)(5)(A) meets this requirement.

[^ 45] See INA 235(a).

[^ 46] See legacy INS General Counsel Opinion 98-10, 1998 WL 1806685.

[^ 47] As with any immigration benefit request, eligibility for adjustment must exist when the application is filed and continue through adjudication. See 8 CFR 103.2(b)(1).

[^ 48] For example, parole does not erase any periods of prior unlawful status. Therefore, a noncitizen who entered without inspection will remain ineligible for adjustment of status, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exceptions to INA 245(c)(2) or INA 245(c)(8).

[^ 49] See INA 245(c)(2). See Chapter 4, Status and Nonimmigrant Visa Violations (INA 245(c)(2) and INA 245(c)(8)) [7 USCIS-PM B.4].

[^ 50] See INA 236(a)(2)(B). Neither the statute nor regulations deem a release on conditional parole equal to a parole under INA 212(d)(5)(A). Several circuits and the BIA have opined on this and rejected the argument that the two concepts are equivalent processes. See *Ortega-Cervantes v. Gonzales* (PDF), 501 F.3d 1111 (9th Cir. 2007). See *Matter of Castillo-Padilla* (PDF), 25 I&N Dec. 257 (BIA 2010). See *Delgado-Sobalvarro v. Atty. Gen.* (PDF), 625 F.3d 782 (3rd Cir. 2010). See *Cruz Miguel v. Holder*, 650 F.3d 189 (2nd Cir. 2011).

[^ 51] See Authorization for Parole of an Alien into the United States (Form I-512 or I-512L).

[^ 52] See 8 CFR 235.1(h)(2). If a noncitizen was admitted to the United States by CBP at an airport or seaport after April 30, 2012, the noncitizen may have been issued an electronic Form I-94 by CBP, instead of a paper Form I-94. For more information, see the CBP website.

[^ 53] See Consolidated Natural Resources Act of 2008, Pub. L. 110-229 (PDF) (May 8, 2008).

[^ 54] See INA 235(a)(1).

[^ 55] See INA 244. See 8 CFR 244.

[^ 56] On June 7, 2021, the Supreme Court held that a grant of TPS is not an admission, stating that where a noncitizen was not lawfully admitted or paroled, "TPS does not alter that fact." See *Sanchez v. Mayorkas (PDF)*, 141 S.Ct. 1809 (2021). Before this decision, the U.S. Courts of Appeals in the Sixth Circuit, Eighth Circuit, and Ninth Circuit had ruled that a noncitizen who enters the United States without inspection and who is subsequently granted TPS meets the inspected and admitted or inspected and paroled requirement under INA 245(a). USCIS applied these rulings only to applications for adjustment of status filed by applicants residing within their respective jurisdictions. The Supreme Court decision in *Sanchez* overrules the rulings of the Sixth, Eighth, and Ninth Circuits; therefore, on or after June 7, 2021, a grant of

TPS is no longer an admission for adjustment of status purposes in any circuit. However, USCIS deems applicants who became lawful permanent residents under the Sixth, Eighth, or Ninth Circuit Court precedents before June 7, 2021, to have been lawfully admitted for permanent residence. See *Flores v. USCIS (PDF)*, 718 F.3d 548 (6th Cir. 2013). See *Velasquez v. Barr (PDF)*, 979 F.3d 572 (8th Cir. 2020). See *Ramirez v. Brown (PDF)*, 852 F.3d 954 (9th Cir. 2017).

[^ 57] See *Sanchez v. Mayorkas (PDF)*, 141 S.Ct. 1809 (2021). See *Matter of H-G-G-*, 27 I&N Dec. 617 (AAO 2019).

[^ 58] See INA 244(f)(4). See 8 CFR 244.10(f)(2)(iv).

[^ 59] See *Matter of H-G-G-*, 27 I&N Dec. 617 (AAO 2019).

[^ 60] See INA 244(f)(3). See 8 CFR 244.10(f)(2)(iii).

[^ 61] See 8 CFR 244.15(a). Although 8 CFR 244.15 provides that permission to travel abroad is sought and provided "pursuant to the Service's advance parole provisions," the regulation was issued in 1991 before enactment of the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (MTINA), Pub. L. 102-232 (PDF) (December 12, 1991), as amended, and, consequently, the reference in 8 CFR 244.15 to advance parole was overruled by Section 304(c) of that statute, which required that eligible TPS beneficiaries "shall be inspected and admitted" upon return from qualifying authorized travel. See DHS Office of General Counsel, Immigration Consequences of Authorized Travel and Return to the United States by Individuals Holding Temporary Protected Status (PDF, 3.36 MB), Attachment p. 28, issued April 6, 2022. Until 8 CFR 244.15 is amended in accordance with MTINA, and corresponding changes are made to related forms and other documentation, USCIS considers the reference to advance parole in 8 CFR 244.15 to encompass any advance discretionary authorization to travel under INA 244(f)(3). See Rescission of *Matter of Z-R-Z-C-* as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries (PDF, 3.36 MB), PM-602-0188, issued July 1, 2022. Related forms and documentation include the Application for Temporary Protected Status (Form I-821) and Application for Travel Document (Form I-131).

[^ 62] See Section 304(c) of MTINA, Pub. L. 102-232 (PDF), 105 Stat. 1733, 1749 (December 12, 1991), as amended. TPS beneficiaries subject to certain criminal, national security, and related grounds of inadmissibility as described in INA 244(c)(2)(A)(iii) may not be eligible for admission into TPS when returning from travel authorized under INA 244(f)(3).

[^ 63] Inspection and admission after TPS-authorized travel also satisfies the admission requirement of INA 245(k). However, admission into TPS does not mean that the TPS beneficiary is "admissible" as required by INA 245(a)(2), as MTINA specifies that only certain inadmissibility grounds apply to beneficiaries returning to the United States after TPS-authorized travel. See Section 304(c) of MTINA, Pub. L. 102-232 (PDF), 105 Stat. 1733, 1749 (December 12, 1991), as amended.

[^ 64] See DHS Office of General Counsel, Immigration Consequences of Authorized Travel and Return to the United States by Individuals Holding Temporary Protected Status (PDF, 3.36 MB), Attachment p. 28, issued April 6, 2022.

[^ 65] See *Duarte v. Mayorkas*, 27 F.4th 1044 (5th Cir. 2022). For more information, see Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions, Section D, Jurisdiction [7 USCIS-PM A.3(D)]. Additionally, USCIS applies the holding of *Matter of Arrabally and Yerrabelly (PDF)*, 25 I&N Dec. 771 (BIA 2012)—that a noncitizen who leaves the United States temporarily with advance parole does not make a

departure from the United States within the meaning of INA 212(a)(9)(B)(i)(II)—to noncitizens who leave the United States with authorization under INA 244(f)(3), as the Board's reasoning is equally applicable to TPS-authorized travel and return under MTINA.

[^ 66] See General Adjustment of Status Policies and Section 245(a) of the Immigration and Nationality Act (PDF, 171.82 KB), PA-2016-001, issued February 25, 2016.

[^ 67] See Matter of Z-R-Z-C-, Adopted Decision 2020-02 (AAO Aug. 20, 2020) (PDF, 268.36 KB), PM-602-0179, issued August 20, 2020, rescinded July 1, 2022.

[^ 68] See Rescission of Matter of Z-R-Z-C- as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries (PDF, 3.36 MB), PM-602-0188, issued July 1, 2022.

[^ 69] TPS beneficiaries are noncitizens granted TPS in accordance with INA 244(a)(1)(A).

[^ 70] See INA 244(c)(3). See INA 244(b)(3).

[^ 71] See Section 304(c) of MTINA, Pub. L. 102-232 (PDF), 105 Stat. 1733, 1749 (December 12, 1991), as amended.

[^ 72] These TPS beneficiaries do not meet the requirements specified in Section 304(c) of MTINA, Pub. L. 102-232 (PDF), 105 Stat. 1733, 1749 (December 12, 1991), as amended.

[^ 73] See Duarte v. Mayorkas, 27 F.4th 1044, 1061 (5th Cir. 2022) (concluding that "USCIS was … not authorized to grant the Appellants the advance parole that the 512L form it issued them purported to allow" and that as a result they "were admitted and not paroled into the country").

[^ 74] Determining whether a prior entry was an admission or parole may be necessary, for example, in employment-based adjustment of status applications by noncitizens seeking an exception to the bars to adjustment in INA 245(c)(2), (7), and (8). The exception at INA 245(k) requires, in part, that the applicant be present in the United States "pursuant to a lawful admission." In such cases, USCIS conducts the individualized assessment described above.

[^ 75] See Pub. L. 102-232 (PDF) (December 12, 1991), as amended.

[^ 76] The five-factor test formulated by the D.C. Circuit entails consideration of whether the particular case is one of first impression, whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, the extent to which the party against whom the new rule is applied relied on the former rule, the degree of the burden which a retroactive order imposes on a party, and the statutory interest in applying a new rule despite the reliance of a party on the old standard. See Retail, Wholesale and Department Store Union AFL-CIO v. NLRB, 466 F.2d 380, 390 (D.C. Cir. 1972). See Montgomery Ward & Co. v. FTC, 691 F.2d 1322 (9th Cir. 1982). See Matter of Cordero-Garcia, 27 I&N Dec. 652, 657 (BIA 2019) (adopting the test in the immigration context).

[^ 77] "The former rule" meaning prior USCIS or INS legal interpretation, policy, or practice regarding the effect of TPS-authorized travel.

[^ 78] See Retail, Wholesale and Department Store Union AFL-CIO v. NLRB, 466 F.2d 380, 390 (D.C. Cir. 1972).

[^ 79] See the table, Effect of Authorized Travel on TPS Beneficiaries Under Applicable Policy, above.

004323

[^ 80] See *Retail, Wholesale and Department Store Union AFL-CIO v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972). Because USCIS applies the holding of *Matter of Arrabally and Yerrabelly (PDF)*, 25 I&N Dec. 771 (BIA 2012) to travel authorized under INA 244(f)(3) followed by admission to the United States into TPS, a noncitizen who leaves the United States temporarily on TPS-authorized travel does not make a departure from the United States within the meaning of INA 212(a)(9)(B)(i)(II). Therefore, whether or not USCIS considers travel under MTINA as an admission after authorized travel or a parole after advance parole will not adversely affect noncitizens with respect to reliance upon *Matter of Arrabally*.

[^ 81] See *Retail, Wholesale and Department Store Union AFL-CIO v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972) (citing *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)) (explaining that courts must assess whether retroactivity would produce more "mischief" than the ill effects of continuing to enforce a rule which is "contrary to statutory design or legal and equitable principles").

[^ 82] See 8 CFR 209.2. For more information on asylee adjustment, see Part M, Asylee Adjustment [7 USCIS-PM M].

[^ 83] Due to the different statutory bases, different eligibility requirements, exceptions, and waivers apply to applicants seeking adjustment based on their asylum status compared to those seeking adjustment under INA 245(a).

[^ 84] The grant of asylum is not an admission contemplated under INA 101(a)(13)(A). See *Matter of V-X- (PDF)*, 26 I&N Dec. 147 (BIA 2013). See legacy INS General Counsel Opinion, expressed by INS Central Office, Deputy Asst. Commissioner, Adjudications, R. Michael Miller, in letter dated September 4, 1986, reprinted in Interpreter Releases, Vol. 63, No. 40, October 10, 1986, pp. 891-892.

[^ 85] See *Matter of Quilantan* (PDF), 25 I&N Dec. 285, 291-92 (BIA 2010). See *Matter of Areguillin* (PDF), 17 I&N Dec. 308 (BIA 1980). See 8 CFR 103.2(b).

[^ 86] Any documentary evidence of admission should be consistent with entry information provided in the adjustment application or in oral testimony and should not contradict any other admission or departure evidence in DHS records. For example, when there is no Arrival/Departure Record or passport with an admission stamp, an officer may rely on information in DHS records, information in the applicant's file, and the applicant's testimony to make a determination on whether the applicant was inspected and admitted or inspected and paroled into the United States.

[^ 87] See 8 CFR 103.2(b). See Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 88] For more information, see Subsection 2, Admission [7 USCIS-PM B.2(A)(2)].

[^ 89] See 8 CFR 103.2(a) and 8 CFR 103.2(b). See 8 CFR 103.2(a)(2). See Fee Schedule (Form G-1055). The applicant may submit a fee waiver request. See Request for Fee Waiver (Form I-912).

[^ 90] See 8 CFR 103.2(a)(7) and 8 CFR 245.2(a)(2)(i). In addition, USCIS should process a fee refund when an adjustment application is accepted in error because a visa was unavailable at the time of filing and the error is recognized before interview or adjudication. For more information on the definition of "properly filed" and fee refunds, see Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions [7 USCIS-PM A.3] and Volume 1, General Policies and Procedures, Part B, Submission of Benefit Requests, Chapter 3, Fees [1 USCIS-PM B.3].

[^ 91] See INA 201(b). Immediate relatives of a U.S. citizen include the U.S. citizen's spouse, children (unmarried and under 21 years of age), and parents (if the U.S. citizen is 21 years of age or older). Widow(er)s of U.S. citizens and noncitizens admitted to the United States as a fiancé(e) or child of a fiancé(e) of a U.S. citizen may also be considered immediate relatives if they meet certain conditions.

[^ 92] Diversity visas do not rely on a USCIS-filed petition to obtain a visa. The diversity visa lottery is conducted by the U.S. Department of State.

[^ 93] See 8 CFR 103.2(b)(1).

[^ 94] See Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions, Section C, Concurrent Filings [7 USCIS-PM A.3(C)].

[^ 95] See Part A, Adjustment of Status Policies and Procedures, Chapter 3, Filing Instructions, Section B, Definition of "Properly Filed," Subsection 4, Visa Availability Requirement [7 USCIS-PM A.3(B)(4)] and Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section C, Verify Visa Availability [7 USCIS-PM A.6(C)].

[^ 96] See INA 245(a)(3). See 8 CFR 245.1(g)(1), 8 CFR 245.2(a)(5)(ii), and 8 CFR 103.2(b)(1). For more information, see Part A, Adjustment of Status Policies and Procedures, Chapter 6, Adjudicative Review, Section C, Verify Visa Availability [7 USCIS-PM A.6(C)].

[^ 97] If one or more of the grounds listed in INA 212 applies to an applicant then the applicant may be inadmissible. For more information, see Volume 8, Admissibility [8 USCIS-PM] and Volume 9, Waivers and Other Forms of Relief [9 USCIS-PM].

[^ 98] See Volume 9, Waivers and Other Forms of Relief [9 USCIS-PM].

[^ 99] See INA 245(c).

[^ 100] Even if noncitizens are barred from adjusting under INA 245(a), they may still adjust under another statutory basis as long as they meet the applicable eligibility requirements.

[^ 101] An immigrant category may exempt an applicant or make an applicant eligible for a waiver of certain adjustment bars and grounds of inadmissibility. Even if an exemption applies to an applicant who would otherwise be barred from adjustment of status, the applicant may still be denied adjustment as a matter of discretion. For more information on discretion, see Part A, Adjustment of Status Policies and Procedures, Chapter 10, Legal Analysis and Use of Discretion [7 USCIS-PM A.10].

[^ 102] It is service as a crewman that triggers the bar to adjustment, not the actual nonimmigrant status. This bar applies if the noncitizen was actually permitted to land under the D-1 or D-2 visa category. The bar also applies if the noncitizen was a crewman admitted as a C-1 to join a crew, or as a B-2 if serving on a crew.

[^ 103] This does not apply to noncitizens who failed to maintain lawful status through no fault of their own or solely for technical reasons, as defined in 8 CFR 245.1(d)(2).

[^ 104] The INA 245(c)(2) bar addresses three distinct types of immigration violations.

[^ 105] See 8 CFR 245.1(d)(3).

[^ 106] See INA 201(b). Immediate relatives of a U.S. citizen include the U.S. citizen's spouse, children (unmarried and under 21 years of age), and parents (if the U.S. citizen is 21 years of age or older). Widow(er)s of U.S. citizens and noncitizens admitted to the United States as a fiancé(e) or child of a fiancé(e) of a U.S. citizen may also be considered immediate relatives if they meet certain conditions.

[^ 107] See special immigrants described in INA 101(a)(27)(H)-(K).

[^ 108] If an adjustment applicant is eligible for the 245(k) exemption, then he or she is exempted from the INA 245(c)(2) bar to adjustment. See Chapter 8, Inapplicability of Bars to Adjustment, Section E, Employment-Based Exemption under INA 245(k) [7 USCIS-PM B.8(E)].

[^ 109] See INA 212(l) and INA 217.

[^ 110] See INA 101(a)(15)(S) and INA 245(j). The applicants are beneficiaries of a request by a law enforcement agency to adjust status (Inter-Agency Alien Witness and Informant Record (Form I-854)).

[^ 111] See INA 237(a)(4)(B).

[^ 112] Although VAWA-based applicants are exempt from all INA 245(c) bars per statute, a VAWA-based applicant may still be determined to be removable (INA 237(a)(4)(B)) or inadmissible (INA 212(a)(3)) due to egregious public safety risk and on security and related grounds.

[^ 113] INA 245(c)(7) does not apply to VAWA-based applicants, immediate relatives, family-based applicants, or special immigrant juveniles because these noncitizens are not seeking adjustment as employment-based applicants. See 8 CFR 245.1(b)(9).

[^ 114] If an employment-based adjustment applicant is eligible for the INA 245(k) exemption, then he or she is exempted from the INA 245(c)(7) bar to adjustment. See Chapter 8, Inapplicability of Bars to Adjustment, Section E, Employment-Based Exemption under INA 245(k) [7 USCIS-PM B.8(E)].

[^ 115] This is also referred to as a noncitizen who has violated the terms of his or her nonimmigrant status.

[^ 116] There are no time restrictions on when such a violation must have occurred while physically present in the United States. Violations either before or after the filing of Form I-485 will render a noncitizen ineligible to adjust status under INA 245(a). A noncitizen seeking employment during the pendency of his or her adjustment applicant must fully comply with the requirements of INA 274A and 8 CFR 274a. See 62 FR 39417 (PDF) (Jul. 23, 1997).

[^ 117] The INA 245(c)(8) bar addresses two distinct types of immigration violations.

[^ 118] See 8 CFR 245.1(d)(3).

[^ 119] USCIS interprets the exemption listed in INA 245(c)(2) for immediate relatives and certain special immigrants as applying to the 245(c)(8) bar in addition to the 245(c)(2) bar. See 62 FR 39417 (PDF) (Jul. 23, 1997).

[^ 120] If an adjustment applicant is eligible for the 245(k) exemption, then he or she is exempted from the INA 245(c)(8) bar to adjustment. See Chapter 8, Inapplicability of Bars to Adjustment, Section E, Employment-Based Exemption under INA 245(k) [7 USCIS-PM B.8(E)].

[^ 121] See INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8).

004326

[^ 122] See Chapter 8, Inapplicability of Bars to Adjustment [7 USCIS-PM B.8].

[^ 123] This applies to religious workers only.

[^ 124] Notwithstanding INA 245(c)(2), INA 245(c)(7), and INA 245(c)(8), the officer should treat a noncitizen who meets the conditions set forth in INA 245(k) in the same manner as an applicant under INA 245(a).

Current as of July 18, 2024

004327

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**U.S. Citizenship and Immigration Services**

November 15, 2013                                    PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

**Purpose**

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to ensure consistent adjudication of parole requests made on behalf of aliens who are present without admission or parole and who are spouses, children and parents of those serving on active duty in the U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S. Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter 40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

**Scope**

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS) employees.

**Authority**

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(d)(5)(A), 1225(a), and 1255(a), (c)

**Background**

**Parole of Spouses, children and parents of Armed Forces personnel**

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives to assist military members, veterans, and their families to navigate our complex immigration system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.

- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.

- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States.  We as a nation have made a commitment to our veterans, to support and care for them.  It is a commitment that begins at enlistment, and continues as they become veterans.

- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families.  The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible."  Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]

- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States.  Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.  This latter use of parole is sometimes called "parole in place."  The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2]  That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3]  In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4]  The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States."  INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).

[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.

[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).

[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under  INA § 236(a)(2)(B) (so-called "conditional parole"), *see Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual.
Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be
  granted to certain family members of active duty members of the U.S. Armed Forces, individuals
  in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S.
  Armed Forces or the Selected Reserve of the Ready Reserve?  The second is a legal question: Does
  parole in place (for military family members or anyone else) affect whether an alien is inadmissible
  under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the
  alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed
Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously
Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.
Generally, parole in place is to be granted only sparingly.  The fact that the individual is a spouse, child
or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve
of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected
Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent
a criminal conviction or other serious adverse factors, parole in place would generally be an
appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that
situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status
under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to
the alien who is "present in the United States without being admitted or paroled."  This inadmissibility
ground generally covers those who entered the United States without inspection (and are still in the
United States).  Aliens who have entered the United States without inspection, while not "arriving
aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for
admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the
United States at any time or place other than as designated by the [Secretary of Homeland Security]."
Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense
("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is
true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the
various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of
coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA §
212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their
decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual.
Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular,
when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In
contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense.
Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien
who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i)
would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United
States without admission or parole, as the first prong requires, is to have entered without inspection at
some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives"
were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.
Together, they capture aliens who have already achieved entry without inspection and those who are in
the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two
anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically
superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i),
reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not
possibly have intended.  The latter ground renders inadmissible any alien who has ever been
unlawfully present in the United States for more than 180 days and then departs, but it limits the
inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the
second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections
212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added);
212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis
added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*,
sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted,
or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any
other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only
predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge");
212(a)(10)(A) ("coming to the United States to practice polygamy").
[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted
to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party");
212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or
admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented,
himself or herself" to be a U.S. citizen).
[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within
even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is
denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be
inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the
<u>only</u> intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).
[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the
United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even
after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have
to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or
policy reason to interpret "arrives" in that way.

004331

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless.  One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years.  That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole.  Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection).  Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i).  It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  INA § 245(c)(2).  Parole does not erase any periods of prior unlawful status.  Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**

AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞      1. A new section 21.1(c) is added to read:

**21.1   General Information About Relative Petitions**

\* \* \* \* \*

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o  Completed Form I-131, Application for Travel Document  (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o  Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or less, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- o  Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);

- o  Two identical, color, passport style photographs; and

- o  Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞  2.  Chapter 40.6.2(a) of the AFM is revised:

    a.  By amending Chapter 40.6.2(a)(1);

    b.  By deleting Chapter 40.6.2(a)(3)(ii);

    c.  By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and

    d.  By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

## 40.6.2  Individual Grounds of Inadmissibility Under INA Section 212(a)(6)

### (a)  INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.  Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a). The grant of parole overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility.  An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *


 (4) <u>Exemptions and Waivers</u>

* * * * *


 (ii) <u>Waivers</u>.  There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c).  As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 9

☞     3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c) Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate.



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

November 23, 2016                                              **PM-602-0114**

# Policy Memorandum

SUBJECT:    Discretionary Options for Designated Spouses, Parents, and Sons and Daughters
of Certain Military Personnel, Veterans, and Enlistees

**Purpose**

This policy memorandum (PM) clarifies and supplements guidance issued by U.S. Citizenship and
Immigration Services (USCIS) in 2013 ("the 2013 PM")[1] with respect to designated family members
of certain military personnel and veterans.  Specifically, this PM provides additional guidance on
discretionary options for:  (a) certain alien family members of individuals serving on active duty in
the U.S. Armed Forces or in the Selected Reserve of the Ready Reserve; (b) certain alien family
members of those who previously served on active duty or in the Selected Reserve of the Ready
Reserve (whether living or deceased) and were not dishonorably discharged; and (c) enlistees in the
Department of Defense (DoD) Delayed Entry Program (DEP).  This PM amends Chapter 21.1(c) of
the Adjudicator's Field Manual (AFM) to:

- Clarify that individuals who previously served in the military include those who are now
deceased but do not include those who were dishonorably discharged;

- Change all references to "children" to "sons and daughters";

- Provide guidance on deferred action for certain nonimmigrant and other alien recruits
(including enlistees in the Military Accessions Vital to the National Interest (MAVNI)
program) whose authorized periods of stay expire during the enlistment process, including
the time they are in the DEP;

- Provide guidance on deferred action for certain MAVNI and other DEP enlistees' family
members who are present in the United States without authorized periods of stay; and

- Provide guidance on deferred action for certain military family members who would be
eligible for parole under the guidelines in the 2013 PM but for the fact that they have already
been admitted.

---

[1] See USCIS Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces,
the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the
Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act 212(a)(6)(A)(i)* (Nov.
15, 2013), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-
1115_Parole_in_Place_Memo_.pdf.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 2

**Scope**

This PM applies to all U.S. Citizenship and Immigration Services (USCIS) employees.

**Authority**

Immigration and Nationality Act (INA) §§ 103(a)(1), 103(a)(3), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1103(a)(1), 1103(a)(3), 1182(d)(5)(A), 1225(a), and 1255(a), (c); 6 U.S.C. § 202(5).

**Background**

On November 15, 2013, pursuant to the authority conferred upon the Secretary of Homeland Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), USCIS issued a PM guiding the exercise of discretion with respect to applications for parole by designated family members of certain U.S. military personnel and veterans.  On November 20, 2014, the Secretary directed USCIS to expand on these policies, including by issuing new policies on the use of both parole and deferred action for certain family members of military personnel, veterans, and DEP enlistees.[2]  These new policies are intended to support the DoD in several ways, including by:

- Elaborating on general USCIS deferred action policies by identifying factors that are of particular relevance to discretionary determinations involving military personnel, veterans, DEP enlistees, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist military personnel, veterans, DEP enlistees, and their families in navigating our immigration system;

- Facilitating military morale and readiness and supporting DoD recruitment policies by considering temporarily deferring the removal of certain military family members;

- Furthering the goal of the MAVNI program to recruit certain foreign nationals whose skills are considered vital to the national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans who have served and sacrificed for our nation, and their families.

*DoD Delayed Entry Program (DEP)*

The DoD receives approximately 250,000 individuals into the all-volunteer force each year.  To effectively sustain this large volunteer force, DoD uses the DEP to manage and predictably meet the accession requirements of the military services.  Individuals who have no previous military experience and are seeking to enlist in the U.S. military must sign a contract by which they enter into the DEP for a period of up to 365 days while awaiting Basic Training.  This waiting period allows DoD to better anticipate and meet the needs of the various service components.  The DEP is a cornerstone of the U.S. military enlistment process.

Individuals who enlist in the military through the MAVNI program may also enter the DEP.  The MAVNI program allows certain nonimmigrants and other aliens to enlist in the military to fill

---

[2] Secretary of Homeland Security Memorandum, *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 3

positions requiring skills for which there are critical shortages of enlistees.[3] The program is currently
open to individuals with certain health care skills and individuals fluent in certain foreign languages.


**Policy**

I.   Parole in Place for Families of Certain Military Personnel and Veterans

USCIS has authority to grant parole to noncitizen applicants for admission, including those residing
in the United States (through "parole in place"),[4] on a case-by-case basis for urgent humanitarian
reasons or significant public benefit.  INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).  The 2013 PM
provides guidance on granting parole, on a discretionary case-by-case basis, for certain spouses,
children, and parents of, among others, individuals who "previously" served on active duty or in the
Selected Reserve of the Ready Reserve.  This PM clarifies that such language in the 2013 PM is
meant to include former designated military personnel (who were not dishonorably discharged)
whether they are living or deceased.  The close family members of such individuals, who served and
sacrificed for our Nation, are deserving of consideration for a favorable exercise of discretion on a
case-by-case basis in accordance with the 2013 PM.  This is true regardless of whether the former
military service members are living or deceased.

In addition, the 2013 PM contains multiple references to the "children" of current or former military
personnel.  Under the INA, the term "child" is limited to individuals who are unmarried and under
the age of 21.  *See* INA § 101(b)(1), 8 U.S.C. § 1101(b)(1).  This PM seeks to expand on the
provisions in the 2013 PM by replacing all references to "children" in the 2013 PM (and the
corresponding provisions in the AFM) with the term "sons and daughters."  This change would
further expand the provisions in the 2013 PM to the adult and married sons and daughters of covered
military personnel and veterans.  Because covered military personnel and veterans generally will be
U.S. citizens or lawful permanent residents (or, in the case of MAVNI, soon-to-be U.S. citizens or
lawful permanent residents), their sons and daughters will often be on paths to lawful permanent
resident status and eventual citizenship.  *See* INA § 203(a), 8 U.S.C. § 1153(a).  Parole in place or
deferred action would therefore serve as a temporary bridge for such sons and daughters while they
apply for and await adjudication of their applications for lawful permanent resident status.
Moreover, important family relationships continue to exist even after children turn 21 or marry.  The
same morale, deservedness, and preparedness rationales articulated in the 2013 PM with respect to
military personnel and their children continue to apply when such children turn 21 or marry.

II.   Deferred Action Requests by DEP Enlistees and the Families of Military Personnel, Veterans,
       and DEP Enlistees

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments
based on the totality of the evidence.  In doing so, USCIS will weigh and balance all relevant
considerations, both positive and negative.  Certain factors are of particular relevance to the exercise
of that discretion when deferred action requests are submitted by DEP enlistees or by the family

---

[3] The MAVNI program is authorized by 10 U.S.C. § 504(b)(2).  For further details, see DoD Instruction 1304.26.
"Qualifications for Enlistment, Appointment and Induction." For information about the DoD MAVNI program, see the
DoD MAVNI fact sheet, http://www.defense.gov/news/mavni-fact-sheet.pdf.
[4] The parole authority is most frequently used to permit aliens who are outside the United States to come into U.S.
territory, but aliens who are already physically present in the United States without having been admitted are also
eligible for parole.  See INA §§ 212(d)(5)(A), 235(a)(1). This latter use of parole is called "parole in place."

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 4

members of military personnel, veterans, or DEP enlistees.  Particularly strong positive factors
specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's
  authorized period of stay expires or terminates while in the DEP);

- Being the spouse, parent, son, or daughter of a MAVNI or other DEP enlistee (even if
  present in the United States without an authorized status); and

- Being an individual who would be eligible for parole under the 2013 PM, as clarified and
  amended by the present PM, but for the fact that such individual has already been admitted.

The presence of one or more of the preceding factors does not guarantee a grant of deferred action,
which constitutes only a favorable exercise of immigration enforcement discretion, but may be
considered a strong positive factor weighing in favor of granting deferred action as a matter of
discretion.  The ultimate decision rests on whether, based on the totality of the facts of the individual
case, USCIS finds that the positive factors outweigh any negative factors that may be present and
that a favorable exercise of enforcement discretion is warranted.

If an individual described in any of the three bullets above is approved for deferred action in the
exercise of discretion, the period of deferred action should be authorized in two-year increments;
USCIS may consider requests for renewal of deferred action as appropriate.

III. Petition for Alien Relative and Work Authorization

USCIS encourages applicants to continue on a path toward lawful permanent resident status
whenever applicable.  In cases where it is applicable, USCIS encourages the filing of a Form I-130,
Petition for Alien Relative, or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant.
In some cases where subsequent parole in place or a renewal of deferred action is requested, such
filing may be required (see AFM 21.1(c)(3)(A) below).  In addition, individuals who have obtained
parole in place or deferred action are eligible to apply for work authorization for the period of parole
or deferred action if they can demonstrate economic necessity.[5]

**Implementation**

The Adjudicator's Field Manual (AFM) Chapter 21.1, General Information About Relative Visa
Petitions, is amended as follows:

1. **Section 21.1(c) is revised by:**

- Redesignating current section "(c)" as subsection "(1)";

- Inserting new section "(c)" heading "Special Parole and Deferred Action Considerations.";

- Inserting, at the beginning of section (c):

On November 15, 2013, USCIS, pursuant to the authority conferred upon the Secretary of
Homeland Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), issued a Policy
Memorandum guiding the exercise of discretion with respect to applications for parole by

---

[5] See 8 CFR 274a.12(c)(11), (14).  See Form I-765, Application for Employment Authorization.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 5

designated family members of U.S. military personnel and veterans.  On November 20,
2014, the Secretary directed USCIS to issue new policies on the use of both parole in place
and deferred action for certain family members of certain military personnel, veterans, and
individuals who are seeking to enlist in the U.S. military.  See Secretary of Homeland
Security Memorandum, "Families of U.S. Armed Forces Members and Enlistees" (Nov. 20,
2014),
http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf

These new policies support the Department of Defense (DoD) in several ways, including
by:

- Elaborating on general USCIS deferred action policies by identifying factors that
  are of particular relevance to discretionary determinations involving military
  personnel, veterans, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist
  military members, veterans, and their families in navigating our complex
  immigration system;

- Facilitating military morale and readiness and supporting DoD recruitment policies
  by considering temporarily deferring the removal of certain military family
  members;

- Furthering the goal of the Military Accessions Vital to the National Interest (MAVNI)
  program to recruit certain foreign nationals whose skills are considered vital to the
  national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans, who have
  served and sacrificed for our nation, and their families.

For guidance on parole in place for certain family members of military personnel and
veterans, see AFM Chapter 21.1(c)(1).  For guidance on deferred action for certain
enlistees and certain family members of military personnel and veterans, see AFM Chapter
21.1(c)(2).

- Revising new subsection 21.1(c)(1) by:

    o Striking "Spouses, Children and Parents" and inserting "Spouses, Parents, Sons, and
      Daughters" in the heading;

    o Striking "spouse, child or parent" and inserting "spouse, parent, son, or daughter" in
      the sentence that begins with "The fact that the individual";

    o Inserting "(whether still living or deceased)" in the following places: in the heading,
      after the word "who"; and in the bullet point that begins with "Evidence that the
      alien's family member", after the word "who";

    o Inserting "on active duty" in the following places: in the heading, after the word
      "served"; in the sentence that begins with "The fact that the individual", after the

004341

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 6

        word "served"; and in the bullet point that begins with "Evidence that the alien's
family member", after the word "served";

- o Inserting "and Were Not Dishonorably Discharged" at the end of the heading;

- o Inserting "(if the former service member was not dishonorably discharged and either
  is living or died while the family member was residing in the United States)" in the
  sentence that begins with "The fact that the individual", after the second instance of
  the word "Ready Reserve";

- o Inserting "(this may include proof of filing a petition in certain cases – see AFM
  21.1(c)(3) below);" at the end of the bullet point that begins with "Evidence of the
  family relationship";

- o Inserting "(in the case of family members of veterans (whether still living or
  deceased), the service member must not have received a dishonorable discharge upon
  separation from the military)" after "(DD Form 1173)" in the bullet point that begins
  with "Evidence that the alien's family member";

- o Inserting "In the case of surviving family members, proof of residence in the United
  States at the time of the service member's death;" in a new bullet point after the bullet
  point that begins with "Evidence that the alien's family member"; and

- o Inserting the following new paragraphs after the bullet points: "Individuals who have
  obtained parole in place are eligible to apply for work authorization for the period of
  parole if they can demonstrate economic necessity.  See 8 CFR 274a.12(c)(11), (14).
  See Form I-765, Application for Employment Authorization.

  Parole in place may be granted only to individuals who are present without admission
  and are therefore applicants for admission.  Individuals who were admitted to the
  United States but are currently present in the United States beyond their periods of
  authorized stay are not eligible for parole in place, as they are no longer applicants for
  admission."

**2.  A new subsection (2) is added to Chapter 21.1(c) to read as follows:**

(2) <u>Deferred Action Consideration for Spouses, Parents, and Sons and Daughters of Active
Duty Military Personnel, Individuals in the Selected Reserve of the Ready Reserve, and
Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the
U.S. Military or the Selected Reserve of the Ready Reserve and Were Not Dishonorably
Discharged; and for MAVNI and other Enlistees in the Delayed Entry Program and their
Spouses, Parents, and Sons and Daughters</u>.

(A) <u>Deferred Action for DoD Delayed Entry Program Enlistees (Including MAVNI Recruits)
and Certain Family Members</u>.

Individuals who have no previous military experience and are seeking to enlist in the U.S.
Armed Forces must sign a contract by which they enter into the Delayed Entry Program
(DEP) for a maximum of 365 days while awaiting Basic Training.  While in the DEP, there
can be delays in starting active duty for the Active Components or initial active duty for
training for the Reserve Components.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 7

Individuals who enlist in the military through the Military Accessions Vital to the National
Interest (MAVNI) program may also enter the DEP.  The MAVNI program allows certain
foreign nationals to enlist in the military to fill positions where there are critical shortages in
health care and foreign language skills.  See the DoD MAVNI program fact sheet for further
details: http://www.defense.gov/news/mavni-fact-sheet.pdf.

Most MAVNI recruits are in a lawful nonimmigrant status at the time that they enlist.  For
example, it is common for a J-1 foreign exchange visitor or F-1 foreign student to enlist in
the U.S. military through MAVNI.  Through no fault of their own, MAVNI recruits in the DEP
may fall out of their lawful status while waiting to enter Basic Training.  This may occur, for
example, in cases where an F-1 foreign student completes his or her program of study
while waiting to enter Basic Training in the DEP.  In the same way, the family members of
such recruits often lose their lawful statuses because their statuses depend on those of the
recruits.  In addition, family members might lack status either because they are present
without being admitted or paroled, or because they were admitted or paroled but
overstayed their authorized periods of stay even before their MAVNI or other DEP family
member entered the DEP.

As in all deferred action determinations, USCIS will make case-by-case, discretionary
judgments based on the totality of the evidence.  In doing so, USCIS will weigh and
balance all relevant considerations, both positive and negative.  Certain factors, however,
are of particular relevance to the exercise of that discretion when deferred action requests
are submitted by individuals in DEP and their family members.  Particularly strong positive
factors specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's
  authorized period of stay expires while in the DEP); and

- Being the spouse, parent, son, or daughter of a MAVNI recruit or other individual in
  the DEP (even if present in the United States without an authorized status).

The presence of one or more of the preceding factors does not guarantee a grant of
deferred action but may be considered a strong positive factor weighing in favor of granting
deferred action.  The ultimate decision rests on whether, based on the totality of the facts of
the individual case, USCIS finds that the positive factors outweigh any negative factors that
may be present.

If an individual described in either of the two bullets above is granted deferred action in the
exercise of discretion, the period of deferred action should be authorized in two-year
increments; USCIS may consider requests for renewal of deferred action as appropriate.  If
the individual withdraws from the DEP or becomes disqualified from joining the military, any
period of deferred action for the family member may be terminated.

See AFM Chapter 21.1(c)(2)(C) for guidance on filing requests for deferred action.  See
AFM Chapter 21.1(c)(1) for guidance on parole in place.

(B) Deferred Action for Certain Family Members of Active Duty Members of the U.S.
Military, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who

004343

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 8

<u>(Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military
or in the Selected Reserve of the Ready Reserve and Were Not Dishonorably
Discharged</u>.

As in all deferred action determinations, USCIS will make case-by-case, discretionary
judgments based on the totality of the evidence.  In doing so, USCIS will weigh and
balance all relevant considerations, both positive and negative.  Certain factors, however,
are of particular relevance to the exercise of that discretion when deferred action requests
are submitted by the family members of military personnel and veterans.  One particularly
strong positive factor specific to such requests is that the person has been admitted and
is the spouse, parent, son, or daughter of an individual who is serving, or has previously
served on active duty in the U.S. military or in the Selected Reserve of the Ready
Reserve (if the former service member was not dishonorably discharged and either is
living or died while the family member was residing in the United States).  Such an
individual ordinarily fits the guidelines for parole under section 21.1(c)(1) above, except
for being statutorily ineligible solely because of his or her prior admission.  See INA §§
212(d)(5)(A), 235(a)(1), 8 U.S.C. §§ 1182(d)(5)(A), 1225(a)(1).

The presence of the preceding factor does not guarantee a grant of deferred action but
may be considered a strong positive factor weighing in favor of granting deferred action.
The ultimate decision rests on whether, based on the totality of the facts of the individual
case, USCIS finds that the positive factors outweigh any negative factors that may be
present.  If USCIS grants deferred action in the exercise of discretion, the period of
deferred action should be authorized in two-year increments; USCIS may consider
requests for renewal of deferred action as appropriate.

(C) <u>Filing Request for Deferred Action.</u>

To request deferred action, one must submit the following to the director of the USCIS
office with jurisdiction over the requestor's place of residence:

- Letter stating basis for the deferred action request [See AFM 21.1(c)(2)(A) and
  (c)(2)(B)];

- Evidence supporting a favorable exercise of discretion in the form of deferred
  action as elaborated in AFM 21.1(c)(2)(A) and (c)(2)(B) – (e.g., evidence of family
  member's current or previous military service, or alien's or family member's
  enlistment in the DEP; note that in the case of family members of veterans,
  whether still living or deceased, the service member must not have received a
  dishonorable discharge upon separation from the military);

- Proof of family relationship, if applying based on family relationship to military
  member, veteran, or enlistee (this may include proof of filing a petition in certain
  cases - see section below);

- In the case of surviving family members, proof of residence in the United States at
  the time of the service member's death;

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 9

- Proof of identity and nationality (including a birth certificate, a passport and/or identification card, driver's license, notarized affidavit(s), etc.);

- If applicable, any document the alien used to lawfully enter the United States (including, but not limited to, Form I-94, Arrival/Departure Record, passport with visa and/or admission stamp, and any other documents issued by other components of DHS or legacy INS);

- Form G-325A, Biographic Information;

- Two identical, color, passport style photographs; and

- Evidence of any additional discretionary factors that the requestor would like USCIS to consider.

Individuals who have obtained deferred action are eligible to apply for work authorization for the period of deferred action if they can demonstrate economic necessity.  See 8 CFR 274a.12(c)(11), (14).  See Form I-765, Application for Employment Authorization.

A requestor who has legal representation must submit a properly completed Form G-28, Notice of Entry as Attorney or Accredited Representative.

**3.  A new subsection (3) is added to Chapter 21.1(c) to read as follows:**

(3) <u>Petition Filing Requirement for Certain Parole or Deferred Action Requests</u>.

USCIS encourages applicants to continue on a path toward lawful permanent resident status whenever applicable.  In cases where it is applicable, USCIS encourages the filing of a Form I-130, Petition for Alien Relative (or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant) to allow USCIS to use an established process in evaluating the bona fides of the pertinent family relationship.  In some cases where subsequent parole in place or renewal of deferred action is requested, such filing may be required (see AFM 21.1(c)(3)(A) below).  USCIS checks the bona fides of the qualifying family relationship in all parole in place and deferred action requests regardless of whether the Form I-130 (or Form I-360) has been filed.

In all cases where a Form I-130 or Form I-360 has been filed, USCIS may grant either parole in place, as provided in AFM 21.1(c)(1), or deferred action, as provided in AFM 21.1.(c)(2), as long as the applicant's Form I-130 (or Form I-360) is pending or approved (and still valid). Even in cases where the Form I-130 or Form I-360 is required, it does not need to be approved prior to a grant of either parole in place or deferred action.  Upon receiving the receipt notice for the Form I-130 or Form I-360, the alien may file the request for either parole in place or deferred action with the USCIS office with jurisdiction over the alien's place of residence.  The request for either parole in place or deferred action must include documentation to establish an eligible family relationship.  Such evidence may include a previously approved petition.

<u>Note</u>: Proof of filing the Form I-130 or Form I-360 is not required, even in applicable cases,

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 10

for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1)
and AFM 21.1(c)(2).  See AFM 21.1(c)(3)(B).

(A) <u>Petition Required for Request for Subsequent Parole in Place or Renewal of  Deferred
Action</u>.

Active Duty military members, individuals in the Selected Reserve of the Ready Reserve,
individuals who have previously served on active duty in the U.S. military or in the Selected
Reserve of the Ready Reserve, and DEP enlistees, if eligible to file a Form I-130 on behalf
of a family member requesting subsequent parole in place or renewal of deferred action as
provided under AFM 21.1(c)(1) or (c)(2), <u>must</u> submit a completed Form I-130 for the family
member, with fee and according to the instructions on the form, prior to filing the request for
subsequent parole in place or renewal of deferred action, as applicable. (See Form I-130
instructions for more information on who may file.)

Surviving spouses, parents, sons, and daughters of deceased service members and
veterans (described above) who were residing in the United States at the time of the
service member's death and who are eligible to file Form I-360 on their own behalf must
submit a completed Form I-360, with fee and according to the instructions on the form, prior
to filing the request for subsequent parole in place or renewal of deferred action, as
applicable. (See Form I-360 instructions for more information on who may file. See also the
USCIS web site at: http://www.uscis.gov/military/family-based-survivor-benefits/survivor-
benefits-relatives-us-citizen-military-members.)

The Form I-130 (or Form I-360) filing requirement for requests for subsequent parole in
place or renewal of deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2)
applies only to requests that are submitted  on or after November 23, 2017 (one year after
publication of this memorandum).

(B) <u>Cases where Petition is Not Required at Any Time</u>.

Individuals who are ineligible to file a Form I-130 or a Form I-360 are not required to do so;
they may still request parole in place or deferred action, as applicable.  In particular, MAVNI
recruits in the DEP are not eligible to file Form I-130 and therefore not required to do so.
MAVNI recruits may, however, become eligible for naturalization under INA § 329(a) upon
entering active duty. Recruits typically must wait until they naturalize before filing a Form I-
130 for any eligible family members.

Proof of filing the Form I-130 (or Form I-360) also is not required, even in applicable cases,
for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1)
and AFM 21.1(c)(2).

**4.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical
order, to read:**

| AFM Update (11/23/2016) | Chapter 21.1 | This PM amends AFM Chapter 21.1(c) to address discretionary options for designated spouses, parents, and sons and daughters of certain military personnel, veterans, and enlistees. |
|---|---|---|

004346

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 11

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official
duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit,
substantive or procedural, enforceable at law or by any individual or other party in removal
proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the
Field Operations Directorate or Office of Policy & Strategy.

| AREA_TITLE | OCC_TITLE | O_GROUP | H_MEAN | H_PCT10 | H_PCT25 | H_MEDIAN | H_PCT75 | H_PCT90 |
|---|---|---|---|---|---|---|---|---|
| U.S. | All Occupations | total | 31.48 | 13.97 | 17.14 | 23.11 | 37.01 | 58.40 |
| U.S. | Management Occ | major | 66.23 | 26.23 | 37.66 | 56.19 | 81.29 | 111.36 |
| U.S. | Top Executives | minor | 65.43 | 22.31 | 31.81 | 49.74 | 79.57 | # |
| U.S. | Chief Executives | broad | 124.47 | 38.46 | 62.90 | 99.37 | # | # |
| U.S. | Chief Executives | detailed | 124.47 | 38.46 | 62.90 | 99.37 | # | # |
| U.S. | General and Oper | broad | 62.18 | 22.28 | 31.34 | 48.69 | 77.06 | 111.59 |
| U.S. | General and Oper | detailed | 62.18 | 22.28 | 31.34 | 48.69 | 77.06 | 111.59 |

  

# N E W S   R E L E A S E
## B U R E A U   O F   L A B O R   S T A T I S T I C S
U. S.   D E P A R T M E N T   O F   L A B O R

**For release 10:00 a.m. (ET) Friday, March 17, 2023**                    USDL-23-0488

Technical information:   (202) 691-6199  •  ncsinfo@bls.gov  •  www.bls.gov/eci
Media contact:           (202) 691-5902  •  pressoffice@bls.gov

## EMPLOYER COSTS FOR EMPLOYEE COMPENSATION - DECEMBER 2022

Total employer compensation costs for **civilian** workers averaged $42.48 per hour worked in December 2022, the U.S. Bureau of Labor Statistics reported today. Wages and salaries cost employers $29.32 and accounted for 69.0 percent of total costs, while benefits cost $13.17 and accounted for the remaining 31.0 percent. (See chart 1 and table 1.)

Total employer compensation costs for **state and local government** averaged $57.60 per hour worked. Wages and salaries averaged $35.69 per hour worked and represented 62.0 percent of total compensation costs, while benefit costs averaged $21.91 and accounted for the remaining 38.0 percent. (See chart 1 and tables 1 and 3.)

Total employer compensation costs for **private industry** workers averaged $40.23 per hour worked. Wage and salary costs averaged $28.37 and accounted for 70.5 percent of employer costs, while benefit costs were $11.86 and accounted for 29.5 percent. (See chart 1 and tables 1 and 4.)



**Chart 1. Employer costs per employee hour worked by ownership, December 2022**



**Chart 2. Retirement and savings costs by ownership, December 2022**

Retirement and savings costs for private industry workers averaged $1.36 per hour worked in December 2022 and accounted for 3.4 percent of total compensation costs. Retirement and savings costs for state and local government workers averaged $7.48 per hour worked in December 2022 and accounted for 13.0 percent of total compensation costs. Defined benefit costs averaged $0.41 per hour worked for private industry workers and $6.98 per hour worked for state and local government workers. Defined contribution costs averaged $0.95 per hour worked for private industry workers and $0.51 per hour worked for state and local government workers. (See chart 2 and table 1.)

004349

**Private industry retirement and savings costs**

Among private industry supersectors, the leisure and hospitality industry had the lowest employer retirement and savings costs at $0.18 per hour worked. Among the benefit components within the leisure and hospitality industry, legally required benefits accounted for 9.5 percent of total compensation and had the highest employer costs at $1.74 per hour worked. (See chart 3 and table 4.)

**Chart 3. Private industry retirement and savings costs by industry, December 2022**



Retirement and savings costs for union workers averaged $4.62 per hour worked and accounted for 8.5 percent of total compensation costs. Retirement and savings costs for nonunion workers averaged $1.07 per hour worked and accounted for 2.7 percent of total compensation costs. Defined benefit costs averaged $2.98 per hour worked for union workers and $0.18 per hour worked for nonunion workers. Defined contribution costs averaged $1.64 per hour worked for union workers and $0.89 per hour worked for nonunion workers. (See chart 4, table 5 and www.bls.gov/eci/data.htm.)

**Chart 4. Private industry retirement and savings costs by bargaining status, December 2022**



**Chart 5. Private industry retirement and savings costs by establishment size, December 2022**



Retirement and savings costs for workers in establishments with 1-49 workers averaged $0.71 per hour worked and accounted for 2.2 percent of total compensation. Retirement and savings costs for workers in establishments with 500 workers or more averaged $2.84 per hour worked and accounted for 4.9 percent of total compensation. (See chart 5 and table 6.)

**Employer Costs for Employee Compensation for March 2023 is scheduled to be released on Friday, June 16, 2023, at 10:00 a.m. (ET).**

004350

**TECHNICAL NOTE**

Employer Costs for Employee Compensation (ECEC), a product of the National Compensation Survey, provides the average employer cost for wages and salaries as well as benefits per hour worked. The ECEC covers the civilian economy, which includes data from both private industry and state and local government. Federal government workers are excluded. Additionally, the self-employed, private household workers, and the agricultural sector are excluded from private industry.

Total benefit costs consist of five major categories and include 18 benefit costs:

- Paid leave - vacation, holiday, sick, and personal leave;
- Supplemental pay - overtime and premium, shift differentials, and nonproduction bonuses;
- Insurance - life, health, short-term and long-term disability;
- Retirement and savings - defined benefit and defined contribution; and
- Legally required benefits - Social Security [refers to Old-Age, Survivors, and Disability Insurance (OASDI) program], Medicare, federal and state unemployment insurance, and workers' compensation.

All workers are included in the benefit cost estimates including those that do not have plan access or do not participate. Costs are also affected by other factors such as cost sharing between employers and employees, plan features, and plan generosity. For the latest information on the percentage of workers with access to and participating in employer-sponsored benefit plans, including health care and retirement and savings plans, see www.bls.gov/ebs.

The National Compensation Measures provides additional details on the sample design, calculation methodology, and resources explaining changes over time, see www.bls.gov/opub/hom/ncs/home.htm.

**Sample size**: Data for this reference period were collected from a probability sample of approximately 28,100 occupational observations selected from a sample of about 7,000 private industry establishments and approximately 7,600 occupational observations selected from a sample of about 1,400 state and local government establishments that provided data at the initial interview. Beginning December 2021, an additional (fourth) private industry sample is used in estimation to mitigate the impact of decreasing response rates.

**Measures of reliability**: Relative standard errors (RSEs) provide users a tool to ascertain the quality of an estimate to ensure that it is within an acceptable range for their intended purpose. RSEs are available at www.bls.gov/web/ecec/ecec-rse.htm and the database query tool at www.bls.gov/eci/data.htm.

**Comparisons**: Compensation cost levels in state and local government should not be directly compared with levels in private industry. Differences between these sectors stem from factors such as variation in work activities and occupational structures.

**Classification systems**: The National Compensation Survey publishes estimates of compensation costs and trends as well as benefit coverage by ownership, industry group, occupational group, and geographic areas, see www.bls.gov/eci/factsheets/national-compensation-survey-classification-systems-mapping-files.htm.

**Additional information**: Additional and historical ECEC estimates are available in the ECEC database query tool at www.bls.gov/eci/data.htm and in xlsx format at www.bls.gov/eci/tables.htm. The 2023 ECEC release schedule is available at www.bls.gov/schedule/news_release/ecec.htm. Subscribe to receive the BLS Economic News Release email at public.govdelivery.com/accounts/USDOLBLS/subscriber/new.

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

004351

**Table 1. Employer Costs for Employee Compensation by ownership**
[Dec. 2022]

| Compensation component | Civilian workers[1] | | Private industry workers | | State and local government workers | |
|---|---|---|---|---|---|---|
| | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation | Cost ($) | Percent of compensation |
| Total compensation[2] | 42.48 | 100.0 | 40.23 | 100.0 | 57.60 | 100.0 |
| Wages and salaries | 29.32 | 69.0 | 28.37 | 70.5 | 35.69 | 62.0 |
| Total benefits | 13.17 | 31.0 | 11.86 | 29.5 | 21.91 | 38.0 |
| Paid leave | 3.17 | 7.5 | 3.01 | 7.5 | 4.23 | 7.3 |
| Vacation | 1.55 | 3.6 | 1.54 | 3.8 | 1.58 | 2.7 |
| Holiday | 0.94 | 2.2 | 0.89 | 2.2 | 1.21 | 2.1 |
| Sick | 0.50 | 1.2 | 0.41 | 1.0 | 1.09 | 1.9 |
| Personal | 0.19 | 0.4 | 0.16 | 0.4 | 0.34 | 0.6 |
| Supplemental pay | 1.37 | 3.2 | 1.49 | 3.7 | 0.56 | 1.0 |
| Overtime and premium[3] | 0.37 | 0.9 | 0.39 | 1.0 | 0.25 | 0.4 |
| Shift differentials | 0.07 | 0.2 | 0.07 | 0.2 | 0.05 | 0.1 |
| Nonproduction bonuses | 0.93 | 2.2 | 1.03 | 2.6 | 0.26 | 0.5 |
| Insurance | 3.45 | 8.1 | 3.00 | 7.4 | 6.52 | 11.3 |
| Life | 0.05 | 0.1 | 0.04 | 0.1 | 0.08 | 0.1 |
| Health | 3.28 | 7.7 | 2.82 | 7.0 | 6.36 | 11.0 |
| Short-term disability | 0.08 | 0.2 | 0.09 | 0.2 | 0.03 | 0.1 |
| Long-term disability | 0.05 | 0.1 | 0.05 | 0.1 | 0.05 | 0.1 |
| Retirement and savings | 2.16 | 5.1 | 1.36 | 3.4 | 7.48 | 13.0 |
| Defined benefit | 1.26 | 3.0 | 0.41 | 1.0 | 6.98 | 12.1 |
| Defined contribution | 0.89 | 2.1 | 0.95 | 2.4 | 0.51 | 0.9 |
| Legally Required benefits | 3.02 | 7.1 | 3.01 | 7.5 | 3.12 | 5.4 |
| Social Security and Medicare | 2.39 | 5.6 | 2.39 | 5.9 | 2.45 | 4.3 |
| Social Security[4] | 1.91 | 4.5 | 1.91 | 4.8 | 1.87 | 3.2 |
| Medicare | 0.49 | 1.1 | 0.47 | 1.2 | 0.59 | 1.0 |
| Federal unemployment insurance | 0.03 | 0.1 | 0.03 | 0.1 | —[5] | —[6] |
| State unemployment insurance | 0.14 | 0.3 | 0.15 | 0.4 | 0.07 | 0.1 |
| Workers' compensation | 0.46 | 1.1 | 0.45 | 1.1 | 0.59 | 1.0 |

[1] Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.
[2] Includes costs for wages and salaries and benefits.
[3] Includes premium pay for work (such as overtime, weekends, and holidays) in addition to the regular work schedule.
[4] Social Security refers to the Old-Age, Survivors, and Disability Insurance (OASDI) program.
[5] Cost per hour worked is $0.01 or less.
[6] Less than .05 percent.

- 4 -

004352

**Table 2. Employer Costs for Employee Compensation for civilian workers by occupational and industry group**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Civilian workers[2] | 42.48 | 100.0 | 29.32 | 69.0 | 13.17 | 31.0 | 3.17 | 7.5 | 1.37 | 3.2 | 3.45 | 8.1 | 2.16 | 5.1 | 3.02 | 7.1 |
| **Occupational group** | | | | | | | | | | | | | | | | |
| Management, professional, and related | 67.86 | 100.0 | 46.20 | 68.1 | 21.65 | 31.9 | 5.97 | 8.8 | 2.23 | 3.3 | 5.28 | 7.8 | 3.98 | 5.9 | 4.20 | 6.2 |
| Management, business and financial | 79.20 | 100.0 | 53.93 | 68.1 | 25.27 | 31.9 | 7.78 | 9.8 | 3.54 | 4.5 | 5.48 | 6.9 | 3.69 | 4.7 | 4.77 | 6.0 |
| Professional and related | 62.65 | 100.0 | 42.66 | 68.1 | 19.99 | 31.9 | 5.14 | 8.2 | 1.63 | 2.6 | 5.18 | 8.3 | 4.11 | 6.6 | 3.93 | 6.3 |
| Teachers[3] | 68.47 | 100.0 | 46.21 | 67.5 | 22.25 | 32.5 | 3.63 | 5.3 | 0.29 | 0.4 | 6.51 | 9.5 | 8.30 | 12.1 | 3.53 | 5.2 |
| Primary, secondary, and special education school teachers | 66.94 | 100.0 | 44.09 | 65.9 | 22.85 | 34.1 | 3.16 | 4.7 | 0.26 | 0.4 | 7.05 | 10.5 | 9.20 | 13.7 | 3.18 | 4.8 |
| Registered nurses | 66.46 | 100.0 | 43.80 | 65.9 | 22.66 | 34.1 | 6.75 | 10.2 | 2.55 | 3.8 | 5.59 | 8.4 | 3.24 | 4.9 | 4.53 | 6.8 |
| Sales and office | 31.58 | 100.0 | 22.48 | 71.2 | 9.09 | 28.8 | 2.15 | 6.8 | 0.86 | 2.7 | 2.70 | 8.5 | 1.08 | 3.4 | 2.31 | 7.3 |
| Sales and related | 30.30 | 100.0 | 23.12 | 76.3 | 7.17 | 23.7 | 1.76 | 5.8 | 0.89 | 2.9 | 1.56 | 5.1 | 0.66 | 2.2 | 2.31 | 7.6 |
| Office and administrative support | 32.52 | 100.0 | 22.01 | 67.7 | 10.51 | 32.3 | 2.44 | 7.5 | 0.84 | 2.6 | 3.53 | 10.9 | 1.39 | 4.3 | 2.31 | 7.1 |
| Service | 23.05 | 100.0 | 16.86 | 73.1 | 6.19 | 26.9 | 1.18 | 5.1 | 0.49 | 2.1 | 1.56 | 6.8 | 1.00 | 4.3 | 1.95 | 8.5 |
| Natural resources, construction, and maintenance | 42.77 | 100.0 | 28.69 | 67.1 | 14.07 | 32.9 | 2.43 | 5.7 | 1.58 | 3.7 | 3.66 | 8.6 | 2.69 | 6.3 | 3.71 | 8.7 |
| Construction, extraction, farming, fishing, and forestry | 42.93 | 100.0 | 28.74 | 66.9 | 14.20 | 33.1 | 1.89 | 4.4 | 1.62 | 3.8 | 3.65 | 8.5 | 3.07 | 7.2 | 3.97 | 9.2 |
| Installation, maintenance, and repair | 42.58 | 100.0 | 28.65 | 67.3 | 13.93 | 32.7 | 3.02 | 7.1 | 1.55 | 3.6 | 3.67 | 8.6 | 2.26 | 5.3 | 3.43 | 8.1 |
| Production, transportation, and material moving | 33.17 | 100.0 | 22.34 | 67.3 | 10.83 | 32.7 | 2.05 | 6.2 | 1.40 | 4.2 | 3.31 | 10.0 | 1.30 | 3.9 | 2.78 | 8.4 |
| Production | 32.59 | 100.0 | 21.66 | 66.5 | 10.93 | 33.5 | 2.04 | 6.3 | 1.82 | 5.6 | 3.49 | 10.7 | 0.95 | 2.9 | 2.62 | 8.0 |
| Transportation and material moving | 33.51 | 100.0 | 22.74 | 67.9 | 10.77 | 32.1 | 2.05 | 6.1 | 1.14 | 3.4 | 3.21 | 9.6 | 1.51 | 4.5 | 2.87 | 8.6 |
| **Industry group** | | | | | | | | | | | | | | | | |
| Education and health services | 48.44 | 100.0 | 32.96 | 68.0 | 15.48 | 32.0 | 3.78 | 7.8 | 0.79 | 1.6 | 4.37 | 9.0 | 3.47 | 7.2 | 3.07 | 6.3 |
| Educational services | 59.39 | 100.0 | 39.16 | 65.9 | 20.23 | 34.1 | 3.79 | 6.4 | 0.32 | 0.5 | 6.12 | 10.3 | 6.84 | 11.5 | 3.16 | 5.3 |
| Elementary and secondary schools | 58.10 | 100.0 | 37.74 | 65.0 | 20.36 | 35.0 | 3.02 | 5.2 | 0.26 | 0.4 | 6.47 | 11.1 | 7.70 | 13.3 | 2.90 | 5.0 |
| Junior colleges, colleges, and universities | 67.13 | 100.0 | 44.36 | 66.1 | 22.77 | 33.9 | 5.94 | 8.8 | 0.43 | 0.6 | 6.35 | 9.5 | 6.28 | 9.4 | 3.77 | 5.6 |
| Health care and social assistance | 42.22 | 100.0 | 29.44 | 69.7 | 12.78 | 30.3 | 3.78 | 8.9 | 1.05 | 2.5 | 3.38 | 8.0 | 1.56 | 3.7 | 3.02 | 7.2 |
| Hospitals | 58.85 | 100.0 | 38.84 | 66.0 | 20.01 | 34.0 | 5.74 | 9.8 | 2.13 | 3.6 | 5.38 | 9.1 | 2.95 | 5.0 | 3.82 | 6.5 |

[1] Includes costs for wages and salaries and benefits.
[2] Includes workers in the private nonfarm economy except those in private households, and workers in the public sector, except the federal government.
[3] Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

- 5 -

004353

**Table 3. Employer Costs for Employee Compensation for state and local government workers by occupational and industry group**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| State and local government workers.... | 57.60 | 100.0 | 35.69 | 62.0 | 21.91 | 38.0 | 4.23 | 7.3 | 0.56 | 1.0 | 6.52 | 11.3 | 7.48 | 13.0 | 3.12 | 5.4 |
| **Occupational group** | | | | | | | | | | | | | | | | |
| Management, professional, and related............ | 68.57 | 100.0 | 43.87 | 64.0 | 24.70 | 36.0 | 4.68 | 6.8 | 0.44 | 0.6 | 7.11 | 10.4 | 9.00 | 13.1 | 3.48 | 5.1 |
| Professional and related............ | 66.63 | 100.0 | 42.90 | 64.4 | 23.72 | 35.6 | 4.15 | 6.2 | 0.42 | 0.6 | 7.09 | 10.6 | 8.71 | 13.1 | 3.36 | 5.0 |
| Teachers[2]............ | 75.23 | 100.0 | 49.61 | 65.9 | 25.62 | 34.1 | 3.59 | 4.8 | 0.30 | 0.4 | 7.63 | 10.1 | 10.57 | 14.1 | 3.53 | 4.7 |
| Primary, secondary, and special education school teachers............ | 74.90 | 100.0 | 48.65 | 65.0 | 26.25 | 35.0 | 3.27 | 4.4 | 0.28 | 0.4 | 8.13 | 10.8 | 11.23 | 15.0 | 3.34 | 4.5 |
| Sales and office............ | 40.05 | 100.0 | 23.00 | 57.4 | 17.05 | 42.6 | 3.48 | 8.7 | 0.35 | 0.9 | 6.19 | 15.4 | 4.66 | 11.6 | 2.37 | 5.9 |
| Office and administrative support............ | 40.23 | 100.0 | 23.05 | 57.3 | 17.18 | 42.7 | 3.50 | 8.7 | 0.35 | 0.9 | 6.26 | 15.6 | 4.70 | 11.7 | 2.37 | 5.9 |
| Service............ | 43.14 | 100.0 | 24.81 | 57.5 | 18.33 | 42.5 | 3.61 | 8.4 | 0.93 | 2.1 | 5.16 | 12.0 | 5.97 | 13.8 | 2.65 | 6.1 |
| **Industry group** | | | | | | | | | | | | | | | | |
| Education and health services............ | 60.01 | 100.0 | 38.40 | 64.0 | 21.61 | 36.0 | 3.82 | 6.4 | 0.39 | 0.7 | 6.67 | 11.1 | 7.70 | 12.8 | 3.03 | 5.1 |
| Educational services............ | 61.39 | 100.0 | 39.48 | 64.3 | 21.91 | 35.7 | 3.63 | 5.9 | 0.29 | 0.5 | 6.78 | 11.0 | 8.20 | 13.4 | 3.02 | 4.9 |
| Elementary and secondary schools............ | 59.71 | 100.0 | 38.38 | 64.3 | 21.33 | 35.7 | 3.01 | 5.0 | 0.26 | 0.4 | 6.81 | 11.4 | 8.36 | 14.0 | 2.87 | 4.8 |
| Junior colleges, colleges, and universities............ | 66.74 | 100.0 | 42.95 | 64.4 | 23.79 | 35.6 | 5.58 | 8.4 | 0.35 | 0.5 | 6.66 | 10.0 | 7.72 | 11.6 | 3.48 | 5.2 |
| Health care and social assistance............ | 51.74 | 100.0 | 31.92 | 61.7 | 19.82 | 38.3 | 4.97 | 9.6 | 1.03 | 2.0 | 6.03 | 11.6 | 4.68 | 9.1 | 3.11 | 6.0 |
| Hospitals............ | 54.48 | 100.0 | 34.30 | 63.0 | 20.19 | 37.0 | 5.17 | 9.5 | 1.20 | 2.2 | 6.01 | 11.0 | 4.55 | 8.3 | 3.25 | 6.0 |
| Public administration............ | 55.88 | 100.0 | 32.32 | 57.8 | 23.56 | 42.2 | 5.17 | 9.3 | 0.85 | 1.5 | 6.48 | 11.6 | 7.70 | 13.8 | 3.36 | 6.0 |

[1] Includes costs for wages and salaries and benefits.
[2] Includes postsecondary teachers; primary, secondary, and special education teachers; and other teachers and instructors.

- 6 -

004354

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Private industry workers............ | 40.23 | 100.0 | 28.37 | 70.5 | 11.86 | 29.5 | 3.01 | 7.5 | 1.49 | 3.7 | 3.00 | 7.4 | 1.36 | 3.4 | 3.01 | 7.5 |
| **Occupational group** | | | | | | | | | | | | | | | | |
| Management, professional, and related occupations............ | 67.64 | 100.0 | 46.91 | 69.3 | 20.74 | 30.7 | 6.36 | 9.4 | 2.77 | 4.1 | 4.72 | 7.0 | 2.47 | 3.6 | 4.41 | 6.5 |
| Management, business, and financial occupations............ | 79.04 | 100.0 | 54.40 | 68.8 | 24.64 | 31.2 | 7.77 | 9.8 | 3.89 | 4.9 | 5.28 | 6.7 | 2.88 | 3.6 | 4.83 | 6.1 |
| Professional and related occupations............ | 61.02 | 100.0 | 42.55 | 69.7 | 18.46 | 30.3 | 5.55 | 9.1 | 2.13 | 3.5 | 4.40 | 7.2 | 2.22 | 3.6 | 4.17 | 6.8 |
| Sales and office occupations............ | 30.82 | 100.0 | 22.44 | 72.8 | 8.39 | 27.2 | 2.03 | 6.6 | 0.91 | 2.9 | 2.38 | 7.7 | 0.76 | 2.5 | 2.30 | 7.5 |
| Sales and related occupations............ | 30.27 | 100.0 | 23.13 | 76.4 | 7.14 | 23.6 | 1.75 | 5.8 | 0.90 | 3.0 | 1.55 | 5.1 | 0.64 | 2.1 | 2.31 | 7.6 |
| Office and administrative support occupations............ | 31.29 | 100.0 | 21.84 | 69.8 | 9.44 | 30.2 | 2.27 | 7.3 | 0.91 | 2.9 | 3.10 | 9.9 | 0.87 | 2.8 | 2.30 | 7.3 |
| Service occupations............ | 20.21 | 100.0 | 15.73 | 77.8 | 4.48 | 22.2 | 0.84 | 4.1 | 0.43 | 2.1 | 1.06 | 5.2 | 0.30 | 1.5 | 1.86 | 9.2 |
| Natural resources, construction, and maintenance occupations............ | 42.25 | 100.0 | 28.66 | 67.8 | 13.59 | 32.2 | 2.28 | 5.4 | 1.64 | 3.9 | 3.44 | 8.1 | 2.47 | 5.9 | 3.76 | 8.9 |
| Construction, extraction, farming, fishing, and forestry occupations............ | 42.47 | 100.0 | 28.75 | 67.7 | 13.72 | 32.3 | 1.70 | 4.0 | 1.69 | 4.0 | 3.41 | 8.0 | 2.89 | 6.8 | 4.03 | 9.5 |
| Installation, maintenance, and repair occupations............ | 42.02 | 100.0 | 28.57 | 68.0 | 13.45 | 32.0 | 2.91 | 6.9 | 1.58 | 3.8 | 3.48 | 8.3 | 2.02 | 4.8 | 3.46 | 8.2 |
| Production, transportation, and material moving occupations............ | 32.77 | 100.0 | 22.21 | 67.8 | 10.56 | 32.2 | 2.01 | 6.1 | 1.41 | 4.3 | 3.22 | 9.8 | 1.16 | 3.5 | 2.77 | 8.4 |
| Production occupations............ | 32.30 | 100.0 | 21.53 | 66.7 | 10.77 | 33.3 | 2.00 | 6.2 | 1.83 | 5.7 | 3.44 | 10.7 | 0.87 | 2.7 | 2.62 | 8.1 |
| Transportation and material moving occupations............ | 33.07 | 100.0 | 22.64 | 68.5 | 10.43 | 31.5 | 2.01 | 6.1 | 1.15 | 3.5 | 3.07 | 9.3 | 1.34 | 4.0 | 2.86 | 8.6 |
| **Industry and occupational group** | | | | | | | | | | | | | | | | |
| Goods-producing industries[2]............ | 43.07 | 100.0 | 29.14 | 67.7 | 13.93 | 32.3 | 2.76 | 6.4 | 2.07 | 4.8 | 3.76 | 8.7 | 1.86 | 4.3 | 3.47 | 8.1 |
| Management, professional, and related occupations............ | 71.24 | 100.0 | 48.82 | 68.5 | 22.42 | 31.5 | 6.36 | 8.9 | 3.20 | 4.5 | 5.02 | 7.0 | 3.10 | 4.4 | 4.73 | 6.6 |
| Management, business, and financial occupations............ | 74.69 | 100.0 | 52.17 | 69.8 | 22.53 | 30.2 | 6.64 | 8.9 | 3.16 | 4.2 | 4.89 | 6.5 | 2.90 | 3.9 | 4.94 | 6.6 |
| Professional and related occupations............ | 67.34 | 100.0 | 45.04 | 66.9 | 22.30 | 33.1 | 6.05 | 9.0 | 3.25 | 4.8 | 5.17 | 7.7 | 3.33 | 5.0 | 4.50 | 6.7 |
| Sales and office occupations............ | 36.80 | 100.0 | 26.48 | 71.9 | 10.32 | 28.1 | 2.33 | 6.3 | 1.25 | 3.4 | 3.04 | 8.3 | 0.88 | 2.4 | 2.82 | 7.7 |
| Office and administrative support occupations............ | 33.20 | 100.0 | 23.66 | 71.3 | 9.54 | 28.7 | 2.07 | 6.2 | 1.12 | 3.4 | 3.00 | 9.0 | 0.77 | 2.3 | 2.58 | 7.8 |
| Natural resources, construction, and maintenance occupations............ | 42.58 | 100.0 | 28.76 | 67.5 | 13.82 | 32.5 | 1.88 | 4.4 | 1.86 | 4.4 | 3.43 | 8.1 | 2.66 | 6.3 | 3.99 | 9.4 |
| Construction, extraction, farming, fishing and forestry occupations............ | 42.39 | 100.0 | 28.68 | 67.7 | 13.71 | 32.3 | 1.63 | 3.8 | 1.75 | 4.1 | 3.34 | 7.9 | 2.90 | 6.8 | 4.08 | 9.6 |
| Installation, maintenance, and repair occupations............ | 43.23 | 100.0 | 29.03 | 67.2 | 14.19 | 32.8 | 2.72 | 6.3 | 2.24 | 5.2 | 3.72 | 8.6 | 1.84 | 4.3 | 3.67 | 8.5 |
| Production, transportation, and material moving occupations............ | 33.77 | 100.0 | 22.20 | 65.7 | 11.57 | 34.3 | 2.09 | 6.2 | 1.99 | 5.9 | 3.74 | 11.1 | 1.00 | 3.0 | 2.75 | 8.1 |
| Production occupations............ | 33.82 | 100.0 | 22.12 | 65.4 | 11.70 | 34.6 | 2.15 | 6.3 | 2.05 | 6.1 | 3.86 | 11.4 | 0.95 | 2.8 | 2.70 | 8.0 |

See footnotes at end of table.

004355

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Transportation and material moving occupations. | 33.55 | 100.0 | 22.50 | 67.1 | 11.04 | 32.9 | 1.84 | 5.5 | 1.77 | 5.3 | 3.28 | 9.8 | 1.20 | 3.6 | 2.96 | 8.8 |
| Construction industry. | 43.58 | 100.0 | 30.51 | 70.0 | 13.07 | 30.0 | 2.03 | 4.6 | 1.63 | 3.7 | 3.19 | 7.3 | 2.24 | 5.1 | 3.99 | 9.2 |
| Manufacturing industry. | 42.78 | 100.0 | 28.38 | 66.3 | 14.40 | 33.7 | 3.22 | 7.5 | 2.29 | 5.3 | 4.10 | 9.6 | 1.64 | 3.8 | 3.16 | 7.4 |
| Management, professional, and related occupations. | 73.73 | 100.0 | 49.82 | 67.6 | 23.91 | 32.4 | 6.89 | 9.3 | 3.43 | 4.6 | 5.40 | 7.3 | 3.47 | 4.7 | 4.74 | 6.4 |
| Management, business, and financial occupations. | 78.95 | 100.0 | 54.29 | 68.8 | 24.66 | 31.2 | 7.51 | 9.5 | 3.44 | 4.4 | 5.40 | 6.8 | 3.34 | 4.2 | 4.98 | 6.3 |
| Professional and related occupations. | 69.28 | 100.0 | 46.01 | 66.4 | 23.27 | 33.6 | 6.36 | 9.2 | 3.42 | 4.9 | 5.39 | 7.8 | 3.57 | 5.2 | 4.53 | 6.5 |
| Sales and office occupations. | 36.63 | 100.0 | 25.58 | 69.8 | 11.04 | 30.2 | 2.60 | 7.1 | 1.51 | 4.1 | 3.26 | 8.9 | 1.03 | 2.8 | 2.64 | 7.2 |
| Office and administrative support occupations. | 33.44 | 100.0 | 23.11 | 69.1 | 10.33 | 30.9 | 2.31 | 6.9 | 1.32 | 4.0 | 3.37 | 10.1 | 0.92 | 2.8 | 2.41 | 7.2 |
| Natural resources, construction, and maintenance occupations. | 47.14 | 100.0 | 29.40 | 62.4 | 17.74 | 37.6 | 3.19 | 6.8 | 2.81 | 6.0 | 4.83 | 10.2 | 3.21 | 6.8 | 3.70 | 7.9 |
| Installation, maintenance, and repair occupations. | 46.32 | 100.0 | 30.01 | 64.8 | 16.30 | 35.2 | 3.34 | 7.2 | 2.74 | 5.9 | 4.64 | 10.0 | 1.92 | 4.2 | 3.65 | 7.9 |
| Production, transportation, and material moving occupations. | 33.13 | 100.0 | 21.66 | 65.4 | 11.47 | 34.6 | 2.12 | 6.4 | 1.99 | 6.0 | 3.77 | 11.4 | 0.93 | 2.8 | 2.66 | 8.0 |
| Production occupations. | 33.42 | 100.0 | 21.79 | 65.2 | 11.63 | 34.8 | 2.16 | 6.5 | 2.04 | 6.1 | 3.86 | 11.5 | 0.91 | 2.7 | 2.66 | 8.0 |
| Transportation and material moving occupations. | 31.60 | 100.0 | 20.97 | 66.4 | 10.62 | 33.6 | 1.92 | 6.1 | 1.71 | 5.4 | 3.31 | 10.5 | 1.02 | 3.2 | 2.67 | 8.5 |
| Aircraft manufacturing industry. | 82.16 | 100.0 | 50.40 | 61.3 | 31.76 | 38.7 | 7.79 | 9.5 | 5.53 | 6.7 | 8.00 | 9.7 | 5.28 | 6.4 | 5.16 | 6.3 |
| Service-providing industries[3]. | 39.67 | 100.0 | 28.22 | 71.1 | 11.46 | 28.9 | 3.06 | 7.7 | 1.37 | 3.5 | 2.85 | 7.2 | 1.26 | 3.2 | 2.92 | 7.4 |
| Management, professional, and related occupations. | 67.25 | 100.0 | 46.70 | 69.4 | 20.55 | 30.6 | 6.36 | 9.5 | 2.73 | 4.1 | 4.69 | 7.0 | 2.39 | 3.6 | 4.38 | 6.5 |
| Management, business, and financial occupations. | 79.76 | 100.0 | 54.77 | 68.7 | 24.99 | 31.3 | 7.95 | 10.0 | 4.01 | 5.0 | 5.34 | 6.7 | 2.87 | 3.6 | 4.82 | 6.0 |
| Professional and related occupations. | 60.52 | 100.0 | 42.36 | 70.0 | 18.16 | 30.0 | 5.51 | 9.1 | 2.04 | 3.4 | 4.34 | 7.2 | 2.14 | 3.5 | 4.14 | 6.8 |
| Sales and office occupations. | 30.38 | 100.0 | 22.13 | 72.9 | 8.24 | 27.1 | 2.01 | 6.6 | 0.88 | 2.9 | 2.34 | 7.7 | 0.76 | 2.5 | 2.26 | 7.4 |
| Sales and related occupations. | 29.64 | 100.0 | 22.68 | 76.5 | 6.96 | 23.5 | 1.70 | 5.7 | 0.87 | 2.9 | 1.50 | 5.1 | 0.62 | 2.1 | 2.26 | 7.6 |
| Office and administrative support occupations. | 31.06 | 100.0 | 21.63 | 69.6 | 9.43 | 30.4 | 2.29 | 7.4 | 0.89 | 2.9 | 3.11 | 10.0 | 0.88 | 2.8 | 2.26 | 7.3 |
| Service occupations. | 20.18 | 100.0 | 15.72 | 77.9 | 4.46 | 22.1 | 0.83 | 4.1 | 0.43 | 2.1 | 1.05 | 5.2 | 0.29 | 1.5 | 1.85 | 9.2 |
| Natural resources, construction, and maintenance occupations. | 41.78 | 100.0 | 28.53 | 68.3 | 13.25 | 31.7 | 2.86 | 6.8 | 1.31 | 3.1 | 3.46 | 8.3 | 2.20 | 5.3 | 3.43 | 8.2 |
| Installation, maintenance, and repair occupations. | 41.55 | 100.0 | 28.39 | 68.3 | 13.15 | 31.7 | 2.98 | 7.2 | 1.32 | 3.2 | 3.39 | 8.2 | 2.09 | 5.0 | 3.37 | 8.1 |
| Production, transportation, and material moving occupations. | 32.21 | 100.0 | 22.22 | 69.0 | 9.99 | 31.0 | 1.96 | 6.1 | 1.09 | 3.4 | 2.92 | 9.1 | 1.25 | 3.9 | 2.77 | 8.6 |
| Production occupations. | 27.61 | 100.0 | 19.72 | 71.4 | 7.89 | 28.6 | 1.57 | 5.7 | 1.14 | 4.1 | 2.18 | 7.9 | 0.64 | 2.3 | 2.36 | 8.6 |
| Transportation and material moving occupations. | 33.01 | 100.0 | 22.66 | 68.6 | 10.35 | 31.4 | 2.03 | 6.1 | 1.08 | 3.3 | 3.04 | 9.2 | 1.36 | 4.1 | 2.85 | 8.6 |
| Trade, transportation, and utilities industry. | 34.17 | 100.0 | 24.35 | 71.3 | 9.82 | 28.7 | 2.25 | 6.6 | 1.07 | 3.1 | 2.55 | 7.5 | 1.25 | 3.6 | 2.70 | 7.9 |

See footnotes at end of table.

004356

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Management, professional, and related occupations.......... | 65.94 | 100.0 | 47.27 | 71.7 | 18.67 | 28.3 | 5.88 | 8.9 | 2.26 | 3.4 | 3.89 | 5.9 | 2.31 | 3.5 | 4.32 | 6.5 |
| Management, business, and financial occupations........... | 75.95 | 100.0 | 54.12 | 71.3 | 21.82 | 28.7 | 7.04 | 9.3 | 2.93 | 3.9 | 4.40 | 5.8 | 2.68 | 3.5 | 4.76 | 6.3 |
| Professional and related occupations.......... | 52.67 | 100.0 | 38.19 | 72.5 | 14.48 | 27.5 | 4.35 | 8.3 | 1.37 | 2.6 | 3.22 | 6.1 | 1.81 | 3.4 | 3.73 | 7.1 |
| Sales and office occupations........... | 26.41 | 100.0 | 20.00 | 75.7 | 6.41 | 24.3 | 1.45 | 5.5 | 0.71 | 2.7 | 1.55 | 5.9 | 0.60 | 2.3 | 2.09 | 7.9 |
| Sales and related occupations........ | 25.03 | 100.0 | 19.47 | 77.8 | 5.56 | 22.2 | 1.25 | 5.0 | 0.69 | 2.7 | 1.14 | 4.5 | 0.48 | 1.9 | 2.01 | 8.0 |
| Office and administrative support occupations........... | 31.38 | 100.0 | 21.93 | 69.9 | 9.45 | 30.1 | 2.17 | 6.9 | 0.81 | 2.6 | 3.05 | 9.7 | 1.05 | 3.3 | 2.37 | 7.6 |
| Service occupations........... | 21.89 | 100.0 | 16.25 | 74.2 | 5.64 | 25.8 | 1.07 | 4.9 | 0.62 | 2.8 | 1.39 | 6.4 | 0.64 | 2.9 | 1.92 | 8.8 |
| Natural resources, construction, and maintenance occupations... | 45.97 | 100.0 | 30.71 | 66.8 | 15.26 | 33.2 | 3.33 | 7.2 | 1.64 | 3.6 | 3.89 | 8.5 | 2.70 | 5.9 | 3.70 | 8.0 |
| Installation, maintenance, and repair occupations........... | 46.37 | 100.0 | 31.08 | 67.0 | 15.29 | 33.0 | 3.39 | 7.3 | 1.68 | 3.6 | 3.86 | 8.3 | 2.64 | 5.7 | 3.71 | 8.0 |
| Production, transportation, and material moving occupations........... | 35.17 | 100.0 | 23.83 | 67.8 | 11.34 | 32.2 | 2.26 | 6.4 | 1.17 | 3.3 | 3.34 | 9.5 | 1.60 | 4.5 | 2.97 | 8.5 |
| Transportation and material moving occupations........... | 35.32 | 100.0 | 23.95 | 67.8 | 11.38 | 32.2 | 2.27 | 6.4 | 1.15 | 3.2 | 3.35 | 9.5 | 1.63 | 4.6 | 2.99 | 8.5 |
| Wholesale trade industry........... | 46.35 | 100.0 | 33.03 | 71.2 | 13.33 | 28.8 | 3.60 | 7.8 | 1.79 | 3.9 | 3.09 | 6.7 | 1.45 | 3.1 | 3.39 | 7.3 |
| Sales and office occupations........... | 47.80 | 100.0 | 34.87 | 73.0 | 12.93 | 27.0 | 3.60 | 7.5 | 1.52 | 3.2 | 2.99 | 6.2 | 1.49 | 3.1 | 3.33 | 7.0 |
| Office and administrative support occupations........... | 32.52 | 100.0 | 22.97 | 70.6 | 9.55 | 29.4 | 2.38 | 7.3 | 1.14 | 3.5 | 2.84 | 8.7 | 0.79 | 2.4 | 2.40 | 7.4 |
| Production, transportation, and material moving occupations........... | 30.37 | 100.0 | 20.95 | 69.0 | 9.42 | 31.0 | 1.87 | 6.2 | 1.35 | 4.4 | 2.65 | 8.7 | 0.86 | 2.8 | 2.69 | 8.9 |
| Transportation and material moving occupations........... | 30.28 | 100.0 | 20.91 | 69.1 | 9.36 | 30.9 | 1.84 | 6.1 | 1.30 | 4.3 | 2.60 | 8.6 | 0.92 | 3.1 | 2.69 | 8.9 |
| Retail trade industry........... | 23.98 | 100.0 | 18.39 | 76.7 | 5.59 | 23.3 | 1.22 | 5.1 | 0.62 | 2.6 | 1.33 | 5.6 | 0.41 | 1.7 | 2.00 | 8.3 |
| Sales and office occupations........... | 20.94 | 100.0 | 16.51 | 78.8 | 4.43 | 21.2 | 0.89 | 4.2 | 0.53 | 2.5 | 0.97 | 4.6 | 0.28 | 1.3 | 1.77 | 8.5 |
| Sales and related occupations........... | 20.47 | 100.0 | 16.23 | 79.3 | 4.24 | 20.7 | 0.82 | 4.0 | 0.53 | 2.6 | 0.88 | 4.3 | 0.26 | 1.3 | 1.75 | 8.5 |
| Office and administrative support occupations........... | 25.77 | 100.0 | 19.39 | 75.2 | 6.38 | 24.8 | 1.58 | 6.1 | 0.53 | 2.0 | 1.85 | 7.2 | 0.40 | 1.5 | 2.03 | 7.9 |
| Production, transportation, and material moving occupations........... | 22.81 | 100.0 | 16.66 | 73.0 | 6.15 | 27.0 | 1.18 | 5.2 | 0.57 | 2.5 | 1.85 | 8.1 | 0.56 | 2.4 | 1.99 | 8.7 |
| Transportation and material moving occupations........... | 22.54 | 100.0 | 16.51 | 73.3 | 6.03 | 26.7 | 1.16 | 5.1 | 0.55 | 2.4 | 1.81 | 8.0 | 0.54 | 2.4 | 1.97 | 8.7 |
| Transportation and warehousing industry........... | 43.75 | 100.0 | 28.89 | 66.0 | 14.85 | 34.0 | 3.07 | 7.0 | 1.37 | 3.1 | 4.46 | 10.2 | 2.42 | 5.5 | 3.53 | 8.1 |
| Utilities industry........... | 75.65 | 100.0 | 46.45 | 61.4 | 29.20 | 38.6 | 6.83 | 9.0 | 2.60 | 3.4 | 7.18 | 9.5 | 7.47 | 9.9 | 5.12 | 6.8 |
| Information industry........... | 68.31 | 100.0 | 44.63 | 65.3 | 23.68 | 34.7 | 6.78 | 9.9 | 3.19 | 4.7 | 6.09 | 8.9 | 3.37 | 4.9 | 4.26 | 6.2 |
| Management, professional, and related occupations........... | 86.85 | 100.0 | 57.56 | 66.3 | 29.30 | 33.7 | 9.22 | 10.6 | 4.47 | 5.1 | 7.03 | 8.1 | 3.35 | 3.9 | 5.24 | 6.0 |

See footnotes at end of table.

004357

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Professional and related occupations........ | 82.09 | 100.0 | 54.14 | 65.9 | 27.95 | 34.1 | 8.60 | 10.5 | 4.03 | 4.9 | 6.94 | 8.5 | 3.30 | 4.0 | 5.08 | 6.2 |
| Sales and office occupations........ | 44.58 | 100.0 | 29.11 | 65.3 | 15.47 | 34.7 | 3.79 | 8.5 | 1.68 | 3.8 | 4.95 | 11.1 | 2.14 | 4.8 | 2.91 | 6.5 |
| Financial activities industry........ | 56.23 | 100.0 | 37.31 | 66.4 | 18.92 | 33.6 | 5.07 | 9.0 | 3.54 | 6.3 | 4.79 | 8.5 | 2.02 | 3.6 | 3.49 | 6.2 |
| Management, professional, and related occupations........ | 83.20 | 100.0 | 54.27 | 65.2 | 28.93 | 34.8 | 8.16 | 9.8 | 6.27 | 7.5 | 6.31 | 7.6 | 3.32 | 4.0 | 4.87 | 5.8 |
| Management, business, and financial occupations........ | 83.88 | 100.0 | 54.79 | 65.3 | 29.09 | 34.7 | 8.19 | 9.8 | 6.63 | 7.9 | 6.23 | 7.4 | 3.22 | 3.8 | 4.82 | 5.8 |
| Professional and related occupations........ | 80.82 | 100.0 | 52.43 | 64.9 | 28.40 | 35.1 | 8.06 | 10.0 | 5.04 | 6.2 | 6.59 | 8.2 | 3.69 | 4.6 | 5.01 | 6.2 |
| Sales and office occupations........ | 39.68 | 100.0 | 26.85 | 67.7 | 12.83 | 32.3 | 3.19 | 8.1 | 1.86 | 4.7 | 3.97 | 10.0 | 1.26 | 3.2 | 2.54 | 6.4 |
| Sales and related occupations........ | 51.45 | 100.0 | 36.60 | 71.1 | 14.85 | 28.9 | 4.06 | 7.9 | 2.66 | 5.2 | 3.39 | 6.6 | 1.64 | 3.2 | 3.09 | 6.0 |
| Office and administrative support occupations........ | 34.76 | 100.0 | 22.77 | 65.5 | 11.98 | 34.5 | 2.83 | 8.2 | 1.52 | 4.4 | 4.21 | 12.1 | 1.11 | 3.2 | 2.31 | 6.6 |
| Finance and insurance industry........ | 63.47 | 100.0 | 41.56 | 65.5 | 21.91 | 34.5 | 5.89 | 9.3 | 4.37 | 6.9 | 5.41 | 8.5 | 2.47 | 3.9 | 3.76 | 5.9 |
| Credit intermediation and related activities industry........ | 57.03 | 100.0 | 37.46 | 65.7 | 19.57 | 34.3 | 5.46 | 9.6 | 3.50 | 6.1 | 5.08 | 8.9 | 2.09 | 3.7 | 3.44 | 6.0 |
| Insurance carriers and related activities industry........ | 56.80 | 100.0 | 37.07 | 65.3 | 19.73 | 34.7 | 5.14 | 9.0 | 3.30 | 5.8 | 5.30 | 9.3 | 2.39 | 4.2 | 3.59 | 6.3 |
| Real estate and rental and leasing industry........ | 35.25 | 100.0 | 25.02 | 71.0 | 10.23 | 29.0 | 2.70 | 7.6 | 1.12 | 3.2 | 3.00 | 8.5 | 0.71 | 2.0 | 2.71 | 7.7 |
| Professional and business services industry........ | 49.66 | 100.0 | 35.41 | 71.3 | 14.25 | 28.7 | 4.00 | 8.1 | 2.11 | 4.2 | 3.33 | 6.7 | 1.29 | 2.6 | 3.53 | 7.1 |
| Management, professional, and related occupations........ | 74.08 | 100.0 | 51.82 | 69.9 | 22.27 | 30.1 | 6.86 | 9.3 | 3.54 | 4.8 | 4.78 | 6.5 | 2.22 | 3.0 | 4.86 | 6.6 |
| Management, business, and financial occupations........ | 84.64 | 100.0 | 58.46 | 69.1 | 26.19 | 30.9 | 8.48 | 10.0 | 4.43 | 5.2 | 5.45 | 6.4 | 2.67 | 3.2 | 5.15 | 6.1 |
| Professional and related occupations........ | 66.78 | 100.0 | 47.22 | 70.7 | 19.56 | 29.3 | 5.74 | 8.6 | 2.92 | 4.4 | 4.32 | 6.5 | 1.91 | 2.9 | 4.66 | 7.0 |
| Sales and office occupations........ | 33.21 | 100.0 | 24.53 | 73.9 | 8.68 | 26.1 | 2.17 | 6.5 | 0.88 | 2.6 | 2.55 | 7.7 | 0.61 | 1.8 | 2.47 | 7.4 |
| Office and administrative support occupations........ | 30.34 | 100.0 | 21.91 | 72.2 | 8.43 | 27.8 | 2.08 | 6.9 | 0.93 | 3.1 | 2.62 | 8.6 | 0.55 | 1.8 | 2.25 | 7.4 |
| Service occupations........ | 23.51 | 100.0 | 18.09 | 76.9 | 5.42 | 23.1 | 1.04 | 4.4 | 0.71 | 3.0 | 1.40 | 6.0 | 0.16 | 0.7 | 2.10 | 9.0 |
| Production, transportation, and material moving occupations........ | 26.16 | 100.0 | 19.28 | 73.7 | 6.88 | 26.3 | 1.20 | 4.6 | 1.09 | 4.1 | 1.92 | 7.3 | 0.33 | 1.3 | 2.34 | 8.9 |
| Transportation and material moving occupations........ | 27.08 | 100.0 | 19.89 | 73.5 | 7.19 | 26.5 | 1.17 | 4.3 | 1.10 | 4.0 | 2.11 | 7.8 | 0.35 | 1.3 | 2.46 | 9.1 |
| Professional, scientific, and technical services industry........ | 65.33 | 100.0 | 45.95 | 70.3 | 19.38 | 29.7 | 5.87 | 9.0 | 3.00 | 4.6 | 4.34 | 6.6 | 1.86 | 2.8 | 4.31 | 6.6 |
| Administrative and waste services industry........ | 29.79 | 100.0 | 22.48 | 75.4 | 7.32 | 24.6 | 1.53 | 5.1 | 0.84 | 2.8 | 1.92 | 6.4 | 0.46 | 1.5 | 2.57 | 8.6 |
| Education and health services........ | 42.93 | 100.0 | 30.37 | 70.7 | 12.56 | 29.3 | 3.77 | 8.8 | 0.97 | 2.3 | 3.28 | 7.6 | 1.46 | 3.4 | 3.09 | 7.2 |
| Management, professional, and related occupations........ | 57.90 | 100.0 | 40.65 | 70.2 | 17.25 | 29.8 | 5.51 | 9.5 | 1.35 | 2.3 | 4.28 | 7.4 | 2.20 | 3.8 | 3.92 | 6.8 |

See footnotes at end of table.

004358

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Management, business, and financial occupations.......... | 71.86 | 100.0 | 50.73 | 70.6 | 21.13 | 29.4 | 8.02 | 11.2 | 0.97 | 1.4 | 4.89 | 6.8 | 2.84 | 4.0 | 4.41 | 6.1 |
| Professional and related occupations.......... | 56.23 | 100.0 | 39.44 | 70.1 | 16.79 | 29.9 | 5.21 | 9.3 | 1.40 | 2.5 | 4.20 | 7.5 | 2.12 | 3.8 | 3.86 | 6.9 |
| Sales and office occupations.......... | 30.95 | 100.0 | 21.98 | 71.0 | 8.96 | 29.0 | 2.51 | 8.1 | 0.42 | 1.4 | 2.90 | 9.4 | 0.77 | 2.5 | 2.37 | 7.6 |
| Office and administrative support occupations.......... | 29.67 | 100.0 | 20.92 | 70.5 | 8.75 | 29.5 | 2.39 | 8.1 | 0.44 | 1.5 | 2.90 | 9.8 | 0.78 | 2.6 | 2.24 | 7.5 |
| Service occupations.......... | 23.93 | 100.0 | 17.43 | 72.9 | 6.49 | 27.1 | 1.48 | 6.2 | 0.59 | 2.5 | 1.82 | 7.6 | 0.55 | 2.3 | 2.06 | 8.6 |
| Educational services industry.......... | 52.93 | 100.0 | 38.12 | 72.0 | 14.81 | 28.0 | 4.34 | 8.2 | 0.40 | 0.8 | 4.01 | 7.6 | 2.44 | 4.6 | 3.62 | 6.8 |
| Management, professional, and related occupations.......... | 58.44 | 100.0 | 42.32 | 72.4 | 16.12 | 27.6 | 4.83 | 8.3 | 0.42 | 0.7 | 4.25 | 7.3 | 2.70 | 4.6 | 3.93 | 6.7 |
| Management, business, and financial occupations.......... | 72.64 | 100.0 | 51.24 | 70.5 | 21.40 | 29.5 | 8.13 | 11.2 | 0.42 | 0.9 | 4.90 | 6.7 | 3.24 | 4.5 | 4.45 | 6.1 |
| Professional and related occupations.......... | 55.32 | 100.0 | 40.36 | 73.0 | 14.96 | 27.0 | 4.10 | 7.4 | 0.36 | 0.7 | 4.11 | 7.4 | 2.58 | 4.7 | 3.81 | 6.9 |
| Sales and office occupations.......... | 32.18 | 100.0 | 22.04 | 68.5 | 10.14 | 31.5 | 2.64 | 8.2 | 0.25 | 0.8 | 3.60 | 11.2 | 1.41 | 4.4 | 2.24 | 7.0 |
| Office and administrative support occupations.......... | 32.11 | 100.0 | 21.98 | 68.5 | 10.13 | 31.5 | 2.64 | 8.2 | 0.24 | 0.7 | 3.60 | 11.2 | 1.41 | 4.4 | 2.24 | 7.0 |
| Service occupations.......... | 28.04 | 100.0 | 20.11 | 71.7 | 7.93 | 28.3 | 1.86 | 6.6 | 0.34 | 1.2 | 2.13 | 7.6 | 1.22 | 4.3 | 2.38 | 8.5 |
| Junior colleges, colleges, universities and professional schools industry.......... | 67.83 | 100.0 | 46.85 | 69.1 | 20.99 | 30.9 | 6.56 | 9.7 | 0.57 | 0.8 | 5.81 | 8.6 | 3.75 | 5.5 | 4.30 | 6.3 |
| Health care and social assistance industry.......... | 41.48 | 100.0 | 29.24 | 70.5 | 12.23 | 29.5 | 3.68 | 8.9 | 1.05 | 2.5 | 3.17 | 7.6 | 1.31 | 3.2 | 3.01 | 7.3 |
| Registered nurse occupations.......... | 66.96 | 100.0 | 44.39 | 66.3 | 22.57 | 33.7 | 6.94 | 10.4 | 2.66 | 4.0 | 5.44 | 8.1 | 2.86 | 4.3 | 4.67 | 7.0 |
| Management, professional, and related occupations.......... | 57.77 | 100.0 | 40.25 | 69.7 | 17.52 | 30.3 | 5.67 | 9.8 | 1.57 | 2.7 | 4.28 | 7.4 | 2.08 | 3.6 | 3.91 | 6.8 |
| Professional and related occupations.......... | 56.42 | 100.0 | 39.25 | 69.6 | 17.18 | 30.4 | 5.45 | 9.7 | 1.62 | 2.9 | 4.22 | 7.5 | 2.02 | 3.6 | 3.87 | 6.9 |
| Sales and office occupations.......... | 30.82 | 100.0 | 21.97 | 71.3 | 8.84 | 28.7 | 2.50 | 8.1 | 0.44 | 1.4 | 2.82 | 9.2 | 0.70 | 2.3 | 2.38 | 7.7 |
| Office and administrative support occupations.......... | 29.40 | 100.0 | 20.81 | 70.8 | 8.59 | 29.2 | 2.36 | 8.0 | 0.46 | 1.6 | 2.82 | 9.6 | 0.71 | 2.4 | 2.24 | 7.6 |
| Service occupations.......... | 23.78 | 100.0 | 17.34 | 72.9 | 6.44 | 27.1 | 1.46 | 6.1 | 0.60 | 2.5 | 1.81 | 7.6 | 0.53 | 2.2 | 2.05 | 8.6 |
| Hospitals industry.......... | 59.70 | 100.0 | 39.73 | 66.5 | 19.97 | 33.5 | 5.85 | 9.8 | 2.31 | 3.9 | 5.26 | 8.8 | 2.63 | 4.4 | 3.93 | 6.6 |
| Management, professional, and related occupations.......... | 71.20 | 100.0 | 47.79 | 67.1 | 23.41 | 32.9 | 7.18 | 10.1 | 2.71 | 3.8 | 5.75 | 8.1 | 3.18 | 4.5 | 4.60 | 6.5 |
| Registered nurse occupations.......... | 68.99 | 100.0 | 44.93 | 65.1 | 24.07 | 34.9 | 7.05 | 10.2 | 3.06 | 4.4 | 6.02 | 8.7 | 3.24 | 4.7 | 4.69 | 6.8 |
| Service occupations.......... | 31.57 | 100.0 | 20.04 | 63.5 | 11.53 | 36.5 | 2.50 | 7.9 | 1.57 | 5.0 | 3.74 | 11.8 | 1.40 | 4.4 | 2.31 | 7.3 |
| Nursing and residential care facilities industry.......... | 28.80 | 100.0 | 20.91 | 72.6 | 7.89 | 27.4 | 2.07 | 7.2 | 0.75 | 2.6 | 2.27 | 7.9 | 0.45 | 1.6 | 2.36 | 8.2 |
| Management, professional, and related occupations.......... | 43.21 | 100.0 | 31.25 | 72.3 | 11.96 | 27.7 | 3.58 | 8.3 | 1.12 | 2.6 | 3.15 | 7.3 | 0.86 | 2.0 | 3.25 | 7.5 |
| Service occupations.......... | 23.05 | 100.0 | 16.79 | 72.9 | 6.26 | 27.1 | 1.45 | 6.3 | 0.63 | 2.7 | 1.89 | 8.2 | 0.28 | 1.2 | 2.01 | 8.7 |
| Nursing care facilities industry.......... | 32.04 | 100.0 | 23.04 | 71.9 | 9.00 | 28.1 | 2.33 | 7.3 | 0.94 | 2.9 | 2.67 | 8.3 | 0.50 | 1.6 | 2.56 | 8.0 |

Note: one Supplemental pay value reads 0.68[4].

**Table 4. Employer Costs for Employee Compensation for private industry workers by occupational and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Management, professional, and related occupations.... | 47.05 | 100.0 | 34.28 | 72.8 | 12.78 | 27.2 | 3.75 | 8.0 | 1.36 | 2.9 | 3.33 | 7.1 | 0.78 | 1.7 | 3.54 | 7.5 |
| Service occupations........ | 24.33 | 100.0 | 17.25 | 70.9 | 7.08 | 29.1 | 1.58 | 6.5 | 0.75 | 3.1 | 2.31 | 9.5 | 0.36 | 1.5 | 2.07 | 8.5 |
| Leisure and hospitality industry....... | 18.40 | 100.0 | 14.98 | 81.4 | 3.42 | 18.6 | 0.56 | 3.1 | 0.26 | 1.4 | 0.67 | 3.6 | 0.18 | 1.0 | 1.74 | 9.5 |
| Sales and office occupations...... | 20.55 | 100.0 | 15.99 | 77.8 | 4.56 | 22.2 | 0.92 | 4.5 | 0.25 | 1.2 | 1.42 | 6.9 | 0.25 | 1.2 | 1.71 | 8.3 |
| Service occupations............ | 16.49 | 100.0 | 13.67 | 82.9 | 2.82 | 17.1 | 0.36 | 2.2 | 0.23 | 1.4 | 0.47 | 2.9 | 0.14 | 0.8 | 1.62 | 9.9 |
| Accommodation and food services industry............. | 17.31 | 100.0 | 14.20 | 82.0 | 3.11 | 18.0 | 0.44 | 2.6 | 0.26 | 1.5 | 0.59 | 3.4 | 0.15 | 0.9 | 1.67 | 9.6 |
| Other services industry............... | 34.89 | 100.0 | 26.10 | 74.8 | 8.80 | 25.2 | 2.47 | 7.1 | 0.47 | 1.4 | 1.93 | 5.5 | 1.22 | 3.5 | 2.70 | 7.8 |

[1] Includes costs for wages and salaries and benefits.

[2] Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.

[3] Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional, scientific, and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

[4] The relative standard error for this estimate is equal to or greater than 30 percent.

- 12 -

004360

**Table 5. Employer Costs for Employee Compensation for private industry workers by bargaining and work status**
[Dec. 2022]

| Series | Total compensation[1] Cost ($) | Percent | Wages and salaries Cost ($) | Percent | Total benefits Cost ($) | Percent | Paid leave Cost ($) | Percent | Supplemental pay Cost ($) | Percent | Insurance Cost ($) | Percent | Retirement and savings Cost ($) | Percent | Legally required benefits Cost ($) | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Union workers | 54.34 | 100.0 | 32.71 | 60.2 | 21.63 | 39.8 | 3.91 | 7.2 | 2.08 | 3.8 | 7.03 | 12.9 | 4.62 | 8.5 | 3.99 | 7.3 |
| Goods-producing industries[2] | 53.98 | 100.0 | 31.36 | 58.1 | 22.62 | 41.9 | 2.94 | 5.5 | 2.71 | 5.0 | 7.61 | 14.1 | 5.15 | 9.5 | 4.20 | 7.8 |
| Manufacturing industry | 46.63 | 100.0 | 26.48 | 56.8 | 20.15 | 43.2 | 3.27 | 7.0 | 3.10 | 6.6 | 7.34 | 15.7 | 3.04 | 6.5 | 3.40 | 7.3 |
| Service-providing industries[3] | 54.52 | 100.0 | 33.38 | 61.2 | 21.14 | 38.8 | 4.39 | 8.0 | 1.76 | 3.2 | 6.75 | 12.4 | 4.36 | 8.0 | 3.88 | 7.1 |
| Trade, transportation, and utilities industry | 53.43 | 100.0 | 32.78 | 61.4 | 20.65 | 38.6 | 4.10 | 7.7 | 1.72 | 3.2 | 6.58 | 12.3 | 4.44 | 8.3 | 3.81 | 7.1 |
| Retail trade industry | 26.28 | 100.0 | 16.74 | 63.7 | 9.54 | 36.3 | 1.57 | 6.0 | 0.65 | 2.5 | 3.44 | 13.1 | 1.74 | 6.6 | 2.14 | 8.1 |
| Transportation and warehousing industry | 62.87 | 100.0 | 38.79 | 61.7 | 24.08 | 38.3 | 4.98 | 7.9 | 2.04 | 3.2 | 7.61 | 12.1 | 5.09 | 8.1 | 4.36 | 6.9 |
| Education and health services industry | 63.58 | 100.0 | 38.83 | 61.1 | 24.75 | 38.9 | 5.83 | 9.2 | 2.25 | 3.5 | 7.85 | 12.4 | 4.44 | 7.0 | 4.37 | 6.9 |
| Health care and social assistance industry | 63.14 | 100.0 | 38.21 | 60.5 | 24.93 | 39.5 | 5.88 | 9.3 | 2.47 | 3.9 | 7.77 | 12.3 | 4.46 | 7.1 | 4.36 | 6.9 |
| Nonunion workers | 38.96 | 100.0 | 27.98 | 71.8 | 10.99 | 28.2 | 2.93 | 7.5 | 1.43 | 3.7 | 2.63 | 6.8 | 1.07 | 2.7 | 2.92 | 7.5 |
| Goods-producing industries[2] | 40.89 | 100.0 | 28.69 | 70.2 | 12.20 | 29.8 | 2.73 | 6.7 | 1.95 | 4.8 | 3.00 | 7.3 | 1.20 | 2.9 | 3.33 | 8.1 |
| Manufacturing industries | 42.03 | 100.0 | 28.74 | 68.4 | 13.29 | 31.6 | 3.21 | 7.6 | 2.13 | 5.1 | 3.47 | 8.3 | 1.36 | 3.2 | 3.12 | 7.4 |
| Service-providing industries[3] | 38.63 | 100.0 | 27.85 | 72.1 | 10.77 | 27.9 | 2.96 | 7.7 | 1.34 | 3.5 | 2.57 | 6.7 | 1.05 | 2.7 | 2.85 | 7.4 |
| Trade, transportation, and utilities industries | 31.25 | 100.0 | 23.07 | 73.8 | 8.18 | 26.2 | 1.97 | 6.3 | 0.97 | 3.1 | 1.94 | 6.2 | 0.76 | 2.4 | 2.54 | 8.1 |
| Retail trade industries | 23.83 | 100.0 | 18.50 | 77.6 | 5.33 | 22.4 | 1.20 | 5.0 | 0.62 | 2.6 | 1.19 | 5.0 | 0.33 | 1.4 | 1.99 | 8.4 |
| Transportation and warehousing industries | 33.92 | 100.0 | 23.80 | 70.2 | 10.11 | 29.8 | 2.09 | 6.2 | 1.03 | 3.0 | 2.84 | 8.4 | 1.04 | 3.1 | 3.10 | 9.2 |
| Education and health services industries | 41.58 | 100.0 | 29.81 | 71.7 | 11.76 | 28.3 | 3.63 | 8.7 | 0.89 | 2.1 | 2.98 | 7.2 | 1.26 | 3.0 | 3.01 | 7.2 |
| Health care and social assistance industries | 40.02 | 100.0 | 28.64 | 71.6 | 11.38 | 28.4 | 3.54 | 8.8 | 0.96 | 2.4 | 2.86 | 7.1 | 1.10 | 2.7 | 2.92 | 7.3 |
| Full-time workers | 46.30 | 100.0 | 31.94 | 69.0 | 14.35 | 31.0 | 3.73 | 8.1 | 1.85 | 4.0 | 3.76 | 8.1 | 1.70 | 3.7 | 3.31 | 7.2 |
| **Occupational group** | | | | | | | | | | | | | | | | |
| Management, professional and related occupations | 69.71 | 100.0 | 47.92 | 68.7 | 21.79 | 31.3 | 6.69 | 9.6 | 2.96 | 4.2 | 5.08 | 7.3 | 2.62 | 3.8 | 4.45 | 6.4 |
| Management, business, and financial occupations | 79.87 | 100.0 | 54.90 | 68.7 | 24.96 | 31.3 | 7.88 | 9.9 | 3.95 | 4.9 | 5.35 | 6.7 | 2.92 | 3.7 | 4.87 | 6.1 |
| Professional and related occupations | 62.90 | 100.0 | 43.23 | 68.7 | 19.67 | 31.3 | 5.90 | 9.4 | 2.29 | 3.6 | 4.90 | 7.8 | 2.41 | 3.8 | 4.17 | 6.6 |
| Sales and office occupations | 35.73 | 100.0 | 25.27 | 70.7 | 10.46 | 29.3 | 2.65 | 7.4 | 1.15 | 3.2 | 3.13 | 8.8 | 1.00 | 2.8 | 2.53 | 7.1 |
| Office and administrative support occupations | 40.86 | 100.0 | 30.20 | 73.9 | 10.66 | 26.1 | 2.86 | 7.0 | 1.39 | 3.4 | 2.51 | 6.1 | 1.03 | 2.5 | 2.86 | 7.0 |
| Service occupations | 32.86 | 100.0 | 22.51 | 68.5 | 10.35 | 31.5 | 2.53 | 7.7 | 1.02 | 3.1 | 3.47 | 10.6 | 0.97 | 3.0 | 2.35 | 7.1 |
| Natural resources, construction, and maintenance occupations | 24.15 | 100.0 | 17.75 | 73.5 | 6.40 | 26.5 | 1.36 | 5.6 | 0.70 | 2.9 | 1.86 | 7.7 | 0.47 | 2.0 | 2.01 | 8.3 |
| Construction, extraction, farming, fishing, and forestry occupations | 42.98 | 100.0 | 29.02 | 67.5 | 13.96 | 32.5 | 2.35 | 5.5 | 1.68 | 3.9 | 3.59 | 8.3 | 2.55 | 5.9 | 3.80 | 8.8 |
| | 42.84 | 100.0 | 28.90 | 67.5 | 13.94 | 32.5 | 1.73 | 4.0 | 1.71 | 4.0 | 3.52 | 8.2 | 2.93 | 6.8 | 4.06 | 9.5 |

See footnotes at end of table.

- 13 -

004361

**Table 5. Employer Costs for Employee Compensation for private industry workers by bargaining and work status — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Installation, maintenance, and repair occupations.......... | 43.13 | 100.0 | 29.15 | 67.6 | 13.98 | 32.4 | 3.03 | 7.0 | 1.65 | 3.8 | 3.66 | 8.5 | 2.12 | 4.9 | 3.51 | 8.2 |
| Production, transportation, and material moving occupations.......... | 35.36 | 100.0 | 23.59 | 66.7 | 11.77 | 33.3 | 2.30 | 6.5 | 1.63 | 4.6 | 3.67 | 10.4 | 1.30 | 3.7 | 2.88 | 8.1 |
| Production occupations.......... | 33.11 | 100.0 | 21.92 | 66.2 | 11.19 | 33.8 | 2.09 | 6.3 | 1.90 | 5.7 | 3.62 | 10.9 | 0.92 | 2.8 | 2.66 | 8.0 |
| Transportation and material moving occupations.......... | 37.26 | 100.0 | 24.99 | 67.1 | 12.26 | 32.9 | 2.47 | 6.6 | 1.40 | 3.8 | 3.71 | 10.0 | 1.62 | 4.4 | 3.06 | 8.2 |
| **Industry group** | | | | | | | | | | | | | | | | |
| Goods-producing industries[2].......... | 43.66 | 100.0 | 29.44 | 67.4 | 14.22 | 32.6 | 2.83 | 6.5 | 2.11 | 4.8 | 3.87 | 8.9 | 1.90 | 4.3 | 3.50 | 8.0 |
| Construction industry.......... | 44.11 | 100.0 | 30.75 | 69.7 | 13.36 | 30.3 | 2.08 | 4.7 | 1.66 | 3.8 | 3.29 | 7.5 | 2.31 | 5.2 | 4.02 | 9.1 |
| Manufacturing industry.......... | 43.41 | 100.0 | 28.72 | 66.2 | 14.69 | 33.8 | 3.30 | 7.6 | 2.33 | 5.4 | 4.21 | 9.7 | 1.66 | 3.8 | 3.19 | 7.3 |
| Service-providing industries[3].......... | 47.00 | 100.0 | 32.61 | 69.4 | 14.39 | 30.6 | 3.97 | 8.5 | 1.78 | 3.8 | 3.73 | 7.9 | 1.64 | 3.5 | 3.26 | 6.9 |
| Trade, transportation, and utilities industry.......... | 41.64 | 100.0 | 28.91 | 69.4 | 12.73 | 30.6 | 3.10 | 7.5 | 1.43 | 3.4 | 3.40 | 8.2 | 1.68 | 4.0 | 3.11 | 7.5 |
| Information industry.......... | 73.56 | 100.0 | 47.75 | 64.9 | 25.81 | 35.1 | 7.29 | 9.9 | 3.52 | 4.8 | 6.73 | 9.2 | 3.74 | 5.1 | 4.52 | 6.1 |
| Financial activities industry.......... | 58.01 | 100.0 | 38.33 | 66.1 | 19.68 | 33.9 | 5.29 | 9.1 | 3.71 | 6.4 | 5.00 | 8.6 | 2.11 | 3.6 | 3.57 | 6.1 |
| Professional and business services industry.......... | 53.05 | 100.0 | 37.33 | 70.4 | 15.72 | 29.6 | 4.53 | 8.5 | 2.34 | 4.4 | 3.76 | 7.1 | 1.47 | 2.8 | 3.62 | 6.8 |
| Education and health services industry.......... | 45.99 | 100.0 | 31.87 | 69.3 | 14.12 | 30.7 | 4.25 | 9.2 | 1.06 | 2.3 | 3.96 | 8.6 | 1.68 | 3.7 | 3.17 | 6.9 |
| Leisure and hospitality industry.......... | 24.57 | 100.0 | 18.91 | 77.0 | 5.66 | 23.0 | 1.19 | 4.8 | 0.53 | 2.1 | 1.48 | 6.0 | 0.40 | 1.6 | 2.05 | 8.4 |
| Other services industry.......... | 41.18 | 100.0 | 29.93 | 72.7 | 11.25 | 27.3 | 3.32 | 8.1 | 0.61 | 1.5 | 2.62 | 6.4 | 1.68 | 4.1 | 3.01 | 7.3 |
| Part-time workers.......... | 22.05 | 100.0 | 17.65 | 80.1 | 4.39 | 19.9 | 0.84 | 3.8 | 0.40 | 1.8 | 0.70 | 3.2 | 0.35 | 1.6 | 2.10 | 9.5 |
| **Occupational group** | | | | | | | | | | | | | | | | |
| Management, professional and related occupations.......... | 49.60 | 100.0 | 38.10 | 76.8 | 11.49 | 23.2 | 3.47 | 7.0 | 1.18 | 2.4 | 1.61 | 3.2 | 1.15 | 2.3 | 4.07 | 8.2 |
| Professional and related occupations.......... | 50.38 | 100.0 | 38.72 | 76.9 | 11.66 | 23.1 | 3.56 | 7.1 | 1.21 | 2.4 | 1.57 | 3.1 | 1.17 | 2.3 | 4.15 | 8.2 |
| Sales and office occupations.......... | 18.71 | 100.0 | 15.44 | 82.5 | 3.27 | 17.5 | 0.51 | 2.7 | 0.30 | 1.6 | 0.55 | 2.9 | 0.19 | 1.0 | 1.73 | 9.2 |
| Sales and related occupations.......... | 17.04 | 100.0 | 14.29 | 83.9 | 2.75 | 16.1 | 0.36 | 2.1 | 0.28 | 1.6 | 0.34 | 2.0 | 0.16 | 0.9 | 1.61 | 9.4 |
| Office and administrative support occupations.......... | 22.75 | 100.0 | 18.20 | 80.0 | 4.54 | 20.0 | 0.86 | 3.8 | 0.33 | 1.4 | 1.05 | 4.6 | 0.28 | 1.2 | 2.02 | 8.9 |
| Service occupations.......... | 16.52 | 100.0 | 13.84 | 83.8 | 2.68 | 16.2 | 0.34 | 2.1 | 0.19 | 1.1 | 0.31 | 1.9 | 0.13 | 0.8 | 1.71 | 10.4 |
| Production, transportation, and material moving occupations.......... | 22.76 | 100.0 | 16.89 | 74.2 | 5.88 | 25.8 | 0.89 | 3.9 | 0.59 | 2.6 | 1.46 | 6.4 | 0.61 | 2.7 | 2.33 | 10.2 |
| Transportation and material moving occupations.......... | 23.16 | 100.0 | 17.06 | 73.7 | 6.10 | 26.3 | 0.92 | 4.0 | 0.58 | 2.5 | 1.56 | 6.7 | 0.66 | 2.9 | 2.37 | 10.2 |
| **Industry group** | | | | | | | | | | | | | | | | |
| Service-providing industries[3].......... | 21.96 | 100.0 | 17.60 | 80.1 | 4.37 | 19.9 | 0.84 | 3.8 | 0.39 | 1.8 | 0.70 | 3.2 | 0.34 | 1.6 | 2.09 | 9.5 |
| Trade, transportation, and utilities industry.......... | 20.24 | 100.0 | 15.84 | 78.3 | 4.40 | 21.7 | 0.65 | 3.2 | 0.41 | 2.0 | 0.97 | 4.8 | 0.44 | 2.2 | 1.94 | 9.6 |

See footnotes at end of table.

- 14 -

004362

**Table 5. Employer Costs for Employee Compensation for private industry workers by bargaining and work status — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Professional and business services industry............ | 28.49 | 100.0 | 23.42 | 82.2 | 5.07 | 17.8 | 0.70 | 2.5 | 0.67 | 2.3 | 0.60 | 2.1 | 0.17 | 0.6[4] | 2.93 | 10.3 |
| Education and health services industry............ | 33.54 | 100.0 | 25.77 | 76.8 | 7.77 | 23.2 | 2.29 | 6.8 | 0.71 | 2.1 | 1.17 | 3.5 | 0.77 | 2.3 | 2.84 | 8.5 |
| Leisure and hospitality industry. ... | 14.78 | 100.0 | 12.68 | 85.8 | 2.10 | 14.2 | 0.19 | 1.3 | 0.11 | 0.7 | 0.19[4] | 1.3[4] | 0.06 | 0.4 | 1.56 | 10.5 |

[1] Includes costs for wages and salaries and benefits.
[2] Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.
[3] Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.
[4] The relative standard error for this estimate is equal to or greater than 30 percent.

- 15 -

004363

**Table 6. Employer Costs for Employee Compensation for private industry workers by establishment size and industry group**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| All workers................... | 40.23 | 100.0 | 28.37 | 70.5 | 11.86 | 29.5 | 3.01 | 7.5 | 1.49 | 3.7 | 3.00 | 7.4 | 1.36 | 3.4 | 3.01 | 7.5 |
| 1-99 workers................ | 33.52 | 100.0 | 24.91 | 74.3 | 8.61 | 25.7 | 2.14 | 6.4 | 0.90 | 2.7 | 2.08 | 6.2 | 0.81 | 2.4 | 2.69 | 8.0 |
| 1-49 workers............ | 32.32 | 100.0 | 24.26 | 75.1 | 8.06 | 24.9 | 1.99 | 6.2 | 0.83 | 2.6 | 1.90 | 5.9 | 0.71 | 2.2 | 2.63 | 8.1 |
| 50-99 workers........... | 37.85 | 100.0 | 27.25 | 72.0 | 10.60 | 28.0 | 2.69 | 7.1 | 1.15 | 3.0 | 2.71 | 7.2 | 1.16 | 3.1 | 2.89 | 7.6 |
| 100 workers or more........ | 48.38 | 100.0 | 32.57 | 67.3 | 15.81 | 32.7 | 4.06 | 8.4 | 2.20 | 4.5 | 4.11 | 8.5 | 2.03 | 4.2 | 3.40 | 7.0 |
| 100-499 workers.......... | 41.07 | 100.0 | 28.53 | 69.5 | 12.54 | 30.5 | 3.19 | 7.8 | 1.53 | 3.7 | 3.35 | 8.2 | 1.44 | 3.5 | 3.03 | 7.4 |
| 500 workers or more....... | 58.38 | 100.0 | 38.09 | 65.2 | 20.29 | 34.8 | 5.26 | 9.0 | 3.12 | 5.3 | 5.16 | 8.8 | 2.84 | 4.9 | 3.90 | 6.7 |
| Goods-producing industries[2].. | 43.07 | 100.0 | 29.14 | 67.7 | 13.93 | 32.3 | 2.76 | 6.4 | 2.07 | 4.8 | 3.76 | 8.7 | 1.86 | 4.3 | 3.47 | 8.1 |
| 1-99 workers................ | 37.08 | 100.0 | 26.62 | 71.8 | 10.46 | 28.2 | 1.88 | 5.1 | 1.32 | 3.6 | 2.57 | 6.9 | 1.35 | 3.7 | 3.33 | 9.0 |
| 1-49 workers............ | 35.78 | 100.0 | 26.09 | 72.9 | 9.69 | 27.1 | 1.71 | 4.8 | 1.14 | 3.2 | 2.24 | 6.3 | 1.24 | 3.5 | 3.36 | 9.4 |
| 50-99 workers........... | 40.35 | 100.0 | 27.95 | 69.3 | 12.40 | 30.7 | 2.30 | 5.7 | 1.79 | 4.4 | 3.39 | 8.4 | 1.65 | 4.1 | 3.27 | 8.1 |
| 100 workers or more........ | 48.49 | 100.0 | 31.42 | 64.8 | 17.08 | 35.2 | 3.56 | 7.3 | 2.75 | 5.7 | 4.85 | 10.0 | 2.31 | 4.8 | 3.60 | 7.4 |
| 100-499 workers.......... | 44.72 | 100.0 | 29.74 | 66.5 | 14.99 | 33.5 | 3.03 | 6.8 | 2.15 | 4.8 | 4.29 | 9.6 | 2.00 | 4.5 | 3.52 | 7.9 |
| 500 workers or more....... | 53.97 | 100.0 | 33.86 | 62.7 | 20.11 | 37.3 | 4.33 | 8.0 | 3.63 | 6.7 | 5.65 | 10.5 | 2.77 | 5.1 | 3.73 | 6.9 |
| Manufacturing industry......... | 42.78 | 100.0 | 28.38 | 66.3 | 14.40 | 33.7 | 3.22 | 7.5 | 2.29 | 5.3 | 4.10 | 9.6 | 1.64 | 3.8 | 3.16 | 7.4 |
| 1-99 workers................ | 33.66 | 100.0 | 24.05 | 71.5 | 9.61 | 28.5 | 2.09 | 6.2 | 1.22 | 3.6 | 2.64 | 7.8 | 0.91 | 2.7 | 2.74 | 8.1 |
| 1-49 workers............ | 31.58 | 100.0 | 23.17 | 73.4 | 8.41 | 26.6 | 1.89 | 6.0 | 0.97 | 3.1 | 2.12 | 6.7 | 0.76[3] | 2.4[3] | 2.67 | 8.4 |
| 50-99 workers........... | 37.20 | 100.0 | 25.55 | 68.7 | 11.64 | 31.3 | 2.44 | 6.5 | 1.65 | 4.4 | 3.52 | 9.5 | 1.16 | 3.1 | 2.87 | 7.7 |
| 100 workers or more........ | 47.87 | 100.0 | 30.79 | 64.3 | 17.08 | 35.7 | 3.85 | 8.0 | 2.88 | 6.0 | 4.91 | 10.3 | 2.04 | 4.3 | 3.40 | 7.1 |
| 100-499 workers.......... | 41.97 | 100.0 | 28.02 | 66.8 | 13.94 | 33.2 | 3.25 | 7.7 | 2.04 | 4.9 | 4.10 | 9.8 | 1.41 | 3.4 | 3.14 | 7.5 |
| 500 workers or more....... | 54.52 | 100.0 | 33.91 | 62.2 | 20.61 | 37.8 | 4.51 | 8.3 | 3.83 | 7.0 | 5.83 | 10.7 | 2.76 | 5.1 | 3.69 | 6.8 |
| Service-providing industries[4]. | 39.67 | 100.0 | 28.22 | 71.1 | 11.46 | 28.9 | 3.06 | 7.7 | 1.37 | 3.5 | 2.85 | 7.2 | 1.26 | 3.2 | 2.92 | 7.4 |
| 1-99 workers................ | 32.93 | 100.0 | 24.63 | 74.8 | 8.31 | 25.2 | 2.18 | 6.6 | 0.83 | 2.5 | 1.99 | 6.1 | 0.72 | 2.2 | 2.58 | 7.8 |
| 1-49 workers............ | 31.81 | 100.0 | 23.99 | 75.4 | 7.82 | 24.6 | 2.03 | 6.4 | 0.78 | 2.5 | 1.85 | 5.8 | 0.63 | 2.0 | 2.52 | 7.9 |
| 50-99 workers........... | 37.28 | 100.0 | 27.09 | 72.7 | 10.19 | 27.3 | 2.77 | 7.4 | 1.00 | 2.7 | 2.56 | 6.9 | 1.05 | 2.8 | 2.81 | 7.5 |
| 100 workers or more........ | 48.35 | 100.0 | 32.84 | 67.9 | 15.51 | 32.1 | 4.18 | 8.6 | 2.07 | 4.3 | 3.94 | 8.2 | 1.96 | 4.1 | 3.35 | 6.9 |
| 100-499 workers.......... | 40.19 | 100.0 | 28.24 | 70.3 | 11.94 | 29.7 | 3.23 | 8.0 | 1.38 | 3.4 | 3.12 | 7.8 | 1.30 | 3.2 | 2.92 | 7.3 |
| 500 workers or more....... | 59.37 | 100.0 | 39.04 | 65.8 | 20.33 | 34.2 | 5.47 | 9.2 | 3.01 | 5.1 | 5.05 | 8.5 | 2.85 | 4.8 | 3.94 | 6.6 |
| Trade, transportation, and utilities industry........... | 34.17 | 100.0 | 24.35 | 71.3 | 9.82 | 28.7 | 2.25 | 6.6 | 1.07 | 3.1 | 2.55 | 7.5 | 1.25 | 3.6 | 2.70 | 7.9 |
| 1-99 workers................ | 30.36 | 100.0 | 22.84 | 75.2 | 7.52 | 24.8 | 1.75 | 5.8 | 0.81 | 2.7 | 1.79 | 5.9 | 0.66 | 2.2 | 2.52 | 8.3 |
| 1-49 workers............ | 29.80 | 100.0 | 22.68 | 76.1 | 7.11 | 23.9 | 1.66 | 5.6 | 0.78 | 2.6 | 1.60 | 5.4 | 0.58 | 2.0 | 2.49 | 8.3 |
| 50-99 workers........... | 32.53 | 100.0 | 23.46 | 72.1 | 9.07 | 27.9 | 2.07 | 6.4 | 0.89 | 2.8 | 2.52 | 7.7 | 0.93 | 2.9 | 2.66 | 8.2 |
| 100 workers or more........ | 38.58 | 100.0 | 26.09 | 67.6 | 12.49 | 32.4 | 2.83 | 7.3 | 1.38 | 3.6 | 3.44 | 8.9 | 1.93 | 5.0 | 2.91 | 7.6 |
| 100-499 workers.......... | 32.13 | 100.0 | 22.42 | 69.8 | 9.71 | 30.2 | 2.15 | 6.7 | 1.14 | 3.6 | 2.66 | 8.3 | 1.20 | 3.7 | 2.56 | 8.0 |
| 500 workers or more....... | 53.08 | 100.0 | 34.35 | 64.7 | 18.73 | 35.3 | 4.35 | 8.2 | 1.92 | 3.6 | 5.19 | 9.8 | 3.57 | 6.7 | 3.71 | 7.0 |
| Wholesale trade industry....... | 46.35 | 100.0 | 33.03 | 71.2 | 13.33 | 28.8 | 3.60 | 7.8 | 1.79 | 3.9 | 3.09 | 6.7 | 1.45 | 3.1 | 3.39 | 7.3 |
| 1-99 workers................ | 45.03 | 100.0 | 32.66 | 72.5 | 12.37 | 27.5 | 3.33 | 7.4 | 1.62 | 3.6 | 2.84 | 6.3 | 1.21 | 2.7 | 3.36 | 7.5 |
| 1-49 workers............ | 45.01 | 100.0 | 32.90 | 73.1 | 12.12 | 26.9 | 3.27 | 7.3 | 1.56 | 3.5 | 2.71 | 6.0 | 1.21 | 2.7 | 3.37 | 7.5 |
| 100 workers or more........ | 48.67 | 100.0 | 33.67 | 69.2 | 15.00 | 30.8 | 4.06 | 8.3 | 2.09 | 4.3 | 3.54 | 7.3 | 1.88 | 3.9 | 3.44 | 7.1 |

See footnotes at end of table.

004364

**Table 6. Employer Costs for Employee Compensation for private industry workers by establishment size and industry group — Continued**
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| 100-499 workers.......... | 47.64 | 100.0 | 33.16 | 69.6 | 14.47 | 30.4 | 3.90 | 8.2 | 2.02 | 4.2 | 3.45 | 7.2 | 1.74 | 3.6 | 3.36 | 7.1 |
| Retail trade industry........ | 23.98 | 100.0 | 18.39 | 76.7 | 5.59 | 23.3 | 1.22 | 5.1 | 0.62 | 2.6 | 1.33 | 5.6 | 0.41 | 1.7 | 2.00 | 8.3 |
| 1-99 workers........ | 23.19 | 100.0 | 18.38 | 79.3 | 4.80 | 20.7 | 1.05 | 4.5 | 0.46 | 2.0 | 1.03 | 4.4 | 0.29 | 1.2 | 1.98 | 8.5 |
| 1-49 workers........ | 22.64 | 100.0 | 18.14 | 80.1 | 4.50 | 19.9 | 0.98 | 4.3 | 0.45 | 2.0 | 0.90 | 4.0 | 0.23 | 1.0 | 1.95 | 8.6 |
| 50-99 workers........ | 25.41 | 100.0 | 19.36 | 76.2 | 6.04 | 23.8 | 1.34 | 5.3 | 0.49 | 1.9 | 1.58 | 6.2 | 0.54 | 2.1 | 2.10 | 8.3 |
| 100 workers or more........ | 25.15 | 100.0 | 18.40 | 73.2 | 6.75 | 26.8 | 1.47 | 5.9 | 0.87 | 3.4 | 1.78 | 7.1 | 0.60 | 2.4 | 2.03 | 8.1 |
| 100-499 workers........ | 24.65 | 100.0 | 18.03 | 73.2 | 6.61 | 26.8 | 1.41 | 5.7 | 0.84 | 3.4 | 1.78 | 7.2 | 0.58 | 2.3 | 2.01 | 8.2 |
| Transportation and warehousing industry........ | 43.75 | 100.0 | 28.89 | 66.0 | 14.85 | 34.0 | 3.07 | 7.0 | 1.37 | 3.1 | 4.46 | 10.2 | 2.42 | 5.5 | 3.53 | 8.1 |
| 1-99 workers........ | 32.57 | 100.0 | 23.56 | 72.3 | 9.01 | 27.7 | 1.67 | 5.1 | 0.76 | 2.3 | 2.72 | 8.4 | 0.68 | 2.1 | 3.17 | 9.7 |
| 1-49 workers........ | 31.55 | 100.0 | 23.29 | 73.8 | 8.26 | 26.2 | 1.55 | 4.9 | 0.70 | 2.2 | 2.33 | 7.4 | 0.58 | 1.8 | 3.11 | 9.8 |
| 100 workers or more........ | 49.44 | 100.0 | 31.61 | 63.9 | 17.83 | 36.1 | 3.79 | 7.7 | 1.69 | 3.4 | 5.34 | 10.8 | 3.30 | 6.7 | 3.71 | 7.5 |
| 100-499 workers........ | 38.29 | 100.0 | 24.78 | 64.7 | 13.51 | 35.3 | 2.52 | 6.6 | 1.27 | 3.3 | 4.25 | 11.1 | 2.10 | 5.5 | 3.36 | 8.8 |
| Information industry........ | 68.31 | 100.0 | 44.63 | 65.3 | 23.68 | 34.7 | 6.78 | 9.9 | 3.19 | 4.7 | 6.09 | 8.9 | 3.37 | 4.9 | 4.26 | 6.2 |
| 1-99 workers........ | 49.77 | 100.0 | 33.35 | 67.0 | 16.43 | 33.0 | 4.29 | 8.6 | 1.87 | 3.8 | 4.39 | 8.8 | 2.47[3] | 5.0[3] | 3.41 | 6.9 |
| 100 workers or more........ | 83.21 | 100.0 | 53.70 | 64.5 | 29.50 | 35.5 | 8.78 | 10.6 | 4.25 | 5.1 | 7.46 | 9.0 | 4.08 | 4.9 | 4.93 | 5.9 |
| 100-499 workers........ | 67.46 | 100.0 | 45.13 | 66.9 | 22.33 | 33.1 | 6.55 | 9.7 | 2.33 | 3.5 | 6.56 | 9.7 | 2.67 | 4.0 | 4.22 | 6.3 |
| 500 workers or more........ | 96.10 | 100.0 | 60.72 | 63.2 | 35.38 | 36.8 | 10.61 | 11.0 | 5.82 | 6.1 | 8.19 | 8.5 | 5.24 | 5.5 | 5.52 | 5.7 |
| Financial activities industry........ | 56.23 | 100.0 | 37.31 | 66.4 | 18.92 | 33.6 | 5.07 | 9.0 | 3.54 | 6.3 | 4.79 | 8.5 | 2.02 | 3.6 | 3.49 | 6.2 |
| 1-99 workers........ | 45.52 | 100.0 | 31.50 | 69.2 | 14.02 | 30.8 | 3.85 | 8.5 | 2.07 | 4.6 | 3.79 | 8.3 | 1.29 | 2.8 | 3.01 | 6.6 |
| 1-49 workers........ | 43.42 | 100.0 | 30.16 | 69.5 | 13.26 | 30.5 | 3.57 | 8.2 | 2.01 | 4.6 | 3.60 | 8.3 | 1.18 | 2.7 | 2.91 | 6.7 |
| 100 workers or more........ | 70.30 | 100.0 | 44.95 | 63.9 | 25.35 | 36.1 | 6.67 | 9.5 | 5.46 | 7.8 | 6.11 | 8.7 | 2.98 | 4.2 | 4.13 | 5.9 |
| 100-499 workers........ | 65.69 | 100.0 | 43.42 | 66.1 | 22.28 | 33.9 | 6.03 | 9.2 | 4.01 | 6.1 | 5.76 | 8.8 | 2.55 | 3.9 | 3.93 | 6.0 |
| 500 workers or more........ | 74.08 | 100.0 | 46.21 | 62.4 | 27.87 | 37.6 | 7.19 | 9.7 | 6.66 | 9.0 | 6.39 | 8.6 | 3.33 | 4.5 | 4.30 | 5.8 |
| Professional and business services industry........ | 49.66 | 100.0 | 35.41 | 71.3 | 14.25 | 28.7 | 4.00 | 8.1 | 2.11 | 4.2 | 3.33 | 6.7 | 1.29 | 2.6 | 3.53 | 7.1 |
| 1-99 workers........ | 46.92 | 100.0 | 34.55 | 73.6 | 12.37 | 26.4 | 3.52 | 7.5 | 1.54 | 3.3 | 2.91 | 6.2 | 0.97 | 2.1 | 3.42 | 7.3 |
| 1-49 workers........ | 43.25 | 100.0 | 32.08 | 74.2 | 11.17 | 25.8 | 3.06 | 7.1 | 1.40 | 3.2 | 2.65 | 6.1 | 0.81 | 1.9 | 3.26 | 7.5 |
| 50-99 workers........ | 57.93 | 100.0 | 41.97 | 72.5 | 15.96 | 27.5 | 4.92 | 8.5 | 1.98 | 3.4 | 3.70 | 6.4 | 1.46 | 2.5 | 3.90 | 6.7 |
| 100 workers or more........ | 52.28 | 100.0 | 36.23 | 69.3 | 16.05 | 30.7 | 4.46 | 8.5 | 2.65 | 5.1 | 3.72 | 7.1 | 1.59 | 3.0 | 3.63 | 6.9 |
| 100-499 workers........ | 47.28 | 100.0 | 33.40 | 70.6 | 13.88 | 29.4 | 4.03 | 8.5 | 1.75 | 3.7 | 3.57 | 7.5 | 1.23 | 2.6 | 3.30 | 7.0 |
| 500 workers or more........ | 58.82 | 100.0 | 39.93 | 67.9 | 18.90 | 32.1 | 5.02 | 8.5 | 3.83 | 6.5 | 3.93 | 6.7 | 2.06 | 3.5 | 4.06 | 6.9 |
| Education and health services industry........ | 42.93 | 100.0 | 30.37 | 70.7 | 12.56 | 29.3 | 3.77 | 8.8 | 0.97 | 2.3 | 3.28 | 7.6 | 1.46 | 3.4 | 3.09 | 7.2 |
| 1-99 workers........ | 33.87 | 100.0 | 25.43 | 75.1 | 8.45 | 24.9 | 2.57 | 7.6 | 0.37 | 1.1 | 2.16 | 6.4 | 0.73 | 2.1 | 2.62 | 7.7 |
| 1-49 workers........ | 33.85 | 100.0 | 25.63 | 75.7 | 8.22 | 24.3 | 2.52 | 7.5 | 0.34 | 1.0 | 2.03 | 6.0 | 0.71 | 2.1 | 2.61 | 7.7 |
| 50-99 workers........ | 33.98 | 100.0 | 24.67 | 72.6 | 9.30 | 27.4 | 2.74 | 8.1 | 0.47 | 1.4 | 2.66 | 7.8 | 0.80 | 2.3 | 2.64 | 7.8 |
| 100 workers or more........ | 51.16 | 100.0 | 34.86 | 68.1 | 16.30 | 31.9 | 4.86 | 9.5 | 1.52 | 3.0 | 4.29 | 8.4 | 2.12 | 4.1 | 3.52 | 6.9 |
| 100-499 workers........ | 41.57 | 100.0 | 29.64 | 71.3 | 11.92 | 28.7 | 3.71 | 8.9 | 0.93 | 2.2 | 3.00 | 7.2 | 1.29 | 3.1 | 2.99 | 7.2 |
| 500 workers or more........ | 59.04 | 100.0 | 39.15 | 66.3 | 19.89 | 33.7 | 5.80 | 9.8 | 2.00 | 3.4 | 5.34 | 9.1 | 2.80 | 4.7 | 3.95 | 6.7 |

See footnotes at end of table.

- 17 -

004365

Table 6. Employer Costs for Employee Compensation for private industry workers by establishment size and industry group — Continued
[Dec. 2022]

| Series | Total compensation[1] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Educational services industry.......... | 52.93 | 100.0 | 38.12 | 72.0 | 14.81 | 28.0 | 4.34 | 8.2 | 0.40 | 0.8 | 4.01 | 7.6 | 2.44 | 4.6 | 3.62 | 6.8 |
| 1-99 workers........... | 39.57 | 100.0 | 30.44 | 76.9 | 9.13 | 23.1 | 2.48 | 6.3 | 0.14 | 0.3 | 2.28 | 5.8 | 1.20 | 3.0 | 3.04 | 7.7 |
| 100 workers or more........... | 63.12 | 100.0 | 43.98 | 69.7 | 19.14 | 30.3 | 5.76 | 9.1 | 0.60 | 1.0 | 5.32 | 8.4 | 3.40 | 5.4 | 4.06 | 6.4 |
| 100-499 workers........... | 50.00 | 100.0 | 36.34 | 72.7 | 13.66 | 27.3 | 3.94 | 7.9 | 0.34[3] | 0.7[3] | 3.93 | 7.9 | 1.93 | 3.9 | 3.53 | 7.1 |
| 500 workers or more........... | 72.26 | 100.0 | 49.29 | 68.2 | 22.96 | 31.8 | 7.02 | 9.7 | 0.79 | 1.1 | 6.30 | 8.7 | 4.42 | 6.1 | 4.43 | 6.1 |
| Health care and social assistance industry.......... | 41.48 | 100.0 | 29.24 | 70.5 | 12.23 | 29.5 | 3.68 | 8.9 | 1.05 | 2.5 | 3.17 | 7.6 | 1.31 | 3.2 | 3.01 | 7.3 |
| 1-99 workers........... | 33.13 | 100.0 | 24.78 | 74.8 | 8.36 | 25.2 | 2.58 | 7.8 | 0.40 | 1.2 | 2.15 | 6.5 | 0.67 | 2.0 | 2.56 | 7.7 |
| 1-49 workers........... | 33.66 | 100.0 | 25.33 | 75.3 | 8.33 | 24.7 | 2.61 | 7.7 | 0.37 | 1.1 | 2.09 | 6.2 | 0.68 | 2.0 | 2.59 | 7.7 |
| 50-99 workers........... | 31.02 | 100.0 | 22.56 | 72.7 | 8.46 | 27.3 | 2.47 | 8.0 | 0.52 | 1.7 | 2.40 | 7.7 | 0.59 | 1.9 | 2.47 | 8.0 |
| 100 workers or more........... | 49.26 | 100.0 | 33.41 | 67.8 | 15.85 | 32.2 | 4.71 | 9.6 | 1.67 | 3.4 | 4.12 | 8.4 | 1.91 | 3.9 | 3.43 | 7.0 |
| 100-499 workers........... | 40.36 | 100.0 | 28.69 | 71.1 | 11.68 | 28.9 | 3.68 | 9.1 | 1.02 | 2.5 | 2.86 | 7.1 | 1.20 | 3.0 | 2.92 | 7.2 |
| 500 workers or more........... | 56.76 | 100.0 | 37.39 | 65.9 | 19.36 | 34.1 | 5.59 | 9.8 | 2.22 | 3.9 | 5.18 | 9.1 | 2.52 | 4.4 | 3.86 | 6.8 |
| Leisure and hospitality industry.......... | 18.40 | 100.0 | 14.98 | 81.4 | 3.42 | 18.6 | 0.56 | 3.1 | 0.26 | 1.4 | 0.67 | 3.6 | 0.18 | 1.0 | 1.74 | 9.5 |
| 1-99 workers........... | 16.99 | 100.0 | 14.15 | 83.3 | 2.84 | 16.7 | 0.39 | 2.3 | 0.20 | 1.2 | 0.50 | 2.9 | 0.09 | 0.5 | 1.66 | 9.8 |
| 1-49 workers........... | 16.66 | 100.0 | 13.92 | 83.6 | 2.73 | 16.4 | 0.36 | 2.2 | 0.19 | 1.1 | 0.49 | 2.9 | 0.06 | 0.4 | 1.64 | 9.9 |
| 50-99 workers........... | 18.24 | 100.0 | 15.01 | 82.3 | 3.22 | 17.7 | 0.49 | 2.7 | 0.26 | 1.4 | 0.53 | 2.9 | 0.20 | 1.1 | 1.75 | 9.6 |
| 100 workers or more........... | 24.10 | 100.0 | 18.34 | 76.1 | 5.75 | 23.9 | 1.27 | 5.3 | 0.51 | 2.1 | 1.36 | 5.6 | 0.57 | 2.4 | 2.05 | 8.5 |
| 100-499 workers........... | 23.66 | 100.0 | 18.30 | 77.3 | 5.36 | 22.7 | 1.15 | 4.9 | 0.51 | 2.2 | 1.19 | 5.0 | 0.45 | 1.9 | 2.06 | 8.7 |
| 500 workers or more........... | 25.28 | 100.0 | 18.46 | 73.1 | 6.81 | 26.9 | 1.58 | 6.3 | 0.50 | 2.0 | 1.81 | 7.2 | 0.89 | 3.5 | 2.03 | 8.0 |

[1] Includes costs for wages and salaries and benefits.
[2] Includes mining, construction, and manufacturing. The agriculture, forestry, farming, and hunting sector is excluded.
[3] The relative standard error for this estimate is equal to or greater than 30 percent.
[4] Includes utilities; wholesale trade; retail trade; transportation and warehousing; information; finance and insurance; real estate and rental and leasing; professional and technical services; management of companies and enterprises; administrative and waste services; educational services; health care and social assistance; arts, entertainment and recreation; accommodation and food services; and other services, except public administration.

- 18 -

004366

**Table 7. Employer Costs for Employee Compensation for private industry workers by census region and division**
[Dec. 2022]

| Area[1] | Total compensation[2] | | Wages and salaries | | Total benefits | | Paid leave | | Supplemental pay | | Insurance | | Retirement and savings | | Legally required benefits | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent | Cost ($) | Percent |
| Northeast................. | 46.57 | 100.0 | 32.26 | 69.3 | 14.30 | 30.7 | 3.66 | 7.9 | 1.76 | 3.8 | 3.56 | 7.7 | 1.83 | 3.9 | 3.49 | 7.5 |
| New England................. | 46.44 | 100.0 | 31.96 | 68.8 | 14.47 | 31.2 | 3.77 | 8.1 | 2.18 | 4.7 | 3.56 | 7.7 | 1.61 | 3.5 | 3.35 | 7.2 |
| Middle Atlantic................. | 46.61 | 100.0 | 32.37 | 69.4 | 14.24 | 30.6 | 3.62 | 7.8 | 1.62 | 3.5 | 3.57 | 7.6 | 1.90 | 4.1 | 3.54 | 7.6 |
| South................. | 35.52 | 100.0 | 25.71 | 72.4 | 9.81 | 27.6 | 2.60 | 7.3 | 1.22 | 3.4 | 2.39 | 6.7 | 1.00 | 2.8 | 2.60 | 7.3 |
| South Atlantic................. | 36.74 | 100.0 | 26.49 | 72.1 | 10.24 | 27.9 | 2.76 | 7.5 | 1.19 | 3.2 | 2.50 | 6.8 | 1.06 | 2.9 | 2.73 | 7.4 |
| East South Central................. | 31.61 | 100.0 | 22.83 | 72.2 | 8.78 | 27.8 | 2.21 | 7.0 | 1.08 | 3.4 | 2.38 | 7.5 | 0.80 | 2.5 | 2.32 | 7.3 |
| West South Central................. | 35.25 | 100.0 | 25.70 | 72.9 | 9.55 | 27.1 | 2.50 | 7.1 | 1.36 | 3.8 | 2.18 | 6.2 | 0.98 | 2.8 | 2.52 | 7.2 |
| Midwest................. | 38.95 | 100.0 | 26.81 | 68.8 | 12.14 | 31.2 | 2.85 | 7.3 | 1.70 | 4.4 | 3.29 | 8.5 | 1.46 | 3.8 | 2.83 | 7.3 |
| East North Central................. | 40.82 | 100.0 | 28.08 | 68.8 | 12.75 | 31.2 | 3.03 | 7.4 | 1.81 | 4.4 | 3.35 | 8.2 | 1.64 | 4.0 | 2.92 | 7.2 |
| West North Central................. | 35.04 | 100.0 | 24.18 | 69.0 | 10.86 | 31.0 | 2.47 | 7.0 | 1.49 | 4.2 | 3.18 | 9.1 | 1.09 | 3.1 | 2.65 | 7.6 |
| West................. | 43.52 | 100.0 | 30.81 | 70.8 | 12.71 | 29.2 | 3.27 | 7.5 | 1.44 | 3.3 | 3.16 | 7.3 | 1.43 | 3.3 | 3.41 | 7.8 |
| Mountain................. | 36.51 | 100.0 | 26.04 | 71.3 | 10.47 | 28.7 | 2.53 | 6.9 | 1.26 | 3.5 | 2.80 | 7.7 | 1.10 | 3.0 | 2.78 | 7.6 |
| Pacific................. | 46.68 | 100.0 | 32.96 | 70.6 | 13.72 | 29.4 | 3.60 | 7.7 | 1.52 | 3.3 | 3.33 | 7.1 | 1.58 | 3.4 | 3.69 | 7.9 |

[1] The census divisions are defined as follows: New England: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; Middle Atlantic: New Jersey, New York, and Pennsylvania; South Atlantic: Delaware, District of Columbia, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and West Virginia; East South Central: Alabama, Kentucky, Mississippi, and Tennessee; West South Central: Arkansas, Louisiana, Oklahoma, and Texas; East North Central: Illinois, Indiana, Michigan, Ohio, and Wisconsin; West North Central: Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota; Mountain: Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming; and Pacific: Alaska, California, Hawaii, Oregon, and Washington.

[2] Includes costs for wages and salaries and benefits.

- 19 -

004367

FRED Graph Observations
Federal Reserve Economic Data
Link: https://fred.stlouisfed.org
Help: https://fredhelp.stlouisfed.org
Economic Research Division
Federal Reserve Bank of St. Louis

ECIWAG                          Employment Cost Index: Wages and Salaries: Private Industry Workers,
                                Index Dec 2005=100, Quarterly, Seasonally Adjusted

Frequency: Quarterly
observation_date            ECIWAG
              2019-01-01         135.8
              2019-04-01         136.8
              2019-07-01         137.9
              2019-10-01         138.9
              2020-01-01         140.3
              2020-04-01         140.8
              2020-07-01         141.6
              2020-10-01         142.8
              2021-01-01         144.5
              2021-04-01         145.8
              2021-07-01         148.0
              2021-10-01         149.9
              2022-01-01         151.7
              2022-04-01         154.0
              2022-07-01         155.8
              2022-10-01         157.6
              2023-01-01         159.4
              2023-04-01         161.1
              2023-07-01         162.7
              2023-10-01         164.4
              2024-01-01         166.2

Last accessed 7/18/24



Categories > Population, Employment, & Labor Markets > Current Population Survey (Household Survey) > Employment Population Ratio

☆ **Employment-Population Ratio - 25-54 Yrs.** (LNS12300060)

DOWNLOAD 📥

| **Observation:** Jul 2024: **80.9** Updated: Aug 2, 2024 7:46 AM CDT | **Units:** Percent, Seasonally Adjusted | **Frequency:** Monthly |
|---|---|---|

1Y | 5Y | 10Y | Max

EDIT GRAPH ⚙





*Shaded areas indicate U.S. recessions.*

Source: U.S. Bureau of Labor Statistics

Share Links 🔗    Account Tools 👤

 

**NOTES**

**Source:** U.S. Bureau of Labor Statistics 🗗    **Release:** Employment Situation 🗗

**Units:** Percent, Seasonally Adjusted

**Frequency:** Monthly

**Suggested Citation:**

U.S. Bureau of Labor Statistics, Employment-Population Ratio - 25-54 Yrs. [LNS12300060], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/LNS12300060, August 16, 2024.

**RELATED DATA AND CONTENT**

**Data Suggestions Based On Your Search**



004369

**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Employment Projections > Data

# Employment Projections

| Search Employm | Go |

EP Home

EP Publications ▾

EP Data ▾

EP Methods ▾

About EP ▾

Contact EP

## Occupations with the most job growth

Other available formats: (XLSX)

**Table 1.4 Occupations with the most job growth, 2022 and projected 2032 (Numbers in thousands)**

| 2022 National Employment Matrix title | 2022 National Employment Matrix code | Employment, 2022 | Employment, 2032 | Employment change, numeric, 2022–32 | Employment change, percent, 2022–32 | Median annual wage, dollars, 2023[1] |
|---|---|---|---|---|---|---|
| Total, all occupations | 00-0000 | 164,482.6 | 169,148.1 | 4,665.5 | 2.8 | 48,060 |
| Home health and personal care aides | 31-1120 | 3,715.5 | 4,520.1 | 804.6 | 21.7 | 33,530 |
| Software developers | 15-1252 | 1,594.5 | 2,004.9 | 410.4 | 25.7 | 132,270 |
| Cooks, restaurant | 35-2014 | 1,361.2 | 1,638.9 | 277.6 | 20.4 | 35,780 |
| Stockers and order fillers | 53-7065 | 2,851.6 | 3,030.3 | 178.6 | 6.3 | 36,390 |
| Registered nurses | 29-1141 | 3,172.5 | 3,349.9 | 177.4 | 5.6 | 86,070 |
| Laborers and freight, stock, and material movers, hand | 53-7062 | 2,988.5 | 3,147.3 | 158.8 | 5.3 | 37,660 |
| General and operations managers | 11-1021 | 3,507.8 | 3,655.1 | 147.3 | 4.2 | 101,280 |
| Medical and health services managers | 11-9111 | 509.5 | 654.2 | 144.7 | 28.4 | 110,680 |
| Light truck drivers | 53-3033 | 1,164.6 | 1,298.4 | 133.8 | 11.5 | 42,470 |
| Financial managers | 11-3031 | 792.6 | 919.2 | 126.6 | 16.0 | 156,100 |
| Nurse practitioners | 29-1171 | 266.3 | 384.9 | 118.6 | 44.5 | 126,260 |
| Market research analysts and marketing specialists | 13-1161 | 868.6 | 985.2 | 116.6 | 13.4 | 74,680 |
| Medical assistants | 31-9092 | 764.4 | 870.2 | 105.9 | 13.9 | 42,000 |
| Management analysts | 13-1111 | 987.6 | 1,083.3 | 95.7 | 9.7 | 99,410 |
| Heavy and tractor-trailer truck drivers | 53-3032 | 2,192.3 | 2,281.5 | 89.3 | 4.1 | 54,320 |
| Computer and information systems managers | 11-3021 | 557.4 | 643.3 | 86.0 | 15.4 | 169,510 |
| Substance abuse, behavioral disorder, and mental health counselors | 21-1018 | 388.2 | 459.6 | 71.5 | 18.4 | 53,710 |
| Accountants and auditors | 13-2011 | 1,538.4 | 1,605.8 | 67.4 | 4.4 | 79,880 |
| Lawyers | 23-1011 | 826.3 | 888.7 | 62.4 | 7.5 | 145,760 |
| Construction laborers | 47-2061 | 1,418.6 | 1,480.5 | 61.9 | 4.4 | 45,300 |

Footnotes:

[1] Data are from the Occupational Employment and Wage Statistics program, U.S. Bureau of Labor Statistics. Wage data cover non-farm wage and salary workers and do not cover the self-employed, owners and partners in unincorporated firms, or household workers.

Source: Employment Projections program, U.S. Bureau of Labor Statistics

| 2022 National Employment Matrix title | 2022 National Employment Matrix code | Employment, 2022 | Employment, 2032 | Employment change, numeric, 2022–32 | Employment change, percent, 2022–32 | Median annual wage, dollars, 2023[1] |
|---|---|---|---|---|---|---|
| First-line supervisors of food preparation and serving workers | 35-1012 | 1,221.7 | 1,281.8 | 60.0 | 4.9 | 38,520 |
| Industrial machinery mechanics | 49-9041 | 402.2 | 462.1 | 59.9 | 14.9 | 61,420 |
| Data scientists | 15-2051 | 168.9 | 228.2 | 59.4 | 35.2 | 108,020 |
| Maintenance and repair workers, general | 49-9071 | 1,607.2 | 1,664.4 | 57.2 | 3.6 | 46,700 |
| Nursing assistants | 31-1131 | 1,361.3 | 1,417.8 | 56.5 | 4.1 | 38,200 |
| Project management specialists | 13-1082 | 881.3 | 936.0 | 54.7 | 6.2 | 98,580 |
| Information security analysts | 15-1212 | 168.9 | 222.2 | 53.2 | 31.5 | 120,360 |
| Animal caretakers | 39-2021 | 339.0 | 391.5 | 52.5 | 15.5 | 31,200 |
| Human resources specialists | 13-1071 | 874.5 | 925.9 | 51.4 | 5.9 | 67,650 |
| Computer systems analysts | 15-1211 | 531.4 | 582.6 | 51.1 | 9.6 | 103,800 |

Footnotes:

[1] Data are from the Occupational Employment and Wage Statistics program, U.S. Bureau of Labor Statistics. Wage data cover non-farm wage and salary workers and do not cover the self-employed, owners and partners in unincorporated firms, or household workers.

Source: Employment Projections program, U.S. Bureau of Labor Statistics

**Last Modified Date:** April 17, 2024

U.S. BUREAU OF LABOR STATISTICS   Office of Occupational Statistics and Employment Projections   PSB Suite 2135   2 Massachusetts Avenue NE   Washington, DC 20212-0001

Telephone:1-202-691-5700  www.bls.gov/EMP   Contact EMP

**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Economic News Release

# Economic News Release



## Employment Situation News Release

Transmission of material in this news release is embargoed until     USDL-24-0006
8:30 a.m. (ET) Friday, January 5, 2024

Technical information:
 Household data:    (202) 691-6378  *  cpsinfo@bls.gov  *  www.bls.gov/cps
 Establishment data: (202) 691-6555  *  cesinfo@bls.gov  *  www.bls.gov/ces

Media contact:     (202) 691-5902  *  PressOffice@bls.gov


            THE EMPLOYMENT SITUATION -- DECEMBER 2023


Total nonfarm payroll employment increased by 216,000 in December, and the unemployment
rate was unchanged at 3.7 percent, the U.S. Bureau of Labor Statistics reported today.
Employment continued to trend up in government, health care, social assistance, and
construction, while transportation and warehousing lost jobs.

This news release presents statistics from two monthly surveys. The household survey
measures labor force status, including unemployment, by demographic characteristics.
The establishment survey measures nonfarm employment, hours, and earnings by industry.
For more information about the concepts and statistical methodology used in these two
surveys, see the Technical Note.

```
┌─────────────────────────────────────────────────────────────────────┐
│                                                                       │
│            Revision of Seasonally Adjusted Household Survey Data      │
│                                                                       │
│   Seasonally adjusted household survey data have been revised using   │
│   updated seasonal adjustment factors, a procedure done at the end    │
│   of each calendar year. Seasonally adjusted estimates back to        │
│   January 2019 were subject to revision. The unemployment rates for   │
│   January 2023 through November 2023 (as originally published and as  │
│   revised) appear in table A, along with additional information about │
│   the revisions.                                                      │
│                                                                       │
└─────────────────────────────────────────────────────────────────────┘
```

Household Survey Data

The unemployment rate held at 3.7 percent in December, and the number of unemployed
persons was essentially unchanged at 6.3 million. These measures are higher than a
year earlier, when the jobless rate was 3.5 percent and the number of unemployed
persons was 5.7 million. (See table A-1.)

Among the major worker groups, the unemployment rates for adult men (3.5 percent),
adult women (3.3 percent), teenagers (11.9 percent), Whites (3.5 percent), Blacks
(5.2 percent), Asians (3.1 percent), and Hispanics (5.0 percent) showed little change
in December. (See tables A-1, A-2, and A-3.)

The number of long-term unemployed (those jobless for 27 weeks or more), at 1.2 million,
was little changed in December and over the year. The long-term unemployed accounted
for 19.7 percent of all unemployed persons in December. (See table A-12.)

The labor force participation rate, at 62.5 percent, and the employment-population ratio,
at 60.1 percent, both decreased by 0.3 percentage point in December. These measures
showed little or no change over the year. (See table A-1.)

The number of persons employed part time for economic reasons, at 4.2 million, changed
little in December but was up by 333,000 over the year. These individuals, who would
have preferred full-time employment, were working part time because their hours had
been reduced or they were unable to find full-time jobs. (See table A-8.)

The number of persons not in the labor force who currently want a job edged up to 5.7
million in December and was up by 514,000 over the year. These individuals were not
counted as unemployed because they were not actively looking for work during the 4
weeks preceding the survey or were unavailable to take a job. (See table A-1.)

Among those not in the labor force who wanted a job, the number of persons marginally
attached to the labor force changed little in December but was up by
306,000 over the year. These individuals wanted and were available for work and had
looked for a job sometime in the prior 12 months but had not looked for work in the
4 weeks preceding the survey. The number of discouraged workers, a subset of the
marginally attached who believed that no jobs were available for them, at 346,000,
was little changed in December and over the year. (See Summary table A.)

Establishment Survey Data

Total nonfarm payroll employment increased by 216,000 in December. Employment
continued to trend up in government, health care, social assistance, and construction,
while transportation and warehousing lost jobs. Payroll employment rose by 2.7 million

004372

growth (an average monthly gain of 225,000), less than the increase of 4.8 million in
2022 (an average monthly gain of 399,000). (See table B-1.)

Government employment increased by 52,000 in December. Employment continued to trend
up in local government (+37,000) and federal government (+7,000). Government added an
average of 56,000 jobs per month in 2023, more than double the average monthly gain of
23,000 in 2022.

In December, health care added 38,000 jobs. Employment continued to trend up in
ambulatory health care services (+19,000) and hospitals (+15,000). Job growth in health
care averaged 55,000 per month in 2023, compared with the 2022 average monthly gain
of 46,000.

Employment in social assistance rose by 21,000 in December, mostly in individual and
family services (+17,000). Social assistance employment rose by an average of 22,000
per month in 2023, little different than the average increase of 19,000 per month
in 2022.

In December, construction employment continued to trend up (+17,000). Employment in
nonresidential building construction increased by 8,000. Construction added an average
of 16,000 jobs per month in 2023, little different than the 2022 average monthly gain
of 22,000.

Employment in transportation and warehousing declined by 23,000 in December. Couriers
and messengers lost 32,000 jobs, while air transportation added 4,000 jobs. Since
reaching a peak in October 2022, employment in transportation and warehousing has
decreased by 100,000.

Employment in leisure and hospitality changed little in December (+40,000). The
industry added an average of 39,000 jobs per month in 2023, less than half the
average gain of 88,000 jobs per month in 2022. Employment in the industry is
below its pre-pandemic February 2020 level by 163,000, or 1.0 percent.

Retail trade employment changed little in December (+17,000). Over the month,
employment increased in warehouse clubs, supercenters, and other general merchandise
retailers (+14,000); building material and garden equipment and supplies dealers
(+8,000); and automotive parts, accessories, and tire retailers (+4,000). These job
gains were partially offset by a job loss in department stores (-13,000). Retail
trade employment has shown little change, on net, since recovering in early 2022
from pandemic-related losses.

In December, employment in professional and business services changed little (+13,000).
Employment in professional, scientific, and technical services continued to trend up
(+25,000); this industry added an average of 22,000 jobs per month in 2023, about half
the average monthly gain of 41,000 in 2022. In December, employment in temporary help
services continued its downward trend (-33,000) and has fallen by 346,000 since reaching
a peak in March 2022. Overall, employment in professional and business services changed
little in 2023.

Employment showed little change over the month in other major industries, including
mining, quarrying, and oil and gas extraction; manufacturing; wholesale trade;
information; financial activities; and other services.

In December, average hourly earnings for all employees on private nonfarm payrolls
rose by 15 cents, or 0.4 percent, to $34.27. Over the past 12 months, average hourly
earnings have increased by 4.1 percent. In December, average hourly earnings of
private-sector production and nonsupervisory employees rose by 10 cents, or 0.3 percent,
to $29.42. (See tables B-3 and B-8.)

The average workweek for all employees on private nonfarm payrolls edged down by 0.1
hour to 34.3 hours in December. In manufacturing, the average workweek was little changed
at 39.8 hours, and overtime remained at 2.9 hours. The average workweek for production
and nonsupervisory employees on private nonfarm payrolls edged down by 0.1 hour to 33.7
hours. (See tables B-2 and B-7.)

The change in total nonfarm payroll employment for October was revised down by 45,000,
from +150,000 to +105,000, and the change for November was revised down by 26,000, from
+199,000 to +173,000. With these revisions, employment in October and November combined
is 71,000 lower than previously reported. (Monthly revisions result from additional
reports received from businesses and government agencies since the last published
estimates and from the recalculation of seasonal factors.)

_____

The Employment Situation for January is scheduled to be released on Friday, February 2,
2024, at 8:30 a.m. (ET).

```
┌──────────────────────────────────────────────────────────────────┐
│                   Upcoming Changes to Household Survey Data        │
│                                                                    │
│   Effective with the release of The Employment Situation for January 2024 on February │
│   2, 2024, new population controls will be used in the household survey estimation │
│   process. These new controls reflect the annual update of population estimates by the │
│   U.S. Census Bureau. In accordance with usual practice, historical data will not be │
│   revised to incorporate the new controls. Consequently, household survey data for │
│   January 2024 will not be directly comparable with data for December 2023 or earlier │
│   periods. A table showing the effects of the new controls on the major labor force │
│   series will be included in The Employment Situation for January 2024.            │
└──────────────────────────────────────────────────────────────────┘
```

```
|                                                                              |
|                 Upcoming Changes to Establishment Survey Data                |
|                                                                              |
|  Effective with the release of The Employment Situation for January 2024 on  |
|  February 2, 2024, nonfarm payroll employment, hours, and earnings data from |
|  the establishment survey will be revised to reflect the annual benchmark    |
|  process and updated seasonal adjustment factors. Not seasonally adjusted    |
|  data beginning with April 2022 and seasonally adjusted data beginning with  |
|  January 2019 are subject to revision. Consistent with standard practice,    |
|  additional historical data may be revised as a result of the benchmark      |
|  process.                                                                    |
|                                                                              |
```

### Revision of Seasonally Adjusted Household Survey Data

At the end of each calendar year, BLS updates the seasonal adjustment factors for the national labor force series derived from the household survey. As a result of this process, seasonally adjusted data for January 2019 through November 2023 were subject to revision. (Not seasonally adjusted data were not subject to revision.)

Table A shows the unemployment rates for January 2023 through November 2023, as first published and as revised. The rate changed by one-tenth of a percentage point in 1 of the 11 months and was unchanged in the remaining 10 months. Table B shows revised seasonally adjusted data for major labor force series back to December 2022.

More information on this year's revisions to seasonally adjusted household series is available at www.bls.gov/web/empsit/cps-seas-adjustment-methodology.pdf. Detailed information on the seasonal adjustment methodology is found at www.bls.gov/cps/seasonal-adjustment-methodology.htm.

Historical data for the household series contained in the A tables (A-1 through A-16) of this news release, including the revised seasonally adjusted data, can be accessed at www.bls.gov/cps/cpsatabs.htm. Additional revised historical seasonally adjusted data are available at www.bls.gov/cps/data.htm and https://download.bls.gov/pub/time.series/ln/.

Table A. Seasonally adjusted unemployment rates in 2023 and changes due to revision January - November 2023

| Month | As First Published | As Revised | Change |
|-------|--------------------|------------|--------|
| January............. | 3.4 | 3.4 | 0.0 |
| February............ | 3.6 | 3.6 | 0.0 |
| March............... | 3.5 | 3.5 | 0.0 |
| April............... | 3.4 | 3.4 | 0.0 |
| May................. | 3.7 | 3.7 | 0.0 |
| June................ | 3.6 | 3.6 | 0.0 |
| July................ | 3.5 | 3.5 | 0.0 |
| August.............. | 3.8 | 3.8 | 0.0 |
| September........... | 3.8 | 3.8 | 0.0 |
| October............. | 3.9 | 3.8 | -0.1 |
| November............ | 3.7 | 3.7 | 0.0 |

## HOUSEHOLD DATA
### Table B.  Employment status of the civilian population by sex and age, seasonally adjusted
[Numbers in thousands]

| Employment status, sex, and age | 2022 | 2023 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
| **TOTAL** | | | | | | | | | | | | | |
| Civilian noninstitutional population(1) | 264,844 | 265,962 | 266,112 | 266,272 | 266,443 | 266,618 | 266,801 | 267,002 | 267,213 | 267,428 | 267,642 | 267,822 | 267,991 |
| Civilian labor force | 164,998 | 165,871 | 166,263 | 166,690 | 166,678 | 166,823 | 167,000 | 167,113 | 167,840 | 167,897 | 167,723 | 168,127 | 167,451 |
| Participation rate | 62.3 | 62.4 | 62.5 | 62.6 | 62.6 | 62.6 | 62.6 | 62.6 | 62.8 | 62.8 | 62.7 | 62.8 | 62.5 |

Footnotes

(1) The population figures are not adjusted for seasonal variation.

NOTE: Seasonally adjusted data have been revised to reflect updated seasonal adjustment factors.

| Employment status, sex, and age | 2022 Dec. | 2023 Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employed | 159,300 | 160,152 | 160,301 | 160,824 | 160,962 | 160,707 | 161,004 | 161,209 | 161,500 | 161,550 | 161,280 | 161,866 | 161,183 |
| Employment-population ratio | 60.1 | 60.2 | 60.2 | 60.4 | 60.4 | 60.3 | 60.3 | 60.4 | 60.4 | 60.4 | 60.3 | 60.4 | 60.1 |
| Unemployed | 5,698 | 5,719 | 5,962 | 5,866 | 5,715 | 6,117 | 5,997 | 5,904 | 6,340 | 6,347 | 6,443 | 6,262 | 6,268 |
| Unemployment rate | 3.5 | 3.4 | 3.6 | 3.5 | 3.4 | 3.7 | 3.6 | 3.5 | 3.8 | 3.8 | 3.8 | 3.7 | 3.7 |
| **Men, 20 years and over** | | | | | | | | | | | | | |
| Civilian noninstitutional population(1) | 120,360 | 121,283 | 121,346 | 121,415 | 121,488 | 121,565 | 121,646 | 121,735 | 121,832 | 121,931 | 122,029 | 122,111 | 122,187 |
| Civilian labor force | 84,702 | 85,039 | 85,145 | 85,565 | 85,393 | 85,481 | 85,776 | 85,770 | 85,951 | 86,124 | 85,687 | 86,256 | 86,007 |
| Participation rate | 70.4 | 70.1 | 70.2 | 70.5 | 70.3 | 70.3 | 70.5 | 70.5 | 70.5 | 70.6 | 70.2 | 70.6 | 70.4 |
| Employed | 82,051 | 82,281 | 82,340 | 82,688 | 82,596 | 82,520 | 82,836 | 82,896 | 82,800 | 82,853 | 82,526 | 83,084 | 82,958 |
| Employment-population ratio | 68.2 | 67.8 | 67.9 | 68.1 | 68.0 | 67.9 | 68.1 | 68.1 | 68.0 | 68.0 | 67.6 | 68.0 | 67.9 |
| Unemployed | 2,651 | 2,759 | 2,805 | 2,877 | 2,797 | 2,962 | 2,941 | 2,874 | 3,151 | 3,271 | 3,161 | 3,172 | 3,050 |
| Unemployment rate | 3.1 | 3.2 | 3.3 | 3.4 | 3.3 | 3.5 | 3.4 | 3.4 | 3.7 | 3.8 | 3.7 | 3.7 | 3.5 |
| **Women, 20 years and over** | | | | | | | | | | | | | |
| Civilian noninstitutional population(1) | 127,345 | 127,546 | 127,613 | 127,684 | 127,761 | 127,845 | 127,932 | 128,028 | 128,132 | 128,237 | 128,342 | 128,430 | 128,513 |
| Civilian labor force | 73,951 | 74,472 | 74,703 | 74,723 | 74,920 | 75,030 | 74,963 | 75,167 | 75,514 | 75,453 | 75,487 | 75,399 | 75,047 |
| Participation rate | 58.1 | 58.4 | 58.5 | 58.5 | 58.6 | 58.7 | 58.6 | 58.7 | 58.9 | 58.8 | 58.8 | 58.7 | 58.4 |
| Employed | 71,570 | 72,176 | 72,257 | 72,368 | 72,597 | 72,527 | 72,605 | 72,837 | 73,107 | 73,119 | 73,066 | 73,049 | 72,587 |
| Employment-population ratio | 56.2 | 56.6 | 56.6 | 56.7 | 56.8 | 56.7 | 56.8 | 56.9 | 57.1 | 57.0 | 56.9 | 56.9 | 56.5 |
| Unemployed | 2,382 | 2,295 | 2,446 | 2,355 | 2,324 | 2,503 | 2,358 | 2,330 | 2,407 | 2,333 | 2,421 | 2,350 | 2,460 |
| Unemployment rate | 3.2 | 3.1 | 3.3 | 3.2 | 3.1 | 3.3 | 3.1 | 3.1 | 3.2 | 3.1 | 3.2 | 3.1 | 3.3 |
| **Both sexes, 16 to 19 years** | | | | | | | | | | | | | |
| Civilian noninstitutional population(1) | 17,139 | 17,133 | 17,153 | 17,173 | 17,194 | 17,208 | 17,223 | 17,239 | 17,249 | 17,260 | 17,270 | 17,281 | 17,291 |
| Civilian labor force | 6,345 | 6,360 | 6,415 | 6,402 | 6,365 | 6,312 | 6,261 | 6,176 | 6,374 | 6,321 | 6,549 | 6,472 | 6,396 |
| Participation rate | 37.0 | 37.1 | 37.4 | 37.3 | 37.0 | 36.7 | 36.4 | 35.8 | 37.0 | 36.6 | 37.9 | 37.5 | 37.0 |
| Employed | 5,680 | 5,695 | 5,704 | 5,767 | 5,770 | 5,660 | 5,563 | 5,476 | 5,593 | 5,578 | 5,688 | 5,733 | 5,638 |
| Employment-population ratio | 33.1 | 33.2 | 33.3 | 33.6 | 33.6 | 32.9 | 32.3 | 31.8 | 32.4 | 32.3 | 32.9 | 33.2 | 32.6 |
| Unemployed | 665 | 665 | 711 | 635 | 595 | 652 | 698 | 699 | 781 | 743 | 861 | 739 | 758 |
| Unemployment rate | 10.5 | 10.5 | 11.1 | 9.9 | 9.3 | 10.3 | 11.2 | 11.3 | 12.3 | 11.8 | 13.1 | 11.4 | 11.9 |

**Footnotes**

(1) The population figures are not adjusted for seasonal variation.

NOTE: Seasonally adjusted data have been revised to reflect updated seasonal adjustment factors.

**HOUSEHOLD DATA**
**Summary table A. Household data, seasonally adjusted**
[Numbers in thousands]

| Category | Dec. 2022 | Oct. 2023 | Nov. 2023 | Dec. 2023 | Change from: Nov. 2023- Dec. 2023 |
|---|---|---|---|---|---|

| Category | Dec. 2022 | Oct. 2023 | Nov. 2023 | Dec. 2023 | Change from: Nov. 2023-Dec. 2023 |
|---|---|---|---|---|---|
| **Employment status** | | | | | |
| **Civilian noninstitutional population** | 264,844 | 267,642 | 267,822 | 267,991 | 169 |
| Civilian labor force | 164,998 | 167,723 | 168,127 | 167,451 | -676 |
| Participation rate | 62.3 | 62.7 | 62.8 | 62.5 | -0.3 |
| Employed | 159,300 | 161,280 | 161,866 | 161,183 | -683 |
| Employment-population ratio | 60.1 | 60.3 | 60.4 | 60.1 | -0.3 |
| Unemployed | 5,698 | 6,443 | 6,262 | 6,268 | 6 |
| Unemployment rate | 3.5 | 3.8 | 3.7 | 3.7 | 0.0 |
| Not in labor force | 99,846 | 99,919 | 99,695 | 100,540 | 845 |
| **Unemployment rates** | | | | | |
| **Total, 16 years and over** | 3.5 | 3.8 | 3.7 | 3.7 | 0.0 |
| Adult men (20 years and over) | 3.1 | 3.7 | 3.7 | 3.5 | -0.2 |
| Adult women (20 years and over) | 3.2 | 3.2 | 3.1 | 3.3 | 0.2 |
| Teenagers (16 to 19 years) | 10.5 | 13.1 | 11.4 | 11.9 | 0.5 |
| White | 3.0 | 3.5 | 3.3 | 3.5 | 0.2 |
| Black or African American | 5.7 | 5.8 | 5.8 | 5.2 | -0.6 |
| Asian | 2.4 | 3.1 | 3.5 | 3.1 | -0.4 |
| Hispanic or Latino ethnicity | 4.2 | 4.8 | 4.6 | 5.0 | 0.4 |
| **Total, 25 years and over** | 2.8 | 3.1 | 3.1 | 3.2 | 0.1 |
| Less than a high school diploma | 5.0 | 5.8 | 6.3 | 6.0 | -0.3 |
| High school graduates, no college | 3.6 | 4.0 | 4.1 | 4.2 | 0.1 |
| Some college or associate degree | 3.0 | 3.1 | 2.8 | 3.1 | 0.3 |
| Bachelor's degree and higher | 1.9 | 2.1 | 2.1 | 2.1 | 0.0 |
| **Reason for unemployment** | | | | | |
| **Job losers and persons who completed temporary jobs** | 2,596 | 3,120 | 3,058 | 3,058 | 0 |
| **Job leavers** | 824 | 801 | 821 | 833 | 12 |
| **Reentrants** | 1,786 | 1,869 | 1,771 | 1,741 | -30 |
| **New entrants** | 502 | 603 | 582 | 609 | 27 |
| **Duration of unemployment** | | | | | |
| **Less than 5 weeks** | 2,218 | 2,269 | 2,069 | 2,191 | 122 |
| **5 to 14 weeks** | 1,645 | 1,836 | 2,060 | 1,791 | -269 |
| **15 to 26 weeks** | 792 | 1,079 | 931 | 1,104 | 173 |
| **27 weeks and over** | 1,106 | 1,291 | 1,220 | 1,245 | 25 |
| **Employed persons at work part time** | | | | | |
| **Part time for economic reasons** | 3,878 | 4,284 | 3,994 | 4,211 | 217 |
| Slack work or business conditions | 2,643 | 2,985 | 2,790 | 2,960 | 170 |
| Could only find part-time work | 916 | 1,000 | 934 | 964 | 30 |
| **Part time for noneconomic reasons** | 21,537 | 21,576 | 21,879 | 22,458 | 579 |
| **Persons not in the labor force** | | | | | |
| **Marginally attached to the labor force** | 1,256 | 1,416 | 1,583 | 1,562 | -21 |
| Discouraged workers | 417 | 419 | 425 | 346 | -79 |

NOTE: Persons whose ethnicity is identified as Hispanic or Latino may be of any race. Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

**ESTABLISHMENT DATA**
**Summary table B. Establishment data, seasonally adjusted**

| Category | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|

| Category | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|
| **EMPLOYMENT BY SELECTED INDUSTRY** (Over-the-month change, in thousands) | | | | |
| Total nonfarm | 239 | 105 | 173 | 216 |
| Total private | 232 | 44 | 136 | 164 |
| Goods-producing | 36 | -12 | 30 | 22 |
| Mining and logging | 4 | -1 | -2 | -1 |
| Construction | 26 | 27 | 6 | 17 |
| Manufacturing | 6 | -38 | 26 | 6 |
| Durable goods(1) | 23 | -37 | 34 | 8 |
| Motor vehicles and parts | 9.5 | -31.8 | 31.3 | -2.1 |
| Nondurable goods | -17 | -1 | -8 | -2 |
| Private service-providing | 196 | 56 | 106 | 142 |
| Wholesale trade | 9.6 | 8.1 | 4.5 | 5.5 |
| Retail trade | 26.7 | 16.5 | -24.4 | 17.4 |
| Transportation and warehousing | 0.3 | -28.4 | -5.0 | -22.6 |
| Utilities | -0.7 | 1.8 | 0.0 | -0.4 |
| Information | -9 | -12 | 15 | 14 |
| Financial activities | 4 | -8 | 1 | 2 |
| Professional and business services(1) | 23 | -26 | -19 | 13 |
| Temporary help services | -55.0 | -42.1 | -22.1 | -33.3 |
| Private education and health services(1) | 71 | 84 | 109 | 74 |
| Health care and social assistance | 73.1 | 67.1 | 96.0 | 58.9 |
| Leisure and hospitality | 58 | 25 | 12 | 40 |
| Other services | 13 | -5 | 13 | -1 |
| Government | 7 | 61 | 37 | 52 |
| (3-month average change, in thousands) | | | | |
| Total nonfarm | 284 | 177 | 180 | 165 |
| Total private | 253 | 119 | 126 | 115 |
| **WOMEN AND PRODUCTION AND NONSUPERVISORY EMPLOYEES AS A PERCENT OF ALL EMPLOYEES**(2) | | | | |
| Total nonfarm women employees | 49.8 | 49.9 | 49.9 | 49.9 |
| Total private women employees | 48.4 | 48.4 | 48.4 | 48.4 |
| Total private production and nonsupervisory employees | 81.3 | 81.4 | 81.4 | 81.5 |
| **HOURS AND EARNINGS ALL EMPLOYEES** | | | | |
| Total private | | | | |
| Average weekly hours | 34.4 | 34.3 | 34.4 | 34.3 |
| Average hourly earnings | $32.92 | $34.00 | $34.12 | $34.27 |
| Average weekly earnings | $1,132.45 | $1,166.20 | $1,173.73 | $1,175.46 |
| Index of aggregate weekly hours (2007=100)(3) | 114.2 | 115.3 | 115.8 | 115.6 |
| Over-the-month percent change | -0.1 | -0.3 | 0.4 | -0.2 |
| Index of aggregate weekly payrolls (2007=100)(4) | 179.7 | 187.5 | 188.9 | 189.4 |
| Over-the-month percent change | 0.3 | 0.1 | 0.7 | 0.3 |
| **DIFFUSION INDEX** (Over 1-month span)(5) | | | | |
| Total private (250 industries) | 64.0 | 56.4 | 56.6 | 59.6 |
| Manufacturing (72 industries) | 52.8 | 43.1 | 48.6 | 47.9 |

| Category | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|

**Footnotes**

(1) Includes other industries, not shown separately.

(2) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries.

(3) The indexes of aggregate weekly hours are calculated by dividing the current month's estimates of aggregate hours by the corresponding annual average aggregate hours.

(4) The indexes of aggregate weekly payrolls are calculated by dividing the current month's estimates of aggregate weekly payrolls by the corresponding annual average aggregate weekly payrolls.

(5) Figures are the percent of industries with employment increasing plus one-half of the industries with unchanged employment, where 50 percent indicates an equal balance between industries with increasing and decreasing employment.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

---

Frequently Asked Questions about Employment and Unemployment Estimates

1. Why are there two monthly measures of employment?

   The household survey and establishment survey both produce sample-based estimates of employment, and both have strengths and limitations. The establishment survey employment series has a smaller margin of error on the measurement of month-to-month change than the household survey because of its much larger sample size. An over-the-month employment change of about 130,000 is statistically significant in the establishment survey, while the threshold for a statistically significant change in the household survey is about 600,000. However, the household survey has a more expansive scope than the establishment survey because it includes self-employed workers whose businesses are unincorporated, unpaid family workers, agricultural workers, and private household workers, who are excluded by the establishment survey. The household survey also provides estimates of employment for demographic groups. For more information on the differences between the two surveys, please visit www.bls.gov/web/empsit/ces_cps_trends.htm.

2. Are undocumented immigrants counted in the surveys?

   It is likely that both surveys include at least some undocumented immigrants. However, neither the establishment nor the household survey is designed to identify the legal status of workers. Therefore, it is not possible to determine how many are counted in either survey. The establishment survey does not collect data on the legal status of workers. The household survey does include questions which identify the foreign and native born, but it does not include questions about the legal status of the foreign born. Data on the foreign and native born are published each month in table A-7 of The Employment Situation news release.

3. Why does the establishment survey have revisions?

   The establishment survey revises published estimates to improve its data series by incorporating additional information that was not available at the time of the initial publication of the estimates. The establishment survey revises its initial monthly estimates twice, in the immediately succeeding 2 months, to incorporate additional sample receipts from respondents in the survey and recalculated seasonal adjustment factors. For more information on the monthly revisions, please visit www.bls.gov/web/empsit/cestn.htm#section7.

   On an annual basis, the establishment survey incorporates a benchmark revision that re-anchors estimates to nearly complete employment counts available from unemployment insurance tax records. The benchmark helps to control for sampling and modeling errors in the estimates. For more information on the annual benchmark revision, please visit www.bls.gov/web/empsit/cesbmart.htm.

4. Does the establishment survey sample include small firms?

   Yes; about 40 percent of the establishment survey sample is comprised of business establishments with fewer than 20 employees. The establishment survey sample is designed to maximize the reliability of the statewide total nonfarm employment estimate; firms from all states, size classes, and industries are appropriately sampled to achieve that goal.

5. Does the establishment survey account for employment from new businesses?

   Yes; monthly establishment survey estimates include an adjustment to account for the net employment change generated by business births and deaths. The adjustment comes from an econometric model that forecasts the monthly net jobs impact of business births and deaths based on the actual past values of the net impact that can be observed with a lag from the Quarterly Census of Employment and Wages. The establishment survey uses modeling rather than sampling for this purpose because the survey is not immediately able to bring new businesses into the sample. There is an unavoidable lag between the birth of a new firm and its appearance on the sampling frame and availability for selection. BLS adds new businesses to the survey twice a year.

6. Is the count of unemployed persons limited to just those people receiving unemployment insurance benefits?

Also the estimate of unemployment is based on a monthly sample survey of households. All persons who are without jobs and are actively seeking and available to work are included among the unemployed. (People on temporary layoff are included even if they do not actively seek work.) There is no requirement or question relating to unemployment insurance benefits in the monthly survey.

7. Does the official unemployment rate exclude people who want a job but are not currently looking for work?

Yes; however, there are separate estimates of persons outside the labor force who want a job, including those who are not currently looking because they believe no jobs are available (discouraged workers). In addition, alternative measures of labor underutilization (some of which include discouraged workers and other groups not officially counted as unemployed) are published each month in table A-15 of The Employment Situation news release. For more information about these alternative measures, please visit www.bls.gov/cps/lfcharacteristics.htm#altmeasures.

8. How can unusually severe weather affect employment and hours estimates?

In the establishment survey, the reference period is the pay period that includes the 12th of the month. Unusually severe weather is more likely to have an impact on average weekly hours than on employment. Average weekly hours are estimated for paid time during the pay period, including pay for holidays, sick leave, or other time off. The impact of severe weather on hours estimates typically, but not always, results in a reduction in average weekly hours. For example, some employees may be off work for part of the pay period and not receive pay for the time missed, while some workers, such as those dealing with cleanup or repair, may work extra hours.

Typically, it is not possible to precisely quantify the effect of extreme weather on payroll employment estimates. In order for severe weather conditions to reduce employment estimates, employees have to be off work without pay for the entire pay period. Employees who receive pay for any part of the pay period, even 1 hour, are counted in the payroll employment figures. For more information on how often employees are paid, please visit www.bls.gov/ces/publications/length-pay-period.htm.

In the household survey, the reference period is generally the calendar week that includes the 12th of the month. Persons who miss the entire week's work for weather-related events are counted as employed whether or not they are paid for the time off. The household survey collects data on the number of persons who had a job but were not at work due to bad weather. It also provides a measure of the number of persons who usually work full time but had reduced hours due to bad weather. Current and historical data are available on the household survey's most requested statistics page, please visit data.bls.gov/cgi-bin/surveymost?ln.

Technical Note

This news release presents statistics from two major surveys, the Current Population Survey (CPS; household survey) and the Current Employment Statistics survey (CES; establishment survey). The household survey provides information on the labor force, employment, and unemployment that appears in the "A" tables, marked HOUSEHOLD DATA. It is a sample survey of about 60,000 eligible households conducted by the U.S. Census Bureau for the U.S. Bureau of Labor Statistics (BLS).

The establishment survey provides information on employment, hours, and earnings of employees on nonfarm payrolls; the data appear in the "B" tables, marked ESTABLISHMENT DATA. BLS collects these data each month from the payroll records of a sample of nonagricultural business establishments. Each month the CES program surveys about 122,000 businesses and government agencies, representing approximately 666,000 individual worksites, in order to provide detailed industry data on employment, hours, and earnings of workers on nonfarm payrolls. The active sample includes approximately one-third of all nonfarm payroll jobs.

For both surveys, the data for a given month relate to a particular week or pay period. In the household survey, the reference period is generally the calendar week that contains the 12th day of the month. In the establishment survey, the reference period is the pay period including the 12th, which may or may not correspond directly to the calendar week.

Coverage, definitions, and differences between surveys

Household survey. The sample is selected to reflect the entire civilian noninstitutional population. Based on responses to a series of questions on work and job search activities, each person 16 years and over in a sample household is classified as employed, unemployed, or not in the labor force.

People are classified as employed if they did any work at all as paid employees during the reference week; worked in their own business, profession, or on their own farm; or worked without pay at least 15 hours in a family business or farm. People are also counted as employed if they were temporarily absent from their jobs because of illness, bad weather, vacation, labor-management disputes, or personal reasons.

People are classified as unemployed if they meet all of the following criteria: they had no employment during the reference week; they were available for work at that time; and they made specific active efforts to find employment sometime during

the 1-week period ending with the reference week. Persons laid off from a job and
expecting recall need not be looking for work to be counted as unemployed. The
unemployment data derived from the household survey in no way depend upon the
eligibility for or receipt of unemployment insurance benefits.

The civilian labor force is the sum of employed and unemployed persons.
Those persons not classified as employed or unemployed are not in the labor
force. The unemployment rate is the number unemployed as a percent of the
labor force. The labor force participation rate is the labor force as a
percent of the population, and the employment-population ratio is the
employed as a percent of the population. Additional information about the
household survey can be found at www.bls.gov/cps/documentation.htm.

Establishment survey. The sample establishments are drawn from private
nonfarm businesses such as factories, offices, and stores, as well as
from federal, state, and local government entities. Employees on nonfarm
payrolls are those who worked or received pay for any part of the reference pay
period, including persons on paid leave. Persons are counted in each job
they hold. Hours and earnings data are produced for the private sector for
all employees and for production and nonsupervisory employees. Production
and nonsupervisory employees are defined as production and related employees
in manufacturing and mining and logging, construction workers in construction,
and nonsupervisory employees in private service-providing industries.

Industries are classified on the basis of an establishment's principal
activity in accordance with the 2022 version of the North American Industry
Classification System. Additional information about the establishment survey
can be found at www.bls.gov/ces/.

Differences in employment estimates. The numerous conceptual and methodological
differences between the household and establishment surveys result in important
distinctions in the employment estimates derived from the surveys. Among these are:

--The household survey includes agricultural workers, self-employed workers
  whose businesses are unincorporated, unpaid family workers, and private
  household workers among the employed. These groups are excluded from the
  establishment survey.

--The household survey includes people on unpaid leave among the employed.
  The establishment survey does not.

--The household survey is limited to workers 16 years of age and older.
  The establishment survey is not limited by age.

--The household survey has no duplication of individuals, because
  individuals are counted only once, even if they hold more than one
  job. In the establishment survey, employees working at more than one
  job and thus appearing on more than one payroll are counted separately
  for each appearance.

Seasonal adjustment

Over the course of a year, the size of the nation's labor force and the levels
of employment and unemployment undergo regularly occurring fluctuations. These
events may result from seasonal changes in weather, major holidays, and the opening
and closing of schools. The effect of such seasonal variation can be very large.

Because these seasonal events follow a more or less regular pattern each year,
their influence on the level of a series can be tempered by adjusting for regular
seasonal variation. These adjustments make nonseasonal developments, such as
declines in employment or increases in the participation of women in the labor
force, easier to spot. For example, in the household survey, the large number of
youth entering the labor force each June is likely to obscure any other changes
that have taken place relative to May, making it difficult to determine if the
level of economic activity has risen or declined. Similarly, in the establishment
survey, payroll employment in education declines by about 20 percent at the end
of the spring term and later rises with the start of the fall term, obscuring the
underlying employment trends in the industry. Because seasonal employment changes
at the end and beginning of the school year can be estimated, the statistics can be
adjusted to make underlying employment patterns more discernable.  The seasonally
adjusted figures provide a more useful tool with which to analyze changes in
month-to-month economic activity.

Many seasonally adjusted series are independently adjusted in both the household
and establishment surveys. However, the adjusted series for many major estimates,
such as total payroll employment, employment in most major sectors, total employment,
and unemployment are computed by aggregating independently adjusted component series.
For example, total unemployment is derived by summing the adjusted series for four
major age-sex components; this differs from the unemployment estimate that would be
obtained by directly adjusting the total or by combining the duration, reasons, or
more detailed age categories. Percentage distributions of unemployment by reason and
duration are derived from the sum of the independently seasonally adjusted component
series and will not necessarily match calculations made using the seasonally adjusted
total unemployment level. Additional information about seasonal adjustment in the
household survey can be found at www.bls.gov/cps/documentation.htm#sa.

For both the household and establishment surveys, a concurrent seasonal adjustment
methodology is used in which new seasonal factors are calculated each month using all
relevant data, up to and including the data for the current month. In the household
survey, new seasonal factors are used to adjust only the current month's data. In the

establishment survey. However, new seasonal factors are used each month to adjust the
three most recent monthly estimates. The prior 2 months are routinely revised to
incorporate additional sample reports and recalculated seasonal adjustment factors.
In both surveys, 5-year revisions to historical data are made once a year.

Reliability of the estimates

   Statistics based on the household and establishment surveys are subject to both
sampling and nonsampling error. When a sample, rather than the entire population,
is surveyed, there is a chance that the sample estimates may differ from the true
population values they represent. The component of this difference that occurs
because samples differ by chance is known as sampling error, and its variability
is measured by the standard error of the estimate. There is about a 90-percent
chance, or level of confidence, that an estimate based on a sample will differ by
no more than 1.6 standard errors from the true population value because of sampling
error. BLS analyses are generally conducted at the 90-percent level of confidence.

   For example, the confidence interval for the monthly change in total nonfarm
employment from the establishment survey is on the order of plus or minus 130,000.
Suppose the estimate of nonfarm employment increases by 50,000 from one month to
the next. The 90-percent confidence interval on the monthly change would range from
-80,000 to +180,000 (50,000 +/- 130,000). These figures do not mean that the sample
results are off by these magnitudes, but rather that there is about a 90-percent
chance that the true over-the-month change lies within this interval. Since this
range includes values of less than zero, we could not say with confidence that
nonfarm employment had, in fact, increased that month. If, however, the reported
nonfarm employment rise was 250,000, then all of the values within the 90-percent
confidence interval would be greater than zero. In this case, it is likely (at
least a 90-percent chance) that nonfarm employment had, in fact, risen that month.
At an unemployment rate of around 6.0 percent, the 90-percent confidence interval
for the monthly change in unemployment as measured by the household survey is
about +/- 300,000, and for the monthly change in the unemployment rate it is about
+/- 0.2 percentage point.

   In general, estimates involving many individuals or establishments have lower
standard errors (relative to the size of the estimate) than estimates which are based
on a small number of observations. The precision of estimates also is improved when
the data are cumulated over time, such as for quarterly and annual averages.

   The household and establishment surveys are also affected by nonsampling error,
which can occur for many reasons, including the failure to sample a segment of the
population, inability to obtain information for all respondents in the sample,
inability or unwillingness of respondents to provide correct information on a
timely basis, mistakes made by respondents, and errors made in the collection or
processing of the data.

   For example, in the establishment survey, estimates for the most recent 2 months
are based on incomplete returns; for this reason, these estimates are labeled
preliminary in the tables. It is only after two successive revisions to a monthly
estimate, when nearly all sample reports have been received, that the estimate is
considered final.

   Another major source of nonsampling error in the establishment survey is the
inability to capture, on a timely basis, employment generated by new firms. To
correct for this systematic underestimation of employment growth, an estimation
procedure with two components is used to account for business births. The first
component excludes employment losses from business deaths from sample-based
estimation in order to offset the missing employment gains from business births.
This is incorporated into the sample-based estimation procedure by simply not
reflecting sample units going out of business, but imputing to them the same
employment trend as the other firms in the sample. This procedure accounts for
most of the net birth/death employment.

   The second component is an ARIMA time series model designed to estimate the
residual net birth/death employment not accounted for by the imputation. The
historical time series used to create and test the ARIMA model was derived from
the unemployment insurance universe micro-level database, and reflects the actual
residual net of births and deaths over the past 5 years.

   The sample-based estimates from the establishment survey are adjusted once a
year (on a lagged basis) to universe counts of payroll employment obtained from
administrative records of the unemployment insurance program. The difference
between the March sample-based employment estimates and the March universe counts
is known as a benchmark revision, and serves as a rough proxy for total survey
error. The new benchmarks also incorporate changes in the classification of
industries. Over the past decade, absolute benchmark revisions for total nonfarm
employment have averaged 0.1 percent, with a range from -0.3 percent to 0.3 percent.

Other information

   If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1
to access telecommunications relay services.

**HOUSEHOLD DATA**
**Table A-1. Employment status of the civilian population by sex and age**
[Numbers in thousands]

004381

| Employment status, sex, and age | Not seasonally adjusted | | | Seasonally adjusted(1) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **TOTAL** | | | | | | | | | |
| **Civilian noninstitutional population** | 264,844 | 267,822 | 267,991 | 264,844 | 267,213 | 267,428 | 267,642 | 267,822 | 267,991 |
| Civilian labor force | 164,224 | 167,977 | 166,661 | 164,998 | 167,840 | 167,897 | 167,723 | 168,127 | 167,451 |
| Participation rate | 62.0 | 62.7 | 62.2 | 62.3 | 62.8 | 62.8 | 62.7 | 62.8 | 62.5 |
| Employed | 158,872 | 162,149 | 160,754 | 159,300 | 161,500 | 161,550 | 161,280 | 161,866 | 161,183 |
| Employment-population ratio | 60.0 | 60.5 | 60.0 | 60.1 | 60.4 | 60.4 | 60.3 | 60.4 | 60.1 |
| Unemployed | 5,352 | 5,827 | 5,907 | 5,698 | 6,340 | 6,347 | 6,443 | 6,262 | 6,268 |
| Unemployment rate | 3.3 | 3.5 | 3.5 | 3.5 | 3.8 | 3.8 | 3.8 | 3.7 | 3.7 |
| Not in labor force | 100,621 | 99,845 | 101,330 | 99,846 | 99,374 | 99,531 | 99,919 | 99,695 | 100,540 |
| Persons who currently want a job | 4,948 | 5,006 | 5,157 | 5,157 | 5,374 | 5,424 | 5,376 | 5,343 | 5,671 |
| **Men, 16 years and over** | | | | | | | | | |
| **Civilian noninstitutional population** | 129,050 | 130,903 | 130,985 | 129,050 | 130,608 | 130,713 | 130,816 | 130,903 | 130,985 |
| Civilian labor force | 87,251 | 89,258 | 88,610 | 87,875 | 89,114 | 89,335 | 88,968 | 89,555 | 89,250 |
| Participation rate | 67.6 | 68.2 | 67.6 | 68.1 | 68.2 | 68.3 | 68.0 | 68.4 | 68.1 |
| Employed | 84,304 | 85,910 | 85,198 | 84,897 | 85,527 | 85,657 | 85,327 | 85,981 | 85,794 |
| Employment-population ratio | 65.3 | 65.6 | 65.0 | 65.8 | 65.5 | 65.5 | 65.2 | 65.7 | 65.5 |
| Unemployed | 2,947 | 3,347 | 3,412 | 2,978 | 3,587 | 3,678 | 3,641 | 3,574 | 3,456 |
| Unemployment rate | 3.4 | 3.8 | 3.9 | 3.4 | 4.0 | 4.1 | 4.1 | 4.0 | 3.9 |
| Not in labor force | 41,799 | 41,646 | 42,375 | 41,175 | 41,494 | 41,378 | 41,848 | 41,348 | 41,735 |
| **Men, 20 years and over** | | | | | | | | | |
| **Civilian noninstitutional population** | 120,360 | 122,111 | 122,187 | 120,360 | 121,832 | 121,931 | 122,029 | 122,111 | 122,187 |
| Civilian labor force | 84,262 | 86,094 | 85,564 | 84,702 | 85,951 | 86,124 | 85,687 | 86,256 | 86,007 |
| Participation rate | 70.0 | 70.5 | 70.0 | 70.4 | 70.5 | 70.6 | 70.2 | 70.6 | 70.4 |
| Employed | 81,589 | 83,128 | 82,493 | 82,051 | 82,800 | 82,853 | 82,526 | 83,084 | 82,958 |
| Employment-population ratio | 67.8 | 68.1 | 67.5 | 68.2 | 68.0 | 68.0 | 67.6 | 68.0 | 67.9 |
| Unemployed | 2,673 | 2,966 | 3,071 | 2,651 | 3,151 | 3,271 | 3,161 | 3,172 | 3,050 |
| Unemployment rate | 3.2 | 3.4 | 3.6 | 3.1 | 3.7 | 3.8 | 3.7 | 3.7 | 3.5 |
| Not in labor force | 36,098 | 36,017 | 36,623 | 35,658 | 35,881 | 35,807 | 36,343 | 35,854 | 36,180 |
| **Women, 16 years and over** | | | | | | | | | |
| **Civilian noninstitutional population** | 135,795 | 136,919 | 137,006 | 135,795 | 136,605 | 136,715 | 136,826 | 136,919 | 137,006 |
| Civilian labor force | 76,973 | 78,719 | 78,051 | 77,123 | 78,726 | 78,562 | 78,755 | 78,572 | 78,201 |
| Participation rate | 56.7 | 57.5 | 57.0 | 56.8 | 57.6 | 57.5 | 57.6 | 57.4 | 57.1 |
| Employed | 74,568 | 76,239 | 75,556 | 74,404 | 75,973 | 75,893 | 75,953 | 75,885 | 75,389 |
| Employment-population ratio | 54.9 | 55.7 | 55.1 | 54.8 | 55.6 | 55.5 | 55.5 | 55.4 | 55.0 |
| Unemployed | 2,405 | 2,480 | 2,495 | 2,720 | 2,752 | 2,669 | 2,801 | 2,688 | 2,811 |
| Unemployment rate | 3.1 | 3.2 | 3.2 | 3.5 | 3.5 | 3.4 | 3.6 | 3.4 | 3.6 |
| Not in labor force | 58,821 | 58,199 | 58,955 | 58,671 | 57,879 | 58,153 | 58,071 | 58,346 | 58,805 |
| **Women, 20 years and over** | | | | | | | | | |
| **Civilian noninstitutional population** | 127,345 | 128,430 | 128,513 | 127,345 | 128,132 | 128,237 | 128,342 | 128,430 | 128,513 |
| Civilian labor force | 73,981 | 75,681 | 75,079 | 73,951 | 75,514 | 75,453 | 75,487 | 75,399 | 75,047 |
| Participation rate | 58.1 | 58.9 | 58.4 | 58.1 | 58.9 | 58.8 | 58.8 | 58.7 | 58.4 |
| Employed | 71,843 | 73,504 | 72,862 | 71,570 | 73,107 | 73,119 | 73,066 | 73,049 | 72,587 |
| Employment-population ratio | 56.4 | 57.2 | 56.7 | 56.2 | 57.1 | 57.0 | 56.9 | 56.9 | 56.5 |
| Unemployed | 2,138 | 2,177 | 2,217 | 2,382 | 2,407 | 2,333 | 2,421 | 2,350 | 2,460 |
| Unemployment rate | 2.9 | 2.9 | 3.0 | 3.2 | 3.2 | 3.1 | 3.2 | 3.1 | 3.3 |
| Not in labor force | 53,365 | 52,749 | 53,434 | 53,394 | 52,618 | 52,784 | 52,856 | 53,031 | 53,466 |
| **Both sexes, 16 to 19 years** | | | | | | | | | |
| **Civilian noninstitutional population** | 17,139 | 17,281 | 17,291 | 17,139 | 17,249 | 17,260 | 17,270 | 17,281 | 17,291 |

**Footnotes**

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Updated population controls are introduced annually with the release of January data.

| Employment status, sex, and age | Not seasonally adjusted | | | Seasonally adjusted(1) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| Civilian labor force | 5,981 | 6,202 | 6,018 | 6,345 | 6,374 | 6,321 | 6,549 | 6,472 | 6,396 |
| Participation rate | 34.9 | 35.9 | 34.8 | 37.0 | 37.0 | 36.6 | 37.9 | 37.5 | 37.0 |
| Employed | 5,439 | 5,517 | 5,399 | 5,680 | 5,593 | 5,578 | 5,688 | 5,733 | 5,638 |
| Employment-population ratio | 31.7 | 31.9 | 31.2 | 33.1 | 32.4 | 32.3 | 32.9 | 33.2 | 32.6 |
| Unemployed | 541 | 685 | 619 | 665 | 781 | 743 | 861 | 739 | 758 |
| Unemployment rate | 9.1 | 11.0 | 10.3 | 10.5 | 12.3 | 11.8 | 13.1 | 11.4 | 11.9 |
| Not in labor force | 11,158 | 11,079 | 11,273 | 10,794 | 10,875 | 10,939 | 10,721 | 10,809 | 10,895 |

**Footnotes**

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-2. Employment status of the civilian population by race, sex, and age**
[Numbers in thousands]

| Employment status, race, sex, and age | Not seasonally adjusted | | | Seasonally adjusted(1) | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **WHITE** | | | | | | | | | |
| Civilian noninstitutional population | 203,684 | 204,949 | 205,022 | 203,684 | 204,645 | 204,756 | 204,867 | 204,949 | 205,022 |
| Civilian labor force | 125,934 | 127,720 | 126,748 | 126,392 | 127,931 | 127,755 | 127,612 | 127,773 | 127,226 |
| Participation rate | 61.8 | 62.3 | 61.8 | 62.1 | 62.5 | 62.4 | 62.3 | 62.3 | 62.1 |
| Employed | 122,301 | 123,849 | 122,552 | 122,549 | 123,543 | 123,403 | 123,198 | 123,550 | 122,802 |
| Employment-population ratio | 60.0 | 60.4 | 59.8 | 60.2 | 60.4 | 60.3 | 60.1 | 60.3 | 59.9 |
| Unemployed | 3,633 | 3,871 | 4,196 | 3,843 | 4,387 | 4,352 | 4,414 | 4,223 | 4,424 |
| Unemployment rate | 2.9 | 3.0 | 3.3 | 3.0 | 3.4 | 3.4 | 3.5 | 3.3 | 3.5 |
| Not in labor force | 77,750 | 77,229 | 78,274 | 77,292 | 76,714 | 77,001 | 77,255 | 77,177 | 77,796 |
| **Men, 20 years and over** | | | | | | | | | |
| Civilian labor force | 65,789 | 66,627 | 66,172 | 66,020 | 66,535 | 66,615 | 66,363 | 66,695 | 66,405 |
| Participation rate | 70.0 | 70.2 | 69.7 | 70.3 | 70.2 | 70.3 | 70.0 | 70.3 | 70.0 |
| Employed | 63,876 | 64,660 | 63,912 | 64,171 | 64,307 | 64,313 | 64,148 | 64,559 | 64,208 |
| Employment-population ratio | 68.0 | 68.2 | 67.3 | 68.3 | 67.9 | 67.9 | 67.6 | 68.1 | 67.7 |
| Unemployed | 1,912 | 1,967 | 2,260 | 1,849 | 2,228 | 2,302 | 2,215 | 2,136 | 2,197 |
| Unemployment rate | 2.9 | 3.0 | 3.4 | 2.8 | 3.3 | 3.5 | 3.3 | 3.2 | 3.3 |
| **Women, 20 years and over** | | | | | | | | | |
| Civilian labor force | 55,533 | 56,373 | 55,902 | 55,474 | 56,422 | 56,349 | 56,209 | 56,130 | 55,844 |
| Participation rate | 57.1 | 57.8 | 57.3 | 57.1 | 57.9 | 57.8 | 57.6 | 57.5 | 57.2 |
| Employed | 54,181 | 54,995 | 54,419 | 53,935 | 54,803 | 54,767 | 54,621 | 54,609 | 54,175 |
| Employment-population ratio | 55.7 | 56.4 | 55.8 | 55.5 | 56.3 | 56.2 | 56.0 | 56.0 | 55.5 |
| Unemployed | 1,353 | 1,378 | 1,483 | 1,540 | 1,619 | 1,583 | 1,588 | 1,521 | 1,669 |
| Unemployment rate | 2.4 | 2.4 | 2.7 | 2.8 | 2.9 | 2.8 | 2.8 | 2.7 | 3.0 |
| **Both sexes, 16 to 19 years** | | | | | | | | | |
| Civilian labor force | 4,612 | 4,720 | 4,674 | 4,897 | 4,973 | 4,790 | 5,040 | 4,947 | 4,976 |
| Participation rate | 36.8 | 37.7 | 37.3 | 39.1 | 39.7 | 38.2 | 40.2 | 39.5 | 39.7 |
| Employed | 4,244 | 4,194 | 4,221 | 4,443 | 4,433 | 4,323 | 4,430 | 4,382 | 4,418 |
| Employment-population ratio | 33.9 | 33.5 | 33.7 | 35.5 | 35.4 | 34.5 | 35.4 | 35.0 | 35.3 |
| Unemployed | 369 | 526 | 453 | 454 | 540 | 467 | 611 | 565 | 558 |
| Unemployment rate | 8.0 | 11.1 | 9.7 | 9.3 | 10.9 | 9.8 | 12.1 | 11.4 | 11.2 |
| **BLACK OR AFRICAN AMERICAN** | | | | | | | | | |
| Civilian noninstitutional population | 34,301 | 34,821 | 34,853 | 34,301 | 34,714 | 34,751 | 34,788 | 34,821 | 34,853 |
| Civilian labor force | 21,278 | 22,149 | 21,955 | 21,424 | 21,782 | 21,900 | 21,902 | 22,171 | 22,094 |

**Footnotes**

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Estimates for the above race groups will not sum to totals shown in table A-1 because data are not presented for all races. Updated population controls are introduced annually with the release of January data.

8/16/24, 9:05 AM                               Employment Situation News Release - 2023 M13 Results

| Employment status, race, sex, and age | Not seasonally adjusted | | | Seasonally adjusted[1] | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| Participation rate | 62.0 | 63.6 | 63.0 | 62.5 | 62.7 | 63.0 | 63.0 | 63.7 | 63.4 |
| Employed | 20,146 | 20,924 | 20,896 | 20,199 | 20,626 | 20,650 | 20,636 | 20,886 | 20,952 |
| Employment-population ratio | 58.7 | 60.1 | 60.0 | 58.9 | 59.4 | 59.4 | 59.3 | 60.0 | 60.1 |
| Unemployed | 1,132 | 1,225 | 1,059 | 1,225 | 1,155 | 1,251 | 1,266 | 1,285 | 1,143 |
| Unemployment rate | 5.3 | 5.5 | 4.8 | 5.7 | 5.3 | 5.7 | 5.8 | 5.8 | 5.2 |
| Not in labor force | 13,023 | 12,672 | 12,898 | 12,877 | 12,933 | 12,851 | 12,886 | 12,650 | 12,759 |
| Men, 20 years and over | | | | | | | | | |
| Civilian labor force | 9,886 | 10,279 | 10,229 | 9,950 | 10,155 | 10,201 | 10,048 | 10,299 | 10,294 |
| Participation rate | 67.8 | 69.1 | 68.7 | 68.2 | 68.5 | 68.8 | 67.7 | 69.3 | 69.2 |
| Employed | 9,399 | 9,651 | 9,771 | 9,449 | 9,640 | 9,631 | 9,520 | 9,648 | 9,821 |
| Employment-population ratio | 64.5 | 64.9 | 65.7 | 64.8 | 65.0 | 64.9 | 64.1 | 64.9 | 66.0 |
| Unemployed | 487 | 628 | 459 | 502 | 516 | 570 | 528 | 651 | 473 |
| Unemployment rate | 4.9 | 6.1 | 4.5 | 5.0 | 5.1 | 5.6 | 5.3 | 6.3 | 4.6 |
| Women, 20 years and over | | | | | | | | | |
| Civilian labor force | 10,631 | 11,086 | 10,964 | 10,687 | 10,880 | 10,890 | 11,065 | 11,067 | 11,014 |
| Participation rate | 61.7 | 63.7 | 63.0 | 62.1 | 62.7 | 62.7 | 63.6 | 63.6 | 63.2 |
| Employed | 10,100 | 10,575 | 10,483 | 10,104 | 10,367 | 10,403 | 10,475 | 10,533 | 10,486 |
| Employment-population ratio | 58.7 | 60.8 | 60.2 | 58.7 | 59.8 | 59.9 | 60.3 | 60.5 | 60.2 |
| Unemployed | 531 | 511 | 481 | 583 | 513 | 487 | 590 | 534 | 528 |
| Unemployment rate | 5.0 | 4.6 | 4.4 | 5.5 | 4.7 | 4.5 | 5.3 | 4.8 | 4.8 |
| Both sexes, 16 to 19 years | | | | | | | | | |
| Civilian labor force | 761 | 784 | 762 | 787 | 746 | 809 | 789 | 805 | 786 |
| Participation rate | 30.4 | 30.7 | 29.8 | 31.5 | 29.3 | 31.7 | 30.9 | 31.5 | 30.7 |
| Employed | 646 | 698 | 643 | 647 | 619 | 615 | 642 | 705 | 644 |
| Employment-population ratio | 25.9 | 27.3 | 25.1 | 25.9 | 24.3 | 24.2 | 25.1 | 27.6 | 25.2 |
| Unemployed | 114 | 85 | 120 | 140 | 126 | 193 | 147 | 100 | 142 |
| Unemployment rate | 15.0 | 10.9 | 15.7 | 17.7 | 16.9 | 23.9 | 18.7 | 12.4 | 18.0 |
| ASIAN | | | | | | | | | |
| Civilian noninstitutional population | 17,005 | 17,769 | 17,896 | 17,005 | 17,515 | 17,633 | 17,593 | 17,769 | 17,896 |
| Civilian labor force | 10,890 | 11,494 | 11,384 | 10,940 | 11,487 | 11,587 | 11,490 | 11,548 | 11,436 |
| Participation rate | 64.0 | 64.7 | 63.6 | 64.3 | 65.6 | 65.7 | 65.3 | 65.0 | 63.9 |
| Employed | 10,650 | 11,096 | 11,054 | 10,677 | 11,125 | 11,255 | 11,134 | 11,144 | 11,084 |
| Employment-population ratio | 62.6 | 62.4 | 61.8 | 62.8 | 63.5 | 63.8 | 63.3 | 62.7 | 61.9 |
| Unemployed | 241 | 398 | 330 | 263 | 362 | 332 | 356 | 404 | 353 |
| Unemployment rate | 2.2 | 3.5 | 2.9 | 2.4 | 3.2 | 2.9 | 3.1 | 3.5 | 3.1 |
| Not in labor force | 6,115 | 6,275 | 6,511 | 6,065 | 6,028 | 6,047 | 6,103 | 6,221 | 6,459 |

Footnotes

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Estimates for the above race groups will not sum to totals shown in table A-1 because data are not presented for all races. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-3. Employment status of the Hispanic or Latino population by sex and age**
[Numbers in thousands]

| Employment status, sex, and age | Not seasonally adjusted | | | Seasonally adjusted[1] | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| HISPANIC OR LATINO ETHNICITY | | | | | | | | | |
| Civilian noninstitutional population | 46,624 | 47,974 | 48,068 | 46,624 | 47,671 | 47,774 | 47,877 | 47,974 | 48,068 |
| Civilian labor force | 30,872 | 32,202 | 31,996 | 30,944 | 32,009 | 32,115 | 32,056 | 32,101 | 32,081 |

Footnotes

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Persons whose ethnicity is identified as Hispanic or Latino may be of any race. Updated population controls are introduced annually with the release of January data.

004384

| Employment status, sex, and age | Not seasonally adjusted | | | Seasonally adjusted(1) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| Participation rate | 66.2 | 67.1 | 66.6 | 66.4 | 67.1 | 67.2 | 67.0 | 66.9 | 66.7 |
| Employed | 29,594 | 30,822 | 30,418 | 29,642 | 30,451 | 30,637 | 30,525 | 30,636 | 30,480 |
| Employment-population ratio | 63.5 | 64.2 | 63.3 | 63.6 | 63.9 | 64.1 | 63.8 | 63.9 | 63.4 |
| Unemployed | 1,278 | 1,379 | 1,578 | 1,303 | 1,558 | 1,478 | 1,531 | 1,465 | 1,602 |
| Unemployment rate | 4.1 | 4.3 | 4.9 | 4.2 | 4.9 | 4.6 | 4.8 | 4.6 | 5.0 |
| Not in labor force | 15,752 | 15,772 | 16,072 | 15,680 | 15,662 | 15,659 | 15,822 | 15,873 | 15,986 |
| **Men, 20 years and over** | | | | | | | | | |
| Civilian labor force | 16,691 | 17,271 | 17,199 | 16,753 | 17,172 | 17,256 | 17,128 | 17,267 | 17,261 |
| Participation rate | 79.0 | 79.2 | 78.8 | 79.3 | 79.3 | 79.5 | 78.7 | 79.2 | 79.1 |
| Employed | 15,958 | 16,597 | 16,340 | 16,055 | 16,436 | 16,520 | 16,409 | 16,537 | 16,438 |
| Employment-population ratio | 75.6 | 76.2 | 74.8 | 76.0 | 75.9 | 76.1 | 75.4 | 75.9 | 75.3 |
| Unemployed | 734 | 674 | 860 | 699 | 736 | 736 | 719 | 729 | 824 |
| Unemployment rate | 4.4 | 3.9 | 5.0 | 4.2 | 4.3 | 4.3 | 4.2 | 4.2 | 4.8 |
| **Women, 20 years and over** | | | | | | | | | |
| Civilian labor force | 12,837 | 13,368 | 13,367 | 12,805 | 13,363 | 13,355 | 13,265 | 13,260 | 13,346 |
| Participation rate | 60.6 | 61.5 | 61.3 | 60.4 | 61.8 | 61.7 | 61.1 | 61.0 | 61.3 |
| Employed | 12,385 | 12,866 | 12,790 | 12,328 | 12,776 | 12,785 | 12,727 | 12,737 | 12,746 |
| Employment-population ratio | 58.5 | 59.2 | 58.7 | 58.2 | 59.1 | 59.0 | 58.6 | 58.6 | 58.5 |
| Unemployed | 453 | 502 | 577 | 477 | 587 | 570 | 537 | 523 | 601 |
| Unemployment rate | 3.5 | 3.8 | 4.3 | 3.7 | 4.4 | 4.3 | 4.1 | 3.9 | 4.5 |
| **Both sexes, 16 to 19 years** | | | | | | | | | |
| Civilian labor force | 1,343 | 1,562 | 1,430 | 1,386 | 1,473 | 1,504 | 1,664 | 1,574 | 1,474 |
| Participation rate | 31.1 | 35.2 | 32.2 | 32.1 | 33.4 | 34.1 | 37.6 | 35.5 | 33.2 |
| Employed | 1,252 | 1,359 | 1,288 | 1,259 | 1,238 | 1,332 | 1,389 | 1,361 | 1,296 |
| Employment-population ratio | 29.0 | 30.6 | 29.0 | 29.2 | 28.1 | 30.2 | 31.4 | 30.7 | 29.2 |
| Unemployed | 92 | 203 | 142 | 127 | 235 | 172 | 275 | 213 | 177 |
| Unemployment rate | 6.8 | 13.0 | 9.9 | 9.2 | 15.9 | 11.4 | 16.5 | 13.5 | 12.0 |

Footnotes

(1) The population figures are not adjusted for seasonal variation; therefore, identical numbers appear in the unadjusted and seasonally adjusted columns.

NOTE: Persons whose ethnicity is identified as Hispanic or Latino may be of any race. Updated population controls are introduced annually with the release of January data.

### HOUSEHOLD DATA
### Table A-4. Employment status of the civilian population 25 years and over by educational attainment
[Numbers in thousands]

| Educational attainment | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **Less than a high school diploma** | | | | | | | | | |
| Civilian labor force | 8,918 | 9,549 | 9,417 | 8,885 | 9,261 | 9,203 | 9,312 | 9,492 | 9,384 |
| Participation rate | 45.8 | 48.5 | 47.6 | 45.6 | 47.7 | 47.0 | 48.0 | 48.3 | 47.5 |
| Employed | 8,428 | 8,992 | 8,803 | 8,445 | 8,759 | 8,698 | 8,771 | 8,891 | 8,819 |
| Employment-population ratio | 43.3 | 45.7 | 44.5 | 43.4 | 45.1 | 44.4 | 45.2 | 45.2 | 44.6 |
| Unemployed | 490 | 557 | 613 | 441 | 502 | 506 | 542 | 601 | 564 |
| Unemployment rate | 5.5 | 5.8 | 6.5 | 5.0 | 5.4 | 5.5 | 5.8 | 6.3 | 6.0 |
| **High school graduates, no college(1)** | | | | | | | | | |
| Civilian labor force | 35,532 | 35,817 | 35,662 | 35,616 | 36,250 | 36,198 | 35,637 | 35,790 | 35,748 |
| Participation rate | 56.1 | 57.4 | 57.0 | 56.2 | 56.5 | 56.8 | 56.9 | 57.3 | 57.1 |
| Employed | 34,270 | 34,413 | 34,167 | 34,348 | 34,848 | 34,708 | 34,195 | 34,327 | 34,247 |

Footnotes

(1) Includes persons with a high school diploma or equivalent.

(2) Includes persons with bachelor's, master's, professional, and doctoral degrees.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals for those 25 years and over because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

8/16/24, 9:05 AM                                 Employment Situation News Release - 2023 M13 Results

| Educational attainment | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| Employment-population ratio | 54.1 | 55.1 | 54.6 | 54.2 | 54.2 | 54.5 | 54.5 | 55.0 | 54.7 |
| Unemployed | 1,262 | 1,404 | 1,495 | 1,268 | 1,402 | 1,490 | 1,442 | 1,463 | 1,501 |
| Unemployment rate | 3.6 | 3.9 | 4.2 | 3.6 | 3.9 | 4.1 | 4.0 | 4.1 | 4.2 |
| **Some college or associate degree** | | | | | | | | | |
| Civilian labor force | 35,849 | 36,164 | 35,765 | 35,816 | 35,845 | 35,918 | 35,814 | 35,874 | 35,737 |
| Participation rate | 62.8 | 62.6 | 62.4 | 62.7 | 62.7 | 62.7 | 62.2 | 62.1 | 62.4 |
| Employed | 34,851 | 35,215 | 34,715 | 34,757 | 34,751 | 34,843 | 34,691 | 34,866 | 34,623 |
| Employment-population ratio | 61.0 | 61.0 | 60.6 | 60.9 | 61.3 | 60.8 | 60.3 | 60.4 | 60.4 |
| Unemployed | 998 | 949 | 1,050 | 1,059 | 1,094 | 1,076 | 1,123 | 1,009 | 1,114 |
| Unemployment rate | 2.8 | 2.6 | 2.9 | 3.0 | 3.1 | 3.0 | 3.1 | 2.8 | 3.1 |
| **Bachelor's degree and higher**(2) | | | | | | | | | |
| Civilian labor force | 63,241 | 64,518 | 64,293 | 63,239 | 64,330 | 64,234 | 64,504 | 64,452 | 64,297 |
| Participation rate | 72.8 | 72.8 | 72.3 | 72.8 | 73.4 | 73.4 | 72.8 | 72.7 | 72.3 |
| Employed | 62,156 | 63,230 | 63,053 | 62,029 | 62,886 | 62,851 | 63,133 | 63,091 | 62,933 |
| Employment-population ratio | 71.5 | 71.4 | 70.9 | 71.4 | 71.8 | 71.8 | 71.2 | 71.2 | 70.8 |
| Unemployed | 1,085 | 1,289 | 1,239 | 1,210 | 1,444 | 1,383 | 1,371 | 1,360 | 1,364 |
| Unemployment rate | 1.7 | 2.0 | 1.9 | 1.9 | 2.2 | 2.2 | 2.1 | 2.1 | 2.1 |

Footnotes
(1) Includes persons with a high school diploma or equivalent.
(2) Includes persons with bachelor's, master's, professional, and doctoral degrees.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals for those 25 years and over because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-5. Employment status of the civilian population 18 years and over by veteran status, period of service, and sex, not seasonally adjusted**
[Numbers in thousands]

| Employment status, veteran status, and period of service | Total | | Men | | Women | |
|---|---|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| **VETERANS, 18 years and over** | | | | | | |
| Civilian noninstitutional population | 18,237 | 17,727 | 16,203 | 15,686 | 2,034 | 2,041 |
| Civilian labor force | 8,770 | 8,716 | 7,592 | 7,505 | 1,177 | 1,211 |
| Participation rate | 48.1 | 49.2 | 46.9 | 47.8 | 57.9 | 59.4 |
| Employed | 8,487 | 8,455 | 7,329 | 7,284 | 1,158 | 1,171 |
| Employment-population ratio | 46.5 | 47.7 | 45.2 | 46.4 | 56.9 | 57.4 |
| Unemployed | 283 | 261 | 263 | 221 | 20 | 41 |
| Unemployment rate | 3.2 | 3.0 | 3.5 | 2.9 | 1.7 | 3.3 |
| Not in labor force | 9,467 | 9,011 | 8,611 | 8,181 | 857 | 830 |
| **Gulf War-era II veterans** | | | | | | |
| Civilian noninstitutional population | 5,021 | 5,094 | 4,098 | 4,201 | 923 | 893 |
| Civilian labor force | 4,029 | 4,114 | 3,349 | 3,441 | 680 | 673 |
| Participation rate | 80.2 | 80.8 | 81.7 | 81.9 | 73.6 | 75.3 |
| Employed | 3,907 | 3,980 | 3,240 | 3,323 | 666 | 657 |
| Employment-population ratio | 77.8 | 78.1 | 79.1 | 79.1 | 72.2 | 73.5 |
| Unemployed | 122 | 134 | 109 | 118 | 13 | 16 |
| Unemployment rate | 3.0 | 3.3 | 3.3 | 3.4 | 1.9 | 2.4 |
| Not in labor force | 992 | 980 | 749 | 760 | 244 | 220 |

NOTE: Veterans served on active duty in the U.S. Armed Forces and were not on active duty at the time of the survey. Nonveterans never served on active duty in the U.S. Armed Forces. Veterans could have served anywhere in the world during these periods of service: Gulf War era II (September 2001-present), Gulf War era I (August 1990-August 2001), Vietnam era (August 1964-April 1975), Korean War (July 1950-January 1955), World War II (December 1941-December 1946), and other service periods (all other time periods). Veterans who served in more than one wartime period are classified only in the most recent one. Veterans who served during one of the selected wartime periods and another period are classified only in the wartime period. Dash indicates no data or data that do not meet publication criteria (values not shown where base is less than 75,000).

8/16/24, 9:05 AM                                    Employment Situation News Release - 2023 M13 Results

| Employment status, veteran status, and period of service | Total | | Men | | Women | |
|---|---|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| **Gulf War-era I veterans** | | | | | | |
| Civilian noninstitutional population | 3,185 | 2,965 | 2,724 | 2,476 | 461 | 489 |
| Civilian labor force | 2,185 | 2,189 | 1,880 | 1,841 | 305 | 349 |
| Participation rate | 68.6 | 73.8 | 69.0 | 74.3 | 66.1 | 71.3 |
| Employed | 2,117 | 2,127 | 1,812 | 1,797 | 305 | 331 |
| Employment-population ratio | 66.5 | 71.7 | 66.5 | 72.6 | 66.1 | 67.6 |
| Unemployed | 68 | 62 | 68 | 44 | 0 | 18 |
| Unemployment rate | 3.1 | 2.8 | 3.6 | 2.4 | 0.0 | 5.2 |
| Not in labor force | 1,000 | 776 | 844 | 635 | 156 | 140 |
| **World War II, Korean War, and Vietnam-era veterans** | | | | | | |
| Civilian noninstitutional population | 6,100 | 5,806 | 5,857 | 5,562 | 243 | 244 |
| Civilian labor force | 964 | 759 | 932 | 738 | 33 | 22 |
| Participation rate | 15.8 | 13.1 | 15.9 | 13.3 | 13.4 | 8.9 |
| Employed | 929 | 736 | 897 | 715 | 33 | 22 |
| Employment-population ratio | 15.2 | 12.7 | 15.3 | 12.8 | 13.4 | 8.9 |
| Unemployed | 35 | 23 | 35 | 23 | 0 | 0 |
| Unemployment rate | 3.6 | 3.1 | 3.8 | 3.2 | - | - |
| Not in labor force | 5,136 | 5,047 | 4,925 | 4,824 | 210 | 222 |
| **Veterans of other service periods** | | | | | | |
| Civilian noninstitutional population | 3,931 | 3,862 | 3,524 | 3,447 | 407 | 415 |
| Civilian labor force | 1,592 | 1,653 | 1,431 | 1,485 | 160 | 168 |
| Participation rate | 40.5 | 42.8 | 40.6 | 43.1 | 39.4 | 40.6 |
| Employed | 1,534 | 1,612 | 1,380 | 1,450 | 154 | 162 |
| Employment-population ratio | 39.0 | 41.7 | 39.2 | 42.1 | 37.8 | 39.0 |
| Unemployed | 58 | 42 | 51 | 35 | 7 | 7 |
| Unemployment rate | 3.6 | 2.5 | 3.6 | 2.4 | 4.1 | 3.9 |
| Not in labor force | 2,339 | 2,209 | 2,093 | 1,962 | 247 | 247 |
| **NONVETERANS, 18 years and over** | | | | | | |
| Civilian noninstitutional population | 237,329 | 240,868 | 108,183 | 110,479 | 129,146 | 130,389 |
| Civilian labor force | 153,028 | 155,581 | 78,544 | 79,996 | 74,484 | 75,586 |
| Participation rate | 64.5 | 64.6 | 72.6 | 72.4 | 57.7 | 58.0 |
| Employed | 148,134 | 150,208 | 75,956 | 76,962 | 72,178 | 73,246 |
| Employment-population ratio | 62.4 | 62.4 | 70.2 | 69.7 | 55.9 | 56.2 |
| Unemployed | 4,894 | 5,374 | 2,588 | 3,034 | 2,306 | 2,340 |
| Unemployment rate | 3.2 | 3.5 | 3.3 | 3.8 | 3.1 | 3.1 |
| Not in labor force | 84,301 | 85,287 | 29,639 | 30,483 | 54,662 | 54,804 |

NOTE: Veterans served on active duty in the U.S. Armed Forces and were not on active duty at the time of the survey. Nonveterans never served on active duty in the U.S. Armed Forces. Veterans could have served anywhere in the world during these periods of service: Gulf War era II (September 2001-present), Gulf War era I (August 1990-August 2001), Vietnam era (August 1964-April 1975), Korean War (July 1950-January 1955), World War II (December 1941-December 1946), and other service periods (all other time periods). Veterans who served in more than one wartime period are classified only in the most recent one. Veterans who served during one of the selected wartime periods and another period are classified only in the wartime period. Dash indicates no data or data that do not meet publication criteria (values not shown where base is less than 75,000).

**HOUSEHOLD DATA**
**Table A-6. Employment status of the civilian population by sex, age, and disability status, not seasonally adjusted**
[Numbers in thousands]

| Employment status, sex, and age | Persons with a disability | | Persons with no disability | |
|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |

NOTE: A person with a disability has at least one of the following conditions: is deaf or has serious difficulty hearing; is blind or has serious difficulty seeing even when wearing glasses; has serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition; has serious difficulty walking or climbing stairs; has difficulty dressing or bathing; or has difficulty doing errands alone such as visiting a doctor's office or shopping because of a physical, mental, or emotional condition. Updated population controls are introduced annually with the release of January data.

| Employment status, sex, and age | Persons with a disability | | Persons with no disability | |
|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| **TOTAL, 16 years and over** | | | | |
| Civilian noninstitutional population | 32,874 | 33,847 | 231,970 | 234,144 |
|   Civilian labor force | 7,761 | 8,293 | 156,463 | 158,367 |
|     Participation rate | 23.6 | 24.5 | 67.4 | 67.6 |
|   Employed | 7,370 | 7,741 | 151,501 | 153,013 |
|     Employment-population ratio | 22.4 | 22.9 | 65.3 | 65.3 |
|   Unemployed | 390 | 552 | 4,962 | 5,355 |
|     Unemployment rate | 5.0 | 6.7 | 3.2 | 3.4 |
|   Not in labor force | 25,114 | 25,554 | 75,507 | 75,776 |
| **Men, 16 to 64 years** | | | | |
|   Civilian labor force | 3,208 | 3,478 | 77,843 | 78,963 |
|     Participation rate | 40.0 | 42.3 | 82.1 | 82.3 |
|   Employed | 3,052 | 3,216 | 75,240 | 76,007 |
|     Employment-population ratio | 38.0 | 39.1 | 79.4 | 79.2 |
|   Unemployed | 156 | 262 | 2,603 | 2,955 |
|     Unemployment rate | 4.9 | 7.5 | 3.3 | 3.7 |
|   Not in labor force | 4,819 | 4,744 | 16,924 | 17,004 |
| **Women, 16 to 64 years** | | | | |
|   Civilian labor force | 3,184 | 3,419 | 68,853 | 69,440 |
|     Participation rate | 38.2 | 39.4 | 71.7 | 72.3 |
|   Employed | 2,998 | 3,197 | 66,762 | 67,295 |
|     Employment-population ratio | 35.9 | 36.8 | 69.5 | 70.1 |
|   Unemployed | 186 | 221 | 2,090 | 2,145 |
|     Unemployment rate | 5.8 | 6.5 | 3.0 | 3.1 |
|   Not in labor force | 5,160 | 5,268 | 27,235 | 26,589 |
| **Both sexes, 65 years and over** | | | | |
|   Civilian labor force | 1,368 | 1,396 | 9,768 | 9,965 |
|     Participation rate | 8.3 | 8.2 | 23.8 | 23.6 |
|   Employed | 1,320 | 1,328 | 9,499 | 9,710 |
|     Employment-population ratio | 8.0 | 7.8 | 23.1 | 23.0 |
|   Unemployed | 49 | 68 | 269 | 254 |
|     Unemployment rate | 3.6 | 4.9 | 2.8 | 2.6 |
|   Not in labor force | 15,135 | 15,542 | 31,348 | 32,183 |

NOTE: A person with a disability has at least one of the following conditions: is deaf or has serious difficulty hearing; is blind or has serious difficulty seeing even when wearing glasses; has serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition; has serious difficulty walking or climbing stairs; has difficulty dressing or bathing; or has difficulty doing errands alone such as visiting a doctor's office or shopping because of a physical, mental, or emotional condition. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-7. Employment status of the civilian population by nativity and sex, not seasonally adjusted**
[Numbers in thousands]

| Employment status and nativity | Total | | Men | | Women | |
|---|---|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| **Foreign born, 16 years and over** | | | | | | |
| Civilian noninstitutional population | 45,736 | 48,049 | 22,302 | 23,679 | 23,434 | 24,370 |
|   Civilian labor force | 30,077 | 31,591 | 17,165 | 18,157 | 12,912 | 13,435 |
|     Participation rate | 65.8 | 65.7 | 77.0 | 76.7 | 55.1 | 55.1 |
|   Employed | 29,130 | 30,387 | 16,610 | 17,477 | 12,520 | 12,910 |

NOTE: The foreign born are those residing in the United States who were not U.S. citizens at birth. That is, they were born outside the United States or one of its outlying areas such as Puerto Rico or Guam, to parents neither of whom was a U.S. citizen. The native born are persons who were born in the United States or one of its outlying areas such as Puerto Rico or Guam or who were born abroad of at least one parent who was a U.S. citizen. Updated population controls are introduced annually with the release of January data.

| Employment status and nativity | Total Dec. 2022 | Total Dec. 2023 | Men Dec. 2022 | Men Dec. 2023 | Women Dec. 2022 | Women Dec. 2023 |
|---|---|---|---|---|---|---|
| Employment-population ratio | 63.7 | 63.2 | 74.5 | 73.8 | 53.4 | 53.0 |
| Unemployed | 947 | 1,205 | 554 | 680 | 393 | 525 |
| Unemployment rate | 3.1 | 3.8 | 3.2 | 3.7 | 3.0 | 3.9 |
| Not in labor force | 15,659 | 16,458 | 5,137 | 5,523 | 10,522 | 10,935 |
| **Native born, 16 years and over** | | | | | | |
| Civilian noninstitutional population | 219,109 | 219,942 | 106,748 | 107,306 | 112,361 | 112,636 |
| Civilian labor force | 134,147 | 135,069 | 70,086 | 70,453 | 64,061 | 64,616 |
| Participation rate | 61.2 | 61.4 | 65.7 | 65.7 | 57.0 | 57.4 |
| Employed | 129,742 | 130,367 | 67,693 | 67,721 | 62,049 | 62,646 |
| Employment-population ratio | 59.2 | 59.3 | 63.4 | 63.1 | 55.2 | 55.6 |
| Unemployed | 4,405 | 4,702 | 2,393 | 2,732 | 2,012 | 1,970 |
| Unemployment rate | 3.3 | 3.5 | 3.4 | 3.9 | 3.1 | 3.0 |
| Not in labor force | 84,962 | 84,872 | 36,662 | 36,853 | 48,300 | 48,020 |

NOTE: The foreign born are those residing in the United States who were not U.S. citizens at birth. That is, they were born outside the United States or one of its outlying areas such as Puerto Rico or Guam, to parents neither of whom was a U.S. citizen. The native born are persons who were born in the United States or one of its outlying areas such as Puerto Rico or Guam or who were born abroad of at least one parent who was a U.S. citizen. Updated population controls are introduced annually with the release of January data.

## HOUSEHOLD DATA
### Table A-8. Employed persons by class of worker and part-time status
[In thousands]

| Category | Not seasonally adjusted Dec. 2022 | Not seasonally adjusted Nov. 2023 | Not seasonally adjusted Dec. 2023 | Seasonally adjusted Dec. 2022 | Seasonally adjusted Aug. 2023 | Seasonally adjusted Sept. 2023 | Seasonally adjusted Oct. 2023 | Seasonally adjusted Nov. 2023 | Seasonally adjusted Dec. 2023 |
|---|---|---|---|---|---|---|---|---|---|
| **CLASS OF WORKER** | | | | | | | | | |
| Agriculture and related industries | 2,267 | 2,234 | 2,156 | 2,317 | 2,279 | 2,286 | 2,201 | 2,262 | 2,205 |
| Wage and salary workers(1) | 1,482 | 1,535 | 1,497 | 1,503 | 1,553 | 1,563 | 1,468 | 1,549 | 1,520 |
| Self-employed workers, unincorporated | 755 | 683 | 646 | 789 | 694 | 694 | 707 | 701 | 680 |
| Unpaid family workers | 31 | 16 | 14 | - | - | - | - | - | - |
| Nonagricultural industries | 156,604 | 159,916 | 158,598 | 156,970 | 159,275 | 159,306 | 159,166 | 159,578 | 158,993 |
| Wage and salary workers(1) | 147,639 | 150,878 | 149,325 | 147,988 | 150,262 | 150,134 | 150,170 | 150,505 | 149,702 |
| Government | 21,943 | 22,072 | 21,951 | 21,696 | 21,249 | 21,618 | 21,664 | 21,878 | 21,700 |
| Private industries | 125,696 | 128,807 | 127,373 | 126,359 | 128,893 | 128,558 | 128,454 | 128,612 | 128,086 |
| Private households | 692 | 771 | 787 | - | - | - | - | - | - |
| Other industries | 125,003 | 128,035 | 126,586 | 125,766 | 128,254 | 127,958 | 127,800 | 127,889 | 127,414 |
| Self-employed workers, unincorporated | 8,923 | 9,011 | 9,242 | 9,014 | 8,827 | 9,043 | 8,957 | 9,014 | 9,335 |
| Unpaid family workers | 43 | 26 | 31 | - | - | - | - | - | - |
| **PERSONS AT WORK PART TIME(2)** | | | | | | | | | |
| **All industries** | | | | | | | | | |
| Part time for economic reasons(3) | 3,991 | 3,871 | 4,324 | 3,878 | 4,221 | 4,069 | 4,284 | 3,994 | 4,211 |
| Slack work or business conditions | 2,755 | 2,700 | 3,071 | 2,643 | 2,821 | 2,799 | 2,985 | 2,790 | 2,960 |

#### Footnotes
(1) Includes self-employed workers whose businesses are incorporated.
(2) Refers to those who worked 1 to 34 hours during the survey reference week and excludes employed persons who were absent from their jobs for the entire week.
(3) Refers to those who worked 1 to 34 hours during the reference week for an economic reason such as slack work or unfavorable business conditions, inability to find full-time work, or seasonal declines in demand.
(4) Refers to persons who usually work part time for noneconomic reasons such as childcare problems, family or personal obligations, school or training, retirement or Social Security limits on earnings, and other reasons. This excludes persons who usually work full time but worked only 1 to 34 hours during the reference week for reasons such as vacations, holidays, illness, and bad weather.

- Data not available.
NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

| Category | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **Could only find part-time work** | 893 | 911 | 940 | 916 | 1,017 | 940 | 1,000 | 934 | 964 |
| **Part time for noneconomic reasons(4)** | 22,084 | 22,662 | 23,020 | 21,537 | 22,030 | 22,177 | 21,576 | 21,879 | 22,458 |
| **Nonagricultural industries** | | | | | | | | | |
| **Part time for economic reasons(3)** | 3,903 | 3,796 | 4,229 | 3,812 | 4,149 | 3,988 | 4,205 | 3,931 | 4,138 |
| **Slack work or business conditions** | 2,703 | 2,654 | 3,019 | 2,597 | 2,779 | 2,753 | 2,941 | 2,735 | 2,913 |
| **Could only find part-time work** | 873 | 903 | 926 | 898 | 1,016 | 930 | 992 | 923 | 953 |
| **Part time for noneconomic reasons(4)** | 21,640 | 22,210 | 22,604 | 21,113 | 21,582 | 21,752 | 21,214 | 21,444 | 22,060 |

Footnotes

(1) Includes self-employed workers whose businesses are incorporated.

(2) Refers to those who worked 1 to 34 hours during the survey reference week and excludes employed persons who were absent from their jobs for the entire week.

(3) Refers to those who worked 1 to 34 hours during the reference week for an economic reason such as slack work or unfavorable business conditions, inability to find full-time work, or seasonal declines in demand.

(4) Refers to persons who usually work part time for noneconomic reasons such as childcare problems, family or personal obligations, school or training, retirement or Social Security limits on earnings, and other reasons. This excludes persons who usually work full time but worked only 1 to 34 hours during the reference week for reasons such as vacations, holidays, illness, and bad weather.

- Data not available.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-9. Selected employment indicators**
[Numbers in thousands]

| Characteristic | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **AGE AND SEX** | | | | | | | | | |
| **Total, 16 years and over** | 158,872 | 162,149 | 160,754 | 159,300 | 161,500 | 161,550 | 161,280 | 161,866 | 161,183 |
| **16 to 19 years** | 5,439 | 5,517 | 5,399 | 5,680 | 5,593 | 5,578 | 5,688 | 5,733 | 5,638 |
| **16 to 17 years** | 2,251 | 2,172 | 2,091 | 2,362 | 2,104 | 2,121 | 2,161 | 2,235 | 2,194 |
| **18 to 19 years** | 3,188 | 3,345 | 3,308 | 3,320 | 3,466 | 3,432 | 3,518 | 3,514 | 3,446 |
| **20 years and over** | 153,433 | 156,632 | 155,355 | 153,620 | 155,907 | 155,972 | 155,592 | 156,133 | 155,545 |
| **20 to 24 years** | 13,728 | 14,781 | 14,616 | 13,861 | 14,611 | 14,684 | 14,565 | 14,787 | 14,756 |
| **25 years and over** | 139,705 | 141,851 | 140,739 | 139,576 | 141,129 | 141,218 | 140,887 | 141,194 | 140,617 |
| **25 to 54 years** | 102,069 | 103,930 | 103,265 | 101,964 | 103,508 | 103,515 | 103,311 | 103,451 | 103,161 |
| **25 to 34 years** | 35,152 | 35,953 | 35,888 | 35,121 | 35,972 | 35,945 | 35,799 | 35,779 | 35,869 |
| **35 to 44 years** | 35,029 | 35,832 | 35,566 | 35,010 | 35,467 | 35,501 | 35,486 | 35,680 | 35,546 |
| **45 to 54 years** | 31,888 | 32,145 | 31,811 | 31,833 | 32,069 | 32,069 | 32,026 | 31,992 | 31,757 |
| **55 years and over** | 37,636 | 37,921 | 37,474 | 37,612 | 37,620 | 37,704 | 37,576 | 37,742 | 37,455 |
| **Men, 16 years and over** | 84,304 | 85,910 | 85,198 | 84,897 | 85,527 | 85,657 | 85,327 | 85,981 | 85,794 |
| **16 to 19 years** | 2,714 | 2,783 | 2,705 | 2,846 | 2,727 | 2,804 | 2,801 | 2,897 | 2,836 |
| **16 to 17 years** | 1,018 | 1,014 | 952 | 1,105 | 1,015 | 1,061 | 1,067 | 1,071 | 1,033 |
| **18 to 19 years** | 1,696 | 1,769 | 1,753 | 1,748 | 1,675 | 1,725 | 1,730 | 1,846 | 1,807 |
| **20 years and over** | 81,589 | 83,128 | 82,493 | 82,051 | 82,800 | 82,853 | 82,526 | 83,084 | 82,958 |
| **20 to 24 years** | 6,967 | 7,406 | 7,293 | 7,099 | 7,367 | 7,316 | 7,262 | 7,446 | 7,432 |
| **25 years and over** | 74,623 | 75,722 | 75,200 | 74,817 | 75,288 | 75,452 | 75,118 | 75,514 | 75,397 |
| **25 to 54 years** | 54,325 | 55,420 | 55,048 | 54,451 | 55,279 | 55,279 | 55,012 | 55,262 | 55,178 |

Footnotes

(1) Beginning with data for January 2020, refers to persons in both opposite-sex and same-sex married couples. Prior to January 2020, referred to persons in opposite-sex married couples only.

(2) Beginning with data for January 2020, refers to female householders residing with one or more family members, but not a spouse of either sex. Prior to January 2020, referred to female householders residing with one or more family members, but not an opposite-sex spouse.

(3) Employed full-time workers are persons who usually work 35 hours or more per week.

(4) Employed part-time workers are persons who usually work less than 35 hours per week.

- Data not available.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

| Characteristic | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| 25 to 34 years | 18,644 | 19,144 | 19,066 | 18,679 | 19,208 | 19,120 | 18,975 | 19,088 | 19,104 |
| 35 to 44 years | 18,743 | 19,149 | 19,038 | 18,812 | 19,050 | 19,112 | 19,043 | 19,107 | 19,108 |
| 45 to 54 years | 16,938 | 17,127 | 16,944 | 16,960 | 17,020 | 17,047 | 16,994 | 17,067 | 16,966 |
| 55 years and over | 20,298 | 20,302 | 20,152 | 20,365 | 20,009 | 20,173 | 20,106 | 20,252 | 20,219 |
| Women, 16 years and over | 74,568 | 76,239 | 75,556 | 74,404 | 75,973 | 75,893 | 75,953 | 75,885 | 75,389 |
| 16 to 19 years | 2,725 | 2,735 | 2,694 | 2,834 | 2,866 | 2,774 | 2,887 | 2,836 | 2,802 |
| 16 to 17 years | 1,233 | 1,158 | 1,139 | 1,257 | 1,089 | 1,061 | 1,094 | 1,164 | 1,162 |
| 18 to 19 years | 1,492 | 1,577 | 1,555 | 1,572 | 1,791 | 1,707 | 1,788 | 1,668 | 1,639 |
| 20 years and over | 71,843 | 73,504 | 72,862 | 71,570 | 73,107 | 73,119 | 73,066 | 73,049 | 72,587 |
| 20 to 24 years | 6,761 | 7,375 | 7,323 | 6,762 | 7,244 | 7,368 | 7,303 | 7,342 | 7,324 |
| 25 years and over | 65,082 | 66,129 | 65,539 | 64,759 | 65,841 | 65,766 | 65,769 | 65,679 | 65,220 |
| 25 to 54 years | 47,744 | 48,510 | 48,216 | 47,513 | 48,230 | 48,236 | 48,298 | 48,189 | 47,983 |
| 25 to 34 years | 16,508 | 16,809 | 16,822 | 16,442 | 16,763 | 16,825 | 16,823 | 16,691 | 16,755 |
| 35 to 44 years | 16,286 | 16,683 | 16,528 | 16,198 | 16,417 | 16,389 | 16,443 | 16,573 | 16,438 |
| 45 to 54 years | 14,950 | 15,017 | 14,867 | 14,873 | 15,050 | 15,022 | 15,032 | 14,926 | 14,791 |
| 55 years and over | 17,338 | 17,619 | 17,322 | 17,246 | 17,611 | 17,530 | 17,471 | 17,490 | 17,237 |
| **MARITAL STATUS** | | | | | | | | | |
| Married men, spouse present[1] | 46,099 | 46,384 | 46,319 | 46,186 | 45,956 | 46,338 | 46,059 | 46,344 | 46,392 |
| Married women, spouse present[1] | 36,763 | 37,118 | 36,982 | 36,564 | 37,339 | 37,198 | 37,018 | 36,887 | 36,790 |
| Women who maintain families[2] | 10,150 | 9,916 | 9,718 | - | - | - | - | - | - |
| **FULL- OR PART-TIME STATUS** | | | | | | | | | |
| Full-time workers[3] | 131,812 | 134,634 | 132,585 | 132,422 | 134,267 | 134,145 | 134,502 | 134,727 | 133,196 |
| Part-time workers[4] | 27,060 | 27,515 | 28,169 | 26,712 | 27,201 | 27,348 | 26,702 | 27,032 | 27,794 |
| **MULTIPLE JOBHOLDERS** | | | | | | | | | |
| Total multiple jobholders | 8,140 | 8,463 | 8,696 | 8,020 | 8,069 | 8,173 | 8,360 | 8,343 | 8,565 |
| Percent of total employed | 5.1 | 5.2 | 5.4 | 5.0 | 5.0 | 5.1 | 5.2 | 5.2 | 5.3 |
| **SELF-EMPLOYMENT** | | | | | | | | | |
| Self-employed workers, incorporated | 6,811 | 6,872 | 6,637 | - | - | - | - | - | - |
| Self-employed workers, unincorporated | 9,678 | 9,695 | 9,888 | 9,804 | 9,521 | 9,737 | 9,664 | 9,715 | 10,014 |

**Footnotes**

(1) Beginning with data for January 2020, refers to persons in both opposite-sex and same-sex married couples. Prior to January 2020, referred to persons in opposite-sex married couples only.

(2) Beginning with data for January 2020, refers to female householders residing with one or more family members, but not a spouse of either sex. Prior to January 2020, referred to female householders residing with one or more family members, but not an opposite-sex spouse.

(3) Employed full-time workers are persons who usually work 35 hours or more per week.

(4) Employed part-time workers are persons who usually work less than 35 hours per week.

- Data not available.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**
**Table A-10. Selected unemployment indicators, seasonally adjusted**

| Characteristic | Number of unemployed persons (in thousands) | | | Unemployment rates | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |

| Characteristic | Number of unemployed persons (in thousands) | | | Unemployment rates | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **AGE AND SEX** | | | | | | | | | |
| **Total, 16 years and over** | 5,698 | 6,262 | 6,268 | 3.5 | 3.8 | 3.8 | 3.8 | 3.7 | 3.7 |
| **16 to 19 years** | 665 | 739 | 758 | 10.5 | 12.3 | 11.8 | 13.1 | 11.4 | 11.9 |
| **16 to 17 years** | 214 | 287 | 331 | 8.3 | 11.9 | 12.8 | 14.7 | 11.4 | 13.1 |
| **18 to 19 years** | 458 | 455 | 433 | 12.1 | 12.7 | 11.1 | 12.5 | 11.5 | 11.2 |
| **20 years and over** | 5,033 | 5,522 | 5,510 | 3.2 | 3.4 | 3.5 | 3.5 | 3.4 | 3.4 |
| **20 to 24 years** | 1,095 | 1,051 | 1,006 | 7.3 | 7.1 | 7.0 | 7.0 | 6.6 | 6.4 |
| **25 years and over** | 4,015 | 4,498 | 4,574 | 2.8 | 3.0 | 3.0 | 3.1 | 3.1 | 3.2 |
| **25 to 54 years** | 2,996 | 3,356 | 3,491 | 2.9 | 3.1 | 3.2 | 3.2 | 3.1 | 3.3 |
| **25 to 34 years** | 1,388 | 1,458 | 1,556 | 3.8 | 3.9 | 4.0 | 4.2 | 3.9 | 4.2 |
| **35 to 44 years** | 864 | 1,055 | 1,079 | 2.4 | 3.0 | 2.8 | 2.9 | 2.9 | 2.9 |
| **45 to 54 years** | 745 | 843 | 856 | 2.3 | 2.5 | 2.8 | 2.4 | 2.6 | 2.6 |
| **55 years and over** | 1,026 | 1,138 | 1,089 | 2.7 | 2.7 | 2.7 | 2.7 | 2.9 | 2.8 |
| Men, 16 years and over | 2,978 | 3,574 | 3,456 | 3.4 | 4.0 | 4.1 | 4.1 | 4.0 | 3.9 |
| **16 to 19 years** | 327 | 402 | 407 | 10.3 | 13.8 | 12.7 | 14.6 | 12.2 | 12.5 |
| **16 to 17 years** | 113 | 164 | 185 | 9.3 | 12.1 | 15.4 | 16.3 | 13.3 | 15.2 |
| **18 to 19 years** | 223 | 244 | 229 | 11.3 | 15.2 | 11.4 | 14.2 | 11.7 | 11.3 |
| **20 years and over** | 2,651 | 3,172 | 3,050 | 3.1 | 3.7 | 3.8 | 3.7 | 3.7 | 3.5 |
| **20 to 24 years** | 567 | 571 | 509 | 7.4 | 8.4 | 8.3 | 7.8 | 7.1 | 6.4 |
| **25 years and over** | 2,138 | 2,624 | 2,587 | 2.8 | 3.1 | 3.3 | 3.3 | 3.4 | 3.3 |
| **25 to 54 years** | 1,565 | 1,942 | 1,984 | 2.8 | 3.2 | 3.6 | 3.4 | 3.4 | 3.5 |
| **25 to 34 years** | 762 | 844 | 885 | 3.9 | 3.9 | 4.6 | 4.6 | 4.2 | 4.4 |
| **35 to 44 years** | 442 | 631 | 625 | 2.3 | 3.0 | 3.0 | 3.0 | 3.2 | 3.2 |
| **45 to 54 years** | 361 | 468 | 474 | 2.1 | 2.8 | 3.1 | 2.6 | 2.7 | 2.7 |
| **55 years and over** | 573 | 682 | 603 | 2.7 | 2.8 | 2.5 | 2.7 | 3.3 | 2.9 |
| Women, 16 years and over | 2,720 | 2,688 | 2,811 | 3.5 | 3.5 | 3.4 | 3.6 | 3.4 | 3.6 |
| **16 to 19 years** | 338 | 338 | 352 | 10.7 | 10.7 | 10.8 | 11.7 | 10.6 | 11.1 |
| **16 to 17 years** | 101 | 123 | 147 | 7.5 | 11.8 | 10.1 | 13.1 | 9.5 | 11.2 |
| **18 to 19 years** | 235 | 211 | 204 | 13.0 | 10.3 | 10.8 | 10.8 | 11.2 | 11.1 |
| **20 years and over** | 2,382 | 2,350 | 2,460 | 3.2 | 3.2 | 3.1 | 3.2 | 3.1 | 3.3 |
| **20 to 24 years** | 528 | 480 | 497 | 7.2 | 5.8 | 5.6 | 6.2 | 6.1 | 6.4 |
| **25 years and over** | 1,877 | 1,874 | 1,987 | 2.8 | 2.9 | 2.7 | 2.9 | 2.8 | 3.0 |
| **25 to 54 years** | 1,431 | 1,414 | 1,506 | 2.9 | 3.0 | 2.8 | 3.0 | 2.9 | 3.0 |
| **25 to 34 years** | 626 | 614 | 671 | 3.7 | 3.9 | 3.3 | 3.7 | 3.5 | 3.9 |
| **35 to 44 years** | 422 | 424 | 454 | 2.5 | 2.9 | 2.5 | 2.9 | 2.5 | 2.7 |
| **45 to 54 years** | 383 | 375 | 381 | 2.5 | 2.2 | 2.4 | 2.2 | 2.5 | 2.5 |
| **55 years and over** | 446 | 458 | 480 | 2.5 | 2.6 | 2.7 | 2.8 | 2.6 | 2.7 |
| **MARITAL STATUS** | | | | | | | | | |
| **Married men, spouse present(1)** | 828 | 965 | 980 | 1.8 | 2.0 | 2.1 | 2.0 | 2.0 | 2.1 |
| **Married women, spouse present(1)** | 764 | 760 | 825 | 2.0 | 2.1 | 2.1 | 2.1 | 2.0 | 2.2 |
| **Women who maintain families(2)** | 383 | 495 | 475 | 3.6 | 4.9 | 4.0 | 4.6 | 4.8 | 4.7 |
| **FULL- OR PART-TIME STATUS** | | | | | | | | | |
| **Full-time workers(3)** | 4,658 | 5,177 | 5,228 | 3.4 | 3.7 | 3.6 | 3.7 | 3.7 | 3.8 |
| **Part-time workers(4)** | 1,097 | 1,108 | 1,084 | 3.9 | 4.4 | 4.3 | 4.6 | 3.9 | 3.8 |

| | Number of unemployed persons (in thousands) | | | Unemployment rates | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Characteristic | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |

**Footnotes**

(1) Beginning with data for January 2020, refers to persons in both opposite-sex and same-sex married couples. Prior to January 2020, referred to persons in opposite-sex married couples only.

(2) Data are not seasonally adjusted. Beginning with data for January 2020, refers to female householders residing with one or more family members, but not a spouse of either sex. Prior to January 2020, referred to female householders residing with one or more family members, but not an opposite-sex spouse.

(3) Full-time workers are unemployed persons who have expressed a desire to work full time (35 hours or more per week) or are on layoff from full-time jobs.

(4) Part-time workers are unemployed persons who have expressed a desire to work part time (less than 35 hours per week) or are on layoff from part-time jobs.

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to totals because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

## HOUSEHOLD DATA
## Table A-11. Unemployed persons by reason for unemployment
[Numbers in thousands]

| | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reason | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **NUMBER OF UNEMPLOYED** | | | | | | | | | |
| **Job losers and persons who completed temporary jobs** | 2,583 | 2,816 | 3,048 | 2,596 | 2,946 | 2,869 | 3,120 | 3,058 | 3,058 |
| On temporary layoff | 848 | 720 | 981 | 788 | 813 | 813 | 904 | 889 | 917 |
| Not on temporary layoff | 1,735 | 2,096 | 2,067 | 1,808 | 2,132 | 2,056 | 2,217 | 2,169 | 2,140 |
| Permanent job losers | 1,255 | 1,536 | 1,466 | 1,332 | 1,545 | 1,421 | 1,636 | 1,589 | 1,543 |
| Persons who completed temporary jobs | 480 | 560 | 601 | 476 | 588 | 636 | 581 | 580 | 597 |
| **Job leavers** | 768 | 810 | 777 | 824 | 804 | 797 | 801 | 821 | 833 |
| **Reentrants** | 1,613 | 1,660 | 1,570 | 1,786 | 1,931 | 2,024 | 1,869 | 1,771 | 1,741 |
| **New entrants** | 388 | 541 | 512 | 502 | 592 | 586 | 603 | 582 | 609 |
| **PERCENT DISTRIBUTION** | | | | | | | | | |
| **Job losers and persons who completed temporary jobs** | 48.3 | 48.3 | 51.6 | 45.5 | 47.0 | 45.7 | 48.8 | 49.1 | 49.0 |
| On temporary layoff | 15.8 | 12.4 | 16.6 | 13.8 | 13.0 | 13.0 | 14.1 | 14.3 | 14.7 |
| Not on temporary layoff | 32.4 | 36.0 | 35.0 | 31.7 | 34.0 | 32.8 | 34.7 | 34.8 | 34.3 |
| **Job leavers** | 14.4 | 13.9 | 13.2 | 14.4 | 12.8 | 12.7 | 12.5 | 13.2 | 13.4 |
| **Reentrants** | 30.1 | 28.5 | 26.6 | 31.3 | 30.8 | 32.3 | 29.2 | 28.4 | 27.9 |
| **New entrants** | 7.3 | 9.3 | 8.7 | 8.8 | 9.4 | 9.3 | 9.4 | 9.3 | 9.8 |
| **UNEMPLOYED AS A PERCENT OF THE CIVILIAN LABOR FORCE** | | | | | | | | | |
| **Job losers and persons who completed temporary jobs** | 1.6 | 1.7 | 1.8 | 1.6 | 1.8 | 1.7 | 1.9 | 1.8 | 1.8 |
| **Job leavers** | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| **Reentrants** | 1.0 | 1.0 | 0.9 | 1.1 | 1.2 | 1.2 | 1.1 | 1.1 | 1.0 |
| **New entrants** | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.3 | 0.4 | 0.3 | 0.4 |

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to total unemployed in table A-1 because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

## HOUSEHOLD DATA
## Table A-12. Unemployed persons by duration of unemployment
[Numbers in thousands]

| | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Duration | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| **NUMBER OF UNEMPLOYED** | | | | | | | | | |
| **Less than 5 weeks** | 2,128 | 1,873 | 2,102 | 2,218 | 2,224 | 2,053 | 2,269 | 2,069 | 2,191 |
| **5 to 14 weeks** | 1,490 | 1,939 | 1,619 | 1,645 | 1,913 | 2,043 | 1,836 | 2,060 | 1,791 |
| **15 weeks and over** | 1,733 | 2,016 | 2,185 | 1,898 | 2,296 | 2,288 | 2,370 | 2,150 | 2,350 |
| **15 to 26 weeks** | 749 | 897 | 1,000 | 792 | 970 | 985 | 1,079 | 931 | 1,104 |

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to total unemployed in table A-1 because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.

| | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Duration** | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| 27 weeks and over | 984 | 1,119 | 1,185 | 1,106 | 1,326 | 1,303 | 1,291 | 1,220 | 1,245 |
| | | | | | | | | | |
| Average (mean) duration, in weeks | 19.1 | 19.9 | 21.9 | 19.5 | 20.4 | 21.4 | 21.6 | 19.5 | 22.3 |
| Median duration, in weeks | 7.5 | 9.3 | 9.0 | 8.3 | 8.8 | 9.1 | 8.6 | 9.0 | 9.7 |
| | | | | | | | | | |
| PERCENT DISTRIBUTION | | | | | | | | | |
| Less than 5 weeks | 39.8 | 32.1 | 35.6 | 38.5 | 34.6 | 32.2 | 35.0 | 33.0 | 34.6 |
| 5 to 14 weeks | 27.8 | 33.3 | 27.4 | 28.6 | 29.7 | 32.0 | 28.4 | 32.8 | 28.3 |
| 15 weeks and over | 32.4 | 34.6 | 37.0 | 33.0 | 35.7 | 35.8 | 36.6 | 34.2 | 37.1 |
| 15 to 26 weeks | 14.0 | 15.4 | 16.9 | 13.8 | 15.1 | 15.4 | 16.7 | 14.8 | 17.4 |
| 27 weeks and over | 18.4 | 19.2 | 20.1 | 19.2 | 20.6 | 20.4 | 19.9 | 19.4 | 19.7 |

NOTE: Detail for the seasonally adjusted data shown in this table will not necessarily add to total unemployed in table A-1 because of the independent seasonal adjustment of the various series. Updated population controls are introduced annually with the release of January data.


**HOUSEHOLD DATA**
**Table A-13. Employed and unemployed persons by occupation, not seasonally adjusted**
[Numbers in thousands]

| | Employed | | Unemployed | | Unemployment rates | |
|---|---|---|---|---|---|---|
| **Occupation** | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| Total, 16 years and over(1) | 158,872 | 160,754 | 5,352 | 5,907 | 3.3 | 3.5 |
| Management, professional, and related occupations | 69,297 | 70,572 | 1,198 | 1,314 | 1.7 | 1.8 |
| Management, business, and financial operations occupations | 29,725 | 30,327 | 537 | 607 | 1.8 | 2.0 |
| Professional and related occupations | 39,572 | 40,245 | 661 | 706 | 1.6 | 1.7 |
| Service occupations | 25,334 | 25,689 | 1,225 | 1,177 | 4.6 | 4.4 |
| Sales and office occupations | 30,185 | 30,043 | 1,008 | 1,152 | 3.2 | 3.7 |
| Sales and related occupations | 14,053 | 14,332 | 488 | 654 | 3.4 | 4.4 |
| Office and administrative support occupations | 16,133 | 15,710 | 520 | 497 | 3.1 | 3.1 |
| Natural resources, construction, and maintenance occupations | 14,295 | 14,411 | 689 | 732 | 4.6 | 4.8 |
| Farming, fishing, and forestry occupations | 945 | 978 | 69 | 102 | 6.8 | 9.5 |
| Construction and extraction occupations | 8,491 | 8,631 | 510 | 502 | 5.7 | 5.5 |
| Installation, maintenance, and repair occupations | 4,860 | 4,802 | 110 | 128 | 2.2 | 2.6 |
| Production, transportation, and material moving occupations | 19,760 | 20,039 | 829 | 998 | 4.0 | 4.7 |
| Production occupations | 8,152 | 8,372 | 223 | 333 | 2.7 | 3.8 |
| Transportation and material moving occupations | 11,608 | 11,667 | 606 | 665 | 5.0 | 5.4 |

Footnotes
(1) Persons with no previous work experience and persons whose last job was in the U.S. Armed Forces are included in the unemployed total.

NOTE: Updated population controls are introduced annually with the release of January data. Effective with January 2020 data, occupations reflect the introduction of the 2018 Census occupational classification system into the Current Population Survey, or household survey. This classification system is derived from the 2018 Standard Occupational Classification (SOC). No historical data have been revised. Data for 2020 are not strictly comparable with earlier years.


**HOUSEHOLD DATA**
**Table A-14. Unemployed persons by industry and class of worker, not seasonally adjusted**

| | Number of unemployed persons (in thousands) | | Unemployment rates | |
|---|---|---|---|---|
| **Industry and class of worker** | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| Total, 16 years and over(1) | 5,352 | 5,907 | 3.3 | 3.5 |
| Nonagricultural private wage and salary workers | 4,117 | 4,595 | 3.2 | 3.5 |

Footnotes
(1) Persons with no previous work experience and persons whose last job was in the U.S. Armed Forces are included in the unemployed total.

NOTE: Updated population controls are introduced annually with the release of January data. Effective with January 2020 data, industries reflect the introduction of the 2017 Census industry classification system into the Current Population Survey. This industry classification system is derived from the 2017 North American Industry Classification System (NAICS). No historical data have been revised.

| Industry and class of worker | Number of unemployed persons (in thousands) | | Unemployment rates | |
|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |
| Mining, quarrying, and oil and gas extraction | 12 | 9 | 1.9 | 1.7 |
| Construction | 443 | 442 | 4.4 | 4.4 |
| Manufacturing | 271 | 456 | 1.8 | 3.0 |
|   Durable goods | 175 | 206 | 1.8 | 2.1 |
|   Nondurable goods | 95 | 250 | 1.8 | 4.6 |
| Wholesale and retail trade | 688 | 810 | 3.6 | 4.0 |
| Transportation and utilities | 349 | 322 | 4.0 | 3.9 |
| Information | 67 | 86 | 2.4 | 3.1 |
| Financial activities | 271 | 293 | 2.6 | 2.9 |
| Professional and business services | 668 | 721 | 3.5 | 3.9 |
| Education and health services | 483 | 560 | 2.0 | 2.2 |
| Leisure and hospitality | 694 | 662 | 5.4 | 4.8 |
| Other services | 170 | 236 | 2.7 | 3.5 |
| Agriculture and related private wage and salary workers | 75 | 110 | 5.0 | 7.0 |
| Government workers | 381 | 330 | 1.7 | 1.5 |
| Self-employed workers, unincorporated, and unpaid family workers | 391 | 359 | 3.9 | 3.5 |

Footnotes

(1) Persons with no previous work experience and persons whose last job was in the U.S. Armed Forces are included in the unemployed total.

NOTE: Updated population controls are introduced annually with the release of January data. Effective with January 2020 data, industries reflect the introduction of the 2017 Census industry classification system into the Current Population Survey. This industry classification system is derived from the 2017 North American Industry Classification System (NAICS). No historical data have been revised.

**HOUSEHOLD DATA**

**Table A-15. Alternative measures of labor underutilization**

[Percent]

| Measure | Not seasonally adjusted | | | Seasonally adjusted | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Nov. 2023 | Dec. 2023 | Dec. 2022 | Aug. 2023 | Sept. 2023 | Oct. 2023 | Nov. 2023 | Dec. 2023 |
| U-1 Persons unemployed 15 weeks or longer, as a percent of the civilian labor force | 1.1 | 1.2 | 1.3 | 1.2 | 1.4 | 1.4 | 1.4 | 1.3 | 1.4 |
| U-2 Job losers and persons who completed temporary jobs, as a percent of the civilian labor force | 1.6 | 1.7 | 1.8 | 1.6 | 1.8 | 1.7 | 1.9 | 1.8 | 1.8 |
| U-3 Total unemployed, as a percent of the civilian labor force (official unemployment rate) | 3.3 | 3.5 | 3.5 | 3.5 | 3.8 | 3.8 | 3.8 | 3.7 | 3.7 |
| U-4 Total unemployed plus discouraged workers, as a percent of the civilian labor force plus discouraged workers | 3.5 | 3.7 | 3.7 | 3.7 | 4.0 | 4.0 | 4.1 | 4.0 | 3.9 |
| U-5 Total unemployed, plus discouraged workers, plus all other persons marginally attached to the labor force, as a percent of the civilian labor force plus all persons marginally attached to the labor force | 4.0 | 4.4 | 4.4 | 4.2 | 4.6 | 4.6 | 4.6 | 4.6 | 4.6 |
| U-6 Total unemployed, plus all persons marginally attached to the labor force, plus total employed part time for economic reasons, as a percent of the civilian labor force plus all persons marginally attached to the labor force | 6.4 | 6.7 | 7.0 | 6.5 | 7.1 | 7.0 | 7.2 | 7.0 | 7.1 |

NOTE: Persons marginally attached to the labor force are those who currently are neither working nor looking for work but indicate that they want and are available for a job and have looked for work sometime in the past 12 months. Discouraged workers, a subset of the marginally attached, have given a job-market related reason for not currently looking for work. Persons employed part time for economic reasons are those who want and are available for full-time work but have had to settle for a part-time schedule. Updated population controls are introduced annually with the release of January data.

**HOUSEHOLD DATA**

**Table A-16. Persons not in the labor force and multiple jobholders by sex, not seasonally adjusted**

[Numbers in thousands]

| Category | Total | | Men | | Women | |
|---|---|---|---|---|---|---|
| | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 | Dec. 2022 | Dec. 2023 |

| Category | Total Dec. 2022 | Total Dec. 2023 | Men Dec. 2022 | Men Dec. 2023 | Women Dec. 2022 | Women Dec. 2023 |
|---|---|---|---|---|---|---|
| **NOT IN THE LABOR FORCE** | | | | | | |
| **Total not in the labor force** | 100,621 | 101,330 | 41,799 | 42,375 | 58,821 | 58,955 |
| Persons who currently want a job | 4,948 | 5,465 | 2,349 | 2,599 | 2,600 | 2,867 |
| Marginally attached to the labor force(1) | 1,260 | 1,567 | 673 | 769 | 587 | 798 |
| Discouraged workers(2) | 421 | 350 | 217 | 190 | 204 | 160 |
| Other persons marginally attached to the labor force(3) | 839 | 1,217 | 456 | 579 | 384 | 638 |
| **MULTIPLE JOBHOLDERS** | | | | | | |
| **Total multiple jobholders(4)** | 8,140 | 8,696 | 4,075 | 4,108 | 4,065 | 4,588 |
| Percent of total employed | 5.1 | 5.4 | 4.8 | 4.8 | 5.5 | 6.1 |
| Primary job full time, secondary job part time | 4,594 | 5,085 | 2,454 | 2,632 | 2,140 | 2,452 |
| Primary and secondary jobs both part time | 1,940 | 2,113 | 759 | 658 | 1,182 | 1,455 |
| Primary and secondary jobs both full time | 388 | 399 | 226 | 217 | 163 | 181 |
| Hours vary on primary or secondary job | 1,133 | 1,028 | 589 | 560 | 544 | 468 |

Footnotes

(1) Data refer to persons who want a job, have searched for work during the prior 12 months, and were available to take a job during the reference week, but had not looked for work in the past 4 weeks.

(2) Includes those who did not actively look for work in the prior 4 weeks for reasons such as thinks no work available, could not find work, lacks schooling or training, employer thinks too young or old, and other types of discrimination.

(3) Includes those who did not actively look for work for such reasons as school or family responsibilities, ill health, and transportation problems, as well as a number for whom reason for nonparticipation was not determined.

(4) Includes a small number of persons who work part time on their primary job and full time on their secondary job(s), not shown separately.

NOTE: Updated population controls are introduced annually with the release of January data.

## ESTABLISHMENT DATA
## Table B-1. Employees on nonfarm payrolls by industry sector and selected industry detail
[In thousands]

| Industry | Not seasonally adjusted Dec. 2022 | Not seasonally adjusted Oct. 2023 | Not seasonally adjusted Nov. 2023(P) | Not seasonally adjusted Dec. 2023(P) | Seasonally adjusted Dec. 2022 | Seasonally adjusted Oct. 2023 | Seasonally adjusted Nov. 2023(P) | Seasonally adjusted Dec. 2023(P) | Change from: Nov.2023 - Dec.2023(P) |
|---|---|---|---|---|---|---|---|---|---|
| **Total nonfarm** | 155,344 | 157,936 | 158,395 | 158,228 | 154,535 | 156,843 | 157,016 | 157,232 | 216 |
| Total private | 132,746 | 134,669 | 134,993 | 134,930 | 132,204 | 133,929 | 134,065 | 134,229 | 164 |
| Goods-producing | 21,377 | 21,806 | 21,746 | 21,646 | 21,461 | 21,631 | 21,661 | 21,683 | 22 |
| Mining and logging | 626 | 649 | 643 | 640 | 628 | 644 | 642 | 641 | -1 |
| Logging | 45.5 | 48.1 | 46.4 | 45.1 | 45.7 | 47.2 | 45.8 | 45.0 | -0.8 |
| Mining, quarrying, and oil and gas extraction | 580.5 | 601.2 | 596.8 | 595.1 | 582.4 | 596.4 | 596.2 | 595.8 | -0.4 |
| Oil and gas extraction | 118.0 | 119.7 | 119.5 | 120.0 | 117.2 | 119.1 | 118.6 | 119.1 | 0.5 |
| Mining (except oil and gas) | 183.9 | 188.2 | 188.1 | 187.1 | 186.5 | 186.6 | 187.6 | 188.4 | 0.8 |
| Coal mining | 40.8 | 40.9 | 41.1 | 41.1 | 41.1 | 40.8 | 41.2 | 41.1 | -0.1 |
| Metal ore mining | 43.2 | 44.0 | 44.2 | 44.3 | 43.5 | 44.1 | 44.5 | 44.4 | -0.1 |
| Nonmetallic mineral mining and quarrying | 99.9 | 103.3 | 102.8 | 101.7 | 102.0 | 101.7 | 101.9 | 102.9 | 1.0 |
| Support activities for mining | 278.6 | 293.3 | 289.2 | 288.0 | 278.7 | 290.7 | 290.0 | 288.3 | -1.7 |
| Construction | 7,763 | 8,195 | 8,113 | 7,993 | 7,859 | 8,033 | 8,039 | 8,056 | 17 |
| Construction of buildings | 1,773.2 | 1,841.2 | 1,826.5 | 1,830.0 | 1,785.9 | 1,819.2 | 1,817.5 | 1,829.5 | 12.0 |
| Residential building construction | 928.2 | 947.9 | 935.9 | 936.5 | 934.3 | 934.8 | 932.2 | 936.1 | 3.9 |
| Nonresidential building construction | 845.0 | 893.3 | 890.6 | 893.5 | 851.6 | 884.4 | 885.3 | 893.4 | 8.1 |
| Heavy and civil engineering construction | 1,040.2 | 1,182.9 | 1,156.1 | 1,101.5 | 1,081.5 | 1,132.0 | 1,136.5 | 1,136.0 | -0.5 |
| Specialty trade contractors | 4,949.3 | 5,170.7 | 5,130.2 | 5,061.0 | 4,991.4 | 5,082.0 | 5,084.8 | 5,090.7 | 5.9 |

Footnotes

(1) Includes other industries, not shown separately.

(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.

(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

8/16/24, 9:05 AM — Employment Situation News Release - 2023 M13 Results

| | Not seasonally adjusted | | | | Seasonally adjusted | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Industry | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Change from: Nov.2023 - Dec.2023(P) |
| Residential specialty trade contractors | 2,301.4 | 2,402.5 | 2,380.1 | 2,342.8 | 2,324.8 | 2,364.4 | 2,361.5 | 2,363.1 | 1.6 |
| Nonresidential specialty trade contractors | 2,647.9 | 2,768.2 | 2,750.1 | 2,718.2 | 2,666.6 | 2,717.6 | 2,723.3 | 2,727.6 | 4.3 |
| Manufacturing | 12,988 | 12,962 | 12,990 | 13,013 | 12,974 | 12,954 | 12,980 | 12,986 | 6 |
| Durable goods | 8,107 | 8,107 | 8,149 | 8,170 | 8,096 | 8,110 | 8,144 | 8,152 | 8 |
| Wood product manufacturing | 429.2 | 420.2 | 420.5 | 418.7 | 429.3 | 420.5 | 420.5 | 418.4 | -2.1 |
| Nonmetallic mineral product manufacturing | 428.9 | 438.6 | 437.7 | 434.0 | 432.4 | 434.2 | 434.2 | 434.2 | 0.0 |
| Primary metal manufacturing | 368.6 | 368.4 | 365.6 | 369.5 | 366.5 | 369.3 | 367.3 | 367.9 | 0.6 |
| Fabricated metal product manufacturing | 1,448.6 | 1,455.1 | 1,458.3 | 1,463.6 | 1,449.4 | 1,456.3 | 1,458.6 | 1,461.5 | 2.9 |
| Machinery manufacturing | 1,124.6 | 1,127.8 | 1,132.0 | 1,134.9 | 1,123.0 | 1,132.0 | 1,132.7 | 1,134.3 | 1.6 |
| Computer and electronic product manufacturing | 1,102.4 | 1,095.7 | 1,096.7 | 1,101.6 | 1,100.7 | 1,097.5 | 1,098.8 | 1,100.4 | 1.6 |
| Computer and peripheral equipment manufacturing | 168.2 | 166.4 | 166.3 | 168.1 | 167.4 | 166.4 | 166.7 | 167.5 | 0.8 |
| Communications equipment manufacturing | 84.5 | 86.3 | 86.0 | 85.6 | 85.2 | 86.4 | 86.0 | 85.6 | -0.4 |
| Semiconductor and other electronic component manufacturing | 393.8 | 382.3 | 383.4 | 385.2 | 393.9 | 383.6 | 384.3 | 385.2 | 0.9 |
| Navigational, measuring, electromedical, and control instruments manufacturing | 423.4 | 427.8 | 428.2 | 429.6 | 422.0 | 428.3 | 429.0 | 429.6 | 0.6 |
| Manufacturing and reproducing magnetic and optical media and audio and video equipment manufacturing | 32.5 | 32.9 | 32.8 | 33.1 | 32.3 | 32.9 | 32.7 | 32.6 | -0.1 |
| Electrical equipment, appliance, and component manufacturing | 403.9 | 406.5 | 404.9 | 406.0 | 405.2 | 407.0 | 405.6 | 405.1 | -0.5 |
| Transportation equipment manufacturing(1) | 1,792.0 | 1,811.1 | 1,848.6 | 1,852.7 | 1,784.4 | 1,807.8 | 1,842.6 | 1,844.0 | 1.4 |
| Motor vehicles and parts(2) | 1,060.0 | 1,051.1 | 1,084.1 | 1,084.9 | 1,048.1 | 1,046.9 | 1,078.2 | 1,076.1 | -2.1 |
| Furniture and related product manufacturing | 374.7 | 355.2 | 356.3 | 356.9 | 373.2 | 356.9 | 356.0 | 355.3 | -0.7 |
| Miscellaneous manufacturing | 634.4 | 628.2 | 628.7 | 631.9 | 634.3 | 628.5 | 627.7 | 630.9 | 3.2 |
| Nondurable goods | 4,881 | 4,855 | 4,841 | 4,843 | 4,878 | 4,844 | 4,836 | 4,834 | -2 |
| Food manufacturing | 1,725.4 | 1,732.1 | 1,728.2 | 1,735.4 | 1,717.3 | 1,724.9 | 1,724.8 | 1,726.4 | 1.6 |
| Textile mills | 96.0 | 93.0 | 93.8 | 92.8 | 96.0 | 93.0 | 93.6 | 92.8 | -0.8 |
| Textile product mills | 102.3 | 97.4 | 97.3 | 97.2 | 102.6 | 97.8 | 97.2 | 96.7 | -0.5 |
| Apparel manufacturing | 92.6 | 90.5 | 90.1 | 89.6 | 91.9 | 90.6 | 90.0 | 89.9 | -0.1 |
| Paper manufacturing | 359.0 | 346.6 | 347.8 | 349.0 | 358.7 | 347.6 | 347.4 | 347.3 | -0.1 |
| Printing and related support activities | 385.5 | 374.5 | 373.0 | 370.5 | 381.5 | 373.4 | 370.4 | 368.2 | -2.2 |
| Petroleum and coal products manufacturing | 102.0 | 106.9 | 106.3 | 106.6 | 104.0 | 105.3 | 107.0 | 108.5 | 1.5 |
| Chemical manufacturing | 915.2 | 911.2 | 909.3 | 911.3 | 916.1 | 913.8 | 911.7 | 910.4 | -1.3 |
| Plastics and rubber products manufacturing | 755.4 | 736.7 | 734.6 | 733.0 | 754.7 | 737.4 | 733.3 | 730.7 | -2.6 |
| Beverage, tobacco, and leather and allied product manufacturing | 347.8 | 366.3 | 360.9 | 357.7 | 355.3 | 360.3 | 360.7 | 362.6 | 1.9 |
| Private service-providing | 111,369 | 112,863 | 113,247 | 113,284 | 110,743 | 112,298 | 112,404 | 112,546 | 142 |
| Trade, transportation, and utilities | 29,506 | 28,963 | 29,399 | 29,661 | 28,767 | 28,871 | 28,846 | 28,846 | 0 |
| Wholesale trade | 6,032.5 | 6,098.7 | 6,099.2 | 6,110.1 | 6,028.8 | 6,089.0 | 6,093.5 | 6,099.0 | 5.5 |
| Merchant wholesalers, durable goods | 3,331.1 | 3,370.7 | 3,374.8 | 3,383.0 | 3,330.0 | 3,370.7 | 3,373.9 | 3,377.1 | 3.2 |
| Merchant wholesalers, nondurable goods | 2,175.6 | 2,194.2 | 2,192.0 | 2,199.1 | 2,174.6 | 2,187.6 | 2,190.2 | 2,195.2 | 5.0 |
| Wholesale trade agents and brokers | 525.8 | 533.8 | 532.4 | 528.0 | 524.2 | 530.7 | 529.4 | 526.7 | -2.7 |

**Footnotes**

(1) Includes other industries, not shown separately.

(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.

(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Not seasonally adjusted | | | | Seasonally adjusted | | | | Change from: Nov.2023 - Dec.2023(P) |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | |
| Retail trade | 15,868.1 | 15,564.5 | 15,859.4 | 15,979.1 | 15,477.8 | 15,550.3 | 15,525.9 | 15,543.3 | 17.4 |
| Motor vehicle and parts dealers | 2,019.7 | 2,061.9 | 2,061.6 | 2,060.8 | 2,026.1 | 2,058.2 | 2,059.5 | 2,063.0 | 3.5 |
| Automobile dealers | 1,257.3 | 1,271.8 | 1,276.1 | 1,277.9 | 1,259.7 | 1,271.4 | 1,274.7 | 1,275.3 | 0.6 |
| Other motor vehicle dealers | 172.7 | 174.5 | 168.7 | 164.5 | 178.6 | 173.9 | 172.5 | 171.3 | -1.2 |
| Automotive parts, accessories, and tire retailers | 589.7 | 615.6 | 616.8 | 618.4 | 587.7 | 612.4 | 612.4 | 616.4 | 4.0 |
| Building material and garden equipment and supplies dealers | 1,386.9 | 1,349.3 | 1,344.6 | 1,369.1 | 1,416.4 | 1,375.8 | 1,376.7 | 1,384.2 | 7.5 |
| Food and beverage retailers | 3,259.9 | 3,249.9 | 3,283.9 | 3,283.5 | 3,231.9 | 3,251.2 | 3,251.2 | 3,247.7 | -3.5 |
| Furniture, home furnishings, electronics, and appliance retailers | 906.0 | 844.9 | 856.9 | 865.4 | 877.5 | 840.5 | 834.8 | 831.5 | -3.3 |
| Furniture and home furnishings retailers | 462.6 | 437.3 | 444.4 | 451.4 | 448.2 | 435.6 | 431.9 | 430.4 | -1.5 |
| Electronics and appliance retailers | 443.4 | 407.6 | 412.5 | 414.0 | 426.7 | 403.8 | 402.3 | 401.1 | -1.2 |
| General merchandise retailers | 3,269.2 | 3,192.1 | 3,309.7 | 3,351.5 | 3,068.4 | 3,173.8 | 3,152.1 | 3,153.7 | 1.6 |
| Department stores | 1,038.0 | 957.7 | 1,011.8 | 1,035.4 | 917.4 | 946.3 | 929.4 | 916.7 | -12.7 |
| Warehouse clubs, supercenters, and other general merchandise retailers | 2,231.2 | 2,234.4 | 2,297.9 | 2,316.1 | 2,151.0 | 2,227.5 | 2,222.8 | 2,237.0 | 14.2 |
| Health and personal care retailers | 1,139.7 | 1,105.7 | 1,119.5 | 1,122.5 | 1,114.1 | 1,099.0 | 1,095.4 | 1,091.1 | -4.3 |
| Gasoline stations and fuel dealers | 1,055.6 | 1,077.6 | 1,082.4 | 1,081.8 | 1,055.4 | 1,075.7 | 1,077.6 | 1,082.0 | 4.4 |
| Clothing, clothing accessories, shoe, and jewelry retailers | 1,239.9 | 1,139.8 | 1,213.7 | 1,251.5 | 1,153.0 | 1,141.1 | 1,142.6 | 1,154.4 | 11.8 |
| Sporting goods, hobby, musical instrument, book, and miscellaneous retailers | 1,591.2 | 1,543.3 | 1,587.1 | 1,593.0 | 1,535.0 | 1,535.0 | 1,536.0 | 1,535.7 | -0.3 |
| Transportation and warehousing | 7,049.5 | 6,736.8 | 6,877.1 | 7,008.8 | 6,704.9 | 6,669.8 | 6,664.8 | 6,642.2 | -22.6 |
| Air transportation | 520.5 | 554.8 | 556.0 | 559.9 | 523.6 | 554.2 | 558.2 | 561.9 | 3.7 |
| Rail transportation | 148.7 | 150.2 | 150.2 | 150.2 | 148.8 | 150.2 | 150.0 | 150.5 | 0.5 |
| Water transportation | 64.5 | 70.5 | 67.9 | 66.7 | 65.7 | 69.6 | 68.8 | 68.3 | -0.5 |
| Truck transportation | 1,611.0 | 1,592.4 | 1,592.9 | 1,588.4 | 1,607.1 | 1,581.5 | 1,583.0 | 1,586.3 | 3.3 |
| Transit and ground passenger transportation | 444.0 | 454.6 | 452.7 | 455.7 | 428.7 | 435.6 | 436.7 | 440.4 | 3.7 |
| Pipeline transportation | 48.1 | 47.8 | 48.0 | 47.6 | 47.9 | 47.9 | 47.9 | 47.6 | -0.3 |
| Scenic and sightseeing transportation | 27.5 | 37.4 | 33.7 | 33.7 | 31.2 | 36.4 | 37.0 | 38.1 | 1.1 |
| Support activities for transportation | 820.7 | 819.6 | 822.2 | 829.0 | 809.0 | 815.8 | 816.4 | 819.5 | 3.1 |
| Couriers and messengers | 1,383.6 | 1,114.4 | 1,244.4 | 1,374.9 | 1,109.5 | 1,112.9 | 1,110.7 | 1,078.4 | -32.3 |
| Warehousing and storage | 1,980.9 | 1,895.1 | 1,909.1 | 1,902.7 | 1,933.4 | 1,865.7 | 1,856.1 | 1,851.2 | -4.9 |
| Utilities | 555.5 | 562.5 | 563.2 | 563.0 | 555.3 | 562.2 | 562.2 | 561.8 | -0.4 |
| Information | 3,139 | 3,030 | 3,055 | 3,070 | 3,120 | 3,022 | 3,037 | 3,051 | 14 |
| Motion picture and sound recording industries | 470.1 | 439.3 | 466.9 | 474.1 | 461.7 | 432.6 | 451.9 | 463.3 | 11.4 |
| Publishing industries | 955.5 | 919.6 | 918.4 | 919.0 | 952.3 | 920.9 | 918.0 | 916.3 | -1.7 |
| Broadcasting and content providers | 359.9 | 350.3 | 348.9 | 350.1 | 359.6 | 349.5 | 347.3 | 348.0 | 0.7 |
| Telecommunications | 662.7 | 635.0 | 633.8 | 635.1 | 658.1 | 635.3 | 633.6 | 633.8 | 0.2 |
| Computing infrastructure providers, data processing, web hosting, and related services | 490.0 | 494.2 | 495.0 | 501.2 | 486.7 | 493.8 | 495.9 | 500.3 | 4.4 |
| Web search portals, libraries, archives, and other information services | 200.8 | 191.5 | 192.1 | 190.8 | 201.3 | 190.3 | 190.0 | 189.4 | -0.6 |
| Financial activities | 9,132 | 9,173 | 9,166 | 9,171 | 9,101 | 9,145 | 9,146 | 9,148 | 2 |
| Finance and insurance | 6,716.2 | 6,714.7 | 6,714.5 | 6,716.3 | 6,691.7 | 6,706.0 | 6,701.2 | 6,698.8 | -2.4 |

**Footnotes**

(1) Includes other industries, not shown separately.

(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.

(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Not seasonally adjusted | | | | Seasonally adjusted | | | | Change from: |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Nov.2023 - Dec.2023(P) |
| Monetary authorities-central bank | 21.8 | 21.9 | 21.9 | 21.9 | 21.8 | 21.9 | 21.9 | 21.9 | 0.0 |
| Credit intermediation and related activities | 2,684.9 | 2,636.1 | 2,630.4 | 2,627.2 | 2,681.3 | 2,638.4 | 2,630.5 | 2,624.3 | -6.2 |
| Depository credit intermediation(1) | 1,784.7 | 1,766.6 | 1,766.4 | 1,766.2 | 1,783.4 | 1,772.2 | 1,768.6 | 1,765.7 | -2.9 |
| Commercial banking | 1,376.9 | 1,354.5 | 1,354.0 | 1,353.0 | 1,376.6 | 1,359.7 | 1,356.7 | 1,353.9 | -2.8 |
| Nondepository credit intermediation | 579.5 | 560.8 | 557.4 | 556.3 | 577.6 | 558.1 | 555.5 | 553.5 | -2.0 |
| Activities related to credit intermediation | 320.7 | 308.7 | 306.6 | 304.7 | 320.3 | 308.1 | 306.4 | 305.1 | -1.3 |
| Securities, commodity contracts, funds, trusts, and other financial vehicles, investments, and related activities | 1,073.5 | 1,096.1 | 1,097.3 | 1,097.2 | 1,068.3 | 1,091.9 | 1,093.5 | 1,092.8 | -0.7 |
| Insurance carriers and related activities | 2,936.0 | 2,960.6 | 2,964.9 | 2,970.0 | 2,920.3 | 2,953.8 | 2,955.3 | 2,959.8 | 4.5 |
| Real estate and rental and leasing | 2,416.1 | 2,458.0 | 2,451.0 | 2,454.6 | 2,409.2 | 2,439.4 | 2,444.7 | 2,449.0 | 4.3 |
| Real estate | 1,855.6 | 1,871.1 | 1,868.3 | 1,872.8 | 1,844.9 | 1,854.5 | 1,857.4 | 1,859.6 | 2.2 |
| Rental and leasing services | 537.7 | 564.0 | 559.8 | 558.8 | 541.8 | 562.2 | 564.5 | 566.6 | 2.1 |
| Lessors of nonfinancial intangible assets (except copyrighted works) | 22.8 | 22.9 | 22.9 | 23.0 | 22.5 | 22.7 | 22.8 | 22.8 | 0.0 |
| Professional and business services | 22,907 | 23,222 | 23,182 | 23,012 | 22,814 | 22,952 | 22,933 | 22,946 | 13 |
| Professional, scientific, and technical services | 10,750.7 | 10,959.5 | 10,992.1 | 11,014.6 | 10,713.5 | 10,939.4 | 10,955.5 | 10,980.8 | 25.3 |
| Legal services | 1,190.0 | 1,187.4 | 1,192.3 | 1,200.4 | 1,180.4 | 1,183.2 | 1,186.0 | 1,190.5 | 4.5 |
| Accounting, tax preparation, bookkeeping, and payroll services | 1,130.5 | 1,118.2 | 1,135.1 | 1,159.0 | 1,131.7 | 1,158.0 | 1,157.7 | 1,162.1 | 4.4 |
| Architectural, engineering, and related services | 1,645.5 | 1,697.5 | 1,695.8 | 1,689.7 | 1,644.7 | 1,686.7 | 1,690.3 | 1,690.6 | 0.3 |
| Specialized design services | 159.3 | 162.6 | 162.2 | 161.2 | 157.2 | 161.4 | 160.3 | 159.6 | -0.7 |
| Computer systems design and related services | 2,492.2 | 2,529.9 | 2,536.8 | 2,533.2 | 2,493.4 | 2,519.4 | 2,523.0 | 2,531.5 | 8.5 |
| Management, scientific, and technical consulting services | 1,850.9 | 1,909.4 | 1,910.9 | 1,910.9 | 1,832.2 | 1,888.4 | 1,891.2 | 1,896.0 | 4.8 |
| Scientific research and development services | 914.5 | 946.5 | 951.6 | 953.1 | 913.9 | 946.6 | 951.7 | 953.9 | 2.2 |
| Advertising, public relations, and related services | 493.9 | 506.3 | 505.2 | 507.5 | 493.3 | 503.5 | 502.7 | 504.6 | 1.9 |
| Other professional, scientific, and technical services | 873.9 | 901.7 | 902.2 | 899.6 | 866.7 | 893.1 | 892.5 | 892.0 | -0.5 |
| Management of companies and enterprises | 2,523.7 | 2,525.3 | 2,521.6 | 2,534.4 | 2,516.3 | 2,526.1 | 2,521.6 | 2,527.7 | 6.1 |
| Administrative and support and waste management and remediation services | 9,632.1 | 9,736.7 | 9,668.7 | 9,463.1 | 9,584.0 | 9,486.8 | 9,455.6 | 9,437.3 | -18.3 |
| Administrative and support services | 9,147.9 | 9,236.4 | 9,166.9 | 8,961.0 | 9,101.6 | 8,989.6 | 8,955.9 | 8,935.0 | -20.9 |
| Office administrative services | 610.0 | 638.3 | 639.2 | 636.4 | 612.8 | 633.4 | 636.2 | 638.5 | 2.3 |
| Facilities support services | 158.7 | 167.0 | 166.5 | 166.0 | 158.4 | 165.4 | 165.7 | 165.7 | 0.0 |
| Employment services(1) | 3,945.7 | 3,814.0 | 3,799.8 | 3,691.5 | 3,839.5 | 3,652.0 | 3,621.9 | 3,592.6 | -29.3 |
| Temporary help services | 3,147.1 | 3,028.4 | 3,011.9 | 2,916.7 | 3,037.9 | 2,886.4 | 2,864.3 | 2,831.0 | -33.3 |
| Business support services | 784.8 | 745.0 | 748.5 | 747.0 | 766.2 | 739.0 | 732.2 | 728.8 | -3.4 |
| Travel arrangement and reservation services | 179.2 | 189.0 | 190.0 | 189.2 | 180.9 | 187.7 | 190.4 | 191.2 | 0.8 |
| Investigation and security services | 979.2 | 988.6 | 994.1 | 988.7 | 970.9 | 984.1 | 986.8 | 985.7 | -1.1 |
| Services to buildings and dwellings | 2,151.1 | 2,341.4 | 2,281.5 | 2,196.6 | 2,230.2 | 2,281.9 | 2,277.4 | 2,286.8 | 9.4 |
| Other support services | 339.2 | 353.1 | 347.3 | 345.6 | 342.8 | 346.2 | 345.4 | 345.6 | 0.2 |

**Footnotes**

(1) Includes other industries, not shown separately.
(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.
(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Not seasonally adjusted | | | | Seasonally adjusted | | | | Change from: Nov.2023 - Dec.2023(P) |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | |
| Waste management and remediation services | 484.2 | 500.3 | 501.8 | 502.1 | 482.4 | 497.2 | 499.7 | 502.3 | 2.6 |
| Private education and health services | 24,960 | 25,894 | 26,070 | 26,043 | 24,827 | 25,695 | 25,804 | 25,878 | 74 |
| Private educational services | 3,920.4 | 4,098.5 | 4,138.5 | 4,070.4 | 3,856.3 | 3,959.9 | 3,972.9 | 3,987.4 | 14.5 |
| Health care and social assistance | 21,039.2 | 21,795.9 | 21,931.1 | 21,972.6 | 20,970.2 | 21,735.2 | 21,831.2 | 21,890.1 | 58.9 |
| Health care(3) | 16,660.1 | 17,177.9 | 17,285.0 | 17,323.0 | 16,591.3 | 17,129.3 | 17,207.6 | 17,245.3 | 37.7 |
| Ambulatory health care services | 8,314.9 | 8,562.0 | 8,619.5 | 8,639.9 | 8,272.8 | 8,533.8 | 8,573.4 | 8,592.6 | 19.2 |
| Offices of physicians | 2,877.4 | 2,956.3 | 2,979.6 | 2,989.1 | 2,855.9 | 2,944.6 | 2,960.6 | 2,966.0 | 5.4 |
| Offices of dentists | 1,031.4 | 1,036.7 | 1,043.0 | 1,039.9 | 1,031.2 | 1,036.2 | 1,040.3 | 1,036.4 | -3.9 |
| Offices of other health practitioners | 1,114.6 | 1,160.6 | 1,166.5 | 1,170.9 | 1,110.2 | 1,155.0 | 1,159.9 | 1,165.9 | 6.0 |
| Outpatient care centers | 1,058.2 | 1,073.6 | 1,082.6 | 1,089.7 | 1,053.0 | 1,073.9 | 1,079.9 | 1,083.6 | 4.4 |
| Medical and diagnostic laboratories | 321.1 | 325.0 | 328.0 | 328.2 | 320.4 | 324.7 | 327.5 | 327.6 | 0.1 |
| Home health care services | 1,575.7 | 1,664.9 | 1,674.4 | 1,676.6 | 1,567.7 | 1,655.0 | 1,661.2 | 1,668.2 | 7.0 |
| Other ambulatory health care services | 336.5 | 344.9 | 345.4 | 345.5 | 334.4 | 344.5 | 344.7 | 344.9 | 0.2 |
| Hospitals | 5,262.8 | 5,406.8 | 5,432.2 | 5,444.0 | 5,245.3 | 5,393.2 | 5,413.2 | 5,428.5 | 15.3 |
| Nursing and residential care facilities | 3,082.4 | 3,209.1 | 3,233.3 | 3,239.1 | 3,073.2 | 3,202.3 | 3,221.0 | 3,224.2 | 3.2 |
| Skilled nursing care facilities | 1,382.1 | 1,439.9 | 1,447.4 | 1,452.5 | 1,375.9 | 1,433.7 | 1,440.4 | 1,445.1 | 4.7 |
| Residential intellectual and developmental disability, mental health, and substance abuse facilities | 623.5 | 645.6 | 650.2 | 651.3 | 621.7 | 644.8 | 649.1 | 649.9 | 0.8 |
| Continuing care retirement communities and assisted living facilities for the elderly | 923.0 | 966.0 | 978.2 | 977.6 | 921.2 | 966.4 | 974.6 | 972.4 | -2.2 |
| Other residential care facilities | 153.8 | 157.6 | 157.5 | 157.7 | 154.4 | 157.4 | 156.9 | 156.8 | -0.1 |
| Social assistance | 4,379.1 | 4,618.0 | 4,646.1 | 4,649.6 | 4,378.9 | 4,605.9 | 4,623.6 | 4,644.8 | 21.2 |
| Individual and family services | 2,912.0 | 3,094.5 | 3,110.4 | 3,116.9 | 2,913.6 | 3,087.2 | 3,098.0 | 3,115.1 | 17.1 |
| Community food and housing, and emergency and other relief services | 211.1 | 220.4 | 223.2 | 223.9 | 208.9 | 221.0 | 221.6 | 221.1 | -0.5 |
| Vocational rehabilitation services | 274.1 | 284.8 | 286.3 | 285.2 | 275.1 | 283.7 | 284.9 | 285.0 | 0.1 |
| Child care services | 981.9 | 1,018.3 | 1,026.2 | 1,023.6 | 981.3 | 1,014.0 | 1,019.1 | 1,023.6 | 4.5 |
| Leisure and hospitality | 15,947 | 16,693 | 16,482 | 16,450 | 16,316 | 16,730 | 16,742 | 16,782 | 40 |
| Arts, entertainment, and recreation | 2,241.7 | 2,477.2 | 2,369.1 | 2,372.7 | 2,397.8 | 2,503.8 | 2,501.6 | 2,513.7 | 12.1 |
| Performing arts, spectator sports, and related industries | 487.5 | 583.4 | 556.5 | 557.1 | 513.4 | 571.3 | 568.8 | 575.3 | 6.5 |
| Museums, historical sites, and similar institutions | 161.8 | 176.3 | 173.1 | 171.1 | 164.8 | 174.7 | 175.6 | 175.9 | 0.3 |
| Amusement, gambling, and recreation industries | 1,592.4 | 1,717.5 | 1,639.5 | 1,644.5 | 1,719.6 | 1,757.8 | 1,757.2 | 1,762.5 | 5.3 |
| Accommodation and food services | 13,705.5 | 14,215.8 | 14,112.6 | 14,077.2 | 13,918.1 | 14,225.9 | 14,240.2 | 14,268.6 | 28.4 |
| Accommodation | 1,770.5 | 1,878.0 | 1,835.0 | 1,828.4 | 1,846.2 | 1,891.0 | 1,892.0 | 1,898.3 | 6.3 |
| Food services and drinking places | 11,935.0 | 12,337.8 | 12,277.6 | 12,248.8 | 12,071.9 | 12,334.9 | 12,348.2 | 12,370.3 | 22.1 |
| Other services | 5,778 | 5,888 | 5,893 | 5,877 | 5,798 | 5,883 | 5,896 | 5,895 | -1 |
| Repair and maintenance | 1,410.8 | 1,465.8 | 1,462.5 | 1,459.1 | 1,417.7 | 1,459.3 | 1,462.0 | 1,465.0 | 3.0 |
| Personal and laundry services | 1,520.9 | 1,552.2 | 1,552.2 | 1,545.6 | 1,521.6 | 1,548.0 | 1,550.0 | 1,545.2 | -4.8 |
| Religious, grantmaking, civic, professional, and similar organizations | 2,846.4 | 2,869.8 | 2,878.5 | 2,872.2 | 2,859.1 | 2,876.1 | 2,884.3 | 2,885.1 | 0.8 |
| Government | 22,598 | 23,267 | 23,402 | 23,298 | 22,331 | 22,914 | 22,951 | 23,003 | 52 |

**Footnotes**

(1) Includes other industries, not shown separately.

(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.

(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Not seasonally adjusted | | | | Seasonally adjusted | | | | Change from: Nov.2023 - Dec.2023(P) |
|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | |
| **Federal** | 2,890 | 2,962 | 2,970 | 2,972 | 2,874 | 2,956 | 2,958 | 2,965 | 7 |
| Federal, except U.S. Postal Service | 2,277.9 | 2,356.3 | 2,363.0 | 2,358.4 | 2,278.8 | 2,348.9 | 2,355.3 | 2,362.4 | 7.1 |
| U.S. Postal Service | 611.7 | 605.4 | 607.0 | 613.3 | 595.5 | 606.6 | 602.9 | 602.4 | -0.5 |
| **State government** | 5,167 | 5,481 | 5,508 | 5,433 | 5,087 | 5,314 | 5,318 | 5,326 | 8 |
| State government education | 2,511.3 | 2,743.0 | 2,771.2 | 2,693.7 | 2,421.5 | 2,576.4 | 2,577.3 | 2,579.0 | 1.7 |
| State government, excluding education | 2,655.5 | 2,737.8 | 2,736.5 | 2,738.8 | 2,665.8 | 2,738.0 | 2,740.4 | 2,746.8 | 6.4 |
| **Local government** | 14,541 | 14,824 | 14,924 | 14,893 | 14,370 | 14,644 | 14,675 | 14,712 | 37 |
| Local government education | 8,114.9 | 8,208.6 | 8,299.3 | 8,288.0 | 7,868.1 | 7,993.9 | 8,008.3 | 8,027.5 | 19.2 |
| Local government, excluding education | 6,426.5 | 6,615.1 | 6,624.7 | 6,604.6 | 6,501.6 | 6,650.3 | 6,666.5 | 6,684.2 | 17.7 |

Footnotes
(1) Includes other industries, not shown separately.
(2) Includes motor vehicle manufacturing, motor vehicle body and trailer manufacturing, and motor vehicle parts manufacturing.
(3) Includes ambulatory health care services, hospitals, and nursing and residential care facilities.
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-2. Average weekly hours and overtime of all employees on private nonfarm payrolls by industry sector, seasonally adjusted**

| Industry | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|
| **AVERAGE WEEKLY HOURS** | | | | |
| Total private | 34.4 | 34.3 | 34.4 | 34.3 |
| Goods-producing | 39.7 | 39.8 | 39.8 | 39.7 |
| Mining and logging | 45.5 | 44.8 | 45.1 | 45.5 |
| Construction | 38.6 | 39.2 | 39.3 | 39.1 |
| Manufacturing | 40.1 | 40.0 | 39.9 | 39.8 |
| Durable goods | 40.6 | 40.5 | 40.3 | 40.2 |
| Nondurable goods | 39.4 | 39.2 | 39.3 | 39.0 |
| Private service-providing | 33.3 | 33.3 | 33.3 | 33.3 |
| Trade, transportation, and utilities | 34.1 | 33.9 | 34.0 | 33.9 |
| Wholesale trade | 38.7 | 38.6 | 38.8 | 38.9 |
| Retail trade | 30.2 | 29.8 | 30.1 | 29.7 |
| Transportation and warehousing | 38.4 | 38.3 | 38.1 | 38.4 |
| Utilities | 41.8 | 42.0 | 41.8 | 42.0 |
| Information | 36.5 | 36.2 | 36.1 | 36.7 |
| Financial activities | 37.4 | 37.4 | 37.4 | 37.4 |
| Professional and business services | 36.4 | 36.4 | 36.5 | 36.4 |
| Private education and health services | 33.3 | 33.3 | 33.2 | 33.3 |
| Leisure and hospitality | 25.3 | 25.5 | 25.5 | 25.6 |
| Other services | 32.3 | 32.3 | 32.3 | 32.3 |
| **AVERAGE OVERTIME HOURS** | | | | |
| Manufacturing | 2.9 | 2.9 | 2.9 | 2.9 |
| Durable goods | 3.1 | 3.0 | 3.0 | 3.0 |
| Nondurable goods | 2.7 | 2.7 | 2.6 | 2.6 |

Footnotes
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-3. Average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted**

| Industry | Average hourly earnings | | | | Average weekly earnings | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
| **Total private** | $32.92 | $34.00 | $34.12 | $34.27 | $1,132.45 | $1,166.20 | $1,173.73 | $1,175.46 |
| **Goods-producing** | 33.11 | 34.58 | 34.78 | 34.90 | 1,314.47 | 1,376.28 | 1,384.24 | 1,385.53 |
| **Mining and logging** | 36.64 | 38.60 | 38.60 | 38.81 | 1,667.12 | 1,729.28 | 1,740.86 | 1,765.86 |
| **Construction** | 35.60 | 37.00 | 37.20 | 37.24 | 1,374.16 | 1,450.40 | 1,461.96 | 1,456.08 |
| **Manufacturing** | 31.47 | 32.89 | 33.09 | 33.25 | 1,261.95 | 1,315.60 | 1,320.29 | 1,323.35 |
| **Durable goods** | 32.96 | 34.53 | 34.74 | 34.97 | 1,338.18 | 1,398.47 | 1,400.02 | 1,405.79 |
| **Nondurable goods** | 28.92 | 30.06 | 30.24 | 30.25 | 1,139.45 | 1,178.35 | 1,188.43 | 1,179.75 |
| **Private service-providing** | 32.88 | 33.86 | 33.97 | 34.13 | 1,094.90 | 1,127.54 | 1,131.20 | 1,136.53 |
| **Trade, transportation, and utilities** | 28.23 | 29.23 | 29.32 | 29.49 | 962.64 | 990.90 | 996.88 | 999.71 |
| **Wholesale trade** | 35.87 | 36.95 | 37.09 | 37.13 | 1,388.17 | 1,426.27 | 1,439.09 | 1,444.36 |
| **Retail trade** | 23.45 | 24.05 | 24.13 | 24.33 | 708.19 | 716.69 | 726.31 | 722.60 |
| **Transportation and warehousing** | 28.17 | 29.60 | 29.67 | 29.84 | 1,081.73 | 1,133.68 | 1,130.43 | 1,145.86 |
| **Utilities** | 48.44 | 50.13 | 50.37 | 49.78 | 2,024.79 | 2,105.46 | 2,105.47 | 2,090.76 |
| **Information** | 47.74 | 48.62 | 49.03 | 49.44 | 1,742.51 | 1,760.04 | 1,769.98 | 1,814.45 |
| **Financial activities** | 42.42 | 44.20 | 44.38 | 44.54 | 1,586.51 | 1,653.08 | 1,659.81 | 1,665.80 |
| **Professional and business services** | 39.53 | 40.89 | 41.08 | 41.29 | 1,438.89 | 1,488.40 | 1,499.42 | 1,502.96 |
| **Private education and health services** | 32.58 | 33.26 | 33.28 | 33.38 | 1,084.91 | 1,107.56 | 1,104.90 | 1,111.55 |
| **Leisure and hospitality** | 20.78 | 21.41 | 21.52 | 21.60 | 525.73 | 545.96 | 548.76 | 552.96 |
| **Other services** | 29.37 | 30.29 | 30.33 | 30.51 | 948.65 | 978.37 | 979.66 | 985.47 |

**Footnotes**
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-4. Indexes of aggregate weekly hours and payrolls for all employees on private nonfarm payrolls by industry sector, seasonally adjusted**
[2007=100]

| Industry | Index of aggregate weekly hours(1) | | | | | Index of aggregate weekly payrolls(2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) |
| **Total private** | 114.2 | 115.3 | 115.8 | 115.6 | -0.2 | 179.7 | 187.5 | 188.9 | 189.4 | 0.3 |
| **Goods-producing** | 97.1 | 98.1 | 98.2 | 98.1 | -0.1 | 145.3 | 153.3 | 154.4 | 154.7 | 0.2 |
| **Mining and logging** | 89.8 | 90.7 | 91.0 | 91.6 | 0.7 | 132.1 | 140.5 | 141.0 | 142.8 | 1.3 |
| **Construction** | 104.6 | 108.5 | 108.9 | 108.6 | -0.3 | 161.8 | 174.5 | 176.0 | 175.7 | -0.2 |
| **Manufacturing** | 93.6 | 93.2 | 93.2 | 93.0 | -0.2 | 137.0 | 142.6 | 143.4 | 143.8 | 0.3 |
| **Durable goods** | 92.5 | 92.5 | 92.4 | 92.3 | -0.1 | 135.5 | 141.8 | 142.6 | 143.3 | 0.5 |
| **Nondurable goods** | 95.9 | 94.8 | 94.9 | 94.1 | -0.8 | 140.8 | 144.6 | 145.6 | 144.4 | -0.8 |
| **Private service-providing** | 118.7 | 120.4 | 120.5 | 120.7 | 0.2 | 189.7 | 198.1 | 199.0 | 200.2 | 0.6 |
| **Trade, transportation, and utilities** | 107.2 | 106.9 | 107.2 | 106.8 | -0.4 | 163.2 | 168.6 | 169.4 | 169.9 | 0.3 |
| **Wholesale trade** | 102.9 | 103.7 | 104.3 | 104.7 | 0.4 | 154.4 | 160.2 | 161.8 | 162.5 | 0.4 |
| **Retail trade** | 95.1 | 94.3 | 95.1 | 94.0 | -1.2 | 147.5 | 150.0 | 151.8 | 151.2 | -0.4 |
| **Transportation and warehousing** | 147.9 | 146.8 | 145.9 | 146.6 | 0.5 | 212.0 | 221.0 | 220.2 | 222.5 | 1.0 |

**Footnotes**
(1) The indexes of aggregate weekly hours are calculated by dividing the current month's estimates of aggregate hours by the corresponding 2007 annual average aggregate hours. Aggregate hours estimates are the product of estimates of average weekly hours and employment.
(2) The indexes of aggregate weekly payrolls are calculated by dividing the current month's estimates of aggregate weekly payrolls by the corresponding 2007 annual average aggregate weekly payrolls. Aggregate payrolls estimates are the product of estimates of average hourly earnings, average weekly hours, and employment.
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Index of aggregate weekly hours(1) | | | | | Index of aggregate weekly payrolls(2) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) |
| Utilities | 100.4 | 102.2 | 101.7 | 102.1 | 0.4 | 160.7 | 169.2 | 169.2 | 167.9 | -0.8 |
| Information | 104.0 | 99.9 | 100.1 | 102.3 | 2.2 | 176.8 | 173.0 | 174.8 | 180.0 | 3.0 |
| Financial activities | 111.5 | 112.0 | 112.1 | 112.1 | 0.0 | 184.5 | 193.2 | 194.0 | 194.7 | 0.4 |
| Professional and business services | 129.9 | 130.7 | 131.0 | 130.7 | -0.2 | 208.0 | 216.5 | 217.9 | 218.6 | 0.3 |
| Private education and health services | 135.0 | 139.7 | 139.9 | 140.7 | 0.6 | 211.6 | 223.6 | 224.0 | 226.0 | 0.9 |
| Leisure and hospitality | 117.8 | 121.7 | 121.8 | 122.6 | 0.7 | 197.5 | 210.3 | 211.5 | 213.6 | 1.0 |
| Other services | 108.0 | 109.6 | 109.8 | 109.8 | 0.0 | 173.8 | 181.9 | 182.5 | 183.6 | 0.6 |

Footnotes

(1) The indexes of aggregate weekly hours are calculated by dividing the current month's estimates of aggregate hours by the corresponding 2007 annual average aggregate hours. Aggregate hours estimates are the product of estimates of average weekly hours and employment.

(2) The indexes of aggregate weekly payrolls are calculated by dividing the current month's estimates of aggregate weekly payrolls by the corresponding 2007 annual average aggregate weekly payrolls. Aggregate payrolls estimates are the product of estimates of average hourly earnings, average weekly hours, and employment.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-5. Employment of women on nonfarm payrolls by industry sector, seasonally adjusted**

| Industry | Women employees (in thousands) | | | | Percent of all employees | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
| Total nonfarm | 76,965 | 78,188 | 78,282 | 78,412 | 49.8 | 49.9 | 49.9 | 49.9 |
| Total private | 63,943 | 64,839 | 64,904 | 65,002 | 48.4 | 48.4 | 48.4 | 48.4 |
| Goods-producing | 4,965 | 4,993 | 5,002 | 5,005 | 23.1 | 23.1 | 23.1 | 23.1 |
| Mining and logging | 81 | 84 | 85 | 84 | 12.9 | 13.0 | 13.2 | 13.1 |
| Construction | 1,111 | 1,145 | 1,149 | 1,154 | 14.1 | 14.3 | 14.3 | 14.3 |
| Manufacturing | 3,773 | 3,764 | 3,768 | 3,767 | 29.1 | 29.1 | 29.0 | 29.0 |
| Durable goods | 2,018 | 2,021 | 2,026 | 2,035 | 24.9 | 24.9 | 24.9 | 25.0 |
| Nondurable goods | 1,755 | 1,743 | 1,742 | 1,732 | 36.0 | 36.0 | 36.0 | 35.8 |
| Private service-providing | 58,978 | 59,846 | 59,902 | 59,997 | 53.3 | 53.3 | 53.3 | 53.3 |
| Trade, transportation, and utilities | 11,327 | 11,283 | 11,269 | 11,287 | 39.4 | 39.1 | 39.1 | 39.1 |
| Wholesale trade | 1,845.6 | 1,866.8 | 1,859.3 | 1,859.2 | 30.6 | 30.7 | 30.5 | 30.5 |
| Retail trade | 7,514.4 | 7,487.5 | 7,483.5 | 7,490.7 | 48.5 | 48.2 | 48.2 | 48.2 |
| Transportation and warehousing | 1,823.3 | 1,779.9 | 1,776.5 | 1,787.8 | 27.2 | 26.7 | 26.7 | 26.9 |
| Utilities | 144.0 | 148.5 | 149.2 | 149.3 | 25.9 | 26.4 | 26.5 | 26.6 |
| Information | 1,265 | 1,229 | 1,229 | 1,232 | 40.5 | 40.7 | 40.5 | 40.4 |
| Financial activities | 5,071 | 5,096 | 5,099 | 5,098 | 55.7 | 55.7 | 55.8 | 55.7 |
| Professional and business services | 10,502 | 10,568 | 10,544 | 10,537 | 46.0 | 46.0 | 46.0 | 45.9 |
| Private education and health services | 19,106 | 19,747 | 19,815 | 19,873 | 77.0 | 76.9 | 76.8 | 76.8 |
| Leisure and hospitality | 8,599 | 8,768 | 8,784 | 8,800 | 52.7 | 52.4 | 52.5 | 52.4 |
| Other services | 3,108 | 3,155 | 3,162 | 3,170 | 53.6 | 53.6 | 53.6 | 53.8 |
| Government | 13,022 | 13,349 | 13,378 | 13,410 | 58.3 | 58.3 | 58.3 | 58.3 |

Footnotes
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-6. Employment of production and nonsupervisory employees on private nonfarm payrolls by industry sector, seasonally adjusted(1)**
[In thousands]

| Industry | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|
| **Total private** | 107,475 | 108,968 | 109,134 | 109,338 |
| Goods-producing | 15,393 | 15,442 | 15,478 | 15,494 |
|    Mining and logging | 471 | 497 | 497 | 500 |
|    Construction | 5,798 | 5,880 | 5,888 | 5,900 |
|    Manufacturing | 9,124 | 9,065 | 9,093 | 9,094 |
|      Durable goods | 5,624 | 5,571 | 5,601 | 5,601 |
|      Nondurable goods | 3,500 | 3,494 | 3,492 | 3,493 |
| Private service-providing | 92,082 | 93,526 | 93,656 | 93,844 |
|    Trade, transportation, and utilities | 24,212 | 24,353 | 24,321 | 24,352 |
|      Wholesale trade | 4,793.8 | 4,803.1 | 4,801.6 | 4,797.6 |
|      Retail trade | 13,148.2 | 13,265.8 | 13,244.7 | 13,267.9 |
|      Transportation and warehousing | 5,828.6 | 5,836.0 | 5,826.6 | 5,838.7 |
|      Utilities | 441.4 | 448.5 | 448.0 | 448.1 |
|    Information | 2,484 | 2,419 | 2,426 | 2,438 |
|    Financial activities | 6,845 | 6,867 | 6,874 | 6,877 |
|    Professional and business services | 18,140 | 18,131 | 18,120 | 18,116 |
|    Private education and health services | 21,594 | 22,363 | 22,457 | 22,548 |
|    Leisure and hospitality | 14,088 | 14,594 | 14,650 | 14,712 |
|    Other services | 4,719 | 4,799 | 4,808 | 4,801 |

Footnotes

(1) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries. These groups account for approximately four-fifths of the total employment on private nonfarm payrolls.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**

**Table B-7. Average weekly hours and overtime of production and nonsupervisory employees on private nonfarm payrolls by industry sector, seasonally adjusted(1)**

| Industry | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|
| **AVERAGE WEEKLY HOURS** | | | | |
| Total private | 33.8 | 33.8 | 33.8 | 33.7 |
|    Goods-producing | 40.3 | 40.6 | 40.6 | 40.4 |
|      Mining and logging | 46.7 | 47.8 | 48.2 | 48.0 |
|      Construction | 39.3 | 39.9 | 40.0 | 39.7 |
|      Manufacturing | 40.6 | 40.7 | 40.5 | 40.4 |
|        Durable goods | 40.9 | 40.9 | 40.7 | 40.6 |
|        Nondurable goods | 40.0 | 40.3 | 40.2 | 40.1 |
|    Private service-providing | 32.8 | 32.6 | 32.6 | 32.6 |
|      Trade, transportation, and utilities | 34.0 | 33.9 | 34.0 | 33.8 |
|        Wholesale trade | 38.7 | 38.5 | 38.7 | 38.6 |
|        Retail trade | 30.2 | 30.3 | 30.4 | 30.1 |
|        Transportation and warehousing | 38.0 | 37.8 | 37.7 | 37.8 |
|        Utilities | 42.7 | 42.1 | 42.0 | 41.9 |
|      Information | 36.0 | 36.0 | 35.7 | 36.4 |
|      Financial activities | 37.1 | 36.6 | 36.8 | 36.7 |
|      Professional and business services | 36.3 | 36.2 | 36.3 | 36.2 |
|      Private education and health services | 32.5 | 32.5 | 32.4 | 32.5 |
|      Leisure and hospitality | 24.4 | 24.3 | 24.2 | 24.3 |

Footnotes

(1) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries. These groups account for approximately four-fifths of the total employment on private nonfarm payrolls.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

| Industry | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
|---|---|---|---|---|
| Other services | 31.3 | 31.2 | 31.2 | 31.3 |
| **AVERAGE OVERTIME HOURS** | | | | |
| Manufacturing | 3.6 | 3.5 | 3.4 | 3.5 |
| Durable goods | 3.7 | 3.6 | 3.4 | 3.5 |
| Nondurable goods | 3.4 | 3.3 | 3.4 | 3.4 |

**Footnotes**
(1) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries. These groups account for approximately four-fifths of the total employment on private nonfarm payrolls.
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-8. Average hourly and weekly earnings of production and nonsupervisory employees on private nonfarm payrolls by industry sector, seasonally adjusted**(1)

| Industry | Average hourly earnings | | | | Average weekly earnings | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) |
| **Total private** | $28.21 | $29.19 | $29.32 | $29.42 | $953.50 | $986.62 | $991.02 | $991.45 |
| Goods-producing | 28.72 | 29.98 | 30.23 | 30.38 | 1,157.42 | 1,217.19 | 1,227.34 | 1,227.35 |
| Mining and logging | 33.41 | 34.82 | 34.91 | 35.31 | 1,560.25 | 1,664.40 | 1,682.66 | 1,694.88 |
| Construction | 33.22 | 34.64 | 34.94 | 34.92 | 1,305.55 | 1,382.14 | 1,397.60 | 1,386.32 |
| Manufacturing | 25.67 | 26.70 | 26.91 | 27.16 | 1,042.20 | 1,086.69 | 1,089.86 | 1,097.26 |
| Durable goods | 26.85 | 27.90 | 28.09 | 28.49 | 1,098.17 | 1,141.11 | 1,143.26 | 1,156.69 |
| Nondurable goods | 23.73 | 24.76 | 24.97 | 24.99 | 949.20 | 997.83 | 1,003.79 | 1,002.10 |
| Private service-providing | 28.10 | 29.03 | 29.14 | 29.22 | 921.68 | 946.38 | 949.96 | 952.57 |
| Trade, transportation, and utilities | 24.53 | 25.44 | 25.50 | 25.62 | 834.02 | 862.42 | 867.00 | 865.96 |
| Wholesale trade | 29.93 | 30.61 | 30.71 | 30.81 | 1,158.29 | 1,178.49 | 1,188.48 | 1,189.27 |
| Retail trade | 20.09 | 20.64 | 20.72 | 20.83 | 606.72 | 625.39 | 629.89 | 626.98 |
| Transportation and warehousing | 26.38 | 28.18 | 28.19 | 28.25 | 1,002.44 | 1,065.20 | 1,062.76 | 1,067.85 |
| Utilities | 43.38 | 44.84 | 45.02 | 45.28 | 1,852.33 | 1,887.76 | 1,890.84 | 1,897.23 |
| Information | 38.81 | 39.96 | 40.29 | 40.37 | 1,397.16 | 1,438.56 | 1,438.35 | 1,469.47 |
| Financial activities | 32.91 | 34.50 | 34.77 | 34.70 | 1,220.96 | 1,262.70 | 1,279.54 | 1,273.49 |
| Professional and business services | 33.31 | 34.53 | 34.69 | 34.83 | 1,209.15 | 1,249.99 | 1,259.25 | 1,260.85 |
| Private education and health services | 29.65 | 30.42 | 30.41 | 30.49 | 963.63 | 988.65 | 985.28 | 990.93 |
| Leisure and hospitality | 18.39 | 19.04 | 19.23 | 19.24 | 448.72 | 462.67 | 465.37 | 467.53 |
| Other services | 25.30 | 26.07 | 26.13 | 26.26 | 791.89 | 813.38 | 815.26 | 821.94 |

**Footnotes**
(1) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries. These groups account for approximately four-fifths of the total employment on private nonfarm payrolls.
(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**ESTABLISHMENT DATA**
**Table B-9. Indexes of aggregate weekly hours and payrolls for production and nonsupervisory employees on private nonfarm payrolls by industry sector, seasonally adjusted**(1)
[2002=100]

| Industry | Index of aggregate weekly hours(2) | | | | | Index of aggregate weekly payrolls(3) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) |

| Industry | Index of aggregate weekly hours(2) | | | | | Index of aggregate weekly payrolls(3) | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) | Dec. 2022 | Oct. 2023 | Nov. 2023(P) | Dec. 2023(P) | Percent change from: Nov. 2023 - Dec. 2023(P) |
| Total private | 121.1 | 122.7 | 122.9 | 122.8 | -0.1 | 228.2 | 239.4 | 240.9 | 241.4 | 0.2 |
| Goods-producing | 94.8 | 95.8 | 96.0 | 95.7 | -0.3 | 166.7 | 175.9 | 177.7 | 177.9 | 0.1 |
| Mining and logging | 116.9 | 126.2 | 127.3 | 127.5 | 0.2 | 227.1 | 255.7 | 258.5 | 261.9 | 1.3 |
| Construction | 114.1 | 117.5 | 117.9 | 117.3 | -0.5 | 204.7 | 219.7 | 222.5 | 221.1 | -0.6 |
| Manufacturing | 85.0 | 84.7 | 84.5 | 84.3 | -0.2 | 142.8 | 147.9 | 148.8 | 149.8 | 0.7 |
| Durable goods | 86.4 | 85.6 | 85.6 | 85.4 | -0.2 | 144.8 | 149.1 | 150.2 | 151.9 | 1.1 |
| Nondurable goods | 82.5 | 83.0 | 82.7 | 82.5 | -0.2 | 138.3 | 145.2 | 145.9 | 145.7 | -0.1 |
| Private service-providing | 128.7 | 129.9 | 130.1 | 130.3 | 0.2 | 248.0 | 258.7 | 260.0 | 261.2 | 0.5 |
| Trade, transportation, and utilities | 115.2 | 115.6 | 115.8 | 115.2 | -0.5 | 202.0 | 210.1 | 210.9 | 211.0 | 0.0 |
| Wholesale trade | 110.1 | 109.7 | 110.3 | 109.9 | -0.4 | 194.5 | 198.3 | 199.9 | 199.9 | 0.0 |
| Retail trade | 100.7 | 101.9 | 102.1 | 101.3 | -0.8 | 173.4 | 180.4 | 181.4 | 180.9 | -0.3 |
| Transportation and warehousing | 167.6 | 167.0 | 166.2 | 167.0 | 0.5 | 281.5 | 299.5 | 298.3 | 300.3 | 0.7 |
| Utilities | 96.4 | 96.6 | 96.2 | 96.0 | -0.2 | 174.5 | 180.7 | 180.8 | 181.5 | 0.4 |
| Information | 102.1 | 99.4 | 98.9 | 101.3 | 2.4 | 196.1 | 196.6 | 197.2 | 202.4 | 2.6 |
| Financial activities | 119.5 | 118.3 | 119.1 | 118.8 | -0.3 | 242.0 | 251.1 | 254.7 | 253.6 | -0.4 |
| Professional and business services | 147.0 | 146.5 | 146.8 | 146.4 | -0.3 | 291.2 | 300.9 | 303.0 | 303.3 | 0.1 |
| Private education and health services | 149.6 | 155.0 | 155.1 | 156.2 | 0.7 | 292.8 | 311.1 | 311.4 | 314.4 | 1.0 |
| Leisure and hospitality | 125.9 | 129.9 | 129.9 | 131.0 | 0.8 | 263.0 | 280.9 | 283.6 | 286.1 | 0.9 |
| Other services | 103.6 | 105.0 | 105.2 | 105.4 | 0.2 | 191.0 | 199.5 | 200.3 | 201.6 | 0.6 |

**Footnotes**

(1) Data relate to production employees in mining and logging and manufacturing, construction employees in construction, and nonsupervisory employees in the service-providing industries. These groups account for approximately four-fifths of the total employment on private nonfarm payrolls.

(2) The indexes of aggregate weekly hours are calculated by dividing the current month's estimates of aggregate hours by the corresponding 2002 annual average aggregate hours. Aggregate hours estimates are the product of estimates of average weekly hours and employment.

(3) The indexes of aggregate weekly payrolls are calculated by dividing the current month's estimates of aggregate weekly payrolls by the corresponding 2002 annual average aggregate weekly payrolls. Aggregate payrolls estimates are the product of estimates of average hourly earnings, average weekly hours, and employment.

(P) Preliminary

NOTE: Data have been revised to reflect March 2022 benchmark levels and updated seasonal adjustment factors.

**Last Modified Date:** January 05, 2024

U.S. BUREAU OF LABOR STATISTICS  Division of Labor Force Statistics  PSB Suite 2135  2 Massachusetts Avenue NE  Washington, DC 20212-0001

Telephone:1-202-691-6378  www.bls.gov/CPS  Contact CPS

U.S. BUREAU OF LABOR STATISTICS  Division of Current Employment Statistics  PSB Suite 4860  2 Massachusetts Avenue NE  Washington, DC 20212-0001

Telephone:1-202-691-6555  www.bls.gov/CES  Contact CES

# N E W S   R E L E A S E
## B U R E A U   O F   L A B O R   S T A T I S T I C S
### U.S.  D E P A R T M E N T  O F  L A B O R

**BLS**

**For release 10:00 a.m. (ET) Tuesday, May 21, 2024**                    USDL-24-1008

Technical information:  (202) 691-6378  •  cpsinfo@bls.gov  •  www.bls.gov/cps
Media contact:            (202) 691-5902  •  PressOffice@bls.gov

## FOREIGN-BORN WORKERS: LABOR FORCE CHARACTERISTICS — 2023

The unemployment rate for the foreign born in the United States edged up from 3.4 percent in 2022 to 3.6 percent in 2023, the U.S. Bureau of Labor Statistics reported today. The jobless rate of the native born changed little at 3.6 percent in 2023. Both measures are down considerably from their highs in 2020. However, the jobless rate for the foreign born remains above its level of 3.1 percent in 2019, prior to the coronavirus (COVID-19) pandemic, while the rate for the native born is below its pre-pandemic level of 3.8 percent.

Data on nativity are collected as part of the Current Population Survey (CPS), a monthly sample survey of approximately 60,000 households. The foreign born are people who reside in the United States but who were not U.S. citizens at birth. Specifically, they were born outside the United States (or one of its outlying areas such as Puerto Rico or Guam), and neither parent was a U.S. citizen. The foreign born include legally-admitted immigrants, refugees, temporary residents such as students and temporary workers, and undocumented immigrants. However, the survey does not separately identify people in these categories. For further information about the survey, see the Technical Note in this news release.

**Highlights from the 2023 data:**

- In 2023, the foreign born accounted for 18.6 percent of the U.S. civilian labor force, up from 18.1 percent in 2022. (See table 1.)

- From 2022 to 2023, the unemployment rate of the foreign born edged up to 3.6 percent, while the jobless rate for the native born changed little at 3.6 percent. (See table 1.)

- Hispanics continued to account for nearly one-half (47.6 percent) of the foreign-born labor force in 2023, and Asians accounted for one-quarter. (See table 1.) (Data in this news release for people who are White, Black, or Asian do not include those of Hispanic or Latino ethnicity. Data on people of Hispanic or Latino ethnicity are presented separately.)

- Foreign-born men continued to participate in the labor force at a considerably higher rate in 2023 (77.5 percent) than their native-born counterparts (66.1 percent). By contrast, 56.1 percent of foreign-born women were labor force participants, lower than the participation rate of 57.6 percent for native-born women. (See table 1.)

004407

- In 2023, foreign-born workers were more likely than native-born workers to be employed in service occupations; natural resources, construction, and maintenance occupations; and in production, transportation, and material moving occupations. Foreign-born workers were less likely than native-born workers to be employed in management, professional, and related occupations and in sales and office occupations. (See table 4.)

- The median usual weekly earnings of foreign-born full-time wage and salary workers were $987 in 2023, compared with $1,140 for their native-born counterparts. (See table 5.) (Differences in earnings reflect a variety of factors, including variations in the distributions of foreign-born and native-born workers by educational attainment, occupation, industry, and geographic region.)

**Demographic Characteristics**

The demographic composition of the foreign-born labor force differs from that of the native-born labor force. In 2023, men accounted for 57.0 percent of the foreign-born labor force, compared with 52.3 percent of the native-born labor force. By age, the proportion of the foreign-born labor force made up of 25- to 54-year-olds (70.3 percent) was higher than for the native-born labor force (62.3 percent). Labor force participation typically is highest among people in that age bracket. (See table 1.)

In 2023, nearly one-half (47.6 percent) of the foreign-born labor force was Hispanic, and one-quarter (25.1 percent) was Asian. Hispanics and Asians made up much lower percentages of the native-born labor force, at 12.5 percent and 2.5 percent, respectively. Whites comprised 15.3 percent of the foreign-born labor force and Blacks comprised 10.7 percent, compared with 69.3 percent and 12.5 percent, respectively, of the native-born labor force.

In terms of educational attainment, the proportion of the foreign-born labor force age 25 and over that had not completed high school was 18.5 percent in 2023, much higher than the figure for the native-born labor force, at 3.3 percent. The foreign born were less likely than the native born to have some college or an associate degree—15.1 percent versus 27.1 percent. The proportions of foreign-born and native-born high school graduates (25.3 percent versus 24.7 percent) and those with a bachelor's degree or higher (41.1 percent versus 45.0 percent) were more similar.

**Labor Force**

In 2023, the foreign born accounted for 18.6 percent of the U.S. civilian labor force, up from 18.1 percent in 2022. In 2023, the labor force participation rate of the foreign born increased to 66.6 percent. The rate for foreign-born women increased to 56.1 percent, while the rate for foreign-born men changed little at 77.5 percent. The labor force participation rate of the native born rose to 61.8 percent. The rate for native-born women increased to 57.6 percent, while the rate for men was little changed at 66.1 percent. (See table 1.)

Labor force participation rates for the foreign born varied across the major race and ethnicity groups in 2023, ranging from 60.7 percent for foreign-born Whites to 72.9 percent for foreign-born Blacks. Participation rates for the native born showed less variation across the major race

and ethnicity groups, ranging from 61.0 percent for native-born Whites to 65.9 percent for native-born Hispanics.

Among the major race and ethnicity groups, the labor force participation rate of foreign-born Hispanics increased to 68.2 percent in 2023. The rates for foreign-born Whites, Blacks, and Asians showed little change over the year. Among the native born, the participation rate of Blacks increased to 61.3 percent. The rates for native-born Whites, Asians, and Hispanics changed little from 2022 to 2023.

In 2023, foreign-born mothers with children under age 18 were less likely to be labor force participants than were native-born mothers—64.3 percent versus 77.1 percent. Labor force participation differences between foreign-born and native-born mothers were greater among those with younger children than among those with older children. Among women with children under age 3, the participation rate for foreign-born mothers was 53.5 percent, 16.1 percentage points below that for native-born mothers, at 69.6 percent. By comparison, the labor force participation rate of foreign-born mothers with children ages 6 to 17 (68.8 percent) was 12.0 percentage points lower than that for native-born mothers with children ages 6 to 17 (80.8 percent). The labor force participation rates of foreign-born and native-born fathers with children under age 18 were more similar, at 93.6 percent and 93.3 percent, respectively. (See table 2.)

By region, the foreign born made up a larger share of the labor force in the West (23.9 percent) and in the Northeast (22.6 percent) in 2023 than for the nation as a whole (18.6 percent). The foreign born made up a smaller share of the labor force than for the nation as a whole in the South (18.1 percent) and the Midwest (10.1 percent). (See table 6.)

**Employment**

In 2023, the employment-population ratio—the number of employed people as a percentage of the civilian noninstitutional population—of the foreign born increased to 64.2 percent. The ratio for foreign-born women rose to 53.9 percent, while the ratio for men was little changed at 74.8 percent. The employment-population ratio of the native born rose to 59.5 percent. The ratio for native-born women increased to 55.7 percent, while the ratio for men changed little at 63.6 percent. (See table 1.)

**Unemployment**

From 2022 to 2023, the unemployment rate of the foreign born edged up to 3.6 percent, while the jobless rate for the native born changed little at 3.6 percent.

The jobless rate in 2023 for the foreign born remained higher than its pre-pandemic 2019 level (3.1 percent), while the rate for the native born was below its pre-pandemic level (3.8 percent). The unemployment rates for both foreign-born men and women changed little in 2023, at 3.5 percent and 3.8 percent, respectively. Among the native born, the rate for women was down by 0.2 percentage point to 3.4 percent, while the rate for men was little changed at 3.9 percent. (See table 1.)

For both the foreign born and the native born, jobless rates vary considerably by race and ethnicity. Among the foreign born, Hispanics had the highest unemployment rate in 2023 (4.1 percent), followed by Blacks (3.8 percent), Whites (3.2 percent), and Asians (2.8 percent). Among the native born, jobless rates were highest for Blacks (5.9 percent), followed by Hispanics (5.1 percent), Asians (3.3 percent), and Whites (2.9 percent).

**Occupation**

In 2023, foreign-born workers were more likely than native-born workers to be employed in service occupations (21.8 percent versus 15.0 percent); natural resources, construction, and maintenance occupations (13.8 percent versus 7.8 percent); and production, transportation, and material moving occupations (15.2 percent versus 11.8 percent). Foreign-born workers were less likely than native-born workers to be employed in management, professional, and related occupations (36.1 percent versus 45.4 percent) and in sales and office occupations (13.0 percent versus 20.1 percent). (See table 4.)

Among employed men, the disparity was especially great in natural resources, construction, and maintenance occupations—22.7 percent of the foreign born worked in this occupational field in 2023, versus 14.0 percent of the native born. The occupational disparity for women was pronounced in service occupations—30.5 percent of the foreign born worked in that occupation group, compared with 17.6 percent of the native born. By contrast, employed native-born men and women were more likely than their foreign-born counterparts to work in management, professional, and related occupations and in sales and office occupations.

**Earnings**

In 2023, median usual weekly earnings of foreign-born full-time wage and salary workers ($987) were 86.6 percent of the earnings of their native-born counterparts ($1,140). Among men, median weekly earnings for the foreign born ($1,051) were 84.9 percent of the earnings of the native born ($1,238). Median earnings for foreign-born women ($899) were 87.7 percent of the earnings of native-born women ($1,025). (See table 5.) (Differences in earnings reflect a variety of factors, including variations in the distributions of foreign-born and native-born workers by educational attainment, occupation, industry, and geographic region.)

Among the major race and ethnicity groups, Hispanic foreign-born full-time wage and salary workers earned 83.6 percent as much as their native-born counterparts in 2023. White and Black foreign-born workers earned more than their native-born counterparts, by 12.7 percent and 5.7 percent, respectively. Asian foreign-born workers earned slightly more (2.7 percent) than their native-born counterparts.

The earnings of both foreign-born and native-born workers increase with education. In 2023, foreign-born workers age 25 and over with less than a high school diploma earned $692 per week, while those with a bachelor's degree and higher earned 2.4 times as much—$1,637 per week. Among the native born, those with a bachelor's degree and higher earned 2.1 times as much as those with less than a high school diploma—$1,602 per week versus $748 per week.

-4-

004410

Native-born workers earn more than the foreign born at most educational attainment levels. For example, among high school graduates (no college), full-time workers who are foreign born ($809) earned 88.0 percent as much as their native-born counterparts ($919) in 2023. However, among those with a bachelor's degree and higher, the earnings of foreign-born workers ($1,637) were slightly higher than the earnings of native-born workers ($1,602).

004411

# Technical Note

The estimates in this news release are based on annual average data from the Current Population Survey (CPS). The CPS, which is conducted by the U.S. Census Bureau for the Bureau of Labor Statistics (BLS), is a monthly survey of about 60,000 eligible households that provides information on the labor force status, demographics, and other characteristics of the nation's civilian noninstitutional population age 16 and over. In response to the increased demand for statistical information about the foreign born, questions on nativity, citizenship, year of entry into the United States, and the parental nativity of respondents were added to the CPS beginning in January 1994. Prior to 1994, the primary sources of data on the foreign born were the decennial census, two CPS supplements (conducted in April 1983 and November 1989), and, to some extent, information collected by the U.S. Citizenship and Immigration Services (formerly known as the Immigration and Naturalization Service).

The foreign- and native-born data presented in this news release are not strictly comparable with data for earlier years due to the introduction of updated population estimates, or controls, used in the CPS. The population controls are updated each year in January to reflect the latest information about population change.  Additional information is available from the BLS website at www.bls.gov/cps/documentation.htm#pop.

If you are deaf, hard of hearing, or have a speech disability, please dial 7-1-1 to access telecommunications relay services.

## Reliability of the estimates

Statistics based on the CPS are subject to both sampling and nonsampling error. When a sample, rather than the entire population, is surveyed, there is a chance that the sample estimates may differ from the true population values they represent. The component of this difference that occurs because samples differ by chance is known as *sampling error*, and its variability is measured by the standard error of the estimate. There is about a 90-percent chance, or level of confidence, that an estimate based on a sample will differ by no more than 1.6 standard errors from the true population value because of sampling error. BLS analyses are generally conducted at the 90-percent level of confidence.

The CPS data also are affected by *nonsampling error*. Nonsampling error can occur for many reasons, including the failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, and errors made in the collection or processing of the data.

Additional information about the reliability of data from the CPS and estimating standard errors is available at www.bls.gov/cps/documentation.htm#reliability.

## Definitions

Definitions of the principal terms used in this news release are presented below.

*Foreign born.* The foreign born are people residing in the United States who were not U.S. citizens at birth. Specifically, they were born outside the United States (or one of its outlying areas such as Guam or Puerto Rico), and neither parent was a U.S. citizen. The foreign-born population includes legally-admitted immigrants, refugees, temporary residents such as students and temporary workers, and undocumented immigrants. The survey data, however, do not separately identify the number of people in these categories.

*Native born.* The native born are people born in the United States or one of its outlying areas such as Puerto Rico or Guam or who were born abroad of at least one parent who was a U.S. citizen.

*Race and ethnicity groups.* In this news release, the data are presented for non-Hispanic Whites, Blacks, and Asians and for people of Hispanic or Latino ethnicity. These four groups are mutually exclusive but not exhaustive. Other race groups (including people who selected more than one race category) are included in the overall totals but are not shown separately because the number of survey respondents is too small to develop statistically reliable estimates. The presentation of data on race and ethnicity in this news release differs from that which appears in most analyses of CPS labor force data because people of Hispanic or Latino ethnicity are separated from the race groups. Because people of Hispanic or Latino ethnicity can be of any race, they are usually included in the race groups as well as shown separately in the Hispanic or Latino ethnicity group. The reason for the difference in the data presentation in this news release is because about half of the foreign born are of Hispanic or Latino ethnicity and they have somewhat different labor force characteristics than the non-Hispanic foreign born.

*Employed.* Employed people are all those who, during the survey reference week, (a) did any work at all as paid employees; (b) worked in their own business, profession, or on their own farm; or (c) worked 15 hours or more as unpaid workers in a family member's business. People who were temporarily absent from their jobs because of illness, bad weather, vacation, labor dispute, or another reason also are counted as employed.

*Unemployed*. The unemployed are those who had no employment during the reference week, were available for work at that time, and had made specific efforts to find employment sometime during the 4-week period ending with the reference week. People who were waiting to be recalled to a job from which they had been laid off need not be looking for work to be classified as unemployed.

*Civilian labor force*. The civilian labor force comprises all people classified as employed or unemployed.

*Unemployment rate*. The unemployment rate is the number unemployed as a percent of the civilian labor force.

*Labor force participation rate*. The labor force participation rate is the labor force as a percent of the population.

*Usual weekly earnings*. Data represent earnings before taxes and other deductions and include any overtime pay, commissions, or tips usually received (at the main job in the case of multiple jobholders). Earnings reported on a basis other than weekly are converted to a weekly equivalent.

*Full-time wage and salary workers.* These are workers who usually work 35 hours or more per week at their sole or principal job and receive wages, salaries, and other types of compensation. The group includes employees in both the private and public sectors but, for purposes of the earnings series, excludes all self-employed people, regardless of whether or not their businesses are incorporated.

*Median earnings*. The median earnings is the amount which divides a given earnings distribution into two equal groups, one having earnings above the median and the other having earnings below the median.

**Table 1. Employment status of the foreign-born and native-born populations by selected characteristics, 2022-2023 annual averages**

[Numbers in thousands]

| Characteristic | 2022 | | | | | | 2023 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Civilian noninsti-tutional popula-tion | Civilian labor force | | | | | Civilian noninsti-tutional popula-tion | Civilian labor force | | | | |
| | | Total | Participa-tion rate | Em-ployed | Unemployed | | | Total | Participa-tion rate | Em-ployed | Unemployed | |
| | | | | | Number | Unem-ploy-ment rate | | | | | Number | Unem-ploy-ment rate |
| **TOTAL** | | | | | | | | | | | | |
| Total, 16 years and over.................... | 263,973 | 164,287 | 62.2 | 158,291 | 5,996 | 3.6 | 266,942 | 167,116 | 62.6 | 161,037 | 6,080 | 3.6 |
| Men........................................ | 128,617 | 87,421 | 68.0 | 84,203 | 3,218 | 3.7 | 130,476 | 88,877 | 68.1 | 85,500 | 3,377 | 3.8 |
| Women..................................... | 135,356 | 76,866 | 56.8 | 74,089 | 2,778 | 3.6 | 136,466 | 78,239 | 57.3 | 75,537 | 2,702 | 3.5 |
| **FOREIGN BORN** | | | | | | | | | | | | |
| Total, 16 years and over.................... | 45,150 | 29,755 | 65.9 | 28,737 | 1,017 | 3.4 | 46,651 | 31,051 | 66.6 | 29,932 | 1,119 | 3.6 |
| Men........................................ | 21,998 | 17,031 | 77.4 | 16,475 | 556 | 3.3 | 22,840 | 17,704 | 77.5 | 17,091 | 613 | 3.5 |
| Women..................................... | 23,152 | 12,724 | 55.0 | 12,262 | 462 | 3.6 | 23,811 | 13,347 | 56.1 | 12,841 | 506 | 3.8 |
| **Age** | | | | | | | | | | | | |
| 16 to 24 years............................. | 3,409 | 1,846 | 54.2 | 1,691 | 155 | 8.4 | 3,698 | 2,037 | 55.1 | 1,880 | 157 | 7.7 |
| 25 to 34 years............................. | 7,255 | 5,671 | 78.2 | 5,484 | 187 | 3.3 | 7,432 | 5,905 | 79.5 | 5,655 | 250 | 4.2 |
| 35 to 44 years............................. | 9,898 | 7,918 | 80.0 | 7,678 | 240 | 3.0 | 10,014 | 8,097 | 80.9 | 7,841 | 257 | 3.2 |
| 45 to 54 years............................. | 9,353 | 7,570 | 80.9 | 7,358 | 212 | 2.8 | 9,545 | 7,817 | 81.9 | 7,589 | 228 | 2.9 |
| 55 to 64 years............................. | 7,338 | 5,128 | 69.9 | 4,963 | 166 | 3.2 | 7,678 | 5,412 | 70.5 | 5,245 | 167 | 3.1 |
| 65 years and over.......................... | 7,897 | 1,621 | 20.5 | 1,564 | 58 | 3.6 | 8,283 | 1,783 | 21.5 | 1,722 | 61 | 3.4 |
| **Race and Hispanic or Latino ethnicity[1]** | | | | | | | | | | | | |
| White non-Hispanic or Latino............... | 7,915 | 4,768 | 60.2 | 4,608 | 160 | 3.4 | 7,850 | 4,766 | 60.7 | 4,612 | 155 | 3.2 |
| Black non-Hispanic or Latino............... | 4,245 | 3,086 | 72.7 | 2,939 | 147 | 4.8 | 4,562 | 3,324 | 72.9 | 3,197 | 126 | 3.8 |
| Asian non-Hispanic or Latino............... | 11,354 | 7,345 | 64.7 | 7,168 | 178 | 2.4 | 11,930 | 7,789 | 65.3 | 7,575 | 214 | 2.8 |
| Hispanic or Latino ethnicity............... | 21,048 | 14,168 | 67.3 | 13,650 | 519 | 3.7 | 21,696 | 14,790 | 68.2 | 14,180 | 610 | 4.1 |
| **Educational attainment** | | | | | | | | | | | | |
| Total, 25 years and over.................... | 41,741 | 27,908 | 66.9 | 27,047 | 862 | 3.1 | 42,953 | 29,015 | 67.5 | 28,052 | 962 | 3.3 |
| Less than a high school diploma.......... | 9,076 | 5,100 | 56.2 | 4,878 | 222 | 4.4 | 9,315 | 5,371 | 57.7 | 5,129 | 241 | 4.5 |
| High school graduates, no college[2]..... | 10,990 | 7,109 | 64.7 | 6,874 | 235 | 3.3 | 11,299 | 7,338 | 64.9 | 7,067 | 271 | 3.7 |
| Some college or associate degree........ | 6,391 | 4,328 | 67.7 | 4,189 | 139 | 3.2 | 6,441 | 4,378 | 68.0 | 4,250 | 127 | 2.9 |
| Bachelor's degree and higher[3].......... | 15,284 | 11,371 | 74.4 | 11,105 | 266 | 2.3 | 15,897 | 11,928 | 75.0 | 11,606 | 322 | 2.7 |
| **NATIVE BORN** | | | | | | | | | | | | |
| Total, 16 years and over.................... | 218,823 | 134,533 | 61.5 | 129,554 | 4,979 | 3.7 | 220,291 | 136,065 | 61.8 | 131,104 | 4,961 | 3.6 |
| Men........................................ | 106,619 | 70,390 | 66.0 | 67,727 | 2,663 | 3.8 | 107,636 | 71,173 | 66.1 | 68,409 | 2,764 | 3.9 |
| Women..................................... | 112,204 | 64,143 | 57.2 | 61,827 | 2,316 | 3.6 | 112,655 | 64,892 | 57.6 | 62,695 | 2,197 | 3.4 |
| **Age** | | | | | | | | | | | | |
| 16 to 24 years............................. | 34,548 | 19,246 | 55.7 | 17,687 | 1,559 | 8.1 | 35,641 | 20,092 | 56.4 | 18,492 | 1,600 | 8.0 |
| 25 to 34 years............................. | 36,913 | 31,054 | 84.1 | 29,816 | 1,238 | 4.0 | 37,095 | 31,398 | 84.6 | 30,182 | 1,216 | 3.9 |
| 35 to 44 years............................. | 33,101 | 27,753 | 83.8 | 26,946 | 806 | 2.9 | 33,440 | 28,333 | 84.7 | 27,559 | 775 | 2.7 |
| 45 to 54 years............................. | 30,641 | 24,871 | 81.2 | 24,295 | 576 | 2.3 | 30,414 | 24,990 | 82.2 | 24,397 | 593 | 2.4 |
| 55 to 64 years............................. | 34,807 | 22,332 | 64.2 | 21,798 | 534 | 2.4 | 33,724 | 21,839 | 64.8 | 21,317 | 522 | 2.4 |
| 65 years and over.......................... | 48,813 | 9,276 | 19.0 | 9,011 | 266 | 2.9 | 49,977 | 9,412 | 18.8 | 9,157 | 255 | 2.7 |
| **Race and Hispanic or Latino ethnicity[1]** | | | | | | | | | | | | |
| White non-Hispanic or Latino............... | 154,438 | 94,061 | 60.9 | 91,292 | 2,769 | 2.9 | 154,634 | 94,343 | 61.0 | 91,617 | 2,726 | 2.9 |
| Black non-Hispanic or Latino............... | 27,612 | 16,698 | 60.5 | 15,636 | 1,062 | 6.4 | 27,814 | 17,045 | 61.3 | 16,039 | 1,006 | 5.9 |
| Asian non-Hispanic or Latino............... | 5,019 | 3,207 | 63.9 | 3,091 | 116 | 3.6 | 5,181 | 3,343 | 64.5 | 3,232 | 111 | 3.3 |
| Hispanic or Latino ethnicity............... | 25,123 | 16,433 | 65.4 | 15,650 | 783 | 4.8 | 25,836 | 17,027 | 65.9 | 16,162 | 865 | 5.1 |
| **Educational attainment** | | | | | | | | | | | | |
| Total, 25 years and over.................... | 184,275 | 115,286 | 62.6 | 111,866 | 3,420 | 3.0 | 184,650 | 115,973 | 62.8 | 112,612 | 3,361 | 2.9 |
| Less than a high school diploma.......... | 10,713 | 3,888 | 36.3 | 3,620 | 268 | 6.9 | 10,166 | 3,810 | 37.5 | 3,540 | 270 | 7.1 |
| High school graduates, no college[2]..... | 52,717 | 28,810 | 54.6 | 27,623 | 1,186 | 4.1 | 52,120 | 28,590 | 54.9 | 27,462 | 1,127 | 3.9 |
| Some college or associate degree........ | 50,149 | 31,316 | 62.4 | 30,334 | 982 | 3.1 | 50,485 | 31,425 | 62.2 | 30,463 | 962 | 3.1 |
| Bachelor's degree and higher[3].......... | 70,697 | 51,273 | 72.5 | 50,289 | 984 | 1.9 | 71,880 | 52,149 | 72.5 | 51,147 | 1,002 | 1.9 |

[1] Data for race/ethnicity groups do not sum to totals because data are not presented for all races.
[2] Includes persons with a high school diploma or equivalent.
[3] Includes persons with bachelor's, master's, professional, and doctoral degrees.
NOTE: Updated population controls are introduced annually with the release of January data.

**Table 2. Employment status of the foreign-born and native-born populations 16 years and over by presence and age of youngest child and sex, 2022-2023 annual averages**
[Numbers in thousands]

| Characteristic | 2022 | | | 2023 | | |
|---|---|---|---|---|---|---|
| | Total | Men | Women | Total | Men | Women |
| **FOREIGN BORN** | | | | | | |
| **With own children under 18** | | | | | | |
| Civilian noninstitutional population................................. | 15,547 | 7,295 | 8,251 | 15,554 | 7,375 | 8,179 |
| Civilian labor force................................................. | 12,011 | 6,816 | 5,196 | 12,166 | 6,906 | 5,259 |
| Participation rate................................................ | 77.3 | 93.4 | 63.0 | 78.2 | 93.6 | 64.3 |
| Employed......................................................... | 11,662 | 6,651 | 5,012 | 11,793 | 6,715 | 5,079 |
| Employment-population ratio.............................. | 75.0 | 91.2 | 60.7 | 75.8 | 91.0 | 62.1 |
| Unemployed..................................................... | 349 | 165 | 184 | 372 | 191 | 181 |
| Unemployment rate........................................ | 2.9 | 2.4 | 3.5 | 3.1 | 2.8 | 3.4 |
| **With own children 6 to 17, none younger** | | | | | | |
| Civilian noninstitutional population................................. | 9,210 | 4,250 | 4,960 | 9,390 | 4,423 | 4,966 |
| Civilian labor force................................................. | 7,313 | 3,933 | 3,381 | 7,514 | 4,098 | 3,416 |
| Participation rate................................................ | 79.4 | 92.5 | 68.2 | 80.0 | 92.6 | 68.8 |
| Employed......................................................... | 7,103 | 3,836 | 3,267 | 7,291 | 3,985 | 3,307 |
| Employment-population ratio.............................. | 77.1 | 90.2 | 65.9 | 77.7 | 90.1 | 66.6 |
| Unemployed..................................................... | 210 | 97 | 113 | 222 | 113 | 110 |
| Unemployment rate........................................ | 2.9 | 2.5 | 3.4 | 3.0 | 2.7 | 3.2 |
| **With own children under 6** | | | | | | |
| Civilian noninstitutional population................................. | 6,337 | 3,045 | 3,291 | 6,164 | 2,952 | 3,212 |
| Civilian labor force................................................. | 4,698 | 2,883 | 1,815 | 4,652 | 2,809 | 1,843 |
| Participation rate................................................ | 74.1 | 94.7 | 55.1 | 75.5 | 95.2 | 57.4 |
| Employed......................................................... | 4,559 | 2,815 | 1,744 | 4,502 | 2,730 | 1,772 |
| Employment-population ratio.............................. | 72.0 | 92.4 | 53.0 | 73.0 | 92.5 | 55.2 |
| Unemployed..................................................... | 139 | 68 | 70 | 150 | 79 | 71 |
| Unemployment rate........................................ | 3.0 | 2.4 | 3.9 | 3.2 | 2.8 | 3.9 |
| **With own children under 3** | | | | | | |
| Civilian noninstitutional population................................. | 3,298 | 1,596 | 1,703 | 3,250 | 1,557 | 1,693 |
| Civilian labor force................................................. | 2,412 | 1,514 | 897 | 2,382 | 1,477 | 905 |
| Participation rate................................................ | 73.1 | 94.9 | 52.7 | 73.3 | 94.8 | 53.5 |
| Employed......................................................... | 2,336 | 1,473 | 864 | 2,304 | 1,437 | 866 |
| Employment-population ratio.............................. | 70.8 | 92.3 | 50.7 | 70.9 | 92.3 | 51.2 |
| Unemployed..................................................... | 75 | 42 | 34 | 79 | 40 | 39 |
| Unemployment rate........................................ | 3.1 | 2.7 | 3.7 | 3.3 | 2.7 | 4.3 |
| **With no own children under 18** | | | | | | |
| Civilian noninstitutional population................................. | 29,603 | 14,703 | 14,901 | 31,098 | 15,465 | 15,632 |
| Civilian labor force................................................. | 17,743 | 10,215 | 7,528 | 18,886 | 10,798 | 8,087 |
| Participation rate................................................ | 59.9 | 69.5 | 50.5 | 60.7 | 69.8 | 51.7 |
| Employed......................................................... | 17,075 | 9,825 | 7,250 | 18,139 | 10,376 | 7,763 |
| Employment-population ratio.............................. | 57.7 | 66.8 | 48.7 | 58.3 | 67.1 | 49.7 |
| Unemployed..................................................... | 668 | 390 | 278 | 747 | 422 | 325 |
| Unemployment rate........................................ | 3.8 | 3.8 | 3.7 | 4.0 | 3.9 | 4.0 |
| **NATIVE BORN** | | | | | | |
| **With own children under 18** | | | | | | |
| Civilian noninstitutional population................................. | 47,482 | 21,128 | 26,354 | 47,006 | 21,095 | 25,911 |
| Civilian labor force................................................. | 39,624 | 19,596 | 20,028 | 39,638 | 19,673 | 19,965 |
| Participation rate................................................ | 83.5 | 92.7 | 76.0 | 84.3 | 93.3 | 77.1 |
| Employed......................................................... | 38,551 | 19,193 | 19,358 | 38,664 | 19,285 | 19,378 |
| Employment-population ratio.............................. | 81.2 | 90.8 | 73.5 | 82.3 | 91.4 | 74.8 |
| Unemployed..................................................... | 1,073 | 403 | 670 | 974 | 387 | 587 |
| Unemployment rate........................................ | 2.7 | 2.1 | 3.3 | 2.5 | 2.0 | 2.9 |
| **With own children 6 to 17, none younger** | | | | | | |
| Civilian noninstitutional population................................. | 26,646 | 11,879 | 14,768 | 26,483 | 11,863 | 14,619 |
| Civilian labor force................................................. | 22,622 | 10,877 | 11,744 | 22,764 | 10,951 | 11,814 |
| Participation rate................................................ | 84.9 | 91.6 | 79.5 | 86.0 | 92.3 | 80.8 |
| Employed......................................................... | 22,064 | 10,662 | 11,402 | 22,255 | 10,740 | 11,515 |
| Employment-population ratio.............................. | 82.8 | 89.8 | 77.2 | 84.0 | 90.5 | 78.8 |

**Table 2. Employment status of the foreign-born and native-born populations 16 years and over by presence and age of youngest child and sex, 2022-2023 annual averages — Continued**
[Numbers in thousands]

| Characteristic | 2022 | | | 2023 | | |
|---|---|---|---|---|---|---|
| | Total | Men | Women | Total | Men | Women |
| Unemployed.......................................... | 558 | 215 | 343 | 509 | 210 | 299 |
| Unemployment rate.............................. | 2.5 | 2.0 | 2.9 | 2.2 | 1.9 | 2.5 |
| **With own children under 6** | | | | | | |
| Civilian noninstitutional population.................................. | 20,836 | 9,250 | 11,586 | 20,523 | 9,231 | 11,292 |
| Civilian labor force....................................... | 17,002 | 8,719 | 8,284 | 16,873 | 8,722 | 8,151 |
| Participation rate........................................ | 81.6 | 94.3 | 71.5 | 82.2 | 94.5 | 72.2 |
| Employed.......................................... | 16,487 | 8,531 | 7,956 | 16,408 | 8,545 | 7,863 |
| Employment-population ratio.................................. | 79.1 | 92.2 | 68.7 | 80.0 | 92.6 | 69.6 |
| Unemployed.......................................... | 516 | 188 | 328 | 465 | 177 | 288 |
| Unemployment rate.............................. | 3.0 | 2.2 | 4.0 | 2.8 | 2.0 | 3.5 |
| **With own children under 3** | | | | | | |
| Civilian noninstitutional population.................................. | 11,893 | 5,340 | 6,554 | 11,892 | 5,421 | 6,471 |
| Civilian labor force....................................... | 9,565 | 5,050 | 4,515 | 9,645 | 5,139 | 4,506 |
| Participation rate........................................ | 80.4 | 94.6 | 68.9 | 81.1 | 94.8 | 69.6 |
| Employed.......................................... | 9,268 | 4,939 | 4,329 | 9,371 | 5,034 | 4,337 |
| Employment-population ratio.................................. | 77.9 | 92.5 | 66.1 | 78.8 | 92.9 | 67.0 |
| Unemployed.......................................... | 298 | 111 | 186 | 275 | 105 | 169 |
| Unemployment rate.............................. | 3.1 | 2.2 | 4.1 | 2.8 | 2.0 | 3.8 |
| **With no own children under 18** | | | | | | |
| Civilian noninstitutional population.................................. | 171,342 | 85,491 | 85,850 | 173,285 | 86,541 | 86,744 |
| Civilian labor force....................................... | 94,909 | 50,794 | 44,115 | 96,427 | 51,500 | 44,927 |
| Participation rate........................................ | 55.4 | 59.4 | 51.4 | 55.6 | 59.5 | 51.8 |
| Employed.......................................... | 91,003 | 48,534 | 42,469 | 92,440 | 49,123 | 43,317 |
| Employment-population ratio.................................. | 53.1 | 56.8 | 49.5 | 53.3 | 56.8 | 49.9 |
| Unemployed.......................................... | 3,906 | 2,260 | 1,646 | 3,987 | 2,377 | 1,610 |
| Unemployment rate.............................. | 4.1 | 4.4 | 3.7 | 4.1 | 4.6 | 3.6 |

NOTE: Own children include sons, daughters, step-children, and adopted children. Not included are nieces, nephews, grandchildren, and other related and unrelated children. Updated population controls are introduced annually with the release of January data.

**Table 3. Employment status of the foreign-born and native-born populations 25 years and over by educational attainment, race, and Hispanic or Latino ethnicity, 2022-2023 annual averages**
[Numbers in thousands]

| Characteristic | 2022 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Less than a high school diploma | High school graduates, no college[1] | Some college or associate degree | Bachelor's degree and higher[2] | Less than a high school diploma | High school graduates, no college[1] | Some college or associate degree | Bachelor's degree and higher[2] |
| **FOREIGN BORN** | | | | | | | | |
| **White non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 549 | 1,678 | 1,375 | 3,807 | 564 | 1,616 | 1,352 | 3,822 |
| Civilian labor force...................................... | 209 | 840 | 803 | 2,670 | 241 | 837 | 765 | 2,682 |
| Participation rate..................................... | 38.0 | 50.1 | 58.4 | 70.1 | 42.7 | 51.8 | 56.6 | 70.2 |
| Employed............................................. | 197 | 811 | 779 | 2,600 | 232 | 811 | 739 | 2,608 |
| Employment-population ratio..................... | 35.9 | 48.3 | 56.6 | 68.3 | 41.1 | 50.2 | 54.6 | 68.2 |
| Unemployed.......................................... | 11 | 29 | 24 | 70 | 9 | 26 | 26 | 74 |
| Unemployment rate................................. | 5.5 | 3.5 | 3.0 | 2.6 | 3.7 | 3.1 | 3.5 | 2.8 |
| **Black non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 376 | 1,055 | 900 | 1,503 | 402 | 1,167 | 906 | 1,654 |
| Civilian labor force...................................... | 206 | 734 | 674 | 1,266 | 207 | 818 | 698 | 1,382 |
| Participation rate..................................... | 54.8 | 69.6 | 74.9 | 84.3 | 51.5 | 70.1 | 77.0 | 83.5 |
| Employed............................................. | 192 | 698 | 639 | 1,234 | 197 | 779 | 679 | 1,343 |
| Employment-population ratio..................... | 51.2 | 66.1 | 71.0 | 82.1 | 49.1 | 66.8 | 74.9 | 81.2 |
| Unemployed.......................................... | 13 | 36 | 35 | 33 | 10 | 39 | 19 | 38 |
| Unemployment rate................................. | 6.5 | 4.9 | 5.2 | 2.6 | 4.7 | 4.7 | 2.7 | 2.8 |
| **Asian non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 901 | 1,927 | 1,309 | 6,445 | 964 | 2,038 | 1,317 | 6,773 |
| Civilian labor force...................................... | 321 | 1,090 | 817 | 4,749 | 367 | 1,117 | 853 | 5,063 |
| Participation rate..................................... | 35.6 | 56.6 | 62.4 | 73.7 | 38.1 | 54.8 | 64.8 | 74.8 |
| Employed............................................. | 312 | 1,063 | 799 | 4,654 | 353 | 1,089 | 831 | 4,938 |
| Employment-population ratio..................... | 34.6 | 55.2 | 61.1 | 72.2 | 36.6 | 53.4 | 63.1 | 72.9 |
| Unemployed.......................................... | 9 | 27 | 17 | 95 | 14 | 28 | 23 | 125 |
| Unemployment rate................................. | 2.8 | 2.5 | 2.1 | 2.0 | 3.9 | 2.5 | 2.6 | 2.5 |
| **Hispanic or Latino ethnicity** | | | | | | | | |
| Civilian noninstitutional population.................... | 7,197 | 6,208 | 2,687 | 3,290 | 7,321 | 6,334 | 2,751 | 3,427 |
| Civilian labor force...................................... | 4,341 | 4,377 | 1,949 | 2,506 | 4,527 | 4,481 | 1,987 | 2,635 |
| Participation rate..................................... | 60.3 | 70.5 | 72.5 | 76.2 | 61.8 | 70.7 | 72.2 | 76.9 |
| Employed............................................. | 4,155 | 4,237 | 1,888 | 2,441 | 4,320 | 4,306 | 1,931 | 2,555 |
| Employment-population ratio..................... | 57.7 | 68.3 | 70.3 | 74.2 | 59.0 | 68.0 | 70.2 | 74.5 |
| Unemployed.......................................... | 186 | 140 | 60 | 64 | 207 | 175 | 56 | 80 |
| Unemployment rate................................. | 4.3 | 3.2 | 3.1 | 2.6 | 4.6 | 3.9 | 2.8 | 3.1 |
| **NATIVE BORN** | | | | | | | | |
| **White non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 6,171 | 36,913 | 35,927 | 56,190 | 5,933 | 36,398 | 35,981 | 56,710 |
| Civilian labor force...................................... | 2,172 | 19,161 | 21,542 | 39,816 | 2,150 | 18,934 | 21,395 | 40,138 |
| Participation rate..................................... | 35.2 | 51.9 | 60.0 | 70.9 | 36.2 | 52.0 | 59.5 | 70.8 |
| Employed............................................. | 2,058 | 18,523 | 20,971 | 39,115 | 2,029 | 18,344 | 20,861 | 39,406 |
| Employment-population ratio..................... | 33.4 | 50.2 | 58.4 | 69.6 | 34.2 | 50.4 | 58.0 | 69.5 |
| Unemployed.......................................... | 114 | 638 | 571 | 701 | 121 | 589 | 535 | 732 |
| Unemployment rate................................. | 5.2 | 3.3 | 2.7 | 1.8 | 5.6 | 3.1 | 2.5 | 1.8 |
| **Black non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 2,054 | 7,907 | 6,824 | 6,122 | 1,845 | 7,717 | 6,837 | 6,495 |
| Civilian labor force...................................... | 650 | 4,476 | 4,482 | 4,667 | 634 | 4,391 | 4,503 | 4,974 |
| Participation rate..................................... | 31.7 | 56.6 | 65.7 | 76.2 | 34.4 | 56.9 | 65.9 | 76.6 |
| Employed............................................. | 576 | 4,171 | 4,260 | 4,529 | 559 | 4,104 | 4,295 | 4,861 |
| Employment-population ratio..................... | 28.1 | 52.8 | 62.4 | 74.0 | 30.3 | 53.2 | 62.8 | 74.8 |
| Unemployed.......................................... | 74 | 305 | 222 | 138 | 75 | 287 | 208 | 113 |
| Unemployment rate................................. | 11.4 | 6.8 | 5.0 | 3.0 | 11.9 | 6.5 | 4.6 | 2.3 |
| **Asian non-Hispanic or Latino** | | | | | | | | |
| Civilian noninstitutional population.................... | 149 | 499 | 643 | 2,365 | 151 | 533 | 671 | 2,353 |

See footnotes at end of table.

**Table 3. Employment status of the foreign-born and native-born populations 25 years and over by educational attainment, race, and Hispanic or Latino ethnicity, 2022-2023 annual averages — Continued**
[Numbers in thousands]

| Characteristic | 2022 | | | | 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Less than a high school diploma | High school graduates, no college[1] | Some college or associate degree | Bachelor's degree and higher[2] | Less than a high school diploma | High school graduates, no college[1] | Some college or associate degree | Bachelor's degree and higher[2] |
| Civilian labor force.................................. | 59 | 296 | 450 | 1,869 | 66 | 321 | 458 | 1,887 |
| Participation rate................................... | 39.7 | 59.3 | 70.0 | 79.0 | 44.1 | 60.2 | 68.2 | 80.2 |
| Employed............................................. | 58 | 287 | 434 | 1,826 | 66 | 310 | 440 | 1,843 |
| Employment-population ratio................... | 38.9 | 57.6 | 67.5 | 77.2 | 43.9 | 58.3 | 65.6 | 78.3 |
| Unemployed......................................... | 1 | 8 | 16 | 44 | 0 | 10 | 17 | 45 |
| Unemployment rate.............................. | 1.9 | 2.8 | 3.5 | 2.3 | 0.3 | 3.1 | 3.7 | 2.4 |
| **Hispanic or Latino ethnicity** | | | | | | | | |
| Civilian noninstitutional population................. | 1,970 | 5,876 | 5,190 | 4,566 | 1,886 | 5,980 | 5,335 | 4,801 |
| Civilian labor force................................. | 872 | 3,951 | 3,812 | 3,795 | 836 | 4,032 | 3,981 | 3,946 |
| Participation rate................................... | 44.3 | 67.2 | 73.5 | 83.1 | 44.3 | 67.4 | 74.6 | 82.2 |
| Employed............................................. | 809 | 3,779 | 3,687 | 3,721 | 778 | 3,846 | 3,833 | 3,864 |
| Employment-population ratio................... | 41.0 | 64.3 | 71.0 | 81.5 | 41.2 | 64.3 | 71.8 | 80.5 |
| Unemployed......................................... | 64 | 172 | 125 | 74 | 58 | 186 | 148 | 82 |
| Unemployment rate.............................. | 7.3 | 4.3 | 3.3 | 2.0 | 7.0 | 4.6 | 3.7 | 2.1 |

[1] Includes persons with a high school diploma or equivalent.
[2] Includes persons with bachelor's, master's, professional, and doctoral degrees.
NOTE: Data for race/ethnicity groups do not sum to totals because data are not presented for all races. Updated population controls are introduced annually with the release of January data.

**Table 4. Employed foreign-born and native-born persons 16 years and over by occupation and sex, 2023 annual averages**
[Percent distribution]

| Occupation | Foreign born | | | Native born | | |
|---|---|---|---|---|---|---|
| | Total | Men | Women | Total | Men | Women |
| Total employed (in thousands)........................................ | 29,932 | 17,091 | 12,841 | 131,104 | 68,409 | 62,695 |
| **Occupation as a percent of total employed** | | | | | | |
| Total employed.................................................. | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Management, professional, and related occupations........... | 36.1 | 33.6 | 39.5 | 45.4 | 41.1 | 50.0 |
| Management, business, and financial operations occupations.................................................. | 14.5 | 14.3 | 14.8 | 20.0 | 20.7 | 19.3 |
| Management occupations..................................... | 10.0 | 11.0 | 8.8 | 13.7 | 15.0 | 12.2 |
| Business and financial operations occupations............ | 4.4 | 3.2 | 6.0 | 6.3 | 5.7 | 7.1 |
| Professional and related occupations......................... | 21.6 | 19.3 | 24.7 | 25.4 | 20.4 | 30.7 |
| Computer and mathematical occupations.................. | 5.8 | 7.3 | 3.8 | 3.6 | 5.1 | 2.0 |
| Architecture and engineering occupations................. | 2.3 | 3.2 | 1.1 | 2.2 | 3.6 | 0.7 |
| Life, physical, and social science occupations............ | 1.4 | 1.3 | 1.5 | 1.1 | 1.0 | 1.2 |
| Community and social service occupations............... | 0.9 | 0.5 | 1.4 | 2.0 | 1.2 | 2.9 |
| Legal occupations............................................. | 0.5 | 0.4 | 0.8 | 1.3 | 1.2 | 1.4 |
| Education, training, and library occupations................ | 3.7 | 2.1 | 5.7 | 6.3 | 3.2 | 9.7 |
| Arts, design, entertainment, sports, and media occupations................................................. | 1.6 | 1.4 | 1.8 | 2.3 | 2.3 | 2.3 |
| Healthcare practitioners and technical occupations....... | 5.4 | 3.1 | 8.6 | 6.5 | 2.8 | 10.5 |
| Service occupations............................................... | 21.8 | 15.3 | 30.5 | 15.0 | 12.6 | 17.6 |
| Healthcare support occupations............................. | 4.1 | 1.2 | 7.9 | 3.0 | 0.9 | 5.3 |
| Protective service occupations.............................. | 0.9 | 1.2 | 0.5 | 2.2 | 3.2 | 1.1 |
| Food preparation and serving related occupations........... | 6.6 | 5.8 | 7.5 | 4.7 | 4.1 | 5.5 |
| Building and grounds cleaning and maintenance occupations................................................. | 7.4 | 5.9 | 9.2 | 2.5 | 3.2 | 1.8 |
| Personal care and service occupations....................... | 3.0 | 1.2 | 5.3 | 2.5 | 1.2 | 4.0 |
| Sales and office occupations..................................... | 13.0 | 9.7 | 17.5 | 20.1 | 15.0 | 25.7 |
| Sales and related occupations............................... | 6.5 | 5.8 | 7.4 | 9.4 | 9.3 | 9.6 |
| Office and administrative support occupations.............. | 6.6 | 3.9 | 10.0 | 10.7 | 5.7 | 16.1 |
| Natural resources, construction, and maintenance occupations................................................. | 13.8 | 22.7 | 2.0 | 7.8 | 14.0 | 0.9 |
| Farming, fishing, and forestry occupations................... | 1.3 | 1.6 | 0.9 | 0.5 | 0.7 | 0.3 |
| Construction and extraction occupations.................... | 9.7 | 16.3 | 0.9 | 4.2 | 7.8 | 0.4 |
| Installation, maintenance, and repair occupations........... | 2.9 | 4.9 | 0.2 | 3.1 | 5.6 | 0.3 |
| Production, transportation, and material moving occupations................................................. | 15.2 | 18.7 | 10.5 | 11.8 | 17.3 | 5.8 |
| Production occupations....................................... | 6.6 | 6.9 | 6.2 | 4.8 | 6.7 | 2.7 |
| Transportation and material moving occupations............ | 8.6 | 11.8 | 4.3 | 7.0 | 10.5 | 3.1 |

NOTE: Updated population controls are introduced annually with the release of January data.

**Table 5. Median usual weekly earnings of full-time wage and salary workers for the foreign born and native born by selected characteristics, 2022-2023 annual averages**
[Numbers in thousands]

| Characteristic | 2022 | | | | | 2023 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Foreign born | | Native born | | Earnings of foreign born as percent of native born | Foreign born | | Native born | | Earnings of foreign born as percent of native born |
| | Number | Median weekly earnings | Number | Median weekly earnings | | Number | Median weekly earnings | Number | Median weekly earnings | |
| Total, 16 years and over.................. | 21,929 | $945 | 96,940 | $1,087 | 86.9 | 22,675 | $987 | 98,232 | $1,140 | 86.6 |
| Men........................................... | 12,974 | 1,000 | 52,580 | 1,185 | 84.4 | 13,447 | 1,051 | 53,253 | 1,238 | 84.9 |
| Women....................................... | 8,955 | 861 | 44,360 | 975 | 88.3 | 9,228 | 899 | 44,978 | 1,025 | 87.7 |
| **AGE** | | | | | | | | | | |
| 16 to 24 years.............................. | 1,049 | 683 | 9,677 | 691 | 98.8 | 1,178 | 672 | 10,247 | 718 | 93.6 |
| 25 to 34 years.............................. | 4,477 | 962 | 24,820 | 998 | 96.4 | 4,492 | 992 | 25,257 | 1,054 | 94.1 |
| 35 to 44 years.............................. | 6,049 | 992 | 22,016 | 1,233 | 80.5 | 6,184 | 1,059 | 22,518 | 1,301 | 81.4 |
| 45 to 54 years.............................. | 5,730 | 983 | 19,567 | 1,250 | 78.6 | 5,839 | 1,033 | 19,772 | 1,326 | 77.9 |
| 55 to 64 years.............................. | 3,676 | 933 | 16,467 | 1,202 | 77.6 | 3,905 | 976 | 16,126 | 1,266 | 77.1 |
| 65 years and over.......................... | 949 | 889 | 4,393 | 1,082 | 82.2 | 1,077 | 898 | 4,312 | 1,131 | 79.4 |
| **RACE AND HISPANIC OR LATINO ETHNICITY[1]** | | | | | | | | | | |
| White non-Hispanic or Latino............ | 3,294 | 1,318 | 67,524 | 1,162 | 113.4 | 3,275 | 1,380 | 67,748 | 1,224 | 112.7 |
| Black non-Hispanic or Latino............. | 2,360 | 943 | 12,391 | 871 | 108.3 | 2,482 | 971 | 12,893 | 919 | 105.7 |
| Asian non-Hispanic or Latino............. | 5,584 | 1,435 | 2,359 | 1,398 | 102.6 | 5,904 | 1,503 | 2,489 | 1,464 | 102.7 |
| Hispanic or Latino ethnicity............... | 10,408 | 758 | 11,819 | 910 | 83.3 | 10,716 | 792 | 12,117 | 947 | 83.6 |
| **EDUCATIONAL ATTAINMENT** | | | | | | | | | | |
| Total, 25 years and over.................. | 20,881 | 968 | 87,263 | 1,150 | 84.2 | 21,497 | 1,012 | 87,984 | 1,206 | 83.9 |
| Less than a high school diploma...... | 3,748 | 663 | 2,454 | 708 | 93.6 | 3,694 | 692 | 2,353 | 748 | 92.5 |
| High school graduates, no college[2]... | 5,157 | 767 | 21,277 | 879 | 87.3 | 5,298 | 809 | 21,029 | 919 | 88.0 |
| Some college or associate degree.... | 3,083 | 889 | 23,193 | 981 | 90.6 | 3,109 | 944 | 23,418 | 1,027 | 91.9 |
| Bachelor's degree and higher[3]......... | 8,893 | 1,581 | 40,338 | 1,537 | 102.9 | 9,397 | 1,637 | 41,185 | 1,602 | 102.2 |

[1] Data for race/ethnicity groups do not sum to totals because data are not presented for all races.
[2] Includes persons with a high school diploma or equivalent.
[3] Includes persons with bachelor's, master's, professional, and doctoral degrees.
NOTE: Updated population controls are introduced annually with the release of January data.

**Table 6. Employment status of the foreign-born and native-born populations 16 years and over by census region and division, 2022-2023 annual averages**
[Numbers in thousands]

| Census region and division | 2022 | | | | | | 2023 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Civilian noninstitutional population | Civilian labor force | | | | | Civilian noninstitutional population | Civilian labor force | | | | |
| | | Total | Participation rate | Employed | Unemployed | | | Total | Participation rate | Employed | Unemployed | |
| | | | | | Number | Unemployment rate | | | | | Number | Unemployment rate |
| **FOREIGN BORN** | | | | | | | | | | | | |
| Northeast.................... | 9,443 | 6,201 | 65.7 | 5,962 | 240 | 3.9 | 9,882 | 6,564 | 66.4 | 6,300 | 264 | 4.0 |
| New England............ | 2,111 | 1,440 | 68.2 | 1,390 | 49 | 3.4 | 2,217 | 1,524 | 68.7 | 1,469 | 55 | 3.6 |
| Middle Atlantic.......... | 7,332 | 4,762 | 64.9 | 4,571 | 190 | 4.0 | 7,665 | 5,040 | 65.7 | 4,831 | 209 | 4.1 |
| South........................ | 16,072 | 10,774 | 67.0 | 10,449 | 325 | 3.0 | 16,885 | 11,451 | 67.8 | 11,097 | 354 | 3.1 |
| South Atlantic........... | 9,343 | 6,318 | 67.6 | 6,147 | 171 | 2.7 | 9,981 | 6,773 | 67.9 | 6,605 | 168 | 2.5 |
| East South Central..... | 926 | 617 | 66.6 | 599 | 18 | 3.0 | 867 | 591 | 68.2 | 568 | 23 | 3.9 |
| West South Central.... | 5,802 | 3,839 | 66.2 | 3,703 | 136 | 3.5 | 6,037 | 4,088 | 67.7 | 3,925 | 163 | 4.0 |
| Midwest.................... | 5,164 | 3,552 | 68.8 | 3,437 | 116 | 3.3 | 5,149 | 3,547 | 68.9 | 3,422 | 125 | 3.5 |
| East North Central..... | 3,899 | 2,641 | 67.7 | 2,552 | 89 | 3.4 | 3,859 | 2,617 | 67.8 | 2,520 | 97 | 3.7 |
| West North Central..... | 1,265 | 911 | 72.0 | 885 | 26 | 2.9 | 1,290 | 930 | 72.1 | 902 | 28 | 3.0 |
| West......................... | 14,471 | 9,227 | 63.8 | 8,890 | 337 | 3.7 | 14,735 | 9,489 | 64.4 | 9,113 | 376 | 4.0 |
| Mountain................. | 2,776 | 1,799 | 64.8 | 1,743 | 56 | 3.1 | 2,842 | 1,876 | 66.0 | 1,803 | 73 | 3.9 |
| Pacific..................... | 11,695 | 7,429 | 63.5 | 7,148 | 281 | 3.8 | 11,893 | 7,613 | 64.0 | 7,310 | 303 | 4.0 |
| **NATIVE BORN** | | | | | | | | | | | | |
| Northeast.................... | 36,639 | 22,502 | 61.4 | 21,594 | 908 | 4.0 | 36,458 | 22,522 | 61.8 | 21,679 | 844 | 3.7 |
| New England............ | 10,318 | 6,556 | 63.5 | 6,326 | 230 | 3.5 | 10,287 | 6,498 | 63.2 | 6,291 | 207 | 3.2 |
| Middle Atlantic.......... | 26,321 | 15,945 | 60.6 | 15,268 | 677 | 4.2 | 26,171 | 16,024 | 61.2 | 15,388 | 636 | 4.0 |
| South........................ | 84,813 | 50,751 | 59.8 | 49,000 | 1,751 | 3.5 | 85,967 | 51,755 | 60.2 | 50,007 | 1,748 | 3.4 |
| South Atlantic........... | 44,238 | 26,303 | 59.5 | 25,445 | 858 | 3.3 | 44,751 | 26,805 | 59.9 | 25,965 | 840 | 3.1 |
| East South Central..... | 14,498 | 8,320 | 57.4 | 8,037 | 283 | 3.4 | 14,705 | 8,381 | 57.0 | 8,111 | 270 | 3.2 |
| West South Central.... | 26,077 | 16,128 | 61.8 | 15,518 | 609 | 3.8 | 26,511 | 16,569 | 62.5 | 15,931 | 638 | 3.9 |
| Midwest.................... | 49,363 | 31,264 | 63.3 | 30,174 | 1,090 | 3.5 | 49,588 | 31,633 | 63.8 | 30,548 | 1,085 | 3.4 |
| East North Central..... | 33,634 | 20,861 | 62.0 | 20,035 | 826 | 4.0 | 33,771 | 21,165 | 62.7 | 20,371 | 794 | 3.8 |
| West North Central..... | 15,730 | 10,403 | 66.1 | 10,139 | 264 | 2.5 | 15,817 | 10,468 | 66.2 | 10,177 | 290 | 2.8 |
| West......................... | 48,008 | 30,016 | 62.5 | 28,787 | 1,230 | 4.1 | 48,278 | 30,155 | 62.5 | 28,870 | 1,285 | 4.3 |
| Mountain................. | 17,403 | 11,080 | 63.7 | 10,677 | 403 | 3.6 | 17,633 | 11,279 | 64.0 | 10,880 | 399 | 3.5 |
| Pacific..................... | 30,604 | 18,937 | 61.9 | 18,110 | 826 | 4.4 | 30,645 | 18,876 | 61.6 | 17,990 | 886 | 4.7 |

NOTE: The states (plus the District of Columbia) that comprise the census divisions are: New England (Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont); Middle Atlantic (New Jersey, New York, and Pennsylvania); South Atlantic (Delaware, District of Columbia, Florida, Georgia, Maryland, North Carolina, South Carolina, Virginia, and West Virginia); East South Central (Alabama, Kentucky, Mississippi, and Tennessee); West South Central (Arkansas, Louisiana, Oklahoma, and Texas); East North Central (Illinois, Indiana, Michigan, Ohio, and Wisconsin); West North Central (Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota); Mountain (Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming); Pacific (Alaska, California, Hawaii, Oregon, and Washington). Updated population controls are introduced annually with the release of January data.

**U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Data Tools > Charts and Applications > Charts for Economic News Releases

# Graphics for Economic News Releases

## Number of unemployed persons per job opening, seasonally adjusted

Charts related to the latest "Job Openings and Labor Turnover Survey" news release   |   More chart packages

PREV   NEXT     Number of unemployed persons per job opening, seasonally adjusted         GO



**Number of unemployed persons per job opening, seasonally adjusted**
Click and drag within the chart to zoom in on time periods

Hover over chart to view data.
Note: Shaded area represents recession, as determined by the National Bureau of Economic Research.
Source: U.S. Bureau of Labor Statistics.

Show table

U.S. BUREAU OF LABOR STATISTICS  OEUS/JOLTS, PSB Suite 4840   PSB Suite 4160   2 Massachusetts Avenue NE   Washington, DC 20212-0001

Telephone:1-202-691-5870   www.bls.gov/JLT   Contact JOLTS

 **U.S. BUREAU OF LABOR STATISTICS**

Bureau of Labor Statistics > Occupational Employment and Wage Statistics

# Occupational Employment and Wage Statistics

Search Occupati | **Go**

| OEWS Home |
| OEWS Publications ▾ |
| OEWS Data ▾ |
| OEWS Methods ▾ |
| About OEWS ▾ |
| Contact OEWS |

## Occupational Employment and Wages, May 2023

### 23-1011 Lawyers

Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

National estimates for Lawyers
Industry profile for Lawyers
Geographic profile for Lawyers

### National estimates for Lawyers:

Employment estimate and mean wage estimates for Lawyers:

| Employment (1) | Employment RSE (3) | Mean hourly wage | Mean annual wage (2) | Wage RSE (3) |
|---|---|---|---|---|
| 731,340 | 0.7 % | $ 84.84 | $ 176,470 | 1.6 % |

Percentile wage estimates for Lawyers:

| Percentile | 10% | 25% | 50% (Median) | 75% | 90% |
|---|---|---|---|---|---|
| Hourly Wage | $ 33.54 | $ 47.13 | $ 70.08 | $ 104.50 | (5) |
| Annual Wage (2) | $ 69,760 | $ 98,030 | $ 145,760 | $ 217,360 | (5) |

### Industry profile for Lawyers:

Industries with the highest published employment and wages for Lawyers are provided. For a list of all industries with employment in Lawyers, see the Create Customized Tables function.

Industries with the highest levels of employment in Lawyers:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Legal Services | 445,110 | 37.49 | $ 87.51 | $ 182,020 |
| Local Government, excluding Schools and Hospitals (OEWS Designation) | 57,160 | 1.04 | $ 63.60 | $ 132,290 |
| State Government, excluding Schools and Hospitals (OEWS Designation) | 47,650 | 2.25 | $ 51.16 | $ 106,420 |
| Federal, State, and Local Government, excluding State and Local Government Schools and Hospitals and the U.S. Postal Service (OEWS Designation) | 40,630 | 1.90 | $ 76.58 | $ 159,280 |
| Management of Companies and Enterprises | 22,110 | 0.80 | $ 114.12 | $ 237,370 |

Industries with the highest concentration of employment in Lawyers:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Legal Services | 445,110 | 37.49 | $ 87.51 | $ 182,020 |

| Industry | Employment | Percent | Hourly mean wage | Annual mean wage |
|---|---|---|---|---|
| State Government, excluding Schools and Hospitals (OEWS Designation) | 47,650 | 2.25 | $ 51.16 | $ 106,420 |
| Lessors of Nonfinancial Intangible Assets (except Copyrighted Works) | 450 | 2.03 | $ 89.74 | $ 186,650 |
| Federal, State, and Local Government, excluding State and Local Government Schools and Hospitals and the U.S. Postal Service (OEWS Designation) | 40,630 | 1.90 | $ 76.58 | $ 159,280 |
| Other Investment Pools and Funds | 320 | 1.70 | $ 90.31 | $ 187,830 |

Top paying industries for Lawyers:

| Industry | Employment (1) | Percent of industry employment | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|
| Water, Sewage and Other Systems | 30 | 0.05 | $ 151.44 | $ 315,000 |
| Other Ambulatory Health Care Services | 140 | 0.04 | $ 145.77 | $ 303,190 |
| Clothing and Clothing Accessories Retailers | 40 | (7) | $ 145.09 | $ 301,780 |
| Motion Picture and Video Industries | 1,100 | 0.27 | $ 135.06 | $ 280,910 |
| Promoters of Performing Arts, Sports, and Similar Events | 180 | 0.11 | $ 134.38 | $ 279,510 |

## Geographic profile for Lawyers:

States and areas with the highest published employment, location quotients, and wages for Lawyers are provided. For a list of all areas with employment in Lawyers, see the Create Customized Tables function.

### Employment of lawyers, by state, May 2023



Employment
■ 200 - 2,470  ■ 2,830 - 6,660
■ 7,270 - 15,870  ■ 16,080 - 94,300
Blank areas indicate data not available.

States with the highest employment level in Lawyers:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| California | 94,300 | 5.25 | 1.09 | $ 102.82 | $ 213,860 |
| New York | 86,000 | 9.16 | 1.90 | $ 100.23 | $ 208,480 |
| Florida | 61,320 | 6.41 | 1.33 | $ 70.83 | $ 147,320 |
| Texas | 45,950 | 3.39 | 0.70 | $ 85.53 | $ 177,890 |
| District of Columbia | 34,660 | 49.38 | 10.25 | $ 114.90 | $ 238,990 |

## Location quotient of lawyers, by state, May 2023



Blank areas indicate data not available.

States with the highest concentration of jobs and location quotients in Lawyers:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| District of Columbia | 34,660 | 49.38 | 10.25 | $ 114.90 | $ 238,990 |
| New York | 86,000 | 9.16 | 1.90 | $ 100.23 | $ 208,480 |
| Florida | 61,320 | 6.41 | 1.33 | $ 70.83 | $ 147,320 |
| New Jersey | 25,680 | 6.11 | 1.27 | $ 85.21 | $ 177,230 |
| Delaware | 2,830 | 6.03 | 1.25 | $ 102.09 | $ 212,360 |

## Annual mean wage of lawyers, by state, May 2023



Blank areas indicate data not available.

Top paying states for Lawyers:

| State | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| District of Columbia | 34,660 | 49.38 | 10.25 | $ 114.90 | $ 238,990 |
| California | 94,300 | 5.25 | 1.09 | $ 102.82 | $ 213,860 |
| Delaware | 2,830 | 6.03 | 1.25 | $ 102.09 | $ 212,360 |
| New York | 86,000 | 9.16 | 1.90 | $ 100.23 | $ 208,480 |
| Connecticut | 8,230 | 4.96 | 1.03 | $ 94.10 | $ 195,730 |

## Employment of lawyers, by area, May 2023



**Employment**

◻ 30 - 120    ◼ 130 - 230
◼ 240 - 540    ◼ 550 - 90,980

Blank areas indicate data not available.

Metropolitan areas with the highest employment level in Lawyers:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| New York-Newark-Jersey City, NY-NJ-PA | 90,980 | 9.58 | 1.99 | $ 102.61 | $ 213,420 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 48,470 | 15.67 | 3.25 | $ 107.64 | $ 223,890 |
| Los Angeles-Long Beach-Anaheim, CA | 43,410 | 7.02 | 1.46 | $ 105.64 | $ 219,740 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 28,220 | 10.37 | 2.15 | $ 74.43 | $ 154,810 |
| Chicago-Naperville-Elgin, IL-IN-WI | 26,750 | 5.94 | 1.23 | $ 89.59 | $ 186,340 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 19,190 | 6.78 | 1.41 | $ 83.46 | $ 173,590 |
| Boston-Cambridge-Nashua, MA-NH | 18,900 | 6.84 | 1.42 | $ 94.79 | $ 197,150 |
| Atlanta-Sandy Springs-Roswell, GA | 17,940 | 6.37 | 1.32 | $ 85.47 | $ 177,770 |
| San Francisco-Oakland-Hayward, CA | 17,010 | 7.02 | 1.46 | $ 113.43 | $ 235,940 |
| Dallas-Fort Worth-Arlington, TX | 14,720 | 3.71 | 0.77 | $ 90.56 | $ 188,350 |

## Location quotient of lawyers, by area, May 2023



**Location quotient**

- 0.19 - 0.40
- 0.80 - 1.25
- 2.50 - 3.50
- 0.40 - 0.80
- 1.25 - 2.50

Blank areas indicate data not available.

Metropolitan areas with the highest concentration of jobs and location quotients in Lawyers:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 48,470 | 15.67 | 3.25 | $ 107.64 | $ 223,890 |
| Tallahassee, FL | 2,040 | 11.29 | 2.34 | $ 50.90 | $ 105,860 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 28,220 | 10.37 | 2.15 | $ 74.43 | $ 154,810 |
| New York-Newark-Jersey City, NY-NJ-PA | 90,980 | 9.58 | 1.99 | $ 102.61 | $ 213,420 |
| Trenton, NJ | 2,170 | 9.09 | 1.89 | $ 74.54 | $ 155,050 |
| Santa Fe, NM | 530 | 8.62 | 1.79 | $ 56.28 | $ 117,070 |
| New Orleans-Metairie, LA | 4,230 | 8.22 | 1.71 | $ 70.20 | $ 146,010 |
| Charleston, WV | 830 | 8.09 | 1.68 | (8) | (8) |
| Denver-Aurora-Lakewood, CO | 12,480 | 7.84 | 1.63 | $ 95.55 | $ 198,750 |
| Albany-Schenectady-Troy, NY | 3,380 | 7.69 | 1.60 | $ 65.13 | $ 135,470 |

## Annual mean wage of lawyers, by area, May 2023



**Annual mean wage**

☐ $62,380 - $114,320     ■ $114,500 - $128,850
■ $128,930 - $143,620     ■ $143,880 - $268,570

Blank areas indicate data not available.

Top paying metropolitan areas for Lawyers:

| Metropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| San Jose-Sunnyvale-Santa Clara, CA | 7,080 | 6.20 | 1.29 | $ 129.12 | $ 268,570 |
| Bridgeport-Stamford-Norwalk, CT | 2,320 | 5.78 | 1.20 | $ 121.26 | $ 252,210 |
| Boulder, CO | 960 | 4.92 | 1.02 | $ 120.91 | $ 251,490 |
| San Francisco-Oakland-Hayward, CA | 17,010 | 7.02 | 1.46 | $ 113.43 | $ 235,940 |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | 48,470 | 15.67 | 3.25 | $ 107.64 | $ 223,890 |
| Midland, MI | 100 | 2.66 | 0.55 | $ 106.15 | $ 220,780 |
| Los Angeles-Long Beach-Anaheim, CA | 43,410 | 7.02 | 1.46 | $ 105.64 | $ 219,740 |
| Fort Collins, CO | 500 | 2.90 | 0.60 | $ 104.22 | $ 216,770 |
| New York-Newark-Jersey City, NY-NJ-PA | 90,980 | 9.58 | 1.99 | $ 102.61 | $ 213,420 |
| Corpus Christi, TX | 740 | 3.96 | 0.82 | $ 102.32 | $ 212,830 |

Nonmetropolitan areas with the highest employment in Lawyers:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Southwest Montana nonmetropolitan area | 840 | 5.54 | 1.15 | $ 49.83 | $ 103,640 |
| Central Kentucky nonmetropolitan area | 650 | 3.51 | 0.73 | $ 42.25 | $ 87,870 |
| Southwest Maine nonmetropolitan area | 630 | 3.31 | 0.69 | $ 46.99 | $ 97,730 |
| Kansas nonmetropolitan area | 560 | 1.43 | 0.30 | $ 45.25 | $ 94,120 |
| Northeast Mississippi nonmetropolitan area | 540 | 2.37 | 0.49 | $ 62.57 | $ 130,140 |

Nonmetropolitan areas with the highest concentration of jobs and location quotients in Lawyers:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| Southwest Montana nonmetropolitan area | 840 | 5.54 | 1.15 | $ 49.83 | $ 103,640 |

004428

| | Employment | Employment per thousand jobs | Location quotient | Hourly mean wage | Annual mean wage |
|---|---|---|---|---|---|
| Central New Hampshire nonmetropolitan area | 510 | 5.53 | 1.15 | $ 58.45 | $ 121,570 |
| West South Dakota nonmetropolitan area | 290 | 4.69 | 0.97 | $ 54.65 | $ 113,660 |
| West Montana nonmetropolitan area | 310 | 3.71 | 0.77 | $ 47.11 | $ 97,990 |
| Maryland nonmetropolitan area | 210 | 3.57 | 0.74 | $ 64.61 | $ 134,390 |

Top paying nonmetropolitan areas for Lawyers:

| Nonmetropolitan area | Employment (1) | Employment per thousand jobs | Location quotient (9) | Hourly mean wage | Annual mean wage (2) |
|---|---|---|---|---|---|
| North Valley-Northern Mountains Region of California nonmetropolitan area | 180 | 1.80 | 0.37 | $ 81.76 | $ 170,060 |
| Connecticut nonmetropolitan area | 40 | 1.12 | 0.23 | $ 81.64 | $ 169,800 |
| West Texas Region of Texas nonmetropolitan area | 180 | 0.92 | 0.19 | $ 76.32 | $ 158,740 |
| Eastern Sierra-Mother Lode Region of California nonmetropolitan area | 90 | 1.49 | 0.31 | $ 74.08 | $ 154,080 |
| Big Thicket Region of Texas nonmetropolitan area | 120 | 1.10 | 0.23 | $ 70.19 | $ 145,990 |

About May 2023 National, State, Metropolitan, and Nonmetropolitan Area Occupational Employment and Wage Estimates

These estimates are calculated with data collected from employers in all industry sectors, all metropolitan and nonmetropolitan areas, and all states and the District of Columbia. The top employment and wage figures are provided above. The complete list is available in the downloadable XLS files.

The percentile wage estimate is the value of a wage below which a certain percent of workers fall. The median wage is the 50th percentile wage estimate—50 percent of workers earn less than the median and 50 percent of workers earn more than the median. More about percentile wages.

(1) Estimates for detailed occupations do not sum to the totals because the totals include occupations not shown separately. Estimates do not include self-employed workers.

(2) Annual wages have been calculated by multiplying the hourly mean wage by a "year-round, full-time" hours figure of 2,080 hours; for those occupations where there is not an hourly wage published, the annual wage has been directly calculated from the reported survey data.

(3) The relative standard error (RSE) is a measure of the reliability of a survey statistic. The smaller the relative standard error, the more precise the estimate.

(5) This wage is equal to or greater than $115.00 per hour or $239,200 per year.

(7) The value is less than .005 percent of industry employment.

(8) Estimate not released.

(9) The location quotient is the ratio of the area concentration of occupational employment to the national average concentration. A location quotient greater than one indicates the occupation has a higher share of employment than average, and a location quotient less than one indicates the occupation is less prevalent in the area than average.

Other OEWS estimates and related information:

May 2023 National Occupational Employment and Wage Estimates

May 2023 State Occupational Employment and Wage Estimates

May 2023 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates

May 2023 National Industry-Specific Occupational Employment and Wage Estimates

May 2023 Occupation Profiles

Technical Notes

**Last Modified Date:** April 3, 2024

U.S. BUREAU OF LABOR STATISTICS  Division of Occupational Employment and Wage Statistics  PSB Suite 2135  2 Massachusetts Avenue NE  Washington, DC 20212-0001

https://www.bls.gov/oes/2023/may/oes231011.htm

004429

7/8

Telephone:1-202-691-6569, www.bls.gov/OES , Contact OEWS

004430

An official website of the United States Government Here's how you know

Home > Refugee Admissions > Safe Mobility Initiative

# Safe Mobility Initiative

## BUREAU OF POPULATION, REFUGEES, AND MIGRATION

The United States has led the largest expansion in decades of lawful pathways to the United States to help refugees, vulnerable migrants, and other forcibly displaced persons in the Western Hemisphere.

Individuals seeking international protection and other lawful pathways have many options, including seeking refugee resettlement, humanitarian parole, family reunification, labor pathways, and seeking asylum in host countries, as well as various support services provided by international organizations and NGOs.

The Safe Mobility (SMO) initiative is one of the many ways the United States is facilitating access to safe and lawful pathways from partner countries in the region at no cost, so refugees and vulnerable migrants don't have to undertake dangerous journeys in search of safety and better opportunities.

**There are various pathways available depending on the profile and needs of the applicant:**

The Safe Mobility initiative facilitates expedited refugee processing via the U.S. Refugee Admissions Program (USRAP) and provides information and/or referrals to humanitarian parole, family reunification, and labor pathways through MovilidadSegura.org and Safe Mobility Offices (SMOs) in Colombia, Costa Rica, Guatemala, and Ecuador.

004431

Tens of thousands of people have already submitted a free application on **MovilidadSegura.org**. SMOs are reviewing applications for eligibility and international protection needs and contacting applicants to provide information about a potential lawful pathway and to schedule an appointment for further processing.

Individuals in the region seeking international protection and other lawful pathways have several options, including seeking refugee resettlement, humanitarian parole, family reunification, labor pathways, and seeking asylum in host countries, as well as various support services provided by international organizations and NGOs.

---

TAGS

Refugee Admissions

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

004432

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

004433

An official website of the United States Government    Here's how you know

Home > Mexico > U.S. Relations With Mexico

# U.S. Relations With Mexico

### BILATERAL RELATIONS FACT SHEET

### BUREAU OF WESTERN HEMISPHERE AFFAIRS

SEPTEMBER 13, 2023

**More information about Mexico is available on the Mexico Page and from other Department of State publications and other sources listed at the end of this fact sheet.**

**U.S.-MEXICO RELATIONS**

In 2022, the United States and Mexico celebrated 200 years of diplomatic relations. By virtue of shared geography, history, and deep cultural and people-to-people ties, Mexico remains one of the United States' closest and most valued partners.  The countries share a 2,000-mile border with 47 active land ports of entry.  This bilateral relationship directly impacts the lives and livelihoods of millions of Americans, whether the issue is trade and economic development, education exchange, citizen security, drug control, migration, human trafficking, entrepreneurship, innovation, environmental protection, climate change, or public health.  The broad scope of relations between the United States and Mexico extends beyond diplomatic and official relations.  It encompasses extensive commercial, cultural, and educational exchange. Hundreds of thousands of people cross the border legally each day.  In addition, an estimated 1.6 million U.S. citizens live in Mexico, and Mexico is the top foreign destination for U.S. travelers.

**Bilateral Economic Issues and the United States-Mexico-Canada Agreement**

Mexico became the top U.S. trading partner in early 2023, with bilateral trade totaling $263 billion in the first four months of the year and accounting for more than 15 percent of total U.S. trade. In 2022, U.S. goods and services trade with Mexico reached $863 billion, making Mexico our second-largest trading partner. According to the Department of Commerce, U.S. exports of goods and services to Mexico totaled $362.5 billion in 2022, which accounted for 13 percent of total U.S. exports and 43 percent of Mexican imports.  U.S. exports supported an estimated 1.1 million jobs in 2019 (latest data available).

In 2022, Mexico remained the second-largest source of foreign crude oil to the United States as well as the top destination for U.S. petroleum product exports and U.S. natural gas.  Other top U.S. exports to Mexico include machinery, electrical machinery, vehicles, mineral fuels, and plastics.  The stock of foreign direct investment by U.S. companies in Mexico stood at $130.3 billion in 2022 while Mexican stock investment in the United States was over $33.8 billion in 2022, according to the Department of Commerce.

The United States-Mexico-Canada Agreement (USMCA) entered into force on July 1, 2020, replacing NAFTA as the free trade agreement for North America.  The USMCA supports mutually beneficial trade leading to freer markets, fairer trade, and robust economic growth in North America.  The agreement generates job opportunities, improves worker protections, prevents forced labor, increases agricultural trade, produces new investments in vital manufacturing industries, protects intellectual property rights, creates similar environmental standards across the three countries, and updates digital trade protections.

The USMCA requires a formal review of the agreement at least every six years.  These periodic reviews are designed to ensure that the terms of the agreement remain beneficial for all parties and to identify emerging issues for potential revisions.  The agreement is set to terminate on July 1, 2036, but can be extended for an additional 16 years by all three countries after each review. Also, USMCA includes a Rapid Response Mechanism (RRM) to handle plant-level labor disputes related to denial of rights.  As of July 2023, twelve cases had been filed using the RRM.

Mexico, a strong promoter of trade liberalization, maintains thirteen trade agreements with 50 countries plus 32 investment promotion agreements, and nine limited economic agreements, including pacts with Japan, the European Union, and many Latin American partners.

004435

On September 12, 2022, senior government officials from the United States and Mexico met in Mexico City to convene the U.S.-Mexico High-Level Economic Dialogue (HLED).  The next HLED meeting will be held in Washington, D.C. in September 2023.  The dialogue focuses on building back together to improve the regional business environment and strengthen supply chain resilience, promoting sustainable economic and social development in southern Mexico and Central America, securing the tools for future prosperity by supporting regulatory compatibility in the information, communication, telecom, and infrastructure sectors, supporting micro, small and medium enterprise (MSME) development and equipping our workforces with the skills to succeed in the modern global economy.  The Department of Commerce, the Department of State, and the U.S. Trade Representative co-chair the annual cabinet-level dialogue.  Periodic updates related to the HLED are published at **www.trade.gov/hled** where stakeholders may submit input.

The United States and Mexico maintain deep ties in science and technology cooperation, with collaborative research on health, meteorology, hydrology, earth sciences, and energy technology facilitated by the 1972 Agreement on Scientific and Technical Cooperation.  U.S. science agencies such as NOAA, NSF, NIST, NIH, USGS, NASA, and DOE contribute to a solid body of bilateral scientific research.  In 2021, Mexico joined 21 other countries in signing the Artemis Accords with NASA, outlining the principles and rules to enhance governance of the responsible exploration of outer space.

**Migration**

The United States works with Mexico to address the root causes of irregular migration and to implement humane migration management policies that prioritize control and security for our respective borders; respect for the human rights of migrants; and access to international protection for those in need.  Mexico is a member of the Regional Conference on Migration (RCM), an eleven-member consultative mechanism to coordinate regional migration policies.  RCM member countries commit to addressing issues of international migration in a multilateral context that respects orderly movements and human rights.  Mexico also participates in the Comprehensive Regional Protection and Solutions Framework, known by its Spanish acronym MIRPS — a regional application of the Global Compact for Refugees wherein countries collaborate to prevent and respond to forced displacement within their borders and regionally.  The United States supports MIRPS efforts as a member and incoming chair of its parallel donor

004436

Support Platform and with humanitarian funding contributions through international organizations.

The United States and Mexico have expanded cooperation to address the root causes of migration and manage our shared border in a humane and orderly way.  The U.S. government supports international organization and NGO partners to respond to the needs of asylum seekers, refugees, internally displaced persons, and vulnerable migrants in Mexico.  With USG funds, the United Nations High Commissioner for Refugees (UNHCR) assisted the Mexican Commission for Refugee Assistance (COMAR) to increase its asylum case registration and processing capacity by 400 percent since 2018.  The Bureau of International Narcotics and Law Enforcement Affairs (INL) builds the capacity of Mexico's border and migration officials to humanely manage migration and to coordinate with Mexican and U.S. law enforcement to secure borders.  INL programming also increases the capacity of Mexican security and justice sector institutions to identify, investigate, and prosecute human smuggling and trafficking.

Between 2021 and 2023, the United States Agency for International Development (USAID) and Mexican Agency for International Cooperation and Development (AMEXCID) have worked closely with state governments in southern Mexico to link Micro, Small, and Medium Sized Enterprises with markets and investors and have trained farmers on conservation techniques and access to markets and finance, benefiting more than 40,000 people to date.

In June 2021, USAID and AMEXCID signed a Memorandum of Understanding to strengthen development cooperation in northern Central America.  This MOU supports U.S. and Mexican efforts to exchange knowledge, experiences, assets, and resources to address the root causes of irregular migration in northern Central America.  In December 2021, the United States and Mexico announced *Sembrando Oportunidades*, a bilateral framework with goals, projects, and indicators to carry out this cooperation to address the root causes of migration from Central America. Through *Sembrando Oportunidades*, USAID and AMEXCID coordinate every day and have jointly reached nearly 2,000 farmers and youth in Honduras and El Salvador with interventions that provide them with greater economic opportunity. Based on the *Sembrando Oportunidades* model, Canada has now joined AMEXCID and USAID to coordinate foreign assistance to northern Central America to address the root causes of migration in northern Central America.

**U.S.-Mexico Border**

The border region represents a combined population of approximately 15 million people. Cooperation between the United States and Mexico along the border includes coordinating with state and local officials on cross-border infrastructure, transportation planning, and security as well as collaboration with institutions that address migration, natural resource, environment, and health issues.

In November 2021, President Biden signed the Bipartisan Infrastructure Law, a historic investment in U.S. infrastructure that included approximately $1.4 billion for construction and modernization projects at land ports of entry along the U.S.-Mexico border.  During their July 2022 meeting, Presidents Biden and Lopez Obrador reaffirmed their commitment to create borders that are more resilient, more efficient, and safer and that will enhance our shared commerce.  The joint effort seeks to align priorities, unite border communities, and make the flow of commerce and people more secure and efficient.  Mexico committed to invest $1.5 billion on border infrastructure between 2022 and 2024.

In 2010, the United States and Mexico created the 21st Century Border Management Initiative (21CB) to spur binational advancements to promote a modern, secure, and efficient border. High-level representatives from the U.S. and Mexican governments meet annually in the 21CB Executive Steering Committee to adopt action plans that guide bilateral efforts to modernize and expand ports of entry along the shared border; facilitate the flow of trade and travelers between the two countries; and strengthen cooperation on public safety in the border region.

The U.S. and Mexican governments also meet through the multi-agency Binational Bridges and Border Crossings Group (BBBXG) to advance joint initiatives that improve the efficiency of existing crossings and coordinate planning for new ones.  The BBBXG meets three times a year and provides the ten U.S. and Mexican border states, private sector representatives, and other public participants a forum to discuss cross-border infrastructure.  The BBBXG also discusses many federal, state, and local mechanisms that impact the border region, including Border Master Plans to coordinate infrastructure and development and close collaboration on transportation and customs issues.  The most recent BBBXG meeting took place in July 2023 in Washington, D.C.

The United States and Mexico also have a long history of cooperation on environmental and natural resource issues, particularly in the border area, where there are challenges caused by rapid population growth, urbanization, industrialization, and climate change.  Cooperative

activities between the United States and Mexico take place under several mechanisms, such as the North American Development Bank; the North American Commission for Environmental Cooperation; the Border Health Commission; and a variety of other agreements that address health of border residents, wildlife, migratory birds, national parks, and similar issues.

The International Boundary and Water Commission (IBWC), created by a treaty between the United States and Mexico, manages a wide variety of water resource and boundary preservation issues.  The U.S. and Mexican Sections of the IBWC work closely to distribute treaty-stipulated portions of water from the Rio Grande and Colorado River to both countries.  The IBWC also works to mitigate and prevent cross-border flows of untreated wastewater.  In that capacity, the U.S. Section of IBWC is one of the Environmental Protection Agency's lead partners in planning and implementing construction of major wastewater infrastructure – particularly in the Tijuana-San Diego area – under a $300 million appropriation provided as part of the USMCA implementation act.

## U.S. Security Cooperation with Mexico

Security is a shared responsibility.  Neither country can be secure if the other is not.  Cooperation between Mexico and the United States has never been more vital in the fight to combat the deadly threat of illicit fentanyl, methamphetamine, heroin, and other drugs.  We are committed to cooperation with Mexico to better *protect* the health and safety of our citizens and promote the development of the most vulnerable communities in both countries; *prevent* criminal organizations from harming our countries, and *pursue* and bring criminals to justice.

The United States partners with Mexico to reduce the impact of illicit drugs on U.S. and Mexican communities, dismantle criminal organizations, manage migration, improve citizen security, reduce criminal impunity, combat illicit arms trafficking, and promote human rights and the rule of law.  U.S.-funded training, equipment, and technical assistance complement Mexico's own investment in building the capacity of Mexican institutions and personnel to achieve these goals.

Through the Bicentennial Framework for Security, Public Health, and Safe Communities, adopted at the 2021 High-Level Security Dialogue, the United States and Mexico are increasing joint efforts to combat production of synthetic and other illicit drugs; working to better understand and reduce drug demand; increasing drug interdictions; pursuing the illicit financial flows that fund transnational criminal organizations ; working to prosecute and convict transnational

004439

criminal organizations; and reducing the amount of illicit firearms, bulk cash, and other illicit goods crossing the U.S.-Mexico border.  Because of this collaboration, the shared border is more secure, information sharing is more fluid, and both countries benefit from professionally trained officials and state-of-the-art equipment to confront transnational crime.  The next High-Level Security Dialogue will take place in October 2023 in Mexico City.

The United States and Mexico partner to combat transnational organized crime and drug trafficking while strengthening human rights and the rule of law.  Between 2008 and 2023, the United States appropriated approximately $3.4 billion in equipment, training, and capacity building for Mexican justice and law enforcement sectors.  Security cooperation between U.S. and Mexican law enforcement agencies helps police, prosecutors, and judges share best practices and expand capacity to track criminals, precursor chemicals, drugs, arms, and money to disrupt transnational crime.

U.S. Agency for International Development (USAID) programs support Mexican efforts to improve citizen security.  USAID programs help communities resist the effects of crime and violence while supporting Mexico's implementation of criminal justice constitutional reforms that protect citizens' rights.

**Educational and Cultural Exchanges**

The United States has a robust series of educational and cultural programs with Mexico that support young leaders, students, civil society, and entrepreneurs.  They provide English language learning, advance STEAM education, identify and advise on U.S. higher education opportunities, strengthen civil society, enhance security procedures, and expand economic opportunity.  They include music and sports diplomacy such as the **International Sports Programming Initiative**, **Sports Visitor** and **Sports Envoy** programs, the **Global Sports Mentoring Program**, and the e-sports leadership program for youth; the **Ambassadors Fund for Cultural Preservation**, the **Academy of Women Entrepreneurs**, the U.S. Speaker Program; leadership programs such as **Jóvenes en Acción** (Youth in Action); the **Young Leaders of the Americas Initiative**, the **Study of the U.S. Institutes** program which includes courses targeting indigenous and Afro-Mexican women; **Arts Envoy** and American Music Abroad Programming focused on engagement with underserved communities; the **International Visitor Leadership Program (IVLP)**, the **TechCamp Program** and English language opportunities for teachers and learners through such high-demand initiatives as the

004440

**English Access Microscholarship** **Online Professional English Network (OPEN)** and **English Language Virtual Educator** **Fellow** & **Specialist** programs.  There are over 40,000 alumni of U.S. government-funded or sponsored exchange programs.

EducationUSA has 23 advising centers throughout Mexico, which provide free and unbiased information on U.S. higher education opportunities to Mexican students.  Mexico is the ninth highest source worldwide of international students to the United States (and the sixth highest source to U.S. community colleges).  Mexico is the twelfth highest study abroad destination worldwide for U.S. students.  The EducationUSA Opportunity Funds program assists highly qualified Mexican students who are likely to be awarded full financial aid from U.S. colleges and universities but lack the financial resources to cover the up-front costs to apply, such as testing, application fees, or airfare.  Many of these students receive offers of admission and generous scholarships from U.S. higher education institutions.

The Fulbright Program in Mexico is one of the largest in the world.  Since 1948, nearly 9,000 students, scholars, and teachers have received Fulbright awards, and many have risen to prominent positions in business, academics, culture, and politics.  The binational Fulbright Commission – COMEXUS: the U.S.-Mexico Commission for Educational and Cultural Exchange – was established in 1990 via an agreement between both governments.  Funding to support Fulbright-COMEXUS exchange programs comes from annual contributions from the Department of State (e.g. ECA and Post) and Mexico (e.g. SRE and SEP).  In keeping with the binational spirit of the program, since 1992, all Fulbright grants administered by the Commission are referred to as *Fulbright-Garcia Robles* grants, in honor of Mexican Ambassador Emeritus and Nobel Peace Prize Laureate Alfonso Garcia Robles.

Mexico is also a significant participant in BridgeUSA, a cultural and educational program that offers exchanges in 13 different categories.  Mexico is one of the few countries with post-pandemic levels of participation greater than before COVID-19.  In 2019, 9,808 Mexicans started new programs, while 10,339 started new programs in 2020.  Currently, there are 14,183 active exchange visitors from Mexico participating in BridgeUSA.  The three categories with the most exchange visitors are Summer Work Travel (5,501), Camp Counselor (3,221), and Au Pair (2,838).

The Jóvenes en Acción exchange is a partnership between the Department of State, the Mexican Secretariat of Public Education (Secretaría de Educación Pública), the U.S. Embassy in Mexico City, and the embassy's private partners.  Since 2010, ECA and Mission Mexico have brought nearly

900 high school students from Mexico to the United States for a four-week exchange program focused on leadership development, civic engagement, and community service.  The exchange participants apply in groups of three to four with a teacher who serves as a mentor when they return home and implement a service project to address an issue plaguing their community such as violence, substance abuse, climate change, or cybersecurity.

It is indispensable to train students so they can be more competitive and prepared for the demands of the 21st century workforce and economic development of Mexico and the United States.  To that end, the Department of State's signature hemisphere-wide education initiative – 100,000 Strong in the Americas – creates interregional networks to strengthen institutional capacity and catalyze student development and mobility via new models of innovative education exchange and training opportunities. The 100K Strong Innovation Fund is the mechanism and trusted U.S. Government-branded collaboration between the Department of State, U.S. embassies, and regional private, public, and academic sectors to support 100K Strong competitions that benefit and engage underserved students in the U.S. and the rest of the Western Hemisphere, including Mexico.  In under ten years (2014-2023), Mexico is a leader in 100K Strong partnerships between a diversity of U.S. colleges/universities and Mexican higher education institutions (HEIs). To date, the 100K Strong Innovation Fund has provided 84 grants ($25,000 each) to 120 teams of HEIs in 28 U.S states and 23 Mexican states to increase student exchange and workforce development training programs STEM, public health, technology, financial inclusion, agriculture/food sciences, logistics, and business development.  The Mexican private sector has thus far contributed close to $1,900,000 USD in the last eight years to increase bilateral exchanges via the 100K Strong. In addition, the Embassy of the United States in Mexico City and Department of State are working with public and private sectors in Mexico and in Canada to launch the first ever 100,000 Strong in the Americas (100K Strong) "North America" grant competition by November 2023 that would expand innovation, inclusion, and climate-focused student/faculty exchange programs between higher education institutions in the U.S., Mexico, and Canada.

The year 2020 marked the 50th anniversary of the signing of the U.S.-Mexico treaty on the recovery and return of stolen archaeological, historical, and cultural properties.  This was the first international treaty related to cultural property trafficking.  Predating the UNESCO 1970 Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, this treaty demonstrates both countries' leadership on this topic.  Through the U.S. Ambassadors Fund for Cultural Preservation (AFCP), the United States

has awarded $1.7 million in grants since 2002 for nine projects to preserve Mexico's cultural heritage.

**Mexico's Membership in International Organizations**

Mexico is a strong supporter of the United Nations and a member of several other regional organizations.  For instance, Mexico was elected to a 2021-2023 seat on the UN Economic and Social Council.  Mexico and the United States belong to a number of the same international organizations, including the Asia-Pacific Economic Cooperation forum, Organization for Economic Cooperation and Development, International Energy Agency, International Monetary Fund, World Bank, Inter-American Development Bank, World Trade Organization, International Maritime Organization, Organization of American States, and the Wassenaar Arrangement on conventional arms.

The United States, Mexico, and Canada collaborate through the North American Leaders' Summit, revived in 2021, and in the 2022 Los Angeles Declaration on Migration and Protection, endorsed by 21 countries in the hemisphere.

**Bilateral Representation**

The **Department's Key Officers List** includes principal U.S. embassy and consulate officials in Mexico.

Mexico maintains an **embassy** in the United States at 1911 Pennsylvania Ave. NW, Washington, DC 20006 (tel. 202-728-1600).

More information about Mexico is available from the Department of State and other sources, some of which are listed here:

**CIA World Factbook Mexico Page**
**U.S. Embassy**
**U.S.-Mexico High-Level Economic Dialogue**
**FACT SHEET: U.S.-Mexico High-Level Security Dialogue | The White House**
**Summary of the Action Plan for U.S.-Mexico Bicentennial Framework for Security, Public Health, and Safe Communities**

004443

**FACT SHEET: Second Meeting of the U.S.-Mexico High-Level Security Dialogue | The White House**

**USAID Mexico Page**

**History of U.S. Relations With Mexico**

**Office of the U.S. Trade Representative – Mexico**

**Office of the U.S. Trade Repetitive – United States-Mexico-Canada Agreement**

**U.S. Census Bureau Foreign Trade Statistics**

**Export.gov International Offices Page**

**Library of Congress Country Studies**

**International Boundary and Water Commission, U.S. Section Page**

**Travel Information**

**Department of Energy: U.S. Energy Information Administration (EIA) Analysis**

**Department of Commerce: 2014 Mid-Year Review of High Level Economic Dialogue Progress**

**Trilateral Agreement with United States, Canada, and Mexico to Expand Trusted Traveler Programs**

---

TAGS

Bureau of Western Hemisphere Affairs        Mexico

---

White House

USA.gov

Office of the Inspector General

Archives

004444

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

004445

An official website of the United States Government. Here's how you know

Home > ... > Discussions with Mexican Officials on Migration at.

# Discussions with Mexican Officials on Migration at the Department of State

**READOUT**

**OFFICE OF THE SPOKESPERSON**

JANUARY 20, 2024

The below is attributable to Spokesperson Matthew Miller:

Secretary of State Antony J. Blinken hosted Mexican Foreign Secretary Alicia Bárcena yesterday at the Department of State to follow up on migration commitments made on December 27 in response to the invitation of President Andrés Manuel López Obrador.

Secretary of Homeland Security Alejandro Mayorkas, White House Homeland Security Advisor Liz Sherwood-Randall, Deputy Attorney General Lisa Monaco, and USAID Deputy Administrator Isobel Coleman joined Secretary Blinken for the meeting.

Foreign Secretary Bárcena was joined by Defense Secretary Luis Crescencio Sandoval González; Secretary of the Navy Admiral Rafael Ojeda Duran; Secretary of Public Security Rosa Icela Rodríguez Velazquez; Mexican Ambassador to the United States Esteban Moctezuma Barragán; Félix Arturo Medina, Undersecretary of Human Rights, Population and Migration, SEGOB; Roberto Velasco, Head of the Unit for North America, SRE; Commissioner for the National Migration Institute Francisco Garduño Yaez; and Alejandro Celorio, Legal Counselor, SRE.

004446

8/19/24, 6:01 PM                    Discussions with Mexican Officials on Migration at the Department of State - United States Department of State

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4454 of 4699 PageID #: 7619

During the meeting, Secretary Blinken and the U.S. delegation noted that our coordinated efforts with Mexico are demonstrating positive results at our shared border.  They discussed the positive impact of efforts to increase migration controls on bus and train routes, crack down on criminal smuggling networks, and scale up repatriations for those who do not have a legal basis to remain in our countries.

Secretary Blinken highlighted the peaceful transfer of power in Guatemala as one of the most significant developments in the region since the last meeting.  In close collaboration with the Government of Mexico, the United States stands ready to support the people of Guatemala and their new government on a wide range of issues including economic development and hemispheric migration management.

U.S. and Mexican officials also discussed their bilateral efforts to counter human smuggling and arms trafficking.  In addition, they reaffirmed the importance of further expanding lawful pathways and work opportunities, including between our two countries.

Migration is a hemispheric challenge.  The United States is committed to work hand in hand with Mexico and countries across the region to address the root causes of migration and advance economic opportunities in the spirit of Los Angeles Declaration for Migration and Protection.

The two governments committed to continue their strong cooperation on migration, including in senior leader discussions on the margins of the Trilateral Fentanyl Committee meeting in Mexico City in early February.

---

TAGS

Bureau of Population, Refugees, and Migration        Bureau of Western Hemisphere Affairs

Mexico        Migration        Office of the Spokesperson

---

004447

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4455 of 4699 PageID #: 7620

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

004448

## Immigrant Visa Backlog Report – July 2024

| | |
|---|---|
| Number of IV applicants whose cases are documentarily complete at NVC and ready for interview as of June 30 | 488,285 |
| Number of documentarily complete IV applicants scheduled for July 2023 interview appointments | 53,450 |
| **Number of eligible IV applicants still pending the scheduling of an interview after July 2023 appointment scheduling was completed** | **394,835** |

An official website of the United States Government Here's how you know

Home > ... > Secretary Antony J. Blinken and Secretary of Hom…

# Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability

**REMARKS**

**ANTONY J. BLINKEN, SECRETARY OF STATE**

**PRESS BRIEFING ROOM**

**WASHINGTON, DC**

APRIL 27, 2023

004450

8/19/24, 3:45 PM    Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas At a Joint Press Availability - United States D…

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 4458 of 4699 PageID #: 7623

**SECRETARY BLINKEN:** Well, good morning, everyone. Let me just say at the top that besides being delighted to be joined by Secretary Mayorkas, I also want to take this opportunity to say how thrilled I am that we have Matt Miller joining us as our new spokesperson. Probably have more to say on that in the days to come. But I couldn't be more pleased, not just for me but for the department and, indeed, for our country. An extraordinary professional I've had the benefit of working with over many years. And I'm equally grateful to Vedant Patel, who's done an extraordinary job as our spokesperson these past weeks.

In two weeks' time, the CDC's temporary Title 42 public health order will expire, as required by court order. President Biden and agencies across our government have been taking robust steps to prepare for the effect this will likely have on our immigration system, our partners in the region, and the movement of people across our hemisphere.

Secretary Mayorkas will speak about the immediate impact of Title 42's expiration and our stepped-up enforcement efforts. But first, I'd like to take this opportunity to put this in the context of our broader approach to migration in the region, which we'll continue to build on in the coming weeks. It's an approach focused on making migration more safe, orderly, and humane, and on advancing the interests of the American people.

If you step back – and it's really important to do that – globally there are more than 100 million people on the move today, compelled to leave their homes in search of security and better lives. That is more people than at any time in recorded history. And in our own hemisphere, we are facing an unprecedented migration challenge. Long-term drivers like violence, corruption, lack of economic opportunity, continue to push people from their homes – problems that have been exacerbated by the pandemic, crises of governance, extreme weather events caused by the changing climate. Twenty million people are displaced across this hemisphere, and the strain on transit and host countries is high.

Migration is the definition of a challenge that no country can solve alone. The magnitude, the range of drivers, the push and pull factors – all demand that we work together. That's why last summer President Biden brought together leaders from nations across the Western Hemisphere to agree to the Los Angeles Declaration on Migration and Protection; 21 countries have joined that declaration. The LA Declaration is an acknowledgment of our shared responsibility on migration, and our shared commitment to work together and leverage the strengths of partners

004451

8/19/24, 2:58 PM    Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability - United States D…

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4459 of 4699 PageID #: 7624

across government, civil society, the private sector, humanitarian organizations, multilateral organizations, all coming together to address this challenge.

So let me highlight some of the ways the United States is working with our partners in the region on migration so as to take, among other things, pressure off our borders by giving people alternatives to making a hazardous journey to seek asylum in the United States.

Of course, fundamentally we're working to tackle the root causes of migration so that people don't have to leave their homes in the first place.  That includes investing and redirecting and mobilizing resources toward greater economic opportunities, as we've done through the more than $4.2 billion in private sector commitments that Vice President Harris has helped to secure for northern Central America.  These investments by businesses and social enterprises will sustain and create jobs, connect people to the digital economy, expand access to financing, provide training and education for young people and workers, and improve economic livelihoods across the region.

We're also investing in economic opportunity through the nearly $1.2 billion that we provided in humanitarian assistance across the region last year, and through initiatives like our commitment to work with our partners to train and equip 500,000 local healthcare workers across the hemisphere over the next five years so that more people can get quality care in their own communities.  All of these investments will help people feel that they have a future in their own communities.

Now, of course many of these investments can take time to bear fruit.  So we're working in parallel on critical collaborations and initiatives with partners in the hemisphere to have a more near-term impact.  First, we're supporting host countries as they provide legal protections and assistance to refugees and migrants so that they can thrive in their new communities.  We're doing that by delivering funding to schools, health facilities, and other providers of support to migrants, funding the staffing and capacity-building of local asylum centers and systems, and supporting registration and documentation efforts so that individuals can gain and demonstrate legal status, which is critical for access to work, to schools, to social services.

Our partners in turn are doing extraordinary work in this area.  Colombia, for example, has given 10-year temporary protected status to approximately 2.5 million Venezuelans, allowing them to work, to study, to access public services.  Ecuador, Costa Rica, Belize are also undertaking similar

004452

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4460 of 4699 PageID #: 7625

efforts to regularize migrants from Venezuela and Nicaragua, as well as Peru. We see efforts as well to forgive existing migrant overstay fines, effectively removing one of the largest barriers to regularization. Brazil's "Operation Welcome" helped over 100,000 Venezuelans voluntarily resettle in places where they have greater economic opportunity. Mexico and Canada are increasing the number of people that they welcome on a humanitarian basis.

We're also working with partners in the hemisphere to accept repatriation flights, increase security forces along migration routes, provide more assistance to migrants and refugees. We continue to surge assistance to host countries throughout the hemisphere to help integrate refugees and migrants, and increase humanitarian aid and protection for vulnerable populations.

Second, we're announcing a 60-day surge of urgent assistance to regional partners to enhance security, to counter smuggling – an effort that Ali will share more about in a few moments. We're also working to counter disinformation being spread by traffickers and other bad actors, including by expanding our paid and earned media outreach to high out-migration communities and migrant routes through channels potentially reaching upward of 85 million people – so that people who want to migrate have accurate information about how to do so legally and safely, and know the dangers of putting themselves in the hands of traffickers.

Third, we're significantly expanding access to lawful pathways for migration for those in need, including the U.S. Refugee Admissions Program. For too many people in too many places, these pathways feel far from reach. So we're working to create more opportunities, and to make them more accessible. The United States welcomed six times as many refugees from Latin America and the Caribbean in 2022 than during the previous year. We're on track to more than double those arrivals in 2023.

And in January, President Biden committed to welcoming 30,000 individuals every month from Cuba, Haiti, Venezuela, and Nicaragua through a parole program. Irregular migration from those four countries fell by more than 97 percent within the first month – because people now have a legal and safe pathway. That means tens of thousands of people are no longer making the perilous overland journey to our border, or putting themselves at the mercy of abusive smugglers.

We're partnering with both national and international NGOs to connect the most vulnerable populations – including religious minorities, political dissidents, LGBTQI+ persons, and survivors

004453

8/19/24, 9:41 PM                Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability - United States D…

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4461 of 4699   PageID #: 7626

of gender-based violence – to expedited resettlement processes.

We're developing new ways to increase the scope and effectiveness of our migration system, like Welcome Corps, which – for the first time ever – allows American individuals to sponsor refugees.

And soon we will stand up Regional Processing Centers in select locations in the region.  I want to thank Colombia and Guatemala specifically for their role as excellent partners of the United States in these efforts.  These centers will be operated by international organization partners and improve qualified individuals' access to accelerated refugee resettlement processing, family reunification, and labor pathways in the United States.  They will also be a referral point for lawful pathways as well, as well as humanitarian and refugee protections in other countries, like Canada and Spain.

These centers will take a hugely important step to prevent people from making the dangerous journey to the border by providing a much safer legal option to migrate that they can pursue in and from their own countries.  It's a new and innovative approach that does right by people who want to migrate, and that enhances security and stability in the region.

Later today, I'll have a chance to travel to Denver for the Cities Summit of the Americas, where we've convened leaders to talk about how governments can better deliver for their people.  And that mission is at the heart of the migration challenge:  How can we all work together, as we are, to provide the foundation for better, more secure, and more hopeful futures for all our citizens?

With that, let me turn it over to Secretary Mayorkas.

**SECRETARY MAYORKAS:** Good morning.  Thank you, Secretary Blinken.  As the Secretary described, this is a hemispheric challenge that demands hemispheric solutions.   Working with our neighbors in the region, we can and will reduce the number of migrants who reach our southern border.  The Regional Processing Centers announced today will be a critical addition to the programs and processes DHS has in place for qualifying individuals to obtain authorization to enter the United States before arriving at our borders.

This is particularly important because we have a humanitarian obligation to cut the smugglers out.  We have seen a dramatic rise in the reach, sophistication, and cruelty of the smuggling organizations over the past ten years and the challenges that presents.

004454

The comprehensive plan we have developed and are executing takes this reality into account. We are building lawful pathways for people to come to the United States without resorting to the smugglers. At the same time, we are imposing consequences on those who do not use those pathways and instead irregularly migrate to our southern border.

This plan has proven effective. Building on the success of Uniting for Ukraine, we created parole processes for qualifying Cubans, Haitians, Nicaraguans, and Venezuelans, and we expelled individuals from these countries who sought to enter at our southern border. We have seen a high degree of interest in these parole processes and a dramatic drop in encounters from these nationalities. Overall, the number of Border Patrol encounters in March 2023 was down 23 percent compared to March of last year. When people have safe and orderly pathways to come to the United States and face consequences for failing to do so, they use those pathways.

After May 11th, our court-compelled use of Title 42 will end and we will once again process all migrants under Title 8 of the United States code. This is a longstanding immigration enforcement authority that multiple administrations – Republican and Democratic alike – have used to process individuals. It carries stiff consequences for irregular migration, including at least a five-year ban on reentry and potential criminal prosecution for repeated attempts to cross unlawfully. The return to processing migrants under Title 8 authorities will be swift and immediate.

We have been preparing for this transition for more than a year and a half. Notwithstanding those preparations, we do expect that encounters at our southern border will increasing, as smugglers are seeking to take advantage of this change and already are hard at work spreading disinformation that the border will be open after that. High encounters will place a strain on our entire system, including our dedicated and heroic workforce and our communities.

The smuggler's propaganda is false. Let me be clear: Our border is not open and will not be open after May 11th.

Today, we are announcing the expansion of our plan to build lawful pathways and to impose consequences for failure to use those pathways.

First, the Department of Homeland Security is proud to work with the State Department in establishing the Regional Processing Centers that Secretary Blinken described. We are dedicating specially trained refugee officers to the centers. They will interview applicants for the U.S.

004455

Refugee Admissions Program and provide for the swift processing of a greater number of individuals.  In addition to refugee processing, migrants may be screened at these centers and referred to pursue additional pathways to the United States or to other countries for which they may be eligible.

Second, we are streamlining the long-established family reunification parole processes for Cubans and Haitians so that individuals from these countries with approved family-based petitions can more quickly reunite with their families here in the United States.

Third, I have directed my team to develop family reunification processes that will extend this well-recognized model to certain individuals from El Salvador, Guatemala, Honduras, and Colombia. More information about these processes will be available by May 11th.

Fourth, we will continue the successful processes we announced in January.  Through our CPB One mobile app, we will enable individuals to schedule more appointments at ports of entry, consistent with Title 8 processing.  The Cuba, Haiti, Nicaragua, and Venezuela parole processes, as well as the corresponding returns to Mexico for those without a legal basis to remain will continue.

At the same time, we are imposing consequences for individuals who do not use our lawful pathways.

Beginning on May 12th, we will be – we will place eligible individuals who arrive at our southern border in expedited removal proceedings.  Those who arrive at our border and do not have a legal basis to stay will have made the journey, often having suffered horrific trauma and having paid their life savings to the smugglers, only to be quickly removed.  They will be removed most often in a matter of days in just a few weeks.

Unlike the Title 42 public health authority, the penalty for being removed from the United States under Title 8 through expedited removal and other immigration laws we will be enforcing is not just removal.  An individual who is removed is subject to at least a five-year ban on admission to the United States and can face criminal prosecution for any subsequent attempt to cross the border illegally.

We will process eligible single adults for expedited removal while they are in our Border Patrol and Immigration and Customs Enforcement facilities.  U.S. Citizenship and Immigration Services

8/19/24, 9:06 AM    Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability - United States D…

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4464 of 4699 PageID #: 7629

will be conducting any credible fear interviews.  We have expanded our holding capacity and set up equipment and procedures so that individuals have the ability to access counsel.  We have digitized processes, surged personnel, and with the cooperation of partner governments increased return flights.  We are ensuring that removals are accomplished fairly, efficiently, and quickly.

Families have always presented unique challenges within our immigration system, particularly for an administration like ours that priorities family unity and opposes family separation.  Like single adults, families will be placed in removal proceedings, including expedited removal.  We are currently focused on utilizing the full spectrum of our Alternatives to Detention Programs, including GPS monitoring and enhanced supervision, such as curfews and expanding case management services.  This will be coupled with more stringent measures for those who do not comply.

The same principle will apply to single adults and families.  They will have an opportunity to seek protection or other relief from removal.  If they receive a final order of removal, we will enforce the law, and they will be removed.

In addition to our land border, we will continue to confront the challenge of migration on our seas.

Since we announced our parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans, we have made it clear that those who arrive at our southern border are not eligible for the parole processes.  We are announcing today that that ineligibility will now extend to individuals who take to the seas and are interdicted trying to arrive at our maritime borders.  We have seen too many people – families, women, children – perish in the rough seas.

We have increased the presence of our United States Coast Guard to interdict migrants trying to reach the United States by sea.  We have saved countless lives, and we have returned the migrants to their home countries.  That will continue.

In addition, we are finalizing the regulation that the Departments of Justice and Homeland Security jointly proposed earlier this year.  That proposed regulation will incentivize individuals to avail themselves of lawful, safe, and orderly pathways, and disincentivize dangerous border crossings by placing a new condition on asylum eligibility for those who fail to use those

004457

pathways.  The Departments of Justice and Homeland Security aim to have the rule finalized by May 11 and will swiftly implement it.

The work we have been performing to prepare for post Title 42 continues, as I have previously outlined in our six-pillar plan.  We are surging resources to our border, modernizing processes, attacking the smuggling organizations with unprecedented law enforcement focus, strengthening our immigration enforcement tool of expedited removal, working to increase information sharing and resources – having distributed over $130 million this fiscal year with 290 more to be awarded in the coming weeks – for local communities and their non-profit organizations.  We are partnering with nations in the region to address the challenges of unprecedented migration throughout the hemisphere.

For example, two weeks ago we reached a trilateral agreement with Colombia and Panama to attack the smugglers who falsely coax people into the treacherous terrain of the Darien.  We initiated a 60-day coordinated campaign with Panama and Colombia to prevent the incredibly dangerous humanitarian situation of migrants traversing the Darien jungle.  We have made more than 10,000 smuggling arrests since April of last year and seized more than $47 million in smugglers' illegal property and finances.  The Canadian commitment to accept an additional 15,000 migrants was part of a complementary effort to create lawful pathways.

Everyone agrees – everyone agrees – our immigration system is outdated and badly broken.  We must tackle the challenges before us together.  This includes the potential for increases in migration after May 11 and the strain it will place on our communities, our workforce, and our system.

That's why today we notified Congress of our intent to reprogram funds within our budget to support other emerging requirements across DHS.  This reprograming of existing funds will not meet our longer term needs for securing our border and enforcing our laws.  The administration requested $4.9 billion for these requirements but received only $2.7 billion in the funding bill passed this December.  While the department is prudently utilizing the limited funding Congress has provided to prepare for the post-Title 42 environment, this notification of repurposing existing funds is only a fraction of what we will ultimately need.

We know smugglers will seek to take advantage of the end of Title 42 and that the first few weeks will be challenging, but I have full confidence in the dedicated men and women of DHS.  We will

004458

do all we can to manage our border and increased encounters in a safe, orderly, and humane way.  We are working with our regional partners.  We are going after the smugglers.  We are surging resources to the border.  But we cannot do everything that we need to do until Congress provides the needed resources and reforms.  We call on Congress to provide the resources we need to continue our work.  We stand ready to work with Congress to pass desperately needed reform to our immigration and asylum system.  In the meantime, we will continue to do our part, implementing the approach we have described here today.

Thank you.

**MR PATEL:**  We will take a couple questions.  I see we have a special guest today.  I don't know if you want to ask the secretaries first.

**SECRETARY BLINKEN:** That's right.  It's Take Your Children to Work Day, and we'd happy – happy to take a question from you, if you have one.  (Laughter.)  Or you can whisper to Matt.

**QUESTION:**  Well, I think she wanted to ask about the geopolitical and strategic implications of the U.S.-China-Russia rivalry, but that's a little bit off topic.  Instead, she had a joke she wanted to tell, but I don't – not sure if she's got a little bit of stage fright.  So let me go ahead and start.

**MR PATEL:**  Go ahead, Matt.

**QUESTION:**  One, for either of you, on the Regional Processing Centers, do you have a target, an estimate, of how many people will be able to – the capacity for these, like per week or per month?  And whether you do or not, if you think that they will be so successful and are truly new and innovative, why hasn't this been done before?

And then secondly, for Secretary Blinken, I'm just wondering if there's any updates on the Sudan evacuation or non-evacuation situation in terms of the State Department.  Thank you.

**SECRETARY BLINKEN:** Do you want to start, Ali?

**SECRETARY MAYORKAS:** Happy to.  So this is a process that will scale up over time.  We are going to begin in collaboration, of course, with the State Department and our partner countries to begin several thousand each month, 5-6,000 plus each month individuals processed, a material impact on the decision-making of people who are seeking relief in a country.  The whole

004459

8/19/24, 9:48 AM    Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability - United States D...

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4467 of 4699   PageID #: 7632

model is to reach the people where they are, to cut the smugglers out, and to have them avoid the perilous journey that too many do not make. But we are beginning in Guatemala and Colombia. We are beginning at the level that I described and we will scale up. We are incredibly proud of the fact that we negotiated this agreement with those foreign countries and we hope to expand beyond there.

**SECRETARY BLINKEN:** Thanks, Ali. And Matt, just to add one point on that, I think as this effort moves forward and we establish it, my expectation would be that even beyond the numbers of people who might be processed in a given month, other people, having – seeing that this is now a way to access legal pathways to the United States that doesn't require them to, again, take the hazardous journey to our border and to put themselves in the hands of smugglers, and then to come only to be turned away in any event, my expectation would be that many other people beyond those who are actually being processed in a given month will stay put and wait to avail themselves of this additional way of accessing legal pathways. So we'll see. We have to build it out and we're very actively working on doing that.

As to why this hasn't been done before, well, I mean, it's like any good idea. You can say, "Gee, why didn't we think of this before?" But the fact is we're working on it now, and we're working to make it real and effective.

On Sudan, just a few things. First, we are very actively working to extend the ceasefire. We've had a 72-hour ceasefire, which like most ceasefires is imperfect but nonetheless has reduced violence. And that's obviously created somewhat better conditions for people in Sudan. It's also enabled some humanitarian assistance to continue to move around.

But we want to make sure that, if possible, this is extended. We're very actively engaged on that. I hope and expect to have more information on that in the coming hours. And the focus, again, is on extending the ceasefire and making sure there is humanitarian access.

With regard to American citizens in Sudan, a few things to be said about that. We are providing the best possible advice that we can to anyone asking for our assistance about conditions, about safety, about security, so that they can make decisions with the most information possible about what they want to do, whether they want to stay, whether they want to try to go.

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4468 of 4699   PageID #: 7633

As you know, the vast majority of American citizens who are in Sudan are dual nationals, most of whom have made their lives and livelihoods in Sudan for years, decades. So these are very challenging decisions for people to make. But we're in contact with Americans who have registered with us in one way or another, and very active contact.

What's happened over the last 72 or so hours is that the reduction in violence that we were able to achieve through the ceasefires that we helped produce has allowed partners and allies, in coordination with us, to conduct some aerial evacuations. We're providing important logistical support to these efforts. This is a collaborative process and we have managed to direct many Americans who have – were seeking to leave to that evacuation process so that they could, along with other nationals, take advantage of it. And that's ongoing.

At the same time, what happens in these situations is you have people who are not all at once – everyone making a decision in a given moment, at a given time, about what they're going to do or not do. This changes over time. So people who today think that they're going to stay put may decide next week, next month, that they want to leave.

What we need to do and what we're working to establish is a sustained process for enabling people to leave, assuming that the conditions that we see now are maintained, by which I mean on the one hand, yes, a ceasefire, however imperfect, but also ongoing violence, confrontation between the two rival military groups, et cetera.

As we've looked at this, we believe that the best way to have an enduring capability to help people leave Sudan, if that's what they so choose, is overland. And we are working to establish a process that would enable people to move overland to a place where they can more easily exit the country – in all likelihood, Port Sudan. So that's under very active development, and again, that will be the most effective way to have a sustained process, a sustained mechanism, an enduring capability to enable people to leave if that's the choice they make.

**MR PATEL:** Tracy.

**QUESTION:** Thank you. A couple of technical questions and then something broader for either of you. Following up on the regional centers, how many more countries are you negotiating with to set up centers to add them down the line? You have set a goal, I think you said, of doubling the number of refugees to be admitted. Is that realistic given the huge backlog, the enormous

004461

demand, and how long it does take to scale up to the 6,000 a month or whatever it is? So I'm wondering how many more people will really be helped in these new measures.

Secretary Mayorkas, you said something I didn't quite get about family detention. Will entire families now be detained? Is that the idea?

And finally, for Secretary Blinken, you mentioned the global aspect of immigration, and so I wanted to ask about Russians who've been coming to the United States seeking asylum, saying they're fleeing conscription. Many of them are minorities, and it seems like their cases are being turned down. Many have been detained by ICE and a few that we know of have been deported back to Russia. So why is that not a – why do they not have a credible fear case? Thank you.

**SECRETARY MAYORKAS:** So let me – I can take the questions, if I may. So the issue of credible fear, the determination of credible fear is a very case-specific, individualized determination. Our very experienced asylum officers make those determinations based on the facts presented to them as well as their background information with respect to the country conditions. And so they evaluate the claims based on the people before them and the case that those individuals present.

We are indeed in discussions with other countries to expand the Regional Processing Centers, and they will have a significant impact on the migratory decisions of individuals in the region, and our parole processes really communicate that fact quite powerfully. People don't want to place their lives and their life savings in the hands of ruthless smugglers. If they have a lawful, safe, and orderly pathway to come to the United States or another destination country – like Canada or Spain, as Secretary Blinken mentioned – they will avail themselves of those lawful pathways. That has proven true through our parole processes and other lawful pathways that we have implemented to date.

That is especially true when, if they do take that perilous journey and happen to survive, because all too many do not, they will find that the border is not open and they are subject to removal. And removal will occur in the expedited removal context swiftly, in a matter of days or just a few weeks.

The Regional Processing Centers will indeed make a big difference because we are surging asylum officers to work with the international organizations – the UN High Commissioner for

004462

Refugees, the International Organization for Migration – to screen people very quickly. We are going to be delivering efficiencies in the refugee screening process to move that process more rapidly than before. This is going to have a material impact in a number of ways. One, we will provide relief for a greater number of people; and two, an even greater number of people will wait to avail themselves of this pathway because of its magnitude and the consequence of not doing so.

We have no plan to detain families. As I mentioned, we will be employing alternatives to detention, including some innovations in that regard, and we will on a case-by-case basis use enhanced alternatives to detention as warranted.

**MR PATEL:** Camilla.

**QUESTION:** Thank you. The – my understanding is that the U.S. intends to continue deporting Cubans, Haitians, Nicaraguans, Venezuelans to Mexico if they crossed the southern border unlawfully. So do you know how many migrants or deportees Mexico has agreed to accept, if any? I don't think Mexico has spoken about it publicly.

**SECRETARY MAYORKAS:** To date – to date, Mexico has agreed to accept up to 30,000 expulsions under Title 42 per month. That is a decision that they have made. We intend in a post-Title 42 environment, when we are using expedited removal – our Title 8 of the United States Code authorities – we intend to return individuals to Mexico from those nationalities.

**MR PATEL:** Final question, Leon.

**QUESTION:** Just a technical question on these regional centers, if I may. If I understood you correctly, you said they were being – they would be operated by international partners. Are you outsourcing the immigration process?

**SECRETARY BLINKEN:** I'm happy to start with that. No, the point here is to do the following: It's to take advantage of the fact that international partners have physical locations in a number of countries where they are doing very, very important work, and to be able to bring some of our own officers and experts into these centers so that people can come to them and explore whether they are eligible for one of the various legal pathways to come to this country, whether it's as a refugee, whether it's for family reunification, whether it's for a labor pathway. And that means that it's a lot easier for people who are contemplating coming to determine from their

004463

own countries whether they have a legal pathway to do that, so it's making legal pathways much more accessible.

And as Secretary Mayorkas was saying, as this gets up and running and as people see that there is now a more accessible way to determine whether they are eligible to come to the United States through a variety of pathways, we believe that that will take significant incentive away for people to instead make this incredibly hazardous journey to the United States, put themselves in the hands of smugglers, encounter all the terrible dangers that we know they encounter along the way in an effort to pursue asylum, and in any event not get in.

So that's the idea. But no, it is reliant on our own people to share the information and to do some prescreening of individuals who come to these centers.

Anything you want to —

**QUESTION:** Have you discussed with Colombia about returning migrants?

**MR PATEL:** Thanks, everybody. Thanks, everybody.

---

TAGS

Bureau of Population, Refugees, and Migration     Bureau of Western Hemisphere Affairs

Migration     Office of the Spokesperson     Refugee and Humanitarian Assistance

The Secretary of State

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

004465

8/19/24, 1:45 PM    U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration - United States Department of State

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4473 of 4699 PageID #: 7638

An official website of the United States Government Here's how you know

Home >   ...   > U.S.-Colombia Joint Commitment to Address the H...

# U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration

**MEDIA NOTE**

**OFFICE OF THE SPOKESPERSON**

JUNE 4, 2023

On April 11, 2023, the governments of Colombia, Panama, and the United States of America held a trilateral meeting in Panama City, Republic of Panama to discuss joint efforts on border security and the migratory challenges happening in the Darien.  During the meeting, we reaffirmed our joint commitment to carry out coordinated actions to address the humanitarian risks in the jungle zones due to irregular migration.  The following three points were accepted as the beginning of a solution:

1. Combat human smuggling and trafficking networks in the Darien in land and maritime corridors where vulnerable people die and are exploited.

2. Open new and flexible lawful pathways to reduce irregular migration.

3. Launch a plan to reduce poverty, improve access to national services, create jobs, and promote sustainable economic opportunities for border communities in northern Colombia and Panama through international partnerships with financial institutions, civil society, and the private sector.

In addition to the above, the U.S. government has recently proposed the creation of Safe Mobility Offices that would identify, register, and categorize the reasons for irregular migration and

004466

channel those who qualify through lawful pathways from Colombia to the United States. The goal is to prevent those who intend to start or continue irregular migration to the United States or other places such as Canada from taking such a risk. Such offices are planned for several countries in the region.

The U.S. government is working with the government of Colombia to promptly implement a model to ensure the success of this initiative. This model will work to direct migrants from Haiti, Cuba, and Venezuela toward lawful pathways. The start date of the Safe Mobility Offices initiative will be established in the coming days. Safe Mobility Offices established in Colombia will be jointly managed.

Colombia welcomes the initiative within the framework of the Declaration on Migration and Protection endorsed at the Summit of the Americas in Los Angeles, California, on June 10, 2022. This mechanism will strengthen the respect for human rights of migrants.

The government of the United States, like the government of Colombia, urges people seeking to travel to the United States to take advantage of the expanded lawful pathways.

The U.S. government also reaffirms its commitment to simultaneously expand additional lawful pathways for Colombians with temporary work visas and expanded family reunification, creating more pathways to reunite Colombian-American families and help Colombian workers access employment opportunities in the United States.

The United States and Colombia continue to demonstrate their joint commitment to address the hemispheric challenge of irregular migration.

---

TAGS

Bureau of Population, Refugees, and Migration      Bureau of Western Hemisphere Affairs

Colombia      Immigration      Migration      Office of the Spokesperson      Panama

---

004467

8/19/24, 1:38 PM · U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration - United States Department of State

Case 6:24-cv-00306-JCB Document 124 Filed 11/07/24 Page 4475 of 4699 PageID #: 7640

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

---

---

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

004468



**Benefits for Cuban/Haitian Entrants**
FACT SHEET

**Are you a Cuban or Haitian individual who has been granted entry into the United States?**

You may be eligible for cash assistance, medical assistance, employment preparation, job placement, English language training, and other services offered through the Office of Refugee Resettlement (ORR). You may also be eligible for federal "mainstream" (non-ORR funded) benefits, such as cash assistance through Supplemental Security Income (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supplemental Nutrition Assistance Program (SNAP). This document focuses on the benefits and services that ORR funds. To find out what resettlement benefits and services are available, contact your State Refugee Coordinator: https://www.acf.hhs.gov/orr/grant-funding/key-state-contacts.

**Where do I sign up for ORR benefits/services to qualify as a Cuban/Haitian Entrant?**

ORR provides funding to state governments, resettlement agencies, and other nonprofit community-based organizations to provide benefits and services for eligible individuals. You can sign up at the state government benefits office or closest resettlement agency in your state beginning on or after the date that you qualify as a Cuban/Haitian Entrant. For a list of state contacts go to: https://www.acf.hhs.gov/orr/ grant-funding/key-state-contacts.

**When should I sign up for ORR benefits/services?**

004469

Now. Do not wait. Your benefits and services are only available for a limited time. ORR-funded cash and medical assistance are limited to a maximum of eight months from your date of eligibility. For most employment services and other services aimed at economic self-sufficiency, the eligibility period is five years from the date you became eligible as a Cuban/ Haitian Entrant.

### What are some of the benefits and services I can receive as a Cuban/Haitian Entrant?

Some Cuban/Haitian Entrants are eligible to apply for federal mainstream benefits in their state, such as cash assistance through Supplemental Security Income (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supplemental Nutrition Assistance Program (SNAP).

## Initial ORR Benefits (up to 8 months from eligibility date)



**Refugee Cash Assistance (RCA)**
Those not eligible for SSI or TANF may receive Refugee Cash Assistance (RCA). Counting from their date of eligibility, individuals may receive up to 12 months of RCA to help meet their most basic needs, such as food, shelter, and transportation.



**ORR Matching Grant Program**
Some may participate in the ORR Matching Grant (MG) Program, an early self-sufficiency program. Enrollment slots are limited in number and by location. The MG Program provides cash assistance, intensive case management, and employment services to help clients immediately find and maintain

employment. The goal of the program is to assist clients to become economically self-sufficient within 180 days. Individuals should enroll in the MG Program as soon as possible after their date of eligibility.



**Refugee Medical Assistance (RMA)**
Those not eligible for Medicaid may receive up to 12 months of RMA from their date of eligibility. RMA provides the same health insurance coverage as Medicaid.

## Services (up to 5 years from eligibility date)

**Employment Assistance: Refugee Support Services**
SIV holders and SQ/SI parolees may access the Refugee Support Services (RSS) program to receive employability services, available for up to five years from their date of eligibility. RSS helps provide employability services; job training and preparation; assistance with job search, placement, and retention; English language training; childcare; transportation; translation and interpreter services; and case management.

**Specialized Programs**
Some clients may be eligible for specialized programs such as health services, technical assistance for small business start-ups, financial savings, youth mentoring, or other targeted support programs.

[1] Section 212(d)(5) of the Immigration and Nationality Act provides DHS with discretion to parole an individual into the United States temporarily under certain conditions on a case-by-case basis.

[2] The U.S. Department of Justice conducts administrative court proceedings, called removal proceedings, to decide whether foreign-born individuals who are charged by DHS with violating immigration law should be ordered removed from the United States or should be granted relief or protection from removal and be permitted to remain in the United States.

[3] For more information, please see ORR Policy Letter 16-01 at https://www.acf.hhs.gov/orr/policy-guidance/status-and-documentation-requirements-orrrefugee-resettlement-program#cuban.

**Who may qualify as a Cuban/ Haitian Entrant?**

You may qualify as a Cuban/ Haitian Entrant if you are a Cuban or Haitian national: 1) granted parole as a Cuban/ Haitian Entrant,[1] 2) in removal proceedings,[2] or 3) with an application for asylum pending.[3]

**What should I bring with me?**

You should bring proof of your eligibility as a Cuban/Haitian Entrant and the date you received it. Types of proof include: 1) an I-94 (DHS Arrival/Departure Record) noting parole; 2) a DHS form indicating a Notice to Appear, Order of Release on Recognizance, or other removal proceedings form; 3) a form from an immigration judge showing an application for asylum; 4) an Employment Authorization Document (EAD) with selected codes; or 5) other documentation issued by the federal government indicating that you are eligible. This list does not include all types of documentation or specific information on your documentation that may prove your eligibility as a Cuban/Haitian Entrant. For a complete list go to: https://www.acf.hhs.gov/sites/default/files/documents/orr/orr_fact_sheet_cuban_haitian_entrant.pdf (PDF).

🇺🇸 An official website of the United States government    Here's how you know

Listen

## Benefits for Cuban/Haitian Entrants

# FACT SHEET

**View PDF**

**Are you a Cuban or Haitian individual who has been granted entry into the United States?**

You may be eligible for cash assistance, medical assistance, employment preparation, job placement, English language training, and other services offered through the Office of Refugee Resettlement (ORR). You may also be eligible for federal "mainstream" (non-ORR funded) benefits, such as cash assistance through Supplemental Security Income (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supplemental Nutrition Assistance Program (SNAP). This document focuses on the benefits and services that ORR funds. To find out what resettlement benefits and services are available, contact your State Refugee Coordinator: **https://www.acf.hhs.gov/orr/grant-funding/key-state-contacts**.

**Where do I sign up for ORR benefits/services to qualify as a Cuban/Haitian Entrant?**

**Who may qualify as a Cuban/ Haitian Entrant?**

▶ You may qualify as a Cuban/ Haitian Entrant if you are a Cuban or Haitian national: 1) granted parole as a Cuban/ Haitian Entrant,[1] 2) in removal proceedings,[2] or 3) with an application for asylum pending.[3]

004473

ORR provides funding to state governments, resettlement agencies, and other nonprofit community-based organizations to provide benefits and services for eligible individuals. You can sign up at the state government benefits office or closest resettlement agency in your state beginning on or after the date that you qualify as a Cuban/Haitian Entrant. For a list of state contacts go to: **https://www.acf.hhs.gov/orr/ grant-funding/key-state-contacts**.

### When should I sign up for ORR benefits/services?

Now. Do not wait. Your benefits and services are only available for a limited time. ORR-funded cash and medical assistance are limited to a maximum of eight months from your date of eligibility. For most employment services and other services aimed at economic self-sufficiency, the eligibility period is five years from the date you became eligible as a Cuban/Haitian Entrant.

### What are some of the benefits and services I can receive as a Cuban/Haitian Entrant?

Some Cuban/Haitian Entrants are eligible to apply for federal mainstream benefits in their state, such as cash assistance through Supplemental Security Income (SSI) or Temporary Assistance for Needy Families (TANF), health insurance through Medicaid, and food assistance through Supplemental Nutrition Assistance Program (SNAP).

**What should I bring with me?**



You should bring proof of your eligibility as a Cuban/Haitian Entrant and the date you received it. Types of proof include: 1) an I-94 (DHS Arrival/Departure Record) noting parole; 2) a DHS form indicating a Notice to Appear, Order of Release on Recognizance, or other removal proceedings form; 3) a form from an immigration judge showing an application for asylum; 4) an Employment Authorization Document (EAD) with selected codes;

004474

## Initial ORR Benefits (up to 8 months from eligibility date)

### Refugee Cash Assistance (RCA)

Those not eligible for SSI or TANF may receive Refugee Cash Assistance (RCA). Counting from their date of eligibility, individuals may receive up to 12 months of RCA to help meet their most basic needs, such as food, shelter, and transportation.



### ORR Matching Grant Program

Some may participate in the ORR Matching Grant (MG) Program, an early self-sufficiency program. Enrollment slots are limited in number and by location. The MG Program provides cash assistance, intensive case management, and employment services to help clients immediately find and maintain employment. The goal of the program is to assist clients to become economically self-sufficient within 180 days. Individuals should enroll in the MG Program as soon as possible after their date of eligibility.



### Refugee Medical Assistance (RMA)

Those not eligible for Medicaid may receive up to 12 months of RMA from their date of eligibility. RMA provides the same health insurance coverage as Medicaid.



or 5) other documentation issued by the federal government indicating that you are eligible. This list does not include all types of documentation or specific information on your documentation that may prove your eligibility as a Cuban/Haitian Entrant. For a complete list go to: **https://www.acf.hhs.gov/sites/defa files/documents/orr/orr_fact_sheet cuban_haitian_entrant.pdf** (PDF).

## Services (up to 5 years from eligibility date)

### Employment Assistance: Refugee Support Services

004475

8/19/24, 2:05 PM
Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4483 of 4699 PageID #:  7648
Benefits for Cuban/Haitian Entrants | The Administration for Children and Families

SIV holders and SQ/SI parolees may access the Refugee Support Services (RSS) program to receive employability services, available for up to five years from their date of eligibility. RSS helps provide employability services; job training and preparation; assistance with job search, placement, and retention; English language training; childcare; transportation; translation and interpreter services; and case management.

**Specialized Programs**

Some clients may be eligible for specialized programs such as health services, technical assistance for small business start-ups, financial savings, youth mentoring, or other targeted support programs.

004476

[1] Section 212(d)(5) of the Immigration and Nationality Act provides DHS with discretion to parole an individual into the United States temporarily under certain conditions on a case-by-case basis.

[2] The U.S. Department of Justice conducts administrative court proceedings, called removal proceedings, to decide whether foreign-born individuals who are charged by DHS with violating immigration law should be ordered removed from the United States or should be granted relief or protection from removal and be permitted to remain in the United States.

[3] For more information, please see ORR Policy Letter 16-01 at https://www.acf.hhs.gov/orr/policy-guidance/status-and-documentation-requirements-orrrefugee-resettlement-program#cuban.

004477

004478



# HHS Public Access

Author manuscript

*J Immigr Minor Health.* Author manuscript; available in PMC 2017 August 01.

Published in final edited form as:

*J Immigr Minor Health.* 2017 August ; 19(4): 913–920. doi:10.1007/s10903-016-0463-6.

# U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children

**Edward D. Vargas, Ph.D.**[1,*] and **Vickie D. Ybarra, Ph.D**[2]

[1]Center for Women's Health and Health Disparities Research, University of Wisconsin-Madison, IRP, 1180 Observatory Drive, Madison, WI 53706, USA

[2]Robert Wood Johnson Foundation Center for Health Policy at the University of New Mexico, MSC02 1645, 1 University of New Mexico, 1909 Las Lomas NE, Albuquerque, NM 87131, USA

## Abstract

**Background—**We examine Latino citizen children in mixed-status families and how their physical health status compares to their U.S. citizen, co-ethnic counterparts. We also examine Latino parents' perceptions of state immigration policy and its implications for child health status.

**Methods—**Using the 2015 Latino National Health and Immigration Survey (n=1493), we estimate a series of multivariate ordered logistic regression models with mixed-status family and perceptions of state immigration policy as primary predictors.

**Results—**We find that mixed-status families report worse physical health for their children as compared to their U.S. citizen co-ethnics. We also find that parental perceptions of their states' immigration status further exacerbate health disparities between families.

**Discussion—**These findings have implications for scholars and policy makers interested in immigrant health, family wellbeing, and health disparities in complex family structures. They contribute to the scholarship on Latino child health and on the erosion of the Latino immigrant health advantage.

## Keywords

mixed-status families; health disparities; legal status; Latino child health; immigrant health

## Background

The United States is undergoing a period of heightened immigration policy activity that has far-reaching consequences. Caught between partisan politics and practical solutions are millions of American children living in mixed-status families whose parents are at risk of

*Corresponding author: Edward D. Vargas, Center for Women's Health and Health Disparities Research, University of Wisconsin-Madison, IRP, 1180 Observatory Drive, Madison, WI 53706, USA, edward.vargas@gmail.com.

Compliance with Ethical Standards:

All procedures performed in studies involving human participants were in accordance with the ethical standards of the institutional and/or national research committee and with the 1964 Helsinki declaration and its later amendments or comparable ethical standards. Informed consent was obtained from all individual participants included in the study.

being deported [1]. Alongside increased funding for enforcement of federal immigration laws and record deportations during the Obama Administration, the period between 2005 and 2012 saw an unprecedented rise in anti-immigrant legislation at the state level [2]. This rise in anti-immigrant policymaking has in turn led to an environment that is unhealthy for Latino families. In what is described as "multi-generational" punishment, Enriquez [3] argues that U.S. citizen children and their undocumented parents often share in the risks and punishments associated with undocumented immigration status. In other words, immigration enforcement is not just impacting undocumented immigrant adults, it is also spilling over to their U.S. citizen family members. This climate is a result of numerous federal, state, and local policies that have made life hard on working families and their children.

Of particular importance to our study is the racialized undertone of this political dialogue and hostility that is evident to Latinos, which was highlighted by Anderson and Finch [4], who find that Arizona's S.B. 1070 (a highly punitive state policy) has led to poorer Latino self-reported health among immigrant Spanish-speaking respondents. This environment has helped to generate and perpetuate the disruption of Latino neighborhood cohesion, community trust, and family ties, ultimately taking a toll on the health of immigrants and their families [5].

Building on this work, this study uses a representative survey to directly assess the influence of Latinos' perceptions of the favorability of their states' immigrant policies towards immigrants on the health of Latino children living in mixed-status families. Building on the work of public health scholars and others who have found a link between this heightened anti-immigrant policy environment and the mental health of immigrants, we find that there are physical health consequences associated with these policies that reach beyond the undocumented community in the United States [6,7,8,9]. These findings are relevant to scholars of public health and policymakers as they consider the consequences of the current policy environment.

**Health of Latino Children**

Previous scholarship points to a Latino immigrant health advantage that erodes over an individual's time in the U.S. and over generations [10,11]. The Latino immigrant health advantage is essentially the observation that the health of populations of Latino immigrants new to the U.S. exhibits a weaker correlation to socioeconomic status than that of U.S.-born populations, thus low-income Latino immigrants demonstrate better health outcomes than might be expected given their socioeconomic status. The correlation between health and socioeconomic status becomes stronger with time in the U.S. and with subsequent generations, thus the health advantage diminishes [12]. Latino children in the U.S. who are children of immigrants are less likely than those with U.S.-born parents to have low birth weight or to die in the first year of life [13]. At the same time, some groups of Latino children in the U.S. experience disproportionately poorer health in a number of areas, including behavioral and developmental disorders, obesity, diabetes, and asthma [14,15].

Although much scholarship on the Latino immigrant health advantage and its erosion over time point to cultural and behavioral explanations [16,17], more recent scholarship focuses on structural contributors to the erosion of the advantage [18,19]. Latino children with

004480

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 4488 of 4699 PageID #:  7653

immigrant parents who may have experienced the protection of the immigrant health advantage during their early years may be more vulnerable to poor health than their parents as they age. Vega (2009) [20] posits that Latino children "represent the tip of emergent health disparities in the Latino population that will be largely determined by differential environmental exposures and the intergenerational social stratification patterns of U.S. society" (102). Social epidemiologists have long pointed to the health effects of social contexts [21]. That is, the recognition that health outcomes are greatly influenced by factors in the social environment such as socioeconomic status, educational attainment, societal race/ethnic/class hierarchies, neighborhood conditions, and social cohesion [22]. To this mix of social factors influencing health outcomes, contemporary scholars have added public policy [23,24], which may be viewed as social structure with the power to constrain human agency. Thus public policy is capable of influencing the choices that individuals and families make to benefit their own health and well-being.

In this study we attempt to approach a deeper understanding of the relationship between health and public policy as social structure as posited by Williams [25], "…if we are to understand the impact of social structures on health we need to comprehend both the historical, real-time processes that particular structures and locales embody; and we need to enter into the way in which these processes shape the life courses and biographies of individuals" (146). Thus we contend that state immigration-related public policy is a social structure that contains, at least in part, the public opinion of a given geographic area; in this way immigration policy may be viewed as reflecting the contemporary and historical social context of a given area.

There is growing and compelling research that explores the links between immigration policy and immigrant health with particular focus on intermediary factors. The hostile environments generated by punitive immigration-related policies have led to the perception of "being hunted" by federal immigration enforcement consequently producing intense feelings of anxiety, fear, and depression [6,25,26]. These are all psychosocial reactions that exacerbate pre-existing health conditions such as high blood pressure and diabetes [6,8]. Parental legal status is a strong predictor in explaining the role of immigration enforcement on poor Latino child health status, particularly a higher risks of internalizing and externalizing behavior problems relative to their counterparts with documented or naturalized citizen mothers [27]. In attempting to understand the role legal status has on family wellbeing, the limited research in this area finds that it is the mother's legal status that matters the most in predicting children's health [28]. Moreover, youth and children of undocumented immigrants are especially vulnerable to the high levels of stress associated with legal status and the hostile anti-immigrant environment. Feelings of hopelessness, anxiety, guilt, and despair are common among undocumented youth. Issues related to legal status compound the already difficult stages of psychosocial development experienced during adolescence, negatively impacting mental and emotional health [7].

We build on this literature by exploring physical health among Latino children across family types along with Latino parents' perceptions of whether the immigrant policies in their state are favorable or unfavorable towards immigrants. The extant research strongly suggests that there are potential health consequences associated with punitive immigrant policies and that

004481

the racialized natures of these policies pose important challenges for Latinos and their children. In fact, 78 percent of the respondents to the survey used in this study indicate that they believe there is an anti-Hispanic and/or anti-immigrant environment in the U.S. today. Thus we hypothesize that there will be a negative association between respondents' perception of their state's immigration policies as unfavorable toward immigrants and children's physical health. Our approach makes important contributions to this literature. First, the representative nature of the sample allows us to explore child health disparities across family types, not just the undocumented or Latinos in individual states. Second, we utilize a perception of immigration policy measure that allows us to assess the impact of the overall policy climate on Latino children's health rather than discrete policies. Lastly, unlike most studies that create proxies for undocumented status, our survey directly assesses respondent immigration status. This research design provides a new perspective on this important and interesting research question.

## Methods

### Data

We take advantage of the Robert Wood Johnson Foundation (RWJF) Center for Health Policy at the University of New Mexico's 2015 Latino National Health and Immigration Survey (LNHIS, Total N=1,493), a unique survey designed for the specific purpose of examining the relationship between immigrant policy and Latino family health and well-being. The LNHIS relies on a sample provided by a mix of cell phone and landline households along with web surveys. This mixed-mode approach improves our ability to capture a wide segment of the Hispanic population in the sample by providing a mechanism to poll the growing segment of the Hispanic population that lacks a land-line telephone as well as those who prefer to engage surveys on-line. A total of 989 Latinos were interviewed over the phone and an additional 504 Latinos were sampled through the Internet to create a dataset of 1,493 respondents. Web survey respondents are from a double-opt-in national Internet panel who were then randomly selected to participate in the study and weighted to be representative of the Latino population. The survey has an overall margin of error of +/− 2.5 percent with an AAPOR response rate of 18 percent for the telephone sample. Sampling is from the 44 states and Puerto Rico that collectively account for 91 percent of the U.S. Latino adult population. Respondents across all modes of data collection could choose to be interviewed in either English or Spanish, and all interviewers were fully bilingual. The full dataset of both phone and web interviews are weighted to match the 2013 Current Population Survey estimate of Latino adults with respect to age, place of birth, gender, and state.

### Measures

The primary health outcome variable of interest is parents' report of their child's health status within the LNHIS dataset. Parental report of children's health is a common measure of child health status used in public health research. Parental report of child's health status is a good representation of the child's actual health status [18]. The child health question in the LNHIS closely mirrors that used in the National Survey of Children's Health.[1] The question utilizes a 1 to 5 Likert scale, with respondents rating their child's health status from

excellent to poor. The specific survey question is "*How would you rate your child's overall physical health -- excellent, very good, good, fair, or poor?*". The variable in our analysis ranges from 1=poor to 5=excellent to predict optimal health using ordered logistic regression.

Our main explanatory variables are three mutually exclusive family categories and a measure of state immigration policy perception. The first family category is mixed-status undocumented families, in which respondents self-reported that they were foreign-born non-citizens/non-legal permanent residents (LPR) and their child was born in the United States. The next category is families coded as mixed-status LPR, which includes those in which the responding parent is LPR and their child was born in the United States. The last family category, coded as U.S. citizen families, are those in which the responding parent is a U.S. citizen whose child was born in the United States. Unlike most national surveys, where researchers estimate legal status, we asked respondents: *"Are you currently a U.S. citizen, a Legal Permanent Resident, or a non-citizen?"*

To measure perceptions of state immigration policy, we utilize the following question, "*Thinking about the immigrant population in your state, would you describe [STATE] policies as favorable or unfavorable towards immigrants?*"The categories of the variable are favorable or unfavorable (coded as 0=favorable and 1=unfavorable). It is important to note that states vary widely in their participation in immigration policymaking since the 2000s [2], thus we assume this variable reflects geographic variation.

We control for a handful of measures that have been found to be correlated with Latino children's health status in previous research, including standard measures of family income, parental educational attainment, age, parental marital status, parental gender, language of interview, and child's age. One of the more important controls in our model is for insurance coverage, as previous literature has found that having access to health insurance influences Latino health outcomes [30,31].

Lastly, the U.S. Latino population is immensely diverse, with members originating from twenty-one countries. Latino sub-groups tend to reside in different areas of the United States; they may have different cultural practices/norms, different immigration experiences, and varying health status. For example, the Mexican-origin population (which comprises 65 percent of the total U.S. Latino population) has been found to have unique health outcomes relative to Latinos from other backgrounds [32,33]. This variation motivates us to account for Mexican origin in our study, so we include a binary variable for Mexican origin to account for Latino heterogeneity by national origin. Inclusion of a Mexican-origin variable also accounts for the distinct and historical legacy of "undocumentedness" relative to other Latino subgroups like Cubans who have benefited from U.S. policy that has allowed Cuban political refugees to gain access to social services, permanent residency, and U.S. citizenship.

---

1 http://www.cdc.gov/nchs/slaits/nsch.htm

*J Immigr Minor Health.* Author manuscript; available in PMC 2017 August 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

All statistical analysis was conducted using Stata 12 software (StataCorp. 2011) and survey weights were used to account for the complex survey design. Our analytic approach is intended to determine the relationship between family type and perceived immigration climate on child health status within a representative sample of Latino families. We restrict the sample to respondents who have at least one child living in the household who is under 18 years of age. From this original sample 1,068 of the respondents had children and a total of 598 respondents had children who were under 18 years of age and living in the household.

## Results

As shown in the summary descriptive statistics detailed in Appendix A, the mean reported health status indicator category is "very good" child health. The distribution for our family categories shows that 75 percent of our sample are U.S. families, and the remaining 25 percent include mixed-status families where at least one responding parent is undocumented (12.5 percent) and where at least one parent is a LPR (12.3 percent). To provide context, of the estimated 17.6 million Latino children in the U.S., 89 percent are U.S.-born, and a majority of those have at least one foreign-born parent. Twenty-one percent of all Latino children are U.S.-born with at least one undocumented parent, 31 percent are U.S.-born with at least one legal permanent resident (LPR) parent, and 37 percent are U.S.-born with only U.S.-born parents [34].

Table 1 displays results from our multivariate analyses. The first model (Model 1) tests the difference between family categories on child's health status, controlling for a vector of co-variates. We then estimate a model (Model 2) that examines Latinos' perceptions of their state's immigrant policies on child's health status, controlling for a vector of co-variates. Our first set of results in Table 1 estimates an ordered logistic regression model that includes family type and a vector of control variables. We find strong support for our first hypothesis, as we find that there are differences between family types in the probability of parents reporting optimal child health status. In fact, the odds of reporting optimal health are 2.9 times larger for U.S. citizen families compared to mixed-status undocumented families, holding all else constant (*p<0.01*). We also find differences between mixed-status undocumented families and mixed-status LPR families in the probability of parents reporting optimal child health status. The odds of reporting optimal health are 1.9 times larger for mixed-status LPR families compared to mixed-status undocumented families, holding all else constant (*p<0.05*).

The substantive impacts of these relationships are shown in Figure 1, which displays the post-estimation results of our first ordered logistic regression. Figure 1 graphs the predicted probabilities of family types on each response category of child health status. As shown, mixed-status undocumented families are statistically less likely to report optimal health relative to U.S. citizen families and mixed-status LPR families, holding all else constant.

Our second model estimates an ordered logistic regression that includes unfavorable state immigrant policies equal to one (favorable polices equal to zero). Here we find strong support for our second hypothesis, as we find that there are differences between the impact

of parents' perceptions of their state's immigrant policies on the probability of reporting optimal health for their child. In fact, the odds of parents reporting optimal child health status are 0.522 times larger for respondents who perceive their state's immigrant policies as unfavorable, holding all else constant (*p<0.01*). Further, including parental perceptions of immigrant policy in the model increases the disparity in children's health status. We now find that the odds of reporting optimal health are 3.2 times larger for U.S. citizen families compared to mixed-status undocumented families, holding all else constant (*p<0.01*). In other words, once we introduce parental perceptions of state immigrant policies, we find greater health disparity among children in mixed-status undocumented families compared to U.S. citizen families.

## Conclusion

The United States has undergone a nearly unprecedented period of heightened immigrant policy activity with a marked punitive undertone that is having consequences for Latino families. We set out to determine whether these perceptions are associated with American children's health status in the context of mixed-status families, and we find strong and consistent evidence that they are. This study makes several important contributions to the literature associated with the health consequences of public policies. Utilizing a representative survey specifically designed to assess the relationship between immigration policies and health, our research design provided the opportunity to assess the impact of the perceived punitive nature of immigrant policy across family type and its consequences for children's health. This led to findings that mixed-status families report poorer child health status compared to mixed-status LPR families and U.S. Latino families. Our findings also suggest that punitive immigrant policies have an impact on children's health. Moreover, once we introduce Latinos' perceptions of their state's policies towards immigrants, we find that the disparity between mixed-status families and U.S.-born families increases threefold, suggesting that these policies are a major mechanism by which Latino family type is impacting child health status. Most importantly, this finding holds even after controlling for parental marital status, parental gender, parental education, family income, insurance coverage, language of interview, child's age, and parental Mexican origin.

The findings echo the warning articulated by Vega (2009) [20] regarding health disparities among Latino children arising as a result of the social stratification experienced by their parents, as well as those of Williams (2003) [25] regarding the impact of historical and contemporary social structures on the life course and health of individuals. Furthermore, these findings suggest that public policy that adversely affects Latino mixed-status families is one mechanism by which the Latino immigrant health advantage erodes from one generation to the next, thus contributing importantly to the scholarship on Latino child health as well as on the role that social structures play in the erosion of the Latino immigrant health advantage over time and generations in the U.S.

We also acknowledge the limitations of this study. Given that our study is cross-sectional and a study of Latino populations, we are limited in our ability to make causal claims and generalizations across racial and ethnic populations over time. This limitation is not particular to this study, as currently there are no available longitudinal datasets which query

Author Manuscript

respondents on their perceptions of immigration policy environment that would also allow us to construct mixed-status family types. Our study also does not tackle the role of deportations and family disruption among immigrant families. As illustrated in recent work, the dramatic increase in immigration policy enforcement, including deportations and detentions, has important repercussions for U.S.-born children of immigrants who Zayas calls our "Forgotten Citizens" [35]. These negative externalities range from social, economic, and political challenges, to psychosocial and health consequences [36,37,38,39,40]. As discussed by Doering-White et al. 2016, the aftermath of deportations illustrates the complexities and gendered aspects of immigration enforcement [41]. Horner et al. [42] find that children in mixed-status families have complex lives and are constantly worried that their families can be separated due to their immigration status. Using qualitative interviews, they find that youth experience high levels of stress. This fear of family separation because of deportation can create stressful environment for families and lead to poor mental health. Miranda et al. (2005) find that immigrant Latinas who were separated from their children were more likely to report depression relative to mother's whose children were currently living with them at home [43]. Given the likelihood of continued policy activity in the area of immigration at both the state and federal level for the foreseeable future, the consequences of these policies will continue to be felt among Latino Americans. With continued growth of the Latino population expected, the health ramifications of these policies should be of concern not only to public health advocates but also to policymakers who may be costing their states valuable economic resources to treat the health issues created by the immigration policies that they are passing.

## Acknowledgments

The project described is supported, in part, by a NICHD training grant to the University of Wisconsin-Madison (T32HD049302). The content is solely the responsibility of the authors and does not necessarily represent the official views of the Eunice Kennedy Shriver National Institute of Child Health and Human Development or the National Institutes of Health. The authors would like to acknowledge and thank Dr. Francisco I. Pedraza for developing the survey question "Thinking about the immigrant population in your state, would you describe [STATE] policies as favorable or unfavorable towards immigrants?"

## References

1. Vargas ED. Immigration enforcement and mixed-status families: The effects of risk of deportation on Medicaid use. Children and youth services review. 2015; 57:83–9. [PubMed: 26435562]

2. Ybarra VD, Sanchez LM, Sanchez GR. Anti-immigrant anxieties in state policy: The great recession and punitive immigration policy in the American states, 2005–2012. State Politics & Policy Quarterly. 2015 1532440015605815.

3. Enriquez LE. Multigenerational punishment: Shared experiences of undocumented immigration status within mixed-status families. Journal of Marriage and Family. 2015; 77(4):939–53.

4. Anderson KF, Finch JK. Racially Charged Legislation and Latino Health Disparities: The Case of Arizona's S.B. 1070. Sociological Spectrum. 2014; 34(6):526–548.

5. Valdez CR, Padilla B, Valentine JL. Consequences of Arizona's immigration policy on social capital among Mexican mothers with unauthorized immigration status. Hispanic Journal of Behavioral Sciences. 2013; 35(3):303–22.

6. Cavazos-Rehg PA, Zayas LH, Spitznagel EL. Legal status, emotional well-being and subjective health status of Latino immigrants. Journal of the National Medical Association. 2007; 99(10):1126. [PubMed: 17987916]

7. Gonzales RG, Suárez-Orozco C, Dedios-Sanguineti MC. No place to belong: Contextualizing concepts of mental health among undocumented immigrant youth in the United States. American Behavioral Scientist. 2013 0002764213487349.

8. Salas LM, Ayón C, Gurrola M. Estamos traumados: The effect of anti-immigrant sentiment and policies on the mental health of Mexican immigrant families. Journal of Community Psychology. 2013; 41(8):1005–20.

9. Androff DK, Ayon C, Becerra D, Gurrola M. US immigration policy and immigrant children's well-being: The impact of policy shifts. J Soc & Soc Welfare. 2011; 38:77.

10. Markides KS, Coreil J. The health of Hispanics in the southwestern United States: an epidemiologic paradox. Public Health Reports. 1986; 101(3):253. [PubMed: 3086917]

11. Franzini L, Ribble JC, Keddie AM. Understanding the hispanic paradox. Ethnicity and disease. 2001; 11(3):496–518. [PubMed: 11572416]

12. Riosmena, F., Dennis, JA. Aging, health, and longevity in the Mexican-origin population. Springer US; 2012. A tale of three paradoxes: the weak socioeconomic gradients in health among Hispanic immigrants and their relation to the Hispanic Health Paradox and negative acculturation; p. 95-110.

13. Iván A. Perinatal outcomes among Mexican Americans: a review of an epidemiological paradox. Ethnicity & Disease. 2002; 12:480–7. [PubMed: 12477133]

14. Flores G, Fuentes-Afflick E, Barbot O, Carter-Pokras O, Claudio L, Lara M, McLaurin JA, Pachter L, Gomez FR, Mendoza F, Valdez RB. The health of Latino children: urgent priorities, unanswered questions, and a research agenda. JAMA. 2002; 288(1):82–90. [PubMed: 12090866]

15. Canino G, Koinis-Mitchell D, Ortega AN, McQuaid EL, Fritz GK, Alegría M. Asthma disparities in the prevalence, morbidity, and treatment of Latino children. Social Science & Medicine. 2006; 63(11):2926–37. [PubMed: 16956704]

16. Lopez-Gonzalez L, Aravena VC, Hummer RA. Immigrant acculturation, gender and health behavior: A research note. Social Forces. 2005; 84(1):581–93.

17. Johnson MA, Marchi KS. Segmented assimilation theory and perinatal health disparities among women of Mexican descent. Social Science & Medicine. 2009; 69(1):101–9. [PubMed: 19450913]

18. Campbell K, Garcia DM, Granillo CV, Chavez DV. Exploring the Latino paradox how economic and citizenship status impact health. Hispanic Journal of Behavioral Sciences. 2012; 34(2):187–207.

19. Viruell-Fuentes EA, Miranda PY, Abdulrahim S. More than culture: structural racism, intersectionality theory, and immigrant health. Social Science & Medicine. 2012; 75(12):2099–106. [PubMed: 22386617]

20. Vega WA, Rodriguez MA, Gruskin E. Health disparities in the Latino population. Epidemiologic Reviews. 2009; 31(1):99–112. [PubMed: 19713270]

21. Krieger N. Theories for social epidemiology in the 21st century: an ecosocial perspective. International Journal of Epidemiology. 2001; 30(4):668–77. [PubMed: 11511581]

22. Berkman, LF.Kawachi, I., Glymour, MM., editors. Social epidemiology. Oxford University Press; 2014.

23. Navarro V, Shi L. The political context of social inequalities and health. Social Science & Medicine. 2001; 52(3):481–91. [PubMed: 11330781]

24. Navarro V, Muntaner C, Borrell C, Benach J, Quiroga Á, Rodríguez-Sanz M, Vergés N, Pasarín MI. Politics and health outcomes. The Lancet. 2006; 368(9540):1033–7.

25. Williams GH. The determinants of health: structure, context and agency. Sociology of Health & Illness. 2003; 25(3):131–54. [PubMed: 14498934]

26. Dreby J. The burden of deportation on children in Mexican immigrant families. Journal of Marriage and Family. 2012; 74(4):829–45.

27. Landale NS, Hardie JH, Oropesa RS, Hillemeier MM. Behavioral Functioning among Mexican-origin Children Does Parental Legal Status Matter? Journal of Health and Social Behavior. 2015; 56(1):2–18. [PubMed: 25722124]

28. Oropesa RS, Landale NS, Hillemeier MM. Family legal status and health: Measurement dilemmas in studies of Mexican-origin children. Social Science & Medicine. 2015; 138:57–67. [PubMed: 26056934]

*J Immigr Minor Health*. Author manuscript; available in PMC 2017 August 01.

004487

29. Flores G, Bauchner H, Feinstein AR, Nguyen US. The impact of ethnicity, family income, and parental education on children's health and use of health services. American Journal of Public Health. 1999; 89(7):1066–71. [PubMed: 10394317]

30. Probst JC, Wang JY, Moore CG, Powell MP, Martin AB. Continuity of health insurance coverage and perceived health at age 40. Medical Care Research and Review. 2008; 65(4):450–77. [PubMed: 18490702]

31. Fisher-Owens SA, Isong IA, Soobader MJ, Gansky SA, Weintraub JA, Platt LJ, Newacheck PW. An examination of racial/ethnic disparities in children's oral health in the United States. Journal of Public Health Dentistry. 2013; 73(2):166–74. [PubMed: 22970900]

32. Frieden TR. CDC Health Disparities and Inequalities Report-United States, 2013. Foreword. Morbidity and mortality weekly report. Surveillance summaries (Washington, DC: 2002). 2013; 62:1–2.

33. Zsembik BA, Fennell D. Ethnic variation in health and the determinants of health among Latinos. Social Science & Medicine. 2005; 61(1):53–63. [PubMed: 15847961]

34. Fry, R., Passel, JS. Latino children: A majority are US-born offspring of immigrants. Pew Hispanic Center; 2009.

35. Zayas, L. Forgotten citizens: Deportation, children, and the making of American exiles and orphans. Oxford University Press; USA: 2015.

36. Orrenius, P., Zavodny, M. How do e-verify mandates affect unauthorized immigrant workers?. Federal Reserve Bank of Dallas Research Department; 2014. Working paper 1403https://www.dallasfed.org/assets/documents/research/papers/2014/wp1403.pdf

37. Amuedo-Dorantes C, Pozo S. On the intended and unintended consequences of enhanced US border and interior immigration enforcement: Evidence from Mexican deportees. Demography. 2014; 51(6):2255–79. [PubMed: 25361892]

38. Brabeck K, Xu Q. The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. Hispanic Journal of Behavioral Sciences. 2010; 32(3):341–61.

39. Capps, R., Castañeda, RM., Chaudry, A., Santos, R. Paying the price: The impact of immigration raids on America's children. Washington, DC: National Council of La Raza; 2007. http://www.urban.org/sites/default/files/alfresco/publication-pdfs/411566-Paying-the-Price-The-Impact-of-Immigration-Raids-on-America-s-Children.PDF

40. Gubernskaya Z, Bean FD, Van Hook J. (Un) Healthy Immigrant Citizens Naturalization and Activity Limitations in Older Age. Journal of Health and Social Behavior. 2013; 54(4):427–43. [PubMed: 24311754]

41. Doering-White J, Horner P, Sanders L, Martinez R, Lopez W, Delva J. Testimonial engagement: Undocumented Latina mothers navigating a gendered deportation regime. Journal of International Migration and Integration. 2014:1–6.

42. Horner P, Sanders L, Martinez R, Doering-White J, Lopez W, Delva J. "I Put a Mask on" The Human Side of Deportation Effects on Latino Youth. Journal of Social Welfare and Human Rights. 2014; 2(2):33–47.

43. Miranda, J., Siddique, J., Der-Martirosian, C., Belin, TR. Psychiatric Services. 2005. Depression among Latina immigrant mothers separated from their children.

## Appendix A: Summary Statistics (unweighted), using 2015 National Latino Health and Immigration Survey

| Variable | Mean | Std. Dev. | Min | Max |
| --- | --- | --- | --- | --- |
| Child's Health Status[1] | 4.20 | 0.99 | 1 | 5 |
| Mixed Status: Undocumented | 0.13 | 0.33 | 0 | 1 |
| Mixed Status: Legal Permanent Resident | 0.12 | 0.33 | 0 | 1 |
| Non-Mixed Status: U.S. Citizen | 0.75 | 0.43 | 0 | 1 |

*J Immigr Minor Health.* Author manuscript; available in PMC 2017 August 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Vargas and Ybarra
Page 11

| Variable | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|
| State Unfavorable Toward Immigrants | 0.38 | 0.48 | 0 | 1 |
| Parental Married Status: Married | 0.53 | 0.50 | 0 | 1 |
| Parent Reporting: Female | 0.62 | 0.49 | 0 | 1 |
| Parental Education[2] | 5.52 | 2.36 | 1 | 10 |
| Parental Age | 45.87 | 17.00 | 18 | 98 |
| Family Income Missing | 0.21 | 0.41 | 0 | 1 |
| Family Income: Less than 20K | 0.20 | 0.40 | 0 | 1 |
| Family Income: 20K–39K | 0.21 | 0.40 | 0 | 1 |
| Family Income: 40k–60k | 0.13 | 0.33 | 0 | 1 |
| Family Income: 60k–80k | 0.09 | 0.28 | 0 | 1 |
| Family Income: 80k–100k | 0.06 | 0.24 | 0 | 1 |
| Family Income: 100k–150k | 0.07 | 0.25 | 0 | 1 |
| Family Income: 150k+ | 0.04 | 0.19 | 0 | 1 |
| Uninsured[3] | 0.15 | 0.36 | 0 | 1 |
| Language of Interview: Spanish[4] | 0.58 | 0.49 | 0 | 1 |
| Child's Age | 7.83 | 5.81 | 0 | 18 |
| Parental Mexican Origin | 0.55 | 0.50 | 0 | 1 |

[1] Health Status: (0=Poor, Fair, Good, 1=Very Good and Excellent)

[2] Highest education levels completed, (1= No formal schooling, 2= Grade 1–8, 3=Some HS, 4=GED, 5=HS Graduate, 6=Some College, 7=Associates, 8=Bachelors, 9=MA, 10=Ph.D/MD)

[3] Insurance Coverage: (0=Currently Insured, 1= Currently Uninsured)

[4] Language of Interview: (0=English, 1=Spanish)

004489

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Vargas and Ybarra                                                                                   Page 12

**Figure 1. Adjusted Predicted Probabilities of Child's Health Status (Poor to Excellent) by Family Type (n=514), using 2015 National Latino Health and Immigration Survey**

*Note.* Controlling for age, gender, education, income, marital status, insurance coverage, language of interview, Mexican origin, and child age (all of which were set to their mean or mode values).

\*$P < 0.05$ for the difference mixed-status undocumented families and U.S. Citizen families in the same response category, †$P < 0.05$ for the difference between mixed-status undocumented families and mixed-status permanent resident families in the same response category.

004490

**Table 1**

Ordered Logistic Coefficients for Regressions of Family Type and Unfavorable State Immigrant Policies on Children's Health Status (Poor - Excellent), using 2015 National Latino Health and Immigration Survey.

| Variables | Model 1 | | Model 2 | |
|---|---|---|---|---|
| | β | Odds Ratios | β | Odds Ratios |
| Reference Category: Mixed Status Undocumented Family | | | | |
| U.S. Citizen | 1.110*** | 3.035*** | 1.189*** | 3.282*** |
| Legal Permanent Resident | 0.649** | 1.914** | 0.842** | 2.322** |
| Unfavorable State Immigrant Policy[1] | | | −0.650*** | 0.522*** |
| Married Status: Married[2] | 0.124 | 1.132 | 0.109 | 1.115 |
| Parent Female | −0.580*** | 0.560*** | −0.487** | 0.615** |
| Parental Education[3] | 0.148*** | 1.159*** | 0.169*** | 1.184*** |
| Parental Age | −0.037*** | 0.963*** | −0.036*** | 0.964*** |
| Reference Family Income: Less than 20 | | | | |
| Family Income Missing | 0.753** | 2.123** | 0.642* | 1.901* |
| Family Income: 20K–39K | −0.015 | 0.985 | 0.010 | 1.010 |
| Family Income: 40k–60k | 0.169 | 1.184 | 0.086 | 1.090 |
| Family Income: 60k–80k | 0.801** | 2.228** | 0.675* | 1.965* |
| Family Income: 80k–100k | −0.114 | 0.892 | −0.267 | 0.766 |
| Family Income: 100k–150k | −0.079 | 0.924 | −0.079 | 0.924 |
| Family Income: 150k+ | 0.271 | 1.311 | 0.001 | 1.001 |
| Uninsured | −0.203 | 0.816 | −0.039 | 0.961 |
| Spanish | −0.225 | 0.799 | −0.218 | 0.804 |
| Child's Age | −0.024 | 0.976 | −0.027* | 0.973* |
| Parental Mexican Origin | −0.024 | 0.976 | −0.027* | 0.973* |
| Observations | 514 | | 492 | |
| Adjusted R-squared | 0.0725 | | 0.0756 | |

Notes:

***
p<0.01,

**
p<0.05,

*
p<0.1, β is a logit coefficient

[1] State Policies towards Immigrants: (0=Favorable, 1=Unfavorable)

[2] Reference Category: Martial Status-Single

[3] Highest education levels completed, (1= No formal schooling, 2= Grade 1–8, 3=Some HS, 4=GED, 5=HS Graduate, 6=Some College, 7=Associates, 8=Bachelors, 9=MA, 10=Ph.D/MD)

*J Immigr Minor Health.* Author manuscript; available in PMC 2017 August 01.

Author Manuscript

Original Articles

# Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults

## The Adverse Childhood Experiences (ACE) Study

Vincent J. Felitti, MD, FACP, Robert F. Anda, MD, MS, Dale Nordenberg, MD, David F. Williamson, MS, PhD, Alison M. Spitz, MS, MPH, Valerie Edwards, BA, Mary P. Koss, PhD, James S. Marks, MD, MPH

**Background:** The relationship of health risk behavior and disease in adulthood to the breadth of exposure to childhood emotional, physical, or sexual abuse, and household dysfunction during childhood has not previously been described.

**Methods:** A questionnaire about adverse childhood experiences was mailed to 13,494 adults who had completed a standardized medical evaluation at a large HMO; 9,508 (70.5%) responded. Seven categories of adverse childhood experiences were studied: psychological, physical, or sexual abuse; violence against mother; or living with household members who were substance abusers, mentally ill or suicidal, or ever imprisoned. The number of categories of these adverse childhood experiences was then compared to measures of adult risk behavior, health status, and disease. Logistic regression was used to adjust for effects of demographic factors on the association between the cumulative number of categories of childhood exposures (range: 0–7) and risk factors for the leading causes of death in adult life.

**Results:** More than half of respondents reported at least one, and one-fourth reported ≥2 categories of childhood exposures. We found a graded relationship between the number of categories of childhood exposure and each of the adult health risk behaviors and diseases that were studied ($P < .001$). Persons who had experienced four or more categories of childhood exposure, compared to those who had experienced none, had 4- to 12-fold increased health risks for alcoholism, drug abuse, depression, and suicide attempt; a 2- to 4-fold increase in smoking, poor self-rated health, ≥50 sexual intercourse partners, and sexually transmitted disease; and a 1.4- to 1.6-fold increase in physical inactivity and severe obesity. The number of categories of adverse childhood exposures showed a graded relationship to the presence of adult diseases including ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease. The seven categories of adverse childhood experiences were strongly interrelated and persons with multiple categories of childhood exposure were likely to have multiple health risk factors later in life.

**Conclusions:** We found a strong graded relationship between the breadth of exposure to abuse or household dysfunction during childhood and multiple risk factors for several of the leading causes of death in adults.

**Medical Subject Headings (MeSH):** child abuse, sexual, domestic violence, spouse abuse, children of impaired parents, substance abuse, alcoholism, smoking, obesity, physical activity, depression, suicide, sexual behavior, sexually transmitted diseases, chronic obstructive pulmonary disease, ischemic heart disease. (Am J Prev Med 1998;14:245–258) © 1998 American Journal of Preventive Medicine

Department of Preventive Medicine, Southern California Permanente Medical Group (Kaiser Permanente), (Felitti) San Diego, California 92111. National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention, (Anda, Williamson, Spitz, Edwards, Marks) Atlanta, Georgia 30333. Department of Pediatrics, Emory University School Medicine, (Nor–denberg) Atlanta, Georgia 30333. Department of Family and Community Medicine, University of Arizona Health Sciences Center, (Koss) Tucson, Arizona 85727.

Address correspondence to: Vincent J. Felitti, MD, Kaiser Permanente, Department of Preventive Medicine, 7060 Clairemont Mesa Boulevard, San Diego, California 92111.

0749-3797/98/$19.00
PII S0749-3797(98)00017-8

**245**

004492

## Introduction

Only recently have medical investigators in primary care settings begun to examine associations between childhood abuse and adult health risk behaviors and disease.[1–5] These associations are important because it is now clear that the leading causes of morbidity and mortality in the United States[6] are related to health behaviors and lifestyle factors; these factors have been called the "actual" causes of death.[7] Insofar as abuse and other potentially damaging childhood experiences contribute to the development of these risk factors, then these childhood exposures should be recognized as the basic causes of morbidity and mortality in adult life.

Although sociologists and psychologists have published numerous articles about the frequency[8–12] and long-term consequences[13–15] of childhood abuse, understanding their relevance to adult medical problems is rudimentary. Furthermore, medical research in this field has limited relevance to most primary care physicians because it is focused on adolescent health,[16–20] mental health in adults,[20] or on symptoms among patients in specialty clinics.[22,23] Studies of the long-term effects of childhood abuse have usually examined single types of abuse, particularly sexual abuse, and few have assessed the impact of more than one type of abuse.[5,24–28] Conditions such as drug abuse, spousal violence, and criminal activity in the household may co-occur with specific forms of abuse that involve children. Without measuring these household factors as well, long-term influence might be wrongly attributed solely to single types of abuse and the cumulative influence of multiple categories of adverse childhood experiences would not be assessed. To our knowledge, the relationship of adult health risk behaviors, health status, and disease states to childhood abuse and household dysfunction[29–35] has not been described.

We undertook the Adverse Childhood Experiences (ACE) Study in a primary care setting to describe the long-term relationship of childhood experiences to important medical and public health problems. The ACE Study is assessing, retrospectively and prospectively, the long-term impact of abuse and household dysfunction during childhood on the following outcomes in adults: disease risk factors and incidence, quality of life, health care utilization, and mortality. In this initial paper we use baseline data from the study to provide an overview of the prevalence and interrelation of exposures to childhood abuse and household dysfunction. We then describe the relationship between the number of categories of these deleterious childhood exposures and risk factors and those diseases that

underlie many of the leading causes of death in adults.[6,7,36,37]

## Methods

### Study Setting

The ACE Study is based at Kaiser Permanente's San Diego Health Appraisal Clinic. More than 45,000 adults undergo standardized examinations there each year, making this clinic one of the nation's largest free-standing medical evaluation centers. All enrollees in the Kaiser Health Plan in San Diego are advised through sales literature about the services (free for members) at the clinic; after enrollment, members are advised again of its availability through new-member literature. Most members obtain appointments by self-referral; 20% are referred by their health care provider. A recent review of membership and utilization records among Kaiser members in San Diego continuously enrolled between 1992 and 1995 showed that 81% of those 25 years and older had been evaluated in the Health Appraisal Clinic.

Health appraisals include completion of a standardized medical questionnaire that requests demographic and biopsychosocial information, review of organ systems, previous medical diagnoses, and family medical history. A health care provider completes the medical history, performs a physical examination, and reviews the results of laboratory tests with the patient.

### Survey Methods

The ACE Study protocol was approved by the Institutional Review Boards of the Southern California Permanente Medical Group (Kaiser Permanente), the Emory University School of Medicine, and the Office of Protection from Research Risks, National Institutes of Health. All 13,494 Kaiser Health Plan members who completed standardized medical evaluations at the Health Appraisal Clinic between August–November of 1995 and January–March of 1996 were eligible to participate in the ACE Study. Those seen at the clinic during December were not included because survey response rates are known to be lower during the holiday period.[38]

In the week after visiting the clinic, and hence having their standardized medical history already completed, members were mailed the ACE Study questionnaire that included questions about childhood abuse and exposure to forms of household dysfunction while growing up. After second mailings of the questionnaire to persons who did not respond to the first mailing, the response rate for the survey was 70.5% (9,508/13,494).

> See related Commentary on pages 354, 356, 361.



**Figure 1.** ACE Study design. *After exclusions, 59.7% of the original wave I sample (8,056/13,494) were included in this analysis.

A second survey wave of approximately the same number of patients as the first wave was conducted between June and October of 1997. The data for the second survey wave is currently being compiled for analysis. The methods for the second mail survey wave were identical to the first survey wave as described above. The second wave was done to enhance the precision of future detailed analyses on special topics and to reduce the time necessary to obtain precise statistics on follow-up health events. An overview of the total ACE Study design is provided in Figure 1.

## Comparison of Respondents and Nonrespondents

We abstracted the completed medical evaluation for every person eligible for the study; this included their medical history, laboratory results, and physical findings. Respondent ($n = 9,508$) and nonrespondent ($n = 3,986$) groups were similar in their percentages of women (53.7% and 51.0%, respectively) and in their mean years of education (14.0 years and 13.6 years, respectively). Respondents were older than nonrespondents (means 56.1 years and 49.3 years) and more likely to be white (83.9% vs. 75.3%) although the actual magnitude of the differences was small.

Respondents and nonrespondents did not differ with regard to their self-rated health, smoking, other substance abuse, or the presence of common medical conditions such as a history of heart attack or stroke, chronic obstructive lung disease, hypertension, or diabetes, or with regard to marital status or current family, marital, or job-related problems (data not shown). The health appraisal questionnaire used in the clinic con-

tains a single question about childhood sexual abuse that reads "As a child were you ever raped or sexually molested?" Respondents were slightly more likely to answer affirmatively than nonrespondents (6.1% vs. 5.4%, respectively).

## Questionnaire Design

We used questions from published surveys to construct the ACE Study questionnaire. Questions from the Conflicts Tactics Scale[39] were used to define psychological and physical abuse during childhood and to define violence against the respondent's mother. We adapted four questions from Wyatt[40] to define contact sexual abuse during childhood. Questions about exposure to alcohol or drug abuse during childhood were adapted from the 1988 National Health Interview Survey.[41] All of the questions we used in this study to determine childhood experiences were introduced with the phrase "While you were growing up during your first 18 years of life . . ."

Questions about health-related behaviors and health problems were taken from health surveys such as the Behavioral Risk Factor Surveys[42] and the Third National Health and Nutrition Examination Survey,[43] both of which are directed by the Centers for Disease Control and Prevention. Questions about depression came from the Diagnostic Interview Schedule of the National Institute of Mental Health (NIMH).[44] Other information for this analysis such as disease history was obtained from the standardized questionnaire used in the Health Appraisal Clinic. (A copy of the questionnaires used in this study may be found at *www.elsevier.com/locate/amepre.*)

004494

**Table 1.** Prevalence of childhood exposure to abuse and household dysfunction

| Category of childhood exposure[a] | Prevalence (%) | Prevalence (%) |
|---|---|---|
| **Abuse by category** | | |
| **Psychological** | | **11.1** |
| *(Did a parent or other adult in the household . . .)* | | |
| Often or very often swear at, insult, or put you down? | 10.0 | |
| Often or very often act in a way that made you afraid that you would be physically hurt? | 4.8 | |
| **Physical** | | **10.8** |
| *(Did a parent or other adult in the household . . .)* | | |
| Often or very often push, grab, shove, or slap you? | 4.9 | |
| Often or very often hit you so hard that you had marks or were injured? | 9.6 | |
| **Sexual** | | **22.0** |
| *(Did an adult or person at least 5 years older ever . . .)* | | |
| Touch or fondle you in a sexual way? | 19.3 | |
| Have you touch their body in a sexual way? | 8.7 | |
| Attempt oral, anal, or vaginal intercourse with you? | 8.9 | |
| Actually have oral, anal, or vaginal intercourse with you? | 6.9 | |
| **Household dysfunction by category** | | |
| **Substance abuse** | | **25.6** |
| Live with anyone who was a problem drinker or alcoholic? | 23.5 | |
| Live with anyone who used street drugs? | 4.9 | |
| **Mental illness** | | **18.8** |
| Was a household member depressed or mentally ill? | 17.5 | |
| Did a household member attempt suicide? | 4.0 | |
| **Mother treated violently** | | **12.5** |
| *Was your mother (or stepmother)* | | |
| Sometimes, often, or very often pushed, grabbed, slapped, or had something thrown at her? | 11.9 | |
| Sometimes, often, or very often kicked, bitten, hit with a fist, or hit with something hard? | 6.3 | |
| Ever repeatedly hit over at least a few minutes? | 6.6 | |
| Ever threatened with, or hurt by, a knife or gun? | 3.0 | |
| **Criminal behavior in household** | | |
| Did a household member go to prison? | 3.4 | **3.4** |
| | **Any category reported** | **52.1%** |

[a]An exposure to one or more items listed under the set of questions for each category.

## Defining Childhood Exposures

We used three categories of childhood abuse: psychological abuse (2 questions), physical abuse (2 questions), or contact sexual abuse (4 questions). There were four categories of exposure to household dysfunction during childhood: exposure to substance abuse (defined by 2 questions), mental illness (2 questions), violent treatment of mother or stepmother (4 questions), and criminal behavior (1 question) in the household. Respondents were defined as exposed to a category if they responded "yes" to 1 or more of the questions in that category. The prevalence of positive responses to the individual questions and the category prevalences are shown in Table 1.

We used these 7 categories of childhood exposures to abuse and household dysfunction for our analysis. The measure of childhood exposure that we used was simply the sum of the categories with an exposure; thus the possible number of exposures ranged from 0 (unexposed) to 7 (exposed to all categories).

## Risk Factors and Disease Conditions Assessed

Using information from both the study questionnaire and the Health Appraisal Clinic's questionnaire, we chose 10 risk factors that contribute to the leading causes of morbidity and mortality in the United States.[6,7,36,37] The risk factors included smoking, severe obesity, physical inactivity, depressed mood, suicide attempts, alcoholism, any drug abuse, parenteral drug abuse, a high lifetime number of sexual partners (≥50), and a history of having a sexually transmitted disease.

We also assessed the relationship between childhood exposures and disease conditions that are among the leading causes of mortality in the United States.[6] The presence of these disease conditions was based upon medical histories that patients provided in response to the clinic questionnaire. We included a history of ischemic heart disease (including heart attack or use of nitroglycerin for exertional chest pain), any cancer, stroke, chronic bronchitis, or emphysema (COPD),

004495

diabetes, hepatitis or jaundice, and any skeletal fractures (as a proxy for risk of unintentional injuries). We also included responses to the following question about self-rated health: "Do you consider your physical health to be excellent, very good, good, fair, or poor?" because it is strongly predictive of mortality.[45]

### Definition of Risk Factors

We defined severe obesity as a body mass index (kg/meter$^2$) ≥35 based on measured height and weight; physical inactivity as no participation in recreational physical activity in the past month; and alcoholism as a "Yes" response to the question "Have you ever considered yourself to be an alcoholic?" The other risk factors that we assessed are self-explanatory.

### Exclusions from Analysis

Of the 9,508 survey respondents, we excluded 51 (0.5%) whose race was unstated and 34 (0.4%) whose educational attainment was not reported. We also excluded persons who did not respond to certain questions about adverse childhood experiences. This involved the following exclusions: 125 (1.3%) for household substance abuse, 181 (1.9%) for mental illness in the home, 148 (1.6%) for violence against mother, 7 (0.1%) for imprisonment of a household member, 109 (1.1%) for childhood psychological abuse, 44 (0.5%) for childhood physical abuse, and 753 (7.9%) for childhood sexual abuse. After these exclusions, 8,056 of the original 9,508 survey respondents (59.7% of the original sample of 13,494) remained and were included in the analysis. Procedures for insuring that the findings based on complete data were generalizable to the entire sample are described below.

The mean age of the 8,506 persons included in this analysis was 56.1 years (range: 19–92 years); 52.1% were women; 79.4% were white. Forty-three percent had graduated from college; only 6.0% had not graduated from high school.

### Statistical Analysis

We used the Statistical Analysis System (SAS)[46] for our analyses. We used the direct method to age-adjust the prevalence estimates. Logistic regression analysis was employed to adjust for the potential confounding effects of age, sex, race, and educational attainment on the relationship between the number of childhood exposures and health problems.

To test for a dose-response relationship to health problems, we entered the number of childhood exposures as a single ordinal variable (0, 1, 2, 3, 4, 5, 6, 7) into a separate logistic regression model for each risk factor or disease condition.

### Assessing the Possible Influence of Exclusions

To determine whether our results were influenced by excluding persons with incomplete information on any of the categories of childhood exposure, we performed a separate sensitivity analysis in which we included all persons with complete demographic information but assumed that persons with missing information for a category of childhood exposure did not have an exposure in that category.

## Results

### Adverse Childhood Exposures

The level of positive responses for the 17 questions included in the seven categories of childhood exposure ranged from 3.0% for a respondent's mother (or stepmother) having been threatened with or hurt by a gun or knife to 23.5% for having lived with a problem drinker or alcoholic (Table 1). The most prevalent of the 7 categories of childhood exposure was substance abuse in the household (25.6%); the least prevalent exposure category was evidence of criminal behavior in the household (3.4%). More than half of respondents (52%) experienced ≥1 category of adverse childhood exposure; 6.2% reported ≥4 exposures.

### Relationships between Categories of Childhood Exposure

The probability that persons who were exposed to any single category of exposure were also exposed to another category is shown in Table 2. The relationship between single categories of exposure was significant for all comparisons ($P < .001$; chi-square). For persons reporting any single category of exposure, the probability of exposure to any additional category ranged from 65%–93% (median: 80%); similarly, the probability of ≥2 additional exposures ranged from 40%–74% (median: 54.5%).

The number of categories of childhood exposures by demographic characteristics is shown in Table 3. Statistically, significantly fewer categories of exposure were found among older persons, white or Asian persons, and college graduates ($P < .001$). Because age is associated with both the childhood exposures as well as many of the health risk factors and disease outcomes, all prevalence estimates in the tables are adjusted for age.

### Relationship between Childhood Exposures and Health Risk Factors

Both the prevalence and risk (adjusted odds ratio) increased for smoking, severe obesity, physical inactivity, depressed mood, and suicide attempts as the number of childhood exposures increased (Table 4). When

004496

**Table 2.** Relationships between categories of adverse childhood exposure

| First Category of Childhood Exposure | Sample Size* | Percent (%) Exposed to Another Category | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Psychological Abuse | Physical Abuse | Sexual Abuse | Substance Abuse | Mental Illness | Treated Violently | Imprisoned Member | Any One Additional Category | Any Two Additional Categories |
| Childhood Abuse: | | | | | | | | | | |
| Psychological | 898 | — | 52* | 47 | 51 | 50 | 39 | 9 | 93 | 74 |
| Physical abuse | 874 | 54 | — | 44 | 45 | 38 | 35 | 9 | 86 | 64 |
| Sexual abuse | 1770 | 24 | 22 | — | 39 | 31 | 23 | 6 | 65 | 41 |
| Household dysfunction: | | | | | | | | | | |
| Substance abuse | 2064 | 22 | 19 | 34 | — | 34 | 29 | 8 | 69 | 40 |
| Mental illness | 1512 | 30 | 22 | 37 | 46 | — | 26 | 7 | 74 | 47 |
| Mother treated violently | 1010 | 34 | 31 | 41 | 59 | 38 | — | 10 | 86 | 62 |
| Member imprisoned | 271 | 29 | 29 | 40 | 62 | 42 | 37 | — | 86 | 64 |
| median | | 29.5 | 25.4 | 40.5 | 48.5 | 38 | 32 | 8.5 | 80 | 54.5 |
| range | | (22–54) | (19–52) | (34–47) | (39–62) | (31–50) | (23–39) | (6–10) | (65–93) | (40–74) |

*Number exposed to first category. For example, among persons who were psychologically abused, 52% were also physically abused. More persons were a second category than would be expected by chance (P < .001; chisquare).

persons with 4 categories of exposure were compared to those with none, the odds ratios ranged from 1.3 for physical inactivity to 12.2 for suicide attempts (Table 4).

Similarly, the prevalence and risk (adjusted odds ratio) of alcoholism, use of illicit drugs, injection of illicit drugs, ≥50 intercourse partners, and history of a sexually transmitted disease increased as the number of childhood exposures increased (Table 5). In comparing persons with ≥4 childhood exposures to those with none, odds ratios ranged from 2.5 for sexually transmitted diseases to 7.4 for alcoholism and 10.3 for injected drug use.

### Childhood Exposures and Clustering of Health Risk Factors

We found a strong relationship between the number of childhood exposures and the number of health risk factors for leading causes of death in adults (Table 6). For example, among persons with no childhood exposures, 56% had none of the 10 risk factors whereas only 14% of persons with ≥4 categories of childhood exposure had no risk factors. By contrast, only 1% of persons with no childhood exposures had four or more risk factors, whereas 7% of persons with ≥4 childhood exposures had four or more risk factors (Table 6).

### Relationship between Childhood Exposures and Disease Conditions

When persons with 4 or more categories of childhood exposure were compared to those with none, the odds ratios for the presence of studied disease conditions ranged from 1.6 for diabetes to 3.9 for chronic bronchitis or emphysema (Table 7). Similarly, the odds ratios for skeletal fractures, hepatitis or jaundice, and poor self-rated health were 1.6, 2.3, and 2.2, respectively (Table 8).

### Significance of Dose-Response Relationships

In logistic regression models (which included age, gender, race, and educational attainment as covariates) we found a strong, dose-response relationship between the number of childhood exposures and each of the 10 risk factors for the leading causes of death that we studied (P < .001). We also found a significant (P < .05) dose-response relationship between the number of childhood exposures and the following disease conditions: ischemic heart disease, cancer, chronic bronchitis or emphysema, history of hepatitis or jaundice, skeletal fractures, and poor self-rated health. There was no statistically significant dose-response relationship for a history of stroke or diabetes.

004497

**Table 3.** Prevalence of categories of adverse childhood exposures by demographic characteristics

| Characteristic | Sample size (N) | Number of categories (%)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 3 | 4 |
| Age group (years) | | | | | | |
| 19–34 | 807 | 35.4 | 25.4 | 17.2 | 11.0 | 10.9 |
| 35–49 | 2,063 | 39.3 | 25.1 | 15.6 | 9.1 | 10.9 |
| 50–64 | 2,577 | 46.5 | 25.2 | 13.9 | 7.9 | 6.6 |
| ≥65 | 2,610 | 60.0 | 24.5 | 8.9 | 4.2 | 2.4 |
| Gender[b] | | | | | | |
| Women | 4,197 | 45.4 | 24.0 | 13.4 | 8.7 | 8.5 |
| Men | 3,859 | 53.7 | 25.8 | 11.6 | 5.0 | 3.9 |
| Race[b] | | | | | | |
| White | 6,432 | 49.7 | 25.3 | 12.4 | 6.7 | 6.0 |
| Black | 385 | 38.8 | 25.7 | 16.3 | 12.3 | 7.0 |
| Hispanic | 431 | 42.9 | 24.9 | 13.7 | 7.4 | 11.2 |
| Asian | 508 | 66.0 | 19.0 | 9.9 | 3.4 | 1.7 |
| Other | 300 | 41.0 | 23.5 | 13.9 | 9.5 | 12.1 |
| Education[b] | | | | | | |
| No HS diploma | 480 | 56.5 | 21.5 | 8.4 | 6.5 | 7.2 |
| HS graduate | 1,536 | 51.6 | 24.5 | 11.3 | 7.4 | 5.2 |
| Any college | 2,541 | 44.1 | 25.5 | 14.8 | 7.8 | 7.8 |
| College graduate | 3,499 | 51.4 | 25.1 | 12.1 | 6.1 | 5.3 |
| **All participants** | **8,056** | **49.5** | **24.9** | **12.5** | **6.9** | **6.2** |

[a]The number of categories of exposure was simply the sum of each of the seven individual categories that were assessed (see Table 1).
[b]Prevalence estimates adjusted for age.

## Assessment of the Influence of Exclusions

In the sensitivity analysis where missing information for a category of childhood exposure was considered as no exposure, the direction and strength of the associations between the number of childhood exposures and the risk factors and disease conditions were nearly identical (data not shown). Thus, the results we present appear to be unaffected by our decision to exclude persons for whom information on any category of childhood exposure was incomplete.

## Discussion

We found a strong dose response relationship between the breadth of exposure to abuse or household dysfunction during childhood and multiple risk factors for several of the leading causes of death in adults. Disease conditions including ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease, as well as poor self-rated health also showed a graded relationship to the breadth of childhood exposures. The findings suggest that the impact of these adverse childhood experiences on adult health status is strong and cumulative.

The clear majority of patients in our study who were exposed to one category of childhood abuse or household dysfunction were also exposed to at least one other. Therefore, researchers trying to understand the long-term health implications of childhood abuse may benefit from considering a wide range of related adverse childhood exposures. Certain adult health outcomes may be more strongly related to unique combinations or the intensity of adverse childhood exposures than to the total breadth of exposure that we used for our analysis. However, the analysis we present illustrates the need for an overview of the net effects of a *group* of complex interactions on a wide range of health risk behaviors and diseases.

Several potential limitations need to be considered when interpreting the results of this study. The data about adverse childhood experiences are based on self-report, retrospective, and can only demonstrate associations between childhood exposures and health risk behaviors, health status, and diseases in adulthood. Second, some persons with health risk behaviors or diseases may have been either more, or less, likely to report adverse childhood experiences. Each of these issues potentially limits inferences about causality. Furthermore, disease conditions could be either over- or under-reported by patients when they complete the medical questionnaire. In addition, there may be mediators of the relationship between childhood experiences and adult health status other than the risk factors we examined. For example, adverse childhood experiences may affect attitudes and behaviors toward health and health care, sensitivity to internal sensations, or physiologic functioning in brain centers and neurotransmitter systems. A more complete understanding of these issues is likely to lead to more effective ways to address the long-term health problems associated with childhood abuse and household dysfunction.

However, our estimates of the prevalence of child-

**Table 4.** Number of categories of adverse childhood exposure and the adjusted odds of risk factors including current smoking, severe obesity, physical inactivity, depressed mood, and suicide attempt

| Health problem | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Current smoker[d] | 0 | 3,836 | 6.8 | 1.0 | Referent |
| | 1 | 2,005 | 7.9 | 1.1 | ( 0.9–1.4) |
| | 2 | 1,046 | 10.3 | 1.5 | ( 1.1–1.8) |
| | 3 | 587 | 13.9 | 2.0 | ( 1.5–2.6) |
| | 4 or more | 544 | 16.5 | 2.2 | ( 1.7–2.9) |
| | Total | 8,018 | 8.6 | — | — |
| Severe obesity[d] | 0 | 3,850 | 5.4 | 1.0 | Referent |
| (BMI ≥ 35) | 1 | 2,004 | 7.0 | 1.1 | ( 0.9–1.4) |
| | 2 | 1,041 | 9.5 | 1.4 | ( 1.1–1.9) |
| | 3 | 590 | 10.3 | 1.4 | ( 1.0–1.9) |
| | 4 or more | 543 | 12.0 | 1.6 | ( 1.2–2.1) |
| | Total | 8,028 | 7.1 | — | — |
| No leisure-time physical activity | 0 | 3,634 | 18.4 | 1.0 | Referent |
| | 1 | 1,917 | 22.8 | 1.2 | ( 1.1–1.4) |
| | 2 | 1,006 | 22.0 | 1.2 | ( 1.0–1.4) |
| | 3 | 559 | 26.6 | 1.4 | ( 1.1–1.7) |
| | 4 or more | 523 | 26.6 | 1.3 | ( 1.1–1.6) |
| | Total | 7,639 | 21.0 | — | — |
| Two or more weeks of depressed mood in the past year | 0 | 3,799 | 14.2 | 1.0 | Referent |
| | 1 | 1,984 | 21.4 | 1.5 | ( 1.3–1.7) |
| | 2 | 1,036 | 31.5 | 2.4 | ( 2.0–2.8) |
| | 3 | 584 | 36.2 | 2.6 | ( 2.1–3.2) |
| | 4 or more | 542 | 50.7 | 4.6 | ( 3.8–5.6) |
| | Total | 7,945 | 22.0 | — | — |
| Ever attempted suicide | 0 | 3,852 | 1.2 | 1.0 | Referent |
| | 1 | 1,997 | 2.4 | 1.8 | ( 1.2–2.6) |
| | 2 | 1,048 | 4.3 | 3.0 | ( 2.0–4.6) |
| | 3 | 587 | 9.5 | 6.6 | ( 4.5–9.8) |
| | 4 or more | 544 | 18.3 | 12.2 | (8.5–17.5) |
| | Total | 8,028 | 3.5 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

hood exposures are similar to estimates from nationally representative surveys, indicating that the experiences of our study participants are comparable to the larger population of U.S. adults. In our study, 23.5% of participants reported having grown up with an alcohol abuser; the 1988 National Health Interview Survey estimated that 18.1% of adults had lived with an alcohol abuser during childhood.[41] Contact sexual abuse was reported by 22% of respondents (28% of women and 16% of men) in our study. A national telephone survey of adults in 1990 using similar criteria for sexual abuse estimated that 27% of women and 16% of men had been sexually abused.[12]

There are several reasons to believe that our estimates of the long-term relationship between adverse childhood experiences and adult health are conservative. Longitudinal follow-up of adults whose childhood abuse was well documented has shown that their retrospective reports of childhood abuse are likely to under-estimate actual occurrence.[47,48] Underestimates of childhood exposures would result in downwardly biased estimates of the relationships between childhood exposures and adult health risk behaviors and diseases. Another potential source of underestimation of the strength of these relationships is the lower number of childhood exposures reported by older persons in our study. This may be an artifact caused by premature mortality in persons with multiple adverse childhood exposures; the clustering of multiple risk factors among persons with multiple childhood exposures is consistent with this hypothesis. Thus, the true relationships between adverse childhood exposures and adult health risk behaviors, health status, and diseases may be even stronger than those we report.

An essential question posed by our observations is, "Exactly how are adverse childhood experiences linked to health risk behaviors and adult diseases?" The link-

**Table 5.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of health risk factors including alcohol or drug abuse, high lifetime number of sexual partners, or history of sexually transmitted disease

| Health problem | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Considers self an alcoholic | 0 | 3,841 | 2.9 | 1.0 | Referent |
|  | 1 | 1,993 | 5.7 | 2.0 | (1.6–2.7) |
|  | 2 | 1,042 | 10.3 | 4.0 | (3.0–5.3) |
|  | 3 | 586 | 11.3 | 4.9 | (3.5–6.8) |
|  | 4 or more | 540 | 16.1 | 7.4 | (5.4–10.2) |
|  | Total | 8,002 | 5.9 | — |  |
| Ever used illicit drugs | 0 | 3,856 | 6.4 | 1.0 | Referent |
|  | 1 | 1,998 | 11.4 | 1.7 | (1.4–2.0) |
|  | 2 | 1,045 | 19.2 | 2.9 | (2.4–3.6) |
|  | 3 | 589 | 21.5 | 3.6 | (2.8–4.6) |
|  | 4 or more | 541 | 28.4 | 4.7 | (3.7–6.0) |
|  | Total | 8,029 | 11.6 | — |  |
| Ever injected drugs | 0 | 3,855 | 0.3 | 1.0 | Referent |
|  | 1 | 1,996 | 0.5 | 1.3 | (0.6–3.1) |
|  | 2 | 1,044 | 1.4 | 3.8 | (1.8–8.2) |
|  | 3 | 587 | 2.3 | 7.1 | (3.3–15.5) |
|  | 4 or more | 540 | 3.4 | 10.3 | (4.9–21.4) |
|  | Total | 8,022 | 0.8 | — | — |
| Had 50 or more intercourse partners | 0 | 3,400 | 3.0 | 1.0 | Referent |
|  | 1 | 1,812 | 5.1 | 1.7 | (1.3–2.3) |
|  | 2 | 926 | 6.1 | 2.3 | (1.6–3.2) |
|  | 3 | 526 | 6.3 | 3.1 | (2.0–4.7) |
|  | 4 or more | 474 | 6.8 | 3.2 | (2.1–5.1) |
|  | Total | 7,138 | 4.4 | — |  |
| Ever had a sexually transmitted disease[d] | 0 | 3,848 | 5.6 | 1.0 | Referent |
|  | 1 | 2,001 | 8.6 | 1.4 | (1.1–1.7) |
|  | 2 | 1,044 | 10.4 | 1.5 | (1.2–1.9) |
|  | 3 | 588 | 13.1 | 1.9 | (1.4–2.5) |
|  | 4 or more | 542 | 16.7 | 2.5 | (1.9–3.2) |
|  | Total | 8023 | 8.2 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

ing mechanisms appear to center on behaviors such as smoking, alcohol or drug abuse, overeating, or sexual behaviors that may be consciously or unconsciously used because they have immediate pharmacological or psychological benefit as coping devices in the face of the stress of abuse, domestic violence, or other forms of family and household dysfunction. High levels of exposure to adverse childhood experiences would expectedly produce anxiety, anger, and depression in children. To the degree that behaviors such as smoking, alcohol, or drug use are found to be effective as coping devices, they would tend to be used chronically. For

**Table 6.** Relationship between number of categories of childhood exposure and number of risk factors for the leading causes of death[a]

| Number of categories | Sample size | % with number of risk factors | | | | |
|---|---|---|---|---|---|---|
|  |  | 0 | 1 | 2 | 3 | 4 |
| 0 | 3,861 | 56 | 29 | 10 | 4 | 1 |
| 1 | 2,009 | 42 | 33 | 16 | 6 | 2 |
| 2 | 1,051 | 31 | 33 | 20 | 10 | 4 |
| 3 | 590 | 24 | 33 | 20 | 13 | 7 |
| ≥4 | 545 | 14 | 26 | 28 | 17 | 7 |
| Total | 8,056 | 44 | 31 | 15 | 7 | 3 |

[a]Risk factors include: smoking, severe obesity, physical inactivity, depressed mood, suicide attempt, alcoholism, any drug use, injected drug use, ≥50 lifetime sexual partners, and history of a sexually transmitted disease.

004500

**Table 7.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of heart attack, cancer, stroke, COPD, and diabetes

| Disease condition[d] | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Ischemic heart disease | 0 | 3,859 | 3.7 | 1.0 | Referent |
| | 1 | 2,009 | 3.5 | 0.9 | (0.7–1.3) |
| | 2 | 1,050 | 3.4 | 0.9 | (0.6–1.4) |
| | 3 | 590 | 4.6 | 1.4 | (0.8–2.4) |
| | 4 or more | 545 | 5.6 | 2.2 | (1.3–3.7) |
| | Total | 8,022 | 3.8 | — | — |
| Any cancer | 0 | 3,842 | 1.9 | 1.0 | Referent |
| | 1 | 1,995 | 1.9 | 1.2 | (1.0–1.5) |
| | 2 | 1,043 | 1.9 | 1.2 | (1.0–1.5) |
| | 3 | 588 | 1.9 | 1.0 | (0.7–1.5) |
| | 4 or more | 543 | 1.9 | 1.9 | (1.3–2.7) |
| | Total | 8,011 | 1.9 | — | — |
| Stroke | 0 | 3,832 | 2.6 | 1.0 | Referent |
| | 1 | 1,993 | 2.4 | 0.9 | (0.7–1.3) |
| | 2 | 1,042 | 2.0 | 0.7 | (0.4–1.3) |
| | 3 | 588 | 2.9 | 1.3 | (0.7–2.4) |
| | 4 or more | 543 | 4.1 | 2.4 | (1.3–4.3) |
| | Total | 7,998 | 2.6 | — | — |
| Chronic bronchitis or emphysema | 0 | 3,758 | 2.8 | 1.0 | Referent |
| | 1 | 1,939 | 4.4 | 1.6 | (1.2–2.1) |
| | 2 | 1,009 | 4.4 | 1.6 | (1.1–2.3) |
| | 3 | 565 | 5.7 | 2.2 | (1.4–3.3) |
| | 4 or more | 512 | 8.7 | 3.9 | (2.6–5.8) |
| | Total | 7,783 | 4.0 | — | — |
| Diabetes | 0 | 3,850 | 4.3 | 1.0 | Referent |
| | 1 | 2,002 | 4.1 | 1.0 | (0.7–1.3) |
| | 2 | 1,046 | 3.9 | 0.9 | (0.6–1.3) |
| | 3 | 587 | 5.0 | 1.2 | (0.8–1.9) |
| | 4 or more | 542 | 5.8 | 1.6 | (1.0–2.5) |
| | Total | 8,027 | 4.3 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

example, nicotine is recognized as having beneficial psychoactive effects in terms of regulating affect[49] and persons who are depressed are more likely to smoke.[50,51] Thus, persons exposed to adverse childhood experiences may benefit from using drugs such as nicotine to regulate their mood.[49,52]

Consideration of the positive neuroregulatory effects of health-risk behaviors such as smoking may provide biobehavioral explanations[53] for the link between adverse childhood experiences and health risk behaviors and diseases in adults. In fact, we found that exposure to higher numbers of categories of adverse childhood experiences increased the likelihood of smoking by the age of 14, chronic smoking as adults, and the presence of smoking-related diseases. Thus, smoking, which is medically and socially viewed as a "problem" may, from the perspective of the user, represent an effective immediate solution that leads to chronic use. Decades later, when this "solution" manifests as emphysema, cardiovascular disease, or malignancy, time and the

tendency to ignore psychological issues in the management of organic disease make improbable any full understanding of the original causes of adult disease (Figure 2). Thus, incomplete understanding of the possible benefits of health risk behaviors leads them to be viewed as irrational and having solely negative consequences.

Because adverse childhood experiences are common and they have strong long-term associations with adult health risk behaviors, health status, and diseases, increased attention to primary, secondary, and tertiary prevention strategies is needed. These strategies include prevention of the occurrence of adverse childhood experiences, preventing the adoption of health risk behaviors as responses to adverse experiences during childhood and adolescence, and, finally, helping change the health risk behaviors and ameliorating the disease burden among adults whose health problems may represent a long-term consequence of adverse childhood experiences.

004501

**Table 8.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of skeletal fracture, hepatitis or jaundice, and poor self-rated health

| Disease condition | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Ever had a skeletal | 0 | 3,843 | 3.6 | 1.0 | Referent |
| fracture | 1 | 1,998 | 4.0 | 1.1 | (1.0–1.2) |
| | 2 | 1,048 | 4.5 | 1.4 | (1.2–1.6) |
| | 3 | 587 | 4.0 | 1.2 | (1.0–1.4) |
| | 4 or more | 544 | 4.8 | 1.6 | (1.3–2.0) |
| | Total | 8,020 | 3.9 | — | — |
| Ever had hepatitis or | 0 | 3,846 | 5.3 | 1.0 | Referent |
| jaundice | 1 | 2,006 | 5.5 | 1.1 | (0.9–1.4) |
| | 2 | 1,045 | 7.7 | 1.8 | (1.4–2.3) |
| | 3 | 590 | 10.2 | 1.6 | (1.2–2.3) |
| | 4 or more | 543 | 10.7 | 2.4 | (1.8–3.3) |
| | Total | 8,030 | 6.5 | — | — |
| Fair or poor self-rated | 0 | 3,762 | 16.3 | 1.0 | Referent |
| health | 1 | 1,957 | 17.8 | 1.2 | (1.0–1.4) |
| | 2 | 1,029 | 19.9 | 1.4 | (1.2–1.7) |
| | 3 | 584 | 20.3 | 1.4 | (1.1–1.7) |
| | 4 or more | 527 | 28.7 | 2.2 | (1.8–2.7) |
| | Total | 7,859 | 18.2 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age and gender.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

Primary prevention of adverse childhood experiences has proven difficult[54,55] and will ultimately require societal changes that improve the quality of family and household environments during childhood. Recent research on the long-term benefit of early home visitation on reducing the prevalence of adverse childhood experiences is promising.[56] In fact, preliminary data from the ACE Study provided the impetus for the Kaiser Health Plan to provide funding to participate at 4 locations (including San Diego County, California) in the Commonwealth Fund's "Healthy Steps" program. This program extends the traditional practice of pediatrics by adding one or more specialists in the developmental and psychosocial dimensions of both childhood and parenthood. Through a series of office visits, home visits, and a telephone advice line for parents, these specialists develop close relationships between children and their families from birth to 3 years of age. This approach is consistent with the recommendation of the U.S. Advisory Board on Child Abuse and Neglect that a universal home visitation program for new parents be developed[57,58] and provides an example of a family-based primary prevention effort that is being explored in a managed care setting. If these types of approaches can be replicated and implemented on a large scale, the long-term benefits may include, somewhat unexpectedly, substantial improvements in overall adult health.

Secondary prevention of the effects of adverse childhood experiences will first require increased recognition of their occurrence and second, an effective understanding of the behavioral coping devices that commonly are adopted to reduce the emotional impact of these experiences. The improbability of giving up an immediate "solution" in return for a nebulous long-term health benefit has thwarted many well-intended preventive efforts. Although articles in the general medical literature are alerting the medical community to the fact that childhood abuse is common,[59] adolescent health care is often inadequate in terms of psychosocial assessment and anticipatory guidance.[60] Clearly, comprehensive strategies are needed to identify and intervene with children and families who are at risk for these adverse experiences and their related outcomes.[61] Such strategies should include increased communication between and among those involved in family practice, internal medicine, nursing, social work, pediatrics, emergency medicine, and preventive medicine and public health. Improved understanding is also needed of the effects of childhood exposure to domestic violence.[19,62] Additionally, increased physician training[63] is needed to recognize and coordinate the management of all persons affected by child abuse, domestic violence, and other forms of family adversity such as alcohol abuse or mental illness.

In the meantime, tertiary care of adults whose health problems are related to experiences such as childhood abuse[5] will continue to be a difficult challenge. The relationship between childhood experiences and adult health status is likely to be overlooked in medical practice because the time delay between exposure



**Figure 2.** Potential influences throughout the lifespan of adverse childhood experiences.

during childhood and recognition of health problems in adult medical practice is lengthy. Moreover, these childhood exposures include emotionally sensitive topics such as family alcoholism[29,30] and sexual abuse.[64] Many physicians may fear that discussions of sexual violence and other sensitive issues are too personal even for the doctor-patient relationship.[65] For example, the American Medical Association recommends screening of women for exposure to violence at every entrance to the health system;[66] however, such screening appears to be rare.[67] By contrast, women who are asked about exposure to sexual violence say they consider such questions to be welcome and germane to routine medical care,[68] which suggests that physicians' fears about patient reactions are largely unfounded.

Clearly, further research and training are needed to help medical and public health practitioners understand how social, emotional, and medical problems are linked throughout the lifespan (Figure 2). Such research and training would provide physicians with the confidence and skills to inquire and respond to patients who acknowledge these types of childhood exposures. Increased awareness of the frequency and long-term consequences of adverse childhood experiences may also lead to improvements in health promotion and disease prevention programs. The magnitude of the difficulty of introducing the requisite changes into

medical and public health research, education, and practice can be offset only by the magnitude of the implications that these changes have for improving the health of the nation.

We thank Naomi Howard for her dedication to the ACE Study. This research is supported by the Centers for Disease Control and Prevention via cooperative agreement TS-44-10/12 with the Association of Teachers of Preventive Medicine.

## References

1. Springs F, Friedrich WN. Health risk behaviors and medical sequelae of childhood sexual abuse. Mayo Clin Proc 1992;67:527–32.
2. Felitti VJ. Long-term medical consequences of incest, rape, and molestation. South Med J 1991;84:328–31.
3. Felitti VJ. Childhood sexual abuse, depression and family dysfunction in adult obese patients: a case control study. South Med J 1993;86:732–6.
4. Gould DA, Stevens NG, Ward NG, Carlin AS, Sowell HE, Gustafson B. Self-reported childhood abuse in an adult population in a primary care setting. Arch Fam Med 1994;3:252–6.
5. McCauley J, Kern DE, Kolodner K, Schroeder AF, et al. Clinical characteristics of women with a history of childhood abuse. JAMA 1997;277:1362–8.

004503

6. Mortality patterns: United States, 1993. Morb Mortal Wkly Rep 1996;45:161–4.

7. McGinnis JM, Foege WH. Actual causes of death in the United States. JAMA 1993;270:2207–12.

8. Landis J. Experiences of 500 children with adult sexual deviation. Psychiatr Q 1956;30(Suppl):91–109.

9. Straus MA, Gelles RJ. Societal change and change in family violence from 1975 to 1985 as revealed by two national surveys. J Marriage Family 1986;48:465–79.

10. Wyatt GE, Peters SD. Methodological considerations in research on the prevalence of child sexual abuse. Child Abuse Negl 1986;10:241–51.

11. Berger AM, Knutson JF, Mehm JG, Perkins KA. The self-report of punitive childhood experiences of young adults and adolescents. Child Abuse Negl 1988;12:251–62.

12. Finkelhor D, Hotaling G, Lewis IA, Smith C. Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors. Child Abuse Negl 1990; 14:19–28.

13. Egelend B, Sroufe LA, Erickson M. The developmental consequence of different patterns of maltreatment. Child Abuse Negl 1983;7:459–69.

14. Finkelhor D, Browne A. The traumatic impact of child sexual abuse Am J Orthopsychiatry. 1985;55:530–41.

15. Beitchman JH, Zucker KJ, Hood JE, DaCosta GA, Akman D, Cassavia E. A review of the long-term effects of sexual abuse. Child Abuse Negl 1992;16:101–18.

16. Hibbard RA, Ingersoll GM, Orr DP. Behavioral risk, emotional risk, and child abuse among adolescents in a nonclinical setting. Pediatrics 1990;86:896–901.

17. Nagy S, Adcock AG, Nagy MC. A comparison of risky health behaviors of sexually active, sexually abused, and abstaining adolescents. Pediatrics 1994;93:570–5.

18. Cunningham RM, Stiffman AR, Dore P. The association of physical and sexual abuse with HIV risk behaviors in adolescence and young adulthood: implications for public health. Child Abuse Negl 1994;18:233–45.

19. Council on Scientific Affairs. Adolescents as victims of family violence. JAMA 1993;270:1850–6.

20. Nelson DE, Higginson GK, Grant-Worley JA. Physical abuse among high school students. Prevalence and correlation with other health behaviors. Arch Pediatr Adolesc Med 1995;149:1254–8.

21. Mullen PE, Roman-Clarkson SE, Walton VA, Herbison GP. Impact of sexual and physical abuse on women's mental health. Lancet 1988;1:841–5.

22. Drossman DA, Leserman J, Nachman G, Li Z, et al. Sexual and physical abuse in women with functional or organic gastrointestinal disorders. Ann Intern Med 1990;113: 828–33.

23. Harrop-Griffiths J, Katon W, Walker E, Holm L, Russo J, Hickok L. The association between chronic pelvic pain, psychiatric diagnoses, and childhood sexual abuse. Obstet Gynecol 1988;71:589–94.

24. Briere J, Runtz M. Multivariate correlates of childhood psychological and physical maltreatment among university women. Child Abuse Negl 1988;12:331–41.

25. Briere J, Runtz M. Differential adult symptomatology associated with three types of child abuse histories. Child Abuse Negl 1990;14:357–64.

26. Claussen AH, Crittenden PM. Physical and psychological maltreatment: relations among types of maltreatment. Child Abuse Negl 1991;15:5–18.

27. Moeller TP, Bachman GA, Moeller JR. The combined effects of physical, sexual, and emotional abuse during childhood: long-term health consequences for women. Child Abuse Negl 1993;17:623–40.

28. Bryant SL, Range LM. Suicidality in college women who were sexually and physically punished by parents. Violence Vict 1995;10:195–201.

29. Zeitlen H. Children with alcohol misusing parents. Br Med Bull 1994;50:139–51.

30. Dore MM, Doris JM, Wright P. Identifying substance abuse in maltreating families: a child welfare challenge. Child Abuse Negl 1995;19:531–43.

31. Ethier LS, Lacharite C, Couture G. Childhood adversity, parental stress, and depression of negligent mothers. Child Abuse Negl 1995;19:619–32.

32. Spaccarelli S, Coatsworth JD, Bowden BS. Exposure to family violence among incarcerated boys; its association with violent offending and potential mediating variables. Violence Vict 1995;10:163–82.

33. McCloskey LA, Figueredo AJ, Koss MP. The effects of systemic family violence on children's mental health. Child Dev 1995;66:1239–61.

34. Brent DA, Perper JA, Moritz G, Schweers J, Balach L, Roth C. Familial risk factors for adolescent suicide: a case-control study. Acta Psychiatr Scand 1994;89:52–8.

35. Shaw DS, Vondra JI, Hommerding KD, Keenan K, Dunn M. Chronic family adversity and early child behavior problems: a longitudinal study of low income families. J Child Psychol Psychiatry 1994;35:1109–22.

36. U.S. Department of Health and Human Services. Physical activity and health: A report of the Surgeon General. Atlanta, Georgia. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion; 1996.

37. Rivara FP, Mueller BA, Somes G, Mendoza CT, Rushforth NB, Kellerman AL. Alcohol and illicit drug abuse and the risk of violent death in the home. JAMA 1997;278:569–75.

38. Dillman DA. Mail and telephone surveys: the total design method. New York: John Wiley & Sons; 1978.

39. Straus M, Gelles RJ. Physical violence in American families: risk factors and adaptations to violence in 8,145 families. New Brunswick: Transaction Press; 1990.

40. Wyatt GE. The sexual abuse of Afro-American and White-American women in childhood. Child Abuse Negl 1985; 9:507–19.

41. National Center for Health Statistics. Exposure to alcoholism in the family: United States, 1988. Advance Data, No. 205. U.S. Department of Health and Human Services, Washington, DC; September 30, 1991.

42. Siegel PZ, Frazier EL, Mariolis P, et al. Behaviorial risk factor surveillance, 1991; Monitoring progress toward the Nation's Year 2000 Health Objectives. Morb Mortal Wkly Rep 1992;42(SS-4).1–15.

43. Crespo CJ, Keteyian SJ, Heath GW, Sempos CT. Leisure-time physical activity among US adults: Results from the

004504

Third National Health and Nutrition Examination Survey. Arch Intern Med 1996;156:93–8.

44. Robins LN, Helzer JE, Groughan J, Ratliff K. National Institute of Mental Health Diagnostic Interview Schedule: its history, characteristics, and validity. Arch Gen Psychiatry 1981;38:381–9.

45. Idler E, Angel RJ. Self-rated health and mortality in the NHANES I Epidemiologic Follow-up Study. Am J Pub Health 1990;80:446–52.

46. SAS Procedures Guide. SAS Institute Inc. Version 6, 3rd edition, Cary, NC: SAS Institute; 1990.

47. Femina DD, Yeager CA, Lewis DO. Child abuse: adolescent records vs. adult recall. Child Abuse Negl 1990;14: 227–31.

48. Williams LM. Recovered memories of abuse in women with documented child sexual victimization histories. J Traumatic Stress 1995;8:649–73.

49. Carmody TP. Affect regulation, nicotine addiction, and smoking cessation. J Psychoactive Drugs 1989;21:331–42.

50. Anda RF, Williamson DF, Escobedo LG, Mast EE, Giovino GA, Remington PL. Depression and the dynamics of smoking. A national perspective. JAMA 1990;264:1541–5.

51. Glassman AH, Helzer JE, Covey LS, Cottler LB, Stetner F, Tipp JE, Johnson J. Smoking, smoking cessation, and major depression. JAMA 1990;264:1546–9.

52. Hughes JR. Clonidine, depression, and smoking cessation. JAMA 1988;259:2901–2.

53. Pomerlau OF, Pomerlau CS. Neuroregulators and the reinforcement of smoking: towards a biobehavioral explanation. Neurosci Biobehav Rev 1984;8:503–13.

54. Hardy JB, Street R. Family support and parenting education in the home: an effective extension of clinic-based preventive health care services for poor children. J Pediatr 1989;115:927–31.

55. Olds DL, Henderson CR, Chamberlin R, Tatelbaum R. Preventing child abuse and neglect: a randomized trial of nurse home visitation. Pediatrics 1986;78:65–78.

56. Olds DL, Eckenrode J, Henderson CR, Kitzman H, et al. Long-term effects of home visitation on maternal life course and child abuse and neglect: Fifteen-year follow-up of a randomized trial. JAMA 1997;278:637–43.

57. U.S. Advisory Board on Child Abuse and Neglect. Child abuse and neglect: critical first steps in response to a national emergency. Washington, DC: U.S. Government Printing Office; August 1990; publication no. 017-092-00104-5.

58. U.S. Advisory Board on Child Abuse and Neglect. Creating caring communities: blueprint for an effective federal policy on child abuse and neglect. Washington, DC: U.S. Government Printing Office; September 1991.

59. MacMillan HL, Fleming JE, Trocme N, Boyle MH, et al. Prevalence of child physical and sexual abuse in the community. Results from the Ontario Health Supplement. JAMA 1997;278:131–5.

60. Rixey S. Family violence and the adolescent. Maryland Med J 1994;43:351–3.

61. Chamberlin RW. Preventing low birth weight, child abuse, and school failure: the need for comprehensive, community-wide approaches. Pediatr Rev 1992;13:64–71.

62. Kashani JH, Daniel AE, Dandoy AC, Holcomb WR. Family violence: impact on children. J Am Acad Child Adolesc Psychiatry 1992;31:181–9.

63. Dubowitz H. Child abuse programs and pediatric residency training. Pediatrics 1988;82:477–80.

64. Tabachnick J, Henry F, Denny L. Perceptions of child sexual abuse as a public health problem. Vermont, September 1995. Morb Mortal Wkly Rep 1997;46:801–3.

65. Sugg NK, Inui T. Primary care physicians' response to domestic violence. Opening Pandora's box. JAMA 1992; 267:3157–60.

66. Council on Scientific Affairs. American Medical Association Diagnostic and Treatment Guidelines on Domestic Violence. Arch Fam Med 1992;1:38–47.

67. Hamberger LK, Saunders DG, Hovey M. Prevalence of domestic violence in community practice and rate of physician inquiry. Fam Med 1992;24:283–7.

68. Friedman LS, Samet JH, Roberts MS, Hans P. Inquiry about victimization experiences. A survey of patient preferences and physician practices. Arch Int Med 1992;152: 1186–90.

004505

# violence prevention
# the evidence

# Preventing violence through the development of safe, stable and nurturing relationships between children and their parents and caregivers

## Series of briefings on violence prevention

This briefing for advocates, programme designers and implementers and others is one of a seven-part series on the evidence for interventions to prevent interpersonal and self-directed violence. The other six briefings look at reducing access to lethal means; developing life skills in children and adolescents; reducing availability and misuse of alcohol; promoting gender equality; changing cultural norms that support violence; and victim identification, care and support.

For a searchable evidence base on interventions to prevent violence, please go to: www.preventviolence.info

For a library of violence prevention publications, including the other briefings in this series, please go to: http://www.who.int/violenceprevention/publications/en/index.html




004506

WHO Library Cataloguing-in-Publication Data :

Preventing violence through the development of safe, stable and nurturing relationships between children and their parents and caregivers.

(Series of briefings on violence prevention: the evidence)

1.Violence – prevention and control. 2.Parent-child relations. 3.Family relations. 4.Child behavior.
5.Caregivers. 6.Aggression. 7.Child abuse – prevention and control. 8.Social behavior.
I.World Health Organization.

ISBN 978 92 4 159782 1                                   (NLM classification: HV 6625)

© World Health Organization 2009

All rights reserved. Publications of the World Health Organization can be obtained from WHO Press, World Health Organization, 20 Avenue Appia, 1211 Geneva 27, Switzerland (tel.: +41 22 791 3264; fax: +41 22 791 4857; e-mail: bookorders@who.int). Requests for permission to reproduce or translate WHO publications – whether for sale or for noncommercial distribution – should be addressed to WHO Press, at the above address (fax: +41 22 791 4806; e-mail: permissions@who.int).

The designations employed and the presentation of the material in this publication do not imply the expression of any opinion whatsoever on the part of the World Health Organization concerning the legal status of any country, territory, city or area or of its authorities, or concerning the delimitation of its frontiers or boundaries. Dotted lines on maps represent approximate border lines for which there may not yet be full agreement.

The mention of specific companies or of certain manufacturers' products does not imply that they are endorsed or recommended by the World Health Organization in preference to others of a similar nature that are not mentioned. Errors and omissions excepted, the names of proprietary products are distinguished by initial capital letters.

All reasonable precautions have been taken by the World Health Organization to verify the information contained in this publication. However, the published material is being distributed without warranty of any kind, either expressed or implied. The responsibility for the interpretation and use of the material lies with the reader. In no event shall the World Health Organization be liable for damages arising from its use.

Designed by minimum graphics
Printed in Malta

004507

# Overview

**Interventions that encourage safe, stable and nurturing relationships between parents (or caregivers) and children in their early years can prevent child maltreatment and reduce childhood aggression.**

This briefing looks at the effectiveness of interventions that encourage safe, stable and nurturing relationships for preventing child maltreatment and aggressive behaviour in childhood. The focus is on primary prevention programmes, those that are implemented early enough to avoid the development of violent behaviour such as child maltreatment and childhood aggression (a risk factor for youth violence).

**There are four types of violence prevention programmes that aim to develop these nurturing relationships.**

Parenting programmes (e.g. the Positive Parenting Program or Triple P) provide information and support to help parents. Parent and child programmes (e.g. Early Head Start) provide both parents and their children with family support, preschool education, child care and health and community services. Social support groups (e.g. Parents Anonymous) help parents build social networks to provide peer support and reduce social isolation. Media interventions (e.g. the television series "Families") aim to educate all parents to increase their knowledge and strengthen awareness of child maltreatment.

**Evidence suggests that parenting and parent and child programmes can reduce child maltreatment and aggressive behaviour in children.**

High-quality evidence has shown, for instance, that the Nurse Family Partnership home-visiting programme and the Triple P in the United States of America reduce child maltreatment. Findings also suggest that parenting and parent and child programmes can reduce problematic aggressive, disruptive and defiant behaviour in children in the short term, and arrests, convictions and violent acts in adolescence and early adulthood.

**More rigorous evaluations of prevention programmes worldwide are needed.**

More rigorous evaluations using actual child maltreatment, rather than risk factors for child maltreatment, as an outcome measure are required, as are more cost-effectiveness studies. In addition, more research is urgently needed on the applicability and effectiveness of violence prevention programmes in developing countries.

**The life-long negative consequences of child maltreatment can be prevented.**

There is some strong evidence to show that programmes that promote safe, stable and nurturing relationships between parents (or caregivers) and children reduce child maltreatment and its life-long negative consequences for mental and physical health, social and occupational functioning, human capital and security and, ultimately, for economic development.

004508

# 1. Introduction

**BOX 1**

**Early relationships influence physical and social development**

Positive, secure attachments with caregivers are linked to:

- Increased social skills in infancy, including greater competence, sociability, friendliness, cooperativeness, compliance, engagement with peers, development of a conscience, ability to imitate mothers;
- Greater social activity, popularity, self-esteem, a positive outlook in childhood;
- Increased problem-solving skills and IQ in infancy, academic skills in adolescence;
- Greater ability to regulate stress in infancy; and
- Positive health and lifestyle choices in adulthood.

Insecure attachments with caregivers are linked to:

- Use of aggression by age four years;
- Social withdrawal in childhood;
- Higher dependence, non-compliance, hostility, impulsivity and aggression in preschool and kindergarten;
- Reactive attachment disorder in childhood, characterized by disturbed and inappropriate social behaviour, including violent behaviour; and
- Anxiety, depression, conduct disorder, anti-social personality disorder and other mental health problems.

Safe, stable and nurturing relationships with parents and other caregivers are central to a child's healthy development (*1,2*). Such relationships offer lasting affection, parental responsiveness, trust and guidance, enabling children to safely explore the world and develop the skills required to establish loving and supportive relationships with others. Early relationships are thought to affect structural and functional development of the brain, and in turn, the cognitive, emotional and social development of a child (**Box 1;** *2,3*). Lack or disruption of safe, stable and nurturing relationships in early childhood can have severe and long-lasting effects and is related to a variety of problems from childhood through to adulthood. These include anxiety and depression, poor communication skills, low self-esteem, difficulties forming peer relationships, lack of empathy for others in distress, anti-social behaviour, poor educational attainment and economic productivity and being a perpetrator or victim of violence (*1–6*).

Child maltreatment is a particular risk for families that experience difficulties creating safe, stable and nurturing relationships.[1] For instance, a child has greater risk of being abused if its parents

---

[1] "Child abuse or maltreatment constitutes all forms of physical and/or emotional ill-treatment, sexual abuse, neglect or negligent treatment or commercial or other exploitation, resulting in actual or potential harm to the child's health, survival, development or dignity in the context of a relationship of responsibility, trust or power"(*7*).

have little understanding of child development and, therefore, unrealistic expectations about behaviour. The same is true if the parents offer less nurturing and affection; are less responsive; have a more controlling, aggressive or inconsistent parental approach; and approve of physical punishment to discipline a child (7–9). Regardless of whether a child is maltreated, however, poor relationships between caregivers and children can increase the risk of aggressive and violent behaviour displayed in childhood and later in life (e.g. youth violence) (7).

There are many strategies employed to improve parent–child relations and parenting skills, and so encourage safe, stable and nurturing relationships. Although many of these do not explicitly aim to reduce violent behaviour by parents or children, their ability to improve relationships suggests they also have potential to prevent both child maltreatment and childhood aggressive behaviour. Being a victim of child maltreatment is associated with victimization by and perpetration of other types of violence, such as intimate partner, sexual and self-directed violence. Consequently, programmes that prevent child maltreatment also have the potential to reduce involvement in violence later in life (10). This briefing provides a brief overview of the types of programmes that can encourage safe, stable and nurturing relationships, focusing in particular on their effectiveness in preventing child maltreatment and aggressive behaviour in childhood. It deals mainly with primary prevention, aimed at preventing violent behaviour – such as child maltreatment – before it manifests itself, rather than responding to it once it has occurred. It includes programmes that aim to reduce problematic childhood behaviour such as conduct disorder, since this is a risk factor for youth violence and other types of violence later in life (7).

There are four main types of interventions that can help develop safe, stable and nurturing relationships between children and their caregivers: parenting programmes, parent and child programmes, social support and media interventions (**Box 2**). These vary in their primary objectives, which include improving child or maternal health, decreasing problematic child behaviour, promoting family wellness, building social networks, increasing parenting skills and reducing child maltreatment. All, however, have the potential to improve relationships between parents and children.

---

**BOX 2**

**Types of programmes to strengthen relationships between children and their parents and other caregivers** (see also **Table 1**)

**PARENTING PROGRAMMES** (e.g. Nurse Family Partnership and Triple P): These centre on increasing parental skills and improving the relationship between parents and children. With support and information, they strengthen parents' ability to adapt to the changing needs of the child, develop strategies to cope with their child's behaviour and build knowledge of child development and capabilities (7,8,11,12,25).

**PARENT AND CHILD PROGRAMMES** (e.g. Early Head Start and Sure Start): Family support, preschool education, child care and health and community services are common components of these programmes. The objectives are normally wide-ranging, including, for instance, promoting children's academic success, encouraging parental involvement in their child's education, improving maternal health, encouraging child development and providing parental support and education (13,14).

**SOCIAL SUPPORT** (e.g. Parents Anonymous and Circle of Friends): These groups help parents build social networks to provide peer support, increase problem-solving and coping skills, reduce social isolation and strengthen parental communication (15).

**MEDIA INTERVENTIONS** (e.g. "Families" and Play Nicely): These provide information to parents through a variety of media: newsletters, magazines, television, etc. They aim to increase parenting knowledge and strengthen awareness of child maltreatment in all parents (16).

---

TABLE 1

**Programmes to encourage safe, stable and nurturing relationships***

| | Triple P (Positive Parenting Program) | Nurse Family Partnership |
|---|---|---|
| **PARENTING** | Offers different levels of support for parents, from providing information (level 1) to sessions addressing severe childhood problems (level 5). Triple P aims to create a stable, harmonious and supportive family; reduce problematic behaviour; build positive relationships with children; and manage problems effectively. | An evidence-based nurse home-visiting programme that aims to improve the health, well-being and self-sufficiency of low-income first-time mothers and their children. Women enroll as early as possible, ideally by the 16th week of pregnancy. Visits include prenatal health advice and support, child development education and life coaching for the mother. |
| | **www.triplep.net** | **www.nursefamilypartnership.org** |
| | Implemented in Australia, Belgium, Canada, Germany, Hong Kong, New Zealand, Singapore, Switzerland, the United Kingdom and the United States, for example. | Implemented in the United States, for example. |
| | **Early Head Start** | **Sure Start** |
| **PARENT AND CHILD** | This community-based programme targets vulnerable families with children up to age three, aiming to improve the health of pregnant women, encourage child development, provide family support through home-visiting or community centre sessions and provide early childhood and parent education. | A community-based initiative, Sure Start brings together early child education, child care and health and family support, spanning pregnancy up to the child's 14th year. Some components are available to all parents, others target vulnerable groups such as families living in disadvantaged areas. |
| | **www.ehsnrc.org** | **www.surestart.gov.uk** |
| | Implemented in the United States, for example. | Implemented in the United Kingdom, for example. |
| | **Circle of Parents** | **Parents Anonymous** |
| **SOCIAL SUPPORT** | Parent-led, weekly self-help group for sharing of ideas, support, information and resources. Groups are designed for all parents, with children of all ages, and aim to prevent child maltreatment and neglect and strengthen families. | A self-help support group that aims to strengthen families and build caring communities to prevent child maltreatment and neglect. Led by parents and professionally trained facilitators, they are open to all parents and aim to reduce social isolation, develop coping strategies and offer social support. |
| | **www.circleofparents.org** | **www.parentsanonymous.org** |
| | Implemented in the United States, for example. | Implemented in Bermuda, Canada, Malawi, Nigeria, South Africa and the United States, for example. |
| | **"Families"** | **Play Nicely** |
| **MEDIA** | Developed as a component of a Triple P parenting programme, "Families" is a 12-episode television series that explores parenting strategies to cope with common behavioural problems and prevent problematic behaviour. It also discusses family functioning and offers a parent information sheet. | A 30-minute CD-ROM that aims to inform parents about effective ways of responding to childhood aggression. |
| | **(16)** | **(58)** |
| | Implemented in Australia, for example. | Implemented in the United States, for example. |

\* Not all of these programmes have been evaluated for their effectiveness in preventing child maltreatment and childhood aggression.

004512

# 2. Parenting programmes

Parenting programmes are among the most common strategies to improve parent–child relationships. Programmes can be offered to groups or individuals through home visits (home-visiting programmes) or at designated centres in communities, and they can be presented to all families, or targeted at vulnerable families (e.g. disadvantaged or teenage mothers). They are usually delivered by a nurse, social worker, or other professional (although sometimes this is done by experienced mothers) during the first two or three years of a child's life (some programmes begin prenatally).

A number of factors are thought to increase the effectiveness of parenting programmes, including:

- Offering services in more than one setting (e.g. office and home) (*17*);

- Providing both group and individual services (rather than just one) (*17,18*);

- Providing at least 12 sessions (*17*) or interventions spread out over a longer duration (*19,20*);

- Having nurses, social workers, or other professionals (rather than non-professionals, such as lay helpers) deliver programmes (*20*); and

- Training in positive interactions between parents and children, emotional communication, the use of time-out as a disciplinary technique, responding consistently to children's behaviour and making time in sessions for parents to practice new skills with their own children (*21*).

## 2.1   Prevention of child maltreatment

A number of evaluations of parenting programmes suggest that they help prevent child maltreatment (*19,20,22–25*), and improve aspects of family life that may be related to child maltreatment, such as parental attitudes (*18*), child rearing or parenting skills (*18,26,27*), family wellness (*19*) and relationships with partners (*28*). For example, a review of early childhood home-visiting programmes suggests an overall reduction of reported child maltreatment of approximately 39% following intervention (*20*). However, home-visiting programmes are not uniformly effective in reducing child maltreatment (*29*). Furthermore, it is difficult to draw any firm conclusions about the efficacy of parenting programmes overall, because:

- Different evaluations define and measure child maltreatment differently (*30*). For instance, some use direct measures of child maltreatment (e.g. reports from child protective services), while others use risk factors for child maltreatment (e.g. measures of child abuse potential or parental stress);

- Evaluations are often limited by methodological weaknesses (*31,32*) and there are few randomized trials on whether interventions prevent maltreatment (*29,33*);

- Child maltreatment may be more likely to be detected in homes that are visited (a problem termed "surveillance bias") (*32*); and

- Programmes are often multifaceted and complex, making the effects difficult to quantify (*34*).

The effects of parenting programmes are also likely to depend on factors such as the length of the programme and frequency of visits or sessions, the type of professional employed, target group, content, outcome measures and follow-up period.

The programme with some of the best evidence of effectiveness is the Nurse Family Partnership (see

**BOX 3**

**Population-based prevention of child maltreatment using the Positive Parenting Program (Triple P)**

In an evaluation of Triple P in South Carolina in the United States, 18 counties were randomly assigned to either dissemination of the Triple P or to the services-as-usual control condition. Dissemination involved Triple P professional training for the existing workforce (over 600 service providers), as well as universal media and communication strategies. Large effects were found for three independently derived population indicators: substantiated child maltreatment, child out-of-home placements and child maltreatment injuries. The Triple P resulted in 688 fewer cases of child maltreatment, 240 fewer out-of-home placements and 60 fewer children with injuries requiring hospitalization or emergency room treatment for every 100 000 children under age eight years. This study is the first to randomize geographical areas and show preventive impact on child maltreatment at a population level using evidence-based parenting interventions (*25*).

Table 1), in which nurses visit the homes of families to improve the health, well-being and self-sufficiency of low-income, first-time parents and their children. In a 15-year follow-up of a randomized controlled trial of this programme in Elmira in the United States, participants were 48% less likely to be identified as perpetrators of child maltreatment than members of the control group (*35*). Furthermore, during pregnancy and in the first two years of their child's life, participants at high risk of care-giving dysfunction showed improvements in pre-natal health-related behaviour, pregnancy outcomes, quality of the home environment and the number of injuries recorded in medical files (*36*). Another well evaluated programme is Early Start, an intensive home-visiting programme targeted at families facing stress and difficulty. A randomized controlled trial of the programme in New Zealand found that at age three years Early Start children had about a third of the rate of parent-reported physical abuse than members of the control group. There was no difference in the percentage of participants and members of the control arm who were in contact with official agencies for child maltreatment. However, since participants were under regular surveillance by family support workers, they were more likely to be referred to agencies for child maltreatment concerns than were members of the control group (*37*).

The Nurse Family Partnership and Early Start share common features that may help explain their effectiveness in reducing child maltreatment: both were developed as research programmes rather than service provision models, both use workers with college or university degrees and both have made significant investments to ensure the fidelity of programme delivery (*29*).

Parenting programmes have also been shown to be effective in reducing child maltreatment when presented outside the home (**Box 3**). In a hospital setting, for instance, all new parents in maternity units throughout Western New York State were given a one-page leaflet on preventing shaken baby syndrome, shown an 11-minute video tape that discussed the dangers of shaking, along with methods of dealing with chronic infant crying and were asked to sign a commitment statement confirming their receipt and understanding of the materials. Using a cohort design, the evaluation study reported a 47% reduction in the number of abusive head injuries reported to the children's hospital in the region (over the following five-year period) compared to a similar period before the intervention (*38*).

## 2.2 Preventing aggressive behaviour in children

Parenting programmes have been successful in improving emotional and behavioural problems in children in the short term, including conduct disorders characterized by aggressive, destructive behaviour (*39–45*). For instance, a randomized controlled trial of a Triple P programme in Switzerland followed 150 couples who had children between 2 and 12 years of age. The percentage of participating mothers who reported dysfunctional child behaviour fell from 48% before the intervention to 22% one year later (compared to 53% before and 55% after for mothers in the control group) (*45*). Similarly in Norway, a randomized controlled trial was implemented to evaluate the efficacy of the Incredible Years[2] programme in treating children with

---

[2] A parent training, teacher training and child social skills training programme that has proven effective for reducing children's aggression and behaviour problems and increasing social competence at home and at school.

conduct problems. The evaluation found that mean scores on a child behaviour test, in which higher scores indicate greater frequency of problematic behaviour, decreased more among participants (by 41 points from before to after the programme) than among members of the control group (by 22 points over the same period) (*47*). In addition, decreases in test scores were still evident among participants one year after the programme.

Longer-term benefits have also been reported. For instance, in a randomized trial of Healthy Families Alaska in the United States, participants and controls were followed over a period of two years. At the end of this time, compared to children in the control group, more participating children scored in the normal range for problem behaviour, such as externalizing behaviour (e.g. over-activity, aggression, defiance: 82% for participants versus 77% for controls) and internalizing behaviour (e.g. inhibition, depression, withdrawal: 87% for participants versus 79% for controls) (*48*). In another randomized controlled trial in the United States, of the Nurse Family Partnership, researchers followed-up participants for 15 years after the initial study. Compared with controls, adolescents whose mothers had received home visits during pregnancy and postnatally reported fewer incidents of running away, arrests, convictions and violations of probation and behavioural problems related to the use of alcohol and drugs (*49*).

# 3. Parent and child programmes

Parent and child programmes provide the most comprehensive interventions for improving family relationships and other beneficial outcomes. Typically, these programmes target vulnerable families with teenage mothers or parents with low incomes, and their services are delivered in the community at designated centres. Programmes often incorporate parenting programmes along with child education, social support and other services.

## 3.1   Prevention of child maltreatment

Two systematic reviews concluded that parent and child programmes could help prevent child maltreatment (*26*) and improve factors that may be related to maltreatment, such as family wellness (*20*). Our understanding of their impact is limited, however, by the relative scarcity of evaluation studies of parent and child programmes, compared to the number of evaluations of other types of early childhood interventions. Nevertheless, a randomized trial of an Early Head Start programme in the United States (**Table 1**) found that compared with parents in the control group, participating parents were less likely to report spanking their child in the previous week (47% for participants versus 54% for controls) (*50*). A non-randomized, matched cohort study of children in the Chicago Child-Parent Center preschool programme also indicated beneficial outcomes. The programme provided comprehensive education, family and health services to children aged 3–9 years who lived in Chicago's poorest neighbourhoods. This included educational workshops and home-visits to parents. As the cohort study reveals, a follow-up of the programme 15 years later found that by age 17 years, participating children had lower lifetime rates of child maltreatment – as measured by court petitions and referrals to child

protection services – than did children in the control group (5.0% for participants versus 10.5% for controls) (*51*).

## 3.2   Reducing aggressive behaviour in children

Parent and child programmes can be effective in reducing aggressive or violent child behaviour. For instance, in a randomized trial of the above-mentioned Early Head Start programme parents were asked to rate their child's aggressive behaviour using a behaviour checklist. Compared with those in the control group, participating children were rated by their parents as having lower levels of aggressive behaviour at the end of the programme, when the average age of the children was 37 months (*50*). The beneficial effects of parent and child programmes may also be sustained over the long term. In a 15-year follow-up of individuals who went through the Chicago Child-Parent Center programme as children, compared to the control group, participants had lower levels of juvenile arrest (17% for participants versus 25% for controls), multiple arrests (10% for participants versus 13% for controls) and arrests for violent offences (9% for participants versus 15% for controls) (*52*). By age 24 years, relative to a comparison group, these participants also had lower rates of arrest for felonies, serious crimes punishable by imprisonment for more than one year (17% for participants versus 21% for controls) and lower rates of incarceration (21% for participants versus 26% for controls). However, there were no differences for levels of violent arrest (*53*).

In Seattle in the United States, a follow-up of a non-randomized controlled trial of a parent and child intervention was conducted when the child participants were 18-years-old. The programme

004516

combined teacher training in classroom instruction and management, parent training in child behaviour management and social competence training for children from grades one to six (ages 6–12 years). At 18 years, there were fewer violent delinquent acts reported for those who participated in the intervention than for those in the control group (48.3% for participants versus 59.7% for controls) (54).

004517

# 4. Social support

Social support groups can run independently, but they are often part of a wider family programme within, for example, multi-component programmes. Professionals may contribute or the groups may be open to peers only; however, all social support programmes are driven by the needs of group members, rather than directed by professionals (*24*).

## 4.1 Prevention of child maltreatment and aggressive behaviour in children

Neglectful or abusive parents are more likely to be socially isolated (*55,56*), but there is little evidence to suggest that involvement in social support groups can prevent child maltreatment (*15,26*) or aggressive behaviour in children. However, such groups have been successful in improving factors that may be related to violent behaviour, including family wellness (*19*). Furthermore, there is some evidence to suggest that social groups can im-

prove maternal mental health. For instance, in a qualitative study of Canadian parents taking part in Parent Mutual Aid Organizations (informal parent-run networks for parents involved with child welfare agencies), 75% cited feeling supported and being less lonely as the best thing about participating (*57*). Over a one-year period, compared to controls, average measures of parental self-esteem increased and perceived stress decreased for participants. In addition, the percentage of parents needing to see a professional about family and home responsibilities decreased more among participants than among members of the control group (by 32.3% among participants versus 15.6% among controls). The same was true for the percentage of parents in contact with a child protection worker: this decreased by 61% among participants and by 23% among those in the control group.

004518

# 5. Media interventions

Although often costly to implement, media interventions are accessible to a large proportion of the population and may allow parents to recognize and address early warning signs of behavioural problems in children before they fully develop (*16*). While such interventions can be components of other programmes (e.g. parenting programmes such as Triple P; see **Table 1**), they can also be implemented on their own.

## 5.1   Prevention of child maltreatment

Little research has been done on the outcomes of stand-alone media interventions to encourage safe, secure and nurturing relationships, and thus prevent violent behaviour. Such programmes have been found, however, to have a small positive effect on family wellness in general (*19*). Additionally, there is some evidence that they can improve parenting skills, maternal self-esteem and other factors that may be related to child maltreatment. For instance, a survey of parents of 6–18-month-old children in the United States found that, one year after they began participating in a multimedia Play Nicely programme (**Table 1**), 65% thought the programme had helped them manage aggressive behaviour in their child (*58*). In Australia, meanwhile, the effectiveness of a 12-episode television series, "Families" (part of a Triple P parenting programme; **Table 1**), was evaluated using a randomized controlled study, which assessed participants before and after watching the series. The series offered guidelines for parenting strategies that deal with common behavioural problems. Compared with members of the control group (who did not see the TV series), participants reported feeling greater efficacy as parents after viewing the series (*16*).

## 5.2   Reducing aggressive behaviour in children

The evidence is limited, but media interventions appear to have had some success in improving child behavioural problems. For instance, in the Australian intervention "Families", 43% of children in the intervention were in the clinically elevated range for disruptive child behavioural problems before the programme started. Immediately after the series, this fell to 14% and, six months later, to 10% (*16*).

# 6. Costs and benefits of prevention programmes

Well-implemented interventions can actually reduce the costs of health care, criminal justice, education and other public services. A review of the costs and benefits of early intervention programmes concluded that some home-visiting programmes targeting high-risk/low-income mothers returned between $2 and $3 for each dollar spent (*59*). In a further review of nine early childhood programmes, seven were found to be cost-effective, yielding between $2 and $17 in benefits for every dollar invested (*60*). Despite this, both reviews concluded that not all childhood interventions were cost-effective, with some being ineffective and very expensive.

004520

# 7. Summary

There is evidence that interventions that encourage safe, stable and nurturing relationships between children and parents early in life can prevent child maltreatment and childhood aggression. For the prevention of child maltreatment, parenting programmes are the most common and most evaluated and the Nurse Family Partnership and Triple P are supported by the strongest evidence. Some parent and child programmes have also generated encouraging results. There is a need for more evidence concerning the effectiveness of social support and media programmes for reducing child maltreatment, despite these interventions improving factors that may be related to child maltreatment, such as parental self-esteem, confidence and isolation.

In many evaluation studies, risk factors for child maltreatment (e.g. changes in parental attitudes towards discipline) are used to assess programmes rather than direct measures (e.g. reports of child maltreatment). Furthermore, because many programmes are designed to encourage healthy relationships and increase parental skills, rather than prevent or address violent behaviour, violence is seldom measured as an outcome. Encouraging programmes to incorporate child maltreatment as an outcome measure and to include direct as well as indirect measures of child maltreatment would further our understanding of the effectiveness of different primary prevention approaches.

For the prevention of aggression in children, some evidence suggests that parenting programmes and parent and child interventions reduce aggressive, disruptive and defiant behaviour in the short term, and arrests, convictions and violent acts in the long term (in adolescence and early adulthood). Additionally, there is some evidence that media interventions can address disruptive child behaviour in the short term, although in other respects the evidence for media interventions is lacking. There is no evidence, however, that social support programmes reduce aggressive childhood behaviour. Moreover, it is unclear whether the improvements in childhood behaviour that various interventions strive for can be linked to reduced use of violence later in life.

Given the shortage of randomized controlled trials that use actual maltreatment as an outcome measure, there is a need for more rigorously evaluated programmes before their effectiveness in preventing violence can be accurately determined. Furthermore, only a small proportion of evaluations include an analysis of the economic benefits of programme implementation. Programmes should be encouraged to conduct evaluations that measure not only effects on violent behaviour, but also their economic costs and benefits.

Although early childhood programmes have generated some positive results, the majority of evaluations have focused on programmes in Canada, the United States and other developed countries. Early childhood programmes have been implemented in developing countries – Bangladesh (61), Syria (62) and Zambia (63), for example – but their effect on levels of violent behaviour or its risk factors have rarely been evaluated. Owing to social and cultural differences, one cannot necessarily apply the results of research in developed countries to other parts of the world. More research is urgently needed, therefore, on the applicability and effectiveness of early childhood violence prevention programmes in developing countries.

This briefing shows that there is some strong evidence demonstrating that programmes that promote safe, stable and nurturing relationships between parents (or caregivers) and children reduce child maltreatment and its life-long negative consequences for mental and physical health, social and occupational functioning, human capital and security and, ultimately, for economic development.

# Further reading

Barlow J, Simkiss D, Stewart-Brown S. Interventions to prevent or ameliorate child physical abuse and neglect: findings from a systematic review of reviews. *Journal of Children's Services*, 2006, 1:6–28.

Bilukha O et al. The effectiveness of early childhood home visitation in preventing violence. A systematic review. *American Journal of Preventive Medicine*, 2005, 28:11–39.

Daro DA, McCurdy KP. Interventions to prevent child maltreatment. In Doll L et al., eds. *Handbook of injury and violence prevention*. Atlanta, USA, Springer, 2006.

Geeraert L et al. The effects of early prevention programs for families with young children at risk for physical child abuse and neglect: a meta-analysis. *Child Maltreatment*, 2004, 9:277–291.

Lundahl BW, Nimer J, Parsons B. Preventing child abuse: a meta-analysis of parent training programs. *Research on Social Work Practice*, 2006, 16:251–262.

MacMillan HL et al. Interventions to prevent child maltreatment and associated impairment. *Lancet* 2008; DOI:10:1016/S0140–6736(08)61708–0.

Olds DL, Sadler L, Kitzman H. Programs for parents of infants and toddlers: recent evidence from randomized trials. *Journal of Child Psychology and Psychiatry*, 2007, 48:355–391.

Sweet, MA, Appelbaum, MI. Is home visiting an effective strategy? A meta-analytic review of home visiting programs for families with young children. *Child Development*, 2004, 75:1435–1456.

004522

# References

1.  Ranson KE, Urichuk LJ. The effect of parent-child attachment relationships on child biopsychosocial outcomes: a review. *Early Child Development and Care*, 2006, 178:129–152.
2.  Shonkoff JP, Phillips DA, eds. *From neurons to neighborhoods. The science of early childhood development*. Washington, National Academy of Sciences, 2000.
3.  Knudsen EI et al. Economic, neurobiological, and behavioural perspectives on building America's future workforce. *Proceedings of the National Academy of Sciences*, 2006, 103:10155–10162.
4.  Anda RF et al. The enduring effects of abuse and related adverse experiences in childhood: a convergence of evidence from neurobiology and epidemiology. *European archives of psychiatry and neurological sciences*, 2006, 256:174–186.
5.  Waters E, Wippman J, Sroufe LA. Attachment, positive affect, and competence in the peer group. *Child Development*, 1979, 50:821–829.
6.  Renken B et al. Early childhood antecedents of aggressive and passive withdrawal in early elementary school. *Journal of Personality*, 1989, 57:257–281.
7.  Krug EG et al., eds. *World report on violence and health*. Geneva, World Health Organization, 2002.
8.  *Preventing child maltreatment: a guide to taking action and generating evidence*. Geneva, World Health Organization, 2006.
9.  Trickett PK, Schellenbach CI. *Violence against children in the family and the community*. Washington DC, American Psychological Association, 1998.
10. Foshee VA, McNaughton Reyes L, Wyckoff SC. Approaches to preventing psychological, physical, and sexual partner abuse [in press].
11. Pinheiro PS. *World report on violence against children*. Geneva, United Nations Secretary General's Study on Violence against Children, 2006.
12. Sanders MR. Triple P-Positive Parenting Program: towards an empirically validated multilevel parenting and family support strategy for the prevention of behavior and emotional problems in children. *Clinical Child and Family Psychology Review*, 1999, 2:71–90.
13. Early Head Start. (www.ehsnrc.org, accessed 19th June 2008).
14. Olds DL, Sadler L, Kitzman H. Programs for parents of infants and toddlers: recent evidence from randomized trials. *Journal of Child Psychology and Psychiatry*, 2007, 48:355–391.
15. Budde S, Schene P. Informal social support interventions and their role in violence prevention: an agenda for future evaluation. *Journal of Interpersonal Violence*, 2004, 19:341–355.
16. Sanders MR, Montgomery DT, Brechman-Toussaint ML. The mass media and the prevention of child behavior problems: the evaluation of a television series to promote positive outcomes for parents and their children. *Journal of Child Psychology and Psychiatry*, 2000, 41:939–948.
17. Krugman SD, Lane WG, Walsh CM. Update on child abuse prevention. *Current Opinion in Pediatrics*, 2007, 19:711–718.
18. Lundahl BW, Nimer J, Parsons B. Preventing child abuse: a meta-analysis of parent training programs. *Research on Social Work Practice*, 2006, 16:251–262.
19. MacLeod J, Nelson G. Programs for the promotion of family wellness and the prevention of child maltreatment: a meta-analytic review. *Child Abuse and Neglect*, 2000, 24:1127–1149.
20. Bilukha O et al. The effectiveness of early childhood home visitation in preventing violence. A systematic review. *American Journal of Preventive Medicine*, 2005, 28:11–39.
21. Kaminski JW et al. A meta-analytic review of components associated with parent training program effectiveness. *Journal of Abnormal Child Psychology*, 2008, 36:567–589.
22. Olds DL, Sadler L, Kitzman H. Programs for parents of infants and toddlers: recent evidence from randomized trials. *Journal of Child Psychology and Psychiatry*, 2007, 48:355–391.
23. Geeraert L et al. The effects of early prevention programs for families with young children at risk for physical child abuse and neglect: A meta-analysis. *Child Maltreatment*, 2004, 9:277–291.
24. Nelson G, Laurendeau M, Chamberland C. A review of programs to promote family wellness and prevent the maltreatment of children. *Canadian Journal of Behavioural Science*, 2001, 33:1–13.

25. Prinz et al. Population-based prevention of child maltreatment: the US Triple P system population trial. *Prevention Science*, 2009, DOI 10.1007/s11121–009–0123–3.

26. Barlow J, Simkiss D, Stewart-Brown S. Interventions to prevent or ameliorate child physical abuse and neglect: findings from a systematic review of reviews. *Journal of Children's Services*, 2006, 1:6–28.

27. Elkan R et al. The effectiveness of domiciliary home visiting: a systematic review of international studies and a selective review of the British literature. *Health Technology Assessment*, 2000, 4:i–v,1–399.

28. Barlow J, Coren E and Stewart-Brown SSB. Parent training programmes for improving maternal psychosocial health, *Cochrane Database Systematic Reviews*, 2003, 4:CD002020.

29. MacMillan HL et al. Interventions to prevent child maltreatment and associated impairment. *Lancet* 2008; DOI:10:1016/S0140–6736(08)61708–0

30. Daro DA, McCurdy KP. Interventions to prevent child maltreatment. In Doll L et al, eds. *Handbook of injury and violence prevention*. Atlanta, USA, Springer, 2006.

31. MacMillan HL et al. Development of a policy-relevant child maltreatment research strategy. *Milbank Quarterly*, 2007, 85:337–374.

32. Chaffin M. Letter to the editor, *Child Abuse and Neglect*, 2005, 29:241–249.

33. Chaffin M. Is it time to rethink Healthy Start/Healthy Families? *Child Abuse and Neglect*, 2004, 28:589–595.

34. Sweet, MA, Appelbaum, MI. Is home visiting an effective strategy? A meta-analytic review of home visiting programs for families with young children. *Child Development*, 2004, 75:1435–1456.

35. Olds DL et al. Long-term effects of home visitation on maternal life course and child abuse and neglect: 15 year follow-up of a randomized trial. *Journal of the American Medical Association*, 1997, 278:637–643.

36. Olds DL et al. Preventing child abuse and neglect: A randomized trial of nurse home visitation. *Pediatrics*, 1986, 78:65–78.

37. Fergusson DM et al. Randomized trial of the Early Start program of home visitation. *Pediatrics*, 2005, 116;e803–e809.

38. Dias MS et al. Preventing abusive head trauma among infants and young children: a hospital-based, parent education program. *Pediatrics*, 2005, 115:e470–e477.

39. Dretzke J et al. The effectiveness and cost-effectiveness of parent-training/education programmes for the treatment of conduct disorder, including oppositional defiant disorder, in children. *Health Technology Assessment*, 2005, 9:iii,ix–x,1–233.

40. De Graaf I et al. Effectiveness of the Triple P positive parenting program on behavioral problems in children: meta-analysis of randomized control trials. *Journal of Child Psychology and Psychiatry*, 2008, 32:714–735.

41. Thomas R and Zimmer-Gembeck MJ. Behavioral outcomes of parent-child interaction therapy and Triple P – Positive Parenting Program: a review and meta-analysis. *Journal of Abnormal Child Psychology*, 2007, 35:475–495.

42. Barlow J, Stewart-Brown S. Behavior problems and group-based parent education programs. *Journal of Developmental and Behavioral Pediatrics*, 2000, 21:356–370.

43. Barlow J, Parsons J, Stewart-Brown S. Preventing emotional and behavioural problems: the effectiveness of parenting programmes with children less than 3 years of age. *Child Care, Health and Development*, 2004, 31:33–42.

44. Nixon RDV. Treatment of behaviour problems in preschoolers: a review of parent training programmes. *Clinical Psychology Review*, 2002, 22:525–546.

45. Sanders MR, Bor W, Morawska A. Maintenance of treatment gains: a comparison of enhanced, standard, and self-directed Triple P-Positive Parenting program. *Journal of Abnormal Child Psychology*, 2007, 35:983–998.

46. Bodenmann G et al. The efficacy of the Triple P-Positive Parenting program in improving parenting and child behavior: a comparison with two other treatment conditions. *Behaviour Research and Therapy*, 2008, 46:411–427.

47. Larsson B et al. Treatment of oppositional defiant and conduct problems in young Norwegian children. *European Child and Adolescent Psychiatry*, 2008. DOI 10.1007/s00787–008–0702–z

48. Caldera D et al. Impact of a statewide home visiting program on parenting and on child health and development. *Child Abuse and Neglect*, 2007, 31:829–852.

49. Olds D et al. Long-term effects of nurse home visitation on children's criminal and antisocial behavior. *Journal of the American Medical Association*, 1998, 280:1238–1244.

50. Love JM et al. The effectiveness of Early Head Start for 3-year old children and their parents: Lessons for policy and programs. *Developmental Psychology*, 2005, 41:885–901.

51. Reynolds AJ, Robertson DL. School-based early intervention and later child maltreatment in the Chicago longitudinal study. *Child Development*, 2003, 74:3–26.

52. Reynolds AJ et al. Long term effects of an early childhood intervention on educational achievement and juvenile arrest. *Journal of the American Medical Association*, 2001, 285:2339–2346.

53. Reynolds AJ et al. Effects of a school-based, early childhood intervention on adult health and well-being: a 19 year follow-up of low income families. *Archives of Pediatrics and Adolescent Medicine*, 2007, 161:730–739.

54. Hawkins JD et al. Preventing adolescent health-risk behaviors by strengthening protection during childhood. *Archives of Pediatrics and Adolescent Medicine*, 1999, 153:226–234.

55. Seagull EAW. Social support and child maltreatment: a review of the evidence. *Child Abuse and Neglect*, 1987, 11:41–52.

56. Sidebotham P, Heron J, ALSPAC Study Team. Child maltreatment in the "children of the nineties": a cohort study of risk factors. *Child Abuse and Neglect*, 2006, 30:497–522.

57. Cameron G. Motivation to join and benefits from participating in parent mutual aid organizations. *Child Welfare*, 2002, 81:33–57.

58. Scholer SJ et al. A multimedia program helps parents manage childhood aggression. *Clinical Pediatrics*, 2006, 45; 835–840.

59. Aos S et al. *Benefits and costs of prevention and early intervention programs for youth.* Olympia WA, Washington State Institute for Public Policy, 2004.

60. Kilburn R, Karoly LA. *The economics of early childhood policy. What the dismal science has to say about investing in children.* Santa Monica CA, Arlington VA, Pittsburgh PA, RAND Corporation, 2008.

61. Aboud FE. Evaluation of an early childhood parenting programme in rural Bangladesh. *Journal of Health, Population, and Nutrition*, 2007, 25:3–13.

62. Bashour HN et al. Effect of postnatal home visits on maternal/infant outcomes in Syria: a randomized controlled trial. *Public Health Nursing*, 2008, 25:115–25.

63. Ransjö-Arvidson AB et al. Maternal and infant health problems after normal childbirth: a randomised controlled study in Zambia. *Journal of Epidemiology and Community Health*, 1998, 51:385–91.

004525

J Labor Res (2012) 33:119–142
DOI 10.1007/s12122-012-9134-0

# The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986

Ying Pan

Published online: 16 February 2012
# Springer Science+Business Media, LLC 2012

**Abstract**  The Immigration Reform and Control Act (IRCA), the largest amnesty in U.S. history, took effect in 1986 and legalized all immigrants who arrived before 1982. The IRCA creates a discontinuity, according to the year of entry, in the probability of having legal status. Therefore, I use the regression discontinuity approach to study the impact of legality on immigrants' labor market outcomes and human capital. Using Californian Latino immigrants from Census 1990, I find that the 1975–81 arrivals, on average, outperform the 1982–86 arrivals in male wages, female employment probability, and male English-speaking ability. These findings are not due to a general trend in U.S. labor market conditions because the same analysis, using refugees, Puerto Rican migrants and U.S.-born Latinos—three comparison groups without legality issues—indicates no difference in outcomes between the 1975–81 and 1982–86 cohorts. However, the advantage of Latino immigrants of the earlier cohort over the later cohort diminishes in Census 2000.

**Keywords**  Undocumented immigrants · Amnesty · IRCA

## Introduction

The population of illegal immigrants living in the U.S. is estimated to be around 11 million, which accounts for almost one-third of the foreign-born population (Passel 2005). Immigration reform has been a heated topic in national policy for years. One proposed reform is to offer existing illegal immigrants a path to citizenship, which is de facto an amnesty. From labor economists' perspective, an important question is how legality can affect previously unauthorized immigrants' labor market outcomes. However, due to the paucity of data containing legal-status information on individual

I thank Vernon Henderson, Nathaniel Baum-Snow, Rachel Friedberg and Naci Mocan. All errors are mine.

Y. Pan (*)
2118 Patrick F. Taylor Hall, Louisiana State University, Baton Rouge, LA 70803, USA
e-mail: ypan@lsu.edu

 Springer

immigrants, only a handful of published papers have examined this question. Rivera-Batiz (1999), Kossoudji and Cobb-Clark (2002) and Amuedo-Dorantes et al. (2007) all use the two waves of Legalized Population Surveys (LPS) to examine the changes in the labor market outcomes of the immigrants who were legalized by the Immigration Reform and Control Act (IRCA). Their results indicate a six- to fifteen-percent increase in immigrants' wages following legalization. However, only half of the first-wave LPS participants responded to the second-wave survey. The potential non-random attrition could cause bias in the estimations. Hill et al. (2010) use the New Immigrant Survey (NIS) to compare immigrants' labor market performance before and after obtaining Lawful Permanent Residence (LPR). The NIS surveyed a sample of immigrants who independently acquired LPR in 2003. Hill et al. (2010) find that the gains in earnings right after the status change are negligible for low-skilled unauthorized immigrants and small for high-skilled ones. However, the LPR status in Hill et al.'s study is endogenous, which makes it difficult to compare their results with other findings that are generated from an exogenous change in legality.

This paper uses Census data to assess the impact of the IRCA on both male and female immigrants' labor market outcomes and human capital development. Since the Census data include as many immigrants as possible, it is a good source of information for re-examining the impact of the IRCA, the largest amnesty in U.S. history, legalizing 2.7 million immigrants. However, the Census contains no direct information indicating immigrants' legal status. Therefore, I exploit the natural experiment that is created by the IRCA.

The IRCA took effect in 1986 and retrospectively legalized immigrants who had arrived in the U.S. before 1982. On the one hand, since immigrants who arrived before 1986 did not anticipate this law, they could not react beforehand. There is no evidence that 1975–1981 arrivals have, on average, different pre-determined characteristics from 1982–1986 arrivals.[1] On the other hand, the IRCA creates a sharp discontinuity between the 1975–1981 and 1982–1986 cohorts with regard to the probability of having legal status. Hence, based on the Regression Discontinuity Design (RDD), I contrast the labor market performance of the pre- and post-1982 immigrants in 1990 and 2000, and I attribute the difference in the outcomes between the two cohorts to the difference in their legality.

My empirical analysis uses Latino immigrants living in California in the 1990 Census. I find that, conditioned on the duration of their stay in the U.S. and other observable characteristics, pre-1982 male immigrants earn, on average, 4.5-percent higher wages than their post-1982 counterparts. And pre-1982 female immigrants are four percentage points more likely than their post-1982 counterparts to be employed. In order to rule out that the difference between the two cohorts simply reflects the general trend in U.S. economic conditions, I conduct the same empirical analysis using three benchmark groups that have no legal-status issue. The first group is refugees who arrived in the U.S. during 1975–1986; the second group is Puerto Ricans who migrated to the U.S. mainland during 1975–1986; and the third group is U.S.-born Latino Americans who started their first jobs during the same period. None of these groups demonstrates that the pre-1982 cohort outperformed the post-1982 cohort in 1990.

---

[1] Detailed analysis of this point is in Pan (2009).



Moreover, I study the long-run impact of legal status, which previous scholars have not addressed. Using Census 2000, I find that, except for men with relatively better education, the 1975–1981 cohort generally no longer outperformed the 1982–1986 cohort, which suggests that the returns to legality may diminish over time.

In addition to the original regression discontinuity approach, which is based on the IRCA's policy design of IRCA, this paper contributes to the existing literature in two other important ways.[2] First, I investigate the gender difference in the mechanism through which the impact of legalization takes place. While most previous papers limit their research to men, two papers also analyze female immigrants (Rivera-Batiz 1999; Amuedo-Dorantes et al. 2007) and find that the IRCA increases both male and female wages and reduces both male and female employment rates.[3] My empirical analysis shows that amnesty benefits male and female immigrants in different ways. The IRCA increases men's wages by promoting upward occupational mobility and increases the returns to human capital. Hence, men with high human capital receive larger wage gains than men with little human capital do. Regarding women, legalization has no impact on their wages or occupational mobility but, instead, increases their likelihood of employment. And this effect is slightly stronger for women with little human capital than for those with high human capital.

Second, little is known about whether an amnesty would affect immigrants' human capital development. The IRCA increases the returns to skills (e.g., education and English-speaking ability) for legalized immigrants (Kossoudji and Cobb-Clark 2002), which may motivate them to accumulate more human capital after legalization. Moreover, legalization increases immigrants' certainty about staying in the host country permanently, which provides another incentive for them to invest in the host-country's specific human capital, such as language skills. Cortes (2004) finds that refugees, who are more likely than economic immigrants to remain in the U.S. permanently, improve their English more rapidly than the latter group. In this paper, I examine the English-speaking ability of the 1975–1981 and 1982–1986 cohorts. I find that, as of 1990, male immigrants of the earlier cohort spoke English better than the later cohort, conditioned on duration of stay.

The remainder of this paper is organized as follows: Section "Pre-1982 and Post-1982 Latino Immigrants" introduces the legislative background of the IRCA, describes the empirical strategy, and compares pre-1982 and post-1982 immigrants. Section "Three Benchmark Groups" compares the pre-1982 and post-1982 cohorts in the three benchmark groups. Section "How Does Legal Status Work?" discusses the

---

[2] Two recent working papers (Barcellos 2010; Lozano and Sorenson 2011) also exploit the 1982-cutoff in IRCA eligibility to study the labor market value of legal status. However, both papers were dated after the earlier draft of this paper (Pan 2010); Lozano and Sorenson (2011) cited Pan (2010). As stated in the following text, I not only present the impact of legality but also investigate the mechanism through which the impact takes place; and I find that the mechanism is different between men and women. The gender difference in the mechanism is never documented in other papers and I consider this an important contribution to the literature. In addition, Lozano and Sorenson (2011) use data from the Mexican Migrant Project; Barcellos (2010) takes nationwide samples from the Census. However, this paper restricts the Census sample to the immigrants who migrated as adults and who reside in California. The estimated impact of the IRCA on immigrants' wages in this paper is smaller than that in Lozano and Sorenson (2011) and much larger than that in Barcellos (2010). Further discussion on this is in Appendix A and footnote 18.
[3] However, Rivera-Batiz (1999) does not account for the selection of women's labor force participation when estimating women's wages.



Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4536 of 4699 PageID #:  7701

mechanism through which legal status works. Section "The Long-Term Impact of Legal Status" studies the long-term impact of legal status, and Section "Conclusion" concludes.

### Pre-1982 and Post-1982 Latino Immigrants

The Immigration Reform and Control Act (IRCA) took effect in October 1986. The bill contained two amnesty programs that granted legal status to the following two types of undocumented aliens: (1) those who had continuously resided in the United States since January 1, 1982, through the Legally Authorized Workers (LAW) program or so called pre-1982 program; and (2) those who had worked in agriculture for 90 days or more between May 1985 and May 1986 — the Special Agricultural Workers (SAW) program. About 1.6 million immigrants were legalized under the LAW program, and about 1.1 million immigrants were legalized under SAW. Although there were two amnesty programs, this paper focuses on the consequences of LAW because, from regular datasets, it is easier to identify the beneficiaries of LAW than those of SAW.[4]

The impact of the LAW program on immigrants' legal status can be detected from a few datasets. Using the data from the Los Angeles Family and Neighborhood Survey (LAFANS), Pan (2009) shows that, among the Latina immigrants living in Los Angeles County in 2000, almost 100% of the pre-1982 arrivals, but only about 70% of 1982–1986 arrivals, have legal status (Appendix Fig. 4). Census data provide similar evidence. Although there are no legality indicators in Censuses, they do present immigrants' citizenship. Since only immigrants with lawful permanent residence (green cards) can apply for U.S. citizenship, the size of the foreign-born naturalized citizens can reflect, to some degree, the size of the legal immigrant population. Using a sample of Mexican and Central American immigrants from the Census 2000 Integrated Public Use Microdata Series (IPUMS) 5% sample, I plot the ratio of naturalized citizens to total immigrants by years of entry.[5] Figure 1 presents the plots, among which one can see a clear discontinuous drop at the 1982 arrivals. Before discussing Fig. 1 in detail, I first explain the sample that I use.

The working sample consists of the Latino immigrants who came to the U.S. as adults (at least 15 years old) and resided in California cities when the Census surveys were conducted. The reason I use the above restrictions is as follows. As stated earlier, the identification strategy is the RDD. The RDD estimation is a local treatment effect that applies to only the unauthorized immigrants who could not have adjusted their status if there had been no IRCA. Therefore, the ideal data for assessing the impact of the IRCA should consist of the post-1982 immigrants who stayed illegal and the pre-1982 immigrants with similar characteristics who adjusted to legal status due to the IRCA. Since the Census data do not contain legality information, I take a sample of immigrants who were the most likely to remain long-term illegal. Therefore, I set the restrictions stated as above. First, immigrants from Latin America are

---

[4] To identify the LAW beneficiaries, one need only know an immigrant's year of entry. However, to identify the SAW beneficiaries, one must know an immigrant's occupation in the 1980s.

[5] I use Census 2000, not Census 1990, to examine U.S. citizenship because immigrants are eligible to be naturalized after they have Legal Permanent Resident (LPR) status for 5 years. Most of the amnestied immigrants did not obtain their LPR status until 1990. Hence, they were not yet naturalized in 1990.

 Springer

004529

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4537 of 4699 PageID #:  7702



Fig. 1 Ratio of Naturalized Citizens to Total Latino Immigrants by Entry Years. Notes: Only Mexican and Central American (except Cuban and Haitian) immigrants who entered the U.S. at an age no less than 15 and who resided in California cities in 2000 are used. Source: Census 2000 Public Use 5% Micro Sample (PUMS)

much more likely than those from Asia and Europe to enter the U.S. without documentation due to the geographic proximity between Latin America and the U.S. Indeed, Latino immigrants account for 81% of total illegal immigrants (Passel 2005). Second, California ranks first in concentration of illegal immigrants, accounting for 45% of all unauthorized immigrants in 1990 and 24% in 2000 (Passel 2005). In addition, unauthorized immigrants are more likely to settle in California than elsewhere. Fortuny et al. (2007) documented that, among Latino unauthorized immigrants, about 63% in California arrived in 1994 or earlier, as opposed to only 39% nationally. Therefore, by focusing on California's Latino immigrant population, the sample contains a large proportion of illegal immigrants, particularly the long-term illegal immigrants arriving in the 1980s, who are more relevant to this research than recent illegal immigrants.[6] Third, the sample is restricted to city residents. With this restriction, I exclude agricultural workers, who can still be legalized under SAW, even if they arrived in the U.S. after 1982.[7] Fourth, the sampled immigrants' age at arrival must be at least 15. For young immigrants, the year of entry is not a critical factor for legal status. Because U.S. immigration policy favors reuniting families, a child immigrant who arrived after 1982 can still have legal status, if her parents are legal. Because of the above four restrictions, a large proportion of the sampled immigrants can be post-1982 long-term illegal immigrants and pre-1982 immigrants who could not have legal status if the IRCA's LAW program had not existed. This sample makes the contrast in citizenship ratio between the pre-1982 and post-1982 cohorts as dramatic as possible. Appendix A discusses what happens if I relax these restrictions.

---

[6] One concern about restricting the sample to California residents arises from the potential selective migration issue. Successful immigrants may eventually move out of California to other states. However, the pre-1982 immigrants have legal status and should be, on average, more likely than the post-1982 immigrants to be successful and to move to other states. This suggests that pre-1982 immigrants who stay in California may have lower unobservable attributes than post-1982 immigrants who do so. Therefore, the bias caused by immigrants leaving California, if there is any, should work against my finding.

[7] Appendix Table 1 presents the distribution of sampled immigrants by cities. Among the 22 California cities identified in the Census 2000 5% sample, Los Angeles accounts for 55% of the immigrant population. Therefore, the results of this paper are derived mainly from the residents of this city.

🍻 Springer

004530

In Fig. 1, the ratio of naturalized citizens to the total sampled immigrants in 2000 stays around 0.4 for all the cohorts of pre-1982 arrivals, and starts to decline after the 1982 arrivals. The figure indicates that, when everyone is eligible to be naturalized (i.e., for pre-1982 immigrants), about 40% of Latino immigrants who reside in California cities become U.S. citizens. Among post-1982 Latino immigrants, the citizen ratio drops dramatically, suggesting that some immigrants are not eligible to be naturalized. These ineligible people are, perhaps, illegal immigrants. For 1982–1986 arrivals, the average citizen ratio is 24%, which suggests that legal immigrants probably account for 60% (24/40) of total 1982–1986 arrivals. In other words, about 40% of Latino immigrants who arrived in the U.S. during 1982–1986 and reside in California cities may be illegal immigrants. This number is consistent with the estimation in Pan (2009), using LAFANS.

The idea of the RDD is as follows. The ratio of legal status stays at 100% for pre-1982 immigrants and drops to roughly 60% for 1982–1986 arrivals. Assuming that other factors—such as age and duration of stay in the U.S. —affect immigrants' labor market outcomes or human capital in a continuous fashion, if there is a discontinuous drop in the outcome variables between the pre- and post-1982 cohorts, this drop can be attributed to the discontinuous change in legal status. This strategy relies on one condition: Immigrants who entered the U.S. during the years adjacent to the 1982 cut-off are homogeneous. The previous literature (Briggs 2004) documents that the IRCA was passed unexpectedly in 1986. Immigrants arriving before 1986 did not anticipate this amnesty and, thus, could not react beforehand (Orrenius and Zavodny 2003). However, after the IRCA was enacted, more illegal immigrants were induced to cross the border because those who were legalized by the IRCA could assist their relatives and friends in migrating (Orrenius and Zavodny 2003). Under this scenario, some aliens who originally did not plan to migrate may have changed their minds after 1986. Consequently, post-1986 immigrants may have different unobservable attributes from pre-1986 immigrants. Therefore, I exclude the post-1986 arrivals from this research and only use the 1982–1986 arrivals as the treatment group, and I use the 1975–1981 arrivals as the control group.

In Fig. 2, I plot Latino immigrants' English-speaking ability and labor market outcomes in 1990 by their years of entry. The sample is still composed of Latino adult immigrants, who live in California cities. An additional restriction used is that these individuals were younger than 46 in 1990 (or younger than 56 in 2000), which is a common restriction for studying labor market outcomes. Census 1990 codes year of entry by intervals, from which I choose four: 1975–1979, 1980–1981, 1982–1983, and 1984–1986. Two intervals are before 1982, and the other two are after 1982. The labor market outcome is measured by the natural log of wage rate for men and by employment probability for women. The human-capital outcome is measured by the rate of immigrants who speak English well.[8] For each outcome, I plot the (age-adjusted) cohort average against year of entry (the middle year of each interval). I normalize the average of the first cohort (1975–1979) to zero. Hence, the averages of the subsequent cohorts are in terms of relative values. Figure 2 shows that all the outcomes have a downward trend as the year of entry becomes more recent. This indicates that the earlier cohorts perform better than the later cohorts. Yet, none of the graphs presents a clear discontinuous drop in 1982, probably because Census 1990

---

[8] Appendix B contains the definition of wages, employment probability and English-speaking ability.



J Labor Res (2012) 33:119–142                                                      125



Fig. 2 The Outcomes of Latino Immigrants by Entry Year. Notes: Census 1990 categorized immigrants' entry years into several intervals: 1975–1979, 1980–1981, 1982–1984, and 1985–1986. I use the middle year to represent each interval. Only Mexican and Central American (except Cuban and Haitian) immigrants who entered the U.S. at an age no less than 15, were younger than 46 in 1990 and who resided in California cities are used. The outcomes of the first cohort are normalized to zero. The outcomes of the other cohorts reflect the change relative to the first cohort, after controlling for a quadratic form of age. Source: Census 1990 Public Use 5% Micro Sample (PUMS)

groups years of entry and, thus, I only have four points in each figure. The downward trend does not rule out the effect of duration of stay in the U.S., meaning that earlier immigrants assimilate better simply because they have been in the U.S. longer. However, a closer look at panels (a), (b) and (d) shows that the most dramatic decline occurs between the 1980–81 and the 1982–83 cohorts. The duration effect cannot be explained this pattern.

Is it possible that pre-1982 immigrants have better unobservable attributes? Although it is difficult to test unobservable abilities, studying observable characteristics can at least shed some light. In Fig. 3, I plot two pre-determined characteristics of immigrants—years of schooling and age at entry—by immigrants' entry-year intervals. The figure shows that pre-1982 male and female immigrants are younger on arrival and have fewer years of schooling than their post-1982 counterparts. Since pre-1982 immigrants' observable characteristics are less desirable than those of post-1982 immigrants, it is hard to imagine that the earlier arrivals' unobservable qualities would be better than those of later arrivals.

Next, I use an RDD model to estimate the difference in labor market outcomes between 1975–1981 and 1982–1986 immigrants, other things being equal. The empirical model is:

$$outcome_i = b_0 + b_1 pre82_i + X_{1i} b_2 + \varepsilon_i;  \qquad (1)$$

where the outcome variable is either the natural log of wage rates or a binary indicator of employment. pre82 is an indicator for pre-1982 immigrants. $\beta_1$ captures the

 Springer



Fig. 3 The Characteristics of Latino Immigrants by Entry Year. Notes: Census 1990 categorized immigrants' entry year into several intervals: 1975–1979, 1980–1981, 1982–1984, and 1985–1986. I use the middle year to represent each interval. Only Mexican and Central American (except Cuban and Haitian) immigrants who entered the U.S. at an age no less than 15, were younger than 46 in 1990, and who resided in California cities are used. Sources : Census 1990 Public Use 5% Micro Sample (PUMS)

discontinuity of log wage in 1982 (or the impact of IRCA). $X_1$ represents a vector of control variables, such as the duration of stay in the U.S. (both linear and quadratic forms are used), a quadratic form of age, educational-attainment indicators, marital status, number of children, country-of-origin indicators and city indicators. Marital status and number of children control for labor force participation, which is particularly important for females.[9]

The regression results are presented in Table 1— males in panel A and females in panel B. Columns 1 and 4 control for a linear form of duration effect, while the other columns control for a quadratic form of duration effect. Columns 3 and 6 add the indicator of speaking English well as an additional control variable. Columns 1–3 in Panel A show that, conditioned on experience and education, pre-1982 male immigrants earn four to five percent more in wages than their post-1982 counterparts. Recall that arriving before 1982 increases the fraction of legal immigrants from 60 to 100%. If one divides the 4.5% wage difference by the fraction of people whose legal status is changed by the law, one gets the 2SLS estimate of the impact of legality on wages, which is approximately 10%. This result is consistent with the findings of Rivera-Batiz (1999) and Kossoudji and Cobb-Clark (2002). Columns 4–6 in Panel A show that arriving before 1982 and, thus, being eligible for IRCA does not increase male immigrants' employment probability. In fact, unauthorized male immigrants always have a high level of employment despite their illegality (Passel 2005). For this

---

[9] I also applied a two-stage Heckman selection model to both male and female immigrants, using marital status and number of children as the excluded variable in the labor force participation equation. Though the results are not presented, they are consistent with the OLS estimations that are presented in the paper.

 Springer

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4541 of 4699 PageID #: 7706

Table 1  The labor market outcomes of pre/post-1982 Latino immigrants in 1990

| Dependent Variable: | lnwage | | | employment probability | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| A. men | | | | | | |
| pre82 | 0.048*** | 0.045** | 0.041** | -0.007 | -0.013 | -0.012 |
| | [0.015] | [0.017] | [0.017] | [0.010] | [0.010] | [0.010] |
| duration | 0.022*** | 0.027** | 0.024** | 0.004** | 0.015*** | 0.016*** |
| | [0.003] | [0.011] | [0.011] | [0.001] | [0.004] | [0.004] |
| duration squared | | 0.000 | 0.000 | | -0.001*** | -0.001*** |
| | | [0.001] | [0.001] | | [0.000] | [0.000] |
| speaking English well | | | 0.098*** | | | 0.012** |
| | | | [0.013] | | | [0.006] |
| observations | 10,499 | 10,499 | 10,499 | 11,957 | 11,957 | 11,957 |
| B. women | | | | | | |
| pre82 | -0.036* | -0.027 | -0.023 | 0.049*** | 0.039** | 0.040** |
| | [0.020] | [0.023] | [0.022] | [0.016] | [0.018] | [0.018] |
| duration | 0.029*** | 0.016 | 0.012 | 0.007*** | 0.022*** | 0.020** |
| | [0.004] | [0.012] | [0.012] | [0.002] | [0.007] | [0.007] |
| duration squared | | 0.001 | 0.001 | | -0.001** | -0.001** |
| | | [0.000] | [0.001] | | [0.000] | [0.000] |
| speaking English well | | | 0.112*** | | | 0.040*** |
| | | | [0.016] | | | [0.006] |
| observations | 5,361 | 5,361 | 5,361 | 8,993 | 8,993 | 8,993 |

1. All regressions control for a quadratic form of age, an indicator for some college education or beyond, an indicator for high-school graduation, an indicator for 9–11 years of schooling, an indicator for marital status, number of children, country-of-origin fixed effects and city fixed effects

2. Standard errors are clustered by cities. *** $p<0.01$, ** $p<0.05$, * $p<0.1$

reason, I do not study men's employment probability in the rest of this paper. With regard to female immigrants, columns 1–3 in Panel B show that pre-1982 female wages are not significantly different from those of post-1982 females. However, columns 4–6 in Panel B indicate that pre-1982 females are four to five percentage points more likely than post-1982 females to be employed, which implies that legality increases female immigrants' employment likelihoods by ten to 12 percentage points.

Besides experience and education, another important determinant of immigrants' wages and employment likelihoods is their English-speaking ability. Column 3 shows that the ability to speak English well increases male wages by 10% and female wages by 11%. Column 6 indicates that speaking English well increases male and female employment likelihoods by 1.2 and four percentage points, respectively. Since English-speaking ability has a good labor market returns for immigrants in the U.S. labor market, it is interesting to examine whether legalization would motivate immigrants to master the host country's language. I still use model (1), employing the binary indicator of speaking English well as the outcome variable. The results are


Springer

004534

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4542 of 4699 PageID #:  7707

presented in Table 2, where columns 1 and 3 control for a linear duration-of-stay impact and columns 2 and 4 control for a quadratic form of duration-of-stay impact. Table 2 indicates that pre-1982 male immigrants are four percentage points more likely than their post-1982 counterparts to speak English well. However, pre-1982 female immigrants do not speak English better than post-1982 females. Section "How Does Legal Status Work?" discusses in detail about the gender difference in the impact of legality.

### Three Benchmark Groups

The U.S. macroeconomic conditions in the particular year that immigrants enter the U.S. labor market may influence their entry wages and initial occupational choices. Both of these can have a long-term impact on their working lives (Oreopoulos et al. 2006). A severe economic recession started in the second half of 1980 and continued until 1983. The unemployment rate peaked in 1982 and 1983. If the recession had a persistent impact on people's labor market outcomes, it would be hard to argue that the 1982 and 1983 arrivals did not perform as well as their predecessors just because of illegality. Therefore, in order to disentangle the effect of the macro economy from the effect of the IRCA, one should examine the difference between the pre-1982 and post-1982 cohorts of a benchmark group of people who are very close to Latino immigrants in every aspect, except that the benchmark group has no legal-status issue. Three candidate benchmark groups can be considered— refugees and Puerto Rican migrants who entered the U.S. between 1975 and 1986, and U.S.-born Latino people who entered the labor market during the same period.

Refugees are admitted to the U.S. with no legal-status problem. However, refugees, like economic immigrants, must adapt to a new language, a new culture and a

Table 2  The english-speaking ability of pre/post-1982 Latino immigrants in 1990

| Dependent Variable: Speaking English well 0 1 | | | | |
|---|---|---|---|---|
| | Men | | Women | |
| | (1) | (2) | (3) | (4) |
| pre82 | 0.041*** | 0.039*** | 0.015 | 0.014 |
| | [0.010] | [0.009] | [0.016] | [0.017] |
| duration | 0.027*** | 0.031*** | 0.030*** | 0.036*** |
| | [0.002] | [0.010] | [0.003] | [0.009] |
| duration$^2$ | | 0.000 | | 0.000 |
| | | [0.001] | | [0.000] |
| observations | 11,957 | 11,957 | 8,993 | 8,993 |

1. All regressions control for a quadratic form of age, an indicator for some college education or beyond, an indicator for high-school graduation, an indicator for 9–11 years of schooling, an indicator for marital status, number of children, country-of-origin fixed effects and city fixed effects

2. Standard errors are clustered by cities. *** $p<0.01$, ** $p<0.05$, * $p<0.1$


Springer

004535

new society to make a living. Therefore, refugees are good candidates for a benchmark group. Although Census data do not distinguish refugees from economic immigrants, INS records show that a few countries were the main source of refugees during the 1980s. Following Cortes (2004), I classify immigrants from the following countries as refugees: Afghanistan, Cambodia, Cuba, Laos, Russia, Vietnam, and Ethiopia.[10] Using the country of origin as the standard to determine refugee status certainly creates measurement errors. Cortes (2004) admits that the groups of individuals from refugee-sending countries probably include some illegal immigrants. However, this measurement error only makes the refugee sample more similar to the Latino economic immigrants sample and upwardly biases the difference between pre-1982 and post-1982 refugees.

A possible challenge to using refugees as a benchmark group is that they may receive assistance from refugee agencies for initial settlement, English tutoring, and job searching. And, because these agencies might work harder to help refugees when the economy is slow, this "unobservable" help can distort the comparison between pre-1982 and post-1982 refugees. Therefore, I use Puerto Ricans who migrate to the U.S. mainland (Furtado and Theodoropoulos 2010) and U.S.-born Latinos (Kossoudji and Cobb-Clark 2002) as the two other benchmark groups. Puerto Ricans have many of the characteristics of foreign-born Hispanics but are U.S. citizens by birth. Neither group receives special assistance from charity agencies for job seeking, and, thus, they are independently subject to business cycles.

Table 3 presents the descriptive statistics of the sampled Latino immigrants, refugees Puerto Rican migrants and native-born Latinos in Census 1990. Consistent with the restrictions of the Latino immigrant sample, all people in the control groups were younger than 46 in 1990. The refugees and the Puerto Ricans are those who migrated as adults. The refugees and the native-born Latinos[11] are Californian urban workers, while the Puerto Ricans include residents of all U.S. states due to the small population of Puerto Ricans in Census 1990. Table 3 shows that the Puerto Ricans' characteristics are closest to those of Latino immigrants, followed by the refugees and then the native-born Latinos.[12]

I use equation (1) to test whether pre-1982 refugees and native-born Latino workers have better outcomes than their post-1982 counterparts in terms of wages, employment probabilities and the ability to speak English well. Panels A, B and C of Table 4 present the results for refugees, native-born Latino workers and Puerto Rican migrants, respectively. Columns 1–6 are for men and columns 7–12 are for women. The odd-numbered columns control for a linear duration effect; the even-numbered columns control for a quadratic form of duration effect. The results in Table 4 show that none of the pre-1982 benchmark groups performed better than their post-1982

---

[10] Table 3 presents the breakdown of the refugee population living in Californian cities in 1990 by countries of origin.

[11] Appendix B explains the method that I use to define the year of entry and duration of work for U.S.-born workers.

[12] Native-born Latinos have, on average, five more years of schooling than Latino immigrants. One concern is that high-skilled workers may have different experiences from low-skilled workers during economic recessions. For example, the post-1982 Latino immigrants may have suffered more from the 1980 recession than the post-1982 native-born Latinos did. Hence, I did a robustness check using the native-born Latinos whose years of schooling were 12 or less. The regression results using equation (1) are similar to the results that are derived from the full sample of native-born Latinos.

Table 3  Descriptive statistics of the Latino immigrants and the benchmark groups

|                    | Immigrants | Refugees | Native-borns | Puerto Ricans |
|--------------------|------------|----------|--------------|---------------|
| age of entry       | 22.18      | 24.84    | 19.21        | 24.47         |
| years of schooling | 7.94       | 10.53    | 13.05        | 10.8          |
| married            | 0.52       | 0.65     | 0.42         | 0.47          |
| number of children | 1.38       | 1.84     | 0.94         | 1.36          |
| observations       | 20,950     | 3,579    | 7,822        | 7,385         |

Source: Census 1990 Public Use 5% Micro Sample (PUMS)

1. The immigrant group is composed of the Latino immigrants who entered the U.S. during 1975–1986, who were at least 15 years old at entry but younger than 46 in 1990, and who resided in California cities in 1990

2. The Refugee group consists of immigrants from Afghanistan, Cambodia, Cuba, Laos, Russia, Vietnam, and Ethiopia. They entered the U.S. during 1975–1986. They were at least 15 years old at entry but younger than 46 in 1990, and they resided in California cities in 1990

3. The Native-born group consists of U.S.-born Latinos who finished schooling and started work during 1975–1986. They were younger than 46 and resided in California cities in 1990

4. The Puerto Ricans group consists of people who were born in Puerto Rico and migrated to U.S. mainland during 1975–1986. They were at least 15 years old at entry but younger than 46 in 1990

counterparts in any of those outcomes, after controlling for duration of stay in the U.S., education, experience and other observable characteristics. Therefore, the advantage of the pre-1982 cohort over the post-1982 cohort is a unique finding that exists only among economic immigrants. This provides strong evidence that legal status, rather than macroeconomic conditions, is the reason for the gap between the two cohorts of economic immigrants.

How Does Legal Status Work?

Section "Pre-1982 and Post-1982 Latino Immigrants" shows that legal status increases male wages but not female wages. Why does legal status affect male and female immigrants in different ways? In this section, I address this question by examining immigrants' occupational choices and the returns to skills before and after legalization. Illegality restricts the occupational choice of unauthorized immigrants, who typically rely on ethnic networks to get their first jobs (such as farm workers or food-processing workers) in the U.S. (Kossoudji and Cobb-Clark 2000). The limited options for illegal immigrants actually grant their employers monopsonistic power and force illegal immigrant workers to lower their reservation wages (Rivera-Batiz 1999). In addition, the limited occupational options may not match individual workers' skills very well, particularly for those who have relatively high skills. Hence, I propose the following two-part hypothesis: male immigrants' wage growth after legalization arises from 1) upward occupational mobility and 2) the increasing returns to skill.

I define four occupational categories based on the occupation codes in the Census. Farming, forestry, and fishing occupations are in category one (called Farmers



Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4545 of 4699 PageID #:  7710

004538

Table 4 The outcomes of pre/post-1982 benchmark groups in 1990

| | Men | | | | Women | | | | | |
| | Invage | | Speaking English Well | | Invage | | Employment | | Speaking English Well | |
| | (1) | (2) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) |
| **A. Refugees** | | | | | | | | | | |
| pre82 | -0.071 | -0.063 | 0.029 | 0.038 | -0.05 | 0.002 | -0.01 | 0.019 | -0.028 | 0.03 |
| | [0.076] | [0.100] | [0.035] | [0.042] | [0.148] | [0.154] | [0.027] | [0.035] | [0.046] | [0.058] |
| observations | 1,287 | 1,287 | 1,892 | 1,892 | 733 | 733 | 1,687 | 1,687 | 1,687 | 1,687 |
| **B. US-born Latinos** | | | | | | | | | | |
| pre82 | -0.053 | -0.073* | -0.002 | 0.002 | 0.025 | 0.034 | 0.02 | 0.044 | -0.007 | -0.003 |
| | [0.041] | [0.038] | [0.008] | [0.008] | [0.050] | [0.054] | [0.025] | [0.026] | [0.013] | [0.014] |
| Observations | 3,386 | 3,386 | 3,901 | 3,901 | 2,898 | 2,898 | 3,921 | 3,921 | 3,921 | 3,921 |
| **C. Puerto Ricans** | | | | | | | | | | |
| pre82 | 0.029 | -0.01 | 0.029 | 0.01 | -0.242 | -0.214* | 0.002 | 0.002 | -0.028 | -0.042 |
| | [0.077] | [0.062] | [0.035] | [0.039] | [0.156] | [0.119] | [0.008] | [0.008] | [0.050] | [0.061] |
| **D. Immigrants (from Tables 1 and 2)** | | | | | | | | | | |
| pre82 | 0.048*** | 0.045** | 0.041*** | 0.039*** | -0.036* | -0.027 | 0.049*** | 0.039** | 0.015 | 0.014 |
| | [0.015] | [0.017] | [0.010] | [0.009] | [0.020] | [0.023] | [0.016] | [0.018] | [0.016] | [0.017] |
| observations | 2,347 | 2,347 | 3,550 | 3,550 | 1,432 | 1,432 | 3,835 | 3,835 | 3,835 | 3,835 |

1. The odd-numbered columns control for linear duration-of-stay impact while the even-numbered columns control for a quadratic form of duration-of-stay impact. All regressions control for a quadratic form of age, an indicator for some college education or beyond, an indicator for high-school graduation, an indicator for 9–11 years of schooling, an indicator for marital status, number of children, country-of-origin fixed effects and city fixed effects

2. Standard errors are clustered by cities. *** $p<0.01$, ** $p<0.05$, * $p<0.1$

below); laborer, operative and craft occupations are in category two (called Laborers below); service occupations are in category three (called Service Workers below); and professional, managerial, technical and clerical occupations are in category four (called Professionals below).[13] Table 5 presents the mean of years of schooling, the rate of speaking English well, and the mean of wages by occupational categories for the sampled male and female Latino immigrants. The table shows that Farmers, on average, have the fewest years of schooling and the least English-speaking ability, followed by Laborers, Service Workers and Professionals. For men, all non-agricultural occupations pay higher than agricultural jobs do. However, for women, only Professionals are paid more than Farmers.

The last two columns of Table 5 show the breakdown of occupational categories for both pre-1982 and post-1982 immigrants. Relative to the post-1982 immigrants, the pre-1982 men are less likely to work as Farmers or Service Workers and more likely to be Professionals, which suggests that legalization enables male immigrants to move to better-paid jobs. As for female immigrants, it is interesting to note that the pre-1982 cohort is more likely to work as Laborers, despite the fact that the wage rate of laborer is the lowest among the four occupation categories. Notice that the population of working women in the pre-1982 cohort is 50% larger than that of the post-1982 cohort. Thus, the change in female immigrants' occupational distribution actually suggests that legalization allows more women to find jobs, and the new female workers disproportionately work as poorly-paid Laborers. Consequently, legalization increases female employment probabilities but does not increase the average wage of female immigrants.

Next, I test whether pre-1982 immigrants' human capital receives higher returns than post-1982 immigrants'. The same empirical models as in equations (1) are used, except that I add to the right-hand side of the equation the following interaction terms: (pre82*duration in the U.S.), (pre82* the educational level indicators), and (pre82* the indicator of speaking English well). The coefficients of the interaction terms measure the difference in the returns to human capital between pre-1982 and post-1982 cohorts. Consider that the IRCA promotes occupational mobility for men but not for women. These coefficients are hypothesized to be positive for men and zero for women.

The regression results are presented in Table 6. Columns 1 and 2 are for male wages, columns 3 and 4 for female wages, and columns 5 and 6 for women's employment rate. All the even-numbered columns control for English-speaking ability, while the odd-numbered columns do not. Columns 1 and 2 show that the returns to human capital are very different between the two cohorts of male immigrants. The returns to speaking English well of pre-1982 male immigrants are more than three times as high as those of post-1982 men. The returns to some college education or beyond and the returns to high-school graduation of pre-1982 male immigrants are both about twice as much as those of post-1982 men. Post-1982 male immigrants with nine to eleven years of schooling do not receive rewards from their

---

[13] Though the occupational categories are defined broadly, Latino immigrants actually concentrate in only a few occupations in each category. For example, male Laborers are mainly delivery drivers, construction laborers and machine operators; female Laborers are mainly seamstresses and assemblers of electrical equipment. Male Service workers are mainly cooks and janitors; female Service workers are mainly housekeepers and servants.

 Springer

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4547 of 4699 PageID #:  7712

Table 5   The occupational distribution of Latino immigrants

|  | years of schooling | speaking English well | wage | percentage (%) | |
|---|---|---|---|---|---|
|  | (mean) |  |  | pre-1982 | post-1982 |
| **A. Men** | | | | | |
| Farmers | 6.65 | 0.29 | 6.72 | 6.24 | 8.15 |
| Laborers | 7.89 | 0.43 | 8.46 | 62.77 | 62.52 |
| Service Workers | 8.15 | 0.47 | 7.47 | 17.69 | 18.29 |
| Professionals | 10.03 | 0.64 | 8.97 | 13.29 | 11.03 |
| (observations) | | | (5,286) | (5,845) | |
| **B. Women** | | | | | |
| Farmers | 6.20 | 0.24 | 6.65 | 1.94 | 2.69 |
| Laborers | 7.22 | 0.28 | 6.19 | 46.80 | 42.64 |
| Service Workers | 7.77 | 0.39 | 6.34 | 31.38 | 35.83 |
| Professionals | 10.48 | 0.63 | 8.30 | 19.87 | 18.84 |
| (observations) | | | (3,814) | (2,601) | |

Source: Census 1990 Public Use 5% Micro Sample (PUMS)

education. In contrast, pre-1982 immigrant men with nine to eleven years of schooling see their education pay off. The above results indicate that legalization raises the returns to male immigrants' human capital, which implies that men with high human capital benefit more from legalization than men with little human capital.

The results for women's wages are quite different from those for men. Columns 3 and 4 of Table 6 show that, compared to post-1982 female immigrants, the pre-1982 cohort does not receive higher returns to education or English-speaking ability. This is not surprising since the IRCA does not promote upward occupational mobility for female immigrants. However, it does open up low-skilled job opportunities to a lot of female immigrants who couldn't previously work due to their illegal status. This is reflected by the results in columns 5 and 6, where the coefficient of pre82 is significantly positive and the coefficients of the interaction terms are negative. The results indicate that legalization increases the labor force participation rate of all pre-1982 female immigrants, and the effect may be stronger for women with little human capital than for women with high human capital. Hence, women with little human capital might receive more gains from legalization than those with high human capital.

The Long-Term Impact of Legal Status

In this section, I use Census 2000 to examine whether the impact of the IRCA observed in 1990 was sustained in 2000. The sample still includes Latino immigrants who came to the U.S. between 1975 and 1986 at the age of at least 15 and who lived in California cities in 2000. To be consistent with the maximum age restriction for the 1990 sample, the maximum age for the 2000 sample now is 55. Table 7 presents the

 Springer

004540

Table 6  The returns to human capitals for pre/post-1982 Latino immigrants

|  | Men | | Women | | | |
|---|---|---|---|---|---|---|
|  | lnwage | | lnwage | | Employment | |
|  | (1) | (2) | (3) | (4) | (5) | (6) |
| pre82 | 0.018 | -0.062 | 0.031 | 0.000 | 0.135*** | 0.140*** |
|  | [0.041] | [0.043] | [0.053] | [0.053] | [0.025] | [0.025] |
| duration | 0.024*** | 0.023*** | 0.023*** | 0.023*** | 0.012*** | 0.010** |
|  | [0.005] | [0.005] | [0.007] | [0.007] | [0.004] | [0.004] |
| pre82*dur | -0.001 | -0.002 | 0.007 | 0.006 | -0.008** | -0.007* |
|  | [0.005] | [0.006] | [0.005] | [0.005] | [0.004] | [0.004] |
| some college or above | 0.146*** | 0.138*** | 0.293*** | 0.284*** | 0.137*** | 0.113*** |
|  | [0.028] | [0.029] | [0.023] | [0.023] | [0.025] | [0.027] |
| pre82* (some college or above) | 0.102** | 0.092** | 0.006 | 0.000 | -0.036 | -0.020 |
|  | [0.047] | [0.045] | [0.035] | [0.034] | [0.031] | [0.035] |
| high school | 0.058*** | 0.051*** | 0.106*** | 0.099*** | 0.076*** | 0.058*** |
|  | [0.012] | [0.012] | [0.021] | [0.020] | [0.013] | [0.017] |
| pre82*hsch | 0.054*** | 0.045** | 0.061*** | 0.053** | -0.042 | -0.032 |
|  | [0.018] | [0.018] | [0.020] | [0.020] | [0.025] | [0.029] |
| 9-11 years of schooling | -0.014 | -0.019 | 0.079*** | 0.075** | 0.053*** | 0.040* |
|  | [0.013] | [0.013] | [0.027] | [0.027] | [0.018] | [0.021] |
| pre82 * (9-11 years of schooling) | 0.086*** | 0.080*** | -0.047 | -0.054 | -0.078*** | -0.072** |
|  | [0.017] | [0.019] | [0.030] | [0.033] | [0.027] | [0.031] |
| speaking English well |  | 0.040*** |  | 0.092** |  | 0.075*** |
|  |  | [0.011] |  | [0.017] |  | [0.023] |
| pre82* (speaking English well) |  | 0.099*** |  | 0.042 |  | -0.023 |
|  |  | [0.024] |  | [0.029] |  | [0.027] |
| Observations | 10,499 | 10,499 | 5,361 | 5,361 | 8,993 | 8,993 |

1. All regressions control for a quadratic form of age, an indicator for marital status, number of children, country-of-origin fixed effects and city fixed effects

2. Standard errors are clustered by cities. *** $p<0.01$, ** $p<0.05$, * $p<0.1$

regression results. Columns 1 and 2 are for male wages; columns 3 and 4 are for male English-speaking ability; column 5 is for female wages; columns 6 and 7 are for female employment probability; and columns 8 and 9 are for female English-speaking ability. Column 1 shows that the impact of legalization on male wages diminishes when using Census 2000 data. However, recall that the impact of legalization on male wages is stronger for more-educated than for less-educated men. Hence, I further restrict the sample to high-school graduates or beyond and estimate the impact of legality for those more-educated immigrants. The results, presented in column 2, indicate that the wages of the pre-1982 cohort are 7.7% higher than those of their post-1982 counterparts. Similar results can be observed for male English-speaking ability. Column 3 indicates that, in 2000, pre-1982 immigrant men did not


 Springer

J Labor Res (2012) 33:119–142                                                    135

Table 7  The outcomes of pre/post-1982 Latino immigrants in 2000

| | Men | | | | Women | | | | |
| | lnwage | | speaking English well | | lnwage | employment | | speaking English well | |
| | all | high-school and beyond | all | high-school and beyond | all | all | no schooling | all | no schooling |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| pre82 | 0.013 | 0.077** | 0.016 | 0.037* | -0.023 | 0.016 | 0.097** | -0.015 | 0.069* |
| | [0.018] | [0.028] | [0.017] | [0.018] | [0.024] | [0.016] | [0.041] | [0.009] | [0.042] |
| duration | 0.028* | 0.023 | 0.006 | -0.025 | 0.066* | 0.014 | -0.041 | 0.024 | -0.017 |
| | [0.015] | [0.026] | [0.023] | [0.041] | [0.035] | [0.017] | [0.043] | [0.021] | [0.058] |
| duration2 | 0.000 | 0.000 | 0.000 | 0.001 | -0.001 | 0.000 | 0.001 | 0.000 | 0.001 |
| | [0.000] | [0.001] | [0.001] | [0.001] | [0.001] | [0.000] | [0.001] | [0.001] | [0.001] |
| observations | 8,423 | 3,104 | 10,068 | 3,310 | 4,761 | 8,438 | 1,209 | 8,438 | 1,209 |

1. All regressions control for a quadratic form of age, an indicator for some college education or beyond, an indicator for high-school graduation, an indicator for 9–11 years of schooling, an indicator for marital status, number of children, country-of-origin fixed effects and city fixed effects

2. Standard errors are in brackets. *** $p<0.01$, ** $p<0.05$, * $p<0.1$

speak English better than the post-1982 cohort. However, when the sample is restricted to high-school graduates and beyond, the pre-1982 cohort is found to be more likely than the post-1982 cohort to speak English well by 3.7 percentage points. As for female results, Columns 5, 6 and 8 show that legalization had no impact on immigrant women's wages, labor force participation or English-speaking ability in 2000. However, when the sample is restricted to female immigrants with no schooling at all, the pre-1982 cohort is found to be more likely to be employed, by 9.7 percentage points, and more likely to speak English well, by 6.9 percentage points, than the post-1982 cohort.

Generally speaking, the impact of legalization on immigrants' labor market outcomes and human-capital development diminished in 2000, though it still existed for some groups. This result can be attributed to several causes. First, some post-1982 illegal immigrants had been legalized by 2000 under a new amnesty. Since U.S. immigration policy has a tradition of favoring family reunion, a de facto amnesty (Section 245(i)) allowed 580,000 illegal immigrants whose spouse or parents had legal status, to apply for status adjustment between 1995 and 1997. Though these immigrants could not officially obtain their green cards before 2001, they were treated as if they were legal immigrants while their applications were processed.[14] Besides the amnesties, false documentation is another source for illegal immigrants to seek relief from illegality. Over time, many illegal immigrants have learned where to obtain false documents (Kossoudji and Cobb-Clark 2000). Hence, the difference between pre-1982 and post-1982 immigrants probably became much weaker in 2000 than it was in 1990.

---

[14] Source: http://www.numbersusa.com/text?ID01049.

The second reason for the diminishing impact of the IRCA legalization in 2000 is the selection of return migration. Unsuccessful immigrants may be more likely than successful immigrants to return to their country of origin (Bean et al. 1988; Massey 1987). Thus, the post-1982 immigrants who manage to stay permanently may have better unobserved abilities than those of pre-1982 immigrants because it is harder to survive without a legal status. [15] Figure 3 shows that post-1982 immigrants who were present in Census 1990 had slightly more years of schooling and arrived at a somewhat older age than their pre-1982 counterparts. If return migration is truly a negative selection, then post-1982 illegal immigrants who stay in the U.S. may, in the long run, assimilate faster than their legalized counterparts of the pre-1982 cohort. Appendix Table 10 presents the summary statistics of both the pre-1982 and post-1982 cohorts in 1990 and 2000. Consistent with previous regression results, Appendix Table 10 shows that while post-1982 immigrants lagged behind their forerunners in 1990, they managed to converge in 2000. In 1990, post-1982 immigrant men's and women's wages were, respectively, $1.99 and $1.29 less than those of their pre-1982 counterparts, but both gaps diminished to zero in 2000. In 1990, post-1982 immigrant women's employment probability was seven percentage points lower than their pre-1982 counterparts', and the difference decreased to two percentage points in 2000. In 1990, pre-1982 male and female immigrants' probability of speaking English well exceeded their post-1982 counterparts' by 13 and nine percentage points, respectively, decreasing to five and four percentage points in 2000. The above evidence indicates that the undocumented Latino immigrants who managed to stay in the U.S. for more than 15 years have, perhaps, overcome illegality and converged with their legalized counterparts.

## Conclusion

This paper examines the effect of the amnesty program IRCA on immigrants' labor market outcomes and English-speaking ability. IRCA 1986 creates a discontinuity in the immigrants' probability of having legal status by their year of arrival. All pre-1982 undocumented immigrants were legalized by the IRCA, while only 60% of low-skilled Latino immigrants arriving in California from 1982 to 1986 have documents. Assuming that the 1975–1981 and 1982–1986 arrivals of low-skilled Latino immigrants in California are homogeneous, I use a regression discontinuity model and Census data to estimate the discontinuous change in labor market outcomes and English-speaking ability between the two cohorts. I find that, in 1990, male immigrants of the 1975–

---

[15] It may be the other way around, considering that legal immigrants can return to the U.S. quite easily if they change their minds but illegal immigrants cannot. However, unsuccessful illegal immigrants may temporarily delay their return trip until they achieve their target earnings (Dustmann 2003) rather than become permanent migrants. Lindstrom (1996) documented that the duration of the first-trip of return migrants on average is 22 months and the standard deviation is 28 months. His finding suggests that immigrants who arrived in the early or mid-1980s and planned to return probably had already done so before 1990.

 Springer

1981 cohort earned, on average, 4.5% higher wages than their counterparts who arrived in 1982–1986. Female immigrants of the 1975–1981 cohort are four percentage points more likely to participate in the labor force than their post-1982 counterparts. In addition, pre-1982 male immigrants are four percentage points more likely to speak English well than the post-1982 cohort, and pre-1982 female immigrants are three percentage points more likely to be able to speak English than the post-1982 cohort. Considering that the above results reflect the difference between 100% legalization and 60% legal immigrants, this implies that legalization can (a) increase male immigrants' wages by 10%; (b) increase female immigrants' employment rate by ten percentage points; and (c) induce an additional ten percentage points of male immigrants to improve their English.

In order to find out whether the gap between the two cohorts is driven by the IRCA or by U.S. macroeconomic fluctuations, I examine three benchmark groups, who also work in the U.S. but have no legality issue: refugees, Puerto Rican migrants and U.S.-born Latino workers. I do not find that the pre-1982 cohort outperforms the post-1982 cohort in any of the benchmark groups. This result provides evidence that IRCA caused the advantage of pre-1982 economic immigrants over their post-1982 counterparts.

The mechanism through which legalization benefits male immigrants is that legalization promotes occupational mobility for male immigrants, and, consequently, their human capital receives higher returns. Men with higher human capital are found to gain larger wage growth from legalization than men with little human capital do. In contrast, legalization does not increase women's occupational mobility or the returns to their human capital. Instead, legalization increases the female employment rate. The magnitude of the increase is slightly larger for women with little human capital than for women with higher human capital.

The same regression discontinuity analysis using Census 2000 shows that the advantage of pre-1982 immigrants over post-1982 immigrants diminished in 2000. An additional amnesty program in the late 1990s and the negative selection in illegal immigrants' return migration may be responsible for the convergence of post-1982 immigrants with their pre-1982 counterparts.

## Appendix

### A. Explanation of the Sample Restriction

As I stated in Section "Pre-1982 and Post-1982 Latino Immigrants", the working sample consists of the Latino immigrants who came to the U.S. as adults (at least 15 years old) and reside in California cities. In order to explain why these restrictions are necessary, I discuss the cases if the restrictions are relaxed. I plot citizen ratio against years of entry for the following four samples: (a) European and Asian immigrants in the U.S.; (b) Latino immigrants live in states other than California; (c) Latino immigrants who entered the U.S. at the age of 14 or younger. (d) Latino immigrants living in rural California. The plots of the above four cases are presented in Appendix

 Springer

004544

Fig. 5, panels A-D. Each case is presented in contrast with the figure that is plotted using the working sample.

In panels A-C, the three figures plotted using the samples (a)-(c) all present a continuous trend (linear or quadratic) with no obvious discontinuity in 1982. In other words, conditioning on duration of stay in the U.S., all the post-1982 cohorts have achieved the same level of citizenship probability as the pre-1982 cohorts. This implies that many post-1982 immigrants in samples (a)-(c) have adjusted to Legal Permanent Resident (LPR) status (and eventually citizens) without being eligible for the IRCA. They either came legally or have LPR or citizen family members. Therefore, these people make the discontinuity in 1982 undetectable in panels A-C. The figure plotted using sample (d) in Panel D does not have a clear trend. Yet, one can see that the citizen ratios of the 1978–1985 cohorts are flat and have no discontinuity in 1982. This reflects the impact of the IRCA's SAW program, which legalized post-1982 agricultural workers.

Therefore, the contrast between the working sample and samples (a)-(d) indicates that it is necessary to have the restrictions in order to exclude a lot of immigrants who could have legality without the IRCA's LAW program. Having these people in the analysis sample can dissipate the estimated impact of the IRCA. [16] As a placebo test, I use the empirical model in equation (1) to estimat the impact of arriving before 1982 on the natural log of male wage using sample a-d. The results, presented in Appendix Table 9, show that none of the samples shows that pre-1982 male immigrants have higher wages than post-1982 male immigrants.

B. Explanation of the Variables in Use

1. Definitions of Wage and Employment Probability

    Wage is defined as wage income per year divided by hours of work per year. Employment Probability is a binary indicator, which is one if women's wage income is positive and zero otherwise.

2. Measurement of English-speaking Ability

    In the Census data, an individual's English-speaking ability is defined by one of the following five cases: (1) speaks only English; (2) speaks very well; (3) speaks well; (4) speaks English but not well; or (5) does not speak English. I construct an indicator for speaking English well, which is one if an individual is in case (1), (2), or (3), and zero otherwise.

3. The Definitions of the Year of Entry and Duration of Work for U.S.-born People

    For U.S.-born people who have at least 8 years of schooling, the year of entry is the year in which they finished schooling, and their duration of work can be calculated by (age - 6 - years of schooling). For those whose education is fewer than 8 years, considering that in the U.S., the minimum age for

---

[16] For example, Barcellos (2010) uses the sample of all foreign-borns in the U.S. Censuses and find that arriving before 1982 increases all immigrants' wages by only 0.6%, as opposed to 4.5%, which is the estimation in this paper.


Springer



Source: Pan (2009) Figure 3.
Data Source: Los Angeles County Family and Neighborhood Survey

**Fig. 4** Ratio of Legal Immigrant Women to Total Immigrant Women by Entry Year. Source: Pan (2009)

employment is 14, the year of entry is set to be the year that they reach 14, and duration is (age - 14).



**Fig. 5** Citizen Ratio by Years of Entry Using Various Samples. Note: Sample (a) consists of European and Asian immigrants in the U.S. Sample (b) consists of Latino immigrants live in states other than California. Sample (c) consists of Latino immigrants who entered the U.S. at age of 14 or younger. Sample (d) consists of Latino immigrants living in rural California. The working sample consists of the Latino immigrants who entered the U.S. during 1975–1986, who were at least 15 years old at entry but younger than 46 in 1990, and who resided in California cities. Source: Census 2000 Public Use 5% Micro Sample (PUMS)

 Springer

004546

J Labor Res (2012) 33:119–142

Table 8  Distribution of sampled Latino immigrants by cities

| city | population | % |
| --- | --- | --- |
| Anaheim, | 1,832 | 4.81 |
| Bakersfield, | 386 | 1.01 |
| El Monte, | 862 | 2.26 |
| Fresno, | 934 | 2.45 |
| Fullerton, | 339 | 0.89 |
| Garden Grove, | 658 | 1.73 |
| Glendale, | 310 | 0.81 |
| Huntingon Beach, | 214 | 0.56 |
| Inglewood, | 689 | 1.81 |
| Long Beach, | 1,659 | 4.36 |
| Los Angeles, | 20,914 | 54.94 |
| Modesto, | 230 | 0.6 |
| Moreno Valley, | 316 | 0.83 |
| Ontario, | 735 | 1.93 |
| Pasadena, | 416 | 1.09 |
| Pomona, | 961 | 2.52 |
| Rancho Cucamonga, | 86 | 0.23 |
| Riverside, | 641 | 1.68 |
| Sacramento, | 527 | 1.38 |
| Salinas, | 898 | 2.36 |
| San Francisco, | 793 | 2.08 |
| Santa Ana, | 3,665 | 9.63 |
| Total | 38065 | 100 |

Only Mexican and Central American immigrants who entered the U.S. at an age no less than 15, who were younger than 46 in 1990, and who resided in California cities are usedSource: Census 1990 Public Use 5% Micro Sample (PUMS)

Table 9   A placebo test of IRCA impact on male wages

dependent variable: lnwage

| sample | a | b | c | d |
| --- | --- | --- | --- | --- |
| pre82 | -0.014 | -0.009 | -0.001 | -0.016 |
| | [0.019] | [0.014] | [0.012] | [0.019] |
| observations | 10,615 | 93,041 | 50,279 | 55,458 |

Sample (a) consists of European and Asian immigrants in the U.S. Sample (b) consists of Latino immigrants live in states other than California. Sample (c) consists of Latino immigrants who entered the U.S. at age 14 or younger. Sample (d) consists of Latino immigrants living in rural California

 Springer

004547

Table 10  Summary statistics of pre/post-1982 immigrants

| | 1990 | | | | 2000 | | | |
|---|---|---|---|---|---|---|---|---|
| | pre-82 | post-82 | difference | s.e. | pre-82 | post-82 | difference | s.e. |
| **A. Men** | | | | | | | | |
| wage | 9.16 | 7.17 | 1.99*** | [0.26] | 16.80 | 15.26 | 1.54 | [1.49] |
| employment probability | 0.89 | 0.87 | 0.02** | [0.01] | 0.83 | 0.85 | 0.02** | [0.01] |
| speaking English well | 0.52 | 0.39 | 0.13*** | [0.01] | 0.55 | 0.50 | 0.05*** | [0.01] |
| age of entry | 21.65 | 22.04 | -0.40*** | [0.10] | 21.32 | 21.63 | -0.31*** | [0.11] |
| years of schooling | 7.78 | 8.37 | -0.59*** | [0.08] | 7.66 | 8.41 | -0.75*** | [0.09] |
| some college or more | 0.11 | 0.13 | -0.01** | [0.01] | 0.11 | 0.13 | -0.02*** | [0.01] |
| high school graduate | 0.20 | 0.22 | -0.03*** | [0.01] | 0.19 | 0.23 | -0.04*** | [0.01] |
| 9-11 years of schooling | 0.14 | 0.19 | -0.05*** | [0.01] | 0.14 | 0.17 | -0.03*** | [0.01] |
| married | 0.59 | 0.33 | 0.26*** | [0.01] | 0.71 | 0.66 | 0.05*** | [0.01] |
| number of children | 1.57 | 0.63 | 0.94*** | [0.03] | 2.04 | 1.77 | 0.27*** | [0.03] |
| observations | 5963 | 6264 | | | 4870 | 5198 | | |
| **B. Women** | | | | | | | | |
| wage | 7.37 | 6.08 | 1.29*** | [0.34] | 12.70 | 12.40 | 0.31 | [0.46] |
| employment probability | 0.62 | 0.56 | 0.07*** | [0.01] | 0.57 | 0.55 | 0.02** | [0.01] |
| speaking English well | 0.40 | 0.31 | 0.09*** | [0.01] | 0.45 | 0.41 | 0.04*** | [0.01] |
| age of entry | 22.32 | 23.07 | 0.75*** | [0.12] | 22.21 | 22.95 | 0.74*** | [0.12] |
| years of schooling | 7.62 | 7.99 | -0.37*** | [0.10] | 7.31 | 8.07 | 0.76*** | [0.10] |
| some college or more | 0.10 | 0.10 | 0.00 | [0.01] | 0.10 | 0.13 | 0.03*** | [0.01] |
| high school graduate | 0.18 | 0.23 | -0.05*** | [0.01] | 0.17 | 0.20 | -0.02*** | [0.01] |
| 9-11 years of schooling | 0.14 | 0.16 | -0.02*** | [0.01] | 0.13 | 0.16 | -0.04*** | [0.01] |
| married | 0.62 | 0.52 | 0.10*** | [0.01] | 0.61 | 0.64 | -0.03** | [0.01] |
| number of children | 2.06 | 1.23 | 0.83*** | [0.03] | 2.13 | 2.10 | 0.03 | [0.04] |
| observations | 5190 | 3803 | | | 4596 | 3842 | | |

Only Mexican and Central American (except Cuban and Haitian) immigrants who entered the U.S. at an age no less than 15, were younger than 46 in 1990, and resided in California cities are used Sources: Census 1990 and Census 2000 Public Use 5% micro Samples (PUMS)

## References

Amuedo-Dorantes C, Bansak C, Raphael S (2007) Gender differences in the labor market: impact of IRCA's amnesty provisions. Am Econ Rev 97(2):412–416

Barcellos SH (2010) Legalization and the economic status of immigrants, RAND Working Papers 754

Bean FD, Lowell BL, Taylor LJ (1988) Undocumented Mexican immigrants and the earnings of other workers in the United States. Demography 25:35–52

Briggs VM (2004) Guestworker programs, lessons from the past and warnings for the future. Center for Immigration Studies, Washington D.C

Cortes K (2004) Are refugees different from economic immigrants? Some empirical evidence on the heterogeneity of immigrant groups in the United States. Rev Econ Stat 86(2):465–480

 Springer

Dustmann Christian (2003) Return migration, wage differentials and the optimal migration duration. Eur Econ Rev 47:353–369

Fortuny K, Capps R, Passel JS (2007) The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States. The Urban Institute, Washington, DC

Furtado D, Theodoropoulos N (2010) Why does intermarriage increase immigrant employment? The role of Networks, The B.E. Journal of Economic Analysis & Policy, Berkeley Electronic Press, 10:1

Kossoudji SA, Cobb-Clark DA (2002) Coming out of the shadows: learning about legal status and wages from the legalized population. J Labor Econ 20(3):598–628

Kossoudji SA, Cobb-Clark DA (2000) IRCA's impact on the occupational concentration and mobility of newly-legalized Mexican men. J Popul Econ 13(1):81–98

Hill LE, Lofstrom M, Hayes JM (2010) Immigrant legalization: assessing the labor market effects, Public Policy Institute of California

Lindstrom D (1996) Economic opportunity in Mexico and return migration from the United States. Demography 33(3):357–374

Lozano FA, Sorensen T (2011) The Labor Market Value to Legal Status," IZA Discussion Papers 5492, Institute for the Study of Labor

Massey D (1987) Understanding Mexican migration to the United States. Am J Sociol 92:1372–1403

Oreopoulos P, von Wachter T, Heisz A (2006) The short- and long-term career effects of graduating in a recession: hysteresis and heterogeneity in the market for college graduates. Columbia University, Mimeo

Orrenius PM, Zavodny M (2003) Do amnesty programs encourage illegal immigration? Evidence from IRCA. Demography 40(3):437–450

Passel JS (2005) Unauthorized migrants: numbers and characteristics. Pew Hispanic Center, Washington, DC

Pan Y (2009) Gains from Green Cards, Immigrant Parents' Legal Status and Children's Scholastic Achievement, LSU working paper

Pan Y (2010) The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986, LSU working paper

Rivera-Batiz FL (1999) Undocumented workers in the labor market: an analysis of the earnings of legal and illegal immigrants in the U.S. J Popul Econ 12(1):91–116

004549

# Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers

Zachary Liscow, *Yale Law School*, and William Gui Woolston, *Nuna Health*

Send correspondence to: Zachary Liscow, Yale Law School;
Email: zachary.liscow@yale.edu

Of the estimated 11.1 million undocumented immigrants in the United States, 1.1 million are children. Due to differential treatment in the labor market, teenage undocumented immigrants face low returns to schooling. To measure the effect of legal status on the educational choices of Hispanic teenagers, we compare siblings who differ in their legal status due to their birth country. We find that teenagers who were born in Mexico are 2.7 percentage points more likely to be out of school than their U.S.-born siblings. Alternative explanations, such as differences in prenatal or childhood environment, appear largely unable to explain this result, suggesting that legal status has a significant impact on schooling decisions. After accounting for these alternative explanations to the extent possible and using proxies for legal status in the U.S. Census, our results suggest that being undocumented roughly doubles high school students' dropout rate relative to their U.S.-born siblings, with substantial wage decreases implied by back-of-the-envelope calculations. (*JEL*: I21, I28, J61, F22)

> *Well, when I realized I was undocumented around like 15, like, that's when it really hit me. . . . . And I was going like, what is the point of me even trying in school? What is the point of me doing anything if I'm not going to be able to have a career or be able to, I guess, be normal?*

<div align="right">

- Undocumented immigrant[1]

</div>

This article has benefited enormously from helpful comments from Ran Abramitzky, Leah Platt Boustan, David Card, Mark Duggan, Michael Greenstone, Caroline Hoxby, Ilyana Kuziemko, Cristina Rodriguez, Max Schanzenbach, Luke Stein, participants at the Conference on Empirical Legal Studies and the National Tax Association Annual Meeting, and two anonymous referees. Daniel Giraldo and Jacob Waggoner provided excellent research assistance. This article previously circulated under the title, "Does Legal Status Affect Educational Attainment in Immigrant Families?"

1. Martin, M. (2017) "DACA, A Student's Story: 'They Are the Types of Immigrants You Want in Your Country,'" *NPR*. Interview transcript. http://www.npr.org/templates/transcript/transcript.php?storyId=551544757.

American Law and Economics Review
doi:10.1093/aler/ahy006
Advance Access publication on September 21, 2018

© The Author 2018. Published by Oxford University Press on behalf of the American Law and Economics Association. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com

004550

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4558 of 4699 PageID #:  7723

## 1. Introduction

There are an estimated 1.1 million undocumented immigrants in the United States who are children (Passel and Cohn, 2010). This article seeks to shed light on the educational choices of these individuals and to explore the hypothesis that lack of legal status may discourage them from finishing high school. Due to differential treatment in the labor market and barriers to attending college, teenagers who are undocumented immigrants likely face lower net returns to attending high school. While being undocumented may not discourage work in industries where low-skilled immigrants are heavily represented, such as landscaping or agriculture (Cortes, 2008), legal status may prevent work in high-skill professions. Furthermore, the risk of deportation may decrease the returns to country-specific human capital investment (Chiswick, 1984; Chiswick, 1988). Another reason why undocumented immigrants may be more likely to leave high school is that undocumented immigrants may have higher costs, broadly construed, of attending college. If attending college is too costly, individuals who might otherwise finish high school to retain the option of going to college may instead choose to drop out (Chin and Juhn, 2007). Indeed, undocumented immigrants have noted in interviews that their legal status led to their disillusionment and to decreased interest in their schooling (Gonzales, 2011).

Determining the effect of legal status on the educational choices of teenagers is important for at least three reasons. First, measuring this effect can inform optimal policy regarding immigrants who currently live in the United States. There is heated debate surrounding policies, such as the DREAM Act, that would give some undocumented teenagers legal status.[2] If current laws decrease the net returns to education for undocumented immigrants, then teenage undocumented immigrants may acquire less schooling and compete more directly in the labor market with low-skilled and poor natives. In addition, if current policies decrease the incentives for undocumented immigrants to invest in school, the government may recover less in taxes from undocumented immigrants and spend more on the children

---

2.   See, for example, DREAM Act, S. 1291, 107th Cong. (2001); DREAM Act of 2010, H.R. 5281, 111th Cong. (2010).

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

of these undocumented immigrants (Bouvier and Gardner, 1986). Second, the lack of legal status may be one possible explanation for the low educational attainment of Hispanic adults, a fifth of whom are estimated to be undocumented.[3]

Third, the expected educational outcomes of this population are likely to influence the number and type of individuals who choose to move to the United States without documentation (Cornelius, 2005; Ryo, 2013). Just as individuals are likely to compare the returns to their education and skills in their home and potential host countries (Roy, 1951; Borjas, 1987), parents are likely to take into account the prospects for their children when deciding to immigrate without documentation. If parents understand that United States policy discourages their non-U.S.-born children from finishing high school, parents who believe that the returns to education are likely to be high for their children may be less likely to immigrate. Moreover, the legal treatment of immigrants' foreign-born children can influence the speed of the children's economic assimilation.

Empirically assessing how legal status influences educational choices is complicated by the fact that legal status is not randomly assigned, with a bias that could go in either direction. On the one hand, being undocumented may be correlated with factors that increase the chance that an individual will drop out of high school, such as attending lower-performing schools or having parents who do not speak English. On the other hand, parents who immigrate may be especially motivated to ensure that their children succeed in school. Moreover, throughout much of the 1990s, some undocumented immigrants were able to take steps (such as finding a sponsoring employer) that would allow both the individual and her family to become documented.[4] Therefore, legal status may be a choice on the part

---

3. In the United States, 41% of Hispanic adults aged 20 years and older do not have a regular high school diploma, versus 23% for Blacks and 14% of Whites (Fry, 2010).

4. Before the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), undocumented immigrants could obtain Legal Permanent Status through a couple of avenues. Undocumented immigrants could marry a U.S. citizen and apply for Adjustment of Status, or they could apply for a suspension of their deportation if they could should show that deportation would inflict exceptional and "extremely unusual hardship" on them or on a spouse, parent, or child who is a U.S. citizen or legal permanent resident. Immigration and Nationality Act of 1952 §§244–245, 8

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

of an individual or her family and hence may be endogenous. Some have used policy changes like the 1986 Immigration Reform and Control Act,[5] which conferred amnesty on many undocumented immigrants, to study college enrollment rates (Cortes, 2013). Others have studied the impact of Deferred Action for Childhood Arrivals (DACA),[6] President Obama's administrative grant of documentation on some individuals (Pope, 2016; Amuedo-Dorantes and Antman, 2017; Kuka, Shenhav and Shih, 2018), on a variety of outcomes, including mixed results on educational attainment. DACA, though, led to an uncertain, limited, and potentially temporary grant of documentation.[7]

The state of the art for estimating the effect on high school outcomes of the standard form of documentation that a proposal like the

---

U.S.C. §§1254–1255; §319(a), 8 U.S.C. §1430 (1994). After the passage of IIRIRA, the opportunities to obtain legal status through these routes decreased significantly. In the case of U.S. citizen marriage, the application for Adjustment of Status through marriage to a U.S. citizen required the undocumented immigrant to first leave the United States, at the risk of not being allowed to return for 3 or 10 years depending on the length of their "unlawful presence" in the United States, and then demonstrate that being barred for 3 or 10 years would cause "extreme harship" to the applicant's citizen spouse, a difficult standard to meet (American Immigration Council, 2016). Regarding Cancellation of Removal, the law only allowed undocumented immigrants who had been in the United States for at least 10 years to apply, required that they demonstrate that their deportation would inflict "exceptional and extremely unusual hardship" on a U.S. citizen, and limited the number of yearly Cancellations of Removal to 4,000. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 §304, 8 U.S.C. §1229b (1998). Finally, at certain points in time since 1994, undocumented immigrants could apply for Adjustment of Status under Section 245(i) if they qualified for family-based or employer-based visas. The provision was a temporary measure that required Congressional renewal, and the last time undocumented immigrants could file a visa petition under this provision was April 30, 2001 (Bruno, 2002).

    5.  Pub. L. No. 99–603, 100 Stat. 3359 (1986) (amending scattered sections of 8 U.S.C.).

    6.  Memorandum from Janet Napolitano, Secretary, Department of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) [hereinafter Napolitano Memo].

    7.  Anecdotal evidence suggests that DACA's legal uncertainty could impact recipients. For example, the legal director for the National Immigration Law Center says that DACA recipients "want security. They want to be able to plan their lives, pursue their education, raise their children without the constant threat of legal ping pong." Chang, A. (2018) "Immigration Lawyer Discusses Future of DACA Program," NPR. Interview transcript. https://www.npr.org/2018/08/08/636854720/immigration-lawyer-discusses-future-of-daca-program.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004553

Electronic copy available at: https://ssrn.com/abstract=3083026

DREAM Act would confer is measuring this correlation between legal status and school attainment (Bean et al., 2011; Greenman and Hall, 2013; Diaz-Strong and Ybarra, 2016), which suffers from these endogeneity problems.

To help address the potential endogeneity of legal status across families, this article exploits differences in legal status across siblings that arise from their different countries of birth. Since the end of the 19th century, the United States has extended citizenship (and hence legal status) to all individuals who are born in the United States, even if their families moved without documentation. This article compares the educational attainment of siblings who are close in age but differ in their legal status because one sibling was born in, and the other outside of, the United States. This within-family analysis helps to ensure that family-level differences, such as parental or local residential characteristics, do not confound the results.

To understand the identification strategy, consider two families, each with two children - one aged 15 years and the other 16. In family A, the family moved from Mexico 15.5 years before the data were collected. The older sibling was born in Mexico and is an undocumented immigrant. Her younger sister was born in the United States and is eligible for U.S. citizenship. Since older siblings are more likely to be both born in Mexico and out of school, we need to control for age effects, which this article does by also studying individuals in otherwise similar families (like family B) where the siblings do not differ in their countries of birth.[8] Family B also has children ages 15 and 16 years. But, unlike family A, family B moved from Mexico 14 years before the data were collected: both children are born in Mexico and are undocumented immigrants. Using the comparison of the educational outcomes of the siblings in family A with those from family B to account

---

8. One strategy to measure the effect of legal status on educational enrollment would be to determine if the older sibling in family A is less likely to be enrolled in school than her younger sibling. However, typically (and in this example), if a family has siblings who differ in their country of birth, the older sibling is born outside the United States while the younger sibling is born in the United States. The older sibling is therefore more likely to be an undocumented immigrant. Because older siblings are also less likely to be in school, and being older is correlated with being undocumented, failing to control for age would bias the estimated effect of being undocumented away from zero.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

for age effects then allows the within-family comparison of family A to reveal the impact of being born in Mexico on school attendance.

Using this within-family comparison, this article establishes two main facts. First, Mexican-born teenagers, who are far more likely to be noncitizens or undocumented than their U.S.-born siblings, are also approximately 2.7 percentage points less likely to be enrolled in school than their U.S.-born siblings. Second, to the extent that a battery of tests indicate, mechanisms other than legal status appear unable to explain most of the result.

We consider three main alternative explanations for the pattern in school attendance. They appear largely unable to explain the pattern. First, being an older sibling, rather than being of a particular age (which is controlled for by age fixed effects), could drive the results. We address this concern by showing that the results remain even when the Mexican-born sibling is actually older than his U.S.-born sibling, among other tests. Second, different childhood environments between Mexico and the United States could drive the results. Among other tests like controlling for English ability (which could result from different childhood environments), we zoom in on siblings close in their age of arrival to the United States. Though these sibling pairs have relatively small differences in their childhood environments, the results largely remain. Third, prenatal differences between the United States and Mexico could drive the results. We use estimates from the literature to approximate how much this factor may contribute to our results. The estimated impact is small—an order of magnitude smaller than our estimated effect—suggesting that it is not a primary driver of the results. Accounting for these factors to the extent possible with the data, what remains is still a sizable impact on being in school that is plausibly attributable to the difference in legal status between the U.S.- and Mexican-born siblings; that impact is about 72% of the unadjusted effect of being born in Mexico.

Given existing estimates of the undocumented share among Mexican-born immigrants, the results suggest that being undocumented makes a teenager of Mexican heritage 2.7 percentage points less likely to be in school, leading to roughly a doubling of the rate of being out of school relative to the rate for those who are documented. These estimates suggest that about one half of the baseline level of not attending school for this population of undocumented Mexican immigrants can be attributed

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

to lack of documentation. Of course, these estimates are local to mixed-country-of-birth families and reflect our best (but still imperfect) estimate of the effect of being born in Mexico that operates through documentation status. We produce conservative back-of-the-envelope calculations to estimate the size of these impacts on lifetime wages. We estimate that the impact of documentation that operates through attending high school increases an undocumented individual's lifetime earnings by $8,726 in present discounted value and that, over the next 75 years, documentation increases earnings by $20 billion in aggregate across all undocumented Hispanics.

The article unfolds as follows. Section 2 discusses background on U.S. immigrants and immigration policy. Section 3 discusses the data and presents summary statistics. Section 4 describes the empirical strategy. Sections 5 and 6 present results and consider alternative explanations, respectively. Section 7 discusses the results, and Section 8 concludes with a discussion of the implications of the results for proposed legislation like the DREAM Act.

## 2. Background on Immigration to the United States

The children of undocumented immigrants constitute a substantial fraction of America's youth. Passel and Taylor (2010) estimate that children of undocumented immigrants represent 7% of the under-18 population and 8% of the newborn population. While roughly four-fifths of the children of undocumented immigrants are U.S.-born and hence eligible for U.S. citizenship, in 2009 there were an estimated 1.1 million children who were themselves likely undocumented immigrants (Passel and Cohn, 2010).

Understanding the educational choices of this population is important partly because, as a whole, undocumented immigrants are much less well-educated than the U.S.-born population. While only 2% of the U.S.-born adult population aged 25–64 years has less than a 9th-grade education, an estimated 29% of undocumented immigrants do. Under 10% of U.S.-born adults are not high-school graduates, while 48% of undocumented immigrants are. Perhaps partly as a consequence, undocumented immigrants are disproportionately represented in low-wage sectors and are substantially more likely to be classified as poor (Passel and Cohn, 2009). Moreover,

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

these differences in educational attainment are present even for undocumented immigrants who moved to the United States early in their life. For example, Passel and Cohn (2009) estimate that 28% of undocumented immigrants aged 18–24 years who arrived in the United States before the age of 14 years have not completed high school, versus 18% for the U.S.-born population.

One potential explanation for these differences in educational outcomes is that the inability to work legally may depress undocumented immigrants' returns to schooling. Simple regressions support the view that the returns to schooling are lower for individuals who are less likely to be able to work legally in the United States.[9] Individuals are able to work legally in the United States if they meet any of the following three conditions. First, all citizens are able to work legally. Second, an individual can obtain a visa and later become a legal permanent resident, although these are generally difficult for undocumented immigrants to get.[10] A work visa allows an individual and her family to enter the country for a specified period of time. The visas are generally given to inter-company transferees, foreign investors, and workers themselves. The majority of these visas are given to individuals who engage in highly skilled work. Others, who

---

9. Following Barrow and Rouse (2005), we run regressions of the logarithm of annual earnings on years of schooling, a quadratic in potential experience, and an indicator for whether the individual was female. We also add state fixed effects and run OLS regressions on a sample of Hispanic individuals aged 25–65 years. Data are drawn from the 2000 Decennial Census and the 2001–2012 American Community Surveys. We further divide the sample into two groups—citizens (who are able to work legally in the United States) and noncitizens (some of whom are undocumented immigrants) and estimate the return to schooling separately for each group. To ensure that differences in quality of formal schooling between the United States and other countries are not driving the results, we restrict attention to individuals who were either U.S.-born or who arrived in the United States by the age of 6 years. For citizens, an additional year of schooling is associated with a 0.117 log point increase in annual earnings. For noncitizens, the return is substantially (0.022 log points) smaller ($P < 0.01$).

10. For example, even if they have an immediate family member or spouse who is a citizen, undocumented immigrants who did not enter legally are usually not eligible for a family visa or legal permanent residence. Generally, if they want to obtain legal status, they must first leave the country and stay away from the United States for a specified period of time. If they accrued more than 180 days but less than a year of unauthorized U.S. stays, they have to stay away for three years. If they accrued more than a year, they have to stay away for 10 years before they can be readmitted legally into the United States (American Immigration Council, 2016).

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

326   American Law and Economics Review V20 N2 2018 (318–381)

obtain family-based visas, typically by being a family member of a citizen, may also work. Finally, an undocumented immigrant can be granted amnesty. Of course, there are many other statuses as well—for example, those on student visas who cannot work for extended periods of time. In our analysis, we compare teenagers who are noncitizens with those who are not and teenagers who are likely undocumented with those who are not. Those who are noncitizens may later gain citizenship and those who are in the subcategory of noncitizens who are undocumented may gain citizenship or lawful permanent resident status and thus be able to work with authorization.[11]

This article exploits differences in legal status that are driven by citizenship status originating from an individual's country of birth. Since 1898, the United States has followed the practice of *jus soli* (right of soil), granting citizenship to all U.S.-born children, including those of immigrants.[12]

---

11.   In recent decades, there was one major episode of amnesty: the Immigration Reform and Control Act of 1986 (IRCA). Researchers have used the passage of the Immigration Reform and Control Act of 1986 to study the effect of amnesty on a wide range of outcomes. Chiswick (1988) provides a review of the major provisions of the act. Donato et al. (1992) study the effect of the law on the migration patterns of Mexicans. Cobb-Clark, Shiells and Lowell (1995) and Kossoudji and Cobb-Clark (2002) estimate the effect of legalization and employer sanction on the wages. Baker (2015) examines the law's effect on crime. Researchers have also studied the effects of immigrant legalization on crime in Italy (Pinotti, 2017).

12.   Many countries follow a practice of *jus sanguinis* (right of blood) where citizenship is determined by ethnic ties rather than by birth. China, Germany, India, Japan, and Turkey, among many other countries, reduce the requirements to obtain citizenship for people of favored ethnic groups. Others countries, especially in the New World, practice *jus soli* (right of soil) where citizenship is largely determined by place of birth. Examples of New World countries that practice *jus soli* include Argentina, Brazil, Canada, Mexico, and Venezuela. In many of those countries, the original goal of this immigration policy was generally to encourage immigration. While the Unites States follows the *jus soli* doctrine (in addition to *jus sanguinis*) and awards citizenship to all individuals who are born in the Unites States, it does so for a different reason from that of most other countries. The 1857 U.S. Supreme Court decision *Dred Scott v. Sandford* 60 U.S. 393, held that people of African descent imported into the United States and held as slaves– and their descendants, regardless of whether they were slaves–could never be citizens of the United States. After the North won the Civil War, the Unites States adopted a constitutional amendment that reversed the *Dred Scott* decision. The 14th amendment to the U.S. Constitution declares that "all persons born or naturalized in the United States . . . are citizens of the United States." In 1898, the Court's decision in *United States v. Wong Kim Ark 169 U.S. 649*, clarified that the 14th amendment applied to U.S.-born children of foreigners.

004558

Electronic copy available at: https://ssrn.com/abstract=3083026

Although the U.S.-born children of undocumented immigrants are eligible to become citizens, it is possible that many of them may not. Their parents could be afraid to interact with government agencies or could be unaware of their children's eligibility. There are three reasons that these concerns are unlikely to invalidate the results presented here. First, to ensure that endogenous take up of citizenship is not driving the results, this paper exploits the variation in citizenship originating from the country of a child's birth rather than relying on a parent's choice to obtain citizenship for her child. Second, becoming a U.S. citizen after being born in the United States is very easy, even for the children of undocumented immigrants.[13] Third, given the perceived attractiveness of U.S. citizenship, parents of children born in the United States are likely to be highly aware of the potential for their children to become citizens.[14]

## 3. Data and Summary Statistics

This article's primary data source draws on the 5% sample of the 2000 U.S. decennial Census, as well as American Community Survey (ACS) data from 2001 to 2012 (Ruggles et al., 2017).[15] These data have three attractive features. First, our empirical strategy relies on families with some teenagers born in the Unites States and some born in Mexico, and such families are relatively rare; in the baseline sample of teenagers of Mexican heritage, only 3.0% of individuals are in such families. Our empirical strategy therefore requires a large sample size, which the Census, unlike alternatives such as the Survey of Income and Program Participation, provides. Second, unlike

---

13.   If the birth takes place in the hospital (and by law undocumented immigrants cannot be barred from emergency rooms) or at home with a midwife, children are automatically given birth certificates. If a birth takes place unaided by professionals, obtaining a birth certificate generally requires the parent to deliver a form to the state/county vital records office. If a birth certificate is filed late (more than 1 year after birth), obtaining a birth certificate generally requires more work (documents showing that the mother was in state when the birth occurred, etc.) but is not especially burdensome, even for undocumented immigrants. The Social Security Administration, State Department, and other government agencies accept birth certificates as proof of citizenship.

14.   Moreover, Mexico and many other countries in Latin America also follow the doctrine of *jus soli*, so immigrants are more likely to be familiar with the legal doctrine.

15.   Because of the similarity in the structure and administration between the Census and the American Community Survey, we will refer to both as "Census data."

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

highly specialized datasets such as the Children of Immigrants Longitudinal Study that only examine immigrants who live in a particular city or who immigrated at a specific time, the Census is designed to be nationally representative. Finally, the Census contains a relatively rich set of individual and family level covariates that are used to explore the robustness of the results.

There are, however, two primary disadvantages of the Census data. First, like all nationally representative datasets, the Census does not directly ask for a respondent's legal status (Chin and Juhn, 2007). We will therefore rely on proxies of legal status, which introduce measurement error. Second, we know if an individual is enrolled in school and (for some years) if the student is the expected grade for her age, but the Census does not contain more detailed information on individuals' academic performance such as grades or test scores.

Using data from 2000 to 2012 strikes a balance between increasing the sample size on the one hand and using only the most recent data on the other hand. We end our sample in 2012 to exclude years after President Obama announced his Deferred Action on Childhood Arrivals (DACA) policy, which could have separately impacted the results; given DACA's uncertain future, we wish to estimate a comparison of providing citizenship to undocumented immigrants and other noncitizens, ignoring the small movement in the direction of citizenship provided by DACA. Using data from before 2000 in the primary specification might be less informative of the effect of legal status on schooling decisions today, both because of changes in the labor markets and returns to schooling (Goldin and Katz, 2007; Autor, Katz and Kearney, 2008), and because of the evolving nature of the immigrant population and immigration policy (Passel, Capps and Fix, 2004). Appendix Tables A1 and A2 report the number of observations by survey year, birthplace, and citizenship status.

We primarily focus on undocumented immigrants from Mexico because Mexico is both the largest source of immigrants to the U.S., documented and undocumented, and also the source with the highest share of undocumented immigrants. Since 1990, 34% of total immigrant arrivals to the Unites States have been from Mexico. The number of Mexican-born people in the Unites States equals roughly a tenth of the population of Mexico (Hanson, 2006). At the same time, the majority of undocumented immigrants are from Mexico (52%), with 25% coming from elsewhere in Latin

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004560

Electronic copy available at: https://ssrn.com/abstract=3083026

America (Passel and Cohn, 2016), and those of Mexican heritage have an especially high probability of being undocumented (an estimated 72% of Mexican noncitizens are undocumented versus 59% of non-Mexican Hispanic noncitizens and 28% of non-Hispanic noncitizens).[16] Focusing on one country of origin helps us address concerns about differential prenatal and childhood environments, and focusing on Mexico, which has such a large undocumented share, helps us focus on undocumented immigrants.

The article makes five selection criteria for the baseline sample. First, for the above reasons, we consider only children of Mexican heritage.[17] In robustness checks, we consider all Hispanics, who (including Mexican-born individuals) constitute 77% of all undocumented immigrants (over 2/3 of whom are of Mexican heritage). Second, the article focuses on individuals who are aged 13–17 years, for whom dropping out of high school is a relevant choice.[18] Third, to ensure that observations are siblings rather than unrelated teenagers living in the same household, we consider only sons and daughters of the household head, although this sample restriction has little impact on the results. Fourth, we include only families in which all siblings

---

16.   We estimated the fraction of noncitizen Mexican heritage individuals in the Unites States that were undocumented in 2009. Passel and Cohn (2016) estimated that the number of undocumented immigrants of Mexican heritage in the United States in 2009 was 6.35 million. From the weights in the ACS sample from 2009, we estimate that the number of Mexican heritage noncitizens in the United States was 8,817,936. Dividing one number by the other, we estimate that 72.0% of noncitizen Mexican heritage immigrants in the United States were undocumented in 2009. We calculated the figure for non-Mexican Hispanic noncitizens in a similar manner, with a slight wrinkle. Passel and Cohn (2016) reported estimates of undocumented immigrants from Mexico, Central America, South America, and the Caribbean. The figure from the Caribbean likely includes people that do not usually identify as Hispanic, such as Jamaicans or Haitians. Without the figures from the Caribbean our estimate is that 59% of non-Mexican Hispanic noncitizens are undocumented. Finally, we calculated the figure for all non-Hispanic noncitizens by dividing the total estimated non-Hispanic undocumented immigrants in 2009 from Passel and Cohn (2016) by the total number of non-Hispanic noncitizens in 2009, which we estimated using tabulations of the 2009 ACS.

17.   In particular, the 2000 Census long form asked respondents if they were "Spanish/Hispanic/Latino." This questions is asked in some way in every ACS. The baseline specification restricts attention to individuals who indicated that they were "Mexican, Mexican Am., [or] Chicano."

18.   The article does not include 18-year-olds because the Census only allows linking of siblings if they live in the same household, and individuals who are at least 18 years old are much more likely to leave their parents' home for reasons that may be correlated with school attendance. See Appendix Figure A1 for information on the probability that an individual is in the same household as her parent(s).

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 1**. Summary Statistics by Country of Birth

|  | Full pop. | Born in United States | Born in Mexico |
|---|---|---|---|
| Age | 14.914 | 14.900 | 14.978 |
|  | (1.407) | (1.409) | (1.395) |
| Female | 0.487 | 0.489 | 0.478 |
|  | (0.500) | (0.500) | (0.500) |
| Noncitizen | 0.149 | 0.000 | 0.879 |
|  | (0.356) | (0.000) | (0.326) |
| Likely undocumented | 0.137 | 0.000 | 0.808 |
|  | (0.344) | (0.000) | (0.394) |
| Speaks English very well | 0.882 | 0.918 | 0.705 |
|  | (0.322) | (0.274) | (0.456) |
| Not in school | 0.029 | 0.024 | 0.051 |
|  | (0.167) | (0.153) | (0.220) |
| Num. obs. per family in sample | 1.511 | 1.511 | 1.507 |
|  | (0.668) | (0.668) | (0.670) |
| Personal care problem | 0.007 | 0.007 | 0.006 |
|  | (0.081) | (0.083) | (0.075) |
| Physical difficulty | 0.010 | 0.010 | 0.009 |
|  | (0.100) | (0.101) | (0.094) |
| Age at arrival | 0.863 | 0.000 | 5.076 |
|  | (2.429) | (0.000) | (3.651) |
| Observations | 260,844 | 216,855 | 43,989 |

*Notes:* Mean and standard deviation reported. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All individuals who are not citizens of the United States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military.

in the sample are born in (i) the United States, (ii) Mexico, or (iii) either Mexico or the United States (though including the small number of families containing children born outside of the United States or Mexico has little impact on the results). Finally, to focus on individuals who moved to the United States as children rather than as teenagers, we drop any families where any of the children arrived in the United States after the age of 12 years.

Table 1 presents summary statistics for the individuals in the sample by their country of birth. (Results are weighted by Census sample weights, like all results in the paper.)[19] The baseline sample of only individuals in

---

19.    In particular, we use the Census household sample weights.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004562

Electronic copy available at: https://ssrn.com/abstract=3083026

families with no children born outside of the United States or Mexico and who identify as being of Mexican heritage contains 260,844 individuals. Of these, about 83% (216,855) were born in the United States. The rest (43,989) were born in Mexico. Across the three groups (full sample, born in the United States, and born in Mexico), the average age is close to 15 years, approximately half of each sample is female, and the number of siblings is broadly similar.

In addition, Table 1 explores how a sufficient condition for legal status—having U.S. citizenship—varies with country of birth. The Census, like all nationally representative datasets, does not contain direct information on an individual's legal status (Chin and Juhn, 2007). As a first cut of the data, Table 1 uses a dummy variable for not having U.S. citizenship.[20] While all citizens are able to work legally in the United States, not all noncitizens are

---

20.   A potential concern is measurement error in the Census data. Because the Census is conducted by the U.S. government, undocumented immigrants may be reluctant to truthfully answer questions from the Census Bureau. While nontruthful response is a concern, four facts about the Census partially alleviate concerns about nontruthful responses. First, privacy and confidentiality are major concerns of the Census Bureau. By law, the Census Bureau cannot share personal information with other government or law enforcement agencies, and the Census Bureau strives to make this fact clear to respondents. For example, the first substantive sentences on the 2001 American Community Survey form assure respondents that the Census Bureau cannot violate their privacy. The sentences read: "People are our most important resource. This Census Bureau survey collects information about education, employment, income, and housing — information your community uses to plan and fund programs. Your response is important, and we keep your answers confidential." Second, to increase response rate and accuracy, the Census engages in outreach to Hispanic organizations. The Census Bureau works with NALEO, MALDEF, LULAC, and the National Council of La Raza, faith-based leaders, and locally elected officials. Because representation in state and federal governments and federal appropriations are based on the Census, community organizations have an incentive to ensure that household heads complete the Census. Third, because the Census does not directly ask about legal status, undocumented immigrants do not need to directly report that they are breaking the law. Fourth, the Census is largely conducted by mail, so respondents have the opportunity to talk with their neighbors and discover that responding does not endanger them. Moreover, the Census gives respondents an opportunity to obtain questionnaires in Spanish (and other languages). In addition, this paper's fixed effects strategy will help prevent nontruthful response from biasing the estimates. Suppose, for example, that some fraction of respondents with undocumented children falsely report that all of their children are citizens and born in the United States. Because of the family fixed effects, all families where the reported country of birth and legal status are identical across siblings do not identify the parameter of interest. Therefore, while differential nontruthful response will render the estimates local to families that truthfully answer the Census, it may not bias the coefficient of interest.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

undocumented. In our sample, 87.9% of the Mexican-born individuals are not U.S. citizens. Mexican-born individuals are also less likely to be enrolled in school and are substantially less likely to speak English very well.

Appendix Table A3 replicates Table 1, showing summary statistics based on proxies for legal status. Individuals who are classified as *noncitizen* are less likely to be enrolled in school and are substantially less likely to speak English very well. In addition, we attempt to classify individuals as *likely undocumented*. An individual is labeled as *likely undocumented* if two things are true: (1) she is not a U.S. citizen and (2) no one in her household has participated in government programs (since participation in the programs make it unlikely that the family is undocumented). These government programs consist of receiving money from the Social Security Administration (either regular Social Security or supplemental) or public welfare, or being a veteran of the U.S. military. The intuition behind this refinement is simple; although there is evidence that undocumented immigrants have been able to collect supplemental Social Security income, especially before the 1996 Welfare Reform Act (Hayes, 2003), families in which the parents are undocumented are plausibly less likely to register with the government for social insurance. Moreover, undocumented immigrants generally cannot serve in the U.S. military, and immigrants who serve are generally given a path to citizenship upon discharge. Hence individuals labeled as *likely undocumented* are more likely to be actually undocumented than individuals who are labeled merely as *noncitizen*. While this proxy for legal status is subject to measurement error, it likely correctly identifies some noncitizens as undocumented immigrants. This definition classifies roughly 11% of the *noncitizen* individuals as likely documented (i.e., not likely undocumented). Along most observables, the *noncitizen* and *likely undocumented* groups look similar.

Because the article's empirical strategy relies on families with some teenagers born in the United States and some born in Mexico, Appendix Table A4 classifies individuals based on their birthplace and those of their siblings. The vast majority (82%) of the individuals in the baseline sample live in families in which all siblings in the sample were born in the United States. A smaller number (15%) are from families with all members of the household included in the sample born in Mexico. Finally, roughly 3% of individuals are from families where at least one sibling was born in

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Mexico and at least one sibling was born in the United States ("mixed-country-of-birth" families). As before, individuals in these three groups have similar mean age and are approximately equally likely to be female. Along some dimensions, such as having U.S. citizenship, speaking English very well, and probability of being in school, individuals in mixed-country-of-birth families fall in between their counterparts in U.S.- or Mexican-born families.[21]

Finally, Table 2 presents summary statistics by country of birth for the 7,851 individuals living in families in which some siblings in the sample are born in Mexico and some in the United States. The fourth column of this table summarizes the results from nine separate regressions where the variable of interest is the outcome indicated by the row, and the regressors are family fixed effects and a dummy variable for being born in Mexico. Relative to their U.S.-born siblings, Mexican-born siblings are, on average, 84.2 percentage points more likely to be noncitizens and 4.1 percentage points less likely to be enrolled in school. In addition, these Mexican-born siblings are approximately 1.3 years older and are 5.0 percentage points less likely to report speaking English very well. The differences in legal status and school enrollment preview the article's results. The differences along other dimensions highlight the fact that, within a family, being born in Mexico is not randomly assigned. These summary statistics raise threats to identification: Mexican-born siblings are likely to be older and speak English less well. Section 6 explores the robustness of the article's results in the face of these threats.

## 4.  Empirical Framework

Interpreting a bivariate correlation between being undocumented and school enrollment as causal may be misleading because undocumented and

---

21.  One notable exception to this general pattern is with the number of siblings in the sample. All else equal, individuals are more likely to be classified in the mixed-country-of-birth group if they have more siblings in the sample. Individuals from mixed-country-of-birth families have, on average, approximately one more sibling in the sample than individuals in either the U.S.- or Mexican-born families. This pattern is not surprising, as individuals from families with mixed-country-of-birth siblings will, by construction, not include any one-child families.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 2**. Summary Statistics for Individuals in Mixed-Country-of-Birth Families

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

| | Summary statistics | | | Regression estimates with family FE |
|---|---|---|---|---|
| | Full pop. in this sample | Born in U.S. | Born in Mexico | Born in Mexico |
| Age | 14.955 | 14.311 | 15.619 | 1.339*** |
| | (1.470) | (1.303) | (1.330) | (0.055) |
| Female | 0.509 | 0.509 | 0.510 | −0.005 |
| | (0.500) | (0.500) | (0.500) | (0.017) |
| Noncitizen | 0.415 | 0.000 | 0.842 | 0.842*** |
| | (0.493) | (0.000) | (0.364) | (0.009) |
| Likely undocumented | 0.364 | 0.000 | 0.739 | 0.739*** |
| | (0.481) | (0.000) | (0.439) | (0.012) |
| Speaks English very well | 0.809 | 0.833 | 0.784 | −0.050*** |
| | (0.393) | (0.373) | (0.412) | (0.009) |
| Not in school | 0.033 | 0.013 | 0.053 | 0.041*** |
| | (0.178) | (0.114) | (0.223) | (0.006) |
| Num. obs. per family in sample | 2.314 | 2.328 | 2.300 | — |
| | (0.541) | (0.551) | (0.531) | — |
| Personal care problem | 0.007 | 0.006 | 0.008 | 0.003 |
| | (0.081) | (0.074) | (0.087) | (0.003) |
| Physical difficulty | 0.010 | 0.010 | 0.011 | 0.001 |
| | (0.100) | (0.097) | (0.103) | (0.004) |
| Age at arrival | 1.272 | 0.000 | 2.582 | 2.499*** |
| | (2.634) | (0.000) | (3.272) | (0.087) |
| Observations | 7,851 | 3,964 | 3,887 | 7,851 |

*Notes:* Mean and standard deviation reported for the first three columns. Regression coefficient and standard error reported for fourth column. Regression outcome variable is given by the row heading. Regression includes a dummy variable for being born in Mexico and a family fixed effect. Note that the variable "number of siblings in the the sample" does not vary with families; the estimate of being born in Mexico on the number of siblings in the sample therefore is not identified in a regression with family fixed effects. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual who identifies as being of Mexican heritage aged 13–17 years who lives in a family with at least one sibling in the sample who is born in the United States and at least one sibling in the sample who is born in Mexico. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All individuals who are not citizens of the United States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

documented immigrants may differ along a number of dimensions that could influence their educational outcomes. Although one could attempt to control for observable differences between the two groups, such a strategy is unlikely to yield consistent estimates for two reasons. First, undocumented

Electronic copy available at: https://ssrn.com/abstract=3083026

and documented children likely have families that differ in ways not measured in our data. In particular, since the parents of immigrants choose to come to the U.S., this endogenous selection raises the possibility that parents of undocumented and documented immigrants may differ along a range of difficult-to-observe dimensions like motivation, education, valuation of their children's education, and language skills.[22] As well, in ways imperfectly observed in the data, undocumented and documented immigrants may live in different neighborhoods, attend different schools, and go to different churches, potentially driving educational outcomes.

Second, for some individuals, even within families, legal status may be endogenously determined. Under some circumstances, undocumented immigrants can, with significant difficulty and expense, obtain legal status. For example, during much of the 1990s, under Section 245(i) of the Immigration and Nationality Act, individuals who entered the United States without documentation but who would be eligible for immigrant visas based on their family relationships or job skills could become legal permanent residents without leaving the United States, provided they pay a fee of several hundred dollars (Bruno, 2002). This provision meant that individuals who were able to find a sponsoring employer or spouse and were willing to pay the fee were more likely to become citizens. Individuals who attempted this difficult process are likely to do so because they believe that they (or their children) have high returns from becoming a legal worker.[23] Having a high return from work may be correlated with other determinants of an individual's optimal schooling choice, raising the prospect that legal status is endogenous to an individual's decision to remain in school.

The article's empirical strategy seeks to address both of these empirical challenges by comparing the educational outcomes of siblings who are close in age and who share the same family and neighborhood but differ in their legal status due to the country of their birth. To use within-family

---

22.   In addition, English language skills and education may be complements; differences in educational attainment between undocumented and documented immigrants could be driven by differences in language ability.

23.   Quantitatively, estimates suggest that the number of undocumented immigrants who obtained permanent resident status (a green card holder) is large; from 1998 to 2001, Vaughan, 2003 reports that "at least 600,000 undocumented aliens have received green cards."

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

comparisons, the baseline results control for family fixed effects. To exploit the difference in legal status originating from a sibling's country of birth rather than the possibly endogenous legal status, the article studies the relationship between not being enrolled in school and being born in Mexico.[24] The estimating equation for individual $i$ in family $j$ is

$$\mathbb{I}_{\text{Not in School},ij} = \alpha_1 + \alpha_2 \cdot \mathbb{I}_{\text{Born Mexico},ij}$$

$$+ \underbrace{\sum_{l=13}^{17} \alpha_{3l} \cdot \mathbb{I}_{\text{age}=l}}_{\text{Age FE}} + \underbrace{\sum_{m} \alpha_{4m} \cdot \mathbb{I}_{\text{family}=m}}_{\text{Family FE}} + \varepsilon_{1ij}. \quad (1)$$

The impact of being born in Mexico is the focus of the article. As this is our baseline specification, we consider robustness checks from this regression.

The Alternative Explanation and Discussion sections will describe how explanations other than documentation status appear largley unable to explain this result and will interpret accordingly.

To ease interpretation, all outcome variable are multiplied by 100 so that the coefficients can be interpreted as a representing percentage point changes in the outcome variables. Finally, despite the fact that the primary variable of interest (a dummy for not being in school) is binary, we estimate linear models because of the well-known incidental parameters associated with logit models with a small number of observations per fixed effect. Still, it is reassuring that when we estimate conditional logit regressions with family fixed effects, being born in Mexico has a large and highly statistically significant effect on the probability that an individual is not in school.[25]

While this identification strategy alleviates many of the concerns related to omitted variables and selection, there are three potential limitations. First, this approach does not estimate general equilibrium effects that may be associated with a change in the legal status of a large number of undocumented

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

---

24.   We focus on Mexican-born undocumented immigrants because, as discussed in Section 3, Mexican-born undocumented immigrants constitute more than half of all undocumented immigrants (Passel and Cohn, 2016), and most Mexican immigrants are undocumented (Passel, Capps and Fix, 2004). Note, however, that results are very similar if a dummy variable for being born outside the United States is used.

25.   Specifically, in a conditional logit model version of Equation (1), the coefficient on the dummy variable for being born in Mexico is 1.42 ($P < 0.01$). Controlling for English language ability and health proxies yields very similar results.

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4576 of 4699 PageID #:  7741

immigrants from, for example, passage of the DREAM Act. Second, if siblings born in different countries differ in ways other than legal status, then the estimates will reflect not only the direct effect of legal status on schooling but also the effect of those other differences, a hypothesis that we explore in Section 6. In response to evidence that being born in Mexico affects school attendance through means other than documentation status (i.e., childhood and prenatal environment), we refine our specification to try to address these concerns. Third, the effect estimated will be local to families with more than one child and, in particular, families with mixed-country-of-birth children.[26]

## 5. Results

### 5.1. Cross-Sectional OLS Results

Here, we present the basic cross-sectional relationships between 1) being a noncitizen and school attendance, and 2) being undocumented and school attendance, both without family fixed effects. Standard errors are clustered at the family level, like all results in the article. The estimating equation is given by

$$\mathbb{I}_{\text{Not in School},ij} \cdot 100 = \alpha + \beta \cdot \mathbb{I}_{\text{Undocumented},ij} + \sum_{l=13}^{17} \psi_l \cdot \mathbb{I}_{\text{age}=l} + \varepsilon_{ij} \quad (2)$$

The results from this regression are presented in Table 3.

The coefficients on *noncitizen* and *likely undocumented* are positive and precisely estimated in all models. Column (1) includes no controls except for age fixed effects, and column (2) includes both age fixed effects and a control for being a female. These estimates indicate that individuals who are either *noncitizens* or *likely undocumented* are approximately 2.7–2.8 percentage points less likely to be in school than their peers. Omitted variables may cause this OLS estimate to be biased in either direction.

Column (3) interacts being female with, by turns, *noncitizen* and *likely undocumented*. The negative coefficient on the interaction terms suggests

---

26.   Appendix Table A5 examines the extent to which Mexican-born children in mixed-country-of-birth families differ from the general Mexican-born population in the United States.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

338    American Law and Economics Review V20 N2 2018 (318–381)

**Table 3**. OLS — Effect of Legal Status on Being Out of School

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| *Panel A: Noncitizens* | | | | | |
| Noncitizen | 2.788*** | 2.785*** | 3.097*** | 2.844*** | 2.493*** |
|  | (0.207) | (0.207) | (0.294) | (0.714) | (0.269) |
| Female |  | −0.293*** | −0.195* | −0.448** | −0.215** |
|  |  | (0.104) | (0.104) | (0.174) | (0.104) |
| Noncitizen * Female |  |  | −0.654* |  |  |
|  |  |  | (0.381) |  |  |
| *Panel B: Likely undocumented* | | | | | |
| Likely undocumented | 2.712*** | 2.708*** | 3.044*** | 2.971*** | 2.384*** |
|  | (0.217) | (0.217) | (0.306) | (0.794) | (0.282) |
| Female |  | −0.294*** | −0.197* | −0.447** | −0.215** |
|  |  | (0.104) | (0.104) | (0.174) | (0.104) |
| Likely undocumented * Female |  |  | −0.703* |  |  |
|  |  |  | (0.395) |  |  |
| Family FE |  |  |  | X |  |
| All sibs. arrived in U.S. by age 6 |  |  |  |  | X |
| Mean dep. var. | 2.869 | 2.869 | 2.869 | 2.869 | 2.665 |
| Observations | 260,844 | 260,844 | 260,844 | 260,844 | 241,586 |

*Notes:* Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being in school * 100. All individuals who are not citizens of the United States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military. The fifth column restricts to individuals in families in which all siblings in the sample had moved to the United States by the age of 6 years. All regressions include age fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

that the effect of legal status is stronger for men than for women. Column (4) adds family fixed effects to column (2), slightly increasing the estimated coefficient.

Column (5) restricts attention to observations in families where all individuals in the sample arrived in the United States by the age of 6 years or were born in the United States. The estimated coefficient is smaller than the column (4) estimate.

## 5.2. Effect of Being Born in Mexico on School Attendance

This subsection presents the key results of the article. It establishes that Mexican-born teenagers are more likely not to be enrolled in school than

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004570

Electronic copy available at: https://ssrn.com/abstract=3083026

their U.S.-born siblings. Table 4 presents estimates of Equation (1), the within-family relationship between being born in Mexico and not attending school. Column (1) estimates the equation without fixed effects. Column (2) presents one of the key results of the article: the baseline estimates with family fixed effects. Being born in Mexico is associated with a 2.73 percentage point increase in the probability that a teenager is not enrolled in school, off of a baseline probability of 2.87%; that is, being born in Mexico roughly doubles the probability that a teenager is not in school, resulting from the very large effect relative to the rather small base of Mexican-heritage teenagers who drop out of high school. The effect is precisely estimated ($P < 0.01$) and is slightly higher than the coefficient of the specification without family fixed effects. Note that the impact with fixed effects actually increases relative to the impact without fixed effects, which could be due to a combination of a larger local average treatment effect for mixed-country-of-birth families or positive (or at least only modestly negative) selection into being born in Mexico (e.g., if immigrant parents are especially motivated to ensure that their children perform well in school). For interpreting the result, it is important to remember that the measured impact is that for being out of school *each year* between the ages of 13 and 17 years. That is, for understanding the implication of the results for total years of school attendance, we need to multiply by 5; the results thus imply that being born in Mexico reduces schooling by 2.73 * 5 = 0.137 years for those born in Mexico relative to their U.S.-born siblings.

Columns (3)–(5) present the same robustness checks as in Table 3 and show that the point estimate and statistical significance change little across specifications. When being female is interacted with being born in Mexico in column (4), the coefficient of the interaction term is about −1.10 and is statistically significant ($P < 0.05$). Being born in Mexico has a stronger effect on dropping out for men than women; women born in Mexico are estimated to be about 15% less likely to drop out than men born in Mexico.

## 5.3.  Effect of Being Born in Mexico on Legal Status

One potential explanation for the difference in school enrollment patterns between the U.S.- and Mexican-born siblings is the difference in legal status. Table 5 presents results on the impact of being born in Mexico on legal status (Equation (2)) with family fixed effects. Panel A shows

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 4**. Effect of Being Born in Mexico on Being Out of School

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Born in Mexico | 2.622*** | 2.730*** | 2.729*** | 3.283*** | 2.539*** |
|  | (0.190) | (0.628) | (0.628) | (0.687) | (0.686) |
| Female |  |  | −0.445** | −0.255 | −0.372** |
|  |  |  | (0.174) | (0.182) | (0.175) |
| Born Mexico * Female |  |  |  | −1.094** |  |
|  |  |  |  | (0.549) |  |
| Constant | 6.082*** | 5.653*** | 5.869*** | 5.769*** | 5.501*** |
|  | (0.180) | (0.256) | (0.274) | (0.275) | (0.258) |
| Family FE |  | X | X | X | X |
| All sibs. arrived in U.S. by age 6 |  |  |  |  | X |
| Mean dep. var. | 2.869 | 2.869 | 2.869 | 2.869 | 2.665 |
| Observations | 260,844 | 260,844 | 260,844 | 260,844 | 241,586 |

*Notes:*  Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being in school * 100. The fifth column restricts to individuals in families in which all siblings in the sample had moved to the United States by the age of 6 years. All regressions include age fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

results with *noncitizen* as the outcome variable, while estimates with *likely undocumented* as the outcome variable are presented in Panel B. In both panels, the point estimate and standard error change little across the set of robustness checks. In Panel A, the estimates suggest that a Mexican-born sibling is about 84 percentage points more likely to be classified *noncitizen* than her non-Mexican-born sibling (column (5)). The estimates in Panel B show that a Mexican-born sibling is about 74 percentage points more likely to be classified as *likely undocumented* than her non-Mexican-born sibling. In all specifications, the effect is precisely estimated.

The difference in magnitude between the results in the two panels is expected. All individuals who are born in the United States are recorded as citizens and hence are recorded as not being *noncitizen* or *likely undocumented*. In contrast, many of the individuals born in Mexico are noncitizens, but some of these individuals live in households where there is reason to think that the members of the household are not undocumented. These individuals are recorded as being *noncitizen* but not as *likely undocumented*. Therefore the difference in legal status between Mexican- and non-Mexican-born individuals varies more when the outcome variable is *noncitizen* than when it is *likely undocumented*.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004572

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 5**. Effect of Being Born in Mexico on Legal Status

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| *Panel A: Effect on being a noncitizen* | | | | | |
| Born in Mexico | 87.905*** | 84.192*** | 84.193*** | 83.970*** | 83.681*** |
|  | (0.275) | (0.880) | (0.880) | (0.899) | (0.985) |
| Female |  |  | 0.094 | 0.018 | 0.023 |
|  |  |  | (0.081) | (0.073) | (0.080) |
| Born Mexico * Female |  |  |  | 0.439 |  |
|  |  |  |  | (0.421) |  |
| Mean dep. var. | 14.938 | 14.938 | 14.938 | 14.938 | 9.279 |
| *Panel B: Effect on being likely undocumented* | | | | | |
| Born in Mexico | 80.849*** | 73.780*** | 73.780*** | 73.579*** | 74.219*** |
|  | (0.344) | (1.172) | (1.172) | (1.186) | (1.269) |
| Female |  |  | 0.056 | −0.013 | −0.094 |
|  |  |  | (0.105) | (0.094) | (0.099) |
| Born Mexico * Female |  |  |  | 0.397 |  |
|  |  |  |  | (0.526) |  |
| Mean dep. var. | 13.739 | 13.739 | 13.739 | 13.739 | 8.512 |
| Family FE |  | X | X | X | X |
| All sibs. arrived in U.S. by age 6 |  |  |  |  | X |
| Observations | 260,844 | 260,844 | 260,844 | 260,844 | 241,586 |

*Notes:* Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being a citizen of the U.S. * 100 (Panel A) or a dummy variable for being classified "likely undocumented" * 100 (Panel B). All individuals who are not citizens of the United States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military. The fifth column restricts to individuals in families in which all siblings in the sample had moved to the United States by the age of 6 years. All regressions include age fixed effects.

Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

## 5.4. Alternative Specifications

This section explores the sensitivity of the results to alternative specifications. In column (1) of Table 6, we reestimate the baseline model, restricting attention only to individuals 14 and older (versus the inclusion of those 13 years and older in the baseline specification). If 13-year-olds are relatively unresponsive, we would expect the estimated coefficient on legal status to increase in magnitude. In fact, the estimate is essentially the same as the baseline estimate.

Second, we augment the baseline model by interacting the variable of interest with a dummy variable for an individual's being aged 16 or

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 6**. Effect on Being Out of School, Alternative Specifications

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Born in Mexico | 2.722*** | 1.354* |  | 2.425** |
|  | (0.778) | (0.702) |  | (0.985) |
| Born in Mexico * Age ≥16 |  | 2.533*** |  |  |
|  |  | (0.590) |  |  |
| Born abroad |  |  | 2.759*** |  |
|  |  |  | (0.526) |  |
| Born in Mexico * Year > 2006 |  |  |  | 0.644 |
|  |  |  |  | (1.221) |
| Just individuals age ≥ 14 | X |  |  |  |
| All Hispanics |  |  | X |  |
| Mean dep. var. | 3.266 | 2.869 | 2.848 | 2.869 |
| Observations | 205,420 | 260,844 | 400,497 | 260,844 |

*Notes:* Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being in school * 100. The third column includes all Hispanic individuals aged 13–17 years. Born Abroad is a dummy variable for not being born in the United States. All regressions include family, age, and gender fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

17 years, allowing the effect to differ for individuals aged 13–15 years from those aged 16 and 17 years. Results are reported in column (2) of Table 6. The uninteracted coefficient is positive but not statistically significant ($P > 0.05$), suggesting that we cannot reject the null that, for individuals aged 13–15 years, being undocumented has no effect on school attendance. The coefficient on the interaction between being *born in Mexico* and being aged 16 and 17 years is large and highly statistically significant ($P < 0.01$); this estimate suggests that being born in Mexico increases the likelihood of not being in school by 3.89 percentage points for children 16 and 17 years old. The probability that 16- and 17-year-old individuals who are classified as *noncitizen* are not in school is 7.71%. Taken at face value, these estimates suggest that being undocumented can account for slightly less than half of this baseline level for 16- and 17-years-old.

We also looked at the effect of being born abroad on the sample of all Hispanic immigrants (versus the inclusion of just Mexican-heritage individuals in the baseline specification). Column (3) shows the results of a specification with the standard fixed effects. The estimated coefficient of *born abroad* is highly statistically significant ($P < 0.01$) and suggests

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB    Document 124    Filed 11/07/24    Page 4581 of 4699 PageID #:  7746

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4582 of 4699 PageID #:  7747

that being born outside of the United States increases the likelihood of not being in school by 2.76 percentage points. This result is similar to that for our baseline sample with only Mexican-heritage individuals.

In column (4), we examine whether the effect of being born in Mexico is different over time. In that specification, we include a variable that interacts being born in Mexico with being in a sample that was taken after 2006. The coefficient of the interaction term is not significantly different from 0, suggesting that the effect of being born in Mexico is stable over time.

## 6. Alternative Explanations for the Effect of Being Born in Mexico

Within a family, siblings born in Mexico are much less likely to be citizens or to be documented. However, other differences between siblings born in Mexico and those born in the United States may explain the pattern of Mexican-born individuals being less likely to be in school than their U.S.-born siblings. We explore three categories of such explanations here. First, because many families give birth to their older children in Mexico and their younger children in the United States, siblings born in Mexico are more likely to be the oldest sibling in the household, which some may worry could partially drive the results. Second, those born in the United States and Mexico may face different childhood environments with lasting effects on educational attainment. Finally, they may have different prenatal environments. This section examines each potential threat to the identification and suggests that they do modestly impact the results. As a result, we refine our specification, attempting to account for these factors to the extent possible. The refined specification yields an estimate that is modestly (28%) smaller than the baseline specification. Furthermore, the end of the section produces a falsification test that divides our data into three subsamples by the classification of the Mexican-born child—likely undocumented, citizen, and likely documented—to see whether the effects are in fact largest for families with an undocumented child. The results from these tests are consistent with our contention that difference in legal status drives a large portion of the difference in school attendance between U.S.- and Mexican-born siblings.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

### 6.1. Birth Order and Age Effects

The typical mixed-country-of-birth family has the older children born in Mexico and the younger children born in the United States. Because older children are less likely to be enrolled in school, failing to control for age introduces a spurious correlation between being born in Mexico and being in school. To address this concern, all regressions control for age fixed effects. However, if the schooling-age profile differs between the individuals in mixed-country-of-birth families and other individuals because of differential birth-order effects between mixed-country-of-birth families and others, then the impact of being born in Mexico will be partly driven by this factor even with age fixed effects. For example, if the age profile of school attendance is steeper for children in mixed-county-of-birth families than for children in households where all children are born in the United States for reasons unrelated to legal status, then the fixed effects would fail to pick up this different profile and would therefore overstate the impacts. One example of this phenomenon is that, in developing countries, older children may be more likely to be out of school than younger children to help with younger siblings (Emerson and Portela Souza, 2008; Dammert, 2010; De Haan, Plug and Rosero, 2014). If such behavior happened more commonly in mixed-country-of-birth families in the Unites States than other families, the results might be biased away from zero, since older children are more likely to have been born in Mexico.[27]

Table 7 presents a variety of robustness checks to help address this concern. Column (1) restricts attention only to individuals who live in families with total income less than or equal to the median family income in the sample, calculated separately for each sample year. If individuals from higher-income families have a more flat age-schooling profile and if immigrant families are less likely to be high-income, then excluding these individuals should decrease the estimated effect. However, the estimates in column (1) only are slightly smaller (15%) than the baseline result, and are precisely estimated.

---

27.   And, indeed, there is some evidence of the reverse effect in developed countries, with being born later in birth order associated with worse outcomes (Björklund and Salvanes, 2011). For example, one study of Norway found that being born later in birth order is associated with less schooling (Black, Devereux and Salvanes, 2005).

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4584 of 4699 PageID #:  7749

**Table 7**. Effect of Being Born in Mexico on Being Out of School, Birth Order Checks

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Born in Mexico | 2.320*** | 3.544*** | 4.220*** | 2.730*** |
|  | (0.769) | (0.959) | (1.287) | (0.628) |
| Family income < median | X |  |  |  |
| Atypical legal status |  | X |  |  |
| Atypical born Mexico status |  |  | X |  |
| Controls for being oldest sib. |  |  |  | X |
| Mean dep. var. | 3.355 | 2.476 | 2.444 | 2.869 |
| Observations | 131,118 | 221,272 | 215,129 | 260,844 |

*Notes:* Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being in school * 100. The first column restricts attention to individuals living in families where the total family income is less than the median family income for individuals in the sample. Median family income is calculated separately for each Census year. The second column restricts attention to individuals where either all siblings are U.S.-born or where a citizen sibling is older than a noncitizen sibling. The third column restricts attention to families where all siblings are born in the United States or where there is a Mexican-born sibling who is younger than a U.S.-born sibling. The final column includes a dummy variable for being the oldest sibling observed in the sample. All regressions include age, family, and gender fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

A more direct test of the robustness of the results to improperly measured age effects comes from columns (2) and (3), which identify the coefficient of interest by restricting attention to families with atypical birth orders. For example, if parents in mixed-country-of-birth families encourage their oldest siblings to leave school early to provide financial support for their younger siblings, then the observed relationship between country of birth and educational attainment could partially be driven by this parental encouragement; looking at atypical birth order families helps alleviate this concern. In 4.49% of the cases where at least one member of the family is classified as a *noncitizen*, the oldest citizen child in the sample is older than the youngest *noncitizen* sibling. If the estimated age coefficients are inappropriate for the population of interest, then looking at these families with atypical birth/noncitizen order should produce estimates that differ from the baseline results. Column (2) includes only individuals in families in which all siblings in the sample are citizens or in which a citizen sibling is older than a noncitizen sibling. This sample restriction sharply reduces the sample size of individuals with mixed-country-of-birth siblings. Nonetheless, the

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004577

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4585 of 4699 PageID #:  7750

estimated coefficients in (2) are significant at the 1% level and are larger in magnitude than those in the baseline specification. Column (3) repeats this exercise for birthplace. Here, we restrict attention to individuals for whom all siblings in the sample are U.S.-born or the oldest U.S.-born child is older than the youngest Mexican-born child. The results in (3) are similar to those in (2)—highly statistically significant and larger than the baseline estimates.

Finally, as noted, in families with mixed-country-of-birth children, the oldest sibling tends to be born in Mexico. If parents or teachers systematically treat oldest siblings differently, differences in schooling outcomes between Mexican and U.S.-born siblings may be contaminated by these birth order effects. Column (4) includes a control variable for being the oldest sibling observed in the sample. (Because we cannot follow individuals over time, we do not know if the oldest child in the sample is the oldest child in the family.) The results barely change with the control, which is reassuring.[28]

## 6.2. Childhood Environment

A second concern is whether potentially different childhood environments generate part of our results. (We discuss prenatal environment

---

28.    In additional analysis, we show three other sets of results that are reassuring about the concern that birth order effects bias the results toward finding effects of being born in Mexico on school attendance. First, when breaking the sample into three subsamples in which (1) all siblings of the family are born in Mexico, (2) all siblings of the family are born in the United States, and (3) siblings are born in both the United States and Mexico, the effect of being the oldest sibling on being in school is not significant in any of the subsamples. We also further add an interaction term between being oldest with gender, and that interaction term also does not yield any statistically significant results. Second, we limit the sample to only mixed-country-of-birth families and control for being oldest, oldest * female, and female, in addition to the main effect on *Born in Mexico*. With the controls, and limiting to this subsample, the effect of being born in Mexico stays similar and actually increases to 3.189 ($P < 0.01$). Third, we drop all oldest siblings from the sample; both dropping all such siblings and also just those for mixed-country-of-birth families yields similar (actually, somewhat larger) effects of being born in Mexico on school attendance. All three of these tests help alleviate concerns that differential age profiles of families in which all children are born in the United States, all children are born in Mexico, and at least one is born in each of the United States and Mexico are driving the results.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004578

Electronic copy available at: https://ssrn.com/abstract=3083026

separately.) Evidence suggests that childhood environment matters for subsequent performance (e.g., Hoynes, Schanzenbach and Almond, 2016; Chetty et al., 2011; Almond, Currie and Herrmann, 2012; Currie, 2009; Gould, Lavy and Paserman, 2011). We do not know though how different childhood environments are in Mexico and the United States for immigrant children. Of course, Mexico is substantially poorer, and there are a variety of ways in which Mexico could have worse childhood environments than the United States. For example, in Mexico, there may be less social assistance for the poor, less access to quality childhood education, more dangerous disease environments, and lower quality healthcare. However, evidence suggests that Mexican immigrants are drawn from the middle of the Mexican income distribution (Chiquiar and Hanson, 2005; Hanson, 2006), whereas Mexican immigrants are more likely to be at the bottom of the earnings distribution in the United States.[29] In addition, undocumented immigrants face challenges in the United States that they do not face in their home countries that could hinder childhood development, such as reduced access to healthcare (Hacker et al., 2015). If individuals at the bottom of the income distribution tend to have worse childhood environments, then country-level averages may overstate the true difference in the quality of childhood environments between Mexico and the United States that is relevant for our sample. Thus, since we do not know how different childhood environments for U.S.- and Mexican-born siblings—or even which country has better environments—we have three tests in which better childhood environments would predict a certain result. The first two tests are reassuring, but fairly crude, so we use the last test to refine our estimates in light of evidence of modest impacts of childhood environment.

First, we test for whether foreign-born children exhibit higher rates of being held back in school than U.S.-born children, as one indication of childhood environment and human capital investment even for children who are younger than 13 years and at little risk of not being enrolled in school. If being born in Mexico means that a child was exposed to a worse childhood environment (by virtue of being in Mexico or by virtue of

---

29.  See Borjas (1987) for other evidence on the selection of immigrants from Mexico. Mexican immigrants are more likely to earn the minimum wage and be high school dropouts than the median native-born American (Passel, Capps and Fix, 2004).

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

parental human capital investment), we would expect being undocumented to increase the probability that a child is not enrolled in the correct grade for her age. Alternatively, the childhood inputs and environment could be better for Mexican-born children either because the environment in Mexico is actually better than in the United States or because parents (or their children) invest *more* in the human capital of their undocumented children, perhaps due to concerns of equity or because of the tradition of compulsory pre-school education in Mexico. In this case, being undocumented should decrease the probability that a child is not enrolled in the correct grade for her age. If foreign-born children enter the United States with worse childhood experiences, they should be held back in school more than those U.S.-born children.

We construct a *held back* dummy variable that determines if an individual is in less than the expected grade for her age and reestimate the baseline regressions with this outcome variable. Unfortunately, the Census data does not ask sufficiently detailed questions about age attendance for 2000–2007, so these regressions are estimated on the 2008–2012 samples only.[30] To construct this age-in-grade measure, we group observations into bins based on their age, birth quarter, and state of residence. For each bin, we calculate the modal grade attended. If an individual is attending a grade that is less than this grade, she is classified as *held back*. To ensure that these results do not simply pick up the baseline result that being undocumented increases the probability of not being enrolled in school, we include only individuals beneath the age of 16 years, the minimum age of mandatory school attendance in the United States. We also include all individuals older than 5 years.[31] According to this definition, 23% of children in the sample are

---

30.   Specifically, for 2000–2007, the Census only asks if an individual is in middle school or high school rather than asking the specific grade that a student is enrolled. This information is not sufficiently detailed to know if, for example, most 17-year-olds are in the correct grade for their age.

31.   At the age of 14 years, 98.55% of children in the sample are in school, a similar proportion to earlier ages; attendance starts dropping off at the age of 15 years, to 97.86%, then to 95.75% at the age of 16 years and then to 92.30% at the age of 17 years. An alternative approach to addressing the endogeneity of school attendance is to define an individual who is not in school as being in the correct grade, but include the entire sample. When we estimate these regressions, the results are very similar to those produced here.

Electronic copy available at: https://ssrn.com/abstract=3083026

below their expected grade. The equation we are estimating is:

$$\mathbb{I}_{\text{Held Back},ij} \cdot 100 = \gamma_1 + \gamma_2 \cdot \mathbb{I}_{\text{Born in Mexico},ij}$$

$$+ \sum_{l=5}^{15} \gamma_{3l} \cdot \mathbb{I}_{\text{age}=l} + \sum_m \gamma_{4m} \cdot \mathbb{I}_{\text{family}=m} + \varepsilon_{ij}. \quad (3)$$

Column (1) of Table 8 suggests that, if anything, the U.S.-born children are held back in school more than the Mexican-born children. When the outcome variable is a dummy variable (scaled by 100) for not being in the correct age-in-grade, the point estimate on *born in Mexico* is −1.528, which is significant at the 10% level, meaning that Mexican-born immigrants are actually less likely to be held back. This is evidence against a childhood environment that favors U.S.-born siblings, since—if the childhood environment did favor U.S.-born siblings—we might expect the estimate to be positive, reflecting an inferior childhood environment for Mexican-born siblings that leads them to be held back in school later in life.

Second, we test whether health or English ability impacts resulting from different childhood experiences could drive the results.[32] Within-family differences in health that are correlated with an individual's country of birth might explain the impact of being born in Mexico on school attendance. The fourth column of Table 2 suggests that Mexican-born siblings tend to be in slightly worse health than their U.S.-born siblings, at least as measured by the health outcomes present in the U.S. Census: having a personal care problem or a physical difficulty. However, those coefficients are not statistically significantly different from 0.[33] While these proxies are crude, the

---

32. For reviews, see Glewwe (2005) and Glewwe and Miguel (2007). Studies of calories and protein in four Guatemalan villages (Pollitt et al., 1993), deworming in Kenya (Miguel and Kremer, 2004), and iron supplements in India (see Glewwe, 2005) suggest that health matters for education. Moreover, evidence from outside of developing countries points to similar results. For example, the 1918 influenza pandemic (Almond, 2006), the eradication of hookworms in the American South (Bleakley, 2007), and the fallout from radiation from Chernobyl (Almond, Edlund and Palme, 2009) all point to an effect of health on education.

33. One might be concerned that physical disabilities would generate selection, since families with Mexican-born children with disabilities may be less likely to migrate as a family unit. In particular, the Mexican-born child that has a physical disability may be less likely to immigrate to the United States with the rest of his family, thereby leading to selection in the sample of at least two-child families that produce the variation that the

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004581

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 8.** Effect of Being Born in Mexico on Being Out of School, English and Health Checks

|  | Held back | Not in school | | | |
|---|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) | (5) |
| Born in Mexico | −1.528* | 2.724*** | 2.727*** | 2.546*** | 2.549*** |
|  | (0.838) | (0.628) | (0.628) | (0.614) | (0.614) |
| Personal care problem |  | 1.718 |  | 0.569 |  |
|  |  | (1.844) |  | (2.481) |  |
| Physical difficulty |  |  | 1.837 | 1.528 |  |
|  |  |  | (1.332) | (1.854) |  |
| Speaks English very well |  |  |  | −3.232*** | −3.247*** |
|  |  |  |  | (0.700) | (0.699) |
| Mean dep. var. | 19.140 | 2.871 | 2.871 | 2.871 | 2.871 |
| Observations | 225,917 | 260,635 | 260,635 | 260,635 | 260,635 |

*Notes:* For the first column, the sample is limited to children below the age of 16 years and children who have not dropped out. Data come from the 2008 to 2012 American Community Surveys. The unit of observation is an individual who identifies as being of Mexican heritage aged 6–15 years. The outcome variable of the regression is a dummy variable for not being in the correct grade for one's age*100. To construct this age-in-grade measure, we group observations into bins based on their age, birth quarter, and state of residence. For each bin, we calculate the modal grade attended. If an indvidual is attending a grade less than this grade, she is labeled as *held back*. For the last four columns, data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual who identifies as being of Mexican heritage, aged 13–17 years, who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy for not being in school * 100. "Personal care problem" is a dummy variable for having a personal care problem. "Physical difficulty" is a dummy variable for having a physical difficulty. "Speaks English very well" is a dummy variable for speaking English very well or as a sole language. All regressions include family, age, and gender fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

health variables are highly predictive of cross-sectional school enrollment patterns.[34] However, adding these controls has little impact on the baseline result (columns (2)–(4) in Table 8).[35]

---

regressions exploit. Such selection would mean that we under-estimate the impacts, since we would be including pairs of siblings when a disabled sibling (who is presumably more likely to be out of school) is born in the United States, but not when a disabled sibling is born in Mexico. However, as Table 2 shows, there is little reason to be concerned about this under-estimation, since there is virtually no difference between the probability of having a physical difficulty between U.S.- and Mexican-born siblings.

34.    In the baseline sample, the probability that an individual with neither a personal care problem nor a physical difficulty is not enrolled in school is 2.65; for individuals with both a personal care problem and a physical difficulty, the probability is 7.34, and this difference is highly statistically significant. In addition, previous work has used these variables as proxies for health (Almond, 2006).

35.    Column (2) in Table 8 reestimates the baseline model, controlling for a dummy variable for having a personal care problem; column (3) adds a dummy variable for

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004582

Electronic copy available at: https://ssrn.com/abstract=3083026

In addition to health controls, we control for English ability. Table 2 demonstrates that Mexican-born siblings are 5 percentage points less likely to report speaking English very well than their non-Mexican-born siblings. Part of the difference in English ability may reflect the fact that Mexican-born siblings are more likely to have spent the first years of life in an environment with limited exposure to English.[36] If the inability to speak English well decreases a student's return from schooling, then English ability would drive part of the effect of being born in Mexico on school attendance.[37] However, when we include a proxy for English ability (a dummy variable for an individual's speaking English "very well" or speaking "only English")[38] in column (5) of Table 8, the change in magnitude of the coefficient of interest is small. As expected, the point estimate on *born in Mexico* drops, but only by 7% relative to the baseline specification.[39]

_____

having a physical difficulty; and column (4) includes both health proxies as well as the language control. Across these specifications, the coefficients on *born in Mexico* are almost identical to the baseline specification and are statistically significant at the 1% level. As an additional robustness check, we also control for a dummy variable for having a cognitive difficulty; the results are essentially unchanged.

36.   Indeed, previous research suggests that children who received their first exposure to English at an earlier age attain a higher level of English-language proficiency than those who received it later (Bleakley and Chin, 2004).

37.   On the other hand, differences in English skills may partly reflect the endogenous choice not to learn English because an individual knows that he will not finish high school (Chiswick and Miller, 1995). If education and English skills are complements on the labor market and if Mexican-born siblings understand that they will acquire less schooling than their U.S.-born peers, then differences in English ability may reflect the indirect effect of citizenship on schooling rather than a threat to identification. In this case, accounting for differences in English ability will understate the effects of citizenship on school attendance.

38.   The Census contains no direct tests of English ability. Respondents report only an individual's language ability along a subjective scale. In general, such results from these subjective measurements are difficult to interpret because definitions of speaking English "very well" may differ across respondents. Because the specifications include family fixed effects, however, these estimates reflect differences in how the same respondent reports the English-speaking ability of teenagers in his household. Controlling for speaking English "well," "very well," or speaking "only English" yields essentially identical results.

39.   We also see how the effect of being born in Mexico on English-speaking ability varies for mixed-country-of-birth families as we shrink the age at which children arrived in the United States. (In other words, we disaggregate the effect of being born in Mexico on being in school from Table 2.) The sample sizes here are quite small, yielding noisy estimates. Nevertheless, the difference in English ability shrinks a huge amount as we restrict to those who arrived at younger ages, going from an average effect of $-15.37$ for

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004583

Electronic copy available at: https://ssrn.com/abstract=3083026

While helpful, these tests are ultimately fairly crude, so we turn to another test to try to purge the potential effects of childhood environment.

In particular, we test whether restricting the sample to those who arrived in the United States at young ages—and thus had less exposure to the Mexican childhood environment—affects the results. If childhood conditions truly are worse in Mexico than in the United States, and that is what is driving the results, then the results should be larger for families in which the foreign-born sibling arrived in the United States at a later age and thus had more exposure to the foreign childhood environment. Table 9 shows these results. Moving from left to right, the columns limit the sample to individuals who arrived in the United States at progressively younger ages. (Individuals who were born in the United States are included in all samples.) If early childhood impacts drive the results, then the results should shrink when going from left to right. Table 9 shows that, though the results decline somewhat, the effect is still statistically significant and around 2 when restricting to children who arrived in the United States by the age of 1 year ($P < 0.01$) and at the age of 0 ($P < 0.05$). We also conducted three hypothesis tests to see if the coefficients of the different columns were equal. Let $H_i$ be the coefficient of *born in Mexico* for the sample that restricts to siblings who arrived in the United States by age $i$. We tested the null hypotheses $H_{12} = H_2, H_{12} = H_1,$ and $H_{12} = H_0$. We failed to reject the null for each of the three hypotheses ($P > 0.1$).

Overall then, of the three tests, the first two are fairly crude. The last one suggests that the main driver of the impact of being born in Mexico on school attendance is not childhood environment, but that (despite the absence of a statistically significant difference between the full and more limited samples) childhood environment may have some impact. As a result, in the discussion section, we refine our estimate by using an estimate from this table, zooming in on those siblings with similar ages of arrival, to try to purge the results of the impact of childhood environment. In particular,

---

those who arrived at ages 10–12 years, to an average effect of −1.54 for those who arrived at ages 0–2 years, with a statistically significant effect entirely disappearing for the later age-of-arrival groups, except for the marginally significant effect for those arriving at the age of 0. Thus, the results provide supporting evidence that the refinement of limiting the sample to those with ages of arrival close to those of their U.S.-born siblings helps to purge the results of the impacts of differential childhood environments.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 9**.  Effect of Being Born in Mexico on Not Being in School By Maximum Age of Arrival

| | (1) 12 years | (2) 11 years | (3) 10 years | (4) 9 years | (5) 8 years | (6) 7 years | (7) 6 years |
|---|---|---|---|---|---|---|---|
| Born in Mexico | 2.729*** (0.628) | 2.793*** (0.635) | 2.865*** (0.652) | 2.757*** (0.661) | 2.807*** (0.674) | 2.679*** (0.681) | 2.548*** (0.679) |
| Mean dep. var. | 2.688 | 2.648 | 2.617 | 2.578 | 2.549 | 2.523 | 2.497 |
| Observations | 260,844 | 258,913 | 256,670 | 254,129 | 251,130 | 247,945 | 244,480 |
| | (8) 5 years | (9) 4 years | (10) 3 years | (11) 2 years | (12) 1 year | (13) 0 years | |
| Born in Mexico | 2.531*** (0.694) | 2.432*** (0.712) | 2.328*** (0.737) | 1.647** (0.662) | 1.973*** (0.751) | 2.303** (1.010) | |
| Mean dep. var. | 2.473 | 2.447 | 2.435 | 2.417 | 2.407 | 2.388 | |
| Observations | 240,870 | 237,017 | 233,275 | 229,361 | 225,750 | 222,016 | |

*Notes:* Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The title of each column refers to the maximum age of arrival allowed for that column's sample. For example, column (3) restricts to individuals who were 10 years old or younger when they arrived. The unit of observation is an individual who identifies as being of Mexican heritage, aged 13–17 years, who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. The outcome variable is a dummy variable for not being in school * 100. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All regressions include age, family, and gender fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

we take the coefficient from the sample restricted to age of arrival of zero (Table 9, column (13)), 2.303.

## 6.3. Prenatal Environment

Another concern is that the prenatal environment may differ between the United States and Mexico in ways that impact school attendance. Previous research has provided evidence for the "fetal origins hypothesis": that prenatal conditions can have significant effects on a variety of life outcomes (Almond and Currie, 2011; Currie and Vogl, 2013; Currie and Rossin-Slater, 2015; Almond, Currie and Duque, 2017). As is the case for childhood environment, we do not know how different prenatal environments are for immigrants from Mexico to the U.S. versus the U.S.-born. We do know about average differences, and conditions tend to be worse in Mexico (see Appendix B.1). Again, though, we do not know how conditions vary for those who immigrate, since evidence suggests that they are at

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004585

Electronic copy available at: https://ssrn.com/abstract=3083026

the middle of the Mexican income distribution and arrive at the bottom of the U.S. income distribution, suggesting that average differences may overstate the differences that immigrants face between the United States and Mexico.

The evidence we presented in our subsection on childhood environment is reassuring about the lack of impact of prenatal environment. In particular, the evidence on Mexican-born students not being held back in school more or having worse health outcomes suggests that the prenatal environment is not playing a large role in driving the results. These results apply as much to the prenatal environment as to the childhood environment. However, as noted earlier, these tests are fairly crude, and other tests are unavailable to exclude the possibility of prenatal impacts, since — while immigrants may have had different amounts of childhood experience in Mexico — they all were, by definition, born in Mexico, and thus experienced a Mexican prenatal environment. Since we cannot test the importance of the prenatal environment beyond these proxies, we instead review the literature on the impact of prenatal environment to develop an estimate of how much those impacts might matter for high school attainment.

The standard measure of prenatal environment is birthweight, and we produce a calculation using the literature's estimates of the effect of prenatal environment (as measured by birthweight) on number of years of education given observed differences in birthweight. We explain methods and report results in Appendix A. The results are modest. We find, as a likely upperbound estimate based on studies on the impact of prenatal environments and average differences in prenatal environment between Mexico and the United States, that such differences may lead to a 0.3 percentage point increase in high school dropout rates. Recall that even limiting the sample to those with less than 1 year of age at arrival yielded an average coefficient of 2.30 percentage points, so the estimated 0.3 percentage point impact is roughly an order of magnitude smaller, suggesting that differences in prenatal environment are not primary drivers of the impact of being born in Mexico on school attendance. Again we emphasize that we do not know the true magnitude of the differences in prenatal environment, and we think it likely that this is an upper bound of the impact, since undocumented immigrants are likely at the bottom of the U.S. distribution and higher in the Mexican distribution. The next section discusses the main results in

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

light of these estimates of the potential impacts of prenatal environment differences. In particular, as our best estimate of the impact of being born in Mexico that is plausibly related to documentation status, we use the refined estimate limiting to those who were 0 years old at arrival, and then subtract off the prenatal estimate of 0.3, giving a percentage point impact of being born in Mexico on not being in school plausibly driven by documentation status.

### 6.4. Falsification Test

Having explored three alternative explanations, we now turn to a falsification test for the importance of documentation status. In particular, we use the legal status categories available from the data and from our algorithm for being likely undocumented to see whether the effects of being born in Mexico on high school attendance are most pronounced for those who are undocumented. From the Census data, we know which children are U.S. citizens. For those Mexican-born children who are not citizens, we have assigned them the status of being either likely undocumented or likely documented (that is, not likely undocumented). If the mechanism we are proposing is the correct one—that is, if the difference between Mexican-born and non-Mexican born children in school attendance is driven mostly by legal status—then restricting to a subsample that includes only citizen children or likely documented children should yield estimates that are lower than the estimates including only Mexican-born children who are likely undocumented. Of course, the endogeneity concerns about who is a citizen and who is undocumented remain.[40] To try to limit the extent to which

---

40.   This endogeneity could take at least three forms. First, receipt of social benefits changes who is categorized as "likely documented." Parents can decide whether to get their children on social benefits, which results not in a change in true legal status but rather in a change in our categorization of legal status. If families are likely to receive social benefits like welfare or Supplemental Security Income to help out a misbehaving noncitizen child, then there will be selection into the likely documented category of families with Mexican-born children that are particularly likely to have high dropout rates. As a result, the coefficient on *born Mexico* for the likely documented category would be biased upward. Second, U.S. citizen parents who don't have U.S.-born children can choose whether or not their children become citizens, which can involve a complicated process. Immigration and Nationality Act of 1952 §322(a), 8 U.S.C. §1433 (1994). Third, there can be selection into who gets a Green Card. For many of the years in our sample

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

childhood environment is intermingled with the effects, we conduct the falsification test by replicating Table 9, which zooms in on siblings by their "age of arrival" in the United States.

Appendix Tables A6, A7, and A8 show the results of the falsification test. The results are reassuring. For the likely undocumented subsample (Appendix Table A6), the results are large and statistically significant, mostly at the 1% level. As expected, the coefficients decline as we zoom in on children who arrived at younger ages, but stay significant. The coefficients are 2.448 at an age of arrival of 2 years (Column 11), 2.787 at 1 year (Column 12), and 2.446 at 0 years (Column 13). For the citizen and likely undocumented samples, the results are much smaller and are not significant, as we would expect if what is really driving results are the families with undocumented children. The results do not reach zero. But in all cases, the coefficients are lower, often substantially lower (being as little as 13% the size of the corresponding coefficient for likely undocumented). And, in any case, the standard errors here are are large—in fact, in all these cases, the standard error is larger than, or about as large as, the coefficient. These results are consistent with our claim that what drives the results is documentation status, though obviously they do not prove it because of the large standard errors and because of the potential endogeneity of legal status.

## 7. Discussion

Section 6 provided evidence consistent with our claim that documentation status is the main (though probably not the only) driver of our results. Thus, we refine our estimates here to focus on the portion of the effect plausibly driven by documentation status, trying to account for prenatal and childhood environments, before turning to back-of-the-envelope implications for loss in human capital and fiscal flows. In particular, as noted above, to address to the extent possible concerns about child environment, we take the coefficient from the sample that arrived before the age of 1, giving an

---

(any year before 1996; the earliest birth year in our sample is 1983), undocumented individuals could gain a Green Card and eventually become citizens under conditions that are far more lenient than those today.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

impact of 2.303 percentage points. We then subtract our likely upper-bound estimate of the impact of prenatal impacts, giving us our "refined" estimate of 2.00 percentage points as the impact of being born in Mexico on being in school that plausibly operates through documentation status.

To estimate the impact of being undocumented, we need to scale this refined estimate (of course, assuming that the effect of the refined estimate operates entirely through the effect of documentation status). We can do so using either (1) the effect of being born in Mexico on being a noncitizen or likely undocumented or (2) estimates from the literature on the share of Mexican-born immigrants that are undocumented. We produce both here. We first scale the effect of being born in Mexico on years of schooling by the estimate of the effect of being born in Mexico on being a *noncitizen* (Table 5, Panel A, Column 2), suggesting that being a *noncitizen* reduces the probability of being in school by 2.37 percentage points. We do the same for the corresponding estimate for *likely undocumented* (Table 5, Panel B, Column 2), which suggests that the impact of being undocumented on being in school is 2.70 percentage points. We can check this last figure against estimates from the leading scholars on counting undocumented immigrants, Passel and Cohn (2016); their estimates suggest that the percentage of Mexican immigrants in the United States who are undocumented is 72%, very similar to the estimate for our proxy of undocumented immigrants (74%).[41] Scaling our estimate by this smaller number increases the estimate to 2.77 percentage points.

We take as our preferred scaling estimate our calculation using *likely undocumented*, or 2.70 percentage points.[42] This impact implies roughly a doubling of the average share out of school relative to the population average of those that likely do have documentation (2.5%). Recall from Section 5 that the way to interpret these results is to note that this estimate refers to the impact on being in school *each* year for those between the ages of 13 and 17 years. So, to find the impact on years of schooling, we need to

---

41.   See the discussion above for how we arrive at this number in Section 3. Note that these estimates are for all Mexican-born individuals, not just teenagers, which was unavailable beyond our own estimates.

42.   Unlike the numbers from Passel and Cohn, these numbers include family fixed effects, and so better-reflect the analysis here as a methodological matter. Of course, since the numbers are so similar, which estimate is used is immaterial to the outcome.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table 10**. Net Present Value Wage Impacts of Being Undocumented

| Per person | Single cohort | 75-year cost |
|---|---|---|
| $8,726 | $751 million | $20.5 billion |

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

multiply by 5, giving a decrease of 0.135 years of schooling as a result of being likely undocumented.

   To further interpret the magnitude of these results, we produce back-of-the-envelope calculations of the implications of the results for the wage and fiscal impacts. The calculations are detailed in Appendix B, but we briefly describe the calculations here. For both wage and fiscal estimates, we produce estimates for one undocumented teenager, one cohort of undocumented teenagers, and the 75-year impact of the policy (following National Academies of Sciences, Engineering, and Medicine (2017)). All estimates are in net present value, and we show the wage estimates in Table 10. For the wage impacts, we combine our estimates with those on the causal impact on earnings of attending more years of school. We find that being an undocumented immigrant reduces lifetime earnings by $8,726.[43] For one cohort of undocumented Hispanic immigrants, the total reduction in earnings is $751 million dollars. And over a 75-year time horizon, with many cohorts of undocumented Hispanic immigrants, the total reduction in earnings is $20.5 billion. These estimates are, of course, only a partial impact. For example, they do not account for other ways in which documentation could impact wages (e.g., a greater willingness of employers of skilled employees to hire them), since the estimates only relate to the potential impact of being undocumented on wages that operate through increased years of high school attendance. Nor do we account for potentially changed immigration patterns as a result of a new policy.

   We develop parallel fiscal cost estimates using estimates from the National Academies of Sciences, Engineering, and Medicine (2017) of the fiscal costs and benefits of immigrants with and without high school degrees.

---

   43.   This is consistent with evidence that being undocumented lowers wages (Massey and Gentsch, 2014).

004590

Electronic copy available at: https://ssrn.com/abstract=3083026

These estimates are substantially more speculative, since the National Academies do not purport to produce causal estimates of spending more years in school, but rather only produce population estimates of fiscal impacts of those with various years of education. Our results imply that one undocumented teenager produces $4,231 less net revenue for the government and one cohort produces $364 million less. The 75-year cost is $9.3 billion. The same limitations from above also apply.

These results suggest that adopting a law like the DREAM Act, which would provide a path to citizenship for undocumented children, may have a substantial and positive impact on wages and more speculatively, on the public fisc.

Ours is the first article to study the impact of permanent legalization on high school education outcomes that goes beyond correlations. There are earlier studies with mixed results on the impact of DACA, a temporary measure, on college enrollment and high school completion.[44] Kuka, Shenhav and Shih (2018) find that DACA had a positive impact on high school graduation, as well as a positive effect on college attendance among women. In contrast, another study did not find any effect of the work permits provided by DACA on college enrollment or obtaining a GED (Pope, 2016), and one actually showed a negative impact on college enrollment (Amuedo-Dorantes and Antman, 2017). Our results contrast with these neutral or even negative estimates of the impact of DACA.[45] Though there could be many reasons for this disparity, it could be explained by the fact that

---

44.   Announced by President Obama in June 2012, the Department of Homeland Security began accepting applications for the DACA program in August 2012. DACA allows undocumented immigrants who fit certain criteria to obtain a two-year reprieve from deportation and an Employment Authorization Document. To qualify for DACA, an undocumented immigrant must: (1) have been younger than 31 years old on June 15, 2012; (2) have been younger than 16 by the time they came to the U.S.; (3) have lived continuously in the U.S. since June 15, 2007; (4) have been in the United States on June 15, 2012 and at the time of filing the application; (5) have had no lawful status on June 15, 2012; (6) be currently in school, have graduated from high school, obtained a GED, or be an honorably discharged veteran of the Coast Guard or the U.S. Armed Forces; and (7) not have been convicted of a felony, significant misdemeanor, or more than three misdemeanors, and not otherwise pose a threat to national security or public safety. Napolitano Memo.

45.   Studies have also examined the impact of DACA on other outcomes. Amuedo-Dorantes and Antman (2016) found that DACA was associated with a reduction in the incidence of poverty for the eligible population. Amuedo-Dorantes and Antman

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004591

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

DACA was temporary and did not give a path to citizenship, thus reducing incentives to stay in school, since the grant was uncertain and was of a limited bundle of rights. A temporary reprieve from deportation and the granting of work authorization lower barriers to employment, but their effect on the returns to schooling are less clear, since the payoffs to education take time to realize. Since the DREAM Act would not be temporary and would ultimately grant citizenship, our results arguably are more relevant for predicting the ultimate effects of the DREAM Act, or at least are a useful complementary piece of evidence. The results from the other studies may be more appropriate for evaluating the effects of the proposed BRIDGE Act, which would essentially extend DACA protections by three years.[46]

## 8. Conclusion

This article seeks to estimate the effect of being an undocumented immigrant on the educational attainment of the 1.1 million undocumented immigrants who are children. Because of labor market restrictions that make working in the formal and skilled labor market more difficult and because of their limited ability to finance higher education, undocumented immigrants may have worse job matches (Kossoudji and Cobb-Clark, 2002) and have decreased returns to finishing high school.

To help address the endogeneity of legal status, this article compares the educational outcomes of siblings who differ in their legal status due to the

---

2017) used a differences-in-differences method to find that DACA increased employment among the eligible population. Using a much larger sample, Pope (2016) found that DACA increased employment for people who qualified for the program and did not affect the likelihood of being enrolled in college or obtaining a GED. Kuka, Shenhav and Shih (2018) found that DACA led to a decrease in teenage births. Also, though it does not look at the effects of a specific policy program, this article is related to the large literature that has evaluated the effects of government policies towards undocumented immigrants. One such policy was the 1986 Immigration Reform and Control Act, which gave amnesty to many undocumented immigrants in the United States. Cortes (2013) found that being granted legal status increased the likelihood of college enrollment for a previously undocumented youth. Researchers have also evaluated state policies that allowed undocumented immigrants to pay in-state tuition at state colleges. Kaushal (2008) and Flores (2010) found that such policies increased postsecondary enrollment for undocumented Mexican and Latino youth, respectively.

46.   See BRIDGE Act, H.R. 496, 115th Cong. §244A(d) (2017).

Electronic copy available at: https://ssrn.com/abstract=3083026

country of their birth. We show that Mexican-born siblings, who are more likely to lack legal status, are also more likely to not be enrolled in school. We look to the data to try to account for potential differences in prenatal and childhood environments. The estimates suggest that the results are driven largely not by these factors, but rather by differences in legal status, and that undocumented students are roughly twice as likely to drop out of high school as their U.S.-born siblings.

The results of this article suggest that legislation like the DREAM Act that would give teenage undocumented immigrants a path to citizenship is likely to alter their educational choices. This finding raises three additional questions for future research. First, how would the general equilibrium effects of the DREAM Act differ from the partial equilibrium estimates in this article? In a static model without international trade, changing the legal status of a large number of individuals has the potential to alter the fraction of individuals who drop out of high school and decrease the returns to a high school diploma. In this case, the general equilibrium effects may be smaller than the partial equilibrium ones identified here. On the other hand, changing the legal status of a large number of individuals may encourage schools and families in immigrant neighborhoods to make investments that increase the net returns to finishing high school. Second, how would legalizing a large number of undocumented teenagers influence the incentives for natives and the wage structure of the United States? Finally, allowing teenage undocumented immigrants a path to citizenship may change the number and type of families who move without documentation. Legal status for one's children likely makes undocumented immigration more attractive for all potential immigrants, but especially those that believe that their children are likely to have high returns in the legal and formal labor market.

## Appendix A: Impact of Prenatal Environment on Schooling

Estimating the impact of birth environment on schooling requires first measuring differences in the prenatal environment and then estimating from the existing literature how much of an impact those differences have on school attendance. Subsection 1 covers how we measure differences in the prenatal environment between Mexico and the United States. Subsection 2

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004593

Electronic copy available at: https://ssrn.com/abstract=3083026

uses the existing literature to estimate how much these potential differences in the prenatal environment may affect educational attainment.

## 1. Measuring Prenatal Environment for Mexico and the United States

Turning first to the difference in the prenatal environment between the United States and Mexico, we use birthweight, "a commonly used marker of infant health that can be seen as a summary proxy for prenatal conditions, [since] [l]ow birth weight is strongly associated with infant mortality and subsequent morbidity for infants who survive" (Currie and Rossin-Slater, 2015, p. 212–13). We calculated mean birthweight and low birthweight rate for Mexico and the United States to estimate the percentage of our coefficient that might be explained by differences in prenatal conditions in the two countries. A child weighing less than 2,500 grams at birth is classified as low birthweight.

*Births in Mexico.*   Our Census sample has children born as early as 1983 and as late as 1999. The best available data for Mexican births in this year range came from a 1987 Demographic and Health Survey report conducted by the Health Ministry of Mexico and the Institute for Resource Development/Macro Systems, Inc (1989, p. 101). The survey contained data on 5,311 births from a representative sample of women of child-bearing age in Mexico. The births in the survey sample occurred between the years 1982 and 1987. While we could not find the original dataset with the birthweights of these children, the report did contain a table listing the frequency of births that occurred at different ranges of birthweight. The bins that were not top- or bottom-coded had widths of 500 grams; for these, we multiplied the midpoint of the bin by the fraction of children in the bin. For bottom-coded and top-coded bins, we similarly assumed that in their width was 500 g and also imposed the constraint that there was no more of the population in that bin than in the bin next to it. If there was more population in the top/bottom-coded bin than the one next to it, we used the excess density to create another bin of 500 grams in width and used the corresponding midpoint of that new bin.

Using this method, we calculated a mean birthweight for Mexico of 3,166 grams. Also, Schlaepfer and Infante (1995) used the original dataset from

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004594

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4602 of 4699 PageID #:  7767

the study above to estimate that the low birthweight rate in Mexico across our years of interest was 11.1%.

*Births in the United States.*   To calculate the mean birthweight of U.S. births, we used the birth certificate data from the National Vital Statistics System of the National Center for Health Statistics.[47] These data contain information from almost all births in the United States for each calendar year. For years after 1984, they contain birth certificate information for all births. The documentation file for each year's data contained a table similar to that of the Mexico data; it also reported bins of birthweight with a width of 500 grams. We use the same method explained above to calculate mean birthweight. The mean birthweight calculated for the United States was 3,352 grams. Using these same tables, we calculated that the low birthweight rate in the United States across our years of interest was 6.8%.

## 2. Effect of Prenatal Environment on School Attendance

To estimate how much of our results might be explained by worse prenatal conditions in Mexico, we explored the literature on the association between prenatal conditions and later-life outcomes. To find studies, we first turned to literature reviews that examined how prenatal conditions affected later life outcomes: Almond and Currie (2011), Currie and Vogl (2013), Currie and Rossin-Slater (2015), and Almond, Currie and Duque (2017). Most economic studies have either used exogenous prenatal shocks (such as a pandemic or famine) or birth indicators of fetal health and conditions (almost always birthweight) to identify the effect of prenatal conditions on later life outcomes.

From these literature reviews, we included the studies that examined how prenatal conditions affected schooling outcomes and met two criteria. The first was that the study measured the relationship between birthweight and educational outcomes. We focused on studies that used birthweight rather than prenatal shocks because it is difficult to extrapolate the findings from a particular famine or disease event to calculate how much of our effect may

---

47.   Available at https://www.cdc.gov/nchs/data_access/vitalstatsonline.htm.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

be explained by persistent and more moderate differences in prenatal conditions between Mexico and the United States. Second, we included only studies that examined the relationship between birthweight and years of school completed because this was the educational outcome our estimates were best equipped to address. This ruled out studies that measured birthweight's effect on a dummy for completing high school. The five studies listed in the table below met our criteria. We used these to produce estimates of how much of our estimated effect may be explained by the differences in the prenatal environments between Mexico and the United States. Averaging the studies while weighting by the square root of the sample size produces an estimate of 0.0154 years of schooling; to make that comparable to the coefficients produced in the article, we divide by 5 (since our coefficient refers to the probability of being in school each year), to get an impact of, on average, a 0.3 percentage point reduction in the probability of being in school each year.

**Table**.  Estimates of Effect of Birthweight on Years of Education

| Study | Predicted effect | Sample size | Sample, years of birth |
|---|---|---|---|
| Behrman and Rosenzweig (2004) | 0.107 | 804 | Minnesota, 1936–1955 |
| Currie and Moretti (2007) | 0.0043 | 536,077 | California, 1970–1974 |
| Royer (2009) | 0.0296 | 6,792 | California, 1960–1982 |
| Rosenzweig and Zhang (2013) | 0.0512 | 1,872 | China, 1973–1984 |
| Figlio, Guryan, Karbownik, and Roth (2014) | 0.0289 | 42,212 | Florida, 1992–2002 |
| Mean (Weighted by square root of sample size) | 0.0154 | | |

*Note:* The predicted effect is the number of additional years of schooling expected for children born in the average prenatal environment in the United States versus that in Mexico.

## Appendix B: Wage and Fiscal Impacts

We estimated the wage losses and fiscal impacts from our estimated effect of being undocumented on schooling. For each of these categories of effects, we estimated: (1) the present value effect for an individual undocumented 16-year-old, (2) the present value effect for the entire cohort of 2012 undocumented Hispanic 16-year-olds, and (3) the impact for all cohorts over the course of 75 years. (We also estimated (2) and (3) using the

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4604 of 4699 PageID #:  7769

2012 cohort of undocumented Mexican-heritage 16-year-olds.) We calculated these figures starting from 2014, when the 16-year olds in the sample would have been 18. In the following sections, we detail the steps taken and assumptions made to produce these estimates. All present value calculations used a discount rate of 3% following the National Academy of Sciences, Engineering and Medicine's *The Economic and Fiscal Consequence of Immigration* (2017). All figures were converted to 2016 dollars using the CPI-U. We estimated that the number of *likely undocumented* 16-year-olds of Mexican heritage and of Hispanic ethnicity in the United States in 2012 was 59,284 and 86,084, respectively, by using the individual sampling weights from the 2012 American Community Survey and our measure of *likely undocumented*. (For the purpose of these calculations, we assume that the impact is similar for Mexican-heritage and non-Mexican-heritage Hispanics, which is borne out by our robustness check using all Hispanics, column (3) of Table 6. We also show numbers for those of Mexican heritage.)

## 1. Wage Losses

To estimate the wage losses from being undocumented, we multiply our estimate of the impact of being undocumented on years of schooling by an estimate of how much a year of schooling increases earnings. To estimate how much a year of schooling increases earnings, we multiply an estimated baseline wage by a return to schooling. For the baseline wage, we use the the Bureau of Labor Statistics' average median weekly earning of full-time, Hispanic, wage and salary workers who were 25 years and older and who were less-than-high-school graduates; this was $472. We use this as our baseline wage for a less-than-high-school graduate in all time periods. The literature has a consensus estimate of a return to schooling of a 10% increase in wages per year of schooling (Card, 1999; Card, 2001). This is consistent with estimates of the return to schooling for Hispanics (Barrow and Rouse, 2005).

The expression $52 * 472 * 0.1$ represents the gains from an additional year of schooling for Hispanics with less than a high school degree. It evaluates to $2,456.98. Our estimated loss in years of schooling for Hispanics from noncitizenship is 0.135 years. As explained in the Section 7,

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

we obtained this figure from the the maximum age of arrival of 0 specifi-
cation (Table 9, column (13)). We then multiplied this number by five, the
number of ages represented by our sample of 13-17-year-olds, to obtain
a years of schooling effect. From this number we subtracted the prenatal
environment effect (0.015) then scaled it by the estimated impact of *likely
undocumented* on *born in Mexico* (Table 5, Panel B, column 3). As a result,
we calculate $2,456.98 * 0.133 \approx 327.64$ as the mean yearly wage loss from
being undocumented per undocumented Hispanic. This is the central figure
used to calculate all three wage loss effects.

To calculate the present value of the lifetime wage loss from noncitizen-
ship for an undocumented 16-year-old Hispanic, we assumed the individual
began working at the age of 18 years, lost $327.64 from lack of legal status
every year, and stopped working at the age of 67 years. The first period of
the calculation is 2014, the year in which the 16-year-olds in 2012 turned
18 years. It is from 2014 that we start discounting. The present value of the
wage loss per noncitizen Hispanic 16-year old in 2016 dollars is $8,726.
Multiplying this figure by the number of Hispanic 16-year-olds in 2012
yields a present value total loss from the lack of legal status for undocu-
mented 16-year-olds Hispanics of about $751 million in 2016 dollars. (For
only individuals of Mexican heritage, this figure was $517 million.)

We calculated the present value 75-year cost by assuming that each sub-
sequent cohort of people turning 18 would have the same number of people
as the 2012 cohort of undocumented 16-year-old Hispanics and that each
cohort would only work until the age of 67 years. The first period of the
calculation is the year 2014, and the 75th and final period in the calculation
is the year 2088. We assumed that each individual loses $327.64 each year
from noncitizenship, discounting appropriately by the year. We multiplied
this discounted wage loss by the number of cohorts of working age (1 in
2011, 2 in 2012, and so on until the year 2058, after which every year has 49
cohorts of working age) and by the number of undocumented 16-year old
Hispanics in 2012. That gave the present value loss from lack of legal status
for undocumented Hispanic youth. Summing up the amount for every year
yields a present value 75-year cost of $20.5 billion. (The corresponding
estimate for only individuals of Mexican heritage was $14.2 billion.)

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4606 of 4699 PageID #:   7771

## 2. Fiscal Impacts

For fiscal impacts, we compare estimates of the fiscal impacts of immigrants with and without high school degrees. On the one hand, we are de facto treating the observed difference in wages between non-high-school graduates and high school graduates as causal, which might not be accurate and might overstate the effects. On the other hand, comparing only those without a high school degree with those with only a high school degree understates the impact of graduating from high school, since some of those graduates will go on to have some college or a college degree, and therefore earn substantially more. As a result, we regard the results on fiscal impacts as speculative given the absence of a causal fiscal impact. We conduct these calculations both taking into account decendants and not doing so. The main text describes only the estimates not taking into account descendants, since adding descendants makes the results additionally speculative.

We retrieved the figure for the difference in fiscal flows between an immigrant with less than a high school degree and an immigrant with a high school degree from *The Economic and Fiscal Consequences of Immigration* by the National Academies of Sciences, Engineering, and Medicine (2017, Tables 8–12). The authors calculated the average 75-year net present value flows for consolidated federal, state, and local governments for immigrants by age of arrival and education level. We used the panel that calculated the averages using the assumptions in the CBO long-term budget outlook, that did not include public goods, that used all available immigrants in their sample, and that was calculated for immigrants who arrived between the ages of 0 and 24.

In the averages that did not take the fiscal impact of descendants into account, the 75-year net present value fiscal benefit for an immigrant that arrived between the ages of 0 and 24 with less than a high school education was $33,450. For an immigrant with only a high school education, this number was $164,111, leading to a difference of $130,661. When taking into account the fiscal impacts of descendants, an immigrant who arrived between the ages of 0–24 and had less than a high school degree had, on average, a 75-year net present value fiscal flow of $51,220, while the corresponding immigrant with only a high school education had a 75-year net present value fiscal flow of $283,275. The difference in the net flows, taking descendants into account, is $232,055.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

To get the present value effect per undocumented 16-year old Hispanic, we multiplied the difference in net flows between terminal high school graduates and less-than-high-school graduates by an estimated probability of not completing high school. Up to now, we have produced estimates on being in high school, but the available figures on fiscal impact are on *graduating* from high school. To estimate the impact on graduating from high school, we take the oldest teenagers in our sample (those 16 and 17 years old) and treat the effect of their being in school as equivalent to the effect on graduating from high school. Especially given the inclusion of 16-year-olds, this is likely a lower-bound impact, since more teenagers are likely to drop out after they turn 16. This view is consistent with the larger impact of being born in Mexico for older teenagers than for younger teenagers, from Table 6, column (2). To estimate this probability of not completing high school, we use a specification that restricted the sample to siblings who had arrived before the age of 1 year, similar to that in Table 9, and that includes a term that interacted being born in Mexico with being 16 and older. We sum the main effect and the interaction effect to obtain the estimate for the effect of being born in Mexico on the probability of finishing high school. This estimated probability is 0.0324, which implies a per-undocumented-Hispanic-youth, 75-year, net present value fiscal loss from lack of documentation in 2016 dollars of $7,514 when taking descendants into account and $4,231 without taking them into account.

Multiplying these numbers by the number of undocumented Hispanic 16-year-olds in 2012 gave the estimated net present value fiscal loss from lack of documentation for the cohort $646 million and $364 million 2016 dollars with descendants and without descendants, respectively. (For only Mexican heritage individuals, the corresponding estimates were $445 million and $251 million.) Finally, we calculated the 75-year total cost by once again assuming that each subsequent cohort of Hispanic undocumented youth turning 16 would have the same number of people as the 2012 cohort 16-year-olds, and that they would have the same 75-year net present value impact of the 2012 cohort. We also assumed that the fiscal impacts of the immigrants were constant each year; that is, we ignored life cycle differences in fiscal flows and assumed that the $232,055 figure for descendants, for example, represented the sum of a constant flow appropriately discounted each year of the 75-year period. Formally, we assumed that in the following

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004600

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4608 of 4699 PageID #:  7773

75-year summation of fiscal flow impact, where $x_t$ represents the net fiscal flow of the immigrant at year $t$,

$$\sum_{t=0}^{74} \frac{x_t}{(1.03)^t}$$

$x_t = x$ for all $t$. We solved for $x$ by using the formula for the partial sum of a geometric series. Using the $232,055 figure for descendants,

$$x = \frac{1 - \frac{1}{1.03}}{1 - \left(\frac{1}{1.03}\right)^{75}} * 232,055 = 7,586.$$

The corresponding figure using the estimate that does not include descendants is $4,271. So we assumed that the effects from lack of documentation per year and per 16-year-old including and excluding descendants were $7,586 and $4,271, respectively. We calculated the total present value loss each year for the 75-year period by multiplying the per year loss, discounted appropriately, by the number of undocumented 16-year old Hispanics in 2012, by our estimated undocumented effect of 0.0323, and by the number of relevant cohorts. The number of relevant cohorts increases by one each year. In 2014, there is one; in 2015, there are two, and so on until there are 75 cohorts in 2088. By adding up the present value of the loss for each year, we estimate the total net present value 75-year cost of being undocumented at $16.4 billion with descendants and $9.3 billion without descendants in 2016 dollars. For only Mexican heritage individuals, the estimated costs are $11.3 billion and $6.4 billion, respectively.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004601

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4609 of 4699 PageID #:  7774

**Table A1**. Number of Observations by Year, Country of Birth, and Citizenship Status.

| | Born in U.S. | | Born in Mexico | | |
|---|---|---|---|---|---|
| Year | Citizen | Noncitizen | Citizen | Noncitizen | Total |
| 2000 | 56,869 | 0 | 2,221 | 13,786 | 72,876 |
| 2001 | 4,007 | 0 | 130 | 815 | 4,952 |
| 2002 | 3,769 | 0 | 133 | 744 | 4,646 |
| 2003 | 4,801 | 0 | 147 | 907 | 5,855 |
| 2004 | 4,761 | 0 | 128 | 840 | 5,729 |
| 2005 | 14,803 | 0 | 409 | 2,585 | 17,797 |
| 2006 | 15,769 | 0 | 344 | 2,685 | 18,798 |
| 2007 | 16,355 | 0 | 424 | 2,771 | 19,550 |
| 2008 | 18,279 | 0 | 376 | 2,612 | 21,267 |
| 2009 | 18,690 | 0 | 432 | 2,622 | 21,744 |
| 2010 | 19,322 | 0 | 371 | 2,581 | 22,274 |
| 2011 | 19,598 | 0 | 386 | 2,660 | 22,644 |
| 2012 | 19,832 | 0 | 400 | 2,483 | 22,715 |
| Total | 216,855 | 0 | 5,898 | 38,091 | 260,844 |

*Notes:* Sample sizes by year, country of birth, and legal status are reported. Data comes from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual age 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico.

**Table A2**. Number of Observations by Year, Country of Birth, and Likely Documentation Status

| | Born in U.S. | | Born in Mexico | | Total |
|---|---|---|---|---|---|
| Year | Likely documented | Likely undocumented | Likely documented | Likely undocumented | |
| 2000 | 56,869 | 0 | 4,594 | 11,410 | 72,876 |
| 2001 | 4,007 | 0 | 198 | 747 | 4,952 |
| 2002 | 3,769 | 0 | 202 | 675 | 4,646 |
| 2003 | 4,801 | 0 | 226 | 828 | 5,855 |
| 2004 | 4,761 | 0 | 202 | 766 | 5,729 |
| 2005 | 14,803 | 0 | 625 | 2,369 | 17,797 |
| 2006 | 15,769 | 0 | 513 | 2,516 | 18,798 |
| 2007 | 16,355 | 0 | 609 | 2,586 | 19,550 |
| 2008 | 18,279 | 0 | 563 | 2,425 | 21,267 |
| 2009 | 18,690 | 0 | 625 | 2,429 | 21,744 |
| 2010 | 19,322 | 0 | 609 | 2,343 | 22,274 |
| 2011 | 19,598 | 0 | 565 | 2,481 | 22,644 |
| 2012 | 19,832 | 0 | 626 | 2,257 | 22,715 |
| Total | 216,855 | 0 | 10,157 | 33,832 | 260,844 |

*Note:* Sample sizes by year, country of birth, and legal status are reported. Data comes from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual age 13–17 years who identifies as being  of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004602

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table A3**. Summary Statistics by Legal Status, Cross Section

|  | Full pop. | U.S. citizen | Noncitizen | Likely undocumented | Likely documented |
|---|---|---|---|---|---|
| Age | 14.914 | 14.907 | 14.954 | 14.949 | 14.908 |
|  | (1.407) | (1.409) | (1.394) | (1.393) | (1.409) |
| Female | 0.487 | 0.489 | 0.476 | 0.476 | 0.489 |
|  | (0.500) | (0.500) | (0.499) | (0.499) | (0.500) |
| Noncitizen | 0.149 | 0.000 | 1.000 | 1.000 | 0.014 |
|  | (0.356) | (0.000) | (0.000) | (0.000) | (0.117) |
| Likely undocumented | 0.137 | 0.000 | 0.920 | 1.000 | 0.000 |
|  | (0.344) | (0.000) | (0.272) | (0.000) | (0.000) |
| Speaks English very well | 0.882 | 0.916 | 0.690 | 0.690 | 0.913 |
|  | (0.322) | (0.277) | (0.463) | (0.463) | (0.282) |
| Not in school | 0.029 | 0.024 | 0.053 | 0.052 | 0.025 |
|  | (0.167) | (0.155) | (0.223) | (0.223) | (0.156) |
| Num. obs. per family in sample | 1.511 | 1.510 | 1.513 | 1.504 | 1.512 |
|  | (0.668) | (0.667) | (0.676) | (0.665) | (0.669) |
| Personal care problem | 0.007 | 0.007 | 0.005 | 0.005 | 0.007 |
|  | (0.081) | (0.083) | (0.074) | (0.072) | (0.083) |
| Physical difficulty | 0.010 | 0.010 | 0.009 | 0.009 | 0.010 |
|  | (0.100) | (0.101) | (0.094) | (0.093) | (0.101) |
| Age at arrival | 0.863 | 0.096 | 5.227 | 5.249 | 0.164 |
|  | (2.429) | (0.823) | (3.640) | (3.644) | (1.083) |
| Observations | 260,844 | 222,753 | 38,091 | 33,832 | 227,012 |

*Notes:*  Mean and standard deviation reported. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the Unites States or Mexico. All individuals who are not citizens of the Unites States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the Unites States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004603

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table A4**. Summary Statistics by Place of Birth of Siblings, Cross Section

| | Full pop. | All sibs. born U.S. | Some sibs. born U.S., some Mexico | All sibs. born Mexico |
|---|---|---|---|---|
| Age | 14.914 | 14.912 | 14.955 | 14.914 |
| | (1.407) | (1.408) | (1.470) | (1.386) |
| Female | 0.487 | 0.488 | 0.509 | 0.475 |
| | (0.500) | (0.500) | (0.500) | (0.499) |
| Noncitizen | 0.149 | 0.000 | 0.415 | 0.883 |
| | (0.356) | (0.000) | (0.493) | (0.322) |
| Likely undocumented | 0.137 | 0.000 | 0.364 | 0.815 |
| | (0.344) | (0.000) | (0.481) | (0.388) |
| Speaks English very well | 0.882 | 0.920 | 0.809 | 0.697 |
| | (0.322) | (0.271) | (0.393) | (0.460) |
| Not in school | 0.029 | 0.024 | 0.033 | 0.051 |
| | (0.167) | (0.154) | (0.178) | (0.220) |
| Num. obs. per family in sample | 1.511 | 1.495 | 2.314 | 1.428 |
| | (0.668) | (0.660) | (0.541) | (0.630) |
| Personal care problem | 0.007 | 0.007 | 0.007 | 0.006 |
| | (0.081) | (0.083) | (0.081) | (0.074) |
| Physical difficulty | 0.010 | 0.010 | 0.010 | 0.009 |
| | (0.100) | (0.101) | (0.100) | (0.093) |
| Age at arrival | 0.863 | 0.000 | 1.272 | 5.324 |
| | (2.429) | (0.000) | (2.634) | (3.593) |
| Observations | 260,844 | 212,891 | 7,851 | 40,102 |

*Notes:* Mean and standard deviation reported. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the Unites States or Mexico. An individual is classified as "All sibs. born U.S." if all individuals in the family that are included in the sample are born in the Unites States. "Some sibs. born U.S., some Mexico" means that at least one member of his family in the sample is born in the U.S. and at least one member of the family in the sample is born in Mexico. "All sibs. born Mexico" means that all members of the family in the sample are born in Mexico. All individuals who are not citizens of the Unites States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the Unites States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table A5**. Summary Statistics and Regression Coefficients for Mexican-Born Individuals by Birthplace of Siblings

| | Summary statistics | | | Regression estimates with family FE |
|---|---|---|---|---|
| | Full pop. | Some sibs. born U.S. | No sibs. born U.S. | Some sibs. born U.S. |
| Age | 14.978 | 15.619 | 14.914 | - |
| | (1.395) | (1.330) | - | |
| Female | 0.478 | 0.510 | 0.475 | 0.035*** |
| | (0.500) | (0.500) | (0.499) | (0.013) |
| Noncitizen | 0.879 | 0.842 | 0.883 | −0.033*** |
| | (0.326) | (0.364) | (0.322) | (0.010) |
| Likely undocumented | 0.808 | 0.739 | 0.815 | −0.069*** |
| | (0.394) | (0.439) | (0.388) | (0.013) |
| Speaks English very well | 0.705 | 0.784 | 0.697 | 0.073*** |
| | (0.456) | (0.412) | (0.460) | (0.011) |
| Not in school | 0.051 | 0.053 | 0.051 | −0.015** |
| | (0.220) | (0.223) | (0.220) | (0.006) |
| Num. obs. per family in sample | 1.507 | 2.300 | 1.428 | 0.862*** |
| | (0.670) | (0.531) | (0.630) | (0.018) |
| Personal care problem | 0.006 | 0.008 | 0.006 | 0.002 |
| | (0.075) | (0.087) | (0.074) | (0.002) |
| Physical difficulty | 0.009 | 0.011 | 0.009 | 0.002 |
| | (0.094) | (0.103) | (0.093) | (0.003) |
| Age at arrival | 5.076 | 2.582 | 5.324 | −2.926*** |
| | (3.651) | (3.272) | (3.593) | (0.098) |
| Observations | 43,989 | 3,887 | 40,102 | 43,989 |

*Notes:* Mean and standard deviation reported for the first three columns. Regression coefficient and standard error reported for fourth column. Regression outcome variable is given by the row heading. Regressions have a family-level dummy variable for including a sibling in the sample born in the United States, as well as age fixed effects. Because these regressions control for age effects, the mean difference in age is not identified. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The unit of observation is an individual aged 13–17 years who identifies as being of Mexican heritage and who belongs to a family in which the siblings in the sample were born in either the United States or Mexico. All individuals who are not citizens of the United States are classified as "noncitizen." An individual is classified as "likely undocumented" if she is both not a citizen and if no one in her household is receiving money from the Social Security Administration, on public welfare, or a veteran of the U.S. military. Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004605

Electronic copy available at: https://ssrn.com/abstract=3083026

**Table A6.** Effect of Being Born in Mexico on Being Out of School by Age of Arrival—Families with Likely Undocumented Mexican-Born Child

| | (1)<br>12 years | (2)<br>11 years | (3)<br>10 years | (4)<br>9 years | (5)<br>8 years | (6)<br>7 years | (7)<br>6 years |
|---|---|---|---|---|---|---|---|
| Born in Mexico | 3.732***<br>(0.928) | 3.753***<br>(0.943) | 3.823***<br>(0.975) | 3.742***<br>(0.997) | 3.962***<br>(1.030) | 3.953***<br>(1.044) | 3.870***<br>(1.078) |
| Mean dep. var. | 3.416 | 3.419 | 3.390 | 3.303 | 3.275 | 3.198 | 3.112 |
| Observations | 5,445 | 5,353 | 5,222 | 5,086 | 4,916 | 4,753 | 4,563 |

| | (8)<br>5 years | (9)<br>4 years | (10)<br>3 years | (11)<br>2 years | (12)<br>1 year | (13)<br>0 years | |
|---|---|---|---|---|---|---|---|
| Born in Mexico | 3.994***<br>(1.135) | 4.089***<br>(1.226) | 3.973***<br>(1.299) | 2.448**<br>(0.984) | 2.787**<br>(1.084) | 2.446**<br>(1.030) | |
| Mean dep. var. | 2.945 | 2.938 | 2.874 | 2.691 | 2.791 | 2.686 | |
| Observations | 4,346 | 4,119 | 3,862 | 3,530 | 2,974 | 1,824 | |

*Notes:* The sample is likely undocumented Mexican-born children and their U.S.-born siblings from families in which some of the children were born in the United States and some in Mexico, aged 13–17 years. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The title of each column refers to the maximum age of arrival allowed for that column's sample. For example, column (3) restricts to individuals who were 10 years old or younger when they arrived. The outcome variable is a dummy variable for not being in school * 100. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All regressions include age and family fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004606

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4614 of 4699 PageID #:  7779

**Table A7**.  Effect of Being Born in Mexico on Being Out of School by Age of Arrival—Families with U.S.-Citizen Mexican-Born Child

| | (1) 12 years | (2) 11 years | (3) 10 years | (4) 9 years | (5) 8 years | (6) 7 years | (7) 6 years |
|---|---|---|---|---|---|---|---|
| Born in Mexico | 2.170* (1.285) | 2.216* (1.293) | 2.240* (1.329) | 1.940 (1.347) | 1.964 (1.402) | 1.472 (1.406) | 1.487 (1.439) |
| Mean dep. var. | 2.617 | 2.602 | 2.639 | 2.555 | 2.496 | 2.426 | 2.271 |
| Observations | 1,452 | 1,422 | 1,402 | 1,370 | 1,322 | 1,278 | 1,233 |

| | (8) 5 years | (9) 4 years | (10) 3 years | (11) 2 years | (12) 1 year | (13) 0 years |
|---|---|---|---|---|---|---|
| Born in Mexico | 1.030 (1.454) | 1.267 (1.494) | 0.864 (1.517) | 0.920 (1.570) | 1.061 (1.771) | 1.237 (2.436) |
| Mean dep. var. | 2.189 | 2.238 | 2.222 | 2.220 | 2.454 | 2.541 |
| Observations | 1,188 | 1,117 | 1,035 | 946 | 815 | 551 |

*Notes:*  The sample is citizen Mexican-born children and their U.S.-born siblings from families in which some of the children were born in the United States and some in Mexico, aged 13–17 years. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The title of each column refers to the maximum age of arrival allowed for that column's sample. For example, column (3) restricts to individuals who were 10 years old or younger when they arrived. The outcome variable is a dummy variable for not being in school * 100. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All regressions include age and family fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004607

Electronic copy available at: https://ssrn.com/abstract=3083026

376   American Law and Economics Review V20 N2 2018 (318–381)

**Table A8.** Effect of Being Born in Mexico on Being Out of School by Age of Arrival—Families with Likely Documented Mexican-Born Child

|  | (1) 12 years | (2) 11 years | (3) 10 years | (4) 9 years | (5) 8 years | (6) 7 years | (7) 6 years |
|---|---|---|---|---|---|---|---|
| Born in Mexico | 1.866** (0.946) | 1.914** (0.954) | 1.946* (1.001) | 1.553 (0.993) | 1.544 (1.026) | 0.851 (1.022) | 0.840 (1.057) |
| Mean dep. var. | 3.574 | 3.616 | 3.587 | 3.428 | 3.430 | 3.235 | 3.206 |
| Observations | 2,378 | 2,323 | 2,286 | 2,217 | 2,128 | 2,040 | 1,965 |

|  | (8) 5 years | (9) 4 years | (10) 3 years | (11) 2 years | (12) 1 year | (13) 0 years |
|---|---|---|---|---|---|---|
| Born in Mexico | 0.772 (1.006) | 0.812 (1.052) | 0.566 (1.078) | 0.243 (1.154) | 0.616 (1.246) | 1.202 (1.842) |
| Mean dep. var. | 3.087 | 2.953 | 2.805 | 2.772 | 2.629 | 2.847 |
| Observations | 1,879 | 1,761 | 1,640 | 1,479 | 1,255 | 808 |

*Notes:* The sample is likely documented Mexican-born children and their U.S.-born siblings from families in which some of the children were born in the United States and some in Mexico, aged 13–17 years. Data come from the 2000 decennial Census and the 2001–12 American Community Surveys. The title of each column refers to the maximum age of arrival allowed for that column's sample. For example, column 3 restricts to individuals who were 10 years old or younger when they arrived. The outcome variable is a dummy variable for not being in school * 100. Age at arrival is calculated as the difference between a respondent's age and the number of years that she has been in the United States. This variable is set to 0 for all U.S.-born individuals, including those born in Guam, Puerto Rico, and the Virgin Islands. All regressions include age and family fixed effects.
Significance levels: *$P < 0.1$, **$P < 0.05$, ***$P < 0.01$. Standard errors are clustered at the family level.



Chart shows fraction of Hispanics of Mexican heritage that are sons/daughters of the household head, by age.
Line at age 17.

**Figure A1.**

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004608

Electronic copy available at: https://ssrn.com/abstract=3083026

## References

Almond, D. 2006. "Is the 1918 Influenza Pandemic Over? Long-Term Effects of In Utero Influenza Exposure in the Post-1940 U.S. Population," 114(4) *Journal of Political Economy* 672–712.

Almond, D. and J. Currie. 2011. "Killing Me Softly: The Fetal Origins Hypothesis," 25(3) *Journal of Economic Perspectives* 153–72.

Almond, D., J. Currie, and V. Duque. 2017. "Childhood Circumstances and Adult Outcomes: Act II," NBER Working Paper, 23017.

Almond, D., J. Currie, and M. Herrmann. 2012. "From Infant to Mother: Early Disease Environment and Future Maternal Health," 19(4) *Labour Economics* 475–83.

Almond, D., L. Edlund, and M. Palme. 2009. "Chernobyl's Subclinical Legacy: Prenatal Exposure to Radioactive Fallout and School Outcomes in Sweden," 124(4) *The Quarterly Journal of Economics* 1729–72.

American Immigration Council. 2016. "The Three- and Ten-Year Bars: how New Rules Expand Eligibility for Waivers." Available at: https://www.americanimmigrationcouncil.org/research/three-and-ten-year-bars.

Amuedo-Dorantes, C. and F. Antman. 2016. "Can Authorization Reduce Poverty Among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program," 147 *Economics Letters* 1–4.

Amuedo-Dorantes, C. and F. Antman. 2017. "Schooling and Labor Market Effects of Temporary Authorization: Evidence from DACA," 30(1) *Journal of Population Economics* 339–73.

Autor, D., L. Katz, and M. Kearney. 2008. "Trends in U.S. Wage Inequality: Re-Assessing the Revisionists," 90(2) *Review of Economics and Statistics* 300–23.

Barrow, L. and C. Rouse. 2005. "Do Returns to Schooling Differ by Race and Ethnicity?" 95(2) *American Economic Review: Papers and Proceedings* 83–7.

Baker, S. 2015. "Effects of Immigrant Legalization on Crime," 105(5) *American Economic Review: Papers and Proceedings* 210–3.

Bean, F., S. Brown, J. Bachmeier, and R. Conley-Estrada. 2015. "The Implications of Unauthorized Migration for the Schooling of Immigrants and Their Offspring," in F. Bean, S. Brown, & J. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration,* New York: Russel Sage.

Bean, F., M. Leach, S. Brown, J. Bachmeier, and J. Hipp. 2011. "The Educational Legacy of Unauthorized Migration: Comparisons Across U.S.-Immigrant Groups in How Parents' Status Affects Their Offspring," 45(2) *International Migration Review* 348–85.

Behrman, J. and R. Rosenzweig. 2004. "Returns to Birth Weight," 86(2) *Review of Economics and Statistics* 586–601.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Björklund, A. and K. Salvanes. 2011. "Education and Family Background: Mechanisms and Policies," in E. Hanushek, S. Machin, and L. Woessmann, eds., *Handbook of the Economics of Education*. Amsterdam: Elsevier Science.

Black, S., P. Devereux, and K. Salvanes. 2005. "The More the Merrier? The Effect of Family Size and Birth Order on Children's Education," 120(2) *Quarterly Journal of Economics* 669–700.

Bleakley, H. 2007. "Disease and Development: Evidence from Hookworm Eradication in the American South," 122(1) *Quarterly Journal of Economics* 73–117.

Bleakley, H. and A. Chin. 2004. "Language Skills and Earnings: Evidence from Childhood Immigrants," 86(2) *Review of Economics and Statistics* 481–96.

Borjas, G. 1987. "Self-Selection and the Earnings of Immigrants," 77(4) *American Economic Review* 531–53.

Bouvier, L. and R. Gardner. 1986. "Immigration to the U.S.: The Unfinished Story." Population Reference Bureau Working Paper.

Bruno, A. 2002. "Immigration: Adjustment to Permanent Resident Status under Section 245(i)." CRS Report for Congress.

Card, D. 1999. "The Causal Effect of Education Earnings," in O. Ashenfelter and D. Card, eds., *Handbook of Labor Economics,* Vol. 3, Amsterdam: North Holland Press.

Card, D. 2001. "Estimating the Return to Schooling: Progress on Some Persistent Econometric Problems," 69(5) *Econometrica* 1127–60.

Chetty, R., J. Friedman, N. Hilger, E. Saez, D. Schanzenbach, and D. Yagan. 2011. "How Does Your Kindergarten Classroom Affect Your Earnings? Evidence from Project STAR," 126(4) *Quarterly Journal of Economics* 1593–660

Chin, A. and C. Juhn. 2007. "Does Reducing College Costs Improve Educational Outcomes for Undocumented Immigrants?" James A. Baker Institute for Public Policy Working Paper.

Chiquiar, D. and G. Hanson. 2005. "International Migration, Self-Selection, and the Distribution of Wages: Evidence from Mexico and the United States," 113(2) *Journal of Political Economy* 239–81.

Chiswick, B. 1984. "Illegal Aliens in the United States Labor Market: Analysis of Occupational Attainment and Earnings," 18(3) *International Migration Review* 714–32.

Chiswick, B. 1988. "Illegal Immigration and Immigration Control," 2(3) *Journal of Economic Perspectives* 101–15.

Chiswick, B. and P. Miller. 1995. "The Endogeneity between Language and Earnings: International Analyses," 13(2) *Journal of Labor Economics* 246–88.

Cobb-Clark, D., C. Shiells, and L. Lowell. 1995. "Immigration Reform: The Effects of Employer Sanctions and Legalization on Wages," 13(3) *Journal of Labor Economics* 472–98.

004610

Electronic copy available at: https://ssrn.com/abstract=3083026

Case 6:24-cv-00306-JCB   Document 124   Filed 11/07/24   Page 4618 of 4699 PageID #:  7783

Cornelius, W. 2005. "Controlling "Unwanted" Immigration: Lessons from the United States, 1993–2004," 31(4) *Journal of Ethnic and Migration Studies* 775–94.

Cortes, P. 2008. "The Effect of Low-Skilled Immigration on U.S. Prices: Evidence from CPI Data," 116(3) *Journal of Political Economy* 381–422.

Cortes, K. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access," 103(3) *American Economic Review: Papers & Proceedings* 428–32.

Currie, J. 2009. "Healthy, Wealthy, and Wise: Socioeconomic Status, Poor Health in Childhood, and Human Capital Development," 47(1) *Journal of Economic Literature* 87–122.

Currie, J. and E. Moretti. 2007. "Biology as Destiny? Short and Long- Run Determinants of Intergenerational Transmission of Birth Weight," 25(2) *Journal of Labor Economics* 231–63.

Currie, J. and K. Rossin-Slater. 2015. "Early-Life Origins of Life-Cycle Well-Being: Research and Policy Implications," 34(1) *Journal of Policy Analysis and Management* 208–42.

Currie, J. and T. Vogl. 2013. "Early-Life Health and Adult Circumstance in Developing Countries," 5 *Annual Review of Economics* 1–36.

Dammert, A. 2010. "Siblings, Child Labor, and Schooling in Nicaragua and Guatemala," 23(1) *Journal of Population Economics* 199–224.

De Haan, M., E. Plug, and J. Rosero. 2014. "Birth Order and Human Capital Development: Evidence from Ecuador," 49(2) *Journal of Human Resources* 359–92.

Diaz-Strong, D. and M. Ybarra. 2016. "Disparities in High School Completion Among Latinos: The Role of the Age-at-Arrival and Immigration Status," 71 *Children and Youth Services Review* 282–9.

Donato, K., J. Durand, and D. Massey. 1992. "Stemming The Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act," 29(2) *Demography* 139–57.

Emerson, P. and A. Portela Souza. 2008. "Birth Order, Child Labor and School Attendance in Brazil," 36(9) *World Development* 1647–64.

Figlio, D., Guryan, J., Karbownik, K., and Roth, J. 2014. "The Effects of Poor Neonatal Health on Children's Cognitive Development," 104(12) *American Economic Review*, 3921–55.

Flores, S. 2010. "State Dream Acts: The Effect of In-State Resident Tuition Policies and Undocumented Latino Students," 33(2) *Review of Higher Education* 239–83.

Fry, R. 2010. "Hispanics, High School Dropouts, and the GED." Pew Hispanic Center Report.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

004611

Electronic copy available at: https://ssrn.com/abstract=3083026

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Goldin, C. and L. Katz. 2007. "Long-Run Changes in the Wage Structure: Narrowing, Widening, Polarizing," 2 *Brookings Papers on Economic Activity* 135–67.

Gonzales, R. 2011. "Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood," 76(4) *Americal Sociological Review* 602–19.

Gould, E., V. Lavy, and D. Paserman. 2011. "Sixty Years after the Magic Carpet Ride: The Long-Run Effect of the Early Childhood Environment on Social and Economic Outcomes," 78(3) *Review of Economic Studies* 938–73.

Glewwe, P. 2005. "The Impact of Child Health and Nutrition on Education in Developing Countries: Theory, Econometric Issues, and Recent Empirical Evidence," 26(2) *Food and Nutrition Bulletin* S235–50.

Glewwe, P. and E. Miguel. 2007. "The Impact of Child Health and Nutrition on Education in Less Developed Countries," in T. P. Schultz and J. Strauss, eds., *Handbook of Development Economics*, Vol. 4. Amsterdam: North Holland Press.

Greenman, E. and M. Hall. 2013. "Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth," 91(4) *Social Forces* 1475–98.

Hacker, K., M. Anies, B. Folb, and L. Zallman. 2015. "Barriers to Health Care for Undocumented Immigrants: A Literature Review," 8 *Risk Management and Healthcare Policy* 175–83.

Hanson, G. 2006. "Illegal Migration from Mexico to the United States," 44(4) *Journal of Economic Literature* 869–924.

Hayes, M. 2003. "Illegal Immigrants Eligible for Social Security Benefits." *Fox News*. http://www.foxnews.com/story/2003/02/20/illegal-aliens-eligible-for-social-security-benefits.html.

Health Ministry of Mexico and the Institute for Resource Development/Macro Systems, Inc. 1989. *Encuesta Nacional sobre Fecundidad y Salud 1987*. Mexico, D.F.

Hoynes, H., D. Schanzenbach, and D. Almond. 2016. "Long-Run Impacts of Childhood Access to the Safety Net," 106(4) *American Economic Review* 903–34.

Kaushal, N. 2008. "In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults," 27(4) *Journal of Policy Analysis and Management* 771–92.

Kuka, E., N. Shenhav, and K. Shih. 2018. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA," NBER Working Paper, 24315.

Kossoudji, S. and D. Cobb-Clark. 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population," 20(3) *Journal of Labor Economics* 598–628.

Massey, D. and K. Gentsch. 2014. "Undocumented Migration and the Wages of Mexican Immigrants," 48(2) *International Migration Review* 482–99.

004612

Electronic copy available at: https://ssrn.com/abstract=3083026

Miguel, E. and M. Kremer. 2004. "Worms: Identifying Impacts on Education and Health in the Presence of Treatment Externalities," 72(1) *Econometrica* 159–217.

National Academies of Sciences, Engineering, and Medicine. 2017. *The Economic and Fiscal Consequences of Immigration*. Washington, DC: The National Academies Press.

Passel, J., R. Capps, and M. Fix. 2004. "Undocumented Immigrants: Facts and Figures" Urban Institute Immigration Studies Program.

Passel, J. and D. Cohn. 2009. "A Portrait of Unauthorized Immigrants in the United States," Pew Hispanic Center Report.

Passel, J. and J. Cohn. 2010. "U.S. Unauthorized Immigration Flows are Down Sharply Since Mid-Decade," Pew Hispanic Center Report.

Passel, J. and J. Cohn. 2016. "Overall Number of U.S. Unauthorized Immigrants Holds Steady since 2009," Pew Hispanic Center Report.

Passel, J. and P. Taylor. 2010. "Unauthorized Immigrants and Their U.S.-Born Children," Pew Hispanic Center Report.

Pinotti, P. 2017. "Clicking on Heaven's Door: The Effect of Immigrant Legalization on Crime," 107(1) *American Economic Review* 138–68.

Pollitt, E., K. Gorman, P. Engle, R. J. Martorell, T. Wachs, and N. Scrimshaw. 1993. "Early Supplementary Feeding and Cognition: Effects over Two Decades," 58(7) Monographs of the Society for Research in Child Development 1–118.

Pope, N. 2016. "The Effects of DACAmention: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," 143 *Journal of Public Economics* 98–114.

Rosenzweig, M. and J. Zhang. 2013. "Economic Growth, Comparative Advantage, and Gender Differences in Schooling Outcomes: Evidence from the Birthweight Differences of Chinese Twins," 104 *Journal of Development Economics* 245–60.

Roy, A. 1951. "Some Thoughts on the Distribution of Earnings," 3(2) *Oxford Economic Papers* 135–46.

Royer, H. 2009. "Separated at Girth: US Twin Estimates of the Effects of Birth Weight," 1(1) *American Economic Journal: Applied Economics* 49–85

Ryo, E. 2013. "Deciding to Cross: Norms and Economics of Unauthorized Migration," 78(4) *American Sociological Review* 574–603.

Ruggles, S., K. Genadek, R. Goeken, J. Grover, and Sobek, M. 2017. "Integrated Public Use Microdata Series: Version 7.0 [dataset]," Minneapolis, MN: University of Minnesota.

Schlaepfer, L. and C. Infante. 1995. "Bajo Peso al Nacer en Mexico: Evidencias a Partir de Una Encuesta Retrospectiva a Nivel Nacional," 52(3) *Boletin Medico del Hospital Infantil de Mexico* 168–79.

Vaughan, J. 2003. Bar none: an evaluation of the 3/10-year bar. Center for Immigration Studies.

Downloaded from https://academic.oup.com/aler/article-abstract/20/2/318/5105240 by guest on 20 October 2018

Electronic copy available at: https://ssrn.com/abstract=3083026

individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; Fellowship Review: Physiology and Pathobiology of Cardiovascular and Respiratory Systems.

*Date:* September 5, 2024.

*Time:* 11:00 a.m. to 5:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892 (Virtual Meeting).

*Contact Person:* Courtney Elaine Watkins, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 496–3093, *courtney.watkins2@ nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel; PAR–22–233: Time-Sensitive Opportunities for Health Research.

*Date:* September 6, 2024.

*Time:* 9:30 a.m. to 1:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892 (Virtual Meeting).

*Contact Person:* Jacinta Bronte-Tinkew, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Room 3164, MSC 7770, Bethesda, MD 20892, (301) 806–0009, *Jacinta.bronte-tinkew@nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844, 93.846–93.878, 93.892, 93.893, National Institutes of Health, HHS)

Dated: August 14, 2024.

**David W. Freeman,**

*Supervisory Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2024–18556 Filed 8–19–24; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute on Alcohol Abuse and Alcoholism; Notice of Closed Meeting

Pursuant to section 1009 of the Federal Advisory Committee Act, as amended, notice is hereby given of a meeting of the Board of Scientific Counselors, National Institute on Alcohol Abuse and Alcoholism.

The meeting will be closed to the public as indicated below in accordance with the provisions set forth in section 552b(c)(6), Title 5 U.S.C., as amended for the review, discussion, and evaluation of individual intramural programs and projects conducted by the National Institute on Alcohol Abuse and Alcoholism, including consideration of personnel qualifications and performance, and the competence of individual investigators, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Board of Scientific Counselors, National Institute on Alcohol Abuse and Alcoholism.

*Date:* September 3–4, 2024.

*Time:* 9:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate personnel qualifications and performance, and competence of individual investigators.

*Place:* National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, 5625 Fishers Lane, Rockville, MD 20852, (Virtual Meeting).

*Contact Person:* David Lovinger, Ph.D., Scientific Director, Laboratory for Integrative Neuroscience, Section on Synaptic Pharmacology, National Institute of Alcohol Abuse and Alcoholism, 5625 Fishers Lane, Room TS–11, Rockville, MD 20852, (301) 443–2445, *lovindav@mail.nih.gov.*

Information is also available on the Institute's/Center's home page: *https:// www.niaaa.nih.gov/research/division-intramural-clinical-and-biological-research/ office-scientific-director,* where an agenda and any additional information for the meeting will be posted when available.

(Catalogue of Federal Domestic Assistance Program Nos. 93.271, Alcohol Research Career Development Awards for Scientists and Clinicians; 93.272, Alcohol National Research Service Awards for Research Training; 93.273, Alcohol Research Programs; 93.891, Alcohol Research Center Grants, National Institutes of Health, HHS)

Dated: August 14, 2024.

**David W. Freeman,**

*Supervisory Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2024–18554 Filed 8–19–24; 8:45 am]

**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HOMELAND SECURITY

**[CIS No. 2779–24; DHS Docket No. USCIS–2024–0010]**

**RIN 1615–ZC09**

### Implementation of Keeping Families Together

**AGENCY:** Department of Homeland Security.

**ACTION:** Notice of implementation of the Keeping Families Together process.

**SUMMARY:** This notice announces the U.S. Department of Homeland Security's (DHS) implementation of the Keeping Families Together process for certain noncitizen spouses and stepchildren of U.S. citizens who are present in the United States without admission or parole to request parole in place under existing statutory authority. Granting parole in place, on a case-by-case basis, to eligible noncitizens under this process will achieve the significant public benefit of promoting the unity and stability of families, increasing the economic prosperity of American communities, strengthening diplomatic relationships with partner countries in the region, reducing strain on limited U.S. government resources, and furthering national security, public safety, and border security objectives.

**DATES:** DHS will begin using the Form I–131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, for this process on August 19, 2024.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

### I. Background

Family unity is a bedrock objective of the U.S. immigration system. Nearly 60 years ago, the Immigration and Nationality Act of 1965, a foundation of modern U.S. immigration law, enshrined as a core principle the importance of promoting the ability of U.S. citizens to unify with their relatives—a principle that endures to this day.[1] Yet, amidst growing demands and challenges, including chronic underfunding of our immigration[2] and visa processing backlogs compounded by the COVID–19 pandemic, our

---

[1] Public Law 89–236 (1965).

[2] For example, in the Fiscal Year (FY) 2024 President's Budget, USCIS requested $865 million in appropriated funding, but Congress only provided $281 million. *See* Department of Homeland Security U.S. Citizenship and Immigration Services Budget Overview, Fiscal Year 2024 Congressional Justification, available at *https://www.dhs.gov/sites/default/files/2023-03/ U.S.%20CITIZENSHIP%20AND%20IMMIGRATION%20SERVICES_ Remediated.pdf* (last visited July 16, 2024); Department of Homeland Security Appropriations Act, 2024, Public Law 118–47, div. C (2024); Department of Homeland Security U.S. Citizenship and Immigration Services Budget Overview, Fiscal Year 2025 Congressional Justification, available at *https://www.dhs.gov/sites/default/files/2024-04/ 2024_0325_us_citizenship_and_immigration_ services.pdf* (last visited July 16, 2024). The February 2024 Bipartisan Border Agreement would have provided $20 billion in funding for border management, including $4 billion to USCIS.

immigration system has often been challenged in its ability to fully achieve this core principle. U.S. citizens and their noncitizen family members have in many cases faced lengthy processing backlogs and potential years-long separation to access immigration benefits intended by Congress to promote family unity.

DHS estimates that there are approximately 765,000 noncitizens in the United States who are married to U.S. citizens and lack lawful immigration status.[3] Estimates indicate that the median time these noncitizens have been in the United States is 20 years, and they collectively live with more than 2.5 million U.S. citizen family members, raising and caring for more than 1.6 million U.S. citizen children.[4] While U.S. immigration law provides noncitizens who are beneficiaries of approved immigrant visa petitions [5] filed by their U.S. citizen spouses the opportunity to apply for adjustment of status to that of a lawful permanent resident (LPR) while remaining in the United States, there are certain requirements to adjust status that prevent many noncitizens from availing themselves of this benefit.[6] In particular, to apply for LPR status while in the United States, an applicant generally must have been "inspected and admitted or paroled" into the United States.[7]

DHS estimates that more than two-thirds of noncitizens without lawful immigration status who are married to U.S. citizens [8] are present in the United States without admission or parole, and as a result, are generally not eligible for adjustment of status.[9] They must therefore depart the United States and seek an immigrant visa at a U.S.

embassy or consulate abroad. However, if they choose to depart the United States, they face uncertainty about whether they will be granted an immigrant visa and be able to return to the United States.[10] The noncitizen also must remain abroad while waiting for their immigrant visa application to be processed at a U.S. embassy or consulate and any necessary waiver applications to be processed by U.S. Citizenship and Immigration Services (USCIS), and as a result, they may be separated from their U.S. citizen family members for months or years.[11] The length and uncertainty of the process, along with the prospect of either separating from their U.S. citizen family members or uprooting them to travel abroad creates a disincentive and makes it difficult for noncitizens to pursue LPR status despite their eligibility to apply.

Recognizing the harms that families and communities face every day as a result of flaws in the U.S. immigration system, President Joseph R. Biden in 2021 directed DHS and other agencies to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and

consistent with applicable law." [12] In response to the President's directive, DHS and its immigration components, including USCIS, have taken several steps to promote accessibility and increase efficiency in the immigration system.[13]

On June 18, 2024, President Biden announced that DHS would take action to preserve the unity of U.S. citizens and their noncitizen spouses and noncitizen stepchildren who currently cannot access LPR status without first departing the United States.[14] In furtherance of the President's directive, DHS is now establishing a process, through its existing discretionary parole authority under INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A),[15] for DHS to consider, on a case-by-case basis, parole in place requests filed by certain noncitizen spouses and stepchildren of U.S. citizens. If granted parole in place, these noncitizens, if otherwise eligible, could apply for adjustment of status to that of an LPR, rather than having to depart the United States to pursue an immigrant visa, as the parole in place would satisfy the "inspected and admitted or paroled" requirement.[16]

This process does not change or eliminate the eligibility criteria for adjustment of status to that of an LPR. Noncitizens who are granted parole in place under this process will still have to satisfy all other statutory and regulatory requirements when applying to adjust status to that of an LPR, including that they have an approved immigrant visa petition based on a bona fide relationship to a U.S. citizen, are admissible to the United States, and merit a grant of adjustment of status as

---

[3] U.S. Dep't of Homeland Security, Office of Homeland Security Statistics (OHSS) analysis of OHSS Estimates of the Unauthorized Immigrant Population Residing in the United States: Jan. 2018–Jan. 2022 ("OHSS Analysis"), tbl. 3.

[4] *Id.* tbls. 4, 5. Estimated data shows that the median amount of time the entire population of noncitizen spouses of U.S. citizens has been in the United States is 20 years; the median time the PIP-eligible population of noncitizen spouses of U.S. citizens (where the noncitizen spouses have been in the United States for at least 10 years) has been in the United States is 23 years.

[5] This is filed on Form I–130, Petition for Alien Relative.

[6] Adjustment of status is the process by which certain noncitizens may seek LPR status while remaining in the United States, as opposed to consular processing, the process by which certain noncitizens seek an immigrant visa at a United States embassy or consulate abroad and then are admitted to the United States as an LPR at a port of entry. *See* INA sec. 245(a), 8 U.S.C. 1255(a); *cf.* INA secs. 221–222, 8 U.S.C. 1201–1202 (immigrant visa applications).

[7] INA sec. 245(a), 8 U.S.C 1255(a).

[8] OHSS Analysis, *supra* note 3, tbl. 3.

[9] INA sec. 245(a), 8 U.S.C. 1255(a).

[10] For most of these noncitizens, their departure to pursue consular processing and seeking admission through the application of an immigrant visa makes them inadmissible, and seeking of admission through the application for an immigrant visa within three years from their departure (if they accrued more than 180 days but less than one year of unlawful presence in the United States during a single stay), or within ten years from their departure or removal (of departure or removal (if they accrued one year or more of unlawful presence in the United States during a single stay)), will make them inadmissible under INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i). *See, e.g., Matter of Duarte-Gonzalez,* 28 I. & N. Dec. 688, 689–90 (BIA 2023); *Matter of Rodarte-Roman,* 23 I. & N. Dec. 905, 908–10 (BIA 2006) (holding that the 3-year and 10-year unlawful presence bars are not triggered unless and until the noncitizen departs from the United States). This ground of inadmissibility may be waived, but approval of such a waiver is discretionary and requires applicants to "establish [ ] . . . that the refusal of [the applicant's] admission . . . would result in extreme hardship to the citizen or [LPR] spouse or parent" of the applicant. INA sec. 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v).

[11] As discussed in greater detail in this notice, the provisional waiver process through the Form I–601A, Application for Provisional Unlawful Presence Waiver, permits certain noncitizens to apply for a provisional waiver of the unlawful presence grounds of inadmissibility under INA section 212(a)(9)(B)(v), 8 U.S.C. 1182(a)(9)(B)(v), prior to their departure from the United States. While an important mechanism, the Form I–601A provisional waiver process has become significantly backlogged in recent years, still requires the noncitizen to depart and remain separated from their U.S. citizen relatives during consular processing, and does not provide a guarantee that an immigrant visa will ultimately be granted. *See* 8 CFR 212.7(e) (describing the provisional unlawful presence waiver process).

[12] Exec. Order No. 14012, *Restoring Faith in Our Legal Immigration System and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021).

[13] *See* USCIS, Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade (Feb. 9, 2024), *https:// www.uscis.gov/EOY2023;* USCIS Fiscal Year 2022 Progress Report (Dec. 2022), *www.uscis.gov/sites/ default/files/document/reports/OPA_ ProgressReport.pdf.*

[14] The White House, *FACT SHEET: President Biden Announces New Actions to Keep Families Together,* June 18, 2024, available at *https:// www.whitehouse.gov/briefing-room/statements-releases/2024/06/18/fact-sheet-president-biden-announces-new-actions-to-keep-families-together/.*

[15] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) ("The [Secretary] may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . ."").

[16] *See* Section II.B. of this notice for additional information on parole in relation to adjustment of status.

a matter of discretion.[17] Eligibility for a family-based immigrant visa petition (Form I–130, Petition for Alien Relative),[18] and application to adjust status to that of an LPR (Form I–485, Application to Register Permanent Residence or Adjust Status), will be determined in a distinct and separate process from the parole in place adjudication.

This process will be available to certain noncitizen spouses of U.S. citizens who are present in the United States without admission or parole; who have been continuously physically present in the United States for a minimum of ten years as of June 17, 2024 (that is, continuously physically present since June 17, 2014 and through the date of filing the request for parole); who have a legally valid marriage to a U.S. citizen as of June 17, 2024; who have no disqualifying criminal history; [19] who do not pose a threat to national security, public safety, or border security; and who merit parole in place as a matter of discretion. Certain noncitizen stepchildren of U.S. citizens may also request parole in place under this process, provided that they have been continuously physically present in the United States without admission or parole since June 17, 2024 through the date of filing, have no disqualifying criminal history and do not pose a threat to national security or public safety, meet the INA's definition and requirements of a stepchild [20] of a U.S. citizen, and merit parole in place as a matter of discretion.

Only noncitizens who are "applicants for admission" to the United States may be eligible for parole.[21] Noncitizens who lack lawful status but were inspected and admitted to the United States are not eligible for parole.[22] This parole in

place process is available specifically to noncitizens who are present in the United States without admission or parole and who remain applicants for admission. Requests for parole in place under this process will be considered on a case-by-case basis in the exercise of discretion. Positive and negative discretionary factors will be considered when determining whether to grant parole in place to a noncitizen, based on significant public benefit or urgent humanitarian reasons. DHS estimates that 500,000 noncitizen spouses and 50,000 noncitizen stepchildren of U.S. citizens may meet the requirements to request parole in place under this process.[23]

As described elsewhere in this **Federal Register** notice (notice), the authority to parole applicants for admission "in place"—*i.e.*, while the noncitizen is present within the United States without having been admitted—is consistent with DHS's longstanding interpretation of its authorities, and DHS continues to believe that it reflects the best reading of the statute.[24] The parole authority has been used for over 15 years in the specific context of preserving family unity for military families.[25] In 2010, USCIS provided guidance to its officers on considering parole in place requests submitted by noncitizen family members of U.S. military service members, which

enables them to adjust status without leaving the United States,[26] an authority Congress legislatively reaffirmed in 2019.[27] Congress has also expressed support in legislation for the use of DHS's parole authority in certain instances as a discretionary tool where justified for urgent humanitarian reasons or significant public benefit.[28]

As explained more fully in Section IV of this notice, the Secretary of Homeland Security's ("Secretary") exercise of the parole authority in this manner will provide a significant public benefit to the United States, including to

---

[17] *See* INA sec. 245(a), (c), 8 U.S.C. 1255(a), (c); 8 CFR part 245.

[18] And in the case of certain widows or widowers, where eligible as described in this notice, Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant.

[19] Noncitizens who have been convicted of serious offenses, such as felonies, will be ineligible for this process. *See* Section V.A. of this notice for additional detail on disqualifying criminal history.

[20] *See* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1).

[21] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see also* INA sec. 235(a)(1), 8 U.S.C. 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.").

[22] Noncitizens who are immediate relatives of a U.S. citizen and were admitted to the United States on a valid nonimmigrant visa but have remained in the United States beyond the period of stay authorized will generally meet the "inspected and

admitted or paroled" requirement for adjustment of status without the need for parole in place. *See* INA sec. 245(a), 8 U.S.C. 1255(a); INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2). Similarly, noncitizens who were paroled into the United States on or after their last arrival would also meet this requirement.

[23] OHSS Analysis, *supra* note 3, tbl. 3.

[24] *See, e.g.*, Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98–10, 1998 WL 1806685 (Aug. 21, 1998), *superseded in part on other grounds by* Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, *Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) ("Coldebella Memo"), *available at https://www.uscis.gov/sites/default/files/document/legal-docs/Coldebella_Memo.pdf*; *see also, e.g., Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (discussing 1998 INS General Counsel Memo and 1999 INS Cuban parole policy, and stating that "[w]e see nothing [in the INA] that would preclude the government from paroling . . . into the United States under § 1182(d)(5)(A)" noncitizens "who are currently present in the United States but who were not inspected upon arrival at a port of entry" and that "[t]he [INS] General Counsel's memorandum is consistent with our conclusion . . . that there is no per se bar on paroling unlawful entrants into the United States pursuant to § 1182(d)(5)(A)").

[25] *Immigration Needs of America's Fighting Men and Women, Hearing Before the Subcomm. on Immigr., Citizenship, Refugees, Border Sec., & Int'l L. of the Comm. on the Judiciary, H.R.*, 110th Cong. 15 (2008) (testimony of Margaret Stock, Attorney and Lieutenant Colonel, Military Police Corps, United States Army Reserve).

[26] While the USCIS policy memorandum articulating the use of parole in place for military family members was issued in 2013, as a matter of practice, USCIS has been issuing parole in place for members of this population since 2010. Making this process available only to certain spouses and stepchildren of U.S. citizens is consistent with past sparing uses of parole in place. *See id.* DHS continues to view use of parole in place as consistent with the best reading of the statute, as described in section II in this notice. For reasons discussed throughout this notice, making it available to this population also is a better practice than retaining the status quo. *See* USCIS Policy Memorandum, PM–602–0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act sec. 212(a)(6)(A)(i)* (Nov. 15, 2013) ("USCIS Military Parole in Place Memorandum"), *available at https://www.uscis.gov/sites/default/files/document/memos/2013-1115_Parole_in_Place_Memo_.pdf, superseded in part by* USCIS Policy Memorandum, PM–602–1104, *Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees* (Nov. 23, 2016), *available at https://www.uscis.gov/sites/default/files/document/memos/PPM-DA_Military_Final_112316.pdf.*

[27] *See* National Defense Authorization Act for Fiscal Year 2020, Public Law 116–92, sec. 1758 (2019) (8 U.S.C. 1182 note) (NDAA 2020) ("the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed").

[28] *See, e.g.*, Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Public Law 101–167, sec. 599E (8 U.S.C. 1255 note) (authorizing granting permanent residence to parolees from the Soviet Union, Vietnam, Laos, and Cambodia); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, div. C, sec. 646 (8 U.S.C. 1255 note) (providing for adjustment of status for noncitizens from Poland and Hungary who had been denied refugee status but who had been "inspected and granted parole into the United States"); NDAA 2020, sec. 1758, *supra* note 27 (expressing congressional support for an ongoing parole program for relatives of U.S. military members and considering in each case-by-case determination whether parole would advance family unity that would constitute a significant public benefit); Extending Government Funding and Delivering Emergency Assistance Act of 2021, Public Law 117–43, sec. 2502 (8 U.S.C. 1101 note) (providing refugee benefits to Afghans paroled under INA section 1182(d)(5) and funds to support those benefits); Ukraine Supplemental Appropriations Act of 2022, Public Law 117–128, sec. 401 (8 U.S.C. 1101 note) (providing benefits to Ukrainians paroled under INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5) and funds to support those benefits).

the impacted U.S. citizens, noncitizens, their families, and their communities at large. *First,* it will promote family unity by enabling U.S. citizen spouses and children to remain with their noncitizen family members while their noncitizen family members apply for adjustment of status to that of an LPR, thus promoting stability and preventing avoidable disruptions to these families. *Second,* it will advance U.S. economic and labor interests by enabling paroled noncitizens to work lawfully in the United States and contribute economically to their families and communities.[29] *Third,* it will further critical U.S. diplomatic interests and U.S. foreign policy objectives of managing migration, increasing economic stability, and fostering security in the United States and in partner countries in the region. *Fourth,* it will preserve limited resources across U.S. government agencies that may otherwise be expended on consular processing and removal proceedings. *Fifth,* it will further national security, public safety, and border security objectives by encouraging noncitizens to provide information for background and security checks.

## II. Parole Authority and Existing Family Unity Parole Processes

### A. Parole Authority

The Secretary, and those other officials as designated by the Secretary,[30] have the discretionary authority under INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), to parole any applicant for admission "into the United States temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

DHS's parole authority extends to noncitizens inside the United States who have not been "admitted" as defined in the INA through a practice known as "parole in place."[31] Parole is

available to an "applicant for admission," which the INA defines in relevant part as "[a]n alien present in the United States who has not been admitted or who arrives in the United States."[32] Because the INA creates a distinct meaning for "admission," noncitizens who have entered the United States without having been "admitted" are still considered "applicants for admission," even though they are physically inside the United States, and may be paroled in accordance with INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). Longstanding DHS legal opinions have affirmed the availability of parole in place under U.S. immigration law, as discussed elsewhere in this notice.[33]

Parole is neither an admission of the noncitizen to the United States nor a determination of admissibility, and a parolee remains an applicant for admission during the period of parole in the United States.[34] DHS sets the duration of the period of parole based on the purpose for granting the parole request and may also impose conditions on parole.[35] DHS may terminate parole in its discretion at any time.[36] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States during their period of parole.[37] While in

a period of parole, noncitizens do not accrue unlawful presence for purposes of inadmissibility under INA sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I), 8 U.S.C. 1182(a)(9)(B)(i) and 1182(a)(9)(C)(i)(I).[38]

The parole authority has long been interpreted to allow for designation of specific groups of noncitizens for whom parole should be favorably considered as furthering a significant public benefit or for urgent humanitarian reasons, as long as the parole of each noncitizen within the group furthers such significant public benefit or addresses such urgent humanitarian reasons, as determined on a discretionary, case-by-case basis.[39] Congress has repeatedly expressed support in legislation for the use of DHS's parole authority to benefit individuals falling within particular groups.[40]

### B. Parole in Relation to Adjustment of Status Eligibility

To be eligible for adjustment of status, an applicant generally must, among other requirements, have been "inspected and admitted or paroled into the United States."[41] A grant of parole, including parole in place, under INA

---

[29] *See* Economic Analysis section in this notice.

[30] *See* Delegation to the Bureau of Citizenship and Immigration Services (Delegation No. 0150.1, Sec. II(O)) (June 5, 2003) (vesting parole authority in USCIS through its Director and subordinate officers).

[31] *See* INA sec. 101(a)(13)(A), 8 U.S.C. 1101(a)(13)(A),] (defining the terms "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer"); INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5); *see also* USCIS Policy Manual, Volume 7, Adjustment of Status, Part B, 245(a) Adjustment, Chapter 2, Eligibility Requirements, Section 3, Parole [7 USCIS PM B.2 (A)(3)] ("Parole in Place: Parole of Certain Noncitizens Present Without Admission or Parole"), available at *https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-2* (last updated July 16, 2024).

[32] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); INA sec. 235(a)(1), 8 U.S.C. 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of [the INA] an applicant for admission. A noncitizen placed in removal proceedings pursuant to INA sec. 240, 8 U.S.C. 1229a, may also be an applicant for admission, and such an individual could be considered for this parole in place process even if released from custody under INA sec. 236(a), 8 U.S.C. 1226(a), as long as they have not been admitted. *See* INA sec. 240(a)(2), 8 U.S.C. 1229a(a)(2) ("An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title. . .").

[33] *See supra* note 24 and Section II.C of this notice.

[34] INA sec. 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B); INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[35] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[36] 8 CFR 212.5(e) (providing that a noncitizen's parole may terminate automatically or upon written notice). In addition, neither the denial of a parole in place request nor a parole termination determination is subject to judicial review. *See* INA sec. 242(a)(2)(B)(ii), 8 U.S.C. 1252(a)(2)(B)(ii); *Bolante* v. *Keisler,* 506 F.3d 618, 621 (7th Cir. 2007); *Samirah* v. *O'Connell,* 335 F.3d 545, 549 (7th Cir. 2003); *see also Vazquez Romero* v. *Garland,* 999 F.3d 656, 665 (9th Cir. 2021) ("We have previously concluded that the jurisdiction-stripping provision of [8 U.S.C.] 1252(a)(2)(B)(ii) applies to discretionary parole decisions under sec. 1182(d)(5)." (citing *Hassan* v. *Chertoff,* 593 F.3d 785, 790 (9th Cir. 2010))).

[37] 8 CFR 274a.12(c)(11).

[38] INA sec. 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii) ("[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.").

[39] *See infra* notes 65–72 and Section II.D. of this notice for a discussion of Existing Family Unity Parole Policies; *see also, e.g., Reno* v. *Flores,* 507 U.S. 292, 313–14 (1993) (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules"); *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) (upholding INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *cf.* INA sec. 212(d)(5)(B), 8 U.S.C. 1182(d)(5)(B) (providing that DHS may parole a noncitizen determined to be a refugee only if DHS "determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee" (emphasis added)).

[40] *See supra* note 28.

[41] INA sec. 245(a); 8 U.S.C. 1255(a). To apply for adjustment of status under INA sec. 245(a), the noncitizen must also have an immigrant visa "immediately available to him" or her at the time of filing. INA sec. 245(a)(3), 8 U.S.C. 1255(a)(3). Because there is no numerical limit on immigrant visas for spouses of U.S. citizens, *see* INA sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), immigrant visas are immediately available to them upon approval of a Form I–130. *See* 8 CFR 245.2(a)(2)(i)(B). Cuban nationals who are paroled also may be eligible for adjustment of status under the Cuban Adjustment Act, Public Law 89–732 (1966) (8 U.S.C. 1255 note), without regard to the availability of an immigrant visa.

section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), satisfies this threshold requirement.[42]

The noncitizen must also satisfy all other requirements for adjustment of status, including establishing that they are not inadmissible under any applicable grounds,[43] and that they merit a favorable exercise of discretion including not being a threat to public safety or national security.[44]

## C. Existing Parole in Place Processes

Parole in place is currently used for certain noncitizens to promote family unity and remove barriers to adjustment of status. As federal courts, including the Supreme Court, have long recognized, "parole creates something of legal fiction," as a paroled noncitizen is allowed to be present in the United States temporarily but remains an "applicant for admission" as defined in INA 235(a)(1), 8 U.S.C. 1225(a)(1), pending the granting of relief from removal such as asylum or adjustment of status.[45] Through this well-

established legal fiction, the statute has long authorized the parole of applicants for admission "into the United States"—whether in the form of temporary release from immigration custody or otherwise—even after they have crossed into the United States and are already physically present in the country.[46]

Congress preserved this legal fiction in IIRIRA while expanding the legal concept of an "applicant for admission." Congress provided that any noncitizen who is present in the United States without admission "shall be deemed . . . an applicant for admission,"[47] and that although the Secretary may parole "any [noncitizen] applying for admission," such parole does not constitute an admission, and the parolee remains an applicant for admission.[48] Thus, "even noncitizens already physically present in the United States" after having entered without inspection remain applicants for admission unless and until they are admitted or removed and "may be eligible for humanitarian or public benefit parole under [section 212(d)(5)(A) of the INA] by virtue of their status as applicants for

admission."[49] Put differently, because noncitizens physically present without authorization are deemed "applicants for admission," they are therefore "applying for admission to the United States,"[50] and thus eligible under the parole statute for parole "into the United States."[51]

DHS, like the former INS, has long understood section 212(d)(5)(A) as allowing for parole of applicants for admission who entered the United States without inspection and admission at a port of entry and were present in the country beyond the border. The INS General Counsel issued an opinion in 1998 adopting that straightforward, reasonable construction of the statute.[52] In 2007, the DHS General Counsel issued an opinion endorsing the 1998 INS General Counsel opinion in relevant part.[53] The Department also, for example, issued a Federal Register notice in 2002 providing that applicants for admission who are encountered in the United States within two years of having entered by sea unlawfully and who are placed in expedited removal proceedings may be "paroled into the United States" under INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).[54]

---

[42] DHS may also release a noncitizen present without admission or parole from custody on "conditional parole," also known as a release on one's own recognizance, under INA sec. 236(a)(2)(B), 8 U.S.C. 1226(a)(2)(B), pending INA sec. 240, 8 U.S.C. 1229a, removal proceedings. Conditional parole under INA sec. 236(a)(2)(B), however, does not equate to parole under INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5), and therefore does not constitute parole for purposes of adjustment of status under INA sec. 245, 8 U.S.C. 1255, or the Cuban Adjustment Act. *See Matter of Cabrera-Fernandez,* 28 I&N Dec. 747, 748–50 (BIA 2023) (reaffirming *Matter of Castillo-Padilla,* 25 I&N Dec. 257 (BIA 2010), *aff'd,* 417 F. App'x 888 (11th Cir. 2011)); Coldebella Memo, *supra* note 24 (clarifying that "conditional parole" under section INA 236(a)(2)(B), 8 U.S.C. 1226(a)(2)(B), does not constitute parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5)). However, such noncitizens may remain eligible to request a grant of parole in place if they have not otherwise been "admitted" to the United States and meet the other requirements.

[43] *See* INA sec. 245, 8 U.S.C. 1255 (requirements for adjustment of status); INA sec. 212(a), 8 U.S.C. 1182(a) (grounds of inadmissibility). While noncitizens generally must also have "maintain[ed] continuously a lawful status since entry into the United States" to qualify for adjustment of status under INA sec. 245(a), 8 U.S.C. 1255(a), this restriction does not apply to immediate relatives, which includes spouses and children (including stepchildren) of U.S. citizens. *See* INA sec. 245(c), 8 U.S.C. 1255(c) (bars to adjustment of status eligibility); INA sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i) (defining "immediate relatives"); INA sec. 101(b)(1), 8 U.S.C. 1151(b)(1) (defining "child"). *See also* discussion of unlawful presence *supra* note 10.

[44] INA sec. 245(a), 8 U.S.C. 1255(a).

[45] *Duarte* v. *Mayorkas,* 27 F.4th 1044, 1058 (5th Cir. 2022); *see* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A) (providing that parole shall not be regarded as admission); INA sec. 101(a)(13)(B), 8 U.S.C. 1101(a)(13)(B) (same); *see also, e.g., Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 175 (1993) (observing that "[u]nder the INA, both then and now, those seeking 'admission' and trying to avoid 'exclusion' were already within our territory (or at its border)" could be paroled under INA section

212(d)(5), 8 U.S.C. 1182(d)(5), "but the law treat[s] them as though they had never entered the United States at all"); *Leng May Ma* v. *Barber,* 357 U.S. 185, 189 (1958) (noting the legal fiction that a parolee is considered to be constructively remaining at the border applying for admission); *Cruz-Miguel* v. *Holder,* 650 F.3d 189, 197 n.12 (2d Cir. 2011) ("Although [noncitizens] paroled under 8 U.S.C. 1182(d)(5)(A) physically enter the United States temporarily, they are nevertheless deemed to remain constructively detained at the border.").

[46] The phrase "parole into the United States" in INA section 212(d)(5)(A) allows for the temporary release or continued presence of "any" applicant for admission—even though already present in the United States—within U.S. territory pending accomplishment of the purpose of the parole. INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5). At the same time, as described in settled case law, the parolee is deemed to be constructively at the border, and courts have consistently understood "parole into the United States" as being applicable to applicants for admission who are already present in U.S. territory (*e.g.,* arriving noncitizens who were subject to detention pending exclusion proceedings), even if, under pre-IIRIRA law, they were not considered to have effected an "entry," as that term was formerly defined, *see* 8 U.S.C. 1101(a)(13) (1994), into the United States for immigration purposes. *See, e.g., Sale,* 509 U.S. at 175; *Leng May Ma,* 357 U.S. at 189; *see also Abramski* v. *United States,* 573 U.S. 169, 179 (2014) ("[W]e must (as usual) interpret the relevant words in a statute not in a vacuum, but with reference to the statutory context, structure, history and purpose.") (quotation marks omitted); *FDA* v. *Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) (underscoring the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"); *cf. Bruesewitz* v. *Wyeth LLC,* 562 U.S. 223, 243 (2011) (emphasizing the force of "consistent judicial gloss" assigned to a statutory "term or concept").

[47] INA sec. 235(a)(1), 8 U.S.C. 1225(a)(1).

[48] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A); *see Cruz-Miguel,* 650 F.3d at 197–98 & n.12.

[49] *Cruz-Miguel,* 650 F.3d at 198; *see also Ortega-Cervantes,* 501 F.3d at 1116 (same).

[50] INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A). For purposes of the parole statute, "applying for admission" is synonymous with "applicant for admission." *See id.* (providing that when DHS determines the purposes of parole of the noncitizen "have been served," the noncitizen's "case shall continue to be dealt with in the same manner as that of *any other applicant for admission* to the United States") (emphasis added); 8 CFR 212.5 (1959) (referring to parole at ports of entry under INA sec. 212(d)(5) of "any . . . applicant for admission" at the INS district director's discretion).

[51] *Id.; see Ortega-Cervantes,* 501 F.3d at 1116.

[52] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens,* Legal Op. No. 98–10, 1998 WL 1806685 (Aug. 21, 1998). Based on that 1998 INS legal opinion, the INS Commissioner issued a policy statement authorizing the parole of certain Cuban nationals who entered the United States without inspection, taking into consideration the fact that parole could allow an application for adjustment of status under the Cuban Adjustment Act of 1966 after one year. *See* Memorandum from Doris Meissner, INS Commissioner, to INS officials, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999), *reprinted in* 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).

[53] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, *Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) ("Coldebella Memo"), available at *https:// www.uscis.gov/sites/default/files/document/legal-docs/Coldebella_Memo.pdf.*

[54] *Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the*
Continued

In 2013, relying on existing statutory authorities, USCIS issued policy guidance on the parole in place process for family members of certain current or former members of the U.S. Armed Forces. Pursuant to that guidance, a grant of parole enables those family members to meet the ''inspected and admitted or paroled'' requirement for adjustment of status.[55] In November 2014, the Secretary directed USCIS to expand on these policies to include family members of U.S. citizens and LPRs who seek to enlist in the U.S. Armed Forces.[56]

In 2019, Congress explicitly recognized that parole in place is a legitimate use of parole authority under INA section 212(d)(5).[57] That legislation ''reaffirmed'' ''the importance of the Secretary's parole in place authority.'' [58] More specifically, this emphasized that the use of ''parole in place reinforces the objective of military family unity,'' and directed DHS to ''consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit.'' [59] That same year, Congress provided a new long-term immigration status specifically for certain noncitizens in the Commonwealth of the Northern Mariana Islands who had been paroled in place by USCIS for various reasons, including family unity, and authorized continued parole in place for those noncitizens pending adjudication of their applications for the new status.[60]

In the National Defense Authorization Act for FY 2020, Congress legislatively

reaffirmed the use of parole for noncitizens already physically present within the United States, indicating Congress's intent that parole in place of individuals already present in the United States constitutes a parole ''into the United States.[61] Likewise, at least two courts of appeals have endorsed this long-standing understanding of the INA, which DHS continues to believe constitutes the best reading of the statute.[62]

According to USCIS data, since it announced the parole in place process for certain military family members in 2013, approximately 82,000 noncitizens have applied for, and 61,000 noncitizens have received, parole in place as the spouse, child, or parent of a servicemember, reservist, or veteran of the U.S. Armed Forces, as of June 30, 2024.[63]

### D. Existing Family Unity Parole Processes

Past Secretaries have similarly exercised the parole authority to promote family unity for noncitizens outside the United States who are waiting for a family-based immigrant visa to become available.[64]

For example, the Cuban Family Reunification Parole (CFRP) Program, established in 2007, allows U.S. citizens and LPRs to request parole for certain eligible family members in Cuba who are the beneficiaries of an approved Form I–130.[65] If parole is authorized, these family members may travel to the United States before their immigrant visa priority dates are current and seek parole at a U.S. port of entry to reunify with their family members while awaiting availability of an immigrant visa. In 2014, USCIS launched the Haitian Family Reunification Parole (HFRP) Program, a similar process for U.S. citizens and LPRs with eligible family members in Haiti.[66] In 2016, USCIS announced a family reunification process to allow certain Filipino World War II veterans in the United States to

reunite with their eligible family members who are waiting for their immigrant visas to become available.[67]

More recently, DHS announced the implementation of new Family Reunification Parole (FRP) processes for nationals of Colombia,[68] Ecuador,[69] El Salvador,[70] Guatemala,[71] and Honduras,[72] and their immediate family members, who have approved family-based immigrant visa petitions filed on their behalf by a U.S. citizen or LPR. DHS also announced updates to the existing CFRP and HFRP processes to adopt the same modernized and streamlined processing steps implemented for the newer FRP processes.[73]

### III. Parole in Place Process for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

Under this new process, USCIS will consider requests for parole in place from noncitizen spouses of U.S. citizens who are present in the United States without admission or parole and have been continuously physically present for at least 10 years as of June 17, 2024 (that is, continuously physically present since June 17, 2014), and remain continuously physically present through the date they file their request for parole in place. USCIS will also consider parole in place requests from certain noncitizen stepchildren of U.S. citizens provided that they have been continuously physically present in the United States without admission or parole since June 17, 2024 and through the filing of their request for parole in place, and meet the INA's definition of a stepchild of a U.S. citizen.[74]

---

*Immigration and Nationality Act,* 67 FR 68924, 68925 (Nov. 13, 2002). The Department, likewise, for the past two decades, has routinely ''parole[d] into the United States'' under INA section 212(d)(5)(A) certain applicants for admission who encountered within 14 days and 100 miles of the U.S. land border after having crossed into the country without inspection and being placed in expedited removal proceedings. *See Designating Aliens for Expedited Removal,* 69 FR 48877, 48879 (Aug. 11, 2004).

[55] USCIS Military Parole in Place Memorandum, *supra* note 26.

[56] Memorandum from Jeh Johnson, Secretary, U.S. Dep't of Homeland Security, *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20, 2014) (directing USCIS to issue expanded policies on the use of both parole in place and deferred action for certain spouses, children, and parents of individuals seeking to enlist in the U.S. Armed Forces as well as those currently serving), available at *https://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf.*

[57] *See* NDAA 2020, sec. 1758(a) (referring to ''parole in place under section 212(d)(5)''), *supra* note 27.

[58] NDAA 2020, sec. 1758(b)(3), *supra* note 27.

[59] NDAA 2020, sec. 1758(a) and (b), *supra* note 27.

[60] *See* Northern Mariana Islands Long-Term Legal Residents Relief Act, Public Law 116–24, sec. 2 (2019) (48 U.S.C. 1806(e)(6)).

[61] *See* NDAA 2020, sec. 1758(b)(3), *supra* note 27.

[62] *See Cruz-Miguel,* 650 F.3d at 198; *Ortega-Cervantes,* 501 F.3d at 1116.

[63] DHS, USCIS, Office of Performance and Quality (OPQ), Computer-Linked Application Information Management System (CLAIMS) 3 (queried 6/2024).

[64] *See Texas* v. *Biden,* 20 F.4th 928, 947 (5th Cir. 2021) (noting that ''[q]uintessential modern uses of the parole power include . . . paroling aliens who qualify for a visa but are waiting for it to become available'') (citing T. Alexander Aleinikoff et al., Immigration and Citizenship: Process and Policy 299 (9th ed. 2021)), *rev'd on other grounds,* 597 U.S. 785 (2022).

[65] *Cuban Family Reunification Parole Program,* 72 FR 65588 (Nov. 21, 2007).

[66] *Implementation of Haitian Family Reunification Parole Program,* 79 FR 75581 (Dec. 18, 2014).

[67] *Filipino World War II Veterans Parole Policy,* 81 FR 28097 (May 9, 2016).

[68] *Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023).

[69] *Implementation of a Family Reunification Parole Process for Ecuadorians,* 88 FR 78762 (Nov. 16, 2023).

[70] *Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023).

[71] *Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023).

[72] *Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023).

[73] *Implementation of Changes to the Cuban Family Reunification Parole Process,* 88 FR 54639 (Aug. 11, 2023); *Implementation of Changes to the Haitian Family Reunification Parole Process,* 88 FR 54635 (Aug. 11, 2023).

[74] INA sec. 101(b)(1)(B), 8 U.S.C. 1101(b)(1)(B) (defining ''child'' as an unmarried person under age twenty-one, who is, *inter alia,* ''a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred'').

Upon receipt of a properly filed parole in place request,[75] USCIS will determine whether the noncitizen meets the criteria outlined in this notice, whether a grant of parole in place is warranted based on significant public benefit or urgent humanitarian reasons, and whether the requestor merits a favorable exercise of discretion. All parole in place requests will be considered on a case-by-case basis as required under the parole statute.[76]

USCIS will exercise its unfettered discretion in administering this process and prioritizing requests consistent with the statute and any applicable regulations. For example, if it determines that the evidence submitted does not establish eligibility for parole in place, USCIS may, in its discretion, issue a request for evidence, issue a notice of intent to deny, or deny the request without requesting additional information or evidence.[77] In addition, requestors may be required to appear for an interview.[78] There is no right to the adjudication of a parole request, including within any given period. Nor is there a right to an administrative appeal.

USCIS will consider on a case-by-case basis: criminal history; any previous removal proceedings and removal orders; the results of background checks, which include national security and public safety vetting; positive and adverse factors presented by the requestor; and any other relevant information available to or requested by USCIS. Noncitizens who have been convicted of serious offenses will be ineligible for this process, as will those whom USCIS determines, in its discretion, otherwise pose a threat to national security, public safety, or border security.[79] Other criminal convictions, excluding minor traffic offenses, will result in a rebuttable presumption of ineligibility for parole in place. This presumption can be rebutted on a case-by-case basis by weighing the seriousness of the conviction against mitigating factors relating to the conviction as well as other positive factors that suggest that the noncitizen merits a favorable exercise of discretion. Noncitizens with pending criminal charges will be ineligible for parole in

place under this process, until those charges are resolved.[80]

Eligible noncitizens who are currently in removal proceedings and do not have a final order of removal may request parole in place. However, if the noncitizen would otherwise constitute a national security, public safety, or border security concern,[81] they will be ineligible to receive parole in place pursuant to this process.[82] USCIS will evaluate, in the exercise of its discretion, the existence and circumstances of the removal proceedings in determining whether the noncitizen may be granted parole in place. Noncitizens with unexecuted final removal orders are presumptively ineligible for this process. In the exercise of its discretion, USCIS will evaluate the facts and circumstances underlying the unexecuted final removal order, including the basis for the removal order, to determine whether the noncitizen may overcome the presumption of ineligibility and be granted parole in place.[83] In so doing, USCIS will coordinate as necessary with the U.S. Immigration and Customs Enforcement (ICE) Office of the Principal Legal Advisor (OPLA).

Parole determinations are reserved to the exclusive discretionary authority of DHS. If parole in place is denied, there is no right to an administrative appeal, and neither immigration judges nor the Board of Immigration Appeals (BIA) have the authority to consider or review parole requests.[84]

Nothing in this notice or the implementation of this parole in place

process is intended to limit DHS's authority to take enforcement actions in accordance with the INA and consistent with governing policies and practices. DHS may initiate and pursue enforcement action pursuant to its enforcement priorities[85] under its existing authorities notwithstanding a noncitizen's intent to request parole in place, eligibility to request parole in place, filing of a request for parole in place, or grant of parole in place under this process.

**IV. Basis for Parole—Significant Public Benefit**

Granting parole in place on a case-by-case basis to noncitizens who meet the criteria outlined in this notice and merit a favorable exercise of discretion will generally provide a significant public benefit to the United States, including to the impacted noncitizens, their families, and their communities at large by: (1) promoting family unity and stability; (2) strengthening the U.S. economy and the economic position of families and U.S. communities; (3) advancing diplomatic relationships and key foreign policy objectives of the United States; (4) reducing strain on limited U.S. government resources; and (5) furthering national security, public safety, and border security objectives. Through a case-by-case assessment, USCIS will consider whether parole for each requestor individually will provide a significant public benefit to further these goals.

*Promoting Family Unity and Stability*

This process will promote family unity by allowing certain noncitizens who have long lived in the United States to apply for permanent residence, if otherwise eligible, in the United States without separating them from their U.S. citizen spouses and, in many cases, their U.S. citizen children. Courts have long recognized preservation of family unity to be a "prevailing purpose" of U.S. immigration law.[86] This use of the Secretary's statutory parole authority addresses a barrier that currently prevents many of these otherwise eligible noncitizens from

---

[75] *See* Section VI. of this notice for additional information regarding proper filing of a request for parole in place under this process.

[76] *See* INA 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[77] *See* 8 CFR 103.2(b)(8).

[78] *See* 8 CFR 103.2(b)(9).

[79] As discussed further in Section V.A. of this notice, there is an exception for border security concerns for stepchildren who otherwise meet the criteria for parole in place under this process.

[80] *See* Section V.A. of this notice.

[81] *See, e.g.,* Memorandum from Alejandro N. Mayorkas, Secretary, U.S. Dep't of Homeland Security to Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement, et al., *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021) ("September 2021 Guidelines"), available at *https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.*

[82] As noted above and discussed further in Section V.A. of this notice, noncitizens present border security concerns if they were apprehended while attempting to enter the U.S. unlawfully or if they entered unlawfully after November 1, 2020. There is an exception to this for stepchildren who otherwise meet the criteria for parole in place under this process.

[83] A noncitizen with an unexecuted final removal order who overcomes this presumption and is granted parole in place, and who wishes to pursue adjustment of status, may file a motion to reopen or a motion to reopen and terminate removal proceedings with EOIR. Noncitizens may request U.S. Immigration and Customs Enforcement (ICE) Office of the Principal Legal Advisor (OPLA) to join (or not oppose) a motion to reopen and dismiss or terminate submitted to EOIR, depending on the facts and circumstances. Any such motion would be decided on its own merits in a distinct and separate process from the parole in place adjudication.

[84] *See Matter of Castillo-Padilla,* 25 I. & N. Dec. 257, 261 (BIA 2010), *aff'd,* 417 F. App'x 888 (11th Cir. 2011).

[85] *See, e.g.,* September 2021 Guidelines, *supra* note 81.

[86] *Nwozuzu* v. *Holder,* 726 F.3d 323, 332 (2d Cir. 2013) (citing H.R. Rep. No. 82–1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. at 1680); *see also Holder* v. *Martinez Gutierrez,* 566 U.S. 583, 594 (2012) (recognizing that the "objectives of providing relief to [noncitizens] with strong ties to the United States and promoting family unity . . . underlie or inform many provisions of immigration law," even if "they are not the INA's only goals, and Congress did not pursue them to the *n*th degree") (quotation marks omitted) (citing *Fiallo* v. *Bell,* 430 U.S. 787, 795 n.6 (1977), and *INS* v. *Errico,* 385 U.S. 214, 220 (1966)).

obtaining LPR status and will also promote the long-term sense of security and stability for these families.

This process will benefit an estimated 500,000 noncitizen spouses and 50,000 noncitizen stepchildren.[87] The noncitizen spouses eligible for this process have lived in the United States for a median time period of 23 years, illustrating the depth of their ties to the country.[88] More than 1.6 million U.S. citizen family members, including 1.1 million U.S. citizen children, are estimated to live with these noncitizen family members.[89] Absent this process, for these noncitizens to apply for permanent residence, their U.S. citizen spouses and children might have to endure prolonged separation from them, which would disrupt their lives, create instability, and result in avoidable economic and emotional hardship. Without this process, hundreds of thousands of noncitizen spouses of U.S. citizens are likely to instead remain in the United States without lawful status, causing these families to live in fear and with uncertainty about their futures.[90]

In justifying the establishment of the parole in place process for military families in partnership with the Department of Defense, USCIS described how in the absence of such a process, service members faced ''stress

and anxiety because of the immigration status of their family members in the United States.''[91] Here, too, access to parole in place will reduce the stress and anxiety of U.S. citizen spouses and children by providing stability for these families in the short and long term.

Strengthening the U.S. Economy and the Economic Position of Families and U.S. Communities

If parole in place is granted, the noncitizen will be immediately eligible to apply for employment authorization for the duration of their parole period, which will benefit both their U.S. citizen family members and the broader U.S. economy. Additionally, this process will provide these noncitizens the ability to work lawfully,[92] which will facilitate greater access to job mobility and improve overall economic productivity;[93] provide stable, consistent support to their U.S. citizen family members;[94] reduce their risk of facing labor exploitation;[95] and allow for these noncitizens to contribute their full talents to the U.S. workforce.[96]

Currently, an estimated 65 percent of noncitizens over the age of 16 who do not have lawful status are already participating in the U.S. workforce, and many are self-employed.[97] The noncitizen spouses of U.S. citizens covered by this process generally lack access to employment authorization and are therefore prevented from contributing as fully to the economy as they otherwise could. Like other U.S. families, U.S. citizen spouses, noncitizen spouses, and their families pay taxes and stimulate the economy by

consuming goods and services. These activities contribute to further growth of the economy and create additional jobs and opportunities for U.S. citizens.[98] Providing these noncitizens access to employment authorization could also increase their labor force participation in a tight labor market, where there are more jobs than workers.[99]

U.S. citizen family members will also benefit from the stability offered through this process. Absent this process, applying for LPR status requires noncitizens who are present without admission or parole (PWAP) to depart the United States and remain abroad for an indefinite period, which is disruptive to the family's economic and emotional wellbeing. By contrast, parole and the subsequent ability to apply for LPR status from within the United States will enable these noncitizens to consistently support and provide for their U.S. citizen family members.

Access to employment authorization will also reduce potential labor exploitation, furthering a DHS and government-wide interest.[100] Research demonstrates that noncitizens who lack employment authorization are more likely to experience violations of labor laws, including laws governing workplace conditions and minimum wages.[101] They are also less likely to report those violations to enforcement agencies because of their unauthorized status.[102] This allows unscrupulous

[87] OHSS Analysis, *supra* note 3, tbl. 3.

[88] *Id.* tbl. 5.

[89] *Id.* tbl. 4. While the total number of U.S. citizens living in families with noncitizen spouses who lack lawful status is over 2.5 million, including over 1.6 million children, the subset of U.S. citizens living with noncitizen spouses who lack lawful status, who have lived in the country for 10 or more years, and who entered without inspection is estimated to be 1.65 million, including an estimated 1.1 million U.S. citizen children.

[90] Edward Vargas & Vickie Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children,* J. Immigr. Minor Health (Aug. 2017), available at *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5236009.* The impact of this instability is particularly profound for children in these families. *See* ''Preventing violence through the development of safe, stable, and nurturing relationships between children and their parents and caregivers,'' World Health Organization and Centre for Public Health (2009), *https://iris.who.int/bitstream/handle/10665/44088/9789241597821_eng.pdf;* Vincent J. Felitti et al., *Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study,* Am. J. Preventive Medicine 14 no. 4, 245–258 (1998), *https://www.ajpmonline.org/article/S0749-3797(98)00017-8/fulltext;* A. Martinez, L. Ruelas, and D. Granger, *Household fear of deportation in Mexican-origin families: Relation to body mass index percentiles and salivary uric acid,* Am. J. Hum. Biol. 2017, *https://pubmed.ncbi.nlm.nih.gov/28726338/;* L. Rojas-Flores, M. Clements, J. Hwang Koo, and J. London, *Trauma and psychological distress in Latino citizen children following parental detention and deportation,* Psychol. Trauma 2017, *https://pubmed.ncbi.nlm.nih.gov/27504961/.*

[91] USCIS Military Parole in Place Memorandum, *supra* note 26.

[92] *See* 8 CFR 274a.12(c)(11). Noncitizens who apply for adjustment of status to that of an LPR under INA sec. 245 may also apply for and obtain employment authorization while their adjustment application remains pending. *See* 8 CFR 274a.12(c)(9).

[93] Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, White House Council of Economic Advisers, *Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021), *https://www.whitehouse.gov/cea/written-materials/2021/09/17/the-economic-benefits-of-extending-permanent-legalstatus-to-unauthorized-immigrants/.*

[94] *Id.*

[95] Felipe González Morales, United Nations Special Rapporteur on the Human Rights of Migrants, *How to Expand and Diversify Regularization Mechanisms and Programmes to Enhance the Protection of the Human Rights of Migrants,* at 3, U.N. Doc. A/HRC.52/26 (Apr. 20, 2023).

[96] *See supra* note 93.

[97] *See* Migration Policy Institute, ''Profile of the Unauthorized Population: United States,'' available at *https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US* (last visited June 16, 2024).

[98] Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, White House Council of Economic Advisers, *Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021) (describing the ways in which the presence of immigrants helps stimulate the economy), available at *https://www.whitehouse.gov/cea/written-materials/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

[99] *Id.; see also* U.S. Bureau of Labor Statistics, *Number of unemployed persons per job opening, seasonally adjusted, available at https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm#.*

[100] Memorandum from Alejandro Mayorkas, Secretary, U.S. Dep't of Homeland Security, *Worksite Enforcement: The Strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual* (Oct. 12, 2021), available at *https://www.dhs.gov/publication/memorandum-worksite-enforcement.*

[101] *See, e.g.,* Annette Bernhardt, Ruth Milkman, and Nik Theodore, National Employment Law Project, *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities* 25, 42–45 (Sept. 21, 2009), available at *https://www.nelp.org/insights-research/broken-laws-unprotected-workers-violations-of-employment-and-labor-laws-in-americas-cities/.*

[102] *See, e.g.,* Tsedeye Gebreselassie, Nayantara Mehta, and Irene Tung, National Employment Law Project, *How California Can Lead on Retaliation Reforms to Dismantle Workplace Inequality* 8 (Nov. 2, 2022), available at *https://www.nelp.org/insights-research/how-california-can-lead-on-retaliation-*

employers to unfairly compete with those who hire U.S. workers.[103]

In addition, although undocumented noncitizens contribute billions in Federal, State, and local taxes each year, regularizing the status of this population has the potential to increase these tax revenues.[104] Noncitizens who lack employment authorization may file taxes using an Individual Taxpayer Identification Number (ITIN). Past estimates suggest that noncitizens filing with ITINs pay billions in withheld payroll taxes annually.[105] While a precise estimate of the tax compliance rate among the undocumented population is unknown, government agencies and nongovernmental organizations have previously inferred that it may be between 50 to 75 percent. Providing access to employment authorization for this population would increase tax revenues by decreasing barriers to compliance with the tax code and increasing the earning potential of these noncitizens.[106]

The benefits of facilitating access to employment authorization for this particular population far outweigh the potential costs to American workers or to the U.S. economy. First, a review of economic studies concludes that providing legal status to unauthorized noncitizens does not harm U.S.-born and other workers in the longer term, as the impact of immigration on wages overall is both limited and very small.[107] Second, the impact on public benefits at both the State and Federal level is expected to be minimal, at least initially, as these noncitizens would be ineligible to access most means-tested benefits for five years after being granted parole in place, as discussed in detail in Section VII.C of this notice.[108] See additional discussion of benefits related to the economy and labor market in Section VIII.A. of this notice.

Advancing Diplomatic Relationships and Key Foreign Policy Objectives of the United States

This process responds to the requests and interests of key foreign partners and aligns with the U.S. government's broader foreign policy objectives to collaboratively manage migration and promote economic stability in countries throughout the Western Hemisphere.

The significant majority of noncitizens who stand to benefit from this process are nationals of Western Hemisphere countries that serve as key migration management partners of the United States. An estimated 64 percent of the noncitizens who are likely to access this process are Mexican nationals, while 20 percent are from Guatemala, Honduras, and El Salvador.[109] An additional 13 percent are nationals of other Western Hemisphere countries.[110]

The United States continues to engage with partner countries in the Western Hemisphere to manage extraordinary levels of migration. These efforts include addressing the root causes of migration, expanding access to lawful pathways, and disrupting human smuggling, trafficking, and criminal networks that prey on the most vulnerable individuals. As part of the strategy to reduce irregular migration and ensure migrants have access to protection, services and employment, the United States has worked with its partners to ensure migrants in other countries have access to regularization programs.

For example, as part of a multilateral process involving 21 countries, in May 2024, Ecuador announced a new regularization program under which certain migrants are able to obtain a temporary resident permit, while others are able to apply for a temporary visa.[111] Colombia has given 10-year temporary protected status to approximately 2.5 million Venezuelans,[112] and announced a plan for parents and legal guardians of children with such status to obtain special permits. Colombia also announced a new special permanent visa for Latin American and Caribbean migrants without regular status in the country. Similarly, Costa Rica committed to expand its Special Temporary Category regularization pathway and reduce barriers to access with continued assistance from the international community.[113]

This parole in place process demonstrates U.S. partnership and commitment to the shared goals of addressing migration through the Western Hemisphere. Partner countries have requested regularization of their respective nationals who have lived in the United States for long periods of time without lawful status.[114] For

reforms-to-dismantle-workplace-inequality/ (noting that only 10 percent of respondents who experienced labor violations reported those violations to a government agency).

[103] U.S. Dep't of Homeland Security, DHS Announces Process Enhancements for Supporting Labor Enforcement Investigations (Jan. 13, 2023) (describing how deferred action protects undocumented workers who may then come forward to participate in enforcement agency investigations of potential violations of labor laws), available at https://www.dhs.gov/news/2023/01/13/dhs-announces-process-enhancements-supporting-labor-enforcement-investigations.

[104] See, e.g., Carl Davis, Marco Guzman, and Emma Sifre, Institute on Taxation and Economic Policy, Tax Payments by Undocumented Immigrants (July 30, 2024), available at https://itep.org/undocumented-immigrants-taxes-2024.

[105] See, e.g., Nat'l Taxpayer Advocate, Annual Report to Congress, Vol. 1, 199 (2015) ("In 2015, 4.4 million ITIN filers paid over $5.5 billion in payroll and Medicare taxes and $23.6 billion in total taxes"), available at https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2020/08/ARC15_Volume1.pdf; Stephen Goss et al., Social Security Administration, Office of the Chief Actuary, Actuarial Note No. 151, Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds (Apr. 2013) ("For the year 2010, we estimate that the excess of tax revenue paid to the [Social Security] Trust Funds over benefits paid from these funds based on earnings of unauthorized workers is about $12 billion."), available at https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf.

[106] Rouse et al., supra note 93 (citing Elizabeth U. Cascio & Ethan G. Lewis, Distributing the Green (Cards): Permanent Residency and Personal Income Taxes after the Immigration Reform and Control Act of 1986, 172 J. Pub. Econ. 135 (2019)); Davis et al., supra note 104.

[107] See, e.g., National Academies, The Economic and Fiscal Consequences of Immigration (2017), available at https://www.nationalacademies.org/our-work/economic-and-fiscal-impact-of-immigration.

[108] USCIS, Appendix: Eligibility for Public Benefits (describing limitations on when "qualified aliens," including parolees and LPRs, can access public benefits, typically after five years), available at https://www.uscis.gov/sites/default/files/document/policy-manual-resources/Appendix-EligibilityforPublicBenefits.pdf; see also 8 U.S.C. 1641(b) (defining "qualified alien"). Cuban and Haitian nationals who are granted parole, however, are generally eligible for "Cuban-Haitian Entrant Program" (CHEP) benefits. See Refugee Education Assistance Act of 1980, Public Law 96–422, sec. 501 (8 U.S.C. 1522 note); 8 CFR 212.5(h); see also U.S. Dep't of Health and Human Services, Office of Refugee Resettlement, Benefits for Cuban/Haitian Entrants (Fact Sheet), available at https://www.acf.hhs.gov/orr/fact-sheet/benefits-cuban/haitian-entrants. Eventually, with LPR status, these parolees could potentially become eligible for other public benefits, but their uptake of these public benefits would likely be curtailed by their access to lawful employment and offset by the increased taxes they would pay as formal contributors to the economy. Rouse et al., supra note 93. However, as discussed elsewhere in this section, DHS estimates that only 13 percent of noncitizens likely to access this parole in place process are nationals of Western Hemisphere countries other than Mexico, Guatemala, Honduras, or El Salvador.

[109] OHSS Analysis, supra note 3, tbl. 3.

[110] Id.

[111] The White House, Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala (May 7, 2024) ("White House Fact Sheet"), available at https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala/.

[112] See U.S. Dep't of State, Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability (Apr. 27, 2023), available at https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability.

[113] White House Fact Sheet, supra note 111.

[114] The White House, Mexico-U.S. Joint Communique: Mexico and the United States Reaffirm Their Shared Commitments on an Orderly, Humane and Regular Migration (Dec. 28, 2023), available at https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/28/mexico-u-s-

Continued

example, the Government of Mexico has urged the United States to regularize Mexican nationals who are long-term residents of the United States.[115] Further, the Government of Colombia has requested that the United States regularize certain Colombian nationals living in the United States. Both Mexico and Colombia have partnered closely with the United States to address irregular migration.[116] This parole in place process will therefore strengthen the United States' ability to cooperate and engage with these and other key partners in the region. This cooperation and engagement extends to matters of national and border security as well.

This process will also further the key foreign policy objectives of increasing economic stability in countries that are major sources of migration to the United States. By providing certain noncitizen long-term residents of the United States the ability to access employment authorization and adjustment of status, this process will enhance their ability to send remittances to family members in their countries of origin, promoting stability and reducing incentives for those family members or others to irregularly migrate to the United States.[117] Remittances play a pivotal role in origin countries' economies in the Western Hemisphere. In 2023, remittances received by the countries of Latin America and the Caribbean reached $154 billion.[118] Remittances are crucial to low- and middle-income countries, as they can improve a

country's ability to repay debt and national banks can use future inflows as collateral to lower the costs of international borrowing.[119]

Reducing Strain on Limited U.S. Government Resources

The process will also provide the significant public benefit of preserving and more effectively using limited U.S. government resources for DHS (including USCIS and ICE), DOS, and DOJ (EOIR). USCIS anticipates that this process will ultimately reduce pressure on the overlapping, lengthier, and more complex Form I–601A, Application for Provisional Unlawful Presence Waiver, workload.[120]

As of the third quarter of FY 2024, nearly 124,000 Forms I–601A were pending adjudication, and the median processing time to adjudicate a Form I–601A was 41.7 months. Of these pending applications, approximately 44,000, or 35 percent, were filed by noncitizens who have been in the United States for 10 years or more and are married to a U.S. citizen. While increased resources have allowed USCIS to complete more Form I–601A adjudications in FY 2024 year-to-date than in all of FY 2023, the backlog has only been reduced by 5,000 since the start of FY 2024. Although USCIS will carefully consider parole in place requests under this process on a case-by-case basis, USCIS expects that these adjudications will require fewer resources than those required to adjudicate the Form I–601A, given the nature of the adjudication. For example, requestors for this parole in place process will be required to file online, allowing for a more efficient adjudication, while the Form I–601A can only be filed on paper through the mail. USCIS has leveraged many of the efficiencies[121] developed for the online Form I–131 in the development of Form I–131F, which will be both filed and

adjudicated electronically. Furthermore, as described elsewhere in this notice, the Form I–601A is a more complex adjudication involving the determination of various factors, including whether the noncitizen has met their burden to show they would be inadmissible only under INA section 212(a)(9)(B)(i) at the time of their consular interview, and whether they have demonstrated extreme hardship to a qualifying relative as required under INA section 212(a)(9)(B)(v), issues that are inherently more difficult to assess in comparison to a discretionary parole request.

USCIS also anticipates that a significant number of noncitizens who may have otherwise filed Form I–601A as a step towards obtaining lawful permanent residence will instead pursue a parole in place request under this process. If future I–601A workloads are reduced, USCIS will be better able to focus on reducing the I–601A backlog, while assuming fewer new I–601A filings.

Although USCIS created a new Form I–131F to support this process, and USCIS will assume a new workload by accepting these parole in place requests, it will offset this new workload by charging a filing fee of $580 as it generally does for parole requests filed online.[122] Thus, USCIS anticipates it will recover the costs associated with this new workload through the fees collected.

Because this process may result in fewer noncitizens filing Forms I–601A and pursuing immigrant visa applications at U.S. embassies or consulates, the parole in place process is also expected to reduce strain on DOS. Consular processing of an immigrant visa application after USCIS approves a Form I–601A involves significant DOS resources. The provisional unlawful presence waiver does not take effect until the applicant departs the United States, appears for an immigrant visa interview at a U.S. embassy or consulate, and is determined by a consular officer to be otherwise eligible for an immigrant visa in light of the approved provisional waiver.[123] If the consular officer finds that the noncitizen is inadmissible based on a ground other than INA section 212(a)(9)(B)(i), 8 U.S.C. 1182(a)(9)(B)(i), the provisional unlawful presence waiver is automatically revoked, and the noncitizen must seek a waiver of inadmissibility for all waivable grounds of inadmissibility through filing a Form I–601, Application for Waiver of

---

[115] *See, e.g.,* Government of Mexico, *En diálogo con su homólogo estadounidense, presidente López Obrador ratifica propuesta en materia migratoria (In Dialogue with His American Counterpart, President López Obrador Ratifies Proposal on Immigration Matters)* (Feb. 3, 2024), available at *https://www.gob.mx/presidencia/prensa/en-dialogo-con-su-homologo-estadounidense-presidente-lopez-obrador-ratifica-propuesta-en-materia-migratoria.*

[116] *See, e.g.,* Department of State, *U.S.-Colombia Joint Commitment to Address the Hemispheric Challenge of Irregular Migration* (June 4, 2023), available at *https://www.state.gov/u-s-colombia-joint-commitment-to-address-the-hemispheric-challenge-of-irregular-migration/; see also* Department of State, *U.S. Relations with Mexico* (Sept. 13, 2023), available at *https://www.state.gov/u-s-relations-with-mexico/.*

[117] *See, e.g.,* Jose Ivan Rodriguez-Sanchez, *An Economic Lifeline? How Remittances from the U.S. Impact Mexico's Economy,* Baker Institute of Rice University (Nov. 13, 2023), available at *https://www.bakerinstitute.org/research/economic-lifeline-how-remittances-us-impact-mexicos-economy.*

[118] Jeremy Harris and René Maldonado, *Migrant wages and remittances to Latin America and the Caribbean in 2023,* Migration Unpacked, Inter-American Development Bank (May 15, 2024), available at *https://blogs.iadb.org/migracion/en/migrant-wages-and-remittances-to-latin-america-and-the-caribbean-in-2023/.*

joint-communique-mexico-and-the-united-states-reaffirm-their-shared-commitments-on-an-orderly-humane-and-regular-migration/.

[119] *See id.*

[120] Certain immigrant visa applicants may use Form I–601A to request a provisional waiver of the unlawful presence grounds of inadmissibility under INA section 212(a)(9)(B) before departing the United States to appear at a U.S. Embassy or Consulate for an immigrant visa interview. 8 CFR 212.7(e)(3).

[121] Every submission completed online rather than through paper provides cost savings and operational efficiencies to both USCIS and its customers. USCIS scans some applications, petitions, and requests received on paper so that they can be processed electronically. USCIS offers recommendations to avoid delays when filing paper; if more documents were filed electronically, it would reduce the time spent on scanning paper documents and free up more time for adjudication rather than administrative tasks. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194 (Jan. 31, 2024).

[122] *See* 8 CFR 106.2(a)(7); 106.1(g).

[123] 8 CFR 212.7(e)(12)(i).

Grounds of Inadmissibility.[124] In such cases, the noncitizen must await USCIS adjudication of the Form I–601, which has a median processing time of 20.5 months. This revocation followed by a new adjudication adds to the DOS workload and reduces interview availability for other visa applicants. The parole in place process may thus help decrease future wait times for other noncitizens who have a visa number and are waiting for a visa interview at a U.S. embassy or consulate. Despite considerable efforts, some U.S. consular sections are still working to reduce backlogs caused by the COVID–19 pandemic.[125] As of June 2024, DOS's National Visa Center (NVC) had 394,836 individuals awaiting an immigrant visa interview; on average, the NVC can schedule 48,898 applicants for interviews each month.[126] If, as anticipated, more noncitizens pursue adjustment of status instead of consular processing, DOS could save consular interview appointments for other immigrant and nonimmigrant visa categories. While this would result in an increase in USCIS' adjustment of status workload, those filings will be accompanied by the required fee; USCIS believes that on net, implementation of the parole in place process will result in saving government resources compared to the status quo.

The parole in place process also may save resources for ICE and the Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) if, as a result of being granted parole in place and pursuing adjustment of status, fewer members of this population are placed in or remain in removal proceedings. Additionally, noncitizens who meet the criteria and are not priorities for enforcement may request to be considered for parole in place under this process, despite currently being in removal proceedings. If granted parole in place, they may seek to have their removal proceedings terminated or dismissed[127] and apply to adjust their

status.[128] In the currently overburdened immigration court system, cases that are terminated or dismissed free up court time and permit immigration judges and ICE OPLA attorneys to focus on priority cases.

Furthering National Security, Public Safety, and Border Security Objectives

This process will promote national security, public safety, and border security by requiring noncitizens who choose to request parole in place under this process to submit biometric and biographic information to DHS and undergo background and security checks. The information collected through this process will be used to thoroughly vet every requestor and may identify and disqualify individuals who pose a national security, public safety, or border security threat.[129] DHS has also determined that the criteria outlined in this notice—such as the requirements that the requestor have 10 years of continuous physical presence in the United States and that the marriage to a U.S. citizen must have occurred on or before June 17, 2024—promote process integrity, prevent potential fraud, and provide greater certainty about the scope of the potential population.

Further, noncitizens granted parole may be more willing to report crimes because they will be less fearful that interacting with law enforcement will result in an immigration enforcement action.[130] One study found that 59 percent of Deferred Action for Childhood Arrivals (DACA) recipients would not report a crime that they would not have reported before receiving DACA.[131] In that same study, two-thirds

of respondents said they were less afraid of law enforcement after receiving DACA.[132] Additionally, studies have shown that when vulnerable communities feel safer reporting crimes, law enforcement can create more comprehensive strategies to effectively target perpetrators.[133]

## V. Eligibility

### A. Criteria

To be considered for a discretionary grant of parole in place under this process, a requestor who is the noncitizen spouse of a U.S. citizen must meet the following criteria:

• Be present in the United States without admission or parole;

• Have been continuously physically present in the United States since at least June 17, 2014 through the date of filing the parole in place request;

• Have a legally valid marriage to a U.S. citizen on or before June 17, 2024;

• Have no disqualifying criminal history; and

• Submit biometrics, undergo required background checks and national security, public safety, and border security vetting, and be found not to pose a threat to national security or public safety.

To be considered for a discretionary grant of parole in place under this process, a requestor who is the stepchild of a U.S. citizen must meet the following criteria:

• Be present in the United States without admission or parole;

• Have a parent who entered into a legally valid marriage with a U.S. citizen on or before June 17, 2024 and before the child's 18th birthday;

• Have been continuously physically present in the United States since at least June 17, 2024 through the date of filing;

• Have no disqualifying criminal history; and

• Submit biometrics, undergo required background checks and national security and public safety vetting, and be found not to pose a threat to national security or public safety.

The burden is on the requestor to demonstrate by a preponderance of the evidence that they meet the criteria outlined in this notice, and that parole

---

[124] 8 CFR 212.7(e)(14).

[125] U.S. Dep't of State, Immigrant Visa Interview-Ready Backlog Report (July 2024), available at *https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html*.

[126] *Id.*

[127] A grant of parole in place pursuant to this process does not automatically result in removal proceedings before DOJ EOIR being terminated or dismissed. Generally, a party to the removal proceedings (either the noncitizen or ICE) must move for termination or dismissal of removal proceedings. DOJ EOIR (either an immigration judge or the Board of Immigration Appeals) will evaluate and issue a decision on the motion for termination or dismissal under applicable standards. *See, e.g.,* 8 CFR 1003.1(m), 1239.2(b); 8 CFR 1003.18(d).

[128] If removal proceedings are not terminated or dismissed, the immigration judge generally retains exclusive jurisdiction to adjudicate any application for adjustment of status. 8 CFR 1245.2(a)(1) (providing that in "the case of any [noncitizen] who has been placed in . . . removal proceedings (other than as an arriving alien), the immigration judge . . . has exclusive jurisdiction to adjudicate any application for adjustment of status"); *see also* 8 CFR 1245.2(a)(1)(ii) (describing exceptions for certain "arriving aliens"); 8 CFR 245.2(a)(1) (providing that USCIS "has jurisdiction to adjudicate an application for adjustment of status filed by any [noncitizen], unless the immigration judge has jurisdiction to adjudicate the application").

[129] As discussed further in Section V.A. of this notice, there is an exception for border security concerns for stepchildren who otherwise meet the criteria for parole in place under this process.

[130] *See, e.g.,* Stefano Comino *et al., Silence of the Innocents: Undocumented Immigrants' Underreporting of Crime and their Victimization,* 39 J. of Pol'y Analysis, 1214, 1215 (2020) ("Undocumented victims' reporting rate is less than half the size of documented ones.").

[131] *See* Roberto G. Gonzales, *Here's How DACA Changed the Lives of Young Immigrants, According to Research,* Vox (Feb. 16, 2018), available at

*https://www.vox.com/2017/9/2/16244380/daca-benefits-deferred-action-undocumented-immigrants-jobs.* Similar to deferred action, however, parole may be revoked at any time and does not constitute a right against enforcement action.

[132] *Id.*

[133] *See, e.g.,* Stacey Ivie & Natalie Nanasi, *The U Visa: An Effective Resource for Law Enforcement,* 78 FBI Law Enforcement Bulletin 10, 10–16 (Oct. 2009).

is warranted as a matter of discretion for urgent humanitarian reasons or significant public benefit. Meeting the requirements for parole in place under this process does not establish eligibility for other immigration benefits, including LPR status.

Present in the United States Without Admission or Parole

A requestor must be present in the United States without admission or parole. Noncitizens who were last admitted with a valid nonimmigrant visa but have remained in the United States beyond the period of stay authorized for parole in place.[134]

Continuous Physical Presence Since June 17, 2014

Noncitizen spouses of U.S. citizens requesting parole in place under this process must have been continuously physically present in the United States since at least June 17, 2014, through the date of filing the parole in place request. Requestors should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.[135] USCIS will evaluate the totality of the evidence to determine whether the requestor has established by a preponderance of the evidence continuous physical presence for the required period of time.

Marriage to a U.S. Citizen

To be eligible for parole in place as the noncitizen spouse of a U.S. citizen, the requestor must have entered into a valid marriage to a U.S. citizen on or before June 17, 2024, and be married on the date of filing the parole in place request (with an exception for widows and widowers as discussed below). USCIS will generally recognize a marriage as valid for purposes of this parole in place process if it is legally valid in the place where the marriage was celebrated.[136] This includes

termination of any prior marriage. Although States and foreign countries may have specific laws governing jurisdiction, the place of celebration is generally where the ceremony took place or where the officiant of the ceremony was located and where the marriage certificate was issued.[137] Even if a marriage is valid in the place of celebration, there are circumstances where USCIS may not recognize a marriage as valid for purposes of this process, consistent with existing case law and policies for family-based immigrant visa petitions and other benefits.[138]

Consistent with the INA and case law, examples of the types of marital relationships that USCIS generally will not recognize for purposes of this process include, but are not limited to:

• Civil unions, domestic partnerships, or other relationships that do not confer the same legal rights and responsibilities to the parties as in a marriage recognized by a civil authority;

• Marriages that are contrary to public policy in the United States;[139] and

• Marriages where one or both parties to the marriage are not legally free to marry or have not given consent to the marriage.[140]

A noncitizen may be eligible for parole in place if their U.S. citizen

of a legislative definition of marriage for immigration purposes, "the generally accepted rule is that the validity of a marriage is governed by the law of the place of celebration")).

[137] See 8 CFR 204.2(a)(2) (requiring certificate of marriage issued by civil authorities).

[138] See Adjudicator's Field Manual, Chapter 21, Family-based Petitions and Applications available at https://www.uscis.gov/sites/default/files/document/policy-manual-afm/afm21-external.pdf; see also USCIS Policy Manual Volume 12, Part G, Spouses of U.S. Citizens, Chapter 2, Marriage and Marital Union for Naturalization, Section A, Validity of Marriage [12 USCIS–PM G.2(A)], available at https://www.uscis.gov/policy-manual/volume-12-part-g-chapter-2 (last updated June 28, 2024).

[139] This includes polygamous marriages and marriages involving minors, or marriages involving close relatives. See Matter of Manjoukis, 13 I. & N. Dec. 705 (BIA 1971) (14 year old not able to enter into legally valid marriage as it would be void under state law); Matter of H-, 9 I. & N. Dec. 640 (BIA 1962) (a polygamous marriage, though valid where contracted, is not recognized for immigration purposes); see also INA sec. 101(a)(35), 8 U.S.C. 1101(a)(35); Matter of Lovo-Lara, 23 I. & N. Dec. 746, 752 n.3 (BIA 2005); Matter of B-, 5 I. & N. Dec. 698 (BIA 1954).

[140] USCIS does not recognize marriages that violate strong Federal public policy, see Matter of H-, 9 I. & N. Dec. 640 (BIA 1962), and there is a strong Federal policy against marriages to which one or both parties do not consent. The Violence Against Women Act Reauthorization Act of 2022 added a definition of forced marriage ("a marriage to which 1 or both parties do not or cannot consent, and in which 1 or more elements of force, fraud, or coercion is present"), and provided for grants for victims' services and legal assistance for victims of forced marriage. See 34 U.S.C. 12291(a)(16).

spouse is deceased, as long as a legally valid marriage was entered into on or before June 17, 2024. However, there are additional requirements separate from the parole in place process that the noncitizen must meet to be eligible for adjustment of status. A noncitizen widow(er) must have a pending or approved Form I–130 filed on their behalf at the time of the U.S. citizen spouse's death or must file a Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, within two years from the date of the U.S. citizen spouse's death. The noncitizen must not have been legally separated from the U.S. citizen spouse at the time of the U.S. citizen spouse's death and must not have since remarried.[141]

Noncitizen Stepchildren of U.S. Citizens

Noncitizen children of a noncitizen married to a U.S. citizen may be considered for parole in place under this process. For a child to qualify as the stepchild of a U.S. citizen, the child must have been under age 18 at the time of the marriage that created the stepparent-stepchild relationship and must have been unmarried and under the age of 21[142] as of June 17, 2024.[143]

The stepchild does not need to demonstrate continuous physical presence since June 17, 2014. However, they must have been continuously physically present in the United States since at least June 17, 2024, through the date of filing.[144] In addition, the stepchild's noncitizen parent must have entered into a legally valid marriage with a U.S. citizen on or before June 17, 2024.

If the marriage between the noncitizen parent and U.S. citizen spouse is terminated, either through divorce or death of one or both parents, the stepchild may still be eligible for parole in place if a valid marriage was entered into on or before June 17, 2024, and the stepchild meets the above criteria.[145] An

[141] See INA sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i).

[142] An immediate relative child's age is frozen at the time their Form I–130 or Form I–360 is filed in order to protect them from aging out before being able to adjust status. See INA sec. 201(f), 8 U.S.C. 1151(f).

[143] See INA sec. 101(b)(1)(B), 8 U.S.C. 1101(b)(1)(B).

[144] See Section VI.B of this notice for a list of documents that may be provided to establish continuous physical presence.

[145] For the stepchild to be eligible for an immigrant visa petition or adjustment of status, additional requirements must be met, including that a bona fide relationship exists between the stepchild and U.S. citizen stepparent and, if applicable, eligibility for certain surviving relative benefits. See Matter of Pagnerre, 13 I. & N. Dec. 173 (BIA 1971) (when marriage is terminated by death but there was a continuing relationship thereafter

[134] Noncitizens who are immediate relatives of a U.S. citizen and had a valid nonimmigrant visa but who remained in the United States beyond the period of stay authorized were admitted and paroled may be eligible to apply for adjustment of status without seeking parole in place. See INA sec. 245(a), 8 U.S.C. 1255(a).

[135] See section VI.B. of this notice for a list of documents that may be provided to establish continuous physical presence.

[136] See Matter of Hosseinian, 19 I. & N. Dec. 453, 455 (BIA 1987) ("the validity of a marriage for immigration purposes is generally governed by the law of the place of celebration of the marriage"); Matter of Rodriguez-Cruz, 18 I. & N. Dec. 72, 73 (BIA 1981) (citing Matter of P-, 4 I. & N. Dec. 610, 613–14 (A.G. 1952) (observing that in the absence

eligible stepchild may file on their own with their birth certificate and evidence of their parents' valid marriage without the participation of either parent.

Lack of Criminal History, National Security Concerns, Public Safety Concerns, or Border Security Concerns

Requestors must not have a disqualifying criminal history or otherwise constitute a threat to national security, public safety, or border security.[146] All pending criminal charges are disqualifying, regardless of the nature of the charges. A noncitizen may apply for parole in place once those charges are resolved.

All felony convictions, including felony driving under the influence (DUI) offenses, are disqualifying. Additionally, disqualifying criminal history includes convictions for the following offenses, regardless of whether the offense is classified as a felony.[147]

• Murder, torture, rape, or sexual abuse;

• Offenses involving firearms, explosive materials, or destructive devices;

• Offenses relating to peonage, slavery, involuntary servitude, and trafficking in persons;

• Aggravated assault;

• Offenses relating to child pornography, sexual abuse or exploitation of minors, or solicitation of minors;

• Domestic violence, stalking, child abuse, child neglect, or child abandonment; and

• Controlled substance offenses (other than simple possession of 30 grams or less of marijuana).[148]

All other criminal convictions,[149] excluding minor traffic offenses, will result in a rebuttable presumption of ineligibility for parole in place. This presumption can be rebutted on a case-by-case basis by weighing the seriousness of the conviction against mitigating factors relating to the conviction as well as other positive factors that suggest that the noncitizen merits a favorable exercise of discretion. The weight of the rebuttable presumption will be guided by the seriousness of the conviction.[150] A less serious conviction, or a conviction that does not raise public safety concerns, will result in a presumption that carries less weight and can be more easily rebutted. In adjudicating parole in place requests on an individualized, case-by-case basis, the nature and seriousness of the conviction will determine the evidence needed to overcome it. Factors that can be considered in overcoming the presumption may include, for example:

• Age of the conviction(s) (remoteness in time);

• Requestor's age at the time of the offense and conviction, including whether the requestor was a juvenile at the time of the offense;

• Sentence or penalty imposed;

• Evidence of subsequent rehabilitation;

• Nature of the conviction, including whether the conduct at issue was non-violent;

• Whether the conviction was an isolated offense when considered against the rest of the requestor's history (including consideration of whether multiple criminal convictions were on the same date and may have arisen out of the same act);

• Existence of a mental or physical condition that may have contributed to the criminal conduct;

• Requestor's particular vulnerability, including any physical or mental condition requiring treatment or care in the United States;

• Requestor's status as a victim of or witness to criminal activity, including domestic violence, or civil rights violation or labor rights violation under investigation by a labor agency, particularly if related to the criminal conduct at issue;

• Requestor's status, or that of their U.S. citizen spouse, as a current or former member of the U.S. military;

• Requestor's status as the primary caregiver for a U.S. citizen child or elderly parent or in-law;

• Evidence of requestor's good character, such as property ties, business ties, or value and service to the community;

• Length of requestor's presence in the United States;

• Requestor's status as a caregiver for an individual with disabilities, including U.S. citizen in-laws or siblings;

• Impact on other family members, including family members who are U.S. citizens and LPRs or

• Other factors USCIS considers relevant in its exercise of discretion.

*B. Requestors with Unexecuted Final Removal Orders or Currently in Section 240 Proceedings*

Requestors With Unexecuted Final Removal Orders

Noncitizens with unexecuted final removal orders [151] will be presumptively ineligible for parole in place under this process. However, DHS will evaluate, in the exercise of its discretion on a case-by-case basis, the facts and circumstances underlying the unexecuted final removal order in determining whether the noncitizen may overcome the presumption of ineligibility and be granted parole. Examples of information that may be relevant to DHS in its determination of whether the requestor has overcome the presumption of ineligibility include, but are not limited to:[152]

---

between petitioner and beneficiary, petitioner is regarded as the stepparent of beneficiary for immigration purposes and petition); *Matter of Mowrer*, 17 I. & N. Dec. 613 (BIA 1981) (where the parents have legally separated or where the marriage has been terminated by divorce or death, the appropriate inquiry is whether a family relationship has continued to exist as a matter of fact between the stepparent and stepchild); *see also* INA secs. 201(b)(2)(A)(i) and 204(*l*), 8 U.S.C. 1151(b)(2)(A)(i), 1154(*l*) (describing additional requirements with respect to benefits for certain surviving relatives); 8 CFR 204.2(b) (same).

[146] Indicators of national security concerns include, but are not limited to, participation in activities that threaten the United States or gang membership. Indicators of public safety concerns include, but are not limited to, serious criminal conduct or criminal history. Indicators of border security concerns include recent apprehension while attempting to enter the U.S. unlawfully or apprehension following unlawful entry after November 1, 2020; however, there is an exception for border security concerns for stepchildren who otherwise meet the criteria for parole in place under this process.

[147] These categories of convictions also generally overlap with inadmissibility grounds for purposes of adjustment of status. *See* INA sec. 212(a), 8 U.S.C. 1182(a). DHS reserves its discretion to determine that other offenses are disqualifying, even if not listed.

[148] Noncitizens who were under the age of 18 but convicted of a felony or a disqualifying misdemeanor are considered to have disqualifying criminal history and are not eligible for this process.

[149] Although not generally considered convictions for immigration purposes, USCIS will nonetheless consider juvenile delinquency adjudications as resulting in a presumption of ineligibility. However, the presumption may be overcome by factors such as the nature of the underlying offense, requestor's age at the time of the commission of the underlying offense, the length of time that has passed since the adjudication, the sentence or penalty imposed, evidence of rehabilitation, and any other relevant information.

[150] Arrests or criminal charges that do not result in a conviction, such as where a requestor had been arrested but no charges were lodged, or a requestor had been arrested with charges lodged that were later dismissed, does not result in a presumption of ineligibility.

[151] Presumptive ineligibility applies to any removal order issued under INA 240, 8 U.S.C. 1229a, INA 235(b)(1), 8 U.S.C. 1225(b)(1), or any other provision of law. A final removal order under INA 240, 8 U.S.C. 1229a, is defined at INA 101(a)(47), 8 U.S.C. 1101(a)(47), and 8 CFR 1241.1.

[152] These examples solely concern DHS's determination regarding whether the presumption of ineligibility for parole in place has been overcome; they are distinct from any standards considered by DOJ EOIR in the context of a motion to reopen.

- Lack of proper notice;
- Age of the noncitizen at the time the removal order was issued;
- Ineffective assistance of counsel or being a victim of fraud in connection with immigration representation; or
- Other extenuating factors or considerations such as:
  ○ Inability to understand proceedings because of language barriers;
  ○ Status as a victim of domestic violence;
  ○ Other extenuating personal factors, such as requestor's limited resources (*e.g.,* lack of housing that would have impacted ability to appear);
- A physical or mental condition requiring care or treatment during immigration proceedings.[153]

Requestors in Section 240 Removal Proceedings

Eligible noncitizens who are currently in removal proceedings under INA section 240, including those who have been released under INA section 236(a) on bond or their own recognizance, and those without a final removal order, may submit a request to be considered for parole in place on a case-by-case basis, taking into account the totality of the circumstances, under this process.[154] Note, however, that a noncitizen who constitutes a national security, public safety, or border security concern is ineligible for parole under this process.[155] Further, this process does not preclude DHS from, in

its discretionary authority, taking enforcement actions as deemed appropriate.

*C. Factors Considered*

As discussed in this notice, DHS's decision whether to grant parole in place to a requestor is a discretionary, case-by-case determination. Even if a requestor establishes that they have met all of the criteria for eligibility, USCIS will examine the totality of the circumstances in the individual case to determine whether the requestor merits a grant of parole in place as a matter of discretion for significant public benefit or urgent humanitarian reasons. In doing so, USCIS will weigh the positive factors against the negative factors that are present in the record. Requestors may provide evidence of positive factors to establish that they merit a favorable exercise of discretion, which may relate to, but are not limited to:

- Community ties;
- Advanced or young age;
- Length of presence in the United States;
- Status as a parent or caregiver of a U.S. citizen child or elderly parent or in-law;
- Status as a caregiver for an individual with disabilities, including U.S. citizen in-laws or siblings;
- Physical or mental condition requiring care or treatment in the United States;
- Status as a victim of or witness to a crime or civil rights violation, or labor rights violation under investigation by a labor agency;
- Impact on other family members, including family members who are U.S. citizens and LPRs;
- Status, or that of their U.S. citizen spouse, as a current or former member of the U.S. military; or
- Other positive factors about which the requestor wishes to provide information.

This is a non-exhaustive list of factors; USCIS may consider any relevant fact in the discretionary analysis.

**VI. Filing Requirements and Processing Steps**

*A. Form*

Requestors seeking parole in place as the spouse or stepchild of a U.S. citizen must submit Form I–131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, online with the appropriate fee. To submit Form I–131F, requestors must both complete the required form fields and submit the required evidence establishing eligibility.

*B. Documentation*

Requestors must submit the required evidence establishing eligibility, in compliance with Form I–131F instructions. Required documentation for noncitizen spouse requestors includes the following:

- Proof of identity, which may include:
  ○ Valid State or country driver's license or identification;
  ○ Birth certificate with photo identification;
  ○ Valid passport; or
  ○ Any government issued document bearing the requestor's name, date of birth, and photo.[156]
- Evidence establishing their continuous physical presence since at least June 17, 2014, which may include, but is not limited to:
  ○ Internal Revenue Service (IRS) tax transcripts listing tax information;
  ○ Rent receipts or utility bills;
  ○ Deeds, mortgage statements, or rental contracts;
  ○ Bank, credit card, or loan statements showing regular transactions;
  ○ Insurance policies;
  ○ Automobile license receipts, title, or registration;
  ○ Hospital or medical records;
  ○ School records (letters, report cards, etc.);
  ○ Attestations to the requestor's physical presence by religious entities, unions, or other civic or community organizations;
  ○ Official records from a religious entity confirming the requestor's participation in a religious ceremony;
  ○ Birth certificates for children born in the United States;
  ○ Money order receipts for money sent into or out of the United States; or
  ○ Any other document that shows that the requestor maintained continuous physical presence in the United States for the requisite time period.
- Evidence establishing a valid marriage between the noncitizen spouse and U.S. citizen:
  ○ Current marriage certificate showing a legally valid marriage took place on or before June 17, 2024;
  ○ Any divorce decree, annulment decree, or death certificate showing that the noncitizen spouse's and their U.S. citizen spouse's prior marriages were terminated (if applicable); and
  ○ Death certificate of U.S. citizen spouse (if applicable).
- Proof of the U.S. citizenship status of the spouse/stepparent, which must include one of the following:

---

[153] A decision by USCIS to grant parole in place to a requestor with an unexecuted removal order does not rescind, cancel, vacate, or otherwise remove the existence of the unexecuted removal order. DOJ EOIR has sole jurisdiction over the decision to reopen removal proceedings under INA section 240, 8 U.S.C. 1229a, *see* INA sec. 240(c)(7), 8 U.S.C. 1229a(c)(7); such reopening vacates any final removal order issued under INA section 240, 8 U.S.C. 1229a, *see Nken* v. *Holder,* 556 U.S. 418, 429 n.1 (2009). An unexecuted removal order issued by DOJ EOIR under INA section 240, 8 U.S.C. 1229a, remains in existence, notwithstanding a grant of parole in place, unless and until the INA section 240 proceedings are reopened by an immigration judge or the BIA. Unexecuted removal orders issued by DHS (such as an order of expedited removal under INA section 235(b)(1), 8 U.S.C. 1225(b)(1), or an administrative order of removal under INA section 238(b), 8 U.S.C. 1228(b)), likewise remain in existence unless and until they are vacated, canceled, or rescinded by the relevant issuing authority within DHS in that agency's sole discretion.

[154] This includes those with a pending appeal to the BIA, as their removal order would not be administratively final pending resolution of the appeal.

[155] See, e.g., September 2021 Guidelines, *supra* note 81. As noted in the September 2021 Guidelines, noncitizens present border security concerns if they were apprehended while attempting to enter the U.S. unlawfully or if they entered unlawfully after November 1, 2020. There is an exception to this for stepchildren who otherwise meet the criteria for parole in place under this process.

[156] Expired documents may be provided in conjunction with other documents.

○ The spouse's/stepparent's U.S. birth certificate (if the spouse has held U.S. citizenship since birth);

○ The spouse's/stepparent's Certificate of Naturalization;

○ The spouse's/stepparent's Certificate of Citizenship;

○ The spouse's/stepparent's Form FS–240, Consular Report of Birth Abroad; or

○ The biographical page of the spouse's/stepparent's current U.S. passport.

• Arrest records and court dispositions of any arrests, charges, and convictions (if applicable).

Required documentation for noncitizen stepchild requestors includes the following:

• The birth certificate of the stepchild listing the name of the noncitizen parent as a natural parent;

• Proof of identity (as listed above);

• Evidence establishing their continuous physical presence since June 17, 2024 (as listed above);

• Evidence establishing a legally valid marriage between the noncitizen stepchild's noncitizen parent and the noncitizen stepchild's U.S. citizen stepparent took place on or before June 17, 2024 (as listed above);

• Proof of the U.S. citizenship status of the spouse/stepparent (as listed above);

• Arrest records and court dispositions of any arrests, charges, and convictions (if applicable).

*C. Processing Steps*

This parole in place process will be implemented in accordance with the lessons learned from similar processes, while building on technological advances and efficiencies in USCIS processing.

Filing Procedure

Each requestor must submit Form I–131F with the applicable filing fee, as listed on Form G–1055, Fee Schedule (currently $580). Fee waivers are not available, and requests must be submitted online. For information on creating a USCIS online account, visit *www.uscis.gov/file-online/how-to-create-a-uscis-online-account.* Each requestor, including noncitizen stepchild requestors, must file a separate Form I–131F and pay the fee individually.

Biometrics Submission

After the requestor files Form I–131F, they will be required to provide biometrics to USCIS, including fingerprints, photographs, and a signature. The requestor's biometric information will be used to conduct

background checks, including checks for criminal history records, verify identity, determine eligibility for requested benefits, create immigration documents (*e.g.,* Employment Authorization Documents), or for any other purpose authorized by the INA.[157] After the requestor files the Form I–131F online, USCIS will notify the noncitizen in writing of the time and location for a biometric services appointment. Failure to appear for biometrics submission may result in a denial of the parole in place request.

Case-by-Case Consideration for Parole

Noncitizens who meet the criteria listed in this notice may be considered for a discretionary grant of parole on a case-by-case basis. USCIS may grant parole in place to the requestor if USCIS determines that there is a significant public benefit or urgent humanitarian reason for parole and that the requestor merits a favorable exercise of discretion in the totality of the circumstances.

USCIS may prioritize the adjudication of Form I–131F for noncitizens who previously filed a Form I–601A. In establishing this parole in place process, DHS considered that certain noncitizens eligible for the parole in place process will have already prepared, filed, and paid a filing fee for a Form I–601A. USCIS has determined that prioritizing the adjudication of Forms I–131F filed by these noncitizens is justified in recognition that they availed themselves of existing processes to pursue an immigrant visa but may nonetheless wish to pursue parole in place to avoid the costs and potential separation or disruption to their family that consular processing entails. Additionally, prioritizing this population may have the downstream effect of reducing the adjudicatory resources needed for pending Forms I–601A as noncitizens who are granted parole in place through this process may subsequently apply, and be approved, for adjustment of status to that of an LPR.

Upon a grant of parole in place, the noncitizen will receive a Form I–797, Notice of Action, and a Form I–94, Arrival/Departure Record.

Parole Period

If granted parole in place on a case-by-case basis in the exercise of discretion, parole will generally be granted for a period of up to three years. Parole may be terminated at any time upon notice at DHS's discretion

pursuant to 8 CFR 212.5(e)(2)(i). DHS does not contemplate a re-parole process at this time.

In addition, USCIS, in its sole discretion, may impose conditions on a grant of parole with respect to any noncitizen under this process, and it may request verification of the noncitizen's compliance with any such condition at any time.[158] Violation of any condition of parole may lead to termination of the parole in accordance with 8 CFR 212.5(e).

Employment Authorization

If parole in place is granted, the parolee will be eligible to request an Employment Authorization Document (EAD) pursuant to 8 CFR 274a.12(c)(11), as recipients of parole under INA section 212(d)(5), 8 U.S.C. 1182(d)(5). An individual seeking employment authorization as a parolee (category (c)(11)) may request a waiver of the Form I–765, Application for Employment Authorization, fee by submitting Form I–912, Request for Fee Waiver along with the Form I–765.

Subsequent Form I–130 or Form I–485

A grant of parole in place does not establish eligibility for an immigrant visa petition or a presumption that the marriage is bona fide for purposes of an immigrant visa petition or other immigration benefits. Following a grant of parole to a noncitizen, the U.S. citizen spouse or stepparent of the noncitizen is encouraged to file a Form I–130, or, in the case of certain widow(er)s, the noncitizen may file Form I–360, concurrently with the Form I–485 if they have not filed a standalone Form I–130 or Form I–360 already. For purposes of Form I–130 based on marriage, a petitioner must demonstrate that they entered into a bona fide marriage with the beneficiary, and for a Form I–130 for a stepchild, the petitioner must demonstrate they entered into a bona fide marriage to the beneficiary's noncitizen parent. There are additional requirements for Form I–360 for certain widow(er)s and their children, including filing deadlines, residence requirements, and marital status requirements.[159] A stepchild may remain eligible for an immigrant visa despite their parent's marriage to a U.S. citizen being terminated through death of either parent or divorce, so long as a bona fide stepparent-stepchild relationship continued to exist following the death or divorce.

---

[157] As authorized by the INA, biometric information collected in this process may be used by other DHS components. *See also* 8 CFR 103.16. *See also* discussion on information use and disclosure in this notice.

[158] *See* INA sec. 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A).

[159] *See* INA secs. 201(b)(2)(A)(i), 204(l), 8 U.S.C. 1151(b)(2)(A)(i), 8 U.S.C. 1154(l).

Further, a discretionary grant of parole does not in itself establish eligibility for adjustment of status to that of an LPR under INA section 245(a), 8 U.S.C. 1255(a). As discussed elsewhere in this notice, a grant of parole would satisfy the requirement under INA section 245(a), 8 U.S.C. 1255(a), that the applicant has been inspected and admitted or paroled by an immigration officer. The noncitizen, however, must satisfy all other requirements for adjustment of status, including establishing that they are not inadmissible under any applicable grounds.[160] As noted, if the noncitizen is granted parole in place, the noncitizen and their spouse or stepparent would need to file Form I–130 (if not previously filed) and Form I–485.[161]

*Information Use and Disclosure*

DHS generally will not use information contained in a request for parole in place under this process for the purpose of initiating immigration enforcement action against the requestor unless DHS determines, in its discretion, the requestor poses a threat to national security, public safety, or border security.[162] This process does not preclude DHS from, in its discretionary authority, taking enforcement actions as deemed appropriate, in accordance with the INA and consistent with governing policies and practices, against noncitizens who may be eligible or who have pending applications for parole under this process. Information provided under this process may be otherwise disclosed consistent with statutory authorities, obligations, and restrictions, as well as governing privacy and information-sharing policies.

*D. Termination and No Private Rights*

As provided under INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), parole decisions are made by the Secretary "in his discretion." This process is being implemented as a matter of the Secretary's discretion, and the Secretary retains the sole discretion to terminate parole in place under this process at any point. It is not intended to, shall not be construed to, may not be

relied upon to, and does not create any rights, privileges, benefits, substantive or procedural, enforceable by any party in any matter, civil or criminal, against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## VII. Considerations in the Establishment of This Parole in Place Process

In establishing this process, DHS considered various alternatives, as well as the impacts on resources and processing and the broader impacts on both the Federal government and State and local governments.

*A. Alternatives to This Process*

In exercising the Secretary's discretionary parole authority to establish a parole in place process, DHS considered various alternatives to the process.

First, DHS considered whether it could instead dedicate additional resources to the processing of pending Forms I–601A. As discussed elsewhere in this notice, the provisional unlawful presence waiver process allows certain noncitizens, including spouses of U.S. citizens, to obtain a provisional unlawful presence waiver prior to their departure from the United States to pursue an immigrant visa at a U.S. embassy or consulate abroad. It is intended to reduce the time noncitizens must spend apart from their U.S. citizen family members while increasing certainty that they will be granted a waiver of the inadmissibility ground that is triggered once they depart.[163] However, the provisional unlawful presence waiver process still entails some period of families being separated because it requires consular processing abroad after approval of the Form I–601A, often at great financial cost. It also involves some level of uncertainty and risk. The grant of a provisional waiver is not a guarantee that the waiver of inadmissibility or the immigrant visa, will ultimately be granted.[164] Likewise, a grant of parole in place does not guarantee that an application for adjustment of status will be approved, but because the application process takes place while the applicant is in the United States, noncitizens may be more likely to pursue this option. For some families, even a short-term separation from a family member, whose income or other household contributions are needed, may be untenable.

Moreover, even if, as an alternative to this process, USCIS dedicated additional resources to provisional waiver processing, doing so would not provide the previously noted significant public benefit of this process. As described in Section IV of this notice, this process furthers diplomatic relationships and foreign policy objectives. It also sets out a streamlined and less resource intensive adjudication, as compared to the more complex and resource intensive provisional waiver process which involves determining if the applicant has met their burden of proving they would be inadmissible only for unlawful presence upon departure, and that they have demonstrated extreme hardship to a qualifying relative.[165] Although USCIS has significantly increased resources devoted to the Form I–601A backlog relative to previous years, the backlog of pending applications will still take at least three years to be meaningfully reduced. Accordingly, although USCIS considered dedicating even more resources to Form I–601A processing, it concluded that doing so would not effectively address the backlog in the near term or support timely adjudications of other workloads as compared to the processing efficiencies gained through implementation of this parole in place process.

USCIS anticipates that its adjudication of parole requests under this process will be less resource-intensive than the adjudication of Form I–601A applications, given process efficiencies that USCIS has identified in adjudicating parole requests in other parole processes, and considering the complexity and resources required for the I–601A adjudication. And unlike the provisional waiver process, parole in place will not entail a period of separation from U.S. citizen family members or, alternatively, require U.S. citizen family members to depart the United States with the noncitizen. Additionally, it will obviate the need for consular processing, thereby diverting noncitizens with parole in place from DOS backlogs and reducing wait times for other noncitizens seeking visas at U.S. consulates.

While the Form I–601A process will remain critical for other categories of immigrant visa applicants who are not eligible for this process, parole in place offers a less onerous path for a subset of the I–601A-eligible population who have lived in the United States for at least 10 years, are married to U.S. citizens or are the noncitizen

---

[160] Furthermore, by avoiding the need to depart the United States to seek an immigrant visa at a U.S. embassy or consulate, the noncitizen would not trigger the inadmissibility grounds at INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B), by seeking admission after such departure.

[161] Additionally, there may be instances where the noncitizen would also have to file the Form I–601, Application for Waiver of Grounds of Inadmissibility.

[162] *See, e.g.,* September 2021 Guidelines, *supra* note 81.

[163] *See* 78 FR 536 (Jan. 6, 2013).

[164] *See* 8 CFR 212.7(e)(12)(i) (noting the conditions that must be satisfied for the provisional unlawful presence waiver to take effect).

[165] 8 CFR 212.7(e).

stepchildren of U.S. citizens, have no disqualifying factors, and merit a favorable exercise of discretion.

DHS acknowledges that there will be an increase in filings of Form I–765, as well as an increase in Form I–130 and Form I–485 filings but notes that these forms have associated filing fees that cover the cost of adjudication, and USCIS has implemented streamlined processing for certain categories of employment authorization documents, and other immigration benefit requests, including those filed by parolees. In considering all the factors, DHS determined that the benefits of implementing this process, as discussed in Section IV of this notice, outweigh any additional workload assumed by USCIS.

Second, DHS has considered alternative approaches in designing this process. Specifically, in proposing parameters for this process, DHS considered the following alternatives:

• *Length of requisite physical presence:* DHS considered the time period by which a requestor would likely have established deep ties to their communities in the United States in determining the period of continuous physical presence required to access this process. In making this determination, DHS considered whether a longer period (such as 15 years) or a shorter period (such as five or eight years) was more appropriate and considered estimates of the potential population for each of these time periods. Because Congress has articulated a 10-year length of continuous presence as a prerequisite for certain non-LPR noncitizens to seek lawful permanent residence through a separate process known as cancellation of removal,[166] DHS concluded that 10 years would be an appropriate length of time to require noncitizens to have been present in the United States to access this process.

DHS also considered whether the noncitizen could continue to accrue the required 10 years of continuous physical presence until the time a parole request is filed, or whether the noncitizen must have accrued the 10 years by the time the process was announced. DHS determined that requiring continuous physical presence to have accrued by a certain date provides greater predictability and certainty about the scope of the potential population, which in turn will assist DHS in determining the appropriate resources to dedicate to this process. Requiring 10 years of

continuous physical presence by June 17, 2024 for noncitizen spouses of U.S. citizens also provides clarity to the public and avoids unintentionally incentivizing any irregular migration by noncitizens who might otherwise seek to enter the United States to access this process.

• *Marriage to a U.S. citizen:* In requiring noncitizen spouses of U.S. citizens to have a legally valid marriage on or before June 17, 2024, DHS considered whether marriages that took place after this date could nevertheless be qualifying. DHS determined that requiring marriages to have taken place by June 17, 2024 would better promote process integrity, prevent potential fraud, and provide greater certainty about the scope of the potential population.

DHS also considered whether marriage to an LPR could be a qualifying factor and determined against it because a primary goal of establishing this proposed process is to remove a barrier to an immigration benefit that may otherwise be immediately available to the noncitizen. When a noncitizen marries a U.S. citizen, they qualify as an ''immediate relative'' under the INA and are able to immediately apply for LPR status (*i.e.,* without needing to wait for an immigrant visa to become available).[167] Noncitizen spouses of LPRs who lack lawful status do not qualify as ''immediate relatives'' and therefore do not have an immediate path to adjustment of status (even if granted parole) because they must wait for an immigrant visa to become available before they can apply for LPR status. They also are subject to other ineligibility provisions barring adjustment of status that are not applicable to spouses of U.S. citizens.[168]

DHS considered whether the marriage must be of a specified duration (*e.g.,* two years) at the time of the parole in place request, particularly to address potential concerns about marriage fraud and integrity of this process. The fixed date by which the marriage must have taken place (June 17, 2024), eliminates any concern that individuals may marry solely to take advantage of this process. Moreover, USCIS will further assess the validity of the marriage for immigration purposes, including a thorough review of the bona fides of the marriage, during its consideration of the Form I–130 and Form I–485. In its consideration of these forms, USCIS will employ its standard, rigorous procedures to detect potential

marriage fraud, further ensuring that fraudulent marriages will not serve as the basis for a grant of adjustment of status following access to this parole in place process. Finally, USCIS can grant adjustment of status to conditional lawful permanent residents on the basis of marriage to a U.S. citizen when the marriage is less than two years in length. Therefore, DHS determined that this process will not require that the marriage be of a specified length, though DHS requires that the marriage be legally valid in the place of celebration as of June 17, 2024.

DHS also decided to include widow(er)s who entered into a legally valid marriage with a U.S. citizen prior to June 17, 2024. DHS believes that including this population furthers the goals of the process because widow(er)s of U.S. citizens may continue to be eligible for immigrant visa petition approval and to apply to adjust status if certain requirements are met. DHS also notes that including this population is consistent with the process for family members of military service members, in which the widow(er) of a deceased U.S. citizen service member is eligible for parole in place. To be eligible for immigrant visa petition approval and be eligible to apply to adjust status, the widow(er) must have a Form I–130 filed on their behalf at the time of the U.S. citizen's death or file a Form I–360 within two years of the U.S. citizen's death. The widow(er) must also be unmarried when their immigrant visa petition is adjudicated. A widow(er)'s children may also be eligible for immigrant visa petition approval and to adjust status as the derivative child of the widow(er). For these reasons, DHS determined that, based on continued eligibility to apply for an immigration benefit and adjustment of status, spouses and stepchildren of deceased U.S. citizens could qualify for this parole process if they demonstrate the additional qualifying criteria at the time of filing an immigrant visa petition.

• *Stepchildren of a U.S. citizen:* Noncitizens who are granted parole under this process may have children in the United States who lack lawful status and who are unable to adjust their status without facing the same barriers that their noncitizen parents would encounter in the absence of a parole in place grant under this process.

DHS determined that providing these noncitizen stepchildren access to this process is necessary to fully meet its objective of promoting the unity and stability of families in which a U.S. citizen is married to a noncitizen who lacks lawful status. DHS estimates that 50,000 noncitizen children of

---

[166] *See* INA sec. 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A).

[167] *See* INA sec. 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i); 8 CFR 204.1(a)(1).

[168] *See, e.g.,* INA sec. 245(c)(2), 8 U.S.C. 1255(c)(2).

noncitizen spouses who are married to U.S. citizens may be eligible to request consideration under this process. However, DHS is requiring that the noncitizen stepchild have been continuously physically present in the United States without admission or parole since at least June 17, 2024, and through the date of filing, since children may be under the age of 10 or otherwise unable to meet the 10 years required for noncitizen spouses of U.S. citizens. Additionally, as with the physical presence requirement for spouses, requiring physical presence in the United States as of a date prior to announcing this process avoids unintentionally incentivizing any irregular migration by noncitizens who might otherwise seek to enter the United States to access this process.

DHS also considered limiting this parole in place process to children whose noncitizen parent was also requesting parole. DHS determined that noncitizen stepchildren of a U.S. citizen may apply for an immigrant visa petition separately even if the noncitizen parent does not have an immigrant visa or status, and therefore should not be excluded from this process. A qualifying noncitizen stepchild of a U.S. citizen may be eligible as a beneficiary of Form I–130 based on their relationship with the U.S. citizen stepparent. This is the case even if the parents divorced or the noncitizen parent died. As such, DHS determined that noncitizen stepchildren who would otherwise be eligible as a beneficiary of Form I–130 based on a stepparent-stepchild relationship, notwithstanding divorce of the parents or death of the noncitizen parent, should also be eligible to request parole in place under this process.

• *Criminal history and threats to national security, public safety or border security:* DHS determined that noncitizens with serious criminal convictions will be ineligible for parole under this process.[169] DHS also determined that other criminal convictions (other than minor traffic offenses) will result in a presumption of ineligibility for parole. This presumption can be rebutted on a case-by-case basis by weighing the seriousness of the conviction against positive factors that overcome the presumption.[170] Additionally, all requestors will undergo rigorous national security and public safety

vetting as part of this process. Those individuals who pose a threat to national security, public safety or border security[171] will be disqualified from this process and, where appropriate, will be referred to law enforcement. In making these determinations, DHS considered that certain criminal convictions were likely to render a noncitizen statutorily ineligible for adjustment of status, and decided that those criminal convictions that are disqualifying for this process would generally overlap with the statutory inadmissibility grounds. In addition, DHS determined that noncitizens with pending criminal charges will be ineligible for parole in place under this process until those charges are resolved.

• *Parole period length:* DHS determined that a three-year grant of parole was most appropriate for this process, though it considered both shorter and longer periods of time. Other processes, such as the family reunification parole processes, provide for up to a three-year grant of parole.

After being granted parole in place, the noncitizen will generally be eligible to apply to adjust their status if they have an approved Form I–130 or their Form I–485 is accompanied by a Form I–130. The benefits of parole (including lawful presence and employment authorization) will remain in effect for the period of parole. Currently, the median processing time for an immediate relative Form I–130, when filed separately from a Form I–485, is 11.4 months, for Form I–360 (all categories) is 3.2 months, and the median processing time for a family-based Form I–485, when filed separately from a Form I–130, is 9.4 months.[172] Concurrent filing of these two forms is permitted for noncitizen spouses of U.S. citizens. Assuming that noncitizens would need time to compile evidence for these applications, save the necessary funds to pay fees, and file these applications, a three-year grant of parole will provide an appropriate amount of time to obtain adjustment of status following the grant of parole in place based on median USCIS processing times. A shorter timeframe would likely be insufficient to cover the time needed to prepare and file the adjustment application, while a longer timeframe would risk disincentivizing

parolees from timely applying for adjustment of status.

In making this determination, DHS considered that parole in place is granted for certain military family members for a one-year period, which currently is subject to subsequent periods of parole in one-year increments, and is also fee exempt. Additionally, military parole in place is available for a broader category of relatives: spouses, widow(er)s, parents, and sons and daughters of U.S. citizen or LPR military members and veterans, whereas this process is open only to certain noncitizen spouses and stepchildren of U.S. citizens who may have an immediate path to adjustment of status. However, in more recent parole processes, DHS has found that a longer parole period is more efficient for the public and the agency as it reduces the need for recipients to seek re-parole.[173] A three-year parole period was therefore determined to be appropriate for certain noncitizen spouses and stepchildren of U.S. citizens to ensure that they have sufficient time to obtain adjustment of status during their parole period, especially given that re-parole for requestors granted parole under this process is not contemplated at this time.

• *Removal proceedings:* DHS considered whether and how a parole in place process should be available to noncitizens in pending removal proceedings under INA section 240, 8 U.S.C. 1229a. Given that some noncitizens in removal proceedings may be eligible to adjust status if granted parole, USCIS will consider requests for otherwise eligible noncitizens in pending removal proceedings who do not have a final order of removal. This includes those who have been released on bond or their own recognizance under INA section 236(a), 8 U.S.C. 1226(a), provided they remain applicants for admission. USCIS will coordinate with ICE OPLA as it deems appropriate. A noncitizen who is considered a national security, public safety or border security concern will be generally disqualified from receiving

---

[169] *See* Section V.A. of this notice for the full list of disqualifying criminal convictions.

[170] *See id.* for a list of factors USCIS may consider in determining whether the requestor has overcome the presumption.

[171] There is an exception for border security concerns for stepchildren who otherwise meet the criteria for parole in place under this process.

[172] *See* Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms by Fiscal Year, available at *https://egov.uscis.gov/processing-times/historic-pt.*

[173] *See, e.g., Implementation of a Family Reunification Parole Process for Colombians,* 88 FR 43591 (July 10, 2023); *Implementation of a Family Reunification Parole Process for Ecuadorians,* 88 FR 78762 (Nov. 16, 2023); *Implementation of a Family Reunification Parole Process for Salvadorans,* 88 FR 43611 (July 10, 2023); *Implementation of a Family Reunification Parole Process for Guatemalans,* 88 FR 43581 (July 10, 2023); *Implementation of a Family Reunification Parole Process for Hondurans,* 88 FR 43601 (July 10, 2023); *Implementation of Changes to the Cuban Family Reunification Parole Process,* 88 FR 54639 (Aug. 11, 2023); *Implementation of Changes to the Haitian Family Reunification Parole Process,* 88 FR 54635 (Aug. 11, 2023).

parole in place pursuant to this process. However, given the overall objective to preserve family unity, there is an exception for border security concerns for stepchildren who were placed into proceedings after November 1, 2020, who otherwise meet the criteria for parole in place under this process. In such cases, USCIS will consider any extenuating or mitigating factors, including family unity, age at the time of placement in proceedings, or other factors that USCIS considers relevant in the exercise of discretion. The exception for border security for certain noncitizen stepchildren of a U.S. citizen is consistent with the eligibility requirement for this process as stated in section V.A. of this preamble (explaining that noncitizen stepchildren may request parole in place under this process), the requirement for continuous physical presence in the United States only covers June 17, 2024 through the date of filing.

- *Prior removal orders:* DHS considered whether noncitizens with unexecuted final removal orders should be eligible for this process. DHS determined that noncitizens with unexecuted final removal orders will be presumptively ineligible for parole under this process. DHS recognizes that a noncitizen may have grounds to request that an immigration judge or the BIA reopen their immigration proceedings when they are otherwise eligible for adjustment of status, and thus determined that categorical ineligibility for this parole process would be inappropriate. As a result, DHS will evaluate, in the exercise of its discretion on a case-by-case basis, the facts and circumstances underlying the unexecuted final removal order and all other mitigating factors presented in determining whether the noncitizen may overcome the rebuttable presumption of ineligibility and be granted parole in place.[174]

DHS acknowledges that granting parole in place to requestors with unexecuted removal orders could increase the volume of motions to reopen removal proceedings that EOIR will receive, and which ICE OPLA will review and respond to, as appropriate. DHS believes that a rebuttable presumption of ineligibility, and consideration of the factors listed in Section V.B. of this notice strike an appropriate balance to providing access to parole in place under this process to noncitizens who may have grounds to

support the granting of parole in place. If granted parole in place, noncitizens who are prima facie eligible for adjustment of status may independently pursue reopening and dismissal of their case before EOIR to permit the filing of an adjustment of status application before USCIS.

- *Form I–130:* DHS considered whether the noncitizen should be required to have an approved Form I–130 prior to being granted parole in place under this process, given that it is a prerequisite for access to the FRP processes. However, DHS anticipates that many noncitizens who will benefit from this process may not yet have filed a Form I–130 because they are currently ineligible to adjust status and may not wish to pursue consular processing given the prospect of prolonged separation from their U.S. citizen family members. Requiring a previously approved Form I–130 could disqualify a significant portion of this population from this process and would be less effective in achieving the significant public benefits described in this notice, including of stabilizing and unifying families and enabling these noncitizens to contribute more fully to the U.S. economy. Moreover, immediate relatives who have been paroled are eligible to file their Form I–130 concurrently with their Form I–485. Requiring that a noncitizen file a Form I–130—either alone, or concurrently with a Form I–485—to request parole in place under this process would create significant inefficiencies and run counter to DHS' goal of reducing strain on limited government resources.

- *Form I–134:* DHS considered whether the noncitizen should be required to file Form I–134, Declaration of Financial Support, which USCIS uses in certain circumstances to determine whether applicants or beneficiaries of certain immigration benefit requests have sufficient financial resources or financial support to pay for expenses during their temporary stay in the United States.[175] However, DHS declined to include a requirement for submission of Form I–134 for this parole in place process. USCIS has not generally required Form I–134 for parole in place requests. For the existing military parole in place process, noncitizen family members of U.S. military service members who are granted parole in place are required to file Form I–864, Affidavit of Support Under INA Section 213A when they file for adjustment of status. Form I–864A is

executed by a sponsor as evidence that the noncitizen has adequate means of financial support and are not likely at any time to become a public charge under INA section 212(a)(4)(A), 8 U.S.C 1182(a)(4)(A). Similarly, following a grant of parole in place through this process, noncitizen spouses and noncitizen stepchildren are expected to apply to adjust status, at which time they too will be required to submit a Form I–864. Once adjustment of status is granted, the sponsorship obligations associated with the Form I–864 remain in effect until, for example, the noncitizen naturalizes or is credited with 40 quarters of work.[176]

DHS has, therefore, determined that requiring a noncitizen to submit a Form I–134 as part of their parole in place request when shortly thereafter, they will be required to submit a Form I–864 with their adjustment of status application, is unnecessarily duplicative and adds an extra burden on requestors. Moreover, requiring USCIS officers to adjudicate similar but unrelated evidence related to financial support would create inefficiencies that run counter to DHS's goals of reducing strain on limited government resources and facilitating access to adjustment of status through this process.

- *Inadmissibility:* DHS additionally considered requiring the requestor to demonstrate that they are not inadmissible under any ground set forth in INA section 212(a), 8 U.S.C. 1182(a), to be granted parole under this process. This parole in place process is meant for those requestors who are otherwise eligible to adjust status. As noted elsewhere in this notice, serious criminal convictions, including certain convictions that would render the requestor inadmissible and therefore ineligible for adjustment of status, will be disqualifying for this process; other criminal convictions, as well as prior, unexecuted removal orders, will trigger a rebuttable presumption of ineligibility for this process. However, detailed consideration of grounds of inadmissibility—including whether applicable grounds can be waived—is a complex analysis undertaken during the Form I–485 adjustment of status adjudication. Requiring parole in place adjudicators to conduct the inadmissibility analysis that is normally conducted at the adjustment of status stage would be an inefficient, duplicative, and costly use of USCIS resources. Therefore, when assessing eligibility for parole in place, while DHS will consider the requestor's criminal and immigration history and any other

---

[174] *See* Section V.A. of this notice for a list of examples of information that may be relevant to DHS in its determination as to whether the requestor has overcome the presumption of ineligibility.

[175] DOS also requests applicants or beneficiaries of certain immigration benefit requests submit Form I–134 in certain circumstances.

[176] *See* 8 CFR 213a.3(e)(2)(i).

adverse factors that could bear upon admissibility, it will not import the admissibility analysis conducted at the Form I–485 stage into the parole adjudication.

As discussed elsewhere in this notice, a grant of parole in place would satisfy the requirement under INA section 245(a), 8 U.S.C. 1255(a), that the adjustment applicant has been "inspected and admitted or paroled" by an immigration officer. This process is meant for requestors who are otherwise eligible for adjustment of status and who merit a favorable exercise of discretion; the noncitizen, however, when applying to adjust status, must satisfy all other requirements for adjustment of status, including establishing that the requestor is not inadmissible under any applicable grounds.

## B. Resource Considerations and Impacts on USCIS Processing

DHS has considered the potential impact of this process on noncitizens applying for other immigration benefits. While there could be an impact initially on wait times for other USCIS-administered immigration programs and processes, over time, this process will assist USCIS in creating efficiencies in other workloads. For example, USCIS will be able to reduce processing times more quickly for the Form I–601A because some noncitizens who would have filed a Form I–601A and pursued consular processing would instead request parole in place and adjustment of status. DHS also considered the potential impact of this process on USCIS operations. This process will result in an increased number of individuals visiting USCIS Application Support Centers (ASC) to have their biometrics collected and will require USCIS to divert some resources to develop the technical solutions to administer this process and complete the adjudications. However, because USCIS will require all parole in place requestors to pay a fee, it is anticipated that the agency will recover fully the costs associated with this workload.

USCIS also anticipates that this process will lead to increased filings of Forms I–485 because some noncitizens who would otherwise seek lawful permanent residence via consular processing, or would have remained without status, will now seek adjustment of status. However, USCIS expects that the costs to the agency of adjudicating increased volumes of Forms I–485 will be in large part recovered by the Form I–485 fees. DHS has also determined that any additional adjudicatory costs are warranted by the significant public benefits described throughout this notice.

Finally, the process will provide needed relief to U.S. embassies and consulates, some of which have significant backlogs of noncitizens awaiting interviews for immigrant visa applications.

## C. Potential Impact on Federal Government and Access to Federal Benefits

DHS has considered the impact of the proposed process on eligibility for Federal public benefits. Only noncitizens who are considered "qualified aliens" may access certain Federal benefits programs.[177] "Qualified aliens" include noncitizens paroled under INA section 212(d)(5), 8 U.S.C. 1182(d)(5), for a period of at least one year, as well as lawful permanent residents and several other categories.

However, nearly all of these benefits programs are available only to noncitizens who have been in "qualified" status for at least five years. For example, the Supplemental Nutrition Assistance Program (SNAP) generally requires noncitizens to have been in "qualified" status for five years before they may potentially receive benefits. Medicaid, Temporary Assistance for Needy Families (TANF), and the Children's Health Insurance Program (CHIP) similarly generally require five years in "qualified" status for noncitizens who entered after August 22, 1996.[178] Given that noncitizens eligible for this process are estimated on average to have lived in the United States for 23 years,[179] DHS anticipates that the majority of those who may be considered for parole in place will have entered after this date. Accordingly, most noncitizens who receive parole pursuant to this process will not be eligible to access public Federal benefits for at least five years. And, although the provision of parole in place will start the five-year waiting period prior to adjustment of status, DHS anticipates that the uptake of these public benefits would likely be curtailed by the noncitizen's access to lawful employment. Upon receipt of employment authorization and gainful employment, spouses and stepchildren of U.S. citizens may no longer need or qualify for public benefits. Additionally, noncitizens' eventual potential ability to access benefits after being granted parole through this process may well be offset by increased tax revenue and other economic benefits created by their ability to obtain lawful employment.

Unlike the analysis that most noncitizens who receive parole pursuant to this process will not be eligible to access public benefits for at least five years, Cuban and Haitian nationals who are granted parole are eligible for special "Cuban-Haitian Entrant Program" (CHEP) benefits.[180]

## D. Potential Impact on States

DHS considered the potential impact of the proposed process on State budgets, including noncitizens' access to means tested benefits, driver's licenses, and public education. As discussed elsewhere in this notice, DHS also considered the potential economic benefit to State and local governments through the provision of employment authorization to eligible parolees, and increased tax revenue to States that will result from this process. A comprehensive quantified accounting of local and State fiscal impacts specifically due to this parole in place process is not possible, in part due to the case-by-case nature of the determinations. DHS cannot predict with the available information the impact these noncitizens might have on State and local programs or the degree they will contribute to State and local budgets.

Access to means-tested benefits for eligible noncitizens varies at the State level. States can accept Federal funds to assist them with providing such benefits and have the authority to determine the eligibility of qualified noncitizens for certain designated Federal programs including TANF, Medicaid, and CHIP. Several States–including Indiana, Mississippi, Ohio, South Carolina, and Texas–deny some qualified noncitizens access to TANF even after the five-year waiting period has elapsed. While means-tested benefit costs at both the Federal and State levels could increase because of potential earlier access to qualified noncitizen status for the purpose of benefits eligibility than would otherwise be the case absent this parole in place process, for most States, any increase in benefit-based spending for these parolees will be delayed by the five-year waiting period. Upon receipt of employment authorization and gainful employment, spouses and stepchildren of U.S. citizens may no

---

[177] See Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Public Law 104–193, title IV, 110 Stat. 2105, 2260–77 (Aug 22, 1996).

[178] 8 U.S.C. 1613.

[179] OHSS Analysis, supra note 3, tbl. 5.

[180] See Refugee Education Assistance Act of 1980, Public Law 96–422, sec. 501 (8 U.S.C. 1522 note); 8 CFR 212.5(h); see also U.S. Dep't of Health and Human Services, Office of Refugee Resettlement, Benefits for Cuban/Haitian Entrants (Fact Sheet), available at https://www.acf.hhs.gov/orr/fact-sheet/benefits-cuban/haitian-entrants.

longer need or qualify for public benefits. Additionally, noncitizens' eventual potential ability to access benefits after being granted parole through this process may well be offset by increased tax revenue and other economic benefits created by their ability to obtain lawful employment.

The extent to which this process will impact States in the short term because of noncitizens granted parole gaining access to driver's licenses will depend on State policy. Although 19 States, the District of Columbia, and Puerto Rico already provide noncitizens access to driver's licenses regardless of immigration status, other States make access to driver's licenses contingent on lawful immigration status. However, the REAL ID Act of 2005 [181] and its implementing regulations exclude parolees from the list of categories of individuals eligible for REAL ID-compliant licenses. Therefore, whether noncitizens who are granted parole under this process can receive driver's licenses will depend upon States' willingness to continue to issue non-REAL ID compliant licenses to this population, either because they issue driver's licenses to noncitizens regardless of their immigration status or because they contemplate issuing licenses to noncitizens in immigration statuses beyond those included in the REAL ID Act. DHS acknowledges that the provision of parole in place may enable noncitizens to pursue adjustment of status sooner than they otherwise would, and in States where a noncitizen would not have access to a driver's license before becoming an LPR, this process would render them eligible to apply for a driver's license sooner. However, many States may also charge fees for driver's licenses, and therefore the cost to States caused by additional noncitizens becoming eligible for driver's licenses following a grant of parole in place under this process may be mitigated.

DHS also considered the impact of this process on State education costs. DHS recognizes that undocumented noncitizen students receive K–12 education that is publicly funded. Although the provision of parole to some of these undocumented noncitizen students may result in some indirect fiscal effects on State and local governments, the direction of the effect is dependent on multiple factors. Given the criteria requiring stepchildren of U.S. citizens to be continuously physically present in the United States

since at least June 17, 2024, these noncitizens would already be present in the United States and likely attending public school even in the absence of this process.

While some States may allow noncitizens with parole to qualify for in-state tuition rates at public universities, which may not be available to similarly situated noncitizens without parole, the costs to the States will depend on choices they make and will be location-specific. The fiscal impact is therefore difficult to quantify, let alone predict. However, any cost associated with additional access to in-state tuition rates at public universities may be offset by the further pursuit of education and the resultant economic benefits. The provision of parole and employment authorization may motivate recipients to continue their education, pursue post-secondary and advanced degrees, and seek additional vocational training, which ultimately provides greater opportunities, financial stability, and disposable income for themselves and their families.[182] This in turn benefits their communities at large and increases the potential economic benefit to State and local governments.

As described throughout this notice, this process will provide multiple significant benefits to the U.S. public. DHS has identified and considered the interests of the parties affected by establishment of this process and has, to the extent possible, determined that the significant public benefits of the case-by-case parole of noncitizens under this process to the United States outweigh the anticipated costs to Federal and State governments alike. Additionally, given that the population eligible to request parole in place under this process is limited to those who have been continuously physically present in the United States since June 17, 2014, or in the case of stepchildren of U.S. citizens, since at least June 17, 2024, DHS does not believe this process will meaningfully affect or create incentives for noncitizens to enter the United States.

## VIII. Regulatory Requirements

### A. Analysis of Benefits, Costs, and Governmental Transfers

Estimated Population

According to DHS analysis from the Office of Homeland Security Statistics, this process could benefit an estimated

500,000 unauthorized noncitizen spouses of U.S. citizens as well as an estimated 50,000 unauthorized noncitizen stepchildren of U.S. citizens. The estimated 500,000 unauthorized noncitizen spouses is the average of the estimated interval of 300,000 to 700,000 potential noncitizen spouses of U.S. citizens. To provide a more informed analysis when estimating costs, benefits, and transfers of this process, DHS assumes two scenarios: one designates "*scenario 350K*" as a low population estimate scenario that includes 300,000 spouses and 50,000 stepchildren, and the other designates "*scenario 750K*" as a high population estimate that includes 700,000 spouses and 50,000 stepchildren.[183] For the final estimated numbers DHS takes the point estimate, that is the average between the low estimate and high estimate scenarios.

Using data on the estimated unauthorized immigrant population living in the United States,[184] DHS first estimates the broader unauthorized population present in the United States for at least 10 years. DHS then separates the unauthorized populations into two categories, making assumptions on the population that is PWAP (previously known as entered without inspection or EWI) and the population that overstayed their period of admission. The PWAP population is the population of interest under this process. Once the PWAP population in the United States is estimated, DHS filters this population by the proportion of the unauthorized population married to a U.S. citizen,[185] which yields the estimated 500,000 unauthorized noncitizen spouses present in the United States for at least 10 years. To arrive at the estimated number of 50,000 stepchildren, DHS uses fertility data to assume a rate of children per marriage as well as assumptions on the average household composition of U.S. citizen children and unauthorized stepchildren.[186]

---

[181] See Public Law 109–13, div. B, secs. 201–207 (codified at 49 U.S.C. 30301 note); see also 6 CFR pt. 37.

[182] See, e.g., Zachary Liscow and William Woolson, *Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers*, American Law and Economics Review (Dec. 11, 2017), available at *https://dx.doi.org/10.2139/ssrn.3083026*.

[183] DHS cannot accurately predict the behavior of the affected population and hence cannot accurately forecast how many individuals would choose to pursue this policy. The two population scenarios can therefore better inform stakeholders of possible impacts, showing estimated impacts if less (more) individuals than the point estimate of 550,000 choose to pursue this policy.

[184] Bryan Baker and Robert Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022*, available at *https://ohss.dhs.gov/topics/immigration/unauthorized-immigrants/estimates-unauthorized-immigrants* (last visited June 17, 2024).

[185] This rate is on average 12%. Source: Migration Policy Institute, *Profile of the Unauthorized Population: United States*, available at *https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US* (last visited June 17, 2024).

Wages

DHS estimates that this process would result in increased earnings for the population that gains work authorization by removing the "wage penalty" that affects undocumented individuals in the United States. Determining the magnitude of this increase in earnings requires identifying the percentage of the population that applies for parole that is in the labor force, the size of the wage penalty, and the wages of this population in the baseline.

First, DHS assumes the labor participation rate of this population is similar to that of foreign-born workers. Therefore, DHS estimates that approximately 67 percent of this population are currently in the informal labor force,[187] or 234,500 individuals for scenario 350K, and 502,500 individuals for scenario 750K. DHS assumes these estimates remain constant with this process, *i.e.*, the same percentage in this population would transition to or chose to participate in the formal labor market once authorized under this process.

DHS recognizes that providing employment authorization could induce additional entry into the labor force. For example, Pope (2016) found DACA increased the likelihood of a sample of noncitizens in DACA-eligible age groups working by 3.7–4.8 percentage points and their number of hours worked per week by 0.9–1.7 hours, stemming from an increase in labor force participation and a decrease in unemployment.[188] Pope also notes that because the non-citizen sample analyzed was comprised of nearly 40% *authorized* immigrants, the true effect would be approximately 1.6 times larger (5.9–7.7 percentage points). Additional research from Pan (2012)[189]—studying the effects of the Immigration Reform and Control Act of 1986—and Orrenius and Zavodny (2015)[190]—studying the effects of Temporary Protected Status—provides more granular detail that, following receipt of lawful status, wage increases (discussed below) may be clustered among men and higher employment rates may be clustered among women. However, DHS assumes no increase in employment resulting from this process. As a result, the assumption of a static employment rate could result in an underestimate of the total impact.

Second, there is an extensive literature showing that documented immigrants tend to earn higher wages than those who are undocumented. This difference is known as the wage penalty,[191] which Borjas and Cassidy (2019) define as the wage difference between observationally-equivalent documented and undocumented immigrants.[192] In order to quantify the marginal impact of providing employment authorization on earnings for undocumented spouses, DHS consulted several studies. Table 1 shows the studies and the various wage penalty percentages from their findings.

TABLE 1—STUDIES ON UNDOCUMENTED WORKER WAGE PENALTIES

| Wage penalty | Author | Title and descriptor |
|---|---|---|
| 4% to 6% | Borjas & Cassidy (2019). | *The wage penalty to undocumented immigration.* Wage earned as a documented noncitizen could be, on average, 4 to 6 percent higher than the wage of an individual working as an undocumented noncitizen. |
| 5% | Ortega & Hsin (2022) | *Occupational barriers and the productivity penalty from lack of legal status.* The wage gap between documented and undocumented workers in the period 2010–2012 is 12 percent in occupations with entry barriers (30.1% of undocumented workers) and 2 percent in occupations without entry barriers (69.9% of undocumented workers) when accounting for observable characteristics (similar education and skills) other than occupation. |
| 8% | Albert (2021) | *The Labor Market Impact of Immigration: Job Creation versus Job Competition.* Using data from 1994–2016, the wage gap—conditional on observable characteristics—between undocumented and document immigrants is 8 percent. |
| 14% to 24% | Kossoudji & Cobb-Clark (1998). | *Coming Out of the Shadows: Learning about Legal Status and Wages From the Legalized Population.* The Immigration Reform and Control Act of 1986 (IRCA) authorized the granting of lawful status to approximately 1.7 million long-term unauthorized workers in an effort to bring them "out of the shadows" and improve their labor market opportunities. An analysis of wages using panel data for a sample of men granted lawful status provides evidence that wage determinants are structurally different after legal status was available for them but not for the comparison group as measured during the same time periods. The wage penalty for being unauthorized is estimated to range from 14% to 24%. |

Borjas and Cassidy (2019) examine the wage differential between informal and formal work for immigrant populations finding that the wage earned as a documented noncitizen could be, on average, 4 to 6 percent higher than the wage of an individual working as an undocumented noncitizen.[193]

Ortega and Hsin (2022) find that the wage penalty between documented and undocumented workers in the period 2010–2012 is 12 percent in occupations with entry barriers (30.1% of undocumented workers) and 2 percent in occupations without entry barriers (69.9% of undocumented workers) when accounting for observable

---

[187] In 2023, the labor force participation rate of the foreign born increased to approximately 67 percent (rounded value). *See* BLS Foreign-Born Workers: Labor Force Characteristics—2023 (May 21, 2024) *https://www.bls.gov/news.release/archives/forbrn_05212024.pdf.*

Calculation: 350,000 * 67 percent = 234,500, and 750,000 * 67 percent = 502,500.

[188] Nolan G. Pope, The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants,

Journal of Public Economics, vol. 143, 2016: 98–114.

[189] Pan, Y. The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986. J. Labor Res. 33, 119–142 (2012).

[190] Orrenius, Pia M., and Madeline Zavodny. 2015. "The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes." *American Economic Review*, 105(5): 576–80.

[191] Despite being labeled as a "wage penalty," such estimates are generally reported as a percentage of earnings before work authorization, rather than after.

[192] *See* George J. Borjas and Hugh Cassidy, *The wage penalty to undocumented immigration*, Lab. Econ. 61, art. 101757 (2019) [hereinafter Borjas and Cassidy (2019)], *https://scholar.harvard.edu/files/gborjas/files/labourecon2020.pdf.*

[193] *Id.*

characteristics (similar education and skills) other than occupation.[194] In aggregate, the wage penalty is 5%.

Albert (2021) uses data from 1994–2016 to estimate that the wage gap—conditional on observable characteristics—between undocumented and document immigrants is 8 percent.[195]

Kossoudji & Cobb-Clark (1998) used the change in policy caused by the Immigration Reform and Control Act of 1986 (IRCA)—which authorized the granting of lawful status to approximately 1.7 million long-term unauthorized workers—to analyze the question of whether and how legal status influences wages.[196] The policy effectively brought unauthorized immigrants out of the informal labor market and improved their labor market opportunities. Their analysis of wages used panel data for a sample of Mexican and Central American legalized men which provided evidence that wage determinants are structurally different after legal status was extended to this group. The analysis suggests that upon arrival in the U.S. labor market, unauthorized men's wages would have been 14 percent higher if they had been authorized workers; if they had been authorized for all their U.S. working lives, wages in 1992 would be 24 percent higher than actual wages.[197]

Third, estimating baseline wages cannot be done through use of traditional sources for wages, such as the Department of Labor Bureau of Labor Statistics' (BLS) data, as they do not provide wage estimates for undocumented workers. Consequently, DHS considered several studies to get a range of estimates for earnings of undocumented workers.

A 2022 report by the Center for Migration Studies states that "mean and median annual wages of Hispanic undocumented immigrants who are employed (ages 16 and above) are

$28,252 and $25,000, respectively." [198] Given that two-thirds of the estimated undocumented immigrant population is Hispanic,[199] DHS considers the mean wage of $28,252, which we adjust up using the Employment Cost Index (wages and salaries for private industry workers) to $33,302 (2023 dollars), a reasonable lower estimate for this population's earnings.[200]

In other regulations, USCIS has used the 10th percentile wage as a proxy for low-paying or entry-level jobs weighted to include benefits for full compensation.[201] The 10th percentile wage is not specific to undocumented workers; however, it is an example of a lower wage that we have used in other rules. DHS presents wage data from BLS National Occupational Employment and Wage Estimates for an unweighted, 10th percentile wage estimate for all occupations to provide another point of

comparison.[202] DHS takes the hourly wage of $13.97 and adjusts it by 1.45 to account for worker benefits to get the average total rate of compensation as $20.26 per hour.[203] This wage estimate adjusted by 1.45 is appropriate, even if workers are in the informal labor market and do not receive similar benefits. It is appropriate in this analysis because the 10th percentile of full compensation is being estimated based on the 10th percentile wage estimate in order to serve as a plausible benchmark for this population's average earnings.

Assuming approximately 1,784 hours worked per year (34.3 average weekly hours worked as of 2023, multiplied by 52 weeks in a year),[204] someone earning compensation of $20.26 per hour would earn approximately $36,136 annually. DHS does not rule out the possibility that this population might earn higher wages than shown in this analysis on average, but we believe that these earnings represent a reasonable estimate of the range of incomes that undocumented spouses may be able to earn.

In Table 2, we apply the various wage penalty estimates from Table 1 to the wage estimates for unauthorized workers discussed above to estimate a range of increase in potential income—from 4 percent to 24 percent—as a result of obtaining parole. We also include a simple arithmetic mean of the central estimate of the three articles used to generate these estimates, 9%, to illustrate a potential central estimate of the wage penalty.[205] The result is a range of estimates for the increased marginal earnings due to work authorization. DHS estimates that receiving employment authorization can increase an immigrant's earnings by about $1,332 to $8,672 per year.

---

[194] Francesc Ortega and Amy Hsin, *Occupational barriers and the productivity penalty from lack of legal status*, Labour Economics 76 (2022): 102181, *https://docs.iza.org/dp11680.pdf https://www.sciencedirect.com/science/article/abs/pii/S0927537122000720*.

[195] Albert, Cristoph *The Labor Market Impact of Immigration: Job Creation versus Job Competition*, American Economic Journal: Macroeconomics 13(1) 2021, *https://pubs.aeaweb.org/doi/pdfplus/10.1257/mac.20190042*.

[196] Kossoudji & Cobb-Clark *Coming Out of the Shadows: Learning About Legal Status and Wages from the Legalized Population*, Lab. Econ. 20(3) 2002, *https://www.journals.uchicago.edu/doi/epdf/10.1086/339611*.

[197] *Id.*

[198] Evin Millet and Jacquelyn Pavilon, *Demographic Profile of Undocumented Hispanic Immigrants in the United States* (Oct. 14, 2022), at *https://cmsny.org/publications/hispanic-undocumented-immigrants-millet-pavilon-101722/*. This report also provides that, in comparison, the mean and median wages for Hispanic documented immigrants are $40,032 and $30,000, respectively. Accordingly, the 2022 Center for Migration Studies (CMS) data indicate a wage gap of 40 percent for mean earnings and 20 percent for median earnings. However, DHS excludes the 20 percent to 40 percent wage gap identified in the report from this analysis because the CMS report compares only the average wages between documented and undocumented workers. The CMS report did not state it made any adjustments for other factors that may affect the differences in wages between the two populations, such as age, education, or skills. Without these adjustments, the wage gap between the two populations may not necessarily equate to the wage penalty for being undocumented.

**Note:** This study uses 2019 Census ACS data. Earnings to be adjusted to 2023 dollars.

[199] Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022, DHS, Office of Homeland Security Statistics (May 6, 2024), at *https://www.dhs.gov/sites/default/files/2024-05/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%E2%80%93january-2022.pdf*, Table 2 Unauthorized Immigrant Population Estimates by Top 10 Countries of Birth: 2018–2020 and 2022.

[200] Source: *https://fred.stlouisfed.org/series/ECIWAG*. Calculation: Earnings CY 2019 *(Average CY 2023 ECIWAG/Average CY 2019 ECIWAG) = $28,252 * 1.17874 = $33,302 (rounded).

[201] *See Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants*, 89 FR 24628 (Apr. 8, 2024) (final rule), *https://www.govinfo.gov/content/pkg/FR-2024-04-08/pdf/2024-07345.pdf; Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 89 FR 34864 (Apr. 30, 2024) (final rule), *https://www.govinfo.gov/content/pkg/FR-2024-04-30/pdf/2024-09022.pdf*.

[202] See Occupational Employment Statistics program, All Occupations, available at *https://www.bls.gov/oes/2023/may/oes_nat.htm#00-0000*. 10th percentile hourly wages used here are available in the "national_M2023_dl" excel file at *https://www.bls.gov/oes/special.requests/oesm23nat.zip* (last visited July 11, 2024).

[203] The benefits-to-wage multiplier is calculated as follows: (total employee compensation per hour)/(wages and salaries per hour) = $42.48/$29.32 = 1.45 (rounded). *See* Bureau of Labor Stat., U.S. Dep't of Labor, "Employer Costs for Employee Compensation—December 2023," *https://www.bls.gov/news.release/archives/ecec_03172023.pdf* (last visited July 11, 2024).

[204] Bureau of Labor Stat., U.S. Dep't of Labor, *https://www.bls.gov/news.release/archives/empsit_01052024.htm* (last visited July 10, 2024).

[205] Calculation: ((4% + 6%)/2 + 5% + 8% + (14% + 24%)/2)/4 = 9% (rounding).

**67482**      **Federal Register** / Vol. 89, No. 161 / Tuesday, August 20, 2024 / Notices

### TABLE 2—ESTIMATED INCREASED MARGINAL EARNINGS PER WORKER AND PER YEAR

[2023 Dollars]

| Wage penalty (%) | Scenarios for earnings without work authorization | |
|---|---|---|
| | $33,302 [1] | $36,135 [2] |
| 4 | $1,332 | $1,445 |
| 5 | 1,665 | 1,807 |
| 6 | 1,998 | 2,168 |
| 8 | 2,664 | 2,891 |
| 9 | 2,997 | 3,252 |
| 14 | 4,662 | 5,059 |
| 24 | 7,992 | 8,672 |

**Notes:**
Estimated marginal earning per worker calculated for each scenario by multiplying the wage penalty by the earnings without work authorization, for example: $33,302 × 4% = $1,332.
[1] CMS: *https://cmsny.org/publications/hispanic-undocumented-immigrants-millet-pavilon-101722*.
Adjusted 2019 estimate using Employment Cost Index to 2023 dollars.
[2] 10% Percentile: *https://www.bls.gov/oes/current/oes_research_estimates.htm*.
Adjusted to include benefits as reported by BLS, *https://www.bls.gov/news.release/archives/ecec_03132024.htm*.

DHS assumes that the estimated 234,500 in scenario 350K and 502,500 individuals in scenario 750K are currently in the informal labor force and would receive parole as well as employment authorization—increasing their earnings—as a result of this process. Consistent with standard practice in regulatory impact analyses, as well as current evidence in the labor market,[206] DHS assumes full

employment (that is, that all workers looking for work can find employment in the labor market); accordingly, there is no need to consider the extent to which the labor of affected individuals substitutes for the labor of workers already employed in the economy. For further discussion of the literature on labor substitution and immigration, see "Labor Market Impacts" below.

The increased gross annual earnings from the process are estimated by multiplying the marginal increased earnings per worker due to employment authorization (Table 2) by the estimated labor force participation population numbers under scenario 350K (234,500) and 750K (502,500), respectively. Table 3 presents these estimates.

### TABLE 3—TOTAL GROSS ANNUAL MARGINAL EARNINGS GAINED

[2023 Dollars]

| Wage penalty (%) | Earnings $33,302 | | Earnings $36,135 | |
|---|---|---|---|---|
| | Scenario 350k | Scenario 750k | Scenario 350k | Scenario 750k |
| 4 | $312,372,760 | $669,370,200 | $338,946,300 | $726,313,500 |
| 5 | 390,465,950 | 836,712,750 | 423,682,875 | 907,891,875 |
| 6 | 468,559,140 | 1,004,055,300 | 508,419,450 | 1,089,470,250 |
| 8 | 624,745,520 | 1,338,740,400 | 677,892,600 | 1,452,627,000 |
| 9 | 702,838,710 | 1,506,082,950 | 762,629,175 | 1,634,205,375 |
| 14 | 1,093,304,660 | 2,342,795,700 | 1,186,312,050 | 2,542,097,250 |
| 24 | 1,874,236,560 | 4,016,221,200 | 2,033,677,800 | 4,357,881,000 |

**Note:** Total annual earnings is calculated by taking the benefits estimated from work authorization in Table 2 for each scenario and multiplying it by the population participating in the labor market. For example: under the 350k scenario where the relevant population are earning, on average, $33,302/year and the wage penalty is 4%, then the benefit of work authorization is $1,332/year; when multiplied by the working population of 234,500, the total annual increase of gaining work authorization for this population is $312 million/year.

---

[206] The prime-age (25–54) employment-to-population ratio has been over 80% since November 2022. *https://fred.stlouisfed.org/series/LNS12300060* (last accessed July 10, 2024). Methods that isolate the effect of population aging (capturing, for example, aging within the 25–54 cohort) indicate that the adjusted employment-to-

population ratio is at historical highs. *https://www.whitehouse.gov/cea/written-materials/2023/07/27/labor-market-indicators-are-historically-strong-after-adjusting-for-population-aging/*. Other measures of full employment provide evidence that there is not substantial slack in the labor market; for example, in the July 2024 Summary of Economic

Projections of the Board of Governors of the Federal Reserve System, the unemployment rate is projected to remain below the longer-run stable value in 2024. *https://www.federalreserve.gov/monetarypolicy/2024-07-mpr-part3.htm*.

Using the 9% wage penalty as the preferred measure of central tendency, it implies increased earnings of $0.70 billion to $1.63 billion in additional earnings per year. To produce a point estimate, DHS takes the average across the two scenarios (using the 9% wage penalty) to arrive at $1.15 billion (rounded), as its preferred estimate of the gross annual increased earnings resulting from this process.

Benefits

As noted above, DHS estimates an additional $1.15 billion in annual earnings stemming from this process.[207] As noted in Ortega & Hsin (2022), these short-term increased earnings are explained by group-specific occupational barriers associated with a lack of legal status that cause a misallocation of talent and human capital. The study found that providing legal status to these workers increases the productivity of these workers, and therefore represent net economic gains.

To the extent that the long-term increase in productivity is not fully captured by the increase in earnings—for example, due to employer labor market power—this earnings estimate understates the true economic gains.[208] And as previously noted, to the extent that this process leads to additional labor force participation—as per Pope (2016), Pan (2012), and Orrenius and Zavodny (2015)—the earnings estimate may also understate the benefit of this process. The total increase in earnings will also be understated if individuals, after gaining lawful status, switch from industries where they currently face lower wage penalties to industries where they would currently face higher wage penalties. In the Ortega and Hsin (2022) estimation of the effects of grants of lawful status on GDP, the direct wage effect is less than a fifth of the total increase in earnings, meaning the true effect of lawful status on earnings may be five times higher than the wage penalty estimate. In addition, Ortega & Hsin note that the long-term productivity gain may be higher because the affected population anticipates labor market barriers in occupations with high skill requirements, leading to under-investment in human capital. To the extent the process leads to closer-to-optimal investment in human capital (in a manner not reflected in the literature used to estimate the wage penalty), the

long-term benefits of this process could be higher.

Beyond earnings, the process's immediate benefits include a sense of security and belonging for the affected population, their families, and communities due to the program offering a less burdensome path to adjustment of status. The population that could be eligible for parole in place through this process subsequently could apply for adjustment of status to that of an LPR and, if granted, would gain the freedom and ability to travel internationally.

Noncitizens in the population granted parole in place under this process would benefit from being able to earn lawful wages through participation in the labor market (less the value of their leisure time prior to this process) including expanded employment options not previously available to them. Noncitizens who work would contribute to Federal, State, and local taxes and would benefit from the Social Security system in retirement. Additionally, and generally, some noncitizens could benefit from eventually having access to public assistance programs only available to qualified noncitizens and U.S. citizens if a need for such assistance arises and if they are not already a beneficiary of assistance through their U.S. citizen spouse or parent.[209]

Research provides a variety of more specific evidence on the benefits of gaining lawful status for populations that have resided in the United States for periods of time without lawful status. For example, Patler and Pirtle (2018) find that reports of current psychological wellness increase for DACA recipients.[210] Hasager (2024) finds that in conditions where women's resident status is contingent on remaining married to their husbands, grants of legal status (in this case, asylum) to such women decreases their risk of being victims of violence.[211]

Research also indicates that benefits can spillover to additional individuals. For example, Cascio, Cornell, and Lewis (2024) found that the Immigration

Reform and Control Act of 1986 led to higher birthweights among mothers who gained legal status.[212] This effect arose immediately after applications opened—long before the affected women would have been able to become eligible for Medicaid—indicating that the causality stemmed from factors other than improved access to prenatal care, such as higher family income and reductions in stress that come from gaining legal status. As Cascio, Cornell, and Lewis (2024) note, birthweight is a predictor of later school achievement[213] as well as adult educational attainment rates, IQ, health, and labor market outcomes.[214]

Costs

The costs to the population affected by this process will include the various application costs (one person, parent or stepchild, per application). These costs include opportunity costs of time (OCT) of requestors and, if applicable, their representatives for filing Forms I–131F, I–765, I–130, and I–485 (OCT = [value of time based on relevant wages] * [estimated time burden to complete and submit required forms]). Requestors would also be responsible for any travel costs associated with a required biometrics collection appointment at a USCIS ASC.

The process to request parole in place requires an individual to file Form I–131F. Currently, Form I–131F has an estimated time burden of 1.1667 hours with a filing fee of $580.[215] To request employment authorization, an individual is required to file Form I–765, with a time burden of 4.317 hours,[216] and a fee of $470 if filing

---

[207] Not all of these earnings are retained by workers; some are taxed, both through payroll taxes and other taxes, as previously discussed.

[208] See, e.g., David Card, Who Set *Your* Wage?, American Economic Review, vol. 112, no. 4, April 2022: 1075–90.

[209] For example, without this policy and all else equal, stepchildren that become adults and become independent of parents would not have access to public assistance program only available to authorized noncitizens or naturalized citizens. The same could apply in the cases of divorce.

[210] Caitlin Patler and Whitney Laster Pirtle, From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Youth Adults?, Social Science & Medicine, vol. 199 (2018): 39–48.

[211] Linea Hasager, Does Granting Refugee Status to Family-Reunified Women Improve Their Integration?, Journal of Public Economics, vol. 234 (2024): 105119.

[212] Elizabeth U. Cascio, Paul Cornell and Ethan G. Lewis, The Intergenerational Effects of Permanent Legal Status, NBER Working Paper No. 32635 (June 2004), *https://www.nber.org/papers/w32635*.

[213] Figlio, David, Jonathan Guryan, Krzysztof Karbownik, and Jeffrey Roth. 2014. "The Effects of Poor Neonatal Health on Children's Cognitive Development." American Economic Review 104(12): 3921–3955.

[214] Behrman, Jere R. and Mark R. Rosenzweig. 2004. "Returns to Birth Weight." Review of Economics and Statistics. 86(2): 586–601; Black, Sandra E., Paul J. Devereux, and Kjell G. Salvanes. 2007. "From the Cradle to the Labor Market? The Effect of Birth Weight on Adult Outcomes." Quarterly Journal of Economics 122(1): 409–439; Philip Oreopoulos, Mark Stabile, Randy Walld, and Leslie L. Roos, Short-, Medium-, and Long-Term Consequences of Poor Infant Health: An Analysis Using Siblings and Twins, Journal of Human Resources, January 2008, 43 (1) 88–138; Royer, Heather. 2009. "Separated at Girth: U.S. Twin Estimates of the Effects of Birth Weight." American Economic Journal: Applied Economics 1(1): 49–85.

[215] Estimated burden hours, subject to revision based on public comments.

[216] See USCIS, Form I–765, Instructions for Application for Employment Authorization, OMB Control Number 1615–0040 (expires Feb. 28, 2027),

Continued

online.[217] Parolees who later choose to apply for adjustment of status must file Form I–485, with a time burden of 6.987 hours[218] and submit a fee of $1,440.[219] In addition to the Form I–485, U.S. citizen spouses or parents must file Form I–130, with a time burden of 1.817 hours[220] and a fee of $625 if filed online.[221] DHS assumes that if given the option, requestors will submit the required forms online. For all forms together, the total time burden is 14.2877 hours.

DHS calculates the costs of applying under this process as follows. Under the two earnings scenarios previously discussed, we convert the annual earnings of $33,302 and $36,135 to per hour earnings, arriving at an estimated $18.67 and $20.26 per hour, respectively. (DHS herein refers to the estimated $18.67 hourly wage as "earnings scenario 1" and the estimated $20.26 hourly wage as "earnings scenario 2.") We do not include any wage penalty adjustments for application costs purposes as the population is not authorized at the time of application, so their OCT is their estimated informal labor earnings. For applications that are prepared by a representative, DHS estimates an hourly total compensation rate of $123.02 (rounded) using the national average hourly wage for attorneys, adjusted to include benefits, as a reasonable proxy of the opportunity cost of time.[222] Using the behavior of I–601A filers as a best-approximation for the data, DHS estimates that 81 percent of applicants could seek assistance from a lawyer or an accredited representative and 19 percent would not.[223]

Biometrics collection occurs at a designated USCIS ASC. While travel times and distances vary, DHS estimates that the average roundtrip distance to an ASC is 50 miles[224] and travel takes about 2.5 hours on average to complete a roundtrip.[225] Furthermore, DHS estimates that a requestor spends an average of 1 hour and 10 minutes (1.17 hours) at an ASC to submit biometrics,[226] adding up to a total biometrics collection-related time burden of 3.7 hours per requestor. The per requestor biometrics travel costs are approximately $99.77 under earnings scenario 1, and $105.60 under earnings scenario 2.[227]

The costs are calculated under the two earnings scenarios and the two population scenarios, scenario 350K and scenario 750K. For scenario 350K, we estimate that approximately 66,500 individuals would not use a representative to file the required forms and 283,500 would use a representative. For scenario 750K, we estimate 142,500 individuals would not use a representative and 607,500 would use a representative. Table 4 presents the total cost estimates, including total time burden for filing required forms, per hour OCT estimates for requestors and representatives, population estimates, and biometrics travel costs estimates. To arrive at a point estimate, DHS takes the average across each population scenario and each earning scenario. As a result, the point estimate is approximately $868,583,362 ($0.87 billion).

TABLE 4—TOTAL PROGRAM APPLICATION COSTS

[2023 Dollars]

| Costs | Earnings $33,302 ($18.67/hour) | | Earnings $36,135 ($20.26/hour) | |
|---|---|---|---|---|
| | Scenario 350k | Scenario 750k | Scenario 350k | Scenario 750k |
| Forms | $516,039,219 | $1,105,798,327 | $517,549,929 | $1,109,035,563 |
| Biometrics | 34,919,115 | 74,826,675 | 36,961,470 | 79,203,150 |
| Total | 550,958,334 | 1,180,625,002 | 554,511,399 | 1,188,238,713 |

**Note:** For example, forms costs under scenario 350k and $18.67/hour OCT, are calculated as the time burden for all forms, 14.2877 hours, multiplied by the applicant population of 66,500 and their OCT, plus the total forms time burden, 14.2877 hours, multiplied by the population using a representative, 283,500, and their respective OCT. This is (14.2877 * 66,500 * $18.67) + (14.2877 * 283,500 * $123.02) = $17,738,965 + $498,300,254 = $516,039,219 (rounded). Biometrics costs are approximately $99.77 * 350,000 = $34,919,115. Numbers are slightly off due to rounding.

Transfer Payments

All the fees paid for the required forms for this process represent a transfer to the federal government (see Table 5). As previously noted, an individual must file Form I–131F to request parole in place and pay a (online) filing fee of $580; file Form I–765 to request work authorization and pay a (online) filing fee of $470 and file Form I–485 to apply for adjustment of status and pay a (mail-in) fee of $1,440. Concurrently with Form I–485, U.S. citizen spouses or parents must file Form I–130, with (online) fee of $625.

---

*https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf* (last visited July 11, 2024).

[217] *See* USCIS, Form G–1055, Fee Schedule, Effective April 1, 2024, p. 33 of 39, *https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf* (last visited July 11, 2024).

[218] *See* USCIS, Form I–485, Instructions for Application to Register Permanent Residence or Adjust Status, OMB Control Number 1615–0023 (expires Feb. 28, 2026), *https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf* (last visited July 11, 2024).

[219] *See* USCIS, Form G–1055, Fee Schedule, Effective April 1, 2024, p. 14 of 39, *https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf* (last visited July 11, 2024).

[220] *See* USCIS, Form I–130, Instructions for Form I–130, Petition for Alien Relative, and Form I–130A, Supplemental Information for Spouse Beneficiary, OMB Control Number 1615–0012 (expires Feb. 28, 2027), *https://www.uscis.gov/sites/default/files/document/forms/i-130instr.pdf* (last visited July 11, 2024).

[221] *See* USCIS, Form G–1055, Fee Schedule, Effective April 1, 2024, p. 7 of 39, *https://www.uscis.gov/sites/default/files/document/forms/g-1055.pdf* (last visited July 11, 2024).

[222] DHS assumes the preparers with similar knowledge and skills necessary for filing an application have average wage rates equal to the average lawyer wage of $84.84 per hour. DHS adjusts by the benefits-to-wage multiplier for a total compensation rate of $84.84 * 1.45 = $123.02 (rounded). *See* Bureau of Labor Stat., DOL, Occupational Employment and Wage Statistics, "Occupational Employment and Wages, May 2023, 23–1011 Lawyers," *https://www.bls.gov/oes/2023/may/oes231011.htm*.

[223] Source: OP&S, PRD, C3. Queried July 17, 2024.

[224] A mileage rate for travel-related automobile costs is assumed. A rate of $0.625 per mile is adopted from the U.S. General Services Administration website at *https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived* for privately owned vehicle mileage reimbursement rates. Rate effective July 1, 2022.

[225] *See Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10284 (Feb. 25, 2015); *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* 78 FR 536, 572 (Jan. 3, 2013).

[226] Source: USCIS, DHS, Instructions for Application to Register Permanent Residence or Adjust Status (Form I–485), OMB No. 1615–0023 (expires Feb. 28, 2026), *https://www.uscis.gov/sites/default/files/document/forms/i-485instr.pdf.*

[227] Calculations: (((50 * $0.625) + ((2.5+1.17) * $18.67))) = $99.77 (rounded).

If the option exists to submit a form online, DHS assumes that requestors would take advantage of this option to save costs and hence we use the online form submission fees to calculate the fee transfers. Any fee waivers granted for filing forms would reduce transfers from the affected population to USCIS.[228]

### TABLE 5—FORM FEE TRANSFERS TO THE FEDERAL GOVERNMENT

[2023 Dollars]

| Forms | Fee | Scenario 350K | Scenario 750K |
|-------|-----|---------------|---------------|
| I–131F | $580 | $203,000,000 | $435,000,000 |
| I–765 | 470 | 164,500,000 | 352,500,000 |
| I–130 | 625 | 218,750,000 | 468,750,000 |
| I–485 | 1,440 | 504,000,000 | 1,080,000,000 |
| Total | 3,115 | 1,090,250,000 | 2,336,250,000 |

**Note:** The point estimate is the average of the two scenarios, $1,713,250,000.

Tax Revenue Transfer Payments

Increased earnings would result in increased tax revenue to different levels of government. For Federal income taxes, DHS presents an estimate using the simplified assumption that all individuals have marginal earnings taxed at a 12% rate. This is the tax rate that DHS believes would be applicable to such earnings for most individuals.[229] The gross earnings estimates are multiplied by 12% to yield the results in Table 6.

### TABLE 6—TOTAL FEDERAL INCOME TAX TRANSFERS AT 12% RATE

[2023 Dollars]

| Wage penalty (%) | Earnings $33,302 | | Earnings $36,135 | |
|------------------|------------------|------------------|------------------|------------------|
| | Scenario 350K | Scenario 750K | Scenario 350K | Scenario 750K |
| 4 | $37,484,731 | $80,324,424 | $40,673,556 | $87,157,620 |
| 5 | 46,855,914 | 100,405,530 | 50,841,945 | 108,947,025 |
| 6 | 56,227,097 | 120,486,636 | 61,010,334 | 130,736,430 |
| 8 | 74,969,462 | 160,648,848 | 81,347,112 | 174,315,240 |
| 9 | 84,340,645 | 180,729,954 | 91,515,501 | 196,104,645 |
| 14 | 131,196,559 | 281,135,484 | 142,357,446 | 305,051,670 |
| 24 | 224,908,387 | 481,946,544 | 244,041,336 | 522,945,720 |

**Note:** The point estimate is the average across the 9% row, which is $138,172,686.

Following the same approach to calculating the point estimate as was done previously produces an estimate of approximately $138 million in additional annual Federal income tax revenue as a result of the process.

It is difficult to quantify State tax transfers because taxation rules imposed by different levels of government vary widely.[230] For that reason, DHS is not able to monetize State income tax revenue increases that will occur as a result of this process, but DHS anticipates that at least some states will see tax revenue increases.

DHS is also able to estimate the increase in transfer payments to Federal employment tax programs, namely Medicare and Social Security, which have a combined payroll tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[231] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated increase in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent. DHS takes this rate and multiplies it by the total marginal increase in pre-tax, gross, income earnings from Table 3 to estimate the increase in employment tax transfers resulting from work authorization. Table 7 presents these estimates.

### TABLE 7—TOTAL FEDERAL PAYROLL TAX TRANSFERS AT 15.3% RATE

[2023 Dollars]

| Wage penalty (%) | Earnings $33,302 | | Earnings $36,135 | |
|------------------|------------------|------------------|------------------|------------------|
| | Scenario 350K | Scenario 750K | Scenario 350K | Scenario 750K |
| 4 | $47,793,032 | $102,413,641 | $51,858,784 | $111,125,966 |
| 5 | 59,741,290 | 128,017,051 | 64,823,480 | 138,907,457 |
| 6 | 71,689,548 | 153,620,461 | 77,788,176 | 166,688,948 |

---

[228] DHS cannot accurately and confidently estimate how many potential waivers could be granted across all of the required forms. For the purposes of this FRN, DHS assumes that if requestors have the ability to submit a new form I–131F and pay the $580 fee, they would generally have the ability to pay the rest of the required form filing fees in this process created by this policy and would generally not qualify for any fee waivers.

Nevertheless, if some fee waivers were to be granted, the total amount of transfer payments would not change, but the fee waivers would represent a transfer from the USCIS-fee paying population to the requestors.

[229] Internal Revenue Service, Federal Income Tax Rates and Brackets, *https://www.irs.gov/filing/federal-income-tax-rates-and-brackets.*

[230] *See, e.g.,* Tonya Moreno, "Your Guide to State Income Tax Rates," The Balance, *https://www.thebalance.com/state-income-tax-rates-3193320* (last updated July 11, 2024).

[231] Internal Revenue Service, *Topic No. 751 Social Security and Medicare Withholding Rates, https://www.irs.gov/taxtopics/tc751* (last updated July 11, 2024).

TABLE 7—TOTAL FEDERAL PAYROLL TAX TRANSFERS AT 15.3% RATE—Continued

[2023 Dollars]

| Wage penalty (%) | Earnings $33,302 | | Earnings $36,135 | |
|---|---|---|---|---|
| | Scenario 350K | Scenario 750K | Scenario 350K | Scenario 750K |
| 8 | 95,586,065 | 204,827,281 | 103,717,568 | 222,251,931 |
| 9 | 107,534,323 | 230,430,691 | 116,682,264 | 250,033,422 |
| 14 | 167,275,613 | 358,447,742 | 181,505,744 | 388,940,879 |
| 24 | 286,758,194 | 614,481,844 | 311,152,703 | 666,755,793 |

**Note:** The point estimate is the average across the 9% row, which is $176,170,175.

Following the same approach to calculating the point estimate as was done previously, this produces an estimate of approximately $176 million in additional annual Federal payroll tax revenue as a result of the process, half from employers and half from the employed population.

Additionally, DHS has considered the impact of the process on eligibility for Federal public benefits. Only noncitizens who are considered "qualified aliens" may access certain Federal public benefits programs. "Qualified aliens" include noncitizens paroled under INA section 212(d)(5) for a period of at least one year. However, nearly all benefits programs are available only to noncitizens who have been in "qualified" status for at least five years. For example, the Supplemental Nutrition Assistance Program (SNAP) generally requires noncitizens to have been in "qualified" status for five years before they can receive benefits. Similarly, Medicaid, Temporary Assistance for Needy Families (TANF), and the Children's Health Insurance Program (CHIP) generally require five years in "qualified" status for noncitizens who entered the United States after August 22, 1996. Given that noncitizens eligible for this process are estimated on average to have lived in the United States for 23 years, DHS anticipates that the majority of those who may be considered for parole in place will have entered after this date. Accordingly, most noncitizens who receive parole pursuant to this process will not be eligible to access public Federal benefits for at least five years. Beyond five years, DHS is not able to monetize the degree of additional outlays from Federal public benefit programs.

The potential fiscal impacts of this process on State and local governments would vary based on a range of factors, such as the social and economic characteristics of the population within a particular jurisdiction at a particular time (or over a particular period), including a parolee's age, educational attainment, income, and level of work-related skill as well as the number of dependents in their families. Fiscal effects would also vary significantly depending on local rules governing eligibility for public benefits. Under this process, additional earnings have the effect of increasing tax revenues. With regard to drawing on public assistance programs, the effects would be uncertain and depend on a range of factors, including personal circumstances and any State and local policies' eligibility criteria.

Compared to the baseline, there are multiple reasons to believe that any burden on State and local fiscal resources caused by the process are unlikely to be significant, and further that the rule may have a positive net effect on their fiscal resources. In the baseline, the vast majority of this population would remain in the country, but without the additional measure of security, employment authorization, and lawful presence promoted by this process. In addition, because State and local governments are already expending resources on public goods for the population gaining lawful status due to this process—for example, public K–12 education—the marginal effect of gaining lawful status on State and local public expenditures is likely to be small. By contrast, the increased earnings stemming from lawful status clearly increase tax revenues relative to baseline (State and local income tax revenues; higher earnings leading to higher spending, and therefore higher sales tax revenues; higher earnings leading to higher spending on property, and therefore higher property tax revenues), albeit one that DHS cannot fully monetize.

In the long term, DHS expects State and local governments to continue to choose how to finance public goods, set tax structures and rates, allocate public resources, and set eligibilities for various public benefit programs, and to adjust these approaches based on the evolving conditions of their respective populations. DHS acknowledges that though this process may result in some indirect fiscal effects on State and local governments, such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments, and may very well be offset by increases in tax revenue and economic productivity that are equally challenging to quantify.

Labor Market Impacts

The labor market impacts of increased immigration are largely not relevant to the analysis of this process because it applies to individuals who have resided in the United States for more than 10 years. Such individuals would likely continue to reside in the United States with or without this process. Nevertheless, for completeness and to the extent relevant, DHS has included discussion of the effects of increased immigration on native-born workers' employment and earnings.

Although the estimated population is small relative to the total U.S. and individual State labor forces, DHS recognizes that, in general, any potential increase in worker supply may affect wages and, in turn, the welfare of other workers and employers. However, the effects are not obvious or straightforward as changes in wages depend on many factors and various market forces, such as the type of occupation and industry, geographic market locations, employer preferences, worker preferences, worker skills, experience, and education levels, and overall economic conditions. For example, in a tight labor market, certain industries' labor demand might outpace labor supply, such as in healthcare, food services, and software development sectors. BLS projects that home health and personal care aide occupations will grow by about 34 percent over the next 10 years, cooks in restaurants by about 23 percent, and software development occupations by about 22 percent.[232] In

---

[232] See BLS, Employment Projections (Sept. 2020), *Occupations with the most job growth*, Table 1.4. Occupations with the most job growth, 2019 and projected 2029, available at *https://www.bls.gov/emp/tables/occupations-most-job-growth.htm.*

growing industries or sectors such as these, holding everything else constant, any increases in the labor supply might not be enough to temporarily satisfy labor demand. As a result, employers might offer higher wages to attract workers. The opposite could happen in a slack labor market for industries or sectors where labor supply is greater than labor demand due to these industries not growing and/or too many workers entering theses industry relative to labor demand.

DHS also notes the possibility of positive dynamic effects from employing the population relevant to this process. Hiring persons from this population might permit businesses to grow and thus have positive, rather than negative, effects on other workers, including U.S. citizens. DHS cannot predict the degree to which this population of interest is substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as described above as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, training needs, and labor market regulations, among others.

Assuming this population of interest would remain in the United States even without this process, there is the possibility that unauthorized noncitizens looking for work without authorization may be exploited, and employers may pay substandard wages, which in turn could potentially depress wages for some native and authorized noncitizen workers. By reducing this possibility, this process may help to protect U.S. workers and employers against the possible effects of unauthorized labor.

Generally, the benefits of facilitating access to employment authorization for this population outweigh potential costs to American workers or to the U.S. economy. A 2017 National Academies of Sciences, Engineering, and Medicine (NAS) publication concludes that providing legal status to unauthorized migrants does not harm U.S.-born and other immigrant workers in the longer term, as overall the impact of immigration on wages is very small.[233]

Research has found little evidence that immigration significantly affects the overall employment rate of native-born workers. The 2017 NAS publication synthesizes the then-current peer-reviewed literature on the effects of immigration along with empirical findings from various publications.[234] With respect to wages, in particular, the 2017 NAS Report described recent research showing that, when measured over a period of more than 10 years, the impact of immigration on the wages of natives overall is very small.[235] However, the NAS Report described research finding that immigration reduces the number of hours worked by native teens (but not their employment rate). Moreover, as with wage impacts, there is some evidence that recent immigrants reduce the employment rate of prior immigrants, suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.[236]

Further, the characteristics of local economies matter with respect to wage and employment effects. For instance, the impacts to local labor markets can vary based on whether such market economies are experiencing growth, stagnation, or decline. On average, immigrants tend to locate to areas with relatively high labor demand or low unemployment levels where worker competition for available jobs is low.[237] This dissipates short-term localized labor supply shock effects and increases the efficiency of labor markets.[238]

The 2017 NAS Report also discusses the economic impacts of immigration and considers effects beyond labor market impacts. Similar to citizens, immigrants also pay taxes; stimulate the economy by consuming goods, services, and entertainment; engage in the real estate market; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations.[239]

More recent evidence provides a stronger evidentiary basis that immigration increases the employment rate of native-born workers. Empirical evidence from Peri, Rury, and Wiltshire (2024) of the effect of Puerto Ricans who were displaced to Orlando following Hurricane Maria found "evidence that the migration event induced by Hurricane Maria caused employment growth in Orlando, in aggregate and also within sectors most likely to be affected by labor supply and demand shocks." [240] Peri, Rury, and Wiltshire (2024) found that this held for non-Hispanic workers and less-educated workers as well. Clemens and Hunt (2019) as well as Peri and Yasenov (2019) found evidence that previous approaches to examining the labor market effects of the Mariel Boatlift were methodologically flawed, concluding that—when properly controlled—no significant difference in labor market outcomes could be discerned.[241]

More comprehensively, Caiumi and Peri (2024) extends and improves upon a series of previous influential articles in the field that estimated how the supply of immigrant workers affected native wages in the U.S. by extending the years studies (through 2022) and using improved identification methods.[242] They find that the effect of immigration at every skill level "on natives' employment-population ratio is positive, significant and between 0.05% and 0.095%, in response to a 1% increase in immigrant employment." On the wage side, Caiumi and Peri (2024) estimate that the "average increase of native wage by 0.01% to 0.02% for each 1% growth of immigrant share can be fully due to shifts of natives into better-paying types of occupations in response to immigration." These estimates imply that the 2000 to 2019 immigrant flows increased the wages of native workers with a high school degree or less by 1.7% to 2.6%, had no significant wage effect on native workers with a college degree, and in aggregate increased wages for all workers by an average of 0.5% to 0.8%; regarding employment in this period, this implies that these immigrant flows increased natives' employment rate by 2.4%. Similar, but smaller, estimates are generated for the 2019–2022 period.

---

[233] See, e.g., National Academies, The Economic and Fiscal Consequences of Immigration (2017), https://www.nationalacademies.org/our-work/economic-and-fiscal-impact-of-immigration.

[234] NAS, The Economic and Fiscal Consequences of Immigration (2017), at 195 https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration.

[235] Id. at 5.

[236] Id. at 5–6.

[237] Id. at 5.

[238] Joan Monras, Immigration and Wage Dynamics: Evidence from the Mexican Peso Crisi, Journal of Political Economy, 2020, vol. 128, no. 8: 3017–89.

[239] NAS Report at 6–7.

[240] Giovanni Peri, Derek Rury, and Justin C. Wiltshire, The Economic Impact of Migrants from Hurricane Maria, Journal of Human Resources (2022): 0521–11655R1.

[241] Clemens, M.A., and Hunt, J. (2019). The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results. ILR Review, 72(4), 818–857; Giovanni Peri and Vasil Yasenov, The Labor Market Effects of a Refugee Wave: Synthetic Control Method Meets the Mariel Boatlift, Journal of Human Resources, vol. 54, no. 2 (2019): 267–309.

[242] Alessandro Caiumi and Giovanni Peri, Immigration's Effect on US Wages and Employment Redux, NBER Working Paper No. 32389 (Apr. 2024), https://www.nber.org/papers/w32389.

ACCOUNTING STATEMENT

| Category | Primary estimate | Dollar year | Discount rate | Time horizon |
|---|---|---|---|---|
| *BENEFITS:* | | | | |
| Annualized monetized benefits | $1.15 billion .................................................................... | 2023 | N/A | Annual. |
| Annualized quantified, but non-monetized benefits. | N/A ...................................................................................... | N/A | N/A | N/A. |
| Unquantified benefits ................ | *To Population That Benefits from the Process:* | N/A | N/A | N/A. |
| | • Increased sense of security and belonging, and psychological wellness. | | | |
| | • Freedom and ability to travel internationally and access travel documents. | | | |
| | • Access to a college education .................................................... | | | |
| | • Reduced risk of being subject to violence ................................. | | | |
| | *Other:* | | | |
| | • Higher birth weights for children of population, and consequent lifetime benefits to those children. | | | |
| | • Preserve and more effectively use limited resources of the Federal government. | | | |
| *COSTS:* | | | | |
| Total monetized costs ............... | $0.87 billion .................................................................... | 2023 | N/A | Year 1. |
| Total quantified, but non-monetized costs. | N/A. | | | |
| Unquantified costs. | | | | |
| *TRANSFERS:* | | | | |
| Year 1 monetized Federal budgetary transfers. | $2.03 billion .................................................................... | 2023 | N/A | Year 1. |
| Year 2+ annualized monetized Federal budgetary transfers. | $0.31 billion .................................................................... | 2023 | N/A | Annual. |
| *Bearers of transfer gain and loss?* | From fees (Year 1) and taxes from applicants and employers to the Federal government (annual). | | | |
| *NET BENEFITS:* | | | | |
| Year 1 monetized net benefits | $0.28 billion .................................................................... | 2023 | N/A | Year 1. |
| Year 2+ annualized monetized net benefits. | $1.15 billion .................................................................... | 2023 | N/A | Annualized. |

**B. Administrative Procedure Act**

This **Federal Register** notice is exempt from notice-and-comment rulemaking requirements for the following reasons.

*First,* DHS is merely adopting a general statement of policy,[243] *i.e.,* a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [244] As INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion" and this process leaves USCIS adjudicators the discretion to approve or deny requests consistent with the guidance described in section V.C. of this Notice as they perform their case-by-case review.[245] DHS has generally

exercised its parole authority without rulemaking on the substance of parole processes through the issuance of such general statements of agency policy.[246]

---

[243] 5 U.S.C. 553(b)(A).

[244] *See Lincoln* v. *Vigil,* 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979)).

[245] A general policy statement typically uses permissive, rather than binding, language that leaves the agency free to exercise discretion. *See, e.g., Nat'l Mining Ass'n* v. *McCarthy,* 758 F.3d 243, 251–52 (D.C. Cir. 2014) (distinguishing legislative rules from general statements of policy, observing that "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy"); *Appalachian Power Co.* v.

*EPA,* 208 F.3d 1015, 1023 (D.C. Cir. 2000) (rejecting the EPA's characterization of its document as guidance exempt from notice-and-comment rulemaking, reasoning that the guidance "commands, . . . requires, . . . orders, [and] dictates"); *Cmty. Nutrition Inst.* v. *Young,* 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam) (noting as primary considerations whether the agency action (1) "impose[s] any rights and obligations," or (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion" (quotation marks omitted)).

[246] *See, e.g., Cuban Family Reunification Parole Program* (Nov. 21, 2007), *supra* note 65; *Central American Minors Parole Program* (Dec. 1, 2014), discussed at 82 FR 38926; *Haitian Family Reunification Parole Program* (Oct. 27, 2014), *supra* note 66; *Filipino World War II Veterans Parole Policy* (May 9, 2016), *supra* note 67; *Implementation of a Family Reunification Parole Process for Colombians, et al.* (July 10–Aug. 11, 2023), *supra* notes 68–72. Prior to these parole policy statements, even after Congress's limiting amendment to the parole statute in 1996 to require "case-by-case" consideration, the parole authority continued to be used expansively to create new parole programs and processes. In 2000, for example, the parole authority was used to entirely replace the statutorily sunsetting Visa Waiver Pilot Program under INA section 217, in order to provide the significant public benefit of avoiding the wholesale disruption of international travel and commerce, and the serious harm to the U.S. economy and foreign relations that would have been caused by abruptly imposing visa requirements on visitors for business or pleasure from most developed countries. *See, e.g., Visa Waiver Pilot Program Expires; INS Puts In Place*

And it is well established that "the mere fact that an agency action," including a policy statement, "may have a substantial impact does not transform it into a legislative rule." [247]

*Second,* even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United

---

*Interim Procedures,* 77 Interpreter Releases 597 (May 8, 2000); Congressional Research Service, *Visa Waiver Program* (revised Aug. 1, 2016) at 29, available at *https://crsreports.congress.gov/product/pdf/RL/RL32221/42.* Under that parole process, tens of millions of foreign visitors were paroled into the United States on a case-by-case basis between May 1 and October 30, 2000, without rulemaking. Although DHS prescribed certain guidelines for determinations on parole from custody of certain noncitizens, *see* 8 CFR 212.5(b), and established the international entrepreneur parole process, *see* 8 CFR 212.19, through notice-and-comment rulemaking, this does not preclude the Department from electing, consistent with the APA, to forgo formal rulemaking. *See, e.g., Hoctor* v. *U.S. Dep't of Agric.,* 82 F.3d 165, 171–72 (7th Cir. 1996) (observing that there is nothing in the APA that forbids an agency's use of notice-and-comment procedures even if not required under the APA, and that courts should attach no weight to an agency's varied approaches involving similar rules).

[247] *Cent. Texas Tel. Coop.* v. *FCC,* 402 F.3d 205, 214 (D.C. Cir. 2005) (cleaned up); *accord Secd. Indus. and Fin. Mkts. Ass'n* v. *CFTC,* 67 F. Supp. 3d 373, 423 (D.D.C. 2014) (citing cases).

States.[248] Courts have held that this exemption applies when the rule in question " 'is clearly and directly involved' in 'a foreign affairs function.' " [249] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[250]

This process is exempt under both standards. Specifically, as discussed above, this process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. Regularizing certain noncitizens who have lived in and established deep ties to the United States is a key request of our partner countries, and establishment of this proposed process will help ensure our partners' continued collaboration to address irregular migration in the Western Hemisphere and improve economic stability and security in countries that are common sources of irregular migration to the United States.[251]

Delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing conversations with key foreign partners about migration management on a range of priorities. These priorities include collaborating with partner countries on initiatives aimed at disrupting human smuggling, trafficking, and transnational criminal networks; increasing migration controls on bus and train routes; [252] imposing additional visa requirements to prevent individuals from exploiting legitimate travel regimes to facilitate their irregular journey to the United States; [253] and expanding access to lawful pathways.

The delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate with our international partners, including Mexico and Colombia, for additional enforcement measures and increased cooperation with removals. In the context of ongoing discussions on migration management, representatives of Mexico have specifically requested that the U.S. government regularize Mexican nationals who have been long-term residents of the United States.[254] Similarly, the Government of Colombia delivered a diplomatic note in April 2024 that requested Deferred Enforced Departure for certain nationals of Colombia residing in the United States, which would enable those individuals to remain lawfully in the United States and access work authorization. The Government of Colombia made similar requests in November 2022 through its ambassador to the United States [255] and again in May 2023 during high-level dialogues to stem the flows of irregular migration through the Darién and during negotiations to establish and extend Safe Mobility Offices [256] beyond the initial phase.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[257] DHS similarly invoked the foreign affairs exemption more recently in connection with the parole processes for Cubans, Haitians,

Nicaraguans, and Venezuelans [258] and family reunification parole processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras, announced in 2023.[259]

## C. Paperwork Reduction Act (PRA)

Under the Paperwork Reduction Act (PRA), 44 U.S.C. chapter 35, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any new reporting requirements they impose. The process announced by this notice requires a new collection of information on Form I–131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens (OMB control number 1615–NEW), which will be used for the parole in place process for certain noncitizen spouses and stepchildren of U.S. citizens. The Form I–131F will be available for online filing only to support more efficient adjudications and will charge a filing fee of $580 per requestor. The Form I–131F will require the requestor to submit biographic data, processing information, and other supporting documentation in order to evaluate the criteria outlined in this notice, including to: establish the requestor's status as either the spouse or stepchild of a U.S. citizen; rigorously screen the applicant for public safety and national security threats; identify whether the requestor has previously filed Form I–601A with USCIS; instruct the requestor on next steps for submitting required biometrics; and determine whether the requestor meets other criteria related to presence without admission or parole and physical presence for the requisite period, among other questions.

USCIS has submitted, and OMB has approved, the request for emergency authorization of the new Form I–131F (under 5 CFR 1320.13) for a period of 6 months. Within 60 days of publication of this notice at the **Federal Register**, USCIS will begin normal clearance procedures under the PRA to obtain

[248] *See* 5 U.S.C. 553(a)(1).

[249] *Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (C.I.T. 1984) (quoting H.R. Rep. No. 79–1980, at 23 (1946)).

[250] *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008).

[251] *See, e.g.,* The White House, *Fact Sheet: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables* (June 10, 2022), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/fact-sheet-the-los-angeles-declaration-on-migration-and-protection-u-s-government-and-foreign-partner-deliverables/.*

[252] U.S. Dep't of State, Discussions with Mexican Officials on Migration at the Department of State (Jan. 20, 2024), available at *https://www.state.gov/discussions-with-mexican-officials-on-migration-at-the-department-of-state.*

[253] Ministry of Foreign Affairs of Mexico, Visas: Important Information, available at *https://embamex.sre.gob.mx/peru/index.php/consulares/visas* (last visited June 16, 2024).

[254] The White House, Mexico-U.S. Joint Communique, *supra* note 114.

[255] Manuel Rueda and Elliot Spagat, *Colombia asks for legal status for its people already in US,* Associated Press, Nov. 29, 2022, available at *https://apnews.com/article/venezuela-colombia-caribbean-united-states-immigration-7ed5fcde20338d56b04ff56925e54aff.*

[256] The Safe Mobility Initiative is one of the many ways the United States facilitates access to lawful pathways from partner countries in the region at no cost, so migrants do not have to undertake dangerous journeys in search of safety and better opportunities. *See* U.S. Safe Mobility Initiative— United States Department of State, Bureau of Population, Refugees, and Migration, Safe Mobility Initiative, available at *https://www.state.gov/refugee-admissions/safe-mobility-initiative/* (last visited July 24, 2024).

[257] *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea,* 82 FR 4902 (Jan. 17, 2017).

[258] *See Implementation of a Parole Process for Cubans,* 88 FR 1266 (Jan. 9, 2023); *Implementation of a Parole Process for Haitians,* 88 FR 1243 (Jan. 9, 2023); *Implementation of a Parole Process for Nicaraguans,* 88 FR 1255 (Jan. 9, 2023); and *Implementation of Changes to the Parole Process for Venezuelans,* 88 FR 1279 (Jan. 9, 2023).

[259] *See* U.S. Dep't of Homeland Security, DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras (July 17, 2023), *https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala* *see also Implementation of a Family Reunification Parole Process for Colombians, et al., supra* notes 68–72.

three-year approval for this collection.[260]

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2024–18725 Filed 8–19–24; 8:45 am]
**BILLING CODE P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

[BLM_AZ_FRN_MO4500181369]

**Establishment and Call for Nominations for the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument Advisory Committee**

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The Bureau of Land Management (BLM) is publishing this notice in accordance with the Federal Land Policy and Management Act, as amended (FLPMA), the Federal Advisory Committee Act (FACA), and Presidential Proclamation 10606, ''Establishment of the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument''. The BLM gives notice that the Secretary of the Interior is establishing the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument Advisory Committee (MAC) and is seeking nominations for individuals to be considered as MAC members.

**DATES:** Comments regarding the establishment of this MAC must be submitted no later than September 4, 2024. All nominations must be received no later than October 4, 2024.

**ADDRESSES:** Comments regarding the establishment of the MAC and nominations for the MAC should be sent to the BLM office listed in the **FOR FURTHER INFORMATION CONTACT** section of this notice.

**FOR FURTHER INFORMATION CONTACT:** Rachel Carnahan, Public Affairs Specialist, BLM Arizona Strip District Office, 345 E Riverside Drive, St. George, UT 84780, phone: (435) 688–3303, email: *rcarnahan@blm.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered

within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** Presidential Proclamation 10533 directs the Secretary of the Interior, through the Director of the BLM, and the Secretary of Agriculture, through the Chief of the U.S. Forest Service, to establish and maintain an advisory committee under FACA (5 U.S.C. ch. 10) with the specific purpose of providing information and advice regarding the development of the management plan and, as appropriate, management of the Baaj Nwaavjo I'tah Kukveni-Ancestral Footprints of the Grand Canyon National Monument. The MAC is established in accordance with section 309 of FLPMA, as amended (43 U.S.C. 1739). The BLM is subject to standards and procedures for the creation, operation, and termination of BLM resource advisory councils at 43 CFR 1784.

The MAC will include 15 members to be appointed by the Secretary of the Interior and the Secretary of Agriculture as follows:

1. A representative of the Arizona Game and Fish Department;

2. A representative employed by a State agency;

3. An elected official from local government;

4. Three representatives of Tribal Nations;

5. A representative of developed outdoor recreation, off-highway vehicle users, or commercial recreation activities in the Monument;

6. A representative of the conservation community;

7. A representative of wildlife, hunting, or fishing organizations;

8. A representative of cultural or historical interests;

9. A representative of the scientific community;

10. A representative of the ranching community;

11. A representative of local business owners; and

12. Two representatives of the public-at-large.

Members will be appointed to the MAC to serve three-year staggered terms.

*Nominating Potential Members:* Nominations should include a resume providing an adequate description of the nominee's qualifications, including information that would enable the Department of the Interior to make an informed decision regarding the membership requirements of the MAC and permit the Department of the Interior to contact a potential member. Nominees are strongly encouraged to

include supporting letters from employers, associations, professional organizations, and/or other organizations that indicate support by a meaningful constituency for the nominee. Please indicate any BLM permits, leases, or licenses that you hold personally or are held by your employer. Members of the MAC serve without compensation. However, while away from their homes or regular places of business, members engaged in MAC business may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by 5 U.S.C. 5703, in the same manner as persons employed intermittently in Federal Government service.

The MAC will meet approximately two to four times annually, and at such other times as designated by the Designated Federal Officer.

Simultaneous with this notice, the BLM will issue a press release providing additional information for submitting nominations.

*Public Disclosure of Comments:* Before including your address, phone number, email address, or other personally identifiable information (PII) in your comment, you should be aware that your entire comment—including your PII—may be made publicly available at any time. While you may ask us in your comment to withhold your PII from public review, we cannot guarantee that we will be able to do so.

**Deb Haaland,**
*Secretary of the Interior.*
[FR Doc. 2024–18663 Filed 8–19–24; 8:45 am]
**BILLING CODE 4331–12–P**

---

## DEPARTMENT OF THE INTERIOR

### National Park Service

[NPS–WASO–NRNHL–DTS#-; PPWOCRADI0, PCU00RP14.R50000]

**National Register of Historic Places; Notification of Pending Nominations and Related Actions**

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The National Park Service is soliciting electronic comments on the significance of properties nominated before August 10, 2024, for listing or related actions in the National Register of Historic Places.

**DATES:** Comments should be submitted electronically by September 4, 2024.

**ADDRESSES:** Comments are encouraged to be submitted electronically to *National_Register_Submissions@ nps.gov* with the subject line ''Public

---

[260] *See* 5 CFR 1320.8(d) and 1320.10(e).

# DHS National Environmental Policy Act
## Memorandum For Record
### for Categorically Excluded Actions that do not require a REC

| INTRODUCTION |
| --- |
| The purpose of this Memorandum for Record is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in compliance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction 023-01-001-01, Implementation of NEPA. DHS has previously analyzed actions of this type and concluded that there is no potential for significant impact on the human environment, that a DHS Categorical Exclusion applies, and that a more detailed review and documentation in a Record of Environmental Consideration is not necessary. |

| SECTION I - Description of Proposed Action |
| --- |
| 1.  **Title of Proposed Action:**  Implementation of a Parole in Place Process for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens |
| 2.  **Identifying Number of Proposed Action (if available):**  DSS-USCIS-2024-20213, CIS Number- 2779-24 |
| 3.  **Project Security Type:**  Unclassified |
| 4.  **Estimated Start Date:**  08/19/2024 |
| 5.  **Location of Proposed Action (e.g., Nationwide, Regional, Site-Specific.  If site-specific, provide street address, city, county and state):**<br>    Nationwide |
| 6.  **Project Type:**<br>· Administrative & Regulatory Activities - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents. (CATEX A3)<br>· Administrative & Regulatory Activities - Other, Use "other" to trigger full review |
| 7.  **Description of Proposed Action.**<br>U.S. Department of Homeland Security's (DHS) implement of a process for certain noncitizen spouses and stepchildren of U.S. citizens who are present in the United States without admission or parole to request parole in place under existing statutory authority. Granting parole in place, on a case-by-case basis, to eligible noncitizens under this process will achieve the significant public benefit of promoting the unity and stability of families, increasing the economic prosperity of American communities, strengthening diplomatic relationships with partner countries in the region, reducing strain on limited U.S. government resources, and furthering national security and public safety objectives.<br><br>DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from implementing a parole in place process for eligible noncitizen spouses and stepchildren of U.S. citizens, nor is DHS aware of the existence of any extraordinary circumstances that would be impacted by this action.  DHS finds the proposed action clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures. |
| 8.  **Document Preparer:**  Faisal Akhter |
| 9.  **Senior Environmental Reviewer:**  Jennifer Hass |
| 10.  **Project Proponent:**  Mirna Smith |

| SECTION II - Finding |
| --- |

004646

Memorandum For Record (Unclassified)

This action is not expected to result in any significant adverse environmental impacts as described in the National Environmental Policy Act of 1969 (NEPA). The proposed action has been thoroughly reviewed by the U.S. Citizenship and Immigration Services and it has been determined, by the undersigned, that this action is categorically excluded under current DHS by the undersigned, that this action is categorically excluded under current DHS CATEX(A3) from further environmental documentation, in accordance with DHS Directive 023-01 and Instruction 023-01-001-01, Implementation of NEPA, since implementation of this action:

1. Clearly fits within one or more of the categories of excludable actions listed in Appendix A of DHS Instruction 023-01-001-01;
2. Has not been segmented into smaller parts in order to avoid a more extensive evaluation of the potential for significant environmental impacts; and
3. Does not involve any extraordinary circumstances, as defined in DHS Instruction 023-01-001-01, Section V(B)(2), that would create the potential for a normally excluded action to have a significant environmental effect.

| 07/30/2024 | *Faisal Akhter* |
| --- | --- |
| Date | Document Preparer |

| 08/13/2024 | *Jennifer Hass* |
| --- | --- |
| Date | Senior Environmental Reviewer |

In reaching my decision/recommendation on the U.S. Citizenship and Immigration Services component's proposed action, I have considered the information contained in this MFR on the potential for environmental impacts.

| 08/13/2024 | *Mirna Smith* |
| --- | --- |
| Date | Proponent |

004647



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

June 17, 2024

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM:        Ur M. Jaddou    UR M          Digitally signed by UR M
             Director        JADDOU        JADDOU
                                           Date: 2024.06.17
             U.S. Citizenship and Immigration Services    15:19:49 -04'00'

SUBJECT:        **Process for Certain Noncitizen Spouses of U.S. Citizens**

---

**Purpose**

The purpose of this memorandum is to recommend that you exercise your authority under immigration law, including the discretionary parole authority, to establish a process for certain noncitizens who are married to U.S. citizens, who have been continuously present in the United States for at least ten years as of the date of signature of this memorandum, and who meet certain other requirements, to be considered for parole in place on a case-by-case basis. Noncitizens may apply for parole in place under existing law and policy. Establishing a process for this particularized population to apply and be considered for parole in place on a case-by-case basis would achieve the significant public benefit of promoting the unity and stability of American families, increasing the economic prosperity of American communities, strengthening diplomatic relationships with partner countries in the region, reducing strain on limited U.S. government resources, and furthering national security and public safety objectives.

This memorandum, if approved, would, in concert with a subsequent implementing *Federal Register* notice, be an internal policy statement of DHS about the use of statutory parole authority under section 212(d)(5)(A) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(d)(5)(A), which provides that parole decisions are made by the Secretary "in his discretion."[1] This policy would establish a process for making discretionary, case-by-case parole decisions based on existing legal authorities. It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or

---

[1] Although section 212(d)(5) of the INA continues to refer to the Attorney General, the parole authority now resides exclusively with the Secretary of Homeland Security. *See Matter of Castillo-Padilla*, 25 I&N Dec. 257, 261 & n.1 (BIA 2010); *see also* 6 U.S.C. § 202(4) (charging the Secretary with the responsibility for "[e]stablishing and administering rules . . . governing . . . parole").

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 2 of 27

procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

## Background and Context

Family unity is a bedrock objective of the U.S. immigration system. Nearly 60 years ago, the Immigration and Nationality Act of 1965, a foundation of modern U.S. immigration law, enshrined as a core principle the importance of promoting the ability of U.S. citizens to unify with their relatives – a principle that endures to this day.[2] Yet, amidst growing demands and challenges, including chronic underfunding,[3] the administration of our immigration system has often failed to fully achieve this core principle. U.S. citizens and their families have been required in many cases to face near-impossible barriers, including lengthy backlogs and potential years-long separation from their families, to access immigration benefits meant to promote family unity.

Overall, there are an estimated 745,000 noncitizens lacking lawful immigration status who are married to U.S. citizens.[4] On average, these noncitizens have been in the United States for 20 years, live with over 2.3 million U.S. citizen family members, and collectively raise and care for over 1.6 million U.S. citizen children.[5] While U.S. immigration law provides these noncitizens the ability to apply for lawful permanent residence based on their marriage to U.S. citizens, a series of complex barriers prevents many of them from doing so without first needing to leave the country and enduring prolonged, potentially indefinite, separation from their U.S. citizen family members while navigating a bureaucratic process abroad that can span many years and multiple government agencies.

Specifically, a threshold qualification to adjust status to that of a lawful permanent resident (LPR) is that an applicant must have been "inspected and admitted or paroled."[6] Spouses who entered the United States without inspection – who constitute an estimated two-thirds of all noncitizens without lawful status who are married to U.S. citizens[7] – generally can meet this requirement only by departing the United States and seeking an immigrant visa to allow for admission at a port of entry. However, by departing, they typically trigger a bar to reentry that can last three years (if they have accrued more than 180 days but less than one year of unlawful presence in the United States) or, more likely, ten years (if they have accrued one year or more of unlawful presence in the United States).[8] While this bar can, in some circumstances, be waived, the waiver can be granted only once the noncitizen has left the United States, and the noncitizen must remain abroad and separated from their U.S. citizen family members while their application for an immigrant visa

---

[2] Pub. L. No. 89-236 (1965).

[3] *See* U.S. Citizenship and Immigration Services (USCIS) Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 88 Fed. Reg. 402, 428 (Jan. 4, 2023) (noting that "USCIS remains underfunded to accomplish its operational objectives," including processing applications related to family unity).

[4] U.S. Dep't of Homeland Security Office of Homeland Security Statistics (OHSS) analysis of OHSS Estimates of the Unauthorized Immigrant Population Residing in the United States: Jan. 2018-Jan. 2022 ("OHSS Analysis"), tbl. 3.

[5] *Id.* tbls. 4, 5.

[6] INA § 245(a), 8 U.S.C § 1255(a).

[7] OHSS Analysis, *supra* note 4, tbl. 3.

[8] INA § 212(a)(9)(B)(i), 8 U.S.C. § 1182(a)(9)(B)(i).

004649

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 3 of 27

is processed at a U.S. consulate.[9]  As a result of these significant obstacles and the prospect of prolonged separation, these noncitizens often do not pursue this pathway.

Recognizing the harms experienced by American families and communities as a result of barriers in the immigration system, President Biden in 2021 directed DHS and other agencies to "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law."[10]  Since then, U.S. Citizenship and Immigration Services (USCIS) has taken several steps to promote accessibility and increase efficiency in the immigration system.[11]

In furtherance of the President's direction, USCIS now recommends you establish a parole in place process, through existing discretionary parole authority, for certain long-residing noncitizen spouses of U.S. citizens who would be eligible to apply for lawful permanent residence in the United States but for the fact that they were not "inspected and admitted or paroled."  Under existing authority, you would be articulating a process to consider on a case-by-case basis parole in place requests for these spouses, which would allow them to satisfy this requirement and seek lawful permanent residence without first having to depart the United States.  This proposed process does not change the eligibility criteria for LPR status but opens the opportunity for eligible noncitizen spouses of U.S. citizens to adjust their status under existing authorities.

USCIS recommends that this parole in place process be available to certain noncitizens who are present in the United States without admission or parole; who have been continuously present in the United States for a minimum of ten years as of the date of signature of this memorandum; who have a legally valid marriage to a U.S. citizen as of the date of signature of this memorandum;[12] who have no disqualifying criminal history; who do not pose a threat to national security or public safety; and who establish positive discretionary factors, such as community ties or status as parents and caregivers of U.S. citizen children.  Because noncitizens who lack lawful status but were previously admitted are not eligible for parole in place, and because they can adjust status from within the United States if they are otherwise eligible to do so, this process would be available specifically to those noncitizens who entered without inspection and who are applicants for admission.  Parole adjudications that would take place within this proposed process would also consider negative discretionary factors.  USCIS anticipates approximately 500,000 noncitizen

---

[9] INA § 212(a)(9)(B)(v), 8 U.S.C. § 1182(a)(9)(B)(v) (requiring waiver applicants to "establish[ ] to the satisfaction of the [Secretary] that the refusal of [the applicant's] admission . . . would result in extreme hardship to the citizen or [LPR] spouse or parent" of the applicant); *see also* 8 C.F.R. § 212.7(e) (describing the provisional unlawful presence waiver of inadmissibility process). As discussed in greater detail below, the Form I-601A provisional waiver process, while an important mechanism, has faced significant backlogs in recent years, and requires the noncitizen to depart and, in all likelihood, remain separated from their U.S. citizen relatives during consular processing for an indefinite period of time. *See infra* pp. 17-18.

[10] Exec. Order No. 14012, *Restoring Faith in Our Legal Immigration System and Strengthening Integration and Inclusion Efforts for New Americans*, 86 Fed. Reg. 8277 (Feb. 5, 2021).

[11] *See* USCIS, Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade, (Feb. 9, 2024), https://www.uscis.gov/EOY2023; USCIS Fiscal Year 2022 Progress Report (Dec. 2022), www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf.

[12] As described in further detail below, certain stepchildren of U.S. citizens may also be considered for parole under this process. *See infra* pp. 22-23.

004650

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 4 of 27

spouses of U.S. citizens may meet the requirements to apply for parole in place under this process.[13]

As described below, the authority to parole applicants for admission "in place" – meaning while the noncitizen is present within the United States without having been inspected and admitted – is consistent with DHS's longstanding application of its authorities.[14]  It has been used for over a decade in the specific context of preserving family unity: since 2010, noncitizen family members of U.S. military servicemembers have obtained parole in place to enable them to adjust status without leaving the United States,[15] a practice Congress legislatively reaffirmed in 2019.[16]  While immigration laws enacted by Congress generally contemplate that noncitizens who have entered unlawfully must first depart and apply for lawful permanent residence through consular processing of an immigrant visa application and subsequent admission at a port of entry, Congress has also explicitly authorized the use of parole in certain instances as a discretionary tool where justified for urgent humanitarian reasons or significant public benefit, which may reasonably be construed to include promoting family unity.

Exercising your parole authority in this manner with respect to certain noncitizen spouses of U.S. citizens would provide a significant public benefit.  *First*, it would promote family unity by allowing U.S. citizen spouses and children to remain with their noncitizen family members who obtain parole in place through this process and permit these noncitizens to remain in the United States while they apply for lawful permanent residence, thus promoting stability and preventing avoidable disruptions to these families.  *Second*, a parole in place process would advance U.S. economic and labor interests.  *Third*, a parole in place process would further critical U.S. diplomatic interests and further our foreign policy objectives of managing migration, increasing economic stability, and fostering security here and in partner countries in the region.  *Fourth*, use of parole in place in this manner would preserve limited resources across U.S. government agencies that would otherwise be expended on consular processing and complex waiver adjudications.  *Fifth*, establishment of such a process would further national security and public safety interests by encouraging noncitizens to provide information that would be used for

---

[13] OHSS Analysis, *supra* note 4, tbl. 3.

[14] *See, e.g.*, Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998), *superseded in part on other grounds by* Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, *Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007) ("Coldebella Memo").

[15] While the USCIS policy memorandum articulating the use of parole in place for military family members was issued in 2013, as a matter of practice, USCIS has been issuing parole in place for members of this population since 2010. *See* USCIS Policy Memorandum, PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)* (Nov. 15, 2013), *available at* https://www.uscis.gov/sites/default/files/document/memos/2013-1115_Parole_in_Place_Memo_.pdf ("USCIS Military Parole in Place Memorandum"), *superseded in part by* USCIS Policy Memorandum, PM-602-1104, *Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees* (Nov. 23, 2016), *available at* https://www.uscis.gov/sites/default/files/document/memos/PIP-DA_Military_Final_112316.pdf.

[16] *See* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 1758 (2019) (8 U.S.C. § 1182 note) (NDAA 2020).

004651

Process for Certain Noncitizen Spouses of U.S. Citizens
Page 5 of 27

screening and vetting.

**Parole Authority and Prior Family Unity Parole Processes**

*Parole Authority*

The Secretary of Homeland Security has the discretionary authority under section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), to parole any applicant for admission "into the United States temporarily under such reasonable conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

DHS's parole authority can be extended to noncitizens outside the United States as well as noncitizens inside the United States who have not been lawfully admitted, a practice known as "parole in place." Parole is available to an "applicant for admission," which the INA defines in relevant part as "an alien present in the United States who has not been admitted or who arrives in the United States."[17] Noncitizens who have entered the United States without inspection may be paroled because they are still considered "applicants for admission," even though they are inside the United States. Longstanding DHS legal opinions have affirmed the availability of parole in place under U.S. immigration law.[18]

Parole is not an admission of the noncitizen to the United States, and a parolee remains an applicant for admission during the period of parole in the United States.[19] DHS sets the duration of the parole based on the purpose for granting the parole request and may impose reasonable conditions on parole.[20] DHS may terminate parole in its discretion at any time.[21] By regulation, parolees may apply for and be granted employment authorization to work lawfully in the United States.[22] Noncitizens who are paroled do not accrue unlawful presence for purposes of inadmissibility under section 212(a)(9)(B) of the INA, 8 U.S.C. § 1182(a)(9)(B), while their parole remains valid.

Although parole may only be granted on an individualized basis, the parole authority has long been interpreted to allow for designation of specific groups of noncitizens for whom parole should

---

[17] *See* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); INA § 235(a)(1), 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of [the INA] an applicant for admission."). A noncitizen placed in removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a, also remains an applicant for admission, and such an individual could be considered for this parole in place process even if released from custody under INA § 236(a), 8 U.S.C. § 1226(a). *See* INA § 240(a)(2), 8 U.S.C. § 1229a(a)(2) ("An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title…").

[18] *See supra* note 14.

[19] INA § 101(a)(13)(B), 8 U.S.C. § 1101(a)(13)(B); INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

[20] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).

[21] 8 C.F.R. § 212.5(e). In addition, neither the denial of a parole in place request nor a parole termination determination is subject to judicial review. *See* INA § 242(a)(2)(B)(ii), 8 U.S.C. § 1252(a)(2)(B)(ii); *Bolante v. Keisler*, 506 F.3d 618, 621 (7th Cir. 2007); *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003); *see also Vazquez Romero v. Garland*, 999 F.3d 656, 665 (9th Cir. 2021) ("We have previously concluded that the jurisdiction-stripping provision of § 1252(a)(2)(B)(ii) applies to discretionary parole decisions under § 1182(d)(5).").

[22] 8 C.F.R. § 274a.12(c)(11).

Process for Certain Noncitizen Spouses of U.S. Citizens
Page 6 of 27

be favorably considered, so long as the parole of each noncitizen within the group is considered on a discretionary, case-by-case basis.  Congress has repeatedly expressed support in legislation for the use of DHS's parole authority to benefit individuals falling within particular groups.[23]

*Parole in Relation to Adjustment of Status Eligibility*

For noncitizens who have entered the United States without inspection at some point in the past and remain in the United States, a grant of parole under INA § 212(d)(5)(A), 8 U.S.C. §1182(d)(5)(A), affects two eligibility requirements for adjustment of status to that of LPR under section 245(a) of the INA, 8 U.S.C. § 1255(a).[24]

First, to seek adjustment of status, the applicant must be "admissible."[25] Parole renders inapplicable one ground of inadmissibility, INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), which applies to a noncitizen who is "present in the United States without being admitted or paroled."[26]  When a noncitizen who has entered the United States without inspection subsequently receives parole, they will no longer be inadmissible under this section because they have been paroled.[27]  Second, to qualify for adjustment of status, the applicant generally must have been

---

[23] *See, e.g.*, Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Pub. L. No. 101-167, § 599E (8 U.S.C. § 1255 note) (authorizing granting permanent residence to parolees from the Soviet Union, Vietnam, Laos, and Cambodia); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 646 (8 U.S.C. § 1255 note) (providing for adjustment of status for noncitizens from Poland and Hungary who had been denied refugee status but who had been "inspected and granted parole into the United States"); NDAA 2020, *supra* note 16 (expressing congressional support for an ongoing parole program for relatives of U.S. military members and considering in each case-by-case determination whether parole would advance family unity that would constitute a significant public benefit); Extending Government Funding and Delivering Emergency Assistance Act of 2021, Pub. L. No. 117-43, § 2502 (8 U.S.C. § 1101 note) (providing refugee benefits to Afghans paroled under Section 1182(d)(5) and funds to support those benefits); Ukraine Supplemental Appropriations Act of 2022, Pub. L. No. 117-128, § 401 (8 U.S.C. § 1101 note) (providing benefits to Ukrainians paroled under INA § 212(d)(5), 8 U.S.C. § 1182(d)(5) and funds to support those benefits).
[24] To apply for adjustment of status under INA § 245(a), the noncitizen must also have an immigrant visa "immediately available to him" or her at the time of filing. INA § 245(a)(3), 8 U.S.C. § 1255(a)(3). Because there is no numerical limit on immigrant visas for spouses of U.S. citizens, *see* INA § 201(b)(2)(A)(i), 8 U.S.C. § 1151(b)(2)(A)(i), immigrant visas are immediately available to them upon approval of a Form I-130. *See* 8 C.F.R. § 245.2(a)(2)(i)(B). Cuban nationals who are paroled also may be eligible for adjustment of status under the Cuban Adjustment Act, Pub. L. No. 89-732 (1966) (8 U.S.C. § 1255 note), without regard to the availability of an immigrant visa.
[25] INA § 245(a)(2), 8 U.S.C. § 1255(a)(2).
[26] The use of the present tense in the second prong of INA § 212(a)(6)(A)(i), which applies to a noncitizen "who *arrives* in the United States at any time or place other than as designated by the Attorney General" (emphasis added) is interpreted to mean a noncitizen who is in the process of entering U.S. territory without inspection. In this manner, the two prongs of INA § 212(a)(6)(A)(i) are complementary, rather than duplicative of each other. USCIS Military Parole in Place Memorandum, *supra* note 15. This second prong is inapplicable to noncitizens who are already present in the United States. *Id.*
[27] USCIS generally considers noncitizens who were paroled and who were inadmissible under INA § 212(a)(7)(A), 8 U.S.C. § 1182(a)(7)(A), for lack of documents "at the time of application for admission" to remain eligible for adjustment of status under INA § 245(a)(2), 8 U.S.C. § 1255(a)(2).

004653

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 7 of 27

"inspected and admitted or paroled into the United States."[28]  A grant of parole under INA § 212(d)(5)(A), including parole in place, satisfies this threshold requirement as well.[29]

The noncitizen, however, must still satisfy all the other requirements for adjustment of status, including establishing that they are not inadmissible under any other relevant grounds.[30] Moreover, in addition to satisfying the statutory prerequisites, applicants for adjustment of status must demonstrate that they merit a favorable exercise of discretion.

Congress therefore granted the Secretary broad discretionary authority to grant parole to noncitizens based on urgent humanitarian reasons or significant public benefit, *see* INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), and also chose to include parolees in the requirements at INA § 245(a), 8 U.S.C. § 1255(a) for adjustment of status.  Together, these statutory authorities allow the Secretary, where appropriate, to create an alternative process for seeking lawful permanent residence for noncitizens who otherwise qualify.

*Prior Parole in Place Policies*

Parole in place has been used for noncitizens already in the United States to remove barriers to adjustment of status and promote the significant public benefit of family unity.  In 2013, USCIS announced a process to accept parole in place applications for family members of certain U.S. military personnel and veterans to enable those family members to adjust their status.[31]  In November 2014, DHS directed USCIS to expand on these policies.[32]

In 2019, Congress passed legislation "reaffirm[ing] the importance of the parole-in-place authority of the Secretary of Homeland Security" and emphasizing the sense of Congress that the use of "parole in place reinforces the objective of military family unity," and directing DHS to "consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit."[33]  That same year, Congress

---

[28] INA § 245(a), 8 U.S.C. § 1255(a).

[29] DHS may also conditionally release an applicant for admission from custody, also known as "conditional parole" under INA § 236(a)(2)(B), 8 U.S.C. § 1226(a)(2)(B), pending INA § 240 removal proceedings. Conditional release under INA § 236(a)(2)(B), however, does not constitute parole for purposes of INA § 212(d)(5), 8 U.S.C. § 1182(d)(5) or adjustment of status under INA § 245, 8 U.S.C. § 1255. *See Matter of Cabrera-Fernandez*, 28 I&N Dec. 747 (BIA 2023), affirming *Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010); Coldebella Memo, *supra* note 14 (clarifying that "conditional parole" under section 236(a)(2)(B) of the INA, 8 U.S.C. § 1226(a)(2)(B), does not constitute parole for purposes of INA section 212(d)(5), 8 U.S.C. § 1182(d)(5)). However, such individuals would remain eligible for a grant of parole in place if they have not otherwise been "admitted" to the United States.

[30] *See* INA § 245, 8 U.S.C. § 1255 (requirements for adjustment of status); *see also* INA § 212(a), 8 U.S.C. § 1182(a) (grounds of inadmissibility). While noncitizens generally must also have "maintain[ed] continuously a lawful status since entry into the United States" to qualify for adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a), this restriction does not apply to immediate relatives, which includes spouses of U.S. citizens. *See* INA § 245(c), 8 U.S.C. § 1255(c) (bars to adjustment); INA § 201(b)(2)(A)(i), 8 U.S.C. § 1151(b)(2)(A)(i) (defining "immediate relatives").

[31] USCIS Military Parole in Place Memorandum, *supra* note 15.

[32] Memorandum from Jeh Johnson, Secretary, U.S. Dep't of Homeland Security, *Families of U.S. Armed Forces Members and Enlistees*, https://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf (Nov. 20, 2014) (directing USCIS to issue expanded policies on the use of both parole in place and deferred action for certain spouses, children, and parents of individuals seeking to enlist in the U.S. Armed Forces as well as those currently serving).

[33] *See* NDAA 2020, *supra* note 16.

004654

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 8 of 27

provided a new long-term immigration status specifically for certain noncitizens in the Commonwealth of the Northern Mariana Islands who had been paroled in place by USCIS for various reasons including family unity and authorized continued parole in place for those noncitizens pending adjudication of their applications for the new status.[34]

Since USCIS announced the establishment of a parole in place process for certain military family members in 2013, 81,762 noncitizens have applied for, and 60,506 noncitizens have received, parole in place as the spouse, child, or parent of a servicemember, reservist, or veteran of the U.S. Armed Forces.

*Prior Family Unity Parole Policies*

Past Secretaries have similarly exercised the parole authority to promote family unity by establishing several parole processes for individuals outside the United States who are waiting for a family-based visa to become available.[35]

For example, the Cuban Family Reunification Parole (CFRP) Program, established in 2007, allows U.S. citizens and LPRs to request parole for certain eligible family members in Cuba who are beneficiaries of approved Forms I-130.[36]  If parole is authorized, these family members may come to the United States and seek parole before their immigrant visa priority dates are current so they can reunify with their family members while awaiting availability of an immigrant visa. Similarly, in 2014, the Haitian Family Reunification Parole (HFRP) Program was established, allowing U.S. citizens and LPRs to request parole for certain eligible family members in Haiti who are beneficiaries of approved Forms I-130, who may subsequently come to the United States to be reunited with family and seek parole before their immigrant visa priority dates are current.[37]  In 2016, USCIS announced a similar process to allow Filipino World War II veterans in the United States to reunite with their family members who are the beneficiaries of approved Forms I-130 while waiting for their immigrant visas to become available.[38]

More recently, DHS announced the implementation of new Family Reunification Parole (FRP) processes for nationals of Colombia,[39] Ecuador,[40] El Salvador,[41] Guatemala,[42] and Honduras,[43] and their immediate family members, who have approved family-based visa petitions filed on their behalf by a U.S. citizen or LPR. DHS also announced updates to the existing CFRP and HFRP

---

[34] *See* Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. No. 116-24, § 2 (2019) (48 U.S.C. § 1806(e)(6)).
[35] *See Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021) (noting that "quintessential modern uses of the parole power include . . . paroling aliens who qualify for a visa but are waiting for it to become available") (internal citations omitted), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).
[36] Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007).
[37] Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014).
[38] Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016).
[39] Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023).
[40] Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023).
[41] Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023).
[42] Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).
[43] Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023).

004655

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 9 of 27

processes by adopting the same modernized and streamlined processing steps implemented for the newer FRP processes.[44]

**Justification**

Paroling in place on a case-by-case basis certain spouses of U.S. citizens who have lived in the United States for at least 10 years, have no disqualifying criminal convictions, do not pose a threat to national security or public safety, and merit a favorable exercise of discretion would provide a significant public benefit to the United States by: 1) promoting family unity; 2) strengthening the U.S. economy and the economic position of American families; 3) advancing diplomatic relationships and key foreign policy objectives of the United States; 4) reducing strain on limited U.S. government resources; and 5) furthering national security and public safety interests.

*Promoting Family Unity*

This proposed process would promote family unity by allowing certain noncitizens who have long lived in the United States to remain together with their U.S. citizen spouses – and, in many cases, their U.S. citizen children – while they apply for permanent residence.  By addressing a barrier that currently prevents many of these otherwise eligible noncitizens to regularize their status, this process would also promote the long-term stability of these families.

The proposed process would benefit an estimated 500,000 noncitizens.[45]  These noncitizens have lived in the United States for an average of 23 years, illustrating the depth of their ties to the country.[46]  Over 1.6 million U.S. citizen family members, including 1.1 million U.S. citizen children, are estimated to live in their families.[47]  Absent this proposed process, for these noncitizens to apply for permanent residence, their U.S. citizen spouses and children would have to endure prolonged, potentially indefinite, separation from them, which would cause profound disruption and economic and emotional hardship upon their lives.  As a result, hundreds of thousands of noncitizen spouses of U.S. citizens instead remain without lawful status, leading their U.S. citizen family members to live in fear and uncertainty about their futures.[48]

The impact of this instability is particularly profound for children in these families.  As has been extensively documented, the stable presence of parents and caregivers is critical to a child's wellbeing.[49]  Studies have found that children experience serious health issues that persist into

---

[44] Implementation of Changes to the Cuban Family Reunification Parole Process, 88 Fed. Reg. 54639 (Aug. 11, 2023); Implementation of Changes to the Haitian Family Reunification Parole Process, 88 Fed. Reg. 54635 (Aug. 11, 2023).

[45] OHSS Analysis, *supra* note 4, tbl. 3.

[46] *Id.* tbl. 5.

[47] *Id.* tbl. 4. While the total number of U.S. citizens living in families with noncitizen spouses who lack lawful status is over 2.3 million, including over 1.6 million children, the subset of U.S. citizens living with noncitizen spouses who lack lawful status, who have lived in the country for 10 or more years, and who entered without inspection is estimated to be 1.65 million, including an estimated 1.1 million U.S. citizen children.

[48] Edward Vargas & Vickie Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, J. Immigr. Minor Health, August 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5236009.

[49] "Preventing violence through the development of safe, stable, and nurturing relationships between children and their

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 10 of 27

adulthood when they lose a parent or when the parent is absent, regardless of the reason or length of time.[50] Furthermore, studies have demonstrated that children can experience poorer health outcomes as a result of the stress and uncertainty caused by their parent's lack of lawful immigration status.[51]

In justifying the establishment of its parole in place policy for military families, USCIS described how in the absence of such a policy, servicemembers faced "stress and anxiety because of the immigration status of their family members in the United States."[52] Here, too, access to parole in place would reduce the stress and anxiety of U.S. citizen spouses and children and ensure the stability of these families both immediately, during the noncitizen's application for lawful permanent residence, as well as in the long term, once the noncitizen is able to adjust status. It would also comport with what courts have long recognized to be a "prevailing purpose" of U.S. immigration law: the preservation of family unity.[53]

_Advancing U.S. Economic and Labor Interests_

The proposed process would allow certain noncitizen spouses of U.S. citizens to immediately seek employment authorization on the basis of the parole grant, which would benefit both their U.S. citizen family members and the broader U.S. economy. By removing a barrier to adjustment of status, this process would also provide these noncitizens the enduring ability to work lawfully, provide stable, consistent support to their U.S. citizen family members, and reduce their risk of facing labor exploitation.

Currently, an estimated 65 percent of noncitizens over the age of 16 who do not have lawful status are already participating in the workforce, and many are self-employed.[54] U.S. citizen spouses, noncitizen spouses, and their families, like other U.S. families, pay taxes and stimulate the economy by consuming goods and services. Such activities contribute to further growth of the

---

parents and caregivers," World Health Organization and Centre for Public Health (2009), https://iris.who.int/bitstream/handle/10665/44088/9789241597821_eng.pdf.
[50] Vincent J. Felitti et al., _Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study_, Am. J. Preventive Medicine 14 no. 4 (1998), 245-258, https://www.ajpmonline.org/article/S0749-3797(98)00017-8/fulltext.
[51] A. Martinez, L. Ruelas, and D. Granger, _Household fear of deportation in Mexican-origin families: Relation to body mass index percentiles and salivary uric acid_, Am. J. Hum. Biol. 2017, https://pubmed.ncbi.nlm.nih.gov/28726338/; L. Rojas-Flores, M. Clements, J. Hwang Koo, and J. London, _Trauma and psychological distress in Latino citizen children following parental detention and deportation_, Psychol. Trauma 2017, https://pubmed.ncbi.nlm.nih.gov/27504961/.
[52] USCIS Military Parole in Place Memorandum, _supra_ note 15.
[53] _Nwozuzu v. Holder_, 726 F.3d 323, 332 (2d Cir. 2013) (citing H.R. Rep. No. 82-1365 (1952), _reprinted in_ 1952 U.S.C.C.A.N. at 1680); _see also Holder v. Martinez Gutierrez_, 566 U.S. 583, 594 (2012) (recognizing that the "objectives of providing relief to [noncitizens] with strong ties to the United States and promoting family unity . . . underlie or inform many provisions of immigration law," even if "they are not the INA's only goals, and Congress did not pursue them to the _n_th degree") (quotation marks omitted) (citing _Fiallo v. Bell_, 430 U.S. 787, 795 n.6 (1977), and _INS v. Errico_, 385 U.S. 214, 220 (1966)).
[54] _See_ Migration Policy Institute, "Profile of the Unauthorized Population: United States," https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US (last visited June 16, 2024).

004657

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 11 of 27

economy and create additional jobs and opportunities for both U.S. citizen and noncitizen populations.[55]

However, because they lack access to employment authorization, noncitizen spouses of U.S. citizens who lack lawful status are prevented from contributing as fully to the economy as they otherwise could. Without employment authorization, they are restricted to particular sectors of the economy and have limited opportunities for job mobility, which, in turn, reduces overall economic productivity.[56] Providing these noncitizens access to employment authorization could also increase labor force participation in a tight labor market.[57]

U.S. citizen family members would also benefit from the stability that access to parole and eventual adjustment of status this process would provide. As noted above, the current process to apply for lawful permanent residence requires noncitizens who are present without admission or parole to remain abroad for an indefinite period of time, which could be profoundly disruptive to the family's economic wellbeing, particularly when the noncitizen is a breadwinner or a caregiver for their U.S. citizen family members. By contrast, being able to apply for lawful permanent residence from within the United States would enable these noncitizens to stably support and provide for their U.S. citizen family members.

Access to employment authorization would also reduce potential labor exploitation, a DHS and government-wide objective.[58] Research has demonstrated that noncitizens who lack employment authorization are more likely to experience violations of labor laws, including laws governing workplace conditions and minimum wage.[59] They are also less likely to report those violations to enforcement agencies given their unauthorized status.[60] Authorized workers may be more willing and able to vindicate labor rights, which lessens incentives for unscrupulous employers to hire undocumented noncitizens over U.S. workers.[61]

---

[55] Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas, White House Council of Economic Advisers, *Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021), https://www.whitehouse.gov/cea/written-materials/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/ (describing the ways in which the presence of immigrants helps stimulate the economy).

[56] *Id.*

[57] *Id.*

[58] Memorandum from Alejandro Mayorkas, Secretary, U.S. Dep't of Homeland Security, *Worksite Enforcement: The Strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual*, available at https://www.dhs.gov/publication/memorandum-worksite-enforcement (Oct. 12, 2021).

[59] *See, e.g.*, Annette Bernhardt, Ruth Milkman, and Nik Theodor, National Employment Law Project, *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities* 25, 42-45 (Sept. 21, 2009), https://www.nelp.org/insights-research/broken-laws-unprotected-workers-violations-of-employment-and-labor-laws-in-americas-cities/.

[60] *See, e.g.*, Tsedeye Gebreselassie, Nayantara Mehta, and Irene Tung, National Employment Law Project, *How California Can Lead on Retaliation Reforms to Dismantle Workplace Inequality* 8 (Nov. 2, 2022), https://www.nelp.org/insights-research/how-california-can-lead-on-retaliation-reforms-to-dismantle-workplace-inequality/ (noting that only 10 percent of respondents who experienced labor violations reported those violations to a government agency).

[61] U.S. Dep't of Homeland Security, DHS Announces Process Enhancements for Supporting Labor Enforcement Investigations (Jan. 13, 2023), https://www.dhs.gov/news/2023/01/13/dhs-announces-process-enhancements-supporting-labor-enforcement-investigations (describing how deferred action protects undocumented workers who may then come forward to participate in enforcement agency investigations of potential violations of labor laws).

004658

Process for Certain Noncitizen Spouses of U.S. Citizens
Page 12 of 27

In addition, regularizing status for this population has the potential to increase tax revenues. Noncitizens who lack lawful status may file taxes using an Individual Taxpayer Identification Number (ITIN); past estimates suggest that noncitizens filing with ITINs pay billions in withheld payroll taxes annually.[62] While the tax compliance rate among the undocumented population is unknown, government agencies and non-governmental organizations have previously inferred that it may be between 50-75 percent, as opposed to tax compliance rates on ordinary wage income, which are close to 100 percent.[63] Noncitizens who lack lawful status may not pay taxes because they lack access to a Social Security number. Access to employment authorization would further incentivize payment of taxes and likely foster greater compliance with the tax code.[64]

The benefits of facilitating access to employment authorization to this particular population outweigh any potential costs to American workers or to the U.S. economy. First, a review of economic studies concludes that providing legal status to unauthorized migrants does not harm U.S.-born and other immigrant workers in the longer term, as the impact of immigration on wages overall is very small.[65] Second, the impact on public benefits at both the state and federal level is likely to be minimal initially and, in the long term, offset by increased tax contributions, as these noncitizens would be ineligible to access most means-tested benefits for five years after being paroled in place, as discussed in detail below.[66] To the extent that this population may have access to public benefits, they may be related to job placement assistance and language or skills-based training, among other supports, which could further promote this population's early or expanded participation in the workforce.[67] Eventually, these noncitizens could become eligible for public benefits, but their uptake of these public benefits would likely be curtailed by their increased

---

[62] *See, e.g.*, Nat'l Taxpayer Advocate, Annual Report to Congress, Vol. 1 (2015) https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2020/08/ARC15_Volume1.pdf, at 199 ("In 2015, 4.4 million ITIN filers paid over $5.5 billion in payroll and Medicare taxes and $23.6 billion in total taxes"); Stephen Goss et al., Social Security Administration, Office of the Chief Actuary, Actuarial Note No. 151, *Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds* (Apr. 2013), https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf ("For the year 2010, we estimate that the excess of tax revenue paid to the [Social Security] Trust Funds over benefits paid from these funds based on earnings of unauthorized workers is about $12 billion.").
[63] Congressional Budget Office, *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* (Dec. 2007), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf, at 6.
[64] Rouse et al., *supra* note 55 (citing Elizabeth U. Cascio & Ethan G. Lewis, *Distributing the Green (Cards): Permanent residency and personal income taxes after the Immigration Reform and Control Act of 1986*, 172 J. Pub. Econ. 135 (2019)).
[65] *See, e.g.*, National Academies, *The Economic and Fiscal Consequences of Immigration* (2017), https://www.nationalacademies.org/our-work/economic-and-fiscal-impact-of-immigration.
[66] USCIS, Appendix: Eligibility for Public Benefits, https://www.uscis.gov/sites/default/files/document/policy-manual-resources/Appendix-EligibilityforPublicBenefits.pdf (describing limitations on when "qualified aliens," including parolees and lawful permanent residents, can access public benefits, typically after five years); *see also* 8 U.S.C. § 1641(b) (defining "qualified alien").
[67] Hamutal Bernstein and Carolyn Vilter, *Upskilling the Immigrant Workforce to Meet Employer Demand for Skilled Workers*, Urban Institute (July 2018), https://www.urban.org/sites/default/files/publication/98766/upskilling_immigrant_workforce_to_meet_employer_demand_for_skilled_workers_2.pdf.

004659

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 13 of 27

access to lawful employment and offset by the increased taxes they would pay as formal contributors to the economy.[68]

*Furthering Diplomatic Relationships and Foreign Policy Objectives*

This proposed process responds to the requests and interests of key foreign partners and aligns with the U.S. government's broader foreign policy objectives to collaboratively manage migration and promote economic stability in countries throughout the Western Hemisphere.

The vast majority of noncitizens who stand to benefit from this proposed process are from countries in the Western Hemisphere that serve as key migration management partners of the United States. An estimated 64 percent of the noncitizens eligible to access this process are Mexican nationals, while 20 percent are from Guatemala, Honduras, and El Salvador.[69] An additional 13 percent hail from other countries in the Western Hemisphere.[70]

The United States continues to engage with partner countries in the Western Hemisphere to manage unprecedented levels of migration. These efforts include addressing the root causes of migration, expanding access to lawful pathways, and disrupting human smuggling, trafficking, and criminal networks that prey on the most vulnerable individuals. As part of the strategy to reduce irregular migration and ensure migrants have access to protection, services and employment, the United States has worked with its partners to ensure migrants in other countries have access to regularization programs.

For example, in May 2024, Ecuador announced a new regularization program under which certain migrants are able to obtain a temporary resident visa, while others are able to apply for a temporary visa.[71] Colombia, in addition to its previous regularization process that has given 10-year temporary protected status to approximately 2.5 million Venezuelans,[72] announced a plan for regularization of irregular migrants through special permits for parents and legal guardians of children with such status. Colombia also announced a new special permanent visa for Latin American and Caribbean migrants without regular status in the country. Similarly, Costa Rica committed to expand the Special Temporary Category regularization pathway and reduce barriers to access with continued assistance from the international community.[73]

This proposed process, if adopted, would demonstrate U.S. partnership and commitment to the shared goals of addressing migration through the Western Hemisphere. Partner countries, including Mexico and Colombia, have requested regularization of noncitizens who are nationals of

---

[68] Rouse et al., *supra* note 55.

[69] OHSS Analysis, *supra* note 4, tbl. 3.

[70] *Id.*

[71] The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala/ ("White House Fact Sheet").

[72] *See* U.S. Dep't of State, Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas at a Joint Press Availability (Apr. 27, 2023), https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-at-a-joint-press-availability/.

[73] White House Fact Sheet, *supra* note 71.

004660

their countries who lack lawful status and who have lived in the United States for long periods of time.[74] For example, the Government of Mexico has urged the United States to regularize Mexican nationals who are long-term residents of the United States.[75] Further, the Government of Colombia has requested that the United States regularize certain Colombian nationals living in the United States. Both Mexico and Colombia have partnered closely with the United States to address irregular migration. Establishing this parole in place process would therefore strengthen the United States' ability to cooperate and engage with these and other key partners in the region. This cooperation and engagement would extend to matters of national and homeland security as well.

This proposed process would also further the key foreign policy objectives of increasing economic stability in countries that are major sources of migration to the United States. By providing certain noncitizens who have been long-term residents of the United States the ability to access work authorization and eventual regularization of their status, this process would enable them to send remittances to family members in their countries of origin, promoting stability and reducing incentives for those family members to irregularly migrate to the United States.[76] Remittances play a pivotal role in origin countries' economies in the Western Hemisphere: in 2023, remittances received by the countries of Latin America and the Caribbean reached $154 billion.[77] Remittances are crucial to low- and middle-income countries, where they can improve a country's ability to repay a debt and where national banks can use future inflows as collateral to lower the costs of international borrowing for national banks.[78]

_Reducing Strain on Limited U.S. Government Resources_

The proposed process would also provide the significant public benefit of preserving and more effectively using limited U.S. government resources.

While USCIS would assume a new workload under this proposed process, it anticipates a significant reduction in its provisional waiver caseload. Currently, noncitizen spouses of U.S. citizens who are barred from adjustment of status due to not having been inspected and admitted or paroled, and who have accrued more than 180 days of unlawful presence, may file a Form I-601A, Application for Provisional Unlawful Presence Waiver, a form that is more complex and requires more time to adjudicate than a request for parole. If the provisional waiver is approved, the noncitizen spouse must then depart the United States to apply for an immigrant visa with the

---

[74] The White House, _Mexico-U.S. Joint Communique: Mexico and the United States Reaffirm Their Shared Commitments on an Orderly, Humane and Regular Migration_ (Dec. 28, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/28/mexico-u-s-joint-communique-mexico-and-the-united-states-reaffirm-their-shared-commitments-on-an-orderly-humane-and-regular-migration/.

[75] Memorandum to File from Royce Bernstein Murray, Acting Ass't Sec'y for Border and Immigration Policy, Office of Strategy, Policy and Plans, U.S. Dep't of Homeland Security, _Requests of Foreign Partners and Parole in Place Process_ (June 17, 2024).

[76] _See, e.g._, Jose Ivan Rodriguez-Sanchez, _An Economic Lifeline? How Remittances from the U.S. Impact Mexico's Economy_, Baker Institute of Rice University (Nov. 13, 2023), https://www.bakerinstitute.org/research/economic-lifeline-how-remittances-us-impact-mexicos-economy.

[77] Jeremy Harris and René Maldonado, _Migrant wages and remittances to Latin America and the Caribbean in 2023_, Migration Unpacked, Inter-American Development Bank (May 15, 2024), https://blogs.iadb.org/migracion/en/migrant-wages-and-remittances-to-latin-america-and-the-caribbean-in-2023/.

[78] _See id._

004661

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 15 of 27

Department of State (DOS) at a U.S. consulate, which ultimately determines whether the waiver will be granted.

USCIS has nearly 124,000 Form I-601A requests awaiting adjudication, and the median processing time to adjudicate a Form I-601A is 41.7 months.[79] While increased resources have allowed USCIS to complete more Form I-601A adjudications in FY 2024 year-to-date than in all of FY 2023, the backlog has only been reduced by 5,000 since the start of FY 2024.[80]

Similarly, despite considerable efforts, U.S. consulates are still struggling to reduce backlogs caused by the COVID-19 pandemic for noncitizens who are interview-ready for an immigrant visa.[81] As of May 2024, DOS had 438,443 individuals awaiting an interview but was able to schedule only 43,607 interviews in June 2024.[82]

Under the proposed process, USCIS anticipates that eligible noncitizens would seek parole in place and adjust status from within the United States instead of applying for a provisional waiver and consular processing abroad. USCIS could thus deploy existing staff adjudicating Forms I-601A to other high-priority or less complex workloads, thereby allowing USCIS to further reduce the overall number of pending cases, and DOS could save valuable consular interview appointments for other immigrant and nonimmigrant visa categories. Although USCIS would need to adjudicate the parole in place applications contemplated under this process, we expect that these would require fewer resources than those required to adjudicate the Form I-601A, given the nature of the adjudication and the efficiencies USCIS has achieved in its parole processing efforts.[83]

Moreover, creating a pathway to adjust status for certain noncitizen spouses of U.S. citizens could save resources for the U.S. Immigration and Customs Enforcement (ICE) Office of the Principal Legal Advisor (OPLA) and the Department of Justice Executive Office for Immigration Review (EOIR) for noncitizens who may request to be considered for this process and who are currently in removal proceedings. Allowing these noncitizens access to parole in place would allow OPLA to pursue dismissal of pending cases in the currently overburdened immigration court system, thus freeing precious court time and permitting immigration judges and OPLA attorneys to focus on priority cases.

---

[79] USCIS, Historical National Median Processing Time for All USCIS Offices for Select Forms By Fiscal Year, Data for FY24 (Oct. 1, 2023-April 30, 2024), https://egov.uscis.gov/processing-times/historic-pt (last visited June 16, 2024).

[80] USCIS, One-Year Anniversary of the Humanitarian, Adjustment, Removing Conditions, and Travel Documents (HART) Service Center (Mar. 25, 2024), https://www.uscis.gov/newsroom/stakeholder-messages/one-year-anniversary-of-the-humanitarian-adjustment-removing-conditions-and-travel-documents-hart.

[81] U.S. Dep't of State, Immigrant Visa Interview-Ready Backlog Report (June 2024), https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html.

[82] *Id.*

[83] For example, USCIS has started to allow online filing of the Form I-131, while the Form I-601A is not currently available for online filing. *See* USCIS, Certain Individuals Requesting Parole Can Now File Form I-131 Online (June 9, 2023), https://www.uscis.gov/newsroom/alerts/certain-individuals-requesting-parole-can-now-file-form-i-131-online.

Process for Certain Noncitizen Spouses of U.S. Citizens
Page 16 of 27

*Furthering National Security and Public Safety Interests*

The proposed process would promote national security and public safety interests by requiring noncitizens to provide biometric and biographic information to DHS in conjunction with their parole application. The information collected through this process would be used to vet and screen every applicant and identify anyone who may pose a public safety or national security threat. Specifically, applicants would be required to pass Federal Bureau of Investigation (FBI) fingerprint checks, as well as TECS and NCIC checks.

**Parole Process, Scope, Steps, and Resources**

If this memorandum is approved, USCIS would consider requests for parole in place, filed pursuant to a subsequent *Federal Register* notice, from noncitizen spouses of U.S. citizens who are present in the United States without admission or parole. USCIS would also consider parole in place requests from certain noncitizen children provided that they are physically present in the United States without admission or parole as of the date of signature of this memorandum and meet the INA's definition of a stepchild of a U.S. citizen.[84]

USCIS has developed for your consideration a set of criteria to be considered for a discretionary grant of parole under this process; factors to be considered as part of the discretionary case-by-case analysis; and high-level processing steps. This information can be found in Attachment A.

**Additional Considerations in the Establishment of this Process**

In recommending the establishment of this proposed process, USCIS considered various alternatives to this process, as well as impacts on resources and processing and broader impacts to both the federal government and state and local governments.

*Alternatives to This Process*

In recommending that you exercise your discretionary parole authority to establish a parole in place process, USCIS has considered alternatives to the proposed process.

*First*, USCIS has considered whether, as an alternative to the proposed process, it could instead dedicate additional resources to the processing of Form I-601A provisional waiver applications. As discussed above, the Form I-601A process allows certain noncitizens, including immediate relatives of U.S. citizens, to obtain a provisional waiver of the three- and ten-year unlawful presence inadmissibility grounds prior to their departure from the United States, which triggers those grounds.[85] It is intended to reduce the time noncitizens must spend apart from their U.S. citizen family members while increasing certainty that they will be granted a waiver once they depart. However, the process still entails some period of family separation, as it requires processing at a U.S. consulate abroad, often at great financial cost. It also involves some level of

---

[84] INA § 101(b)(1)(B), 8 U.S.C. § 1101(b)(1)(B) (defining "child" as an unmarried person under age twenty-one, who is, *inter alia*, "a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred").
[85] *See* 8 C.F.R. § 212.7(e); Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 536 (Mar. 4, 2013).

004663

uncertainty and risk: the grant of the provisional waiver is not a guarantee that the waiver, or the underlying immigrant visa, will ultimately be granted. A grant of parole in place likewise does not guarantee that an application for adjustment of status will be approved, but since the denial (and any subsequent appeal) would take place while the applicant is in the United States, noncitizens may be more likely to pursue this option. Moreover, for some families, even a short-term separation from a family member, whose income or other household contributions are needed, may be untenable.[86]

In addition, even if, as an alternative to this proposed process, USCIS dedicated additional resources to provisional waiver processing, doing so would not provide the significant public benefits that this proposed process would provide, given the large backlog of pending provisional waiver requests, the complexity of the adjudication, and current processing times. While USCIS is already dedicating significant increased resources to the Form I-601A backlog, it will still take at least three years to meaningfully reduce the backlog of pending applications. Accordingly, although USCIS considered in the alternative increasing dedicated resources even further to this caseload, doing so would not effectively address the backlog or support timely adjudications of other workloads.

While this proposed process could be viewed as replacing one adjudication (the provisional waiver application) with another (the parole application), given process efficiencies that USCIS has identified in adjudicating parole requests in other parole processes, USCIS anticipates that its adjudication of parole requests pursuant to this process would be less resource-intensive than the adjudication of Form I-601A applications. And unlike the provisional waiver process, parole in place would not entail a period of separation from U.S. citizen family members and would obviate the need for consular processing, thereby diverting individuals with parole in place from DOS backlogs and reducing wait times for other noncitizens seeking immigrant visas at U.S. consulates. In addition, once paroled, noncitizens could, unlike pending Form I-601A applicants, immediately apply for employment authorization, allowing them to support their U.S. citizen family members during the pendency of their adjustment of status process. While the Form I-601A process will remain critical for other categories of immigrant visa applicants, parole in place offers a less onerous path for a subset of this population who have particularly strong equities and ties to the United States.

*Second*, USCIS has considered alternative approaches in designing this proposed process. Specifically, in proposing parameters for this process, USCIS considered the following alternatives:

- Length of requisite physical presence: USCIS considered the time period by which an applicant would likely have established deep ties to their communities in the United States

---

[86] In putting forward this carefully tailored proposal, USCIS considered that the INA provides an avenue for certain spouses of U.S. citizens to adjust their status to lawful permanent residence in the United States regardless of the manner of their entry. This provision, found in INA § 245(i), allows certain individuals present in the United States without admission or parole to apply for adjustment of status in the United States if they were the beneficiary of certain petitions or applications filed before a date certain and by paying, in most cases, an additional $1,000 fee. Although the deadline in INA § 245(i) was extended several times, the provision last sunset on April 30, 2001. *See* INA § 245(i), 8 U.S.C. § 1255(i).

in determining 10 years as the period of physical presence that should be required to access this process. Because Congress has articulated a 10-year length of continuous presence as a prerequisite for certain noncitizens to seek lawful permanent residence through cancellation of removal,[87] USCIS concluded that, similarly, 10 years would be an appropriate length of time to require noncitizens to have been present in the United States to access this process. In making this determination, USCIS considered whether a longer period (such as 15 years) or a shorter period (such as five or eight years) was more appropriate and considered estimates of the potential population for each of these time periods.

USCIS also considered whether the noncitizen could continue to accrue physical presence until the time a parole application is filed, or whether the noncitizen must have accrued the physical presence before the process is announced. Ultimately, USCIS determined that requiring physical presence to have accrued by a date certain would provide greater predictability and certainty about the scope of the potential population, which in turn would assist USCIS in determining the appropriate resources to dedicate to this process. Requiring 10 years of physical presence by the date of signature of this memorandum also avoids incentivizing irregular migration by noncitizens who might otherwise potentially seek to enter the United States to access this process.[88]

- Marriage to a U.S. citizen: In proposing that a legally valid marriage to a U.S. citizen be required at the time of the signing of this memorandum, USCIS considered whether marriages that took place after the signing of the memorandum could nevertheless be qualifying. USCIS determined that requiring marriages to have taken place by the date this memorandum has been signed would better promote process integrity, prevent potential fraud, and provide greater certainty about the scope of the potential population.

USCIS also considered whether marriage to an LPR could be qualifying and determined that given that a primary goal of establishing this proposed process would be to remove a barrier to an immigration benefit that would otherwise be immediately available to the applicant, including spouses of LPRs would not be appropriate. Given that marriage to a U.S. citizen is required to immediately apply for adjustment of status (i.e., without needing to wait for an immigrant visa to become available), USCIS determined that marriage to a U.S. citizen should similarly be required to access this proposed process. Noncitizen spouses of LPRs who do not have lawful status, by contrast, do not have an immediate path to adjustment of status, as they must wait for a visa to become immediately available prior to applying for adjustment. Unlike spouses of U.S. citizens, they are also subject to ineligibility provisions barring adjustment of status on the basis of having worked without authorization.[89]

---

[87] INA § 240A(b)(1)(A), 8 U.S.C. § 1229b(b)(1)(A).

[88] *Cf.* Deferred Action for Childhood Arrivals Final Rule, 87 Fed. Reg. 53152, 53177-78 (Aug. 30, 2022) (noting that requiring continuous physical presence by a fixed date helped mitigate concerns that the policy incentivized irregular migration, while also noting that motivations for irregular migration are complex and multifaceted, and that there are many reasons why noncitizens decide to emigrate from their countries, with some reports claiming economic and social issues as primary reasons).

[89] *See* INA § 245(c)(2), 8 U.S.C. § 1255(c)(2).

004665

Finally, USCIS considered whether the marriage must be of a specified duration (e.g., two years) at the time of the parole in place application, particularly to address potential concerns about marriage fraud and integrity of this process. Because there will be a fixed date by which the marriage must have taken place (the date of signature of this memorandum), the concern that individuals may marry solely to take advantage of this process is minimal. Furthermore, USCIS will assess these marriages during its consideration of the Form I-130, Petition for Alien Relative, and Form I-485, Application to Register Permanent Residence or Adjust Status, where there are additional rigorous procedures in place to further detect potential marriage fraud concerns, ensuring that potentially fraudulent marriages will not serve as the basis for a grant of adjustment of status following access to this proposed process. Furthermore, while a marriage of two years is necessary to remove conditions on a grant of lawful permanent residence through an immediate relative, USCIS can grant adjustment of status on the basis of marriage to a U.S. citizen even when the marriage is less than two years in length. Given this, USCIS does not propose that the marriage must be of a specified length, though USCIS does propose that the marriage must be legally valid at the date of signature of this memorandum.

- Criminal history and threats to national security or public safety: USCIS determined that noncitizens whose criminal convictions are likely to render them statutorily ineligible for adjustment of status will be ineligible for parole under this process. USCIS also determined that the statutory ineligibility grounds for adjustment are not sufficiently encompassing, and that certain convictions (or series of convictions) that do not render noncitizens statutorily ineligible for adjustment of status nevertheless warrant their disqualification from this process in the exercise of discretion. All applicants will undergo national security and public safety vetting as part of this process. Those that pose a threat to national security or public safety will be disqualified from this process and, where appropriate, may be referred to law enforcement.

- Parole period length: USCIS determined that a three-year grant of parole was most appropriate for this process, though it considered both shorter and longer periods of time.[90] Other processes, such as the family reunification parole processes, contemplate a three-year grant of parole.

  USCIS determined that a three-year period was most appropriate for this process. After being granted parole in place, the applicant would generally be eligible to immediately apply to adjust their status if the Form I-485, Application to Register Permanent Residence or Adjust Status, is accompanied by a Form I-130, Petition for Alien Relative, so the benefits of parole (including lawful presence and employment authorization) should remain available for long enough to accommodate that process. Currently, the median processing time for a Form I-130, when filed separately, is 11.2 months, and the average processing time for the Form I-485, when filed separately, is 9.8 months.[91] Concurrent

---

[90] Parole must be "temporar[y]," and may be terminated "when the purposes of such parole shall, in the opinion of the [Secretary], have been served." INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); *see also* 8 C.F.R. § 212.5(e).

[91] *See supra* note 79.

filing of these two forms is permitted for spouses of U.S. citizens. Assuming that applicants would need time to compile evidence for these applications, establish a work history that includes their own income to assist with overcoming the public charge inadmissibility ground, save the necessary funds to pay fees, and file these applications, a three-year grant of parole will provide noncitizens an appropriate window of time to seek adjustment of status following the parole grant based on average USCIS processing times. A shorter timeframe would likely be insufficient to cover the potential length of time needed to prepare and file the application, while a longer timeframe would risk disincentivizing applicants from timely applying for adjustment of status.

In making this recommendation, USCIS considered that parole in place is granted for certain military family members for a one-year period. However, unlike military parole in place, which is available for a broader category of immediate relative spouses, parents, and children of lawful permanent resident or U.S. citizen military members and veterans, this process is open only to certain noncitizen spouses of U.S. citizens who have an immediate path to adjustment of status. Unlike military parole in place, which permits renewals of initial parole grants, we do not contemplate a re-parole process here at this time. Therefore, a three-year length is appropriate to ensure that the duration of parole gives noncitizens sufficient time to prepare and file their adjustment of status application.

- <u>Removal proceedings</u>: DHS considered whether and how a parole in place process should be available to noncitizens in pending removal proceedings. Given that there may be some noncitizens in removal proceedings who may be eligible to adjust status if granted parole, the proposed process contemplates that USCIS will consider requests for otherwise eligible noncitizens in removal proceedings, including those who have been released on bond or their own recognizance under section 236(a) of the INA, 8 U.S.C. § 1226(a),[92] because they remain applicants for admission. USCIS will coordinate with ICE OPLA as appropriate. A noncitizen who would constitute an enforcement priority on the basis of national security or public safety will be disqualified from receiving parole in place pursuant to this process.

- <u>Prior removal orders</u>: USCIS considered whether noncitizens with unexecuted final removal orders should be considered under this process. USCIS determined that noncitizens with removal orders will be presumptively ineligible for parole under this process. However, USCIS will evaluate, in the exercise of its discretion on a case-by-case basis, the facts and circumstances underlying the final removal order in determining whether the noncitizen may overcome the presumption of ineligibility and be granted parole.

- <u>Other requirements</u>: USCIS also considered whether other parameters should be included. For example, we considered whether the noncitizen should be required to have an

---

[92] See *supra* notes 17 and 29. Release on "conditional parole" under INA § 236(a), 8 U.S.C. § 1226(a), is neither an admission nor a grant of "parole" under INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), for purposes of adjustment of status under INA § 245(a), 8 U.S.C. § 1255(a). *See Matter of Cabrera-Fernandez*, 28 I&N Dec. 747, 750 (BIA 2023) ("[A]pplicants for admission who were released on conditional parole rather than humanitarian parole . . . have not been 'inspected and admitted or paroled,' and accordingly are not eligible for adjustment of status.").

approved Form I-130 prior to receiving parole through this process, given that it is a prerequisite for access to the family reunification parole processes. However, USCIS anticipates that many noncitizens who would benefit from this process may not yet have filed the Form I-130 because they are currently ineligible to adjust status and, for the reasons described extensively above, may not wish to pursue consular processing given the uncertainties and prolonged separation from their U.S. citizen family members. Requiring an approved Form I-130 by the date of signature of this memorandum could thus disqualify a significant portion of this population from this process and would therefore not as effectively achieve its intended significant public benefit of stabilizing and unifying families and enabling these noncitizens to contribute more fully to the U.S. economy. Moreover, immediate relatives who have been paroled are eligible to file their Form I-130 concurrently with their Form I-485. Requiring a bifurcated process for the noncitizens granted parole under this process would create significant inefficiencies, which would run counter to our goal of reducing strain on limited government resources.

USCIS additionally considered requiring the applicant to demonstrate that they are otherwise admissible in order to be granted parole under this process. However, consideration of grounds of inadmissibility – including whether they can be waived – is a complex analysis undertaken during the Form I-485 adjudication process. Requiring adjudicators to conduct the inadmissibility analysis that is conducted at the Form I-485 stage in this proposed parole process would be an inefficient, duplicative, and costly use of limited resources. Public messaging and guidance will make clear that this process is meant for noncitizen spouses of U.S. citizens who have lived in the United States for at least 10 years and who are otherwise eligible to apply for adjustment of status. However, when making a discretionary parole determination, USCIS will take into account the applicant's immigration history and any adverse factors that may exist, including those that could bear upon admissibility.

- <u>Children of noncitizens granted parole under this process</u>: Noncitizens who are granted parole under this process may have children in the United States who lack lawful status and who are unable to adjust their status without facing the same barriers that their noncitizen parents would face in the absence of a parole in place grant under this process. USCIS proposes that children of noncitizens granted parole under this process, who are physically present in the United States without admission or parole as of the date of signature of this memorandum and who otherwise qualify as a stepchild of a U.S. citizen under the INA, may apply for parole in place under this process. [93]

In making this recommendation, USCIS determined that providing these noncitizen children access to this process would be necessary to fully meet this process's objective of promoting the unity of families in which a U.S. citizen is married to a noncitizen who lacks lawful status. Internal estimates reflect that the population of eligible noncitizen children of noncitizen spouses who are married to U.S. citizens, and who may request consideration under this process, could be around 50,000. [94] However, USCIS recommends requiring that the noncitizen child have been physically present in the United States as of the date of

---

[93] INA § 101(b)(1)(B), 8 U.S.C. § 1101(b)(1)(B); *see supra* note 84.
[94] OHSS Analysis, *supra* note 4, tbl. 4.

signature of this memorandum in order to avoid incentivizing potential attempted unlawful migration by children whose noncitizen parents are eligible for this process but who are themselves outside of the United States.

*Resource Considerations and Impacts on USCIS Processing*

USCIS has considered the potential impact of this proposed process on individuals applying for benefits under other immigration programs. While there could be an impact initially on backlogs and wait times for USCIS-administered immigration programs and processes, over time, this process will assist USCIS in creating efficiencies in family-based immigrant visa processing. For example, USCIS will be able to more efficiently address processing times for the Form I-601A because some noncitizens who would have filed a Form I-601A will instead request parole in place, which is a more efficient adjudication.

USCIS has also considered the potential impact of this proposed process on USCIS operations. While this process will result in an increased number of individuals visiting a USCIS Applicant Support Center for their biometrics collection and will require USCIS to divert resources to develop the technical solutions to administer this process and complete the adjudications, with USCIS's recent fee rule, it will be able to recover the costs associated with taking on this workload.[95] Additionally, these costs are outweighed by the many benefits that this process would provide, including more streamlined and resource-efficient adjudications of applications for lawful permanent residence.

Finally, the process will provide some needed relief to U.S. embassies and consulates, which have significant backlogs of noncitizens awaiting interviews for immigrant visa applications.

*Impact on Federal Government and Access to Federal Benefits*

USCIS has considered the impact of the proposed process on eligibility for federal public benefits. Only noncitizens who are considered "qualified aliens" may access certain federal public benefits programs.[96] "Qualified aliens" include noncitizens paroled under INA section 212(d)(5) for a period of at least one year.[97]

However, nearly all of these benefits programs are available only to noncitizens who have been in "qualified" status for at least five years. For example, the Supplemental Nutrition Assistance Program (SNAP) generally requires noncitizens to have been in "qualified" status for five years before they can receive benefits. Medicaid, Temporary Assistance for Needy Families (TANF), and the Children's Health Insurance Program (CHIP) similarly generally require five years in "qualified" status for noncitizens who entered after August 22, 1996.[98] Given that noncitizens eligible for this process are estimated on average to have lived in the United States for 23 years, we anticipate that the majority of those who may be considered for parole in place will have

---

[95] *See* USCIS Fee Schedule, *supra* note 3.
[96] 8 U.S.C. § 1612.
[97] 8 U.S.C. § 1612.
[98] 8 U.S.C. § 1613.

004669

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 23 of 27

entered after this date.[99] Accordingly, most noncitizens who receive parole pursuant to this proposed process would not be eligible to access public federal benefits for at least five years.

*Impact on States*

USCIS considered the impact of the proposed process on states, including noncitizens' access to means tested benefits and driver's licenses. As discussed above, USCIS has also considered the potential economic benefit to state and local governments through the provision of employment authorization to eligible parolees, and increased tax revenue to states that would result from this process.[100]

At the state level, access to means tested benefits for eligible noncitizens varies. States can accept federal funds to assist them with providing such benefits and have the authority to determine the eligibility of qualified aliens for certain designated federal programs including SNAP, TANF, and CHIP.[101] Several states – including Indiana, Mississippi, Ohio, South Carolina, and Texas – deny some qualified noncitizens access to TANF even after the five-year waiting period has elapsed.[102] While means-tested benefit costs at both the federal and state levels could increase because of potential earlier access to benefits as a result of adjustment to LPR status sooner than would otherwise be the case absent this parole in place process, for most states, any increase in benefit-based spending for these parolees would be significantly delayed by the five-year waiting period. Additionally, noncitizens' eventual ability to access benefits after accessing parole through this process would be offset by their ability to seek and obtain lawful employment through the employment authorization they would receive.[103] Thus, the significant benefits of this process outweigh the possible costs given that when noncitizens are authorized to work, their earnings may increase as much as 35 percent per hour.[104]

As for driver's licenses, nineteen states, the District of Columbia, and Puerto Rico already provide noncitizens access to driver's licenses regardless of immigration status, while other states make

---

[99] OHSS Analysis, *supra* note 4, tbl. 5.
[100] In 2023, a group of 21 states – including Texas, Alabama, Alaska, Arkansas, Florida, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming – brought suit against DHS over the implementation of the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV), which were implemented in late 2022 and early 2023, challenging DHS's authority to implement the parole processes. The lawsuit rested on the premise that the parole processes were likely to increase the number of CHNV nationals in the states, and thus increase the states' costs. However, in a decision from the U.S. District Court for the Southern District of Texas, the court held that the states lacked standing to bring the suit due to an inability to demonstrate that they had suffered any "injury in fact" as a result of the parole processes. Importantly here, in assessing standing, the court looked to the overall impact of migrant flows into the representative state of Texas from the CHNV countries and the resulting decrease in net costs, rather than evaluating costs incurred as a result of individual noncitizens paroled under the CHNV processes in isolation. *See Texas v. DHS*, No.6:23-cv-00007, 2024 WL 1021068, at *15 (S.D. Tex. Mar. 8, 2024) ("[L]ooking to the costs that would have been incurred absent the challenged agency action, is the appropriate lens through which the Court must consider the CHNV Parole Program.").
[101] 8 U.S.C. § 1612.
[102] Tanya Broder and Gabrielle Lessard, *Overview of Immigrant Eligibility for Federal Programs, National Immigration Law Center* (May 2024), https://www.nilc.org/issues/economic-support/overview-immeligfedprograms/.
[103] Rouse et al., *supra* note 55.
[104] *See id.*

004670

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 24 of 27

access to driver's licenses contingent on lawful immigration status.[105]  However, the REAL ID Act of 2005 and its implementing regulations exclude parolees from the list of categories of individuals eligible for REAL ID-compliant licenses.[106] Therefore, whether noncitizens who are granted parole under this process can receive driver's licenses will depend upon states' willingness to continue to issue non-REAL ID compliant licenses to this population, either because they issue driver's licenses to noncitizens regardless of their immigration status or because they contemplate issuing licenses to noncitizens in immigration statuses beyond those included in the REAL ID Act.

As described throughout this memorandum, this process would provide multiple significant benefits to the U.S. public. USCIS has identified and considered the interests of the parties affected by establishment of these processes and have, to the extent possible, determined that the significant public benefits of the case-by-case parole of noncitizens under this process to the United States likely outweigh any costs.[107] Additionally, given that the population eligible to apply under this proposed process is limited to those who are in the United States as of the date of signature of this memorandum, USCIS does not believe this process will meaningfully affect or create incentives for noncitizens to enter the United States, and further believes that the benefits of this process outweigh the costs.

**Administrative Procedure Act**

This proposal is exempt from notice-and-comment rulemaking requirements for the following reasons.

*First*, DHS would merely be adopting a general statement of policy,[108] i.e., a "statement issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."[109] As section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), provides, parole decisions are made by the Secretary of Homeland Security "in his discretion."[110]

---

[105] National Conference of State Legislatures, *States Offering Driver's Licenses to Immigrants* (Mar. 13, 2023), https://www.ncsl.org/immigration/states-offering-drivers-licenses-to-immigrants.

[106] 6 C.F.R. § 37.3 (defining "lawful status" as "a citizen or national of the United States; or an alien: lawfully admitted for permanent or temporary residence in the United States; with conditional permanent resident status in the United States; who has an approved application for asylum in the United States or has entered into the United States in refugee status; who has a valid nonimmigrant status in the United States; who has a pending application for asylum in the United States; who has a pending or approved application for temporary protected status (TPS) in the United States; who has approved deferred action status; or who has a pending application for lawful permanent residence (LPR) or conditional permanent resident status").

[107] Rouse et al., *supra* note 55.

[108] 5 U.S.C. § 553(b)(A).

[109] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)).

[110] A general policy statement typically uses permissive, rather than binding, language that leaves the agency free to exercise discretion. *See, e.g., Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) (distinguishing legislative rules from general statements of policy, observing that "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule—is a general statement of policy"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (rejecting the EPA's characterization of its document as guidance exempt from notice-and-comment rulemaking, reasoning that the guidance "commands, . . . requires, . . . orders, [and] dictates"); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (per curiam) (noting as primary considerations whether the agency action (1) "impose[s] any rights and obligations," or (2) "genuinely leaves the agency and its decisionmakers free to exercise discretion" (quotation marks omitted)).

004671

DHS has generally exercised its parole authority without rulemaking on the substance of parole processes,[111] in contrast to other discretionary authorities such as asylum, employment authorization, and adjustment of status.[112]

*Second*, even if this process were considered to be a legislative rule that would normally be subject to requirements for notice-and-comment rulemaking and a delayed effective date, the process is exempt from such requirements because it involves a foreign affairs function of the United States.[113] Courts have held that this exemption applies when the rule in question "is clearly and directly involved in a foreign affairs function."[114] In addition, although the text of the Administrative Procedure Act does not require an agency invoking this exemption to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing.[115]

This proposal is exempt under both standards. Specifically, as discussed above, this process is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration. Regularizing certain noncitizens who have lived in and established deep ties to the United States is a key ask on the part of our partner countries, and establishment of this proposed process will help ensure our partners' continued collaboration to address irregular migration in the Western Hemisphere and improve economic stability and security in countries that are common sources of irregular migration to the United States.

Delaying issuance and implementation of this process to undertake rulemaking would complicate ongoing conversations with key foreign partners about migration management on a range of priorities. These priorities include collaborating with partner countries on initiatives aimed at disrupting human smuggling, trafficking, and transnational criminal networks; increasing migration controls on bus and train routes;[116] imposing additional visa requirements to prevent individuals from exploiting legitimate travel regimes to facilitate their irregular journey to the United States;[117] and expanding access to lawful pathways.

The delay associated with implementing this process through notice-and-comment rulemaking would adversely affect the United States' ability to negotiate with our international partners, including Mexico and Colombia, for additional enforcement measures and increased cooperation with removals. Representatives of Mexico have emphasized the need for the U.S. government to

---

[111] *See, e.g.*, Implementation of a Family Reunification Parole Process for Colombians *et al.*, *supra* notes 39-43.
[112] While DHS established the international entrepreneur parole process, *see* 8 C.F.R. § 212.19, through notice-and-comment rulemaking, it does not preclude the Department from electing, consistent with the APA, to forgo formal rulemaking. *See, e.g.*, *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171-72 (7th Cir. 1996) (observing that there is nothing in the APA that forbids an agency's use of notice-and-comment procedures even if not required under the APA, and that courts should attach no weight to an agency's varied approaches involving similar rules).
[113] *See* 5 U.S.C. § 553(a)(1).
[114] *Mast Indus. v. Regan*, 596 F. Supp. 1567, 1582 (C.I.T. 1984) (cleaned up).
[115] *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008).
[116] U.S. Dep't of State, Discussions with Mexican Officials on Migration at the Department of State (Jan. 20, 2024), https://www.state.gov/discussions-with-mexican-officials-on-migration-at-the-department-of-state.
[117] Ministry of Foreign Affairs of Mexico, Visas: Important Information, https://embamex.sre.gob.mx/peru/index.php/sconsulares/visas (last visited June 16, 2024).

004672

**Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 26 of 27

regularize Mexican nationals who have been long-term residents of the United States.[118] Similarly, the Government of Colombia delivered a diplomatic note in April 2024 that requested Deferred Enforced Departure for certain nationals of Colombia residing in the United States, which would enable those individuals to remain lawfully in the United States and access work authorization.[119] Since May 2023, Colombian officials have made similar requests during high-level dialogues to stem the flows of irregular migration through the Darién and during negotiations to establish and extend Safe Mobility Offices beyond the initial first phase.

The invocation of the foreign affairs exemption here is also consistent with DHS precedent. For example, in 2017, DHS published a notice eliminating an exception to expedited removal for certain Cuban nationals, which explained that the change in policy was consistent with the foreign affairs exemption because the change was central to ongoing negotiations between the two countries.[120] DHS similarly invoked the foreign affairs exemption more recently in connection with the CHNV parole processes[121] and family reunification parole processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras, announced in 2023.[122]

**Conclusion**

For the reasons described above, USCIS believes that establishing a process to parole in place, on a case-by-case basis, certain spouses of U.S. citizens who have been continuously present in the United States for a minimum of 10 years as of the date of signature of this memorandum, have no disqualifying criminal offenses, do not pose a threat to public safety or national security, and merit a favorable exercise of discretion, would serve a significant public benefit. Noncitizen children of individuals granted parole in place under this process who are present in the United States without admission or parole as of the date of signature of this memorandum, and who otherwise qualify as a stepchild of a U.S. citizen, may also be considered for parole on a case-by-case basis pursuant to this process.

---

[118] The White House, Mexico-U.S. Joint Communique, *supra* note 74.

[119] Manuel Rueda and Elliot Spagat, *Colombia asks for legal status for its people already in US*, Associated Press, Nov. 29, 2022, https://apnews.com/article/venezuela-colombia-caribbean-united-states-immigration-7ed5fcde20338d56b04ff56925e54aff.

[120] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).

[121] *See* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); and Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

[122] *See* U.S. Dep't of Homeland Security, DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras (July 17, 2023), https://www.dhs.gov/news/2023/07/07/dhs-announces-family-reunification-parole-processes-colombia-el-salvador-guatemala; *see also* Implementation of a Family Reunification Parole Process for Colombians *et al.*, *supra* notes 39-43.

004673

**Parole in Place Process for Certain Noncitizen Spouses of U.S. Citizens**
Page 27

**Recommendation:** USCIS recommends that you use your authority under the immigration laws, including your discretionary parole authority under section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), to establish this parole in place process for certain noncitizen spouses and, where applicable, their noncitizen children who otherwise meet the definition of a stepchild of a U.S. citizen child at INA § 101(b)(1)(B), 8 U.S.C. § 1101(b)(1)(B). USCIS recommends this process be scoped as outlined within this memorandum and attachment and implemented via a *Federal Register* notice requiring your approval. USCIS recommends that it review and consider requests for a discretionary grant of parole in place on a case-by-case basis for these noncitizens. USCIS also recommends that you determine that parole of certain noncitizens under the terms of this process may be justified, on a case-by-case basis, for significant public benefit.

Approve/date _Alejandro N Mayorkas_   Disapprove/date _____

_June 17, 2024_

Modify/date _____   Needs discussion/date _____

004674



**U.S. Department of Justice**
Immigration and Naturalization Service

HQCOU 90/15-P; HQCOU 120/17-P

Office of the General Counsel

*425 I Street NW*
*Washington, DC 20536*

JUN 15 2001

MEMORANDUM FOR JEFFREY L. WEISS, DIRECTOR
                        OFFICE OF INTERNATIONAL AFFAIRS

FROM:        Bo Cooper
             General Counsel

SUBJECT:     Legal Opinion:  Parole of Individuals From the Former Soviet Union Who Are
             Denied Refugee Status

## I. Question Presented:

1. May the Attorney General continue to parole individuals into the United States from the
Former Soviet Union after they are denied refugee status?

## II. Summary Conclusion:

1. Yes.  Section 212(d)(5)(A) of the Immigration and Nationality Act, as amended, authorizes
the Attorney General to parole individuals into the United States from the Former Soviet Union
after they are denied refugee status.

## III. Analysis:

### A. Introduction

    This memorandum explores the legal basis upon which, and the extent to which, the
Immigration and Naturalization Service (INS) may continue to parole into the United States
individuals who are denied refugee status after applying through the in-country refugee program
in Moscow.  Since 1988, the INS has exercised its discretionary authority to parole into the
United States aliens from the Former Soviet Union who were denied refugee status.  In 1996, the
104th Congress amended the standards which guide the Attorney General's exercise of the parole
power.  As amended in 1996, section 212(d)(5)(A) of the Immigration and Nationality Act (INA,
or the Act) does not curtail the Attorney General's legal authority to parole into the United States
individuals from the Former Soviet Union who are denied refugee status.

## B.  Refugee Processing and Parole in the Context of the Former Soviet Union

Before 1988, Soviet refugee applicants were processed in Rome.  The shift to in-country processing in Moscow began in August 1988 with approximately 2000 Armenians who were divested of their Soviet citizenship, but unable to leave the Soviet Union for lack of State Department funding for their transportation and temporary support in Rome.  At the inception of in-country refugee processing in Moscow, INS adjudicators apparently construed refugee eligibility more broadly than permitted by the statute and, as a result, approval rates were high.  Attorney General Edwin Meese instructed INS to bring the Moscow program "into sync" with existing statutes and INS procedures, but nonetheless offered to parole into the United States those individuals who did not qualify as refugees.[1]

*The Lautenberg Amendment (1990)*:  When INS aligned its overseas refugee processing with the standards set out in the Act, refugee approval rates in the Moscow program declined appreciably.  Congress responded by adopting a provision, commonly known as the Lautenberg Amendment, designed to restore the traditionally high approval rates for certain categories of refugee applicants by reducing the evidentiary burden for establishing eligibility for refugee status.[2]  While not expressly endorsing parole of those denied refugee status, section 599E of the Lautenberg Amendment does permit nationals of the Soviet Union, Vietnam, Laos, or Cambodia to adjust their status if they had been paroled into the United States after being denied refugee status.

To date, INS in Moscow continues both to process qualified refugee applicants under the reduced evidentiary standards set out in the Lautenberg Amendment and also to parole into the United States a high percentage of Lautenberg category members who are denied refugee status.

---

[1]  Letter from Edwin Meese, Attorney General, to then Lt. General Colin Powell, Assistant to the President for National Security Affairs (Aug. 4, 1988) (on file with the INS, Office of the General Counsel).

[2]  Sections 599D and E of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1990, Pub. L. No. 101-167, 103 Stat. 1195 (1989).  An introductory note to the July 13, 1989, Senate Voting Record on the Lautenberg Amendment explains:

> Proponents stated that this amendment is necessary to correct the actions of Attorney General Meese, who, in 1988, changed the criteria under which Soviet Jews and Vietnamese . . . could qualify as refugees.  In the past, these two groups of people have been assumed to have a well-founded fear of persecution and, therefore, have automatically qualified as refugees.  As a result of the Attorney General's actions in March 1988, the denial rate for Soviet Jews rose from seven percent to a high of 38 percent. . . .  Many of the refugees from the Soviet Union and Vietnam, who have been turned down, are displaced and uprooted.  They have given up their country, homes, and families because they thought they could rely on the U.S. government's long-standing promise of resettlement.

Senate Voting Record No. 134, Bill No. S.1160 (H.R. 1487), Amendment No. 367.  Temp. Cong. Rec. S-8394 (July 20, 1989).

Parole decisions are made on a case-by-case basis in accordance with section 212(d)(5)(A) of the Act.

### C.  Evolution of INA Section 212(d)(5)

The Attorney General's parole authority has changed little since 1952, when it was codified into section 212(d)(5) of the INA.  Though subsequent Congresses often debated the proper scope of the Attorney General's parole power,[3] section 212(d)(5) has been amended only three times in the past fifty years.  As originally enacted, section 212(d)(5) of the Act provided:

> (5)  The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5) (1952); Act of June 27, 1952, 66 Stat. 163.

*The Refugee Act of 1980*:  As part of the comprehensive restructuring of refugee admission procedures achieved in the Refugee Act of 1980,[4] the 96th Congress split section 212(d)(5) into subparagraphs (A) and (B), adding the underlined text as follows:

> (A)  The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States. . . .

> (B)  The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 207.

1980 Refugee Act § 202(f).  This language was designed to funnel all refugee admissions under the numerical cap to be established annually by the President after consultations with Congress,

---

[3]  See, e.g., Arthur Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71 INTERPRETER RELEASES 1637 (Dec. 12, 1994); Deborah E. Anker & Michael H. Posner, *The Forty Year Crisis:  A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. REV. 9 (1981); Elizabeth J. Harper, IMMIGRATION LAWS OF THE UNITED STATES 503-14 (3d ed. 1975).

[4]  Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 108, *codified as* 8 U.S.C. §§ 1157-1159 (1980) (hereinafter 1980 Refugee Act).

and thus to discourage the admission of additional refugees under the Attorney General's parole power.[5]

*The Immigration Act of 1990*:  In 1990, the 101st Congress added a minor limitation to section 212(d)(5)(A):  "The [AG] may, except as provided in subparagraph (B) <u>or in section 214(f)</u>, in his discretion parole. . ." (emphasis added).[6]  This amendment curtails the Attorney General's power to parole an alien crewmember who is present in the United States during a labor dispute that leads to a strike or lockout.  <u>See</u> <u>also</u> INA § 214(f)(2)(A).  Until this point, no Congress had modified the substantive criteria that guide the Attorney General's exercise of the parole authority.

*The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)*:  In 1996, as part of its overhaul of the INA, the 104th Congress narrowed the Attorney General's parole authority by striking "for emergent reasons or for reasons deemed strictly in the public interest" and inserting "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  IIRIRA § 602(a).[7]

### D.  Construing INA Section 212(d)(5)(A), as Amended by IIRIRA Section 602

The question presented is whether, under the amended statutory criteria, INS may continue to parole into the United States persons denied refugee status.

*Plain Meaning*:  The preferred method of statutory construction is to carry out the plain meaning of the text of a statute.  <u>Perry v. Commerce Loan Co.</u>, 383 U.S. 392, 400, <u>reh'g denied</u>, 384 U.S. 934 (1966), *cited in* <u>Matter of H-N-</u>, Int. Dec. 3414 (BIA 1999).  The 104th Congress replaced "emergent" reasons with "urgent humanitarian" reasons, and "strictly in the public interest" with "significant public benefit."  IIRIRA § 602(a).  The differences between these phrases are perceptible, but the text alone is insufficient to determine whether Congress intended, by this amendment, to end the practice of paroling those denied refugee status from the Former Soviet Union.

---

[5]  For analysis of this amendment to section 212(d)(5) of the Act and of the 1980 Refugee Act in general, see Anker & Posner, *supra* note 3.

[6]  Reference to section 214(f) added by section 202(b) of the Immigration Act of 1990, Act of Nov. 29, 1990, Pub. L. 101-649, 104 Stat. 4978.

[7]  Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009-546 (Sept. 30, 1996).  At the same time, Congress also inserted a provision requiring the Attorney General to submit an annual report describing the number and category of aliens paroled into the United States, including information such as the country of origin, duration of parole, current status of such parolees.  IIRIRA § 602(b).

Section 602 of IIRIRA, which amends INA section 212(d)(5), is entitled "Limitation on Use of Parole."[8]  Titles have a communicative function.  They may be considered to clarify uncertainty in the text but cannot limit the text's plain meaning.  2A Sutherland, *Statutes and Statutory Construction* (6th ed., Norman Singer ed.) § 47.03.  The title "Limitation on Use of Parole" confirms what the text suggests, but does not resolve by *how much* Congress intended to curtail the Attorney General's parole authority.

*Legislative History*:  The legislative history of IIRIRA section 602 is similarly vague.  Describing the import of proposed language that would ultimately be adopted in the final version of IIRIRA section 602, a Senate Report states only that the amendment "[t]ightens The [sic] Attorney General's parole authority. . . ."  S. Rep. No. 249, 104th Cong., 2d Sess. 21 (1996).  Nor does the final Conference Report for IIRIRA explain to what extent parole should be "tightened."  H.R. Conf. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

While the legislative history does not clarify to what extent Congress sought to limit the parole authority, it does indicate that the 104th Congress rejected language that would have circumscribed the Attorney General's authority to parole individuals who were denied refugee status.  The adopted Senate language replaced an earlier House proposal, section 524 of H.R. 2202, that enumerated four exclusive reasons for which the Attorney General could parole an individual into the United States:  medical emergency; organ donation; to visit a dying relative; and to assist U.S. law enforcement efforts (or to protect an individual who so assisted).  In addition, section 524 provided:

> (D) LIMITATION ON THE USE OF PAROLE AUTHORITY- The Attorney General may not use the parole authority under this paragraph to permit to come to the United States aliens who have applied for and have been found to be ineligible for refugee status or any alien to whom the provisions of this paragraph do not apply.

The 104th Congress specifically considered, but rejected, the House's proposal to limit the practice of paroling into the United States those denied refugee status.  "[W]here the language under question was rejected by the legislature and thus not contained in the statute it provides an indication that the legislature did not want the issue considered."  2A Sutherland, *supra*, § 48.04.

*Re-Authorization of the Lautenberg Amendment*:  Within the Omnibus Consolidated Appropriations Act of 1997, Congress both amended the Attorney General's parole authority (Division C) and re-authorized the Lautenberg Amendment for an additional year (Division A).  *Compare* Pub. L. 104-208, Div. C, Title VI § 602(a), 110 Stat. 3009-689 (Sept. 30, 1996), *with* Pub. L. 104-208, Div. A, Title I § 101(c) [Title V, § 575(2)], 110 Stat. 3009-168 (Sept. 30, 1996).  As discussed above, the Lautenberg Amendment affords adjustment of status to those who are paroled into the United States after being denied refugee status.  Not only did the 104th Congress specifically reject proposed limits to the Attorney General's authority to parole denied

---

[8]  This title is not codified into the INA.

Memorandum for Jeffrey L. Weiss                                                    Page 6
Subject:  Parole of Individuals From the Former Soviet Union Who Are Denied Refugee Status

refugee applicants, it tacitly approved of the practice by renewing an existing provision that
permitted these parolees to adjust their status to that of lawful permanent residents.  Subsequent
Congresses have re-authorized the Lautenberg Amendment four (4) times since IIRIRA.[9]

    *Case-by-case basis of parole decisions*:  For indivi...s found to be ineligible to be
classified as a refugees, parole decisions must comply with the case-by-case requirement of
amended section 212(d)(5)(A) of the Act and may not be made on a "blanket" basis.
Designating, whether by regulation or policy, a class whose members generally would be
considered appropriate candidates for parole does not conflict with a "case-by-case" decision
requirement, since the adjudicator must individually determine whether a person is a member of
the class and whether there are any reasons not to exercise the parole authority in the particular
case.

    Under current practice, every refugee applicant is interviewed by an immigration officer
for possible classification as a refugee.  If the applicant is found not to be eligible for refugee
status, the officer considers the merits of the case for an offer of parole.  So long as individual
consideration is given to parole decisions, the Service's determination - that it is generally in the
public interest to parole denied refugee applicants from Moscow who belong to groups specified
in the Lautenberg Amendment - does not violate the case-by-case requirement.

**IV.  Conclusion:**

    While section 602 of IIRIRA generally tightens the criteria by which parole decisions are
made, it is the opinion of the General Counsel that section 212(d)(5)(A), as amended, does not
curtail the Attorney General's legal authority to parole into the United State individuals from the
Former Soviet Union who are denied refugee status.

---

[9]  Pub. L. 105-118, Title V, § 574(2), Nov. 26, 1997, 111 Stat. 2432; Pub. L. 105-277, Div. A, § 101(f) [Title VII, §
705(2)], Oct. 21, 1998, [12 Stat. 2681-389; Pub. L. 106-113, Div. B, § 1000(a)(4) [Title II, § 214(2)], Nov. 29,
1999, 113 Stat. 1535, 1501A-240; Pub. L. 106-554, enacting by reference Title II, § 212(2) of H.R. 5656, Dec. 21,
2000, 14 Stat. 2763A-25.

004680



Form I-601A, Application for Provisional Unlawful Presence Waiver
Receipt by Applicant Country of Birth
Fiscal Years 2022 - 2024, as of June 10, 2024

U.S. Citizenship
and Immigration
Services

| Country of Birth | FY2022 Receipts | FY2023 Receipts | FY2024 Receipts (as of June 10, 2024) |
|---|---|---|---|
| Grand Total | 36,246 | 35,491 | 26,025 |
| MEXICO | 21,556 | 21,374 | 15,614 |
| EL SALVADOR | 3,960 | 3,979 | 2,951 |
| GUATEMALA | 2,710 | 2,744 | 2,070 |
| HONDURAS | 2,343 | 2,392 | 1,818 |
| ECUADOR | 932 | 915 | 700 |
| DOMINICAN REPUBLIC | 1,024 | 822 | 598 |
| BRAZIL | 514 | 535 | 345 |
| PERU | 446 | 397 | 246 |
| CHINA | 310 | 329 | 277 |
| NICARAGUA | 311 | 293 | 205 |
| COLOMBIA | 322 | 264 | 206 |
| INDIA | 153 | 180 | 116 |
| Unknown | 295 | 73 | 35 |
| POLAND | 122 | 104 | 65 |
| PHILIPPINES | 126 | 82 | 74 |
| JAMAICA | 110 | 78 | 63 |
| GUYANA | 74 | 81 | 37 |
| COSTA RICA | 65 | 56 | 54 |
| KOREA, SOUTH | 72 | 53 | 47 |
| BOLIVIA | 63 | 54 | 32 |
| HAITI | 79 | 38 | 18 |
| VENEZUELA | 50 | 41 | 31 |
| CUBA | 28 | 45 | 25 |
| CHILE | 26 | 22 | 27 |
| ARGENTINA | 27 | 35 | 10 |

004681

| Country | | | |
|---|---|---|---|
| ALBANIA | 18 | 24 | 27 |
| BANGLADESH | 15 | 25 | 16 |
| BELIZE | 19 | 25 | 12 |
| TRINIDAD AND TOBAGO | 19 | 20 | 15 |
| NIGERIA | 17 | 24 | 12 |
| PAKISTAN | 20 | 17 | 10 |
| PARAGUAY | 17 | 16 | 14 |
| GHANA | 18 | 11 | 16 |
| INDONESIA | 15 | 16 | 14 |
| VIETNAM | 13 | 14 | 14 |
| TURKEY | 17 | 13 | 8 |
| NORTH MACEDONIA | 13 | 12 | 6 |
| THAILAND | 12 | 8 | 11 |
| PANAMA | 14 | 8 | 8 |
| ROMANIA | 12 | 9 | 9 |
| PORTUGAL | 13 | 9 | 7 |
| GRENADA | 13 | 5 | 10 |
| URUGUAY | 15 | 9 | 4 |
| UKRAINE | 11 | 13 | 3 |
| SAINT VINCENT AND THE GREN | 8 | 6 | 5 |
| JORDAN | 10 | 5 | 3 |
| KOSOVO | 4 | 9 | 5 |
| BULGARIA | 5 | 7 | 5 |
| EGYPT | 5 | 5 | 7 |
| LEBANON | 5 | 9 | 2 |
| MONTENEGRO | 7 | 7 | 2 |
| SAINT LUCIA | 6 | 6 | 3 |
| CANADA | 6 | 3 | 5 |
| ISRAEL | 7 | 3 | 4 |
| ITALY | 4 | 7 | 3 |
| DOMINICA | 7 | 4 | 2 |
| KENYA | 3 | 8 | 1 |
| RUSSIA | 3 | 5 | 4 |

004682

| Country | | | |
|---|---|---|---|
| LITHUANIA | 4 | 4 | 3 |
| SLOVAKIA | 4 | 7 | |
| CAMBODIA | 3 | 4 | 3 |
| GERMANY | 3 | 5 | 2 |
| MALAYSIA | 4 | 3 | 3 |
| SAUDI ARABIA | 8 | 2 | |
| ETHIOPIA | 4 | 4 | 1 |
| UGANDA | 4 | 3 | 2 |
| ARMENIA | 2 | 5 | 1 |
| BAHAMAS, THE | 4 | 3 | 1 |
| CABO VERDE | 4 | 4 | |
| HONG KONG | 4 | 1 | 3 |
| IRAN | 1 | 3 | 4 |
| KUWAIT | 4 | 3 | 1 |
| MOROCCO | 4 | 2 | 2 |
| NEPAL | 3 | 3 | 2 |
| UNITED KINGDOM | 1 | 4 | 3 |
| BELARUS | 1 | 4 | 2 |
| CZECHIA | 2 | 2 | 3 |
| LAOS | 1 | 3 | 3 |
| MONGOLIA | 3 | 3 | 1 |
| SENEGAL | 3 | | 4 |
| SERBIA | 2 | 3 | 2 |
| SIERRA LEONE | 3 | 3 | 1 |
| SINT MAARTEN | 5 | 1 | 1 |
| TAIWAN | 2 | 2 | 3 |
| YUGOSLAVIA | 3 | 4 | |
| CAMEROON | 1 | 2 | 3 |
| CÔTE D'IVOIRE | 2 | 3 | 1 |
| GEORGIA | 1 | 1 | 4 |
| SPAIN | 2 | 2 | 2 |
| SRI LANKA | 3 | 1 | 2 |
| ZIMBABWE | 4 | 1 | 1 |

004683

| Country | | | |
|---|---|---|---|
| FRANCE | 3 | 1 | 1 |
| HUNGARY | 2 | 2 | 1 |
| IRELAND | 1 | 3 | 1 |
| JAPAN | 1 | 3 | 1 |
| BARBADOS | 2 | 1 | 1 |
| GAMBIA, THE | 1 | 2 | 1 |
| MAURITANIA | 2 | 1 | 1 |
| SYRIA | 1 | 2 | 1 |
| UZBEKISTAN | 2 | 1 | 1 |
| ANTIGUA AND BARBUDA | 2 | 1 | |
| BURMA | 1 | 2 | |
| CONGO (KINSHASA) | 1 | 1 | 1 |
| GUINEA | 1 | 1 | 1 |
| MOLDOVA | | 2 | 1 |
| SURINAME | 3 | | |
| TOGO | 1 | 2 | |
| TONGA | 2 | 1 | |
| YEMEN | | 2 | 1 |
| AUSTRALIA | | | 2 |
| BOSNIA AND HERZEGOVINA | 1 | | 1 |
| BURKINA FASO | | 1 | 1 |
| FIJI | 2 | | |
| GABON | 2 | | |
| GREECE | 1 | | 1 |
| GUADELOUPE | | 2 | |
| IRAQ | | 1 | 1 |
| KYRGYZSTAN | 2 | | |
| LATVIA | 1 | | 1 |
| LIBERIA | | 1 | 1 |
| LIBYA | 2 | 2 | |
| SAINT KITTS AND NEVIS | 1 | 1 | 1 |
| SAMOA | 1 | 1 | |
| SEYCHELLES | 2 | | |

004684

| Country | | | |
|---|---|---|---|
| SOMALIA | 1 | | 1 |
| SOUTH AFRICA | | 1 | 1 |
| TUNISIA | | 1 | 1 |
| ZAMBIA | | | 2 |
| AFGHANISTAN | 1 | | |
| ALGERIA | | 1 | 1 |
| ANGOLA | | | 1 |
| ANGUILLA | | 1 | |
| AUSTRIA | | | 1 |
| AZERBAIJAN | | | 1 |
| BELGIUM | | | 1 |
| BERMUDA | | | 1 |
| BURUNDI | | 1 | 1 |
| CAYMAN ISLANDS | 1 | | 1 |
| CHAD | 1 | 1 | |
| CONGO (BRAZZAVILLE) | | 1 | 1 |
| CROATIA | | 1 | 1 |
| ERITREA | | 1 | 1 |
| GUERNSEY | | | 1 |
| LESOTHO | | | 1 |
| MALAWI | 1 | | |
| MALI | | | 1 |
| MOZAMBIQUE | | | 1 |
| NETHERLANDS | 1 | | |
| NETHERLANDS ANTILLES | | 1 | 1 |
| PUERTO RICO | | | 1 |
| SOVIET UNION | 1 | | 1 |
| STATELESS | | | 1 |
| SUDAN | | | 1 |
| SWEDEN | | | 1 |
| SWITZERLAND | 1 | 1 | |
| TANZANIA | 1 | | |
| TURKS AND CAICOS ISLANDS | 1 | | |

004685

| UNITED ARAB EMIRATES | |
|---|---|
| ZAIRE | 1 |
| | 1 |

**Notes**

1) Some applications received may be approved or denied in subsequent reporting periods.

2) This report reflects the most up-to-date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

NPD, queried 06/2024 TRK 15160.

U.S. Citizenship and Immigration Services

I-131, Application for Travel Document
Military Parole in Place Completions (Approvals/Denials) by Age Group
Fiscal Year 2023 to 2024 (as of June 4, 2024)

| Fiscal Year | Age Group | Spouse, parent, or child of Active member U.S. forces or reserve | | | Spouse, parent, or child of Former member U.S. forces or reserve | | | TOTAL Military Parole in Place | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Approved | Denied | TOTAL Completions | Approved | Denied | TOTAL Completions | Approved | Denied | TOTAL Completions |
| 2023 | TOTAL | 8,376 | 1,163 | 9,539 | 1,650 | 245 | 1,895 | 10,026 | 1,408 | 11,434 |
| | Less than 18 years | 14 | 10 | 24 | 23 | 6 | 29 | 37 | 16 | 53 |
| | Between 18 and 65 years | 8,333 | 1,146 | 9,479 | 1,607 | 234 | 1,841 | 9,940 | 1,380 | 11,320 |
| | Greater than 65 years | 29 | 7 | 36 | 20 | 5 | 25 | 49 | 12 | 61 |
| 2024 | TOTAL | 6,896 | 1,005 | 7,901 | 1,401 | 200 | 1,601 | 8,297 | 1,205 | 9,502 |
| | Less than 18 years | 24 | 9 | 33 | 28 | 4 | 32 | 52 | 13 | 65 |
| | Between 18 and 65 years | 6,840 | 986 | 7,826 | 1,353 | 191 | 1,544 | 8,193 | 1,177 | 9,370 |
| | Greater than 65 years | 32 | 10 | 42 | 20 | 5 | 25 | 52 | 15 | 67 |

Note(s):

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

5) Age is determined by applicant date of birth to receipt date.

Source:

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

NPD, C3, queried 6/2024, TRK 15066.

004686

004687

## Table 1: Estimated Unauthorized Immigrant Population as of Jan. 1, 2022

| Total | 10,990,000 |
|---|---|
| Mexico | 4,810,000 |
| N. Central America | 2,020,000 |
| Other W. Hemisphere | 1,970,000 |
| E. Hemisphere | 2,180,000 |

Source: https://www.dhs.gov/ohss/topics/immigration/population-estimates/unauthorized-resident.

## Table 2: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC

by Number of Years in the United States, Country, and Method of Entry

(low and high estimates)

| | >10 years | | >8 years | | >5 years | | Total | |
|---|---|---|---|---|---|---|---|---|
| | low | high | low | high | low | high | low | high |
| **EWIs only** | | | | | | | | |
| Total | 300,000 | 700,000 | 320,000 | 730,000 | 340,000 | 790,000 | 390,000 | 890,000 |
| Mexico | 190,000 | 450,000 | 190,000 | 460,000 | 200,000 | 480,000 | 210,000 | 510,000 |
| N. Central America | 70,000 | 130,000 | 70,000 | 140,000 | 90,000 | 170,000 | 110,000 | 220,000 |
| Other W. Hemisphere | 40,000 | 90,000 | 50,000 | 100,000 | 50,000 | 120,000 | 60,000 | 140,000 |
| E. Hemisphere | 0 | 20,000 | 0 | 20,000 | 0 | 30,000 | 0 | 30,000 |
| **Overstayers only** | | | | | | | | |
| Total | 0 | 170,000 | 0 | 180,000 | 0 | 190,000 | 0 | 210,000 |
| Mexico | 0 | 50,000 | 0 | 60,000 | 0 | 60,000 | 0 | 60,000 |
| N. Central America | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 |
| Other W. Hemisphere | 0 | 30,000 | 0 | 30,000 | 0 | 30,000 | 0 | 40,000 |
| E. Hemisphere | 0 | 80,000 | 0 | 90,000 | 0 | 90,000 | 0 | 100,000 |
| **Total** | | | | | | | | |
| Total | 300,000 | 870,000 | 320,000 | 910,000 | 340,000 | 980,000 | 390,000 | 1,100,000 |
| Mexico | 190,000 | 510,000 | 190,000 | 520,000 | 200,000 | 540,000 | 210,000 | 570,000 |
| N. Central America | 70,000 | 140,000 | 70,000 | 150,000 | 90,000 | 180,000 | 110,000 | 230,000 |
| Other W. Hemisphere | 40,000 | 120,000 | 50,000 | 130,000 | 50,000 | 150,000 | 60,000 | 180,000 |
| E. Hemisphere | 0 | 110,000 | 0 | 110,000 | 0 | 120,000 | 0 | 120,000 |

Source: DHS Office of Homeland Security Statistics estimates.

**Table 3: Estimates of the Unauthorized Immigrant Population on Jan. 1, 2022, Who Were Married to a USC**
by Number of Years in the United States, Country, and Method of Entry
(point estimates)

|  | > 10 years | > 8 years | > 5 years | Total |
|---|---|---|---|---|
| **EWIs only** |  |  |  |  |
| Total | 500,000 | 525,000 | 565,000 | 640,000 |
| Mexico | 320,000 | 325,000 | 340,000 | 360,000 |
| N. Central America | 100,000 | 105,000 | 130,000 | 165,000 |
| Other W. Hemisphere | 65,000 | 75,000 | 85,000 | 100,000 |
| E. Hemisphere | 10,000 | 10,000 | 15,000 | 15,000 |
| **Overstayers only** |  |  |  |  |
| Total | 85,000 | 90,000 | 95,000 | 105,000 |
| Mexico | 25,000 | 30,000 | 30,000 | 30,000 |
| N. Central America | 5,000 | 5,000 | 5,000 | 5,000 |
| Other W. Hemisphere | 15,000 | 15,000 | 15,000 | 20,000 |
| E. Hemisphere | 40,000 | 45,000 | 45,000 | 50,000 |
| **Total** |  |  |  |  |
| Total | 585,000 | 615,000 | 660,000 | 745,000 |
| Mexico | 350,000 | 355,000 | 370,000 | 390,000 |
| N. Central America | 105,000 | 110,000 | 135,000 | 170,000 |
| Other W. Hemisphere | 80,000 | 90,000 | 100,000 | 120,000 |
| E. Hemisphere | 55,000 | 55,000 | 60,000 | 60,000 |

Source: DHS Office of Homeland Security Statistics estimates.

**Table 4: Estimates of USC Family Members Residing with Unauthorized Noncitizens**

|  | >10 years |  | Total |  |
|---|---|---|---|---|
|  | EWI | Total | EWI | Total |
| # of USC children | 1,100,000 | 1,290,000 | 1,410,000 | 1,640,000 |
| # of undoc children | 50,000 | 60,000 | 60,000 | 70,000 |
| total # of USCs in mixed-status families | 1,650,000 | 1,940,000 | 2,050,000 | 2,390,000 |

004688

004689

**Table 5: Noncitizen Spouses' Average Length of Presence in the United States**

| All | > 10 years |
|---|---|
| 20 years | 23 years |

77 No. 18 Interpreter Releases 597

**Interpreter Releases**
May 8, 2000

VISA WAIVER PILOT PROGRAM EXPIRES; INS PUTS IN PLACE INTERIM PROCEDURES

Copyright (c) 2000 West Group

The Visa Waiver Pilot Program (VWPP) expired on April 30, 2000, as Congress failed to act on several pending bills that would terminate the program's "pilot" status and make it a permanent feature of immigration law. The VWPP, which waives the nonimmigrant visa requirement for the admission of certain aliens into the U.S. for a period not to exceed 90 days, was created by § 313 of the Immigration Reform and Control Act of 1986 (IRCA). There are currently 29 countries participating in the program.

The INS expects that Congress will renew the program in the near future, and therefore has established interim procedures through May 30. Should Congress fail to act within that time, the INS will revisit the issue. According to information received by the American Immigration Lawyers Association (AILA) from the INS's Director of Business Liaison, Linda Dodd-Major, the agency is attempting to make the transition to the interim procedures as seamless as possible for travelers. To that end, INS headquarters has instructed the ports-of-entry to parole for 90 days all applicants who would have been VWPP-eligible had the program been continued. The INS will grant such parole pursuant to INA § 212(d)(5)(a).

AILA reports that the alien traveler must complete both the front and the back of Form I-94W, Nonimmigrant Visa Waiver Arrival/Departure Form, before applying for admission. If the alien would have been admissible under the VWPP, INS inspectors are to place the admission stamp on both the arrival and departure portions of the I-94W. In addition, the admission block of the form, the inspecting officer will draw a line through the word "admitted" and insert the word "paroled" in its place, and will place the same notation in the alien's passport. For the parole code, the officer will write "cp," the code corresponding to public benefit parole.

If the alien traveler is denied admission and returned abroad, or paroled for any other reason, the officer will so note the disposition in both the arrival and departure blocks of Form I-94W. Inadmissible aliens will be subject to withdrawal and/or expedited removal. The INS informed AILA that to ensure uniformity, each port-of-entry will assign a person to ensure that the I-94Ws for each flight are completed in accordance with these interim procedures. In addition, the INS noted that during this 30-day interim period, participating VWPP transportation lines will not incur any fines under INA § 273 for transporting individuals who otherwise would have been admissible under the VWPP. The INS intends to continue collecting the $6.00 land border I-94W processing fee during this interim period.

Finally, the INS informed AILA that VWPP applicants who would have used the INSPASS entry system[17] had the VWPP continued in operation will not be able to use the system during the period of the interim procedures. Moreover, the INS explained, VWPP applicants without passports who otherwise would have used the INSPASS line generally will not be eligible for a Form I-193 passport waiver under INA § 212(d)(4)(A) unless the alien can demonstrate that, due to an unforeseen emergency, he or she cannot present a valid passport. The agency added that an INSPASS VWPP applicant will generally carry a valid passport because the INSPASS agreement requires such passengers to carry their passports. An "unforeseen emergency," said the INS, will typically be an accident, medical emergency, or other "truly unforeseeable event."

As noted above, the INS expects that Congress will act in the near future to renew the program. The House of Representatives has already approved a bill (H.R. 3767) that would make the visa waiver program permanent.[18] Slightly behind is the Senate, whose Judiciary Committee approved its own version of legislation that would do the same (S. 2367).[19] The Senate bill differs only slightly from the House-passed measure.

004690

According to the INS, approximately 17 million travelers entered the U.S. under the VWPP in 1998.[20] For more on the VWPP, see Vázquez-Azpiri, "The Visa Waiver Pilot Program: A Guide to the Benefits and Risks," 96-8 Immigration Briefings (Aug. 1996).

## Footnotes

[17]    The INSPASS (INS Passenger Accelerated Service System) is a rapid-entry system that combines automation with a hand geometry biometric image to validate a traveler's claimed identity. A report issued by the INS last year stated that the seven airports that currently offer INSPASS service handled an average of 20,000 automated immigration inspections per month. For more on the program, see 76 Interpreter Releases 649 (Apr. 26, 1999).

[18]    For previous reports on H.R. 3767, see 77 Interpreter Releases 517 (Apr. 17, 2000), 468 (Apr. 10, 2000).

[19]    For more on S. 2367, see 77 Interpreter Releases 517 (Apr. 17, 2000).

[20]    See *CQ Daily Monitor*, Mar. 30, 2000, at 11.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

004691